IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE,<br><br>               Plaintiff,<br><br>v.<br><br>U.S. ARMY CORPS OF ENGINEERS,<br><br>               Defendant. | Case No. 1:16-cv-1534-JEB |

**MOTION FOR PRELIMINARY INJUNCTION**

**REQUEST FOR EXPEDITED HEARING**

Pursuant to LCvR 65.1, Plaintiff Standing Rock Sioux Tribe hereby respectfully moves this Court to preliminarily enjoin the U.S. Army Corps of Engineers to withdraw Nationwide Permit 12 as applied to the Dakota Access Pipeline, and to withdraw verifications issued on July 25, 2016 for the Dakota Access Pipeline to discharge in federally regulated waters at 204 sites along the pipeline route.  The basis for such injunction is contained in the memorandum of points and authorities in support of this motion filed herewith, and the declarations of Jon Eagle, Sr., Chairman Dave Archambault II, and Jan Hasselman.  Undersigned counsel has conferred about this motion with counsel for defendants and anticipated intervenors, who oppose this motion.

Pursuant to LCvR 65.1(d), Plaintiff requests an expedited hearing in this matter.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

Expedition is essential in this case because the construction of the Dakota Access Pipeline is already underway in North Dakota, South Dakota, Iowa, and Illinois.  As explained in the accompanying memorandum, there is a high risk that culturally and historically significant sites will be damaged or destroyed in the absence of an injunction.

Additionally, pursuant to LCvR 65.1(d), Plaintiff asks the Court to schedule oral argument and live witness testimony in support of a preliminary injunction within 21 days or less.  Witness testimony is intended to focus on the issue of irreparable harm only.  Plaintiffs can provide the Court and all parties with a list of witnesses and the time required for presentation, but anticipates between two and four witnesses requiring less than an hour each for direct examination.  Witness testimony in this case will assist the Court because the irreparable harm faced by plaintiff involves cultural and religious impacts to an Indian Tribe that are best communicated orally.

Accordingly, Plaintiff respectfully moves this Court to preliminarily enjoin the Army Corps of Engineers, and asks that this Court grant Petitioners request to hold an expedited hearing with live testimony.

Dated:  August 4, 2016

Respectfully submitted,

*/s/ Jan E. Hasselman*
Patti A. Goldman, DCBA # 398565
Jan E. Hasselman, WSBA # 29107
(*Admitted Pro Hac Vice*)
Stephanie Tsosie, WSBA # 49840
(*Admitted Pro Hac Vice*)
Earthjustice
705 Second Avenue, Suite 203
Seattle, WA  98104
Telephone:  (206) 343-7340
pgoldman@earthjustice.org
jhasselman@earthjustice.org
stsosie@earthjustice.org
*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE, <br><br>            Plaintiff, <br><br>    v. <br><br> U.S. ARMY CORPS OF ENGINEERS, <br><br>            Defendant. | Case No. 1:16-cv-1534-JEB |

**MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

**EXPEDITED HEARING REQUESTED**

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

STATUTORY OVERVIEW ....................................................................................2

I.     THE NATIONAL HISTORIC PRESERVATION ACT.....................................2

II.    THE CLEAN WATER ACT AND RIVERS AND HARBORS ACT...............5

FACTUAL BACKGROUND ...................................................................................8

I.     THE STANDING ROCK SIOUX TRIBE AND THE CONTROVERSY OVER DAPL ...................................................................................................8

II.    THE CORPS' FLAWED § 106 CONSULTATION PROCESS......................10

III.   THE CORPS' JULY 25, 2016 VERIFICATION DECISIONS ......................17

STANDARD FOR ISSUANCE OF A PRELIMINARY INJUNCTION ...................18

ARGUMENT ..........................................................................................................20

I.     THE TRIBE IS LIKELY TO PREVAIL ON THE MERITS OF ITS CLAIM THAT NWP 12 VIOLATES THE NHPA.........................................................20

     A.    The Corps Did Not Consult on Issuance of NWP 12 .............................20

     B.    In Adopting NWP 12, the Corps Unlawfully Abdicated its § 106 Responsibilities ................................................................................23

II.    THE TRIBE IS LIKELY TO PREVAIL ON THE MERITS OF ITS CLAIM THAT THE CORPS DID NOT COMPLY WITH § 106 FOR ITS VERIFICATIONS AND PERMITS .................................................................26

     A.    The Corps' Consultation Effort Was Limited to the Areas of its Direct Jurisdiction ......................................................................................27

     B.    The Corps Failed to Conduct a Lawful § 106 Consultation .................30

III.   THE TRIBE WILL BE IRREPARABLY HARMED IN THE ABSENCE OF AN INJUNCTION.............................................................................................34

IV.   THE BALANCE OF HARMS FAVORS AN INJUNCTION .........................39

V.    THE PUBLIC INTEREST FAVORS AN INJUNCTION ..............................42

CONCLUSION.......................................................................................................43

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

TABLE OF AUTHORITIES

**Cases**

*Armstrong v. Bush,*
    807 F. Supp. 816 (D.D.C. 1992) ....................................... 20

*Brady Campaign to Prevent Gun Violence v. Salazar,*
    612 F.Supp.2d 1 (D.D.C. 2009) ....................................... 37

*California Wilderness Coal. v. U.S. Dep't of Energy,*
    631 F.3d 1072 (9th Cir. 2011) ......................................... 22

* *Colorado River Indian Tribes v. Marsh,*
    605 F. Supp. 1425 (C.D. Cal. 1985) .................... 30, 35, 38, 42

* *Comanche Nation v. United States,*
    2008 WL 4426621 (W.D. Okla. 2008) ......................... 35, 39

*Comm. to Save Cleveland's Huletts v. U.S. Army Corps of Engineers,*
    163 F. Supp.2d 776 (N.D. Ohio 2001) ............................. 30

*Confederated Tribes and Bands of Yakama Nation v. U.S. Dep't of Agriculture,*
    2010 WL 3434091 (E.D. Wash., Aug. 30, 2010) ................... 22

*Crow Creek Sioux Tribe v. Brownlee,*
    331 F.3d 912 (D.C. Cir. 2003) ........................................ 19

* *CTIA-Wireless Ass'n v. FCC,*
    466 F.3d 105 (D.C. Cir. 2006) .............................. 2, 22, 29

*David v. Mineta,*
    302 F.3d 1104 (10th Cir. 2002) ...................................... 41

*Envtl. Def. Fund v. Corps of Engineers of U.S. Army,*
    331 F. Supp. 925 (D.D.C. 1971) ..................................... 20

*FCC v. NextWave Pers. Commc'ns,*
    537 U.S. 293 (2003) ................................................... 19

*Fox Television Stations v. FilmOn X,*
    966 F. Supp.2d 30 (D.D.C. 2013) ................................... 19

*Indiana Coal Council v. Lujan,*
    774 F. Supp. 1385 (D.D.C. 1991) ................................... 21

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ................................................... 19

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

* *McMillan Park Comm. v. Nat'l Capital Planning Comm'n*,
   968 F.2d 1283 (D.C. Cir. 1992) ....................................................................... 29

*Monsanto v. Geertson Seed Farms*,
   561 U.S. 139 (2010) ........................................................................................ 19

*Montana v. Blackfeet Tribe of Indians*,
   451 U.S. 759 (1985) ........................................................................................ 29

* *Montana Wilderness Ass'n v. Fry*,
   310 F. Supp.2d 1127 (D. Mont. 2004) .................................................. 21, 38, 42

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*,
   177 F.3d 800 (9th Cir. 1999) ........................................................................... 4

*Ohio Valley Envtl. Coal. v. U.S. Army Corps of Engineers*,
   538 F. Supp.2d 625 (S.D. W. Va. 2007) ..................................................... 40, 42

* *Ohio Valley Envtl. Coal. v. U.S. Army Corps of Engineers*,
   723 F. Supp. 2d 886 (S.D. W.Va. 2010) ........................................................... 19

* *Pit River Tribe v. U.S. Forest Service*,
   469 F.3d 768 (9th Cir. 2008) ...................................................................... 19, 41

* *Pueblo of Sandia v. United States*,
   50 F.3d 856 (10th Cir. 1995) ....................................................................... 22, 31

*Qualls v. Rumsfeld*,
   357 F.Supp.2d 274 (D.D.C.2005) ..................................................................... 18

* *Quechan Tribe of Fort Yuma Indian Reservation v. U.S. Department of the Interior*,
   755 F. Supp. 2d 1104 (S.D. Cal. 2010) ..................................................... passim

*R.I.L-R v. Johnson*,
   80 F. Supp. 3d 164 (D.D.C. 2015) .................................................................... 19

*Save Our Sonoran, Inc. v. Flowers*,
   227 F. Supp. 2d 1111 (D. Ariz. 2002) .............................................................. 19

*Sayler Park Village Council v. U.S. Army Corps of Engineers*,
   2003 WL 22423202 (S.D. Ohio Jan. 17, 2003) ........................................... 39, 41

*Sheridan Kalorama Historical Ass'n v. Christopher*,
   49 F.3d 750 (D.C. Cir. 1995) ........................................................................... 21

*Sierra Club v. United States Army Corps of Engineers*,
   645 F.3d 978 (8th Cir. 2011) ........................................................................... 41

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

*Te-Moak Tribe of Western Shoshone v. Nevada v. U.S. Dep't of Interior*,
   608 F.3d 592 (9th Cir. 2010) .......................................................................... 2

*Washington Toxics Coal. v. U.S. Dept. of Interior*,
   457 F. Supp.2d 1158 (W.D. Wash. 2006) ..................................................... 26

*Winter v. Natural Res. Def. Council*,
   555 U.S. 7 (2008) ......................................................................................... 18

*Yankton Sioux Tribe v. Kempthorne*,
   442 F. Supp. 2d 774 (D.S.D. 2006) .............................................................. 22

**Statutes**

33 C.F.R. § 322.3 .............................................................................................. 6

33 C.F.R. § 329.4 .............................................................................................. 5

33 C.F.R. § 330.1(b) .......................................................................................... 6

33 C.F.R. § 330.1(e)(1) ...................................................................................... 6

33 C.F.R. § 330.2(i) ........................................................................................... 7

33 C.F.R. § 330.5(g)(2) ...................................................................................... 7

33 C.F.R. § 330.6(a) .......................................................................................... 6

33 C.F.R. pt. 328 ............................................................................................... 5

33 U.S.C. § 1251(a) ........................................................................................... 5

33 U.S.C. § 1311(a) ........................................................................................... 5

33 U.S.C. § 1344(a) ........................................................................................... 6

33 U.S.C. § 1344(a)–(e) ..................................................................................... 5

33 U.S.C. § 1344(e) ........................................................................................... 6

33 U.S.C. § 403 ................................................................................................. 5

33 U.S.C. § 408 ............................................................................................. 5, 6

36 C.F.R. § 60.4 .............................................................................................. 38

36 C.F.R. § 800.1 .............................................................................................. 2

36 C.F.R. § 800.1(c) ......................................................................................... 21

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

36 C.F.R. § 800.14 ................................................................................................................ 4

36 C.F.R. § 800.14(a) ........................................................................................................... 23

36 C.F.R. § 800.14(b) ...................................................................................................... 4, 22

36 C.F.R. § 800.14(b)(1) ....................................................................................................... 5

36 C.F.R. § 800.16(d) ..................................................................................................... 4, 27

36 C.F.R. § 800.16(f) ............................................................................................................ 3

36 C.F.R. § 800.16(i) ........................................................................................................... 38

36 C.F.R. § 800.16(y) ..................................................................................................... 21, 27

36 C.F.R. § 800.2(a) ............................................................................................................ 23

36 C.F.R. § 800.2(a)(4) ........................................................................................................ 24

36 C.F.R. § 800.2(c)(2) ....................................................................................... 3, 24, 25, 30

