**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **STANDING ROCK SIOUX TRIBE,** | |
| **Plaintiff,** | **Case No. 1:16-cv-1534-JEB** |
| **v.** | |
| **U.S. ARMY CORPS OF ENGINEERS,** | |
| **Defendant.** | |

### CHEYENNE RIVER SIOUX TRIBE'S MOTION TO INTERVENE

The Cheyenne River Sioux Tribe ("Tribe"), a federally-recognized Indian tribe (81 Fed. Reg. 26826 (May 4, 2016)), by and through its undersigned counsel, hereby respectfully submits this Motion, the accompanying Memorandum of Points and Authorities, and Complaint in accordance with Local Rule 7(j), to intervene as of right pursuant to Federal Rule of Civil Procedure 24(a)(2), or in the alternative, to intervene permissively pursuant to Federal Rule of Civil Procedure 24(b)(1)(B).   The Tribe has contacted the Defendant U.S. Army Corps of Engineers, Intervenor-Defendant Dakota Access, LLP ("Dakota Access"), and Plaintiff Standing Rock Sioux Tribe.  Dakota Access is the only party that opposes this motion.

Proposed Intervenor-Plaintiff is similarly situated to the Standing Rock Sioux Tribe, and states that if intervention is granted, it will participate in this action on the schedule that has been established for the existing parties, avoid unnecessary duplication of effort in areas satisfactorily addressed and represented by the existing Plaintiff to the extent possible, and coordinate proceedings with the existing parties to the extent possible.

The grounds for this motion, more fully set forth in the accompanying Memorandum of Points and Authorities, are briefly set forth below.

1

1.  Plaintiff Standing Rock Sioux Tribe brought this action for declaratory and injunctive relief challenging federal permits granted by the Army Corps of Engineers to Dakota Access to construct a pipeline intended to transport crude oil from Stanley, North Dakota to Patoka, Illinois, through ancestral lands of the Cheyenne River Sioux Tribe containing Tribally significant and historical sites and under waters sacred to the Cheyenne River Sioux Tribe.

2.  As set forth in detail herein, the Cheyenne River Sioux Tribe's Motion to Intervene as of right is warranted.  First, this Motion is timely as it is filed a mere 14 days after the filing of the Plaintiff's Complaint, just five days after Intervenor-Defendant's successful motion to intervene, and before the filing of any Answer.  Second, the Cheyenne River Sioux Tribe has a legally protected interest in this litigation in light of the fact that the construction site that is the primary subject of this litigation is on ancestral lands of the Cheyenne River Sioux Tribe such that the Army Corps of Engineers had an obligation to consult with the Tribe prior to granting permits under § 106 of the National Historic Preservation Act, 54 U.S.C. § 306108. Moreover, the construction site is a mere 70 miles upstream of the Tribe's existing lands. Third, an unfavorable disposition of the present case has the potential to threaten or impair the Tribe's interest as it would permit Dakota Access to cause potential harm both to culturally significant sites and the waters on which the Tribe relies for its health, well-being, and culture. Finally, the Plaintiffs Standing Rock Sioux Tribe and the Cheyenne River Sioux Tribe are wholly separate sovereign Indian nations with the potential for their interests to diverge such that the Standing Rock Sioux Tribe cannot adequately represent the Tribe's interest.

3.  In the alternative, the Tribe submits that permissive intervention pursuant to Rule 24(b)(1)(B) is warranted.  First, an independent basis for subject matter jurisdiction exists in light of the fact that the U.S. Army Corps of Engineers had an independent duty under the National

Historic Preservation Act to consult with the Cheyenne River Sioux Tribe, and the Tribe has an independent interest in the safety of the waters under which the pipeline is scheduled to be constructed.   Furthermore, jurisdiction exists pursuant to 28 U.S.C. § 1362, which states "district courts shall have original jurisdiction of all civil actions, brought by any Indian Tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States." Second, this Motion is timely, having been filed during the infancy of this litigation.  Finally, there is no risk of delay or prejudice as the Tribe does not propose to add any new claims.

## CONCLUSION

For the foregoing reasons, and for the reasons set forth in the Memorandum of Points and Authorities below, the Cheyenne River Sioux Tribe respectfully requests to be granted leave to intervene as of right under Federal Rule of Civil Procedure 24(a)(2).  In the Alternative, the Tribe requests to be granted permissive intervention pursuant to Federal Rule of Civil Procedure 24(b)(1)(B).

Respectfully submitted this 10th day of August, 2016

                                  CHEYENNE RIVER SIOUX TRIBE,

By:    /s/ Conly J. Schulte
        Conly J. Schulte
        FREDERICKS PEEBLES & MORGAN LLP
        1900 Plaza Drive
        Louisville, CO  80027
        Telephone:  (303) 673-9600
        Facsimile:  (303) 673-9839
        Email:  cschulte@ndnlaw.com

        Nicole E. Ducheneaux, *Pro Hac Vice Pending*
        FREDERICKS PEEBLES & MORGAN LLP
        3610 North 163rd Plaza
        Omaha, NE  68116
        Telephone:  (402) 333-4053
        Facsimile:  (402) 333-4761
        Email:  nducheneaux@ndnlaw.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **STANDING ROCK SIOUX TRIBE,** | |
| **Plaintiff,** | **Case No. 1:16-cv-1534-JEB** |
| **v.** | |
| **U.S. ARMY CORPS OF ENGINEERS,** | |
| **Defendant.** | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**MOTION TO INTERVENE**

