## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STANDING ROCK SIOUX TRIBE,** | |
| **Plaintiff,** | **Case No. 1:16-cv-1534-JEB** |
| **v.** | |
| **U.S. ARMY CORPS OF ENGINEERS,** | |
| **Defendant.** | |

### DECLARATION OF TRIBAL HISTORICAL PRESERVATION OFFICER STEVE VANCE IN SUPPORT OF CHEYENNE RIVER SIOUX TRIBE'S UNOPPOSED MOTION TO INTERVENE AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO INTERVENE

1. The information contained herein is based on my personal knowledge, and I am competent to testify to the contents contained herein if I am called to do so in any proceeding.

2. My name is Steve Vance. I am an enrolled member of the Cheyenne River Sioux Tribe and am the duly appointed Tribal Historic Preservation Officer ("THPO"). I have served as the THPO for the last six years since Cheyenne River Sioux Tribal Council asked me to serve in the position in 2010.

3. I have a long history serving the Tribe and preserving traditional culture. Prior to accepting the post as the THPO, I served in the United States Military and then returned to the Cheyenne River Sioux Reservation in 1976. Off and on, from 1982-1995, I acted as a Tribal Police Officer of Cheyenne River Sioux Tribe's Law Enforcement Division eventually becoming state certified and a Senior Officer. In 1995, I became a state-certified teacher and taught traditional language, culture, and history to grades K-12. In 2001, I returned to Law Enforcement as the Indian Highway Safety Officer for three (3) years. I have significant knowledge of the Cheyenne River Sioux Tribe's oral history, cultural and spiritual laws, and historical documentation.

1

4.      When appointed by the Tribe, I was honored to serve as the Tribe's THPO because it is critical for Cheyenne River Sioux Tribe to participate in its own preservation and protection. Through historical preservation, the Tribe has the opportunity to record its own culture, preserve its history for future generations, and provide an account based on traditional interpretation and understanding.

5.      Historic Preservation was once under the purview of the State of South Dakota, but in the early 1990s, Cheyenne River Sioux Tribe was one of few tribes to assume what was traditionally the state historic preservation officer position. Cheyenne River Sioux Tribe assumed all functions of the Historic Preservation Office and now fulfills all compliance measures of such office.

6.      The THPO is authorized by the National Historic Preservation Act 1992 amendments to include the Native American Graves Protection and Repatriation Act, Archaeological Resources Protection Act, and Antiquities Act of 1906.

7.      The THPO is essentially a regulatory Officer that manages and protects cultural resources, sacred areas, and sites within the exterior boundaries of the Cheyenne River Sioux Tribe's Reservation; however, Historic Preservation is essential to telling our own story and maintaining cultural identity.

8.      The Cheyenne River Sioux Tribe's THPO manages the review of nearly three million acres of land on limited budget and a sole staff member. Such limited resources means that only a small percentage of such property to be reviewed each year. Surveying property with ongoing construction or land alteration projects takes precedence over more established areas of the Reservation.

9.      As the THPO, I survey the Cheyenne River Sioux Tribe's Reservation acreage, draft accomplishment reports and inventories on such surveys, identify eligible properties and submit applications for consideration for the National Registry, file annual reports on property and historic sites, maintain an inventory on cultural properties, and apply for annual funding.  In addition to surveying the Cheyenne River Sioux Tribe's Reservation property, I am also in charge of examining potential sites of historical significance that are uncovered in the course of building, and assessing potential damages to such sites.

10.     Serving as the THPO, for me, has a connection to traditional and natural law.  Long before Columbus landed in North America or Lewis and Clark explored what they knew as the Louisiana Purchase, the Sioux people lived and thrived along what is now known as the Missouri River.  Traditionally, Native people are from the earth and, therefore, have a responsibility to care for the earth.  Even today, caring for the earth is essential to Tribal culture.  Traditional ways tell us that where we must take from the land, we also have to put something back.

11.     As the THPO, my job is not only to preserve culturally important historical sites, but also to preserve our culture and make a better life for the next generation.  Historical Preservation should at least provide for future generations what the Elders left for us if not more.

12.     The Sioux are comprised of three distinct groups of people: the Lakota, Dakota, and Nakota, each having slightly different language dialects.

13.     The Cheyenne River Sioux Tribe and its people have been present on the land currently known as the Cheyenne River Sioux Indian Reservation since before the creation of the United States of America and their presence spans into time immemorial.

14.     Prior to reservations, the Lakota bands placed within this reservation had no boundary to their territory.  The bands were hunters that traveled over their ancestral homelands in search of their main food source, the American bison or buffalo.

15.     The present land base of the Cheyenne River Sioux Indian Reservation was established by the 1868 Fort Laramie Treaty.  The Sioux Agreement Act of 1889 set the current reservation boundary lines so that the reservation is located within the exterior boundaries of South Dakota.

16.     Geographically, four Lakota bands, the *Minnicoujou*, *Itazipco*, *Siha Sapa*, and *Oohenumpa*, are now located on the land known currently as the Cheyenne River Indian Reservation.

