IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE, | Case No. 1:16-cv-1534-JEB |
| Plaintiff, | |
| v. | |
| U.S. ARMY CORPS OF ENGINEERS, | |
| Defendant. | |

**DECLARATION OF TIM MENTZ, SR. IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION**

I.     QUALIFICATIONS AND RELEVANT EXPERIENCE

1.     My name is Tim Mentz Sr.  I am an enrolled member, blood affiliation of

*Hunkpapa* and *Pa Baksa* (Cuthead Dakota) bands, of the Standing Rock Sioux Tribe (SRST).  I

have lived most of my entire life on the Standing Rock Reservation.  I was born on March 9,

1954, at home in a two-room log house along the Missouri River in the Cannon Ball district, one

of eight communities on the Standing Rock Reservation.  I currently reside in the district of Long

Soldier which is part of the city of Fort Yates, North Dakota.

2.     I worked for the SRST for 39 years, starting in the spring of 1977 in various

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

positions until 2008.  In the spring of 1996 the SRST submitted an application to the National

Park Service (NPS) to assume certain responsibilities from the State Historic Preservation

Officers (SHPO) from both North and South Dakota as provided in the 1992 amendments to the

National Historic Preservation Act (NHPA).  The SRST was the first federally recognized Tribe

in the Nation to be certified to assume all SHPO responsibilities from both States; and I was

appointed by my Tribe and recognized by NPS as the first certified Tribal Historic Preservation

Officer (THPO) in the Nation in the fall of 1996.  In August, 2008 I resigned my position as

THPO for health reasons, completing 12 years of service as THPO for the SRST.

    3.     I also served on the Tribal Council for Standing Rock tribal government from

1991 to 1995.  During my term on Tribal Council, I assisted in pushing the 1992 amendments to

the NHPA that established Tribes assuming SHPO responsibilities to Section 106.  I pursued

these responsibilities because of my family ties to the land areas that were identified by the bands

as Dakota territory which is in North and South Dakota, Minnesota and Iowa including parts of

Canada.  Within these areas are the tangible evidence of our people who used *Inyan* (stone) in

conducting spiritual ceremonies and guided our way of life.  These are the stone features that

have some recordings in the archaeological reports of DAPL, i.e., stone rings, stone effigies,

stone alignments, rock cairns to name a few that are numerous in these areas.  I was fortunate to

be born into a family who were society leaders of a warrior society (Red Hand Society) specific

to our family, who knew where each band had their stone feature sites or commonly referred to

as sacred sites.  We knew our land very well.

    4.     In the spring of 2009 our family started a business registered in the State of North

Dakota as Mentz-Wilson Consultants, LLC; dba is Makoche Wowapi.  Currently, our company

has been working in Cultural Resource Management (CRM) in the Great Plains for 7 years as

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

consultants in the fields of Archaeology and Tribal Cultural Resource Management conducting

archaeological and/or Tribal identification survey work within the States of North and South

Dakota, Minnesota and Iowa.  We have documented and recorded thousands of "historic

properties of religious and cultural significance to tribes" primarily in the bakken region and

west and east of the Missouri River.

5.      In 2014, the Standing Rock Sioux Tribe (SRST) passed a resolution that

establishes Makoche Wowapi as their preferred contractor for all Federal, State, Tribal and

Private Undertakings within our aboriginal homelands regardless of location.  We have

represented the Standing Rock Sioux Tribe in the identification process through surveying within

and outside the reservation boundaries administering that responsibility to find stone feature sites

or areas significant to the SRST.  We have extensive experience assisting in the THPO and

government-to-government consultation and I have assisted other *Oceti Sakowin* tribal THPOs in

addressing the identification and evaluation process for our sites to be listed on the National

Register of Historic Places.  Most projects we service are federal projects that have a federal

nexus or specific to federal land managing agencies complying with the NHPA.

6.      I have 31 years' experience in CRM working in six states as well as Canada,

conducting or participating in the archaeological work and in the identification of religious and

cultural significant historic properties.  Together with my wife, who co-owns the business, I

maintain a staff of 15 individuals with most staff having 7 years or more of experience in

surveying specific sites and in identification and recordation of sites significance to the SRST.

