**IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE,<br><br>     Plaintiff,<br><br>v.<br><br>UNITED STATES ARMY CORPS OF<br>ENGINEERS,<br><br>     Defendant. | )<br>)<br>)<br>)<br>)<br>)    Case No. 1:16-cv-01534 (JEB)<br>)<br>)<br>)<br>)<br>)<br>) |

**UNITED STATES ARMY CORPS OF ENGINEERS' OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

i

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iv

LIST OF EXHIBITS ..................................................................................................... xi

LIST OF ACRONYMS ................................................................................................. xii

INTRODUCTION ...........................................................................................................1

BACKGROUND ..............................................................................................................2

I.      STATUTORY AND REGULATORY BACKGROUND ...................................................2

        A.      National Historic Preservation Act............................................................2

        B.      The Clean Water Act ..................................................................................6

        C.      Rivers and Harbors Act .............................................................................7

        D.      Nationwide Permit 12 and Conditions Regarding Historic Preservation..................7

                1.   Nationwide Permitting Process ............................................................8

                2.   Conditions Regarding Historic Preservation .....................................11

                3.   Nationwide Permit 12 .......................................................................12

II.     FACTUAL BACKGROUND ........................................................................................13

STANDARD OF REVIEW ............................................................................................18

ARGUMENT ................................................................................................................20

I.      PLAINTIFF HAS NOT ESTABLISHED THAT IT IS LIKELY TO PREVAIL ON
        THE MERITS OF ITS CLAIM THAT THE CORPS VIOLATED THE
        NATIONAL HISTORIC PRESERVATION ACT ...........................................................20

        A.      Plaintiff Is Unlikely to Prevail on Its Claim That Nationwide Permit 12
                Violates the NHPA Because the Corps Reasonably Consulted with
                 Federally Recognized Tribes ....................................................................20

        B.      Nationwide Permit 12 and Its General Conditions Reasonably Fulfill the
                Corps' Duties Under Section 106 of the NHPA .......................................24

C.      The Corps Fully Complied with NHPA Section 106 with Respect to the
        Pre-construction Notices and Verifications at Issue. ...............................................29

D.      The Corps' Section 106 Review in This Case Was Reasonable ...........................34

II.     PLAINTIFF HAS NOT SHOWN IMMEDIATE IRREPARABLE INJURY ..................38

III.    THE BALANCE OF EQUITIES TIPS IN FAVOR OF THE CORPS, AND
        ISSUANCE OF AN INJUNCTION WOULD HARM THE PUBLIC INTEREST..........42

CONCLUSION....................................................................................................................44

CERTIFICATE OF SERVICE ................................................................................................46

## TABLE OF AUTHORITIES

### CASES

*Apache Survival Coal. v. United States*,
  21 F.3d 895 (9th Cir. 1994) ...................................................................... 35, 38

*City of Tacoma v. FERC*,
  460 F.3d 53 (D.C. Cir. 2006) ........................................................................ 3

*Colo. Wild Horse & Burro Coal., Inc. v. Jewell*,
  130 F. Supp. 3d 205 (D.D.C. 2015) .............................................................. 42

*Colo. River Indian Tribes v. Marsh*,
  605 F. Supp. 1425 (C.D. Cal. 1985) .............................................................. 33

*Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo-Mitsubishi, Ltd.*,
  15 F. Supp. 2d 1 (D.D.C. 1997) .................................................................... 19

*Comm. to Save Cleveland's Huletts v. U.S. Army Corps of Eng'rs*,
  163 F. Supp. 2d 776 (N.D. Ohio 2001) ......................................................... 33

*Crutchfield v. Cnty. Of Hanover, Va.*,
  325 F.3d 211 (4th Cir. 2003) ........................................................................ 26

*CTIA - The Wireless Ass'n v. FCC*,
  466 F.3d 105 (D.C. Cir. 2006) ...................................................................... 3

*Davis v. Latschar*,
  202 F.3d 359 (D.C. Cir. 2000) ...................................................................... 3

*Dorfmann v. Boozer*,
  414 F.2d 1168 (D.C. Cir. 1969) .................................................................... 19

*\*Duncan's Point Lot Owners Ass'n v. FERC*,
  552 F.3d 371 (D.C. Cir. 2008) ...................................................................... 30

*Elec. Privacy Info. Ctr. v. Dep't of Justice*,
  15 F. Supp. 3d 32 (D.D.C. 2014) .................................................................. 18

*Friends of the Earth v. Hintz*,
  800 F.2d 822 (9th Cir.1986) .......................................................................... 26

* Denotes cases chiefly relied upon.

iv

*Gonzales v. Oregon*,
  546 U.S. 243 (2006) ................................................................................................ 32

*Harrison v. U.S. Dep't of the Army*,
  No. 3:08-CV-105-H, 2009 WL 3347109 (W.D. Ky. Oct. 14, 2009) ........................... 26, 30, 42

*Karst Envtl. Educ. & Prot., Inc. v. EPA*,
  475 F.3d 1291 (D.C. Cir. 2007) .............................................................................. 3, 31

*Konarski v. Donovan*,
  763 F. Supp. 2d 128 (D.D.C. 2011) ........................................................................ 18

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ................................................................................................ 39

*Macht v. Skinner*,
  916 F.2d 13 (D.C.Cir.1990) .................................................................................... 31

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997) ................................................................................................ 42

*McGehee v. U.S. Army Corps of Eng'rs*,
  No. 3:11-C-160-H, 2011 WL 2009969 (W.D. Ky. May 23, 2011) ........................... 32

*\*McGehee v. U.S. Army Corps of Eng'rs*,
  No. 3:11-C-160-H, 2011 WL 3101773 (W.D. Ky. July 19, 2011) ................................... 30, 34

*Monsanto v. Geertson Seed Farms*,
  561 U.S. 139 (2010) ................................................................................................ 19

*Munaf v. Geren*,
  553 U.S. 674 (2008) ................................................................................................ 18

*Narragansett Indian Tribe v. Warwick Sewer Auth.*,
  334 F.3d 161 (1st Cir. 2003) .................................................................................. 35

*New Hanover Twp. v. U.S. Army Corps of Eng'rs*,
  992 F.2d 470 (3d Cir. 1993) .................................................................................. 10

*Nken v. Holder*,
  556 U.S. 418 (2009) ................................................................................................ 42

*Ohio Valley Envtl. Coal. v. Bulen*,
  429 F.3d 493 (4th Cir. 2005) ................................................................................. 8

*Ohio Valley Envtl. Coal. v. Hobet Mining, LLC*,
    723 F. Supp. 2d 886 (S.D. W. Va. 2010) .......................................................... 19

*Pueblo of Sandia v. United States*,
    50 F.3d 856 (10th Cir. 1995) ........................................................................... 35

*Quechan Tribe of the Ft. Yuma Indian Reservation v. U.S. DOI*,
    927 F. Supp. 2d 921 (S.D. Cal. 2013) ......................................................... 35, 38

*Quechan Tribe of the Ft. Yuma Reservation v. U.S. DOI*,
    755 F. Supp. 2d 1104 (S. D. Cal. 2010) ........................................................... 35

*Save Our Sonoran, Inc. v. Flowers*,
    227 F. Supp. 2d 1111 (D. Ariz. 2002) .............................................................. 19

*Sheridan Kalorama Historical Ass'n v. Christopher*,
    49 F.3d 750 (D.C. Cir. 1995) ............................................................... 3, 23, 30

*Sherley v. Sebelius*,
    644 F.3d 388 (D.C. Cir. 2011) ........................................................................ 18

*\*Sierra Club v. U.S. Army Corps of Eng'rs*,
    990 F. Supp. 3d 9 (D.D.C. 2013) ..................................................................... 44

*\*Sierra Club v. U.S. Army Corps of Eng'rs*,
    803 F.3d 31 (D.C. Cir. 2015) ..................................................................... 23, 31

*Sierra Club, Inc. v. Bostick*,
    2012 WL 3230552 (D.D.C. Aug. 5, 2012) ....................................................... 38

*Sierra Club, Inc. v. Bostick*,
    787 F.3d 1043 (10th Cir. 2015) ...................................................................... 31

*Sugerloaf Citizens Ass'n v. FERC*,
    959 F.2d 508 (4th Cir 1992) ........................................................................... 31

*Summit Lake Paiute Tribe of Nev. v. U.S. Bureau of Land Mgmt.*,
    496 Fed. Appx. 712 (9th Cir. 2012) ................................................................... 4

*Wash. Toxics Coal. v. U.S. DOI*,
    457 F. Supp. 2d 1158 (W.D. Wash. 2006) ........................................................ 25

*Winnebago Tribe of Nebraska v. Ray*,
    621 F.2d 269 (8th Cir. 1980) .......................................................................... 32

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) .................................................................................................. 18, 38, 39

*Wis. Gas Co. v. FERC,*
    758 F.2d 669 (D.C. Cir. 1985) ........................................................................................ 39, 41

## **STATUTES**

16 U.S.C. § 470f ........................................................................................................................ 3

33 U.S.C. § 403 .......................................................................................................................... 7

33 U.S.C. § 408 ................................................................................................................... 1, 7, 8

33 U.S.C. § 1251(a) ................................................................................................................... 6

33 U.S.C. § 1311(a) ................................................................................................................... 6

33 U.S.C. § 1344 ........................................................................................................................ 7

33 U.S.C. § 1344(a) ................................................................................................................... 6

33 U.S.C. § 1344(b)(1) .............................................................................................................. 8

33 U.S.C. § 1344(e) ............................................................................................................ 6, 8, 9

33 U.S.C. § 1344(e)(1) .............................................................................................................. 6

33 U.S.C. § 1344(e)(2) .............................................................................................................. 8

33 U.S.C. § 1362(7) ................................................................................................................... 6

42 U.S.C. § 4332(C) .................................................................................................................. 8

54 U.S.C. § 300320 ............................................................................................................. 30, 33

54 U.S.C. § 304101 .................................................................................................................... 4

54 U.S.C. § 304108 .................................................................................................................... 4

54 U.S.C. § 306108 (2016) ....................................................................................................... 3

Pub. L. No. 113-287, § 7, 128 Stat. 3272 (2014) ..................................................................... 3

## CODE OF FEDERAL REGULATIONS

33 C.F.R. § 208.10(a)(5) ........................................................................................ 7

33 C.F.R. § 322.3(a) ............................................................................................... 7

33 C.F.R. pt. 323 .................................................................................................... 6

33 C.F.R. § 328.3(a) ............................................................................................... 6

33 CFR pt. 325 ............................................................................................... passim

33 CFR pt. 329 ..................................................................................................... 32

33 C.F.R. § 329.4 .................................................................................................... 7

33 C.F.R. § 330.1(b) ........................................................................................... 6, 9

33 C.F.R. § 330.1(d) .......................................................................................... 9, 10

33 C.F.R. § 330.1(e)(1) ......................................................................................... 10

33 C.F.R. § 330.1(e)(2) ......................................................................................... 10

33 C.F.R. § 330.1(e)(3) ......................................................................................... 10

33 C.F.R. § 330.2(b) ............................................................................................... 6

33 C.F.R. § 330.2(c) .............................................................................................. 10

33 C.F.R. § 330.4(e) .............................................................................................. 10

33 C.F.R. § 330.4(e)(1) ........................................................................................... 9

33 C.F.R. § 330.4(g) ............................................................................................. 27

33 C.F.R. § 330.4(g)(4) ......................................................................................... 27

33 C.F.R. § 330.5(a)(2) ........................................................................................... 9

33 C.F.R. § 330.5(b)(2)(ii) .................................................................................... 11

33 C.F.R. § 330.5(c)(1) ........................................................................................... 9

33 C.F.R. § 330.5(c)(1)(i) ....................................................................................... 9

33 C.F.R. § 330.6(a) ........................................................................................... 10

33 C.F.R. § 330.6(a)(3)(i) .................................................................................. 10

33 C.F.R. § 800.16(y) ........................................................................................ 32

36 C.F.R. pt. 800 ........................................................................................... 4, 32

36 C.F.R. § 800.2(a)(3) ...................................................................................... 26

36 C.F.R. § 800.2(c)(2)(ii)(A) .............................................................................. 4

36 C.F.R. § 800.2(c)(2)(ii)(B) ............................................................................ 34

36 C.F.R. § 800.4(b)(1) ........................................................................................ 4

36 C.F.R. § 800.4(d)(1)(ii) ................................................................................... 5

36 C.F.R. § 800.4(d)(1)(iv) .................................................................................. 5

36 C.F.R. § 800.5(b) ............................................................................................ 5

36 C.F.R. § 800.5(c) ........................................................................................... 33

36 C.F.R. § 800.5(c)(3) ........................................................................................ 5

36 C.F.R. § 800.5(c)(3)(ii)(B) .............................................................................. 5

36 C.F.R. § 800.5(d)(1)-(2) .................................................................................. 5

36 C.F.R. § 800.8(b) .......................................................................................... 24

36 C.F.R. § 800.13 ............................................................................................. 24

40 C.F.R. pt. 230 .................................................................................................. 9

40 C.F.R. § 1508.10 ............................................................................................. 8

## FEDERAL REGISTERS

36 Fed. Reg. 800.5(c) ........................................................................................ 33

76 Fed. Reg. 9174 (Feb. 16, 2011) ....................................................... 9, 10, 11, 13

77 Fed. Reg. 10,184 (Feb. 21, 2012) ....................... 8, 9, 11, 12, 13, 21, 22, 24, 25, 27

## <u>LEGISLATIVE HISTORY</u>

H.R. Conf. Rep. No. 95-830 (1977), reprinted in 1977 U.S.C.C.A.N. 4424 ................................. 6

