IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE,<br><br>                        Plaintiff,<br><br>    v.<br><br>U.S. ARMY CORPS OF ENGINEERS,<br><br>                     Defendant. | Case No. 1:16-cv-1534-JEB |

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION**

*Earthjustice
705 Second Ave., Suite 203
Seattle, WA  98104
(206) 343-7340*

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

ARGUMENT ........................................................................................................................2

    I.     PLAINTIFF IS LIKELY TO PREVAIL ON THE MERITS OF ITS
         CLAIM THAT NWP 12 VIOLATES THE NHPA ..................................................2

    II.    PLAINTIFF IS LIKELY TO PREVAIL ON THE MERITS OF ITS
         CLAIM THAT THE CORPS VIOLATED § 106 WITH RESPECT TO
         THE 204 VERIFICATIONS..................................................................................5

         A.    The ACHP's Interpretation of the NHPA Warrants Deference..................5

         B.    The Corps Utilized an Unlawfully Narrow Scope ......................................6

         C.    The § 106 Process Was Inadequate ...........................................................11

    III.   THE TRIBE WILL BE IRREPARABLY HARMED WITHOUT AN
         INJUNCTION...................................................................................................16

         A.    The Tribe's Showing of Irreparable Harm Satisfies the *Winter*
               Standard ...................................................................................................16

          B.    Defendant-Intervenors Should also be Enjoined from Further
               Clearing and Grading Until this Case can be Resolved............................19

    IV.   THE BALANCE OF HARMS FAVORS THE TRIBE .......................................20

         A.    Any Financial Harm Suffered by DAPL Is Self-Inflicted ........................20

          B.    DAPL's Economic Harms are Overblown and Do Not Outweigh
               the Tribe's Irreparable Harm ...................................................................22

    V.    THE PUBLIC INTEREST SUPPORTS AN INJUNCTION ...............................24

CONCLUSION....................................................................................................................25

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

# TABLE OF AUTHORITIES

## Cases

*Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.*,
    840 F. Supp. 2d 327 (D.D.C. 2012)....................................... 23

*Alaska Conservation Council v. U.S. Army Corps of Eng'rs*,
    472 F.3d 1097 (9th Cir. 2006) ........................................ 23

*Alliance for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) ........................................ 25

*Alliance for the Wild Rockies v. Marten*,
    -- F.Supp.3d --, 2016 WL 4068459 (D. Mont. 2016) ........................ 19

*American Electric Power Service Corp. v. F.C.C.*,
    708 F.3d 183 (D.C. Cir. 2013).......................................... 2

*Andrus v. Sierra Club*,
    442 U.S. 347 (1979)................................................... 5

*Animal Welfare Inst. v. Beech Ridge Energy*,
    675 F. Supp. 2d 540 (D. Md. 2009)..................................... 21

*Brady Campaign to Prevent Gun Violence v. Salazar*,
    612 F. Supp. 2d 1 (D.D.C. 2009)....................................... 18

*Bragg v. Robertson*,
    54 F. Supp. 2d 635 (S.D. W.Va. 1999).............................. 19, 23

*CACI, Inc. v. Stone*,
    990 F.2d 1233 (Fed. Cir. 1993) ....................................... 22

*Colorado River Indian Tribes v. Marsh*,
    605 F. Supp. 1425 (C.D. Cal. 1985) .................................... 6

*Covelo Indian Cmty. v. Federal Energy Regulatory Comm'n*,
    895 F.2d 581 (9th Cir. 1990) ......................................... 12

*CTIA-Wireless Ass'n v. FCC*,
    466 F.3d 105 (D.C. Cir. 2006)......................................... 5

*District of Columbia v. Merit Systems Prot. Bd.*,
    762 F.2d 129 (D.C. Cir. 1985)........................................ 19

*Duncan's Point Lot Owners Ass'n v. FERC*,
    522 F.3d 371 (D.C. Cir. 2008)........................................ 11

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

*Friends of the Earth v. Hintz*,
   800 F.2d 822 (9th Cir. 1986) ........................................................................ 4

*Fund for Animals v. Espy*,
   814 F. Supp. 142 (D.D.C. 1993) ................................................................... 24

*Fund for Animals v. Norton*,
   281 F.Supp.2d 209 (D.D.C. 2003) ........................................................... 18, 24

*Grand Canyon Trust v. FAA*,
   290 F.3d 339 (D.C. Cir. 2002) ...................................................................... 5

*Jones v. SEC*,
   298 U.S. 1 (1936) ........................................................................................ 21

*Karst Envtl. Educ. & Prot. v. EPA*,
   475 F.3d 1291 (D.C. Cir. 2007) ................................................................... 11

*Kos Pharm., Inc. v. Andrx Corp.*,
   369 F.3d 700 (3d Cir. 2004) ......................................................................... 21

*Lee v. Thornburgh*,
   707 F. Supp. 600 (D.D.C. 1989) .................................................................. 16

*McMillan Park Comm. v. Nat'l Capital Planning Comm'n*,
   968 F.2d 1283 (D.C. Cir. 1992) .................................................................... 5

*N. Cheyenne Tribe v. Hodel*,
   851 F. 2d 1152 (9th Cir. 1988) .................................................................... 21

*Nat'l Ass'n of Government Employees, Inc. v. Federal Labor Relations Authority*,
   179 F.3d 946 (D.C. Cir. 1999) ...................................................................... 6

*Nat'l Wildlife Fed'n v. Burford*,
   835 F.2d 305 (D.C. Cir. 1987) ..................................................................... 24

*National Association of Homebuilders v. U.S. Army Corps of Engineers*,
   417 F.3d 1272 (D.C. Cir. 2005) .................................................................... 2

*National Mining Ass'n v. Fowler*,
   324 F.3d 752 (D.C. Cir. 2003) ...................................................................... 6

*Natural Resources Defense Council v. U.S. E.P.A.*,
   824 F.2d 1146 (D.C. Cir. 1987) .................................................................... 2

*Ohio Valley Envtl. Coal. v. U.S. Army Corps of Engineers*,
   528 F. Supp. 2d 625 (S.D.W.Va. 2007) ....................................................... 23

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

*Park County Resource Council, Inc. v. U.S. Dept. of Agriculture*,
    817 F.2d 609 (10th Cir. 1987) ........................................................................ 23

*Quechan Tribe of Fort Yuma Indian Res. v. U.S. Dep't of Interior*,
    755 F. Supp. 2d 104 (S.D. Cal. 2010) ....................................... 13, 16, 19

*Save Our Sonoran v. Flowers*,
    408 F.3d 1113 (9th Cir. 2005) ...................................................................... 7, 8

*Sayler Park Vill. Council v. U.S. Army Corps of Engineers*,
    2002 WL 32191511 (S.D. Ohio Dec. 30, 2002) ............................... 6, 19

*Schneider v. Dumbarton Developers*,
    767 F.2d 1007 (D.C. Cir. 1985) .................................................................... 19

*Seminole Nation v. United States*,
    316 U.S. 286 (1942) .......................................................................................... 12

*Sierra Club v. Bostick*,
    787 F.3d 1043 (10th Cir. 2015) ........................................................ 5, 10, 21

*Sierra Club v. Martin*,
    933 F. Supp. 1559 (N.D. Ga. 1996) ............................................................ 16

*Sierra Club v. U.S. Army Corps of Engineers*,
    645 F.3d 978 (8th Cir. 2011) .................................................................. 19, 21

*Sierra Club v. U.S. Army Corps of Engineers*,
    803 F.3d 31 (D.C. Cir. 2015) .................................................................... 4, 10

*Trustees for Alaska v. Hodel*,
    806 F.2d 1378 (9th Cir. 1986) ........................................................................ 6

*United States v. Mitchell*,
    463 U.S. 206 (1983) .......................................................................................... 12

*Wetlands Action Network v. U.S. Army Corps of Engineers*,
    222 F.3d 1105 (9th Cir. 2000) ...................................................................... 7, 8

