## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STANDING ROCK SIOUX TRIBE,** | |
| **Plaintiff,** | **Case No. 1:16-cv-1534-JEB** |
| **and** | |
| **CHEYENNE RIVER SIOUX TRIBE,** | |
| **Intervenor-Plaintiff,** | |
| **v.** | |
| **U.S. ARMY CORPS OF ENGINEERS,** | |
| **Defendant.** | |
| **and** | |
| **DAKOTA ACCESS, LLP,** | |
| **Intervenor-Defendant.** | |

### INTERVENOR-PLAINTIFF CHEYENNE RIVER SIOUX TRIBE'S FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Intervenor-Plaintiff Cheyenne River Sioux Tribe seeks declaratory and injunctive relief against Defendant and, in support thereof, states as follows:

### INTRODUCTION

1.     This is a complaint for declaratory and injunctive relief.  The Cheyenne River Sioux Tribe ("Tribe") brings this action in connection with federal actions relating to the Dakota Access Pipeline ("DAPL"), a 1,168-mile-long crude oil pipeline running from North Dakota to Illinois owned by the oil company, Dakota Access LLP ("Dakota Access").  The Tribe, a federally-recognized Indian Tribe with a reservation in South Dakota (25 U.S.C. § 479a; 81 Fed. Reg. 5020 (Jan. 29, 2016), brings this case against Defendant U.S. Army Corps of Engineers ("Corps"),

whose authorization of DAPL violates the United States' trust and protectorate relationship with the Tribe, as embodied in the United States Constitution, multiple treaties with the Tribe, federal statutes, executive orders, and regulations, in addition to violating multiple federal statutes that govern pipeline construction and operation.  The construction and operation of the pipeline, as authorized by the Corps, represents an existential threat to the Tribe's permanent homeland and our environmental and economic well-being, and will damage and destroy sites of great historic, religious, and cultural significance to the Tribe.

2.      Specifically, the DAPL crude oil pipeline approved by the Corps is planned to transect the heart of the Tribe's ancestral and treaty lands and will run directly under the Missouri River at the site of the Oahe Reservoir, which is the primary source of water for the Cheyenne River Sioux Reservation.  The waters of the Missouri River or *Mni Šoše* are sacred to the Lakota people of the Cheyenne River Sioux Tribe and constitute the lifeblood of our religion and traditions.  Further, the Tribe's treaties and the federal statutes that govern the Tribe's rights with regard to the Missouri River establish that the Tribe enjoys a clear property right in the waters of the Missouri and enjoys a right to waters that are clean and suitable for drinking, agricultural use, hunting, fishing, and other rights.  This property right is subject to the special trust relationship between the United States and the Cheyenne River Sioux Tribe.

3.      Should this oil pipeline fail, like so many before it have, it will contaminate this essential resource and deprive the Tribe of the right guaranteed to us by the United States to rely on the Missouri River to sustain our homeland.  These public health and safety concerns caused Dakota Access to abandon an early proposal to run the pipeline under the Missouri River near the city of Bismarck, North Dakota, which relies upon these waters for its municipal waters.  Nevertheless, when the Environmental Protection Agency, the Department of Interior, and the

Tribe communicated their grave concerns about the environmental impact of siting the DAPL under Tribally-owned waters, the Corps improperly relied upon an Environmental Assessment ("EA") that failed to analyze the significant environmental effects of the oil pipeline on the Tribe's water. The Corps' issuance of the permits that allow Dakota Access to run its pipeline through the Tribe's waters was arbitrary and capricious and should be set aside because it violated the National Environmental Policy Act ("NEPA"), Department of Defense policies and regulations, and because it breached the United States' trust responsibility to the Cheyenne River Sioux Tribe.

4.     The Tribe also brings an as-applied challenge to Nationwide Permit 12 ("NWP 12"), issued by the Corps in 2012 pursuant to the federal Clean Water Act ("CWA") and Rivers and Harbors Act ("RHA"). DAPL crosses hundreds if not thousands of federally-regulated rivers, streams, and wetlands along its route. The discharge of any fill material in such waters is prohibited absent authorization from the Corps. Federal authorization under these statutes, in turn, triggers requirements under the National Historic Preservation Act ("NHPA"), intended to protect sites of historic and cultural significance to Tribes like Cheyenne River. In issuing NWP 12, however, the Corps authorized discharges into federal waters without ensuring compliance with the NHPA. In essence, in enacting NWP 12, the Corps pre-authorized construction of DAPL in all but a handful of places requiring federal authorization without any oversight from the Corps. In so doing, the Corps abdicated its statutory responsibility to ensure that such undertakings do not harm historically and culturally significant sites.

5.     In addition, on July 25, 2016, the Corps issued multiple federal authorizations needed to construct the pipeline in certain designated areas along the pipeline route. One such authorization allows Dakota Access to construct the pipeline underneath Lake Oahe, approximately seventy miles upstream of the Tribe's reservation. Others authorize the DAPL to

discharge into waters of the United States at multiple locations throughout the Tribe's ancestral lands.  The Tribe brings this challenge because these authorizations were made in violation of the CWA and its governing regulations and without compliance with NHPA, and the NEPA.  These authorizations also violate the Corps' responsibility to manage the waters of Lake Oahe, which are owned by the Cheyenne River Sioux Tribe, pursuant to the Flood Control Act of 1944, P.L. 83-776, Department of Defense policies and regulations, and in violation of the Corps' trust and fiduciary responsibility to the Tribe set forth in statute and Treaty.

6.    The Tribe seeks a declaration that the Corps violated the NHPA in issuing NWP 12, and an injunction preventing the Corps from using NWP 12 as applied to DAPL and directing the Corps to ensure full compliance with § 106 of the NHPA at all sites involving discharges into waters of the United States.  The Tribe also seeks a declaration that the July 25, 2016 authorizations were made in violation of the CWA, NEPA, and NHPA, and an order vacating all existing authorizations and verifications pending full compliance with the CWA, NEPA, and NHPA.  The Tribe finally seeks a declaration that the Corps' authorization of the DAPL crossing under the Missouri River violated the United States' trust responsibility to the Tribe, and an order vacating all existing authorizations and verifications.

7.    The Tribe seeks a declaration the Corps violated the Mineral Leasing Act ("MLA") and the Administrative Procedures in its failure to promulgate regulations in accordance with the MLA.  The Tribe also seeks a declaration that any right-of-way issued by the Corps was made in violation of the MLA, and an order vacating the issues of any right-of-way on lands with the Corps exercises jurisdiction.

**JURISDICTION AND VENUE**

8.    This case arises under the Constitution and laws of the United States, including the Supremacy Clause, U.S. Const., Art. 6; the Treaty of Fort Laramie, 11 Stat. 749 (Sep. 17, 1851);

and the 1868 Sioux Nation Treaty, 15 Stat. 635 (Apr. 29, 1868).  This case also states a claim

under the Administrative Procedures Act, 5 U.S.C. § 701 et seq. ("APA"), which authorizes a

federal court to find unlawful and set aside any final agency action that is "arbitrary and capricious,

an abuse of discretion, or otherwise not in accordance with law."  *Id*. at § 706.  Jurisdiction arises

under 28 U.S.C. § 1362 ("district courts shall have original jurisdiction of all civil actions, brought

by any Indian Tribe or band with a governing body duly recognized by the Secretary of the Interior,

wherein the matter in controversy arises under the Constitution, laws, or treaties of the United

States"); § 2201 (declaratory relief); § 2202 (injunctive relief).

9.      Venue in this district is appropriate under 28 U.S.C. § 1391(e) because it is the

district in which the Defendant resides and in which "a substantial part of the events or omissions

giving rise to the claim occurred."

## PARTIES

10.      The Cheyenne River Sioux Tribe is a federally-recognized Indian tribe with a

governing body recognized by the Secretary of the Interior.  The Tribe is a member of the *Oceti*

*Šakowiŋ* ("Seven Council Fires," also known as the Great Sioux Nation), which includes the

Lakota, Dakota, and Nakota people.  The Tribe is comprised of four of the seven bands of Lakota

(*Itazipco*, *Minnicoujou*, *Oohenumpa*, and *Siha Sapa*) and is a party to the 1851 Fort Laramie Treaty

and the 1868 Sioux Nation Treaty.  In those Treaties, the United States made solemn promises to

the Tribe, including the explicit guarantee of "protection" and the reservation of lands intended to

provide a homeland and subsistence for the Tribe "set apart for [their] absolute and undisturbed

use and occupation."  In consideration for those promises, the Tribe ceded a large portion of their

aboriginal territory in the northern Great Plains.

11.      The original territory set aside by the United States for the Tribe was diminished

over time to create nine much smaller Sioux reservations, including the Cheyenne River.  The

present Cheyenne River Sioux Reservation is bordered on the north by the Standing Rock Sioux Reservation and bordered on the east by Lake Oahe, upon which the Tribe relies for its very subsistence—its drinking water, its agricultural water, its industrial water, and the waters that support subsistence and sport hunting, fishing, and boating. Lake Oahe is the same reservoir of the Missouri that the proposed pipeline is intended to cross. The Cheyenne River Sioux Reservation is approximately seventy miles downstream of that proposed crossing.

12.     The territory set aside for the Tribe in the 1851 Treaty of Fort Laramie was vast, including all of the Dakotas west of the Missouri River and large sections of Montana, Wyoming, and Nebraska. These Treaty lands encompass exactly the site of the proposed pipeline. Further, the Tribe's aboriginal territory prior to 1851 included the entirety of the Dakotas (in addition to other areas). Hence, a great portion of the rest of the DAPL pipeline crossing through the Dakotas is within the Tribe's ancestral and ceded lands.

13.     The present-day borders of the Cheyenne River Sioux Reservation were established by the Act of March 2, 1889, 25 Stat. 888, but a significant portion of those lands were later taken by an unconsented inundation of Tribal lands when the Defendant here flooded the Missouri River to create Lake Oahe in the 1950s which took 104,420 acres of the our very best lands. Since the beginning of its interactions with the Tribe, however, the United States has reiterated time and again by statute, regulation, and executive order its promise to provide the Tribe with protection, subsistence, a livable homeland, and the waters necessary to maintain the same.

14.     The U.S. Army Corps of Engineers is an agency of the United States government and a division of the U.S. Army, part of the U.S. Department of Defense. It is charged with regulating any dredging and filling of the waters of the United States under § 404 of the CWA and

§ 10 of the RHA.  The Corps is empowered by statute to exercise comprehensive control over the waters of Lake Oahe.  33 U.S.C. § 707.

15.     By filing this action, the Tribe does not waive its sovereign immunity and does not consent to suit as to any claim, demand, offset, or cause of action of the United States, its agencies, officers, agents, or any other person or entity in this or any other court.

**TREATIES, STATUTES, AND REGULATONS, RELATED TO THE CORPS' OBLIGATIONS TO MANAGE WATERS OF LAKE OAHE AND TRUST DUTY TO THE TRIBE**

**I.      THE FORT LARAMIE TREATY OF 1851 AND 1868 SIOUX NATION TREATY**

16.     At the close of the War of 1812, the United States settled with Great Britain in the Treaty of Ghent, promising that Indian nations and tribes would enjoy the same status with the United States as they had prior to the War.  Accordingly, the United States sent out treaty delegations to Indian country.  In 1851, the United States entered into a treaty with the Great Sioux Nation, including the four bands of the Lakota who comprise the Cheyenne River Sioux Tribe. 1851 Treaty of Fort Laramie, 11 Stat. 749 (Sep. 17, 1851).  In this peacetime treaty, the Tribe reserved a vast territory encompassing all of the Dakotas west of the Missouri River and large swaths of Montana, Wyoming, and Nebraska.  The United States bound itself to "protect" the Great Sioux Nation "against the commission of all depredations by the people of the said United States, after the ratification of this treaty."

