—1

1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
2

3   STANDING ROCK SIOUX TRIBE,    )
    et al.,                       )
4                                 )    Civil No. 16-01534
              Plaintiffs          )
5                                 )
        v.                        )
6                                 )    Washington, D.C.
    UNITED STATES ARMY CORPS OF   )
7   ENGINEERS, et al.,            )
                                  )    Tuesday, September 6, 2016
8                                 )    3:00 p.m.
              Defendants.         )
9   _____)
                     TRANSCRIPT OF MOTION HEARING
10            BEFORE THE HONORABLE JAMES E. BOASBERG
                   UNITED STATES DISTRICT JUDGE
11

    <u>APPEARANCES</u>:
12

    For the Plaintiff:         JAN HASSELMAN, ESQ.
13                             Earthjustice Legal Defense Fund
                               705 Second Avenue
14                             Suite 203
                               Seattle, Washington  98104-1711
15
    For the Intervenor         NICOLE E. DUCHENEAUX, ESQ. (Phone)
16  Plaintiff:                 Fredericks Peebles & Morgan LLP
                               1900 Plaza Drive
17                             Louisville, Colorado  80027

18  For the Defendant:         MATTHEW M. MARINELLI, ESQ.
                               ERICA M. ZILIOLI, ESQ.
19                             U.S. Department of Justice
                               Environment and Natural Resources
20                             Division
                               P.O. Box 663
21                             Ben Franlin Station
                               Washington  D.C.  20044
22
    For the Intervenor         BILL LEONE, ESQ.
23  Defendant:                 Norton Rose Fulbright US LLP
                               799 9th Street, NW
24                             Suite 1000
                               Washington, DC  20001
25

2

1    Court            PATRICIA A. KANESHIRO-MILLER, RMR, CRR
     Reporter:        U.S. Courthouse, Room 4704-B
2                     333 Constitution Avenue, NW
                      Washington, DC 20001
3                     (202) 354-3243

4

   Proceedings reported by stenotype shorthand.
5  Transcript produced by computer-aided transcription.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

—3—

                    P R O C E E D I N G S

1

2              (In open court)

3              THE DEPUTY CLERK:  Matter before the Court, Civil

4   Action Number 16-1534, Standing Rock Sioux Tribe versus United

5   States Army Corps of Engineers.

6              Counsel, please come forward and identify yourselves

7   for the record.

8              MR. HASSELMAN:  Good afternoon, Your Honor.  Jan

9    Hasselman for Standing Rock Sioux Tribe.

10             THE COURT:  Good afternoon.

11             I've got someone on the phone.

12             MS. DUCHENEAUX:  Your Honor --

13             THE COURT:  I can't really hear you.  If you're on a

14    cell phone or some other type of --

15             MS. DUCHENEAUX:  Your Honor, this is Nicole

16    Ducheneaux on behalf of Plaintiff-Intervenor Cheyenne River

17    Sioux Tribe.

18             THE COURT:  Thank you.  That's better.

19             MR. MARINELLI:  Matthew Marinelli for Defendant

20    United States Army Corps of Engineers.  With me at counsel

21    table are Erica Zilioli, also from the Department of Justice,

22    and Melanie Casner from the Corps of Engineers.

23             THE COURT:  Good afternoon.

24             MR. LEONE:  Good afternoon, Your Honor.  Bill Leone

25    from Norton Rose Fulbright firm on behalf of Intervenor

4

1      Dakota Access.  With me today is my associate Kim Caine and

2      Keegan Pieper, who is in-house counsel for the company.  I

3      have a couple of other people here as the last time, who may

4      be able to answer some questions if you have specific

5      questions about construction.

6              THE COURT:  Thank you.

7              Let me just discuss for a minute how we got here,

8      just so this is clear.

9              After the preliminary injunction hearing, I indicated

10     that I would issue a ruling by September the 9th, and my

11     intent is still to do so.

12             On Sunday, the plaintiff filed a TRO motion, and the

13     way this Court handles emergency motions filed not during

14     business hours is that there is an emergency judge assigned

15     to handle that.  I spoke to the emergency judge this weekend

16     and said that I would handle this today.  I didn't think it

17     fair to inflict all of this on a judge who had no idea what

18     was going on.  Further, I didn't think it was fair to the

19     judge, I didn't think it was fair to the parties for you

20     folks to have someone try to come up to speed in a couple of

21     hours on a case that you have devoted a lot of time to and

22     that I have devoted a lot of time to, which is why I set this

23     for today.  I certainly didn't intend to delay it, but it

24     wasn't practical for a new judge to handle this.

25             Just as a preliminary matter -- Mr. Hasselman, I'm

1  directing this to you -- our chambers has been flooded with

2  calls all day regarding the pipeline, and it seems that some

3  people believe that the Court is like a legislator's office

4  and that we sit there tallying calls for or against.  Of

5  course, you well know that is not how our judicial system

6  works, and I'm certainly not saying that your clients are

7  directing the calls.  And in fact, we know that one source is

8  a pipeline opposition group in Indianapolis.  I would

9  appreciate it if you would remind your client not to

10  encourage such calls.  All they are doing is interrupting our

11  chamber's ability to get the work done to get the opinion

12  out.  Again, I certainly don't believe -- I know -- that you

13  are not directing that, and I'm not sure what role your

14  client has in it.  But again, it is not anything that is

15  particularly helpful.

16        MR. HASSELMAN:  I will certainly take steps to get

17  the word out.  As you recognize, there is extraordinary

18  interest in this matter.  And my client, the Standing Rock

19  Sioux Tribe, does not have control over what everybody is

20  doing out there.

