**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE, | |
| Plaintiff, | |
| and | |
| CHEYENNE RIVER SIOUX TRIBE, | |
| Plaintiff–Intervenor, | |
| v. | Case Number: 16-cv-1534 (JEB) |
| UNITED STATES ARMY CORPS OF ENGINEERS, | |
| Defendant–Cross Defendant, | |
| and | |
| DAKOTA ACCESS, LLC, | |
| Defendant–Intervenor–Cross Claimant. | |

**CROSS CLAIMANT DAKOTA ACCESS, LLC'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Kimberly H. Caine
William J. Leone
Robert D. Comer
NORTON ROSE FULBRIGHT US LLP
799 9th St. N.W., Suite 1000
Washington, D.C.  20001-4501
(202) 662-0200

Edward V. A. Kussy
NOSSAMAN LLP
1666 K Street, N.W., Suite 500
Washington, D.C. 20006
(202) 887-1400

William S. Scherman
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500
wscherman@gibsondunn.com

*Counsel for Defendant–Intervenor–Cross Claimant Dakota Access, LLC*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 4

      A.     The Dakota Access Pipeline ........................................................................ 4

      B.     The Regulatory Background ........................................................................ 5

      C.     The Corps Treats Dakota Access's Section 408 Permission And Right-Of-Way As A Single Approval Under A Single Approval Process ....................................................................................................... 6

      D.     Corps Documents Reiterate The Grant Of A Right-Of-Way To Construct, Operate, And Maintain A Pipeline Crossing At Lake Oahe ............................................................................................................. 11

      E.     The Government Attempts To Block Pipeline Construction By Purporting To Withhold Authorization Already Granted ......................... 13

JURISDICTION ................................................................................................................. 17

STANDARD OF REVIEW ................................................................................................ 18

ARGUMENT ...................................................................................................................... 18

    I.     The Corps Has Granted Dakota Access A Right-Of-Way Under The Mineral Leasing Act To Cross Federal Lands At Lake Oahe ............................. 20

      A.     The Corps Has Made Every Finding, Determination, And Decision For The Grant Of A Right-Of-Way ......................................................... 20

      B.     The Corps Has Consistently Treated The Approval Of The Pipeline's Crossing Of Federal Land As A Single Process With A Single Outcome ......................................................................................... 23

      C.     Every Condition For A Right-Of-Way Under The MLA Has Been Satisfied ................................................................................................... 25

      D.     The Government Cannot Justify Its Conduct By Characterizing It As A Reopening Of Final Agency Action ................................................ 27

    II.    Dakota Access Is Entitled To Declaratory Relief .............................................. 31

CONCLUSION .................................................................................................................. 34

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)..................................................................................................................18

*AquAlliance v. U.S. Bureau of Reclamation*,
   No. 1:14-CV-000945-LJO-BAM, 2014 WL 3401390 (E.D. Cal. July 11,
   2014) ........................................................................................................................................28

*Atlas Air, Inc. v. Air Line Pilots Ass'n, Int'l*,
   69 F. Supp. 2d 155 (D.D.C. 1999)...........................................................................................17

*Colorado Envtl. Coal. v. Office of Legacy Mgmt.*,
   819 F. Supp. 2d 1193 (D. Colo. 2011).....................................................................................28

*Dep't of Transp. v. Pub. Citizen*,
   541 U.S. 752 (2004)..................................................................................................................29

*Doehler Metal Furniture Co. v. Warren*,
   129 F.2d 43 (D.C. Cir. 1942)....................................................................................................32

*F.C.C. v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009)..................................................................................................................29

*Hammond v. Norton*,
   370 F. Supp. 2d 226 (D.D.C. 2005)..........................................................................................27

*Kaseman v. District of Columbia*,
   444 F.3d 637 (D.C. Cir. 2006)..................................................................................................22

*Marsh v. Or. Nat. Res. Council*,
   490 U.S. 360 (1989)..................................................................................................................27

*MedImmune, Inc. v. Genentech, Inc.*,
   549 U.S. 118 (2007)..................................................................................................................31

*Medtronic, Inc. v. Mirowski Family Ventures, LLC*,
   134 S. Ct. 843 (2014)................................................................................................................18

*Perez v. Mortgage Bankers Ass'n*,
   135 S.Ct. 1199 (2015)...............................................................................................................29

_____

\* Authorities on which this motion chiefly relies are marked with an asterisk (\*).

*Sierra Club v. U.S. Forest Serv.*,
   828 F.3d 402 (6th Cir. 2016) ..................................................................................26

*Tierney v. Schweiker*,
   718 F.2d 449 (D.C. Cir. 1983) ................................................................................32

*Trudeau v. FTC*,
   456 F.3d 178 (D.C. Cir. 2006) ................................................................................18

*United Gov't Sec. Officers of Am. v. Chertoff*,
   587 F. Supp. 2d 209 (D.D.C. 2008) ........................................................................17

*Water Transp. Ass'n v. ICC*,
   684 F.2d 81 (D.C. Cir. 1982) ..................................................................................26

*Wilderness Soc'y v. Morton*,
   479 F.2d 842 (D.C. Cir. 1973) ...........................................................................22, 26

*Wildlands v. U.S. Forest Serv.*,
   791 F. Supp. 2d 979 (D. Or. 2011) ..........................................................................27

**Statutes**

5 U.S.C. § 702 ..........................................................................................................18

10 U.S.C. § 2662 ......................................................................................................26

10 U.S.C. § 2668 ......................................................................................................24

28 U.S.C. § 1331 ......................................................................................................18

28 U.S.C. § 2201 ......................................................................................................17

* 30 U.S.C. § 185 ................................................................4, 6, 20, 21, 22, 23, 24, 25, 26, 30, 34

30 U.S.C. § 195 ...................................................................................................18, 31

* 33 U.S.C. § 408 ..............................................................................2, 6, 7, 20, 21, 22

42 U.S.C. § 4332 ........................................................................................................7

**Regulations**

33 C.F.R. § 208.10 .....................................................................................................7

33 C.F.R. § 230.5 .......................................................................................................9

**Rules**

Fed. R. Civ. P. 56 ..................................................................................................................18

Fed. R. Civ. P. 57 ..................................................................................................................32

**Other Authorities**

Black's Law Dictionary (10th ed. 2014)...................................................................................24

## INTRODUCTION

Dakota Access, LLC respectfully moves for summary judgment on its cross-claim, which seeks a declaration under the Declaratory Judgment Act that it has a legal right-of-way to construct, operate, and maintain an oil pipeline beneath federal land at Lake Oahe.  No material facts needed to resolve this cross-claim are in dispute; the sole question before this Court is the legal effect of the permissions the U.S. Army Corps of Engineers ("Corps") has already granted to Dakota Access.

Dakota Access files this motion now because just yesterday, December 4, 2016, the government completely contradicted representations made directly to this Court and to others by purporting to conclude that further work is needed—in particular, it proposes an Environmental Impact Statement—before, in the government's view, a right-of-way for the pipeline to run beneath Lake Oahe can be approved.  The government is using the fiction of a separate right-of-way determination to hold up completion of a pipeline that the Corps has already finally approved to the full extent of the Corps's jurisdiction.  By the Corps's own admission, that record is closed.  The Corps has repeatedly stood by the propriety of its initial decision to allow the pipeline to cross federal land at Lake Oahe—a decision that included the express final determination that an Environmental Impact Statement is *not* necessary.  In answering the complaint in this case, the Corps denied Plaintiffs' allegations to the contrary.  The Department of the Army also repeated in a letter filed with this Court on November 14 that after a thorough review of permission for the pipeline to cross at Lake Oahe, it "concluded that its previous decisions comported with legal requirements."  Ex. A (D.E. 56-1), at 2.[1]

---

[1] "D.E." refers to docket entries in this Court.

The only thing of note since November 14 is that Plaintiff, the Standing Rock Sioux Tribe, responded to yet another offer by the Corps to consult about conditions for the pipeline with the same posture that rightly doomed its motion for a preliminary injunction:  The Tribe once again refused to consult on the very subjects identified by the Corps. Ex. F (November 22, 2016 letter from Corps to Tribe Chairman noting that in response to Army's offer to "pursue additional discussions" on "pipeline safety matters," the Chairman stated he "had no desire to further discuss opportunities to address pipeline safety concerns").

