**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

STANDING ROCK SIOUX TRIBE,

　　　　　　　　　　　　Plaintiff,

and

CHEYENNE RIVER SIOUX TRIBE,

　　　　　　　　　　　　Plaintiff–Intervenor,

　　v.

UNITED STATES ARMY CORPS OF
ENGINEERS,

　　　　　　　　　　　　Defendant–Cross Defendant,

and

DAKOTA ACCESS, LLC,

　　　　　　　　　　Defendant–Intervenor–Cross Claimant.

Case Number: 16-cv-1534 (JEB)

**DECLARATION OF WILLIAM S. SCHERMAN IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

I, William S. Scherman, declare as follows:

1.　　I am a partner with the law firm of Gibson, Dunn & Crutcher LLP, counsel of record for

Defendant–Intervenor–Cross Claimant Dakota Access, LLC.  I am a member in good

standing of the Bar of this Court.

2.　　Attached hereto are true and correct copies of the following materials which are relevant

to the issues in this motion:

| EXHIBIT | DESCRIPTION | DOCKET NO. |
|---------|-------------|------------|
| A | Letter from Jo-Ellen Darcy, Asst. Sec'y of Army, to Chairman Dave Archambault, Kelcy Warren, and Joey Mahmoud (Nov. 14, 2016) | D.E. 56-1 |
| B | United States Army Corps of Eng'rs Information Package | D.E. 57-1 |
| C | Declaration of Monica Howard | D.E. 22-3 |
| D | Declaration of Joey Mahmoud | D.E. 22-1 |
| E | Declaration of Jon Eagle, Sr. | D.E. 6-2 |
| F | Letter from Col. John Henderson to Chairman Dave Archambault (Nov. 22, 2016) | |
| G | E-mail from Rick Noel, Chief Civil Branch, Real Estate Division Contracting Officer, to Steve Rowe (June 7, 2016) | D.E. 62-2 |
| H | E-mail from Thomas Tracey, District Counsel, Omaha District, to Bill Leone (Aug. 16, 2016) | D.E. 62-5 |
| I | E-mail and Attachments from Rick Noel, Chief Civil Branch, Real Estate Division Contracting Officer (Aug. 2, 2016) | D.E. 62-4 |
| J | Sept. 16, 2016, Hearing Transcript | D.E. 49 |
| K | Joint Statement of Department of the Army and Department of the Interior Regarding the Dakota Access Pipeline (Nov. 14, 2016) | D.E. 56-2 |
| L | Declaration of Tom Gross | D.E. 22-23 |
| M | Affidavit of Robert Poteete | D.E. 22-25 |

| N | Affidavit of C. Michael Palmer | D.E. 22-31 |
|---|---|---|
| O | Declaration of Ross Evan Eisenberg | D.E. 22-27 |
| P | Letter from Bernard Sanders, Senator and Energy and Nat. Res. Comm. Member, to President Barack Obama (Oct. 28, 2016) | |
| Q | Joint Statement of Department of Justice, Department of the Army and the Department of the Interior Regarding Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers (Sept. 9, 2016) | D.E. 42-1 |
| R | Joint Statement of Department of Justice, Department of the Army and Department of the Interior Regarding D.C. Circuit Court of Appeals Decision in Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers (Oct. 10, 2016) | |
| S | Memorandum for Commander, U.S. Army Corps of Engineers re: Proposed Dakota Access Pipeline Crossing at Lake Oahe, North Dakota (Dec. 4, 2016) | D.E. 65-1 |
| T | Press Release, Army will not grant easement for Dakota Access Pipeline crossing (Dec. 4, 2016) | |

Executed on December 5, 2016


___/s/ William S. Scherman___

William S. Scherman

# EXHIBIT A



**DEPARTMENT OF THE ARMY**
**OFFICE OF THE ASSISTANT SECRETARY**
**CIVIL WORKS**
**108 ARMY PENTAGON**
**WASHINGTON DC 20310-0108**

1

The Honorable Dave Archambault II
Chairman, Standing Rock Sioux Tribe
P.O. Box D
Fort Yates, North Dakota 58538

Kelcy Warren
Chairman and Chief Executive Officer
Energy Transfer Partners, L.P.
8111 Westchester Drive
Dallas, TX 75225

Joey Mahmoud
Executive Vice President
Dakota Access LLC
3738 Oak Lawn Avenue
Dallas, TX 75219

Dear Gentlemen:

I am writing regarding the review that the Department of the Army initiated in September regarding the proposed crossing of the Dakota Access Pipeline (DAPL) under Lake Oahe. As you know, on September 9, 2016, the Department of Justice, the Department of the Army, and the Department of the Interior stated that the Army would move expeditiously to determine whether it would need to reconsider any of its previous decisions regarding DAPL's proposed crossing at the Lake Oahe site. The Army has completed that review, accounting for information it has received from the Tribes and the pipeline company since September, and has concluded that its previous decisions comported with legal requirements.

The Army is mindful of the history of the Great Sioux Nation's repeated dispossessions, including those to support water-resources projects. This history compels great caution and respect in considering the concerns that the Standing Rock Sioux Tribe has raised regarding the proposed crossing of Lake Oahe north of its reservation. The Army recognizes that portions of Lake Oahe remain within the Standing Rock Sioux Tribe's reservation boundaries and the Tribe retains hunting and fishing rights in the lake. Additionally, the Army recognizes that the Tribe relies on Lake Oahe and the Missouri River for drinking water. We take seriously our government-to-government relationship with the Tribe. This history, the importance of Lake Oahe to the Tribe, and our government-to-government relationship call for caution, respect, and particular care regarding the proposed DAPL crossing at Lake Oahe.

As you are aware, the statute governing rights of way for pipelines through Federal lands mandates that the Army "impose requirements for the operation of the pipeline and related facilities in a manner that will protect the safety of workers and protect the public

from sudden ruptures and slow degradation of the pipeline." 30 U.S.C. §185(g). It also requires the Army to "protect the interests of individuals living in the general area of the right-of-way or permit who rely on the fish, wildlife, and biotic resources of the area for subsistence purposes," 30 U.S.C. §185(h)(2)(D). In addition, the statute authorizes the Army to subject a right-of-way to "terms and conditions" "regarding extent, duration, survey, location, construction, operation, maintenance, use, and termination," to protect the environment and public health and safety, 30 U.S.C. §185(k).

Accordingly, the Army has determined that additional discussion with the Standing Rock Sioux Tribe and analysis are warranted. The Army invites the Standing Rock Sioux Tribe to engage in discussion concerning the following topics:

- Potential conditions in an easement for the pipeline crossing, which would further reduce the risk of a spill or rupture, hasten detection and response, or otherwise enhance the protection of Lake Oahe, the Tribe's water supplies, and its treaty rights;
- With such conditions, the risk to the Tribe of a spill from the pipeline crossing Lake Oahe at the proposed location; and
- In light of such conditions, whether to grant an easement for the pipeline to cross Lake Oahe at the location currently proposed.

The Army plans to provide a framing paper to facilitate this discussion with the Standing Rock Sioux Tribe regarding these topics. While these topics are of particular interest to the Army, we welcome any input that the Tribe believes is relevant to the proposed pipeline crossing or easement. The Army will work with the Tribe on a timeline that allows for robust discussion and analysis to be completed expeditiously.

While these discussions and analysis are ongoing, construction on or under Corps land bordering or under Lake Oahe cannot occur because the Army has not made a final decision on whether to grant an easement.

Respectfully,

Jo-Ellen Darcy
Assistant Secretary of the Army
(Civil Works)

# EXHIBIT B

# US Army Corps of Engineers

# Dakota Access Pipeline (DAPL)

# USACE Information Package

7 November 2016



US Army Corps
of Engineers ®



# GENERAL BACKGROUND





# What is Dakota Access Pipeline (DAPL)?



Figure 1 – Map of Dakota Access Pipeline with Cannonball River Inset

**Background:** Dakota Access, LLC proposes to construct and operate the DAPL Project to connect Bakken and Three Forks crude oil production areas in North Dakota to existing infrastructure in Illinois. In North Dakota, the project crosses federal flowage easements at the Missouri River upstream of Lake Sakakawea in Williams County and federally-owned lands at Lake Oahe in Morton and Emmons counties. The DAPL Project spans approximately **1,168-mile**, crude oil pipeline system designed to carry up oil from the Bakken and Three Forks production region of North Dakota from Stanley, ND to Patoka, IL.

**USACE Actions:** USACE has regulatory jurisdiction over about 3% of the pipeline's total length, specifically where it crosses Corps-held flowage easements or Corps-managed federal property. Dakota Access applied for permits to build sections of the pipeline through three USACE Districts (Omaha, Rock Island, St. Louis). Beginning in SEP 14, the Corps conducted formal consultations with tribal representatives in accordance with Section 106 of the National Historic Preservation Act. The Corps' administrative record details over 250 interactions between various stakeholders for the DAPL project. All interested tribes were notified for opportunity to monitor construction areas within Omaha District (NWO), but none accepted.

USACE verified 203 water crossings (Figure 1) met the terms and conditions of ensuring National Environmental Policy Act (NEPA) and National Historic Preservation Act compliance for Nationwide Permits (NWP) 12, including at Lake Oahe, ND. On 25 JUL 16, USACE Omaha District (NWO) granted two Section 408 permissions for the DAPL project. One permission gave consent to cross flowage easements held by USACE at Lake Sakakawea, ND; the other provided an easement to cross federal property administered by USACE for flood control & navigation at Lake Oahe, ND.





US Army Corps of Engineers ®

3

# Origin of DAPL Protests

**North Dakota**

The United States Army Corps of Engineers drafted environmental assessments (EAs) for water crossings in North Dakota from 8 DEC 15 to 8 JAN 16. The EAs were accepted on 11 JAN 16. The Corps met with Standing Rock Sioux Tribe (SRST) on several occasions, completed on-site visits with SRST and made changes to the EA to address information received. Additionally, the U.S Fish and Wildlife Service concurred that the portions of the DAPL project that cross federal real property interests administered by USACE will have either "No Effect" or "May Affect, But Not Likely to Adversely Affect" on listed species

On 10 AUG, protestors began to interfere with DAPL construction on private land near the Lake Oahe crossing in Cannon Ball, ND. SRST led protest is in opposition to pipeline construction in this area. Protestors claim USACE failed to conduct proper cultural and historical reviews before granting approval for the pipeline. By 19 AUG, the Governor of North Dakota declared a state of emergency as the number of protestors grew to approximately 1500 and eventually caused pipeline construction to cease, due to safety concerns.

The SRST filed a law suit challenging USACE decisions along the pipeline's route. SRST requested a court order suspending the Corps' NWP 12 verifications, which effectively shut down construction. While awaiting decision, on 4 SEP, the SRST asked the court for emergency relief based on allegations that the construction was destroying cultural sites. On 6 SEP, the court partially granted the request and halted construction for about a mile west of Lake Oahe and 20 miles east of Lake Oahe.

On 9 SEP, the D.C. District Court ruled that the "Corps of Engineers has complied with the National Historic Preservation Act and that the Tribe has not shown it will suffer injury that would be prevented by an injunction the Court could issue." In mid-SEP, the Omaha District (NWO) coordinated with the SRST leadership for a (Special Use Permit) to allow protestors to occupy campgrounds on USACE property south of Cannonball River in North Dakota. The SUP was approved on 22 SEP.

 In late OCT, protestor and law enforcement activities significantly changed the DAPL protest dynamic. Protestors fired at Law Officers, destroyed DAPL equipment, and illegally blocked roads. Law Enforcement set up perimeters to keep protesters south of the Cantapeta Creek Bridge on HWY 1806 and on USACE property. The Law Enforcement restriction of protestors allows DAPL to finish installing the pipeline toward Lake Oahe.

**Other Locations**

Thus far, there have been five protests at USACE offices in response to DAPL; HQUSACE (35 people on 5 AUG, 3 on 3 NOV), Northwestern Division HQ (160 people on 31 OCT), Philadelphia District (500 people on 2 NOV), and Omaha District (50 people on 8 SEP). These were peaceful protests and were handled appropriately. However, the escalating volatility of the situation and recent threat on Social Media against USACE may indicate an increased potential for violence than what has been previously experienced.

**US Army Corps of Engineers ®**

# Dakota Access Pipeline (DAPL) Protests at USACE Offices



Northwestern DIV HQ
160 PPL on 31 OCT
Portland, OR

Omaha HQ
50 PPL on 8 SEP
Omaha, NE

Chicago HQ
40 PPL on 4 NOV
Chicago, IL

Philadelphia HQ
~500 PPL on 2 NOV
Omaha, NE

San Francisco HQ
Planned (15 NOV)
San Francisco, CA

New England District
Planned (15 NOV)
Concord, MA &
Essex Junction, VT

HQUSACE
35 PPL on 5 AUG
3 PPL on 3 NOV
Washington, DC

**LEGEND**

USACE
**Planned Protest**
**Protest (Last 24 Hours)**
**Past Protest**
**Violent Protest**

**Lessons Learned:**
- Senior Leader engagement to demonstrate USACE concern and receive petitions and correspondence. (HQUSACE, NWO, NAP)
- Planned Protest Actions – Contact local Law Enforcement, alert building security, inform workforce and provide options for alternate entry and tele-work. (NWO)

**USACE Actions:**
- DCG sent guidance to senior leaders this evening
- USACE added CCIR 21 Planned or Active Protest/Demonstrations at USACE Facilities or Sites.
- OPS Protect scheduled web forum to discuss security measures and protestor engagement. 7-9 NOV 1400-1500 EDT
- G3, OPS Protect, PAO, and Counsel developed Employee and Leader guidance DAPL packages.



US Army Corps
of Engineers ®



U.S.ARMY

POC: USACE Operations Center, ce-uoc@usace.army.mil

# EMPLOYEE GUIDANCE





# Signs of Escalation

## Verbal and Non-Verbal

| | | |
|---|---|---|
| Threats – Direct | Forced or strained speech | Personal space violation |
| Threats – Veiled | A nervous laugh or laughing at inappropriate times | Standing toe to toe |
| Threats – Conditional | Yelling or screaming | Finger pointing |
| Boasts of prior violence | Non-stop profanity | Making fists |
| Confused thinking | Slurred speech | Staring through you |
| An increase in pitch when speaking | Person refuses any eye contact | Face flushing |
| Repetitive word use, parroting and or echoing | Someone blocks egress | Heavy breathing |
| Receiving emails, text messages, or letters that are written in ALL CAPs | | |





# Open Source Force Protection Concerns/Influencers

General Information / Background Information / Influencers Pages / Info

- **Protesters are arriving from around the world and the U.S.**, and are reportedly impacting the local communities like Cannon Ball, North Dakota.

- **Colorado woman charged with attempted murder** while participating in the protests; as protests continue to grow, more engagements with law enforcement are likely.

- **Local Law Enforcement resources are stretched**; use of temporary holding cells and writing numbers on those in custody drew media attention critical of law enforcement; numerous allegations of excessive force have been made.

- **Facebook "Check In"** at Standing Rock Sioux gets more than a million supporters

- **Hollywood A-Listers joining the protesters** either on the ground, through social media, developing TV ads or leading protests in other cities; reports of Rev. Jesse Jackson traveling to North Dakota.

- **Families of police officers** are reportedly being threatened, followed home, and having their residence photographed and video taped.



US Army Corps
of Engineers ®



# Engaging with Protesters

## Employees:

- Do not debate with protesters or supporters in person or on social media

- Employees should consider not wearing USACE logos or paraphernalia to and from work; Military members should consider wearing civilian clothes to and from work and change into uniform at the office.

- Employees should identify multiple routes to and from work; avoid protesters completely and do not attempt to cross through gatherings; protests may appear peaceful but can escalate quickly

- If engaged or cornered by protesters or hostile supporters, employees should do everything they can to remain professional and de-escalate the situation:

  o **Get their name:** People respond favorably to their own name. It also makes the conversation more personal.
  o **Use Active Listening; Maintain Eye Contact:** Clarifying, paraphrasing and open-ended questions all help to ensure that the person is aware you have understood their frustrations completely.
  o **Speak slowly and suspend judgement:** Empathy needs to be shown during conflict situations. Even if you do not agree with the person's position, expressing an understanding why that person feels a particular way will help resolve the conflict.
  o **Get them to say yes:** Use clarifying questions and providing summaries during the conversation all help to confirm you have understood their point. When you clarify using a statement such as, "So you are feeling frustrated because of XYZ, is that right?"
  o **Don't use clichés:** The worst of these being "Calm Down".
  o **Ask for their idea or solution**: This assures the person that their concerns are being heard, and potentially being reviewed. Ask to take notes if you have the ability.
  o **Consistency in Courtesy:** maintain the position of positive brand ambassador and consummate professional.
  o **Remove yourself from the situation at the first opportunity.**

- If threatened call Law Enforcement immediately (Dial 9-1-1)





# Dakota Access Pipeline Desk Card

Thank you for your call to express your concerns about the Dakota Access Pipeline.  The Department of the Army is currently reviewing its decisions related to the pipeline and is exploring a range of options that consider the concerns raised by tribes and other stakeholders.  We are unable to speculate on when the review will be completed or what the outcome of that review will be.  If you would like, I would be more than happy to take your name and where you are calling from to add to the list of people who have called to express their concerns about the Dakota Access Pipeline.  As an alternative, I can also provide you with a phone number for the headquarters of the U.S. Army Corps of Engineers that you can call to express your concerns.  That number is 202-761-8700.



**US Army Corps of Engineers ®**



# Dakota Access Pipeline Personal Card

Dakota Access Pipeline Personal Card

| | | |
|---|---|---|
| **Dakota Access Pipeline**<br><br>    Thank you for your concern regarding the Dakota Access Pipeline.  The Department of the Army is reviewing its decisions related to the pipeline.  I am unable to speculate on when that review will be completed.  If you would like I can provide you with a phone number to the U.S. Army Corps of Engineers that you can call to express your concerns.  USACE Phone Number : 202-761-8700.<br><br>Building Strong® | **Dakota Access Pipeline**<br><br>    Thank you for your concern regarding the Dakota Access Pipeline.  The Department of the Army is reviewing its decisions related to the pipeline.  I am unable to speculate on when that review will be completed.  If you would like I can provide you with a phone number to the U.S. Army Corps of Engineers that you can call to express your concerns.  USACE Phone Number : 202-761-8700.<br><br>Building Strong® | **Dakota Access Pipeline**<br><br>    Thank you for your concern regarding the Dakota Access Pipeline.  The Department of the Army is reviewing its decisions related to the pipeline.  I am unable to speculate on when that review will be completed.  If you would like I can provide you with a phone number to the U.S. Army Corps of Engineers that you can call to express your concerns.  USACE Phone Number : 202-761-8700.<br><br>Building Strong® |
| **Dakota Access Pipeline**<br><br>    Thank you for your concern regarding the Dakota Access Pipeline.  The Department of the Army is reviewing its decisions related to the pipeline.  I am unable to speculate on when that review will be completed.  If you would like I can provide you with a phone number to the U.S. Army Corps of Engineers that you can call to express your concerns.  USACE Phone Number : 202-761-8700.<br><br>Building Strong® | **Dakota Access Pipeline**<br><br>    Thank you for your concern regarding the Dakota Access Pipeline.  The Department of the Army is reviewing its decisions related to the pipeline.  I am unable to speculate on when that review will be completed.  If you would like I can provide you with a phone number to the U.S. Army Corps of Engineers that you can call to express your concerns.  USACE Phone Number : 202-761-8700.<br><br>Building Strong® | **Dakota Access Pipeline**<br><br>    Thank you for your concern regarding the Dakota Access Pipeline.  The Department of the Army is reviewing its decisions related to the pipeline.  I am unable to speculate on when that review will be completed.  If you would like I can provide you with a phone number to the U.S. Army Corps of Engineers that you can call to express your concerns.  USACE Phone Number : 202-761-8700.<br><br>Building Strong® |
| **Dakota Access Pipeline**<br><br>    Thank you for your concern regarding the Dakota Access Pipeline.  The Department of the Army is reviewing its decisions related to the pipeline.  I am unable to speculate on when that review will be completed.  If you would like I can provide you with a phone number to the U.S. Army Corps of Engineers that you can call to express your concerns.  USACE Phone Number : 202-761-8700.<br><br>Building Strong® | **Dakota Access Pipeline**<br><br>    Thank you for your concern regarding the Dakota Access Pipeline.  The Department of the Army is reviewing its decisions related to the pipeline.  I am unable to speculate on when that review will be completed.  If you would like I can provide you with a phone number to the U.S. Army Corps of Engineers that you can call to express your concerns.  USACE Phone Number : 202-761-8700.<br><br>Building Strong® | **Dakota Access Pipeline**<br><br>    Thank you for your concern regarding the Dakota Access Pipeline.  The Department of the Army is reviewing its decisions related to the pipeline.  I am unable to speculate on when that review will be completed.  If you would like I can provide you with a phone number to the U.S. Army Corps of Engineers that you can call to express your concerns.  USACE Phone Number : 202-761-8700.<br><br>Building Strong® |



US Army Corps
of Engineers ®



# Reporting Protocol

- **Serious Incident/Activity Reports (SIR/SAR):**
    - Report potential protests and active protest activity under the recently approved CCIR #21 (Planned or active protests/demonstrations at USACE facilities or sites).
    - Security Managers at the District, Division, FOAs and Labs log threats as Serious Incident Report (SIR) or Serious Activity Reports (SAR) in ENGLINK.
    - These SIR/SARs are then captured, screened, passed to local and state law enforcement and/or logged into the FBI eGuardian System by the OPD CRIMINT Analyst at HQs to create a case for investigative follow up by the FBI.
- **SPOTREP**
    - DIVs submit an after actions report on the incident highlighting actions by USACE, lessons learned and any documents that were exchanged (Petitions).





# LEADER GUIDANCE




# Protest Preparation Guidance

Thus far, there have been five protests at USACE offices in response to DAPL; HQUSACE (35 people on 5 AUG, 3 on 3 NOV), Northwestern Division HQ (160 people on 31 OCT), Philadelphia District (500 people on 2 NOV), and Omaha District (50 people on 8 SEP).

- Each of the protests were conducted peacefully and were handled appropriately
- However, the escalating volatility of the situation and recent threat on Social Media against USACE may indicate an increased potential for violence than *what has been* previously experienced

**HQUSACE Operational Protection Division will provide question & answer session webinar on protest TTPs on 7-9 NOV from 1400-1500 EST.**

**Commanders/Leaders:**

- Engage with local law enforcement, building security counsel and community leaders in order to be made aware of any permits that were issued for planned protests. This will indicate the day, time and location of approved protests to enhance command planning.
- If a protest takes place that has not been permitted by local government, contact law enforcement immediately
- Assess the impacts to mission and execute the best strategy (status quo, telework, COOP) that mitigates impacts (NAB AAR – Post Baltimore Riots/Freddie Gray Trial)
- Ask that employees not become involved in any situation that could become volatile in person or through social media
- Assess employee sympathizers to the DAPL cause; access to USACE buildings, information, etc that has not been approved or vetted could escalate the situation
- If protests turn violent or employees are threated call Law Enforcement Immediately (Dial 9-1-1)

US Army Corps of Engineers®

U.S.ARMY

# Security at Stand-Alone Facilities

- **In response to the Chattanooga Shootings** in July 2015 OPD (with guidance from DoD and HQDA) and in coordination with the divisions, FOAs, and Labs has taken actions to mitigate the risk at all USACE Stand-Alone Facilities. In FY 16 these included:

  ✓ COORDINATION WITH LOCAL LAW ENFORCEMENT AND FIRST RESPONDERS.

  ✓ ENSURING EVERY FACILITY HAS AN EMERGENCY ACTION PLAN

  ✓ ENFORCING ACCESS CONTROL MEASURES TO INCLUDE FORCE PROTECTION MEASURES (FPCON) AND RANDOM ANTI-TERRORISM MEASURES (RAM).

  ✓ REGULARLY CONDUCTING ACTIVE SHOOTER RESPONSE TRAINING AND MASS WARNING NOTIFICATION WITH EMPLOYEES AND STAFF

  ✓ CONDUCT ANNUAL RISK ASSESSMENT AND MAKE ADJUSTMENTS BASED ON CURRENT AND EMERGING THREATS

- **IAW HQDA EXORD 011-16 (FRAGO 3)** HQDA States: *"COMMANDERS WILL PRIORITIZE COMPLETION OF LOE2 PHYSICAL SECURITY ENHANCEMENTS AND COMPLETE NECESSARY FORCE PROTECTION UPGRADES IN FY17 WITH EXISTING COMMAND FUNDS."*

  ❑ IDENTIFY LOCAL RISK THRESHOLDS FOR PROTECTION ENHANCEMENTS, INCLUDING ARMING.

  ❑ PRIORITIZE AND PERFORM LOE 2 PHYSICAL SECURITY UPGRADES AND PROCEDURAL SECURITY ENHANCEMENTS RESULTING FROM POST-CHATTANOOGA SECURITY SURVEYS AND ASSESSMENTS IN ORDER TO MEET IDENTIFIED DOD POST-CHATTANOOGA MINIMUM STANDARDS (ACCESS CONTROL, BALISTIC PROTECTION, ALTERNATE EGRESS).

- In 1st QTR FY17, OPD, in coordination with the divisions, FOAs, and Labs, is developing the guidance for minimum standards at our facilities and then the deep dive to identify the required equipment and costs. USACE will use a common sense approach to meeting the DoD Minimum Standards taking into consideration the type of structure (ie. Dams), the public mission different than other Army Commands (Visitor Centers vs. Recruiting Stations), and various tenant vs owner relationship.





# Senior Leader Protest Engagement Card

**Dakota Access Pipeline**

We value our long-standing relationships with Native American Tribes and have great respect for the cultures, traditions, and concerns of those Tribes. We respect their right to peacefully protest and look forward to continuing to strengthening our relationships in the future. We welcome all messages from concerned citizens voicing their opinion about the Dakota Access Pipeline.

The Department of the Army is currently reviewing its decisions related to the pipeline and is exploring a range of options that consider the concerns raised by tribes and other stakeholders. We are unable to speculate on when the review will be completed or what the outcome of that review will be. I will be more than happy to accept your petition on behalf of the Army. Citizen comments concerning the Dakota Access Pipeline can be made by calling 202-761-8700.

Media queries can be made by emailing or calling our public affairs team at HQ-PUBLICAFFAIRS@usace.army.mil or by calling 202-761-8700. Thank you.

Building Strong®

---

**Dakota Access Pipeline**

We value our long-standing relationships with Native American Tribes and have great respect for the cultures, traditions, and concerns of those Tribes. We respect their right to peacefully protest and look forward to continuing to strengthening our relationships in the future. We welcome all messages from concerned citizens voicing their opinion about the Dakota Access Pipeline.

The Department of the Army is currently reviewing its decisions related to the pipeline and is exploring a range of options that consider the concerns raised by tribes and other stakeholders. We are unable to speculate on when the review will be completed or what the outcome of that review will be. I will be more than happy to accept your petition on behalf of the Army. Citizen comments concerning the Dakota Access Pipeline can be made by calling 202-761-8700.

Media queries can be made by emailing or calling our public affairs team at HQ-PUBLICAFFAIRS@usace.army.mil or by calling 202-761-8700. Thank you.

Building Strong®

---

**Dakota Access Pipeline**

We value our long-standing relationships with Native American Tribes and have great respect for the cultures, traditions, and concerns of those Tribes. We respect their right to peacefully protest and look forward to continuing to strengthening our relationships in the future. We welcome all messages from concerned citizens voicing their opinion about the Dakota Access Pipeline.

The Department of the Army is currently reviewing its decisions related to the pipeline and is exploring a range of options that consider the concerns raised by tribes and other stakeholders. We are unable to speculate on when the review will be completed or what the outcome of that review will be. I will be more than happy to accept your petition on behalf of the Army. Citizen comments concerning the Dakota Access Pipeline can be made by calling 202-761-8700.

Media queries can be made by emailing or calling our public affairs team at HQ-PUBLICAFFAIRS@usace.army.mil or by calling 202-761-8700. Thank you.

Building Strong®

---

**Dakota Access Pipeline**

We value our long-standing relationships with Native American Tribes and have great respect for the cultures, traditions, and concerns of those Tribes. We respect their right to peacefully protest and look forward to continuing to strengthening our relationships in the future. We welcome all messages from concerned citizens voicing their opinion about the Dakota Access Pipeline.

The Department of the Army is currently reviewing its decisions related to the pipeline and is exploring a range of options that consider the concerns raised by tribes and other stakeholders. We are unable to speculate on when the review will be completed or what the outcome of that review will be. I will be more than happy to accept your petition on behalf of the Army. Citizen comments concerning the Dakota Access Pipeline can be made by calling 202-761-8700.

Media queries can be made by emailing or calling our public affairs team at HQ-PUBLICAFFAIRS@usace.army.mil or by calling 202-761-8700. Thank you.

Building Strong®



US Army Corps of Engineers ®



# EXHIBIT C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| STANDING ROCK SIOUX TRIBE | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | **Case No. 1:16-CV-01534** |
| U.S. ARMY CORPS OF ENGINEERS | § | |
| | § | |
| Defendant. | § | |
| | § | |
| | § | |

## DECLARATION OF MONICA HOWARD
## IN SUPPORT OF DAKOTA ACCESS, LLC'S OPPOSITION TO
## PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION
## PURSUANT TO 28 U.S.C. § 1746

1.      My name is Monica Howard.  I am over 21 years of age, of sound mind, and duly qualified to make this declaration.  I make this declaration based upon my personal knowledge, including without limitation, (i) my position as the Director of Environmental Sciences at Dakota Access, LLC ("Dakota Access"), (ii) my personal involvement in the application, authorization, verification, and other permitting procedures that the Dakota Access Pipeline ("DAPL") was subject to and that are subject of this litigation, (iii) my personal involvement in the coordination and oversight of the environmental and cultural surveys that were conducted for DAPL, and (iv) my personal involvement in Dakota Access's public awareness programs and other efforts to communicate with and address the concerns of the general public and Native American tribes.

## SURVEYING

2.      I started working on DAPL in June 2014.  At that time, DAPL was in the pre-construction planning stages, primarily securing right-of-way ("ROW") permissions from private and public landowners to conduct environmental and cultural surveys.

3.      Dakota Access devised a preliminary survey route by late June 2014.  In July 2014, Dakota Access began securing survey rights-of-way for a 400-foot corridor.  If Dakota Access hit a stop point (environmental or otherwise) that presented an obstacle to construction or operation along this route, it would seek reroutes or modified route segments to avoid the obstacle.

4.      The preliminary route was devised considering already surveyed, identified, and cataloged cultural resources.  The preliminary route took into account and avoided sites eligible for or listed on the National Register of Historic Places ("National Register") that could potentially be impacted by construction.

5.      The cultural resource surveys performed along the route in North Dakota revealed 149 potentially eligible sites, of which 91 had stone features.  The route and/or workspace was modified to avoid every single potentially eligible site with stone features, and modified to avoid all other potentially eligible sites but nine.  For the nine sites that were not avoided, Dakota Access conducted mitigation in coordination with North Dakota's State Historic Preservation Officer ("SHPO").

6.      Thus, in North Dakota, the DAPL project was modified 140 times due to cultural resources.

7.      Additionally, a portion of DAPL's route in North Dakota has been or will be constructed using Horizontal Directional Drilling ("HDD").  The HDD method allows for construction across

a sensitive area without excavation of a trench by installing the pipeline through a drilled hole significantly below the conventional depth of a pipeline. Dakota Access uses HDD acros all portions of DAPL that cross Corps fee-owned property and over all portions of DAPL that required authorization under Section 10 of the Rivers and Harbors Act.

8.      Over the course of 2014 and 2015, Dakota Access retained professional archeologists from Merjent, Inc., HRA Gray & Pape, Inc., and Alpine Archeological Consultants, Inc. to conduct Class II and/or Class III Cultural Surveys for 100% of DAPL's entire route through North Dakota and South Dakota. All archeologists retained by Dakota Access met or exceeded the professional qualifications set by the Secretary of the Interior for cultural surveyors.

9.      A Class II Cultural survey is a pedestrian survey that focuses on visual reconnaissance of the ground surface in settings with high ground surface visibility. A Class III Cultural Survey is an intensive inventory consisting of a comprehensive archaeological survey program that is coordinated with and approved by the SHPO. The program includes both a surface visual inspection and excavation of shovel test probes on fixed transects/grid in order to inventory, delineate, and assess archaeological sites or historic structures within the study area.

10.      Surveying in North Dakota commenced in August 2014; no surveys were performed in Spring of 2014. The initial survey was conducted around buffers of all jurisdictional waters of the United States within the pipeline route corridor, in order to determine which waters of the United States, if any, warranted a Preconstruction Notice ("PCN") under General Condition 20 of the Nationwide Permit program. The entire North Dakota and South Dakota route were then surveyed by Class II and/or III methods pursuant to respective state regulations. Substantial portions of the

Iowa and Illinois route were also surveyed pursuant to or in exceedance of respective state law requirements.

11.     Dakota Access surveyed a 400 ft. corridor of the entire route (200 ft. to each side of the planned pipeline route) in North Dakota and South Dakota.

12.     Though the pipeline is expected to run approximately 357 miles in North Dakota, Dakota Access surveyed nearly twice that many miles in North Dakota to account for all necessary deviations from the preliminary pipeline path.

13.     For the nine mitigated sites in North Dakota (see *supra*, ¶ 5), Dakota Access worked in coordination with and with approval of the North Dakota SHPO to perform data recovery mitigation.  Data recovery efforts consisted of the systematic and controlled excavation of multiple block units placed at select locations within the proposed workspace areas to recover significant data to address pertinent region-specific research issues and for preservation purposes.

14.     In order to ensure no accidental impact to eligible or unevaluated sites that were fifty feet or less from the proposed construction workspace, Dakota Access erected exclusionary fencing that protected each site (and the immediate twenty-five feet upstream and downstream from the site).  All other sites along the route in North Dakota were either (a) far enough away from the pipeline to be entirely avoided, or (b) not eligible for listing on the National Register and therefore did not warrant protection.

15.     If not enough information was available to determine whether a location is eligible for inclusion on the National Register, it is considered an unevaluated site.  Out of an abundance of

caution, Dakota Access treated all unevaluated sites as potentially eligible sites and did not disturb them.

16.     Any eligible or unevaluated sites at the Lake Oahe crossing were avoided by DAPL construction workspace by designing the workspace around them as discussed above, and thus are not impacted by DAPL.  Both the U.S. Army Corps of Engineers ("Corps") and the North Dakota SHPO agreed that there is no effect to cultural resources at the Lake Oahe crossing.  This determination is based on DAPL's avoidance of sensitive resources by using the Horizontal Directional Drill technique to drill 90-115 feet below the bed of Lake Oahe.

17.     As an additional safeguard to cultural resources, Dakota Access implemented an Unanticipated Discovery Plan (the "Plan") to manage any potential occurrence of a cultural resource during the course of construction.  Under the plan, if any foreign object is observed by any construction personnel that appears to be cultural, paleontological, or human remains, the Environmental Inspector is to be notified immediately and construction is to be halted and the site secured until the object is evaluated.  If the object is cultural in nature, a qualified archeologist is brought to the site to further investigate. Notification and coordination with SHPOs and other appropriate agencies, including Tribal Historic Preservation Officer(s) ("THPO"), would continue until evaluation, treatment, avoidance, and/or mitigation of the site is complete and authorized by the respective jurisdictional agency and company official.  A copy of the North Dakota Unanticipated Discovery Plan is attached as Exhibit B1.

18.     As a testament to Dakota Access's proactive planning, to this date, while approximately 45% of construction of DAPL has already been completed, the plan has been implemented a total

of 6 times regarding cultural resources, none of which were in North Dakota and none of which resulted in discovery of a site potentially eligible for inclusion on the National Register.

## OUTREACH

19.     Dakota Access's public awareness programs meet or exceed industry standards and federal requirements pursuant to 49 C.F.R. § 195.440.  A copy of American Petroleum Institute Recommended Practice 1162, the relevant industry standard, can be found on the American Petroleum Institute's website.[1]

20.     On September 23-26, 29, 30, October 1, 2, 6-9, and December 1-4, 14, and 15 and pursuant to its public awareness programs, Dakota Access held several public meetings and open houses in Illinois, North Dakota, South Dakota, and Iowa in order to disseminate information about DAPL and address any concerns raised by individuals or organizations.

