**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **STANDING ROCK SIOUX TRIBE,** | |
| **Plaintiff,** | **Case No. 1:16-cv-1534-JEB** |
| **and** | |
| **CHEYENNE RIVER SIOUX TRIBE,** | **INTERVENOR-PLAINTIFF'S CONSOLIDATED MOTION TO** |
| **Intervenor-Plaintiff,** | **DISMISS, OPPOSITION TO INTERVENOR-DEFENDANT'S** |
| **v.** | **MOTION FOR SUMMARY JUDGMENT, AND CROSS-MOTION FOR SUMMARY** |
| **U.S. ARMY CORPS OF ENGINEERS,** | **JUDGMENT** |
| **Defendant – Cross-Defendant.** | |
| **and** | |
| **DAKOTA ACCESS, LLC,** | |
| **Intervenor-Defendant Cross-Claimant.** | |

In accordance with Federal Rules of Civil Procedure 12(b)(1) and 56(a), Intervenor-Plaintiff Cheyenne River Sioux Tribe ("Tribe"), a federally-recognized Indian Tribe, respectfully moves this court to enter an order dismissing Dakota Access, LLC's ("Dakota Access") Cross-Claim for lack of ripeness, as its claim challenges an agency action that is not yet final. The Tribe bases this motion on the text of Dakota Access's Cross-Claim, Dakota Access's Motion for Summary Judgment, and Exhibit S of the Declaration of William S. Scherman in Support of Dakota Access's Motion for Summary Judgment, and respectfully asks the Court to enter the proposed dismissal order filed concurrently with this motion.

1

In the alternative to its motion to dismiss, the Tribe respectfully submits its opposition to Dakota Access's Motion for Summary Judgment and cross moves this Court to enter summary judgment against Dakota Access on the sole claim in its Cross-Claim that it has a legal right-of-way to construct an oil pipeline on federal land on the grounds that there is no genuine issue of material fact and Plaintiffs are entitled to judgment as a matter of law.  The Tribe bases its motion on the pleadings and other papers on file, the separate statement of material facts not in genuine dispute attached hereto pursuant to D.C. Local Rule 7(h)(1), as well as the following memorandum of points and authorities, the Declaration of William S. Scherman in Support of Dakota Access's Motion for Summary Judgment and exhibits referenced therewith, and any argument of counsel that may be heard by the Court, and respectfully asks the Court to enter the proposed order entering summary judgment against Dakota Access filed concurrently with this motion.

Dated: January 6, 2017

CHEYENNE RIVER SIOUX TRIBE,
Intervenor-Plaintiff,

By:    /s/ Nicole E. Ducheneaux
Nicole E. Ducheneaux, *Pro Hac Vice*
Joseph V. Messineo, *Pro Hac Vice*
Fredericks Peebles & Morgan LLP
3610 North 163rd Plaza
Omaha, NE  68116
Telephone:  (402) 333-4053
Facsimile:  (402) 333-4761
Email: nducheneaux@ndnlaw.com

Conly J. Schulte
FREDERICKS PEEBLES & MORGAN LLP
1900 Plaza Drive
Louisville, CO  80027
Telephone:  (303) 673-9600
Facsimile:  (303) 673-9839
Email:  cschulte@ndnlaw.com

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STANDING ROCK SIOUX TRIBE,** | |
| **Plaintiff,** | **Case No. 1:16-cv-1534-JEB** |
| **and** | |
| **CHEYENNE RIVER SIOUX TRIBE,** | |
| **Intervenor-Plaintiff,** | |
| **v.** | |
| **U.S. ARMY CORPS OF ENGINEERS,** | |
| **Defendant – Cross-Defendant.** | |
| **and** | |
| **DAKOTA ACCESS, LLC,** | |
| **– Intervenor-Defendant Cross-Claimant.** | |

**INTERVENOR-PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CONSOLIDATED MOTION TO DISMISS, OPPOSITION TO INTERVENOR-DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, AND CROSS-MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................. 5

II.    FACTUAL AND PROCEDURAL BACKGROUND ......................................... 8

III.   MOTION TO DISMISS ..................................................................................... 10

IV.   SUMMARY JUDGMENT ................................................................................. 18

    1.   Section 408 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 408 .......................... 18

    2.   Mineral Leasing Act, 30 U.S.C. § 185 .......................................................... 20

    3.   Standard of Review ....................................................................................... 23

V.    ARGUMENT ...................................................................................................... 24

   1.   The Corps has not Granted Any Right-of-Way to Cross Federal Lands at Lake Oahe Pursuant to the Mineral Leasing Act, 30 U.S.C. § 185 ...................................................... 24

   2.   Authorizations Pursuant to the Mineral Leasing Act, 30 U.S.C. § 185 and the Rivers and Harbors Act, 33 U.S. § 408 Are Wholly Substantively Distinct ..................... 29

CONCLUSION ............................................................................................................. 32

CERTIFICATE OF SERVICE ................................................................................... 34

## TABLE OF AUTHORITIES

**Cases**

*Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967)............................................................ 8, 13

*Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166 (D.C. Cir. 2003)............................ 10

*Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240 (1975)........................................ 16

*Alyeska Pipeline Service Co. v. United States*, 824 F.2d 1005 (Ct. of Claims 1980).................. 26

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986) .......... 20

*AT&T Corp. v. FCC*, 349 F.3d 692 (D.C. Cir. 2003) .................................................................... 13

*Bayer v. United States Dep't of Treasury*, 956 F.2d 330 (D.C. Cir. 1992) .................................. 20

*Chevron v. Natural Res. Defense Council, Inc.*, 467 U.S. 837 (1984) .................................. 12, 27

*City of Dover v. U.S. E.P.A*, 956 F. Supp. 2d 272 (D.D.C. 2013) ................................................ 22

*Code v. McHugh*, 139 F. Supp. 3d 465 (D.D.C. 2015)................................................................. 24

*Decatur v. Paulding*, 39 U.S. 497 (1840) ................................................................................... 22

*E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621 (D.C. Cir. 1997)............................ 7

*Eagle-Picher Indus. v. EPA*, 759 F.2d 905 (D.C. Cir. 1985).......................................................... 8

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13 (D.C. Cir. 2006) ............ 7, 11

*Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9 (2001)....................... 7

*Gray v. Universal Serv. Admin. Co.*, 581 F. Supp. 2d 47 (D. D.C. 2008)............................... 19, 20

*Griffith v. Fed. Labor Relations Auth.*, 842 F.2d 487 (D.C. Cir. 1988) ...................................... 10

*Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271 (D.C. Cir. 1994) ................................................... 7

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ................................................................... 7

*Md. Dep't of Human Res. v. Dep't of Health & Human Servs.*, 763 F.2d 1441
    (D.C. Cir. 1985) ...................................................................................................................... 10

*Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 134 S. Ct. 843 (2014) ......................... 10, 11

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Engineers*, 440 F.3d 459 (D.C. Cir. 2006) ........................................................................................................... 8

*Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 454 U.S. 967 (2005) ..................... 27

*Nat'l Park Hospitality Ass'n v. Dep't of Interior,* 538 U.S. 803 (2003)........................................ 8

*Nevada v. Dep't of Energy*, 457 F.3d 78 (D.C. Cir. 2006) ................................................. 8, 11, 13

*No Oilport v. Carter*, 520 F.Supp. 334 (D.C.D. 1981) .................................................................. 26

*Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251 (D.C. Cir. 2004) ......................................... 13

*Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726 (1998) ............................................. 8, 13

*Papasan v. Allain*, 478 U.S. 265 (1986) ....................................................................................... 7

