IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STANDING ROCK SIOUX TRIBE,

                        Plaintiff,

     v.

U.S. ARMY CORPS OF ENGINEERS,

                        Defendant.

Case No. 1:16-cv-1534-JEB

**MEMORANDUM IN SUPPORT OF STANDING ROCK SIOUX TRIBE'S MOTION TO DISMISS AND CROSS-MOTION FOR SUMMARY JUDGMENT**

Patti A. Goldman, DCB # 398565
Jan E. Hasselman, WSBA # 29107
(*Admitted Pro Hac Vice*)
Stephanie Tsosie, WSBA # 49840
(*Admitted Pro Hac Vice*)
Earthjustice
705 Second Avenue, Suite 203
Seattle, WA  98104
Telephone:  (206) 343-7340
pgoldman@earthjustice.org
jhasselman@earthjustice.org
stsosie@earthjustice.org

*Attorneys for Plaintiff*

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

BACKGROUND .................................................................................................2

    I.      THE STANDING ROCK SIOUX TRIBE AND THE OAHE SITE ....................2

         A.     The Fort Laramie Treaties and Subsequent Statutes....................................2

         B.     The Authorization of the Oahe Project ........................................................4

         C.     The Federal Government's Treaty and Trust Obligations to the
              Tribe .............................................................................................................5

    II.     THE TRIBE'S CONCERNS OVER THE DAKOTA ACCESS PIPELINE
         AND THE LAKE OAHE CROSSING................................................................8

         A.     The Tribe Immediately Raised Concerns About the Lake Oahe
              Crossing ......................................................................................................8

         B.     The Corps' Issuance of a Draft Environmental Assessment that
              Ignored the Tribe Elevated the Tribe's Concerns ....................................10

         C.     The July 25 Clean Water Act and § 408 Decisions ..................................13

    III.    THE SEPTEMBER 9 AGENCY DECISION AND SUBSEQUENT
         CONSIDERATION BY THE FEDERAL AGENCIES ........................................14

STATUTORY OVERVIEW ...............................................................................17

    I.      THE MINERAL LEASING ACT, 30 U.S.C. § 185............................................17

    II.     SECTION 408 OF THE RIVERS AND HARBORS ACT ..................................18

STANDARD OF REVIEW .................................................................................20

ARGUMENT ...................................................................................................21

    I.      THE CORPS HAS NOT GRANTED THE §185 EASEMENT, NOR CAN
         AN EASEMENT BE IMPUTED FROM NEPA DOCUMENTS AND
         INFORMAL STATEMENTS................................................................................21

         A.     The §185 Easement Was Never Granted, Nor Can an Easement be
              Imputed. ....................................................................................................21

         B.     A §185 Easement is a Separate Decision, Subject to Different
              Standards, than a § 408 Authorization........................................................26

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

II.     DAPL CANNOT CHALLENGE THE CORPS' DECISION TO
        CONDUCT ADDITIONAL REVIEW BEFORE DECIDING WHETHER
        TO ISSUE THE EASEMENT ...............................................................................29

        A.     This Court Has No Jurisdiction to Review the Corps' Decision to
               Conduct an EIS. ......................................................................................29

        B.     The Corps was Correct to Withhold the Easement Pending Further
               Review. ...................................................................................................31

III.    EVEN IF DAPL'S CLAIMS HAD MERIT, THIS COURT SHOULD
        NOT ISSUE A DECLARATORY JUDGMENT UNTIL THE TRIBE'S
        CLAIMS CAN BE RESOLVED. .........................................................................34

        A.     Issuance of a Declaratory Judgment is Disfavored Where it Won't
               Resolve the Legal Issues in the Case .......................................................34

        B.     The Court Should Decline to Issue the Requested Declaratory
               Judgment Before Resolving the Tribe's Claims. ......................................36

CONCLUSION ................................................................................................................37

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

TABLE OF AUTHORITIES

**Cases**

*Aluminum Co. of Am. v. United States*,
  790 F.2d 938 (D.C. Cir. 1986) ............................................................... 31

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ............................................................................... 20

*Appalachian Power Co. v. E.P.A.*,
  208 F.3d 1015 (D.C. Cir. 2000) ............................................................. 30

*Bennett v. Spear*,
  520 U.S. 154 (1997) ............................................................................... 29

*California Co. v. Udall*,
  296 F.2d 384 (D.C. Cir. 1961) ............................................................... 17

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ............................................................................... 20

*Cmtys. for a Great Nw., Ltd. v. Clinton*,
  112 F. Supp. 2d 29 (D.D.C. 2000) ......................................................... 31

*Covelo Indian Cmty. v. FERC*,
  895 F.2d 581 (9th Cir. 1990) ................................................................... 6

*Ctr. for Biological Diversity v. England*,
  No. 02-5163, 2003 WL 179848 (D.C. Cir. Jan. 23, 2003) ..................... 24

*Ctr. for Biological Diversity v. Pirie*,
  191 F. Supp. 2d 161 (D.D.C. 2002) ....................................................... 24

*FiberLight, LLC v. Nat'l R.R. Passenger Corp.*,
  81 F. Supp. 3d 93 (D.D.C. 2015) ........................................................... 36

*Fourth Branch Assocs. v. F.E.R.C.*,
  253 F.3d 741 (D.C. Cir. 2001) ............................................................... 30

*Friends of Tims Ford v. Tenn. Valley Auth.*,
  585 F.3d 955 (6th Cir. 2009) ................................................................. 24

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
  460 F.3d 13 (D.C. Cir. 2006) ................................................................. 21

*Glenn v. Thomas Fortune Fay*,
  __F. Supp. 3d__, 2016 WL 7131463 (D.D.C. Dec. 6, 2016) ................. 35

*Haley v. Seaton*,
  281 F.2d 620 (D.C. Cir. 1960) ............................................................... 17

*Hanes Corp. v. Millard*,
  531 F.2d 585 (D.C. Cir. 1976) ............................................................... 35

*Headwaters, Inc. v. Talent Irrigation Dist.*,
  243 F.3d 526 (9th Cir. 2001) ................................................................. 28

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

*Hisler v. Gallaudet Univ.,*
    344 F. Supp. 2d 29 (D.D.C. 2004) ...................................................................... 36

*In re Am. River Transp. Co.,*
    800 F.3d 428 (8th Cir. 2015) ........................................................................... 19

*Klamath Water Users Protective Ass'n v. Patterson,*
    204 F.3d 1206 (9th Cir. 1999) ............................................................................ 7

*Landis v. North Am. Co.,*
    299 U.S. 248 (1936) ......................................................................................... 36

*Laningham v. U.S. Navy,*
    813 F.2d 1236 (D.C. Cir. 1987) ........................................................................ 21

*Maydak v. United States,*
    630 F.3d 166 (D.C. Cir. 2010) .......................................................................... 21

*MedImmune v. Genentech, Inc.,*
    549 U.S. 118 (2007) ......................................................................................... 35

*Menominee Tribe v. United States,*
    391 U.S. 404 (1968) ........................................................................................... 6

*Nance v. EPA,*
    645 F.2d 701 (9th Cir. 1981) .............................................................................. 6

*Nat'l Coal. to Save Our Mall v. Norton,*
    161 F. Supp. 2d 14 (D.D.C. 2001) .................................................................... 24

*Nat'l Parks Conservation Ass'n v. Norton,*
    324 F.3d 1229 (11th Cir. 2003) ........................................................................ 30

*Native Ecosystems Council v. Dombeck,*
    304 F.3d 886 (9th Cir. 2002) ............................................................................ 24

*Ne. Utilities Serv. Co. v. FERC,*
    993 F.2d 937 (1st Cir. 1993) ............................................................................ 27

*Norton v. Southern Utah Wilderness Alliance,*
    542 U.S. 55 (2004) ........................................................................................... 31

*Nw. Sea Farms, Inc. v. U.S. Army Corps of Eng'rs,*
    931 F. Supp. 1515 (W.D. Wash. 1996) ................................................................ 7

*ONRC Action v. Bureau of Land Mgmt.,*
    150 F.3d 1132 (9th Cir. 1998) .......................................................................... 30

*Perkins v. Lukens Steel Co.,*
    310 U.S. 113 (1940) ......................................................................................... 18

*Pine River Irrigation Dist. v. U.S.,*
    656. F. Supp. 2d 1298 (D. Colo. 2009) ............................................................ 22

*POM Wonderful LLC v. F.T.C.,*
    894 F. Supp. 2d 40 (D.D.C. 2012) .................................................................... 36

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

*Portland Cement Ass'n v. E.P.A.*,
665 F.3d 177 (D.C. Cir. 2011) ................................................................. 30

*Pub. Citizen v. Office of U.S. Trade Representatives*,
970 F.2d 916 (D.C. Cir. 1992) ................................................................. 30

*Pyramid Lake Paiute Tribe v. Morton*,
354 F. Supp. 252 (D.D.C. 1972) ................................................................. 7

*Radzanower v. Touche Ross & Co.*,
426 U.S. 148 (1976) ................................................................. 29

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989) ................................................................. 23

*Scheuer v. Rhodes*,
416 U.S. 232 (1974) ................................................................. 21

*Sierra Club v. U.S. Dep't of Energy*,
825 F. Supp. 2d 142 (D.D.C. 2011) ................................................................. 23, 24

*The Barbara Cates v. United States*,
17 F. Supp. 241 (E.D. Pa. 1936) ................................................................. 19

*Trudeau v. FTC*,
456 F.3d 178 (D.C. Cir. 2006) ................................................................. 21

*U.S. ex rel. Jordan v. Ickes*,
143 F.2d 152 (D.C. Cir. 1944) ................................................................. 17

*Udall v. Tallman*,
380 U.S. 1 (1965) ................................................................. 17

*United States v. Adair*,
723 F.2d 1394 (9th Cir. 1983) ................................................................. 6

*United States v. Dion*,
476 U.S. 734 (1986) ................................................................. 6

*United States v. Gila River Valley Irrigation Dist.*,
920 F. Supp. 1444 (D. Ariz. 1996) ................................................................. 5

*United States v. Mitchell*,
463 U.S. 206 (1983) ................................................................. 6

*United States v. Sioux Nation*,
448 U.S. 371 (1980) ................................................................. 3

*United States v. Winans*,
198 U.S. 371 (1905) ................................................................. 6

*Vill. of Bensenville v. FAA*,
457 F.3d 52 (D.C. Cir. 2006) ................................................................. 31

*Watt v. Alaska*,
451 U.S. 259 (1981) ................................................................. 29

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

*Wilton v. Seven Falls Co.*,
   515 U.S. 277 (1995) ................................................................................... 35, 36

*Winters v. United States*,
   207 U.S. 564 (1908) ....................................................................................... 5

