IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STANDING ROCK SIOUX TRIBE,

                Plaintiff,

and

CHEYENNE RIVER SIOUX TRIBE,

                Plaintiff-Intervenor,

      v.

U.S. ARMY CORPS OF ENGINEERS,

                Defendant,

and

DAKOTA ACCESS, LLC,

                Defendant-Intervenor.

Civil Action No. 1:16-cv-1534 (JEB)

**DAKOTA ACCESS, LLC'S CONSOLIDATED (1) OPPOSITION TO MOTIONS
TO DISMISS BY U.S. ARMY CORPS OF ENGINEERS, STANDING ROCK
SIOUX TRIBE, AND CHEYENNE RIVER SIOUX TRIBE; (2) OPPOSITION TO
STANDING ROCK SIOUX TRIBE'S AND CHEYENNE RIVER SIOUX TRIBE'S
CROSS-MOTIONS FOR SUMMARY JUDGMENT; AND (3) REPLY IN
SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Kimberly H. Caine
William J. Leone
Robert D. Comer
NORTON ROSE FULBRIGHT US LLP
799 9th St. N.W., Suite 1000
Washington, D.C.  20001-4501
(202) 662-0200

Edward V. A. Kussy
Alan M. Glen
NOSSAMAN LLP
1666 K Street, N.W., Suite 500
Washington, D.C. 20006
(202) 887-1400

William S. Scherman
David Debold
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500
wscherman@gibsondunn.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

ARGUMENT ......................................................................................................................... 3

I.      Plaintiffs Cannot Seek Summary Judgment On A Claim To Which They Are
        Not A Party. ............................................................................................................... 3

II.     The Rule 12 Motions Must Be Denied Because They Are Based On
        Mischaracterizations Of Dakota Access's Cross-Claim. .................................................. 4

        A.      The Declaratory Judgment Cross-Claim Is Within This Court's
                Federal-Question Jurisdiction. .............................................................................. 5

        B.      Restrictions For Administrative Procedure Act Claims Do Not Bar
                Dakota Access's Declaratory Judgment Act Cross-Claim. .................................... 7

III.    The Corps Has Already Given Dakota Access Its Right-Of-Way Under The
        Mineral Leasing Act. ................................................................................................... 8

        A.      The Corps and Plaintiffs Do Not Deny That The Corps Used A
                Single Process That Led To A Single Decision Allowing Dakota
                Access To Build And Operate Its Pipeline Below Federal Land. ........................... 8

        B.      Mineral Leasing Act Provisions Cited By The Corps And Plaintiffs
                Do Not Bar Dakota Access's Right-Of-Way. ..................................................... 13

        C.      The Corps's And Plaintiffs' Remaining Challenges Are Meritless. ..................... 26

        D.      Events After July 25, 2016 Do Not Change The Fact That Dakota
                Access Has A Right-Of-Way. ............................................................................ 28

IV.     This Court Should Not Delay Granting Declaratory Relief. ............................................ 31

CONCLUSION ..................................................................................................................... 33

# TABLE OF AUTHORITIES

**Cases**

*Abbott Laboratories v. Gardner,*
    387 U.S. 136 (1967) ............................................................................................................7

*Ali v. Rumsfeld,*
    649 F.3d 762 (D.C. Cir. 2011) ..........................................................................................5

*Caterpillar Inc. v. Williams,*
    482 U.S. 386 (1987) ............................................................................................................8

*Dixon v. Cty. of Alameda,*
    No. C 95–4617–SI, 1997 WL 220311 (N.D. Cal. Apr.18, 1997) ......................................4

*Friends of the Earth v. Potomac Elec. Power Co.,*
    419 F. Supp. 528 (D.D.C. 1976) ......................................................................................33

*Hanes Corp. v. Millard,*
    531 F.2d 585 (D.C. Cir. 1976) ........................................................................................33

*Headwaters, Inc. v. Talent Irrigation Dist.,*
    243 F.3d 526 (9th Cir. 2001) ..........................................................................................10

*Holmes Grp., Inc. v. Vornado Air Circulation Sys., Inc.,*
    535 U.S. 826 (2002) ............................................................................................................8

*Lake Carriers' Ass'n v. MacMullan,*
    406 U.S. 498 (1972) ............................................................................................................6

*Md. Cas. Co. v. Pac. Coal & Oil Co.,*
    312 U.S. 270 (1941) ............................................................................................................6

*MedImmune, Inc. v. Genentech, Inc.,*
    549 U.S. 118 (2007) ............................................................................................................7

* *Medtronic, Inc. v. Mirowski Family Ventures, LLC,*
    134 S. Ct. 843 (2014) ....................................................................................................5, 6

*Morgan Drexen, Inc. v. CFPB,*
    785 F.3d 684 (D.C. Cir. 2015) ........................................................................................33

-----------------------------------------------

\* Authorities on which this motion chiefly relies are marked with an asterisk (\*).

*Nat'l Wildlife Fed. v. Burford*,
    835 F.2d 305 (D.C. Cir. 1987) ........................................................................32

*Ne. Utils. Serv. Co. v. FERC*,
    993 F.2d 937 (1st Cir. 1993) ..........................................................................10

*President v. Vance*,
    627 F.2d 353 (D.C. Cir. 1980) ........................................................................33

*Rosenbaum v. Freight, Lime & Sand Hauling, Inc.*,
    No. 2:10-CV-287, 2012 WL 4832248 (N.D. Ind. Oct. 10, 2012) .........................3, 4

*Tierney v. Schweiker*,
    718 F.2d 449 (D.C. Cir. 1983) ........................................................................33

*United States v. Abernathy*,
    No. 10-311, 2011 WL 3420592 (E.D. Okla. Aug. 4, 2011) ..................................5

*United States v. Paternostro*,
    966 F.2d 907 (5th Cir. 1992) ..........................................................................5

*Wilderness Soc'y v. Morton*,
    479 F.2d 842 (D.C. Cir. 1973) ..........................................................12, 13, 14

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008) ........................................................................................31

**Statutes**

28 U.S.C. § 1345 ..............................................................................................5

\* 30 U.S.C. § 185 ............................................................................................25

30 U.S.C. § 185(d) ........................................................................................1, 14

30 U.S.C. § 185(g) ......................................................................................14, 15

30 U.S.C. § 185(h) ..................................................................................15, 16, 18

30 U.S.C. § 185(i) ......................................................................................1, 9, 18

30 U.S.C. § 185(j) ............................................................................................18

30 U.S.C. § 185(*l*) ....................................................................................1, 20, 21

30 U.S.C. § 185(n) ......................................................................................21, 22

30 U.S.C. § 185(p) ............................................................................................22

30 U.S.C. § 185(v) ..................................................................................................22

30 U.S.C. § 185(w) ..................................................................................23, 24, 25, 26

30 U.S.C. § 185(x) ..................................................................................................23

30 U.S.C. § 195(c) ...................................................................................................5

* 33 U.S.C. § 408 ............................................................8, 9, 10, 11, 14, 17, 26, 27, 28

**Other Authorities**

E. Borchard, DECLARATORY JUDGMENTS (2d ed. 1941) ..............................................33

Press Release, Dakota Access Delays Jeopardize Future Infrastructure Investment
   and Development (Nov. 15, 2016) ..........................................................................24

**Rules**

Fed. R. Civ. P. 12 ..........................................................................................1, 4, 7, 31

Fed. R. Civ. P. 56 ...................................................................................................3

Fed. R. Civ. P. 57 .................................................................................................33

**Regulations**

32 C.F.R. § 643.4 ..................................................................................................27

36 C.F.R. § 327.20 ..................................................................................................5

## INTRODUCTION

If there had been any doubt what the government is really up to in refusing to acknowledge that it granted Dakota Access a right-of-way, the briefs by Plaintiffs and the Corps make things perfectly clear.  Despite rote citation in those briefs to a dozen Mineral Leasing Act ("MLA") provisions, it is plain that the government's refusal has nothing to do with such things as the width of the requested right-of-way, *see* 30 U.S.C. § 185(d) (allowing 50-foot-wide rights-of-way—precisely what Dakota Access requested); figuring out who has been building the pipeline, *id.* § 185(i), or payment of right-of-way-related costs, *id.* 185(*l*).  The briefs prove again and again that the holdup is entirely unrelated to any MLA provision.  Instead, political pressure and violent protests have caused higher-ups in the government to try to stop the pipeline from going forward *even though* they concede that the process by which authorization was already granted in July was legally valid in all respects.  In short, nothing new has been under consideration since July 25, 2016—and certainly nothing peculiar to the MLA.

