**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **STANDING ROCK SIOUX TRIBE,** | |
| **Plaintiff,** | **Case No. 1:16-cv-1534-JEB** |
| **and** | |
| **CHEYENNE RIVER SIOUX TRIBE,** | |
| **Intervenor-Plaintiff,** | |
| **v.** | |
| **U.S. ARMY CORPS OF ENGINEERS,** | |
| **Defendant – Cross-Defendant.** | |
| **and** | |
| **DAKOTA ACCESS, LLP,** | |
| **– Intervenor-Defendant Cross-Claimant.** | |

**INTERVENOR-PLAINTIFF CHEYENNE RIVER SIOUX TRIBE'S
MOTION FOR PRELIMINARY INJUNCTION
(Oral Argument Requested)**

Pursuant to Federal Rule of Civil Procedure 65 and Local Rule 65.1, Intervenor-Plaintiff Cheyenne River Sioux Tribe hereby moves for a preliminary injunction directing Defendant United States Army Corps of Engineers to withdraw the easement/right-of-way issued on February 8, 2017 that permits Dakota Access, LLC to drill an oil pipeline under federally-owned lands under and on either side of Lake Oahe as the easement/right-of-way constitutes a substantial burden on the free exercise of Cheyenne River Sioux tribal members' religion, no compelling interest justifies

the burden, and the pipeline does not represent the least restrictive means of achieving the government's interest for the reasons set forth in the accompanying memorandum of law.

The Tribe requests that a Preliminary Injunction preventing drilling under Lake Oahe be issued immediately with a hearing to be held on this matter at the Court's earliest convenience.


Dated: February 9, 2017

<div style="text-align:center">

CHEYENNE RIVER SIOUX TRIBE,
Intervenor-Plaintiff,

</div>


By:   /s/ Nicole E. Ducheneaux
    Nicole E. Ducheneaux
    Fredericks Peebles & Morgan LLP
    3610 North 163rd Plaza
    Omaha, NE  68116
    Telephone:  (402) 333-4053
    Facsimile:  (402) 333-4761
    Email: nducheneaux@ndnlaw.com

    Conly J. Schulte
    FREDERICKS PEEBLES & MORGAN LLP
    1900 Plaza Drive
    Louisville, CO  80027
    Telephone:  (303) 673-9600
    Facsimile:  (303) 673-9839
    Email:  cschulte@ndnlaw.com

<div style="text-align:center">

**CERTIFICATE OF SERVICE**

</div>

I HEREBY CERTIFY that on this 9th day of February, 2017, a copy of the foregoing was filed electronically with the Clerk of the Court.  The electronic filing prompted automatic service of the filing to all counsel of record in this case who have obtained CM/ECF passwords.


        /s/ Nicole E. Ducheneaux

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**STANDING ROCK SIOUX TRIBE,**

    **Plaintiff,**

  **and**

**CHEYENNE RIVER SIOUX TRIBE,**

    **Intervenor-Plaintiff,**

  **v.**

**U.S. ARMY CORPS OF ENGINEERS,**

    **Defendant – Cross-Defendant.**

  **and**

**DAKOTA ACCESS, LLP,**

    **Intervenor-Defendant**
 **–**    **Cross-Claimant.**

**Case No. 1:16-cv-1534-JEB**

## INTERVENOR-PLAINTIFF CHEYENNE RIVER SIOUX TRIBE'S COMBINED MEMORANDUM IN SUPPORT OF EX-PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND APPLICATION FOR PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

FACTUAL BACKGROUND ......................................................................................... 4

    I.   The Religious Exercise of the Cheyenne River Sioux Tribe and Its Members ................... 4

       A.  General principles of Cheyenne River Lakota religious exercise ..................................... 4

       B.  Specific beliefs and sacraments of the Cheyenne River Lakota and their relationship
          to *mni* or water........................................................................................................ 6

       C.  The Tribe's Sacred Connection to the Missouri River—*Mni Sose* ................................ 9

    II.  The United States' Systematic Restriction of the Tribe's and Its Members' Access to
       Sacred Waters ............................................................................................................ 10

    III.  The Tribe's Ownership of the Waters of Lake Oahe ..................................................... 14

    IV.  The Impact of the Easement on Lakota Religious Practice ........................................... 17

    V.  The Present Dispute .................................................................................................... 20

STANDARD FOR GRANTING TEMPORARY INJUNCTIVE RELIEF................................. 22

ARGUMENT ................................................................................................................. 24

    I.   The Cheyenne River Sioux Tribe is Likely to Succeed on Its RFRA Claim..................... 24

       A.  Practitioners of the Lakota Religion Are Sincerely Compelled to Observe and
          Practice the Rites of Lakota Spirituality, Especially Inipi ............................................. 24

       B.  The Corps' Granting of Permission for Dakota Access to Construct and Operate a
          Crude Oil Pipeline Under the Tribe's Sacred Waters Substantially Burden the
          Tribal Members' Religious Exercise............................................................................ 29

       C.  The Corps has no Compelling Interest in the Construction of the Dakota Access
          Pipeline.................................................................................................................... 37

       D.  Even if the Corps Had a Compelling Interest Here, Construction of the Pipeline
          Under Sacred Waters Owned by the Cheyenne River Sioux Tribe is Not the Least
          Restrictive Means of Furthering That Interest .............................................................. 39

II. The Remaining Factors All Weigh In Favor of Granting Temporary and Preliminary Injunctive Relief ............................................................................................................... 40

   A. The Cheyenne River Sioux Tribe will suffer irreparable harm absent injunctive relief 41

   B. The Balance of Harms Weighs in the Cheyenne River Sioux Tribe's Favor ................ 42

   C. The Public Interest Favors Granting an Injunction ....................................................... 44

CONCLUSION .................................................................................................................... 45

# TABLE OF AUTHORITIES

## Cases

*A.A. ex. rel. Betenbaugh v. Needville Indep. Sch. Dist.*, 611 F.3d 248 (5th Cir. 2010) ............... 25

*ACLU of Ill. v. Alvarez*, 679 F.3d 583 (7th Cir. 2012) ..................................................... 44

*Barrow v. Graham*, 124 F. Supp. 2d 714 (D .D.C. 2000) .................................................. 23

*Cappaert v. United States*, 426 U.S. 128 (1976) ........................................................... 14

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006) ...................... 42

*Cherokee Nation v. Georgia*, 5 Pet. 1 (1831) .............................................................. 32

*City of Boerne v. Flores*, 521 U.S. 507 (1997) ............................................................ 37

*Cobell v. Babbitt*, 91 F. Supp. 2d 1 (D. D.C. 1999) ...................................................... 17

*Crawford-El v. Britton*, 951 F.2d 1314 (D.C. Cir. 1991) ................................................. 32

*Elrod v. Burns*, 427 U.S. 347 (1976) ................................................................. 23, 41

*ETSI Pipeline Project v. Missouri*, 484 U.S. 495 (1988) .................................................. 17

*Frazee v. Ill. Dep't of Emp't Sec.*, 489 U.S. 829 (1989) .............................................. 25, 29

*\*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006) ......... passim

*Haight v. Thompson*, 763 F.3d 554 (6th Cir. 2014) ...................................................... 30

*Henderson v. Kennedy*, 256 F.3d 12 (D.C. Cir. 2001) .................................................... 29

*Hernandez v. Comm'r of Internal Revenue*, 490 U.S. 680 (1989) ...................................... 25, 36

*Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114 (10th Cir. 2013) ................................. 40

*\*Burwell v. Hobby Lobby*, 134 S. Ct. 2751 (2014) ............................................... passim

*\*Holt v. Hobbs*, 135 S. Ct. 853 (2015) .......................................................... passim

*Hopi Tribe v. United States*, 782 F.3d 662 (Fed. Cir. 2015) ............................................. 17

*Hudson v. Dennehy*, 538 F. Supp. 2d 400 (D. Mass. 2008) ....................................... 30, 31, 34, 36

*Hunafa v. Murphy*, 907 F.2d 46 (7th Cir. 1990) ........................................................ 30, 31, 34, 36

*Jackson v. Mann*, 196 F.3d 316 (2d Cir. 1999) ........................................................... 30, 31, 34, 36

*Jamul Action Comm. v. Chaudhuri*, 837 F.3d 958, 965 (9th Cir. 2016) .................................. 2, 42

*Kay v. Bemis*, 500 F.3d 1214 (10th Cir. 2007) ........................................................................ 25

*\*Korte v. Sebelius*, 735 F.3d 654 (7th Cir. 2013) ................................................................ 22, 40

*Love v. Reed*, 216 F.3d 682 (8th Cir. 2000) ...................................................................... 29, 31, 34

*Lyng v. Northwest Indian Cemetery Protective* Association, 485 U.S. 439 (1988) .............. 33, 34

*McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465 (5th Cir. 2014) ............................... 39

*McElyea v. Babbitt*, 833 F.2d 196 (9th Cir. 1987) ..................................................... 30, 31, 34, 36

*Mills v. Dist. of Columbia*, 517 F.3d 1304 (D.C. Cir. 2009) ..................................................... 41

*Moussazadeh v. Tex. Dep't of Criminal Justice*, 703 F.3d 781 (5th Cir. 2013) .......................... 25

*Nance v. EPA*, 645 F.2d 701 (9th Cir. 1981) ............................................................................ 15

*Native Am. Council of Tribes v. Weber*, 750 F.3d 742 (8th Cir. 2014) ........................................ 30

*Navajo Nation v. U.S. Forest Service*, 535 F.3d 1058 (9th Cir. 2008) ............................ 33, 34, 35

*Navajo Tribe of Indians v. United States*, 224 Ct. Cl. 171 (1980) ............................................... 17

*Northwest Sea Farms, Inc. v. U.S. Army Corps of Eng'rs*, 931 F. Supp. 1515 (W.D. Wash. 1996) ........................................................................................................ 16

*O Centro Espirita Beneficent Uniao Do Vegetal v. Ashcroft*, 282 F. Supp. 2d 1236 (D. N.M. 2002) ................................................................................................................ 42, 44

*Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440 (1969) ......................................................................................................... 36

*Rigdon v. Perry*, 962 F. Supp. 150 (D. D.C.) ...................................................................... 24, 41

*Seminole Nation v. United States*, 316 U.S. 268 (1942) ............................................................ 15

*Shereley v. Sebelius*, 644 F.3d 388 (D.C. Cir. 2011) ................................................................ 22

*Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 3d 9 (D. D.C. 2013) ............................ 38

*Simms v. Dist. of Columbia*, 872 F. Supp. 2d 90 (D. D.C. 2012) ................................................. 41

*Singh v. McHugh*, 185 F. Supp. 3d 201 (D. D.C. 2016) ................................................................ 24

*Smith*, 494 U.S. at 887 ................................................................................................................. 29, 36

*Snoqualmie Indian Tribe v. F.E.R.C.*, 545 F.3d 1207 (9th Cir. 2008) .................................... 33, 34

*South Dakota v. Bourland*, 508 U.S. 679 (1993) ......................................................................... 15

*Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707 (1981) .......................................... 25

*Tyndale*, 904 F. Supp. 2d at 130 ................................................................................................... 44

*United States v. Adair*, 723 F.2d 1394, 1409 (9th Cir. 1983) ...................................................... 15

*United States v. Ballard*, 322 U.S. 78 (1944) .................................................................. 25, 29, 36

*United States v. Dion*, 476 U.S. 734 (1986) ................................................................................. 15

*United States v. Gila River Irrigation Dist.*, 920 F. Supp. 1444 (D. Ariz. 1996) .................. 15, 17

*United States v. Hardman*, 297 F.3d 1116 (10th Cir. 2002) ........................................................ 26

*United States v. Jicarilla Apache Nation*, 465 U.S. 162 (2011) ................................................. 17

*United States v. Mitchell*, 463 U.S. 206 (1983) ............................................................... 15, 17, 32

*United States v. Sioux Nation of Indians*, 448 U.S. 371 (1980) ................................................... 11

*United States v. Sterling*, 75 M.J. 407 (C.A.A.F. 2016) .............................................................. 24

*United States v. Winans*, 198 U.S. 371 (1905) ............................................................................ 15

*Warsoldier v. Woodford*, 418 F.3d 989 (9th Cir. 2005) ................................................... 29, 31, 34

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ..................................................... 22

*Winters v. United States*, 207 U.S. 564 (1908) .............................................................. 14, 15, 16

*Wis. Gas Co. v. F.E.R.C.*, 758 F.2d 669 (D.C. Cir. 1985) .......................................................... 43

*Yellowbear v. Lampert*, 741 F.3d 48 (10th Cir. 2014) ......................................................... 29, 30

## Statutes

16 U.S.C. §§ 460d, 825s (1946 ed.) .......................................................................... 17

25 Stat. 888, § 4 ....................................................................................................... 15

