UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
----------------------------X

STANDING ROCK SIOUX TRIBE,

                    Plaintiff

              v.                    Civil Action 16-1534.

U.S. ARMY CORPS OF ENGINEERS,

                    Defendant

----------------------------X

                              Washington, D.C
                      Monday, February 6, 2017
                              11:30 a.m.

           TRANSCRIPT OF STATUS CONFERENCE
      BEFORE THE HONORABLE JAMES E. BOASBERG
              UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:  Jan Hasselman, Esq.
                    Stephanie Tsosie, Esq. (telephone)
                    Patti A. Goldman, Esq. (telephone)
                    EARTHJUSTICE LEGAL DEFENSE FUND
                    705 Second Avenue, Suite 203
                    Seattle, WA 98104-1711
                    (206) 343-7340

Intervenor Cheyenne Nicole E. Ducheneaux, Esq.
River Sioux Tribe:  FREDERICKS PEEBLES & MORGAN LLP
                    3610 North 163rd Plaza
                    Omaha, NE 68116
                    (402) 333-4053

Court Reporter:     Lisa Walker Griffith, RPR
                    U.S. District Courthouse
                    Room 6507
                    Washington, D.C.  20001
                    (202) 354-3247

```
APPEARANCES:  (Cont'd.)



For the Defendant:  Matthew M. Marinelli, Esq.
                    Erica M. Zilioli, Esq.
                    U.S. DEPARTMENT OF JUSTICE
                    Environment & Natural Resources Division
                    P.O. Box 663, Ben Franklin Station
                    Washington, DC 20044-0663
                    (202) 305-0293



For Cross Claimant  David Debold, Esq.
Dakota Access:      William S. Scherman, Esq.
                    GIBSON, DUNN & CRUTCHER, LLP
                    1050 Connecticut Avenue, NW
                    Washington, DC 20036
                    (202) 955-8551
```

```
 1                        P R O C E E D I N G S

 2              THE DEPUTY CLERK:  This is Civil Action 16-1534.

 3    Standing Rock Sioux Tribe versus United States Army Corps

 4    of Engineers.

 5              Would counsel on the phone please identify

 6    yourselves for the record.

 7              MS. GOLDMAN:  Good morning, Your Honor.  This is

 8    Patti Goldman on behalf of Standing Rock Sioux Tribe.

 9              MS. TSOSIE:  Good morning.  This is Stephanie

10    Tsosie on behalf of Standing Rock Sioux Tribe.

11              THE COURT:  Thank you.

12              Anyone else?  We'll have plaintiffs approach.

13              MR. HASSELMAN:  Jan Hasselman for plaintiffs,

14    Standing Rock Sioux Tribe.

15              MS. DUCHENEAUX:  Good morning, Your Honor.

16    Nicole Ducheneaux on behalf of the Cheyenne River Sioux

17    Tribe.

18              MR. MARINELLI:  Good morning, Your Honor.  Matt

19    Marinelli from for the Department of Justice for the Corps

20    of Engineers.  With me at counsel table are Erica Zilioli

21    also from Department of Justice and Milt Boyd from the Army

22    Corps of Engineers.

23              THE COURT:  Okay.  Welcome to you folks.

24              MR. DEBOLD:  Good morning, Your Honor.  David

25    Debold appearing on behalf of Dakota Access.  With me at
```

1    counsel table are Bill Scherman and Bob Comer.

2            THE COURT:  Okay, welcome.

3            I think there was an issue at last hearing --

4    first of all I should say to those in attendance that the

5    Court rules prohibit any audio or videotaping of these

6    proceedings.  So given the technology can be -- has made

7    advances so as to be somewhat surreptitious. I'm advising

8    anybody here, it is a violation of Court's rules for any

9    audio or videotaping of this court proceeding absent

10   specific leave of court.  Thank you.

11           All right.  Mr. Marinelli, we're ready for

12   detailed update from you.

13           MR. MARINELLI:  Thank you, Your Honor.

14           The Army continues to undertake the review

15   process set forth in paragraph two of the presidential

16   memorandum.  The Corps has prepared a review and analysis

17   pursuant to paragraph two of the January 24th memorandum.

