Case No. 1:16-cv-01534-JEB

# ATTACHMENT 1

Case No. 1:16-cv-01534-JEB

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE, | Case No. |
| Plaintiff, | |
| and | FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| CHEYENNE RIVER SIOUX TRIBE, | |
| Plaintiff-Intervenor, | |
| v. | |
| U.S. ARMY CORPS OF ENGINEERS, | |
| Defendant-Cross Defendant, | |
| and | |
| DAKOA ACCESS, LLC, | |
| Defendant-Intervenor-Cross Claimant. | |

INTRODUCTION

1.     This is a complaint for declaratory and injunctive relief.  The Standing Rock

Sioux Tribe ("Tribe") brings this action in connection with federal actions relating to the Dakota

Access Pipeline ("DAPL"), a 1,168-mile-long crude oil pipeline running from North Dakota to

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

Illinois.  The Tribe, a federally recognized American Indian Tribe with a reservation in North Dakota and South Dakota, brings this case because defendant U.S. Army Corps of Engineers ("Corps") has taken actions that authorize the pipeline's construction and operation in violation of multiple federal statutes, Treaties, the U.S. Constitution, the U.S. trust responsibility, executive orders, and regulations.  The construction and operation of the pipeline, as authorized by the Corps, threatens the Tribe's environmental and economic well-being, and would damage and destroy sites of great historic, religious, and cultural significance to the Tribe.  In addition, construction and operation of a crude oil pipeline under the Missouri River and Lake Oahe would desecrate the sanctity of these waters and impose a substantial burden on Tribal members' practice of rituals that are central to their faith and religious practice.

2.      This complaint involves four kinds of claims.  First, the Tribe brings an as-applied challenge to Nationwide Permit 12 ("NWP 12"), issued by the Corps in 2012 pursuant to the federal Clean Water Act ("CWA") and Rivers and Harbors Act ("RHA").  DAPL crosses hundreds if not thousands of federally regulated rivers, streams, and wetlands along its route. The discharge of any fill material in such waters is prohibited absent authorization from the Corps.  Federal authorization under these statutes, in turn, triggers requirements under the National Historic Preservation Act ("NHPA"), intended to protect sites of historic and cultural significance to Tribes like Standing Rock.  In issuing NWP 12, however, the Corps authorized discharges into federal waters without ensuring compliance with the NHPA.  In essence, in enacting NWP 12, the Corps pre-authorized construction of DAPL in all but a handful places requiring federal authorization without any oversight from the Corps.  In so doing, the Corps abdicated its statutory responsibility to ensure that such undertakings do not harm historically and culturally significant sites.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

3.      Second, on July 25, 2016, the Corps issued multiple federal authorizations needed to construct the pipeline in certain designated areas along the pipeline route.  It issued one authorization needed for DAPL to construct the pipeline underneath Lake Oahe, approximately half a mile upstream of the Tribe's reservation.  It issued others authorizing DAPL to discharge into waters of the United States at multiple locations in the Tribe's ancestral lands.  In issuing these authorizations, the Corps relied on an environmental assessment ("EA") and finding of no significant impact ("FONSI") issued pursuant to the National Environmental Policy Act ("NEPA").  The authorizations issued on July 25, 2016 were made in violation of the CWA and its governing regulations and without compliance with NHPA, NEPA, and the Corps' trust obligation to consult with the Tribe and ensure its Treaty rights are protected.

4.      Third, under the Mineral Leasing Act ("MLA"), DAPL requires an easement to construct the pipeline under Lake Oahe.  The Corps did not issue such an easement on or before July 25, 2016.  After this litigation commenced, the Corps acknowledged that the Lake Oahe crossing had impacts on the Tribe's Treaty rights, including its reserved water rights and fishery rights in the Missouri River and Lake Oahe, and that the EA and the Corps' prior analysis had not adequately considered and taken steps to fulfill its trust obligation to consider and protect the Tribe's Treaty rights.  The Corps committed to conduct a full environmental impact statement ("EIS") and initiated that process on January 18, 2017.  After the inauguration, the new President directed the Army to grant the easement on an expeditious basis to the extent permitted by law and as warranted.  Heeding that direction, the Corps terminated the EIS process and granted the easement on February 8, 2017.  In reversing course, abandoning the EIS process, and granting the easement, the Corps acted arbitrarily and capriciously and violated NEPA, the MLA, and its trust obligation to consult with the Tribe and ensure its Treaty rights are protected.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

5.      Fourth, the Tribe challenges the Corps' approvals of construction and operation of the crude oil pipeline under Lake Oahe for substantially and impermissibly burdening the rights of the Standing Rock people to exercise their religion, in violation of the Religious Freedom Restoration Act ("RFRA") and First Amendment Right to Free Exercise of Religion.

6.      The Tribe seeks a declaration that the Corps violated the NHPA in issuing NWP 12, and an injunction preventing the Corps from using NWP 12 as applied to DAPL and directing the Corps to ensure full compliance with § 106 at all sites involving discharges into waters of the United States.  The Tribe further seeks a declaration that the July 25, 2016 authorizations were made in violation of the CWA, NEPA, NHPA, and the Corps' trust obligation to consult with the Tribe and ensure its Treaty rights are protected, and an order vacating all existing authorizations and verifications.  The Tribe also seeks a declaration that granting the February 8, 2017 easement was arbitrary and capricious and in violation of NEPA, the MLA, and the Corps' trust obligation to consult with the Tribe and ensure its Treaty rights are protected, and an order vacating the easement.  Finally, the Tribe seeks a declaration that construction and operation of the pipeline under the sacred waters of Lake Oahe violates the RFRA and the First Amendment, and an order setting aside the authorizations and enjoining construction and operation of the pipeline under Lake Oahe.

## JURISDICTION AND VENUE

7.      This case arises under the U.S. Constitution and laws of the United States, including the Supremacy Clause and the First Amendment.  This case presents claims under the Administrative Procedures Act, 5 U.S.C. § 701, *et seq*. ("APA"), which authorizes a federal court to find unlawful and set aside any final agency action that is "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id*. § 706.  The claim that the Corps violated its trust responsibility is subject to the highest fiduciary standards and heightened

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

scrutiny. *Jicarilla Apache Nation v. United States*, 112 Fed. Cl. 274, 287–88 (2013). The Tribe brings these claims on its own behalf and on behalf of its members.

8.      Jurisdiction arises under 28 U.S.C. § 1362 ("district courts shall have original jurisdiction of all civil actions, brought by any Indian Tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States"); § 2201 (declaratory relief); § 2202 (injunctive relief).

9.      Venue in this district is appropriate under 28 U.S.C. § 1391(e) because it is the district in which the defendant resides and in which "a substantial part of the events or omissions giving rise to the claim occurred."

PARTIES

10.      The Standing Rock Sioux Tribe is a federally-recognized Indian tribe with a governing body recognized by the Secretary of the Interior. Since time immemorial, the Tribe's ancestors lived on the landscape to be crossed by the DAPL. The pipeline crosses areas of great historical and cultural significance to the Tribe, the potential damage or destruction of which greatly injures the Tribe and its members. The pipeline also crosses waters of utmost cultural, religious, spiritual, ecological, and economic significance to the Tribe and its members. The Tribe and its members have been, are being, and, unless the relief sought herein is granted, will be harmed by the Corps' failure to comply with environmental and historic preservation laws, the Corps' trust responsibility, and the laws safeguarding its members' rights to exercise their religion.

11.      The U.S. Army Corps of Engineers is an agency of the United States government, and a division of the U.S. Army, part of the U.S. Department of Defense. It is charged with regulating any dredging and filling of the waters of the United States under § 404 of the CWA

5

and § 10 of the RHA, issuing leases under the MLA, fulfilling the United States' trust responsibility to Tribes, and complying with NEPA in the course of undertaking major federal actions.

12.     Intervenor-Defendant Dakota Access, LLC is a limited liability company formed to construct and own Dakota Access Pipeline.  Energy Transfer Partners, L.P., Sunoco Logistics Partners, L.P. and Phillips 66 are the beneficial owners of Dakota Access, LLC.

13.     By filing this action, the Tribe does not waive its sovereign immunity and does not consent to suit as to any claim, demand, offset, or cause of action of the United States, its agencies, officers, agents, or any other person or entity in this or any other court.

BACKGROUND

I.     THE TREATIES AND STATUTES THAT THE ARMY CORPS MUST SAFEGUARD UNDER ITS TRUST OBLIGATION TO THE TRIBE

14.     The Standing Rock Sioux Tribe is a successor to the Great Sioux Nation.  In 1851, the United States entered into the Fort Laramie Treaty, Sept. 17, 1851, 11 Stat. 749, with several Tribes of the Northern Great Plains to establish peace and to define the territory of each Tribe.  In that Treaty, the United States recognized that the territory of the Great Sioux Nation was expansive, including large portions of North and South Dakota, as well as parts of Nebraska, Wyoming and Montana.  That Treaty further bound the United States to "protect" the Great Sioux Nation "against the commission of all depredations by the people of the said United States, after the ratification of this treaty."  11 Stat. 749, Art 3.

15.     The discovery of gold led to an influx of immigrants into this territory.  In derogation of the promises made in the 1851 Treaty, the United States did not stop these incursions or their destruction of the buffalo on which the Sioux relied for sustenance and other needs.  Conflicts followed in which the Sioux fought to protect the integrity of their Treaty lands

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

from the incursion of white settlers.

16.     The Fort Laramie Treaty of 1868, Apr. 29, 1868, 15 Stat. 635, was an effort to restore peace.  In that Treaty, the United States set apart the Great Sioux Reservation for the "absolute and undisturbed use and occupation" of the Sioux Nation.  *Id.* art 2.  The Treaty also secured to the Sioux an additional area, defined as "unceded Indian territory," and the United States promised that "no white person or persons shall be permitted to settle upon or occupy any portion of the same."  15 Stat. 635, Art 16.  In the 1868 Treaty, the United States further promised that no cession of lands by the Tribe would be valid "unless executed by at least three-fourths of the adult male Indians."  *Id* Art. 12.   By an Executive Order of March 16, 1875, the northern boundary of the Great Sioux Reservation was extended to the Cannon Ball River.

17.     The United States soon violated the promises it made in these Treaties.  *United States v. Sioux Nation*, 448 U.S. 371, 383 (1980).  The federal government allowed gold miners and others to trespass on the reserved and unceded Sioux lands, and told the Sioux they could no longer hunt on the territories where they had reserved Treaty rights to hunt.

18.     By statute enacted in 1877, the United States purported to ratify an "agreement" made in 1876 with the Sioux to take large portions of lands reserved for the Sioux under the two Fort Laramie Treaties.  *See* Act of Feb. 28, 1877, 19 Stat. 254.  However, that "agreement" was signed by only ten percent of the adult Sioux males, and so fell far short of the three-quarters of the adult males required by the 1868 Treaty.

19.     In 1889, Congress again enacted a statute that stripped vast portions of the Treaty lands, leaving several much smaller Sioux Reservations, including the modern-day Standing Rock Sioux Reservation.  Act of Mar. 2, 1889, ch. 405, 25 Stat. 888.

20.     The Standing Rock Sioux Reservation includes Treaty lands, appurtenant waters,

7

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

natural resources, grazing, timber, mineral rights, hunting and fishing rights, and usufructuary rights. The Tribe's reservation of land was accompanied by a reservation of water rights in the Missouri River to fulfill the purpose of the reservation and to provide for the Tribe's self-sufficiency. *Winters v. United States*, 207 U.S. 564 (1908). This *Winters* right includes the right to clean, safe water that is consistent with the purpose of the reservation. *Id.*

21.     The Standing Rock Sioux Tribe also retains rights to hunt, fish and gather on the Reservation. *Menominee Tribe v. United States*, 391 U.S. 404 (1968); *United States v. Dion*, 476 U.S. 734, 738 (1986).

22.     In the Flood Control Act of 1944, the United States authorized the Army Corps to construct dams on the Missouri River, including the Oahe Dam, to provide for federal flood control, navigation, and for other purposes as long as such uses did not conflict with present and future beneficial consumptive uses of waters for "domestic, municipal, stock water, irrigation, mining, or industrial purposes." 33 U.S.C. §701-1(b); Flood Control Act of 1944, Pub. L. 78-54, ch. 665, 58 Stat. 887 (Dec. 22, 1944) (codified at 16 U.S.C. § 460d, and various sections of Titles 33 and 43 of the United States Code).

23.     In 1958, Congress enacted legislation that took 56,000 acres of the Tribe's Reservation lands along the Missouri River for the Oahe project, the purpose of which was to provide for flood control downstream. Act of Sept. 2, 1958, Pub. L. No. 85-915, 72 Stat. 1762. The lands that were taken for the Oahe project were the best remaining lands of the Reservation, containing most of the Tribe's timberlands, habitat for animals needed for subsistence, fertile lands where families had gardens, and important sources of wild berries and plants essential to the Tribe's diet and for medicinal and religious purposes. S. Rep. No. 102-267, at 188 (1992). As a result of the permanent flooding of these 56,000 acres of Reservation lands from the Oahe

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

project, 190 families lost their homes, as whole Tribal communities were forced to move from the sheltered and natural resource-rich lands along the Missouri River to the windswept and desolate uplands.  S. Rep. No. 102-267 at 188-89 (1992).  This loss has devastated the Tribal economy and left the Tribal community with longstanding and abiding economic poverty.  The Tribe today resides on its remaining Reservation.  Lake Oahe plays a vital role in Tribal life on the Reservation.

24.     Today, the Standing Rock Sioux Reservation encompasses roughly 3,500 square miles of North and South Dakota, with Lake Oahe running north and south along the entire Reservation, supplying the primary water source for the Reservation.  The Tribe relies upon the waters of Lake Oahe for drinking water for Tribal members' homes, as well as the hospital, schools, Tribal businesses and Tribal administrative buildings throughout the Reservation.  The Tribe also relies on the waters of Lake Oahe for agriculture (both farming and grazing) as well as industrial purposes.  Additionally, the waters of the Missouri River are sacred to the Tribe, a cultural and spiritual resource that is central to the Tribe's practice of religion.

