**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE,<br><br>Plaintiff,<br><br>and<br><br>CHEYENNE RIVER SIOUX TRIBE,<br><br>Plaintiff-Intervenor,<br><br>v.<br><br>UNITED STATES ARMY CORPS OF ENGINEERS,<br><br>Defendant,<br><br>and<br><br>DAKOTA ACCESS LLC,<br><br>Defendant-Intervenor-Cross Claimant. | Case No. 1:16-cv-01534-JEB |

---

**RESPONSE OF DAKOTA ACCESS, LLC IN OPPOSITION TO
PLAINTIFF CHEYENNE RIVER SIOUX TRIBE'S MOTION FOR A TEMPORARY
RESTRAINING ORDER**

---

Kimberley Caine
William J. Leone
Robert D. Comer
NORTON ROSE FULBRIGHT US LLP
799 9th St. NW, Suite 1000
Washington, D.C.  20001-4501
(202) 662-0200

William S. Scherman
David Debold
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
wscherman@gibsondunn.com

*Counsel for Dakota Access, LLC*

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

BACKGROUND ..................................................................................................2

ARGUMENT .......................................................................................................4

    I.    This Court Should Deny The TRO Because Cheyenne River's
         RFRA Claim Is Not Properly Before The Court And Amendment
         Of The Complaint Is Unwarranted..........................................................5

    II.    Cheyenne River Cannot Establish Imminent Or Likely Irreparable
         Harm ........................................................................................................8

    III.    The Requested Order Would Cause Undue Harm To Others.............10

    IV.    The Public Interest And Balance Of The Equities Warrant Denial
         Of A TRO ...............................................................................................11

CONCLUSION ..................................................................................................12

## INTRODUCTION

The Court should deny Cheyenne River Sioux Tribe's emergency bid for a temporary re-straining order to stop the work that just recently resumed on the Dakota Access Pipeline at Lake Oahe.  Cheyenne River bases its extraordinary request solely on a legal claim—alleged violation of the Religious Freedom Restoration Act ("RFRA")—that Cheyenne River did not even hint might apply to this pipeline project until last Thursday when it filed this emergency motion. Apart from that claim being exceedingly tardy, the supposed harms that it invokes are not con-struction-related issues.  In addition, as explained at the most recent status conference (February 6, 2017), any supposed harms based on the risk of a leak of oil once operations begin could not conceivably meet the required showing of irreparable harm needed to support a restraining order or preliminary injunction.[1]  Thus, while Dakota Access LLC is amenable to a briefing schedule that expedites resolution of the issues in this case, the Court should deny a restraining order or other emergency relief.  None of the claims by either Plaintiff should be used in any way to hin-der or place conditions on Dakota Access's right to finish and operate this long-delayed pipeline.

The Court determined at the February 6, 2017 status conference that the flow of oil in the Dakota Access Pipeline at Lake Oahe is not imminent.  When the Court asked counsel for Plain-tiffs whether they agreed that the Court therefore had time to receive briefing and rule on Plain-tiffs' legal challenges to the pipeline, counsel for Cheyenne River made no mention of an obsta-cle posed by a potential new RFRA claim.  D.E. 104 (Ex. A), at 16-17.  Nor did either Plaintiff identify any alleged harm that would possibly come from constructing—as opposed to operat-ing—a pipeline.  *Id.*

---

[1]  As Dakota Access explained at the most recent status conference, the extensive analysis in the record demonstrates that commencing operation of the pipeline will not harm the water in Lake Oahe, let alone risk any near-term harm.  Thus, the Court *need not* compress the briefing schedule so that it reaches a decision before oil will be in the pipeline.

This opposition brief is limited to whether the Court should stop work below Lake Oahe before this new claim (or any others) can be fully briefed, argued, and decided.  There is no basis for that extraordinary measure.  First, and wholly apart from merits issues that Dakota Access will brief later if needed, Dakota Access will be opposing Cheyenne River's untimely effort to amend its complaint by adding a claim that Cheyenne River knew about long ago and that has been waived.  Second, the supposed harms raised in the RFRA claim—interference with exercise of religious beliefs from the flow of oil beneath Lake Oahe—are not based on anything imminent.  Claims of a supposed harm are both premature and, in any event, will be incapable of meeting the demanding test for a restraining order or injunction at any time while this lawsuit remains pending.  Finally, the harm to Dakota Access from delay, the public interest, and the equities all cut sharply against rewarding this last-minute delay tactic.  Cheyenne River is heaving a last-ditch desperation throw to the end zone.  These long pass attempts, rarely successful, are usually made as time is running out.  Here, however, and as set forth below, Cheyenne River is out of time to run this play.

