**IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| and | ) |
| | ) |
| CHEYENNE RIVER SIOUX TRIBE, | ) |
| | ) |
| Plaintiff-Intervenor | ) |
| | ) |
| v. | )  Case No. 1:16-cv-01534 (JEB) |
| | ) |
| UNITED STATES ARMY CORPS OF | ) |
| ENGINEERS, | ) |
| | ) |
| Defendant, | ) |
| | ) |
| and | ) |
| | ) |
| DAKOTA ACCESS, LLC, | ) |
| | ) |
| Defendant-Intervenor and Cross-Claimant | ) |

**UNITED STATES ARMY CORPS OF ENGINEERS' OPPOSITION TO CHEYENNE
RIVER SIOUX TRIBE'S MOTION FOR TEMPORARY RESTRAINING ORDER**

**TABLE OF CONTENTS**

I.     Introduction ...........................................................................................................1

II.    Background ............................................................................................................1

       A.     Factual Background.......................................................................................1

       B.     Religious Freedom Restoration Act ...............................................................5

III.   Standard of Review ...............................................................................................6

IV.    Argument...............................................................................................................7

       A.     Cheyenne River has not demonstrated a substantial likelihood that it
              will prevail on the merits............................................................................7

              1.     Cheyenne River's RFRA claim is barred by Laches...............................7

              2.     Cheyenne River has not demonstrated standing to challenge
                     the construction of a pipeline beneath Lake Oahe. ...................................9

              3.     *Lyng* defeats Cheyenne River's RFRA claim ..........................................11

              4.     The United States has no trust duty to manage Lake Oahe as
                     Cheyenne River prefers.........................................................................14

       B.     Cheyenne River has shown neither imminent irreparable injury nor
              that the equities weigh in its favor.............................................................17

V.     CONCLUSION.....................................................................................................19

**LIST OF EXHIBITS**

| Exhibit | Description |
|---------|-------------|
| A | February 3, 2017 Memorandum re: Dakota Access Pipeline; USACE Technical and Legal Review for the Department of the Army |
| B | R. Harnois notes, AR 66995 |
| C | August 17, 2015 Letter from S. Vance, Cheyenne River, to R. Harnois, Corps, at 2, AR 69815 |
| D | Tribal Resolution No. 324-2015-CR (Dec. 10, 2015), AR 66801 |
| E | May 19, 2016 Letter from S. Vance, Cheyenne River, to Col. Henderson, Corps, AR 64221 |
| F | June 3, 2016 Letter from Chairman Frazier, Cheyenne River, to Corps, AR 64137 |
| G | July 25, 2016 Letter from Chairman Frazier, Cheyenne River, to Col. Henderson, Corps, AR 63951 |
| H | Sept. 19, 2016 Letter from Chairman Frazier, Cheyenne River, to Col. Henderson, Corps at 2 |
| I | January 27, 2017 Letter from Chairman Frazier, Cheyenne River, to Hon. R. Speer |
| J | February 1, 2017 Letter from Chairman Frazier, Cheyenne River, to Col. Henderson, Corps |
| K | February 13, 2017 Declaration of Richard Harnois |

## I.      INTRODUCTION

The Cheyenne River Sioux Tribe's motion for a temporary restraining order, which has been joined by the Standing Rock Sioux Tribe, is based solely upon a claim that the granting of an easement by the U.S. Army Corps of Engineers for a pipeline deep underneath Army Corps-managed Federal land at Lake Oahe violates "the Tribe's rights under the Religious Freedom Restoration Act." The TRO motion asserts no other legal grounds in support of the extraordinary relief that the Tribe is requesting.

The motion for a TRO should be denied because Cheyenne River fails to establish that it will suffer any injury, much less an imminent irreparable injury, from either the mere conveyance of a real estate interest or the construction of a pipeline that will contain no oil for at least 53 days.  Moreover, the doctrine of laches bars the Cheyenne River Sioux Tribe from raising such an argument at this late juncture.  Cheyenne River's motion should also be denied because the Corps' issuance of the Lake Oahe easement does not substantially burden the exercise of the Tribe's religious beliefs in violation of the Religious Freedom Restoration Act and, therefore, the Tribe is not likely to succeed on the merits of its claims.

With weeks of construction and testing yet to occur before oil is introduced into the Dakota Access Pipeline under Lake Oahe, Defendant requests that the Court deny Cheyenne River's motion for a temporary restraining order and set a briefing schedule to address Cheyenne River's motion for a preliminary injunction.

## II.     BACKGROUND

### A.      Factual Background

The facts surrounding the permitting and legal background for the Dakota Access Pipeline ("DAPL") are well known to this Court, and will not be restated in detail in this memorandum. *Standing Rock Sioux Tribe v. U. S. Army Corps of Eng'rs*, 2016 U.S. Dist. LEXIS 121997 (D.D.C. Sept. 9, 2016).

On December 4, 2016, the Assistant Secretary for the Army (Civil Works) issued a memorandum directing the Corps to engage in additional review of Dakota Access's Lake Oahe

easement application.  Memorandum re: Proposed Dakota Access Pipeline Crossing at Lake

Oahe, North Dakota (Dec. 4, 2016) (ECF 65-1).  The memorandum stated that the analysis

would be "best accomplished, in my judgment, by preparing an Environmental Impact

Statement," *id*. at 3.  Contrary to Cheyenne River's assertions, the memorandum did not order

the Corps to complete an Environmental Impact Statement.  Importantly, the memorandum also

stated "that this decision does not alter the Army's position that the Corps' prior reviews and

actions have comported with legal requirements."  *Id.* at 4.

