# EXHIBIT  A

*Standing Rock Sioux Tribe v. United States Army Corps of Engineers*
Case No. 1:16-cv-01534 (JEB)
United States Army Corps of Engineers' Opposition to Cheyenne River Sioux Tribe's
Motion for Temporary Restraining Order



**DEPARTMENT OF THE ARMY**
U.S. ARMY CORPS OF ENGINEERS
441 G STREET, NW
WASHINGTON, DC 20314-1000

REPLY TO
ATTENTION OF

CECG

*3 February 2017*

MEMORANDUM FOR Mr. Doug Lamont, Office of the Assistant Secretary of Army for Civil Works, 108 Army Pentagon, Washington DC 20310-0108

SUBJECT:  Dakota Access Pipeline; USACE Technical and Legal Review for the Department of the Army

1.  The purpose of this memorandum is to comply with the Presidential Memorandum (PM) to the Secretary of the Army dated January 24, 2017, and the Acting Secretary of the Army's Memorandum to the Assistant Secretary of the Army for Civil Works and the Chief of Engineers/Commanding General of the U.S. Army Corps of Engineers, dated January 31, 2017.

2.  I have attached a technical and legal review for the Department of the Army, in accordance with the U.S. Army Corps of Engineers' obligations set forth in Section 2.(a)(i) through 2.(a)(v) of the PM.  The Corps of Engineers recommends that the Deputy Assistant Secretary of the Army for Installations, Housing, and Partnerships make the required notification to the appropriate Congressional committees of the Corps' intent to grant the easement at Lake Oahe, North Dakota to Dakota Access, LLC.  The Corps will grant the easement only after the Congressional notification has been completed and in accordance with Corps regulations.  The Corps also recommends that the Office of the Assistant Secretary of the Army for Civil Works publish a notice in the Federal Register withdrawing the January 18, 2017 notice of intent to prepare an Environmental Impact Statement for the Lake Oahe pipeline crossing.

3.  My points of contact for any questions regarding this memorandum and the enclosed technical and legal review are MG Ed Jackson, Deputy Commanding General for Civil Works and Emergency Operations, and Mr. David Cooper, Chief Counsel, U.S. Army Corps of Engineers.

TODD T. SEMONITE
Lieutenant General, USA
Commanding

Encl


Printed on  Recycled Paper

## DAKOTA ACCESS PIPELINE
## TECHNICAL AND LEGAL REVIEW
## AND RECOMMENDATION TO THE DEPARTMENT OF THE ARMY

### A. Background

The approximately 1,168-mile Dakota Access Pipeline (DAPL) will connect the Bakken and Three Forks oil production region in North Dakota to an existing crude oil market hub near Patoka, Illinois. The pipeline crosses three U.S. Army Corps of Engineers (Corps or USACE) districts: Omaha, Rock Island, and St. Louis. The Corps was required to consider three categories of requests submitted by Dakota Access, LLC (Dakota Access) for: (1) individual verifications that activities at more than 200 locations along the DAPL route satisfied the terms and conditions of Nationwide Permit (NWP) 12 (under the Clean Water Act, 33 U.S.C. § 1344, or the Rivers and Harbors Act of 1899, 33 U.S.C. § 403), which authorizes activities required for the construction of utility lines in federally regulated waters; (2) permissions to cross or lay the pipeline in seven locations used by the Corps for navigation or flood control under section 14 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 408 (section 408); and (3) consent to cross flowage easements in Illinois and at Lake Sakakawea in North Dakota, and a real estate easement to lay the pipeline under a Corps-managed lake (Lake Oahe) and adjacent Corps-managed property in North Dakota. Of the total length of the pipeline, only approximately three percent of its route is subject to Corps jurisdiction. The Corps granted all of the requested NWP 12 verifications for the water crossings associated with the pipeline, granted the permissions for the pipeline to alter, occupy, or use Corps projects under Section 408, and issued consent to cross Corps-held flowage easements at several locations. The only remaining action is for the Corps to determine whether to grant an easement for the pipeline to cross Corps-managed federal lands at Lake Oahe.

The pipeline would cross Lake Oahe at approximately one-half mile upstream of the northern boundary of the Standing Rock Sioux Tribe's (SRST's) reservation. Dakota Access would use a technique called horizontal directional drilling (HDD) to place the pipeline approximately 92 feet below the lakebed. The Corps would need to provide Dakota Access with three separate permissions for this specific crossing. Dakota Access required and received verification that the crossing meets the terms and conditions of NWP 12. Because the pipeline would cross Corps-managed property, section 408 required the Corps to "grant permission for the alteration or permanent occupation or use of [the project] when in the judgment of the Secretary such occupation or use will not be injurious to the public interest and will not impair the usefulness of such work." 33 U.S.C. § 408. Finally, the Corps would need to grant Dakota Access an easement (i.e., a "right-of-way") because the pipeline would cross Corps-managed federal property. 30 U.S.C. § 185(a).

The Corps' consideration of whether to grant the easement for the pipeline to cross under Lake Oahe has been the subject of a robust administrative process. This document describes the various steps and considerations in that process. The most recent consideration is the issuance of a Presidential Memorandum to the Secretary of the Army on January 24, 2017. Presidential Documents, Memorandum of January 24, 2017, Construction of the Dakota Access Pipeline, 82 Fed. Reg. 8661 (Jan. 30, 2017). The Presidential Memorandum requires the Secretary of the



Army to instruct the Assistant Secretary of the Army for Civil Works (ASA(CW)) and USACE, including the Commanding General and Chief of Engineers, "to take all actions necessary and appropriate to . . . review and approve in an expedited manner, to the extent permitted by law and as warranted, and with such conditions as are necessary or appropriate, requests for approvals to construct and operate the DAPL . . ." *Id.* at Sec. 2(a)(i). The Presidential Memorandum also required the Army to perform certain other tasks that are addressed in this technical and legal review.

**B. USACE Has Taken All Necessary and Appropriate Actions Concerning the DAPL, Except for Granting the Easement at Lake Oahe, North Dakota**

**1. USACE issued verifications in July and August 2016 that water crossings associated with the DAPL met the terms of Nationwide Permit 12 and were authorized under Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act.**

The Clean Water Act (CWA) is designed to "restor[e] and main[tain] [the] chemical, physical and biological integrity of [the] Nation's waters." 33 U.S.C. § 1251(a). The CWA prohibits the discharge of any "pollutant," including dredged or fill material, into "navigable waters" without a permit. *See Id.* §§ 1311(a), 1344(a). "[N]avigable waters" means "the waters of the United States," which include, by regulation, certain tributaries and wetlands. *Id.* § 1362(7); 33 C.F.R. § 328.3(a). Under Section 404 of the CWA, the Corps authorizes discharges of dredged or fill material into waters of the United States through individual and general permits. 33 U.S.C. § 1344(a), (e).

Section 10 of the Rivers and Harbors Act of 1899 (RHA) forbids certain activities within the "navigable water of the United States" without the permission of the Corps. 33 U.S.C. § 403; *see also* 33 C.F.R. § 322.3(a) (permits required under Section 10 for "structures and/or work in or affecting navigable waters of the United States"). For purposes of Section 10 of the RHA, Corps regulations define navigable waters as "those waters that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce." 33 C.F.R. § 329.4. The Corps also issues individual or general Section 10 permits.

Congress authorized the Corps to issue general permits for categories of activities to eliminate unnecessary delay and administrative burdens on the public. 33 U.S.C. § 1344(e). The CWA authorizes general permits "for any category of activities involving discharges of dredged or fill material if the Secretary determines that the activities in such category are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e)(1). Any such permit shall "set forth the requirements and standards which shall apply to any activity authorized by such general permit." *Id.* Nationwide permits are general permits and "regulate with little, if any, delay or paperwork certain activities having minimal impacts." 33 C.F.R. §§ 330.2(b) & 330.1(b). The Nationwide Permit program addressing CWA Section 404 also authorizes RHA Section 10 activities.

2/16 TS

The Corps conducts the environmental analysis required for the NWPs when the permits are issued to determine whether the individual and cumulative adverse environmental impacts of the activities authorized are no more than "minimal." 33 U.S.C. § 1344(e). At this stage, the Corps prepares the necessary documentation to satisfy the National Environmental Policy Act, 42 U.S.C. § 4332(2)(C) (NEPA), and imposes guidelines governing compliance with Section 106 of the National Historic Preservation Act, 54 U.S.C. § 306108 (NHPA), and other laws, including the Endangered Species Act 16 U.S.C. § 1536. The Corps further imposes additional terms through "General Conditions" that are applicable to all nationwide permits. Before issuing or reissuing a nationwide permit, CWA Section 404(e) and the Corps' regulations require "an opportunity for public notice and comment." 33 C.F.R. §§ 330.1(b) and 330.5(a)(2); 33 U.S.C. § 1344(e). The Corps memorializes its NEPA analysis and other environmental analyses in a decision document for each NWP. NWPs are valid for five years. On February 16, 2011, the Corps released for public comment draft decision documents containing the NEPA and CWA analysis supporting its proposal to reissue the NWPs. *See* Proposal to Reissue and Modify Nationwide Permits, 76 Fed. Reg. 9174 (Feb. 16, 2011). On February 21, 2012, after reviewing public comments, the Corps published a final rule reissuing NWPs. Reissuance of Nationwide Permits, 77 Fed. Reg. 10,184 (Feb. 21, 2012). The Corps also prepared a decision document for each NWP after evaluating public comments on the proposal.

If a proposed activity meets the terms and conditions of an NWP, including any applicable regional conditions, a potential discharger can assume the activity is authorized by the NWP and may proceed with the activity unless the NWP requires advance approval through a pre-construction notification (PCN). When the Corps receives a PCN, the District Engineer evaluates the proposed activities to ensure compliance with all terms and conditions of the NWP, including compliance with the NHPA. The District Engineer reviews the notification and may add specific conditions to ensure compliance with the NWP and that the activity's adverse impacts are no more than minimal. 33 C.F.R. §§ 330.1(e)(2), (3), and 330.6(a)(3)(i).

With respect to the DAPL, NWP 12 authorizes "[a]ctivities required for the construction, maintenance, repair, and removal of utility lines and associated facilities in waters of the United States, provided the activity does not result in the loss of greater than 1/2-acre of waters of the United States for each single and complete project." 77 Fed. Reg. at 10,271. A "utility line" is "any pipe or pipeline for the transportation of any gaseous, liquid, liquescent, or slurry substance, for any purpose, and any cable, line, or wire for the transmission for any purpose of electrical energy, telephone, and telegraph messages, and radio and television communication." *Id.* at 10,271-72. Work that falls within the parameters of NWP 12 can begin without any further contact with the Corps, unless certain exceptions come into play. The presence of historic and cultural properties is one such exception. Specifically, "[i]n cases where the district engineer determines that the activity may affect properties listed, or eligible for listing, in the National Register of Historic Places, the activity is not authorized, until the requirements of Section 106 of the National Historic Preservation Act (NHPA) have been satisfied." *Id.* at 10,284.

In late December 2014, Dakota Access submitted its initial PCN packages to the Corps and then submitted additional documentation over the next few months to complete the packages. On July 25, 2016, the Corps' Omaha District verified that 12 water crossing requiring PCNs for the pipeline route in North Dakota and South Dakota met the terms and conditions of

NWP 12. *See* Letter, Corps Omaha District to Dakota Access Pipeline, LLC (July 25, 2016)(S.D. Verifications); Letter, Corps Omaha District to Dakota Access Pipeline, LLC, NWO-214-2177-BIS, (July 25, 2016)(N.D. Verifications). On that same date, the Corps' Rock Island District verified that 107 water crossings requiring PCNs for the route in Illinois and Iowa also met the terms and conditions of NWP 12. *See* Letter, Corps Rock Island District to Dakota Access Pipeline, LLC, Subject: CEMVR-OD-P-2014-1313-a (July 25, 2016)(Iowa Verifications);Letter, Corps Rock Island District to Dakota Access Pipeline, LLC, Subject: CEMVR-OD-P-2014-1313 (July 25, 2016)(Illinois Verifications). On July 25, 2016 and August 5, 2016, the Corps' St. Louis District verified that 78 water crossings requiring PCNs in Illinois met the terms and conditions of NWP 12. *See* Letter, Corps Saint Louis District to Dakota Access Pipeline, LLC, File Number: MVS-2014-797 (July 25, 2016)(76 Illinois Verifications); Letter, Corps Saint Louis District to Dakota Access Pipeline, LLC, File Number: MVS-2014-797 (August 5, 2016)(two Illinois verifications). These actions represented all of the NWP 12 verifications for PCNs that Dakota Access required for water crossings associated with the pipeline in accordance with the CWA and RHA.

## 2.   USACE granted the required permissions under the Section 14 of the RHA, 33 U.S.C. § 408 (the Section 408 permissions).

The RHA provides for the "construction, completion, repair, and preservation of" public works. 30 Stat. 1152. Section 14 of the Act, codified in Title 33 of the U.S. Code, addresses navigation and navigable waters. 33 U.S.C. § 408. Section 408, consistent with Congress's goal of preserving navigation, focuses on two factors relevant to navigation. Section 408 generally prohibits taking possession of, using, or impairing Corps-managed projects. It allows the Secretary of the Army to "grant permission for the alteration or permanent occupation or use of . . . public works when in the judgment of the Secretary such occupation or use will not be injurious to the public interest and will not impair the usefulness of such work." 33 U.S.C. § 408.

### a. Section 408 Permission to Cross the Mississippi River Channel

Dakota Access requested permission from the Corps' Rock Island District under Section 408 use HDD to route the pipeline approximately 72 feet below the Mississippi River navigation channel. The Rock Island District prepared environmental documentation under NEPA to consider the required Section 408 permission to alter, occupy, or use the Mississippi River channel. The Corps prepared a record of consideration that documented that the crossing was eligible for a categorical exclusion from further NEPA consideration under Corps regulations. *See* NEPA Checklist for Record of Environmental Consideration (May 10, 2016)(finding that categorical exclusion at Engineering Regulation 200-2-2, para. 9.h.2.(March 4, 1988) applied (categorical exclusion also published at 33 C.F.R. § 230.9(i)(2)). The Rock Island District granted the Section 408 permission to Dakota Access to impact the Mississippi Channel on July 25, 2016. *See* Letter, Corps Rock Island District to Dakota Access (July 25, 2016)(granting permission under Section 408).

**b. Section 408 Permission Concerning Certain Corps Projects and Flowage Easements in Illinois**

Dakota Access requested permission under Section 408 from the Corps' St. Louis District to cross Corps-projects or Corps-held flowage easements in Illinois. The St. Louis District prepared environmental documentation under NEPA to consider the required Section 408 permission to alter, occupy, or use the projects and easement in Illinois. The Corps issued a public notice and solicited public comment on the proposed Corps actions from January 5, 2016 to February 5, 2016. The Corps published a final Environmental Assessment (EA) and Finding of No Significant Impact (FONSI) on August 3, 2016. The St. Louis District granted Dakota Access permission under Section 408 to impact Coon Run Drainage and Levee District, McGee Creek Drainage and Levee District, Illinois River Navigation Channel, and the Carlyle Lake Flowage Easement, Illinois on August 3, 2016. *See* Memorandum, Summary of Finding, Dakota Access Pipeline Section 408 Permission Request (Aug. 3, 2016).

**c. Section 408 Permission Concerning Lake Sakakawea in North Dakota**

Dakota Access requested permission from the Corps' Omaha District to cross a Corps-held flowage easement at the Corps project at Lake Sakakawea. The Omaha District prepared environmental documentation under NEPA to consider the required Section 408 permission to cross the flowage easements. The Corps published a draft EA on December 8, 2015, and made it available for public comment. After reviewing the comments received, the Corps published the final EA and FONSI for the Lake Sakakawea crossing on July 25, 2016. The EA focused on the two determinations required by Section 408, concluding that "the Proposed Action is not injurious to the public interest and will not impair the usefulness of the federal projects." Final EA at 1. The Corps relied on that determination to support its grant of the Section 408 permission. FONSI at 2. The Omaha District Commander formally approved the Section 408 decision document on July 21, 2016. Memorandum, Subject: Dakota Access Pipeline Project, Garrison Project (Consent Flowage Easements), Oahe Project (Easement) (June 10, 2016) (approval signed by District Commander on July 21, 2016). The "approval under Section 408 does not grant any property rights" and the Corps would still need to issue a consent to cross Corps-held flowage easements to allow the crossing at Lake Sakakawea. Engineering Circular 1165-2-216 at ¶ 6(b) (Sept. 30, 2015).

**d. Section 408 Permission Concerning Lake Oahe in North Dakota**

Dakota Access requested permission from the Corps' Omaha District to cross a Corps-managed project at Lake Oahe. For this crossing, Dakota Access would again use the HDD technology and place the pipeline approximately 92 feet below the lakebed. The Omaha District prepared environmental documentation under NEPA to consider the required Section 408 permission to cross Lake Oahe. The Corps published a draft EA on December 8, 2015, and circulated it for public comment. After reviewing the comments received, the Corps published the final EA and FONSI for the Lake Oahe crossing on July 25, 2016. This EA focused on the two determinations required by Section 408, concluding that "the Proposed Action is not injurious to the public interest and will not impair the usefulness of the federal projects." Final EA at 1. The Corps relied on that determination to support granting the Section 408 permission.

FONSI at 2. The Omaha District Commander formally approved the Section 408 decision document on July 21, 2016. Memorandum, Subject: Dakota Access Pipeline Project, Garrison Project (Consent Flowage Easements), Oahe Project (Easement) (June 10, 2016) (approval signed by District Commander on July 21, 2016). The "approval under Section 408 does not grant any property rights" and the Corps would still need to issue an easement to allow the crossing at Lake Oahe. Engineering Circular 1165-2-216 at ¶ 6(b) (Sept. 30, 2015).

## 3. Real Estate Actions.

### a. Consent to Cross Corps-held Flowage Easement at Carlyle Lake, Illinois

In addition to granting permission under Section 408 at Carlyle Lake, the Corps would need to grant formally its consent to cross Corps-held easements to Dakota Access. The Corps' St. Louis District issued Dakota Access the consent to cross a Corp-held flowage easement at Carlyle Lake, Illinois on May 26, 2016. *See* Department of the Army, Consent to Cross U. S. Government Easement at Carlyle Lake Fayette County, Illinois, DACW43-3-16-28 (May 26, 2016).

### b. Consent to Cross Corps-held Flowage Easements at Lake Sakakawea Dakota

In addition to granting permission under Section 408 at Lake Sakakawea, the Corps would need to grant formally its consent to cross Corps-held easements to Dakota Access. The Corps' Omaha District granted Dakota Access this consent on August 2, 2016. *See* Department of the Army, Corps of Engineers, Omaha District, Consent to Easement Structures, DACW45-9-16-8071 (Aug. 2, 2016).

### c. Pending Easement to Cross Corps-managed Federal Lands at Lake Oahe

In addition to granting permission under Section 408 at Lake Oahe, the Corps would need to grant Dakota Access an easement (*i.e.,* a "right-of-way") because the pipeline would cross Corps-managed federal property at the site. 30 U.S.C. § 185(a). Additionally, because of the diameter of the pipeline that would cross federally-owned land, the congressional notification requirements of the Mineral Leasing Act also apply to the DAPL crossing at Lake Oahe. *See* 30 U.S.C. § 185(w)(2). The Corps has reached the point in the administrative process for considering the Dakota Access easement application where the Corps can decide whether to grant the easement and, if so, to provide the required congressional notification.

Since early September 2016, the ASA(CW), with input from other federal executive offices, engaged in further consideration of Dakota Access' request for an easement to cross Lake Oahe. That engagement is described in detail in the following pages. At the same time, the SRST has engaged in litigation challenging the Corps' decisions related to the DAPL. In August 2016, the SRST sought a court order to enjoin preliminarily the U.S. Army Corps of Engineers to withdraw Nationwide Permit 12 as applied to the DAPL, and to withdraw verifications issued on July 25, 2016 for the DAPL to discharge in federally regulated waters at 204 sites along the pipeline route. On September 9, 2016, the court denied the SRST's request. *Standing Rock*

*Sioux Tribe v. U.S. Army Corps of Eng'rs.* No. 16-cv-01534, Memorandum Opinion Denying Plaintiff's Request for Preliminary Injunction, Docket No. 39 (D.C. Dist. Sept. 9, 2016).

Immediately after the federal district court issued its decision denying the SRST's request for an injunction, the Departments of the Army, Interior and Justice issued a joint statement stating that "[t]he Army will not authorize constructing the Dakota Access pipeline on Corps land bordering or under Lake Oahe until it can determine whether it will need to reconsider any of its previous decisions regarding the Lake Oahe site under the National Environmental Policy Act (NEPA) or other federal laws." Joint Statement from the Department of Justice, the Department of the Army and the Department of the Interior Regarding Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers (September 9, 2016). The Department of the Army's resulting review to determine whether it will need to reconsider any of its previous decisions regarding the DAPL's crossing at Lake Oahe focused on six issues. Those issues were:

(1)  Evaluate the North Bismarck route, the basis for selecting the Lake Oahe route as the preferred alternative, and the basis for establishing a 0.5-mile buffer between the northern boundary of the SRST reservation and the pipeline route.

(2)  Evaluate the Fort Laramie Treaties of 1851 and 1868, and other federal laws, and whether the finding in the EA that there are no impacts to treaty fishing or hunting rights is supported. This evaluation would include consideration of any reserved water rights of the SRST.

(3)  Evaluate whether the discussion in the EA of impacts to water intake structures for drinking and irrigation purposes is adequate and consider what role the possible downstream move of the SRST's water intake structure will have in the analysis.

(4)  Evaluate whether the environmental justice discussion in the EA of issues related to the SRST is adequate.

(5)  Determine whether there are any NHPA Section 110 issues that are not before the court already and any other cultural resource issues identified more recently within the area of federal jurisdiction.

(6)  Evaluate the implications of the provision of the 1889 Sioux Act, 25 Stat. 888, which provides that the eastern boundary of the Standing Rock Reservation is "the center of the main channel of the Missouri River . . . down said center of the main channel."

During September and October 2016, representatives of the Corps met with Dakota Access, the SRST, and other tribes, and addressed the information provided in those meetings in its review. Corps headquarters conducted an in-depth 36-page analysis of the issues and determined that the Omaha District adequately considered and disclosed the environmental, cultural, and other potential impacts of its actions, and that its decisions were not arbitrary or capricious with respect to issues one (1) through four (4) and six (6) listed above. *See* Memorandum, Subject Dakota Access Pipeline Crossing at Lake Oahe, North Dakota, (October

20, 2016). Additionally, with respect to those issues, the Corps did not identify any new information indicating that actions by the Department of the Army will affect the quality of the human environment to a significant extent not already considered. *Id.* at 36. Finally, the Corps recommended that additional investigation and analysis be undertaken to determine whether the pipeline was in violation of the CWA and NHPA in certain areas near the Lake Oahe crossing to address issue five. *Id.* The Corps performed a site inspection of those areas on October 20, 2016, with SRST and other interested parties in attendance, and did not find any CWA jurisdiction (and, hence, no CWA violation). Periodic Inspection Report, Permit No. NWO-2014-2177-BIS at 2 (October 26, 2016). Without CWA jurisdiction over those areas, the Corps had no further role with respect to compliance with Section 110(k) of the NHPA, 54 U.S.C. § 306113 (requiring agencies to determine the appropriateness of issuing a related permit if it appears that an applicant has engaged in anticipatory demolition of historic resources with the intent to avoid the requirements of section 106 of the NHPA).

During October 2016, Corps headquarters also prepared a memorandum providing sample easement conditions to enhance protection from any perceived risks associated with the DAPL crossing at Lake Oahe. Memorandum, Subject: Draft Proposed Additional Conditions for an Easement for the Dakota Access Pipeline Crossing at Lake Oahe, North Dakota (October 31, 2016) (October 31 Memorandum). The October 31 Memorandum also addressed the risks of a potential pipeline mishap, concluding that the risks are minimal and that other federal agency findings supported this determination. *Id.* at 1-2 (referencing Department of Interior's BakkenLink Dry Creek to Beaver Lodge Pipeline EA, Risk Assessment and Environmental Consequences Analysis).

On November 14, 2016, the ASA(CW) alerted representatives of the DAPL and the SRST that the Army had completed the review contemplated in the September 9 Joint Statement and had concluded "that its previous decisions comported with legal requirements." Letter from Assistant Secretary of the Army for Civil Works to Energy Transfer Partners, Dakota Access LLC, and the Standing Rock Sioux Tribe (November 14, 2016). The letter also called for "additional discussion" with the SRST on three topics:

> (1) Potential conditions in an easement for the pipeline crossing, which would further reduce the risk of a spill or rupture, hasten detection and response, or otherwise enhance the protection of Lake Oahe, the Tribe's water supplies, and its treaty rights;

> (2) With such conditions, the risk to the Tribe of a spill from the pipeline crossing Lake Oahe at the proposed location; and

> (3) In light of such conditions, whether to grant an easement for the pipeline to cross Lake Oahe at the location currently proposed.

*Id.* at 2.

Following this direction from the ASA(CW), on December 2, 2016, representatives of the Corps' Omaha District, Dakota Access, and the SRST met for five hours in Bismarck, ND to

8/16 115

discuss the issues identified by the ASA(CW) and to address additional requests for information from the SRST. The following day, December 3, 2016, the Corps' Omaha District Commander submitted a memorandum, through Corps headquarters to the ASA(CW), recommending that the Army provide the notice to Congress, required by the Mineral Leasing Act, that the Corps intends to grant the easement for the crossing at Lake Oahe. Memorandum, Subject: Application for an Easement for an Oil Pipeline to Cross U.S. Army Corps of Engineers-Managed Federal Land at Lake Oahe, North Dakota (December 3, 2016), at at pp. 6 and 9 (December 3 Memorandum); *see* Mineral Leasing Act, 30 U.S.C. § 185(w)(2) (requiring congressional "notice of intention to grant the right-of-way" before the right-of-way can be granted). The December 3 Memorandum made specific findings that Dakota Access' application for an easement to cross Lake Oahe complied with Corps policy and statutory requirements. *Id.* The unexecuted easement, which included 36 special conditions on the construction and operation of the DAPL, accompanied the December 3 Memorandum. *Id.*, Exhibit D.

Additionally, on the evening of December 2, 2016, the Corps received ████████ ██████ a draft memorandum prepared by the Solicitor's Office of the Department of Interior (DOI). The DOI memorandum addressed many of the same issues that the Corps considered in its October 20, 2016 memorandum, and made certain assertions about the law under NEPA and about the government's trust relationship with the SRST and other tribes, among other things. After reviewing the DOI memorandum, the Corps ██████████ ████ determined that the Corps addressed the concerns expressed in the DOI memorandum with respect to the proposed DAPL crossing at Lake Oahe in the NEPA documents and additional easement conditions summarized above and attached to this technical and legal review. Moreover, concerns were raised about whether much of the DOI memorandum is legally supportable.

On December 4, 2016, the ASA(CW) issued another memorandum stating, among other things, that "the Army will not grant an easement to cross Lake Oahe at the proposed location based on the current record." Memorandum, Subject: Proposed Dakota Access Pipeline Crossing at Lake Oahe, North Dakota (December 4, 2016), at p. 3. This memorandum also directed the Corps to engage in additional review and analysis concerning the following subjects:

- A robust consideration and discussion of alternative locations for the pipeline crossing the Missouri River, including, but not limited to, more detailed information on the alternative crossing that was considered roughly ten miles north of Bismarck.

- Detailed discussion of potential risk of an oil spill, and potential impacts to Lake Oahe, the Standing Rock Sioux Tribe's water intakes, and the Tribe's water rights as well as treaty fishing and hunting rights; and

- Additional information on the extent and location of the Tribe's treaty rights in Lake Oahe.

*Id.*

In the memorandum dated December 4, 2016, the ASA(CW) also stated that the Corps' analysis would be "best accomplished, in my judgment, by preparing an Environmental Impact Statement." *Id.* The memorandum also stated "that this decision does not alter the Army's position that the Corps' prior reviews and actions have comported with legal requirements." *Id.* at 4.

On January 18, 2017, the ASA(CW) published in the Federal Register a notice of intent to prepare an EIS for the DAPL crossing under Lake Oahe. Notice of Intent to Prepare an Environmental Impact Statement in Connection with Dakota Access, LLC's Request for an Easement to Cross Lake Oahe, North Dakota, 82 Fed. Reg. 5,543 (Jan. 18, 2017) (NOI). The NOI sought public input on three "scoping concerns," which essentially restated the three subjects identified for additional review and analysis in the ASA(CW)'s memorandum dated December 4, 2016: There were: (1) input on alternative locations for the pipeline crossing the Missouri River; (2) input on "[p]otential risks and impacts of an oil spill, and potential impacts to Lake Oahe, the Standing Rock Sioux Tribe's water intakes, and the Tribe's water, treaty fishing, and hunting rights" and (3) "[i]nformation on the extent and location of the [Standing Rock Sioux] Tribe's treaty rights in Lake Oahe." *Id.* The NOI also mentioned that the Corps was developing a plan to implement the December 4, 2016 memorandum and stated that the "notice of public scoping should be integrated into the Corps' plan of action." *Id.*

The Corps previously evaluated the Lake Oahe crossing in an EA that the Corps completed in July 2016. *See* Environmental Assessment, Dakota Access Pipeline Project Crossings of Flowage Easements and Federal Lands (July 25, 2016) (Final EA). The Final EA's scope was "limited to the crossings of Corps-owned lands and flowage easements." Final EA at 3. The Corps "use[d] the information in the EA to make a final determination whether to grant the required 408 permissions" for the Lake Oahe crossing. *Id.* at 4; *see also* Mitigated Finding of No Significant Impact, Dakota Access Pipeline Project, Williams, Morton, And Emmons Counties, North Dakota at p. 2 (July 25, 2016) (FONSI).

## C. USACE Determinations and Findings

The Corps has determined that the Final EA and FONSI, completed in July 2016, also satisfy the NEPA requirements for evaluating the easement required for the DAPL to cross Corps-managed federal lands at Lake Oahe. The EA and FONSI both recognized that a real estate outgrant or an easement would be a required federal action if the pipeline were to be built in the proposed location. Final EA at 3 ("proposed crossings of Corps-owned lands . . . would require the Corps to grant . . . Section 408 permissions as well as real estate outgrants"); FONSI at p. 2 (pipeline would require "real estate actions and Section 10 permits and Section 408 permissions"). The Final EA fully informed decision makers and the public of the environmental effects of the proposed crossing and those of reasonable alternatives, including informing the decision on whether to grant an easement under the Mineral Leasing Act.

Further, the Final EA and FONSI prepared in connection with the DAPL crossing at Lake Oahe are consistent with Corps policy for NEPA documentation supporting a decision to grant an easement for non-recreational purposes, such as an easement granted under the Mineral Leasing Act. *See* Engineering Regulation 1130-2-550, Project Operations and Maintenance,

Guidance and Procedures, Chap. 17, Non-Recreation Outgrant Policy, at para. 17-2 and Appendix F, National Environmental Policy Act Guidance, at para. F-3 (September 30, 2013). Moreover, Corps policy specific to easements granted under the Mineral Leasing Act contemplates relying on public comments and participation from previous NEPA procedures related to the proposal. *See* Engineering Regulation 405-1-12, Real Estate Handbook, Chap. 8-182, Easements for Fuel Pipelines and Related Facilities, at para. c.8 (September 30, 1994).

After reviewing the record in its entirety and giving further consideration to the input received over the past four months, including additional review and analyses of the subjects identified by the ASA(CW), other federal executive offices, and the SRST, the Corps finds that the Final EA concerning the crossing of the DAPL at Lake Oahe is sufficient and does not need further supplementation. The Council for Environmental Quality (CEQ) NEPA regulations require agencies to supplement an EIS or EA when there are "substantial changes in the proposed action that are relevant to environmental concerns," or when "significant new circumstances or information relevant to environmental concerns" comes to light after an EIS or EA is final. 40 C.F.R. § 1502.9(c)(1)(i) and (ii); *see also Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1152 (9th Cir. 1998) (standard for supplementing an EA is the same as for an EIS). In determining whether to prepare a supplemental EIS or EA, an agency is to apply the "rule of reason" based on a consideration of the "value of the new information to the still pending decisionmaking process." *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 373-374 (1989). If a major federal action is to occur and if new information shows that the remaining action will affect the quality of the human environment to a significant extent not already considered, a supplemental EIS must be prepared. *Id.* at 374.

With regard to the proposed crossing of the DAPL underneath Lake Oahe, there are no "substantial changes in the proposed action that are relevant to environmental concerns." 40 C.F.R. § 1502.9(c)(1)(i). The proposed action described in the Final EA has not changed. *See* Final EA at 17 and December 3, 2016 Memorandum at 2. Dakota Access is still proposing to use HDD to place the DAPL at least 92 feet below the Lake Oahe lakebed at the same location in North Dakota. *Id.*

Further, there are no new significant circumstances or information relevant to environmental concerns. 40 C.F.R. § 1502.9(c)(1)(ii). As explained above, the Corps reviewed and analyzed six issues identified by representatives of federal executive offices after the issuance of the September 9 Joint Statement. *See* October 20, 2016 Memorandum, at p. 2 (listing the six issues). Five of those issues raised possible issues about information addressed in the Final EA and FONSI. *Id.* at 2 (issues 1, 2, 3, 4, and 6 related to NEPA and issue 5 related to Section 110 of the NHPA). After carefully reviewing and analyzing each of the five issues, the Corps concluded, and the ASA(CW) confirmed in writing, that formal reconsideration or the preparation of supplemental NEPA document was not required. November 14, 2016 Letter at 1; December 4, 2016 Memorandum at 4.

Additionally, in a series of letters received by the ASA(CW) and the Corps, from September 2016 to December 2016, the SRST raised questions about the proposed crossing of the DAPL at Lake Oahe and the Final EA and FONSI, including issues concerning the federal trust relationship to the Tribe. *See* Letter, SRST to ASA(CW), at p. 2-3 (September 22, 2016).

The SRST also raised these questions in its comments on the Draft EA, which the Corps noted in the Final EA. *See* Letter, SRST to Corps, at pp. 12-13 (January 8, 2016); Letter, SRST to Corps, at pp. 6-11 (March 24, 2016); Final EA, App. J at pp. 9, 16, and 19 (addressing SRST comments related to the trust relationship). Further, the Corps specifically addressed the government's trust relationship with the Tribe in the October 20, 2016 Memorandum, finding that the Corps had complied with any legal obligation under treaties or the trust relationship. *See* October 20, 2016 Memorandum at pp. 14-15.

Based upon a comprehensive and thorough review and analysis of the record, including information provided to the ASA(CW) and to the Corps by the SRST and other interested parties, the questions raised about the trust relationship between the government and the Tribe have not presented new circumstances or information that would require supplemental NEPA documentation. The Corps and the ASA(CW) already considered these questions.

The letters submitted by the SRST also raised questions about the Corps' analysis of alternatives. *See* Letter, SRST to ASA(CW), at pp. 10-11 (September 22, 2016); Letter, SRST to ASA(CW) at pp. 1-3 (October 3, 2016). The SRST faulted the Corps' alternative analysis in comments on the Draft EA. *See* Letter SRST to Corps at pp. 1-2 (January 8, 2016); Letter, SRST to Corps at p. 11 (March 24, 2016). The Final EA acknowledged the SRST's comments on alternatives, as well as general comments received by other parties regarding alternatives, and provided responses to those comments. Final EA, App. J at pp. 10, 15, & 16. The Corps also addressed the alternatives analysis in the Final EA in the October 20, 2016 Memorandum and found that the analysis was legally sufficient. *See* October 20, 2016 Memorandum at p. 10. The SRST's issues concerning the alternatives analysis do not raise significant new circumstances or information that would require supplemental NEPA documentation. The issues were considered by the Corps and by the ASA(CW).

Finally, in its letters to the ASA(CW) and the Corps, the SRST raised concerns about risks from oil spills that could occur during pipeline operations. *See* Letter, SRST to ASA(CW) at pp. 7-8 and 11-12 (September 22, 2016); Letter, SRST to ASA(CW) at pp. 5-7 (October 3, 2016); Letter, SRST to ASA(CW) (October 28, 2016) (including a report from SRST consultant addressing risk of oil spill). Further, the Tribe also raised concerns about how a pipeline spill could impact treaty fishing, hunting or reserved water rights, as well as the Tribe's water intakes from Lake Oahe. *See, e.g.,* Letter, SRST to ASA(CW) at p. 7 (September 22, 2016); Letter, SRST to ASA(CW) (December 2, 2016).

The SRST raised essentially the same concerns about risks from oil spills in its comments on the draft EA, and the Corps addressed those concerns and comments in the Final EA. *See* Final EA, App. J, at pp. 8, 9, and 17. The Corps also reviewed the treaty fishing, hunting or reserved water rights, as well as the Tribe's water intakes issues in the Final EA and in the October 20, 2016 Memorandum. *See* October 20, 2016 Memorandum at pp. 10-15 (addressing treaty fishing and hunting rights and reserved water rights) and pp. 16-21(addressing water intakes). The Corps addressed the risks of oil spills in the Final EA and in the October 20, 2016 Memorandum, as well. *See* Final EA at 87 and October 20, 2016 Memorandum at p. 27. Finally, the Corps also address the risks of an oil spill in the October 31, 2016 Memorandum. *See* October 31, 2016 Memorandum at p. 2 (noting that the finding of low risk is consistent with

other federal agency findings). In expressing its concerns about the risks of oil spills and the potential impacts on treaty fishing, hunting or reserved water rights, as well as the Tribe's water intakes, the SRST has not raised significant new circumstances or presented any new information that would require supplemental NEPA documentation. The Corps and the ASA(CW) considered all of these issues.

