1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
2
    - - - - - - - - - - - - - - - - x
3   STANDING ROCK SIOUX TRIBE,
                                    CA No:  1:16-cv-01534-JEB
4                Plaintiff,
                                    Washington, D.C.
5   vs.                            Monday, February 13, 2017
                                    2:01 p.m.
6
    UNITED STATES ARMY CORPS OF
7   ENGINEERS,

8                Defendant.
    - - - - - - - - - - - - - - - - x
9

10  _____

11          TRANSCRIPT OF STATUS CONFERENCE/MOTION HEARING
          HELD BEFORE THE HONORABLE JAMES E. BOASBERG
12                UNITED STATES DISTRICT JUDGE
    _____

13  APPEARANCES:

14

15  For the Cheyenne River    **NICOLE E. DUCHENEAUX, ESQ.**
    Sioux Tribe:             **CONLY JOHN SCHULTE, ESQ.**
                            **JOSEPH V. MESSINEO, ESQ.**
16                          FREDERICKS PEEBLES & MORGAN LLP
                            3610 North 163rd Plaza
17                          Omaha, NE 68116
                            (402) 333-4053
18                          nducheneaux@ndnlaw.com

19

20  For the Standing Rock    **JAN HASSELMAN, ESQ.**
    Sioux Tribe:             **STEPHANIE TSOSIE, ESQ. (via phone)**
                            **PATTI A. GOLDMAN, ESQ. (via phone)**
21                          EARTHJUSTICE LEGAL DEFENSE FUND
                            705 Second Avenue, Suite 203
22                          Seattle, WA 98104-1711
                            (206) 343-7340
23                          jhasselman@earthjustice.org

24  (CONTINUED ON NEXT PAGE)

25  Proceedings recorded by mechanical stenography; transcript
    produced by computer-aided transcription

```
1    APPEARANCES (CONTINUED):

2    For the United States          MATTHEW M. MARINELLI, ESQ.
     Army Corps of Engineers:       ERICA M. ZILIOLI, ESQ.
3                                   MELANIE CASNER, ESQ.
                                    U.S. DEPARTMENT OF JUSTICE
4                                   Environment and Natural
                                    Resources Division
5                                   P.O. Box 7611
                                    Ben Franklin Station
6                                   Washington, DC 20044
                                    (202) 305-0293
7                                   Matthew.Marinelli@usdoj.gov

8

     For Dakota Access LLC:         DAVID DEBOLD, ESQ.
9                                   BILL LEONE, ESQ.
                                    BILL SCHERMAN, ESQ.
10                                  BOB COMER, ESQ.
                                    GIBSON, DUNN & CRUTCHER, LLP
11                                  1050 Connecticut Avenue, NW
                                    Washington, DC 20036
12                                  (202) 955-8551
                                    ddebold@gibsondunn.com

13

14

15   Court Reporter:               Lisa A. Moreira, RDR, CRR
                                    Official Court Reporter
16                                  U.S. Courthouse, Room 6718
                                    333 Constitution Avenue, NW
17                                  Washington, DC  20001
                                    202-354-3187

18

19

20

21

22

23

24

25
```

1

2

3                    P R O C E E D I N G S

4           THE COURT:  Okay.  Good afternoon, everyone.

5           THE COURTROOM DEPUTY:  Good afternoon.  This

6    afternoon we have Civil Action 16-1534, *Standing Rock Sioux*

7    *Tribe vs. United States Army Corps of Engineers*.  We have

8    Ms. Stephanie Tsosie appearing telephonically as well as

9    Ms. Patti Goldman, and if counsel will approach the lectern

10   and identify yourselves for the record.

11          MR. HASSELMAN:  Good afternoon, Your Honor; Jan

12   Hasselman for plaintiff, Standing Rock Sioux Tribe.

13          THE COURT:  Good afternoon.

14          MS. DUCHENEAUX:  Good afternoon, Your Honor;

15   Nicole Ducheneaux on behalf of the Cheyenne River Sioux

16   Tribe, and I have with me my partners Conly Schulte and

17   Joseph Messineo.

18          THE COURT:  Okay.  Good afternoon to all of you.

19          MR. DEBOLD:  Good afternoon, Your Honor; Matt

20   Marinelli from the Department of Justice on behalf of the

21   Corps of Engineers.  With me at counsel table are Erica

22   Zilioli from the Department of Justice and Melanie Casner

23   from the Corps of Engineers.

24          THE COURT:  Okay.  Welcome, the three of you.

25          MR. DEBOLD:  Good afternoon, Your Honor; David

1   Debold appearing on behalf of Dakota Access.  With me at

2   counsel table are Bill Leone, Bill Scherman, and Bob Comer.

3            THE COURT:  Okay.  Good afternoon to you,

4   gentlemen.

5            All right.  Since we were last here on Monday,

6   February 16th, the Secretary of the Army has granted an

7   easement to Dakota Access to drill under Lake Oahe and

8   install the pipeline under the lake, which would complete

9   the over 1,100-mile pipeline.

10            At this juncture, the tribes seek to block the

11   construction of the pipeline and the introduction of oil

12   through the completed pipeline.  To that end, the following

13   procedural steps have been taken since we were here last.

14            On February 9th, Cheyenne River Sioux Tribe filed

15   a motion to amend its complaint to add a claim under the

16   Religious Freedom Restoration Act or RFRA, R-F-R-A.  On the

17   same day, Cheyenne River filed an application for a TRO and

18   a motion for a preliminary injunction.

19            On February 10, Standing Rock Sioux Tribe filed a

20   motion to amend its complaint to include both an RFRA claim

21   and an APA claim, and it then joined Cheyenne River's TRO

22   application.

23            In addition, on February 2nd there was a motion

24   filed by the Great Plains Tribal Chairman's Association for

25   leave to file an Amicus brief on the TRO.  I will grant that

1    motion, and I have, in fact, reviewed the brief.

2              On February 11th, Steve Vance of the Cheyenne

3    River filed a motion to intervene as a plaintiff in the

4    case.  He says that his claim is identical to Cheyenne

5    River's but wishes to be included in the event Cheyenne

6    River's motion to amend is denied so that he can bring his

7    own claim under RFRA.  I will not decide this motion yet but

8    will make a determination before any preliminary injunction

9    hearing in the matter.

