# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

STANDING ROCK SIOUX TRIBE,

                Plaintiff,

and

CHEYENNE RIVER SIOUX TRIBE,

                Plaintiff-Intervenor,

    v.

U.S. ARMY CORPS OF ENGINEERS,

                Defendant,

and

DAKOTA ACCESS, LLC,

      Defendant-Intervenor-Cross Claimant.

Case No. 1:16-cv-01534-JEB

---

## RESPONSE OF DAKOTA ACCESS, LLC IN OPPOSITION TO PLAINTIFF CHEYENNE RIVER SIOUX TRIBE'S MOTION FOR A PRELIMINARY INJUNCTION

---

Kimberley Caine
William J. Leone
Robert D. Comer
NORTON ROSE FULBRIGHT US LLP
799 9th St. NW, Suite 1000
Washington, D.C.  20001-4501
(202) 662-0200

William S. Scherman
David Debold
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
wscherman@gibsondunn.com

*Counsel for Dakota Access, LLC*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... ii

INTRODUCTION ..................................................................................................... 1

BACKGROUND ....................................................................................................... 2

ARGUMENT ............................................................................................................. 6

    I.     The Tribe's Request For A Preliminary Injunction Based On A RFRA Claim
         Is Improper Because No RFRA Claim Is Properly Before The Court ................... 7

    II.    The Tribe Cannot Demonstrate A Likelihood Of Success On The Merits ........... 11

          A.    RFRA Does Not Apply To The Tribe's Claim ........................................ 12

               1.    The Tribe Is Not A "Person" Under The Statute ........................... 12

               2.    The Government Is Not The Actor That Supposedly Will
                     Burden Religious Exercise Here ..................................................... 14

          B.    The Tribe Cannot Demonstrate That RFRA Entitles It To An Order
             Retracting The Easement Or Enjoining Private Activity ......................... 17

               1.    Substantial Burden ......................................................................... 17

               2.    Compelling Government Interest..................................................... 24

               3.    Least-Restrictive Means.................................................................. 26

    III.   Cheyenne River Cannot Demonstrate Irreparable Harm ..................................... 27

    IV.   The Public Interest And Balance Of Equities Weigh Against A Preliminary
         Injunction ........................................................................................................... 30

CONCLUSION......................................................................................................... 33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apache Survival Coal. v. United States,*
  21 F.3d 895 (9th Cir. 1994) .............................................................................................11

*Arizona v. California,*
  373 U.S. 546 (1963).........................................................................................................23

*Asociacion de Compositores y Editores de Musica Latinoamericana v. Copyright Royalty Tribunal,*
  809 F.2d 926 (D.C. Cir. 1987)........................................................................................13

*Bd. of Regents of State Colleges v. Roth,*
  408 U.S. 564 (1972).........................................................................................................25

*Bill Barrett Corp. v. U.S. Dep't of Interior,*
  601 F. Supp. 2d 331 (D.D.C. 2009) ...............................................................................30

*Bldg. & Constr. & Trades Dep't v. Brock,*
  838 F.2d 1258 (D.C. Cir. 1988).......................................................................................23

*BNSF Ry. Co. v. Surface Transp. Bd.,*
  526 F.3d 770 (D.C. Cir. 2008).........................................................................................30

*Burwell v. Hobby Lobby Stores, Inc.,*
  134 S. Ct. 2751 (2014)................................................................................12, 16, 17, 19

*Capitol Square Review & Advisory Bd. v. Pinette,*
  515 U.S. 753 (1995).........................................................................................................25

*Cappaert v. United States,*
  426 U.S. 128 (1976).........................................................................................................23

*Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo-Mitsubishi Ltd.,*
  15 F. Supp. 2d 1 (D.D.C. 1997).........................................................................................7

*Comm. in Solidarity with the People of El Salvador v. Sessions,*
  705 F. Supp. 25 (D.D.C. 1989)........................................................................................31

*De Beers Consol. Mines v. United States,*
  325 U.S. 212 (1945)...........................................................................................................7

*Elec. Privacy Info. Ctr. v. Dep't of Justice,*
  15 F. Supp. 3d 32 (D.D.C. 2014)..........................................................................7, 12, 27

# TABLE OF AUTHORITIES
(*continued*)

Page(s)

*Employment Division v. Smith*,
494 U.S. 872 (1990)................................................................15, 19

*Fed. Power Comm'n v. Niagara Mohawk Power Corp.*,
347 U.S. 239 (1954)................................................................22, 23

*Foman v. Davis*,
371 U.S. 178 (1962)..........................................................................7

*Fordham Univ. v. Brown*,
856 F. Supp. 684 (D.D.C. 1994)..........................................................25

*Gull Airborne Instruments, Inc. v. Weinberger*,
694 F.2d 838 (D.C. Cir. 1982)............................................................10

*Holt v. Hobbs*,
135 S. Ct. 853 (2015)......................................................................24

*Jackson v. Metro. Edison Co.*,
419 U.S. 345 (1974)........................................................................15

*Lyng v. Nw. Indian Cemetery Protective Ass'n*,
485 U.S. 439 (1988)............................................17, 18, 19, 22, 23

*Majorica, S.A. v. R.H. Macy & Co.*,
762 F.2d 7 (2d Cir. 1985) ................................................................29

*Menominee Indian Tribe of Wis. v. United States*,
614 F.3d 519 (D.C. Cir. 2010)............................................................10

*Mich. v. Bay Mills Indian Cmty.*,
134 S. Ct. 2024 (2014)....................................................................12

*Moose Lodge No. 107 v. Irvis*,
407 U.S. 163 (1972)........................................................................15

*Nat. Res. Def. Council v. Kempthorne*,
525 F. Supp. 2d 115 (D.D.C. 2007) ....................................................30

*Nat. Res. Def. Council v. Pena*,
147 F.3d 1012 (D.C. Cir. 1998)..........................................................29

*Navajo Nation v. U.S. Forest Serv.*,
535 F.3d 1058 (9th Cir. 2008) ......................................................18, 19

# TABLE OF AUTHORITIES
### (*continued*)

**Page(s)**

*Nuclear Energy Inst., Inc. v. EPA,*
   373 F.3d 1251 (D.C. Cir. 2004) ............................................................................9

*O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft,*
   389 F.3d 973 (10th Cir. 2004) ............................................................................29

*Okla. Tax Comm'n v. Citizen Band Potawatomi Tribe of Okla.,*
   498 U.S. 505 (1991) ............................................................................................12

*Petrella v. Metro-Goldwyn-Mayer, Inc.,*
   134 S. Ct. 1962 (2014) ........................................................................................10

*Pro Football, Inc. v. Harjo,*
   565 F.3d 880 (D.C. Cir. 2009) ............................................................................10

*South Dakota v. Bourland,*
   508 U.S. 679 (1993) .......................................................................................21, 22

*St. John's United Church of Christ v. City of Chicago,*
   502 F.3d 616 (7th Cir. 2007) ..............................................................................25

*Sweet v. City of Syracuse,*
   129 N.Y. 316 (1891) ...........................................................................................23

*United States v. L.A. Tucker Truck Lines, Inc.,*
   344 U.S. 33 (1952) ................................................................................................9

*United States v. Sterling,*
   75 M.J. 407 (C.A.A.F. 2016) ..............................................................................29

*Vill. of Bensenville v. FAA,*
   457 F.3d 52 (D.C. Cir. 2006) ........................................................14, 15, 16, 17, 19

*Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens,*
   529 U.S. 765 (2000) ............................................................................................13

*Will v. Mich. Dep't of State Police,*
   491 U.S. 58 (1989) ..............................................................................................13

*Wilson v. Block,*
   708 F.2d 735 (D.C. Cir. 1983) .......................................................................16, 17

*Wilson v. Omaha Tribe,*
   442 U.S. 653 (1979) ............................................................................................13

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)..................................................................................6, 27, 29

*Winters v. United States*,
   207 U.S. 564 (1908)..........................................................................22

**Constitutional Provisions**

U.S. Const., amend. V...............................................................................24, 25

**Statutes and Treaties**

1868 Treaty, 15 Stat. 635 ...........................................................................20

1877 Treaty, 19 Stat. 254 ...........................................................................20

1889 Treaty, 25 Stat. 888 ...........................................................................20

Cheyenne River Act of Sept. 3, 1954, 68 Stat. 1191 .............................................21, 22

Dictionary Act, 1 U.S.C. § 1 .......................................................................12, 13

Flood Control Act of 1944, 58 Stat. 887.............................................................21

Religious Freedom Restoration Act.................................................1, 5, 8, 10, 11, 12, 13
   42 U.S.C. § 2000bb...........................................................................12, 14, 15, 19
   42 U.S.C. § 2000bb-1 .........................................................................1, 5, 11, 16, 17

**Rules**

Fed. R. Civ. P. 15.....................................................................................7

Fed. R. Civ. P. 65.....................................................................................32

**Administrative Materials**

82 Fed. Reg. 5,543 (Jan. 18, 2017) .................................................................4

**Other Authorities**

Black's Law Dictionary (10th ed. 2014)..............................................................24

S. Rep. No. 103-111 (1993)...........................................................................18

11A Wright & Miller, *Federal Practice & Procedure* § 2947 (3d ed.)...................................7

## INTRODUCTION

The Cheyenne River Sioux Tribe asks this Court for a preliminary injunction based on a legal claim that has no chance of success on the merits even if the Court overlooks the inexcusable and extreme delay in making that claim.  In fact, because Cheyenne River never before even raised the issues that underlie this new claim, the Corps did not have a chance to develop a record, and the Court's only remedy would be to deprive Dakota Access—a private party with no legal duties under the Religious Freedom Restoration Act ("RFRA")—of its contractual and property rights.  The courts recognize that such a drastic remedy—which goes far beyond the typical order preliminarily enjoining future conduct—should be reserved for only the most extraordinary cases.  This is not one of them.

