**IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE, | |
|       Plaintiff, | |
| and | Case No. 1:16-cv-01534 (JEB) |
| CHEYENNE RIVER SIOUX TRIBE, | |
|   Plaintiff-Intervenor, | |
| v. | |
| UNITED STATES ARMY CORPS OF ENGINEERS, | |
|       Defendant, | |
| and | |
| DAKOTA ACCESS, LLC, | |
|   Defendant-Intervenor and Cross-Claimant | |

**UNITED STATES ARMY CORPS OF ENGINEERS' OPPOSITION TO CHEYENNE
RIVER SIOUX TRIBE'S MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

I.    Introduction ...................................................................................................1

II.   Background ....................................................................................................1

    A.    Dakota Access Pipeline-Related Permitting..........................................1

    B.    Factual Background................................................................................3

III.  The Religious Freedom Restoration Act .........................................................8

IV.   Standard of Review .........................................................................................9

V.    Argument......................................................................................................10

    A.    Cheyenne River Has Not Demonstrated a Substantial Likelihood That
          It Will Prevail on the Merits................................................................10

         1.    Cheyenne River's RFRA Claim Is Barred by Laches.............10

         2.    Cheyenne River Has Not Met Its Burden of Proof to Show a
             "Substantial Burden" on Its Religious Exercise......................15

         3.    *Lyng* Defeats Cheyenne River's RFRA Claim.......................21

         4.    Any Burden on Cheyenne River's Exercise of Religion
             Caused by the Dakota Access Pipeline Is Not Fairly
             Attributable to the Corps. ......................................................24

         5.    The United States Has No Trust Duty to Manage Lake Oahe
             as Cheyenne River Prefers. ...................................................27

    B.    Cheyenne River Has Not Established That It Will Be Imminently and
          Irreparably Injured by the Corps' Grant of the Lake Oahe Easement.................33

    C.    The Balance of Equities Tips in Favor of the Corps, and Issuance of
          an Injunction Would Harm the Public Interest......................................33

VI.   CONCLUSION.............................................................................................35

## TABLE OF AUTHORITIES

**Cases**

*Apache Survival Coal. v. United States,*
    21 F.3d 895 (9th Cir. 1994) ..........................................................................................12

*Blum v. Yaretsky,*
    457 U.S. 991 (1982) ......................................................................................................25

*Bowen v. Roy,*
    476 U.S. 693 (1986) ..................................................................................................9, 19

*Burwell v. Hobby Lobby Stores, Inc.,*
    134 S. Ct. 2751 (2014) ......................................................................................8, 18, 23

*Callahan v. Woods,*
    736 F.2d 1269 (9th Cir. 1984) .......................................................................................16

*City of Albuquerque v. U.S. Dep't of the Interior,*
    379 F.3d 901 (10th Cir. 2004) ...........................................................................28, 29, 32

*City of Boerne v. Flores,*
    521 U.S. 507 (1997) .........................................................................................................8

*City of Carmel-by-the-Sea v. U.S. Dep't of Transp.,*
    123 F.3d 1142 (9th Cir. 1997) ...................................................................................31, 32

*Cobell v. Norton,*
    392 F.3d 461 (D.C. Cir. 2004) .......................................................................................28

*Colo. Wild Horse & Burro Coal., Inc. v. Jewell,*
    130 F. Supp. 3d 205 (D.D.C. 2015) ..............................................................................33

*Creek Nation v. United States,*
    318 U.S. 629 (1943) .......................................................................................................31

*Dep't of Transp. v. Pub. Citizen,*
    541 U.S. 752 (2004) .......................................................................................................12

*El Paso Nat. Gas Co. v. United States,*
    750 F.3d 863 (D.C. Cir. 2014) .......................................................................................28

*El Paso Nat. Gas Co. v. United States,*
    774 F. Supp. 2d 40 (D.D.C. 2011) ...........................................................................27, 28

*Employment Div. v. Smith,*
    494 U.S. 872 (1990) .........................................................................................................8

*Employment Div., Dep't of Human Res. of Or. v. Smith,*
    485 U.S. 660 (1988) .......................................................................................................16

*Everson v. Bd. of Educ.*,
   330 U.S. 1 (1947) ...................................................................................................16

*Henderson v. Kennedy*,
   253 F.3d 12 (D.C. Cir. 2001) ................................................................................20

*Holt v. Hobbs*,
   135 S. Ct. 853 (2015) ......................................................................................15, 18

*Hopi Tribe v. United States*,
   782 F.3d 662 (Fed. Cir. 2015)..........................................................................30, 31

*Jackson v Metro. Edison Co.*,
   419 U.S. 345 (1974) ...............................................................................................25

*Kaemmerling v. Lappin*,
   553 F.3d 669 (D.C. Cir. 2008) ..............................................................................18

*Konarski v. Donovan*,
   763 F. Supp. 2d 128 (D.D.C. 2011) .........................................................................9

*La Cuna De Aztlan Sacred Sites Prot. Circle Advisory Comm. v. U.S. Dep't of the Interior*,
   No. CV 11-00400 DMG (DTBx), 2013 WL 4500572 (C.D. Cal. Aug. 16, 2013) .................17, 18

*LeBeau v. United States*,
   CIV. 14-4056, 2015 U.S. Dist. LEXIS 23093 (D.S.D. Feb. 26, 2015).............................................3

*Lyng v. Nw. Indian Cemetery Protective Ass'n*,
   485 U.S. 439 (1988) ..............................................................................10, 21, 22, 24

*Mahoney v. Doe*,
   642 F.3d 1112 (D.C. Cir. 2011) ...............................................................................9

*Major v. Plumbers Local Union No. 5*,
   370 F. Supp. 2d 118 (D.D.C. 2005) .......................................................................12

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997) ...............................................................................................33

*Menominee Indian Tribe of Wisc. v. United States*,
   136 S.Ct. 750 (2016) ..............................................................................................27

*Munaf v. Geren*,
   553 U.S. 674 (2008) .................................................................................................9

*NAACP v. NAACP Legal Def. & Educ. Fund, Inc.*,
   753 F.2d 131 (D.C. Cir. 1985) ...............................................................................10

*Nat'l R.R. Passenger Corp. v. Morgan*,
   536 U.S. 101 (2002) ...............................................................................................11

*Navajo Nation v. United States Forest Serv.*,
   535 F.3d 1058 (9th Cir. 2008).....................................................................9, 16, 18

*Niagara Mohawk Power Corp. v. Fed. Power Comm'n*,
    202 F.2d 190 (D.C. Cir. 1952) ..............................................................................17, 29

*Nken v. Holder*,
    556 U.S. 418 (2009) ........................................................................................................33

*O Centro Espirita Beneficient Uniao Do Vegetal v. Ashcroft*,
    282 F.Supp.2d 1236 (D.N.M. 2002) ...........................................................................32, 33

*Priests for Life v. U.S. Dep't of Health & Human Servs.*,
    808 F.3d 1 (D.C. Cir. 2015) ...............................................................................15, 18, 20

*Pro-Football, Inc. v. Harjo*,
    567 F. Supp. 2d 46 (D.D.C. 2008) ...................................................................................11

*Sherbert v. Verner*,
    374 U.S. 398 (1963) ...............................................................................................8, 16, 17

*Sherley v. Sebelius*,
    644 F.3d 388 (D.C. Cir. 2011) .........................................................................................10

*Shoshone-Bannock Tribes v. Reno*,
    56 F.3d 1476 (D.C. Cir. 1995) .........................................................................................31

*Sierra Club v. U.S. Army Corps of Eng'rs*,
    803 F.3d 31 (D.C. Cir. 2015) ...........................................................................................26

*Sierra Club, Inc. v. Bostick*,
    787 F.3d 1043 (10th Cir. 2015).........................................................................................26

*Singh v. McHugh*,
    185 F. Supp. 3d 201 (D.D.C. 2016) .................................................................................15

*Snoqualmie Indian Tribe v. FERC.*,
    545 F.3d 1207 (9th Cir. 2008)..........................................................................................23

*South Dakota v. Bourland*,
    508 U.S. 679 (1993) ......................................................................................................3, 4

*Standing Rock Sioux Tribe v. U. S. Army Corps of Eng'rs*,
    Civil No. 16-1534, 2016 U.S. Dist. LEXIS 121997 (D.D.C. Sept. 9, 2016) ...........2, 3, 4, 6, 15, 26

*Stone v. Williams*,
    873 F.2d 620 (2d Cir. 1989)..............................................................................................11

*Tri-Star Pictures, Inc. v. Leisure Time Prods.*,
    17 F.3d 38 (2d Cir. 1994)..................................................................................................11

*United States v. Jicarilla Apache Nation*,
    564 U.S. 162 (2011) ..........................................................................................................27

*United States v. Navajo Nation*,
    537 U.S. 488 (2003) ....................................................................................................27, 32

*United States v. Navajo Nation*,
  556 U.S. 287 (2009) ................................................................................................28, 29

*Vill. of Bensenville v. Fed. Aviation Admin.*,
  457 F.3d 52 (D.C. Cir. 2006) ............................................................23, 24, 25, 26, 27

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ..............................................................................................................10

*Winters v. United States*,
  207 U.S. 564 (1908) ..........................................................................................................30

*Wisc. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) .....................................................................................32

*Wisconsin v. Yoder*,
  406 U.S. 205 (1972) ...........................................................................................................8

*Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
  435 U.S. 519 (1978) ..........................................................................................................12

**Statutes**

16 U.S.C. § 460d ....................................................................................................................28

25 U.S.C. § 1632(a)(5) ........................................................................................................28

33 U.S.C. § 408 .......................................................................................................................7

33 U.S.C. § 701-1(b) ...........................................................................................................28

42 U.S.C. § 2000bb(a)(4)–(5) ..........................................................................................8

42 U.S.C. § 2000bb–1(a) ....................................................................................................9

