## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STANDING ROCK SIOUX TRIBE,** | **Case No. 1:16-cv-1534-JEB** |
| **Plaintiff,** | |
| **and** | |
| **CHEYENNE RIVER SIOUX TRIBE,** | **INTERVENOR-PLAINTIFF'S PARTIAL MOTION FOR SUMMARY JUDGMENT** |
| **Intervenor-Plaintiff,** | |
| **v.** | |
| **U.S. ARMY CORPS OF ENGINEERS,** | |
| **Defendant – Cross-Defendant.** | |
| **and** | |
| **DAKOTA ACCESS, LLC,** | |
| **Intervenor-Defendant – Cross-Claimant.** | |

In accordance with Federal Rule of Civil Procedure 56(a), Intervenor-Plaintiff Cheyenne River Sioux Tribe ("Tribe"), a federally-recognized Indian Tribe, respectfully moves this Court to enter summary judgment in favor of the Tribe on the following claims set forth in the Tribe's Complaint:

1) The United States Army Corps of Engineers' ("Corps") issuance of a Section 408 permit to Dakota Access, LLC ("Dakota Access") was arbitrary and capricious and otherwise not in accordance with the Flood Control Act of 1944 or 30 U.S.C. § 408 requirements;

2) The Corps' issuance of a Section 408 permit and its issuance of an easement under the Mineral Leasing Act ("MLA"), 30 U.S.C. § 185 done in violation of the Corps' duty to consult with the Cheyenne River Sioux Tribe in a meaningful way pre-decisionally on any action that has the potential to substantially affect trust resources or treaty rights;

3) The Corps' issuance of a Section 408 permit and its issuance of an easement under the MLA violated the Corps' trust responsibility and the Tribe's treaty rights; and

4) The Corps' issuance of the easement under the MLA was not in accordance with the requirements of the MLA as the Corps' actual easement and Memorandum decision of February 7, 2017 do not comport with the requirements of 30 U.S.C. § 185.

The Tribe bases this motion on the pleadings and other papers on file, the separate statement of material facts not in genuine dispute attached hereto pursuant to Local Rule 7(h)(1),[1] as well as the following memorandum of points and authorities, the accompanying declarations of Leo Fisher, Nicole Ducheneaux, Chairman Harold Frazier, and Rollie Wilson, additional declarations of Steve Martin and Hakan Bekar filed under seal, exhibits referenced herewith, and any argument of counsel that may be heard by the Court, and respectfully asks the Court to enter the proposed order filed concurrently with this motion.

---

[1] Local Rule 7(h)(2) provides that a separate statement of material facts as to which it contends there is no genuine issue must be filed in "cases in which judicial review is based solely on the administrative record." In the present case, the existing administrative record does not contain any documents created prior to July 25, 2016. As the instant dispute also concerns documents created after July 25, 2016 and through February 8, 2017, the Tribe cannot rely solely on the existing administrative record and has therefore appended hereto declarations and exhibits outside of that record. In an effort to comply with the letter of Local Rule 7(h), the Tribe has included a separate statement of material facts as to which it contends there is no genuine issue.

Dated: February 22, 2017

CHEYENNE RIVER SIOUX TRIBE,
Intervenor-Plaintiff,


By:   /s/ Nicole E. Ducheneaux
Nicole E. Ducheneaux, *Pro Hac Vice*
Fredericks Peebles & Morgan LLP
3610 North 163rd Plaza
Omaha, NE  68116
Telephone:  (402) 333-4053
Facsimile:  (402) 333-4761
Email: nducheneaux@ndnlaw.com

Conly J. Schulte
FREDERICKS PEEBLES & MORGAN LLP
1900 Plaza Drive
Louisville, CO  80027
Telephone:  (303) 673-9600
Facsimile:  (303) 673-9839
Email:  cschulte@ndnlaw.com


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 22nd day of February, 2017, a copy of the foregoing

was filed electronically with the Clerk of the Court.  The electronic filing prompted automatic

service of the filing to all counsel of record in this case who have obtained CM/ECF passwords.


/s/ Nicole E. Ducheneaux

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **STANDING ROCK SIOUX TRIBE,** | |
| **Plaintiff,** | **Case No. 1:16-cv-1534-JEB** |
| **and** | |
| **CHEYENNE RIVER SIOUX TRIBE,** | |
| **Intervenor-Plaintiff,** | |
| **v.** | |
| **U.S. ARMY CORPS OF ENGINEERS,** | |
| **Defendant – Cross-Defendant.** | |
| **and** | |
| **DAKOTA ACCESS, LLP,** | |
| **Intervenor-Defendant Cross-Claimant.** | |

**PLAINTIFF-INTERVENOR CHEYENNE RIVER SIOUX TRIBE'S MEMORANDUM
IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT AND
MOTION TO JOIN PLAINTIFF STANDING ROCK SIOUX TRIBE'S MOTION FOR
PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................... i

TABLE OF AUTHORITIES .................................................................................... iii

INTRODUCTION AND BACKGROUND ................................................................. 1

STATEMENT OF MATERIAL FACTS ABOUT WHICH THERE IS NO DISPUTE ................ 5

STANDARD OF REVIEW AND CANONS OF CONSTRUCTION ......................................... 6

   A.    STANDARD OF REVIEW ............................................................. 6

   B.    CANONS OF CONSTRUCTION ................................................... 7

ARGUMENT ........................................................................................................ 8

   I.    JOINDER IN THE MOTION FOR PARTIAL SUMMARY JUDGMENT OF THE
        STANDING ROCK SIOUX TRIBE IS APPROPRIATE. .................................. 8

   II.   THE GRANTING OF A SECTION 408 PERMIT WAS ARBITRARY,
        CAPRICIOUS AND UNLAWFUL BECAUSE THE PERMIT WOULD IMPAIR
        EACH OF THE MISSOURI RIVER MAINSTEM SYSTEM PROJECT
        PURPOSES, TRIBAL TREATY RIGHTS AND TRUST RESOURCES AND
        THE PUBLIC INTEREST .............................................................................. 8

      A.    The Corps' Section 408 Permit Decision did not Consider Potential impacts to
            all of the Authorized Purposes of the Missouri River Mainstem System, and
            Failed to Demonstrate that the DAPL Permit Would not Impair Those Purposes..... 11

      B.    The Section 408 Permit Impermissibly Relied upon Benefits to the Pipeline
            Owner and Oil Industry that the Corps Is Prohibited From Considering  under
            Law and Regulation ................................................................................. 20

   III.  THE GRANTING OF THE SECTION 408 PERMIT AND THE MINERAL
        LEASING ACT (MLA) EASEMENT WAS DONE WITHOUT ANY
        CONSULTATION ON THE IMPACTS OF THOSE ACTIONS ON THE
        CHEYENNE RIVER SIOUX TRIBE'S TREATY RIGHTS AND TRUST
        RESOURCES IN VIOLATION OF APPLICABLE LAW AND POLICY. ................. 22

A.  The Corps has a Duty to Pre-decisionally Consult with Tribal Governments on Actions That May Have the Potential to Significantly Affect Tribal Resources. ...... 22

B.  The Corps Did Not Consult with the Tribe Prior to Issuance of the Draft EA FONSI, the Section 408 Permit, or the MLA Easement ........................................... 24

C.  Consultation under the National Historic Preservation Act ("NHPA") § 106 Does Not Meet the Obligation to Consult on Impacts to Treaty and Trust Resources. ............................................................................................................... 30

IV.  THE GRANTING OF THE SECTION 408 PERMIT AND THE MLA EASEMENT VIOLATED THE TREATY RIGHTS OF THE CHEYENNE RIVER SIOUX TRIBE AND THE CORPS' FIDUCIARY TRUST RESPONSIBLITIES. ................................................................................................. 30

A.  The Corps has a Fiduciary Trust Obligation to the Tribe. .......................................... 32

B.  The Corps Breaches its Obligation to Ensure its Actions did not Violate the Treaty Rights of the Tribe and Did Not Adversely Affect the Tribal Trust Resources ................................................................................................................ 34

V.  THE GRANTING OF THE MLA EASEMENT UNDER 30 U.S.C. § 185 WAS ARBITRARY, CAPRICIOUS AND NOT IN ACCORDANCE WITH THE LAW. ... 37

A.  The Easement Record of Decision Fails to Demonstrate the DAPL Easement is Not Inconsistent with the Purpose of the Reservation as Required by Section 185(b)(1) .................................................................................................................... 38

B.  The Easement Determination Fails to Meet the Requirements of Section 185(h)(2). ............................................................................................................ 41

C.  The Corps' Issuance of the Easement Violated the Requirement to Consult with the Tribe and the Corps' Fiduciary Duty to Protect the Tribe's Treaty and Trust Resources. ............................................................................................................... 44

CONCLUSION ................................................................................................................... 45

CERTIFICATE OF SERVICE ........................................................................................... 46

# TABLE OF AUTHORITIES

**Cases**

*Albuquerque Indian Rights v. Lujan,* 930 F.2d 49 (D.C. Cir. 1991)..................................... 7, 8, 24

*Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240 (1975)......................................... 38

*American Indians Residing on Maricopa–AK Chin Reservation v. United States*,
   667 F.2d 980, 229 Ct.Cl. 167 (1981), *cert. denied,* 456 U.S. 989, 102 S.Ct. 2269
   (1982).................................................................................................................................. 34

*Arizona v. California*, 373 U.S. 546 (1963)................................................................................. 32

*Assiniboine & Sioux Tribes. v. Oil & Gas Conservation*, 792 F.2d 782 (9th Cir. 1986).......... 7, 34

*Baltimore Gas & Elec. Co. v. Natural Res. Def Council,* 462 U.S. 87 (1983) ............................... 6

*Cappaert v. United States*, 426 U.S. 128 (1976) .......................................................................... 31

*Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984) ............................ 15

*Cheyenne River Sioux Tribe v. Jewell*, No. 3:15-03072, 2016 WL 4625672
   (D.S.D. Sept. 6, 2016)......................................................................................................... 24

*City of Arlington, Tex. v. F.C.C.*, 133 S. Ct. 1863 (2013) ........................................................... 15

*Cobell v. Babbitt*, 91 F. Supp.2d 1 (D.D.C. 1999)................................................................... 7, 33

*Confederated Tribes and Bands of the Yakama Nation v. U.S. Department of Agriculture*,
   No. 10-3050, 2010 WL 3434091 (E.D. Wash. Aug.30, 2010) ................................................ 23

*Ctr. for Biological Diversity v. Salazar*, No. 10-2130, 2011 WL 6000497
   (D. Ariz. Nov. 30, 2011) ......................................................................................................... 23

*Defenders of Wildlife v. Babbitt*, 958 F. Supp. 670 (1997)......................................................... 10

*Dep't. of Transp. v. Public Citizen*, 541 U.S. 752, 124 S. Ct. 2204 (June 7, 2004) ..................... 18

*ETSI Pipeline Project v. Missouri*, 484 U.S. 495 (1988).............................................................. 33

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)............................................................. 7

*Fox v. Clinton*, 684 F.3d 67 (D.C. Cir. 2012) ................................................................................ 6

*In re Johnson*, 518 F.2d 246 (10th Cir.), *cert. denied*, 423 U.S. 893 (1975) ................................ 34

*Indian Educators Fed'n Local 4524 of Am. Fed'n of Teachers, AFL-CIO v. Kempthorne*,
     541 F. Supp. 2d 257 (D.D.C. 2008) ........................................................................ 7, 24

*Klamath Tribes v. United States,* No. 96-381, 1996 WL 924509 (D. Or. Oct.2, 1996) .............. 23

*Lower Brule Sioux Tribe v. Deer,* 911 F.Supp. 395 (D.S.D.1995) ................................................ 24

*Montana v. Blackfeet Tribe of Indians,* 471 U.S. 759, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985) .... 7

*Morton v. Ruiz*, 415 U.S. 199 (1974) ............................................................................................ 8

*Motor Vehicle Mfrs'. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29 (1983) ...................... 6

*Muckleshoot Indian Tribe v. Hall*, 698 F. Supp. 1504 (W.D. Wa. 1988) ...................................... 32

*Muscogee (Creek) Nation v. Hodel,* 851 F.2d 1439 (D.C.Cir.1988) ............................................. 7

*Navajo Nation v. United States*, 224 Ct.Cl. 171 (1980) ................................................................ 33

*North Dakota v. Ubbelohde*, 541 U.S. 987 (2004) ........................................................................ 15

*Northwest Sea Farms, Inc. v. U.S. Army Corps of Engineers*, 931 F. Supp. 1515
     (W.D. Wa. 1996) ...................................................................................................... 32, 33, 34

*Ocean Advocates v. U.S. Army Corps of* Engineers, 402 F.3d 846 (9th Cir. 2004) ........... 6, 18, 19

*Oglala Sioux Tribe v. Andrus,* 603 F.2d 707 (8th Cir.1979) .................................................. 24, 30

*Pueblo of Sandia v. United States*, 50 F.3d 856 (10th Cir. 1995) .............................................. 30

