IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STANDING ROCK SIOUX TRIBE,

                Plaintiff,

and

CHEYENNE RIVER SIOUX TRIBE,

                Plaintiff-Intervenor,

     v.

U.S. ARMY CORPS OF ENGINEERS,

                Defendant-Cross
                Defendant,

and

DAKOTA ACCESS, LLC,

                Defendant-Intervenor-
                Cross Claimant.

Case No. 1:16-cv-1534-JEB

**STANDING ROCK SIOUX TRIBE'S AND CHEYENNE RIVER SIOUX TRIBE'S
OPPOSITION TO MOTION FOR A PROTECTIVE ORDER**

INTRODUCTION

The Standing Rock Sioux Tribe ("SRST") and Cheyenne River Sioux Tribe ("CRST")

(collectively, "Tribes") respectfully submit this joint opposition to the Motion for a Protective

(No. 1:16-cv-1534-JEB) - 1

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

Order filed by Dakota Access, LLC ("DAPL") (ECF 92).  In a case that is fundamentally about the adequacy of the government's consideration of oil spill risks and impacts, DAPL seeks to shield from scrutiny the deeply flawed documents that purport to evaluate those risks and impacts.  Indeed, the failure of the U.S. Army Corps of Engineers ("Corps") to provide the Tribes, other agencies and experts, and the public with these documents was a key factor in the Army's December 4 decision to deny the easement pending fuller consideration of the Oahe crossing through a transparent and participatory environmental impact statement ("EIS") process.  The Tribes have challenged the Corps' reversal of its December 4 decision in pending motions for summary judgment.  The failure of the Corps to grapple with both substantive inadequacies of the oil spill risk analyses, and the procedural problems in keeping them secret, is at the heart of those motions.

DAPL claims that the documents must be kept hidden from view because hypothetical persons with "malicious intent," including terrorists, could use them to cause harm.  This is a ruse.  There is no information in these documents that would aid acts of terrorism.  The location of the pipeline is well known—detailed maps are included in the Final Environmental Assessment, other administrative record documents, and state utility commission filings.  Construction has left an unmistakable 400-foot-wide path across the landscape for anyone to see.  While the documents DAPL seeks to shield from public review would not aid terrorists, they would greatly assist other agencies, the public, and the Tribes in understanding the basis for the Corps' conclusion that the risks and impacts of oil spills were so insignificant that no EIS was necessary.   DAPL seeks to shield these documents not to keep the public safe from terrorists, but because the documents are embarrassingly inadequate and undermine DAPL's primary narrative in this case—that oil spill risk can be dismissed without further analysis or independent

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

expert review.

The Tribes are unaware of any situation in which a court has held that documents submitted by a permit applicant to an agency, and relied on by the agency in making a critically important decision, may be shielded from public review under the guise that they could be used by terrorists. There is no basis for a protective order under statutes protecting "security" information, or "critical infrastructure" information. Neither is there any basis for a discovery order under Fed. R. Civ. P. 26(c). The motion for a protective order should be denied and the documents included in full in the public administrative record.

BACKGROUND

As this Court understands, the risks of leaks and spills from the Dakota Access pipeline, and their impacts on the Tribes' Treaty rights at Lake Oahe, are central issues in the Tribes' case as well as to the public's concerns about this project. At the outset, the Corps disclaimed any responsibility for considering the risk of oil spills from the Oahe crossing, asserting that this was the responsibility of other agencies. AR 6424 ("Analysis of oil spills during operation and maintenance of a pipeline falls outside of USACE authorities under the Clean Water Act."). The Corps released a draft Environmental Assessment ("EA") in December, 2015, that said virtually nothing about oil spill risks or the Tribes' interests, going so far as to omit the Standing Rock reservation, one-half mile downstream from the crossing site, from maps of the project. *See* SRST Summary Judgment Mem. (ECF 117-1) at 8. SRST submitted three sets of technical and legal comments on the draft EA that contained extensive information on oil spills for the Corps to consider more thoroughly. *Id*. at 8-9. Many other tribes, organizations, and federal agencies did the same. *Id*.; *see also* ECF 131-1 at ¶ 19. Nonetheless, in late July, the Corps granted the first set of permits for the Oahe crossing, supported by a Final EA that summarily concluded that the risks of oil spills were not significant enough to warrant a full EIS.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