36 C.F.R. § 800.2(c)(2)(ii)(A) .................................................................................. 25, 32, 33

36 C.F.R. § 800.2(c)(2)(ii)(B) ......................................................................................... 3, 31

36 C.F.R. § 800.2(c)(2)(ii)(D) ......................................................................................... 3, 31

36 C.F.R. § 800.2(c)(4) ........................................................................................................ 25

36 C.F.R. § 800.2(c)(ii)(A) .............................................................................................. 3, 31

36 C.F.R. § 800.2(c)(ii)(D) .................................................................................................... 4

36 C.F.R. § 800.3(f) .......................................................................................................... 3, 4

36 C.F.R. § 800.4(a) .............................................................................................................. 4

36 C.F.R. § 800.4(a)(1) .......................................................................................................... 4

36 C.F.R. § 800.4(b) ......................................................................................................... 4, 33

36 C.F.R. § 800.4(c) ......................................................................................................... 4, 33

36 C.F.R. § 800.5 ................................................................................................................... 4

36 C.F.R. § 800.5(a) ....................................................................................................... 25, 33

36 C.F.R. § 800.5(a)(2) ........................................................................................................ 38

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

36 C.F.R. § 800.5(c)(2) .................................................................................................. 4

36 C.F.R. § 800.6 ........................................................................................................... 4

54 U.S.C. § 300320 ................................................................................................. 21, 27

54 U.S.C. § 302706 ................................................................................................... 3, 31

54 U.S.C. § 304101 ......................................................................................................... 3

54 U.S.C. § 304102 ......................................................................................................... 3

54 U.S.C. § 306108 ............................................................................................. 2, 21, 23

**Other Authorities**

77 Fed. Reg. 10184 (Feb. 21, 2012) ............................................................................ 6, 7

*Engineering Exceptions to Historic Preservation Law: Why the Army Corps of Engineers Section 106 Regulations are Invalid*, 40 Wm. Mitchell L. Rev. 1580 (2014) ................................. 30

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

INTRODUCTION

The Standing Rock Sioux Tribe ("Tribe") respectfully moves this Court for preliminary injunctive relief.  The Tribe brings this action in connection with federal actions relating to the Dakota Access Pipeline ("DAPL"), a 1,168-mile-long crude oil pipeline running from North Dakota to Illinois.  The Tribe, a federally recognized American Indian Tribe with a reservation in North Dakota and South Dakota, brings this case because defendant U.S. Army Corps of Engineers ("Corps") has taken actions in violation of multiple federal statutes that authorize the pipeline.  An injunction is needed because the ongoing construction of the pipeline, as authorized by the Corps, will damage and destroy sites of great historic, religious, and cultural significance to the Tribe.  While the Tribe's complaint raises issues under multiple statutes, this motion focuses on violations of the National Historic Preservation Act ("NHPA").

The Tribe is likely to prevail on the merits of its NHPA claims.  First, the Tribe challenges Nationwide Permit 12 ("NWP 12"), issued by the Corps in 2012 pursuant to the federal Clean Water Act and Rivers and Harbors Act, as applied to DAPL.  In issuing NWP 12, the Corps effectively authorized construction of the vast majority of the pipeline in and around federally regulated waters without any provision to ensure against destruction to culturally important sites, in violation of the NHPA.  Second, the Tribe challenges 204 Clean Water Act and Rivers and Harbors Act verifications that allow specific segments of DAPL to be built. These site-specific actions were also made without full compliance with the NHPA.  The Tribe asks that this Court preliminarily enjoin the Corps to withdraw Nationwide Permit 12, as applied to DAPL, as well as the 204 verifications, which would effectively block construction of the pipeline in federally protected waters.

The Tribe will be irreparably harmed in the absence of an injunction.  The pipeline crosses the Tribe's ancestral lands, and traverses landscapes that are sacred to the Tribe and carry

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

great historical significance.  There are sacred stones and historically important sites in the path

of the pipeline, few of which have been fully evaluated by Tribal archaeologists.  Loss of such

sites constitutes irreparable injury to the Tribe and its members.  Moreover, DAPL has initiated

construction even though the regulatory process remains incomplete, numerous lawsuits have

been filed against it, and significant public controversy surrounds the project.  DAPL seeks to

render the legal dispute moot by finalizing construction before the Tribe can be heard.  It has

explicitly chosen to initiate this work at its own risk, and, as a result, the balance of harms and

public interest tip in the Tribe's favor.  A preliminary injunction is warranted.

## STATUTORY OVERVIEW

## I.      THE NATIONAL HISTORIC PRESERVATION ACT

"Congress enacted the National Historic Preservation Act ("NHPA") in 1966 to foster

conditions under which our modern society and our prehistoric and historic resources can exist in

productive harmony."  *CTIA-Wireless Ass'n v. FCC*, 466 F.3d 105 (D.C. Cir. 2006), *citing* 16

U.S.C. § 470-1(1).[1]  The NHPA has been characterized as a "stop, look, and listen" statute that

requires agencies to fully consider the effects of its actions on historic, cultural, and sacred sites.

*See, e.g., Te-Moak Tribe of Western Shoshone v. Nevada v. U.S. Dep't of Interior*, 608 F.3d 592,

606 (9th Cir. 2010).  Section 106 of the NHPA requires that prior to issuance of any federal

funding, permit, or license, agencies must take into consideration the effects of that

"undertaking" on historic properties.  54 U.S.C. § 306108.  Agencies "must *complete* the section

106 process *prior* to the approval of the expenditure of any Federal funds on the undertaking or

prior to the issuance of any license."  36 C.F.R. § 800.1 (emphasis added).  The NHPA also

created the Advisory Council on Historic Preservation ("ACHP"), an independent agency

---

[1] In 2014, Congress recodified the NHPA at 54 U.S.C. § 3001001-307108.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

charged with implementing the Act, as well as the National Register of Historic Places, the

nation's official registry of historically and culturally important sites.  54 U.S.C. §§ 304101,

304102.

The § 106 process requires consultation between agencies and Indian Tribes on federally

funded or authorized "undertakings" that could affect sites that are on, or could be eligible for,

listing in the National Register, including sites that are culturally significant to Indian Tribes.  54

U.S.C. § 302706 (properties "of traditional religious and cultural importance to" a Tribe may be

included on the National Register, and federal agencies "shall consult with any Indian

Tribe…that attaches religious or cultural significance" to such properties); 36 C.F.R. §

800.2(c)(2).  "Consultation is the process of seeking, discussing, and considering the views of

other participants, and, where feasible, seeking agreement with them regarding matters arising in

the Section 106 process."  *Id.* § 800.16(f).  Consultation must occur regarding sites with

"religious and cultural significance" to Indians even if they occur on ancestral or ceded land.  *Id.*

§ 800.2(c)(2)(ii)(D).  An agency official must "ensure" that the process provides Tribes with "a

reasonable opportunity to identify its concerns about historic properties, advise on the

identification and evaluation of historic properties….articulate its views on the undertaking's

effects on such properties, and participate in the resolution of adverse effects."  *Id.*

§ 800.2(c)(ii)(A).  This requirement imposes on agencies a "reasonable and good faith effort" by

agencies to consult with Tribes in a "manner respectful of tribal sovereignty."  *Id.* 36 C.F.R.

§ 800.2(c)(2)(ii)(B); *see also id.* § 800.3(f) (any Tribe that "requests in writing to be a consulting

party shall be one").

Section 106 consultation involves a multi-step process to evaluate potential effects to

listed or potentially eligible sites.  *See, e.g. Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

F.3d 800, 805 (9th Cir. 1999).  A threshold step is determining the area of potential effects

("APE") of the federal undertaking.  36 C.F.R. § 800.4(a)(1).  The APE is defined to include the

area "within which an undertaking may directly or indirectly cause alterations in the character or

use of historic properties…." *Id*. § 800.16(d).  An agency must then identify historic properties

within the APE that could potentially be affected. *Id*. § 800.4(b).  The agency must evaluate the

historic significance of such sites, and determine whether they are potentially eligible for listing

under the National Register. *Id*. § 800.4(c).  Next, the agency must evaluate the potential effects

that the undertaking may have on those properties, *id*. § 800.5, and, finally, the agency must

resolve any such adverse effects through the development of mitigation measures. *Id*. § 800.6.

At every one of these steps, the agency *must* consult with Indian tribes that attach religious and

cultural significance to affected sites, even if they are outside Tribal lands. *Id*. § 800.3(f); §

800.4(a); § 800.5(c)(2); § 800.6; *id*. § 800.2(c)(ii)(D).

The ACHP authorizes agencies to adopt their own regulations for implementing its § 106

obligations. Such regulations must be reviewed and approved by the ACHP in order to be valid.

*Id*. § 800.14.  The Corps has adopted procedures intended to satisfy its § 106 obligations. *See*

App. C to 33 C.F.R. Part 325.  However, those procedures have never been approved by the

ACHP, and as discussed further below, several courts and the ACHP have concluded that the

Corps' NHPA procedures are legally invalid. *See infra* at 30.  ACHP regulations also provide an

alternative compliance mechanism under which agencies can negotiate a "programmatic

agreement" with the ACHP to resolve "complex project situations or multiple undertakings."  36

C.F.R. § 800.14(b).  Such agreements are suitable for "when effects on historic properties are

similar and repetitive or are multi-State or regional in scope;" "when effects on historic

properties cannot be fully determined prior to approval of an undertaking;" or when "nonfederal

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

parties are delegated major decisionmaking responsibilities," among other situations.  *Id.* §
800.14(b)(1).  Programmatic agreements require consultation with Tribes, among others, as well
as public participation.  *Id.*

## II.    THE CLEAN WATER ACT AND RIVERS AND HARBORS ACT

Congress enacted the Clean Water Act in order to "restore and maintain the chemical,
physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  To accomplish
this goal, the Act prohibits the discharge of any pollutant, including dredged spoil or other fill
material, into waters of the United States unless authorized by a permit.  *Id.*, § 1311(a); 33 C.F.R.
pt. 328 (defining waters of the United States).  Unless statutorily exempt, all discharges of
dredged or fill material into waters of the United States must be authorized under a permit issued
by the Corps.  33 U.S.C. § 1344(a)–(e).

The Rivers and Harbors Act similarly prohibits a number of activities that impair ports,
channels and other navigable waters.[2]  Section 10 of the Act, 33 U.S.C. § 403, among other
things, makes it unlawful "to excavate or fill, or in any manner to alter or modify the course,
location, condition, or capacity of" any navigable water without a permit from the Corps.  Like §
404 permits, § 10 permits may be issued as individual permits or pursuant to the NWP program
and are generally subject to many of the same regulations.  A separate provision of the Act,
known as "Section 408," makes it unlawful to "build upon, alter, deface, destroy, move, injure,
obstruct by fastening vessels thereto or otherwise, or in any manner whatever impair the
usefulness of any sea wall, bulkhead, jetty, dike, levee, wharf, pier, or other work built by the
United States" without a permit from the Corps.  33 U.S.C. § 408.  Prior to issuance of a § 408

---

[2] Unlike the Clean Water Act, which applies in all waters of the United States, the Rivers and
Harbors Act applies only in "navigable" waters, defined as waters subject to the ebb and flow of
the tides, or waters that are "presently used, or have been used in the past, or may be susceptible
for use to transport interstate or foreign commerce."  33 C.F.R. § 329.4.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

permit, the Corps must determine whether the use or occupation will be injurious to the public interest or impair the usefulness of the project.