# TABLE OF CONTENTS

INTRODUCTION .......................................................................................................... 1

FACTUAL BACKGROUND............................................................................................ 2

DISCUSSION.................................................................................................................... 7

   I.   THE CHEYENNE RIVER SIOUX TRIBE SHOULD BE PERMITTED TO
       INTERVENE AS A MATTER OF RIGHT ....................................................... 7

      a.   The Cheyenne River Sioux Tribe's Motion Is Timely ................................. 8

      b.   The Cheyenne River Sioux Tribe Has a Legally Protected Interest in this
          Suit to Enjoin the Corps from Harming Its Sacred Sites, Ancestral, Lands, and the
          Health and Welfare of Its Members............................................................. 8

      c.   The Disposition of this Action Concerning Federal Permitting of the Dakota
          Access Pipeline Threatens to Impair the Cheyenne River Sioux Tribe's Interest
          in Its Sacred Sites, Ancestral Lands, and the Health and Welfare of Its Members .... 11

      d.   The Cheyenne River Sioux Tribe's Interests Are Not Adequately Protected by the
          Standing Rock Sioux Tribe........................................................................... 11

   II.  ALTERNATIVELY, THE CHEYENNE RIVER SIOUX TRIBE SHOULD BE
       PERMITTED TO INTERVENE UNDER RULE 24(b)(1)(B) ....................................... 13

CONCLUSION.................................................................................................................. 15

# TABLE OF AUTHORITIES

**Cases**

*Butte County, CA v. Hogen*, No. 08-519, 2008 WL 2410407 (D.D.C. Jun. 16, 2008) ................. 15

*Ctr. for Biological Diversity v. U.S. E.P.A.*, 274 F.R.D. 305 (D.D.C. 2011) ............................... 14

*Cheyenne River Sioux Tribe v. United States*, 806 F.2d 1046 (Fed. Cir. 1986) ........................... 2

*Crow Tribe of Indians v. Norton*, No. Civ. A. 02-2847, 2006 WL 908048
    (D.D.C. Apr. 7, 2006) ........................................................................................................... 14

*EEOC v. Nat'l Children's Ctr.*, 146 F.3d 1042 (D.C. Cir. 1998) ................................................ 14

*\*Forest County Potawatomi Cmty v. United States*, No. 15-105, ___ F.R.D. ___,
    2016 WL 1465324 (D.D.C. Apr. 14, 2016) ...................................................................... 8, 11

*Foster v. Gueory*, 655 F.2d 1319 (D.C. Cir. 1981) ..................................................................... 12

*\*Fund for Animals v. Norton*, 322 F.3d 728 (D.C. Cir. 2003) ............................................. passim

*In re Vitamins Antitrust Litigation*, No. MISC. 99-197, MDL 1285, 2001 WL 34088808
    (D.D.C. Mar. 19, 2001) ....................................................................................................... 14

*\*Karsner v. Lothian*, 532 F.3d 876 (D.C. Cir. 2008) ............................................................. 8, 11

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .................................................................... 7

*Mass. Schl. Of Law at Andover, Inc. v. United States*, 118 F.3d 776 (D.C. Cir. 1997) ............... 15

*Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060 (D.C. Cir. 1998) .................................................. 7

*Natural Res. Def. Council v. Costle*, 561 F.2d 904 (D.C. Cir. 1977) ......................................... 13

*Nuesse v. Camp*, 385 F.2d 694 (D.C. Cir. 1967) ..................................................................... 9, 13

*Roeder v. Islamic Republic of Iran*, 333 F.3d 228 (D.C. Cir. 2003) ............................................. 7

*SEC v. Prudential Sec. Inc.*, 136 F.3d 143 (D.C. Cir. 1998) ......................................................... 8

*So. Utah Wilderness v. Norton*, No, 01-2518, 2002 WL 32617198 (D.D.C. June 28, 2002) ......... 9

*Sokaogon Chippewa Cmty. v. Babbitt*, 214 F.3d 941 (7th Cir. 2000) ........................................... 7

*South Dakota v. Bourland*, 508 U.S. 679 (1993) ................................................................ 2, 3, 12

*Trobovich v. United Mine Workers*, 404 U.S. 528 (1972) ............................................................. 11

*United States v. Sioux Nation of Indians*, 448 U.S. 371 (1980) ..................................................... 3

**Statutes**

5 U.S.C. §§ 701, et seq. ................................................................................................................ 10

33 U.S.C. § 401, et seq. ................................................................................................................... 5

*33 U.S.C. § 403 ...................................................................................................................... 2, 10

*33 U.S.C. § 408 ...................................................................................................................... 2, 10

*33 U.S.C § 1344 ................................................................................................................. 2, 5, 10

33 U.S.C. § 13111 .......................................................................................................................... 10

42 U.S.C. §§ 4321, et seq. ............................................................................................................... 2

54 U.S.C. § 300320 ........................................................................................................................ 10

*54 U.S.C. § 302707 .................................................................................................................. 9, 14

*54 U.S.C. § 306108 ............................................................................................................... passim

**Rules**

Fed. R. Civ. P. 24 ..................................................................................................................... passim

**Regulations**

33 C.F.R. § 322 ............................................................................................................................. 10