17.     Since time immemorial, the Sioux people, including the Cheyenne River Sioux today, have associated the Missouri River with a "blood line."  The Tribe has relied upon the Missouri River to serve as a highway from its headwaters in Montana down to where it flows into the Mississippi.  Oral tradition discusses the Missouri River as a location for bartering and trade, ceremonies, and communication.  Likewise, the Missouri River bottomlands have provided game, timber, and shelter.

18.     As a "blood line" of the Lakota people, the waters of the Missouri River, itself, are considered to be sacred, inviolable, and essential to the Lakota way of life.

19.     Upon assuming the duties of THPO, I became familiar with the intricacies of Historic Preservation and have since consulted with several State and Federal Agencies in an effort to fulfill Section 106 Processes.  My familiarity of the Section 106 Processes and review of documentation surrounding the Dakota Access Pipeline ("DAPL") made it clear that the Section

106 Process being implemented by the Army Corps of Engineers ("Corps") was fundamentally flawed.

20.     The Tribe suffered greatly in the building of the Oahe Dam.  The Dam destroyed more Indian land than any other single public works project in the history of the United States. The Cheyenne River Sioux Tribe lost 104,420 acres, including unfathomable numbers of historic archeological and sacred sites.

21.     Proper Section 106 Processes are essential to Historic Preservation because, since time immemorial, areas of confluence, like PCN 4 site where the Cannonball River flows into the Missouri River, were traditional points of intersection for the Lakota people as well as the other tribes to trade, attend cultural events, engage in disputes, attend spiritual gatherings.  In fact, there is documentation that the Sioux people traversed the entire area being proposed for the DAPL, from North Dakota to Illinois.  Historically, Sioux peoples regularly traveled along the Missouri River, so it is likely that historic sites lie in multiple locations along the river, including at the site of PCN 4.  As this area has not yet been inspected for historically significant items, and without observing the proper Section 106 procedures, there will likely be significant damage to historically important sites.

22.     Projects affecting the Missouri River have a wider impact and longer lasting effects than centered solely on the immediate crossing location.  The project should be viewed as a whole and not an isolated event.

23.     The original DAPL plan slated the pipeline to cross the Missouri River North of Bismarck, North Dakota.  However, due to local discontent, the Missouri River crossing was moved South to its present planned location, which lies immediately north of the Cheyenne River Sioux Tribe's Reservation.  Although the crossing is not within the Reservation boundaries, its

short distance upstream will have immediate impact on the Cheyenne River Sioux Tribe. All digging, dredging, and filling that occurs upstream will run down the Missouri River and have a lasting impact on the Reservation.

24.     As mentioned above, the Sioux people have a history of traversing the entire land area where the DAPL is intended to be placed, including grounds in North Dakota, South Dakota, Iowa, and Illinois. Even at its strongest, Section 106 is not prepared to evaluate the significance of traditional tribal land as a whole because Native Plains people were inherently transitory. Traditional Sioux people were not confined to the land that amounts to the present Cheyenne River Sioux Reservation, so historical preservation is not limited to the Cheyenne River Sioux Tribe's Reservation boundaries. For example, in my position as THPO, I have participated in many historical preservation trips as far reaching as North Carolina where artifacts were discovered associated with the Sioux people. However, although Section 106 may be limited in scope, the Section 106 Processes are significantly important to preserving the Tribe's history and culture, and such Processes must be observed.

25.     Lead Federal Agencies, such as the Corps and the United States Fish and Wildlife Services, are responsible for conducting government- to-government tribal consultations regarding their federal actions on the DAPL Project.

26.     The Corps Omaha District contacted me via letter on February 17, 2015 stating that the Corps was currently evaluating 55 pre-construction notifications for the DAPL Project. The letter further advised that the Corps was interested in consultation with interested Tribes pursuant to Section 106 of the National Historic Preservation Act. A true and correct copy of USACE's February 17, 2015 Letter to Vance is attached hereto as **"Exhibit 1."**

27.     The Corps provided notice for general public hearings to be held in May and December 2015 to address the DAPL proposals for installation of crude oil transmission lines across Lake Sakakawea and Lake Oahe.  A true and correct copy of the May 2015 Notice is attached hereto as **"Exhibit 2."**  A true and correct copy of Vance's July 6, 2016 Letter to Van Ness is attached hereto as **"Exhibit 3."**

28.     The Cheyenne River Sioux Tribe attempted to take part in the comment process by supporting Standing Rock Sioux Tribe's formal comment to the Corps regarding various environmental and historic preservation identification concerns, but Cheyenne River Sioux Tribe's concerns were never addressed by the Corps.  A true and correct copy of Vance's August 17, 2015 Letter to Harnois is attached hereto as **"Exhibit 4."**

29.     On December 8, 2015, the Corps held a "comment resolution" meeting in Sioux Falls, South Dakota.  However, the Tribes in attendance only received an agenda.  Tribes did not receive any project information; they did not receive studies, surveys, or maps.  Instead, the Corps claimed that the reports were sent to the Tribes via an internet link; however, Tribes were unable to access the link provided.  DAPL later presented the Tribes with the documentation on an electronic jump drive, which was not conducive to immediate review.  The December 8, 2015 meeting was completely ineffective.  The Corps scheduled another meeting in Sioux Falls, South Dakota only nineteen (19) days after the first meeting.  The information previously provided by the DAPL was extensive as it covered Class III Cultural Resource Reports for North Dakota, South Dakota, Iowa, and Illinois.  Section 106 requires a thirty (30) day response period for review of reports.  Cheyenne River Sioux Tribe did not attend the December 27, 2015 meeting because it had not completed review of the materials, and the notice by the Corps was defective under Section 106. *See* Exhibit 3.