My title in the business is Projects Manager for all proposed Federal, State, County, Private and

Tribal Undertakings conducting and managing field surveys. I have National Environmental

Policy Act (NEPA) training and advanced NEPA training provided by Region 8, EPA in Denver,

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

Colorado.  I also attended training in Section 106 provided by the Advisory Council on Historic

Preservation (ACHP) and have been a trainer in Section 106; assisted the Federal Law

Enforcement Training Center in providing Archeological Resources Protection Act training for 2

years on the Standing Rock Reservation for regional law enforcement, THPO tribal monitors and

Federal and State Game and Fish wardens.  We also assisted THPOs and entities in survey work

to meet the requirements in particular to the identification of "historic properties of religious and

cultural significance" to Tribes as provided in Section 101(d)(6)(B) of the NHPA.  This allows

the Federal agencies to have this data our company generates from the identification phase to

assist in the consultation requirements between Federal agency officials and Tribes on any

Federal undertaking and within the evaluation process in Section 106.

      7.      I have reviewed several documents related to the Dakota Access Pipeline

(DAPL), including the Environmental Assessment of the Army Corps of Engineers and the U.S.

Fish and Wildlife Service; and reviewed the Class III Archaeological Reports generated by the

consulting firms in segments of the entire 1,200 mile route of the proposed Dakota Access

Pipeline.  I have reviewed the documents the consultants submitted especially reviewing their

determinations and recommendations to the lead federal agency.  I have also reviewed the

determinations of effects letters generated by Army Corps and U.S. Fish and Wildlife sent to the

various State SHPOs and disagree with their request for concurrence.  I am very familiar with the

landscape through which the pipeline is proposed to travel, especially in North and South

Dakota.

II.     HISTORIC SIGNIFICANCE OF STONE FEATURE SITES

     A.     <u>Spiritual Use and Significance Of Stone Features</u>

      8.      The 1992 amendments to the NHPA allow the tribes to assist in the identification

of "historic properties of religious and cultural significance to tribes" when there is a Federal

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

undertaking.  The Standing Rock Sioux Tribe by resolution # 378-14 has claimed association to all stone features that are located *"wherever the buffalo roamed and left its evidence of occupation, use and bone material is considered Oceti Sakowin homelands as we are considered the Buffalo Nation or people and that is where you will find our sacred areas, burials, stone effigies and stone alignments of our star knowledge and sacred stone feature sites that only member bands of the original Oceti Sakowin can claim…"*

9.      In providing data and information, we sometimes are asked to step out of our spiritual protocol to create understanding in our connection to *Unci Maka'* or Grandmother Earth; to describe the significance of how strong our spiritual walk of life was as some of these sites date to 1,500 years or more within the Great Plains; and that are running concurrent with all living creatures and the environment especially the most important medicine to all living, *Mni Wiconi* or Water of Life.  I shall step out of our spiritual protocol to describe our connection to the stone features that the corridor of DAPL dissects and are located adjacent to both sides of these drainages, rivers, streams, natural springs and areas where the one spirit is located important to the bands residing on the Standing Rock Reservation.  These stone feature areas are all over within the Great Plains and have been documented by archaeologists and Tribal consultants like Makoche Wowapi.  These important stone features can be found from the foothills east of the Rocky Mountain range to north up to the bush country in Canada, to east up to the Great Lakes and south to the Gulf of Mexico.  *Oceti Sakowin* placed their prayer sites and burials there as evidence of our existence.

10.      For the Lakota/Dakota, spirituality provided the ultimate guide for structured daily living; it was through our spiritual practices that the *Oyate* gained understanding of how we should live with creation and its inhabitance.  This heritage of the Lakota Dakota *Oyate* (People)

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

included a balance between the four forces of Mother Nature, the people's livelihood, and the spiritual movement of the people and animal nations during each season of the year. This spiritual belief system evolved over time beginning with the use of the stone people (*Inyan Oyate*) in our creation story and developing to include the twelve grandfathers, the stone ring or *wa hocho'ka* and the sacred white buffalo calf pipe housed today at Green Grass, South Dakota located on the Cheyenne River Reservation.