**EXHIBIT LIST**

| Exhibit Number | Description |
|---|---|
| 1 | Interim Guidance for Implementing Appendix C of 33 CFR part 325 with the revised ACHP Regulations at 36 CFR part 800 |
| 2 | Supplement to the Decision Document for Nationwide Permit 12 for Illinois District |
| 3 | 2012 Nationwide Permit Regional Conditions for North Dakota |
| 4 | 2012 Nationwide Permit Regional Conditions for South Dakota |
| 5 | 2012 Nationwide Permit Regional Conditions for Iowa |
| 6 | 2012 Nationwide Permit Regional Conditions for Illinois |
| 7 | Memorandum for Record for South Dakota Verifications, July 25, 2016 |
| 8 | Tribal Distribution List |
| 9 | Tribal Consultation Spreadsheet |
| 10 | Memorandum for Record for Iowa Verifications, July 25, 2016 |
| 11 | Memorandum for Record for North Dakota Verifications,  July 25, 2016 |
| 12 | Letter from Col. R. Ruch, Corps, to Chairman C. Murphy, SRST (Feb. 16, 2011) |
| 13 | Tribal Information Fact Sheet, Omaha District (Mar. 7, 2012) |
| 14 | Letter from Col. R. Ruch, Corps, to Chairman J. Brings Plenty, CRST (Nov. 9, 2012) (Ex. 14) |
| 15 | Advisory Council on Historic Preservation Mem. re: Corps of Engineers Permits and 106 Compliance (Aug. 21, 1979) |
| 16 | Environmental Assessment Dakota Access Pipeline Project Crossings of Flowage Easements and Federal Lands, App. F – Unanticipated Discoveries Plan Cultural Resources, Human Remains, Paleontological Resources & Contaminated Media, July 2016 |
| 17 | Declaration of Joel Ames |
| 18 | Declaration of Martha Chieply and accompanying Exhibits 1 - 16 |
| 19 | Declaration of Richard Harnois and accompanying Exhibits 1 - 5 |
| 20 | Declaration of Jonathan Shelman |

## LIST OF ACRONYMS

**ACHP**        Advisory Council on Historic Preservation

**CRST**        Cheyenne River Sioux Tribe

**NEPA**        National Environmental Policy Act

**NHPA**        National Historic Preservation Act

**NWP**         Nationwide Permit

**RHA**         Rivers and Harbors Act

**SRST**        Standing Rock Sioux Tribe

## INTRODUCTION

Plaintiff Standing Rock Sioux Tribe seeks to stop the construction of a 1,168-mile-long pipeline that is 97% outside the jurisdiction of Defendant United States Army Corps of Engineers ("Corps").  The Corps' role was limited to processing three categories of requests submitted by Intervenor Dakota Access, LLC ("Dakota Access") for: (1) individual verifications that activities at more than 200 locations satisfied the terms and conditions of Nationwide Permit 12, which authorizes activities required for the construction of utility lines in federally regulated waters; (2) a real estate easement to lay pipeline beneath a Corps-owned lake and consent to cross Corps flowage easements at two additional locations; and (3) permissions to cross or lay pipeline in seven locations used by the Corps for navigation or flood control under the Rivers and Harbors Act, 33 U.S.C. § 408.[1]  Plaintiff asks this Court to order the Corps to withdraw Nationwide Permit 12, as applied to the pipeline, as well as the 200+ individual verifications along the pipeline.  But in several ways Plaintiff has failed to meet the heightened preliminary injunction standard applicable to its request for affirmative injunctive relief.

First, Plaintiff is unlikely to prevail on the merits of its challenges to the Corps' consultation under Section 106 of the National Historic Preservation Act.  The Corps engaged in a multi-phase consultation process with federally recognized tribes, including Plaintiff, regarding the Corps' establishment of a framework for its Nationwide Permits that reasonably requires the

---

[1]      Plaintiff's request for a preliminary injunction appears to cover only the first of these Corps actions—the issuance of verifications pursuant to Nationwide Permit 12 to discharge into federally regulated waters—as well as the overall application of Nationwide Permit 12 to the pipeline in question.  *See* Pl.'s Mem. in Supp. of Mot. for Prelim. Inj. 1 (ECF 6) (hereinafter "Pl.'s Br."); Proposed Order (ECF 6-68).  Regardless, the Corps' consultation process that is the focus of Plaintiff's claims was reasonable and met the statutory and regulatory requirements for all three kinds of authorizations for portions of the pipeline.

evaluation of historic and cultural resources.  And in its site-specific review of portions of this pipeline within the Corps' jurisdiction, the Corps followed a robust tribal consultation process.

In addition, Plaintiff has not demonstrated that it will suffer an immediate, irreparable injury. Plaintiff has not pointed to specific sites of significance at locations under the Corps' jurisdiction and instead argues that there are bound to be cultural and historical sites *somewhere* across the entire 1,168 miles of pipeline.  But even if previously unknown sites of potential significance were discovered during construction, Plaintiff has not shown that the sites would be immediately and irreparably harmed where Dakota Access is subject to requirements to consult with tribes and take avoidance measures upon discovery.

Finally, the balance of equities and public interest weigh against an injunction, because Plaintiff did not avail itself of the opportunity to engage in the National Historic Preservation Act consultation process designed to protect the very interests that Plaintiff now claims will be harmed absent an injunction.[2]

## BACKGROUND

## I.      STATUTORY AND REGULATORY BACKGROUND

### A.      National Historic Preservation Act

Section 106 of the National Historic Preservation Act ("NHPA") requires federal agencies to consider the potential effects of federal agency actions on historic properties.  54

---

[2]      This Opposition does not respond to Cheyenne River Sioux Tribe's Motion for Joinder, which purports to join Plaintiff's Motion and present additional factual declarations and arguments for the Court's consideration.  ECF 19.  The Corps does not oppose the Tribe's joinder.  But the lateness of the filing prevents the Corps from adequately responding to the new information presented.  Thus, the Court should not consider the Tribe's materials at the hearing on August 24.  Should the Court be inclined to consider the materials, we request the opportunity to present a supplemental brief after the hearing, before the Court rules.

U.S.C. § 306108 (2016).[3]  "[T]he text of § 106 still applies by its terms only to federally funded

or federally licensed undertakings.  Thus however broadly the Congress or the ACHP define

'undertaking,' § 106 applies only to: 1) 'any Federal agency having … jurisdiction over a

proposed Federal or federally assisted undertaking'; and 2) 'any Federal … agency having

authority to license any undertaking.'"  *Sheridan Kalorama Historical Ass'n v. Christopher*, 49

F.3d 750, 755 (D.C. Cir. 1995) (citing 16 U.S.C. § 470f).  The NHPA requires that, before

funding or licensing a "[f]ederal or federally assisted undertaking," federal agencies must (1)

"take into account the effect of the undertaking on any district, site, building, structure, or object

that is included in or eligible for inclusion in the National Register," and (2) "afford the Advisory

Council on Historic Preservation . . . a reasonable opportunity to comment with regard to such

undertaking."  *Karst Envtl. Educ. & Prot., Inc. v. EPA*, 475 F.3d 1291, 1294 (D.C. Cir. 2007)

(internal quotation marks and citation omitted).  "[T]he Act does 'not require [a federal agency]

to engage in any particular preservation activities; rather, Section 106 only requires that the

[agency] consult the [State Historic Preservation Office] and the [Advisory Council on Historic

Preservation] and consider the impacts of its undertaking.  *CTIA - The Wireless Ass'n v. FCC*,

466 F.3d 105, 107 (D.C. Cir. 2006) (quoting *Davis v. Latschar*, 202 F.3d 359, 370 (D.C. Cir.

2000)).  The NHPA requires agencies "to consider the effect *of their actions* on certain historic

or culturally significant sites and properties (expressly including those of Indian tribes) and to

seek ways to mitigate those effects."  *City of Tacoma v. FERC*, 460 F.3d 53, 69 (D.C. Cir. 2006)

(emphasis added).

---

[3]      The NHPA has recently been repealed and recodified at Title 54 of the U.S. Code,
"except with respect to rights and duties that matured, penalties that were incurred, or
proceedings that were begun before the date of enactment of th[e recodification]."  Pub. L. No.
113-287, § 7, 128 Stat. 3272, 3272–73 (2014).  Because these proceedings began after December
19, 2014, this brief will refer to the revised codification.

The Advisory Council on Historic Preservation ("Advisory Council") administers the NHPA, *see* 54 U.S.C. §§ 304101, 304108, and has promulgated regulations to govern federal agency compliance with Section 106, codified at 36 C.F.R. Pt. 800.  The Corps promulgated regulations further governing its compliance with Section 106.  33 C.F.R. Pt. 325, App. C. Under both sets of regulations the Corps must "make reasonable and good faith effort" to identify historic properties within the undertaking's area of potential effects.  *See* 36 C.F.R. § 800.4(b)(1).  The Advisory Council's regulations identify several different methods an agency may use to satisfy this requirement, "which may include background research, consultation, oral history interviews, sample field investigation, and field survey," *Id.*, but the good faith standard does not require the agency to use all of those techniques.  *Summit Lake Paiute Tribe of Nev. v. U.S. Bureau of Land Mgmt.*, 496 Fed. Appx. 712 (9th Cir. 2012).

The agency also must "consult with any Indian tribe or Native Hawaiian organization that attaches religious and cultural significance to historic properties that may be affected by an undertaking," 36 C.F.R. § 800.2(c)(2)(ii), and must "provide[] the Indian tribe . . . a reasonable opportunity to identify its concerns about historic properties, advise on the identification and evaluation of historic properties, including those of traditional religious and cultural importance, articulate its views on the undertaking's effects on such properties, and participate in the resolution of adverse effects."  *Id.* § 800.2(c)(2)(ii)(A).  The Corps' Appendix C regulations are designed to promote such consultation.  *See* 33 C.F.R. Pt. 325, App. C ¶ 3 (requiring initial review of district files, the National Register, and other sources "to determine if there are any designated historic properties"); ¶ 5 (requiring further investigation when, among other things, "response to public notice indicates the existence of a potentially eligible property"); ¶ 6 (establishing guidelines for applying the National Register criteria to make eligibility

determinations and for resolving disputes regarding those determinations); ¶ 7 (assessing

whether proposed actions would have no effect, no adverse effect, or an adverse effect on a

designated historical property).  The Corps supplemented its Appendix C Regulations with

interim guidance that also governs its consultation with federally recognized Indian tribes on

activities authorized by nationwide permits.  Interim Guidance for Implementing Appendix C of

33 CFR part 325 with the revised ACHP Regulations at 36 CFR part 800 ¶ n  ("2005 NHPA

Guidance") (Ex. 1).[4]

      The Section 106 process also requires agencies to take steps to resolve certain

disagreements with State and Tribal Historic Preservation Offices.  *See* 36 C.F.R. §§

800.4(d)(1)(ii), 800.5(b); 2005 NHPA Guidance; 33 C.F.R. Pt. 325, App. C ¶ 7 (assessing

whether proposed actions would have no effect, no adverse effect, or an adverse effect on a

historical property). And in the case of disagreement between an agency and a historic

preservation officer regarding an effects determination, Section 106 provides for consultation

with the Advisory Council.  36 C.F.R. §§ 800.4(d)(1)(iv), 800.5(c)(3), (d)(1)-(2); 33 C.F.R. Pt.