*White Tanks Concerned Citizens v. Strock*,
    563 F.3d 1033 (9th Cir. 2009) ...................................................................... 8, 9

*Winter v. Natural Resources Defense Council*,
    555 U.S. 7 (2008) .............................................................................................. 17

*Wisconsin Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) ...................................................................... 23

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

## Statutes

16 U.S.C. SEC. 470cc(c) ........................................................................ 24

25 U.S.C. § 3001 .................................................................................. 24

33 C.F.R. Pt. 325, App. C, ¶ 1(g)(4) ...................................................... 7

36 C.F.R. § 800.1 ................................................................................. 13

36 C.F.R. § 800.1(c) ............................................................................ 14

36 C.F.R. § 800.14(a) ............................................................................ 6

36 C.F.R. § 800.2(c)(4) ........................................................................ 14

36 C.F.R. § 800.4(b) ......................................................................... 7, 14

36 U.S.C. § 30001 ................................................................................ 24

42 U.S.C. § 1996 .................................................................................. 24

42 U.S.C. § 4342 .................................................................................... 5

42 U.S.C. § 4344 .................................................................................... 5

43 C.F.R. § 10.5 ................................................................................... 24

54 U.S.C. § 304101 ................................................................................ 5

54 U.S.C. § 304108 ................................................................................ 5

54 U.S.C. § 306102(5)(A) ...................................................................... 6

56 U.S.C. § 306113 .............................................................................. 20

## Other Authorities

65 Fed. Reg. 67,249 (Nov. 6, 2000) ....................................................... 12

77 Fed. Reg. 10184 (Feb. 21, 2012) .................................................... 2, 4

Executive Order 13007 "Protection and Accommodation of Access
    to 'Indian Sacred Sites'"(May 24, 1996) ......................................... 24

Executive Order 13175 "Consultation and Coordination With Indian
    Tribal Governments" (Nov. 6, 2000) ................................................ 24

H.R. No. 1916 ........................................................................................ 8

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

Memorandum for the Heads of Executive Departments and Agencies,
74 Fed. Reg. 57,881 (Nov. 5, 2009) ...................................................................................... 12

**Rules**

Fed. R. Civ. Pro. 65(d)(2) .......................................................................................................... 19

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

## INTRODUCTION

This case concerns the scope of the government's duties to an Indian tribe in connection with an oil pipeline that presents significant risks to tribal interests in water and cultural resources.  In responding to this motion, the U.S. Corps of Engineers ("Corps") seeks to avoid its responsibilities to consult with the Tribe under the National Historic Preservation Act ("NHPA") regarding cultural resources by:  (1) invoking Nationwide Permit ("NWP") 12 to totally sidestep § 106 consultation with respect to the vast majority of water crossings along the pipeline's proposed route, and (2) misconstruing NHPA to drastically limit its consultation duties in the relatively few sites subject to Clean Water Act ("CWA") verification to just the immediate area of its CWA jurisdiction.  For its part, Dakota Access Pipeline, LLC ("DAPL") seeks to prevent meaningful relief by completing construction before the issues can be decided.  DAPL's opposition also offers a range of distractions, from questioning the Tribe's motives, to hyperbole about the impacts of an injunction, to an unsupportable request for a $1.4 billion bond.  None of it should succeed.

Plaintiff Standing Rock Sioux Tribe is entitled to a preliminary injunction.  The NHPA requires timely and meaningful consultation with the Tribe, respectful of tribal sovereignty.  It never happened here.  What the Corps and DAPL mischaracterize as NHPA "consultation" was, in fact,  mostly an effort by the Corps to impose on the Tribe an unlawfully narrow view of the scope of its consultation duties – a matter as to which the federal agency with the greatest expertise on the NHPA (the Advisory Council on Historic Preservation ("ACHP")) took the Tribe's side.  Moreover, private parties should not be rewarded for seeking to circumvent the proper implementation of § 106 consultation.  A preliminary injunction should be issued to enjoin further construction activities to the extent necessary to protect culturally important resources and ensure that the requirements of the NHPA are met.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

ARGUMENT

I.   PLAINTIFF IS LIKELY TO PREVAIL ON THE MERITS OF ITS CLAIM THAT NWP
     12 VIOLATES THE NHPA

In its opening brief, the Tribe explained how the Corps neither consulted pursuant to §

106 at the time it issued NWP 12, nor "ensured" that impacts to historic sites would be

considered when it pre-authorized impacts to federal waters.[1]  Defendants concede that the Corps

did not conduct § 106 consultation on the NWP in 2012.  Corps Opp. at 21; DAPL Opp. at 12

(consultation on NWPs would be "obviously impossible").  While the NWP notice discusses

compliance with the Clean Water Act ("CWA"), National Environmental Policy Act ("NEPA"),

Endangered Species Act ("ESA"), among others, there is no mention of compliance with NHPA.

77 Fed. Reg. 10184, 10186-87 (Feb. 21, 2012).  Letters sent by the Corps to Tribes inviting

comment on NWP reissuance did not even mention the NHPA, and no party claims they were

intended to satisfy the requirements of § 106.  Compliance also did not occur under the guise of a

programmatic agreement or authorized regulatory alternative approved by the ACHP.

Instead, the Corps argues that the NWPs "reasonably defer any site-specific consultation"

to later stages of the process.  Corps Opp. at 22.  But NWP 12 and GC 20 don't "defer" site-

specific consultation.  They delegate the determination of historic impacts to the project

---

[1] The Tribe did not "waive" its claim with respect to NWP12 as DAPL argues.  First, there is no
requirement to have commented on a NWP in order to challenge it.  *See, e.g., National
Association of Homebuilders v. U.S. Army Corps of Engineers*, 417 F.3d 1272 (D.C. Cir. 2005).
Even if there were, such a requirement is excused where the issue was raised by another party.
*See, e.g., Natural Resources Defense Council v. U.S. E.P.A.*, 824 F.2d 1146, 1150-51 (D.C. Cir.
1987); *American Electric Power Service Corp. v. F.C.C.*, 708 F.3d 183, 190 (D.C. Cir. 2013).
The Tribe's concerns in this case were raised in the 2012 NWP process by the ACHP and others.
Ex. 55 ("GC20 appears to grant permittees the authority to make 'effect determinations' and
determinations of eligibility, based on the permittees' belief that the permitted activity may have
an effect on historic properties. … [Permit applicants] cannot be responsible for making
determinations and findings, which remain the legal responsibility of the agency"); Ex. 56 at 2
(National Trust for Historic Preservation) ("non-federal applicants will have no basis for making
this determination, and no incentive to try to do so properly.").

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

proponent to make on their own, with absolutely no guidance, accountability, or standards. Contrary to DAPL's argument, Opp. at 13, the Tribe doesn't argue that deferral of the § 106 analysis to a site-specific level is, by itself, unlawful.  The issue is that the "deferral" takes the Corps out of the picture altogether and puts project proponents in charge of making § 106 determinations.  The Corps' claim that it uses "information provided by project proponents to determine which sites require pre-construction notices based upon the potential presence of historical resources" is demonstrably untrue.  Opp. at 25.  There is not a single piece of evidence that the Corps was involved in determining which components of DAPL would have to submit PCNs based on NHPA impacts.  To the contrary, the Corps had no information with respect to the vast majority of impacts because PCNs were never submitted.[2]

This case highlights the fundamental problem with the Corps' approach.  Out of 771 documented impacts to streams, wetlands, rivers, and lakes in the pipeline's 359-mile route through North Dakota, PCNs were filed for two sites.  PI Motion at 9.  In South Dakota, 10 PCNs were filed for 273 miles with hundreds of aquatic impacts.  *Id*.  Despite the blizzard of information presented by the Corps and DAPL in their oppositions, *there is not a single example* in all of the pipeline's 1,172 miles of DAPL seeking a PCN based on potential impacts to historic resources.  As Mr. Mentz and Mr. Eagle explain, the pipeline traverses areas rich in cultural resources.  The fact that DAPL reported a total of zero "potential" impacts in nearly 1200 miles of construction highlights the pitfalls of the Corps abdicating its § 106 duty.[3]

The Corps' reliance on cases upholding reliance on private studies in the regulatory

_____

[2] Nor does the fact that the Corps retains authority to require PCNs overcome their improper delegation to private parties.  DAPL Opp. at 14.  The Tribe explicitly asked the Corps to exercise that authority here by requiring PCNs for all jurisdictional waters on the route.  Ex. 53.  The Corps' responded by inviting the Tribe to survey the 2 PCN areas in North Dakota.