17.     From 1867 to 1868, the Great Sioux Nation fought the Powder River War, a series of military engagements in which the Sioux Tribes fought to protect the integrity of the Treaty lands recognized by the United States in1851 from the incursion of white settlers.  The United States, acting under the auspices of the Indian Peace Commission, sought a treaty to end the war. The Treaty Commission travelled up the Missouri River to meet with the leaders of the Great Sioux

Nation where they negotiated the 1868 Sioux Nation Treaty.  15 Stat. 635 (Apr. 29, 1868).  In the

Treaty of 1868, the Sioux Nation reserved all of the lands west of the low water mark of the

Missouri River in South Dakota and adjacent lands in North Dakota as the Tribe's permanent

homeland, including without limitation appurtenant waters, natural resources, grazing, timber,

mineral rights, hunting and fishing rights, usufructuary rights, and absolute and undisturbed use,

occupancy, ownership, self-government and treaty rights protected by the United States' honor,

the Full Faith and Credit of the United States, the federal trust responsibility and the Constitution

of the United States.  The Reservation of the Great Sioux Nation's permanent homeland includes

the sacred pledge by the United States that it would be a livable homeland.

**II.      ACT OF MARCH 2, 1889, 25 Stat. 888**

18.     In 1889, after a prior illegal abrogation of the 1868 Treaty, the United States

reserved the present-day Cheyenne River Sioux Reservation as the permanent home for the four

Lakota bands that comprise the Cheyenne River Sioux Tribe today.  The Act states:

> That the following tract of land, being a part of the said Great Reservation of the
> Sioux Nation, in the Territory of Dakota, is hereby set apart for a permanent
> reservation for the Indians receiving rations and annuities at the Cheyenne River
> Agency, in the said Territory of Dakota, namely:  Beginning at a point in the center
> of the main channel of the Missouri River, ten miles north of the mouth of the
> Moreau River, said point being the southeastern corner of the Standing Rock
> Reservation; thence down said center of the main channel of the Missouri River,
> including also entirely within said reservation all islands, if any, in said river, to a
> point opposite the mouth of the Cheyenne River; thence west to said Cheyenne
> River, and up the same to its intersection with the one hundred and second meridian
> of longitude; thence north along said meridian to its intersection with a line due
> west from a point in the Missouri River ten miles north of the mouth of the Moreau
> River; thence due east to the place of beginning.

25 Stat. 888, §4.

The reservation includes treaty lands, appurtenant waters, natural resources, grazing, timber,

mineral rights, hunting and fishing rights, usufructuary rights, and absolute and undisturbed use,

occupancy and ownership, self-government and treaty rights. This reservation of land was accompanied by a reservation of water rights in the Missouri River to fulfill the purpose of the reservation to provide for the Tribe's self-sufficiency. *Winters v. United States*, 207 U.S. 564 (1908). The Tribe enjoys a clear property right in the waters of Lake Oahe and the Missouri River reserved to it by the United States by the creation of the Cheyenne River Sioux Reservation. *Id*. This *Winters* right includes the right to clean, safe water that is consistent with the purpose of the reservation. *Id.*

### III.     FLOOD CONTROL ACT OF 1944, PUBLIC LAW 83-776

19.     In Public Law 83-776, the United States directed the Defendant Army Corps of Engineers to construct the Oahe Dam on the Missouri River to provide for federal flood control for Americans living downstream of the Cheyenne River Sioux Tribe. The Act permitted a taking of Tribal lands that resulted in the inundation 104,420 acres of the Tribe's very best lands. Public Law 83-776, however, reserved the Reservation boundaries, appurtenant waters, natural resources, grazing, timber, mineral rights, hunting and fishing rights, usufructuary rights, and absolute and undisturbed use occupancy and ownership, self-government and treaty rights.

20.     The Flood Control Act also granted to the Army Corps of Engineers comprehensive power over federally-owned reservoirs such as Lake Oahe, including authority over water use, leases, construction, recreation, storage, flood control and navigation, and regulations related to the same. *See* 16 U.S.C. §§ 460d, 825s (1946 Ed.); 33 U.S.C. §§ 708, 709 (1946 Ed.). The Corps' control over federally-owned reservoirs is pervasive, excluding even its sister agencies. *ETSI Pipeline Project v. Missouri*, 484 U.S. 495 (1988).

21.     The Flood Control Act, further, explicitly prohibits the Corps from taking any action in its management of Lake Oahe that conflicts with present and future beneficial

consumptive uses of the waters in Lake Oahe for domestic, municipal, stock water, irrigation, mining, or industrial purposes.  Act of December 22, 1944, 58 Stat. 887, §1(b).

## IV.     THE CORPS' TRUST RESPONSIBILITY TO THE TRIBE

22.     The Cheyenne River Sioux Tribe owns reserved water rights guaranteed by its Treaties in the waters of Lake Oahe.  "Indian reserved water rights are vested property rights for which the United States has a trust responsibility, with the United States holding legal title to such water in trust for the benefit of the Indians."  Criteria and Procedures for the Participation of the Federal Government in Negotiations for the Settlement of Indian Water Rights Claims, 55 Fed. Reg. 9223 (Mar. 12, 1990).  Under the federal trust responsibility, the United States has a duty to conserve Indian lands, waters, and natural resources, and appropriately manage tribal natural resources  25 U.S.C. § 162(a)-(d).  It is also "the policy of the United States, that all Indian communities . . . be provided with safe and adequate water supply. . . ."  25 U.S.C § 1632(a) (5).  Among the United States' core obligations is their duty to prevent upstream users from impairing a tribes' reserved right.  *See Winters*, 207 U.S. at 577-78.

23.     The Corps and the Department of Defense exercise their trust responsibility to protect tribes and tribal trust resources by government-to-government consultation with tribes on any action under their authority that could impair tribal trust resources or tribal rights.  Department of Defense Instruction 4710.02 (Sept. 14, 2006); *see also* Secretary of Defense Policy on "Department of Defense American Indian and Alaska Native Policy," Oct. 20, 1998; Executive Order 13175, *Consultation and Coordination with Indian Tribal Governments* (Nov. 6, 2000); *Presidential Memorandum on Tribal Consultation* (Nov. 6, 2009).  While the courts and the Corps itself recognize that the Corps owes a trust duty to Tribes, particularly with regard to ensuring that Treaty rights are given full effect, the Corps also owes a specific trust responsibility to the Tribe

to protect its reserved water emanating from its comprehensive statutory control over the Tribe's trust property.

24.     The Corps' duty to the Tribe is a moral obligation of the highest responsibility and trust that should be judged by the most exacting fiduciary standards. *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 207 (2011).

## THE CLEAN WATER ACT

25.     Congress enacted the CWA in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To accomplish this goal, the CWA prohibits the discharge of any pollutant, including dredged soil or other fill material, into waters of the United States unless authorized by a permit. *Id*. at § 1311(a). Unless statutorily exempt, all discharges of dredged or fill material into waters of the United States must be authorized under a permit issued by the Corps. *Id*. at §§ 1344(a)–(e).

26.     The Corps is authorized to issue two types of permits under § 404: individual permits and general permits. *Id*. The Corps issues individual permits under § 404(a) on a case-by-case basis. *Id*. at § 1344(a). Such permits are issued after a review involving, among other things, site specific documentation and analysis, public notice and opportunity for a hearing, public interest analysis, and formal determination. 33 C.F.R. § 322.3, Parts 323, 325.

27.     The CWA also authorizes the Corps to issue "general" permits on a state, regional, or nationwide basis. 33 U.S.C. § 1344(e). Such general permits may be issued for any category of similar activities that "will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment." *Id*. "No general permit . . . shall be for a period of more than five years after the date of its issuance." 33

U.S.C. § 1344(e)(2).  The purpose of this approach to permitting is to "regulate with little, if any, delay or paperwork certain activities that have minimal impacts."  33 C.F.R. § 330.1(b).

28.     The Corps issued the current set of 48 nationwide permits ("NWPs") in February of 2012.  77 Fed. Reg. 10184 (Feb. 21, 2012).  The 2012 NWPs in "most cases" authorize discharge into regulated waters without any further process involving the Corps.  In effect, the NWP pre-authorizes certain categories of discharge, without any additional approval from, or even notification to, the Corps.  33 C.F.R. § 330.1(e)(1).  In other instances, discharges cannot occur until the proponent of the action files a "pre-construction notification" ("PCN") to the Corps, and receives verification that the proposed action is consistent with the terms of the NWP.  *Id*. at § 330.6(a).  The specifics of whether or not a PCN is required are spelled out in each individual NWP as well as a series of "general conditions" accompanying the NWP.  77 Fed. Reg. at 10282 (listing 31 general conditions).

## THE RIVERS AND HARBORS ACT

29.     The Rivers and Harbors Act of 1899 is the nation's oldest environmental law.  The statute prohibits a number of activities that impair ports, channels, and other navigable waters. Unlike the CWA, which applies in all waters of the United States, the RHA applies only in "navigable" waters, defined as waters subject to the ebb and flow of the tides, or waters that are "presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce."  33 C.F.R. § 329.4.

30.     Section 10 of the RHA, 33 U.S.C. § 403, among other things, makes it unlawful "to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of" any navigable water without a permit from the Corps.  Like § 404 permits, § 10 permits may be issued as individual permits or pursuant to the NWP program and are generally subject to many of the same regulations.

31.     Tunneling under a navigable water requires a § 10 permit from the Corps, even without any discharge into navigable waters.  33 C.F.R. § 322.3(a) ("For purposes of a Section 10 permit, a tunnel or other structure or work under or over a navigable water of the United States is considered to have an impact on the navigable capacity of the waterbody.").

32.     A separate provision of the RHA, known as "Section 408," makes it unlawful to "build upon, alter, deface, destroy, move, injure, obstruct by fastening vessels thereto or otherwise, or in any manner whatever impair the usefulness of any sea wall, bulkhead, jetty, dike, levee, wharf, pier, or other work built by the United States" without a permit from the Corps.  33 U.S.C. § 408.  Unlike § 10 permits, § 408 permits cannot be issued pursuant to the NWP program but are only issued as individual permits.  Prior to issuance of a § 408 permit, the Corps must determine whether the use or occupation will be injurious to the public interest or impair the usefulness of the project.

## THE NATIONAL HISTORIC PRESERVATION ACT

33.     Section 106 of the National Historic Preservation Act requires that, prior to issuance of a federal permit or license, federal agencies shall take into consideration the effects of that "undertaking" on historic properties.  54 U.S.C. § 306108.  Agencies "must complete the Section 106 process prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license."  36 C.F.R. § 800.1.

34.     The NHPA defines undertaking as "a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including (1) those carried out by or on behalf of the Federal agency; (2) those carried out with Federal financial assistance; (3) those requiring a Federal permit, license, or approval; and (4) those subject to State or local regulation administered pursuant to a delegation or approval by a Federal agency."  54 U.S.C. § 300320; 36 C.F.R. § 800.16(y).

35.     Early in the NHPA process, an agency must determine the area of potential effects ("APE") of a federal undertaking.  36 C.F.R. § 800.4(1)(1).  The APE is defined by regulation to include the area "within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties.  The [APE] is influenced by the scale and nature of an undertaking and may be different for different kinds of effects caused by the undertaking."  *Id*. at § 800.16(d).