21        THE COURT:  I completely understand, and I am not

22  holding it against them or anyone.  I just thought I would

23  just mention it.

24        In terms of the TRO here, what I'm hopeful on is,

25  given the pleadings that I have seen, is that we may be able

1    to reach an agreement here pending the issuance of my opinion

2    in a few days.

3            Let me just go through that potential area of

4    agreement, to see if, in fact, it is an area of agreement.

5    And so, Mr. Hasselman, I start with you.  What you're

6    seeking, according to your pleadings, is a TRO on additional

7    construction work at the site described by Mr. Mentz in his

8    supplemental declaration, and that is the area to the north

9    of the reservation, the Meyers farm; correct?

10           MR. HASSELMAN:  That's right.  It is the area west of

11   State Route 1806, extending for a couple of miles.

12           THE COURT:  Then, also, a TRO on any additional

13   construction work on the pipeline within 20 miles on either

14   side of Lake Oahe; is that correct?

15           MR. HASSELMAN:  That's correct.

16           THE COURT:  Again, I just say to all of you, there's

17   a lot of material that has been filed in this case, but I

18   can't say that the maps have been particularly helpful to me,

19   and it is something I have sought throughout.  Either they're

20   far too detailed or they're all of the Midwest.  I wish I had

21   better maps from both of you.  It would help me in trying to

22   situate the activities that are involved here.

23           MR. LEONE:  Your Honor, if I might, in anticipation

24   of that, we have brought some maps that I hope will help

25   clarify things for you.  I gave them to Mr. Hasselman before

1    the hearing began.

2           THE COURT:  I appreciate that.

3           MR. LEONE:  Your Honor, there's two maps, just so you

4    understand what you have.  There is a one-page map, which

5    shows the general contours of the project with some outlines

6    of where the river is, where the federal land is, where the

7    existing northern pipeline is, where our pipeline is, and I

8    can point out to you some other features of the map when it

9    is appropriate.  The second series of maps is a more detailed

10   map that shows -- our client was able to map each and every

11   site referenced in Mr. Mentz's declaration on the first page.

12   So the purple marks on the second set of charts shows where

13   all those sites are relative to the pipeline right-of-way and

14   the work area.

15           THE COURT:  Okay.  On your first map, where is the

16   lake?

17           MR. LEONE:  So if you will look, Your Honor, I'm

18   holding the one-page map, what is shaped like a river but it

19   is called Lake Oahe.

20           THE COURT:  All of the green?

21           MR. LEONE:  The green is the lake.  That is the

22   flooded area of the river that was flooded by the

23   construction of the dam back in the '60s.

24           Then to the left of the lake is to the west, and to

25   the right of the lake is east, obviously.  Maybe "not

1    obviously."

2         THE COURT:  Even I do know that, if it is oriented

3    correctly.

4         MR. LEONE:  The purple outlined area shown on the

5    west and east are the area of the Corps of Engineers's

6    federal lands that we talked about at the preliminary

7    injunction hearing.  As you go up the pipeline to the

8    northwest, you will see a yellow line, two sections from the

9    boundary that is Highway 1806.

10        THE COURT:  Right.

11        MR. LEONE:  So when Mr. Hasselman says what we're

12   talking about here is west of 1806, east of 1806, that shows

13   you where 1806 is relative to the river.

14        THE COURT:  Okay.  Approximately how large is each

15   one of these squares in terms of length, how wide east to

16   west?

17        MR. LEONE:  These are the sections, so they're a mile

18   by a mile, square mile.

19        THE COURT:  Got it.

20        MR. LEONE:  The area that we're talking about, just

21   again to orient you, east of 1806, between 1806 and the

22   river, there has been a voluntary stand-down of construction.

23        THE COURT:  I do want to get to that in a minute.

24        MR. LEONE:  So it is a mile and a third, at least as

25   I look at this, between 1806 and the river?

1          MR. LEONE:  As the crow flies, that's right.  As the

2     pipeline lies, it is about two miles from the river to the

3     area in question.

4          THE COURT:  Thank you.  That is helpful.

5          MR LEONE:  Does that help?

6          THE COURT:  Yes.  Thank you.

7          Mr. Hasselman, if I can have you return.

8          On the map that Mr. Leone has just shown me, the land

9     described by Mr. Mentz, does that appear or not?

10         MR. HASSELMAN:  It does.  The one that shows Lake

11    Oahe and the Corps lands in purple, you can see Route 1806,

12    heading up the middle, and the area around which Mr. Mentz

13    found the features he described as actually marked in black.

14    I haven't seen these maps until a moment ago.  We certainly

15    have questions about the way the features that Mr. Mentz

16    found are portrayed on maps.

17         THE COURT:  Those are in black to the left?

18         MR. HASSELMAN:  Correct.

19         THE COURT:  I see.  All right.  So thank you.

20         Let me ask, Mr. Marinelli, if you could approach for

21    a moment.  So according to your pleadings, you do not oppose

22    a temporary restraining order for any work on the pipeline

23    within 20 miles of either side; is that correct?

24         MR. MARINELLI:  Correct, Your Honor.

25         THE COURT:  How much of that 20 miles is within Corps

1    of Engineers jurisdiction?

2         MR. MARINELLI:  Your Honor, there is only one

3    preconstruction notification site.

4         THE COURT:  And that's the lake.

5         MR. MARINELLI:  That's Lake Oahe.  My understanding

6    is there may be several other jurisdictional lands that are

7    not subject to preconstruction notification.