This motion seeks to stop the government's effort—which is part of a transparent capitulation to political pressure—at selling one version of the truth to this Court and a different version at other times and other places.  On July 25, 2016, the Corps granted Dakota Access permission, citing a provision of the Rivers and Harbors Act ("RHA"), 33 U.S.C. § 408, to construct, operate, and maintain a pipeline by crossing federal lands at Lake Oahe in North Dakota.  AR 71182; *see* AR 71174–214, 71220–990.[2]  More than four months later, however, the Corps continues to insist that Dakota Access lacks authority to proceed without having in its possession an *additional* document styled as an "easement" that reiterates the permission that Dakota Access has already received.  In particular, the Corps announced on September 9 that it would not deliver a copy of the easement document until it had determined whether it needed to reconsider any of its prior decisions to allow construction, operation, and maintenance of a pipeline crossing federal lands at Lake Oahe.  Then, on November 14, the Corps announced that after completing this determination-whether-to-reconsider process, it had "concluded that its previous decisions comported with legal requirements." Ex. A, at 1.  That should have brought the unwarranted delay to an end.  Instead, bowing to political pressure and an escalating

---

[2]  "AR" refers to the administrative record.

campaign of violence and disorder waged by protestors who seek to impede the construction of

the pipeline, the government still insisted that Dakota Access lacks the Corps's authority to cross

beneath federal land at Lake Oahe.  Dakota Access filed its cross claim the following day.

On December 4, the Department of the Army did an about-face, announcing that it "will

not grant an easement to cross Lake Oahe at the proposed location based on the current record,"

Ex. S (D.E. 65-1), at ¶ 12, saying there is "a need to explore alternate routes for the Dakota

Access Pipeline crossing," Ex. T, and that a "robust consideration of reasonable alternatives"

would be "best accomplished" through an Environmental Impact Statement, Ex. S, at ¶ 12.  In

other words, after the Army made a decision that it continues to defend in this Court as a lawful

final agency action, it now contends—based solely on vague references to policy and without

purporting to follow any lawful agency process for reopening a final decision—that it needs to

"consider" taking a step that it conclusively rejected in reaching that final decision.

Significantly, the Army does not say that an Environmental Impact Statement is required or that

any of the additional review contemplated by this new document has any impact on the validity

or finality of its previous decisions approving the Missouri River crossing.

Dakota Access did everything in its power to avoid burdening the Court with this

additional litigation over construction of its pipeline.  A challenge to the Corps's strained reading

of the statutory scheme would have been unnecessary had the Corps acted expeditiously, as it

said it would, in delivering the document that it erroneously asserts Dakota Access needs before

moving forward.  But after months of costly and unlawful delay—with still no end in sight—

Dakota Access is compelled to seek a judgment declaring that the permission the Corps has

already given to Dakota Access confers a right-of-way to construct, operate, and maintain a

pipeline below federal land at Lake Oahe.

The Corps's contrary view requires a rewrite of the Mineral Leasing Act ("MLA"), the law that governs "[r]ights-of-way" for private parties to use federal lands "for pipeline purposes." 30 U.S.C. § 185(a). The decision whether to grant a right-of-way for pipeline purposes turns on whether it would be consistent with the "public interest" and "compatible with" the "mission" of the federal project. Army Reg. 405-80 ¶ 4-1(c) (if "in the public interest" and "compatible with the installation/project mission"). On July 25, 2016, when the Corps gave Dakota Access permission to proceed at Lake Oahe, the Corps made those very determinations: *i.e.,* the pipeline crossing was determined "to not be injurious to the public interest and" would "not impair the usefulness of work built by the United States." AR 71181.

It is no coincidence that the July 25 decision included each determination relevant to a right-of-way. That is because the Corps's own documents repeatedly confirm that the agency treated RHA and MLA approval at Lake Oahe as a single process resulting in a single decision. Even the Corps's own internal communications recognize that the July 25 documents "provided an easement to cross federal property administered by [the Corps] for flood control & navigation at Lake Oahe, ND." *See* Ex. B (D.E. 57-1), at 3. This Court should therefore declare that Dakota Access has the lawful right-of-way to construct, operate, and maintain its pipeline at Lake Oahe.

## BACKGROUND

### A.      The Dakota Access Pipeline

Dakota Access began planning the Dakota Access Pipeline (or "DAPL") in 2014. It is a $3.78 billion project financed entirely by private funds. AR 71304. The underground pipeline will run 1,172 miles from the Bakken region of North Dakota on a southeast path, ending at refineries and terminals in Patoka, Illinois. D.E. 39, at 13–14 ("Op."). It is expected to have a transportation capacity of 570,000 barrels of oil per day, with an expected day-one volume of

450,000 barrels per day.  AR 71229-30.  Dakota Access acquired the rights to a 400-foot-wide

construction corridor over the length of the pipeline.  Op. 13 (citing Ex. C (Howard Decl., D.E.

22-3), at ¶ 3).

Throughout the planning and construction process, Dakota Access has gone to great

lengths to minimize as far as practicable any effects on cultural or sensitive environmental

resources.  Dakota Access hired professional archeologists who surveyed the entire pipeline

route in North and South Dakota, as well as much of the route in Iowa and Illinois.  *Id.* 13–14

(citing Ex. C, at ¶ 8).  Indeed, while the pipeline travels only about 357 miles in North Dakota,

the archeologists surveyed nearly twice that distance in carrying out Dakota Access's plan to

reduce impacts on cultural resources.  *Id.* at 14 (citing Ex. C, at ¶ 12).  Through survey efforts

and coordination with tribes who participated in consultations, Dakota Access modified the

pipeline route 140 times in North Dakota alone in order to avoid potential harm to cultural sites.

*Id.* (citing Ex. C, at ¶ 6).

Dakota Access also sought to minimize any potential environmental impact by installing

the pipeline where the ground had already been dug up or otherwise disturbed by other utility

project.  For example, at and leading up to the crossing at Lake Oahe, Dakota Access sought to

avoid cultural sites and environmentally sensitive locations by routing the pipeline through so-

called "brownfield" sites.  Op. 14–15 (citing Ex. D (Mahmoud Decl., D.E. 22-1), at ¶¶ 18–19).

As a result, the planned pipeline route runs parallel with, and in close proximity to, a pre-existing

natural gas pipeline and an overhead power transmission line.  AR 71241.

### B.      The Regulatory Background

No single federal agency is assigned to regulate the siting of an entire crude-oil pipeline.

Instead, federal agency jurisdiction over the construction and operation of an oil pipeline, if any,

stems from each agency's regulatory authority over distinct portions of that pipeline.

DAPL will cross under the Missouri River twice in North Dakota.  The first location is Lake Sakakawea.  Further south the pipeline crosses the river again at Lake Oahe, where it will run 140 to 210 feet below the surface of federally owned lands on each shore and approximately 92 feet below the lake bed itself.  AR 71260.  Lake Oahe was created in 1958 when the Corps constructed a dam on the Missouri River.  Op. 12 (citing Ex. E (Eagle Decl., D.E. 6-2), at ¶ 11).  The Corps asserts RHA jurisdiction over construction there on the ground that such activity is an "alteration or permanent occupation or use of" a "public work[]" that is "under the control of the United States . . . for the preservation and improvement of [ ] navigable waters or to prevent floods."  33 U.S.C. § 408.  The MLA likewise governs the grant of a right-of-way at that location because the pipeline will cross under "Federal lands."  30 U.S.C. § 185(a).

Permission for the crossing of federal land at Lake Oahe under RHA § 408 turns on whether that activity is consistent with "the public interest."  33 U.S.C. § 408 (if the occupation or use of a public work "will not be injurious to the public interest and will not impair the usefulness of such work").  The MLA authorizes the "appropriate agency head" to grant "[r]ights-of-way through any Federal lands" "for pipeline purposes," 30 U.S.C. § 185(a), "subject to regulations promulgated in accord with the provisions of this section," *id.* § 185(f).  By Army regulation, the standard for giving rights-of-way to cross federal land within the Corps's control is whether the activity will "be in the public interest" and "compatible with the installation/ project mission."  Army Reg. 405-80 ¶ 4-1(c).

### C.   The Corps Treats Dakota Access's Section 408 Permission And Right-Of-Way As A Single Approval Under A Single Approval Process.

The Corps has eight geographic "divisions" in the United States, with each division subdivided into "districts."  Districts are headed by District Engineers (sometimes called District

Commanders).  District Engineers are authorized to exercise the Section 408 responsibilities of the Chief of Engineers.  *See* 33 C.F.R. § 208.10(a)(5).