21.     The meetings in North Dakota occurred on September 29 and 30, and October 1 and 2, and were held in New Salem, Killdeer, New Town, and Watford, North Dakota.  In North Dakota, meeting notice was provided to the public via newspapers (the New Salem Journal, Dunn County Extra, new Town News, Williston Herald, and McKenzie County Farmer), and posting on the Public Service Commission website, www.psc.nd.gov.  To the best of my knowledge, no representative of the Standing Rock Sioux Tribe attended these meetings.

22.     Simultaneous with the North Dakota Open House on September 30, Joe Malucci (the then-DAPL North Dakota Project Manager) and Chuck Fry (Vice President of Engineering at Energy Transfer Partners) attended a tribal council meeting with the Standing Rock Sioux Tribe.  Joe and

---

[1] http://mycommittees.api.org/standards/pipeline/1162%20Links/1162nonprintable.pdf.

Chuck made a DAPL project presentation to the tribe. Instead of raising issues related to the project itself, the tribe discussed historical treaties and other historical issues between the tribe and non-native people.

23. In October of 2014, after the conclusion of the DAPL public meetings and open houses, I received a phone call from Waste Win Young, the then-Tribal Historic Preservation Officer of the Standing Rock Sioux Tribe. Waste Win Young asked me questions about tribal consultations, and I explained to her that the Corps is lead federal agency on the DAPL project and that it is responsible for formal tribal consultation. I further described and explained the cultural resource surveys that Dakota Access was already conducting throughout North Dakota.

24. Having apparently reviewed DAPL maps made publicly available by Dakota Access, Waste expressed concern regarding potential impacts at the Lake Oahe crossing. I offered to meet with her and to bring the DAPL North Dakota principal investigator to discuss her concerns. We set up a meeting in her office for the last week of October.

25. On October 28, 2014, our North Dakota Principle Investigator from Merjent, Dean Sather, and I met with Waste and Terry Clouthier, a former Standing Rock Sioux Tribe Tribal Historic Preservation Officer who now runs a consulting firm that performs Tribal Cultural Preservation survey work.

26. At the meeting, Waste, Terry, Dean, and I reviewed the general North Dakota map of the project, the project schedule, the federal permits that Dakota Access sought, and the draft plan/profile of the Lake Oahe HDD work space and drill site.

27.    Waste voiced relief that Dakota Access was planning on conducting an HDD under the lake to install the pipe, as opposed to other, techniques such as by an open cut trench excavation. Waste also expressed that she was glad that DAPL's route did not affect a nearby traditional cultural tribal property, the Sundance site located west of the Lake Oahe crossing.

28.    Terry explained his former role as THPO and that he had started a consulting firm performing surveys for various infrastructure projects and offered his services to Dakota Access. I informed him that the cultural and archeological surveys were already underway, and asked him to please let me know if the tribe had any areas of concern that DAPL appeared to be in or near so we could work through them. Waste and Terry requested the centerline file for the project's route in North Dakota and South Dakota to review for areas of tribal concern.  I sent them the files via e-mail on November 13, 2014.  *See* Exhibit B2, November 13 E-mail to Waste Win Young. Neither I nor (to the best of my knowledge) anyone at Dakota Access or the project consultants received any response regarding these project files or any areas of tribal concern.

29.    Dakota Access completed its surveys in 2015 and sent the Cultural Resource Inventory Reports to the Corps.  On February 17, 2016, the Corps sent a letter to all federally recognized tribes along or near the DAPL route in compliance with Section 106 of the National Historic Preservation Act to determine if any tribes were interested in tribal consultation.  The Corps requested a response by March 30, 2015.  A copy of this letter is attached as Exhibit B3.

30.    Before the Corps even sent out the February 17 letter, the Corps had been providing the Standing Rock Sioux Tribe with information regarding DAPL since at least December 2014, and soliciting information about the tribe's concerns with proposed DAPL crossings.  For instance, in a February 12 e-mail, the Corps informed Waste of the Lake Oahe project crossing.  Rick Harnois

of the Corps wrote, "Since [the crossing location] is right outside the SRST boundary, I do not want to assume anything." *See* Exhibit B4, February 12, 2015 Corps E-mail to Waste Win Young.

31. On September 3, 2015, the Corps sent another letter to 61 tribes convening Section 106 consultation and review regarding areas subject to preconstruction notification under Clean Water Act § 404 Nationwide Permit 12 ("NWP"). A copy of the letter sent to the Standing Rock Sioux Tribe is attached as Exhibit B5.

32. Separate and aside from this September 3 consultation notification concerning the NWPs, several months earlier in July 2015, the Corps had begun consulting with tribal entities on the 33 U.S.C. § 408 properties located on Corps project lands. By September 3, the Corps had already introduced the Missouri River Programmatic Agreement signatory tribes, and other tribes including the Standing Rock Sioux Tribe, to the DAPL crossings subject to § 408 review and permits (including the flowage easements upstream of Lake Sakakawea [part of the Garrison project] and the HDD under Lake Oahe), the Environmental Assessment that was being prepared, and the cultural resource finds in proximity to the crossings.

33. The Corps' September 3 letter detailed background information regarding DAPL, and the jurisdictional scope of the Corps' regulatory authority and responsibility over the project. The Corps explained that it had been granted regulatory authority and responsibility over the portions of DAPL that required authorization under Section 10 of the Rivers and Harbors Act and Section 404 of the Clean Water Act. *Id.* The Corps further explained that DAPL was a linear project, and that it was currently evaluating 209 single and complete crossings requiring preconstruction notices ("PCN") under its regulatory authority. The Corps enclosed the locations of the PCN areas,

a DAPL fact sheet, points of contact, and maps to the letter.  Additionally, the Corps provided

access to the Cultural Resource Inventory Reports for review by the tribes.

34.     The Corps asked the tribes, including the Standing Rock Sioux Tribe, if they would like to

consult on the undertaking.  Specifically, the Corps wrote,

> Please let the Corps know if you would like to consult on this undertaking.  In
> addition, the Corps requests information that will assist us in identifying historic
> properties.  The Corps would like to know if you have any knowledge or concerns
> regarding historic properties, including sites of religious importance, at the project
> locations you would like the Corps to consider.  If there are any known Traditional
> Cultural Properties within these areas, please notify us by September 30, 2015.

Ex. B5 at 1.

35.     I understand that the Standing Rock Sioux Tribe requested formal consultation and a site

visit to Lake Oahe in response to the Corps September 3, 2015, letter to all tribes.  I am aware that

at least one and possibly additional meetings were set with Colonel Henderson (Omaha Corps

District Engineer) and cancelled by the Standing Rock Sioux Tribe.  Dakota Access arranged

another consultation meeting for October 28, 2015 and a potential site visit for November 9, 2015.

The Standing Rock Sioux Tribe, other interested tribes, and the North Dakota State Historic

Preservation Officer were invited.   Only the Corps and the North Dakota State Historic

Preservation Officer attended the site visit.

36.     As a follow up to the September 3 letter, the Corps issued a letter on November 20, 2015,

inviting various tribes, including the Standing Rock Sioux Tribe, to another consultation meeting

on December 8 and 9, 2015 in Sioux Falls, South Dakota.  A copy of this letter is attached as

Exhibit B6.[2]  The letter states,

---

[2] Though Exhibit B6 was addressed to Chariman Rhodd of the Iowa Tribe of Kansas and Nebraska, the contents of
that letter were also sent to the Standing Rock Sioux Tribe.

Your assistance in identification of all historic properties, including sites of religious and cultural significance, or traditional cultural properties (TCP) in the PCN areas is critical to determining the effect of this project. My staff is anxious to hear from your Tribe of any culturally significant concerns that may affect these areas. The Corps will treat historic property information as sensitive and will not disseminate to the public.

*Id.* at 1-2.

37.     Dakota Access attended the meeting, covered the costs of the meeting location, lodging, travel, and breakfast and lunch for any Tribal representatives who attended the December meeting. A conference number was provided for tribal representatives who could not physically attend but wanted to participate. The Standing Rock Sioux Tribe did not attend this meeting in person or via teleconference.

38.     During the meeting, certain tribes expressed an interest in surveying undisturbed areas regardless of federal jurisdiction, and Dakota Access agreed to facilitate these surveys. Dakota Access delineated the undisturbed areas along the route in its entirety and sent it to all of the tribes on the Corps' distribution list along with the centerline it its entirety in multiple electronic formats. Additionally, at this meeting it was mentioned that some of the tribes were having difficulty accessing the FTP site that housed the electronic cultural resource reports referenced in the September 3 Corps letter. Dakota Access offered to provide the posted reports in hard copy along with all cultural resource reports along the route, regardless of federal jurisdiction, in both electronic format on a jump drive as well as in hard copy. These packages were-sent via Federal Express the week of December 20. At the end of the meeting, it was agreed that after approximately 2 weeks to review the information sent another meeting would be held in Sioux Falls at the paid expense of Dakota Access.

**MISCELLANEOUS**

39.     Separate and aside from Dakota Access's attempts to reach out and consult with the Standing Rock Sioux Tribe, I am also aware that the Corps set up several consultation meetings specifically with the Standing Rock Sioux Tribe in 2016.  At least one meeting occurred in January 2016, *see* Ex. B7, and one meeting occurred between at the end of February 2016.  I am aware that the Corps issued several letter responses to the tribe to address its concerns, and I am aware that the Corps conducted more than one site visit to Lake Oahe with the tribe later in 2016.

40.     Jon Eagle's testimony regarding Site 32WI1744, *see* Eagle Decl. at ¶¶ 17-18, is inaccurate because it was based on an error in the survey that he read.  The stone site that Eagle refers to is actually not in the DAPL right of way, and therefore is not affected by DAPL.  Dakota Access still considers the site ineligible for inclusion on the National Register—but the site will not be impacted at all.  Instead, DAPL crosses a former homestead at that site (that is also ineligible for inclusion on the National Register).  I notified the North Dakota SHPO of this error after reading Jon Eagle's declaration and attempting to verify his testimony and corrected information has been formally submitted to be incorporated into the final reports.

41.     I do not find Tim Mentz, Sr.'s testimony regarding cultural survey requirements credible, and do not believe he can credibly evaluate whether—based on watching from "200 feet" to "a mile or so" away—DAPL's archeological surveys were "completely deficient for identifying culturally significant sites."  Mentz Decl. at ¶ 32-33.  While Mentz testifies that he witnessed this purported survey in the Spring of 2014, *id.* at ¶ 32,  surveying for the DAPL project did not begin until the Summer of 2014, and surveying in North Dakota did not begin until August.  Mentz also fails to identify why he believed the purported DAPL surveyors were archeological surveyors, as opposed to biological surveyors.  DAPL conducted biological surveys on the route in the same area.  To me, this calls Mentz's entire narrative on DAPL's surveying efforts into doubt.

42.     Even assuming that Mentz witnessed a DAPL archeological surveying team in the field, Mentz's allegations regarding how people "would go far in distance and stop, do a shovel probe, and continue walking" do not speak to the quality of the DAPL survey. *Id.* at ¶ 33. Cultural Resource survey methodology is designed to be flexible, and can vary at the discretion of the Principal Investigator or Field Lead based on a variety of factors, including but not limited to setting, archeological probability modeling, modern disturbances, locations of previously recorded sites or surveys, and ground surface visibility. While the relevant SHPO provides minimum survey standards, these standards can be modified in the field so long as adequate description or reasoning is provided in the subsequent technical reports detailing the findings. If ground surface visibility is high (e.g., in recently plowed agricultural settings), archaeologists may walk along further spaced transects to ensure adequate visual inspection of survey corridors. Closer-spaced transects (spaced 5 to 10 meters apart) are also often used at archeological sites to define site boundaries based on the distribution of artifacts on the contemporary ground surface.

43.     If Mentz indeed witnessed a survey in 2014, it would have occurred in the late Summer or Fall of 2014. At that time, Dakota Access was largely only surveying buffers at U.S. jurisdictional waters or revisiting previously recorded sites. Mentz most likely saw DAPL's survey team between survey areas and casually walking close together until they reached the next survey area. The survey team could have possibly thought they saw something and conducted a quick shovel probe, dismissed it, and moved on.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 18, 2016.

_____

Monica Howard

- 13 -

# EXHIBIT D

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| STANDING ROCK SIOUX TRIBE | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| U.S. ARMY CORPS OF ENGINEERS | § | **Case No. 1:16-CV-01534** |
| | § | |
| Defendant, | § | |
| | § | |
| DAKOTA ACCESS, LLC | § | |
| | § | |
| Intervenor. | § | |
| | § | |

## DECLARATION OF JOEY MAHMOUD IN SUPPORT OF DAKOTA ACCESS, LLP'S OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

1)     My name is Joey Mahmoud.  I am over 21 years of age, of sound mind, and duly

qualified to make this declaration.  I make this declaration based upon my personal knowledge,

including without limitation (1) my personal involvement with the business dealings of Dakota

Access and the Dakota Access Pipeline ("DAPL"); (ii) my personal involvement in the

application, authorization, verification, and other permitting procedures that DAPL was subject

to and that are subject of this litigation; and (iii) my position as Vice President of Dakota Access

and Executive Vice President of Engineering & Construction of Energy Transfer Partners, L.P.

("ETP"), a beneficial owner of Dakota Access.

2)     I received a Bachelor's of Science in Animal Science from Texas A&M

University in 1993 and a Masters of Agriculture in Rangeland Ecology and Management

(Ecosystem Management) with an emphasis in Rangeland and Wetland Ecology Management

from Texas A&M University in 1996. My professional experience is centered on the

transportation and logistics of moving energy and related products across the United States. My

career emphasis has been in project management and execution, leadership of projects for

successful execution and deployment of development capital into energy infrastructure projects.

3)      ETP (collectively with its affiliates) primarily is engaged in liquid petroleum and

natural gas transportation in North American and, through subsidiaries, owns the largest liquid

petroleum and natural gas pipeline system by volume in the United States. ETP's oil and gas

pipeline systems have undergone significant expansion in recent years and span approximately

72,000 miles across North America.

4)      ETP transports crude oil to multiple refineries primarily in the Midcontinent and

Gulf coast states.

5)      Dakota Access is a limited liability company formed to construct and own DAPL.

In that capacity it has applied for, received and holds various federal permits, authorizations and

verifications needed for the Project.

6)      The DAPL Pipeline is a $3.8 billion private project extending approximately

1,172 miles, commencing in Stanley, North Dakota, and traversing through North Dakota, South

Dakota, Iowa and Illinois, terminating at the Patoka, Illinois hub.

7)      Over the past three years, as the lead person in charge of project development and

execution, I have approved, participated in and overseen the coordination, communication,

survey and consultation regarding the cultural resources and tribal coordination. My team of

professionals, contractors and consultants has spent nearly three years acquiring data to route the

pipeline to avoid sensitive cultural resources.

2

## HISTORY OF CULTURAL RESOURCE SURVEYS AND TRIBAL COOPERATION AND CONSULTATION BY DAPL

8)      The team has surveyed nearly the entire route for cultural resources. Reports have been provided to the four State Historic Preservation Officers and the USACE archaeologists. The reports and their findings have been accepted and approved by each agency. The agencies then made the determination that the planned route will have no adverse effects to any known sites.

9)      Additionally, over the course of project development, my team has attempted to reach out to and consult and coordinate with all of tribes in the region to identify any sensitive sites, such as Traditional Cultural Properties, and we have on multiple occasions shared the results of all of our surveys and data with each tribe, including the Standing Rock Sioux Tribe both in the form of electronic data and hard copy data.

10)      In the absence of data from the tribes and to assure that the project will not knowingly impact any unknown sites, DAPL has developed and deployed a comprehensive Unanticipated Discoveries Plan for each state that spells out the procedures to stop work, notify the proper authorities, which includes tribal contacts, and implement guidelines for how to mitigate the discovery of any unanticipated cultural resource during construction. The Plan was provided to the tribes for comment and their comments were incorporated. The Plan has been reviewed and approved by permitting authorities both at the state and federal levels.

11)      During the course of the planning process, my oversight and coordination also included multiple offers to the tribes to participate with my team to conduct tribal surveys along the proposed route where the private landowners would allow the surveys to occur.  This offer was made for the federal jurisdictional areas subject to the Clean Water Act and the National

Historic Preservation Act Section 106 guidelines plus for any and all areas that could reasonably be identified as having intact tribal features, which included undisturbed land, locations that are considered to have a high probability of containing cultural sites and areas identified by the various authorities, inclusive of tribal considerations, as having the possibility of containing cultural sites. These efforts and consultation resulted in 76 percent of the project route being studied for cultural resources. Lake Oahe was one of the areas investigated, studied, and evaluated for cultural and tribal resources.

12)     This offer to conduct tribal surveys was made multiple times throughout the development of the project all the way up until we began construction on May 16, 2016, and even at that time, DAPL voluntarily agreed to allow tribal monitoring at locations identified by various states, certain tribes, at the PCN locations identified by the USACE and where DAPL had identified sensitive locations.

13)     The vast majority of the tribes, and specifically the Standing Rock Sioux Tribe, over the course of the project have not: 1) participated in or coordinated with the DAPL process and explicitly told Dakota Access that they would not because it is not a government entity, 2) provided any data to assist in the routing of the pipeline to avoid any particular sites, 3) identified boundary areas as exclusion zones to avoid the tribes having to divulge the specific locations of their sacred sites; or 4) participated in any tribal surveys with my staff in planning or routing, only participating when there was USACE coordination. The only response or comments we received from the Standing Rock Sioux Tribe were to stop the project and categorically avoid the entire western Great Plains Region as that is considered the "Greater Sioux Nation's "historical range," which is an impossible request to accommodate.

4

14)     As late as the preparation of this affidavit only three tribes (which do not include the Standing Rock Sioux Tribe) have conducted some level of survey in coordination with Dakota Access, although all the federally recognized tribes with an historical interest in the region were given multiple opportunities over the period of two years to participate.  In fact, the Standing Rock Sioux Tribe has never agreed to participate in surveys with DAPL, provide any comments or cooperate in any meaningful manner to protect and avoid any known sensitive areas or otherwise cooperate with DAPL.  Similarly, and as further evidence of its approach to cooperative endeavors, the Standing Rock Sioux Tribe has refused to sign the Programmatic Agreement between the USACE and the 29 area tribes governing sovereign cooperation on Missouri River management issues. Even when DAPL, in coordination with the USACE held tribal coordination meetings, the Standing Rock Sioux Tribe chose to send a legal representative instead of a tribal or cultural professional.  Their entire participation has provided the appearance of preparing for and provoking a legal dispute rather than sharing data to avoid and protect cultural and tribal sensitive areas.

15)     Since Dakota Access has started construction on private lands near Lake Oahe north of the Standing Rock Sioux reservation, tribal members have conducted both violent and non-violent protests of the project and have denied DAPL, the private landowners who have signed easements, the shippers who are relying on the pipeline to transport their oil to monetize their upstream and downstream assets, the people of North Dakota who are relying upon the significant tax base the project will generate and the many, many jobs that have been and will be created, and the entire United States the lawful right to build the pipeline and to derive the benefits the project brings. Tribal members have been attempting to stop the project and block

5

the legal right of Dakota Access to construct on private land.  Over the past week, multiple

people have been arrested, including the Chairman of the Standing Rock Sioux Tribe, who on

information and belief may have been personally leading these civil uprisings to block our work,

including attempts to intimidate our employees, law enforcement and the landowner. On

information and belief, the Chairman gave tribal employees the day off last Friday to participate

in protests that became violent. See: https://app.box.com/s/v7sctzjemi2mgatk20cojo5tngvspz74

16)     Instead of working with Dakota Access to protect the resources that the Standing

Rock Sioux Tribe claims to want to protect, it has used this legitimate federal process to try to

stop the project rather than to enter into good faith negotiations or data sharing to protect cultural

resources.  In no instance has the tribe provided any data, coordination, consultation or

information to protect and avoid cultural resources, but rather they have tried to stop the project

at and with any means possible, including violating DAPL's legal rights.   This exact statement

has been made by multiple tribes over the project duration.

17)     In summary, although Dakota Access has attempted every avenue to facilitate

surveys and cooperation with the tribes, specifically with respect to the Standing Rock Sioux

Tribe, it has been met with opposition and obstructionism rather than any cooperative attempt to

provide data or engage in efforts to avoid cultural resource impacts.


## DAPL WAS ROUTED TO AVOID CULTURAL AND ENVIRONMENTAL AREAS OF CONCERN AND IS CO-LOCATED WITH EXISTING INFRASTRUCTURE

18)     DAPL is co-located with existing utility, roadway and infrastructure wherever

feasible.  Specifically, where DAPL crosses Lake Oahe, it is 100% located adjacent to and

within 22 to 300 feet from the existing Northern Border pipeline.  It also is co-located parallel to

an existing overhead power line owned by the Basin Electric that crosses Lake Oahe. Thus all three projects, the existing Northern Border and transmission lines and DAPL all cross Lake Oahe at the same location, which itself is a man-made lake, created by flooding portions of the Missouri River.

19)     The importance of DAPL paralleling these other utilities across man-made Lake Oahe, as well as certain other locations along the route, is that Dakota Access selected crossing locations that have been disturbed in the past - both above and below ground level - making it a "brownfield crossing location." The decision to cross at this brownfield location was made specifically to cross the man-made Lake in an area that had been previously disturbed by past and recent ground disturbing activities and where the likelihood of intact cultural or tribal features and resources would be extremely remote. This assessment was further validated by Dakota Access's very detailed, multiple cultural surveys with professional archaeologists and ethnographic specialists; by the USACE which had conducted its own surveys prior to Dakota Access for previous USACE endeavors and then specifically for Dakota Access, and by tribal representatives from the Standing Rock and Upper Sioux Tribes in conjunction with USACE site visits. In each case, no intact cultural or tribal features were found during any testing within the boundaries of the work area and Dakota Access was specifically told by the Standing Rock Sioux Tribe that it would not share any data because Dakota Access is not a government entity.

20)     I personally led, participated and attended two tribal coordination meetings attempting to solicit their participation in the process and directly hired a tribal liaison to provide an additional level of outreach to the tribes, again attempting to engage them in the process. Additionally, as part of the consultation and outreach process, Dakota Access attempted to meet

with the Standing Rock Sioux Tribe Historic Preservation Office to ascertain if there were any sensitive sites that should be avoided at Lake Oahe as well as along the pipeline length, but our requests to consult and share data were met with resistance and the tribe shared no data.

21)     The crossing at Lake Oahe will be installed using advanced construction technology called HDD or Horizontal Directional Drilling and will be installed between 90 to 115 feet deep beneath the bed and shoreline of the Lake to avoid impacts to unknown or undocumented sensitive cultural resources. Where the pipe becomes shallow at the Lake approaches, Dakota Access conducted detailed, above-ground surveys to insure the area was free of any intact cultural features. The depth of the crossing was chosen to avoid any potential cultural resource sites by being at depths that are too deep to contain cultural or tribal resources as the date of the geology and soils predates human occupation. Therefore, the construction activity surrounding installation of the pipe at Lake Oahe will simply not have any impacts to cultural or tribal resources as the impact zone is beneath the zone with the potential to contain human artifacts. This conclusion by DAPL's archeological consultant has been concurred with by the North Dakota SHPO through the Section 106 process.

22)     DAPL as designed is a buried oil pipeline generally installed at a depth of 4 feet as measured from the top of the surface. DAPL is subject to stringent design, construction, operation, inspection and maintenance requirements of federal pipeline safety regulations at 49 CFR Parts 194 and 195, which are administered by the Pipeline and Hazardous Materials Safety Administration ("PHMSA"). In addition to federal pipeline safety regulations, the design and construction will also adhere to safety codes and industry best practices, such as those issued by the American Society of Mechanical Engineers, the National Association of Corrosion Engineers

8

and the American Petroleum Institute, among others. Crossing of certain streams and rivers is completed by either an HDD or various open-cut methods approved by state and Federal agencies. The HDD employs GPS guided technology to dig a tunnel for pipe placement well below the river bed or the land surface to avoid erosive impacts from water flow or banks and to protect sensitive cultural and environmental resources. Public road crossings are completed by an underground bore leaving the road surface undisturbed. All road crossings are subject to various state and local permits.

23)    Dakota Access also incorporates a variety of safety specifications and best management practices that exceed those required by PHMSA, including: additional drain tile and topsoil protection measures important to the agricultural landowners; pipe mill inspections with on-site quality control measures including enhanced testing and record retention and additional pipe wall thickness (45% greater) at all public road, waterway and railroad crossings; installation of valves with motorized actuators to supplement local monitoring with remote monitoring; and, enhanced hydrostatic and other testing, including an inspection of the entire pipeline length by an internal deformation tool prior to startup and a cathodic protection system activated earlier than required. Exhibit A-1 provides a detailed list of the various commitments DAPL is executing "above and beyond" the state and federal regulations to insure the safety of the pipeline.

## REGULATORY OVERVIEW

24)    *Unlike oil pipelines*, construction of new interstate *natural gas* pipelines must be approved and permitted by the Federal Energy Regulatory Commission under the National Gas Act. The NGA contains a detailed federal approval process requiring a finding of public

9

necessity and convenience before a new gas pipeline may be constructed. For example, the pipeline that Dakota Access parallels at many locations and specifically Lake Oahe is a natural gas pipeline that was placed into service in 1982 and is regulated by the Federal Energy Regulatory Commission. As part of that project's development and execution, a Federal Environmental Impact Statement was produced, which considered the potential impacts or effects to cultural and tribal resources and concluded with the approval and construction of the pipeline. This would indicate that no significant effects to resources occurred and the pipeline was allowed to be constructed as proposed. DAPL is partially within and immediately adjacent to the previously disturbed area of the approved natural gas pipeline, and based upon the data that has been collected, the surveys completed, previous disturbance and current concurrence from the state authorities and USACE, no impacts will occur to cultural resources as a result of DAPL. In the event of a find during construction, DAPL has developed an approved, comprehensive Unanticipated Discovery Plan that will result in stopping work, coordinating the find with the appropriate agencies and tribes, and then restarting construction once the site or find is mitigated or an alternative crossing is identified. In contrast, Congress has chosen to **not regulate oil pipeline** projects without some other significant federal nexus, and as such, most oil pipelines are not federalized. Importantly, there is no federal agency charged with determining whether or how a common carrier liquid petroleum pipeline, such as DAPL, should be built. Instead, the States play a substantial role in regulating petroleum pipelines. Each state traversed by Dakota Access contains extensive planning and review processes and requires a particularized public utility commission determination of public need for new pipeline construction. Dakota

10

Access has successfully received all the required state and local level permits to site, construct and operate the DAPL pipeline.

25)     As part of the planning and permitting processes, Dakota Access submitted applications to the North Dakota Public Service Commission ("PSC") (filed on December 22, 2014), the South Dakota Public Utilities Commission ("PUC") (filed on December 15, 2014 and revised, December 22, 2014), the Iowa Utilities Board ("IUB") (filed on January 20, 2015) and the Illinois Commerce Commission ("ICC") (filed on December 22, 2014). Following an extensive evidentiary proceeding in each jurisdiction, a "Certificate of Good Standing" was issued by each Commission for the DAPL pipeline. Each Certificate was granted upon a finding that DAPL is safe, necessary and should be constructed to promote the security and convenience of the public.

26)     To the extent there is federal permitting for domestic liquid petroleum pipelines, it tends to be for the isolated, site-specific jurisdictional components, *e.g.*, crossing individual wetlands under jurisdiction of the U.S. Army Corps of Engineers ("Corps") or acquisition of easements for land under jurisdiction of a federal agency. For DAPL, lands affected by federal jurisdictional crossings or that require a federal permit comprise a very minor component (approximately 3%) of the project. To my knowledge, no domestic, interstate oil pipeline constructed in the last decade, that does not cross substantial federal acreage, has been subject to project-wide federal permitting requirements, and none have triggered the need to prepare either a project-wide federal Environmental Assessment or an Environmental Impact Statement.

27)     DAPL receives no federal funding and primarily crosses private land. Along its route, DAPL crosses approximately 0.02% (1,094 feet) of Corps owned property and

11

approximately 0.2% of the route (2.83 miles) of Corps managed private easements in North

Dakota and approximately 0.2% of the route (2.42 miles) of Corps managed private easements in

Illinois.  The total crossing of Corps fee owned land and  Corps easements over private land is

0.42% of the route. DAPL crosses no other jurisdictional federal or tribal trust lands.

28)     DAPL was only required to obtain pre-construction authorization for permits for

jurisdictional features under Federal permitting authority which includes approximately 3% of

the entire route (which is inclusive of the permit review area or the "area of potential effect").

Overall, approximately 0.55% of the project traverses land with waters of the U.S. jurisdictional

features.  Essentially, other than very minor and minimal crossings, the project was routed to

avoid Federal jurisdiction and to avoid and minimize impacts to regulated environmental

resources, which included cultural, historical, traditional and tribal resources that would be

protected under Section 106 of the National Historic Preservation Act.  This was not done to

avoid consultation, but rather in consultation and cooperation with the various authorities to

avoid and minimize impacts, which is the preferred form of mitigation under federal policy.

29)     DAPL crosses certain private lands on which the U.S. Fish and Wildlife Service

has non-exclusive conservation or grassland easements. These are non-jurisdictional crossings of

private land.

30)     DAPL crosses land that is owned by the Three Affiliated Tribes of North Dakota,

which is non tribal-trust land and where Dakota Access has secured an easement and agreement

from the tribes to cross, construct and operate the pipeline.  During this process, which included

a 14 month long negotiation that resulted in a favorable plan to cross tribal property, I personally

12

worked with the Tribal Chairman and certain other tribal members, employees and consultants to negotiate and resolve a mutually agreeable crossing agreement and easement.

31)     Dakota Access (and ETP) views the safety and integrity of its pipelines as its highest priority and its pipelines remain among the safest and most environmentally protective modes of transportation.  There is no safer mode of crude transportation in the world than pipelines. Designed to move nearly 6.5% of the entire domestic production of crude oil, DAPL is an essential element to the domestic crude oil supply chain.   Based upon U.S. Department of Transportation data and statistics it often is reported that pipelines are between 3.6 to 4.5 times safer than rail and 34 times safer than truck transportation of crude oil.  For a large portion of the oil located on the western side of the Bakken oil field, there is no way to move this oil from its Bakken origin to the south and east without crossing the Missouri or Mississippi Rivers, and this includes rail, truck and pipelines mode of transportation.  Pipelines by far minimize the potential for impacts.

32)     DAPL's design employs the very latest operational, safety and environmentally protective technologies.  For example, many locations involve horizontal directional drilling, which places the pipeline deep beneath the surface to avoid sensitive environmental and cultural resource impacts. Additionally, DAPL has developed and strictly adheres to a robust Facilities Response Plan to manage and respond to any type of pipeline event.  All DAPL employees will be fully trained in emergency response planning to complement the capability of certified, professional response teams to ensure safe pipeline operation.

33)     Although not a Federal or State requirement across the vast majority of the project area, DAPL made multiple attempts to work with the various tribes.  For example, during the

initial development of the project, significant effort was made to avoid impacts to Federal and tribal lands.  By focusing on this key routing criterion, Dakota Access was able to avoid 99.98% of federal land along the entire route, with the exception of three small crossings of USACE owned fee land at Lake Oahe. DAPL avoided all (100%) of tribal trust lands.

34)     Even though public and tribal lands were avoided, Dakota Access still attempted to coordinate with the tribes to identify key sensitive locations within the various historical ranges of the tribes and/or key features of cultural and spiritual significance.  As early as June 2014 in the project development cycle, Dakota Access had begun to reach out to the various tribes to identify these sensitive areas, and in fact, in September 2014 the Standing Rock Sioux Tribe was the first tribe Dakota Access met with in person as part of the coordination process.

## PURPOSE OF THE DAKOTA ACCESS PIPELINE

35)     The primary purpose of DAPL is to provide safe and cost effective shipment of Bakken/Three Forks crude to U.S. markets.  DAPL will deliver Bakken crude on a very cost effective basis to Patoka, Illinois, for shipment primarily to eastern and Gulf refineries.  DAPL transportation efficiencies will enable Bakken crude to be more cost competitive, creating substantial benefits to Bakken producers, mineral royalty owners, including the United States, shippers and the American consumers, especially in the current market downturn.  The importance of this pipeline and its low cost service is to allow certain producers to continue to produce in a depressed pricing environment effectively keeping the crude flowing to market, whereas without the pipeline, many producers would be forced to further curtail production or stop production entirely until the market conditions improved.

14

36)     The expanded capacity of DAPL is approximately 570,000 barrels of oil per day,

and DAPL is expected to initially transport approximately 450,000 barrels of oil per day.  In

response to shipper requests and following publicly announced open seasons,  DAPL received

contractual commitments from 9 eligible shippers with terms ranging up to 10 years.  With the

overwhelming commitments, DAPL has been requested to conduct a third open season to expand

the initial capacity up to the expanded capacity case.  That process is currently underway.

37)     In connection with its long-term capacity transportation contracts with 9

committed shippers, Dakota Access has committed to complete, test and have DAPL in-service

by January 1, 2017.

38)     Increased access to growing supplies from the Bakken region is forecast to

displace imported crude oil delivered to U.S. refineries from other production fields, including

Mexico, Venezuela, Africa and the Middle East, and will enhance domestic national and energy

security.

### DAPL PLANNING AND PUBLIC CONSULTATION

39)     Although not required by any Federal law, DAPL conducted a NEPA like

alternatives analysis to identify and select the preferred route that minimized impacts to the most

stakeholders and resources.  Dakota Access engaged in over three years of planning, design,

permitting, consultation and environmental survey work for the routing of DAPL. In selecting

this specific route, Dakota Access evaluated options and identified the most feasible route that

considered a host of factors including constructability, population centers, cost, and minimization

of potential public, cultural and environmental impacts.  To the extent feasible, Dakota Access

avoids routes that cross federal, state, tribal trust and environmentally sensitive lands and

features and does not trigger any Environmental Justice concerns, for instance as compared with crossing to the north of Bismarck, North Dakota. See Environmental Assessment ("EA") prepared by the U.S. Army Corps of Engineers at:

http://www.nwo.usace.army.mil/Missions/Civil-Works/Planning/Project-Reports/Article/633496/dakota-access-pipeline-environmental-assessment/.

40)     Route planning concluded that the preferred and most environmentally protective route would co-locate with existing linear utility features, such as transmission lines and the Northern Border Pipeline corridor to the greatest extent practical in order to minimize new land disturbance and maximize public safety benefits from co-locating with utility infrastructure. After many months of route planning, DAPL identified landowners for each tract of land as the initial route was refined and the construction alignment finalized.  Landowners were asked for permission to conduct civil, cultural and environmental surveys. Following more detailed engineering, DAPL began acquisition of easements in November 2014 for all states except Iowa, which began in February 2015.

41)     DAPL has identified 3,686 tracts of property along the approximately 1,172 mile route.  DAPL has acquired or is finalizing acquisition of 100% of the private land rights along the route.

42)     In addition to any specific public notice initiated by federal, state or local agencies with jurisdiction over DAPL, Dakota Access has implemented a public outreach and consultation programs, which include:

a)  A Public Awareness Program that meets and exceeds industry (American Petroleum Institute Recommended Practice 1162) and federal (49 CFR 195.440) requirements

16

addressed to the affected publics, local public officials, emergency officials, and excavators,

b) DAPL has consulted with and coordinated with all state and Federal resource agencies regarding sensitive ecological resources including wetlands, sensitive vegetation, wildlife, and endangered and threatened species, many of which have been the subject of public review in state and federal open forums and documents.

c) DAPL was amenable to the sharing of the Federal Response Plan as appropriate with Standing Rock Sioux tribal authorities and responding to its comments on the Plan, including notification contacts.

d) Dakota Access offered access to all the known, federally recognized tribes interested in conducting cultural resource surveys, which resulted in project changes to avoid, mitigate and minimize impacts during the design stages. Dakota Access made multiple offers, met with interested tribes on three different occasions and communicated with each known interested tribe to solicit their input into the routing. However, no tribes (except the Osage Nation) proactively accepted the offer until late in the final steps of the permitting process and in fact only three tribes, the Osage Nation, Upper Sioux, and the Northern Arapaho agreed to do surveys at the PCN areas and only three tribes accepted our proposal to survey non-PCN areas – Three Affiliated Tribes, Osage Nation and Northern Arapaho.

e) DAPL has developed, provided copies of, accepted comments from and modified its Unanticipated Discovery Plan in coordination with the various tribes who provided

comments, and in coordination with the various state and federal agencies to protect cultural resources during construction.

f) DAPL has agreed, in coordination with the USACE and in compliance with the Nationwide Permit and other Federal approvals, to allow the various tribes to provide tribal member monitors during construction, which for instance, includes participation by the Tribal Historic Preservation Officer for the Standing Rock Sioux Tribe. This opportunity to monitor includes non-PCN areas where DAPL and the specific tribes have agreed to monitor non-jurisdictional or permitted areas.

g) DAPL has funded and hosted three tribal consultation meetings to disseminate information and address the concerns of tribes and offered to fund tribal surveys prior to construction.

h) Dakota Access has conducted cultural resource surveys along 76.5% of the project route, which includes all waters of the U.S. (inclusive of all PCN areas) and all areas where an agency, regulation or any of the many archaeological consultants identified an area as having the potential to contain cultural resources (this included 100% of all work areas in North and South Dakota, 42.3% in Iowa and 45.8% in Illinois).

i) During this outreach over a period of 25 months, Dakota Access has listened to, addressed and accommodated most concerns.