*Prieto v. United States*, 655 F. Supp. 1187 (D.D.C. 1987)............................................................ 24

*Remmie v. Mabus*, 846 F. Supp. 2d 91 (D.D.C. 2012) .................................................................. 7

*Scheuer v. Rhodes*, 416 U.S. 232 (1974) ....................................................................................... 7

*Sierra Club v. U.S. Army Corps of Engineers*, 99 F. Supp. 2d 9 (D.D.C. 2013)................... 16, 26

*Sierra Club v. U.S. Dept. of Energy*, 825 F. Supp. 2d 142 (D.D.C. 2011) ............................... 7, 24

*State of Alaska v. United States*, 32 Fed.Cl. 689, 693 (Fed. Cl. 1995) ........................................ 26

*Texas v. United States*, 523 U.S. 296 (1998) ............................................................................... 13

*Trudeau v. FTC*, 372 F.3d 178 (D.C. Cir. 2006) ............................................................ 7, 10, 12

*U.S. Ecology, Inc. v. U.S. Dep't of Interior*, 231 F.3d 20 (D.C. Cir. 2000) ................................. 7

*Udall v. Tallman*, 380 U.S. 1 (1965) ...................................................................... 16, 20, 22, 26

*United States v. Sioux Nation of Indians*, 448 U.S. 371 (1980)................................................... 3

*Venetian Casino Resort, L.L.C. v. E.E.O.C.*, 409 F.3d 359 (D.C. Cir. 2005)........................ 6, 7, 8

*Wilderness Soc'y v. Morton*, 479 F.2d 842 (D.C. Cir. 1973) .................................................... 21

*Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43 (D.C. Cir. 1999) ................................. 8

*XP Vehicles, Inc. v. U.S. Dep't of Energy*, 156 F. Supp. 3d 185 (D.D.C. 2016) ......................... 24

3

**Statutes**

\*5 U.S.C. §§ 702-706 ............................................................................... passim

10 U.S.C. § 2667 ............................................................................................. 21

10 U.S.C. § 2668 ............................................................................................. 21

10 U.S.C. § 4777 ............................................................................................. 21

16 U.S.C. § 460 ............................................................................................... 21

16 U.S.C. § 663 ............................................................................................... 21

28 U.S.C. § 1331 ............................................................................................... 9

28 U.S.C. § 1367 ............................................................................................... 9

\*30 U.S.C. § 185 ..................................................................................... passim

\*33 U.S.C. § 408 ..................................................................................... passim

40 U.S.C. § 319 ............................................................................................... 21

**Rules**

D.C. Local Rule 7(h)(1) ................................................................................... 2

Federal Rules of Civil Procedure 12(b)(1) ............................................... 1, 6, 7, 14

Federal Rules of Civil Procedure 56(a) ......................................................... 1, 19

**Regulations**

\*Army Reg. 405-80, ¶ 4-1 ......................................................................... passim

**Other Authorities**

Act of Nov. 16, 1973, Pub. L. No. 93-153, 87 Stat. 576 ............................... 16

BLACK'S LAW DICTIONARY (10th ed. 2014) ................................................. 19

Daniel A. Medina & Chiara Sottile, *What Will a Trump Presidency Mean for the*
*Dakota Access Pipeline?* NBC News, Nov. 12 2016 ..................................... 3, 13

## I.     INTRODUCTION

The Mineral Leasing Act, 30 U.S.C. § 185 requires, in no uncertain terms, that an oil company must obtain a right-of-way from the Army Corps of Engineers ("Corps") pursuant to the substantive provisions of the Act before it can enter onto Corps-owned property for purposes of constructing and operating an oil pipeline.   On July 25, 2016, after Dakota Access, LLC ("Dakota Access") had constructed the vast majority of its $3.7 billion oil pipeline, the oil company received from the Corps the permission it required under 33 U.S.C. § 408 (Section 408 of the Rivers and Harbors Act) to construct the pipeline under the Corps' reservoir of the Missouri River, Lake Oahe, in addition to an Environmental Assessment and a Finding of No Significant Impact.   Dakota Access did not, however, receive the right-of-way that is required pursuant to 30 U.S.C. § 185.   No materials that accompanied the Section 408 permit purported to grant the right-of-way, or even referenced its substantive provisions.

Dakota Access understood at that time that it had not received the statutorily required right-of-way and that, as a consequence, it could not enter onto Corps-owned property.   Dakota Access merely had the expectation that it would receive the right-of-way soon.   The company had deadlines it had hoped to meet, and it had seemingly positive interactions with certain regional Corps' officials that apparently led the oil company to believe that the Corps would deliver the right-of-way as a matter of course without making any further substantive findings pursuant to 30 U.S.C. § 185.

Then this litigation was filed.   With the right-of-way decision still pending, the Standing Rock Sioux Tribe and the Cheyenne River Sioux Tribe challenged the sufficiency of the Corps' review of the impacts of this pipeline on Tribal rights, waters, and lands pursuant to the

governing statutes and principles of federal law.  Presumably the Corps, including its attorneys and higher level officials, then undertook a serious appraisal of whether its review of the impacts of this pipeline on Tribal rights, waters, and lands was sufficient pursuant to the governing statutes and principles of federal law.  Indeed, on September 9, 2016, the Corps announced that it was doing just that, reviewing its existing and pending decisions for their legal sufficiency, and that it would not grant the pending right-of-way until it concluded that analysis.

Dakota Access claimed that it had deadlines and a construction schedule that it had to meet.  The nature of those deadlines is obscure, but the deferred right-of-way decision necessarily delayed Dakota Access's construction schedule.  Despite this inconvenience to the oil company, the Corps continued its substantive review, including receiving factual and legal comments from the plaintiff Tribes.  On November 14, 2016, the Corps advised specifically that it was reviewing and accepting comments as to the right-of-way question under 30 U.S.C. § 185.  And on December 4, 2016, the Corps announced that, as a result of the brief comment period, the Corps had decided that the right-of-way decision required more process and more fact-finding pursuant to 30 U.S.C. § 185, and a full Environmental Impact Statement.

The Corps did not deny Dakota Access's application for a right-of-way.  It merely announced that more administrative process was required before it could issue a final decision on the question.  Indeed, the Corps suggested that its goal would be to find some compromise, including a reroute or additional conditions to the right-of-way, that would both permit Dakota Access ultimately to construct its pipeline and respect the Tribal plaintiffs' rights.  So Dakota Access sued, despite the fact that no decision had been rendered against it and no final agency action existed.

The basis of Dakota Access's suit is not that the Corps has failed to give Dakota Access what it wanted, but rather that the Corps failed to give the oil company what it wanted when it wanted it.  Lacking a final agency action and unwilling to wait for one,[1] Dakota Access has brought an unripe and improper APA challenge that makes two indefensible claims:  (1) that it already has been granted a right-of-way under the Mineral Leasing Act; and (2) that the Mineral Leasing Act is substantively identical to the Rivers and Harbors Act.

The true heart of Dakota Access's claim, however, is its unmet expectations.  Based on its interactions with regional Corps officials, Dakota Access complains that it "had an abiding faith" that the government would give it the pipeline right-of-way that it wanted in the summer of 2016.  ECF No. 66-1 at p. 32.  Instead, the government has delayed its decision in order to explore ways that it might avoid violating the rights and treaties of the Great Sioux Nation, and so the oil company's faith in the federal government has been shaken.  The irony here is not lost on the Cheyenne River Sioux Tribe.  Sometimes, unmet expectations or broken government promises are actionable,[2] but unless there is some legal decision that is susceptible to judicial review or a colorable argument that the government has violated a statutory directive, those claims must fail.