**Statutes**

11 Stat. 749 (Sept. 17, 1851) ............................................................................. 2

11 Stat. 749, Art. 3 ............................................................................................ 3

11 Stat. 749, Art. 5 ............................................................................................ 2

15 Stat. 635 (Apr. 29, 1868) ............................................................................. 3

15 Stat. 635, Art. 12 .......................................................................................... 3

15 Stat. 635, Art. 16 .......................................................................................... 3

15 Stat. 635, Art. 2 ............................................................................................ 3

28 U.S.C. § 2201(a) .......................................................................................... 35

30 U.S.C. § 185 ................................................................................................. 17

30 U.S.C. § 185(a) ............................................................................................ 17

30 U.S.C. § 185(f) ............................................................................................. 17

30 U.S.C. § 185(h) ............................................................................................ 17

30 U.S.C. § 185(h)(2)(D) ................................................................................. 33

30 U.S.C. § 185(i) ............................................................................................. 17

30 U.S.C. § 185(j) ............................................................................................. 17

30 U.S.C. § 185(k) ............................................................................................ 18

30 U.S.C. § 185(l) ............................................................................................. 18

30 U.S.C. § 185(m) ...................................................................................... 18, 33

30 U.S.C. § 185(q) ............................................................................................ 18

30 U.S.C. § 185(w) ........................................................................................... 23

30 U.S.C. § 186(j) ............................................................................................. 33

33 C.F.R. § 330.6(a)(3)(1) ............................................................................... 28

33 U.S.C. § 408 ................................................................................................. 19

5 U.S.C. § 706 .................................................................................................... 2

5 U.S.C. § 706(1) .............................................................................................. 31

5 U.S.C. § 706(2) .............................................................................................. 29

19 Stat. 254 (Feb. 28, 1877) ............................................................................... 4

25 Stat. 888 (Mar. 2, 1889) ................................................................................ 4

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

Pub. L. No. 85-915, 72 Stat. 1762 (Sep. 2, 1958) ........................................................ 4, 6

**Other Authorities**

10 WRIGHT & MILLER, § 2759 (1973) ........................................................................... 35

Exec. Order 13,175, Consultation and Coordination with Indian Tribal Governments, 65 Fed. Reg. 67249 (Nov. 6, 2000) ........................................................................... 7

S. Rep. No. 102-267 (1992) ........................................................................................... 4

**Regulations**

33 C.F.R. § 209.170(b)-(c) ........................................................................................... 19

33 C.F.R. § 330.1(e)(2) ................................................................................................. 28

40 C.F.R. § 1500.1(b) ................................................................................................... 23

40 C.F.R. § 1502.20 ...................................................................................................... 24

Army Reg. 405-80 4-1(c) .............................................................................................. 22

Army Reg. 405-80, ¶ 3-1 .............................................................................................. 18

Army Reg. 405-80, ¶ 4-1 .............................................................................................. 18

Army Reg. 405-80, ¶ 4-1(a) ..................................................................................... 18, 22

Army Reg. 405-80, ¶ 4-1(b) .......................................................................................... 18

Army Reg. 405-80, ¶ 4-1(c) .......................................................................................... 27

Army Reg. 405-80, ¶ 4-1(d) .......................................................................................... 18

Army Reg. 405-80, ¶¶ 4-8 ............................................................................................ 18

Army Reg. 405-80, p. 11 ............................................................................................... 22

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

## INTRODUCTION

The Standing Rock Sioux Tribe ("Tribe") respectfully submits this memorandum in support of its motion to dismiss, and cross-motion for summary judgment on, the cross-claim filed by Dakota Access Pipeline, LLC ("DAPL"). DAPL contends that the Corps has already issued the easement legally required under the Mineral Leasing Act ("MLA"), 30 U.S.C. § 185, to cross Lake Oahe, and that DAPL may proceed with construction under the Lake without additional federal action. This argument fails, as the legally required easement under the MLA to convey the right to cross federal lands has not been issued and the process of considering the easement remains ongoing. The record is replete with evidence that the easement decision has not yet been made, and the U.S. Army Corps of Engineers ("Corps") has never made the requisite findings required by the statute. DAPL cannot impute a final real estate transaction under the MLA from equivocal statements in emails and a public relations handout.

DAPL's cross-claim also fails because it is based on a legal fallacy – that approval under one statute implies approval under a different statute. The heart of their argument is that the permit under § 408 of the Rivers and Harbors Act ("RHA"), which the Corps granted in July of this past year, automatically constitutes approval under the MLA. But the RHA is a regulatory statute under which the Corps issues permits based on a series of factors, while the MLA governs federal property management and is administered under a different set of standards by a separate Corps division. DAPL asks this Court for a ruling that would require the Corps to ignore the scheme Congress enacted in these two complementary but separate statutes.

Contrary to DAPL's argument, the Corps has properly determined that further review is necessary to comply with the MLA. To the extent DAPL is claiming that the Corps' December 4, 2016 determination to undertake further review before issuing the easement was unlawful, this Court has no jurisdiction to hear this claim because the Corps has not denied the

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

easement.  Instead, the Corps has chosen to consider impacts of the requested easement on the

Tribe, including its Treaty rights, through an environmental impact statement.  Such a decision is

not a reviewable "final agency action" under the Administrative Procedure Act ("APA"),

5 U.S.C. § 706.  The Corps was well within its rights—in the Tribe's view, legally compelled

under its trust responsibility—to review the impacts of the pipeline on the Tribe's rights,

including reserved Treaty water, fishing, and hunting rights, before finalizing a decision under

the MLA.  Accordingly, the Court should dismiss the cross-claim and allow the environmental

impact statement process assessing the pipeline's impact on the Tribe's Treaty rights, and

alternative routes outside the Tribe's Treaty territory, to proceed.

BACKGROUND

DAPL's cross-claim arises in the context of a long and troubling history between the

United States Government and the Standing Rock Sioux Tribe.  This context is important here

because it provides an integral part of the legal foundation for the Corps' recent actions, which

DAPL continually mischaracterizes as arbitrary or politicized.

I.      THE STANDING ROCK SIOUX TRIBE AND THE OAHE SITE

   A.      The Fort Laramie Treaties and Subsequent Statutes

The Standing Rock Sioux Tribe ("Tribe") is a federally recognized Tribe and successors

to the Great Sioux Nation, or Oceti Sakowin.  Under the 1851 Fort Laramie Treaty, Sept. 17,

1851, 11 Stat. 749, several tribes of the northern Great Plains, including the Sioux, agreed with

the United States to establish peace and to recognize the territory of each tribe.  In the 1851

Treaty, the United States recognized an expansive territory for the Great Sioux Nation, including

large portions of North and South Dakota, as well as parts of Nebraska, Wyoming and Montana.

*Id.* Art. 5.  *See* Ex. 1 (map of 1851 Sioux reservation).  The United States bound itself to

"protect" the Great Sioux Nation "against the commission of all depredations by the people of

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

the said United States..."  11 Stat. 749, Art. 3.  Soon thereafter, however, the discovery of gold led to an influx of immigrants into this territory.  In derogation of the promises made in the Treaty, the United States did not stop these incursions or their destruction of the buffalo on which the Sioux relied for sustenance and other needs.  *See United States v. Sioux Nation*, 448 U.S. 371, 376-382 (1980).  Conflicts followed in which the Sioux fought to protect the integrity of their treaty lands.  *Id.*

The Fort Laramie Treaty of 1868, Apr. 29, 1868, 15 Stat. 635, was an effort to restore peace.  In that Treaty, the Sioux reserved the Great Sioux Reservation for the "absolute and undisturbed use and occupation" of the Sioux Nation.  *Id.* Art. 2.  Ex. 2 (map of 1868 reservation).  The Treaty also secured to the Sioux an additional area of land, defined as "unceded Indian territory," and the United States promised that "no white person or persons shall be permitted to settle upon or occupy any portion of the same; or without the consent of the Indians first had and obtained, to pass through the same."  15 Stat. 635, Art. 16.  In the 1868 Treaty, the United States further promised that no cession of lands by the Tribe would be valid "unless executed by at least three-fourths of all the adult male Indians."  *Id.* Art. 12.

The United States soon violated the promises it made in these treaties.  *United States v. Sioux Nation*, 448 U.S. at 383.  The federal government allowed gold miners and others to trespass on the reserved and unceded Sioux lands, and told the Sioux they could no longer hunt on the territories where they had reserved treaty rights to hunt.  Moreover, having destroyed the buffalo and ordered the Sioux to leave their hunting grounds, the United States refused to provide the subsistence rations promised in the treaties.  In other words, the United States tried to starve the Sioux to force them to give up their lands.  *Id.* at 388 ("a more ripe and rank case of dishonorable dealings will never, in all probability, be found in our history…").

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

By statute enacted in 1877, the United States purported to ratify an "agreement" made in 1876 with the Sioux to take large portions of lands reserved for the Sioux under the two Fort Laramie Treaties. *See* Act of Feb. 28, 1877, 19 Stat. 254. However, that "agreement" was signed by only ten percent of the adult Sioux males, and so fell far short of the three quarters of the adult males required by the 1868 Treaty. Subsequently, in 1889, Congress again enacted a statute that stripped vast portions of the Treaty lands, leaving several much smaller Sioux Reservations, including the modern-day Standing Rock Sioux Reservation. Act of Mar. 2, 1889, ch. 405, 25 Stat. 888. Ex. 3 (map of current reservations).

B.      The Authorization of the Oahe Project

This history of federal dispossession of the Tribe's lands and violations of the Treaties continued into the modern era. In 1958, Congress enacted legislation that took 56,000 acres of the Tribe's reservation lands along the Missouri River for the Oahe project, the purpose of which was to provide for flood control downstream. Act of Sept. 2, 1958, Pub. L. No. 85-915, 72 Stat. 1762. The lands that were taken for the Oahe Project were the best remaining lands of the Reservation. S. Rep. No. 102-267, at 188 (1992). For example, ninety percent of the Reservation's timber was found along the Missouri River. The bottomlands provided important habitat for animals that were needed for subsistence, and were fertile lands where families had garden plots. The taken lands were also important as a source of wild berries and other plants which were essential to the Tribe's diet and which had medicinal and religious significance. *Id.*

Hundreds of Standing Rock families lost their homes, as whole communities were forced to move from the sheltered and resource rich lands along the Missouri River to windswept uplands. *Id.* at 188-89. These events took place within the living memory of many current tribal members and leaders. Ex. 4 at 34 ("And in my lifetime, a national sacrifice area to build the dams so that there could be hydropower and revenue in the national interest for this country; and

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

taking my home, flooding it, in the middle of a cold winter.  I know what it is to be homeless.  I know what it is to be hungry in this great land of plenty, where we lived in the richest riverbed in the world.").  These losses devastated the Tribal economy and left the Tribal community with longstanding and abiding economic poverty.  AR 66166 at 14-15 (Tribe "continues to face very significant social and economic challenges, including poverty and its related ills…The Oahe flooding of 56,000 acres in particular was a devastating event in the life of the Tribe, which caused extensive physical, economic, and social dislocation"); AR 67201, at P-1 (Missouri River programmatic agreement) ("The loss of our river homes affected every aspect of the quality of our lives:  spiritual, mental, physical, emotional, and socio-economic lifeways, all of which make up our very identity as Native Peoples.").