The Corps and Plaintiffs first seek dismissal under Rule 12, but those arguments fail to recognize the cross-claim for what it is.  The cross-claim does not ask this Court to review or compel agency action under the Administrative Procedure Act ("APA").  Dakota Access instead seeks a declaration that it *already* received its legal authority to drill beneath federal land, thus allowing it to complete its pipeline free from the threat of a federal lawsuit accusing the company of acting without permission.  That difference defeats the jurisdictional challenges, because where—as here—a *threatened action* by the government would fall within the Court's jurisdiction, the Court likewise has jurisdiction over a Declaratory Judgment Act claim anticipating the threatened action.  The cross-claim is also ripe, because no party denies that the controversy between the Corps and Dakota Access over the existence of a right-of-way is *substantial* or *immediate*.

1

As for the merits of the cross-claim, no material facts are disputed.  Nothing in the record supports the Corps's and Plaintiffs' arguments that requirements supposedly peculiar to the MLA could explain why the Corps refuses to acknowledge the existence of a right-of-way.  The process leading up to the July 25 decision to allow the pipeline to cross beneath federal land at Lake Oahe considered whether the pipeline was in the "public interest," including possible risks to the environment or effects on nearby tribes.  The earlier public comments, including those by Standing Rock Sioux Tribe ("SRST"), raised the same concerns that Plaintiffs now claim are somehow peculiar to the MLA.  Plaintiffs' and the Corps's own recitations of the history of that process show the error of their theory.  The Corps itself has insisted in its public statements starting September 9 that a short delay was needed to review the validity of "previous" decisions—meaning decisions already made and announced on July 25, 2016.  Because the Corps concedes that it has not revoked those decisions, Dakota Access will be able to proceed with the last major stage of the pipeline construction if this Court issues a judgment declaring that the Corps has already granted the right-of-way.

None of the MLA provisions to which the Corps and Plaintiffs point could prevent this Court from issuing that judgment.  The record shows that those various MLA restrictions are irrelevant to this pipeline, have already been resolved, or do not need to be resolved before work can begin under a right-of-way.  True, the Corps is expected to give notice to Congress and deliver a signed easement, but its refusal to do such things cannot somehow undo the right-of-way decision already made in July.  An easement is one form of right-of-way, but the Corps can grant the right-of-way or a permit (another MLA option) to begin work on federal land even if it has yet to deliver a signed easement.  Given that the purpose of the relief requested is to allow Dakota Access to finish the pipeline free of a threatened enforcement action, that purpose would

be achieved by a declaration that Dakota Access has a legal right to proceed with a right-of-way *even though* the Corps has yet to deliver the easement.  And by issuing a judgment declaring that right, the Court will pave the way for the Corps to continue doing its job under the MLA and relevant regulations.  That will result, for example, in Dakota Access receiving a signed easement (as well as the information needed to pay any amounts owing pursuant to the MLA) without the need for the Court to order the government to do its job.

Finally, the Court should decline SRST's proposal to delay or altogether abstain from exercising its power to grant declaratory relief.  The relief requested will hasten the conclusion of this lawsuit so that all parties can proceed with full knowledge of their rights and duties.  SRST's alternative would impose substantial costs on the one party that has played by the government's rules.  Declaratory relief is warranted.

## ARGUMENT

### I.    Plaintiffs Cannot Seek Summary Judgment On A Claim To Which They Are Not A Party.

The Court allowed Plaintiffs to be heard on whether Dakota Access is entitled to summary judgment on its cross-claim against the Corps, but Plaintiffs go beyond what the Court allowed.  They move for summary judgment in their favor.  A court can only grant judgment in favor of a party, and Plaintiffs are not parties to the cross-claim.  Their unworkable request for summary judgment should be denied.

Rule 56(a) allows only a "party" to move for summary judgment, and only if "the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In fact, only a party to a claim can even oppose summary judgment on that claim.  "[I]n order for a party to oppose a motion for summary judgment, the opposing party must be an opposing party to the claim for which summary judgment is being sought."  *Rosenbaum v. Freight, Lime & Sand Hauling, Inc.*, No.

2:10-CV-287, 2012 WL 4832248, at *3 (N.D. Ind. Oct. 10, 2012).  Courts routinely apply this

rule to prohibit one codefendant from opposing "another codefendant's motion for summary

judgment."  *Id.* at *2 (internal quotation marks omitted) (noting "the weight of the authority of

courts that have considered this issue have concurred with" this position); *see also Dixon v. Cty.

of Alameda*, No. C 95–4617–SI, 1997 WL 220311, at *6 n.8 (N.D. Cal. Apr. 18, 1997) (noting

that co-defendant did not have standing to oppose co-defendant's motion for summary

judgment).

SRST and the Cheyenne River Sioux Tribe ("CRST") are not parties to Dakota Access's

cross-claim.  Thus, while the Court allowed each to support the Corps's opposition to summary

judgment against the Corps, the Court did not—and could not—allow CRST and SRST to seek

summary judgment in their favor.  When A sues B, the suit ends with a judgment for either A or

B.  A judgment for C and D would be unworkable, especially when A and B are still litigating

the claim.  The Corps has not sought summary judgment in its favor.  Plaintiffs' cross-motions

for summary judgment should be denied.

## II.     The Rule 12 Motions Must Be Denied Because They Are Based On Mischaracterizations Of Dakota Access's Cross-Claim.

The arguments for dismissal under Rule 12 assume that the cross-claim is an

Administrative Procedure Act challenge to agency action or inaction.  But rather than challenge

an agency action, Dakota Access asks the Court to declare the legal effect of one.  As Dakota

Access clearly explained in its motion (at 17–18), the cross-claim instead seeks declaratory relief

to address the threat of a federal civil action by the government if Dakota Access drills beneath

federal land at Lake Oahe.  That threatened legal action falls within this Court's federal question

jurisdiction, and the Corps does not deny that the risk of such an action is real and imminent.

The other Rule 12 arguments fail due to the same misconception, because the premise for the

cross-claim is that the Corps has *already* taken all action needed. Rather than compel action, the judgment would declare the legal significance of previous action.

A. **The Declaratory Judgment Cross-Claim Is Within This Court's Federal-Question Jurisdiction.**

**1.** In contesting jurisdiction, the Corps acts as if the cross-claim seeks to enforce some free-standing statutory or constitutional right to a right-of-way. Corps Opp. 9 (stating cross-claim should be dismissed "because it does not identify any judicially remediable right"). But Dakota Access already explained in its motion (at 17–18) that jurisdiction here is based instead on the threat of a "coercive action" that the government could bring in federal court. Precisely *because* "the Declaratory Judgment Act 'is not an independent source of federal jurisdiction,'" *see* Corps Opp. 9 (quoting *Ali v. Rumsfeld*, 649 F.3d 762, 778 (D.C. Cir. 2011)), the Court "look[s] to the nature of the action that the declaratory judgment defendant . . . could have brought" to determine whether it has jurisdiction, *Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 134 S. Ct. 843, 848 (2014).

The Corps does not mention—much less dispute—the explanation in Dakota Access's motion (at 18, 31) that a civil enforcement action is the government's threatened response to construction beneath federal land at Lake Oahe. *See* 30 U.S.C. § 195(c); *see also United States v. Abernathy*, No. 10-311, 2011 WL 3420592 at *5 (E.D. Okla. Aug. 4, 2011) (federal civil action for trespass and violation of 36 C.F.R. § 327.20); *United States v. Paternostro*, 966 F.2d 907 (5th Cir. 1992) (federal prosecution for construction of unauthorized structure in violation of § 327). Whether the government brings a legal action under MLA § 195(c) or some other authority (including a state-law-based trespass claim), the action falls within federal court jurisdiction. *See* 28 U.S.C. § 1345 (giving federal district courts jurisdiction over "all civil

actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress").

Under the rule in *Medtronic*, *supra*, because this "threatened action" is within federal court jurisdiction, this Court has jurisdiction over the cross-claim too.  Armed with a Declaratory Judgment Act judgment declaring that Dakota Access already has a lawful right-of-way for construction under those lands, Dakota Access can proceed free from the risk of legal consequences from the threatened action.  The Corps's brief completely ignored this ground on which Dakota Access invoked federal court jurisdiction in its motion for summary judgment.

**2.**   CRST also challenges jurisdiction with an assertion that the cross-claim is not yet ripe.  CRST Opp. 15–18.  Dakota Access's motion already explained that a claim under the Declaratory Judgment Act is "ripe for decision" when "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *Lake Carriers' Ass'n v. MacMullan*, 406 U.S. 498, 506 (1972) (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).  One need only read the Corps's opposition to summary judgment to know "there is a substantial controversy" between Dakota Access and the Corps.  The Corps remains adamant that Dakota Access lacks authorization to drill beneath federal land at Lake Oahe.

It is equally clear that the controversy is of "sufficient immediacy."  Everyone agrees that Dakota Access is eager to finish the pipeline, *see, e.g.,* SRST Opp. 12, and that drilling at Lake Oahe is the next (and final) major step.  Dakota Access is prepared to begin work as soon as its right-of-way is recognized through the requested relief.  If that is not "sufficiently immediate," nothing is.  Likewise, nobody disputes that the government is prepared to respond with threatened action expeditiously if drilling begins without a declaratory judgment.  That, too, is all

the law requires, because "where threatened action by *government* is concerned," courts "do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007). The dilemma posed by requiring a party to "abandon[] his rights or risk[] prosecution" "is 'a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate.'" *Id.* at 129 (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 152 (1967)). This controversy is ripe. This Court has jurisdiction.