25 U.S.C. § 1632 ...................................................................................................... 16

25 U.S.C. § 280 (1922) ............................................................................................ 18

30 U.S.C. § 185 ........................................................................................................ 21

33 U.S.C. § 403 ........................................................................................................ 20

33 U.S.C. § 408 ........................................................................................................ 38

33 U.S.C. § 701-1(b) ........................................................................................... 13, 17

33 U.S.C. §§ 708, 709 (1946 ed.) ............................................................................ 17

42 U.S.C. § 1996 ...................................................................................................... 26

*42 U.S.C. § 2000bb-1 ...................................................................................... passim

42 U.S.C. § 4321 et seq. ........................................................................................... 20

68 Stat. 1191, 1192-1193, § VI, § 10 ....................................................................... 13

## Other Authorities

*1868 Fort Laramie Treaty* .......................................................................................... 14

82 Fed. Reg. 5544 (Jan. 18, 2017) ................................................................. 21, 40, 43

Act of February 28, 1877, 19 Stat. 254 (1877) .............................................. 11, 12, 15

Act of March 2, 1889, ch. 206, 25 Stat. 88, § 2 ...................................................... 12

Act of March 21, 1968, Pub. L. 90-270, 82 Stat. 51 ............................................... 13

Army Corps of Eng'rs., Memorandum for Record, Gateway Pacific Terminal Project & Lummi Nation's Usual & Accustomed Treaty Fishing Rights at Cherry Point, Whatcom Cnty., (May 9, 2016) ......................................................................................................... 16

Dep't of Def. Instruction 130017 .............................................................................. 24

Dep't of Def. Instruction 4710.02 (Sept. 14, 2006) ..................................................... 16

EO 13175, *Consultation & Coordination with Indian Tribal Govts.* (Nov. 6, 2000) ................... 16

*Flood Control Act of 1944*, Pub. L. 78-54, ch. 665, 58 Stat. 887 (Dec. 22, 1944) ...................... 13

Jenni Monet, *For Native "Water Protectors," Standing Rock Protest Has Become Fight for Religious Freedom, Human Rights*, PBS NEWSHOUR (NOV. 3, 2016, 5:19 PM) ..................... 27

Louise Erdrich, *How to Stop a Black Snake*, N.Y. TIMES (Dec. 10, 2016) .................................. 28

Michael J. Simpson, *Accommodating Indian Religions: the Proposed 1993 Amendment to the American Indian Religious Freedom Act* 54 Mont. L. Rev. 19, 28 ......................................... 18

Michael L. Lawson, DAMMED INDIANS 56-58 (1982) .......................................................... 12, 13

Mike Anderson, *Dakota Access Pipeline Fight United the Seven Sioux Nations*, RAPID CITY JOURNAL (Sep. 11, 2016) ........................................................................................ 28

Office of Indian Affairs, Circular No. 1665 (1921) ........................................................... 18

*Presidential Memorandum on Tribal Consultation* (Nov. 6, 2009) ........................................... 16

Raymond J. DeMallie, *Lakota Belief & Ritual in the Nineteenth Century*, *in* SIOUX INDIAN RELIGION: TRADITION AND INNOVATION 25 (Raymond J. DeMallie & Douglas R. Parks eds., 1987) ............................................................................................................. passim

Robert Hilbert, S.J., *Contemporary Catholic Mission Work Among the Sioux*, *in* SIOUX INDIAN RELIGION: TRADITION AND INNOVATION 145 ................................................................. 18

Sec'y of Def. Policy on "Dep't of Def. Am. Indian & Alaska Native Policy," Oct. 20, 1998 ..... 16

Stephen E. Feraca, WAKINYAN: LAKOTA RELIGION IN THE TWENTIETH CENTURY 32 (1998) ........ 8

Sydney Brownstone, *The New Protectors: How the Standing Rock Sioux Tribe Stood Up to Big Oil and Built a New Activist Movement*, THE STRANGER (Sep. 27, 2016) ............................... 27

*Treaty of Fort Laramie with Sioux, Etc., Sept. 17, 1851*, art. 5, 11 Stat. 749 ......................... 10, 14

*Treaty with the Sioux – Brule, Oglala, Miniconjou, Yanktonai, Hunkpapa, Blackfeet, Cuthead, Two Kettle, Sans Arc, and Santee – And Arapahoe*, April 29, 1868, 15 Stat. 635 .................. 11

William K. Powers, OGLALA RELIGION 56 (1977) ....................................................................... 6

Winona LaDuke, *The Black Snake Hears a Song: Declaring War on the Keystone Pipeline*, INDIAN COUNTRY MEDIA NETWORK (Nov. 21, 2014) ............................................................. 28

## INTRODUCTION

At the status conference on this matter on Monday, February 6, 2017, counsel for Defendant U.S. Army Corps of Engineers represented to the Court that it would not issue an easement permitting Defendant Dakota Access, LLP to construct a pipeline under Lake Oahe before the end of this week, saying that the easement could issue "as *early as* the end of this week." Notwithstanding such representations, the very next day, the Corps issued a notice that it would issue the easement, and on February 8, the Corps issued the easement.  Dakota Access has now begun construction to place the pipeline under Lake Oahe.  Declaration of Harold Frazier dated Feb. 8, 2017 at ¶ 18 (hereinafter "Frazier Decl.").  Intervenor-Plaintiff the Cheyenne River Sioux Tribe ("Tribe") now moves this Court for an ex-parte temporary restraining order and a preliminary injunction to preserve the status quo, enjoining the effect of the easement purported granted pursuant to 30 U.S.C. § 185 on February 8, 2017, allowing private Defendant Dakota Access, LLC ("Dakota Access") and those acting concert to begin constructing the Dakota Access Pipeline under Lake Oahe.  The Tribe further requests an order enjoining Dakota Access and those acting in concert with Dakota Access from any construction related to the pipeline in the area described in the easement pending further order of this Court.  The granting of the easement and resulting construction activity violates the Tribe's and its members' Constitutional rights,  and will result in immediate and irreparable harm to the Tribe and its members (Frazier Decl. at ¶¶ 8-21) before this Court will be able to rule on the merits of this claim.  Fed R. Civ. P 65(b)(1)(A).  The Tribe also requests an injunction to maintain the status quo in order to preserve the peace at and near the construction site, to avoid injury to the health and safety of tribal members and others in the vicinity of the construction site, which is imminent and very real, considering the history of violence perpetrated by police and private security forces upon such persons during the past several months.

In its motions, the Tribe requests very limited relief:  that this Court suspend the effect of

the easement[1] until the parties have resolved the merits of the claims set forth in the Plaintiffs'

Complaint.  The ex-parte temporary injunctive relief the Tribe requests will not cause any harm to

the Federal Defendant.  The Corps itself affirmatively supported the indefinite suspension of the

subject easement between September 9, 2016 and January 24, 2017 and even committed itself on

December 4, 2016 to preparing a full Environmental Impact Statement ("EIS") a process that

generally takes an agency at least 360 days.[2]

This request for relief is based upon the fact that the easement granted is entirely unlawful

as a violation of the Tribe's rights under the Religious Freedom Restoration Act, 42 U.S.C. §

2000bb-1 ("RFRA"), which provides that the "Government shall not substantially burden a

person's exercise of religion" unless the Government "demonstrates that application of the burden

to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least

restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000bb-1(b).

The Lakota people believe that the mere existence of a crude oil pipeline under the waters

of Lake Oahe will desecrate those waters and render them unsuitable for use in their religious

sacraments.  Declaration of Steve Vance dated Jan. 30, 2017 at ¶ 18 (hereinafter "Vance Decl.").

The Lakota people believe that the pipeline correlates with a terrible Black Snake prophesied to

---

[1] A lthough both the Notice to Congress and the "Term" section of the easement at issue (both of which were filed with this Court) state that it is for a term of 30 years, Exhibit B to the easement (at page 13 of [ECF No. 96]), which is incorporated into the easement itself, provides that the easement is a "PERMANENT EASEMENT" in both its title and its legal description, calling into question whether the easement exceeds the scope of the approved project, the Environmental Assessment, and also whether the Corps' official that signed the easement exceeded his own authority.  Whether such contradiction is sloppy drafting or something more nefarious, this inconsistency further supports the need for a preservation of the status quo pending a hearing and this Court's review and decision on the instant motion.

[2] *E.g.*, *Jamul Action Comm. v. Chaudhuri*, 837 F.3d 958, 965 (9th Cir. 2016).

come into the Lakota homeland and cause destruction. *Id at ¶ 18.* The Lakota believe that the very existence of the Black Snake under their sacred waters in Lake Oahe will unbalance and desecrate the water and render it impossible for the Lakota to use that water in their Inipi ceremony. *Id. at ¶¶* 18-20. Without access to natural, unadulterated, and ritually pure water, the Lakota people cannot practice their religion. As Lake Oahe is the only natural, unadulterated, and ritually pure water available to the Tribe—a trust resource for which the United States owes the Tribe a fiduciary duty—desecration of these waters represents a substantial burden on the Tribe's religious exercise. The United States cannot meet its burden of demonstrating that a compelling governmental interest justifies siting this pipeline under these sacred waters owned by the Tribe. And as the Corps has considered a litany of alternatives to placing the pipeline at this location under Lake Oahe, it cannot meet its burden of demonstrating that the crossing of the pipeline under Lake Oahe is the least restrictive means of furthering any governmental interest.

As this violation of the Tribe's and its members' religious exercise implicates their constitutional freedoms, the mere issuance of the easement that threatens the violation is sufficient to establish irreparable harm. And in view of the threat to the Tribe's and its members' constitutional right, this Court may not wait until the oil is slithering under the Tribe's sacred waters. The law entitles the Tribe to relief as soon as the government acts to threaten their rights.

Although the Tribe requires immediate relief, the nature of relief requested is specific and limited. The Tribe does not argue that Dakota Access may not have its oil pipeline elsewhere, or that infrastructure projects in Lakota territory must be barred forever; only that ***this pipeline***, sited through ***these sacred waters***, owned in trust by the United States for ***this Tribe***, violate the Cheyenne River Sioux Tribe's and its members' right to exercise their religion. For these reasons, the Tribe respectfully requests that this Court immediately restrain the effect of the subject

easement and the construction and operation of the Dakota Access Pipeline under the waters of Lake Oahe.

## FACTUAL BACKGROUND

**I.     The Religious Exercise of the Cheyenne River Sioux Tribe and Its Members**

**A.     General principles of Cheyenne River Lakota religious exercise**

The Cheyenne River Sioux Tribe is a member of the *Oceti Sakowin* (Seven Council Fires) also known as the Great Sioux Nation, which includes the Lakota, Dakota, and Nakota people. The Cheyenne River Sioux Tribe is comprised of four of the seven bands of the Lakota: *Itazipco*, *Minnicoujou*, *Oohenumpa*, and *Siha Sapa*. Before the United States confined the Lakota people to Reservations in the late 19th century, the people lived a nomadic lifestyle following the buffalo in their aboriginal territory, which spanned the Dakotas, Montana, Wyoming, Nebraska, and beyond. ECF No. 11-7.

Non-Indian anthropologists have long been interested in the religion of the Lakota people and produced many early studies of the same based upon the writings and first-hand accounts of Lakota people. Raymond J. DeMallie, *Lakota Belief & Ritual in the Nineteenth Century*, *in* SIOUX INDIAN RELIGION: TRADITION AND INNOVATION 25 (Raymond J. DeMallie & Douglas R. Parks eds., 1987). Scholars have agreed on basic principles concerning traditional Lakota religious practices. The traditional Lakota religious perspective is based upon a concept of oneness, balance, and unity with nature. *See id*. at 27-28. Lakota people believe as a part of their religious worldview that human beings are a part of nature, not separate from it. *Id.* at 28. Lakota religious practice, like Catholicism or Judaism, requires an adherent to participate in a number of sacred rites or sacraments, including among others the Inipi or sweatlodge ceremony, sundance, hanbleceya or

vision questing, and coming of age ceremonies.  Anthropologists view Lakota religious beliefs as being powerfully dependent upon the practice of these rituals and sacraments.  *Id* at 33.

Like many other religions, Lakota belief provides the system of knowledge that represents man and the universe, and ritual is the means for putting that belief into action.  But in the Lakota religion ritual takes on more profound meaning because it is "not merely a reflection of belief; it [is] also a means to further belief; for through ritual a person [comes] to expand his knowledge." *Id.* at 33-34.  In the Lakota religion, therefore, belief itself is fluid and may change subject to new revelations or developments in the world.  Lakota religion has no dogma or uniform theology; instead it is Lakota rituals and sacraments that are standardized.  Though the nuances of belief may be disparate or mutable, the rites themselves are static and have incredible and potentially dangerous power.  The Lakota people believe that their sacraments were dictated to them by holy beings and must be performed as such.  *Id* at 33.  Anthropologists understand that the Lakota believe that failure to perform rituals in the proper way could result in grave harm.  *Id.* at 34.