18   That review is currently pending before the Department of

19   the Army.  We anticipate that the Army review process may

20   be completed as early as the end of this week.

21           THE COURT:  All right.  And then, what would then

22   derive therefrom?

23           MR. MARINELLI:  I think the process could take

24   two broad paths.  One would be going forward with an

25   easement at Lake Oahu, the other would be denying the

1 easement at Lake Oahe.

2       THE COURT:  I know you are doing the best you can

3 to explain to me where things stand, so I know you are not

4 being evasive at all.  I'm just trying to pin down as best

5 I can details.  So let's assume by the end of the week.

6 Again you are not committing that but let's assume by the

7 end of the week the process has reached its end.  Would

8 that mean that an announcement would be made very shortly

9 thereafter as to one of the two alternatives you just

10 mentioned?

11       MR. MARINELLI:  I would expect -- so taking --

12 that path is a little more clear in the event that an

13 easement is granted because I think, as we've said to this

14 Court, there is a provision of the Mineral Leasing Act that

15 requires notice to Congress.  I would anticipate that if

16 that is the path taken that we will file any notice to

17 Congress with this Court.

18       THE COURT:  Okay.  And so that could occur,

19 again, in the event an easement is granted, that notice to

20 Congress could occur as early as the end of the week?

21       MR. MARINELLI:  I hesitate to say more than it

22 may occur by the end of this week.  As the earliest it will

23 occur -- and it has not occurred yet.  But I cannot give a

24 more definite timetable today.

25       THE COURT:  Okay.  And then, do you know whether

```
1   the government's position is that there is still a two week
2   requirement between the time of the notifying Congress and
3   the giving Dakota Access the actual easement or has the
4   Department reached a position on whether it would follow
5   that earlier practice?  I know, I'm pretty sure it's not in
6   an actual regulation or rule, it's a practice.  And has the
7   Department reached a decision on that?
8           MR. MARINELLI:  The short answer is no.  The
9   Department has not reached a decision on a waiver of that
10  policy that we cited to in our briefing on Dakota Access'
11  Motion for Summary Judgment.
12          THE COURT:  All right.  So again, I don't want to
13  waste anybody's time.  We've got a lot of folks who are
14  busy.  But I also want to stay on top of this the best I
15  can so that we can give everybody as much notice as
16  possible as well.  So, what do you think is a good
17  timetable to return here?
18          MR. MARINELLI:  Well, given that we have a reply
19  brief due next Friday, and what I've said, that we may, the
20  Department of Army may have reached a discussion by the end
21  of this week, we propose coming back on Monday if that is
22  acceptable to the parties and the Court.
23          THE COURT:  Okay.  The 13th.  Okay.  Thank you
24  very much.
25          Let me hear from Mr. Debold first on the briefing
```

|   |   |
|---|---|
| 1 | question is the first issue I have for you, which is do you |
| 2 | want -- there are a couple of pieces.  We talked about this |
| 3 | last time.  Do you want me not to rule on your pending |
| 4 | motion, given what you have heard from the government, do |
| 5 | you still want them to file their final brief as proposed |
| 6 | or do you -- are you happy for the government to put that |
| 7 | off given what is occurring here? |
| 8 | MR. DEBOLD:  We're not asking for a change in |
| 9 | that due date at this time, Your Honor.  The only |
| 10 | difference I would have with Mr. Marinelli, we agree that |
| 11 | we should come back to court, he said Monday, we would |
| 12 | prefer Friday.  That's really the only area where I think |
| 13 | we have a disagreement.  But we're not asking the Court to |
| 14 | move ahead and try to rule on the summary judgment with |
| 15 | this prospect, you know, a little bit more definite given |
| 16 | what we heard today. |
| 17 | THE COURT:  All right, thank you.  I'll be |
| 18 | getting back to you on the timeline issue we talked about |
| 19 | last time. |
| 20 | Mr. Hasselman, Ms. Ducheneaux, do you want to be |
| 21 | heard on what we've just discussed with both of these |
| 22 | counsel? |
| 23 | Mr. Hasselman? |
| 24 | MR. HASSELMAN:  I'm not sure if you want to talk |
| 25 | about this now or at the next step, but I do want to |

1   acknowledge the predicament that we're in.  Our position is

2   that the easement, the issuance of the easement without the

3   previously announced EIS process would be unlawful.  There

4   are very formidable legal issues involved, under tribal

5   treaties, under NEPA, under the Clean Water Act.