## II.     THE CLEAN WATER ACT

25.     Congress enacted the CWA in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).  To accomplish this goal, the CWA prohibits the discharge of any pollutant, including dredged spoil or other fill material, into waters of the United States unless authorized by a permit.  *Id.*, § 1311(a).  Unless statutorily exempt, all discharges of dredged or fill material into waters of the United States must be authorized under a permit issued by the Corps.  *Id.*, §§ 1344(a)–(e).

26.     The Corps is authorized to issue two types of permits under § 404: individual permits and general permits.  *Id.*  The Corps issues individual permits under § 404(a) on a case-by-case basis.  *Id.*, § 1344(a).  Such permits are issued after a review involving, among other

things, site specific documentation and analysis, public notice and opportunity for a hearing,

public interest analysis, and formal determination. 33 C.F.R. § 322.3; Parts 323, 325.

27.     The CWA also authorizes the Corps to issue "general" permits on a state, regional

or nationwide basis.  33 U.S.C. § 1344(e).  Such general permits may be issued for any category

of similar activities that "will cause only minimal adverse environmental effects when performed

separately, and will have only minimal cumulative adverse effect on the environment." *Id*. "No

general permit … shall be for a period of more than five years after the date of its issuance." 33

U.S.C. § 1344(e)(2).  The purpose of this approach to permitting is to "regulate with little, if any,

delay or paperwork certain activities that have minimal impacts." 33 C.F.R. § 330.1(b).

28.     The Corps issued the current set of 48 nationwide permits ("NWPs") in February

of 2012.  77 Fed. Reg. 10184 (Feb. 21, 2012).  The 2012 NWPs in "most cases" authorize

discharge into regulated waters without any further process involving the Corps.  In effect, the

NWP pre-authorizes certain categories of discharge, without any additional approval from, or

even notification to, the Corps.  33 C.F.R. § 330.1(e)(1).  In other instances, discharges cannot

occur until the proponent of the action files a "pre-construction notification" ("PCN") to the

Corps, and receives verification that the proposed action is consistent with the terms of the NWP.

*Id*. § 330.6(a).  The specifics of whether or not a PCN is required are spelled out in each

individual NWP as well as a series of "general conditions" accompanying the NWP.  77 Fed.

Reg. at 10282 (listing 31 general conditions).

III.    THE RIVERS AND HARBORS ACT

29.     The Rivers and Harbors Act of 1899 is the nation's oldest environmental law.

The statute prohibits a number of activities that impair ports, channels and other navigable

waters.   Unlike the CWA, which applies in all waters of the United States, the RHA applies only

in "navigable" waters, defined as waters subject to the ebb and flow of the tides, or waters that

*Earthjustice*
705 Second Ave., Suite 203
Seattle, WA  98104-1711
(206) 343-7340

are "presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce."  33 C.F.R. § 329.4.

30.     Section 10 of the RHA, 33 U.S.C. § 403, among other things, makes it unlawful "to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of" any navigable water without a permit from the Corps.  Like § 404 permits, § 10 permits may be issued as individual permits or pursuant to the NWP program and are generally subject to many of the same regulations.

31.     Tunneling under a navigable body of water requires a section 10 permit from the Corps, even without any discharge into navigable waters.  33 C.F.R. § 322.3(a) ("For purposes of a section 10 permit, a tunnel or other structure or work under or over a navigable water of the United States is considered to have an impact on the navigable capacity of the waterbody.").

32.     A separate provision of the RHA, known as "Section 408," makes it unlawful to "build upon, alter, deface, destroy, move, injure, obstruct by fastening vessels thereto or otherwise, or in any manner whatever impair the usefulness of any sea wall, bulkhead, jetty, dike, levee, wharf, pier, or other work built by the United States" without a permit from the Corps.  33 U.S.C. § 408.  Unlike Section 10 permits, § 408 permits cannot be issued pursuant to the NWP program but are only issued as individual permits.  Prior to issuance of a § 408 permit, the Corps must determine whether the use or occupation will be injurious to the public interest or impair the usefulness of the project.

IV.     THE MINERAL LEASING ACT

33.     Congress enacted the Mineral Leasing Act ("MLA") in 1920 to govern development of the nation's natural resources and to obtain for the public a reasonable financial return on use of publicly owned assets.  The Act gives the agencies broad discretion to refuse to issue leases.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

34.     As to pipelines, the statute provides that "rights of way through any Federal lands may be granted" by the appropriate agency head for purposes of oil pipelines in accordance with detailed standards provided in that section and agency regulations.  30 U.S.C. § 185(a).  The Act gives agencies broad discretion to establish conditions pertaining to the "extent, duration, survey, location, construction, operation, maintenance, use, and termination" of a pipeline.  *Id.* § 185(f).  The statute also establishes extensive, specific requirements for allowing a pipeline to cross federal land.  Plans of operation are required, and the agency must develop regulations or impose stipulations that must include, at a minimum, a variety of requirements to control or prevent damage to the environment, property, and public health and safety.  *Id.* § 185(h).  Agencies must include specific conditions to protect people in the "general area" who "rely on the fish, wildlife, and biotic resources of the area for subsistence purposes."  *Id.*

35.     Furthermore, the agency head can issue a right-of-way only when he or she "is satisfied that the applicant has the technical and financial capability to construct, operate, maintain, and terminate the project for which the right-of-way is requested."  *Id.* § 185(j); *see also id.* § 185(i) (requiring disclosure of identity of all participants in corporate venture); § 185(m) (authorizing agency to require a bond).  Provisions are included for public notice and opportunity to comment, including hearings.  *Id.* § 185(k).  Finally, an applicant seeking authorization to cross federal lands must pay in advance "the fair market rental value of the right-of-way or permit" as well as the costs of administering it.  *Id.* § 185(l).  The importance of these standards, which are unique to the special risks of pipelines, is further reinforced by a provision in the statute that prohibits granting a right-of-way "except under and subject to the provisions, limitations, and conditions of this section."  30 U.S.C. § 185(q).

36.     Army Corps regulations implementing the MLA delegate the authority to issue

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

"outgrants" authorizing the use of Army real property to Division or District commanders or their respective chiefs of real estate.  Army Reg. 405-80, ¶ 3-1, Ex. 16.  An outgrant is a "written document setting out the terms and conditions of non-Army use of real property."  *Id.* ¶ 4-1(a).  Such use "must be of direct benefit to the U.S., promote the national defense or an Army mission, or be in the public interest."  *Id.* ¶ 4-1(b).  The regulations make clear that the outgrant program involves the Army Corps "as landowner managing its real property holdings" rather than acting in a regulatory capacity.  *Id.* ¶ 4-1.  The Army regulations also ensure that the United States will receive a "stated consideration" for an outgrant authorizing use of Corps property.  *Id.* ¶ 4-1(d).  Finally, the regulations clarify that outgrants will not be issued where they conflict with federal policy on environmental or historic preservation.  *Id.* ¶¶ 4-8.

V.      THE NATIONAL HISTORIC PRESERVATION ACT

37.     Section 106 of the National Historic Preservation Act ("NHPA") requires that, prior to issuance of a federal permit or license, federal agencies shall take into consideration the effects of that "undertaking" on historic properties.  54 U.S.C. § 306108.  Agencies "must complete the section 106 process prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license."  36 C.F.R. § 800.1.

38.     The NHPA defines undertaking as "a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including— (1) those carried out by or on behalf of the Federal agency; (2) those carried out with Federal financial assistance; (3) those requiring a Federal permit, license, or approval; and (4) those subject to State or local regulation administered pursuant to a delegation or approval by a Federal agency."  54 U.S.C. § 300320; 36 C.F.R. § 800.16(y).

39.     Early in the NHPA process, an agency must determine the area of potential effects ("APE") of a federal undertaking.  36 C.F.R. § 800.4(1)(1).  The APE is defined by regulation to

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

include the area "within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties…. The [APE] is influenced by the scale and nature of an undertaking and may be different for different kinds of effects caused by the undertaking." *Id.* § 800.16(d).

40.     The Section 106 process requires consultation with Indian Tribes on federal undertakings that potentially affect sites that are culturally significant to Indian Tribes.  36 C.F.R. § 800.2(c)(2); 54 U.S.C. § 302707 (properties "of traditional religious and cultural importance to" a Tribe may be included on the National Register, and federal agencies "shall consult with any Indian Tribe … that attaches religious or cultural significance" to such properties).  Consultation must occur regarding sites with "religious and cultural significance" even if they occur on ancestral or ceded land.  *Id.* § 800.2(c)(2)(II)(D).

41.     Under the consultation regulations, an agency official must "ensure" that the process provides Tribes with "a reasonable opportunity to identify its concerns about historic properties, advise on the identification and evaluation of historic properties….articulate its views on the undertaking's effects on such properties, and participate in the resolution of adverse effects." *Id.* § 800.2(c)(ii)(A).  This requirement imposes on agencies a "reasonable and good faith effort" by agencies to consult with Tribes in a "manner respectful of tribal sovereignty." *Id.* § 800.2(c)(2)(II)(B).

42.     Acting "in consultation with … any Indian tribe … that might attach religious and cultural significance to properties within the area of potential effects, the agency official shall take steps necessary to identify historic properties within the area of potential effects." *Id.* §800.4(b).  The agency must evaluate the historic significance of such sites, and determine whether they are potentially eligible for listing under the National Register.  *Id.* § 800.4(c).

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

43.     If the agency determines that no historic properties will be affected by the undertaking, it must provide notice of such finding to the state and tribal historic preservation offices, and the Advisory Council on Historic Preservation ("ACHP"), which administers the NHPA. *Id*. § 800.4(d).  The regulations give those parties the opportunity to object to such a finding, which elevates the consultation process further.  *Id*.

44.     If the agency finds that historic properties are affected, it must provide notification to all consulting parties, and invite their views to assess adverse effects.  *Id*.  Any adverse effects to historic properties must be resolved, involving all consulting parties and the public.  *Id*. § 800.6.  If adverse effects cannot be resolved, the process is elevated again to the ACHP and the head of the agency undertaking the action.  *Id*. §800.7.  Until this process is complete, the action in question cannot go forward.

45.     The ACHP authorizes agencies to adopt their own regulations for implementing its § 106 obligations.  Such regulations must be reviewed and approved by the ACHP in order to be valid.  *Id*. § 800.14.

46.     The Corps has adopted procedures intended to satisfy its § 106 obligations.  *See* App. C to 33 C.F.R. Part 325.  Those procedures, which predate amendments to the NHPA that significantly broaden the role of Tribes in the § 106 process, have never been approved by the ACHP.  Several courts have concluded that the Corps' NHPA procedures are legally invalid.  However, the Corps continues to follow these procedures for purposes of § 106 consultation, including in the process surrounding DAPL.

47.     Section 106 regulations also provide an alternative compliance mechanism under which agencies can negotiate a "programmatic agreement" with the ACHP to resolve "complex project situations or multiple undertakings."  36 C.F.R. § 800.14(b).  Such agreements are

suitable for "when effects on historic properties are similar and repetitive or are multi-State or regional in scope;" "when effects on historic properties cannot be fully determined prior to approval of an undertaking;" or when "nonfederal parties are delegated major decisionmaking responsibilities," among other situations. *Id*. § 800.14(b)(1). Programmatic agreements require consultation with Tribes, among others, as well as public participation.

48.     The Corps has never adopted a programmatic agreement with the ACHP regarding its CWA/RHA permits or any other activity.

## VI.    THE NATIONAL ENVIRONMENTAL POLICY ACT

49.     NEPA, 42 U.S.C. §§ 4321–4370f, is our "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). It makes environmental protection a part of the mandate of every federal agency. 42 U.S.C. § 4332(1).

50.     NEPA seeks to ensure that federal agencies take a "hard look" at environmental concerns. One of NEPA's primary purposes is to ensure that an agency, "'in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts.'" *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349 (1989). NEPA also "guarantees that the relevant information [concerning environmental impacts] will be made available to the larger audience," including the public, "that may also play a role in the decisionmaking process and the implementation of the decision." *Id.*

51.     NEPA requires agencies to fully disclose all of the potential adverse environmental impacts of its decisions before deciding to proceed. 42 U.S.C. § 4332(C). NEPA also requires agencies to use high quality, accurate scientific information and to ensure the scientific integrity of the analysis. 40 C.F.R. §§ 1500.1(b), 1502.24.

52.     If an agency action has adverse effects that are "significant," they need to be

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

analyzed in an environmental impact statement ("EIS").  40 C.F.R. § 1501.4.  If it is unclear

whether impacts are significant enough to warrant an EIS, it may prepare an "environmental

assessment" to assist in making that determination.  *Id.*  If the agency determines that no EIS is

required, it must document that finding in a "finding of no significant impact" ("FONSI").

  53. NEPA's governing regulations define what "range of actions, alternatives, and

impacts [must] be considered in an environmental impact statement."  40 C.F.R. § 1508.25.  This

is in part what is known as the "scope" of the EIS.  The EIS must consider direct and indirect

effects.  The direct effects of an action are those effects "which are caused by the action and

occur at the same time and place."  40 C.F.R. § 1508.8(a).  The indirect effects of an action are

those effects "which are caused by the action and are later in time or farther removed in distance,

but are still reasonably foreseeable."  40 C.F.R. § 1508.8(b).

  54. An agency must also analyze and address the cumulative impacts of a proposed

project.  40 C.F.R. § 1508.25(c)(3).  Cumulative impacts are the result of any past, present, or

future actions that are reasonably certain to occur.  Such effects "can result from individually

minor but collectively significant actions taking place over a period of time."  40 C.F.R.

§ 1508.7.

## VII. THE FIRST AMENDMENT FREE EXERCISE CLAUSE AND THE RELIGIOUS FREEDOM RESTORATION ACT

  55. The First Amendment to the United States Constitution prevents the government

from burdening the free exercise of religion.

  56. The Religious Freedom Restoration Act of 1993 ("RFRA"), Pub. L. No. 103-141,

42 U.S.C. § 2000bb, further protects the exercise of religion.  Under RFRA, the federal

government may not "substantially burden a person's exercise of religion even if the burden

results from a rule of general applicability", unless the government "demonstrates that

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

application of the burden to the person – (1) is in furtherance of a compelling governmental

interest; and (2) is the least restrictive means of furthering that compelling governmental

interest."  42 U.S.C. § 2000bb-1(a).