Dakota Access has the greatest respect for the religious beliefs and traditions of Cheyenne River and the other tribes participating in the process.  The emergency relief sought here simply is not necessary to protect the exercise of those beliefs or preserve those traditions.

## BACKGROUND

Cheyenne River supports its TRO motion with, among other things, a January 30, 2017 declaration from Steve Vance, Cheyenne River's Tribal Historic Preservation Officer.  D.E. 99-4 (Ex. F).  In speaking of the Lakota people, Vance states:  "Long ago our prophets told of the coming of a Black Snake" that "was going to devour the people."  *Id.*, ¶ 18.  Noting that the Dakota Access Pipeline, "like this story, is black, it is slippery, and it moves," Vance then explains: "We Lakota people believe that the crude oil that is proposed to flow through the Dakota Access

pipeline is the Black Snake." *Id.* According to Vance, the pipeline thus "poses a special threat to the way we practice our religion because my people own these waters that comprise Lake Oahe." *Id.*

Both the prophecy described by Vance and Cheyenne River's assertion that the operation of the Dakota Access Pipeline might somehow violate anyone's religious freedom are brand new to this litigation, including the administrative proceedings that led up to it. The administrative process here has spanned more than two years, during which the federal government "exceeded" its consultation obligations. D.E. 39 (Sept. 9, 2016 Opinion), at 48. The Cheyenne River Sioux Tribe had ample opportunity to raise all concerns about the Dakota Access pipeline. The lengthy administrative record contains no fewer than half a dozen letters and other communications from Cheyenne River expressing multiple concerns about the proposed pipeline. These concerns ranged from leaks, spills, pre-installation storage of pipes, possible negative effects of construction on bird migration, climate change, fossil fuel emissions, construction harms to cultural and historic sites, and more. *See* AR 69815 *et seq.* (Ex. G) (August 17, 2015 letter from Vance to Corps); AR 66801 *et seq.* (Ex. H) (December 10, 2015 Cheyenne River Tribal Memorandum); AR 68220 *et seq.* (Ex. I) (May 2, 2016 letter from Cheyenne River Chairman Harold Frazier to Corps); AR 64221 *et seq.* (Ex. J) (May 19, 2016 letter from Frazier to Corps); AR 64137 *et seq.* (Ex. K) (June 3, 2016 letter from Frazier to Corps); AR 67565 *et seq.* (Ex. L) (July 6, 2016 letter from Vance to Dept. of Interior). But *not once* did Cheyenne River, or anyone else for that matter, assert that the flow of oil beneath Lake Oahe in and of itself—fully contained within a pipeline more than 90 feet below the bottom of the lake—would prevent anyone from using Lake Oahe's waters for religious ceremonies.

Cheyenne River was allowed to intervene in this lawsuit on August 19, 2016.   When Cheyenne River also sought leave to file its own complaint on September 8, 2016, *see* D.E. 37, the Court initially denied the request, *see* D.E. Sept. 12, 2016 (minute order striking Intervenor Plaintiff's first amended complaint).   On reconsideration, the Court granted leave, and the September 8 complaint was accepted for filing.   *See* D.E. 48.   That complaint includes claims under several statutes, including the National Historic Preservation Act, the National Environmental Policy Act, the Clean Water Act, the Rivers and Harbors Act, and even the Mineral Leasing Act. D.E. 37, ¶¶ 154-254.   But when the complaint invoked the religious significance of the waters at Lake Oahe, it only described harms from a possible *spill* or *leak* of oil at Lake Oahe.   D.E. 37, ¶ 94.   Nowhere did Cheyenne River mention that merely allowing oil to flow below Lake Oahe would interfere with the exercise of religion.   Nor did it state that Cheyenne River or any other party had asked the Corps to consider and accommodate the pipeline's possible negative effects on the exercise of religion in a manner relevant to RFRA.   The February 8, 2017 filings are the first mention of it.