On January 24, 2017, the President issued a memorandum directing the Army to "review

and approve in an expedited manner, to the extent permitted by law and as warranted," the Lake

Oahe Easement application and "consider, to the extent permitted by law and as warranted,

whether to rescind or modify" the December 4 Memorandum.  Presidential Memorandum

Regarding Construction of the Dakota Access Pipeline § 2 (Jan. 24, 2017) (ECF 89-1).  As

explained in the "Presidential Memorandum Regarding Construction of the Dakota Access

Pipeline," signed by the President of the United States on January 24, 2017, the DAPL

"represents a substantial, multi-billion-dollar private investment in our Nation's energy

infrastructure. This approximately 1,100-mile pipeline is designed to carry approximately

500,000 barrels per day of crude oil from the Bakken and Three Forks oil production areas in

North Dakota to oil markets in the United States. At this time, the DAPL is more than 90 percent

complete across its entire route. Only a limited portion remains to be constructed."  *Id.* at § 1.

That limited portion is a short segment crossing deep underneath Lake Oahe, at a particular

location that already serves as a crossing for another pipeline and that is outside the boundaries

of the Standing Rock and Cheyenne River reservations. *See Standing Rock Sioux Tribe*, aCivil

No. 16-1534, 2016 U.S. Dist. LEXIS 121997 at *2-3, 22.  The Army and the Corps completed

the review directed by the Presidential Memorandum.  Memorandum re: Dakota Access

Pipeline; USACE Technical and Legal Review for the Department of the Army (Feb. 3, 2017)

(Ex. A).  The Army provided Congress with notice of its intent to issue the easement on

February 7, and issued the easement on February 8, 2017.  ECF 96.

The Oahe Dam, a federally-authorized civil works project, impounds the Missouri River forming Lake Oahe, which stretches from Pierre, South Dakota, to near Bismarck, North Dakota. *LeBeau v. United States*, 2015 U.S. Dist. LEXIS 23093 (D.S.D. Feb. 26, 2015). Lake Oahe and adjacent federal and private lands are used for numerous industrial and other purposes. In fact, the Dakota Access pipeline "will track both the Northern Border Gas Pipeline, which was placed into service in 1982, and an existing overhead utility line." *Standing Rock Sioux Tribe*, 2016 U.S. Dist. LEXIS 121997 at *22. Likewise, an oil refinery is located on the Missouri River and several pipelines cross the river upstream of the Cheyenne River Reservation. *See* Map of North Dakota Crude Oil Pipelines.[1] At least one wastewater treatment plant is authorized to discharge into Green Grass Creek, a tributary of the Moreau River, which flows through the Cheyenne River Reservation into Lake Oahe. City of Eagle Butte NPDES Permit (Sept. 30, 2011).[2] Buffalo graze the pipeline route on the west side of Lake Oahe. Mentz Decl. at ¶ 2 (ECF 29-1). And the Missouri River is open to recreational activities such as boating. Dakota Access Pipeline Project Crossings of Flowage Easements and Federal Lands at 73, AR 71297 (ECF 73-10). Notwithstanding the existence of these facilities, activities, and pipelines at Lake Oahe, the Standing Rock Sioux Tribe's water intakes were located several miles downstream from the pipeline route. Memorandum re: Dakota Access Pipeline Crossing at Lake Oahe, North Dakota at 11 (Oct. 20, 2016). And Standing Rock's new water intake structures are being constructed "approximately 50 miles further downstream from the . . . pipeline crossing" and just north of the Cheyenne River Sioux Reservation's northernmost boundary. *Id*. at 19. We are also not aware of any legal efforts by the Cheyenne River to end these activities at Lake Oahe.

"The northern border of the [Cheyenne River] Reservation is the [southern border of the] Standing Rock Sioux Reservation." Decl. of Chairman Harold Frazier ¶ 12 (ECF 11-7). Just as the Corps sought to consult with Standing Rock, *Standing Rock Sioux Tribe*, 2016 U.S. Dist.

---

[1] Available at: https://www.dmr.nd.gov/pipeline/assets/maps/ND%20Crude%20Oil%20Map.pdf.

[2] Available at: https://www.epa.gov/region8/city-eagle-butte-npdes-permit.

LEXIS 121997 at *24-25, the Corps repeatedly sought information from Cheyenne River regarding its concerns regarding the pipeline.  R. Harnois notes, AR 66995 (Aug. 17, 2015) (expressing "concerns that we had gotten no comments back yet") (Ex. B).