The Corps addressed issues raised by the SRST in addition to the formal NEPA process. The Corps developed a possible range of easement conditions that would add to and clarify the draft easement conditions outlined in the FONSI. *See* FONSI at 3-5 (listing easement conditions); *See* October 31, 2016 Memorandum at p. 2 and Attachment 2, Proposed Additional Draft Easement Conditions. These proposed draft easement conditions would further mitigate any risks to the Tribe from any oil spill. Moreover, at the request of the ASA(CW), the Tribe, the Corps, and Dakota Access met face-to-face in Bismarck on December 2, 2016 and discussed the possible range of easement conditions that might allay the SRST's concerns. The Corps has adopted a set of 36 special conditions for the Lake Oahe easement that add to and clarify the original nine special conditions in the easement that were described in the FONSI. *See* FONSI at 3-4. The 36 special conditions were based on the October 31, 2016 proposed draft conditions and the Corps has made them part of the easement prepared for the Lake Oahe crossing. *See* December 3, 2016 Memorandum and Unexecuted Easement, para. 29 (incorporating special conditions in Exhibit D into the easement).

Moreover, the December 2, 2016 draft DOI memorandum mentioned above, which was issued as a final legal opinion from the DOI Office of the Solicitor on December 4, 2016, and subsequently published on the DOI website (*see* M-37038), addresses a series of issues rooted in the perceived risk that the DAPL would leak into Lake Oahe. As explained in the Final EA and the October 20, 2016 Memorandum, that risk is low. That low risk was further mitigated by the easement conditions described in the October 31, 2016 Memorandum, restated in the December 3, 2016 Memorandum, and incorporated in the unexecuted easement accompanying the December 3, 2016 Memorandum. The December 3, 2016 Memorandum and accompanying unexecuted easement were publicly filed with the District Court for the District of Columbia on January 6, 2017. *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs.* No. 16-cv-01534, U.S. Army Corps of Engineers Motion to Dismiss, Exhibit 14, Docket No. 73-14 (D.C. Dist. filed Jan. 6, 2017). The DOI Solicitor's opinion does not address the additional conditions included in the easement. Pursuant to the review directed by the January 24, 2017 Presidential Memorandum, the Corps has concluded that the additional easement conditions address the concerns set forth in the DOI opinion by mitigating the already low risk of an oil spill into Lake Oahe.

Based on the foregoing determinations and findings, the Corps recommends that the Army, acting through the Office of the ASA(CW), find that all of the prior reviews and determinations by the Corps, including the EA and FONSI issued in July 2016, satisfy all applicable requirements of NEPA, and any other applicable provisions of law. *See* Presidential Document, Memorandum of January 24, 2017, Construction of the Dakota Access Pipeline, Sec. 2(a)(iii), 82 Fed. Reg. 8,661 (January 30, 2017).

**D. The Army Does Not Need to Rescind or Modify the December 4, 2016 Memorandum, but Should Publish in the Federal Register a Notice of Withdrawal of the NOI to Prepare an EIS**

The ASA(CW)'s December 4, 2016 Memorandum includes a discretionary policy determination based on a particular view of Dakota Access' application for an easement to cross under Lake Oahe. *Id.* at p. 4 (stating "[m]y decision acknowledges and addresses that a more robust analysis of alternatives *can* be done and *should* be done, under these circumstances, before an easement is granted for the Dakota Access Pipeline to cross the Missouri River on Corps land"[emphasis added]). The December 4, 2016 Memorandum did not result in any final agency action with regard to the easement application, however. In fact, the December 4, 2016 Memorandum specifically contemplated further administrative consideration and processing of Dakota Access' easement application.

The ASA(CW)'s policy determination in the December 4, 2016 Memorandum, while within her discretion, was not compelled by the law. Moreover, the ASA(CW) did not identify any legal reason to require the "heightened analysis" described in the December 4, 2016 Memorandum. The record of reviews, analyses, and determinations conducted and made during the last four months and summarized in this technical and legal review, and in the documents referenced herein, fully supports issuing the easement for the pipeline crossing at Lake Oahe at this time without additional study because the Corps found that the proposed action did not have a significant effect on the human environment that would require the preparation of an EIS. *See* FONSI at 6 and October 20, 2016 Memorandum at 36. Further, the CEQ's NEPA regulations support relying on the Final EA and FONSI. 40 C.F.R. § 1500.5(l)("Agencies shall reduce delay by . . . [u]sing a [FONSI] when an action . . . will not have a significant effect on the human environment . . . and is therefore exempt from requirements to prepare an [EIS]").

Because the determinations made in the December 4, 2016 Memorandum reflect the exercise of the former ASA(CW)'s policy discretion, and that Memorandum was not a final agency action, the Army has the authority to make a different decision based on an evaluation of the record before it and the requirements of NEPA and any other applicable laws. Moreover, because the December 4, 2016 Memorandum is not a final agency action, the Army would not need to rescind or modify it. A decision to approve the granting of the easement to Dakota Access would reflect the Army's intent to not be bound by the policy determination in the December 4, 2016 Memorandum and would serve to conclude the administrative process.

However, the Corps does recommend that the Army issue a notice in the Federal Register withdrawing the notice of intent to prepare an EIS. Withdrawing a notice of intent when an agency no longer plans to complete an EIS is contemplated under NEPA and is not unusual. *See, e.g.,* Withdrawal of Notice of Intent for the Environmental Impact Statement Process for the Delta Wetlands Project in San Joaquin and Contra Costa, Counties, California, 82 Fed. Reg. 8,827 (January 31, 2017); Withdrawal of Notice of Intent To Prepare an Environmental Impact Statement for the Proposed Lower Passaic River Ecosystem Restoration Project, Essex, Hudson, Passaic, and Bergen Counties, NJ: Feasibility Phase, 81 Fed. Reg. 85,944 (November 29, 2016). The withdrawal notice contains brief background information and brief statement explaining the reason for the withdrawal. *Id.* We have attached a draft withdrawal notice to this memorandum.

**E.  USACE Recommends that the Army Notify Congress of the Intent to Grant the Easement at Lake Oahe, and that USACE Waives Part of the Post-Notification Waiting Period**

The Mineral Leasing Act prohibits an agency from granting an easement through federal lands for pipeline purposes until "a notice of intention to grant the right-of-way" together with the agency's detailed findings as to the terms and conditions the agency "proposes to impose, has been submitted" to the Committee on Natural Resources of the United States House of Representatives and the Committee on Energy and Natural Resources of the United States Senate. 30 U.S.C. § 185(w)(2).  For the reasons set forth in the December 3, 2016 Memorandum, the Corps finds that the issuance of the easement attached to that Memorandum to Dakota Access complies with the requirements of the Mineral Leasing Act.  Accordingly, the Corps recommends that the Deputy Assistant Secretary of the Army for Installations, Housing, and Partnerships make the required notification to the appropriate Congressional committees of the Army's intent to grant the easement at Lake Oahe.  A draft notification package is forthcoming.

Corps policy is to wait 14 days following notification of the appropriate Congressional committees of an intent to grant an easement under the Mineral Leasing Act, unless the committees provide an "affirmative response."  Memorandum, Subject: Real Estate Policy Guidance Letter No. 27 - Official U.S. Army Corps of Engineers Real Estate Policy, at p. 1 (October 29, 2008) (PGL 27).  The 14-day notice period is not a requirement of the Mineral Leasing Act, or of any other federal law, but is purely an internal Corps policy.  Thus, the Corps has the discretion to waive this post-notification waiting period.

On July 28, 2016, Dakota Access requested that the Corps waive the post-notification waiting period.  To date, the Corps has not made a decision on whether to grant Dakota Access' waiver request because the Corps had not received approval from the Army to grant the easement and the Corps had not made a decision on whether to grant the easement.  Given the unique visibility of this matter, the fact that the Corps' recommendation to notify Congress of the proposed easement and the proposed easement itself have been publicly available since January 6, 2017, and, particularly, the directives in the Presidential Memorandum published in the Federal Register on January 30, 2017 (*see* Sec. 2.(a)(iv) of the Presidential Memorandum), the Corps finds that a shorter post-notification waiting period would be permitted by law, policy, and warranted.  Therefore, once the Army has completed the required Congressional notification, the Corps intends to grant in part Dakota Access' request for a waiver of the 14-day post-notification waiting period.  Thereafter, the Omaha District may execute the easement with Dakota Access at a time that is mutually convenient for the signatories to the easement.

**F.  Attachments (incorporated by reference)**

1. Memorandum, Subject: Dakota Access Pipeline Crossing at Lake Oahe, North Dakota (October 20, 2016).
2. Memorandum, Subject: Draft Proposed Additional Conditions for an Easement for the Dakota Access Pipeline Crossing at Lake Oahe, North Dakota (October 31, 2016).

15/16 TT5

3. Memorandum, Subject: Application for an Easement for an Oil Pipeline to Cross U.S. Army Corps of Engineers-Managed Federal Land at Lake Oahe, North Dakota (December 3, 2016).
4. Draft Federal Register Withdrawal of Notice of Intent.



**DEPARTMENT OF THE ARMY**
**U.S. ARMY CORPS OF ENGINEERS**
**441 G STREET, NW**
**WASHINGTON, DC 20314-1000**

REPLY TO
ATTENTION OF

CECC-ZA                                                                   October 20, 2016

MEMORANDUM THRU Deputy Commanding General for Civil Works and Emergency
Operations, U.S. Army Corps of Engineers

FOR Assistant Secretary of the Army for Civil Works

SUBJECT: Dakota Access Pipeline Crossing at Lake Oahe, North Dakota

1. The purpose of this memorandum and enclosure is to provide information to the
Department of the Army to enable it to determine whether it will need to reconsider any
of its previous decisions regarding the location of the Dakota Access Pipeline (DAPL) at
the Lake Oahe site in North Dakota under the National Environmental Policy Act
(NEPA), 42 U.S.C. § 4231 *et seq.*, or other federal laws, as indicated in the "Joint
Statement from the Department of Justice, the Department of the Army and the
Department of the Interior Regarding Standing Rock Sioux Tribe v. U.S. Army Corps of
Engineers," dated September 9, 2016 (Joint Statement).

2. Applying the "hard look" standard of review under NEPA, we have concluded that the
Corps' Omaha District adequately considered and disclosed the environmental, cultural
and other potential impacts of its actions and that its decisions were not arbitrary or
capricious. We have also concluded that supplementation of the Environmental
Assessment (EA) to address any new information is not required at this time. Applying
the applicable law under NEPA, we have not identified any new information indicating
that actions by the Department of the Army will affect the quality of the human
environment to a significant extent not already considered. However, we recommend
that additional investigation and analysis be undertaken to determine whether the DAPL
is in violation of the Clean Water Act and National Historic Preservation Act in the areas
identified in the Tribe's September 2, 2016 court filing.

3. If you have any questions about this memorandum or the enclosure, please contact
Milton Boyd or me.

Encl

DAVID R. COOPER
Chief Counsel



Printed on Recycled Paper

## TECHNICAL AND LEGAL ANALYSIS OF PREVIOUS CORPS DECISIONS REGARDING THE DAPL CROSSING AT LAKE OAHE

### INTRODUCTION AND BACKGROUND

The approximately 1,168 mile DAPL will connect the Bakken and Three Forks oil production region in North Dakota to an existing crude oil market hub near Patoka, Illinois.  The pipeline crosses three Corps districts: Omaha, Rock Island and St. Louis. The Corps was required to consider three categories of requests submitted by Dakota Access, LLC (Dakota Access) for: (1) individual verifications that activities at more than 200 locations along the DAPL route satisfied the terms and conditions of Nationwide Permit (NWP) 12 (under the Clean Water Act, 33 U.S.C. § 1344, or the Rivers and Harbors Act of 1899, 33 U.S.C. § 403), which authorizes activities required for the construction of utility lines in federally regulated waters; (2) a real estate easement to lay the pipeline under a Corps-managed lake (Lake Oahe) and adjacent Corps-managed property; and (3) permissions to cross or lay the pipeline in seven locations used by the Corps for navigation or flood control under section 14 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 408 (section 408).  Of the total length of the pipeline, only approximately three percent of the pipeline route is subject to Corps jurisdiction.

The pipeline would cross Lake Oahe at approximately one-half mile upstream of the northern boundary of the Standing Rock Sioux Tribe's (SRST's) reservation.  Dakota Access would use a technique called horizontal directional drilling (HDD) to place the pipeline approximately 92 feet below the lake bed.  The Corps would need to provide Dakota Access with three separate permissions for this specific crossing.  Dakota Access required and received verification that the crossing meets the terms and conditions of NWP 12.  Because the pipeline would cross Corps-managed property, section 408 required the Corps to "grant permission for the alteration or permanent occupation or use of [the project] when in the judgment of the Secretary such occupation or use will not be injurious to the public interest and will not impair the usefulness of such work." 33 U.S.C. § 408.  Finally, the Corps would need to grant Dakota Access an easement (*i.e.,* a "right-of-way") because the pipeline crosses Corps-managed federal property.  30 U.S.C. § 185(a).

The Omaha District prepared environmental documentation under NEPA to support the required section 408 permission to cross Lake Oahe.  The District published a draft EA on December 8, 2015, which was circulated for public comment.  *See* 40 C.F.R. § 1508.9 (defining EAs).  After reviewing the comments received, the Corps published the final EA and a Finding of No Significant Impact (FONSI) for the crossing on July 25, 2016.[1]  *See* 40 C.F.R. § 1508.13 (defining FONSIs)

The SRST initiated litigation in the U.S. District Court for the District of Columbia immediately after the Corps decision on the NWP 12 verifications and section

---

[1] This EA also included an analysis of the DAPL crossing of Corps flowage easements at Lake Sakakawea. There is a second EA and FONSI, completed in 2012, covering activities authorized under NWP 12.  The EA and FONSI covering activities under NWP 12 are not at issue in this matter.

408 Lake Oahe decision.  The SRST sought a preliminary injunction suspending the Corps verifications that water crossings associated with the pipeline met the terms and conditions of NWP 12.  The SRST's request focused on alleged failures by the Corps in consultations under section 106 of the National Historic Preservation Act, 54 U.S.C. § 306108 (NHPA).  The court denied the SRST's request on September 9, 2016.  The SRST immediately appealed that decision to the U.S. Circuit Court of Appeals for the District of Columbia Circuit, where the matter is currently pending.

<u>**ISSUES FOR PRELIMINARY CONSIDERATION**</u>

Immediately after the D.C. District Court issued its decision on the SRST's request for an injunction, the Departments of Justice, the Army, and the Interior issued the Joint Statement referenced in the memorandum above.  The following week, representatives of those departments identified six issues for the Department of the Army to consider, preliminarily, to determine whether it will need to reconsider any of its previous decisions regarding DAPL's location at Lake Oahe.  Those issues are:

1.  Evaluate the North Bismarck route, the basis for selecting the Lake Oahe route as the preferred alternative, and the basis for establishing a 0.5 mile buffer between the northern boundary of the SRST reservation and the pipeline route.

2.  Evaluate the Fort Laramie Treaties of 1851 and 1868, and other federal laws, and whether the finding in the EA that there are no impacts to treaty fishing or hunting rights is supported.  This evaluation would include consideration of any reserved water rights of the SRST.

3.  Evaluate whether the discussion in the EA of impacts to water intake structures for drinking and irrigation purposes is adequate and consider what role the possible downstream move of the SRST's water intake structure will have in the analysis.

4.  Evaluate whether the environmental justice discussion in the EA of issues related to the SRST is adequate.

5.  Determine whether there are any NHPA Section 110 issues that are not before the court already and any other cultural resource issues identified more recently within the area of federal jurisdiction.

6.  Evaluate the implications of the provision of the 1889 Sioux Act, 25 Stat. 888, which provides that the eastern boundary of the Standing Rock Reservation is "the center of the main channel of the Missouri River . . . down said center of the main channel."

<u>**STANDARD OF REVIEW**</u>

In examining the issues identified above, we applied a standard of review that is used by the courts in evaluating federal actions under NEPA.  Although an agency has discretion over whether to perform additional NEPA analysis, we have looked to the

courts for general guidance on exercising that discretion.  NEPA requires the federal government to identify and assess in advance the likely environmental impact of its proposed actions, including its authorization or permitting of private actions.  *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756-57 (2004).  As is well established, NEPA is "essentially procedural."  *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978).  It does not mandate "particular substantive environmental results;" rather, it "focus[es] Government and public attention on the environmental effects of proposed agency action."  *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1989).  NEPA is intended to foster better decision making and informed public participation for actions that affect both people and the natural environment.  *See* 42 U.S.C. § 4321; 40 C.F.R. § 1501.1(a).  The statute serves those purposes by requiring federal agencies to take a "hard look" at the environmental consequences of proposed actions in advance of deciding whether and how to proceed.  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350-51 (1989).

NEPA's "hard look" doctrine is designed "to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious."  *Nat'l Comm. for the New River v. FERC*, 373 F.3d 1323, 1327 (D.C. Cir. 2004).  Accordingly, the D.C. Circuit has consistently instructed that a reviewing court is not to "flyspeck an agency's environmental analysis" looking for any deficiency, no matter how minor.  *Minisink Residents for Envtl. Pres. & Safety v. FERC*, 762 F.3d 97, 112 (D.C. Cir. 2014) (internal quotation omitted); *see also Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 75 (D.C. Cir. 2011); *Nevada v. Dep't of Energy*, 457 F.3d 78, 93 (D.C. Cir. 2006).

Under NEPA an agency is "only required to adequately assess the information that is available."  *Fla. Coal. for Peace & Justice v. Bush*, CIV. A. No. 89-2682-OG, 1990 WL 157934, at *4 (D.D.C. Oct. 5, 1990).  Thus, NEPA does not require that an agency "halt action in the face of uncertain information -- it just requires disclosure that such information is lacking, and commands the agency to provide as comprehensive an analysis as it can with the information available to it."  *Oceana v. Bureau of Ocean Energy Mgmt.*, 37 F. Supp. 3d 147, 159-60 (D.D.C. 2014) (citing 40 C.F.R. § 1502.22).

If "significant new circumstances or information relevant to environmental concerns" comes to light after an EIS or EA is final, an agency should consider whether a supplemental EIS or EA is merited.  40 C.F.R. § 1502.9(c); *see also Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1152 (9th Cir. 1998) (standard for supplementing an EA is the same as for an EIS).  When determining whether to prepare a supplemental EIS or EA an agency is to apply the "rule of reason" based on a consideration of the "value of the new information to the still pending decisionmaking process."  *Marsh*, 490 U.S. at 373-374.  If there is major federal action to occur and if new information shows that the remaining action will affect the quality of the human environment to a significant extent not already considered, a supplemental EIS must be prepared.  *Id*. at 374.  However, "a reduction in the environmental impact is less likely to be considered a substantial change relevant to environmental concerns than would be an increase in the environmental impact."  *Friends of the Bow v. Thompson*, 124 F.3d 1210, 1218-19 (10th Cir. 1997); *see*

3

*also Arkansas Wildlife Fed'n v. Corps*, 431 F.3d 1096, 1103 (8th Cir. 2005) (holding no supplemental EA was necessary where the Corps adequately considered the environmental impact of the proposed changes and reasonably concluded that they were not significant and that any environmental impact appears to be positive rather than negative).

**DISCUSSION**

1.  Evaluate the North Bismarck route, the basis for selecting the Lake Oahe route as the preferred alternative, and the basis for establishing a 0.5 mile buffer between the northern boundary of the SRST reservation and the pipeline route.

A.  EA Discussion



Route Alternative, North of Bismarck.
Source:  Final EA, Figure 13.

The Corps limited its analysis in the EA to "pipeline placement on federal real property interests administered by the Corps."  Final EA at 7.  The Corps evaluated major route alternatives for the pipeline route as a whole.  *Id.*  Dakota Access began the route selection process using a "sophisticated and proprietary Geographic Information System (GIS)-based routing program."  *Id.*  This program took into account a number of variables, including, but not limited to, existing pipelines, environmental considerations and land use, to develop potential pipeline routes.  *Id.*  From this initial analysis, the Corps further evaluated two of the route alternatives.  The first alternative was a route that would avoid crossing Corps-held flowage easements around Lake Sakakawea.  *Id.*  The second alternative was a route that took the pipeline crossing of the Missouri River 10 miles north of Bismarck, North Dakota.  Final EA at 7-8.  The Corps considered the North Bismarck crossing a viable alternative even though early in the pipeline planning process Dakota Access eliminated this alternative from consideration.  *Id.*

The discussion of the North Bismarck route alternative was succinct:

Early in the routing phase of the [pipeline] Project, Dakota Access considered but eliminated an alternative centerline that originated in Stanley, North Dakota, within Mountrail County, where it connected to customer receipt points and headed southwest through Williams County and crossed the Missouri River approximately 8.5 miles east of the Yellowstone River and Missouri River confluence (Figure 12). The centerline then headed southeast across the state and crossed Lake Oahe approximately 10 miles north of Bismarck (Figure 13), where it then headed south again and entered South Dakota approximately 35 miles east of Lake Oahe in McIntosh County. In addition to other evaluation criteria listed in Table 2.1, the route alternative was in proximity to and/or crossing multiple conservation easements, habitat management areas, National Wildlife Refuges, state trust lands, waterfowl production areas, and private tribal lands.

As a result of public input and comment during this EA process, additional desktop evaluation of the North Bismarck alternative portion of the early route (Figure 13) was undertaken. The comparison of this alternative to the preferred route is included in Tables 2-1 and 2-2 contained herein. As illustrated in the tables, the data substantiates eliminating this route as a viable alternative. While the alternative does avoid Corps fee owned land at Lake Oahe; therefore, would not require a Corps real estate outgrant or Corps EA review, approximately 11-miles of length would be added to the pipeline route, consisting of roughly 165 additional acres of impact, multiple additional road crossings, waterbody and wetland crossings, etc. In addition to the criteria shown in the tables, due to the proximity to Bismarck, the North Bismarck route alternative crossed through or in close proximity to several wellhead source water protection areas that are identified and avoided in order to protect areas that contribute water to municipal water supply wells. The route was also severely constrained by the North Dakota Public Service Commission's 500-ft residential buffer requirement at multiple locations. Furthermore, this route alternative crossed other populated PHMSA [Pipeline and Hazardous Materials Safety Administration] high consequence areas (HCAs) that are not present on the preferred route. Pipeline safety regulations use the concept of HCAs to identify specific locales where a release from a pipeline could have the most significant adverse consequences.

Final EA at 8.

The EA contained two charts, both labeled as Table 2-1, which compared the North Bismarck route alternative to the Dakota Access preferred route alternative that crossed Corps-managed property at Lake Oahe.

| Table 2-1<br>Alternatives Evaluation Matrix Between Preferred Crossing at Lake Oahe and Alternative Crossing North of Bismarck | | | |
|---|---|---|---|
| **Evaluation Factors** | **ALTERNATIVE ROUTE Crossing North of Bismarck** | **PREFERRED ROUTE Crossing at Lake Oahe** | **PREFERRED COMPARED TO ALTERNATIVE ROUTE** |
| Total Overall Route Mileage | | | |
| Total Mileage | 111.0 | 100.4 | -10.6 |
| Collocation | | | |
| Pipeline (mi) | 0.0 | 34.6 | +34.6 |
| Powerline (mi) | 2.9 | 6.1 | +3.2 |
| *Overall Corridor Collocation (%)* | 3% | 41% | +38% |
| Amount of Greenfield Crossed (non-collocated areas-mi) | 108.1 | 59.6 | -48.4 |
| Existing Pipeline Crossing (count) | | | |
| Crossing Count | 6 | 10 | +4 |
| Floodplain 100 Year | | | |
| Floodplain Crossings (Count) | 13 | 2 | -11 |
| Total Mileage | 1.4 | 0.2 | -1.2 |
| Land Cover Types (mi) | | | |
| Agriculture | 42.5 | 36.1 | -6.4 |
| Developed/Low Intensity | 0.2 | 0.1 | -0.1 |
| Developed/Open Space | 6.6 | 2.0 | -4.6 |
| Grass/Pasture | 59.3 | 60.7 | +1.4 |
| Land Ownership Potential Conflicts | | | |
| USACE Reservoirs - Lake Oahe | 0 | 1 | +1 |
| Flowlines - NHD* | | | |
| Waterbody Count | 149 | 116 | -33 |

Final EA at 9.

| Table 2-1<br>Alternatives Evaluation Matrix Between Preferred Crossing at Lake Oahe and Alternative Crossing North of Bismarck | | | |
|---|---|---|---|
| **Evaluation Factors** | **ALTERNATIVE ROUTE Crossing North of Bismarck** | **PREFERRED ROUTE Crossing at Lake Oahe** | **PREFERRED COMPARED TO ALTERNATIVE ROUTE** |
| Waterbodies- NHD* | | | |
| Perennial | 3 | 1 | -2 |
| Intermittent | 1 | 0 | -1 |
| NWI Wetland (count) | | | |
| Freshwater Emergent Wetland | 26 | 5 | -21 |
| Freshwater Forested/Shrub Wetland | 1 | 0 | -1 |
| Freshwater Pond | 2 | 0 | -2 |
| PHMSA Populated Areas Dissolved (mi) | | | |
| Ecological HCA | 2.6 | 2.6 | 0 |
| Highly Populated Areas | 0 | 0 | 0 |
| Other Populated Areas | 1.6 | 0 | -1.6 |
| Drinking Water HCA | 0 | 0 | 0 |
| Powerline Crossing | | | |
| Total Crossing Count | 14 | 13 | -1 |
| Transportation Crossing | | | |
| Total Crossing Count | 139 | 112 | -27 |

* Flowline and waterbody crossings from the U.S. Geological Survey (USGS) National Hydrography Dataset

6

Final EA at 10.

The EA also contained a chart that compared costs between the North Bismarck route and the preferred route alternative:

| | | | PREFERRED ROUTE Crossing at Lake Oahe | |
|---|---|---|---|---|
| **Table 2-2** **Construction Cost Comparison Between Crossing at Lake Oahe and Alternative Crossing North of Bismarck** | | | | |
| | **ALTERNATIVE ROUTE Crossing North of Bismarck** | | **PREFERRED ROUTE Crossing at Lake Oahe** | |
| Length of Segment | 111.0 | miles | 100.4 | miles |
| | 585,974 | feet | 530,112 | feet |
| Cost for Road/Railroad Bores | | | | |
| Number of Road/Railroad Bores | 139 | bores | 112 | bores |
| Total Cost for Road Bores (at $34,600/bore) | $ 4,809,400 | USD | $ 3,875,200 | |
| Cost of Installation for Non-HDD Areas | | | | |
| Length of Pipeline Non-HDD | 580,008 | feet | 522,312 | feet |
| Total Cost for Installation of Non-HDD Section | $ 201,262,915 | USD | $ 181,242,264 | USD |
| Horizontal Directional Drill (HDD) Across Mo River/Lake Oahe | | | | |
| Length of HDD | 5,966 | feet | 7,800 | feet |
| Total Cost of HDD Crossing | $ 7,696,140 | USD | $ 10,062,000 | USD |
| Cost of Geotechnical Investigation | | | | |
| | $ 140,000 | USD | $110,000 | USD |
| Aboveground Facility Costs | | | | |
| Mainline Valves Needed (one per each 10 mile segment) | 11 | valves | 10 | valves |
| Total Cost of Mainline Valves (at $450,000/valve location) | $ 4,995,000 | USD | $ 4,500,000 | USD |
| Right-of-Way Acquisition Costs (at $37/foot) | $ 21,681,053 | USD | $ 19,614,144 | USD |
| Additional Cost Including Engineering and Consultants (at $131,000/mile) | $ 14,538,380 | USD | $ 13,152,400 | USD |
| **Total Cost of Alternative** | **$ 255,122,888** | **USD** | **$ 232,556,008** | **USD** |

Final EA at 11.

B.  Analysis

Although the discussion of the North Bismarck route was brief, it provided sufficient reasons for why Dakota Access chose the preferred alternative that crossed Lake Oahe north of the SRST reservation.  The preferred route avoided tribal land, was co-located with an existing natural gas pipeline, complied with North Dakota rural residence avoidance requirements, had fewer water crossings and avoided HCAs as identified by PHMSA.  The preferred route was also less expensive than the alternative, but cost was not identified as a reason for selecting the preferred route.  *See* Final EA at 11, Table 2-2.

As noted above, the preferred route would cross Lake Oahe at approximately 0.5 miles north of the SRST reservation.  The EA discussed the use of a 0.5 mile buffer in its environmental justice analysis.  It stated that "linear projects typically use a 0.5 mile buffer area to examine Environmental Justice effects" and provided three docket numbers from natural gas pipeline projects evaluated by the Federal Energy Regulatory

7

Commission to support this choice. Final EA at 84 and 87. The three docket numbers cited as support are actually tied to the same project. Final Environmental Impact Statement, Corpus Christi LNG Project (October 2014). However, there is additional support for this approach. *See, e.g.,* Julianna Maantay, Mapping Environmental Injustices: Pitfall and Potential of Geographic Information Systems in Assessing Environmental Health and Equity, 110 Environmental Health Perspectives 161, 164 (April 2002) (stating that "buffer zones are intended to act as surrogates for the areas of impact and are usually established as circles with a radius of one-half mile or 1 mile, or other appropriate distance, from the noxious land use"); David Forkenbrock, Jason Shelly, Effective Methods for Environmental Justice Assessment, 319 (2004) (providing example of a linear transportation project that used a half-mile buffer). Dakota Access used the 0.5 mile buffer in the routing software it applied for siting the pipeline and also used it to avoid certain types of land, such as tribal lands. Final EA at 7.

In any event, the actual location of the preferred Lake Oahe crossing focused more on co-locating the pipeline with an existing right-of-way for an existing natural gas pipeline than on any perceived requirement to maintain a 0.5-mile buffer from the SRST reservation or on whether risks were greater for the North Bismarck route than for the crossing near the SRST reservation. Table 2-1 shows that the preferred route is co-located with other pipelines or utility corridors along 41 percent of the route, while the North Bismarck alternative is only co-located with other pipelines or utility corridors along three percent of the route. The EA and FONSI both discussed how co-location of the pipeline with other established utility corridors helped to minimize direct and cumulative environmental impacts. FONSI at 6; Final EA at 86 and 98. Co-location helped to minimize impacts to sensitive environmental and cultural resources as this route would limit impacts to undisturbed areas. The following map from the EA shows the co-location of the proposed pipeline with an existing pipeline at Lake Oahe.



Final EA at 1008.

The preferred alternative also presented other advantages. North Dakota law requires pipelines to have an avoidance setback of 500 feet from inhabited rural residences. Final EA at 86 and North Dakota Energy Conversion and Transmission

8

Facility Siting Act Exclusion and Avoidance Areas Criteria, N.D. Cent. Code Ann. § 49-22-05.1 (West).  In the vicinity of the SRST reservation, the residence that is closest to the pipeline crossing at Lake Oahe is a rural residence located more than 1.5 miles away from the crossing.  Final EA at 86.  As noted above, the North Bismarck alternative was "severely constrained by the North Dakota Public Service Commission's 500-ft residential buffer requirement at multiple locations."  Final EA at 7.

Table 2-1 also shows that the preferred route crosses five wetland features while the North Bismarck route crosses 28 water features.  The total number of freshwater emergent wetland crossings increased from a total of 203 in the preferred route to a total of 224 in the North Bismarck route.  This is an increase of approximately 10 percent. Dakota Access Pipeline Project Application to the North Dakota Public Service Commission, App. D at 8 and Final EA at Table 2-1.  The first Table 2-1 listed only the raw number of crossings instead of giving the total amount of impacts measured as acreage or linear feet so that a more accurate comparison of the route could be made. The EA did not otherwise specify the acreage of impacts.  Throughout the length of the pipeline most of the water impacts are temporary and small, averaging about a tenth of an acre for freshwater emergent wetlands impacts, for example.  *Id.*, App. D at 8 (203 freshwater emergent wetlands (PEM) totaling 21.25 acres impacted by construction). Thus, it is likely that the five areas of impacts along the preferred route would be minimal.

The EA stated that the North Bismarck "route alternative crossed other populated PHMSA high consequence areas (HCAs) that are not present on the preferred route." Final EA at 7 and Table 2-1 (noting presence of "other populated areas on the North Bismarck route).  Under PHMSA regulations, if an operator identifies an area as an HCA, it must take additional measures to prevent and mitigate the consequences of a pipeline failure.  49 C.F.R. § 195.452 (outlining "pipeline integrity management" requirements for pipeline in HCAs).  For HCAs, pipeline operators must develop a program to manage pipeline integrity, take "prompt action to address all anomalous conditions" discovered in the pipeline, be able to "immediately repair" the pipeline and take measures to "prevent and mitigate the consequences of a pipeline failure."  *Id.* at § 195.452(b), (h) & (i).  HCAs include navigable waterways, high population areas (50,000 or more people, with a density of over 1,000 per square mile), other populated areas and "unusually sensitive areas," such as community water intakes.  49 C.F.R. §§ 195.450 & 195.6(a)(1).

While both routes would cross HCAs and therefore would require enhanced protections, the North Bismarck route would cross HCAs that the Lake Oahe route would not cross.  The HCAs appear to be the Menoken and Harmon "other population areas," which are communities on either side of the Missouri River near Bismarck, but are not specifically named or addressed in the EA.  *See* 49 C.F.R. § 195.450(3); PHMSA National Pipeline Mapping System, Public Map Viewer, Other Population Areas, available at: https://www.npms.phmsa.dot.gov/.  The Lake Oahe route included HCAs and those areas were discussed elsewhere in the EA.  Final EA at 94, App. J at 17.  The crossing of additional HCAs for "other populated areas" on the North Bismarck route

provided support for selecting the preferred alternative crossing at Lake Oahe; it would seem reasonable for a pipeline operator to locate a pipeline in such a way as to impact as few HCAs as possible.

C.  Conclusion

The analysis of the pipeline route alternatives in the EA was brief, but it is legally sufficient.  Aspects of the analysis that could have been expanded, such as the discussion of wetland impacts between the two alternatives, are not sufficient to require reconsideration of the EA and FONSI.  "NEPA permits agencies to eliminate alternatives from detailed analysis so long as they 'briefly discuss the reasons for their having been eliminated.'"  *Pac. Coast Fed'n. of Fishermen's Assn's. v. Blank*, 693 F.3d 1084, 1101 (9th Cir. 2012) (quoting 40 C.F.R. § 1502.14(a)); *see also Tongass Conservation Soc'y v. Cheney,* 924 F.2d 1137, 1141 (D.C. Cir. 1991) (stating "an agency need only 'briefly discuss the reasons' why rejected possibilities were not 'reasonable alternatives'" (quoting 40 C.F.R. § 1502.14(a)).  Accordingly, we have concluded that formal reconsideration of the EA/FONSI or preparation of supplemental NEPA documentation is not legally required with respect to this particular issue.

2.  Evaluate the Fort Laramie Treaties of 1851 and 1868, and other federal laws, and whether the finding in the EA that there are no impacts to treaty fishing or hunting rights is supported.  This evaluation would include consideration of any reserved water rights of the SRST.

A.  EA Discussion

The EA did not directly discuss the Fort Laramie Treaties of 1851 and 1868.  It found that no impacts to treaty fishing, hunting or reserved water rights will occur as a result of the proposed action.  For example, the EA stated that "[n]o impacts to treaty fishing and hunting rights are anticipated due to construction within the Project Area or Connected Actions."  Final EA at 58.  In response to an SRST comment on the draft EA, the final EA also stated that "[a]s the pipeline will be installed under the river, the installation and operation of the pipeline will not have direct impacts to the waterway and there are no anticipated impacts to water rights."  Final EA at App. J at 8.  The EA statements on treaty fishing and hunting rights included off-reservation fishing and hunting rights held by the SRST within the reservation.

In the EA discussion of wildlife management areas near the proposed crossing, the Corps examined the extent of popular hunting grounds.  The EA noted that the closest wildlife management area was 14.5 miles north of the proposed crossing.  Final EA at 74.  The EA also discussed the SRST reservation as an area of special interest and specifically discussed hunting on the reservation.  Final EA at 75.  It stated that, "[b]ig game on the reservation includes white tail deer, mule deer and antelope, while small game includes jackrabbit, cottontail, and squirrel."  *Id.*  The EA acknowledged that there would be temporary impacts to hunting and related activities from project construction.  *Id.*  The EA also found that there would be no impact to lake recreation "[b]ecause the pipeline would

10

cross underneath the river via the HDD method [and] there would be no disruption to the course or cross-current of the river. . ." *Id.* Specific to the SRST, the EA found that there would be no impacts to the Tribe's treaty hunting and fishing rights. Final EA at 85.

Turning to the consideration of water rights, the SRST's treaty-based water rights were addressed directly in the comment and response section of the EA, but were not discussed elsewhere. EA, App. J at 8-9 (addressing SRST comments 15-14, 15-15 and 15-18). The Corps found that the crossing had no anticipated impacts to SRST's reserved water rights. *Id.* (responding to comment 15-14). The Corps stated that "[a]s the pipeline will be installed under the river, the installation and operation of the pipeline will not have direct impacts to the waterway . . ." *Id.* (responding to comment 15-14). The Corps also referenced the discussion in the EA about precautions to prevent impacts to Lake Oahe during pipeline operations. *Id.* (responding to comment 15-14 and referencing section 3.2. Surface Water and section 3.11 Reliability and Safety in the EA).