10             Finally, in an order of February 9th I indicated

11   that I would consider the tribe's TRO application at today's

12   status hearing, which was a hearing that was set last

13   Monday.  So we're now here on the TRO application by

14   Cheyenne River, which was joined by Standing Rock.

15             Now, again, more for the public than for counsel,

16   people should understand the only claim presented at today's

17   TRO is one for a violation of RFRA.  In other words, this is

18   not an environmental claim or one that the government is

19   inappropriately or inappropriately withdrew its notice of

20   intent to prepare an environmental impact statement.  The

21   sole issue relates to religion, and I'm going to read the

22   applicable section of Cheyenne River's brief which tees up

23   the issue, I think, pretty clearly.  This is on Pages 2 and

24   3, and it states:

25             "The Lakota people believe that the mere existence

1    of a crude oil pipeline under the waters of Lake Oahe will

2    desecrate those waters and render them unsuitable for use in

3    their religious sacraments.  The Lakota people believe that

4    the pipeline correlates with a terrible Black Snake

5    prophesied to come into the Lakota homeland and cause

6    destruction.  The Lakota believe that the very existence of

7    the Black Snake under their sacred waters in Lake Oahe will

8    unbalance and desecrate the water and render it impossible

9    for the Lakota to use that water in their Inipi ceremony."

10         And Ms. Ducheneaux, is that the correct

11   pronunciation, Inipi?

12         MS. DUCHENEAUX:  It's "in-ee-pee," Your Honor.

13         THE COURT:  Inipi, thank you very much.

14         So the claim under the RFRA is that the approval

15   of the pipeline substantially burdens the Cheyenne River's

16   exercise of religion, which is not permissible under RFRA

17   unless the government demonstrates that application of the

18   burden is in furtherance of a compelling government interest

19   and the least restrictive means of furthering such interest.

20         Okay.  So that is the issue that's teed up today,

21   and Ms. Ducheneaux, I'll now hear argument from you.

22         And Mr. Hasselman, you joined -- are you asking

23   for separate argument as well today?

24         MR. HASSELMAN:  I don't need additional argument.

25         THE COURT:  Okay.  Thank you, Mr. Hasselman.

1              So Ms. Ducheneaux, I will hear from you.

2              MS. DUCHENEAUX:  Thank you so much, Your Honor,

3      and good afternoon.

4              Your Honor, if I may, I will start with claims

5      made in the defendant's oppositions which they filed today

6      as to the timeliness of the amendment of our complaint.  And

7      I would note at the outset that the defendants take the

8      illogical position that our amendment was both tardy and

9      premature.  In fact, I think it was right on time.

10             This Court knows the timeline of these events and

11     that the Cheyenne River Sioux Tribe intervened in this

12     motion in August of 2016.  There was a PI hearing for the

13     Standing Rock Sioux Tribe during that time, and then on the

14     same day that this Court issued its opinion on that PI,

15     there was a joint statement of the Department of Justice and

16     the Court suspending the easement process.

17             Between September 9th and into January it was the

18     reasonable expectation, based upon the representations of

19     the government and the acts of the government, that there

20     would be an administrative process that would permit the

21     tribe to bring information before the agency with regard to

22     the potential harms that the pipeline would cause to the

23     tribe.

24             On February 8th, that process was abruptly taken

25     away from the tribe.  It was not until that time, until that

1    date when the easement was granted, that this claim became

2    ripe.

3              We could not have amended our pleading any time

4    during -- between September and February 8th.  It was the

5    representation to this Court that we would wait until the

6    easement had been granted at whatever time that may be.

7              DAPL, the Dakota Access Pipeline, raises a case,

8    this *Nuclear Energy Institute* case, in which such an

9    amendment in an administrative proceeding was considered to

10   be too late.  That was a case in which the review process at

11   issue had been full and complete.

12             In fact, under the process, the EIS process that

13   the government noticed up on January 18th, we had at least

14   until February 20th to provide scoping comments that would

15   include information such as the RFRA claim contained herein.

16   That date, today, has not even passed, and so

17   representations that this claim is somehow untimely are

18   simply not true.

19             Likewise, the government has raised a claim of

20   laches under that equitable doctrine which is even less

21   credible.  In this jurisdiction, in a case called *Major v.*

22   *Plumbers Local*, 370 F Supp. 2d 118, which is a district

23   court case from 2005, the Court held that six years was

24   squarely within the laches time, so claims that this claim

25   has been brought too late are simply not on point.

1           THE COURT:  Okay.  Let me ask you to clarify what

2     precisely the injury you discuss stems from, if I might.  So

3     is the harm in your contention from the oil flowing through

4     the pipeline even if the oil doesn't touch the river itself,

5     doesn't touch the water itself, or is the harm that there

6     may be a rupture and that the oil would then leak or spill

7     into the river?

8           MS. DUCHENEAUX:  Your Honor, it's the former.  The

9     sincerely held belief of the members of the Cheyenne River

10    Sioux Tribe is that the mere presence of the oil in the

11    pipeline renders that water ritually impure for use in their

12    religious sacraments.

13          THE COURT:  Okay.  So taking that as the case,

14    aren't we still premature coming in for a TRO?  In other

15    words, why -- the harm is not -- the harm, then, is not the

16    actual building of the pipeline under the river, but the

17    turning on of the oil that would flow through the pipeline,

18    right?

19          MS. DUCHENEAUX:  Well, Your Honor, I disagree with

20    that.  The *O Centro* case, which is a U.S. Supreme Court case

21    in the --

22          THE COURT:  Okay.  But let me stop you for a

23    second.

24          MS. DUCHENEAUX:  Sure.

25          THE COURT:  You would agree that there is no harm

1    to the Cheyenne River until the oil is actually flowing

2    under the river.

3            MS. DUCHENEAUX:  Well, under a case called *Elrod*,

4    the mere threat of constitutional harm -- this is a U.S.

5    Supreme Court case that the D.C. Circuit has adopted -- the

6    mere threat of a constitutional harm is sufficient to

7    establish irreparable harm.  It's a different analysis than

8    the environmental harm.

9            THE COURT:  But is that the threat of prosecution?

10   What are the facts in that?

11           MS. DUCHENEAUX:  Well, the better case to look at

12   is *O Centro*, which involved a federal criminal -- a drug

13   criminal statute.

14           THE COURT:  Right.  But the fear was there was

15   this threat of prosecution, right?

16           MS. DUCHENEAUX:  Right, uh-huh.

17           THE COURT:  But here it's not a question of maybe

18   they'll turn on the oil or maybe they won't.  The harm to

19   you comes when the spigots are turned on and the oil flows

20   through the pipeline.

21           MS. DUCHENEAUX:  Well, I disagree.  I mean, what

22   *Elrod* stands for, and other cases out of the D.C. Circuit,

23   is even the slightest infringement of constitutional harm is

24   enough.  And it's a certainty, Your Honor.

25           THE COURT:  But there's no -- but there's not even

1    a slight infringement, under your theory, from the pipeline

2    itself, right?  It's only the oil.

3              MS. DUCHENEAUX:  It is only the oil; that's

4    correct.

5              That being said, there's no question, especially

6    in light of the easement having been granted on February

7    8th, that the Dakota Access Pipeline described last Monday

8    how long it was going to take them.  It is an absolute

9    certainty.  It's not even a threat.  It's going to happen.

10             THE COURT:  Right.  But my question to you

11   essentially is, look, you've rushed into court to stop now

12   what we can take some time -- and I'll find out exactly what

13   time.  The government says 53 days.  But what you're

14   referring to is the Dakota Access's position that it was

15   going to be about 60 days last week.