Cheyenne River bases its request on a claim that the presence of oil in the Dakota Access pipeline being built beneath Lake Oahe would burden the Tribe's exercise of religion, in violation of the RFRA.  Yet in an administrative process that has spanned more than two years, and litigation that has spanned some six months (and two different complaints by the Tribe), this motion is literally the Tribe's first mention of RFRA or the supposed burden underlying its RFRA claim.  The claim has been waived, and laches would bar it in any event.  That is enough to deny the Tribe's request for a preliminary injunction.

The Tribe's claim would fail if the Court allows Cheyenne River to amend its complaint a second time.  RFRA says that the "Government shall not substantially burden a person's exercise of religion."  42 U.S.C. § 2000bb-1(a).  Two words are dispositive here:  "person" and "Government."  Specifically, the Tribe, a semi-sovereign governmental entity, is not a "person" entitled to the statute's protections.  And D.C. Circuit case law establishes that the federal government, by approving the pipeline, is not the actor that will build or operate the pipeline that gives rise to the claim of "burden."  Moreover, Supreme Court precedent holds that a person's religious beliefs

1

cannot dictate the government's use of federal property.  That is exactly what the Tribe seeks to do here.  For these reasons, among others, the Tribe has not shown that it is likely to succeed on the merits.

The Tribe's motion also fails for lack of irreparable harm.  Harm from the presence of oil in a pipeline simply is not irreparable, as counsel for Standing Rock Sioux Tribe conceded at the most recent status conference.  In addition, the degree of any incremental harm, if any, is extremely attenuated given existing pipelines and other man-made interventions at and near the waters that form the basis for the motion.  Cheyenne River's lack of diligence in raising this issue also cuts strongly against this factor.  And to the extent harm is based on risk of a leak or spill, that is far from imminent or irreparable given the extreme unlikelihood of such an event and the steps that are in place to prevent harm to the waters near Lake Oahe.  Moreover, the public interest and equities weigh against an injunction.  Among other things, the Tribe requests an extreme form of relief—essentially, to order the government to breach a contract—that is at odds with the timing for this new claim.  This Court should deny the motion.

Dakota Access continues to have the greatest respect for the religious beliefs and traditions of Cheyenne River and the other tribes that have participated in the process.  But, as Dakota Access explained in opposing the TRO, Cheyenne River's last-ditch desperation pass comes after time has expired, and the relief that Cheyenne River requests simply is not necessary to protect the exercise of its beliefs or preserve those traditions.  This Court should deny the motion.

## BACKGROUND

1.      More than two years ago, Dakota Access began the process for obtaining regulatory approval for the slivers of the Dakota Access Pipeline that implicate federal authority.  Cheyenne River was invited to participate in that process.  It responded with a number of requests and objections.  For example, it echoed the Standing Rock Sioux Tribe's argument that an Environmental

Impact Statement ("EIS") should "be completed" to address the risk of an oil leak or spill.  AR 68221 (Ex. A).  And, invoking the risk of harm to sites of religious and cultural significance from *building* the pipeline, it contended that the Corps had not complied "with section 106 of the" National Historic Preservation Act ("NHPA").  AR 64139 (Ex. B).

On July 25, 2016, the Corps issued a final Environmental Assessment which found that the pipeline would not significantly impact the environment.  *See* AR 71225–26 (Ex. C).  The Corps noted, in response to Cheyenne River's concerns, that it had conducted cultural resources investigations "in accordance with Section 106 of the NHPA" and that there was no need for an EIS given the lack of significant impact on the environment.  AR 71300 (Ex. C).  Two days later, the Standing Rock Sioux Tribe sued the Corps for declaratory and injunctive relief.  D.E. 1.

Shortly thereafter, on August 10, 2016, Cheyenne River intervened and filed a complaint of its own to "protect its interests under" the NHPA, the Clean Water Act, the Rivers and Harbors Act, and the National Environmental Policy Act ("NEPA").  D.E. 11, at 10.  The following month, on September 8, 2016, the Tribe filed an amended complaint again asserting claims under each of those statutes.  D.E. 37 ¶¶ 154–254.  It also joined Standing Rock's ultimately unsuccessful motion for a preliminary injunction based solely on NHPA.  D.E. 19; D.E. 39.  Dakota Access answered Cheyenne River's amended complaint in November.  D.E. 57.

**2.**      Early in this lengthy process of approvals for construction of the pipeline, Dakota Access applied for a right-of-way to cross federal land that the Corps administers at Lake Oahe. Despite the Corps's July 25, 2016 Finding of No Significant Impact, on September 9, 2016, the Departments of Justice, the Army, and the Interior jointly announced that "the Army will not authorize constructing the Dakota Access pipeline . . . until it can determine whether it will need to reconsider any of its previous decisions . . . under [NEPA] or other federal laws."  D.E. 42-1

(Ex. D), at 1.  The Corps and the Army ultimately concluded that all decisions complied with all applicable laws.  D.E. 56-1 (Ex. E), at 2.  Nonetheless, the Army's Assistant Secretary for Civil Works (Jo-Ellen Darcy) decided as a matter of "policy" to proceed with further analysis.  D.E. 65-1 (Ex. F).  She then waited more than a month—*i.e.,* two days before the new Administration took office—to publish a notice of intent to prepare an EIS.  *See* 82 Fed. Reg. 5,543 (Jan. 18, 2017).

On January 24, 2017, the President directed the Secretary of the Army to instruct the Assistant Secretary of the Army for Civil Works and the Corps to "take all actions necessary and appropriate" to "review and approve in an expedited manner, to the extent permitted by law and as warranted, and with such conditions as are necessary or appropriate, requests for approval to construct and operate the" Dakota Access Pipeline, "including easements or rights-of-way to cross Federal areas."  D.E. 89-1 (Ex. G) § 2.

The Court held a status conference on February 6, 2017 in anticipation that the Army would take action on the easement as directed in the Presidential Memorandum.  Cheyenne River told this Court that if an easement is approved without an EIS, the Tribe would challenge that action as unlawful "under tribal treaties, under NEPA, [and] under the Clean Water Act."  D.E. 104 (Ex. H), at 8–9.  This Court thus summarized the "two central" claims:  (1) the original environmental review process "violated NEPA"; and (2) the government could not "grant the easement" after deciding "to go forward with an EIS."  *Id.* at 15.

The next day, the Army informed the House Committee on Natural Resources and the Senate Committee on Energy and Natural Resources that it intended to grant a right-of-way to Dakota Access.  D.E. 95-1 (Ex. I).  The Army's letters to Congress explained that because the Corps had "already prepared" an Environmental Assessment there was "no cause for completing any additional environmental analysis."  D.E. 95-2 (Ex. HH), at 2.  The Army therefore withdrew

the January 18, 2017 notice of intent to prepare an EIS.  D.E. 95-3 (Ex. J).  The Corps and Dakota

Access executed the easement on February 8, 2017, and construction resumed later that day.

**3.**      Early on February 9, 2017, Cheyenne River filed a motion for a temporary restrain-

ing order to halt the construction work at Lake Oahe, and a separate motion for a preliminary

injunction ordering the Corps to withdraw the already executed easement.  *See* D.E. 98 ("Mot.");

D.E. 99.  The Tribe's preliminary injunction motion did not seek to vindicate rights "under tribal

treaties," or "under NEPA," or "under the Clean Water Act," or under NHPA.  D.E. 104 (Ex. H),

at 8–9.  Instead, the Tribe claimed—for the very first time in this case—"a violation of [its] rights

under the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1 ('RFRA')."  Mot. 12.  Each

declaration in support of an alleged burden on the exercise of religion had been signed the week

before the February 6 status conference.  D.E. 99-1 (Ex. K); D.E. 99-2 (Ex. L); D.E. 99-3 (Ex. M);

D.E. 99-4 (Ex. N).  Because RFRA had yet to appear in any pleading—or anywhere in the lengthy

administrative record, for that matter—Cheyenne River also sought leave to amend its complaint.

D.E. 97.  The Tribe's sole excuse for waiting this long was that it "was informed" that the recently

terminated EIS process "would be the vehicle by which [it] could express [its] concerns" about

religious free exercise.  D.E. 97, at 3.