42 U.S.C. § 2000bb–1(b)(1)-(2) ......................................................................................9

42 U.S.C.A. § 2000bb(b)(1) ..............................................................................................9

Pub. L. No. 106-274, 114 Stat. 803 (2000) ...............................................................23

Pub. L. No. 106-511, 114 Stat. 2365 (2000) ..............................................................4

**Regulations**

55 Fed. Reg. 9223 (Mar. 12, 1990) ..............................................................................29

61 Fed. Reg. 26771 (May 24, 1996) .............................................................................20

**Other Authorities**

139 Cong. Rec. S14461 (daily ed. Oct. 27, 1993)....................................................22

19 Stat 254, 44th Cong. (2d Sess. 1877) ...................................................................30

25 Stat. 888, 50th Cong. (2d Sess. 1889) ..................................................................30

68 Stat. 1191, 83rd Cong. (2d Sess. 1954) ..................................................................30

Executive Order No. 13175 (2000) ..............................................................................31

S. Rep. No. 103-111 (1993) ............................................................................................9

*Treaty of Fort Laramie with Sioux, Etc.,*
    11 Stat. 749 (Sept. 17, 1851)...................................................................................30

*Treaty with the Sioux,*
    15 Stat. 635 (Apr. 29, 1868)...................................................................................30

U.S. Army Corps of Engineers, Oahe Dam/Lake Oahe Final Master Plan,
    http://www.nwo.usace.army.mil/Missions/Dam-and-Lake-Projects/Project-Master-Plans ............4

# LIST OF EXHIBITS

| Exhibit | Description |
|---------|-------------|
| A | February 3, 2017 Memorandum re: Dakota Access Pipeline; USACE Technical and Legal Review for the Department of the Army |
| B | Pipeline and Hazardous Materials Safety Administration Maps of Morton and Burleigh Counties |
| C | February 21, 2017 Declaration of J. Macpherson |
| D | R. Harnois notes, AR 66995 |
| E | February 12, 2017 Declaration of Richard Harnois |
| F | August 17, 2015 Letter from S. Vance, Cheyenne River, to R. Harnois, Corps, at 2, AR 69815 |
| G | Tribal Resolution No. 324-2015-CR (Dec. 10, 2015), AR 66801 |
| H | May 19, 2016 Letter from S. Vance, Cheyenne River, to Col. Henderson, Corps, AR 64221 |
| I | June 3, 2016 Letter from Chairman Frazier, Cheyenne River, to Corps, AR 64137 |
| J | July 25, 2016 Letter from Chairman Frazier, Cheyenne River, to Col. Henderson, Corps, AR 63951 |
| K | Sept. 19, 2016 Letter from Chairman Frazier, Cheyenne River, to Col. Henderson, Corps at 2 |
| L | January 27, 2017 Letter from Chairman Frazier, Cheyenne River, to Hon. R. Speer |
| M | February 1, 2017 Letter from Chairman Frazier, Cheyenne River, to Col. Henderson, Corps |
| N | February 13, 2017 Hearing Transcript |
| O | Memorandum re: Temporary Suspension of Certain Solicitor M-Opinions Pending Review |

## I.      INTRODUCTION

The Cheyenne River Sioux Tribe's motion for a preliminary injunction is based solely upon a claim that the granting of an easement by the U.S. Army Corps of Engineers to Dakota Access, LLC allowing the installation of a portion of the pipeline deep underneath Army Corps-managed Federal land at Lake Oahe violates "the Tribe's rights under the Religious Freedom Restoration Act." ECF No. 98 at 12.

Cheyenne River's motion should be denied because the doctrine of laches bars the Tribe from alleging that the easement will substantially burden its exercise of its religion for the first time after an administrative process that lasted more than two years.  Cheyenne River's motion should also be denied because: (1) the Corps' management of its own property falls squarely within the type of actions the Supreme Court has found not to substantially burden tribal religion; (2) even if the challenged action constituted a substantial burden, that burden is caused by Dakota Access and not fairly attributable to the Corps; (3) and the easement does not substantially burden the exercise of the Tribe's religious beliefs in violation of the Religious Freedom Restoration Act ("RFRA").  Therefore, the Tribe is not likely to succeed on the merits of its claims.  Finally, Cheyenne River's motion should be denied because the equities weigh in favor of requiring parties to inform the Corps of RFRA concerns in the administrative process so that those concerns can be addressed in that administrative process.

## II.     BACKGROUND

### A.      Dakota Access Pipeline-Related Permitting

The facts surrounding the permitting and legal background for the Dakota Access Pipeline ("DAPL") are well known to this Court, and will not be restated in detail in this

memorandum. *Standing Rock Sioux Tribe v. U. S. Army Corps of Eng'rs*, Civil No. 16-1534, 2016 U.S. Dist. LEXIS 121997 (D.D.C. Sept. 9, 2016).

On December 4, 2016, the Assistant Secretary of the Army (Civil Works) issued a memorandum directing the Corps to engage in additional review of Dakota Access's Lake Oahe easement application.  Memorandum re: Proposed Dakota Access Pipeline Crossing at Lake Oahe, North Dakota (Dec. 4, 2016), Ex. 1, ECF No. 65-1.  The memorandum stated that the analysis would be "best accomplished, in my judgment, by preparing an Environmental Impact Statement. . ." *Id*. at 3.  Contrary to Cheyenne River's assertions, the memorandum did not order the Corps to complete an Environmental Impact Statement.  Importantly, the memorandum also stated "that this decision does not alter the Army's position that the Corps' prior reviews and actions have comported with legal requirements." *Id.* at 4.

On January 24, 2017, the President issued a memorandum directing the Army to "review and approve in an expedited manner, to the extent permitted by law and as warranted," the Lake Oahe Easement application and "consider, to the extent permitted by law and as warranted, whether to rescind or modify. . ." the December 4 Memorandum.  Presidential Memorandum Regarding Construction of the Dakota Access Pipeline § 2(i), (ii), 2 of 4 (Jan. 24, 2017), ECF No. 89-1.  As explained in the Presidential Memorandum, the DAPL "represents a substantial, multi-billion-dollar private investment in our Nation's energy infrastructure.  This approximately 1,100-mile pipeline is designed to carry approximately 500,000 barrels per day of crude oil from the Bakken and Three Forks oil production areas in North Dakota to oil markets in the United States. At this time, the DAPL is more than 90 percent complete across its entire route. Only a limited portion remains to be constructed." *Id.* § 1.  That limited portion is a short segment crossing deep underneath Lake Oahe, at a particular location that already serves as a crossing for

another pipeline and that is outside the boundaries of the Standing Rock and Cheyenne River reservations. *See Standing Rock Sioux Tribe*, 2016 U.S. Dist. LEXIS 121997 at *2-3, 22. The property where the pipeline crosses Lake Oahe is federal land that was condemned by the United States so that the Corps could create Lake Oahe, as authorized by the 1944 Flood Control Act. *See South Dakota v. Bourland*, 508 U.S. 679, 684 (1993). The Corps manages the land for the U.S. Government and, consistent with applicable laws and regulations, the Corps routinely grants easements across federal land that it manages. The Army and the Corps completed the review directed by the Presidential Memorandum. Memorandum re: Dakota Access Pipeline; USACE Technical and Legal Review for the Department of the Army (Feb. 3, 2017) (attached hereto as Ex. A). The Army provided Congress with notice of its intent to issue the easement on February 7, ECF No. 95-1, and the Corps issued the easement on February 8, 2017. ECF No, 96-1. This decision was the culmination of a process of review by the Corps of at least two years.

> **B.   Factual Background**
>
> > **i.   The Oahe Dam**

The Oahe Dam, a federally-authorized civil works project, impounds the Missouri River forming Lake Oahe, which stretches from Pierre, South Dakota, to near Bismarck, North Dakota. *LeBeau v. United States*, CIV. 14-4056, 2015 U.S. Dist. LEXIS 23093 (D.S.D. Feb. 26, 2015).[1]

---

[1] "Lake Oahe can be divided into three segments based on the character of the lake. The southern segment extends from the dam to just south of Mobridge, South Dakota. This portion of Lake Oahe is characterized by water depths that may approach 200 feet, relatively few boating hazards, and very little current. The middle segment, extending from south of Mobridge, South Dakota to the North Dakota/South Dakota State line, is a transition area exhibiting characteristics of both a lake and a river. Some snags and sandbars are present, water depths are less, and some slight current is evident. The northern segment extends north from the North Dakota/South Dakota State line to the upstream project boundary near Bismarck. This segment is more river-like in appearance and is characterized by both submerged and emergent snags, sandbars, many

Congress "authorized limited takings of Indian lands for hydroelectric and flood control dams on the Missouri River in both North and South Dakota" and the construction of the Oahe Dam as part of a comprehensive flood control plan "[a]fter severe floods devastated the lower Missouri River basin in 1943 and 1944." *South Dakota v. Bourland*, 508 U.S. 679, 683 (1993) (citation omitted). "Congress required the Cheyenne River Sioux Tribe to relinquish 104,420 acres of its trust lands, including roughly 2,000 acres of land underlying the Missouri River." *Id.* (footnote omitted). "The Tribe's agreement to 'convey to the United States all tribal, allotted, assigned, and inherited lands or interests' needed for the project is memorialized in the Cheyenne River Act of Sept. 3, 1954, 68 Stat. 1191." *Id.* (footnote omitted). Section 10 of that agreement provided that Cheyenne River:

> shall have, without cost, the right of free access to the shoreline of the reservoir including the right to hunt and fish in and on the aforesaid shoreline and reservoir, subject, however, to regulations governing the corresponding use by other citizens of the United States.

68 Stat. at 1193. Cheyenne River received an additional $290,722,958 in compensation for the Lake Oahe taking in 2000. Cheyenne River Sioux Tribe Equitable Compensation Act, P.L. No. 106-511, § 104(b)(1), 114 Stat. 2365 (2000).