*Quechan Tribe of Fort Yuma Indian Reservation v. United States Department of Interior*,
     755 F.Supp.2d 1101 (S.D. Ca. 2010) ........................................................................ 28, 30

*Seminole Nation v. United States*, 316 U.S. 286 (1942) .............................................................. 7

*South Dakota v. Bourland*, 508 U.S. 679 (1993) ........................................................................ 31

*South Dakota v. Ubbelohde*, 330 F.3d 1014 (8th Cir. 2003) ........................................................ 15

*United States v. Atl. Research Corp.*, 551 U.S. 128 (2007) .............................................. 38, 41, 44

*United States v. Dion*, 476 U.S. 734 (1986) ................................................................................ 31

*United States v. Federal Barge Lines, Inc.,* 573 F.2d 993 (8th Cir. 1978) ................................ 8, 9

*United States v. Gila River Irrigation Dist.*, 920 F. Supp. 1444 (D. Ariz. 1996) ........................ 33

*United States v. Jicarilla Apache Nation*, 465 U.S. 162 (2011) ................................................. 33

*United States v. Mitchell*, 463 U.S. 206 (1983) ....................................................................... 33

*United Techs. Corp. v. U.S. Dep't of Defense*, 601 F.3d at 562 (D.D.C. 2010) .................... 10, 44

*Wellford v. Ruckelshaus*, 439 F.2d 598 (D.C. Cir. 1971) ........................................................ 7

*Wilderness Soc'y v. Morton*, 479 F.2d 842 (D.C. Cir. 1973)............................................ 38, 41, 44

*Winder v. HMA LLC v. Burwell*, _ F. Supp. 3d _, No. 14-2021, 2016 WL 4007070
   (D.D.C. Jul. 25, 2016) ......................................................................................................... 9

*Winters v. United States*, 207 U.S. 564 (1908) .................................................................. 31, 32

*Wyoming v. Sierra Club*, No. 15-8126, 2016 WL 3853806 (10th Cir. July 13, 2016)................ 28

*Wyoming v. United States Dep't of the Interior*, 136 F. Supp. 3d 1317 (D. Wyo. 2015) ............ 28

*Yankton Sioux Tribe v. Kempthorne*, 442 F.Supp.2d 774 (D.S.D.2006) ................................ 24, 30

**Statutes**

25 U.S.C. § 1632........................................................................................................... 22, 33

30 U.S.C. § 185........................................................................................................... passim

30 U.S.C. § 403.................................................................................................................. 1

33 U.S.C. § 185..................................................................................................... 1, 41, 42

33 U.S.C. § 408........................................................................................................... passim

33 U.S.C. § 701........................................................................................................... passim

42 U.S.C. §§ 4321 et seq.................................................................................................... 6

5 U.S.C. § 706.................................................................................................................. 6

58 Stat. 887 ................................................................................................................... 11

58 Stat. 889 ................................................................................................................... 11

58 Stat. 890 ................................................................................................................ 11, 12

59 Stat. 10 ...................................................................................................................... 11

59 Stat. 11 ...................................................................................................................... 11

**Rules**

LCvR 7(h)(1) ................................................................................................................. 1, 5

**Regulations**

33 C.F.R. § 1501 ............................................................................................................... 4

40 C.F.R. § 1501 ............................................................................................. 23, 26, 28

**Other Authorities**

82 Fed. Register 5543 (Jan. 18, 2017) ........................................................................... 4

Act of Nov. 16, 1973, Pub. L. No. 93-153, 87 Stat. 576 ............................................. 38

Army Reg. 405-80 ¶ 4 ................................................................................................... 39

*Criteria and Procedures for the Participation of the Federal Government in Negotiations
    for the Settlement of Indian Water Rights Claims*, 55 Fed. Reg. 9,223 (Mar. 12, 1990) ......... 31

*Dep't of Def.* Instruction 4710 .................................................................. 22, 23, 25, 32

*Master Manual*, U.S. Army Corps of Engineers, Northwestern Division – Missouri
    River Basin (March 2006) ................................................................. 13, 14, 19, 32

*The Act of September 3, 1954*, Pub. L. 83-776, 68 Stat. 1191-1193 ............................. 31

*Water Infrastructure Improvements for the Nation Act*, Pub. L. 114-322, § 1120(c) (1), 130 Stat
    1628 (December 16, 2016) ......................................................................................... 23

## INTRODUCTION AND BACKGROUND

The United States Army Corps of Engineers' ("Corps") approval of the Dakota Access Pipeline ("DAPL") is a clear case of allowing the fox to run the henhouse. The Cheyenne River Sioux Tribe ("Tribe") intervened in this case because of the clear and present threat this pipeline poses to the trust resources of the Tribe and its members, and the immediate threat it poses to the Tribe's and its members' rights to religious freedom. In this suit, the Tribe challenges the Corps' issuance of permits pursuant to Section 10 of Rivers and Harbors Act ("RHA") 30 U.S.C. § 403 under Nationwide Permit 12, Section 408 of the RHA 33 U.S.C. § 408, and an easement for the crossing of Lake Oahe under the Mineral Leasing Act ("MLA"), 33 U.S.C. § 185, which taken together authorize Dakota Access to construct DAPL across Lake Oahe.

Significantly, this crossing is the longest freshwater lake crossing of an oil pipeline of this circumference ever to be permitted by any government in the world. *See,* Statement of Material Facts ("SMF")[1] ¶ 77(h); **Exhibit 4**, Declaration of Rollie Wilson, Attachment A at Bates Nos. 101 - 174 (Envy Report); ECF 117-23 at 17. It crosses under waters that the Tribe has reserved water rights to by treaty that are managed exclusively by the Corps for the specific authorized purposes set forth in the Flood Control Act of 1944, and its own Missouri River Master Water Control Manual. The Corps of Engineers approved the Lake Oahe crossing without adequate environmental review or consideration of the project's purposes, in an arbitrary and capricious manner, and without consideration of its fiduciary obligations to protect the treaty rights of the CRST or any other tribe, guaranteed by the 1851 and 1868 Fort Laramie treaties. The approval

---

[1] The Tribe's Statement of Material Facts is submitted to comply with LCvR 7(h)(1) because there is no official Administrative Record on file with the Court after July 25, 2017. To the extent the Tribe's filings discuss actions taken before July 25, 2017, in compliance with LCvR7(h)(1), the Tribe cites to the unofficial Administrative Record ("AR") on file.

process was both breathtakingly fast and based on an Environmental Assessment ("EA") drafted and paid for by Dakota Access, LLC ("Dakota Access") and submitted to the Corps in March 2015. **AR 0075101-0075191.** The Corps issued a mitigated Finding of No Significant Impact ("FONSI") to support its Section 408 permit based solely on environmental risk analysis prepared by Dakota Access. Not a single independent engineer, or oil pipeline engineer, or geologist specializing in pipeline construction reviewed the Lake Oahe crossing for significant risks to the environment, for compliance with project purposes of the Missouri River Mainstem System operated by the Corps, for violations of the Tribe's treaty rights, or for impacts on the public's interest. SMF at ¶¶ 15 - 19; **AR 006424; AR 0068358; AR 0068779; AR 0071180.**

The Corps completely disregarded its duties under the Flood Control Act of 1944, the RHA, and the MLA and the Missouri River Mainstem System Master Manual when it approved a pipeline that has the potential to render the waters of Lake Oahe unsuitable for the project purposes the Corps is charged with protecting. 33 U.S.C. § 701-1(b). It likewise abdicated its responsibility as a steward of the public trust, and more egregiously, as the fiduciary with a trust responsibility to the Tribal Nations whose reserved water rights it manages. And it did so in a swift and shockingly arbitrary, capricious, and secretive manner.

Notably, the Corps had acceptable alternative siting locations that would allow Dakota Access to transport oil from the Bakken oil field in North Dakota to Illinois. DAPL could have been routed from the oil company's terminal along the East side of the Missouri River, thereby avoiding Lake Oahe, or crossing the Missouri River North of Lake Oahe (at a much shorter distance) posing much less risk to Lake Oahe water supplies that are relied upon by the tribes and others. Instead, Dakota Access selected, and the Corps approved — without any independent review — a route that allows DAPL to cross the Missouri River *twice* — both times beneath

freshwater lakes that support Indian reservations and tribal communities:  First at Lake Sakakawea then at Lake Oahe.  **AR0075290-0075292.**[2]  This route serves no legitimate governmental interest, or public purpose, and was the result of the Corps' utter failure to examine any reasonable alternative, and its failure to give a "hard look" at the potential harm that each option presents to the Missouri River Mainstem System.

Further, the Corps' decision was not based upon the governing laws, but instead, upon the benefits to Energy Transfer Partners ("ETP"), Dakota Access and the oil industry.  SMF ¶¶77-81; ECF No. 22-1 at 30, ¶ 70; **AR0071157; AR0001657-0001658.**  The benefits to private business interests is not a permissible measure of public interest defined in 33 U.S.C. § 701-1(b).  The Corps' actions also violate the RHA as well as the Corps' Section 408 permit regulations, which require impartiality in the review of, and decision to grant, a Section 408 permit, and which make clear that oil pipeline applicants are not public utilities with a public purpose.  SMF ¶ 79;  EC 1165-2-16, Appendix G, § G-4(c) & G-4(f).  **AR0012846–0012915**.  Further, the Corps allowed Dakota Access to craft the EA, which improperly weighs the benefit of construction jobs nationwide and Dakota Access' investment in the entire pipeline against its under-assessed impacts at each Lake crossing site.  SMF ¶¶ 8-9; ¶¶ 79-80.  By allowing Dakota Access to consider benefits to private interests and then measure such private benefits against a self-interested and vastly understated potential for public harm, violates the Corps' statutory and regulatory duties and renders the Section 408 permit decision arbitrary, capricious, and unlawful.

Moreover, the Corps was obligated to engage in pre-decisional government-to-government consultation with the Cheyenne River Sioux Tribe on the impacts of DAPL to its treaty rights and

---

[2]  March 19, 2015 emails from Corps' employees questioning why the pipeline had to cross the Missouri River at all.

trust resources, yet it excluded the Tribe from the list of parties who received a scoping notice in March 2015 in violation of 33 C.F.R. § 1501.2(d)(2). Such consultation was required before the Corps issued a draft EA FONSI on December 8, 2015, a Section 408 permit and EA FONSI on July 25, 2016, and an easement under the MLA on February 8, 2017. Had the Corps met this obligation, it would have known from the outset that it failed to consider reasonable alternatives, that its decision did not properly analyze the risk of an oil spill, and that a full Environmental Impact Statement ("EIS") was required. Had the Corps complied with binding pre-decision consultation and disclosure requirements, instead of withholding key documents from the Tribe, and claiming that regulating the construction of the pipeline or oil spills was beyond the scope of the Corps' authority (**AR 0068779**), this case would likely not be before this Court.

After this suit against the Corps was initiated in late July 2016, the Corps belatedly heeded to the admonitions of the Environmental Protection Agency ("EPA"), the Department of Interior ("DOI"), and the Advisory Council on Historic Preservation ("ACHP"), who advised the Corps that an EIS was warranted prior to authorizing construction of DAPL under Lake Oahe. SMF at ¶ 19. On December 4, 2016, the Corps decided to withhold authorization of an MLA easement pending "additional analysis, more rigorous exploration and evaluation of reasonable siting alternatives, and greater public and tribal participation and comments as contemplated in the CEQ's National Environmental Policy Act (NEPA) implementing regulations." ECF No. 65-1 at 4, ¶ 12. The Corps also decided to prepare an EIS and to evaluate the impact of an oil spill on tribal treaty rights and trust resources. *Id.* The Corps formally initiated the EIS process January 18, 2017, by issuing a Scoping Notice of the EIS ("EIS Notice") and inviting the Tribe to consult. 82 Fed. Register 5543 (Jan. 18, 2017).

However, just six days later President Trump, without any tribal consultation, issued an Executive Memorandum that ordered the Corps to expedite its decision, rescind the EIS Notice, and to grant the easement to Dakota Access, "to the extent permitted by law." ECF No. 89-1. The Corps then utilized the Executive Memorandum to authorize the easement by *fait accompli*,[3] and granted the easement on February 8, 2017. The Corps' decisions to grant a Section 408 permit and MLA easement to Dakota Access were plainly arbitrary and capricious, and unlawful.

The Corps also breached its fiduciary trust duties to CRST and other signatory Tribes to the 1851 and 1868 Fort Laramie Treaties. *See,* Section IV, *infra;* SMF ¶¶ 138 – 165; ¶¶ 202-205. The Corps' utter failure as a fiduciary in this case ranks alongside the illegal taking of the Black Hills by the United States government in 1877. In 1877, however, the Army had been tasked, albeit unlawfully, with *taking* lands and waters from the Tribe by violent force. Today, by contrast, the Army and the Corps has an explicit trust responsibility to *protect* the Tribe's and its members' resources. And today, the Tribe has the right to bring an action in the courts of the United States for relief — a right they were utterly denied in 1877. The United States illegally took the Black Hills. Let today not be the day that it takes the last remaining waters and related rights as well.