Following continued efforts by the Tribes pressing their case that the EA was inadequate, the Corps and other federal agencies concluded that the Tribes had raised important issues, and opened up a further period of discussion and examination of the Oahe crossing.  SRST SJ Mem. at 11.  The Tribe again participated closely in that process, for example, by providing an expert review finding that the Final EA's conclusions with respect to oil spill risk were "seriously deficient."  *Id.*  Other tribes provided similar reviews that found numerous fundamental flaws in the Final EA.  *See, e.g., id.* at 11-12.

While that process was underway, the Corps filed with this Court the administrative record supporting the July 25 decisions.  ECF 55 (Nov. 10, 2016).  The filing revealed that 31 documents were being withheld at the request of DAPL because of its concerns about allegedly sensitive information.  This was the first time that the Tribes were even aware that there were additional documents in the Corps' possession relating to spill risk and response.  The Corps did not provide the documents until the parties agreed to restrict access to "attorneys' eyes only," which occurred in late December 2016.  At that point, for the first time the Tribes' counsel had an opportunity to review the numerous documents that included analyses prepared by DAPL's consultants analyzing oil spill risk in the Missouri River, as well as oil spill response plans. However, those documents remained unavailable to the Tribes, their experts, and anyone else.[1]

On December 4, the Army decided that the easement should not be granted pending a full EIS that assessed oil spill risks and the impacts on the Tribes and their Treaty rights, and closer scrutiny of alternative crossing sites.  ECF 65-1.  That decision was supported by a comprehensive memo from the Interior Solicitor that, among other things, recommended that no

---

[1] Reflecting a startling lack of care as well as a "cut and paste" approach to a critically important issue, multiple spill model documents contain the identical typographical error in their title, which is presented as a "Spili Modei Discussion."  AR 074092; AR 74713; AR 12398; *but see* AR 12419 ("Spill Model").

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

easement be granted pending further study of oil spill risks by independent experts.  *See* Ex. 4 to

SRST SJ Motion (ECF 117-6).  Both the Interior Solicitor and the Army Assistant Secretary

highlighted the fact that the key oil spill risk analyses and response plans had never been

provided to the Tribes, other agencies, or the public.  *See id*. at 28 (finding that spill model "does

not correlate with the majority of actual releases that occur during operation of an oil

pipeline"…and "the Tribes were not afforded an opportunity to consider and independently

analyze any of the information that led to the Corps' conclusions as part of its 408 permitting

evaluation that the DAPL project poses almost no risk to water"); ECF 65-1 at 3 (encouraging

expert and agency review of DAPL oil spill documents).  The Corps subsequently initiated an

EIS process in the Federal Register, seeking comment on oil spill risks and other issues, and

began collecting comments.  82 Fed. Reg. 5543 (Jan. 18, 2017).

Soon after the inauguration, and at the order of the President, the Corps reversed itself

and summarily issued the easement.  SRST SJ Motion at 15.  The Corps supported its decision

with a February 3, 2016 "Technical and Legal Review" that found that the risk of oil spills was

low and that no additional analysis was necessary, but did not address the numerous expert

criticisms that had been made of the Final EA.  Similarly, nowhere does this review

acknowledge, let alone address, the withholding of oil spill risk documents from the Tribes and

the public, or the consequent lack of any opportunity to subject DAPL's spill risk conclusions to

public and full expert scrutiny.  SRST promptly amended its complaint, and moved for summary

judgment challenging the granting of the easement (and the earlier permissions) as arbitrary,

capricious, and contrary to law under the APA.  That motion will be fully briefed by March 21,

2017.  CRST also amended its complaint and filed a motion for summary judgment that will be

fully briefed by April 6.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

ARGUMENT

I.     THE DOCUMENTS DAPL SEEKS TO PROTECT DO NOT QUALIFY FOR
       SENSITIVE SECURITY INFORMATION OR CRITICAL INFRASTRUCTURE
       INFORMATION

As even DAPL appears to acknowledge, the documents that it seeks to shield with a

protective order do not fit into the definition or scheme of Sensitive Security Information

("SSI").  SSI is defined as information that is "obtained or developed in the conduct of *security*

activities."  49 C.F.R. § 15.5(a) (emphasis added), 49 U.S.C. § 114(r).  For example, DAPL's

brief highlights how "security programs" and "vulnerability assessments" can constitute SSI.