The Corps is authorized to issue two types of permits under its § 404 and § 10 authorities: individual permits and general permits.  *Id.*  The Corps issues individual permits on a case-by-case basis.  *Id.*, § 1344(a).  Decisions on such permits are made after a review involving, among other things, site specific documentation and analysis, public notice and opportunity for a hearing, a "public interest analysis," and a formal determination.  33 C.F.R. § 322.3; Parts 323, 325.  The Clean Water Act also authorizes the Corps to issue "general" permits on a state, regional or nationwide basis.  33 U.S.C. § 1344(e).  Such general permits may be issued for any category of similar activities that "will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment."  *Id.*  The purpose of this approach to permitting is to "regulate with little, if any, delay or paperwork certain activities that have minimal impacts."  33 C.F.R. § 330.1(b).[3]

The Corps issued the current set of 48 nationwide permits ("NWPs") in February of 2012.  77 Fed. Reg. 10184 (Feb. 21, 2012).  The 2012 NWPs in "most cases" authorize discharge into regulated waters without any further process involving the Corps.  In effect, the NWP pre-authorizes certain categories of discharge, without any additional approval from, or even notification to, the Corps.  33 C.F.R. § 330.1(e)(1).  In other instances, discharges cannot occur until the proponent of the action files a "pre-construction notification" ("PCN") to the Corps, and receives verification from the Corps that the proposed action is consistent with the terms of the NWP.  *Id.* § 330.6(a).  The specifics of whether or not a PCN is required are spelled out in each

---

[3] § 408 permits cannot be issued pursuant to the NWP program but are only issued as individual permits.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

individual NWP as well as a series of "general conditions" accompanying the NWP.  77 Fed.
Reg. at 10282.

Of relevance to this case, NWP 12 authorizes "utility line activities," which includes
crude oil pipelines, providing that the activity does not result in the loss of greater than a half-
acre of waters "for each single and complete project."  *Id*. at 10271.  Counter-intuitively, a
"single and complete project" in the case of utility lines is any stand-alone crossing of a
waterbody.  33 C.F.R. § 330.2(i).  Under this definition, a single pipeline can be made up of
hundreds if not thousands of "single and complete projects."  Under NWP 12, preconstruction
notification ("PCN") to the Corps by a non-federal project proponent, and a verification from the
Corps, is required if one of various listed criteria is met.  77 Fed. Reg. at 10272.  If none of the
criteria are met, the proponent is authorized by NWP 12 to proceed with the work in regulated
waters without additional notification to, or approval from, the Corps.  None of these NWP 12-
specific criteria relates to historic or cultural preservation.

The NWP program also includes a set of general conditions that are applicable to all
NWPs, include NWP 12.  General Condition 20 ("GC 20") addresses historic properties.  Under
GC 20, a non-federal permittee must submit a PCN "if the authorized activity may have the
potential to cause effects to any historic priorities listed on, determined to be eligible for listing
on, or potentially eligible for listing on the National Register of Historic Places, including
previously unidentified properties."  *Id*. at 10284.  If a PCN is provided, the Corps purports to
comply with § 106 of the NHPA prior to verifying that the NWP is applicable, and work may not
commence until such verification is provided.  33 C.F.R. § 330.5(g)(2).  Conversely, if no PCN
is provided, no § 106 process occurs.  NWP 12 was formally adopted by the Corps in a
"Decision Document" signed by Major General Michael J. Walsh on Feb. 13, 2012.  Ex. 1.  In

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

responding to public comment regarding potential impacts to tribal sites, the Decision Document states that compliance with NHPA on NWP implementation is carried out via GC 20.  *Id.* at 10.

## FACTUAL BACKGROUND

I.     THE STANDING ROCK SIOUX TRIBE AND THE CONTROVERSY OVER DAPL

The Standing Rock Sioux Tribe is a federally-recognized Indian tribe with a governing body recognized by the Secretary of the Interior.  The Tribe is a successor to the Great Sioux Nation, a party to the two Treaties of Fort Laramie in 1851 and 1868.  The Tribe's reservation in North Dakota and South Dakota is the sixth largest Indian reservation in the country, and there are approximately 18,000 enrolled members of the Tribe.  *See* Declaration of Chairman Dave Archambault II, ¶ 2.  Economic and social conditions on the Standing Rock Reservation are challenging, with high poverty and unemployment.  However, the Tribe's commitment to its traditional culture remains strong.  *Id.*

Tribal leaders first became aware of the proposal to construct DAPL near the reservation in late 2014.  Archambault Decl., ¶ 9.  The Tribe was immediately concerned because of the risk of harm to the Missouri River, which is central to the culture, religion, and economy of the Tribe, and because of the sacredness of the landscapes across which DAPL would traverse.  *Id.*; *see* Declaration of Tribal Historic Preservation Officer Jon Eagle, Sr., at ¶ 11-12.  In particular, the confluence of the Cannonball and Missouri Rivers, the site chosen by DAPL for the pipeline's crossing of the Missouri at Lake Oahe, is sacred ground to the Standing Rock Sioux.  *Id.*; Archambault Decl., ¶ 12.  It is rich in history, and it is rich in cultural and religious significance.  Industrial development of that site for the crude oil pipeline has a high potential to destroy sites eligible for listing in the National Register.  Eagle Decl., ¶ 40.

Water is sacred to the Standing Rock people, as is the Missouri River itself.  Eagle Decl., ¶ 25; Archambault Decl., ¶ 8-12.  Cognizant of multiple major spills from crude oil pipelines in

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

recent years, the Tribe feared that an oil spill on the Missouri could pose an existential threat to the Tribe. Their concerns were heightened when they learned that the original configuration of the pipeline took it just upstream of Bismarck, North Dakota, but that it was later moved just outside their reservation, thus placing the burden of a potential spill squarely on the Tribe.

At 1,168 miles in length, DAPL crosses countless rivers, streams, lakes and wetlands which are regulated as "waters of the United States" under the Clean Water Act. For example, DAPL's route through North Dakota is 359 miles. A report provided to the state Public Service Commission identifies 263 waterbodies (rivers, streams, and lakes) and 509 wetlands that would be impacted by the pipeline. Ex. 2, at 3, 5. In South Dakota, DAPL would cross 273 miles, and DAPL's state Public Utilities Commission filings reveal 288 waterbody crossings and 102 acres of wetlands impacts. Ex. 3, at 25. However, DAPL submitted PCNs for only two of the North Dakota sites, and at 10 sites in South Dakota, relying on NWP 12 for the vast majority of these impacts to regulated waters.[4]

One of the two places in North Dakota where DAPL has applied for Corps authorization is at Lake Oahe, where the pipeline would cross underneath the Lake (a dammed section of the Missouri River) half a mile upstream of the Tribe's reservation. The Lake Oahe crossing requires a § 408 permit as well as a NWP 12 verification, as it crosses federally owned property, and the § 408 permit request triggered an environmental review under the National Environmental Policy Act ("NEPA"). Due to its concerns about the configuration of the pipeline and potential impacts to Lake Oahe in the event of an oil spill, the Tribe participated extensively in the public process associated with this environmental review, including filing numerous formal technical comments

---

[4] The precise number of PCNs in each of the four states has shifted repeatedly throughout the process. In this motion, the Tribe uses the figures used by the Corps in its final NWP 12 verifications.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

on the Lake Oahe crossing, meeting with Corps' leadership and staff, and communicating with elected representatives and agency officials to express concerns.[5]

At various times during the process around DAPL, the Corps has stated that it was proceeding with tribal consultation pursuant to the 2004 "Programmatic Agreement" governing management of the Missouri River mainstem system ("Missouri PA").  Ex. 4.  That document acknowledges the sacredness of the river corridor to tribal people:

> There is a direct relationship between the environment, traditional worship practices, and the continued survival of diverse indigenous groups…. For indigenous Tribal Peoples, the Missouri River is characterized as "The Water of Life" and the very water that created the corridor is considered sacred.  When the Army Corps of Engineers built the six mainstem dams on the Missouri River, life for the Indigenous Peoples who called the River home changed immediately and dramatically.

The agreement laid out standards attendant to the Corps "operation and management" of the mainstem river system such that Tribes could "expect to be equal participants in making decisions and in carrying out decisions."  *Id*. at P-3.  The Standing Rock Sioux Tribe is not a party to the Missouri PA, which is inapplicable to the pipeline in any event.  Archambault Decl., ¶ 19.

## II.   THE CORPS' FLAWED § 106 CONSULTATION PROCESS

On February 17, 2015, the Corps sent the Standing Rock Tribal Historic Preservation Office ("THPO") a generic form letter seeking to initiate consultation under § 106 on the Lake Oahe crossing component of DAPL.[6]  Ex. 5.  The THPO responded immediately and forcefully. Ex. 6.  The THPO's response highlighted the significance of the site to the Tribe and observed

---

[5] The Corps is not the only federal agency involved in authorizing DAPL.  The U.S. Fish and Wildlife Service also has regulatory oversight over a portion of the pipeline that crosses federally managed lands in North and South Dakota.

[6] Previous to this time, there had been correspondence between the Corps and the Tribe regarding bore hole testing, which also was a subject of significant concern to the Tribe, and as to which § 106 consultation never took place.  Complaint, ¶ 87-89.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98101*
*(206) 343-7340*

that previous cultural surveys of the area, on which the Corps was relying, were conducted

without tribal involvement.  The THPO committed the Tribe to full participation in the § 106

process, and "recommend[ed] a full TCP (Traditional Cultural Property) and archaeological

Class III cultural Resource Survey to be completed prior to any mitigation that would take

place," using tribal monitors.

The Corps did not immediately respond, and in the months that followed, both the THPO

and the Tribal Chairman followed up with numerous additional letters to the Corps outlining

concerns about cultural impacts, and seeking to engage the Corps in the good-faith consultation

process required by § 106.  *See, e.g.,* Ex. 7 at 1 (April 8, 2015 letter from THPO) ("To date we

have not received any specific communications or correspondence in reference to any of our

concerns addressed" in previous letters); Ex. 8 at 1 (August 19, 2015 letter from Tribal

Chairman) ("The Standing Rock Sioux Tribe expects the required government-to-government

consultation and environmental and cultural resource review processes to be followed with

respect to Dakota Access.  However, as of the present time, I have not been contacted by your

office on this matter."); Ex. 9 at 2 (August 21, 2015 letter from THPO) ("The SRST THPO is

extremely concerned that the exclusion of tribal participation in the § 106 process will result in

an incorrect type placement as well as an incorrect National Register status.").

The Corps failed to respond to any of this correspondence until September of 2015, when

a second form letter was sent to the Tribal Chairman that, somewhat bizarrely, inquired "if you

would like to consult" on the pipeline project.  Ex. 10 at 2.  The letter asked for any "knowledge

or concerns regarding historic properties" that the Tribe wanted the Corps to consider.  A

deadline of less than a month later was provided.  *Id*.  Again, the THPO responded promptly,

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

outlining the Tribe's concerns with significant and unevaluated properties on the site, and its

ongoing exclusion from the § 106 process.  Ex. 11.  The THPO emphasized:

> Section 106 of the National Historic Preservation Act requires full consultation
> with the requesting THPO offices at the earliest stages.  Our office was not
> afforded the opportunity to participate in identification efforts.  The SRST THPO
> has not been able to determine the significance of known sites because of
> exclusion thus far in the Section 106 process, i.e., consultation, identification, and
> resolution of adverse effects.  *We remain concerned about the irreparable
> damage to these known sites that will occur* if the ancillary facilities, staging
> areas, and roads are built without adequate buffers.

*Id*. (emphasis added).  The THPO concluded that "it has become clear that the Corps is

attempting to circumvent the Section 106 process" and urged the Corps to broaden its review to

include affected areas outside the Corps' jurisdiction as required by governing regulations.  After

several more months went by without a response, the THPO wrote again, highlighting the lack of

response to its repeated concerns.  Ex. 12 ("The THPO office is opposed to any work unless a

full TCP survey is conducted on the area of potential effect.  Our tribe has never surveyed this

land and it has specific historical and cultural resources of relevance to our tribe.").  The letter

concluded that "We are still waiting to see when this consultation begins in earnest."