36 C.F.R. § 800.1 .......................................................................................................................... 10

*36 C.F.R. § 800.2 ...................................................................................................................... 9, 14

36 C.F.R § 800.16 ......................................................................................................................... 10

**Other Authorities**

77 Fed. Reg. 10184 (Feb. 21, 2012) ............................................................................ 10

Act of March 2, 1889, 25 Stat. 888 ................................................................................ 3

Flood Control Act of 1944, ch. 665, 58 Stat. 877 .......................................................... 4

Fort Laramie Treaty of 1851, 11 Stat. 749 ............................................................... 2, 12

Fort Laramie Treaty of 1868, 15 Stat. 635 ............................................................... 2, 12

Mary Garrigan, *Ziebach County Still Poorest in America*, Rapid City J., Dec. 10, 2010 ............. 4

MICHAEL L. LAWSON, DAMMED INDIANS REVISITED 25 (2009) ..................................................... 5

## MEMORANDUM OF POINTS AND AUTHORITIES

COMES NOW the Cheyenne River Sioux Tribe ("Tribe") and hereby submits its Memorandum in Support of Motion to Intervene pursuant to Fed. R. Civ. P. 24(a)(2).

## INTRODUCTION

On July 25, 2016, the United States Army Corps of Engineers ("Corps") issued multiple federal authorizations to Dakota Access, LLC ("Dakota Access"), an entity owned by Energy Transfer Partners, L.P., Sunoco Logistics Partners, L.P., and Phillips 66, that Dakota Access required to construct the proposed Dakota Access Pipeline ("DAPL"). ECF No. 7-1 at p. 2 n.1. One of these authorizations permits DAPL to construct the pipeline underneath Lake Oahe, a manmade reservoir created when the Corps inundated hundreds of thousands of acres of Cheyenne River Sioux Tribal lands during the 1950s by construction of the Oahe Dam. The particular permit at issue is known as PCN 4. The PCN 4 site is located on lands that are considered to be sacred by the Cheyenne River Sioux Tribe, on ancestral lands that were later ceded in a series of treaties with the United States and which are rife with culturally important archeological sites and the graves of the Tribe's ancestors. The Tribe considers the waters of Lake Oahe to be sacred and relies upon them for its drinking water and the livelihoods of the Tribal people. PCN 4 permits Dakota Access to dig into these grounds and construct a tunnel that will carry crude oil under the waters. The Tribe considers the destruction of any of its spiritually and culturally significant ancestral lands and any discharges, whether deliberate or accidental, into the sacred waters of the Lake Oahe to be a desecration.

The Tribe further asserts that the Corps has failed to meet its legally required duty to consult with the Tribe regarding the impact of PCN 4 on its cultural and spiritual sites under § 106 the National Historic Preservation Act ("NHPA"), 54 U.S.C. § 306108, the Clean Water Act, 33 U.S.C

§ 1344, and the Rivers and Harbors Act, 33 U.S.C. §§ 403, 408, and further that the Corps did not ensure proper environmental review under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, et seq. These are the claims that the Standing Rock Sioux Tribe has identified in its Complaint filed in this matter on July 27, 2016. ECF No. 1. The Cheyenne River Sioux Tribe does not intend to bring any additional claims. The Cheyenne River Sioux Tribe seeks intervention in this matter to protect its interests with respect to these powerfully important sacred sites.

## FACTUAL BACKGROUND

The Cheyenne River Sioux Tribe is comprised of four of the seven bands of the Lakota[1] Tribe who reside on the Cheyenne River Sioux Indian Reservation in north-central South Dakota: the *Itazipco* or *Sans Arc* band, the *Siha Sapa* or Blackfoot band, the *Oohenumpa* or Two Kettle band, and the *Minnicoujou*. Declaration of Steve Vance ("Vance Decl.") at ¶ 15. The Tribe has approximately 16,000 members, about half of whom presently reside on the Reservation. Declaration of Chairman Harold Frazier ("Frazier Decl.") at ¶ 9. The Tribe and its four bands are successors to the Great Sioux Nation, with which the United States entered into the Fort Laramie Treaty of 1851, 11 Stat. 749, and the Fort Laramie Treaty of 1868, 15 Stat. 635. *See South Dakota v. Bourland*, 508 U.S. 679, 682 (1993); Vance Decl. at ¶ 14. Pursuant to these treaties, the Great Sioux Nation ceded its right to ancestral lands that included a vast territory spanning all of the Dakotas and much of Montana, Wyoming, and Nebraska. *Cheyenne River Sioux Tribe v. United States*, 806 F.2d 1046, 1047 (Fed. Cir. 1986). In exchange, the United States reserved to the Great Sioux Nation for its "absolute and undisturbed use and occupation . . ." "a tract of land bounded

---

[1] Non-Indians and the United States have long referred to the Lakota, Dakota, and Nakota people (tribal peoples that share a similar language and culture) as "Sioux," a word used by another tribe to refer to these people. *See* Cheyenne River Sioux History, http://www.sioux.org/cheyenne-river-sioux-history.html (last accessed Aug. 10, 2016). "Lakota" is used herein to describe the people of the seven bands of the Lakota Tribe, to which the people of the Cheyenne River Sioux and the Standing Rock Sioux Tribes belong.