30.     Cheyenne River Sioux Tribe's communications with the Corps has not been fruitful.  Section 106 requires meaningful consultation with Tribes affected by a project.  The Corps, even after several communication attempts by Cheyenne River Sioux Tribe, never engaged in a face-to-face consultation with the Tribe.  Neither has the Corps ever specifically addressed Cheyenne River Sioux Tribe's concerns.

31.     The Corps has failed to meet its Section 106 obligations because it has not had meaningful government-to-government relations with Cheyenne River Sioux Tribe.  The Corps did not properly consult with the Tribe, but rather contracted with a third party archaeological firm, with which the Tribe has not agreed to formal communications.  Communications with a third party delegate are not sufficient to comply with Section 106.  A true and correct copy of Vance's August 3, 2016 Email to Chairman Frazier and Matt Vogel is attached hereto as **"Exhibit 5."**

32.     Cheyenne River Sioux Tribe repeatedly requested in-person government-to-government consultation with the Corps, but such meeting never took place.  As the Corps never engaged in formal communications pursuant to Section 106, Cheyenne River Sioux Tribe refused to engage in any of the advanced Section 106 Processes, such as site visits because such determinations were premature to the actual status of the DAPL Project.

33.     Lands surrounding the DAPL Project likely involves review by other government agencies, such as the United States Fish and Wildlife and the Environmental Protection Agency.  The Tribe drafted comments to the United States Fish and Wildlife Service in October 2015; the agency did not consult Cheyenne River Sioux Tribe until February of 2016.  *See* Exhibit 3.

34.     A large portion of the pipeline will cross private lands to which the Cheyenne River Sioux Tribe's Historic Preservation Office does not have access.  This THPO was never afforded the opportunity to consult with the Corps or DAPL in the development of the draft Environmental

Assessment, nor were we afforded the opportunity to assist in identifying sites of religious and cultural significance to our people.

35.     It is imperative that federal agencies when initiating Section 106 consultations identify tribes as consulting parties to assist with identifying the Areas of Potential Affect and to identify sites of religious and cultural significance to the tribes.  I regularly see a large number of sites that are recorded as ineligible or unevaluated in the 2015 Cultural Resource Report prepared by DAPL's consultants because non-tribal archeologists do not have the ability to properly assess sites that they list as ineligible and/or unevaluated.  In effect, important sites lack federal protection, and development is allowed to cause irreparable harm to these sites.  Without tribal participation in consultation we will continue to see adverse effects on sites.

36.     The DAPL will cause direct damage to the Cheyenne River Sioux Reservation in the form of run off, silt movement, drainage contamination, and oil pipeline leaks.  Although oil pipeline materials are manufactured to the highest quality that they have ever been, there is still a potential for leakage.  Energy Transfer Partners, parent company of Dakota Access, LLC, assures that they are safe, and yet we hear quite regularly of pipeline leaks.  As a historical example, in the 1800s, gold mining occurred along the Cheyenne River, which is the southernmost boundary of the Reservation.  As a result of the Homestake Gold Mine, the Cheyenne River is still contaminated today with arsenic material.  It was not until much later the extent of the damage was known, but now the damage is irreversible.  The DAPL will cause significant damage, it is just a matter of when.  As THPO, it is my duty to protect Cheyenne River Sioux Tribe's future generations from such certain harm.

37.     The DAPL's plan for dealing with "inadvertent discoveries" during pipeline construction is not a substitute for proper consultation and identification because it is unlikely that

a pipeline construction worker will be able to properly identify places of historical significance before its complete destruction. Western interpretation of tribal sites worthy of historic preservation is inadequate. Full cultural surveys take time, time that is not allowed under the strenuous DAPL timeline.

38.    THPOs have allowed Cheyenne River Sioux Tribe to find ourselves as a people and find the culture. It is imperative that we the Sioux people control our own narrative. Non-Tribal archeologists do not have the ability to identify and evaluate sites of religious and cultural significance to the tribes.

39.    It is my personal and professional opinion that the DAPL will very likely destroy sites that are of great religious and cultural significance to the Cheyenne River Sioux Tribe. Failure to acknowledge the federal historical preservation statutes and failure to follow Section 106 Processes during the construction of the DAPL is unlawful and will destroy historical and cultural artifacts. Some of the sites are identified but deemed ineligible for protection by people who are not competent to make that decision. Other sites remain undiscovered because there has never been a proper Tribal survey.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: August 9, 2016

Steve Vance,
Tribal Historic Preservation Officer,
Cheyenne River Sioux Tribe

10