11.     The stone features that remain here throughout the northern plains are tangible evidence of a highly structured spiritual walk of life practiced by our people whose spiritual advisors and medicine people strictly followed and maintained the protocols established by the Grandfathers. Appointed individuals used the natural powers of Mother Nature through a guided walk of life chosen for them by the spirits; "they were picked." Stone features, such as the ones discussed here within and near the pipeline corridor of the Dakota Access Pipeline, are where these individuals made commitments for the people and where spiritual pledges were fulfilled.

12.     Use of a specific site was conducted with the guidance of a person's spiritual advisor using his gift or spiritual bundle. In this way, these stone features enabled the individual, following established protocol, to step into his chosen spiritual portal to communicate with *Tunkasina* (Grandfather). Such individuals found vital spiritual connection through prayer and commitment at these stone features and it was through these individual commitments made by people in the band or *tiospaye* that the Lakota/Dakota *Oyate* sustained itself. Our spiritual practitioners gave themselves to the greater power so the people may live and it happened at these stone feature sites of the Lakota/Dakota *Oyate.*

13.     With the fasting or vision quest (*Hanbdeceya*), an individual would pursue and may achieve one of the seven sacred rites given by the White Buffalo Calf Pipe Woman who

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

brought the *Oceti Sakowin* bands of Lakota/Dakota/Nakota our most sacred *canupa* (pipe).  The

significance of the vision quest starts with the stone ring and stone features using a canupa,

where individuals made the commitments and pledges that would guide them through their life.

When used with the Sacred White Buffalo Calf Pipe, these stone features enhanced an

individual's connection to the spiritual side of all living creation, all those that have a spirit or

*na' gi*.

14.     The numerous stone rings within North and South Dakota, Minnesota and Iowa

are Hanbdeceya or fasting rings.  Because the DAPL corridor crosses over countless waterways

and drainages along nearly 1,200 miles, destruction of some number of these prayer sites is

certain.  The presumption that stone rings are "tipi rings", as they are commonly referred to

within the archeological community, is a term that is categorically false and has no meaning to

the Lakota/Dakota *Oyate*.  These stone rings, arcs, stone alignments, and in particular buffalo

effigies are the tangible evidence of our spiritual walk of life of member bands of *Oceti Sakowin*

and is referenced in resolution #378-14 of the SRST.

15.     Every stone ring is a *wa hocho'ka*, or fasting stone ring, representing a spiritual

portal for the individual who used it in seeking a vision and spiritual understanding from

*Tunkasina*.  When Societies gathered to pray their stone rings were connected in multi layers,

depending on the number of members, to pray with one heart and one mind for the protection of

the *Oyate*.  The intent of a spiritual practitioner using a stone feature was to grasp Mother

Nature's gifts of the four forces of nature resting in each cardinal direction.  In doing so, he was

dependent upon using a particular cardinal gate that opened his cardinal direction.  This

individual also used specific colors at his cardinal gate to identify which of the four directions he

was using.  The color of the stones showed his walk of life and was configured in different ways

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

depending on what an individual was seeking.  The star constellations also played a significant

role in making spiritual commitments, particularly at leadership levels.  Generally a

constellation's physical characteristics are referenced at the site that guided a practitioner's

purpose or goal in life.

16.      From the start of their life, boys had to stand and fast in one of these stone rings

or *wa hocho'ka* to receive direction in their future roles – as young men, within their band, and

within their life in general.  As men advanced in their life ways, society membership was decided

by an individual's daily action and his spiritual commitment to himself, his family, his society

and people.  The stone circle he once stood in alone, as an individual, might one day later be

attached to a relative, society member, leader or clan's vision/fasting ring.  If spiritually directed,

additional rings, arcs, stone effigies or alignments were added on to the initial ring.  Medicine

bundles were also created only at these stone feature sites and were based off of gifts that were

given to the medicine people by the Grandfathers.  When a man died, his *wa hocho'ka* was also

his final grave site; his *na gi'* (spirit) returned to the place that had helped him commit to the

course of life chosen for him and in so doing, he was again helped on his final journey to meet

the grandfathers.  He was either physically brought to his stone ring or his spirit was kept and

returned to this site generally marked by or referenced as a stone cairn.  These attributes cannot

be mitigated or minimized to the satisfaction of today's development in the Great Plains.  It's the

members of *Oceti Sakowin* that end up paying the ultimate price from this destructive

development.