325, App. C ¶¶ 7-9.  Ultimately, the Advisory Council's regulations vest an agency with the

authority to affirm its initial finding that historic properties will not be affected by an

undertaking.  36 C.F.R. § 800.5(c)(3)(ii)(B) ("If the final decision of the agency is to affirm the

initial finding of no adverse effect, once the summary of the decision has been sent to the

Council, the SHPO/THPO, and the consulting parties, the agency official's responsibilities under

section 106 are fulfilled.").

---

[4]     As set forth in Exhibit 1, Interim Guidance was issued on April 25, 2005, and reaffirmed on January 31, 2007, and January 6, 2009.

B.        The Clean Water Act

The Clean Water Act is designed to "restor[e] and main[tain] [the] chemical, physical and biological integrity of [the] Nation's waters."  33 U.S.C. § 1251(a).  The Act therefore prohibits the discharge of any "pollutant," including dredged or fill material, into "navigable waters" without a permit.  *See id.* §§ 1311(a), 1344(a).  "[N]avigable waters" means "the waters of the United States," which include, by regulation, certain tributaries and wetlands.  *Id.* § 1362(7); 33 C.F.R. § 328.3(a).  Under Section 404, the Corps authorizes discharges of dredged or fill material into waters of the United States through individual and general permits.  33 U.S.C. § 1344(a), (e).  Individual permits require a resource-intensive, case-by-case review, including extensive site-specific documentation, public comment, and a formal determination on the permit.  *Id.* § 1344(a); *see* 33 C.F.R. Pts. 323, 325 (policies and procedures for permit issuance).

Concerned that requiring individual permits for routine activities would impose unnecessary delay and administrative burdens on the public and the Corps, Congress in 1977 authorized the Corps to issue general permits for categories of activities.  33 U.S.C. § 1344(e); *see* H.R. Conf. Rep. No. 95-830 (1977), reprinted in 1977 U.S.C.C.A.N. 4424. Clean Water Act Section 404(e) authorizes general permits "for any category of activities involving discharges of dredged or fill material if the Secretary determines that the activities in such category are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment."  33 U.S.C. § 1344(e)(1).  Any such permit shall "set forth the requirements and standards which shall apply to any activity authorized by such general permit."  *Id.*  Nationwide permits are general permits, 33 C.F.R. § 330.2(b), and, consistent with Congress's goal, "regulate with little, if any, delay or paperwork certain activities having minimal impacts."  *Id.* § 330.1(b).

### C.    Rivers and Harbors Act

Section 10 of the Rivers and Harbors Act of 1899 ("RHA") forbids certain activities within the "navigable water of the United States" without permission of the Corps.  33 U.S.C. § 403; see also 33 C.F.R. § 322.3(a) (permits required under Section 10 for "structures and/or work in or affecting navigable waters of the United States").  For purposes of Section 10, Corps regulations define navigable waters as "those waters that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce."  33 C.F.R. § 329.4.  The Nationwide Permit program addressing Clean Water Act Section 404 also authorizes RHA Section 10 activities.

Section 14 of the RHA also prohibits any person from injuring, obstructing, or impairing the usefulness of a structure built by the United States for the improvement of navigable waters or flood prevention.  33 U.S.C. § 408.  The Corps' regulations prohibit construction within the right-of-way for flood protection facilities without a prior determination by the Corps that the construction "will not adversely affect the functioning of the protective facilities."  33 C.F.R. § 208.10(a)(5).  After the Corps makes this determination, it issues a permission to the applicant.

### D.    Nationwide Permit 12 and Conditions Regarding Historic Preservation

As noted above, the Corps can authorize certain activities in waters of the United States under Section 404 of the Clean Water Act, 33 U.S.C. § 1344, and/or Section 10 of the RHA, 33 U.S.C. § 403, through a nationwide permit.  In this case, Plaintiff challenges more than 200 verifications that the Corps issued for portions of the Pipeline under Nationwide Permit 12, which authorizes certain activities relating to utility lines in waters of the United States.  *See*

Reissuance of Nationwide Permits, 77 Fed. Reg. 10,184 (Feb. 21, 2012).  Plaintiff specifically

contests the adequacy of the Corps' tribal consultation for these verifications.  Pl.'s Br. 3.[5]

### 1.      Nationwide Permitting Process

By way of background, the Corps manages nationwide permit activities in three stages.

**First Stage:  Headquarters Nationwide Permit Issuance.**  In issuing nationwide

permits, which are effective for five years, 33 U.S.C. § 1344(e)(2), the Corps conducts a

predictive environmental analysis at the national level to determine whether the individual and

cumulative adverse environmental impacts of the activities authorized by each nationwide permit

are no more than "minimal" as required under Clean Water Act Section 404(e)(1).  *Id.* § 1344(e).

At this stage, analysis of potential adverse effects consists of "reasoned predictions."  *Ohio*

*Valley Envtl. Coal. v. Bulen*, 429 F.3d 493, 501 (4th Cir. 2005).  The Corps prepares appropriate

documentation to satisfy the National Environmental Policy Act ("NEPA"), 42 U.S.C. §

4332(C),[6] and imposes guidelines governing compliance with Section 106 of the NHPA.  77 Fed.

Reg. at 10,226, 10,250; 40 C.F.R. § 1508.10.  The Corps applies guidelines developed by the

Environmental Protection Agency pursuant to Section 404(b)(1) of the Clean Water Act, 33

U.S.C. § 1344(b)(1), to evaluate potential impacts on the aquatic ecosystem of the proposed

---

[5]      While Plaintiff seeks to enjoin only the Corps' verification of those pre-construction notification sites under Nationwide Permit 12 authorizing discharges into federally regulated waters, Pl.'s Br. 1, the Corps also reviewed activities that fall within its jurisdiction under authorities other than Section 404 of the Clean Water Act, such as verifications under Section 10 of the RHA.  In addition, the Corps has jurisdiction under 33 U.S.C. § 408 to authorize alterations or occupations that will not impair or obstruct federal flood control or navigation projects.  The Corps also has jurisdiction over activities that cross lands owned by the Corps. Prior to issuing a § 408 permission or an easement over Corps-owned lands, the Corps also conducts a review under Section 106 of the NHPA.  *See* Omaha District Envtl. Assessment (ECF 6-51).  This Section 106 review, while procedurally distinct, may overlap with and augment Section 106 review under a Nationwide Permit.  *See id.* at 75-80.
[6]      NEPA generally requires federal agencies to evaluate potential environmental impacts from their actions and make informed decisions.

discharge.  *See* 40 C.F.R. Pt. 230. ("404(b)(1) Guidelines").  The Corps further imposes additional terms through "General Conditions" that are applicable to all nationwide permits.  77 Fed. Reg. at 10,282-90.

Before issuing or reissuing a nationwide permit, Clean Water Act Section 404(e) and the Corps' regulations require "an opportunity for public notice and comment."  33 C.F.R. § 330.1(b); *id*. § 330.5(a)(2); 33 U.S.C. § 1344(e).  The Corps memorializes its 404(b)(1), NEPA, and other environmental analyses in a decision document for each nationwide permit.

**Second Stage:  Division Engineer Review.**  AThe Division Engineer has "discretionary authority to modify, suspend, or revoke NWP authorizations for any specific geographic area, class of activities, or class of waters within his division  . . . by issuing a public notice or notifying the individuals involved."  33 C.F.R. § 330.5(c)(1).  He may exercise this authority "whenever he determines sufficient concerns for the environment under the section 404(b)(1) Guidelines or any other factor of the public interest so requires, or if he otherwise determines that the NWP would result in more than minimal adverse environmental effects either individually or cumulatively."  *Id*. § 330.4(e)(1); *see id*. § 330.1(d).  Following public comment, the Division Engineers prepare supplemental decision documents and may impose regional conditions to ensure that nationwide permit activities have only minimal adverse effects and are in the public interest.  Proposal to Reissue and Modify Nationwide Permits, 76 Fed. Reg. 9174, 9177 (Feb. 16, 2011); 33 C.F.R. §§ 330.5(c)(1)(i), 330.1(d).

**Third Stage:  Project-Specific Review by District Engineers.**  If a proposed activity meets the terms and conditions of a nationwide permit, including any applicable regional conditions, a potential discharger can assume the activity is authorized by the nationwide permit and "may simply operate under the nationwide permit without informing the Corps in advance

unless the nationwide permit in question requires advance approval . . ." *New Hanover Twp. v. U.S. Army Corps of Eng'rs*, 992 F.2d 470, 471 (3d Cir. 1993); *see* 33 C.F.R. § 330.2(c).  "This assumption is subject to the [District Engineer's] authority to determine if any activity complies with the terms and conditions of an NWP."  33 C.F.R. § 330.2(c).  Although some nationwide permits are self-executing, others require potential dischargers to submit a pre-construction notification seeking verification from the Corps that their proposed activity complies with and is authorized by the nationwide permit.  *Id*. § 330.6(a); *see id*. § 330.1(e)(1); Nationwide Permit 12 Decision Document, at 2-3 (ECF 6-4).  Pre-construction notification can be required due to any number of terms and conditions associated with the nationwide permit. When the Corps receives a pre-construction notification, the District Engineer evaluates the proposed activities to ensure compliance with all terms and conditions of the nationwide permit, including compliance with the NHPA.

The District Engineer reviews the notification "and may add activity-specific conditions," such as compensatory mitigation requirements, "to ensure that the activity complies with the terms and conditions of the NWP" and that adverse impacts are no more than minimal.  33 C.F.R. §§ 330.1(e)(2), (3), 330.6(a)(3)(i); *see* 76 Fed. Reg. at 9175, 9178-79.  If the District Engineer determines that "the adverse effects are more than minimal," he "will notify the prospective permittee that an individual permit is required" unless the permittee proposes mitigation measures "to reduce the adverse impacts to minimal."  33 C.F.R. § 330.1(e)(3). Following verification, the District Engineer retains discretion to suspend, modify, or revoke the verification based on later arising "concerns for the aquatic environment under the [404(b)(1)] Guidelines or for any factor of the public interest."  *Id*. §§ 330.1(d), 330.4(e).

## 2. Conditions Regarding Historic Preservation

As noted above, the Corps imposes general conditions on all nationwide permits.  Two of particular relevance in this case are Nationwide General Conditions 20 and 21.  General Condition 20 "requires 'non-federal permittees [to] submit pre-construction notification . . . [where an] activity [authorized by NWP 12] may have the potential to cause effects to historic properties" listed on, eligible for listing on, or potentially eligible for listing on the National Register of Historic Places.  77 Fed. Reg. at 10,284.  "Where the non-Federal applicant has identified historic properties on which the activity may have the potential to cause effects and so notified the Corps, the non-Federal applicant shall not begin the activity until notified by the district engineer either that the activity has no potential to cause effects or that consultation under Section 106 of the NHPA has been completed."  *Id*.  The scope of General Condition 20 extends to consideration of "visual or noise effects to historic properties outside of the project area that have to be evaluated through the [Corps'] section 106 consultation process."  *Id*. at 10,250.  Thus, in the third stage of the nationwide permitting process described above, the District Engineer is responsible for evaluating whether the proposed activity may impact historic properties under Section 106 of the NHPA.  *Id*. at 10,284**.**

General Condition 21 imposes an additional, ongoing requirement that, if previously unknown artifacts or remains are discovered during the permitted activities, permittees must "notify the district engineer . . . and to the maximum extent practicable, avoid construction activities that may affect the remains and artifacts" until "Federal, Tribal and state coordination" is completed.  *Id*. at 10,284.

The Corps also imposes Regional Conditions on its nationwide permits on a state-by-state basis.  76 Fed. Reg. at 9175; 33 C.F.R. § 330.5(b)(2)(ii).  Here, the Corps issued notices of its

intent to issue Regional Conditions and gave the public an opportunity to submit comments.

Supplement to the Decision Document for Nationwide Permit 12 for Illinois District at 1 (Ex. 2).

The Corps engaged in Government-to-Government consultation with Federally Recognized

Indian Tribes prior to imposing these Regional Conditions.  *Id*. at 4-5.  The districts whose

verifications are at issue in this case relied on Regional Conditions specific to the states in which

they operate.  2012 Nationwide Permit Regional Conditions for North Dakota (Ex. 3),[7] South

Dakota (Ex. 4), Iowa (Ex. 5), and Illinois (Ex. 6).  These Regional Conditions restrict the scope

of Nationwide Permits and expand the types of activities requiring pre-construction notice.