[3] In fact, the Corps worked with DAPL to *reduce* the number of PCN filings to the minimum feasible—and where there is no PCN, there is no § 106 process at all.  Corps Opp. at 14.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

process sidesteps the issue entirely.  Corps Opp. at 26.  It is generally lawful under NEPA for

private parties to be involved in drafting assessments, however, the Corps is responsible for

ensuring the accuracy of these drafts, reviews them, and issues them in its own name.  *See*

Shelman Decl.  No such oversight occurs under GC20.  Unlike in *Friends of the Earth v. Hintz*,

800 F.2d 822, 835-36 (9th Cir. 1986), the Corps did not "exhaustively study" privately gathered

information.  Corps Opp. at 26.  Rather, since it never received PCN notification for the vast

majority of waters along the route, it had no information about them at all.  Similarly, DAPL's

analogy to the ESA, which also directs applicants to submit a PCN if there are potential impacts

to listed species, is inapposite, as determining whether protected species are in the vicinity is a

matter of simply looking at a map.  77 Fed. Reg. at 10283 (GC 18).  Determining potential

effects to cultural sites requires far greater judgment and expertise, and, under the NHPA, the

involvement of Tribes.[4]  Even though the NHPA gives the Tribes a central role in finding and

evaluating these sites, the Tribe had no chance to fulfill it for most of the route.

The Corps defends NWP12 and GC 20 by asserting that they "subject all sites containing

historic resources to" PCNs and verification.  Corps Opp. at 25.  Its circular reasoning misses the

point.  No one knows if a site "contains" historic resources unless there is some kind of

consultation, and it is the Corps' duty to carry that out with the Tribes.  The Tribe has explained

repeatedly that the pipeline route traverses areas rich in cultural sites.  Yet in not a single

instance did GC 20 trigger a PCN.  NWP 12 is fundamentally flawed and in violation of § 106.[5]

---

[4] The Corps submits a memo—obviously prepared in anticipation of this litigation—stating that
a Corps staffer "performed a quick review" of DAPL's cultural surveys and had no "concerns"
about non-PCN crossings.  Chieply Decl., Ex. 16.  But the proximity of identified sites to waters
of the United States is not identified in the cultural surveys.  Ex. 44.  Moreover, DAPL claims
that the Corps never surveys outside of jurisdictional areas.  Ex. 62 at p.82.

[5] Requiring a PCN for every crossing is not only workable, it appears to be the norm.  *See, e.g.,*
*Sierra Club v. U.S. Army Corps of Engineers*, 803 F.3d 31, 39 (D.C. Cir. 2015) (1,950 PCN

Earthjustice
705 Second Ave., Suite 203
Seattle, WA  98104
(206) 343-7340

II.   PLAINTIFF IS LIKELY TO PREVAIL ON THE MERITS OF ITS CLAIM THAT THE
CORPS VIOLATED § 106 WITH RESPECT TO THE 204 VERIFICATIONS

A.       The ACHP's Interpretation of the NHPA Warrants Deference

The heart of this motion involves competing interpretations of §106, especially the

definitions of "undertaking" and "area of potential effect."  The ACHP, like the Tribe, supports a

broader interpretation of these terms than the one used by the Corps.  Just a few days ago, the

ACHP yet again determined that the Corps' Appendix C guidance does not substitute for the

ACHP regulations "or provide equivalent consideration for the protection of historic

properties..." Ex. 58 ("The differences between the Section 106 regulations and Appendix C are

substantial….We believe these inconsistencies too often leave the Corps unable to fully meet its

legal obligation under Section 106.").  How much weight to accord these respective

interpretations, while significant to the outcome of this case, is not a difficult question.  Under

the NHPA and the law of this Circuit, the Court must defer to the ACHP, the agency charged by

Congress with implementing the NHPA and issuing regulations governing its implementation.

54 U.S.C. §§ 304101, 304108.  As this Circuit explained in *CTIA-Wireless Ass'n v. FCC*, 466

F.3d 105, 116 (D.C. Cir. 2006), "Congress has entrusted one agency with interpreting and

administering section 106 of the NHPA:  the Council," and the Council and its regulations

"command substantial deference."  *See also McMillan Park Comm. v. Nat'l Capital Planning

Comm'n*, 968 F.2d 1283, 1287-88 (D.C. Cir. 1992).[6]  In contrast, the Corps does not implement

the NHPA – it is regulated *by* it.  The Corps also lacks specialized expertise in historic

---

verifications in 593 miles); *Sierra Club v. Bostick*, 787 F.3d 1043 (10th Cir. 2015) (over 2000
verifications in 485 miles).

[6] In *McMillan Park Comm.*, the D.C. Circuit analogized ACHP's statutorily assigned role to that
of the Council on Environmental Quality ("CEQ") under NEPA.  Like ACHP, CEQ is charged
with issuing binding implementing regulations, 42 U.S.C. §§ 4342, 4344, and its regulations and
interpretations of NEPA are entitled to "substantial deference."  *Andrus v. Sierra Club*, 442 U.S.
347, 358 (1979); *see also Grand Canyon Trust v. FAA*, 290 F.3d 339, 341-42 (D.C. Cir. 2002).

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

preservation.  It is owed none of the deference accorded agencies charged with implementing a

statute.  *See, e.g., Nat'l Ass'n of Government Employees, Inc. v. Federal Labor Relations*

*Authority,* 179 F.3d 946, 950 (D.C. Cir. 1999); *National Mining Ass'n v. Fowler*, 324 F.3d 752,

757 (D.C. Cir. 2003); *Trustees for Alaska v. Hodel*, 806 F.2d 1378, 1384 n.10 (9th Cir. 1986)

(agencies are due no deference in interpreting statutes regulating them).

     The NHPA expressly makes ACHP's regulations binding on other federal agencies,

unless ACHP affirmatively approves them, 54 U.S.C. § 306102(5)(A); 36 C.F.R. § 800.14(a), or

the agency negotiates a programmatic agreement with the ACHP governing implementation of a

particular program.  *Id*. § 800.14(b).  The *sine qua non* of both alternative procedures and

programmatic agreements is ACHP's approval.  In the absence of such approval, the Corps'

procedures, including Appendix C, carry no weight when they are at odds with the ACHP

regulations.  *See Colorado River Indian Tribes v. Marsh*, 605 F. Supp. 1425 (C.D. Cal. 1985);

*Sayler Park Vill. Council v. U.S. Army Corps of Engineers*, 2002 WL 32191511, at *7 (S.D.

Ohio Dec. 30, 2002) (dismissing Corps' § 106 interpretation as inconsistent with ACHP

regulations).[7]  The ACHP's position in this litigation is entitled to great weight.