36.     The § 106 process requires consultation with Indian tribes on federal undertakings that potentially affect sites that are culturally significant to Indian tribes.  36 C.F.R. § 800.2(c)(2); 54 U.S.C. § 302707 (properties "of traditional religious and cultural importance to" a Tribe may be included on the National Register, and federal agencies "shall consult with any Indian Tribe . . . that attaches religious or cultural significance" to such properties).  Consultation must occur regarding sites with "religious and cultural significance" even if they occur on ancestral or ceded land.  *Id*. at § 800.2(c)(2)(II)(D).

37.     Under the consultation regulations, an agency official must "ensure" that the process provides Tribes with "a reasonable opportunity to identify its concerns about historic properties, advise on the identification and evaluation of historic properties . . . articulate its views on the undertaking's effects on such properties, and participate in the resolution of adverse effects."  *Id*. at § 800.2(c)(ii)(A).  This requirement imposes on agencies a "reasonable and good faith effort" to consult with tribes in a "manner respectful of tribal sovereignty."  *Id*. at § 800.2(c)(2)(II)(B).

38.     Acting "in consultation with . . .  any Indian tribe  . . . that might attach religious and cultural significance to properties within the area of potential effects, the agency official shall take steps necessary to identify historic properties within the area of potential effects."  *Id*. at §

800.4(b).  The agency must evaluate the historic significance of such sites and determine whether they are potentially eligible for listing under the National Register.  *Id*. at § 800.4(c).

39.     If the agency determines that no historic properties will be affected by the undertaking, it must provide notice of such finding to the state and tribal historic preservation offices, and the Advisory Council on Historic Preservation ("ACHP"), which administers the NHPA.  *Id*. at § 800.4(d).  The regulations give those parties the opportunity to object to such a finding, which elevates the consultation process further.  *Id*.

40.     If the agency finds that historic properties are affected, it must provide notification to all consulting parties and invite their views to assess adverse effects.  *Id*.  Any adverse effects to historic properties must be resolved, involving all consulting parties and the public.  *Id*. at § 800.6.  If adverse effects cannot be resolved, the process is elevated again to the ACHP and the head of the agency undertaking the action.  *Id*. at § 800.7.  Until this process is complete, the action in question cannot go forward.

41.     The ACHP authorizes agencies to adopt their own regulations for implementing its § 106 obligations.  Such regulations must be reviewed and approved by the ACHP in order to be valid.  *Id*. at § 800.14.

42.     The Corps has adopted procedures intended to satisfy its § 106 obligations.  *See* App. C to 33 C.F.R. Part 325.  Those procedures, which predate amendments to the NHPA that significantly broaden the role of tribes in the § 106 process, have never been approved by the ACHP.  Several courts have concluded that the Corps' NHPA procedures are legally invalid.  However, the Corps continues to follow these procedures for purposes of § 106 consultation, including in the process surrounding DAPL.

43.     Section 106 regulations also provide an alternative compliance mechanism under which agencies can negotiate a "programmatic agreement" with the ACHP to resolve "complex project situations or multiple undertakings."  36 C.F.R. § 800.14(b).  Such agreements are suitable for "when effects on historic properties are similar and repetitive or are multi-State or regional in scope;" "when effects on historic properties cannot be fully determined prior to approval of an undertaking;" or when "nonfederal parties are delegated major decisionmaking responsibilities," among other situations.  *Id*. at § 800.14(b)(1).  Programmatic agreements require consultation with Tribes, among others, as well as public participation.

44.     The Corps has never adopted a programmatic agreement with the ACHP regarding its CWA/RHA permits or any other activity.

## THE NATIONAL ENVIRONMENTAL POLICY ACT

45.     NEPA, 42 U.S.C. §§ 4321–4370f, is our "basic national charter for protection of the environment."  40 C.F.R. § 1500.1(a).  It makes environmental protection a part of the mandate of every federal agency.  42 U.S.C. § 4332(1).

46.     NEPA seeks to ensure that federal agencies take a "hard look" at environmental concerns.  One of NEPA's primary purposes is to ensure that an agency, "'in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts.'"  *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349 (1989).  NEPA also "guarantees that the relevant information [concerning environmental impacts] will be made available to the larger audience," including the public, "that may also play a role in the decisionmaking process and the implementation of the decision."  *Id.*

47.     NEPA requires agencies to fully disclose all of the potential adverse environmental impacts of its decisions before deciding to proceed.  42 U.S.C. § 4332(C).  NEPA also requires

agencies to use high quality, accurate scientific information and to ensure the scientific integrity of the analysis.  40 C.F.R. §§ 1500.1(b), 1502.24.

48.      If an agency action has adverse effects that are "significant," they need to be analyzed in an environmental impact statement ("EIS").  40 C.F.R. § 1501.4.  If it is unclear whether impacts are significant enough to warrant an EIS, it may prepare an "environmental assessment" ("EA") to assist in making that determination.  *Id*.  If the agency determines that no EIS is required, it must document that finding in a "finding of no significant impact" ("FONSI").

49.      NEPA's governing regulations define what "range of actions, alternatives, and impacts [must] be considered in an environmental impact statement."  40 C.F.R. § 1508.25.  This is in part what is known as the "scope" of the EIS.  The EIS must consider direct and indirect effects.  The direct effects of an action are those effects "which are caused by the action and occur at the same time and place."  40 C.F.R. § 1508.8(a).  The indirect effects of an action are those effects "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable."  40 C.F.R. § 1508.8(b).

50.      An agency must also analyze and address the cumulative impacts of a proposed project.  40 C.F.R. § 1508.25(c)(3).  Cumulative impacts are the result of any past, present, or future actions that are reasonably certain to occur.  Such effects "can result from individually minor but collectively significant actions taking place over a period of time."  40 C.F.R. § 1508.7.

## THE MINERAL LEASING ACT

51.      The Mineral and Leasing Act imposes a mandatory duty that rights-of-way or permits granted or renewed pursuant to 30 U.S.C. § 185 shall be subject to promulgated regulations.

52.      The relevant section is set forth in 30 U.S.C. § 185(f).

53.     The section is intended to ensure that permits and rights-of-way granted or renewed pursuant to the Mineral Leasing Act are promulgated in accordance with the provisions of section 185.  In addition to the mandatory requirement of regulations being promulgated in accordance with the provisions of section 185, the Secretary of the Interior or agency head may prescribe additional terms and conditions regarding the extent, duration, survey, location, construction, operation, maintenance, use and termination of such permits and grants.

54.     The Corps has not promulgated any regulations or final rule regarding the grant of rights-of-way or permits granted or renewed pursuant to the Mineral Leasing Act.

55.     The APA requires promulgated rulemaking by agencies after the public receives notice and an opportunity to comment.

56.     It is incumbent upon an agency to follow is own procedures.  *Morton v. Ruiz*, 415 U.S. 199 (1974).

## FACTUAL ALLEGATIONS

## VI.     INTERESTS OF THE CHEYENNE RIVER SIOUX TRIBE

57.     Since time immemorial, the Tribe's ancestors—the *Oceti Šakowiŋ*, also known as the Great Sioux Nation—used and occupied a broad area throughout the northern Great Plains, including much of the area that Dakota Access proposes to cross with its pipeline.  Although the Tribe followed migrating buffalo herds without limitation across the North American landscape (including present-day Iowa and Illinois), the Tribe's aboriginal territory prior to the 1851 Fort Laramie Treaty has been understood to include all of the Dakotas and large parts of Montana, Wyoming, and Nebraska.  The Tribe's traditional territories as set forth in the various treaties has been judicially established to include all of the Dakotas west of the Missouri River and large parts of Montana, Wyoming, and Nebraska.  This broad territory embraces a landscape filled with cultural and historical significance central to the Tribe's identity.

58.     The Tribe's traditional and ancestral territory extends well beyond the current Reservation's exterior boundaries, encompassing lands that are the subject of this action, but especially those lands that have been judicially established as treaty territories of the tribe.  The Corps and other federal agencies have repeatedly acknowledged the traditional use of lands within and around the DAPL route by the Tribe's ancestors.

59.     The Tribe's cultural resources are historically and culturally interrelated over the entirety of the land within the Tribe's traditional territory, within and outside of the exterior boundaries of the Reservation.  Protection of the Tribe's cultural heritage is of significant importance to the Tribe.  Destruction or damage to any one cultural resource, site, or landscape contributes to destruction of the Tribe's culture, history, and religion.  Injury to the Tribe's cultural resources causes injury to the Tribe and its people.

60.     Cultural resources of significance to the Tribe are located on the lands that are the subject of this action and adjacent lands.  In addition to specific archaeological sites that have been identified to date, there are numerous significant culturally important sites that have not been identified.  The lands within the pipeline route are culturally and spiritually significant.

61.     The waters of the Missouri River moreover are sacred to the Tribe and essential to the Tribe's practice of our religion.  The waters of the Missouri River are themselves a Tribal cultural and spiritual resource.

62.     The Tribe and its members also have a cultural interest in preserving the quality of the land, water, air, fauna, and flora within the Tribe's traditional territory, within and outside the Reservation.  For example, the Tribe is concerned with impacts to the habitat of wildlife species such as piping plovers, least tern, Dakota skipper, the black-footed ferret, and pallid sturgeon, among others.  The Tribe has a particular concern for bald eagles, which remain federally protected

and play a significant role in the Tribe's culture, and which would be adversely affected by the proposed pipeline. The Tribe is greatly concerned with the possibility of oil spills and leaks from the pipeline should it be constructed and operated, particularly into waters that are of considerable economic, religious, and cultural importance to the Tribe.

63.     The Tribe has a clear legally recognized property right in the waters of Lake Oahe. *See Winters v. United States*, 207 U.S. 564 (1908). When the United States set aside the lands that comprise the Cheyenne River Sioux Reservation, it impliedly reserved waters both sufficient to sustain the Reservation and of a quality to serve that purpose. *Id.* Although the Tribe has never quantified those rights, the Tribe relies upon the waters of Lake Oahe for nearly all of its drinking water, agricultural and industrial water, as well as water to support subsistence and sport hunting and fishing. The Cheyenne River Sioux Tribe relies upon the waters of Lake Oahe for its health, safety, and economy. In light of the Tribe's almost total reliance upon Lake Oahe for its water, contamination of those waters by toxic discharge or by a failure of the proposed pipeline would devastate the Cheyenne River Sioux Reservation, impair our property rights, and threaten the Tribe's very existence.

## THE CORPS' ISSUANCE OF NWP 12

64.     The Corps issued the current suite of 48 NWPs, covering a wide array of potential activities involving discharges into regulated waters, in February of 2012. 77 Fed. Reg. 10184 (Feb. 21, 2012). Of relevance here, NWP 12 governs "utility line activities." *Id*. at 10271. NWP 12 authorizes the "construction, maintenance, repair and removal of utility lines and associated facilities" in waters of the United States, providing that the activity does not result in the loss of greater than a ½ acre of waters "for each single and complete project." Counterintuitively, a "single and complete project" in the case of linear projects like utility lines is any crossing of a

separate waterbody.  33 C.F.R. § 330.2(i).  Under this definition, a pipeline like DAPL is made up of hundreds if not thousands of "single and complete projects."

65.     The NWP defines "utility line" to include "any pipe or pipeline for the transportation of any gaseous, liquid, liquescent, or slurry substance, for any purpose."  77 Fed. Reg. at 10271.  The Corps considers pipelines carrying crude oil to be covered by NWP 12.