8         And then I would also flag for you -- and I can

9    provide the Court with another map.  This one is included

10   with the environmental assessment, and it is ECF 651,

11   page 159 of 164.  It is similar to the map that Mr. Leone

12   just provided, but it indicates the areas outside of the

13   Corp's jurisdiction that were also considered by the Court as

14   part of its Section 106 analysis.

15        THE COURT:  Thank you.

16        Mr. Leone, I assume there is a typo in your pleading.

17   So on page 4, bottom of 4, carrying over to 5, you say --

18   last paragraph, carrying over, first sentence -- "all work on

19   the west side of Lake Oahe has been complete for multiple

20   weeks."  Do you mean east side?

21        MR. LEONE:  Your Honor, as you can imagine, with the

22   brief being filed Sunday, there's a little bit of a scramble.

23        THE COURT:  I don't say this in any accusatory way.

24   I'm simply trying to understand your position specifically.

25        MR. LEONE:  I expected these questions.  That's why I

1    asked to have an easel here because some parts of it will be

2    easier to draw.  All the work on the east side of the lake is

3    complete.

4            THE COURT:  And going for 20 miles?

5            MR. LEONE:  Yes.

6            THE COURT:  So you have no objection to an injunction

7    or temporary restraining order issuing for construction

8    20 miles to the east of the lake because it is completed

9    anyway?

10           MR. LEONE:  Let me make sure with my client that

11   there is not some seeding or reclamation activity, something

12   like that going on.

13           THE COURT:  Again, we're talking about between now

14   and Friday.

15           (Pause)

16           MR. LEONE:  Your Honor, we believe that the

17   construction is complete.  There's probably some reclamation

18   work still happening, but my client does not authorize me to

19   agree to a restraining order to the east of the river.

20           THE COURT:  Why not?  What's happening?  I understand

21   there may be principle, but what do you need to be doing

22   between now and Friday over there?  And where in that

23   20 miles?

24           MR. LEONE:  Your Honor, I am unaware of any specific

25   work that needs to be done between now and Friday to the east

—12—

1    of the lake, but there is a principle at issue, and it is a

2    very important principle to my client.

3         THE COURT:  I understand.

4         So, then, work on the west side, you then say, has

5    been temporarily suspended while waiting for the ruling.

6    When you say that, you're talking about just from the west

7    side of the lake to Highway 1806?

8         MR. LEONE:  That's correct.

9         THE COURT:  But work is ongoing west of 1806?

10        MR. LEONE:  That's correct.

11        THE COURT:  Now, then, is it also true that you are

12   not harmed by a restraining order enjoining you from acting

13   between now and the issuance of my ruling on the west side of

14   the river -- it appears as a river in the map -- excuse

15   me -- lake, between the lake and Highway 1806; is that fair?

16        MR. LEONE:  Between now and Friday?

17        THE COURT:  Right.

18        MR. LEONE:  Your Honor, we do not anticipate doing

19   any work between those two locations.  The only thing I would

20   say, Your Honor, is with respect to that -- and again I have

21   to talk to my client about it -- I'm sure we will get into

22   that when we talk about the conditions on the ground out

23   there and the situation in the fields --

24        THE COURT:  What I'm actually hoping is to avoid

25   getting into too much detail on that if we can all agree on a

1 reasonable order where no one is harmed, then that would be a

2 nice way to hold matters for the next few days.

3    MR. LEONE:  I understand, Your Honor.  I will talk to

4 my client.  One thing that we obviously want to avoid is any

5 imposition of a restraining order because it carries with it

6 an implication that the client has done something wrong or we

7 have done something wrong or that the plaintiffs are likely

8 to prevail on the merits or there has been some violation of

9 law, and that would be, especially given the situation on the

10 ground, would be a horrible outcome.  I take your comments to

11 be:  Is there a way that we can avoid even having to deal

12 with that issue with respect to the territory between

13 Highway 1806 and the lake?  And I'm happy to discuss that

14 with my client, Your Honor, but I would probably need a few

15 minutes and a recess to do that.

16    THE COURT:  I'm going to give you that in a few

17 minutes.  Let me go back to Mr. Hasselman for a minute.

18    So Mr. Hasselman, I understand that Dakota Access

19 wishes to avoid the taint of any injunction, but why isn't it

20 good enough for you if I can engineer an agreement among all

21 sides that no construction activity will occur 20 miles to

22 the east of the lake and no construction activity will occur

23 between the western edge of the lake and 1806 until Friday?

24 Why isn't that good enough?

25    MR. HASSELMAN:  There's two parts of it.  One is the

—14—

1    agreement part of it.  In principle, I don't have any

2    objection if we can reach an agreement on something as long

3    as it is enforceable and that there is a penalty for

4    non-compliance.  I don't think that is a problem if we are

5    looking at a short duration of time.

6            What you just described, however, is different than

7    what we asked for.  The area on the other side of 1806, a

8    small grading and clearing has been done in a relatively

9    small area there.  It is, to the best of our knowledge, the

10   precise area described by Mr. Mentz in his declaration filed

11   on Friday.  What I understand is that on the other side of

12   that is approximately 15 or so miles of pipeline corridor

13   that has not been cleared at all.  To the extent that there

14   is anything left in this area for us to protect, that is

15   exactly the kind of place that we need to have an opportunity

16   to survey.

17           What Mr. Mentz said initially was, because of the

18   importance of this area, the historical significance of the

19   Cannon Ball confluence, we know that there are sites all over

20   the place.  When he had an opportunity to go look, he found

21   truly remarkable sites.  We haven't surveyed the rest of that

22   pipeline corridor, and it is some of the only uncleared land

23   left in the Dakotas based on Mr. Leone's representations.  So

24   we would like to see an agreement or an order extend the full

25   20 miles, which is our best estimate of what hasn't been

1   cleared yet.