The Omaha District—located in the Northwestern Division of the Corps—covers North Dakota, South Dakota, Iowa and seven other states.  On October 21, 2014, Dakota Access submitted paperwork to the Omaha District formally beginning the process for the Corps to grant Dakota Access permission under RHA § 408 to drill from private land on one side of Lake Oahe to private land on the other side for purposes of installing and operating the pipeline.  Ex. H (D.E. 62-5), at 24.  At the point where the requested path runs beneath Lake Oahe, that path includes a total of approximately 1,100 feet of Corps-owned lands on either side of the Lake. AR 71238.  The Corps did not have a separate approval process for an MLA right-of-way.

Dakota Access also sought authorization for the pipeline to cross federal "flowage easements" upriver from Lake Oahe at Lake Sakakawea—the other Missouri crossing in North Dakota.  *See* AR 75355.  The Corps combined its Lake Sakakawea review with its review of the Lake Oahe crossing.  *See* AR 71220 *et seq*.  The result was that all approvals that Dakota Access needed from the Corps to cross the Missouri River in North Dakota were reviewed (and ultimately approved) in a single process.

The unified nature of the review was apparent throughout the approval process.  For example, on June 7, 2016, Rick Noel, Chief of the Civil Branch of the Omaha District's Real Estate Division, confirmed that the Section 408 permission and the grant of a right-of-way to cross federal land around Lake Oahe were a single approval.  *See* Ex. G (D.E. 62-2), at 3. Referring to the Environmental Assessment for the crossing at Lake Oahe required by the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332, Noel wrote that the Corps "may have a decision on the EA/Section 408 in the near future" and, "[i]n anticipation of that

occurring, I am finalizing the easement." Ex. G, at 3. Apart from determining whether Dakota

Access needed to be on Corps property when it commenced its drilling beneath Lake Oahe, *id.*—

the answer was "no," *id.* at 2 —Noel's only other question was "[t]o whom should I send the

easement for signature," *id.* at 3. Noel's e-mail also stated he would "complete the easement and

have it ready to be sent back to you after" after completing two other steps that are tied to the

Section 408 permission process: the approval and signing of "the final environmental

documents," and receipt of "any site specific conditions" to add to the easement. *Id.*

On June 10, 2016, the Chief of the Recreation and Natural Resources Branch of the

Corps's Omaha District sent a memorandum to the Commander and District Engineer of the

Omaha District with the relevant approvals for Dakota Access's right-of-way under the federal

land at Lake Oahe. AR 71181. The memorandum stated that the Corps's technical reviewers did

not believe that granting the right-of-way would be injurious to the public interest, nor would it

impair the usefulness of work built by the United States. AR 71181.

A few days later, the Omaha District's coordinator for Section 408 right-of-way requests,

Brent Cossette, concurred that Dakota Access's requested right-of-way met all legal and policy

requirements. AR 71184–85. Cossette also concluded that Dakota Access's application did not

fall within any of the categories that might trigger the need for a higher-ranking official to

approve the right-of-way; it could be granted by the Commander and District Engineer of the

Omaha District. AR 71185.

On July 25, 2016, the Commander and District Engineer of the Omaha District, Colonel

John W. Henderson, completed the Corps's NEPA review by signing a Finding of No Significant

Impact document, which accompanied the Corps's final Environmental Assessment. *See*

AR 71220 *et seq.*; AR 71174 *et seq.* In addition to his delegated authority under the RHA and

MLA, Colonel Henderson has delegated authority to conduct and approve reviews under NEPA.
33 C.F.R. § 230.5.

The Finding of No Significant Impact document repeatedly treats permission to cross the
federal land at Lake Oahe and at Lake Sakakawea as a single approval process with a single
outcome.  For example, it states that the Environmental Assessment was prepared to evaluate the
potential effects of a decision by the Omaha District "granting permission under Section [408]"
to "allow the proposed Dakota Access Pipeline (DAPL) Project to cross *federal real property
interests* administered by the District."  AR 71174 (emphasis added).  It noted that the pipeline
"would cross federal flowage easements near the upper end of Lake Sakakawea, . . . and
federally-owned property at Lake Oahe," and that the Corps's purpose was to determine whether
to "grant permission for Dakota Access to place the pipeline on federal real property interests" at
"the Garrison Dam/Lake Sakakawea and Oahe Dam/Lake."  AR 71174.  The Finding of No
Significant Impact document also set forth various "Conditions of Easement (Lake Oahe
crossing)," AR 71176–78, and included several "conditions" that "will be placed on real estate
outgrants."  AR 71176*.*  In other words, the Finding of No Significant Impact decision was
reached after the Corps identified and adopted conditions for a right-of-way to cross federal
lands at both river crossings.

The Finding of No Significant Impact document further stated that, with these conditions
in place, the pipeline "will not impair the usefulness of the federal projects."  AR 71179.  It
concluded with a statement by Colonel Henderson that he had "evaluated the anticipated
environmental, economic, cultural, and social effects, and any cumulative effects of the Proposed
Action"—*i.e.*, the Lake Oahe and Lake Sakakawea crossings—"and determined that the
Proposed Action is not injurious to the public interest and will not impair the usefulness of the

federal projects." AR 71179.  His statement concluded that an Environmental Impact Statement

was not needed:

> Moreover, for the reasons stated herein and discussed in greater detail in the
> Environmental Assessment, the District granting the referenced Section 408
> permissions does not constitute a major federal action that would significantly
> affect the quality of the human environment.  *As a result, I have determined that
> preparation of an Environmental Impact Statement is not required.  This conclusion
> and the processes and documents supporting it are in compliance with all
> applicable laws, executive orders, regulations and guidelines*.

*Id.* (emphasis added).

Likewise, the final Environmental Assessment states that the Corps evaluated the effects

of allowing Dakota Access "to place a portion of the Dakota Access Pipeline Project (DAPL

Project) *on federal real property interests* acquired and managed for the Garrison Dam/Lake

Sakakawea and Oahe Dam/Lake Oahe Projects in North Dakota," AR 71225 (emphasis added),

as well as the impact of the "construction and/or operations of" such placement.  AR 71228.  The

Assessment's analysis accordingly focused on determining whether to allow rights-of-way at

Lake Sakakawea and Lake Oahe:  "[T]he analysis is limited to the effects of allowing the

pipeline to *cross* federal flowage easements near Lake Sakakawea and *federally owned lands* at

Lake Oahe in North Dakota, to determine whether the placement of the pipeline on federal real

property interests is injurious to the public interest or will impair the usefulness of the federal

projects." AR 71225 (emphases added).  As part of that assessment, the Corps carefully

considered the possibility of a route that would cross approximately 10 miles north of Bismarck.

AR 71232.  Based in part on computer modeling of relative risks, AR 71231, the Corps

concluded that "the data substantiates eliminating this route as a viable alternative." AR 71232

(noting, among other things, the need to add approximately 11 miles to the pipeline length, its

"proximity to and/or crossing multiple conservation easements, habitat management areas,

National Wildlife Refuges, state trust lands, waterfowl production areas, and private tribal

lands," the crossing through and close proximity to "wellhead source water protection areas,"

and other safety and regulatory constraints on the route).

### D. Corps Documents Reiterate The Grant Of A Right-Of-Way To Construct, Operate, And Maintain A Pipeline Crossing At Lake Oahe.

On August 16, 2016, Thomas Tracey, District Counsel to the Omaha District, sent an e-

mail to counsel for Dakota Access attaching the paperwork for the Lake Oahe right-of-way,

writing: "Here is the Section 408 permission package for the Oahe crossing. . . . I will note that

this document has not been released to the public, through posting on our external website, so I

would ask that you maintain this document in a close-hold nature." Ex. H, at 2. Included in the

paperwork was a Section 408 decision bearing Colonel Henderson's approval signature, dated

July 25, 2016, with the subject line: "Dakota Access Pipeline Project, Garrison Project (Consent

Flowage Easements), Oahe Project (Easement)." AR 71182. The document approved a

memorandum stating that Dakota Access sought authorization to "cross under the Missouri River

(Lake Sakakawea) . . . and cros[s] under Lake Oahe," and that "technical reviewers have

reviewed and have determined the request to not be injurious to the public interest and not impair

the usefulness of work built by the United States." AR 71181. Accompanying this permission

document was a record of the determination that "a Section 408 decision may be rendered by the

District Commander" without a "final decision by the Director of Civil Works at HQUSACE"

because all seven questions relevant to the potential need for a higher approval level were

answered in the negative. AR 71185. More than a dozen signatures from Corps personnel

appear in the approval package. AR 71183.