43) With minor exceptions, the vast majority of the public and public officials who have expressed a view generally support or have approved the project.

**DAPL STATUS**

44)     Dakota Access designed, is building and will eventually operate DAPL in compliance, and often in excess of all local, state and federal laws and regulations and any safety requirements.  DAPL has hired the best and most experienced engineering design firms, has bought the best and highest standard materials on the market (also which are mostly domestically produced, fabricated, manufactured and supplied), has engaged the most experienced contractors in the business and along with some of the most well-trained, and experienced employees in the market providing for the safest pipeline in the industry.

45)     Contractors have been selected and contracted to complete survey work; construct the pipeline; conduct environmental, archeological, craft, weld testing and other inspections; and provide spill response planning and other project related services.  Contractors were screened based on ETP standards and industry safety and experience.  Major construction and service firms already hired directly by Dakota Access and under contract include: 2 general contractors and 5 national craft unions to construct a total of nine pipeline spreads, pumping stations and associated facilities.  In addition, monitors and inspectors are on site to assure construction quality and environmental, archeological and cultural resource protection, along with specialized testing organizations to independently test and document weld quality and complete hydrostatic pressure tests of the DAPL pipeline.  In turn, those contractors and consultants have hired dozens of subcontractors from the local area and region. Approximately 10,000 U.S. jobs are involved in the construction of DAPL. In addition, there are multiple state and county inspectors across each state providing inspection and monitoring of the project construction to insure compliance with the state or local permits, rules and regulations and any project specific plans and procedures

19

approved by the various local and state authorities. Additionally, the Department of

Transportation via the Pipeline Hazardous Materials Safety Administration is actively inspecting

the materials and construction of the pipeline on a frequent and constant basis and will oversee

the operations and maintenance once the pipeline goes into service.

46)     Within the United States, there are a limited number of general contractors and

workers qualified to complete large diameter pipeline construction, including both union and

non-union work forces. Dakota Access has made commitments to the various trades who are

part of the National Pipeline Agreement to build the pipeline, plus one additional national union.

The labor unions involved with DAPL are the International Brotherhood of Teamsters, Laborers

International Union of North America, United Association of Journeymen and Apprentices of the

Plumbing and Pipefitting Industry, International Brotherhood of Electrical Workers and

International Union of Operating Engineers. Generally, the contractors provide approximately

50% of the workers from their own employee base and about 50% of the workers are hired from

respective local union halls.

47)     Dakota Access began construction of private portions of the DAPL Pipeline on

May 16, 2016 in non-Preconstruction Notification areas (*i.e.,* non-NWP PCN and dryland private

lands) following the receipt of the key local and state permits and just recently in the remaining

PCN locations following the issuance of the USACE permits and verifications. Federal

jurisdiction areas requiring advanced notice and receipt of the required authorization were not

impacted until receipt of the relevant federal permit, easement or verification. For example,

Dakota Access has temporarily agreed not to commence the HDD under Lake Oahe until this

court rules in this preliminary injunction proceeding on August 24, 2016, which based upon the 90 to 120 day schedule to execute the HDD, is a significant concession.

48)     Enjoining DAPL construction while the court determines if the overall USACE regulatory program has a flaw would be an unfair decision isolating DAPL from the hundreds of thousands of projects that have been constructed or are currently working under the same premise and guidelines under NWP 12. An injunction would cause unjust, irreparable harm and damage not only to the thousands of people receiving their incomes from DAPL project work, the entire U.S. from an energy supply and security standpoint and the owners of DAPL, but to the entire U.S. societal infrastructure by denying this Congressionally provided for streamlined permitting mechanism for future roads and water, cable, transmission, oil, gas and similar utility corridors. An injunction against DAPL would necessitate revoking or rescinding all verified and programmatic NWPs creating a national state of non-compliance and a work stoppage on various infrastructure projects and lawful activities across the entire United States.

49)     At this time, DAPL has concluded roughly 45% of construction.

50)     Nearly $1 billion in materials have been secured and are located on-site across the 1,172 miles of the system, being or ready to be installed. Total project spending through August 1, 2016 is approximately $1.96 billion.

51)     To complete construction by the January 1, 2017, in-service date, installation work must continue. Land reclamation activities will continue to meet landowner and permit requirements. Construction generally is occurring six days per week for a minimum of ten hours per day or as long as possible each day, but has been delayed for 5 months on properties with a federal nexus due to supplemental tribal coordination process implementation. The continued

21

delay is unacceptable and is unfair as DAPL has attempted in every manner to work with, educate, consult, coordinate and share any type of information with the tribes and has proven via detailed surveys and consultation with the states and the USACE that no impacts will occur that have not been otherwise permitted or mitigated through the legal and coordination process under § 106 of the National Historic Preservation Act or under state law.

52)     As of this date, approximately 8,000 workers are currently in the field, which continues to ramp up daily and overall the project will employ approximately 10,000 people over the course of the job.

53)     DAPL also is generating indirect economic stimulus and support jobs in local communities catering to the construction effort, such as food, hospitality and transport. With the majority of workers moving around up and down the job, they are spending their income on goods and services in the various communities traversed along the route.  Couple this spending with the tax revenues from the income taxes and taxes on materials, the communities and states traversed by the project are benefiting from the influx of many millions of dollars into their communities.  These benefits would simply cease if the project was suspended or stopped and each and every person, the communities and the states would be financially harmed immediately and permanently.


## IMPACTS FROM AN INJUNCTION

54)     Each remaining calendar day is vital to timely construction of the DAPL pipeline. Supplemental tribal consultation processes, above and beyond the normal and customary process for any nationwide permit, already have delayed project construction for 3 months resulting in

critical path timing at the Lake Oahe crossing. Additionally, project construction delays from a
preliminary injunction are extremely costly and follow-on effects could effectively cause project
development to cease. *See infra.* A bond to pay for delay costs would be very expensive for
Plaintiff, but would be just as a result of the financial impacts that would occur to the multiple
owners of the project, the impacts to the thousands of workers, the communities and states
traversed by the project, the contractors and all American's who rely upon crude oil, its resulting
products, fuels and lubricants utilized every day.  The immediate financial damages to DAPL
even for a temporary shut-down would be greater than $430 million plus $83.3 million per
month resulting in damages of $1.4 billion in the first year, not including the losses on the
materials and expenses already spent on the construction, labor and equipment. If for some
reason, DAPL was able to carry the cost of construction spreads, staff and equipment on a
month-to-month basis to preserve its ability to restart construction, those costs would total $372
million per month for every month of delay.  However, this number would be too great to absorb
and therefore the project would have to shut down.  This level of economic harm would be
direct, irreparable and not recoverable, and would have irreparable harm and damage to DAPL's
and ETP's reputation and ability to conduct business in the future.  Stopping work at this time is
near impossible without causing significant and extreme harm.  It would be an infeasible task
without grave and irreparable impacts to DAPL, its workers, the landowners, economy, both the
state and federal government, and the environment.

  55)  If a temporary injunction of indefinite term is granted pending consideration of a
permanent injunction in the normal course of judicial business, DAPL's construction on the Lake
Oahe Corps easement and PCN areas were to be halted, construction of the entire project would

cease, and the project itself jeopardized. It would be prohibitively costly to move people and equipment around outside the current construction schedule, which was created in reliance on long-established Corps permitting and verification procedures.

56)     If an injunction is granted, Dakota Access estimates hundreds of deviations from the construction schedule and construction plan would occur, costing $540,000 in relocation costs for each occurrence of having to move around each USACE jurisdictional feature. For example for the NWPs with PCNs, that could mean 203 permits x $540,000 totaling $109,260,000 in direct damages just to move around the PCN areas. DAPL already has had to move around some of these locations that resulted from the previous delay in the project timing from May to July, resulting in direct damages of nearly $25 million dollars in move around damages. Extend these damages to all USACE jurisdictional areas (in addition to the PCN areas) and the costs are too severe to continue with construction and unfeasible to overcome. The court would be essentially condemning the project with no trial and no evidence of impacts to tribal or cultural properties (conversely there is a mountain of data suggesting and confirming there are no impacts as concurred by the four State Historic Preservation Officers and the USACE archaeologists).

57)     An injunction would suggest that all nationwide permits across the entire U.S. would have to be placed on hold or suspended while the court heard and decided this case because if DAPL was suspended after and based upon the approval of the permits in accordance with the USACE policies and procedures of the USACE permitting program, then it would only stand to reason that all nationwide permits that relied upon the same policies and procedures of the USACE would be invalid. Therefore, an injunction decision logically would necessitate that

24

all existing, in progress and future nationwide permits would have to be suspended while this challenge was heard, resulting in a national non-compliance crisis and disruption to the entire U.S. economy.

58)    Construction would come to a halt with jobs, income and union benefits such as healthcare and retirement irretrievably lost to these approximate 10,000 working class families.

59)    As of August 1, 2016, Dakota Access has incurred approximately $2 billion in project development costs. It plans to spend approximately $3.8 billion to complete project construction. If this Court issues a preliminary injunction, the Dakota Access beneficial owners will incur substantial monetary costs and penalties under the terms of the contracts entered into with unions, other service providers and related project completion agreements and would suffer the loss of resources spent on the materials and equipment purchased to construct the pipeline, all of which would not be recoverable. Currently, DAPL is spending roughly $1.3 million dollars per spread per day or approximately $11.7 million dollars per day on contractor labor and equipment and has plans to move this $14.3 million per day. In the event of a short-term cessation of work, Dakota Access simply could not sustain that cost with no production and without the certainty of capital recovery within the project economic predictions and therefore would cease construction and release the workforce and contractors.

60)    In the event of a prolonged work cessation, contractors and equipment would be demobilized. At this point, the project is roughly 45% installed and project construction is advancing by roughly 1% per day with the goal of finishing installation around December 1, 2016 and then going into service January 1, 2017.

61)     At this point, it will take as much work and land disturbance, if not more to temporarily stabilize, continuously maintain and protect the right-of-way than it would to finish the pipeline.  For the majority of the pipeline length and over 98% in North Dakota and South Dakota, the right-of-way is cleared, graded and the pipe strung along the right-of-way waiting for the trenching activities and welding to occur (which construction is almost 90% complete in North and South Dakota).  This means that the soils have been disturbed to the depth of the top soil in most places, roughly 1 to 3 feet below the surface where any cultural features are likely to occur. The only remaining digging activities left would be the actual trenching activities in less than 10% of the project areas in North and South Dakota that would include roughly a 5 to 8 foot wide trench along the remaining lengths of pipeline to depth of an additional 4 to 8 feet deep. Therefore to stop construction now would cause more harm than good and would not prevent any harm.  Additionally, nothing to date has been uncovered in North and South Dakota of relevance to any interested parties.

62)     In theory, demobilization would first require a very carefully and detailed plan to secure those portions of the route and road/river crossings that have been exposed, road/river crossings where drilling and boring have been initiated and other locations where project impacts have already occurred.  Along the mileage where topsoil has been stripped and grading or trenching has begun, there would be significant incremental impact to the environment and landowners.  To avoid or reduce such impacts, as part of any demobilization, subsoil and topsoil would need to be replaced and stabilized by re-seeding and implementing additional erosion control measures – all of which require additional capital not available to the project. Additionally, pipe sections would need to be lowered into trenches and trenches refilled.  For

26

safety and other reasons, trenches should not be left open for any length of time to protect the public, wildlife and the environment, but with an injunction these unrecoverable economic and potential harmful impacts would result and the likelihood of safety issues would increase significantly.

63)     Resuming work, if feasible, following demobilization would require development of a construction plan based on duration of the shutdown, environmental and landowner "windows" affecting the timing of activities in specific areas, and the availability of the contractors and workers who would have dispersed following an injunction-spawned layoff. If demobilization occurs, it is less than certain that the project will ever re-start.

64)     In the majority of the easements, construction must finish within 18 months from starting. If an injunction is imposed, based on a May 16, 2016 start date, DAPL's rights to construct terminate November 2017 for the majority of the project. In the event of an injunction, prior to restarting DAPL would have to repurchase the permanent or temporary easements, which would be a significant and unpredictable amount of money, to reenter the properties. This is a direct and unrecoverable harm to DAPL and its financial and equity partners.

65)     Furthermore, the fields and farms along the route have been compensated for this growing season. A delay or suspension would then require an additional year or more of impact to the farmer and their crop production (2016). This means DAPL would have to compensate the farmers for those additional lost crops and the domestic and international consuming public of agricultural commodities would not have the benefit of those crops to purchase. This harm would be permanent and unrecoverable and would be approximately $70 million (assuming the easements can be renewed).

27

66) The incremental cost (over and above project budget) to demobilize and then (once an injunction is lifted) to remobilize contractors, equipment and workers is estimated to have an approximate cost of at least $200 million. This cost is inclusive of fixed costs for contract terminations and cancellation of service and supply contracts; completion of activities required to stabilize the right-of-way, roadways and river crossings; additional measures required to place an additional coating on the pipe to prevent ultraviolet degradation, application of corrosion inhibitor systems and payment of additional incremental crop damages; maintenance of the idle pipeline and facilities; and, the incremental cost expected to be incurred to enter into new contracts for qualified pipeline construction firms, inspectors and other services . These costs cannot be recovered. This estimate of the incremental cost is based on DAPL's knowledge of the higher bids of non-successful potential contractors not selected for this contract or delay and unit price items included in the existing contracts.

67) Dakota Access has spent many months in a competitive bidding process with General Contractors for the DAPL project and remobilization would not allow a similar competitive bidding process. Instead, a remobilization designed to re-commence work as swiftly as possible would require that construction services be secured through a negotiated contract price process. Contractors would be presumed to escalate their previous estimates due to the higher costs of remobilizing an extensive, full line of equipment in a shorter timeframe and hiring key workers in a much compressed timeframe *e.g.*, some major equipment now required to be leased at higher costs, premium paid to supervisory or key skilled trades to entice them back to the job and away from some other job they may then be on.

68)     The additional "variable" costs per month of delay caused by an injunction include:  (1) $1.5 million per month to establish crews to maintain environmental controls at the worksites, inspect those worksites, maintain leases for field offices and pipe yards, and assure security of the facilities; and (2) a cost of capital expense of $3 million per month. Further, $15.5 million would be required to reacquire the project lending instrument. These costs cannot be recovered.

69)     DAPL's beneficial owners earn revenue based on negotiated terms for each barrel transported.  Based on contracts negotiated with DAPL shippers and volumes that will be transported for other shippers, Dakota Access estimates that delay in initiation of DAPL operations will result in a 2017 revenue loss to its partners and the investing public of approximately $913 million, rising to over $1 billion in 2018, and increasing each year thereafter. These costs cannot be recovered.

70)     In connection with its long-term transportation contracts with 9 committed shippers, Dakota Access has committed to complete, test and have DAPL in service by January 1, 2017.  The long-term transportation contracts give shippers a right to terminate their commitments if DAPL is not in full service per the contract deadline. Meanwhile, faced with an uncertain delay, shippers would need to determine alternative sources for secure, reliable transportation of crude oil supplies to the refineries. These costs cannot be recovered and loss of shippers to the project could effectively result in project cancellation.

71)     In addition, there are downstream losses to the beneficial owners of DAPL and other producers and shippers from the loss of: crude to other transportation and refining facilities; infrastructure costs to connect to DAPL; Bakken production due to the transport

economics of DAPL; royalty revenue to mineral owners, including the U.S. from lost production and lower market prices for Bakken supply absent DAPL; and, greater environmental health and safety risk due to increased reliance on rail and truck transport. These costs cannot be recovered. In addition to the impacts to the beneficial owners and users of DAPL, a workforce of approximately 10,000 people will face layoffs and associated adverse impacts. *See, e.g.,* Ex. D to Dakota Access LLC's Opposition to Plaintiff's Motion for Preliminary Injunction ("Opposition"), Decl. of Tom D. Gross on behalf of the United Association of Journeymen and Apprentices of Plumbing and Pipe Fitting Industry of the United States and Canada; Ex. E to Opposition, Decl. of Mark Maher on behalf of the International Union of Operating Engineers; Ex. F to Opposition, Decl. of Robert Poteete on behalf of Precision Pipeline, LLC; Ex. G to Opposition, Decl. of Perry Schuldhaus on behalf of Enbridge Energy Partners, L.P. and Enbridge Holdings (DakTex) L.L.C.; Ex. H to Opposition, Decl. of Ross Eisenberg on behalf of the National Association of Manufacturers; Ex. I to Opposition, Decl. of Gregory Davis on behalf of the Laborers International Union of North America; Ex. J to Opposition, Aff. of Marion Davis on behalf of the International Brotherhood of Teamsters. These are highly paid construction jobs where laborers, equipment operators, welders, and environmental inspectors earn fully loaded wages of between $53 and $105 per hour and expect significant overtime hours during the six day/week - ten hour/day work schedule for much of the construction period. Many workers also qualify for a per diem for lodging and food. While it is feasible some of these workers could be hired to work construction jobs in other areas on other jobs that is not always possible because the pipeline workforce is so specialized and there are few large infrastructure or building projects that would absorb this many workers. Once forgone, income to these families is lost forever.

Thus, many would need to travel far from home to find work and many likely would face unemployment. Moreover, these jobs offer lucrative benefits, unlike most trade jobs in the current economy.

72)     The construction process occurs in an assembly line fashion to minimize the time from grading to reclamation, which in turn minimizes the potential for environmental impacts. With the clearing, grading, trenching, pipe laying and welding portions of the construction sequence well underway, there already is significant mileage that has exposed soils and open excavations, and an injunction ordering work cessation would pose significant additional cost and incremental risk to the environment. For example, rain events during a shut down without proper man power and equipment to maintain those areas similar to conditions during construction could result in unnecessary sedimentation to wetlands and streams and impacts to wildlife and other environmental resources. This could mean impacts to off right-of-way cultural features that were specifically avoided by routing but could be impacted by the unsecured erosion and sedimentation resulting from a work stoppage.

73)     Should this Court impose an injunction, there are also incremental impacts to landowners beyond those included in construction planning, mitigation and landowner damage settlements. Specifically, delay could defer construction to the peak of harvest in some areas and an injunction would significantly prolong the time that landowners, tenant farmers and the community need to be inconvenienced in having to work around construction in their communities that already has begun. Dakota Access has assured or established access points to fields and detours around construction prolong these temporary effects, especially to farmers.

31

Delays would impact these people which would ultimately delay or impact their ability to grow, harvest and sell their crop commodities.

74)     Landowner and land use practices vary greatly across the 3,686 tracts of private land, and in many cases, special landowner accommodations have been made based on the current local construction schedule. For example, we are contractually obligated to complete construction by a certain date to accommodate agricultural practices for specialized seed in Illinois.  If construction is delayed and reclamation is not completed this fall, next year's planting is likely to be delayed, which would jeopardize existing contracts.  These damages would total $4.5 million in damages for specialty seed contracts in Illinois alone.  In another example, Dakota Access agreed to adjust its construction schedule to accommodate duck hunting in Illinois by agreeing to complete construction by a certain date to facilitate flooding the fields. If this obligation is not met, DAPL would be exposed to a $3 million penalty. In addition to Illinois individual landowner damages, DAPL has multiple site-specific or individual provisions located across the remaining three states.  For example in North Dakota, there are many tracts that have "completed-by" requirements that if DAPL is not completed with construction by the end of 2017, DAPL would suffer approximately $4.3 million in damage payments to the landowners.  Numerous other site-specific examples are factored into the current construction and tract-specific timing schedules now underway and a delay would result in missed commitments, lost revenue and substantial financial damages in the millions of dollars. A delay in construction now would make it impossible to meet the January 1, 2017 in-service date and risk inordinate, non-recompensable financial harm to the beneficial owners of DAPL and downstream industry participants, which directly, negatively impacts the American public

32

75)     There also would be significant economic impacts to the communities and the public. DAPL represents a significant new asset that will be subject to property tax revenues in four states and potentially on certain prospective tribal trust lands. Specifically, annual property tax revenues in the four states are estimated, following consultation with respective taxing authorities, to be approximately $55 million dollars. In addition to property tax, the mobilization of workers already has resulted in sales tax benefits to local and state governments as supplies, fuel, supplies, lodging, food, expendables and services are purchased from local business owners. While Dakota Access cannot speak for the states, I am aware, based on my discussions with elected officials over the last three years that the incremental property and sales/use tax revenues are welcome. The local spending from the project construction also contributes to the ongoing economic recovery. A delay in construction of DAPL has an immediate, direct and negative impact on the local economies of the states through which pipeline passes. In addition to consumption related taxes, each state and local community would suffer from the loss of income tax on the pipeline as it would not go into operation and therefore the states and local jurisdictions would only be able to assess a pro-rata amount of property tax on the pipeline based upon the deprecated value of the material instead of the actual revenue tax methodologies often utilized by the states to determine property tax on pipelines. This would be an irreparable harm to the states and local communities that could not be recovered.

76)     In some cases, an injunction will cause workers from out-of-town to vacate their temporary housing and return home. Thus, local communities now experiencing the economic benefits of housing, feeding, and supplying workers, their families, and suppliers will be

adversely impacted. While Dakota Access was not required to complete an economic impact analysis for DAPL as a whole, during the proceedings before the state utility commissions, it engaged with economists to use commonly accepted economic input-output models. These models predicted the trickle down of local investments such as new workers hired by the hotel and hospitality industry or other jobs indirectly created as workers spend earnings and landowners spend payments received for acquisition of an easement. These economics suggest that for every dollar spent on the project roughly $5 is generated across the U.S. and for each $1 million invested in DAPL, there would be 2.6 new direct and indirect jobs created. These jobs and benefits would be lost and could be lost forever if DAPL were suspended and potentially terminated over the suspension.

77) Additional injunction-induced damages would result from the cost to crude producers and shippers and to society due to lower royalty income, reduced tax revenue and related to higher costs for interim shipping options and the attendant environmental and spill risks. Based upon the statistics of pipeline to rail or truck transportation methods, the incremental safety hazards of the alternate methods of transportation would increase 3.4 to 4.5 times with rail and 34 times with trucking, significantly increasing the potential harm, damage and safety to the public. This impact can simply be avoided by the construction and operation of this pipeline by removing the 5 to 7 unit trains of crude oil per day or the 200 plus trucks that would be removed from the roads each day.

## DUE PROCESS AND THE RULE OF LAW

78)    Throughout project development, which includes permitting the pipeline, Dakota

Access has relied upon the current laws and regulations that govern the siting, routing and

construction requirements of crude oil pipelines.  Dakota Access made good faith decisions

based upon the law to deploy precious capital and invest over $3.8 billion dollars on a project

that connects domestic crude oil supplies to domestic refineries for public consumption.

79)    In all respects, DAPL has followed the laws and has relied upon the agencies with

permitting authority to insure that the permits they have issued are valid and have been issued in

accordance with governing regulations and laws.  In this particular matter, DAPL relied upon the

USACE and the Nationwide Permit program to make informed decisions. Any applicant should

have the confidence that once a permit is issued it would remain valid unless the applicant

violated the conditions or terms of the permit.  For example, Dakota Access worked closely with

the USACE to identify the preconstruction notification locations as well as to clearly identify the

extent of the action area for which the nationwide permit preconstruction notification area would

cover.  Based upon those planning steps, Dakota Access made significant and substantial

business decisions to deploy the resources to begin construction of the pipeline after 18 months

of permitting with the USACE as well as spending more than 24 months (since June of 2014)

working with all the various interested parties. Construction in lawful, duly authorized areas in

accordance with the terms of the various permits that have issued is not wrong-doing in any

sense, as DAPL has been accused of, but rather consistent with the law, due process and good

economic stewardship of investor financial resources deployed in permitting this project. Billions

of dollars have been invested into a U.S. energy infrastructure project that all Americans, even

35

the opponents of this project, materially benefit from once it is placed into service.  Anything to the contrary would result in a flight of capital from deserving projects in the U.S. and invalidation of the USACE and U.S. regulatory processes.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and accurate.

Executed on this _18th_ day of August, 2016.

Joey Mahmoud

# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STANDING ROCK SIOUX TRIBE,

                Plaintiff,

v.

U.S. ARMY CORPS OF ENGINEERS,

                Defendant.

Case No. 1:16-cv-1534-JEB

**DECLARATION OF JON EAGLE, SR. IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION**

I.      QUALIFICATIONS AND RELEVANT EXPERTISE

1.      My name is Jon Eagle Sr.  I am the Tribal Historic Preservation Officer

("THPO") for the Standing Rock Sioux Tribe ("SRST"), and an enrolled member of the Tribe.

The Standing Rock Sioux Tribe is located in both the States of North Dakota and South Dakota

and is home to the Hunkpapa and Sihasapa bands of Lakota Oyate and the Ihunktuwona and

Pabaksa bands of the Dakota Oyate.  We are a member tribe of the Oceti Sakonwin, also known

as the Great Sioux Nation.  I was appointed by the SRST Council to serve in this capacity on

February 8th, 2016.

2.      The SRST/THPO office is authorized by the National Historic Preservation Act,

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

1992 amendments, to include the Native American Graves Protection And Repatriation Act, Archaeological Resources Protection Act, Antiquities Act of 1906 and the Standing Rock Sioux Tribes Cultural Resource Code, Title XXXII. The SRST/THPO is a regulatory office that manages and protects cultural resources, sacred areas, and sites within the exterior boundaries of the Standing Rock Sioux Tribe to include the original boundaries of the Fort Laramie Treaties of 1851 and 1868, and the aboriginal homelands of the Oceti Sakonwin.

3. I have twenty-six years of experience working with children, families and communities and seventeen years of experience consulting with tribal, state and federal agencies. After studying Sociology at Fort Lewis College, in Durango, Colorado, I returned home to Sitting Bull College where I finished a Bachelor of Science Degree in General Studies. I have two years of experience working with the SRST/Elders Preservation Council to identify and evaluate Stone Features, stone cairns, and stone effigies. Since my appointment I have attended the Advisory Council on Historic Preservation, National Historic Preservation Act, Section 106 Essentials and Advanced training in Denver, Colorado.

4. I am a descendant of the Oceti Sakonwin and come from the Hunkpapa Oyate. I speak the Lakota language and am considered to be knowledgeable of our cultural and spiritual laws, oral history, and sacred knowledge and have been asked by my people to serve in the traditional leadership of our people.

5. I was born in Minneapolis, MN and returned to Standing Rock with my parents at the age of 2 and have lived here since then, only leaving to serve in the United States Army and to attend college. I have dedicated over twenty six years of my life to helping my people.

6. In 2014, the Cheyenne River Sioux Tribe honored our relationship with the Buffalo Nation. It was at this traditional gathering that I heard Tim Mentz of Makoce Wowapi,

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

LLC., talk of stone features. During his presentation he showed a drawing of a site in North Dakota that his company found while conducting Class III Cultural Surveys near Williston, North Dakota. The site was of religious and cultural significance to the Oceti Sakonwin. He told us that the day after his company had identified and evaluated the site, an official from a federal agency told the land owner what was found. The next day, the land owner went through the site with a bulldozer and destroyed the site.

7.      It's hard to put into words how this news made me feel. The only way I can describe it is by saying it hurt. A deep, spiritual hurt that someone would have a total disregard for who my ancestors were and the connection to who we are as a people today. We will never have the opportunity to go back there and see what our ancestors left for us. It is gone forever. It was at this point in my life that I became aware of not only what my ancestors left on the land for their grandchildren, I also became aware of the destruction of sites of religious and cultural significance to the Oceti Sakowin in the name of development. This incident is what motivated me to apply for the position of the Standing Rock Sioux Tribe, Tribal Historic Preservation Officer.

8.      Upon assuming the duties of SRST/THPO, I immediately became immersed in Historic Preservation and have since consulted with several State and Federal Agencies, all of which were fulfilling their responsibilities to the Section 106 Process. I have read and became familiar with correspondence to the United States Army Corps of Engineers by my predecessor, Ms. Waste Win Young., and the Chairman of the SRST, Dave Archambault II. It was after reading those letters that it became clear that the Section 106 Process being implemented by the Corps was fundamentally flawed. I have also reviewed and am familiar with the draft and final Environmental Assessment and the cultural surveys prepared by DAPL.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

9.      As keepers of sacred knowledge, we have a responsibility to the next seven generations to ensure that they have good land, clean water, and clean air.  The Draft EA made no mention of the people of Standing Rock who would be directly affected should the pipeline leak.  Energy Transfer like any other pipeline assures that they are safe and yet we hear almost weekly of a pipeline that has leaked.  The recent leak of Keystone 1 near Freeman, South Dakota clearly demonstrates the potential for a manmade disaster.  Like the proposed Dakota Access Pipeline, Keystone 1 had safety measure in place to alert pipeline officials of a leak, and yet over 16,000 gallons of oil leaked without their knowledge.  It was a farmer who noticed the sheen from the oil in a ditch.

10.      It's not a matter of if; it's a matter of when that pipeline will leak.  It won't be my generation that will have to deal with the manmade disaster when it occurs, it will be my children or my grandchildren.  They are the future of our people and as such are not expendable.

II.      THE LAKE OAHE SITE

11.      The confluence of the Cannon Ball River and the Missouri River is a site of religious and cultural significance to the Oceti Sakonwin.  The Cannon Ball River was known to my ancestors as Inyan Wakan Kagapi Wakpa (River Where the Sacred Stones Are Made), and the Missouri River was known as Mni Sose (Turbulent Water).  The force of those two rivers coming together formed perfectly round stones once considered sacred to the Mandan, Arikara, Cheyenne and the member tribes of the Oceti Sakonwin.  When the Corps dredged and altered the course of the Cannon Ball River the river, that undertaking had an adverse effect at the confluence and the rivers quit making the sacred stones.  We will never again see this phenomenon again.

12.      The area within and around the horizontal directional drilling site, where the pipeline is going to cross the Missouri River, is considered sacred by many tribes to include the

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

Mandan, Arikara, Cheyenne and Dakota. At this site, traditional enemy tribes camped within sight of each other and never fought because of the reverence they had for this Traditional Cultural Landscape. Over the years, several Sun dances have occurred in the area because of the sacred nature of the rivers and the land. The member tribes of the Oceti Sakonwin have seven sacred rites given to us by the creator and the Sundance is held to be one of the most sacred.

13.     Three site visits occurred at the Historic Cannon Ball Ranch in connection with the DAPL proposal, which currently owns the land where the horizontal directional drilling ("HDD") on the west side of Lake Oahe would take place. The first visit was attended by my staff and I only, the second visit the Standing Rock Sioux Tribal Chairman escorted Colonel John Henderson, Commander of the Omaha District Army Corps to the ranch, and the third visit was with archeologists from the Corps and my office. During the visit with the USACE archeologist, the SRST/THPO Section 106 Coordinator, LaDonna Brave Bull Allard, shared the rich history of this area by pointing out village sites of the Mandan, Arikara, Cheyenne and Ihunktuwana. We described how these tribes who camped peacefully within view of one another were traditional enemies, but because of their reverence for this sacred place there were no wars fought or blood spilt on the land. This site was also a historic place of commerce where the tribes would gather during times of peace to trade with one another.

14.     Evidence of their existence is still on the ground. While walking through an Arikara Village site, Dr. Kelly Morgan, SRST/THPO Archeologist, pointed out places where moles had pushed the dirt to the surface. In this mole dirt, we found pottery shards, pieces of bone, flint and tools used for scraping hides and cutting. Both Dr. Morgan and Ms. Allard pointed out that many of the sites we were witnessing had not previously been recorded. During our visit I asked the opinion of Rick Harnois, USACE Archeologist if the sites that were pointed

Earthjustice
705 Second Ave., Suite 203
Seattle, WA 98104
(206) 343-7340

out to his staff were previously known at which point he told me no, they were not recorded.  I also asked if they should be recorded, and he said yes.  I then asked him his opinion on what was happening with DAPL and he said what was going on is wrong.  However, none of what was spoken about at the site made it into his determination of, "No Historic Properties Subject to Affect."

15.     Also in the area is a sacred stone where our ancestors went to pray and ask for guidance.  As a Lakota, I have been fortunate enough to have traveled to this area with elders who are no longer with us, to pray and leave offerings, asking for good direction, strength and protection on behalf of our people.  In an interview conducted in the late 1800's by Colonel A.B. Welch, a warrior spoke of the sacredness of the area, "It was there when we came across the Missouri.  I think it had been an Arikara stone.  I think they found it first.  They put things there, too.  No one would strike an enemy around that place.  Everyone was safe there.  There were always many presents there.  There were weapons and things to eat and valuable cloth on sticks.  There were buffalo heads there, too, for meat to come around.  It is very holy.  It is there yet.  I do not want to talk much about it."  A.B. Welch Collection.  The site of this stone is confidential and protected by this office.  It must be noted that this is a place of prayer that is still in use today.  A place where people indigenous of this continent continue to go for good direction, strength, and protection for the coming year.  The HDD drilling, staging of equipment and construction will have an adverse effect on the audio, visual, and atmospheric elements of a Traditional Cultural Landscape and a site of religious and cultural significance to the Oceti Sakonwin.

16.     During our visit to the site, we noticed several undocumented stone features and rock cairns that need further study.  The knowledge required to identify and evaluate stone

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

features, stone cairns, effigies, etc., lies within the cultural and spiritual protocols of the Oceti Sakonwin.  It relates to our creation stories and star knowledge which has been passed down from generation to generation.  As a Lakota who has been taught by my elders, I can tell when the first day of winter, spring, summer and fall are just by looking at the stars.  I can also tell when my ancestors visited the sacred places by the orientation of the stone features in relationship to star constellations.  We have a belief that what happens above happens below and what happens below happens above.  Archeologists lack the cultural awareness and sensitivities to identify sites of religious and cultural significance to tribes.  Only the tribes themselves have that ability.

17.     We believe that along the entire 1,100 route of the pipeline, there is great potential for eligible sites.  After reading the surveys prepared by DAPL, it is apparent to me that the archeologist involved do not have the knowledge or cultural sensitivity to be identifying and or evaluating sites that are significant to the tribes.  For example, in Williams County in North Dakota, survey crews identified a cairn and an associated rock feature on the top of a narrowing, rolling ridge above Beaver Creek in the Missouri River drainage system.  Site 32WI1744 was declared, "Not Eligible," and recommended that no further work be done.  The archeological report stated:  "The proposed Dakota Access centerline crosses the site from west to east and passes roughly 30 ft. (9 m) south of the deflated cairn (F1) and 130 ft. (40 m) north of the rock feature.  ROW blading and pipeline installation have the potential to impact the site by destroying F1.  Because site 32WI1744 is recommended not eligible for listing in the [National Register,] no further work is required."

18.     We disagree with this assessment.  It is clear that the archeologists involved aren't aware of what they are looking at because if they knew that the deflated cairn was potentially a

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

burial and the associated rock feature is a site of religious and cultural significance to the tribes, they'd know that by allowing the pipeline to go through this site this action will have an adverse effect on this site. The Standing Rock Sioux Tribe, Tribal Historic Preservation Office maintains our belief that there is a strong potential for adverse effects to site of religious and cultural significance to the tribes along the entire pipeline route.