As set forth in detail herein, Dakota Access's Cross-Claim is unripe and must be dismissed both for lack of subject matter jurisdiction and for failure to state a claim upon which

---

[1]  Notably, Dakota Access does not think it will wait very long for a favorable outcome.  On November 12, 2016, Energy Transfer Partners CEO Kelcy Warren told NBC News that the oil company is "100 percent sure that the pipeline will be approved by a Trump administration."  Daniel A. Medina & Chiara Sottile, *What Will a Trump Presidency Mean for the Dakota Access Pipeline?*  NBC News, Nov. 12 2016, http://www.nbcnews.com/storyline/dakota-pipeline-protests/what-will-trump-presidency-mean-dakota-access-pipeline-n682746 (last accessed Jan. 4, 2017).

[2]  *See United States v. Sioux Nation of Indians*, 448 U.S. 371 (1980) (holding that United States effected an unlawful taking that illegally abrogated the 1868 Fort Laramie Treaty).

relief can be granted.   In the alternative, the Cheyenne River Sioux Tribe opposes Dakota Access's pending Motion for Summary Judgment and moves for summary judgment on the grounds that there is no genuine issue of material fact, and the Tribe is entitled to judgment as a matter of law.

## II.      FACTUAL AND PROCEDURAL BACKGROUND

All persons involved with the Dakota Access Pipeline ("Dakota Access") understood that the completion of the 408 permitting process did not result in the granting of an easement for the Lake Oahe crossing.  On April 29, 2016, Colonel Henderson informed Brig. Gen. Robert Crear that "The second risk [apart from the permitting process] is the ability to get the easement through [the Army Corps] and Congress."  AR 64275.  Mr. Joseph Mahmoud was aware that the 408 permit was separate from the real estate easement writing in an email to Brig. Gen. Crear that Dakota Access needed "Lake Oahe 408 *and* real estate release." (emphasis added).   AR 64278.  On May 11, 2016, Melissa Hoerner with the Army Corps of Engineers informed Monica Howard with Energy Transfer Partners that "Remember that this Consent [referring to easement for water crossing] is separate and distinct from the 'Section 408' permit."  AR 5732.

Dakota Access was well be aware that a real estate instrument was necessary to complete the easement process.   On May 12, 2016, Dakota Access provided to the Army Corps of Engineers the signed "Department Of The Army Consent To Cross U.S. Government Easement At Carlyle Lake Fayette County, Illinois."  AR 13752-13759.  This Easement specifically sets forth that the grant of the Easement is separate from the "Section 408" permitting process.  AR 13754, ¶ 6.

On July 19, 2016, Martha Chieply with the Army Corps of Engineers informed her colleagues that the Lake Oahe crossing requires Congressional notification.  AR 67472.  On July

19, 2016, Gary Lenz with the Army Corps of Engineers informed his colleagues that the 408

permits for Dakota Access should issue July 20, 2016.  AR 67473.  Undated "Fact Sheet" from

the Army Corps of Engineers sets forth that an "Outstanding Issue" on the Dakota Access

Pipeline project is that for "pipelines under the authority of the Mineral Leasing Act . . .

Congressional notification is required of the intent to issue an easement.  The time required for

that notification and response is unknown at this time."  AR 66748.

On July 25, 2016, the same day the Army Corps issued its FONSI on the 408 permits,

Larry Janis with the Army Corps of Engineers informed Joseph Mahmoud with Energy Transfer

Partners that,

> I wanted to let you know that earlier today the Section 408 permission for the two
> Missouri River crossings (Lake Oahe and Lake Sakakawea) was signed by
> Colonel Henderson and delivered to our Real Estate division.  The 408 package
> included the signed FONSI.  *As mentioned previously, you cannot begin work at
> either the Lake Oahe Crossing or the Lake Sakakawea flowage easement
> properties until an easement or consent to easement, respectively are signed by
> our chief of Real Estate.  The easement for the Lake Oahe crossing also requires
> Congressional notification.  Mr. Rick Noel, Chief of Civil Branch, Real Estate
> Division will be your point of contact for this part of the process.* (emphasis
> added).

AR 71215.

On August 2, 2016, the Department of the Army Real Estate Contracting Officer Rick Noel

issued the "Department of the Army Corps Of Engineers Omaha District Consent To Easement

Structures" for the Dakota Access crossing at Lake Sakakawea, but this did not included an

easement for the crossing at Lake Oahe.  (ECF 66-3.)

Litigation on the 408 permit FONSI was initiated by the Standing Rock Sioux Tribe

("Standing Rock") on July 27, 2016.  (ECF 1.)  The Cheyenne River Sioux Tribe ("Cheyenne

River" collectively referred to with Standing Rock as the "Tribes")) motioned to intervene on

August 10, 2016 (ECF 11), which was granted on August 19, 2016.  (Minute Order)  The first

order of business in the litigation was Standing Rock's Motion For Preliminary Injunction.  This

was heard by the Court on August 24, 2016.  On September 9, 2016, the Court denied Standing

Rock's motion.  (ECF 38.)

At the August 24, 2016 hearing, Dakota Access's legal counsel acknowledged to the

Court that drilling must await the issuance of an easement.  August 24, 2016 Hearing Transcript

at 41:14-15.  Army Corps of Engineers legal counsel Matthew Marinelli confirmed to the Court

that the easement had not yet been sent to Congress and there was no easement.  August 24, 2016

Hearing Transcript at 40:8-10.  This was later reiterated by Army Corps of Engineers legal

counsel Micheal Thorp.  September 16, 2016 Hearing Transcript at 7:15-18; 8:12-15.

> On September 9, 2016, the Department of Justice, the Department of the Army
> and the Department of the Interior issued a joint press release setting forth that the
> Army will not allow construction at the Lake Oahe crossing "until it can
> determine whether it needs to reconsider any of its previous decisions regarding
> the Lake Oahe site."  (ECF 42-1.)  On November 14, 2016, the Army Corps of
> Engineers determined that "additional discussion and analysis" on the issue of the
> Lake Oahe crossing was needed.  (ECF 56-1.)  On December 4, 2016, the Army
> Corps of Engineers formally determined that it needed further consideration of the
> Lake Oahe crossing pursuant to the National Environmental Policy Act.  (ECF
> 65.)  That process is currently ongoing.

## III.   MOTION TO DISMISS

Dakota Access's Cross-Claim warrants dismissal under Rules 12(b)(1) and 12(b)(6) as it

is constitutionally and procedurally unripe and because it is functionally a claim brought under

the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702-706 but lacks a final agency action.

The oil company cannot avoid these problems by creative pleading.  As set forth herein, the

Cross-Claim must be dismissed.

Dismissal for lack of ripeness is governed by Federal Rule of Civil Procedure 12(b)(1).

*See e.g.*, *Venetian Casino Resort, L.L.C. v. E.E.O.C.*, 409 F.3d 359, 363-61 (D.C. Cir. 2005).

Dismissal on the basis of no final agency action is governed by Federal Rule of Civil Procedure

12(b)(6).  *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 18 n. 4 (D.C. Cir. 2006).  The Court must construe the allegations of the Complaint favorably to the pleader on both a motion to dismiss for lack of subject matter jurisdiction and a motion to dismiss for failure to state a cause of action.  *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Sierra Club v. U.S. Dept. of Energy*, 825 F. Supp. 2d 142, 153-54 (D.D.C. 2011).  However, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation, . . . or to accept inferences drawn by [the pleader] if such inferences are unsupported by the facts set out in the complaint." *Trudeau v. FTC*, 372 F.3d 178, 193 (D.C. Cir. 2006) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986) and *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)) (internal punctuation omitted).