     C.     <u>The Federal Government's Treaty and Trust Obligations to the Tribe</u>

Today, the Standing Rock Sioux Reservation encompasses roughly 3,500 square miles of North and South Dakota, with Lake Oahe running north and south along the entire Reservation, supplying the primary water source for the Reservation.  Under well-settled law, the Standing Rock Reservation includes water rights in the Missouri River sufficient to sustain the purposes for which the Reservation was established.  Accordingly, the Tribe holds, as a property right, water sufficient to sustain the Reservation, now and in the future, as a permanent homeland for the Tribe.  *Winters v. United States*, 207 U.S. 564, 577 (1908); *see* also AR 5750 (Department of Interior letter) (affirming Tribe's *Winters* rights to Lake Oahe).  This entails both a sufficient quantity and quality of water to meet these beneficial purposes, and impairment of water quality is a violation of *Winters'* rights.  *See*, *e.g.*, *United States v. Gila River Valley Irrigation Dist.*, 920 F. Supp. 1444, 1448 (D. Ariz. 1996).  The Tribe relies upon the waters of Lake Oahe for drinking water for tribal members' homes, as well as the hospital, schools, tribal businesses and tribal administrative buildings throughout the Reservation.  The Tribe also relies on the waters of Lake

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

Oahe for agriculture (both farming and grazing) as well as industrial purposes.  Additionally, the waters of the Missouri River are sacred to the Tribe, a cultural and spiritual resource that is central to the Tribe's practice of religion.  Archambault Preliminary Injunction Decl., (ECF 6-1), at ¶¶8, 12; Eagle Preliminary Injunction Decl., (ECF 6-2), at ¶¶11, 25, 30.

The Standing Rock Sioux Tribe also retains rights to hunt, fish and gather on the reservation.  *Menominee Tribe v. United States*, 391 U.S. 404 (1968); *United States v. Dion*, 476 U.S. 734, 738 (1986) ("Indians enjoy exclusive treaty rights to hunt and fish on lands reserved to them . . . [and] [t]hese rights need not be expressly mentioned in the treaty").  These rights were explicitly preserved when Congress authorized the Oahe project.  Pub. L. 85-915, § 10, 72 Stat. 1762, 1764.  The courts have recognized that rights to subsist through hunting, fishing and gathering natural resources were "not much less necessary to the existence of the Indians than the atmosphere they breathed."  *United States v. Winans*, 198 U.S. 371, 381 (1905).  Tribal water rights under the *Winters* doctrine include a sufficient source of water necessary to support their hunting and fishing rights.  *United States v. Adair*, 723 F.2d 1394, 1409, 1411 (9th Cir. 1983).

The obligations assumed by the United States under its Treaties are further subject to the federal government's trust responsibility to the tribes.  The "undisputed existence of a general trust relationship between the United States and the Indian people," *United States v. Mitchell*, 463 U.S. 206, 225 (1983), is well established.  The trust responsibility applies to all actions of all federal agencies in the Executive Branch impacting Tribes.  *Nance v. EPA*, 645 F.2d 701, 711 (9th Cir. 1981); *Covelo Indian Cmty. v. FERC*, 895 F.2d 581, 586 (9th Cir. 1990) ("The same trust principles that govern private fiduciaries determine the scope of FERC's obligations to the [Indian] Community").  The federal government's trust responsibility applies to all agencies, including the Army Corps.  *See, e.g., Nw. Sea Farms, Inc. v. U.S. Army Corps of Eng'rs*, 931 F.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

Supp. 1515, 1519-20 (W.D. Wash. 1996).

The trust responsibility has been affirmed in federal policy; *see, e.g.*, Exec. Order 13,175, Consultation and Coordination with Indian Tribal Governments, 65 Fed. Reg. 67249 (Nov. 6, 2000), AR 66767 (Obama 2009 Memorandum on Tribal Consultation) ("History has shown that failure to include the voices of tribal officials in formulating policy affecting their communities has all too often led to undesirable and, at times, devastating and tragic results."); and memorialized in the policies of both the Department of Defense and the Army Corps.  *See* Hasselman Preliminary Injunction Decl., Ex. 60 (ECF 24-7) at 3 (Corps "will ensure that it addresses Tribal concerns regarding protected tribal resources, tribal rights (including treaty rights) and Indian lands."); *id.* at 9 (DOD "policy recognizes the importance of understanding and addressing the concerns of Federally-recognized Tribes prior to reaching decisions on matters that may have the potential to significantly affect tribal rights, tribal lands, or protected tribal resources."); *see also* AR 67201 (Missouri River programmatic agreement).

In sum, while the Oahe project took important Reservation land, the Tribe retains reserved water, fishing, and hunting rights in and around Lake Oahe.  These rights are fundamental to the Tribe's survival and well-being on its Reservation.  The federal government has clear obligations to protect those rights in accordance with its trust responsibility.  *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1213-14 (9th Cir. 1999); *Pyramid Lake Paiute Tribe v. Morton*, 354 F. Supp. 252, 256 (D.D.C. 1972).  The Corps "owes a fiduciary duty to ensure that the [Indian] Nation's treaty rights are not abrogated or impinged… [The trust responsibility] mandates that the Corps take treaty rights into consideration" when it issues permits or other approvals.  *Nw. Sea Farms, Inc.*, 931 F. Supp. at 1520.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

II.     THE TRIBE'S CONCERNS OVER THE DAKOTA ACCESS PIPELINE AND THE
        LAKE OAHE CROSSING

    A.     <u>The Tribe Immediately Raised Concerns About the Lake Oahe Crossing</u>

The proposal to build the Dakota Access Pipeline across the Tribes' treaty territory, and

across the Missouri a half a mile upstream of the Standing Rock reservation, continued a historic

pattern of taking actions that benefit others in derogation of the law and without the Tribe's

consent.  The Tribe's position regarding this pipeline in this sensitive location has been clear

from the outset, and it registered its strong concerns about the proposed routing at the very

earliest opportunity.  *See*, *e.g.*, AR 67148 (September 2014) ("The SRST would like to consult

on the Dakota Access pipeline and feels a meeting is in order as soon as possible… This pipeline

project is extremely important to the SRST because of its proximity to our homelands.  It is

proposed to cross our boundaries under the 1851 and 1868 Fort Laramie treaties.").[1]  Indeed,

many of these communications took place months before DAPL even applied for permits.  *See*,

*e.g.*, AR 67157; 67368 (permits applied for Dec. 29, 2014).

The Tribe also communicated its concerns directly to DAPL.  In September of 2014,

DAPL staff visited Standing Rock to describe the project.  As the transcript of the recorded

meeting reveals, the Tribe's reaction to the location chosen by DAPL for the Missouri crossing

was unambiguous.  Ex. 4.  Chairman Archambault opened the meeting by reminding DAPL's

staff that the land crossed the Tribe's Treaty boundaries and that the Tribe could not support the

project.  *Id.* at 4 ("We have a standing resolution that was passed in 2012 that opposes any

---

[1] This email, in which the Tribe's Tribal Historical Preservation Office reached out affirmatively
to the Corps to express deep concern about the project in light of its location on Treaty lands,
was not provided in the record for the preliminary injunction proceedings.  Rather, it was logged
in a "tribal consultation spreadsheet" as follows:  "SRST-attempts to arrange a meeting."  *See*
Ex. 9 to Corps Preliminary Injunction Opp. (ECF 21-9).  In his declaration, Corps tribal liaison
Joel Ames never acknowledges that the Tribe reached out and expressed concerns, describing
these interactions as only focused on scheduling a meeting.  Ames Decl. at ¶ 5 (ECF 21-17).

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

pipeline within the treaty boundary.").  Waste Win-Young, the Tribal Historic Preservation

Officer ("THPO") at that time, discussed at length the historic and cultural importance of the

area, and even discussed culturally sacred knowledge so that DAPL could understand the depth

of the Tribe's objections.  *Id.* at 16 ("And for us to officially endorse or accept a proposal that

would negatively impact our cultural sites, our prayer sites, our duties and responsibilities as

stewards of the land, it would be unacceptable and goes against the very intent of our office in

fighting and protecting and preserving what we have here, what we have left for our people and

our children.").  Several other Tribal Council members explained why the Tribe could not

support the project in its current location.  *See id.*

DAPL chose to proceed with permitting the project at the disputed Lake Oahe location

anyway.  It applied to the Army Corps for the three authorizations needed for the project:  a

"verification" that the Oahe crossing was authorized under Nationwide Permit 12; a Rivers and

Harbors Act § 408 permit to impact the federally managed reservoir; and a real estate easement,

required by the MLA, to cross federal land alongside the river.  *See* Corps Opp. to Preliminary

Injunction Motion, at 1 (ECF 21).  Once the Corps became involved with permitting, the Tribe

reaffirmed its strong objections to the pipeline's route in numerous letters and meetings sounding

a common refrain:  the route selected for the crossing ran through culturally sacred areas and the

Tribe's treaty lands, and threatened the Tribe's water, culture, economic well-being, and public

health.  *See*, *e.g.*, AR 67023-67025 (documenting spill risk and cultural and historic resources:

"We still consider the taken lands to be our lands.  We are opposed to any kind of oil pipeline

construction through our ancestral lands."); AR 66988 (Tribe is "extremely concerned" about

sacred sites); AR 66811 (documenting risk to cultural resources and oil spills); AR 66811 at P-1

(documenting lack of consultation with Tribe on project in ancestral lands).  The Tribe engaged

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

tirelessly through the administrative process to draw attention to what it felt was steamrolling the project on an aggressive timeline without adequate consideration of Tribal interests.

B.    The Corps' Issuance of a Draft Environmental Assessment that Ignored the Tribe Elevated the Tribe's Concerns

The Tribe's concerns deepened when the Corps released a profoundly flawed draft environmental assessment, drafted by DAPL, in December of 2015 ("EA").  Shelman Preliminary Injunction Decl., at ¶ 4 (ECF 21-20); Draft EA (ECF 6-19).[2]  Remarkably, the draft EA was silent on the implications of the project for the Tribe, failing even to identify the Reservation on maps which showed the alternative pipeline routes.  Draft EA at pdf p. 127.  The draft EA was equally silent on the pipeline's impacts on the Tribe's treaty rights to water, and on taken Treaty lands.  It said nothing about subsistence hunting, fishing and gathering.  It said nothing about either the risk of oil spills from the pipeline affecting the river, or the consequences to the Tribe of a spill.  The draft EA also informed the Tribe for the first time that DAPL had originally proposed to route the pipeline across Lake Oahe ten miles north of Bismarck, North Dakota, but abandoned that route in part because of risks to municipal water supplies.  *Id.* at 10.