**B.      Restrictions For Administrative Procedure Act Claims Do Not Bar
          Dakota Access's Declaratory Judgment Act Cross-Claim.**

The remaining Rule 12 dismissal arguments also rest on the erroneous premise that the cross-claim is "a run-of-the-mill APA claim." CRST Opp. 15 (further contending that the claim "must be based on a final agency action"); SRST Opp. 30 (arguing there "is not a final agency action subject to review"); Corps Opp. 10 (arguing that Dakota Access "cannot state a cause of action under the Administrative Procedure Act"). That premise is wrong. As explained above, jurisdiction instead flows from the nature of the threatened governmental action that would occur due to drilling beneath federal land. Because the requested declaration would state that the Corps has *already* made a final decision to allow construction beneath federal land, the cross-claim does not rest on the availability of an order under the APA—or any other statute—compelling the Corps to take action. *Cf.* CRST Opp. 13 (incorrectly asserting that Dakota Access asks "this Court [to] compel the permission to cross federal land that it alleges the Corps has unlawfully withheld"); SRST Opp. 31 (arguing that "discretionary determinations" whether to grant an easement "cannot be compelled under § 706(1)").

For the same reason, the Court should reject calls to rewrite the cross-claim. CRST Opp. 15. That effort is mistakenly grounded in a supposed need to avoid "creat[ing] a broad exception

to the requirement of ripeness and final agency action." *Id.*  The point of the cross-claim is to obtain a judgment declaring that the Corps completed and announced its decision in favor of the right-of-way months ago.  In any event, it is established beyond debate that "the plaintiff is 'the master of the complaint,'" *Holmes Grp., Inc. v. Vornado Air Circulation Sys., Inc.*, 535 U.S. 826, 831 (2002) (quoting *Caterpillar Inc. v. Williams*, 482 U.S. 386, 398–99 (1987)).

The motions to dismiss should be denied.

## III.   The Corps Has Already Given Dakota Access Its Right-Of-Way Under The Mineral Leasing Act.

Plaintiffs and the Corps hypothesize ways in which the Corps *could* grant Section 408 permission to an applicant under the Rivers and Harbors Act while still putting off the decision to bestow a right-of-way within the meaning of the MLA.  But that does not defeat summary judgment because it ignores what actually happened in *this* case.  The Court would have to blind itself to the record to suppose that some factor unique to the MLA has held things up at the political levels of three executive departments (only *one* of which has any MLA responsibilities for this project) for the last five months and counting.  In fact, the same briefs that urge this Court to throw out the cross-claim go on to acknowledge that *every* consideration the other parties now offer as a pretext for refusing to acknowledge a right-of-way and deliver a signed easement is a consideration that the Corps fully addressed and finally resolved before giving Dakota Access permission on July 25 to install and operate its pipeline below federal land at Lake Oahe.  For that reason and others discussed below, summary judgment should be granted.

### A.   The Corps and Plaintiffs Do Not Deny That The Corps Used A Single Process That Led To A Single Decision Allowing Dakota Access To Build And Operate Its Pipeline Below Federal Land.

For all the talk about how MLA factors could be read differently than provisions found in other statutes, no party disputes that *in this case* the Corps engaged in a single process, ending

with a single decision to allow Dakota Access to build and operate its pipeline below federal land on each side of Lake Oahe.  It defies belief that the Corps would have engaged in such an extensive process, culminating in a 770-page Environmental Assessment and no fewer than 12 separate Corps approvals, AR 71220–990; D.E. 62-3 at 5–7, if there could be no right-of-way due to, *e.g.*, the Corps being unsure who has been building the pipeline.  30 U.S.C. § 185(i) (requiring agency to require applicant to disclose participants in a project).  Even without examining the details of specific MLA provisions such as that one (*see infra* Argument II.B), the record alone proves that on July 25, 2016, the Corps finalized the decision that forms the basis for the requested declaratory relief.

On that date, the Corps granted Dakota Access permission to construct, operate, and maintain a pipeline crossing federal lands at Lake Oahe. AR 71181–82 (citing 33 U.S.C. § 408); *see* AR 71174–214, 71220–990.[1]  The Corps grants such permission under the Army regulations that implement the MLA if a project is "in the public interest" and "compatible with the installation/project mission." Army Reg. 405-80 ¶ 4-1(c).  When the Corps gave Dakota Access permission to proceed at Lake Oahe on July 25, the Corps made those very determinations: *i.e.,* it determined that the pipeline crossing would "not be injurious to the public interest and" would "not impair the usefulness of work built by the United States."  AR 71181.

---

[1]  This brief follows the format used in the opening brief when referring to the administrative record.  The full Bates numbering format for the original administrative record is USACE_DAPL0000001.  The Corps's additions to the administrative record have a different Bates numbering prefix:  USACE_OAHE0000001.  Thus, to avoid confusion, this brief continues to use just the last five numbers when referring to the original record (*e.g.*, AR 71174), but uses the full Bates number when referring to the new documents (*e.g.*, AR OAHE0000001).  All documents from the additions to the administrative record cited in this brief can be found in Exhibit 1.

SRST disagrees, arguing that a "public interest" finding under the Army's relevant MLA regulation is more rigorous than a "public interest" finding under Section 408.  But it grounds that argument in inapposite case law.  *See* SRST Opp. 27–29.  In *Northeast Utilities Service Co. v. FERC*, 993 F.2d 937 (1st Cir. 1993), petitioners challenged the Federal Energy Regulatory Commission's approval for two utility companies to merge.  That court declined to subject FERC's utility-merger approvals to the same test that *bank* regulators must use when reviewing *bank* mergers.  Key differences in the wording of the two statutes was one reason for that holding; more importantly, the court explained that Congress intentionally treated bank mergers and utility mergers differently.  *Id.* at 947 ("There is no evidence that Congress sought to have [FERC] serve as an enforcer of antitrust policy," while "[t]he Bank Merger Act reveals a quite different intention" for those agencies that consider bank mergers).  Thus, that case dealt with application of differently worded "public interest" tests used by different agencies to review mergers of different companies in different industries.  Here, by contrast, a single agency—the Corps—is making all relevant determinations as it assesses whether it should allow the same private project (the pipeline) to pass under the same public project (the dam built and administered by the Corps) and property.[2]

---

[2]  *Headwaters, Inc. v. Talent Irrigation Dist.*, 243 F.3d 526 (9th Cir. 2001), is even further from the mark.  It did not involve a "public interest" test.  That court merely held that herbicides could be governed by the different requirements of two separate statutes—one (called FIFRA) that governs herbicide labeling and another (NPDES) that governs permission to use the herbicide— because "even [a] cursory review of the statutes reveals that a FIFRA label and a NPDES permit serve different purposes."  *Id.* at 531.  Among other things, "FIFRA's labels are the same nationwide, and so the statute does not and cannot consider local environmental conditions"; "[b]y contrast, the NPDES program under the CWA does just that."  *Id.*  This case has nothing remotely similar to that national / local distinction; one agency considered the same effects of the same pipeline project on the same federal land, and it approved the project.

Not a single document in the administrative record even hints that the Corps burdened itself by promulgating a regulation that imposes a test more stringent than the one that Section 408 already sets forth for the exact same activity.  In fact, if the Corps's "public interest" test for MLA decisions really *was* more stringent, it would apply that test *first*, instead of wasting substantial time and energy on a Rivers and Harbors Act ("RHA") "public interest" test that has no effect on the outcome.  And surely Plaintiffs themselves would have focused their comments on the MLA "public interest" test if it was the test that ultimately mattered.  Moreover, if SRST truly believed its own argument, it would point the Court to at least one example of a pipeline that satisfied the Section 408 "public interest" test, but not the "public interest" test under the MLA regulation.  It cannot do so.

The record, in fact, shows that the Corps did not use different public interest tests. Rather, the Corps decided on a single process—with a single Environmental Assessment and a single notice-and-comment period—because it was making a single determination.  The Corps's own recently disclosed documents prove it.  When explaining the right-of-way approval process internally just last month, Commander Henderson admitted over and over again that the MLA analysis and the RHA analysis were one and the same.  *See, e.g.*, D.E. 73-14 ¶ 5a ("The analysis supporting the grant of permission under 33 U.S.C. 408 is adopted in support of the Corps finding that granting an easement for the pipeline to cross Lake Oahe will not adversely impact the capability of the project to generate the benefits for which the project was Congressionally authorized."); ¶ 5d (explaining that various requirements for easements under the Corps's engineering regulations (ERs) are met based on the "Final EA and FONSI"); ¶ 5e (acknowledging that "Corps policy is to grant an easement when it is in the public interest" and confirming that the Corps made that determination by "adopt[ing]" the "analysis of the public

interest supporting the grant of permission under 33 U.S.C. 408" "in support of the Corps finding that granting an easement for the pipeline to cross Lake Oahe is in the public interest").