These non-Indian anthropological views of Lakota religious exercise are consistent with the Tribe's and its members' conception of their own beliefs.  Tribal members describe a unity of their religious belief with the understanding and respect of the natural world, in addition to broader religious focus on the need for balance and oneness in the intersection between religious practice and the natural world.  Vance Decl. at ¶1 7.  Lakota religious adherents describe the necessity of balance in their sacraments as being similar to the eastern concept of the yin and the yang, which is signified by an hourglass shape.  *Id* at ¶ 12.  The Cheyenne River Sioux people also echo difficulty in describing a static religious dogma owing in part to the limitations of the English language in capturing the religious meaning inherent in Lakota principles, but also to the general variation inherent in a religion that operates in the context of an oral tradition and individualized

experience.  *Id* at ¶ 7.  Cheyenne River Sioux adherents likewise stress the primacy of ritual and rite over belief.  Sacred rites are standardized and must be practiced according to strict custom. The Cheyenne River Sioux adherents believe that their sacred rights cannot be practiced at all if they are not practiced properly—deviation from proper conduct is strictly prohibited.  *See id.* at ¶¶ 14-17, 20.

### B. Specific beliefs and sacraments of the Cheyenne River Lakota and their relationship to *mni* or water

#### 1. The Tribe's relationship with sacred water

The Lakota people acknowledge, as discussed above, that because theirs is an oral tradition, there may be more than one version of a religious teaching or belief.  *Id* at ¶ 7.  One important Lakota religious tradition accepted by the Cheyenne River Sioux teaches that in the beginning there was only water— mni.  Water was the world's life source, which is echoed in human birth from the water in our mother's womb.  *Id*.  Along with the water that comprised the beginnings of creation, was a single energy called Inyan.  *Id* at ¶ 8.  Inyan gave everything of itself to bring forth the earth from the water and was left completely depleted.  Inyan means "rock" in Lakota, and the people believe that the rock is Inyan, who gave everything of itself until it was devoid of energy and hard and unyielding.  *Id* at ¶¶ 8, 14.

The original people were the last creation.  The Lakota believe they first lived below the present world and ultimately emerged from a site in the Black Hills and suffered greatly as they had nothing, including no sustenance; but Creator or God caused the sacred buffalo to lead the people to food and to water, which saved them.  *Id* at ¶ 9.  Because of this, the Lakota believe that "water is our first medicine" (mni kiŋpejuta tokaheya).  To the Lakota, medicine or pejuta is something that heals, both natural and supernatural.  William K. Powers, OGLALA RELIGION 56 (1977).  As a corollary of these beliefs and the Lakota notion of unity and wholeness of the world

6

and nature, the Lakota believe generally that water is sacred and that clean, pure water is an essential part of the Lakota way of life.  Declaration of Ron Black Bird dated Feb. 1, 2017 at ¶ 9. (hereinafter "Black Bird Decl.").  Water moreover holds a special significance for the people of the Cheyenne River Sioux Reservation.  Minnecoujou, one of the four bands of the Cheyenne River Sioux Tribe, means "plants by the water."  Oohenumpa, one of the four bands of the Cheyenne River Sioux Tribe, means "two kettle" or "boils twice."  Vance Decl. at ¶ 10.  The Cheyenne River people consider water to be a central part of their religious and tribal identity. Frazier Decl. at ¶ 17; *see also*, Declaration of Marcella Gilbert dated Feb. 1, 2017 at ¶¶ 5-6 (hereinafter "Gilbert Decl.").

### 2.   The role of water in Lakota sacraments

Significantly, water does not just have a generalized sanctity in the Lakota religion, but it has a very specific, critical role in the practice of the Lakota sacred rites.  The Lakota religion is characterized by several essential ceremonies.  Vance Decl at ¶ 11a; *see also*, Black Bird Decl at ¶ 5.  Although there are numerous sacred rites of the Lakota, some of which may not be discussed in public, the Lakota consider the following sacraments to be among their most important:

- *Hanbleceya*:  A ceremony where participants fast and pray for a vision in a solitary place.  Some refer to Hanbleceya as vision-questing;

- *Wiwanyan Wacipi*:  The Sundance ceremony of renewal and rebirth where Lakota adherents gather and dance, pray, and sacrifice to enhance the welfare of relatives and loved ones in the next year;

- *Isnati Awiciliwanpi*:  A coming of age ceremony for young women;

- *Wiping of the tears*:  A ceremony that is held one year after a loved one has passed way, which signifies the end of a mourning period; and

- ***Inipi***:  A ceremony of prayer and purification inside a sweat lodge.

Vance Decl. at ¶ 11a.  The Cheyenne River people cannot practice their religion without their ceremonies.  *Id.*; *see also,* Declaration of Russ Cournoyer dated Feb. 1, 2017 at ¶ 4 (hereinafter "Cournoyer Decl.").  Sacred water figures prominently in all of these ceremonies, including Hanbleceya and Wiwanyan Wacipi where participants purposely deprive themselves of life-giving water, a deprivation intended to remind Lakota people why water is essential to life and to instill a deep respect for it.  Vance Decl at ¶ 12; *see also*, Cournoyer Decl. at ¶ 18.

Water figures most centrally and explicitly in the Inipi or sweat lodge ceremony.  Inipi is understood to be the oldest sacrament known to the Lakota people.  Stephen E. Feraca, WAKINYAN: LAKOTA RELIGION IN THE TWENTIETH CENTURY 32 (1998).  Inipi is, moreover, arguably the most important of all Lakota sacraments because Lakota people cannot perform other sacraments without first performing Inipi, a purification rite intended to cleanse one's spirit.  DeMallie, 33.  To the Lakota, Inipi is essential to remain in sacred balance.  It takes away the negative energy, isolation, and separation that interferes with balance.  To perform Inipi, religious adherents heat a number of rocks (Inyan) in a fire and gather in an enclosed dome-shaped lodge.  Inside the lodge, sacred water (Mni) is poured on the hot stones in a ritualistic fashion creating burning hot steam.  The participants offer prayers, make offerings, and observe various rituals associated with Inipi.  *Id.* at 33-34.  At the conclusion of the ceremony, which is long, difficult and involved, the adherent is purified in spirit and body.  *Id*.

The sacrament itself mirrors the Lakota creation story.  Sacred, yielding water (Mni) and selfless, rigid rock (Inyan) act together to provide man with healing energy and purification.  The water of the Inipi ceremony is known as ***mni wiconi*** or the ***water of life***.  Lakota people believe that "[t]he steam that issues when the water touches the hot rocks is the 'breath of life' that pierces

8

you to your spirit." Vance Decl. at ¶ 14. The sacrament exemplifies the Lakota's sacred balance: hard and soft; hot rocks and cold water.

Significantly, Lakota adherents are taught that anything that they use for their sacred ceremonies, especially water, must be ritually pure. Such purity is of special importance in the cleansing Inipi ceremony. Inipi practitioners cannot wear jewelry or manmade items. *Id* at ¶ 20. If practitioners are using sage, they cannot gather sage from the roadside where it is growing near trash; they have to go into the country and find clean, fresh, unadulterated plants. *Id* at ¶ 16. This is a critical consideration for the mni wiconi—the water of life—used in the sweat lodge. Cheyenne River adherents have been taught that the water used in the Inipi ceremony must be clean and ritually pure. *Id.* It must be collected from nature. Adherents cannot use bottled water, which is surrounded by plastic and hence contaminated. *Id.* Adherents cannot use impure water of any kind. Carrying ceremony water in a metal bucket is not permitted, as that is a manmade material. *Id* at 20. Adherents must use a wooden bucket because wood is from nature. The use of unnatural waters is not a substitute that practitioners of the Lakota religion can accept. Vance Decl at ¶ 20; Cournoyer Decl. at ¶ 8; Black Bird Decl at ¶ 9; Gilbert Decl. at ¶6.

C.      **The Tribe's Sacred Connection to the Missouri River—*Mni Sose***

The Cheyenne River people consider the Missouri River to be sacred and vital to the practice of their religion, both for religious and cultural reasons and for the concrete, unavoidable legal reasons discussed at length herein. In the Lakota language, the Missouri River is called Mni Sose. The Missouri River is squarely in the heart of both lands that the Lakota have occupied since time immemorial,l and the lands that comprise their permanent reservation homeland today. The Lakota understand that the waters of the Missouri River have always been necessary for their existence as Lakota people and for their spiritual practices. The Missouri River was here before

the human beings were here, and the Lakota people chose to live along its banks from time immemorial.  It has always been an important source for Lakota foods, medicines, and of course water.  The Lakota consider it to be their "bloodline and the lifeline of the people . . ., and [they] cannot live without it."   As discussed below, the Missouri River has taken on paramount importance to the people of the Cheyenne River Sioux Tribe because the United States has systematically deprived the Tribe of other sources of water.  Lake Oahe is the reservoir formed by the Missouri River and through which flows all waters that sustain the Cheyenne River Sioux Tribe.

## II.     The United States' Systematic Restriction of the Tribe's and Its Members' Access to Sacred Waters

Prior to the 19th century, the Lakota people had the ability to access waters for their sacred rites in the clean, natural bodies of water throughout their vast aboriginal homeland, which included lands in what is now the states of North and South Dakota, Montana, Wyoming, and Nebraska.  ECF No. 11-7.  In 1851, the United States sent out treaty delegations to Indian country to enter into peace time treaties with the various tribes, including the four bands of the Cheyenne River Sioux Tribe.  The Great Sioux Nation consequently negotiated and entered into a treaty with the United States and reserved a large portion of these aboriginal lands as the exclusive territory of the Great Sioux Nation.  *Treaty of Fort Laramie with Sioux, Etc., Sept. 17, 1851*, art. 5, 11 Stat. 749 (hereinafter the "1851 Fort Laramie Treaty").  The United States bound itself in this treaty to "protect" the Great Sioux Nation "against the commission of all depredations by the people of the said United States, after ratification of this treaty."  *Id.* at art. 4.  The Tribe and its members retained the right to access clean, pure water in numerous bodies of water throughout this territory reserved for their exclusive use, including streams and creeks in the Black Hills and the sacred Missouri River, which was included within the eastern external boundary of the territory.  *Id.* at art. 5.

10

In 1868, the Great Sioux Nation entered into treaty negotiations with the United States to end ongoing conflicts arising from the American invasion of their treaty lands, which resulted in the 1868 Sioux Nation Treaty.  *Treaty with the Sioux – Brule, Oglala, Miniconjou, Yanktonai, Hunkpapa, Blackfeet, Cuthead, Two Kettle, Sans Arc, and Santee – And Arapahoe*, April 29, 1868, 15 Stat. 635 (hereinafter "1868 Fort Laramie Treaty").  This Treaty "set apart for the absolute and undisturbed use and occupation of the [Great Sioux Nation]" all lands west of the low water mark of the Missouri River between the forty-sixth parallel north and the northern boundary of the state of Nebraska for "the undisturbed absolute use and occupation" by the Sioux Nation, including the Missouri River which was fully within this territory.  *Id.* at art. 2.  The United States "solemnly agree[d]" to prohibit settlers and unauthorized persons from settling in or crossing through this territory.  *Id.*  Again, the Tribe and its members retained the right to access clean, pure water in numerous bodies of water throughout this newly defined territory, including streams and creeks in the Black Hills and the sacred Missouri River, which was still within the eastern boundary of the territory.  *Id.*

In 1874, however, gold was discovered in the Black Hills.  The United States responded by repeatedly violating the "solemn" promises it had made in the Sioux Nation Treaty just six years earlier, until finally, the United States unlawfully enacted the Act of February 28, 1877, which purported to remove the Black Hills from the absolute and exclusive occupation of the Sioux Nation.  19 Stat. 254 (1877).  Many years later, the United States Supreme Court held that the taking of the Black Hills in the Act of February 28, 1877, which was obtained in violation of the Treaty, constituted an unlawful taking.  *See United States v. Sioux Nation of Indians*, 448 U.S. 371 (1980).  The Supreme Court famously observed that "a more ripe and rank case of dishonorable dealings will never, in all probability be found in our history." *Id.* at 388.  When the United States

11

denied the Sioux Nation access and undisturbed use of the Black Hills in this ignoble Act, they also lost access to the streams and creeks in the sacred Black Hills for use in their sacred rites. But, the Great Sioux Reservation continued to include the sacred Missouri River within its boundaries, which was confirmed in Article 2 of the Act of February 28, 1877. 19 Stat. 254 at art. 2.