6           We're in a situation where we can't raise those

7   issues until the actual decision is made.  And then things

8   start moving very fast.  So, we're going to be approaching

9   you for very, for relief on a very short timeline.

10          We did have some thoughts about maybe some ways

11  to structure that to make it a little more manageable for

12  all the parties.  One thought is in the past the Corps has

13  asked you for 48 hours notice prior to a decision.  I think

14  that is an appropriate standard for us to ask the Corps so

15  we at least know when things are going to happen.

16          The second thought is this is a decision on a

17  short timeline.  We would think it would be appropriate

18  for the Court to order the Corps to compile the

19  administrative record while it is making its decision and

20  file the administrative record at the time that it makes

21  the decision.  So that the Court and the parties have an

22  opportunity to look at that material while we're in this

23  emergency motion phase.

24          THE COURT:  Okay.  Thank you.

25          Ms. Ducheneaux.

1          MS. DUCHENEAUX:  Your Honor, thank you.  What Mr.

2     Hasselman just said on behalf of the Standing Rock reflects

3     Cheyenne River's position as well.

4          THE COURT:  Thank you.

5          Let me then go to Mr. Debold on the question that

6     I raised, rather that Mr. Hasselman raised last time

7     regarding a timeline from the potential receipt of an

8     easement through the commencement of oil flow through the

9     pipeline.  If you could sketch that out for us as best you

10    understand, that would be helpful.

11         MR. DEBOLD:  Yes, I'm happy to do that, Your

12    Honor.  I would like to just take a minute or two to put it

13    in context especially in light of points that Mr. Hasselman

14    just raised.

15         The last time we were before Your Honor a week

16    ago today, Standing Rock raised the idea of what he called

17    a waiting period after we got permission through a signed

18    easement to go forward with the completion of the pipeline

19    below Lake Oahe.  Obviously, that would require an

20    injunction or a temporary restraining order or something of

21    that nature.  Dakota Access is not going to agree to a

22    further delay.

23         As Your Honor sort of previewed with your

24    question to us, one of the things they would have to show

25    is irreparable harm, probable, immediate, not remote or

1   speculative.   You know, that the injury here would

2   presumably attach to the opening of the pipeline which led

3   to your question about the timeline.

4          But we want to make clear before I give you the

5   detail there is that for purposes of any request to stall,

6   halt, enjoin or whatever you want to call it, it would be

7   wrong for the Court to be focused on what is the first day

8   that oil is flowing through the pipeline, or even really

9   what is the first year that oil is flowing through the

10  pipeline.

11         Every harm, as you noted in the status conference

12  last week, every harm the tribes have raised relates to a

13  possibility that the oil would leak through the pipeline.

14  I've gone back through all their comment letters and that's

15  really the harm they are point to.

16         THE COURT:  The earlier harm was destruction in

17  the actual construction of the pipeline.  So I assume --

18  that they haven't raised it yet but I'm assuming that the

19  harm they will raise will be the potential injury from the

20  oil itself, from a rupture.

21         MR. DEBOLD:  Right, which leads to the question

22  of when is there is actually going to be oil in the

23  pipeline.  We just want the Court to be aware that it is

24  really not going to be sufficient to focus on that first

25  day that the oil is running, although that will be several

1    days off and I will explain in a minute.  But if you look

2    at the raw statistical data referenced in the environmental

3    assessment, not one of the types of risk that they're

4    talking about would be a day one risk.

5          In fact, for any pipeline anywhere in the U.S.,

6    any one-mile segment of it, the data show that the risk of

7    a leak or a spill is on the order of, at the most

8    pessimistic view, once every 474 years.  And that is

9    assuming that you have got other kinds of problems like

10   third party damage, which happens when you have a shallow

11   pipeline or one that is exposed, or a pipeline exposed to

12   natural elements or deterioration over time.