57.      Congress enacted RFRA to "provide greater protection for religious exercise than

is available under the First Amendment," *Holt v. Hobbs*, 135 S. Ct. 853, 860 (2015), and "far

beyond what this Court has held is constitutionally required."  *Burwell v. Hobby Lobby Stores,*

*Inc.*, 134 S. Ct. 2751, 2767 (2014).

58.      To fall under RFRA's protection, a religious belief must be sincerely held by the

adherent.

59.      Once a party makes a prima facie case that the government action creates a

substantial burden on the free exercise of religion, the burden shifts to the government to prove

that its action is necessary to meet a compelling government interest and the action is the least

restrictive way to meet the interest.

60.      The least restrictive means standard is exceptionally demanding and it requires

the government to show that it lacks other means of achieving its desired goal without imposing

a substantial burden on the exercise of religion by the objecting party.

## FACTUAL ALLEGATIONS

I.      THE CORPS' ISSUANCE OF NWP 12

61.      The Corps issued the current suite of 48 NWPs, covering a wide array of potential

activities involving discharges into regulated waters, in February of 2012.  77 Fed. Reg. 10184

(Feb. 21, 2012).  Of relevance here, NWP 12 governs "utility line activities."  *Id*. at 10271.

NWP 12 authorizes the "construction, maintenance, repair and removal of utility lines and

associated facilities" in waters of the United States, providing that the activity does not result in

the loss of greater than a ½ acre of waters "for each single and complete project."

Counterintuitively, a "single and complete project" in the case of linear projects like utility lines is any crossing of a separate waterbody. 33 C.F.R. § 330.2(i). Under this definition, a pipeline like DAPL is made up of hundreds if not thousands of "single and complete projects."

62.     The NWP defines "utility line" to include "any pipe or pipeline for the transportation of any gaseous, liquid, liquescent, or slurry substance, for any purpose." 77 Fed. Reg. at 10271. The Corps considers pipelines carrying crude oil to be covered by NWP 12.

63.     Under NWP 12, preconstruction notification ("PCN") to the Corps by a non-federal project proponent, and a verification from the Corps, is required if any one of several criteria is met. *Id*. at 10272. If none of the criteria are met, the proponent is authorized by NWP 12 to proceed with the work in regulated waters without additional notification to, or approval from, the Corps. None of the NWP 12-specific criteria relates to historic or cultural preservation.

64.     The NWP program also includes a set of general conditions that are applicable to all NWPs, include NWP 12. General Condition 20 ("GC 20") addresses historic properties. Under GC 20, a non-federal permittee must submit a PCN "if the authorized activity may have the potential to cause effects to any historic priorities listed on, determined to be eligible for listing on, or potentially eligible for listing on the National Register of Historic Places, including previously unidentified properties." *Id*. at 10284. If a PCN is provided, the Corps purports to comply with § 106 of the NHPA prior to verifying that the NWP is applicable, and work may not commence until such verification is provided. 33 C.F.R. § 330.5(g)(2). Conversely, if no PCN is provided, no § 106 process occurs.

65.     GC 20 puts the responsibility on the proponent, not the Corps, to determine whether historic or culturally significant properties are present, and requires Corps' verification only if the proponent finds such sites and reports them to the Corps via a PCN.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

66.     NWP 12 was formally adopted by the Corps in a "Decision Document" signed by Major General Michael J. Walsh on Feb. 13, 2012.  In responding to public comment regarding potential impacts to tribal sites, the Decision Document states that compliance with NHPA on NWP implementation is carried out via GC 20.

II.     FACTS RELEVANT TO CHALLENGE TO NWP 12

67.     The proponent of DAPL proposes to construct a major crude oil pipeline across 1,168 miles through North Dakota, South Dakota, Iowa, and Illinois.  The pipeline will have a capacity of 570,000 barrels of crude oil per day, making it one of the largest crude oil pipelines in the nation, carrying over half of the current capacity of North Dakota's oil production.

68.     DAPL is one of several pipelines that have been proposed for the North Dakota oil production area, some of which have been moving on a slower timeline due to environmental review requirements.  DAPL has moved aggressively to get the pipeline constructed as quickly as possible.

69.     The pipeline's route passes through the Tribe's ancestral lands, and areas of great cultural, religious and spiritual significance to the Tribe.  Construction of the pipeline includes clearing and grading a 100-150 foot access pathway nearly 1200 miles long, digging a trench as deep as 10 feet, and building and burying the pipeline.  Such work would destroy burial grounds, sacred sites, and historically significant areas in its path.  These sites carry enormous cultural importance to the Tribe and its members.

70.     DAPL claims to have completed cultural resource surveys along the entire pipeline length.  However, the out-of-state, non-Tribal consultants hired by DAPL to do cultural surveys are unable to assess the potential cultural significance of sites in this area to the Tribes.  Only Tribally trained and approved consultants have the ability to assess such sites.  The Tribe has never had the opportunity to discuss protocols for cultural surveys, or participate in the

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

surveys that were conducted.  Instead, it was provided copies of partial surveys after they were completed.

71.     Compared to other pipelines, DAPL has taken a highly unusual approach to Corps permitting for activities involving discharges into regulated waters.  Rather than seek Corps' verifications on all waters of the U.S. in which pipeline construction would cause a discharge, as has been typical, DAPL has only sought Corps' verification for a tiny minority of the impacts to federally regulated waters.

72.     For example, DAPL's route through North Dakota is 359 miles.  A 2015 "Wetlands and Waterbodies Delineation Report" provided to the state Public Service Commission identifies 263 waterbodies and 509 wetlands that would be impacted by the pipeline.  However, this information was never provided to the Corps.  Instead, DAPL submitted PCNs for only two of these sites, at crossings of the Missouri River.  Neither of these PCNs was submitted based on potential impacts to historic sites.

73.     In South Dakota, DAPL would cross 273 miles.  DAPL's state Public Utilities Commission filings reveal 288 waterbody crossings and 102 acres of wetlands impacts. However, DAPL only provided the Corps with PCNs for 10 of these sites.  None of the PCNs in South Dakota was triggered by impacts to historic sites.

74.     In both states, this delineation of waterbody impacts was only partially complete, as DAPL did not have landowner access to all sites along the pipeline route.  Accordingly, some of the features were estimated through desktop analysis.  The ultimate number of waterbody and wetland impacts remains unknown.

75.     One of the two places in North Dakota where Corps authorization is required is at Lake Oahe, where the pipeline would cross underneath the Lake (a dammed section of the

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

Missouri River) immediately upstream of the Tribe's reservation.

76.     Due to its concerns about the configuration of the pipeline and inadequacies in the regulatory process, the Tribe has participated extensively in the public process associated with the permits, including filing numerous formal technical comments on the Lake Oahe crossing, meeting with Corps' leadership and staff, and communicating with elected representatives and agency officials to express concerns.  The Tribe has repeatedly conveyed to the Corps and other government officials the significance of its concerns and the risks to the Tribe about moving ahead with the pipeline in its current configuration.  The Tribe has in particular highlighted the inadequacies of the Corps' § 106 consultation process with regard to historic and cultural impacts at the Lake Oahe site.

77.     On July 25, 2016, the Corps issued the NWP 12 verification and other authorizations required at the roughly 204 sites in the four states for which verification has been requested along the pipeline's entire length.  However, prior to that time, construction started along the remainder of the route, including construction involving discharges into the hundreds if not thousands of sites where pipeline construction involves discharges into waters of the United States, but for which no PCN is required.

78.     The Tribe repeatedly expressed concerns to the Corps regarding construction in waters of the United States pursuant to NWP 12 without any section 106 consultation on historic impacts.  On June 30, 2016, the Standing Rock Tribal Historic Preservation Officer, Jon Eagle Sr., wrote to the Corps District Commander regarding the extensive work proceeding without any § 106 consultation under NWP 12.  This letter explained that non-Tribal archaeologists were unable to appreciate the cultural significance of Tribal historic sites, and that his office had found the DAPL cultural surveys, conducted by out-of-state archaeologists with no training in the

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

cultural practices of the Oceti Sakowin to be "gravely deficient."

79.     The letter requested that the Corps declare that all impacts to waters of the United States had potential historic impacts and requested that the Corps require PCNs from all such crossings, so that full § 106 consultation could occur.

80.     In response, the regulatory branch chief of the Corps' Omaha district invited Mr. Eagle's office to participate in "monitoring" for "post construction discoveries of cultural resources and/or burials" at six sites subject to PCNs in North and South Dakota.  The Corps did not respond to the issue to which Mr. Eagle's letter was actually addressed, specifically, cultural impacts at sites that are not subject to a PCN.

81.     The Tribe's concerns were highlighted in June of 2016 when archaeologists working on behalf of Upper Sioux Tribe discovered a site of great religious and cultural significance to Oceti Sakowin in the pipeline's route in Iowa.  The site was not discovered by DAPL during its cultural resource surveys, even though it lay directly in the pipeline's route.

82.     The pipeline will also impact historic and culturally significant sites in uplands along the pipeline's route in between areas of Corps' jurisdiction.  The Corps views any impacts to such uplands sites as outside of its responsibility under § 106, as the Corps interprets §106 to apply only within the immediate area of CWA jurisdiction.

83.     The ACHP regulations take a different approach.  In a May 6, 2016 letter to the Corps regarding DAPL, the ACHP explained that its regulations "define the undertaking as the entire project, portions of which may require federal authorization or assistance."  Even where the jurisdiction is limited to particular portions of a project, the ACHP explained, "the federal agency remains responsible for taking into account the effects of the undertaking on historic properties."  The letter concluded that given the close relationship between the project and

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

multiple federal approvals, "a greater effort to identify and evaluate historic properties" was required.

84.     In a May 19, 2016, letter, the ACHP formally objected to the Corps' finding of "no effect" at the site of the Lake Oahe crossing, one of only two sites in the entire state of North Dakota for which the Corps even purported to engage in § 106 consultation.  The ACHP asserted that the Corps misapplied § 106 by considering only historic properties within its areas of jurisdiction, when it should consider indirect impacts to historic sites in uplands that could not occur but for the Corps' authorization to discharge into waters of the United States.

85.     At the time of filing this complaint, DAPL has not executed agreements with all landowners, and eminent domain proceedings are underway in several states.  Additionally, several lawsuits have been filed against DAPL and state regulatory agencies which challenge the legality of DAPL approvals, and seeking the remedy of vacating such approvals, which would require DAPL to stop work.  However, DAPL has chosen to move ahead with construction in places where regulatory approval is secured and where landowner consent has been obtained.

86.     DAPL has been repeatedly told by state regulatory agencies that any construction prior to the completion of the regulatory and eminent domain process is at its own risk.  DAPL has repeatedly acknowledged that it bears the risk of starting construction prior to the completion of the regulatory and legal process.

III.    GENERAL FACTS REGARDING THE CORPS' ISSUANCE OF THE § 408 PERMITS
        AND CWA VERIFICATIONS

87.     On July 25, 2016, the Corps' issued authorizations pursuant to § 408 of the RHA for DAPL to cross federally managed or owned lands on the Missouri River in two places, at Lake Sakakawea and Lake Oahe, roughly 230 miles apart.  Accompanying this authorization, the Corps released a July 2016 final EA and FONSI with respect to two components of the DAPL in

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

North Dakota.  The EA and FONSI concluded that these two small segments of the pipeline did not have sufficient adverse environmental impact to warrant preparation of an environmental impact statement ("EIS"), which would have triggered substantially broader environmental review, a closer comparison of alternatives, and greater public engagement.

88.     This decision authorizes DAPL proponents to begin drilling a pipeline path underneath each of the two reservoirs, install the pipeline, and begin operating it to transport crude oil in the Tribe's culturally significant ancestral lands, and adjacent its reservation. DAPL notified Tribes that construction at the site is scheduled to begin on July 30, 2016.

89.     Also on that date, the Corps issued verifications pursuant to the CWA and RHA finding that 204 crossings of jurisdictional waters of the United States, for which PCNs had been filed, met the terms of NWP 12.  The verifications include federally protected waters in four states: North Dakota (2 verifications), South Dakota (10 verifications), Iowa (61 verifications), and Illinois (45 verifications).  The verifications authorize DAPL proponents to begin construction of the pipeline through federally regulated streams, rivers, and wetlands, and operate the pipeline to transport crude oil in the Tribe's culturally significant ancestral lands, and adjacent its reservation.  DAPL notified Tribes that construction is set to begin at such many of these sites on or before August 1, 2016.

90.     The Corps did not grant an easement under the MLA for DAPL to dig, construct, and operate the pipeline under Lake Oahe in July 2016 when it issued the other authorizations.

91.     On January 5, 2016, the St. Louis District of the Corps released a public notice announcing that it intended to authorize another segment of the pipeline under § 408 of the RHA. That segment crossed federal flowage easements and federally managed levees on the Illinois River.  No permit or even draft environmental review document was issued for this segment of

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

the pipeline before this lawsuit was filed.

92.     On or about December 17, 2015, the U.S. Fish and Wildlife Service ("FWS") released a draft EA for yet another segment of the pipeline.  That EA reviewed potential impacts of the pipeline over grassland easements held by FWS and managed for wildlife values.  A final EA and FONSI were issued by the FWS on July 25, 2016.

93.     The current proposed route crosses Lake Oahe a half of a mile upstream of the Tribe's reservation boundary, where any leak or spill from the pipeline would flow into the reservation. The Tribe and its members have been deeply concerned about the potential impacts of the Lake Oahe crossing since its inception, for two primary reasons.  First, the Tribe relies on the waters of Lake Oahe for drinking water, irrigation, fishing, and recreation, and to carry out cultural and religious practices.  The public water supply for the Tribe, which provides drinking water for thousands of people, is located a few miles downstream of the proposed pipeline crossing route.  Additionally, the cultural and religious significance of these waters cannot be overstated.  An oil spill from the pipeline into Lake Oahe would cause an economic, public health and welfare, and cultural crisis of the greatest magnitude.