## ARGUMENT

"A temporary restraining order is an extraordinary remedy, one that should be granted only when the moving party, by a clear showing, carries the burden of persuasion."   *Sibley v. Obama*, 810 F. Supp. 2d 309, 310 (D.D.C. 2011).   The moving party must "demonstrate: (1) a substantial likelihood of success on the merits; (2) that the moving party would suffer irreparable injury if the temporary restraining order were not granted; (3) that such an order would not substantially injure other interested parties; and (4) that such an order furthers the public interest." *Id.*   Given the accelerated timing for argument on this motion, this Opposition brief is limited to factors (2) – (4).   That being said, D.C. Circuit precedent plainly forecloses a RFRA claim where the plaintiff—instead of objecting that the government has required, prohibited or coerced action

or inaction by the plaintiff that burdens his religion—challenges government *approval* of another private party's activity. *See Vill. of Bensenville v. Fed. Aviation Admin.*, 457 F.3d 52, 63 (D.C. Cir. 2006).[2] The Court should not take any action based on Cheyenne River's unprecedented and sweeping RFRA theory without at least having the benefit of full briefing.

## I.     This Court Should Deny The TRO Because Cheyenne River's RFRA Claim Is Not Properly Before The Court And Amendment Of The Complaint Is Unwarranted.

As a threshold matter, this Court should deny Cheyenne River's TRO request because it rests on a claim that is not—and should not be—before the Court. Cheyenne River seeks leave to amend its complaint to assert a RFRA claim because its TRO request is based solely on that putative claim. Although this Court may "freely give leave" to amend a complaint "when justice so requires," Fed. R. Civ. P. 15(a)(2), it undermines the interests of justice to give leave when the movant engages in "undue delay." *Foman v. Davis*, 371 U.S. 178, 182 (1962). Cheyenne River

---

[2] In *Village of Bensenville*, the plaintiffs argued that FAA approval of an airport-layout plan substantially burdened the exercise of their religion because the plan relocated a cemetery. 457 F.3d at 58-60. The D.C. Circuit held that the FAA was not responsible for that alleged burden because the agency did no "more than merely approve" "[t]he specific conduct" at issue. *Id.* at 60, 65. For purposes of RFRA, the "cause of any burden on religious exercise" was the airport developer, which "submitted the plan to the FAA," "fought for approval of the plan," and, "at the end of the day," relocated the cemetery. *Id.* at 65. That remained the case despite the FAA's "broad regulatory power," "thorough consideration of alternatives pursuant to NEPA," and "intention to provide partial funding" for the plan. *Id.* at 61, 65-66. "'Mere approval of or acquiescence in the initiatives of a private party is not sufficient'" to trigger RFRA. *Id.* at 64 (citation omitted).

As in *Village of Bensenville*, the federal government here has done no "more than merely approve" Dakota Access's plan to build and operate a pipeline, including—as in *Village of Bensenville*—consideration of alternatives under NEPA. 457 F.3d at 61. In fact, the government's role here is even smaller. Unlike airports, which are subject to "broad regulatory power," domestic-oil pipelines "require no general approval from the federal government." D.E. 39 at 2. And no federal funding is involved. *See also Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 357 (1974) ("[a]pproval by a state utility commission . . . does not transmute a practice initiated by the utility and approved by the commission into 'state action.'").

has no excuse for waiting until this late date to assert the RFRA concerns that it now raises; the facts underlying such a claim literally have been known for years.[3]

Cheyenne River claims it did "not seek amendment sooner" because it anticipated raising its RFRA concerns in the recently announced (January 18) and even more recently terminated (February 7) supplemental environmental review process. D.E. 97, at 3. That does not explain, however, why Cheyenne River never raised this concern during the lengthy administrative process. Nor does it address its failure to assert the claim in its initial complaint. That complaint is dated September 8, 2016—*i.e.*, before any announcement that the government was even contemplating a new review process. Cheyenne River's original complaint alleges that the Corps failed to consider potential negative effects that the pipeline supposedly would have on "properties of cultural and religious significance," D.E. 37, ¶ 1, but nowhere does it allege that the flow of oil alone could cause any such harm.