Cheyenne River expressed general concerns about the pipeline crossing all bodies of water along its route.  Letter from S. Vance, Cheyenne River, to R. Harnois, Corps, at 2 AR 69815 (Aug. 17, 2015) (Ex. C).  Rather than express these concerns as a matter of religious freedom centered around its ceremonial use of Lake Oahe, Cheyenne River expressed its concern that these waters "will then travel on to the Mississippi and the Gulf.  This is not a local concern but a global one."  *Id*.  Steve Vance, the Cheyenne River Tribal Historic Preservation Officer participated in a December 8, 2015 meeting with the Corps. Decl. of J. Ames at ¶¶ 15-16, ECF 21-17.  Cheyenne River subsequently passed a tribal resolution opposing the pipeline based upon alleged noncompliance with the National Environmental Policy Act and the National Historic Preservation Act, with no mention of the claims raised here under RFRA.  Resolution No. 324-2015-CR, AR 66801 (Dec. 10, 2015) (Ex. D).  Mr. Vance again met with the Corps on February 18 and 19.  Decl. of M. Chiefly at ¶ 22, ECF 21-18.  Cheyenne River transmitted letters to the Corps on May 19, June 3, and July 25, 2016.  None of these letters referenced the Religious Freedom Restoration Act.  Letter from S. Vance, Cheyenne River, to Col. Henderson, Corps, AR 64221 (May 19, 2016) (Ex. E); Letter from Chairman Frazier, Cheyenne River, to Corps, AR 64137 (June 3, 2016) (Ex. F); Letter from Chairman Frazier, Cheyenne River, to Col. Henderson, Corps, AR 63951 (July 25, 2016) (Ex. G).

Cheyenne River did not specifically assert that the verifications of two Nationwide Permits in North Dakota, permissions under 33 U.S.C. § 408, consents to cross flowage easements, or issuance of an easement would substantially burden its free exercise of religion. Even after the Corps' issued its Environmental Assessment relating to Lake Oahe on July 25, 2016, Cheyenne River did not focus its concerns on a potential violation of the Religious Freedom Restoration Act, or potential impacts of pipeline construction on religious exercise. Chairman Frazier's declaration in support of Cheyenne River's first motion to intervene in this

<div align="center">4</div>

case similarly focused on the general threat of "discharges into Lake Oahe."  Frazier Decl. at ¶¶ 15-16 (ECF 11-7).   And Cheyenne River's subsequent letters focus on the risk that a pipeline leak might contaminate the tribe's "water pipelines."  Letter from Chairman Frazier, Cheyenne River, to Col. Henderson, Corps at 2 (Sept. 19, 2016) (Ex. H).  *See also* Letter from Chairman Frazier, Cheyenne River, to Hon. R. Speer (Jan. 27, 2017) (Ex. I); Letter from Chairman Frazier, Cheyenne River, to Col. Henderson, Corps (Feb. 1, 2017) (Ex. J).  Cheyenne River raised no concern referencing the Religious Freedom Restoration Act until filing its motion for a temporary restraining order last week, which was more than two years after becoming aware of the proposed pipeline.

### B.      Religious Freedom Restoration Act

In 1993, Congress enacted the Religious Freedom Restoration Act ("RFRA") in response to the Supreme Court's opinion in *Employment Division v. Smith.*  494 U.S. 872 (1990). *Smith* addressed whether the Free Exercise Clause of the First Amendment allowed Oregon to deny unemployment benefits to two members of the Native American Church who were fired because of their sacramental, yet state-law prohibited, use of peyote. *Id.* The Court "held that, under the First Amendment, 'neutral, generally applicable laws may be applied to religious practices even when not supported by a compelling governmental interest.'" *Burwell v. Hobby Lobby Stores, Inc.,* 134 S..Ct. 2751, 2761 (2014) (quoting *City of Boerne v. Flores,* 521 U.S. 507, 514 (1997)). In so holding, *Smith* departed from the Court's compelling interest test articulated in *Sherbert v. Verner,* 374 U.S. 398 (1963) and *Wisconsin v. Yoder,* 406 U.S. 205 (1972), which "would have asked whether Oregon's prohibition substantially burdened a religious practice, and, if it did, whether the burden was justified by a compelling government interest." *Boerne,* 521 U.S. at 513 (referencing *Sherbert).* The Court's reduction of scrutiny prompted Congress to pass RFRA, stating: "The Congress finds that in *[Smith]* the Supreme Court virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion; and the compelling interest test as set forth in prior Federal court rulings is a workable test for striking sensible balances between religious liberty and competing prior

governmental interests." 42 U.S.C. § 2000bb(a)(4)–(5).  Congress identified the purpose of RFRA as:

> to restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened

42 U.S.C.A. § 2000bb(b). Under RFRA, the "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless the government "demonstrates that application of the burden to the person–(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb–1(a), (b).

RFRA does not define "substantial burden," but consistent with Congress's purpose of "restor[ing] the compelling interest test" of *Sherbert* and *Yoder*, courts look to pre-*Smith* cases to construe the term. 42 U.S.C. 2000bb(b)(1).  That "law makes it clear that strict scrutiny does not apply to government actions involving . . . the use of the Government's own property or resources," including management of public lands.  *See* S. Rep. No. 103-111, 1st Sess. 9 (1993); *Navajo Nation v. United States Forest Serv.*, 535 F.3d 1058, 1069-79 (9th Cir. 2008).

## III.    STANDARD OF REVIEW

The grant of a preliminary injunction or temporary restraining order is an "'extraordinary and drastic remedy.'"  *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (citation omitted). "As an extraordinary remedy, courts should grant such relief sparingly."  *Konarski v. Donovan*, 763 F. Supp. 2d 128, 133 (D.D.C. 2011).  A party seeking a preliminary injunction must demonstrate four elements:  (1) a substantial likelihood of success on the merits; (2) that it would suffer irreparable injury if the injunction were not granted; (3) that the balance of the equities tips in its favor; and (4) that the public interest would be furthered by the injunction.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011).  Cheyenne River fails to meet its burden on any of the four prongs.