The potential effects on surface and groundwater, along with the precautions taken by the Corps to address those potential effects, and their relationship to the SRST reservation, were addressed in the general discussion of potential effects to water resources. In the FONSI, the Corps stated:

> The Standing Rock Sioux Tribe (SRST) and other tribal governments object to the pipeline and its alignment because the proposed route crosses under Lake Oahe a few miles upstream of the SRST water intakes. Tribes are concerned that a leak or rupture would contaminate the river, including the SRST's drinking water. The tribes argue the District did not adequately consult on the DAPL pipeline alignment. The EA establishes that the District made a good faith effort to consult with the tribes and that it considered all tribal comments. In addition, the pipeline will be located under Lake Oahe, and Dakota Access has developed response and action plans, and will include several monitoring systems, shut-off valves and other safety features to minimize the risk of spills and reduce or remediate any potential damages.

FONSI at 2.

The precautions identified to address the SRST's concerns about potential impacts to water were addressed in a list of required terms and conditions placed on Dakota Access through the issuance of the Section 408 permission. FONSI at 3-5. Table 8-2 in the EA summarized all of the conditions required by the Corps for environmental protection, which encompasses 10 categories of effects, including water resources, wildlife resources and aquatic resources. Final EA at 117-125, Table 8-2. Each condition must be met as a term of the permission to cross under Lake Oahe pursuant to the Army's section 408 authority and will also be conditions in the required easement. FONSI at 4-5.

B. Analysis

The EA addressed the SRST's fishing, hunting and reserved water rights in conjunction with the overall discussion of the environmental effects of the proposed Lake Oahe crossing.  The question is whether the existence of those rights presented unique issues that the EA did not address sufficiently under the NEPA standard of review.

The Sioux Territory was first defined in the Fort Laramie Treaty of 1851, 11 Stat. 749.  Under that treaty, the territory comprised what is now South Dakota and parts of Nebraska, Wyoming, North Dakota and Montana.  The Sioux tribes also reserved "the privilege of hunting, fishing, or passing over" any of the lands described in the treaty. Fort Laramie Treaty of 1851, Art. 5, 11 Stat. 749 (text quoted from 1851 WL 7655 (Trty.)).  The second Fort Laramie Treaty, in 1868, 15 Stat. 635, established the Great Sioux Reservation.  The reservation covered much of what is now western South Dakota and part of North Dakota.  The 1868 Treaty provided the "absolute and undisturbed use and occupation" of the reservation lands to the Sioux tribes.  1868 Treaty, Article II, 15 Stat. 636.  The 1868 treaty reserved prior Sioux treaty rights, except provisions regarding the payment of annuities.  *Id.*, Art. XVII, 15 Stat. 637.  In 1889, Congress enacted a statute diminishing the Great Sioux Reservation and dividing the remaining territory into six smaller reservations, one of which is the Standing Rock Sioux Reservation.  1889 Sioux Act, 25 Stat. 888, March 2, 1889.  The 1889 Act expressly preserved any rights under the 1868 treaty that were "not in conflict" with the Act.  1889 Act, § 19, 25 Stat. 896.  The Fort Laramie treaties provided the tribes the right to hunt and fish on reservation lands and on specified off-reservation lands.  *See South Dakota v. Bourland,* 508 U.S. 679, 696 (1993) (acknowledging treaty-based hunting and fishing rights for the Sioux Tribes under the Fort Laramie treaties).

Between 1949 and 1962, Congress enacted seven statutes to carry out the Missouri River project, which authorized takings of land within the six reservations created by the 1889 Act.  *Bourland,* 508 U.S. at 684.  Some of the largest of the legislative takings involved SRST lands for the impoundment of the Missouri River to create Lake Oahe.  The relevant takings language for the Lake Oahe project established that the SRST retained "without cost, access to the shoreline of [Lake Oahe], including permission to hunt and fish in and on the aforesaid shoreline and [Lake], subject, how*ever, to regulations governing the corresponding use by other citizens* of the United States."  Section 10, Public Law 85-915, 72 Stat. 1762, 1764, September 2, 1958 (the 1958 Act) (emphasis in original).  This right extended between "the water level of the reservoir and the exterior boundary of the takings area," which would be just south of the proposed pipeline crossing.  1958 Act, 72 Stat. 1764.  In the area taken, the 1958 Act reserved the SRST's fishing and hunting rights on the shoreline and reservoir of Lake Oahe within the boundaries of the reservation and did not diminish those rights in any relevant way.

The EA addressed temporary impacts to fishing and hunting activities as a result of the proposed action, but did not specifically address the treaty-based nature of those activities for the SRST.  *See* Final EA at App. J, p. 8.  Potential impacts on fishing and

hunting activities in general were addressed in the EA. Final EA at 75. The impacts would be temporary during construction of the crossing. *Id.* The SRST's comments on the EA did not assert that the fishing and hunting activities of its members in the area of the pipeline crossing would be restricted in any specific way, and the Corps' response to those comments and the analysis in the EA recognized the existence of the SRST's treaty-based rights. Final EA at 58, 86 and App. J at 8-9. The Corps found that there would be no impact to the SRST's treaty-based hunting and fishing rights. *Id.* The support for that conclusion was derived from the EA's overall analysis of the reliability of the pipeline, which addressed the low risk possibility of a rupture. Final EA at App. J. at 8. The EA outlined numerous environmental impact avoidance and mitigation measures relevant to protecting these resources relevant the SRST's hunting and fishing rights. *See, e.g.,* Final EA at 117-125, Table 8-2 (summarizing environmental avoidance and mitigation measures).

The EA also addressed potential impacts to water resources that were relevant to the SRST's hunting and fishing rights, in several sections of the document, and it addressed general concerns about water resources raised by the SRST. *See, e.g.,* Final EA at 35-51 (water resources); Final EA at 85-87 (SRST discussion).

The Corps response to a particular SRST comment on the draft EA warrants additional explanation. The SRST commented that "[t]he draft EA ignores vitally important facts about the Tribe . . . [it] ignored the Tribe's history -- including its Treaty history -- which must inform the Corps' decision-making." EA App. J at 17. The Corps responded to this comment by stating that "[a] discussion on the SRST has been added to the EA in Section 3.6.3. Although the history of the SRST and treaty rights is beyond the scope of the EA, no impact to tribal treaty rights are anticipated due to construction or operation of the pipeline within the Project Area or Connected Actions. No treaty rights have been identified that would be adversely affected by project permitting, construction or operation." EA App. J at 17. The statement that, "the history of the SRST and treaty rights is beyond the scope of this EA" means exactly what it says and should not be taken out of context. A section in the EA on the history of the SRST's treaty rights would not have added anything to the EA's analysis of the environmental impacts of the Lake Oahe crossing. The acknowledgement of the SRST's treaty rights in the final EA demonstrated that they were necessary considerations in the agency's decision-making. Final EA at 58, 86 and App. J at 8-9 (referencing the SRST's treaty hunting and fishing rights).

With regard to the SRST's reserved water rights, the EA addressed the Tribe's concerns about the risk of its water resources being impaired, both specifically for the Tribe and more generally in connection with the discussion of all water resource concerns. Final EA at 35-51; App. J at 8-9. Further, the EA considered the proximity of the SRST reservation to the proposed pipeline crossing throughout the EA and specifically addressed it in the context of potential impacts on water resources. Final EA at 35-36. The mitigation measures to address water resource concerns were listed in Table 8-2. Final EA at 117-125. Although the EA did not discuss the SRST's reserved water rights in a separate section of the document, the treatment of those rights in the EA was sufficient under NEPA standards.

The SRST's reserved water rights are implied by law under the *Winters* Doctrine. *Winters v. United States*, 207 U.S. 564 (1908). In *Winters*, the Court recognized that the establishment of an Indian reservation under federal law includes an implied reservation of water necessary for the purposes of the reservation. *Winters,* 207 U.S. at 576-578; *see also* Robert T. Anderson, *Indian Water Rights, Practical Reasoning, and Negotiated Settlements*, 98 Cal. L. Rev., Vol. 1133 (2010). This legal status sets reserved water rights apart from other water rights, even in unappropriated water. *Cappaert v. United States*, 426 U.S. 128, 138 (1976).

The EA did not specifically address the legal status of the SRST's reserved water rights under the *Winters* Doctrine. However, the EA addressed all foreseeable potential impacts of the proposed action on water resources and the legal status of the SRST's reserved water rights did not present any unique environmental considerations that required separate discussion. In other words, the EA analyzed the potential environmental impacts of the proposed pipeline crossing under Lake Oahe on all water resources, including impacts that could implicate the reserved water rights of the SRST under the *Winters* Doctrine.

The Lake Oahe crossing does not pose a direct risk of impairment of the SRST's reserved *Winters* water rights. The construction and operation of the pipeline does not require any use of water from the lake, nor does the placement of the pipeline impair the Tribe's ability to withdraw water from Lake Oahe to meet the Tribe's needs. Final EA at 37 (stating that water needed for construction will not be obtained from Lake Oahe). However, the pipeline does increase the reservation's exposure to an oil spill in Lake Oahe in the unlikely event that the pipeline ruptures at the crossing. The EA determined that a spill in the worst-case scenario would likely temporarily impact the SRST's water resources. Final EA at 87, 88-94. The EA discussed mitigation measures that would limit any impact from a rupture. For example, the geographic and project-specific response plans developed by Dakota Access to address any spill that might adversely affect water rights by impacting drinking and irrigation intakes were considered a worst case scenario and were produced in accordance with the applicable guidance for submission to PHMSA. *See* 49 CFR § 194.105; Final EA at 88-94. The EA discussed water intakes and shut-off valves, containment scenarios and tribal participation in spill-response training events. Final EA at 88-94. While the risk is low, the consequences of such an event are high and could impact water resources downstream. Final EA at 92-94. The EA accounted for this possibility through discussion of various response and mitigation measures.

The construction of the pipeline would not diminish available water to the SRST reservation and would only impair water quality in the unlikely event of a worst-case scenario rupture. Thus, the SRST's *Winters*-based reserved water rights are not implicated by the construction of the pipeline at Lake Oahe.

Finally, the Corps fulfilled its legal obligations to the SRST under the government's trust relationship with the Tribe. The government's legal obligations to

tribes must be based on and are defined exclusively by statutes and regulations. *United States v. Navajo Nation*, 537 U.S. 488 (2003); *United States v. Navajo Nation*, 129 S. Ct. 1547 (2009). Here, the Corps complied with the statutory requirements of 33 U.S.C. § 408 and its implementing guidance. *See* Engineering Circular 1165-2-216, Policy and Procedural Guidance for Processing Requests to alter US Army Corps of Engineers Civil Works Projects Pursuant to 33 USC 408 (July 31, 2014, updated Sept. 30, 2015); Policy and Procedural Guidance for Processing Requests to Alter U.S. Army Corps of Engineers Civil Works Projects, Notice, 79 Fed. Reg. 45,790 (Aug. 6, 2014). Under section 408 and supported by the Final EA, the Corps made the required findings that the pipeline crossing at Lake Oahe is not "injurious to the public interest" and will not "impair the usefulness of such work." FONSI at 6. Further, the Corps considered SRST's treaty-based hunting and fishing rights and also considered the Tribe's reserved water rights as described in this section. The Corps also investigated and considered impacts of the Lake Oahe pipeline crossing on the SRST through the NEPA documentation and mitigated the risk of any impacts to the Tribe. FONSI at 3-5; *Okanogan Highlands Alliance v. Williams*, 1999 U.S. Dist. LEXIS 4068 at *45-47 (D. Or. 1999) (stating that the trust relationship gives rise to a procedural requirement that the federal government "at the very least . . . investigate and consider the impact of its action upon a potentially affected Indian tribe" (citations omitted)). This analysis and findings met the Corps legal obligation under the trust relationship.

C.  Conclusion

The EA addressed the potential impacts of the proposed pipeline crossing at Lake Oahe on fishing and hunting activities within the broader discussion of potential environmental impacts and concluded that the nature of those impacts would not violate the SRST's treaty-based rights. While a separate discussion in the EA of the SRST's treaty-based fishing and hunting rights, and reserved water rights, might have provided greater detail, the analysis of the overall environmental impacts that could affect the SRST's treaty-based hunting, fishing and reserved water rights met the NEPA "hard look" standard. *See* 40 C.F.R. § 1508.9(a)(1) (EA must only "provide sufficient analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact"). Discussion in the EA of the legal status of the SRST's fishing and hunting rights, or the reserved water rights under the *Winters* Doctrine, would not have resulted in additional disclosures of potential environmental impacts. *See Nevada v. Dep't of Energy*, 457 F.3d 78, 90-91 (D.C. Cir. 2006) (stating that under the harmless error standard a court would not order an agency to revise a NEPA document when it would be "a meaningless gesture"). Accordingly, we have concluded that formal reconsideration of the EA/FONSI or preparation of supplemental NEPA documentation is not legally required with respect to this particular issue.

3.  Evaluate whether the discussion in the EA of impacts to water intake structures for drinking and irrigation purposes is adequate and consider what role the possible downstream move of the SRST's water intake structure will have in the analysis.

A.  EA Discussion

The EA noted that while wells supply the water needs for certain residents on the SRST reservation, the Tribe also has intake structures in the river downstream of the Lake Oahe project area.  Final EA at 38.  The SRST has indicated that the EA's statement that a "majority" of residents on the reservation obtain their water from wells is inaccurate.  The EA could have been more exact by using language from a report published by the SRST, which stated that "[m]any residents currently depend on poorly constructed or low-capacity individual wells or have water hauled to underground cisterns. . . . The Reservation communities of Little Eagle, Porcupine, Kenel, Bullhead and Cannonball each depend on one or more wells for their water supply.  Fort Yates obtains its water from the Missouri River.  Water for Wakpala is delivered by pipeline from a Missouri River source at a site some 5 miles distant.  The non-Native communities of Keldron, McIntosh, Morristown, Thunder Hawk, Walker, Wataugua, Mahto, Solen, Selfridge, and McLaughlin depend on wells as their source of supply."  Standing Rock Sioux Tribe Comprehensive Economic Development Strategy, 2013-2017.[2]

Nonetheless, the passing reference in the EA to the use of wells by residents of the SRST reservation was irrelevant to the EA's substantive analysis of the project's potential impacts to water intake structures.  The EA did not consider the use of wells as a factor that would either increase or decrease the significance of possible impacts to drinking water supplied by water intake structures.  In other words, the number of reservation residents who obtain their water from wells or use underground cisterns is wholly separate from the issue of impacts to water intakes.  Thus, while the statement in the EA regarding the use of wells could have been more precise, any error was harmless in terms of the impact assessment in the EA for intake structures.

The EA disclosed that water intakes located downstream from the Lake Oahe crossing could potentially be at risk temporarily if there was an oil spill during pipeline operations that reached Lake Oahe in the vicinity of drinking water intake structures.  The EA explained that in the event of a spill or leak, response measures would be taken in accordance with the Geographical Response Plan and Facility Response Plan submitted by Dakota Access as required by federal law and regulations.  Those response plans evaluate the potential for a spill to compromise a potable water supply and address alternative water sources, such as shutting down certain intakes and utilizing others, or using bottled water.  The EA provided a detailed, technical explanation of how accidental spills or leaks from the pipeline system during operations could migrate through the soil toward groundwater or surface water.  Final EA at 44-45.  In brief, the oil "would travel

---

[2] Available at http://standingrock.org/data/upfiles/files/SRST%20CEDS%20For%20Community%20Review%2012%207%2012.pdf (last viewed on September 22, 2016).

along the path of least resistance both laterally and vertically at a rate determined by a number of factors including volume released, soil conditions (permeability, porosity, moisture, etc.), depth to groundwater, and the speed and effectiveness of response and remediation measures." Final EA at 45. Once the oil reached the water constituents could be dissolved in limited amounts. The EA continued by explaining that benzene is of most concern as it is the water soluble compound within oil that could be capable of exceeding the groundwater protection thresholds for drinking water.

A subsection within section 3.2.1.2 of the EA titled "Water Intake Mitigation Measures" provided additional detail on measures Dakota Access will take to minimize the risk of a pipeline leak and protect the users of downstream water intakes. Final EA at 42-43. This subsection identified more than a dozen specific design and operation measures that Dakota Access will take, including use of quality assurance measures for materials used to construct the pipeline, specific testing measures and extra monitoring commitments. These operation and design mitigation measures are in addition to risk-reduction and response measures described in the Facility Response Plan.

The Water Intake Mitigation Measures subsection also indicated that Dakota Access provided the Corps with the results of worst case risk analysis for spills at both the Missouri River and Lake Oahe crossings. The information provided by Dakota Access was not itself contained within the EA as it was protected from public disclosure as security sensitive documents. However, the EA explained that the documents used spill models that follow PHMSA modeling and included information on hypothetical worst case discharge volumes, intake locations and an analysis of the flow distance and the time that it would take for the first oil from an unabated release to travel downstream and reach water intakes. This information was used to design location-specific Geographic Response Plans to be used for training exercises and incident response, all of which was provided to the Corps as "privileged and confidential" materials.

The Water Intake Mitigation Measures subsection described other mitigation measures Dakota Access will undertake in addition to the operation and design mitigation measures and the spill response planning and exercise measures already discussed. Final EA at 42-43. Examples of additional mitigation measures included open water and ice scenario emergency response drills/exercises in accordance with the National Preparedness for Response Exercise Program (PREP) downstream of the crossings at Lake Oahe and the Missouri River. Dakota Access will also coordinate with the Corps and any other applicable stakeholders to establish an all-weather access boat ramp and collection point downstream of both the Missouri River crossing and the Lake Oahe crossing. Each location will be supported with a fenced equipment storage facility that includes a permanent storage area for winter and open water spill response equipment. Each storage facility will store sufficient response equipment to mitigate an unintended worst case release into the river at each crossing and will be constructed within one year after the pipeline becomes operational.

The EA provided an additional seven pages of detailed information about measures that Dakota Access will take to minimize the risk of a pipeline spill or leak and

17

protect the users of downstream intakes.  Final EA at 88-94.  The section also provided additional discussion of the worst case spill scenario and gave more information on the full-scale open water and winter/ice exercises that Dakota Access will conduct with stakeholder involvement.  This section pointed out that while an oil spill "is considered unlikely and a high precaution to minimize the chances has been taken, it is still considered a low risk/high consequence event."  Final EA at 92.  Therefore, the EA closely examined nine things that could damage the pipeline (termed "pipeline integrity threat categories") and explained how Dakota Access will prevent such damage.

## B.  Analysis

The primary issue is whether the EA adequately addressed the potential impact of the pipeline crossing at Lake Oahe on downstream water intakes.  In a similar situation, citizens of a small town in Maryland challenged FERC's approval of construction of a natural gas compressor station in their town, arguing that FERC's EA failed to take a "hard look" at quantifying the impacts of the project on nearby property values.  The U.S. Court of Appeals for the District of Columbia explained that although the definition of "hard look" may be "imprecise," the agency has taken the required "hard look" at the "environmental impacts of a proposed action if the statement contains sufficient discussion of the relevant issues and opposing viewpoints, and the agency's decision is fully informed and well-considered."  *Myersville Citizens for a Rural Community, Inc. v. FERC*, 783 F.3d 1301, 1325 (D.C. Cir. 2015) (internal quotations omitted) (citing *Nevada v. Dep't of Energy*, 457 F.3d 78, 93 (D.C. Cir. 2006)).  In *Myersville*, the D.C. Circuit concluded that FERC's EA took the requisite "hard look" at the station's potential effect on property values where FERC had noted that the station could depress property values for nearby land but concluded that the station would not significantly reduce property values because some of the property-value effects could be mitigated through noise and visual screening.  *Myersville*, 783 F.3d at 1325.

The same is true here.  The EA acknowledged the potential harm that may result from an oil spill in the vicinity of water intake structures and identified that, although the risk of an oil spill may be low, there could be significant consequences if a spill occurred.  The EA then exhaustively addressed prevention and response measures that will be taken to reduce the risk that such harms could occur.  Because the discussion of impacts of the Lake Oahe crossing on downstream water intakes acknowledged the potential harms, but concluded, after a well-considered examination, that such harm can be averted, the Corps met its obligation to take a "hard look" at the issue.  Although some may disagree with the conclusion, "their disagreement does not mean that the [Corps] failed to consider the issue altogether."  *Minisink*, 762 F.3d at 112.

It is of no consequence that the EA did not separately address drinking water intake structures and those used for irrigation purposes.  All potential impacts to water intake structures would result from an oil spill and the effects of an oil spill on drinking water and irrigation water would make either unusable for its intended purpose.  The risk of an oil spill was thoroughly detailed in the EA, along with precautionary measures that would prevent harm to water intakes for drinking water and irrigation alike.  Thus, the

EA met the goal of ensuring informed decision making and informed public comment on this topic, and it is unnecessary to "flyspeck" by making an unnecessary distinction between drinking water and irrigation.  *See Nevada*, 457 F.3d at 93 (declining to give any significance to alleged deficiencies in a discussion of rail corridor impacts where the agency had fully assessed a wide array of environmental factors).

Though not stated in the EA, the Corps is aware that a new water intake structure is being constructed downstream of the existing water intake structure near Fort Yates. The Bureau of Reclamation in 2009 issued an EA addressing construction of a new SRST reservation-wide water project intended to fulfill the water needs of all communities in the reservation.  According to the Bureau of Reclamation's Final Environmental Assessment for the Standing Rock Rural Water System - Phase 2 - Reservation-wide Water Project in North and South Dakota, DK-600-04-04, dated February 2009 (the "SRRWS EA"), the core facilities of the new reservation-wide system will include a deep water Lake Oahe intake (Indian Memorial Intake), a new raw water pipeline connecting the Indian Memorial Intake to a new Wakpala water treatment plant (WTP) and main transmission pipelines connecting the new Wakpala WTP to a five million gallon main storage reservoir.  SRRWS EA p. 4.  The new reservation-wide system is designed to have enough capacity to provide water for all existing communities located within the SRST reservation that express interest in being included in the system.  *Id*. p. 5.

The Indian Memorial Intake is being constructed on the west bank of Lake Oahe in the southeast corner of the SRST reservation, about 13 miles south of Wakpala, South Dakota (near Mobridge, South Dakota).  SRRWS EA p. 4.  This new intake structure will be approximately 50 miles further downstream from the Dakota Access pipeline crossing, which is near Cannon Ball, North Dakota, than the existing water intake structure located near Fort Yates, North Dakota.  The location is depicted on the following map:



The new intake structure, combined with the new Wakpala WTP, is intended to provide for all of the SRST reservation's water needs. Thus, the EA provided that once "the new Wakpala WTP becomes operational and connecting pipelines to the Reservation-wide system [are] completed, the existing WTPs at Fort Yates and Wakpala could be taken out of service." *Id*. at p. 4.

The Corps considered whether this information about construction of the Indian Memorial Intake and potential future closure of the Fort Yates water intake structure necessitated supplementing the existing EA. *See* 40 C.F.R. § 1502.9(c) (supplementation required if there "are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts"); *see also Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1152 (9th Cir. 1998) (standard for supplementing an EA is the same as for an EIS). In determining whether to prepare a supplemental EIS or EA an agency is to apply the "rule of reason" based on a consideration of the "value of the new information to the still pending decisionmaking process." *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 373-374 (1989). If there is major federal action to occur and if new information shows that the remaining action will affect the quality of the human environment to a significant extent not already considered, a supplemental EIS must be prepared. *Id*. at 374. However, "a reduction in the environmental impact is less likely to be considered a substantial change relevant to environmental concerns than would be an increase in the environmental impact." *Friends of the Bow v. Thompson*, 124 F.3d 1210, 1218-19 (10th Cir.1997).

20

The EA fully considered potential impacts to the Fort Yates water intake. Impacts to the new Indian Memorial Intake will be similar to those for the Fort Yates water intake. However, one difference is that the new location will allow for more response time to prevent hydrocarbons from a pipeline spill at the Lake Oahe crossing from reaching the Indian Memorial Intake as compared to the Fort Yates intake structure. Therefore, it is likely there would be fewer or less significant environmental impacts or risks associated with a pipeline rupture with the construction of the new intake structure farther downstream.

The EA stated that the Geographic Response Plans and Facility Response Plans provided by Dakota Access consider "shutting down certain intakes and utilizing others" in the event that an oil spill compromises a potable water supply intake. Final EA at 38. The construction of the new Indian Memorial Intake downstream of Fort Yates will provide yet another option for utilizing other intakes if the Fort Yates intake remains in operation but must be shut down temporarily because it is compromised by an oil spill. Where, as here, the environmental impact of the new circumstances will not be significant and those environmental impacts are likely to be positive rather than negative, a supplemental EA is not required. *See Arkansas Wildlife Fed'n v. Corps*, 431 F.3d 1096, 1103 (8th Cir. 2005) (holding no supplemental EA was necessary for changes to a water project including substitution of pipelines for canals, reduction of natural stream use, and reduction of upland hardwood permanently impacted by the project because impacts related to the changes were not significant and any environmental impact would be beneficial).

C.  Conclusion

The discussion in the EA of potential impacts to water intake structures was legally sufficient with respect to such structures for drinking and irrigation purposes. Further, supplementation of the EA to address new information about the construction of a new water intake structure farther downstream from the pipeline crossing is not required because this information does not result in greater environmental impacts and, in fact, likely reduces risks to the SRST's water intake in the event of a pipeline rupture. *See Friends of the Bow v. Thompson*, 124 F.3d 1210, 1218-19 (10th Cir. 1997) ("a reduction in the environmental impact is less likely to be considered a substantial change relevant to environmental concerns than would be an increase in the environmental impact"); *see also Arkansas Wildlife Fed'n v. Corps*, 431 F.3d 1096, 1103 (8th Cir. 2005) (holding no supplemental EA was necessary where the Corps adequately considered the environmental impact of the proposed changes and reasonably concluded that they were not significant and that any environmental impact appears to be positive rather than negative). Accordingly, we have concluded that formal reconsideration of the EA/FONSI or preparation of supplemental NEPA documentation is not legally required with respect to this particular issue.

4.  Evaluate whether the environmental justice discussion in the EA of issues related to the SRST is adequate.

A.  EA Discussion

A federal agency is required to "make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities in minority populations and low-income populations."  Executive Order 12898, Federal Actions to Address Environmental Justice in Minority and Low-Income Populations, 59 Fed. Reg. 7,629, (Feb. 16. 1994).  The EA addressed environmental justice issues by analyzing the affected environment and impacts to minority and low-income populations at the proposed action area at the Missouri River or Lake Oahe crossing, and it focused on the SRST reservation.  Final EA at 84-87.  The EA also evaluated the cumulative effects of the pipeline crossing at Lake Oahe with respect to environmental justice.  Final EA at 107.

The Corps relied on Council on Environmental Quality (CEQ) guidance to identify minority populations as either: (a) the minority population percentage of the affected area that exceeds 50 percent; or (b) the minority population percentage of the affected area that is meaningfully greater than the minority population in the general population or other appropriate unit of geographic analysis.  Final EA at 84; CEQ, Environmental Justice Guidance under the National Environmental Policy Act at 25 (December 10, 1997) (CEQ Guidance).  The Corps also relied on the CEQ definition of "low-income populations" based on an annual statistical poverty threshold.  Final EA at 84.  The EA noted that "[i]n 2013, the poverty threshold for the 48 contiguous states for an individual under the age of 65 living alone was $12,119 (U.S. Census Bureau, 2014)."  *Id.*  The EA identified minority and low-income populations within census tracts crossed by the proposed action.  *Id.*  "The census tracts crossed by the Proposed Action encompass an area greater than 0.5 mile radius for the project; therefore additional census tracts were not evaluated."  *Id.*  Per the CEQ guidance, the selection of the appropriate unit of geographic analysis may be a governing body's jurisdiction, neighborhood, census tract or other similar unit that is to be chosen so as to not artificially dilute or inflate the affected minority population.  CEQ Guidance at 26.  The EA used census tracts for the unit of geographic analysis.  Final EA at 85.

The EA used a 0.5 mile buffer area to examine the environmental justice effects of the proposed action.  The buffer was based on industry practice for linear projects, such as transportation projects under the Federal Transit Administration and natural gas pipeline projects under the Federal Energy Regulatory Commission.  Final EA at 84; *supra* at Section 1 (discussing route alternatives).  The Lake Oahe crossing is centrally located within Emmons County on the east side of the lake and in southern most part of Morton County on the west side of the lake.  Final EA at 84.  Sioux County is south of Morton County and is outside the 0.5 miles buffer from Proposed Action.  *Id.*  Sioux County is adjacent to Lake Oahe and in close proximity to the crossing.  Thus, the Corps designated Morton, Emmons and Sioux Counties as "counties in the general vicinity of

22

the Lake Oahe crossing" and calculated the average of their demographic data to obtain the baseline area data set.

The EA evaluated environmental justice effects on the two census tracts located within 0.5 miles of the federal lands at the Lake Oahe crossing (CT204 and CT 9965) by comparing the average of the demographic data from the two census tracts to: (1) the average demographic data of the counties in the general vicinity of the Lake Oahe crossing; and (2) the average demographic data of the State of North Dakota.  Final EA at 84.

The EA showed that the average minority population of the three counties in the vicinity of the Lake Oahe crossing was greater than the state average.  Final EA at 85.  However, the average minority population of CT204 and CT 9965 "is much lower," 29 percent lower, than the average minority population of the three counties in the vicinity of the Lake Oahe crossing and the average minority population of CT 204 and CT9965 was nine percent lower than the state average.  *Id.*  Based on this analysis, the Corps determined that "the census tracts associated with the Proposed Action Area at Lake Oahe have a meaningfully lower minority percentage" than the average demographic data of Morton, Emmons and Sioux Counties and reasonably concluded that "[n]o appreciable minority or low-income populations exist within the census tracts directly affected by the Proposed Action" at the Lake Oahe crossing.  *Id.*

The EA environmental justice discussion included Table 3-15, summarizing the minority and low income population statistics for the federal lands project area.

| Table 3-15 Minority and Low Income Population Statistics for Federal Lands Project Area | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Percent | | | | | |
| Geographic Area | Total Population | White | Black or African Am. | Am. Indian and Alaska Native | Asian | Native Hawaiian and Other Pacific Islander | Some Other Race | Two or More Races | Total Minority Population | Persons Below the Poverty Level |
| **State** | | | | | | | | | | |
| North Dakota | 704,925 | 89.20 | 1.53 | 5.25 | 1.15 | 0.04 | 0.73 | 2.10 | 10.80 | 11.9 |
| **Counties Within Baseline Analysis (Baseline Area)** | | | | | | | | | | |
| Morton | 27,439 | 93.98 | 0.50 | 3.70 | 0.20 | 0.00 | 0.50 | 1.30 | 6.20 | 8.7 |
| Emmons | 3,491 | 99.28 | 0.00 | 0.23 | 0.17 | 0.00 | 0.00 | 0.32 | 0.72 | 13.5 |
| Sioux | 4,317 | 13.67 | 0.02 | 82.26 | 0.25 | 0.07 | 0.53 | 3.20 | 86.33 | 36.4 |
| Average | 15,465 | 68.98 | 0.17 | 28.73 | 0.21 | 0.02 | 0.34 | 1.60 | 31.08 | 58.6 |
| **Proposed Action Area** | | | | | | | | | | |
| CT204 | 3,143 | 96.5 | 0 | 1.4 | 0 | 0 | 0.8 | 1.3 | 3.5 | 4.4 |
| CT9665 | 3,491 | 99.3 | 0 | 0.2 | 0.2 | 0 | 0 | 0.3 | 0.7 | 13.5 |
| Average | 3,317 | 97.88 | 0.00 | 0.83 | 0.09 | 0.00 | 0.40 | 0.81 | 2.12 | 8.95 |
| **State Comparison to Proposed Action Area** | | | | | | | | | | |
| Proposed Action | -701,608 | 8.68 | -1.53 | -4.42 | -1.07 | -0.04 | -0.33 | -1.29 | -8.68 | 49.65 |
| **Baseline Area Comparison to Proposed Action Area** | | | | | | | | | | |
| Proposed Action | -12,148 | 28.90 | -0.17 | -27.90 | -0.12 | -0.02 | 0.05 | -0.79 | -28.96 | -2.95 |

Source: U.S. Census Bureau, American Community Survey (2010-2014 5-year estimates).
Note: totals may not sum across the table due to rounding used in data collection.

Final EA at 83.

The table contained an error in the average of the counties within the baseline analysis area for persons below the poverty level. It stated that the average percentage of residents below the poverty level in Morton, Emmons and Sioux Counties was 58.6 percent. The number should be 19.54 percent.

The EA considered impacts to Sioux County and the SRST even though the county was slightly more than 0.5 miles from the crossing and out of the affected environment analysis area. The EA identified and addressed potential environmental justice impacts specific to the SRST because the Tribe "has a high population of minorities and low-income residents." EA page 85. Based on the analyses presented in other sections of the EA, the Corps determined that "[d]irect and indirect impacts from the Proposed and Connected Actions will not affect members of the Standing Rock Sioux Tribe or the Tribal reservation." EA page 85. This determination relied in part on the fact that "[t]he Lake Oahe crossing will be installed via HDD beneath the river from private lands adjacent to Corps owned lands to avoid impacts to environmental resources (e.g., water, soil, cultural resources, vegetation, etc.)." EA page 85. The EA also noted that "[t]he HDD drilling process is . . . itself . . . a mitigation measure with no anticipated effects to the environment including vibration or frac-out within or outside of the Proposed action for the short duration of the construction project." Final EA at 85-86 (referencing the EA at sections 2.3.2.6 and 3.1.1.2).

The Corps next considered whether there might be disproportionately high and adverse human health or environmental effects on the SRST as a result of the pipeline and, particularly, as a result of "an inadvertent release reaching intake structures on Lake Oahe." Final EA at 87. The EA considered engineering design, installation methodology, operations measures and response plans in concluding that not only is the risk of an inadvertent release low but also that in the event of an inadvertent release, private and/or non-tribal water intakes are closer to the Lake Oahe crossing than any water intakes owned by the tribe. *Id.*

Alignment alternatives to the proposed action all contained the required criteria that they avoid tribal reservations and federal lands, and "included a preference for co-locating the route with existing infrastructure." Final EA page 86. As such, the Proposed Action was co-located with existing power and pipe lines across Lake Oahe . . ." *Id.* Additionally, the EA noted that the pipeline would be placed using HDD below Lake Oahe and that Dakota Access developed response and action plans, to include several monitoring systems, shut-off valves and other safety features, to minimize the risk of spills and reduce or remediate any potential damages. Final EA at 85 and 87. The EA determined that "[a]s a result of this routing criteria, the nature of the action (construction associated with laying an underground oil pipeline), the short term duration of effects, construction and operation on private lands, the concurrent reclamation activities, state of the art construction techniques, use of high quality materials and standards that meet or exceed federal standards, there will be no direct or indirect effects to the Standing Rock Sioux Tribe . . . include[ing] a lack of impact to its lands, cultural artifacts, water quality or quantity, treaty hunting and fishing rights, environmental quality, or socio-economic

status." EA page 86.  As a result, the Corps concluded that "there is no resulting adverse or disproportionate impacts of the Proposed Action with respect to Environmental Justice considerations."  EA page 86.

The cumulative impacts section of the EA assessing environmental justice issues relied on the environmental justice analysis outlined in Section 3.9.  The discussion of environmental justice issues noted that the pipeline was co-located with existing utilities and that it avoided tribal reservation lands across its entire length.  Final EA at 107.  The Corps concluded that "[t]here are no reasonable past, present, or reasonably foreseeable actions that together with these Proposed Actions will have a cumulative significant adverse effect . . . or a disproportionate impact on low-income or minority populations, including the Standing Rock Sioux or other tribes in or around the Project."  *Id.*

After that first finding, the EA added that "the holders of the mineral rights and landowners in the region, including particular tribes and tribal members, have witnessed a recent windfall from oil and gas development."  Final EA at 107.  The EA noted that private land owners provide permission for oil and gas development on their private land.  *Id.*  The EA stated that "[g]iven this ascent, there is no disproportionate impact to low income, minority or tribal populations benefited by the Environmental Justice policy."  *Id.*

B.  Analysis

The CEQ Guidance to assist federal agencies in identifying and addressing environmental justice concerns expressly acknowledges that neither Executive Order 12898 nor the Guidance prescribes "a standard formula for how environmental justice issues should be identified or addressed."  CEQ Guidance at 8.  However, it identifies several basic principles.