16             MS. DUCHENEAUX:  Uh-huh.

17             THE COURT:  In other words, why can't we set a

18   preliminary injunction hearing in 30 days or so and let

19   everybody really brief the issue and think about it, and let

20   me think about it for more than a weekend, before we come in

21   here to try to stop it?

22             MS. DUCHENEAUX:  Well, one of the struggles that

23   we have, Your Honor -- and I think this is set forth in a

24   supplemental document that we filed today -- is the Cheyenne

25   River Sioux Tribe and the Standing Rock Sioux Tribe have

1    hired some experts that have experience in pipeline

2    construction, and they reviewed the process by which this

3    pipeline is going to be placed in the ground, and where

4    Dakota Access last Monday said that the pipeline would not

5    be complete and oil would not be flowing through that

6    pipeline for 60 days, this new report suggests as early as

7    30 days.

8              THE COURT:  So -- and I think -- and that's

9    something I'm going to certainly ascertain from Mr. Debold,

10   and if you're worried that this is going to happen, that

11   it's going to flow before I make a decision on the merits or

12   rather at least on an injunction, that's something that

13   won't happen.

14             But I understand -- I'm certainly not criticizing

15   your filing a TRO.  Your job is to zealously represent your

16   clients, and you need to safeguard whatever rights are

17   important and to do so prophylactically.  I completely

18   understand that.

19             I'm just asking, don't you agree that as long as

20   I've made a decision before the oil flows that your rights

21   are protected?

22             MS. DUCHENEAUX:  Yes, Your Honor.  But I think I

23   would remind the Court that, you know, environmental harm

24   can be cleaned up.  It can be remediated.  You know, the

25   Cheyenne River Sioux Tribe and the Corps disagree about the

1    adequacy of the matrix that they have put in place.  We

2    think they're inadequate.

3              But a harm to our religious practice, there are

4    different standards under the Constitution, and, you know,

5    it's unknown how the Lakota religious adherence will respond

6    to that, how long it will take them to heal from that.  And

7    the fact is that the timing in this case and the

8    vacillations of the government and Dakota Access have

9    resulted in great uncertainty and, when you weigh the

10   uncertainty on this side and the grave constitutional

11   concerns of the Cheyenne River Sioux Tribe on the other

12   side, caution is warranted.  And I think that's what cases

13   such as *O Centro* and *Elrod* demand.

14             THE COURT:  And I certainly -- given the facts

15   that you've pointed out, I certainly agree that to protect

16   your rights it's wise to move sooner rather than later.

17             Let me ask you a few other questions on this.

18             MS. DUCHENEAUX:  Sure.

19             THE COURT:  So why isn't the natural gas flowing

20   and the natural gas pipeline in the same spot, why isn't

21   that a desecration?

22             MS. DUCHENEAUX:  Well, as you pointed out when you

23   framed the issue just a few minutes ago, a major component

24   of the reason why this is a desecration and renders the

25   water ritually impure is the correlation to the prophecy of

1    the Black Snake.  This is a very real and serious prophecy

2    and religious belief of the Lakota people.  You know, the

3    imagery and the beliefs that it is premised on is this

4    black, slippery, oozing, terrible threat.

5            The Cheyenne River Sioux Tribe is aware of the

6    natural gas pipeline.  They have tolerated the natural gas

7    pipeline.  That pipeline is not the Black Snake, and that

8    question goes to the sincerity of the belief of the

9    religious adherence, and that's a question, that's an

10   inquiry in which the courts, the U.S. Supreme Court and the

11   D.C. Circuit, said require a light judicial touch.

12           THE COURT:  And similarly -- and I see your point

13   on that.  Similarly, the government talks about other

14   pipelines crossing the river, oil pipelines crossing the

15   river.  How far away from your reservation would the -- is

16   the dam situated to cross?

17           MS. DUCHENEAUX:  I believe it is about 70 miles.

18           THE COURT:  Seven, zero?

19           MS. DUCHENEAUX:  Seven, zero.

20           As set forth in the declarations that we

21   submitted, the Lakota people of the Cheyenne River Sioux

22   Reservation understand and believe that Lake Oahe, which is

23   a discrete area of the Missouri River, constitutes their

24   area of concern.  And as I also -- as we also discuss in our

25   briefing, the United States by its serial dispossessions of

1    the Lakota people overtime, have restricted our use of water

2    from Lake Oahe.

3         You know, we're not concerned about oil pipelines

4    that may be somewhere above outside of waters that we own in

5    Lake Oahe, and the government and Dakota Access have not

6    shown that there are any other oil pipelines under Lake

7    Oahe.  This is the solely contemplated one.

8         THE COURT:  Okay.  Now, let me ask you another

9    question that's referred to by Dakota Access.  This is

10   largely in footnotes, but it was an issue that was

11   concerning me this weekend, which is the *Bensenville* case,

12   the D.C. Circuit case from 2006.  And so the question is,

13   that case seems to hold that government approval of a

14   private party's action can't constitute a RFRA violation.

15   So what I want to know -- in other words, there's a

16   violation only where the private party's action may be

17   fairly treated as that of the federal government.

18        MS. DUCHENEAUX:  Right.

19        THE COURT:  So here, how do you get around

20   *Bensenville*?  Because unlike the prisoner diet cases, unlike

21   some of the other American Indian cases, the action here

22   isn't the government's action, it's the Dakota Access's

23   action that's causing you the harm.

24        MS. DUCHENEAUX:  Yes.  Thank you.

25        There are a couple of reasons why *Bensenville* is

1    not applicable here, and I would start with *Hobby Lobby*,

2    which is a case that we cite over and over again in our

3    briefing.

4             In that case, the government regulation permitted

5    employees of the closely held corporation in that case who

6    had insurance, both of whom were third parties, to get

7    contraception which violated the religious beliefs of the

8    parties.  Those were third parties to that transaction.  And

9    there's no question that the U.S. Supreme Court found that

10   there was a RFRA violation and a substantial burden.

11            But the other reason that *Bensenville* is not on

12   point in this case comes -- and I would direct the Court to

13   the very first sentence of this case in which -- this is the

14   D.C. Circuit -- the D.C. Circuit said, "The principle issue

15   in this appeal is whether the RFRA requires strict scrutiny

16   of a federal agency's approval of an airport layout plan

17   incident to the agency's approval of a determination of

18   eligibility for federal funding if the plan, when

19   implemented by a subdivision of a state, may burden

20   religious exercise."

21            It's not a mere plan that we are objecting to.

22   It's not a mere funding scheme.  It is a decision of the

23   federal government on how it's using its land, and it's land

24   that affects waters that are actually owned by the Cheyenne

25   River Sioux Tribe.

1        THE COURT:  And when you say "owned by the

2   Cheyenne River," I mean, isn't there a difference between

3   ownership and ability to use?