The Tribe's RFRA claim rests on what one of its declarants calls the Black Snake prophecy:

"Lakota prophets told the coming of a Black Snake that would be coiled in the Tribe's homeland

and which would harm the people."  D.E. 98-1 (Ex. O) ¶ 18 (cited at Mot. 2–3).  According to the

Tribe's papers, some of its members believe that the Dakota Access Pipeline is the "terror de-

scribed in the Black Snake prophecy."  Mot. 19.  The Tribe notes that it "has tolerated the con-

struction and operation of natural gas pipelines under Lake Oahe," but only because they "are not

the Black Snake."  *Id.* at 43.  What distinguishes this pipeline, according to the Tribe's papers, is

"the crude oil that is proposed to flow through." D.E. 98-1 (Ex. O) ¶ 18. Four of the declarations accompanying the motion—one from the Tribe's historic preservation officer, and three from Tribe members—raise the possibility that the pipeline would affect religious practices. *See* D.E. 98-1 (Ex. O); D.E. 98-3 (Ex. P); D.E. 98-4 (Ex. Q); D.E. 98-5 (Ex. R). But the declarants do not appear to agree on how that might happen. Vance, the historic preservation officer, is the only one to mention the Black Snake prophecy. He says the "act of pumping" oil burdens religious exercise by the Lakota people. D.E. 98-1 (Ex. O) ¶ 18. Two others point to the pipeline's "construction and operation" as the source of a burden. D.E. 98-3 (Ex. P) ¶ 10 (Gilbert); D.E. 98-4 (Ex. Q) ¶ 8 (Cournoyer). The final declarant says the burden will occur if "the pipeline breaks." D.E. 98-5 (Ex. R) ¶ 10 (Black Bird). The Tribe's Motion claims generally that "construction and operation of a crude oil pipeline" burdens its free exercise of religion. Mot. 24.

At a February 13 status conference, counsel for Cheyenne River asserted it is "the mere presence of oil in the pipeline" that burdens the Tribe's exercise of religion and causes irreparable harm. D.E. 119 (Ex. S), at 9; *id.* at 11 ("It is only the oil; that's correct."). In response to the Court's question about other oil pipelines crossing the Missouri River, the Tribe responded that Lake Oahe "constitutes [its] area of concern." *Id.* at 14. Counsel for the two Tribes did not dispute the Court's understanding that the alleged harm would not occur if the pipeline ceased containing oil beneath Lake Oahe. *Id.* at 28. This Court denied Cheyenne River's request for a TRO and ordered briefing on its motion for a preliminary injunction.

## ARGUMENT

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citation omitted). Moreover, because the Tribe's

proposed order would direct the Corps "to withdraw the easement" that the Corps already granted, D.E. 98-12, at 1, this motion seeks a *mandatory* injunction, which is to say one that "would alter, rather than preserve, the status quo by commanding some positive act." *Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo-Mitsubishi Ltd.*, 15 F. Supp. 2d 1, 4 (D.D.C. 1997), *aff'd*, 159 F.3d 636 (D.C. Cir. 1998) (citation omitted). The power to issue such an injunction "should be sparingly exercised," and the "moving party must meet a higher standard than in the ordinary case by showing clearly that he or she is entitled to relief or that extreme or very serious damage will result." *Elec. Privacy Info. Ctr. v. Dep't of Justice*, 15 F. Supp. 3d 32, 39 (D.D.C. 2014) (citation omitted). As explained below, the Tribe falls well short.

**I.      The Tribe's Request For A Preliminary Injunction Based On A RFRA Claim Is Improper Because No RFRA Claim Is Properly Before The Court.**

As a threshold matter, this Court should deny Cheyenne River's motion for a preliminary injunction because it rests on a claim that is not—and should not be—before the Court. Courts do not grant preliminary injunctions based on claims that are "outside the issues in the underlying suit." 11A Wright & Miller, *Federal Practice & Procedure* § 2947 (3d ed.); *see also De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945) ("It is not an injunction in the cause, and it deals with a matter lying wholly outside the issues in the suit."). Cheyenne River has been involved in this lawsuit for six months. It has known the facts giving rise to this claim for more than two years. Yet it did not so much as hint at a RFRA claim until the day it filed the motion at issue here. That alone is sufficient to dispose of this motion.

Recognizing this flaw, Cheyenne River belatedly seeks leave to amend its complaint to assert the RFRA claim needed to support its preliminary injunction motion. Although this Court may grant leave to amend a complaint "when justice so requires," Fed. R. Civ. P. 15(a)(2), it un-dermines the interests of justice to give leave when the movant engages in "undue delay." *Foman*

*v. Davis*, 371 U.S. 178, 182 (1962).  Cheyenne River has no excuse for waiting until this late date

to assert the RFRA concerns that it now raises.

**A.**     Cheyenne River could have raised these concerns years ago, before any pipeline

construction began.  During an administrative process spanning more than two years, the Corps

engaged in extensive consultations with various tribes on matters of historic, cultural, and religious

importance, *see* D.E. 39, at 48, and specifically requested comments from tribal authorities, in-

cluding Cheyenne River, on its draft Environmental Assessment.  D.E. 39, at 26; AR 64300 (Ex. T)

(letter to Cheyenne River requesting meeting with Tribe); AR 64062 (Ex. U) (letter replying to

Cheyenne River's comments and inviting further questions); AR 64120 (Ex. V) (letters responding

to Cheyenne River's comments); AR 66820 (Ex. W) (letter advising Cheyenne River of consulta-

tion meeting in Sioux Falls, South Dakota); AR 86333 (Ex. X) (e-mail inviting Cheyenne River to

participate in tribal monitoring during construction).  Despite these opportunities, Cheyenne River

never asserted a need to accommodate any person's exercise of religion under RFRA, nor did it

allege that the pipeline's operation—in and of itself—would impose any burden on someone's

exercise of religion.  Instead, when raising religious concerns, the Tribe (through correspondence

from Vance and tribal Chairman Harold Frazier) limited its comments to (1) harm to cultural or

religious artifacts that may be disturbed by construction due to being in the path of the pipeline;

and (2) harm to sacred waters from a leak or spill of oil.  AR 67924 (Ex. Y); AR 68220 (Ex. A);

AR 69815 (Ex. Z); AR 64139 (Ex. B).

Cheyenne River also could have raised this claim when it filed its original complaint in

August 2016, or its amended complaint in September 2016—both of which were filed soon after

the Lake Oahe crossing had been approved.  Yet when the amended complaint alleged that the

Corps failed to consider the pipeline's supposed effects on "sites of great historic, religious, and

cultural significance," D.E. 37 ¶ 1, Cheyenne River once again made no reference to a Black Snake prophecy or any other burden on the exercise of religion from the mere presence of oil in a pipeline beneath Lake Oahe.

Cheyenne River says that it did "not seek amendment sooner" because it anticipated raising its RFRA concerns in the supplemental environmental review process that the Corps terminated on February 7, 2017.  D.E. 97, at 3.  But that supplemental process was not announced until January 18, 2017, and the Army did not even preview it until December 4, 2016.  It therefore does not explain why Cheyenne River never raised this concern during the lengthy administrative process that culminated in a Finding of No Significant Impact on July 25, 2016.  After all, when *that* decision was announced, all parties understood—and rightly so—that the environmental review process for the Lake Oahe crossing had been completed.  Beyond that, Cheyenne River does not explain why it failed to assert this claim in its original complaint (filed August 10) or its amended complaint (filed September 8).

**B.**    Not only does Cheyenne River's inexcusable delay in raising its RFRA claim strongly counsel against allowing amendment; Cheyenne River has affirmatively waived that claim.  Challenges to agency action can be based only on claims that were properly before that agency during the administrative process.  "It is a hard and fast rule of administrative law, rooted in simple fairness, that issues not raised before an agency are waived and will not be considered by a court on review."  *Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1297 (D.C. Cir. 2004).  "[O]rderly procedure and good administration require that objections . . . be made while [the agency] has opportunity for correction."  *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952).  An "opportunity for correction" is particularly important when claims such as this one are brought.  Cheyenne River contends that the Corps substantially burdened the exercise of

the Tribe's religion, while lacking a compelling interest and without choosing the least restrictive alternative.  The time for the Corps to consider assertions of burden, compelling interest, and alternatives—followed, if needed, by a different decision—was *before* the Corps approved the pipeline route at Lake Oahe and issued a right-of-way.  Surely Congress, in passing RFRA, did not grant parties a license to wait silently until the government's sole option is to breach its contract with another private party, take away that other party's property rights, and compel it to abandon construction already underway.  Any RFRA claim has thus been waived, and cannot form the basis of a preliminary injunction.