### ii.    Infrastructure and Activities on Lake Oahe

Lake Oahe and adjacent federal and private lands are used for numerous industrial and other purposes. In fact, the Dakota Access pipeline "will track both the Northern Border Gas Pipeline, which was placed into service in 1982, and an existing overhead utility line." *Standing Rock Sioux Tribe*, 2016 U.S. Dist. LEXIS 121997 at *22. Likewise, an oil refinery is located on

---

shallow areas, and a definite current." Oahe Dam/Lake Oahe Final Master Plan at p. 1-2 (Sept. 2010), available at http://www.nwo.usace.army.mil/Missions/Dam-and-Lake-Projects/Project-Master-Plans.

the Missouri River at Mandan, North Dakota, approximately 7.5 river-miles north of Lake

Oahe's northernmost point, and uses a pipeline to transport oil from that refinery under the

Missouri River.  Pipeline and Hazardous Materials Safety Administration Maps of Morton and

Burleigh Counties (attached hereto as Ex. B); Declaration of J. Macpherson (attached hereto as

Ex. C).   Several additional oil pipelines cross the river upstream of the Mandan pipeline

crossing.  *See* Decl. of J. Macpherson, Ex. 1, (Ex. C).  At least one wastewater treatment plant is

authorized to discharge into Green Grass Creek, a tributary of the Moreau River, which flows

through the Cheyenne River Reservation into Lake Oahe.  City of Eagle Butte NPDES Permit

(Sept. 30, 2011).[2]  Buffalo graze the pipeline route on the west side of Lake Oahe.  Suppl. Decl.

of T. Mentz Decl. ¶ 2, Attach. 1, ECF No. 29-1.  And the Missouri River is open to recreational

activities involving the use of boats fueled by petroleum products, such as motor boating and

fishing.  Environmental Assessment: Dakota Access Pipeline Project Crossings of Flowage

Easements and Federal Lands 73, Ex. 8, AR 71297, ECF No. 73-10.

Notwithstanding the existence of the above-described facilities, activities, and pipelines

at Lake Oahe, the Standing Rock Sioux Tribe's water intakes were located "a few miles"

downstream from the pipeline route.  Memorandum re: Dakota Access Pipeline Crossing at Lake

Oahe, North Dakota 11 (Oct. 20, 2016) (Ex. A).  Standing Rock's new water intake structures

are being constructed approximately 75 miles downstream from the pipeline crossing and just

north of the Cheyenne River Sioux Reservation's northernmost boundary.  *Id*. at 19-20

(explaining that the intake will be moved 50 miles further downstream from the existing Fort

Yates location, which is approximately 25 miles from the pipeline crossing).  The Corps is not

---

[2] Available at: https://www.epa.gov/region8/city-eagle-butte-npdes-permit.

aware of any legal efforts by the Cheyenne River to end these activities at Lake Oahe or its

tributaries.

### iii.       The Corps' Consultation with the Cheyenne River Sioux

"The northern border of the [Cheyenne River] Reservation is the [southern border of the]

Standing Rock Sioux Reservation."  Decl. of Chairman Harold Frazier ¶ 12, ECF 11-7 ("Frazier

Decl.").  Just as the Corps sought to consult with Standing Rock, *Standing Rock Sioux Tribe*,

2016 U.S. Dist. LEXIS 121997 at *24-25, the Corps repeatedly sought information from

Cheyenne River regarding its concerns about the portions of the Dakota Access pipeline under

the Corps' jurisdiction.  R. Harnois notes, AR 66995 (Aug. 17, 2015) (expressing "concerns that

we had gotten no comments back yet") (attached hereto as Ex. D).  Cheyenne River's responses

did not raise the particular religious concerns that form the foundation of its RFRA claims.  Decl.

of R. Harnois ¶¶ 31-33 (Feb. 12, 2017) (attached hereto as Ex. E).

Cheyenne River expressed general concerns about water quality and the pipeline crossing

all bodies of water along its route.  Letter from S. Vance, Cheyenne River, to R. Harnois, Corps,

at 2, AR 69815 (Aug. 17, 2015) (attached hereto as Ex. F).  Rather than express these concerns

as a matter of religious freedom centered around its ceremonial use of Lake Oahe, Cheyenne

River expressed its concern that these waters "will then travel on to the Mississippi and the Gulf.

This is not a local concern but a global one."  *Id.*  Steve Vance, the Cheyenne River Tribal

Historic Preservation Officer participated in a December 8, 2015 meeting with the Corps. Decl.

of J. Ames ¶¶ 15-16, Ex. 17, ECF No. 21-17.  Cheyenne River subsequently passed a tribal

resolution opposing the pipeline based upon alleged noncompliance with the National

Environmental Policy Act and the National Historic Preservation Act, with no mention of the

claims raised here under the RFRA.  Resolution No. 324-2015-CR, AR 66801 (Dec. 10, 2015)

(attached hereto as Ex. G).  Mr. Vance again met with the Corps on February 18 and 19.  Decl. of M. Chiefly ¶ 22, Ex. 18, ECF No. 21-18.  Cheyenne River transmitted letters to the Corps on May 19, June 3, and July 25, 2016.  None of these letters referenced the Religious Freedom Restoration Act.  Letter from S. Vance, Cheyenne River, to Col. Henderson, Corps, AR 64221 (May 19, 2016) (attached hereto as Ex. H ); Letter from Chairman Frazier, Cheyenne River, to Corps, AR 64137 (June 3, 2016) (attached hereto as Ex. I); Letter from Chairman Frazier, Cheyenne River, to Col. Henderson, Corps, AR 63951 (July 25, 2016) (attached hereto as Ex. J).

Cheyenne River did not specifically assert that the verifications of two Nationwide Permits ("NWP") in North Dakota, permissions under 33 U.S.C. § 408, consents to cross flowage easements, or issuance of an easement would substantially burden its free exercise of religion.  Even after the Corps issued its Environmental Assessment relating to Lake Oahe on July 25, 2016, Cheyenne River did not focus its concerns on a potential violation of the Religious Freedom Restoration Act, or potential impacts of pipeline construction on religious exercise.  Chairman Frazier's declaration in support of Cheyenne River's first motion to intervene in this case similarly focused on the general threat of "discharges into Lake Oahe."  Frazier Decl. ¶¶ 15-16, ECF No. 11-7.  And Cheyenne River's subsequent letters focus on the risk that a pipeline leak might contaminate the tribe's "water pipelines."  Letter from Chairman Frazier, Cheyenne River, to Col. Henderson, Corps 2 (Sept. 19, 2016) (attached hereto as Ex. K).  *See also* Letter from Chairman Frazier, Cheyenne River, to Hon. R. Speer (Jan. 27, 2017) (attached hereto as Ex. L); Letter from Chairman Frazier, Cheyenne River, to Col. Henderson, Corps (Feb. 1, 2017) (attached hereto as Ex. M).  Cheyenne River raised no concern referencing the Religious Freedom Restoration Act until filing its motion for a preliminary injunction on February 9, 2017, ECF No. 98, which was more than two years after becoming aware of the proposed pipeline.

III.    **THE RELIGIOUS FREEDOM RESTORATION ACT**

In 1993, Congress enacted the Religious Freedom Restoration Act in response to the

Supreme Court's opinion in *Employment Division v. Smith.*  494 U.S. 872 (1990).  *Smith*

addressed whether the Free Exercise Clause of the First Amendment allowed Oregon to deny

unemployment benefits to two members of the Native American Church who were fired because

of their sacramental, yet state-law prohibited, use of peyote.  *Id.*  The Court "held that, under the

First Amendment, 'neutral, generally applicable laws may be applied to religious practices even

when not supported by a compelling governmental interest.'"  *Burwell v. Hobby Lobby Stores,*

*Inc.,* 134 S. Ct. 2751, 2761 (2014) (quoting *City of Boerne v. Flores,* 521 U.S. 507, 514 (1997),

*superseded by statute on other grounds by Knight v. Thompson*, 787 F.3d 934 (11th Cir. 2015)).

In so holding, *Smith* departed from the Court's compelling interest test articulated in *Sherbert v.*

*Verner,* 374 U.S. 398 (1963) and *Wisconsin v. Yoder,* 406 U.S. 205 (1972), which "would have

asked whether Oregon's prohibition substantially burdened a religious practice, and, if it did,

whether the burden was justified by a compelling government interest." *Boerne,* 521 U.S. at 513

(referencing *Sherbert).*  The Court's reduction of scrutiny prompted Congress to pass the RFRA,

stating: "The Congress finds that in *[Smith]* the Supreme Court virtually eliminated the

requirement that the government justify burdens on religious exercise imposed by laws neutral

toward religion; and the compelling interest test as set forth in prior Federal court rulings is a

workable test for striking sensible balances between religious liberty and competing prior

governmental interests." 42 U.S.C. § 2000bb(a)(4)–(5).  Congress identified the purpose of the

RFRA as:

> to restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S.
> 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972) and to guarantee its
> application in all cases where free exercise of religion is substantially burdened

42 U.S.C.A. § 2000bb(b)(1).  Under the RFRA, the "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless the government "demonstrates that application of the burden to the person–(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000bb–1(a),  (b)(1)-(2).

The RFRA does not define "substantial burden," but consistent with Congress's purpose of "restor[ing] the compelling interest test" of *Sherbert* and *Yoder*, courts look to pre-*Smith* cases to construe the term.  42 U.S.C. 2000bb(b)(1).  That "law makes it clear that strict scrutiny does not apply to government actions involving . . . the use of the Government's own property or resources," including management of public lands.  *See* S. Rep. No. 103-111, at 9 (1993), *as reprinted in* 1993 U.S.C.C.A.N. 1892, 1898 (footnote omitted); *Navajo Nation v. United States Forest Serv.,* 535 F.3d 1058, 1069-79 (9th Cir. 2008) (en banc) ("*Navajo Nation I*").