### STATEMENT OF MATERIAL FACTS ABOUT WHICH THERE IS NO DISPUTE

Attached hereto is the Tribe's SMF filed pursuant to D.C. Cir. Rule LCvR7(h)(1). Sections I, II, and IV of the SMF relate to the Tribe's motion for Joinder in the Standing Rock Sioux Tribe's Motion for Summary Judgment. All Sections of the SMF are filed in relation to this Motion.

---

[3] The Corps' decisions to rescind the EIS Notice ignored more than 200,000 comments filed in response to the EIS Notice. *See,* Ex. 4, Wilson Decl. at ¶¶ 13 - 14.

## STANDARD OF REVIEW AND CANONS OF CONSTRUCTION

### A. STANDARD OF REVIEW

Challenges to agency compliance with the MLA, 33 U.S.C. § 408, 33 U.S.C. § 701-1(b) and National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et seq., are reviewed pursuant to the Administrative Procedure Act ("APA"). Under the APA, a reviewing court will set aside agency actions that it determines were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action is arbitrary and capricious where an agency has "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs'. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 42 (1983). A decision can be upheld only where the agency "considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Baltimore Gas & Elec. Co. v. Natural Res. Def Council,* 462 U.S. 87, 105 (1983). In NEPA cases, the courts asks "whether the Corps decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Ocean Advocates v. U.S. Army Corps of* Engineers, 402 F.3d 846, 858 (9th Cir. 2004) (internal citations omitted). The Court will not "'rubber stamp" administrative decisions inconsistent with a statutory mandate or "that frustrate the congressional policy underlying a statute." *Id.* "No deference is owed to an agency action that is based on an agency's purported expertise where the agency's explanation for its action lacks any coherence." *Fox v. Clinton*, 684 F.3d 67, 76 (D.C. Cir. 2012). An agency decision regarding application of statutory mandates is not entitled to *Chevron* style deference, but rather, "respect, only to the extent it has the 'power to persuade'" *Id.*

The decision granting an easement under the MLA after the agency had already determined an EIS was required, and then reversing that determination, is subject to heightened scrutiny under *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009), if the agency did not "provide reasoned explanation for its action…"; "show that there are good reasons for the new policy"; or "its new policy rests upon factual findings that contradict those which under lay its prior policy." *Id.* at 515. An agency may not rely upon *post hoc* rationalizations. *Id.*

Violations of the 1851 and 1868 Treaty and the Corps' fiduciary duties to protect treaty and trust resources are subject to "the most exacting fiduciary standards." *Cobell v. Babbitt*, 91 F. Supp.2d 1, 46 (D.D.C. 1999) (citing *Seminole Nation v. United States*, 316 U.S. 286, 296-97 (1942)); *Assiniboine & Sioux Tribes v. Oil & Gas Conservation*, 792 F.2d 782, 794 (9th Cir. 1986). "'Close scrutiny of administrative action is particularly appropriate when the interests at stake are not merely economic interests … but personal interests of life and health.'" *Id.* (citing *Wellford v. Ruckelshaus*, 439 F.2d 598,601 (D.C. Cir. 1971)).

## B. CANONS OF CONSTRUCTION

When construing statutes, treaties and executive orders affecting Tribes, "the courts in this Circuit recognize that the *Chevron* principle of deference to administrative interpretations is subjugated by the 'long-standing canon that 'statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit.'" *Albuquerque Indian Rights v. Lujan,* 930 F.2d 49, 58 (D.C. Cir. 1991)(quoting *Montana v. Blackfeet Tribe of Indians,* 471 U.S. 759, 766, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985)); *see also Muscogee (Creek) Nation v. Hodel,* 851 F.2d 1439, 1441 (D.C.Cir.1988). This canon of construction has "special strength" because of the "distinctive obligation of trust incumbent upon the Government …" *Indian Educators Fed'n Local 4524 of Am. Fed'n of Teachers, AFL-CIO v. Kempthorne,* 541 F. Supp. 2d 257, 264–65

(D.D.C. 2008) (citing *Seminole Nation v. United States,* 316 U.S. 286, 296 (1942)).   As the

Supreme Court has noted, where an agency "has traditionally expressed one position to Congress

and the Indian tribes, 'it is essential that the legitimate expectation of Indians not be extinguished

by what amounts to an *ad hoc* determination.'"   *Albuquerque Indian Rights,* 930 F.2d at 58

(quoting *Morton v. Ruiz*, 415 U.S. 199, 236 (1974)).

## ARGUMENT

### I.   JOINDER IN THE MOTION FOR PARTIAL SUMMARY JUDGMENT OF THE STANDING ROCK SIOUX TRIBE IS APPROPRIATE.

The Cheyenne River Sioux Tribe hereby joins the Standing Rock Sioux Tribe's Partial

Motion for Summary Judgment on the basis (I) that the Corps violated NEPA by failing to prepare

an EIS on the Lake Oahe Crossing (at pp. 17-31); (II) that the granting of the easement and other

Corps' authorizations were arbitrary, capricious, and contrary to law; (III) that the Oahe crossing

does not qualify for streamlined Nationwide permit status; and (IV) that this Court should vacate

the easement and permit decisions.  ECF No. 117-1.  In support, the Cheyenne River Sioux Tribe

references facts set forth in its Statement of Material Facts, Sections I, II, and IV.

### II. THE GRANTING OF A SECTION 408 PERMIT WAS ARBITRARY, CAPRICIOUS AND UNLAWFUL BECAUSE THE PERMIT WOULD IMPAIR EACH OF THE MISSOURI RIVER MAINSTEM SYSTEM PROJECT PURPOSES, TRIBAL TREATY RIGHTS AND TRUST RESOURCES AND THE PUBLIC INTEREST.

33 U.S.C. § 408 establishes the Corps' authority to alter a project the Corp operates by

granting a permit "for the alteration or permanent occupation or use of any of the aforementioned

public works when in the judgment of the Secretary such occupation or use will not be injurious

to the public interest and will not impair the usefulness of such work."  *United States v. Federal*

*Barge Lines, Inc.,* 573 F.2d 993, 997 (8th Cir. 1978).  The term "impair the usefulness of such

work" is not limited to actual damage to a dam or physical structure built by the Corps because,

although "physical damage might impair the usefulness of a dam, its usefulness can be impaired in other ways . . . ." *Id.* Consequently, the language of Section 408 "indicates that it covers such impairments in addition to physical damage." *Id.*

On July 25, 2016, the Corps of Engineers officially approved documents issuing a Section 408 permit to Dakota Access under 33 U.S.C. § 408. **AR0071180-0077124.** The basis for the permit is woefully insufficient. *See,* SMF at ¶¶ 23 - 25. The only documents referenced for the determination that the permit would not "impair" the public project are the EA FONSI issued on July 25, 2016, and the Memoranda of Decisions attached to the Section 408 Decision. **AR0071181.** Those documents give no rationale for why the Corps determined the project purposes of Lake Oahe will not be impaired. The Section 408 Permit Determination itself lists no rationale for that determination, but instead simply declares "the Corps' technical reviewers have reviewed and have determined the request not to be injurious to the public interest and not impair the usefulness of the work built by the United States." **AR0071181, ¶ 3.b.** The Memoranda of Decisions contain no information from the Oahe District Recreation and Natural Resources Branch or the Flood Risk and Flood Management Branches. SMF ¶ 25. The Water Quality Division Memorandum only states that they "have no comments at this time," and is dated November 4, 2015 *before* the Draft EA was even issued. *Id.*

These documents contain only conclusory statements that the project satisfies Section 408 requirements. Conclusory statements of an agency that provide no reason for the decision are by their very nature arbitrary and capricious. Although courts generally must not substitute their judgment for that of the agency, courts also "do not defer to the agency's conclusory or unsupported suppositions." *United Techs. Corp. v. U.S. Dep't of Defense*, 601 F.3d 557, 562 (D.D.C. 2010) (internal citations omitted); *see also, Winder v. HMA LLC v. Burwell*, _ F. Supp.

3d _, No. 14-2021, 2016 WL 4007070, * 6 (D.D.C. Jul. 25, 2016) (Boasberg, J.).  The D.C. Circuit applied this principle in *Defenders of Wildlife v. Babbitt*, when it held that the Fish and Wildlife Service's decision was arbitrary and capricious because the agency issued a "cursory" decision restating the statutory framework, and ignored evidence and analysis available about the statutory factors required.  958 F. Supp. 670, 683-85 (1997).  The Court held that such an irrationally based decision was unlawful, and vacated the Agency's decision.  *Id.* at 685.  In the present cases, the EA and the February Memorandum are comprised of conclusory and unsupported suppositions. SMF ¶ 25; ¶¶ 65 - 76.  The Corps' cursory, one paragraph reference to the language of 33 U.S.C. § 408 in the EA FONSI, **AR0071179,** and the February 3, 2017 Memorandum, lack any analysis. ECF No. 114-1 at 7, ¶ 2.d (relating to Section 408 permit) and ¶ 3.d at pp. 8-12 (relating to MLA Easement).

Unlike the Fish and Wildlife Service in *Defenders of Wildlife v. Babbitt*, the Corps here did not even employ its own experts.  Instead it relied exclusively upon on the applicant, Dakota Access, to render the self-serving and conclusory analyses on which the permitting was based. *See,* SMF ¶¶ 8 - 19.  The Corps ignored the preliminary expert reports offered by SRST, CRST and the Oglala Sioux Tribe during the truncated easement "comment" period before rendering its conclusory decision.  SMF ¶ 43; *see, e.g.* Wilson Decl. Ex. 4, Attachment A at Bates Nos. 0101-017; ECF No. 117-5; ECF No. 117-18; ECF No. 117-23.  At the same time, the Corps denied the tribes access to the reports that it relied upon for its "review."  SMF ¶ 184; ECF No. 65-1 at ¶ 14, p. 4.  The Tribe's experts, relying on information available, conclude that the analysis conducted by Dakota Access drastically understates  the actual oil spill risk, potential for harm, and overstates the ability to mitigate that harm.  SMF ¶¶ 43; 77.

A.   **The Corps' Section 408 Permit Decision did not Consider Potential impacts to all of the Authorized Purposes of the Missouri River Mainstem System, and Failed to Demonstrate that the DAPL Permit Would not Impair Those Purposes.**

1.   **Authorized Purposes of the Missouri Mainstem System Operated by the Corps under the Flood Control Act and the RHA**.

The Corps has authority to operate Missouri River Mainstem System in North and South Dakota pursuant to the Flood Control Act and the RHA for the purposes set forth in those statutes. 58 Stat. 887, Section 1(a) and (b); 59 Stat. 11, Section 1(b).  The Acts contain identical language regarding the authorized purposes of the Missouri River Mainstem System ("Mainstem System"). The exclusive purposes Congress granted the Corps authority to operate the Mainstem System for were all consumptive uses of water for:

a)  Flood Control, 58 Stat. 889, § 1 (including run-off and water-flow prevention and soil erosion prevention), 58 Stat. 889, § 2;
b)  Navigation, *Id.;*
c)  Domestic water supply, 58 Stat. 889, § 1(b);
d)  Municipal water supply, *Id.*;
e)  Stock water, *Id.*;
f)  Irrigation, *Id.*;
g)  Mining, *Id.*;
h)  Industrial purposes, *Id.*; (specifically hydroelectric power), 58 Stat. 890, § 5, § 6
i)  Public park and recreational facilities, 58 Stat. 889-890, § 4.

An important provision of the Flood Control Act of 1944 and the RHA is Section 1 (b) in both Acts.  33 U.S.C. § 701-1(b), 58 Stat. 889; 59 Stat. 10-11.   Section 1(b) preserves to users within states wholly or partly west of the ninety-eight meridian, which includes both North and South Dakota, priority in the System for their specified **beneficial consumptive uses both present and future.** It states,

> The use for navigation in connection with the operation and maintenance of such works herein authorized for construction, of waters arising in States lying wholly or partially west of the ninety-eighth meridian shall be only such use as does not conflict with any beneficial consumptive use, present or future, in States lying

11

wholly or partly west of the ninety-eighth meridian, of such waters for domestic, municipal, stock water, irrigation, mining, or industrial purposes."