DAPL Motion at 5.  By definition, these are documents that specifically address "security

incidents" or "threats" (definition of "security contingency plan" in 49 C.F.R. § 15.3), or

documents used to "determine … vulnerability to unlawful interference" (definition of

"vulnerability assessments" in 49 C.F.R. § 15.3).  Moreover, statutory SSI protection only

extends to "disclosure of records and information that the Secretary of DOT has determined to be

Sensitive Security Information," 49 C.F.R. § 15.1(a), and it must be specifically identified as

such.  *Id*. § 15.13.  *See also Robinson v. Napolitano*, 689 F.3d 888, 893 n. 2 (8th Cir. 2012)

(discussing SSI determination procedures).

Indeed, under the governing statute, information cannot be withheld under the pretext that

it is SSI when it is really being withheld to "prevent embarrassment to a person, organization, or

agency," to "conceal a violation of law, inefficiency, or administrative error," or to prevent the

release of information unrelated to transportation security.  49 U.S.C. § 114(r)(4).  Cases

involving SSI universally deal with plans, procedures, and information that are specific to

maintaining transportation security.  *See, e.g., U.S. v. Moussaoui*, No. CRIM.01-455-A, 2002

WL 1311736 (E.D. Va. June 11, 2002) (information on aviation security countermeasures is

SSI); *Public Citizen v. F.A.A.*, 988 F.2d 186, 198 (D.C. Cir. 1993) (information on security

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

staffing and training at airports).

DAPL has not shown, and cannot show, that its oil spill risk assessments and response plans meet the definition of SSI.  First and foremost, they were not "obtained or developed in the conduct of security activities."  They are not security contingency plans, since they do not address security under any conceivable definition, and they do not address vulnerability to "unlawful interference."  49 C.F.R. § 15.3.  Instead, they are assessments addressing the potential impact of an accidental spill on the environment, and used to support the Corps' determination that the project would not have significant enough impacts to warrant a full NEPA review.  DAPL has not pointed to a single instance, from any court, in which such a non-security technical document underlying a NEPA process was deemed SSI.  *Compare San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n*, 635 F.3d 1109 (9th Cir. 2011) (rejecting request for disclosure of "classified terrorist attack scenarios" in NEPA process).  Second, DAPL has not shown that the documents have been deemed SSI by any agency, let alone the Department of Transportation.  They are not marked or identified as such.  To the contrary, DAPL seeks to prevent disclosure of information that is "not clearly related to transportation security" solely for the purpose of avoiding embarrassment, and to "conceal a violation of law, inefficiency, or administrative error."  49 U.S.C. § 114(r).  This is not permitted.

DAPL's showing is even less adequate with respect to its assertion that the information should be protected as Critical Infrastructure Information ("CII").  In the Critical Infrastructure Protection Act, Congress articulated policies to protect "critical infrastructure," which it defined to mean "systems and assets, whether physical or virtual, so vital to the United States that the incapacity or destruction of such systems and assets would have a debilitating impact on security, national economic security, national public health or safety, or any combination of

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

those matters."  42 U.S.C. § 5195c(e).  Receiving CII protection requires a submitted application

and must be validated from the Department of Homeland Security.  6 C.F.R. § 29.5 (detailing

requirements for application for protection); *id.* at § 29.6(a) ("Only the DHS PCII Program

Manager is authorized to validate, and mark information as PCII").