The Corps did not respond to this letter either.  Instead, its next step was to publish a draft

environmental assessment ("EA") for the Lake Oahe crossing that, remarkably, did not identify

the potential impacts of the pipeline project on the Tribe, or refer to any of the extensive

correspondence demonstrating the Tribe's concern for areas of historic and cultural significance

to the Tribe. Ex. 13.[7]  The Tribe, deeply offended by its exclusion from the draft EA, submitted

extensive technical and legal comments on the it, highlighting both the flaws in the § 106

consultation process as well as the significant cultural resources that could be harmed by the

---

[7] Instead, the EA stated falsely that the Standing Rock THPO had indicated to DAPL that the
Lake Oahe site avoided impacts to tribally significant sites.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

project. *See* Archambault Decl., ¶ 16; Ex. 14 at 4 (The NHPA "requires full tribal consultation

from the earliest stages of project planning.  The Corps should have consulted with the Tribe

prior to the start of archeological surveys, and before soil bore testing at the proposed Missouri

River crossing – but that did not happen."); Ex. 15 at 23 ("the proposed Dakota Access pipeline

route would pass through an area adjacent to Lake Oahe that is rich in historic and archeological

resources, traditional cultural properties, and burial remains."); Ex. 16 at 4 ("the Corps has

mishandled virtually every one of the steps required by § 106").  Another key focus of the

Tribe's EA comments was its failure to address the risk of oil spills in the Missouri on the Tribe.

Ex. 14 at 8-16; Ex. 15, 16.

        The Corps also received critical letters on the EA from the U.S. Environmental Protection

Agency, the U.S. Department of Interior, and the ACHP.  Ex. 17 at 1 (first EPA letter) ("the

scope of the document is limited to small portions of the completed project and does not identify

the related effects from the entire project segment"); Ex. 18 (second EPA letter); Ex.19 at 2

(Department of Interior comment) ("[O]ur understanding is that although formal consultation

was requested by multiple tribes, tribal consultation has not yet occurred").  In its comment on

the EA, the ACHP observed that it had "not been provided evidence that the Corps has met" the

requirements of § 106, observing that "there is likely to be significant tribal interest" and that

"[t]he Corps' approach to meeting its government-to-government consultation is extremely

important."  Ex. 20 at 2.  The ACHP subsequently asked to be made a party to consultation on

the project.

        Around the time the draft EA was released, in mid-December 2015, the pipeline's

proponent sent the Tribe the results of private archaeological surveys conducted by DAPL's non-

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

tribal consultants along the pipeline route during 2014 and 2015.  Ex. 21 at 2.[8]  Neither the

proponent nor the Corps had ever consulted with the Tribe about the protocols for those

assessments or the area of potential affects, or had invited their timely participation as the Tribe

had repeatedly requested.  Instead, the proponent provided the Tribe (and other affected tribes)

with a massive quantity of completed survey data, after it was complete, and stated that if there

were "questions or concerns" about the material, DAPL representatives could be contacted.  *Id*.

Other Tribes whose ancestral lands were crossed by the pipeline's route were making

their concerns known as well.  For example, the Iowa Tribe THPO wrote the ACHP to decry a

"rushed, chaotic and segmented" approach to consultation and noted that "We have not been

consulted in an appropriate manner about the presence of traditional cultural properties, sites, or

landscapes vital to our identity and spiritual well-being."  Ex. 22; Ex. 23 at 1 (Iowa Commission

on Native American Affairs) ("The route of the proposed pipeline would cut through and damage

ancestral lands of religious and cultural significance….").  The THPO for the Osage Nation sent

an email to the Commander of the Omaha District stating:  "It is quite apparent that there has

been a major oversight as the Corps is not in compliance with the NHPA nor the Nationwide

Agreement in terms of the tribal consultation on the DAP project."  Ex. 24 at 2; Ex. 43.

On March 15, 2016 the ACHP wrote to the Corps again, noting that the agency

"remained perplexed" by the Corps' difficulties in consulting with the Tribe, pointing out that

there was no tribal participation in identification surveys and urging the Corps to look at

alternative pipeline alignments as required by ACHP regulations.  Ex. 25 at 2.  The ACHP sent

another letter responding to previous correspondence between the Corps and ACHP a few

---

[8] The letter is mis-dated.  It should have been dated December 16, 2015.  The letter referenced a tribal coordination meeting led by DAPL that occurred a few weeks earlier.  The Tribe did not participate in that meeting, in keeping with § 106 protocols which require consultation with the federal agency.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

months later.  Ex. 26.  That letter laid out a number of significant criticisms of the Corps'

compliance with § 106 and made recommendations for additional steps that Corps should take.

A third letter, sent to the Assistant Secretary of the Army for Civil Works, discussed a meeting

with DAPL proponents, who had described for the ACHP their efforts to conduct cultural

resource surveys.  Ex. 27.  The ACHP informed the Assistant Secretary that the information

provided by DAPL "does not change the conclusions outlined in our letters regarding

shortcomings in the Section 106 review carried by the Corps and FWS.  We continue to disagree

with the Corps' findings regarding effects on historic properties and believe a comprehensive

Programmatic Agreement…. be developed."  *Id.*

   After numerous requests by the Tribe, Omaha District Commander Col. John Henderson

visited the Tribe's reservation and toured the Lake Oahe crossing site on Feb. 29, 2016.

Archambault Decl., ¶ 19.  A follow up visit between Corps and Tribal archaeologists occurred on

March 7, 2016, during which Tribal staff pointed out places where moles had pushed dirt to the

surface, carrying prehistoric pottery shards, pieces of bone, flint, and tools.  Eagle Decl., ¶ 13-15;

Ex. 28 at 2.  Tribal participants in this meeting emphasized the cultural importance of the site,

and demonstrated it with specific evidence.  As Mr. Eagle described in notes written up shortly

after the visit, the Tribe's Ph.D. archaeologist (Dr. Kelly Morgan) and § 106 coordinator

(LaDonna Brave Bull Allard) pointed out that the sites shown to the Corps staff had never been

previously assessed or recorded, consistent with the Tribe's repeatedly expressed belief that the

site generally was rich in unassessed sites of historic and cultural significance.  Ex. 28 at 2.

During this visit Corps archaeologists stated that they were unaware of many of the sites that

they were witnessing and agreed with Tribal staff that additional study was required.  Eagle

Decl., ¶ 14; Ex. 15 at 25 ("Throughout the site visit, the Corps archeologists commented that

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

they had not been aware of many of these sites, and many of the sites did not appear on any of

the site maps that were being used by the Corps for the Section 106 analysis.  The Corps

archaeologists expressed the view that these should be studied and documented.").  However, no

such additional study ever occurred.

Despite a rich record of correspondence from Tribes and the ACHP concerning major

problems in the § 106 process, the Corps concluded the process on April 22, 2016 with a finding

that no historic properties were affected by the Lake Oahe decision. Ex. 29 at 9.  The letter made

it clear that the "area of potential effects" included only the bore pits for the subsurface drilling

at the Lake Oahe site, along with staging areas and access routes:  "The APE for this project will

**not** include construction for any portion of the pipeline alignment that extends past the bore pit

locations." *Id.* at 2 (emphasis in original).  The letter acknowledged 41 recorded sites within a

one mile radius of the bore pit site, some of which lay directly in the path of the pipeline's

construction, or were very close to it. *Id.*; s*ee also infra* at 35-36.  It did not acknowledge the

Tribal evidence that there were many more unevaluated sites at the location.

Both Chairman Archambault and the THPO formally objected to the "no historic

properties affected," again laying out the litany of procedural flaws and legal misinterpretations

that infected the process from the start.  Ex. 30 at 2 ("To date, none of our requests for

consultation or Class III Cultural Surveys have been honored."); Ex. 31.  The ACHP also

formally objected to the effects determinations made by the Corps for DAPL.  Ex. 32.  The

ACHP outlined several fundamental flaws with the Corps' § 106 compliance, including a failure

to properly define the undertaking and area of potential effects, inadequate Tribal consultation

and incomplete identification efforts, and numerous procedural flaws. The ACHP summarized

the flaws in the process:

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98101*
*(206) 343-7340*

Based on the inadequacies of the tribal consultation and the limited scope for identification of historic properties that may be affected, the ACHP questions the sufficiency of the Corps' identification effort, its determinations of eligibility, and assessments of effect.  The Corps' effect determinations, thus far, fail to consider the potential for effects from the larger undertaking on historic properties, including those of religious and cultural significance to Indian Tribes.  The Corps' identification effort did not adequately facilitate the use of tribal expertise to assist in the identification of historic properties and assessment of effects.  The Tribes have had extremely limited access to some PCN areas….

*Id* at 4.[9]

## III.     THE CORPS' JULY 25, 2016 VERIFICATION DECISIONS

On July 25, 2016, the Corps issued the final NWP 12 verification required at the roughly 204 sites in the four states for which verification has been requested, including at the Lake Oahe site. Ex. 33, 34, 35, 36.  Although none of the verifications mentioned § 106 compliance, they did include a "Tribal Monitoring Plan" that required DAPL to allow tribal monitors at PCN sites when construction was occurring.

The Corps also issued a final environmental assessment ("final EA") and finding of no significant impact ("FONSI") for the Lake Oahe crossing § 408 permit. Ex. 37 and 38.  The Final EA, unlike the draft, acknowledged the risks of oil spills in Lake Oahe, and included some spill response and notification measures as mitigation.  The EA also acknowledged that the project area "has a moderate to high probability for archaeological deposits based on proximity to permanent water sources, topography, lack of significant ground disturbances, and depositional processes." Ex. 37 at 76.  Surprisingly, even though the pipeline would pass underneath the Missouri just half a mile upstream of the reservation boundary, in proximity to

---

[9] The ACHP also formally objected to the decision by the U.S. Fish and Wildlife Service that the pipeline would not harm historic properties on federally managed grasslands easements, and urged the Corps and FWS "to develop a comprehensive [programmatic agreement] to address varying jurisdiction and authority over components of the DAPL Project." Ex. 45.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

the Tribe's public water intake systems, the EA concluded that there will be "no direct or indirect impacts to the Standing Rock Sioux Tribe." *Id*. at 86.

As required by § 106 regulations, the Assistant Secretary of the Army also formally responded to the ACHP's objection to its § 106 process. Ex. 39.  The Corps disagreed with the ACHP that it needed to consider the impacts of the pipeline outside of the immediate area of its jurisdiction, asserting that under its regulations each of the 204 individual crossings of regulated waters was a separate undertaking. *Id*., Enclosure at 1.  The Assistant Secretary also rejected the ACHP's conclusion that § 106 consultation was inadequate, observing that "Tribes were notified and invited to participate in the Section 106 process and provide information." *Id*. at 2.  The letter failed to mention the Tribe's formal objection to the no effects determination (and the Tribe never received a response to it), and continued to focus exclusively on harm to cultural sites only within the Corps' interpretation of the exceedingly narrow APE. *Id*. at 4.  For example, even though the Tribe had provided evidence of multiple significant cultural sites around the Lake Oahe crossing, the Assistant Secretary misleadingly concluded that "Field visits conducted with SRST representatives provided no additional information to indicate the presence of TCPs in areas of planned disturbance *within the area of potential effects*." *Id*. (emphasis added).

## STANDARD FOR ISSUANCE OF A PRELIMINARY INJUNCTION

To obtain a preliminary injunction, a party must show:  (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in their favor; and (4) that an injunction is in the public interest. *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008).  When moving for a preliminary injunction, the plaintiff "bear[s] the burdens of production and persuasion." *Qualls v. Rumsfeld*, 357 F.Supp.2d 274, 281 (D.D.C.2005).  "To meet these burdens, he may rely on 'evidence that is less

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

complete than in a trial on the merits,' but the evidence he offers must be 'credible'." *R.I.L-R v.*

*Johnson*, 80 F. Supp. 3d 164, 173 (D.D.C. 2015) (internal citations omitted).[10]

The Tribe asks this Court to enjoin the Corps to withdraw NWP 12 as applied to DAPL

as well as the 204 Clean Water Act verifications pending resolution of the issues in this case.