on the east by the Missouri River, on the south by the northern border of the State of Nebraska, on

the north by the forty-sixth parallel of north latitude, and on the west by the one hundred and fourth

meridian of west longitude. . . ." *United States v. Sioux Nation of Indians*, 448 U.S. 371, 374

(1980) (quoting 15 Stat. 635).   In 1877, after gold had been discovered in the Black Hills within

the Great Sioux Reservation and American prospectors entered the Tribe's territory in violation of

the Treaty, the United States abrogated the Treaty to validate the intrusion and further diminished

the Great Sioux Nation's lands.  *Id.* at 382-84.  The United States Supreme Court later held this

abrogation to have been unlawful.  *Id.*  The present day exterior boundaries of the existing

Cheyenne River Sioux Reservation were established by an additional diminishment effected by

the Act of March 2, 1889, 25 Stat. 888.  *Bourland*, 508 U.S. at 681.  As the four bands of the

Cheyenne River Sioux Tribe are a nomadic people who once ranged the vast territory described

herein, the Tribe's ancestral territory is not limited to the present day exterior boundaries.  Vance

Decl. at ¶¶ 23, 28.

The eastern boundary of the Cheyenne River Sioux Reservation is the Missouri River or

*Mni Sose*.  *Bouland*, 508 U.S. at 683.  The Tribe has relied upon the waters of the Missouri River

for its survival from time immemorial.  Vance Decl. at ¶¶ 9, 16, 20; Declaration of Joye Braun

("Braun Decl.") at ¶ 14.  The very waters of the River are considered by the Tribe to be sacred,

inviolable, and essential to the Lakota way of life.  Vance Decl. at ¶ 17; Braun Decl. at ¶ 14.

Today, the waters of the River are the major source of drinking water for the Tribe and are critical

to agriculture and tourism, the primary industries on this Reservation, which encompasses what

has been determined in recent studies to be the poorest county in the United States with more than

60% of the population living below the poverty line.[2]  Frazier Decl. at ¶¶ 13-16.  Significantly, before inundation, the Missouri River bottomlands provided game, timber, and shelter for the Tribe from time immemorial.  And prior to establishment of the reservations and prior to the arrival of non-Indians in the American West, the Missouri River served as a kind of super highway for the Lakota people and other tribes to travel this country to trade with other tribes, attend spiritual gatherings, and follow game.   Vance Decl. at ¶¶ 16, 20. Consequently, there are uncounted archeological and sacred sites along the banks of the Missouri, including the site of PCN 4 at the confluence of the Missouri and the Cannonball Rivers.  *Id.* at ¶ 20.

PCN 4 is adjacent to the confluence of the Cannonball and Missouri Rivers.  Braun Decl. at ¶ 8.  The Cannonball River is so named because of the presence of a collection of unusual rocks at this site that are of critical spiritual significance to the Tribe.  *Id.* at ¶ 10.  Prior to the damming of the Missouri River, the confluence of the Cannonball and the Missouri Rivers created a kind of whirling hydrological feature that sucked in boulders being forced downstream in high currents, spun the boulders in an eddy until they were smooth and perfectly spherical, and deposited them on the bank.  *Id.*  The people of the Tribe pilgrimaged and worshiped there from time immemorial. *Id.* at ¶ 11.  Community organizers that are members of the Tribe and who are currently occupying the site adjacent to PCN 4 in protest of the proposed pipeline report they have observed Lakota burial cairns, sundance grounds, and other culturally significant material in wide distribution around this area.  *Id.* at ¶ 13.  The sacred stone site at PCN 4 is of especially profound importance to the Tribe because it was spared from the massive deluge that occurred during the 1950s as a result of the Flood Control Act of 1944, ch. 665, 58 Stat. 877, in which the United States directed

---

[2]    Mary Garrigan, *Ziebach County Still Poorest in America*, Rapid City J., Dec. 10, 2010, http://rapidcityjournal.com/news/ziebach-county-still-poorest-in-america/article_eda45bae-040a-11e0-92aa-001cc4c03286.html (last accessed Aug. 10, 2016).

Defendant Army Corps of Engineers to construct a series of dams and reservoirs on the Missouri River that destroyed over 550 square miles of Indian land alone—this figure excludes deluged lands in ancestral territories that went out of tribal ownership in the nineteenth century.  Braun Decl. at ¶ 12; MICHAEL L. LAWSON, DAMMED INDIANS REVISITED 25 (2009).  The Oahe Dam destroyed more Indian land than any other single public works project in the United States.  LAWSON at 25.  The Cheyenne River Sioux Tribe lost 104,420 acres to the deluge, including unfathomed archeological and sacred sites.  *Id.* at 47; Vance Decl. at ¶ 19; Braun Decl. at ¶ 12.

On February 17, 2015, Steve Vance, Tribal Historic Preservation Officer for the Cheyenne River Sioux Tribe, received a letter from the Corps indicating that the Corps was currently evaluating 55 preconstruction notifications ("PCN") pursuant to § 10 of the Rivers and Harbors Act (33 U.S.C. § 401, et seq.) and § 404 of the Clean Water Act (33 U.S.C. § 1344) from DAPL consultants permitting Dakota Access to begin construction of the DAPL project at issue here.  The letter further advised that the Corps was the sole federal agency responsible for conducting consultation with interested tribes in accordance with Section 106 of the NHPA.  Vance Decl. at ¶ 26, Ex. 1.  The purpose of the Corps' letter was to initiate Section 106 consultation and review, determine the Cheyenne River Sioux Tribe's interest in consulting, and to gather information regarding historic properties.  *Id.*  However, since the issuance of the letter, the Corps has failed to engage in meaningful face-to-face government-to-government consultation with the Cheyenne River Sioux Tribe.  Frazier Decl. at ¶ 21; Vance Decl. at ¶ 30.