17.      To this day, each of the cardinal directions has a specific use for our spiritual

advisors and continues to provide direction with men and women's spirituality on a daily basis.

However, when the *Oyate* (or people) were forced underground with their spirituality in the late

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

1890s, people had to hide and pray indoors or in secret and conduct ceremonies within the confines of their houses because they didn't have access to the special areas they once traveled to pray at their individual stone ring site; the stones were then replaced by tobacco ties.  Although the use of the four cardinal directions and their colors has survived the passage of time for our *Oyate*, the use of star constellations, forces in the landscape, and stone features connected with our spiritual teachings and the four forces of Mother Nature, is not common knowledge among the archaeologists or Federal Preservation Officers but only with our *Oyate*.

18.     Today for the Lakota/Dakota, it is rare to find individuals who have reached an important level of spiritual achievement because they are denied access to their family or society sacred sites and are not willing to document any of this knowledge within his/her life time because of the pledge to keep this oral knowledge secret.  Therefore, outside of the features themselves, very little of this information on the spiritual use of stone features has been documented, let alone provided in a public setting.  But it is still kept orally and passed down from generation to generation.

19.     Sadly, our *Oyate* cannot visit most of these places of power today.  Yet a connection to the stone features remains within the sacred bundles derived from these places. Since many care takers of generational family bundles exist, it is important for bundle keepers to remain connected to these stone features.  Unfortunately, when any type of development or project destroys a sacred stone ring or feature today, it inadvertently destroys the power of any sacred bundle connected to that place and ultimately severs the tie between the *Oyate* and the landforms where our spiritual power resides, this is an intangible adverse effect.  There is no "fix" in mitigation for these types of sites.  Destruction of these sites will eventually destroy generations of family connections to these areas of spiritual power that we still have knowledge

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

of where they are located and how they still can be used, but are not there anymore.  For this

reason, steps taken to preserve sites like this are important to the survival and recovery of our

spiritual traditions for our people, as these sites still retain the ability to mend our people, as

prophesied by our spiritual advisors.  But the sites need to remain in their place undisturbed.

     B.    *TiWakan* (Sacred Lodge)

20.    Understanding of star constellations is critical to understanding the structure and

purpose of the societies that used many of the stone features in this area and that are central to

the Lakota/Dakota *Oyate*.  The societies and constellations associated with them play a vital part

in both men's and women's role in life, status within the *Oyate* and even in death.

21.    These constellations were the portal or spiritual openings that allowed man and all

living things to connect to the spirit of Mother Nature.  One can say that the stone features

associated with these constellations represent the genesis of one's self, his/her spirituality and

cultural heritage.  These constellations guide the timing of when spiritual ceremonies for

individuals are initiated or conducted.  I shall provide you an explanation of just one

constellation that is at the center of this discussion and is found near Tioga where the corridor

runs for DAPL.

22.    It is important that I clarify the stone ring that most archaeologists commonly call

tipi rings.  They are not tipi rings and it is upsetting to hear such nonsense.  They do not hold

down a tipi cover as archaeologists defend.  This is the best they can do to describe why they are

common almost everywhere where you have undisturbed land in the Great Plains.  The stone

ring is tied to our creation story of our dwelling or Tipi lodge.  The Lakota have specific star

knowledge amongst the bands of the Teton.  The Dakota oral history and knowledge revolves

around our Tipi which is the center of our genesis story and is identified as the star constellation

*TiWakan* or sacred lodge.  This is the same constellation many people recognize as Orion the

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

Hunter out of Greek mythology.  For Dakotas, the twelve grandfathers are the sacred foundations of the twelve poles that make up *TiWakan* and can be recognized and visible in the stone ring and stone features that DAPL will destroy if further work continues.

23.     Because the Tipi was truly the woman's home, every part of it had a spiritual connection to the woman who created the spirit which grew to a child in her womb.  Consider the structure of the Tipi from the top: tips of the twelve poles forming a Tipi's skeleton spiral in a clockwise direction to the point where they all come together and cross before fanning out again to form the circular base where the lodge meets the earth.  When a Tipi is being erected, a reddish ocher leather strap called the umbilical cord is wrapped around the poles at their crossing point and then is brought inside the circle and tied to two wooden stakes representing the father and mother criss-crossing similar to the letter X and staked to the ground.