### 3.      Nationwide Permit 12

Nationwide Permit 12 authorizes "[a]ctivities required for the construction, maintenance,

repair, and removal of utility lines and associated facilities in waters of the United States,

provided the activity does not result in the loss of greater than 1/2-acre of waters of the United

States for each single and complete project."  77 Fed. Reg. at 10,271.  A "utility line" is "any

pipe or pipeline for the transportation of any gaseous, liquid, liquescent, or slurry substance, for

any purpose, and any cable, line, or wire for the transmission for any purpose of electrical

energy, telephone, and telegraph messages, and radio and television communication."  *Id*. at

10,271-72.  Work that falls within the limitations of Nationwide Permit 12 can begin without any

further contact with the Corps, unless any of several criteria are met.  Historic and cultural

properties present one such exception: "In cases where the district engineer determines that the

activity may affect properties listed, or eligible for listing, in the National Register of Historic

---

[7]      North Dakota's Regional Conditions require (1) pre-construction notification "prior to initiating any regulated activity in the Missouri River, including Lake Sakakawea and Lake Oahe" and (2) permittees to notify the Corps of "the location of any borrow site that will be used in conjunction with the construction of the authorized activity so that the Corps may evaluate the site for potential impacts to . . . historic properties."  Ex. 3 at 1-2.

Places, the activity is not authorized, until the requirements of Section 106 of the National

Historic Preservation Act (NHPA) have been satisfied." *Id*. at 10,284.

On February 16, 2011, the Corps released for public comment a draft Decision Document

containing the NEPA and Clean Water Act analysis supporting its proposal to reissue (among

others) Nationwide Permit 12. *See* 76 Fed. Reg. at 9175. On February 21, 2012, after reviewing

public comments, the Corps published a final rule reissuing several nationwide permits,

including Nationwide Permit 12, and issuing two new ones. 77 Fed. Reg. at 10,184. The Corps

also prepared a Decision Document for Nationwide Permit 12 after evaluating public comments

on the proposal. Nationwide Permit 12 Decision Document (ECF 6-4). That Decision

Document contained a section addressing Nationwide Permit 12's compliance with applicable

laws, including the NHPA. *Id*. at 3-4. As set forth in that Decision Document, "[m]any NWPs

have pre-construction notification requirements that trigger case-by-case review of certain

activities. Two NWPs general conditions require case-by-case review of all activities that may

adversely affect Federally-listed endangered or threatened species or historic properties (i.e.,

general conditions 18 and 20)." *Id*. at 4. *See also, id*. at 29, § 5.1(f).

## II.      FACTUAL BACKGROUND

The Dakota Access Pipeline ("Pipeline") will connect the Bakken and Three Forks

production region of North Dakota to Patoka, Illinois. Chiefly Decl. ¶ 4. The pipeline, which

will be approximately 1,168 miles long, crosses through three Corps Districts: Omaha, Rock

Island, and St. Louis. July 25, 2016 Letter and Mem. from Sec'y Darcy, Assistant Sec'y of the

Army for Civil Works, to J. Fowler, ACHP, Mem. at 2-6 (ECF 6-53) ("July 25, 2016 Sec'y

Darcy Letter and Mem."). "Approximately 3% of the total pipeline is subject to the Corps

jurisdiction." *Id*. at 1.

On December 29, 2014, Dakota Access submitted its first, incomplete pre-construction notice package to the Corps.  *E.g.,* Mem. for Record for S.D. Verifications (July 25, 2016) (Ex. 7).  Dakota Access submitted additional documentation over the next few months, completing its final table of pre-construction notifications for South Dakota on August 31, 2015.  *Id*. at 2.

Omaha District's[8] Regulatory Project Manager examined the pre-construction notices to ensure that the proposed activities would comply with the terms and conditions of Nationwide Permit 12, including the General Conditions and the Regional Conditions applicable to North and South Dakota. *Id*. at 13.  Omaha District confirmed that the applicant had accurately identified water crossings in its pre-construction notifications and had, in fact, been over-inclusive in identifying the crossings subject to pre-construction notification.  *Id*. at 1-2.  Within South Dakota, Dakota Access originally submitted 16 wetland and stream crossings as pre-construction notifications.  *Id*. at 1.  Upon review, the Corps determined that 6 of those sites did not require pre-construction notification.  *Id*.  The Corps' Rock Island and St. Louis districts engaged in similar processes.  Rock Island District reviewed 108 pre-construction notifications – 63 in Iowa and 45 in Illinois.  July 25, 2016 Sec'y Darcy Letter and Mem., Mem. at 4.  And St. Louis District reviewed 86 pre-construction notifications in Illinois.  *Id*. at 5.

On February 9, 2015, the Corps' Omaha District notified Dakota Access that "they couldn't begin any work relative to their submitted PCNs until the Corps completed its responsibilities in accordance with Section 106 of the National Historic Preservation Act."  Mem. for Record for S.D. Verifications at 1 (Ex. 7).  In addition, the Corps notified Dakota

---

[8]     Because of the extensive administrative record and the fact that the District includes the area where Plaintiff's reservation and Lake Oahe are located, only the facts pertaining to the Omaha District will be summarized.  But the Omaha District's review and consultation efforts are representative of the kind of review process the Rock Island and St. Louis Districts undertook.

Access that it was "initiating the solicitation of Tribal input necessary for the Corps to make effect determinations on the permit areas." *Id*. On July 30, 2015, Dakota Access added another pre-construction notification site, bringing the number of such sites in South Dakota to 11. *Id*. at 2.

Dakota Access retained archaeologists and historians to survey the entire pipeline. Dakota Access Survey for Williams and Dunn Counties, North Dakota (ECF 6-57). These surveys contained substantial detail about sites such as cairns and stone circles, *id*. at 83, and pictures of sites. *Id*. at 3. Movant-Intervenor Cheyenne River Sioux Tribe described these surveys, which Dakota Access provided to consulting tribes as "massive" "Class III Cultural Resource Reports." Letter from S. Vance, CRST, to M. Van Ness, Corps (July 6, 2016) (ECF 11-4). The Corps scheduled several meetings regarding these reports. Chiefly Decl. ¶¶ 17-18, 21-22. The January 22 and February 18-19 meetings were attended by Colonel Henderson, the Corps' Omaha District Commander, and Plaintiff's Tribal Historic Preservation Officer. *Id*.

Omaha District diligently consulted under the NHPA with State Historic Preservation Officers, as well as 63 Federally Recognized Indian Tribes. Harnois Decl. ¶¶ 6, 11, 13, 16, 17, 26; Tribal Distribution List (Ex. 8). This consultation process included meetings between the Corps and Plaintiff on November 6, 2014, January 22, 2016; January 25, 2016; February 26, 2016; March 3, 2016; March 7, 2016; March 22, 2016; April 29, 2016, May 14, 2016. Tribal Consultation Spreadsheet (Ex. 9) (listing several hundred instances of consultation with federally recognized tribes); Harnois Decl. ¶¶ 27-28; Ames Decl. ¶¶ 7, 20, 27-28, 33, 36. Many of these meetings were attended by Omaha District's Commanding Officer. *Id*.[9] And on March 3, 2016,

---

[9]      The Corps also aggressively sought to consult with Movant-Intervenor Cheyenne River. *See* Ames Decl. ¶¶ 16-17.

the Principal Deputy Assistant Secretary of the Army for Civil Works met with Plaintiff.  Ames

Decl. ¶¶ 7, 20, 27-28, 33, 36; Harnois Decl. ¶¶ 27-28; Tribal Consultation Spreadsheet (Ex. 9).

On March 8 and March 22, 2016, pursuant to an agreement between Colonel Henderson and

Chairman Archambault, Corps and Standing Rock archaeologists and Standing Rock's Tribal

Historic Preservation Officer, among others, surveyed the Lake Oahe pre-construction

notification site.  Harnois Decl. ¶¶ 29, 32. The Corps incorporated information Plaintiff provided

into its Section 106 analysis for that site.  *Id*. ¶¶ 32-33 (noting that another pipeline passes

through the area of the Lake Oahe crossing).[10]

Moreover, the Corps attempted to meet with Plaintiff on additional occasions about

additional sites.  Plaintiff initially scheduled, and then withdrew from, a site visit of the proposed

Lake Oahe crossing on September 28, 2015.  Harnois Decl. ¶¶ 23-26.  The Corps also "invit[ed]

tribes to participate in tribal surveys at Preconstruction Notification (PCN) permit areas

associated with the proposed Dakota Access Pipeline."  Letter from J. Eagle, SRST, to Col.

Henderson, USACE (May 17, 2016) (ECF 6-44).  Plaintiff "respectfully decline[d] this offer to

participate" in surveys at all but one pre-construction notification site.  *Id*.  Wheretribes

participated in consultation, that consultation led in several cases to rerouting pipeline segments

that were within the Corps' jurisdiction. Mem. for Record for S.D. Verifications at 7 (July 25,

2016) (Ex. 7).  ("[a]t PCNs 3&4, the pipeline was rerouted to avoid potential historic

properties."); Mem. for Record for Iowa Verifications, Attach. C, Mar. 14, 2016 entry (Ex. 10).

("MVR receives letter from Osage informing them that they concur that rerouting of pipeline at

Mississippi crossing will avoid [sites and] result in 'No Adverse Effect.'").

---

[10]     The Corps notes that the pipeline was routed next to "existing pipelines to the extent
possible to minimize potential impacts."  Omaha District Envtl. Assessment at 7 (ECF 6-51).

The Corps determined that other permitted portions of the pipeline would have no effect on historical and cultural properties and notified state and tribal historic preservation officers. July 25, 2016 Sec'y Darcy Letter and Mem., Mem. at 4.  Some state and tribal historic preservation officers either agreed with the "no effect" determination or did not respond to the Corps.  *Id.* at 3-6. Other state and tribal historic preservation officers disagreed with these determinations because they deemed the Corps definition of "undertaking" to be too narrow.  *Id.* at 3.

The Advisory Council joined the Section 106 process in February 2016.  Chiefly Decl. ¶ 27.  On June 2, 2016, the Advisory Council provided its final letter to the Corps setting forth its advice and recognizing that "the final decision regarding the effects on historic properties is the responsibility of the Corps."  Letter from J. Fowler, ACHP, to Sec'y Darcy (June 2, 2016) (also recognizing "varying jurisdiction and authority over components of the DAPL pipeline") (ECF 6-41).

On July 25, 2016, the Corps concluded the Section 106 process by responding to the Advisory Council with a letter and memorandum setting forth the basis for the Corps' affirmance of its determinations regarding the effects upon sites within the Corps' jurisdiction that were not addressed by rerouting the pipeline or other mitigation.  July 25, 2016 Sec'y Darcy Letter and Mem., Mem. at 3.  With respect to the two locations where the pipeline is subject to the Corps' jurisdiction because it will cross a federal flowage easement and Corps-owned property, the Corps issued an Environmental Assessment and Mitigated Finding of No Significant Impact (July 25, 2016) (ECF 6-52).  This document noted that after consultation with Plaintiff regarding the easement under Lake Oahe, the Corps selected the "proposed pipeline route and installation method . . . to minimize impacts to sensitive resources."  *Id* at 5.  Specifically, "[t]he alignment

of the pipeline was selected because it will be co-located within existing utility corridors and be

installed on federal real property interests using the HDD method[,]" thereby "avoid[ing]

impacts to formerly undisturbed areas and surface resources." *Id*. at 6.  The Corps also required

Dakota Access to "offer Tribal Monitoring for all PCN areas" during construction.  Letter from

M. Chieply, Corps, to J. Mahmoud, Dakota Access, at 2 (ECF 6-48) and attached tribal

monitoring plan; Mem. for Record for North Dakota Verifications at 5 (July 25, 2016) (Ex. 11).

### STANDARD OF REVIEW

The grant of a preliminary injunction is an "'extraordinary and drastic remedy.'"  *Munaf*

*v. Geren*, 553 U.S. 674, 689 (2008) (citation omitted).  "As an extraordinary remedy, courts

should grant such relief sparingly."  *Konarski v. Donovan*, 763 F. Supp. 2d 128, 133 (D.D.C.