    B.    The Corps Utilized an Unlawfully Narrow Scope

     The Tribe acknowledges that the Corps' CWA *jurisdiction* is limited to waters of the

United States, and the Corps' attempt to reframe the issue as whether § 106 "expands" its

jurisdiction to cover the entire pipeline asks the wrong question.  Corps Opp. at 31.  The question

presented here is the extent to which the Corps must comply with § 106 for portions of the

---

[7] DAPL's lengthy effort to distinguish or dismiss these cases is baseless. The ACHP itself has
taken every opportunity to point out that the Corps' § 106 guidance is invalid. Ex. 55 ("The
basis for our disagreement centers on the Corps' adherence to Appendix C . . ., which does not
substitute for the Section regulations . . ., or provide equivalent consideration for the protection
of historic properties as provided for in those regulations."); Ex. 50 at 1-2.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

pipeline outside direct areas of its CWA jurisdiction.  Courts have grappled with this question in

cases involving NEPA.  *See Save Our Sonoran v. Flowers*, 408 F.3d 1113 (9th Cir. 2005) (Corps

must perform environmental review of entire private development project even though actual

CWA jurisdiction limited to 5% of the total area); *Wetlands Action Network v. U.S. Army Corps*

*of Engineers,* 222 F.3d 1105 (9th Cir. 2000) (full NEPA analysis on project not required because

wetland areas were "separate and independent" part of master project).

Given that the scope of § 106 review is the focal point of this case, it is remarkable that

the Corps remains unable to articulate its position.  In many places, the Corps contends that its

NHPA duties stop at the waters' edge.  *See* Corps Opp. at 29 ("undertaking" for § 106 purposes

"comprise[s] only the portion of the entire right-of-way for a pipeline that crosses jurisdictional

waters"); *id*. at 31 ("The Corps reasonably limited its NHPA analysis to the areas over which it

has jurisdiction."); DAPL Opp. at 16.  In the one instance for which a clear delineation is

provided, the Corps makes clear that *no* portion of pipeline right-of-way is part of the § 106

analysis.  Ex. 29 at Ex. 3.[8]  But the Corps' own NHPA guidance state that "some portion of the

right-of-way, approaching the crossing would not occur in its given configuration 'but for' the

authorized activity" and hence should be part of the § 106 review.  33 C.F.R. Pt. 325, App. C, ¶

1(g)(4).[9]  How long was this portion with respect to the 204 PCN crossings for DAPL?  How

does the Corps determine the cutoff between the portion of the pipeline right-of-way that falls

within this standard and the portion immediately adjacent to it that does not?  There is no answer

---

[8] How the Corps determined that the access road to build the HDD infrastructure was part of the
undertaking, but the pipeline itself was not, is not discernible.  *Id.*

[9] While acknowledging that it must consider impacts outside the "permit area," the Corps'
guidance disclaims any responsibility for "identifying or assessing" such sites.  *Id.* at App. C.
¶ 1(g)(1),(4).  This attempt to wash its hands of NHPA obligations is directly contrary to the
NHPA.  36 C.F.R. § 800.4(b) (agency official "shall take the steps necessary to identify historic
properties within the area of potential effects").

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

that can be discerned to these questions either in the record or in the parties' briefs.

As the ACHP has repeatedly pointed out, the reality is that there would be no pipeline at all without the Corps' NWP 12 authorizations.  Exs. 25, 26, 32, 45, 50.  Under the Appendix C "but for" causation test, the components of the pipeline linking federal waters in the pipeline's paths must be considered as part of the §106 analysis.  Ex. 16 at 3-4.  The answer is even more clear under the ACHP regulations, which emphasize that actions under the "indirect" jurisdiction of agencies, and their "indirect" impacts must be considered.  PI Mem. at 27-28; H.R. No. 1916, *reprinted in* 1966 USCCAN 3307, 3310 ("The committee agreed that Federal agencies having direct or indirect jurisdiction over various undertakings, either through Federal funding or through their licensing powers, should recognize these [preservation] values.").

Under NEPA, courts routinely find that private projects requiring Corps authorization for a small portion of a private project require NEPA review for the entire project.  For example, in *Save Our Sonoran*, 408 F.3d at 1122, the Ninth Circuit rejected a NEPA analysis that looked only at the 5% of a development project that fell in CWA jurisdiction, and ignored the effects of the project as a whole.  "Although the Corps' permitting authority is limited to those aspects of a development that directly affect jurisdictional waters, it has responsibility under NEPA to analyze all of the environmental consequences of a project."  *Id.*  Because the 5% of CWA jurisdictional area "ran through the property like lines run through graph paper," the Court reasoned that the project could not exist without Corps authorization, and hence the Corps needed to analyze the entire project.  *Compare White Tanks Concerned Citizens v. Strock*, 563 F.3d 1033, 1039-41 (9th Cir. 2009) (even though CWA jurisdiction extended to a "very small number of acres in a very large development"—less than 5%—NEPA review required of entire project); *with Wetlands Action,* 222 F.3d at 1112 (no full analysis when project could proceed

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

largely as envisioned without Corps permit).  The courts in *Save Our Sonoran* and *White Tanks* found particularly relevant the fact that the "no action" alternative in the Corps' environmental review, which was limited to the areas of its jurisdiction, was that the private project could not be built at all.  Both courts also gave significant weight to comments from EPA and FWS that sought a more expansive review.  *White Tanks*, 563 F.3d at 1042 ("when other federal agencies suggest to the Corps that the Corps has inappropriately failed to consider the effects of a project, this court is more likely to find that the Corps has acted in an arbitrary and capricious manner").

Here, while the percentage of the Corps' jurisdiction may be small, it would unquestionably be impossible to build a 1,200-mile pipeline a third of the way across the continent without numerous Corps permits.  *See* Ex. 3 (maps).[10]  Moreover, just as in *Sonoran* and *White Tanks*, the "no action" alternative in the EA for the Lake Oahe crossing is also that there would be no pipeline at all.  Ex. 37 at 13 ("Under the 'no action' alternative, Dakota Access would not construct the DAPL project.").  Similarly, the ACHP and the FWS both disagreed sharply with the Corps' approach to limiting its NHPA and ESA responsibilities to just the immediate areas of its jurisdiction.[11]

DAPL's assertion that there is no overarching federal permit required for crude oil pipelines also misses the point.  There is no overarching federal permit for shopping malls, golf courses, or private residential developments either, but where they require CWA authorization from the Corps, duties like NEPA and NHPA are triggered, and the scope of that review is

---

[10] Both the Corps and DAPL claim that only 3% of the pipeline is in federal jurisdiction.  The Tribe has never seen any documentation for that number.  It may be based on the limited areas subject to NWP verifications, not the thousands of other jurisdictional areas where construction is authorized by NWP12, and hence is of little value here.

[11] The Corps also tried to limit the ESA analysis to areas of jurisdiction.  The FWS refused, and conducted its analysis with respect to the entire pipeline.  Ex. 57 ("Interdependent actions would be useless 'but for' the completion of the action that is subject to section 7 consultation.  In this case, the DAPL project would be useless if it did not connect through the permit areas.").

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

governed by regulations and caselaw.  *Sierra Club,* 803 F.3d at 33 (even though there is no

"general" approval for crude oil pipelines, federal reviews may be triggered by statute).  The

Tribe is not claiming that the Corps must assume oversight of the regulation of crude oil

pipelines.  Rather, the Tribe, like the ACHP, believes that when the Corps issues thousands of

CWA permits that facilitate construction of pipelines, it must examine that "undertaking" within

the "area of potential effects" pursuant to § 106.