66.     Under NWP 12, preconstruction notification ("PCN") to the Corps by a non-federal project proponent, and a verification from the Corps, is required if any one of several criteria is met.  *Id.* at 10272.  If none of the criteria are met, the proponent is authorized by NWP 12 to proceed with the work in regulated waters without additional notification to, or approval from, the Corps.  None of the NWP 12-specific criteria relates to historic or cultural preservation.

67.     The NWP program also includes a set of general conditions that are applicable to all NWPs, including NWP 12.  General Condition 20 ("GC 20") addresses historic properties.  Under GC 20, a non-federal permittee must submit a PCN "if the authorized activity may have the potential to cause effects to any historic priorities listed on, determined to be eligible for listing on, or potentially eligible for listing on the National Register of Historic Places, including previously unidentified properties."  *Id.* at 10284.  If a PCN is provided, the Corps purports to comply with § 106 of the NHPA prior to verifying that the NWP is applicable, and work may not commence until such verification is provided.  33 C.F.R. § 330.5(g)(2).  Conversely, if no PCN is provided, no § 106 process occurs.

68.     GC 20 puts the responsibility on the proponent, not the Corps, to determine whether historic or culturally significant properties are present, and requires Corps' verification only if the proponent finds such sites and reports them to the Corps via a PCN.

69.     NWP 12 was formally adopted by the Corps in a "Decision Document" signed by
Major General Michael J. Walsh on Feb. 13, 2012.  In responding to public comment regarding
potential impacts to tribal sites, the Decision Document states that compliance with NHPA on
NWP implementation is carried out via GC 20.

## FACTS RELEVANT TO CHALLENGE TO NWP 12

70.     The proponent of DAPL proposes to construct a major crude oil pipeline across
1,168 miles through North Dakota, South Dakota, Iowa, and Illinois.  The pipeline will have a
capacity of 570,000 barrels of crude oil per day, making it one of the largest crude oil pipelines in
the nation, carrying over half of the current capacity of North Dakota's oil production.

71.     DAPL is one of several pipelines that have been proposed for the North Dakota oil
production area, some of which have been moving on a slower timeline due to environmental
review requirements.  DAPL has moved aggressively to get the pipeline constructed as quickly as
possible.

72.     The pipeline's route passes through the Tribe's ancestral lands, and areas of great
cultural, religious, and spiritual significance to the Tribe.  Construction of the pipeline includes
clearing and grading a 100-150 foot access pathway nearly 1,200 miles long, digging a trench as
deep as 10 feet, and building and burying the pipeline.  Such work would destroy burial grounds,
sacred sites, and historically significant areas in its path.  These sites carry enormous cultural
importance to the Tribe and its members.

73.     DAPL claims to have completed cultural resource surveys along the entire pipeline
length.  However, the out-of-state, non-Tribal consultants hired by DAPL to do cultural surveys
are unable to assess the potential cultural significance of sites in this area to the affected Tribes.
Only Tribally-trained and approved consultants have the ability to assess such sites.  The Tribe has

never had the opportunity to discuss protocols for cultural surveys, or participate in the surveys that were conducted.  Instead, it was provided copies of partial surveys after they were completed.

74.     Compared to other pipelines, DAPL has taken a highly unusual approach to Corps permitting for activities involving discharges into regulated waters.  Rather than seek Corps' verifications on all waters of the U.S. in which pipeline construction would cause a discharge, as has been typical, DAPL has only sought Corps' verification for a tiny minority of the impacts to federally-regulated waters.

75.     For example, DAPL's route through North Dakota is 359 miles.  A 2015 "Wetlands and Waterbodies Delineation Report" provided to the state Public Service Commission identifies 263 waterbodies and 509 wetlands that would be impacted by the pipeline.  However, this information was never provided to the Corps.  Instead, DAPL submitted PCNs for only two of these sites, at crossings of the Missouri River.  Neither of these PCNs was submitted based on potential impacts to historic sites.

76.     In South Dakota, DAPL would cross 273 miles.  DAPL's state Public Utilities Commission filings reveal 288 waterbody crossings and 102 acres of wetlands impacts.  However, DAPL only provided the Corps with PCNs for 10 of these sites.  None of the PCNs in South Dakota was triggered by impacts to historic sites.

77.     In both states, this delineation of waterbody impacts was only partially complete, as DAPL did not have landowner access to all sites along the pipeline route.  Accordingly, some of the features were estimated through desktop analysis.  The ultimate number of waterbody and wetland impacts remains unknown.

78.     One of the places in South Dakota where Corps' authorization is required is at Lake Oahe, where the pipeline would cross underneath the Lake (a dammed section of the Missouri River) immediately upstream of the Tribe's reservation.

79.     Due to its concerns about the configuration of the pipeline and inadequacies in the regulatory process, the Tribe has participated in the public meeting process associated with the permits, including joining Standing Rock Sioux's formal technical comments on the Lake Oahe crossing.  The Tribe has repeatedly attempted to interact with the Corps to facilitate in person government-to-government consultation with the Tribal Council.  The Tribe is greatly concerned about the risks to the Tribe that would occur if the pipeline was to move forward in its current configuration.  The Tribe has in particular highlighted the inadequacies of the Corps' § 106 consultation process with regard to historic and cultural impacts at the Lake Oahe site.

80.     On July 25, 2016, the Corps issued the NWP 12 verification and other authorizations required at the roughly 204 sites in the four states for which verification has been requested along the pipeline's entire length.  However, prior to that time, construction started along the remainder of the route, including construction involving discharges into the hundreds if not thousands of sites where pipeline construction involves discharges into waters of the United States, but for which no PCN is required.

81.     The Tribe has repeatedly expressed concerns to the Corps regarding construction in waters of the United States pursuant to NWP 12 without any § 106 consultation on historic impacts.  On May 19, 2016, the Cheyenne River Sioux Tribal Historic Preservation Officer, Steve Vance, wrote to the Corps Omaha District Engineer regarding the extensive work proceeding on the DAPL Project without any § 106 consultation.  This letter explained that non-Tribal archaeologists were unable to appreciate the cultural significance of Tribal historic sites, and that

his office had found the DAPL cultural surveys, conducted by out-of-state archaeologists with no training in the cultural practices of the Oceti Šakowiŋ to be "gravely deficient."

82.    The letter requested that other federal agencies, such as the United States Environmental Protection Agency, the Department of Energy, and the Federal Energy Regulatory Commission, take part in the § 106 consultation.  The letter also stated that the DAPL Project impacts to waters of the United States beyond those identified by the Corps and has numerous potential historic impacts.

83.    The Corps did not respond to Mr. Vance's raised concerns.

84.    The Tribe's concerns were highlighted in June of 2016 when archaeologists working on behalf of the Upper Sioux Tribe discovered a site of great religious and cultural significance to Oceti Šakowiŋ in the pipeline's route in Iowa.  The site was not discovered by DAPL during its cultural resource surveys, even though it lay directly in the pipeline's route.

85.    The pipeline will also impact historic and culturally significant sites in uplands along the pipeline's route in between areas of Corps' jurisdiction.  The Corps views any impacts to such uplands sites as outside of its responsibility under § 106, as the Corps interprets § 106 to apply only within the immediate area of CWA jurisdiction.

86.    The ACHP regulations take a different approach.  In a May 6, 2016 letter to the Corps regarding DAPL, the ACHP explained that its regulations "define the undertaking as the entire project, portions of which may require federal authorization or assistance."  Even where the jurisdiction is limited to particular portions of a project, the ACHP explained, "the federal agency remains responsible for taking into account the effects of the undertaking on historic properties." The letter concluded that given the close relationship between the project and multiple federal approvals, "a greater effort to identify and evaluate historic properties" was required.

87.     In a May 19, 2016, letter, the ACHP formally objected to the Corps' finding of "no effect" at the site of the Lake Oahe crossing, one of only two sites in the entire state of North Dakota for which the Corps even purported to engage in § 106 consultation.  The ACHP asserted that the Corps misapplied § 106 by considering only historic properties within its areas of jurisdiction, when it should consider indirect impacts to historic sites in uplands that could not occur but for the Corps' authorization to discharge into waters of the United States.

88.     At the time of filing this Complaint, DAPL has not executed agreements with all landowners, and eminent domain proceedings are underway in several states.  Additionally, several lawsuits have been filed against DAPL and state regulatory agencies which challenge the legality of DAPL approvals, and seeking the remedy of vacating such approvals, which would require DAPL to stop work.  However, DAPL has chosen to move ahead with construction in places where regulatory approval is secured and where landowner consent has been obtained.

89.     DAPL has been repeatedly told by state regulatory agencies that any construction prior to the completion of the regulatory and eminent domain process is at its own risk.  DAPL has repeatedly acknowledged that it bears the risk of starting construction prior to the completion of the regulatory and legal process.

## GENERAL FACTS REGARDING THE CORPS' ISSUANCE OF THE § 408 PERMITS AND CWA VERIFICATIONS

90.     On July 25, 2016, the Corps issued authorizations pursuant to § 408 of the RHA for DAPL to cross federally-managed or owned lands on the Missouri River in two places, at Lake Sakakawea and Lake Oahe, roughly 230 miles apart.  Accompanying this authorization, the Corps released a final environmental assessment ("EA") and "finding of no significant impact" ("FONSI") with respect to two components of the DAPL in North Dakota.  The EA and FONSI concluded that these two small segments of the pipeline did not have sufficient adverse

environmental impact to warrant preparation of an environmental impact statement ("EIS"), which would have triggered substantially broader environmental review, a closer comparison of alternatives, and greater public engagement.

91.     Also on that date, the Corps issued verifications pursuant to the CWA and RHA finding that 204 crossings of jurisdictional waters of the United States, for which PCNs had been filed, met the terms of NWP 12.  The verifications include federally-protected waters in four states: North Dakota (2 verifications), South Dakota (10 verifications), Iowa (61 verifications), and Illinois (45 verifications).  The verifications authorize DAPL proponents to begin construction of the pipeline through federally-regulated streams, rivers, and wetlands, and operate the pipeline to transport crude oil in the Tribe's culturally significant ancestral lands, and adjacent to its reservation.  DAPL notified tribes that construction was set to begin at many of these sites on or before August 1, 2016.  Permits have been granted at the Lake Oahe site and construction is ongoing at this time.

92.     On January 5, 2016, the St. Louis District of the Corps released a public notice announcing that it intended to authorize another segment of the pipeline under § 408 of the RHA. That segment crossed federal flowage easements and federally-managed levees on the Illinois River.  To date, no permit or even draft environmental review document has been issued for this segment of the pipeline.

93.     On or about December 17, 2015, the U.S. Fish and Wildlife Service ("FWS") released a draft EA for yet another segment of the pipeline.  That EA reviewed potential impacts of the pipeline over grassland easements held by FWS and managed for wildlife values.  A final EA and FONSI were issued by the FWS on June 22, 2016.

94.    The current proposed route crosses Lake Oahe about 70 miles upstream of the Tribe's reservation boundary, where any leak or spill from the pipeline would flow directly into the reservation.   The Tribe and its members have been deeply concerned about the potential impacts of the Lake Oahe crossing since its inception, for two primary reasons.   First, the Tribe relies on the waters of Lake Oahe for drinking water, irrigation, fishing, and recreation, and to carry out cultural and religious practices.   The public water supply for the Tribe, which provides drinking water for thousands of people, is located directly downstream of the proposed pipeline crossing route.   Additionally, the cultural and religious significance of these waters cannot be overstated.   An oil spill from the pipeline into Lake Oahe would cause an economic, public health and welfare, and cultural crisis of the greatest magnitude.