2        THE COURT:  How much of the proposed pipeline area

3   west of 1806 did Mr. Mentz survey?

4        MR. HASSELMAN:  Approximately two miles, Your Honor.

5        THE COURT:  So if you're looking at the map that

6   Mr. Leone gave me, Mr. Hasselman, I see that two boxes from

7   the left and the middle are those black outlined areas, but

8   that is not equivalent to two miles.  Do the two miles run

9   east or west from there or both?

10       MR. HASSELMAN:  Sure.  Mr. Mentz started at 1806 and

11  went two miles up the pipeline corridor.  So, as I understand

12  it, he found an intense concentration of sites in this one

13  area more or less in the middle of what he surveyed for.

14       THE COURT:  He surveyed two miles west, but there

15  would be another 16 miles west within your proposed boundary

16  approximately?  In other words, there's two miles to the east

17  of 1806 to the lake, he surveyed two miles to the west, and

18  if you want 20, there's another approximately 16.

19       MR. HASSELMAN:  And that was our best guess for what

20  is still out there that has not been cleared yet.

21       Your Honor, if I may, another way to do this, instead

22  of picking numbers that are based on our best guess, is

23  focusing on areas that haven't been graded yet.  We don't

24  know where they are.

25       THE COURT:  And that's what I want to talk to him

1    about.

2              Next question for you, Mr. Leone:  Of the

3    approximately next 18 miles proceeding west from 1806 -- so

4    that would be the two miles Mr. Mentz has surveyed and

5    another approximately 16 -- and I know these are rough

6    numbers -- do you agree that that 16 miles has not yet been

7    graded and cleared, or has some of it?  Do you know the

8    answer to that?

9              MR. LEONE:  Your Honor, I think I know the answer.

10   It is a moving target.  I believe that virtually everything

11   to the west of 1806 has been cleared, the topsoil has been

12   cleared, except for -- I need to verify this -- there are

13   spots to the west of 1806 where we have been unable to do our

14   work because of the attacks on the crews.  As I understand

15   it, there were two more attacks today at the location of

16   Highway 6 and Highway 80 that may have stopped some of the

17   clearing activities in certain locations.

18             THE COURT:  Again, I know that both sides have

19   diametrically opposed presentations of what is occurring on

20   the ground out there, but if any of these altercations were

21   not occurring, what is the timeline for the clearing of those

22   16 miles?

23             MR. LEONE:  Well, as I say, Your Honor, my client,

24   who has the most up-to-date information on this tells me all

25   but 400 feet of the pipeline from origin to 1806 has been

—17—

1    cleared.

2              THE COURT:  And then how about graded?

3              MR. LEONE:  Well, the process is stake, clear away

4    the topsoil to whatever depth is necessary to do that.  It

5    can vary depending on the depth of topsoil, but it is about

6    18 inches.  There is grading that takes place depending on

7    the terrain of the property to make it more accessible by the

8    equipment that needs to dig the trenches and lay the pipes.

9    So that grading, I would have to check to see what percent

10   has been graded.

11             THE COURT:  Why don't you check.

12             MR. LEONE:  I believe what I have been told, all but

13   400 feet have been cleared.

14      (Pause)

15             MR. LEONE:  Your Honor, it might help if I put a

16   couple more lines on it to orient you to what I am about to

17   say.

18             THE COURT:  Fine.

19             MR. LEONE:  So we have got river, and then we have

20   Highway 1806 and the federal land.  The next mile post is

21   Highway 80, and the next mile post after that is Highway 6.

22             It is about 12 miles from Highway 6 to Highway 80.

23   And it is about 9,000 feet or about -- less than two miles

24   from Highway 80 to the point of the Saturday altercation, I

25   will say.

1           Of that entire span, there should only be about a

2    thousand feet, linear feet, to the east of Highway 80 and

3    between 1806 that is not yet graded.

4           I think we have gotten it correct, Your Honor.

5           THE COURT:  All right.  Let me ask Mr. Hasselman:  So

6    if it has all been cleared, if this whole area has been

7    cleared -- the main act of destruction is the clearing;

8    right?  I mean the grading is part of it, but the principle

9    one is clearing.

10          MR. HASSELMAN:  Well, if clearing means removal of

11   vegetation, that is not right.  The area that Mr. Mentz

12   surveyed had been cleared of brush and mowed, so it was

13   almost like a golf course or something, and he could see the

14   features very clearly, and there wasn't any disturbance of

15   features.  It just enabled him to see it.  I understand your

16   problem-solving mode -- not evidence mode -- so this is

17   hearsay, I recognize that.  Mr. Mentz described to me that

18   the area on the other side of what he surveyed is untouched.

19   I haven't been out there.  Mr. Leone hasn't been out there.

20   I think what this conversation highlights is a need to take

21   our foot off the gas pedal.  We know that a great deal of the

22   work has been done.  We know, at the end of the week, there

23   is an intent to have a decision.  There is no harm in holding

24   off on any remaining clearing.  I don't know where it is.

25   But it doesn't seem like there is any harm to anyone for

1    taking the foot off the gas pedal until we can sort some of

2    these issues out.

3            THE COURT:  Mr. Leone, then, your response to that?

4    If you have already cleared it, is there grading that is

5    going to be occurring in the next three days?