Just a few days after Colonel Henderson's approval for the crossings at Lake Sakakawea

and Lake Oahe, the Corps issued documentation reiterating the approval of construction at Lake

Sakakawea. The Corps did so without making, or needing to make, any additional findings or

other determinations.  That document, which Noel signed and delivered on August 2, 2016,

stated that Dakota Access may construct, operate, and maintain the pipeline at Lake Sakakawea.

Ex. I (D.E. 62-4), at 4.  Moreover, the easement conditions for Lake Sakakawea were expressly

based on Dakota Access already having a right-of-way to run the pipeline under Corps-owned

lands at Lake Oahe.  For example, the conditions require that Dakota Access conduct training

exercises (a form of testing) on an alternating basis between Lake Oahe and Lake Sakakawea

during triennial cycles.  *Id*. at 6.

The Corps has also confirmed internally that the Section 408 permission package for

Lake Oahe is a right-of-way authorization.  In a November 7, 2016 document distributed to all

Corps personnel, the Corps stated that the July 25, 2016 Section 408 permission "provided an

easement to cross federal property administered by [the Corps] for flood control & navigation at

Lake Oahe, ND."  *See* Ex. B, at 3.  The Corps's approval decisions for the Dakota Access

pipeline, including its July 25, 2016 Finding of No Significant Impact document, were widely

reported in the media, and both the President and members of both the House Committee on

Natural Resources and the Senate Committee on Energy and Natural Resources have publicly

commented on the project since that date.[3]

---

[3]  *See*, *e.g.*, Madison Park, *5 Things to Know about the Dakota Access Pipeline*, CNN, Aug. 31, 2016, http://www.cnn.com/2016/08/31/us/dakota-access-pipeline-explainer/ (reporting that "[t]he US Army Corps of Engineers approved the [DAPL] project, granting final permits in July"); Rebecca Hersher, *Obama: Army Corps Examining Possible Rerouting of Dakota Access Pipeline*, NPR, Nov. 2, 2016, http://www.npr.org/sections/thetwo-way/2016/11/02/500363689/obama-army-corps-examining-possible-rerouting-of-dakota-access-pipeline; Ex. P (Letter from Bernard Sanders, Senator and Energy and Natural Resources Committee Member, to President Barack Obama (Oct. 28, 2016)); Press Release, Nat. Res. Comm. Democrats Ranking Member Raúl M. Grijalva, Grijalva 'Disappointed' by Court Ruling on DAPL; Calls on Dakota Access to Voluntarily Halt Construction Until Corps of Engineers Concludes Ongoing Review (Oct. 11, 2016), https://democrats-naturalresources.house.gov/media/press-releases/grijalva-disappointed-by-court-ruling-on-dapl-calls-on-dakota-access-to-voluntarily-halt-construction-until-corps-of-engineers-concludes-

**E.      The Government Attempts To Block Pipeline Construction By Purporting To Withhold Authorization Already Granted.**

On July 27, 2016, two days after Colonel Henderson signed the paperwork giving Dakota Access a right-of-way to construct, operate, and maintain the pipeline at Lake Oahe, *see, e.g.*, AR 71182, the Standing Rock Sioux Tribe filed suit in this Court seeking declaratory and injunctive relief against the Corps. *See* D.E. 1. The Standing Rock Sioux Tribe moved for a preliminary injunction on August 4, 2016, *see* D.E. 5, and the Court denied the motion on September 9, 2016. *See* D.E. 39.

Almost immediately after the Court denied the motion for preliminary injunction, the Department of Justice, the Department of the Army, and the Department of the Interior issued a joint statement (the "September 9 Joint Statement"), in which they said that "[t]he Army will not authorize constructing the Dakota Access pipeline on Corps land bordering or under Lake Oahe until it can determine whether it will need to reconsider any of its previous decisions regarding the Lake Oahe site under the National Environmental Policy Act (NEPA) or other federal laws." Ex. Q (D.E. 42-1). The government did not identify the particular decisions that it was determining whether to reconsider, or what parts of any decisions were open to the possibility of being reconsidered. Nor did the government say how the earlier decisions could possibly be separate and distinct from the question whether to allow the pipeline to cross federal lands at Lake Oahe. The government instead simply asked the company to "voluntarily pause all construction activity within 20 miles east or west of Lake Oahe." *Id.*

At a status hearing on September 16, 2016, the Court questioned whether counsel for the Corps complied with its "duty of candor to the tribunal, when [it] knew, and apparently had

---

ongoing-review; Press Release, House Comm. on Nat. Res., Bishop: Obama Administration Is Exploiting Native Americans to Advance Their Extreme Environmental Agenda (Sept. 23, 2016), http://naturalresources.house.gov/newsroom/documentsingle.aspx?DocumentID=401256.

known for some time . . . that" the government "would reverse [its] opinion."  Ex. J (D.E. 49), at

5–6.  Government counsel stated that the right-of-way was being held up pending potential

reconsideration of the Corps's prior decisions under NEPA and the National Historic

Preservation Act.  *Id.* at 9.  He added that the change in course was driven by "conversations and

considerations" between the Department of Justice, the Department of the Interior, and the

Department of the Army.  *Id.* at 11.  Government counsel emphasized that these discussions

occurred at high levels:

> I will tell you honestly that while I was not personally involved in those
> conversations, they were happening at a level higher than I was involved, those
> conversations were literally on an ongoing basis, including the content, what would
> be said, conversations from agency to agency about what we could and could not
> do appropriately given the situation and the ongoing litigation.

*Id.* at 12.

On October 10, 2016—in another joint statement by the Department of the Army, the

Department of Justice, and the Department of the Interior (the "October 10 Joint Statement")—

the government announced that it was continuing to analyze the authorizations at issue here, and

that it "hope[d] to conclude its ongoing review soon."  Ex. R.  The October 10 Joint Statement

maintained that, until this review was complete, the Corps was withholding authorization that the

Corps believed Dakota Access still needed before it could cross federal land at Lake Oahe.  *Id.*

The following day, the Corps filed its Answer to the Complaint in this case.  The Corps

repeatedly denied that any of its decisions were contrary to law, including all those related to

environmental issues.  *See, e.g.*, D.E. 47, at ¶¶ 1–3 (denying it violated any statute or regulation

at issue); *id.* at ¶¶ 133, 146, 153, 177 (denying violations of National Historic Preservation Act);

*id.* at ¶¶ 179, 182, 188, 193 (denying violations of NEPA); *id.* at ¶¶ 198, 202, 206, 210, 212

(denying violations of CWA and RHA).

On November 14, 2016, the Corps filed in this Court a letter from the Army to the Standing Rock Sioux Tribe, Dakota Access, and Dakota Access's parent company stating that the Army had "completed [its] review, accounting for information it has received from the Tribes and the pipeline company since September, and has concluded that its previous decisions comported with legal requirements." Ex. A, at 1; *see also* Ex. K (D.E. 56-2), at 1 (joint statement by Department of the Army and Department of the Interior advising that the Army "has completed the review that it launched on September 9, 2016"). Nonetheless, the Army stated that "additional discussion with the Standing Rock Sioux Tribe and analysis are warranted." Ex. A, at 2; *see also* Ex. K, at 1. The Army's letter accordingly invited the Standing Rock Sioux Tribe—but not Dakota Access—"to engage in discussion" regarding "[p]otential conditions in an easement for the pipeline crossing." Ex. A, at 2. The Corps stated that this new discussion would "be completed expeditiously," *id.*—the same representation it made more than two months earlier when stating how long it would take to complete *the entire* process of delivering an easement document. And like the September and October Joint Statements, the November 14 letter and its accompanying joint statement made no effort to reconcile the Corps's July 25 documents with its purported withholding of authorization for Dakota Access to build beneath federal land at Lake Oahe.

Meanwhile, this Court authorized the Cheyenne River Sioux Tribe, an Intervenor, to lodge its own complaint on October 19, 2016. *See* D.E. 48. On November 15, 2016, Dakota Access timely filed its answer to the Cheyenne River Sioux Tribe's complaint. *See* D.E. 57. That pleading includes Dakota Access's cross-claim against the Corps—the request for declaratory relief that is the subject of this motion.

The Corps reached out to the Standing Rock Sioux Tribe for the consultations the Army offered in its November 14 letter.  The Tribe's response, much like the response that doomed its NHPA challenge, was a refusal to engage in the very discussion that the Corps offered.  In the memorandum filed with this Court, the Corps states that on November 23 the Tribe's Chairman said he was "willing to engage in discussions" with the Corps, Ex. S, at ¶ 9, but the memorandum leaves out the fact that when the Corps sat down with the Tribe a week earlier—just three days after the November 14 letter—the Tribe's Chairman said he "had no desire to further discuss opportunities to address pipeline safety concerns" and that "the only acceptable solution was to relocate the pipeline," Ex. F.