19.    In DAPL's cultural surveys, in many places the consultants identify a stone circle, or cairn, that they propose to "mitigate" pipeline construction impacts by fencing, signage and a 50 foot buffer. The assumption is that through this mitigation adverse effects to the site are avoided. The assumption is wrong. These are sacred sites. The attributes which make them sacred include the environment around them, and the context in which these sit. The regulations defining adverse effects include "Change of the character of the property's use or of physical features within the property's setting that contribute to its historic significance" and "introduction of visual, atmospheric or audible elements that diminish the integrity of the property's significant historic features." A chain link fence and major industrial construction just 50 feet way—15 paces for a person of my size—would cause adverse effects to sacred sites. That's why it is important to include Tribes in not just the determination of the historic significance of sites, but a determination of adverse effects. Due to the Corps flawed process we have never been gotten pass the first step of the 106 process, much less had the opportunity to identify sites of religious and cultural significance to the tribes, not to mention never being invited to the table to assess or resolve adverse effects.

20.    My elders have taught me to have a deep reverence for the land. We have a saying in our language, "Le makoce kin teunkilapi sni ki, hehan un Lakotapi kte sni." When translated this means, "When we no longer cherish the land, we will no longer be Lakota." We

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

refer to the earth as Unci Maka, or grandmother earth, and are taught that she nourishes and nurtures everything that we need to thrive as a people. We are taught that everything has a nagi, or spirit. Nagi can also be translated to mean the spiritual essence of everything in creation as we believe that everything has a spirit.

21.     On the land are cultural and spiritual laws that acknowledge the spiritual essence of everything in creation. At one time we only took what we needed. Whether it was wild turnips, choke cherries, deer, buffalo or traditional medicines, we always acknowledge the life and the sacrifice. These cultural and spiritual laws hold true to sacred sites, stone features, cairns, effigies, as there are laws that govern how we enter these sites.

22.     The construction of the pipeline at the crossing of the Missouri River will have an adverse effect on the Traditional Cultural Landscape of the area. This is a site of religious and cultural significance to the people of Standing Rock that is still in use. Our people still travel to these sacred areas for prayer. Pipeline construction at this site will adversely affect culturally significant and sacred sites, either by destroying them outright, or by fencing them off in the immediate vicinity of industrial operations. This harms the Tribe, and harms me personally.

23.     DAPL has a plan for dealing with "inadvertent discoveries" during pipeline construction. But if pipeline archaeologists can't recognize important cultural sites, how can pipeline construction workers recognize them? It is not a substitute for proper consultation and identification. Similarly, the Army Corps has included a provision for including Tribal monitors at PCN sites. Of course, the Army Corps only imposes this requirement on a tiny area around HDD entry and exist sites, and not the pipeline to and from such sites. This requirement is of limited value. Full cultural surveys take time. We cannot walk in front of the bulldozers, on the company's rushed schedule, and be expected to ensure the protection of these sites.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

III.     SACRED AND HISTORIC SITES ELSEWHERE ON THE PIPELINE ROUTE

24.     Wherever the buffalo roamed, my ancestors left evidence of their existence on the land.  Mainstream society refers to them as nomadic but I don't believe this to be true, because to say a people were nomadic is to say that they wandered around aimlessly.  My ancestors followed the buffalo and the buffalo followed the stars.  They traveled as far west as Wyoming and Montana, as far north as the Canadian bush country, as far east as the Great Lakes, and as far south as Kansas.  This territory was the aboriginal homelands of the Oceti Sakonwin.

25.     Water  is considered to be sacred.  In our language we say, Mni Wiconi, or Water of Life, because without water there can be no life.  For nine months our mothers carry us in water.  We are primarily made up of water.  Water is sacred to our people.  We still have people who go to the water to pray and make offerings so that all life that is sustained by our rivers may live.  People, deer, cattle, fish, birds, all life is considered to be sacred and is dependent upon the water from the Missouri River.  The water ways of this nation were highways of their times as my ancestors traveled from lake to lake, river to river, stream to stream.  Stone features, burial cairns and effigies can be found near water on the hill tops, along ridges, hills sides and drainages.  In my experience, it is likely to find such features near water.

26.     Protection of stone features is very important to the Standing Rock Sioux Tribe.  On July 2, 2014 the Standing Rock Sioux Tribe passed resolution number 378-14, which reads as follows:

> NOW THEREFORE BE IT RESOLVED, the four (4) bands on the Standing Rock Reservation who are members of the original structure of Oceti Sakonwin claim all stone feature sites, our identified burial/places, stone alignments and effigies, our sacred landscapes and drainages that are connected to these sacred areas and sites, regardless of location, within our original homelands of Oceti Sakonwin: and

> BE IT FURTHER RESOLVED, that wherever the buffalo roam and left its evidence of occupation, use and bone material is considered Oceti Sakonwin

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

homelands as we are considered the Buffalo Nation or people and that is where you will find our sacred areas, burials, stone effigies and stone alignments of our star knowledge and sacred stone feature sites that only member band so the original Oceti Sakonwin can claim.

27.     We have prophesies that one day man was going to go too far and when that happened the animals were going to show their sacred color.  This would be a signal for the grandchildren to go back to these sacred places of prayer and ask for guidance.  We believe we are in this time of prophesy with the birth of a white buffalo calf in Jamestown, North Dakota and sighting of white deer, elk, moose within the aboriginal homelands of the Oceti Sakonwin.

28.     Within our way of life, there are people who have the responsibility of keeping the oral histories and sacred knowledge of our people.  This knowledge comes with strict laws on who, when, where and why these teachings are shared.  The creation stories and star knowledge can only be told after the first day of winter and can no longer be told after the first day of spring.  The fact that as a THPO, I will be asked to share cultural and spiritual laws out of context in an attempt to protect what is sacred to me will cause me, my children, grandchildren and those not yet born irreparable harm as these stories are not written down but have been passed down generation to generation.  It is the keeping of this knowledge that helps us to protect sacred sites.

29.     As a member of the Oceti Sakonwin it is imperative that we control our own narrative.  My greatest concern is that non-Tribal archeologists are going to write down our stories, and cultural and spiritual laws, and assume they now have the abilities to identify and evaluate sites of religious and cultural significance to the tribes.  They do not have that ability.   I am in no way giving anyone the right to tell our stories or share our sacred knowledge.

30.     Water was considered sacred by my ancestors, they referred to water as Mni Wiconi, or Water of Life, because without water there can be no life.  The water ways of this country were the highways of the past.  My ancestors traveled from lake to lake, river to river,

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

steam to stream.  It was at these sacred bodies of water that men stood in stone circles for four

days, with no food or water, crying for a vision to guide their people.  It wasn't the exposure to

the elements or the hunger that was life threatening, it was the lack of water that was the greatest

sacrifice and test for these men.  These stone features can be found on ridges and drainages

around water ways.

31.     A large portion of the pipeline will cross private lands that our office do not have

access to.  This office was never afforded the opportunity to consult with the Corps or DAPL in

the development of the draft EA, nor were we afforded the opportunity to assist in identifying

sites of religious and cultural significance to our people.

32.     In Iowa, a tribal cultural surveyor, Makoce Wowapi, LLC., was conducting Class

III Cultural Surveys on behalf of the Upper Sioux THPO from Minnesota and found a site of

religious and cultural significance to our tribe in the pipeline route.  At the request of the Upper

Sioux THPO, we traveled to Iowa to assist in identifying and evaluating the find.  We were met

by the Flandreau Sioux Tribe THPO, Upper Sioux THPO, elders, spiritual leaders, as well as

archeologists from the State of Iowa, USACE, Iowa Division of Natural Resources and the Iowa

SHPO.

33.     Much to their credit, the non-Tribal archeologists waited while we took our elders

and spiritual leaders to the site.  After identifying and evaluating the site, a ceremony was held

and a long discussion was held by our elders and spiritual leaders.  In the end it was decided that

I as the Standing Rock THPO was to share with the archeologist what was found and to escort

them to the site so they could see for themselves.

34.     After introductions, I told the archeologist that I was aware of the practice in the

field to discredit stone features as glacial uplift.  I told them that I was going to share cultural and

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

spiritual teachings with them in an attempt to help them to see the error of their ways.  I began by asking them where in their life do they see cycles.  They spoke of sunrise to sunset, the changing of the seasons, birth to death, at which point I told them if all you see with are your eyes you will always be limited in what you perceive in this world, but, if you learn to see with your heart you will be able to acknowledge your relationship to everything in creation, going all the way out to the universe.

35.     We were standing in a stand of trees and I pointed out that we were inhaling oxygen and exhaling carbon dioxide.  I told them that the trees were exhaling oxygen and inhaling carbon dioxide.  As we were standing there a light rain began to fall.  I reminded them that water evaporates into the atmosphere and comes back as rain.  I told them that this same sacred motion goes all the way out into the universe.  The earth and planets revolve around the sun and the stars move in a circle as is evident by the known spiral galaxies.  I told them this is just a glimpse into what we call, Cangleska Wakan, or the Sacred Hoop of Life, and then I showed them the site drawings at which point both the Iowa State Archeologist and Iowa SHPO both declared the site eligible for the National Registry as a site of religious and cultural significance to the tribes.

36.     The site drawing showed a stone circle with rock cairns set in the four directions.  I explained to them that this was a place where a warrior stood and fasted in prayer.  It was also one of the hardest places to fast because it was set on a hill side as opposed to a flat surface, which would have caused this man great discomfort as he stood there in prayer for four days with no food or water.  The rock cairns marked burials where men who were associated with this walk of life were buried.

37.     We then escorted them to the site itself at which point the archeologist pointed out

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

that they were aware of previous surveys and this site was never recorded. We pointed out that while conducting the surveys, the archeologist would have had to have literally walked right over the site. We told them this is why it was so important to identify tribes as consulting parties to the section 106 process as only the tribes had the ability to identify sites of religious and cultural significance.

38.  Sara Childers, Upper Sioux THPO shared with this office a site map of a site identified by DAPL as 30BE0029. The site map clearly shows that the Dakota Access Pipeline will go straight through burial mounds and stone features without any consideration to how the tribes view sites such as this, which again, are sites of religious and cultural significance to the tribes. This site is a Traditional Cultural Landscape and must be avoided. It's not just the individual sites; it's the entire landscape that is considered sacred.

39.  Of great concern to our office is the number of sites that are recorded as ineligible or unevaluated in the 2015 Cultural Resource Report prepared by DAPL's consultants. It is imperative that federal agencies when initiating section 106 consultations identify tribes as consulting parties to assist with identifying the Areas of Potential Affect and to identify sites of religious and cultural significance to the tribes. Non-tribal archeologists do not have the ability to properly assess sites they list as ineligible and/or unevaluated. By doing so, important sites lack federal protection, and development is allowed to cause irreparable harm to these sites. Without tribal participation in consultation we will continue to see adverse effects on sites.

40.  Based on the above, it is my personal and professional opinion that DAPL will very likely destroy sites that are of great religious cultural significance to the Tribe. Some of the sites are identified but deemed ineligible for protection by people who are not competent to make that decision. Other sites remain undiscovered because there's never been any Tribal survey.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

DAPL is a linear, 1,100 mile pipeline that will cross waters of U.S. Corps and Civil Works

projects in North Dakota, South Dakota, Iowa and Illinois.  The landscape it crosses is rich in

historic significance.  Wherever we look for closely for these sites, we find them in abundance,

especially near water.  We have already seen the inadequacies of DAPL's private cultural

surveys.  We have already seen examples of important religious sites that were completely

ignored by DAPL in the pipeline's path.

IV.    THE TRIBE AND TRIBAL MEMBERS WILL BE IRREPARABLY HARMED BY
       PIPELINE CONSTRUCTION

       41.    As a veteran of the United States Army, it had long been a wish of mine to visit

Arlington National Cemetery.  In 1998, my wish came true.  One of first things I noticed while

entering this hallowed ground were the hushed tones of the people as they walked through the

cemetery.  I knew it was because here lay the men and women who fell in defense of this nation.

It is with this same reverence that we, the descendants of the Oceti Sakonwin enter the sites

where our ancestors fell in defense of our country.  An elder once told me that our ancestors

knew four hardships in life; to hear an orphan cry, to lose a child, to lose your mother, and to not

know where a warrior fell.  All across the aboriginal homelands of the Oceti Sakonwin are stone

cairns that mark such places, and are considered to be sites of religious and cultural significance

to our tribe.  To me, and to members of the Tribe, destruction of or disrespect to these sites feels

just like it would feel to me if a pipeline was dug through the middle of Arlington National

Cemetery, turning over gravestones and displacing graves.  Mainstream society would not

tolerate the desecration of Arlington National Cemetery.  But this is what DAPL is doing in the

traditional lands of the Oceti Sankowin.

       42.    By way of comparison, recent events in the world show a total lack of

appreciation and respect by ISIS for ancient sites in the Middle East.  Every time they destroy an

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

ancient site we lose a part of our collective history, that once destroyed is gone forever. It's not just happening in the Middle East, it's happening right here in America in the name of development, or in the name of the national interest. Every time a site of religious and cultural significance to the tribes is destroyed, this causes irreparable harm to me, my children, grandchildren and those not yet born. Once it is gone, it is gone forever.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed on August 3, 2016, at Fort Yates, North Dakota.

Jon Eagle, Sr.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

# EXHIBIT F



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, OMAHA DISTRICT
1616 CAPITOL AVENUE
OMAHA NE  68102-4901

NOV 2 2 2016

District Commander

Mr. Dave Archambault II, Chairman
Standing Rock Sioux Tribe
Building #1 North Standing Rock Ave
P.O. Box D
Ft Yates, North Dakota 58538

Dear Chairman:

I am writing regarding Assistant Secretary of the Army for Civil Works (ASA/CW) Jo-Ellen Darcy's November 14, 2016 letter where she committed that the Army would pursue additional discussions with your Tribe on pipeline safety matters on an expeditious timeline that allows for a robust discussion and analysis.

During our meeting on November 17 in Rapid City, you stated that you had no desire to further discuss opportunities to address pipeline safety concerns.  Additionally, you stated that the only acceptable solution was to relocate the pipeline.  The Army takes its tribal consultation requirements seriously and we feel it is our responsibility to continue to reach out you on this matter.  We are aware of the concerns you raised in your letter to Ms. Darcy on October 28, 2016, and would again like to offer you the opportunity for additional discussion and analysis.  The goal would be to seek potential easement conditions that would further reduce the risk of a spill or rupture, hasten detection and response, or otherwise enhance the protection of Lake Oahe, the Tribe's water supplies, and treaty rights.

Our team is available during the week of November 28, 2016 to meet with you and your staff.  Please let us know if you are interested in this opportunity and a time that works best for your team.  If you are still not interested in discussing this further, please let us know as we will still address the concerns raised in your October 28, 2016 letter.  If there are any questions, please contact me or my Tribal Liaison, Mr. Joel Ames at (402) 995-2909, or joel.o.ames@usace.army.mil.

Sincerely,

John W. Henderson, P.E.
Colonel, Corps of Engineers
District Commander

# EXHIBIT G

**From:** Rowe, Steve <Steve.Rowe@hdrinc.com>
**Sent:** Wednesday, June 8, 2016 5:18:34 PM
**To:** Noel, Rick L NWO
**Cc:** Cossette, Brent NWO; Siguaw, Tom; Rose, Robert; Rorie, Micah T
**Subject:** RE: DAPL Easement

Rick,

Regarding your request for clarification about whether or not a temporary construction license is being requested, I offer the following:

I understand from our discussion that the temporary construction license is for construction workspace outside of the 50-ft easement. If we are not requesting any workspace outside of the 50-ft easement, then we would not need both an easement and a temporary construction license.

The request for the temporary construction license referenced below may have been a carry-over from a template document or a reference to an earlier DAPL submittal. The reason the temporary construction license was included in some earlier submittals relative to Lake Oahe was that a temporary construction license was contemplated at one time during the project planning phase. Prior to geotechnical testing and HDD design, there may have been the possibility that part of the construction associated with the HDD entry/exit point would be located within COE lands.

However, in the final HDD design, there is no proposed construction workspace on USACE owned lands on either side of the Lake Oahe crossing. Accordingly, DAPL is not requesting a temporary construction license.

Please let us know if you have any questions,

Steve Rowe
Pipeline Environmental Practice Lead
HDR
1670 Broadway, Suite 3400
Denver, CO 80202
D 303.318.6306 M720.539.6495
steve.rowe@hdrinc.com
hdrinc.com/follow-us


-----Original Message-----
From: Rowe, Steve
Sent: Tuesday, June 07, 2016 12:38 PM
To: 'Noel, Rick L NWO'
Cc: Cossette, Brent NWO; Siguaw, Tom
Subject: RE: DAPL Easement

Rick,

Please send the easement information to Tom Siguaw

Tom Siguaw
Dakota Access/ETC
14th Flor
1300 Main Street
Houston, TX 77002
Phone 713-989-2841

Please call me to discuss the temporary construction license question.

Steve

2

Steve Rowe
Pipeline Environmental Practice Lead
HDR
1670 Broadway, Suite 3400
Denver, CO 80202
D 303.318.6306 M720.539.6495
steve.rowe@hdrinc.com
hdrinc.com/follow-us


-----Original Message-----
From: Noel, Rick L NWO [mailto:Rick.L.Noel@usace.army.mil]
Sent: Tuesday, June 07, 2016 10:11 AM
To: Rowe, Steve
Cc: Cossette, Brent NWO
Subject: DAPL Easement

Steve

As I understand the current schedule, we may have a decision on the EA/Section 408 in the near future.  In anticipation of that occurring, I am finalizing the easement and had a couple of questions:

1.  To whom should I send the easement for signature?

2.  Please clarify that a temporary construction license is not needed.  Your original application (SF 299) indicated a construction license was not needed, however the easement marked up by Mr. Rose in April that was sent to the District indicated a two year license was required.  Please clarify.

After receiving your response, I will complete the easement and have it ready to be sent back to you after the final environmental documents are signed and any site specific conditions are provided to me to add to the easement.  After you receive the easement, you will need to have it signed and sent back to me along with a check for the total consideration.  Upon receipt, I will forward the easement and draft letters of Congressional notification to our Division Office who in turn will forward to HQ USACE.

Rick L. Noel, J.D.
Chief, Civil Branch, Real Estate Division Real Estate Contracting Officer USAED, Omaha
402-995-2832 (phone)
402-995-2826 (fax)
rick.l.noel@usace.army.mil


Private and confidential as detailed here. If you cannot access hyperlink, please e-mail sender.

# EXHIBIT H

-----Original Message-----
From: Tracy, Thomas J NWO [mailto:Thomas.J.Tracy@usace.army.mil]
Sent: Tuesday, August 16, 2016 2:34 PM
To: Leone, Bill
Subject: FW: Final Signed DAPL Garrison Consent Flowage Easement.pdf

Here is the Section 408 permission package for the Oahe crossing. I presume that you already have the Section 408 package for the Garrison crossing.

I will note that this document has not been released to the public, through posting on our external website, so I would ask that you maintain this document in a close-hold nature.

I was called by General Crear regarding this matter, and I advised that I was sending this e-mail to you.


Thomas J. Tracy
District Counsel
U.S. Army Corps of Engineers, Omaha District
1616 Capitol Avenue
Omaha, Nebraska 68102-4901
(402) 995-2607
thomas.j.tracy@usace.army.mil



-----Original Message-----
From: Shelman, Johnathan A NWO
Sent: Tuesday, August 16, 2016 3:35 PM
To: Tracy, Thomas J NWO <Thomas.J.Tracy@usace.army.mil>
Subject: Emailing: Final Signed DAPL Garrison Consent Flowage Easement.pdf


Your message is ready to be sent with the following file or link attachments:

Final Signed DAPL Garrison Consent Flowage Easement.pdf


Note: To protect against computer viruses, e-mail programs may prevent sending or receiving certain types of file attachments.  Check your e-mail security settings to determine how attachments are handled.

CONFIDENTIALITY NOTICE:  This email, including any attachments, is confidential and may be privileged.  If you are not the intended recipient please notify the sender immediately, and please delete it; you should not copy it or use it for any purpose or disclose its contents to any other person.  Norton Rose Fulbright entities reserve the right to monitor all email communications through their networks.

Norton Rose Fulbright Australia, Norton Rose Fulbright LLP, Norton Rose Fulbright Canada LLP, Norton Rose Fulbright South Africa Inc and Norton Rose Fulbright US LLP are separate legal entities and all of them are members of Norton Rose Fulbright Verein, a Swiss verein. Norton Rose Fulbright Verein helps coordinate the activities of the members but does not itself provide legal services to clients. Details of each entity, with certain regulatory information, are available at nortonrosefulbright.com.

Private and confidential as detailed here<http://www.energytransfer.com/mail_disclaimer.aspx>. If you cannot access hyperlink, please e-mail sender.

Operations Division
Real Estate Routing and Review

Project: Dakota Access Pipeline Consent (Garrison) and Easement (Oahe)

Date Received: 5/26/2016

POC Field Office: Wade Spooner/Jeremy Thury
POC District Office: Brent Cossette

| | Concur | Concur (Comments Attached) | Non-concur (Comments Attached) | Not Applicable | Date | Signature |
|---|---|---|---|---|---|---|
| Environmental Compliance, OD-TN | | ✓ | | ▓ | HARLON.WILLIAM.D.III.1258312887 | Digitally signed by HARLON.WILLIAM.D.III.1258312887 ... |
| Sustainability, OD-TN | | | | ✓ | COSSETTE.BRENT.JAMES.1249364289 | Digitally signed ... |
| Environmental Stewardship, OD-TN | ✓ | | | ▓ | COSSETTE.BRENT.JAMES.1249364289 | Digitally signed ... |
| Master Plan, OD-TN | ✓ | | | | GRUNDMAN.JONAS.L.1387947155 | Digitally signed by GRUNDMAN.JONAS.L.1387947155 ... Date: 2016.06.09 12:54:21 -05'00' |
| Recreation, OD-TN | | | | ✓ | 03Jun16 KEY.HAROLD.M.1231026947 | Digitally signed by KEY.HAROLD.M.1231026947 ... |
| Water Quality, ED-HA | ✓ | | | | DINKEL.BRENT.ALLEN.1474049333 | Digitally signed ... |
| NWDR 1110-2-5 Land Development, ED-HB | ✓ | | | | KRAUSE.TONY.DEAN.1282509551 | Digitally signed by KRAUSE.TONY.DEAN.1282509551 ... |
| Hydraulics, ED-HD | ✓ | | | | MILLER.CURTIS.J.1257728443 | Digitally signed ... |
| Geotechnical Engineering, ED-G | ✓ | | | | LANG.DEAN.T.1147761313 | Digitally signed ... |
| River and Reservoir Engineering, ED-HF | | | | ✓ | PRIDAL.DANIEL.B.1231204730 | Digitally signed ... |
| Geology, ED-GG | ✓ | | | | WAGNER.JASON.L.1249731869 | Digitally signed ... |
| Mechanical, ED-DA | | ✓ | | | SMITH.MICHAEL.T.1277678086 | Digitally signed ... |
| Dam Safety, ED-GB | | | | ✓ | WORDEN.ROBERT.J.1231346097 | Digitally signed ... |
| Section 106, PM-AE | | ✓ | | ▓ | BRANDON.DAVID.A.1231349819 | Digitally signed by BRANDON.DAVID.A.1231349819 ... |
| 408 Review | ✓ | | | | | Brt G. Cosset |
| NEPA, Eric Laux | | | | ✓ | LAUX.ERIC.A.1231341427 | Digitally signed by LAUX.ERIC.A.1231341427 ... Date: 2016.06.09 09:41:32 -05'00' |
| Chief, OD-TN: ~~Kelly Crane~~ Luke Wallace | ✓ | | | | | |
| Chief, OD-T: Larry D. Janis | ✓ | | | | | |



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, OMAHA DISTRICT
1616 CAPITOL AVENUE
OMAHA NE 68102-4901

REPLY TO
ATTENTION OF

CENWO-OD-T                                                                                      10 June 2016

MEMORANDUM FOR Commander, U.S. Army Corps of Engineers, Omaha District (Henderson)

SUBJECT: Dakota Access Pipeline Project, Garrison Project (Consent Flowage Easements), Oahe Project (Easement)

1. References:

   a. EC 1165-2-216, Policy and Procedural Guidance for Processing Requests to Alter US Army Corps of Engineers Civil Works Project Pursuant to 33 USC 408.

   b. NWDR 1110-2-5, Land Development Guidance at Corps Reservoir Projects

2. In accordance with reference 1.a., enclosed for District-level approval is the proposal for modification and alteration of the Garrison Project on Corps fee property. The modification has undergone an agency review (ATR) by the Omaha District (NWO) and is recommended for approval as the request has been determined to not be injurious to the public interest and not impair the usefulness of work built by the United States.

3. Background:

   a. The Dakota Access, LLC, (Dakota Access) is requesting an easement on Corps-owned lands with a 30- inch light crude oil pipeline. The pipeline will cross under the Missouri River (Lake Sakakawea) via horizontal directional drill (HDD) and continues south to Lake Oahe and crosses under Lake Oahe with a second HDD. The project will begin near Stanley, North Dakota and end at Patoka, Illinois. The total length of the pipeline is about 1,100 miles.

   b. Corps technical reviewers have reviewed and have determined the request to not be injurious to the public interest and not impair the usefulness of work built by the United States.

4. The point of contact for this project and/or issues regarding this application is Mr. Brent  Cossette, Natural Resources Specialist, CENWO-OD-TN, 402-995-2712 or brent.j.cossette@usace.army.mil .

3 Encls
1. Summary of Findings
2. Technical Review Package
3. Finding of No Significant Impact

LARRY D. JANIS
Chief, Recreation and Natural Resources Branch

 Printed on Recycled Paper

CENWO-OD-T
SUBJECT: Dakota Access Pipeline Project, Garrison Project (Consent Flowage Easements), Oahe Project (Easement)

### DISTRICT COMMANDER'S APPROVAL
### OF
### SECTION 408 DECISION DOCUMENT

I attest that the Decision Document for the Dakota Access Pipeline Project is consistent with Army policy, and has been reviewed for legal sufficiency by District Counsel. Accordingly, I approve this Decision Document.

2 5 JUL 2016

_____          Date
JOHN W. HENDERSON
Colonel, Corps of Engineers
District Commander

2

## OMAHA DISTRICT, CORPS OF ENGINEERS
## CERTIFICATION CHECKLIST

| TO ALTER US ARMY CORPS OF ENGINEERS CIVIL WORKS PROJECTS PURSUANT TO 33 USC 408 |
|---|

| Dakota Access Pipeline Project, Garrison (Consent Flowage Easements), Oahe Project (Easement) |
|---|

The Dakota Access, LLC, (Dakota Access) is requesting an easement on Corps-owned lands with a 30- inch light crude oil pipeline. The pipeline will cross under the Missouri River (Lake Sakakawea) via horizontal directional drill (HDD) and continues south to Lake Oahe and crosses under Lake Oahe with a second HDD. The project will begin near Stanley, North Dakota and end at Patoka, Illinois. The total length of the pipeline is about 1,100 miles.

33 U.S.C. § 408 prohibits non-federal entities from building upon, altering, destroying, injuring or in any manner whatever impairing the usefulness of any work built by the United States for the preservation and improvement of navigable waters or to prevent floods. Before any construction, including horizontal drilling and laying pipeline, may commence within the boundaries of the Corps projects, the Secretary of the Army must grant permission for such alteration, occupation or use of navigation and flood control structures when in the judgment of the Secretary such occupation or use will not be injurious to the public interest and will not impair the usefulness of such work.

The proposed activities will not impair the usefulness of a USACE project and are not injurious to the public interest.

| Office | Representing Authorized Purpose for Project | Not injurious to public interest or Project Purposes | | | Comments (Attached) | Signature/Date |
|---|---|---|---|---|---|---|
| | | Concur | Non-Concur | N/A | | |
| Operations | Recreation | | | ✓ | See N/A on Request Package | COSSETTE.BRENT.JAMES.1249364289 |
| Operations | Fish & Wildlife | ✓ | | | | COSSETTE.BRENT.JAMES.1249364289 |
| Operations | Water Supply | ✓ | | | | RIEF.AMEE.LURENE.1512990173 |
| Operations | Navigation | | | ✓ | | MELLEMA.GREGORY.J.1231349096 |
| Engineering | Flood Risk Reduction | ✓ | | | | [signature] |
| Operations | Water Quality | ✓ | | | | DINKEL.BRENT.ALLEN.1474049333 |
| Operations | Hydropower | | | ✓ | | MELLEMA.GREGORY.J.1231349096 |
| Planning (ENV) | NEPA Coverage for All | ✓ | | | | LAUX.ERIC.A.1231341427 |
| Real Estate | All | ✓ | | | | NOEL.RICK.L.1231350426 |
| Section 408 Coordinator | All | ✓ | | | | Brent J. Cossette 7/19/2016 |
| Office of Counsel Certification | All | ✓ | | | | [signature] |
| Chief OD-TN | All | ✓ | | | | [signature] |
| Chief OD-T | All | ✓ | | | | [signature] |

**SUMMARY OF FINDINGS**
**PURSUANT 33 USC 408 and EC 1165-2-216**

**Dakota Access Pipeline Project, Garrison Project (Consent Flowage Easements), Oahe Project (Easement)**

**Summary of Rationale and Conclusion (EC 1165-2-216, Par 7(c)(5)(a)):** The Dakota Access, LLC, is requesting an easement on Corps-owned lands with a 30- inch light crude oil pipeline. The pipeline will cross under the Missouri River (Lake Sakakawea) via horizontal directional drill (HDD) and continues south to Lake Oahe and crosses under Lake Oahe with a second HDD. The project will begin near Stanley, North Dakota and end at Patoka, Illinois. The total length of the pipeline is about 1,100 miles.

**Written Request (EC 1165-2-216, Par 7(c)(5)(b)):** See attached.

**Project History, Description, and Authorization (EC 1165-2-216, Par 7(c)(5)(c&d)):** The Garrison Dam/Lake Sakakawea Project was authorized on December 22nd, 1944, by the Flood Control Act of 1944, Public Law 534, 78th Congress, 2nd session, along with four other Missouri River main stem projects. The project was authorized for flood control, navigation, irrigation, hydropower, municipal and industrial water supply, fish and wildlife, recreation and other purposes.

The Oahe Project was authorized by the Flood Control Act of 1944, Public Law 534, 78th Congress, 2nd Session, along with four other Missouri River main stem projects – Gavins Point, Fort Randall, Big Bend, and Garrison. These five reservoirs are elements of a plan for the development of the Missouri River main stem.

**Section 408 Determination:** The Section 408 ATRT recommending a Section 408 determination consists of subject matter experts in the following offices: operations, real estate, regulatory, office of counsel, engineering, planning, and emergency management.

1. Impact to the Usefulness of the USACE Project Determination (EC 1165-2-216, Par 7(c)(5)(e)): Due to the proposed pipeline request, the ATRT members determined this request will not limit the ability of either the Garrison or Oahe Projects to function as authorized and will not compromise or change any authorized project conditions, purposes, or outputs. Reference attached memos of the request package.

2. Injurious to the Public Interest Determination (EC 1165-2-216, Par 7(c)(5)(f)): The ATRT members considered all mitigation measures in the environmental assessment along with conditions for the easement and believe this development will not be injurious to the public interest.

**Policy Compliance Certification (EC 1165-2-216, Par 7(c)(5)(g)):** Each ATRT member has reviewed this request in accordance with applicable policies and regulations. Please see attached certification checklist.

**Certification of Legal Sufficiency (EC 1165-2-216, Par 7(c)(5)(h)):** District Office of Counsel concurs that the proposal meets all legal and policy requirements. See attached certification checklist.

**Certification of Adequate Real Estate Documentation (EC 1165-2-216, Par 7(c)(5)(i)):** Chief of the District Real Estate Division concurs that the real estate documentation is adequate. See attached certification checklist.

**USACE Studies (EC 1165-2-216, Par 7(c)(5)(j)):** There are no ongoing USACE studies that relate to this proposed request.

**Operations & Maintenance (O&M) Manual (EC 1165-2-216, Par 7(c)(5)(k)):** There will be no assumed responsibilities or costs for USACE for this proposed request, therefore, no changes or impacts will occur to the O&M Manual. Dakota Access LLC will be responsible to O&M per their Corps easement.

**Project Partnership Agreement (PPA) or Cooperative Agreement Changes (EC 1165-2-216, Par 7(c)(5)(l)):** Not applicable.

**Environmental Compliance (EC 1165-2-216, Par 7(c)(5)(m)):** A decision on a Section 408 request is a federal action, and therefore subject to the National Environmental Policy Act (NEPA) and other environmental compliance requirements. An Environmental Assessment was conducted and is attached.

**Finding of No Significant Impact (FONSI)/Record of Decision (ROD) (EC 1165-2-216, Par 7(c)(5)(n)):** The proposed request was reviewed in accordance with NEPA regulations and was found to need an environmental assessment. A mitigated FONSI was issued and is attached.

**Funds Pursuant Section 214 (EC 1165-2-216, Par 7(c)(5)(o)):** Not applicable.

**Final Conclusions or Information (EC 1165-2-216, Par 7(c)(5)(p)):**

<u>Section 408 Decision Level:</u> Certain proposed alterations, once recommended by the District and Division Commanders, will require a final decision by the Director of Civil Works at HQUSACE if any of the seven questions listed in the EC 1165-2-216 are answered "yes". None of the questions were answered "yes" for this proposal; therefore, a Section 408 decision may be rendered by the District Commander.