The pleading party bears the burden of proving that the court has subject matter jurisdiction to hear claims that have been challenged by a motion to dismiss under Rule 12(b)(1). *Remmie v. Mabus*, 846 F. Supp. 2d 91, 93-94 (D.D.C. 2012) (Boasberg, J.) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *U.S. Ecology, Inc. v. U.S. Dep't of Interior*, 231 F.3d 20, 24 (D.C. Cir. 2000)).  Further, because a court bears an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority," the pleadings party's "factual allegations in the complaint will bear closer scrutiny in resolving a 12(b)(1) motion." *Id.* (quoting *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (2001)). Importantly, courts considering 12(b)(1) motions, especially motions based on lack of ripeness, "may consider materials outside the pleadings." *Id.* (citing *Venetian Casino Resort, L.L.C.*, 409 F.3d at 366); *see also E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 n. 3 (D.C. Cir. 1997).

The ripeness doctrine dictates that "an Article III court cannot entertain the claims of a litigant unless they are 'constitutionally and prudentially ripe.'" *Nevada v. Dep't of Energy*, 457 F.3d 78, 83-84 (D.C. Cir. 2006) (quoting *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 48 (D.C. Cir. 1999).   The doctrine protects courts "through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Engineers*, 440 F.3d 459, 463 (D.C. Cir. 2006) (quoting *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003)).   Courts analyzing ripeness must balance the pleader's "interest in prompt consideration of allegedly unlawful agency action against the agency's interest in crystallizing its policy before that policy is subjected to judicial review and the court's interests in avoiding unnecessary adjudication and in deciding issues in a concrete setting." *Venetian Casino Resort, L.L.C.*, 409 F.3d at 364 (citing *Eagle-Picher Indus. v. EPA*, 759 F.2d 905, 915 (D.C. Cir. 1985)).   A court must weigh "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* (citing *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967)).   To this end, the Supreme Court has set forth specific factors that a court must consider when it evaluates ripeness:  "(1) whether delayed review would cause hardship to the [pleading party]; (2) whether judicial intervention would inappropriately interfere with administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998).

As an initial matter, there is no question that Dakota Access's Cross-Claim and later Motion for Summary Judgment have been artfully crafted to attempt to avoid the problem of

ripeness and the lack of a final agency action.  Although the Cross-Claim expressly premises jurisdiction of this Court on the entirety of the APA, 5 U.S.C. §§ 701-706, including portions defining the substantive scope of review, as well as 28 U.S.C. §§ 1331 and 28 U.S.C. § 1367 and the Declaratory Judgment Act, 28 U.S.C. § 2201 (ECF No. 57 at p. 53); Dakota Access's later filed Motion for Summary Judgment attempts to narrow the scope of its claim to avoid the APA, incorporate only the waiver of sovereign immunity contained in 5 U.S.C. § 702, and base its cause of action instead solely on the Declaratory Judgment Act and federal question jurisdiction. ECF No. 66-1 at pp. 17-18.

Notwithstanding its clever construction, Dakota Access's claim is by its own terms an action for declaratory judgment that "the Corps has issued a right-of-way under 30 U.S.C. § 185(a) that allows [it] to construct, operate, and maintain [a] pipeline beneath federal land at Lake Oahe, North Dakota," despite the fact that the Corps explicitly has not yet either granted or denied such permission pursuant to the statute.  ECF No. 57 at p. 66.  Put another way, Dakota Access believes that it is entitled to judicial review of the Corps' failure to expressly grant to it permission to construct, operate, and maintain a pipeline under federal land in a manner that it alleges is inconsistent with 30 U.S.C. § 185(a).  Dakota Access has requested that this Court compel the permission to cross federal land that it alleges the Corps has unlawfully withheld. This is nothing more or less than a simple APA claim.  5 U.S.C. §§ 702 and 706.  The APA entitles a party to judicial review who has suffered "a legal wrong because of agency action, or [has been] adversely affected or aggrieved by agency action within the meaning of a relevant statute."  *Id.* at § 702.  The scope of this review empowers courts to "compel agency action unlawfully withheld or unreasonably delayed."  *Id*. at § 706(1).

13

Dakota Access's attempt to avoid the APA by crafting the claim as "a declaratory judgment in anticipation of threatened action [that] invokes federal question jurisdiction" (ECF No. 66-1 at pp. 17-18) does not launder the claim of its APA character.  The Declaratory Judgment Act may create federal jurisdiction for suits that anticipate federal question jurisdiction.  *Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 134 S. Ct. 843, 848 (2014).  And the APA may separately waive the United States' sovereign immunity for nonmonetary claims for relief that are not APA claims.  *Trudeau*, 456 F.3d 185.  However, challenges to an agency action pursuant to the agency's statutory authority remain APA claims.  *See* 5 U.S.C. §§ 702; 706.  Indeed, Courts analyzing the sovereign immunity waiver at § 702 have highlighted the difference between APA claims and other nonstatutory, non-APA kinds of claims.  APA claims are "generic cause[s] of action in favor of persons aggrieved by agency action." *Trudeau*, 456 F.3d at 188 (quoting *Md. Dep't of Human Res. v. Dep't of Health & Human Servs.*, 763 F.2d 1441, 1445 n. 1 (D.C. Cir. 1985)).  Non-APA claims contemplated by the broader waiver in § 702 are claims seeking judicial review "'when an agency acts *ultra vires*,' even if a statutory cause of action is lacking." *Id.* at 187 n. 13 (quoting *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1173 (D.C. Cir. 2003)).  Such nonstatutory review "is intended to be of extremely limited scope." *Id.* at 190 (quoting *Griffith v. Fed. Labor Relations Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988) (noting that nonstatutory review of agency action is typically confined to agency action that is so extreme that it may be viewed as jurisdictional).  Dakota Access's complaint does not allege that the Corps has acted outside of the scope of its authority; only that the Corps has withheld granting a right-of-way to which Dakota Access alleges it is entitled under the Mineral Leasing Act, 30 U.S.C. § 185(a).

That Dakota Access's claim is merely a run-of-the-mill APA claim, rather than some extraordinary nonstatutory claim, by itself does not divest this Court of jurisdiction under 5 U.S.C. § 702.  *See, e.g., Trudeau*, 456 F.3d at 186.  However, it does mean that the claim is subject to usual prudential and constitutional ripeness considerations and, separately, the requirement that the suit must be based on a final agency action.  *See Nevada*, 457 F.3d at 84; *Fund for Animals, Inc.*, 460 F.3d at 19-20.  To hold otherwise would be to create a broad exception to the requirement of ripeness and final agency action for any litigant savvy enough to couch a prematurely filed APA claim as a declaratory judgment action brought in anticipation of coercive action that would present a federal question.  ECF No. 66-1 at p. 18 (citing *Medtronic Inc.* 134 S. Ct. at 848).  No such exception exists under federal law despite Dakota Access's creative pleading.