The Tribe submitted three lengthy sets of comments on the draft EA with accompanying technical support in an effort to persuade the Army Corps to give the Tribe's interests proper consideration through a full EIS and evaluation of alternative crossing sites.  AR 69152 at 9 ("the draft EA is completely silent on the close proximity of the Pipeline to the Reservation boundary… [and] does not provide a sufficient analysis of the risk of pipeline leaks or spills");  AR 66166 at 6 (discussing government's treaty and trust obligations to protect Tribe's significant

---

[2] A copy of the draft EA that was released to the public does not appear to have been included in the administrative record.  A copy was filed with this Court previously in this litigation.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

interests in Lake Oahe); AR 84802 at 4 (extensive documentation of oil spill risks not considered in EA).  These letters extensively documented the cultural importance of the proposed crossing site, as well as the proximity to irrigation and drinking water intakes and fish and wildlife relied on by Tribal members for "subsistence, cultural, and religious practices."  AR 69152 at 8-9; AR 66166 at 2 (discussing drinking water, "irrigation and other economic pursuits central to the Tribal economy" and habitat for fish and wildlife).  A consistent theme of this correspondence was the need for a full EIS that considered route alternatives that did not cross the Missouri in a place of such historic and cultural significance, where Sioux Tribes have Treaty rights.  *See*, *e.g.*, AR 67074 at 2 ("The SRST THPO is requesting that an Environmental Impact Statement be completed.  The SRST is committed to participating in these efforts."); AR 67025 (asking for EIS); AR 4777.

Several federal agencies supported the Tribe in seeking greater consideration of the Tribe's interests.  For example, the U.S. Department of the Interior explicitly asked the Corps for a full EIS on the project's impacts to the people of Standing Rock.  AR 5750.  The Interior Department stated, "We believe that, if the pipeline's current route along the edge of the Reservation remains an option, the potential impact on trust resources in this particular situation necessitates full analysis and disclosure of potential impacts through the preparation of an EIS." *Id.*  Similarly, the U.S. Environmental Protection Agency sent two letters critiquing the Corps' National Environmental Policy Act ("NEPA") analysis and asking for more robust review, again with a focus on risks to water and to Tribal resources.  *See*, *e.g.*, AR 74021 ("the document lacks sufficient analysis of direct and indirect impacts to water resources [and] lacks information on the measures that will be required to assure that impacts from construction and operation of the pipeline are not significant"); AR 66288 (recommending additional analysis of drinking and

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

irrigation water impacts and environmental justice); *see also* AR 68891 ("EPA concerned over environmental justice – Tribal interests have not been addressed sufficiently.").  And the Advisory Council on Historic Preservation ("ACHP") repeatedly raised serious objections to the Corps' lack of compliance with the National Historic Preservation Act that was elevated to the respective agencies' heads and never resolved.  AR 69096; AR 4936; AR 5649; AR 5895; AR 5716.  Other Tribes weighed in with the same theme:  that the Lake Oahe crossing needed more analysis and consultation, that the Corps was ignoring Treaty rights, and that the risks to water were too great.  *See*, *e.g.*, AR 65507 (Yankton Sioux letter addressing Treaty rights and asking for EIS); AR 6056 (Upper Sioux community) (seeking EIS and tribal consultation on cultural resources); *see also* AR 66575 (transcript of contentious meeting between Tribal representatives and Corps).

These efforts to persuade the Corps to give greater consideration to Tribal concerns over the Oahe crossing continued through the spring and early summer of 2016.  After the Tribe submitted its comments on the draft EA, the Tribe continued to press the Corps to engage, and the Corps responded with some additional efforts.  For example, at the Tribe's insistence, Omaha District Commander Col. John Henderson met with Tribal officials to discuss the Tribe's perspectives.  The Tribe continued to object that the Corps was not properly considering its concerns and legal interests.

In the face of strong Tribal opposition, however, DAPL continued to pursue an unusually aggressive approach to permitting, seeking permits on the fastest timetable possible.  AR 72442 (Corps document describing DAPL as "aggressive, pushing for early approvals"); AR 80016 (pipeline "moving on a regulatory fast track with no other purpose than to accommodate the

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

applicant's construction schedule").[3]  DAPL hired a retired Army General to lobby Corps

regulatory staff who at one point reported them to their superiors for not being sufficiently

deferential towards DAPL's preferred approach on a regulatory issue.  AR 6394; AR 65407.

Corps staff also complained of DAPL's "blatantly racist attitudes" towards Indians.  AR 64200;

*see also id.* ("Someone needs to tell Joey [Mahmoud] that the next RACIST comment will shut

down the entire project.") (capitalization in original).  Despite the high-level interagency disputes

over the Corps permits, and the significant concerns raised by the Tribe and other tribes, DAPL

started building the pipeline outside Corps jurisdictional areas in May of 2016, well before it had

any federal permits.  In fact, extensive construction had already occurred by the time the Corps

issued the first permits in late July.  *See* Memorandum Opinion re. Preliminary Injunction (ECF

39) ("PI Order"), at 53.

       C.      The July 25 Clean Water Act and § 408 Decisions

On July 25, 2016, the Corps released the first of the required permits for the Lake Oahe

crossing by issuing a Clean Water Act verification that the two Missouri River crossings were in

compliance with Nationwide Permit ("NWP") 12, AR 67342, and a RHA § 408 determination

for the Oahe crossing.  AR 71180.  However, the Corps did not issue the real estate easement to

cross federal land required under the MLA, and explicitly told DAPL that construction at the

crossing could not proceed until the easement was issued and Congress was notified.  AR 71215

("As mentioned previously, you cannot begin work at either the Lake Oahe Crossing or the Lake

---

[3] For example, DAPL repeatedly rejected advice from the Corps to involve Tribes in cultural
survey work, opting instead to conduct surveys on its own and seek input from Tribes after the
fact.  *See, e.g.,* AR 70053 ("Not getting tribal input before the survey work has been a problem in
the past."); AR 70056 (Corps recommended that DAPL reach out to tribes and conduct survey
work jointly:  "Of course that recommendation fell on deaf ears."); AR 4779 ("The applicant
took a risk by not including the tribes when conducting their Level III Intensive Cultural
Resources Survey."); AR 67074 (letter from SRST THPO requesting to participate in surveys).

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

Sakakawea flowage easement properties until an easement or consent to easement, respectively are signed by out [sic] Chief of Real Estate.  The easement for the Lake Oahe crossing also requires Congressional notification.").

The Corps' issuance of the NWP 12 verification and §408 authorization led to the filing of the Tribe's lawsuit against the Corps a few days later, which raised multiple claims under CWA, NEPA, and National Historic Preservation Act ("NHPA").  Because at that time construction under Lake Oahe was precluded by the lack of easement and therefore completion and operation of the pipeline was not imminent, the Tribe sought preliminary injunctive relief only under its NHPA claims to prevent construction in other areas while the litigation proceeded. On September 9, 2016, this Court denied the motion.[4]

III.   THE SEPTEMBER 9 AGENCY DECISION AND SUBSEQUENT CONSIDERATION
       BY THE FEDERAL AGENCIES

On that same day, the Corps, along with the Department of Justice and the Department of the Interior, issued a press statement announcing that, notwithstanding the Court's decision, "important issues raised by the Standing Rock Sioux Tribe and other tribal nations and their members regarding the Dakota Access pipeline specifically… remain."  ECF 66-3 at 215.  The agencies announced that they would not authorize construction under Corps lands (i.e., issue the still-pending easement) at that time, and would initiate a review to determine whether its previous decisions needed to be reconsidered.  *Id.*  They asked DAPL to voluntarily cease construction within 20 miles of Lake Oahe, a request that the company has repeatedly rejected. Despite the lack of an easement and the federal government's request to cease construction in the

---

[4] The Tribe appealed this Court's preliminary injunction decision and sought an emergency injunction pending appeal, which led to an "administrative injunction" over construction within 20 miles of Lake Oahe that was in place for approximately three weeks.  The D.C. Circuit ultimately denied the request for an emergency injunction.  The appeal remains pending.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

disputed area, DAPL continued construction towards the banks of Lake Oahe through the fall of 2016, triggering numerous conflicts between law enforcement and water protectors opposed to the pipeline.[5]  *See*, *e.g.*, Ex. 5 (U.S. Commission on Civil Rights decrying "excessive use of force by police" and joining calls for full EIS); Ex. 6 (former White House staff letter) ("We were outraged to see attack dogs unleashed on water protectors.  And we were disgusted as we watched local law enforcement agencies spray water on unarmed people in sub-freezing weather.").  The agencies affirmed the need to continue their review and tribal consultations on two occasions.  *See* Oct. 10 Statement (ECF 66-3 at 218); Nov. 14 Statement (ECF 56-2) (Corps "determined that additional discussion with the Standing Rock Sioux Tribe and analysis are warranted").

For its part, the Tribe fully engaged in the opportunity presented by the agencies' September 9 announcement to continue its effort to persuade the Corps to consider route alternatives and conduct a full EIS in light of the Tribe's treaty rights and historic connection to the area.  *See*, *e.g.*, Ex. 7 (framing fundamental issues around pipeline); Ex. 8 (further documenting oil spill risk).[6]  It participated in a full-day visit to the sites that were subject to the early September temporary restraining order.  Ex. 10.  It again pointed out fundamental factual

---

[5] As DAPL recognized, such construction was at its own risk—since it had previously conceded that it lacked the requisite easement to complete the pipeline under Lake Oahe.  *See* Hasselman Preliminary Injunction Decl., Ex. 47 (ECF 6-60) at 5 ("Dakota Access has full confidence in receiving the PCNs from the [Corps] and is prepared to move forward with construction at its own risk to keep the Project on schedule…."); *id.,* Ex. 48 (ECF 6-61) at 9 ("Any such activities [*i.e.,* construction prior to receiving Corps permits] will be conducted at the company's own risk."); PI Order, at 52 ("Dakota Access has demonstrated that it is determined to build its pipeline right up to the water's edge regardless of whether it has secured a permit to then built across"); AR 5729 ("Talked to Joey [Mahmoud]– he is aware that any work in WOUS is taken at his own risk…"); AR 5753; AR 66858.