The Corps and Plaintiffs also contend it is not possible for Dakota Access to have a right-of-way because it has yet to receive a signed easement.  That argument improperly conflates two different things.  While an easement is one type of right-of-way, and while delivery of an easement document is evidence that a right-of-way was granted, this Court can (and should) declare that the Corps made its final right-of-way decision despite the Corps's failure to deliver an easement document.  As the case law cited in Dakota Access's motion demonstrates, the right-of-way provided for in the MLA is "nothing more than a special and limited right of use." *Wilderness Soc'y v. Morton*, 479 F.2d 842, 853–54 (D.C. Cir. 1973) (right-of-way is a "right of passage over another person's land").  Such rights of use are often "construed" as easements or revocable licenses, *id.* at 853, but they need not be granted in those forms, *id.* at 854.  In short, delivery of a signed easement would be *sufficient* to establish Dakota Access's right-of way, but it is not *necessary*.[3]  That helps explain why the Corps itself could state internally in November

---

[3]  CRST accuses Dakota Access of "twisted logic" and "misrepresent[ing]" *Wilderness Soc'y*. CRST Opp. 25.  According to CRST, that opinion's interpretation of the term right-of-way instead "created an immense burden on pipeline companies who required the additional width for construction"—*i.e.,* more than 50 feet.  But apart from the fact that the statute has changed (Congress went on to amend this very provision of the statute to remove the "burden"), a width limit would be a problem only if Dakota Access requested a right-of-way wider than 50 feet.  As discussed *infra* in II.B, Dakota Access did not.  With that supposed burden gone, the importance of *Wilderness Soc'y* to *this* case remains the D.C. Circuit's recognition that one does not need an easement to have a right-of-way.  *Id.* at 855 (concluding that a special land use permit is a "'right-of-way' 'for the transportation of oil'" under the MLA).  The Corps, for its part, notes that because *Wilderness Soc'y* was decided based on the MLA's width limit, without reaching the National Environmental Policy Act ("NEPA") issues, the statutes must have different requirements.  Corps Opp. 23–24.  But Dakota Access is not disputing a difference between NEPA issues (such as environmental factors) and width restrictions.  The fact that *Wilderness Soc'y* could be decided on one of them alone does not refute that in this case the Corps made a single decision to allow the pipeline to run beneath federal land, and that it used a single set of information and findings to do so.

that it had already granted an easement even though it had yet to deliver the document to Dakota

Access.  D.E. 57-1.  Far from being "staff error," Corps Opp. 28, this statement was an honest

description of the July 25 decision.

As explained earlier, the cross-claim was brought in anticipation of a threatened coercive

action by the government.  Thus, when deciding whether Dakota Access has a right-of-way to

begin drilling beneath the federal land at Lake Oahe, the Court does so while applying the rule

that a right-of-way is more than just an easement.  Putting that as a question:  If a company

begins construction on federal land after the government announces that the company has

permission to use federal land for that purpose, can the government then succeed in an

enforcement action on the ground that the government itself never got around to completing and

delivering a signed easement documenting the right-of-way (*i.e.*, documenting permission to use

the land)?  Neither the Corps nor Plaintiffs address this question, much less do they establish that

an enforcement action would be possible under those circumstances.  Because a right-of-way is

not confined to easements, if the Court issues a declaratory judgment stating that Dakota Access

was given a right-of-way as of July 25, the company can proceed with construction despite not

yet having the easement document.[4]

### B.   Mineral Leasing Act Provisions Cited By The Corps And Plaintiffs Do Not Bar Dakota Access's Right-Of-Way.

The record—reviewed above—clearly shows that the Corps conducted a unitary approval

process through which it decided in July 2016 to give Dakota Access a right-of-way to use the

federal land near Lake Oahe for its pipeline.  The Corps and Plaintiffs nonetheless contend that

---

[4]  As Dakota Access explained in its motion, the Court should assume that the Corps respects court judgments.  Here, that would mean that the Corps delivers an easement document and notifies Dakota Access of the costs to be paid.  That is why Dakota Access has not asked the Court to order the Corps to take action on the easement.

provisions in the MLA stood in the way of the Corps's ability to make a right-of-way decision in July. They argue that the Corps could not have decided to grant a right-of-way after reviewing the factors relevant to Section 408 because the MLA contains even more requirements. *See* Corps Opp. 18–20; CRST Opp. 29–30; SRST Opp. 26–29. That argument fails because for each alleged additional requirement, the relevant factor either did not need to be resolved before deciding to grant a right-of-way; *was*, in fact, resolved by July 25; or both.

Section 185(d) – right-of-way width. The Tribes and the Corps rely on the MLA's requirement that the Corps consider "[w]hether the easement's width exceeds 'fifty feet plus the ground occupied by the pipeline,' and, if it does, whether 'the wider right-of-way is necessary for operation and maintenance.'" *E.g.* Corps Opp. 19 (quoting 30 U.S.C. § 185(d)). As noted earlier, this provision was not a barrier to a right-of-way because in its July 25 decision the Corps expressly considered the width of Dakota Access's right-of-way and correctly concluded that— unlike the one in *Wilderness Soc'y*, *supra*—it does not exceed the 50-foot limit.[5]

Section 185(g) – worker safety and risk of sudden ruptures or slow degradation. The parties next cite the Corps's duty to consider "whether any requirements are necessary to 'protect the safety of workers and protect the public from sudden ruptures and slow degradation of the pipeline.'" *E.g.* Corps Opp. 19 (quoting 30 U.S.C. § 185(g)). The Corps did this too, concluding on July 25 that Dakota Access's safety measures were adequate.[6]

---

[5]  *See* AR 71245 ("Following completion of construction, a 50-foot-wide permanent easement that is generally centered on the pipeline (25 feet on either side of the centerline) would be retained along the pipeline route."); *see also* AR OAHE000028 (providing a legal description of the 50-foot right-of-way); AR OAHE00001227 (map of 50-foot right-of-way).

[6]  *See* AR 71312 ("Given the low population density of the area, risks would be limited to workers involved with the Proposed Action. All activities would be conducted in a safe manner in accordance with the standards specified in the Occupational Safety and Health Administration (OSHA) regulations."); AR 71260–67 (describing protective measures against inadvertent

Section 185(h)(2) – projects that may significantly affect the environment.  The other parties point to a number of potential requirements ("regulations" and "stipulations") that fall under the heading of "Environmental protection."  *E.g.*, Corps Opp. 19 (quoting 30 U.S.C. § 185(h)(2), which references regulations and stipulations governing:  impacts on the "land"; "air and water quality"; "damage to the environment"; "property" damage, "hazards to public health and safety"; and interests of those "who rely on the fish, wildlife, and biotic resources of the area for subsistence purposes").  This subsection of the MLA does not affect the cross-claim for two separate reasons.

*First*, the predicate for applicability of this subsection is "a new project which may have a significant impact on the environment."  30 U.S.C. § 185(h)(2).  The Corps has expressly concluded that this is not such a project.  The Corps proceeded by environmental assessment rather than an environment impact statement here because it concluded that any "impacts to the environment would be temporary and *not* significant."  AR 71176 (emphasis added).  Plaintiffs disagree with that determination—indeed, their complaints directly challenge what the Corps determined—but there can be no question that the Corps already did so.

*Second*, even assuming the regulations and stipulations in subsection (h)(2) apply when impacts will not be "significant," the Corps did everything required as part of its unitary approval process.[7]  Plaintiffs own actions prove that nothing listed in MLA § 185(h)(2) adds to the

---

release—sudden or otherwise—including 24-hour monitoring during drilling, hydrostatic testing of pipeline segments prior to installation, implementation of a geographical response plan, implementation of a facility response plan, cathodic protection, pipeline inspection and monitoring, and participation in a pre-dig notification program).

[7]  As for land impacts, the Corps considered and imposed requirements for restoration and protection of the surface.  *See* AR 71241 (describing measures for right-of-way clean up and restoration, including that "Permanent" erosion control devices "would be installed as appropriate, and revegetation measures would be applied in accordance with the Environmental

lengthy set of factors the Corps already considered before July 25.  In SRST's pre-July 25

comments opposing the pipeline, it repeatedly raised *the same* environmental points it now touts

as relevant only to a later MLA decision.  *See* AR 69152 *et seq.* (SRST responds to draft

Environmental Assessment with claims about water quality harm; leakage risks to both the

public and environmental safety: impacts on those living in the general area of the right-of-way,

particularly minority populations, low-income populations, and Indian tribes; and impacts on fish

and wildlife habitat); AR 66166 *et seq.* (SRST supplemental comments on the draft

Environmental Assessment raising similar issues, as well as the pipeline's impacts on air

quality).   SRST's brief freely admits this.  SRST Opp. 8–13 (stating that SRST raised these

same environmental concerns before the Corps made the July 25 decisions).  Indeed, for all the

ink Plaintiffs spill trying to persuade this Court that the MLA adds its own "stringent substantive

requirements," CRST Opp. 20, not once during their opposition to the pipeline did either

Plaintiff identify a single MLA provision that would require the Corps to engage in a separate

MLA analysis, much less require it to reach a different result.  Those comments never even

*invoke* a relevant MLA requirement.  That explains why SRST tries to defend the government's

*current* delay tactic (SRST calls it "Further Review") by invoking the Corps's supposed "failure

to *previously* consider the Tribe's Treaty rights and other risks to the Tribe."  SRST Opp. 31–32

(emphasis added).