In 1889, the United States acted unilaterally again to "set aside as a permanent reservation" nine smaller reservations within the Great Sioux Reservation, including the present-day Cheyenne River Sioux Reservation.  Act of March 2, 1889, ch. 206, 25 Stat. 88, § 2.  Although the Act of March 2, 1889 dispossessed the Lakota people of the exclusive use and occupation of much of the Great Sioux Reservation, the Act promised the Cheyenne River Sioux Reservation to the Cheyenne River Sioux Tribe as a permanent home for the four Lakota bands that comprise the Tribe today. *Id.*  The Act reserved to the tribe its present Reservation, with its eastern boundary at the center point of the main channel of the Missouri River.  25 Stat. 888, § 4.

The Cheyenne River Reservation included the rich river bottomlands along the Missouri River.  Here, the people had camped, hunted, gathered foods and medicines, performed religious ceremonies, convened for social and political occasions, buried their dead, and made use of the waters of the Missouri River for religious and consumptive purposes from time immemorial.  *See* Michael L. Lawson, DAMMED INDIANS 56-58 (1982).  In 1944, unbeknownst to the Tribe and without either their consent or consultation, the United States enacted the Flood Control Act of 1944 ("Flood Control Act") that authorized the Army Corps of Engineers to construct dams on the Missouri River and to operate projects for the purposes of navigation and flood control, so long as such uses did not conflict with present and future beneficial consumptive uses of waters for "domestic, municipal, stock water, irrigation, mining, or industrial purposes."  33 U.S.C. § 701-

1(b); *Flood Control Act of 1944*, Pub. L. 78-54, ch. 665, 58 Stat. 887 (Dec. 22, 1944) (codified at 16 U.S.C. § 460d, and various sections of Titles 33 & 43 of the United States Code).

The Cheyenne River Sioux Tribe lost 104,120 acres to the creation of Lake Oahe, including three small towns, the most valuable rangeland, most of the gardens and cultivated farm tracts, and nearly all of the Tribe's timber, wild fruit, and wildlife resources.  Lawson, 56-58.  Significantly, burial grounds, traditional sacred medicines, and sacred stone cairns were destroyed.  The people were forced to dig up the bodies of their parents and grandparents.  They lost their livelihoods, their homes, their birthplaces, important cultural sites, and culture itself.  *Id.*  Ironically, in 1968, Congress renamed the reservoir Lake Oahe "in honor of the Indian people who inhabited the great Missouri River Basin."  Act of March 21, 1968, Pub. L. 90-270, 82 Stat. 51.

Although the Tribe lost much to the dishonest and dishonorable dealings of the United States, it retained property rights in the waters of Lake Oahe, which is still located within the external boundaries of the Cheyenne River Sioux Reservation.  Those rights that pre-existed any contact with the United States were first recognized by the United States in the 1851 and 1868 Fort Laramie Treaties.  The Tribe to this day retains its rights to access and use the clean, pure waters of the Missouri River, now Lake Oahe—a reservoir that spans from Bismarck, North Dakota to the Oahe Dam at Fort Pierre, South Dakota.  Those rights are explicitly recognized in the Oahe Taking Act.  68 Stat. 1191, 1192-1193, § VI, § 10.  In light of these serial dispossessions, the members of the Cheyenne River Sioux Tribe must rely on Lake Oahe exclusively, not just for their drinking water, but for the water they use in their religious ceremonies because Lake Oahe is the only source of natural, pure, uncontaminated water available to the people of the Cheyenne River Sioux Reservation.  The ground water is full of heavy metals and minerals that render it unsuitable for consumption, and the aquifers are too deep to make access feasible.  *United States Army Corps*

*of Engineers, Omaha District, P.L. 84-99 Project Information Report Emergency Water Assistance Due to Drought, Cheyenne River Sioux Tribe – Mni Waste' Water System Fox Ridge Intake*, §5.4 (April 19, 2005) (Declaration of Nicole Ducheneaux (hereinafter "Ducheneaux Decl.")) Exhibit A.  The Cheyenne River that forms the southern boundary of the Reservation is severely contaminated with mining tailings from the operation of the Homestake Gold Mine in the Black Hills.  *Id.* at A-9.

The Tribe's exclusive reliance upon Lake Oahe for both drinking water and water required for their religious practice is significant not just because it is the only water available to them, but also because those waters are a tribal trust resource managed by the United States on behalf of the Cheyenne River Sioux Tribe.  Under federal law, the Tribe has reserved sufficient water to fulfill the purposes of the Reservation and the United States as fiduciary is bound to protect the waters from upstream contamination.

### III.    The Tribe's Ownership of the Waters of Lake Oahe

The reservation of territories including land and water in the 1851 and 1868 Fort Laramie Treaties and in the Act of March 2, 1889 was accompanied by a reservation of water rights in the Missouri River to fulfill the purpose of the Reservation to provide for self-sufficiency.  *Winters v. United States*, 207 U.S. 564 (1908); *Cappaert v. United States*, 426 U.S. 128, 141 (1976).  The Tribe owns a clear property right in the waters of Lake Oahe and the Missouri River, and has held that interest for as long as the Sioux Nation has existed on this earth.  Those rights were reserved to it by the United States when the entire Missouri River to the low water mark of the east bank of the River was included within the reserved territories of the 1851 and 1868 Fort Laramie Treaties.  *1851 Fort Laramie Treaty*, art. 5, *1868 Fort Laramie Treaty*.  The Tribe's reserved ownership of the Missouri River was again recognized in Article 2 of the Act of February 28, 1877. 19 Stat. 254

14

at art. 2.  The Tribe's water rights were not abrogated in the Act of March 2, 1889, which continued to recognize the territorial rights of the—four bands of the present day Cheyenne River Sioux Tribe—in the Missouri River to the center of the main channel.  25 Stat. 888, § 4.  The Tribe's water rights in Lake Oahe are unquantified.

The reserved water right recognized in the *Winters* doctrine include the right to clean, safe water.  *See, e.g., United States v. Gila River Irrigation Dist.*, 920 F. Supp. 1444, 1448 (D. Ariz. 1996).  Likewise, the Tribe has retained its right to hunt, fish, and gather on the Reservation.  *South Dakota v. Bourland*, 508 U.S. 679, 697 (1993) (noting that Congress explicitly has reserved the Cheyenne River Sioux Tribe's original treaty rights, including the right to hunt and fish, on Lake Oahe); *see also United States v. Dion*, 476 U.S. 734, 738 (1986) ("Indians enjoy exclusive treaty rights to hunt and fish on lands reserved to them . . . .").  The United States Supreme Court has long held that these treaty rights to hunting, fishing, and gathering are "not much less necessary to the existence of the Indians than the atmosphere they breathed."  *United States v. Winans*, 198 U.S. 371, 381 (1905).  The Tribe's water rights include a right to water that is sufficient in amount and quality to support hunting and fishing rights.  *United States v. Adair*, 723 F.2d 1394, 1409, 1411 (9th Cir. 1983).

The Court has long recognized the "existence of a general trust relationship between the United States and the Indian people."  *United States v. Mitchell*, 463 U.S. 206, 225 (1983).  The courts are clear that *"any* Federal government action is subject to the United States' fiduciary responsibilities toward the Indian tribes."  *Nance v. EPA*, 645 F.2d 701, 711 (9th Cir. 1981) (emphasis in original) (citing *Seminole Nation v. United States*, 316 U.S. 268, 297 (1942)).  The trust duty specifically applies to the actions of the United States Army Corps of Engineers.  *See, e.g.*, *Northwest Sea Farms, Inc. v. U.S. Army Corps of Eng'rs*, 931 F. Supp. 1515, 1519-20 (W.D.

Wash. 1996).  The federal government has directed the Corps to exercise its trust responsibility to protect tribes and tribal trust resources by government-to-government consultation with tribes on any action under its authority that could impair tribal trust resources or tribal rights.  Dep't of Def. Instruction 4710.02 (Sept. 14, 2006); *see also* Sec'y of Def. Policy on "Dep't of Def. Am. Indian & Alaska Native Policy," Oct. 20, 1998; EO 13175, *Consultation & Coordination with Indian Tribal Govts.* (Nov. 6, 2000); *Presidential Memorandum on Tribal Consultation* (Nov. 6, 2009). The Corps exercises this trust responsibility by denying authorization to activities under its jurisdiction that have more than a *de minimis* impact on tribal treaty rights.  Army Corps of Eng'rs., Memorandum for Record, Gateway Pacific Terminal Project & Lummi Nation's Usual & Accustomed Treaty Fishing Rights at Cherry Point, Whatcom Cnty., (May 9, 2016), http://www.nws.usace.army.mil/Portals/27/docs/regulatory/NewsUpdates/ 160509MFRUADeMinimisDetermination.pdf  (last accessed Feb. 8, 2017).

The United States' trust duty applies specifically to protection of tribal reserved water rights from upstream contamination resulting.  Indian reserved water rights are "vested property rights for which the United States has a trust responsibility, with the United States holding legal title to such water in trust for the benefit of the Indians."  55 Fed. Reg. 9223 (Mar. 12, 1990). Under the federal trust responsibility, the United States has a duty to conserve Indian lands, waters, and natural resources, and appropriately manage tribal natural resources.  It is also "the policy of the United States[] that all Indian communities . . . be provided with safe and adequate water supply. . . ."  25 U.S.C. § 1632.  Among the United States' core obligations is its duty to prevent upstream users from impairing a tribe's reserved right.  *See Winters*, 207 U.S. at 577-78.  This obligation includes the obligation to prevent upstream users from engaging in practices that reduce the quality of water that feeds the reservation.  *Hopi Tribe v. United States*, 782 F.3d 662, 669

(Fed. Cir. 2015) (citing *United States v. Gila Valley Irrigation Dist.*, 920 F. Supp. 1444, 1454-55 (D. Ariz. 1996)).

The U.S. Army Corps of Engineers owes the Cheyenne River Sioux Tribe more than a general duty to protect the waters of Lake Oahe and ensure that the waters are safe, adequate, and not impaired in quality by uses that are not authorized in the Flood Control Act of 1944.  33 U.S.C. § 701-1(b), Pub. L. 78-54, ch. 665, 58 Stat. 887 (Dec. 22, 1944).  Significantly, the Flood Control Act of 1944 granted the Corps comprehensive power over Lake Oahe, including authority over water use, leases, construction, recreation, storage, flood control, and navigation, and regulations related to the same.  *See* 16 U.S.C. §§ 460d, 825s (1946 ed.); 33 U.S.C. §§ 708, 709 (1946 ed.). The Supreme Court has held that the Corps' control over Lake Oahe is pervasive, excluding even its sister agencies.  *See ETSI Pipeline Project v. Missouri*, 484 U.S. 495, 505 (1988).  The Supreme Court has further held that "a fiduciary relationship necessarily arises when the Government assumes such elaborate control over . . . property belonging to Indians."  *United States v. Mitchell*, 463 U.S. 206, 225 (1983).  Indeed, "where the Federal Government takes on or has control or supervision over tribal . . . properties, the fiduciary relationship normally exists with respect to such . . . properties (unless Congress has provided otherwise) even though nothing is said expressly in the authorizing or underlying statute (or other fundamental document) about . . . a trust or fiduciary connection."  *Id.* (quoting *Navajo Tribe of Indians v. United States*, 224 Ct. Cl. 171, 183 (1980)); *see also Cobell v. Babbitt*, 91 F. Supp. 2d 1, 24 (D. D.C. 1999).  The Corps' duty to the Tribe to protect the trust property from upstream contamination by third-parties is a moral obligation of the highest responsibility and trust that should be judged by the most exacting fiduciary standards.  *United States v. Jicarilla Apache Nation*, 465 U.S. 162, 207 (2011).

## IV.     The Impact of the Easement on Lakota Religious Practice

As soon as the Lakota people encountered the United States, the government in its insatiable greed for the resources of the Lakota people began restricting Lakota access to the waters necessary for the practice of their religion, confining the Tribe to ever smaller reservations and depriving them of access to their sacred Black Hills.  But Lakota religion was not merely collateral damage of westward expansion.  Indeed, beginning in the 19th century, the United States embarked on an explicit 200-year-long campaign to destroy the Lakota religion based on the belief that their religion was paganistic and immoral—actively encouraging the replacement of the Lakota religion with Christianity,[3] forcing Lakota children to attend boarding school where their language and religious practice were strictly forbidden,[4] and even criminalizing Lakota sacraments like the Sundance.[5]  Despite these efforts, and risking their safety and liberty, the Lakota people of the Cheyenne River Sioux Reservation nurtured the spark of their faith, practicing their religion in secret and away from the prying eyes of government agents.  Hence, when the United States finally decriminalized the practice of the Lakota religion in 1978[6] and the faithful could come out of the shadows, the Lakota religion flourished again.  Today, the Tribe's members practice widely their native religion, some in conjunction with other western faiths.  Frazier Decl. at ¶¶ 7-15; *see also* Robert Hilbert, S.J., *Contemporary Catholic Mission Work Among the Sioux*, *in* SIOUX INDIAN RELIGION: TRADITION AND INNOVATION 145.