13         And they refer to certain pipelines, one is

14   Kalamazoo, Michigan; Marshall, Michigan, the Kalamazoo

15   River.  One in the Yellowstone River where the pipelines

16   were exposed and were more than 40 years old.  We have not

17   seen anything dealing with this type of construction, the

18   HDD, horizontal directional drill with lots of extra

19   precautions that have been taken here.

20         So I just want the Court to understand that,

21   although we're going to give you the information about how

22   long it is going to take for there to be actual oil in the

23   pipeline, from the standpoint of when do we need to have a

24   decision from Your Honor, we do not need to be looking at

25   that as a day one decision.

1          The one out of 474 years  statistic is also for

2     releases of less than four barrels of oil.  If you are

3     talking about crossing a stream, the risk is now one in

4     every 1430 years for that small amount of release.  If

5     you're talking about a large spill, it's once every 142,993

6     years.  This is all in the administrative record.  Plus the

7     response plans that have been put in place deal with the

8     pipeline as sort of a contingency, what would happen in the

9     worse case scenario.  The worse case scenario that they

10    have mapped out is if the pipeline were resting on top of

11    the water and was totally sliced in half, a guillotine cut.

12          And they've prepared to respond to that kind of a

13    spill, even though there is no way possible that this

14    pipeline, 92 below the river bed, would have that kind of a

15    cut.

16          THE COURT:  Right.  Well this all goes to your

17    irreparable harm argument.

18          MR. DEBOLD:  Exactly.  So I just wanted to make

19    sure we're reviewing this in the right context.  The other

20    final point, and then I'll move to the timeline, is that

21    the environmental assessment, it's been undisputed.  I've

22    gone through the comment letters, nobody has disputed that

23    the pipeline in the aggregate is safer than the other modes

24    of transportation which is either trucking or rail lines.

25          The tribe has oil and gas leases on their

1   reservation.  There is a rail line that runs within two

2   miles of the new water intake that was built, which is 70

3   miles south of pipeline.  So in fact, if you are talking

4   about preserving the status quo is that actually a more

5   risky proposition.

6           So getting to the question, when oil would be

7   flowing through the pipeline, the best case scenario for

8   oil flowing through for commercial service would be 83 days

9   after the work resumes at Lake Oahe.  Now, there will be

10  oil in the pipeline earlier then that.  The best case

11  scenario for when there's actually oil present in the

12  pipeline under Lake Oahe is 60 days.

13          I'll explain to you how we get to two different

14  figures.  There are two drill boxes, as Your Honor knows,

15  one on either side of the lake.  They're over 6500 feet

16  apart.

17          The initial drilling has occurred on both of

18  those drill boxes.  And the drilling has gone down and

19  stopped where the border is for the federal land which is

20  about 6450 feet apart.  Ultimately the hole is going to be

21  between 42 and 48 inches in diameter.  So it can

22  accommodate a 30 inch diameter pipe.  But the first stage

23  is to drill the smaller hole, are eight inches in diameter.

24  So the two holes will meet at eight inches diameter.  Then

25  there will be a back and forth process of expanding the

1    hole through a number of passes until it is between 42 and

2    48 inches.

3            Then they're going to well the pipeline above

4    ground and check every one of the wells, the girth wells

5    through xray or ultrasonic testing, there will be seven

6    different tests done on the pipeline before that process.

7            Once the pipe has been put together above ground,

8    they're going to run a hydrostatic test, a four hour test

9    where it has to maintain pressure using water which is 25

10   percent above the maximum operating pressure.  If it passes

11   that test, they run the pipe through, they connect it, they

12   do a second test for eight hours, the same process, the

13   same high pressure testing.

14           They also inspect the pipeline that came out the

15   other end to make sure there is no harm to the coating and

16   what not, or any dents.  They do another test with what is

17   called a caliper, what is called a caliper pig, which they

18   run through the pipeline to make sure that there is no

19   damage on the inside, no dents, et cetera.