94.     Pipeline leaks and spills are routine in both new and old pipelines.  A segment of the Keystone pipeline built in 2010 recorded 35 leaks in its first year of operations.  A study of North Dakota's pipelines revealed over 300 leaks in two years, most of which were unreported to the public.  Major spills from crude oil pipelines have occurred recently on the Kalamazoo and Yellowstone Rivers, with devastating economic and environmental impacts.  The Corps does not require, and DAPL does not propose, any technology or mitigation approaches that reduce risk relative to other recent pipelines that have been the source of major and minor spills and leaks in recent years.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

95.     Second, the Lake Oahe crossing will take place in an area of great cultural, religious and spiritual significance to the Tribe.  Construction of the pipeline, which includes clearing and grading a 100-150 foot access pathway nearly 1200 miles long, digging a trench as deep as 10 feet, and building and burying the pipeline, would destroy burial grounds, sacred sites, and historically significant areas on either side of Lake Oahe.  These sites carry enormous cultural importance to the Tribe and its members.

96.     Construction of pipelines involves other significant environmental impacts, including massive amounts of water required for hydrostatic testing and permanent maintenance of a 50-foot right of way above the pipeline.

97.     The confluence of the Cannonball and Missouri Rivers, where the crossing would take place, is a sacred place to the Tribe.  It is a place of great historical significance, serving as a place of peace, prayer, and trade where traditional enemies could meet without risk of violence. There are numerous sacred stones and historically important sites in the immediate landscape of the Lake Oahe Crossing, few of which have been fully evaluated by Tribal archaeologists.

98.     The Corps operates Oahe dam, downstream of the Lake Oahe crossing, for flood control and other purposes.  The result of its management is that water levels fluctuate greatly in the reservoir, with attendant erosion, scouring, and deposition of sediments.  The geomorphology of the segment of Lake Oahe to be crossed by the pipeline is highly dynamic.

99.     Due to its concerns about the configuration of the pipeline and inadequacies in the regulatory process, the Tribe participated extensively in the public process associated with the permits, including filing numerous formal technical and legal comments on the Lake Oahe crossing, meeting with Corps' leadership and staff, and communicating with agency officials to express concerns.  The Tribe repeatedly conveyed to the Corps and other government officials

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

the significance of its concerns and the risks to the Tribe about moving ahead with the pipeline in its current configuration.

IV.     SPECIFIC FACTS RELATED TO NHPA COMPLIANCE FOR JULY 25, 2016
        AUTHORIZATIONS

100.    The confluence of the Cannonball and Missouri Rivers is sacred ground to the Standing Rock Sioux people.  It is rich in history, and it is rich in cultural and religious significance.  Industrial development of that site for the crude oil pipeline has a high potential to destroy sites eligible for listing in the National Register.

101.    The Corps undertook a process to consider the impacts of the Missouri River crossing on historic and culturally significant sites that was flawed in multiple respects.  It defined the "area of potential effects" ("APE") for the Lake Oahe crossing exceptionally narrowly to include only a tiny parcel immediately surrounding the horizontal directional drilling ("HDD") pits on each side of the river and a narrow strip for an access road and "stringing area" on the west side of the crossing.  On the east side of the river, the APE is difficult to determine because in some of the Corps' figures, the "project workspace" includes both the access road and stringing area, while in others only the HDD pit is included.

102.    The Corps' attempts at § 106 consultation omit the actual pipeline route that will be entering and existing the HDD borehole.  The pipeline itself will involve 100-150 yard swath of industrial development—clearing, grading, excavation of a 6 to 10 foot trench, and construction work to shape and place the pipeline.

103.    It is likely that such development would destroy any historic or culturally significant sites in its path.  There are known but unevaluated historic sites—in other words, sites that may be eligible for protection under the National Historic Preservation Act ("NHPA")—in the direct path of the pipeline immediately in the area of the HDD crossing.  For example,

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

according to the draft EA, several sites are directly in the pipeline's path in the first mile outside of the HDD site.

104.     Consultation with the Tribal Historic Preservation Office ("THPO") on the DAPL, which would be routed just outside the reservation boundary, on ancestral land with great cultural and religious importance to the Standing Rock Sioux Tribe, has been profoundly inadequate.  The Tribe has never been able to participate meaningfully in assessing the significance of sites that are potentially affected by the project.

105.     The non-Tribal consultants hired by DAPL to do cultural surveys are not equipped to suitably assess the potential cultural significance of sites in this area.  The Tribe has never had the opportunity to discuss protocols for cultural surveys or participate in the surveys that were conducted.

106.     The Tribe's first record of correspondence from the Corps related to the DAPL is dated February 12, 2015, when a Corps representative emailed the THPO asking if there were concerns related to preliminary bore hole testing to be conducted at the HDD site.

107.     The THPO, Ms. Waste'Win Young, wrote back immediately objecting to the Corps' conclusion that no historic properties would be affected by the bore hole drilling, documenting numerous specific important sites that could be affected as well as the cultural significance of the area generally, and requesting a full Class III survey with tribal archaeologists before any work was done.

108.     No response to this urgent correspondence was ever provided, despite several follow up requests from the THPO, and the work was done without any additional tribal consultation or process.  Many months later, in a September 16, 2015 letter, a Corps official stated that the § 106 process *had ended* on January 18, 2015—nearly a month *prior* to the Corps'

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

initial email about the project.

109.    On February 17, 2015, the Corps sent the THPO a generic form letter seeking to initiate consultation under § 106 on the DAPL.  The THPO wrote back immediately, committing the SRST to participation in the § 106 process, highlighting the significance of the site, and recommending full Class III surveys with tribal involvement.

110.    In the months that followed, both the THPO and the Chairman of the SRST followed up with numerous additional letters to the Corps outlining concerns about cultural impacts, and seeking to engage the Corps in a good-faith consultation process as required by § 106 regulations.

111.    However, no response was received from the Corps to this correspondence until September of 2015, when another letter was sent to the Tribal Chairman that again inquired "if you would like to consult" on the pipeline project.  The letter asked for any "knowledge or concerns regarding historic properties" that the Tribe wanted the Corps to consider.  A deadline of less than a month later was provided.

112.    The THPO responded promptly, outlining the Tribe's significant concerns with properties on the site, and its ongoing exclusion from the § 106 process.  The THPO observed that "it has become clear that the Corps is attempting to circumvent the Section 106 process" and urged it to broaden its review to include affected areas outside the Corps' jurisdiction, as required by governing regulations.  The Corps did not respond to this letter.

113.    Instead, the Corps' next action was to publish a draft EA that included not a single mention of the potential impacts of the pipeline project on the SRST or areas of historic and cultural significance to the Tribe.  The draft EA also stated incorrectly that the SRST THPO had indicated to DAPL that the Lake Oahe site avoided impacts to tribally significant sites.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

114.    SRST submitted extensive comments on the EA, on three occasions, highlighting both the flaws in the § 106 consultation process as well as the significant cultural resources that could be harmed by the project.

115.    Additionally, the Corps received critical letters from the U.S. Environmental Protection Agency, the U.S. Department of Interior, and the ACHP, all of whom questioned the Corps' approach to consultation with the SRST.  The ACHP observed that it had "not been provided evidence that the Corps has met" the requirements of § 106, observing that "there is likely to be significant tribal interest" and that "[t]he Corps' approach to meeting its government-to-government consultation is extremely important."  It later asked to be formally made a party to consultation on the project.

116.    Around the time of the draft EA, the Tribe also learned that the proponent had conducted cultural surveys at the Lake Oahe site and along the pipeline route during 2014 and 2015.  Neither the proponent nor the Corps ever consulted with the Tribe about the protocols for those assessments or the area of potential affects, or had invited their participation as the Tribe had repeatedly requested.  Instead, the proponent provided the Tribe with a massive quantity of its survey data, after it was complete, and provided an opportunity to comment.

117.    During this same time frame, *i.e.,* late 2015 and early 2016, the proponent stated repeatedly in public and private meetings that construction was slated to start in mid-May of 2016, regardless of any additional process requirements or needs.

118.    In February of 2016, the Tribe and the commander of the Omaha District, Col. John Henderson, entered discussions about a visit to the reservation and the Lake Oahe crossing site.  SRST Chairman Archambault emphasized in a letter to the Colonel that "there can be no meaningful consultation with respect to decisions that have already been made," and urged a

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

reopening of the NEPA process to assess route alternatives.

119.    The meeting with the Colonel took place on February 29, 2016, at which time the

Colonel and Corps archaeologists toured the site with the Chairman, THPO, and tribal

archaeologists.  Tribal participants in this meeting emphasized the cultural importance of the site,

and demonstrated it with specific evidence.

120.    In a follow up letter, the Chairman expressed hope that the visit would constitute

a "turning point" in what had been to that point a flawed process, and that the Corps could

pursue greater consideration of the Tribe's interests through a full EIS.

121.    A follow up visit between Corps and Tribal archaeologists occurred on March 7,

2016, during which SRST staff pointed out places where moles had pushed dirt to the surface,

carrying prehistoric pottery shards, pieces of bone, flint, and tools.  The sites shown to the Corps

staff had never been previously assessed or recorded, consistent with the Tribe's repeatedly

expressed belief that the site generally was rich in unassessed sites of historic and cultural

significance.

122.    During this visit Corps archaeologists stated that they were unaware of many of

the sites that they were witnessing and agreed with Tribal staff that additional study was

required.

123.    On March 15, 2016 the ACHP wrote to the Corps again, noting that the agency

"remained perplexed" by the Corps' difficulties in consulting with the SRST, pointing out that

there was no tribal participation in identification surveys and urging the Corps to look at

alternative pipeline alignments as required by ACHP regulations.

124.    In later March 2016, Chairman Archambault invited Col. Henderson back to the

reservation to continue the dialogue about impacts to historic properties.  However, on April 22,

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

2016, the Corps' next action was to make a formal finding that no historic properties were affected by the Lake Oahe decision.

125.    The Tribal THPO requested that the ACHP review the April 22 decision by letter on May 2, 2016.

126.    On May 6, 2016, the ACHP sent another letter responding to previous correspondence between the Corps and ACHP.  The letter laid out a number of significant criticisms of the Corps' compliance with § 106 and made recommendations for additional steps that Corps should take.

127.    The Chairman of the SRST sent a letter to the Corps formally objecting to the "no historic properties effected" on May 18, 2015.  The THPO also sent an objection letter on May 17, 2016.  Neither the Chairman nor the THPO received any response to these formal objections besides additional general information from the Corps on their permitting process.

128.    On May 19, 2016, the ACHP formally objected to the effects determinations made by the Corps for DAPL.  The ACHP outlined several fundamental flaws with the Corps § 106 compliance, including a failure to properly define the undertaking and area of potential effects; inadequate Tribal consultation and incomplete identification efforts; and numerous procedural flaws.

129.    The April 22, 2016 finding pertains only to the Lake Oahe crossing site.  It does not apply to any the other hundreds of NWP 12 verifications along the pipeline's route.

130.    Section 106 consultation is required for the Corps' verifications as well.  But the Corps has not consulted with the Tribe to evaluate the impacts of PCN verifications on historic sites within its ancestral lands, including sites in South Dakota and Iowa.  Instead, in issuing the verifications, it provided for tribal monitoring during construction.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

V.        SPECIFIC FACTS RELATED TO NEPA COMPLIANCE AS OF JULY 25, 2016

131.    The Corps evaluated different components of DAPL in multiple separate

segments, each following an independent process and on its own timeline.  The Corps'

documents for each segment fail to acknowledge the existence or impacts of the other segments.

132.    One segment is made up of two crossings of Corps-managed or Corps-owned

lands in North Dakota, at Lake Sakakawea and at Lake Oahe, roughly 230 miles apart from one

another.  Another segment is the crossing of Corps-managed and operated land and levees

towards the other end of the pipeline, on the Illinois River.  Finally, the Corps issued 204

verifications in four states that DAPL can proceed under NWP 12 where they cross jurisdictional

waters.

133.    In yet another NEPA process, the FWS reviewed the impacts of providing

authorization to cross easements on private land intended to protect wildlife.  In July of 2016,

FWS released a final EA covering authorization to cross miles of grasslands and wetlands

easements in North and South Dakota.

134.    The Corps and FWS have pursued a NEPA process for each of these components

independently of the other components.  For the North Dakota crossings, the Omaha District of

the Corps released a draft EA in December 2015 and a final EA and FONSI on July 25, 2016.

For the Illinois River crossings, the St. Louis District of the Corps released an EA and FONSI on

July 25, 2016, but without having provided a draft EA and any opportunity for public comment.

For the FWS easements, an EA was issued in June of 2016.  For the CWA NWP 12 verifications,

the Corps has not taken any action to comply with NEPA, asserting that verifications are not

federal actions subject to NEPA.

135.    The North Dakota EA looks narrowly at the impacts of pipeline construction at

the HDD crossing site only.  It does not look at the indirect effect of facilitating pipeline

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

construction to, from, and through the two HDD crossings.  Accordingly, the EA is silent on the impacts to the environment associated with pipeline construction outside the immediate confines of the HDD crossing site, including oil spill risks to waters or lands of cultural significance to the Tribe.

136.    The North Dakota EA also does not analyze the environmental impacts of the North Dakota crossings in the context of either the CWA verifications for the pipeline, the Illinois River § 408 permit, or the FWS easement crossings, all of which are integrally related to a single pipeline project.

137.    In multiple sets of legal comments, the Tribe expressed its concerns regarding these and many other issues associated with the NEPA process.

138.    On January 8, 2016, the U.S. Environmental Protection Agency ("EPA") sent comments to the Corps on the draft EA saying that the document lacked "sufficient analysis of direct and indirect impacts to water resources," lacks information related to the operation of the pipeline, and that the document is "limited to small portions of the complete project and does not identify the related effects of the entire project segment."

139.    EPA sent additional comments on March 11, 2016, highlighting the proximity of the Tribe's drinking water intake to the pipeline crossing.  The letter highlighted multiple risks to water resources from the project, recommended additional analysis of emergency preparedness measures, and urged consideration of additional alternatives that reduced potential conflicts with drinking water supplies.