During an administrative process spanning more than two years, the Corps engaged in extensive consultations with various tribes, D.E. 39, at 48, and specifically requested comments from tribal authorities, including Cheyenne River, on a draft Environmental Assessment. D.E. 39, at 26; AR 64300 (Ex. M) (letter to Cheyenne River requesting meeting with Tribe); AR 64062 (Ex. N) (letter replying to Cheyenne River's comments and inviting further questions); AR 64120 (Ex. O) (letters responding to Cheyenne River's comments); AR 66820 (Ex. P) (letter advising Cheyenne River of consultation meeting in Sioux Falls, South Dakota); AR 86333 (Ex. Q) (e-mail inviting Cheyenne River to participate in tribal monitoring during construction). Despite having had every opportunity, Cheyenne River did not assert a need to accommodate its members' exercise of religion under RFRA, nor did it allege that the pipeline's operation—in

---

[3] Dakota Access will also be filing a separate response opposing Cheyenne River's motion for leave to amend its complaint.

and of itself—would impose any burden (let alone a substantial one) on the exercise of religion. Moreover, if Cheyenne River truly believes—as it insists in its motion—that "the mere issuance of the easement" is "sufficient to establish irreparable harm" because it "threatens the violation" of religious rights, CRST Mot. at 3, there was no reason to wait until *after* the easement was granted to raise its concerns for the first time.

Challenges to the Corps's actions can only be based on claims that were properly before that agency during the administrative process. "It is a hard and fast rule of administrative law, rooted in simple fairness, that issues not raised before an agency are waived and will not be considered by a court on review." *Nuclear Energy Inst., Inc. v. Envtl. Prot. Agency*, 373 F.3d 1251, 1297 (D.C. Cir. 2004). "[O]rderly procedure and good administration require that objections . . . be made while [the agency] has opportunity for correction." *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952). An "opportunity for correction" is particularly important here. The time for the Corps to consider potential burdens and make any accommodation of religion that RFRA may require was *before* the Corps approved the pipeline route at Lake Oahe. There is no further action relevant to RFRA for the Corps to take here. Congress surely did not intend to allow parties to stand silent until the only available remedy under RFRA is to force an agency to breach its contract with another private party and take away a property right that the agency granted to that party at the conclusion of the approval process. Any RFRA claim has been waived.[4]

Cheyenne River's decision to wait this long to assert a novel legal claim—especially one based on a legend dating back to time immemorial—presumably reflects its own appraisal of that

---

[4] For many of the same reasons this new claim is also barred by laches. *See Menominee Indian Tribe of Wisc. v. United States*, 614 F.3d 519, 531 (D.C. Cir. 2010) (noting that lack of diligence and prejudice are the two factors for applying laches).

claim's lack of merit as compared to the claims it chose to advance from the start.  At a minimum, doubts over whether Cheyenne River will be allowed to pursue this claim are reason enough to reject a TRO.

## II.   Cheyenne River Cannot Establish Imminent Or Likely Irreparable Harm.

Nothing in Cheyenne River's request for a TRO (or its request for a preliminary injunction) establishes that any irreparable harm is imminent, much less likely.  Cheyenne River must prove irreparable harm that is "certain, great, actual, and imminent."  *Coal. for Common Sense in Gov't Procurement v. United States*, 576 F. Supp. 162, 168 (D.D.C. 2008).  That means "a likelihood of irreparable injury—not just a possibility." *Id.*  And the alleged harm must be "immediate and palpable" rather than "remote" and "speculative."  *Nat'l Wildlife Fed. v. Burford*, 835 F.2d 305, 326 (D.C. Cir. 1987).  Cheyenne River falls well short.