IV. **ARGUMENT**

A. **Cheyenne River has not demonstrated a substantial likelihood that it will prevail on the merits**

First, the record is devoid of any mention of Cheyenne River's current specific religious concerns throughout the lengthy consultation and administrative process.[3] The doctrine of laches thus bars Cheyenne River from prevailing in litigation based upon a concern it did not express in a timely manner. In addition, Cheyenne River has not established standing because it cannot demonstrate any harm from construction of the pipeline, let alone the granting of an easement. Even if this Court reaches the merits, however, Cheyenne River is unlikely to prevail on its RFRA claim because, as an initial matter, the Corps' management of its own property—the land under Lake Oahe—falls squarely within the type of actions the Supreme Court found not to substantially burden tribal religion in *Lyng v. Nw. Indian Cemetery Protective Ass'n.* 485 U.S. 439 (1988), and additionally, the granting of an easement here does not constitute a substantial burden on the religious freedoms of the Tribes.

1. **Cheyenne River's RFRA claim is barred by Laches**

The court should decline to hear Cheyenne River's RFRA claim because it is barred by laches. *See NAACP v. NAACP Legal Def. & Educ. Fund, Inc.,* 753 F.2d 131, 137 (D.C. Cir. 1985) (explaining that the doctrine of laches is "founded on the notion that equity aids the vigilant" and that equity does not aid those who have not taken action early enough to assert claims). This defense "requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 121-22 (2002) (internal quotation marks omitted); *Pro-Football,*

---

[3] In the event that the Court grants Standing Rock's motion for joinder in Cheyenne River's motion for temporary restraining order, ECF 107, Defendant believes, based upon its review of the administrative record to the extent permitted by time, that its arguments would apply equally to Standing Rock.

*Inc. v. Harjo*, 567 F. Supp. 2d 46, 56 (D.D.C. 2008), *aff'd in part sub nom. Pro Football, Inc. v. Harjo*, 565 F.3d 880 (D.C. Cir. 2009). As a case-specific equitable doctrine, laches "requires that the resolution be based on the circumstances peculiar to each case." *Tri-Star Pictures, Inc. v. Leisure Time Prods.*, 17 F.3d 38, 44 (2d Cir. 1994); *see also Stone v. Williams,* 873 F.2d 620, 624, *vacated on other grounds,* 891 F.2d 401 (2d Cir. 1989) ("it is the reasonableness of the delay rather than the number of years that elapse which is the focus of inquiry").

The Government has a strong policy of accommodating Native American religious practices and protecting religious cultural sites. But as demonstrated above, Cheyenne River was not diligent in asserting its RFRA claims. The Corps consulted with the Tribe while it was considering Dakota Access' NWP Pre-Construction Notifications, Section 408 requests to alter federally-authorized projects, and easement application. The Tribe sent at least six letters to the Corps generally opposing the pipeline. As described in depth in the declaration of Richard Harnois, the Corps also held meetings with Cheyenne River and reviewed correspondence to understand its concerns. Decl. of R. Harnois ¶¶ 8-32 (Feb. 13, 2017) (Ex. K). At no point in this process did Cheyenne River express the specific religious concerns it now articulates, *i.e.*, that the granting of an easement for the construction and operation of the pipeline burdens the Tribe's religion. Advancing these concerns for the first time in an amended Complaint after the real estate interest has been conveyed and the pipeline is nearly complete, at the last step of the years-long administrative and legal process, is an example of the lack of diligence the laches doctrine is designed to address.

In *Apache Survival Coalition v. United States*, a tribe similarly chose not to participate in the long administrative NEPA and NHPA process, and then sued alleging that the construction of an observatory would harm its sacred sites. 21 F.3d 895, 898 (9th Cir. 1994). The Ninth Circuit found that the tribe's claims were barred by laches because it "ignored the very process that its members now contend was inadequate," and asserted its rights "with inexcusable tardiness." *Id*. at 907. Here, Cheyenne River chose—like the tribe in *Apache Survival*—to remain silent about specific religious concerns during the process until after the administrative process concluded

and months into litigation. *See* Decl. of R. Harnois at ¶¶ 30-32 (Feb. 13, 2017) (Ex. K). The court should treat the Cheyenne River Tribe's claims similarly. *See Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 553–54 (1978) (plaintiffs must bring specific concerns to agency's attention in administrative process).

And Cheyenne River's lack of diligence could prejudice the Corps. Without being made aware of the Cheyenne River's specific religious objection to granting the easement until after the easement was granted, the Corps could not meaningfully engage with Cheyenne River to discuss the Tribe's concerns. *See U.S. Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764-65 (2004) ("Because respondents did not raise these particular objections to the EA, FMCSA was not given the opportunity to examine any proposed alternatives to determine if they were reasonably available. Respondents have therefore forfeited any objection to the EA on the ground that it failed adequately to discuss potential alternatives to the proposed action."). Cheyenne River cannot dispute that it had ample time and opportunity to raise the specific religious concerns raised by its RFRA claim while the Corps was considering Dakota Access' easement application but failed to do so.