The CEQ Guidance recommended that federal agencies "consider the composition of the affected area, to determine whether minority populations, low-income populations, or Indian tribes are present in the area affected by the proposed action, and if so whether there may be disproportionately high and adverse human health or environmental effects on minority populations, low-income populations, or Indian tribes."  CEQ Guidance at 9.  The first guiding principle can be broken down into two parts: (1) agencies should determine whether minority populations, low-income populations or Native American tribes are present in the area affected by the proposed action; and (2) if such populations are present, then determine whether there may be disproportionately high and adverse human health or environmental effects on such populations.  *Id.*

The Corps' determination of the affected environment, as outlined in section 3.9.1 of the EA, can be questioned here.  Final EA at 84.  The affected environment only included two census tracts that were within the 0.5 mile buffer of the centerline of the pipeline.  *Id.*  The two census tracts, 204 for Morton County and 9665 for Emmons County, did not include Sioux County, in which the SRST reservation is located.  Sioux

County is just outside the 0.5-mile pipeline buffer.  *Id.*  While the equally sized buffer on both sides of the pipeline seems reasonable along land areas, it is arguably less so as water areas because of the potential for water currents to carry a spill downstream.  Sioux County is located just south and downstream of the pipeline.  Thus, the SRST population present immediately outside of the proposed area or affected environment and downstream reasonably could have been within the area identified as the affected environment in the EA.  If that area was included, the EA would then determine whether there might be a disproportionately high and adverse human health or environmental effect on the SRST.  CEQ Guidance at 9 and 14.

The environmental justice discussion on impacts and mitigation, in section 3.9.2 of the EA, made findings that do not include consideration of the SRST.  It concluded that "no appreciable minority or low-income populations exist within the Census tracts directly affected by the Proposed Action at [Lake Oahe]."  Final EA at 85.  However, the EA did include a separate discussion of the SRST, even though they were not part of the proposed area.  The inclusion of this section would satisfy any environmental justice requirement to consider impacts to the SRST notwithstanding the earlier environmental justice discussion in the EA that did not include the Tribe.

Although the CEQ Guidance recommends methodologies to identify minority populations, the courts have suggested that to accomplish the purpose of an environmental justice analysis a federal agency "must compare the demographics of an affected population with demographics of a more general character (for instance, those of an entire state)."  *Mid States Coalition for Environment v. FERC*, 345 F.3d 520, 541 (8th Cir. 2008).  The EA did not directly make that comparison, but the information was there to do so.  For example, 82.3 percent of Sioux County residents are Native American compared to 5.3 percent of the North Dakota population.  Final EA at 83, Table 3-15.  Further, 36.4 percent of Sioux County residents are below the poverty line compared with 11.9 percent statewide.  *Id.*  The information is in the EA to compare the demographic of an affected population, including the SRST, to the more general statewide demographics.  CEQ Guidance at 8 (regarding not prescribing a standard formula for how environmental justice issues should be identified or addressed).

An agency should state clearly in its NEPA documentation "whether in light of all the facts and circumstances, a disproportionately high and adverse human health or environmental impact on minority-populations, low-income populations, or Indian tribes is likely to result" if a minority population, low-income population or Indian tribe is identified.  CEQ Guidance at 9.  To determine whether human health effects are disproportionately high and adverse, agencies consider to the extent practicable:  (1) whether the health effects are significant or above generally accepted norms; (2) whether the risk or rate of hazard exposure is significant and appreciably exceeds or is likely to appreciable exceed the risk or rate to the general population or other baseline comparison group; and (3) whether health effects occur in the minority population, low-income population or Native American tribe affected by cumulative or multiple adverse exposures from environmental hazards.  Executive Order 12898, Sec. 1-1.

The EA addressed these considerations with respect to the SRST.  The health effects were not above generally accepted norms because the pipeline would be located more than half a mile away from the reservation boundary and more than 1.5 miles from the closest residence on the reservation, the pipeline will be operated in accordance with PHMSA requirements and the risk of an inadvertent spill or leak reaching (or in) Lake Oahe would be low.  Final EA at 87.  The risk or rate of hazard exposure from the pipeline to the SRST would not be significant and would not appreciably exceed the risk or rate of hazard to the general population.  Final EA at 86 -87.  The risks of a pipeline rupture generally are minimal:

| Year | Reported Significant Incidents | Total Miles of Crude Oil Pipelines | Percentage of Incident/Mile Per Year |
|------|------|------|------|
| 2015 | 77 | 72,562 | 0.106116% |
| 2014 | 74 | 66,813 | 0.110757% |
| 2013 | 78 | 61,086 | 0.127689% |
| 2012 | 63 | 57,462 | 0.109638% |
| 2011 | 56 | 56,100 | 0.099822% |
| 2010 | 49 | 54,630 | 0.089694% |

PHMSA, Data and Statistics (available at: http://www.phmsa.dot.gov/pipeline/library/data-stats).

The various mitigation measures for pipeline operations and protections for the SRST water intakes also helped to minimize any cumulative impacts or multiple adverse exposures from environmental hazards.  *See supra* Section 3 (discussing water intakes); Final EA at 107 (discussing environmental justice cumulative effects).

The CEQ Guidance also recommends that federal agencies "seek tribal representation in the process in a manner that is consistent with the government-to-government relationship between the United States and tribal governments, the federal government's trust responsibility to federally-recognized tribes, and any treaty rights." CEQ Guidance at 9.  As established in the analyses throughout the EA, the Corps attempted to engage in meaningful discussions with the SRST on numerous occasions about the nature of the project, cultural resources and the Lake Oahe crossing beginning in October 2014 and continuing through March 2016.  Final EA at 85; *see also Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs.* No. 16-cv-01534, Memorandum Opinion Denying Plaintiff's Request for Preliminary Injunction, Docket No. 39 at 48 (D.C. Dist. Sept. 9, 2016)(finding that, on the preliminary injunction record, the Corps exceeded its NHPA obligations at many sites).

The cumulative impacts section on environmental justice in the EA did not substantiate how "the ascent [from Oil and Gas Development]" supported the statement that "there is no disproportionate impact to low-income, minority or tribal populations benefited by the Environmental Justice policy."  Final EA at 107.  Without attribution to supporting materials or any connection to the actual residents in the affected

27

environment, we have not given any weight to those statements or conclusions in this review.  The EA appropriately found that "no reasonable past, present or reasonably foreseeable actions that together with these Proposed Actions will have a cumulative significant adverse effect on the environment or a disproportionate impact on low-income or minority populations, including the Standing Rock Sioux or other tribes in or around the Project."  *Id.*  This statement is supported by the finding in the section on environmental justice in the EA.  Final EA at 84-87 (section 3.9).

Finally, the additional information about the movement of the SRST's water intake from Fort Yates to the Indian Memorial Intake downstream also provided evidence of reduced potential impacts to the SRST.  *See supra* Section 3 (discussing impacts to water intakes).  As discussed previously, the new intake location is about 50 miles farther downstream from the Fort Yates intake.  *Id.*  This distance reduces the risk of a spill from a pipeline rupture at the Lake Oahe crossing reaching the water intake structure and allows for additional time to respond to a spill.

C.  Conclusion

The evaluation of environmental justice impacts in the EA ultimately meets the "hard look" standard of review under NEPA.  The EA devoted an entire chapter to environmental justice impacts, including a full section on impacts on the SRST, and complied with the CEQ Guidance on environmental justice analysis.  The EA "delineated a clear study area, defined the low-income and minority populations within this study area, and determined that the Project would not result in these populations bearing any disproportionate environmental burden."  *Coalition for Healthy Ports v. U.S. Coast Guard*, 2015 U.S. Dist. LEXIS 159090, 159092 (S.D. N.Y. 2015); CEQ Guidance at 10-16.

The environmental justice analysis in the EA could have been organized differently to provide greater clarity and to avoid the appearance of not providing detailed discussion of the SRST in certain parts of the analysis.  However, the analysis ultimately focused on the SRST and met the policy goals for an environmental justice analysis in accordance with NEPA standards and CEQ Guidance.  The Corps complied with Executive Order 12898 by reasonably identifying minority populations and specifically addressing Native Americans and the SRST, particularly.  The EA addressed whether these populations would be adversely or disproportionately impacted by potential environmental effects associated with the pipeline crossing under Lake Oahe.  Accordingly, we have concluded that formal reconsideration of the EA/FONSI or preparation of supplemental NEPA documentation is not legally required with respect to this particular issue.

5. Determine whether there are any NHPA section 110 issues that are not before the court already and any other cultural resource issues identified more recently within the area of federal jurisdiction.

The SRST filed a declaration by Mr. Tim Mentz, Sr., on September 2, 2016, with the U.S. District Court for the District of Columbia in the Tribe's lawsuit against the Corps. *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, Case No. 16-cv-01534, Plaintiff's Motion for Leave to File Supplemental Declaration, ECF No. 29 (Sept. 2, 2016)(Mentz Declaration). The Mentz Declaration described site visits that Mr. Mentz made on August 28, 30 and 31, and September 1, 2016, to an area west of Highway 1806 that is adjacent to the right-of-way for the pipeline. Mentz Declaration, ECF 29-1 at 2 and 4. The area is approximately 1.75 miles from the proposed Lake Oahe pipeline crossing. *Id.* at 3. Mr. Mentz noted that, at the time of his declaration, the pipeline corridor was already mowed and cleared of large vegetation although no construction equipment was in sight. *Id.*

Mr. Mentz observed a "significant number of stone features (82) and archeological sites, including at least 27 burials" along the south side adjacent to the pipeline right-of-way. *Id.* at 4. Mr. Mentz's conclusions about the burial sites that he believed were located within the center of the pipeline corridor were based on the presence of "rock cairns," which commonly mark burial sites. Mr. Mentz described sites of "very great cultural and historic significance," including stone features called *Iyokaptan Tanka* (Big Dipper), *Chante Tinza Wapaha* (Strong Heart Society Staff), *Mato Wapiya* (Bear Medicine Healer) stone effigy, *Itancha* (Chiefs Dreaming Pair with Staffs) stone feature, and a Grave and Stone Arc. *Id.* at 5-8. Neither the Corps nor the North Dakota State Historical Preservation Office participated in Mr. Mentz's site visit.

The day after the SRST filed the Mentz Declaration, Dakota Access construction crews allegedly graded the entire portion of the pipeline corridor that contained the features described by Mr. Mentz. *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, Case No. 16-cv-01534, Plaintiff's Motion for a Temporary Restraining Order, ECF No. 30 at 4 (Sept. 4, 2016). In a second declaration supporting the Tribe's request for a restraining order, Mr. Mentz alleged that Dakota Access construction crews intentionally graded much deeper than is normally required for such construction projects. Mentz Declaration II, ECF 30-1 at 3. Mr. Mentz also stated that until his declaration was filed, the nearest construction equipment was 20 miles west of Highway 1806. *Id.* at 3.

Agencies must determine the appropriateness of issuing a permit if it appears that an applicant has engaged in anticipatory demolition of historic resources with the intent to avoid the requirements of section 106 of the NHPA. 54 USC § 306113. Section 110(k) states:

> Each Federal agency shall ensure that the agency will not grant a loan, loan guarantee, permit, license, or other assistance to an applicant that, with intent to avoid the requirements of section 306108 of this title [54 USCS §

306108], has intentionally significantly adversely affected a historic
property to which the grant would relate, or having legal power to prevent
it, has allowed the significant adverse effect to occur, unless the agency,
after consultation with the Council, determines that circumstances justify
granting the assistance despite the adverse effect created or permitted by
the applicant.

54 U.S.C. § 306113.

Consultation under the NHPA ended and the Corps made its decision with respect
to NHPA compliance for the Lake Oahe crossing and easement. *See* Letter from Ms. Jo-
Ellen Darcy, Assistant Secretary of the Army (Civil Works) to Mr. Jim Fowler, Executive
Director, Advisory Council on Historic Preservation (July 25, 2016)(concluding the
NHPA process for the Lake Oahe crossing). The activities described by Mr. Mentz in his
declarations occurred outside the review area for the crossing and are not connected to
the issuance of the easement.

Nevertheless, there could still be a potential Clean Water Act enforcement issue
based on the facts alleged by the SRST and supported by Mr. Mentz's declarations. If
there are non-reporting NWP 12 authorizations in the areas where the alleged destruction
occurred, then there could be a violation of the terms and conditions of NWP 12. NWP
General Conditions 20 and 21 cover NHPA compliance. 77 Fed. Reg. 10,284. General
Condition 21 would cover the situation here where the pipeline construction possibly
encountered previously unknown remains and artifacts. That condition requires:

If you discover any previously unknown historic, cultural or archeological
remains and artifacts while accomplishing the activity authorized by this
permit, you must immediately notify the district engineer of what you have
found, and to the maximum extent practicable, avoid construction activities
that may affect the remains and artifacts until the required coordination has
been completed. The district engineer will initiate the Federal, Tribal and
state coordination required to determine if the items or remains warrant a
recovery effort or if the site is eligible for listing in the National Register of
Historic Places.

77 Fed. Reg. 10,284.

If Dakota Access performed an activity that required authorization and
encountered previously unknown remains or artifacts in the area covered by the
authorization, then it would have been required to notify the Corps and avoid
construction that might affect the remains or artifacts. If this requirement was triggered
and Dakota Access did not comply with General Condition 21, then it would be working
without the required Clean Water Act authorization and would need a permit from the
Corps. The Corps potentially would be required to consider section 110(k) of the NHPA
in making that permit decision.

The facts of what happened on September 2-3, 2016, and whether the identified sites are historical sites or burial sites are disputed.  *See, e.g., Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, Case No. 16-cv-01534, Dakota Access, LLC Opposition to Plaintiff's Motion for a Temporary Restraining Order, ECF No. 34 (Sept. 6, 2016).  The parties also dispute whether the sites were impacted by construction.  *Id.*  The Corps will have to reconcile this dispute to the extent it has jurisdiction in the area.  Both Dakota Access and the SRST have also submitted additional information on this issue to the government.  The additional information will need to be analyzed by appropriate experts in the Corps.  A site visit will be necessary to determine whether the sites visited by Mr. Mentz were impacted by construction.  The visit would also need to determine whether there are any jurisdictional areas that had discharges of dredged or fill material that were covered by non-reporting NWP 12 authorizations.  Further, the Corps would need to determine whether there are any other facts necessary for the Corps to complete NHPA section 110(k) and NWP General Condition 20 or 21 reviews.

We recommend that this issue receive further investigation and evaluation, and understand that such investigation is already underway.

6.  Evaluate the implications of the provision of the 1889 Sioux Act, 25 Stat. 888, which provides that the eastern boundary of the Standing Rock Reservation is "the center of the main channel of the Missouri River … down said center of the main channel."

A.  EA Discussion

The EA did not discuss the 1889 Sioux Act.

B.  Analysis

The 1889 Sioux Act, 25 Stat. 888, removed a substantial amount of land from the Great Reservation of the Sioux Nation, in the Dakota Territory, and divided the remainder into six separate "permanent reservations."  Section three of the Act described the area assigned to the SRST:

> Beginning at a point in the center of the main channel of the Missouri River, opposite the mouth of Cannon Ball River; thence down said center of the main channel to a point ten miles north of the mouth of the Moreau River, including also within said reservation all island, if any, in said river; thence due west to the one hundred and second degree of west longitude from Greenwich; thence north along said meridian to its intersection with the South Branch of Cannon Ball River, also known as Cedar Creek; thence down said South Branch of Cannon Ball River to its intersection with the main Cannon Ball River, and down said main Cannon Ball River to the center of the main channel of the Missouri River at the place of beginning.

25 Stat. at 889.



Section 28 of the Act provided that the statute would not become effective unless it was accepted and agreed to by the Sioux Nation as provided in Article 12 of the 1868 treaty, which required acceptance by three-fourths of the adult male Native Americans on the Great Sioux Reservation.  25 Stat. 899.  If the president received "satisfactory proof" of the requisite acceptance, he was to proclaim the effectiveness of the 1889 Sioux Act; if, however, he did not receive and proclaim such proof within a year of the passage of the 1889 Sioux Act, the statute would not take effect.  *Id.*  President Benjamin Harrison issued the required proclamation within the year and the 1889 Sioux Act took effect. Proclamation of President Harrison, No. 9, 26 Stat. 1554 (1890); *see also Oglala Sioux Tribe of Pine Ridge Reservation v. U.S. Army Corps of Eng'rs,* 570 F.3d 327, 332-333 (D.C. Cir. 2009) (rejecting claim that 1889 Sioux Act was null and void).

The 1889 Sioux Act included a number of other provisions that are not relevant to this analysis (*e.g.,* descriptions of areas assigned to other tribes, the allotment of lands within such areas, treatment of lands outside of the separate, newly-created permanent reservations).

After major floods in the lower Missouri River basin in 1943 and 1944, Congress passed the Flood Control Act of 1944 that authorized the Corps to create a flood control

32

plan along the Missouri River.  Flood Control Act of 1944, 58 Stat. 887 (1944).  The Missouri River forms the eastern border of the SRST reservation.  Between 1949 and 1962, Congress enacted seven laws that authorized limited takings of land within the six reservations created by the 1889 Sioux Act to carry out the Missouri River project.  *See Bourland,* 508 U.S. 679, at 684.  Some of the largest of these legislative takings involved Lake Oahe.

In 1958, Congress enacted Public Law 85-915, 72 Stat. 1762, which effected a legislative taking of nearly 56,000 acres of land within the area reserved for the SRST by the 1889 Sioux Act.  Specifically, "in furtherance of the Oahe Dam and Reservoir project as authorized by the Act of December 22, 1944," 58 Stat. 887 (the 1944 Flood Control Act), the 1958 Act stated:

> [T]itle to the entire interest, excluding the interest in oil, gas, and all other minerals of any nature whatsoever, in approximately 55,993.82 acres of land within the taking area described in this Act on the Standing Rock Reservation in South Dakota and North Dakota, in which Indians have a trust or restricted interest, and title to any interest Indians may have in the bed of the Missouri River so far as it is within the boundaries of the Standing Rock Reservation, are hereby taken by the United States for the Oahe project on the Missouri River and in consideration thereof the United States will pay to the Standing Rock Sioux Tribe and the individual Indian owners out of funds available for the Oahe Dam and Reservoir project:
> . . . (1) a sum aggregating $1,952,040 . . .; and
>      (2) the amount of $3,299,513, which shall be in settlement of all claims, rights, and demands of the tribe and individual Indians arising out of the taking under this Act . . . .

72 Stat. at 1762.

The legislative history to the 1958 Act is wholly consistent with the text of the statute, stating that the amount set forth in subsection (2) "includes approximately 22,000 acres of land in the bed of the Missouri River valued by the tribe at $132,000."  S. Report No. 85-2374, at p. 5, (August 14, 1958).  The Senate Committee on Interior and Insular Affairs noted that "[t]he House deemed it in the overall interest that this acreage be removed from tribal ownership to prevent jurisdictional disputes and conflicts, which might arise, and the committee agrees that this should be done."  *Id.*

Section three of the 1958 Act provided that "[t]he Secretary of the Army, out of funds appropriated for the construction of the Oahe project other than those authorized by this act, shall relocate and reestablish such Indian cemeteries, tribal monuments, and shrines with the area taken under this Act as the Standing Rock Tribal Council shall select and designate, with the approval of the Secretary of the Interior."  72 Stat. 1763.  The 1958 Act also provided for the relocation or reconstruction of facilities, such as schools hospitals, service buildings, etc., and an additional $6,960,000 for the purpose of "developing individual and family plans, relocating, reestablishing, and providing other

assistance designed to help improve the economic and social conditions of all recognized members of the Standing Rock Sioux Tribe." *Id.*

Under section six of the Act, all minerals, including oil and gas, within the area taken by the Act were reserved to the SRST or individual Native American owners, but the exploration, exploitation and development of the minerals, including oil and gas, were made subject to all reasonable regulations imposed by the Secretary of the Army for the protection of the Oahe project. Finally, under section 10 of the Act, the Tribe and its members were given permission to graze livestock on the land between the water level of the reservoir and the exterior boundary of the taking area and the tribal council and the members of the Tribe were permitted to have, without cost, access to the shoreline of the reservoir, including permission to hunt and fish in and on the shoreline and reservoir, "subject, however, to regulations governing the corresponding use by other citizens of the United States." *Id.* at 1764.

Section 16 of the 1958 Act described the "taking area" referred to in the Act and the land for which the government paid compensation to the Tribe and individual Native Americans. *Id.* at 1765. Specifically, the taking area was "the land defined in report numbered 134, Missouri River Basin investigation project, and delimited on a map entitled "Map Showing Tribal and Individual Indian Restricted and Trust Land of the Standing Rock Sioux Reservation Acquired by the United States for the Oahe Project and Forming a Basis for the Agreed Sale Price of $1,952,040 Under an Agreement Dated March 24, 1958, Between the United States and the Standing Rock Sioux Tribe." *Id.*

Both the land assigned to the SRST by the 1889 Sioux Act and the land taken from the Tribe by the 1958 Act are located downstream from the point at which the DAPL would cross the Missouri River, which was impounded to create Lake Oahe. This pipeline crossing would involve the installation of 0.21 miles of a 30-inch diameter pipe 92 to 100 feet below the river bed, and would be co-located with existing pipelines and other linear facilities previously installed on the federal property.

Based on this information, there are no legal implications of the provision of the 1889 Sioux Act that provides that the eastern boundary of the Standing Rock Reservation is "the center of the main channel of the Missouri River . . . down said center of the main channel" or of the land and river bed taken by the government under the authority of the 1958 Act. Normal installation and operation of the pipeline would not have any implications for the SRST's property interests.

If the issue was raised because of concerns about potential implications for the SRST downstream from the pipeline, such as environmental risks or potential damage to cultural and sacred resources from a rupture of the pipeline, which could contaminate the river, the EA addressed those risks in several sections. For example, section 3.2.1.2 of the EA provides in part:

> The primary impact that could occur as a result of an HDD [Horizontal Directional Drill] is an inadvertent release of drilling fluid directly or

indirectly into the waterbody. Drilling fluid (also referred to as drilling mud) is primarily comprised of water. However, bentonite clay is added to the water to enhance lubricating, spoil transport and caking properties of the drilling fluid. Bentonite is a naturally occurring, non-toxic, inert substance that meets National Science Foundation (NSF)/American National Standards Institute (ANSI) Standard 60 Drinking Water Additives Standards and is frequently used for drilling potable water wells. The potential exists for drilling fluid to leak through previously unidentified fractures in the material underlying the river bed. Potential release sources of the drilling fluid include the drilling fluid entry/exit pit(s) and the directional borehole itself, which is maintained under pressure to keep it open. The probability of an inadvertent release is greatest when the drill bit is working near the surface (i.e., near the entry and exit points). To alleviate this concern, the HDD Contractor plans to install steel surface casing at both the entry and exit locations of the Lake Oahe crossing. Because the HDD entry and exit points would be set back from the banks of the Missouri River (approximately 1,400 feet north and 300 feet south) and Lake Oahe (approximately 900 feet east and 1,100 feet west) the potential for an inadvertent release to occur in the water would be minimized. Additionally, geotechnical investigations conducted by Dakota Access indicated that the drill path is not located in materials where there is a high probability of an inadvertent release of drilling fluids that would reach ground surface or enter Lake Oahe. Therefore, the potential for inadvertently released drilling fluids to enter any waterbody from below or from the shoreline is low. No downstream impacts to Sovereign Nations from inadvertent release of drilling fluid are anticipated.

Final EA at 36.

Additionally, as described in the "Summary of Environmental Impact" in the FONSI, Dakota Access developed response and action plans to address potential environmental risks from a potential spill, and will include several monitoring systems, shut-off valves and other safety features to minimize the risk of spills and reduce or remediate any potential damages should a leak or rupture occur. FONSI at 3-5. Additional mitigation measures are described in the EA/FONSI, as discussed above. *See also, supra,* Section 3, (discussing water intake structures). Finally, the easement required for the crossing at Lake Oahe will incorporate all environmental commitments outlined in the EA. FONSI at 3 -5.

C. Conclusion

Based upon the foregoing information, there are no legal or other implications of the provision of the 1889 Sioux Act, which provides that the eastern boundary of the Standing Rock Reservation is "the center of the main channel of the Missouri River . . . down said center of the main channel." Based on the "hard look" standard, it is reasonable to conclude that the Corps properly evaluated possible implications of the

1889 Sioux Act when it evaluated anticipated environmental and cultural effects of the proposed crossing of the pipeline at Lake Oahe upstream from the lands reserved for the SRST.  Accordingly, we have concluded that formal reconsideration of the EA/FONSI or preparation of supplemental NEPA documentation is not legally required with respect to this particular issue.

### CONCLUSION

We have reviewed the final EA and FONSI, as well as other information available to the Corps, for the purpose of enabling the Department of the Army to determine whether it will need to reconsider any of its previous decisions regarding the DAPL crossing at the Lake Oahe site under NEPA and other federal laws, as directed by the Joint Statement.  Using the "hard look" standard under NEPA, we have concluded that the Corps' Omaha District adequately considered and disclosed the environmental, cultural and other potential impacts of its actions and that its decisions were not arbitrary or capricious.  *See Nat'l Comm. for the New River*, 373 F.3d. at 1327, and *Oceana* 37 F. Supp. 3d. at 159-60.

We have also concluded that supplementation of the EA to address any new information is not legally required at this time.  Applying the "rule of reason," we have not identified any new information showing that any actions by the Department of the Army will affect the quality of the human environment to a significant extent not already considered.  *See Marsh*, 490 U.S. at 373-374.

However, we do recommend that additional investigation and evaluation be undertaken to determine whether Dakota Access may have violated the Clean Water Act and NHPA in the areas identified in the SRST's September 2, 2016 court filings, as explained in Section 5, *supra* (discussing the need to determine whether there are any NHPA section 110(k) issues that are not before the court already and any other cultural resource issues identified more recently within the area of federal jurisdiction).



**DEPARTMENT OF THE ARMY**
U.S. ARMY CORPS OF ENGINEERS
441 G STREET, NW
WASHINGTON, DC 20314-1000

REPLY TO
ATTENTION OF

CECC-ZA                                                          31 October 2016

MEMORANDUM THRU Deputy Commanding General for Civil Works and Emergency Operations, U.S. Army Corps of Engineers

FOR Assistant Secretary of the Army for Civil Works

SUBJECT: Draft Proposed Additional Conditions for an Easement for the Dakota Access Pipeline Crossing at Lake Oahe, North Dakota

1.  The purpose of this memorandum is to provide a list of possible conditions that may be included in an easement for the Dakota Access Pipeline (DAPL) crossing at Lake Oahe, North Dakota. The enclosed conditions were developed with assistance from the Pipeline and Hazardous Materials Safety Administration (PHMSA).

2.  The draft easement prepared by the Omaha District of the U.S. Army Corps of Engineers (Corps or USACE) contained nine special conditions related to pipeline construction and operations. *See* Attachment 1, Draft Easement, DACW45-2-16-8059. The special conditions referenced specific commitments in the Environmental Assessment (EA) prepared for the Lake Oahe crossing, as well as PHMSA regulations. These special conditions may be enhanced further. The Corps may include the specific commitments referenced in the EA as conditions in the easement and may also include additional conditions that the Department of the Army determines to be necessary. We believe that the inclusion of additional conditions in the attached Draft Easement will provide further protection from any perceived risks posed by the pipeline crossing at Lake Oahe. We have attached a list of 36 proposed easement conditions that add to and clarify the original nine conditions in the Draft Easement. *See* Attachment 2, Proposed Additional Draft Easement Conditions.

  a.  As reported in our Technical and Legal Analysis of Previous Corps Decisions Regarding the DAPL Crossing at Lake Oahe, dated October 20, 2016 (attached), the risks of a pipeline rupture are minimal:

| Year | Reported Significant Incidents | Total Miles of Crude Oil Pipelines | Percentage of Incident/Mile Per Year |
|------|-------------------------------|-----------------------------------|--------------------------------------|
| 2015 | 77 | 72,562 | 0.106116% |
| 2014 | 74 | 66,813 | 0.110757% |
| 2013 | 78 | 61,086 | 0.127689% |
| 2012 | 63 | 57,462 | 0.109638% |
| 2011 | 56 | 56,100 | 0.099822% |
| 2010 | 49 | 54,630 | 0.089694% |

CECC-ZA
SUBJECT:  Draft Proposed Additional Conditions for an Easement for the Dakota Access
Pipeline Crossing at Lake Oahe, North Dakota

PHMSA, Data and Statistics (available at: http://www.phmsa.dot.gov/pipeline/library/data-stats).

     b.  The PHMSA-reported significant incidents include pipelines that were constructed
before modern pipeline design and construction methods and upgrades became available to a
pipeline such as the one proposed to cross Lake Oahe.  Thus, the PHMSA statistics likely
overstate the risk of a pipeline rupture at the crossing.  Further, one of the leading risks of
pipeline failure -- third party damage -- is low at the Lake Oahe crossing.  The risk of third-party
damage from excavation or other causes is low because the pipeline will be buried 90 to 125 feet
below the lake bed.  Sunoco Logistics, Pipeline Integrity Management Plan, Rev 014, at 24
(September 2014); Final EA at 92.  The conclusion in the Final EA on the overall low probability
of a pipeline rupture is supported by other federal agency findings.  *See, e.g.,* Department of
Interior, Bureau of Land Management, BakkenLink Dry Creek to Beaver Lodge Pipeline EA,
App. A, Risk Assessment and Environmental Consequences Analysis at p. 4.1 (May 2016)
(stating that the risk of a pipeline rupture occurring in a given mile is an occurrence once every
473 years).

     c.  While the risk of a pipeline rupture at the Lake Oahe crossing is very low, some risk
may still exist.  Adding and clarifying the conditions in the original Draft Easement can further
mitigate this risk.  Accordingly, we have developed the attached list of possible conditions to add
to and clarify the current conditions in the Draft Easement with the help of experts from
PHMSA.  For example, the additional conditions require enhanced testing after construction
(Draft Additional Conditions c and d).  Initial inline inspections are required, which would look
for cracks (Draft Additional Condition r).  Overall, the conditions are designed to prevent spills
and to ensure that any spills are detected if they occur.  Some of the conditions are already part
of the Draft Easement, some are specific commitments in the Final EA, and others are new.  The
easement will be strengthened, as legal matter, by adding the conditions to the terms of the
easement rather than referencing documents outside of the easement as in the current draft.

3.  The Corps has the legal authority to impose the proposed additional conditions.

     a.  As a general matter, when the United States manages public land, it "exercises the
powers both of a proprietor and of a legislature."  *See Kleppe v. New Mexico*, 426 U.S. 529, 540
(1976).  The authority of the federal government over public land under the Property Clause of
the Constitution, Article IV, Section 3, Clause 2, is expansive and is "entrusted to Congress is
without limitations."  *Kleppe*, 426 U.S. at 539; *United States v. San Francisco*, 310 U.S. 16, 29
(1940); *United States v. Gardner*, 107 F.3d 1314, 1318 (9th Cir. 1997).  Under longstanding
Supreme Court precedent, as proprietor "[t]he United States can prohibit absolutely or fix the
terms on which its property may be used."  *Light v. United States*, 220 U.S. 523, 536 (1911); *see
also Utah Power & Light Co. v. United States*, 243 U.S. 389, 405 (1917).  This wide discretion
applies to the Corps' management of water resource development projects.  *See South Dakota v.
Bourland*, 508 U.S. 679, 690 (1993) (Corps may "prohibit[] any 'use' of the lands . . . which is
determined by the Secretary of the Army to be 'contrary to the public interest'").

CECC-ZA
SUBJECT:  Draft Proposed Additional Conditions for an Easement for the Dakota Access
Pipeline Crossing at Lake Oahe, North Dakota


      b.  Specifically, with regard to the issuance of the easement to allow the DAPL crossing
at Lake Oahe, the Mineral Leasing Act authorizes "appropriate agency head[s]" to grant rights-
of-way through federal lands for oil pipelines.  30 U.S.C. § 185(a).  Before granting a right-of-
way, agencies shall impose conditions, including requirements to control or prevent damage to
the environment, public or private property, hazards to public health and safety, and measures to
protect the interests of individuals living in the general area who rely on certain natural resources
in the area for subsistence.  30 U.S.C. § 185(h)(2).  Further, section 185 requires agencies to
impose requirements for the operation of pipelines that "protect the public from sudden ruptures
and slow degradation of the pipeline."  30 U.S.C. § 185(g).  The conditions proposed for
inclusion in the DAPL easement all fit within the parameters of 30 U.S.C. § 185.


4.  The proposed conditions would require negotiation with representatives of the pipeline
company and, although not required by law, the Corps could discuss the proposed conditions
with representatives of the Standing Rock Sioux Tribe.  We recommend that the Corps discuss
the issuance of the easement and the possible additional conditions with the Tribe.  We estimate
that these discussions would take about 45-60 days to complete.  The discussions would allow
the Tribe to have further input into the easement decision and, if issued, what easement
conditions might provide further mitigation of any perceived risk to the Tribe from the pipeline
crossing at Lake Oahe.


5.  If you have any questions about this memorandum or the enclosure, please contact Milton
Boyd or me.


Encl

                              DAVID R. COOPER
                              Chief Counsel

Attachment 1

Draft Easement,
DACW45-2-16-8059

DACW45-2-16-8059

# DEPARTMENT OF THE ARMY
## EASEMENT FOR FUEL CARRYING PIPELINE RIGHT-OF-WAY

### LOCATED ON

### LAKE OAHE PROJECT

### MORTON AND EMMONS COUNTIES, NORTH DAKOTA

This Easement is made on behalf of **THE UNITED STATES OF AMERICA** (the "United States"), between **THE SECRETARY OF THE ARMY**, acting by and through the Chief, Real Estate Division, U.S. Army Engineer District, Omaha District, hereinafter referred to as the "Grantor", under and by virtue of the authority vested in Title 30, United States Code, Section 185, and **DAKOTA ACCESS, LLC, a Limited Liability Company, duly organized and existing under and by virtue of the laws of the State of Delaware, with its principal office at 1300 Main, Houston, Texas 77002,** hereinafter referred to as the "Grantee."

**NOW THEREFORE:**

The Grantor, for good and valuable consideration set forth below, the receipt and sufficiency of all of which are hereby acknowledged, upon and subject to the terms, covenants and conditions set forth in this Easement for right-of-way, does hereby:

Grant and convey to Grantee, an easement for a fuel carrying pipeline right-of-way for the installation, construction, operation, maintenance, repair, replacement and termination of a **thirty inch (30") diameter, horizontal directional drill (HDD) buried oil pipeline for the purpose of transporting crude oil**, and related facilities, hereinafter collectively referred to as the "Facilities", over, across, in and upon lands of the United States **at and under Lake Oahe and the Lake Oahe Project**, as identified in **EXHIBITS "A" and "B"**, hereinafter referred to as the "Premises", and which is attached hereto and made a part hereof; with the width of a right-of-way being fifty feet plus the ground occupied by the pipeline (that is, the pipe and its related facilities);

Make no claim of title during the term of this Easement to any Facilities of whatever nature located, constructed, or placed on the Premises by the Grantee.

**THIS EASEMENT** is granted subject to the following conditions.

## 1.    TERM

This easement is hereby granted for a term of **Thirty Years**, beginning on the date of execution by the Grantor and ending thirty (30) years from the date of execution by the Grantor.

The Grantor shall renew this Easement in accordance with the provisions of 30 U.S.C. § 185, so long as the project is in commercial operation and is operated and maintained in accordance with all of the provisions of this Easement and applicable law. The Grantor prior to renewing this Easement must receive from the Grantee written notice of its intent to seek renewal or extension not less than one year prior to the Easement expiration or termination date and all plans, contracts, agreements, or other information or material which the Grantor deems necessary to determine whether a right-of-way shall be renewed and the terms and conditions which should be included in the right-of-way.

## 2.    CONSIDERATION, MITIGATION, AND DAMAGES

a. As consideration for this Easement, the Grantee shall pay cash consideration in advance to the Grantor in the amount of **One Hundred Twenty Six Thousand Five Hundred and No/100 Dollars ($126,500.00)**.

b. The Grantee will mitigate damages caused to the Premises, surrounding areas, or to the **Lake Oahe Project**, during initial installation and construction of the Facilities, and damages caused during operation, maintenance, or subsequent construction work, and complete all site restoration in accordance with the Mitigation / Restoration Plan submitted by Grantee on file in the U.S. Army Engineer District, **Omaha, specifically referenced in the Grantee's pipeline Environmental Assessment ("EA") in Section 3.3.2.5 "Clean-up and Restoration", and further outlined in the Stormwater Pollution Prevention Plan ("SWPPP") presented in Appendix A of the EA and the Environmental Construction Plan presented in Appendix G of the EA**.

c. The Grantee shall reimburse the Grantor in advance for the costs incurred in monitoring the construction, operation, maintenance, and termination of the pipeline and related facilities on the Premises in the amount of **Two Thousand Two Hundred Fifty and No/100 Dollars ($2,250.00)**.

d. Any cash payments to the Grantor will be made to the order of the **"FAO-USAED, OMAHA"**, and delivered to **USAED, Omaha, ATTN:  CENWO-RE, 1616 Capitol Avenue, Omaha, Nebraska 68102**.

e. Any payments due under the terms of this easement must be paid on or before the date they are due in order to avoid the mandatory sanctions imposed by the Debt Collection Act of 1982, as amended (31 U.S.C. Section 3717).  This statute requires the

imposition of an interest charge for the late payment of debts owed to the United States; an administrative charge to cover the costs of processing and handling delinquent debts; and the assessment of an additional penalty charge on any portion of a debt that is more than 90 days past due.

## 3.    NOTICES

All correspondence and notices to be given pursuant to this easement shall be in writing and addressed, if to the Grantee, to **DAKOTA ACCESS LLC, 1300 Main Street, Houston, Texas 77002** and, if to the Grantor, to the **U. S. Army Engineer District, Omaha, Attention: Chief, Real Estate Division, 1616 Capitol Avenue, Omaha, Nebraska 68102,** or as may from time to time otherwise be directed by the parties.  Notices shall be mailed by certified mail, postage prepaid, return receipt requested, addressed to the addresses above.  The effective date of the notice shall be the earlier of the actual date of receipt or the date the addressee is notified of the attempted delivery of the certified mail, whether or not the addressee actually accepts delivery.