4        In other words, the Cheyenne River have been

5   granted access for hunting and fishing and use of the water,

6   but isn't that different from ownership?

7        MS. DUCHENEAUX:  Well, I think, pursuant to

8   *Winters*, they do have a property right in that water.  It's

9   unquantified, but that is a property right that belongs to

10  the Cheyenne River Sioux Tribe and over which the United

11  States has an unquestioned duty to protect it from third

12  parties.

13        The Corps has disclaimed suddenly its trust

14  responsibility over Lake Oahe, but the Court doesn't need to

15  consider that to render this decision.  That's just insult

16  added to injury.

17        THE COURT:  Okay.  And there's one other issue

18  which is raised by the government, which is the *Lyng*

19  case, the Supreme Court case of 1988.  So the question is,

20  again, unlike prisoner cases and some of the other American

21  Indian land usage cases -- again, this is a question -- *Lyng*

22  seems to say there's no violation where the government is

23  granted -- there wouldn't be a violation to the government's

24  granting easement to its own land in this case.

25        MS. DUCHENEAUX:  Right.

1          THE COURT:  In other words, this belongs to the

2     government.  So how is this different from *Lyng*?

3          MS. DUCHENEAUX:  Well, one of the things that *Lyng*

4     said that was striking to me is the Court, in part, rejected

5     the tribe's argument because it felt that allowing the tribe

6     to assert its religious freedoms on federal land would

7     result in a de facto beneficial ownership of that property.

8     There is no de facto ownership here.  The Cheyenne River

9     Sioux Tribe actually owns the waters of Lake Oahe.

10          But moreover, *Lyng* and *Navajo Nation*, which is a

11     Ninth Circuit case, essentially said that it wasn't

12     reasonable for tribes to have these sort of subjective

13     emotional -- you know, for a subjective emotional impact to

14     constitute a substantial burden.  *Hobby Lobby* tells us that

15     that's -- you know, that's not an appropriate consideration,

16     that that goes more to the plausibility of the burden, which

17     is a sincerity of belief question which requires, as I said,

18     a light judicial touch.

19          If the -- you know, what they're alleging is that

20     the government regulation is too attenuated from the

21     religious -- the substantial burden on the tribe, and that's

22     not appropriate under *Hobby Lobby*.

23          THE COURT:  Okay.  Thank you very much.

24          MS. DUCHENEAUX:  Thank you, Your Honor.

25          THE COURT:  I appreciate those points.

1           Let's have the government next.  Mr. Marinelli.

2           And so let me ask you a slight twist of the

3    waiver/laches argument that Ms. Ducheneaux's raising.  So

4    even if you're right on that, if Mr. Vance were permitted to

5    intervene, so he's just bringing suit for the first time,

6    would those arguments apply to him?

7           MR. MARINELLI:  Well, Your Honor, the laches

8    argument that we raised is not tied solely to the Cheyenne

9    River Sioux Tribe's previous complaint, but also to the

10   totality of the administrative process.  And we look to the

11   *Vermont Yankee* case there and the correspondence that the

12   Cheyenne River Sioux Tribe, including Mr. Vance, who is a

13   Cheyenne River officer, their tribal historic preservation

14   officer, submitted, and those comments did not raise, among

15   other things, this issue of the Black Snake prophecy, but

16   rather focused, to the extent they focused, on oil-related

17   issues to oil spill concerns.

18          THE COURT:  Okay.  And what's your -- tell me your

19   position on *Bensenville*.  I know that you -- you didn't

20   argue that in your brief.  Again, I know timing was rather

21   compressed.  You argued -- you made the *Lyng* argument.  Do

22   you have a position on the *Bensenville* argument?

23          MR. MARINELLI:  Well, Your Honor, the first

24   position I would offer for the Court is that I'd suggest

25   that the Court need not address *Lyng* or *Bensenville* or the

1     merits today because of the lack of imminent irreparable

2     injury under Cheyenne River's theory until oil flows.

3             THE COURT:  The first issue that I was pressing

4     Ms. Ducheneaux about.

5             MR. MARINELLI:  Yes.

6             THE COURT:  Okay.  So let's put that to the side

7     for a moment, and I appreciate that.  And tell me, again --

8     and if you haven't had an opportunity to think deeply about

9     *Bensenville*, I'm happy to pass on it, but I'd be interested

10    if you do have a position.

11            MR. MARINELLI:  Your Honor, we certainly cited

12    *Bensenville* from a standpoint that it is -- it cites

13    favorably to *Lyng*, but as to the specific *Bensenville*

14    issue raised by Dakota Access's brief and addressed by

15    Ms. Ducheneaux, we've not had an opportunity to think deeply

16    about that.

17            THE COURT:  Okay.  Let me ask you another

18    question.  You refer in your brief to other pipelines, but I

19    may have missed -- I may have missed it, but I don't think

20    there are specifics about where they're located.

21            Can you give me a sense in terms of the space of

22    where they are in relation to the Dakota Access pipeline?

23            MR. MARINELLI:  My understanding is that if we're

24    moving upstream from the Dakota Access pipeline route, that

25    the first oil pipeline that would be encountered would be

1    near Mandan, North Dakota, and that is just, as I understand

2    it, north of the Lake Oahe project boundary.  So just --

3              THE COURT:  Any sense of miles?

4              MR. MARINELLI:  If you'll --

5              THE COURT:  Sure.

6              MR. MARINELLI:  From the map that we provided the

7    Court, I cannot tell you the mileage.  I may have that

8    information.

9              THE COURT:  All right.  So, again, for subsequent

10   briefing, that would be helpful.

11             MR. MARINELLI:  To follow up on the point that

12   Ms. Ducheneaux raised, my understanding is that there is a

13   pipeline associated with that refinery that does cross the

14   river, but I think Ms. Ducheneaux's correct that that is not

15   clear from the exhibit that we filed.

16             THE COURT:  Okay.  And so, again, for further

17   briefing, a map with other pipelines and mileage would be

18   helpful.  Again, I know you didn't have time to prepare for

19   today.

20             Okay.  So go ahead, Mr. Marinelli, if there was

21   any other response you wanted to make to Ms. Ducheneaux.

22             MR. MARINELLI:  I have nothing further on that.

23             THE COURT:  Okay.

24             MR. MARINELLI:  Oh, on the -- no, nothing further

25   at this time, Your Honor.

1          THE COURT:  Okay.  Thanks very much.

2          Okay.  Mr. Debold.

3          So the first question, I think one that's going to

4     be important for me now, important going forward, is if you

5     can give us all an update about completion schedule and most

6     particularly about when oil would first enter the pipeline

7     under the lake.

8          MR. DEBOLD:  Sure.  As I think I said last week,

9     the company is moving as quickly as it can to try to

10    complete the pipeline and make up for the lost time over the

11    last several months, and I gave you an explanation and some

12    detail of what the process was and the speed of it, I think

13    I explained, depending on a number of factors, including how

14    quickly they can drill the bore hole and then expand on it,

15    and that's a function of some engineering requirements and

16    the torque that they can run it and all those things.