**C.**      Cheyenne River's RFRA claim is also barred by the doctrine of laches.  The Tribe seeks equitable relief.  Because "equity aids the vigilant, not those who slumber on their rights," *Gull Airborne Instruments, Inc. v. Weinberger*, 694 F.2d 838, 843 (D.C. Cir. 1982) (citation omitted), the equitable defense of laches applies.  *See also Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962, 1967 (2014).  "Laches 'applies where there is '(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense.'"  *Menominee Indian Tribe of Wis. v. United States*, 614 F.3d 519, 531 (D.C. Cir. 2010) (quoting *Pro Football, Inc. v. Harjo*, 565 F.3d 880, 882 (D.C. Cir. 2009)).

Both prongs of this test are satisfied here.  First, as already discussed, Cheyenne River displayed an extreme lack of diligence by "inexcusably or unreasonably" delaying the assertion of RFRA rights.  *Menominee Indian Tribe*, 565 F.3d at 531 (citation omitted).  Second, the Tribe's failure to raise its RFRA claim earlier has prejudiced Dakota Access and the Corps too.  Had Cheyenne River or any of its members raised this issue during the administrative process, the Corps could have developed a record on a number of relevant issues.  That record likely would have included an assessment of the level and extent of the religious burden, exploration of options

for reducing or eliminating the burden, weighing the burden against the hardship of a different route, determining the extent to which other routes might burden the religious exercise of others, and so on.[1]  If that administrative process had not resolved the issue to the satisfaction of Cheyenne River, then the Tribe could have included RFRA among the claims in its initial complaint, and Dakota Access's Answer—filed three months ago—would have responded to those allegations. That would have allowed the parties to brief the claim under a schedule that avoids putting the government in the unenviable role of breaching a contract or taking away a property right if RFRA has been violated.  The Tribe instead stood silent while Dakota Access incurred significant costs. It would be inequitable to foist the consequences of that silence upon Dakota Access, and it would encourage the "sandbagging of agency decisionmakers" by waiting until the last minute to raise new objections.  *See Apache Survival Coal. v. United States*, 21 F.3d 895, 912 (9th Cir. 1994) (laches barred a tribe's NHPA claim because the tribe waited until long after completion of the administrative record and well into the construction phase to raise its concern that a project approved by the Forest Service would harm sacred sites).

## II.     The Tribe Cannot Demonstrate A Likelihood Of Success On The Merits.

RFRA provides that the "[g]overnment shall not substantially burden a person's exercise of religion" unless that burden "is in furtherance of a compelling governmental interest; and is the least restrictive means of furthering that compelling governmental interest."   42 U.S.C. § 2000bb-1.  Here, RFRA does not even apply to Cheyenne River's claim.  And even if it did, the

---

[1]  Two months *after* the Corps' July 25, 2016 Finding of No Significant Impact, Standing Rock complained that the "Final EA does not mention" RFRA or the American Indian Religious Freedom Act.  D.E. 115-4 at 6 (September 22, 2016 letter from Dave Archambault to Assistant Secretary Darcy).  But that could hardly have come as a surprise; during the comment period Standing Rock did not ask the Corps to consider the possible relevance of RFRA.  Moreover, even the September 22 letter did not assert—as Cheyenne River does now—that the mere presence of oil might substantially burden the exercise of religion.  Instead, Standing Rock only mentioned harms to "religious practices" if a "pipeline leaks into Lake Oahe."  *Id.*

Tribe could not demonstrate a violation of the statute—to say nothing of the clear showing necessary for the extraordinary remedy of a mandatory injunction. *Elec. Privacy Info. Ctr.*, 15 F. Supp. 3d at 39.

**A.     RFRA Does Not Apply To The Tribe's Claim.**

Cheyenne River's claim fails at the threshold for two independent reasons. First, the Tribe is not a "person" entitled to invoke RFRA. Second, the government merely approved the Lake Oahe crossing, and thus is not the source of an alleged burden from construction or operation of the pipeline.

**1.     The Tribe Is Not A "Person" Under The Statute.**

Cheyenne River's RFRA claim fails because the Tribe is a semi-sovereign government entity—not a "person"—and RFRA protects only a "person's" exercise of religion from substantial burdens imposed by the government. 42 U.S.C. § 2000bb-1(a).

There is no doubt that Cheyenne River is a governmental entity with a measure of sovereign authority. The Tribe itself asserts that it is a "federally-recognized Indian Tribe." D.E. 11-12 ¶ 1. And "Indian tribes are 'domestic dependent nations' that exercise 'inherent sovereign authority.'" *Mich. v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2030 (2014) (quoting *Okla. Tax Comm'n v. Citizen Band Potawatomi Tribe of Okla.*, 498 U.S. 505, 509 (1991)). That is the basis for Cheyenne River's position that it is entitled to "government-to-government consultation" with the federal government. *E.g.*, Mot. 16; D.E. 11-12 ¶ 58.

Government entities are not "person[s]" within the meaning of RFRA. In *Burwell v. Hobby Lobby Stores, Inc.*, the Supreme Court held that the term "person" in RFRA is defined by reference to the Dictionary Act, because there is "nothing in RFRA that suggests a congressional intent to depart from the Dictionary Act definition." 134 S. Ct. 2751, 2768 (2014). The Dictionary Act, in

turn, defines "person" to include individuals and a number of private organizations—including

"corporations, companies, associations, firms, partnerships, societies, and joint stock companies."

1 U.S.C. § 1.  Government entities such as the Tribe are not included.  In fact, the Supreme Court

applies a "longstanding interpretive presumption that 'person' does not include" sovereign entities;

only an "affirmative showing of statutory intent to the contrary" can rebut that presumption.  *See*

*Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 780–81 (2000) (holding that a State

is not a "person" subject to *qui tam* liability under the False Claims Act); *see also Will v. Mich.*

*Dep't of State Police*, 491 U.S. 58, 64 (1989) (applying the "'often-expressed understanding that

in common usage, the term "person" does not include the sovereign, and statutes employing the

word are ordinarily construed to exclude it'" (quoting *Wilson v. Omaha Tribe*, 442 U.S. 653, 667

(1979))).  The Tribe is not a "person" and cannot bring a claim under RFRA.[2]

---

[2]  A reply brief would be no place for Cheyenne River to seek permission, for the first time, to bring suit on behalf of those who *are* persons.  Apart from the fact that such a position would be waived for tardiness, *Asociacion de Compositores y Editores de Musica Latinoamericana v. Copyright Royalty Tribunal*, 809 F.2d 926, 928 (D.C. Cir. 1987) ("We will not consider a novel contention first advanced in a reply brief."), the Tribe concedes that its members do not all believe the same things as relevant to this claim.  Mot. 5 ("Lakota religion has no dogma or uniform theology" and "the nuances of belief may be disparate or mutable").  A RFRA analysis would therefore vary with each individual, which no doubt explains why Steven Vance is seeking to intervene while represented by counsel for Cheyenne River.  This is no small issue.  Cheyenne River is an "unincorporated Tribe" composed of many different smaller tribes, with an estimated 15,993 members total.  *Cheyenne River Agency*, U.S. Department of the Interior, Indian Affairs (Feb. 15, 2017), https://www.bia.gov/WhoWeAre/RegionalOffices/GreatPlains/WeAre/Agencies/Cheyenne/.
And, as explained earlier, the declarations from just four of its members show differing beliefs on how the pipeline would purportedly burden the exercise of each member's religion.  RFRA is intended to protect each particular *person's* religious exercise.  The statute would be unworkable if courts were tasked with applying it to the "belief" of a single plaintiff when, in reality, that plaintiff includes numerous persons with a host of diverse beliefs.

### 2.     The Government Is Not The Actor That Supposedly Will Burden Religious Exercise Here.

RFRA also does not apply because the government is not the actor for the alleged burden on religious exercise that the Tribe asserts.  RFRA says that the "Government shall not substantially burden a person's exercise of religion."  42 U.S.C. § 2000bb-1(a).  By its plain terms, the statute applies only "when it can be said that the federal government is responsible for the burden on religious exercise." *Vill. of Bensenville v. FAA*, 457 F.3d 52, 63 (D.C. Cir. 2006).  That happens when the government "has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the" government. *Id.* at 64 (citation omitted).  "Mere approval of or acquiescence in the initiatives of a private party," though, "is not sufficient."  *Id.* (citation omitted).

In *Village of Bensenville*, the FAA approved an airport-layout plan that relocated a cemetery.  457 F.3d at 58–59.  The plaintiffs there claimed that relocation of the cemetery substantially burdened their free exercise of religion in violation of RFRA.  *Id.* at 60.  But the D.C. Circuit held that the FAA did not impose the alleged burden because the agency merely approved "[t]he specific conduct" at issue and thus had a "peripheral role" in the relocation.  *Id.* at 64–65.  Under RFRA, the "cause of any burden on religious exercise" was the airport developer.  For it "submitted the plan to the FAA," "fought for approval of the plan," and, "at the end of the day," relocated the cemetery.  *Id.* at 65.  That remained true despite the FAA's "broad regulatory power," "thorough consideration of alternatives pursuant to NEPA," and "intention to provide partial funding" for the plan.  *Id.* at 61, 65–66.