Whether a burden is "substantial" under the RFRA is a question of law, not a "question[] of fact, proven by the credibility of the claimant." *Mahoney v. Doe*, 642 F.3d 1112, 1121 (D.C. Cir. 2011); *see, e.g., Bowen v. Roy*, 476 U.S. 693, 701 n.6 (1986).

## IV.   STANDARD OF REVIEW

The grant of a preliminary injunction is an "'extraordinary and drastic remedy.'"  *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (quotation omitted).  "As an extraordinary remedy, courts should grant such relief sparingly."  *Konarski v. Donovan*, 763 F. Supp. 2d 128, 133 (D.D.C. 2011) (citation omitted).  A party seeking a preliminary injunction must demonstrate four elements:  (1) a substantial likelihood of success on the merits; (2) that it would suffer irreparable injury if the injunction were not granted; (3) that the balance of the equities tips in its favor; and

(4) that the public interest would be furthered by the injunction.  *Winter v. Nat. Res. Def.*

*Council, Inc.*, 555 U.S. 7, 20 (2008); *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011).

Cheyenne River fails to meet its burden on any of the four prongs.

## V.     ARGUMENT

### A.     Cheyenne River Has Not Demonstrated a Substantial Likelihood That It Will Prevail on the Merits

First, the record is devoid of any mention of Cheyenne River's current, specific religious

concerns throughout the lengthy consultation and administrative process.  The doctrine of laches

thus bars Cheyenne River from prevailing in litigation based upon a concern it did not express in

a timely manner.  Even if this Court were to reach the merits, however, Cheyenne River is

unlikely to prevail on its RFRA claim because: (1) Cheyenne River has not met its burden of

proof to show a "substantial burden" on its religious exercise; (2) the Corps' management of its

own property—the land under Lake Oahe—falls squarely within the type of actions the Supreme

Court found not to substantially burden tribal religion in *Lyng v. Northwest Indian Cemetery*

*Protective Association,*. 485 U.S. 439 (1988); (3) even if the challenged action constituted a

substantial burden, that burden is caused by Dakota Access and not fairly attributable to the

Corps; and (4) Cheyenne River has not identified a specific trust duty requiring the extraordinary

relief it seeks.

### 1.     Cheyenne River's RFRA Claim Is Barred by Laches.

The court should decline to hear Cheyenne River's RFRA claim because it is barred by

laches.  *See NAACP v. NAACP Legal Def. & Educ. Fund, Inc.,* 753 F.2d 131, 137 (D.C. Cir.

1985) (explaining that the doctrine of laches is "founded on the notion that equity aids the

vigilant" and that equity does not aid those who have not taken action early enough to assert

claims).  This defense "requires proof of (1) lack of diligence by the party against whom the

defense is asserted, and (2) prejudice to the party asserting the defense." *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 121-22 (2002) (internal quotation marks and citation omitted); *Pro-Football, Inc. v. Harjo*, 567 F. Supp. 2d 46, 56 (D.D.C. 2008), *aff'd in part* 565 F.3d 880 (D.C. Cir. 2009). As a case-specific equitable doctrine, laches "requires that the resolution be based on the circumstances peculiar to each case." *Tri-Star Pictures, Inc. v. Leisure Time Prods.*, 17 F.3d 38, 44 (2d Cir. 1994); *see also Stone v. Williams,* 873 F.2d 620, 624, *vacated on other grounds,* 891 F.2d 401 (2d Cir. 1989) ("it is the reasonableness of the delay rather than the number of years that elapse which is the focus of inquiry") (citations omitted).

The Government has a strong policy of accommodating Native American religious practices and protecting religious cultural sites. But as demonstrated above, Cheyenne River was not diligent in asserting its RFRA claims. The Corps consulted with the Tribe while the Corps was considering Dakota Access' NWP Pre-Construction Notifications, Section 408 requests to alter federally-authorized projects, and easement application. The Tribe sent at least six letters to the Corps generally opposing the pipeline. As described in depth in the declaration of Richard Harnois, the Corps also held meetings with Cheyenne River and reviewed correspondence to understand its concerns. Decl. of R. Harnois ¶¶ 8-33 (Feb. 12, 2017) (Ex. E). At no point in this process did Cheyenne River express the religious concerns it now articulates, *i.e.*, that the granting of the Lake Oahe easement burdens the Tribe's religion. Advancing these concerns for the first time in an amended Complaint after the real estate interest has been conveyed, at the last step of the years-long administrative and legal process, is an example of the lack of diligence the laches doctrine is designed to address.

In *Apache Survival Coalition v. United States*, a tribe similarly chose not to express its religious concerns in the long administrative NEPA and NHPA process, and then sued alleging

that the construction of an observatory would harm its sacred sites.  21 F.3d 895, 898 (9th Cir.

1994).  The Ninth Circuit found that the tribe's claims were barred by laches because it "ignored

the very process that its members now contend was inadequate," and asserted its rights "with

inexcusable tardiness."   *Id*. at 907 (emphasis omitted).  Here, Cheyenne River chose—like the

tribe in *Apache Survival*—to remain silent about specific religious concerns during the process

until after the administrative process concluded and months into litigation.  The court should

treat Cheyenne River's claims similarly.  *See Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def.*

*Council, Inc.*, 435 U.S. 519, 553–54 (1978) (plaintiffs must bring specific concerns to agency's

attention in administrative process); Decl. of R. Harnois ¶¶ 30-33 (Feb. 12, 2017) (Ex. E).  And

Cheyenne River's lack of diligence could prejudice the Corps.  Without being made aware of

Cheyenne River's specific religious objection to granting the easement until after the easement

was granted, the Corps could not meaningfully engage with Cheyenne River to discuss the

Tribe's concerns.  *See U.S. Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764-65 (2004)

("Because respondents did not raise these particular objections to the EA, FMCSA was not given

the opportunity to examine any proposed alternatives to determine if they were reasonably

available. Respondents have therefore forfeited any objection to the EA on the ground that it

failed adequately to discuss potential alternatives to the proposed action.").

Cheyenne River's suggestion at the February 13, 2017, hearing that its claim is timely

because it was filed within six years of the easement being granted misses the mark.  *See* Tr. at

8:19-25 (Feb. 13, 2017) (attached hereto as Ex. N) (citing *Major v. Plumbers Local Union No. 5*,

370 F. Supp. 2d 118 (D.D.C. 2005)).  First, *Major* held that a "six-year delay . . . puts this case

squarely within the zone of cases that have applied laches" to bar a claim and found that the

defendants <u>could</u> raise laches as a defense.  *Id*. at 128 (citations omitted).  More importantly

though, *Major* focused on the years that elapsed between the Equal Employment Opportunity Commission ("EEOC") taking plaintiffs' timely employment discrimination claim under advisement and plaintiffs requesting right to sue letters from the EEOC. *Major* is inapposite because the plaintiffs in that case provided the relevant agency with information in a timely manner, thereby allowing the agency to incorporate that information into its decisionmaking. The *Major* plaintiffs therefore survived a motion to dismiss, causing the laches analysis in that case to focus on the passage of time after the plaintiffs provided necessary information to the agency. Cheyenne River is not similarly situated, as it failed to bring what it contends is dispositive information regarding its religious beliefs to the agency's attention until after the agency made its decision. Cheyenne River cannot dispute that it had ample time and opportunity to raise the specific religious concerns raised by its RFRA claim while the Corps was considering Dakota Access' easement application, but failed to do so.

Cheyenne River's February 13, 2017, supplemental declaration in support of its motion, ECF No. 115, attaches documents that provide additional support for the Corps' argument—that Cheyenne River did not identify its concerns regarding the black snake prophecy until after the Corps issued the Lake Oahe easement. [3] Mr. Vance's testimony at the October 27, 2016 Federal Consultation Meeting merely conveyed a generalized belief that "land is sacred to us. Air is sacred to us. Water is sacred to us." Ex. C, ECF No. 115-3 at 145:15-16. This is not sufficient to bring the Tribe's specific concern articulated in their complaint to the Corps' attention. Nor does similar testimony by Pechanga Band of Luiseño Indians chairman Mark Macarro at a

---

[3] The Corps notes that several documents submitted by Cheyenne River in support of its motion for preliminary injunction were not before the easement decisionmaker and will not be included in the certified administrative record that the Corps is diligently compiling. See, e.g., ECF Nos. 98-7, 115-3, 115-5.

November 15, 2016, consultation meeting meet Cheyenne River's burden of demonstrating that it raised its specific religious concerns in a timely manner.  Ex. E, ECF No. 115-5 at 39:18-20. And the portion of the February 6, 2017, hearing transcript that Cheyenne River relies upon highlights that prior to granting the easement, tribal concerns focused on "oil spill ruptures" rather than identifying any specific religious harm from the construction and operation of the pipeline.  Ex F, ECF No.115-6 at 17:4-5.  Finally, Cheyenne River's reliance on a suspended and temporarily withdrawn opinion by the Department of the Interior's Solicitor is misplaced,[4] as that opinion makes no mention of the specific religious concerns that form the basis of Cheyenne River's RFRA claim.  Ex. I, Opinion re: Tribal Treaty and Environmental Statutory Implications of the Dakota Access Pipeline 15-16, ECF No. 115-9.

In sum, the record of extensive consultations regarding the portions of the Dakota Access pipeline under the Corps' jurisdiction—from October 2014 through the February 8, 2017, grant of the Lake Oahe easement—contains no reference to the concerns that form the foundation of Cheyenne River's RFRA claim.  As discussed above, Cheyenne River raised generalized concerns about oil spill risks.  The Corps reasonably responded to initial tribal concerns regarding spill risks by outlining draft easement conditions in its July 25, 2016, Finding of No Significant Impact.  February 3, 2017, memo 13 (Ex. A).  And the Corps reasonably responded to the post-July 25 tribal concerns by "adopt[ing] a set of 36 special conditions for the Lake

---

[4] The Corps expects to raise other issues relating to Opinion M-37038 in its response to Standing Rock's motion for summary judgment.  For purposes of responding to Cheyenne River's RFRA claim, the Corps notes that the opinion does not support that claim.  Additionally, the Secretary of the Interior suspended and temporarily withdrew Opinion M-37038 along with other opinions to enable recently appointed or designated agency officials time to review the opinions and the underlying regulations or decisions to which they apply.  *See* Memorandum re: Temporary Suspension of Certain Solicitor M-Opinions Pending Review (Feb. 6, 2017) (Ex. O).