*Id.* This language is clear on its face that the present and future beneficial consumptive uses of water for domestic, municipal, stock water, irrigation, mining or industrial purposes may not be subrogated to uses of the system by others east of the ninety-eight meridian, nor may it be subrogated to non-consumptive uses of the Mainstem System. Further, industrial and domestic consumptive uses of water are only authorized once there has been a determination there is surplus water available, and that such use "will not adversely affect ***then existing*** lawful uses of such water." 58 Stat. 890, § 6 (emphasis added). Hence, any adverse impact from the pipeline's construction or operation on lawful existing uses of the waters of the Missouri River in North and South Dakota is not an authorized use. Further, Congress requires the Corps to affirmatively determine that the use being contemplated **"will not affect then existing lawful uses**." *Id.*

**2.   The Missouri River Mainstem Master Manual Imposes Duties on the Corps to Protect Water Supply, Water Quality, and Tribal Treaty Rights and Trust Obligations.**

The Corps operates the Missouri River in accordance with the Missouri River Mainstem Reservoir System Master Water Control Manual ("Master Manual"), first adopted in 1979 and subsequently updated and amended periodically with the last amendment enacted in 2006. The Master Manual makes clear that the Corps lacks authority to approve an oil pipeline crossing of the Missouri River that could impair the beneficial consumptive uses of the river both present and future. The Master Manual specifies the authorized purposes for which the Corps operates the System. Specifically, Section IV, 4-02 states,

The six System dams are regulated as a hydrologically and electrically integrated system for the congressionally authorized purposes of flood control, navigation, hydropower, water supply, water quality, irrigation, recreation, and fish and wildlife….The Endangered Species Act of 1973 …states that the policy of Congress is for all federal departments and agencies to seek to conserve endangered

and threatened species and to utilize their authorities in furtherance of the purposes
of the Act. … The Missouri River Mainstem System Master Water Control Manual
presents the guidelines and operational objectives for regulating the System for the
congressionally authorized purposes, with recognition that other incidental benefits
are also achieved.

*Master Manual*, U.S. Army Corps of Engineers, Northwestern Division – Missouri River Basin

(March 2006), § 4-02.  The Current Water Control Plan in the Master Manual has four

objectives:

> First to serve the contemporary needs of the basin and the Nation; second, to serve
> the Congressionally authorized purposes; third to comply with other applicable
> statutory and regulatory requirements including environmental laws such as the
> Endangered Species Act (ESA); and fourth, **to fulfill the Corps' responsibilities
> to Federally recognized Tribes.**

*Id.* at § 7-01, p. VII-1 (Emphasis added).  One of the considerations throughout the Master Manual

is the availability of water for water intakes, as well as the **quality** of water available to provide

water supply.  For example, Section 7-03.7 sets forth considerations taken into account during

drought including water intake access on the upper three reservoirs including Lake Oahe, and

reservoir and river water quality.  *Id.* at VII-13.  In addition, Section 7-11.2 specifies that there are

more than 1,600 water intakes in the Missouri River including 302 intakes and intake facilities

serving American Indian Tribes.  *Id.* at VII-46.  Section 7-11.2 includes a commitment by the

Corps of Engineers to guarantee that "the supply of water in the Missouri River is adequate to meet

this project purpose."  *Id.  See also,* Section 7-11.1 at p. VII-45; Appendix C at C-1 (noting that

"the Corps is not the source of pollutants that enter the Missouri River; however, **it is responsible

for managing the hydrologic regimes that store or transport pollutants downstream**.")

(Emphasis Added).  Further, the Corps of Engineers expends funds on System Water Quality

Monitoring and Modeling to ensure its operation of the System does not negatively impact water

quality and engages in system regulation activities to ensure water quality is preserved.  *Id.* at § 6-

04.1.8, VI-17. *See also*, § 5-02, V-8 & § 7-09, VII-41, 42 (discussing historic system regulation to preserve water quality and challenges to water quality).

Currently the uses of the Missouri River for water supply are substantial and depend on consistent quality water supply.   The Corps recognizes this, stating, "[w]ater supply is a purpose that has grown more than originally envisioned.  The regulation of the system in such a predictable manner has resulted in a dependency from many river communities for using the Missouri River as a source for domestic as well as industrial water supply."  *Id.* at § E-01, E-1.  On Lake Oahe alone, there are 218 water intakes serving a population of 48,050 people.  *Id.* at § E-01.1.1.5, E5.  Of these, 14 water intakes serve the Standing Rock Sioux Reservation and 9 water intakes serve the Cheyenne River Reservation.  *Id.*  All told, 3 million people are served by water intakes on the Missouri River.  *Id.* at § E-02, E-7.

> The Corps of Engineers recognizes that Tribes along the Missouri River, "are entitled to water rights in streams running through and along their Reservations under the Winters Doctrine….These water rights are not forfeited by non-use."

*Id.* at § E-06 on p. E-10.  The Corps of Engineers further recognizes that,

> Native American reserved water rights are rights to divert water for a stream for beneficial use.  When a Tribe exercises its water rights, these consumptive uses will then be incorporated as an existing depletion.   …Further modifications to System operation, in accordance with pertinent legal requirements, will be considered as Tribal Water rights are exercised in accordance with applicable law.

*Id.*  The Master Manual does not provide any authorization to the Corps to permit the use of the Mainstem System for oil pipeline rights-of-way when they place any of the authorized purposes at risk.  Such a use was not contemplated in 1944 and such a use in present day is not a beneficial consumptive use.  For this reason, if DAPL impairs any of the project purposes as defined by

Congress and the Master Manual, the Section 408 permit cannot be issued.[4]   EC 1165-2-16(7)(c)(4)(b)(i).

The Court has held that the Master Manual is binding on the Corps.  *South Dakota v. Ubbelohde*, 330 F.3d 1014, 1027-1029 (8th Cir. 2003), *cert. denied North Dakota v. Ubbelohde*, 541 U.S. 987 (2004).  Consequently, the Corps has no authority to give priority to the interests of Dakota Access, or the oil industry, over the purposes for which the Corps was given authority to operate the System.  The Supreme Court has held that where Congress has determined an issue by statute, an agency has no authority to ignore the balance struck by Congress and that courts, as well as the agency, "must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984).  As the Supreme Court explained, "[b]oth their power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires."  *City of Arlington, Tex. v. F.C.C.*, 133 S. Ct. 1863, 1869 (2013).  In this case, the Corps did not properly consider the authorized purposes of the System in issuing permits to Dakota Access.

### 3. The Mitigated FONSI and EA do not Demonstrate that the DAPL Permit Would not Impair the Authorized Purposes of the Project or Tribal Treaty Rights and Trust Resources.

Quite simply, nothing in the EA FONSI, or the Section 408 Permit decision supports a determination that the granting of a Section 408 permit "will not impair" the specific purposes of the Mainstem System.  To the contrary, as the Standing Rock Sioux Tribe points out, the risks of

---

[4]  EC 1165-2-16(7)(c)(4)(b)(i) requires the Corps to "ensure that the proposed alteration will not limit the ability of the project to function as authorized and will not compromise or change any authorized project conditions, purposes, or outputs.  …If at any time it is concluded that the usefulness of the authorized project will be negatively impacted, any further evaluation under 33 U.S.C. § 408 should be terminated."

this oil pipeline running underneath Lake Oahe are not insignificant.  ECF No. 117-1 at Section II.A-E.  Further, the EA itself concludes, "landslides can represent a significant geologic hazard during construction and operation of the pipeline….", and that areas on the east and west sides of Lake Oahe on the HDD drill site have a high incidence of landslides.  SMF ¶ 59; **AR0071251-AR007252**.  The Corps conducted no analysis of what the actual risk is after mitigation, or the impacts of a landslide that damages the pipeline during operations and the EA does not determine what the impacts on project uses would be if there were an earthquake, or a landslide damaging the pipeline.  SMF ¶¶ 59 - 61.  The Tribes' independent experts have concluded the actual impact of an oil spill on project purposes would be catastrophic.  SMF ¶¶ 43; 77.  The risk is vastly underestimated for several reasons, including the fact that the EA does not address risks to Lake Oahe and downstream users from oil spills originating in the portions of the pipeline that are on Corps' lands outside the HDD drilled area, and portions running close to Lake Oahe but outside the Corps lands.  *Id.*

Perhaps most disturbingly, the EA states, "**drinking water could be at risk if there was a release that reached these bodies of water in the vicinity of the intake structures.**" **AR0071262** (emphasis added).  The EA states that in the event of a pipeline leak (a possibility that the Dakota Access drafted EA calls "unlikely," without explanation), "[a]lternative sources [of water] would be included as part of the contingency planning.  Shutting down certain intakes and utilizing others or different drinking water sources or bottled water will be evaluated as part of this process." **AR0071262–AR0071263**; SMF ¶ 64.  This is an admission that an oil spill would impair the project purpose of domestic water supply protected by the Flood Control Act and the Master Manual.  Most egregiously, the Corps itself already determined as of 2005, the Cheyenne River Sioux Tribe's Water intake is the only source of drinking water supply available to the 14,000

residents of the Reservation, and loss of that intake's use would be catastrophic.  SMF ¶ 46; *See also*, SMF *¶¶* 41 - 58*;* ECF No. 99-7 at 9-13.   Because the Corps built the Mni Waste' Water Intake for the Tribe in 2005-2007, the Corps knew that the Tribe has no alternative drinking water supplies available.   Yet the EA FONSI makes no mention of these impacts, *and does not mention the Cheyenne River Sioux Tribe at all*, despite the numerous efforts of the Tribe to alert the Corps of its concerns including its water intake.  SMF ¶ 165; **AR 71220 – 84368; AR071774.**  Further, the EA determined that, "**Accidental releases from the pipeline system during operations could potentially affect groundwater**."  **AR0071269** (Emphasis Added).   While the EA goes on to discuss all the mitigating conditions placed on the pipeline, this does not eliminate the conclusion that groundwater is at risk.

The  EA  does  not  even  discuss  risks  of  an  oil  spill  to  vegetation  or  to  recreation. **AR0071274-0071293.**  The EA concludes that "Increased levels of sedimentation and turbidity from an inadvertent release **could adversely affect fish eggs, juvenile fish survival, benthic community diversity and health, and spawning habitat**."  **AR0071293** (Emphasis added). Without more than two sentences of discussion, the EA concludes that Facility Response Plans "minimize" this risk.  *Id.*  The Tribe's expert disagrees, and the Tribe filed a copy of its report on the potentially catastrophic effects on wildlife with the Corps on January 19, 2017.  SMF ¶ 70. The EA assessment of water quality impacts states that, "[b]ecause Lake Oahe already meets state water quality standards, the Proposed and Connected Action Areas are not anticipated to result in impacts that would cause an impairment of water quality or the designated use of Lake Oahe." **AR0071298.**  The EA fails to conduct any analysis of the impact of an oil spill on water quality. The Tribe's own expert report concludes that the impact on water quality from a spill would be catastrophic.  SMF ¶ 72.

The EA makes no mention of, and the Section 408 Permit offers no analysis of, the impact of the permit on six of the purposes listed in the Flood Control Act, including stock water, irrigation, navigation, industrial (including hydropower), or flood control.  Any impacts to water intakes impact stock water and irrigation because those are supplied through water intakes. Navigation could be impacted by a spill because it could require shutting down the Oahe Dam, reducing flows for navigation downstream and increasing flooding.  Recreation impacts would result from impacts on fish species that the EA determined would happen in a spill scenario, and certainly from oil discharging from any pipeline break outside of Corps' jurisdiction that flows downhill into Lake Oahe.

The EA FONSI itself includes findings that document a risk of oil spill that would impact the beneficial consumptive uses that are project purposes; for other authorized uses, the EA does not even try to analyze the impacts of an oil spill.  Other courts have held that an EIS must be completed when there is an increased risk of an oil spill.  *Ocean Advocates*, 402 F.3d at 868.  As the Ninth Circuit stated, "[b]ecause a "reasonably close relationship" exists between the Corps' issuance of the permit, the environmental effect of increased vessel traffic, and the attendant increased risk of oil spills, the Corps had a duty to explore this relationship further in an EIS."  *Id., citing Dep't. of Transp. v. Public Citizen*, 541 U.S. 752, 124 S. Ct. 2204, 2215 (June 7, 2004)). Just as in *Ocean Advocates*, wherein the court determined the Corps is not entitled to rely on the "self-serving claims" of BP, here the Corps cannot rely on the self-serving claims of Dakota Access that the risk of an oil spill is low, and is mitigated by its construction techniques and its response plans.  *Id.* at 866.  Just as in *Ocean Advocates*, here, "the record evidence raises a substantial question" as to whether the pipeline will result in an impact on the project purposes.  *Id.* at 867. Where the environmental effects of a proposed action are highly uncertain or involve unique or

unknown risks, an agency must prepare an EIS. *Id.* at 870. Finally, this Section 408 permit record, like the record in *Ocean Advocates¸* "was based entirely on [Dakota Access's] assertions, and the record reflects no convincing reason for the Corps' decision." *Id.* at 871.

### 4. The 408 Permit was issued without consideration of the Tribe's Treaty Rights.

Despite the mandate in the Master Manual that one of the four purposes of the Manual was to "meet the Corps responsibilities to Tribes," and the Master Manual's recognition that tribes on Lake Oahe have reserved water rights, *see,* Section IV.A., *infra; Master Manual,* § E-06 & § 7-01, p. VII-1, the Section 408 Permit decision did not include any analysis of the impact on tribal treaty rights and trust resources. The EA and FONSI, without any analysis of these purposes, specifically respond to a comment on treaty rights, in Appendix J, by stating, "treaty rights is beyond the scope of the EA." **AR071774** at Comment 15(2)-8. For the reasons set forth in Standing Rock Sioux Tribe's Motion for Partial Summary Judgment, Section I.C., ECF No. 117-1 at 33-40, and Section IV, *infra*, the Cheyenne River Sioux Tribe has Treaty rights that the Corps was required to consider before determining whether the Section 408 permit was injurious to the public interest, or impaired a project purpose. *See also*, SMF ¶ 141 - ¶ 163. The Department of Interior issued a Solicitor's Opinion on December 4, 2016 that clearly delineates the Tribe's treaty rights in Lake Oahe,[5] ECF No. 117-6.