There is no debate that the Dakota Access pipeline has never been designated "critical

infrastructure" by any agency, rendering their entire argument beside the point.  Nor has DAPL

pointed to any statutory or regulatory provisions relating to confidentiality of information for

designated critical infrastructure.  It has not cited any case finding that oil spill risk assessment or

response planning—or any other document related to a crude oil pipeline—should be subject to

confidential treatment under this statute.  Simply invoking an act relating to infrastructure does

not entitle DAPL to shield important evidence from public view.  In any event, the location of

the pipeline is already well known to the public and is documented extensively elsewhere—a

terrorist intent on doing harm to the pipeline would have to look no further than the Final EA and

its appendices.[2]

In sum, the documents that are the subject of DAPL's motion do not constitute either SSI

or CII.  They do not meet any statutory or regulatory definition of sensitive information, and they

have not been designated as such by any agency with the authority to do so.  Nor does the

proposed protective order advance the purposes of these statutes.  DAPL advocates that a

protective order is needed "to protect details…for the same reasons SSI is protected from public

release" (ECF 92 at 7), but the underlying information is not close at all to the protections that

---

[2] Outside of a news article pertaining to claimed threats to *trains*, DAPL also provides no support
whatsoever for its theory that pipelines constitute a terror threat.  The Transportation Security
Adminstration has declared that the risk of terror threats to pipelines is low.  TSA Office of
Intelligence, Pipeline Threat Assessment (2011) ("TSA-OI assesses with high confidence that the
terrorist threat to the U.S. pipeline industry is low.") available at
<https://info.publicintelligence.net/TSA-PipelineThreats2011.pdf> (visited March 1, 2017).

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

SSI and CII normally cover, such as nuclear weapons storage and airline transportation safety. Extending SSI and CII protections to documents that outline environmental risks is directly contrary to the statute's direction that SSI not be used as a cover to hide embarrassing or inconvenient materials from public view.

II.     FEDERAL RULE 26(C) DOES NOT SUPPORT THE REQUESTED PROTECTIVE ORDER

Implicitly recognizing that there is no basis to treat the relevant documents as SSI or CII, DAPL asks this Court to grant the protective order under Rule 26(c).  Rule 26 is a discovery rule, and gives a court discretion to set limits on discovery or the use of specific discovered evidence during litigation.  Relevant to this motion, Fed. R. Civ. P. 26(c)(1)(G) authorizes a court to grant a protective order directing that certain kinds of information, specifically "a trade secret or other confidential research, development, or commercial information," not be revealed or only be revealed in a particular way.  The burden is on the party seeking a protective order to establish that the information sought is covered by the rule and that it will be harmed by disclosure.  *In re Wilson*, 149 F.3d 249 (4th Cir. 1998).  Indeed, as this Court has noted, "[t]he moving party carries a 'heavy burden' of showing extraordinary circumstances based on 'specific facts' that would justify a protective order."  *Ecomission Sols., LLC v. CTS Holdings, Inc.*, 2016 WL 4506974, at *2 (D.D.C. Aug. 26, 2016) (citing *Eidos Display, LLC v. Chunghwa Picture Tubes, Ltd.*, 296 F.R.D. 3, 6 (D.D.C. 2013).

DAPL has not made any such showing.  As a threshold matter, Rule 26 is inapposite to this case because no party is seeking discovery of these materials, which were included in the administrative record but then withheld at DAPL's request despite the Corps disagreeing with the premise of DAPL's request for confidentiality.  In Administrative Procedure Act cases such as this one, Rule 26 questions generally arise when a plaintiff is seeking to conduct discovery

*Earthjustice*
705 Second Ave., Suite 203
Seattle, WA  98104
(206) 343-7340

*outside* of the administrative record—not when a defendant seeks to shield administrative record documents from public disclosure.  *See Amfact Resorts LLC v. U.S. Dept. of Interior*, 143 F. Supp. 7 (D.D.C. 2001) (denying discovery to plaintiffs in APA case).  Moreover, DAPL has not shown that this discovery privilege—for trade secrets and other commercially confidential materials—allows shielding of documents provided to a federal agency and relied on by that agency in making its decision that is in turn the subject of a nationally significant controversy.

In short, Rule 26(c) does not give this Court a basis on which to shield the requested documents from public review.  Absent some other source of law requiring that these documents be maintained as confidential, the motion must be denied.