This is the relief that the Tribe would be entitled to if it prevails on the merits.  *See FCC v.*

*NextWave Pers. Commc'ns*, 537 U.S. 293, 300 (2003) ("In all cases agency action must be set

aside if the action was arbitrary, capricious, an abuse of discretion or otherwise not in accordance

with law.").  An injunction-like standard does not apply to vacatur or suspension of an agency

decision.  Vacatur is not the same as an injunction. It is a "less drastic remedy" than "the

additional and extraordinary relief of an injunction."  *Monsanto v. Geertson Seed Farms*, 561

U.S. 139, 165-66 (2010).  As a preliminary form of vacatur, federal courts have suspended Corps

§ 404 permits pending a final decision on the merits.  *E.g., Ohio Valley Envtl. Coal. v. U.S. Army*

*Corps of Engineers,* 723 F. Supp. 2d 886, 899 (S.D. W.Va. 2010); *Save Our Sonoran, Inc. v.*

*Flowers*, 227 F. Supp. 2d 1111, 1115 (D. Ariz. 2002).

Federal Rule of Civil Procedure 65(c) gives authority to require security when issuing a

preliminary injunction, but provides wide discretion in whether a bond should be required.  *See,*

*e.g., Fox Television Stations v. FilmOn X*, 966 F. Supp.2d 30, 52 (D.D.C. 2013).  This Court has

previously issued nominal bonds in injunction proceedings against the Corps.  *See Envtl. Def.*

---

[10] The Tribe also satisfies the elements of standing, particularly insofar as it seeks enforcement of procedural rights in this motion.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 & n.7 (1992). Archambault Decl., ¶ 6; Eagle Decl., ¶ 7; *Pit River Tribe v. U.S. Forest Service*, 469 F.3d 768 (9th Cir. 2008) (Pit River Tribe has standing because the affected area has been recognized as one with cultural and religious significance to the tribe, the harm is traceable to the agency, and the claim is redressable); *compare Crow Creek Sioux Tribe v. Brownlee*, 331 F.3d 912 (D.C. Cir. 2003) (holding that the Crow Creek Sioux Tribe could not demonstrate an actual or imminent injury because historic protections will be kept in place, thus mitigating any harm to historic properties).

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

*Fund v. Corps of Engineers of U.S. Army*, 331 F. Supp. 925 (D.D.C. 1971) (ordering a bond of

one dollar to enjoin waterway project after construction had already begun).  The Court should

similarly waive or require only a nominal bond here.  The Tribe brings this motion as a last

resort to protect cultural, historic, and religious resources that are essential to the Tribe's cultural

survival.  The Tribe has scarce financial resources, almost all of which are directed at providing

for the security, safety, health, and welfare of its tribal members.  The public interest of

protecting the cultural and historic resources of the Tribe also favors a nominal bond.  *See*

*Armstrong v. Bush*, 807 F. Supp. 816, 823 (D.D.C. 1992) ("Plaintiffs shall only be required to

post $100 security because the public interest favors granting the Temporary Restraining Order

under these circumstances").

ARGUMENT

I.     THE TRIBE IS LIKELY TO PREVAIL ON THE MERITS OF ITS CLAIM THAT
       NWP 12 VIOLATES THE NHPA.

       NWP 12 authorized the vast majority of the pipeline's construction in federally regulated

waters with no notification to, or verification from, the Corps—everywhere except the 204

verification sites (discussed in § II below).  The Tribe is likely to prevail on the merits of its

claim that NWP 12, as applied to DAPL, is fundamentally flawed on both procedural and

substantive grounds.

       A.     The Corps Did Not Consult on Issuance of NWP 12

       Issuance of an individual or general § 404 permit is an "undertaking" as defined in the

NHPA.  The NHPA defines "undertaking" as "a project, activity, or program funded in whole or

in part under the direct or indirect jurisdiction of a Federal agency, including— (1) those carried

out by or on behalf of the Federal agency; (2) those carried out with Federal financial assistance;

(3) those requiring a Federal permit, license, or approval; and (4) those subject to State or local

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

regulation administered pursuant to a delegation or approval by a Federal agency." 54 U.S.C.

§ 300320; 36 C.F.R. § 800.16(y). In *Sheridan Kalorama Historical Ass'n v. Christopher*, 49

F.3d 750, 755 (D.C. Cir. 1995), this Court emphasized that "permits," "licenses," and approvals"

all qualify as undertakings, even in the absence of federal funding. Similarly, in *Indiana Coal

Council v. Lujan*, this District found that a federal agency's delegation of permitting authority to

a state constituted an undertaking. 774 F. Supp. 1385, 1401 (D.D.C. 1991), *vacated as moot,*

1993 WL 184022 (D.C. Cir. April 26, 1993) ("OSM cannot escape the duties imposed under

Section 106 of the NHPA simply by delegating some of its duties to the states and yet still

maintaining a powerful oversight role."); *see also Montana Wilderness Ass'n v. Fry*, 310 F.

Supp.2d 1127, 1152 (D. Mont. 2004) (right-of-way grant for pipeline was "undertaking"). In the

case of individual permits—for example the § 408 permits involved in this case—the Corps has

never disputed that it must comply with § 106 prior to issuance of that permit.

Because issuance of NWP 12 was a federal undertaking, § 106 consultation was required

to determine the effect of such undertaking on historic properties. 54 U.S.C. § 306108 ("prior to

the issuance of any license, [the Federal agency] *shall* take into account the effect of the

undertaking on any historic property") (emphasis added); 36 C.F.R. § 800.1(c) (agency official

must "complete" § 106 process prior to issuance of license). However, the Corps did not

consider the impacts of NWP 12 on historic or culturally significant properties, or otherwise

engage in the § 106 consultation process, prior to issuance of NWP 12 in 2012. Instead, the

2012 Decision Document adopting NWP 12 states simply that § 106 is addressed through GC 20,

which as discussed further below, largely shifts the responsibility for § 106 compliance to private

project proponents. Ex. 1 at 10.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

"The consultation requirement is not an empty formality; rather, it 'must recognize the government-to-government relationship between the Federal Government and Indian tribes' and is to be 'conducted in a manner sensitive to the concerns and needs of the Indian tribe.'" *Quechan Tribe of Fort Yuma Indian Reservation v. U.S. Department of the Interior,* 755 F. Supp. 2d 1104, 1108-9 (S.D. Cal. 2010); *California Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072 (9th Cir. 2011) (finding that failure to consult is not harmless error and vacating agency action for failure to comply).  Other courts have reached similar conclusions, vacating or enjoining agency actions for failure to consult.  *See, e.g., Confederated Tribes and Bands of Yakama Nation v. U.S. Dep't of Agriculture*, 2010 WL 3434091 (E.D. Wash., Aug. 30, 2010) (entering preliminary injunction against USDA due, in part, to "serious questions about whether Defendants adequately consulted with the Yakama Nation"); *Yankton Sioux Tribe v. Kempthorne*, 442 F. Supp. 2d 774, 784-85 (D.S.D. 2006) (granting preliminary injunction due to United States' failure to consult with affected tribes); *Pueblo of Sandia v. United States*, 50 F.3d 856 (10th Cir. 1995) (finding that USFS failed to engage in good-faith consultation with Indian tribe).

Conducting a suitable § 106 consultation on a major class of prospective actions would be challenging.  However, ACHP regulations specifically provide a mechanism, called programmatic agreements, to address § 106 consultation in complex situations like the NWP system.  36 C.F.R. § 800.14(b).  This circuit has recognized that such programmatic agreements "are frequently used for undertakings whose effects are 'similar or repetitive' or 'cannot be fully determined prior to approval' of the undertaking."  *CTIA-Wireless*, 466 F.3d at 107.  The programmatic agreement approach could provide a structure to address § 106 compliance in the NWP program.  Alternatively, ACHP regulations allow agencies to craft their own implementing

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

regulations that supersede ACHP's regulations, as long as the ACHP approves of then.  36 C.F.R. § 800.14(a).  The Corps has never developed a programmatic agreement with the ACHP with respect to the NWPs, nor has it adopted regulations that would address § 106 on NWPs. *See infra* at 30.  In the absence of either a programmatic agreement, approved regulations, or a specific consultation, issuance of NWP 12 violated the NHPA.  Accordingly, the Tribe is likely to prevail on the merits of its claim that issuance of NWP 12 without § 106 consultation is "contrary to law," in violation of the Administrative Procedure Act, 5 U.S.C. § 706.

B.    In Adopting NWP 12, the Corps Unlawfully Abdicated its § 106 Responsibilities

The statutory command in the NHPA could not be clearer.  It states that federal agencies "*shall* take into account" the effect of its actions on historic properties.  54 U.S.C. § 306108 (emphasis added).  Under ACHP regulations, "it is the statutory obligation *of the Federal agency* to fulfill the requirements of section 106 and to *ensure* that an agency official with jurisdiction over an undertaking takes legal and financial responsibility for section 106 compliance…."  36 C.F.R. § 800.2(a).  The regulations go on to lay out an extensive, multi-step consultation process, with a strong emphasis on including Indian tribes.  ACHP's Tribal Consultation Guidance states specifically that "federal agencies cannot unilaterally delegate their responsibilities to conduct government-to-government consultation with Indian Tribes to non-federal entities."  Ex. 40 at 19.[11]

In issuing NWP 12, however, the Corps did not "take legal and financial responsibility" for compliance for the actions it authorizes.  Rather, it provided up-front authorization to discharge fill into waters of the United States, effectively ending its involvement in most situations.  NWP 12 delegates to the proponent the Corps' statutory NHPA duty to evaluate

---

[11] The Tribe raised these issues in connection with DAPL but never received a response.  Ex. 53.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98101*
*(206) 343-7340*

whether there would be any potential impact to historic properties from the project.  If the proponent determines for itself that its own project will not affect historic properties, the Corps is never even notified of the action and has no further role in it.  In such circumstances, the Corps does not consider, and does not give the ACHP or interested parties a reasonable opportunity to comment on, the potential impacts to historic sites.  In enacting this regime, the Corps improperly abdicated its § 106 responsibility.

Notably, the ACHP, in its recent comments on the Corps proposal to reissue the existing NWPs, appears to agree completely with this analysis.  Ex. 50 at 1-2.  "[R]eliance on GC 20, 21, and 32 is not a substitute for compliance with Section 106 in individual cases, particularly as currently drafted.  In the absence of a Section 106 review process that is carried out prior to reissuance of the NWPs, the Corps fails to meet the requirements of 36 C.F.R. part 800."  *Id.*  The comment letter went on to observe that "the burden is placed solely on the permittee to determine if the proposed activity will have an effect on historic properties.  No guidance is provided to explain to the applicant what 'potential to cause effects to any historic property' means.  Nor is there any mechanism for oversight of such determinations by the Corps detailed."  *Id.* at 2.