Although the Corps made some overtures to the Cheyenne River Sioux Tribe to attend general public meetings, including public meetings held in May 2015 and December 2015, specific requests from the Tribe to engage in government-to-government consultation with the Tribe's executive and legislative branches resulted only in a single meeting between Mr. Vance and

representatives of another federal agency in February of 2016.  Vance Decl. at ¶ 27 Exs. 2 and 3; ¶ 32, ¶ 33 Ex. 3; Frazier Decl. at ¶¶ 17-21, Exs. 1-3.  The Corps refused to attend any government-to-government consultation with the Tribe's Chairman and its Tribal Council as specifically and repeatedly requested by the Tribe between March 2015 and July 2016.  Frazier Decl. at ¶¶ 17-21, Exs. 1-3.  Significantly, Tribal officials who attended the public meetings felt that such meetings were not sufficient to meet the Corps' consultation obligations as they either did not provide project information in advance of the meeting or provided insufficient notice of the meetings, and Tribal officials felt they were not, therefore, sufficiently informed to participate in meaningful discussion.  Vance Decl. at ¶ 28 Ex. 4, ¶ 29.

Despite the fact that the Tribe deemed that the Corps has failed to engage in meaningful efforts to consult with it pursuant to Section 106, the Cheyenne River Sioux Tribe attempted at various times to engage in the comment process related to DAPL including, supporting the Standing Rock Sioux Tribe's formal comment to the Corps regarding various aspects of environmental and historic preservation identification concerns previously raised by the Standing Rock Sioux Tribe on August 17, 2015.  These comments included specific questions and concerns regarding geotechnical boring, insufficiencies arising from NEPA environmental review, a need for a Class III Archaeological Study, disagreement with Corps' determinations, and concerns about water quality.  *Id.* at ¶ 28, Ex. 4.  The Tribe further provided the United States Forest Service with comments on the proposed DAPL.  *Id* at ¶ 27, Ex. 3.

Finally, the Tribe has perceived its limited interactions with the Corps to be confusing as it appears that the Corps has attempted to hold out its interactions with one federally-recognized Indian tribe as sufficient to satisfy its consultation with all affected tribes.  For example, at a meeting between the Corps and multiple tribes in 2015, Colonel Henderson indicated that "official

[tribal] consultation started September 2015"; however, this date has no relation to any interactions by the Corps with the Cheyenne River Sioux Tribe.  Vance Decl. at ¶ 27 Ex. 3.

## DISCUSSION

The Cheyenne River Sioux Tribe moves pursuant to Fed. R. Civ. P. 24(a) to intervene in this action as a matter of right.  In the alternative, the Tribe seeks leave of this Court pursuant to Fed. R. Civ. P. 24(b) to intervene permissibly in this action.

## I.      THE CHEYENNE RIVER SIOUX TRIBE SHOULD BE PERMITTED TO INTERVENE AS A MATTER OF RIGHT

Rule 24(a) of the Federal Rules of Civil Procedure provides that, on timely motion, the court must permit anyone to intervene who "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest."  Fed. R. Civ. P. 24(a)(2).  The D.C. Circuit has identified four requirements for intervention as a matter of right:  (1) the motion must be timely; (2) the intervenor must have a "legally protected" interest in the action; (3) the disposition of the action must threaten to impair or impede the intervenor's interest in the action; and (4) the intervenor's interest may not be adequately represented by an existing party.  *E.g.*, *Fund for Animals v. Norton*, 322 F.3d 728, 732 (D.C. Cir. 2003) (citing *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1074 (D.C. Cir. 1998)).  A prospective intervenor must also demonstrate the existence of standing under Article III of the Constitution just like any litigant, demonstrating injury-in-fact, causation, and redressability.  *Id.* at 732-33 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  However, in the D.C. Circuit, successful intervention of right under Rule 24(a) is sufficient to establish Article III standing.  *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 233 (D.C. Cir. 2003) (citing *Sokaogon Chippewa Cmty. v. Babbitt*, 214 F.3d 941, 946 (7th Cir. 2000)).  As such, the Cheyenne River

Sioux Tribe submits that in light of its entitlement to intervention as of right, discussed below, it also enjoys Article III standing in this matter.

### a.     The Cheyenne River Sioux Tribe's Motion Is Timely

Fed R. Civ. P. 24(a) requires that a motion to intervene must be timely.  Timeliness is a "context-specific inquiry" that considers the time elapsed since commencement of the action, risk of prejudice to existing parties, the purpose for which intervention is sought, and the need for intervention to preserve an intervenor's rights.  *Karsner v. Lothian*, 532 F.3d 876, 885-86 (D.C. Cir. 2008).  An intervenor-plaintiff's motion to intervene is timely when it is filed early in the proceeding, especially before defendants have filed an answer.  *Fund for Animals*, 332 F.3d at 735 (finding a motion to intervene was timely filed when it was filed before defendants filed their answer); *see also Forest County Potawatomi Comty.  v. United States*, No. 15-105, ___ F.R.D. ___, 2016 WL 1465324, at *6 (D.D.C. Apr. 14, 2016) (finding a motion to intervene timely that was filed before defendants filed their answer).  The instant motion has been filed a mere 14 days after the filing of the Standing Rock Sioux Tribe's Complaint (ECF No. 1), five days after the filing of Intervenor-Defendants successful motion to intervene (ECF Nos) and prior to the filing of any answer.  Consequently, there is no risk of prejudice to any party, and this motion is timely.