24.     The spiral of the poles crossing on top creates a belly button and the leather strap serves as the umbilical cord that is attached to the belly button.  Because we are star people, we believe that when a man and woman ask for a child, the spirit of that child is caught by the Tipi on top in the fan of the Tipi and catches the spirit of the child falling from the Milky Way.  The spirit of the child travels down through the umbilical cord to the mother and father inside the Tipi hence the woman conceives the spirit and becomes with child.

25.     Because the leather strap that a woman used to tie the poles together and stakes down the Tipi was also the umbilical cord, the cord was tied in half hitches so as not to have a knot in the strap.  If the strap was knotted, the woman would have a hard time giving birth to a child.

26.     From this strap or umbilical cord also come both the straight lance, carried by the *Na ca'*, or society leaders and the curved staff carried by the *Itancan*, or Chief.  Men carrying

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

either staff commit their lives to protecting the woman and oral history/knowledge of the tipi thereby safeguarding the future of our generations to come.  When a staff carrier lifted his staff which is the umbilical cord or straight lance, he showed honor to our creation story and to the women who bring life to this world.  This action he would take to the society stone rings to pledge himself in life or death, to protect the oral knowledge, our spiritual culture, our women, children, grandchildren and the yet unborn generations to come, thus preserving the sustainability of our people.

III.    CULTURAL SURVEY TECHNIQUES AND DATA

27.    When Makoche Wowapi is hired to provide identification of "historic properties of religious and cultural significance," the width of the corridor or area of potential effect is very important.  The larger the corridor the more manpower is needed and the timeline to complete the project is a concern for the applicant.  The advantage to a big corridor is inventorying where stone features extend outside of the area of potential effect.  These stone features sometimes have connecting features that extend well beyond 150 meters.  We have been in areas where societies string their places of prayer along ridge lines up to one half mile, some societies have over one hundred members praying together at one location, that's what makes us so unique and the site itself.

28.    Non-tribal archaeologists don't like a large site boundary because the applicant often feels that Tribe's identification process includes cultural landscapes, audio, visual, and water sources.  But a large site boundary is important both to find all sites and to ensure that sites would not be adversely affected.  Our main objective is to look at the areas, see what type of topography we have walked into and understand which spiritual walk of life these society men use.  Some societies use the upper terraces, some use deflated or rolling hills, one walk of life requires using flat level topography and others go into a drainage or ravine system because of the

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

setting, i.e., crescent moon, in the shape of the letter Y, etc.

29.     This is where conventional archaeology fails the Tribes.  Non-tribal archaeologists don't know the requirements of our spiritual people, for example, what type of environment and topography they require, unless they are members of our Tribes.  Most archaeologists, similar to those who DAPL hired, are European descendants, are not from the Great Plains, and don't know our ways of conducting prayer at these types of location.  The archaeologists are inconsistent in trying to evaluate stone feature sites, as they are not privy to this intellectual property as it is proprietary information to the Standing Rock Sioux Tribe and belongs to all of our bands of *Oceti Sakowin* that is connected to the *canupa* (pipe).  For example, the DAPL archaeological report lists some stone rings as eligible for the National Register of Historic Places.  Numerous other stone features are declared ineligible.  I question this report.  Within the recommendation contained in all DAPL archaeological reports each consulting firm give different recommendations on eligibility and are inconsistent with the other.  One firm recommends stone ring(s) as eligible and others in the same report with a similar site type are not eligible.  They don't know what to look for and they don't know how to evaluate these types of sites.  I know for a fact the site types and stone features up in the Tioga area where DAPL is starting and the site types down east of the Missouri River around Linton, North Dakota are different.  Only a trained eye and years of experience would assist an individual, if he was Lakota/Dakota.  That's why the regulations for Section 106 allow for tribes to assist in evaluating these types of sites (36 CFR § 800.4(c)(1)).  But there was no consultation with Tribal experts that I'm aware of that would enable them to make these determinations.

30.     Our company does not conduct surveys similar to non-tribal archaeologists.  Our methodology is different.  What is very important is that we connect to the intangibleness of

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

these sites when looking for what makes this site different from the one just a mile back.  We have witnessed and experienced that most, if not at all sites, are still spiritually active.  Another way to express this is you feel things that archaeologists don't.  We always pray when we come upon a site or site complex.  We always have one or two spiritual advisors with our survey crew to assist the surveyor and we leave offerings with the appropriate song and prayer.