2011).  A party seeking a preliminary injunction must demonstrate four elements:  (1) a

substantial likelihood of success on the merits; (2) that he would suffer irreparable injury if the

injunction were not granted; (3) that the balance of the equities tips in his favor; and (4) that the

public interest would be furthered by the injunction.  *Winter v. Nat. Res. Def. Council, Inc.*, 555

U.S. 7, 20 (2008); *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011).

In its Motion, Plaintiff asks this Court to enjoin the Corps to withdraw Nationwide Permit

12 as applied to the Pipeline and to withdraw the Nationwide Permit 12 verifications the Corps

previously issued concerning discharges into federally regulated waters at approximately 200

locations.  *See* Pl.'s Proposed Order Granting Mot. for Prelim. Inj. (ECF No. 6-68).  Because

Plaintiff asks the Court to order the Corps to take affirmative steps to withdraw previously issued

authorizations, Plaintiff is subject to an even higher standard than if it were seeking a preliminary

injunction designed to maintain the status quo.  *Electronic Privacy Info. Ctr. v. Dep't of Justice*,

15 F. Supp. 3d 32, 39 (D.D.C. 2014) ("[W]here an injunction is mandatory—that is, where its

terms would alter, rather than preserve, the status quo by commanding some positive act—the moving party must meet a higher standard than in the ordinary case by showing clearly that he or she is entitled to relief or that extreme or very serious damage will result from the denial of the injunction.") (internal quotation marks and citation omitted).  The D.C. Circuit has emphasized that "[t]he power to issue a preliminary injunction, especially a mandatory one, should be 'sparingly exercised.'"  *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969) (citation omitted); *see also Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo-Mitsubishi, Ltd.*, 15 F. Supp. 2d 1, 4 (D.D.C. 1997), *aff'd*, 159 F.3d 636 (D.C. Cir. 1998) (courts must be "extremely cautious" about granting preliminary relief that goes beyond maintaining the status quo).

Plaintiff surprisingly argues that this Court should apply a *lesser* standard on the theory that the relief it seeks is "not the same as an injunction."  Pl.'s Br. at 19 ("An injunction-like standard does not apply to vacatur or suspension of an agency decision.").  In support, Plaintiff relies on *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010), in which the Supreme Court held that a permanent injunction preventing the planting of genetically engineered alfalfa nationwide was an unnecessarily broad remedy where partial or complete vacatur of the agency action in question would have sufficed.  But the Court's holding was focused on the appropriate scope of relief, not a standard of review.  Plaintiff also relies on two cases for the proposition that courts have suspended Clean Water Act section 404 permits pending a final decision on the merits where vacatur is the ultimate relief.  Pl.'s Br. 19 (citing *Ohio Valley Envtl. Coal., Inc. v. Hobet Mining, LLC*, 723 F. Supp. 2d 886 (S.D. W. Va. 2010)[11] and *Save Our Sonoran, Inc. v. Flowers*, 227 F. Supp. 2d 1111 (D. Ariz. 2002)).  Plaintiff's

---

[11]     Plaintiff mistakenly cites the *Ohio Valley Environmental Coalition* case as against the Corps.  Pl.'s Br. 19.  The Corps was not a party to the case cited.

reliance on these cases is also inapposite.  In *Ohio Valley*, the court granted summary judgment

on the merits of a citizen suit against a mining company for violating its State-issued Clean

Water Act permit (under section 402, not 404 as Plaintiff alleges), among other claims.  723 F.

Supp. 2d at 895.  It did not address the standard for a preliminary injunction.  And *Save Our*

*Sonoran* was a pre-*Winter* case that did not apply the four-prong standard for preliminary

injunction.  Moreover, Plaintiff is not seeking temporary suspension of any Corps authorizations

but rather for the Corps to withdraw them completely.  Thus, the heightened standard for

mandatory injunctions applies.

## ARGUMENT

I.    **PLAINTIFF HAS NOT ESTABLISHED THAT IT IS LIKELY TO PREVAIL ON THE MERITS OF ITS CLAIM THAT THE CORPS VIOLATED THE NATIONAL HISTORIC PRESERVATION ACT.**

Plaintiff's effort to satisfy the requirement that it establish the likelihood of its success on

the merits focuses primarily on the allegation that the Corps failed to comply with its NHPA

consultation duties.  Plaintiff's arguments on this score inevitably fail, because – both in the

context of the Nationwide Permit 12, and in the context of its site-specific verifications – the

Corps' efforts to involve and consult with affected Tribes, including Plaintiff, were exemplary.

A.    **Plaintiff Is Unlikely to Prevail on Its Claim That Nationwide Permit 12 Violates the NHPA Because the Corps Reasonably Consulted with Federally Recognized Tribes.**

In promulgating nationwide permits, the Corps reasonably focuses its Section 106

analysis on the portions of projects that are within the Corps' jurisdiction.  That permitting

process provides for comments or consultation at two separate stages.  First, the Corps sought

public comments on its 2012 Nationwide Permits and General Condition 20 – which imposes

conditions on the permit to protect historic sites.  Second, the nationwide permits, General

Condition 20, and the Corps' regulations require site-specific Section 106 analysis to be conducted once areas where the nationwide permit might be used are identified.  Together, this structure fully complies with the Corps' responsibilities under Section 106.

As discussed above, general permits, including Nationwide Permit 12, are promulgated pursuant to Federal Register notice.  77 Fed. Reg. at 10,184.  The public, including Plaintiff, therefore had an opportunity to comment on Nationwide Permit 12 prior to its issuance.  *See id*. That notice and comment procedure reasonably imposed broad general conditions to protect historic properties.  Because general permits cover the entire nation, the Corps did not engage in site-specific consultation at the first stage in its general permit process for Nationwide Permit 12 – the issuance of the general permit.

The Corps reasonably addressed the NHPA by engaging in a notice and comment process that permitted the public, including Plaintiff, to comment on general conditions attached to the permit.  General Condition 20 applies to historic properties.  It requires "non-federal permittees [to] submit pre-construction notification . . . [where] activity [authorized by NWP 12] may have the potential to cause effects to historic properties" listed on, eligible for listing on, or potentially eligible for listing on the National Register of Historic Places.  77 Fed. Reg. at 12,084.  "Where the non-Federal applicant has identified historic properties on which the activity may have the potential to cause effects and so notified the Corps, the non-Federal applicant shall not begin the activity until notified by the district engineer either that the activity has no potential to cause effects or that consultation under Section 106 of the NHPA has been completed."  *Id*.  As the Corps stated in response to comments, this restriction ensures that "activities that . . . have the potential to cause effects to historic properties are not authorized [by Nationwide Permit 12] until the required consultations are completed."  *Id*. at 10,258.  Similarly, General Condition 21

protects previously unknown remains and artifacts by requiring users of Nationwide Permit 12 to "notify the district engineer . . . and to the maximum extent practicable, avoid construction activities that may affect the remains and artifacts" until "Federal, Tribal and state coordination" is completed. *Id*. at 10,284. The Corps consulted with Plaintiff prior to imposing these broad general conditions protecting historic properties on its Nationwide Permits. Letter from Col. R. Ruch, Corps, to Chairman C. Murphy, SRST (Feb. 16, 2011) (Ex. 12). The Corps' provision of this general opportunity to consult was reasonable, particularly when viewed in conjunction with the subsequent site-specific consultation provided for by Nationwide Permit 12.

The Corps provided Plaintiff with another opportunity to consult regarding the adoption of regional conditions in its Nationwide Permits. The Corps issued notices of its intent to issue Regional Conditions restricting the scope of Nationwide Permits and expanding the types of activities requiring pre-construction notification. The Corps engaged in Government-to-Government consultation with Federally Recognized Indian Tribes prior to imposing these Regional Conditions. *See, e.g.,* Supplement to the Decision Document for Nationwide Permit 12 for Illinois District at 1 (Ex. 2). Notably, the Omaha District consulted with Plaintiff regarding the issuance of its Regional Conditions. Tribal Information Fact Sheet, Omaha District (Mar. 7, 2012) (Ex. 13); Letter from Col. R. Ruch, Corps, to Chairman J. Brings Plenty, CRST (Nov. 9, 2012) (Ex. 14). Plaintiff suggests no additional steps that the Corps could reasonably have taken to consult with Plaintiff regarding historical and cultural properties prior to the identification of specific projects.

Nationwide permits reasonably defer any site-specific consultation to the third phase of the nationwide permitting process. During that phase, district engineers engage in appropriate and effective site-specific consultation, including with Indian tribes. 33 C.F.R. Pt. 325,

Appendix C and 2005 NHPA Guidance (Ex. 1).  Plaintiff's citation to several cases, including

*Sheridan Kalorama Historical Ass'n*, 49 F.3d at 755, are inapposite, Pl.'s Br. 21-22, and do not

suggest that the Corps is required to complete its entire Section 106 review prior to issuing a

Nationwide Permit.  To the contrary, the Corps may defer assessment of certain potential impacts

until after it issues a nationwide permit.  *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31,

46 (D.C. Cir. 2015) (upholding Corps' deferral under the Endangered Species Act of "any

consideration of species impacts and authorization of species take until the verification stage, in

the context of specific projects").  The Corps was similarly reasonable in bifurcating its NHPA

compliance into: (1) consultation regarding Nationwide Permit 12's general conditions; and (2)

site-specific consultation once potentially impacted sites are identified.  The court's analysis

need proceed no further.

Plaintiff's arguments that the Corps failed to adequately consult regarding its issuance of

Nationwide Permit 12 actually illustrate the reasonableness of the Corps' consultation.

Plaintiff's suggestion, Pl.'s Br. 21, 24, that the Corps should have engaged in Section 106

consultation to "consider the impacts of NWP 12 on historic or culturally significant properties,

or otherwise engage in the § 106 consultation process, prior to issuance of NWP 12 in 2012" is

without merit.  Plaintiff's almost comically understated concession that it would be

"challenging" to engage in such consultation on every property listed *or eligible* to be listed on

the National Register – throughout all fifty states and the District of Columbia – in order to

reauthorize nationwide permits *every five years* aptly illustrates that such consultation is not

viable.

Plaintiff's proposed alternative – that the Corps enter into programmatic agreements as

part of the process for reissuing its nationwide permits – is no more realistic under Plaintiff's

interpretation of such agreements.  Pl.'s Br. 22.  The Corps has in fact entered into programmatic

agreements with numerous tribes, including Cheyenne River Sioux Tribe, and the Advisory

Council.  Programmatic Agreement for the Operation and Management of the Missouri River

Main Stem System for Compliance with the HPA (ECF 6-10).  But Plaintiff contends that this

programmatic agreement "is inapplicable to the pipeline" despite the fact that Plaintiff's primary

concern appears to be the pipeline crossing under the Missouri River.  Pl.'s Br. 10.  Plaintiff does

not, and cannot, suggest how the Corps could anticipate what programmatic agreements will be

applicable in the five years following its reissuance of a Nationwide Permit and negotiate those

agreements if the Missouri River programmatic agreement is not applicable here.  Regardless,

the Corps is under no duty to enter a programmatic agreement.  *See* 36 C.F.R. § 800.13.

Moreover, the Advisory Council's regulations explicitly allow agencies to promulgate

categorical exclusions and then subsequently complete any necessary Section 106 analysis – a

process akin to the Section 106 analysis provided by the Corps' Nationwide Permits.  *Id.* §

800.8(b).  The Corps' promulgation of General Condition 20 and subsequent site-specific NHPA

analysis is therefore more than sufficient to address all NHPA issues that can reasonably be

addressed at the time Nationwide Permits are issued.

> **B.**    **Nationwide Permit 12 and Its General Conditions Fully Complied With and Reasonably Fulfill The Corps' Duties Under Section 106 of the NHPA.**

The Corps' Nationwide Permits reasonably require compliance with Section 106 of the

NHPA.  Contrary to Plaintiff's claims, Pl.'s Br. 23-26, the Corps is ultimately responsible for

determining compliance with the requirements of Section 106 of the National Historic

Preservation Act.  77 Fed. Reg. at 10,250 (affirming in response to comments on Nationwide

Permit 12 that it has ultimate responsibility "for determining compliance with the requirements

of Section 106 of the National Historic Preservation Act").  Corps regulations and General

Condition 20 require the Corps to consider whether a proposed project under the Nationwide Permits may affect historic properties.