  The defendants' reliance on *Sierra Club v. U.S. Army Corps of Engineers*, 803 F.3d 31

(D.C. Cir. 2015) is unavailing.  The D.C. Circuit rejected Sierra Club's claim seeking a pipeline-

wide NEPA analysis because the Corps had prepared NEPA analysis on the nationwide permits

when they were issued and therefore did not need to do so at the verification stage; whereas here,

as all parties acknowledge, the Corps conducted no NHPA analysis on issuance of the

nationwide permits.  *Id*. at 48; *see also Sierra Club v. Bostick*, 787 F3d 1043 (10th Cir. 2015)

(because Corps analyzed impacts of NWPs at time of issuance, there was no need to do an

additional NEPA analysis at time of verification).  Moreover, the Fish and Wildlife Service

consulted and prepared a biological opinion on the entire pipeline.  The Corps imposed limits as

part of its verifications drawn from that biological opinion to mitigate the pipeline's impacts to

two listed species.  The D.C. Circuit held that the Corps' site-specific NEPA obligations were

limited to those conditions.  *Id*. at 48.  Significantly, Sierra Club failed to preserve any claim that

the Corps had a NEPA obligation to consider all of the direct and indirect impacts from

pipeline's water crossings, even if that meant less than a pipeline-wide assessment.  *Id*.  Here, in

contrast, the Tribe is claiming that the Corps violated the binding NHPA regulations and acted

arbitrarily by failing to assess together the impacts of all of the water crossings, even those not

requiring Corps verification.  Similarly, *Duncan's Point Lot Owners Ass'n v. FERC*, 522 F.3d

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

371, 377 (D.C. Cir. 2008), an organization sought to apply the NHPA to a private party, but the

D.C. Circuit upheld the federal agency's focus on the action that it had previously authorized

with limitations.  The definitions of undertaking, area of potential effects, and scope of review

were never mentioned, and the organization failed to preserve any ESA or CWA claims.[12]

Under the NHPA and ACHP regulations, the Corps is obligated to look beyond the areas

of its direct jurisdiction as part of the § 106 analysis.  The reference in the Corps' Appendix C

guidance to indirect effects confirms this legal requirement, but the Corps limited its analysis to

areas of direct jurisdiction.  This Court need not determine whether that analysis must include the

entire pipeline to find that the Corps' approach—which was to blind itself to any impact past the

water's edge—was arbitrary and capricious.

C.      The § 106 Process Was Inadequate

In a remarkable effort to reframe the issue, the Corps and DAPL use a mix of hearsay,

unsupported characterizations, and flat-out falsehoods to try to make the Tribe look like the

problem in the § 106 process rather than the victim.  The actual record of written correspondence

—which both defendants pointedly ignore—tells a very different story.  PI Mem. at 8-17.  The

Tribe did not "obstruct" the process.  It repeatedly and consistently sought participation in it,

growing increasingly frustrated as its efforts were stymied.

---

[12] In any event, the Corps' citation to *Karst Envtl. Educ. & Prot. v. EPA*, 475 F.3d 1291 (D.C. Cir. 2007) for the proposition that "federal actions" under NEPA and "undertakings" under NHPA are the same thing is inaccurate.  The court's dicta comparing the two statutes arose in the context of determining whether the plaintiffs had pled "final agency action" sufficient to invoke Administrative Procedures Act jurisdiction.  *Id*. at 1294-95.  That case did not involve a determination of whether a § 106 analysis extended beyond an area of an agency's jurisdiction, and it certainly did not have the rich factual record presented here.  NHPA's definition of "undertaking" is in fact substantially broader than NEPA's definition of "major federal action."

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

1.    *The Scope of The Corps' NHPA Duties is Informed by the Trust Responsibility*

The scope of the Corps' obligations to the Tribe must be understood within the framework of the federal trust responsibility. *United States v. Mitchell*, 463 U.S. 206, 225 (1983).  The trust responsibility commits the federal government to the protection of Indian tribes' rights, resources, and interests as a guardian would protect those of his or her ward. Federal agencies must strictly adhere to the duties of a private fiduciary when their actions impact Indian rights. *Covelo Indian Cmty. v. Federal Energy Regulatory Comm'n*, 895 F.2d 581, 586 (9th Cir. 1990).  The standard which must be met is high, and officials of the United States must observe "obligations of the highest responsibility and trust" and "the most exacting fiduciary standards." *Seminole Nation v. United States*, 316 U.S. 286, 296-97 (1942).  A significant component of the trust responsibility is the duty to consult with potentially affected tribes. This duty is reflected in Executive Order 13175, which requires each agency to provide "regular and meaningful consultation and collaboration with tribal officials in the development of Federal policies with tribal implications…"  65 Fed. Reg. 67,249 (Nov. 6, 2000).  President Obama expanded upon this Executive Order:

> History has shown that failure to include the voices of tribal officials in formulating policy affecting their communities has all too often led to undesirable and, at times, devastating and tragic results. By contrast, meaningful dialogue between Federal officials and tribal officials has greatly improved Federal policy toward Indian tribes. Consultation is a critical ingredient of a sound and productive Federal-tribal relationship.

Memorandum for the Heads of Executive Departments and Agencies, 74 Fed. Reg. 57,881, 57,881 (Nov. 5, 2009).  The foundation of this duty to consult is the "unique legal and political relationship with Indian tribal governments, established through and confirmed by the Constitution of the United States, treaties, statutes, executive orders, and judicial decisions." *Id.*; *see also* Corps' Tribal Consultation Policy at 2-3, Ex. 60 ("USACE will ensure that it addresses

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

Tribal concerns regarding protected tribal resources, tribal rights (including treaty rights) and Indian lands").  The Corps' policies also incorporate the Department of Defense's American Indian and Alaska Native Policy, under which consultation with tribes on a "government-to-government" basis requires a high degree of formality.  Ex. 64.  Tribal consultation must also be timely.  As the DoD policy notes, "The single most important element of consultation is to initiate the dialogue with potentially affected tribes *before decisions affecting tribal interests are made*."  *Id*. (fn. k).  The Corps' efforts to engage the Tribe, and the Tribe's insistence that the Corps adhere to these protocols, should be viewed through this lens.

2.       *The Corps and DAPL Mischaracterize a Serious Dispute Over the Quality of Consultation as the Consultation Itself*

Ignoring the clear record of correspondence, the Corps embarks upon an extended effort to persuade the Court that the contacts between the Tribe and the Corps, simply by virtue of their sheer volume, satisfied § 106.  That's obviously not the law.  *Quechan Tribe of Fort Yuma Indian Res. v. U.S. Dep't of Interior*, 755 F. Supp. 2d 104 (S.D. Cal. 2010).  The claim that its interactions with the Tribe were legally adequate falls apart upon modest scrutiny.[13]  These contacts reflect the ongoing dispute between the parties about the scope of the consultation and the Tribe's role in it—they do not reflect compliance with the detailed, step-by-step process laid out in the ACHP regulations at 36 C.F.R. § 800.1.

For example, the Corps points to hundreds of contacts with the Tribe pertaining to the pipeline, itemizing them in a "consultation spreadsheet."  That document, far from supporting the Corps' process, illustrates its deficiencies.  The spreadsheet is mostly made up of *de minimus*

---

[13] The Tribe does not have time to refute every mischaracterization and misstatement in the Corps' and DAPL's submissions, but is confident that the actual written record it supplied with its opening motion suffice to show its good-faith efforts.  On the merits, the Court will have a full administrative record to judge the Corps' compliance.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

interactions such as phone calls made for the purpose of scheduling or to confirm contact information.  It includes examples of other federal agencies, such as the Department of the Interior, sending letters to the Corps criticizing their approach.  It includes numerous examples of efforts by the Tribe to *initiate* consultation and to lay out its concerns with the Corps' approach.

Until the end of 2015, consultation was mostly a one-way street with the Tribe emphasizing its concerns, and the Corps responding with either silence or form letters inquiring if the Tribe would like to consult.[14]  PI Motion at 9-11.  It was only after the draft EA came out in December 2015, completely failing to mention the potential impacts of the Lake Oahe crossing on the Tribe's cultural resources and livelihood—an event which shocked Tribal leaders and touched off several critical letters from other federal agencies—did actual meaningful conversations commence, including direct meetings between the Colonel and the Chairman.  By that time, of course, the entire route had been surveyed without the Tribe's involvement, and construction had been scheduled.  And while meetings took place in early 2016, they mostly sought to resolve the parties' dispute over the scope of review for the project, rather than engage in the process of identifying and assessing culturally important sites required by the regulations.