95.    Pipeline leaks and spills are routine in both new and old pipelines.   A segment of the Keystone pipeline built in 2010 recorded 35 leaks in its first year of operations.   A study of North Dakota's pipelines revealed over 300 leaks in two years, most of which were unreported to the public.   Major spills from crude oil pipelines have occurred recently on the Kalamazoo and Yellowstone Rivers, with devastating economic and environmental impacts.   The Corps does not require, and DAPL does not propose, any technology or mitigation approaches that reduce risk relative to other recent pipelines that have been the source of major and minor spills and leaks in recent years.

96.    Second, the Lake Oahe crossing will take place in an area of great cultural, religious and spiritual significance to the Tribe.   Construction of the pipeline, which includes clearing and grading a 100-150 foot access pathway nearly 1,200-miles long, digging a trench as deep as 10 feet, and building and burying the pipeline, would destroy burial grounds, sacred sites, and

historically significant areas on either side of Lake Oahe.  These sites carry enormous cultural importance to the Tribe and its members.

97.     Construction of pipelines involves other significant environmental impacts, including massive amounts of water required for hydrostatic testing and permanent maintenance of a 50-foot right-of-way above the pipeline.

98.     The confluence of the Cannonball and Missouri Rivers, where the crossing would take place, is a sacred place to the Tribe.  It is a place of great historical significance, serving as a place of peace, prayer, and trade where traditional enemies could meet without risk of violence. There are numerous sacred stones and historically important sites in the immediate landscape of the Lake Oahe Crossing, few of which have been fully evaluated by Tribal archaeologists.

99.     The Corps operates Oahe dam, downstream of the Lake Oahe crossing, for flood control and other purposes.  The result of its management is that water levels fluctuate greatly in the reservoir, with attendant erosion, scouring, and deposition of sediments.  The geomorphology of the segment of Lake Oahe to be crossed by the pipeline is highly dynamic.

100.     Due to its concerns about the configuration of the pipeline and inadequacies in the regulatory process, the Tribe has participated in the public process associated with the permits, including filing formal technical and legal comments on the Lake Oahe crossing.  The Tribe has attempted numerous times to engage in government-to-government consultation with the Corps to express its concerns, but no avail, and in violation of § 106.  The Tribe has repeatedly conveyed to the Corps and other government officials the significance of its concerns and the risks to the Tribe about moving ahead with the pipeline in its current configuration.

## SPECIFIC FACTS RELATED TO NHPA COMPLIANCE FOR
## JULY 25, 2016 AUTHORIZATIONS

101.    The confluence of the Cannonball and Missouri Rivers is sacred ground to the Cheyenne River Sioux people.   It is rich in history, and it is rich in cultural and religious significance.  Industrial development of that site for the crude oil pipeline has a high potential to destroy sites eligible for listing in the National Register.

102.    The Corps undertook a process to consider the impacts of the Missouri River crossing on historic and culturally significant sites that was flawed in multiple respects.  It defined the "area of potential effects" ("APE") for the Lake Oahe crossing exceptionally narrowly to include only a tiny parcel immediately surrounding the horizontal directional drilling ("HDD") pits on each side of the river and a narrow strip for an access road and "stringing area" on the west side of the crossing.  On the east side of the river, the APE is difficult to determine because in some of the Corps' figures, the "project workspace" includes both the access road and stringing area, while in others only the HDD pit is included.

103.    The Corps' attempts at § 106 consultation omit the actual pipeline route that will be entering and existing the HDD borehole.  The pipeline itself will involve a 100-150 yard swath of industrial development—clearing, grading, excavation of a 6 to 10 foot trench, and construction work to shape and place the pipeline.

104.    It is likely that such development would destroy any historic or culturally significant sites in its path.  There are already known but unevaluated historic sites—in other words, sites that may be eligible for protection under the National Historic Preservation Act ("NHPA")—in the direct path of the pipeline immediately in the area of the HDD crossing.  For example, according to the draft EA, several sites are directly in the pipeline's path in the first mile outside of the HDD site.

105.     Consultation with the Tribal Historic Preservation Office ("THPO") on the DAPL, which would be routed on historic ancestral land with great cultural and religious importance to the Cheyenne River Sioux Tribe, has been profoundly inadequate.  The Tribe has never been able to participate meaningfully in assessing the significance of sites that are potentially affected by the project.

106.     The non-Tribal consultants hired by DAPL to do cultural surveys are not equipped to suitably assess the potential cultural significance of sites in this area.  The Tribe has never had the opportunity to discuss protocols for cultural surveys or participate in the surveys that were conducted.

107.     The Tribe's first record of correspondence from the Corps related to the DAPL is dated October 29, 2014, when a Corps representative contacted the THPO addressing proposed soil boring in Section 10 and 11, Township 134N, Range 79 W, Morton and Emmons Counties, North Dakota.

108.     The Cheyenne River Sioux THPO, Steve Vance, joined Standing Rock Sioux THPO's formal Complaint, which objected to the Corps' conclusion that no historic properties would be affected by the bore hole drilling, documenting numerous specific important sites that could be affected as well as the cultural significance of the area generally, and requesting a full Class III survey with tribal archaeologists before any work was done.

109.     No response to this urgent correspondence was ever provided, despite several follow up requests from the Cheyenne River Sioux and Standing Rock Sioux THPOs, and the work was done without any additional tribal consultation or process.

110.    On February 17, 2015, the Corps sent the THPO a generic form letter seeking to initiate consultation under § 106 on the DAPL.  The Tribe has attempted numerous times to initiate such government-to-government contact, with no meaningful response from the Corps.

111.    In the months that followed, both the THPO and the Chairman of the Tribe followed up with numerous additional letters and several in-person requests to the Corps outlining concerns about cultural impacts, and seeking to engage the Corps in a good-faith consultation process as required by § 106 regulations.

112.    The Tribe has indicated its significant concerns with properties on the site, and its ongoing exclusion from the § 106 process.  Due to the lack of interaction and meaningful response by the Corps, it became clear to the Tribe that the Corps was attempting to circumvent the § 106 process.  The THPO urged the Corps to include other federal agencies in the § 106 process and broaden its review to include affected areas outside the Corps' jurisdiction, as required by governing regulations.

113.    Instead, the Corps' next action was to publish a draft environmental assessment ("EA") that included not a single mention of the potential impacts of the pipeline project on the Cheyenne River Sioux or areas of historic and cultural significance to the Tribe.

114.    Additionally, the Corps received critical letters from the U.S. Environmental Protection Agency, the U.S. Department of Interior, and the ACHP, all of whom questioned the Corps' approach to consultation with the Standing Rock Sioux Tribe.  The ACHP observed that it had "not been provided evidence that the Corps has met" the requirements of § 106, observing that "there is likely to be significant tribal interest" and that "[t]he Corps' approach to meeting its government- to-government consultation is extremely important."  It later asked to be formally made a party to consultation on the project.

115.    Around the time of the draft EA, the Tribe also learned that the proponent had conducted cultural surveys at the Lake Oahe site and along the pipeline route during 2014 and 2015.  Neither the proponent nor the Corps ever consulted with the Tribe about the protocols for those assessments or the area of potential affects, or had invited their participation as the Tribe had repeatedly requested.  Instead, the proponent provided the Tribe with a massive quantity of its survey data, after it was complete, and provided an opportunity to comment.

116.    During this same time frame, i.e., late 2015 and early 2016, the proponent stated repeatedly in public and private meetings that construction was slated to start in mid-May of 2016, regardless of any additional process requirements or needs.

117.    The THPO and Chairman Frazier continued attempts to facilitate government-to-government consultation with the Corps through the commander of the Omaha District, Col. John Henderson.  As the Corps had not met its consultation requirement vis-a-vis the Cheyenne River Sioux Tribe, the Tribe did not participate in the informal multi-tribe informational meetings and site visits conducted by the Corps.

118.    To date there has been no formal government-to-government meeting between the Corps and the Cheyenne River Sioux Tribe.

119.    The Tribe has repeatedly advised the Corps that the site generally is rich in unassessed sites of historic and cultural significance.  Representatives of the Standing Rock Sioux Tribe have specifically identified evidence of such sites and notified the Corps of the same.  The Corps has refused to acknowledge the Tribes' identification of its own culturally and historically significant material on the sites at issue.

120.    On April 22, 2016, the Corps made a formal finding that no historic properties were affected by the Lake Oahe decision.

121.    On May 19, 2016, the ACHP sent a letter responding to the Corps in response to its April 22, 2016 determination.  The letter laid out a number of significant criticisms of the Corps' compliance with § 106 and made recommendations for additional steps that Corps should take.

122.    The Cheyenne River Sioux Tribe's THPO sent a letter to the Corps formally objecting to the "no historic properties effected" on May 19, 2016.  No response was received to these formal objections besides additional general information from the Corps on their permitting process.

123.    On May 19, 2016, the ACHP formally objected to the effects determinations made by the Corps for DAPL.  The ACHP outlined several fundamental flaws with the Corps § 106 compliance, including a failure to properly define the undertaking and area of potential effects; inadequate Tribal consultation and incomplete identification efforts; and numerous procedural flaws.

124.    The April 22, 2016 finding pertains only to the Lake Oahe crossing site.  It does not apply to any the other hundreds of NWP 12 verifications along the pipeline's route.

125.    Section 106 consultation is required for the Corps' verifications as well.  But the Corps has not consulted with the Tribe to evaluate the impacts of PCN verifications on historic sites within its ancestral lands, including sites in South Dakota, Iowa, and Illinois.  Instead, in issuing the verifications, it provided for tribal monitoring during construction.

### SPECIFIC FACTS RELATED TO NEPA COMPLIANCE FOR JULY 25, 2016 AUTHORIZATIONS

126.    The Corps is evaluating different components of DAPL in multiple separate segments, each following an independent process and on its own timeline.  The Corps' documents for each segment fail to acknowledge the existence or impacts of the other segments.

127.    One segment is made up of two crossings of Corps-managed or Corps-owned lands in North Dakota, at Lake Sakakawea and at Lake Oahe, roughly 230 miles apart from one another. Another segment is the crossing of Corps-managed and operated land and levees towards the other end of the pipeline, on the Illinois River.  Finally, the Corps issued 204 verifications in four states that DAPL can proceed under NWP 12 where they cross jurisdictional waters.

128.    In yet another NEPA process, the FWS reviewed the impacts of providing authorization to cross easements on private land intended to protect wildlife.  In June of 2016, FWS released a final EA covering authorization to cross miles of grasslands and wetlands easements in North and South Dakota.

129.    The Corps and FWS have pursued a NEPA process for each of these components independently of the other components.  For the North Dakota crossings, the Omaha District of the Corps released a draft EA in December 2015 and a final EA and FONSI on July 25, 2016.  For the Illinois River crossings, the St. Louis District of the Corps released an EA and FONSI on July 25, 2016, but without having provided a draft EA and any opportunity for public comment.  For the FWS easements, an EA was issued in June of 2016.  For the CWA NWP 12 verifications, the Corps has not taken any action to comply with NEPA, asserting that verifications are not federal actions subject to NEPA.

130.    The North Dakota EA looks narrowly at the impacts of pipeline construction at the HDD crossing site only.  It does not look at the indirect effect of facilitating pipeline construction to, from, and through the two HDD crossings.  Accordingly, the EA is silent on the impacts to the environment associated with pipeline construction outside the immediate confines of the HDD crossing site, including oil spill risks to waters or lands of cultural significance to the Tribe.

131.    The North Dakota EA also does not analyze the environmental impacts of the North Dakota crossings in the context of either the CWA verifications for the pipeline, the Illinois River § 408.

132.    The North Dakota EA also does not analyze the environmental impacts of the North Dakota crossings in the context of either the CWA verifications for the pipeline, the Illinois River § 408 permit, or the FWS easement crossings, all of which are integrally related to a single pipeline project.