6            MR. LEONE:  Yes.  Let me add one more feature here,

7    Your Honor.  Between Highway 1806 and Highway 80 there

8    is -- I'm going to call it a hill, that's the way it has been

9    described to me -- so I think some of the observations about

10   what has and hasn't been done there are affected by how far

11   people can see from the places that they are able to access.

12   So I wanted to add that.

13           With respect to the issue of harm and delay and

14   stoppage, I do think there are some data points I need to get

15   on the table for you.  We have with us today the person who

16   really knows the construction timetable and the layout.  What

17   has been explained to me, Your Honor, is that there are about

18   700 workers working across the length of this pipeline, just

19   in this area, in this North Dakota area.  This last 12 miles

20   between the river and the west of Highway 6 is really end of

21   pipeline.  The company that is doing that work, their mandate

22   ends at Highway 1806, and another company takes over to build

23   and do the bore under the river.

24           At any given point in time, there is work taking

25   place across the length of this pipeline that could be as

1    much as 50 or 60 miles.  The workers, the crews, are strung

2    out across the length of the pipeline.  It is all sequenced

3    work.  It is easier to see in a pipeline.  As I said, they're

4    staking.  That crew is moving.  If they stop or slow down,

5    everybody piles up behind them.  Then, there is clearing --

6    I'm going to use that word consistently, which is mowing,

7    removal of brush.  And then removal of topsoil is the next

8    piece.  Then, grading.  Then, the heavy equipment comes in.

9    This pipeline of 700 workers scattered over 20 to 50 miles is

10   working at a rate of about two to three miles a day.  That is

11   the pace at which this train is moving.  And so it is not so

12   simple as to say, well, let's just take our foot off the gas

13   and stop here.

14        THE COURT:  So you're saying, and they're working

15   between Highway 6 and 1806?

16        MR. LEONE:  Yes.

17        THE COURT:  They are doing that this week?

18        MR. LEONE:  Yes, Your Honor.  What I'm told is that

19   but for the disturbances, we would have this pipeline in to

20   1806 by the end of this week.

21        One of the reasons that we were so anxious to have

22   that -- just to refresh from our prior discussion, we had

23   talked before about, in connection with the preliminary

24   injunction, where to stop work.  And I think what we had

25   indicated at the time -- but we do not have any intention

—21—

```
1     obviously to work where we needed an easement.  Mr. Marinelli
2     clarified what the status of the easement was.  And so our
3     client already voluntarily stood down from anything east of
4     1806 but has been working at a feverish pitch on everything
5     west of 1806.
6              I can go into more detail.  I'm not sure you're
7     inviting that level of argument at this point.  When we get
8     into what happened on Saturday I can explain how that
9     sequencing relates to this train that's moving down the track
10    towards the drill box for the bore site.
11             THE COURT:  All right.  Let me, again in
12    problem-solving mode, as Mr. Hasselman, accurately described
13    it, it seems to me then that we can get an agreement, is what
14    I'm hearing, from people for no pipeline activity between
15    1806 and 20 miles east of Lake Oahe.  Again, that would cover
16    the two miles between 1806 and the west bank of the lake and
17    20 miles east from the lake.  I know that is not good enough
18    for Mr. Hasselman because you want the 18 miles west, but
19    let's do this in two phases.
20             Again, Mr. Leone, I can also understand the potential
21    negative effects of the Court's granting the motion and
22    thereby placing its imprimatur on the plaintiff's view of
23    events.  But if instead of issuing an order granting in part
24    the TRO, that the sides agree that no pipeline activity
25    between 1806 and 20 miles east of the lake until -- we can
```

1    even say Friday, at midnight, since I certainly expect to

2    have my opinion issued by then -- you're amenable to that

3    piece?

4            MR. LEONE:  Let me confer with my client, Your Honor.

5            (Pause)

6            MR. LEONE:  Your Honor, I need just a couple of

7    minutes.

8            THE COURT:  We will take a five-minute recess.

9        (Recess)

10           THE COURT:  Mr. Leone, what says you?

11           MR. LEONE:  Your Honor, let me try and put this in

12   perspective.

13           I think I have already told you that my client

14   doesn't intend to work east of the lake or east of 1806, but

15   there are some really raw feelings that have developed in

16   this case over the last couple of weeks.  And what my client

17   would like to see is that if it agrees that it will continue

18   to stand down in this limited area, we get an equivalent

19   commitment from the plaintiffs that they will withdraw from

20   the areas west of 1806, that they will stop interfering with

21   construction activities west of 1806, that they will honor

22   the restraining order that was entered by the federal judge

23   in North Dakota, and that they will do everything in their

24   power to stop what really amount to attacks on the

25   construction crews west of 1806.  Those attacks have expanded

1    from when we were first here.  When we were first here, we

2    were talking about not drilling under the lake, which was

3    from the drilling pad under the lake.  Since then, now the

4    assault has come over the fences and over the hill to this

5    area just west of 1806.  Then, as of this morning, it had

6    spread all the way to the small incomplete area of Highway 6

7    and Highway 80.

8            Law enforcement and the prosecutors in North Dakota

9    have to figure out how to get their arms around this

10   situation, and they have to deal with it.  But as recently as

11   Saturday, the chairman of the plaintiff's tribe was on CNN

12   saying that there was no room for compromise unless the

13   pipeline went away.