Despite the Tribe's continued intransigence, the Army announced on December 4 that its supposedly expeditious process was about to enter yet another phase of "additional analysis," also described as "more heighted [sic] analysis" with "more rigorous exploration and evaluation."  Ex. S, at ¶ 12.  In particular, the Army proposed that the Corps engage in a robust consideration and discussion of alternative locations for the pipeline to cross the Missouri River.  The Army added that this consideration of alternative locations is "best accomplished," in the judgment of the Assistant Secretary of Army for Civil Works, "by preparing an Environmental Impact Statement (EIS)."  *Id.*  Nowhere does the announcement detail any newly available information—*i.e.*, information that could not have been furnished before July 25, 2016—or anything at all that the Corps did not previously consider.  In fact, every consideration offered in support of this added analysis was already well known to all.  *Id.* at ¶ 15 (citing, as grounds for additional analysis, "the involvement of historic tribal homelands, the close proximity to reservation lands that extend into the potentially affected waters, and the potential impacts on treaty hunting and fishing rights").  That explains why the Assistant Secretary reiterated, for the

sake of being "clear," the Army's position that "the Corps' prior reviews and actions have

comported with legal requirements." *Id*. Those actions included the conclusion that an

Environmental Assessment satisfied the requirements for permission to cross the federal lands at

Lake Oahe. Rather than identify a lawful basis for revisiting final agency action, the Corps

invokes a new and unarticulated "policy," specially crafted for "these circumstances," in which

previous decisions are upended on the ground that something more "can be done." *Id.* Members

of the public (including Dakota Access) received no notice of this policy; its contours are

wrapped in mystery; and the Army does not give a hint as to when another person or entity can

anticipate that it—or other policies like it—will upend decisions that the Corps has already

reached in full compliance with the law.[4]

**JURISDICTION**

To establish jurisdiction in a declaratory-judgment action, "a plaintiff must demonstrate

that 'there is a substantial controversy, between parties having adverse legal interests, of

sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *United*

*Gov't Sec. Officers of Am. v. Chertoff*, 587 F. Supp. 2d 209, 222 (D.D.C. 2008) (quoting *Atlas*

*Air, Inc. v. Air Line Pilots Ass'n, Int'l*, 69 F. Supp. 2d 155, 162 (D.D.C. 1999)); *see also* 28

U.S.C. § 2201. When a plaintiff seeks a declaratory judgment in anticipation of threatened

---

[4] Also pending before the Court are a motion to supplement the administrative record, D.E. 58, and a motion to expedite briefing on summary judgment, D.E. 59. Dakota Access is confident that the records at issue in the first motion would further support summary judgment. For example, upon information and belief, a memorandum by Colonel Henderson dated December 2, 2016—*i.e.*, after the last meeting mentioned in Ex. S—recommended delivering the easement to Dakota Access. Due to the urgency of the cross-claim, however, Dakota Access asks the Court to proceed with summary judgment briefing while ordering the Corps to supplement the record in the meantime. Dakota Access is also prepared to argue in favor of summary judgment at the December 9 status conference and asks the Court to entertain such argument given the highly unusual circumstances.

action and invokes federal question jurisdiction, the Court "ask[s] whether 'a coercive action' brought by 'the declaratory judgment defendant . . . would necessarily present a federal question.'" *Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 134 S. Ct. 843, 848 (2014) (citations omitted). This Court's jurisdiction is secure, because a coercive action brought by the Corps would present a federal question within the meaning of 28 U.S.C. § 1331. *See, e.g.*, 30 U.S.C. § 195(a)(1) (specifying conduct that violates the Mineral Leasing Act), (c) (authorizing civil actions in district court for violations). The federal government has waived its sovereign immunity for this action "'seeking relief other than money damages.'" *Trudeau v. FTC*, 456 F.3d 178, 185 (D.C. Cir. 2006) (quoting 5 U.S.C. § 702).

## STANDARD OF REVIEW

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

## ARGUMENT

Since 2014, Dakota Access has worked with the Corps, other federal and state agencies, and every willing tribe and other interested third party to help ensure that pipeline construction at Lake Oahe and elsewhere complies with the law, respects historic sites, and is conducted in an environmentally safe manner. When this Court denied preliminary injunctive relief to the Standing Rock Sioux Tribe, it concluded based on the available record that this consultation likely complied with the National Historic Preservation Act. *See* D.E. 39. Dakota Access's planning efforts also successfully avoided significant environmental effects, as the Corps's Finding of No Significant Impact document confirms. Dakota Access likewise obtained a "verification" from the Corps that pipeline construction falls within a nationwide permit under

the Clean Water Act.  And it has demonstrated to the Corps's satisfaction that the pipeline is in the public interest and will not impair the usefulness of the federal projects at Lake Oahe.

The issue in dispute is the legal effect of the Corps's decisions, particularly those in the July 25 Finding of No Significant Impact and RHA § 408 decisional documents.  The Corps—bowing to political pressure and the lawless acts of numerous protestors—claims that its July 25 grant of "permission for Dakota Access to place the pipeline on federal real property interests acquired and managed by USACE for the Garrison Dam/Lake Sakakawea and Oahe Dam/Lake Oahe projects," AR 71174, is something other than a right-of-way to place the pipeline on those same federal real property interests.

The Corps is wrong.  Dakota Access *and* the Corps have done everything needed for Dakota Access to have a right-of-way to construct a pipeline crossing those federal lands.  On July 25, 2016 the Corps granted Dakota Access permission to build the pipeline beneath federal land at Lake Oahe after finding that the pipeline satisfies all requirements for a right-of-way, including that the project is consistent with the public interest.  In no case, including this one, has the Corps suggested that "public interest" means different things under the RHA and the MLA.  Moreover, the Corps itself conducted a unitary approval process resulting in a single decision approving the crossing of federal land.  It comes as no surprise, then, that the Corps's own internal documents state that the Corps approved an easement on July 25, 2016.

The Corps's insistence that Dakota Access needs yet one more piece of paper—a *separate* document bearing the title of "easement"—simply cannot be reconciled with the text of the MLA, the Corps's process for approving the crossing at Lake Oahe, the decisions resulting from that process that the Corps has successfully defended in court, the Corps's public and private statements, or the Corps's prior practices.  This Court should declare that the permission

the Corps has already granted to Dakota Access authorizes the company to construct, operate, and maintain a pipeline on federal land at Lake Oahe.

**I.    The Corps Has Granted Dakota Access A Right-Of-Way Under The Mineral Leasing Act To Cross Federal Lands At Lake Oahe.**

Section 185 of the MLA authorizes private parties to obtain "[r]ights-of-way" to use federal lands "for pipeline purposes."  30 U.S.C. § 185(a).  Here, the Corps granted "permission for Dakota Access to place the pipeline on federal real property interests acquired and managed by" the Corps for the "Oahe Dam/Lake Oahe project[]," AR 71174, after concluding that the pipeline would neither injure the public interest nor impair the usefulness of that project, AR 71179.  That is all the law requires for granting a right-of-way, and the Corps's own actions and statements confirm that this is precisely what the Corps did.

**A.    The Corps Has Made Every Finding, Determination, And Decision For The Grant Of A Right-Of-Way.**

Two federal statutes—RHA § 408 and MLA § 185—apply to pipelines like this one that cross federal land administered by the Corps.  Those statutes merge when it comes to the requirements for approving such crossings, because each turns on whether the pipeline is consistent with the public interest and will not interfere with federal projects.  Thus, when the Corps concluded that Dakota Access satisfied those requirements under RHA § 408, it simultaneously concluded that all requirements relevant to MLA § 185 are also satisfied.

Section 408 governs "permission for the alteration or permanent occupation or use" of "public works" managed by the Corps.  33 U.S.C. § 408.  The reach of the MLA is narrower than Section 408 in one sense, and broader in another.  It is narrower in that it is limited to pipelines, while Section 408 covers any activity that occupies or uses a public work managed by the Corps. The MLA is broader in that it covers pipelines crossing "through any Federal lands," 30 U.S.C. § 185(a), not just lands administered by the Corps.  Because the Dakota Access pipeline crosses

federal land administered by the Corps, both statutes come into play.  Put another way, the differences in the *reach* of the two statutes is immaterial to this case.