_____          7/19/2016
Brent Cossette                   Date
Section 408 Coordinator, Corps of Engineers
Omaha District

**APPENDIX B-1**
**Vicinity Map of Proposed Request Located on Garrison Project, ND**





## <u>Section 408 Determination Checklist</u>

**Determination Checklist**
US Army Corps of Engineers, Omaha District
Per EC 1165-2-216

| | Exemptions |
|---|---|
| ☐ | Alterations performed by District as part of a federally authorized project. |
| ☐ | Alterations performed by the non-federal Sponsor that are specified in the Operations, Maintenance, Repair, Replacement, and Rehabilitation Manual, including repair, replacement, and rehabilitation alterations described under §5 l of ER 1110-2-401. |
| ☐ | Routine Operations and Maintenance activities specified in the O&M manual. |
| ☐ | Alterations compliant with an approved Project Master Plan, Shoreline Management Plan, or Operational Management Plan. |
| ☐ | Real Estate Outgrants issued to implement an approved Project Master Plan, Shoreline Management Plan, or Operational Management Plan. |
| ☐ | Alterations included within Real Estate Outgrants issued pursuant to the procedures in ER/EP 1130-2-550, Chapters 16 or 17, except for alterations that need to be reviewed in accordance to Appendix B-E of EC 1165-2-216. |
| ☐ | Alterations undertaken by a non-federal sponsor as an in kind contribution for an authorized USACE project pursuant to an executed project partnership agreement. |
| ☐ | Requests for alterations received by District for review or coordination before 31 July 2014, however, requests for alterations received prior to 31 July 2014 will continue to be reviewed under EC 1165-2-214 and prior 33 USC 408 reviews. |
| | **Categorical Permissions** |
| ☐ | <span style="color:red">(list currently being compiled for approval)</span> |

| | HQUSACE Decision Level | |
|---|---|---|
| **yes** | **no** | |
| ☐ | ☑ | Does the proposed alteration require a Type II IEPR (Safety Assurance Review) reference EC 1165-2-214? |
| ☐ | ☑ | Does the proposed alteration require an Environmental Impact Statement (EIS) in which USACE is the lead agency? |
| ☐ | ☑ | Does the proposed alteration change how the USACE project will meet its authorized purpose? |
| ☐ | ☑ | Does the proposed alteration preclude or negatively impact alternatives for a current General Investigation (GI) or other study? |
| ☐ | ☑ | Is the non-federal sponsor for a USACE project proposing to undertake the alteration as in-kind contributions eligible for credit under Section 221 of Flood Control Act of 1970, as amended? |
| ☐ | ☑ | Is the proposed alteration for installation of hydropower facilities? |
| ☐ | ☑ | Is there a desire for USACE to assume operations and maintenance responsibilities of the proposed navigation alteration pursuant to Section 204(f) of Water Resources Development Act (WRDA) of 1986? |
| | **District/Division Decision Level** | |
| ☑ | | Request is not applicable in any of the above categories and recommendation is for District Level Section 408 Determination. |
| ☐ | | Request is not applicable in any of the above categories and recommendation is for Division Level Section 408 Determination. |

**Requester Checklist**
Section 408 Written Requests
US Army Corps of Engineers, Omaha District

General: Requester is responsible for providing all information that identifies as necessary to satisfy all applicable federal laws, executive orders, regulations, policies, and ordinances.

| Written Request (EC 1165-2-216 Par 7(c)(2)) | |
|---|---|
| Complete Description: | [ X ] drawings, sketches, maps, and plans sufficient to determine the purpose, scope, and location |
| Also Pursuing Section 10/404/103 permits? | [ ] No<br>[ X ] Yes |
| Indicate if also seeking: | [ ] credit under Section 221 of the Flood Control Act of 1970<br>[ ] credit under Section 204(f) of WRDA 1986<br>[ X ] Not Applicable – Not Applicable |
| Will require the use of federally owned real property? | [ ] No<br>[ X ] Yes, this request requires the use of federally-owned real property or property owned by the non-federal sponsor. |
| Is there a non-federal sponsor? | [ X ] No<br>[ ] Yes, the request originates from the non-federal sponsor<br>[ ] Yes, a written statement from the non-federal sponsor endorsing the alteration is included |
| Required Documentation for All Requests (EC 1165-2-216 Par 7(c)(3)) | |
| Technical Analysis and Design | [ X ] project design is at 60% or more of final design |
| Hydrologic and Hydraulics System Performance Analysis | [ X ] No, not required and justification included – Proposes project is located above the flood pool with no potential hydrologic impacts, therefore, performance analysis is not applicable.<br>[ ] Yes |
| Environmental Compliance | [ X ] NEPA completed and attached<br>[ X ] EA completed and attached (if applicable)<br>[ ] EIS completed and attached (if applicable)<br>[ ] Additional environmental compliance requirements included |
| Description of Real Estate Requirements | [ ] Included in a completed Right of Availability checklist<br>[ X ] Included in the written request<br>[ ] Not Applicable |
| Executive Order 11988 Considerations | [ ] Sufficient information is included in the written request.<br>[ X ] Not Applicable - Alteration will not be located within flood plain. |
| Requester Review Plan | [ X ] No requester review plan is needed.<br>[ ] A requester review plan was determined necessary by District and is included.<br>[ ] Request requires a Type II IEPR and requester review plan is required and is included. |
| Operations & Maintenance | [ X ] no O&M will be necessary<br>[ ] O&M will be necessary and USACE will assume; justification for augmenting O&M is provided<br>[ ] O&M will be necessary and will be performed by the non-federal sponsor; information for updating the O&M manual is provided |
| Other Information | [ X ] USACE determines no other information is required from requester<br>[ ] USACE determines other information is required and is attached in the submittal |
| For Dams and Reservoirs  - See Attached Engineering Memos | |
| See EC 1165-2-216, Appendix B Part B-4 Requirements | |
| For Non-Federal Hydropower Development at USACE Facilities (N/A) | |
| See EC 1165-2-216, Appendix C Part C-4 Requirements | |
| For Levee, Floodwall or Flood Risk Management Channel Projects (N/A) | |
| See EC 1165-2-216, Appendix D Part D-4 Requirements | |
| For Navigation Channels, Jetties, Bridges, and other Features (N/A) | |
| See EC 1165-2-216, Appendix E Part E-4 Requirements | |



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, OMAHA DISTRICT
1616 CAPITOL AVENUE
OMAHA NE 68102-4901

CENWO-OD-TN

10 June 2016

MEMORANDUM FOR RECORD

SUBJECT: Dakota Access Pipeline Consent to Flowage Easements – Garrison Project

1. Dakota Access, LLC, (Dakota Access) is requesting a consent to multiple flowage easements at Lake Sakakawea for a 24 inch light crude oil pipeline.

The pipeline would cross under the Missouri River via horizontal directional drill (HDD) and continue south to Lake Oahe and cross Lake Oahe with a second HDD. The project will begin near Stanley, North Dakota and end at Patoka, Illinois. The total length of the pipeline is about 1,100 miles.

Relative to the Garrison Project Office, Dakota Access is requesting a consent to flowage easement for a 24 inch diameter light crude oil pipeline.

2. Please place the following special conditions on the consent to easement:

   a. All environmental commitments in the Environmental Assessment and Finding of No Significant Impact must be conducted and incorporated by reference.

   b. Pipeline must be maintained and operated per ASME B31.3, B31.4, B31.8, CFR 192, CFR 195, API 1104, and related codes.

   c. Cathodic Protection will be operated and maintained per applicable codes and Dakota Access's Operations and Maintenance Manual. Wall thickness testing will be performed on a 5 year interval through the use of in-line inspection. The periodic in-line inspection will be performed in-lieu of periodic hydro tests. Inspection reports must be sent to the Garrison Project Office.

   d. The Facility Response Plan will be submitted to the United States Army Corps of Engineers (USACE) for review prior to the operation of the pipeline.

   e. All plans not final at the time the Environmental Assessment is complete will be submitted to the USACE for review and the incorporation of USACE comments prior to submittal to PHMSA.

      These plans include, but are not limited to the;
      a. Geographical Response Plan
      b. Operations and Maintenance Manual
      c. Risk Assessment (Integrity Management Plan)


Printed on Recycled Paper

      d.  Spill Models (Using the National Hydrography Dataset by the USGS)

f.  Any plans that have been updated in condition "d" must be sent to USACE Environmental Compliance Coordinators at the Omaha District Office and the Garrison Project Office within one year of the update.

g.  Must provide as-built drawings for the crossing of the Missouri River to the USACE Section 408 Coordinator Omaha District Office and the Operations Project Manager Garrison Project Office within 6 months of the completion of pipeline construction.

h.  Commitment for Training Exercises:
      a.  Must conduct full scale open water and full scale winter/ice exercises that at Lake Sakakawea and Lake Oahe. A full scale exercise will occur once every 3 years (triennial cycle) with the location and type of exercise occurring on alternating schedules (e.g. open water exercise at Oahe the first triennial cycle, followed by winter exercise at Sakakawea the following triennial cycle, followed by a winter exercise at Oahe the following triennial cycle, etc.). The first exercise will occur within the first 3 years after the pipeline becomes operational.

      b.  To facilitate USACE staff involvement, Dakota Access must notify the USACE Environmental Compliance Coordinators at the Omaha District Office and the Garrison Project Office at least ninety (90) days prior to initiation of the training exercises. Dakota Access must also solicit the participation of key stakeholders (federal, state, local, and Tribal) in these exercises.

i.  Within one year of operation of the pipeline, DAPL must provide for an all-weather access and collection point downstream of the Lake Sakakawea Missouri River HDD crossing. DAPL must provide an equipment storage facility on non-federal lands that includes a fenced permanent storage area for winter and open water spill response equipment. The storage facility should be placed in a strategic location and near existing facilities that would support access to the water. DAPL would coordinate with the USACE and any other applicable stakeholders to obtain all necessary permits and approvals prior to construction for any ground disturbing activities associated with these facilities. The storage facility should contain sufficient response equipment at a minimum to mitigate an unintended worst case release for this crossing.

BRENT J. COSSETTE
Section 408 Coordinator, Omaha District



DEPARTMENT OF THE ARMY
CORPS OF ENGINEERS, OMAHA DISTRICT
GARRISON PROJECT OFFICE
PO BOX 527
RIVERDALE, NORTH DAKOTA 58565-0527

CENWO-OD-GA                                                        19 May 2016

MEMORANDUM THRU

Garrison Project Office, Omaha District (CENWO-OD-GA), (Lindquist)

Recreation and Natural Resource Branch, Omaha District, Corps of Engineers
(CENWO-OD-TN), (Cossette)

FOR Real Estate Branch, Omaha District, Corps of Engineers (CENWO-RE), (Noel)

SUBJECT: Dakota Access, LLC. Construction of Dakota Access Pipeline (DAPL)
crossing flowage easements LL3440E, LL3483E-1, LL3453E, LL3430E, LL3450E-2,
LL3431E & LL3426E-2 north of Lake Sakakawea/Missouri River in Williams Counties,
ND.

1. An application has been submitted to the U.S. Army Corps of Engineers (USACE)
Garrison Project Office by Dakota Access, LLC to receive a Consent to Easement
for the construction, operation, & maintenance of 1,100 miles of 12-30" diameter
crude oil pipeline under Lake Sakakawea in Williams Counties.

    1. The 24" dia. Pipeline is proposed to cross sections 7, 18, 19 & 30
Township 153N, Range 103W on USACE flowage easements LL3440E,
LL3483E-1, LL3453E, LL3430E, LL34350E-2, LL3431E & LL3426E-2 on
the North side of Lake Sakakawea/ Missouri River for 2.83 miles.

    2. Construction workspace needed to trench in pipeline and stage HDD
boring site within flowage easements totals 59.3 ac.

2. The proposed installation for this project is to open cut and trench on flowage
easements and cross the river using HDD.

3. Review by Natural Resource staff indicated the following conditions:

1. No impacts to USACE fee title land is proposed.  All activity proposed is located on USACE flowage easement on private land.

2. All environmental commitments in the Environmental Assessment, Finding of No Significant Impact, and Plan of Development submitted by Dakota Access and all conservation recommendations in the Biological Opinion as applicable and are hereby incorporated by reference

3. This pipeline is also crossing the Missouri River for .21 miles on Corps Fee title land at Lake Oahe.  This segment of the project is not reflected in this memo and was not reviewed by the Garrison Project Office.

4. An Environmental Assessment has been completed on the flowage easement crossing and is currently being reviewed by USACE within the project and Omaha district office.

4. Garrison Project Natural Resource Staff recommends consent to easement. Point of contact is Jeremy J. Thury. Phone: 701-654-7761.

5. For Your Action.

Encl
ROA packet

ALFRED C. STONESIFER
Supervisory Natural Resource Specialist

CONCURRENCES:

a. CENWO-OD-GA concurs with the above recommendation.

Signature: _Todd J. Lindquist_

Todd J. Lindquist
Operation Project Manager

2

Garrison Project, ND

Date: _24 May 2016_

b. CENWO-OD-T concurs with the finding of no significant environmental concerns and the recommendations for resolution of the encroachments, based on the attached documentation.

Signature: _____

Larry D. Janis
Chief, Recreation and Natural Resource Branch
Omaha District

Date: _7/19/16_



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, OMAHA DISTRICT
GARRISON PROJECT OFFICE
PO BOX 527
RIVERDALE, NORTH DAKOTA 58565-0527

CENWO-OD-GA                                            19 May 2016

MEMORANDUM THRU

Garrison Project Office, Omaha District (CENWO-OD-GA), (Lindquist)

Recreation and Natural Resource Branch, Omaha District, Corps of Engineers
(CENWO-OD-TN), (Cossette)

FOR Real Estate Branch, Omaha District, Corps of Engineers (CENWO-RE), (Noel)

SUBJECT:  Dakota Access, LLC. Construction of Dakota Access Pipeline (DAPL)
crossing flowage easements LL3440E, LL3483E-1, LL3453E, LL3430E, LL3450E-2,
LL3431E & LL3426E-2 north of Lake Sakakawea/Missouri River in Williams Counties,
ND.

1.  An application has been submitted to the U.S. Army Corps of Engineers (USACE)
    Garrison Project Office by Dakota Access, LLC to receive a Consent to Easement
    for the construction, operation, & maintenance of 1,100 miles of 12-30" diameter
    crude oil pipeline under Lake Sakakawea in Williams Counties.

    1.  The 24" dia. Pipeline is proposed to cross sections 7, 18, 19 & 30
        Township 153N, Range 103W on USACE flowage easements LL3440E,
        LL3483E-1, LL3453E, LL3430E, LL34350E-2, LL3431E & LL3426E-2 on
        the North side of Lake Sakakawea/ Missouri River for 2.83 miles.

    2.  Construction workspace needed to trench in pipeline and stage HDD
        boring site within flowage easements totals 59.3 ac.

2.  The proposed installation for this project is to open cut and trench on flowage
    easements and cross the river using HDD.

3.  Review by Natural Resource staff indicated the following conditions:

1. No impacts to USACE fee title land is proposed. All activity proposed is located on USACE flowage easement on private land.

2. All environmental commitments in the Environmental Assessment, Finding of No Significant Impact, and Plan of Development submitted by Dakota Access and all conservation recommendations in the Biological Opinion as applicable and are hereby incorporated by reference

3. This pipeline is also crossing the Missouri River for .21 miles on Corps Fee title land at Lake Oahe. This segment of the project is not reflected in this memo and was not reviewed by the Garrison Project Office.

4. An Environmental Assessment has been completed on the flowage easement crossing and is currently being reviewed by USACE within the project and Omaha district office.

4. Garrison Project Natural Resource Staff recommends consent to easement. Point of contact is Jeremy J. Thury. Phone: 701-654-7761.

5. For Your Action.

Encl
ROA packet

ALFRED C. STONESIFER
Supervisory Natural Resource Specialist

CONCURRENCES:

a. CENWO-OD-GA concurs with the above recommendation.

Signature: _____

Todd J. Lindquist
Operation Project Manager

Garrison Project, ND

Date: _24 May 2016_

b. CENWO-OD-T concurs with the finding of no significant environmental concerns and the recommendations for resolution of the encroachments, based on the attached documentation.

Signature: _____

Larry D. Janis
Chief, Recreation and Natural Resource Branch
Omaha District

Date:_____

2



VIA EMAIL

October 7, 2015

Brent Cossette
Natural Resource Specialist
Environmental Stewardship
CENWO-OD-TN
United States Army Corps of Engineers, Omaha District
1616 Capital Avenue, Suite 9000
Omaha, NE  68102
Brent.J.Cossette@usace.army.mil

Re:     **Updated Request for Consent to Easement Across Flowage and Saturation
        Easements for the Proposed Dakota Access Pipeline Project in Williams County,
        North Dakota**

Dear Mr. Cossette:

Dakota Access, LLC, (Dakota Access) is proposing the Dakota Access Pipeline (DAPL) Project;
an approximate 1,100 mile long, 12- to 30-inch diameter light crude oil pipeline project
beginning near Stanley, North Dakota, and routing through South Dakota, Iowa and ending at
Patoka, Illinois.

DAPL is proposed to cross private lands which the U.S. Corps of Engineers (Corps) has seven
flowage and saturation easements over (**Figure 1**), associated with the Buford-Trenton-
Irrigation District (Garrison Dam) and north of Lake Sakakawea/ Missouri River.  It is
understood that due to these crossings, the Corps will need to provide consent to easement
for the pipeline to be constructed and installed on lands where Corps has easements.

Dakota Access has performed environmental and geotechnical analysis of the subsurface at
these crossings to determine environmental features and feasible crossing methods.  It is
anticipated that the pipeline will cross the flowage easements via conventional
trench/backfill method; this additionally includes a portion of the planned horizontal
directional drill (HDD) entry point for the Lake Sakakawea/Missouri River crossing (**Figure 2**).

The purpose of this letter is to provide an update to the formal request for initiation of the
Corps consent to easement process dated March 9, 2015.  The following provides additional
information regarding this request.



**DAPL Project Crossing Corps Easements**

The proposed 24-inch diameter pipeline in this location of the DAPL Project will cross seven (7) contiguous Corps flowage and saturation easements on the north side of Lake Sakakawea/Missouri River for approximately 2.97 miles. The proposed pipeline will cross Corps easements identified below in the respective section, township, range and county and as depicted in the attached **Figures 1 and 2**.

| County | Tract No. | Township | Range | Section |
|--------|-----------|----------|-------|---------|
| Williams | LL3440E | 152N | 103W | 19, 20, 29, 30 |
| | LL3483E-1 | 152N | 103W | 19, 20 |
| | LL3453E | 152N | 103W | 18, 19 |
| | LL3430E | 152N | 103W | 18, 19 |
| | LL3450E-2 | 152N | 103W | 18 |
| | LL3431E | 152N | 103W | 7, 18 |
| | LL3426E-2 | 152N | 103W | 7 |

Dakota Access is securing a 50 foot wide permanent easement along the entire Project alignment that is generally centered on the pipeline (i.e. 25 feet on either side of the centerline). Based upon Corps provided easement documents and mapping, Dakota Access understands that the distance across Corps flowage and saturation easement areas north of the Missouri River is approximately 15,692 feet (2.97 miles).

Dakota Access performed a geotechnical boring program to assess soil and geology to assist with design of the HDD (**Figure 2**). Two soil borings were advanced on the property where Corps has easements. The plan is to establish the HDD entry point on the north side of the river and the HDD exit point on the south side of the river. A temporary workspace, which measures approximately 200 feet by 250 feet will be used on the Corps easements to facilitate the Missouri River HDD on the north side of the river. The HDD will result in approximately 1,570 feet of pipeline on Corps easements.

For activities associated with the installation of HDD and the hydrostatic testing of the HDD segment, Dakota Access plans to withdrawal water from the Missouri River. Acquisition points would coincide with the proposed pipeline crossing of the river. The pump will be set on a barge or float anchored just offshore of each bank at the proposed permanent easement. The barge/float would be approximately 12 feet wide by 14 feet long and fitted with a secondary containment structure. The pump's intake hose will be eight inches in diameter and connect the screened intake to the pump. The intake hose will push the water from the pump to the top of bank and then to the HDD equipment or pipeline section. The



intake hose would be temporarily (during construction only) located within the 50-foot permanent pipeline easement (Figure 2). No ground disturbance along the permanent easement is anticipated.

Dakota Access plans to install remaining pipeline using conventional open-cut construction methods on Corps flowage and saturation easement lands north of the HDD entry point. After pipeline installation is completed there will be no above ground facilities associated with the pipeline. The proposed typical construction easement for the DAPL is 150 feet wide (and includes the 50 feet of permanent easement as indicated in **Figure 3**). Additional temporary workspace is included at road crossings and change in pipe alignment. All dimensions and additional construction information are included in the Environmental Assessment (EA).

We appreciate your assistance with this request for Corps consent to cross flowage and saturation easement areas north of the Missouri River. We understand the March 9, 2015 formal DAPL Project request for consent to easement from the Corps officially initiated the Corps real estate process. We further understand that the environmental review for crossing these easements will be combined with the environmental review for the proposed DAPL crossing of the Corps owned lands at Lake Oahe.

Should you have any questions or comments, or require any other information for this request, please contact me at 713.989.7186, Monica.Howard@energytransfer.com, or at Dakota Access, LLC, c/o Monica Howard, 1300 Main Street Rm 14.030, Houston, TX 77002.

Sincerely,

**Dakota Access, LLC**

Monica Howard
Director Environmental Sciences


Enc.  Figure 1 – Corps Flowage and Saturation Easement Areas Crossed by Proposed DAPL Project
Figure 2 – DAPL Project Layout
Figure 3 – DAPL Project Typical ROW Configuration

CENWO-ED-G                                                    1 0 DEC 2015

MEMORANDUM THRU CHIEF, ENGINEERING DIVISION

MEMORANDUM FOR CENWO-OD-TN/COSSETTE

SUBJECT: Dakota Access Pipeline Project Crossing of Lake Oahe

The U.S. Army Corps of Engineers (USACE), Omaha District (Corps) received an Applicant's Technical Supplement for a proposed Dakota Access Pipeline Horizontal Directional Drilling (HDD) crossing of Lake Oahe in Morton and Emmons Counties, North Dakota for the installation of a 30" diameter steel pipeline for transportation of crude oil from the Bakken and Three Forks plays in North Dakota and South Dakota to points east.

Oahe Dam, including Lake Oahe, is a congressionally authorized and federally constructed project along the Missouri River. The US Army Corps of Engineers maintains and operates Oahe Dam and Lake Oahe, in cooperation with other agencies. The Corps has a congressionally mandated responsibility to ensure that the federally constructed projects are appropriately operated and maintained. No improvements shall be passed over, under, or through the walls, levees, improved channels or floodways; nor shall any excavation or construction be permitted within the limits of the projects right-of-way, nor shall any change be made in any feature of the works without prior approval of the Corps. The US Army Corps of Engineers Regulation ER 200-2-2 (33 CR Part 230) applies.

All (13) geotechnical comments by Mr. Dean Lang and Mr. Jason Wagner that were generated during the technical review have been entered into a log. Once the comments were satisfactorily addressed by the Engineer-of-Record, Dakota Access LLC and GeoEngineers, they were closed out. Technical record of comments and responses, follow-up comments and responses, etc., are kept in Projnet.

Dakota Access LLC and GeoEngineers will fully implement all required and agreed upon technical changes, as has been recorded by the review process in Projnet.

Dakota Access LLC and GeoEngineers are responsible for amending the Operations & Maintenance (O&M) Manual for the project to reflect the as-built conditions for any permanent modifications or encroachments. The amendment to the O&M Manual is required to be provided to the Corps for record keeping purposes within 60 days of completion of construction. The Corps can provide guidance on developing an addendum to the O&M Manual, upon request.

The comments herein pertain only to the geotechnical and flowable easement issues related HDD and Geotechnical investigations in the floodway and do not constitute USACE approval of any permits that may be required.

CENWO-ED-G
SUBJECT:  Dakota Access Pipeline Project Crossing of Lake Oahe

If you have any questions, please contact Mr. Dean Lang at (402) 995-2231, Mr. Jason Wagner at (402) 995-2276, or the undersigned at (402) 995-2218.

DAVID P. RAY P.E.
Chief, Geotechnical Engineering
    and Sciences Branch

2

CENWO-ED-DA                                                    18 December 2015

MEMORANDUM FOR CENWO-OD-TN (Cossette)

SUBJECT:    Dakota Access Pipeline (DAPL) Review

1. The U.S. Army Corps of Engineers, Omaha District (Corps) received an Applicant's Technical Supplement for proposed Dakota Access Pipeline (DAPL) Horizontal Directional Drilling (HDD) plan for the installation of steel pipeline below Lake Sakakawea, North Dakota, for transportation of crude oil.

2. Garrison Dam, including Lake Sakakawea, is a congressionally authorized and federally constructed project along the Missouri River. The US Army Corps of Engineers (Corps) maintains and operates Garrison Dam and Lake Sakakawea in cooperation with other Federal agencies.

3. The Corps has a congressionally mandated responsibility to ensure that the federally constructed projects are appropriately operated and maintained. No improvements shall be passed over, under or through the walls, levees, improved channels or floodways, nor shall any excavation or construction be permitted within the limits of the project right-of-way, nor shall any change be made in any feature of the works without prior approval of the Corps.

4. Mechanical aspects of this project were reviewed by Michael T. Smith, Design Branch Mechanical Section Chief, and all mechanical comments generated during the technical review were entered into the ProjNet / DrChecks. Once the comments were satisfactorily addressed by the Engineer-of-Record (Jonathan Fredland), they were closed out in ProjNet/DrChecks. Technical record of comments and responses, follow-up comments and follow-up responses, etc. is kept in ProjNet / DrChecks.

5. The Engineer-of-Record will fully implement all required and agreed upon technical changes, as has been recorded by ProjNet / DrChecks review process.

6. The Engineer-of-Record is responsible for amending the O&M Manual for the project to reflect the as-built conditions for any permanent modifications or encroachments. The amendment to the O&M Manual is required to be provided to the Corps for record keeping purposes within 60 days of completion of construction. The Corps can provide guidance on developing an addendum to the O&M Manual, upon request.

7. The comments herein pertain only to the mechanical issues related to pipeline lake crossing and do not constitute Corps of Engineers' approval of any permits that may be required.

8. If you have any questions, please contact Michael T. Smith at 402-995-2133.

*Michael T. Smith, P.E.*

Michael T. Smith, P.E.
Chief, Design Branch Mechanical Section
US Army Corps of Engineers, Omaha District

CENWO-ED-HA                                                04 November 2015

MEMORANDUM FOR CENWO-OD-TN

SUBJECT:  Water Quality Team Review of Draft Environmental Assessment for
Dakota Access Pipeline Project Crossings of Flowage Easements and Federal Lands.


1.  The Omaha District Water Quality Team (WQ) is responsible for coordinating
compliance with the guidance and requirements set forth in the U.S. Army Corps of
Engineers' Engineering Regulation – ER 1110-2-8154, "Water Quality and
Environmental Management for Corps Civil Works Projects".  The guiding principles
taken from ER 1110-2-8154 serve as the basis for surface water quality management
activities in the Omaha District.  WQ has reviewed the Draft Environmental
Assessment for Dakota Access Pipeline Project Crossings of Flowage Easements and
Federal Lands and has no comments at this time.  Additional documentation
supporting ER 1110-2-8154 is provided in the comments below.

2.  The Corps' water quality management authority is founded on the Federal Water
Pollution Control Act (FWPCA) of 1948 and its amendments including the Clean
Water Act (CWA) of 1977 and the Water Quality Act of 1987. The FWPCA
Amendments of 1972 (PL 92-500) strongly affirm the Federal interest in water
quality. Executive Order 12088, Federal Compliance with Pollution Control
Standards, dated 13-October-1978, requires compliance by Federal facilities and
activities with applicable pollution control standards in the same manner as any
non-Federal entity.

3.  The ultimate responsibility to control water quantity and quality at all Corps projects
rests with the Corps.

4.  If you have any questions or comments regarding this review, please me at (402)
995-2347.

John Hargrave
Limnologist
Omaha District Water Control and Water Quality
Section
Hydrologic Engineering Branch
Engineering Division



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, OMAHA DISTRICT
1616 CAPITOL AVENUE
OMAHA NE  68102-4901

CENWO-ED-HB                                                                                  9 March 2016

MEMORANDUM FOR CENWO-OD-TN (Cossette)

SUBJECT:  Executive Order 11988 and NWDR 1110-2-5 Compliance Memo for the
Proposed Dakota Access Pipeline (DAPL) Project in Williams County, North Dakota,
across Flowage and Saturation Easements

1.  The Omaha District Flood Risk and Floodplain Management Section (FRFM) is
responsible for coordinating the compliance with the requirements of Executive Order
11988 (Flood Plain Management).  FRFM reviewed the updated proposed project
submittal by Mrs. Monica Howard originally submitted March 2015, and as found it to be
in compliance with EO 11988.  Executive Order 11988 is applicable to all planning,
design, and construction civil works projects, activities under the operation and
maintenance program, and to real estate program (ER 1165-2-26).  Specific to
alteration of civil works projects EO 11988 compliance is identified in EC1165-2-216 in
Section 7.c.(3).ix.(e) and Section 7.c.(4)(b).

2.  The proposed project is approximately 1,100 miles long, 12- to 30-inch diameter light
crude oil underground pipeline beginning near Stanley, North Dakota and routing
through South Dakota, Iowa and ending at Patoka, Illinois.  This review is for the portion
of the proposed project that crosses seven USACE flowage and saturation easements
(LL3440E, LL3483E-1, LL3453E, LL3430E, LL3450E-O, LL34316E, and LL3426E-2) for
approximately 3 miles, with a portion of it within the Garrison Dam flood control pool.

3.  The following comments are outlined using the review criteria identified in ER 1165-
2-26:

    a.  Determine if the proposed action is in the base floodplain:  The project is located
in Williams County, North Dakota which participates in the National Flood Insurance
Program (NFIP).  The portion of the proposed pipeline that crosses the USACE flowage
and saturation easements is in the Zone A Special Flood Hazard Area (SFHA) shown
on Map Panel 3803120025A.

    b.  Identify and evaluate practicable alternatives to the action or to location of the
action:  The proposed project is functionally dependent on its location in the floodplain.

    c.  Advise the general public in the affected area and obtain their views and
comments :  It should be ensured that the proposed project is in compliance with


Printed on  Recycled Paper

CENWO-ED-HB
SUBJECT: Executive Order 11988 and NWDR 1110-2-5 Compliance Memo for the
Proposed Dakota Access Pipeline (DAPL) Project in Williams County, North Dakota,
across Flowage and Saturation Easements

floodplain management criteria of Williams County and the State of North Dakota. It is
recommended that the applicant obtain a local floodplain permit prior to construction.

    d. Identify beneficial and adverse impacts due to the action: The proposed pipeline
has no adverse impacts on the operation of the Garrison flood control pool (see the
below comments for compliance with NWDR 1110-2-5).

    e. Identify the potential for the project to induce development in the base
floodplain: Because this project will not change zoning or restrictions, the project is not
expected to have any impact on development potential within the Zone A SFHA.

    f. Determine viable methods to minimize any adverse impacts:

       (1) Provided that the site topography is left at its natural ground elevation after
construction, the proposed project should not adversely impact the USACE flowage and
saturation easements.

       (2) Flood-related problems should not occur if the pipeline is buried far enough
below the beds of the Missouri River to prevent exposure due to streambed erosion
during periods of high flood flows.

       (3) The shutoff valve location presented in the original proposal was identified as
a potential issue, but has since been addressed and removed according to Dakota
Access Pipeline Project Figure 6-B, dated August 2015.

4. Plans for the proposed pipeline were reviewed for compliance with appendix A
(Typical Cut and Fill Volumes for Land Development Proposals) of NWDR 1110-2-5,
Land Development Guidance at Corps Reservoir Projects. Provided that the site
topography is left at its natural ground elevation after construction and all excess
material is hauled off site, there are no flood risk and floodplain management concerns
from this office and therefore the proposed project is recommended for approval.

2

CENWO-ED-HB
SUBJECT:  Executive Order 11988 and NWDR 1110-2-5 Compliance Memo for the
Proposed Dakota Access Pipeline (DAPL) Project in Williams County, North Dakota,
across Flowage and Saturation Easements

5.  The comments herein pertain only to flood risk and floodplain management
concerns.  If you have any questions, please contact Mr. Brennan Beam at (402) 995-
2317 or myself at (402) 995-2322.

TONY D. KRAUSE, P. E., CFM
Chief, Flood Risk and Floodplain
    Management Section
Hydrologic Engineering Branch
Engineering Division

## U.S. ARMY CORPS OF ENGINEERS OMAHA DISTRICT
## NEPA CONSIDERATION CHECKLIST for PROJECT ACTIONS

| Project Name: GARRISON PROJECT LAKE SAKAKAWEA | Address/Location: 7,18,19,20,29, & 30  152N-103W |
|---|---|

**Brief Description of Proposed Action:**
CROSSING OF FLOWAGE EASEMENT WITH 12"-30" CRUDE OIL PIPELINE.

| | | | INITIAL |
|---|---|---|---|
| 1. The proposed action would have significant adverse effects on public health or safety. | YES ☐ | NO ☒ | JT |
| 2. The proposed action is in a location with unique geographic characteristics such as historical or paleontological resources | YES ☐ | NO ☐ | |
| 3. An Archaeologist reviewed this federal undertaking for cultural clearance. See attached documentation or copy of official email. | YES ☐ | NO ☐ | |
| 4. The proposed action would adversely affect park, recreation, or refuge lands; principle drinking water aquifers; wetlands; floodplain; prime or unique farmlands; or ecologically significant or critical habitat areas. | YES ☐ | NO ☒ | JT |
| 5. The proposed action would have highly controversial environmental effects. | YES ☐ | NO ☒ | JT |
| 6. The proposed action would have highly uncertain environmental effects or involve unique or unknown environmental risks. | YES ☐ | NO ☒ | JT |
| 7. The proposed action would establish a precedent for future action or represents a decision in principle about a future consideration with significant environmental effects. | YES ☐ | NO ☒ | JT |
| 8. The proposed action is related to other actions with individually insignificant, but cumulatively significant environmental effects. | YES ☒ | NO ☒ | JT |
| 9. The proposed action would adversely affect properties listed or eligible for listing in the National Register of Historic Places. See attached documentation or copy of official email. | YES ☐ | NO ☐ | < |
| 10. The proposed action would affect either directly or indirectly, a species included or proposed to be included on the list of endangered or threatened species. Attach USFWS concurrence. | YES ☐ | NO ☐ | |
| 11. The proposed action may violate Federal, State, Local or Tribal law or regulation imposed for the protection of the environment or imposed to ensure compliance with Executive Order EO 11988 (Floodplain Management), EO 11990 (Protection of Wetlands), Wild or Scenic Rivers Act, or the Fish and Wildlife Coordination Act. | YES ☐ | NO ☒ | JT |
| 12. The proposed action is in conformance with the project Master Plan and or the project OMP. | YES ☐ | NO ☒ | JT |
| 13. There is evidence of hazardous or toxic materials, which were stored on, disposed of on, or have otherwise contaminated the subject property. | YES ☐ | NO ☒ | JT |
| 14. The proposed action requires a Regulatory Section 10 404 permit. Can still be categorically excluded. | YES ☒ | NO ☐ | JT |
| 15. The proposed action involves surface disturbance greater than one (1) acre –Can still be categorically excluded but may need a NPDES permit. Consult with District or Project ECC if there is a question. | YES ☒ | NO ☐ | JT |
| 16. This action requires that the affected Tribes be consulted per the Programmatic Agreement for the operation and management of the Missouri River main stem system for compliance with the National Historic Preservation Act. Can still be categorically excluded. See attached documentation. | YES ☐ | NO ☐ | |

---

**IT HAS BEEN DETERMINED THAT THE PROPOSED ACTION:**

☐ Qualifies for a Categorical Exclusion in accordance with ER 200-2-2 Paragraph 9 dated March 4, 1988. (Check list on page 2)

☑ Is adequately covered in an existing EA (Environmental Assessment) or EIS (Environmental Impact Statement) entitled

Dakota Access Pipeline EA    June 2016                     and dated

☐ Requires mitigative measures (attach description).

☐ May not be categorically excluded - Proposal forwarded to Omaha District Office (CENWO-OD-TN) for further review.

| Signature of Preparer | Date 3/18/16 | Phone 701-654-7261 |
|---|---|---|
| Operations Manager | Date 5/23/16 | |

9/11/2009CENWO_OD FORM

1/2

## Rogers, Richard R NWO

| | |
|---|---|
| **From:** | Cain, David I NWO |
| **Sent:** | Monday, December 07, 2015 2:31 PM |
| **To:** | Cossette, Brent NWO |
| **Cc:** | Crane, Kelly A NWO; Lindquist, Todd J NWO; Spooner, Wade D NWO; Harnois, Richard D NWO; Price, Julie A NWO; Maier, Megan M NWO; Rogers, Richard R NWO |
| **Subject:** | RE: DAPL Tribal Admin Record (UNCLASSIFIED) |
| **Attachments:** | Garrison O&G Pipeline update02172015.pdf; Document1.docx |

Classification: UNCLASSIFIED
Caveats: NONE

Brent,
The only connection to DAPL we have had officially was the use of flowage easement lands. It had been determined that we do not have jurisdiction on lands we do not have access to. Formal Consultation was not initiated for the DAPL proposal due to the determination that the Regulatory Branch would have the lead role. This being said, due to the involvement with the civil works branch the proposal was mentioned in an oil and gas update PA letter dated February 17, 2015. The project was listed with Hess Hawkeye, Bakkenlink, Bakken Bridge, Paradigm Sakakawea, North Dakota Pipeline/Enbridge Western Expansion; the other currently proposed pipelines.

I must emphasize consultation was not officially initiated by the Garrison office for the DAPL pipeline. It is my understanding that the only consultation that has been officially initiated is for the Oahe Geotechnical Investigation, which is a separate project all together from the pipeline project. I do not want to speak for the Oahe Archaeologists, so Rick and Megan, please correct me if I'm speaking out of turn. However, I have been made aware, indirectly, that a G to G meeting had been arranged for the DAPL project in Sioux Falls, but the generic document attached above is the only documentation I have of the meeting, so I can't tell you if we have already had this meeting or if it has yet to even be officiated.