Dakota Access's Cross-Claim seeks this Court's declaration that the Corps has violated 30 U.S.C § 185 and the Corps' prior practice by failing to grant the oil company a right-of-way to cross federal lands.  This claim is not ripe.  Dakota Access's Cross-Claim sets forth in detail the fact that, although the oil company and the Corps discussed the future issuance of the subject right-of-way to cross federal lands at Lake Oahe under 30 U.S.C. § 185, the Corps never provided Dakota Access with permission under that statute to cross federal lands at Lake Oahe. ECF No. 53 at pp. 53-63.  Dakota Access's Cross-Claim likewise sets forth in detail the Corps' express position on the right-of-way on and after September 9, 2016 that it "will not authorize constructing the Dakota Access pipeline on Corps' land bordering or under the Lake Oahe site" until after the Corps had continued further legal and factual investigation.  *Id.* at p. 63 ¶ 40.  The Cross-Claim reiterates the Corps' position as set forth on November 14, 2016 that it still had not authorized Dakota Access to cross under federal lands pursuant to the statute and that it was

conducting "further analysis" and engaging in further "discussion regarding potential conditions on an easement for the pipeline." *Id.* at p. 64 ¶ 43 (citing ECF No. 56-1).[3] Then on December 4, 2016, the Corps made another statement, cited by Dakota Access in its Summary Judgment briefing, that it still was not ready to grant or deny Dakota Access's request to cross federal lands under 30 U.S.C. § 185 and that it intended to engage in "additional analysis," "more heighted [sic] analysis," and "more rigorous exploration and evaluation" of the facts and law that would be "best accomplished . . . by preparing an Environmental Impact Statement." ECF No. 66-1 at p. 16 (quoting ECF No. 65-1 at ¶ 12).

On the face of Dakota Access's Cross-Claim, the permission that Dakota Access requires has not been either granted or denied, and the Corps has stated explicitly that it will engage in further analysis and prepare a detailed record that supports its future decision to either grant or deny the right-of-way that Dakota Access requires. ECF No. 53 at pp. 53-64; ECF No. 66-1 at p. 16. The only agency action that Dakota Access has presented in its Cross-Claim is a series of conditional statements about the pending approval or disapproval of the right-of-way—after the occurrence of "X" the Corps will either grant or deny. Likewise, Dakota Access's Cross-Claim points to no existing record that sets forth the Corps' express consideration of any 30 U.S.C. § 185 substance. Although Dakota Access's Cross-Claim pronounces that the Corps' separate Rivers and Harbors Act analysis is sufficient to satisfy its § 185 analysis, this opinion is a legal conclusion that this Court should not construe in Dakota Access's favor. *See Trudeau*, 372 F.3d at 193. Further, Dakota Access's opinion that the analysis is complete is expressly contradicted

---

[3] The Corps' letter cited by Dakota Access in its Cross Claim specifically states that the agency intends to continue analyze substantive requirements regarding pipeline safety, human and wildlife reliance on the affected area, and construction issues under 30 U.S.C. § 185(g), (h), and (k), as well easement conditions before either granting or denying the right-of-way. ECF No. 53-1 at pp. 2-3

by the Corps as set forth in the oil company's own Cross-Claim, and it is beyond dispute that "an executive department's construction of a statutory scheme it is entrusted to administer" must be accorded deference. *Chevron v. Natural Res. Defense Council, Inc.*, 467 U.S. 837, 843 (1984); ECF No. 53 at pp. 53-64; ECF No. 66-1 at p 16.

Absent either a decision or a record to support it, the question of whether Dakota Access is entitled to a right-of-way under 30 U.S.C. § 185 is not fit for judicial review. *See Abbott Laboratories*, 378 U.S. 149. The agency's current position on the requested right-of-way is conditional: pending further analysis and development of the record, the Corps may or may not grant the right-of-way. In *Nevada v. Dep't of Energy*, the D.C. Circuit Court of Appeals considered a challenge to the agency's interim transportation plan. 457 F.3d at 84. The plan at issue, like the pending right-of-way, was conditional—depending on events yet to occur, it may or may not have been implemented. *Id.* Applying the *Ohio Forestry Ass'n* factors, the Court held that in light of such uncertainty the agency action was not "sufficiently crystalized" to support a cognizable challenge. *Id.* at 84-5. Judicial intervention would have been premature and the court would benefit from further factual development. *See id.* As to the remaining *Ohio Forestry Ass'n* factor, concerning whether withholding judicial review would cause the pleading party hardship, the Court held that "requiring further administrative or judicial proceedings is not sufficient hardship" to weigh against a finding of unripeness. *Id.* (citing *Ohio Forestry Ass'n*, 523 U.S. at 735; *AT&T Corp. v. FCC*, 349 F.3d 692, 700 (D.C. Cir. 2003)); *see also Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1313 (D.C. Cir. 2004).

The Court held that the same factors demonstrated the lack of a final agency decision warranting APA review. *Id.* at 85-86. The Court observed that "there is nothing definitive in an agency's intending to do something." *Id.* And agency action is not fit for judicial review where

the action "rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all;" in such circumstances, further administrative action is needed to crystallize the agency's position. *Id.* at 86-87 (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)).

Here, the Corps has neither granted nor denied the right-of-way. Whether Dakota Access receives its right-of-way rests on contingent future events that may result in the oil company getting exactly what it wants, just not necessarily right now.[4] Until that time, this Court lacks subject matter jurisdiction to hear this challenge as it is not ripe; and, lacking a final agency action, Dakota Access has failed to state a claim on which relief can be granted. Consequently, Dakota Access's Cross-Claim must be dismissed pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

## IV.  SUMMARY JUDGMENT

In the alternative, the Cheyenne River Sioux Tribe opposes Dakota Access's motion for summary judgment and cross-moves for summary judgment on the grounds that there is no genuine issue of material fact, and Cheyenne River Sioux Tribe is entitled to judgment as a matter of law.

### A.  STATUTORY OVERVIEW

#### 1.  Section 408 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 408

Section 408 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 408 authorizes the Secretary of the Army to grant permission for alteration or use of public works under the jurisdiction of the Army. The statute sets forth just one substantive consideration that the Army

---

[4] Indeed, in the words of its CEO Kelcy Warren, the oil company is "100 percent sure that the pipeline will be approved by a Trump administration." Daniel A. Medina & Chiara Sottile, *What Will a Trump Presidency Mean for the Dakota Access Pipeline?* NBC News, Nov. 12 2016, http://www.nbcnews.com/storyline/dakota-pipeline-protests/what-will-trump-presidency-mean-dakota-access-pipeline-n682746 (last accessed Jan. 4, 2017).

must weigh before granting such permission:  the Secretary must determine that the proposed use or occupation "will not be injurious to the public interest and will not impair the usefulness of the [public] work."  *Id.*

The entirety of Section 408 is as follows:

> It shall not be lawful for any person or persons to take possession of or make use of for any purpose, or build upon, alter, deface, destroy, move, injure, obstruct by fastening vessels thereto or otherwise, or in any manner whatever impair the usefulness of any sea wall, bulkhead, jetty, dike, levee, wharf, pier, or other work built by the United States, or any piece of plant, floating or otherwise, used in the construction of such work under the control of the United States, in whole or in part, for the preservation and improvement of any of its navigable waters or to prevent floods, or as boundary marks, tide gauges, surveying stations, buoys, or other established marks, nor remove for ballast or other purposes any stone or other material composing such works:  Provided, That the Secretary of the Army may, on the recommendation of the Chief of Engineers, grant permission for the temporary occupation or use of any of the aforementioned public works when in his judgment such occupation or use will not be injurious to the public interest:  Provided further, That the Secretary may, on the recommendation of the Chief of Engineers, grant permission for the alteration or permanent occupation or use of any of the aforementioned public works when in the judgment of the Secretary such occupation or use will not be injurious to the public interest and will not impair the usefulness of such work.