[6] DAPL claims that the Tribe was non-responsive to the government's requests, but the record demonstrates the opposite.  For example, when the Corps wrote to the Tribe on Nov. 22 summarizing a meeting between the Colonel and the Chairman, the Tribe wrote back the next day reaffirming its intention to continue the discussions.  Ex. 9.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

errors in the Final EA, such as the Final EA's misstatement that most Tribal members rely on wells rather than the Missouri River for drinking water. Ex. 11. The Tribe also commissioned an expert review of the Corps' oil spill risk analysis which was highly critical of the Corps' conclusions and recommended additional review. Ex. 12. The Tribe documented extensive use of Lake Oahe and its shorelines on the Reservation for subsistence hunting and fishing, Ex. 13, and explained in great detail how the pipeline would impact these and other Treaty rights. Ex. 14. It participated in numerous meetings with Corps staff and leadership, as well as meetings with other federal agencies and local, state, and federal elected officials. Other Sioux Tribes also engaged extensively in this process, seeking greater consideration of route alternatives, oil spill risks, and treaty impacts. *See, e.g.*, Ex. 15.

On December 4, 2016, the Corps announced that it would not be issuing the easement at Lake Oahe pending review of "alternative locations" for the crossing, "detailed discussions of potential risk of an oil spill," and additional consideration of the "extent and location of the Tribe's treaty rights in Lake Oahe." ECF 65-1, at 3. The decision cited the "totality of the circumstances," including the MLA, the impact on the Tribe's historic homelands, the proximity to the Reservation, and risks to treaty hunting and fishing rights. *Id.* at 4. One important feature of the decision was the fact that critically important information regarding oil spill risk and response had been withheld from the Tribe—indeed, the Tribe and its counsel were unaware of the existence of these documents until the Corps provided the administrative record for this case and withheld them as confidential.[7] The Corps announced that such review would occur via an EIS. DAPL filed its motion for summary judgment the following day.

---

[7] The documents were finally received, subject to a verbal confidentiality agreement, on December 23, 2016. As of the date of this filing, the parties have still not agreed to the terms for the use or release of these documents.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

STATUTORY OVERVIEW

I.     THE MINERAL LEASING ACT, 30 U.S.C. § 185

Congress enacted the Mineral Leasing Act ("MLA") in 1920 "to promote wise

development of [the nation's] natural resources and to obtain for the public a reasonable financial

return on assets that 'belong' to the public." *California Co. v. Udall*, 296 F.2d 384, 388 (D.C.

Cir. 1961). While the Act gives agencies "broad power" to issue licenses for oil and gas leases

on federal lands, it also gives the agencies broad "discretion to refuse to issue any lease on a

given tract." *Udall v. Tallman*, 380 U.S. 1, 4 (1965); *Haley v. Seaton*, 281 F.2d 620, 624 (D.C.

Cir. 1960) (act grants agency discretion to grant, or not grant, leases in its discretion); *U.S. ex rel.

Jordan v. Ickes*, 143 F.2d 152, 153 (D.C. Cir. 1944) (same).

As to pipelines, the statute provides that "rights of way through any Federal lands *may* be

granted" by the appropriate agency head for purposes of oil pipelines in accordance with detailed

standards provided in that section and agency regulations. 30 U.S.C. § 185(a) (emphasis added).

The Act gives agencies broad discretion to establish conditions pertaining to the "extent,

duration, survey, location, construction, operation, maintenance, use, and termination" of a

pipeline. *Id.* § 185(f). The statute also establishes extensive, specific requirements for allowing

a pipeline to cross federal land. Plans of operation are required, and the agency must develop

regulations or impose stipulations that must include, at a minimum, a variety of requirements to

control or prevent damage to the environment, property, and public health and safety. *Id.*

§ 185(h). Agencies must include specific conditions to protect people in the "general area" who

"rely on the fish, wildlife, and biotic resources of the area for subsistence purposes." *Id.*

Furthermore, the agency head can issue a right-of-way only when he or she "is satisfied

that the applicant has the technical and financial capability to construct, operate, maintain, and

terminate the project for which the right-of-way is requested." *Id.* § 185(j); *see also id.* § 185(i)

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

(requiring disclosure of identity of all participants in corporate venture); § 185(m) (authorizing

agency to require a bond).  Provisions are included for public notice and opportunity to

comment, including hearings.  *Id.* § 185(k).  Finally, an applicant seeking authorization to cross

federal lands must pay in advance "the fair market rental value of the right-of-way or permit" as

well as the costs of administering it.  *Id.* § 185(l).  The importance of these standards, which are

unique to the special risks of pipelines, is further reinforced by a provision in the statute that

prohibits granting a right-of-way "except under and subject to the provisions, limitations, and

conditions of this section."  30 U.S.C. § 185(q).

Army Corps regulations implementing the MLA delegate the authority to issue

"outgrants" authorizing the use of Army real property to Division or District commanders or

their respective chiefs of real estate.  Army Reg. 405-80, ¶ 3-1, Ex. 16.  An outgrant is a "written

document setting out the terms and conditions of non-Army use of real property."  *Id.* ¶ 4-1(a).

Such use "must be of direct benefit to the U.S., promote the national defense or an Army

mission, or be in the public interest."  *Id.* ¶ 4-1(b).  The regulations make clear that the outgrant

program involves the Army Corps "as landowner managing its real property holdings" rather

than acting in a regulatory capacity.  *Id.* ¶ 4-1; *see also Perkins v. Lukens Steel Co.*, 310 U.S.

113, 128 (1940) (distinguishing between government's "complete and final authority" to protect

its proprietary interests and its more limited "regulatory power over private business or

employment").  The Army regulations also ensure that the United States will receive a "stated

consideration" for an outgrant authorizing use of Corps property.  *Id.* ¶ 4-1(d).  Finally, the

regulations clarify that outgrants will not be issued where they conflict with federal policy on

environmental or historic preservation.  *Id.* ¶¶ 4-8.

II.     SECTION 408 OF THE RIVERS AND HARBORS ACT

Section 14 of the Rivers and Harbors Act of 1899, commonly known as "Section 408,"

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

reads in its entirety as follows:

> It shall not be lawful for any person or persons to take possession of or make use of for any purpose, or build upon, alter, deface, destroy, move, injure, obstruct by fastening vessels thereto or otherwise, or in any manner whatever impair the usefulness of any sea wall, bulkhead, jetty, dike, levee, wharf, pier, or other work built by the United States, or any piece of plant, floating or otherwise, used in the construction of such work under the control of the United States, in whole or in part, for the preservation and improvement of any of its navigable waters or to prevent floods, or as boundary marks, tide gauges, surveying stations, buoys, or other established marks, nor remove for ballast or other purposes any stone or other material composing such works: Provided, That the Secretary of the Army may, on the recommendation of the Chief of Engineers, grant permission for the temporary occupation or use of any of the aforementioned public works when in his judgment such occupation or use will not be injurious to the public interest: Provided further, That the Secretary may, on the recommendation of the Chief of Engineers, grant permission for the alteration or permanent occupation or use of any of the aforementioned public works when in the judgment of the Secretary such occupation or use will not be injurious to the public interest and will not impair the usefulness of such work.

33 U.S.C. § 408.  This provision has generally been viewed as belonging "to the category of those quasi-criminal statutes which provide for the imposition of fines, penalties, and forfeitures." *The Barbara Cates v. United States*, 17 F. Supp. 241, 244 (E.D. Pa. 1936).  Its primary purpose is to address liability for damage to federally managed structures, *In re Am. River Transp. Co.*, 800 F.3d 428, 433 (8th Cir. 2015), and Corps regulations provide for penalties for violations of § 408.  33 C.F.R. § 209.170(b)-(c).

However, § 408 provides for authorization for the "use and occupation" of federal works, and the Corps has developed "policy and procedural guidance" authorizing issuance of such permissions.  *See* EC 1165-2-216 (June 21, 2016), Ex. 17.  The guidance provides additional specificity to the statutory standard that alterations must "not be injurious to the public interest" and "will not impair the usefulness" of federal projects.  *See, e.g.*, *id.* ¶¶ 6(a), 6(k) (proposed use cannot eliminate an authorized project purpose); ¶ 6(l) (proposed alteration must result "in a fully functional element once constructed"); ¶ 6(m) (design and construction standards); ¶ 6(n)

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

(cannot "result in substantial adverse changes in water surface profiles").  It also lays out detailed direction for the procedures to be used in reviewing requests for § 408 permission.  *See*, *e.g.*, *id.* ¶ 7(b) (review process may vary depending on scale of project); ¶ 7(c)(3)(C)(vi) ("Districts must make diligent efforts to involve the public in the decision-making process").  The regulations further distinguish § 408's "not injurious to the public interest" standard from a related but different standard under the CWA, the "contrary to the public interest" determination.  ¶ 7(c)(4)(B)(ii), and call for a range of factors to be considered.

The Corps' § 408 policy guidance recognizes that projects requiring § 408 permissions frequently require other permits as well.  Indeed, it emphasizes that "a requester has the responsibility to acquire all other permissions or authorizations required by" other laws and regulations, including other permits issued by the Corps.  *See id.* ¶ 6(b).  It establishes special procedures for coordinating with other Corps elements, including "real estate."  *See*, *e.g.*, ¶ 7(c)(3)(D) (additional measures required if real estate outgrants required).

## STANDARD OF REVIEW

The Tribe moves for summary judgment, and opposes DAPL's motion for summary judgment, on the narrow question presented under the Declaratory Judgments Act of whether DAPL already has the right under MLA § 185 to cross Lake Oahe, and moves to dismiss all of DAPL's remaining claims under Fed. R. Civ. P. 12(b)(6).  With respect to the summary judgment issues, a court shall grant summary judgment when one of the moving parties shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The mere existence of a factual dispute, by itself, is insufficient to bar summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

supported by sufficient admissible evidence that a reasonable trier of fact could find for the non-moving party. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). "[A] moving party is 'entitled to a judgment as a matter of law [when] the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Maydak v. United States*, 630 F.3d 166, 181 (D.C. Cir. 2010) (internal citations omitted).

With respect to the motion to dismiss, dismissal on the ground of no final agency action is properly sought under Rule 12(b)(6). *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 18 n. 4 (D.C. Cir. 2006). "[I]n passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). However, the Court need not accept as true "a legal conclusion couched as a factual allegation," nor need it accept inferences that are unsupported by the facts set forth in the complaint. *Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006). To the extent that DAPL's cross-claim represents an attack on the Corps' December 4 decision, dismissal under Rule 12(b)(6) is required because there is no final agency action to attack.

## ARGUMENT

I.   **THE CORPS HAS NOT GRANTED THE §185 EASEMENT, NOR CAN AN EASEMENT BE IMPUTED FROM NEPA DOCUMENTS AND INFORMAL STATEMENTS**

A.   <u>The §185 Easement Was Never Granted, Nor Can an Easement be Imputed.</u>

In arguing that the Corps has already granted the § 185 easement, DAPL faces one insurmountable, indisputable problem:  the Corps has not.  The Corps never finalized a decision, never made any of the findings called for under § 185, never notified Congress, and never negotiated—let alone received—the required consideration for the easement.  These are all

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

essential elements of the statutory mandate, and they have yet to be satisfied.