--------

Construction Plan," a "Stormwater Pollution Prevention Plan," and "requirements of applicable
state and federal permits").  The Corps considered the project's compliance with applicable air
quality standards, *see* AR 71319, applicable water-quality standards, *see* AR 71298, and siting
standards, *see* AR 71339 (noting the North Dakota Public Utility Commission's approval of
siting application).  And the Corps considered and imposed mitigation measures to protect both
the environment and individuals living in the general area.  *See* AR 71341–49 (summarizing
environmental mitigation measures designed to protect persons living in the area who rely on
resources for subsistence).

One also need only review Plaintiffs' complaints to see that the factors they have accused the Corps of failing to consider adequately before taking final agency action on July 25 are the same factors they now claim to be relevant only to a decision (i) that has yet to be made (ii) under a statute they now insist is extraneous to deciding the claims in those complaints.[8]

The Corps, for its part, did not put off a single one of Plaintiffs' concerns on the ground that is was relevant solely to some later (and supposedly separate) right-of-way determination. To the contrary, the Corps addressed SRST's comments about possible impacts on the environment—and water quality in particular, including downstream water intakes—as well as the effects of leakage risks on the public and environmental safety.[9]   As recently as December 3, 2016 the Corps affirmed that its earlier "coordination and consultation" with SRST encompassed all issues relevant to the MLA.  D.E. 73-14 at ¶ 5(h).  The Court should reject the Corps's and

---

[8] *See, e.g.,* SRST Complaint, D.E. 1 at 41–43 (claiming § 408 permission is unlawful because it was issued without consideration of all the environmental effects required by NEPA); CRST Complaint, D.E. 37 at 48–51 (same); SRST Complaint, D.E. 1 at 45 (claiming RHA verification is unlawful because it does not comply with regulations regarding public water supplies and Tribal treaty rights); CRST Complaint, D.E. 37 at 52–53 (same); *id.* at 54–55 (claiming § 408 permission and RHA verification are unlawful because they were issued without consulting with the Tribe regarding environmental impacts).

[9] *See* AR 72468 (summary of comments received in response to Draft EA, along with the Corps's response, with SRST denoted by Commenter ID #15).  The Corps also addressed the SRST's comments regarding the pipeline's impacts on the interests of those living near the right-of-way—particularly minority populations, low-income populations, and Indian tribes, *see* AR 72469, as well as the impacts on fish, wildlife, and plants, see AR 72474–75. *See also* AR 69152 (comments on the Draft EA submitted by the SRST on January 8, 2016); AR 66166 (supplemental comments on the Draft EA submitted by the SRST on March 24, 2016); AR 71220 (Final Environmental Assessment incorporating the Corps's responses to comments on the Draft EA).  The CRST does not appear to have even submitted comments on the draft EA. As noted above, Plaintiffs may not agree with the Corps's work on these issues, but the fact that the Corps considered them fully refutes the notion that the MLA required later consideration of different issues.

Plaintiffs' *post hoc*, revisionist efforts to elevate Section 185(h)(2) to a status it never occupied during any part of the DAPL approval process.

Section 185(i) – disclosure of project participants.   The other parties contend it was not possible to have a right-of-way decision as of July 25, 2016, because the MLA requires "the project proponent [to] disclos[e] the identity of certain partners, shareholders, and affiliates." Corps Opp. 19 (citing 30 U.S.C. § 185(i)).   But this provision requires no finding by the Corps. Instead, it states that when an applicant is a business entity, "the Secretary or agency head shall require the applicant to disclose the identity of the participants in the entity."  30 U.S.C. § 185(i) (specifying details for the disclosure).   The Corps does not, and cannot, deny that before July 25 it "require[d] the applicant to disclose" that information.  *See* AR OAHE0000204 & 209–210 (completed form for corporate disclosures; also found at D.E. 73-5).   And even though this subsection requires nothing more, Dakota Access responded with the requested information a year and a half ago.  *See id.* (included in June 29, 2015 response to application form).

Section 185(j) – capabilities of applicant.   The parties note that the Corps must be "satisfied that the applicant has the technical and financial capability to construct, operate, maintain, and terminate the project."  30 U.S.C. § 185(j); *see* Corps Opp. 19.  Even though the statute does not require the Corps to declare that it is "satisfied," the Environmental Assessment amply addressed Dakota Access's capabilities.[10]  In fact, the Corps does not deny that in

---

[10]   *See* AR 71263 (noting that Dakota Access retains financial responsibility in the event of a spill event); AR 71304 ("Dakota Access has teamed up with the various craft and labor unions in the DAPL Project regions and nationally to ensure the DAPL Project is constructed by highly qualified and experienced local and regional labor resources"); AR 71313 ("Following completion of construction and throughout operation of the Proposed Action facilities, the Operator and qualified contractors would maintain emergency response equipment and personnel at strategic points along the pipeline route."); AR 71315 ("Following incident command protocols, the Operator would work in unison to cooperate with and assist fire, police and other

"evaluat[ing] the potential effects" of "granting permission" under the RHA "to Dakota Access,

L.L.C. (Dakota Access) to allow the proposed Dakota Access Pipeline (DAPL) Project to cross

federal real property interests administered by the District," AR 71174—and in finding that there

would be no lasting significant effects, AR 71176—the Corps necessarily satisfied itself of

Dakota Access's capabilities.

Here again, the Corps and Plaintiffs ask this Court to pretend that the long wait for

delivery of an easement document is due to MLA concerns that nobody—including Plaintiffs—

has ever previously expressed.  In fact, the one and only time SRST has even hinted at a possible

problem with technical or financial capabilities is in its brief opposing summary judgment.

SRST Opp. 33.  That argument—limited to *financial* capabilities—is the epitome of boot-

strapping.  Rather than question Dakota Access's capabilities as of July 25, SRST argues that the

Corps *could* question Dakota Access's financial capabilities *as of January 2017* because the

unwarranted delay that the Corps itself created by refusing to acknowledge its right-of-way grant

has been so pronounced that it supposedly puts completion of the project in jeopardy.  Not even

the Corps's own recent efforts to justify the refusal to acknowledge a right-of-way have stooped

to that level.[11]

Section 185(*l*) – cost reimbursement.  MLA § 185(*l*) requires certain payments by a right-

of-way or permit "applicant" and other later payments by the "holder" of a right-of-way or

permit.  30 U.S.C. § 185(*l*).  An "applicant" must "reimburse" the United States for

---

first responders when implementing actions to protect personnel, public safety and the
environment.").

[11]  SRST is wrong in asserting that Dakota Access spokespersons "publicly repudiated" the
statements to this Court that delay is causing irreparable harm.  *See* SRST Opp. 33 n.10.  There is
no inconsistency between Dakota Access's financial losses and its risk of losing supply contracts
as a result of delay, on the one hand, and retaining the opportunity to maintain shipping volumes
and go forward with the project as a whole even if construction was not complete by January 1.

"administrative and other costs incurred in processing the application." *Id.*  A "holder" must (i) "reimburse" for "costs incurred in monitoring the construction, operation, maintenance, and termination of" the pipeline and related facilities; and (ii) "pay annually in advance the fair market value of the right-of-way or permit, as determined by" the Corps.  Neither requirement prevents Dakota Access from having received a right-of-way.