Like their ancestors, modern Lakota people understand that the central precept of the Lakota religion is the notion of balance.  Lakota believers are taught that they must walk in balance

---

[3] *See*, *e.g.*, 25 U.S.C. § 280 (1922) (issuing patents to Indian Lands to religious societies).

[4] Michael J. Simpson, *Accommodating Indian Religions: the Proposed 1993 Amendment to the American Indian Religious Freedom Act* 54 Mont. L. Rev. 19, 28.

[5] Office of Indian Affairs, Circular No. 1665 (1921) (stating that "the sundance, and all other similar dances and so-called religious ceremonies are considered 'Indian Offenses' under existing regulations, and corrective penalties are provided."

[6] American Indian Religious Freedom Act, 42 U.S.C. § 1996.

in their thinking and walk in balance with every step that they take.  Significantly, the Lakota are taught that in order for their water to be natural and ritually pure, it must be in balance and in a state of nature.  As further discussed above, although Lakota ritual, such as Inipi and the Sundance are static and governed by strict rules that dictate how and in what manner one must practice, belief itself is fluid and may change subject to new revelations or developments in the world.  DeMallie, 33.

Long ago, Lakota prophets told of the coming of a Black Snake that would be coiled in the Tribe's homeland and which would harm the people.  In the prophecy, the snake was black, slippery, in motion, and would devour the people.  Although there can be no way of knowing when this prophesy emerged into the Lakota worldview, Lakota religious adherents now in their 50s and 60s were warned of the Black Snake by their elders as children.  The Black Snake prophecy is a source of terror and existential threat in the Lakota worldview.

Lakota religious adherents today believe that the Black Snake has been made real.  Lakota religious practitioners believe that the Dakota Access pipeline, a crude oil pipeline proposed to cross under their homeland is the black, slippery terror described in the Black Snake prophecy. And the coming of the Black Snake is not without consequence in the Lakota religious worldview. Lakota adherents believe that the Black Snake poses an existential threat because it will cause critical imbalance in an essential resource of the Cheyenne River Sioux Tribe: the natural, ritually pure waters of Lake Oahe.  The Lakota believe that the presence of the black crude oil under Mni Sose will so severely imbalance the waters as to render them unnatural and impure such that they will be desecrated.  The Lakota believe that such desecration will make the waters of Lake Oahe unsuitable for use in their religious practices, especially Inipi or the sweat lodge ceremony, which is such a key component of the Lakota religious practice that most other religious rites cannot

proceed.  *See* Feraca 32; DeMallie 33.  If the waters of Lake Oahe are so desecrated, the Tribe and

its members will be unable to exercise their religion as their Reservation lacks any other pure,

natural water source.

## V.     The Present Dispute

The Dakota Access Pipeline is a domestic oil pipeline designed to move over a half-billion

gallons of crude oil daily from North Dakota to Illinois.  ECF No. 39 at p. 2.  On July 25, 2017,

the Corps granted authorization to Dakota Access under various federal statutes, including *inter*

*alia*, Section 408 of the Rivers and Harbors Act, 33 U.S.C. § 403.  In conjunction with that permit,

the Corps issued a final Environmental Assessment, rather than a full Environmental Impact

Statement pursuant to the National Environmental Policy Act, 42 U.S.C. § 4321 et seq., and a

Finding of No Significant Impact.  ECF Nos. 6-51, 6-52.  Although the EA discussed numerous

alternatives to siting of the pipeline under Lake Oahe at the site of the present easement, including

rail, truck, and an alternate pipeline route, it selected this Lake Oahe site under the waters owned

by the Cheyenne River Sioux Tribe.  ECF NO. 6-51 at pp. 6-9.  The EA also did not contain any

consideration of any potential impacts of the pipeline on the Cheyenne River Sioux Tribe.  *See*

*generally, id.*

On July 27, 2016, the Standing Rock Sioux Tribe sued to challenge the Corps'

authorization of the pipeline.  ECF No. 1.  The Standing Rock Sioux Tribe moved for Preliminary

Injunction on August 4, 2016 on the narrow issue of whether the authorization violated the

National Historic Preservation Act.  ECF No. 6.  Dakota Access intervened as Defendant and the

Cheyenne River Sioux Tribe intervened as a Plaintiff, although Cheyenne River did not participate

in the Preliminary Injunction Motion.  *See* ECF No. 39 at pp. 33-34.  During oral argument on the

motion, Dakota Access and the Corps revealed that the oil company lacked the easement required

under the Mineral Leasing Act, 30 U.S.C. § 185 for it to complete drilling across Corps-owned lands.  Hence, Dakota Access had no right and no ability to drill under the Tribe's sacred waters. ECF No. 74-3

Immediately following this Court's order on September 9, 2016 denying Standing Rock's motion for preliminary injunction the United States Departments of Justice, Interior, and the Corps issued a joint statement noting that the government would not grant the easement until it had conducted further review.  Between September 9, 2016 and January 24, 2017, the United States led the parties in this matter, the Court, and the public to believe that the government had determined that it was legally obligated to closely review impacts of the easement on tribal rights and the treaties that govern the United States' relationship with the Plaintiff Tribe's in this matter, even ordering the preparation of a full Environmental Impact Statement.  *See* ECF No. 65-1; 82 Fed. Reg. 5544 (Jan. 18, 2017).  The government had neutralized the threat of the Black Snake to the Tribe's sacred waters, indefinitely suspended the threat, and even committed itself to defeating the harm.

On January 24, 2017, however, the Corps filed its notice of issuance of a Presidential Memorandum Regarding Construction of the Dakota Access Pipeline, in which President Trump directed expedited review and approval of the easement and withdrawal of Notice of Intent to prepare an EIS.  ECF No. 89-1.  Despite representations of counsel for the Corps that the easement would not be granted until the end of this week, the Corps notified Congress of its decision to grant the easement on February 7, 2017 pursuant to 30 U.S.C. § 185, waiving its own 14-day waiting period, and granted the easement on February 8, 2017.  According to media reports and statements made by a representative of the Corps of Engineers to Tribal Chairman Harold Frazier, drilling began immediately.  Frazier Decl. at ¶ 18.  The government has now issued every authorization

that Dakota Access requires to build its Black Snake under the sacred waters of Lake Oahe.  And construction has begun.

## STANDARD FOR GRANTING TEMPORARY INJUNCTIVE RELIEF

The Cheyenne River Sioux Tribe is entitled to a temporary restraining order and preliminary injunctive relief protecting its members' free exercise of religion while this Court considers the merits of its claims under the Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb-4.  Under Federal Rule of Civil Procedure 65, a plaintiff seeking interim injunctive relief must show (1) likelihood of success on the merits; (2) a likelihood of irreparable harm if injunctive relief is not granted; (3) that the balance of interests among the parties favors injunctive relief; and (4) that injunctive relief would be in the best interest of the public generally.  *Shereley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008)).  At the preliminary injunction stage, the burdens of proof "track the burdens at trial." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006).  The Supreme Court has held that in a RFRA case it is the plaintiff's burden to show "more likely than not" that the sincere religious exercise had been substantially burdened—a burden of proof "which does not even rise to the level of a preponderance of the evidence."  *Id.* at 428 (internal citation and quotation marks omitted).  The Supreme Court has explained that this initial burden of proof is satisfied by a showing that the government action "implicates [plaintiff's] religious exercise." *See Holt v. Hobbs*, 135 S. Ct. 853, 862 (2015).  The burden then shifts to the government to show a compelling interest justifies the burden on religious exercise that cannot be satisfied through less restrictive means.  *O Centro*, 546 U.S. at 429.  Moreover, where RFRA is alleged in a motion for temporary injunctive relief, "the likelihood of success on the merits will often be the determinative factor."  *Korte v. Sebelius*, 735 F.3d 654, 666 (7th Cir. 2013) "This is because the "'loss of First

Amendment freedoms . . . unquestionably constitutes irreparable injury. . . .'" *Id.* (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

"The purpose of a temporary restraining order is to preserve the status quo for a limited period of time until the Court has the opportunity to pass on the merits of the demand for a preliminary injunction." *Barrow v. Graham*, 124 F. Supp. 2d 714, 715-16 (D .D.C. 2000). The same test that applies to injunctive relief applies to a motion for temporary restraining order, but with the more modest goal of preserving the status quo. *Id.*

**ARGUMENT**

**I.      The Cheyenne River Sioux Tribe is Likely to Succeed on Its RFRA Claim**

RFRA provides that "Government shall not substantially burden a person's exercise of religion" unless the Government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000bb-4(a), (b).  Under RFRA, "the term 'government' includes [any] branch, department, agency, instrumentality, and official . . . of the United States. . . ," including the United States Army Corps of Engineers.  *See Singh v. McHugh*, 185 F. Supp. 3d 201, 217 (D. D.C. 2016) (noting that the Army concedes that it "is a government actor to which RFRA applies"); *see also Rigdon v. Perry*, 962 F. Supp. 150 (D. D.C.) (applying RFRA against the Secretary of Defense and *inter alia* the Secretary of the Army); *United States v. Sterling*, 75 M.J. 407, 415 (C.A.A.F. 2016) ("RFRA applies to the military."); *see also* Dep't of Def. Instruction 130017 (military regulation adopting RFRA standard).

In the present case, the Corps cannot reasonably dispute that the Cheyenne River Sioux Tribal members' beliefs are sincere and substantially burdened by the construction and operation of a crude oil pipeline under waters owned by the Cheyenne River Sioux Tribe, considered sacred by them and used in their religious ceremonies.  Further, in light of the fact that both the Corps and the oil pipeline company actually considered alternate routes for this pipeline, the Corps cannot demonstrate that the proposed pipeline route constitutes the least restrictive means of further a compelling government interest.

**A.      Practitioners of the Lakota Religion Are Sincerely Compelled to Observe and Practice the Rites of Lakota Spirituality, Especially Inipi**

The sincere belief of the members of the Cheyenne River Sioux Tribe that the construction and operation of a pipeline under waters owned by the Tribe, considered sacred by them, and used

in their religious ceremonies will harm their exercise of their sacred rites cannot reasonably be questioned.  The sincerity inquiry is an important aspect of a RFRA claim, but it is an inquiry that requires courts to tread lightly.  *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 715-16 (1981); *see also Moussazedeh v. Tex. Dep't of Criminal Justice*, 703 F.3d 781, 792 (5th Cir. 2013) ("Though the sincerity inquiry is important, it must be handled with a light touch or judicial shyness.") (Internal citation and punctuation omitted).  Indeed, "the inquiry into the sincerity of a . . . plaintiff's religious beliefs is almost exclusively a creatability assessment . . . ." *Kay v. Bemis*, 500 F.3d 1214, 1219 (10th Cir. 2007) (internal quotation omitted).  The Supreme Court long has held that "courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim." *Burwell v. Hobby Lobby*, 134 S. Ct. 2751, 2779 (2014) (internal quotation omitted).  Further, "it is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *Hernandez v. Comm'r of Internal Revenue*, 490 U.S. 680, 699 (1989).  As the Supreme Court long has held, "[m]en may believe what they cannot prove[, hence,] [t]hey may not be put to the proof of their religious doctrines or belief."  *United States v. Ballard*, 322 U.S. 78, 86 (1944).

The law protects religious exercise even though it may not arise from any organized denomination, be mainstream, subject to a written doctrine, have a single leader, or even comprehensible to others.  *See Frazee v. Ill. Dep't of Emp't Sec.*, 489 U.S. 829, 834 (1989); *Ballard*, 322 U.S. at 86.  And although this has not always been the case, the law today protects Native religions just as it does mainstream Western religions.  *E.g.*, *O Centro*, 546 U.S. at 439 (holding that a federal law criminalizing use of a hallucinogenic tea in Native religious ceremonies violated RFRA); *A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.*, 611 F.3d 248, 263-64 (5th Cir. 2010) (holding that Native American belief in wearing visibly long hair was sincerely held);

*United States v. Hardman*, 297 F.3d 1116, 1127 (10th Cir. 2002) (concluding that Native American belief in sacredness of eagle feather was sincerely held); *see also* 42 U.S.C. § 1996 ("It shall be the policy of the United States to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian . . . and the freedom to worship through ceremonials and traditional rites.")