20           Once that is all done they do a final welding,

21   those are inspected through x-ray ultrasonic.  That's the

22   end of the process that takes about 60 days, it could take

23   as long as 90.

24           The next step is to start filling the pipe with

25   oil which they do in segments.  They start -- by the time

1   the pipeline is ready underneath Lake Oahe, the oil should

2   be at about 161 mile mark from the beginning of the

3   pipeline.  And Lake Oahe is about 166 and a half mile mark.

4   So they start filling that.  It fills all the way through

5   and reaches the end in Illinois.  And that takes the extra

6   23 days.

7            THE COURT:  Okay.  So it seems that the

8   potential, that the plaintiffs' potential arguments are,

9   one, that the approval violated NEPA, that's part of their

10  complaint.  In their earlier preliminary injunction they

11  only raised the National Historic Preservation Act

12  violation.  Again, just so everyone including the public is

13  clear, the claim in the earlier preliminary injunction had

14  nothing to do with any rupture or any leak of oil into Lake

15  Oahe.  The prior preliminary injunction related only to

16  damage to tribal and sacred lands by virtue of construction

17  of the pipeline.

18            So the plaintiffs still have two arguments.  They

19  may have more.  But two central ones which would be that

20  the earlier process violated NEPA, and second that, given

21  that the government agreed to more recently to go forward

22  with an EIS, they can't now turn their back on this and

23  simply grant the easement.

24            But in seeking a preliminary injunction, if they

25  do, it sounds like we have at least 60 days for me to make

1    a determination before any oil would flow and before any

2    harm could potentially accrue to the plaintiffs.  Now I

3    understand your argument that there is no irreparable harm

4    anyway because the odds are so low.  But their argument

5    would be, that there would be such harm.

6         The reason Mr. Hasselman asked, and I think it

7    was a very reasonable request which I endorsed, to get the

8    timeline so we have a sense of what we're looking at going

9    forward.

10        MR. DEBOLD:  Understood.  Sometimes you focus on

11   a question and sometimes that starts defining what the

12   issue is.  We wanted to make sure that the Court is aware

13   that there is nothing magic about that day, except that

14   there will be oil in the pipeline.  And sure they can make

15   different arguments based on that.  But we believe that

16   they would still have a very, very difficult task, in fact

17   an impossible task, of saying we need to have a decision by

18   this day, otherwise the requirements or either a injunction

19   or temporary restraining order would be triggered.

20        THE COURT:  Thank you.

21        So Mr. Hasselman, now that you have heard this

22   time estimate, do you agree that all of us in briefing, and

23   me in deciding, will have 60 days from the date of the

24   grant of the easement?

25        Again, just so everyone is clear, including the

1  public, Mr. Marinelli has not said that any easement will

2  be granted.  We're just hypothesizing about potential legal

3  steps in the event it is granted.

4        MR. HASSELMAN:  Yes.  For sure the risk of oil

5  spill ruptures which can take place outside of the HDD and

6  still wind up in Lake Oahe has been a central narrative in

7  this case.  And it is a central part of the reason we're

8  here.  It is not the only reason.  And we don't agree that

9  the drilling of the pipeline, the construction of the

10 pipeline is harmless.

11        I think we need to go back and think hard amongst

12 ourselves in light of this timeline, which is considerably

13 different than we anticipated it to be, whether we will

14 seek relief on construction as well, which would have to be

15 on a faster time scale, or whether we would sort of agree

16 with your premise that we have at least 60 days.  I think

17 we need to confer with our client before we can make that

18 commitment.

19        THE COURT:  Understood.

20        Ms. Ducheneaux, anything you want to add to that

21 issue?

22        MS. DUCHENEAUX:  No, Your Honor, thank you.

23        THE COURT:  So let me ask you, Mr. Marinelli,

24 just to go back to Mr. Hasselman's earlier request about

25 the administrative record filing, again to the extent

1    they're bringing challenges based on earlier, under earlier

2    alleged NEPA violations, that administrative record I trust

3    is complete already.