140.    On March 29, 2016, the U.S. Department of the Interior sent a comment letter to the Corps urging preparation of a full Environmental Impact Statement ("EIS").  DOI highlighted the risks to the Tribe's reservation and drinking water resources.  The letter also

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

observed that the Corps' NEPA analysis should consider more of the pipeline route as a connected action under NEPA.

## VI.   SPECIFIC FACTS RELATED TO CWA/RHA COMPLIANCE FOR THE JULY 25, 2016 AUTHORIZATIONS

141.    Construction of the DAPL will involve dredge and/or fill in waters of the United States in hundreds if not thousands of locations. Construction of DAPL will also involve obstructions to the capacity of navigable waters of the United States.

142.    The Corps is only issuing individual permits at three locations on the entire length of the pipeline: at the two North Dakota reservoir crossings, and at the Illinois River crossing. Those components of the pipeline require a permit under § 408 of the Rivers and Harbors Act and real estate actions because the pipeline will cross federally owned or managed land.

143.    The remainder of the pipeline's impacts on jurisdictional waters is being processed under NWP 12, which authorizes certain actions without an individual permit.

144.    With respect to PCNs and verifications, the final verifications identify 2 locations in North Dakota, 10 locations in South Dakota, 61 locations in Iowa, and 45 locations in Illinois, for a total of 204 crossings in 1,168 miles of pipeline.

145.    Since the purpose of the pipeline is to carry crude oil developed in western North Dakota to sites in Illinois, no component of the pipeline is useful without all of the other components of the pipeline in place

146.    The Lake Oahe pipeline crossing will take place in close proximity to the Tribe's public water supply, as well as a number of private water supplies, and irrigation intakes and waters used for Tribal rituals and religious purposes.  The crossing will also impair tribal treaty rights on the Standing Rock reservation, including reserved water rights.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

VII.    FACTS RELATED TO THE CORPS' DECISION TO PREPARE AN EIS TO ASSESS
        THE PIPELINE'S IMPACTS ON THE TRIBE'S TREATY RIGHTS, OIL SPILL
        RISKS, AND AN ALTERNATIVE PIPELINE ROUTE THAT WOULD AVOID
        IMPLICATING THE TRIBE'S TREATY RIGHTS

147.    After filing this lawsuit, the Tribe continued its efforts to convince the Corps to

address the pipeline's impacts on the Tribe's Treaty rights and alternative pipeline routes.

148.    On September 9, 2016, the Corps, along with the Department of Justice and the

Department of the Interior, announced publicly that they would not issue the outstanding

easement and authorize construction under Corps lands at Lake Oahe until they completed a

review to address "important issues" raised by the Standing Rock and other Tribes.  They asked

DAPL to voluntarily cease construction within 20 miles of Lake Oahe, but DAPL refused to

comply with that request.  The Tribe fully engaged and urged the Corps to consider route

alternatives and conduct a full EIS in light of the Tribe's treaty rights and historic connection to

the area.  It again pointed out fundamental factual errors in the Final EA, such as the Final EA's

misstatement that most Tribal members rely on wells rather than the Missouri River for drinking

water.  The Tribe commissioned an expert review of the Corps' oil spill risk analysis which was

highly critical of the Corps' conclusions and recommended additional review.  The Tribe

documented extensive use of Lake Oahe and its shorelines on the Reservation for subsistence

hunting and fishing, and explained in great detail how the pipeline would impact these and other

Treaty rights.  It participated in numerous meetings with Corps staff and leadership, as well as

meetings with other federal agencies and local, state, and federal elected officials.  Other Sioux

Tribes also engaged extensively in this process, seeking greater consideration of route

alternatives, oil spill risks, and treaty impacts.

149.    In October 2016, the Corps completed a technical and legal analysis of the

previous Corps' decisions and EA regarding the pipeline which found flaws and gaps in aspects

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

of the EA, but offered the view that there was no need to do a new EA or EIS to address new information obtained after July 2016.

150.    As part of the Corps' review, the Corps solicited a formal legal opinion from the Solicitor of Interior on the extent to which the Tribe's Treaty rights weigh in favor of or against granting the easement and addressing the considerations required under the MLA or other laws. The Solicitor of the Department of the Interior is, by statute, the officer of the United States responsible for the Interior Department's legal work.  43 U.S.C.§ 1455.  A legal opinion designated as an "M-Opinion," like her December 4, 2016 opinion, states the Department's formal legal opinion on a matter.  The Solicitor "provided technical expertise to the United States Army Corps of Engineers regarding the Dakota Access pipeline controversy," including expertise on "the existence and protection of the Standing Rock Sioux Tribe's hunting and fishing treaty rights."

151.    The 35-page formal legal opinion confirmed that the Tribe retains expansive Treaty rights in and around Lake Oahe that must be assessed and protected before issuing the easement.  The Solicitor found that the easement decision "should not be made" until the Corps took a number of specific actions, including:  (1) engage in government-to-government consultation with the Tribes on the proposal to locate the pipeline immediately outside the Standing Rock reservation "in order to determine whether the location or any other aspect of the pipeline project would infringe upon the Tribe's rights"; (2) "Conduct additional NEPA analysis that adequately evaluates the existence of and potential impacts to tribal rights and interests" through an EIS that considers alternative pipeline routes as well as a "catastrophic spill analysis prepared by an independent expert"; and (3) assess DAPL's impacts on "tribal rights, lands, and resources" in a more comprehensive manner.  *Id*. at 4.  After reviewing the history and basis of

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

the Tribe's Treaty rights to Lake Oahe (with attendant treaty rights to hunt, fish, and water), the authoritative opinion recognized that off-reservation activities could implicate those rights; concluded that the trust responsibility imposed a duty to more closely examine and guard against the impacts of an oil spill on the Tribe; and observed that the Corps' July 25, 2016 decision had failed to address Tribal Treaty rights.  In the words of the Solicitor, "the United States' fulfillment of the exacting standard of a fiduciary requires more than conclusory statements that there will be no impact on tribal rights, a dismissive note that a project is situated off-reservation, argument that a private corporation complied with environmental laws, or citation to general pipeline safety technology." *Id*. at 22.

152.    On December 4, 2016, the Assistant Secretary of the Army (Civil Works) announced that it would not issue the Lake Oahe easement until it had completed review of the full extent of the Tribe's Treaty rights in Lake Oahe, the potential risks and impacts of an oil spill, and alternative pipeline routes that would avoid implicating the Tribe's Treaty rights.  The Assistant Secretary announced that it would conduct this review by preparing a full EIS.  The decision cited the totality of the circumstances, including the MLA, the pipeline's impact on the Tribe's historic homelands, the proximity to the Reservation, and risks to the Tribe's reserved Treaty rights to water, fishing, and hunting.  In addition, the December 4, 2016 decision revealed that critically important information regarding oil spill risk and response had been withheld from the Tribe.  The Tribe had been unaware of the existence of these documents prior to this disclosure.

153.    On January 18, 2017, the Army published a notice in the Federal Register of its intent to prepare an EIS regarding DAPL's request for an easement crossing Lake Oahe.  82 Fed. Reg. 5543 (Jan. 18, 2017).  The notice opened the scoping process and solicited comments on

6cf

potential issues and concerns with the crossing and reasonable alternatives, including alternative

pipeline routes like one considered but previously eliminated where the pipeline would cross the

river approximately ten miles north of Bismark, North Dakota.  It set February 20, 2017 as the

deadline for public comments.

VIII.   THE CORPS' REVERSAL AND ISSUANCE OF THE EASEMENT AND
        TERMINATION OF THE EIS PROCESS

154.    Less than a week later, on January 24, 2017, the new President signed a

memorandum directing the Secretary of the Army to "instruct" the Assistant Secretary "to take

all actions necessary and appropriate to…review and approve, in an expedited manner, to the

extent permitted by law and as warranted, and with such conditions as are necessary or

appropriate" the Lake Oahe easement.  The January 24, 2017 Memorandum included directives

to consider withdrawal of the December 4 memorandum and the notice of intent to prepare the

EIS; to determine whether the June EA satisfied NEPA and other legal requirements; and to

waive, to the extent permitted by law, the requirement to provide advance notice to congressional

committees before granting an easement.  On January 31, 2017, the Secretary of the Army

directed the Army Corps to comply with the presidential memorandum.

155.    On February 7, 2017, the Corps sent notification to Congress of its intent to grant

the DAPL easement for a term of 30 years.

156.    The easement decision was supported by a memorandum entitled "Compliance

with Presidential Memorandum" that indicates that the Corps decided to grant the easement and

terminate the EIS process in order to follow the President's direction.  This document includes in

a list of references a Corps Memorandum dated February 3, 2017, which was not made available

until the evening of February 9, 2017.  That memo relies on and attaches the Corps' October

2016 technical and legal analysis, but as to the Solicitor's Opinion, which it does not attach, says

only that the Corps had already addressed those concerns.

157.    On February 7, 2017, the Corps forwarded to the Federal Register a notice of termination of the intent to prepare an EIS regarding DAPL's request for an easement to cross Lake Oahe.  As of February 10, 2017, that notice had not yet been published in the Federal Register.

158.    On February 8, 2017, the Corps granted DAPL an easement for the pipeline to cross under Lake Oahe.

IX.    SPECIFIC FACTS RELATED TO SUBSTANTIAL BURDENS ON THE TRIBE'S
       EXERCISE OF RELIGION

159.    Since time immemorial, the Tribe's ancestors—the Oceti Sakowin, also known as the Great Sioux Nation—have used the waters of the Missouri River including the area now known as Lake Oahe for religious and ceremonial purposes.  The Dakota Access pipeline crosses through land and waters that are sacred to the Standing Rock Sioux Tribe and central to the religious practices of the Standing Rock Sioux people.

160.    The land at the confluence of the Cannon Ball and the Missouri Rivers, including the area where the pipeline is to be built, has unique religious and cultural significance to the Standing Rock Sioux.  It is known as Inyan Wakan Kagapi Wakpa (River Where the Sacred Stones Are Made).  It has long been the site of ceremony and prayer and continues to be used for religious ceremony and prayer.

161.    The religious beliefs of the Standing Rock Sioux require that they protect and conserve not only things on the surface, but in the sky and under the ground as well.  The religious ceremonies reflect the interconnectedness of water, earth, air and sun (fire), and the Tribe's spiritual life depends on the integrity of this understanding.

Water, and, in particular, the waters of the Missouri River, are integral to the Tribe's

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

practice of religion.  Water plays a central role in those spiritual beliefs and religious ceremonies.

The Lakota creation stories include stories of the importance of water, and the belief system

requires maintaining water in a pure form.  When the Tribe says "mni wiconi," it means that

water is a source of life – that water gives life.  Water provides the foundation and basis for all

living things.  That is a core religious belief that sustains the Standing Rock people.

162.     Certasin religious ceremonies, such as the sundance, have historically taken place

on the banks of Lake Oahe right near where Dakota Access proposes to cross.  Other ceremonies

are held in this area, and along the shores of Lake Oahe.  Tribal members return to this area for

ceremony and prayer.

163.     The fish, wildlife and plants in and sustained by the water of Lake Oahe and along

its shoreline are relied upon by the Standing Rock Sioux for use in religious ceremonies.

164.     Sincerely held religious beliefs of the Lakota dictate that disturbing the earth and

having oil flow under the Missouri River at Lake Oahe will render the waters of the river and

lake unsacred leaving them unfit to use in their religious ceremonies.  As the geography and

source of these sacred waters are unique, once sullied and rendered unsacred, there is no

substitute for Lakota religious practices.  Tribal members will simply be unable to engage in

their sacred and ancient religious practices.

165.     An inability to engage in sacred ceremonies would devastate the Standing Rock

Sioux Reservation and its people, substantially burden the exercise of religion, and cause

irreparable harm to the Tribe and its people.

166.     Protection of the Tribe's religious and spiritual heritage is of significant

importance to the Tribe.  Destruction or damage to any religious resources causes irreparable

harm to the Tribe and its members.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

167.    The current placement of the pipeline is not the least restrictive means of completing the pipeline.  The Corps considered numerous different locations for the pipeline, including crossing the Missouri River at locations other than Lake Oahe.

CLAIMS FOR RELIEF

I.    FIRST CLAIM FOR RELIEF – FAILURE TO CONSULT UNDER § 106 OF THE NHPA

168.    Plaintiff reincorporates the allegations in all preceding paragraphs.

169.    Issuance of an individual or general § 404 permit is an "undertaking" as defined in the NHPA.  As such, § 106 consultation is required to determine the effect of such undertaking on historic properties.

170.    The Corps failed to consider the impacts of NWP 12 on historic or culturally significant properties, or otherwise engage in the § 106 process, prior to issuance of NWP 12 in 2012.

171.    The Corps has never developed a programmatic agreement with the ACHP with respect to the NWP program.

172.    Issuance of NWP 12 is a "final agency action" within the meaning of the APA.

173.    The Corps' failure to comply with the requirements of the NHPA and its implementing regulations is arbitrary, capricious, and contrary to law in violation of the APA, 5 U.S.C. § 706.

II.    SECOND CLAIM FOR RELIEF – UNLAWFUL ABDICATION OF § 106 RESPONSIBILITIES

174.    Plaintiff reincorporates the allegations in all preceding paragraphs.

175.    Section 106 of the NHPA directs federal agency heads to take into account the effect of any undertaking on historic properties, and provide the ACHP and affected parties a reasonable opportunity to comment on such undertaking.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

176.     Under ACHP regulations, "it is the statutory obligation *of the Federal agency* to fulfill the requirements of section 106 and to ensure that an agency official with jurisdiction over an undertaking takes legal and financial responsibility for section 106 compliance…." 36 C.F.R. § 800.2(a).

177.     In issuing NWP 12, however, the Corps does not fulfill the requirements of § 106 or "take legal and financial responsibility" for compliance.  Rather, it provided up-front CWA/RHA authorization to discharge fill into waters of the United States, effectively ending its involvement in most situations.  In so doing, it improperly abdicated its § 106 responsibility, and delegated to the proponent its NHPA duty to determine whether there would be any potential impact to historic properties.  If the proponent determines for itself that no historic properties are affected, the Corps is not notified of the action and provides no verification of NWP 12 authorization.  In such circumstances, the Corps does not consider, and does not give the ACHP or interested parties a reasonable opportunity to comment on, the potential impacts to historic sites.  In so doing, the Corps abdicated its § 106 duties and/or improperly delegated them to private parties.