Cheyenne River claims that the Black Snake is the flow of oil beneath the Missouri River (Mni Sose), which feeds into Lake Oahe.  CRST Mot., at 19 ("The Lakota believe that the presence of the black crude oil under Mni Sose will so severely imbalance the waters as to render them unnatural and impure such that they will be desecrated."); *id.* at 9 ("The Cheyenne River people consider the Missouri River to be sacred and vital to the practice of their religion[.]").  As for concerns about the purity of the Missouri River or Lake Oahe in particular, a 42-inch natural gas pipeline already passes *under* Lake Oahe at the same point where the Dakota Access Pipeline is being built.  Several power lines also cross *over* Lake Oahe:  a Basin Electric line (again, at the very same location), another Basin Electric line approximately 10-15 miles south of the planned crossing, and several Rushmore Electric lines near the border between the Standing Rock and Cheyenne River Reservations.  Also crossing *over* Lake Oahe near that same border is the South Dakota State Railroad, which Dakota Access understands to carry several hundred thousand bar-

rels of oil daily.  Also, thirteen other petroleum pipelines cross the Missouri River *upstream* of the Dakota Access Pipeline crossing.

Putting aside all of these highly relevant facts, along with the undisputed fact that Lake Oahe is itself a man-made creation, *cf.* D.E. 99-4 (Ex. F), ¶ 20 (Vance states that water used for religious purposes must be carried in a wooden bucket—not metal—"because wood is from nature"),[5] no oil will be in the pipeline at Lake Oahe imminently.  D.E. 104 (Ex. A), at 13.  Beyond that, Cheyenne River has offered no support for its assertion that "their Reservation lacks any other pure, natural water source" suitable for their religious practices.  CRST Mot., at 20.[6]

Cheyenne River also raises the specter of the risk of a spill or leak, *see, e.g.*, D.E. 99-2 (Ex. B), at 3, but that is even more remote and speculative.  Viewing historical data in the most pessimistic light with a focus on the most likely level of spill volume (no more than 4 barrels), the risk of leakage from a one-mile pipeline segment is once every 474 years.  AR 12395 (Ex. C).  There is even less risk of leakage into *any waterbody*, much less this one: "no more than once every 1,430 to 476,642 years," depending on spill volume.  AR 73039 (Ex. D).  That historical data also does not account for special state-of-the-art safety measures for this pipeline and

---

[5]  In addition to being manmade, Lake Oahe receives water from numerous existing discharge points upstream of the Cheyenne River reservation, including everything from chemically treated wastewater, industrial discharges, storm water, and agricultural runoff into the river.

[6]  Standing Rock Sioux Tribe has joined in Cheyenne River's Motion.  D.E. 107.  The declaration accompanying its Joinder asserts that the drilling itself would "interfere with important religious practices," but does not explain how drilling alone would impose a harm that satisfies the test for a TRO.  *See* D.E. 107-1 (Ex. R), ¶ 16 (Archambault Declaration).  The declaration states that the "area where Dakota Access proposes to drill is a sacred area," *id.*, but drilling had already occurred in that very area by the time of the February 6 status conference, D.E. 104 (Ex. A), at 13, and no new area is to be included in future drilling.  Also, the map accompanying the easement, D.E. 96-1 (Ex. S), at 13, shows that the island where ancestors might be buried is *not* "directly in the path of the proposed Dakota Access Pipeline crossing."  D.E. 107-1 (Ex. R), ¶ 10.

this crossing in particular. *See* D.E. 22-2 (Ex. X) (listing DAPL safety specifications exceeding Department of Transportation requirements).

Dakota Access also has in place a "24-hour a day monitoring program for monitoring and detection of inadvertent releases" and "plans to hydrostatically test the HDD pipeline segments prior to installation at the Lake Oahe and Missouri River crossings." AR 71220 (Ex. Y), at 36–37. The Corps has mandated a response plan for any leak that might occur during operation of the pipeline. *Id.* at 38. It requires a Facility Response Plan that complies with the relevant provisions of the Oil Pollution Act, not to mention other state and federal requirements. *Id.* This plan provides the personnel and equipment necessary to respond to a potential leak. *Id.* The Environmental Assessment further describes numerous specific measures in place "to minimize the risk of a pipeline leak and protect the users of downstream intakes." *Id.* at 42. For instance, Dakota Access will use "the highest quality external pipe coatings" and create a "Leak Detection System" to constantly "monitor the pipeline for leaks via computational algorithms." *Id.* In total, dozens of discrete measures will be in place to avoid and respond to a leak. *Id.* at 42–43. Thus, even *after* the pipeline is operating Plaintiffs will be unable to show the risk of harm required for a restraining order or injunction.