> 2. **Cheyenne River has not demonstrated standing to challenge the construction of a pipeline beneath Lake Oahe.**

A plaintiff bears the burden of proof to establish federal jurisdiction. *Lujan v. Def. of Wildlife,* 504 U.S. 555, 561 (1992). To meet the Article III standing requirements, a plaintiff must establish three elements. *Lujan,* 504 U.S. at 560. First, it must show that it has suffered an "injury in fact" that is "concrete and particularized" and actual or imminent, not "conjectural" or "hypothetical." *Id.* at 560 (citations omitted). Plaintiff's injury must be "certainly impending" and cannot rely "on a highly attenuated chain of possibilities." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1143, 1148 (2013). Allegations of possible future injuries are not sufficient. *Id.* at 1147; *Ctr. For Biological Diversity v. Dep't of Interior*, 563 F.3d 466, 478 (D.C. Cir. 2009). Second, a plaintiff must establish a causal connection between the injuries complained of and the

Corps' action.  Those injuries must be "fairly . . . trace[able]" to the Corps' granting of the Lake

Oahe easement and "not . . . th[e] result [of] the independent action of some third party not

before the court." *Lujan*, 504 U.S. at 560-61 (citations omitted).  Third, a plaintiff must show it

is likely, as opposed to merely speculative, that the injury will be addressed by a favorable

decision of the Court.  *Id.* at 561.  Moreover, a "plaintiff must demonstrate standing for each

claim he seeks to press' and 'for each form of relief' that is sought." *Davis v. F.E.C.*, 554 U.S.

724, 734 (2008) (emphasis added).  Cheyenne River, at a minimum, has failed to establish

standing to enjoin *construction* of the pipeline.[4]

Cheyenne River lacks standing to challenge the *construction* of a portion of the Dakota

Access pipeline under Lake Oahe—the relief sought in its motion for a temporary restraining

order—because it fails to establish that any injury it could conceivably suffer from construction

of an empty pipeline is fairly traceable to the Corps' decision to grant the easement.  Cheyenne

River's alleged injuries appear to be based largely, if not entirely, upon the future flow of oil

through a not-yet-constructed pipeline.  ECF 99 at 41-45.  Consistent with Dakota Access's

representation at the February 6, 2017 status hearing that the process of installing and testing the

pipeline would take at least 60 days, any conceivable harm from the flow of oil through the

pipeline will not occur for another 53 days.  And as discussed above, the Missouri River,

including Lake Oahe, already contains numerous pipelines and utilities, including the Northern

Border Gas Pipeline located next to the Dakota Access pipeline route and other permitted

discharges and activities.  To the extent Cheyenne River's harm is premised on the presence of

an empty pipeline under Lake Oahe, *see, e.g.*, ECF 99 at 26 ("construction and operation of the

---

[4]   Defendant does not concede that Plaintiff has standing with respect to claims set forth in its
Amended Complaint.  The Court need not reach those issues in ruling on this motion.

oil pipeline will desecrate and deconsecrate the waters…"), that harm has already occurred and cannot be remedied by this Court because the presence of the other pipelines would already have rendered the water impure under Cheyenne River's theory. Cheyenne River has not established that any harm it may suffer from the installation of a portion of the Dakota Access pipeline has not already been caused by those additional pipelines. Relatedly, Cheyenne River has not established that the temporary restraining order it seeks to prevent the construction of this portion of the pipeline will redress any injury from the general existence of pipelines, as its proposed relief will not remedy any injuries caused by those pipelines.

### 3. *Lyng* defeats Cheyenne River's RFRA claim

Land management activities, such as easements, that the government undertakes on its own land are not a "substantial burden" on religion under RFRA, and under the relevant caselaw, an individual's objection does "not divest the Government of its right to use what is, after all, its land." *See Lyng,* 485 U.S. 439, 453 (1988). A contrary holding would allow any religious objector to halt government management of its own property.[5]

Cheyenne River asserts that granting an easement over government property constitutes a substantial burden on its religious exercise. Whether a burden is "substantial" under RFRA is a question of law, not a "question[] of fact, proven by the credibility of the claimant." *Mahoney v. Doe*, 642 F.3d 1112, 1121 (D.C. Cir. 2011); *see, e.g., Bowen v. Roy*, 476 U.S. 693, 701 n.6 (1986) ("Roy's religious views may not accept this distinction between individual and governmental conduct," but the law "recognize[s] such a distinction"). As a matter of law, the

---

[5] Defendant does not address the first prong of Cheyenne River's RFRA claim regarding the sincerity of its beliefs. Defendant respects the Tribe's views as expressed in its motion, but reserves the right to review those issues further as part of subsequent proceedings. It is unnecessary for the Court to address the sincerity of Cheyenne River's views here for the other reasons stated in this brief.

government's use of its own property does not constitute a "substantial burden" on religion. *Lyng,* 485 U.S. 439.  This alone defeats Cheyenne River's RFRA claim here.

In *Lyng,* Indian tribes challenged the Forest Service's approval of plans to construct a logging road in the Chimney Rock area of the Six Rivers National Forest in California. *Id.* at 442. The tribes contended the construction would interfere with their free exercise of religion by disturbing a sacred area. *Id.* at 442–43.  The area was an "integral and indispensable part" of the tribes' religious practices, and a Forest Service study concluded the construction "would cause serious and irreparable damage to the sacred areas." *Id.* at 442 (citations and internal quotation marks omitted).