## 4.    AUTHORIZED REPRESENTATIVE

Except as otherwise specifically provided, any reference herein to "Grantor" or "Chief, Real Estate Division" shall include their duly authorized representatives.  Any reference to "Grantee" shall include assignees, transferees and their duly authorized representatives.

## 5.    SUPERVISION BY THE GRANTOR

a. The installation and/or operation and maintenance of said pipeline shall be accomplished without cost or expense to the United States under the general supervision and subject to the approval of the Grantor's representative having immediate jurisdiction over the property, hereinafter designated as "said officer," and in such manner as not to endanger personnel or property of the United States on the said United States land or obstruct travel on any road thereon. The Grantee shall have the right of ingress and egress for such purposes, subject to approval of access by said officer.

b. The use and occupation of said Premises incident to the exercise of the privileges hereby granted shall be subject to such rules and regulations as the said officer may from time to time prescribe.

## 6.    APPLICABLE LAWS AND REGULATIONS

The Grantee shall construct, operate, maintain, and terminate the said pipeline in accordance applicable Federal, state, county, and municipal laws, regulations, and ordinances.  As required by 30 U.S.C. § 185, the Grantee shall construct, operate, and maintain the Facilities as common carriers.  The pipeline installation shall be in accordance with the U.S. Department of Transportation's Minimum Federal Safety Standards and any other applicable Federal or state safety requirements.

3

DACW45-2-16-8059

## 7.    CONDITION OF PREMISES

The Grantee acknowledges that it has inspected the premises, knows its condition, and understands that the same is granted without any representations or warranties whatsoever and without any obligation on the part of the United States.

## 8.    INSPECTION AND REPAIRS

a.  Upon completion of any phase of the pipeline project which causes damage to the Premises, the Grantee shall restore said damage immediately, at the Grantee's own expense, to the same condition in which they existed prior to the commencement of such work, to the satisfaction of the said officer.

b.  The Grantee shall supervise the said pipeline and cause it to be inspected at reasonable intervals, and shall immediately repair any defects or leaks found by such inspection, or when requested by the Grantor to repair any defects or leaks.

## 9.    PROTECTION OF GOVERNMENT PROPERTY

The Grantee shall be responsible for any damage that may be caused to the property of the United States by the activities of the Grantee under this Easement and shall exercise due diligence in the protection of all property located on the Premises against fire or damage from any and all other causes.  Any property of the United States damaged or destroyed by the Grantee incident to the exercise of the privileges herein granted shall be promptly repaired or replaced by the Grantee to a condition satisfactory to the Grantor, or at the election of the Grantor, reimbursement made therefore by the Grantee in an amount to reimburse for the loss satisfactory to the Grantor.

## 10.    RIGHT TO ENTER

a.  The right is reserved to the Grantor, the United States, its officers, agents, and employees to enter upon the premises at any time and for any purpose necessary or convenient in connection with government purposes, to make inspections, to remove timber or other material, except property of the Grantee, to flood the premises, to manipulate the level of the lake or pool in any manner whatsoever and/or to make any other use of the lands as may be necessary in connection with government purposes, and the Grantee shall have no claim for damages on account thereof against the Grantor, the United States or any officer, agent, or employee thereof.

b.  If the entry will involve removal of timber or other material, or heavy equipment, the Grantor will provide reasonable notice to Grantee of any such entry or use so that Grantee may take any necessary measures to assure the safety of its pipeline and any personnel of the United States working in proximity to such pipeline.  Grantee will ensure that Grantor has emergency contact information.

4

DACW45-2-16-8059

## 11.   TRANSFERS AND ASSIGNMENTS

Without prior written approval by the Grantor, the Grantee shall neither transfer nor assign this Easement or any part thereof nor grant any interest, privilege or license whatsoever in connection with this Easement.  The provisions and conditions of this Easement shall extend to and be binding upon and shall inure to the benefit of the representatives, successors and assigns of the Grantee.

## 12.   INDEMNITY

a.  The Grantee shall be strictly liable to the United States for damage or injury which may arise from or be incident to the activities of the Grantee under this easement, or for damages to the property of the Grantee, or for damages to the property or injuries to the person of the Grantee's officers, agents, or employees or others who may be on the premises at their invitation or the invitation of any one of them, and the Grantee shall hold the United States harmless from any and all such claims not including damages due to the fault or negligence of the United States or its contractors.   Grantee shall exercise due diligence in the protection of all property located on the Premises.

b.  All owners of any interest in, and all affiliates or subsidiaries of the Grantee shall be liable to the United States in the event that a claim for damage or injury cannot be collected from the Grantee.  Liability without fault hereunder shall be limited to **Ten Million and No/100 Dollars ($10,000,000.00)** for any one incident. Liability of such Grantee for damages in excess **Ten Million and No/100 Dollars ($10,000,000.00)** shall be in accord with ordinary rules of negligence.  However, this condition shall not impose strict liability on the Grantee for damage or injury resulting from (a) an act of war or force majeure, or (b) negligence of the United States.  In any case where liability without fault is imposed pursuant to this condition and the damage or injuries involved were caused by the negligence of a third party, the rules of subrogation shall apply in accordance with the law of the jurisdiction where the damage or injury occurred.

c.  The Grantee does hereby accept liability, if any, imposed by Federal and state statutes to third parties for injuries incurred in connection with the use and occupancy of the pipeline right-of-way.

## 13.   SUBJECT TO EASEMENTS

a.  This Easement is subject to all other existing easements, or those subsequently granted as well as established access routes for roadways and utilities located, or to be located, on the Premises.

b.  In order to minimize adverse environmental impacts and the proliferation of separate rights-of-way across Federal lands, the utilization of rights-of-way in common shall be required to the extent practical, and this Easement hereby reserves to the Grantor the right to grant additional rights-of-way or permits for compatible uses on or adjacent to the Premises.

c. Provided that the proposed grant of any new easement or route will be coordinated with the Grantee, and easements will not be granted which will, in the opinion of the Grantor, interfere with the use of the premises by the Grantee.

## 14.   REQUIRED SERVICES

*This condition was deleted.*

## 15.   RELOCATION OF FACILITIES

In the event all or any portion of said Premises occupied by said Facilities shall be needed by the United States, or in the event the existence of said Facilities shall be considered detrimental to governmental activities, the Grantee shall, from time to time, upon notice to do so, and as often as so notified, promptly seek authorization from the Federal Energy Regulatory Commission, or other applicable entity, to remove said Facilities, or portion thereof, to such other location or locations on said Premises as may be designated by the Grantor. And in the event said Facilities shall not be removed or relocated within ninety (90) days after any aforesaid notice, the Grantor, after receipt of required approvals, may cause the same to be done at the expense of the Grantee.

## 16.   SUSPENSION OR TERMINATION

a. Abandonment of the Easement herein granted or noncompliance with any provisions of this Easement or applicable provisions of 30 U.S.C. 185 may be grounds for suspension or termination of the right of way if (a) after due notice to the Grantee, (b) a reasonable opportunity to comply with this Easement or applicable provisions of 30 U.S.C. §185, and (c) an appropriate administrative proceeding pursuant to 5 U.S.C. §554, the Grantor determines that any such ground exists that suspension or termination is justified.  No administrative proceeding shall be required where the Easement by its terms provides that it terminates on the occurrence of a fixed or agreed upon condition, event, or time.

b. If the Grantor determines that an immediate temporary suspension of activities within the Premises is necessary to protect public health or safety or the environment, the Grantor may abate such activities prior to an administrative proceeding.

c. Deliberate failure of the Grantee to use the Easement for the purpose for which it was granted or renewed for any continuous two-year period shall constitute a presumption of abandonment of the Easement; provided, that where the failure to use the right-of-way is due to circumstances not within the Grantee's control, the Grantor is not required to commence proceedings to suspend or terminate the right-of-way.

17.    **SOIL AND WATER CONSERVATION**

The Grantee shall maintain, in a manner satisfactory to said officer, all soil and water conservation structures that may be in existence upon said premises at the beginning of or that may be constructed by the Grantee during the term of this Easement, and the Grantee shall take appropriate measures to prevent or control soil erosion within the right-of-way herein granted.  Any soil erosion occurring outside the premises resulting from the activities of the Grantee shall be corrected by the Grantee as directed by said officer.

18.    **ENVIRONMENTAL PROTECTION**

a.  Within the limits of their respective legal powers, the parties hereto shall protect the premises against pollution of its air, ground, and water.  The Grantee shall promptly comply with any laws, regulations, conditions, or instructions affecting the activity hereby authorized if and when issued by the Environmental Protection Agency, or any Federal, state, interstate, or local governmental agency having jurisdiction to abate or prevent pollution.  The disposal of any toxic or hazardous materials within the premises is strictly prohibited.  Such regulations, conditions, or instructions in effect or prescribed by the said Environmental Protection Agency or any Federal, state, interstate, or local governmental agency are hereby made a condition of this Easement.  The Grantee shall not discharge waste or effluent from the premises in such a manner that the discharge will contaminate streams or other bodies of water or otherwise become a public nuisance.

b.  The use of any pesticides or herbicides within the premises shall be in conformance with all applicable Federal, state, and local laws and regulations.  The Grantee must obtain approval in writing from said officer before any pesticides or herbicides are applied to the premises.

c.  The Grantee will use all reasonable means available to protect the environment and natural resources, and where damage nonetheless occurs arising from the Grantee's activities, the Grantee shall be liable to restore the damaged resources.

19.    **ENVIRONMENTAL CONDITION OF PROPERTY**

An Environmental Condition of Property (ECP) documenting the known history of the property with regard to the storage, release, or disposal of hazardous substances thereon, is attached hereto and made a part hereof as **Exhibit "C"**.  Upon expiration, revocation, or termination of this Easement, another ECP shall be prepared which will document the environmental condition of the property at that time.  A comparison of the two studies will assist the said officer in determining any environmental restoration requirements.  Any such requirements will be completed by the Grantee in accordance with the condition on **RESTORATION**.

**20.    HISTORIC PRESERVATION**

The Grantee shall not remove or disturb, or cause or permit to be removed or disturbed, any historical, archeological, architectural or other cultural artifacts, relics, vestiges, remains or objects of antiquity. In the event such items are discovered on the Premises, the Grantee shall immediately notify the Grantor, and the site and the material shall be protected by the Grantee from further disturbance until the Grantor gives clearance to proceed.

**21.    NON-DISCRIMINATION**

The Grantee shall not discriminate against any person or persons because of race, color, age, sex, handicap, national origin, or religion in the conduct of operations on the premises.

**22.    HAZARDOUS WASTE MANAGEMENT**

The Grantee will not store or dispose of non-DoD hazardous materials on the premises unless authorized under 10 U.S.C. §2692, *Storage, Treatment, and Disposal of Non-Defense Toxic and Hazardous Materials*. The Grantee shall strictly comply with the hazardous waste management requirements under the Resource Conservation and Recovery Act and the applicable State hazardous waste management rules, including proper hazardous waste characterization, labeling, storage, disposal and documentation requirements. Except as specifically authorized by the Grantor in writing, the Grantee must provide, at its own expense such hazardous waste management facilities as needed to maintain compliance with all laws and regulations. Army hazardous waste management facilities will not be available to the Grantee.

**23.    HAZARDOUS WASTE OR FUEL SPILL**

The Grantee shall submit to the Grantor and maintain, thereafter, a plan for responding to hazardous waste, fuel, and other chemical spills prior to commencement of use of the premises. Such plan shall be independent of the Government's Spill contingency plan and, except for initial fire response and/or spill containment, shall not rely on use of project personnel or equipment. Should the Grantor provide any personnel or equipment, whether for initial fire response and/or spill containment, or otherwise on request of the Grantee or because the Grantee was not, in the opinion of the said officer, conducting timely clean-up actions, the Grantee agrees to reimburse the Grantor for its costs.

**24.    RESTORATION**

On or before the expiration or termination of this easement, the Grantee shall, without expense to the United States, and within such time as the Grantor may indicate, remove said Facilities and restore the Premises to the satisfaction of the Grantor. In the event the Grantee shall fail, neglect or refuse to remove said Facilities and restore the

Premises, the Grantor shall have the option to take over said Facilities without compensation, or to remove said Facilities and perform the restoration at the expense of the Grantee, and the Grantee shall have no claim for damages against the United States or its officers or agents for such action.  This provision is subject to all regulatory requirements and approvals covering any of the activities described in this Condition.

## 25.    DISCLAIMER

That it is understood that this instrument is effective only insofar as the rights of the United States in the said property are concerned, and that the Grantee shall obtain such permission as may be necessary on account of any other existing rights. It is understood that the granting of this Easement does not eliminate the necessity of obtaining any Department of the Army permit which may be required pursuant to the provisions of Section 10 of the Rivers and Harbors Act of March 3, 1899 (30 Stat. 1151; 33 U.S.C. § 403), Section 404 of the Clean Water Act (33 U.S.C. § 1344), or any other permit or license which may be required by Federal, state or local statute in connection with the use of the premises.  The grant of this Easement pursuant to 30 U.S.C. § 185 shall grant no immunity from the operation of the Federal antitrust laws.

## 26.    OTHER AGENCY AGREEMENTS

It is understood that the provision of the Easement shall not abrogate or interfere with any agreements or commitments made or entered into between the Grantee and any other agency of the United States with regard to financial aid to the Grantee in connection with the installation, operation, or maintenance of said pipeline.

## 27.    CONSTRUCTION, OPERATION AND REHABILITATION PLAN

In compliance with 30 U.S.C. § 185, the Grantee will follow the plan(s) of construction, operation, and rehabilitation submitted to the Grantor prior to the execution of this Easement, on file in the **U.S. Army Engineer District, Omaha District. Restoration will be in accordance with Section 3.3.2.5 of the EA "Clean-up and Restoration" and further outlined in the SWPPP and the Environmental Construction Plan presented in Appendices "A" and "G", respectively, of the EA. Ground disturbing activities will not occur on Corps managed lands; therefore, reseeding is not anticipated in those areas.  However, if reseeding were to become necessary on Corps managed lands, all activities shall be conducted in accordance with applicable Lake Oahe revegatation guidelines.**

## 28.    FEDERAL ENERGY REGULATORY COMMISSION ORDER ISSUING CERTIFICATES

The Grantee shall comply with the conditions set forth in the Federal Energy Regulatory Commission's Order Issuing Certificate **dated December 24, 2014, as applicable, to Docket No. OR14-42-00, Dakota Access LLC.**

DACW45-2-16-8059

## 29.    SPECIAL CONDITIONS

a. All environmental commitments in the Environmental Assessment dated July 2016 and the Mitigated Finding of No Significant Impact dated July 25, 2016, must be satisfied by the Grantee and are incorporated herein by reference.

b. The pipeline must be maintained and operated per ASME B31.3, B31.4, B31.8, CFR 192, CFR 195, API 1104, and related codes.

c. Cathodic Protection will be operated and maintained per applicable codes and the Grantee's "Operations and Maintenance Manual". Wall thickness testing will be performed on a 5 year interval through the use of in-line inspection. The periodic in-line inspection will be performed in-lieu of periodic hydro tests. The Grantee shall send the inspection reports to the Operations Project Manager at the Oahe Project Office (hereinafter the Oahe OPM).

d. The Facility Response Plan will be submitted to the Oahe OPM for review prior to the operation of the pipeline.

e. All plans not final at the time the Environmental Assessment is complete will be submitted to the Oahe OPM for review and the incorporation of USACE comments prior to submittal to the Pipeline and Hazardous Management Safety Administration. These plans include, but are not limited to the following:   Geographical Response Plan, Operations and Maintenance Manual, Risk Assessment (Integrity Management Plan) and Spill Models (Using the National Hydrography Dataset by the USGS)

f. Any plans that have been updated in the "Facility Response Plan" must be sent to the Oahe OPM for review by the USACE Environmental Compliance Coordinators at the Omaha District Office and the Oahe Project Office within one year of the update.

g. The Grantee shall provide as-built drawings for the crossing at Lake Oahe to the Oahe OPM within 6 months of the completion of pipeline construction.

h. The Grantee shall conduct the following training exercises:

(1) A full scale open water and a full scale winter/ice exercises at Lake Sakakawea and Lake Oahe. A full scale exercise will occur once every 3 years (triennial cycle) with the location and type of exercise occurring on alternating schedules (e.g. open water exercise at Lake Oahe the first triennial cycle, followed by winter exercise at Lake Sakakawea the following triennial cycle, followed by a winter exercise at Lake Oahe the following triennial cycle, etc.). The first exercise will occur within the first 3 years after the pipeline becomes operational.

(2) To facilitate USACE staff involvement, the Grantee shall notify the USACE Environmental Compliance Coordinators at the Omaha District Office and the Oahe Project Office at least ninety (90) days prior to initiation of the training exercises. The

Grantee shall also solicit the participation of key stakeholders (federal, state, local, and Tribal) in these exercises.

     i.  Within one year following the pipeline becoming operational, the Grantee shall provide for an all-weather access and collection point downstream of the HDD crossing at Lake Oahe.  The Grantee shall provide an equipment storage facility on non-federal lands that includes a fenced permanent storage area for winter and open water spill response equipment.  The storage facility should be placed in a strategic location and near existing facilities that would support access to the water.  The Grantee will coordinate with the USACE and any other applicable stakeholders to obtain all necessary permits and approvals prior to construction for any ground disturbing activities associated with these facilities. The storage facility should contain sufficient response equipment at a minimum to mitigate an unintended worst case release for this Lake crossing.

## 30.  EXECUTIVE ORDER 13658

     a.  Any reference in this section to "prime contractor" or "contractor shall mean the Grantee and any reference to "contract" shall refer to the Easement.

     b.  It has been determined this contract is not subject to Executive Order 13658 or the regulations issued by the Secretary of Labor in 29 CFR part 10 pursuant to the Executive Order, and the following provisions.

     c.  If a duly authorized representative of the United States discovers or determines whether before or subsequent to executing this contract, that an erroneous determination regarding the applicability of Executive Order 13658 was made, contractor, to the extent permitted by law, agrees to indemnify and hold harmless the Unites States, its officers, agents, and employees, for and from any and all liabilities, losses, claims, expenses, suits, fines, penalties, judgments, demands or actions, costs, fees, and damages directly or indirectly arising out of, caused by, related to, resulting from or in any way predicated upon, in whole or in part, the erroneous Executive Order 13658 determination.  This includes contractor releasing any claim or entitlement it would otherwise have to an equitable adjustment to the contract and indemnifying and holding harmless the United States form the claims of subcontractors and contractor employees.

DACW45-2-16-8059

**IN WITNESS WHEREOF,** I have hereunto set my hand to this Easement by authority of the Secretary of the Army, this _____ day of _____ 2016.

_____

**DAVID V. CHIPMAN**
Chief, Real Estate Division
Real Estate Contracting Officer

**ACKNOWLEDGMENT**

STATE OF NEBRASKA   )
                           ) ss:
COUNTY OF DOUGLAS )

**PERSONALLY APPEARED BEFORE ME,** the undersigned authority in and for said County and State, within my jurisdiction, the within named **David V. Chipman,** who acknowledged that he is the Chief of Real Estate Division, U.S. Army Engineer District, Omaha, and that in said capacity she executed the above and foregoing **Department of the Army Easement for Fuel Carrying Pipeline Right-Of-Way** by authority of the Secretary of the Army for the purposes therein expressed and as the act and deed of the United States of America.

**GIVEN UNDER MY HAND AND SEAL,** this _____ day of _____, **2016**.

(SEAL)

_____

NOTARY PUBLIC

My Commission Expires:

_____

12

DACW45-2-16-8059

**THIS EASEMENT** is also executed by the Grantee this_____ day of _____, 2016.

**DAKOTA ACCESS LLC**

_____

**Robert Rose**
Vice President, Land and Right of Way

**ACKNOWLEDGMENT**

STATE OF   _____ )
                                                      ) ss:
COUNTY OF   _____ )

**PERSONALLY APPEARED BEFORE ME,** the undersigned authority in and for the county and state, on this _____ day of _____, 2016, within my jurisdiction, the within named **Robert Rose**, who acknowledged that he is **Vice President, Land and Right of Way, DAKOTA ACCESS LLC** a Delaware Limited Liability Company, and that for and on behalf of the said company, and as its act and deed she executed the above and foregoing **Department of the Army Easement for Fuel Carrying Pipeline Right-Of-Way,** having been duly authorized by said company so to do.

(SEAL)

_____
NOTARY PUBLIC

My Commission Expires:

_____

13

# Attachment 2

# Proposed Additional Draft Easement Conditions

**PROPOSED ADDITIONAL DRAFT EASEMENT CONDITIONS**

| Condition | General Condition | Notes | Priority |
|---|---|---|---|
| a. | **Procedures and Specifications:** For the pipeline segments crossing Lake Oahe and its "could affect" High Consequence Areas ("could affect" HCAs) (as defined in 49 CFR § 195.450), Grantee must meet the U.S. Army Corp of Engineers easement special conditions by developing, implementing, and maintaining for the duration of the easement all easement special conditions in specifications and procedures for the design, construction, testing, operation and maintenance specifications and procedures as required in 49 CFR §§ 195.100, 195.202, 195.302, and 195.402 and this easement.<br><br>For the purposes of these special conditions, "pipeline segment" is defined as Lake Oahe and the "could affect" HCAs in the vicinity of Lake Oahe from Mile Post XXX to Mile Post XXX. | | Higher |
| | **Construction Conditions** | | |
| b. | **Pipeline Design Factor - Pipelines:** Pipe installed must comply with a design factor of 0.50 or lower in the Lake Oahe crossing and "could affect" HCAs. | **More Specific Requirement**<br>-This condition would be in addition to current Draft Easement conditions. However, the EA states at page 2 of the HDD Plan (pdf page 669 of the Final EA) that the design factor is .50.<br><br>-PHMSA Note: A hazardous liquid pipeline normally has a 0.72 design factor in accordance with 49 CFR § 195.106, which allows lessor wall thickness or strength of pipe to be used. Army Corp of Engineers may want to not include "could affect" HCAs in the design factor requirement. | Higher |
| c. | **Pipe Girth Weld – Nondestructive Tests:** Grantee must nondestructively test all girth welds in accordance with 49 CFR §§ 195.228, 195.230 and 195.234. | **More Specific Requirement**<br>-This is not a specific term in the current Draft Easement, but Dakota Access states that it will do this as | Higher |

| | | | |
|---|---|---|---|
| | | water intake mitigation measure. Final EA at 42.<br><br>-PHMSA Note:  Without this requirement not all girth welds in the "could affect" HCAs might not be nondestructively tested. | |
| **d.** | **Pressure Test Level:**  The pre-in-service hydrostatic test for mainline pipe must be to a pressure producing a hoop stress of either: a minimum 100% specified minimum yield strength (SMYS) or a minimum of 1.50 times maximum operating pressure (MOP) for eight (8) continuous hours for pipeline segments using a design factor of 0.50 or less. | **More Specific Requirement**<br>-The only reference in the Final EA to pressure test level is that the test will be done.  The Final EA does reference compliance in general with 49 C.F.R. part 195.  Final EA at 48, 88.  The Draft Easement notes compliance with "CFR 195."<br><br>-PHMSA Note: A hazardous liquid pipeline normally has an 8-hour pressure test, 1.25 times MOP pressure test for 4-hours and 1.1 times MOP for 4 hours,  in accordance with 49 CFR § 195.106. Suggest considering use of a pressure test of 1.39 times MOP for pipeline segments with a design factor of 0.72. | Higher |
| **e.** | **Assessment of Test Failures:**  Any pipe failure occurring during the pre-in service hydrostatic test must undergo a root cause analysis to include a metallurgical examination of the failed pipe. The results of this examination must preclude a systemic pipeline material issue and the results must be reported to the Operations Project Manager at the Oahe Project Office (Oahe OPM) within 60 days of the failure. | **New Requirement**<br>-The Final EA does not seem to address assessment of test failures. | Higher |
| **f.** | **Coatings for Trenchless Installation:**  Coatings used for directional bore, slick bore and other trenchless installation methods must be capable of resisting abrasion and other damage that may occur due to rocks and other obstructions encountered in this installation technique. | **New or More Specific Requirement**<br>-Coatings for trenchless installation does not seem to be specifically | Higher |

| | | | |
|---|---|---|---|
| | | addressed in final EA or easement conditions.<br>-PHMSA Note: This requirement would require an abrasive resistance coating over the main pipe external coating for directional drills. | |
| **g.** | **Pipe Coating:** Pipe coatings must be non-shielding to cathodic protection (CP). Coatings such as tape and shrink sleeves would be shielding coatings to CP that protects the pipe from external corrosion. The application of a corrosion resistant coating to the steel pipe must be performed according to a coating application quality control program. The program must address pipe surface cleanliness standards, blast cleaning, application temperature control, adhesion, cathodic disbondment, moisture permeation, bending, minimum coating thickness, coating imperfections and coating repair. | **New or More Specific Requirement**<br>-Pipe coating is mentioned in the EA, but not in this detail. Final EA at 42. | Higher |
| **h.** | **Field Coating:** Field joint coatings must be non-shielding to CP. Grantee must implement field girth weld joint coating application specification and quality standards to ensure pipe surface cleanliness, application temperature control, adhesion quality, cathodic disbondment, moisture permeation, bending, minimum coating thickness, holiday detection and repair quality. Field coating applicators must use valid qualified coating procedures and be trained to use these procedures. | **New Requirement**<br>-The Final EA nor the current Draft Easement conditions seem to address specifically field coating. | Higher |
| **i.** | **Construction Coating Survey after Installation:** Promptly after a ditch for the pipeline is backfilled, but not later than three months after placing the pipeline in service, the operator must perform an assessment to ensure integrity of the coating using direct current voltage gradient (DCVG) or alternating current voltage gradient (ACVG). The operator must repair any coating damage classified as moderate or severe (voltage drop greater than 35% for DCVG or 50 dBµV for ACVG) in accordance with section 4 and Appendix A of NACE SP0502-2008 (or latest edition referenced in 49 CFR § 195.3) within six months of the assessment. | **New Requirement**<br>-The Final EA nor the current Draft Easement conditions seem to address specifically construction coating surveys. | Lower because the non-HDD construction may already be complete. |
| **j.** | **Mainline Valve(s) with Remote Control or Automatic Shutdown:** Mainline valves in the pipeline segment must be located in accordance with 49 CFR § 195.260 and by taking into consideration elevation, population, and environmentally sensitive locations, to minimize the consequences of a release from the pipeline. Mainline valves must be | **More Specific Requirement**<br>-The spill model documentation addresses the location of Mainline Valves. N.D. Lake Oahe Crossing Spill Model Discussion at 19 (April 2016). | Higher |

3

placed based on the analysis above or no more than fifteen (15) miles between mainline valves in "could affect" HCAs, whichever is smaller.

Mainline valves protecting "could affect" HCAs must be located as determined by the operator's risk process for identifying preventive and mitigative measures established in 49 CFR § 195.452(i) and by using a process, such as is set forth in Section I.B of Appendix C of Part 195, but with a maximum distance from the high consequence area segment endpoints that does not exceed 7½ miles and a total mainline valve spacing of no more than fifteen (15) miles between mainline valves for isolation of "could affect" HCAs.

Mainline valves with remote control or automatic shutdown for water crossings and reservoirs must be installed on either side of the crossing and additional mainline valves(s) installed either upstream, downstream, or both to protect the water body from the "could affect" HCA on either side of the water crossing. Mainline valves must either be located outside of the flood plain or have valve actuators and other control equipment installed so as to not be impacted by flood conditions.

Mainline valves with remote control or automatic shutdown must contain transit inhibit switches that prevent the valves from shutting at a rate (and in conjunction with pumps being shutdown) so that no pressure surges can occur, or other damage caused by unintended valve closures or too fast of a closure.

Mainline valves must be remotely controlled and actuated or automatic shutdown, and the Supervisory Control and Data Acquisition (SCADA) system must be capable of closing the valve and monitoring the valve position, upstream pressure and downstream pressure so as to minimize the response time in the case of a failure. Remote power backup is required to ensure communications are maintained during inclement weather. Mainline valves must be capable of closure at all times. If it is impracticable to install a remote controlled valve, Grantee must submit a valve design and installation plan to the appropriate Oahe OPM to confirm the alternative approach provides an equivalent level of safety.

Remote operation of the Mainline Valves is addressed throughout the Final EA. See Final EA at 42, 49, 69, 89-90, 93, 119-120, 122, App. J at 4.

-The Supervisory Control and Data Acquisition (SCADA) system is also addressed in the Final EA. Final EA at 89.

-PHMSA Note: For Lake Oahe and its "could affect" HCA, would expect a mainline valve for either remote control or automatic shutdown to be located at the upstream (start) of the "could affect" HCA, near the upstream and downstream sides of Lake Oahe, and on the downstream side of the "could affect" HCA – minimum of a total of 4 mainline valves. Suggest Grantee furnish to the Army Corp of Engineers a pipeline route and elevation map of the pipeline through the Lake Oahe and "could affect" HCAs showing the location of the mainline valves with either remote control or automatic shutdown controls.

-PHMSA Note: For any valves that cannot be remotely actuated, Grantee must document on a yearly basis, not to exceed fifteen (15) months that

4

**PROPOSED ADDITIONAL DRAFT EASEMENT CONDITIONS**

| | | | |
|---|---|---|---|
| | Mainline valves in the pipeline segment must have actuation capability (i.e., remote control shut-off, automatic shut-off, manual shut-off where personnel are in proximity, or alternative equivalent technology) to ensure pipeline ruptures are promptly mitigated based upon maximum valve shut-off times, location, and spacing specified.<br><br>For each mainline valve that is a remote-control shut-off or automatic shut-off valve, the operator must conduct a point-to-point verification between SCADA displays and the mainline valve, sensors, and communications equipment in accordance with 49 CFR § 195.446(c) and (e), or an equivalent verification. | personnel response time to these valves will not take over 30-minutes. | |
| k. | **Supervisory Control and Data Acquisition (SCADA) System:** Grantee must develop, install, operate, and maintain a SCADA system to provide remote monitoring and control of the entire pipeline segment in accordance with 49 CFR Part 195 requirements. | **More Specific Requirement**<br>-The Final EA addresses the SCADA system requirements. The SCADA is also discussed in the Facility Response Plan and is a requirement for the pipeline's N.D. Sovereign Land Permit. Final EA at 42, 89-90, 125, App. J at 13; DAPL North Facility Response Plan at 17-18 (April 2016) (redacted); N.D. Sovereign Land Permit S-1951 at 1. | Higher |
| l. | **Computational Pipeline Monitoring (CPM) Leak Detection:** The pipeline segment must have a computational pipeline monitoring (CPM) leak detection system in accordance with 49 CFR § 195.134 and must have adequate pressure sensors at pump stations, laterals, mainline valves and liquid flow volume measurement along the pipeline at inflows, outflows and spaced along the pipeline to perform accurate leak detection. The pipeline segment must be operated as a continuously pressurized pipeline (with no pressure, slack line pipeline segments). If the pipeline segment is operated as a slack line pipeline segment, an operating plan must be developed, reviewed by a responsible third party independent expert engineering company and submitted to the Oahe OPM for "no objection" prior to being implemented by Grantee. | **More Specific Requirement**<br>-The CPM requirements were addressed in the September 2015, Operations and Maintenance Summary Document for the USACE Federal Action Area at pages 3-4. Continuous pressurized pipeline operations were not discussed in that document or elsewhere. | Higher |
| | **Pipeline Operation Conditions** | | |

| | | | |
|---|---|---|---|
| **m.** | **Mainline Valve - remote control shut-off or automatic shut-off Timing:**  Grantee must identify a rupture in the pipeline segment within 5 minutes of the initial notification to the operator, as defined below as being an actual rupture event or non-event in accordance with operating procedures, regardless of how the rupture is initially detected or observed.  After a "rupture" as defined below is identified, Grantee must complete mainline valve shut-off (closure and rupture segment isolation) and pipeline segment isolation within a maximum time interval of 30 minutes after rupture identification.  Pipeline segment isolation would include shut-off of all laterals for commodity receipts or deliveries and any crossover connections.<br><br>*Rupture* means a significant breach of a pipeline segment that results in a large volume, uncontrolled release of hazardous liquid.  Grantee must treat any of the following as ruptures unless and until determined otherwise:<br>1)  An unanticipated or unplanned flow rate change of 10 percent or greater or a pressure loss of 10 percent or greater (or both), which occurs within a time interval of 15 minutes or less, unless operator has documented in operating procedures the need for a higher flow rate change or higher pressure-change threshold in advance due to pipeline flow dynamics and terrain elevation changes;<br>2)  An unexplained flow rate change, pressure change, instrumentation indication or equipment function that in the operator's experience may be representative of a large-volume, uncontrolled release or failure; or<br>3)  An apparent large-volume, uncontrolled release or failure observed by either operator personnel, the public, or public authorities and that is reported to the operator. | **More Specific Requirement**<br>-The Final EA notes that the CPM system would detect a rupture in 1 to 3 minutes and value closure with 3 minutes.  Final EA at 90.  The term "rupture" is not defined in the Final EA or elsewhere. | Higher |
| **n.** | **Overpressure Protection Control:**  Grantee must limit mainline pipeline segment overpressure protection to a maximum of 110% maximum operating pressure (MOP) during surge events consistent with 49 CFR § 195.406(b).  Before commencing operation, Grantee must perform a surge analysis showing how the pipeline segment will be operated to be consistent with these overpressure protection conditions.  Grantee shall equip the pipeline with field devices to prevent overpressure | **New or More Specific Requirement**<br>-Only the Final EA touches on this issue and not with this much specificity.  Final EA at 93 | Higher |

|  |  |  |  |
|---|---|---|---|
|  | conditions.  Remotely actuated valves or automatic shutoff valves should be fitted with devices that will stop the transit (intentional or uncommanded) of the mainline valve should an overpressure condition occur or an impending overpressure condition is expected.   Sufficient pressure sensors, on both the upstream and downside side of valves, must be installed to ensure that an overpressure situation does not occur.  Sufficient pressure sensors must be installed along the pipeline to conduct real time hydraulic modeling, and which can be used to conduct a surge analysis to determine whether pipeline segments have experienced an overpressure condition. |  |  |
| **o.** | **Cathodic Protection:**  The initial CP system must be operational within six (6) months of placing a pipeline segment in service. | **New Requirement** -While Cathodic Protection is mentioned in various documents, the operational time frame is not. | Higher |
| **p.** | **Interference Current Surveys:**  Interference surveys must be performed over the entire  pipeline segment within six months of placing the pipeline in service to ensure compliance with applicable NACE International Standard Practice 0169-2007 (2007 or the latest version incorporated by reference in § 195.3) and 0177 (2007 or the latest NACE standard version, since NACE SP 0177 is not incorporated by reference in 49 CFR § 195.3) (NACE SP 0169-2007 and NACE SP 0177) for interference current levels.  If interference currents are found, Grantee must determine if there have been any adverse effects on the pipeline and mitigate such effects as necessary as required below.<br><br>The interference current mitigation program for the pipeline segment must include:<br>1)  As frequently as needed, including when new or uprated high voltage alternating current power lines greater than or equal to 69 kVA or electrical substations are co-located near the pipeline, but not to exceed every seven years conduct an interference survey (at times when static or dynamic voltages are at the highest values for a time period of at least 24-hours) to detect the presence and level of any electrical current that could impact external corrosion where interference is suspected; | **New Requirement** -The Final EA and the original Draft Easement conditions only indirectly reference current surveys through the general statements about compliance with the PHMSA regulations at 49 C.F.R. Part 195.<br><br>-PHMSA Note: If no high voltage power lines paralleling the pipeline, would not need to include this section.<br><br>-There are powerlines paralleling the pipeline at the crossing, so this condition would be applicable. | Higher |

| | | | |
|---|---|---|---|
| | 2) Analyze the results of the survey to identify locations where interference currents are greater than or equal to 20 Amps per meter squared; and<br><br>3) a remedial action plan and apply for any necessary permits within four months of completion of the inspection or testing that identified the presence of deleterious electrical stray current.<br><br>4) Implement remedial actions to protect the pipeline segment from detrimental interference currents.  Remedial actions must be completed promptly, but no later than one year after completion of the survey, or as soon as practicable after obtaining necessary permits.  Remedial action means the implementation of measures including, but not limited to, additional grounding along the pipeline to reduce interference currents below 20 Amps per meter squared. The following criteria shall be used to determine when remedial actions are required.<br>    a) AC-induced corrosion does not occur at AC densities less than 20 A/m2 (1.9 A/ft2). The operator shall monitor these locations per (a) above.<br>    b) AC corrosion is unpredictable for AC densities between 20 to 100 A/m2 (1.9 to 9.3 A/ft2). These locations require an engineering assessment to determine if remediation is required.<br>    c) AC corrosion occurs at current densities greater than 100 A/m2 (9.3 A/ft2). These areas require mitigation. Any location that is determined to require mitigation must be mitigated to reduce the AC current density to less than 20 A/m2. | | |
| q. | **Corrosion Surveys:**  Grantee must complete corrosion surveys for the pipeline segment within six (6) months of placing the respective CP system(s) in operation to ensure adequate external corrosion protection per NACE RP 0169-2007.  The survey shall also address the proper number and location of CP test stations as well as alternating current (AC) interference mitigation and AC grounding programs per NACE RP 0177.  At least one (1) CP test station must be located within each "could | **More Specific Requirement**<br>-Corrosion Surveys are addressed two documents.  See Pipeline Integrity Management Plan at 66 (Sept 2014); Final EA at 43. | Higher |

| | | | |
|---|---|---|---|
| | affect" HCA with a maximum spacing between test stations of one-half mile. | | |
| r. | **Initial Inline Inspection (ILI):** Within three (3) years of placing a pipeline segment in service, Grantee must perform a baseline ILI using a high-resolution Magnetic Flux Leakage (HR-MFL) tool, high resolution (HR) deformation tool, and an ultrasonic crack detection tool or equivalent of each. | **New Requirement** -Documentation only states that an ILI will be "considered." Pipeline Integrity Management Plan at 25 (Sept 2014). | Higher |
| s. | **ILI Deformation Tool:** Grantee must perform a high resolution deformation tool run after completion of the hydrostatic strength test and backfill of the pipeline segment and prior to placing the pipeline segment in service. Grantee must remediate pipe in accordance with 49 CFR Part 195 and Subpart O. All expanded pipe must be remediated in accordance with PHMSA's "Interim Guidelines for Confirming Pipe Strength in Pipe Susceptible to Low Yield Strength for Liquid Pipeline" dated October 6, 2009 or any subsequent PHMSA update to this guideline. | **New Requirement** | Unclear – If this only applies to trench construction, then it would have limited applicability because there is only HDD construction on USACE-managed property. |
| t. | **Future ILI:** Future ILI inspections must be based upon pipeline segment integrity threats and must include as a minimum of a high-resolution Magnetic Flux Leakage (MFL) tool, high resolution deformation tool, and an ultrasonic crack detection tool or equivalent of each. ILI inspections must be performed on the entire pipeline segment on a frequency consistent with 49 CFR § 195.452(j)(3) assessment intervals or on a frequency determined by fatigue studies or anomalies found that are indicative of actual operating conditions.<br>1) Conduct periodic close interval surveys (CIS) along the entire pipeline segment with current interrupted to confirm voltage drops in association with periodic ILI assessments under § 195.452(j)(3). Pipeline segments under Lake Oahe would not be able to CIS due to water segment and depth of directional drill across Lake Oahe. | **New and More Specific Requirement** -While the Final EA and original easement conditions reference general compliance with 49 C.F.R. part 195, this imposes additional requirements and is more specific. | Higher |