17         So the number of factors makes it very hard to

18    predict the exact timeline, but it could go faster than what

19    we said last week.  As recently as yesterday they hit a spot

20    where they made a lot of progress in a single day compared

21    to the previous two or three days when they started the

22    work.

23         The company is notifying its customers, those who

24    are actually supplying oil to be shipped to the pipeline,

25    that they should be prepared to provide what's called line

1    fill no later than 45 days from today, and it's not possible

2    for me to say that it won't go even faster than that.  If

3    you ask me could it be done in three weeks or shortly after

4    three weeks, it's possible if they make the kind of progress

5    that they made yesterday.

6            So what I want to make clear is they are moving

7    quickly, and they don't intend to -- and we're not aware of

8    any reason why they should have to stop once they reach that

9    point in putting oil in the pipeline.  In fact, we're aware

10   of no factual or legal basis in this motion, or anything

11   else that is before the Court, that should stop my client

12   from filling and operating the pipeline while any issue

13   remains pending in this case.

14           Now, that being said, we're here on a TRO motion

15   and a PI motion as part of the TRO motion as well.  We are

16   prepared to brief the preliminary injunction aspect of it,

17   which would be an expansion on the arguments we made in our

18   brief that we filed this morning, particularly an ability to

19   get more into the likelihood of success on the merits

20   because we believe there are a number of serious obstacles

21   to recognizing this claim in addition to the ones that

22   Mr. Marinelli referred to and that the government referred

23   to in their brief.

24           But I just want to be absolutely clear that we're

25   not in a position where we can agree to any kind of stopping

1       of the pipeline and the continuation of the work and

2       ultimately the operation of it, and I think if we want to

3       talk about that issue -- and we've talked about a number of

4       reasons in our motion or our opposition as to why the flow

5       of oil is not a triggering point, but if the Court wants us

6       to brief this preliminary injunction --

7               THE COURT:  Well, why isn't it a triggering point

8       for the plaintiffs?

9               MR. DEBOLD:  Your Honor, they have a number of

10      positions in their brief about what the significance of the

11      oil is, one of which is the leaking of the oil.  I think you

12      heard that's still part of their theory.  But even if the

13      theory is of the oil being present under the pipeline, the

14      totality of the four factors, we believe there is no way

15      that they can develop a basis for enjoining the operation of

16      the pipeline if you consider likelihood of success on the

17      merits along with irreparable harm, the harm to our client

18      as well as the equities.

19              You know, for one thing, once the oil starts

20      flowing, if you make a determination that means that the

21      company has to stop flowing oil through the pipeline based

22      on these arguments, that's something we can address.  But

23      there's no -- certainly no irreparable harm and the other

24      three factors combined with that that we believe will

25      justify stopping the pipeline.

```
 1              And if the Court is not satisfied about that, then

 2      we should have a very quick briefing on this preliminary

 3      injunction motion so we can get to that ruling and not have

 4      any risks that our client will be asked or face a motion to

 5      actually stop the operations.

 6              THE COURT:  Okay.  All right.  Let me just ask you

 7      just a housekeeping matter, which is, given the government's

 8      granting of the easement, are you willing to dismiss without

 9      prejudice your cross-claim?

10              MR. DEBOLD:  The language we would prefer, Your

11      Honor, is to hold it in abeyance.  We'd rather not dismiss

12      it.  I think some of the issues in the cross-claim could

13      come into play depending on what arguments we hear from the

14      other side, but we're certainly happy to hold it in

15      abeyance, which means not requiring the other side -- the

16      other two parties, three parties, I guess, to file anything

17      on February 20th.  If ultimately we need to return to it,

18      then we would ask the Court to set a schedule and complete

19      the briefing on the motions that are related to that.

20              THE COURT:  Okay.  All right.  Very well.  Thank

21      you very much.

22              Yes, Mr. Hasselman.

23              MR. HASSELMAN:  Yes.  I don't want to offer

24      argument on the TRO, but I do want to share some information

25      that might be useful as you decide what to do next with the
```

1    procedure here.

2          We've heard you over the last couple of status

3    conferences refer to the turning on of the spigots as sort

4    of the operative moment where things need to get resolved,

5    and my clients don't totally agree.  Mr. Archambault, in his

6    declaration, talks about the effect of construction, but we

7    don't want the fight over that question, construction versus

8    operation, to overwhelm the very formidable legal issues in

9    front of you.

10          So we are filing today, or maybe tomorrow, a

11   partial motion for summary judgment on an expedited basis

12   that encompasses the critical issues in this case, the trust

13   responsibilities, the requirement to do an EIS, the reversal

14   of the government's opinion.  Our view is that these issues

15   are not new.  They've been in front of everybody for a long

16   time.  We think that we can get these resolved on an

17   expedited basis before the spigots get turned on, and, in

18   fact, that approach would simplify matters because it's a

19   straight-up summary judgment.  The remedy would be vacating

20   of the permits.  We don't need to get into preliminary

21   injunction factors.

22          It's a little frustrating to hear Mr. Debold's

23   report last week.  What I heard was that the best possible

24   case scenario was 60 days, and so we were moving ahead with

25   this plan on a theory that, you know, if we filed a summary

1    judgment motion very quickly, we could give a reasonable

2    amount of time, say three weeks, to the other parties to

3    oppose it, we would have two weeks to respond, and you would

4    still have a reasonable amount of time to resolve the

5    issues.  Now we hear that that is potentially faster,

6    potentially slower.

7          I guess what I would propose is that the Court ask

8    the company to provide some weekly updates, and maybe

9    conditions will emerge that we can move on a somewhat more

10   measured pace.  Maybe we need to hurry up.

11         But we're going to get that filed, get the issues

12   teed up in front of you, and that's how we would propose to

13   proceed.  Rather than flipping this into sort of a

14   preliminary injunction, let's just get it resolved on

15   summary judgment.

16         THE COURT:  Okay.  But, again, if the oil is

17   flowing in 30 days, that may be a rather ambitious time

18   frame.

19         The other question, though, is:  Is it your

20   position that -- obviously that harm that you're -- Standing

21   Rock is harmed by the flow of the oil under the pipeline,

22   but if that oil is stopped, in other words, let's say it

23   flows for a period of time but then is stopped, as long as

24   it's not flowing, do you -- is your client's belief that the

25   water is sufficiently pure for its sacraments?

1          MR. HASSELMAN:  You know, I think it's a difficult

2    balance.  We don't want the pipeline turned on.  We think

3    there are meaty legal issues in front of you.

4          You know, the reason we haven't moved for a TRO on

5    these formidable issues is we don't want them to be judged

6    in such an accelerated fashion.  We want them to get the

7    attention they deserve, and we thought 60 days was enough.