The same conclusion holds here.  The "specific conduct of which the plaintiff complains," *id.* at 64, is, in the Tribe's own words, "the construction and operation of a crude oil pipeline." Mot. 24.  As in *Village of Bensenville*, the federal government has done no more than merely

approve that conduct.  In both cases that approval included federal agency consideration of alternatives under NEPA.  457 F.3d at 61.  In fact, the government's role here is even more attenuated.  As this Court has recognized, domestic-oil pipelines "require no general approval from the federal government," D.E. 39, at 2, so the "broad regulatory power" on display in *Village of Bensenville* is absent here, 457 F.3d at 66.  Moreover, the government is not funding the pipeline at all.  Thus, to the extent the pipeline imposes any burden, the Tribe points to the wrong entity by alleging a governmental burden.  Rather, it is Dakota Access that "submitted the plan," "fought for approval of its plan," and, "at the end of the day," will construct and operate the pipeline.  *Id.* at 65.

*Village of Bensenville* is a straight-forward application of Supreme Court precedent rejecting the notion that government action is implicated under the Constitution when the government merely approves private conduct.  For example, in *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 357 (1974), the Court observed that "[a]pproval by a state utility commission . . . does not transmute a practice initiated by the utility and approved by the commission into 'state action.'"  And in *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 177 (1972), the Court held that state approval of a liquor license did not turn a private club's conduct into the State's.  These cases make clear that RFRA does not apply here.

For good reason too.  Mere approval of private activity lies well outside the core of government action that Congress meant RFRA to cover.  RFRA reinstated the rule rejected in *Employment Division v. Smith*, 494 U.S. 872, 881 (1990), by protecting the exercise of religion when the government burdens that exercise through "application of a neutral, generally applicable law." *Id.* (holding that the First Amendment's free-exercise clause was not violated by a neutral, generally applicable law barring the use of peyote); *see* 42 U.S.C. § 2000bb.  Such laws impose governmental burdens.  Not only that, it makes little sense to insist on a "compelling government interest"

just because a private entity needs government approval to engage in private activity.  42 U.S.C.
§ 2000bb-1(b)(1).  This case brings that point into sharper focus given that Dakota Access pipeline
"needs almost no federal permitting of any kind because 99% of its route traverses private land."
D.E. 39, at 2 (emphasis omitted).  Applying the statute to these facts would clash with this Court's
duty to "assure that RFRA's heightened standard is only applied when it can be said that the federal
government is responsible for the burden on religious exercise."  *Village of Bensenville*, 457 F.3d
at 62–63.

    *Hobby Lobby* did not overrule *Village of Bensenville*.  In *Hobby Lobby*, the government
"required" the plaintiffs to buy their employees health insurance that covered contraceptives; this
direct governmental mandate was the claimed burden on religious exercise.  134 S. Ct. at 2762.
Indeed, the Supreme Court used the term "mandate" to describe the government's conduct no
fewer than three-dozen times.  *E.g.*, *id.* at 2779 ("[T]he HHS contraceptive mandate imposes a
substantial burden on the exercise of religion.").  Employers who did not comply with this mandate
faced fines of $2,000 per employee.  *Id.* at 2776.  *Hobby Lobby* thus involved the government
exercise of "coercive power" that was absent from *Village of Bensenville*.  457 F.3d at 64 (citation
omitted).  It is absent here, too.  The government has not mandated that the Tribe do, or refrain
from doing, anything.  Nor has the government put the Tribe to the choice of complying with a
government mandate or suffering some consequence.  *Cf. Hobby Lobby*, 134 S. Ct. at 2776 (ex-
plaining that the plaintiffs would suffer financial penalties if they declined to provide insurance
for contraceptives).  This substantial difference between a direct government mandate and the
government's approval of a private party's proposed easement is dispositive under RFRA.[3]

---

[3]  The majority in *Village of Bensenville* also discussed *Wilson v. Block*, 708 F.2d 735 (D.C. Cir.
1983), a pre-RFRA case in which an Indian tribe had opposed private development on federal land.
*Village of Bensenville* expressly rejected any reading of *Wilson* to suggest that mere approval of

**B.      The Tribe Cannot Demonstrate That RFRA Entitles It To An Order Retracting The Easement Or Enjoining Private Activity.**

As explained above, RFRA prohibits the government from substantially burdening a person's exercise of religion unless it can demonstrate that the burden is "in furtherance of a compelling government interest" and "is the least restrictive means of furthering" that interest.  42 U.S.C. §§ 2000bb-1(a), (b); *see also Hobby Lobby*, 134 S. Ct. at 2767.  Here, the Tribe cannot establish a substantial burden on its religious exercise that would result from the government honoring the easement that it granted.  And even if it could, any such burden would be the least-restrictive means of furthering a compelling government interest.

**1.      Substantial Burden**

To start, the Tribe cannot show a substantial burden on its exercise of religion.  In *Lyng v. Northwest Indian Cemetery Protective Association*, 485 U.S. 439, 442 (1988), the Supreme Court held that the government's decision to build a road across public land did not substantially burden the religious beliefs of Native Americans.  That was true even though the road would "virtually destroy" the plaintiffs' "ability to practice their religion."  *Id.* at 451.  The Court reasoned that

---

private activity suffices under RFRA.  457 F.3d at 67 ("Not even the quoted dicta" from the case "supports the notion that government acquiescence in another actor's decision justifies finding that the government has violated the Constitution.").  *Wilson* in fact "held that the government action did not constitute a burden on religious exercise," and did not "dea[l] with the question of who was responsible for the burden on religious exercise."  *Id.* (emphasis omitted) (further distinguishing *Wilson* because it "involved a challenge to a federal governmental decision about what do with federal government land").  Instead, the dicta in *Wilson* identified stringent *minimum* requirements before a court would even consider a free-exercise claim based on the government's use of its own land, and expressly declined to speculate on whether those requirements would suffice.  *Wilson*, 708 F.2d at 744.  As explained below, the Supreme Court's decision three years later in *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439 (1988), rendered that dicta moot; *Lyng* eliminated the possibility that the use of federal land could be a governmental burden on the right to free religious exercise, *id.* at 442.  Thus, the government's property interest does not make its approval of private activity any more coercive than government approval of activity on non-federal land.

religious beliefs, however sincere, do not confer "*de facto* beneficial ownership of . . . public property," and cannot "divest the [g]overnment of its right to use what is, after all, *its* land." *Id.* at 453. The holding in *Lyng* applies equally under RFRA. *See, e.g.*, *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1071–73 (9th Cir. 2008) (en banc) (applying *Lyng* under RFRA). In fact, RFRA was meant to incorporate the holding in *Lyng*. S. Rep. No. 103-111, at 9 n.19 (1993) (Senate Judiciary Committee Report on RFRA citing *Lyng* and explaining that "strict scrutiny does not apply to government actions involving only management of internal Government affairs or the use of the Government's own property or resources.").

This case is indistinguishable from *Lyng*. The very reason for an easement is that the pipeline will cross federal land at Lake Oahe. The government's decision to honor that easement thus is not a substantial burden under RFRA. That is true regardless of whether a project will "virtually destroy" the Tribe's "ability to practice [its] religion," 485 U.S. at 451, which as explained below is not the case here. The Tribe's RFRA claim is also indistinguishable from that in *Navajo Nation*, where the plaintiffs sought to force the government to prohibit the use of impure water to make snow on a mountainside. 535 F.3d at 1062–63. The plaintiffs argued that the artificial snow would "spiritually contaminate the entire mountain and devalue their religious exercises." *Id.* at 1063. But insomuch as the government's decision concerned its own land—and because that decision neither "force[d] the [p]laintiffs to choose between following the tenets of their religion and receiving a governmental benefit" nor "coerce[d] [them] to act contrary to their religion under the threat of civil or criminal sanctions"—no substantial burden existed. *Id.* at 1070.

Simply put, RFRA does not allow a plaintiff to veto the government's choices about the use of public land—no matter the conflict between that use and the plaintiff's religious beliefs. That is exactly what the Tribe seeks to do here.

Cheyenne River contends that RFRA displaced *Lyng*.  Mot. 34–35.  The legislative history cited above shows to the contrary.  As already noted, RFRA rejected the Supreme Court's view in *Employment Division v. Smith* that laws of neutral application do not typically implicate the religious-exercise protection in the First Amendment.  In overturning that decision, *see* 42 U.S.C. § 2000bb(a)-(b), Congress restored pre-*Smith* cases—such as *Lyng*—that articulate the "substantial burden" standard.  As the D.C. Circuit put it, the statute "restore[d] the standard by which government actions burdening religion were to be judged." *Village of Bensenville*, 457 F.3d at 62.  The Ninth Circuit similarly explained that "the cases that RFRA expressly adopted and restored . . . also control the 'substantial burden' inquiry." *Navajo Nation*, 535 F.3d at 1069.  RFRA expressly deviated from some pre-*Smith* cases, but on a different point:  whether to use a least-restrictive-means requirement *after* a substantial burden is established. *See Hobby Lobby*, 134 S. Ct. at 2761 n.3 (noting that the least restrictive means requirement had not been used in the pre-*Smith* cases that RFRA purported to codify). *Lyng*'s substantial-burden analysis therefore applies under RFRA.