Oahe easement that add to and clarify the original nine special conditions" and "further mitigate

any risks to the Tribe from any oil spill."  *Id*.[5]  Simply put, the Corps addressed the concerns

Cheyenne River raised in the administrative process and cannot reasonably be required to

address claims that were not raised in that process.  Laches bars Cheyenne River from raising its

RFRA claim now, only after the administrative process has concluded and the easement has been

issued.

> 2.      **Cheyenne River Has Not Met Its Burden of Proof to Show a "Substantial Burden" on Its Religious Exercise. [6]**

Cheyenne River bears the "burden of proving that the [challenged action] substantially

burden[s] [its] exercise of religion."  *Priests for Life v. U.S. Dep't of Health & Human Servs.*,

808 F.3d 1, 7 (D.C. Cir. 2015) (citing *Holt v. Hobbs,* 135 S. Ct. 853, 862 (2015)).  In RFRA,

Congress "codified and reinstated the compelling interest test as set forth in [*Sherbert*] and

[*Yoder*]."  *Singh v. McHugh*, 185 F. Supp. 3d 201, 217 (D.D.C. 2016) (internal quotation marks,

citations, footnote, and alterations omitted).  Thus under the RFRA, just as under the Free

---

[5] Similarly, where tribes engaged in consultation focused on Section 106 of the National Historic Preservation Act, that consultation "paid off" with "additional avoidance measures," an agreement "to bury the pipeline 111 feet below a" site identified through consultation, and monitoring.  *Standing Rock Sioux Tribe,* 2016 U.S. Dist. LEXIS 121997 at *46; Mem. for Record for Iowa Verifications, Attach. C, Mar. 14, 2016 entry, ECF No. 21-10.  ("MVR receives letter from Osage informing them that they concur that rerouting of pipeline at Mississippi crossing will avoid [sites and] result in 'No Adverse Effect.'")

[6] The Corps does not address the first prong of Cheyenne River's RFRA claim regarding the sincerity of its beliefs.  The Corps respects the Tribe's views as expressed in its motion, but reserves the right to address those issues further as part of subsequent proceedings.  It is unnecessary for the Court to address the sincerity of Cheyenne River's views here for the other reasons stated in this opposition.  However the Corps notes that the Tribe would have the burden of providing factual development of this element of its claim and has not done so sufficiently here.

Exercise Clause of the U.S. Constitution, plaintiffs can demonstrate a substantial burden in two

limited circumstances, namely:

> only when individuals are forced to choose between following the tenets of their
> religion and receiving a governmental benefit (*Sherbert*) or coerced to act contrary
> to their religious beliefs by the threat of civil or criminal sanctions (*Yoder*).  Any
> burden imposed on the exercise of religion short of that described by *Sherbert* and
> *Yoder* is not a "substantial burden" within the meaning of RFRA, and does not
> require the application of the compelling interest test set forth in those two cases.

*Navajo Nation I*, 535 F.3d at 1070 (citing *Sherbert* and *Yoder*).  Because Cheyenne River has not

been denied a government benefit nor coerced to act contrary to its religious beliefs, it has not

demonstrated a "substantial burden" under the RFRA.

### a)  Cheyenne River has not been denied a government benefit based on its religious beliefs.

Cheyenne River does not allege—nor can it demonstrate—that it was forced to choose

between following the tenets of its religion and receiving a government benefit.  As the Ninth

Circuit explained in *Navajo Nation,* the Supreme Court's decision in *Sherbert* is the prototypical

example of this type of claim.  *Navajo Nation I*, 535 F.3d at 1070.  *Sherbert* involved the denial

of unemployment compensation solely based on the applicant's inability to work on a Saturday

because she was a Seventh Day Adventist.   374 U.S. at 399-401.  Thus, under the

"governmental benefit" theory, a RFRA claim exists only where a plaintiff must make a choice

antithetical to the principles of his or her religion in order to receive some sort of government

benefit, typically a benefit derived under public welfare legislation.  *See Id*. at 410 (holding that

"no State may exclude … the members of any other faith, because of their faith, or lack of it,

from receiving the benefits of public welfare legislation") (internal quotation omitted) (citing

*Everson v. Bd. of Educ.*, 330 U.S. 1, 16 (1947))); *see also Employment Div., Dep't of Human

Res. of Or. v. Smith*, 485 U.S. 660, 663 (1988) (unemployment compensation); *Callahan v.*

*Woods*, 736 F.2d 1269, 1271 (9th Cir. 1984) (social security benefits).  Cheyenne River has not

been coerced to make any choice antithetical to its religion.

Cheyenne River may argue that it is potentially being denied a government benefit such

as a vested water right.  *Cf.* Intervenor Mot. for TRO, ECF No. 99 at 14-16.  This theory fails

first, because the issuance of the easement in no way denies or deprives the Cheyenne River of

its water right.  As explained further in Section V.5. below, Cheyenne River's water right is

usufructary, meaning the Tribe has the right to use the water as it flows in the course of the

Missouri River.  *See Niagara Mohawk Power Corp. v. Fed. Power Comm'n*, 202 F.2d 190, 198

(D.C. Cir. 1952), *aff'd*, 347 U.S. 239 (1954) (distinguishing usufructary rights from absolute

ownership).  Simply put, the Corps is not prohibiting the Tribe from accessing or using the

waters of Lake Oahe.  Nor has the Corps  diminished the Tribe's right to use Lake Oahe water by

issuing an easement.  At worst, the Corps has arguably allowed a minimal risk that the water's

purity may be temporarily diminished at some future time by a third party grantee's use of the

easement.[7]

But even if the court were to conclude that the Corps' easement denies Cheyenne River a

government benefit, this theory would still fail because any such denial is not *because* of

Cheyenne River's religious practice.  *See Sherbert*, 374 U.S. at 410 (holding that "no State may

exclude … the members of any other faith, because of their faith, or lack of it, from receiving the

benefits of public welfare legislation"); *see also La Cuna De Aztlan Sacred Sites Prot. Circle*

---

[7] However the Corps notes that such risk is minimal, the record indicates transporting oil through
a modern pipeline is in fact more protective of water quality than other means of transporting oil,
*see e.g.,* AR 71231, and the Corps has provided significant easement conditions that further
protect against risks to water quality. Special Conditions Lake Oahe, Easement No DACW45-2-
16-8059 13-36, ECF No. 96-1.

*Advisory Comm. v. U.S. Dep't of the Interior*, No. CV 11-00400 DMG (DTBx), 2013 WL 4500572, at \*10 (C.D. Cal. Aug. 16, 2013).  In *La Cuna de Aztlan* the court held that "[d]enial of a government benefit, however, only implicates RFRA if the denial is a response to Plaintiffs' religious practices or, in other words, if a governmental benefit were 'conditioned ... upon conduct that would violate the Plaintiffs' religious beliefs.'"  As with the plantiffs in *La Cuna de Aztlan*, the Cheyenne River have not provided any evidence that the easement was granted *in response to* Plaintiffs' religious practices.  *See id.* (citing *Navajo Nation,* 535 F.3d at 1063), *aff'd,* 603 F. App'x 651 (9th Cir. 2015).  Cheyenne River has not demonstrated a substantial burden based on denial of a government benefit.

<div style="text-align:center">

**b)     Cheyenne River has not been coerced to act contrary to its religious beliefs by threat of sanction.**

</div>

Nor can Cheyenne River demonstrate that the government has coerced it to act contrary to its religious beliefs by the threat of civil or criminal sanctions. *See Yoder*; *see also Holt*, 135 S.Ct. at 862 (articulating the question as whether a plaintiff has been "put[]. . . to th[e] choice. . ." of either "'engag[ing] in conduct that seriously violates [his] religious beliefs'" or facing "serious" consequences. (quoting *Hobby Lobby,* 134 S. Ct. at 2775)).  This Circuit has recently confirmed that "[t]he answer is no if the plaintiff can identify 'no [compelled] action or forbearance on his part.'" *Priests for Life v. U.S. Dep't of Health & Human Servs.*, 808 F.3d at 7 (quoting *Kaemmerling v. Lappin,* 553 F.3d 669, 679 (D.C. Cir. 2008)).

Cheyenne River can demonstrate no action the Corps is compelling it to take that violates its religious belief, nor any "serious consequences" the government would impose if the Tribe did not take this action.  Rather, Cheyenne River attempts to argue that by granting an easement the Corps coerces the Tribe into "using desecrated waters….or abandoning their religious sacraments." ECF No. 99 at 31.  But the Corps is not requiring any conduct or forbearance from

the Tribe.  Nor is the Corps threatening any criminal or civil sanction—or any sanction

whatsoever—to stop Cheyenne River from exercising its religious practices or using its water

rights.  The Corps' conduct in this case is simply not the type of direct coercion by the

government that has been found to be a substantial burden in the case law.  *Cf. Yoder* (Amish

parents faced criminal sanction unless they violated their religion and sent children to school).