Even worse, the Corps completely ignored the existence of the Cheyenne River Sioux Tribe's treaty rights, despite the fact that the Corps has the Tribe's December 2015 resolution

---

[5] The Acting Secretary of Interior issued a temporary suspension of the Solicitor's opinion on February 6, 2017 citing in part President Trump's Executive Memorandum of January 27, 2017 to the Secretary of Army regarding the Dakota Access Pipeline. This political decision to erase this analysis from the books, does not diminish its sound basis in law. The withdrawal of the Opinion, without reasoned explanation, underscores the results-oriented mindset that has permeated the government's decision-making related to this project.

demanding a full EIS on the basis of these rights.   SMF ¶ 102; **AR 0066801 – 806**.   The Corps also failed to mention that the Tribe has no other source of water and would be devastated by a loss of use of Missouri River waters — a fact the Corps itself determined in 2005.   ECF No. 99-7 at 24-27; Section II.B.3., *infra*.   SMF ¶¶ 46 - 58.   The Corps' was notified of the Tribes concerns and request to consult, yet the EA does not even mention the existence of the Cheyenne River Sioux Tribe even once.   **AR0071220 - AR0071382.**   Despite the numerous letters sent by the Tribe listing its concerns and requesting to consult on trust resources and water supply, SMF ¶ 102, the EA does not even list the Tribe as a party that commented on the EA.   SMF ¶ 104; **AR 0071335.** This massive failure by the Corps alone demonstrates that the Section 408 permit is arbitrary, capricious and unlawful.

>   **B.      The Section 408 Permit Impermissibly Relied upon Benefits to the Pipeline Owner and Oil Industry that the Corps Is Prohibited From Considering under Law and Regulation.**

In deciding that the Project was not injurious to the public interest, the Corps violated the requirements of applicable statutes and regulations governing what is defined as "in the public interest."   The Corps' Section 408 Record of Decision contains no analysis independent of the EA and FONSI.   **AR0071179.**   In the FONSI, the Corps relied on Dakota Access' written EA's woefully inadequate conclusion that, while high impact, the risk of oil spill was low, and the social and economic impacts of DAPL were positive.   **AR0071178.**   The Social and Economic analysis proffered by Dakota Access in the EA discusses the amount of money invested by Dakota Access and jobs created by the oil industry — all of which are asserted and not supported by any analysis. **AR0071329-0071330.**   It gives no analysis of the negative impact of the pipeline on downstream Tribes in the event of an oil spill.   *Id.*   The benefits to Dakota Access, the oil industry, and the

economy generally are not an allowable basis for assessing public interest under 33 U.S.C. § 408. SMF ¶¶ 77 - 81.

The Flood Control Act of 1944 defines the public interest in the Missouri River Mainstem System.  Congress determined that the public interest requires that the Corps only permit "such use as does not conflict with any beneficial consumptive use, present or future, in States lying wholly or partly west of the ninety-eighth meridian, of such waters for domestic, municipal, stock water, irrigation, mining or industrial uses."  33 U.S.C. § 701-1(b).  The Corps violated its own regulations when it relied upon an Economic and Social Analysis of DAPL that considered factors outside the congressionally mandated purposes.  EC 1165-2-216 (4) (ii) specifies, "Factors that may be relevant depend on the type of [Corps] project being altered…"  The Corps' own regulations prevent the Corps from approving any alteration that would, "have an effect of de-authorizing a project or eliminating an authorized project purpose."  EC-1165-2-216 (4)(k). Further, Corps' regulations require that "[i]f at any time it is concluded that the usefulness of the authorized project will be **negatively impacted**, any further evaluation under 33 U.S.C. § 408 should be terminated."  Finally, Corps regulations prohibit the Corps from accepting any funds from oil pipeline developers because the development of an oil pipeline is not a public purpose. EC 1165-2-216, Appendix G, § G-4(c); §G-4(f); **AR0012846 - 0012915**.

The Corps' decision was also arbitrary because it failed to recognize that Congress has already determined that providing drinking water to tribal communities serves as a governmental purpose and priority of the United States, and the Corps did not evaluate the extent of risk to tribal water supplies when it issued its decision.  25 U.S.C. § 1632 (noting it is "the policy of the United States that all Indian communities . . . be provided with safe and adequate water supply").

III. **THE GRANTING OF THE SECTION 408 PERMIT AND THE MINERAL LEASING ACT (MLA) EASEMENT WAS DONE WITHOUT ANY CONSULTATION ON THE IMPACTS OF THOSE ACTIONS ON THE CHEYENNE RIVER SIOUX TRIBE'S TREATY RIGHTS AND TRUST RESOURCES IN VIOLATION OF APPLICABLE LAW AND POLICY.**

A. **The Corps has a Duty to Pre-decisionally Consult with Tribal Governments on Actions That May Have the Potential to Significantly Affect Tribal Resources**.

The Corps tribal consultation obligations are set forth in Department of Defense Instruction 4710.02, which require the Corps to

> involve tribal governments **early** in the planning process for proposed actions… Early involvement means that a tribal government is given an opportunity to comment on a proposed action in time for the tribal government to provide meaningful comments that may affect the decision.

*Dep't of Def.* Instruction 4710.02, § 6.6. The administrative record for decision must "show that the Department of Defense has given careful consideration to all the available evidence and points of view before making a final decision." *Id.* at Enclosure 2, § E2.9. Finally, Department of Defense  Instruction 4710.02 requires consultation to be conducted in accordance with references (c) through (h) which includes the October 20, 1998 Secretary of Defense Policy on "Department of Defense American Indian and Alaska Native Policy." *Dep't of Def.* Instruction 4710.*02*, § 6.2.

The Corps is required to consult with Tribal governments on a government-to-government basis when its actions "may have the potential to significantly affect protected tribal resources, tribal rights, or Indian lands …" *Dep't of Def. Instruction 4710.02.* Department of Defense Instruction 4710.02, § 6.3 specifically provides that this duty extends to any action that has potential to significantly affect tribes and lists examples including land use decisions. Congress recently affirmed the Corps' obligation to consult with Tribal governments in the Water Resources Development Act of 2016, which ordered a review of all Corps tribal consultations, and mandated that "**all existing tribal consultation policies, regulations, and guidance continue to be**

22

**implemented**" *Water Infrastructure Improvements for the Nation Act*, Pub. L. 114-322, § 1120(c) (1), 130 Stat 1628 (December 16, 2016) (emphasis added).   The duty to consult with tribal governments is also enshrined in NEPA and its implementing regulations.   40 C.F.R. § 1501.2(d)(2) requires agencies to plan for situations where actions are planned by private applicants to ensure "the Federal agency **consults early** with appropriate State and local agencies and **Indian tribes** and with interested private persons and organizations when its own involvement is reasonably foreseeable."

Finally, the Corps is bound to consult with Tribes in its role as a fiduciary with responsibility for protection of tribal treaty and trust resources resulting from its management of the Missouri River and its pervasive control over Lake Oahe as set forth in Section IV, *infra.*  The Federal Courts have held that the duty to consult is not discretionary when it involves tribal trust or treaty rights and resources.  *Ctr. for Biological Diversity v. Salazar*, No. 10-2130, 2011 WL 6000497, at *11 (D. Ariz. Nov. 30, 2011); *Klamath Tribes v. United States,* No. 96-381, 1996 WL 924509 (D. Or. Oct.2, 1996); *Confederated Tribes and Bands of the Yakama Nation v. U.S. Department of Agriculture,* No. 10-3050, 2010 WL 3434091 (E.D. Wash. Aug.30, 2010).

The duty to consult is binding on an agency when the agency has an announced its consultation policy and the Tribes have come to rely on that policy.  *Yankton Sioux Tribe v. Kempthorne*, 442 F.Supp.2d 774, 784 (D.S.D.2006)*; see also, Oglala Sioux Tribe v. Andrus,* 603 F.2d 707 (8th Cir.1979); *Lower Brule Sioux Tribe v. Deer,* 911 F.Supp. 395 (D.S.D.1995); *Albuquerque Indian Rights,* 930 F.2d at 58; *Indian Educators Fed'n*, 541 F. Supp.2d at 264–65. At a minimum, this requires that the agency give fair notice of its intentions, which requires, "telling the truth and keeping promises." *Yankton Sioux Tribe*, 442 F.Supp.2d at 784, *citing Lower Brule Sioux Tribe,* 911 F. Supp. at 399.  An agency's failure to provide tribes with accurate

information necessary to meaningfully consult *before* a decision is made, is grounds for finding the agency failed to meet its consultation obligation. *Id.* at 785. *See also*, *Cheyenne River Sioux Tribe v. Jewell*, No. 3:15-03072, 2016 WL 4625672 (D.S.D. Sept. 6, 2016) ( holding agency failed to consult where it failed to provide information necessary for the Tribe to assess the impact of the federal action).

**B.     The Corps Did Not Consult with the Tribe Prior to Issuance of the Draft EA FONSI, the Section 408 Permit, or the MLA Easement.**

The facts on consultation demonstrate that the Corps did not meet this obligation to consult on impacts to trust and treaty resources with the Cheyenne River Sioux Tribe at any point in time, let alone prior to making a decision on the Mitigated FONSI, the Section 408 permit, or the MLA easement.

**1.   The Corps Made a Decision on the Draft EA FONSI and Section 408 Permit Prior to Tribal Consultation.**

The Corps claims that it "consulted" with tribes, and that any failure to consult on trust and treaty resources lies with tribes for not engaging adequately with the Corps. *See*, *e.g.*, ECF No. 21-17.  However, the record makes clear that Corps' decision making on the Section 408 permit was completed long before the  July 25, 2016 EA FONSI was issued.  The Corps issued an EA FONSI decision on July 25, 2016.  **AR0071174-0071179.**  The Corps officially issued a Section 408 permit decision on July 25, 2016.  **AR0071180**.  However, the actual decision to issue the permit and the review of the permit decision was completed by every Corps official other than Colonel Henderson much earlier than July 25, 2016.  *See,* SMF ¶ 26; **AR0071180-0071214**.  The Corps Engineering Division signed off on the 408 permit by Memorandum of Record on December 10, 2015.  **AR0071201-02.**  The Water Control and Water Quality Branch offered no comments to the draft EA, and no rationale when it issued its Memorandum of Decision on November 4,

2015 — before the EA was even finalized.  **AR0071205.**  There is no Record of Decision for the

Recreation and Natural Resource Branch on the Lake Oahe Crossing.  **AR0071195-96.**  The

easement under the MLA was issued on February 8, 2017 relying solely on the EA FONSI and the

Memorandum of Decision issued on October 20, 2016 and February 3, 2017.  *See*, SMF ¶ 172;

ECF No. 95-2.

> **2.  The Corps Breached its Duty to Consult on Impacts to Trust Resources and Treaty Rights on the Section 408 Permit Because It Did Not Even Issue a Notice of Consultation on the Section 408 permit or the EA.**

The Corps violated the requirements to consult early in the decision-making process and

to ensure its decision has "given careful consideration to all the available evidence and points of

view before making a final decision" *DoD Instruction 4710.02*, Enclosure 2, § E2.9; Ducheneaux

Decl. Ex. 2, Attachment B; *DoD Instruction 4710.02*, § 6.6.  The Corps started discussing DAPL

with Energy Transfer Partners on September 23, 2014.  **AR0000799.**  The Corps did not invite any

tribal consultation on the EA or the Section 408 permit impacts on trust and treaty resources

officially until the issuance of a letter from Jo-Ellen Darcy to the Cheyenne River Sioux Tribe on

November 14, 2016 — after the Corps had issued its 408 permit, and after the EA FONSI was

issued on July 25, 2016.  SMF ¶¶ 99 – 103, ¶¶ 108; **AR0071179**; Frazier Decl., Ex. 3 at ¶ 16,

Attachment A.

The Corps sent Dakota Access a list of required NEPA consulting parties on March 30,

2015 in compliance with NEPA requirements set forth at 40 C.F.R. § 1501.2(d)(2).  **AR071774.**

Abdicating its responsibilities, the Corps allowed Dakota Access to directly send letters to

consulting parties and to require them to submit their Draft EA comments to Dakota Access and

not the Corps, but Dakota Access never sent any letters to the Tribe or other tribes.  **AR0075281-**

**0075283**.  On December 4, 2015, the Corps issued a generic letter "seeking Tribal and public

**comments** on the draft environmental assessment." **AR0067166** (Emphasis added)**.** At this point, the Corps had already issued the Draft EA which was exclusively drafted directly by Dakota Access and submitted to the Corps in September 2015.  **AR074119**.