## III.   THE PROTECTIVE ORDER WILL PREJUDICE THE TRIBES AS WELL AS OTHERS

DAPL argues that its proposed protective order will not result in prejudice to the Tribes because documents can be available for use in the litigation as long as any related materials are filed under seal.[3]  DAPL is wrong for several reasons.  As a threshold matter, absent any showing by DAPL that it has a legal entitlement for the documents to be kept secret, the question of impacts to the Tribes is immaterial.  In other words, while Rule 26 employs a "balancing" test to determine requests for discovery protective orders, absent a clear showing that DAPL is entitled to maintain the records as confidential, there is nothing to balance.  In any event, DAPL's insistence on keeping the documents secret has already prejudiced the Tribes.  The Tribes and their counsel spent months advocating for better oil spill risk analysis without even knowing about the existence of these materials.  Once they were provided to counsel, these

---

[3] While the Tribe strongly disagrees that the requested documents are subject to any protection at all, and disagrees that its expert declarant revealed any protected information even it was, out of an abundance of caution it filed its expert declaration under seal pending resolution of this motion.  *See* Sealed Declaration of Richard Kuprewicz in Support of SRST's Motion for Summary Judgment (ECF 120).

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

highly technical documents could not be shared with the Tribes or their experts until protocols

were worked out to maintain confidentiality.  As a result, the Tribes' experts had only days to

review these documents and provide input before the Tribe moved for summary judgment.  *See*

Sealed Kuprewicz Decl.; Sealed Declaration of Hakan Bekar in Support of CRST Motion for

Summary Judgment (ECF 135) at Ex. 1.  More time would have allowed for a much more

comprehensive review, aiding this Court's review of the Tribes' claims.

Finally, these documents address matters of keen public interest.  The failure of the Corps

to provide them to the public and other agencies was a key underpinning of the Corps' decision

to withhold the easement pending a full EIS.  Other Tribes have filed their own lawsuits against

the Corps raising these issues, but do not have access to the documents.  Many members of the

media have expressed an interest in obtaining the documents.  The Tribes believe that public

scrutiny of the documents, and analysis by independent experts and other agencies, will support

its public advocacy efforts regarding the pipeline.  None of that work can proceed under DAPL's

proposed protective order.  The Tribes and the general public will be prejudiced by the requested

order.

## IV.    THE CORPS' ALTERNATIVE PROPOSAL SHOULD BE DENIED

Initially, the Corps withheld the 31 documents (only 11 of which are now subject to

DAPL's motion) at DAPL's request.  It did not seek to withhold these documents on its own

accord, and informed the parties and the Court that the documents had been reviewed by the

expert agencies, that no additional redactions were anticipated, and that they intended to oppose

DAPL's motion for a protective order.  After DAPL filed its motion, however, the Corps shifted

its position.  The Corps opposes DAPL's motion for some documents and redactions, but agrees

that a handful of the proposed redactions are warranted—albeit on different legal theories from

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

those proposed by DAPL.[4]  The Corps has proposed extending a protective order to a smaller group of documents (just the spill model reports, not the spill response documents), and a narrower scope of redactions.

The Tribes disagree that there is any legal basis for such confidentiality.  As discussed above, and as the Corps acknowledges, none of the proposed redactions qualifies for protection as commercially confidential information, SSI or CII.  Nor is there any discernible connection between the proposed redactions and any claimed security threats.  In support of its proposed redactions, the Corps proposes to redact material under two theories.  First, under an exemption in the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(b)(7)(F), the Corps proposes redactions for material that, if released, "could reasonably be expected to endanger the life or physical safety of any individual."  Declaration of David Lehman, ECF 146-1 at ¶ 5.  But no support is offered for this startling assertion, and a review of the Corps' proposed redactions leaves one unable to conceive how they would possibly result in such a threat.  Under its second theory, the Corps cites 49 U.S.C. § 60138 (and 5 U.S.C. § 552(b)(3), which exempts from disclosure any documents that are specifically exempt under another statute).  This statute directs the Secretary of Transportation to provide copies of oil spill response plans upon request, but allows it to exclude from such plans any SSI, "specific response resources and tactical resource deployment plans," and "the specific amount and location of worst case discharges."  49 U.S.C. § 60138(a)(2).  But, again, the Corps does not explain which category the proposed redactions belong to, nor is the answer obvious.  The redactions do not even occur in oil spill response plans but in spill risk analyses.  The redactions are plainly not SSI, nor do they pertain to "specific