ACHP regulations direct that agencies "shall involve" consulting parties in findings and determinations made during the § 106 process.  36 C.F.R. § 800.2(a)(4).  Consulting parties must include Indian Tribes "that attach religious and cultural significance to historic properties that may be affected by an undertaking."  *Id.* § 800.2(c)(2).  These regulations acknowledge that the Tribes have specialized knowledge that is unavailable to others.  *Id.*  The agency "shall ensure" that the § 106 process provides such Tribe "a reasonable opportunity" to "identify its concerns about historic properties, advise on the identification and evaluation of historic properties,

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

including those of traditional religious and cultural importance, articulate its views on the undertaking's effects on such properties, and participate in the resolution of adverse effects." *Id*. § 800.2(c)(2)(ii)(A).  It is the "responsibility *of the agency official* to make a reasonable and good faith effort to identify Indian Tribes" to be consulted in the § 106 process.  *Id*. § 800.2(c)(4) (emphasis added).  Consulting tribes play key roles in the identification of historic properties and the determination and resolution of adverse effects.  36 C.F.R. §§ 800.2(c)(2); 800.4(b),(c); 800.5(a).  However, none of these requirements are satisfied in a permitting regime where the Corps pre-authorizes action that may be harmful to Indian tribes, but leaves it to the proponent to make the determinations about the presence of historic properties and adverse effects on them.

ACHP regulations provide for a process under which a responsible official may "authorize an applicant … to initiate consultation with" consulting parties, as long as it "remains legally responsible for all findings and determinations charged to the agency official." *Id*. However, no such "authorization" occurred here.  Authorization requires notice to all state and tribal historic preservation offices, and federal agencies "remain responsible for their government-to-government relationships with Indian Tribes." *Id*.  Similarly, ACHP regulations require Federal agencies to "ensure" that all actions taken by employees or contractors "shall meet professional standards under regulations developed by" the ACHP.  However, in issuing NWP 12 and GC 20, the Corps provided no standards at all to be used by private parties delegated to make their own § 106 threshold determinations.

The Tribe's experience with DAPL highlights the problems created by the Corps' unlawful abdication of its § 106 duties.  As the Corps itself repeatedly emphasizes, the vast majority of the pipeline is being pursued with no notification to or verification from the Corps. There are only 204 places along the 1,168 mile length of the pipeline where the Corps even

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

acknowledges a § 106 responsibility, even though there are hundreds if not thousands of waters

of the United States that require Corps authorization.  *See supra* at 9.  For the vast majority of the

pipeline's impacts to federally protected waters, there is no consultation process, there are no

standards governing determinations made by private parties, and the Corps has no mechanism to

"ensure" compliance with its legal responsibilities.

In sum, by enacting NWP 12 and GC 20, the Corps authorized discharges into waters of

the United States in a way that sidesteps the entire § 106 process.  Under NWP 12 and GC 20,

private project proponents make their own determinations as to the effects on tribally significant

sites without any involvement of the Tribes.  Under NWP 12 and GC 20, Tribes are not provided

any opportunity, let alone a reasonable one, to identify their concerns or assist in the

identification of historic sites.  Under NWP 12 and GC 20, the Corps is not responsible for the

findings and determinations regarding adverse effects.  Under NWP 12 and GC 20, private

project proponents can be made in a vacuum, with no input, no notice, no accountability, and no

oversight.  Accordingly, the Tribe is likely to prevail on its claim that the Corps' abdication of its

§ 106 responsibilities in NWP 12 and GC 20 is *ultra vires* and contrary to the requirements of the

NHPA.  *Cf.  Washington Toxics Coal. v. U.S. Dept. of Interior*, 457 F. Supp.2d 1158 (W.D.

Wash. 2006) (finding unlawful regulation issued under Endangered Species Act that delegates

mandatory duty to regulated party).

## II.   THE TRIBE IS LIKELY TO PREVAIL ON THE MERITS OF ITS CLAIM THAT THE CORPS DID NOT COMPLY WITH § 106 FOR ITS VERIFICATIONS AND PERMITS

While no § 106 consultation at all occurred for the vast majority of the pipeline, the

Corps verified NWP 12 compliance at 204 specific places, including the controversial crossing at

Lake Oahe, and claims to have complied with § 106 with respect to these decisions.  Ex. 39.

However, that "consultation" was fundamentally flawed, leaving the Tribe and other tribes

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

without any meaningful voice in the identification of sacred and culturally significant sites or determination of adverse effects, and triggering a major interagency dispute between the Corps and ACHP.  As discussed further below, there are two major flaws in the Corps' compliance with § 106 for the verifications and § 408 permits.  First, it unlawfully limited its § 106 review to the direct impacts in the immediate area where the Corps had Clean Water Act jurisdiction, and ignored impacts to sites caused by the pipeline even a few yards away.  Second, the Corps failed to engage in a legally adequate § 106 consultation process with the Tribe and others.  Instead, the Corps serially ignored the Tribe's continued requests to be engaged in the process of identifying sites and potential impacts.  Either flaw provides a basis to find the Corps in violation of § 106.

A.     The Corps' Consultation Effort Was Limited to the Areas of its Direct Jurisdiction

The first flaw concerns the Corps' definition of the "undertaking" subject to § 106, and the identification of the "area of potential effects."  As noted above, the "undertaking" includes projects "in whole or in part under the *direct or indirect* jurisdiction of a Federal agency," including, among other things, "those requiring a Federal permit, license, or approval."  54 U.S.C. § 300320 (emphasis added); 36 C.F.R. § 800.16(y).  The area of potential effects, in turn, is defined to include the area "within which an undertaking may *directly or indirectly* cause alterations in the character or use of historic properties…."  *Id.* § 800.16(d) (emphasis added).  Plainly, Congress and the ACHP envisioned an expansive application of the § 106 duties to include not just components of private projects within federal permitting jurisdiction, but also impacts arising from the projects themselves.

The Corps, in contrast, applied a significantly narrower definition of the undertaking and the APE with respect to DAPL.  For example, the APE for the Lake Oahe crossing is only the bore holes, stringing and staging areas, and access routes.  Ex. 29 at 2.  "The APE for this project will **not** include construction of any portion of the pipeline alignment that extends past the bore

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

pit locations (with the exception of those portions of the alignment identified as access routes or staging/temporary work areas)." *Id.* (emphasis in original). But the bore pit itself is simply a hole in the ground at which a tunnel is created under the river for the pipeline. *Id.* Within this exceptionally confined area, the Corps did not report finding any eligible sites.

The Corps applied this approach to each of the 204 separate waterbody crossings verified in its July 25, 2016 verifications, claiming that each of these actions were individual, stand-alone "undertakings." Ex. 39 at 2. The Corps also stated that the APE was, in its view, the same as the undertaking, e.g., the separate and distinct verification at each of the waterbody crossings, and not the pipeline construction on either side of it. *Id.*[12]

The ACHP has criticized the Corps' misapplication of these terms from the outset of the process. In its March 15, 2016 letter, the ACHP stated: "Given the sheer number of individual permits and the unlikelihood that the pipeline could be constructed but for the issuance of these numerous permits, it is unclear how the Omaha District concluded that its jurisdiction and responsibilities to assess environmental impacts form the broader undertaking are limited only to the 209 crossings." Ex. 25 at 1. In its May 6, 2016 letter, the ACHP explained that its regulations "define the undertaking as the entire project, portions of which may require federal authorization or assistance." Ex. 26 at 1. Even where the jurisdiction is limited to particular portions of a project, the ACHP explained, "the federal agency remains responsible for taking into account the effects of the undertaking on historic properties." In formally objecting to the Corps' findings at the Lake Oahe crossing, the ACHP concluded that the Corps misapplied § 106

---

[12] Oddly, the letter also asserted that the Corps' evaluation includes both the permit area and "indirect effects outside the permit area," although there is no evidence that anything outside the immediate permit area was ever considered. *Id.* The Corps' position in this matter has consistently been that it bears no §106 duties with respect to uplands outside of its jurisdictional areas.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

by considering impacts only within its areas of direct Clean Water Act jurisdiction, when it should consider indirect impacts to historic sites in uplands that could not occur but for the Corps' authorization to discharge into waters of the United States.  Ex. 32.

The dispute between the Corps and the ACHP is at least partially attributable to differences in the two agencies' respective regulations.  The ACHP's regulations, and its efforts to get the Corps to apply them, are discussed above.  The Corps, in contrast, has repeatedly emphasized that its own § 106 rules, codified at Appendix C to 33 C.F.R. Pt. 325, control its § 106 compliance.  While that regulation acknowledges that indirect effects should be considered in some limited circumstances, it also states that: "the Corps it not responsible for identifying or assessing potentially eligible historic properties outside the permit area…."  App. C.5(f).

This Circuit, like others, has repeatedly emphasized that the ACHP warrants significant deference as the entity charged by Congress with administering the NHPA.  *McMillan Park Comm. v. Nat'l Capital Planning Comm'n*, 968 F.2d 1283, 1287-88 (D.C. Cir. 1992).  ACHP "regulations command substantial judicial deference");  *CTIA-Wireless Ass'n,* 466 F.3d at 117 ("Congress has entrusted one agency with interpreting and administering section 106 of the NHPA: the Council.");  *see also Montana v. Blackfeet Tribe of Indians,* 451 U.S. 759, 767 (1985) ("statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit").

Accordingly, to the extent that there is a dispute between the Corps and the ACHP around the interpretation of the term "undertaking" and the scope of the APE, this Court should defer to the ACHP.  *Id.*  Several courts have specifically found that the Corps cannot rely on its Appendix C regulations, as they have never been approved by the ACHP, and indeed, they predate the 1992 amendments to the NHPA that provide Tribes with a significantly expanded role in the §

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

106 process.  *See, e.g., Colorado River Indian Tribes v. Marsh*, 605 F. Supp. 1425 (C.D. Cal.

1985) (Corps' regulations "lacking any force or substance"); *Comm. to Save Cleveland's Huletts*

*v. U.S. Army Corps of Engineers,* 163 F. Supp.2d 776, 792 (N.D. Ohio 2001) ("the Corps'

procedures are inconsistent with, and indeed in derogation of those ACHP regulations.  The

Corps, accordingly, cannot rely on its own regulations to define the scope of its notice

obligations or to define the 'permit area' governing the circumstances giving rise to those

obligations."); *see also* Ex. 50 at 2 (ACHP comment on 2017 NWP reissuance) ("ACHP

considers Appendix C as an internal Corps process that does not fulfill the requirements of

Section 106 of the NHPA, which has been supported by court opinions…."); Note, *Engineering*

*Exceptions to Historic Preservation Law: Why the Army Corps of Engineers Section 106*

*Regulations are Invalid*, 40 Wm. Mitchell L. Rev. 1580 (2014).

     This Court should find that the scope of the Corps § 106 duties are governed by the

ACHP regulations, not Appendix C.  The Corps' narrow interpretation of the scope of its § 106

responsibilities with respect to the 204 Clean Water Act verifications for DAPL cannot be

squared with the NHPA or its governing regulations.  Accordingly, the Tribe is likely to prevail

on the merits of its claim that the Corps violated the NHPA with respect to the 204 verifications,

including the Lake Oahe crossing.

     B.     The Corps Failed to Conduct a Lawful § 106 Consultation

     Leaving aside the question of the scope of review, the nature and content of the § 106

consultation process was also fundamentally flawed, and inconsistent with the NHPA and

implementing regulations.

     The § 106 process requires consultation with Indian Tribes on federal undertakings that

potentially affect sites that are sacred or culturally significant to Indian Tribes.  36 C.F.R.

§ 800.2(c)(2).  Consultation must occur regarding sites with "religious and cultural significance"

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98101*
*(206) 343-7340*

even if they occur on ancestral or ceded land.  *Id*. 36 C.F.R. § 800.2(c)(2)(ii)(D); 54 U.S.C. §

302706.  An agency official must "ensure" that the process provides Tribes with "a reasonable

opportunity to identify its concerns about historic properties, advise on the identification and

evaluation of historic properties….articulate its views on the undertaking's effects on such

properties, and participate in the resolution of adverse effects."  36 C.F.R. § 800.2(c)(ii)(A).

This requirement imposes a "reasonable and good faith effort" by agencies to consult with Tribes

in a "manner respectful of tribal sovereignty."  *Id*. § 800.2(c)(2)(ii)(B).