### b.     The Cheyenne River Sioux Tribe Has a Legally Protected Interest in this Suit to Enjoin the Corps from Harming Its Sacred Sites, Ancestral, Lands, and the Health and Welfare of Its Members

The second prong requires an intervenor to demonstrate a "legally protected" interest in the action.  *Karsner*, 532 F.3d at 885 (citing *SEC v. Prudential Sec. Inc.*, 136 F.3d 143, 156 (D.C. Cir. 1998)).  Courts evaluate this prong under a liberal standard, aiming to "involve as many apparently concerned persons as is compatible with efficiency and due process." *Nuesse v. Camp*,

385 F.2d 694, 700 (D.C. Cir. 1967); *see also So. Utah Wilderness v. Norton*, No, 01-2518, 2002 WL 32617198, *5 (D.D.C. June 28, 2002).

The Cheyenne River Sioux Tribe has a legally protected right in this proceeding.  As set forth herein, PCN 4 and the areas surrounding it are not only within the Tribe's ancestral and treaty-based lands, but PCN 4 is also directly adjacent to a recognized Tribal sacred site:  the sacred stones site at the confluence of the Cannonball and Missouri Rivers.  Vance Decl. at ¶¶ 14, 20, 23, 28; Braun Decl. at ¶¶ 10-13.  Under Section 106 of the National Historic Preservation Act ("NHPA"), the Corps was required to take into consideration the effects of the pipeline site on historic properties.  54 U.S.C. § 306108.  This process obligated the Corps to consult with Indian tribes prior to granting the permit on the extent to which the permit would affect sites that are culturally or spiritually significant to those tribes even if those sites are on ancestral or ceded lands.  36 C.F.R. § 800.2(c)(2)(II)(D); 54 U.S.C. § 302707.  Section 106 imposed upon the Corps the duty to provide the Cheyenne River Sioux Tribe with "a reasonable opportunity" to identify historic properties and its concerns related thereto, to advise on identification and evaluation, to articulate its views on the effects of the permit, and to participate in the resolution of adverse effects.  36 C.F.R. § 800.2(c)(ii)(A).  This obligation includes the duty to use a "reasonable and good faith effort" to consult with tribes in a "manner respectful of tribal sovereignty."  *Id*. § 800.2(c)(2)(II)(B).

Like the Standing Rock Sioux Tribe, moreover, the Cheyenne River Sioux Tribe also has a legally protected interest arising under the Clean Water Act and the Rivers and Harbors Act because of their historical and cultural connection to PCN 4, and also because of their interest in the waters of Lake Oahe.  First, as alleged in the Standing Rock Sioux Tribe's Complaint, the Clean Water Act and the Rivers and Harbors Act both authorize the Corps to issue permits for

projects that will discharge into waters of the United States (33 U.S.C. §§ 13111(a); 1344(a)-(e)) and permits to tunnel under navigable waters (33 U.S.C. §§ 403, 408; 33 C.F.R. § 322.3(a)). The Corps issued a set of general nationwide permits under these authorities in February 2012 (77 Fed. Reg. 10184 (Feb. 21, 2012)), an action that constituted a federal undertaking under the NHPA. 54 U.S.C. § 300320; 36 C.F.R § 800.16(y). As such, issuance of this NWP required the Corps to consult with tribes, including the Cheyenne River Sioux Tribe, regarding effects on historic properties under Section 106 of the NHPA prior to issuance. 54 U.S.C. § 306108; 36 C.F.R. § 800.1(c). The Corps did none of these things prior to issuing the permit in 2012.

Second, as alleged in the Standing Rock Sioux Tribe's Complaint, § 408 of the Rivers and Harbor Act requires the Corps to issue a separate permit for any undertaking that proposes to "build upon, alter, deface, destroy, move, injure, obstruct by fastening vessels thereto or otherwise, or in any manner whatever impair the usefulness of any sea wall, bulkhead, jetty, dike, levee, wharf, pier, or other work built by the United States . . . ." 33 U.S.C. § 408. The § 408 permit in this matter triggered an environmental review under the National Environmental Policy Act ("NEPA"). Like the Standing Rock Sioux Tribe, the Cheyenne River Sioux Tribe has communicated with the Corps and other agencies concerning the deficiencies in the environmental review process and has objected to the use of an Environmental Assessment rather than an Environmental Impact study and the Corps' Finding of No Significant Impact, issues that greatly concern the Tribe in light of the fact that any discharges or spills flow directly into the Tribe's drinking water in Lake Oahe.

The Administrative Procedures Act, 5 U.S.C. §§ 701, et seq., provides a cause of action for the Cheyenne River Sioux Tribe to protect its interests under the NPHA, Clean Water Act, Rivers and Harbors Act, and NEPA.