31.     It is common in my experience that non-Tribal archaeologists either misidentify important cultural sites, for example by declaring them as ineligible for National Register status when they are in fact eligible, or they miss them altogether.  Given what I know about the proposed pipeline route, and my experience in this area, I can say with near certainty that there would be additional eligible sites in the pipeline right of way that have not been discovered yet— either misidentified as ineligible, or missed completely.  These sites would be damaged or destroyed by pipeline construction.  That is why the Section 106 consultation requirement is so important.

IV.     FINDINGS IN THE DAKOTA ACCESS PIPELINE ROUTE

32.     In the spring of 2014, our company was conducting a tribal survey identifying "historic properties of religious and cultural significance" for another project for the Standing Rock Sioux Tribe, Sisseton-Wahpeton Dakota Nation, and other *Oceti Sakowin* Tribes.  We were east of Watford City, North Dakota surveying a 300-foot corridor for a client.  Along the way, we crossed the DAPL survey stakes and realized it was running concurrent and sometimes overlapping our corridor Right of Way.  On that day, I observed the archaeology firm personnel hired by DAPL in front of our crew walking the DAPL corridor.  We took a break and observed their methodology, the width of their transect, and what they were recording.  At that time, they were 200 feet walking away from us.

33.     The survey that we saw them conduct was in my view completely deficient for

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

identifying culturally significant sites.  We observed them walking shoulder to shoulder, not walking spaced transects as reported in their Class III report.  They would go far in distance and stop, do a shovel probe, and continue walking.  We observed them as they walked a mile or so before we continued our survey.  Afterwards, we identified stone rings near their survey stakes and realized that the archaeologists just moments earlier had walked right over them, but did not record them.  The DAPL center line was close in numerous places to our survey corridor and we observed many stone features in this vicinity.

34.     The area where we crossed paths with DAPL archaeologists is east of Watford City, North Dakota.  Our project corridor started in Beulah, North Dakota running 70 miles west to Highway 85, turning north up to Williston, North Dakota, going around the west side of Williston and proceeding east of Williston and ended in Tioga, North Dakota, a 298-mile transmission line.  This transmission line had a 300 foot corridor for review.  In the Tioga area, we recorded over 300+ stone feature sites in a 30-mile portion of our corridor area alone.  We recorded over 2,400 stone feature sites within the 300 foot width of the entire 298 mile corridor transmission line.  We observed DAPL survey markers near our corridor right-of-way east of Watford City, North Dakota.  This area in the northwest corner of North Dakota is very dense with stone feature sites.  In a previous survey we conducted for Federal Highways and North Dakota Department of Transportation, we recorded 8,011 stone feature sites on the Williston By-Pass project.  The proposed route of the DAPL pipeline in North Dakota progresses around the city of Williston, North Dakota. Based on the map provided on their web site, the pipeline route is almost adjacent to the Williston By-Pass route we surveyed for Federal Highway where the 8,000+ stone feature sites are located.

35.     I can say without a doubt, DAPL will destroy many stone features in the area

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

around Williston alone.  It's imperative that the current action of DAPL conducting construction at such locations should be stopped.  This really harms me as a Lakota/Dakota person who protects these areas.  My whole life was for one purpose, to protect and preserve these areas for the children and grandchildren and the ones yet unborn, that the prophesy be fulfilled that our seventh generation will walk back to these sites to save the Nation and our spiritual way of life.

36.     The area around the confluence of the Missouri and Yellow Stone Rivers was previously visited for thousands of years by *Oceti Sakowin*.  Many battle sites, gathering sites and many spiritual sites are located here. One site was tested and was 12,000+ years old.  Through thousands of years of occupation, our men stood on every hill at one time or another to pray; "they were everywhere."  The area east and southeast of Watford City is also dense with stone features and is within the DAPL corridor.  Pipeline construction in that area will result in destruction of known sites.  We also documented historic sites on the Fort Berthold Reservation where they enter and cross the Missouri River.  The areas across or on the south side of Fort Berthold is also very dense with these stone feature sites.