Nationwide Permit 12's general conditions ensure compliance with the NHPA in two primary ways.  First, non-federal permittees must submit pre-construction notifications to the Corps for certain activities authorized by Nationwide Permit 12 regardless of whether those activities may affect historic properties.  *See id*. at 10,272.  Where the Corps receives such pre-construction notification and determines the activity has the potential to, or is uncertain if the activity has the potential to, impact historic properties of religious or cultural significance to tribes, the Corps initiates tribal consultation.  2005 NHPA Guidance (Ex. 1).  Plaintiff appears to concede that pre-construction notifications trigger Section 106 review, instead focusing on the set of activities permitted by Nationwide Permit 12 for which they contend "the proponent determines for itself that its own project will not affect historic properties."  Pl.'s Br. 24.  But the Corps' Nationwide Permits subject all sites containing historic resources to pre-construction notice.

Contrary to Plaintiff's assertions, Nationwide Permit General Condition 20 reasonably requires non-federal permittees to "submit a pre-construction notification . . . if the authorized activity may have the potential to" cause effects to any historic properties listed on, determined to be eligible for listing on, or potentially eligible for listing on the National Register.  77 Fed. Reg. at 10,284.[12]  The Corps' use of information provided by project proponents to determine which sites require pre-construction notice based upon the potential presence of historical

---

[12]    Plaintiff's citation to *Washington Toxics Coalition v. U.S. Department of Interior* is inapposite because the Corps does not wholly delegate the responsibility for Section 106 compliance to any permittee.  457 F. Supp. 2d 1158, 1179 (W.D. Wash. 2006) (finding that action agencies may not unilaterally make Endangered Species Act determinations requiring consultation with the United States Fish and Wildlife Service).

resources is reasonable.  Indeed, it is expressly allowed by the ACHP's implementing

regulations.  36 C.F.R. § 800.2(a)(3) provides that an agency "may use the services of applicants,

consultants, or designees to prepare information, analyses and recommendations" so long as the

agency ensures that the study "meets applicable standards and guidelines."  The Corps'

archaeologist reviewed Dakota Access's "cultural survey information and . . . concluded there

was No Effect to historical properties" from unreported PCN crossings. Chiefly Decl. ¶ 38.

Courts have regularly upheld the practice of requiring permit applicants to supply studies

and documentation for review by the agency both under the NHPA and in the analogous context

of NEPA and the Clean Water Act.  In *Harrison v. U.S. Department of the Army*, the court

approved the NHPA analysis where "Utility Defendants hired private consultants to determine

the impact of the proposed federal undertaking."  No. 3:08-CV-105-H, 2009 WL 3347109, at *2

(W.D. Ky. Oct. 14, 2009).  In *Crutchfield v. County of Hanover, Virginia*, the court rejected a

similar argument related to the Corps' use of studies provided by the applicant in verifying

activity under a nationwide permit.  325 F.3d 211 (4th Cir. 2003).  The court noted that "to

require the Corps to do such independent studies rather than reasonably relying on extensive

studies given to them by applicants 'would place unreasonable and unsuitable responsibilities on

the Corps,' which receives thousands of permit applications per year."  *Id.* at 223-24 (citing

*Friends of the Earth v. Hintz*, 800 F.2d 822, 835-36 (9th Cir. 1986) (applying reasoning to

uphold NEPA analysis).  Like the ACHP's Section 106 regulations, the NEPA regulations do not

require an agency to gather its own information.  *See Hintz*, 800 F.2d at 834-35.  *Hintz* found that

the Corps fully complied with NEPA where it had accepted a report from an applicant and had

"exhaustively studied that information prior to making its decision."  *Id.* at 835.

To the extent that Plaintiff suggests that project proponents might be insufficiently motivated to comply with General Condition 20(c)'s requirement to submit pre-construction notifications to the district engineer, the Corps structured its regulations to require sufficient exploration of historic properties.[13]  Nationwide permittees risk violating the Clean Water Act and/or Rivers and Harbors Act if they proceed with a project under Nationwide Permit 12 without adequately investigating NHPA issues and making the required pre-construction notification, where necessary.  *See* General Condition 20, 77 Fed. Reg. at 10,284; 33 C.F.R. § 330.4(g).  In short, the Corps' use of information provided by the applicant is reasonable, particularly when coupled with its efforts to consult with tribes regarding the reports produced by the applicant.

This case illustrates that General Condition 20 produces the type of study and consultation that Plaintiff claims to seek.  Pursuant to General Condition 20, Dakota Access engaged multiple archaeological firms that extensively surveyed for historic properties.  *See* Dakota Access Survey for Williams & Dunn Counties, N.D. (ECF 6-57).  These surveys contained substantial detail about sites such as cairns and stone circles, *id.* at 83, and pictures of sites, *id.* at 3.  These reports provided Plaintiff with sufficient information to engage in consultation.  *See* Letter from S. Vance, CRST, to M. Van Ness, Corps (July 6, 2016) (ECF 11-4) (describing "Class III Cultural Resource Reports" provided by Dakota Access as "massive" and stating that he did not attend a December 2015 meeting because he lacked sufficient time to review the reports prior to the meeting); Decl. of T. Mentz, Sr. ¶ 29 (ECF 16) (commenting on treatment of stone features in the reports); Decl. of J. Eagle, Sr. ¶ 19 (ECF 6-2).  Even if Dakota

---

[13]     The Corps, among other things, encourages consultation with State and Tribal Historic Preservation Officers.  General Condition 20, 77 Fed. Reg. at 12,084; 33 C.F.R. § 330.4(g)(4).

Access's surveys were too massive to be reviewed in 19 days, the Corps provided many more opportunities for consultation regarding the portions of the surveys within Corps jurisdiction.

The Corps engaged in a robust consultation process following Dakota Access's transmission of its survey results.  *See* Tribal Consultation Spreadsheet (noting 389 instances of tribal meetings and communications) (Ex. 9).  As discussed above, the Corps' consultation process with Plaintiff involved at least nine meetings, some of which were site visits, and many of which were attended by the Commanding Officer of the Omaha District and one of which was attended by  *Id*.  The quantity and quality of these consultations renders Plaintiff's claim that the Corps failed to consult in a "reasonable and good faith manner," Pl.'s Br. 31, without merit.

Where tribes provided the Corps with information, the Section 106 process led to rerouting the pipeline "at PCNs 3&4 . . . to avoid potential historic properties."  Mem. for Record for S.D. Verifications at 7 (Ex. 7).  Plaintiff is correct that a map of the James River is illustrative.  Pl.'s Br. at 36.  But that map illustrates that the Corps' consultation process works, as it depicts only a proposed pipeline route.  Chiefly Decl. ¶¶ 24-25.  That route was surveyed, historic properties were identified, and the Corps "directed Dakota Access to realign the pipeline away from Tribal identified cultural resources."  *Id*.  Simply put, the Corps provided tribes with a reasonable opportunity to "advise on the identification and evaluation of historic properties."  Pl.'s Br. 24.  Plaintiff is simply incorrect that tribes "are not provided any opportunity, let alone a reasonable one, to identify their concerns or assist in the identification of historic sites."  *Id.* at 26.  Rather, the Corps' promulgation of Nationwide Permit 12, General Condition 20, and the Corps' Appendix C regulations and 2005 NHPA Guidance reasonably fulfilled the Corps' duties under the NHPA.

C.      **The Corps Fully Complied with NHPA Section 106 with Respect to the Pre-construction Notices and Verifications at Issue.**

Plaintiff's primary objection to the Corps' NHPA compliance in this case is that the Corps limited the scope of its analysis to the areas over which it has jurisdiction.  The analysis required by NHPA is an assessment of the effects of "federal" undertakings, which in the reissuance of Nationwide Permit 12 is the authorization of (1) minimal discharges of dredged or fill material into waters of the United States or (2) work in navigable waters of the United States that will result in minimal adverse effects from activities associated with utility lines. Nationwide Permit 12 Decision Document (ECF 6-4). The Corps' published regulations make clear that such activities, which are regulated under Section 404 of the Clean Water Act or Section 10 of the Rivers and Harbors Act, comprise only the portion of an entire right-of-way for a pipeline that crosses jurisdictional waters.  The NHPA analysis should therefore address "the portion of the right-of-way, approaching the crossing, [that] would not occur in its given configuration 'but for' the authorized activity."  33 C.F.R. Pt. 325, App. C ¶ 1(g)(1), (4).  *See also id.* ¶ 5(f) ("The Corps is not responsible for identifying or assessing potentially eligible properties outside the permit area, but will consider the effects of undertakings on any known historic properties that may occur outside the permit area.").  The Corps' regulations define the three elements of its test for determining the portions of a utility line that meet this test, and apply the test to determine that, while the "'but for' test is not met by the entire project right-of-way . . . "[t]ypically . . . some portion of the right-of-way, approaching the crossing would not occur in its given configuration 'but for' the authorized activity," thus defining the scope of the permit area.  33 C.F.R. Pt. 325, App. C, ¶ 1(g)(4).

The Corps' limited definition of undertakings is consistent with D.C. Circuit precedent. Section 106 of the National Historic Preservation Act requires federal agencies to take into

account the effects of federal "undertakings."  It defines "undertaking" as "a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including . . . those requiring a Federal permit, license, or approval."  54 U.S.C. § 300320(3). "[T]he text of § 106 still applies by its terms only to federally funded or federally licensed undertakings." *Sheridan Kalorama Historical Ass'n*, 49 F.3d at 755.  As the D.C. Circuit noted, regardless of how broadly "Congress or the ACHP define 'undertaking', § 106 applies only to: 1) 'any Federal agency having . . . jurisdiction over a proposed Federal or federally assisted undertaking' and 2) 'any Federal . . . agency having authority to license any undertaking.'" *Id.* (citation omitted).

    The focus is on the extent of the agency's jurisdiction over activities at issue.  *Duncan's Point Lot Owners Ass'n v. FERC*, 522 F.3d 371, 377 (D.C. Cir. 2008).  The Corps' jurisdiction for the "undertaking" is limited to specific crossings over waters of the United States, not the entire pipeline.  The Corps' regulations reasonably interpret the statutory definition of "undertaking" to determine that the undertakings at issue were 202 discrete verifications rather than the entire 1,168-mile pipeline.  *See* 33 C.F.R. Pt. 325 App. C; *Harrison,* 2009 WL 3347109, at *7 (holding that the NHPA "undertaking" was the 10.9 mile portion of a transmission line for which the Corps granted an easement rather than the entire 41.9 mile length of the transmission line); *McGehee v. U.S. Army Corps of Eng'rs*, No. 3:11-CV-160-H, 2011 WL 3101773, at *2 (W.D. Ky. July 19, 2011) ("the issuance of federal permits or federal funding for limited portions of a project, does not make the entire project a federal undertaking for purposes of the NHPA."). While the Corps' Appendix C supports this limitation, this Circuit has rejected efforts to expand the area of Section 106 analysis beyond the actions authorized by an agency's granting of a license. *Duncan's Point Lot Owners Ass'n*, 552 F.3d at 377.  The D.C. Circuit there focused on

plaintiff's failure to "offer any basis upon which FERC would have jurisdiction under the NHPA over activities not authorized under the license." *Id*.  Plaintiff here can provide no basis for the Corps having jurisdiction over private activities taken on private lands that constitute 97% percent of the pipeline.  The discrete Corps undertakings at issue here are similarly confined to the Corps' jurisdiction over water crossings and easements accounting for approximately 3% of the pipeline.  These limited undertakings do not vest the Corps with jurisdiction over the entire 1,168-mile-long pipeline, portions of which are far removed from the Corps' jurisdiction.  *See Sierra Club*, 803 F.3d at 52-55 (relying, in part, on Corps' Appendix B regulations).  The Corps reasonably limited its NHPA analysis to the areas over which it has jurisdiction.