The Corps commends itself for having "engaged in a robust consultation process *following* Dakota Access's transmission of its survey results."  Corps Opp. at 28.  But that is precisely the problem.  Nothing was done to engage the Tribe in identification and assessment work at an appropriate earlier point, despite Standing Rock's timely and repeated requests for such an opportunity.  *But see* 36 C.F.R. § 800.1(c) (agencies "shall ensure that the section 106

---

[14] DAPL complains that its outreach efforts were not well received, but provides no documentation of its claims.  The Corps cannot outsource its consultation duties without authorization, 36 C.F.R. § 800.2(c)(4), and the Tribe is unaware of any such authorization occurring here.   The Tribe rightly demanded that consultation take place at a government-to-government level.  *See also id*. at § 800.4(b) (confidentiality of cultural information).

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

process is initiated early in the undertaking's planning, so that a broad range of alternatives may be considered during the planning process for the undertaking."). The Corps did precisely the opposite, waiting until the route was selected, private archaeological surveys completed, and construction scheduled before offering the Tribe any opportunity to comment.

The opportunities provided at the end of the process were inadequate because of their limited scope. The Corps' eleventh-hour invitation to "survey direct impact areas," Corps Opp. at 27, highlights the problem. By this time, the Corps' position that § 106 consultation was limited to CWA jurisdictional areas had hardened, and the invitation to survey just waters of the United States—and not any of the pipeline route on either side of it—was of limited value to the Tribe. Chieply Decl., ¶ 28, Ex. 13 (inviting surveys in PCN areas "subject to Corps jurisdiction"). The Tribe justifiably declined to participate, but made plain its willingness to engage if the Corps' position changed. Ex. 30 at 3 ("Our office did respectfully decline this offer to participate in incomplete surveys and partial compliance efforts as we did not want to create precedence [*sic*] where fundamentally flawed Section 106 compliance would be legitimized.").[15] Moreover, the offer was limited to places where the landowner granted access. Chieply Decl. at ¶ 38; *see also* Mentz Decl., ¶ 39; Ex. 63 at 2 (Upper Sioux community letter) (describing denial of access at multiple PCN locations in South Dakota). Section 106's duty to "ensure" that historic impacts are considered is not contingent on a landowner's willingness to participate. In

---

[15] The Corps' contention that the Tribe later "relented" and conducted "surveys" with Corps archaeologists at the Lake Oahe site is wrong. Corps Opp. at 16; Chieply Decl., ¶ 30. THPO staff led Corps staff on a tour of the site so they could gain some understanding of the Tribe's concerns. This was not a "survey" but an effort to persuade the Corps that a survey was needed. Eagle Decl., ¶ 14; Harnois Decl., ¶ 29 (discussing "site visit") and Exhibit 5 ("our visit of the area made clear a need to spend additional time with the SRST Preservation office in efforts to more fully document what appears to be a very rich local history"). While the Corps' archeologist agreed that the area contained sites which had not been recorded and which should be studied further, the Corps arranged no further visits, concluding that no cultural resources would be adversely affected in light of its unlawfully narrow scope of review.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

other instances, if survey access is denied, so is a permit.  Mentz Decl. at ¶ 39.

Section 106 consultation must start early, it must be respectful of tribal sovereignty, and it must give Tribes a meaningful role in the identification and evaluation of historic properties and, as necessary, determination and resolution of adverse effects.  What the Tribe got instead was an after-the-fact opportunity to comment on flawed private surveys and an eleventh-hour invitation to survey a sharply limited area around a handful of sites.  The Corps' response that the Tribe should have "raised any concerns" through the process is belied by the fact that the Tribe did raise its concerns, consistently and vocally, from the very beginning of the process. The ACHP agrees with the Tribe that the consultation was inadequate and does not comply with NHPA requirements.  The Tribe is likely to prevail on the merits of its § 106 claim.

III.    THE TRIBE WILL BE IRREPARABLY HARMED WITHOUT AN INJUNCTION

A.    The Tribe's Showing of Irreparable Harm Satisfies the *Winter* Standard

No party disputes the fact that the loss of cultural sites constitutes irreparable harm to the Tribe.  *Quechan Tribe*, 755 F. Supp. at 1120; *Lee v. Thornburgh*, 707 F. Supp. 600, 606 (D.D.C. 1989), *rev'd on other grounds*, 877 F.2d 1053 (D.C. Cir. 1989) (enjoining the destruction of a 1920s-era psychiatric hospital on § 106 grounds); *see also Sierra Club v. Martin*, 933 F. Supp. 1559, 1570–71 (N.D. Ga. 1996) ("the question of irreparable injury does not focus on the significance of the injury, but rather, whether the injury, irrespective of its gravity, is irreparable—that is whether there is any adequate remedy at law").  Instead, the parties pose a variety of arguments with respect to the Tribe's harm, each of which must fail.

The Corps' first argument is that a remedy requiring it to withdraw NWP authorization and verifications would not prevent any harm to the Tribe because DAPL could simply continue construction outside of those areas.  But DAPL has claimed that the moving around specific sites costs over half a million dollars for each one.  Mahmoud Decl., ¶¶ 29, 56.  Given the ubiquity of

*Earthjustice*
705 Second Ave., Suite 203
Seattle, WA  98104
(206) 343-7340

protected waters along the pipeline route, *see, e.g.,* Exs. 2 &3, it is not at all obvious that DAPL

would continue to build countless isolated segments of pipeline in the interim.  In any event,

DAPL should be included in the injunction, as discussed further below.

The Corps' next argument is that the only sites of relevance to the harm analysis are those

that fall within the narrow area of the Corps' jurisdiction.  Corps Opp. at 40-41.  But this begs

the very question at the heart of this case.  The Tribe has shown impacts to sites that should have

been, but were not, part of the § 106 discussion because they were not in the water.  That is

plainly sufficient for showing harm.  The Corps also appears to question whether the Tribe is

harmed by destruction of cultural sites distant from the reservation.[16]  However, the Tribe has

been clear from the start that its cultural concerns extend not just to the Lake Oahe site but the

entire route.  Ex. 7; Ex. 11 ("The SRST is concerned about the entire length of the pipeline and

not just the Missouri River crossing at Lake Oahe."); Mentz Decl., ¶ 8.

Finally, DAPL and the Corps claim that the Tribe has only shown the "possibility" of

irreparable injury, which would be insufficient under the *Winter v. NRDC* standard.  *Winter v.*

*Natural Resources Defense Council*, 555 U.S. 7 (2008).  Corps Opp. at 39.  Defendants ignore

the extensive, detailed showing made by the Tribe.  There are maps that show unevaluated sites

at Lake Oahe directly in the pipeline's path, and documents that catalogue multiple unevaluated

sites, or sites deemed "ineligible" by DAPL's consultants, that will be destroyed.  PI Motion at

36.  DAPL's casual dismissal of such sites as "ineligible" for NHPA protection highlights the

entire problem of the Tribe's exclusion from the evaluation.  DAPL Opp. at 40.  Mr. Mentz and

---

[16] The Corps claims that the Tribe lacks standing over the entire pipeline's length, questioning
whether Iowa and Illinois fall within the ancestral territory of the Great Sioux Nation.  Corps
Opp. at 39.  It is confused.  Standing is a threshold jurisdictional issue that asks whether there is
a sufficient case or controversy to invoke an Article III jurisdictional issue.  Plainly, there is
sufficient injury to the Tribe to invoke this Court's jurisdiction.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

Mr. Eagle, experts in evaluation of tribal cultural sites, offer undisputed opinions that the 150-foot path of construction will destroy sites of cultural importance to the Tribe.  Nor does the existence of an "unanticipated discoveries" plan prevent irreparable harm:  if DAPL's archaeologists are unable to evaluate the significance of tribal cultural sites, it is unclear why the heavy equipment operators would be able to do so.