133.    In multiple sets of legal comments, the Tribe expressed its concerns regarding these and many other issues associated with the NEPA process.

134.    On January 8, 2016, the U.S. Environmental Protection Agency ("EPA") sent comments to the Corps on the draft EA saying that the document lacked "sufficient analysis of direct and indirect impacts to water resources," lacks information related to the operation of the pipeline, and that the document is "limited to small portions of the complete project and does not identify the related effects of the entire project segment."

135.    EPA sent additional comments on March 11, 2016, highlighting the proximity of tribal drinking water intake to the pipeline crossing.  The letter highlighted multiple risks to water resources from the project, recommended additional analysis of emergency preparedness measures, and urged consideration of additional alternatives that reduced potential conflicts with drinking water supplies.

136.    On March 29, 2016, the U.S. Department of the Interior sent a comment letter to the Corps urging preparation of a full Environmental Impact Statement ("EIS").  DOI highlighted the risks to the tribal lands and drinking water resources.  The letter also observed that the Corps' NEPA analysis should consider more of the pipeline route as a connected action under NEPA.

137.    The Corps did not prepare a full EIS.  Instead, it released its final EA on July 25, 2016.  The final EA provided only cursory responses to the agency and tribal comments regarding drinking water and downstream impact.

## SPECIFIC FACTS RELATED TO CWA/RHA COMPLIANCE FOR JULY 25, 2016 AUTHORIZATIONS

138.    Construction of the DAPL will involve dredge and/or fill in waters of the United States in hundreds if not thousands of locations.  Construction of DAPL will also involve obstructions to the capacity of navigable waters of the United States.

139.    The Corps is only issuing individual permits at three locations on the entire length of the pipeline:  at the two North Dakota reservoir crossings, and at the Illinois River crossing. Those components of the pipeline require a permit under § 408 of the Rivers and Harbors Act and real estate actions because the pipeline will cross federally-owned or managed land.

140.    The remainder of the pipeline's impacts on jurisdictional waters is being processed under NWP 12, which authorizes certain actions without an individual permit.

141.    With respect to PCNs and verifications, the final verifications identify 2 locations in North Dakota, 10 locations in South Dakota, 61 locations in Iowa, and 45 locations in Illinois, for a total of 204 crossings in 1,168 miles of pipeline.

142.    Since the purpose of the pipeline is to carry crude oil developed in western North Dakota to sites in Illinois, no component of the pipeline is useful without all of the other components of the pipeline in place.

143.    The Lake Oahe pipeline crossing will take place in to the Tribe's public water supply, as well as a number of private water supplies, and irrigation intakes.  The crossing will also impair tribal treaty rights on the Cheyenne River Sioux Reservation, including reserved water rights.

## FACTS RELATING TO CORPS' FAILURE TO MEET TRUST RESPONSIBILITY TO TRIBE AND THE CORPS' VIOLATION OF FLOOD CONTROL ACT

144.    The Corps has authorized Dakota Access to discharge into Lake Oahe and to construct a crude oil pipeline under this body of water.

145.    The Tribe has a clear property right in the waters of Lake Oahe under federal law and it is a trust property of the Tribe.

146.    The Tribe draws nearly all of its drinking water from a water intake that pumps water directly from the Lake Oahe.

147.    The Corps has never consulted with the Tribe concerning any discharges into this trust property nor the effects of the construction and operation of this oil pipeline on the trust property.

148.    The Corps failed to include any consideration of the effects of the discharges into the trust property and effects of the construction and operation of this oil pipeline on the trust property on the Cheyenne River Sioux Tribe in its EA.

## SPECIFIC FACTS RELATING THE CORPS FAILURE TO PROMULGATE REGULATIONS

149.    Dakota Access requires a right-of-way across lands owned by the Corp in order to engage in HDD boring under Lake Oahe.

150.    The Corps had indicated that it has granted this right-of-way.

151.    The Mineral Leasing Act imposed a clear duty on the Corps to promulgate regulations associated with grants or renewals of rights-of-way or permits it issues pursuant to the MLA.

152.    Corps has failed to promulgate any regulations or final rule.

153.    Corps failure to provide notice to the public and opportunity to comment on any proposed rules.

## CLAIMS FOR RELIEF

## I.    FIRST CLAIM FOR RELIEF

## FAILURE TO CONSULT UNDER § 106 OF THE NHPA

154.    Intervenor-Plaintiff reincorporates the allegations in all preceding paragraphs.

155.    Issuance of an individual or general § 404 permit is an "undertaking" as defined in the NHPA.  As such, § 106 consultation is required to determine the effect of such undertaking on historic properties.

156.    The Corps failed to consider the impacts of NWP 12 on historic or culturally significant properties, or otherwise engage in the § 106 process, prior to issuance of NWP 12 in 2012.

157.    The Corps has never developed a programmatic agreement with the ACHP with respect to the NWP program.

158.    Issuance of NWP 12 is a "final agency action" within the meaning of the APA.

159.    The Corps' failure to comply with the requirements of the NHPA and its implementing regulations is arbitrary, capricious, and contrary to law in violation of the APA, 5 U.S.C. § 706.

## II.    SECOND CLAIM FOR RELIEF

## UNLAWFUL ABDICATION OF § 106 RESPONSIBILITIES

160.    Intervenor-Plaintiff reincorporates the allegations in all preceding paragraphs.

161.    Section 106 of the NHPA directs federal agency heads to take into account the effect of any undertaking on historic properties, and provide the ACHP and affected parties a reasonable opportunity to comment on such undertaking.

162.     Under ACHP regulations, "it is the statutory obligation *of the Federal agency* to fulfill the requirements of section 106 and to ensure that an agency official with jurisdiction over an undertaking takes legal and financial responsibility for section 106 compliance . . . ." 36 C.F.R. § 800.2(a).

163.     In issuing NWP 12, however, the Corps does not fulfill the requirements of § 106 or "take legal and financial responsibility" for compliance.   Rather, it provided up-front CWA/RHA authorization to discharge fill into waters of the United States, effectively ending its involvement in most situations.  In so doing, it improperly abdicated its § 106 responsibility, and delegated to the proponent its NHPA duty to determine whether there would be any potential impact to historic properties.  If the proponent determines for itself that no historic properties are affected, the Corps is not notified of the action and provides no verification of NWP 12 authorization.  In such circumstances, the Corps does not consider, and does not give the ACHP or interested parties a reasonable opportunity to comment on, the potential impacts to historic sites. In so doing, the Corps abdicated its § 106 duties and/or improperly delegated them to private parties.

164.     ACHP regulations direct that agencies "shall involve" consulting parties in findings and determinations made during the § 106 process.  36 C.F.R. § 800.2(a)(4).  Consulting parties must include Indian Tribes "that attach religious and cultural significance to historic properties that may be affected by an undertaking." *Id*. § 800.2(c)(2).  The agency "shall ensure" that the § 106 process provides such Tribe " a reasonable opportunity" to "identify its concerns about historic properties, advise on the identification and evaluation of historic properties, including those of traditional religious and cultural importance, articulate its views on the undertaking's effects on such properties, and participate in the resolution of adverse effects."  *Id*. § 800.2(c)(2)(ii)(A).

Further, it is the "responsibility of the agency official to make a reasonable and good faith effort to identify Indian Tribes" to be consulted in the § 106 process.  *Id*. § 800.2(c)(4).

165.    Applicants for federal permits are "entitled to participate" as consulting parties in § 106 consultation, and the responsible official may "authorize an applicant . . . to initiate consultation with" consulting parties, but "remains legally responsible for all findings and determinations charged to the agency official."  *Id*.  Such authorization requires notice to all state and tribal historic preservation offices, and federal agencies "remain responsible for their government-to-government relationships with Indian Tribes."  *Id*.  Moreover "the views of the public are essential" to the § 106 process and agencies "shall seek and consider the views of the public" in carrying out its responsibilities.  *Id*. § 800.2(d).

166.    Additionally, ACHP regulations require Federal agencies to "ensure" that all actions taken by employees or contractors "shall meet professional standards under regulations developed by" the ACHP.  However, in issuing NWP 12 and GC 20, the Corps did not "ensure" that any standards at all would be used by private parties delegated to make their own § 106 threshold determinations.

167.    In enacting NWP 12 and GC 20, the Corps authorized discharges into waters of the United States in a way that sidesteps virtually all of the requirements of the ACHP § 106 regulations.  Under NWP 12 and GC 20, private project proponents can make their own determinations as to the effects on tribally-significant sites without any involvement of the Tribes.  Under NWP 12 and GC 20, Tribes are not provided any opportunity, let alone a reasonable one, to identify their concerns or assist in the identification of historic sites.  Under NWP 12 and GC 20, the Corps is not responsible for the findings and determinations regarding adverse effects.  Under NWP 12 and GC 20, private project proponents can be made in a vacuum, with no input,

no notice, no accountability, and no oversight.  Moreover NWP 12 and GC 20 do not establish definitions or standards to be used by private project proponents on how to make determinations of historic impacts, leaving it up to the proponents' unfettered discretion to determine whether a PCN is required or not.

168.     NWP 12 and CG 20 are being applied to DAPL to authorize discharges into waters of the United States with no verification or oversight by the Corps, and no accompanying § 106 process.  Through NWP 12 and GC 20, the Corps is violating non-delegable duties:  there is no consultation process, there are no standards governing determinations made by private parties, and the Corps has no mechanism to "ensure" compliance with its legal responsibilities.

169.     The Tribe is harmed by NWP 12 and GC 20 because they have led and will continue to lead to the destruction of culturally significant sites.  Following NWP 12 and GC 20, DAPL proponents have conducted gravely deficient cultural surveys, with no involvement by the Tribes.  DAPL proponents have not found historic properties that would be affected by pipeline construction in Corps' jurisdictional areas.  Accordingly, they have not filed PCNs and sought verification at the vast majority of sites at which they will be discharging into waters of the United States.

170.     The ACHP wrote to the Corps on May 6, 2016 to share the concern that Tribes like the Cheyenne River Sioux Tribe have not had the opportunity to share relevant information "in the vicinity of water crossings and within the project [right-of-way] that the applicant assumes will not require PCNs under General Conditions 20 and 31 [standards for PCNs] of the NWP protocols."

171.     Issuance of NWP 12 is a "final agency action" within the meaning of the APA.

172.   The Corps' delegation of its § 106 responsibilities to private parties in NWP 12 and GC 20 is arbitrary, capricious, and contrary to law in violation of the APA, 5 U.S.C. § 706.

### III.   THIRD CLAIM FOR RELIEF

### FAILURE TO REQUIRE CONSIDERATION OF INDIRECT EFFECTS UNDER § 106

173.   Intervenor-Plaintiff reincorporates the allegations in all preceding paragraphs.

174.   Under NHPA, federal agencies must consult on the effects of "undertakings" to historic properties.  An undertaking is defined by rule to mean "a project, activity, or program funded in whole or in part under the direct *or indirect jurisdiction of a Federal agency*, including those carried out by or on behalf of a federal agency, those carried out with Federal financial assistance, and those requiring a federal permit, license or approval."  36 C.F.R. § 800.16(y) (emphasis added).

175.   The entirety of a private pipeline project that requires Corps' authorization for hundreds if not thousands of discharges into waters of the United States is an "undertaking" for purposes of § 106 because it requires federal approval in order to occur and because it is under the "indirect jurisdiction" of the Corps.