14           I have had multiple conversations with Mr. Hasselman

15   where I have begged him, just make me a proposal, any

16   proposal, anything other than "don't build this pipeline" and

17   I will take it to my client, and there is nothing.

18           I recognize, Your Honor, your request to stand down

19   in a place where we have already said we're not planning to

20   work.  And it is hard for me to stand here and advocate to

21   not accept that readily as a perfectly common sense proposal

22   on your part.  I just want you to understand what the barrier

23   is to my client making that unequivocal commitment to stand

24   down unless we get an equivalent assurance from both

25   plaintiffs, The Standing Rock Sioux and the Cheyenne River

1      Sioux, that they will equivalently stand down.

2              THE COURT:  West of 1806?

3              MR. LEONE:  Correct.

4              THE COURT:  Mr. Hasselman.

5              MR. HASSELMAN:  Mr. Leone, from the start of the

6      case, has been unable to distinguish between my client, the

7      Standing Rock Sioux, and the many thousands of people across

8      the country who have big problems with this project and who

9      are demonstrating in various ways against it.  Chairman

10     Archambault has tirelessly worked to cool temperatures out

11     there.  He has explicitly condemned violence, and he

12     condemned violence again on Sunday.  The violence that he was

13     condemning in part was the violence that was acted out

14     against the demonstrators by the Dakota Access private

15     security forces.  There were scenes out there that we have

16     not seen in America since the '60s.

17             Dakota Access has a separate lawsuit against separate

18     parties.  They have a remedy there.  This lawsuit is about

19     the permits.  And that's what we should be talking about.

20             THE COURT:  That sounds like a "no."

21             MR. HASSELMAN:  A "no" to?

22             THE COURT:  His proposal.

23             MR. HASSELMAN:  I don't know what we are supposed to

24     do.  Standing Rock Sioux Tribe is not attacking anybody.

25     They are working tirelessly to oppose violence, which is not

1    productive to the tribe's interests.  There has been a lot of

2    violence on all sides.

3            THE COURT:  Thank you.

4            Mr. Leone, it sounds like there is not going to be an

5    agreement, then, along the lines that you've proposed.  So my

6    question is -- and I look at this in two phases -- the first,

7    then, instead of using 1806 and the 20-mile barrier is I look

8    first at the Corps's jurisdictional waters.  I'm going to get

9    back to you in one minute.

10           Mr. Marinelli, I let you sit on the sidelines here

11   for most of this, but I need a couple of answers from you.

12   The first is, I think you adverted a little bit earlier that

13   there were other jurisdictional waters west of Lake Oahe.

14   Are there any between Lake Oahe and 1806?

15           MR. MARINELLI:  My understanding is that there are no

16   additional jurisdictional waters between Lake Oahe and 1806

17   and that the Corps has 350 feet of land, the first 350 feet

18   of shoreline west of Lake Oahe.

19           THE COURT:  How about any jurisdictional waters

20   between 1806 and Highway 6?

21           MR. MARINELLI:  I don't know the answer to that, Your

22   Honor.  We can look into trying to determine what other

23   jurisdictional waters were potentially at issue in the

24   20-mile range proposed by plaintiffs, but I don't have an

25   answer to that today.

1          THE COURT:  Mr. Hasselman, are you aware of any

2     between 1806 and Highway 6?

3          MR. HASSELMAN:  Your Honor, I'm not.  It kind of

4     highlights some of the problem here, is that no one is

5     required to catalog any of these non-PCN waters of which we

6     know there to be many.  There are 700 in the state of North

7     Dakota.

8          THE COURT:  Mr. Marinelli, one other question:  Do

9     you know generally the numbers of jurisdictional waters that

10    were permitted under NWP 12 without a PCN?

11         MR. MARINELLI:  I don't have that number handy, Your

12    Honor.

13         THE COURT:  Any ballpark on it?

14         MR. MARINELLI:  Would you allow me to confer with my

15    client?

16         THE COURT:  Of course.

17         MS. DUCHENEAUX:  Your Honor, if I may, the tribe was

18    not heard on our ability to agree to a stand-down, and I

19    would like to reiterate what Mr. Hasselman said about

20    distinguishing between the tribe, which are governments, and

21    the individuals that are down at the camp, some of whom are

22    our tribal members but many of them are from different tribal

23    nations in addition to non-Indians.  I would have to

24    contradict what Mr. Leone said about reaching out and

25    pleading with people.  I did send messages to him, or at

1        least one e-mail message, requesting that he confer with me

2        on some kind of agreement, and he did not even respond to

3        that.

4                THE COURT:  Okay.  Thank you, Ms. Ducheneaux.

5                I want to get back to Mr. Marinelli.  If you can't,

6        you can't.

7                MR. MARINELLI:  My best understanding today, Your

8        Honor, is that there may be over a hundred jurisdictional

9        non-PCN waters in North Dakota, but I cannot say with

10       specificity.

11               THE COURT:  Okay.  Let me go back then since I have

12       now got to figure out about a ruling since we're not

13       brokering an payment.  Mr. Leone, so the Corps conceded in

14       its papers that -- "conceded" is maybe the wrong word -- but

15       didn't oppose the issuance of a TRO relating to land east and

16       west of Lake Oahe, the 20 miles.  Now, certainly they have

17       jurisdiction over the water and the small area of land

18       immediately adjacent, which is marked in purple on your map.

19       I trust, given their concession, you're not opposing a grant

20       of the order in regard to the areas in purple only?  I'm not

21       sure you could, anyway.  But since they're the opposing party

22       in the suit, they have agreed to that, they have jurisdiction

23       over that.

24               Is there any argument you want to raise that I can't

25       do that?

1          MR. LEONE:  Your Honor, jurisdictionally, no.  We are

2     opposed to any entry of an order even with respect to the

3     purple area.  We hope to prevail on the preliminary

4     injunction.  Jurisdictionally, the purple area, there is

5     jurisdiction, I can't contest --

6          THE COURT:  And given they have conceded it, how am I

7     not issuing a TRO as to the purple area?