As to the test for whether a project is approved under either statute, the two statutes are identical.  RHA § 408 states that the Secretary of the Army may grant permission to permanently occupy a public work "when in the judgment of the Secretary such occupation or use will not be injurious to the public interest and will not impair the usefulness of such work."  33 U.S.C. § 408.  A right-of-way under the MLA is governed by the same test.  Under the relevant Army regulation, use of Army-controlled real property for non-Army use is allowed if "in the public interest" and "compatible with the installation/project mission."  Army Reg. 405-80 ¶ 4-1(c); *see also* 30 U.S.C. § 185(f) (authorizing agencies to grant rights-of-way for pipeline purposes "subject to regulations promulgated in accord with the provisions of this section").

The Corps has applied these indistinguishable tests to the Dakota Access pipeline and concluded multiple times that the crossing of federal land at Lake Oahe is authorized.  On June 10, 2016, the Corps sent a memorandum to Colonel Henderson "recommend[ing] for approval" Dakota Access's request to build a pipeline crossing at Lake Oahe, explaining that the request had "been determined to not be injurious to the public interest."  AR 71181.  On July 25, 2016, Colonel Henderson signed the "Section 408 Decision Document," formally "approv[ing]" the permissions recommended in the June 10 memorandum.  AR 71182.  In the Finding of No Significant Impact document, also dated July 25, 2016, Colonel Henderson reiterated that the pipeline crossing of federal real property at the Lake Oahe Dam "is not injurious to the public interest and will not impair the usefulness of the federal projects."  AR 71179.  In reaching that conclusion, he expressly "determined that preparation of an Environmental Impact Statement is

not required" and certified that his "conclusion and the processes and documents supporting it are in compliance with all applicable laws, executive orders, regulations and guidelines." *Id.*

That is all the law requires for a right-of-way to cross the same land with the same pipeline project. A right-of-way is commonly defined as a right of passage over another person's land. *Wilderness Soc'y v. Morton*, 479 F.2d 842, 853 (D.C. Cir. 1973) (interpreting the meaning of "right-of-way" in Section 185). A right-of-way is thus "nothing more than a special and limited right of use." *Id.* at 854 (citation omitted). The Corps's July 25 decisions granted Dakota Access a right-of-way by allowing it to make special use of federal government property: use for the construction, operation, and maintenance of an oil pipeline. Those documents expressly state that Dakota Access will use the authorization to alter and use Corps-owned lands. *See* AR 71181 (recommending approval of "proposal for modification and alteration of" Corps-controlled property); 33 U.S.C. § 408 (authorizing the granting of "permission for the alteration or permanent occupation or use of . . . public works"). Because the MLA has no additional requirements, it would not be possible for the Corps to conclude that the pipeline fails "right-of-way" requirements after having conclusively determined that the pipeline satisfies the identical Section 408 requirement for the same activity beneath the same federal land. To construe the same words—"public interest"—to allow different outcomes would contravene the well settled rule that, "[w]hen possible, statutes should be interpreted to avoid untenable distinctions, unreasonable results, or unjust or absurd consequences." *Kaseman v. District of Columbia*, 444 F.3d 637, 642 (D.C. Cir. 2006) (internal quotation marks and citation omitted).

The Corps has already given Dakota Access permission to "alte[r]," "permanent[ly] occup[y]," and "use" Corps-controlled property for pipeline purposes. 33 U.S.C. § 408. That decision therefore *is* the grant of a right-of-way.

**B.      The Corps Has Consistently Treated The Approval Of The Pipeline's Crossing Of Federal Land As A Single Process With A Single Outcome.**

Not only would it be impossible for the Corps to reach different conclusions for permission to cross federal land (under the RHA) and a right-of-way to cross the same land (under the MLA), the Corps itself has recognized as much by treating them as one and the same decision.  Ever since Dakota Access initiated the Lake Oahe application process more than two years ago, the Corps has time and again made clear that it was reaching a single conclusion in applying RHA § 408 and MLA § 185, and that it would reach that conclusion at the end of a single process.  In both its Environmental Assessment and its Finding of No Significant Impact document, for example, the Corps expressly stated that the permission it was granting would "allow the proposed Dakota Access Pipeline (DAPL) Project to cross federal real property interests administered by the District."  AR 71174; *see also* AR 71225 *et seq*.  The June 7, 2016 email from the Chief of the Civil Branch of the Omaha District's Real Estate Division confirmed this by informing Dakota Access that the Corps "may have a decision on the [Environmental Assessment]/Section 408 in the near future" and adding:  "In anticipation of that occurring, I am finalizing the easement."  Ex. G, at 3.

The Corps's statements and actions for the Lake Sakakawea crossing further reinforce that conclusion.  As noted above, the Corps combined the approvals for the two Missouri River crossings (Lake Sakakawea and Lake Oahe) into a single process with identical and undifferentiated conclusions based on a single comprehensive analysis.  *See*, *e.g.*, AR 71174, 71180.  A week after deciding that these crossings were consistent with the public interest and not harmful to federal property, the Corps delivered the easement document for Lake Sakakawea.  The record shows that the Corps conducted no further analysis and made no further determinations before delivering that document.  The reason is simple:  No other analysis or

determination was needed.  If the grant of a right-of-way was a separate decision requiring

something additional, the delivery of the Lake Sakakawea easement document would have

documented it.

The *content* of the easement document for Lake Sakakawea also shows that the right-of-

way for Lake Oahe had already been granted.  That document includes conditions that Dakota

Access can satisfy only through the construction, operation and testing of the pipeline at Lake

Oahe.  Ex. I, at 4.  These Lake-Oahe-specific conditions to the Lake Sakakawea easement were

not couched in the if/then language used for events that have yet to take place (*e.g.*, "if an

easement is approved for Lake Oahe, then Dakota Access shall engage in alternating tests").  The

Corps plainly recognized that no further analyses, determinations or decisions were needed for

Dakota Access to have a right-of-way for Lake Oahe.  While the Corps planned to deliver a

written easement for Lake Oahe and collect payment for the right-of-way, the authorization for

that right-of-way was complete.

This Court need not rely on inference to conclude that the Corps gave Dakota Access a

right-of-way on July 25, 2016.  The Corps itself has said just that.  In a November 7, 2016

document that the Corps distributed internally to all of its personnel, the Corps stated that the

Section 408 permission "provided an easement to cross federal property administered by [the

Corps] for flood control & navigation at Lake Oahe, ND."  *See* Ex. B, at 3.  An easement—the

very document that the Corps claims is needed for a right-of-way—clearly satisfies the MLA's

requirement that private parties obtain a "[r]ight[]-of-way" before using federal lands "for

pipeline purposes."  30 U.S.C. § 185(a).  *See* Black's Law Dictionary 622 (10th ed. 2014)

(defining "easement" as an interest in land "consisting in the right to use or control the land, or

an area above or below it, for a specific limited purpose"); 10 U.S.C. § 2668 (giving each

military department Secretary power to grant "easements for rights-of-way over, in, and upon public lands permanently withdrawn or reserved for the use of that department" if the Secretary "finds that it will not be against the public interest").

All of this explains why the legal issue created by the Corps's unusual conduct here has *never* come up before.  Dakota Access has challenged the government to identify a single instance in which the Corps has refused to recognize a right-of-way to cross Corps-administered land after the Corps issued documentation like that issued to Dakota Access on July 25, 2016. Never before has the Corps treated the physical delivery of an easement document as anything but a ministerial act that has no independent legal significance on the issue of authorization to cross federal land.

The Corps's own processes, actions, and statements in this case and others before it thus contradict its position that it has yet to give Dakota Access a right-of-way to cross federal land at Lake Oahe.

### C.       Every Condition For A Right-Of-Way Under The MLA Has Been Satisfied.

The "public interest" requirement is the substantive standard by which the Corps determines whether to grant rights-of-way for the crossing of federal land.  Section 185 also contains certain other "provisions, limitations, and conditions." 30 U.S.C. § 185(q).  Neither of the two relevant here alters the conclusion that the Corps has already granted a right-of-way.

First, Section 185(w) directs agency heads to notify two congressional committees when it receives applications for rights-of-way for pipelines of 24 inches or more in diameter.  The existence of that notice is not in dispute.  The same provision also requires notice when the Corps grants the right-of-way.  That condition, too, is satisfied.  The Corps's July 25, 2016 authorization allowing the pipeline to cross federal real property at Lake Oahe has been widely publicized and reported; even the President himself and members of the relevant committees

25

have commented on it.  *See supra* note 3.  Moreover, any added notice, if appropriate, can be accomplished by delivery of the declaratory judgment itself to the relevant committees, and the Corps is free to supplement that as it sees fit.[5]

Second, Section 185(*l*) requires Dakota Access to reimburse the Corps for the "costs incurred in processing the [right-of-way] application … as determined by the Secretary or agency head."  30 U.S.C. § 185(*l*).  Dakota Access stands ready to make prompt payment of the appropriate amount as soon as the Corps "determine[s]" it.  But nothing in this reimbursement provision purports to suspend the validity of a right-of-way or require that reimbursement take place *before* a right-of-way can be issued.