David I. Cain
Lead Field Archeologist
USACE, Garrison Project
201 1st Street
Riverdale, ND 58565
Office:(701)654-7706

-----Original Message-----
From: Cossette, Brent NWO
Sent: Monday, December 07, 2015 1:05 PM
To: Harnois, Richard D NWO; Cain, David I NWO; Price, Julie A NWO
Cc: Crane, Kelly A NWO
Subject: DAPL Tribal Admin Record (UNCLASSIFIED)

CLASSIFICATION: UNCLASSIFIED

All:

1

## Rogers, Richard R NWO

| | |
|---|---|
| **From:** | Cain, David I NWO |
| **Sent:** | Monday, December 07, 2015 2:31 PM |
| **To:** | Cossette, Brent NWO |
| **Cc:** | Crane, Kelly A NWO; Lindquist, Todd J NWO; Spooner, Wade D NWO; Harnois, Richard D NWO; Price, Julie A NWO; Maier, Megan M NWO; Rogers, Richard R NWO |
| **Subject:** | RE: DAPL Tribal Admin Record (UNCLASSIFIED) |
| **Attachments:** | Garrison O&G Pipeline update02172015.pdf; Document1.docx |

Classification: UNCLASSIFIED
Caveats: NONE

Brent,
The only connection to DAPL we have had officially was the use of flowage easement lands. It had been determined that we do not have jurisdiction on lands we do not have access to. Formal Consultation was not initiated for the DAPL proposal due to the determination that the Regulatory Branch would have the lead role. This being said, due to the involvement with the civil works branch the proposal was mentioned in an oil and gas update PA letter dated February 17, 2015. The project was listed with Hess Hawkeye, Bakkenlink, Bakken Bridge, Paradigm Sakakawea, North Dakota Pipeline/Enbridge Western Expansion; the other currently proposed pipelines.

I must emphasize consultation was not officially initiated by the Garrison office for the DAPL pipeline. It is my understanding that the only consultation that has been officially initiated is for the Oahe Geotechnical Investigation, which is a separate project all together from the pipeline project. I do not want to speak for the Oahe Archaeologists, so Rick and Megan, please correct me if I'm speaking out of turn. However, I have been made aware, indirectly, that a G to G meeting had been arranged for the DAPL project in Sioux Falls, but the generic document attached above is the only documentation I have of the meeting, so I can't tell you if we have already had this meeting or if it has yet to even be officiated.

David I. Cain
Lead Field Archeologist
USACE, Garrison Project
201 1st Street
Riverdale, ND 58565
Office:(701)654-7706

-----Original Message-----
From: Cossette, Brent NWO
Sent: Monday, December 07, 2015 1:05 PM
To: Harnois, Richard D NWO; Cain, David I NWO; Price, Julie A NWO
Cc: Crane, Kelly A NWO
Subject: DAPL Tribal Admin Record (UNCLASSIFIED)

CLASSIFICATION: UNCLASSIFIED

All:



0 1,000 2,000 Feet

1 inch = 2,000 feet

DAKOTA ACCESS, LLC

For Environmental Purposes Only

**Figure 1**
**Corps Flowage and Saturation Easement Areas Crossed by Proposed Dakota Access Pipeline Project**

Proposed Centerline

Corps Flowage Easement Areas

Date: (3/6/2015)



Dakota Access Pipeline Project
Figure 2
Project Layout
Flowage Easements
Williams County, North Dakota

DAKOTA ACCESS, LLC

Milepost
Barge Location With Pumping Intake Structure*
Temporary Above Ground Waterline
Project Centerline
DAPL Centerline
Workspace
USACE Flowage Easements

* Barge location dependant on water level

North Dakota

0      2,200
Feet

1:26,400
UTM83-13F          Date: August, 2015

Path: P:\GIS\Client\ETC_EnergyTransfer\DakotaAccess_DAPL\Maps\ENV\ND_FlowEasements\02ND_FlowEasement_Layout.mxd



NOTES:
① DEPTH OF TOPSOIL SEGREGATED BASED UPON SITE-SPECIFIC CONDITIONS.

| REV. | DATE | BY | DESCRIPTION | CHK. |
|---|---|---|---|---|
| C | 12/12/14 | RER | ISSUED FOR REVIEW | |
| B | 12/12/14 | RER | ISSUED FOR REVIEW | |
| A | 9/16/14 | MR | ISSUED FOR REVIEW | |

# TYPICAL RIGHT-OF-WAY CONFIGURATION

## UPLAND CONSTRUCTION FULL WIDTH TOPSOIL SEGREGATION

PROJECT NO. **10395700**

| DRAWN BY: MR | DATE: 09/15/14 | DWG. NO. | REV. |
|---|---|---|---|
| CHECKED BY: RL | DATE: 09/15/14 | **Figure 3** | C |
| SCALE: N.T.S. | APP.: | | |

# EXHIBIT I

-----Original Message-----
From: Noel, Rick L NWO [mailto:Rick.L.Noel@usace.army.mil]
Sent: Tuesday, August 02, 2016 8:00 AM
To: Siguaw, Tom <Tom.Siguaw@energytransfer.com>
Cc: BG (Ret) Robert Crear <robertcrear@aol.com>; Kolke, Timothy D NWO <Timothy.D.Kolke@usace.army.mil>;
Chipman, David V NWO <David.V.Chipman@usace.army.mil>; Simpson, Amanda M NWO
<Amanda.M.Simpson@usace.army.mil>; Mahmoud, Joey <Joey.Mahmoud@energytransfer.com>
Subject: RE: Garrison Consent DACW45-9-16-8071

Mr. Siguaw

Attached is a signed letter and consent.  I will look for the originals and check in the mail today.  If you have
questions, please let me know.


Rick L. Noel
Chief, Civil Branch, Real Estate Division Real Estate Contracting Officer USAED, Omaha
402-995-2832 (phone)
402-995-2826 (fax)
rick.l.noel@usace.army.mil



-----Original Message-----
From: Siguaw, Tom [mailto:Tom.Siguaw@energytransfer.com]
Sent: Monday, August 01, 2016 5:07 PM
To: Noel, Rick L NWO <Rick.L.Noel@usace.army.mil>
Cc: BG (Ret) Robert Crear <robertcrear@aol.com>; Kolke, Timothy D NWO <Timothy.D.Kolke@usace.army.mil>;
Chipman, David V NWO <David.V.Chipman@usace.army.mil>; Simpson, Amanda M NWO
<Amanda.M.Simpson@usace.army.mil>; Mahmoud, Joey <Joey.Mahmoud@energytransfer.com>
Subject: [EXTERNAL] RE: Garrison Consent DACW45-9-16-8071
Importance: High

Mr. Noel

Please see attached ... Scanned executed documents (Consent, Certificate of Authority and Payment) for
crossing the flowage easement tracts at the Garrison Project.
All original documents are being sent in overnight mail to your attention.

Thank you,

Tom Siguaw
Sr. Director
Energy Transfer Partners
(o)  713-989-2841
(c)  713-249-3435


-----Original Message-----
From: Noel, Rick L NWO [mailto:Rick.L.Noel@usace.army.mil]
Sent: Monday, August 01, 2016 2:20 PM
To: Siguaw, Tom <Tom.Siguaw@energytransfer.com>

Cc: BG (Ret) Robert Crear <robertcrear@aol.com>; Kolke, Timothy D NWO <Timothy.D.Kolke@usace.army.mil>; Chipman, David V NWO <David.V.Chipman@usace.army.mil>; Simpson, Amanda M NWO <Amanda.M.Simpson@usace.army.mil>
Subject: Garrison Consent DACW45-9-16-8071

Tom

Attached is the draft Consent for crossing the flowage easement tracts at the Garrison Project.  Please have it and the attached certificate of authority signed and returned as instructed in the attached letter.  The payment for the consent will need to be sent in overnight mail to my attention.  If questions, let me know.  This is only for the Garrison tracts.  As you are aware the Congressional notification of the request for an easement at Lake Oahe is in process and the easement cannot be issued until that notification is complete.  Let me know if you have questions.

Rick L. Noel
Chief, Civil Branch, Real Estate Division Real Estate Contracting Officer USAED, Omaha
402-995-2832 (phone)
402-995-2826 (fax)
rick.l.noel@usace.army.mil

Private and confidential as detailed here<Blockedhttp://www.energytransfer.com/mail_disclaimer.aspx>. If you cannot access hyperlink, please e-mail sender.
Private and confidential as detailed here<http://www.energytransfer.com/mail_disclaimer.aspx>. If you cannot access hyperlink, please e-mail sender.



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, OMAHA DISTRICT
1616 CAPITAL AVENUE
OMAHA NE 68102-1618

REPLY TO
ATTENTION OF

August 2, 2016

Real Estate Division

Dakota Access, LLC
Attn: Tom Siguaw
1300 Main Street, 14th Floor
Houston, Texas 77002

Dear Mr. Siguaw:

Enclosed is a fully executed copy of Consent No. DACW45-9-16-8071. The Consent provides the Government's approval of and consent to the construction, operation and maintenance of a crude oil pipeline by your company over, across and under Government Flowage Easements more specifically described therein at the Lake Sakakawea Project, North Dakota.

An electronic version of this Consent is being sent in advance of an original. Upon receipt of the original you are sending in the mail, it will be signed and an original returned for your records.

If you have any further questions concerning the Consent, please direct them to me at (402) 250-4284 or by e-mail at rick.l.noel@usace.army.mil.

Sincerely,

Rick L. Noel
Chief, Civil Branch, Real Estate Division
Real Estate Contracting Officer

Enclosure

## DEPARTMENT OF THE ARMY
## CORPS OF ENGINEERS
## OMAHA DISTRICT
## CONSENT TO EASEMENT STRUCTURES

No. DACW45-9-16-8071
Project: Garrison Dam Project
Tract Nos. LL3440E, 3483E-1, 3453E, 3430E,
LL3450E-2, 3431E, 3426E-2

**WHEREAS,** the United States has acquired perpetual flowage and saturation easements over multiple tracts identified above at the Garrison Dam Project, North Dakota, located specifically in Sections 7, 18, 19, and 30, Township 153 North, Range 103 West, Williams County, North Dakota, and which are recorded in the records of Williams County, North Dakota;

**WHEREAS,** said easements grant to the United States the right of prior approval for any structure to be located within the easement areas, which areas are under the administrative control of the Omaha District, Corps of Engineers;

**WHEREAS,** the United States has been requested to give consent for the installation, operation and maintenance of a Twenty Four (24) inch, underground crude oil pipeline and associated facilities and work areas on, over and across the above identified tracts;

**NOW THEREFORE,** the United States hereby gives consents to **DAKOTA ACCESS LLC,** a limited liability company, duly organized and existing under and by virtue of the laws of the State of Delaware, with its principal office at 1300 Main, Houston, Texas 77002, hereinafter referred to as the grantee, for the installation, operation and maintenance of a **twenty four (24) inch, underground crude oil pipeline, including valve site, and a construction right-of-way and HDD work space,** at the locations shown on **Exhibit "A",** attached hereto;

**PROVIDED HOWEVER** that this consent is subject to the following conditions:

1. All activities conducted on the premises shall comply with all applicable Federal, state, county and municipal laws, ordinances and regulations wherein the premises are located.

2. The giving of this consent does not in any way subordinate the United States prior easement rights. The United States shall in no case be liable for any damage or injury to the structures herein consented to, which may be caused by any action of the United States under its easement, or that may result from future operations undertaken by the United States, and no claim or right to compensation shall accrue from such exercise of the United States' easement rights.

3. The United States shall not be responsible for damages to property or injuries to persons that may arise from or be incident to the exercise of the consented activity.

4. This instrument is effective only insofar as the rights of the United States in the premises are concerned; and the grantee shall obtain such permission as may be required on account of any other existing rights. It is understood that this consent does not eliminate the necessity for obtaining any Department of the Army permit which may be required pursuant to the provisions of Section 10 of the Rivers and Harbors Act of 3 March 1899 (30 Stat. 1151; 33 U.S.C. § 403), Section 404 of the Clean Water Act (33 U.S.C. § 1344) or any other permit or license which may be required by Federal, state, interstate or local laws in connection with the use of the premises.

## 5. SITE SPECIFIC CONDITIONS

a. All environmental commitments in the Environmental Assessment, Dakota Access Pipeline Project, dated July 2016 and the Mitigated Finding of No Significant Impact dated July 25, 2016, must be satisfied by the grantee and are incorporated herein by reference.

b. The pipeline must be maintained and operated per ASME B31.3, B31.4, B31.8, CFR 192, CFR 195, API 1104, and related codes.

c. Cathodic Protection will be operated and maintained per applicable codes and the grantee's "Operations and Maintenance Manual". Wall thickness testing will be performed on a 5 year interval through the use of in-line inspection. The periodic in-line inspection will be performed in-lieu of periodic hydro tests. The grantee shall send the inspection reports to the Operations Project Manager at the Garrison Project Office (hereinafter the Garrison OPM).

d. The Facility Response Plan will be submitted to the Garrison OPM for review prior to the operation of the pipeline.

e. All plans not final at the time the Environmental Assessment is complete will be submitted to the Garrison OPM for review and the incorporation of USACE comments prior to submittal to the Pipeline and Hazardous Management Safety Administration. These plans include, but are not limited to the following: Geographical Response Plan, Operations and Maintenance Manual, Risk Assessment (Integrity Management Plan) and Spill Models (Using the National Hydrography Dataset by the USGS)

f. Any plans that have been updated in the "Facility Response Plan" must be sent to the Garrison OPM for review by the USACE Environmental Compliance Coordinators at the Omaha District Office and the Garrison Project Office within one year of the update.

g. The grantee shall provide as-built drawings for the crossing of the Missouri River to the Garrison OPM within 6 months of the completion of pipeline construction.

h. The grantee shall conduct the following training exercises:

(1) A full scale open water and a full scale winter/ice exercises at Lake Sakakawea and Lake Oahe. A full scale exercise will occur once every 3 years (triennial cycle) with the location and type of exercise occurring on alternating schedules (e.g. open water exercise at Lake Oahe the first triennial cycle, followed by winter exercise at Lake Sakakawea the following triennial cycle, followed by a winter exercise at Lake Oahe the following triennial cycle, etc.). The first exercise will occur within the first 3 years after the pipeline becomes operational.

(2) To facilitate USACE staff involvement, the grantee shall notify the USACE Environmental Compliance Coordinators at the Omaha District Office and the Garrison Project Office at least ninety (90) days prior to initiation of the training exercises. The grantee shall also solicit the participation of key stakeholders (federal, state, local, and Tribal) in these exercises.

No. DACW45-9-16-8071
Project: Garrison Dam Project

i. Within one year following the pipeline becoming operational, the grantee shall provide for an all-weather access and collection point downstream of the HDD crossing of the Missouri River at Lake Sakakawea. The grantee shall provide an equipment storage facility on non-federal lands that includes a fenced permanent storage area for winter and open water spill response equipment. The storage facility should be placed in a strategic location and near existing facilities that would support access to the water. The grantee will coordinate with the USACE and any other applicable stakeholders to obtain all necessary permits and approvals prior to construction for any ground disturbing activities associated with these facilities. The storage facility should contain sufficient response equipment at a minimum to mitigate an unintended worst case release for this Lake crossing.

IN WITNESS WHEREOF, I have hereunto set my hand by authority of the Secretary of the Army, this _____2nd_____ day of _____August_____, 2016.

Rick L. Noel
Chief, Civil Branch, Real Estate Division
Real Estate Contracting Officer

THIS CONSENT is also executed by the grantee this _____1st_____ day of _____August_____. 2016.

DAKOTA ACCESS LLC

Robert Rose
Vice-President, Land and Right of Way

3



EXHIBIT A

# EXHIBIT J

— 1 —

1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
2

3   STANDING ROCK SIOUX TRIBE,    )
    et al.,                       )
4                                 )   Civil No. 16-01534
              Plaintiffs          )
5                                 )
        v.                        )
6                                 )   Washington, D.C.
    UNITED STATES ARMY CORPS      )
7   OF ENGINEERS, et al.,         )
                                  )   Friday, September 16, 2016
8                                 )   2:05 p.m.
              Defendants.         )
9   _____

                    TRANSCRIPT OF STATUS CONFERENCE
10           BEFORE THE HONORABLE JAMES E. BOASBERG
                   UNITED STATES DISTRICT JUDGE
11

    APPEARANCES:
12

13  For the Plaintiff:          JAN HASSELMAN, ESQ.   (By phone)
                                STEPHANIE TSOSIE, ESQ.(By phone)
14                              Earthjustice Legal Defense Fund
                                705 Second Avenue
15                              Suite 203
                                Seattle, Washington  98104-1711
16
    For the Intervenor          CONLY J. SCHULTE, ESQ. (By phone)
17  Plaintiff:                  NICOLE E. DUCHENAUX    (By phone)
                                Fredericks Peebles & Morgan LLP
18                              1900 Plaza Drive
                                Louisville,  Colorado  80027
19
    For the Defendant:          ERICA M. ZILIOLI, ESQ.
20                              MICHAEL D. THORP, ESQ.
                                JAMES GETTE, ESQ.
21                              U.S. Department of Justice
                                Environment and Natural
22                                Resources Division
                                P.O. Box 663
23                              Ben Franlin Station
                                Washington, D.C.  20044

24

25

2

1    **APPEARANCES (Continued)**

2    **For the Intervenor**          BILL LEONE, ESQ.
     **Defendant:**                  ROBERT D. COMER, ESQ.
3                                    Norton Rose Fulbright US LLP
                                     799 9th Street, NW
4                                    Suite 1000
                                     Washington, DC  20001
5

6

7    **Court**           PATRICIA A. KANESHIRO-MILLER, RMR, CRR
     **Reporter:**       U.S. Courthouse, Room 4704-B
8                        333 Constitution Avenue, NW
                         Washington, DC 20001
9                        (202) 354-3243

10

11   Proceedings reported by stenotype shorthand.
     Transcript produced by computer-aided transcription.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

1      (In open court)

2      THE DEPUTY CLERK:  Civil Action 16-1534, Standing

3  Rock Sioux Tribe versus United States Army Corps of Engineers.

4      Counsel, please announce yourself for the record,

5  starting with counsel on the telephone.

6      MR. HASSELMAN:  Good afternoon, Your Honor.  This is

7  Jan Hasselman and Stephanie Tsosie for plaintiff, Standing

8  Rock Sioux Tribe.

9      THE COURT:  Good afternoon.

10      Sometimes the phone connection is not so great, so

11  please make sure you're near your microphone and speak loudly

12  and clearly, if you can.  Thanks.

13      MS. DUCHENAUX:  Good afternoon.  This is Nicole

14  Ducheneaux on behalf of the Cheyenne River Sioux Tribe, and I

15  also have Conly Schulte on the line with me.

16      THE COURT:  Thank you.  Welcome.

17      Same proviso to you folks.

18      THE COURT:  For the government?

19      MS. ZILIOLI:  Good afternoon, Your Honor.  Erica

20  Zilioli, representing the United States Army Corps of

21  Engineers.  With me at counsel table is Michael Thorp,

22  Assistant Section Chief in the National Resources Section

23  also at DOJ.  He will be standing in for Mr. Marinelli today.

24      THE COURT:  Good afternoon to both of you folks.

—4—

1        MS. ZILIOLI:  Also, at counsel table is James Gette,

2    who is the Principal Deputy Section Chief of the Natural

3    Resources Section of DOJ.

4        THE COURT:  Thank you both for being here.

5        MS. ZILIOLI:  And Melanie Casner of the Army Corps of

6    Engineers.

7        THE COURT:  Thank you.

8        And then for the defendant intervenor?

9        MR. LEONE:  Good afternoon, Your Honor.  Bill Leone

10   on behalf of intervenor, Dakota Access.  My partner, Bob

11   Comer, is with us at counsel table, and Joey Mahmoud, who is

12   the vice president for the company, is also with us at the

13   table.  Mr. Pieper, our associate general counsel at Dakota

14   Access is on the phone listening in.

15       THE COURT:  Thank you all, as well.

16       I want to start with the government, and I'm not sure

17   who wants to answer these questions, so I will let you

18   choose.

19       I will start by saying some of my, shall we say, less

20   restrained colleagues would likely have had you and your

21   supervisors all the way up to, I'm sure, the assistant

22   attorney general here last Friday to explain what happened in

23   connection with the press release you issued immediately

24   after I filed my injunction opinion.  I have not done that.

25   I retained our regularly scheduled date, but that doesn't

1    mean I'm not quite troubled by what happened here.  Let me

2    explain why.

3         If we review the bidding, that on July 27th Standing

4    Rock filed its complaint and then on August 4th, the

5    preliminary injunction motion.  The government's opposition

6    was filed on August 18th, and among other things you said,

7    "Granting the equitable remedy of a preliminary injunction

8    now, after both the Corps and Dakota Access have invested

9    significant time and resources and accommodated timely raised

10   tribal concerns would only reward plaintiffs' unwillingness

11   to engage meaningfully in the consultation process, and it

12   would not serve the public interest to encourage parties in

13   the future to decline to consult and comment and then bring

14   last minute challenges as construction is underway, utilizing

15   judicial resources in the process, rather than taking the

16   proper steps to engage in the planning stages, when their

17   concerns can be addressed without resorting to such a drastic

18   step as an injunction."

19        So you maintain your strong opposition and cite,

20   among other things, the preservation of judicial resources.

21        Then the plaintiff files a TRO on September 4th.  And

22   your filing the next day, September 5th, said you didn't

23   oppose "a short and discrete TRO" until this Court rules on

24   plaintiff's pending motion for a preliminary injunction.

25   Even in that court hearing, you don't tell me that you're

1      reconsidering your position.  So I continue to expend

2      reasonably significant effort to issue in an expedited

3      fashion a lengthy opinion.  And within minutes, you issue a

4      press release from "The Department of Justice, The Department

5      of the Army, and The Department of Interior" indicating the

6      Corps will not authorize construction under Lake Oahe.

7              So my first question is:  How did this happen?  And

8      how is this complying with your duty of candor to the

9      tribunal when you knew, and apparently had known for some

10     time, since the press release talks about coordination among

11     several departments, that you would reverse your opinion, but

12     waited until after my opinion issued?  How can this happen?

13             MR. THORP:  Good afternoon, Your Honor.  Michael

14     Thorp for the government.  If I may, may I rely on Mr. Gette,

15     as well.

16             I think there are is some clarity in order here,

17     Judge.

18             THE COURT:  Please.  I would love some.

19             MR. THORP:  Your Honor, the government has not

20     reversed its position in any way.  I think the press release

21     is intended to be read quite literally here.

22             THE COURT:  So if you had issued the press release

23     before I had issued my opinion, that wouldn't have mooted out

24     the issue about Lake Oahe?

25             MR. THORP:  No, not at all, Your Honor.  The press

1    release should be meant quite literally.  There has been no

2    agency action or any change whatsoever in the agent's

3    position.

4          THE COURT:  In other words, when the press release

5    says, "The Army will not authorize constructing the pipeline

6    under Lake Oahe," is what you're saying that you're not

7    withdrawing the permit, it is just that you're not granting

8    the easement, or both?

9          MR. THORP:  It is really neither, Your Honor.  There

10   has been no suspension or revocation of any authorization,

11   verification, or permit that's already been granted, none

12   whatsoever.

13         THE COURT:  They still have the permit to go ahead

14   and construct?

15         MR. THORP:  That's correct.

16         THE COURT:  What is blocking them?

17         MR. THORP:  With respect to the easement, that has

18   never been granted, and it is still under consideration.

19   That also has not changed.

20         THE COURT:  When you say you won't authorize it, that

21   means you won't issue the easement?

22         MR. THORP:  No.  If you read the statement, what we

23   are really saying is that remains under consideration.

24         THE COURT:  But you're not authorizing it now?

25         MR. THORP:  Right.  That was not a final agency

1    action, Your Honor.  What we were saying is that it won't be

2    authorized today or tomorrow, it will be authorized once the

3    Court completes its review --

4         THE COURT:  When you say "authorized," I want this to

5    be clear.  You tell me to read this literally, but it doesn't

6    mention the easement or the permit, and I'm sure Dakota

7    Access would like to know, I'm sure the plaintiff would like

8    to know, I'm sure the public would like to know what you do

9    mean by that.

10        Does it mean at the moment you're not granting the

11   easement, or you're saying there is something beyond the

12   easement?

13        MR. THORP:  No.  It is at the moment.  The easement

14   has only been under consideration and has not been granted.

15   That easement issue, actually, is not before the Court right

16   now, nor was it ever.

17        THE COURT:  When you say you won't authorize, it

18   means that for now you're not granting the easement?

19        MR. THORP:  What it means is the easement application

20   remains under consideration.

21        THE COURT:  Everyone knows the easement consideration

22   is under consideration.  You're saying you're not going to

23   authorize until it can determine whether it will need to

24   reconsider any of its previous decisions.  Again, you're

25   talking about the easement and not the permit?

1          MR. THORP:  Right.  The easement remains under

2     consideration.  That has never changed.  With respect to all

3     authorizations that have already been approved, the Corps is

4     looking at its prior approvals for the purposes of good

5     governance and due diligence, to make sure that it is in

6     compliance with the law.  That is not unusual.  That is

7     exactly what we did with respect to the NHPA issues.

8          THE COURT:  If you're saying that we're not for the

9     time being going to issue the easement, and Dakota Access

10    can't proceed obviously without that easement, that's the

11    blocking of the pipeline that is occurring now; correct?

12         MR. THORP:  Right, but that has never changed.  That

13    easement application has been pending.

14         THE COURT:  There wouldn't be irreparable harm in

15    regard to Lake Oahe if there is no easement because they

16    couldn't dig.

17         MR. THORP:  Right.  We made that clear.

18         THE COURT:  Did you ever say that in any of your

19    papers, that we're not granting the easement or there is no

20    irreparable harm because we haven't authorized this?  Of

21    course not.

22         MR. THORP:  That's not what we're doing, Your Honor.

23         THE COURT:  You just told me you're doing that.

24         MR. THORP:  What I said was the easement has always

25    been under consideration by the Court.  That hasn't changed.

1          THE COURT:  What's changed is you're now publicly

2     saying, we're not issuing it anytime soon.

3          MR. THORP:  Because the consideration process is

4     ongoing.

5          THE COURT:  If nothing has changed, what is the point

6     of the press release?

7          MR. THORP:  We're making sure the public is aware of

8     what we are doing.

9          THE COURT:  Why did you wait until minutes after my

10    order?  In other words, you could have issued this at any

11    time and say, public, by the way --

12         MR. THORP:  Your Honor, the litigation was an

13    evolving situation throughout this entire process as was

14    public safety issues on the ground.  That continues to be a

15    paramount concern, public safety, as well.  There is nothing

16    that has changed about agency action here, not one thing.

17    What we're saying is we're looking at all our decision making

18    to confirm compliance.  There is really nothing unusual about

19    that.

20         THE COURT:  So why do you wait until -- you're not

21    going to tell me it is coincidental that the press release

22    issues after my ruling; right?  I mean, you waited for my

23    ruling to issue it; right?

24         MR. THORP:  We certainly needed to know what Your

25    Honor was going to rule to determine what our approach would

1   be, sure.

2           MR. GETTE:  Your Honor, if I might?

3           THE COURT:  Please.

4           MR. GETTE:  I think it would be helpful to put into

5   context the situation that our client agencies and the

6   Department of Justice found themselves in last week.

7           THE COURT:  Delighted to hear it.

8           MR. GETTE:  As you know from the taxing week that I'm

9   sure you had, it was a very challenging and fluid situation,

10  both on the ground and legally, as well, as we presented our

11  arguments to you.

12          During that process, our client agencies were

13  grappling with some very heady and important issues,

14  including issues of public safety and public concern, issues

15  that addressed important sovereign-to-sovereign relationships

16  and conversations, all of which was going on minute by minute

17  in the context of us responding to the Court and

18  appropriately litigating on behalf of our agency clients.

19          In that context, the agencies were looking at the

20  statement that they ultimately issued, but their

21  conversations and consideration regarding that statement, I

22  can tell you, and the status of that statement continued up

23  until moments before it was issued.  And we didn't feel like

24  it was driven by the Court's decision.  The issue before the

25  Court --

1          THE COURT:  You would agree it is not coincidental

2     that this issues minutes after my decision?  In other words,

3     you weren't ready to issue it before I ruled; right?

4          MR. GETTE:  We were not.  And I will tell you

5     honestly that while I was not personally involved in those

6     conversations, they were happening at a level higher than I

7     was involved, those conversations were literally on an

8     ongoing basis, including the content, what would be said,

9     conversations from agency to agency about what we could and

10    could not do appropriately given the situation and the

11    ongoing litigation.

12         THE COURT:  How about saying to me at some point,

13    look, Judge, we know you're in trial in another case and yet

14    you're still trying to get this out by the deadline and we're

15    actually reconsidering our position, and if we decide to

16    actually hold the easement, there wouldn't be irreparable

17    harm and maybe you can hold off on doing this work and

18    issuing this opinion because there may be nothing to enjoin?

19         MR. GETTE:  So, Your Honor, I think we felt -- you

20    keep using the term "reconsideration."  As we stand here now,

21    we still do not believe that this is in a situation of

22    reconsideration.

23         THE COURT:  Let me ask you this, just talking about

24    Lake Oahe, because there are other permitted waterways, and

25    we will talk about those in a little bit:  But if the

1      easement was not going to be granted anytime soon, don't you

2      agree that that is a strong argument why there would be no

3      irreparable harm at Lake Oahe?

4            MR. GETTE:  That comes back to "won't be issued

5      anytime soon."  Even in this public release, we have not said

6      that there is a deadline by which we will or won't grant the

7      easement.  That is under consideration.  It was under

8      consideration when we were before the Court.  That

9      consideration is ongoing.

10           I can tell you that there is a sense within the

11     government right now, between the conversations with

12     easements, that that consideration is at this point likely to

13     take weeks but not days.  Also, Your Honor this has only been

14     determined within the last week literally.  And that it is

15     not likely to take months.  We're talking weeks.  There is

16     still an exigency that is hanging over this project.  And so

17     we have tried to address that.  We, of course, are trying to

18     take into consideration the interests of both the plaintiffs

19     in this case, as well as the intervenor defendants, in trying

20     to find a route forward that addresses the concerns of

21     everyone.  We worked very hard at doing that.  Why we felt it

22     was appropriate to issue the statement is that from the

23     client agency's standpoint, nothing in the statement changed

24     anything that the Court was considering at that time.  The

25     NHPA issue was ripe for the Court's consideration.

1           THE COURT:  If that is true, why wouldn't you have

2      said in any of your pleadings, we don't know what is going to

3      happen with the easement?  In fact, the easement issue was

4      raised in oral argument, and Mr. Leone, as I recall, was

5      rather surprised about where that even stood, to learn that

6      it hadn't yet been approved.  It was certainly never raised

7      in the papers as this is an issue, of course Dakota Access

8      has to get the easement, and who knows when that is going to

9      happen.  So it was never raised; right?

10           MR. GETTE:  Your Honor, if we failed to raise that,

11      and it sounds as if we did, in a way that really put you, the

12      Court, on appropriate notice, I apologize, if we failed to

13      raise that and failed to share the specifics of the easement

14      and how it plays into the permitting process.  We did have a

15      permit that had issued, and that was what was being

16      challenged.  So if we didn't share with you sufficient

17      information to fully inform the Court about other issues that

18      played into the context of the overall project, I certainly

19      apologize for that.  That was certainly not our intention.

20           THE COURT:  Again, just so we are completely

21      clear -- this is probably more for the public than the

22      litigants, who I'm sure know -- I have no political position

23      on whether the pipeline is a good idea, bad idea, should be

24      built, shouldn't be built.  That is not what judges are to

25      decide.  I also realize that the executive does make

1       political decisions and decisions where they weigh the

2       interests -- I don't say "political" in any negative

3       fashion -- but decisions where they have to weigh the

4       interests of competing groups.  That's what government does.

5               And for you at any point to say, we decided we're

6       going to hold this easement because there are considerations

7       that we think merit it, that's completely your right, that's

8       your business, I have no opinion on it because it has nothing

9       to do with me.

10              What I do have an opinion on is the way it has been

11      handled and the way that I believe I have -- I won't say been

12      misled -- but that I don't believe the filings have been

13      fully truthful.  I think there have been omissions, material

14      omissions, that would have, had I been informed of them,

15      caused different timetables or this to proceed on a different

16      track.  That's my concern.

17              MR. GETTE:  Your Honor, to the extent that we have

18      not shared with you sufficient information in the way this

19      rolled out, I certainly apologize, if we didn't fully inform

20      the Court in a way that we could have.  As I said, we were

21      literally moving hour by hour throughout the week last week,

22      and if there was more information that we could have provided

23      or that we thought would have been more helpful to the Court,

24      we would have done so.  And I apologize that we didn't.

25              In the end, it seemed to us that regardless of what

1  we did -- and I think this has been borne out by the

2  continued desire by the plaintiffs in both this court and the

3  Court of Appeals -- that they are still seeking the

4  injunctive relief that they sought from this Court as of

5  today.  Despite having made our statement --

6       THE COURT:  I'm going to talk to Mr. Hasselman, but

7  one driver of that could well be non-Lake Oahe sites.  Again,

8  it wasn't clear to me, and I don't know if it was clear to

9  the plaintiffs or Dakota Access whether the language of the

10  press release referred to the permitting or the easement,

11  because it doesn't say, and I didn't know until I had been

12  told today.

13       MR. GETTE:  In fact, our understanding at the time

14  and our belief at the time is the plaintiffs were asking for

15  substantially more than our statement in terms of the Lake

16  Oahe piece and the permitting that was being addressed by our

17  statement.  So we fully thought that as we issued the

18  statement it was not going to, in fact, diminish the

19  plaintiff's desire for the Court to move forward with this

20  adjudication.  And in fact, that was our understanding and

21  one of the reasons that we did not think that it would

22  somehow change the role the Court had to play in this.  If we

23  had for a minute thought that it would negate the requirement

24  that the Court be involved given that we were in an emergency

25  relief situation, we certainly would have informed the Court

—17—

1    immediately.  And that definitely went into our calculus in

2    terms of determining what it was that we were doing in

3    issuing the statement and whether it would have an impact on

4    the Court's role in this.

5          THE COURT:  Thank you.  I appreciate both of your

6    coming down here and addressing these issues and not avoiding

7    them and being forthright with me.  I appreciate that.  We

8    will now move on to some other issues.  Thank you.

9          Let me start with Mr. Leone, and I'm going to ask a

10   few technical issues, because we have to talk about where do

11   we go from here.

12         Mr. Leone, let me go back to the issue I just raised,

13   which is non-Lake Oahe sites.  So my question to you as you

14   stand here:  Are there any other PCN waterways where

15   construction has not been completed aside from Lake Oahe?

16         MR. LEONE:  Not to my knowledge, Your Honor.  Every

17   PCN site other than Lake Oahe site has been fully graded at

18   this point.

19         Wait just a minute.

20      (Pause)

21         MR. LEONE:  I think the right answer, Your Honor, is

22   every PCN site that we intend to work on in the foreseeable

23   months has been graded already

24         THE COURT:  Aside from Lake Oahe?

25         MR. LEONE:  Correct.

1      THE COURT:  Second question:  How about non-PCN

2    permitted sites, again waterways?  We talked to Mr. Marinelli

3    last time, hard to pin down a number.  I know this is

4    somewhat amorphous.  But do you have any estimate of that?

5      MR. LEONE:  Yes, I think I can answer your question.

6    I'm going to limit it to the area 20 miles east of Lake Oahe

7    and then go to the west.  So 20 miles east of Lake Oahe, the

8    pipe is in the ground.  There's only dribs and drabs of work

9    to be done, reclamation.  I think there are some landowners

10   that want to fill in a ditch or two.  The work is done.  We

11   shouldn't even be talking about restraint there.  West of

12   Lake Oahe, everything has been graded now to Highway 1806.  I

13   always transpose the numbers.  Let me get into a little more

14   detail on that.

15      (Pause)

16      MR. LEONE:  Let me correct it, Your Honor.

17   Everything up to 1806 is cleared, and the topsoil has been

18   removed, and it is in the process of being subgraded.

19      THE COURT:  I'm not asking about private land

20   grading.  What I want to know is about waterways grading; in

21   other words, permit 12 waterways.  You're saying it has been

22   graded to Highway 1806 over any waterways?

23      MR. LEONE:  Mr. Mahmoud has the answer to this

24   question.  I can ferry it back and forth or we can have --

25      THE COURT:  Well, you are still the lawyer.

1        MR. LEONE:  All right.  Let me ask him then.

2        (Pause)

3        MR. LEONE:  Your Honor, I don't know we have a

4    specific number for how many of those non-PCN sites.  You

5    kind of have to look at them case by case.  Every one has

6    been disturbed in some way, either with a bridge or access or

7    some kind of grading.

8        THE COURT:  I'm asking in terms of potential

9    injunction.  I'm going to Mr. Hasselman and Ms. Ducheneaux

10   next.

11       Are there other waterways that the plaintiffs, aside

12   from Lake Oahe, that the plaintiffs could still seek to

13   enjoin your work on because they haven't been completed?  You

14   tell me no PCN sites.  But let's talk about the non-PCN

15   permit sites.