33 U.S.C. § 408.

The Corps has established policy and procedural guidance pursuant to § 408 "for processing requests by private, public, tribal, or other federal entities, to make alterations to, or temporarily occupy or use, any [Corps civil works project]."  Declaration of Nicole Ducheneaux ("Ducheneaux Decl.") at Exhibit D, EC-1165-2-216.  The guidance provides "an overall step-by-step procedural guide" for § 408 requests.  The guide reiterates the statute's sole substantive criteria that the "activity will not be injurious to the public interest and will not impair the usefulness of the project," *id*. at 6(a), and elaborates on various ways in which that standard is met.  The guide explicitly warns potential applicants that permissions granted pursuant to 33 U.S.C. § 408, authorizing the applicant to make alterations to federal land, are standalone

19

approvals that do not provide the applicant with any permission under any other statute or any property rights.   Ducheneaux Decl. at Ex. D, 6(b).   Specifically, **"[a] requester has the responsibility to acquire all other permissions or authorizations required by federal, state, and local laws or regulations. . . .   In addition, an approval under Section 408 does not grant any property rights or exclusive privileges."** *Id.* (emphasis added).

### 2.   Mineral Leasing Act, 30 U.S.C. § 185

The Mineral Leasing Act ("MLA"), enacted in 1920, authorizes the United States to grant "[r]ights-of-way through any federal lands . . . for pipeline purposes for the transportation of oil, natural gas, synthetic liquid or gaseous fuels, or any refined product produced therefrom . . . in accordance with provisions of this section."  30 U.S.C. § 185(a).  The Act endows agencies with "broad power" to issue such rights-of-way, including "discretion to refuse to issue any lease at all on a given tract."  *Udall v. Tallman*, 380 U.S.1, 4 (1965).

In 1973, the Act was amended to "impose more stringent safety and liability standards." *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 287 (1975) (Brennan, J., dissenting); Act of Nov. 16, 1973, Pub. L. No. 93-153, 87 Stat. 576.  The resulting statute "places numerous responsibilities on an agency considering whether to permit construction on federal land, including safety requirements, notice requirements, and reporting requirements (including reporting to specific Congressional committees)" as well as compliance "with applicable environmental statutes and regulations, such as the National Environmental Policy Act."  *Sierra Club v. U.S. Army Corps of Engineers*, 99 F. Supp. 2d 9, 14-15 (D.D.C. 2013).  The stringent substantive requirements of the Act include the following:

- **Purpose of the reservation:** "A right-of-way through a Federal reservation shall not be granted if the Secretary or agency head determines that it would be inconsistent with the purposes of the reservation." 30 U.S.C. § 185(b)(1).

- **Width limitations:** Rights-of-way may not exceed fifty feet in width, unless the agency makes specific findings related to operation, environmental protection, and public safety. *Id.* at § 185(d).

- **Pipeline safety:** The agency shall impose conditions for all rights-of-way "that will protect the safety of workers and protect the public from sudden ruptures and slow degradation of the pipeline." *Id.* at § 185(g).

- **Environmental protection**: The Act incorporates the requirements of NEPA, and additionally requires the agency to develop regulations or impose stipulations that include:

  - Conditions requiring "restoration, revegetation, and curtailment of erosion of the surface of the land";

  - Conditions requiring that "activities in connection with the right-of-way or permit will not violate applicable air and water quality standards";

  - Conditions designed to control or prevent (1) damage to the environment, including fish and wildlife habitat, (2) damage to public or private property, and (3) hazards to public health and safety;

  - "[R]equirements to protect the interests of individuals living in the general area of the right-of-way or permit who rely on the fish, wildlife, and biotic resources of the area for subsistence purposes."

*Id.* at § 185(h).

21

- **Disclosure of financial information:**  The Act requires applicants to disclose the identity of and information concerning all participants in the entity, including partners and shareholders owning more than 3 percent of shares, and affiliates.  *Id.* at § 185(i).

- **Technical and financial capability:** An agency may not grant a right-of-way unless it is "satisfied that the applicant has the technical and financial capability to construct, operate, maintain, and terminate the project for which the right-of-way or permit is requested in accordance with the requirements of this section."  *Id.* at § 185(j).

- **Reimbursement of costs:**  The applicant must "pay annually in advance the fair market rental value of the right-of-way or permit."  *Id.* at § 185(l).

- **Bonding:**  The agency may require a right-of-way holder "to furnish a bond, or other security, satisfactory to the Secretary or agency head to secure all or any of the obligations imposed by the terms and conditions of the right-of-way."  *Id.* at § 185(m).

- **State standards:**  The Act requires the agency to take into consideration and comply with State standards that apply to the right-of-way.  *Id.* at § 185(v).

- **Congressional notification:**  "[N]o right-of-way for a pipeline shall be granted until a notice of intention to grant the right-of-way, together with the Secretary's or agency head's detailed findings as to the terms and conditions he proposes to impose has been submitted to [the Committee on Natural Resources of the United States House of Representatives and the Committee on Energy and Natural Resources of the United States Senate]."  *Id.* at § 185(w)(2).

The Army has developed regulations governing "outgrants," which it defines as "the written document setting out the terms and conditions of non-Army use of real property."  Army Reg. 405-80, ¶ 4-1(a).  These regulations were developed pursuant to the Army's "authority to

grant the use of real property under [its] administrative control" under numerous statutes, including 10 U.S.C. § 2667 (leases of non-excess military property); 43 U.S.C. § 961 (easements for electric power and communications lines); 10 U.S.C. § 2669 (easements for gas, water, and sewer pipelines); 10 U.S.C. § 2668 (easements for various rights-of-way); 10 U.S.C. § 4777 (easements for ferry landings, bridges, and livestock crossings); 40 U.S.C. § 319 (easements for "other purposes"); 16 U.S.C. § 460d (leases at water resource development projects); 16 U.S.C. § 663 (licenses for fish and wildlife conservation); and the Mineral Leasing Act, 30 U.S.C. § 185. Army Reg. 405-80, ¶ 1-4, Appendix B.

These Army Regulations, common to all outgrants issued pursuant to the nine statutes listed above, set forth a general substantive standard that any use of Army-controlled real property must "be in the public interest" and must be "compatible with the installation/project mission." *Id.* at ¶ 4-1(c). Importantly, however, the Regulations expressly acknowledge that the Army's authority to grant uses of real property are subject to the discrete "specific legislation giving the Secretary of the Army authority to grant the use of real property under his administrative control." *Id.* at ¶ 1-4(b).

Significantly, the Army Regulations also require that "[a]ll such non-Army use must be authorized by an appropriate realty instrument."[5]  *Id.*

### 3.  Standard of Review

A motion for summary judgment under Federal Rule of Civil Procedure 56(c) must be granted if this Court finds that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Gray v.*

---

[5]  An instrument is defined as a "written legal document that defines rights, duties, entitlements, or liabilities." BLACK'S LAW DICTIONARY (10th ed. 2014).

*Universal Serv. Admin. Co.*, 581 F. Supp. 2d 47, 52 (D. D.C. 2008) (quoting Fed. R. Civ. P. 56(c)).  On a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party.  *Gray*, 581 F. Supp. 2d at 52 (citing *Bayer v. United States Dep't of Treasury*, 956 F.2d 330, 333 (D.C. Cir. 1992)).  Mere allegations or denials are not sufficient to show a genuine issue of material fact, but the non-moving party must set forth specific facts showing that there are genuine issues for trial.  *Gray*, 581 F. Supp. 2d at 52 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986) (citation omitted)).  "The party moving for summary judgment bears the burden of establishing the absence of evidence that supports the non-moving party's case."  *Gray*, 581 F. Supp. 2d at 52.