No document in the 87,000-page administrative record, or any document finalized subsequently, purports to constitute the § 185 easement.  DAPL dismisses the absence of a "piece of paper" as a minor or ministerial matter.  SJ Motion at 2 (complaining that Corps insists upon an "additional document styled as an 'easement'"), 19.  But the § 185 authorization is a real estate transaction, and in real estate, "pieces of paper" documenting ownership are important. *Pine River Irrigation Dist. v. U.S.*, 656. F. Supp. 2d 1298, 1312-1313 (D. Colo. 2009) (in reference to government right-of-ways, "nothing passes but what is conveyed in clear and explicit language – inferences being resolved not against but for the government").  For a pipeline easement across federal land, written documents are mandatory.  Army Reg. 405-80, ¶ 4-1(c) ("All such non-Army use *must* be authorized by an appropriate realty instrument") (emphasis added).  The Army's regulations are explicit about calling for a "*written document* setting out the terms and conditions of non-Army use of property…"  Army Reg. 405-80 at ¶ 4-1(a) (emphasis added); *see also id.* at p. 11 (definitions) (outgrant is a "legal document").  Such "outgrants" must follow the process and meet the conditions established in the regulations.  *Id.*

Moreover, none of the statutorily mandated findings required in §185 has been made.  As discussed above, § 185 requires federal agencies to consider a specified set of factors, ranging from impacts to subsistence fishing to the financial health of the proponent, *see supra* at 17-18, factors that are neither called out in § 408 itself nor considered as part of the Corps' § 408 authorization here.  Given the risks to human health and the environment posed by crude oil pipelines, close consideration of these factors is a crucial part of the §185 decisionmaking process, and the record demonstrates unequivocally that the process is not yet complete.

The MLA also explicitly requires notification to Congress when it issues any § 185

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

easement.  30 U.S.C. § 185(w).  It is Corps policy to wait 14 days after notification before

actually executing the easement to the requesting party.  Ex. 18.  There is no dispute that this

Congressional notification has never occurred.  DAPL argues that such notification can be

imputed, because the dispute over this pipeline has been widely reported and commented on by

elected officials.  SJ Motion at 25.  DAPL provides no legal support for its novel view that a

statutory requirement for formal Congressional notification is satisfied when officials have an

opportunity to read about the issue in a newspaper.  Similarly, right-of-ways to cross federal

lands require payment of fair market value, paid in advance.  *See supra* at 18.  The record does

not indicate that such consideration was ever negotiated, let alone finalized or paid.  Even DAPL

concedes that the amount of consideration has not been determined.  SJ Motion at 26.

Glossing over these obvious deficiencies, DAPL instead points to the NEPA documents

that the Corps used to inform its decisions at Lake Oahe.  *See, e.g.*, SJ Motion at 20 (citing the

EA and FONSI's references to the "easement").  DAPL appears to believe that the EA and

FONSI themselves constitute authorization to cross Lake Oahe.  Such an argument seriously

misunderstands the role of NEPA in agency decision-making.  The EA and FONSI are not

decisions that authorize anyone to do anything; they do not "create[] legal consequences."

*Sierra Club v. U.S. Dep't of Energy*, 825 F. Supp. 2d 142, 155–56 (D.D.C. 2011).  They are

environmental review documents that inform some underlying substantive decision—for

example, a permit, lease, or grant.  40 C.F.R. § 1500.1(b); *Robertson v. Methow Valley Citizens*

*Council*, 490 U.S. 332, 349 (1989) (NEPA documents "ensure[ ] that the agency, in reaching its

decision, will have available, and will carefully consider, detailed information concerning

significant environmental impacts").  In NEPA litigation, one does not challenge the EA or

FONSI itself, but rather the underlying, substantive agency decision that these documents are

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

meant to inform.  *See*, *e.g.*, *Friends of Tims Ford v. Tenn. Valley Auth.*, 585 F.3d 955, 965 (6th

Cir. 2009); *Dep't of Energy*, 825 F. Supp. 2d at 156–57; *Ctr. for Biological Diversity v. Pirie*,

191 F. Supp. 2d 161, 176 (D.D.C. 2002) ("Record of Decision 'mark[s] the consummation of the

agency's decisionmaking process', with respect to whether to [take action] in light of the

environmental consequences identified in the EIS"), *vacated* as *moot sub nom. Ctr. for*

*Biological Diversity v. England*, No. 02-5163, 2003 WL 179848 (D.C. Cir. Jan. 23, 2003); *Nat'l*

*Coal. to Save Our Mall v. Norton*, 161 F. Supp. 2d 14, 20 (D.D.C. 2001) (NEPA process is

"preliminary to final agency action"), *aff'd*, 269 F.3d 1092 (D.C. Cir. 2001).  Nor is there

anything unusual about the same NEPA analysis underlying multiple separate agency decisions

under different statutes.  *See*, *e.g.*, 40 C.F.R. § 1502.20 (explaining multiple decisions may "tier"

to an EIS covering a broader program or policy); *Native Ecosystems Council v. Dombeck*, 304

F.3d 886, 893–94 (9th Cir. 2002).

DAPL appears to concede that separate paperwork is required to document real estate

transactions, and even offers the "consent to easement" that the Corps finalized for the other

Missouri River crossing, at Lake Sakakawea, as evidence.  SJ Motion at 12 and Ex. I; AR 71195

(documenting consent); AR 71198 (DAPL letter requesting and providing additional information

for consent to cross federal easements).  But that document proves the Tribe's point, not

DAPL's.  The "consent to easement" at Lake Sakakawea is not a real estate transaction subject to

30 U.S.C. § 185, since it does not cross federally owned property.  However, even though the

Lake Sakakawea consent was considered in the same NEPA document as the § 408 authorization

for that site, it still needed its own stand-alone review and approval.  The Corps completed that

review for Lake Sakakawea in August of 2016, i.e., as a separate decision from the July 25

authorizations and verifications.  It issued a formal document memorializing its action that laid

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

out the basis for its decision, and establishing specific conditions not included in any other document attendant to the consent to easement.  Sherman Decl., Ex. I.[8]  In contrast, the Corps never completed that real estate process for the Oahe crossing, and has consistently determined that additional consideration of Tribal Treaty rights and other issues is warranted.  The absence of a final § 185 outgrant is not some ministerial oversight—it confirms the absence of a final agency decision that would allow the company to proceed to cross federally owned land.

DAPL says it was "shocked" and "befuddled" by the Corps' statements that the easement had not been issued at the same time as the § 408 permission.  *See* DAPL Reply In Support of Motion to Expedite (ECF 64), at 4.  But these claims are puzzling—the Corps could not have been clearer that both decisions were necessary and that they were proceeding on separate tracks, in separate divisions of the Corps, and on separate timeframes.  *See*, *e.g.*, AR 75379 ("We explained the differences between the regulatory action versus civil works processes and the applicant understood and agreed that from a resource perspective one EA made sense.").  One early schedule had the "Section 408 determination being completed in mid-February and the outgrant (which includes Congressional notification) being completed in mid-March."  AR 66858.[9]  In fact, on July 25, 2016, the same day that the Corps issued the final EA, verifications, and § 408 authorization, Corps staff specifically informed DAPL that the easement was not being issued.  In an email to Joey Mahmoud, an Omaha District engineer stated:

---

[8] Similarly, the crossing at the Mississippi River required both a § 408 authorization as well as a consent to cross federal easements.  Both decisions are included in the record as separate decisions.  AR 6361 (§ 408 grant with conditions); AR 13698 (summary of findings); AR 13726 (consent to cross federal easements, subject to separate conditions).

[9] DAPL places great weight on a Corps public relations handout distributed to Corps staff to help them respond to the public.  Sherman Decl., Ex. B (ECF 66-3) at PDF 10.  The handout mistakenly indicates that the § 408 permits provide an "easement" to cross the River.  Plainly, that is not the Corps' position, nor would such a handout meet the requirements of a § 185 decision.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

> I wanted to let you know that earlier today the Section 408 permission for the two Missouri River crossings (Lake Oahe and Lake Sakakawea) was signed by Colonel Henderson and delivered to our Real Estate division. The 408 package included the signed FONSI. *As mentioned previously, you cannot begin work at either the Lake Oahe Crossing or the Lake Sakakawea flowage easement properties until an easement or consent to easement, respectively are signed by our Chief of Real Estate. The easement for the Lake Oahe crossing also requires Congressional notification.* Mr. Rick Noel, Chief of Civil Branch, Real Estate Division will be your point of contact for this part of the process.

AR 71215 (emphasis added). In short, on July 25, the Corps explicitly told DAPL that it did not have the easement, and that additional steps were necessary before the easement could be issued.

DAPL cannot impute the existence of a § 185 easement out of environmental review documents and press handouts that happen to use the word "easement." Under the MLA and implementing regulations, a formal § 185 decision is required, and a § 185 decision has yet to be made. *See* 30 U.S.C. § 185(q) (no right of way can be granted "except under and subject to the provisions, limitations, and conditions of this section."). Declaratory relief must be denied.

    B.    <u>A §185 Easement is a Separate Decision, Subject to Different Standards, than a § 408 Authorization.</u>

DAPL further appears to contend that § 408 of the RHA and § 185 of the MLA are effectively indistinguishable, and that since the Corps issued one, issuance of the other should be imputed or required. The argument suffers from a number of serious flaws.

DAPL's argument that "the two statutes are identical," SJ Motion at 21, is belied by even a cursory review of the statutes themselves. While DAPL relies almost completely on the belief that both statutes call for a "public interest" test and nothing more, the term "public interest" does not even appear in the MLA. To the contrary, the two statutes have many significant distinctions. As discussed above, § 408 allows the Corps to authorize permanent occupation of "public works" where it "will not be injurious to the public interest and will not impair the usefulness of such work." 33 U.S.C. § 408. The MLA allows the Corps to authorize pipelines

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

across federal lands, but only upon consideration of a long and detailed list of factors.  For example, the MLA specifically addresses impacts to fish and wildlife habitat, public health, and safety considerations particular to the risks presented by pipelines.  30 U.S.C. § 185(g),(h).  Of particular importance to the Tribe, the MLA calls for requirements to protect the interests of those who rely on the fish and wildlife of the area for "subsistence purposes," a factor that closely parallels its Treaty rights to clean water and on-reservation fishing and hunting.  *Id.* § 185(h)(2)(D).  As noted above, it further includes robust measures to scrutinize the financial and technical capabilities of the proponent.  *Id.* § 185(i) (requiring disclosure of identity of all participants in corporate venture); § 186(j) (agency must ensure that applicant has "technical and financial capability to construct, operate, maintain, and terminate" the project); § 185(m) (authorizing agency to require a bond).  None of these provisions is included in § 408 or its implementing guidance.