In arguing otherwise, the Corps first points to the absence of any "document in which the Corps determined, much less collected, any costs associated with the easement[.]"  Corps Opp. 22.  First, the Corps has its facts wrong.  The documents that the Corps itself produced on January 6, 2017 show it has *already* collected—in full—payment for the costs to process the application.[12]  Second, both the Corps and Plaintiffs are wrong on the law.  Nothing in the MLA requires the Corps to collect any payments before it can *grant* a right-of-way.  The Corps insists that "advance payment of the annual rental fee is a statutory precondition to obtaining a Mineral Leasing Act easement."  Corps Opp. 22.  The Corps has contorted the meaning of "advance" in Section 185(*l*).  *See also* SRST Opp. 18.  The actual wording of Section 185(*l*) is that the "holder of a right-of-way or permit" must "pay annually in advance the fair market rental value of the right-of-way or permit, as determined by the Secretary or agency head."  Read in that context, the fair market rental value must be paid at the start of each year—"annually in advance"—after the Corps determines the annual amount; it does not require payment in advance of receiving a right-of-way in the first place.  After all, the payment "in advance" must be made by the "holder"

---

[12]   *See* AR OAHE0000016 (December 2014 letter from Corps requires Dakota Access to make advance payment of $120,000 in estimated administrative expenses "prior to our review" of the application, and explains that if the expenses turn out to be higher than the estimate Dakota Access must pay the additional amount "before we can continue to work on the action"); AR OAHE0000625 (June 2015 email from Corps acknowledging that administrative costs were paid and that nothing more was required).

of the right-of-way or permit—*i.e.*, someone to whom a right-of-way or permit has *already*

issued—not an "applicant."  And, as already noted, the same subsection requires an "applicant"

simply to "reimburse" for application-related costs, rather than pay them "in advance" of

receiving a right-of-way or permit.  The same is true for "costs incurred" by the government in

"monitoring" the "construction, operation, maintenance, and termination" of a pipeline:  the

holder (that is, one who already possesses a right-of-way or permit) need only "reimburse."  The

statute does not say that a holder of a right-of-way or permit must reimburse in advance of

anything—must less in advance of becoming a holder.[13]

Section 185(n) – right-of-way duration.  The parties note that the MLA requires the

Corps to consider "[t]he appropriate duration of" the right-of-way."  Corps Opp. 20 (citing 30

U.S.C. § 185(n)).  That consideration was part-and-parcel of the July 25 decision, in which the

Corps concluded, quite sensibly for a project of this nature, that its expected lifespan was open-

ended—that is, "permanent."  AR 71294–97 (calling it a "permanent" easement).  Given Section

185(n)'s duration limits for rights-of-way ("in no event more than thirty years") and the standard

language in the form easement the Corps uses for pipeline right-of-way requests, *see* D.E. 73-3

(form attached to Army policy guidance letter), the Corps simply chose the 30-year maximum.[14]

Section 185(p) – co-location of easements.  The Corps notes that it must consider

"[w]hether an easement can be co-located with existing easements."  Corps Opp. 20 (citing 30

---

[13]  This makes good sense.  The costs to the government of monitoring are difficult, at best, to
calculate until after the holder of the right-of-way has engaged in construction, operation,
maintenance, or termination of the pipeline.  The Corps can either seek reimbursement after-the-
fact or collect an estimated amount up-front (as it did for the application-related costs).  Nothing
in the statute compels it to collect in advance of granting permission to begin work.

[14]  AR OAHE0000470, at 0000471 (draft easement states: "This easement is hereby granted for
a term of Thirty Years[.]").

U.S.C. § 185(p)).  How this provision could possibly support the position of the Corps or

Plaintiffs is anyone's guess.  Those parties insist that the reason for the hold-up since July 25 is

that the Corps is considering requirements unique to the MLA.  But the route approved by the

Corps on July 25 is the *only* option that *is* co-located with existing easements.[15]  The supposed

alternative that the other parties mention (a several-mile detour that runs north to the other side

of Bismarck) would do violence to this requirement to use "rights-of-way in common" "to the

extent practical" so as to "*minimize* adverse environmental impacts."  30 U.S.C. § 185(p)

(emphasis added).  This provision posed no barrier to granting a right-of-way in July.

 Section 185(v) – state-law standards.  The Corps notes that the MLA requires it to take

into consideration and—to the extent practical—"comply with State standards for right-of-way

construction, operation, and maintenance."  Opp. 20 (citing 30 U.S.C. § 185(v)).  Coordination

with State standards played a significant role in the July 25 decision.  The Corps extensively

considered the importance of compliance with North Dakota's construction, operation, and

maintenance requirements, including revegetation of disturbed areas; spill response; inspection

of construction equipment; removal of aquatic vegetation from vessels, motors, trailers, or

construction equipment; removal of Aquatic Nuisance Species; and inspection of vehicles by

North Dakota Game and Fish Department prior to launch in state waters.  *E.g.*, AR 71263–66.

Finally, neither the Corps nor Plaintiffs mention that the State of North Dakota needed to

make—and already has made—its approvals.  Ex. 2 (North Dakota Public Service Commission

Order and permits approving DAPL).

---

[15]  *See* AR 71249 (noting that the pipeline will be co-located with existing electric transmission
line and natural gas pipeline); AR 71240 (noting that the proposed pipeline is routed parallel to
the existing natural gas pipeline).

Section 185(x) – liability.  The Corps claims that the MLA requires it to "[a]ddress potential liability, including 'the extent to which … holders shall indemnify or hold harmless the United States for liability, damage, or claims arising in connection with the right-of-way or permit." Corps Opp. 20 (quoting 30 U.S.C. § 185(x)).  But the only "shall" directed at agency heads is not a case-by-case determination.  *See, e.g.,* 30 U.S.C. § 185(x)(1) (the agency "shall promulgate regulations and may impose stipulations specifying the extent to which holders of rights-of-way and permits under this chapter shall be liable to the United States" for damage or injury to the United States).  And while this provision does not require any project-specific conditions on this topic (it says an agency "may" impose stipulations to a right-of-way or permit), the Corps already had incorporated into a pre-July 25 draft the standard conditions for liability and indemnity.[16]

Section 185(w) – congressional notice.  As explained in Dakota Access's motion, the MLA contains two notice requirements for certain rights-of-way.  The parties agree that the Corps long ago provided the first:  notification "to the Committee on Natural Resources of the United States House of Representatives and the Committee on Energy and Natural Resources of the United States Senate upon receipt of an application for a right-of-way for a pipeline twenty-four inches or more in diameter." 30 U.S.C. § 185(w)(2).[17]  The other is congressional notice "of intention to grant the right-of-way, together with" the agency head's "detailed findings as to the

---

[16]   AR OAHE0000470, at 0000473–74 (paragraphs 9 & 12 of draft easement addressing liability and indemnity); *id.* at 0000464 (July 21, 2016 email transmitting draft easement); *cf.* D.E. 73-3 (model easement at ¶¶ 9 & 12); *see also* AR 71263 (noting that, in the event of a spill, "the On-Scene Incident Commander (USEPA) would be responsible for assimilating and approving the response actions under the Unified Command," but that "Dakota Access maintains financial responsibility for the duration of the response actions.").

[17]   *See, e.g.*, AR OAHE0000246 (transmitting notice package to relevant members of Congress); AR OAHE0000250–54 (copies of the Sept. 3, 2015 congressional notice letters).

terms and conditions he proposes to impose." 30 U.S.C. § 185(w)(2). Although the Corps refuses to submit notice itself, the relevant committees have received it. Moreover, the Corps cannot use one of its own failings to avoid the legal consequences of its decision to grant a right-of-way.

*First*, the Corps and Plaintiffs do not dispute that the relevant committees received notification of the July 25 decisions and the terms and conditions applicable to a right-of-way for the pipeline. The Environmental Assessment, AR 71220 *et seq.*, and Finding of No Significant Impact document, AR 71114 *et seq.*, were widely publicized, reported upon, and made publicly available. Not only did members of the Committees receive notice of the decision (including detailed findings as to terms and conditions), they have favorably commented on that decision. *See* D.E. 66-1 at 12, n.3; *see also* Press Release, Dakota Access Delays Jeopardize Future Infrastructure Investment and Development (Nov. 15, 2016), http://naturalresources.house.gov/ newsroom/documentsingle.aspx?DocumentID=401348 (statement by Rob Bishop, Chairman of the House Committee on Natural Resources, that "[t]he route was approved the first time around after an exhaustive permitting process under the established regulatory framework, including the Mineral Leasing Act"); Ex. 3, (Letter from Congressman Jared Huffman et al. to President Barack Obama (Nov. 14, 2016)).

Neither the text nor the underlying purposes of the statute requires anything additional before Dakota Access has the lawful authority to proceed beneath the federal land. Section 185(w)(2) does not require notice in any specified form or even that it be "submitted by" any particular person or entity. *Id.* (requiring Secretary or agency head to provide notice of application for right-of-way, but using passive voice for the second notice). After the Corps unreasonably delayed sending notice of its decision to the Committees—a situation Congress had

24

no reason to address expressly in the statute because there was no reason to anticipate this type

of sudden about-face—other means of notification successfully filled the void.  To the extent

internal "policy guidance" describes how the Corps typically provides notification, *see* Corps

Opp. 13 (citing Policy Guidance Letter No. 27), it does not foreclose a right-of-way when notice

is accomplished otherwise.

That conclusion is reinforced by Section 185(w)'s purpose.  Far from intending to enable

political meddling after an agency decision is final, Congress simply wanted to keep itself

informed of actions that agencies approved under this statute.  Consistent with the one-word title

of Section 185(w)—"Reports"—the first of its three subsections requires annual reports "on the

administration of this section and on the safety and environmental requirements imposed

pursuant thereto," 30 U.S.C. § 185(w)(1), and the third similarly requires the Department of

Transportation to report at least annually on "any potential leaks or safety problems," *id.*

§ 185(w)(3).  Between them is the subsection at issue here, which likewise focuses on providing

Congress with safety information—specifically, information about "the terms and conditions"

that the relevant agency "proposes to impose" on larger pipelines.  30 U.S.C. § 185(w)(2).  That

purpose is satisfied because the Committees have the relevant information.