The members of the Cheyenne River Sioux are sincere in their belief that construction and operation of this crude oil pipeline under Lake Oahe will substantially burden and impair the practice of their religion.  As set forth in detail herein, the specific belief of the Lakota people, including members of the Cheyenne River Sioux Tribe, is that the construction and operation of the oil pipeline will desecrate and deconsecrate the waters that they must use for their sacred religious ceremonies such that the water will be rendered unsuitable for such use.  *See generally* Vance Decl.; Frazier Decl.; Gilbert Decl.; Cournoyer Decl; Black Bird Decl.  This belief is not merely sincerely held, but it is reflected in the broader movement surrounding Lakota opposition to the Dakota Access Pipeline.

The Lakota people, including members of the Cheyenne River Sioux Tribe, began a peaceful demonstration against the construction of the oil pipeline by participation in a protest encampment on the Cannonball River near the DAPL construction as early as April 2016.  From its first days, the movement has been centered upon a number of intertwined legal, moral, and spiritual beliefs of the Lakota people: (1) that the proposed crude oil pipeline poses an existential threat to the Tribes' physical existence because of its very real potential to pollute waters that the Tribes physically rely upon and which are owned in trust for them by the United States; (2) that the pipeline would destroy sites of historical, cultural, and spiritual significance to the Lakota people, including ancient stone cairns and burial sites; and (3) that the pipeline would desecrate

26

the waters that Tribal members require for the practice of their religion.  *See generally,* Vance Decl.; Frazier Decl.; Gilbert Decl.; Cournoyer Decl; Black Bird Decl.

Although the legal fight has, until now concerned primarily water safety and cultural sites, the Lakota opposition to the pipeline has always been focused upon the pipeline's impact upon Lakota religious practice.  Tribal religious concerns have pervaded the broader Lakota water protector movement against the DAPL since the beginning. [7]  The movement has always been centered on the concept of *mni wiconi*, a phrase that has been called the rallying cry of the movement.  *Mni wiconi*, however, is not just a slogan; the Lakota people consider it to be the heart of their opposition to the pipeline.[8]  While this Lakota phrase can be translated to mean "water is life," as widely reported in the media, the phrase and the concept more precisely refers to *mni wiconi*, the water *of* life that is so critical to the Lakota's sacred Inipi ceremony.  Hence, although *mni wiconi* as understood in the public eye has taken on an environmental character, its significance is in the religious meaning of the phrase and concept.  This religious-environmental connection in the concept of *mni wiconi* is a microcosm of the Lakota worldview.  Elements of the natural world in their pure, balanced, unpolluted state are at the center Lakota religious beliefs and religious sacraments.  Fire, rock, and sacred water are essential elements of the Inipi ceremony. Lakota people, including the water protectors, feel a special obligation to protect the environment

---

[7]  *E.g.*, Jenni Monet, *For Native "Water Protectors," Standing Rock Protest Has Become Fight for Religious Freedom, Human Rights*, PBS NEWSHOUR (NOV. 3, 2016, 5:19 PM) http://www.pbs.org/newshour/rundown/military-force-criticized-dakota-access-pipeline-protests/ (last visited Feb. 8, 2017); *Jessica Ravitz, The Sacred Land at the Center of the Dakota Pipeline Dispute*, CNN, (Nov. 1, 2016, 2:01 PM) http://www.cnn.com/2016/11/01/us/standing-rock-sioux-sacred-land-dakota-pipeline/index.html (last accessed Feb. 8, 2017); Sydney Brownstone, *The New Protectors: How the Standing Rock Sioux Tribe Stood Up to Big Oil and Built a New Activist Movement*, THE STRANGER (Sep. 27, 2016) http://www.thestranger.com/features/2016/09/27/24585851/the-new-protectors (last accessed Feb. 8, 2017).

[8]  *See* Monet, *supra,* note 9.

because they cannot practice their religion, as described herein, when certain elements used in their religion have been desecrated.  In short, to the extent that there is an intersection between Lakota environmental concerns and Lakota religious concerns, it is the religious belief that drives the environmental concern; not the other way around.

The prophecy of the Black Snake has also been a central image of Lakota opposition to oil pipelines dating back to the fight against the Keystone XL pipeline, another oil pipeline, but one that is not proposed to cross Lake Oahe.[9]  The prophecy itself, however, is much older than that, although it is impossible to know the precise age or origins of the prophecy in light of the fact that the Lakota religion is based on oral tradition rather than written doctrine.  Lakota religious adherents in their 60s recall learning of the Black Snake as children.  Today, Lakota religious adherents, including the declarants herein, believe that crude oil pipelines proposed to cross under lands and resources sacred to Lakota people are the Black Snake.  This belief is widespread among the Lakota people involved in the water protector movement.[10]

Lakota religious adherents, including the Cheyenne River declarants believe that the crude oil pipeline known as the Dakota Access pipeline is the Black Snake and that its proposed route under the waters of Lake Oahe will desecrate the waters that are available to Tribal members and render them unsuitable for use in Lakota religious sacraments, including the Inipi, which is a

---

[9] Winona LaDuke, *The Black Snake Hears a Song: Declaring War on the Keystone Pipeline*, INDIAN COUNTRY MEDIA NETWORK (Nov. 21, 2014) https://indiancountrymedianetwork.com/news/opinions/the-black-snake-hears-a-song-declaring-war-on-the-keystone-pipeline/ (last accessed Feb. 8, 2017).

[10] Louise Erdrich, *How to Stop a Black Snake*, N.Y. TIMES (Dec. 10, 2016) https://www.nytimes.com/2016/12/10/opinion/sunday/how-to-stop-a-black-snake.html?_r=0 (last accessed Feb. 8, 2017); Mike Anderson, *Dakota Access Pipeline Fight United the Seven Sioux Nations*, RAPID CITY JOURNAL (Sep. 11, 2016) http://rapidcityjournal.com/news/local/dakota-access-pipeline-fight-unites-the-seven-sioux-nations/article_9a746b78-f1d-5f30-b5d5-cfde26c0642a.html (last accessed Feb. 8, 2017).

central rite of the Lakota religious practice.  This belief is one that has been widely reflected in the broader Lakota movement opposing the Dakota Access Pipeline.  Challenges to the Cheyenne River declarants' sincerity based upon the unfamiliarity of this belief to mainstream Americans, the lack of a written doctrine setting forth this belief in the Lakota religion, the validity of the belief, or even disparity among Lakota adherents regarding the substance of the belief are inappropriate considerations.  *See Smith*, 494 U.S. at 887; *Ballard*, 322 U.S. at 86; *Frazee*, 489 U.S. at 834.  The Cheyenne River Sioux Tribe is likely to prevail in any challenge to the sincerity of its belief concerning the effect of the Dakota Access Pipeline on their sacred rites.

### B.   The Corps' Granting of Permission for Dakota Access to Construct and Operate a Crude Oil Pipeline Under the Tribe's Sacred Waters Substantially Burden the Tribal Members' Religious Exercise

A regulation that substantially burdens plaintiff's exercise of religion "forces them to engage in conduct that their religion forbids or . . . prevents them from engaging in conduct their religion requires." *Henderson v. Kennedy*, 256 F.3d 12, 16 (D.C. Cir. 2001) (collecting cases).  A burden rises to the level of being substantial "when (at the very least) the government (1) requires the plaintiff to participate in an activity prohibited by a sincerely held religious belief, (2) prevents the plaintiff from participating in an activity motivated by a sincerely held religious belief, or (3) places considerable pressure on the plaintiff to violate a sincerely held religious belief." including presenting the plaintiff with "an illusory or Hobson's choice where the only realistically possibly course of action available to the plaintiff trenches on sincere religious exercise." *Yellowbear v. Lampert*, 741 F.3d 48, 55 (10th Cir. 2014); *see also*, *Warsoldier v. Woodford*, 418 F.3d 989, 996 (9th Cir. 2005) (prison policy that coerced inmates to abandon their beliefs by cutting their hair was a substantial burden); *Love v. Reed*, 216 F.3d 682, 689-690 (8th Cir. 2000) (recognizing that prison's failure to accommodate prisoner's religious diet was substantially burdensome); *Jackson*

*v. Mann*, 196 F.3d 316, 320 (2d Cir. 1999) (same); *Hunafa v. Murphy*, 907 F.2d 46, 47 (7th Cir. 1990) (same); *McElyea v. Babbitt*, 833 F.2d 196, 198 (9th Cir. 1987) (same); *Hudson v. Dennehy*, 538 F. Supp. 2d 400, 411 (D. Mass. 2008).   And because RFRA and its companion statute RLUIPA provide greater protection than the Constitution, the test for showing a substantial burden under RFRA is less than that needed to show a violation of the First Amendment.  *Holt*, 135 S. Ct. at 862;[11] *see also Yellowbear*, 741 F.3d at 55-56 (prison's complete prohibition against an inmate's access to a sweat lodge was a substantial burden on his exercise of religion); *Haight v. Thompson*, 763 F.3d 554, 561 (6th Cir. 2014) (prison's refusal to provide Native American inmates with certain traditional foods in connection with ceremonies substantially burdened their exercise of religion, rejecting the notion that the provision of some but not all of the traditional foods, was sufficient); *Native Am. Council of Tribes v. Weber*, 750 F.3d 742 (8th Cir. 2014) (prison's wholesale ban on tobacco use by Native Americans substantially burdened their exercise of religion, rejecting the prison's claims that the inmate's religious exercise might be satisfied by a substitute for tobacco).

    Allowing construction and operation of a crude oil pipeline under Lake Oahe that renders that water unsuitable for use in Lakota religious rites unquestionably imposes a substantial burden on the Cheyenne River Sioux Tribe and its members.  The Tribe and its members are in a unique position as to their ability to exercise their religion.  The Lakota religion requires natural, un-desecrated water that is ritually pure for use in essential Lakota sacraments.  Yet, as set forth in

---

[11]  In *Holt*, the Court found that the district court erred in concluding that prison's ban on beards did not substantially burden a Muslim's religion because the inmate was allowed to engage in other practices important to his religion allowed to have a prayer rug and Islamic materials, to maintain his required diet, and to observe holidays.  The Supreme Court explained that although the availability of alternative means for practicing religion is a relevant consideration in cases arising under the First Amendment, the statute provided greater protection than the Constitution. *See Holt*, 135 S. Ct. 862.

detail herein, beginning at least with the unlawful taking of the Black Hills in 1877, the United States systematically has been depriving the Cheyenne River Sioux Tribe of access to the critical resource that the Tribe requires for its religious practice by confining the Tribe onto ever-smaller tracts of land.  Where once the Lakota had reserved under federal law millions of acres and all of the bodies of water contained in them, today the Cheyenne River Sioux Tribe and its members have just one pure, natural, un-desecrated source of water within their Tribal territory:  Lake Oahe.

Consequently, if the United States acts to permit Dakota Access to construct and operate a crude oil pipeline that would desecrate the only suitable waters available to the Cheyenne River Sioux Tribe for its religious sacraments, then it will have presented the Tribe and its members with a Hobson's choice of either violating their religious beliefs by using desecrated waters that are unsuitable for religious use or abandoning their religious sacraments.  Such coercion constitutes a clear substantial burden that arises frequently in prisoner cases proceeding under RLUIPA: the government has near complete control over the religious adherent's ability to exercise his religion and, by depriving the adherent of a choice, coerces them into either violating their beliefs or abandoning their religious practice.  *See Warsoldier*, 418 F.3d at 996; *Love*, 216 F.3d at 689-90; *Jackson*, 196 F.3d at 320; *Hunafa*, 907 F.2d at 47; *McElyea*, 883 F.2d at 196; *Hudson*, 538 F. Supp. 2d at 411.

These prisoner cases provide a fitting comparison not only as to the kind of coercion that is at issue here, but as to nature of the burden imposed.  In these cases the burden imposed on the religious adherent often relates to their belief that they will violate their religion by consuming food that it is not prepared in a manner consistent with their religious beliefs—this includes kosher meal preparation for Jews and halal meal preparation for Muslims.  *See Jackson*, 196 F.3d at 320; *Hunafa*, 907 F.2d at 47; *McElyea*, 833 F.2d at 198; *Hudson*, 537 F. Supp. 2d at 411.  Like the

desecration posed by the Dakota Access Black Snake to the waters of Lake Oahe, the unsuitability

of non-kosher or non-halal food to a Jew or a Muslim is simply a matter of the adherent's belief

or faith.  The preparations that render food kosher or halal have no actual effect on non-adherents,

but mean the difference between following or violating a key principle of religious belief for the

adherent.  Likewise, only a person adhering to Lakota religious beliefs would perceive that the

existence of a crude oil pipeline under Lake Oahe had resulted in a desecration of the waters.