4              MR. MARINELLI:  Correct.

5              THE COURT:  In other words, anything predating

6    July 25th.

7              So the question then would be the administrative

8    record that relates to any grant of an easement this week

9    or next week.  How soon would you be able to file the

10   administrative record for that?  Which I imagine would not

11   be terribly extensive.

12             MR. MARINELLI:  Your Honor, I would like to

13   respond by first noting that I have a general objection,

14   it's the same objection that I raised to Dakota Access'

15   efforts to get us to file an administrative record before

16   making a decision.  And that's that, we really can't

17   compile an administrative record before we've made a

18   decision.

19             THE COURT:  They're just saying when you make a

20   decision, they would like the administrative -- if you

21   decide to grant an easement they would like the

22   administrative record for the such decision, they want it

23   simultaneously.

24             MR. MARINELLI:  I understood in that manner, I

25   think there are still a few problems with that.  One is

1  they don't even have a claim pending regarding an ungranted

2  easement today.  Tribes do not have a claim pending

3  regarding an ungranted easement.  Even if they did, there

4  is no final agency action.  That said, and we have been

5  compiling documents related to the decision-making process

6  as we were going along.

7       I cannot predict how long it would take us to

8  compile those documents into an administrative record.  I

9  would note that the timeline that we previously stated,

10 that it takes approximately a week once we, DOJ, receives

11 the documents to process them in a manner that allows us to

12 serve the administrative record still I assume would hold.

13 But as to the Corps compiling that record, conducting the

14 reviews necessary which include the SSI review that is

15 currently pending before the Court or for which a related

16 SSI review is pending before the Court on Dakota Access'

17 motion.  It is difficult for me to predict how long it

18 would compile that record.

19       THE COURT:  I'm not going to then order you to

20 produce it on a specific date now.  But I would ask you to

21 attempt to compile this on an ongoing basis so that we

22 could do it in some expedited fashion.  We may have 60 days

23 but we're going to need to work on a compressed timeframe

24 in the event an easement is granted.

25       So let's pick a date to come back.  I'm happy to

1    do it on Monday.  Is 11:30 same time, same channel good for

2    everybody?

3           MR. DEBOLD:  Afternoon would be better if that is

4    possible.

5           THE COURT:  Any particular time in the afternoon?

6           MR. DEBOLD:  2:00.

7           THE COURT:  All right.

8           Mr. Hasselman is 2:00 convenient for you on the

9    13th?

10          MR. HASSELMAN:  Yes, Your Honor.

11          THE COURT:  Ms. Ducheneaux?

12          MS. DUCHENEAUX:  Yes, Your Honor.

13          THE COURT:  Mr. Marinelli?

14          MR. MARINELLI:  Yes, Your Honor.

15          THE COURT:  Okay.  February 13 at 2:00 P.M.  Any

16   material that relates to the grant easement I would again

17   ask the government to give me notice.

18          Let me ask the government, do you have a position

19   on the protective order motion filed on Wednesday filed by

20   Dakota Access?

21          MR. MARINELLI:  Your Honor, I believe our

22   position is that we will oppose that motion.

23          THE COURT:  Okay.

24          MR. MARINELLI:  We would like the time to respond

25   to it.

1          THE COURT:  Okay.

2          All right.  Any other issues anybody wants to

3   raise now this afternoon?

4          Mr. Hasselman?

5          MR. HASSELMAN:  No, thank you.

6          THE COURT:  Ms. Ducheneaux?

7          MS. DUCHENEAUX:  No, thank you.

8          THE COURT:  Mr. Marinelli?

9          MR. MARINELLI:  No, Your Honor.

10         THE COURT:  Mr. Debold?

11         MR. DEBOLD:  No, Your Honor.

12         THE COURT:  Okay.  Thank you all very much,

13   appreciate it.  We'll see you next week.

14         (Whereupon, at 12:03 p.m., the hearing

15   adjourned.)

16

17

18

19

20

21

22

23

24

25

3                    CERTIFICATE OF REPORTER

4                    I, Lisa Walker Griffith, certify that the

5    foregoing is a correct transcript from the record of

6    proceedings in the above-entitled matter.


11   _____     _____
     Lisa Walker Griffith, RPR                        Date