178.     ACHP regulations direct that agencies "shall involve" consulting parties in findings and determinations made during the § 106 process.  36 C.F.R. § 800.2(a)(4).  Consulting parties must include Indian Tribes "that attach religious and cultural significance to historic properties that may be affected by an undertaking."  *Id.* § 800.2(c)(2).  The agency "shall ensure" that the § 106 process provides such Tribe " a reasonable opportunity" to "identify its concerns about historic properties, advise on the identification and evaluation of historic properties, including those of traditional religious and cultural importance, articulate its views on the undertaking's effects on such properties, and participate in the resolution of adverse effects."  *Id.*

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

§800.2(c)(2)(ii)(A). Further, it is the "responsibility of the agency official to make a reasonable and good faith effort to identify Indian Tribes" to be consulted in the § 106 process. *Id*. § 800.2(c)(4).

179. Applicants for federal permits are "entitled to participate" as consulting parties in § 106 consultation, and the responsible official may "authorize an applicant … to initiate consultation with" consulting parties, but "remains legally responsible for all findings and determinations charged to the agency official." *Id*. Such authorization requires notice to all state and tribal historic preservation offices, and federal agencies "remain responsible for their government-to-government relationships with Indian Tribes." *Id*. Moreover "the views of the public are essential" to the § 106 process and agencies "shall seek and consider the views of the public" in carrying out its responsibilities. *Id*. § 800.2(d).

180. Additionally, ACHP regulations require Federal agencies to "ensure" that all actions taken by employees or contractors "shall meet professional standards under regulations developed by" the ACHP. However, in issuing NWP 12 and GC 20, the Corps did not "ensure" that any standards at all would be used by private parties delegated to make their own § 106 threshold determinations.

181. In enacting NWP 12 and GC 20, the Corps authorized discharges into waters of the United States in a way that sidesteps virtually all of the requirements of the ACHP § 106 regulations. Under NWP 12 and GC 20, private project proponents can make their own determinations as to the effects on tribally significant sites without any involvement of the Tribes. Under NWP 12 and GC 20, Tribes are not provided any opportunity, let alone a reasonable one, to identify their concerns or assist in the identification of historic sites. Under NWP 12 and GC 20, the Corps is not responsible for the findings and determinations regarding

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

adverse effects.  Under NWP 12 and GC 20, private project proponents can be made in a vacuum, with no input, no notice, no accountability, and no oversight.  Moreover NWP 12 and GC 20 do not establish definitions or standards to be used by private project proponents on how to make determinations of historic impacts, leaving it up to the proponents' unfettered discretion to determine whether a PCN is required or not.

182.    NWP 12 and CG 20 are being applied to DAPL to authorize discharges into waters of the United States with no verification or oversight by the Corps, and no accompanying § 106 process.  Through NWP 12 and GC 20, the Corps is violating non-delegable duties: there is no consultation process, there are no standards governing determinations made by private parties, and the Corps has no mechanism to "ensure" compliance with its legal responsibilities.

183.    The Tribe is harmed by NWP 12 and GC 20 because they have led and will continue to lead to the destruction of culturally significant sites.  Following NWP 12 and GC 20, DAPL proponents have conducted gravely deficient cultural surveys, with no involvement by the Tribes.  DAPL proponents have not found historic properties that would be affected by pipeline construction in Corps' jurisdictional areas.  Accordingly, they have not filed PCNs and sought verification at the vast majority of sites at which they will be discharging into waters of the United States.

184.    The ACHP wrote to the Corps on May 6, 2016 to share the concern that Tribes like Standing Rock Sioux Tribe have not had the opportunity to share relevant information "in the vicinity of water crossings and within the project [right of way] that the applicant assumes will not require PCNs under General Conditions 20 and 31 [standards for PCNs] of the NWP protocols."

185.    Issuance of NWP 12 is a "final agency action" within the meaning of the APA.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

186.    The Corps' delegation of its § 106 responsibilities to private parties in NWP 12

and GC 20 is arbitrary, capricious, and contrary to law in violation of the APA, 5 U.S.C. § 706.

III.    THIRD CLAIM FOR RELIEF – FAILURE TO REQUIRE CONSIDERATION OF
        INDIRECT EFFECTS UNDER § 106

187.    Plaintiff reincorporates the allegations in all preceding paragraphs.

188.    Under NHPA, federal agencies must consult on the effects of "undertakings" to

historic properties.  An undertaking is defined by rule to mean "a project, activity, or program

funded in whole or in part under the direct *or indirect jurisdiction of a Federal agency*, including

those carried out by or on behalf of a federal agency, those carried out with Federal financial

assistance, and those requiring a federal permit, license or approval."  36 C.F.R. § 800.16(y)

(emphasis added).

189.    The entirety of a private pipeline project that requires Corps' authorization for

hundreds if not thousands of discharges into waters of the United States is an "undertaking" for

purposes of § 106 because it requires federal approval in order to occur and because it is under

the "indirect jurisdiction" of the Corps.

190.    GC 20 directs permittees to file a PCN with the Corps if the authorized activity

will have the potential to cause effects to historic properties.  However, the Corps directs

permittees to only consider the direct effects of activities in jurisdictional waters, and not indirect

impacts such as construction impacts in uplands.

191.    ACHP regulations require consideration of indirect effects of agency

undertakings, including areas in uplands outside of Corps jurisdiction. With respect to DAPL, in

a May 19, 2016 letter, the ACHP confirmed that the entire 1,168-mile crude oil pipeline is the

"undertaking" for purposes of § 106 consultation, and accused the Corps of "not differentiating

appropriately between federal action and the undertaking…."  The ACHP concluded that "the

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

Corps' effects determinations, thus far, fail to consider the potential for effects from the larger undertaking on historic properties including those of cultural and religious significance to Indian Tribes."

192.    Issuance of NWP 12 is a "final agency action" within the meaning of the APA.

193.    As applied to DAPL, the authorization to discharge into waters of the United States, without consideration of indirect impacts on historic sites as required by § 106, is arbitrary, capricious, and contrary to law in violation of the APA, 5 U.S.C. § 706.

IV.    FOURTH CLAIM FOR RELIEF – VIOLATIONS OF NATIONAL HISTORIC PRESERVATION ACT WITH RESPECT TO JULY 25, 2016 VERIFICATIONS AND § 408 PERMITS

194.    Plaintiff reincorporates the allegations in all preceding paragraphs.

A.    Incorrect Definition of "Area of Potential Effects"

195.    Section 106 of the National Historic Preservation Act ("NHPA") requires that, prior to issuance of a federal permit or license, that federal agencies shall take into consideration the effects of that "undertaking" on historic properties.  54 U.S.C. § 306108.  Issuance of § 408 permits and CWA/RHA verifications under NWP 12 are federal undertakings within the meaning the NHPA.

196.    Early in the NHPA process,  an agency, in consultation with the THPO, must determine the area of potential effects ("APE") of a federal undertaking.  36 C.F.R. § 800.4(1)(1).  The APE is defined by regulation to include the area "within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties…. The [APE] is influenced by the scale and nature of an undertaking and may be different for different kinds of effects caused by the undertaking."  *Id*. § 800.16(d).

197.    The Corps defined the APE for the Lake Oahe crossing unlawfully narrowly, and inconsistently with both the ACHP regulations and its own guidance.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

198.    The APE for the crossing includes only a tiny parcel immediately surrounding the HDD pits on each side of the river and a narrow strip for an access road and "stringing area" on the west side of the crossing.  On the east side of the river, the APE is difficult to determine because in some of the Corps' figures, the "project workspace" includes both the access road and stringing area, while in others only the HDD pit is included.

199.    The Corps unlawfully omits the actual pipeline route that will be entering and exiting the HDD borehole from the APE.  Pipeline construction would involve 100-150 yard swath of industrial development—clearing, grading, excavation of a 6 to 10 foot trench, and construction work to shape and place the pipeline.  Such development would destroy any historic or culturally significant sites in its path.  But because these sites are outside the APE, the Corps' conclusion does not consider them.

200.    The pipeline path should be in the APE because, even where the Corps lacks direct permitting jurisdiction over segments in between regulatory areas, pipeline construction in such areas is an indirect effect of the HDD process.  *Id*. § 800.16(d).

201.    The Corps' failure to consider the impacts to historic and sacred sites outside of the immediate and narrow confines of the HDD drilling sites was arbitrary, capricious, and not in accordance with law in violation of the APA and the NHPA.

B.    Inadequate § 106 Consultation

202.    The Section 106 process requires consultation with Indian Tribes on federal undertakings that potentially affect sites that are sacred or culturally significant to Indian Tribes. 36 C.F.R. § 800.2(c)(2).  Consultation must occur regarding sites with "religious and cultural significance" even if they occur on ancestral or ceded land.  *Id*. § 800.2(c)(2)(II)(D); 54 U.S.C. § 302707.

203.    Under the consultation regulations, an agency official must "ensure" that the

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

process provides Tribes with "a reasonable opportunity to identify its concerns about historic

properties, advise on the identification and evaluation of historic properties….articulate its views

on the undertaking's effects on such properties, and participate in the resolution of adverse

effects." *Id*. § 800.2(c)(ii)(A).  This requirement imposes a "reasonable and good faith effort" by

agencies to consult with Tribes in a "manner respectful of tribal sovereignty." *Id*.

§ 800.2(c)(2)(II)(B).

204.    The Corps' final permit decision is the product of a fundamentally flawed

consultation process that does not meet the requirements of the ACHP regulations.

205.    Consultation never occurred at all on the bore hole testing.  The Tribe was

notified and the work was done before the Tribe's serious concerns were even received by the

Corps.

206.    Consultation did not start at the earliest phases of the process.  Consultation did

not occur on the "area of potential affects."  Consultation did not occur on participation in the

surveys or protocols for how they should be conducted.  36 C.F.R. § 800(c)(2)(II)(A).

207.    Instead, the THPO was given a brief window to "comment" on the proponents'

deeply flawed and completed surveys long after the route had been selected and construction

scheduled.

208.    The Corps' April 22, 2016 "no effect" determination contains citations to

documents, like "Landt & McCord, 2016," that have never been provided to the Tribe.

209.    The Tribe acted promptly and repeatedly to draw the Corps' attention to its

serious concerns.  It immediately responded to all correspondence from the Corps.

210.    Information was not sought from the Tribe in determining the scope of its

identification efforts, as required by 36 C.F.R. § 800.4(a), nor was the Tribe given a meaningful

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

opportunity to assist the Corps in the identification of this culturally rich but largely unassessed site.  *Id.* § 800.4(b).

211.    The Standing Rock THPO formally objected to the Corps' finding of no historic properties affected on May 17, 2016.  Although the regulations required the Corps to either consult with the objecting party to resolve the disagreement, or request action by the ACHP, neither of those things have ever happened.  36 C.F.R. § 800.4(d)(1)(ii).

212.    The ACHP formally objected to the Corps' findings of no historic properties affected on May 19, 2016.  Under ACHP regulations, such an objection must be taken into account by the Corps prior to reaching a final decision, and the Corps must prepare a summary of the decision and its rationale, along with evidence of consideration of the ACHP's objection.  36 C.F.R. § 800.4(d)(1)(iv).

213.    There are significant unevaluated properties in and near the Lake Oahe crossing work site, as well as the broader pipeline route.  Some sites deemed "ineligible" by DAPL's private surveys may in fact be eligible.  Some sites deemed unevaluated have in fact been evaluated and are potentially eligible.

214.    The Corps' decision on the Lake Oahe crossing was arbitrary, capricious, and not in accordance with law in violation of the APA and the NHPA.

C.    No § 106 Consultation for Verifications

215.    The Corps' NWP general conditions require completion of the § 106 process for NWP permit verifications and before work can begin.  The proponent must present a PCN to the Corps wherever an activity "may have the potential to cause effects to any historic properties listed on, determined to be eligible for listing on, or potentially eligible for listing" on the National Register.  77 Fed. Reg. 10184, 10284 (Feb, 21, 2012).

216.    The Corps has never consulted with the Tribe on issuance of verifications in its

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

ancestral lands, which span the length of the pipeline.  The Tribe is unaware of any formal § 106

findings for verifications outside of the two sites in North Dakota.

217.    The Corps' decision that § 106 consultation had been completed on the 204 CWA

verifications was arbitrary, capricious, and not in accordance with law in violation of the APA

and the NHPA.

## V.    FIFTH CLAIM FOR RELIEF – VIOLATIONS OF NEPA

218.    Plaintiff hereby alleges and incorporates and restates all previous paragraphs of

this complaint.

### A.    Arbitrary and Capricious Finding Regarding Environmental Effects

219.    Under NEPA, federal agencies are required to prepare an EIS for "major Federal

actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).

220.    CEQ regulations further define whether impacts are "significant" enough to

warrant a full EIS, requiring consideration of both "context" (i.e., the various scales, regions, and

interests affected by the action) and "intensity" (i.e., the "severity of the impact").  40 C.F.R. §

1508.27.  With respect to the latter, the regulations lay out ten factors that are to be considered.

Examples of these criteria include:  "the degree to which the proposed action affects public

health or safety"; "unique characteristics of the geographic area such as proximity to historic or

cultural resources…"; the degree to which the effects on the environment "are likely to be highly

controversial," are "highly uncertain" or "involve unique or unknown risks"; "whether the action

is related to other actions with individually insignificant but cumulatively significant impacts";

"the degree to which the action may adversely affect [sites] listed in or eligible for listing in the

National Register of Historic Places or may cause loss or destruction of significant scientific,

cultural, or historical resources"; "the degree to which the action may adversely affect" species

listed under the Endangered Species Act.  *Id.*

221.     In June 2016, the Corps issued an EA, which suffers from numerous factual errors and legal flaws as set out below.  Based on that EA, the Corps made a finding of no significant impact or FONSI.