The motion fails to "carry the burden of persuasion" "by a clear showing," as it must to justify the "extraordinary and drastic remedy" Cheyenne River seeks. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2948, 129–30 (2d. ed. 1995)).

## III.   The Requested Order Would Cause Undue Harm To Others.

Granting Cheyenne River's requested order would cause significant and irreparable harm to Dakota Access and the public. Delay continues to be the chief source of irreparable

harm.  The government's delay in issuing the easement—and its September 9 and December 4 reversals, that were eventually set right on February 8—has already cost Dakota Access millions of dollars in penalties and increased costs.  Any further incremental delay to completion of the pipeline project will result in tens of millions of dollars in additional unrecoverable damages every month.  *See*, *e.g.*, D.E. 22-1 (Ex. E).  Delay also injures the public by costing municipalities and states millions of dollars in lost tax revenue and requiring the continued shipment of crude oil from North Dakota by costlier and less safe methods.

**IV.     The Public Interest And Balance Of The Equities Warrant Denial Of A TRO.**

The issuance of a TRO would not serve the public interest.  In the President's January 24, 2017 Memorandum, he expressly found that "construction and operation of lawfully permitted pipeline infrastructure serve the national interest."  D.E. 89-1 (Ex. T), at 3.  The construction and operation of this pipeline thus serves the public interest by strengthening and securing the U.S. energy supply, Mahmoud Aff., D.E. 80-2 (Ex. U), at 139, and it will provide substantial benefits to the states it passes through, *e.g.*, *id.* at 151 (approximately $55 million per year in property tax revenue alone), *id.* at 152 (significant reduction in environmental, health, and safety risks from alternative methods of oil transportation).  Further delaying completion of the pipeline will undermine these interests, which far outweigh any plausible benefit from temporarily halting construction while this Court considers an untimely claim.  *Cf. Kingman Park Civic Ass'n v. Gray*, 956 F. Supp. 2d 230, 259 (D.D.C. 2013) (financial cost of delaying streetcar line construction outweighed community's alleged interest in not being subject to disparate treatment).

Moreover, the equities weigh heavily in favor of denying Cheyenne River's TRO request. Cheyenne River or its members should have invoked RFRA during the administrative process. The purpose of that statute, after all, is for the government to accommodate the free exercise of

religion by not imposing substantial burdens unless the interests are compelling and the least re-strictive means are employed.  But Cheyenne River never notified the Corps that it believed an accommodation was necessary.  And it failed to assert this claim when it first sought leave to file its own complaint—a complaint that accuses the Corps of failing to take into account a number of concerns, including the need to protect cultural and religious sites.  Cheyenne River should have at least notified the Court on February 6 that an emergency motion was in the offing.  Most of the declarations supporting it were signed a week earlier.  *See, e.g.*, D.E. 99-1 (Ex. V), at 3 (Feb. 1); D.E. 99-2 (Ex. B), at 3 (Feb. 1); D.E. 99-3 (Ex. W), at 2 (Feb. 1); D.E. 99-4 (Ex. F), at 7 (Jan. 30).

The public interest and equities weight against the requested extraordinary relief.

## CONCLUSION

This Court should deny Cheyenne River's motion for a temporary restraining order.


Dated:  February 13, 2017                              Respectfully submitted,


                                                        /s/ William S. Scherman
Kimberly Caine                                         William S. Scherman
William J. Leone                                       David Debold
Robert D. Comer                                        GIBSON, DUNN & CRUTCHER LLP
NORTON ROSE FULBRIGHT US LLP                           1050 Connecticut Avenue, N.W.
799 9th St. NW, Suite 1000                             Washington, D.C.  20036
Washington, D.C.  20001-4501                           (202) 955-8500
(202) 662-0200                                         wscherman@gibsondunn.com


*Counsel for Dakota Access, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 13th day of February, 2017, I electronically filed the forego-

ing document using the CM/ECF system.  Service was accomplished by the CM/ECF system.


  /s/ William S. Scherman
William S. Scherman
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
wscherman@gibsondunn.com

*Counsel for Dakota Access LLC*