The Supreme Court rejected the tribes' challenge. It held the government plan, which would "diminish the sacredness" of the land to Indians and "interfere significantly" with their ability to practice their religion, did not impose a burden "heavy enough" to violate the Free Exercise Clause. *Id.* at 447–49. The Court stated:

> The Government does not dispute, and we have no reason to doubt, that the logging and road-building projects at issue in this case could have devastating effects on traditional Indian religious practices.
> …
> Even if we assume that ... the [logging] road will "virtually destroy the ... Indians' ability to practice their religion," the Constitution simply does not provide a principle that could justify upholding [the plaintiffs'] legal claims. However much we might wish that it were otherwise, government simply could not operate if it were required to satisfy every citizen's religious needs and desires.
> …
> No disrespect for these practices is implied when one notes that such beliefs could easily require *de facto* beneficial ownership of some rather spacious tracts of public property.
> …
> *Whatever rights the Indians may have to the use of the area, however, those rights do not divest the Government of its right to use what is, after all, its land.*

*Id.* at 451–53 (citation omitted) (last emphasis added).

Cheyenne River similarly challenges a government action on the government's own land—granting an easement—on the theory that the portion of the pipeline that will be constructed within that easement will diminish its religious exercise.  Even if, as in *Lyng,* it was

assumed that the government action here would "virtually destroy the ... Indians' ability to practice their religion," an issue which is not addressed in this memorandum, Cheyenne River's declarations offer nothing to distinguish the easement here from the logging road in *Lyng*.

Lyng was not overturned by RFRA and indeed legislative history confirms that its holding was meant to be incorporated into RFRA's understanding of "substantial burden." As Senator Hatch explained, RFRA

> does not effect [sic] *Lyng*.., a case concerning the use and management of government resource…. In *Lyng*, the court ruled that the way in which government manages its affairs and uses its own property does not impose a burden on religious exercise.

139 Cong. Rec. S14461, at S14470 (daily ed. Oct. 27, 1993) (statement of Sen. Hatch); *see id* (statement of Sen. Inouye) (RFRA will not address "the circumstance in which Government action on public and Indian lands directly infringes upon the free exercise of a native American religion."). When RFRA was amended, the definition of "substantial burden" was left unaltered.[6] *Lyng's* holding has since been repeatedly upheld. *See Snoqualmie Indian Tribe v. FERC.*, 545 F.3d 1207, 1213-15 (9th Cir. 2008) (dam on government property does not substantially burden religion); *Navajo Nation v. U. S. Forest Serv.,* 535 F.3d 1058, 1069-79 (9th Cir. 2008) (en banc)(reclaimed snow on government property does not substantially burden religion); *see Vill. of Bensenville v. Fed. Aviation Admin.*, 457 F.3d 52, 67 (D.C. Cir. 2006) (citing *Lyng* favorably).

Cheyenne River acknowledges that *Lyng*'s reasoning includes a concern that religious objections to government's use of its own property would give religious objectors "de facto beneficial ownership" over government land. ECF 99 at 44. Cheyenne River attempts to address this concern by arguing that, because it has a vested right in Lake Oahe's *water*, the

---

[6]  *See* Religious Land Use and Institutionalized Persons Act (RLUIPA) of 2000, Pub. L. No.106-274, §§ 7-8, 114 Stat. 803, 806.

United States is barred from granting an easement over its *land*.  This is essentially irrelevant to

the concern and reasoning that animated the *Lyng* line of cases.[7]

To the extent Cheyenne River attempts to argue that *Lyng* was implicitly overturned by

*Hobby Lobby*, this is incorrect.  *Cf.* ECF 99 at 45.  *Hobby Lobby* did not cite, much less directly

overturn, *Lyng*.  *Hobby Lobby* is easily distinguishable because it did not involve government use

of its own land.  Rather, it concerned a requirement to provide contraceptives as part of health

insurance.  *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2775 (2014).

The facts of this case closely parallel *Lyng*, and the many cases that have followed it, and

the same result should be reached here.  Giving Cheyenne River, or any individual with sincerely

held religious beliefs, *de facto* ownership over the government's property is not an intended or

reasonable interpretation of RFRA and has been rightly rejected by every court to examine the

issue.  As in *Lyng*, the government's use of its own property does not constitute a substantial

burden on religion.  *Lyng,* 485 U.S. at 447.  For this reason Cheyenne River cannot succeed on

the merits of its RFRA claim.

4.     **The United States has no trust duty to manage Lake Oahe as Cheyenne River prefers**

To the extent Cheyenne River's RFRA claim is based upon an alleged breach of trust,

this too fails because the Tribe has not identified any substantive source of law that establishes

specific trust duties.  "The trust obligations of the United States to the Indian tribes are

established and governed by statute rather than the common law."  *United States v. Jicarilla*

---

[7]  Notably, this is not a case where the government has taken action to deny Cheyanne River a benefit on the basis of Cheyanne River's religious practice.  *Cf.  La Cuna De Aztlan Sacred Sites Prot. Circle Advisory Comm. v. U.S. Dep't of the Interior*, No. CV 11-00400 DMG (DTBx), 2013 WL 4500572, at *10 (C.D. Cal. Aug. 16, 2013) ("Denial of a government benefit, however, only implicates RFRA if the denial is a response to Plaintiffs' religious practices or, in other words, if a governmental benefit were 'conditioned ... upon conduct that would violate the Plaintiffs' religious beliefs.'  Yet, Plaintiffs have not provided any evidence that the [challenged project] is being built *in response to* Plaintiffs' religious practices.") (citing *Navajo Nation,* 535 F.3d at 1063), *aff'd,* 603 F. App'x 651 (9th Cir. 2015).