PROPOSED ADDITIONAL DRAFT EASEMENT CONDITIONS

| | | | |
|---|---|---|---|
| | 2) CIS must be conducted within three (3) months of running ILI surveys when using a five (5) year ILI frequency, not to exceed sixty-eight (68) months, in accordance with 49 CFR § 195.452 (j) (3) assessment intervals.<br>CIS findings must be integrated into ILI Tool findings. | | |
| u. | **Flaw Growth Assessment:** Two (2) years after the pipeline segment in-service date, Grantee shall use all data gathered on pipeline section experiencing the most severe historical pressure cycling conditions to determine effect on flaw growth that passed manufacturing standards and installation specifications.  This study shall be performed by a third party independent expert engineering company agreed to upon by Grantee and Oahe OPM. | **New Requirement**<br>-We did not find this addressed in any documentation. | Higher |
| v. | **Verification of Reassessment Interval**:  Grantee must conduct a new fatigue analysis to validate the pipeline reassessment interval annually for the first five (5) years after placing the pipeline segment into service.  The analysis must be performed on the segment experiencing the most severe historical pressure cycling conditions using actual pipeline pressure data.  This study shall be performed by a third party independent expert engineering company agreed to upon by Grantee and Oahe OPM. | **New Requirement**<br>-We did not find this addressed in any documentation. | Higher |
| w. | **Anomaly Evaluation and Repair:**  Anomaly evaluations and repairs must be performed based upon 49 CFR Part 195 or the following, whichever is the most conservative requirement:<br>1) Immediate  Repair Conditions:  Follow 49 CFR § 195.452(h)(4)(i) except designate the calculated remaining strength failure pressure ratio (FPR) ≤ 1.15 for anomaly repairs;<br>2) 60-Day Conditions:  Follow 49 CFR  § 195.452(h)(4)(ii) except designate a FPR ≤ 1.25 for anomaly repairs;<br>3) 180-Day Conditions:  Follow 49 CFR § 195.452(h)(4)(iii) with exceptions for the following conditions which must be scheduled for repair within 180 days:<br>    a) Calculated FPR = < 1.39;<br>    b) Areas of corrosion with predicted metal loss greater than 40%;<br>    c) Predicted metal loss is greater than 40%  of nominal wall that is located at a crossing of another pipeline; and Gouge or groove greater than 8% of nominal wall. | **New or More Specific Requirement**<br>-The Final EA notes compliance with "USDOT requirements" for anomalies.  Final EA at 90.  This is above those requirement, which would be the PHMSA regulations at 49 C.F.R. Part 195. | Higher |

| | | | |
|---|---|---|---|
| **x.** | **Internal Corrosion:** Grantee must limit basic sediment and water (BS&W) to 0.5% by volume and report BS&W testing results to Ain the annual report.  Grantee must report upset conditions causing BS&W level excursions above the limit on the annual report.<br><br>1) Grantee must run cleaning pigs twice in the first year and as necessary in succeeding years based on the analysis of oil constituents, liquid test results, weight loss coupons located in areas with the greatest internal corrosion threat and other internal corrosion threats.  At a minimum in the succeeding years following the first year Grantee must run cleaning pigs once a year, with intervals not to exceed 15 months.<br>2) Liquids collected during cleaning pig runs, such as BS&W, must be sampled, analyzed and internal corrosion mitigation plans developed based upon lab test results.<br>3) Grantee shall review the program at least quarterly based upon the crude oil quality and implement adjustments to monitor for, and mitigate the presence of, deleterious crude oil stream constituents. | **More Specific Requirement**<br>-The Pipeline Integrity Management Plan states that Dakota Access would conduct internal corrosion monitoring measurements semi-annually.  Pipeline Integrity Management Plan at 66.  Pipeline documentation also mentions "Pigging," but without any specificity.  Final EA at 92; Operations and Maintenance Summary Document, USACE Federal Action Area at 2 (Sept 2015). | Higher |
| **y.** | **Pipeline Markers:**  Grantee must install and maintain line-of-sight markings on the pipeline segment except in agricultural areas or large water body crossings such as lakes where line of sight signage is not practical.  The marking of pipelines may also be subject to environmental permits and local restrictions.  Additional markers must be placed along the pipeline in areas where the pipeline is buried less than forty-eight (48) inches.  Grantee must promptly replace removed or damaged line-of-sight markers found during pipeline patrols and maintenance on the right-of-way. | **New Requirement** | Lower |
| **z.** | **Pipeline Patrolling:** Grantee must patrol the pipeline segment right-of-way on a two (2) week interval but not exceeding three (3) weeks, for at least twenty-six (26) times each calendar year, to inspect for excavation activities, ground movement, unstable soil, wash outs, leakage, or other activities or conditions affecting the safe operation of the pipeline segment. | **More Specific Requirement**<br>-This is not in the current Draft Easement, but it is in the Final EA.  "The pipeline ROW would be patrolled and inspected by air every 10 days, weather permitting, but at least every three weeks and not less than 26 times per year, to check for abnormal conditions or dangerous activities, such as unauthorized | Higher |

11

PROPOSED ADDITIONAL DRAFT EASEMENT CONDITIONS

| | | | |
|---|---|---|---|
| | | excavation along the pipeline route." Final EA at 48. | |
| **aa.** | **Records:**  All records demonstrating compliance with these easement conditions herein must be maintained for the duration of the easement. | **New Requirement** | Medium |
| **bb.** | **Third Party Independent Expert Engineering Annual Audit:** Grantee and the Oahe OPM must jointly select a Third Party Independent Expert Engineering Company to review these conditions and to report on the implementation of these conditions by Grantee and any other integrity threats that need to be implemented to maintain safety on the pipeline segment to the Oahe OPM.  Annual Third Party audits must be posted by the Grantee by April 1 of the following year on the operator website. | **New Requirement** | Higher |
| **cc.** | **Annual Reporting:**  For the previous year operations in the pipeline segment, Grantee must annually report by February 15th of the next year the following to the Oahe OPM and post on an operator website for public review:<br>1) The results of any ILI run or direct assessment results performed on the pipeline during the previous year;<br>2) The results of all internal corrosion management programs;<br>3) Any new integrity threats identified during the previous year;<br>4) Any encroachment in the right-of-way;<br>5) Any HCA changes during the previous year;<br>6) Any reportable incidents that occurred during the previous year;<br>7) Any leaks or ruptures on the pipeline that occurred during the previous year;<br>8) A list of all repairs on the pipeline made during the previous year;<br>9) On-going damage prevention initiatives on the pipeline and an evaluation of their success or failure;<br>10) Any changes in procedures used to assess and monitor the pipeline; and<br>11) Any company mergers, acquisitions, transfers of assets, or other events affecting the management of the pipeline segment. | **New Requirement**<br>-PHMSA Note:  This would give public a way to monitor pipeline segment integrity. | Higher |
| **dd.** | **Certification:**  A Grantee senior executive officer must certify in writing the following:<br>1) All of the conditions described herein have been or are being implemented; | **New Requirement** | Medium |

12

|  | | | |
|---|---|---|---|
| | 2) That the written design, construction, and operating and maintenance (O&M) plans and procedures for the pipeline have been updated to include all additional requirements herein;<br>3) That reviewed and modified its damage prevention program relative to the pipeline segment to include any additional elements required herein.<br>Grantee must send a copy of the certification with the required senior executive signature and date of signature to the Oahe OPM at least 90 days prior to operating the pipeline. | | |
|  | **From Original Draft Easement** | | |
| ee. | The Grantee will submit the Facility Response Plan will to the Oahe OPM for review prior to the operation of the pipeline. | -From Draft Easement, Condition 29.d. | Higher |
| ff. | The Grantee will submit all plans not final at the time this easement is granted to the Oahe OPM for review and the incorporation of U.S. Army Corps of Engineers comments prior to the Grantee's submittal to the Pipeline and Hazardous Management Safety Administration. These plans include, but are not limited to the following:<br>1) Geographical Response Plan,<br>2) Operations and Maintenance Manual,<br>3) Risk Assessment (Integrity Management Plan), and<br>4) Spill Models (Using the National Hydrography Dataset by the U.S. Geological Survey) | -From Draft Easement, Condition 29.e. | Higher |
| gg. | The Grantee must send any updated plans in the Facility Response Plan to the Oahe OPM for review by the U.S. Army Corps of Engineers Environmental Compliance Coordinators at the Omaha District Office and the Oahe Project Office within one year of the update. | -From Draft Easement, Condition 29.f. | Higher |
| hh. | The Grantee shall provide as-built drawings for the crossing at Lake Oahe to the Oahe OPM within 6 months of the completion of pipeline construction. | -From Draft Easement, Condition 29.g. | Higher |
| ii. | The Grantee shall conduct the following training exercises:<br><br>1) A full scale open water and a full scale winter/ice exercises at Lake Sakakawea and Lake Oahe.  A full scale exercise will occur once every 3 years (triennial cycle) with the location and type of exercise occurring on alternating schedules (e.g. open water exercise at Lake Oahe the first triennial cycle, followed by winter | -From Draft Easement, Condition 29.h. | Higher |

| | | | |
|---|---|---|---|
| | exercise at Lake Sakakawea the following triennial cycle, followed by a winter exercise at Lake Oahe the following triennial cycle, etc.). The first exercise will occur within the first 3 years after the pipeline becomes operational.<br><br>2) To facilitate USACE staff involvement, the Grantee shall notify the USACE Environmental Compliance Coordinators at the Omaha District Office and the Oahe Project Office at least ninety (90) days prior to initiation of the training exercises.  The Grantee shall also solicit the participation of key stakeholders (federal, state, local, and Tribal) in these exercises. | | |
| jj | Within 1 month following the pipeline becoming operational, the Grantee shall provide for an all-weather access and collection point downstream of the HDD crossing at Lake Oahe.  The Grantee shall provide an equipment storage facility on non-federal lands that includes a fenced permanent storage area for winter and open water spill response equipment.  The storage facility should be placed in a strategic location and near existing facilities that would support access to the water.  The Grantee will coordinate with the USACE and any other applicable stakeholders to obtain all necessary permits and approvals prior to construction for any ground disturbing activities associated with these facilities. The storage facility should contain sufficient response equipment at a minimum to mitigate an unintended worst case release for this Lake crossing. | -This was condition 29.i. from the Draft Easement.  We have strengthened it to require that the all-weather access and collection points downstream be set up 1 month after the pipeline is operational instead of a year. | Higher |
| | **Note:  If Dakota Access, LLC has already constructed portions of the pipeline, they may not be able to be implement some of the conditions. | | |

14



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, OMAHA DISTRICT
1616 CAPITOL AVENUE
OMAHA NE 68102-4901

REPLY TO
ATTENTION OF

CENWO

MEMORANDUM FOR RECORD

SUBJECT:  Application for an Easement for an Oil Pipeline to Cross U.S. Army Corps of Engineers-Managed Federal Land at Lake Oahe, North Dakota


1.  <u>References</u>.

    a.  30 U.S.C. § 185, Rights-of-way for Pipelines through Federal Lands.

    b.  33 U.S.C. § 408, Taking Possession of, Use of, or Injury to Harbor or River Improvements.

    c.  Engineering Regulation 405-1-12, Real Estate Handbook, September 30, 1994.

    d.  Engineering Regulation 1130-2-550, Recreation Operations and Maintenance Policies, September 30, 2013.

    e.  Engineering Circular 1165-2-216, Policy and Procedural Guidance for Processing Requests to Alter U.S. Army Corps of Engineers Civil Works Projects Pursuant to 33 U.S.C. 408, June 21, 2016.

    f.  CEMP-CR/CECC-R, Memorandum, Subject: Real Estate Guidance Letter No. 27 – Official U.S. Army Corps of Engineers Real Estate Policy, October 29, 2008.

    g.  Notice of Availability, Dakota Access Lake Oahe Crossing, December 03, 2016.

2.  <u>Purpose</u>.  The purpose of this memorandum is to document the U.S. Army Corps of Engineers (Corps) decision on the Dakota Access, LLC (Dakota Access) application for an easement to cross Corps-managed federal lands at Lake Oahe, North Dakota.  See the attached Unexecuted Easement, Exhibit A, for a map of the area that would be covered by the easement.

3.  <u>Authority</u>.  Congress authorized "appropriate agency head[s]" to grant rights-of-way or easements through federal lands for oil pipelines in the Mineral Leasing Act.  30 U.S.C. § 185(a).  Congress outlined how agencies were to exercise their discretion under this authority -- before granting a right-of-way, agencies must impose conditions, including requirements to control or prevent damage to the environment, public or private property, hazards to public health and safety, and measures to protect the interests of individuals living in the general area who rely on certain natural resources in the area for subsistence.  30 U.S.C. § 185(h)(2).  Further,



CENWO

SUBJECT:  Application for an Easement for an Oil Pipeline to Cross U.S. Army Corps of Engineers-Managed Federal Land at Lake Oahe, North Dakota

section 185 requires agencies to impose requirements for the operation of pipelines that "protect the public from sudden ruptures and slow degradation of the pipeline."  30 U.S.C. § 185(g).

4.  Background.  The Corps received an application for an easement on October 21, 2014 from Dakota Access.  Specifically, the application requested an easement for a 30-inch diameter light crude oil pipeline.  The approximately 1,168 mile Dakota Access Pipeline (DAPL) will connect the Bakken and Three Forks oil production region in North Dakota to an existing crude oil market hub near Patoka, Illinois.  The pipeline crosses three Corps districts: Omaha, Rock Island and St. Louis.  The Corps was required to consider three categories of requests submitted by Dakota Access for: (1) individual verifications that activities at more than 200 locations along the DAPL route satisfied the terms and conditions of Nationwide Permit (NWP) 12 (under the Clean Water Act, 33 U.S.C. § 1344, or the Rivers and Harbors Act of 1899, 33 U.S.C. § 403), which authorizes activities required for the construction of utility lines in federally-regulated waters; (2) a real estate easement to lay the pipeline under a Corps-managed lake (Lake Oahe) and adjacent Corps-managed property; and (3) permissions to cross or lay the pipeline in seven locations used by the Corps for navigation or flood control under section 14 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 408 (section 408).  Of the total length of the pipeline, only approximately three percent of the route is subject to Corps jurisdiction.

The pipeline would cross Lake Oahe at approximately one-half mile upstream of the northern boundary of the Standing Rock Sioux Tribe's (SRST's) reservation.  Dakota Access would use a technique called horizontal directional drilling (HDD) to place the pipeline approximately 92 feet below the lake bed.  The Corps would need to provide Dakota Access with three separate permissions for this specific crossing.  Dakota Access required and received verification that the crossing meets the terms and conditions of NWP 12.  Because the pipeline would cross Corps-managed property, section 408 required the Corps to "grant permission for the alteration or permanent occupation or use of [the project] when in the judgment of the Secretary such occupation or use will not be injurious to the public interest and will not impair the usefulness of such work."  33 U.S.C. § 408.  Finally, the Corps would need to grant Dakota Access an easement (i.e., a "right-of-way") because the pipeline would cross Corps-managed federal property.  30 U.S.C. § 185(a).

The Omaha District prepared environmental documentation under NEPA to support the required section 408 permission to cross Lake Oahe.  The District published a draft EA on December 8, 2015, which was circulated for public comment.  See 40 C.F.R. § 1508.9 (defining EAs).  After reviewing the comments received, the Corps published the final EA and a Finding of No Significant Impact (FONSI) for the crossing on July 25, 2016.  See 40 C.F.R. § 1508.13 (defining FONSIs).  The Corps must now take action on the application for an easement by Dakota Access.

5.  General Policy Evaluation.  The Corps evaluated the Dakota Access application as a policy matter under the Non-Recreational Outgrant Policy at ER 1130-2-550, Chapter 17.

CENWO

SUBJECT:  Application for an Easement for an Oil Pipeline to Cross U.S. Army Corps of Engineers-Managed Federal Land at Lake Oahe, North Dakota

a.  ER 1130-2-550 requires that the Corps determine that "[t]he impact associated with an individual action or the accumulated impact of a series of actions must not adversely impact the capability of the project to generate the benefits for which the project was congressionally authorized, constructed, and is operated" before granting an easement.  ER 1130-2-550, paras. 17-3 and 17-9.b.(1) (2013).

The Lake Oahe project was authorized by the Flood Control Act of 1944, Public Law 78- 534, along with four other Missouri River main stem projects.  The five reservoirs are elements of a plan for the development of the Missouri River main stem.  The main stem plan is a component of the comprehensive river basin development program in the Missouri River Basin, the Pick-Sloan Plan.  Formed from separate proposals recommended by the Bureau of Reclamation and the Corps, the Pick-Sloan Plan was one of the first plans nationwide that recognized the role of tributary basins and the importance of comprehensive planning in flood control.  The Congressionally-authorized purposes of the Lake Oahe project include flood control, navigation, hydropower, recreation, water supply, and water quality.

The Omaha District found that the proposed DAPL crossing at Lake Oahe "will not impair the usefulness" of the Lake Oahe project when the District granted permission to impact the project under 33 U.S.C. 408.  FONSI at p. 6 (July 25, 2016) and District Commander's Approval of Section 408 Decision Document (July 21, 2016).  This finding is supported by the Final EA that was issued on July 25, 2016 and various memoranda supporting the District Commander's Section 408 approval.  The analysis supporting the grant of permission under 33 U.S.C. 408 is adopted in support of the Corps finding that granting an easement for the pipeline to cross Lake Oahe will not adversely impact the capability of the project to generate the benefits for which the project was Congressionally authorized.

b.  Corps policy is to evaluate whether the proposed easement would be "[c]onsistent with complete land use classifications and resource objectives identified in the approved project master plan."  ER 1130-2-550, para. 17-9 b.(3).  The Corps has reviewed the proposed easement and has determined that it is consistent with the Final Oahe Dam/Lake Oahe Master Plan (September 2010).

c.  Corps policy is to evaluate whether there is no viable alternative to utilization of public lands and waters.  ER 1130-2-550, para. 17-9 b.(2).  Corps policy specifically lists pipelines as examples of instances where there is no viable alternative.  Here, that policy is supported by the alternatives analysis in the Final EA.  See Final EA at Section 2.0, Alternatives.  Accordingly, the Corps finds here that there is no viable alternative to utilization of Corps-managed public lands at Lake Oahe.

d.  Corps policy requires that the grant of the easement must be consistent with the applicable appendices to ER 1130-2-550.  ER 1130-2-550, para. 17-9b.(4).  The applicable appendices are Appendix E, General Outgrant Application Information, Appendix F, National Environmental Policy Act (NEPA) Guidance, Appendix G, Mitigation Guidance, and Appendix H, Additional Guidance for Specific Outgrant Applications.  The applicant submitted the materials that are

CENWO

SUBJECT:  Application for an Easement for an Oil Pipeline to Cross U.S. Army Corps of
Engineers-Managed Federal Land at Lake Oahe, North Dakota

required in Appendix E.  The Corps' evaluation of the proposed pipeline crossing at Lake Oahe
complied with NEPA requirements upon the completion of the Final EA and FONSI, thereby
meeting the requirements of ER 1130-2-550, Appendix F.  The easement will also comply with
the mitigation guidance in Appendix G.  The Final EA outlined the various mitigation measures
that the applicant will undertake.  Final EA at Table 8-2.  Further, various mitigation measures
are conditions in Unexecuted Easement.  *See* Unexecuted Easement para. 2 b. and Exhibit "D,"
Special Conditions.  The applicant complied with the portion of Appendix H relevant to oil
pipelines.  Appendix H, para. f, requires the applicant to make certain disclosures of ownership.
The applicant made the ownership disclosures in its application and has provided updated
information to the Corps as recently as December 2, 2016.  *See* Dakota Access, LLC, Standard
Form 299, Application for Transportation and Utility Systems and Facilities on Federal Lands,
Attachment, Section I, at pp.1-2 (submitted June 29, 2015).

    e.  Corps policy is to grant an easement when it is in the public interest.  ER 1130-2-550,
para. 17-9b.(5).  The Omaha District found that the proposed DAPL crossing of the Corps
project at Lake Oahe "will not be injurious to the public interest" when the District granted
permission to impact the project under 33 U.S.C. 408.  FONSI at p. 6 and District Commander's
Approval of Section 408 Decision Document (July 21, 2016).  This finding is supported by the
Final EA that was issued on July 25, 2016 and various memoranda supporting the District
Commander's Section 408 approval.  The analysis of the public interest supporting the grant of
permission under 33 U.S.C. 408 is adopted in support of the Corps finding that granting an
easement for the pipeline to cross Lake Oahe is in the public interest.

    f.  Corps policy is to determine whether the applicant has a demonstrated need for the project.
ER 1130-2-550, at para. 17-9b.(6).  As described in the Dakota Access application, the overall
project purpose or need is to move a supply of crude oil from the Bakken and Three Forks
production region in North Dakota to a crude oil market hub located near Patoka, Illinois.
Dakota Access, LLC, Standard Form 299, Application for Transportation and Utility Systems
and Facilities on Federal Lands, at p. 6 (submitted June 29, 2015).  The overall pipeline project
will improve overall safety to the public and the environment by reducing crude oil shipped by
truck and by rail and significantly increase the amount shipped by pipeline.  As stated above,
Dakota Access has shown that there is no viable alternative to crossing the federal project.  The
Corps finds that the applicant has a demonstrated need for the project.

    g.  Corps policy is determine whether the applicant has the technical and financial
capabilities to comply with the easement's consideration, mitigation and administrative
expenses.  ER 1130-2-550, at para. 17-9b.(7)&(8).  The applicant's parent company, Energy
Transfer, has completed more than 30 capital projects over $50 million.  Energy Transfer Capital
Projects in Excess of US$ 50 million, 2006-2014 (provided Dec, 2, 2016).  Many of these
projects were pipelines of 30 inches or more in diameter.  *Id.*  The Corps finds that the parent
company's completion of those projects demonstrates that the applicant possess the technical and
financial capabilities to comply with the easement.

CENWO

SUBJECT:  Application for an Easement for an Oil Pipeline to Cross U.S. Army Corps of Engineers-Managed Federal Land at Lake Oahe, North Dakota

h.  Corps policy is that it will coordinate and consult with federally-recognized Native American tribes when reservation lands are involved.  ER 1130-2-550, para. 17-3.  The proposed DAPL crossing at Lake Oahe is not on reservation lands; therefore, by policy there is no requirement to coordinate with any federally-recognized tribe.  However, the Corps reached out to the SRST to coordinate and consult on the DAPL project.  As established in the analyses set forth in the Final EA, the Corps attempted to engage in meaningful discussions with the SRST on numerous occasions about the nature of the project, cultural resources, and the Lake Oahe crossing beginning in October 2014 and continuing through March 2016.  Final EA at 85; see also *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*. No. 16-cv-01534, Memorandum Opinion Denying Plaintiff's Request for Preliminary Injunction, Docket No. 39 at 48 (D.C. Dist. Sept. 9, 2016)(finding that, on the preliminary injunction record, the Corps exceeded its NHPA obligations at many sites).

The Department of the Army also invited the SRST to engage in additional discussions about whether to grant this easement.  See Letter from The Honorable Jo-Ellen Darcy, Assistant Secretary of the Army (Civil Works) to The Honorable Dave Archambault II, Chairman, Standing Rock Sioux Tribe, dated November 14, 2016.  Specifically, the Army invited the SRST to engage in discussion with the Corps concerning the following topics:

• Potential conditions in an easement for the pipeline crossing, which would further reduce the risk of a spill or rupture, hasten detection and response, or otherwise enhance the protection of Lake Oahe, the Tribe's water supplies, and its treaty rights;
• With such conditions, the risk to the Tribe of a spill from the pipeline crossing Lake Oahe at the proposed location; and
• In light of such conditions, whether to grant an easement for the pipeline to cross Lake Oahe at the location currently proposed.

On November 22, 2016, the Corps extended an offer to the SRST to discuss those topics and to seek conditions that would address the Tribe's concerns.  Letter from COL John W. Henderson, District Commander, to Mr. Dave Archambault II, Chairman, SRST, dated November 22, 2016.  The SRST responded the following day, November 23, 2016, stating that "[t]he Tribe's fundamental position remains clear -- the easement to cross Lake Oahe at the Tribe's doorstep must be denied," but added that, "I am willing to talk further with you, including on issues relating to pipeline safety.  But for such discussions to be productive, it is my view that they must take place in the context of the Tribe's basic position regarding the pipeline and the Lake Oahe crossing."  Letter from Mr. Dave Archambault II, Chairman, SRST, to COL John W. Henderson, District Commander, dated November 23, 2016.  In this letter, the Tribe requested that the Corps:

. . . [P]rovide the Tribe with the information sought in our expert's October 28, 2016 report.  The information provided should be sure to include: 1) Comprehensive construction and design documentation that includes piping, instrumentation, control system and electrical design; 2) Documentation that lists the industry codes, standards and recommended practices that have been adopted and applied to the design,

CENWO

SUBJECT:  Application for an Easement for an Oil Pipeline to Cross U.S. Army Corps of Engineers-Managed Federal Land at Lake Oahe, North Dakota

construction and operation of the Dakota Access Pipeline project.  Include both codes and standards required by regulation and recommended practices applicable to the project adopted and applied voluntarily; 3) Material specifications including analysis of selected grade of pipe, wall thickness, pipe yield strength, corrosion allowance, ductility, pipe and weld coating systems and stress induced by installation of the pipe; and 4) Data and source materials underlying and relied on in any risk analysis.  We are continuing to consult with pipeline experts who may have additional questions, but our experts cannot proceed without the fundamental baseline.

Letter from Mr. Dave Archambault II, Chairman, SRST, to COL John W. Henderson, District Commander, dated November 23, 2016.

On December 2, 2016, representatives of the SRST, Dakota Access, and the Corps met to discuss the Tribe's request, along with potential terms and conditions that could be placed in the easement.

Accordingly, the Corps finds that it provided more than adequate coordination and consultation with the federally-recognized SRST, in accordance with ER 1130-2-550, para. 17-3, despite the fact that SRST reservation lands are not involved and the SRST reservation would not be directly impacted by the easement.

i.  The Corps finds that granting Dakota Access an easement for the pipeline to cross Lake Oahe would be consistent with the Corps policy on non-recreational outgrants, ER 1130-2-550, Chapter 17, and Omaha District policy.

6.  <u>Specific Statutory Findings</u>.  An easement must meet the statutory requirements of 30 U.S.C. § 185.  Additionally, the grant of an easement must be consistent with Corps policy implementing that statute.  See Reference 1.c., ER 405-1-12, 8-182 (1994).

a.  The Corps must determine that the proposed easement will not be inconsistent with the authorized purposes of the federal project.  30 U.S.C. § 185(b)(1).  As discussed above, at para. 5.a., pp.2-3, the proposed easement would not be inconsistent with the authorized purposes of the Lake Oahe project.

b.  The Corps cannot grant an easement if the width of the easement exceeds 50 feet plus the ground occupied by the pipeline and related facilities, unless it is determined that a wider right of-way is necessary for operation and maintenance after construction, for protection of the environment, or for public safety.  The width of the requested easement will not exceed 50 feet, plus the ground occupied by the pipeline.  See attached Unexecuted Easement at p.1 (stating width of a right-of-way being 50 feet plus the ground occupied by the pipeline (that is, the pipe and its related facilities).

CENWO

SUBJECT:  Application for an Easement for an Oil Pipeline to Cross U.S. Army Corps of
Engineers-Managed Federal Land at Lake Oahe, North Dakota

c.  Any special requirements for safe operation of the pipeline or related facilities should be
imposed.  See Exhibit D to the Unexecuted Easement containing special conditions addressed
during discussions on December 2, 2016.

d.  The Corps is required to impose necessary stipulations to prevent or control damage to the
environment, including fish and wildlife habitat, damage to public or private property, and
hazards to public health and safety; and require restoration, revegetation, and curtailment of
erosion of the surface of the land when deemed appropriate.  See 30 U.S.C. § 185(h)(2); ER
1130-2-550, para. 17-5, Mitigation, and App. G, Mitigation Guidance (2013).  The proposed
easement requires mitigation and has added special conditions to the easement to mitigate any
impacts to the environment.  See Unexecuted Easement, at para. 2.b., and Exhibit D to the
Unexecuted Easement, Special Conditions.

e.  The Corps is required by statute to obtain ownership information from the applicant.  30
U.S.C. § 185(i).  The applicant made these disclosures in its application and has provided
updated information to the Corps as recently as December 2, 2016.  *See* Dakota Access, LLC,
Standard Form 299, Application for Transportation and Utility Systems and Facilities on Federal
Lands, Attachment, Section I, at pp.1-2 (submitted June 29, 2015).

f.  The Corps is required by statute to determine whether applicant has the technical and
financial capability to construct, operate, maintain, and terminate the project for which the permit
or right-of-way is requested, in accordance with this law.  30 U.S.C. § 185(j).  As discussed
previously in this memorandum, the Corps is satisfied that the applicant has the required
technical and financial capability.

g.  The statute requires the Corps to provide federal, state, and local governments, as well as
the public, the opportunity to comment on the easement application.  30 U.S.C. § 185(k).  Corps
policy is that no further comment periods are necessary if the pipeline proposal and related
aspects have previously been scrutinized through NEPA procedures.  ER 405-1-12, para. 8-
182c.(8) (1994).  The Corps provided a public comment period for the NEPA process that
evaluated the DAPL crossing at Lake Oahe.  Thus, this process satisfied the public comment
requirement in 30 U.S.C. § 185(k).  See Final EA, App. J.

h.  The Corps must also include certain other conditions required by statute and policy.  The
grantee must pay all costs of environmental assessment and monitoring.  ER 405-1-12, para. 8-
182c.(5) (1994).  This is included in the attached Unexecuted Easement at para. 2.c and in the
Special Conditions in Exhibit D.  The Corps must also be reimbursed for costs and be paid
consideration for the easement.  30 U.S.C. § 185(l).  This requirement is included in the attached
Unexecuted Easement at para. 2.a. and 2.c.  The easement cannot be for a term of more than 30
years.  30 U.S.C. § 185(n).  The attached Unexecuted Easement is limited to a term of 30 years.
*See* Unexecuted Easement at para. 1.  The easement must also contain certain language about
suspension or termination of the easement.  30 U.S.C. § 185(o).  This requirement is included in
the attached Unexecuted Easement at para. 16.  The easement must also contain a condition that
allows for the joint use of the easement area for other easements granted under 30 U.S.C. § 185.

CENWO

SUBJECT:  Application for an Easement for an Oil Pipeline to Cross U.S. Army Corps of Engineers-Managed Federal Land at Lake Oahe, North Dakota

30 U.S.C. § 185(p).  This requirement is included in the attached Unexecuted Easement at para. 13.  The easement must also contain certain common carrier requirements.  30 U.S.C. § 185(r).  Those requirements are satisfied in the attached Unexecuted Easement at para. 6.  The easement is also required to address matters concerning liability.  30 U.S.C. § 185(x); ER 405-1-12, para. 8-182c.(16).  Those matters are addressed in the attached Unexecuted Easement at para. 12.

   i.  The District Engineer may require the holder of a license or right-of-way to furnish a satisfactory bond or other security for all or any of the obligations imposed by terms and conditions of the license, right-of-way, or regulations.  This requirement is discretionary.  The attached Unexecuted Easement does not include the requirement to furnish a bond or other security.

   j.  The Corps is required by statute and policy to consider state standards for pipeline construction where the right-of-way crosses federal and non-federal lands, and where the state standards for pipeline construction are more stringent than federal standards, the former will be required.  30 U.S.C. § 185(v); ER 405-1-12, para. 8-182c.(8)  The Corps has considered the relevant state standards.  *See*, for example, Final EA at 8 (discussing North Dakota residential buffer requirements) and App. M, State of North Dakota Sovereign Land Permit for the Lake Oahe Crossing, S-1951.

   k.  The Corps is required to utilize easements in common with other pipelines to the extent practical.  30 U.S.C. § 185(p).  This proposed DAPL crossing at Lake Oahe is co-located with an existing natural gas pipeline crossing, as depicted on the following map:



Final EA at 1008.

   l.  Based on the foregoing information, and after reviewing the attached Unexecuted Easement, including the special conditions discussed by the applicant, Dakota Access, and representatives of the SRST, and included in Exhibit D to the Unexecuted Easement, I have determined that that issuance of the attached Unexecuted Easement to Dakota Access would be consistent with the statutory requirements at 30 U.S.C. § 185.

CENWO

SUBJECT:  Application for an Easement for an Oil Pipeline to Cross U.S. Army Corps of
Engineers-Managed Federal Land at Lake Oahe, North Dakota

7.  The Corps of Engineers, through the Department of the Army, is required by statute to notify
Congress when an application is received and when the Corps is going to grant an easement for a
pipeline that is greater than 24 inches in diameter.  30 U.S.C. § 185(w).  The Army notified
Congress of the application on September 13, 2015.  In accordance with this memorandum, I
recommend that the Army notify Congress that the Corps intends to grant the attached easement
to Dakota Access.

8.  After notification to Congress, the Omaha District intends to execute and issue the easement
to Dakota Access.

Encl                                        JOHN W. HENDERSON, P.E.
                                            Colonel, Engineer
                                            Omaha District Commander

DACW45-2-16-8059

## DEPARTMENT OF THE ARMY
## EASEMENT FOR FUEL CARRYING PIPELINE RIGHT-OF-WAY
## LOCATED ON
## LAKE OAHE PROJECT
## MORTON AND EMMONS COUNTIES, NORTH DAKOTA

This Easement is made on behalf of **THE UNITED STATES OF AMERICA** (the "United States"), between **THE SECRETARY OF THE ARMY**, acting by and through the Chief, Real Estate Division, U.S. Army Engineer District, Omaha, hereinafter referred to as the "Grantor," under and by virtue of the authority vested in Title 30, United States Code, Section 185, and **DAKOTA ACCESS, LLC, a Limited Liability Company, duly organized and existing under and by virtue of the laws of the State of Delaware, with its principal office at 1300 Main, Houston, Texas 77002,** hereinafter referred to as the "Grantee."

**NOW THEREFORE:**

The Grantor, for good and valuable consideration set forth below, the receipt and sufficiency of all of which are hereby acknowledged, upon and subject to the terms, covenants and conditions set forth in this Easement for right-of-way, does hereby:

Grant and convey to Grantee, an easement for a fuel carrying pipeline right-of-way for the installation, construction, operation, maintenance, repair, replacement and termination of a **thirty-inch (30) diameter, horizontal directional drill (HDD) buried oil pipeline for the purpose of transporting crude oil**, and related facilities, hereinafter collectively referred to as the "Facilities," over, across, in and upon lands of the United States **at and under Lake Oahe and the Lake Oahe Project**, as identified in **EXHIBITS "A" and "B,"** hereinafter referred to as the "Premises," and which is attached hereto and made a part hereof; with the width of a right-of-way being fifty (50) feet plus the ground occupied by the pipeline (that is, the pipe and its related facilities);

Make no claim of title during the term of this Easement to any Facilities of whatever nature located, constructed, or placed on the Premises by the Grantee.