8          I suppose, if events emerge that things are moving

9    faster, we can revisit the question of whether we want to

10   seek a TRO or whether we wind up in a situation where it

11   starts and then is cut off, which is certainly not where we

12   want to wind up, but these are weighty issues.

13         THE COURT:  Right.  But I guess it's somewhat

14   different from, say, the *Lyng* case where the issue was to

15   stop the government from building the logging trail, and the

16   logging trail meant cutting down trees, cutting down a

17   forest, which is obviously irreparable.  It can't be -- the

18   trees, once cut down, are gone.

19         But here, if there's an argument that -- obviously

20   you prefer the oil not -- never to flow, but unlike the

21   trees, it could be stopped at some point.

22         MR. HASSELMAN:  I understand that, and that's why,

23   you know, in our summary judgment motion that we're filing

24   today we're not focused on -- we're not bringing the RFRA

25   claim.

```
 1                    THE COURT:  Uh-huh.

 2                    MR. HASSELMAN:  We're bringing the treaty, NEPA,

 3     Clean Water Act.

 4                    Once it starts, the risks that haven't been

 5     analyzed emerge.

 6                    THE COURT:  Right.  I mean, is it your -- the

 7     argument is it's not -- the flowing of the oil coupled with

 8     the potential rupture, I understand, are both risks.

 9                    Okay.  Well, let me -- I appreciate that,

10     Mr. Hasselman.  Let me rule, and then we can go from here.

11                    Again, I've said this before, and I think it's

12     important to say again, in part for the public and in part

13     for -- because this is a case that has generated quite a bit

14     of interest.  Again, it's not my job here to decide whether

15     the pipeline is a good idea or a bad idea as a matter of

16     policy.  That's not what judges do.  That's what legislators

17     in the Executive does.  My job is only to rule on the legal

18     challenges before me; in this case, Cheyenne River's claim

19     under the RFRA.

20                    The question is have they made out a sufficient

21     claim that I should issue an immediate injunction?  And as

22     we talked about, and as I think Ms. Ducheneaux even agreed

23     in part, but even if she hadn't, I still think it's the case

24     that there is not imminent harm here -- in other words,

25     immediate harm -- such that a TRO should issue because the
```

1    oil is not set to flow before the Court can give this more

2    studied attention and rule and hear more studied argument by

3    the parties and be able to rule.

4           So because there is no immediate irreparable harm,

5    in other words, because the oil is not going to flow

6    immediately, I'll deny the motion for temporary restraining

7    order.  I think it's important to have time to fully brief

8    and analyze these issues in the context of a preliminary

9    injunction motion or perhaps in a motion for summary

10   judgment.

11          There are serious issues that I think both

12   defendants raise regarding waiver or laches; the question of

13   whether a RFRA claim could even be brought where the conduct

14   is that of a third party, and how do the tribes get around

15   the *Lyng* case.  I think those are all substantial problems,

16   but I would certainly benefit -- I would benefit from

17   further attention and analysis so I'm hoping we'll be able

18   to do that.  So I will deny the application for temporary

19   restraining order.

20          So let's now talk about a schedule, and I think --

21   so Mr. Debold -- so there are two issues here.  There's

22   going to be a motion for summary judgment that Mr. Hasselman

23   is bringing today or tomorrow, and I'll give -- obviously,

24   you and the government can respond to that, and I will rule

25   as quickly as I can on that.

```
1              As Mr. Hasselman and I have discussed, I'm not
2     guaranteeing -- I may not be able to rule before the oil is
3     turned on, but the remedy may well be if the oil's turned
4     off then much is accomplished for the plaintiffs.  So that's
5     one set of briefing that is to go on.
6              The second set of briefing is the motion for
7     preliminary injunction on RFRA alone brought by
8     Ms. Ducheneaux, so what I want to do is talk about a hearing
9     date for that and a schedule for the briefing on that.
10             So -- and I think it would be helpful, as
11    Mr. Hasselman requests, Mr. Debold, if you provide weekly
12    updates in which you give Dakota Access's best estimate of
13    the turning on of the oil.  Any objection to that?
14             And what I should say is for the oil -- did the
15    oil flow under Lake Oahe?  On what date will it flow under
16    Lake Oahe?
17             MR. DEBOLD:  Your Honor, we're obviously willing
18    to be cooperative with that information without giving up
19    our argument that there is no harm from the flowing of the
20    oil, and we really don't want to be put in a situation where
21    we come to a point where you say, "Well, you said it's going
22    to start tomorrow," and we don't have any briefing on --
23    other than the TRO and ultimately the preliminary injunction
24    briefing, we won't have any briefing, if I'm understanding
25    Mr. Hasselman correct, on some sort of preliminary relief.
```

1    It's going to be about a final judgment, albeit summary

2    judgment.

3            So with all that understood, I mean, obviously

4    we'll provide the information to the Court.

5            THE COURT:  Right.  So what I'm going to order you

6    is to provide notice to the Court every Monday until further

7    order.  Next Monday's a holiday, so you can do it on the

8    21st next week.

9            Okay.  So now I want to set a preliminary

10   injunction hearing and briefing schedule such that the

11   Cheyenne River get a hearing before the oil is turned on so

12   we're sort of at the mercy of your proposed forecast,

13   Mr. Debold, and you said as early as 30 days.  If that's the

14   case, then we'll have a hearing soon.

15           So if we had a hearing on, say, March -- in other

16   words, if it's going to be more like 45, I can have the

17   hearing a little bit later, but if it may be as early as 30,

18   then I need to move the hearing up.

19           MR. DEBOLD:  And, Your Honor, I can't say it won't

20   be earlier than 30 either.  I mean, there's just no way to

21   know.  If we make the kind of progress we made yesterday, it

22   can be even earlier.

23           So I would say set an aggressive schedule.  We're

24   happy to brief our response to the PI motion.  We can do it

25   in one week.

1           THE COURT:  Okay.

2           MR. DEBOLD:  You can do a reply in five days, and

3    we can be in front of the Court, Your Honor.

4           THE COURT:  All right.  So how about -- all right.

5    So how about 2:00 on February 27th?  Again, if we're going

6    to have to move quickly, then let's move quickly.

7           Ms. Ducheneaux, is that a convenient date and time

8    for you?

9           MS. DUCHENEAUX:  I believe it is, Your Honor.

10   Yes, Your Honor.

11          THE COURT:  Okay.  Mr. Debold?

12          MR. DEBOLD:  Yes.  That's fine, Your Honor.

13          THE COURT:  Mr. Marinelli?

14          MR. MARINELLI:  Your Honor, if I might be heard?

15          THE COURT:  Please.

16          MR. MARINELLI:  I would like to raise a couple of

17   issues before the Court finalizes the briefing schedule.

18   One, I'd like to note for the Court that the Yankton Sioux

19   Tribe also is likely to move forward with some emergency

20   practice.

21          THE COURT:  I know.  Also there was just a new

22   case filed actually a few hours ago by the Oglala Sioux.