Cheyenne River also contends it would not be acquiring "*de facto* beneficial ownership of . . . public property," as in *Lyng*, 485 U.S. at 453, because the government's trust obligations already give the Tribe a property interest in Lake Oahe. *See* Mot. 34.  But the property interest that the Tribe alleges here does not distinguish this case from *Lyng*.  The Tribe does not "own," nor has it ever owned, the waters of the Missouri River generally or at the Lake Oahe crossing in particular. *Cf.* Mot. 14 (argument heading:  "The Tribe's Ownership of the Waters at Lake Oahe").  For one thing, the pipeline crossing in North Dakota is 80 miles north of the Cheyenne River

reservation's northern boundary—the same boundary set in the 1889 treaty that created the reservation in South Dakota. *See* 1889 Treaty, 25 Stat. 888 § 4 ("1889 Treaty"). Likewise, the crossing does not occur within the boundaries of the Standing Rock reservation.

Moreover, the interests that either Tribe might possess in any waters relevant to this case are not exclusive property interests—*i.e.*, the Tribes do not have the power either to exclude others from using any waters or to dictate how others use or affect those waters. Even the treaties on which Cheyenne River relies—treaties that have been superseded by statute as explained below—expressly allowed construction of utilities across waters. The Treaty of 1868 between the United States and Sioux Nation Tribes, 15 Stat. 635 ("1868 Treaty"), redefined the boundary for lands "set apart for the absolute and undisturbed use and occupation of the Indians." *Id*. art. 2. Under Article 11 of the 1868 Treaty, the Sioux Nation expressly agreed to "withdraw all pretence of opposition to the construction of the railroad now being built along the Platte River and westward to the Pacific Ocean, and they will not in the future object to the construction of rail roads wagon roads, mail stations, or *other works of utility or necessity*, which may be ordered or permitted by the laws of the United States . . . ." *Id*. art. 11 (emphasis added). Article 11 survived changes made by treaties in 1877 and 1889, because each contains a savings clause for non-modified provisions. *See* 1877 Treaty, 19 Stat. 254 ("1877 Treaty") art. 8 ("The provisions of the said treaty of 1868, expect as herein modified, shall continue in full force . . . ."); 1889 Treaty § 19 (providing that "all the provisions of the" 1868 Treaty "with the different bands of the Sioux Nation of Indians" and "the agreement with the same approved" in the 1877 Treaty "not in conflict with the provisions and requirements of this act, are hereby continued in force according to their tenor and

limitation, anything in this act to the contrary not withstanding"). Thus, even if the relevant provisions of these treaties had not been superseded by twentieth century statutes, those treaties would not support the Tribes' claimed ownership of Lake Oahe waters.

Two statutes specific to Cheyenne River's and Standing Rock's rights over the waters at Lake Oahe establish that the Tribes retain, at best, the right to *nonexclusive use* of water for irrigation, consumption, or fishing. In *South Dakota v. Bourland*, 508 U.S. 679 (1993), the Court rejected Cheyenne Rivers claimed right to "regulate hunting and fishing by non-Indians on lands and overlying waters located within the Tribe's reservation but acquired by the United States for the operation of the Oahe Dam and Reservoir." *Id.* at 681–82. The Court explained that while the 1868 Treaty once gave Sioux Tribes "absolute and undisturbed use and occupation" of various lands used for their reservations, *id.* at 682, 688–89, the Flood Control Act of 1944, 58 Stat. 887, and the Cheyenne River Act of Sept. 3, 1954, 68 Stat. 1191, changed that. As relevant here, the statutes limited the Tribes to a right of "free access to the shoreline of the reservoir" created by the Oahe dam, "including the *right* to hunt and fish in and on the aforesaid shoreline and reservoir, *subject, however, to regulations governing the corresponding use by other citizens of the United States*," 508 U.S. at 684 (quoting Cheyenne River Act; emphasis by Court). Because of that limitation, the Court ruled that the Tribe lacked the power to exclude or even to regulate use by others. *Id.* at 689 (holding that in "taking tribal trust lands and other reservation lands for the Oahe Dam and Reservoir Project," the two statutes "eliminated the [Cheyenne River] Tribe's power to exclude non-Indians from these lands, and with that the incidental regulatory jurisdiction formerly enjoyed by the Tribe"); *id.* at 689 n.9 (agreeing that "the area at issue here has been broadly opened to the public").

In short, "Congress gave the Army Corps of Engineers, not the Tribe, regulatory control over the taken area." *Id.* at 691.  The Court concluded that, in the absence of something to the contrary in Corps regulations, "the Flood Control Act's open-access mandate and the Cheyenne River Act's relevant provisions "affirmatively abrogate the Tribe's authority to regulate entry onto or use of these lands." *Id.*  Moreover the statutory reservation of certain *other* rights—such as "mineral, grazing and timber rights retained by the Tribe under the Cheyenne River Act"—undermines a claim by either Tribe to an inalienable right to use Lake Oahe waters for the exercise of religion, because the Court held that "[w]hen Congress reserves limited rights to a tribe or its members, the very presence of such a limited reservation of rights suggests that the Indians would otherwise be treated like the public at large." *Id.* at 693–94; *see also id.* at 693 ("Congress' explicit reservation of certain rights in the taken area does not operate as an implicit reservation of all former rights.").

The Supreme Court's holding in *Winters v. United States*, 207 U.S. 564 (1908), further confirms that the Tribes lack the property rights they would need to distinguish *Lyng*.  The Court ruled there that when the federal government set aside lands for Indian tribes, it implicitly reserved, at the time of the reservation, the right to use that amount of water needed to survive and prosper on the reservation. *Id.* at 576.  So-called *Winters* rights do not give tribes title to water in fee or a right to somehow occupy the water. *See generally Fed. Power Comm'n v. Niagara Mohawk Power Corp.*, 347 U.S. 239, 246 (1954) (distinguishing usufructuary rights from ownership of water outright).  The Supreme Court has explained in this context that "[w]hile the right of its use, as it flows along in a body, may become a property right, yet the water itself, the corpus of the stream, never becomes or, in the nature of things, can become, the subject of fixed appropriation or exclusive dominion, in the sense that property in the water itself can be acquired or become the subject

of transmission from one to another." *Id.* at 247 n.10 (quoting *Sweet v. City of Syracuse*, 129 N.Y. 316, 335 (1891)).  As a result, "[n]either sovereign nor subject can acquire anything more than a mere usufructuary right therein[.]"  *Id.* (quoting *Sweet*, 129 N.Y. at 335).  That is why the Supreme Court in *Arizona v. California*, 373 U.S. 546, 600 (1963), allotted water reserved to tribal reservations based on the amount required to supply "the practicably irrigable acreage on the reservations."  *Id.*  The Tribes do not have a right to exclude or regulate other uses of water; rather, their right—under the "implied-reservation-of-water-rights doctrine"—is limited to the use of "that amount of water necessary to fulfill the purposes of the reservation, no more." *Cappaert v. United States*, 426 U.S. 128, 141 (1976) (citing *Arizona*, 373 U.S. at 600–01).

In sum, to give the Tribes a veto on construction of the pipeline would enlarge their property rights at the expense of the government's—exactly what *Lyng* forbids.  Moreover, the pipeline does not infringe the Tribe's property rights in Lake Oahe.  The Corps expressly concluded that the pipeline was consistent with the government's "trust responsibilities."  AR 71303 (Ex. C); *see also* AR 71282 (Ex. C) ("No impacts to treaty fishing and hunting rights are anticipated."); AR 71311 (Ex. C) (discussing impacts on "tribal drinking water supplies").  The Tribe offers no basis to set aside the Corps's expert judgment on these "matters to which the agency lays claim to special expertise."  *See Bldg. & Constr. & Trades Dep't v. Brock*, 838 F.2d 1258, 1266 (D.C. Cir. 1988).

The Tribe's reliance on a series of cases involving prisoners and the Religious Land Use and Institutionalized Persons Act is misplaced.  As an initial matter, these cases cannot displace *Lyng* because, unlike *Lyng,* they address something other than the government's use of its own land.  Thus, even if approval to construct a pipeline on federal land could be analogized to the "Hobson's choice" in those prison cases, Mot. 31 (choice between abandoning religious beliefs or being punished), *Lyng* forecloses such a claim.  *Id.* at 453–54.

In any event, the Tribe is not put to the Hobson's choice that prisoners face. Cheyenne River notes that, in the incarceration context, "the government has near complete control over the religious adherent's ability to exercise his religion," Mot. 31, and any deviation from prison policy "is grounds for disciplinary action," such that the prisoner is forced either to violate a government directive or violate his religion. *Holt v. Hobbs*, 135 S. Ct. 853, 860, 862 (2015) ("If petitioner contravenes that policy and grows his beard, he will face serious disciplinary action. Because the grooming policy puts petitioner to this choice, it substantially burdens his religious exercise."). Here, in contrast, the Tribe faces no threat of punishment or other adverse governmental action if it disagrees with how the government allows others to use federal land.