This case is instead more analogous to *Bowen v. Roy,* 476 U.S. 693 (1986), where the Supreme

Court held that the state's use of a Native American child's Social Security number in

determining eligibility for federal welfare benefit programs did not impair her parents' freedom

to exercise their religious beliefs, a tenet of which was that use of the number beyond her control

would "rob [her] spirit."  *Id.* at 696.  In *Roy*, parents objected to a statutory requirement that

state agencies "shall utilize" Social Security numbers not because it directly "place[d] any

restriction on what [they could] believe or what [they could] do," but because they believed use

of the number, an entirely governmental act, would harm the child's spirit.  *Id.* at 699. The Court

concluded that the government's use of the child's Social Security number did not "in any

degree" impair her parents' freedom to believe, express, or exercise their religion, emphasizing

that "[t]he Free Exercise Clause simply cannot be understood to require the Government to

conduct its own internal affairs in ways that comport with the religious beliefs of particular

citizens.... [A]ppellees may not demand that the Government join in their chosen religious

practices by refraining from using a number to identify their daughter."  *Id.* at 699–700.

Similarly, here, the government is not directly coercing Cheyenne River's members to

change their beliefs or threatening sanction.  Rather, the government is granting an easement

over its own property, "an entirely governmental act" that Cheyenne River asserts will lead to a

pipeline that will harm the religious purity of Lake Oahe.  Under the case law, this is not a

substantial burden on religion.

<div align="center">

**c)       Cheyenne River has not demonstrated that Lake Oahe
is the only source of water for its religious use.**

</div>

It is Cheyenne River's burden to demonstrate its religious exercise is substantially

burdened; and this Circuit has repeatedly affirmed that "no substantial burden exists where a

regulation is 'at most a restriction on one of a multitude of means' for an individual to engage in

his desired religious exercise." *Priests for Life*, 808 F.3d at 8 (quoting *Henderson v. Kennedy,*

253 F.3d 12, 17 (D.C. Cir. 2001). Thus, Cheyenne River must show that Lake Oahe is the only

source of water available for use in its religious practices, and laying an additional pipeline more

than ninety feet under this water substantially burdens its religion.

Cheyenne River asserts that Lake Oahe, a man-made reservoir completed in 1959 and

which is crossed by man-made infrastructure at several points, contains the "only natural,

unadulterated, and ritually pure water available to the tribe. . . ."  ECF No. 98 at 3.  Cheyenne

River suggests that other sources of water, including "ground water," "aquifers" and rivers might

serve as substitutes if not for inaccessibility or contamination.  ECF No. 98 at 13-14.  However,

Cheyenne River has not established that water upstream of the proposed pipeline cannot be used.

Notably, water from the portions of Lake Oahe that lie upstream of the disputed pipeline crossing

would not have come into contact with the proposed buried pipeline, which Cheyenne River has

identified as the event that makes the water unpure.  *See* ECF No. 99-4 at ¶ 18 ("pumping black

crude oil under [Lake Oahe]… will pollute the pure, natural water of Lake Oahe.").   Nor has

Cheyenne River demonstrated that there exists no other "natural, unadulterated, and ritually pure water" that is available to the Tribe.[8]

Relatedly, Cheyenne River does not demonstrate that the Dakota Access pipeline easement will substantially burden its religious exercise beyond any burden imposed by the other infrastructure located over, in, and under Lake Oahe.  In particular, Cheyenne River does not address the Mandan oil pipeline located approximately eight river-miles north of the Lake Oahe project boundary, as the water that flows from the Missouri River into Lake Oahe flows over that pipeline.

### 3.   *Lyng* Defeats Cheyenne River's RFRA Claim.

As a matter of law, land management activities, such as easements, that the government undertakes on its own land are not a "substantial burden" on religion under RFRA. Under the relevant case law, an individual's religious objection does "not divest the Government of its right to use what is, after all, its land."  *See Lyng,* 485 U.S. at 453 (citation and emphasis omitted).  A contrary holding would allow any religious objector to halt government management of its own property.

In *Lyng,* Indian tribes challenged the U.S. Forest Service's approval of plans to construct a logging road in the Chimney Rock area of the Six Rivers National Forest in California.  *Id.* at 442. The tribes contended the construction would interfere with their free exercise of religion by disturbing a sacred area.  *Id.* at 442–43.  The area was an "integral and indispensable part" of the tribes' religious practices, and a Forest Service study concluded the construction "would cause

---

[8] *See* Decl. of J. Macpherson, Ex. 1 (Ex. C) (identifying water sources near the reservation).  To the extent such pure water may exist on public lands, it is the policy of the government to "accommodate access to and ceremonial use of Indian sacred sites by Indian religious practitioners" on public lands. *See* 61 Fed. Reg. 26771 (May 24, 1996).

serious and irreparable damage to the sacred areas."   *Id.* at 442 (citations and internal quotation

marks omitted).

The Supreme Court rejected the tribes' challenge.  It held the government plan, which

would "diminish the sacredness . . ." of the land to Indians and "interfere significantly. . ." with

their ability to practice their religion, did not impose a burden "heavy enough" to violate the Free

Exercise Clause.  *Id.* at 447–49.  The Court stated:

> The Government does not dispute, and we have no reason to doubt, that the
> logging and road-building projects at issue in this case could have devastating
> effects on traditional Indian religious practices.
>
> Even if we assume that ... the [logging] road will "virtually destroy the ... Indians'
> ability to practice their religion," the Constitution simply does not provide a
> principle that could justify upholding [the plaintiffs'] legal claims. However much
> we might wish that it were otherwise, government simply could not operate if it
> were required to satisfy every citizen's religious needs and desires.
>
> No disrespect for these practices is implied when one notes that such beliefs could
> easily require *de facto* beneficial ownership of some rather spacious tracts of
> public property.
>
> *Whatever rights the Indians may have to the use of the area, however, those rights
> do not divest the Government of its right to use what is, after all, its land.*

*Id.* at 451–53 (citation omitted) (emphasis added).

Cheyenne River similarly challenges a government action on the government's own

land—granting an easement—on the theory that the portion of the pipeline that will be

constructed within that easement will diminish its religious exercise.  Even if, as in *Lyng,* it was

assumed that the government action here would "virtually destroy the ... Indians' ability to

practice their religion,"  *id.* at 452, an issue which is not addressed in this memorandum,

Cheyenne River's declarations offer nothing to distinguish the easement here from the logging

road in *Lyng*.

*Lyng* was not overturned by the RFRA and indeed legislative history confirms that its holding was meant to be incorporated into the RFRA's understanding of "substantial burden." As Senator Hatch explained, the RFRA

> does not effect [sic] *Lyng*.., a case concerning the use and management of government resource…. In *Lyng*, the court ruled that the way in which government manages its affairs and uses its own property does not impose a burden on religious exercise.

139 Cong. Rec. S14461, at S14470 (daily ed. Oct. 27, 1993) (statement of Sen. Hatch); *see id* (statement of Sen. Inouye) (RFRA will not address "the circumstance in which Government action on public and Indian lands directly infringes upon the free exercise of a native American religion."). When the RFRA was amended, the definition of "substantial burden" was left unaltered.[9] *Lyng's* holding has since been repeatedly upheld. *See Snoqualmie Indian Tribe v. FERC.*, 545 F.3d 1207, 1213-15 (9th Cir. 2008) (dam on government property does not substantially burden religion); *Navajo Nation I*, 535 F.3d at1069-79 (reclaimed snow on government property does not substantially burden religion); *see Vill. of Bensenville v. Fed. Aviation Admin.*, 457 F.3d 52, 67 (D.C. Cir. 2006) ("Bensenville") (citing *Lyng* favorably).

Cheyenne River acknowledges that *Lyng*'s reasoning includes a concern that religious objections to government's use of its own property would give religious objectors "de facto beneficial ownership. . ." over government land. ECF No. 99 at 33. Cheyenne River attempts to address this concern by arguing that, because it has a vested right in Lake Oahe's *water*, the United States is barred from granting an easement over its *land*. This is essentially irrelevant to the concern and reasoning that animated the *Lyng* line of cases.

---

[9] *See* Religious Land Use and Institutionalized Persons Act (RLUIPA) of 2000, Pub. L. No.106-274, §§ 7-8, 114 Stat. 803, 806-07.

To the extent Cheyenne River attempts to argue that *Lyng* was implicitly overturned by *Hobby Lobby*, this is incorrect.  *Cf.* ECF No. 99 at 34.  *Hobby Lobby* did not cite, much less directly overturn, *Lyng*.  *Hobby Lobby* is easily distinguishable because it did not involve government use of its own land.  Rather, it concerned a requirement to provide contraceptives as part of health insurance.  *Hobby Lobby Stores*, 134 S. Ct. at 2775.

The facts of this case closely parallel *Lyng*, and the many cases that have followed it, and the same result should be reached here.  Giving Cheyenne River, or any individual with sincerely held religious beliefs, *de facto* ownership over the government's property is not an intended or reasonable interpretation of the RFRA and has been rightly rejected by every court to examine the issue.  As in *Lyng*, the government's use of its own property does not constitute a substantial burden on religion.  485 U.S. at 447.  For this reason Cheyenne River cannot succeed on the merits of its RFRA claim.

4.      **Any Burden on Cheyenne River's Exercise of Religion Caused by the Dakota Access Pipeline Is Not Fairly Attributable to the Corps.**

Even if the government's management of its own land could be a substantial burden on religious exercise, Cheyenne River is unlikely to succeed on the merits of its RFRA claim because any burden in this case flows not from the grant of the easement itself, but rather from action taken by a third party, Dakota Access.  The RFRA restricts the government from taking certain religion-burdening action; but where a third party takes this action "mere acquiescence in a private action" is insufficient to "convert[] that action into that of the [government]." *Bensenville*, 457 F.3d at 67 (quotation marks and citation omitted).  Here, the allegedly religion-burdening activity is *not* activity the government is directly undertaking—the Corps did not design, fund, or construct the pipeline, and will not operate it.  Rather, the Corps granted an

easement and a third party is allegedly burdening Cheyenne River's religious exercise.  Under

these circumstances, this circuit has held that no RFRA claim lies against the government.