Despite the Corps' utter failure to include the Tribe, or any other tribe, as a party receiving a scoping notice under NEPA, and failure to ever engage the Tribe in consultation on its trust and treaty resources, the Tribe continued to pursue the Corps to consult on its treaty rights and natural resources as it had done since March of 2015, and which it continued to do through June of 2016. *See,* SMF ¶¶ 105, 116 - 130; **AR 070574**; **AR 0070576; AR 0066801 – 0066806** (Tribal Resolution No. 324-2015-CR requesting USACE compliance with NEPA by conducting an EIS and initiating full consultation on more than Section 106); **AR 0068777-0068783 (**Documenting the CRST request to consult at Tribal Council Chambers on pipeline impacts on the Tribal resources in a February 18, 2016 NHPA § 106 public meeting).

Tellingly, the Corps itself made public statements acknowledging it had only requested an NHPA Section 106 consultation and not a tribal consultation on the EA.  *"Dakota Access Pipeline Final EA and FONSI released for ND Section 408 crossings"* (July 2, 2016), http://www.nwo.usace.army.mil/Media/News-Releases/Article   /878649/dakota-access-pipeline-final-ea-and-fonsi-released-for-nd-section-408-crossings/ (noting Corps consulted with Tribes under Section 106 only); s*ee also,* **AR0067589 - 0067590** (June 28, 2016 Letter from Colonel Henderson to Department of Interior acknowledging Corps only sought "comments" prior to issuance of the EA.).  Further, the Final EA itself included comment that consideration of treaty rights was "beyond the scope of the EA." **AR071774 at Comment 15(2)-8.**

Numerous federal agencies including EPA, Department of Interior and the ACHP continued to raise concerns that the Corps had failed to consult with tribes on trust and treaty

resources in the Section 408 EA process.   *See,* SMF at ¶ 19; **AR0068891; AR0072159**; **AR0073187 – 0073190; AR0074021 – AR0074024; AR0082926.** These concerns triggered a belated invitation by Jo-Ellen Darcy to consult on November 14, 2016.  SMF ¶ 108; Ex. 3**,** Frazier Decl. ¶ 16, Attachment A.  The Tribe continued to pursue consultation with the Corps through emails and letters.  SMF at ¶¶ 112 - 127.  Finally, the Tribe was informed it would have the ability to consult in the EIS Process noticed in the Federal Register on January 18, 2017.  82 Fed. Reg. 5543 (Jan. 18, 2017).  The Tribe diligently filed both Scoping comments including preliminary expert comments on the risks, impacts and alternatives, and its request to be a Cooperating Agency to promote effective consultation.  Wilson Decl. Ex. 4 ¶ 2, Attachment A.  Ultimately, the Corps never consulted.  Instead, it cancelled meetings the Tribe tried to schedule, and did not respond to written requests to consult filed by the Tribe.  SMF ¶¶ 122 - 129.  The tortured history of the Tribe's efforts to chase down the Corps to consult demonstrate the lengths to which the Tribe went to seek consultation.  SMF ¶¶ 116 - 129.

The failure to include the Tribe in the list of parties to receive scoping notice on March 15, 2015 violated the NEPA requirement to include Tribal governments in scoping on NEPA actions. 40 C.F.R. § 1501.2(d)(2).  The failure to issue any consultation Notice on the EA before it's issuance on December 8, 2015 also violates the duty to consult early in the process.  This case mirrors the fact situation set forth in *Quechan Tribe of Fort Yuma Indian Reservation v. United States Department of Interior,*  where the Court found a mountain of paper submitted by the agency did not demonstrate a meaningful opportunity to consult, because the agency failed to send an official notice inviting consultation prior to making a decision, failed to provide enough information to meaningfully consult, and delayed in its responses to requests for meetings.  755 F.Supp.2d 1101, 1119 (S.D. Ca. 2010).  *See also*, *Wyoming v. United States Dep't of the Interior,*

136 F. Supp. 3d 1317, 1345–46 (D. Wyo. 2015), *vacated and remanded sub nom. Wyoming v. Sierra Club*, No. 15-8126, 2016 WL 3853806 (10th Cir. July 13, 2016) (holding BLM issuance of draft regulations before consulting was a violation of the duty to pre-decisionally consult, particularly where final regulation made no changes to address tribal concerns).

### 3. The Corps Breached Its Duty to Provide Information Necessary for Meaningful Consultation to Occur, and Its Duty to Consult Prior to Making a Decision.

Any effort by the Corps to "consult" is fatally deficient because of the Corps' actions to hide key information from the Tribe necessary for the Tribe to assess risks of the DAPL for itself or to provide information responding to the EA's assertion that oil spill risk was low and was mitigated by the Facility Response Plan. The Tribe had no access to the Scoping Comments in Appendix J to the EA or the environmental justice considerations memorandum until December 2016, and still has no access to the Spill Analysis or the Facility Response Plan, although tribal experts finally received access under confidentiality agreements in February 2017. The Tribe asked for the facility response plan in December 2015, but the Corps permitted Joey Mahmoud, Energy Transfer Partners employee to tell the Tribes present that he "would not share his response plan." **AR 0066390**. On March 30, 2015, the Tribe's THPO, Mr. Vance, asked for a copy of the EA documents when the Corps contacted him about NHPA § 106 consultation. **AR0070574.** The Corps never provided the documents requested. In response to a Corps' NHPA § 106 consultation on soil borings request letter, the Tribal THPO again raised concerns about impacts to water and trust resources on August 17, 2015. **AR0066996.** The Corps waited until November 17, 2015 to respond to the consultation request, and informed the Tribe that

> The DRAFT DAPL Environmental Assessment (EA) is also ongoing. A first copy of the draft EA will be distributed for Tribal, Federal and State Agency and public comments in mid-December 2015. It is our hope the draft EA will assist you with the Section 106 Review and address any other concerns as well. The Corps contact

for the DAPL EA is environmental Resource Specialist, John Shelman…We will try to contact you in person to ensure you are aware of the mailing and comment due dates for this draft.

**AR066830-0066831.**  When the Corps had not yet set up consultation in trust resources with the Tribe by February 17, 2016, after the Draft EA had already been issued, the Tribal THPO Mr. Vance attended a Corps NHPA § 106 meeting on February 17-18, 2016, and demanded a formal consultation on its trust and treaty resources and provided the Tribe's Resolution No. 324-2015-CR, which the Corps received.  **AR0066801-0066806.**  In response to concerns raised about oil spill risks, the Corps informed the Tribe that regulating the construction of the pipeline or oil spills was beyond the scope of the Corps' authority.  **AR 0068779.**  The Corps' view that it had no duty to assess construction or oil spill risk was also repeated in response to the ACHP inquiry into the project and in public fact sheets.  ECF No. 19-3 at 16; **AR00642; AR0068358**.

The Corps' position — that it has no authority or responsibility to regulate pipelines — was contradicted by every other federal agency that commented on the matter.  *See,* SMF at ¶ 20-19.  This false response to tribal concerns, the refusal to disclose key risk documents, and the withholding of the EA Appendix J index of comments which included no comments from the Tribe even though the Corps received comments from the Tribe, shows the length to which the Corps went to exclude the Tribe from its analysis, and to hide information on the Corps' obligations to assess environmental risks.  **AR071720-071776.**  "An agency must comply with its own internal policies even if those are more rigorous than procedures required by [statute]."  *Oglala Sioux Tribe of Indians*, 603 F.2d at 713.  Hiding information necessary for informed decision making in this process is precisely the type of agency action that courts have found to be arbitrary and grounds for requiring an agency to go back to the drawing board and consult.  *Yankton Sioux Tribe*, 442 F.Supp.2d at 776; *Pueblo of Sandia v. United States*, 50 F.3d 856, 864-64 (10th Cir. 1995) (holding

failure to provide Tribe with key information prior to making a decision is a violation of the obligation to consult in good faith); *Quechan Tribe*, 755 F.Supp.2d at 1119 (Tribe must be provided with adequate time and information **before** project approval). The Corps' repeated refusal to disclose the Oil Spill Analysis, Facility Response Plan, and Environmental Justice Memorandum ensured the Tribe could not participate **meaningfully** in any consultation even if the Corps had actually consulted the Tribe, or included its concerns in the Final EA.

### C. Consultation under the National Historic Preservation Act ("NHPA") § 106 Does Not Meet the Obligation to Consult on Impacts to Treaty and Trust Resources.

The NHPA's scope is limited to the protection of tribal cultural and religious sites and resources. Thus, any consultation or public meeting on NHPA § 106 requirements does not constitute consultation on the impact of DAPL on trust and treaty resources under NEPA, Section 408 and the MLA. The Corps' attempt to bootstrap public meetings it held on NHPA § 106, at which the Tribe was present, into the required government-to-government consultation on tribal treaty rights and trust resources has no basis in law and is arbitrary and capricious. *See*, SMF ¶¶ 128-136. In fact, the Corps never even issued a letter to the Tribe inviting consultation on Section 408 permitting, or the MLA easement. Corps' employees knew the Corps had not even begun government-to-government consultation on their trust responsibilities as late as November 6, 2015. **AR 0069197** (Corps internal email concluding, "We should not wait for another agency determination to begin G2G. We have responsibilities and should act.").

### IV. THE GRANTING OF THE SECTION 408 PERMIT AND THE MLA EASEMENT VIOLATED THE TREATY RIGHTS OF THE CHEYENNE RIVER SIOUX TRIBE AND THE CORPS' FIDUCIARY TRUST RESPONSIBLITIES.

The Cheyenne River Sioux Tribe's and other tribes' reserved water rights and hunting and fishing rights in the Missouri River and on their reservation lands is beyond dispute. The Corps

itself acknowledged that the Tribe has those treaty rights, ECF No. 114-1 at 31, and Congress preserved those rights, in addition to the rights to graze, mineral rights in the riverbed of the Missouri River, and the rights to timber and other resources in the Oahe Taking Act. *The Act of September 3, 1954*, Pub. L. 83-776, 68 Stat. 1191-1193.; *See also,* SMFs, ¶¶ 160- 163; *Winters v. United States*, 207 U.S. 564 (1908) (holding tribal reserved water rights include the quantity of water necessary to meet the purposes for the establishment of the reservation); *Cappaert v. United States*, 426 U.S. 128, 141 (1976); *South Dakota v. Bourland*, 508 U.S. 679, 697 (1993) (noting that Congress explicitly has reserved the Cheyenne River Sioux Tribe's original treaty rights, including the right to hunt and fish on Lake Oahe); *United States v. Dion*, 476 U.S. 734, 738 (1986). It is well established that "Indian reserved water rights are vested property rights for which the United States . . . [holds] legal title . . . in trust for the benefit of the Indians." *Criteria and Procedures for the Participation of the Federal Government in Negotiations for the Settlement of Indian Water Rights Claims*, 55 Fed. Reg. 9,223 (Mar. 12, 1990). These rights are created contemporaneous with the establishment of the reservation and they are presently perfected, vested rights, whether the Indians put the water to use or not. *See Winters*, 204 U.S. at 577; *Arizona v. California*, 373 U.S. 546, 600 (1963).

From these treaty rights flows the Corps trust responsibility that it has acknowledged in these proceedings. ECF Nos. 22 - 42 at 4 (Colonel Henderson letter to ACHP acknowledging Corps has a trust responsibility); *DoD Instruction 4710.02,* § 5.3.4; **AR 0000759** (requiring the Corps to engage in tribal consultation to "ensure activities that require DA authorization do not impair treaty rights"); ECF No. 114-1 at 33 (Corps' October 20, 2016 determination that 1868 Fort Laramie Treaty does create reserved water rights, and a trust responsibility).

### A.      The Corps has a Fiduciary Trust Obligation to the Tribe.

That the Corps has a fiduciary trust obligation to protect the treaty rights of the Tribe has already been adjudicated by the federal courts. *Northwest Sea Farms, Inc. v. U.S. Army Corps of Engineers*, 931 F. Supp. 1515, 1520 (W.D. Wa. 1996); *Muckleshoot Indian Tribe v. Hall*, 698 F. Supp. 1504, 1523 (W.D. Wa. 1988); *see also*, SMF ¶¶ 138 - 140.   Further, the Corps has bound itself to protect the Treaty rights of tribes, including reserved water rights, in the Master Manual, stating that one of the four purposes of the Master Manual is to "fulfill the Corps' responsibilities to Federally recognized Tribes." *Master Manual* § 7-01, **Ex. 2**, Attachment A at VII-1.  The Master Manual holds that Tribes along the Missouri River, "are entitled to water rights in streams running through and along their Reservations under the Winters Doctrine ….   These water rights are not forfeited by non-use." *Master Manual,* § E-06, **Ex. 2**, Attachment A.