_____
[4] Counsel for the Corps provided undersigned counsel with proposed redactions.  While the Tribe appreciates the opportunity to seek agreement around the issue, and reviewed the Corps' proposed redactions closely, it still does not agree that there is any legal basis to shield the proposed redacted material from the public.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

response resources." *Id*.  Nor do the redactions clearly relate to "worst case discharges," but rather any discharges.  *See, e.g.,* AR 74104 (███████████████); AR 74104 (████████ ██████████████████████████████████).

Moreover, there is either little benefit in the Corps' proposed redactions, or affirmative prejudice to the Tribes.  For example, the Corps proposes to redact maps that are already in the administrative and public records.  *See, e.g.,* Corps proposed redactions for AR 74096; 74717. There is no benefit to anyone from redacting such material.  The Corps also proposes to redact material that highlights flaws in their analysis and conceals key facts that the public should have an opportunity to scrutinize.  For example, ██████████████████████ ████████████████████████████████████████████████ ██████████████████████████████ This is crucial information that was never revealed in the EA or otherwise included in the discussion of oil spill risks.  ██████████ ████████████████████████████████████████████████████ ██████████████████████████████████ ██████████ This information is not useful to terrorists, but will certainly be of interest to other Tribes, agencies, and the public.  Nor does it qualify for confidentiality under the Corps' cited authorities.

Finally, the Corps seeks to redact information explaining ████████████████ ██████████████████████████████████████ ██████████████████████████████████ Both kinds of proposed redactions do nothing to maintain security, but they do shield critically important information from view of the Tribes, other agencies and independent experts, and the public.  Both SRST and CRST have provided expert input related to these issues.  *See, e.g.,*

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

Kuprewicz Decl. at 

; Bekar Decl., Ex. 1, at 3-4

.

## CONCLUSION

There is no legal basis on which to impose a protective order on the essential oil spill risk and response information included in the administrative record.  It is presumably true that public disclosure will be harmful to DAPL's interests, because it will reveal the deep flaws in the Army Corps' conclusions around oil spill risk and response.  But that is not a valid basis on which to seek a protective order.  Accordingly, the Tribe respectfully requests that the motion be denied.

Dated:  March 1, 2017                    Respectfully submitted,

/s/ Jan E. Hasselman
Patti A. Goldman, DCB # 398565
Jan E. Hasselman, WSBA # 29107
(*Admitted Pro Hac Vice*)
Stephanie Tsosie, WSBA # 49840
(*Admitted Pro Hac Vice*)
Earthjustice
705 Second Avenue, Suite 203
Seattle, WA  98104
Telephone:  (206) 343-7340 | Fax:  (206) 343-1526
pgoldman@earthjustice.org
jhasselman@earthjustice.org
stsosie@earthjustice.org
*Attorneys for Plaintiff Standing Rock Sioux Tribe*


/s/ Nicole E. Ducheneaux
Nicole E. Ducheneaux, *Pro Hac Vice*
Joseph V. Messineo, *Pro Hac Vice*
Fredericks Peebles & Morgan LLP
3610 North 163rd Plaza
Omaha, NE  68116
Telephone:  (402) 333-4053 | Fax:  (402) 333-4761
Email:  nducheneaux@ndnlaw.com
*Attorneys for Intervenor-Plaintiff Cheyenne River Sioux Tribe*

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

## CERTIFICATE OF SERVICE

I hereby certify that on March 1, 2017, I electronically filed the foregoing *STANDING ROCK SIOUX TRIBE'S AND CHEYENNE RIVER SIOUX TRIBE'S OPPOSITION TO MOTION FOR A PROTECTIVE ORDER* with the Clerk of the Court using the CM/ECF system, which will send notification of this filing to the attorneys of record and all registered participants.

*/s/ Jan E. Hasselman*
Jan E. Hasselman

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*