Courts have consistently found that it is the quality of the process that matters, not the

amount of paperwork generated.  *See, e.g., Pueblo of Sandia v. United States*, 50 F.3d 856, 860

(10th Cir. 1995).  In *Pueblo of Sandia,* the agency had requested detailed information from the

tribes documenting the historic significance and location of the properties affected by agency

action, and the tribes had not responded.  Even so, the Court held that the "reasonable effort"

required by §106 had not been satisfied:  "We conclude, however, that the information the tribes

did communicate to the agency was sufficient to require the Forest Service to engage in further

investigations, especially in light of regulations warning that tribes might be hesitant to divulge

the type of information sought."  *Id*.  Similarly, in *Quechan Tribe,* the court emphasized the

requirement of the regulations that agencies must consult "extensively" with Tribes, and indeed,

the Tribe's views warrant "special consideration" under 36 C.F.R. § 800.2.  755 F. Supp.2d at

1109 ("Section 800.4 alone requires at least seven issues about which the Tribe as a consulting

party, is entitled to be consulted before the project was approved.").  The court carefully walked

through the extensive record of correspondence between the agency and the Tribe.  Observing

that there had been 31 contacts between the Tribal Historic Preservation Officer and the agency,

the court concluded that the "sheer volume of documents is not meaningful."  *Id*. at 1113.  To the

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

contrary, despite the extensive record of contact, the court found that most of them involved *pro forma* statements of intent, fluctuating evidence, and requests that the Tribe provide information. "BLM's invitation to consult, then, amounted to little more than a general request for the Tribe to gather its own information about all sites within the area and disclose it at public meetings." *Id.* at 1118-19.  The court concluded:

> Government agencies are not free to glide over requirements imposed by Congressionally-approved statutes and duly adopted regulations.  The required consultation must at least meet the standards set forth in 36 C.F.R. § 800.2(c)(2)(ii) and should begin early.  The Tribe was entitled to be provided with adequate information and time, consistent with its status as a government that is entitled to be consulted.  The Tribe's consulting rights should have been respected.  It is clear that did not happen here.

*Id.* at 1119.

Here, as in the cases above, the Corps can point to correspondence and even some meetings between the Corps and the Tribe.  The record of true government-to-government consultation, however, is "painfully thin."  *Quechan Tribe*, 755 F. Supp.2d at 1118.  Consultation in 2015 consisted primarily of two form letters (in February and again in September) from the Corps asking the Tribe if it wished to consult, and a series of increasingly frantic letters from the THPO and Chairman highlighting the cultural importance of the area, requesting full tribal participation in surveys, and calling for consultation to begin.  But before any meaningful discussions had taken place, the entire route had been surveyed by DAPL's private consultants, and the Corp had issued an astonishing draft EA that ignored the Tribe's concerns completely.  *See also* Ex. 40 at 6 (ACHP Guidance) ("Consultation constitutes more than simply notifying an Indian Tribe about a planned undertaking.").  The process concluded in April before any of the Tribe's concerns had been resolved.

Even though consultation should begin "early in the planning process," 36 C.F.R. § 800.2(c)(2)(ii)(A), by the time consultation even arguably began, the route had been finalized, a

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

draft EA published, DAPL had completed its own cultural surveys without any involvement of the Tribe, and a construction date announced.  *See also* Ex. 40 at 3 (ACHP Guidance) ("federal agencies should talk with interested parties as *early in the planning process as possible*") (emphasis in original); Executive Order 13175, 65 Fed. Reg. 67249 (Nov. 6, 2000) (encouraging "meaningful and timely" consultation with Tribes).  Even though consultation should occur on the "area of potential affects," 36 C.F.R. § 800.4(a)(1), the Corps applied its own flawed regulations in a heavy-handed manner to shut down any conversation around indirect effects out of jurisdictional areas.  Consultation should take place on the "identification and evaluation of historic properties, including those of historic significance to the tribe." Ex. 40 at 12 (ACHP Guidance); 36 C.F.R. § 800.4(b); § 800.2(c)(2)(ii)(A).  Instead, the THPO was given a brief window to "comment" on the proponents' completed surveys.

Consultation should occur on both the historic significance of sites that are identified, *id.* § 800.4(c), as well as the determination of adverse effects.  *Id.* § 800.5(a).  Again, no such consultation ever took place.  The Tribe repeatedly sought full Class III cultural surveys with tribal participation, as the cultural knowledge to determine the existence and significance of sites only lay with the Tribe.  *See, e.g.,* Eagle Decl., ¶ 16.  As the ACHP Guidance states:

> [U]nless an archaeologist has been specifically authorized by a tribe to speak on its behalf on the subject, it should not be assumed that the archaeologist possesses the appropriate expertise to determine what properties are or are not of significance to an Indian tribe. The appropriate individual to carry out such a determination is the representative designated by the tribe for the purpose…The identification of those historic properties that are of traditional religious and cultural significance to a tribe *must be made* by the tribe's designated representative as part of the Section 106 consultation process.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98101*
*(206) 343-7340*

Ex. 40 at 20 (emphasis added).  But they were never given that opportunity.[13]  Moreover, with

respect to sites that were identified by the consultants, DAPL proposed mitigation measures to

avoid adverse effects (like fences and 50-foot buffers) without any input from the Tribe, again in

violation of the ACHP regulations.  Eagle Decl., ¶ 19.  The ACHP, in formally objecting to the

Corps' findings, specifically called out the inadequacies of the consultation process, describing it

as "disjointed and inadequate." Ex. 32 at 2.

> The Corps does not appear to have consulted with tribes in the development of the
> scope of the effort to identify and evaluate historic properties that may be affected
> by the undertaking.  Based on the documentation available to us, the Corps does
> not appear to have adequately consulted with the tribes regarding the
> identification and assessment of eligibility and effects on properties of religious
> and cultural significance to them…"

*Id.*

In short, the § 106 "consultation" process in this case involved the Tribe repeatedly and

emphatically requesting consultation and seeking participation in surveys and resolution of

adverse effects, to no avail.  The Corps never got past the first step of the § 106 process

(identification of potentially affected sites), let alone the other steps such as determining their

potential eligibility for protection, and identifying and resolving adverse effects.  Accordingly,

the Tribe is likely to prevail on the merits of its claim that the Corps' § 106 consultation process

was arbitrary, capricious, and contrary to the NHPA.

## III.    THE TRIBE WILL BE IRREPARABLY HARMED IN THE ABSENCE OF AN INJUNCTION

Construction of DAPL is already underway in all four states.  In North Dakota, for

example, materials filed with the state Public Utilities Commission indicate that half of the

---

[13] Late in the process, the Corps offered the THPO an opportunity to participate in a very limited survey of just the bore hole site at Lake Oahe.  The Tribe, not wishing to legitimatize what it felt was an unlawful approach to § 106, refused to participate.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

clearing and grading required in North Dakota has already taken place, as has a significant amount of pipeline "stringing" and "engineering and bending." Ex. 41.  DAPL started construction before issuance of Corps verifications at the 204 PCN sites.  Now that those verifications have been issued, construction will likely start in those places very soon as well. Ex. 49 (announcing imminent start of construction at PCN sites).

In *Quechan Tribe*, the District Court found that the irreparable harm component of the Tribe's preliminary injunction request was "the easiest and most straightforward part of the inquiry," as the harm to the Tribe from damage to culturally important sites was so obvious. "The parties agree that there are hundreds of known historical sites on the land, and the Tribe attaches cultural and religious significance to many if not most of these…. Damage to or destruction of any of them would constitute irreparable harm to some degree." *Quechan Tribe*, 755 F. Supp.2d at 1120; *see also Comanche Nation v. United States,* 2008 WL 4426621, at *19 (W.D. Okla. 2008) (monetary harm to project proponent would "pale in comparison to the prospect of irreparable harm to sacred lands and centuries-old religious traditions which would occur absent injunctive relief"); *Colorado River Indian Tribes*, 605 F. Supp. at 1440 ("The importance of these sites transcends their spiritual value to the Tribes and, instead, evidences their cultural significance to the general public").

Destruction of sacred sites, or the loss of a historically or culturally significant site, almost by definition, is "irreparable harm" to the Tribe, as it cannot be repaired with money damages.  Archambault Decl., ¶ 14-15; Eagle Decl., ¶22, 40-42.  Here, as in *Quechan Tribe*, the "massive size of the project and the large number of historic properties and incomplete state of the evaluation virtually ensures some loss or damage" to the Tribe's sacred sites.  *Id*.  The pipeline route traverses an area that is rich in history and cultural significance to the Tribe.  Eagle

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

Decl., ¶ 40.  The Corps' April 22 "no effect" determination lists 41 archaeological sites within a one mile radius of the bore hole sites at Lake Oahe, most of them listed as "unevaluated" or "ineligible" for listing.  Ex. 29 at 4-5.  The maps appended to this determination show several sites *directly in the pipeline's construction path*, but since they are outside the Corps' determination of the "project area" for the HDD drilling, they are not otherwise addressed.  *See id*. Figure 3; Figure 4.[14]  Similarly, an illustrative map of one PCN site in South Dakota shows numerous stone circles, mounds, and surface finds of archaeological significance in the immediate vicinity of the pipeline route, including some sites in the pipeline's construction path. Ex. 46.  This archaeological evidence was found even though the private consultants lack the training, cultural sensitivity, or legal authorization to make determinations about cultural significance of Tribal resources.  Eagle Decl., ¶ 16 ; Ex. 54 at 2 (disputing that non-tribal consultants can identify tribally significant sites).

A survey prepared by DAPL's consultants describes dozens of archaeological sites in the pipeline's path in two North Dakota counties.  *See* Ex. 44.[15]  The study deems many of these sites eligible for listing.  As to such sites (and as to other sites deemed "unevaluated"), the study proposes mitigation such as "signage," "fencing," and a 50 foot avoidance buffer.[16]  *See, e.g., id*. at 23, 72, 75, 83-84; 86.  Dozens of other sites are deemed ineligible, and as to these sites, the report acknowledges that many would be damaged or destroyed by pipeline construction.  *See,*

---

[14] In Figures 3 and 4, the following sites appear to lay directly in the construction pathway:  site 32MO0082 is a stone circle deemed to be "unevaluated;" sites 32MOX0179 and 32 ENX1439 are both described as a ineligible "prehistoric isolated find"; 32MO0259 and 32EM0020 are described as "prehistoric artifact scatter" and deemed "unevaluated."

[15] Ex. 44 is a document provided by DAPL to the Tribe in late 2015, and included in an electronic folder titled "2015 Survey Results."  It only covers two counties in North Dakota but was included within a broader set of materials here.  It is intended to be illustrative. .

[16] These are the archaeologist management recommendations; the Tribe has no way of knowing whether DAPL intends to adhere to them.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

*e.g.*, *id*. at 4 (cairn) ("ROW blading and pipeline installation have the potential to impact the site by destroying F1."); 11 ("The bladed ROW will impact the site by destroying or removing the cairns"); 14 (lithic scatter); 21; 33; 49 ("Construction activities such as vegetation clearing and construction corridor blading will result in the displacement and possible destruction of cultural materials."); 50; 59 ("The currently proposed pipeline centerline crosses through the center of site 32DU2247."); 64; 67; 69; 80.  No avoidance or mitigation is proposed.  Of course, the tribes were not consulted with respect to the identification of these sites, their potential eligibility, or the determination that "adverse effects" would be avoided by signs, fences, and buffers.