> **c.** **The Disposition of this Action Concerning Federal Permitting of the Dakota Access Pipeline Threatens to Impair the Cheyenne River Sioux Tribe's Interest in Its Sacred Sites, Ancestral Lands, and the Health and Welfare of Its Members**

The third prong requires the intervenor to demonstrate that disposition of the action has the potential to threaten or impair the intervenor's proffered interest in the action. *Karsner*, 532 F.3d at 885. This inquiry is not rigid, rather it looks to the "practical consequences of denying intervention, even where the possibility of future challenge to the regulation remains available." *Fund for Animals*, 322 F.3d at 735; *see also Forest County Potawatomi*, 2016 WL 1465324, at *3. This is especially true where it would be difficult to reestablish the status quo after a court ruling against the proposed intervenor's favor. *Fund for Animals*, 322 at 735 ("Regardless of whether [proposed intervenor] could reverse an unfavorable ruling by bringing a separate lawsuit, there is no question that the task of reestablishing the status quo . . . will be difficult and burdensome.").

In the instant matter, if the Court denies the Standing Rock Sioux Tribe's motion for Preliminary Injunction, it will issue an order permitting the DAPL to proceed with construction of the pipeline that could cause immediate harm to the Tribe's sacred sites and potential harm to the waters upon which it relies for its health and well-being. Even if the Tribe were able to reverse such a ruling in a separate lawsuit, reestablishing the status quo—undigging the pipeline—would be difficult and burdensome, if not impossible.

> **d.** **The Cheyenne River Sioux Tribe's Interests Are Not Adequately Protected by the Standing Rock Sioux Tribe**

The United States Supreme Court has held that intervenors must only make a *de minimis* showing that its interests will not be adequately represented under Fed. R. Civ. P. 24(a) in order to succeed on a motion to intervene. *Trobovich v. United Mine Workers*, 404 U.S. 528, 538 n. 10 (1972); *Fund for Animals*, 322 F.3d at 735. A petitioner "ordinarily should be allowed to intervene

unless it is clear that the party will provide adequate representation for the absentee." *Fund for Animals*, 322 F.3d at 735 (quoting *Foster v. Gueory*, 655 F.2d 1319, 1325 (D.C. Cir. 1981).

The Cheyenne River Sioux Tribe and the Standing Rock Sioux Tribe are sister Tribes. Two of seven bands of Lakota reside on the Standing Rock Sioux Reservation, the *Hunkpapa* and the *Siha Sapa*. *See* http//www.standingrock.org/history.html (last accessed Aug. 10, 2016). Members of the *Siha Sapa* band also reside on the Cheyenne River Sioux Reservation. The Standing Rock Sioux Reservation is adjacent to the Cheyenne River Sioux Reservation to the north and both tribes are bordered by the Missouri River to the east. See *Bourland*, 508 U.S. at 683. The two Tribes share a language and culture, and they are both successors to the Great Sioux Nation and signatories to the 1851 and 1868 Treaties of Fort Laramie.

Despite their similarities, however, the two Tribes are separate sovereign nations with separate sovereign governments. They have separate present-day geographical territory; and the *Hunkpapa, Siha Sapa, Minnicoujou, Oohenumpa,* and *Itazipco* bands have been separate and distinct from one another since before recorded history. In short, although the two Tribes share much, their present-day government and geography, their history, and their relationship to the land and the River are distinct. In the event that this Court enters an injunction in this matter, the contours of such relief has the potential to affect the Cheyenne River Sioux Tribe differently than the Standing Rock Sioux Tribe. Moreover, the Tribe has had its own separate relationship and interactions with Defendant Corps throughout this process. As the two tribes are separate sovereigns, the Corps had an independent duty to consult with the Cheyenne River Sioux Tribe. The extent of the Corps' consultation efforts with the Cheyenne River Sioux Tribe ("CRST") was dramatically different than its efforts with the Standing Rock Sioux Tribe ("SRST"). The Corps apparently regarded its interactions with the SRST to be sufficient to satisfy some of its

12

consultation duties with the CRST and thus accomplished very little consultation with the CRST. As these deficiencies were fact-specific and unique to the CRST-Corps interaction, the SRST cannot adequately represent CRST's interests.

The D.C. Circuit Court of Appeals has held that "[a]lthough there may be a partial congruence of interests, that does not guarantee the adequacy of representation." *Fund for Animals*, 322 F.3d at 737. Further, the interests of an intervenor need not be wholly adverse as "even a shared general agreement does not necessarily ensure agreement in all particular respects and the tactical similarity of the present legal contentions of the parties does not assure adequacy of representation or necessarily preclude the intervenor from the opportunity to appear in its own behalf." *Id.* (quoting *Natural Res. Def. Council v. Costle*, 561 F.2d 904, 912 (D.C. Cir. 1977); *Neusse v. Camp*, 385 F.2d 694, 703 (D.C. Cir. 1967). This must be especially so when the existing party is one government and the proposed intervenor is a sister government with separate territory, structure, and citizenship as here. Notwithstanding any congruency between the two parties, the possible circumstances under which the two might diverge in interest and litigation strategy is easy to conceive. In light of the permissive standard under this prong, the facts at issue here and the relationship between the two Tribes easily demonstrates that the Standing Rock Sioux Tribe will not adequately represent the Cheyenne River Sioux Tribe's interests and the Cheyenne River Sioux Tribe is entitled to intervene in this matter as of right.