37.     Our crew has also surveyed areas east of the Standing Rock Reservation starting in central North Dakota or within the Red River valley.  This area was mainly Dakota aboriginal homelands, in particular to the Upper Ihunktowanna Pa Baksa (Cuthead) and Lower Yanktonai Ihunktowan Dakota.  These were our areas we maintained and where I had the privilege of stepping into numerous areas I knew from oral history where the spiritual places of our grandfathers are located.  I have done seven surveys east of the Missouri River with a combined total of over 4,800 stone features were identified.  Many if not most of these sites meet the eligibility criteria under the NHPA and, more importantly, carry very high cultural and religious significance to the Tribe.  The DAPL is going right through these areas we have already

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

inventoried.  Numerous burials were encountered along with stone buffalo effigies, huge

multiple stone ring complexes and landscapes specific to buffalo spirit callers, a special spiritual

man within our spiritual walks of life.  My grandfather and great grandfather fought in wars with

the U.S. Calvary in this valley and other enemy tribes to defend these stone feature sites.  The

destruction of these sites would be very personally painful to me and is very harmful to the

cultural survival of the Tribe.  Once lost they can never be restored.

38.     Members of Makoche Wowapi were hired by Upper Sioux Community to assist

in surveying certain PCN locations in South Dakota and Iowa.  Our crew members started in

South Dakota at various PCN locations but access was an issue.  No GIS shape files were

provided to the crew, if you don't have these you are basically walking in the dark trying to find

a needle in a haystack.  This is very uncommon.  We are held to an ethical standard in survey

work that if you don't have a center line and/or boundaries of the "area of potential effect"

provided to you for your GPS unit, you could be outside of the area of review for a federal

agency and you are basically not allowed to start.  Yet, the Army Corps of Engineers (the Corps)

stated that Upper Sioux, when requesting this data for our GPS units, referenced proprietary

information and sent out archaeologists to stake out the center line and the outside boundary of

the corridor without adequate information.  Our crew members were given a map and they had to

guess where the corridor was located in relation to the land.

39.     Where unbroken ground was located, DAPL denied access to the tribal survey

team.  DAPL provided unrestricted access to the archaeologists to survey Class III reports but the

tribes were not given this access.  This is the reason the Upper Sioux objected.  Normally, on

other federal undertakings, the lead federal agency impresses to the applicant that if access is

denied to areas under review, the agency cannot determine adverse impact and will withhold

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

their approval until either access is secured by the applicant so surveying can occur or a Programmatic Agreement is developed and signed off by interested parties and the Advisory Council on Historic Preservation concurs.  In this case sufficient access to PCN locations was denied both by DAPL and the Corps but the permits were granted anyway.

40.     During discussions with the Army Corps, the Tribe raised its concerns that we knew that the pipeline would go through known sacred and historic sites because of the extensive surveys we conducted with other Federal undertakings.  Those warnings were ignored.  Now, construction has already started in many of these sites.  Due to my familiarity with the area and the survey route, it is my opinion that it is highly likely that construction has already impacted and destroyed culturally important sites.  These are sites that are eligible for listing under the National Register, and sites that hold deep cultural meaning for me and other Tribal people.  Not only is the adverse impact occurring in the proposed corridor, but the connecting roads, staging areas, and heavy equipment movement outside of the corridor right-of-way have never been surveyed either.  The destruction of sites of religious and cultural significance to the Standing Rock Sioux Tribes and other *Oceti Sakowin* Tribes in the Great Plains will continue if construction does not stop.

## V.     THE TRIBE AND TRIBAL MEMBERS WILL BE IRREPARABLY HARMED BY PIPELINE CONSTRUCTION

41.     The Tribe and the members of the Standing Rock have direct ties to the stone features.  Many have sacred medicine bundles that are tied to these stone feature sites.  When these sites are adversely impacted, it destroys the spiritual connection to these individuals.  We shall see the continued destruction of our spiritual places if the court doesn't intervene.  This destruction greatly harms the Tribe generally, and members of the Tribe like myself.

I declare under penalty of perjury that the foregoing is true and correct to the best of my

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

knowledge.

Executed on August 11, 2016, at Fort Yates, North Dakota.

_____
Tim Mentz, Sr.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*