Plaintiff's position that the "undertaking" and "area of potential effects" at issue is the entire pipeline is similarly inconsistent with case law interpreting the analogous NEPA.  It is well-established that "federal undertakings" under the NHPA are similar to "major federal actions" under the National Environmental Policy Act.  *See, e.g.*, *Karst Envtl. Educ. & Prot., Inc.*, 475 F.3d at 1294-95 ("Because of the operational similarity between NEPA and NHPA, both of which impose procedural obligations on federal agencies after a certain threshold of federal involvement, courts treat major federal actions under NEPA similarly to federal undertakings under NHPA.") (internal quotation marks and citation omitted); *Sugerloaf Citizens Ass'n v. FERC*, 959 F.2d 508, 515 (4th Cir. 1992) ("The standard for triggering NHPA requirements is similar to that for the triggering of NEPA requirements.").  Significantly, the Corps need not assess the environmental impacts of an entire pipeline under NEPA when it only permits a small portion of the pipeline.  *Sierra Club*, 803 F.3d at 54 n.10 ("[A]gencies were not *required* to perform a pipeline-wide NEPA review.") (emphasis in original); *Sierra Club, Inc. v. Bostick*, 787 F.3d 1043, 1055 (10th Cir. 2015).  *See also, Macht v. Skinner*, 916 F.2d 13, 19

(D.C. Cir. 1990) (no federal action under NEPA where the only federal involvement is issuance of a permit covering 3.58 acres of the 22.5–mile project); *Winnebago Tribe of Neb. v. Ray*, 621 F.2d 269, 272-73 (8th Cir. 1980) (permit allowing transmission line to cross the Missouri River did not require Corps to consider the effect of entire 67–mile project).  Historical sites are inherently localized and site-specific, whereas environmental impacts sometimes reach farther beyond the area of direct impact.  Any differences in the nature of historical and environmental impacts therefore militates in favor of, if anything, defining an undertaking or action more narrowly under NHPA than NEPA.  Put another way, the Corps' focus on the portions of a project that it regulates is even more compellingly justified with respect to the NHPA analysis.

Plaintiff's reliance on the Advisory Council's letters for support is equally unavailing. The Advisory Council's letters largely criticize the Corps' definition of undertaking – suggesting that the Corps should have conducted a Section 106 analysis of the entire 1,168-mile-long pipeline.  Letter from J. Fowler, ACHP, to Sec'y Darcy (June 2, 2016) (ECF 6-41).  But while the Advisory Council administers the NHPA and has promulgated regulations that generally govern federal agency compliance with Section 106, codified at 36 C.F.R. Pt. 800, it is far from clear that there is a conflict between the Corps' and Advisory Council's regulations.  *See McGehee v. U.S. Army Corps of Eng'rs,* No. 3:11-CV-160-H, 2011 WL 2009969, at *16-17 (W.D. Ky. May 23, 2011) ("such conflict is not inevitable nor present here. Of course the Corps defines 'permit area' differently than the definition of "area of potential effects," . . . but both sets of regulations recognize that effects of an undertaking outside the footprint of a project should be considered.").[14]  Second, the Advisory Council's regulations recognize that agencies

---

[14]      The Advisory Council's regulatory definition of "undertaking" merely restates the statute. *Gonzales v. Oregon*, 546 U.S. 243, 257 (2006) ("existence of a parroting regulation does not change the fact that the question here is not the meaning of the regulation but the meaning of

may ultimately disagree with the Advisory Council's recommendations and affirm their initial

finding that historic properties will not be adversely affected.  36 C.F.R.§ 800.5(c).  Finally, the

Advisory Council's final letter relating to the pipeline recognized that the Advisory Council

could not substitute its judgment for the Corps, as "the final decision regarding the effects on

historic properties is the responsibility of the Corps." Letter from J. Fowler, ACHP, to Sec'y

Darcy (June 2, 2016) (also recognizing "varying jurisdiction and authority over components of

the DAPL pipeline") (ECF 6-41).

Plaintiff cites no case establishing that the Corps' jurisdiction over a fraction of a 1,168-

mile-long project is sufficient to require NHPA analysis over the entire 1,168-mile-corridor.

*Colo. River Indian Tribes v. Marsh* addressed a discrete residential development and recognized

that if the Corps' Appendix C regulations were commensurate with the NHPA and the Advisory

Council regulations "any agency decision in accordance therewith would be given due weight

and deference."  605 F. Supp. 1425, 1437 (C.D. Cal. 1985).  And *Committee to Save Cleveland's*

*Huletts v. U.S. Army Corps of Engineers* focused on the Corps' failure to allow the state historic

preservation officer 15 days to comment on a proposed permit for dredging a port area.  163 F.

Supp. 2d 776 (N.D. Ohio 2001).  Neither case involved the type of long, linear utility line or road

projects that have been repeatedly held to be largely outside of federal jurisdiction.  *See*

---

the statute"); *compare* 54 U.S.C. § 300320 and 36 C.F.R. § 800.16(y).  Defendant also notes that
the Advisory Council's comments on the 2017 nationwide permit reissuance has no bearing on
the 2012 Nationwide Permit at issue here.  To the extent such comments on other nationwide
permit issuances are relevant, Defendant notes that the Advisory Council developed and
approved the precursors to the Corps' current Appendix C.  *See* Advisory Council on Historic
Preservation Mem. re: Corps of Engineers Permits and 106 Compliance (Aug. 21, 1979) (Ex.
15).  Those precursor regulations limited the "permit area" to "that area made up of the 'waters
of the United States' (as defined by 33 C.F.R. Pt. 329) which will be physically affected by the
activity to be permitted and any uplands directly affected as a result of permitting the activity
located within the 'waters of the United States.'" *Id.*

*McGehee,* 2011 WL 3101773, at \*3-4 (distinguishing *Comm. to Save Cleveland's Huletts*).  In short, Plaintiff is unlikely to be able to establish that the Corps' Section 106 analysis must cover the entire 1,168 mile-length of a pipeline when the Corps has jurisdiction over only 3% of that pipeline.

> **D.    The Corps' Section 106 Review in This Case Was Reasonable.**

Plaintiff's challenge to the sufficiency of the Corps' Section 106 consultation process at 202 specific sites fails because the Corps engaged in a robust consultation process that fully complies with Section 106.  The Corps' process was designed to identify historic and cultural resources within the area of potential effects of those 202 sites.  The Corps repeatedly engaged Plaintiff's chairman and Tribal Historic Preservation Officer, sought information from Plaintiff, and led to rerouting the pipeline and other avoidance measures where relevant information was provided.  Despite the Corps' repeated efforts to engage Plaintiff, Plaintiff did not fully participate in the Section 106 process.  The Corps therefore proceeded with Section 106 consultation regarding the 202 sites by actively encouraging consultation and using the information provided by consulting parties to eliminate the impact of permitted activities on historic properties.  The Corps does not dispute that the NHPA required the Corps to engage in reasonable and good faith effort to consult with Plaintiff.  Pl.'s Br. 31; 36 C.F.R. § 800.2(c)(2)(ii)(B).  As discussed below, the Corps' many meetings with Plaintiff and other efforts to engage Plaintiff and other tribes in the Section 106 process fully discharged that responsibility.

Tribes cannot use the Section 106 process as a sword when they have declined to provide an agency with information that the Tribe claims is necessary to fully comply with Section 106.  For example, the First Circuit found that an agency complied with the NHPA where it "provided

the Tribe with reports on [a private archaeological firm's] findings, engaged it in other contact about the project, and solicited its comments." *Narragansett Indian Tribe v. Warwick Sewer Auth.*, 334 F.3d 161, 169 (1st Cir. 2003) (also relying upon consulting with State Historic Preservation Officer). And in *Apache Survival Coalition v. United States* the Ninth Circuit approved an agency's Section 106 review where the Tribe did not avail itself of opportunity to provide information it claimed was necessary. 21 F.3d 895, 908 (9th Cir. 1994) ("[M]ost importantly, the Coalition's primary contention, that the Forest Service has failed completely to consider the religious significance of Mount Graham . . . could have been remedied had the Tribe not removed itself from the NHPA process."). Similarly, Plaintiff cannot insist that it is the only party with sufficient knowledge to identify cultural sites and then decline to participate in the Corps' efforts to consult with Plaintiff.

Plaintiff's reliance on two cases finding that agencies violated the NHPA is misplaced because the Corps' consultation efforts here far outstrip the efforts described in those two cases. In *Pueblo of Sandia v. United States*, the agency (1) engaged with the Pueblo only by requesting information and (2) withheld information from the Pueblo. 50 F.3d 856, 860 (10th Cir. 1995). Plaintiff's reliance on *Quechan Tribe of the Fort Yuma Reservation v. U.S. DOI*, 755 F. Supp. 2d 1104 (S.D. Cal. 2010) ("*Quechan I*") is similarly misplaced. In that case, the Court found that an agency failed to comply with the NHPA when its invitation to consult "amounted to little more than a general request for the Tribe to gather its own information about all sites within the area and disclose it at public meetings." *Id.* at 1118. This case is far more akin to *Quechan Tribe of the Fort Yuma Indian Reservation v. U.S. DOI*, 927 F. Supp. 2d 921 (S.D. Cal. 2013) (*Quechan II*). *Quechan II* held that the government complied with the NHPA where it "made numerous attempts . . . to engage in government to government consultation." *Id.* at 933. The Court found

35

it significant that Quechan delayed in accepting the government's request for consultation meetings and failed to show that "they were excluded from access to the 'direct impact' survey areas." *Id*. at 925, 933.

The Corps "initiated consultation as information became available regarding" the request to verify that Nationwide Permit 12 applied to each of the 202 pre-construction notification sites. July 25, 2016 Sec'y Darcy Letter and Mem., Mem. at 1.  The Corps began its Section 106 consultation and coordination with Tribal representatives and State Historic Preservation Officers in September 2014.  Harnois Decl. ¶ 6.  The Corps held "four dedicated consultation meetings" with Tribes and additional "individual consultation efforts for every Tribe accepting" its request to consult.  Mem. at 2 (ECF 6-52); Letter from M. Chieply, Corps, to S. Vance, CRST (Feb. 17, 2015) (ECF 11-2).  The Corps sought and received comments from Tribal representatives and State Historic Preservation Officers and considered all of the information it received from that consultation. Mem. at 1 (ECF 6-52).  As discussed above, that consultation process caused the pipeline to be rerouted.[15]  *See* Tribal Consultation Spreadsheet (Ex. 9). Finally, the Corps added "a special condition . . . to the permit verification" requiring "DAPL to offer Tribal monitoring during the construction process at PCN areas."  Mem. for Record for N. D. Verifications at 4 (Ex. 11).  Dakota Access implemented this special condition.  Email from S. Vance, CRST, to H. Frazier, CRST (Aug. 3, 2016) (ECF 11-6).

---

[15]     As these mitigation measures make clear, Plaintiff is simply incorrect, Pl.'s Br. 33, that the Corps' Section 106 process in this case engaged Plaintiff too late in the planning process. Plaintiff is likewise incorrect, Pl.'s Br. 34, that "DAPL propos[ing] mitigation measures to avoid adverse effects," before consulting with Plaintiff was improper.  Plaintiff could and should have raised any concerns regarding these proposals at one of the many meetings between the Corps and Plaintiff.

Plaintiff's criticism of the Corps' Section 106 analysis therefore suffers from several fatal factual flaws.  Plaintiff suggests that the Corps' NHPA analysis is flawed because "the cultural knowledge to determine the existence and significance of sites only lay with the Tribe."  Pl.'s Br. 33.  But the Corps sought, obtained, and considered "information supplied directly by the SRST."  Mem. at 4 (ECF 6-52).  And contrary to Plaintiff's suggestion that it was excluded from surveys, Pl.'s Br. 32, the Corps explicitly invited Plaintiff to survey direct impact areas.  Plaintiff Standing Rock acknowledges that the Corps "invit[ed] tribes to participate in tribal surveys at Preconstruction Notification (PCN) permit areas associated with the proposed Dakota Access Pipeline."  Letter from J. Eagle, SRST, to Col. Henderson, USACE (May 17, 2016) (ECF 6-44).  The tribe "respectfully decline[d] this offer to participate" because they deemed the offer inadequate.  *Id.* (not explaining basis for deeming offer inadequate).  The Corps therefore reasonably discharged its duty to consult with Plaintiff regarding the 202 sites requiring pre-construction notice verification.

Similarly, Dakota Access provided "massive" "Class III Cultural Resource Reports."  Letter from S. Vance to M. Van Ness (July 6, 2016) (ECF 11-4).  These reports covered the "entire route" of the pipeline.  Pl.'s Br. 32.  Plaintiff had months to review these reports and provide comments at the seven meetings between January 22, 2016 and April 29, 2016.  Tribal Consultation Spreadsheet (Ex. 9).  Plaintiff declined to provide comments on these reports other than to demand a complete resurvey of the entire pipeline route.  The Corps provided Plaintiff with a reasonable opportunity to evaluate properties within the Corps' jurisdiction, articulate its concerns regarding those properties, and resolve those concerns.  This process demonstrably led to successful mitigation and rerouting of this very pipeline.  And the Corps' requirement that Dakota Access allow tribal representatives to monitor all construction activities subject to pre-

37

construction notification offers additional assurance against historical resources suffering adverse effects.  The Corps' entire Section 106 review cannot be undone because Plaintiff did not provide the very information repeatedly sought by the Corps.  *See Quechan II*, 927 F. Supp. 2d at 933*; Apache Survival Coal.*, 21 F.3d at 908.  Plaintiff is therefore unlikely to prevail on the merits of its claim that the Corps' Section 106 process was flawed with respect to the portions of the pipeline within the Corps' jurisdiction.