The Tribe has provided a variety of evidence to support its contention that construction of the pipeline will result in the destruction of culturally significant sites, and that this destruction constitutes irreparable harm.  If this evidence does not meet the *Winter* standard of showing "likely" harm, it is hard to imagine what would.  This showing is amplified by the "procedural harm" suffered by the Tribe in being shut out of the § 106 process.  The 1992 amendments to the NHPA, which put Tribes in a lead role in identification and protection of culturally significant resources, created important processes that carry great significance for the Tribe.  That is why, despite significant resource constraints, the Tribe maintains a Tribal Historic Preservation Office with five full-time staff.  This District's admonition with respect to NEPA in *Brady Campaign to Prevent Gun Violence v. Salazar* can readily be applied to the NHPA:

> Although a procedural violation of NEPA is not itself sufficient to establish irreparable injury, it is certainly a relevant consideration:  [t]he NEPA duty is more than a technicality; it is an extremely important statutory requirement to serve the public and the agency before major federal actions occur.  If plaintiffs succeed on the merits, then the lack of an adequate environmental consideration looms as a serious, immediate, and irreparable injury.  Although the balancing of this harm against other factors is necessarily particularized, the injury itself is clear.  When a procedural violation of NEPA is combined with a showing of environmental or aesthetic injury, courts have not hesitated to find a likelihood of irreparable injury.

612 F. Supp. 2d 1, 24–25 (D.D.C. 2009); *Fund for Animals v. Norton*, 281 F.Supp.2d 209, 221 (D.D.C. 2003) ("procedural harm does bolster plaintiffs' case for a preliminary injunction").

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

B.      Defendant-Intervenors Should also be Enjoined from Further Clearing and
        Grading Until this Case can be Resolved

When the Tribe filed this motion, DAPL was not a party and the Tribe sought relief only

as to the Corps.  Now that DAPL is a party, however, it is appropriate to include DAPL in the

scope of relief by enjoining it from additional clearing and grading along the pipeline route.

*Quechan Tribe*, 755 F. Supp. at 1122 (enjoining private solar project); *Sayler Park Village*

*Counc. v. U.S. Army Corps of Engineers*, 2003 WL 22423202 (S.D. Ohio 2003) (enjoining

private intervenor from uplands work pending NHPA compliance).  This Court has the authority

to issue such an injunction.  Fed. R. Civ. Pro. 65(d)(2).  "When a party intervenes, it becomes a

full participant in the lawsuit and is treated just as if it were an original party."  *Schneider v.*

*Dumbarton Developers*, 767 F.2d 1007, 1017 (D.C. Cir. 1985); *District of Columbia v. Merit*

*Systems Prot. Bd.*, 762 F.2d 129, 132 (D.C. Cir. 1985) ("The 'price' of such intervention, we

believe, is the possibility that the plaintiff will be able to obtain relief against the intervenor-

defendant even if the original defendant is eliminated from the lawsuit.").  Courts regularly

enjoin parties similarly situated to DAPL.  *Sierra Club v. U.S. Army Corps of Engineers,* 645

F.3d 978 (8th Cir. 2011) (affirming injunction against defendant-intervenor that began

construction on private and state lands before the Corps issued the relevant permits); *Alliance for*

*the Wild Rockies v. Marten*, -- F.Supp.3d --, 2016 WL 4068459 (D. Mont. 2016) (joining *sua*

*sponte* a third-party company in an injunction against the Forest Service in order to prevent

activity during proceedings); *Bragg v. Robertson*, 54 F. Supp. 2d 635, 653 (S.D. W.Va. 1999)

(enjoining agencies from issuing permits and enjoining private intervenors "from commencing or

continuing with any pre-construction or mining activities...until the Court resolves the case on

the merits").  Should DAPL be permitted to continue construction in upland areas outside of

Corps jurisdiction, then the § 106 consultation process sought by the Tribe would be rendered

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

moot.  An injunction is supported by a provision in the NHPA that explicitly addresses the intentional harm to historic properties by private parties "with intent to avoid the requirements" of § 106.  *See* 56 U.S.C. § 306113.  This provision constrains the ability of agencies to issue permits to those who seek to circumvent NHPA by moving ahead with actions prior to § 106 consultation.

## IV.   THE BALANCE OF HARMS FAVORS THE TRIBE

DAPL believes that granting limited temporary relief will trigger various social, legal, and economic catastrophes.  DAPL warns that even the tiniest delay would cause the entire $4 billion project to collapse.  Mahmoud Decl., ¶ 54.  Relief would "invalidate the whole NWP program as a whole."  DAPL Opp. at 11-12.  America would be deprived of the benefits of oil.  Mahmoud Decl., ¶ 71.  The vast majority of it is hyperbole.  Given that construction is partially complete, relief can be tailored to what would actually preserve the Tribe's § 106 rights in areas that are not already destroyed, without significant financial impacts.[17]

### A.   Any Financial Harm Suffered by DAPL Is Self-Inflicted

DAPL began construction on May 16, 2016.  Mahmoud Decl., ¶ 12.  It did so before it had received a single authorization from the Corps to cross federal waters in 204 individual places, which were not issued until July 25.  Indeed, the Corps only issued permits for the § 408 crossings at Lake Oahe and Mississippi within the last few days, and *still* has not issued required easements at Lake Oahe.[18]  DAPL started construction despite the initiation of litigation in Iowa,

_____

[17] DAPL accuses the Tribe of supporting violence at protests at the Lake Oahe site, and even goes so far as to accuse the Standing Rock Chairman of personally masterminding them. Mahmoud Decl., ¶15.  The accusations are false.  The Tribal government did not organize these protests and has worked tirelessly to ensure that they remain nonviolent.  Ex. 59.

[18] Because DAPL still has not received permission to start the HDD work at Lake Oahe, Mr. Mahmoud's insistence that it has made a "significant concession" by not proceeding with that work is puzzling.  Mahmoud Decl. ¶ 47.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

a full-blown inter-agency dispute about NHPA compliance, and looming litigation by Tribes. Having started this work before it could lawfully finish it, it now claims that the slightest delay could cause the entire $4 billion project to collapse.  Mahmoud Decl., ¶¶ 54, 63.  If these claims are even partly true, then DAPL has acted with astounding irresponsibility.  Any impacts caused by an injunction would be a result of DAPL's own choice to gamble by knowingly proceeding "at its own risk" without permits.  *See* PI Memo at 41.

Courts have rightly been reluctant to weigh these financial harms when the claimed victim knowingly chose to risk moving ahead despite litigation or significant concerns over a project's legality.  *See, e.g., N. Cheyenne Tribe v. Hodel*, 851 F. 2d 1152, 1157 (9th Cir. 1988) (giving no weight to intervenors' financial interests where they bid on leases "with full awareness of [a] suit and chose to gamble on the EIS being adequate."); *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 728 (3d Cir. 2004) ("We have often recognized that the injury a defendant might suffer if an injunction were imposed may be discounted by the fact that the defendant brought that injury upon itself.")  This type of "self-imposed plight" cannot shield an injunction from issuing.  *Animal Welfare Inst. v. Beech Ridge Energy*, 675 F. Supp. 2d 540, 583 (D. Md. 2009); *Jones v. SEC*, 298 U.S. 1, 17 (1936) (a party acting knowingly in the face of an injunction request "acts at his peril").

As the Eighth Circuit concluded in *Sierra Club v. Army Corps of Engineers*, 645 F.3d 978 (8th Cir. 2011), when defendants "jump the gun" or "anticipate[ ] a pro forma result" in permitting applications, they become "largely responsible for their own harm."  *Compare Sierra Club v. Bostick*, 539 Fed. Appx. 885, 894 (10th Cir. 2013) (contrasting injunction request for pipeline because intervenor did not start construction until all permits had been received).  DAPL's construction began months prior to issuance of the 204 CWA verifications.  The

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

easement needed to cross Lake Oahe still has not been issued.  DAPL explicitly acknowledged

that such work would be done so "at its own risk."  It cannot use the financial impacts of this

choice to defeat an injunction.  *See also CACI, Inc. v. Stone*, 990 F.2d 1233, 1236 (Fed. Cir.