176.   GC 20 directs permittees to file a PCN with the Corps if the authorized activity will have the potential to cause effects to historic properties.  However, the Corps directs permittees to only consider the direct effects of activities in jurisdictional waters, and not indirect impacts such as construction impacts in uplands.

177.   ACHP regulations require consideration of indirect effects of agency undertakings, including areas in uplands outside of Corps jurisdiction.  With respect to DAPL, in a May 19, 2016 letter, the ACHP confirmed that the entire 1,168-mile crude oil pipeline is the "undertaking" for purposes of § 106 consultation, and accused the Corps of "not differentiating appropriately

between federal action and the undertaking . . . ."  The ACHP concluded that "the Corps' effects determinations, thus far, fail to consider the potential for effects from the larger undertaking on historic properties including those of cultural and religious significance to Indian Tribes."

178.    Issuance of NWP 12 is a "final agency action" within the meaning of the APA.

179.    As applied to DAPL, the authorization to discharge into waters of the United States, without consideration of indirect impacts on historic sites as required by § 106, is arbitrary, capricious, and contrary to law in violation of the APA, 5 U.S.C. § 706.

## IV.    FOURTH CLAIM FOR RELIEF

### VIOLATIONS OF NATIONAL HISTORIC PRESERVATION ACT WITH RESPECT TO JULY 25, 2016 VERIFICATIONS AND § 408 PERMITS

180.    Intervenor-Plaintiff reincorporates the allegations in all preceding paragraphs.

### A.    Incorrect Definition of "Area of Potential Effects"

181.    Section 106 of the National Historic Preservation Act ("NHPA") requires that, prior to issuance of a federal permit or license, that federal agencies shall take into consideration the effects of that "undertaking" on historic properties.  54 U.S.C. § 306108.  Issuance of § 408 permits and CWA/RHA verifications under NWP 12 are federal undertakings within the meaning of the NHPA.

182.    Early in the NHPA process, an agency, in consultation with the THPO, must determine the area of potential effects ("APE") of a federal undertaking.  36 C.F.R. § 800.4(1)(1). The APE is defined by regulation to include the area "within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties . . . .  The [APE] is influenced by the scale and nature of an undertaking and may be different for different kinds of effects caused by the undertaking."  *Id*. § 800.16(d).

183.    The Corps defined the APE for the Lake Oahe crossing unlawfully narrowly, and inconsistently with both the ACHP regulations and its own guidance.

184.    The APE for the crossing includes only a tiny parcel immediately surrounding the HDD pits on each side of the river and a narrow strip for an access road and "stringing area" on the west side of the crossing.  On the east side of the river, the APE is difficult to determine because in some of the Corps' figures, the "project workspace" includes both the access road and stringing area, while in others only the HDD pit is included.

185.    The Corps unlawfully omits the actual pipeline route that will be entering and exiting the HDD borehole from the APE.  Pipeline construction would involve a 100-150 yard swath of industrial development—clearing, grading, excavation of a 6 to 10 foot trench, and construction work to shape and place the pipeline.  Such development would destroy any historic or culturally significant sites in its path.  But because these sites are outside the APE, the Corps' conclusion does not consider them.

186.    The pipeline path should be in the APE because, even where the Corps lacks direct permitting jurisdiction over segments in between regulatory areas, pipeline construction in such areas is an indirect effect of the HDD process.  *Id*. § 800.16(d).

187.    The Corps' failure to consider the impacts to historic and sacred sites outside of the immediate and narrow confines of the HDD drilling sites was arbitrary, capricious, and not in accordance with law in violation of the APA and the NHPA.

**B.    Inadequate § 106 Consultation**

188.    The Section 106 process requires consultation with Indian Tribes on federal undertakings that potentially affect sites that are sacred or culturally significant to Indian tribes. 36 C.F.R. § 800.2(c)(2).  Consultation must occur regarding sites with "religious and cultural

significance" even if they occur on ancestral or ceded land. *Id*. § 800.2(c)(2)(II)(D); 54 U.S.C. § 302707.

189.     Under the consultation regulations, an agency official must "ensure" that the process provides Tribes with "a reasonable opportunity to identify its concerns about historic properties, advise on the identification and evaluation of historic properties . . . articulate its views on the undertaking's effects on such properties, and participate in the resolution of adverse effects." *Id*. § 800.2(c)(ii)(A).  This requirement imposes a "reasonable and good faith effort" by agencies to consult with Tribes in a "manner respectful of tribal sovereignty."  *Id*. § 800.2(c)(2)(II)(B).

190.     The Corps' final permit decision is the product of a fundamentally flawed consultation process that does not meet the requirements of the ACHP regulations.

191.     Consultation never occurred at all on the bore hole testing.  The Tribe was notified and the work was done before the Tribe's serious concerns were even received by the Corps.

192.     Consultation did not start at the earliest phases of the process.  Consultation did not occur on the "area of potential affects."  Consultation did not occur on participation in the surveys or protocols for how they should be conducted.  36 C.F.R. § 800(c)(2)(II)(A).

193.     Instead, the THPO was given a brief window to "comment" on the proponents' deeply flawed and completed surveys long after the route had been selected and construction scheduled.

194.     The Corps' April 22, 2016 "no effect" determination contains citations to documents, like "Landt & McCord, 2016," that have never been provided to the Tribe.

195.     The Tribe acted promptly and repeatedly to draw the Corps' attention to its serious concerns.

196.    Information was not sought from the Tribe in determining the scope of its identification efforts, as required by 36 C.F.R. § 800.4(a), nor was the Tribe given a meaningful opportunity to assist the Corps in the identification of this culturally rich but largely unassessed site.  *Id.* § 800.4(b).

197.    The Cheyenne River THPO formally objected to the Corps' finding of no historic properties affected on May 19, 2016.  Although the regulations required the Corps to either consult with the objecting party to resolve the disagreement, or request action by the ACHP, neither of those things have ever happened.  36 C.F.R. § 800.4(d)(1)(ii).

198.    The ACHP formally objected to the Corps' findings of no historic properties affected on May 19, 2016.  Under ACHP regulations, such an objection must be taken into account by the Corps prior to reaching a final decision, and the Corps must prepare a summary of the decision and its rationale, along with evidence of consideration of the ACHP's objection.  36 C.F.R. § 800.4(d)(1)(iv).

199.    There are significant unevaluated properties in and near the Lake Oahe crossing work site, as well as the broader pipeline route.  Some sites deemed "ineligible" by DAPL's private surveys may in fact be eligible.  Some sites deemed unevaluated have in fact been evaluated and are potentially eligible.

200.    The Corps' decision on the Lake Oahe crossing was arbitrary, capricious, and not in accordance with law in violation of the APA and the NHPA.

C.    **No § 106 Consultation for Verifications**

201.    The Corps' NWP general conditions require completion of the § 106 process for NWP permit verifications and before work can begin.  The proponent must present a PCN to the Corps wherever an activity "may have the potential to cause effects to any historic properties listed

47

on, determined to be eligible for listing on, or potentially eligible for listing" on the National Register.  77 Fed. Reg. 10184, 10284 (Feb, 21, 2012).

202.   The Corps has never consulted with the Tribe on issuance of verifications in its ancestral lands, which span the length of the pipeline.  The Tribe is unaware of any formal § 106 findings for verifications outside of the two sites in North Dakota.

203.   The Corps' decision that § 106 consultation had been completed on the 204 CWA verifications was arbitrary, capricious, and not in accordance with law in violation of the APA and the NHPA.

## V.      FIFTH CLAIM FOR RELIEF

### VIOLATIONS OF NEPA WITH RESPECT TO
### JULY 25, 2016 VERIFICATIONS AND § 408 PERMITS

204.   Intervenor-Plaintiff hereby alleges and incorporates and restates all previous paragraphs of this complaint.

### A.      Failure to Consider Indirect Effects of Missouri River Crossings

205.   NEPA requires consideration of indirect effects of agency decision.  The Corps misapplied these legal standards in the final North Dakota EA.  It looked narrowly at the impacts of the river crossings themselves, and did not disclose or consider the impacts of other components of the pipeline, either related to its construction or its operation to transport 570,000 barrels a day of crude oil over nearly 1,200 miles.

206.   Pipeline construction is an indirect impact of the Corps § 408 permits because it is proximately caused by the Corps' decision.  Without the ability to cross the Missouri River, the pipeline could not be built.  Pipeline construction is a reasonably foreseeable outcome of the Corps' decision.

207.    Alternatively, pipeline construction could be considered an indirect effect of the Corps' § 408 permit because it is a future action that is reasonably certain to occur as long as DAPL receives Corps' authorization at the Missouri River crossings.

208.    The Corps failure to consider and disclose the impacts of the pipeline's construction and operation is arbitrary and capricious and not in accordance with law in violation of the APA and NEPA.

**B.      Unlawful Segmentation of Project Components**

209.    NEPA requires consideration of separate components of a single project in a single NEPA review.  40 C.F.R. § 1508.25.  NEPA regulations state that connected actions should be considered in a single EIS, defining them as action that "cannot or will not proceed unless other actions are taken previously or simultaneously," and "are interdependent parts of a larger action and depend on the larger action for their justification."  *Id*.

210.    The Corps' permitting regulations also require it to reject applications that seek to segment a single project into multiple permits.  33 C.F.R. § 325.1(c)(2) ("All activities which the applicant plans to undertake which are reasonable related to the same project and for which a DA permit would be required should be included in the same permit application.").

211.    The Corps has not adhered to these requirements, despite having them pointed out to them by the Tribe, multiple federal agencies, and others.  Rather, it unlawfully segmented its NEPA review into separate components in North Dakota and in Illinois, each of which is proceeding independent of the other.

212.    Moreover, the FWS issued its own EA and FONSI for a component of this pipeline project.  That EA and FONSI did not evaluate the impacts of the FWS decision in the context of the Corps permits or the larger project which it was a part of.

213.     The Illinois § 408 permit, the North Dakota § 408 permit, and the FWS grassland easements, are connected actions because they meet the criteria in 40 C.F.R. § 1508.25.  NEPA requires them to be considered in a single NEPA document.  They were not.

214.     By unlawfully segmenting multiple components of the same pipeline project, the Corps has acted in a manner that is arbitrary, capricious, and not in accordance with law, in violation of NEPA and the APA.

### C.     Arbitrary Economic Analysis

215.     NEPA and its implementing regulations require the Corps to produce environmental review documents that are factually accurate, well supported, and that fully discloses the impacts of an action to the public.  40 C.F.R. § 1502.

216.     These standards apply equally to an agency's treatment of economic data.  40 C.F.R. §§ 1502.23 (cost benefit analysis), 1508.8 (EIS must evaluate economic effects).  An agency's failure to include and analyze information that is important, significant, or essential renders an EA and FONSI inadequate.  40 C.F.R. § 1500.1.  These fundamental NEPA principles apply to both economic and environmental analyses in an EIS.  40 C.F.R. §§ 1502.24, 1508.8 ("effects" in an EIS must evaluate include economic impacts.).

217.     In reaching its decision on the North Dakota crossings, the Corps looked very narrowly at only two tiny segments of the pipeline, ignoring the environmental and economic risks and harms of the pipeline as a whole.

218.     However, it balanced these narrow risks and harms against the full economic benefit of the pipeline as a whole.  For example, the EA cites the full $3.78 billion investment "directly impacting the local, regional, and national labor force by creating nearly 12,000 construction jobs."  Final EA, at 80.  It repeats DAPL's public talking points about providing

"considerable labor income and state income tax revenue—including the generation of more than $13.4 million in ad valorem taxes." *Id.*

219.    The Corps' decision to balance the full economic benefits of building and operating the entire pipeline against the economic risks of constructing tiny segments of that pipeline is arbitrary and capricious and not in accordance with law, in violation of NEPA and the APA.