8          MR. LEONE:  Your Honor, if you will give me just a

9     moment?

10          MR. HASSELMAN:  Your Honor, can I be heard?

11          THE COURT:  You're winning.  You should sit while

12     you're winning.

13          MR. LEONE:  Your Honor, maybe I wasn't clear enough

14     before when I said that our client is willing to agree

15     voluntarily that it will not work east of 1806, including the

16     purple area, until your ruling on Friday.

17          THE COURT:  My understanding of that, that was

18     conditioned on the plaintiffs agreeing to a stand-down rest

19     of 1806, and Mr. Hasselman and Ms. Ducheneaux made different

20     arguments about that, whether they can even control that, but

21     my understanding was your point was conditioned on that only.

22     If that's not correct, I would be happy to hear it.

23          MR. LEONE:  Your Honor, I'm not sure I understood

24     what they were saying.  My point to both has been I

25     understand, we understand, that you don't control everybody

29

1    that is on site.  We have people on site that I'm pretty sure

2    they don't control.  There have been celebrities on site that

3    they don't control.  My point to them has been that their

4    presence -- and even to this day, Mr. Mentz's, for example,

5    presence -- we can get into that -- against the landowner's

6    wishes on his land has become a focal point for all these

7    other people to gather.  We don't expect or condition our

8    offer, agreement, on anything other than them agreeing to do

9    what they can do within their ability.  I think that they

10   understate their influence on the passions and the behavior

11   of the people at this site.  By their presence there, by

12   their encouragement of the resistance, by their appearance on

13   public media, all of it is intended to create and maintain a

14   focal point.  And for them to stand back and say, gee, we

15   don't have anything to do with the violence that ensues after

16   we have created this focal point is not fair and is not

17   realistic.  We have asked them to commit to stand down with

18   respect to what they could do.  I didn't hear them reject

19   that.  I didn't hear them stand up and say, we refuse to

20   follow the law, we refuse to honor the injunction, we refuse

21   to remain off of private property, we refuse to chain

22   ourselves to bulldozers, we refuse to cheer when people --

23        THE COURT:  Both sides, this isn't terribly helpful

24   to me in attempting to resolve that.  I understand the points

25   you want to make and I understand the points that your client

1    wants to make.  This is rhetorically effective but isn't

2    helping me, and I don't think it is helping your attempting

3    to broker something with Mr. Hasselman.

4         Shortly my efforts are going to expire on trying to

5    broker one, but Mr. Hasselman, tell me if there is anything

6    that you're willing to do in exchange for such an agreement.

7    Maybe that is an easier way of putting it.

8         MR. HASSELMAN:  I think what's ironic about the

9    conversation -- I will try not to be rhetorically effective

10   and unhelpful -- is that we are here exercising our rights in

11   the legal process.  That's why we are before you.  And from

12   our perspective, we put in the kind of evidence on Friday

13   that you had asked me about a week ago and which they said we

14   needed.

15        THE COURT:  All right.  You are being rhetorically

16   effective but not helpful, also.

17        Again, my question purely, if I can't help you folks

18   reach an agreement, then I will issue an order granting in

19   part or denying in part or granting or denying the

20   application.  The answer appears to be "no," so I'm not going

21   to -- we have been here an hour -- I'm not going to further

22   seek agreement.

23        So, Mr. Hasselman, tell me, then, what authority I

24   have to enjoin anything west of 1806 on private land?  In

25   other words, the party you are suing is the Corps.  They have

1    already agreed, and I can order them to not permit any

2    construction activity in their jurisdictional area on either

3    side of the lake, but how can I go beyond that?

4         MR. HASSELMAN:  So, Your Honor, you were asking a

5    question about non-PCN jurisdictional areas, and I did want

6    to draw your attention to the preliminary injunction brief at

7    page 9, and it lists 260 streams and rivers and 500 wetlands

8    in the state of North Dakota.  So that gives you some idea.

9         With respect to authority, you have very broad

10   equitable powers to fashion a remedy appropriate to the

11   situation, and this is an extraordinary situation.  Dakota

12   Access has intervened as a party, and they are subject to

13   your --

14        THE COURT:  You don't have any cause of action you

15   have asserted against them.  The only causes of action you

16   have asserted are against the Corps.  So there has to be some

17   relief I can give you on your causes of action against the

18   Corps.  In this injunctive motion, you have only sought

19   relief under the National Historic Preservation Act.  How do

20   I have authority to enjoin them from permitting work on

21   private land that they don't have authority to permit in the

22   first place?

23        MR. HASSELMAN:  So the kinds of sites that we found

24   and described in Friday's declaration of Mr. Mentz are

25   exactly the kind of reason why we're in this lawsuit; that

1    the specific sites may not have been in the direct

2    jurisdiction of the Corps, but they're precisely the kind of

3    thing that the law requires the Corps to think about before

4    they issue a permit.  They didn't think about it here.

5              THE COURT:  The permit for the dredge and fill

6    activity in the waterway, right?

7              Maybe Mr. Leone has better ideas about the HDD

8    process, but maybe they have got a way that they can go so

9    far under the lake that there is no dredge or fill.  Then

10   they wouldn't need a permit at all; right?

11             MR. HASSELMAN:  Your Honor, no, that is not right.

12   Under the Rivers and Harbors Act, under Section 10, you need

13   a permit to tunnel underneath a navigable water.

14             THE COURT:  Even if there is no dredge or fill?

15             MR. HASSELMAN:  That's correct.  It is a separate

16   statute.