One thing the MLA does *not* require is the issuance of a particular form of document, such as an easement.  Section 185 governs "[r]ights-of-way."  It does not use the word "easement," nor does it even require that the grant of a right-of-way identify the MLA as the relevant statutory authority.  The provision simply refers to rights-of-way or permits.  *See* 30 U.S.C. § 185(c)(1); *see also Sierra Club v. U.S. Forest Serv.*, 828 F.3d 402, 404 (6th Cir. 2016) (noting that the U.S. Forest Service issued a "special use permit" pursuant to Section 185(a) to construct and operate an oil pipeline); *Wilderness Soc'y*, 479 F.2d at 854 (finding that a Bureau of Land Management "special land use permit" for construction of a pipeline fell under the terms of Section 185).  Courts have recognized in numerous legal contexts that the substance of the document, not its title, is dispositive.  *See, e.g., Water Transp. Ass'n v. ICC*, 684 F.2d 81, 84 (D.C. Cir. 1982) ("We have held that the substance of the notice [required by the Administrative

---

[5]  The limited notice specified in Section 185(w) contrasts with the more substantial "notice and wait" requirements for a "lease, license, or easement of real property owned by the United States" where—unlike here—"the estimated annual fair market value of the property is more than $750,000."  10 U.S.C. § 2662(a)(1)(C).

Procedure Act], not its title, determines its adequacy.").  The Corps's decision on July 25, 2016, in a document titled "Dakota Access Pipeline Project, Garrison Project (Consent Flowage Easements), Oahe Project (Easement)," to give approval after determining the easement request will "not be injurious to the public interest" and will "not impair the usefulness of work built by the United States," AR 71181, satisfies the requirements for granting a right-of-way.

> ### D.   The Government Cannot Justify Its Conduct By Characterizing It As A Reopening Of Final Agency Action.

The Corps cannot defend its new announcement under the pretext that further review would be good "policy."  Ex. S, at ¶ 15.  The Corps made a final decision under NEPA in July. Its July 25, 2016 Finding of No Significant Impact completed the NEPA process.  *Wildlands v. U.S. Forest Serv.*, 791 F. Supp. 2d 979, 983 (D. Or. 2011).  "The issuance of" a finding of no significant impact "marks the completion of the NEPA process unless the agency makes substantial changes in the proposed action relevant to environmental concerns, or significant new information arises that will affect the quality of the environment 'in a significant manner or to a significant extent not already considered.'"  *Id.* (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 374 (1989)); *Hammond v. Norto*n, 370 F. Supp. 2d 226, 254-56 (D.D.C. 2005).  There is no dispute that the proposed action remains the same.  And the new memorandum by the Corps, Ex. S, does not even purport to be a reconsideration of final agency action, which explains why the Corps does not try to identify the type of "significant new information" that would be needed to undo final action.  The agency has made a final decision; it has defended the legality of that decision; and now it wants to undo it by adopting and implementing a new policy, engineered specifically for this case, only with no notice and no explanation of the underlying bases for the policy.  Nothing in the new memorandum identifies a lawful basis for the Corps do to so, because none exists.

As a threshold matter, the Corps cannot invoke a reconsideration process because it continues to defend all of its decisions as lawfully reached.  That is the end of the matter.  The Corps has not purported to initiate a proceeding to reopen the permissions that it granted, even viewing those permissions in the narrow way the Corps does.  Rather than confront the requirements that could not be met for APA proceedings, the Corps has proceeded by press statement to announce new positions while defending its actions as final in court.  The Corps cannot have it both ways without seriously impairing Dakota Access's rights.

Even if the Corps had followed the correct process, it must point to significant new information that paints a "seriously different picture of the likely environmental harms stemming from the proposed action," *AquAlliance v. U.S. Bureau of Reclamation*, No. 1:14-CV-000945-LJO-BAM, 2014 WL 3401390, at *20 (E.D. Cal. July 11, 2014), and the information must have not been available to the agency when it conducted its initial evaluation.  *Colorado Envtl. Coal. v. Office of Legacy Mgmt.*, 819 F. Supp. 2d 1193, 1217 (D. Colo. 2011), *amended on reconsideration*, No. 08-CV-01624-WJM-MJW, 2012 WL 628547 (D. Colo. Feb. 27, 2012).

By the Corps's own admission, nothing here could satisfy this standard.  The only development between the Army's November 14, 2016 determination that "its previous decisions comported with legal requirements"—which is to say, NEPA—and its December 4, 2016 memorandum is a meeting attended by the Corps, the Tribe, and Dakota Access.  Ex. S, at ¶¶ 8, 10.  But as the Corps's own description of that meeting reveals, no new (or newly available) information was presented; the same parties who had previously contributed to the Corps environmental assessment that ended in July simply discussed measures "that could further reduce the risk of a spill or pipeline rupture."  *Id.* at ¶ 10.  The topic of reducing environmental risks had already been addressed exhaustively in the Environmental Assessment and Finding of

No Significant Impact.  *See* AR 71174 *et seq*.; AR 71220 *et seq*. (Environmental Assessment).

That finding also addressed the very topic that the Corps now proposes to address in its putative

EIS:  the Corps and Dakota Access's consultation with the SRST and other tribal governments

and a review of alternative routings and alignments, *including* the north-of-Bismarck alternative.

AR. 71175, 71232.  Hence there is nothing new in the December 4, 2016 memorandum—let

alone anything significant—to warrant an EIS.[6]

Even if the Corps could point to anything new, it would fall far short of the more

substantial justification that is required when "its new policy rests upon factual findings that

contradict those which underlay its prior policy; or when its prior policy has engendered serious

reliance interests that must be taken into account."  *Perez v. Mortgage Bankers Ass'n*, 135 S.Ct.

1199, 1209 (2015) (quoting *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009));

*see id.* ("It would be arbitrary and capricious to ignore such matters.").  Dakota Access's reliance

interests are highly significant as explained in detail in the two pending motions.  D.E. 58, 59.

---

[6] To the extent the Army proposes to embark on a broad consideration of the effects of alternative routes, the Supreme Court has explained that an activity does not fall within NEPA review if the federal agency lacks jurisdiction over the activity being examined:

> [W]here an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant "cause" of the effect. Hence, under NEPA and the implementing [Council of Environmental Quality] regulations, the agency need not consider these effects in its EA when determining whether its action is a "major Federal action."

*Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 770 (2004).  This Court has already held, at the urging of the Corps, that the Corps's CWA and RHA jurisdiction is limited to "construction activity in the federally regulated waterways – the direct effect of the undertaking – and in uplands around the federally regulated waterways – the indirect effect of the undertaking."  D.E. 39 at 45-46.; D.E. 21 at 31 ("Significantly, the Corps need not assess the environmental impacts of an entire pipeline under NEPA when it only permits a small portion of the pipeline.").  Construction outside the Corps's limited jurisdiction therefore cannot be the basis for NEPA review.

The Corps's new policy has already caused significant financial loss that continues to mount, as described further in Argument II.

The Corps believes it can conduct an EIS after reaching, announcing, and defending in court a final decision.  It bases this belief on nothing but the fact that "a more robust analysis" "can be done."  Ex. S, at ¶ 15.  This is nothing more than a thinly-veiled, procedurally improper revocation of Dakota Access's right-of-way.  As explained above, the Corps made every legal determination necessary for a right-of-way, including the Finding of No Significant Impact under NEPA.  That includes a thorough consideration and rejection of the sole alternative mentioned in the new memorandum, as well as every other alternative that has been raised.  AR 71229–37 (Environmental Assessment).  An agency could always look back on a lawful decision and reason that more "can be done."  That is especially true where, as here, the party unhappy with the result of the process intentionally declined to take part.  Nothing authorizes the Corps to invoke good policy after the process is complete, especially where the Corps agrees that every legal requirement was satisfied in reaching an earlier final decision.