16       MR. LEONE:  Stated another way, is there any work

17   ongoing at non-PCN sites?

18       THE COURT:  Just in the vicinity of waterways, not

19   private land.

20       MR. LEONE:  Right.  When I say non-PCN site, what I

21   mean is a waterway --

22       THE COURT:  You need permit 12 coverage but not PCN.

23       MR. LEONE:  Right.  And I'm limiting this to North

24   Dakota west of Lake Oahe.

25       THE COURT:  Yes.

1          MR. LEONE:  The closest I can give you, Your Honor,

2     is that the pipeline is 60 percent done in that area, which

3     means completely installed, which means there must be some

4     kind of work ongoing on the other 40 percent.  To what extent

5     that includes these non-PCN waterways, I'm not sure.

6          THE COURT:  Okay.  Thank you.

7          Mr. Hasselman, let me move to you and Ms. Ducheneaux.

8     This in some way relates to the appeal.

9          Mr. Hasselman, it seems that your appeal is not moot,

10    I guess, for a few reasons.  And if I am missing something,

11    please tell me.  So the first would be as to Lake Oahe,

12    according to the government, they could change their

13    mind -- I guess I shouldn't say that -- they could grant the

14    easement at any point in the coming weeks.  The PCN

15    waterways, it seems, is moot because they have all been

16    graded and cleared.  But then there are also the non-PCN

17    waterways that would be covered by your motion and that

18    aren't covered by the government's position now.

19          So am I right that then the two issues that remain

20    live for you are Lake Oahe, because you fear the government

21    issuing the easement in the non-PCN waterways?

22          MR. HASSELMAN:  Thank you, Your Honor.

23          I think that's right, but I do want to observe that

24    the fact that there has been a bulldozer that has gone

25    through does not moot out any possible relief that the tribe

1    could seek.  In Mr. Mentz's declaration that we submitted in

2    support of the TRO, he talks about the important need to find

3    and reinter any remains that were disturbed when the graves

4    that he identified were disturbed.

5         So, you know, the fact that a bulldozer has been

6    through doesn't mean that we now have no interest in that

7    area.

8         THE COURT:  But that's not injunctive relief you have

9    been seeking.  That might be subsequent relief.  Right?

10        MR. HASSELMAN:  Well, the injunction relief, in the

11   Court of Appeals, our request for relief is sort of getting

12   smaller and smaller as the construction proceeds.  But what

13   we did with the injunction to the Court of Appeals was to

14   mirror what the government has asked for in terms of a

15   voluntary stand-down, which is the 20 miles on either side.

16   As I think we now understand, 20 miles on the east side

17   really is probably irrelevant.  And then on the other side,

18   we just don't know because it changes every day.

19        THE COURT:  Right.  I haven't seen anything else.  I

20   get notice of certain things from the Court of Appeals but

21   not everything.  Do you have a hearing scheduled on your

22   injunction pending appeal, Mr. Hasselman?  The latest I saw

23   was a briefing schedule.

24        MR. HASSELMAN:  Right, Your Honor.  The briefing is

25   complete as of Wednesday.  We have asked the circuit for a

1    decision by the end of the day today, because that's when the

2    agreement or the TRO or however we characterize it ends, but

3    there is no hearing scheduled.

4              THE COURT:  Okay.  All right.  Thank you.

5              Ms. Ducheneaux, you're certainly a party, although I

6    didn't let you participate in the motion, but I will ask you:

7    Is there anything you want to add on the harm issue?

8              MS. DUCHENAUX:  No, I don't think so.  I think that

9    Jan, on behalf of Standing Rock, represented it well.

10             THE COURT:  Okay.  So the next question then is what

11   the folks want to do here.  Whether you got an injunction

12   pending appeal or not, you have still appealed the

13   preliminary injunction.  So, Mr. Hasselman, is your belief

14   then that that ousts me of jurisdiction to proceed further in

15   the case and we should wait and see what happens in the Court

16   of Appeals?  Or do you want to go forward on any other issues

17   in this case?  Because there certainly are some, I think,

18   separate issues.

19             MR. HASSELMAN:  Yeah, thank you.  Our

20   understanding -- and I believe it is shared by the

21   government -- is that the filing of the interlocutory appeal

22   doesn't divest you of jurisdiction over the other issues in

23   the case.  And I think while you have recognized that we are

24   in a somewhat fluid situation, you know, our expectation is

25   that this case will proceed under the normal course of

1    events.  The next step in a case like this would be the

2    production of the administrative record -- well, the filing

3    of an answer and production of record.  We have been

4    discussing with Ms. Zilioli those dates and have reached, I

5    think, a preliminary understanding around some dates that

6    would work for us and for them.

7           THE COURT:  Okay.  Why don't you tell me those, and

8    then I will hear from the defendants.

9           MR. HASSELMAN:  The e-mail that we received from

10   Ms. Zilioli was that the Corps's response to the complaint

11   would be due November 10th and that the administrative record

12   would be due on December 19th.  And these are extensions of

13   the normal schedule that is provided for under the local

14   rule, but we would not oppose those extensions.

15          THE COURT:  All right.  And that would include Dakota

16   Access, as well, Mr. Hasselman?  Obviously, not in the

17   administrative record but in terms of responding to the

18   complaint as a defendant.

19          MR. HASSELMAN:  I believe Dakota Access has already

20   filed an answer.

21          THE COURT:  I don't remember from the docket.

22   Mr. Leone, is that right?

23          MR. LEONE:  That is right, Your Honor.

24          THE COURT:  I'm sorry.  I see August 24th, I do see

25   that.

1          So the government's response, November 10th;

2     administrative record, December 19th.  Well, we can sort of

3     see if the government or Dakota Access moves to dismiss on

4     the NHPA issue.  I may feel that I shouldn't be ruling on

5     that given the success-on-the-merits question is in front of

6     the Court of Appeals.  But certainly if there are NEPA

7     issues, I could rule on those.

8          And I guess the last issue then is:  Are plaintiffs

9     also seeking that the TRO that I issued remain in effect

10    until further order of the Court, although it seems moot

11    because in the sense the TRO terms that I reimposed are not

12    any broader than the government's voluntary position on the

13    easement issue combined with the mootness of construction

14    east of the lake?  But are you seeking me to retain those TRO

15    conditions?

16          MR. HASSELMAN:  Your Honor, I think retention of the

17    TRO makes a lot of sense in light of the dynamic and the

18    things in motion.  My understanding is that, to date, you

19    have been willing only to issue relief where there is

20    agreement of the parties.

21          THE COURT:  Okay.  Let me hear first from the

22    government; and then, Mr. Leone, I will hear from you.

23          So Ms. Zilioli, you agree with the dates that

24    Mr. Hasselman pointed out?

25          MS. ZILIOLI:  Yes, Your Honor.

1          THE COURT:  I trust that you don't object to the TRO

2     conditions until further order since they are no broader than

3     what you are already voluntarily doing?

4          MS. ZILIOLI:  Your Honor, I think if there is an

5     agreement between the parties, then we would certainly not

6     oppose the extension of a TRO along the lines of the terms of

7     that agreement.

8          THE COURT:  When you say agreement of the parties,

9     you are a principal party.

10         MS. ZILIOLI:  If Dakota Access is willing to agree to

11    the terms, we would not oppose --

12         THE COURT:  Why would you oppose it if it is no

13    broader -- at least west of Lake Oahe -- it is no broader

14    than what you're doing anyway?  Right?

15         MS. ZILIOLI:  Yes, I think our original position on

16    the TRO that we would not oppose that as well as the

17    extension, initially that was premised on concern for public

18    safety.  Since then, those concerns should be addressed by

19    other events.  Again, we would not oppose the extension if

20    Dakota Access is willing to agree to the terms.  We don't

21    think that the urgency of a TRO is necessary if there's not

22    an agreement.

23         THE COURT:  There isn't an application for one, and I

24    wouldn't issue one.  I'm just saying, for clarity, if

25    everybody agrees, I'm happy to make it an order, just so it

1    is clear.

2              THE COURT:  Okay.  Thank you.

3              Mr. Leone, the question to you is what is your

4    position on -- I'm calling them TRO conditions because they

5    first appeared in my TRO by consent by all parties, so that

6    is my shorthand for them.  I would just be imposing a

7    continuing order that was reached by agreement of the

8    parties.  If people don't agree, I won't do it.  Again, it

9    seems that you're not prejudiced because there is nothing to

10   do east of the lake, and without the government's easement,

11   you can't do anything west of the lake in that small area

12   anyway.

13             MR. LEONE:  Your Honor, I exercise great restraint

14   here because we are as confused and befuddled about some of

15   this as you are because I'm not sure what exactly we're

16   hearing either from the plaintiff or the government, to be

17   honest with you.

18             When we walked into the court for that preliminary

19   injunction hearing, we had been told by the Corps that the

20   easement was issued and the 14-day notice was going to

21   Congress 10 days before we showed up here to argue that

22   motion.  The first time we -- and the permits were issued,

23   signed off by the Corps, as high as they need to be signed

24   off on.  That decision was made.  And we were surprised as

25   anyone when I stood here at the podium and the government

1    interrupted in the middle of the argument to say, not so

2    fast, the easement is still sitting on somebody's desk.  We

3    are as shocked as anyone.

4         This company has lost $5 billion in market value in

5    the last two weeks, because the market, the public, were

6    waiting to see what Your Honor would do with respect to the

7    motion for preliminary injunction.  Was the Corps right or

8    was the Corps wrong?  Did they follow a process or not?  The

9    decision came out, and 30 minutes later the government for

10   reasons that are still not clear to us interrupted that

11   process.  And so we are against any form of restraint, even

12   though Your Honor was very careful to say it was based on

13   simply the concessions and accommodations of the parties.

14   The media and the plaintiffs presented that to the world as a

15   victory, that there had been some kind of restraint put on

16   the pipeline.  We will never make that mistake again.  We are

17   opposed to any form of restraint, temporary or otherwise.  We

18   ask you not extend the existing temporary restraining order.

19   We ask that you not grant any form of injunction pending

20   appeal.

21        The specifics of what is and is not moot on the left

22   side of Lake Oahe get a little confusing, but it is not true

23   that the easement is necessary for us to work in the areas

24   east of Highway 1806.  That is still private land.  Most of

25   that from 1806 to the lake is private land.  We don't need an

1    easement for that.  We have all the permits that we need.

2    The company has been deferring from construction for reasons

3    of public safety.  The governor of the state of North Dakota

4    is dealing with the public safety, and that's who should be

5    dealing with that.

6        We would ask that this case go forward on the main

7    case on the normal schedule.  We weren't consulted about the

8    extensions.  Well, we were consulted.  We were asked if we

9    agree.  We don't agree with the extensions of time.

10       THE COURT:  How are you prejudiced by an extension of

11   time?  It would seem that what has prejudiced you is the

12   government's decision on the easement.  But absent that, it

13   would seem that you're happy to take your time here because

14   it is the plaintiffs who are the ones attempting to have

15   Court interference as quickly as possible.

16       MR. LEONE:  Your Honor, let me run at it from this

17   direction for a minute.  I think you put the finger on it a

18   minute ago.  You pointed out it is not your role to make a

19   judgment about whether it is good or bad politics or good or

20   bad decision making to approve this pipeline or not.

21   Obviously, you're right about that.  And we understand that,

22   and we are participating in whatever this process is that

23   exists outside of this courtroom, both the process of

24   negotiation with the tribes, negotiation with the government

25   in our attempts to get our pipeline built.  It does nothing

1    but complicate that process to inject restraining orders or

2    injunctions into the process.

3              THE COURT:  Right.

4              MR. LEONE:  And it does prejudice in that context.

5              THE COURT:  I'm not talking about that.  I'm not

6    going to issue any, because as I said, the only issuance of a

7    restraining order was by agreement.  And I made that explicit

8    in my orders.  But if there is not agreement, I won't issue

9    it because as I said I don't see a basis for it.  So I won't

10   issue that.  But my question had nothing to do with

11   restraining orders or injunctions.  It was simply about the

12   scheduling of the case.  I understand you may not want a

13   lawsuit hanging over your head, but if it doesn't interfere

14   with your proceeding with the pipeline, my question is:  How

15   are you prejudiced by it?

16             MR. LEONE:  Your Honor, as long as it doesn't

17   interfere with our building of the pipeline, then it is hard

18   for me to say what the prejudice is.  But my life experience

19   tells me that with the case hanging over the pipeline, it

20   will interfere with the pipeline.

21             Let me try to put this in a bigger context.  Our hope

22   had been that we could get through the preliminary injunction

23   issues successfully; and that there might be a remaining

24   issue, because a lot of the concerns expressed by the

25   plaintiffs had to do with what happens when somebody puts oil

1    in the pipeline and what does that mean for the river.  And

2    we felt we would have three or four months here before the

3    pipeline has to go into operation to satisfy you, according

4    to a normal good briefing schedule, that any environmental

5    issues associated with the pipeline had been properly

6    addressed by the Corps, and we could do that something other

7    than a file-the-motions-on-Saturday-and-Sunday basis.

8         We would still hope that at some point we can get

9    back on that trajectory and that we can get to the merits of

10   the main case as quickly as possible, which if it was done

11   under the ordinary scheduling, the answer from the government

12   would be due on October 10th, the administrative record would

13   be due on November 10th, and there's at least a fighting

14   chance of getting this case briefed by the end of the year to

15   a point where you can make a decision within that kind of a

16   time frame.

17        Our concern from a scheduling standpoint is we start

18   slipping schedule now and we put off the government's answer

19   for 30 days -- which as I say we have already answered, so we

20   don't know why that should be put off for 30 days -- and if

21   everybody works hard and under the same constraints that we

22   have already been working under to get this case decided, it

23   is beneficial to us.

24        It is for all the reasons we set forth in our papers,

25   Your Honor, about the irreparable harm, the harm that we're

1    incurring.

2            THE COURT:  Let me go back to Mr. Hasselman then.

3    What if I move those deadlines up by a few weeks, the two you

4    just mentioned, the defense response and the administrative

5    record?

6            MR. HASSELMAN:  That may be a rare point of agreement

7    between Mr. Leone and myself.  Our non-opposition to the

8    government's proposed deadline reflects the fact that, in my

9    experience, it's sort of fruitless to oppose them.  I would

10   certainly like a few things moved as fast as possible, and

11   also had originally envisioned this case would be briefed up

12   by the end of the year.  So I would enthusiastically support

13   a faster deadline.

14           THE COURT:  Okay.

15           MR. HASSELMAN:  There is one thing --

16           THE COURT:  Yes.

17           MR. HASSELMAN:  -- that needs to be addressed, is the

18   likelihood that we will need to file an amended complaint.

19   Some of the actions here occurred subsequent to our filing of

20   the complaint at the end of July.  And if an easement is

21   issued, I think we will need to clean up the complaint by

22   including those.  I don't see that it would affect anything

23   about the record in a way that would cause a delay.

24           THE COURT:  You can, obviously, if you talk to

25   defense about consent to filing an amended complaint.  I'm

1    happy to entertain it; if they disagree, I'm happy to look at

2    it.

3          Ms. Zilioli, why can't we say that your response is

4    due October 7th, the administrative record filed by

5    November 7th?

6          MS. ZILIOLI:  Thank you, Your Honor.

7          I believe, based on when the U.S. Attorney's Office

8    was served, our response date would be October 11th.  We can

9    confirm that.  And the record would be due 30 days later,

10   November 10th.

11         THE COURT:  So what is wrong with those dates?

12         MS. ZILIOLI:  Several things, Your Honor.  As you

13   know, the parties have been deeply invested, most of their

14   time and resources in responding to various motions for TRO,

15   preliminary injunction, and injunction pending appeal.

16   Unfortunately, many of the same key Corps personnel who have

17   been investing all of their time in those proceedings have

18   not been able to spend the time they need in continuing to

19   compile the record.

20         The Corps is working diligently in compiling the

21   administrative record, but we are talking about over 200

22   different Corps authorizations across the pipeline that are

23   being challenged.  And the record, as you can imagine, is

24   quite extensive and requires coordination amongst multiple

25   different Corps offices, as well as headquarters.

1              And a minor point, but this particular time of year

2       it is particularly challenging given all the

3       end-of-the-fiscal-year obligations that are simultaneously

4       taking up folks' time.

5              I think for those reasons, we really believe the

6       additional time would be necessary for both the answer and

7       the administrative record.

8              THE COURT:  I will issue the dates as I proposed.

9       The defense response will be due October the 11th, and the

10      administrative record will be due November the 10th.

11             Let's return to discuss a briefing schedule because

12      we may know more from the Court of Appeals thereafter.  Let

13      me just check my schedule.

14             Mr. Hasselman, 10:30, November 14th, although I guess

15      if you're on the West Coast, you might like something later,

16      right?

17             MR. HASSELMAN:  I'm in trial on another matter that

18      week, Your Honor.

19             THE COURT:  Then how about the 10th?

20             MR. HASSELMAN:  The 10th I can do, yeah.

21             THE COURT:  You prefer later in the day, or are you

22      an early morning person and you're happy to do it in the

23      morning here?

24             MR. HASSELMAN:  I don't mind.  Thank you for asking.

25             THE COURT:  Mr. Hasselman, 2:00 on the 10th of

—34—

1    November for a status.  What that status would be would be

2    largely to decide a briefing schedule unless there are other

3    developments from the Court of Appeals or other developments

4    on the ground.  Is that a convenient time and date?

5             MR. HASSELMAN:  Yes, it is.  Thank you for asking.

6             THE COURT:  Ms. Ducheneaux?

7             MS. DUCHENAUX:  Yes, Your Honor, it is.  Thank you.

8             THE COURT:  Ms. Zilioli?

9             MS. ZILIOLI:  Yes, Your Honor.

10            THE COURT:  Mr. Leone?

11            MR. LEONE:  Your Honor, I have a trial starting the

12   following Monday, and I know I'm going to be out of town at

13   that time.  If it is just a status conference for a briefing

14   schedule, if I can participate by phone.

15            THE COURT:  You can do that.

16            Ms. Zilioli, if there are issues regarding the

17   administrative record and you want to seek an extension for

18   good cause, I will hear you, but you should make sure you

19   consult with the other parties before you do that.

20            THE COURT:  Okay.  Any other issues, Mr. Hasselman

21   that, you want to raise today?

22            MR. HASSELMAN:  Not on my end.  Thank you.

23            THE COURT:  Ms. Ducheneaux?

24            MS. DUCHENAUX:  Not today.  Thank you.

25            THE COURT:  Ms. Zilioli?

1          MS. ZILIOLI:  No, Your Honor.

2          THE COURT:  And Mr. Leone?

3          MR. LEONE:  Your Honor, not in this specific

4    proceeding.  I think you're aware that a very similar case

5    was filed recently by a different plaintiff.  It adds a

6    federal defendant.  I think probably the right thing for us

7    to do is to file a very short intervention motion, and we're

8    considering whether we want to consolidate that case.

9          THE COURT:  I'm aware of that.  That has certainly

10   been something in my mind, as well.  If you do intervene, I

11   will hear you, I will hear the government on consolidation.

12   I haven't looked at the specifics of that complaint.  I

13   assume it is fairly similar.  If consolidation makes sense,

14   I'm happy to do that.

15         Mr. Hasselman, are you involved in the other case, or

16   is different counsel?

17         MR. HASSELMAN:  I'm not involved.  Ms. Ducheneaux and

18   I did have a chance to meet with the counsel for Yankton

19   Sioux Tribe.  I believe that they authorized me to represent

20   that they would not oppose consolidation.  And yes, it is a

21   very parallel transaction.

22         THE COURT:  Thank you for doing that legwork for me.

23         Again, if everyone agrees, people can just file a

24   consent motion for consolidation at some point, and I'm happy

25   to consolidate, and we'll go from there.

1                All right.  Thank you all.

2                Have a pleasant weekend.

3                (Proceedings adjourned)

4

5                    *************************

6

7            CERTIFICATE OF OFFICIAL COURT REPORTER

8

9            I, Patricia A. Kaneshiro-Miller, certify that the

10   foregoing is a correct transcript from the record of proceedings

11   in the above-entitled matter.

12

13

14   ---------------------------------    ------------------------

15   PATRICIA A. KANESHIRO-MILLER                    DATE

16

17

18

19

20

21

22

23

24

25

# EXHIBIT K

 

November 14, 2016

Moira Kelley (DOA) 703-614-3992,
moira.l.kelley.civ@mail.mil

Jessica Kershaw (DOI), interior_press@ios.doi.gov

**Statement Regarding the Dakota Access Pipeline**

Washington, D.C. – Today, the Army informed the Standing Rock Sioux Tribe, Energy Transfer Partners, and Dakota Access, LLC, that it has completed the review that it launched on September 9, 2016.  The Army has determined that additional discussion and analysis are warranted in light of the history of the Great Sioux Nation's dispossessions of lands, the importance of Lake Oahe to the Tribe, our government-to-government relationship, and the statute governing easements through government property.

The Army invites the Standing Rock Sioux Tribe to engage in discussion regarding potential conditions on an easement for the pipeline crossing that would reduce the risk of a spill or rupture, hasten detection and response to any possible spill, or otherwise enhance the protection of Lake Oahe and the Tribe's water supplies.  The Army invites discussion of the risk of a spill in light of such conditions, and whether to grant an easement for the pipeline to cross Lake Oahe at the proposed location.  The Army continues to welcome any input that the Tribe believes is relevant to the proposed pipeline crossing or the granting of an easement.

While these discussions are ongoing, construction on or under Corps land bordering Lake Oahe cannot occur because the Army has not made a final decision on whether to grant an easement.  The Army will work with the Tribe on a timeline that allows for robust discussion and analysis to be completed expeditiously.

We fully support the rights of all Americans to assemble and speak freely, and urge everyone involved in protest or pipeline activities to adhere to the principles of nonviolence.

# EXHIBIT L

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STANDING ROCK SIOUX TRIBE      §
                               §
        Plaintiff,             §
                               §
v.                             §
                               §      Case No. 1:16-CV-01534
U.S. ARMY CORPS OF ENGINEERS   §
                               §
        Defendant.             §
                               §
                               §

## DECLARATION OF TOM D. GROSS IN SUPPORT OF DAKOTA ACCESS, LLC'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1.      My name is Tom D. Gross. I am over 21 years of age, of sound mind, and duly qualified to make this declaration. I make this declaration based upon my personal knowledge as Director of Pipeline and Gas Distribution for the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada, AFL-CIO ("UA") and my personal experience and observations as a UA member and representative, described below.

2.      The UA is an international labor organization with a membership of over 350,000 pipefitters, welders, plumbers, sprinkler fitters, and service technicians across North America. The UA is the leading trade union in the United States representing pipefitters and pipeline welders. UA members have been involved in construction of every major pipeline project in the United States and have built many thousands of miles of pipelines, including in the States along the route of the Dakota Access Pipeline Project ("DAPL" or the "Project").

3.      My UA career spans more than 40 years. My current duties as Director of Pipeline and Gas Distribution include administering and interpreting the National Pipe Line

Agreement ("NPLA"), which covers unionized pipeline construction and maintenance work in the United States, on behalf of the UA and its members. The contractor association signatory to the NPLA is the Pipe Line Contractors Association ("PLCA"). There are over one hundred contractors bound to the NPLA. Prior to serving as UA Director of Pipeline Gas Distribution, I served as the UA's Special Representative for Pipeline and Gas Distribution (2007-2012), as Business Agent for Pipeline and Gas Distribution for UA Local 597, Chicago, Illinois (1999-2007) and as Business Manager of Local 81, Ottawa, Illinois (1993-1999). Prior to that, I spent nearly 20 years working in the field, including on pipeline projects, as a Journeyman Pipefitter and Welder (1978-1993) and as an Apprentice (1974-1978). Through my own work in the field as a pipeliner and as a representative of pipeliners in the leadership positions I have held, I have accumulated extensive knowledge of the pipeline industry, the employment cycle that pipeliners experience, and the effects of the existence and non-existence of employment opportunities on pipeliners' lives and livelihoods.

4. The UA intervened as a party in the State permitting proceedings for DAPL in Illinois before the Illinois Commerce Commission ("ICC") in May 2015 and in Iowa before the Iowa Utilities Board ("IUB") in July 2015. As UA Director of Pipeline and Gas Distribution, I submitted pre-filed testimony in both proceedings and was cross examined in person at the IUB proceeding. My testimony discussed the tangible and significant economic benefits of the Project, the extensive training that UA pipeliners receive, the prolific experience and expertise of UA pipeliners on projects like DAPL, and the associated benefits of the Project for the communities in which construction would take place and the United States as a whole. In the Iowa proceeding, many UA members presented oral and written statements to the IUB about the importance of the Project to themselves and their families as a source of work and also as a vital

2

infrastructure project for their communities and the United States. Ultimately, the ICC and IUB both approved DAPL and issued the requisite permits, as did the North Dakota Public Service Commission ("NDPSC") and the South Dakota Public Utilities Commission ("SDPUC"). In issuing their permits, both the ICC and the IUB noted the evidence in the record concerning the enormous socioeconomic benefits of DAPL.

5.      As I explained in my testimony before the ICC and the IUB, DAPL would provide numerous jobs and steady income over a sustained time period for UA members. Although it has been my experience that some people question the importance of pipeline construction jobs because they are "temporary," the opposite is actually true. The "temporary" nature of pipeline construction jobs is precisely what makes each one of them so important. Similar to an event planner or other project-based occupation, any construction worker relies on a stream of "temporary" jobs to support him or herself. Each individual project is independently critical because, unlike a job where the worker is paid whether work exists at the moment or not, a construction worker is only paid while he or she is employed on a project.

6.      In terms of the specific economic benefit to UA workers from DAPL, I estimate that hundreds of UA workers in each State would work between 1,400 and 1,650 hours and earn between $65,000 and $83,000 in addition to receiving contributions to their 401(k) plans, defined benefit pension plans, and other fringe benefits for the duration of construction. In fact, approximately 1,200 UA members are already employed on DAPL. Combining wages, pension, health and other benefits, these 1,200 UA workers are currently earning more than $5 million per week in wages, 401(k), and fringe benefit contributions. Given the tremendous economic benefits to workers that DAPL offers and is now providing to UA members, it goes without saying that delaying DAPL would have a direct and powerful negative impact on the livelihoods

3

of many UA members and their families. Specifically, workers would lose a major employment opportunity and significant income over a lengthy period of time as well as 401(k) and pension contributions. In addition, once the Army Corps of Engineers issued its permits on DAPL, many UA members relocated to work on the Project and arranged for lodging for a substantial length of time. If DAPL were delayed or shut down, workers would lose much of their outlay for these accommodations with no way to recover those costs. These same workers would also face a possible loss of coverage for their health insurance plan, coverage which is based on employer contributions for actual hours worked. These pension and health benefits are keyed directly to hours worked and so for each hour of work lost, these workers lose benefits. I cannot emphasize enough how devastating any of these consequences would be for so many workers and their families who rely on projects just like DAPL to live and plan their futures. This is not an abstract harm – it is real and tangible for thousands of workers and their families, many of whom could be left without work and facing uncertain futures.

7. The importance of construction jobs to workers is also why it is so essential to have predictable, reliable processes in place for approval of projects. Without certainty in the permitting process, workers are constantly unsure about their future prospects for employment and when they may know about those opportunities. For example, when construction on a project is scheduled to start or has already started and is subsequently delayed, workers who were involved in or anticipating work must scramble to secure other opportunities. If DAPL were to be delayed now, the 1,200 UA members who are already working on it would be in that kind of a situation. Families who may have been counting on income from construction of DAPL would suddenly have to change their plans and expectations, which could be a major financial blow. UA Local Unions also rely on efficient approval of projects like DAPL with predictable timeframes

4

for construction so they can anticipate manpower demands. Local unions often increase training and/or recruit new members for a project as large as DAPL. Training members costs money and uses resources. If an anticipated or scheduled project is substantially delayed or terminated, those resources may be wasted. Freshly trained and recruited members may be left disappointed, having also wasted their own time and resources preparing for the project.

8. The harm caused by delay of DAPL would not be confined to UA members or even to the workers directly employed in constructing the Project. As the ICC and the IUB acknowledged in issuing their permits for the Project, the Project would create a significant overall economic benefit to the States through which it runs. One reason for this is that workers employed along the pipeline route would spend significant amounts of money in those communities on living expenses. Based on past observation and experience, my own estimate is that UA workers on DAPL would spend approximately $1,000 per week for the necessities of daily life like lodging, food, recreation, and other items. In addition, in my work on past projects, I have noticed that, during construction, contractors often purchase many supplies from local businesses. Increased demand in these areas would create revenue and jobs in the local service and retail sectors. Finally, as recognized by the ICC, IUB, and SDPUC, DAPL would produce millions of dollars of tax revenue for all of the States through which it would run. There are over 26,000 active members of the UA who reside in North Dakota, South Dakota, Iowa, and Illinois. As residents of those communities, UA members directly benefit from the economic stimulus that the Project would bring and, conversely, will be directly harmed by delays in (or worse, termination of) the Project. The ripple effect is obvious: delays in or termination of the Project will deprive these communities of badly needed economic stimulus and long-term tax revenue, dollars from which will build public projects and provide critical social services.

9.      Based on my decades of experience in the pipeline industry, I have the greatest confidence that DAPL would be constructed according to the highest standards and that the end result would be a safe, reliable, modern pipeline. UA pipeline welders and pipefitters undergo rigorous training prior to receiving journeyman accreditation as well as continuing training thereafter to ensure they are up-to-date with the most advanced construction methods. This training includes welder and welding inspection certification, plant and pipeline inspection, and x-ray certification, among other skills. Many of the techniques that UA welders and pipefitters learn are specifically aimed at avoiding harm to waterbodies. For example, horizontal drilling is utilized so that pipe is installed several feet beneath a body of water without disturbing it. These major water body crossings are also engineered with heavier wall thickness than standard pipe. This is an added safety feature that makes these segments of pipe stronger and able to withstand higher operating pressure. During construction, additional safety measures are used to protect waterbodies such as establishing set-back zones that allow for fueling only within a set distance from the water. Protection of the land and its features is not something that UA members take lightly. We build pipelines safely and responsibly because it's our job to do that, but we also truly respect the land on which the pipelines are built and understand what it means and provides to all of the people who live there. Our respect and care for the land and our expertise, skill, and training will make DAPL the highest quality and safest pipeline possible.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on August 12, 2016.

Dated:   August 12, 2016

Tom D. Gross

276667_1

6

# EXHIBIT M

## AFFIDAVIT OF ROBERT POTEETE ("AFFIDAVIT")

STATE OF WISCONSIN    )
                          )   ss
COUNTY OF CHIPPEWA  )

BEFORE ME appeared Robert Poteete, who upon being duly sworn, deposes, and states:

1.      My name is Robert Poteete. I am over the age of 18 and have personal knowledge of the facts set forth herein.

2.      I am Vice President of Precision Pipeline, LLC ("Precision"), and have served in this role since 2008. Prior to working at Precision, I served in the pipeline industry for over twenty (20) years. I have extensive experience with pipeline construction management, particularly in the oil and gas industry. I am personally involved in the Dakota Access Pipeline Project ("DAPL Project").

3.      The DAPL Project involves the construction of approximately 1,023 miles of steel pipelines (consisting of mainly 30-inch diameter pipe).

4.      Precision was hired by Dakota Access, LLC, an Energy Transfer Partner company, to construct approximately 790 miles of the total project. To date, Precision has cleared, graded, and established a travel lane through the majority of Army Corps Pre-Construction Notification areas.

5.      I have reviewed the Motion for Preliminary Injunction Request for Expedited Hearing ("Motion") filed on behalf of the Standing Rock Sioux Tribe ("Tribe") on August 4, 2016 in the United States District Court for the District of Columbia (*Case No. 1:16-cv-1534-JEB*). The Motion is attached hereto as Exhibit "A."

6.      I submit this Affidavit in support of Dakota Access, LLC's response to the Motion.

1

7.    I understand that if the Motion were granted, the U.S. Army Corps of Engineers ("Army Corps") would be forced to withdraw Nationwide Permit 12 as applied the DAPL Project. Granting the Motion would not only have a profound impact on the DAPL Project itself, but also the surrounding communities, businesses, residents and environment.

8.    At my direction and supervision, Precision has engaged in an analysis to identify and, where appropriate, quantify the negative impacts to the DAPL Project, Precision, surrounding communities, businesses, residents and the environment if the Court were to grant the Motion. The following analysis represents Precision's good faith estimate at this time of those negative impacts.

**Project Impact:**

9.    It is impossible for a project of this size to stop on short notice without incurring significant costs and delays. Precision and its partners have invested several years of human capital into the DAPL Project to build up a complex construction operation with many moving parts. Precision has constructed staging areas, temporary housing and logistics centers, and other facilities to support the DAPL Project, as early as January of 2016. These include:

- Field Office Yard Locations
- Equipment Staging Yards
- Subcontractor Staging Yards

These facilities will have to be maintained and will degrade over time. Materials will have to be stored, incurring additional costs. A sudden shutdown of work would therefore cause irreparable harm to the operation, stranding millions of dollars of past investment. A conservative estimate of such storage, maintenance, demobilization, and stranded investment costs incurred by even a temporary, few-month injunction are approximately $7.5 million. This has to be considered

alongside the lost revenue to Precision and its partners that will result from delays in final project competition.

10.     Highly skilled contract labor is required for this effort, and in the intermediate time during an injunction workers will be forced from the DAPL Project. Some examples of special skills required for the DAPL Project, which are in short availability, include welders, equipment operators, truck drivers, laborers as well as supervisors in unique departments such as safety, quality control, and environmental control. This same worker availability issue extends to our local and regional subcontractors, who will have even fewer resources available to address them. In a realistic worst-case scenario, it may take several months to build up the same operation to the point it was before an injunction. Such delays could jeopardize the future of the DAPL Project in its entirety.

11.     To accomplish the DAPL Project, Precision has engaged a complex network of subcontractors. Delays that result from the stoppages of work will likely lead to change orders from subcontractors for demobilization and remobilization costs.

12.     The DAPL Project has received multiple federal, state, and local permits and approvals, some of which have a limited life, or have other conditions that could be implicated by any stoppage of work. Any disruption to the construction timeline therefore jeopardizes these permits, further putting the entire project at risk, stranding Precision's already-significant investment and employment opportunities for the local community.

**Employment Impact:**

13.     Precision estimates that the granting of the Motion would likely result in the displacement of approximately 3,300 full-time construction jobs, including approximately 1,600

3

employees from Illinois, Iowa and North Dakota. These displaced jobs fall into the following

employment categories and union workforce:

        a. Over 750 Laborers International Union of North America
        b. Over 1,000 International Union of Operating Engineers
        c. Over 250 International Brotherhood of Teamsters
        d. Over 700 United Association of Pipefitters
        e. Over 350 Supervision staff

14.     In addition, Precision estimates that over 850 of its subcontractor's employees

would likely have their jobs displaced. Many of these subcontractor employees are residents of

the nearby communities that are supported by the DAPL Project.

**Financial Impact:**

15.     Precision estimates that the granting of the Motion would likely result in the

following financial losses for Precision's employees, subcontractors and unions:

        a. Weekly salaries for estimated 3,300 employees (over $5.7M per week);
        b. Loss of union benefits (over $3.8M per week); and
        c. Loss of revenue for subcontractors (over $2.5M per week).

16.     Precision cannot quantify the long-term impacts this sudden stoppage of work

will have on its employees. Many employees, including highly skilled laborers, have made

significant investments of their own time and money, and sacrificed other opportunities, to work

on the DAPL Project. It will be impossible for all of them to quickly find other sources of

employment. Significant delays in finding other employment puts employees at risk of having

their skills degrade, and making it even harder for those employees to find another source of

income or livelihood.

**State and Local Impact:**

4

17.    The effects described above would have compounding socio-economic impacts upon the local communities involved with the DAPL Project draws from.  Significant tax revenue and ancillary project benefits (such as housing and food for workers) would be lost, often after the local economy has made significant investment to support the project's workers. Precision estimates that the granting of the Motion would likely result in the following losses at the state and local level:

    a.  Loss of state payroll taxes (over $0.7M per week);
    b.  Loss of corporate state income taxes (over $6.0M);
    c.  Loss of locally procured materials and equipment rentals (over $9.5M per week);
    d.  Loss of local room/board and food (over $0.7M per week); and
    e.  Loss of revenue to local communities for daily expenses and supplies for the workforce including, but not limited to, equipment repair, vendor supplied services, fuel and local subcontractors (greater than $35.0M)

**Landowner Impact:**

18.    The granting of the Motion would delay the progress of the DAPL Project and have a negative impact on the construction schedule.  This delay would not only impact the commercial entities involved, but also the landowners directly impacted by the project, as well as other nearby residents and community areas.