## V.     ARGUMENT

### 1.     The Corps has not Granted Any Right-of-Way to Cross Federal Lands at Lake Oahe Pursuant to the Mineral Leasing Act, 30 U.S.C. § 185

Dakota Access's Cross-Claim is premised on the simple and faulty notion that the Corps has already granted it a right-of-way to cross federal lands at Lake Oahe pursuant to the Mineral Leasing Act, 30 U.S.C. § 185.  Lacking any document or decision that the right-of-way has been granted and in spite of the Corps' express statements that the right-of-way has not been granted and that it lacks sufficient information to make an assessment under the Act, Dakota Access argues, based wholly on informal indicia, that a constructive right-of-way exists.  This contention is both legally and factually incorrect.

The Mineral Leasing Act, 30 U.S.C. § 185 and the Army's regulations developed in conjunction with it are unequivocal that a right-of-way granted pursuant to the Act is a legal real estate instrument that is required to grant permission to cross over federal lands for pipeline purposes.  *Id.* at § 185(a); Army Reg. 405-80, ¶¶ 1-4(b), 4-1(a).  The Act sets forth stringent

safety and liability standards that must be met prior to issuance of a right-of-way.  30 U.S.C. §
185.  If those standards are not met, then the agency administering the Act may exercise its
"discretion to refuse to issue any lease at all on a given tract."  *Tallman*, 380 U.S. at 4.

Dakota Access argues that "right-of-way" under the Mineral Leasing Act has no specific
meaning.  Citing *Wilderness Soc'y v. Morton*, 479 F.2d 842, 853 (D.C. Cir. 1973), the oil
company claims that the D.C. Circuit has held that a right-of-way under the MLA is simply a
"right of passage over another person's land" and "'nothing more than a limited right of use,'"
hence permissions and statements related to authorization granted pursuant to Section 408 of the
Rivers and Harbors Act to conduct the activity that comprises building of the pipeline are all that
it needs.  This is not just twisted logic, it misrepresents the applicable law.  ECF No. 66-1at p.
22.

In fact, *Wilderness Society v. Morton* cuts against the oil company's argument.  In that
case, the Court considered whether the Bureau of Land Management violated the MLA when it
granted a "special land use permit," in addition to a right-of-way granted under the Act, that
exceeded the right-of-way width prescribed by the Act.  *Id.*  The Bureau of Land Management
argued that the excess width contained in the "special land permit" did not meet the definition of
"right-of-way" under the Act because it was temporary and hence it had not violated the MLA.
*Id.*  The Court disagreed.  In the passage cited by the oil company, the Court determined that the
"special land use permits" fell under the legal definition of a "right-of-way," hence they were
subject to the Act and violated the width limitation therein.  *Id.* at 853-56.  The Court recognized
that this interpretation of "right-of-way" created an immense burden on pipeline companies who
required the additional width for construction, yet the Court strictly construed the statute.  *Id.* at
864.  *Wilderness Society v. Morton*, therefore, fails to support to Dakota Access's contention that

25

any permission to conduct activity on federal land establishes a right-of-way under the MLA. To the contrary, it demonstrates that right-of-way requirements under the Act must be strictly construed and cannot be waived to accommodate industry practice or commercial exigencies.

Furthermore, in light of the broad discretion granted to the agency to apply these substantive principles to right-of-way applications, *Tallman*, 380 U.S. at 4, the granting of a right-of-way under the MLA is necessarily not a mere "ministerial act," a notion that Dakota Access champions without any citation to authority throughout its summary judgment brief. *See, e.g., City of Dover v. U.S. E.P.A*, 956 F. Supp. 2d 272, 282-83 (D.D.C. 2013) (distinguishing between nondiscretionary ministerial acts and acts over which an agency exercises discretion); *see also Decatur v. Paulding*, 39 U.S. 497, 516 (1840) ("There is no room for the exercise of any discretion, official or otherwise; all that is shut out by the direct or positive command of the law, and the act to be done is, in every just sense, a mere ministerial act.")

In light of the foregoing, it is critical that the 87,000-page record now before the Court concerning permissions granted to Dakota Access under Section 408 of the Rivers and Harbors Act does not contain anything that satisfies the requirements of 30 U.S.C. § 185 or the regulations developed in conjunction with it. None of these documents is an "outgrant," a "written document setting out the terms and conditions of non-Army use of real property." Army Reg. 405-80, ¶ 4-1(a). The documents likewise do not contain the specific statutory findings required under the Act, including materials that the Corps has specifically found lacking, for example information related to impacts of the pipeline on "those who rely on fish and wildlife in the area for subsistence." ECF 65-1 at p. 2 (citing 30 U.S.C. § 185).

Moreover, contrary to Dakota Access's claim that it already has a "right-of-way" under the Act, the record establishes that Dakota Access is well aware that it has never had the requisite

permission under 30 U.S.C. § 185 and the lack of such permission was an unequivocal barrier to their entry on to federal property.  On May 11, 2016, the Corps expressly reminded Dakota Access the right-of-way "is separate and distinct from the 'Section 408' permit."  AR 5732.  On July 25, 2016, the day the Section 408 permit was granted, the Corps specifically informed Joseph Mahmoud of Energy Transfers Partners that "[a]s previously mentioned, you cannot begin work at either the Lake Oahe Crossing or the Lake Sakakawea flowage easement properties until an easement or consent to easement, respectively are signed by our chief of Real Estate.  The easement for the Lake Oahe crossing also requires Congressional notification.  Mr. Rick Noel, Chief of Civil Branch, Real Estate Division will be your point of contact for this part of the process."  AR 71215.  On April 20, 2016, the Corps advised a retired Brigadier General working for Dakota Access that there are "items of risk that may delay" construction, including "the ability to get the easement through NWD, HQ, ASA and Congress between May and the date mentioned below.  DAPL will need a signed easement (Oahe crossing). . . ."  AR64275. The Brigadier General later forwarded that information to Mahmoud.  *Id.*  Counsel for Dakota Access affirmed its understanding of this fact in this Court proceeding on August 24, 2016 (Ducheneaux Decl. Ex. A)  and the Corps' counsel reiterated this information on both August 24, 2016 and September 16, 2016 (Ducheneaux Decl. Exs. B and C).

While these informal communications between Dakota Access and the Corps demonstrate that both sides understood that the oil company required a right-of-way under the MLA separate and apart from permissions under the Section 408 of the Rivers and Harbors Act, such informal communications fail to make any of the required MLA findings and do not establish that a right-of-way was granted.  Again, the record is totally devoid of any legal real estate instrument regarding the Lake Oahe crossing, which the statutory and regulatory scheme

requires, or any substantive findings under the statute.  Army Reg. 405-80, ¶¶ 1.4(b), 4-1(a); *see generally* 30 U.S.C. § 185.  Even to the extent that communications cited by Dakota Access regarding the MLA easement may be considered here, they did nothing more than express the Corps' opinion that it expected to grant the easement at some point in the future.  ECF No. 66-1 at pp. 7-12.  And then on September 9, 2016, the Corps explicitly stated that it was withholding its decision on the easement, a message that the Corps has consistently reiterated since then. ECF 42-1.

Dakota Access makes much of the fact that the Corps appears to have shifted its position internally on this issue prior to issuing a decision on the right-of-way, but this is of no legal consequence.  Agency discretion is so broad that even after an agency has issued a final a decision that has been properly challenged under the APA (a stage this dispute has plainly not reached), courts freely permit remand to the agency for reconsideration of those decisions "[e]ven in the absence of new evidence or intervening events" if the agency believes its original decision was incorrect.  *XP Vehicles, Inc. v. U.S. Dep't of Energy*, 156 F. Supp. 3d 185, 187 (D.D.C. 2016); *see also Code v. McHugh*, 139 F. Supp. 3d 465, 468 (D.D.C. 2015).  It is well-established that "administrative agencies have inherent power to reconsider their own decisions, since the power to decide in the first instance carries with it the power to reconsider." *Sierra Club v. Van Antwerp*, 560 F. Supp. 2d 21, 23 (D.D.C. 2008) (quoting *Prieto v. United States*, 655 F. Supp. 1187, 1191 (D.D.C. 1987).  Here, if the Corps experienced any changes in its institutional mindset, these occurred before any decision had been reached.  There is nothing either actionable or unusual about that.  *See*, Daniel A. Medina & Chiara Sottile, *What Will a Trump Presidency Mean for the Dakota Access Pipeline?* NBC News, Nov. 12 2016,

http://www.nbcnews.com/storyline/dakota-pipeline-protests/what-will-trump-presidency-mean-dakota-access-pipeline-n682746 (last accessed Jan. 4, 2017).