The single reference to the "public interest" in the MLA regulations—which provides the sole basis for DAPL's argument that the statutes are identical—arises in a different context. Army Reg. 405-80, ¶ 4-1(c) (use of Army real property "must be of direct benefit to the U.S., promote the national defense or an Army mission, or be in the public interest.").  Whereas the § 408 inquiry calls only for a negative finding—that the impact of the project will be "not injurious" to the public interest, the MLA finding is affirmative—the proposed use will actually advance the public interest, not just avoid harm to it.  More broadly, any public interest determination must be informed by each statute's requirements and purposes, and such a determination under one statute cannot be deemed to be a substitute for the required determination under a different statute.  *See*, *e.g.*, *Ne. Utilities Serv. Co. v. FERC*, 993 F.2d 937, 947 (1st Cir. 1993).

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

The weakness of DAPL's argument is further highlighted by the third authorization required for it to cross Lake Oahe:  the CWA verification that the crossing was authorized under NWP 12, which is a distinct process from either § 408 or the easement.  As with the easements, elements of the NWP 12 verification process overlap with the § 408 authorization, including consideration of the public interest, among many other issues.  *See*, *e.g.*, 33 C.F.R. § 330.1(e)(2), § 330.6(a)(3)(1).  Many record documents relate to both the § 408 authorization and the NWP verification at Lake Oahe.  But no one can dispute that the NWP 12 verification is a separate, stand-alone decision from the § 408 authorization.  AR 67342.  DAPL surely could not argue that, based on some overlap in the process and standards, the § 408 authorization could simply supplant the need for a separate NWP verification.  However, that is precisely what it is arguing with respect to the easement.

DAPL places great weight on a June 8 email indicating that a Corps staffer in the real estate division was working on the easement.  SJ Motion at 7-8.  But the email highlights facts that undercut, rather than support, DAPL's argument:  first, work on the easement remained ongoing and the easement had not been issued; and second, the easement was being handled by the Corps' real estate division – a separate part of the Corps from the regulatory branch handling the § 408 permit and CWA verifications.  Moreover, the email states that:  "After you receive the easement, you will need to have it signed and sent back to me along with the check for the total consideration."  *Id.*  Not only did DAPL never receive the easement or send it back, but the parties never even reached agreement as to the amount of consideration to be paid.

Approval under one statute does not imply approval under another.  *See Headwaters, Inc. v. Talent Irrigation Dist.*, 243 F.3d 526, 531 (9th Cir. 2001) (approval under one environmental statute does not fulfill permit requirements under another environmental statute, where two

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

statutes have "different, although complementary, purposes."). DAPL ignores the critical

differences in the statutes and focuses instead on the fact that both involve some evaluation

related to the "public interest." Its argument ignores the different scope of the two statutes, and

the highly specific set of criteria addressing the unique risks of pipelines that must be considered

under the MLA. Its attempt to reduce two statutes into a single generic inquiry has no basis in

law, is contrary to the specific statutory schemes enacted by Congress, and should be rejected.

*Watt v. Alaska*, 451 U.S. 259, 267 (1981) ("We must read the statutes to give effect to each if we

can do so while preserving their sense and purpose."); *Radzanower v. Touche Ross & Co.*, 426

U.S. 148, 155 (1976) ("[W]hen two statutes are capable of co-existence, it is the duty of the

courts ... to regard each as effective.").

## II.     DAPL CANNOT CHALLENGE THE CORPS' DECISION TO CONDUCT ADDITIONAL REVIEW BEFORE DECIDING WHETHER TO ISSUE THE EASEMENT

### A.       This Court Has No Jurisdiction to Review the Corps' Decision to Conduct an EIS.

While the relief DAPL seeks does not expressly relate to the Corps' December 4

decision, DAPL devotes much of its brief attacking the Corps' choice to provide additional

process and NEPA review before making a final decision on the Oahe easement. The heart of

DAPL's argument appears to be that since the Corps granted a § 408 authorization to cross Lake

Oahe on July 25, it would be arbitrary and capricious to withhold a § 185 easement for the same

action, as the two statutes are "identical." Not only is such an argument flatly wrong on the

merits, DAPL's effort to use this motion to undermine the December 4 decision is not justiciable.

The Corps has not denied the § 185 easement; rather, it has determined that further consideration

is necessary before a decision can be made. Such a determination is not reviewable.

Jurisdiction under the APA is only established through a challenge to a final agency

action. 5 U.S.C. § 706(2); *Bennett v. Spear*, 520 U.S. 154, 175 (1997). Under well-established

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

precedent, agency action must meet two criteria to be final and subject to APA review:  "First,

the action must mark the 'consummation' of the agency's decisionmaking process—it must not

be of a merely tentative or interlocutory nature.  And second, the action must be one by which

'rights or obligations have been determined,' or from which 'legal consequences will flow.'"

*Appalachian Power Co. v. E.P.A.*, 208 F.3d 1015, 1022 (D.C. Cir. 2000) (citations omitted).  To

the extent that DAPL seeks to challenge the Corps' decision to further consider the Tribes'

Treaty rights and route alternatives for the Lake Oahe crossing, that decision is not a final agency

action subject to review.  *See ONRC Action v. Bureau of Land Mgmt.*, 150 F.3d 1132, 1135 (9th

Cir. 1998) (BLM's decision to prepare an EIS was not a final agency action); *see also Pub.*

*Citizen v. Office of U.S. Trade Representatives*, 970 F.2d 916, 920 (D.C. Cir. 1992) ("[C]ourts

routinely dismiss NEPA claims in cases where agencies are merely contemplating a particular

course of action but have not actually taken any final action at the time of suit.").

   Indeed, the December 4 announcement is the polar opposite of a final agency action—it

is an agency choice to gather information and consult with Tribes and other parties prior to

making a final decision on whether to grant or deny the easement.  It is simply not the kind of

agency action that can be reviewed under the APA.  *See, e.g., Portland Cement Ass'n v. E.P.A.*,

665 F.3d 177, 193 (D.C. Cir. 2011) (agency's decision to collect additional information was not

"final" agency action subject to judicial review under Clean Air Act); *Fourth Branch Assocs. v.*

*F.E.R.C.*, 253 F.3d 741, 746 (D.C. Cir. 2001) (agency's decision to initiate administrative

proceedings not a final agency action under the APA).  It is not the "consummation" of the

agency decisionmaking process; rather it is a step in an ongoing process.  *See Nat'l Parks*

*Conservation Ass'n v. Norton*, 324 F.3d 1229, 1238 (11th Cir. 2003) (agency had not reached

consummation of its decisionmaking process where it was still considering alternatives under a

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

draft EIS); *Cmtys. for a Great Nw., Ltd. v. Clinton*, 112 F. Supp. 2d 29, 37 (D.D.C. 2000) (draft

EIS is not a final agency action).  It also is not an action which alters DAPL's legal status:  it

lacked an easement previously, and it lacks one today.  *See Vill. of Bensenville v. FAA*, 457 F.3d

52, 69 (D.C. Cir. 2006) ("if the practical effect of the agency action is not a certain change in the

legal obligations of a party, the action is non-final for the purpose of judicial review").  "It is

firmly established that agency action is not final merely because it has the effect of requiring a

party to participate in an agency proceeding." *Aluminum Co. of Am. v. United States*, 790 F.2d

938, 941 (D.C. Cir. 1986).

In light of its obvious jurisdictional infirmities, DAPL may seek to reframe its APA

argument and ask this Court to order the Corps to issue the easement.  *See* 5 U.S.C. § 706(1)

(authorizing court to "compel agency action unlawfully withheld or unreasonably delayed").

DAPL repeatedly refers to the issuance of the easement as "ministerial."  SJ Motion at 25, 31.

But in order to state such a claim for relief under the APA, the action in question must be

nondiscretionary.  *See Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 63 (2004)

("the only agency action that can be compelled under the APA is action legally *required*")

(emphasis in original).  As discussed above, the MLA gives agencies broad discretion as to

whether to grant a lease or an easement.  Such discretionary determinations cannot be compelled

under § 706(1).

B.      The Corps was Correct to Withhold the Easement Pending Further Review.

In the December 4 decision, the Corps considered the standards of the MLA and

concluded —as the Tribe had long asked—that the Oahe crossing needed greater consideration

and a full EIS examining route alternatives before the easement could issue.  DAPL may be

unhappy that the Corps did not give it the easement on its preferred timetable.  SJ Motion at 27-

28.  But the Corps' decision to consider the matter further through an EIS was justified given its

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

failure to previously consider the Tribe's Treaty rights and other risks to the Tribe.  While the

Court has no jurisdiction to reach the issue, the Tribe provides the following support for the

December 4 decision should the Court decide otherwise.

As discussed above, the Tribe, and other tribes, worked hard both before and after July 25

to persuade the Corps to consider its interests more broadly and seek a more robust

environmental review that looked at alternative sites to the Lake Oahe crossing.  *See supra* at 14-

17.  The Tribe provided extensive discussion of its Treaty interests in the affected area.  It

commissioned an expert review of the final EA that significantly undercut the Corps'

conclusions with respect to spill risks.  It met on multiple occasions with agency staff and

leadership.  Similarly, other Tribes provided extensive input.  For example, the Oglala Sioux

Tribe's own expert analysis found numerous oversights and mistakes in the Corps' EA, like the

use of the incorrect water quality standard and errors in calculating spill risk.  Ex. 15.

Many of these important issues simply were never considered in the § 408 decision,

NWP 12 verification, and underlying NEPA documentation.  AR 72484 (Corps email) ("USACE

believes consequences of a spill may be high"); AR 73038 (estimating 7.5 oil spills in ten years

in the North Dakota portion of DAPL) *compare* Final EA (ECF 6-51) at 46-47 (minimizing risks

of spills).  For example, from the very beginning of the process, the Tribe had expressed deep

concerns about the impact on its Treaty rights to water from Lake Oahe and impacts on lands

that are within the Tribe's original Treaty boundaries.  *See supra* at 8-13.  The Corps' EA and

FONSI never address the Tribe's Treaty rights (aside from a conclusory assertion that they will

not be affected), nor did the § 408 decision.  Nor did the Corps address the Tribe's subsistence

hunting and fishing rights in Lake Oahe and along its shores, even though the MLA expressly

requires consideration of pipeline impacts on subsistence hunting and fishing.  30 U.S.C.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

§ 185(h)(2)(D).

Moreover, additional information has emerged since July that is relevant to the MLA's requirement to ascertain the financial suitability of the project. 30 U.S.C. § 186(j) (agency must ensure that applicant has "technical and financial capability to construct, operate, maintain, and terminate" the project); § 185(m) (authorizing agency to require a bond). For example, DAPL has made repeated statements to the Court that its failure to have the project in operation by January 1, 2017—a date that has now passed—would threaten the viability of the project. Mahmoud Preliminary Injunction Decl. (ECF 22-1), at ¶ 79.[10]  As the Corps has recognized, the pipeline has the capacity to carry as much as 60% of the entire oil production of North Dakota, Dec. 4 Memo (ECF 65-1), at 1, leading some analysts to question whether the project could be in financial jeopardy in light of the significant declines in North Dakota production since 2014. Ex. 19 ("if oil prices remain low, as projected, Bakken oil production will continue to decline, and existing pipeline and refinery capacity in the Bakken will be more than adequate to handle the region's oil production" without DAPL). The Corps is obligated by law to ensure that DAPL has the "financial capability" to complete and safely operate the pipeline in light of the changed context. 30 U.S.C. § 186(j).