The government nonetheless insists there is a timing problem.  It contends that

notification must occur before the grant of a right-of-way.  Corps Opp. 12–13.  But Section 185

does not bar publishing the documents that authorize the right-of-way simultaneously with or

even before notification to the Committees.  Rather, Section 185(w) simply states that the right-

of-way is not "granted" until notification occurs.  Thus, now that the Committees have received

notification, the Court can enter judgment on the claim regardless of which date or dates that

notification was received.  The Corps cannot let political interference or anything else undo a

final decision to grant a right-of-way through the pretext of improperly withholding

Congressional notice.  Even if the Corps should have followed through with formal notice,

nothing in the statute requires the applicant for the right-of-way to bear the consequences of that

failure.

*   *   *

In sum, to the extent there are actions the Corps must take before delivering a signed

easement, those actions are confined to details about *how* the right-of-way or easement will

operate, not whether there *is* a right-of-way.  Nor does any one of those details stand as an

obstacle to recognizing that a right-of-way exists.

### C.   The Corps's And Plaintiffs' Remaining Challenges Are Meritless.

Both the Corps and the Tribes raise a host of other arguments why Dakota Access does

not yet have a right-of-way.  These arguments, based on miscellany policies, guidance, and other

documents, are meritless.

**1.**   The Corps's reliance on Engineering Circular 1165-2-216—stating that "an approval

under Section 408 does not grant any property rights or exclusive privileges"—is misplaced.

EC 1165-2-216 at 2 (Sept. 30, 2015).  Dakota Access is not challenging the government's title to

the land, is not seeking a declaration of competing property rights, and does not assert any

exclusive privileges in the land at issue.  Nor does this argument address how the approval

process operated under the undisputed facts of this case.  In these circumstances, the Corps's

determinations made on July 25 were the same determinations it intended to make—and did, in

fact, make—in order to make the right-of-way decision.

**2.**   The Corps also contends that no right-of-way could have issued here, because the

Army did not delegate authority to grant a right-of-way to the person who issued the Section 408

permit—District Commander (also known as District Engineer) Col. John Henderson.  But if, as

Dakota Access has shown, the Section 408 permission includes all of the determinations needed for a right-of-way, no separate delegation is needed.  The delegation that indisputably exists for Section 408 purposes, *see* EC 1165-2-216 at 7, suffices.  Moreover, Army regulations also authorize the Corps to "redelegate" authority "to issue, execute, manage, renew, supplement or revoke outgrants authorizing the use of Army real property."  AR 405-80 ¶ 3-1.  And those regulations further state that "[t]he authority of the COE to grant use of real estate will be delegated, to the extent feasible, to U.S. Army Division and District Engineers."  32 C.F.R. § 643.4(d).  There can be no doubt that the Corps delegated that authority to the District level, because that is how the easement for the Lake Sakakawea crossing was accomplished.  D.E. 62–3 at 3, 6.

      **3.**  CRST cites statements and informal communications to the effect that Dakota Access was waiting for an easement before starting construction beneath Lake Oahe and that the company understood that a Section 408 permit was distinct from a right-of-way under the MLA.  CRST Opp. 26–28.  But these statements and communications were entirely appropriate given the circumstances.  Until this case, no private party has needed to consider—much less litigate—whether decisions like those the Corps announced on July 25 are enough to proceed with construction affecting federal land.  The Corps cannot point to a single instance in which it declined to confirm its approval of a comparable project by delivering a written easement shortly after announcing approval.  Dakota Access had every reason to think the Corps would timely complete the process here, too, because the right-of-way decision was already made.  It was the Corps's unprecedented actions that brought this novel issue to the fore.

      **4.**  SRST suggests that the cross-claim cannot be viable because it would mean that the Section 408 authorization "could simply supplant the need for a separate NWP verification"

under the Clean Water Act.  SRST Opp. 28.  It says that the Corps conducted a "distinct process" for the verifications under NWP 12, even though "elements" of that process "overlap" with the Section 408 authorization.  *Id.*  Of course, the NWP verification process involved much more than the Lake Oahe and Lake Sakakawea crossings, and that process is not limited to crossings of federally owned property.  SRST also makes no effort to match each condition specific to NWP 12 with the Section 408 requirements.  *See* D.E. 21-11 at 2-7 (including nearly two dozen NWP conditions).  To make this argument, SRST therefore needs to oversimplify the rationale for concluding that the Corps granted a right-of-way to Dakota Access.  That conclusion is not based on "some overlap" in the process and standards for the decisions at issue.  SRST Opp. 28.  There was a single decision about the crossing of federal property.  And, as explained earlier, SRST points to no determination that needed to be made before a right-of-way was granted and had yet to be made as of July 25.  That is a far cry from "some overlap."

**D.   Events After July 25, 2016 Do Not Change The Fact That Dakota Access Has A Right-Of-Way.**

The government has repeatedly insisted in recent months, including on December 4, 2016, that Dakota Access does not have its permission to cross beneath federal land at Lake Oahe.  The Corps and Plaintiffs mischaracterize the significance of those statements to Dakota Access's cross-claim.  Just as the cross-claim does not ask this Court to compel agency action, it does not seek APA review of statements the government has made, or actions it has taken, since July 25.  *Cf.* SRST Opp. 29–34 (contesting reviewability of December 4 memorandum).  The point instead is that these statements and actions cannot and do not alter the conclusion that Dakota Access received a right-of-way and still has one.

SRST devotes an entire section of its brief to the argument that Dakota Access "cannot challenge" the Army's December 4 decision to conduct further review.  SRST Opp. 29

(argument heading).  In an argument heading within that section, SRST contends that the

supposed decision "to withhold the easement pending further review" was "correct."  *Id*. at 31.

Neither argument is a reason to dismiss the cross-claim or deny summary judgment.  In fact, they

are wholly beside the point because, by SRST's own telling, the Court never gets to these

arguments so long as it remains an open question whether the Corps previously granted a right-

of-way.

As Dakota Access explained in its motion, the only way the December 4 memorandum

could have legal significance to the cross-claim is if the memorandum purported to revoke a

right-of-way.  Dakota Access's motion explained why it could not be construed as a proper

revocation.  D.E. 66-1 at 30.  The government, in declining to defend the memorandum as a

revocation of a right-of-way, thereby concedes the point.

Despite having no *legal* significance to the cross-claim, the government's post-July 25

actions are important for a different reason.  The Corps and Plaintiffs would have the Court

believe that after the Corps made its Section 408 decision on July 25, it turned its attention to a

different decision:  whether to grant a right-of-way.  Nearly half a year later, that decision

supposedly remains unmade.  Why?  The Corps and Plaintiffs point to a dozen MLA provisions

as possible explanations.  But each time the government has made its periodic announcements

about this new process, it has not mentioned requirements *unique* to the MLA.  When the

government gets around to specifics, it recites the same environmental considerations that were

extensively addressed in a document titled—no surprise—Environmental Assessment.  *See* D.E.

65-1 (December 4 memorandum) ¶¶ 8 & 10.[18]

---

[18]  The December 4 memorandum says that the discussions have involved "additional" terms
and conditions that might "further reduce the risk of a spill or pipeline rupture."  D.E. 65-1 at 2.

It's no mystery what is really going on.  After the Corps made its decision that the pipeline was safe to cross beneath federal land at Lake Oahe and met all of the legal requirements for doing so, and just as the Corps was vigorously defending that decision in this Court, political interference was well underway.  The first ploy was to announce a potential reconsideration of the Corps "previous decisions" to see if they complied with NEPA and other federal laws.  D.E. 42-1.  That bought a few extra months of delay, but the outcome was not helpful to the overall cause:  Upon further review, it turned out that all of the government's "previous decisions comported with legal requirements."  D.E. 56-1 at 2.  With nothing else to work with, the government invoked the importance of getting input from SRST, even though SRST had every opportunity to make its views known since late 2014, D.E. 65-1 ¶ 9, and even though the Corps itself lamented to this Court about the dangers of letting parties come to the table at the eleventh hour to raise concerns that could and should have been fully aired much earlier.  Make no mistake, this hijacking of the approval process has nothing to do with the government's need to address a requirement added by the MLA and everything to do with an unlawful effort to pretend no right-of-way decision was made in July.[19]

---

But each and every "further" condition mentioned in paragraph 10 of that memorandum—such as "a Supervisory Control and Data (SCADA) System" and "Computational Pipeline Monitoring (CPM) Leak Detection"—is already included within the right-of-way conditions set forth in the Environmental Assessment.  *See* AR 71266 (SCADA system); 71313 (same); 71349 (same); 71349 (CPM).  And to the extent enhancements become appropriate, the conditions incorporated from the Environmental Assessment contain ample flexibility to do so.  *Id.* at 71315 (providing that the Facility Response Plan and Geographical Response Plans "will be finalized after construction" and "submitted to the [Corps] for review and incorporation of [Corps] comments" before being submitted to another federal agency.  That is one reason the Lake Sakakawea easement contains the exact same conditions, applicable to both easements.  Exh. I to D.E. 66 at 6 (Lake Sakakawea easement conditions include testing at Lake Oahe).