While the instant case is similar to the prisoner cases above, the facts here involve a much

more substantial burden to religious exercise.  In the prisoner cases, the government coerces the

plaintiff into a Hobson's choice because, like the Cheyenne River Sioux Tribe, the prisoner has

been deprived of any choice by the government in light of his circumstances.  But prisoners lack

choice because they have been convicted of a crime and, as a consequence, have forfeited some of

their rights.  *See Crawford-El v. Britton*, 951 F.2d 1314, 1318 (D.C. Cir. 1991) (noting that prisons

may infringe on fundamental rights provided it is in service of a penological objective).  The

Cheyenne River Sioux Tribe and its members, on the other hand, lack choice because of a series

of government actions, some already deemed illegal, intended to restrict the Tribe and its members

for the government's purposes, not as a punishment to the Cheyenne River Sioux Tribe or its

people.  Further, in the process of restricting the Tribe and its members, the United States

established a relationship with the Tribe like "a ward to his guardian" (*Cherokee Nation v.

Georgia*, 5 Pet. 1 (1831)), promised to protect the Tribe against depredations by outsiders in duly

negotiated treaties (11 Stat. 749), and assumed a specific trust duty to protect waters owned by the

Tribe in Lake Oahe (*see* P.L. 83-77; *Mitchell*, 463 U.S. at 225).  The Corps' authorization of the

Dakota Access Pipeline under Lake Oahe not only would coerce the Tribe and its members into

an improper Hobson's choice that would constitute a substantial burden on their religious exercise,

but it would do so notwithstanding the Tribe's property right in the water and the Corps' fiduciary duty to protect it.

These facts also distinguish the present case from other cases concerning RFRA challenges to federal land regulations that burdened Indian religious exercise. *See Navajo Nation v. U.S. Forest Service*, 535 F.3d 1058 (9th Cir. 2008); *Snoqualmie Indian Tribe v. F.E.R.C.*, 545 F.3d 1207 (9th Cir. 2008). In those cases, although a kind of spiritual contamination was alleged, the regulations at issue did not foreclose religious adherents' ability to practice any part of their religion. Rather, the courts were clear that government action was limited in scope and plaintiffs were left other options to practice the rites at issue, hence their religious exercise was not substantially burdened. *Navajo Nation*, 545 F.3d at 1071 (reasoning that a Forest Service plan to use wastewater on a portion of on off-Reservation mountain considered sacred by tribes and where tribes collected plants and performed ceremonies was not a substantial burden); *Snoqualmie Indian Tribe*, 545 F.3d at 1215 (reasoning a federally licensed hydroelectric plant at an off-Reservation water fall did not substantially burden plaintiffs' religious exercise because the regulation did not prohibit adherents from accessing their sacred site). Those cases, moreover, also concerned sacred sites located on lands owned solely by the federal government and in which in none of the plaintiffs could claim any cognizable property interest. *Navajo Nation*, 535 F.3d at 1064; *Snoqualmie Indian Tribe v. F.E.R.C.*, 545 F.3d at 1210. This issue figured critically in *Lyng v. Northwest Indian Cemetery Protective* Association, 485 U.S. 439 (1988), where the Supreme Court held that it could not vindicate Indian religious adherents' challenge to a government-sanctioned project on the government's own land because to do so would imply in the Indian religious believer "*de facto* beneficial ownership of some rather spacious public property." *Id*. at 453.

Here, the Court does not risk implying in the Tribe or its members an improper *de facto* beneficial ownership of Lake Oahe by the finding that the proposed oil pipeline constitutes a substantial burden on their religious exercise because the Tribe and its members enjoy an *actual* legal ownership interest in the waters of Lake Oahe.  And not only that, the water is a trust property for which the United States is bound to act as a fiduciary in the protection of those waters for the Tribe's benefit.  *Id.*  Further, unlike the plaintiffs in *Navajo Nation*, *Snoqualmie*, and *Lyng*, the resource that the Corps' action is proposed to burden is the only one available to the Cheyenne River Sioux Tribe to practice its religion as the United States has systematically deprived the Tribe of access to other water sources as a function of its more than 200-yearlong campaign to dispossess the Lakota people of their aboriginal lands and resources.  Sadly, in light of these facts, the Tribe and its members here are more closely analogous to the prisoners whose only options in the exercise of their religion are closely controlled by the government.  *See Warsoldier*, 418 F.3d at 996; *Love*, 216 F.3d at 689-90; *Jackson*, 196 F.3d at 320; *Hunafa*, 907 F.2d at 47; *McElyea*, 883 F.2d at 196; *Hudson*, 538 F. Supp. 2d at 411.

Finally, *Navajo Nation* and the court decisions that followed it, including *Snoqualmie*, are no longer good law.  A divided panel of the court in *Navajo Nation* rejected tribal claims that the use of wastewater to create snow for skiers on a mountain held sacred to the Tribe violated RFRA based on an incorrect interpretation of RFRA that cannot be reconciled with the Supreme Court's recent decisions in *Hobby Lobby* and *Holt*.  In *Navajo Nation*, the Ninth Circuit majority construed RFRA to do nothing more than reinstate the compelling interest tests for First Amendment claims and took the position that the Tribe's religious beliefs were not burdened by the application of wastewater on the mountains.  The majority reasoned that the only effect of the project "is on the Plaintiff's subjective emotional religious experience," and applied the Supreme Court's First

34

Amendment precedent to conclude that the "diminishment of spiritual fulfillment – serious though it may be – is not a substantial burden on the free exercise of religion." *Navajo Nation*, 535 F.3d at 1070.

Such reasoning is contrary to the analysis and holdings in *Hobby Lobby* and *Holt*. As the Court there made clear, RFRA provides considerably broader protection to the exercise of religion than the First Amendment's Free Exercise clause. *Hobby Lobby*, 134 S. Ct. at 2671; *Holt*, 135 S. Ct. at 859. The Court relied on First Amendment cases only to define the minimum required by RFRA and RLUIPA (*Hobby Lobby*, 134 S. Ct. at 2671; *Holt*, 135 S. Ct. at 859) but then undertook to give effect to RFRA's and RLUIPA's considerably more expansive protections. *Hobby Lobby*, 134 S. Ct. at 2778; *Holt*, 135 S. Ct. at 862 (noting lower court erred when it "improperly imported" reasoning on substantial burden from First Amendment religious freedom cases as RLUIPA provides "greater protection").

In so doing, the Court rejected the kind of substantial burden critique relied upon by the Ninth Circuit in *Navajo Nation*. *Navajo Nation* held in relevant part that the desecration of the Navajo Tribe's sacred mountain, which it relied upon for its essential religious practices, could not constitute a substantial burden because "[t]he only effect of the proposed [government action] is on the Plaintiffs' subjective, emotional religious experience." *Navajo Nation*, 535 F.3d at 1070. In short, the court held that the burden imposed upon the Indian's religious practice was too weakly connected to the government regulation. In *Hobby Lobby* the Court rejected the premise that courts can determine the existence of a substantial burden under RFRA based upon whether it is *reasonable* in light of the government regulation. The Supreme Court emphasized that the real question that RFRA presents is "whether the [government regulation] imposes a substantial burden on the ability of the plaintiff to [act] in accordance ***their religious beliefs***," not "whether the

religious belief asserted in a RFRA case is reasonable." *Hobby Lobby*, 134 S. Ct. at 2778 (emphasis in original). Such reasonableness determinations tread too closely to a plausibility inquiry, which is not a judicial function. *Id.* (citing *Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989); *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 450 (1969)).

Further, the Ninth Circuit's notion that a substantial burden cannot arise out of an Indian's subjective, emotional religious experience is nonsensical. All religious experiences are subjective, emotional experiences. The prisoner diet cases bear this out. Unless one is an observant Jew, the burden of being forced to eat food that is not prepared in a kosher kitchen must seem subjective and emotional, rather than objective and rational. Yet the courts that heard the prisoner diet cases did not apply a test of whether the belief was objective and rational to determine whether it substantially burdened prisoners forced to choose between eating non-kosher food or violating their religious beliefs. *See Jackson*, 196 F.3d at 320; *Hunafa*, 907 F.2d at 47; *McElyea*, 833 F.2d at 198; *Hudson*, 537 F. Supp. 2d at 411. To apply such a test would be to question the validity of keeping kosher or observing halal practices, which the law does not permit. *See Smith*, 494 U.S. at 887; *Hernandez*, 490 U.S. at 699. If the law does not permit such an inquiry into religious beliefs arising from the Abramhamic traditions, then it also cannot permit an inquiry into the validity Native American religious beliefs, even though they may be unfamiliar and foreign to the court. *See, e.g., Ballard*, 322 U.S. at 87 ("The religious views espoused by respondents might seem incredible, if not preposterous, to most people[, b]ut if those doctrines are subject to trial . . . , then the same can be done with the beliefs of any sect.") Like the Jewish and Muslim prisoners who will violate their religion if forced to eat food that is not prepared consistent with their religious beliefs, the members of their Cheyenne River Sioux Tribe will violate their religion if

36

they are forced to use ritually impure water for their religious sacraments.  These beliefs are neither objective nor rational, but this cannot weigh against them in the RFRA analysis.

Allowing construction and operation of a crude oil pipeline under Lake Oahe renders that water unsuitable for use in Lakota religious rites and hence imposes a substantial burden on the Cheyenne River Sioux Tribe and its members.  Consequently, the Army Corps of Engineers must demonstrate that a compelling governmental interest justifies construction and operation of the pipeline.[12]  It cannot make this showing.

### C.    The Corps has no Compelling Interest in the Construction of the Dakota Access Pipeline

The Corps' grant of permission to Dakota Access to construct and operate an oil pipeline under Lake Oahe constitutes a substantial burden on the Tribe's and its members' religious exercise, therefore, "the burden [of strict scrutiny] is placed squarely on the [United States Army Corps of Engineers]."  *O Centro*, 546 U.S. at 429.  As a result, the Corps must prove that placing the crude oil pipeline under Lake Oahe "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. 2000bb-1(b).  "Requiring a [government] to demonstrate a compelling interest and show that it has adopted the least restrictive means of achieving that interest is the most demanding test known to constitutional law."  *City of Boerne v. Flores*, 521 U.S. 507, 509 (1997).

The compelling governmental interest inquiry in the RFRA context is a "focused" one that requires courts to "look beyond broadly formulated interests justifying the general applicability of government [regulations]."  *O Centro*, 546 U.S. at 431-32.  The test "requires the Government to

---

[12] When a plaintiff moves for preliminary injunction alleging a RFRA violation, the burden shifts to the government once the movant has established a substantial burden on their sincerely held religious beliefs, notwithstanding plaintiffs general burden of demonstrating likelihood of success on the merits.  *O Centro*, 546 U.S. at 428

demonstrate that the compelling interest test is satisfied through application of challenged law 'to the person' – the particular claimant whose sincere exercise of religion is being substantially burdened." *Id.* at 430-31 (quoting 42 U.S.C. § 2000bb-1(b)).  Therefore, the inquiry here requires the Corps to prove, not just that it has a compelling governmental interest in authorizing the construction and operation of a crude oil pipeline to carry oil from North Dakota to Illinois, but that it has a compelling governmental interest in authorizing the pipeline under the waters of Lake Oahe that affect the religious practice of the Cheyenne River Sioux Tribe and its members.

The Corps cannot meet this heavy burden.  The Corps and Dakota Access have already advised this Court of the interests that they believe the pipeline serves, including the general policies promoted by the various statutory schemes that govern the pipeline (ECF No. 21 at p. 43 (citing *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 3d 9, 43 (D. D.C. 2013))), general transportation safety concerns, and general economic benefits (ECF No. 22 at p. 36-37).  Such generalized interests do not satisfy a focused inquiry explaining why crude oil must be carried underground, crossing under the waters of Lake Oahe.  Less general reasons for siting the Dakota Access Pipeline under the waters of Lake Oahe exist in the July 25, 2016 Environmental Assessment ("EA") that accompanied the Corps' granting of permits to Dakota Access under Section 408 of the Rivers and Harbors Act, 33 U.S.C. § 408, but all these demonstrate is that this particular method for transporting oil cross country was marginally more efficient, marginally less expensive, or marginally safer than truck transport or rail transport; and marginally shorter and marginally less impactful to wildlife, the environment, and human populations.[13]  Governmental

---

[13]  The EA demonstrates that it rejected a crossing upstream of the non-Indian community of Bismarck, North Dakota in light of "close proximity to several wellhead source water protection areas that were identified and avoided in order to protect areas that contribute water to municipal water supply wells," while it ignored any impact upon Indian waters.  ECF 6-51 at pp. 8-11.

interests that operate on the margins are not sufficient to meet the test. *See Holt*, 135 S. Ct. at 862 (noting that courts considering the government's claim of a compelling governmental interest must "scrutinize" harm alleged by the government and "'look to the marginal interest in enforcing' the challenged government action in that particular context") (quoting *Hobby Lobby*, 134 S. Ct. at 2779); *see also O Centro*, 546 U.S. at 431. These generalized, marginal governmental interests simply do not meet the government's high burden.