222.     Under the CEQ regulations, authorizing the pipeline, including the Lake Oahe crossing, has significant impacts, requiring preparation of a full EIS.  For example, the pipeline route and Lake Oahe crossing are in close proximity to cultural and religious resources of deep importance to the Tribe, including many on the National Register of Historic Places, and in geographic areas where the Tribe has reserved Treaty rights.  In addition, the pipeline segments approved by the Corps based on the June EA relate to other actions with cumulatively significant impacts.  The pipeline has been highly controversial and an oil spill would pose catastrophic and existential threats to the waters that sustain millions of people and give the Tribe life.

223.     The Corps acted arbitrarily, capriciously, contrary to the evidence before it, and in violation of NEPA and the CEQ regulations and contrary to the APA, in finding that the pipeline and the Lake Oahe crossing in particular would have no significant environmental impact and failing to prepare a full EIS.

B.     Failure to Consider Indirect Effects of Missouri River Crossings

224.     NEPA requires consideration of indirect effects of agency decision.  The Corps misapplied these legal standards in the final North Dakota EA.  It looked narrowly at the impacts of the river crossings themselves, and did not disclose or consider the impacts of other components of the pipeline, either related to its construction or its operation to transport 570,000 barrels a day of crude oil over nearly 1200 miles.

225.     Pipeline construction is an indirect impact of the Corps § 408 permits because it is proximately caused by the Corps' decision.  Without the ability to cross the Missouri River, the pipeline could not be built.  Pipeline construction is a reasonably foreseeable outcome of the

Corps' decision.

226.    Alternatively, pipeline construction could be considered an indirect effect of the Corps' § 408 permit because it is a future action that is reasonably certain to occur as long as DAPL receives Corps' authorization at the Missouri River crossings.

227.    The Corps failure to consider and disclose the impacts of the pipeline's construction and operation is arbitrary and capricious and not in accordance with law in violation of the APA and NEPA.

C.    Unlawful Segmentation of Project Components

228.    NEPA requires consideration of separate components of a single project in a single NEPA review.  40 C.F.R. § 1508.25.  NEPA regulations state that connected actions should be considered in a single EIS, defining them as action that "cannot or will not proceed unless other actions are taken previously or simultaneously," and "are interdependent parts of a larger action and depend on the larger action for their justification."  *Id*.

229.    The Corps' permitting regulations also require it to reject applications that seek to segment a single project into multiple permits.  33 C.F.R. § 325.1(c)(2) ("All activities which the applicant plans to undertake which are reasonable related to the same project and for which a DA permit would be required should be included in the same permit application.").

230.    The Corps has not adhered to these requirements, despite having them pointed out to them by the Tribe, multiple federal agencies, and others.  Rather, it unlawfully segmented its NEPA review into separate components in North Dakota and in Illinois, each of which is proceeding independent of the other.

231.    Moreover, the FWS issued its own EA and FONSI for a component of this pipeline project.  That EA and FONSI did not evaluate the impacts of the FWS decision in the context of the Corps permits or the larger project which it was a part of.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

232.    The Illinois § 408 permit, the North Dakota § 408 permit, and the FWS grassland easements, are connected actions because they meet the criteria in 40 C.F.R. § 1508.25.  NEPA requires them to be considered in a single NEPA document.  They were not.

233.    By unlawfully segmenting multiple components of the same pipeline project, the Corps has acted in a manner that is arbitrary, capricious, and not in accordance with law, in violation of NEPA and the APA.

D.    Arbitrary Economic Analysis

234.    NEPA and its implementing regulations require the Corps to produce environmental review documents that are factually accurate, well supported, and that fully discloses the impacts of an action to the public.  40 C.F.R. § 1502.

235.    These standards apply equally to an agency's treatment of economic data.  40 C.F.R. §§ 1502.23 (cost benefit analysis), 1508.8 (EIS must evaluate economic effects).  An agency's failure to include and analyze information that is important, significant, or essential renders an EA and FONSI inadequate.  40 C.F.R. § 1500.1.  These fundamental NEPA principles apply to both economic and environmental analyses in an EIS.  40 C.F.R. §§ 1502.24, 1508.8 ("effects" in an EIS must evaluate include economic impacts.).

236.    In reaching its decision on the North Dakota crossings, the Corps looked very narrowly at only two tiny segments of the pipeline, ignoring the environmental and economic risks and harms of the pipeline as a whole.

237.    However, it balanced these narrow risks and harms against the full economic benefit of the pipeline as a whole.  For example, the EA cites the full $3.78 billion investment "directly impacting the local, regional, and national labor force by creating nearly 12,000 construction jobs."  Final EA, at 80.  It repeats DAPL's public talking points about providing "considerable labor income and state income tax revenue – including the generation of more than

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

$13.4 million in ad valorem taxes." *Id*.

238.     The Corps' decision to balance the full economic benefits of building and

operating the entire pipeline against the economic risks of constructing tiny segments of that

pipeline is arbitrary and capricious and not in accordance with law, in violation of NEPA and the

APA.

     E.     <u>Arbitrary Environmental Justice Analysis</u>

239.     Under Executive Order 12,898, "each Federal agency shall make achieving

environmental justice part of its mission by identifying and addressing, as appropriate,

disproportionately high and adverse human health or environmental effects of its programs,

policies, and activities on minority populations and low-income populations in the United

States…" Executive Order 12,898, § 1-101, 59 Fed. Reg. 8113 (Feb. 16, 1994). Executive

Order 12,898 directs that Federal agencies use population data "to determine whether their

programs, policies, and activities have disproportionately high and adverse human health or

environmental effects on minority populations and low-income populations." *Id*. at § 3-302.

240.     CEQ has issued guidance on considering environmental justice impacts under

NEPA, directing that "[a]gencies should consider the composition of the affected area, to

determine whether minority populations, low-income populations, or Indian tribes are present in

the area affected by the proposed action, and if so whether there may be disproportionately high

and adverse human health or environmental effects on minority populations, low-income

populations, or Indian tribes." The analysis requires examination of both quantitative as well as

qualitative factors.

241.     The CEQ guidance also calls for special consideration to be given to Indian tribes:

"Agencies should recognize that the impacts within . . . Indian tribes may be different from

impacts on the general population due to a community's distinct cultural practices. For example,

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

data on different patterns of living, such as subsistence fish, vegetation, or wildlife consumption and the use of well water in rural communities may be relevant to the analysis."  In addition, "[w]here environments of Indian tribes may be affected, agencies must consider pertinent treaty, statutory, or executive order rights."  *Id*.  The Guidance further instructs that "the identification of such an effect should heighten agency attention to alternatives (including alternative sites), mitigation strategies, monitoring needs, and preferences expressed by the affected community or population."  *Id*. at 10; *see also id*. at 8 (observing that environmental justice is "highly sensitive to the history or circumstances of a particular community").

242.     The EA contains a section on environmental justice impacts, but dismisses the disproportionate impacts to the Tribe based on misstatements, a skewed analysis, and differential treatment of oil spill risks to largely white populations from a rejected alternative and its treatment of such impacts to the Tribe.

243.     To define an "affected area" of the project, the EA focused on the census tracts where the bore pits for the crossing would be located.  Those census tracts are entirely outside the reservation and are mostly upstream of the crossing cite.  The Corps then compared this claimed affected area to a larger "baseline" area.  That baseline area included Sioux County, which constitutes the entire North Dakota segment of the Standing Rock reservation.  In this way, the Final EA addressed environmental justice by comparing an area that will be almost entirely unaffected by the pipeline, where few Tribal members live, against a baseline that included the entire North Dakota segment of the Tribe's reservation.  Based on this skewed analysis, the affected area did not have a higher population of minority and low-income people than the "baseline."

244.     The EA limited its environmental justice impacts analysis to a 0.5 mile radius

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

from the HDD site.  The Tribe's Reservation boundary is 0.55 miles downstream of the site.  In other NEPA analyses of pipeline projects, the Corps has assessed environmental justice impacts more than 10 miles downstream of areas where the pipeline crossed water.

245.    The Corps used a double standard in reviewing the impacts of a crossing site approximately ten miles upstream of Bismarck, North Dakota, the overwhelmingly white state capitol, and the Lake Oahe crossing.  The Corps did not conduct the environmental justice analysis itself.  DAPL consultants prepared a memorandum comparing the Bismarck and preferred route alternatives, which analyzes the risk of oil spills to downstream communities and water intakes for the Bismarck alternative, but not for downstream communities for the Oahe crossing.  The memorandum concludes without explanation that because the Bismarck alternative would affect a larger population, spill risks are "clearly worse" for the north Bismarck crossing and "would actually lead to more impacts or in fact a disproportionate impact to minorities from a spill or the routing."  DAPL's memo was never made public as part of the NEPA process for public comment.

246.    In these and other ways, the EA failed to accurately assess and disclose whether the Lake Oahe crossing would have a disproportionately adverse effect on minority and low income populations.  By relying on misstatements, treating oil spill risks to Native American and white populations differently, and adopting a skewed analysis, the EA's assessment of environmental justice impacts is arbitrary, capricious, contrary to NEPA, Executive Order 12,898, and the CEQ guidance in violation of the APA.

VI.    SIXTH CLAIM FOR RELIEF – VIOLATIONS OF THE CLEAN WATER ACT AND RIVERS AND HARBORS ACT WITH RESPECT TO JULY 25, 2016 VERIFICATIONS AND § 408 PERMITS

247.    Plaintiff incorporates by reference all preceding paragraphs.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

A.      Arbitrary and Inadequate Public Interest Review for North Dakota Permits

248.    Prior to issuance of a § 408 permit, or any other CWA/RHA permit, the Corps is required to conduct a "public interest" review consistent with its governing regulations, 33 C.F.R. § 320.4(a).

249.    In conducting a public interest review, the Corps must consider the probable impacts of the proposed action, and weigh "all those factors which become relevant." *Id*. The Corps must balance the benefits "which reasonably may be expected to accrue" from the action against the "reasonably foreseeable detriments." *Id*. "All factors" which may be relevant to the proposal must be considered, including the extent of the public and private need for the proposal, and the existence of unresolved conflicts around resource use. The District Engineer is authorized to make an "independent review of the need for the project from the perspective of the overall public interest." *Id*. § 320.4(q)

250.    The Corps' did not conduct a valid public interest review of the § 408 authorizations in North Dakota. To the extent it conducted any public interest review at all, it suffered from all of the same flaws as the NEPA review identified above. Specifically, the Corps conducted an arbitrary and segmented approach that ignored virtually all of the indirect effects of its decision, specifically, the construction and operation of the pipeline itself; and it conducted an arbitrary and one-sided economic balance in which the benefits of the entire $4 billion pipeline were weighed against the impacts of tiny segments of the pipeline.

251.    By failing to undertake a lawful and adequate public interest review of the actions proposed in its § 408 decision, the Corps has acted in a manner that is arbitrary, capricious, and not in accordance with law, in violation of the CWA and the APA.

B.      Unlawful Verification For Lake Oahe Crossing

252.    In addition to a § 408 permit, the portion of the pipeline that crosses under Lake

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

Oahe requires a Rivers and Harbors Act § 10 permit.  33 C.F.R. § 322.3(a)

253.    On July 25, 2016, the Corps issued verification that the Lake Oahe pipeline crossing complied with the conditions of NWP 12, and hence was authorized under § 10 of the Rivers and Harbors Act.

254.    In order to "qualify" for NWP authorization, proposals must meet a number of general conditions.  77 Fed. Reg. 10184, 10282 (Feb. 21, 2012).

255.    The Lake Oahe crossing does not comply with these conditions and, accordingly, does not "qualify" for NWP 12.  *See also* 33 C.F.R. § 330.6(a)(2)  ("If the [Army Corps] decides that an activity does not comply with the terms or conditions of an NWP, he will notify the person desiring to do the work and instruct him on the procedures to seek authorization under a regional general permit or individual permit.").

256.    General Condition 7 states that no activity may be authorized under a NWP that is in "proximity" to public water supplies.  77 Fed. Reg. at 10283.  The Lake Oahe crossing is in close proximity to the Tribe's source of drinking water for a significant portion of the reservation community.

257.    The potential impact on drinking water for the Standing Rock and many other Tribes and communities has also been emphasized by the Environmental Protection Agency and the U.S. Department of Interior, as well as the Tribal government and many of its members.

258.    Further, General Condition 17 states that no activity authorized by a NWP may "impair tribal rights" including "reserved water rights."  77 Fed. Reg. at 10283.  DAPL is routed just upstream of the Tribe's reservation boundary, where any oil spill would have devastating effects within the reservation.  The Reservation necessarily includes the protection of adequate water quality.  The Lake Oahe crossing does not "qualify" for a NWP 12 because of the risks to

Tribal resources protected by treaty.

259.     The Corps decision to verify that the Lake Oahe crossing was consistent with NWP 12 was arbitrary, capricious and not in accordance with law, in violation of the APA.

C.       Issuance of Verifications for 204 Jurisdictional Waters

260.     Under the Corps' regulations, a single project can only proceed under both an NWP and an individual permit where the "portions qualifying for NWP authorization would have independent utility and are able to function or meet their purpose independent of the total project."  33 C.F.R. § 330.6(d).

261.     For the reasons discussed immediately above, the Lake Oahe crossing requires an individual permit.  Moreover, Section 408 authorizations are individual "permits" within the meaning of this regulation.  *See id.,* § 320.2(e); § 320.4 (general policies applicable to "all" Army permits).

262.     No component of DAPL has "independent utility" or the "ability to function" without the other components of the pipeline.  As a result of this, the Corps cannot authorize some portions of DAPL under NWP 12, and other portions as individual permits.

263.     Because the Lake Oahe crossing requires an individual permit, no other component of the pipeline can be authorized under NWP 12.

264.     Issuance of a verification by the Corps constitutes a final agency action within the meaning of the APA.

265.     The Corps' verification of 204 additional crossings of jurisdictional waters was arbitrary and capricious and not in accordance with law, in violation of the APA and the CWA.

VII.     SEVENTH CLAIM FOR RELIEF – BREACH OF THE UNITED STATES' TRUST
         RESPONSIBILITY

266.     Plaintiff incorporates by reference all preceding paragraphs.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

267.     The Tribe holds vested Treaty rights in the Tribe's lands within the Standing
Rock Sioux Reservation and the waters of Lake Oahe.  These rights include reserved water rights
and Treaty rights to hunt, fish and gather natural resources within the Reservation including the
waters of Lake Oahe.  The Tribe's rights include the right to clean, safe water to sustain a livable
permanent homeland and self-sufficiency for the Tribe and its people.  By virtue of its taking of
Reservation lands for the Oahe project, the Corps has pervasive control over the Tribe's Treaty
rights in Lake Oahe.  33 U.S.C. § 707.