*Apache Nation*, 564 U.S. 162, 165 (2011).  Thus, in order to bring a claim for breach of trust, the Tribe "must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties." *United States v. Navajo Nation,* 537 U.S. 488, 506 (2003); *El Paso Nat. Gas Co. v. United States*, 774 F. Supp. 2d 40, 51–52 (D.D.C. 2011), *aff'd*, 750 F.3d 863 (D.C. Cir. 2014).  This "analysis must train on specific rights-creating or duty-imposing statutory or regulatory prescriptions." *Id.*[8] Cheyenne River is simply incorrect, ECF 99 at 17, that control of a Tribe's resources alone is sufficient to establish a trust duty. *United States v. Navajo Nation*, 556 U.S. 287, 301 (2009) ("The Federal Government's liability cannot be premised on control alone.").

Here, the Tribe alleges a breach of trust arising out of the Corps' violations of various statutes, ECF 99 at 14-17.  But none of those statutes articulate the kind of "rights-creating or duty-imposing" language that is required by the case law.  *See El Paso Nat. Gas Co. v. United States*, 750 F.3d 863, 898 (D.C. Cir. 2014).  25 U.S.C § 1632 does not provide a specific duty applicable to this case.  It merely states that "the policy of the United States[] that all Indian communities . . . be provided with safe and adequate water supply. . . ." *Id.* at § 1632(a)(5).  Such policy provides no law to apply regarding whether an agency has conformed to the policy and administrative goals articulated. *See City of Albuquerque v. U.S. Dep't of the Interior*, 379 F.3d 901, 914 (10th Cir. 2004).  Similarly, 33 U.S.C. § 701-1(b) says nothing about a duty on the part of the Corps to take any other specific action.

Cheyenne River does not identify any language in the Flood Control Act that could create a trust duty.  While the Flood Control Act, 16 U.S.C. § 460d, does contain some arguably duty-imposing language, the language has no bearing on this dispute.  The act provides that "[t]he water areas of all such projects shall be open to public use," and that "[a]ll moneys received by the United States for leases or privileges shall be deposited in the Treasury of the United States."

---

[8]  Common law trust principles may then theoretically "particularize [a statutory] obligation." *Cobell v. Norton* (*Cobell XIII* ), 392 F.3d 461, 472 (2004). But common law trust principles are, on their own, insufficient to show that the United States owes a specific trust duty.

*Id.* It addresses duties relating to fining individuals for violations of regulations promulgated by the Army, who may issue such citations. *Id.* And it provides that "preference shall be given to federally recognized Indian tribes and Federal, State, or local governmental agencies, and licenses or leases where appropriate, may be granted without monetary considerations, to such Indian tribes or agencies for the use of all or any portion of a project area for any public purpose, when the Secretary of the Army determines such action to be in the public interest, and for such periods of time and upon such conditions as he may find advisable." *Id.* Even if this language could be interpreted as a creating some duty, it falls far short of establishing a specific trust duty that could support Cheyenne River's motion. Simply put, the Flood Control Act does not impose any trust duty on the United States on behalf of Cheyenne River.

Cheyenne River's reliance on 55 Fed. Reg. 9223 (Mar. 12, 1990) for the proposition that the United States holds water rights in trust for Indians is unavailing. While this may be true as a general matter, it is insufficient to create any specific duty that would support the emergency relief sought. *See Navajo II,* 556 U.S. at 301. Indeed, Cheyenne River's assertion of a trust duty to protect "tribal reserved water rights from upstream contamination," ECF 99 at 16, cannot be even theoretically breached by the pipeline's construction, as during construction no oil will flow within the pipeline.[9]

Finally, Cheyenne River cites Executive Order 13175. Compliance with executive orders may be judicially reviewable only if (1) the order does not expressly disclaim the creation of a private right of action, (2) the order is based upon statutory authority, and (3) there is a legal standard or "law to apply" by which the agency's action may be judged. *See City of Carmel-by-*

---

[9]   Though Cheyenne River asserts an ownership interest in the waters of Lake Oahe, caselaw provides that they have, at most, only a usufructory right. *See Niagara Mohawk Power Corp. v. Fed. Power Comm'n,* 202 F.2d 190, 198 (D.C. Cir. 1952) ("[T]he water rights in question do not rest upon a claim of ownership of the running waters of the Niagara. It is a usufructuary property right in the waters which is asserted—a vastly different thing, which was recognized at common law and has been confirmed by judicial decisions."), *aff'd,* 347 U.S. 239, 247 n.10 (1954) (noting "[n]either sovereign nor subject can acquire anything more than a mere usufructuary right" in a body of water).

*the-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1166-67 (9th Cir. 1997). The failure to meet *any* of these criteria is fatal to a claim based on an executive order, and Executive Order 13,175 meets none of them.  First, the Order expressly states that it does not provide any right or benefit that is enforceable at law or in equity against the federal government. ADD033 (Executive Order 13,175 not intended to create "any right, benefit, or trust responsibility … enforceable … by a party against the United States [or] its agencies"). Language disclaiming the intent to create enforceable rights precludes judicial review. *See City of Carmel-by-the-Sea*, 123 F.3d at 1166. Second, because the Executive Order does not purport to be based on specific statutory authority, it cannot create enforceable rights. *Id*.  Finally, there is no law to apply regarding whether an agency has conformed to the policy and administrative goals articulated.  *Id.* (enforceable executive order must provide an objective legal standard or "law to apply" by which the agency's action may be judged); *see also City of Albuquerque v. U.S. Dep't of the Interior*, 379 F.3d 901, 914 (10th Cir. 2004). The absence of any objective standards also confirms that the Executive Order does not establish any specific trust duty.