**THIS EASEMENT** is granted subject to the following conditions.

## 1.    TERM

This easement is hereby granted for a term of **Thirty Years**, beginning on the date of execution by the Grantor and ending thirty (30) years from the date of execution by the Grantor.

The Grantor shall renew this Easement in accordance with the provisions of 30 U.S.C. § 185, so long as the project is in commercial operation and is operated and maintained in accordance with all of the provisions of this Easement and applicable law. The Grantor prior to renewing this Easement must receive from the Grantee written notice of its intent to seek renewal or extension not less than one year prior to the Easement expiration or termination date and all plans, contracts, agreements, or other information or material which the Grantor deems necessary to determine whether a right-of-way shall be renewed and the terms and conditions which should be included in the right-of-way.

## 2.    CONSIDERATION, MITIGATION, AND DAMAGES

a.  As consideration for this Easement, the Grantee shall pay cash consideration in advance to the Grantor in the amount of **Eight Thousand Fifty and No/100 Dollars ($8,050.00), payable annually on or before the anniversary date of the beginning of this easement**.

b.  The Grantee will mitigate damages caused to the Premises, surrounding areas, or to the **Lake Oahe Project**, during initial installation and construction of the Facilities, and damages caused during operation, maintenance, or subsequent construction work, and complete all site restoration in accordance with the Mitigation/Restoration Plan submitted by Grantee on file in the U.S. Army Engineer District, **Omaha, specifically referenced in the Grantee's pipeline Environmental Assessment ("EA") in Section 3.3.2.5 "Clean-up and Restoration," and further outlined in the Stormwater Pollution Prevention Plan ("SWPPP") presented in Appendix A of the EA and the Environmental Construction Plan presented in Appendix G of the EA**.

c.  The Grantee shall reimburse the Grantor in advance for the costs incurred in monitoring the construction, operation, maintenance, and termination of the pipeline and related facilities on the Premises in the amount of **Seven Hundred Fifty and No/100 Dollars ($750.00) payable annually on or before the anniversary date of the beginning of the Easement**.

d.  Any checks or drafts payable to the Grantor will be made to the order of the **"FAO-USAED, OMAHA"**, and delivered to **USAED, Omaha, ATTN:  CENWO-RE, 1616 Capitol Avenue, Omaha, Nebraska  68102**.

e. Any payments due under the terms of this Easement must be paid on or before the date that they are due to avoid the mandatory sanctions imposed by the Debt Collection Act of 1982, as amended (31 U.S.C. Section 3717). This statute requires the imposition of an interest charge for the late payment of debts owed to the United States; an administrative charge to cover the costs of processing and handling delinquent debts; and the assessment of an additional penalty charge on any portion of a debt that is more than 90 days past due.

## 3.    NOTICES

All correspondence and notices to be given pursuant to this Easement shall be in writing and addressed, if to the Grantee, to **DAKOTA ACCESS LLC**, **1300 Main Street, Houston, Texas 77002** and, if to the Grantor, to the **U. S. Army Engineer District, Omaha, Attention: Chief, Real Estate Division, 1616 Capitol Avenue, Omaha, Nebraska 68102,** or as may from time to time otherwise be directed by the parties. Notices shall be mailed by certified mail, postage prepaid, return receipt requested, addressed to the addresses above. The effective date of the notice shall be the earlier of the actual date of receipt or the date the addressee is notified of the attempted delivery of the certified mail, whether or not the addressee actually accepts delivery.

## 4.    AUTHORIZED REPRESENTATIVE

Except as otherwise specifically provided, any reference herein to "Grantor" or "Chief, Real Estate Division" shall include their duly authorized representatives. Any reference to "Grantee" shall include assignees, transferees and their duly authorized representatives.

## 5.    SUPERVISION BY THE GRANTOR

a. The installation and/or operation and maintenance of said pipeline shall be accomplished without cost or expense to the United States under the general supervision and subject to the approval of the Grantor's representative having immediate jurisdiction over the property, hereinafter designated as "said officer," and in such manner as not to endanger personnel or property of the United States on the said United States land or obstruct travel on any road thereon. The Grantee shall have the right of ingress and egress for such purposes, subject to approval of access by said officer.

b. The use and occupation of said Premises incident to the exercise of the privileges hereby granted shall be subject to such rules and regulations as the said officer may from time to time prescribe.

## 6.    APPLICABLE LAWS AND REGULATIONS

The Grantee shall construct, operate, maintain, and terminate the said pipeline in accordance applicable federal, state, county, and municipal laws, regulations, and ordinances. As required by 30 U.S.C. § 185, the Grantee shall construct, operate, and

maintain the Facilities as common carriers.  The pipeline installation shall be in accordance with the U.S. Department of Transportation's Minimum Federal Safety Standards and any other applicable federal or state safety requirements.

## 7.    CONDITION OF PREMISES

The Grantee acknowledges that it has inspected the Premises, knows its condition, and understands that the same is granted without any representations or warranties whatsoever and without any obligation on the part of the United States.

## 8.    INSPECTION AND REPAIRS

a.  Upon completion of any phase of the pipeline project which causes damage to the Premises, the Grantee shall restore said damage immediately, at the Grantee's own expense, to the same condition in which they existed prior to the commencement of such work, to the satisfaction of the said officer.

b.  The Grantee shall supervise the said pipeline and cause it to be inspected at reasonable intervals, and shall immediately repair any defects or leaks found by such inspection, or when requested by the Grantor to repair any defects or leaks.

## 9.    PROTECTION OF GOVERNMENT PROPERTY

The Grantee shall be responsible for any damage that may be caused to the property of the United States by the activities of the Grantee under this Easement and shall exercise due diligence in the protection of all property located on the Premises against fire or damage from any and all other causes.  Any property of the United States damaged or destroyed by the Grantee incident to the exercise of the privileges herein granted shall be promptly repaired or replaced by the Grantee to a condition satisfactory to the Grantor, or at the election of the Grantor, reimbursement made therefor by the Grantee in an amount to reimburse for the loss satisfactory to the Grantor.

## 10.    RIGHT TO ENTER

a.  The right is reserved to the Grantor, the United States, its officers, agents, and employees to enter upon the premises at any time and for any purpose necessary or convenient in connection with government purposes, to make inspections, to remove timber or other material, except property of the Grantee, to flood the Premises, to manipulate the level of the lake or pool in any manner whatsoever and/or to make any other use of the lands as may be necessary in connection with government purposes, and the Grantee shall have no claim for damages on account thereof against the Grantor, the United States or any officer, agent, or employee thereof.

b.  If the entry will involve removal of timber or other material, or heavy equipment, the Grantor will provide reasonable notice to Grantee of any such entry or use so that Grantee may take any necessary measures to assure the safety of its pipeline and

any personnel of the United States working in proximity to such pipeline.  Grantee will ensure that Grantor has emergency contact information.

## 11.     TRANSFERS AND ASSIGNMENTS

Without prior written approval by the Grantor, the Grantee shall neither transfer nor assign this Easement or any part thereof nor grant any interest, privilege or license whatsoever in connection with this Easement.  The provisions and conditions of this Easement shall extend to and be binding upon and shall inure to the benefit of the representatives, successors and assigns of the Grantee.

## 12.     INDEMNITY

a.  The Grantee shall be strictly liable to the United States for damage or injury which may arise from or be incident to the activities of the Grantee under this Easement, or for damages to the property of the Grantee, or for damages to the property or injuries to the person of the Grantee's officers, agents, or employees or others who may be on the Premises at their invitation or the invitation of any one of them, and the Grantee shall hold the United States harmless from any and all such claims not including damages due to the fault or negligence of the United States or its contractors.  Grantee shall exercise due diligence in the protection of all property located on the Premises.

b.  All owners of any interest in, and all affiliates or subsidiaries of the Grantee shall be liable to the United States in the event that a claim for damage or injury cannot be collected from the Grantee.  Liability without fault hereunder shall be limited to **Ten Million and No/100 Dollars ($10,000,000.00)** for any one incident.  Liability of such Grantee for damages in excess **Ten Million and No/100 Dollars ($10,000,000.00)** shall be in accord with ordinary rules of negligence.  However, this condition shall not impose strict liability on the Grantee for damage or injury resulting from (a) an act of war or force majeure, or (b) negligence of the United States.  In any case where liability without fault is imposed pursuant to this condition and the damage or injuries involved were caused by the negligence of a third party, the rules of subrogation shall apply in accordance with the law of the jurisdiction where the damage or injury occurred.

c.  The Grantee does hereby accept liability, if any, imposed by Federal and state statutes to third parties for injuries incurred in connection with the use and occupancy of the pipeline right-of-way.

## 13.     SUBJECT TO EASEMENTS

a.  This Easement is subject to all other existing easements, or those subsequently granted as well as established access routes for roadways and utilities located, or to be located, on the Premises.

b.  To minimize adverse environmental impacts and the proliferation of separate rights-of-way across federal lands, the utilization of rights-of-way in common shall be

required to the extent practical, and this Easement hereby reserves to the Grantor the right to grant additional rights-of-way or permits for compatible uses on or adjacent to the Premises.

c. Provided that the proposed grant of any new easement or route will be coordinated with the Grantee, and easements will not be granted which will, in the opinion of the Grantor, interfere with the use of the Premises by the Grantee.

## 14.    REQUIRED SERVICES

This condition was deleted.

## 15.    RELOCATION OF FACILITIES

In the event all or any portion of said Premises occupied by said Facilities shall be needed by the United States, or in the event the existence of said Facilities shall be considered detrimental to governmental activities, the Grantee shall, from time to time, upon notice to do so, and as often as so notified, promptly seek authorization from the Federal Energy Regulatory Commission, or other applicable entity, to remove said Facilities, or portion thereof, to such other location or locations on said Premises as may be designated by the Grantor.  In the event said Facilities shall not be removed or relocated within ninety (90) days after any aforesaid notice, the Grantor, after receipt of required approvals, may cause the same to be done at the expense of the Grantee.

## 16.    SUSPENSION OR TERMINATION

a. Abandonment of the Easement herein granted or noncompliance with any provisions of this Easement or applicable provisions of 30 U.S.C. 185 may be grounds for suspension or termination of the right of way if (a) after due notice to the Grantee, (b) a reasonable opportunity to comply with this Easement or applicable provisions of 30 U.S.C. § 185, and (c) an appropriate administrative proceeding pursuant to 5 U.S.C. § 554, the Grantor determines that any such ground exists that suspension or termination is justified.  No administrative proceeding shall be required where the Easement by its terms provides that it terminates on the occurrence of a fixed or agreed upon condition, event, or time.

b. If the Grantor determines that an immediate temporary suspension of activities within the Premises is necessary to protect public health or safety or the environment, the Grantor may abate such activities prior to an administrative proceeding.

c. Deliberate failure of the Grantee to use the Easement for the purpose for which it was granted or renewed for any continuous two-year period shall constitute a presumption of abandonment of the Easement; provided, that where the failure to use the right-of-way is due to circumstances not within the Grantee's control, the Grantor is not required to commence proceedings to suspend or terminate the right-of-way.

17.   **SOIL AND WATER CONSERVATION**

The Grantee shall maintain, in a manner satisfactory to said officer, all soil and water conservation structures that may be in existence upon said Premises at the beginning of or that may be constructed by the Grantee during the term of this Easement, and the Grantee shall take appropriate measures to prevent or control soil erosion within the right-of-way herein granted.  Any soil erosion occurring outside the Premises resulting from the activities of the Grantee shall be corrected by the Grantee as directed by said officer.

18.   **ENVIRONMENTAL PROTECTION**

a.   Within the limits of their respective legal powers, the parties hereto shall protect the Premises against pollution of its air, ground, and water.  The Grantee shall promptly comply with any laws, regulations, conditions, or instructions affecting the activity hereby authorized if and when issued by the Environmental Protection Agency, or any federal, state, interstate, or local governmental agency having jurisdiction to abate or prevent pollution.  The disposal of any toxic or hazardous materials within the Premises is strictly prohibited.  Such regulations, conditions, or instructions in effect or prescribed by the said Environmental Protection Agency or any federal, state, interstate, or local governmental agency are hereby made a condition of this Easement.  The Grantee shall not discharge waste or effluent from the Premises in such a manner that the discharge will contaminate streams or other bodies of water or otherwise become a public nuisance.

b.   The use of any pesticides or herbicides within the Premises shall be in conformance with all applicable federal, state, and local laws and regulations.  The Grantee must obtain approval in writing from said officer before any pesticides or herbicides are applied to the Premises.

c.   The Grantee will use all reasonable means available to protect the environment and natural resources, and where damage nonetheless occurs arising from the Grantee's activities, the Grantee shall be liable to restore the damaged resources.

19.   **ENVIRONMENTAL CONDITION OF PROPERTY**

An Environmental Condition of Property (ECP) documenting the known history of the property with regard to the storage, release, or disposal of hazardous substances thereon, is attached hereto and made a part hereof as **Exhibit "C."**  Upon expiration, revocation, or termination of this Easement, another ECP shall be prepared which will document the environmental condition of the property at that time.  A comparison of the two studies will assist the said officer in determining any environmental restoration requirements.  Any such requirements will be completed by the Grantee in accordance with the condition on **RESTORATION**.

Version Dated 3 December 2016

20.     **HISTORIC PRESERVATION**

The Grantee shall not remove or disturb, or cause or permit to be removed or disturbed, any historical, archeological, architectural or other cultural artifacts, relics, vestiges, remains or objects of antiquity.  In the event such items are discovered on the Premises, the Grantee shall immediately notify the Grantor, and the site and the material shall be protected by the Grantee from further disturbance until the Grantor gives clearance to proceed.

21.     **NON-DISCRIMINATION**

The Grantee shall not discriminate against any person or persons or exclude them from participation in the Grantee's operations, programs or activities conducted on the Premises because of race, color, religion, sex, sexual orientation, gender identity, age, handicap, or national origin, pursuant to Executive Order 13672, 21 July 2014.  The Grantee will comply with the Americans with Disabilities Act and attendant Americans with Disabilities Act Accessibility Guidelines (ADAAG) published by the Architectural and Transportation Barriers Compliance Board.  The Grantee shall comply with Department of Justice rules on non-discrimination.

22.     **HAZARDOUS WASTE MANAGEMENT**

The Grantee will not store or dispose of non-DoD hazardous materials on the premises unless authorized under 10 U.S.C. § 2692, *Storage, Treatment, and Disposal of Non-Defense Toxic and Hazardous Materials*.  The Grantee shall strictly comply with the hazardous waste management requirements under the Resource Conservation and Recovery Act and the applicable state hazardous waste management rules, including proper hazardous waste characterization, labeling, storage, disposal and documentation requirements.  Except as specifically authorized by the Grantor in writing, the Grantee must provide, at its own expense such hazardous waste management facilities as needed to maintain compliance with all laws and regulations.  Army hazardous waste management facilities will not be available to the Grantee.

23.     **HAZARDOUS WASTE OR FUEL SPILL**

The Grantee shall submit to the Grantor and maintain, thereafter, a plan for responding to hazardous water, fuel, and other chemical spills prior to commencement of use of the Premises.  Such plan shall be independent of the Government's spill contingency plan and, except for initial fire response and/or spill containment, shall not rely on use of project personnel or equipment.  Should the Grantor provide any personnel or equipment, whether for initial fire response and/or spill containment, or otherwise on request of the Grantee or because the Grantee was not, in the opinion of the said officer, conducting timely clean-up actions, the Grantee agrees to reimburse the Grantor for its costs.

## 24.    RESTORATION

On or before the expiration or termination of this Easement, the Grantee shall, without expense to the United States, and within such time as the Grantor may indicate, remove said Facilities and restore the Premises to the satisfaction of the Grantor.  In the event the Grantee shall fail, neglect or refuse to remove said Facilities and restore the Premises, the Grantor shall have the option to take over said Facilities without compensation, or to remove said Facilities and perform the restoration at the expense of the Grantee, and the Grantee shall have no claim for damages against the United States or its officers or agents for such action.  This provision is subject to all regulatory requirements and approvals covering any of the activities described in this condition.

## 25.    DISCLAIMER

It is understood that this instrument is effective only insofar as the rights of the United States in the said property are concerned, and that the Grantee shall obtain such permission as may be necessary on account of any other existing rights.  It is also understood that the granting of this Easement does not eliminate the necessity of obtaining any Department of the Army permit that may be required pursuant to the provisions of Section 10 of the Rivers and Harbors Act of March 3, 1899 (30 Stat. 1151; 33 U.S.C. § 403), Section 404 of the Clean Water Act (33 U.S.C. § 1344), or any other permit or license which may be required by federal, state or local statute in connection with the use of the Premises.  The grant of this Easement pursuant to 30 U.S.C. § 185 shall grant no immunity from the operation of the federal antitrust laws.

## 26.    OTHER AGENCY AGREEMENTS

It is understood that the provision of the Easement shall not abrogate or interfere with any agreements or commitments made or entered into between the Grantee and any other agency of the United States with regard to financial aid to the Grantee in connection with the installation, operation, or maintenance of said pipeline.

## 27.    CONSTRUCTION, OPERATION AND REHABILITATION PLAN

In compliance with 30 U.S.C. § 185, the Grantee will follow the plan(s) of construction, operation, and rehabilitation submitted to the Grantor prior to the execution of this Easement, on file in the **U.S. Army Engineer District, Omaha District. Restoration will be in accordance with Section 3.3.2.5 of the EA "Clean-up and Restoration" and further outlined in the SWPPP and the Environmental Construction Plan presented in Appendices "A" and "G," respectively, of the EA. Ground disturbing activities will not occur on Corps-managed lands; therefore, reseeding is not anticipated in those areas.  However, if reseeding were to become necessary on Corps-managed lands, all activities shall be conducted in accordance with applicable Lake Oahe revegatation guidelines.**

**28.    FEDERAL ENERGY REGULATORY COMMISSION ORDER ISSUING CERTIFICATES**

The Grantee shall comply with the conditions set forth in the Federal Energy Regulatory Commission's Order Issuing Certificate **dated December 24, 2014, as applicable, to Docket No. OR14-42-00, Dakota Access LLC.**

**29.    SPECIAL CONDITIONS**

See **Exhibit "D"** for the Special Conditions for this Easement.

**30.    EXECUTIVE ORDER 13658**

a.  Any reference in this section to "prime contractor" or "contractor" shall mean the Grantee and any reference to "contract" shall refer to the Easement.

b.  It has been determined that this contract is not subject to Executive Order 13658 or the regulations issued by the Secretary of Labor in 29 CFR part 10 pursuant to the Executive Order.

c.  If a duly authorized representative of the United States discovers or determines whether before or subsequent to executing this contract, that an erroneous determination regarding the applicability of Executive Order 13658 was made, contractor, to the extent permitted by law, agrees to indemnify and hold harmless the Unites States, its officers, agents, and employees, for and from any and all liabilities, losses, claims, expenses, suits, fines, penalties, judgments, demands or actions, costs, fees, and damages directly or indirectly arising out of, caused by, related to, resulting from or in any way predicated upon, in whole or in part, the erroneous Executive Order 13658 determination.  This includes contractor releasing any claim or entitlement it would otherwise have to an equitable adjustment to the contract and indemnifying and holding harmless the United States form the claims of subcontractors and contractor employees.

**IN WITNESS WHEREOF,** I have hereunto set my hand to this Easement by authority of the Secretary of the Army, this _____ day of _____ 2016.

_____
**DAVID V. CHIPMAN**
Chief, Real Estate Division, Omaha District
Real Estate Contracting Officer

## ACKNOWLEDGMENT

STATE OF NEBRASKA   )
                                      ) ss:
COUNTY OF DOUGLAS  )

     **PERSONALLY APPEARED BEFORE ME,** the undersigned authority in and for said County and State, within my jurisdiction, the within named **David V. Chipman,** who acknowledged that he is the Chief of Real Estate Division, U.S. Army Engineer District, Omaha, and that in said capacity he executed the above and foregoing **Department of the Army Easement for Fuel Carrying Pipeline Right-Of-Way** by authority of the Secretary of the Army for the purposes therein expressed and as the act and deed of the United States of America.

     **GIVEN UNDER MY HAND AND SEAL,** this _____ day of _____, **2016**.

(SEAL)

_____
NOTARY PUBLIC

My Commission Expires:

_____

DACW45-2-16-8059

**THIS EASEMENT** is also executed by the Grantee this_____ day of
_____, 2016.

**DAKOTA ACCESS LLC**

_____

**Robert Rose**
Vice President, Land and Right of Way

**ACKNOWLEDGMENT**

STATE OF _____ )
                                         ) ss:
COUNTY OF _____ )

    **PERSONALLY APPEARED BEFORE ME,** the undersigned authority in and for the county and state, on this _____ day of _____, 2016, within my jurisdiction, the within named **Robert Rose**, who acknowledged that he is **Vice President, Land and Right of Way, DAKOTA ACCESS LLC** a Delaware Limited Liability Company, and that for and on behalf of the said company, and as its act and deed he executed the above and foregoing **Department of the Army Easement for Fuel Carrying Pipeline Right-Of-Way,** having been duly authorized by said company so to do.

(SEAL)

_____
NOTARY PUBLIC

My Commission Expires:

_____



Proposed Pipeline Easement



Pipeline Crossing

# OAHE DAM AND RESERVOIR



0   600   1,200          2,400
Feet

N
W    E
S

### Legend

▪▪▪ Project Boundary (Fee)
━━━ 50' Wide Proposed Easement (±7.37 Acres)
▢ Tracts
▢ Sections
▢ Counties



Date: 28-May-2015

Disclaimer: The Government furnishes this data and the recipient accepts and uses it with the express understanding that the United States Government makes no warranties, expressed or implied, concerning the accuracy, completeness, reliability, usability, or suitability for any particular purpose of the information and data furnished. The United States shall be under no liability whatsoever to any person by reason of any use made thereof. Data displayed on this map are approximations derived from GIS layers and should NOT be used in place of survey data or legal land descriptions.

Path: (regsi1):\re2\jesse\bob_incontro\Oahe\DAPL_Easement\DAPL_Easement.mxd

EXHBIT "A" ATTACHED TO AND
MADE A PART OF DACW45-2-16-8059

## METES AND BOUNDS DESCRIPTION
## CENTERLINE 50' WIDE PERMANENT EASEMENT

Being a centerline description located in the Section 10, Township 134 North, Range 79 West of the 5th P.M., in Morton and Emmons County, North Dakota and Section 11, Township 134 North, Range 79 West of the 5th P.M., in Emmons County, North Dakota, and crossing the following tracts of land and described as follows:

Basis of Bearing:
Bearing are based on UTM Zone 14 Grid North.

Tracts of land:
Tract 1: Portion of Lot 4 and Lot 7; Book 125, Page 395; Deed Records, Morton County.
Tract 2: Lake Oahe.
Tract 3: Portion of the N1/2 of Section 11; Civil Case No. 406; Probate Records, Emmons County.

**COMMENCING** at a 3/8-inch iron rod found for the Northwest corner of said Section 10;

**THENCE**, crossing said Section 10, South 46 degrees 08 minutes 26 seconds East a distance of 3,664.72 feet to the west line of said United States of America Tract 1 for the **POINT OF BEGINNING** of this centerline description;

**THENCE**, crossing the United States of America tracts and through said Section 10 and said Section 11, North 83 degrees 59 minutes 34 seconds East a distance of 6,420.72 feet to the east line of said United States of America Tract 3 for the **TERMINAL POINT** of this centerline description, from which a 1-inch USGS monument found on said east line bears South 01 degrees 17 minutes 30 seconds West a distance of 296.68 feet. Said centerline having a length of 6,420.72 feet, 389.14 rods, and said fifty foot (50') wide.

Permanent Easement containing 7.37 acres of land.

Wood Group Mustang, Inc.
17325 Park Row
Houston, Texas 77084
(832) 809-8000
April 23, 2015
Job No. 103957

**Exhibit "B"**
**DACW45-2-16-8059**

## ENVIRONMENTAL CONDITION OF PROPERTY
Helpful instructions for ECP are located at:
https://w3.nwo.usace.army.mil/intranet/od-tn/policypage/policies/RE/ECP%20Instructions.pdf

This form covers Purpose, Site Location, Current Use of Property and adjacent property, Historical Use of Property and Adjacent Property, User provided Information, Site Reconnaissance, and Records Search and Interviews. Specific Records Search and Interview information will be provided in sections 4.0 and 5.0. Pictures, Maps, Record and Interview information are appendices.

| Project Name: | DACW#: | Address/location: |
|---|---|---|
| Dakota Access Pipeline Project | Pending | Lake Oahe, Morton and Emmons Counties, North Dakota, Approx. 3.5 miles North of Cannonball, North Dakota. |

### 1.0 Purpose

Construct, install and operate an approximate 1,100 mile long crude oil pipeline from near Stanley, North Dakota to Patoka, Illinois. The main trunk line of 30 inch diameter pipe will cross government fee owned property at the Oahe Reservoir. The pipeline will transfer crude oil from the Bakken oil production area in North Dakota to a crude oil transportation terminal in Illinois.

### 2.0 Site Description

#### 2.1 Property Legal Description and Site Address:

NE 1/4 Section 10, T134 N, R79 W, Morton County, North Dakota-Lat 46.43783, Long 100.59806 and NE 1/4 Section 11, T134 N, R79 W, Emmons County, North Dakota- Lat. 46.439908, Long. 100.576745

#### 2.2 Site and Vicinity General Characteristics:

The proposed DAPL pipeline will cross the Oahe Reservoir and lies within the Missouri River corridor and flood plane. The pipeline and corresponding easement band of 30 to 50 feet wide for construction and subsequent operation and maintenance will occur on gently rolling hills and in significant elevation relief in the transition zones of upland to river bed. Land use on the west side of the reservoir is primarily native grasses and legumes with minimal amount of herbaceous and shrub vegetation, while on the east side is native grasses and minor amounts of tillage and farming with scattered herbaceous vegetation. More specific information on land features, vegetation, geology, and environmental features are addressed in the current Draft Environmental Assessment. The proposed pipeline is to be installed by horizontal directional boring (HDD) will be underground below Lake Oahe, with the boring entrance and exit located in the uplands on the west side and east side respectively. The pipeline crossing will occur in a corridor that currently has an existing overhead 500 KV power line crossing administered by Basin Electric Cooperative and an underground 42 inch diameter natural gas line crossing administered by Northern Border Pipeline.

### 3.0 General Site Setting

Yes answers must be documented. Records and interviews must be documented.

**a. Current and Past use of Property:**

| | | | |
|---|---|---|---|
| (1)(a) Is the property used for industrial use? | | | |
| Record Search and/or Interview: | ☐ Yes | ☑ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ☑ No | |
| (1)(b) Is any adjoining property used for an industrial use? For the purposes of this inquiry, adjoining | | | |

Page | 1

EXHIBIT "C"
DACW45-2-16-8059

ENVIRONMENTAL CONDITION OF PROPERTY, CON'T

| | | Yes | No | Unk |
|---|---|---|---|---|
| | property is considered to be property located within a quarter mile of the subject property and individual properties located within a mile of the subject property that exhibit a potential for environmental concern. | | | |
| | Record Search and/or Interview: Existing easements for overhead power line and underground gas line. | ■ Yes | ☐ No | ☐ Unk |
| | Observed during site visit: Existing power line observed. | ■ Yes | ☐ No | |
| | (2)(a)  Did you observe evidence or do you have any prior knowledge that the property has been used for an industrial use in the past? | | | |
| | Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| | Observed during site visit: | ☐ Yes | ■ No | |
| | (2)(b)  Did you observe evidence or do you have any prior knowledge that any adjoining property has been used for an industrial use in the past? | | | |
| | Record Search and/or Interview: Existing easements for overhead power line and underground gas line. | ■ Yes | ☐ No | ☐ Unk |
| | Observed during site visit: Existing power line observed. | ■ Yes | ☐ No | |
| | (3)(a)  Is the property used as a gasoline station, motor repair facility, dry cleaners, photo developing laboratory, junkyard, or landfill, or as a waste treatment, storage, disposal, processing, or recycling facility (if applicable, identify which)? | | | |
| | Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| | Observed during site visit: | ☐ Yes | ■ No | |
| | (3)(b)  Is any adjoining property used as a gasoline station, motor repair facility, dry cleaners, photo developing laboratory, junkyard, or landfill, or as a waste treatment, storage, disposal, processing, or recycling facility (if applicable, identify which)? | | | |
| | Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| | Observed during site visit: | ☐ Yes | ■ No | |
| | (4)(a)  Did you observe evidence or do you have any prior knowledge that the property has been used as a gasoline station, motor repair facility, dry cleaners, photo developing laboratory, junkyard, or landfill, or as a waste treatment, storage, disposal, processing, or recycling facility (if applicable, identify which)? | | | |
| | Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| | Observed during site visit: | ☐ Yes | ■ No | |
| | (4)(b)  Did you observe evidence or do you have any prior knowledge that any adjoining property has been used as a gasoline station, motor repair facility, dry cleaners, photo developing laboratory, junkyard, or landfill, or as a waste treatment, storage, disposal, processing, or recycling facility (if applicable, identify which)? | | | |
| | Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| | Observed during site visit: | ☐ Yes | ■ No | |
| **b.  Specific Property Conditions/Exterior Observations** | | | | |
| | (5)(a)  Are there currently any damaged or discarded automotive or industrial batteries, pesticides, paints, or other chemicals, hazardous substances or petroleum products in individual containers of >5 gal (19 L) in volume or 50 gal (190 L) in the aggregate, stored on or used at the property or at the facility? | | | |
| | Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| | Observed during site visit: | ☐ Yes | ■ No | |
| | (5)(b)  Did you observe evidence or do you have any prior knowledge that there have been previously any damaged or discarded automotive or industrial batteries, pesticides, paints, or other chemicals, hazardous substances or petroleum products in individual containers of >5 gal (19 L) in volume or 50 gal (190 L) in the aggregate, stored on or used at the property or at the facility? | | | |

ENVIRONMENTAL CONDITION OF PROPERTY, CON'T

| | | | | |
|---|---|---|---|---|
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk | |
| Observed during site visit: | ☐ Yes | ■ No | | |
| (6)(a)  Are there currently any industrial drums (typically 55 gal (208 L)) or sacks of chemicals located on the property or facility? | | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk | |
| Observed during site visit: | ☐ Yes | ■ No | | |
| (6)(b)  Did you observe evidence or do you have any prior knowledge that there have been previously any industrial drums (typically 55 gal (208 L)) or sacks of chemicals located on the property or facility? | | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk | |
| Observed during site visit: | ☐ Yes | ■ No | | |
| (7)(a)  Did you observe evidence or do you have any prior knowledge that fill dirt has been brought onto the property that originated from a contaminated site? | | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk | |
| Observed during site visit: | ☐ Yes | ■ No | | |
| (8)(a)  Are there currently any pits, ponds, or lagoons located on the property in connection with waste treatment or waste disposal? | | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk | |
| Observed during site visit: | ☐ Yes | ■ No | | |
| (8)(b)  Did you observe evidence or do you have any prior knowledge that there have been previously, any pits, ponds, or lagoons located on the property in connection with waste treatment or waste disposal? | | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk | |
| Observed during site visit: | ☐ Yes | ■ No | | |
| (9)(a)  Is there currently any stained soil on the property? | | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk | |
| Observed during site visit: | ☐ Yes | ■ No | | |
| (9)(b)  Did you observe evidence or do you have any prior knowledge that there have been previously, any stained soil on the property? | | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk | |
| Observed during site visit: | ☐ Yes | ■ No | | |
| (10)(a)  Are there currently any registered or unregistered storage tanks (above or underground) located on the property? | | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk | |
| Observed during site visit: | ☐ Yes | ■ No | | |
| (10)(b)  Did you observe evidence or do you have any prior knowledge that there have been previously, any registered or unregistered storage tanks (above or underground) located on the property? | | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk | |
| Observed during site visit: | ☐ Yes | ■ No | | |
| (11)(a)  Are there currently any vent pipes, fill pipes, or access ways indicating a fill pipe protruding from the ground on the property or adjacent to any structure located on the property? | | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk | |
| Observed during site visit: | ☐ Yes | ■ No | | |
| (11)(b)  Did you observe evidence or do you have any prior knowledge that there have been previously, | | | | |

## ENVIRONMENTAL CONDITION OF PROPERTY, CON'T

| any vent pipes, fill pipes, or access ways indicating a fill pipe protruding from the ground on the property or adjacent to any structure located on the property? | | | | | | |
|---|---|---|---|---|---|---|
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |

| (12)(a)  Are there currently any strong, pungent, or noxious odors located on the property? | | | | | | |
|---|---|---|---|---|---|---|
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |

| (12)(b)  Did you observe evidence or do you have any prior knowledge that there have been previously, any strong, pungent, or noxious odors located on the property? | | | | | | |
|---|---|---|---|---|---|---|
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |

| (13)(a)  Are there currently any standing surface water, pools or sumps containing liquids likely to be hazardous substances or petroleum products, located on the property? | | | | | | |
|---|---|---|---|---|---|---|
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |

| (13)(b)  Did you observe evidence or do you have any prior knowledge that there have been previously, any standing surface water, pools or sumps containing liquids likely to be hazardous substances or petroleum products located on the property? | | | | | | |
|---|---|---|---|---|---|---|
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |

| **c.  Facility Conditions or Interior Observations** | | | | | | |
|---|---|---|---|---|---|---|
| (c.)(1) Are there facilities currently on site?   See comments below, no enclosed struct. | ■ Yes | ☐ No | ☐ Unk |
| (c.)(2) Is there evidence or prior knowledge of facilities previously on site? | ☐ Yes | ■ No | ☐ Unk |
| If answers (c.)(1) and (c.)(2) are No, than questions 14-16 are | | | ☐ N/A |

| (14)(a)  Is there currently evidence of leaks, releases or staining by substances other than water, or foul odors, associated with any flooring, drains, walls, ceilings, or exposed grounds on the property? | | | | | | |
|---|---|---|---|---|---|---|
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |

| (14)(b)  Did you observe evidence or do you have any prior knowledge that there have been previously any leaks, releases or staining by substances other than water, or foul odors, associated with any flooring, drains, walls, ceilings, or exposed grounds on the property, infrastructure Conditions | | | | | | |
|---|---|---|---|---|---|---|
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |

| (15)  Describe the means of heating and cooling the buildings on the property, including the fuel source for heating and cooling. |
|---|

The facility that is adjacent to the proposed pipeline site is an overhead high voltage power line and on the west and east side of the Oahe Reservoir there is a secured area of above ground piping, valves and controls for the underground gas line.  No enclosed buildings exist, or have existed, on the Government property under consideration for the proposed DAPL oil pipeline to my knowledge.

| (16)  Describe sumps or drains visually and/or physically observed or identified from the interviews that are present in the buildings on the property. |
|---|

N/A

| **d.  Infrastructure Conditions** |
|---|
| (17)  Identify the source of potable water for the property. |

## ENVIRONMENTAL CONDITION OF PROPERTY, CON'T

| N/A | | | | |
|---|---|---|---|---|
| (18) Identify the sewage disposal for the property. | | | | |

N/A

| (19)(a) If the property is served by a private well or non-public water system, is there evidence or do you have prior knowledge that contaminants have been have been identified in the well or system that exceed guidelines applicable to the water system? | | | | |
|---|---|---|---|---|
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk | |
| Observed during site visit: | ☐ Yes | ■ No | | |
| (19)(b) If the property is served by a private well or non-public water system is there evidence or do you have prior knowledge that the well has been designated as contaminated by any government environmental/health agency? | | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk | |
| Observed during site visit: | ☐ Yes | ■ No | | |
| (19)(c) Does the property discharge waste water (not including sanitary waste or storm water) onto or adjacent to the property and/or into a storm water system? | | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk | |
| Observed during site visit: | ☐ Yes | ■ No | | |
| (19)(d) Does the property discharge waste water (not including sanitary waste or storm water) onto or adjacent to the property and/or into a sanitary sewer system? | | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk | |
| Observed during site visit: | ☐ Yes | ■ No | | |
| (20)(a) Has there been a discharge of any substance or material from the property that might contaminate the public water system? | | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk | |
| Observed during site visit: | ☐ Yes | ■ No | | |
| (20)(b) Is the property known to be served by asbestos cement mains, lead containing lines, or piping that uses copper and/or lead solder? | | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk | |
| Observed during site visit: | ☐ Yes | ■ No | | |
| (21)(a) Is the property served by a private/nonpublic water system that has been found to be contaminated in excess of drinking water guidelines or otherwise contaminated? | | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk | |
| Observed during site visit: | ☐ Yes | ■ No | | |
| **e. CERCLA and Related Liability** | | | | |
| (22) Is there any knowledge of environmental remediation orders or agreements applicable to the property or any facility located on the property? | | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk | |
| Observed during site visit: | ☐ Yes | ■ No | | |
| (23)(a) Is there information on the past existence of hazardous substances or petroleum products with respect to the property or any facility located on the property? | | | | |