23          MR. MARINELLI:  And I believe they're in this

24   courtroom today, and I say the government's preference has

25   some desire to have all four of those tribes have their day

1    in court prior to oil flowing, and that's without conceding

2    that there is any irreparable injury from that flow, if they

3    -- you know, if that can be accomplished.

4          But I would like to understand what other

5    emergency motions the government might face in that time

6    frame prior --

7          THE COURT:  I can say that any that are RFRA

8    claim, I would -- any TRO based on RFRA I'm likely to handle

9    the same way and then consolidate it with the hearing on

10   February 27th, is what I would expect.  If there's a

11   different kind of claim, then I'll have to see what it is.

12   I'll have to look at it.

13         MR. MARINELLI:  The second issue I'd like to raise

14   for the Court is that I'm scheduled to go on family leave on

15   approximately February 25th.  My colleague, Mr. Schifman,

16   who filed a brief today, is scheduled to assume my role in

17   this case going forward.  I'm not sure how much flexibility

18   there is, but our preference would be for as much time as

19   possible to coordinate our response to this motion.

20         THE COURT:  Sure.  No, understood.

21         Okay.  I'm sorry, Mr. Debold, did I ask you?  Are

22   you available February 27th at 2:00?

23         MR. DEBOLD:  We are.

24         THE COURT:  Thank you.

25         All right.  So what I'm going to say, then, is

1    that the opposition will be due February 21st, and the reply

2    February 24th.  Again, that's pretty compressed as it is,

3    particularly in terms of my being able to review everything

4    in time for the hearing, but I want to make sure that we

5    have this hearing before any potential oil is flowing.

6             And then, Mr. -- okay.  So Ms. Ducheneaux, does

7    that handle all of the issues that you've raised?

8             MS. DUCHENEAUX:  Your Honor, it does.  Thank you

9    very much.

10            THE COURT:  Thank you.

11            All right.  Mr. Hasselman, so do you want to set a

12   briefing schedule for your motion now?

13            MR. HASSELMAN:  I do, and we were going to file a

14   motion, but we thought it would be appropriate to talk about

15   it.  And I have been discussing it with the other parties,

16   and I want to acknowledge that there are four tribes with

17   overlapping-but-not-exactly-consistent interests, and I want

18   to assure the Court that counsel is working together to make

19   sure that we are not providing anything redundant or getting

20   in each other's way, so we will continue to do that.

21            I'm going to continue to propose the schedule that

22   I discussed with Mr. Marinelli, which is a three-week

23   deadline for the opposition to summary judgment and then two

24   weeks for us to reply.

25            Again, emphasizing that there is absolutely

1    nothing new in our motion, the decision documentation that

2    the Court provided when they made the easement decision is

3    essentially a legal brief on all of the issues that we are

4    raising so we think that schedule is very reasonable.

5           THE COURT:  I mean, without being too technical

6    here, to the extent that you're raising issues that rely on

7    a proposed amended complaint before such has been granted, I

8    mean, I think that what I would think is that the government

9    and Dakota Access can -- you can have the same motion be one

10   to deny the amendment and oppose the motion for summary

11   judgment.  In other words, if your position is futility

12   anyway, then it's going to be the same arguments.

13          So what's the argument for the -- what's the

14   position of Dakota Access on the schedule Mr. Hasselman's

15   proposed?

16          And Mr. Hasselman, can you just -- so we can get

17   dates, is that going to get filed today or tomorrow?

18          MR. HASSELMAN:  I had been hoping it would be

19   filed today.  It might be tomorrow.

20          THE COURT:  Okay.  So I'll say three weeks from

21   tomorrow, March 7th, for opposition; March 21st for reply.

22          MS. DUCHENEAUX:  Your Honor?

23          THE COURT:  Yes.

24          MS. DUCHENEAUX:  Yes, I'm sorry.  I wanted to

25   advise the Court that the Cheyenne River Sioux Tribe also --

1          THE COURT:  Yes, the RFRA was your added claim.

2          MS. DUCHENEAUX:  There are additionally claims

3    related to the granting of the easement that are separate

4    from the RFRA.

5          THE COURT:  There are, okay.

6          MS. DUCHENEAUX:  And as Mr. Hasselman indicated,

7    the other tribes that are involved in litigation are

8    attempting to move in such a way on summary judgment

9    briefing that we don't provide duplicative briefing to the

10   Court and so on and so forth, but the Cheyenne River Sioux

11   Tribe also intends to move for summary judgment on non-

12   RFRA-related claims.

13         THE COURT:  Okay.  So do you want to do it on the

14   same schedule that Mr. Hasselman --

15         MS. DUCHENEAUX:  We are slightly behind

16   Mr. Hasselman.

17         THE COURT:  In terms of your filing?

18         MS. DUCHENEAUX:  In terms of our filing, yes.

19         THE COURT:  Well, then we'll just use the

20   standard -- we'll use the deadlines set out in the rules

21   then, unless I hear differently.

22         MS. DUCHENEAUX:  Okay.  Thank you, Your Honor.

23         THE COURT:  And so -- but in terms of your -- to

24   the extent your PI depends on your motion to amend --

25         MS. DUCHENEAUX:  Yes.

1      THE COURT:  -- then is there any objection to

2  having the defendants get an extension to respond to that so

3  they can just deal with the PI issue?

4      MS. DUCHENEAUX:  No, I don't have any objection.

5      THE COURT:  Okay.  So the defense can have a 30-

6  day extension to respond to the motion to amend the

7  complaint, okay?

8      Mr. Debold, your position on the schedule

9  presented by Mr. Hasselman?

10      MR. DEBOLD:  Our only concern, Your Honor, is that

11  we haven't seen the motion yet so it's hard to know how much

12  time it will take to respond to it.  Also, it's hard to know

13  whether it's going to raise issues that require access to

14  documents that aren't yet in the record.

15      So, I don't know, it may help to get a little more

16  clarity from Mr. Hasselman on what claims are going to be in

17  there and maybe a little bit more color on what those might

18  be.

19      THE COURT:  Okay.

20      MR. DEBOLD:  It's hard for us to say, you know,

21  that three weeks is going to be the right amount of time or

22  that it's even going to be a profitable exercise.

23      THE COURT:  All right.  Let me hear briefly from

24  Mr. Hasselman on that.

25      MR. HASSELMAN:  Yes, Your Honor, as I've tried to

1    emphasize there isn't anything new here.  It really is under

2    NEPA their duty to perform a full environmental impact

3    statement, which had previously been promised and then

4    reversed, and then the arbitrary and capricious nature of

5    the reversal in light of what had previously been found.

6            So I guess what I would propose is we file our

7    motion.  They can look at it.  We think three weeks is

8    plenty of time.  If there's a real heartburn over that,

9    we'll talk about it and see if we can come up with something

10   different.