### 2.    Compelling Government Interest

Even if this Court could determine that the government has substantially burdened the Tribe's religion, that burden would be justified by a compelling government interest. Recall that the Tribe is requesting a mandatory injunction requiring the government to withdraw the easement. The relevant inquiry, therefore, is not whether the Corps has a compelling interest "in authorizing the construction and operation" of the pipeline, as the Tribe claims, Mot. 38, because that authorization pre-dated Cheyenne River's motion. Instead, the question is whether the Corps's refusal to withdraw the easement is the least-restrictive means to furthering a compelling interest. There are two compelling government interests here.

*First*, the Corps has a compelling interest in respecting Dakota Access's property right in the easement. The easement constitutes an "interest in land," *Easement*, Black's Law Dictionary (10th ed. 2014), for which Dakota Access must pay—and has paid—"good and valuable consideration," D.E. 96-1 (Ex. AA), at 2. The easement is therefore an interest in property of which the Corps cannot deprive Dakota Access without "due process of law." U.S. Const., amend. V; *see*

*also Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972) (holding that an individual has property right protected by Constitution if he has "a legitimate claim of entitlement to it").

Cheyenne River has failed to point to any legal authority by which the government can simply withdraw an easement after it has been issued. To deprive Dakota Access of its easement without legal authority would violate the Due Process Clause, and the government undeniably has a compelling interest in complying with the Constitution. *See Fordham Univ. v. Brown*, 856 F. Supp. 684, 697 (D.D.C. 1994) (holding that compliance with the Establishment Clause was a compelling interest under RFRA); *cf. Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 761–62 (1995) ("There is no doubt that compliance with the Establishment Clause is a state interest sufficiently compelling to justify content-based restrictions on speech.").

*Second*, the government has a compelling public interest in securing the nation's energy infrastructure. As the January 24, 2017 order issued by the President of the United States explicitly found, the pipeline "represents a substantial, multi-billion-dollar private investment in our Nation's energy infrastructure," and "construction and operation of lawfully permitted pipeline infrastructure serve the national interest." D.E. 89-1 (Ex. G), at 2–3. Supporting the infrastructure on which America's economy depends is an essential responsibility of government. *See* Presidential Policy Directive 21 ("The Nation's critical infrastructure provides the essential services that underpin American society . . . [E]nergy and communications systems [are] uniquely critical due to the enabling functions they provide across all critical infrastructure sectors."). That is why the Seventh Circuit held in *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 635 (7th Cir. 2007), that Illinois's interest in supporting transportation infrastructure was a compelling interest that justified condemning a church's cemetery in order to expand the O'Hare airport. *Id.* ("Given

O'Hare's unique importance to the national transportation infrastructure, we are persuaded that the City and State have a compelling interest in fixing the problems from which O'Hare suffers.").

### 3.      Least-Restrictive Means

Respecting issuance of the easement is also the least-restrictive means to further these compelling government interests.  In fact, the only way the government can serve the interests jeopardized by the proposed injunction is by leaving the easement in Dakota Access's hands.  Because the alternatives to which the Tribe points all involve withdrawing the easement, Mot. 40, they fail this test.

The Corps's refusal to withdraw the easement—thereby allowing Dakota Access to complete the pipeline—is also the least-restrictive means of furthering the government's interest in the nation's energy infrastructure.  The alternatives Cheyenne River suggests, transporting oil by truck or rail or rerouting the pipeline to avoid Lake Oahe, fail to further the government's interest.  That is because the Corps considered these alternatives and rejected them—and had compelling reasons for doing so.  *See generally* AR 71229–46 (Ex. C).  Transporting oil by truck or rail, for example, is far more hazardous and inefficient than transporting it by pipeline.  D.E. 22-1 (Ex. BB), at 152 ("the incremental safety hazards of the alternate methods of transportation would increase 3.4 to 4.5 times with rail and 34 times with trucking").  Both methods would therefore magnify the risk of burdening religious exercise in the most direct way possible—pollution of Lake Oahe from an accident.  The Corps also considered an alternative to routing the pipeline across Lake Oahe, but concluded that it would produce "roughly 165 additional acres of impact … [and] cros[s] through or in close proximity to several wellhead source water protection areas that are identified and avoided in order to protect areas that contribute water to municipal water supply wells." AR 71232 (Ex. C).  Moreover, the pipeline is now all but completed.  It should go without saying that this

outcome would undermine the government's interest in facilitating the development of America's energy infrastructure, especially if massive infrastructure projects are subject to cancelation on the eve of completion, after billions of dollars in investment, by untimely RFRA claims.

## III.   Cheyenne River Cannot Demonstrate Irreparable Harm.

Irreparable harm is an essential element of any request for preliminary injunctive relief. *See Winter*, 555 U.S. at 20.   And since the Tribe seeks a mandatory injunction, the Tribe must make the heightened showing "that extreme or very serious damage will result." *Elec. Privacy Info. Ctr.*, 15 F. Supp. 3d at 39.   It has not made that showing.

At the outset, the impropriety of the Tribe itself seeking to litigate a RFRA claim—as opposed to an actual "person" whose exercise of religion is burdened, *see supra* Part II.A.1—is accentuated in the irreparable-harm analysis.   The Tribe acknowledges that its members do not all share the same views:   There are "nuances of belief" among its members that "may be disparate or mutable."   Mot. 5.   The Lakota religion "has no dogma or uniform theology," and there is "general variation inherent in [the] religion" because it "operates in the context of an oral tradition and individualized experience."   *Id.* at 5–6.   Only the "Lakota rituals and sacraments" are "standardized."   *Id.* at 5.   Because the Tribe is not a person with a single set of beliefs, and because members of its tribe hold diverse and "fluid" beliefs that "may change," Mot. 5, it cannot be said that the Tribe has established that refusal to withdraw the easement authorizing the Dakota Access pipeline would inflict an irreparable harm on anyone's religious exercise that is not a mere "possibility."   *Winter*, 555 U.S. at 22.

Cheyenne River invokes a burden from the "presence of the oil in the pipeline" beneath Lake Oahe.   D.E. 119 (Ex S), at 9.   But the Court has already identified why such a harm is not irreparable:   The flow of oil in a pipeline can be stopped.   At the February 13, 2017 hearing, the

Court expressly raised this point with counsel for Standing Rock Sioux Tribe, and counsel did not dispute that the alleged harm could be stopped in this way.  D.E. 119 (Ex. S), at 28 (when the Court observes that the harm is unlike the cutting down of a forest because the flow of oil "could be stopped at some point," counsel replies:  "I understand that, and that's why, you know, in our summary judgment motion . . . we're not bringing the RFRA claim.").  Counsel for Cheyenne River did not dispute this either.  Nor could it given what its motion and declarations identify as the cause of the harm.

The Tribe's assertion of irreparable harm also cannot be squared with the religious beliefs on which the Tribe relies.  Lake Oahe is a man-made lake with man-made power lines and man-made natural gas pipelines running across it.  AR 71294 (Ex. C).  The lake is a continuation of the Missouri River, which has several oil pipelines running across it, as well as a man-made oil refinery.  Ex. CC.  A major rail line, which carries large daily shipment of oil, crosses Lake Oahe just north of the Cheyenne River reservation—70 miles closer than the Dakota Access pipeline crossing.  If the waters that flow to the Cheyenne River reservation are pure and natural in this state, then operating the Dakota Access pipeline deep below the bed of the lake cannot by the Tribe's own standards inflict a new injury of any kind, much less an irreparable one.  D.E. 98-1 (Ex. O), at 6–7.  The Tribe's only response is the Black Snake prophecy, but as noted already, none of the lay declarants—the relevant members for purposes of this motion—even mentions this prophecy or otherwise explains how the Dakota Access pipeline would render Lake Oahe unfit for use in light of their other beliefs.  This is not to question the sincerity of any of the Tribe's declarants, but only to say that *their* beliefs do not resolve the inconsistencies outlined above.

Moreover, the Tribe's unexplained delay in raising these concerns casts significant doubt on its assertion that refusing to withdraw the easement will inflict a harm that qualifies as irreparable. The Tribe never sought an accommodation for religious exercise during the administrative process. Nor did the Tribe claim a burden on religious exercise or assert a RFRA claim in either its original complaint or its amended complaint. This delay "may . . . preclude the granting of preliminary injunctive relief, because it goes primarily to the issue of irreparable harm." *Majorica, S.A. v. R.H. Macy & Co.*, 762 F.2d 7, 8 (2d Cir. 1985) (per curiam); *see also Nat. Res. Def. Council v. Pena*, 147 F.3d 1012, 1026 (D.C. Cir. 1998) ("If the plaintiff has failed to prosecute its claim for injunctive relief promptly, and if it has no reasonable explanation for its delay, the district court should be reluctant to award relief."); *cf. United States v. Sterling*, 75 M.J. 407, 411 (C.A.A.F. 2016) (Ryan, J.) (holding that the "failure either to inform [the agency] . . . or seek an accommodation are both relevant to Appellant's failure to establish that [the action] constituted a substantial burden on her exercise of religion"). Indeed, a "party's willingness to put up with a situation in the past can serve as an indication that the party's injury is not as serious as alleged, or that the party has implicitly consented to the supposed injury." *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1017 (10th Cir. 2004) (en banc) (McConnell, J., concurring). It is perfectly appropriate for this Court to ask "why, if the injury is so pressing as to warrant preliminary relief, the plaintiff waited so long before bringing a claim." *Id.* (collecting authorities).