This Circuit addressed a similar situation in *Bensenville*.  In *Bensenville*, the City of

Chicago submitted, and (following an Environmental Impact Statement) the Federal Aviation

Administration ("FAA") approved, a plan that reflected the City's proposed relocation of a

cemetery to accommodate a larger airport. The petitioners argued that the FAA's approval of the

plan violated the RFRA.  The D.C. Circuit rejected the petitioners' claim and found that the

alleged religion-burdening activity was not attributable to the government. The Court noted

"[t]he FAA did not design the [airport plan], nor can it compel the City to implement some or all

of it." *Bensenville*, 457 F.3d at 64 (quotation marks and citation omitted).  In other words, even

though "the FAA has approved the [plan], the FAA has no authority to demand that the City

build the projects described therein." *Id.* at 65.  Therefore, despite pervasive regulation of

airports, and FAA's participation in a NEPA process, Chicago's plan to relocate a cemetery

could not be attributed to FAA for RFRA purposes.  *Id.*

Specifically, *Bensenville* looked to relevant case law and reasoned that "[w]hether the

federal government can be characterized as responsible . . . under RFRA. . ." depends on whether

there is a "sufficiently close nexus. . ." between the government's actions and private party's

actions "'so that the action of the latter may be fairly treated as that of the [federal government]

itself.'" *Id*. at 62 (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)).  The Court contrasted

"mere approval of or acquiescence in. . ." activity with a situation where the government

"exercised coercive power or has provided such significant encouragement . . . that the choice

must in law be deemed to be that of the" government.  *Id.* at 64 (quotations marks and citations

omitted).

Here, as in *Bensenville*, the Corps cannot be held responsible for any infringement on religion caused by Dakota Access's design, funding, construction, and operation of the pipeline because the Corps has not offered significant encouragement over a project that falls almost entirely outside of the Corps' jurisdiction.  *See id*. at 64; *Jackson v Metro. Edison Co.,* 419 U.S. 345, 350 (1974) ("The mere fact that a business is subject to [government] regulation does not by itself convert its action into that of the State. . .") (Footnoted and citation omitted)).

As in *Bensenville*, the Corps' decision to grant the Lake Oahe easement has, at most, an incidental impact on Cheyenne River's exercise of religion because the actions causing the alleged infringement are Dakota Access's.  Just as in *Bensenville*, the Corps "has no authority to demand that" Dakota Access build the pipeline.  457 F.3d at 65.  To the extent that this case can be distinguished from *Bensenville*, it only highlights that the Corps is not infringing upon Cheyenne River's religious exercise.  The FAA has "authority to guide airport development nationwide."  *Id*. at 61-62.  It "must approve any modified airport layout plan" and "must prepare an environmental impact statement ("EIS") determining the plan's effect on the environment. . ."  *Id*. at 58.  Put another way, the FAA "facilitates airport development by providing Federal financial assistance, and reviews and approves or disapproves revisions to the Airport Layout Plans at Federally funded airports."  *Id* at 64 (quotation marks and citation omitted).  In contrast, it is well-established that the Corps generally lacks jurisdiction over entire pipelines.  *Sierra Club v. U.S. Army Corps of Eng'rs,* 803 F.3d 31, 34-35, 52 n.10 (D.C. Cir. 2015) ("[A]gencies were not *required* to perform a pipeline-wide NEPA review."); *Sierra Club, Inc. v. Bostick,* 787 F.3d 1043, 1055 (10th Cir. 2015); *Standing Rock Sioux Tribe,* 2016 U.S. Dist. LEXIS 121997 at *74 ("[T]his Court cannot conclude here that a federal agency with limited jurisdiction over specific activities related to a pipeline is required to consider all the

effects of the entire pipeline to be the indirectly or directly foreseeable effects of the narrower

permitted activity" (emphasis omitted)).  And the indirect effects that may fairly be attributed to

an agency for RFRA purposes are even narrower than the indirect effects that may be fairly

attributed to an agency under NEPA.  *Bensenville,* 457+ F.3d at 65; *id.* at 62 ("[I]mporting

NEPA's applicability into RFRA would give the statute far greater breadth than Congress ever

intended." (citation omitted)).  Further, even if the Corps approves or disapproves easements or

crossings for certain portions of the pipeline, the Dakota Access pipeline is entirely privately

funded, constructed, and operated.

     Just as the FAA could not be held responsible where Chicago "is the cause of any burden

on religious exercise because of its role as inventor, organizer, patron, and builder of the O'Hare

expansion," the Corps cannot be held responsible for any burden the pipeline may place on

Cheyenne River.   *See id.* at 65.  The Corps has not initiated, designed, funded, constructed, or

operated any segment, much less the entirety, of the pipeline Cheyenne River contends is the

"black snake."  *Cf. id.* (FAA did not initiate, design, or construct airport).  Even if the scope of

analysis is limited to the Lake Oahe crossing, the Corps' involvement in that crossing is

insufficient to hold it responsible for any infringement on Cheyenne River's religious exercise.

       **5.**      **The United States Has No Trust Duty to Manage Lake Oahe as
Cheyenne River Prefers.**

     To the extent Cheyenne River's RFRA claim is based upon an alleged breach of trust,

this too fails because the Tribe has not identified any substantive source of law that establishes

specific trust duties.  "The trust obligations of the United States to the Indian tribes are

established and governed by statute rather than the common law."  *United States v. Jicarilla*

*Apache Nation*, 564 U.S. 162, 165 (2011).  *Menominee Indian Tribe of Wisc. v. United States*,

136 S.Ct. 750, 757 (2016) ("We do not question the 'general trust relationship between the

United States and the Indian tribes,' but any specific obligations the Government may have under that relationship are 'governed by statute rather than the common law.'").

Thus, in order to bring a claim for breach of trust, the Tribe "must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties." *United States v. Navajo Nation,* 537 U.S. 488, 506 (2003) (citation omitted) ("*Navajo Nation II*"); *El Paso Nat. Gas Co. v. United States*, 774 F. Supp. 2d 40, 51–52 (D.D.C. 2011), *aff'd*, 750 F.3d 863 (D.C. Cir. 2014). This "analysis must train on specific rights-creating or duty-imposing statutory or regulatory prescriptions." *Id.*[10] (quotation marks and citation omitted). Cheyenne River is simply incorrect, ECF No. 99 at 17, that control of a Tribe's resources alone is sufficient to establish a trust duty. *United States v. Navajo Nation*, 556 U.S. 287, 301 (2009) ("The Federal Government's liability cannot be premised on control alone.") ("*Navajo Nation III*").

Here, the Tribe alleges a breach of trust arising out of the Corps' alleged violations of various statutes, ECF No. 99 at 14-17. But none of those statutes articulate the kind of "rights-creating or duty-imposing. . ." language that is required by the case law. *See El Paso Nat. Gas Co. v. United States*, 750 F.3d 863, 898 (D.C. Cir. 2014) (quotation marks and citation omitted). Section 1632 does not provide a specific duty applicable to this case. It merely states that "the policy of the United States[] that all Indian communities . . . be provided with safe and adequate water supply. . . ." 25 U.S.C. § 1632(a)(5). Such policy provides no law to apply regarding whether an agency has conformed to the policy and administrative goals articulated. *See City of*

---

[10] Common law trust principles may then theoretically "particularize [a statutory] obligation." *Cobell v. Norton*, 392 F.3d 461, 472 (D.C. Cir. 2004). But common law trust principles are, on their own, insufficient to show that the United States owes a specific trust duty.

*Albuquerque v. U.S. Dep't of the Interior*, 379 F.3d 901, 914 (10th Cir. 2004).  Similarly, 33

U.S.C. § 701-1(b) declaration of the United States' policy of controlling floods says nothing

about a duty on the part of the Corps to take any other specific action.

Cheyenne River does not identify any language in the Flood Control Act that could create

a trust duty.  The act provides that "[t]he water areas of all such projects shall be open to public

use . . .," and that "[a]ll moneys received by the United States for leases or privileges shall be

deposited in the Treasury of the United States. . ."  Flood Control Act, 16 U.S.C. § 460d.  It

addresses duties relating to fining individuals for violations of regulations promulgated by the

Army, who may issue such citations.  *Id.*  And it provides that

> preference shall be given to federally recognized Indian tribes and Federal, State,
> or local governmental agencies, and licenses or leases where appropriate, may be
> granted without monetary considerations, to such Indian tribes or agencies for the
> use of all or any portion of a project area for any public purpose, when the
> Secretary of the Army determines such action to be in the public interest, and for
> such periods of time and upon such conditions as he may find advisable.

*Id.*  Even if this language could be interpreted as a creating some duty, it falls far short of

establishing a specific trust duty that could support Cheyenne River's motion.  Simply put, the

Flood Control Act does not impose any trust duty on the United States on behalf of Cheyenne

River.

Cheyenne River's reliance on 55 Fed. Reg. 9223 (Mar. 12, 1990) for the proposition that

the United States holds water rights in trust for Indians is unavailing.  While this may be true as a

general matter, it is insufficient to create any specific duty that would support the emergency

relief sought.  *See Navajo III,* 556 U.S. at 301.[11]

---

[11]  Though Cheyenne River asserts an ownership interest in the waters of Lake Oahe, case law
provides that they have, at most, only a usufructuary right. *See Niagara Mohawk Power Corp. v.*

Cheyenne River's reserved water rights do not impose a trust duty upon the United States to prohibit infrastructure from crossing Lake Oahe.  Cheyenne River identifies no such duty in any of the treaties or statutes it cites.  *See* ECF No. 98 at 14-17.  No trust duty to prohibit infrastructure from crossing the Missouri River, much less Lake Oahe, was imposed by either the 1851 or 1868 Ft. Laramie Treaties.  *See Treaty of Fort Laramie with Sioux, Etc.,* 11 Stat. 749 (Sept. 17, 1851); *Treaty with the Sioux,* 15 Stat. 635 (Apr. 29, 1868).  "Article 2 of the Act of February 28, 1877," ECF No. 98 at 14-15, is similarly unavailing, as it does not even arguably address water usage.[12]  And the Act of 1889 addresses "the use of water for irrigation" rather than religious purposes, much less the specific religious issue identified in Plaintiff's RFRA claim.  25 Stat. 888, 893, § 14. Finally, the Cheyenne River Act of Sept. 3, 1954 provided only "the right of free access to the shoreline of the reservoir including the right to hunt and fish in and on the aforesaid shoreline and reservoir, subject, however, to regulations governing the corresponding use by other citizens of the United States."  68 Stat. at 1193.  Cheyenne River's trust claim must be denied because the Tribe does not identify language that would create a trust duty to manage water resources for religious purposes, much less the specific duty to prevent particular infrastructure projects from traversing Lake Oahe at issue here.  *Hopi Tribe v. United*

---

*Fed. Power Comm'n*, 202 F.2d 190, 198 (D.C. Cir. 1952) ("[T]he water rights in question do not rest upon a claim of ownership of the running waters of the Niagara.  It is a usufructuary property right in the waters which is asserted—a vastly different thing, which was recognized at common law and has been confirmed by judicial decisions."), *aff'd*, 347 U.S. 239, 247 n.10 (1954) (noting "[n]either sovereign nor subject can acquire anything more than a mere usufructuary right" in a body of water).