The trust responsibility of the Corps is a fiduciary duty not just because the Master Manual is binding on the Corps, but also because the Corps maintains pervasive, and exclusive control over the Missouri River itself, and the entire project area.  The United States Supreme Court has held that the Corps' control over Lake Oahe is pervasive and exclusive of any other federal agency. *ETSI Pipeline Project v. Missouri*, 484 U.S. 495, 505 (1988).   "[A] fiduciary relationship necessarily arises when the Government assumes such elaborate control over . . . property belonging to Indians." *United States v. Mitchell*, 463 U.S. 206, 225 (1983).  The Court in *Navajo Nation v. United States*,  explained that a fiduciary responsibility to protect tribal treaty properties

> can be inferred from the nature of the transaction or activity.  In particular, where the Federal government takes on or has control and supervision over tribal monies or properties, the fiduciary relationship normally exists with respect to such monies or properties (unless Congress has provided otherwise) even though nothing is said expressly in in the authorizing or underlying statute…

224 Ct.Cl. 171, 183 (1980); *see also Cobell v. Babbitt*, 91 F. Supp. 2d 1, 24 (D. D.C. 1999).  The

Corps' duty to the Tribe to protect the trust property from upstream contamination by third-parties is a trust to be judged by the most exacting fiduciary standards. *United States v. Jicarilla Apache Nation*, 465 U.S. 162, 207 (2011); *United States v. Gila River Irrigation Dist.*, 920 F. Supp. 1444, 1448 (D. Ariz. 1996). Further, 25 U.S.C. § 1632 establishes that the United States has a duty to conserve Indian lands, waters, and natural resources, and appropriately manage tribal natural resources, and that it is "the policy of the United States[] that all Indian communities . . . be provided with safe and adequate water supply. . . ." 25 U.S.C. § 1632.

The courts have already held that "the Corps owes a fiduciary duty" to ensure that "treaty rights are not abrogated or impinged upon absent an Act of Congress." *Northwest Sea Farms, Inc.,* 931 F. Supp. at 1520. The Corps' incorrectly concludes in this case that because its EA found no significant impact on the human environment, it did not impact treaty rights. ECF No. 114-1 at 33. This conclusion is fundamentally flawed for several reasons. First, the EA did find there was a risk of a large impact on water quality to downstream users, which would include all Tribes downstream, but dismissed that risk based on self-serving, inadequate, and secret documents drafted by Dakota Access. *Id.* Second, the Corps misapprehends its obligations under its fiduciary duty. As the court found in *Northwest Sea Farms,* a Corps' EA FONSI does not automatically result in a finding of no impact to treaty rights. 931 F. Supp. at 1523.

The required level of conduct of a fiduciary is higher than a mere reasonableness determination. To meet its fiduciary obligations, the Corps must act in accordance with the same standards as a private fiduciary. *Assiniboine & Sioux Tribes of Fort Peck Indian Reservation v. Bd. of Oil & Gas Conservation of State of Montana*, 792 F.2d 782, 794–95 (9th Cir. 1986); *American Indians Residing on Maricopa–AK Chin Reservation v. United States*, 667 F.2d 980, 990, 229 Ct.Cl. 167 (1981), *cert. denied,* 456 U.S. 989, 102 S.Ct. 2269 (1982). The Corps'

decision to delegate to Dakota Access all of the power to draft the EA and the Biological Opinion, to draft all comments to respond to comments made to the EA, and the right to withhold key scientific analyses from the beneficiary of the trust including the Spill Response Plan and the Facility Response Plan, and to not have any independent scientific review of those key decision documents by anyone with pipeline safety or HDD drilling experience, was an unlawful abdication of its fiduciary trust duty.  SMF ¶¶ 8 - 16; *Assiniboine & Sioux Tribes*, 792 F.2d at 794–95 (citing *In re Johnson*, 518 F.2d 246, 253 (10th Cir.), *cert. denied*, 423 U.S. 893, (1975) (trustee may not delegate duties for which he is responsible).

**B.**     **The Corps Breaches its Obligation to Ensure its Actions did not Violate the Treaty Rights of the Tribe and Did Not Adversely Affect the Tribal Trust Resources.**

The Corps determined on October 20, 2016, that, "the pipeline does increase the reservation's exposure to an oil spill in Lake Oahe in the unlikely event that the pipeline ruptures at the crossing."  ECF No. 114-1 at 33.  Based solely on Dakota Access' representation and no independent analysis on the part of the Corps, the Corps confirmed that, "while the risk is low, **the consequences of such an event are high and could impact water resources downstream**.  Final EA at 92-94."  *Id*.  The Corps concluded that the construction of DAPL, "would only impair water quality in the unlikely event of a worst-case scenario rupture. Thus, the SRST's *Winters*-based reserved water rights are not implicated by the construction of the pipeline at Lake Oahe."  *Id*. However, because the Corps allowed DAPL to draft the EA comments, and for reasons unexplained in the Final EA, the Corps failed to analyze any of the potential impacts on the treaty rights of the Cheyenne River Sioux Tribe.  The Cheyenne River Sioux Tribe is not an entity listed in Appendix J to the EA of consulting agencies.  **AR AR071720-071776.**  The Resolution passed by the Tribe in December 2015 that the Corps has in hand, and the letters of its THPO submitted

in NHPA § 106 consultations in an effort to raise concerns about treaty resources and the sacredness of the River, are nowhere in the EA.  *Id.*; *See,* SMF ¶ 103*;* **AR 0066801 – 0066806.**

The Corps has known since 2005 when it rebuilt the Tribe's Mni Waste' Water Intake that it was only source of any water for the entire Reservation.  SMF ¶¶ 46-65.  The Corps itself in 2005 determined it would cost 19.5 million dollars a year just to provide bottled water to drink, and that the effects of the Mni Waste' water intake becoming unusable would be devastating to the Tribe.  SMF ¶ 48; ECF No. 99-7 at 9-13.  The Tribe and federal and state agencies have invested over 80 million dollars into the Mni Waste' Water Intake and water system since 2006. SMF ¶¶ 50-51.  The Corps knew this, and yet, the Corps allowed Dakota Access to write into the EA that providing bottled water in the event the waters of Lake Oahe became unusable was an acceptable mitigation measure.  SMF ¶ 64.

The EA utterly fails to mention any potential impacts of an oil spill on the wildlife, trust lands owned by the Tribe adjacent to Lake Oahe, or impact on recreation despite finding a likelihood that an oil spill would affect fisheries on Lake Oahe.  Oil spills happen.  Whether they are a low risk or a higher risk than the Corps admits in its FONSI is highly dependent on the methods of construction, the ability to monitor adequately for leaks, and the ability to detect leaks — none of which were accurately assessed.  *See,* SMF ¶ 77; **Ex. 4**, Attachment A at Bates Nos. 0166-0167.

Compounding these failures as a fiduciary was the Corps' decision not to follow the requirements of 30 U.S.C. § 185(x)(1) and to impose strict liability on Dakota Access commensurate with "the foreseeable risks and commensurate losses."  Despite the known losses to the Cheyenne River Sioux Tribe, and the utter failure of the EA or any other Corps instrument to determine the dollar value of the losses in the event of an oil spill, the Corps only imposed 10

million in strict liability to the United States only — with a waiver of strict liability for any act of *"force majeure"* — like a landslide or earthquake." ECF No. 96-1 at 7, ¶ 12(b). The failure to provide any analysis of why it did this in its decision documents is not just a breach of trust, it is a violation of the requirements imposed by the Mineral Leasing Act. Adding insult to the injury to the beneficiary of the trust — the Tribe — the Corps abdicated its responsibility under 30 U.S.C. § 185(x)(1) to impose liability on Dakota Access to the beneficiary of the Corps' trust responsibility — the Tribe. The Corps imposed no strict liability or even any liability to third parties beyond that afford under "applicable state or federal law." ECF No. 96-1 at 7, ¶ 12(c).

Whether the court reviews this case under a reasonableness standard, or the heightened scrutiny required when reviewing the actions of a fiduciary is used, this EA FONSI, the Section 408 permit, and the MLA easement are unconscionable and must be struck down. The Corps actions including: 1) not hiring its own independent expert to analyze the actual risks and impacts of oil spill of this particular pipeline, but instead to simply allow an oil company to draft the EA and the responses to comments on the EA; 2) to hide from public view the list of who Dakota Access sent scoping letters to and what the EA comments were; 3) to hide the actual Spill Analysis, Mitigation measures considered, and Response Plan; 4) to hide the actual costs and benefits and how they were calculated by Dakota Access, and 5) to issue an easement that does not impose strict liability based on an actual valuation of foreseeable damages in the event of an oil spill and 6) to issue an easement that does not to impose liability to the Tribes most directly affected by the MLA easement are unconscionable. This is tantamount to allowing a trustee to lend money from a trust account to a third party who is going to use that money to make profit, without any bond, and without any benefit accruing to the beneficiary. It amounts to a political grab that risks the

very water the Tribe relies upon for the survival of its communities, its way of life, and its members' religious freedom for the sake of a private corporation and its investors.

## V. THE GRANTING OF THE MLA EASEMENT UNDER 30 U.S.C. § 185 WAS ARBITRARY, CAPRICIOUS AND NOT IN ACCORDANCE WITH THE LAW.

The MLA easement and the Corps' accompanying memorandum issued on February 3, 2017 utterly fail to establish that Dakota Access's application for easement satisfied the stringent requirements set forth by Congress in the MLA.  The Corps acknowledges the strict requirements of the MLA in its motion to dismiss Dakota Access's cross claim, explaining that the Corps' prior Section 408 approval and accompanying EA were insufficient to satisfy the MLA requirements.  S*ee generally,* ECF No. 74.  Despite this, the Corps has granted the easement without making any additional findings or determinations based on anything other than the EA FONSI.  The Corps' Memorandum provides conclusory references to the MLA's substantive provisions; but in reality, it simply cross references its Section 408 approval, ECF No. 114-1 at 10, which it has already acknowledged was insufficient.  ECF No. 74.  This failure renders the Corps' granting of the easement on February 8, 2017 arbitrary and capricious **and** contrary to law.

The MLA, enacted in 1920, authorizes the United States to grant, "[r]ights-of-way through any federal lands . . . for pipeline purposes for the transportation of oil, natural gas, synthetic liquid or gaseous fuels, or any refined product produced therefrom . . . in accordance with the provisions of this section."  30 U.S.C. § 185(a).  In 1973, the Act was amended to "impose more stringent safety and liability standards."  *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 287 (1975) (Brennan, J., dissenting); Act of Nov. 16, 1973, Pub. L. No. 93-153, 87 Stat. 576.  These stringent requirements are listed at 30 U.S.C. § 185 at (a) and (d) through (y), including 24 substantive  requirements.  As the Corps itself explained in its briefing to this Court, courts "'must have regard to all the words used by Congress, and as far as possible give effect to them.'"  ECF

No. 73-1 (quoting *United States v. Atl. Research Corp.*, 551 U.S. 128, 137 (2007)).  The Corps properly noted that "'courts have been wary of interpreting right-of-way statutes so as to make the conditions and limitations enacted by Congress 'of no value whatever.'"  *Id.* (quoting *Wilderness Soc'y v. Morton*, 479 F.2d 842, 892 (D.C. Cir. 1973)).

The Corps' Section 408 permission "did not require the Corps to consider all factors necessary to also grant an easement at Lake Oahe."  And cannot "plausibly" establish compliance with the MLA.  ECF No. 75 at 16, 20.  ECF No. 75 at 16, 20.  As the Corps itself concluded, the Corps must do something more than merely rely on the analyses used to grant the Section 408 approval to establish that the easement complies with the MLA.  The February 3, 2017 and February 8, 2017 Memoranda fail to do so.  The Corps identifies twelve issues the MLA requires the Corps to address "before granting an easement over Federal lands for pipeline purposes."  The February 3, 2017 Memorandum lists only eleven substantive factors.  ECF No.114-1 at 7.  More importantly, the Corps never analyzed whether the easement is "consistent with the purpose of the reservation," as required by 30 U.S.C. § 185(b)(1), and never explains why the duration of the easement was 30 years.[6]

### A.    The Easement Record of Decision Fails to Demonstrate the DAPL Easement is Not Inconsistent with the Purpose of the Reservation as Required by Section 185(b)(1).