These examples involve sites that are already known based on past surveys or that were discovered by DAPL consultants.  Of course, the Tribe is deeply concerned about the presence of unevaluated and unknown sites beyond what appears on their surveys. Eagle Decl., ¶ 31, 40. There is ample reason to believe that such sites lie undiscovered in the pipeline's path.[17] As discussed above, the area is rich in such sites.  A brief site visit to the Lake Oahe site revealed several potential sites that merited further investigation, sites acknowledged by Corps' archaeologists as meriting further study.  *Id*. ¶ 14-16.  In Iowa, Upper Sioux Tribe archaeologists discovered an important Tribal archaeological site directly in the pipeline's path in the Big Sioux Wildlife Management Area.  *Id*. at ¶ 32-37.  The discovery led the state Department of Natural Resources to issue a stop work order to DAPL.  Ex. 51.  The Iowa state archaeologist, after visiting the site with Tribal experts, recommended that it be considered eligible for inclusion in

---

[17] While plaintiff believes that it has provided more than sufficient evidence of the likelihood of irreparable harm, the Corps may argue that the Tribe must show with precision each and every site that is certain to be destroyed.  That is not the law.  The Tribe's injuries cannot be dismissed because the precise locations are not in DAPL's cultural surveys, as this lack of information is a direct result of the Corps' failure to properly consult in the first place.  *See Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F.Supp.2d 1, 25 (D.D.C. 2009).

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

the National Register.  Ex. 52.  The private consultant "would have to have literally walked right over the site" to have missed it.  Eagle Decl., ¶ 37.

The Tribe is also concerned about harm to sites that are not destroyed directly by pipeline construction, but are in close proximity to it.  DAPL's cultural surveys propose that sites near the pipeline should be fenced off, and a 50-foot buffer maintained, as mitigation.  But surrounding a sacred site with fencing and conducting major industrial construction immediately alongside it still can cause "adverse effects" within the meaning of the NHPA.  *See* Eagle Decl., ¶ 19.  Effect, under §106, means "alteration to the characteristics of a historic property qualifying it for inclusion in or eligibility for the National Register."  36 C.F.R. § 800.16(i); *see also id.* § 800.5(a)(2) (adverse effects include "change of the character of the property's use or of physical features within the property's setting that that contribute to its historical significance," and "introduction of visual, atmospheric, or audible elements that diminish the integrity of the property's significant historic features.")  National Register eligibility criteria include consideration of "objects that possess integrity of location, design, setting, materials, workmanship, feeling, and association."  36 C.F.R. § 60.4.

 Of course, relevant characteristics of "location, feeling and association" are implicated by industrial construction a few feet away.  Eagle Decl., ¶ 19.  Similarly, use of fencing and signage to mark a sacred site could "diminish the integrity" of the sites historic features.  *Id.*  In *Montana Wilderness Ass'n v. Fry*, 310 F. Supp.2d 1127 (D. Mont. 2004), the court found an agency in violation of NHPA for concluding that a pipeline wouldn't adversely affect an Indian stone tipi ring that was 54 feet away.  "BLM is obligated to consider the 'affected area' not just the narrow area where the pipeline is laid."  *Id.* at 1153; *see also Colorado River Indian Tribes*, 605 F. Supp. at 1438 (invalidating Corps decision to look only at "permit area" and not broader

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

"affected area"); *Sayler Park Village Council v. U.S. Army Corps of Engineers*, 2003 WL

22423202 (S.D. Ohio Jan. 17, 2003) (enjoining private construction physically distant from

historic site due to concerns about views and sound "impinging" on historic property).  Of

course, determining whether or not an action will have adverse effects, and what mechanisms

could avoid them, is precisely the point of the § 106 consultation process.  Had a meaningful

consultation taken place, the Tribe could have assisted in both the determination and the

resolution of adverse effects.  They were never afforded that opportunity.

The destruction of sacred, culturally significant, and historic sites has likely already

begun.  DAPL is trying to steamroll the project and win this case "on the ground" by rushing

forward with construction.  Harm will continue if project construction proceeds through this

landscape rich in cultural and historic significance.  Loss of these sites constitutes a permanent

loss to Tribe.  Eagle Decl., ¶ 40-41.  No money damages can repair this harm.  *Id.*, *Comanche*

*Nation,* 2008 WL 4426621 at *19 ("The construction of a permanent structure on a site

considered sacred by the Comanche people, and the substantial burden the presence of the

structure would impose on their traditional practices… would constitute irreparable harm").  The

Tribe has met its burden.

## IV.     THE BALANCE OF HARMS FAVORS AN INJUNCTION

As discussed above, the Tribe will be irreparably harmed by damage or destruction to

elements of its cultural patrimony if the injunction is not granted.  In contrast, the Corps itself

will suffer no harm at all from the issuance of an injunction.  Throughout the permitting process,

the Corps has held most of the power – the Corps had the power and the duty to consult, and the

Corps was in control of the permitting process and timeline.  *Quechan Tribe*, 755 F.Supp.2d at

1121.  Courts have "emphasized that consultation with tribes must begin early, and that if

consultation begins after other parties may have invested a great deal of time and money, the

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

other parties may become entrenched and inflexible, and the government agency may be inclined to tolerate degradation it would otherwise have insisted be avoided." *Id.* The fact that the process is so far along is evidence of the scope of the injury to the Tribe, not an excuse to accept the situation as it is.

Because construction is already underway, DAPL would presumably suffer some financial harm if the project is delayed. However, financial harm to DAPL—even if significant—does not outweigh the irreparable injury to the Tribe when its historic and cultural sites are damaged or destroyed. As the *Comanche Nation* court observed, in a situation similar to this one, "the monetary damages Defendants may incur if an injunction issues *pale in comparison* to the prospect of irreparable harm to sacred lands and centuries-old religious traditions which would occur absent injunctive relief." WL 4426621, *19 (emphasis added). While DAPL may have financially invested in the construction of the pipeline, the Tribe has invested centuries in maintaining the historic and spiritual integrity of the land. *Quechan Tribe*, 755 F. Supp.2d at 1121 (balance of equities "tips heavily" in Tribe's favor despite private party spending millions of dollars on project already); s*ee also Ohio Valley Envtl. Coal. v. U.S. Army Corps of Engineers*, 538 F. Supp.2d 625, 632 (S.D. W. Va. 2007) (preliminarily enjoining NWP authorization) ("This temporary economic harm can be outweighed by the permanent harm to the environment that comes from the filling of streams and valleys…. Money can be earned, lost, and earned again: a valley once filled is gone.").

Moreover, any harm to DAPL is entirely self-inflicted, and hence cannot be used to tip the balance of equities. DAPL made a risky choice to start construction outside of PCN areas on this highly controversial project before it received Corps authorization at any of the PCN sites or § 408 crossings, before it secured landowner approval at all sites, and despite multiple lawsuits

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

against it.  In asking the Iowa Utilities Board for permission to begin construction in non-PCN

areas before the Corps issued PCN verifications, for example, DAPL explicitly recognized that

prematurely starting construction would be "at its own risk."  Ex. 47, at 1, 5.  A majority of the

Board granted DAPL's request (over a vigorous dissent), but emphasized that "[a]ny such

activities will be at the company's own risk."  Ex. 48 at 9.  DAPL's choice to "roll the dice" by

starting construction on a controversial and incomplete project cannot be used to tip the equitable

scales away from the Tribe.  *Quechan Tribe*, 755 F. Supp.2d at 1121 ("While the Court is

sympathetic to the problems Defendants face, the fact that they are not pressed for time and

somewhat desperate after having invested a great deal of effort and money *is a problem of their

own making* and does not weigh in their favor.") (emphasis added).  As the Eighth Circuit held in

a similar situation:

> [A]ny injury to SWEPCO was largely self inflicted. SWEPCO spent about $800
> million on plant construction before the § 404 permit was issued and ignored the
> Corps' April 2008 warning letter that construction would proceed "at [its] own
> risk." When agencies "jump the gun" or "anticipate[ ] a pro forma result" in
> permitting applications, they become "largely responsible for their own harm."

*Sierra Club v. United States Army Corps of Engineers*, 645 F.3d 978, 996 (8th Cir. 2011), *citing

David v. Mineta*, 302 F.3d 1104 (10th Cir. 2002).

Finally, allowing the permits to stay in place effectively would allow DAPL to continue

constructing, and probably finish, the project before this case could be resolved on the merits.

The damage to the Tribe would be complete and the company's effort to steamroll the project

would succeed.  Project completion would create even further momentum towards allowing this

project to sidestep the law.  *See, e.g., Pit River Tribe*, 468 F.3d at 785 ("After major investment

of both time and money, it is likely that more environmental harm will be tolerated."); *Sayler

Park, supra* (granting injunction on private construction because allowing it continue would

create "economic pressure and regulatory inertia" that undermined regulatory process).  For

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

these reasons, the balance of equities weighs in the Tribe's favor.  *Montana Wilderness Ass'n*, 310 F. Supp. at 1156 (enjoining operation of already-built pipeline due to NHPA and other legal issues).

## V.      THE PUBLIC INTEREST FAVORS AN INJUNCTION

The requested injunction of preliminarily vacating the relevant permits is also in the public interest.  Courts have repeatedly confirmed that protection of historic sites, and preservation of Tribal culture, is in the public interest.  For example, in *Colorado River Indian Tribes v. Marsh*, 605 F. Supp. 1425, 1440 (C.D. Cal. 1985), the court noted that it was "also mindful of the advancement of the public interest in preserving these resources.  They represent a means by which to better understand the history and culture of the American Indians in the past, and hopefully to provide some insight and understanding of the present day American Indians." Similarly, in *Quechan Tribe*, the court found an injunction against a major development project to be in the public interest in an NHPA case:

> The Tribe itself is a sovereign, and both it and its members have an interest in protecting their cultural patrimony.  The culture and history of the Tribe and its members are also part of the culture and history of the United States more generally…. [I]n enacting NHPA Congress has adjudged the preservation of historic properties and the rights of Indian Tribes to consultation in the public interest…. The Court must adopt the same view.

*Quechan Tribe*, 755 F. Supp.2d at 1121-22.  Similarly, courts have regularly found injunctions against § 404 permits to be in the public interest in environmental cases.  *See, e.g., Ohio Valley Envtl. Coal.*, 538 F. Supp.2d at 632 ("The public has a strong interest in maintaining the balance Congress sought to establish between economic gain and environmental protection.")  The public's interest in protecting cultural and historic sites is no less significant.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

CONCLUSION

For the foregoing reasons, the Tribe respectfully requests this Court GRANT its motion

for a preliminary injunction.

Dated:  August 4, 2016                    Respectfully submitted,


                                          */s/ Jan E. Hasselman*
                                          Patti A. Goldman, DCBA # 398565
                                          Jan E. Hasselman, WSBA # 29107
                                          *(Admitted Pro Hac Vice)*
                                          Stephanie Tsosie, WSBA # 49840
                                          *(Admitted Pro Hac Vice)*
                                          Earthjustice
                                          705 Second Avenue, Suite 203
                                          Seattle, WA  98104
                                          Telephone:  (206) 343-7340
                                          pgoldman@earthjustice.org
                                          jhasselman@earthjustice.org
                                          stsosie@earthjustice.org

                                          *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on August 4, 2016, I electronically filed the foregoing *Motion for Preliminary Injunction* and *Memorandum In Support of Motion For Preliminary Injunction* with the Clerk of the Court using the CM/ECF system.

I further certify that on August 4, 2016, true and correct copies were served on the following, via the method indicated:

Via Federal Express overnight delivery:

Office of the Attorney for the District of
Columbia
441 Fourth Street NW
Washington, DC  20001

U.S. Army Corps of Engineers
441 G Street NW
Washington, DC  20314-1000

U.S. Attorney's Office
Attn:  Civil Process Clerk
555 Fourth Street NW
Washington, DC  20530

Office of the Attorney General
1350 Pennsylvania Avenue NW, Suite 409
Washington, DC  20004

Courtesy copies via email to counsel Dakota Access Pipeline and U.S. Department of Justice Environment and Natural Resources Division.

*/s/ Jan E. Hasselman*
Jan E. Hasselman

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*