## II.   ALTERNATIVELY, THE CHEYENNE RIVER SIOUX TRIBE SHOULD BE PERMITTED TO INTERVENE UNDER RULE 24(b)(1)(B)

For the reasons discussed above, the Cheyenne River Sioux Tribe should be entitled to intervene as a matter of right. Should the Court find otherwise, then the Tribe respectfully moves for permissive intervention pursuant to Fed. R. Civ. P. 24(b), which empowers this Court to allow timely intervention where the proposed intervenor "has a claim or defense that shares with the

main action a common question of law or fact."  This jurisdiction applies a "flexible reading of Rule 24(b)" that gives the "Court considerable latitude to grant or deny intervention based on the particular circumstances of the case."  *Ctr. for Biological Diversity v. E.P.A.*, 274 F.R.D. 305 (D.D.C. 2011) (citing *EEOC v. Nat'l Children's Ctr.*, 146 F.3d 1042, 1046 (D.C. Cir. 1998); *Crow Tribe of Indians v. Norton*, No. Civ. A. 02-2847, 2006 WL 908048, at *2 (D.D.C. Apr. 7, 2006) (internal quotation marks omitted)).  "The requirements for permissive intervention . . . are to be construed liberally, with all doubts resolved in favor of permitting intervention."  *In re Vitamins Antitrust Litigation*, No. MISC. 99-197, MDL 1285, 2001 WL 34088808, * 3 (D.D.C. Mar. 19, 2001) (internal quotation marks omitted).

Permissive intervention is governed by three traditional requirements, all of which the Cheyenne River Sioux Tribe meets.  First, there must be an independent basis for subject matter jurisdiction.  *Nat'l Children's Ctr.*, 146 F.3d at 1046.  The Corps had an independent duty under Section 106 of the NHPA to consult with the Cheyenne River Sioux Tribe regarding historical and cultural sites in the PCN 4 area because they were on ceded and ancestral lands of the Tribe as successors to the Great Sioux Nation and the treaties entered into by that Nation.  *See* 36 C.F.R. § 800.2(c)(2)(II)(D); 54 U.S.C. § 302707.  Likewise, an independent basis for jurisdiction exists deriving from the fact that the Tribe draws its drinking water and the waters that support its economy from the body of water under which DAPL has proposed to tunnel.  Second, the motion to intervene permissively must be timely.  *Nat'l Children's Ctr.*, 146 F.3d at 1046.  As discussed above, this motion is filed a mere 14 days after filing of the initial Complaint in this matter, prior to the filing of any answer, and five days after the filing of Intervenor-Defendant's successfully filed motion to intervene.  This motion is timely.  Finally, the Court must consider whether the requested intervention will unduly delay or prejudice the original parties.  *Id.*  The D.C. Circuit

has explained that the "delay or prejudice" standard is intended to consider the potential consequences of "piling on parties," as well as "issue proliferation and confusion," that could result from intervention. *Butte County v. Hogen*, No. 08-519, 2008 WL 2410407, *3 (D.D.C. Jun. 16, 2008) (quoting *Mass. Schl. Of Law at Andover, Inc. v. United States*, 118 F.3d 776, 782 (D.C. Cir. 1997)).  Risks of delay and prejudice are minimal in cases where, as here, the proposed intervenor does not seek to add new claims and, therefore, requires no additional discovery. *Butte County,* 2008 WL 2410407, *3.

As set forth above, permissive intervention in the instant matter is also warranted.

## CONCLUSION

For the foregoing reasons, the Cheyenne River Sioux Tribe respectfully requests this Court to grant its Motion to Intervene as or right, or in the alternative, permissively.


Dated:  August 10, 2016

> CHEYENNE RIVER SIOUX TRIBE, Intervenor-Plaintiff-Applicant,
>
> By:   /s/ Conly J. Schulte
> Conly J. Schulte
> FREDERICKS PEEBLES & MORGAN LLP
> 1900 Plaza Drive
> Louisville, CO  80027
> Telephone:  (303) 673-9600
> Facsimile:  (303) 673-9839
> Email:  cschulte@ndnlaw.com
>
> Nicole E. Ducheneaux, *Pro Hac Vice Pending*
> FREDERICKS PEEBLES & MORGAN LLP
> 3610 North 163rd Plaza
> Omaha, NE  68116
> Telephone:  (402) 333-4053
> Facsimile:  (402) 333-4761
> Email:  nducheneaux@ndnlaw.com

15

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 10th day of August, 2016, a copy of the foregoing was filed electronically with the Clerk of the Court.  The electronic filing prompted automatic service of the filing to all counsel of record in this case who have obtained CM/ECF passwords.

I FURTHER CERTIFY that on August 10, 2016, true and correct copies were served on the following via Federal Express overnight mail:

| | |
|---|---|
| Office of the Attorney for the<br>District of Columbia<br>441 Fourth Street NW<br>Washington, DC  20001 | Milton Boyd<br>U.S. Army Corps of Engineers<br>441 G Street NW<br>Washington, DC  20314-1000 |
| U.S. Attorney's Office<br>Attn: Civil Process Clerk<br>555 Fourth Street NW<br>Washington, DC  20530 | Office of the Attorney General<br>1350 Pennsylvania Avenue NW, Suite 409<br>Washington, DC  20004 |

A courtesy copy was sent via email to Michael Thorp, counsel for U.S. Department of Justice Environment and Natural Resources Division at michael.thorp@usdoj.gov.

/s/ Conly J. Schulte

16