## II.   PLAINTIFF HAS NOT SHOWN IMMEDIATE IRREPARABLE INJURY.

Because Plaintiff's claims are not likely to succeed, the Court may end its inquiry.  *See Winter*, 555 U.S. at 22; *Sierra Club, Inc. v. Bostick*, No. Civ-12-742-R, 2012 WL 3230552, at *8 (W.D. Okla. Aug. 5, 2012), *aff'd*, 539 Fed. Appx. 885 (10th Cir. 2013) (denying preliminary injunction in challenge to proposed Keystone XL pipeline project after "conclud[ing] that Plaintiffs failed to establish a substantial likelihood of success on the merits").  But even if this Court were to proceed to the second element required for a preliminary injunction, Plaintiff has failed to show that it will suffer immediate irreparable injury.

As an initial matter, it is important to reiterate that the Corps has jurisdiction over a mere 3% of the 1,168-mile Pipeline.  July 25, 2016 Sec'y Darcy Letter and Mem., Mem. at 1 Regardless of whether this Court grants a preliminary injunction, construction can continue on the vast majority of the Pipeline, because Plaintiff has not sued or sought any injunction against Dakota Access.  Any allegations of injury to cultural and historical resources on lands over which the Corps has no jurisdiction, *e.g*., Pl.'s Br. 36, should not influence the Court's decision here, because the requested preliminary injunction would not redress injury to those locations.  Rather, the Court's inquiry must be focused on whether Plaintiff has sufficiently identified an

immediate, irreparable injury as to the limited aspects of the Pipeline that are the subject of this case.  Plaintiff has not satisfied this burden.[16]

First, Plaintiff has not shown with any specificity which cultural and historical sites at project areas subject to the Corps' jurisdiction are likely to be injured.  Plaintiff argues that it is not required to "show with precision each and every site that is certain to be destroyed."  Pl.'s Br. 37 n.17.  Instead, Plaintiff points to general information that its ancestors, the Great Sioux Nation, traversed the area along the route of the Pipeline and that this "area" has significance.[17] Pl.'s Br. 35.  Plaintiff essentially argues that there are bound to be cultural and historical sites across the entire 1,168 miles of pipeline, and concedes that these are currently unidentified, unevaluated, and unknown sites.  *Id.* at 36-37.  But the theoretical possibility of harm to unknown sites does not satisfy the irreparable injury prong.  As the Supreme Court has held, "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter*, 555 U.S. at 22 (citation omitted); *see also Wis. Gas Co. v. FERC,* 758 F.2d 669, 674 (D.C. Cir. 1985) ("[T]he injury must be both certain and great; it must be actual and not theoretical.").  Most of the sites that Plaintiff does point to, *e.g.*, Pl.'s Br. 36 (referencing sites found by the Corps' and Dakota Access's archaeological consultants), are located on land outside the Corps' jurisdiction, are not eligible for protection under the NHPA, or are no longer within the path of the Pipeline due to re-

---

[16]    For the same reasons, Plaintiff also has not established that it has standing to challenge the various Corps authorizations across the entire 1,168-mile Pipeline.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).
[17]    Evidence submitted by Movant-Intervenor Cheyenne River Sioux Tribe indicates that the aboriginal territory of the Great Sioux did not include what is now Iowa and Illinois.  Decl. of H. Frazier ¶ 11 (ECF 11-7).

routing in response to tribal concerns.  Chieply Decl. ¶¶ 24-25.  Plaintiff does not explain how a

preliminary injunction would prevent injury to such sites.  And Plaintiff has had ample

opportunity—almost two years—to identify and evaluate sites of potential significance in the

areas of the Pipeline that are within the Corps' jurisdictions.  If, as Plaintiff claims, non-tribal

consultants "lack the training, cultural sensitivity, or legal authorization to make determinations

about cultural significance of Tribal resources," Pl.'s Br. 36, then Plaintiff should have applied

its members' expertise and knowledge to actually aid the Corps in its investigation.

Second, Plaintiff has not demonstrated that sites of importance to the Tribe (known or

unknown) are likely to be irreparably injured as a result of the Corps' authorizations.  The only

portion of the Pipeline under Corps jurisdiction in close proximity to Plaintiff's reservation

involves horizontal drilling under Lake Oahe.  Plaintiff has not indicated how it will be

irreparably harmed by this activity.  The pipeline itself will run 90 feet under the bottom of Lake

(a mitigation measure in response to tribal concerns) alongside an existing pipeline.  Harnois

Decl. ¶ 32.  And the Corps determined that drilling on the small portions of Corps land adjacent

to the Lake would not cause structural impacts.  Omaha District Envtl. Assessment at 78-79

(ECF 6-51).  Moreover, even if unknown artifacts are discovered during the course of

construction, at any areas under Corps jurisdiction, Dakota Access is required to take steps to

ensure they are not harmed.  Under General Condition 21 to the Nationwide Permit, for example,

upon discovering any previously unknown historical, cultural, or archaeological remains or

artifacts, the company must "immediately notify" the Corps and "to the maximum extent

practicable, avoid construction activities that may affect the remains and artifacts" until the

Corps completes a federal, state, and tribal consultation.  Nationwide Permit 12 Fact Sheet (ECF

6-47).  In addition, at the Lake Oahe and Lake Sakakawea crossings, Dakota Access is bound by

an Unanticipated Discovery Plan, which provides for mitigation in the event of a discovery, such as signs, fences, and other protections.  Omaha District Envtl. Assessment App. F (Ex. 16); Shelman Decl. ¶ 8.  Plaintiff suggests that the mere presence of signs, fences, and construction activity can be an "adverse effect" to nearby cultural resources and landscapes.  Pl.'s Br. 38.  But any such adverse effects are not *irreparable*, as required to obtain a preliminary injunction; signs and fences can be removed, disturbed ground can be restored, and the construction activity will end once the Pipeline is built.

Third, Plaintiff has not shown that any alleged injury is imminent, i.e., will take place prior to this Court's ruling on the merits.  *See Wis. Gas Co.,* 758 F.2d at 674 ("[T]he party seeking injunctive relief must show that '[t]he injury complained of [is] of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm.") (alterations in original) (citation omitted).  With respect to construction activities, there are mitigation measures in place to prevent damage to any undiscovered sites.  As noted above, Dakota Access is subject to nationwide permit General Condition 21 at the 202 pre-construction notifications as well as the Unanticipated Discovery Plan, which require the immediate stop of work upon discovery of any potential site of significance to be followed by consultation with tribes and appropriate mitigation measures to avoid damage to the site.  Omaha District Envtl. Assessment App. F (Ex. 16); Shelman Decl. ¶ 8.  To the extent Plaintiff is concerned about damage to cultural resources from oil spills or leaks, Pl.'s Br. 8-9, the Pipeline may be under construction, but will not be operational imminently, let alone degraded or in a state of disrepair.

In sum, Plaintiff has not shown that the preliminary injunction would cause imminent, irreparable injury.

III.    **THE BALANCE OF EQUITIES TIPS IN FAVOR OF THE CORPS, AND ISSUANCE OF AN INJUNCTION WOULD HARM THE PUBLIC INTEREST.**

The public interest and balancing of the equities prongs are not just a summary of the other prongs; they are separate from and additional to the other prongs.  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (stating that plaintiffs must carry the burden or persuasion as to each element "by a clear showing") (emphasis and citation omitted).  Where the federal government is a party, the equities and public interest inquiries tend to merge.  *See Colo. Wild Horse & Burro Coal., Inc. v. Jewell*, 130 F. Supp. 3d 205, 220-21 (D.D.C. 2015) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  Considering all of the environmental, economic, and social benefits from the nationwide permit program and from this project, the public interest and balancing of the equities weigh against a preliminary injunction.

The balance of equities and public interest weigh against an injunction where Plaintiff did not avail itself of the opportunity to engage in the NHPA consultation process designed to protect the very interests that Plaintiff now claims will be harmed absent an injunction.  The NHPA is specifically designed to protect the public's interest in protection of historical sites and tribal culture by requiring agencies to consult with tribes to identify sites of significance potentially affected by federal actions.[18]  As explained above and in the attached Declarations of Joel Ames and Richard Harnois, the Corps attempted to obtain Plaintiff's input on the locations of potential sites over a two-year consultation process, but Plaintiff repeatedly obstructed the

---

[18]    To the extent Plaintiff's broader complaint concerns the 97% of the Pipeline outside the Corps' jurisdiction, public interest also would not be served by holding the Corps accountable for NHPA review of such lands.  *See Harrison*, 2009 WL 3347109, at *20-21 ("To hold the federal government responsible for reviewing private projects where the extent of its control was to allow utility lines to cross its land, would create federal control over private projects which NHPA does not envision. To do so could create an incentive for the government to refuse such requests, thus unnecessarily increasing costs and decreasing efficiency for private projects.").

process by failing to respond to calls and emails, cancelling meetings, and refusing to acknowledge the authority of anyone to consult except the President or Secretary of Interior. Plaintiff also had ample opportunity to voice concerns about the nature of the consultation process during the public comment periods for the reissuance of Nationwide Permit 12 and the Environmental Assessment for Lake Oahe.  In addition to the general public notice and comment, the Corps sent specific notices to Plaintiff and other tribes seeking input.  *E.g.*, Shelman Decl. ¶ 8.

Granting the equitable remedy of a preliminary injunction now, after both the Corps and Dakota Access have invested significant time and resources and accommodated timely raised tribal concerns, would only reward Plaintiff's unwillingness to engage meaningfully in the consultation process.  And it would not serve the public interest to encourage parties in the future to decline to consult and comment and then bring last-minute challenges as construction is underway—utilizing judicial resources in the process—rather than taking the proper steps to engage in the planning stages when their concerns can be addressed without resorting to such a drastic step as an injunction.

The balance of equities also weigh against an injunction in light of the public interests that Nationwide Permit 12 serves.  As this Court explained:

> [T]he public has an interest in regulatory efficiency with respect to projects that fall within the rubric of the general permitting system that the Clean Water Act expressly authorizes.  This system is carefully designed and administered to minimize the costs of approving projects that the Corps has already determined will not adversely impact the environment.  The general permitting system also has the added benefit of incentivizing project sponsors to conform their construction activities to existing general permits, thereby further reducing the administrative burden while at the same time decreasing the potential negative environmental consequences of those projects.

*Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 3d 9, 43 (D.D.C. 2013) (holding that the balance of harms and public interest factors weighed against a preliminary injunction in a challenge to a proposed 589-mile pipeline from Illinois to Oklahoma where Nationwide Permit 12 provided both resource savings and benefits to the environment).

## CONCLUSION

The Court should deny Plaintiff's Motion for Preliminary Injunction.


Dated: August 18, 2016                    Respectfully submitted,

                                          JOHN C. CRUDEN
                                          Acting Assistant Attorney General
                                          Environment & Natural Resources Division

                                   By:    /s/  Matthew Marinelli

                                          MATTHEW MARINELLI, IL Bar 6277967
                                          U.S. Department of Justice
                                          Natural Resources Section
                                          P.O. Box 7611
                                          Benjamin Franklin Station
                                          Washington, DC 20044
                                          Phone: (202) 305-0293
                                          Fax: (202) 353-2021
                                          matthew.marinelli@usdoj.gov

                                          ERICA M. ZILIOLI, D.C. Bar 488073
                                          U.S. Department of Justice
                                          Environmental Defense Section
                                          P.O. Box 7611
                                          Washington, DC 20044
                                          Phone: (202) 514-6390
                                          Fax: (202) 514-8865
                                          Erica.Zilioli@usdoj.gov

                                          *Attorneys for the United States Army Corps
                                          of Engineers*

OF COUNSEL:

MILTON BOYD
MELANIE CASNER
U.S. Army Corps of Engineers
Office of Chief Counsel
Washington, DC

## CERTIFICATE OF SERVICE

I hereby certify that, on the 18th day of August, 2016, a copy of the foregoing was filed through the Court's CM/ECF management system and electronically served on counsel of record.


/s/  *Matthew Marinelli*
Matthew Marinelli