1993) ("A contractor who enters into an arrangement with an agent of the government bears the

risk that the agent is acting outside the bounds of his authority, even when the agent himself was

unaware of the limitations on his authority.").

> B.    DAPL's Economic Harms are Overblown and Do Not Outweigh the Tribe's
>        Irreparable Harm

DAPL asserts that a sweeping array of financial and community calamities will ensue if

an injunction is granted.  There is remarkably little foundation to support these claims, which are

mostly based on unsupported testimony.  For example, the costs of temporarily stopping the

project vary between DAPL's brief and the supporting declaration by an order of magnitude.

*Compare* DAPL Opp. at 32 (DAPL will lose $900 million for every month of delay) with

Mahmoud Decl., ¶ 54 (citing losses of $83.3 million per month).  There is no mention of what

the temporary shut-down costs are such that they would be "greater than $430 million."  *Id*.

Further, the stated costs to remobilize construction if an injunction were lifted are variable and

duplicative.  *See, e.g.,* Mahmoud Decl., ¶¶ 66 and 68 (counting maintenance of idle pipeline in

two places).  Other economic harms are largely exercises in speculation.  Most notably, while

DAPL hangs the loss of income to contractors and workers on an injunction, it nowhere

demonstrates that DAPL would be released from its obligations under contracts such that

workers would go unpaid.  It could well be that the harm of an injunction would fall on DAPL's

investors, who made the risky choice to proceed without all permits.

The Tribe acknowledges that an injunction would come at some cost, and it is not

insensitive to those impacts.  Archambault Decl., ¶ 3.  However, these harms are entitled to

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

limited weight.  *See Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.*, 840 F. Supp. 2d

327, 335 (D.D.C. 2012); *Wisconsin Gas Co. v. FERC,* 758 F.2d 669, 674 (D.C. Cir. 1985)

("economic loss does not, in and of itself, constitute irreparable harm").  Injunctions against

major infrastructure or construction projects where there are violations of environmental statutes

are not unusual.  *See Bragg v. Robertson*, 54 F. Supp. 2d at 645; *Ohio Valley Envtl. Coal. v. U.S.

Army Corps of Engineers*, 528 F. Supp. 2d 625, 632 (S.D.W.Va. 2007).  Although litigated less

frequently, the same is true for NHPA violations.  *See* PI Motion, at 35, 40.

     Moreover, the core impact to DAPL is not economic "harm" but rather a delay in

realizing its anticipated future profits.  That is not a sufficient basis for avoiding an injunction

because Congress, in enacting the NHPA, presumably understood compliance would mean

projects would be authorized less quickly.  *See Park County Resource Council, Inc. v. U.S. Dept.

of Agriculture*, 817 F.2d 609, 618 (10th Cir. 1987) ("Any increased costs from delay . . . is not

sufficient to establish prejudice, because NEPA contemplates just such a delay.").  Moreover,

"there is no reason to believe that the delay in construction activities caused by the court's

injunction will reduce significantly any future economic benefit that may result from the

[project's] operation."  *See Alaska Conservation Council v. U.S. Army Corps of Eng'rs*, 472 F.3d

1097, 1101 (9th Cir. 2006), *rev'd on other grounds*, 129 S. Ct. 2458 (2009).

     The Tribe was dismayed to learn in DAPL's opposition that clearing and grading are well

advanced in North and South Dakota.[19]  But DAPL's effort to win this lawsuit on the ground

should not deprive the Tribe of the effective relief that remains.  To the extent that DAPL can

demonstrate that construction (including clearing and grading) has been completed in particular

---

[19] Although DAPL claims that clearing and grading is 98% complete, it offers no support or
evidence.  The figure may be exaggerated.  *See, e.g.,* Ex. 61 (August 3, 2016 filing shows
clearing and grading in North Dakota 72% complete).  Areas of the route near the Standing Rock
reservation, which carry great cultural value, remain untouched.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

areas, such that consultation under § 106 would no longer be meaningful in those areas, the

Court could limit the scope of the injunction to areas in which § 106 consultation would still be

valuable.  But construction should be halted, and Corps should be required to consult with the

Tribe, consistent with the requirements of the NHPA, and should take steps to evaluate and

protect what is left, including in the area around Lake Oahe.

## V.   THE PUBLIC INTEREST SUPPORTS AN INJUNCTION

The public interest also weighs in Plaintiff's favor.  The U.S. Congress defined the public

interest when it adopted NHPA.  36 U.S.C. § 30001 (policy).  Numerous other statutes,

regulations, and Executive Orders mandate consultation with tribes in order to protect tribal

spiritual, cultural, and historical resources.  *See, e.g.,* 25 U.S.C. § 3001, *et. seq*.; 43 C.F.R. §

10.5; 16 U.S.C. SEC. 470cc(c); 42 U.S.C. § 1996; Executive Order 13007 "Protection and

Accommodation of Access to 'Indian Sacred Sites'"(May 24, 1996); Executive Order 13175

"Consultation and Coordination With Indian Tribal Governments" (Nov. 6, 2000). There are

definite, recognized benefits to the public interest in ensuring that the Corps complies with laws

requiring a duty to consult, and strengthening the government commitment to tribal consultation.

The public also has an interest in protecting resources and the right to lawful compliance in the

event of environmental degradation.  *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 326-27

(D.C. Cir. 1987) (affirming district court's finding that an injunction was in the public interest to

"protect against further illegal action pending resolution of the merits" and to "protect[] the

environment from any threat of permanent damage); *Fund for Animals v. Espy*, 814 F. Supp.

142, 152 (D.D.C. 1993) (finding "meticulous compliance with the law by public officials," as

relevant to the public interest); *Fund for Animals v. Norton*, 281 F. Supp. 2d at 237 (finding a

public interest in "compliance with NEPA").

DAPL points to "energy source" development and economic growth as factors supporting

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

completion of the project and repeatedly implies that if the injunction were granted, that Dakota

Access would have to make a dramatic exit from pipeline development.  DAPL Opp. at 33-34.

These public interest factors are speculative.  *See Alliance for the Wild Rockies v. Cottrell*, 632

F.3d 1127, 1138-9 (9th Cir. 2011) (finding that the public interest of the effects on the local

economy and preventing job loss does not outweigh the public interest in protecting the

environment).  DAPL also argues that "the public has an interest in avoiding unnecessary

administrative costs incurred by additional and unnecessary § 106 consultations," DAPL Opp. at

34, but this is only true if the consultation is unnecessary.  In addition, DAPL claims that the

project may fail and cause crippling effects is simply another effort at self-preservation that

should not factor into the interests of the *public*.

Perhaps most significantly, failing to issue an injunction in the face of a likelihood of

prevailing on the merits and a showing of irreparable harm would reward private parties who

aggressively move ahead with controversial projects in order to circumvent required reviews.  It

is in the public interest to have private entities receive the message that things need to be done

properly, even if it takes more time.  DAPL has significantly succeeded in its effort to advance

the pipeline before these major controversies could be settled.  Rewarding it for this behavior

would signal to others that this is a sound strategy for the next project.  The public interest

expressed in NHPA and other statutes would be undermined.

CONCLUSION

For the foregoing reasons, the Tribe respectfully asks that its motion be GRANTED.

Dated:  August 22, 2016                      Respectfully submitted,


                                             */s/ Jan E. Hasselman*
                                             Patti A. Goldman, DCB # 398565
                                             Jan E. Hasselman, WSBA # 29107

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

(*Admitted Pro Hac Vice*)
Stephanie Tsosie, WSBA # 49840
(*Admitted Pro Hac Vice*)
Earthjustice
705 Second Avenue, Suite 203
Seattle, WA  98104
Telephone:  (206) 343-7340
pgoldman@earthjustice.org
jhasselman@earthjustice.org
stsosie@earthjustice.org

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on August 22, 2016, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will send notification of this filing to the

attorneys of record and all registered participants.


*/s/ Jan E. Hasselman*
Jan E. Hasselman

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*