## VI.    SIXTH CLAIM FOR RELIEF

### VIOLATIONS OF THE CLEAN WATER ACT AND RIVERS AND HARBORS ACT WITH RESPECT TO JULY 25, 2016 VERIFICATIONS AND § 408 PERMITS

220.    Intervenor-Plaintiff incorporates by reference all preceding paragraphs.

### A.    Arbitrary and Inadequate Public Interest Review for North Dakota Permits

221.    Prior to issuance of a § 408 permit, or any other CWA/RHA permit, the Corps is required to conduct a "public interest" review consistent with its governing regulations, 33 C.F.R. § 320.4(a).

222.    In conducting a public interest review, the Corps must consider the probable impacts of the proposed action, and weigh "all those factors which become relevant." *Id.*  The Corps must balance the benefits "which reasonably may be expected to accrue" from the action against the "reasonably foreseeable detriments." *Id.*  "All factors" which may be relevant to the proposal must be considered, including the extent of the public and private need for the proposal, and the existence of unresolved conflicts around resource use.  The District Engineer is authorized to make an "independent review of the need for the project from the perspective of the overall public interest." *Id.* § 320.4(q).

223.    The Corps' did not conduct a valid public interest review of the § 408 authorizations in North Dakota.  To the extent it conducted any public interest review at all, it suffered from all of the same flaws as the NEPA review identified above.  Specifically, the Corps conducted an

51

arbitrary and segmented approach that ignored virtually all of the indirect effects of its decision, specifically, the construction and operation of the pipeline itself; and it conducted an arbitrary and one-sided economic balance in which the benefits of the entire $4 billion pipeline were weighed against the impacts of tiny segments of the pipeline.

224.   By failing to undertake a lawful and adequate public interest review of the actions proposed in its § 408 decision, the Corps has acted in a manner that is arbitrary, capricious, and not in accordance with law, in violation of the CWA and the APA.

### B.   Unlawful Verification For Lake Oahe Crossing

225.   In addition to a § 408 permit, the portion of the pipeline that crosses under Lake Oahe requires a Rivers and Harbors Act § 10 permit.  33 C.F.R. § 322.3(a).

226.   On July 25, 2016, the Corps issued verification that the Lake Oahe pipeline crossing complied with the conditions of NWP 12, and hence was authorized under § 10 of the Rivers and Harbors Act.

227.   In order to "qualify" for NWP authorization, proposals must meet a number of general conditions.  77 Fed. Reg. 10184, 10282 (Feb. 21, 2012).

228.   The Lake Oahe crossing does not comply with these conditions and, accordingly, does not "qualify" for NWP 12.  *See also* 33 C.F.R. § 330.6(a)(2)  ("If the [Army Corps] decides that an activity does not comply with the terms or conditions of an NWP, he will notify the person desiring to do the work and instruct him on the procedures to seek authorization under a regional general permit or individual permit.").

229.   General Condition 7 states that no activity may be authorized under a NWP that is in "proximity" to public water supplies.  77 Fed. Reg. at 10283.  The Lake Oahe crossing is in

close proximity to the Tribe's source of drinking water for a significant portion of the reservation community.

230.     The potential impact on drinking water for the Cheyenne River and many other tribes and communities has also been emphasized by the Environmental Protection Agency and the U.S. Department of Interior, as well as the Tribal government and many of its members.

231.     Further, General Condition 17 states that no activity authorized by a NWP may "impair tribal rights" including "reserved water rights."  77 Fed. Reg. at 10283.  DAPL is routed just upstream of the Tribe's reservation boundary, where any oil spill would have devastating effects within the reservation.  The Reservation necessarily includes the protection of adequate water quality.  The Lake Oahe crossing does not "qualify" for a NWP 12 because of the risks to Tribal resources protected by treaty.

232.     The Corps' decision to verify that the Lake Oahe crossing was consistent with NWP 12 was arbitrary, capricious and not in accordance with law, in violation of the APA.

**C.     Issuance of Verifications for 204 Jurisdictional Waters**

233.     Under the Corps' regulations, a single project can only proceed under both an NWP and an individual permit where the "portions qualifying for NWP authorization would have independent utility and are able to function or meet their purpose independent of the total project." 33 C.F.R. § 330.6(d).

234.     For the reasons discussed immediately above, the Lake Oahe crossing requires an individual permit.  Moreover, § 408 authorizations are individual "permits" within the meaning of this regulation.  *See id.,* § 320.2(e); § 320.4 (general policies applicable to "all" Army permits).

235.   No component of DAPL has "independent utility" or the "ability to function" without the other components of the pipeline.  As a result of this, the Corps cannot authorize some portions of DAPL under NWP 12, and other portions as individual permits.

236.   Because the Lake Oahe crossing requires an individual permit, no other component of the pipeline can be authorized under NWP 12.

237.   Issuance of a verification by the Corps constitutes a final agency action within the meaning of the APA.

238.   The Corps' verification of 204 additional crossings of jurisdictional waters was arbitrary and capricious and not in accordance with law, in violation of the APA and the CWA.

## VII.   SEVENTH CLAIM FOR RELIEF

## BREACH OF TRUST RESPONSIBILITY

239.   Intervenor-Plaintiff reincorporates the allegations in all preceding paragraphs.

240.   The Tribe has a vested property right in the waters of Lake Oahe, which is held in trust for us by the United States.

241.   The Act of March 2, 1889, the 1868 Sioux Nation Treaty, 15 Stat. 635, and the Fort Laramie Treaty of 1851, 11 Stat. 749 , which reserved to the Tribe its right in the waters of Lake Oahe, include a right to clean, safe water to sustain the a livable permanent homeland and self-sufficiency for the Tribe and its people.

242.   The United States and the Army Corps of Engineers have a specific trust responsibility to manage and protect the trust property on behalf of the Tribe based generally in the Treaties and statutes governing the Tribe and its reservation and the general federal trust doctrine as well as specifically in the Flood Control Act of 1944, P.L. 83-777.

243.    The United States' and the Corps' trust responsibility to protect and manage the trust property can be exercised, in part, by engaging in government-to-government consultation with tribes on actions that could impair tribal trust resources or tribal rights.   Department of Defense Instruction 4710.02 (Sept. 14, 2006).

244.    The authorizations and verifications the Corps issued to Dakota Access on July 25, 2016 pursuant to § 408 of the CWA and § 10 of the RHA, authorizing construction of the oil pipeline under Lake Oahe was a final agency action for purposes of the APA.

245.    The Corps' issuance authorizations and verifications to Dakota Access on July 25, 2016 pursuant to § 408 of the CWA and § 10 of the RHA, without any consultation with the Cheyenne River Sioux Tribe regarding the impact on the trust property and without a full EIS to address concerns about the safety of the Tribe's water was arbitrary and capricious as it breached the Corps' trust responsibility to the Tribe.

## VIII.   EIGHTH CLAIM FOR RELIEF

## VIOLATION OF FLOOD CONTROL ACT

246.    Intervenor-Plaintiff reincorporates the allegations in all preceding paragraphs.

247.    The authorizations and verifications the Corps issued to Dakota Access on July 25, 2016 pursuant to § 408 of the CWA and § 10 of the RHA, authorizing construction of the oil pipeline under Lake Oahe was a final agency action for purposes of the APA.

248.    The Corps' issuance authorizations and verifications to Dakota Access on July 25, 2016 pursuant to § 408 of the CWA and § 10 of the RHA was arbitrary and capricious as it has violates § 1(b) of the Flood Control Act of 1944, P.L. 83-777 by prioritizing discharges into Lake Oahe and construction and operation of the oil pipeline over the beneficial consumptive uses enumerated in the Act.

## IX.    NINTH CLAIM FOR RELIEF

## FAILURE TO PROMULGATE REGULATIONS

149.    Intervenor-Plaintiff reincorporates the allegations in all preceding paragraphs.

150.    The Mineral and Leasing Act imposes a mandatory duty that rights-of-way or permits granted or renewed pursuant to 30 U.S.C. § 185 shall be subject to promulgated regulations.

151.    The relevant section is set forth in 30 U.S.C. §185(f).

152.    The Corps has not promulgated any regulations or final rule regarding the grant of rights-of-way or permits granted or renewed pursuant to the Mineral Leasing Act.

153.    The APA requires promulgated rulemaking by agencies after the public receives notice and an opportunity to comment.

154.    The Corps' failure to promulgate was arbitrary and capricious.

## PRAYER FOR RELIEF

WHEREFORE, Intervenor-Plaintiff respectfully requests that this Court grant the following relief:

1.    Declare that NWP 12 is invalid as applied to DAPL because the Corps failed to comply with § 106 at the time of its issuance, in violation of the NHPA.

2.    Declare that NWP 12 is invalid as applied to DAPL because the Corps unlawfully delegated its responsibility to comply with § 106 to private parties, effectively allowing discharge into waters of the United States without any consideration of impacts to historic properties, in violation of the NHPA.

3.      Declare that NWP 12 is invalid as applied to DAPL because the Corps authorized discharge into waters of the United States without consideration of indirect impacts on historic sites, in violation of the NHPA.

4.      Declare that the July 25, 2016 authorizations and verifications are arbitrary, capricious, in violation of the NHPA, NEPA, CWA and RHA, and implementing regulations, and in violation of the Corps' trust responsibility to the Tribe.

5.      Vacate NWP 12 as applied to DAPL.

6.      Enjoin the Corps to direct DAPL to seek either an individual permit covering all discharges along the entire pipeline route, or submit PCNs for all impacts to waters of the United States, and fully comply with § 106 prior to finalizing such permit or verifications.

7.      Vacate the final EA and FONSI.

8.      Enjoin the Corps and direct it to withdraw its permits as improvidently granted, to require an EIS, and to assess the protection of the Cheyenne River Sioux Tribe's treaty and trust protected property that is the Tribe's water rights in Lake Oahe, a Reservoir of the Missouri River.

9.      Declare that the Corps violated the MLA for failure to promulgate regulations in accordance with the MLA.

10.     Enjoin the Corps and direct it to vacate any rights-of-way on lands with the Corps' jurisdiction granted in violation of the MLA.

11.     Retain jurisdiction over this matter to ensure that the Corps complies with the law.

12.     Award Intervenor-Plaintiff its reasonable fees, costs, expenses, and disbursements, including attorneys' fees, associated with this litigation; and

13.     Grant Intervenor-Plaintiff such further and additional relief as the Court may deem just and proper.

Respectfully submitted this 8th day of September, 2016.

                              CHEYENNE RIVER SIOUX TRIBE,
                              Intervenor-Plaintiff,


                    By:         /s/ Nicole E. Ducheneaux
                              Nicole E. Ducheneaux, *Pro Hac Vice*
                              Fredericks Peebles & Morgan LLP
                              3610 North 163rd Plaza
                              Omaha, NE  68116
                              Telephone:  (402) 333-4053
                              Facsimile:  (402) 333-4761
                              Email:  nducheneaux@ndnlaw.com

                              Conly J. Schulte
                              Fredericks Peebles & Morgan LLP
                              1900 Plaza Drive
                              Louisville, CO  80027
                              Telephone:  (303) 673-9600
                              Facsimile:  (303) 673-9839
                              Email:  cschulte@ndnlaw.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 8th day of September, 2016, a copy of the foregoing was filed electronically with the Clerk of the Court.  The electronic filing prompted automatic service of the filing to all counsel of record in this case who have obtained CM/ECF passwords.


_____/s/ Nicole E. Ducheneaux_____