17             I don't think anybody is disputing that the Corps

18   needs to issue a permit here in addition to the easement,

19   which still has not been issued.

20             THE COURT:  But you agree that if they were willing

21   to not go under Lake Oahe that they could do whatever they

22   wanted on the private lands to the west?

23             MR. HASSELMAN:  They could do whatever they wanted as

24   long as they don't touch any water, and you can't build a

25   pipeline across a third of the country without touching

—33—

1        water.

2                THE COURT:  But they can build it up to the edge and

3        then try to convince the Corps to grant them a permit; right?

4                MR. HASSELMAN:  Your Honor, we're days away from a

5        ruling on the preliminary injunction motion.  You have the

6        authority to craft a remedy in light of the situation that

7        includes the pipeline company, to hold the status quo until

8        these issues can get resolved.  Without it, then any legal

9        victory for us would be a hollow one.

10               I do think we have cited those authorities in our

11       preliminary injunction brief; that Dakota Access falls under

12       the Court's remedial authority when it enters into the case.

13               THE COURT:  Well, that's an interesting question

14       about that, but still, the fact that they are in the case

15       doesn't mean that I can just do anything with regard to

16       Dakota Access if they are not named in a single cause of

17       action.  I doubt that that is true.

18               Mr. Leone.

19               MR. LEONE:  Your Honor, new news.  We are willing to

20       agree we will not work east of 1806 until midnight Friday.

21               THE COURT:  Including 20 miles east of Lake Oahe?

22               MR. LEONE:  20 miles east of Lake Oahe.

23               THE COURT:  From 1806 through 20 miles east of Lake

24       Oahe.

25               MR. LEONE:  From 1806 to 20 miles east of Lake Oahe

—34—

1    we're willing to agree to that.  It is not a condition.  We

2    ask only that the plaintiffs' counsel at least commit that

3    their clients will obey the law in exchange for us agreeing

4    to this, just obey the law.

5        THE COURT:  I understand that, I understood the

6    plaintiffs' position.  All right.  Then, what I'm going to do

7    is this -- and I will issue this in writing -- I'm going to

8    grant in part and deny in part the motion for temporary

9    restraining order, that by agreement by the Corps and Dakota

10   Access, no construction activity will take place between 1806

11   and 20 miles east of Lake Oahe.  I will otherwise deny the

12   temporary restraining order as it relates to the pipeline

13   west of 1806.  I do not find that plaintiffs have established

14   the likelihood of success on the merits or irreparable harm

15   given what I would consider a lack of Corps jurisdiction over

16   such land.  Again, the success on the merits question, the

17   irreparable harm question are difficult questions, ones that

18   I have been grappling with since the pleadings have been

19   filed, and that will be reflected in my opinion that I will

20   issue again by Friday, which at this point is already lengthy

21   enough.  But because these are complicated issues and because

22   just getting my hands on the factual background, which the

23   sides have such diametrically opposing views of what happened

24   regarding consultation is taking quite a while for me to

25   figure out, as best I can, what did happen in such

1    consultation.  But again, that will be part of the opinion

2    that I intend to issue by the end of Friday.  And at that

3    point, you will get the fuller explication of where I believe

4    the merits and the harm lie here.

5        Again, I thank both sides, all sides, for your

6    diligent work in a short time frame.  I also appreciate the

7    fact that I have a full house here today.  I know there are a

8    lot of people interested in this case.  And I appreciate

9    everybody's civility and appropriate decorum in this

10   courtroom, as we have heard these difficult issues.  That's

11   why we have open courtrooms, is for citizens like yourselves

12   to come, be here, and be a part of this, and I appreciate the

13   way you have conducted yourselves.

14       I will issue the temporary restraining order opinion

15   this afternoon, which again will be in a minute order, and

16   then the full opinion on preliminary injunction by the end of

17   Friday.

18       Yes, Mr. Leone.

19       MR. LEONE:  Your Honor, if I might, in the papers

20   that we filed in response to the motion for temporary

21   restraining order, we combined -- hopefully not

22   inappropriately from your view -- our opposition to the

23   supplemental declarations filed by the plaintiff on Friday,

24   which is the supplemental Mentz declaration.  I felt like,

25   given the nature of the allegations against my client with

1    respect to these additional alleged findings and the events

2    of Saturday that they might bear on the preliminary

3    injunction.  And so I would inquire of Your Honor whether or

4    not you will treat our response to the motion for temporary

5    restraining order and the supplemental maps that we submitted

6    today as part of the record with respect to that.

7         THE COURT:  I will.

8         MR. LEONE:  Specifically, Your Honor, I don't know

9    that we have really talked about it, but Exhibit A to our

10   papers today, just so it is clear to you, shows the location

11   as we have charted them from Mr. Mentz's declaration of every

12   site that he found that had this potential cultural

13   significance, and we charted them relative to our pipeline

14   right-of-way and the northern pipeline that already exists

15   right-of-way to demonstrate that they exist almost entirely

16   outside of our right-of-way, and in the one instance where I

17   think there were six sites --

18        THE COURT:  Okay, I think this is argument.  I have

19   already ruled.  I've got the maps.  I appreciate it.

20        Okay.  Thank you, all.

21        (Proceedings adjourned at 4:15 p.m.)

22

23

24

25

1    CERTIFICATE OF OFFICIAL COURT REPORTER

2

3         I, Patricia A. Kaneshiro-Miller, certify that the

4    foregoing is a correct transcript from the record of proceedings

5    in the above-entitled matter.

6

7

8    ----------------------------------    -----------------------

9    PATRICIA A. KANESHIRO-MILLER                    DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25