By purporting to revisit the Corps's final decision—which the Corps acknowledges fully "comport[s] with legal requirements"—the Corps is attempting to revoke the right-of-way that was already granted.  Ex. S, at ¶ 15.  The MLA sets forth detailed procedures for "termination of [a] right-of-way," none of which the Corps has even remotely purported to comply with.  *See* 30 U.S.C. § 185(o).  There is no suggestion of Dakota Access's "[a]bandonment" of the right-of-way or of "noncompliance" with any MLA provision.  *Id.* § 185(o)(1).  Nor has the Corps given Dakota Access "due notice," "a reasonable opportunity to comply with" the Act, or "an appropriate administrative proceeding" under the APA.  *Id.*  Thus, even assuming new

circumstances could be identified, the Corps has failed to invoke or follow any of the procedures required to revoke the right-of-way.

## II.     Dakota Access Is Entitled To Declaratory Relief.

This Court should exercise its authority to grant the declaratory judgment that Dakota Access seeks.  The government's posturing in this case has put Dakota Access in an untenable position.  If it proceeds with drilling below federal land, it faces the risk of government legal action in federal court.  *See, e.g.*, 30 U.S.C. §§ 195(a), (c).[7]  On the other hand, continued delay in construction will cost Dakota Access tens of millions dollars for every month it exceeds its contractual deadline—not to mention the immeasurable costs that delay imposes on the employees working on the pipeline, *see, e.g.*, Ex. L (Gross Decl., D.E. 22-23), at ¶¶ 6–8, Dakota Access's customers, *see, e.g.*, Ex. M (Poteete Aff., D.E. 22-25), at ¶¶ 9–16, American consumers, *see, e.g.*, Ex. N (Palmer Aff., D.E. 22-31), at ¶ 8, state and local governments, *see, e.g.*, Ex. M, at ¶ 17, and the U.S. energy infrastructure, *see, e.g.*, Ex. O (Eisenberg Decl., D.E. 22-27), at ¶ 9.  These are undeniably real and substantial costs to allowing the Corps to do something it never before has claimed it could do:  indefinitely delay the ministerial step of documenting a right-of-way to placate violent protestors with unwarranted gestures toward "additional discussion" while the lawful holder of the right-of-way suffers serious and mounting injury.

---

[7] The issue is not whether such a coercive action would succeed; the threat of needing to defend against it is sufficient to warrant declaratory relief.  *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007) ("[W]here threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat[.]"); *id.* at 129 ("[T]he declaratory judgment procedure is an alternative to pursuit of the arguably illegal activity[.]" (internal quotation marks and citation omitted)).  Thus, by identifying a potential avenue for the government to bring a coercive action in federal district court, Dakota Access does not waive or forfeit *any* defense to such an action.

Dakota Access has no other remedy at this stage, although the availability of one would be no barrier to granting summary judgment.  *See* Fed. R. Civ. P. 57 ("The existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate."); *Doehler Metal Furniture Co. v. Warren*, 129 F.2d 43, 45 (D.C. Cir. 1942).  Nor does Dakota Access need to show that it stands to suffer irreparable harm.  *See* Fed. R. Civ. P. 57 advisory committee's note to 1937 Adoption ("[D]eclaratory relief is … not exclusive or extraordinary."); *Tierney v. Schweiker*, 718 F.2d 449, 457 (D.C. Cir. 1983) ("Although a party must demonstrate irreparable injury before obtaining injunctive relief, such a showing is not necessary for the issuance of a declaratory judgment.").  The fact that Dakota Access *is* suffering significant irreparable harm as a result of the Corps's unjustified delay, combined with the lack of alternative legal remedies, counsel strongly in favor of the prompt issuance of a declaratory judgment.

The Government's unprecedented actions here are not only contrary to law, they have denied Dakota Access, as well as its shareholders, employees, customers, and contractors, the minimum protections of due process of law.  It is no exaggeration that failure to grant relief threatens permanent damage to our rule of law and our economy.  Dakota Access followed every rule that the government promulgated governing the construction of its pipeline, with an abiding faith that its government would, in turn, operate within the rules too.  Dakota Access had every reason to believe that it satisfied all requirements for construction and operation of its pipeline, based on the rules and private property rights at issue, as well as literally hundreds of interactions with the government along the way.  The Government time and time again reinforced that belief with announcements—as recently as yesterday—that every legal requirement has been met.  Yet

the Corps purports to be able to ignore all of that based on a post-hoc, unarticulated, made-especially-for-this-case policy for which no notice was even given.

Dakota Access and its investors and lenders have expended billions of dollars in reliance on this proper functioning of the rule of law. The Corps responds that Dakota Access willingly assumed a risk. D.E. 61, at 2. True, investing in large, national infrastructure projects entails substantial risk—to businesses, their employees and their investors—but this Court should be loath to endorse the novel view that confidence in the fair application of our Nation's laws, rules, and regulations is an uncertain wager. The ability to rely on the rule of law is indispensable to all investment activity, to all commercial activity, and to all infrastructure projects—whether it be oil pipelines, windmills, or solar farms. Serious investment in *any* kind of infrastructure depends in it.

The issue here is not whether an agency can exercise broad discretion to render a decision with which an applicant disagrees. Nor is the issue whether an agency can change its rules, including changes to reflect new policies, before it reaches a final decision in a particular case. In this case, *the process was already complete* before officials with different policy objectives—persons operating "at a level higher" than those defending the actions of the Corps in this Court, Ex. J, at 12—stepped in as part of an effort to overrule the engineers, scientists, investigators, and permit granters. Whatever one thinks of the legitimacy of the motive—in this case, aiming to appease those who prefer violence to lawful protest or faith in the judicial process—the means used here must be rejected. If the rule of law means anything, an agency cannot grant permission to cross federal land after concluding that the project satisfies all legal requirements and then announce—due to raw political calculations made after the fact—that permission was never granted.

## CONCLUSION

This Court should issue a declaratory judgment holding that the Corps's July 25, 2016 permissions to use federal property at Lake Oahe for a pipeline crossing is a right-of-way within the meaning of 30 U.S.C. § 185(a) that allows Dakota Access to construct, operate, and maintain a pipeline beneath federal land at Lake Oahe, North Dakota, and that the right-of-way is subject to the "Conditions of Easement (Lake Oahe)" set forth in the July 25, 2016 Mitigated Findings of No Significant Impact document.

Dated:  December 5, 2016

Kimberly H. Caine
William J. Leone (*Pro Hac Vice* granted)
Robert D. Comer (*Pro Hac Vice* granted)
NORTON ROSE FULBRIGHT US LLP
799 9th St. N.W., Suite 1000
Washington, D.C. 20001
(202) 662-0200

Edward V. A. Kussy
NOSSAMAN LLP
1666 K Street, N.W., Suite 500
Washington, D.C. 20006
(202) 887-1400

    /s/ William S. Scherman
William S. Scherman
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500
(202) 530-9557 (fax)
wscherman@gibsondunn.com

*Counsel for Defendant–Intervenor–Cross Claimant Dakota Access, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of December, 2016, I electronically filed the

foregoing document with the Clerk of the Court for the U.S. District Court for the District of

Columbia using the CM/ECF system.  Service was accomplished by the CM/ECF system on the

following counsel:

> Patti A. Goldman
> Jan E. Hasselman
> EARTHJUSTICE
> 705 Second Avenue, Suite 203
> Seattle, WA  98104
> (206) 343-7340
> pgoldman@earthjustice.org
> jhasselman@earthjustice.org
>
> *Counsel for Plaintiff Standing Rock Sioux
> Tribe*
>
>
> Nicole E. Ducheneaux,
> FREDERICKS PEEBLES & MORGAN, LLP
> 3610 North 163rd Plaza
> Omaha, NE 68116
> (402) 333-4053
> nducheneaux@ndnlaw.com
>
> Conly J. Schulte
> FREDERICKS PEEBLES & MORGAN, LLP
> 1900 Plaza Drive
> Louisville, CO 80027
> (303) 673-9600
> cshulte@ndnlaw.com
>
> *Counsel for Plaintiff–Intervenor Cheyenne
> River Sioux Tribe*

Matthew M. Marinelli
Erica M. Zilioli
U.S. DEP'T OF JUSTICE
Environment & Natural Resources Division
P.O. Box 7415
Washington, D.C.  20044
(202) 514-2000
Matthew.Marinelli@usdoj.gov
Erica.zilioli@usdoj.gov

*Counsel for Defendant–Cross Defendant U.S.
Army Corps of Engineers*


 /s/ William S. Scherman
William S. Scherman
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500
wscherman@gibsondunn.com

*Counsel for Defendant–Intervenor–Cross
Claimant Dakota Access, LLC*