19.    In the course of construction of the DAPL Project, there is undoubtedly a temporary disturbance and disruption along the corridor.  However, allowing a free and unimpeded flow of construction allows Precision to adequately mitigate and minimize the temporary impact to these areas.

20.    Although Precision develops and maintains its best management practices and various protection measures for the temporarily impacted areas, including the placement of environmental control devises, disturbance limits, and detailed restoration measures, the granting

5

of the Motion would still serve to delay the DAPL Project and would potentially extend the
duration of disturbance to these environment and culturally sensitive areas.

21.     A delay could push construction activities into winter months and could
drastically reduce the efficiency of cleanup activities on over 3,682 properties.  This delay could
cause impacted areas, including landowner and community property, to remain exposed for an
unnecessary amount of time.

**Environmental and Cultural Impact**

22.     Precision is committed to environmental and cultural preservation on the
pipeline corridor. As a company, Precision employees an Environmental Compliance Director
who continuously works to ensure that the company complies with all plans, policies, and rules
which govern the project. Each construction Spread (five over Precision's scope of work),
commit a full-time Environmental Coordinator to manage our compliance plan on-site as well as
several (three to four) Environmental Foremen who oversee crews which assist in the
implementation of the plan.

23.     Precision and Dakota Access, LLC prepared a plan to deploy best management
practices to ensure any disturbance is limited to only what was required to safely complete the
work.

24.     Specifically, prior to construction, a survey of the construction corridor was
completed to identify all resources that may be impacted by the DAPL Project.  Once these areas
are identified, control measures and construction practices are developed to complete
construction through these areas with a minimal amount of impact.

25.     Not only are these measures developed prior to construction, they are
continuously revised and implemented throughout the course of the DAPL Project.  For example,

6

when identifying cultural areas, pre-construction excavations are completed to identify whether there are any artifacts in these affected areas.

26.     In addition to measures above, cultural monitors are notified 24-48 hours in advance prior to construction and are on the DAPL Project site through the construction process if any artifacts are found during these phases so that they can be recorded and protected.  Many of the same processes are used for the protection of environmental areas, which are identified prior to construction starting.

27.     Environmental control devices are installed to ensure natural resources are safely and adequately protected throughout the course of construction.  These devices are frequently inspected per permit requirements to ensure their adequacy.

28.     In addition to the environmental control devices, cultural sites are afforded additional safety measures with the installation of an exclusion fence.

29.     Equally important to the above established procedures, each Precision employee working on the DAPL Project participates in a detailed training class on how work will be conducted in environmental and culturally sensitive areas.

30.     It has always been, and will continue to be, Precision's full intention and goal to construct the DAPL Project in full compliance with permit conditions, Department of Transportation regulations, company specifications, and best management practices.

**Reality of the Tribe's Assertions:**

31.     The Tribe's makes the baseless assertion that "there is a high risk that culturally and historically significant sites will be damaged or destroyed in the absence of an injunction." See Exhibit "A", pg. 2.

32.    The Tribe's assertion conflicts with the realities on the DAPL Project.  To date, Precision has cleared, graded, and established a travel lane through the majority of Army Corps Pre-Construction Notification areas and has found no cultural artifacts. It appears that the assertions raised by the Tribe are largely based on a false assumption.

33.    If this Motion were granted and Army Corps was forced to withdraw Nationwide Permit 12 as applied the DAPL Project, there would be a cascading negative economic impact on the DAPL Project itself, but also to the surrounding communities, businesses, residents and environment.

34.    By submitting this Affidavit, I do not waive the attorney-client privilege and work product privilege as to any of the matters referenced in this Affidavit.


FURTHER AFFIANT SAYETH NOT.

_____
ROBERT POTEETE, VICE PRESIDENT
PRECISION PIPELINE, LLC

The foregoing instrument was acknowledged before me this 16th day of August 2016 by _Robert Poteete_____, who is personally known to me and who did take an oath.

Notary: _Calli L. Longsdorf_
[NOTARIAL SEAL]                    Print Name: ___Calli L. Longsdorf___
Notary Public, State of _WI_
My commission expires: _7/28/2019_

8

# EXHIBIT N

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| STANDING ROCK SIOUX TRIBE | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | **Case No. 1:16-CV-01534** |
| U.S. ARMY CORPS OF ENGINEERS | § | |
| | § | |
| Defendant, | § | |
| | § | |
| | § | |
| | § | |

## AFFIDAVIT OF C. MICHAEL PALMER

STATE OF OHIO

COUNTY OF HANCOCK

C. Michael Palmer, being first duly sworn, deposes and says:

1.     My name is C. Michael Palmer. I am Senior Vice President, Supply, Distribution & Planning for Marathon Petroleum Company LP, a wholly owned indirect subsidiary of Marathon Petroleum Corporation ("Marathon").

2.     I am an adult resident of the State of Ohio and in all respects am competent to testify to the matters set forth herein. The contents of this Affidavit are based on my own personal knowledge. If called as a witness, I will testify to the following facts, which are true.

3.     Marathon is an independent petroleum refining, transportation, and marketing company. Marathon is the 3rd largest crude oil refiner in the U.S., operating

seven refineries in six states. Currently, Marathon, through its subsidiaries, purchases more than 52 million barrels of crude oil each month from sources all over the world for our seven refinery system.

4.  I lead a group of approximately 160 employees, including analysts, schedulers, traders, engineers, and risk managers, responsible for all facets of supply. This includes crude oil and feedstock for the demands of our seven refineries.

5.  Marathon entered into an agreement with Enbridge Energy Partners LP, Inc., through Marathon's wholly owned subsidiaries, to form a joint venture with Enbridge to acquire a partial equity interest in the Dakota Access Pipeline (DAPL) and the Energy Transfer Crude Oil Pipeline (ETCOP) projects. The 1,172 mile DAPL and the 749 mile ETCOP make up the Bakken Pipeline system. At closing of the purchase transaction, Marathon will own an approximate 9.2 percent indirect interest in the Bakken Pipeline system in exchange for its investment of $500 million.

6.  The Bakken Pipeline system is currently expected to deliver in excess of 470,000 barrels per day of crude oil from the Bakken/Three Forks production area in North Dakota to the Midwest through Patoka, Illinois, and to the U.S Gulf Coast. Marathon also expects its subsidiary to become a contractually committed shipper on the Bakken Pipeline system.

7.  The Bakken Pipeline system connects a major crude oil production source, in North Dakota, to areas where major users of crude oil require delivery and transportation, including Patoka, Illinois and the U.S. Gulf Coast.

8.  DAPL will increase U.S. refinery access to a secure, stable, domestic light crude oil supply, which in turn may benefit consumers. The Midwest refining complex is

2

a natural and logistically optimal fit for the domestically produced light crude oil from the prolific Bakken shale play.

9.      DAPL will directly connect the Bakken to the Midwest in Patoka, Illinois, a critical crude oil supply hub for Marathon and other Midwest refiners. This direct access in Patoka improves supply diversity and assurance that will serve to reduce the likelihood of interruptions to crude oil supply that could increase refined product prices, particularly in the Midwest.

10.      Marathon is planning to refine Bakken crude oil at its Midwest refineries transported by DAPL to Patoka.

11.      A delay to DAPL would decrease the ability of Midwest refineries supplied through Patoka to secure additional Bakken crude oil.

12.      A delay would also cause MPC and others to continue to supply Patoka from the U.S. Gulf Coast via pipeline with what we believe will be less economical domestic and imported crude oil.

13.      DAPL also provides Midwest refineries with access to a non-Canadian light crude oil source, which will help stabilize crude oil supply and pricing for Midwest refineries in the likely event other currently proposed Canadian pipeline projects divert Canadian light crude oil away from the Midwest (e.g., the Energy East Project and the Trans Mountain Expansion Project).

14.      DAPL provides a more reliable and safer transportation method than crude oil delivered by rail.

3

15. Due to the limited pipeline capacity leaving the Bakken shale play, nearly 375,000 barrels per day of Bakken crude oil production was forced to leave the Bakken region via rail in May 2016, the most current month with data available.

16. The DAPL project provides the necessary scale and efficiency to deliver a cost effective method to transport crude oil.

17. It is Marathon's view that DAPL will provide an industry solution for both Bakken crude producers and refiners that is more reliable and cost effective than rail alternatives.

18. It is widely believed that the amount of crude oil leaving the Bakken by rail will decrease once additional outbound pipeline capacity is available.

19. Crude oil delivered by rail uses the same rail infrastructure that other goods use.

20. Minimizing shipments of crude oil delivered by rail has the potential added benefit of decreasing congestion on rail infrastructure that other industries rely on to supply its materials and products.

21. Marathon views pipelines as a safer transportation method rather than using rail to deliver crude oil.

Further affiant sayeth naught.


[The Remainder Of This Page Is Intentionally Left Blank]

4

I declare under penalty of perjury that the foregoing is true and correct to the best

of my information, knowledge and belief. Executed on August 16, 2016, in Findlay,

Ohio.

C. Michael Palmer
Senior Vice President,
Supply, Distribution & Planning
Marathon Petroleum Company LP

Sworn to before me this
16 day of August, 2016

**Notary Public**
State of Ohio, County of Hancock
Acting in the County of Hancock
My Commission expires: 7/11/2019
SEAL HERE

**Lori A. Martin**
Notary Public, State of Ohio
My Commission Expires July 11, 2019

5

# EXHIBIT O

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STANDING ROCK SIOUX TRIBE       )
                                )
        Plaintiff,              )
                                )
                                )
                                )
v.                              )      Case No. 1:16-CV-01534
                                )
                                )
                                )
U.S. ARMY CORPS OF ENGINEERS,   )
                                )
        Defendant.              )
                                )

**DECLARATION OF ROSS EVAN EISENBERG**
**IN SUPPORT OF DAKOTA ACCESS, LLC'S OPPOSITION TO**
**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

I, Ross Evan Eisenberg, declare as follows:

1. I am Vice President of Energy and Resources Policy at the National Association of
   Manufacturers ("NAM"), the largest manufacturing association in the United States,
   representing small and large manufacturers in every industrial sector and in all 50
   states. The NAM is the powerful voice of the manufacturing community and the
   leading advocate for a policy agenda that helps manufacturers compete in the global
   economy and create jobs across the United States.

2. At the NAM, I oversee our energy and environmental policy work. I am responsible
   for developing and implementing the energy and environmental policies of the NAM
   on behalf of its members. I have expertise on policy and regulatory issues ranging
   from energy production and use to air and water quality, energy efficiency and

environmental regulation. I make this declaration based on personal knowledge. Before working at the NAM, I worked at the U.S. Chamber of Commerce as counsel for environmental and energy policy and executive of the Chamber's Environment & Energy Committee. Before that, I worked in energy and environment at the office of Greenberg Traurig LLP in Washington, D.C. I am a member of the State Bar of the District of Columbia. I hold a B.A. from Emory University and a J.D. from Washington & Lee University School of Law.

3. I am testifying on behalf of the NAM in support of Dakota Access, LLC's proposed Dakota Access Pipeline project ("DAPL").

4. I understand that DAPL is an approximately 1,170 mile oil pipeline that will safely deliver crude oil from the Bakken region in North Dakota through South Dakota and Iowa, ultimately ending in Patoka, Illinois.

5. As the largest manufacturing association in the United States, the NAM supports the Opposition to Plaintiff's Motion for Preliminary Injunction filed by Dakota Access, LLC, because of the benefits to regional and national manufacturers from both constructing and future operations of the Dakota Access pipeline and the potential harm an injunction could cause for them.

6. Domestic manufacturers depend on access to affordable energy to create goods that can compete in the global market, using nearly a third of our nation's energy. Manufacturers also make up the supply chain for new pipeline projects.

7. Growth in domestic production of energy has benefited domestic manufacturers directly and indirectly. But in order for manufacturers to benefit most from the increase in domestic energy supplies, new pipeline infrastructure is necessary to move

those products safely and efficiently to the business and consumers that need access to them. Manufacturers rely on an assured amount of competitively priced oil for industrial use and as an input good for many manufactured goods such as petrochemicals, to process gas and transportation fuels and to power operations. Building new, safe midstream infrastructure such as DAPL is vital to ensuring long term access to input goods.

8. The NAM believes an injunction that delays in construction of DAPL will cause harm to regional and national manufacturers who consume energy and supply inputs for the pipeline. Specifically, inputs like steel pipe, coatings, construction equipment, compressor motors, gauges and instruments, sand and gravel, and engineering and design services are supplied directly by small and large manufacturers. Because of the unique specifications many inputs require, any delay can create significant financial hardship to manufacturers. Complex manufacturing logistics require precise scheduling to compete in a global economy.

9. A report the NAM published in 2014, *Catching Up: Greater Focus Needed to Achieve a More Competitive Infrastructure*,[1] illustrates how our current energy infrastructure has failed to keep up with the growth of domestic oil production. The nearly 200,000 miles of liquid petroleum midstream infrastructure in the United States was built largely to move imported energy supplies, rather than to move domestic energy to domestic markets. Too much of our existing infrastructure exists to move supplies from our coasts, such as the Gulf of Mexico, to markets in the

---

[1] http://www.nam.org/Issues/Infrastructure/Surface-Infrastructure/Infrastructure-Report-2014-Executive-Summary.pdf.

country. Consequently, new pipeline infrastructure is needed to make use of the growing domestic supply of energy from the midcontinent out.

10. A second report, issued by the NAM and IHS Economics in early 2016, *The Economic Impact of Crude Oil Pipeline Construction and Operation*,[2] estimates that construction and operation of crude oil pipelines will have contributed a combined $46.9 billion to GDP and $7.6 billion in manufacturing in 2015 and 2016. During that time, 13,252 miles of new crude oil transmission pipelines will have been constructed in the United States at a cost of $25.6 billion. This is on top of 61,379 miles of onshore crude oil pipelines operating in the United States at the end of 2014. These new pipelines are being constructed to take advantage of new domestic oil supplies.

11. Oil pipelines deliver a significant boost to manufacturers across the supply chain. IHS found that in 2015, construction and operation of crude oil pipelines created 207,000 jobs and contributed $21.8 billion to GDP. IHS further projects that oil pipelines will contribute 243,167 jobs in 2016, of which 28,438 will be in manufacturing, and $25.1 billion in GDP.

12. Between 32 and 37 percent of the cost of constructing an oil pipeline is directly for manufacturing inputs. The major types of manufactured goods used include equipment, line pipe, fittings, coatings and booster stations, including pumps. As a result, at least 66 different manufacturing subsectors (out of 86 total) benefited from the construction of crude oil pipelines by $10 million or more in 2015.

13. Manufacturing sectors benefiting the most from crude oil pipeline construction and operation in 2016 include fabricated metals (14,173 jobs, $1.42 billion in GDP),

---

[2] http://www.nam.org/Issues/Energy-and-Environment/Crude-Oil-Pipeline-Impact-Study.pdf.

paints and chemicals (2,576 jobs, $540.3 million in GDP), machinery manufacturing (2,476 jobs, $463.3 million in GDP), minerals manufacturing (1,395 jobs, $134.5 million in GDP), metals (1,368 jobs, $169.9 million in GDP) and refineries (316 jobs, $540.2 million in GDP).

14. The estimated $3.78 billion DAPL will source much of its material from across the domestic manufacturing supply chain. Construction equipment manufacturers and their suppliers are directly engaged in the construction process and will directly benefit from spending and work on DAPL.

15. Similarly, increasing access to domestic energy enables domestic manufacturers to create and preserve good-paying domestic jobs. DAPL would bring domestically-produced crude oil from the Bakken and Three Forks production areas in North Dakota to refining centers in Illinois and distribute it by existing energy transportation infrastructure. At full capacity, I understand the pipeline would carry 570,000 barrels of crude oil to the market every day.

16. Projects like DAPL are therefore important to manufacturers and the broader manufacturing economy. An injunction will cause harm to manufacturers because it will place in jeopardy the robust economic and energy security opportunities outlined above. These impacts would occur if the project were not allowed to move forward, but some would even be triggered by a delay. Delays in construction cause idled assembly lines, breached contracts and a domino effect that ripples up and down supply chains, injuring manufacturers every step of the way.

17. As an example, one NAM member, a tools, equipment and services provider for DAPL, has $35 million worth of business projected for 2016 attributed to

construction of DAPL. This would be a sizable portion of this manufacturer's 2016 revenues. The manufacturer has hired personnel in anticipation of business this year. Because an injunction could delay construction of DAPL until 2017, this manufacturer could be forced to make very difficult decisions about its staff and management of resources as a result.

18. DAPL is forecast to generate between 8,000 and 12,000 jobs during construction. Many of these will be from small- and medium-sized manufacturers in the supply chain, supplying compressors, valves, fittings, pumps, coatings, seals and other manufactured goods. The cost of delay from an injunction could be crippling for these manufacturers, placing thousands of jobs in jeopardy in 2016 and causing hardship for their employees and the communities these manufacturers support.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

EXECUTED this 16th day of August, 2016, at 4:00 pm.

Ross Evan Eisenberg

# EXHIBIT P

BERNARD SANDERS
VERMONT

COMMITTEES:
BUDGET, RANKING MEMBER
ENERGY AND NATURAL RESOURCES
ENVIRONMENT AND PUBLIC WORKS
HEALTH, EDUCATION, LABOR, AND
PENSIONS
VETERANS' AFFAIRS

# United States Senate

WASHINGTON, DC 20510–4504

332 SENATE DIRKSEN OFFICE BUILDING
WASHINGTON, DC 20510
(202) 224–5141

1 CHURCH STREET, 3RD FLOOR
BURLINGTON, VT 05401
(802) 862–0697
1 (800) 339–9834

www.sanders.senate.gov

October 28, 2016

President Barack Obama
The White House
1600 Pennsylvania Ave
Washington, DC 20500

Dear President Obama,

I write to respectfully but urgently request your intervention in the very troubling situation unfolding at and around the Standing Rock Sioux reservation in North Dakota. As you know, over the past day, scores of law enforcement officers dressed in riot gear and supported by military style vehicles forcibly removed hundreds of peaceful protesters who had gathered to oppose the Dakota Access Pipeline. There are disturbing reports of officers using sound cannons, pepper spray and rubber bullets. The authorities have already arrested at least 140 people.

The first priority must be protecting the safety of the peaceful protesters. That is why I urge you to direct the Department of Justice to send observers to protect the protestors' First Amendment rights to protest the pipeline. I also urge you to request that North Dakota Governor Jack Dalrymple remove the National Guard from the camp, as the military presence only threatens to inflame an already tense situation even more. Lastly, I urge you to direct the Army Corps of Engineers to stop construction within a mile between Highway 1806 and the Missouri River to help reduce tension.

The second priority is suspending all federal permits for this project until the Army Corps of Engineers completes a full cultural and environmental review. To my mind, the Corps should have never approved this project on an expedited basis in the first place. If completed, the pipeline will transport nearly 20 million gallons of crude oil every day, potentially threatening dozens of bodies of water, including Lake Oahe on the Missouri River. Since the Missouri River provides drinking water for 10 states and 28 tribes, a major spill from this pipeline could threaten the drinking water of millions of people. That is a risk we simply cannot afford to take.

The Dakota Access Pipeline would also be a huge blow to our fight against climate change. According to one report, burning the oil transported through the pipeline would produce carbon emissions equivalent to 21 million cars or 30 coal plants. If we have any hope of avoiding the worst consequences of climate change, we should not be building new oil pipelines that lock us into burning fossil fuels for generations to come. Rather, we should be building clean energy infrastructure to transform our energy system away from climate change causing fossil fuels and toward renewable sources of energy.

Moreover, it is deeply distressing to me that the federal government is putting the profits of the oil industry ahead of the treaty and sovereign rights of Native American communities. I understand the Standing Rock Sioux have sued to stop the pipeline, citing the very serious environmental concerns, encroachment on culturally sensitive lands, and violations of tribal treaty rights to a meaningful consultative role in the federal permitting process. To my mind, it is simply unacceptable to build a project like this, in one of the poorest counties in the nation, without the approval of the Native American residents who live there.

Mr. President, you took a bold and principled stand against the Keystone pipeline – I ask you to take a similar stand against the Dakota Access Pipeline. In the meantime, I urge you to take all appropriate measures to protect the safety of the Native Americans protesters and their supporters who have gathered peacefully to oppose the construction of the pipeline.

Sincerely,

Bernard Sanders
United States Senator

# EXHIBIT Q



FOR IMMEDIATE RELEASE
FRIDAY, SEPTEMEBER 9, 2016
WWW.JUSTICE.GOV

OPA
(202) 514-2007
TTY (866) 544-5309

## JOINT STATEMENT FROM THE DEPARTMENT OF JUSTICE, THE DEPARTMENT OF THE ARMY AND THE DEPARTMENT OF THE INTERIOR REGARDING STANDING ROCK SIOUX TRIBE V. U.S. ARMY CORPS OF ENGINEERS

WASHINGTON - The Department of Justice, the Department of the Army and the Department of the Interior issued the following statement regarding *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*:

"We appreciate the District Court's opinion on the U.S. Army Corps of Engineers' compliance with the National Historic Preservation Act.  However, important issues raised by the Standing Rock Sioux Tribe and other tribal nations and their members regarding the Dakota Access pipeline specifically, and pipeline-related decision-making generally, remain.  Therefore, the Department of the Army, the Department of Justice, and the Department of the Interior will take the following steps.

"The Army will not authorize constructing the Dakota Access pipeline on Corps land bordering or under Lake Oahe until it can determine whether it will need to reconsider any of its previous decisions regarding the Lake Oahe site under the National Environmental Policy Act (NEPA) or other federal laws.  Therefore, construction of the pipeline on Army Corps land bordering or under Lake Oahe will not go forward at this time.  The Army will move expeditiously to make this determination, as everyone involved — including the pipeline company and its workers — deserves a clear and timely resolution.  In the interim, we request that the pipeline company voluntarily pause all construction activity within 20 miles east or west of Lake Oahe.

"Furthermore, this case has highlighted the need for a serious discussion on whether there should be nationwide reform with respect to considering tribes' views on these types of infrastructure projects.  Therefore, this fall, we will invite tribes to formal, government-to-government consultations on two questions:  (1) within the existing statutory framework, what should the federal government do to better ensure meaningful tribal input into infrastructure-related reviews and decisions and the protection of tribal lands, resources, and treaty rights; and (2) should new legislation be proposed to Congress to alter that statutory framework and promote those goals.

"Finally, we fully support the rights of all Americans to assemble and speak freely.  We urge everyone involved in protest or pipeline activities to adhere to the principles of nonviolence.

Of course, anyone who commits violent or destructive acts may face criminal sanctions from federal, tribal, state, or local authorities. The Departments of Justice and the Interior will continue to deploy resources to North Dakota to help state, local, and tribal authorities, and the communities they serve, better communicate, defuse tensions, support peaceful protest, and maintain public safety.

"In recent days, we have seen thousands of demonstrators come together peacefully, with support from scores of sovereign tribal governments, to exercise their First Amendment rights and to voice heartfelt concerns about the environment and historic, sacred sites. It is now incumbent on all of us to develop a path forward that serves the broadest public interest."

# # #

# EXHIBIT R

JUSTICE NEWS

**Department of Justice**

Office of Public Affairs

FOR IMMEDIATE RELEASE                                           Monday, October 10, 2016

### Joint Statement from Department of Justice, Department of the Army and Department of the Interior Regarding D.C. Circuit Court of Appeals Decision in Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers

The Department of Justice, the Department of the Army and the Department of the Interior today issued the following statement regarding the D.C. Circuit Court of Appeals' decision in Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers:

"We appreciate the D.C. Circuit's opinion.

"We continue to respect the right to peaceful protest and expect people to obey the law.

"The Army continues to review issues raised by the Standing Rock Sioux Tribe and other Tribal nations and their members and hopes to conclude its ongoing review soon.  In the interim, the Army will not authorize constructing the Dakota Access Pipeline on Corps land bordering or under Lake Oahe.  We repeat our request that the pipeline company voluntarily pause all construction activity within 20 miles east or west of Lake Oahe.

"We also look forward to a serious discussion during a series of consultations, starting with a listening session in Phoenix on Tuesday, on whether there should be nationwide reform on the Tribal consultation process for these types of infrastructure projects."

---

16-1184

<u>Office of Public Affairs</u>

*Updated October 10, 2016*

# EXHIBIT S



**DEPARTMENT OF THE ARMY**
**OFFICE OF THE ASSISTANT SECRETARY**
**CIVIL WORKS**
**108 ARMY PENTAGON**
**WASHINGTON DC 20310-0108**

4 DEC 2016

MEMORANDUM FOR Commander, U.S. Army Corps of Engineers

SUBJECT: Proposed Dakota Access Pipeline Crossing at Lake Oahe, North Dakota

1. On July 25, 2016, the U.S. Army Corps of Engineers (Corps) granted a permission to applicant Dakota Access, L.L.C., under Section 14 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 408 (Section 408 permission), for a proposed crossing of Lake Oahe, a Corps project on the Missouri River, by the Dakota Access Pipeline, an approximately 1,172 mile pipeline that would connect the Bakken and Three Forks oil production areas in North Dakota to an existing crude oil market near Patoka, Illinois. The pipeline is 30 inches in diameter and is projected to transport approximately 470,000 barrels of oil per day, with a capacity as high as 570,000 barrels per day. Total North Dakota field production of crude oil, as of September 2016, was 962,000 barrels per day.

2. The Section 408 permission was accompanied by an Environmental Assessment, as contemplated under the National Environmental Policy Act (NEPA), 42 U.S.C. §4321-4335, and its implementing regulations. The Environmental Assessment was prepared and evaluated in accordance with Section 1506.5 of the Council on Environmental Quality regulations for implementing NEPA, 40 C.F.R. §1506.5, which allow an applicant to prepare an environmental assessment if the Federal agency independently evaluates and verifies its information and analysis. The Environmental Assessment included a finding that granting the Section 408 permission for the proposed crossing of Lake Oahe did not constitute a major Federal action that would have significant environmental impacts.

3. The proposed crossing of Lake Oahe is approximately 0.5 miles upstream of the northern boundary of the Standing Rock Sioux Tribe's reservation. The Tribe relies on Lake Oahe for drinking water and irrigation, portions of Lake Oahe downstream from the proposed crossing remain within the Tribe's reservation boundaries, and the Tribe retains water, hunting and fishing rights in the lake.

4. The Environmental Assessment included a brief description and characterization of factors used in evaluating a potential alternative route and crossing location that it said was considered and eliminated "early in the routing phase." The alternative route would cross the Missouri River approximately 10 miles north of Bismarck, ND.

5. Because of security concerns and sensitivities, several documents supporting the Environmental Assessment were marked confidential and were withheld from the public or representatives and experts of the Standing Rock Sioux Tribe. These documents include a North Dakota Lake Oahe Crossing Spill Model Discussion prepared by the


Printed on Recycled Paper

Wood Group Mustang, the Lake Oahe HDD Risk Analysis Report, and the DAPL – Route Comparison and Environmental Justice Considerations Memorandum.

6. In addition to the Section 408 permission, the proposed crossing of Corps property requires the granting of a right-of-way (easement) under the Mineral Leasing Act, 30 U.S.C. §185. To date, the Army has not made a final decision on whether to grant the easement pursuant to this section.

7. On September 9, 2016, the Army, along with the Departments of Interior and Justice, issued a joint statement noting that there were "important issues raised by the Standing Rock Sioux Tribe and other tribal nations and their members regarding the Dakota Access pipeline," and that it "will not authorize constructing the Dakota Access pipeline on Corps land bordering or under Lake Oahe until it can determine whether it will need to reconsider any of its previous decisions regarding the Lake Oahe site under the National Environmental Policy Act (NEPA) or other federal laws."

8. After completing that review of its previous decisions, as well as information received from Tribes and the applicant, the Army concluded on November 14, 2016 that, although its previous decisions comported with legal requirements, additional discussion with the Standing Rock Sioux Tribe and analysis were warranted in light of the history of the Great Sioux Nation's dispossessions of lands; the importance of Lake Oahe to the Tribe; our government-to-government relationship; and the Mineral Leasing Act's direction to protect the environment, those who rely on fish and wildlife in the area for subsistence, and the public. See, for example, 30 U.S.C. §185(h)(2).

9. On November 22, 2016, the Omaha District Commander requested the Standing Rock Sioux Tribe to meet in order to engage in additional discussion and analysis during the week of November 28, 2016. On November 23, 2016, the Chairman of the Standing Rock Sioux Tribe responded that he was willing to engage in discussions, but that the Tribe needed additional detailed information for a full assessment of oil spill risk.

10. On December 2, 2016, the Omaha District Commander convened representatives of the Standing Rock Sioux Tribe, the applicant, and Omaha District staff. The express purpose of the meeting was to review the Tribe's concerns that were expressed in its October 29, 2016 letter. The group also discussed over 30 additional terms and conditions that could further reduce the risk of a spill or pipeline rupture. For example, the additional terms and conditions discussed include enhanced documentation (plans, drawings and records), and numerous pipeline safety enhancements, for example, a Supervisory Control and Data (SCADA) System, Computational Pipeline Monitoring (CPM) Leak Detection, Overpressure Protection Control, Interference and Corrosion Surveys, High Resolution Deformation Analysis, and Pipeline Patrolling. While the 5-hour long meeting did not produce any definitive mutual agreements, the technical discussions produced a meaningful exchange of information.

11. NEPA requires that Federal agencies consider reasonable alternatives to recommended actions whenever those actions "involve[ ] unresolved conflicts concerning alternative uses of available resources." See 42 U.S.C. §4332(2)(E). The Council on Environmental Quality's (CEQ) has advised that in some circumstances, including in some cases where environmental effects on Tribal resources are at stake, agencies "should heighten agency attention to alternatives (including alternative sites), mitigation strategies, monitoring needs, and preferences expressed by the affected community or population." See CEQ, "Environmental Justice Under the National Environmental Policy Act" at p. 10 (1997).

12. This more heighted analysis, in my judgment, is appropriate in the circumstances present here. Thus, after careful review and consideration, to include the revised proposed easement furnished to me on December 3, 2016, I have concluded that a decision on whether to authorize the Dakota Access Pipeline to cross Lake Oahe at the proposed location merits additional analysis, more rigorous exploration and evaluation of reasonable siting alternatives, and greater public and tribal participation and comments as contemplated in the CEQ's National Environmental Protection Act (NEPA) implementing regulations, 40 C.F.R. §1502.14 and §1503.1. Accordingly, the Army will not grant an easement to cross Lake Oahe at the proposed location based on the current record. The robust consideration of reasonable alternatives that I am directing, together with analysis of potential spill risk and impacts, and treaty rights, is best accomplished, in my judgment, by preparing an Environmental Impact Statement (EIS) that satisfies the accompanying procedures for broad public input and analysis. See, for example, 40 C.F.R. §1502 *et seq.*

13. Consistent with 40 C.F.R. §1500.2(e), the Corps shall engage in the following additional review and analysis (at a minimum):

- A robust consideration and discussion of alternative locations for the pipeline crossing the Missouri River, including, but not limited to, more detailed information on the alternative crossing that was considered roughly ten miles north of Bismarck;

- Detailed discussion of potential risk of an oil spill, and potential impacts to Lake Oahe, the Standing Rock Sioux Tribe's water intakes, and the Tribe's water rights as well as treaty fishing and hunting rights; and

- Additional information on the extent and location of the Tribe's treaty rights in Lake Oahe.

14. The Corps is encouraged to allow, with appropriate safeguards (including redaction), tribal government leaders and their representatives or experts, as well as relevant Federal agencies, the ability to review and respond to all analyses that are central to the concerns raised by the Standing Rock Sioux Tribe and other Tribal Nations, including the Lake Oahe Spill Model Discussion Report, the Lake Oahe HDD

-3-

Risk Analysis Report, and the DAPL – Route Comparison and Environmental Justice Considerations Memorandum.

15.  This policy decision is based on the totality of circumstances in this case, more specifically, the specific mandates of the Mineral Leasing Act (30 U.S.C. §185), the involvement of historic tribal homelands, the close proximity to reservation lands that extend into the potentially affected waters, and the potential impacts on treaty hunting and fishing rights.  I want to be clear that this decision does not alter the Army's position that the Corps' prior reviews and actions have comported with legal requirements. Rather, my decision acknowledges and addresses that a more robust analysis of alternatives can be done and should be done, *under these circumstances*, before an easement is granted for the Dakota Access Pipeline to cross the Missouri River on Corps land.

16.  The Corps, and particularly the Omaha District and Northwestern Division, have performed with remarkable diligence and professionalism in responding to a demanding situation that has galvanized tribal communities across the nation, and presented difficult and unique challenges in protecting public safety, First Amendment rights, property rights, and law enforcement.

Jo-Ellen Darcy
Assistant Secretary of the Army
(Civil Works)

-4-

# EXHIBIT T

army.mil

# Army will not grant easement for Dakota Access Pipeline crossing

Army POC: Moira Kelley (703) 614-3992, moira.l.kelley.civ@mail.mil

The Department of the Army will not approve an easement that would allow the proposed Dakota Access Pipeline to cross under Lake Oahe in North Dakota, the Army's Assistant Secretary for Civil Works announced today.

Jo-Ellen Darcy said she based her decision on a need to explore alternate routes for the Dakota Access Pipeline crossing. Her office had announced on November 14, 2016 that it was delaying the decision on the easement to allow for discussions with the Standing Rock Sioux Tribe, whose reservation lies 0.5 miles south of the proposed crossing. Tribal officials have expressed repeated concerns over the risk that a pipeline rupture or spill could pose to its water supply and treaty rights.

"Although we have had continuing discussion and exchanges of new information with the Standing Rock Sioux and Dakota Access, it's clear that there's more work to do," Darcy said. "The best way to complete that work responsibly and expeditiously is to explore alternate routes for the pipeline crossing."

Darcy said that the consideration of alternative routes would be best accomplished through an Environmental Impact Statement with full public input and analysis.

The Dakota Access Pipeline is an approximately 1,172 mile pipeline that would connect the Bakken and Three Forks oil production areas in North Dakota to an existing crude oil terminal near Pakota, Illinois. The pipeline is 30 inches in diameter and is projected to transport approximately 470,000 barrels of oil per day, with a capacity as high as 570,000 barrels. The current proposed pipeline route would cross Lake Oahe, an Army Corps of Engineers project on the Missouri River.

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of December, 2016, I electronically filed the

foregoing document with the Clerk of the Court for the U.S. District Court for the District of

Columbia using the CM/ECF system.  Service was accomplished by the CM/ECF system on the

following counsel:

Patti A. Goldman
Jan E. Hasselman
EARTHJUSTICE
705 Second Avenue, Suite 203
Seattle, WA  98104
(206) 343-7340
pgoldman@earthjustice.org
jhasselman@earthjustice.org

*Counsel for Plaintiff Standing Rock Sioux
Tribe*


Nicole E. Ducheneaux,
FREDERICKS PEEBLES & MORGAN, LLP
3610 North 163rd Plaza
Omaha, NE 68116
(402) 333-4053
nducheneaux@ndnlaw.com

Conly J. Schulte
FREDERICKS PEEBLES & MORGAN, LLP
1900 Plaza Drive
Louisville, CO  80027
(303) 673-9600
cschulte@ndnlaw.com

*Counsel for Plaintiff–Intervenor Cheyenne
River Sioux Tribe*

Matthew M. Marinelli
Erica M. Zilioli
U.S. DEP'T OF JUSTICE
Environment & Natural Resources Division
P.O. Box 7415
Washington, D.C.  20044
(202) 514-2000
Matthew.Marinelli@usdoj.gov
Erica.zilioli@usdoj.gov

*Counsel for Defendant–Cross Defendant U.S.
Army Corps of Engineers*


 /s/ William S. Scherman
William S. Scherman
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500
wscherman@gibsondunn.com

*Counsel for Defendant–Intervenor–Cross
Claimant Dakota Access, LLC*