Nothing in the materials presented by Dakota Access in its Cross-Claim, its summary judgment briefing, or the administrative record demonstrates that the Corps has already issued a right-of-way under 30 U.S.C. § 185. The oil company's request for declaratory judgment must be denied and summary judgment must be entered against it.

## 2. Authorizations Pursuant to the Mineral Leasing Act, 30 U.S.C. § 185 and the Rivers and Harbors Act, 33 U.S. § 408 Are Wholly Substantively Distinct

Dakota Access's Cross-Claim also rests upon the indefensible argument that Section 408 of the Rivers and Harbors Act and the Mineral Leasing Act are "identical" and that "the MLA has no additional requirements" outside of the requirement that the subject action "will not be injurious to the public interest and will not impair the usefulness of the [public work]." ECF No. 66-1 at pp. 21-22 (citing 33 U.S.C. § 408). Merely laying eyes on the Mineral Leasing Act, 30 U.S.C. § 185, and its myriad subparts proves this claim untrue. This is likely why Dakota Access attempts to ignore the substance of the Act itself and bases its entire comparison of the two statutory schemes on the similarities between the text of Section 408 of the Rivers and Harbors Act ("will not be injurious to the public interest") and the text of the Army Regulation 405-80, ¶ 4-1(c), an Army regulation common to all Army real estate outgrants ("[t]he use granted must be . . .in the public interest").

Although the Army Regulations indeed use the same phrase ("public interest") as Section 408, reliance upon the Army Regulations offers Dakota Access no help. The regulations stress that in addition to the policies and procedures that the regulations describe, the Army's authority to grant uses of real property are subject to the "specific legislation giving the Secretary of the Army authority to grant the use of real property under his administrative control." *Id.* at ¶ 1-4(b).

This echoes the admonition contained in the Corps' regulations that govern Section 408 permits, which warn that the applicant for a 408 permit "has the responsibility to acquire all other permissions or authorizations required by federal, state, and local laws or regulations" and that "an approval under Section 408 does not grant any property rights or exclusive privileges." Ducheneaux Decl. Ex. D, EC-1165-2-216, 6(b).  For Section 408 applicants that intend to build an oil pipeline across Corps-owned lands, like Dakota Access, this means the applicant has the responsibility to acquire a right-of-way under the Mineral Leasing Act, 30 U.S.C. § 185.  And in addition to evaluating the impact on the "public interest" as set forth in the general Army Regulation, the agency must also make the specific statutory findings set forth in MLA prior to granting a right-of-way and has the discretion to refuse to issue any lease at all.  *Tallman*, 380 U.S. at 4.

Further, in spite of Dakota Access's claim that the "public interest" angle causes the MLA and the RHA to "merge" (ECF No. 66-1 at p. 20), Dakota Access can cite no case in which any court has ever held that the Mineral Leasing Act and the Rivers and Harbors Act are subject to a single substantive analysis.  On the contrary, there are numerous cases in which courts have closely analyzed the statutory right-of-way requirements set forth in 30 U.S.C. § 185 that Dakota Access elides in its briefing.  *E.g.*, *No Oilport v. Carter*, 520 F.Supp. 334, 359 (D.C.D. 1981); *Sierra Club v. United States*, 990 F.Supp.2d 9, 14-15 (D.C.D. 2013); *Alyeska Pipeline Service Co. v. United States*, 824 F.2d 1005, 1013 (Ct. of Claims 1980); *State of Alaska v. United States*, 32 Fed.Cl. 689, 693 (Fed. Cl. 1995).  There are no Mineral Leasing Act right-of-way cases that hinge on the "public interest" standard set forth in the Army Regulations.

Instead of citing authority for its claim that the Mineral Leasing Act and the Rivers and Harbors Act are subject to a single analysis, Dakota Access argues seemingly on equitable

grounds that it is entitled a single process that ignores the Mineral Leasing Act requirements because Dakota Access understood that the Corps would treat the two analyses "as one and the same."  ECF No. 66 at pp. 23-25.  Again, it can cite no support for this argument and instead relies upon the Corps' informal communications discussed in part (V)(1) *supra*.  Dakota Access seems to complain that this allegedly "unitary" Mineral Leasing Act / Rivers and Harbors Act process constituted a past practice from which the Corps has improperly deviated.  Even if that were true (and the oil company's briefing does not offer any evidence of that contention), alleged agency inconsistency is properly addressed in an APA claim, which Dakota Access has taken pains not to bring in this case in light of the lack of a final agency action.  *See Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 454 U.S. 967, 981 (2005).  Nevertheless, if Dakota Access's claim is that this Court should enjoin the Corps to dispense with the substantive requirements of the Mineral Leasing Act because the agency's past practice led the oil company to believe the Rivers and Harbors Act approvals were sufficient, then that claim must fail. Dakota Access offers no support for the notion that explicit statutory provisions are repealed by an agency's past practice.  Further, agency practice and statutory interpretation are never carved in stone.  "On the contrary, the agency must consider varying interpretations and the wisdom of its policy on a continuing basis."  *Id.* (quoting *Chevron*, 467 U.S. at 836-64).

Dakota Access's claim that the Mineral Leasing Act, 30 U.S.C. § 185 and Section 408 of the Rivers and Harbors Act are indistinguishable wholly lacks merit and should be disregarded. Evidence that the Corps determined that the oil company was entitled to a Section 408 permit is not sufficient to demonstrate that Dakota Access is entitled to a right-of-way pursuant to the Mineral Leasing Act.  This Court, therefore, should deny Dakota Access's claim for declaratory judgment and enter summary judgment against it.

31

**CONCLUSION**

As set forth fully herein, the Cheyenne River Sioux Tribe respectfully requests that the Court enter an order dismissing Dakota Access's cross claim on the ground that it is unripe and in the alternative that the Court enter summary judgment in favor of the Tribe.

Dated: January 6, 2017

CHEYENNE RIVER SIOUX TRIBE,
Intervenor-Plaintiff,

By:   /s/ Nicole E. Ducheneaux
    Nicole E. Ducheneaux, *Pro Hac Vice*
    Joseph V. Messineo, *Pro Hac Vice*
    Fredericks Peebles & Morgan LLP
    3610 North 163rd Plaza
    Omaha, NE  68116
    Telephone:  (402) 333-4053
    Facsimile:  (402) 333-4761
    Email: nducheneaux@ndnlaw.com

    Conly J. Schulte
    FREDERICKS PEEBLES & MORGAN LLP
    1900 Plaza Drive
    Louisville, CO  80027
    Telephone:  (303) 673-9600
    Facsimile:  (303) 673-9839
    Email:  cschulte@ndnlaw.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 6th day of January, 2017, a copy of the foregoing was filed electronically with the Clerk of the Court.  The electronic filing prompted automatic service of the filing to all counsel of record in this case who have obtained CM/ECF passwords.


_____/s/ Nicole E. Ducheneaux_____