The December 4 memo recognizes these important MLA considerations. As the memo points out, "The Tribe relies on Lake Oahe for drinking water and irrigation, portions of Lake Oahe downstream from the proposed crossing remain within the Tribe's reservation boundaries,

---

[10] The Court should be aware that DAPL spokespeople have publicly repudiated Mr. Mahmoud's sworn statements in this regard on several occasions. *See, e.g.,* Ex. 20 ("Company spokeswoman Vicki Granado said on Friday, however, that the January date would not affect shipping volumes or the project as a whole. 'There is no Jan. 1 deadline,' Granado wrote in an email."); Ex. 21 ("There is nothing contractual tied to the January 1 date. That was an initial in-service target date. The contractual dates are further out and pose no issue to the project."). Even so, DAPL continues to cite to Mr. Mahmoud's testimony in recent briefs to this Court. *See, e.g.,* ECF 64 at 2.

*Earthjustice*
705 Second Ave., Suite 203
Seattle, WA  98104
(206) 343-7340

and the Tribe retains water, hunting and fishing rights in the Lake." Dec. 4 Memo at 1. The

memo for the first time acknowledged the need for additional information about "the extent and

location of the Tribe's treaty rights" in Lake Oahe. *Id.* at 3. The Corps made a well-supported,

rational decision to conduct additional review that considered the pipeline's impacts on Treaty

rights and other impacts specific to the Tribe and other tribes. While that decision is not

reviewable under the APA, it was the correct one.

III.    EVEN IF DAPL'S CLAIMS HAD MERIT, THIS COURT SHOULD NOT ISSUE A
        DECLARATORY JUDGMENT UNTIL THE TRIBE'S CLAIMS CAN BE
        RESOLVED.

        For the reasons discussed above, the Court should deny DAPL's motion because the

Corps did not grant DAPL an easement on July 25, 2016 or thereafter, and because the Court

lacks jurisdiction to hear DAPL's grievances against the Corps' decision to conduct additional

review. Should this Court disagree, it should abstain from issuing any declaratory relief until the

Tribe has had the opportunity to present its challenges to the July 25, 2016 decision. As the

Corps recognized in its September 9 statement, the Tribe's lawsuit has raised important issues.

The Tribe's lawsuit includes formidable legal challenges to the Corps' July 25 decisions,

including violations of NEPA and the CWA, that are currently being held in abeyance. *See*

Complaint (ECF 1), at 41-43 (laying out NEPA violations of unlawfully segmented review and

inadequate analysis of indirect effects); *id.* at 44-46 (laying out violations of CWA and RHA).

The Tribe should have the opportunity to present those claims to the Court before DAPL is

entitled to any relief authorizing it to go forward.

        A.    Issuance of a Declaratory Judgment is Disfavored Where it Won't Resolve the
              Legal Issues in the Case

        The Declaratory Judgment Act is an equitable remedy which provides that a court "*may*

declare the rights and other legal relations of any interested party seeking such declaration."

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

*Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995) (*citing* 28 U.S.C. § 2201(a)) (emphasis in

original).  "Since its inception, the Declaratory Judgment Act has been understood to confer on

federal courts unique and substantial discretion in deciding whether to declare the rights of

litigants…We have repeatedly characterized the Declaratory Judgment Act as 'an enabling Act,

which confers a discretion on the courts rather than an absolute right upon the litigant.'"  *Id.*

> By the Declaratory Judgment Act, Congress sought to place a remedial arrow in
> the district court's quiver; it created an opportunity, rather than a duty, to grant a
> new form of relief to qualifying litigants.  Consistent with the nonobligatory
> nature of the remedy, a district court is authorized, in the sound exercise of its
> discretion, to stay or to dismiss an action seeking a declaratory judgment before
> trial or after all arguments have drawn to a close.  In the declaratory judgment
> context, the normal principle that federal courts should adjudicate claims within
> their jurisdiction yields to considerations of practicality and wise judicial
> administration.

*Id.* at 288.  Courts have broad discretion to dismiss a declaratory judgment action for "equitable,

prudential, and policy arguments."  *MedImmune v. Genentech, Inc.*, 549 U.S. 118, 136 (2007).

In the D.C. Circuit, courts weigh various factors in determining whether or not to grant a

request for declaratory judgment, including:

> whether it would finally settle the controversy between the parties; whether other
> remedies are available or other proceedings pending; the convenience of the
> parties; the equity of the conduct of the declaratory judgment plaintiff; prevention
> of 'procedural fencing'; the state of the record; the degree of adverseness between
> the parties; and the public importance of the question to be decided.

*Hanes Corp. v. Millard*, 531 F.2d 585, 591 n. 4 (D.C. Cir. 1976) (*citing* 10 WRIGHT & MILLER,

§ 2759 (1973)).  The critical factor in most situations is whether the judgment will serve a useful

purpose in fully clarifying the legal relations at issue:  courts are loathe to issue a declaratory

judgment when doing so would not completely resolve the underlying controversy.  *See, e.g.*,

*Glenn v. Thomas Fortune Fay*, __F. Supp. 3d__, 2016 WL 7131463 at *3 (D.D.C. Dec. 6, 2016)

("Where declaratory relief would cause a case to be tried piecemeal, or that only particular issues

will be resolved without settling the entire controversy, a court should not exercise its discretion

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

in favor of granting it."); *POM Wonderful LLC v. F.T.C.*, 894 F. Supp. 2d 40, 44 (D.D.C. 2012) ("Generally, in the interest of judicial efficiency, courts decline to hear declaratory judgment actions that would not fully resolve the parties' claims."); *FiberLight, LLC v. Nat'l R.R. Passenger Corp.*, 81 F. Supp. 3d 93, 114-117 (D.D.C. 2015) (applying *Hanes* factors).

Relatedly, district courts have broad power to manage their dockets in light of each unique case, which includes the authority to stay proceedings or rulings as appropriate for the circumstances. "The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. North Am. Co.*, 299 U.S. 248, 254 (1936); *Hisler v. Gallaudet Univ.*, 344 F. Supp. 2d 29, 35 (D.D.C. 2004) ("A trial court has broad discretion to stay all proceedings in an action pending the resolution of independent proceedings elsewhere."). In the declaratory judgment context, a district court may use its discretion to stay an action before trial or after all arguments have drawn to a close. *Wilton v. Seven Falls Co.*, 515 U.S. at 288 (not an abuse of discretion to stay declaratory judgment action during pendency of parallel state court proceedings).

B.    <u>The Court Should Decline to Issue the Requested Declaratory Judgment Before Resolving the Tribe's Claims.</u>

In the unlikely event that this Court finds DAPL's declaratory judgment arguments to have merit, it should decline to provide DAPL with the relief it seeks at this time. Declaring that DAPL has (or must be given) the easement would render ineffectual the Corps' December 4 decision to conduct an EIS for the Lake Oahe crossing, and immediately ripen the Tribe's claims challenging the July 25 decisions (as well as new claims to an easement, should one be imputed). The Tribe should have an opportunity to present these claims to the Court for resolution before DAPL is allowed to construct the pipeline across Lake Oahe. Accordingly, should the Court find

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

that DAPL is entitled to some relief on its current motion, the Court should stay a decision on the requested declaratory judgment until the Court has had an opportunity to resolve the questions of whether the July 25 decisions comport with the law.

Indeed, this case presents a compelling context for deferring issuance of declaratory judgment.  The critical factor in determining whether to grant declaratory relief is whether it would fully resolve the dispute between the parties.  The answer to that question here is no—the requested declaratory relief would simply shift this litigation into another phase.  Moreover, the equities disfavor DAPL's request.  Its own choices—including building a significant portion of the pipeline before it had any permits, and refusing to voluntarily cease construction in the disputed area around Lake Oahe, as the government repeatedly requested—are responsible for its current predicament.  DAPL knowingly proceeded with construction without permits at its own peril.  Finally, courts are reluctant to issue declaratory judgments when major issues of public importance are at stake.  As this Court is no doubt aware, the routing of the pipeline at the disputed Lake Oahe location has become extraordinarily controversial, building on centuries of broken promises to the Sioux Nation.  After July 25, the Army Corps took another look at its initial decisions, and realized it had given short shrift to Standing Rock's Treaty rights, compounding past wrongs.  Heeding its trust responsibility to consider and protect Treaty rights, the Corps decided that it must understand more fully the Tribe's Treaty rights and the impacts of an oil spill on those rights, and that it must explore alternative routes that would avoid a further affront to the Tribe.  Judicial short-circuiting of the Corps' environmental review and discharge of its trust obligations to the Tribe would be contrary to this nation's solemn, and too often violated, responsibilities to the Standing Rock Sioux Tribe.

## CONCLUSION

DAPL requires an additional Corps decision, in the form of an MLA right-of-way, prior

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

to crossing federal land at Oahe.  For the foregoing reasons, the Tribe asks that this Court so

declare, and GRANT its cross-motion for summary judgment on DAPL's cross-claim, and

DENY DAPL's motion for summary judgment on that claim.  The Tribe further asks that any

remaining claims in DAPL's cross-claim be DISMISSED.

Dated:  January 6, 2017                    Respectfully submitted,


                                           /s/ Jan E. Hasselman
                                           Patti A. Goldman, DCB # 398565
                                           Jan E. Hasselman, WSBA # 29107
                                           (*Admitted Pro Hac Vice*)
                                           Stephanie Tsosie, WSBA # 49840
                                           (*Admitted Pro Hac Vice*)
                                           Earthjustice
                                           705 Second Avenue, Suite 203
                                           Seattle, WA  98104
                                           Telephone:  (206) 343-7340
                                           pgoldman@earthjustice.org
                                           jhasselman@earthjustice.org
                                           stsosie@earthjustice.org

                                           *Attorneys for Plaintiff*

*Earthjustice
705 Second Ave., Suite 203
Seattle, WA  98104
(206) 343-7340*

## CERTIFICATE OF SERVICE

I hereby certify that on January 6, 2017, I electronically filed the foregoing *Memorandum In Support of Standing Rock Sioux Tribe's Motion to Dismiss and Cross-Motion for Summary Judgment* with the Clerk of the Court using the CM/ECF system, which will send notification of this filing to the attorneys of record and all registered participants.


*/s/ Jan E. Hasselman*_____
Jan E. Hasselman

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*