[19]  Given that the Corps and Plaintiffs extensively invoke the government's post-July 25 process as proof that no right-of-way decision has been made, Dakota Access renews its request that the Court order production of documents relevant to that process.  *See* D.E. 58 (expedited motion to

**IV.     This Court Should Not Delay Granting Declaratory Relief.**

**A.**     SRST asks this Court to "abstain from issuing any declaratory relief until [SRST] has had an opportunity to present its challenges to the July 25, 2016 decision."  D.E. 78 at 34. That is nothing more than a backdoor gambit for the type of preliminary injunction this Court and the D.C. Circuit both rejected.  D.E. 38; No. 16-5259, Doc. 1640062 (D.C. Cir. Oct. 9, 2016).  It is also disingenuous.  SRST told this Court—jointly with CRST and the Corps—that it should hold the Tribes' claims "in abeyance" so that the parties and the Court could "focus on resolving the Dakota Access Motion for Summary Judgment on an expedited basis."  D.E. 71 at 1–2 (invoking "interests of judicial economy").  SRST now asks this Court to put *its* claims back at the head of the line after urging this Court to do the opposite.  This Court should refuse to reward this about-face and the added delay SRST seeks to inject into the process.

Giving in to SRST's request—a stay of declaratory relief in Dakota Access's favor until SRST's claims are decided—would mean having the Court conclude that Dakota Access received a right-of-way months ago but denying it a legal judgment declaring the same thing. That would be tantamount to SRST obtaining a preliminary injunction without even trying to satisfy the requirements in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008).  The Court already rejected SRST's earlier request for a preliminary injunction, and the case for one now is also non-existent.  For one thing, SRST could not show even a *possibility* of irreparable harm from the narrow category of construction that remains.  Unlike SRST's earlier motion, in which SRST argued that the *construction* itself leading up to Lake Oahe might damage sites of cultural significance in the path of the construction, D.E. 6 at 34–39, its current

---

supplement record).  The Court cannot deny summary judgment or dismiss the cross-claim under Rule 12(b)(6) without allowing Dakota Access to see documents proving that the government's post-July 25 process is *not* about evaluating factors unique to the MLA.

arguments rest entirely on potential harm from the *operation* of the pipeline.  D.E. 78 at 45.  That is no basis for stopping construction work while the parties brief the claims alleged in Plaintiffs' complaints, because risks associated with sending oil through an uncompleted pipeline are "remote" and "speculative," rather than "immediate and palpable."  *Nat'l Wildlife Fed. v. Burford*, 835 F.2d 305, 326 (D.C. Cir. 1987).

> **B.**     SRST also argues that the cross-claim's declaratory relief will not fully resolve all disputes between the parties.  D.E. 78 at 45.  But it *will* fully resolve the dispute between Dakota Access and the Corps—the only parties to the cross-claim.  The Court allowed SRST and CRST to voice their views despite not being parties to the cross-claim.  They cannot use that grant of permission to argue that *their* disputes with others are reason to reject the claim.  As explained earlier, the dispute between Dakota Access and the Corps has to do with the legal significance of the decisions the Corps made in July.  SRST and CRST may care about the outcome of that dispute, but they are not parties to it.  An order granting Dakota Access the declaratory relief it seeks will resolve its dispute with the Corps, which explains why *the Corps* does not raise this objection.  In any event, the presence of other disputes initiated by Plaintiffs actually supports entertaining Dakota Access's request for declaratory relief.  When this Court decided the preliminary injunction motion on September 9, the case was on track to be decided expeditiously.  The announcement by the government that same day—followed by more announcements in the intervening months—stalled the case to the detriment of Dakota Access.  SRST concedes that granting the declaratory relief would solve this problem because it will "*ripen* the Tribe's claims challenging the July 25 decisions."  D.E. 78 at 44 (emphasis added).

> Even if the claims brought by SRST and CRST are germane to this factor of resolving all disputes, the Court still has ample discretion to entertain the cross-clam.  "While a declaratory

judgment must be conclusive and must settle the controversy, this does not mean that every aspect of the suit must be resolved by the declaratory judgment." *Friends of the Earth v. Potomac Elec. Power Co.*, 419 F. Supp. 528, 532 (D.D.C. 1976) (internal citations and quotation marks omitted). Resolution of the entire suit is just one of many factors. *Morgan Drexen, Inc. v. CFPB*, 785 F.3d 684, 696–97 (D.C. Cir. 2015) (noting "non-exclusive list of" eight factors in *Hanes Corp. v. Millard*, 531 F.2d 585, 591 n.4 (D.C. Cir. 1976)); *id*. at 697 ("every factor need not be considered and others may be" considered (citations and internal quotation marks omitted)).[20]

An important purpose of declaratory relief is to "'clarify[] the legal relations in issue' or . . . afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" *President v. Vance*, 627 F.2d 353, 364 n.76 (D.C. Cir. 1980) (quoting E. Borchard, DECLARATORY JUDGMENTS 299 (2d ed. 1941). That aptly describes this case, because it is the "uncertainty, insecurity, and controversy" caused by the government's post-July 25 positions that prompts Dakota Access to seek a declaration allowing it to complete its pipeline free of doubt over whether an enforcement action could subject it to penalties. The declaratory relief would also "clarify[] the legal relations in issue," thus expediting the complete and final disposition of the Tribes' claims.

## CONCLUSION

The Court should deny the Corps's and Plaintiffs' motions to dismiss; deny Plaintiffs' cross-motions for summary judgment, and grant summary judgment to Dakota Access.

---

[20]  Declaratory relief, while discretionary, is "not exclusive or extraordinary," Fed. R. Civ. P. 57 advisory committee's note to 1937 Adoption. "Although a party must demonstrate irreparable injury before obtaining injunctive relief, such a showing is not necessary for the issuance of a declaratory judgment." *Tierney v. Schweiker*, 718 F.2d 449, 457 (D.C. Cir. 1983).

Respectfully Submitted,


Dated:  January 20, 2017

Kimberly H. Caine                                          /s/ William S. Scherman
William J. Leone (*Pro Hac Vice* granted)      William S. Scherman
Robert D. Comer (*Pro Hac Vice* granted)      David Debold
NORTON ROSE FULBRIGHT US LLP                GIBSON, DUNN & CRUTCHER LLP
799 9th St. N.W., Suite 1000                         1050 Connecticut Avenue, N.W.
Washington, D.C. 20001                                Washington, D.C. 20036
(202) 662-0200                                            (202) 955-8500
                                                              (202) 530-9557 (fax)
Edward V. A. Kussy                                     wscherman@gibsondunn.com
Alan M. Glen
NOSSAMAN LLP
1666 K Street, N.W., Suite 500
Washington, D.C. 20006
(202) 887-1400

*Counsel for Defendant–Intervenor–Cross Claimant Dakota Access, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 20th day of January, 2017, I electronically filed the foregoing

document with the Clerk of the Court for the U.S. District Court for the District of Columbia using

the CM/ECF system.  Service was accomplished by the CM/ECF system on the following counsel:

Patti A. Goldman
Jan E. Hasselman
EARTHJUSTICE
705 Second Avenue, Suite 203
Seattle, WA  98104
(206) 343-7340
pgoldman@earthjustice.org
jhasselman@earthjustice.org

*Counsel for Plaintiff Standing Rock Sioux Tribe*


Nicole E. Ducheneaux,
FREDERICKS PEEBLES & MORGAN, LLP
3610 North 163rd Plaza
Omaha, NE 68116
(402) 333-4053
nducheneaux@ndnlaw.com

Conly J. Schulte
FREDERICKS PEEBLES & MORGAN, LLP
1900 Plaza Drive
Louisville, CO 80027
(303) 673-9600
cshulte@ndnlaw.com

*Counsel for Plaintiff–Intervenor Cheyenne River Sioux Tribe*

Matthew M. Marinelli
Erica M. Zilioli
U.S. DEP'T OF JUSTICE
Environment & Natural Resources Division
P.O. Box 7415
Washington, D.C.  20044
(202) 514-2000
Matthew.Marinelli@usdoj.gov
Erica.zilioli@usdoj.gov

*Counsel for Defendant–Cross Defendant U.S.
Army Corps of Engineers*


 /s/ William S. Scherman
William S. Scherman
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500
wscherman@gibsondunn.com

*Counsel for Defendant–Intervenor–Cross
Claimant Dakota Access, LLC*