<blockquote>

**D.  Even if the Corps Had a Compelling Interest Here, Construction of the Pipeline Under Sacred Waters Owned by the Cheyenne River Sioux Tribe is Not the Least Restrictive Means of Furthering That Interest**

</blockquote>

As the Corps cannot show a compelling governmental interest as applied specifically to siting of the Dakota Access Pipeline under Lake Oahe, the Court may end its analysis here. However, even if the Corps had met its burden, it could not show that constructing and operating the oil pipeline under Lake Oahe represents the least restrictive means of furthering that interest. The burden of proving that the government action at issue represented the least restrictive means is an "exceptionally demanding" standard that "requires the government to 'show that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting party.'" *Holt*, 135 S. Ct. at 864 (quoting *Hobby Lobby*, 134 S. Ct. at 2780). If a less restrictive means exists, "the Government must use it." *Id.* (internal citation omitted).

Significantly, where the government has at its disposal actual less restrictive alternatives, it cannot meet its burden. *See Hobby Lobby*, 134 S. Ct. at 2781-82; *O Centro*, 546 U.S. at 433; *see also McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 476 (5th Cir. 2014) ("The very existence of a government-sanctioned exception to a regulatory scheme that is purported to be the least restrictive means can, in fact, demonstrate that other, less-restrictive alternatives could

exist.")  In the present case, the Corps has set forth a litany of alternatives in its July 25, 2016 EA that would not burden the Tribe's religious exercise.  Dakota Access could transport its oil by truck or by rail instead of an oil pipeline.  Dakota Access could have routed its pipeline to avoid Lake Oahe altogether.  *See* ECF No. 6-51 at pp. 5-8.  Significantly, the government planned to explore these alternatives in detail as set forth in its December 4, 2017 Memorandum stating its intention to prepare an Environmental Impact Statement and its subsequent Notice of Intent to Prepare an EIS.  ECF No. 65-1 at ¶ 12; 82 Fed. Reg. 5544 (Jan. 18, 2017) (noting Army's determination "that a decision on whether to authorize the pipeline to cross Lake Oahe at the proposed location merits additional analysis, more rigorous exploration and evaluation of reasonable siting alternatives, and greater public and tribal participation . . . ").  The government however abandoned that process in favor of the present easement that violates the Tribe's religious exercise.

Because the Corps had at its disposal actual less restrictive alternatives, it cannot prove the Lake Oahe alternative that would burden the Tribe's and its members' religious exercise is the least restrictive alternative. Consequently, there is no question that the Tribe has proven that it is likely to succeed on the merits of its RFRA claim.

## II.     The Remaining Factors All Weigh In Favor of Granting Temporary and Preliminary Injunctive Relief

Proving likelihood of success on the merits is sufficient standing alone to justify a preliminary injunction and restraining order on behalf of the Tribe and its members.  *See Korte v. Sebelius*, 735 F.3d 654, 666 (7th Cir. 2013) (stating that in RFRA cases "the likelihood of success on the merits will often be the determinative factor"); *see also Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013) (same).  Nevertheless, the remaining factors governing temporary and preliminary relief fall in the Tribe's favor.

40

**A.      The Cheyenne River Sioux Tribe will suffer irreparable harm absent injunctive relief**

The Corps is the Tribe's trustee, bound by an obligation of the highest responsibility to protect the Tribe's interest in the waters of Lake Oahe, and yet it has authorized Dakota Access to construct and operate an oil pipeline under its sacred waters that will render those waters unsuitable for use in their holy sacraments.  In its more than 200 yearlong history of interaction with the Lakota people, the United States has acted over and over again to snuff out the spark of the Lakota religion.  In its insatiable greed for the Lakota land, the United States has stolen Lakota sacred sites like the Black Hills and restricted the Tribe's access to natural resources.  The United States has implemented explicit policies intended to destroy Lakota religion, stealing Lakota children and giving them to Christian missionaries and criminalizing religious practice.  Over the past 40 years the Tribe and its members have begun to revitalize their religion and practice it proudly in the light of day.  After all this, the Lakota people are once again facing an existential threat to their religion—the Dakota Access Pipeline, which, if allowed to desecrate the Tribe's sacred waters, will steal from them once and for all the sacred faith that war, genocide, theft, and poverty has not been able to extinguish throughout this centuries-long struggle.  Standing alone, this constitutes plain irreparable harm.

But also, this injury to the Tribe and its members violates their constitutional and civil rights as codified in RFRA.  In this Circuit it is clear that "the loss of constitutional freedoms, '*for even minimal periods of time, unquestionably constitutes irreparable injury*.'"  *Mills v. Dist. of Columbia*, 517 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 372 (1976)) (emphasis added); s*ee also Rigdon v. Perry*, 962 F. Supp. 150 (D. D.C. 1997) (violation of First Amendment religious expression rights constituted irreparable injury); *Simms v. Dist. of Columbia*, 872 F. Supp. 2d 90, 104 D. D.C. 2012) (violation of Fifth Amendment rights constitutes

irreparable harm); *Korte*, 735 F.3d at 666 (the loss of RFRA-protected freedoms "constitutes irreparable harm"); *cf. Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 303 (D.C. Cir. 2006) ("[W]here a movant alleges a violation of the Establishment Clause, this is sufficient, without more, to satisfy the irreparable harm prong for purposes of the preliminary injunction determination.")

Further, to find irreparable harm under RFRA, a threatened harmful action is sufficient.  In *O Centro*, the Supreme Court upheld a grant of preliminary injunction against the government to prevent enforcement of a drug law that violated a small sect's religious exercise.  546 U.S. 418. The facts in front of the trial court were not that of an actual prosecution, but a mere threat of prosecution.  The trial court found that "[a]lthough the United States has not filed any criminal charges . . . the government has threatened prosecution."  *O Centro Espirita Beneficient Uniao Do Vegetal v. Ashcroft*, 282 F. Supp. 2d 1236, 1240 (D. N.M. 2002).  As in *O Centro*, the matter before the Court poses a clear threat to the Tribe's and its member's free exercise of religion.  The government has granted the easement and Dakota Access has begun to drill.  This Court cannot wait until the harm begins to issue equitable relief.  When the free exercise of religion is at stake, a threat certain to that right is enough to constitute irreparable harm.

**B.**      **The Balance of Harms Weighs in the Cheyenne River Sioux Tribe's Favor**

The United States Army Corps of Engineers will suffer no injury from a temporary restraining order or a preliminary injunction.  Indeed, between September 9, 2017 and January 24, 2017, the Corps affirmatively supported the indefinite suspension of the granting of the easement and even committed itself on December 4, 2016 to preparing in full an Environmental Impact Statement, a process that takes an agency at least 360 days.  *E.g.*, *Jamul,* 837 F.3d at 965.  Although

Dakota Access has repeatedly, but inconsistently,[14] complained of economic harms arising from delay in this case, the Cheyenne River Sioux Tribe has demonstrated that it will suffer irreparable harm if Dakota Access constructs and operates its crude oil pipeline under the waters of Lake Oahe.  It is well settled that mere economic harm is not itself an irreparable harm, and thus plainly cannot outweigh an irreparable harm in this calculus.  *See, e.g., Wis. Gas Co. v. F.E.R.C.*, 758 F.2d 669, 674 (D.C. Cir. 1985).

Further it is significant that the Tribe and its members do not request relief that prohibits Dakota Access from having a crude oil pipeline that carries oil from North Dakota to Illinois; rather the Tribe only argues that the siting of this pipeline through the sacred waters of Lake Oahe must be enjoined.  If the oil company wishes to reroute its pipeline away from the Tribe's sacred waters, an alternative that the Corps recommended in both its December 4, 2016 Memorandum stating its intent to prepare an EIS for this pipeline and its Notice of Intent to prepare EIS.  ECF No. 65-1 at ¶ 12; 82 Fed. Reg. 5544 (Jan. 18, 2017).  Likewise, the Tribe and its members do not request relief that would prohibit all pipelines crossing through its territories or its sacred waters. Indeed the Tribe has tolerated the construction and operation of natural gas pipelines under Lake Oahe because these natural gas pipelines are not the Black Snake of Lakota prophecy and do not burden Tribal religious practice.

Finally, where there is a strong likelihood of success on the merits, "the balance of harms 'normally favors granting preliminary injunctive relief' because 'injunctions protecting First

---

[14]  Dakota Access has repeatedly advised the Court that the failure to have the project in operation by January 1, 2017, would threaten the viability of the project.  ECF No. 22-1 at ¶ 79.  Yet, Dakota Access spokespeople have publicly repudiated those statements and denied that delay of the pipeline would cause economic harm to the company.  ECF No. 78-5 at pp. 42.

Amendment freedoms are always in the public interest.'" *Korte*, 735 F.3d at 666 (quoting *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 590 (7th Cir. 2012)).

### C.     The Public Interest Favors Granting an Injunction

As demonstrated by the overwhelming support that the Cheyenne River Sioux Tribe and the Standing Rock Sioux Tribe have received from every day private citizens across the world, environmental and social justice nonprofits, legal advocacy organizations, [15] members of Congress, the Environmental Protection Agency, the Department of Interior, and American Council on Historic Preservation (Ducheneaux Decl. Exs. B - E), and the Army Corps itself (ECF 65-1), there can be no doubt that the public interest favors granting the instant injunction. Moreover, "there is undoubtedly also a public interest in ensuring that the rights secured under . . . RFRA are protected." *Tyndale*, 904 F. Supp. 2d at 130. Indeed, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Hobby Lobby*, 723 F. 3d at 1147; *O Centro Espiriat Benficienta Uniao do Vegetal v. Ashcroft*, 389 F.3d 973, 1010 (10th Cir. 2004) (en banc), *aff'd* 546 U.S. 418 (2006) ("There is a strong public interest in the free exercise of religion.")).

---

[15] *Stop the Bakken Pipeline*, Sierra Club, Iowa Chapter (2017), http://www.sierraclub.org/iowa/stop-bakken-pipeline (last visited Feb. 8, 2017) (Iowa farmers oppose pipeline); Jack Healy, *North Dakota Oil Pipeline Battle: Who's Fighting and Why*, New York Times (Aug. 26, 2016), *available at* https://www.nytimes.com/2016/11/02/us/north-dakota-oil-pipeline-battle-whos-fighting-and-why.html?_r=1; Brian Roewe, *Faith groups express Dakota Access Pipeline opposition to Obama*, National Catholic Reporter (Nov. 18, 2016), https://www.ncronline.org/blogs/eco-catholic/faith-groups-express-dakota-access-pipeline-opposition-obama (religious leaders oppose pipeline); Kiah Collier, *Opposition to Dakota Access pipeline boils over in Austin*, The Texas Tribune (Nov. 15, 2016), *available at* https://www.texastribune.org/2016/11/15/opposition-dakota-access-pipeline-boils-over/ (Texans march against pipeline); Derrick Broze, *19 Members of Congress Call On Obama to Halt Dakota Access Pipeline*, MintPress News (Oct. 5, 2016), http://www.mintpressnews.com/19-members-of-congress-call-on-obama-to-halt-dakota-access-pipeline/221152/ (19 members of Congress oppose pipeline).

In addition, the documented history of protests at or near the pipeline construction site indicate that violent clashes between tribal members, protesters and police/private militia forces are likely to occur should an injunction not be issued to preserve the status quo pending a hearing and decision on the present motion.

## CONCLUSION

As set forth in detail herein, the Cheyenne River Sioux Tribe respectfully urges this Court to grant its motions for temporary restraining order and for a preliminary injunction.

Dated: February 9, 2017

<div style="margin-left: 40%">

CHEYENNE RIVER SIOUX TRIBE,
Intervenor-Plaintiff,

By:   /s/ Nicole E. Ducheneaux
     Nicole E. Ducheneaux
     Fredericks Peebles & Morgan LLP
     3610 North 163rd Plaza
     Omaha, NE  68116
     Telephone:  (402) 333-4053
     Facsimile:  (402) 333-4761
     Email: nducheneaux@ndnlaw.com

     Conly J. Schulte
     FREDERICKS PEEBLES & MORGAN LLP
     1900 Plaza Drive
     Louisville, CO  80027
     Telephone:  (303) 673-9600
     Facsimile:  (303) 673-9839
     Email:  cschulte@ndnlaw.com

</div>

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 9th day of February, 2017, a copy of the foregoing was filed electronically with the Clerk of the Court.  The electronic filing prompted automatic service of the filing to all counsel of record in this case who have obtained CM/ECF passwords.

<div style="margin-left: 40%">

     /s/ Nicole E. Ducheneaux

</div>