263.     The United States, by virtue of the Treaties, federal statutes and the federal
trust responsibility, assumed duties to protect the Tribe's Treaty rights, including the
Reservation, reserved water rights, and rights to hunt, fish and gather and to avoid taking actions
that would damage, degrade or destroy these rights.  The United States has a specific fiduciary
trust responsibility to manage and protect the trust property and resources, like Lake Oahe, on
behalf of the Tribe.  These duties apply to all federal agencies, including the Army Corps of
Engineers.

268.     Under the federal trust responsibility, the Corps must fully assess, in consultation
with the Tribe, the impacts of its actions like authorizations, permits, and easements for a
pipeline crossing Treaty rights areas, and ensure that the Tribe's Treaty rights will be
safeguarded.

269.     By withholding key information about oil spill risks and threats from the Tribe,
the Army Corps breached its trust responsibility to engage in meaningful and forthright
government-to-government consultations with the Tribe over actions affected the Tribe's Treaty
rights.

270.     By failing to adequately address and protect against the potential impacts of the

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

proposed pipeline on the Standing Rock Sioux Tribe and its rights and interests in the lands, waters and natural resources of Lake Oahe, the Corps' authorizations and verifications made pursuant to § 408 of the CWA and § 10 of the RHA, its EA and FONSI, and its grant of an easement under the MLA, violated the duties that the United States owes to the Tribe under the Treaties, statutes and the federal trust responsibility.

271.    The Army Corps, in its decision on December 4, 2016, correctly determined that the July 25, 2016 decisions and Final EA failed to assess and protect against the risk of the proposed pipeline to the Tribe's treaty-protected rights.  The Corps correctly determined that a proper examination of those issues should be done through preparation of an EIS which would include, at a minimum:  (a) "A robust consideration and discussion of alternative locations for the pipeline crossing the Missouri River, including, but not limited to, more detailed information on the alternative crossing that was considered roughly ten miles north of Bismarck"; (b) "detailed discussion of potential risk of an oil spill, and potential impacts to Lake Oahe, the Standing Rock Sioux Tribe's water intakes, and the Tribe's water rights as well as treaty fishing and hunting rights"; and (c) "additional information on the extent and location of the Tribe's treaty rights in Lake Oahe."

272.    The Army Corps reversed that decision in February 2017, terminated the EIS process, and granted the easement to DAPL on February 8, 2017.  The Corps engaged in no consultation with the Tribe over the decisions to reverse the decisions made in recognition of and to protect the Tribe's Treaty rights.  The Corps' February 8, 2017 decision to grant the easement, its reversal of the December 4, 2016 decision, and its termination of the EIS scoping process violated the duties that the United States owes to the Tribe under the Treaties, statutes and federal trust responsibility.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

VIII.   EIGHTH CLAIM FOR RELIEF – VIOLATIONS OF THE APA IN THE FEBRUARY
8, 2017 GRANT OF AN EASEMENT AND REVERSAL OF PRIOR REASONED
AGENCY DECISIONS

273.    A grant of an easement for the DAPL pipeline to cross under Lake Oahe is
governed by the MLA.  Under the MLA, the Army Corps must consider and impose conditions
to mitigate environmental impacts of granting an easement for a pipeline crossing, including to
protect people who rely on the fish, wildlife, and biotic resources of the area for subsistence
purposes.  30 U.S.C. § 185(h).  The Corps must also comply with NEPA and its trust obligation
to assess and protect the Tribe's Treaty rights.

274.    The Tribe repeatedly insisted that the Army Corps comply with these obligations
to assess and protect against adverse effects of the pipeline on Lake Oahe and the Tribe's Treaty
rights both before and after the Corps released its EA in June 2016 and issued verifications and
authorizations on July 25, 2016.  The Corps fell far short of meeting its MLA, NEPA, and trust
responsibility obligations when it issued the July 25, 2016 verifications and authorizations.

275.    The Corps acknowledged its obligation to give greater scrutiny to the Tribe's
Treaty rights and the issues raised by the Tribe in objecting to the pipeline crossing beginning in
September 2016.  In its December 4, 2016 decision, the Army Corps announced that it would
undertake a more complete review of the risks posed by the Lake Oahe crossing to the Tribe's
Treaty-protected rights.  It decided to prepare an EIS that would, at a minimum, assess the full
extent of the Tribe's Treaty rights in Lake Oahe, the potential risks and impacts of an oil spill on
the Tribe's water rights, fishing and hunting rights, and drinking water intakes, and a robust
consideration of alternative Missouri River crossings, including the crossing north of Bismark.
The Corps based its decision to prepare this EIS on the MLA, the totality of the circumstances,
and its recognition of the Tribe's Treaty rights in Lake Oahe.  The Corps obtained a formal legal
opinion from the Solicitor of Interior documenting the Tribe's Treaty rights and the need for a far

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

deeper and expansive analysis of those rights before granting an easement for the pipeline.  The

Corps' findings, the Solicitor's formal legal opinion, and the Corps' determination are well-

reasoned and fully supported by the evidence before the agencies.

276.    On January 18, 2017, the Corps formally initiated the EIS process by publishing a

notice in the Federal Register soliciting public comments on the issues to be addressed and

alternatives to be considered in the EIS.

277.    The Army Corps reversed course soon thereafter.  It did so to carry out the

direction of a newly elected President.  On January 24, 2017, President Trump issued a

Presidential Memorandum directing the Army to review and approve the easement in an

expedited manner, consider rescinding the December 4, 2016 determination, consider deeming

the EA to satisfy all applicable requirements, and seek a waiver of the congressional notice

period required by Corps policy.  Nowhere does the Presidential Memorandum mention the

Tribe, Treaty rights, or the U.S. trust responsibility.

278.    On January 31, 2017, the Acting Secretary of the Army directed the Army Corps

to comply with the Presidential Memorandum.

279.    The Presidential Memorandum directed the Army to consider the EA as satisfying

all applicable requirements, to the extent permitted by law and as warranted.  On February 7,

2017, the Army Corps sent a notice to the Federal Register that would terminate the EIS process.

280.    The Corps provided the statutorily required notice to Congress, but with only a

24-hour waiting period when it is agency practice to have a 14-day waiting period.  It waived the

longer waiting period at the direction of the President.

281.    On February 8, 2017, the Corps granted an easement to DAPL under the MLA for

the pipeline to cross under Lake Oahe.  A memorandum for the record from the senior officer

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

performing the duties of the Assistant Secretary of the Army for Civil Works dated February 7, 2017, documents compliance with the Presidential Memorandum. The Corps' memorandum recites the direction in the Presidential Memorandum and "documents my actions and decisions as directed." He determined that "there is no cause for completing any additional environmental analysis" and determined the December 4, 2016 determination must be rescinded. As support, he pointed to the EA and the Corps' review of the administrative record. Nowhere does the senior officer mention the Tribe, Treaty rights, or the U.S. trust responsibility.

282.    The senior officer directed that the EA, FONSI, and administrative record satisfied all applicable requirements of NEPA and any other provision of law that requires executive agency consultation or review. On that basis, he concluded the EIS process would be terminated and the scoping notice withdrawn. Nowhere does the senior official mention the Tribe, Treaty rights, or the U.S. trust responsibility.

283.    The Senior Officer Memorandum for the record cites as a reference a February 3, 2017 Corps memorandum, which attaches and relies on the October 2016 technical and legal analysis but does not attach the Solicitor's Opinion. It dismisses the Solicitor's Opinion in one paragraph, saying that the Corps believed it had addressed the concerns expressed in that Opinion.

284.    Soon after the election, the Corps reversed course by rescinding the December 4, 2016 determination, terminating the EIS process, and granting the easement for the Lake Oahe crossing. The Corps' decision to reverse course fails to offer a reasoned explanation for dismissing the Solicitor's formal legal opinion which supported the prior decision not to grant the easement without first preparing an EIS and fully assessing its impacts on Treaty rights. It provided no reasoned basis for disregarding or disagreeing with the Solicitor's formal legal

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

opinion or the circumstances that underlay the prior determinations.  It dismisses the December

2016 Solicitor's formal legal opinion based on a Corps analysis prepared in October 2016.

Given that the Department of the Interior and its Solicitor play a paramount role in fulfilling the

U.S. trust responsibility and are owed deference on Treaty rights and tryst resource matters, this

cursory dismissal, without any stated rationale, is arbitrary and capricious.

285.     The Army Corps decisions to rescind the December 4, 2016 determination,

terminate the EIS process, and grant the easement are arbitrary, capricious, and contrary to law in

violation of the APA.

IX.     NINTH CLAIM FOR RELIEF – VIOLATIONS OF THE RELIGIOUS FREEDOM
        RESTORATION ACT AND FIRST AMENDMENT RIGHT OF FREE EXERCISE OF
        RELIGION

286.     Plaintiff incorporates by reference all preceding paragraphs.

287.     The First Amendment to the United States Constitution prevents the government

from interfering with persons' free exercise of religion.

288.     Under RFRA, any government action that creates a substantial burden on the free

exercise of religion must serve a compelling government interest and the action must be the least

restrictive means for meeting the compelling government interest.  *Gonzales v. O Centro*

*Espirita Beneficente Uniao Do Vegetal*, 546 U.S. 418 (2006).

289.     To fall under RFRA's protection, a religious belief must be sincerely held by the

adherent.  Courts are not to second guess the reasonableness of an adherent's beliefs so long as

they are sincere.

290.     Lakota religious adherents sincerely believe that the waters of the Missouri River

and Lake Oahe are sacred and that disturbing the earth and allowing oil to flow under those

waters will disrupt their sacred nature and render them unsuited for use in their religions practice.

This would substantially burden their ability to practice their religion.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

291.     Undertaking HDD drilling to place a major crude oil pipeline under Lake Oahe, as would be done by the Dakota Access pipeline, would interfere with important religious practices of the Standing Rock Sioux.  The construction of the pipeline would harm the integrity and spiritual nature of an area that is sacred and which extends under the ground.  The Tribe's rituals could never be undertaken in those locations again.  The drilling of this major crude oil pipeline under Lake Oahe would impose a substantial burden on the exercise of religion by the Standing Rock Sioux people.

292.     An oil spill would impose even greater substantial burdens on the exercise of religion by the Standing Rock people.  It would foul the waters that are central to religious ceremonies, and poison the fish, wildlife and plants that are also central to tribal religious practices.

293.     The Corps does not have a compelling government interest in granting the easement to Dakota Access to complete and operate the pipeline.

294.     The least restrictive means standard is demanding and requires the government to show that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting party.

295.     Granting the easement and other authorizations for the pipeline to cross the Missouri River at Lake Oahe is not the least restrictive means of achieving any compelling government interest.

296.     The granting of the easement is a specific act substantially burdening the free exercise of the Lakota religion in violation of the First Amendment.

297.     By granting the authorizations and easement, the Corps has authorized activities that will substantially burden the Tribe's free exercise of religion without an over-riding

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

government interest that cannot be served by means that would be less restrictive of the Tribe's religious practices.  In doing so, it has violated RFRA and the First Amendment.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

1.      Declare that NWP 12 is invalid as applied to DAPL because the Corps failed to comply with § 106 at the time of its issuance, in violation of the NHPA;

2.      Declare that NWP 12 is invalid as applied to DAPL because the Corps unlawfully delegated its responsibility to comply with § 106 to private parties, effectively allowing discharge into waters of the United States without any consideration of impacts to historic properties, in violation of the NHPA;

3.      Declare that NWP 12 is invalid as applied to DAPL because the Corps authorized discharge into waters of the United States without consideration of indirect impacts on historic sites, in violation of the NHPA;

4.      Declare that the July 25, 2016 authorizations and verifications are arbitrary, capricious, and in violation of the NHPA, NEPA, CWA, RHA, implementing regulations, and the United States' trust responsibility;

5.      Vacate NWP 12 as applied to DAPL;

6.      Enjoin the Corps to direct DAPL to seek either an individual permit covering all discharges along the entire pipeline route, or submit PCNs for all impacts to waters of the U.S., and fully comply with § 106 prior to finalizing such permit or verifications;

7.      Vacate all authorizations and verifications related to DAPL pending full compliance with law;

8.      Vacate the final EA and FONSI;

9.      Declare that the February 8, 2017 easement is arbitrary, capricious, in violation of

69

the MLA, NEPA, implementing regulations, and the United States' trust responsibility;

10.    Vacate the February 8, 2017 easement;

11.    Declare that the July 25, 2016 authorizations and verifications and the February 8, 2017 easement substantially burden the Tribe's free exercise of religion, in violation of the RFRA and U.S. Constitution;

12.    Enjoin the Corps from authorizing or granting rights to DAPL that would allow a pipeline carrying oil to cross under Lake Oahe;

13.    Enjoin the Corps from granting the right-of-way under Lake Oahe as a violation of the Tribe and Tribal members' rights to free exercise of religion under both the First Amendment to the U.S. Constitution and the Religious Freedom Restoration Act;

14.    Retain jurisdiction over this matter to ensure that the Corps complies with the law;

15.    Award Plaintiff its reasonable fees, costs, expenses, and disbursements, including attorneys' fees, associated with this litigation; and

16.    Grant Plaintiff such further and additional relief as the Court may deem just and proper.

Respectfully submitted this 10th day of February, 2017.


/s/ Patti A. Goldman
Patti A. Goldman, DCBA # 398565
Jan E. Hasselman, WSBA # 29107
(*Pro Hac Vice Application Pending*)
Stephanie Tsosie, WSBA # 49840
(*Pro Hac Vice Application Pending*)
Earthjustice
705 Second Avenue, Suite 203
Seattle, WA  98104
Telephone:  (206) 343-7340

pgoldman@earthjustice.org
jhasselman@earthjustice.org
stsosie@earthjustice.org

*Attorneys for Plaintiff*