In short, Cheyenne River has not identified "specific rights-creating or duty-imposing statutory or regulatory prescriptions," *Navajo I,* 537 U.S. at 490, and therefore are not likely to succeed on the merits of any breach of trust claim.

### B.   Cheyenne River has shown neither imminent irreparable injury nor that the equities weigh in its favor.

Cheyenne River fails to establish the imminent irreparable harm necessary to prevail on its motion for a temporary restraining order.  "[T]he party seeking injunctive relief must show that '[t]he injury complained of [is] of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Wisconsin Gas Co. v. Federal Energy Regulatory Com.*, 758 F.2d 669, 674 (D.C. Cir. 1985) (alterations in original) (citation omitted).  Cheyenne River has not shown that any alleged injury from granting an easement or constructing a portion of an empty oil pipeline is sufficiently imminent to merit a temporary restraining order.

To the extent that Cheyenne River's claim is premised upon the drilling of a hole under Lake Oahe or the "construction" of an empty pipeline, ECF 99 at 1, 43, that harm already occurred when other pipelines were installed. *Standing Rock Sioux Tribe,* 2016 U.S. Dist. LEXIS 121997 (D.D.C. 2016) (discussing colocation of Dakota Access route with Northern Border Pipeline Gas Pipeline). Indeed, the Tribe concedes that the natural gas pipeline operating alongside the Lake Oahe easement is not injurious. ECF 99 at 43. The installation of a pipeline, standing alone, therefore cannot constitute an irreparable injury.

To the extent that Cheyenne River's claim is premised on the risk that oil might spill into Lake Oahe from the Dakota Access pipeline, that harm cannot conceivably occur for at least 53 days. Cheyenne River's reliance, ECF 99 at 42, on *O Centro Espirita Beneficient Uniao Do Vegetal v. Ashcroft* is therefore misplaced. 282 F.Supp.2d 1236, 1240 (D. N.M. 2002). In that case, the threat that the Government would prosecute plaintiffs for possessing a tea containing a controlled substance was imminent—the plaintiffs could be immediately prosecuted for engaging in religious practices involving the banned tea. *Id. See also Mills v. Dist. Of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (unconstitutional checkpoints had been imposed and police had current intent to continue use). Here, Cheyenne River's allegations of harm are based upon the speculative threat that oil will traverse or spill from the Dakota Access pipeline into Lake Oahe. But oil in this pipeline, located 92 to 115 feet below Lake Oahe, will not begin to flow for at least 53 days. Cheyenne River therefore fails to identify an imminent irreparable injury supporting enjoining the pipeline's construction prior to this court ruling on Cheyenne River's motion for a preliminary injunction. Relatedly, Cheyenne River has not identified any equity supporting its motion for a temporary restraining order.

Moreover, the record before the government here shows that the Dakota Access pipeline will be a modern pipeline constructed approximately 92 to 115 feet below Lake Oahe and operated in accordance with applicable standards to prevent releases of oil to the environment. Memorandum re: Dakota Access Pipeline; USACE Technical and Legal Review for the

Department of the Army (Feb. 3, 2017) (Ex. A).  A review of the Corps' easement itself shows that it contains requirements related to safe operations and environmental protection. *Id.*

## V.  CONCLUSION

Cheyenne River's motion for a temporary restraining order preventing construction of the Dakota Access pipeline's Lake Oahe crossing should be denied because the Tribe fails to establish any basis for such emergency relief.  Its motion for preliminary injunction can be addressed in an orderly fashion prior to any oil flowing through the not-yet-constructed pipeline without prejudice to the tribe.

Respectfully submitted,

<div style="margin-left:40%">

JEFFREY H. WOOD
Acting Assistant Attorney General
Environment & Natural Resources Division

By:  /s/  *Matthew Marinelli*
MATTHEW MARINELLI, IL Bar 6277967
By:  /s/  *Reuben S. Schifman*
REUBEN S. SCHIFMAN, NY Bar
U.S. Department of Justice
Natural Resources Section
P.O. Box 7611
Benjamin Franklin Station
Washington, DC 20044
Phone: (202) 305-0293 (Marinelli)
Phone: (202) 305-4224 (Schifman)
Fx: (202) 305-0506
matthew.marinelli@usdoj.gov
reuben.schifman@usdoj.gov

ERICA M. ZILIOLI, D.C. Bar 488073
U.S. Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, DC 20044
Phone: (202) 514-6390
Fax: (202) 514-8865
Erica.Zilioli@usdoj.gov

*Attorneys for the United States Army Corps of Engineers*

</div>

OF COUNSEL:

MILTON BOYD
MELANIE CASNER
U.S. Army Corps of Engineers
Office of Chief Counsel
Washington, DC

**CERTIFICATE OF SERVICE**

I hereby certify that, on the 13th day of February, 2017, a copy of the foregoing was filed through the Court's CM/ECF management system and electronically served on counsel of record.

/s/  *Reuben S. Schifman*

Reuben S. Schifman