## ENVIRONMENTAL CONDITION OF PROPERTY, CON'T

| | | Yes | No | Unk |
|---|---|---|---|---|
| Record Search and/or Interview: Draft Env. Assess., | | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | | ☐ Yes | ■ No | |
| (23)(b)  Is there information on the current existence of hazardous substances or petroleum products with respect to the property or any facility located on the property? | | | | |
| Record Search and/or Interview: | | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | | ☐ Yes | ■ No | |
| (23)(c)  Is there information on the past existence of environmental violations with respect to the property or any facility located on the property? | | | | |
| Record Search and/or Interview: | | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | | ☐ Yes | ■ No | |
| (23)(d)  Is there information on the current existence of environmental violations with respect to the property or any facility located on the property? | | | | |
| Record Search and/or Interview: | | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | | ☐ Yes | ■ No | |
| (24)  Is there any knowledge of any environmental site assessment of the property or facility that indicated the presence of hazardous substances or petroleum products on, or contamination of, the property or recommended further assessment of the property? | | | | |
| Record Search and/or Interview: | | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | | ☐ Yes | ■ No | |
| (25)  Is there any knowledge of any past, threatened, or pending lawsuits or administrative proceedings concerning a release or threatened release of any hazardous substances or petroleum products involving the property by any owner or occupant of the property? | | | | |
| Record Search and/or Interview: | | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | | ☐ Yes | ■ No | |
| (26)  Is there any prior knowledge that any hazardous substances or petroleum products, unidentified waste materials, tires, automotive or industrial batteries, or any other waste materials have been dumped above grade, buried and or burned on the property? | | | | |
| Record Search and/or Interview: | | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | | ☐ Yes | ■ No | |

### 3.1  TOXIC SUBSTANCES CONTROL ACT (TSCA):

| | | Yes | No | Unk |
|---|---|---|---|---|
| a.  Is there a transformer, capacitor, or any hydraulic equipment known to contain or likely to contain polychlorinated biphenyls (PCBs) or any records indicating the presence of such? | | | | |
| Record Search and/or Interview: | | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | | ☐ Yes | ■ No | |

### 3.2  ASBESTOS ABATEMENT AND INSPECTION:

If no facilities then ■ N/A

| | | Yes | No | Unk |
|---|---|---|---|---|
| a.  Were any of the facilities located on the property constructed prior to 1980? | | | | |
| Record Search and/or Interview: | | ☐ Yes | ☐ No | ☐ Unk |
| Observed during site visit: | | ☐ Yes | ☐ No | |
| b.  Have all facilities on the property been inspected by a certified asbestos abatement team? | | | | |
| Record Search and/or Interview: | | ☐ Yes | ☐ No | ☐ Unk |
| Observed during site visit: | | ☐ Yes | ☐ No | |

## ENVIRONMENTAL CONDITION OF PROPERTY, CON'T

| | | | | |
|---|---|---|---|---|
| c. Is there any documented evidence of asbestos (e.g., tests, surveys, management plan) in any of the facilities on the property? | | | | |
| Record Search and/or Interview: | ☐ Yes | ☐ No | ☐ Unk | |
| Observed during site visit: | ☐ Yes | ☐ No | | |
| d. Has all friable asbestos on the property or within facilities on the property been removed or become subject to an Operation and Maintenance (O&M) program so that it does not create the potential for human exposure? | | | | |
| Record Search and/or Interview: | ☐ Yes | ☐ No | ☐ Unk | |
| Observed during site visit: | ☐ Yes | ☐ No | | |
| e. Does the site survey of pre-1980 construction identify potential asbestos containing materials (e.g., boiler insulation, floor tiles, building siding, shingles, roofing felt, wall and ceiling insulation, acoustical ceiling tiles, window putty, fuse boxes, heat reflectors, air duct lining)? | | | | |
| Record Search and/or Interview: | ☐ Yes | ☐ No | ☐ Unk | |
| Observed during site visit: | ☐ Yes | ☐ No | | |

| 3.3 LEAD-BASED PAINT ABATEMENT AND INSPECTION: | | | | |
|---|---|---|---|---|
| If there were never structures then ■ N/A | | | | |
| a. Were any structures or facilities on the property constructed prior to 1979? | | | | |
| Record Search and/or Interview: | ☐ Yes | ☐ No | ☐ Unk | |
| Observed during site visit: | ☐ Yes | ☐ No | | |
| b. Has a screening test been conducted on the property for lead-based paint? | | | | |
| Record Search and/or Interview: | ☐ Yes | ☐ No | ☐ Unk | |
| Observed during site visit: | ☐ Yes | ☐ No | | |
| c. Did the results of the screening tests identify lead-based paint? | | | | |
| Record Search and/or Interview: | ☐ Yes | ☐ No | ☐ Unk | |
| Observed during site visit: | ☐ Yes | ☐ No | | |
| d. Is any of the on-site paint peeling or chipped? | | | | |
| Record Search and/or Interview: | ☐ Yes | ☐ No | ☐ Unk | |
| Observed during site visit: | ☐ Yes | ☐ No | | |

| 3.4 FEDERAL INSECTICIDE, FUNGICIDE, AND RODENTICIDE ACT (FIFRA): | | | | |
|---|---|---|---|---|
| a. Are there or has there been any pesticides, fungicides, or herbicides used on the property? | | | | |
| Record Search and/or Interview: | ☐ Yes | ☐ No | ■ Unk | |
| Observed during site visit: | ☐ Yes | ■ No | | |
| b. In greater than household quantities? | | | | |
| Record Search and/or Interview: | ☐ Yes | ☐ No | ■ Unk | |
| Observed during site visit: | ☐ Yes | ■ No | | |
| c. Applied not in accordance with the manufacturers recommendations? | | | | |
| Record Search and/or Interview: | ☐ Yes | ☐ No | ■ Unk | |
| Observed during site visit: | ☐ Yes | ■ No | | |
| d. Are there or has there been any pesticides, fungicides, or herbicides stored onsite? | | | | |
| Record Search and/or Interview: | ☐ Yes | ☐ No | ■ Unk | |
| Observed during site visit: | ☐ Yes | ■ No | | |

ENVIRONMENTAL CONDITION OF PROPERTY, CON'T

| e. In greater than house-hold quantities? | | | |
|---|---|---|---|
| Record Search and/or Interview: | ☐ Yes | ☐ No | ■ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| f. Have there been reports or evidence of a spill of any pesticides, fungicides, or herbicides on the property? | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |

| **3.5 MEDICAL/BIOHAZARDOUS WASTE:** | | | |
|---|---|---|---|
| a. Has the property been used for chemical or biological testing? | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| b. Has the property been used for burying medical or biohazardous waste? | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |

| **3.6 MUNITIONS AND EXPLOSIVES OF CONCERN** (MEC - i.e., military munitions that may pose unique explosives safety risks, including: (A) unexploded ordnance (UXO), as defined in 10 U.S.C. 2710(e)(9); (B) discarded military munitions (DMM), as defined in 10 U.S.C. 2710(e)(2); or (C) munitions constituents (e.g., TNT, RDX), as defined in 10 U.S.C. 2710(e)(3), present in high enough concentrations to pose an explosive hazard.) | | | |
|---|---|---|---|
| a. Have any citizen complaints or local law enforcement actions occurred regarding MEC on the property? | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| b. Has the site served as a small arms test range or otherwise to service weapons? | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| c. Are any ranges, berms, open burning/open detonation (OB/OD), training, or impact areas onsite? | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |

| **3.7 RADIOLOGICAL SUBSTANCES:** | | | |
|---|---|---|---|
| a. Has the property ever been suspected to contain radioactive waste, including mixed waste? | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| b. Have radiological substances ever been used or services provided on the property? | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| c. Has the property been surveyed for radon? | | | |
| Record Search and/or Interview: | ☐ Yes | ☐ No | ■ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| d. Did the radon survey indicate test results above 4 pCi/l (pico curies/liter)? | | | |
| Record Search and/or Interview: | ☐ Yes | ☐ No | ■ Unk |

## ENVIRONMENTAL CONDITION OF PROPERTY, CON'T

| | | | |
|---|---|---|---|
| Observed during site visit: | ☐ Yes | ■ No | |
| e.  If a radon survey has not been conducted does the vicinity exhibit radon above 4 pCi/l (pico curies/liter)? | | | |
| Record Search and/or Interview: | ☐ Yes | ☐ No | ■ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| f.  Do records indicate that nearby structures have elevated indoor levels of radon? | | | |
| Record Search and/or Interview: | ☐ Yes | ☐ No | ■ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |

### 3.8 Clean Air Act

| | | | |
|---|---|---|---|
| a. Does the facility emit air pollutants into the environment? | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| b. Is the facility a type for which new standards of performance (NSPS) have been promulgated? See 40 C.F.R. Part 60 for a list of new source categories and applicable standards. | | | |
| Record Search and/or Interview: Draft Env. Assess., EPA, SD Dept. Health | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| c. Is the facility in violation or has the facility been in violation of the NSPS or the permit? | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| d. Is the facility located in a nonattainment area? | | | |
| Record Search and/or Interview: Draft Env. Assess., EPA. | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| e. Will the facility be subject to maximum attainable control technology (MACT)? | | | |
| Record Search and/or Interview: | ☐ Yes | ☐ No | ■ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| f. Is the capital expenditure required to meet the requirements of emissions reductions in the new Clean Air Act, i.e., is the facility required to reduce emissions because it is a non-attainment area? | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| g. Does the facility incinerate any wastes of any kind? | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |

### 3.9 ADDITIONAL ISSUES:

| | | | |
|---|---|---|---|
| a.  Does the property exhibit any stressed vegetation or diseased wildlife? | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| b.  Does the property have erosion problems (i.e., gullies, arroyos, sediment loading during storms)? | | | |
| Record Search and/or Interview: Erosion along shoreline | ■ Yes | ☐ No | ☐ Unk |
| Observed during site visit: of the Oahe Reservoir. | ■ Yes | ☐ No | |
| c.  Are there any floodplains or wetlands? | | | |

### ENVIRONMENTAL CONDITION OF PROPERTY, CON'T

| | | | | |
|---|---|---|---|---|
| Record Search and/or Interview: Draft Env. Assess., not impacted. | ■ Yes | ☐ No | ☐ Unk |
| Observed during site visit: Wetland Map Attached. No impact. | ■ Yes | ☐ No | |
| d.  Are there any sinkholes? | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| e.  Are there any valuable mineral resources? | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| f.  Is mold present in facilities on the property? | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |

### 3.10  OTHER CONDITIONS:

Are there any other conditions that exist on the property that should be considered in the decision to outgrant?  Describe.

No other conditions on the property of the proposed installation-DAPL Pipeline.  However, the proposed project is in close proximity of two other approver crossings-1. Overhead Power Line, 2. Underground Gas Line.

### 3.11  ADDITIONAL COMMENTS:

The two existing utility lines have existing authorization and are regulated for installation, maintenance and operation.  Several of the answers in Section 3 and 4  were obtained from a record search of the DRAFT ENVIRONMENTAL ASSESSMENT and PROPOSED PLANS AND SPECIFICATIONS.  FINAL ANSWERS MAY BE CHANGED OR CONFIRMED UPON THE FINALIZATION OF THE DRAFT ENVIRONMENTAL ASSESSMENT, PLANS AND SPECIFICATIONS.

### 4.0  GOVERNMENT RECORDS/HISTORICAL RESOURCES INQUIRY

a. Do any of the following Federal Government record systems list the property or any property within the search distance noted below:

| Federal Government Source | Approximate Minimum Search Distance, miles (kilometers) | Response | |
|---|---|---|---|
| Federal NPL site list | 1.0 (1.6) | ☐ Yes | ■ No |
| Federal CERCLIS list | 0.5 (0.8) | ☐ Yes | ■ No |
| Federal CERCLIS NFRAP site list | property and adjoining properties | ☐ Yes | ■ No |
| Federal RCRA CORRACTS TSD facilities list | 1.0 (1.6) | ☐ Yes | ■ No |
| Federal RCRA non-CORRACTS TSD facilities list | 0.5 (0.8) | ☐ Yes | ■ No |
| Federal RCRA generators list | property and adjoining properties | ☐ Yes | ■ No |
| Federal ERNS list | property only | ☐ Yes | ■ No |

b. Do any of the following state record systems list the property or any property within the search distance noted below:

| State lists of hazardous waste sites identified for investigation or remediation | Approximate Minimum Search Distance, miles (kilometers) | Response | |
|---|---|---|---|
| State – Equivalent NPL | 1.0 (1.6) | ☐ Yes | ■ No |

ENVIRONMENTAL CONDITION OF PROPERTY, CON'T

| State – Equivalent CERCLIS | 0.5 (0.8) | ☐ Yes | ■ No |
|---|---|---|---|
| State landfill and/or solid waste disposal lists | 0.5 (0.8) | ☐ Yes | ■ No |
| State leaking UST lists | 0.5 (0.8) | ☐ Yes | ■ No |
| State registered UST lists | property and adjoining properties | ☐ Yes | ■ No |
| c. Based upon a review of fire insurance maps or consultation with the local fire department serving the property, are any buildings or other improvements on the property or on any adjoining property identified as having been used for industrial use or uses likely to lead to contamination of the property? Please state remarks below. | | ☐ Yes | ■ No |

Remarks: The two adjoining utilities, overhead power line and underground gas pipeline, are improvements that are associated with industrial use. These may have uses and operational equipment that could lead to contamination of the adjoining property. The respective utility companies would be responsible for any contamination of their leased property and for compliance with applicable environmental regulations..

| 5.0 Interviews | | |
|---|---|---|
| | Name | Position |
| 1 | Phil Sheffield | Oahe Lake Manager, Operations Div., CENWO-OD-OA |
| 2 | Francis Kuhn | Riverdale Realty Specialist, Real Estate Div., CECO-C-RAQ |
| 3 | Brent Cossette | Natural Resources Specialist, Omaha District, CENWO-OD-TN |
| 4 | Richard Harnois | Archeologist, Operations Div., CENWO-OD-OA |
| 5 | | |
| 6 | | |

| 6.0 Records | |
|---|---|
| 1 | COE Oahe Project Real Estate Files and Records. |
| 2 | COE Omaha Distric Real Estate Files |
| 3 | DAPL Final Draft Environmental Assessment, 2016.05.10, with Appendices. |
| 4 | US Environmental Protection Agency Database |
| 5 | North Dakota Dept. of Health Database |
| 6 | |

**7.0** We have performed a Phase I Environmental Site Assessment in conformance with the scope and limitations of ASTM Practice E 1527 of Sections 10 & 11, T134 N, R79 W _____ the property. Any exceptions to, or deletions from this practice are described in Section N/A _____ of this report. This assessment has revealed no evidence of recognized environmental conditions in connection with the property.

Environmental Professional (Print) **William Harlon, RF**

| Environmental Professional's Signature HARLON.WILLIAM.D.III.12 58312887 | Digitally signed by HARLON.WILLIAM.D.III.1258312667 DN: c=US, o=U.S. Government, ou=DoD, ou=PKI, ou=USA, cn=HARLON.WILLIAM.D.III.1258312667 Date: 2016.05.20 06:58:01 -05'00' | Date **5/20/16** |
|---|---|---|

| **8.0 CERTIFICATIONS:** | |
|---|---|
| 15.a. The Environmental Professional Completing this report: | |
| | Name: William D. Harlon III |
| | Title: Envrionmental Compliance Coordinator |
| | Organization: US Army Corps of Engineers, Omaha District |
| | Address: 1616 Capitol Avenue, Omaha Nebraska 68102 |
| | Phone number: (402) 995-2500 |
| | Date: 5/20/16 |
| | Qualifications: B.S. Forest Science with 13+ years of environmental compliance experience |

## ENVIRONMENTAL CONDITION OF PROPERTY, CON'T

"[I, We] declare that, to the best of [my our] professional knowledge and belief, [I, we] meet the definition of Environmental professional as defined in 312.10 of 40 CFR 312 and [I, We] have the specific qualifications based on education, training, and experience to assess a property of the nature, history and setting of the subject property.  [I, We] have developed and performed the all appropriate inquiries in conformance with the standards and practices set forth in 40 CFR Part 312."

| 9.0 RECOMMENDATION: |
| --- |
| ■ I recommend that the proposed real estate outgrant be approved and that the action proceed. |
| ☐ I do not recommend that the proposed real estate outgrant be approved and recommend that no further review and processing be done. |

| OPM/ECC Signature | STASCH.ERIC.D.1231345589  Digitally signed by STASCH.ERIC.D.1231345589  DN: c=US, o=U.S. Government, ou=DoD, ou=PKI, ou=USA, cn=STASCH.ERIC.D.1231345589  Date: 2016.05.13 14:01:06 -05'00' | Date | 13 May 2016 |
| --- | --- | --- | --- |

ENVIRONMENTAL CONDITION OF PROPERTY, CON'T

## Appendix A
## Aerial Photographs

| Aerial Photo Date | Flight Date | Source | Item or Feature Observed |
|---|---|---|---|
| Aug., 2015 | Unknown | Google Earth | Project Location, south central North Dakota |
| Unknown | | Map-Draft Env. Assess. | Detailed L. Oahe pipeline crossing map. |
| 09/28/2015 | #1 | On Site | Existing Condtions, West Side of Lake |
| 09/28/2015 | #2 | On Site | Existing Condtions, West Side of Lake |
| 09/28/2015 | #3 | On Site | Existing Conditions, East Side of Lake |
| 09/28/2015 | #4 | On Site | Existing Conditions, East Side of Lake |
| 09/28/2015 | #5 | On Site | Existing Conditions, East Side of Lake |
| Aug., 2014 | Unknown | Google Earth | Nat. Wetland Inventory Map |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |



## DAPL Pipe Line Crossing

Morton and Emmons County, North Dakota
Sec 10, R134N, R79W / Sec. 11, T134N, R79W





P.14



OAHE PROJECT AREA
DAPL Pipeline Crossing Map

LAKE OAHE

PROPOSED PIPELINE

Cannonball River

DAPL LAKE OAHE CROSSING



Pipeline HDD Crossing, West side of Lake Oahe, Photo-West to East.    # 1



Pipeline HDD Approximate Entrance Point, West side of Lake Oahe, Photo-West to East    # 2

DAPL LAKE OAHE CROSSING



Pipeline HDD Crossing, East Side of Lake Oahe, Photo East to West.    # 3



Pipeline HDD Crossing, Approximate Exit Point, East Side of Lake Oahe, Photo East to West.   # 4

DAPL LAKE OAHE CROSSING



DAPL Pipeline Alignment to East, East Side of Lake Oahe, Photo West to East.     # 5

# OAHE PROJECT, DAPL PIPELINE CROSSING
## National Wetlands Inventory Map



OAHE DAPL ECP

RE-CERTIFICATION

This addendum to the Draft DAPL ECP of May, 2016 is to certify that the Environmental
Conditions of the Property has been reviewed and updated within 180 days of the certification
date of May 13, 2016.  Based upon recent visual assessments and review of the site, I certify
that all conditions are unchanged from the date of the documentation.


Eric D. Stasch

Operations Project Manager

_20 May 2016_

Date

# APPENDIX D
# SPECIAL CONDITIONS

| Condition | |
|---|---|
| **1.** | **Procedures and Specifications:** For the pipeline segments crossing Lake Oahe and its "could affect" High Consequence Areas ("could affect" HCAs) (as defined in 49 CFR § 195.450), Grantee must meet the U.S. Army Corp of Engineers easement special conditions by developing, implementing, and maintaining for the duration of the easement all easement special conditions in specifications and procedures for the design, construction, testing, operation and maintenance specifications and procedures as required in 49 CFR §§ 195.100, 195.202, 195.302, and 195.402 and this easement.<br><br>For the purposes of these special conditions, "pipeline segment" is defined as Lake Oahe and the "could affect" HCAs noted in EA for the vicinity of Lake Oahe. |
| **2.** | Grantee will conduct all HDD work according to the HDD Construction Plan [August 18, 2015] (Final EA, Appendix B) that it has prepared, and implement the HDD Contingency Plan [March 11, 2011] (Appendix B) in the event of an inadvertent release. |
| **3.** | Grantee is not authorized to discharge hydrostatic test water under this easement. |
| **4.** | Grantee will follow response, containment, mitigation measures, and cleanup measures described in SPCC, SWPPP, and ECP. |
| **5.** | Grantee will use temporary sediment control measures, such as silt fence, to minimize the introduction of sediment into waterbodies during construction and minimize the movement of spoil and sediment from surface runoff during and after construction. |
| **6.** | Grantee will return all surface drainage contours and vegetation to preconstruction conditions as much as practical. |
| **7.** | Grantee will avoid groundwater contamination by implementing the protective measures set forth in the Project specific spill prevention, control and Countermeasures prepared by the contractor and in the Spill Prevention, Control and Countermeasure Plan [December 2014] (Final EA, Appendix A). |
| | |
| | **Documentation Conditions** |
| **8.** | The Grantee will submit the Facility Response Plan to the Oahe OPM for review prior to the operation of the pipeline. |
| **9.** | The Grantee will submit all plans not final at the time this easement is granted to the Oahe OPM for review and the incorporation of U.S. Army Corps of Engineers comments prior to the Grantee's submittal to the Pipeline and Hazardous Management Safety Administration. These plans include, but are not limited to the following:<br>   a.  Geographical Response Plan,<br>   b.  Operations and Maintenance Manual,<br>   c.  Risk Assessment (Integrity Management Plan), and<br>   d.  Spill Models (Using the National Hydrography Dataset by the U.S. Geological Survey) |
| **10.** | The Grantee must send any updated plans in the Facility Response Plan to the Oahe OPM for review by the U.S. Army Corps of Engineers Environmental Compliance Coordinators at the Omaha District Office and the Oahe Project Office within one year of the update. |

**EXHIBIT "D"**
**DACW45-2-8059**

| 11. | The Grantee shall provide as-built drawings for the crossing at Lake Oahe to the Oahe OPM within 6 months of the completion of pipeline construction. |
|---|---|
| 12. | All records demonstrating compliance with these easement conditions herein must be maintained for the duration of the easement. |
| | |
| | **Pipeline Safety Conditions (Construction)** |
| 13. | **Pipeline Design Factor - Pipelines:** Pipe installed must comply with a design factor of 0.50 or lower in the Lake Oahe crossing and "could affect" HCAs. |
| 14. | **Pipe Girth Weld – Nondestructive Tests:** Grantee must nondestructively test <u>all girth welds</u> in accordance with 49 CFR §§ 195.228, 195.230 and 195.234. |
| 15. | **Pressure Test Level:** The pre-in-service hydrostatic test for mainline pipe must be to a pressure producing a hoop stress of either: a minimum 100% specified minimum yield strength (SMYS) or a minimum of 1.50 times maximum operating pressure (MOP) for eight (8) continuous hours for pipeline segments using a design factor of 0.50 or less. |
| 16. | **Assessment of Test Failures:** Any pipe failure occurring during the pre-in service hydrostatic test must undergo a root cause failure analysis to include a metallurgical examination of the failed pipe. The results of this examination must preclude a systemic pipeline material issue and the results must be reported to the Operations Project Manager at the Oahe Project Office (Oahe OPM) within 60 days of the failure. |
| 17. | **Coatings for Trenchless Installation:** Coatings used for directional bore, slick bore and other trenchless installation methods must be capable of resisting abrasion and other damage that may occur due to rocks and other obstructions encountered in this installation technique. |
| 18. | **Pipe Coating:** Pipe coatings must be non-shielding to cathodic protection (CP). Coatings such as tape and shrink sleeves would be shielding coatings to CP that protects the pipe from external corrosion. The application of a corrosion resistant coating to the steel pipe must be performed according to a coating application quality control program. The program must address pipe surface cleanliness standards, blast cleaning, application temperature control, adhesion, cathodic disbondment, moisture permeation, bending, minimum coating thickness, coating imperfections and coating repair. |
| 19. | **Field Coating:** Field joint coatings must be non-shielding to CP. Grantee must implement field girth weld joint coating application specification and quality standards to ensure pipe surface cleanliness, application temperature control, adhesion quality, cathodic disbondment, moisture permeation, bending, minimum coating thickness, holiday detection and repair quality. Field coating applicators must use valid qualified coating procedures and be trained to use these procedures. |
| 20. | **Construction Coating Survey after Installation:** Promptly after a ditch for the pipeline is backfilled, but not later than three months after placing the pipeline in service, the operator must perform an assessment to ensure integrity of the coating using direct current voltage gradient (DCVG) or alternating current voltage gradient (ACVG). The operator must repair any coating damage classified as moderate or severe (voltage drop greater than 35% for DCVG or 50 dBµV for ACVG) in accordance with section 4 and Appendix A of NACE SP0502-2008 (or latest edition referenced in 49 CFR § 195.3) within six months of the assessment. |
| 21. | **Mainline Valve(s) with Remote Control or Automatic Shutdown:** |

EXHIBIT "D"
DACW45-2-8059

|   |   |
|---|---|
|   | a.  Mainline valves with remote control or automatic shutdown for water crossings and reservoirs must be installed on either side of the crossing and additional mainline valves(s) installed either upstream, downstream, or both to protect the water body from the "could affect" HCA on either side of the water crossing. Mainline valves must either be located outside of the flood plain or have valve actuators and other control equipment installed so as to not be impacted by flood conditions.<br><br>b.  Mainline valves with remote control or automatic shutdown must contain transit inhibit switches that prevent the valves from shutting at a rate (and in conjunction with pumps being shutdown) so that no pressure surges can occur, or other damage caused by unintended valve closures or too fast of a closure.<br><br>c.  Mainline valves must be remotely controlled and actuated or automatic shutdown, and the Supervisory Control and Data Acquisition (SCADA) system must be capable of closing the valve and monitoring the valve position, upstream pressure and downstream pressure so as to minimize the response time in the case of a failure.  Remote power backup is required to ensure communications are maintained during inclement weather.  Mainline valves must be capable of closure at all times.  If it is impracticable to install a remote controlled valve, Grantee must submit a valve design and installation plan to the appropriate Oahe OPM to confirm the alternative approach provides an equivalent level of safety.<br><br>d.  Mainline valves in the pipeline segment must have actuation capability (i.e., remote control shut-off, automatic shut-off, manual shut-off where personnel are in proximity, or alternative equivalent technology) to ensure pipeline ruptures are promptly mitigated based upon maximum valve shut-off times, location, and spacing specified.<br><br>e.  For each mainline valve that is a remote-control shut-off or automatic shut-off valve, the operator must conduct a point-to-point verification between SCADA displays and the mainline valve, sensors, and communications equipment in accordance with 49 CFR § 195.446(c) and (e), or an equivalent verification. |
| 22. | **Supervisory Control and Data Acquisition (SCADA) System:**  Grantee must develop, install, operate, and maintain a SCADA system to provide remote monitoring and control of the entire pipeline segment in accordance with 49 CFR Part 195 requirements. |
| 23. | **Computational Pipeline Monitoring (CPM) Leak Detection:** The pipeline segment must have a computational pipeline monitoring (CPM) leak detection system in accordance with 49 CFR § 195.134 and must have adequate pressure sensors at pump stations, laterals, mainline valves and liquid flow volume measurement along the pipeline at inflows, outflows and spaced along the pipeline to perform accurate leak detection.  The pipeline segment must be operated as a continuously pressurized pipeline (with no pressure, slack line pipeline segments).  If the pipeline segment is operated as a slack line pipeline segment, an operating plan must be developed, reviewed by a responsible third party independent expert engineering company and submitted to the Oahe OPM for "no objection" prior to being implemented by Grantee. |
| 24. | Grantee will minimize or avoid impacts on soils by implementing the mitigation measures described in the DAPL Project's Spill Prevention Control and Countermeasure Plan [December 2014] (SPCC), Storm water Pollution Prevention Plan[July 2015] (SWPPP), and Environmental Construction Plan [April 2015] (ECP) as well as requirements of applicable state and federal permits. |

**EXHIBIT "D"**
**DACW45-2-8059**

|  | **Pipeline Safety Conditions (Operation)** |
|---|---|
| **25.** | **Overpressure Protection Control:**  Grantee must limit mainline pipeline segment overpressure protection to a maximum of 110% maximum operating pressure (MOP) during surge events consistent with 49 CFR § 195.406(b).  Before commencing operation, Grantee must perform a surge analysis showing how the pipeline segment will be operated to be consistent with these overpressure protection conditions.  Grantee shall equip the pipeline with field devices to prevent overpressure conditions.  Remotely actuated valves or automatic shutoff valves should be fitted with devices that will stop the transit (intentional or uncommanded) of the mainline valve should an overpressure condition occur or an impending overpressure condition is expected.   Sufficient pressure sensors, on both the upstream and downside side of valves, must be installed to ensure that an overpressure situation does not occur.  Sufficient pressure sensors must be installed along the pipeline to conduct real time hydraulic modeling, and which can be used to conduct a surge analysis to determine whether pipeline segments have experienced an overpressure condition. |
| **26.** | **Cathodic Protection:**  The initial Cathodic Protection system must be operational within six (6) months of placing a pipeline segment in service. Cathodic Protection will be operated and maintained per applicable codes and the Grantee's 'Operations and Maintenance Manual'. Wall thickness testing will be performed in-lieu of periodic hydro tests. The Grantee shall send the inspection reports to the Operations Project Manager at the Oahe Project Office (hereinafter the Oahe OPM)." |
| **27.** | **Interference Current Surveys:**  Interference surveys must be performed over the entire  pipeline segment within six months of placing the pipeline in service to ensure compliance with applicable NACE International Standard Practice 0169-2007 (2007 or the latest version incorporated by reference in § 195.3) and 0177 (2007 or the latest NACE standard version, since NACE SP 0177 is not incorporated by reference in 49 CFR § 195.3) (NACE SP 0169-2007 and NACE SP 0177) for interference current levels.  If interference currents are found, Grantee must determine if there have been any adverse effects on the pipeline and mitigate such effects as necessary as required below.<br><br>The interference current mitigation program for the pipeline segment must include:<br>1) As frequently as needed, including when new or uprated high voltage alternating current power lines greater than or equal to 69 kVA or electrical substations are co-located near the pipeline, but not to exceed every seven years conduct an interference survey (at times when static or dynamic voltages are at the highest values for a time period of at least 24-hours) to detect the presence and level of any electrical current that could impact external corrosion where interference is suspected;<br>2) Analyze the results of the survey to identify locations where interference currents are greater than or equal to 20 Amps per meter squared; and<br>3) a remedial action plan and apply for any necessary permits within four months of completion of the inspection or testing that identified the presence of deleterious electrical stray current.<br>4) Implement remedial actions to protect the pipeline segment from detrimental interference currents.  Remedial actions must be completed promptly, but no later than one year after completion of the survey, or as soon as practicable after obtaining necessary permits.  Remedial action means the implementation of measures including, but not limited to, |

| | |
|---|---|
| | additional grounding along the pipeline to reduce interference currents below 20 Amps per meter squared. The following criteria shall be used to determine when remedial actions are required.<br>a) AC-induced corrosion does not occur at AC densities less than 20 A/m2 (1.9 A/ft2). The operator shall monitor these locations per (a) above.<br>b) AC corrosion is unpredictable for AC densities between 20 to 100 A/m2 (1.9 to 9.3 A/ft2). These locations require an engineering assessment to determine if remediation is required.<br>c) AC corrosion occurs at current densities greater than 100 A/m2 (9.3 A/ft2). These areas require mitigation. Any location that is determined to require mitigation must be mitigated to reduce the AC current density to less than 20 A/m2. |
| 28. | **Corrosion Surveys:** Grantee must complete corrosion surveys for the pipeline segment within six (6) months of placing the respective CP system(s) in operation to ensure adequate external corrosion protection per NACE RP 0169-2007. The survey shall also address the proper number and location of CP test stations as well as alternating current (AC) interference mitigation and AC grounding programs per NACE RP 0177. At least one (1) CP test station must be located within each "could affect" HCA with a maximum spacing between test stations of one-half mile. |
| 29. | **Initial Inline Inspection (ILI):** Within three (3) years of placing a pipeline segment in service, Grantee must perform a baseline ILI using a high-resolution Magnetic Flux Leakage (HR-MFL) tool, high resolution (HR) deformation tool, and an ultrasonic crack detection tool or equivalent of each. |
| 30. | **ILI Deformation Tool:** Grantee must perform a high resolution deformation tool run after completion of the hydrostatic strength test and backfill of the pipeline segment and prior to placing the pipeline segment in service. Grantee must remediate pipe in accordance with 49 CFR Part 195 and Subpart O. All expanded pipe must be remediated in accordance with PHMSA's "Interim Guidelines for Confirming Pipe Strength in Pipe Susceptible to Low Yield Strength for Liquid Pipeline" dated October 6, 2009 or any subsequent PHMSA update to this provision. |
| 31. | **Future ILI:** Future ILI inspections must be based upon pipeline segment integrity threats and must include as a minimum of a high-resolution Magnetic Flux Leakage (MFL) tool, high resolution deformation tool, and an ultrasonic crack detection tool or equivalent of each. ILI inspections must be performed on the entire pipeline segment on a frequency consistent with 49 CFR § 195.452(j)(3) assessment intervals or on a frequency determined by fatigue studies or anomalies found that are indicative of actual operating conditions.<br>1) Conduct periodic close interval surveys (CIS) along the entire pipeline segment with current interrupted to confirm voltage drops in association with periodic ILI assessments under § 195.452(j)(3). Pipeline segments under Lake Oahe would not be able to CIS due to water segment and depth of directional drill across Lake Oahe.<br>2) CIS must be conducted within three (3) months of running ILI surveys when using a five (5) year ILI frequency, not to exceed sixty-eight (68) months, in accordance with 49 CFR § 195.452 (j) (3) assessment intervals.<br>CIS findings must be integrated into ILI Tool findings. |
| 32. | **Internal Corrosion:** Grantee must limit basic sediment and water (BS&W) to 0.5% by volume and report BS&W testing results to Ain the annual report. Grantee must report upset conditions causing BS&W level excursions above the limit on the annual report. |

|  | |
|---|---|
|  | 1) Grantee must run cleaning pigs twice in the first year and as necessary in succeeding years based on the analysis of oil constituents, liquid test results, weight loss coupons located in areas with the greatest internal corrosion threat and other internal corrosion threats.  At a minimum in the succeeding years following the first year Grantee must run cleaning pigs every five years unless analysis necessitates earlier action.<br>2) Liquids collected during cleaning pig runs, such as BS&W, must be sampled, analyzed and internal corrosion mitigation plans developed based upon lab test results.<br>3) Grantee shall review the program at least quarterly based upon the crude oil quality and implement adjustments to monitor for, and mitigate the presence of, deleterious crude oil stream constituents. |
| **33.** | **Pipeline Patrolling:** Grantee must patrol the pipeline segment right-of-way on a two (2) week interval but not exceeding three (3) weeks, for at least twenty-six (26) times each calendar year, to inspect for excavation activities, ground movement, unstable soil, wash outs, leakage, or other activities or conditions affecting the safe operation of the pipeline segment. |
| **34.** | The Grantee shall conduct the following training exercises:<br><br>1) A full scale open water and a full scale winter/ice exercises at Lake Sakakawea and Lake Oahe.  A full scale exercise will occur once every 3 years (triennial cycle) with the location and type of exercise occurring on alternating schedules (e.g. open water exercise at Lake Oahe the first triennial cycle, followed by winter exercise at Lake Sakakawea the following triennial cycle, followed by a winter exercise at Lake Oahe the following triennial cycle, etc.). The first exercise will occur within the first 3 years after the pipeline becomes operational.<br><br>2) To facilitate USACE staff involvement, the Grantee shall notify the USACE Environmental Compliance Coordinators at the Omaha District Office and the Oahe Project Office at least ninety (90) days prior to initiation of the training exercises.  The Grantee shall also solicit the participation of key stakeholders (federal, state, local, and Tribal) in these exercises. |
| **35.** | Within 1 year following the pipeline becoming operational, the Grantee shall provide for an all-weather access and collection point downstream of the HDD crossing at Lake Oahe.  The Grantee shall provide an equipment storage facility on non-federal lands that includes a fenced permanent storage area for winter and open water spill response equipment.  The storage facility should be placed in a strategic location and near existing facilities that would support access to the water.  The Grantee will coordinate with the USACE and any other applicable stakeholders to obtain all necessary permits and approvals prior to construction for any ground disturbing activities associated with these facilities. The storage facility should contain sufficient response equipment at a minimum to mitigate an unintended worst case release for this Lake crossing. |
|  | |
| **Overall Condition from EA** | |
| **36.** | Grantee is generally responsible for commitments made and mitigation measures in the Final Environmental Assessment, Grantee Pipeline Project Crossing of Flowage Easements and Federal Lands (July 2016), including all Plans includes within Appendices thereof, even if they are not specifically made as a condition to this easement. |

**DEPARTMENT OF THE ARMY**

**Withdrawal of Notice of Intent To Prepare an Environmental Impact Statement in Connection With Dakota Access, LLC's Request for an Easement To Cross Lake Oahe, North Dakota**

**AGENCY:**  Department of the Army; DoD.

**ACTION:**  Notice

**SUMMARY:**  On January 18, 2017, the Department of the Army initiated the Environmental Impact Statement (EIS) process in connection with Dakota Access, LLC's request to grant an easement to cross Lake Oahe, which is on the Missouri River and operated by the US Army Corps of Engineers (Corps).  The official performing the duties of the Assistant Secretary of the Army for Civil Works has reviewed the administrative file and has determined that an EIS is not required because the proposed action will not have a significant effect on the human environment.  Therefore, the Corps is terminating the EIS process and is issuing this notice of intent to withdraw the January 18, 2016 Notice of Intent to Prepare an EIS (82 FR. 5543).

**FOR FURTHER INFORMATION CONTACT:**  Mr. Gib Owen, Water Resources Policy and Legislation, Office of the Assistant Secretary of the Army for Civil Works, Washington, DC 20310-0108; telephone: (703) 695-6791; email: gib.a.owen.civ@mail.mil.

**Brenda S. Bowen,**
Army Federal Register Liaison Officer