11           THE COURT:  I think that's reasonable.

12           Okay.  Any problem with that, Mr. Marinelli?  I

13   know you're going to have a changing of the guard.

14           MR. MARINELLI:  Your Honor, beyond that changing

15   of the guard issue, our position is that the summary

16   judgment should -- motion practice should be based on the

17   administrative record.  We are attempting to finalize a

18   Yankton Sioux administrative -- specific administrative

19   record, and my expectation is to have that relatively

20   shortly.  My best estimate of when we will be able to

21   provide the administrative record for the February 8th

22   easement decision is March 10th right now, and I -- our

23   position is that the briefing should be on that

24   administrative record.  So --

25           THE COURT:  Well, to the extent that they're

1    saying there should have been an EIS before the July

2    decision, then you don't need any -- then that's what -- the

3    administrative record is all set for that.

4         MR. MARINELLI:  I would note that that

5    administrative record has not been certified.  We've simply

6    produced the pre-July 25th documents as ordered by the

7    Court, so there is a difference of substance there.

8         THE COURT:  What do you mean by that?

9         MR. MARINELLI:  Well, I think the -- we would not

10   concede that every single document in that production is

11   part of the administrative record, and I wouldn't -- I'm not

12   saying that we wouldn't either.  It's just that we've not

13   made the determination of the administrative record for that

14   February 8th decision.

15        THE COURT:  All right.  Well, first of all, I'd

16   ask you to get that certified as -- the July -- the pre-

17   July administrative record certified expeditiously, again,

18   to continue to work as well to expedite this February 8th

19   administrative decision.

20        I'll hear you -- I think Mr. Hasselman's proposal

21   makes sense.  You can read his brief, and you can -- I'll

22   hear you on some kind of extension.  What you may need to do

23   is respond to the arguments related to the July decision on

24   this timetable and get some extension for the others, but we

25   can see how it works.

1              MR. MARINELLI:  One other issue for the Court's

2      consideration is Dakota Access still has pending a motion

3      for a protective order.

4              THE COURT:  Right.

5              MR. MARINELLI:  And that, I believe --

6              THE COURT:  But is that even -- is that still --

7              MR. MARINELLI:  I think that still is a live

8      motion.

9              THE COURT:  -- live?

10             MR. MARINELLI:  Yes.

11             THE COURT:  Okay.

12             MR. MARINELLI:  Based on some new information, we

13     would like to discuss with the parties whether certain

14     documents, a subset of those 11 documents that are subject

15     to Dakota Access's protective order, should be redacted, and

16     my intention today was to ask for two weeks to go through

17     that process and perhaps narrow the area of disagreement for

18     the Court.

19             And I say that as just to note for the Court that

20     we do have now one PI motion and that protective order

21     motion that are also pending as well as our efforts to

22     compile the administrative record, and all of those things

23     are going on simultaneously.  We just had to divert

24     resources from that admin record compilation to respond to

25     this TRO motion, and it is very challenging to, even with

1    plaintiffs attempting to coordinate their briefing, respond

2    to all those issues on the time frame that Mr. Hasselman

3    suggested.

4              THE COURT:  All right.  So you're seeking, then, a

5    two-week extension on your opposition to the protective

6    order motion?

7              MR. MARINELLI:  Correct, Your Honor.

8              THE COURT:  Any objection to that, Mr. Debold?

9              MR. DEBOLD:  No objection, Your Honor.

10             THE COURT:  All right.  I'll grant that.

11             Okay.  All right.  I appreciate that.  Again, I

12   know this is -- it's hard.  It's complicated.  But in terms

13   of resources, I would hope that this would be fairly high up

14   on the list of the government's litigation priorities in

15   this division.

16             All right.  I think that covers all of the issues

17   that have been raised.  Mr. Hasselman, have I missed

18   anything from your perspective?

19             MR. HASSELMAN:  No.  Thank you.

20             THE COURT:  Ms. Ducheneaux, anything else?

21             MS. DUCHENEAUX:  No.

22             THE COURT:  Thank you.

23             Mr. Debold?

24             MR. DEBOLD:  Yes.  I just wanted to clarify what

25   we're expecting from the government when Mr. Marinelli

1    referred to the administrative record.  My understanding is

2    that we're going to get everything that post-dates July 25th

3    up to the February 8th decision that relates to the claims

4    that have been brought, which are the NEPA claims, the Clean

5    Water Act, the Mineral Leasing Act claims.

6              THE COURT:  You're saying that predates or

7    post-dates?

8              MR. DEBOLD:  Post-dates.  I'm sorry if I misspoke.

9              THE COURT:  In terms of the second piece.

10             MR. DEBOLD:  The second piece that we're waiting

11   for.  It wasn't clear to me, and I just wanted to clarify

12   that on the record.

13             MR. MARINELLI:  Your Honor, two issues.  One, our

14   compilation and finalization of administrative record

15   depends on the decision challenged, and we don't have all of

16   those before us.  We've not had an opportunity to go through

17   all of the three complaints that were just filed with any

18   detail.

19             And also, to go back to an issue raised the last

20   time I was at the podium, the pre-July 25th record is not a

21   separate decision.  It's -- or I cannot say for certain that

22   it is, but it may be that there's a single decision for the

23   administrative record for the February 8th easement

24   decision, and that's something that we are still, at the

25   Department of the Army and at the Corps of Engineers,

1    working on addressing.

2            THE COURT:  All right.  And again, we will look to

3    see what the argument is by Mr. Hasselman.

4            All right.  Did you want to raise anything else,

5    then, Mr. Marinelli?

6            MR. MARINELLI:  The only other issue that I wanted

7    to raise for the Court was to say that we -- I guess you may

8    have already addressed this, Your Honor, but we -- I expect

9    we will oppose Mr. Vance's intervention separately because

10   he is a tribal officer of the Cheyenne River Sioux Tribe and

11   has filed declarations in support of that.

12           THE COURT:  Okay.  All right.  Very well.  Okay.

13           MR. MARINELLI:  Thank you.

14           THE COURT:  All right.  Again, thank you,

15   everybody.  I know it's a lot of work on a compressed time

16   frame.  I appreciate the professionalism shown by all

17   counsel, and we'll see you in a couple of weeks.

18                   (Whereupon the hearing was

19                    concluded at 3:02 p.m.)

20

21

22

23

24

25

1          **CERTIFICATE OF OFFICIAL COURT REPORTER**

2

3               I, LISA A. MOREIRA, RDR, CRR, do hereby

4      certify that the above and foregoing constitutes a true and

5      accurate transcript of my stenographic notes and is a full,

6      true and complete transcript of the proceedings to the best

7      of my ability.

8          Dated this 14th day of February, 2017.

9

10                              /s/Lisa A. Moreira, RDR, CRR
                                Official Court Reporter
11                              United States Courthouse
                                Room 6718
12                              333 Constitution Avenue, NW
                                Washington, DC 20001
13

14

15

16

17

18

19

20

21

22

23

24

25