Insofar as the Tribe asserts a burden based on a leak in the pipeline, *see* D.E. 98-5 (Ex. R), at 3, the argument for irreparable or imminent harm is even less tenable. *Winter*, 555 U.S. at 22. The Corps concluded that a leak during operation would be highly unlikely, and that Dakota Access has in place a "24-hour a day monitoring program" for inadvertent releases" and "plans to hydrostatically test the HDD pipeline segments prior to installation at the Lake Oahe and Missouri

River crossings." AR 71260–61 (Ex. C). The Corps has mandated a response plan for any leak that might occur during operation of the pipeline, which provides the personnel and equipment necessary to respond to a potential leak. AR 71262 (Ex. C). The Environmental Assessment further describes numerous specific measures in place "to minimize the risk of a pipeline leak and protect the users of downstream intakes." *Id.* Moreover, even after the Environmental Assessment was completed and the Corps made its Finding of No Significant Impact, the Corps added three dozen new conditions to the easement to enhance safe operation of the pipeline. Army Corps of Engineers Technical and Legal Review and Recommendation to the Department of the Army, D.E. 114-1 (Ex. DD), at 8–9. These "predictive judgments about areas that are within the agency's field of discretion and expertise are entitled to particularly deferential review, so long as they are rea-sonable." *BNSF Ry. Co. v. Surface Transp. Bd.*, 526 F.3d 770, 781 (D.C. Cir. 2008). That is no less true in the context of predictions regarding irreparable harm. *E.g.*, *Bill Barrett Corp. v. U.S. Dep't of Interior*, 601 F. Supp. 2d 331, 336 (D.D.C. 2009).

## IV.     The Public Interest And Balance Of Equities Weigh Against A Preliminary Injunction.

A.     This Court has held that "[t]he development of domestic energy resources is of paramount public interest" and that the public interest is harmed "if that development is delayed." *Nat. Res. Def. Council v. Kempthorne*, 525 F. Supp. 2d 115, 127 (D.D.C. 2007). The President has therefore concluded that "construction and operation of the" Dakota Access pipeline will "serve the national interest." D.E. 89-1 (Ex. G). And the Corps has recognized "the tremendous secondary and sustainable economic benefits to the United States" that the pipeline would bring. AR 71305 (Ex. C). Dakota Access has already been subject to months of delay. And additional delay now would only further disserve the public interest as recognized by this Court and the Executive Branch.

Cheyenne River responds that absent an injunction, "violent clashes . . . are likely to oc-cur." Mot. 45. The argument is more extortionate than legal. The Tribe is correct that protests against the pipeline have been marred by violent protestors. For instance, another district court has described the "countless videos and photographs of . . . protestors attaching themselves to con-struction equipment operated by Dakota Access; vandalizing and defacing construction equip-ment; trespassing on privately-owned property; obstructing work on the pipeline; and verbally taunting, harassing, and showing disrespect to members of the law enforcement community." *Da-kota Access, LLC v. Archambault*, No. 1:16-cv-296, D.E. 45 (Ex. EE) (D.N.D. Sept. 16, 2016), at 3. But the judiciary is independent precisely so that violent campaigns will not dictate judicial decisions. Crediting the Tribe's argument would be to endorse this violence and encourage more of it in the future. In both respects, the result would be to corrode—not further—the public interest and the rule of law.

Cheyenne River also says that an injunction would serve the public interest because it has received "overwhelming support" from the public. Mot. 44. But "the public interest is not a popularity contest." *Comm. in Solidarity with the People of El Salvador v. Sessions*, 705 F. Supp. 25, 30 (D.D.C. 1989). Nor does the Tribe demonstrate, in any concrete sense, that public support is so one-sided in its favor. Debate over the pipeline is fiercely contested. So while the Tribe points to some everyday citizens, "environmental and social justice nonprofits, legal advocacy organizations, [and] members of Congress," Mot. 44, Dakota Access can equally point to other everyday citizens, labor unions, the President, the Governor of North Dakota, and other members of Congress.[4] This Court has recognized that it is "not [its] job" to take sides in this public policy debate. D.E. 119 (Ex. S), at 29. That is no less true when assessing the public interest.

---

[4] Tom Gross Declaration, D.E. 22-23 (Ex. II); Mark Maher Declaration, D.E. 22-24 (Ex. JJ); Press Release, House Comm. On Nat. Res., Bishop on Dakota Access Pipeline Easement (Feb. 7,

**B.**     The balance of the equities also counts against an injunction.  Dakota Access has undeniably suffered economic harm as a result of the delay so far, and additional delay will only add to that sum.  In addition, an injunction would deprive both Dakota Access and the government of the benefits of contract to which they both voluntarily agreed.  Moreover as explained above, withdrawal of the easement would force the government to violate that contract and deprive Dakota Access of its property interest.  For that reason, the Tribe is wrong to say that the government "will suffer no injury."  Mot. 42.

The extreme nature of the Tribe's request—to order the government "to withdraw the easement," D.E. 98-12—raises a host of other equitable concerns.  Usually preliminary injunctions merely hold things in place; they do not directly alter the legal rights and obligations of the parties.  Yet here the Tribe seeks to nullify a contract and deprive both parties to that contract of the property interests that they gained thereunder.  There is no legal basis in the easement itself for the Tribe's request.  And to credit the Tribe's request would undermine the important equitable interests in property and contractual rights, not to mention the due process interests described above.  Moreover, the injunction the Tribe seeks would necessarily bind Dakota Access—the counterparty to the contract that Tribe wants rescinded.  The Tribe offers no lawful basis for such an action where Dakota Access is not—nor, as a private entity, could it ever be—bound to comply with RFRA.  *See* Fed. R. Civ. P. 65(d).

Meanwhile, as explained above, Cheyenne River has missed numerous opportunities to raise its RFRA claims during any part of the administrative process or in this litigation, despite obligations of timeliness.  To grant an injunction would be to undermine these doctrines and all of

---

2017) (Ex. FF); Press Release, Gov. Doug Burgum, Burgum Issues Statement about President Trump's Executive Action on Dakota Access Pipeline (Jan. 24, 2017) (Ex. GG).

the equitable values that they serve.  These include avoiding prejudice to other parties and giving agencies the opportunity to assess an alleged harm, develop a record relevant to it, and—if needed—provide a remedy in the first instance.  Indeed, the extremity of the Tribe's request is a needless consequence of its own delay.  Had the Tribe raised its claim earlier in this litigation, the Court would have had the opportunity to address these various issues before the government delivered a signed easement.

In an attempt to downplay the harm that Dakota Access will suffer, Cheyenne River insists that it does not "request relief that prohibits Dakota Access from having a crude oil pipeline" and that the company can therefore "reroute" the pipeline.  Mot. 43.  It also claims to seek only "specific and limited" relief—"only that *this pipeline*, sited through *these sacred waters*, owned in trust by the United States for *this Tribe*" violates the Tribe's free-exercise rights.  Mot. 3.  But rerouting the pipeline would not necessarily avoid concerns about religious free exercise, since Standing Rock has asserted sites of cultural and religious significance "where the buffalo roamed," D.E. 14-1 (Ex. KK) ¶ 8 (Mentz); D.E. 27 (Ex. LL), at 12, and Cheyenne River has made broad claims too, D.E. 97-1 ¶¶ 80–84.  In any event, cases are better decided based on reality.  The reality here is that the pipeline is 99% complete.  The Tribe's delay does not justify requiring Dakota Access to "reroute" the pipeline or start over along a different route based on a claim that Cheyenne River is just now raising, especially after Dakota Access has invested billions in *this* pipeline.

## CONCLUSION

This Court should deny Cheyenne River's motion for a preliminary injunction.

Dated:  February 21, 2017                        Respectfully submitted,


                                                  /s/ William S. Scherman
Kimberly Caine                                   William S. Scherman
William J. Leone                                 David Debold
Robert D. Comer                                  GIBSON, DUNN & CRUTCHER LLP
NORTON ROSE FULBRIGHT US LLP                     1050 Connecticut Avenue, N.W.
799 9th St. NW, Suite 1000                       Washington, D.C.  20036
Washington, D.C.  20001-4501                     (202) 955-8500
(202) 662-0200                                   wscherman@gibsondunn.com


                    *Counsel for Dakota Access, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of February, 2017, I electronically filed the forego-

ing document using the CM/ECF system.  Service was accomplished by the CM/ECF system.

 /s/ William S. Scherman
William S. Scherman
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
wscherman@gibsondunn.com

*Counsel for Dakota Access, LLC*