[12]   Article II provides that "[t]he said Indians also agree and consent that wagon and other roads, not exceeding three in number, may be constructed and maintained, from convenient and accessible points on the Missouri River, through said reservation, to the country lying immediately west thereof, upon such routes as shall be designated by the President of the United States; and they also consent and agree to the free navigation of the Missouri River."  19 Stat 254, 255.

*States*, 782 F.3d 662, 669 (Fed. Cir. 2015) ("The Supreme Court found in [*United States v. Mitchell*, 4445 U.S. 535 (1980)] that such 'bare' trust language is not sufficient to establish a fiduciary duty to manage resources on the land. The same is true of the bare trust language here: it does not establish any particular fiduciary duty to manage water resources on the land." (citation omitted)).

Cheyenne River's reliance on the water rights doctrine of *Winters v. United States*, 207 U.S. 564 (1908), similarly falls far short of identifying an applicable trust duty. Cheyenne River identifies no provision in any of the treaties it relies upon – all of which were signed prior to the creation of Lake Oahe in the 1950s – that reserved water rights in a manner that bars the permitting of infrastructure across (or in this case below) any portion of the Missouri River. Nor does Cheyenne River identify any treaty that would allow this Court to distinguish between the Mandan pipeline located 102 miles north of the Cheyenne River reservation and the Dakota Access pipeline route located 73 miles north of the Cheyenne River reservation. *See* Hr'g Tr. 14:12-17 (Feb. 13, 2017) (Ex. N); Decl. of J. Macpherson, Ex. 1 (Ex. C). "At most, by holding reserved water rights in trust, Congress accepted a fiduciary duty to exercise those rights and exclude others from diverting or contaminating water that feeds the reservation." *Hopi Tribe*, 782 F.3d at 669.[13] Here, the Corps is not permitting contamination and no water has been contaminated. Indeed, the Corps has imposed conditions on the Lake Oahe easement that render any risk of an oil spill vanishingly small. February 3, 2017 memo 13 (Ex. A).

---

[13] The Corps notes that the United States has discretion in "determining when to institute legal proceedings" for trespass on Indian lands. *Creek Nation v. United States*, 318 U.S. 629, 639 (1943); *Shoshone-Bannock Tribes v. Reno*, 56 F.3d 1476, 1480 (D.C. Cir. 1995).

Finally, Cheyenne River cites Executive Order 13175.  Compliance with executive orders may be judicially reviewable only if (1) the order does not expressly disclaim the creation of a private right of action, (2) the order is based upon statutory authority, and (3) there is a legal standard or "law to apply" by which the agency's action may be judged. *See City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1166-67 (9th Cir. 1997). The failure to meet *any* of these criteria is fatal to a claim based on an executive order, and Executive Order 13,175 meets none of them.  First, the Order expressly states that it does not provide any right or benefit that is enforceable at law or in equity against the federal government. ADD033 (Executive Order 13,175 not intended to create "any right, benefit, or trust responsibility … enforceable … by a party against the United States [or] its agencies").  Language disclaiming the intent to create enforceable rights precludes judicial review.  *See City of Carmel-by-the-Sea*, 123 F.3d at 1166. Second, because the Executive Order does not purport to be based on specific statutory authority, it cannot create enforceable rights.  *Id.*  Finally, there is no law to apply regarding whether an agency has conformed to the policy and administrative goals articulated.  *Id.* (enforceable executive order must provide an objective legal standard or "law to apply" by which the agency's action may be judged); *see also City of Albuquerque*, 379 F.3d at 914.  The absence of any objective standards also confirms that the Executive Order does not establish any specific trust duty.

In short, Cheyenne River has not identified "specific rights-creating or duty-imposing statutory or regulatory prescriptions," *Navajo II,* 537 U.S. at 490, and therefore is not likely to succeed on the merits of any breach of trust claim.

**B.** **Cheyenne River Has Not Established That It Will Be Imminently and Irreparably Injured by the Corps' Grant of the Lake Oahe Easement.**

Cheyenne River fails to establish the imminent irreparable harm necessary to prevail on its motion for a preliminary injunction. "[T]he party seeking injunctive relief must show that '[t]he injury complained of [is] of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (some alterations in original) (citation omitted).

As discussed above, it is Cheyenne River's burden to establish that its religious exercise will be substantially burdened by the Corps' actions. Cheyenne River's reliance on *O Centro Espirita Beneficient Uniao Do Vegetal v. Ashcroft* is therefore misplaced. 282 F.Supp.2d 1236 (D.N.M. 2002), *aff'd*, 342 F.3d 1170 (10th Cir. 2003). In that case, the court noted that "Tenth Circuit law indicates that the violations of the religious exercise rights protected under RFRA represent irreparable injuries." *Id.* at 1269-71. The likelihood of success on the merits and irreparable injury prongs therefore at least partially converge. And because Cheyenne River has not demonstrated that it will be substantially burdened by the challenged Lake Oahe easement, it also has not demonstrated that it will be irreparably injured by that easement.

**C.** **The Balance of Equities Tips in Favor of the Corps, and Issuance of an Injunction Would Harm the Public Interest.**

The public interest and balancing of the equities prongs are not just a summary of the other prongs; they are separate from and additional to the other prongs. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (stating that plaintiffs must carry the burden or persuasion as to each element "by a clear showing" (emphasis and citation omitted)). Where the federal government is a party, the equities and public interest inquiries tend to merge. *See Colo. Wild Horse & Burro Coal., Inc. v. Jewell*, 130 F. Supp. 3d 205, 220-21 (D.D.C. 2015) (citing *Nken v. Holder*, 556

U.S. 418, 435 (2009)).  The balance of equities and public interest weigh against an injunction where Plaintiff did not avail itself of the opportunity to engage in the consultation process designed to protect the very interests that Plaintiff now claims will be harmed absent an injunction.

As explained above and in the attached Declaration of Richard Harnois, over a two-year consultation process the Corps attempted to obtain information regarding Cheyenne River's concerns regarding the portions of the Dakota Access pipeline within the Corps' jurisdiction. Decl. of R. Harnois ¶¶ 8-33 (Feb. 12, 2017) (Ex. E).  Cheyenne River raised a number of issues, including generalized concerns regarding oil spills.  The Corps responded to tribal concerns regarding spill risk by adopting 36 easement conditions to reduce an already-low risk of an oil spill at the Lake Oahe crossing.  February 3, 2017 memo 13 (Ex. A).  But the Corps cannot address concerns—such as Cheyenne River's RFRA claim that an easement on federally owned land will substantially burden its religion—that are not raised in a timely manner.

Granting the equitable remedy of a preliminary injunction now, after both the Corps and Dakota Access have invested significant time and resources and accommodated timely raised tribal concerns, would only reward Plaintiff's unwillingness to engage meaningfully in the consultation process.  And it would not serve the public interest because it may encourage parties in the future to decline to consult and comment and then bring last-minute challenges as construction is underway—utilizing judicial resources in the process—rather than taking the proper steps to engage in the planning stages when their concerns can be addressed without resorting to such a drastic step as an injunction.

## VI.    CONCLUSION

Cheyenne River's motion for a preliminary injunction mandating withdrawal of the Lake

Oahe easement should be denied because the Tribe fails to establish any basis for such emergency

relief.  Its motion for preliminary injunction can be addressed in an orderly fashion prior to any oil

flowing through the not-yet-constructed pipeline without prejudice to the Tribe.

Respectfully submitted on February 21, 2017,

<div style="margin-left:40%">

JEFFREY H. WOOD
Acting Assistant Attorney General
Environment & Natural Resources Division

</div>

By:    */s/  Erica Zilioli*_____
        MATTHEW MARINELLI, IL Bar 6277967
        REUBEN S. SCHIFMAN, NY Bar
        U.S. Department of Justice
        Natural Resources Section
        P.O. Box 7611
        Benjamin Franklin Station
        Washington, DC 20044
        Phone: (202) 305-0293
        Fx: (202) 305-0506
        matthew.marinelli@usdoj.gov

        ERICA M. ZILIOLI, D.C. Bar 488073
        U.S. Department of Justice
        Environmental Defense Section
        P.O. Box 7611
        Washington, DC 20044
        Phone: (202) 514-6390
        Fax: (202) 514-8865
        Erica.Zilioli@usdoj.gov

        *Attorneys for the United States Army Corps*
        *of Engineers*

OF COUNSEL:

MILTON BOYD
MELANIE CASNER
U.S. Army Corps of Engineers
Office of Chief Counsel
Washington, DC

**CERTIFICATE OF SERVICE**

I hereby certify that, on the 21st day of February, 2017, a copy of the foregoing was filed

through the Court's CM/ECF management system and electronically served on counsel of

record.

/s/  *Erica Zilioli*
Erica M. Zilioli