30 U.S.C. § 185(b) (1) of the Mineral Leasing Act sets forth a threshold inquiry the Corps must address before granting an easement.  The Act provides that "[a] right-of-way through a Federal reservation shall not be granted if the Secretary or agency head determines that it would

---

[6] Notably, the easement itself is contradictory in that it lists a term of 30 years, but the legal description describes the easement as "Permanent."  If the Corps does not modify the easement, this is a second basis upon which the Court should vacate the easement because the MLA does not permit easements in perpetuity.  30 U.S.C. § 185(n)**.**

be *inconsistent with the purposes of the reservation*." *Id.* (Emphasis added).  The Corps has asserted that "[t]he decision whether to grant a right-of-way for a pipeline turns on whether it would be consistent with the 'public' interest and 'compatible with' the 'mission' of the federal project," ECF No. 66-1 at p. 3 (citing Army Reg. 405-80 ¶ 4-1(c)), which it alleges is identical to the Section 408 inquiry which "turns on whether that activity is consistent with "the public interest").  *Id.* at p. 6 (*citing* 33 U.S.C. § 408).  Unless the purpose of the federal reservation is to serve the public interest, then by the Corps' own terms, Section 408 analysis is insufficient to satisfy Section 185(b)(1).  The Corps' February 3, 2017 Memorandum does nothing to look beyond the analysis contained in its Section 408 approval other than a cursory reference to the legislation that established Lake Oahe, and the Flood Control Act of 1944, Public Law 78-534. ECF No. 114-1 at 1.  The Corps' analysis of this issue is contained in a scant two paragraphs that references "flood control, navigation, hydropower, recreation, waters supply, and water quality," and cross-references the July 25, 2016 Section 408 determination of one paragraph in the FONSI decision stating that the crossing at Lake Oahe "'will not impair the usefulness' of the Lake Oahe project."  *Id.*  The February 3, 2017 Memorandum states:

> This finding is supported by the Final EA that was issued on July 25, 2016 and various memoranda supporting the District Commander's Section 408 approval. The analysis supporting the grant of permission under 33 U.S.C. 408 [sic] is adopted in support of the Corps [sic] finding that granting an easement for the pipeline to cross Lake Oahe will not adversely impact the capability of the project to generate the benefits for which the project was Congressionally authorized.

ECF No. 114-1 at 3.  The Corps has failed to comprehend its own authorizing statute.  Although there is no question that the Flood Control Act of 1944 established Lake Oahe for purposes of flood control, navigation, hydropower, recreation, waters supply, and water quality, as set forth in part III.B.1 *infra*, Congress later amended the Flood Control Act to impose strict limitations upon the way that the Corps may exercise its mission to serve the purpose of the federal reservation.  As

39

set forth in Section II.B.1, *infra,* in the O'Mahoney-Milliken Amendment, Congress limited the

Corps' authority over Lake Oahe to operate the Missouri River Mainstem System for other

purposes, by allowing only other "***consumptive uses***" of water*…* "***only to the extent*** that such

activity does not conflict with **present and future beneficial consumptive** uses of waters for

"domestic, municipal, stock water, irrigation, mining, or industrial purposes." 33 U.S.C. § 701-

1(b) (Emphasis added).

Whether DAPL will have a significant impact on the human environment is the question

asked under NEPA. Whether DAPL will "impair the uses of the project" is the question asked

under Section 408. The MLA inquiry is stricter, because it requires a finding that DAPL is **not**

**"inconsistent with the purposes of the reservation."** 30 U.S.C. § 185 (Emphasis added). The

Corps' decision to grant the easement fails to meet this more stringent requirement in four ways.

First, the Corps fails to articulate any rationale for the statement that the DAPL is consistent with

the authorized purposes of "beneficial consumptive use, present or future …of such waters for

domestic, municipal, stock water, irrigation, mining or industrial uses." 33 U.S.C. § 701-1(b).

Second, the FONSI and EA did not examine impacts to most of the authorized purposes. *See,*

Section II, A.3, *infra*. at 16. Third, it is quite clear that the "mitigated" FONSI concluded that

there was a risk of an oil spill that would have a high impact on one of the authorized purposes —

domestic water supply — and on aquatic species, which would affect treaty fishing rights. *Id. See*

*also,* SMF ¶¶ 63 - 76. Allowing a project that could have a high impact on any of the project

purposes is **not** "consistent" with the authorized purposes of **present and future beneficial**

**consumptive uses**. 33 U.S.C. § 701-1(b). Last, the EA underestimates and ignores the actual

risks specific to this pipeline constructed in this method at this location. *Id. See also,* SMF ¶¶ 43,

57.

The February 3, 2017 Memorandum, Section 408 Record of Decision, EA and Mitigated FONSI all fail to analyze or articulate what the uses for municipal, water, irrigation, mining or industrial use are in Lake Oahe, let alone how an oil pipeline that has a risk of producing an oil spill in the waters used is consistent with their continued beneficial use.  30 U.S.C. § 185(b) does not ask whether there is a high risk of impact.  As set forth in Section II.B.3., *infra*, the authorized uses of Lake Oahe are impaired by an oil spill.  Providing bottled water if water intakes are contaminated by an oil spill, even temporarily, is unacceptable on Lake Oahe, because Congress required more when it passed 33 U.S.C. § 185(b).

As the Corps noted, it is well established that courts must "'must have regard to all the words used by Congress, and as far as possible give effect to them;'" (ECF No. 73-1 (*quoting United States v. Atl. Research Corp.*, 551 U.S.128, 137 (2007)); and "'courts have been wary of interpreting right-of-way statutes so as to make the conditions and limitations enacted by Congress 'of no value whatever'"  (*Id. (quoting Wilderness Soc. v. Morton*, 479 F.2d 842, 892 (D.D.C. 1973), *cert. den.* 411 U.S. 917 (1973)).  Section 185(b)(1) prohibits the Corps from granting the MLA easement until it has properly considered whether the easement "would be inconsistent with the purposes of the reservation."  Having failed to do so, the Corps' analysis is fatally deficient.

**B.     The Easement Determination Fails to Meet the Requirements of Section 185(h)(2).**

Section 185(h)(2) states that, as a prerequisite to granting any easement, the Corps "shall issue regulations or impose stipulations which shall include, but shall not be limited to

(A) requirements for restoration, revegetation, and curtailment of erosion of the surface of the land;
(B) requirements to insure that activities in connection with the right-of-way or permit will not violate applicable air and water quality standards nor related facility siting standards established by or pursuant to law;

41

> (C) requirements designed to control or prevent (i) damage to the environment (including damage to fish and wildlife habitat), (ii) damage to public or private property, and (iii) hazards to health and safety; and
>
> (D) requirements to protect the interests of individuals living in the general area of the right-of-way or permit who rely on the fish, wildlife, and biotic resources of the area for subsistence purposes.

As the Corps admits in its prior briefing, it did consider these factors in its Section 408 analysis.

*See,* ECF No. 73-1 at pp. 14-27.  33 U.S.C. § 185(h)(2) requires either (1) **regulations** that include

the listed requirements; or (2) **stipulations** that include the listed requirements.

Notably, despite the fact that Congress explicitly requires that easements "granted . . .

pursuant to this section shall be subject to regulations promulgated in accord with the provisions

of this section," 30 U.S.C. § 185(f), none exist.  The Corps has promulgated no regulations

governing MLA permitting.  In granting this easement, the Corps has relied upon general

regulations that apply to the agency, none of which consider specifically the MLA requirements,

and therefore do not meet the Corps' obligation under Section 185 (h)(2).  Lacking any Corps-

promulgated regulations, 30 U.S.C. § 185(h)(2) mandates that the Corps must impose **stipulations**

to insure the environmental protections set forth in (A) through (D) of this subpart.

Although the February 3, 2017 and February 8, 2017 Memoranda pay lip service to part

(h)(2), they ignore the requirement to protect the "interests of individuals living in the general area

. . . who rely the fish, wildlife, and biotic resources of the area for subsistence purposes." 30 U.S.C.

§ 185(h)(2)(D).  Instead, the Corps simply states:

> The Corps is required to impose necessary stipulations to prevent or control damage to the environment, including fish and wildlife habitat, damage to public or private property, and hazards to public health and safety . . . See 30 U.S.C. § 185(h)(2) ER 1130-2-550, para. 17-5, Mitigation, and App. G, Mitigation Guidance (2013).  The proposed easement requires mitigation and has added special conditions to the easement to mitigate any impacts to the environment.  See Unexecuted Easement, at para. 2.b., and Exhibit D to the Unexecuted Easement, Special Conditions.

ECF No. 114-1 at 7.  Outrageously, despite the fact that the Corps previously acknowledged that

the Section 408 approval was insufficient to satisfy the MLA, both paragraph 2.b. of the Easement and Exhibit D containing the "Special Conditions," do nothing more than cross-reference the Section 408 materials. ECF No. 114-1 at 10. Special Condition 36 is the only one of 36 that refers even remotely relates to the protections required by Section 185(h) (2), and says nothing more than "[g]rantee is generally responsible for commitments made and mitigation measures in the Final Environmental Assessment . . . ., including all Plans includes [sic] within Appendices thereof, *even if they are not specifically made as a condition to this easement*." ECF No. 96-1 at 41. This "special condition" is illusory. The EA contains no stipulation or condition that provides the "protection" required by Section 185(h) (2)(d), speaking only generally about fish and wildlife and Appendices A (a storm water pollution plan) and G (a revegetation plan). **AR 0071293**. The easement not only lacks a stipulation to protect these resources, it includes conditions that specifically limit Dakota Access' liability for damage to the resources necessary for subsistence in Conditions 12(b) and (c). ECF No. 96-1 at 7; SMF ¶¶ 200 - 205. Nowhere in the EA or the Memoranda does the Corps determine that there are no persons who rely on subsistence uses.

While the Corps may have administrative discretion in how it meets the conditions imposed by statute, the Corps is not free to reinterpret the statute to eliminate the conditions imposed by Congress. The Corps and this Court are bound by an obligation to "have regard to all the words used by Congress, and . . . give effect to them." *Atl. Research Corp.*, 551 U.S. at 137. The MLA cannot be interpreted "so as to make the conditions and limitations enacted by Congress 'of no value whatever.'" *Morton*, 479 F.2d at 892. Conclusory agency statements that do not include reasons for the decision are by their very nature arbitrary. *United Techs. Corp.*, 601 F.3d at 562. Moreover, the Corps cannot argue before this Court that the Section 408 permit decision does not meet the stricter MLA test for easements in January 2016 and then four weeks later interpret the

43

MLA requirements as broad suggestions that do not require the Corps' to conduct specific analysis, but instead allow the Corps to rely on a deficient Section 408 inquiry as a substitute. The Corps' issuance of the subject easement was deficient.

**C.     The Corps' Issuance of the Easement Violated the Requirement to Consult with the Tribe and the Corps' Fiduciary Duty to Protect the Tribe's Treaty and Trust Resources.**

As set forth in detail in Section III, *infra*, between September 9, 2016 and February 8, 2017, the period during which the Corps purportedly was deliberating on the MLA easement, the Tribe made repeated efforts to engage the Corps in government-to-government consultation. During this time, the Corps avoided all of the Tribe's efforts to engage in consultation. SMF ¶¶ 106 - 127. Any and all contact between the Corps and the Tribe was initiated by the Tribe. *Id.* The only meetings that Cheyenne River was permitted to attend with Corps officials were two general meetings that did not cover any easement discussion, and the second of which the Corps did nothing but advise when the EIS process might begin. Harold Frazier Decl,, **Ex. 3** at ¶ 20. As set forth in part III *supra*, this violates the Corps' consultation obligation as well as its clear trust responsibility to the Tribe. These issues are a prerequisite to the Corps' exercise of its authority under the MLA. Having failed to provide the process due, the issuance of this easement was unlawful.

In granting the MLA Easement, the Corps limited strict liability to 10 million dollars to the United States, and did not attach any liability or responsibility to DAPL for remediating or mitigating the catastrophic impacts in the event of a spill. *See*, Section IV.B, *infra*. This is an abdication of its fiduciary responsibility to protect the resources it pervasively regulates and controls. The breach of fiduciary duty to protect the irreplaceable treaty water and hunting and fishing rights was perpetrated without even so much as a glance, let alone a hard look.

**CONCLUSION**

One EPA employee said it best when they questioned the Corps' process in an email to a Corps employee in November of 2015, "[A]s Jeff Goldblume said in Jurassic Park, "You were so busy thinking how you could you forgot to ask whether you should." **AR AR0082926.**  For the reasons set forth herein, the Tribe respectfully asks this Court to grant the Motions for Summary Judgment, and the relief requested therein.  Let today be the day that the Court upholds the rights of every American to due process, to decisions based on law and reason, transparency, and to impartiality.  Let today be the day that the United States ends centuries of broken promises and broken treaties, and requires to Corps to do its duty to consult with the Tribe, conduct a proper EIS, act as the fiduciary it is to protect Tribal treaty protected resources and waters, and comply with its duties to protect the Missouri River Mainstem System project purposes.

Dated: February 22, 2017

CHEYENNE RIVER SIOUX TRIBE,
Intervenor-Plaintiff,


By:   /s/ Nicole E. Ducheneaux
Nicole E. Ducheneaux
Fredericks Peebles & Morgan LLP
3610 North 163rd Plaza
Omaha, NE  68116
Telephone:  (402) 333-4053
Facsimile:  (402) 333-4761
Email: nducheneaux@ndnlaw.com

Conly J. Schulte
FREDERICKS PEEBLES & MORGAN LLP
1900 Plaza Drive
Louisville, CO  80027
Telephone:  (303) 673-9600
Facsimile:  (303) 673-9839
Email:  cschulte@ndnlaw.com


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 22nd day of February, 2017, a copy of the foregoing was filed electronically with the Clerk of the Court.  The electronic filing prompted automatic service of the filing to all counsel of record in this case who have obtained CM/ECF passwords.


/s/ Nicole E. Ducheneaux

46