**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE; YANKTON SIOUX TRIBE; ROBERT FLYING HAWK; OGLALA SIOUX TRIBE, | |
| Plaintiffs, | |
| and | |
| CHEYENNE RIVER SIOUX TRIBE, | |
| Intervenor Plaintiff, | Case No. 1:16-cv-01534-JEB |
| v. | |
| U.S. ARMY CORPS OF ENGINEERS, | |
| Defendant, | |
| and | |
| DAKOTA ACCESS LLC, | |
| Intervenor Defendant. | |

**DECLARATION OF WILLIAM S. SCHERMAN IN SUPPORT OF DAKOTA ACCESS, LLC'S CONSOLIDATED (1) RESPONSE IN OPPOSITION TO PLAINTIFF CHEYENNE RIVER SIOUX TRIBE'S MOTION FOR SUMMARY JUDGMENT AND (2) CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

I, William S. Scherman, declare as follows:

1. I am a partner with the law firm of Gibson, Dunn & Crutcher LLP, counsel of record for Intervenor Defendant Dakota Access, LLC. I am a member in good standing of the Bar of this Court.

2. The table below lists all exhibits cited in Dakota Access's responses to both Cheyenne River's and Standing Rock's summary judgment motions. The exhibits common to both responses are attached herein, as are the new exhibits: DD-VV.

| EXHIBIT | DESCRIPTION | CITATION |
|---------|-------------|----------|
| * = included as an attachment | **EXHIBITS CITED IN DAKOTA ACCESS'S RESPONSE TO SRST'S MOTION FOR SUMMARY JUDGMENT** | |
| A* | Letter from Monica Howard to Brent Cossette, Nat. Res. Specialist USACE (Oct. 21, 2014) | AR OAHE34 |
| B* | Draft Environmental Assessment | D.E. 6-19 (AR 74119) |
| C | SRST Comments on Draft EA (Jan. 8, 2016) | AR 69152 |
| D | SRST Supplemental Comments on Draft EA (Mar. 24, 2016) | AR 66166 |
| E | Letter from Dave Archambault, Chairman SRST, to Col. Joel R. Cross, District Commander USACE (Aug. 19, 2015) | AR 69809 |
| F | Letter from Dave Archambault, Chairman SRST, to Martha Chieply & Joel Ames, USACE (Jan. 27, 2016) | AR 66548 |
| G | Letter from Dave Archambault, Chairman SRST, to Martha Chieply & Joel Ames, USACE (Feb. 12, 2016) | AR 66476 |
| H | Letter from Dave Archambault, Chairman SRST, to Col. Henderson, District Commander USACE (Feb. 29, 2016) | AR 66360 |
| I | Letter from Dave Archambault, Chairman SRST, to Col. John Henderson, District Commander USACE (May 11, 2016) | AR 64280 |
| J | Letter from Dave Archambault, Chairman SRST, to Col. John Henderson, District Commander USACE (July 11, 2016) | AR 64004 |
| K | Letter from Jan Hasselman, Earthjustice, to Col. John Henderson, District Commander USACE (Apr. 26, 2016) | AR 84802 |
| L* | Final Environmental Assessment | AR 71220 |
| M* | Mitigated Finding of No Significant Impact | AR 71174 |
| N | Joint Statement from the Department of Justice, The Department of the Army and the Department of the Interior (Sept. 9, 2016) | D.E. 42-1 |
| O | Status Conference Transcript (Sept. 16, 2016) | D.E. 49 |

| P | Letter from Jo-Ellen Darcy, Assistant Secretary of the Army, to Dave Archambault, Chairman SRST, & Kelcy Warren, Chairman and CEO ETP (Nov. 14, 2016). | D.E. 56-1 |
|---|---|---|
| Q | Public Statement of Department of the Army and Department of the Interior (Nov. 14, 2016) | D.E. 56-2 |
| R | Memorandum from K. Jack Haugrud, Acting Secretary of the Interior, to Acting Solicitor, Department of the Interior (Feb. 6, 2017) | D.E. 127-15 |
| S* | Memorandum for Record, from Col. John Henderson, District Commander USACE (Dec. 3, 2016) | D.E. 73-14 (AR ESMT 652) |
| T | Memorandum for the Commander, USACE, from Jo-Ellen Darcy, Assistant Secretary of the Army (Dec. 4, 2016) | D.E. 65-1 |
| U | Presidential Memorandum Regarding Construction of the Dakota Access Pipeline (Jan. 24, 2016) | D.E. 89-1 |
| V | Congressional Notification of Intent to Grant Easement | D.E. 95-1 |
| W | Memorandum for the Record from Douglas Lamont, Senior Official Performing the Duties of Assistant Secretary of the Army (Jan. 24, 2017) | D.E. 95-2 |
| X | Notice of Termination of the Intent to Prepare an Environmental Impact Statement | D.E. 95-3 |
| Y* | Final Easement for Lake Oahe Crossing (Feb. 8, 2016) | D.E. 96-1 (AR ESMT 1) |
| Z | Declaration of Robert D. Comer (Mar. 6, 2017) | |
| AA | E-mail Exchange re: Cultural Resource Surveys (May 19–20, 2016) | AR 64200 |
| BB | Summary of Comments Received on EA | AR 72463 |
| CC | Declaration of Joey Mahmoud (Aug. 18, 2016) | D.E. 22-1 |
| **All** of the following **are attached** | **EXHIBITS CITED IN DAKOTA ACCESS'S RESPONSE TO CRST'S MOTION FOR SUMMARY JUDGMENT** | |
| DD | Declaration of Martha Chieply, Chief, Regulatory Branch USACE (Aug. 18, 2016) | D.E. 21-18 |

| EE | Declaration of Joel Ames (Aug. 18, 2016) | D.E. 21-17 |
|----|------------------------------------------|------------|
| FF | Letter from Col. John Henderson, District Commander USACE, to Harold Frazier, Chairman CRST (May 6, 2016) | AR 64300 |
| GG | E-mail from Joel Ames, USACE, to Col. John Henderson, District Commander USACE (May 3, 2016) | AR 64317 |
| HH | Letter from Steven Vance, THPO CRST, to Col. John Henderson, District Commander USACE (May 19, 2016) | AR 67923 |
| II | Letter from Steven Vance, THPO CRST, to Richard Harnois, Sr. Field Archeologist CRST (May 2, 2016) | AR 68220 |
| JJ | Letter from Col. John Henderson, District Commander USACE, to Harold Frazier, Chairman CRST (June 22, 2016) | AR 64062 |
| KK | Letter from Martha Chieply, Chief, Regulatory Branch USACE, to Steven Vance, THPO CRST (June 13, 2016) | AR 64120 |
| LL | Section 408 Permit | AR 71180 |
| MM | Form Letter from USACE (Oct. 24, 2014) | AR 67130 |
| NN | Letter from Steve Vance, THPO CRST, to Richard Harnois, Sr. Field Archeologist USACE (Aug. 17, 2015) | AR 69815 |
| OO | Letter from Col. John Henderson, District Commander USACE, to Harold Frazier, Chairman CRST (Sep. 3, 2015) | AR 69758 |
| PP | E-mail from Joel Ames, USACE, to Harold Frazier, Chairman CRST (Mar. 7, 2016) | AR 66310 |
| QQ | E-mail from Joel Ames, USACE, to Larry Janis, USACE (May 9, 2016) | AR 64289 |
| RR | Form Letter from USACE (Dec. 4 2013 [sic]) | AR 67166 |
| SS | Letter from Martha Chieply, Chief, Regulatory Branch USACE, to Steven Vance, THPO CRST (Feb. 17, 2015) | AR 70663 |
| TT | E-mail from Jeff Breckenridge, USACE, to Devetta Hill, USACE (Mar. 23, 2015) | AR 70574 |
| UU | Michels Corporation HDD Drilling Experience | |

| VV | Declaration of Jonathan Shelman, Environmental Resource Specialist USACE (Aug. 18, 2016) | D.E. 21-20 |

3.     Exhibit UU consists of information from a document prepared by Michels Corporation, Dakota Access's horizontal directional drilling contractor.  The underlying document shows the experience of Michels Corporation with horizontal directional drilling of long bores (i.e., those over 7,000 feet) in the United States and Canada.

Executed on March 23, 2017

/s/ William S. Scherman
William S. Scherman

# EXHIBIT A



**VIA CERTIFIED MAIL and EMAIL**

October 21, 2014

Brent Cossette
Natural Resource Specialist
Environmental Stewardship
CENWO-OD-TN
United States Army Corps of Engineers, Omaha District
1616 Capital Avenue, Suite 9000
Omaha, NE  68102
Brent.J.Cossette@usace.army.mil

Re:    Request for Pipeline Easement and Temporary Construction License for the
       Proposed Dakota Access Pipeline Project at Lake Oahe

Dear Mr. Cossette:

Dakota Access, LLC, is proposing the Dakota Access Pipeline (DAPL) Project; an approximate
1,100 mile long, 30-inch diameter light crude oil pipeline project beginning near Stanley,
North Dakota, and routing through South Dakota, Iowa and ending at Patoka, Illinois.  DAPL is
proposed to cross the Missouri River (Lake Oahe) on the boarder of Morton and Emmons
Counties in North Dakota. Dakota Access understands that this crossing involves COE owned
and controlled lands on both sides of this waterbody (**Figure 1**).

Dakota Access is currently securing access rights on private and COE lands to perform
geotechnical analysis of the subsurface at this crossing to determine a feasible crossing
method.   It is currently anticipated that the pipeline will cross Lake Oahe via Horizontal
Directional Drill (HDD).   The proposed pipeline is routed across the Lake where two linear
utilities already exist, an overhead powerline and a buried natural gas pipeline.

The purpose of this letter is to formally request the COE easement process be initiated as
well as the process for DAPL to secure a temporary construction license.

**DAPL Project Crossing and Easement Information**
The proposed pipeline will cross Lake Oahe and COE lands on both the east and west side of
the waterbody.  The proposed crossing is located in Section 10, Township 134 North, Range
79 West in Morton County, North Dakota, and Section 11, Township 134 North, Range 79
West in Emmons County, North Dakota (**Figure 1**).

OAHE0000034



Dakota Access is securing a 50 foot wide permanent easement along the entire Project alignment that is generally centered on the pipeline (i.e. 25 feet on either side of the centerline). Dakota Access understands that the distance from the western boundary of COE owned lands to the eastern boundary of COE lands on both sides of the lake at the proposed crossing location is approximately 6,450 feet. The final length of the requested easement will be determined upon final design of the crossing subsequent to performing a geotechnical analysis.

A temporary construction license is also requested at this time due to the current uncertainty of the HDD layout and if any conventional pipeline installation will be required, if either or both the HDD entry/exit point would be located within COE lands, if access to the waterbody would be required for temporary water rights, etc. The proposed typical construction easement for the DAPL is 150 feet wide (and includes the 50 feet of permanent easement). HDD entry/exit points are typically 200 feet or 250 feet square. All dimensions will be firmed up in the Environmental Assessment to be prepared based on design that is currently ongoing.

We appreciate your assistance with this request for a permanent easement and temporary construction license at Lake Oahe. We understand this formal DAPL Project request for a pipeline easement and temporary construction license from the COE will officially initiate the COE easement process. Should you have any questions or comments, or require any other information for this request, please contact me at 713.989.7186, Monica.Howard@energytransfer.com, or at Dakota Access, LLC, c/o Monica Howard, 1300 Main Street Rm 14.030, Houston, TX 77002.


Sincerely,

**Dakota Access, LLC**

Monica Howard
Director Environmental Sciences

cc:     Phillip Sheffield, COE Natural Resource Manager Oahe Project

Enc.    Figure 1 – Preliminary Proposed Easement at Missouri River/Lake Oahe

OAHE0000035



**Proposed 50ft Easement Inset**

**Figure 1**
Dakota Access, LLC
Dakota Access Pipeline Project

at Missouri River/Lake Oahe

| Legend | |
| --- | --- |
| ○ | Milepost |
| Route | |
| Tracts | |
| Proposed 50ft Easement | |

0   1,000   2,000 Feet
1 inch = 2,000 feet

Merjent
For Environmental Review Purposes Only

OAHE0000036

# EXHIBIT B

# DRAFT
# ENVIRONMENTAL ASSESSMENT
# Dakota Access Pipeline Project
# Crossings of Flowage Easements
# and Federal Lands

**Prepared by:**

## Dakota Access, LLC

1300 Main Street
Houston, TX 77002

**Prepared for:**

## U.S. Army Corps of Engineers – Omaha District

1616 Capitol Avenue, Suite 9000
Omaha, NE 68102

**September 2015**



USACE_DAPL0074119

Environmental Assessment
Dakota Access Pipeline Project
September 2015

# TABLE OF CONTENTS

EXECUTIVE SUMMARY ................................................................................................................ 1

1.0     INTRODUCTION ............................................................................................................... 2
        1.1     DAPL Project Location ........................................................................................... 2
        1.2     Purpose and Need of the Project ............................................................................. 2
        1.3     Authority and Scope of the EA ................................................................................ 2

2.0     ALTERNATIVES ............................................................................................................... 4
        2.1     Alternatives Considered but Eliminated from Detailed Analysis ............................... 4
                2.1.1   Alternative 1 – Trucking Transportation Alternative ..................................... 4
                2.1.2   Alternative 2 – Rail Transportation Alternative ............................................ 5
                2.1.3   Alternative 3 – Route Alternatives ............................................................... 5
                2.1.4   Alternative 4 – Major Waterbody Crossing Alternatives ................................ 7
        2.2     No Action Alternative ............................................................................................. 8
        2.3     The Proposed Action (Preferred Alternative) ........................................................... 8
                2.3.1   Location and Detailed Description of the Proposed Action .............................. 8
                2.3.2   Description of Construction Techniques and Construction Mitigation Measures
                        ................................................................................................................. 11

3.0     THE AFFECTED ENVIRONMENT AND POTENTIAL ENVIRONMENTAL IMPACTS OF THE PROPOSED
        ACTION AND NO ACTION ALTERNATIVE .......................................................................... 15
        3.1     Geology and Soils ................................................................................................ 15
                3.1.1   Geology ................................................................................................... 15
                3.1.2   Mineral Resources ................................................................................... 16
                3.1.3   Geologic Hazards ..................................................................................... 17
                3.1.4   Paleontology ............................................................................................ 20
                3.1.5   Soils ........................................................................................................ 21
        3.2     Water Resources .................................................................................................. 26
                3.2.1   Surface Waters ........................................................................................ 26
                3.2.2   Groundwater ............................................................................................ 31
                3.2.3   Wetlands .................................................................................................. 33
                3.2.4   Floodplain ................................................................................................ 35
                3.2.5   Levees ..................................................................................................... 36
        3.3     Vegetation, Agriculture, and Range Resources ...................................................... 36
                3.3.1   Vegetation ............................................................................................... 36
                3.3.2   Invasive and Noxious Weeds .................................................................... 40
                3.3.3   Threatened, Endangered, Candidate, and Proposed Plant Species ................ 40
        3.4     Wildlife Resources ............................................................................................... 41
                3.4.1   Recreationally and Economically Important Species and Nongame Wildlife ...... 41
                3.4.2   Threatened, Endangered, Candidate, and Proposed Wildlife Species .............. 42
        3.5     Aquatic Resources ............................................................................................... 48
                3.5.1   Habitat and Communities .......................................................................... 48
        3.6     Land Use and Recreation ..................................................................................... 50
                3.6.1   Land Ownership ....................................................................................... 50

i

Environmental Assessment
Dakota Access Pipeline Project
September 2015

|        | 3.6.2 | Land Use | 51 |
|        | 3.6.3 | Recreation and Special Interest Areas | 53 |
| 3.7 | | Cultural and Historic Resources and Native American Consultations | 55 |
|        | 3.7.1 | Cultural Resources Studies | 56 |
|        | 3.7.2 | Native American Consultations | 58 |
| 3.8 | | Social and Economic Conditions | 58 |
|        | 3.8.1 | Demographics, Employment, and Income | 59 |
| 3.9 | | Environmental Justice | 60 |
|        | 3.9.1 | Affected Environment | 60 |
|        | 3.9.2 | Impacts and Mitigation | 60 |
| 3.10 | | Hazardous Waste | 63 |
| 3.11 | | Reliability and Safety | 63 |
| 3.12 | | Air Quality and Noise | 65 |
|        | 3.12.1 | Air Quality | 65 |
|        | 3.12.2 | Noise | 66 |

**4.0 CUMULATIVE IMPACTS** ......................................................... **68**

| 4.1 | Geology and Soils | 69 |
| 4.2 | Water and Aquatic Life Resources | 69 |
| 4.3 | Vegetation, Agriculture, and Range Resources | 71 |
| 4.4 | Threatened, Endangered, Candidate, and Proposed Species | 71 |
| 4.5 | Wildlife Resources | 73 |
| 4.6 | Land Use and Recreation | 73 |
| 4.7 | Cultural and Historic Resources and Native American Consultations | 74 |
| 4.8 | Social and Economic Conditions | 74 |
| 4.9 | Transportation and Traffic | 75 |
| 4.10 | Environmental Justice | 75 |
| 4.11 | Air Quality and Noise | 75 |

**5.0 IRREVERSIBLE AND IRRETRIEVABLE COMMITMENT OF RESOURCES** .................................. **77**

**6.0 MITIGATION SUMMARY** ............................................................. **78**

**7.0 FEDERAL, TRIBAL, STATE, AND LOCAL AGENCY CONSULTATION AND COORDINATION** .......... **80**

**8.0 STATUS OF ENVIRONMENTAL COMPLIANCE** ................................................. **84**

**9.0 LIST OF PREPARERS AND REVIEWERS** ..................................................... **94**

**10.0 ACRONYMS, INITIALS, AND ABBREVIATIONS** ............................................. **95**

**11.0 REFERENCES** ..................................................................... **98**

USACE_DAPL0074121

Environmental Assessment
Dakota Access Pipeline Project
September 2015

## LIST OF TABLES

**Table 2-1:**    Flowage Easements and Federal Land Crossings
**Table 2-2:**    Environmental Assessment Areas of Interest
**Table 3-1:**    Soil Types Mapped on the Flowage Easements Project Area
**Table 3-2:**    Soil Types Mapped on the Federal Lands Project Area and Connected Action
**Table 3-3:**    Soil Impacts on the Flowage Easements Project Area
**Table 3-4:**    Soil Impacts on the Federal Lands Project Area and Connected Action
**Table 3-5**     Waterbodies within the Flowage Easements Project Area
**Table 3-6**     Waterbodies within the Federal Lands Project Area and Connected Action
**Table 3-7:**    Wetlands within the Flowage Easements Project Area
**Table 3-8:**    Land Cover Impacts on the Flowage Easements Project Area
**Table 3-9:**    Land Cover Impacts on the Federal Lands Project Area and Connected Action
**Table 3-10:**   Federally Listed Species with Potential to Occur within the Project Area and Connected Action
**Table 3-11:**   Land Use Impacts on the Flowage Easements Project Area
**Table 3-12:**   Land Use Impacts on the Federal Lands Project Area and Connected Action
**Table 3-13:**   Minority Population Statistics for the Flowage Easements Project Area
**Table 3-14:**   Low-Income Population Statistics for the Flowage Easements Project Area
**Table 3-15:**   Minority Population Statistics for the Federal Lands Project Area
**Table 3-16:**   Low-Income Population Statistics for the Federal Lands Project Area
**Table 3-17:**   Noise Values
**Table 7-1:**    Comments Received
**Table 8-1:**    Environmental Permits, Approvals, and Consultations
**Table 9-1:**    List of Reviewers and Preparers

## LIST OF FIGURES

**Figure 1:**    Project Location—Federal Lands and Flowage Easements
**Figure 2:**    Project Layout—Flowage Easements
**Figure 3:**    Project Layout—Federal Lands
**Figure 4:**    Soils—Flowage Easements
**Figure 5:**    Soils—Federal Lands
**Figure 6:**    Natural Resources—Flowage Easements
**Figure 7:**    Natural Resources—Federal Lands
**Figure 8:**    Cultural Resources—Flowage Easements
**Figure 9:**    Cultural Resources—Federal Lands
**Figure 10:**   Land Cover—Flowage Easements
**Figure 11:**   Land Cover—Federal Lands
**Figure 12:**   Route Alternative—Missouri River Crossing
**Figure 13:**   Route Alternative—Lake Oahe Crossing

USACE_DAPL0074122

Environmental Assessment
Dakota Access Pipeline Project
September 2015

**LIST OF APPENDICES**

**Appendix A:**    Stormwater Pollution Prevention Plan (SWPPP)/Spill Prevention Control and
Countermeasure (SPCC) Plan
**Appendix B:**    HDD Construction Plan - *pending* and HDD Contingency Plan
**Appendix C:**    Right-of-Way (ROW) Configurations and Typical Construction Details
**Appendix D:**    Geotechnical Report
**Appendix E:**    Blasting Plan
**Appendix F:**    Unanticipated Discoveries Plan Cultural Resources, Human Remains, Paleontological
Resources and Contaminated Media (UDP)
**Appendix G:**    Environmental Construction Plan (ECP)
**Appendix H:**    Project Maps and HDD Cross-Sections
**Appendix I:**    Cultural Resources Report
**Appendix J:**    Sample Scoping Letter, Distribution List, and Comments Received
**Appendix K:**    Notice of Availability of Draft Environmental Assessment (EA) for Comment -*pending*



USACE_DAPL0074123

Environmental Assessment
Dakota Access Pipeline Project
September 2015

## EXECUTIVE SUMMARY

In accordance with the National Environmental Policy Act (NEPA) and implementing regulations, the following Environmental Assessment (EA) has been prepared to evaluate the effects of the Dakota Access, LLC (Dakota Access) Dakota Access Pipeline Project (Project or Proposed Action), which would cross lands owned by the federal government or cross lands that have federal government flowage easements under management by the U.S. Army Corps of Engineers (Corps).  Specifically the Proposed Action crosses federal flowage easements near the upper end of Lake Sakakawea north of the Missouri River in Williams County, North Dakota and crosses federally owned lands at Lake Oahe in Morton and Emmons counties, North Dakota.

This EA was prepared by Dakota Access for the Project on behalf of the Corps as the non-federal representative for compliance with the NEPA Act of 1969, the Council on Environmental Quality (CEQ) Regulations (40 Code of Federal Regulations (CFR) 1500-15-8), Corps of Engineers Regulation ER 200-2-2 (33 CFR Part 230), and related environmental compliance requirements for these crossings, including the National Historic Preservation Act (Section 106).  Tribes, Tribal Historic Preservation Offices, State Historic Preservation Offices, the Advisory Council on Historic Preservation, and interested parties were consulted by Corps Omaha District personnel as required through their Programmatic Agreement with tribes that reside within the Missouri River basin.

The Corps takes ownership of this EA and incorporates findings within as part of stipulations to issue a real estate easement and consent to cross flowage easements (federal actions) to Dakota Access for the proposed activity.  This action is being completed in accordance with CEQ regulations in Section 1506.5(a) and 1506.5(b), which allow an applicant to prepare an EA for federal actions.  The Corps has independently evaluated and verified the information and analysis undertaken in this EA and takes full responsibility for the scope and content contained herein.

Based upon extensive route analysis route and system alternatives, including the preferred route (Proposed Action), no action, system options, and various transportation options, the preferred alternative was chosen, because it best meets the purpose and need while avoiding, minimizing, and mitigating environmental impacts.  It would also follow the greatest length of existing disturbed linear utility corridors, traverse property whose landowners have previously granted permissions for similar projects, and would minimize the number of permanent aboveground launchers/receivers and valve sites.

Impacts on the environment would be temporary and not significant as a result of avoiding, minimizing, and mitigating any potential impacts. Impacts on the Missouri River/Lake Oahe are avoided by installing the pipeline via horizontal directional drill (HDD) beneath the feature.  Impacts on wetlands are limited to vegetation maintenance in the permanent pipeline easement.  No known cultural resources would be impacted by the proposed Project.  Dakota Access would comply with all applicable local, state, and federal regulations and permits associated with the construction of the Project.  Thus, construction of the proposed Project is not expected to have any significant direct, indirect, or cumulative impacts on the environment.

1

USACE_DAPL0074124

Environmental Assessment
Dakota Access Pipeline Project
September 2015

## 1.0      INTRODUCTION

In coordination with the U.S. Army Corps of Engineers (Corps), the Applicant, Dakota Access, LLC (Dakota Access) as the non-federal representative for compliance with the National Environmental Policy Act of 1969 (NEPA), the Council on Environmental Quality (CEQ) Regulations (40 Code of Federal Regulations (CFR) 1500-15-8), Corps of Engineers Regulation ER 200-2-2 (33 CFR Part 230), and related environmental compliance requirements, prepared this Environmental Assessment (EA) for the Dakota Access Pipeline (DAPL) Project (Project or Proposed Action). Dakota Access is proposing to construct a new crude oil pipeline that would provide transportation service from points of origin in the Bakken and Three Forks plays in North Dakota through portions of South Dakota and Iowa to a terminus in Patoka, Illinois (**Figure 1**). The operator of the Project is DAPL-ETCO Operations Management, LLC.

### 1.1      DAPL Project Location

The overall proposed DAPL route is an approximate 1,100 mile long crude oil pipeline project beginning near Stanley, North Dakota, and ending at Patoka, Illinois.  In North Dakota, there are two pipeline segments, including the 148-mile Supply Line and the 210 mile Mainline, which total approximately 358 miles across seven counties (Mountrail, Williams, McKenzie, Dunn, Mercer, Morton, and Emmons). The diameter of the pipeline increases incrementally at designated tank terminals from 12 inches to 20, 24, and ultimately, 30 inches. The DAPL pipeline is co-locating with existing pipelines and other linear facilities to the extent practical.

### 1.2      Purpose and Need of the Project

The Project purpose is to efficiently and safely transport crude oil from the Bakken and Three Forks production region in North Dakota to a crude oil market hub located near Patoka, Illinois. The Dakota Access Pipeline is being designed to safely carry 570,000 barrels per day (bpd) or more of crude oil (approximately 450,000 bpd initially) through the states of North Dakota, South Dakota, Iowa, and Illinois and ultimately terminating in Patoka, Illinois. From the Patoka hub, the crude oil would be transported by other pipelines to refineries located in the Midwest and the Gulf Coast, where 80% of the U.S. refining capabilities exist today to further the country's goal of energy independence and support the U.S. consumer's energy demand.

### 1.3      Authority and Scope of the EA

The proposed Project crossings of Corps-owned lands and easements would require real estate actions and regulatory permits from the Corps, which are the federal actions associated with this EA.

To obtain comments on the EA and Project, Dakota Access sent a request for comment letter on behalf of the Corps as the non-federal representative for compliance with NEPA, the CEQ Regulations (40 CFR 1500-15-8), Corps of Engineers Regulation ER 200-2-2 (33 CFR Part 230), and related environmental compliance requirements for these crossings.  In addition to other requirements, the Lake Oahe and Missouri River crossing portions of this Project shall comply with the National Historic Preservation Act (Section 106). Further, tribes, Tribal Historic Preservation Offices, State Historic Preservation Offices, the Advisory Council on Historic Preservation, and interested parties were consulted with by Corps Omaha District

2

USACE_DAPL0074125

Environmental Assessment
Dakota Access Pipeline Project
September 2015

personnel as required through their Programmatic Agreement with tribes that reside within the Missouri River basin.

These crossings require Department of the Army (DA) authorization under Section 404 of the Clean Water Act (CWA Section 404) and/or Section 10 of the Rivers and Harbors Act (Section 10). Separate Corps authorizations are being sought for Section 404, Section 10, and Section 408 crossings along the route. The Corps Regulatory branch is evaluating each separate and distinct crossing of waters of the United States as a single and complete project, consistent with the requirements of Nationwide Permit 12 (NWP 12) for utility lines. A single and complete project includes crossing a single water at a specific location.

This effect analysis is being completed in accordance with CEQ regulations in Section CFR 1506.5(b), which allow an applicant to prepare an EA for a federal action in coordination with the lead federal agency (i.e., Corps). The Corps will make a final determination regarding compliance of the activities with NEPA and NWP 12 with the completed information contained herein. The Corps independently evaluated and verified the information and analysis undertaken in this EA and takes full responsibility for the scope and content contained within.



3

USACE_DAPL0074126

Environmental Assessment
Dakota Access Pipeline Project
September 2015

## 2.0    ALTERNATIVES

The Project would be Energy Transfer's (Company's) first asset in the state.  For this reason, the manipulation of operating pressures to increase transport capacity in pipelines or altering existing infrastructure to increase storage and transport capacity are not viable options to meet the Project's objectives or shippers' demands.  Shipping and routing alternatives were evaluated for the pipeline route as a whole, including through the Proposed Action Areas, which are the focus of this evaluation and discussed below.

### 2.1    Alternatives Considered but Eliminated from Detailed Analysis

### 2.1.1    Alternative 1 – Trucking Transportation Alternative

Currently, due to a lack of transport capacity in the Williston Basin, approximately 1% of the crude oil is moved via truck (Kringstad, 2014).  While trucking is instrumental in the gathering and distribution of crude on a limited scale, trucking as an alternative for transporting the volume of crude oil the distances planned for the Project is not viable.  Factors such as road safety, roadway capacity, and a lack of reliability due to seasonal constraints, in addition to other logistical issues involving availability of labor force, trailer truck capacity, and economics, all contribute to truck transportation not being a realistic alternative.

A sharp increase in traffic on North Dakota roads as a result of the rapid expansion in the number of commercial trucks linked to the oil industry speaks to the issues associated with road safety.  In 2012, the Federal Motor Carrier Safety Administration reported a traffic fatality rate in North Dakota of 0.48 per million vehicle miles traveled, with 48 deaths involving a bus or large truck, far surpassing any other state (U.S. Department of Transportation [DOT], 2014).  In the pre-boom years of 2001 to 2005, there was an average of only 13 annual deaths involving commercial trucks.  Furthermore, the economic cost of severe truck crashes has more than doubled between 2008 and 2012.  Much of the increase in the fatality rate can be attributed to the energy production boom, along with the fact that the state's infrastructure still consists of single-lane, rural, and unpaved roads in many areas (Bachman, 2014).  Harsh winter weather and seasonal road restrictions compromise the reliability of truck transportation even further.

To meet shippers' demands, Dakota Access plans to transport 450,000 bpd approximately 1,100 miles across four states.  A pipeline is a safer and more economical alternative than trucking for the volumes transported and distances covered by the Project.  Assuming the average oil tanker truck is capable of holding about 220 barrels of oil, the transportation of 450,000 bpd would require a total of 2,045 (450,000/220) full trucks to depart the proposed tank terminals daily, and more than 85 (2,045/24) trucks would have to be filled every hour with a 24-hour/day operation.  Time spent in transit, loading/offloading, and additional time for maintenance would add to the number of trucks needed to offset for the Project.

Analysis of infrastructure considerations (the burden of thousands of additional trucks on county, state, and interstate highways, as well as the loading and offloading facilities that would have to be constructed), economic considerations (e.g., labor costs, purchase and maintenance of hauling equipment, fuel, public infrastructure, etc.), and reliability considerations (e.g., weather, mechanical, manpower, road closures) all contribute to making the truck transportation alternative unviable.

4

USACE_DAPL0074127

Environmental Assessment
Dakota Access Pipeline Project
September 2015

### 2.1.2   Alternative 2 – Rail Transportation Alternative

Reliance on rail as a transportation method in the Williston Basin has drastically increased in recent years, carrying a negligible percentage of the overall market share as recently as 2010 to nearly 60% of the overall market share by mid-2014 (Nixon, 2014).  The rise in the use of rail as a primary transportation method has been driven in large part by the rapid increase in production of crude oil coupled with a lack of pipeline capacity to account for additional supplies.

Negative impacts from the growth in popularity of rail as a method of long-distance transportation of crude oil include delays that disrupt the agricultural sector, reductions in coal-fired power plant inventories, and significant production issues in the food production industry.  In August 2014, reports filed with the federal government indicated that the Burlington Northern Santa Fe Railway had a backlog of 1,336 rail cars waiting to ship grain and other products, while Canadian Pacific Railway had a backlog of nearly 1,000 cars (Nixon, 2014).  For industries, such as those listed, in which the use of pipelines is not an option, the only viable alternative would be increased reliance on trucking, which would exacerbate some of the issues listed in the section above.

Assuming a carrying capacity of 600 barrels per car, a total of 750 rail cars would be required to depart the tank terminal daily to transport 450,000 barrels of crude oil to its final destination.  Loading and offloading 750 rail cars in a day would require servicing more than 31 rail cars per hour.  With an assumption of 125 rail cars per train, six trains would have to depart the tank terminal every day.  With 10 to 12 trains currently leaving the state per day carrying Bakken crude, the DAPL Project would represent a 50 to 60% increase in the number of trains transporting crude oil out of the state, likely exacerbating issues with delays (Horwath and Owings, 2014).

Rail operations on the scale of the DAPL Project do not exist in the U.S.  An oil-by-rail facility designed to handle an average of 360,000 bpd has been proposed in the Port of Vancouver, Washington.  Known as the Vancouver Energy proposal, the project would be the largest rail terminal in the country (Florip, 2014).  A rail transportation alternative to handle the volumes of the DAPL Project would require the design and construction of 125 to 158% of that of the Vancouver Energy proposal.

From a safety standpoint, railroad transport consistently reports a substantially higher number of transportation accidents than pipelines (DOT, 2005).  A series of major accidents taking place in 2013 to 2014 in Canada and the U.S. has heightened concern about the risks involved in shipping crude by rail (Fritelli, 2014).

While rail tanker cars are a vital part of the short-haul distribution network for crude oil, pipelines are a more reliable, safer, and more economical alternative for the large volumes transported and long distances covered by the DAPL Project.  As such, rail transportation is not considered a viable alternative.

### 2.1.3   Alternative 3 – Route Alternatives

Major route alternatives were evaluated for the pipeline route as a whole.  During the Project fatal flaw analysis and early routing process, Dakota Access utilized a sophisticated and proprietary Geographic Information System (GIS)-based routing program to determine the pipeline route based on multiple publicly available and purchased datasets.  Datasets utilized during the Project routing analysis included

5

Environmental Assessment
Dakota Access Pipeline Project
September 2015

engineering (e.g., existing pipelines, railroads, karst, powerlines, etc.), environmental (e.g., critical habitat, fault lines, state parks, national forests, brownfields, national registry of historic places, etc.), and land (e.g., fee owned federal lands, federal easements, dams, airports, cemeteries, schools, mining, and military installations, etc.).

Each of these datasets were weighted based on the risk (e.g., low, moderate, or high based on a scale of 1,000) associated with crossing or following certain features.  In general, the route for the pipeline would follow features identified as low risk, avoid or minimize crossing features identified as moderate risk, and exclude features identified as high risk.  For example, the existing pipelines dataset was weighted as a low risk feature, so that the routing tool followed existing pipelines to the extent possible to minimize potential impacts.  An example of a high risk feature is the national park dataset.  Since national parks were weighted for this Project as high risk, the GIS routing program excluded any national parks from the pipeline route to avoid impacts on these federal lands.

Early in the routing phase of the Dakota Access Project described above, the centerline originated in Stanley, North Dakota within Mountrail County where it connected to customer receipt points and headed southwest through Williams County and crossed the Missouri River approximately 8.5 miles east of the Yellowstone River and Missouri River confluence (Figure 12).  The centerline then headed southeast across the state and crossed Lake Oahe approximately 10 miles north of Bismarck (Figure 13) and entered South Dakota approximately 35 miles east of Lake Oahe in McIntosh County.

After review of the route alternative using publically available datasets, concerns with some of the areas crossed by the route immediately removed this route alternative as a feasible option.  The route alternative was in proximity to and/or crossing multiple conservation easements, habitat management areas, National Wildlife Refuges, state trust lands, waterfowl production areas, and private tribal lands.  Since the route alternative crossed north of Bismarck, wellhead sourcewater protection areas were prevalent due to the proximity of the city.  The route alternative also crossed an area of the state that is characterized by a more wet landscape when compared to some of the other regions of the state.

In addition to concerns over the environmentally sensitive areas described above, the route alternative included approximately nine additional miles of pipeline to cross north of Bismarck.  It was also estimated that an additional 10 to 15 miles of pipe would be needed to avoid the wellhead sourcewater areas near Bismarck and other exclusion areas identified in the GIS routing program, as previously referenced.  The additional nine miles of pipeline to cross north of Bismarck would add an exceedance of approximately 145 acres of workspace to get to the customer receipt points.  This increase in pipeline distance to avoid the Corps fee-owned properties at Lake Oahe would significantly increase not only the cost of the Project, but also the area of disturbance and potential environmental impacts.

While the route alternative would avoid crossing Corps fee-owned properties at Lake Oahe, the abundance of easement and tribal properties, potential environmental impacts, and significant cost increase result in the route alternative not being a viable option for Dakota Access to meet the purpose and need of the Project.

Crossing the Missouri River at a location that does not contain flowage easements would move the centerline west of the flowage easements in Williams County.  This was not considered, given that this would require approximately eight additional miles of pipe, an exceedance of an additional 130 acres of

6

USACE_DAPL0074129

Environmental Assessment
Dakota Access Pipeline Project
September 2015

workspace, and another major river crossing (Yellowstone River) in addition to the Missouri River. Furthermore, state and federal properties are located along the river west of the confluence of Missouri and Yellowstone Rivers.

### 2.1.4   Alternative 4 – Major Waterbody Crossing Alternatives

Once an optimal route was selected based on the evaluation of impacts discussed in Section 2.1.3, Dakota Access then identified the preferred major waterbody crossing construction method that would meet the purpose and need while minimizing impacts to resources.  Pipeline construction methods utilized at waterbody crossings are highly dependent on the characteristics of the waterbody encountered.  A variety of waterbody crossing techniques were considered during the Project planning stages for the crossings of major waterbodies, including Dam and Pump, Flume, Open-Cut, and Horizontal Directional Drill (HDD).

Three possible waterbody crossing methods involving the excavation of a trench on the bottom of the waterbody are typically employed on pipeline construction projects.  Two different techniques, including dam and pump and flume crossing methods, are typically used on waterbody crossings well under 100 feet in width and require a temporary diversion of flow within the waterbody.  Because of the large volume of water within the Missouri River system, it is not feasible to temporarily divert the water either by pump or flume, and these methods were ruled out of consideration for the crossing of the Missouri River and Lake Oahe.

Aside from trenchless or HDD crossing techniques, the only feasible crossing method from a constructability standpoint for the major waterbodies associated with the Proposed Action is the wet open-cut crossing method, in which flow would be maintained throughout installation of the pipeline. This method of construction would require the construction right-of-way (ROW) to extend right up to the waterbody itself, allowing equipment to operate from the banks of the waterbody to excavate a trench. The sensitive habitat adjacent to the banks of the waterbodies would be cleared of vegetation and graded to create a safe and level workspace that could accommodate excavation equipment and spoil storage for the duration of the open-cut installation (approximately 6 months).  Since the widths of the Missouri River and Lake Oahe at the crossing locations is such that operating trenching equipment entirely from the banks would not be possible, trench excavation in the waterbodies would require equipment operating from barges.  Furthermore, the depth of the waterbodies crossed (15 to 25 feet) exceeds the reach of a backhoe, and the use of mechanical dragline dredgers would be necessary.  Spoil dredged from the bottom of the waterbody would be stored on a spoil barge or otherwise temporarily stockpiled in the waterbody itself.  This method of excavation would greatly influence the overall sediment load generated in the waterbody for the duration of the installation.  The generation of a downstream turbidity plume would have a direct effect on the aquatic habitat of the waterbody.  In addition, the operation of equipment within and on the banks of the waterbody has the potential for adverse effects on surface water quality (i.e., potential contamination of surface water resources from fuel or leaks from the equipment).  Compared to trenchless technology, the open-cut method would incur far greater impacts on sensitive habitat located on both the banks of the waterbodies and within the waterbodies.  Therefore, this method of construction was eliminated from consideration.

The trenchless construction method known as horizontal directional drilling (HDD) was selected as the preferred construction method of the Proposed Action, because this method of construction involves far less impacts on resources.  In addition, the Garrison Project – Lake Sakakawea Oil and Gas Management

7

Environmental Assessment
Dakota Access Pipeline Project
September 2015

Plan explicitly states that:  Oil and gas pipelines should use directional drilling technology to traverse beneath sensitive habitat areas.  Further information regarding the HDD construction method is provided in Section 2.3.2.6 below.

## 2.2    No Action Alternative

Under the "no action" alternative, Dakota Access would not construct the proposed Project.  The "no action" alternative would not provide the infrastructure necessary to transport light sweet crude oil to refining facilities.  In northwest North Dakota, exploration and production of oil is a major economic activity, with crude oil production being the primary mineral resource of interest.  Although the "no action" alternative itself would not incur environmental impacts, it would also not address the existing demand to transport crude oil to refining facilities.

It is purely speculative to predict the resulting effects and actions that could be taken by another company or Dakota Access' shippers and any associated direct or indirect environmental impacts in response to the "no action" alternative.   However, the "no action" alternative has been carried forward in the environmental analysis of this EA to provide a comparison between it and the impacts of implementing the Preferred Alternative.

## 2.3    The Proposed Action (Preferred Alternative)

### 2.3.1    Location and Detailed Description of the Proposed Action

The DAPL Project originates near Stanley, North Dakota, traversing westerly northwest of Williston then turning south, crossing the Missouri River and traverses southeasterly across the state, exiting through the central portion of the southern border.  Dakota Access proposes to construct the pipeline, ranging in size from 12 to 30 inches in diameter, so that the majority of lands crossed would be privately-owned lands.  The locations for collecting product into the proposed system were largely fixed based on results of the open season, which guided the routing of the supply line.  Connecting the input locations was largely a matter of minimizing length and maximizing the avoidance of sensitive features, developments, public lands, and constructability issues (e.g., steep terrain, potholes, excessive bedrock, etc.), as discussed above.  Based on the location of the collection points, crossing the Missouri River (Lake Sakakawea) was unavoidable.  The selected crossing location of the Proposed Action avoids federally-owned lands to the extent practical, is at a narrow width of the river upstream of the wider Lake Sakakawea, and minimizes impacts on sensitive resources (e.g., piping plover critical habitat, eagle nests, etc.).  The pipeline is 24 inches in diameter where it crosses approximately 14,942 feet (2.83 miles) of the Corps flowage easements at the Missouri River and is 30 inches in diameter where it crosses approximately 1,109 feet (0.21 mile) of the Corps-owned federal lands at Lake Oahe.

Within North Dakota, the proposed Supply pipeline crosses seven tracts of flowage easement retained by the Corps located north of the Missouri River in Williams County (**Figure 2**).  The proposed DAPL Project Mainline route travels through land owned and managed by the Corps on both sides of the Lake Oahe crossing at the border between Morton and Emmons counties (**Figure 3**). These lands, and the associated Project impact acreages, expressed as construction workspace, are identified in **Table 2-1** below.

8

Environmental Assessment
Dakota Access Pipeline Project
September 2015

| Table 2-1 | | |
|-----------|---|---|
| Flowage Easements and Federal Land Crossings | | |
| Grant of Easement Document Number | County | Construction Workspace Within Tract (acres) |
| Flowage Easements | | |
| LL3440E | Williams | 9.4 |
| LL3483E-1 | Williams | 10.8 |
| LL3453E | Williams | 10.7 |
| LL3430E | Williams | 5.0 |
| LL3450E-2 | Williams | 5.2 |
| LL3431E | Williams | 14.7 |
| LL3426E-2 | Williams | 3.4 |
| Total Acres | -- | 59.2 |
| Federally-Owned Lands | | |
| Federal Land | Morton | 0.4 |
| Federal Land | Emmons | 0.8 |
| Total Acres | -- | 1.2 |

The EA review area includes areas within the Corps flowage easements and federal lands that are potentially impacted by construction and/or operation of the Project. The EA review area is hereafter referred to as the Project Area(s). Actions that occur outside of the flowage easements and the federal lands at the Lake Oahe crossing are considered Connected Actions. Connected Actions are those actions that are "closely related" and "should be discussed" in the same NEPA document (40 CFR § 1508.25 (a)(i)). Actions are connected if they automatically trigger other actions that may require an EA, cannot or will not proceed unless other actions are taken previously or simultaneously or if the actions are interdependent parts of a larger action and depend upon the large action for their justification (40 CFR § 1508.25 (a)(i, ii, iii)). Connected Actions are limited to actions that are currently proposed (ripe for decision). Actions that are not yet proposed are not Connected Actions, but may need to be analyzed in the cumulative effects analysis if they are reasonably foreseeable. The only Connected Actions associated with the Proposed Action are those that relate to the HDD workspace at the Missouri River crossing and the HDD workspace, HDD stringing area, and the permanent easement on private lands in the vicinity of the Lake Oahe crossing.

Dakota Access initially proposed an isolation valve to be located within the flowage easements (easement LL3453E); however, the Omaha District has assessed the potential for open water and ice jam flooding within the vicinity of the Project Area in the "Reconnaissance Report, Missouri River, Buford-Trenton Irrigation District, North Dakota" and based on the findings the valve would be located within an area that has the potential to be submerged or damaged by ice jam flooding. Therefore, the valve has been removed from the Project Area.

**Table 2-2** defines the components of both the Project Area and related Connected Actions.

9

USACE_DAPL0074132

Environmental Assessment
Dakota Access Pipeline Project
September 2015

| Table 2-2 Environmental Assessment Areas of Interest | | | |
|---|---|---|---|
| Action/Activity | Federal/ Private Land | EA Review | Acres |
| **Flowage Easements--Williams County** | | | |
| Construction ROW within Corps flowage easements | Private; Federal Easement | Project Area | 58.0 |
| HDD workspace (exit point) within Corps flowage easement | Private; Federal Easement | Project Area | 1.2 |
| Permanent easement over HDD profile within Corps flowage easement and placement of temporary waterline | Private; Federal Easement | Project Area | 1.2 |
| | | | |
| | | | |
| **Flowage Easements Connected Actions – McKenzie County** | | | |
| HDD workspace (entry point) on private land | Private | Connected Action | 2.0 |
| **Federal Lands and Connected Actions - Morton County** | | | |
| HDD workspace (exit point) on private land | Private | Connected Action | 1.2 |
| HDD stringing area on private land | Private | Connected Action | 13.1 |
| Permanent easement over HDD profile on private land between HDD workspace (exit point) and federal lands | Private | Connected Action | 0.8 |
| Permanent easement over HDD profile on federal lands | Federal | Project Area | 0.4 |
| **Federal Lands and Connected Actions - Emmons County** | | | |
| Permanent easement over HDD profile on federal land | Federal | Project Area | 0.8 |
| Permanent easement over HDD profile on private land between federal land and HDD workspace (entry point) | Private | Connected Action | 0.3 |
| HDD workspace (entry point) on private land | Private | Connected Action | 1.2 |
| **Lake Oahe** | | | |
| Permanent easement over HDD profile across Lake Oahe | N/A | Project Area | 6.3 |

### 2.3.1.1   Flowage Easements

The Missouri River HDD is located just upstream of Lake Sakakawea and downstream of the confluence of the Yellowstone and Missouri rivers.  The proposed crossing of flowage easements near upper Lake Sakakawea (flowage easements) is located in Sections 7, 18, 19, and 30, Township 152 North, Range 103 West, in Williams County, North Dakota (**Figure 2**).  The proposed pipeline is routed parallel to an existing buried natural gas pipeline and associated valve sites, which cross the Missouri River and flowage easements just west of the proposed Dakota Access pipeline.

10

Environmental Assessment
Dakota Access Pipeline Project
September 2015

The HDD exit workspace would be located on a flowage easement tract.  Access to the Project Area on the flowage easements would be via the construction ROW from an existing road (38th Street NW).  No additional temporary access roads would be required.  The Connected Action at the flowage easements includes the HDD entry workspace, located on the south side of the Missouri River on private lands in McKenzie County.  Access to the HDD entry workspace will be via the existing access road located adjacent to the HDD entry workspace.  No additional temporary access roads would be required.

### 2.3.1.2    Federal Lands

The proposed crossing of federally-owned tracts at Lake Oahe (federal lands) is located in Section 10, Township 134 North, Range 79 West in Morton County, North Dakota, and Section 11, Township 134 North, Range 79 West in Emmons County, North Dakota (**Figure 3**).  The proposed pipeline is routed to parallel existing linear infrastructure (an overhead powerline and a buried natural gas pipeline) in this area.  The HDD entry and exit point workspaces and stringing area would be located on private land outside of the federal lands and are considered Connected Actions in this analysis.  HDD design reflects a crossing length of approximately 7,500 feet, of which approximately 5,420 feet occurs beneath the bed of Lake Oahe.

### 2.3.2    Description of Construction Techniques and Construction Mitigation Measures

All facilities associated with the Project would be designed, constructed, tested, operated, and maintained in accordance with the U.S. DOT regulations in Title 49 CFR Part 195.  Dakota Access is currently developing Project-specific plans and would implement best management practices (BMPs) to mitigate for potential construction-related impacts associated with stormwater runoff.  This includes implementation of their Stormwater Pollution Prevention Plan (SWPPP; see **Appendix A**), which includes the Spill Prevention Control and Countermeasure Plan (SPCC Plan) as an appendix.   Additionally, Dakota Access would implement their HDD Construction Plan and HDD Contingency Plan (HDD Construction/Contingency Plan; see **Appendix B**) for inadvertent release of drilling mud during HDD construction work at wetland and waterbody crossings to protect sensitive resources from such releases.  The Project would be constructed via a combination of conventional and specialized construction procedures, as described below.

### 2.3.2.1    Clearing and Grading

Prior to commencement of ground-disturbing activities, a standard survey and stakeout would be conducted to identify ROW and workspace boundaries and to locate existing foreign utility lines within the construction ROW.  Following completion of the surveys, the construction ROW would be cleared of vegetation and debris.  Clearing of wetlands is limited to removal of woody debris in the forested wetlands above the HDD profile on the north bank of the Missouri River within the flowage easements.  Stumps would be cut flush with the ground and left in place, as described in Section 3.2.3.  Cleared vegetation and debris along the ROW would be disposed of in accordance with federal, state, and local regulations either by burning, chipping and spreading, or transportation to a commercial disposal facility.  Where necessary, to contain disturbed soils during clearing and grading in upland areas, and to minimize potential erosion and sedimentation of wetlands and waterbodies, temporary erosion control devices (ECDs) would be installed prior to initial ground disturbance and maintained throughout construction.  Vegetative buffers would be left where practical at all waterbody crossings to limit the exposure and impact to these features. Final clearing would take place immediately prior to crossing the feature rather than advance.

11

Environmental Assessment
Dakota Access Pipeline Project
September 2015

### 2.3.2.2    Trenching

Trenching involves excavation of a ditch for pipeline placement and is accomplished through the use of a trenching machine, backhoe, or similar equipment.  Trench spoil would be deposited adjacent to each trench within the construction work areas, with topsoil segregation utilized where necessary based on land use (see the typical ROW configuration drawings in **Appendix C**).  In standard conditions, the trench would be excavated to an appropriate depth to allow for a minimum of 36 inches of cover over the pipe. Ground disturbance associated with conventional pipeline construction is generally limited to approximately 6 to 10 feet below the existing ground surface.  Typically the bottom of the trench would be cut at least 12 inches greater than the width of the pipe.  The width at the top of the trench would vary to allow the side slopes to adapt to local conditions at the time of construction.

### 2.3.2.3    Pipe Stringing, Bending, and Welding

Following preparation of the trench, the new pipe would be strung and distributed along the ROW parallel to the trench.  Depending on available workspace, some pipe may be fabricated off-site and transported to the ROW in differing lengths or configurations.  Pipe would be bent by hydraulic bending machines, as necessary, to conform the pipe to the trench.  Once in place along the ROW, pipe lengths would be aligned, bends fabricated, and joints welded together on skids (i.e., temporary supports).  Welding would be performed in accordance with the American Petroleum Institute Standards, Pipeline and Hazardous Materials Safety Administration (PHMSA) pipeline safety regulations, and company welding specifications. All welds would be coated for corrosion protection and visually and radiographically inspected to ensure there are no defects.   Segments of completed pipeline would undergo hydrostatic pressure testing as described in Sections 3.2.1.2 and 3.11.

### 2.3.2.4    Pipeline Installation and Trench Backfilling

Completed sections of pipe would be lifted off the temporary supports by side boom tractors or similar equipment and placed into the trench.  Prior to lowering-in, the trench would be visually inspected to ensure that it is free of rock and other debris that could damage the pipe or the coating.  Additionally, the pipe and the trench would be inspected to ensure that the configurations are compatible.  Tie-in welding and pipeline coating would occur within the trench to join the newly lowered-in section with the previously installed sections of pipe.  Following this activity, the trench would be backfilled with the previously excavated material and crowned to approximately 6 inches above its original elevation to compensate for subsequent settling.

### 2.3.2.5    Clean-up and Restoration

Following pipeline installation and backfilling, disturbed areas would be restored and graded to pre-construction contours as closely as practicable.  Construction debris and organic refuse unsuitable for distribution over the construction ROW would be disposed of at appropriate facilities in accordance with applicable regulations.  Permanent ECDs would be installed as appropriate, and revegetation measures would be applied in accordance with the Environmental Construction Plan (ECP; see **Appendix G**), SWPPP, and requirements of applicable state and federal permits.

12

Environmental Assessment
Dakota Access Pipeline Project
September 2015

### 2.3.2.6    Major Waterbody Crossing Method

As previously discussed, the preferred waterbody crossing technique for the Proposed Action is the HDD method. The HDD method allows for construction across a feature without the excavation of a trench by drilling a hole significantly below conventional pipeline depth and pulling the pipeline through the pre-drilled hole.  As described in subsequent sections of this document and in greater detail in the HDD Construction Plan (**Appendix B**), by utilizing the trenchless technology, Dakota Access would minimize impacts to resources within and adjacent to the waterbodies crossed and reduce the anticipated duration of the crossing.  The HDD equipment would be staged well outside of the riparian area, avoiding impacts on the steep banks, cultural resources, and sensitive habitat immediately adjacent to the waterbody.

Depending on the HDD equipment utilized, to help guide the drill bit along the pipeline ROW, electric-grid guide wires may be laid along the predetermined HDD route.  In thickly vegetated areas, a small path may be cut to accommodate laying the electric-grid guide wires.  Once the electric-grid guide wires are installed, the directional drilling rig would drill a small diameter pilot hole along the prescribed profile. Following the completion of the pilot hole, reaming tools would be utilized to enlarge the hole to accommodate the pipeline diameter.  The reaming tools would be attached to the drill string at the exit point and would then be rotated and drawn back to incrementally enlarge the pilot hole. During this process, drilling fluid consisting of primarily bentonite clay and water would be continuously pumped into the pilot hole to remove cuttings and maintain the integrity of the hole.  When the hole has been sufficiently enlarged, a prefabricated segment of pipe would be attached behind the reaming tool on the exit side of the crossing and pulled back through the drill hole towards the drill rig.

Fluid pressures can build up within the borehole during HDD operations.  In some instances, this can result in hydraulic fracturing of the substrate and subsequent migration of drilling fluids either into the waterway or to the land surface—this is known as a "frac-out."  The depth of the proposed HDD profiles below the beds of the surface waters to be crossed would minimize the potential for frac-outs to occur.  Additionally, precautions would be taken during all phases of the drilling operation.  A high quality drilling fluid would be used to maintain and protect the integrity of the borehole during the entire HDD operation until the final pipe pull is completed.  The HDD Construction Plan (**Appendix B**) includes more details regarding HDD construction technology and methods.  The work would be performed by an experienced drilling contractor, Michels Directional Crossings, a Division of Michels Corporation, that is knowledgeable in effective HDD practices, including maintaining proper drilling rate, drilling fluid composition, pumping rate of the drilling fluid, pull-back rate, and pumping rate on the back ream, and adjusting these as appropriate for the conditions.

### 2.3.2.7    Minor Waterbody Crossing Methods

There are no minor waterbodies crossed by the pipeline on Corps Fee Lands.  All minor waterbodies encountered on the flowage easements have been identified as falling under the jurisdiction of the Buford/Trenton Irrigation District (BTID) and, in compliance with their regulations, would be crossed via trenchless pipeline construction methods (bores).  Dakota Access is working through the BTID permitting and approval process separately.  One intermittent waterbody has been identified on the south side of the Missouri River crossing, within the connected action area but outside of the flowage easements, and within the HDD workspace.  Temporary impacts to this waterbody would be mitigated during construction with a customized HDD equipment configuration, including the placement of temporary matting/bridging

13

Environmental Assessment
Dakota Access Pipeline Project
September 2015

over the feature as necessary to maintain natural water flow during construction, and installation of appropriate ECDs.  Therefore, impacts on surface waters and adjacent sensitive habitat would be minimized by eliminating open-cut pipeline installations and in-stream work for all crossed waterbodies.

### 2.3.2.8    Wetland Crossings

As discussed in Section 3.2.3 below, the only wetlands that would be crossed by Project activities are located within the permanent easement between HDD workspace and the Missouri River on the flowage easements.  As such, no wetlands would be impacted by construction or operation of the Project facilities within the Project Area/Connected Actions of the federal lands, and no trenching within wetlands would occur within the Project Area on the flowage easements.  A temporary waterline would be laid aboveground, across the wetlands located between the HDD workspace and the north bank of the Missouri River on flowage easement LL3440E (**Figure 6-B**).  No ground disturbing activity would be required for installation of the temporary waterline.  A more detailed discussion regarding wetlands is provided in Section 3.2.3.

### 2.3.2.9    Operation and Maintenance

Following completion of construction, a 50-foot-wide permanent easement along the entire Project alignment that is generally centered on the pipeline (25 feet on either side of the centerline) would be retained along the pipeline route.  The 50-foot-wide easement would be maintained by the Operator in an herbaceous state (cleared of large diameter woody vegetation) to facilitate inspection of the pipeline, operational maintenance, and compliance with the federal pipeline safety regulations.  This 50-foot-wide maintained corridor would be reduced to a 30-foot-wide corridor centered on the proposed pipeline within the wetland area north of the Missouri River in Corps Flowage Easement LL3440E (**Figure 6-B**).

Maintenance of the permanent ROW would entail periodic vegetation clearing measures, in accordance with PHMSA regulation for pipeline inspection.  This may involve selective tree cutting and periodic mowing.  The use of herbicides would not occur on Corps Fee Lands without obtaining prior approval from the Corps.  Vegetation maintenance of the ROW in areas of active cropland is not expected to occur due to agricultural practices.

14

USACE_DAPL0074137

Environmental Assessment
Dakota Access Pipeline Project
September 2015

### 3.0    THE AFFECTED ENVIRONMENT AND POTENTIAL ENVIRONMENTAL IMPACTS OF THE PROPOSED ACTION AND NO ACTION ALTERNATIVE

## 3.1    Geology and Soils

Under the "no action" alternative, Dakota Access would not construct the proposed Project and no impacts on geology and soils would occur.  However, if the objectives of the Project are to be met under the "no action" alternative, other projects and activities would be required and these projects would result in their own impacts on geology and soils, which would likely be similar to or greater than the proposed Project.  Nevertheless, the impacts associated with a future project developed in response to the "no action" alternative are unknown, while only minor and temporary impacts, if any, on geological resources and soils would occur as a result of the Proposed Action, as described in the sections below.

### 3.1.1    Geology

#### 3.1.1.1    Affected Environment

The Corps flowage easements to be crossed extend approximately 2.83 miles north of the Missouri River in Williams County (**Figure 2**).  Conventional open trench construction methods would be used to install the pipeline on approximately 13,553 feet of the 14,953 feet of flowage easements.  The remaining 1,400 feet would be installed via HDD for the adjacent Missouri River crossing.  The easements and Connected Action (and the river) lie within the Missouri River valley and floodplain on top of the Quaternary Oahe Formation (Clayton, 1980).  The Oahe Formation is comprised of unconsolidated sediments, including clay, sand, silt, and gravel, with some dispersed organic material.  Geotechnical borings placed on both sides of the river, ranging in depth from 75 to 95 feet below ground surface, confirm the presence of unconsolidated sand, gravel, and clay to at least these depths.  At this location, the Oahe Formation unconformably overlies the Paleocene Bullion Creek Formation, which is made up of silt, sand, clay, sandstone, and lignite, and is the uppermost part of a thick sequence of early Tertiary and late Mesozoic sedimentary formations. Well borehole data from McKenzie County indicates that this sequence occurs in excess of 15,000 feet thick in certain locations (Freers, 1970).

The flowage easements crossed by the Proposed Action and area crossed by the Connected Action occur within the Great Plains Physiographic Province, which is characterized by a broad expanse of flat land in the central portion of the U.S.  The easements and the Missouri River Project Area lie within an area where physiography is characterized by low-relief alluvial and floodplain deposits and range in elevation from 1,856 to 1,879 feet above mean sea level (MSL).

The bedrock geology of the Lake Oahe crossing area is characterized by Cretaceous sedimentary formations (Clayton, 1980).  The Fox Hills Formation (sandstone and shale) overlies the Pierre Formation (shale), which has been exposed through erosion along the axis of the Lake Oahe reservoir of the Missouri River.  The surficial geology is characterized by alluvium within the valley and dune deposits moving in an eastward direction.  This was corroborated by geotechnical soil borings that were placed on private lands on both sides of Lake Oahe that indicate the presence of sands and clays to depths ranging from at least 150 to 235 feet below ground surface (**Appendix D**).

15

USACE_DAPL0074138

Environmental Assessment
Dakota Access Pipeline Project
September 2015

The Lake Oahe crossing area also lies within the Great Plains Physiographic Province.  On the west side of Lake Oahe, the federal land tracts range in elevation from 1,609 to 1,712 feet above MSL.  The HDD exit point workspace ranges from 1,699 to 1,711 feet MSL, and the stringing area ranges from 1,671 to 1,766 feet MSL.  On the east side of Lake Oahe, the federal lands range in elevation from 1,613 to 1,664 feet MSL, and the HDD entry point workspace ranges from 1,636 to 1,644 feet MSL.

### 3.1.1.2    Impacts and Mitigation

To protect the terrain of the Project Area and Connected Actions, Dakota Access would, to the extent feasible, restore the areas affected by pipeline construction to pre-construction contours and similar vegetation (excepting trees within approximately 15 feet of the centerline).  Pre-construction and as-built surveys would be completed and provided to the Garrison Project.

Construction of the pipeline on the flowage easements and Connected Action at the Missouri River crossing would result in minor impacts on topography and geology, and no unique geologic features that have received state or federal protection would be impacted within the Corps flowage easements or Connected Action.  The impacts attributable to the HDD would not be significant.  Primary impacts of open trench installation within the Corps flowage easements or Connected Action would be limited to construction activities and consist of temporary alteration due to grading and trenching operations.

Construction of the pipeline at the Lake Oahe crossing would not result in adverse impacts on topography or geology on federal lands of the Project Area.  Similarly, construction impacts on topography and geology from the Connected Actions would be low to non-existent.  No unique geologic features would be impacted by any aspect of the HDD installation.

No impacts on topography or geology would occur during operations.

Based on recently obtained geotechnical analysis, no blasting would be expected to occur in association with pipeline installation on the Project Area or Connected Actions, given that the HDD would be conducted in unconsolidated or loosely indurated sediments, as described in Section 3.1.1.1.  Although not anticipated, if blasting is found to be necessary, Dakota Access would follow procedures specified in its Blasting Plan (**Appendix E**).

### 3.1.2    Mineral Resources

### 3.1.2.1    Affected Environment

Williams and McKenzie counties have numerous mineral resources that include petroleum, lignite, halite, sand and gravel, and scoria.  Scoria, sediments baked from the in situ combustion of lignite (Carlson, 1985), is commonly used to surface roads.  Although lignite occurs throughout Williams and McKenzie Counties, there are no lignite beds in the vicinity of the Corps flowage easement crossings (Murphy, 2006; 2007). A review of aerial photographic and USGS 1:24K topographic coverage indicates that there are no sand, gravel, or scoria pits within 1.5 miles of the Corps flowage easement crossing areas.

USACE_DAPL0074139

Environmental Assessment
Dakota Access Pipeline Project
September 2015

Two oil/gas wells are located within the Corps flowage easements (LL3440E), but neither occur within 150 feet of the proposed HDD workspace.  In addition, no oil/gas wells are located within 150 feet of the Connected Action at the Missouri River (North Dakota Department of Mineral Resources, 2015).

The primary mineral resources of Morton and Emmons counties are sand and gravel aggregates.  The older Cretaceous sediments in the vicinity of the Lake Oahe crossing (i.e., scoria) do not contain economical deposits of fossil fuels.  Although lignite occurs in Morton County, no lignite beds were identified in the vicinity of the Lake Oahe crossing.  A review of aerial photographic and USGS 1:24K topographic coverage indicates that there are no sand, gravel, or scoria pits within 1.5 miles of the Lake Oahe crossing.

Since Morton and Emmons Counties are located outside the areal extent of the Bakken Formation, there is little to no development of oil/gas resources.  This is reflected in the fact that no oil/gas wells were located within 150 feet of the federal lands or HDD workspace and stringing area.  However, the proposed pipeline would be co-located with an existing buried natural gas pipeline and an overhead electric transmission line across the lake.

### 3.1.2.2    Impacts and Mitigation

As noted previously, mineral resources, including lignite, halite, sand and gravel, and scoria occur within the region around the Corps flowage easements and Connected Action; however, the only commercially exploited mineral resources in the direct vicinity of the route are oil and gas, as evidenced by the two wells found within the Corps flowage easements.  These wells would not be impacted by the Proposed Action due to proposed conventional construction methods and distance from the wells.  No impacts on any mineral resources are expected as a result of the proposed flowage easement crossings or Connected Action.

The Proposed Action does not cross active mining areas nor any oil or gas wells and facilities in the vicinity of Lake Oahe.  No impacts to any mineral resources are expected as a result of the proposed Lake Oahe crossing.

Dakota Access, in accordance with North Dakota One Call, would require that the construction contractor, prior to initiating any ground disturbance activities, identify all underground utilities to minimize the potential for encountering buried utility structures.  Accordingly, the Proposed Action is not expected to have any impact on mineral resources, because there would be no additional surface disturbance required beyond that used for construction.

## 3.1.3    Geologic Hazards

### 3.1.3.1    Affected Environment

**Earthquakes and Seismic Hazards**

The Project route in North Dakota, including the Proposed Action areas, traverses terrain that overall is geologically stable.  The potential seismic hazard was assessed by evaluating the USGS 2014 Seismic Hazard Map.  According to the Seismic Hazard Map, an earthquake that has a 2% chance of being

17

USACE_DAPL0074140

Environmental Assessment
Dakota Access Pipeline Project
September 2015

exceeded in a 50-year period would result in peak ground accelerations (PGAs) of 2 to 4 percent gravity (g) in the Project Area and Connected Actions (USGS, 2014a).

Ground movement from an earthquake of this magnitude may cause a light perceived shaking but is not expected to cause any structural damage.  The low seismic hazard of the Project Area is further corroborated by the relatively low number of earthquakes that have historically occurred in North Dakota (North Dakota GIS Hub Data Portal, 2010).

**Landslides**

Landslides refer to the gravity-induced downward and outward movement of slope-forming materials and pose the greatest risk to facilities on or near steep slopes or on soil materials that are susceptible to failure particularly in response to earthquakes or heavy precipitation.  A map developed by the USGS that illustrates the regional potential for the occurrence of landslides was used to evaluate the Project Areas for landslide incidence and susceptibility (Radbruch et al., 1982).

Portions of the Project Area within the Corps flowage easements are moderately susceptible to landslides. This includes 59.2 acres (100%) of construction workspace, of which 17.0 acres lies within the 50-foot-wide permanent easement, and 0.55 acre occurs within the 30-foot-wide maintained corridor above the HDD profile within the Corps flowage easement (which would not have surface disturbance aside from selective tree cutting and roots would remain in place).  The HDD entry point on the south side of the Missouri River outside of the flowage easements is considered the Connected Action.  The HDD entry workspace is approximately 2.0 acres and is also moderately susceptible to landslides.

As designed, the Project does not require any surface impacts to the federally owned lands at Lake Oahe, although , 0.4 acre of the permanent easement through the federal property on the west side of the Lake Oahe (Morton County) is classified as having a high incidence of landslides.  Slopes greater than 25% in the Project Area within federal lands are not found on the east side of Lake Oahe (Emmons County) and comprise less than 0.02 acre on the west side. Activities related to the HDD crossing outside of the federal lands at the Lake Oahe crossing are considered Connected Actions.  On the west side of Lake Oahe, 1.2 acres of the HDD workspace (exit point) and 13.1 acres of the pipe stringing area are designated as having a high incidence for landslides. Additionally, the stringing area encompasses approximately 1.8 acres of land that is classified as highly susceptible to landslides.  Approximately 0.9 acre within the stringing area has slopes exceeding 25%.  Approximately 1.2 acres of the HDD entry point workspace on the east side of Lake Oahe is designated as having a high incidence of landslides, but there are no slopes within either the east or west HDD workspace that exceed 25%.

**Karst and Subsidence**

Geologic terrane beneath the flowage easements as well as the Connected Actions has potential for karst development owing to the presence of evaporite deposits, consisting of gypsum, salt, anhydrite, and/or potash (Weary and Doctor, 2014).  These deposits range in age from Devonian to Jurassic and occur at depths ranging from 900 to 3,700 meters (3,000 to 12,000 feet).  Fresh water must be present for the necessary dissolution to occur for karst development.  However, since fresh water is not likely to be found at these depths, dissolution and karst development are not likely to occur (Ackerman, 1980).  Even if karst

18

USACE_DAPL0074141

Environmental Assessment
Dakota Access Pipeline Project
September 2015

conditions were to develop, any physiographic expression at the ground surface would be negligible given the great depth of these formations.

Geologic terrane beneath the federal lands crossings as well as the HDD workspaces at Lake Oahe area may have potential for karst development due to deposits of gypsum and other evaporates (Weary and Doctor, 2014). However, a review of topographic and aerial photographic coverages as well as geotechnical testing gave no indication of karst feature development, and no documentation was found to indicate that karst features have actually developed in this area. Furthermore, an existing buried pipeline and overhead electric transmission line also cross in this location, and no information was found indicating those utilities have been impacted by karst.

Land subsidence may be caused by mining, underlying karst features, and extraction of fluids, such as oil or groundwater. No surface subsidence effects are expected to be incurred in the Project Area since no mines, oil/gas wells, water wells, or karst development have been identified in the Project vicinity. Moreover, despite the fact that oil and gas production has occurred for decades in the Williston Basin, no surface subsidence effects have been documented in that area and, therefore, are not expected to impact the Project Areas within or near the margin of the Williston Basin.

### 3.1.3.2    Impacts and Mitigation

Although landslides can represent a significant geologic hazard during construction and operation of the pipeline, the pipeline would be installed via the HDD to significantly reduce ground disturbing activities in areas with steep slopes (greater than 25%), effectively mitigating the risk.

As previously discussed, no ground disturbing activities would occur within the Project Area on the federal lands. Ground disturbing activities associated with the HDD workspace and pipe stringing area would be required as part of the Connected Action; however, these activities would consist of clearing and grading only and would occur, at the closest distance, 1,040 feet from the bank of Lake Oahe. As such, no trenching or excavation activities would occur within the Project Area or Connected Action of the federal lands, thereby reducing the potential for erosion and off-site sedimentation which could otherwise occur as a result of side-slope trench excavation methods and accumulation of water within the trench.

To further mitigation impacts during construction, Dakota Access would utilize erosion and sediment control devices in accordance with the ECP and SWPPP, and in compliance with the National Pollutant Discharge Elimination System (NPDES) program, during construction in these areas with slopes greater than 25%. Dakota Access would install sediment barriers (e.g., silt fence) at the base of slopes and along the sides of slopes, as necessary, to prevent potential siltation downslope of the construction area from entering waterbodies.

Temporary erosion control devices (ECDs) would be maintained until the areas disturbed by construction have been successfully revegetated or are replaced with permanent ECDs. Following the completion of construction activities, disturbed areas would be restored and graded to pre-construction contours as closely as practical. In order to minimize the potential for future slip or landslide events during operation of the Project facilities, Dakota Access may install permanent ECDs in addition to performing regular restoration and revegetation activities. Permanent ECDs would be installed in accordance with revegetation measures outlined in the ECP, SWPPP, and specific landowner requests. The effectiveness of

USACE_DAPL0074142

Environmental Assessment
Dakota Access Pipeline Project
September 2015

revegetation and permanent ECDs would be monitored by Dakota Access' operating personnel during the long-term operation and maintenance of the Project facilities. Therefore, construction and operation of the Project facilities on the Project Area and Connected Action of the federal lands would not be expected to increase the potential for significant landslide or slip events or result in adverse impacts on aquatic life resources within Lake Oahe.

Dakota Access has completed a geotechnical analysis of the flowage easement and federal land crossing sites to facilitate engineering and design, including selection of appropriate materials and construction methods to limit any environmental impacts attributable to landslides. Results of the geotechnical analysis are included in **Appendix D**.

The strength and ductility of a properly designed pipeline would allow it to span a considerable distance without compromising its integrity in the event of a landslide or other ground movement, such as subsidence. Arc-welded steel pipelines are the most resistant type of piping, vulnerable only to very large and abrupt ground displacement (e.g., earthquakes, severe landslides) and are generally highly resistant to moderate amounts of permanent deformation. This strength and ductility effectively mitigates the effects of fault movement, landslides, and subsidence. Therefore, by implementing the mitigation measures presented here, impacts on the pipeline from geologic hazards are expected to be minimal.

No impacts associated with seismic activity within the Project Area are anticipated. Due to the limited potential for large, seismically induced ground movements, there is minimal risk of earthquake-related impacts on the pipeline. Therefore, no mitigation beyond designing the proposed pipeline to currently accepted industry specifications is necessary.

### 3.1.4    Paleontology

#### 3.1.4.1    Affected Environment

The surficial geology at the Missouri River crossing is dominated by Quaternary glacial drift materials within the floodplain overlying the Bullion Creek and Sentinel Butte Formations. These bedrock formations have been known to contain wide variety of fossils, including fossilized wood and tree stumps, mollusks, leaves, and insects (Hoganson and Campbell, 2002). Additionally, vertebrate fossils have been found, including turtles, crocodile-like champsaurs, and bear-like titanoides.

The surficial geology at the Lake Oahe crossing is also characterized by Quaternary glacial drift materials; however, it is underlain by the Fox Hills and Pierre Formations. These formations could contain diverse fossils, including marine reptiles (e.g., mosasaurs, plesiosaurs, sea turtles), fish (e.g., sharks and rays), birds, and invertebrates (Hoganson, 2006).

While there is potential for the bedrock formations underlying the Missouri River and Lake Oahe crossings to contain fossils, all activities, including HDDs, would only penetrate the surficial geology that is dominated by unconsolidated sediments, as evidenced in the geotechnical report provided in **Appendix D**. The potential for encountering fossils in these unconsolidated sediments at the Missouri River and Lake Oahe crossings is low, as fossils are primarily found in sedimentary rock.

20

USACE_DAPL0074143

Environmental Assessment
Dakota Access Pipeline Project
September 2015

### 3.1.4.2   Impacts and Mitigation

Activities associated with pipeline construction that have the potential to impact paleontological resources are clearing, grading, and trenching, as well as site preparation for HDD operations. The paleontological resources of concern pertaining to construction of the Project are vertebrate fossils that may be present in the Paleocene bedrock sediments, and to a lesser degree, in Quaternary alluvium since this type of deposit only rarely contains vertebrate fossils.

In the event paleontological resources are discovered during construction, Dakota Access would implement measures outlined in its Unanticipated Discoveries Plan Cultural Resources, Human Remains, Paleontological Resources and Contaminated Media (UDP) (**Appendix F**) to avoid further impacts on these resources.

Invertebrate fossils are considered to be insignificant, and mitigative measures would not be required, should they be encountered. However, if any vertebrate fossils are found during pipeline construction, Dakota Access would immediately cease construction activities and notify appropriate agency personnel, including the North Dakota state paleontologist as well as the Corps archaeologist. The appropriate authorities would determine the significance of the find and prescribe the mitigation procedures to be completed prior to resuming pipeline construction.

Operation of the pipeline would not disturb paleontological resources.

### 3.1.5   Soils

#### 3.1.5.1   Affected Environment

Dakota Access identified and assessed soil characteristics in the Project Area and Connected Actions using the Soil Survey Geographic Database, which is a digital version of the original county soil surveys developed by the NRCS for use with GIS (NRCS, 2015). The areas are located within the Rolling Soft Shale Plain of North Dakota, South Dakota, and Montana. The dominant soil orders in the Rolling Soft Shale Plain are Mollisols and Entisols, which are shallow to very deep, generally somewhat excessively drained and loamy or clayey (NRCS, 2006).

The flowage easements and Connected Action are within Zone A of the Missouri River floodplain. Soils within the Project Area are formed out of alluvium deposited by the river over time. Slopes throughout this Project Area are very flat, ranging from 0-2%. Approximately 94% of the flowage easement Project Area and Connected Action would be located within either Scorio silty clay or Lohler silty clay (**Table 3-1, Figure 4**). The Scorio and Lohler silty clay soils are moderately well drained and formed in clayey alluvium. In the case of the Scorio silty clay, the clay alluvium is deposited over a loam alluvium. The Scorio and Lohler soils are identified as Hydrologic Soil Group C, which have slow infiltration rates when thoroughly wet and a slow rate of water transmission. The average depth to the water table across the majority of this Project Area is 4.25 feet. The soils within the flowage easements experience occasional flooding but are not generally ponded. Soil boring data is provided in (**Appendix D**).

USACE_DAPL0074144

Environmental Assessment
Dakota Access Pipeline Project
September 2015

| Table 3-1 Soil Types Mapped on the Flowage Easements Project Area and Connected Action | | | | | | |
|---|---|---|---|---|---|---|
| Soil Map Unit | Soil Map Unit Name | Project Area (acres) [1] | Farmland Rating | Hydrologic Group [2] (infiltration) | Hydric Rating [3] | Wind Erodibility Group [4] |
| E4039A | Mckeen loam, 0-1% slopes, frequently flooded | 0.1 | None | B/D | 96% | 4L |
| E4051A | Trembles fine sandy loam, slightly wet, 0-1% slopes, occasionally flooded | 0.5 | Farmland of Statewide Importance | A | 0% | 3 |
| E4103A | Lohler silty clay, saline, 0-1% slopes, occasionally flooded | 0.9 | None | C | 0% | 4 |
| E4106A | Lohler silty clay, slightly wet, 0-2% slopes, occasionally flooded | 27.8 | Farmland of Statewide Importance | C | 5% | 4 |
| E4159A | Scorio silty clay, slightly wet, 0-2% slopes, occasionally flooded | 29.9 | Farmland of Statewide Importance | C | 0% | 4 |
| E2725F | Arikara-Shambo-Cabba loams, 9-70% slopes | 2.0 | None | B | 0% | 6 |
| EW | Water | 0.3 | None | N/A | N/A | N/A |
| | Total | 61.5 | -- | | | |

[1]  The Project Area includes the construction workspace (58.0 acres) and 30-foot maintenance easement (1.0 acre) located on the flowage easements as well as the Connected Action workspace (2.0 acres).
[2]  Hydrologic Soil Groups are used to estimate runoff from precipitation: A = high infiltration rate, low runoff potential; B = moderate infiltration rate; C = slow infiltration rate; D = very slow infiltration rate, high runoff potential.
[3]  Hydric Rating: Hydric (100%), Hydric (66-99%), Hydric (33-65%), Hydric (1-32%), Not Hydric (0%).
[4]  Wind erodibility group in cultivated areas: Group 1 are the most susceptible to wind erosion, and those assigned to group 8 are the least susceptible. 4L indicates calcareous soils.

The predominant soil type at the federal lands at Lake Oahe is the Flasher-Vebar-Parshall complex.  This complex would comprise 7.5 acres (34%) of the Project Area and Connected Action (**Table 3-2, Figure 5**). The Flasher-Vebar-Parshall complex contains 36% Flasher or similar soils, 22% Vebar or similar soils, 15% Parshall or similar soils, and 27% minor components.  The Flasher-Vebar-Parshall complex is formed from sandy residuum weathered from sandstone and is steep within the Project Area and Connected Action, with slopes ranging from 9 to 35% (NRCS, 2015).  The Flasher-Vebar-Parshall complex is Hydrologic Soil Group D, which has very slow infiltration (high runoff potential) when thoroughly wet.  The depth to the water table is greater than 6.5 feet.  A majority of the soils within the Project Area and Connected Action are neither frequently flooded nor frequently ponded.

22

USACE_DAPL0074145

Environmental Assessment
Dakota Access Pipeline Project
September 2015

| Table 3-2 Soil Types Mapped on the Federal Lands Project Area and Connected Action | | | | | | |
|---|---|---|---|---|---|---|
| Soil Map Unit | Soil Map Unit Name | Project Area (acres) [1] | Farmland Rating | Hydrologic Group [2] (infiltration) | Hydric Rating [3] | Wind Erodibility Group [4] |
| E0623B | Grail-Belfield clay loams, 2-6% slopes | 2.9 | Farmland of Statewide Importance | C | 0% | 6 |
| E0701F | Dogtooth-Janesburg-Cabba complex, 6-35% slopes | 0.8 | None | D | 3% | 6 |
| E1423F | Flasher-Vebar-Parshall complex, 9-35% slopes | 5.8 | None | D | 0% | 2 |
| E1823A | Parshall fine sandy loam, 0-2% slopes | 0.7 | Farmland of Statewide Importance | A | 0% | 3 |
| E2601C | Amor-Cabba loams, 6-9% slopes | 0.3 | None | C | 0% | 6 |
| E2803B | Amor-Shambo loams, 3-6% slopes | 2.0 | Farmland of Statewide Importance | C | 0% | 6 |
| E3802B | Linton-Mandan silt loams, 2-6% slopes | 2.6 | Farmland of Statewide Importance | B | 0% | 5 |
| E3813A | Grassna silt loam, loess, 1-2% slopes | 1.7 | Prime Farmland | B | 2% | 6 |
| E3813B | Grassna silt loam, loess, 2-6% slopes | 0.5 | Prime Farmland | B | 2% | 6 |
| E4139A | Korchea-Fluvaquents complex, channeled, 0-2% slopes, frequently flooded | 0.4 | None | B | 43% | 4L |
| EW /E49999 | Water | 6.4 | None | N/A | N/A | N/A |
| | Total | 24.1 | -- | | | |

[1] The Project Area includes Connected Action areas.
[2] Hydrologic Soil Groups are used to estimate runoff from precipitation: A = high infiltration rate, low runoff potential; B = moderate infiltration rate; C = slow infiltration rate; D = very slow infiltration rate, high runoff potential.
[3] Hydric Rating: Hydric (100%), Hydric (66-99%), Hydric (33-65%), Hydric (1-32%), Not Hydric (0%).
[4] Wind erodibility group in cultivated areas: Group 1 are the most susceptible to wind erosion, and those assigned to group 8 are the least susceptible. 4L indicates calcareous soils.

**Prime Farmland**

Prime farmland has the best combination of physical and chemical characteristics for producing food, feed, forage, fiber, and oilseed crops and is available for these uses. Other soils that do not meet the criteria for prime farmland may be considered farmland of statewide importance.  These soils may produce high yields of crops when managed appropriately (NRCS, 2013).  Climate is the primary limiting

23

USACE_DAPL0074146

Environmental Assessment
Dakota Access Pipeline Project
September 2015

factor preventing farmland of statewide importance in North Dakota from being considered prime farmland; therefore, specific management techniques or other soil amendments cannot elevate farmland of statewide importance to a prime farmland designation (Sieler, 2015).

Within the flowage easements and Connected Action, 95% of soils are considered farmland of statewide importance, and none of the soils are considered prime farmland.  Approximately 9.5% of the soils on the federal lands, consisting only of Grassna silt loams, are considered prime farmland.  Additionally, Linton-Mandan silt loam and Armo-Sambo loam, which comprise 25% of the soils on federal lands are designated as farmland of statewide importance.  The remaining soils do not have a farmland designation.

### 3.1.5.2    Impacts and Mitigation

Pipeline construction activities such as clearing, grading, trench excavation, and backfilling, as well as the movement of construction equipment along the ROW may result in impacts on soil resources. Clearing removes protective cover and exposes soil to the effects of wind and precipitation, which may increase the potential for soil erosion and movement of sediments into sensitive environmental areas. Grading and equipment traffic may compact soil, reducing porosity and percolation rates, which could result in increased runoff potential and decreased soil productivity. Trench excavation and backfilling could lead to a mixing of topsoil and subsoil and may introduce rocks to the soil surface from deeper soil horizons.

Dakota Access would minimize or avoid these impacts on soils by implementing the mitigation measures described in the DAPL Project's SPCC, SWPPP, and ECP as well as requirements of applicable state and federal permits.  These documents would be included as contract documents and enforced as such throughout the DAPL Project.  As a result, impacts on soils as a result of the Project are expected to be insignificant.

Temporary erosion and sedimentation control measures may include installation of silt fence, straw bales, slope breakers, trench breakers, erosion control fabric, and mulch.

To minimize potential impacts on soil productivity, topsoil would be separated during trench excavation in agricultural land, and if applicable, other areas where soil productivity is an important consideration. Unless otherwise requested by the landowner, topsoil in cropland would be removed to a maximum depth of 12 inches from the trench and spoil storage area and stored separately from the trench spoil. After the trench is backfilled, topsoil would be returned to its approximate original location in the soil horizon.

Compaction of agricultural soils would be minimized by restricting construction activities during periods of prolonged rainfall. Where unacceptable levels of compaction occur in agricultural lands, a chisel plow or other deep tillage equipment would be utilized to loosen the soil.

Dakota Access would retain environmental inspectors (EIs) to monitor the contractor's compliance with applicable requirements to protect soil resources during construction of the DAPL Project.  The Garrison Project would be notified if the EIs document non-compliant activities by the contractor(s) on the Project Area or Connected Action Areas.

24

USACE_DAPL0074147

Environmental Assessment
Dakota Access Pipeline Project
September 2015

Soils would be temporarily disturbed within HDD workspaces during construction at the Missouri River and Lake Oahe crossings. Primary impacts attributable through open trench installation within the Corps flowage easements and Connected Action would be limited to construction activities and consist of temporary alteration of the construction ROW due to grading and trenching operations. **Tables 3-3** and **3-4** present the soil types that would be impacted by construction and maintenance activities.  By implementing BMPs and recognized construction methods identified in the Project ECP (**Appendix G**), impacts to soils should be limited.

Additionally, temporary workspace used for staging HDD operations would impact soils, particularly in association with the HDD entry excavation pit (approximately 5 feet to 15 feet across).  The pits would contain the drilling fluid that would be circulated through the borehole during drilling operations and the cuttings that are removed from the borehole.  All drilling mud and cuttings would be disposed at an approved location on non-federal lands, which may include land farming on private property or disposal at a licensed disposal facility.  Drilling fluid pits at the HDD entry and exit workspaces would be backfilled and the area returned as closely as practical to pre-construction conditions.  Dakota Access would implement the erosion control measures described in the SWPPP (**Appendix A**).  The HDD workspace sites would be cleared, graded and matted as needed to avoid rutting and minimize compaction.

There would be no soil disturbance outside of the construction workspace.  Permanent impacts on soils would be avoided through the implementation of BMPs during construction, restoration, and post-construction revegetation management.  A more complete description of BMPs and recognized construction methods can be found in the ECP (**Appendix G**).

There would be no conversion of prime farmland soils to non-agricultural use.

| Table 3-3 Soil Impacts on the Flowage Easements Project Area and Connected Action | | | | |
|---|---|---|---|---|
| Soil Map Unit | Map Unit Name | Project Area Temporary Impacts (acres) | Connected Action Temporary Impacts (acres) | Permanent Impacts (acres) |
| E4039A | McKeen loam, 0-1% slopes, frequently flooded | 0.1 | 0 | 0 |
| E4051A | Trembles fine sandy loam, slightly wet, 0-1% slopes, occasionally flooded | 0.5 | 0 | 0 |
| E4103A | Lohler silty clay, saline, 0-1% slopes, occasionally flooded | 0.9 | 0 | 0 |
| E4106A | Lohler silty clay, slightly wet, 0-2% slopes, occasionally flooded | 27.8 | 0 | 0 |
| E4159A | Scorio silty clay, slightly wet, 0-2% slopes, occasionally flooded | 29.9 | 0 | 0 |
| E2725F | Arikara-Shambo-Cabba loams, 9-70% slopes | 0 | 2.0 | 0 |
| | Total | 59.3 | 2.0 | 0 |

25

Environmental Assessment
Dakota Access Pipeline Project
September 2015

| Table 3-4 Soil Impacts on the Federal Lands Project Area and Connected Action | | | | |
|---|---|---|---|---|
| Soil Map Unit | Map Unit Name | Project Area Temporary Impacts (acres) | Connected Action Temporary Impacts (acres) | Total Impact Acres[1] |
| E0623B | Grail-Belfield clay loams, 2-6% slopes | 0 | 2.9 | 2.9 |
| E0701F | Dogtooth-Janesburg-Cabba complex, 6-35% slopes | 0 | 0.8 | 0.8 |
| E1423F | Flasher-Vebar-Parshall complex, 9-35% slopes | 0.4 | 5.4 | 5.8 |
| E1823A | Parshall fine sandy loam, 0-2% slopes | 0 | 0.7 | 0.7 |
| E2601C | Amor-Cabba loams, 6-9% slopes | 0 | 0.3 | 0.3 |
| E2803B | Amor-Shambo loams, 3-6% slopes | 0 | 2.0 | 2.0 |
| E3802B | Linton-Mandan silt loams, 2-6% slopes | 0 | 2.6 | 2.6 |
| E3813A | Grassna silt loam, loess, 1-2% slopes | 0.7 | 1.0 | 1.7 |
| E3813B | Grassna silt loam, loess, 2-6% slopes | 0 | 0.5 | 0.5 |
| E4139A | Korchea-Fluvaquents complex, channeled, 0-2% slopes, frequently flooded | 0 | 0.4 | 0.4 |
| EW | Water | 0.1 | 0 | 0.1 |
| Total | | 1.2 | 16.6 | 17.8 |

[1] All soil impacts on Federal Lands and Connected Action at Lake Oahe are considered to be temporary.

## 3.2    Water Resources

Under the "no action" alternative, Dakota Access would not construct the proposed Project, and no impacts on water resources would occur.  However, if the objectives of the Project are to be met under the "no action" alternative, other projects and activities would be required and these projects would result in their own impacts on water resources, which would likely be similar to or greater than the proposed Project.  Nevertheless, the impacts associated with a future project developed in response to the "no action" alternative are unknown, while only temporary and minor impacts or insignificant permanent impacts on water resources would occur as a result of the Proposed Action, as described in the sections below.

### 3.2.1   Surface Waters

#### 3.2.1.1     Affected Environment

The Missouri River is a large perennial river and forms the border between Williams and McKenzie counties.  The flowage easements are located on the north side of Lake Sakakawea in the Lake Sakakawea sub-basin (HUC 11010101) within the Upper Missouri River Basin. All drainage patterns from the flowage easements flow east and south towards and into the Missouri River/Lake Sakakawea ending at the Garrison Dam. Once released from the dam, water flows south into the Missouri River (NRCS, 2008).

Lake Oahe is a large reservoir formed behind the Oahe Dam on the Missouri River.  Lake Oahe forms the border between Morton and Emmons counties.   The Project Area is located in the Upper Lake Oahe

26

Environmental Assessment
Dakota Access Pipeline Project
September 2015

Watershed (HUC 10130102) within the Missouri River Basin and adjoins both sides of Lake Oahe at the crossing.

The Oahe Dam/Lake Oahe project is part of the chain of Missouri River main stem lakes authorized in the Flood Control Act of 1944.  The Oahe Dam is located 6 miles north of Pierre, South Dakota and was placed into operation in 1962.  The dam and associated reservoir (Lake Oahe) are congressionally authorized to provide flood control, hydroelectric power, navigation, irrigation, fish and wildlife enhancement, municipal water supply, water quality, and recreational opportunities to the residents of both South Dakota and North Dakota.  At maximum normal operating pool level (1,617 feet MSL), Lake Oahe extends roughly 231 miles from the Oahe Dam in South Dakota to near Bismarck, North Dakota.  At this level, the lake covers approximately 360,000 acres. At elevation 1,607.5 feet MSL base flood control elevation, the lake has over 2,250 miles of shoreline.

Lake Oahe can be divided into three segments based on the character of the lake. The proposed Project is located within the northern segment. The northern segment extends north from the North Dakota/South Dakota state line to the upstream Oahe Dam/Lake Oahe project boundary near Bismarck, North Dakota.  This segment is more river-like in appearance and is characterized by both submerged and emergent snags, sandbars, many shallow areas, and a definite current (USACE, 2010a).

Dakota Access conducted field and desktop delineations of the Project Area/Connected Action on the flowage easements and the Project Area/Connected Action of the federal lands.  Field surveys took place upon permission to access the properties in order to verify desktop delineations and ensure that the most accurate, up-to-date data is used for Section 404 of the CWA and/or Section 10 of the RHA permit filings.  There are four waterbodies (one perennial stream and three ephemeral ditches) within the Project area on the flowage easements and one intermittent waterbody within the Connected Action Project area **(Figure 6)**.  The Project Area and Connected Action of the federal lands encompass two waterbodies (one lake [Lake Oahe] and one ephemeral stream) **(Figure 7)**.  Waterbody ID, type and approximate mileposts are summarized in **Table 3-5** and **Table 3-6**.

### 3.2.1.2    Impacts and Mitigation

Impacts on Lake Oahe and the Missouri River would be minimized by using HDD construction methods to install the proposed pipeline underneath the Missouri River and Lake Oahe.  At the Missouri River crossing, a 24-inch pipeline would be installed a minimum of 60 feet below the bottom of the Missouri River.  At Lake Oahe, a 30-inch pipeline would be installed approximately 140 to 210 feet below the ground surface of federal lands and approximately 92 feet below the bottom of Lake Oahe **(Appendix H)**.

The primary impact that could occur as a result of an HDD is an inadvertent release of drilling fluid directly or indirectly into the waterbody.  Drilling fluid (also referred to as drilling mud) is primarily comprised of water.  However, bentonite clay is added to the water to enhance lubricating, spoil transport and caking properties of the drilling fluid.  Bentonite is a naturally occurring, non-toxic, inert substance that meets National Science Foundation (NSF)/American National Standards Institute (ANSI) Standard 60 Drinking Water Additives Standards and is frequently used for drilling potable water wells.  The potential exists for drilling fluid to leak through previously unidentified fractures in the material underlying the river bed.  Potential release sources of the drilling fluid include the drilling fluid entry/exit pit(s) and the directional borehole itself, which is maintained under pressure to keep it open. The probability of an inadvertent

USACE_DAPL0074150

Environmental Assessment
Dakota Access Pipeline Project
September 2015

release is greatest when the drill bit is working near the surface (i.e., near the entry and exit points). To alleviate this concern, the HDD Contractor plans to install steel surface casing at both the entry and exit locations of the Lake Oahe crossing. Because the HDD entry and exit points would be set back from the banks of the Missouri River (approximately 1,400 feet north and 300 feet south) and Lake Oahe (approximately 900 feet east and 1,100 feet west) the potential for an inadvertent release to occur in the water would be minimized. Additionally, geotechnical investigations conducted by Dakota Access indicated that the drill path is not located in materials that suggest a high probability of an inadvertent release of drilling fluids that would reach ground surface or enter Lake Oahe. Therefore, the potential for inadvertently released drilling fluids to enter any waterbody from below or from the shoreline is low.

The drilling mud and cuttings would be disposed of in accordance with applicable laws and regulations, likely in an existing landfill or by land farming. Final disposition would be negotiated with the facility or private landowner prior to disposal. Dakota Access would conduct all HDD work according to the HDD Construction Plan (**Appendix B**), and implement the HDD Contingency Plan (**Appendix B**) in the event of an inadvertent release. The HDD Construction Plan establishes a 24-hour a day monitoring program for monitoring and detection of inadvertent releases, including monitoring for loss of drilling fluids. The HDD Contingency Plan describes monitoring and mitigation procedures for any inadvertent release of drilling mud into the waterbody or areas adjacent to the waterbody and includes procedures to contain and clean up inadvertent releases.

Dakota Access plans to hydrostatically test the HDD pipeline segments prior to installation at the Lake Oahe and Missouri River crossings. Hydrostatic testing involves filling the new pipeline segments with water acquired in accordance with applicable permits, raising the internal pressure level, and holding that pressure for a specific period of time per U.S. DOT requirements.

Dakota Access is requesting permission to withdraw water from the Missouri River that would be required for installation of the HDD and hydrostatic testing of the pipeline at the Missouri River crossing. Approximately 470,000 gallons of water would be required for activities associated with the installation of HDD and the hydrostatic testing of HDD pipeline segment. Dakota Access intends to submit an application to the North Dakota State Water Commission, Water Appropriations Department for a Temporary Water Permit. The exact number and size of the withdrawal pumps would be determined as a result of the limits imposed by the Temporary Water Permit. The withdrawal activity would comply with all applicable permit conditions and regulations, including the specifications on permitted intake structures outlined in the Corps' Regional Conditions for North Dakota applicable to Nationwide Permit 12 (Utility Line Activities) (Corps, 2012). This regional condition requires that the applicant 1) utilize an intake screen with a maximum mesh opening of ¼-inch; 2) wire, Johnson-like screens must have a maximum distance between wires of 1/8-inch; 3) water velocity at the intake screen shall not exceed ½-foot per second; 4) intake structure shall be floating; and 5) at the beginning of pumping, the intake shall be placed over water with a minimum depth of 20 feet.

The Acquisition point would coincide with the proposed pipeline crossing of the Missouri River. An 8"x 8" Power Associates 2500 Single Stage Pump would be set on a barge or float anchored just offshore at the proposed permanent easement. The barge/float would be approximately 12 feet wide by 14 feet long and fitted with a secondary containment structure (an Eagle 4Drum Flexible Containment SpillNest-T8103 or similar). The pump, capable of withdrawing 2,400 gallons per minute withdrawal and 120 feet of head pressure, would be placed within the secondary containment on the barge/float.

28

USACE_DAPL0074151

Environmental Assessment
Dakota Access Pipeline Project
September 2015

The pump's flexible intake hose would be 8 inches in diameter and connect the screened intake to the pump.  The screened intake (approximately the size of a 55 gallon drum) would be suspended by floats (approximately the size of a tire) within the water column and would be screened to prevent impingement entrainment of foreign objects and aquatic life.  A hard 8-inch diameter take-way pipe extending from the pump would push the water to the top of bank then to the HDD equipment or pipeline section.  This temporary waterline would be laid by hand on top of the ground surface within the permanent ROW, and thus would not require any ground disturbance or trench excavation.  The waterline, barge, pump, and associated equipment would be removed following completion of construction activities.  A depiction of the layout of the barge, pump, and waterline is provided in **Figure 6-B**.

Water needed for HDD construction and hydrostatic testing at the Lake Oahe Crossing in Emmons and Morton counties, North Dakota would not be obtained from Lake Oahe.  Required water would instead be obtained from an alternate surface water, groundwater, or commercial source and transported to the Project Area via water trucks.  Water trucks would not be required to cross Corps Fee Lands.  Prior to construction, Dakota Access would identify a water source for construction activities at the Lake Oahe crossing in accordance with all applicable permits and regulations.

Water discharges associated with hydrostatic testing on Corps flowage easements would be conducted in accordance with applicable permits.  Hydrostatic test water discharges would not occur on Corps fee property.  Dakota Access would conduct trench dewatering and hydrostatic test discharges in a manner consistent with the North Dakota Pollutant Discharge Elimination System (NDPDES) General Permit NDG-070000.  Discharged hydrostatic test water would not contain additives unless written approval is received from Dakota Access and applicable permits authorize such additives.  EIs would monitor permit compliance. Where appropriate, water would be discharged into an energy dissipation and/or filtering device, as described in Dakota Access' SWPPP (**Appendix A**) to remove sediment and to reduce the erosive energy of the discharge.

Of the five waterbodies located within the flowage easements Project Area and Connected Action, one ephemeral ditch (d-k8-wi-011) is located within the portion of the Project that would be crossed via the Missouri River HDD; therefore, no trenching would occur within this feature.  However, a temporary waterline would be installed across this feature to transport surface water from the Missouri River to the HDD equipment.  The temporary waterline would be laid on top of the ground surface, and no grading or ground disturbance in the vicinity of the waterbody crossed by the waterline would be required.  The hard pipe segments would be hand-carried down the slope and assembled by hand.  No tracked or wheeled equipment would be necessary for construction or removal of the temporary aboveground waterline.  Four waterbodies would be temporarily impacted by pipeline construction.  However, impacts on waterbodies would be minimized by conducting pipeline construction activities in accordance with applicable regulatory requirements and implementing trenchless waterbody construction procedures, as described in sections 2.3.2.6 and 2.3.2.7 and the ECP.

No waterbody would be permanently drained or filled as part of the DAPL Project, and effects on waterbodies are expected to be short-term and minor.  Dakota Access would restore the area as close to its previous state and naturally functioning condition as practicable.  Additionally, Dakota Access would take measures to minimize the potential for surface water contamination from an inadvertent spill of fuel or hazardous liquids during refueling or maintenance of construction equipment or during operation of aboveground facilities.  Fuel and all other hazardous materials would be stored in accordance with the

29

USACE_DAPL0074152

Environmental Assessment
Dakota Access Pipeline Project
September 2015

requirements of Dakota Access' SPCC, SWPPP, and ECP. These documents also describe response, containment, and cleanup measures.

| Table 3-5 Waterbodies within the Flowage Easements Project Area and Connected Action | | | | | | |
|---|---|---|---|---|---|---|
| Milepost | Waterbody ID | Waterbody Type | Flow Type | Delineation Source | Class of Aquatic Resource | Area of Impact |
| 92.7 | d-k8-wi-013 | Ditch | Ephemeral | Field | §404 | Construction and Permanent ROW |
| 92.77 | s-k8-wi-002 | Stream | Perennial | Field | §404 | Construction and Permanent ROW |
| 93.23 | d-k8-wi-007 | Ditch | Ephemeral | Field | §404 | Construction and Permanent ROW |
| 94.64 | d-k8-wi-011 | Ditch | Ephemeral | Field | §404 | Permanent ROW over HDD Profile (Temporary Waterline) |
| 94.9 | s-m10-wi-001/s-k2-mk-001 | Stream | Perennial | Field | §10 | Construction and Permanent ROW |
| 95.1 | s-k2-mk-002 | Stream | Intermittent | Field | §404 | Construction and Permanent ROW |

The only surface waterbody identified on the federal lands Project Area is Lake Oahe (s-kc4-em-001/s-kc4-mo-002), which would be avoided via HDD.  The pipe stringing corridor (Connected Action) at Lake Oahe crosses two drainageways that are indicated on the National Hydrography Dataset.  Field delineations carried out by Dakota Access identified one ephemeral stream (s-kc-4-mo-004) associated with these two drainageways that intersect the pipe stringing corridor of the Connected Action.  Impacts on the delineated waterbody would be entirely within the pipe stringing ATWS and are expected to be avoided by bridging the waterways for equipment and vehicle traffic during pipe stringing, fabrication and pullback.  No trenching would occur within the pipe stringing ATWS.  While limited grading may be necessary within the pipe stringing ATWS, no grading would be expected to occur within the waterbody itself.  Vegetation may be mowed/brush-hogged, however, no root masses are anticipated to be removed. Revegetation of these areas would be in accordance with the North Dakota tree and shrub regulations and would not be impacted during operation of the Project.  No trees are expected to be cleared on Corps fee-owned lands.

| Table 3-6 Waterbodies within the Federal Lands Project Area and Connected Action | | | | | | |
|---|---|---|---|---|---|---|
| Milepost | Waterbody ID | Waterbody Type | Flow Type | Delineation Source | Class of Aquatic Resource | Area of Impact |
| 166.3 | s-kc4-em-001 / s-kc4-mo-002 | Lake (Lake Oahe) | N/A | Field | §10 | Project Area – Permanent ROW over HDD Profile |

30

Environmental Assessment
Dakota Access Pipeline Project
September 2015

| 166 | s-kc4-mo-004 | Stream | Ephemeral | Field | §404 | Connected Action – HDD Stringing Area |
|-----|-----|-----|-----|-----|-----|-----|

EIs would monitor compliance with applicable waterbody protection requirements during construction of the facilities.  The Project ECP (**Appendix G**) and SWPPP (**Appendix A**) describe additional mitigation measures and contain illustrations of how sediment control devices are typically installed at waterbody crossings.  Additionally, Dakota Access would maintain a vegetative buffer until the actual crossing of the waterbody takes place.   Temporary sediment control measures, such as silt fence installed at each crossing, would minimize the introduction of sediment into waterbodies during construction and minimize the movement of spoil and sediment from surface runoff during and after construction. Permanent erosion control measures, such as vegetation and installation of slope breakers, would effectively stabilize riparian zones. Dakota Access would stabilize stream banks disturbed during construction using methods as directed by applicable state and/or federal permits. Trenching and dewatering activities used in construction of the proposed pipeline could temporarily alter surface drainage patterns. However, these impacts are expected to be localized and temporary, since the contours and vegetation would be returned as closely as practical to pre-construction conditions.   Dewatering activities would be conducted in accordance with applicable permits and Dakota Access' SWPPP and ECP.

### 3.2.2   Groundwater

#### 3.2.2.1   Affected Environment

Groundwater occurs within the Project Areas of the Corps flowage easements and federal lands in both glacial drift and bedrock aquifers.  Although bedrock aquifers tend to have a greater distribution and be more continuous than Quaternary aquifers, Quaternary aquifers typically provide higher yields to wells.

Groundwater in the bedrock aquifers flows towards the Missouri River and Lake Oahe, a regional groundwater discharge zone.   The water table within phreatic aquifers, which may include both Quaternary and bedrock formations, is typically a subdued replica of the surface topography.  Although groundwater flow directions may vary widely particularly within localized flow regimes, overall regional flow of groundwater in the phreatic aquifer would be to the Missouri River and Lake Oahe.

The most economically important aquifers in the vicinity of the Corps flowage easements are the Cretaceous Dakota Group, the Tertiary Fort Union Group (which includes the Sentinel Butte and Bullion/Tongue River Formations), and glacial drift aquifers of the Quaternary Period (Armstrong, 1969). The glacial drift aquifers are relatively thin at the Project Area, except where they occur in buried or present-day bedrock valleys. In the absence of Quaternary aquifers, members of the Paleocene Fort Union Group commonly serve as the shallowest aquifer.  Individual aquifer members of the Fort Union Group include, in descending order, the Sentinel Butte, Tongue River, Cannonball, and Ludlow Formations (Croft, 1985).  Other bedrock aquifers of economic importance in the flowage easement region are the late Cretaceous Hell's Creek and Fox Hills Aquifer system and the Cretaceous Dakota Group.

Three domestic wells and six observation wells (one of which has been destroyed) are located on the flowage easements, but occur outside of the Project workspace.  The closest well to the proposed pipeline centerline is a domestic well located approximately 430 feet from the centerline.  The flowage easements or Connected Action do not overlie any source water protection areas.

USACE_DAPL0074154

Environmental Assessment
Dakota Access Pipeline Project
September 2015

The most economically important aquifers in Morton and Emmons counties, where the federal lands along Lake Oahe are located, include aquifers within the Cretaceous Fox Hills and Hell Creek Formations; the Tertiary Fort Union Group, which includes the Cannonball and Ludlow Formations, Tongue River Formation, and Sentinel Butte Formation (northwest part of the county only); and alluvial and glacial drift aquifers of the Quaternary Period (Ackerman, 1980; Armstrong, 1978).   The Pierre Formation is considered the base of the active near-surface aquifers, because it is thick and relatively impervious.

No water wells are located within 150 feet of the federal lands or Connected Actions at the Lake Oahe crossing.  Additionally, none of the Project Area or Connected Action overlie any source water protection areas.

### 3.2.2.2    Impacts and Mitigation

Ground disturbance associated with conventional pipeline construction is generally limited to approximately 6 to 10 feet below the existing ground surface.  Where excavation penetrates the water table, potential groundwater impacts from pipeline construction are primarily limited to the radius of influence around the excavation profile.

Construction activities, such as trenching, dewatering, and backfilling that encounter shallow aquifers would cause minor fluctuations in groundwater levels and/or increased turbidity within the aquifer adjacent to the activity due to dewatering activities.  Dewatering would consist of a single or series of submersible pumps that would be lowered into the pipe trench to review excess water to facilitate pipe installation.  In cases of greater water infiltration, well pointing (a series of dewatering points along the outside of the trench connected in series to a pump to enable effective dewatering of the trench) may be used.  These impacts are temporary (only while the trench is open) and highly localized as the infiltration of the dewatered groundwater is in the immediate vicinity of the dewatering activity.

Construction and dewatering activities are not expected to have a significant effect on regional groundwater flow patterns.  Shallow aquifers would quickly reestablish equilibrium if disturbed, and turbidity levels would rapidly subside.  Consequently, the effects of construction would be minor and short-term.  Impacts on deeper aquifers are not anticipated.

The introduction of contaminants to groundwater due to accidental spills of construction-related chemicals, fuels, or hydraulic fluid could have an adverse effect on groundwater quality.  Spill-related impacts from construction activities are typically associated with improper fuel storage, equipment refueling, and equipment maintenance.  Dakota Access' SPCC Plan outlines measures that would be implemented to avoid, minimize, prevent, and respond to releases of fuels and other hazardous substances during construction and includes measures for cleanup, documentation, and reporting of spills (**Appendix A**).  Project-specific SPCCs would be developed by the selected contractor and implemented throughout construction.  By implementing the protective measures set forth in these plans, groundwater contamination due to construction activities is not anticipated.  The draft SPCC is included as Appendix B of **Appendix A** (SWPPP); the Project-specific plan to be developed by the Contractor would meet or exceed all conditions presented in the draft plan.

Accidental releases from the pipeline system during operations could potentially affect groundwater.  As part of the pipeline operation, which is regulated by the PHMSA, Dakota Access has an ongoing

32

Environmental Assessment
Dakota Access Pipeline Project
September 2015

maintenance, inspection, and integrity testing program to monitor the safety of the pipeline system. Monitoring activities include constant remote oversight of the entire system 24/7/365 from the control center, routine inspection of the cathodic protection system, and the use of inspection tools that travel through the inside of the pipeline to check pipe integrity (see Section 3.11 for additional information regarding reliability and safety and the proposed methods for monitoring the Project facilities). Dakota Access also performs regular aerial flyovers to inspect the pipeline ROW. In the event of a leak, Dakota Access would work aggressively to isolate the source through the use of remote-controlled shut-off valves, initiate cleanup activities, and contact the appropriate federal and state authorities to coordinate leak containment and cleanup. Dakota Access proposes to meet or exceed all applicable regulations and requirements for pipeline design, construction, and operation.

A preliminary evaluation of geology indicates that groundwater within the floodplain throughout most of the Corps flowage easements is less than 6.5 feet deep (GeoEngineers, 2014). The pipeline would be installed in saturated sediments as part of the HDD crossing of Lake Oahe. Due to the nature of HDD methodology, this construction method is inherently not a risk to groundwater resources and uses benign substances (bentonite and water) to penetrate through soil, rock, and groundwater. Construction of the Project Area and Connected Action would not be expected to result in significant negative impacts on groundwater resources.

### 3.2.3   Wetlands

#### 3.2.3.1   Affected Environment

Wetland data for the Project Areas was derived from desktop analyses along the entire route and verified by field delineations. Using data from the U.S. Fish & Wildlife Service's (USFWS) National Wetlands Inventory (NWI) dataset, aerial imagery, and topography, an experienced biologist applied professional judgment to create polygon coverage in GIS to define the areal extent of wetlands. These areas have been field-verified to ensure that the most accurate, up-to-date data is being used for permit filings.

The field wetland investigations were conducted using the on-site methodology set forth in the 1987 Corps of Engineers Wetland Delineation Manual and the 2010 Regional Supplement to the Corps of Engineers Wetland Delineation Manual: Great Plains Region (USACE, 1987; 2010b). In addition to the 1987 Manual and the Regional Supplement, wetland areas were examined through analysis of the vegetation, soils, and hydrology, as described in the Classification of Wetland and Deepwater Habitats of the U.S. and The National Wetland Plant List (Cowardin et al., 1979; Lichvar et al., 2014).

#### 3.2.3.2   Impacts and Mitigation

The routing analysis utilized to determine the crossing locations was designed to avoid impacts to sensitive environmental resources including wetlands. Construction workspace on the flowage easements has been selected based on an absence of wetlands within the Project area and, as confirmed by field verification in 2015, no wetlands would be impacted by trench excavation within the construction ROW, ATWS, HDD workspace, or HDD stringing corridor on the flowage easements or Connected Action.

The field wetland investigations conducted by Dakota Access results identified four wetlands located within the permanent easement on the flowage easements (w-m10-wi-001_PSS, w-m10-wi-001_PEM, w-

33

Environmental Assessment
Dakota Access Pipeline Project
September 2015

m10-wi-001_PFO, and w-m10-wi-002_PSS).  These wetlands occur in the portion of the Project Area on the flowage easements that would be constructed via HDD; therefore, no trenching would occur within these wetlands.  However, following construction, a 30-foot-wide corridor centered on the proposed pipeline would be maintained in non-forested state to facilitate inspections of the pipeline, operational maintenance, and compliance with the federal pipeline safety regulations.  The 30 foot permanent ROW would encompass a total of approximately 0.30 acre of the four wetlands.  One of these wetlands (w-m10-wi-001_PFO), approximately 0.05 acre, is classified as a palustrine forested (PFO) wetland and would be converted to shrub-scrub or herbaceous wetland as a result of the Proposed Action since trees would be routinely removed for the life of the pipeline.  The remaining palustrine emergent (PEM) wetland (w-m10-wi-001_PEM) and two palustrine scrub-shrub (PSS) wetlands (w-m10-wi-001_PSS and w-m10-wi-002_PSS), comprising a total of 0.25 acres of the permanent pipeline easement, may require infrequent vegetation clearing of encroaching woody vegetation but would otherwise remain in their natural state.  Dakota Access is in the process of obtaining verification for use of Nationwide Permit 12 for the crossings of wetlands and waterbodies associated with DAPL Project.

Pending approval and receipt of applicable permits and easement permission, a temporary waterline would be installed between the shoreline and the HDD workspace on the flowage easements within the permanent ROW (**Figure 6-B**), in order to supply the HDD equipment with water needed for drilling fluid preparation and hydrostatic testing.  The temporary waterline would be laid on top of the surface, and no ground disturbance of the four wetland features along the permanent easement is anticipated. The hard pipe segments would be hand-carried down the slope and assembled by hand.  No tracked or wheeled equipment would be necessary for construction or removal of the temporary aboveground pipeline.  No excavation or disturbance of wetlands or the river bank is anticipated.

**Table 3-7** summarizes wetlands within the flowage easements that occur within the permanent ROW, which is 30-feet-wide centered on the centerline over the HDD profile and 50-feet-wide elsewhere.

| Table 3-7 | | | | | | |
|-----------|---|---|---|---|---|---|
| Wetlands within the Flowage Easements Project Area | | | | | | |
| Milepost | Wetland ID | Wetland Type | Pre-Construction Notice? | Delineation Source | Area (Acres) | Impacted Area [1] |
| 94.7 | w-m10-wi-001 | Palustrine Scrub-Shrub | No | Field | 0.07 | Permanent ROW over HDD Profile |
| 94.7 | w-m10-wi-001 | Palustrine Emergent | No | Field | 0.04 | Permanent ROW over HDD Profile |
| 94.8 | w-m10-wi-001 | Palustrine Forested | No | Field | 0.05 | Permanent ROW over HDD Profile |
| 94.9 | w-m10-wi-002 | Palustrine Scrub-Shrub | No | Field | 0.14 | Permanent ROW over HDD Profile |

No wetlands would be impacted by the HDD workspace on private land and the permanent ROW on federal land at the crossing of Lake Oahe, because no wetlands exist within the Project Area and Connected Action Area at the Lake Oahe Crossing.

34

USACE_DAPL0074157

Environmental Assessment
Dakota Access Pipeline Project
September 2015

The Project ECP and SWPPP specify several measures to protect wetlands and waterbodies from becoming polluted with fuels or other hazardous materials during construction. These plans prohibit the storage of fuel or other hazardous materials within 100 feet of a wetland or waterbody. The ECP also specifies that equipment must be refueled at least 100 feet from waterbodies unless, due to site-specific conditions, there is no practical alternative such as the proposed pumping intake structure located on the barge at the Missouri River Crossing. In that case, the contractor must implement site-specific protective measures and containment procedures described in the ECP. Contractors would be required to provide trained personnel, appropriate equipment, and materials to contain and clean up releases of fuel, lubricating oil, or hydraulic fluid that result from equipment failure or other circumstances.

### 3.2.4 Floodplain

#### 3.2.4.1 Affected Environment

Floodplains refer to the 100-year floodplain, as defined by Federal Emergency Management Agency (FEMA), and as shown on Flood Insurance Rate Maps (FIRM) or Flood Hazard Boundary Maps for all communities participating in the National Flood Insurance Program (NFIP). The 100-year floodplain is an area subjected to inundation by the 1% chance of an annual flood event. Executive Order (EO) 11988 (Floodplain Management) requires federal agencies to avoid direct or indirect support of development within the 100-year floodplain whenever there is a practical alternative.

According to the FEMA FIRM map, the seven flowage easements are located within Zone A (the 100-year floodplain) of the Missouri River in Williams County. A FEMA flood map is not available for the Connected Action within McKenzie County. The Lake Oahe crossing in Emmons County is located in Zone D, which is an area of undetermined, but possible flood hazards (FEMA, 1987). FEMA has not completed a study to determine flood hazards for Morton County; therefore, a flood map has not been published at this time.

#### 3.2.4.2 Impacts and Mitigation

The Project has been designed in accordance with accepted floodplain management practices; therefore, no impacts on floodplain elevations or velocities are anticipated. Following construction, disturbed areas would be restored to pre-construction grades and contours, as practical. If necessary, soil displaced by installation of the 24-inch pipeline on the flowage easements would be removed from the floodplain and hauled to an upland location in order to ensure original floodplain elevations are restored

The Corps Omaha District Flood Risk and Floodplain Management Section (FRFM) is responsible for coordinating compliance with the requirements of EO 11988. The FRFM reviewed the proposed pipeline plans the portion of the DAPL Project that crosses the flowage easements for compliance with Appendix A (Typical Cut and Fill Volumes for Land Development Proposals) of NWDR 1110-2-5, Land Development Guidance at Corps Reservoir Projects and found that the lowest elevation of the Proposed Action on the flowage easements (1872.25 feet MSL) would be above the Garrison flood control pool maximum operation elevation (1854.0 feet MSL). Therefore, there would be no adverse impacts on the operation of the Garrison flood control pool. Provided that the site topography is left at its natural ground elevation after construction and all excess material is hauled off site, the FRFM concluded that there are no flood risk and floodplain management concerns associated with the Proposed Action. On April 7, 2015 the

35

USACE_DAPL0074158

Environmental Assessment
Dakota Access Pipeline Project
September 2015

FRFM provided Dakota Access with a memorandum verifying compliance under EO 1198 and recommending approval of the Proposed Action (Krause, 2015).

### 3.2.5 Levees

Based on a search of the Corps National Levee Database and FEMA FIRM maps, no levees are located within 10 miles of the Lake Oahe or flowage easement crossings (Corps, 2014). Because no levees are located within 10 miles of either crossing, construction of the Project is not expected to impact levees.

## 3.3 Vegetation, Agriculture, and Range Resources

Under the "no action" alternative, Dakota Access would not construct the proposed Project and no impacts on vegetation, agriculture, and range resources would occur. However, if the objectives of the Project are to be met under the "no action" alternative, other projects and activities would be required and these projects would result in their own impacts on vegetation, agriculture, and range resources, which would likely be similar to or greater than the proposed Project. Nevertheless, the impacts associated with a future project developed in response to the "no action" alternative are unknown, while only temporary and minor impacts or insignificant permanent impacts on vegetation, agriculture, and range resources would occur as a result of the Proposed Action, as described in the sections below.

### 3.3.1 Vegetation

#### 3.3.1.1 Affected Environment

Land cover was analyzed for the flowage easements and federal lands and associated Connected Actions based on the 2011 U.S. Geological Survey (USGS) National Land Cover Dataset (NLCD) and was field-verified where access was available. Land cover on the flowage easements is comprised mostly of cultivated crops, which include corn, sugar beets, alfalfa, soybeans, and spring wheat. Other present land cover types include developed areas, which are primarily roads, pasture/hay/grassland areas that are interspersed with the cultivated crops, emergent wetlands, woody wetlands, mixed forest and deciduous forest associated with the Missouri River.

Land cover on the federal lands is comprised of cultivated crops, emergent herbaceous wetlands, grassland/herbaceous, and open water. Over half of the area of the tracts is characterized as grassland/herbaceous, which primarily occurs on the west side of Lake Oahe. Cultivated cropland consists mainly of oats and canola on the east side of the Lake.

A description of each land cover type encountered at both crossing areas is provided below.

**Cultivated Crop**

The cultivated cropland community is characterized by land used for the production of annual crops, such as corn and soybeans. This class includes all land being actively tilled.

USACE_DAPL0074159

Environmental Assessment
Dakota Access Pipeline Project
September 2015

**Deciduous Forest**

Deciduous forest typically includes trees that are greater than 16 feet tall.  More than 75% of the tree species in this land cover class shed foliage simultaneously in response to seasonal change.

**Mixed Forest**

Mixed forest are generally areas dominated by trees generally greater than 5 meters tall, and greater than 20% of total vegetation cover.  The vegetation cover within mixed forest typically does not have either deciduous or evergreen species greater than 75% of the total tree cover.

**Developed/Open Space**

The developed/open space community type is dominated by lawn grasses and may include some developed areas and roads.  Impervious surfaces account for less than 20% of the total cover.  This class would typically include minor roads and associated ditches.

**Developed/Low Intensity**

The developed/low intensity community includes areas with a mixture of constructed material and vegetation.  These areas most commonly include single-family housing units.  Developed/low intensity in the Project Area is associated with impervious surfaces of larger roads.

**Emergent Herbaceous Wetland**

Refer to Section 3.2.3, which provides a description of data obtained during delineations of the wetlands that would be impacted by the Project.

**Woody Wetlands**

Refer to Section 4.2.3, which provides a description of data obtained during delineations of the wetlands that would be impacted by the Project.

**Grassland/Herbaceous**

The grassland/herbaceous community is dominated by graminoid or herbaceous vegetation.  These areas are not subject to intensive management such as tilling but can be utilized for grazing.

**Pasture/Hay**

The pasture/hay community type consists of areas of grasses, legumes, or grass-legume mixtures planted for livestock grazing or the production of seed or hay crops, typically on a perennial cycle.

**Open Water**

The open water cover type includes areas of open water. This land cover type is associated with Lake Oahe and the Missouri River.

37

Environmental Assessment
Dakota Access Pipeline Project
September 2015

### 3.3.1.2   Impacts and Mitigation

Temporary impacts on land cover would occur in essentially all areas within the construction footprint, the vast majority of which would return to pre-construction land cover upon completion of construction. One exception is at the flowage easement Project Area in forested areas along the permanent easement Impacts on cultivated crops make up the majority of temporary impacts and would return to cultivated crops post-construction.

Tables **3-8** and **3-9** show land cover types impacted by construction and maintenance activities. A description of each category is provided below.

| Table 3-8 | | | | |
|---|---|---|---|---|
| Land Cover Impacts on the Flowage Easements Project Area and Connected Action | | | | |
| Land Cover Type | Connected Action-Construction Workspace (acres) | Connected Action-Permanent ROW (acres) | Construction Workspace (acres) [1] | Permanent ROW (acres) |
| Cultivated Crops | 0 | 0 | 47.4 | 13.3 |
| Deciduous Forest | 0.9 | 0.2 | 0 | 0 |
| Developed, Low Intensity | 0 | 0 | 0.4 | 0.4 |
| Developed, Open Space | .1 | .01 | 1.2 | 0.4 |
| Emergent Herbaceous Wetlands | 0 | 0 | 0.9 | 0.4 |
| Hay/Pasture | 0 | 0 | 6.6 | 1.8 |
| Grassland/Herbaceous | .1 | 0 | 1.7 | 0.5 |
| Mixed Forest | 0.2 | 0.03 | 0 | 0 |
| Open Water | 0.7 | 0.1 | 0 | 0 |
| Woody Wetlands | 0 | 0 | 1.4 | 0.8 |
| **Total** | **2.0** | **0.3** | **59.3** | **17.6** |

[1] Construction workspace includes permanent ROW.

Permanent impacts on land cover in the federal lands would be limited to the permanent ROW and involve limited tree removal within the permanent easement.  Impacts on land cover as part of the Connected Action would occur on private lands and include the HDD workspaces, stringing area, and the permanent easements between the HDD workspaces and federal lands.

| Table 3-9 | | | |
|---|---|---|---|
| Land Cover Impacts on the Federal Lands Project Area and Connected Action | | | |
| Land Cover | Connected Action – Construction Workspace (acres) | Connected Action – Permanent ROW (acres) | Federal Lands Permanent ROW (acres) [1] |
| Cultivated Crops | 0.0 | 0.0 | 0.1 |
| Emergent Herbaceous Wetlands | 0.0 | 0.0 | 0.4 |
| Woody Wetlands | 0.2 | 0.0 | 0.0 |
| Grassland/ Herbaceous | 15.3 | 1.1 | 0.6 |
| **Total** | **15.5** | **1.1** | **1.2** |

38

USACE_DAPL0074161

Environmental Assessment
Dakota Access Pipeline Project
September 2015

| Table 3-9 | | | |
| --- | --- | --- | --- |
| Land Cover Impacts on the Federal Lands Project Area and Connected Action | | | |
| Land Cover | Connected Action – Construction Workspace (acres) | Connected Action – Permanent ROW (acres) | Federal Lands Permanent ROW (acres) [1] |

[1] Land cover impacts on federal lands are limited to the maintained 50-foot permanent easement and do not include approximately 6.3 acres of permanent easement over the HDD profile across Lake Oahe.  Land cover within the banks of Lake Oahe (open water, woody wetlands, and emergent herbaceous wetlands) would not be disturbed during construction.

**Measures to Protect Vegetation**

Dakota Access would clear the ROW to the extent necessary to assure suitable access for construction, safe operation, and maintenance of the DAPL Project. Clearing of herbaceous vegetation during construction is anticipated to result in short-term impacts.  Within areas disturbed by construction of the Project, including the flowage easements Project Area, Dakota Access would implement active revegetation measures and rapid colonization by annual and perennial herbaceous species to restore most vegetative cover within the first growing season.  In areas that require permanent revegetation, Dakota Access would specify appropriate seed mixes, application rates, and seeding dates, taking into account recommendations of appropriate state and federal agencies and landowner requests.  Ground disturbing activities would not occur on Corps fee-owned lands; therefore, reseeding is not anticipated in these areas.  However, if reseeding were to become necessary on Corps fee-owned lands, all activities would be conducted in accordance with applicable Lake Oahe or Garrison Project revegetation guidelines.

In non-agricultural areas, vegetation cleared from ATWS would be allowed to revegetate after construction depending on arrangements with the landowner. Consequently, significant changes in cover types are not anticipated. Revegetation would allow wildlife species to return to the area after construction is completed. Temporary revegetation measures may also be implemented to quickly establish ground cover to minimize the potential for soil erosion and noxious weeds to establish. A temporary seed mix may be applied in these situations. The Project ECP (**Appendix G**) contains more details regarding temporary revegetation.

After completion of waterbody crossings, Dakota Access would revegetate disturbed stream banks in accordance with the ECP, SWPPP, and requirements of applicable state and federal permits. When constructing in agricultural areas, up to 1 foot of topsoil (organic layer) would be stripped from the trench line and stockpiled separately from trench spoil to preserve the native seed stock.  The ECP contains additional details regarding topsoil segregation.

At stream approaches, the Contractor would leave a 20-foot buffer of undisturbed herbaceous vegetation on all stream banks during initial clearing, except where grading is needed for bridge installation or where restricted by applicable regulations and/or permit conditions.

39

USACE_DAPL0074162

Environmental Assessment
Dakota Access Pipeline Project
September 2015

### 3.3.2   Invasive and Noxious Weeds

#### 3.3.2.1   Affected Environment

The state of North Dakota has 11 state-listed noxious and invasive weeds ("invasive species").  The species listed are: Russian knapweed (*Acroptilon repens*), absinth wormwood (*Artemisia absinthium*), musk thistle (*Carduus nutans*), diffuse knapweed (*Centaurea diffusa*), yellow toadflax (*Linaria vulgaris*), spotted knapweed (*Centaurea maculosa*), Canada thistle (*Cirsium arvense*), leafy spurge (*Euphorbia esula*), dalmatian toadflax (*Linaria dalmatica*), purple loosestrife (*Lythrum salicaria*), and saltcedar (*Tamarix chinensis*).  These state invasive species are controlled and regulated under North Dakota Law (NDCC § 4.1-47-02) (North Dakota Department of Agriculture, 2014a).

Each county in North Dakota has a County Weed Board, which consists of a regulation committee to manage noxious and invasive weeds.  Each of these county boards is responsible for the addition of county-specific invasive species to the state-listed species.  Additional noxious weeds are listed in McKenzie County including field bindweed (*Convolvulus arvensis*), burdock (*Arctium* sp.), black hendane (*Hyoscyamus niger*), houndstongue (*Cynoglossum officinale*), and yellow starthistle (*Centaurea solstitialis*).  No additional invasive species have been identified for listing in Williams, Morton, and Emmons counties.

#### 3.3.2.2   Environmental Impact and Mitigation

Dakota Access sent notifications to the McKenzie, Williams, Morton, and Emmons counties weed boards describing the Project and requesting any guidance regarding the known locations of noxious and invasive weeds pertaining to that county.  Dakota Access would work with the county weed boards to ensure the Project ECP contains relevant and necessary mitigation measures that would be implemented to prevent the spread of noxious weed species during construction and operation of the Project.

### 3.3.3   Threatened, Endangered, Candidate, and Proposed Plant Species

#### 3.3.3.1   Affected Environment

There is one federally-listed plant species in North Dakota, the threatened western prairie fringed orchid. This plant species is associated with high quality moist, tall grass prairie.  Most of the orchids in North Dakota are located in the Sheyenne National Grasslands in Ransom and Richland counties in the southeastern corner of the state. The population at Sheyenne National Grasslands is the largest population left in the world, with over 7,000 orchids (USFWS, 2013a).

North Dakota does not have a state threatened and endangered species program or track plant species that are not federally listed.

#### 3.3.3.2   Impacts and Mitigation

There are no known records of western prairie fringed orchids in the Project Area counties, and no suitable habitat was documented; therefore, no effect on the western prairie fringed orchid is expected as a result

40

Environmental Assessment
Dakota Access Pipeline Project
September 2015

of the proposed undertaking.  In the unlikely event that any are observed during construction on federal lands, work would stop and the Corps would be contacted.

## 3.4 Wildlife Resources

Under the "no action" alternative, Dakota Access would not construct the proposed Project, and no impacts on wildlife resources would occur.  However, if the objectives of the Project are to be met under the "no action" alternative, other projects and activities would be required and these projects would result in their own impacts on wildlife resources, which would likely be similar to or greater than the proposed Project.  Nevertheless, the impacts associated with a future project developed in response to the "no action" alternative are unknown, while only temporary and minor impacts, if any, on wildlife resources would occur as a result of the Proposed Action, as described in the sections below.

### 3.4.1 Recreationally and Economically Important Species and Nongame Wildlife

#### 3.4.1.1 Affected Environment

The Project region is home to a large number of mammal and bird species.  Big game species that occur in the Project region include pronghorn and white-tailed deer.  Game birds potentially using the types of wildlife habitat in the Project Area include the ruffed grouse, sharp-tailed grouse, pheasant, woodcock, snipe, and doves.  Furbearers and predators potentially occurring within the Project Area include coyote, beaver, badger, red fox, raccoon, bobcat, fisher, mink, weasel, and muskrat.  Potential small mammal species occurring within the habitat types associated with the Project Area include pocket gopher, skunk, and white-tailed jackrabbit.

Waterfowl and shorebird species potentially occurring within the Project Area include mallards, pintails, American wigeon, blue-winged teal, western grebe, California gull, Canada goose, common tern, killdeer, Wilson's phalarope, and lesser yellowlegs.  Numerous songbirds, including the American goldfinch, black-capped chickadee, cedar waxwing, clay-colored sparrow, lark bunting, song sparrow, tree swallow, western kingbird, western meadowlark, and yellow warbler can be expected to occur in the Project vicinity.

Numerous species of reptiles and amphibians may also occur within the Project Area.  Some amphibian species that may be expected to occur in the Project Area include the northern leopard frog, tiger salamander, and western chorus frog.  Reptile species that may be expected to occur within the Project Area include common snapping turtle, western painted turtle, common garter snake, and racer (Hoberg and Gause, 1992).

#### 3.4.1.2 Impacts and Mitigation

Temporary impacts on wildlife could occur during construction due to clearing of vegetation and movement of construction equipment along the ROW.  The ROW and ATWS would remain relatively clear of vegetation until restoration is completed. Most wildlife, including the larger and more mobile animals, would disperse from the Project Area as construction activities approach. Displaced species may recolonize in adjacent, undisturbed areas, or reestablish in their previously occupied habitats after construction has been completed and suitable habitat is restored.  Some smaller, less mobile wildlife

41

USACE_DAPL0074164

Environmental Assessment
Dakota Access Pipeline Project
September 2015

species such as amphibians, reptiles, and small mammals have the potential to be directly impacted during clearing and grading activities, but given the limited extent of the proposed crossing, measurable impacts are not anticipated.

Herbaceous cover would be seeded on disturbed upland areas during restoration, and it is expected that pre-existing herbaceous and shrub habitats would quickly reestablish themselves. Consequently, it is expected that the wildlife species that use these habitats would also return within one growing season of construction completion. Routine clearing of the permanent easement to improve visibility and remove encroaching trees would be performed in compliance with PHMSA requirements. The lack of trees reestablishing would be the only potential long-term impact to wildlife that depends on forested communities. This impact is expected to be negligible, as it only pertains to extremely small portions of the permanent easement and very little forested habitat is present within the proposed area of impact.

### 3.4.2    Threatened, Endangered, Candidate, and Proposed Wildlife Species

The Endangered Species Act (ESA) directs all federal agencies to work to conserve endangered and threatened species. Crossing the Corps flowage easements and federal lands triggers the consultation procedures of section 7 of the ESA. This section serves as the Biological Evaluation or written analysis documenting the Corps' conclusions and the rationale to support those conclusions regarding the effects of the Proposed Action on protected wildlife resources.

#### 3.4.2.1    Affected Environment

Nine federally listed species have been identified in Williams, McKenzie, Morton, and Emmons counties. Designated critical habitat for the piping plover also occurs in each of the four counties

**Interior Least Tern**

In North Dakota, the interior least tern (*Sterna antillarum*) utilizes sparsely vegetated sandbars on the Missouri River. Birds nest, raise young, and relax on barren river sandbars. In North Dakota, the least tern is found mainly on the Missouri River from Garrison Dam south to Lake Oahe and on the Missouri and Yellowstone Rivers upstream of Lake Sakakawea. Approximately 100 pairs breed in North Dakota during the summer before flying to coastal areas of Central and South American and the Caribbean Islands (USFWS, 2013b).

**Whooping Crane**

Whooping cranes (*Grus americana*) embark on a bi-annual migration from summer nesting and breeding grounds in Wood Buffalo National Park in northern Alberta to the barrier islands and coastal marshes of the Aransas National Wildlife Refuge on the Gulf Coast of Texas. Twice yearly in the spring and fall, whooping cranes migrate along the Central Flyway, a migratory corridor approximately 220 miles wide and 2,400 miles in length. The Central Flyway includes eastern Montana and portions of North Dakota, South Dakota, Nebraska, Kansas, Oklahoma, and eastern Texas (USFWS, 2014a). During the migration, cranes make numerous stops, roosting for short durations in large shallow marshes, and feeding in harvested grain fields. Approximately 75% of the whooping crane sightings in North Dakota occur within

42

USACE_DAPL0074165

Environmental Assessment
Dakota Access Pipeline Project
September 2015

the Central Flyway.  The primary threats to whooping cranes are power lines, illegal hunting, and habitat loss.

**Black-footed Ferret**

The black-footed ferret (*Mustela nigripes*) is a small member of the Mustelidae family native to North American shortgrass and mixed grass prairie.  Prairie dogs make up approximately 90% of the black-footed ferret diet and as such, the species is associated almost exclusively with large complexes of prairie dog towns (USFWS, 2013c; Black-footed Ferret Recovery Implementation Team [BFFRIT], 2011).  Black-footed ferrets are fossorial, nocturnal predators, spending nearly 90% of their time underground in prairie dog burrows, leaving only to hunt (Defenders of Wildlife, 2014; BIFFRIT, 2011).  Once thought to be extirpated in the wild, captive-born individuals have been reintroduced to 21 sites in Wyoming, Montana, South Dakota, Colorado, Utah, Kansas, New Mexico, and Arizona since 1991 (USFWS, 2013c).

**Gray Wolf**

A habitat generalist, the gray wolf (*Canis lupus*) historically occupied most habitat types in North America.  They show little preference for one cover type over another and successfully utilize alpine, forest, grassland, shrubland, and woodland habitats across their range (Mech, 1974).  Once thought to require wilderness areas with little to no human disturbance, recent range expansions have demonstrated the species' ability to tolerate higher rates of anthropogenic development than previously thought.  Given abundant prey and low rates of human-caused mortality, wolves can survive in proximity to human-dominated environments (Fuller, 1989).

**Northern Long-eared Bat**

Northern long-eared bats (*Myotis septentrionalis*) occur throughout the eastern and north-central U.S.  Eastern populations have declined significantly in recent years as a result of white-nose syndrome (WNS), a contagious fungal infection.  Although historically less common in the western portion of its range than in the northern portion, northern long-eared bats occur throughout North Dakota.  Habitat throughout its range includes caves and abandoned mines during the winter and hardwood or mixed forests for roosting and foraging during the summer (USFWS, 2015).

Northern long-eared bats may roost singly or in colonies in cavities, crevices, hollows, or beneath the bark of live and dead trees and/or snags, regardless of tree species.  They prefer trees with a diameter at breast height of at least 3 inches.  Less frequently, Northern long-eared bats have been observed roosting in man-made structures such as sheds or barns.  Northern long-eared bats primarily forage at dusk on insects in forests, but will occasionally forage over small forest clearings and water (USFWS, 2015).

**Piping Plover**

Piping plovers (*Charadrius melodus*) are shore birds that inhabit areas near water, preferring river sandbars and alkali wetlands in the Great Plains for nesting, foraging, sheltering, brood-rearing, and dispersal.  Piping plovers winter along large coastal sand or mudflats near a sandy beaches throughout the southeastern U.S.  Critical Habitat for the piping plover is designated along the Missouri River system throughout North Dakota (USFWS, 2012).

USACE_DAPL0074166

Environmental Assessment
Dakota Access Pipeline Project
September 2015

**Dakota Skipper**

The Dakota skipper (*Hesperia dacotae*) is a small butterfly found in dry-mesic and wet-mesic tallgrass and mesic mixed grass prairie remnants characterized by alkaline and composite soils.  The Dakota skipper is a habitat specialist requiring high-quality prairie habitat (i.e., grasslands or discrete patches of habitat within grasslands that are predominantly native and that have not been tilled).  Only 146 populations are documented in three states and two Canadian provinces (McCabe, 1981; Royer and Marrone, 1992; Cochrane and Delphey, 2002; USFWS, 2011; 2013d).  Remaining populations vary in size and density and for the most part are not influenced by dispersal between populations (McCabe, 1981; Dana, 1991; Dana, 1997; Cochrane and Delphey, 2002).  The species overwinters at the base of grasses in the soil of the site which they inhabit.  In North Dakota, the skipper typically occupies both wet-mesic and dry-mesic prairie (Royer and Marrone, 1992; Cochrane and Delphey, 2002).  The current status of the Dakota skipper in the state is considered tenuous, and most populations are considered vulnerable due to their extremely isolated nature.

**Rufa Red Knot**

The rufa red knot (*Calidris canutus rufa*) is a large sandpiper noted for its long-distance migration between summer breeding grounds in the Arctic and wintering areas at high latitudes in the Southern Hemisphere (USFWS, 2014b).  Some rufa red knots wintering in the northwestern Gulf of Mexico migrate through interior North America during both spring and fall and use stopover sites in the Northern Great Plains.  The species relies heavily on exposed substrate at wetland edges for stopover habitat, and the suitability of a wetland for rufa red knots depends on water levels and may vary annually (Gratto-Trevor et al., 2001).  Additionally, rufa red knots have also been reported to forage in cultivated fields when migrating through interior North America.

**Pallid Sturgeon**

Pallid sturgeon (*Scaphirhynchus albus*) prefer benthic environments associated with swift waters of large turbid, free-flowing rivers with braided channels, dynamic flow patterns, periodic flooding of terrestrial habitats, and extensive microhabitat diversity.  Pallid sturgeon inhabit the Missouri and Mississippi Rivers from Montana to Louisiana and have been documented in the Missouri River downstream from the Fort Peck Dam in Montana to the headwaters of Lake Sakakawea, North Dakota, and downstream from Garrison Dam, North Dakota to the headwaters of Lake Oahe, South Dakota (USFWS, 2014c).  Pallid sturgeon populations are fragmented by dams on the Missouri River and are very scarce in the Lake Oahe portion of the Missouri River.

### 3.4.2.2   Impacts and Mitigation

Dakota Access conducted pedestrian surveys of the workspace at the flowage easements in September 2014 and July 2015 and at the Lake Oahe crossing in April 2015 to assess suitable habitat for listed species.  Given the limited scope of this Project, minimization measures, and the implementation of specialized construction techniques, Dakota Access has determined that the Project would have no effect on six of the listed species and may affect, but not likely to adversely affect three of the listed species in the Project area.  **Table 3-10** lists the impact determinations of the protected species with potential to occur within

44

USACE_DAPL0074167

Environmental Assessment
Dakota Access Pipeline Project
September 2015

the Project Area and Connected Action.  A summary of habitat evaluations and the basis for the
determination of impacts for each listed species is provided below.

| Table 3-10 Federally Listed Species with Potential to Occur within the Project Area and Connected Action | | | | | | |
|---|---|---|---|---|---|---|
| Species | Status | County | | | | Impact Determination |
| | | Williams | McKenzie | Morton | Emmons | |
| Interior Least Tern | Endangered | X | X | X | X | May Affect, Not Likely to Adversely Affect |
| Whooping Crane | Endangered | X | X | X | X | No Effect |
| Black-footed Ferret | Endangered | | X | X | | No Effect |
| Gray Wolf | Endangered | X | X | X | | No Effect |
| Northern Long-eared Bat | Threatened | X | X | X | X | No Effect |
| Piping Plover | Threatened | X | X | X | X | May Affect, Not Likely to Adversely Affect |
| Dakota Skipper | Threatened | | X | X | X | No Effect |
| Rufa Red Knot | Threatened | X | X | X | X | No Effect |
| Pallid Sturgeon | Endangered | X | X | X | X | May Affect, Not Likely to Adversely Affect |

**Interior Least Tern**

Suitable habitat may exist for interior least terns at the Missouri River and at the Lake Oahe crossing
depending on precipitation and seasonal flow variations as exposed sand/gravel bars can be present.
Dakota Access proposes to cross the Missouri River and Lake Oahe utilizing the HDD construction method
to avoid direct impacts to the interior least tern.  Dakota Access will implement the HDD Contingency Plan
(Appendix B) at these crossings.

Dakota Access plans to withdrawal water from the Missouri River, which is required for activities
associated with the installation of the HDD and the hydrostatic testing of the HDD segment.  A temporary
waterline would be installed at the Missouri River between the shoreline and the HDD workspace on the
flowage easements within the permanent ROW (**Figure 6-B**).The temporary waterline would be laid by
hand on top of the surface, and no tracked or wheeled equipment would be necessary for installation or
removal of the temporary aboveground waterline.  No disturbance of the river banks is anticipated.
Additionally, installation and removal of the waterline are anticipated to be complete prior to nesting
season; therefore, no impacts on the interior least tern are anticipated to occur at the Missouri River.  If
the water withdrawal activities are not able to be completed prior to nesting season as expected, Dakota
Access would conduct surveys prior to placement of the waterline to confirm the presence/absence of
interior least terns within the pipeline ROW.  If interior least terns are nesting within the pipeline ROW,

45

USACE_DAPL0074168

Environmental Assessment
Dakota Access Pipeline Project
September 2015

Dakota Access would postpone water withdrawal activities at the Missouri River until the interior least terns have left the area.  No water access is required to complete the crossing at Lake Oahe.

As designed, no indirect impacts, such as those associated with noise, are anticipated due to the distance (greater than 960 feet) of the drill sites from the habitat..  Potential impacts on the tern would be further reduced if construction activities occur outside the nesting season.  .  Both direct and indirect impacts on interior least terns would be avoided and minimized through utilization of the HDD crossing method and the HDD Contingency Plan.  Therefore, the Project may affect, but is not likely to adversely affect the interior least tern.

**Whooping Crane**

In North Dakota, whooping cranes are only present during the twice-yearly migration between winter grounds and summer nesting sites.  As the whooping crane is a migrant and does not breed in North Dakota, the species cannot be confirmed as present in or absent from the Proposed Action areas.  If a whooping crane were to be sighted during construction of the Project, work activities would halt and the Corps would be contacted. Ongoing construction activities during the migration periods would likely cause birds to choose more suitable landing and overnight roosting locations away from construction activities given the abundance of similar habitat throughout the flyway and in the general vicinity of the Project area.  Therefore, the Project would have no effect on whooping cranes.

**Black-footed Ferret**

No suitable black-footed ferret habitat is present in the Project areas.  The black-footed ferret has been recorded in Morton County; however, based on occurrence data received from North Dakota Parks and Recreation, there are no documented occurrences within the vicinity of the Project.  Further, the nearest prairie dog colony (suitable habitat) is more than 0.17 mile from the proposed Lake Oahe crossing location (USFWS, 2014d).  Due to the lack of suitable habitat and the distance of the Project areas from known black-footed ferret occurrences, the Project would have no effect on black-footed ferrets.

**Gray Wolf**

The gray wolf is listed as endangered in all three counties of the Proposed Action areas in North Dakota (south and west of the Missouri River upstream to Lake Sakakawea and west of the centerline of Highway 83 from Lake Sakakawea to the Canadian border).  Wolves in eastern North Dakota are part of the Great Lakes Distinct Population Segment that was delisted by the USFWS in January 2012 (USFWS, 2014e).  North Dakota does not currently have an established breeding population (North Dakota Department of Agriculture, 2014b).   Observations of wolves are sporadic, and it is believed that these individuals are dispersers from adjacent populations (i.e., from Minnesota and Manitoba) (USFWS, 2006; Licht and Fritts, 1994).  Given the unlikely occurrence and high mobility of this species, the Project would have no effect on gray wolves.

**Northern Long-eared Bat**

The northern long-eared bat is currently listed by the USFWS as threatened in North Dakota.  On April 2, 2015, the USFWS published the final listing in the Federal Registrar with an effective date of May 4, 2015.

46

USACE_DAPL0074169

Environmental Assessment
Dakota Access Pipeline Project
September 2015

The USFWS listed the northern long-eared bat as threatened and chose to exercise the option of issuing an interim 4(d) rule to allow for more flexible implementation of the ESA and "to tailor prohibitions to those that make the most sense for protecting and managing at-risk species." In areas outside of the 150-mile WNS buffer zone, incidental take from lawful activities is not prohibited. The State of North Dakota currently falls outside of the WNS 150-mile buffer zone. Per the exemptions of the interim 4(d) rule, the Project would have no effect on the northern long-eared bat (USFWS, 2015).

**Piping Plover**

Potentially suitable habitat may exist at the Missouri River and at the Lake Oahe crossing, depending on precipitation and seasonal flow variations. These areas are also designated as critical habitat for this species under the ESA. Direct impacts on the potentially suitable habitat would be avoided by crossing the Missouri River and Lake Oahe via HDD. Dakota Access will implement the HDD Contingency Plan (Appendix B) at these crossings.

Impacts associated with installation of the temporary waterline at the Missouri River required for activities associated with the installation of the HDD and the hydrostatic testing of the HDD segment would be avoided, as installation and removal of the waterline are anticipated to be complete prior to nesting season. If the water withdrawal activities are not able to be completed prior to nesting season as expected, Dakota Access would conduct surveys prior to placement of the waterline to confirm the presence/absence of piping plovers within the pipeline ROW. If piping plovers are nesting within the pipeline ROW, Dakota Access would postpone water withdrawal activities at the Missouri River until the piping plovers have left the area. No water access is required to complete the Lake Oahe crossing.

As designed, no indirect impacts, such as noise, are anticipated due to the distance (greater than 960 feet) of the drill sites from the habitat. Both direct and indirect impacts on piping plovers would be avoided and minimized through utilization of the HDD crossing method and the HDD Contingency Plan. Therefore, the Project may affect, but is not likely to adversely affect the piping plover.

**Dakota Skipper**

There is no suitable Dakota skipper habitat within the Project Area based on species occurrence and grassland analysis. As such, activities at these crossings would have no effect on this species.

**Rufa Red Knot**

Rufa red knots do not nest in the Project area and only occur as an occasional migrant. During spring and fall migrations, the rufa red knot has the potential to occur in North Dakota. Migrating rufa red knot would likely only occur at migratory stopover habitat (suitable shoreline and sandy beach habitat along major rivers, streams, waterbodies, and wetlands) for a brief amount of time (24 hours or less). The results of the habitat assessment field surveys indicate that potentially suitable loafing habitat (sandbar and beach habitats) for migrating rufa red knots is present at the Lake Oahe crossing. Lake Oahe would be crossed using the HDD construction method, and thus would avoid impacts on potential migrating rufa red knot loafing habitat. Based on the results of the habitat assessment field survey, the brief amount of time that rufa red knots could be in the area, and the proposed implementation of the HDD construction method to cross Lake Oahe, construction of the Project would have no effect on rufa red knots.

47

USACE_DAPL0074170

Environmental Assessment
Dakota Access Pipeline Project
September 2015

**Pallid Sturgeon**

Potentially suitable habitat for the pallid sturgeon occurs at the Missouri River and Lake Oahe. Impacts on suitable habitat present within Lake Oahe would be avoided by crossing these waterbodies via HDD. Dakota Access will implement the HDD Contingency Plan (Appendix B) at both of these crossings.

Dakota Access plans to withdraw water from the Missouri River for installation activities and hydrostatic testing of the HDD segment on the flowage easements.  However, potential impacts on the pallid sturgeon or suitable habitat present within the Missouri River would be avoided by implementing the conditions on permitted intake structures outlined in the Corps' Regional Conditions for North Dakota applicable to Nationwide Permit 12 (Utility Line Activities) (Corps, 2012) (see Section 3.2.1.2) and as described in the USFWS Recovery Plan for the Pallid Sturgeon (USFWS, 2014f). No water access is required to complete the Lake Oahe crossing. The HDD construction method, application of the HDD Contingency Plan, and implementation of the Corps' conditions on the intake structure within the Missouri River would avoid and minimize potential impacts to the pallid sturgeon; therefore, the Project may affect, but is not likely to adversely affect the pallid sturgeon.

## 3.5    Aquatic Resources

Under the "no action" alternative, Dakota Access would not construct the proposed Project, and no impacts on aquatic resources would occur.  However, if the objectives of the Project are to be met under the "no action" alternative, other projects and activities would be required and these projects would result in their own impacts on aquatic resources, which would likely be similar to or greater than the proposed Project.  Nevertheless, the impacts associated with a future project developed in response to the "no action" alternative are unknown, while only temporary and minor impacts, if any, on aquatic resources would occur as a result of the Proposed Action, as described in the sections below.

### 3.5.1    Habitat and Communities

#### 3.5.1.1    Affected Environment

West of Williston, the Missouri River is a braided channel varying in width from 800 feet to over 1,500 feet, with sand bars in many locations. The Yellowstone River confluence with the Missouri River is approximately 20 miles west of Williston and 3.5 river miles upstream from the proposed Missouri crossing. East of Williston, the Missouri River feeds into Lake Sakakawea, the third largest man-made lake in the U.S. formed by the Garrison Dam, several hundred miles downstream.  This portion of the Missouri River is home to several fish species, including cutthroat trout, rainbow trout, brown trout, walleye, northern, and sauger. Amphibians are found along the shores and nearby riparian areas of the Missouri River. Common species found near the Missouri River crossing include Woodhouse's toad, the northern leopard frog, and western chorus frog (Hoberg and Gause, 1992).

Lake Oahe is a 232-mile-long reservoir that extends upriver from the Oahe Dam on the Missouri River from Pierre, South Dakota, to Bismarck, North Dakota.  Approximately three-quarters of a mile south of the proposed pipeline crossing is the confluence of the Cannonball River into the Missouri.  This portion of the Missouri River is home to several fish species, including walleye, northern pike, and channel catfish. Amphibians are found along the shores and nearby riparian areas of Missouri River.  Common species

48

Environmental Assessment
Dakota Access Pipeline Project
September 2015

found near the Lake Oahe crossing include the Great Plains toad, Woodhouse's toad, northern leopard frog, and tiger salamander (Hoberg and Gause, 1992).

### 3.5.1.2    Impacts and Mitigation

The Missouri River, including Lake Oahe, is the only waterbody that would be crossed by the Project with aquatic resources that have potential to be impacted by the Project.

All subsurface disturbing activities would be set back from the banks of Lake Oahe at the HDD entry point. This provides a buffer of undisturbed land between active construction and the Lake. There is potential, although very low due to setbacks of approximately 1,100 feet on the west bank and 900 feet on the east bank, for sediment to be transported from the workspace into the river during precipitation events, which could increase the local turbidity and sediment load in the lake. These increased loads have potential to temporarily affect sensitive fish eggs, fish fry, and invertebrates inhabiting the river.  However, sediment levels would quickly attenuate both over time and distance and would not adversely affect resident fish populations or permanently alter existing habitat.  By also implementing the erosion and sediment control measures specified in the ECP (**Appendix G**) and SWPPP (**Appendix A**), the potential for sediment transport is likely avoided or minimized.   Following construction, the ROW would be restored, revegetated, maintained in an herbaceous or scrub-shrub state, and monitored in accordance with applicable regulations and permit conditions.

A successfully completed HDD crossing would minimize environmental impacts on Lake Oahe since the pipeline would be installed without disturbing the aquatic and benthic environments.  However, crossings via HDD carry a low risk of an inadvertent release of drilling mud, composed primarily of bentonite (a naturally occurring fine clay) slurry.  Increased levels of sedimentation and turbidity from an inadvertent release could adversely affect fish eggs, juvenile fish survival, benthic community diversity and health, and spawning habitat.  Dakota Access' HDD Construction/Contingency Plan (**Appendix B**) establishes monitoring procedures and prescribes measures to be implemented to minimize the impact in the event it occurs.  All HDD operations conducted for crossing the Lake Oahe would adhere to the HDD Contingency Plan and applicable permit conditions to reduce the likelihood of an inadvertent release to minimize and mitigate environmental impacts.   Dakota Access' construction contractor would ensure that the appropriate response personnel and containment equipment are available onsite to effectively implement the HDD Contingency Plan.

In addition to the crossing of Lake Oahe, aquatic resources could also be impacted during water withdrawal from the Missouri River, which is required for activities associated with the installation of HDD and the hydrostatic testing of HDD pipeline segment located on the flowage easements.  However, water withdrawal activities would be conducted in accordance with all applicable permit conditions and regulations and in a manner that would not reduce water flow to a point that would impair flow or impact aquatic life.  Intake screens and floats would also be utilized, as previously discussed in Section 3.2.1.2, to prevent entrainment of aquatic life and avoid impacts on aquatic resources.  In addition, by placing the pump within a secondary containment structure on the barge, the potential for impacts on aquatic resources associated with accidental fuel spills or leaks is likely avoided or minimized.

The primary issue related to impacts on the aquatic environment from operation of the Project would be related to releases from the pipeline.  For portions of the pipeline installed beneath the lake, the depth

49

USACE_DAPL0074172

Environmental Assessment
Dakota Access Pipeline Project
September 2015

of the pipeline profile, increased wall thickness of the pipe, installation of remotely operated valves on both sides of the river crossing, and monitoring of the system 24/7 would further limit the potential for an inadvertent release into the waterbody.  As a result, operations activities are not anticipated to impact aquatic resources or their habitat.  Adherence to the Dakota Access Facility Response Plan (under development and would be issued prior to operating the Project, in accordance with PHMSA and federal regulations) would minimize potential impacts on aquatic wildlife from potential spills during the operation of the pipeline.  In the event of a leak, Dakota Access would work aggressively to contain the leak, initiate cleanup activities, and contact the appropriate authorities, including the Corps.

## 3.6     Land Use and Recreation

Under the "no action" alternative, Dakota Access would not construct the proposed Project, and no impacts on land use and recreation would occur.  However, if the objectives of the Project are to be met under the "no action" alternative, other projects and activities would be required and these projects would result in their own impacts on land use and recreation, which would likely be similar to or greater than the proposed Project.  Nevertheless, the impacts associated with a future project developed in response to the "no action" alternative are unknown, while only temporary and minor impacts or insignificant permanent impacts on land use and recreation would occur as a result of the Proposed Action, as described in the sections below.

### 3.6.1    Land Ownership

The proposed 24-inch pipeline would cross seven contiguous Corps flowage easements over eight privately-owned parcels (**Figure 2**) that are associated with the Buford-Trenton-Irrigation District (Garrison Dam).  Based upon Corps-provided easement documents and mapping, the distance across the flowage easements on the north side of the Missouri River in Williams County is approximately 14,953 feet (2.83 miles).

The flowage easements allow the Government to flood and saturate the land, surface, and subsurface of these properties.  Generally, these easements prohibit the construction of structures for human habitation; provide that any other structures require written approval by the Corps; and provide that no mineral exploration, excavation or placement of fill material may occur on the easement area without the prior approval of the Corps.

The proposed pipeline route would also cross federal lands on the east and west banks of Lake Oahe in Morton and Emmons counties. The distance from the western boundary of federally-owned lands to the eastern boundary of federally-owned lands on both sides of the lake, including the width of the lake, at the proposed crossing location is approximately 6,450 feet. The proposed pipeline would be routed to parallel existing linear infrastructure (an overhead power line and a buried gas transmission pipeline) across Lake Oahe in the same area.  The HDD entry and exit points, measuring approximately 200 by 250 feet, would be located on private lands, as would the stringing corridor required to facilitate the installation.

Dakota Access is securing a 50-foot-wide permanent easement along the entire Project alignment that is generally centered on the pipeline (25 feet on either side of the centerline).  Within the 50-foot-wide easement, a 30-foot corridor free of large woody vegetation, located within flowage easement LL3440E

50

USACE_DAPL0074173

Environmental Assessment
Dakota Access Pipeline Project
September 2015

on the north bank of the Missouri River, would be required to allow for a clear line of sight once construction is completed to perform visual inspections during operation of the pipeline. The corridor would be maintained in a vegetative state.

## 3.6.2    Land Use

### 3.6.2.1    Affected Environment

Land use within the Project Area was assigned a classification based on the principal land characteristic in a given area. Aerial photography, the National Land Cover Database (Multi-Resolution Land Characteristics Consortium, 2011), the Morton County Zoning Map (Morton County, 2014), and the Williams County Comprehensive Plan were used to identify and classify general land use for the Project Area (**Figures 10 and 11**).

**Agricultural Land**

Agriculture is the primary land use within the Project Area.  These lands are primarily used for ranching and cultivating crops.  Agricultural lands allows for land uses such as farming, ranching, animal feeding operations, grain storage, and related functions. Agricultural land within the flowage easements are primarily pivot irrigated cropland (i.e., areas used for production of annual crops such as corn and soybeans).

**Developed Land**

Developed land includes open space around structures such as homes, farmsteads, outbuildings, well sites, and areas associated with roads and ditches.

**Open Space**

Open space includes all land that is not agriculture or developed; namely wetlands, open water, grasslands, and scrub-shrub.  Open space is found primarily along the river banks.  See sections 3.2 and 3.3 for a discussion on water resources and vegetation.

### 3.6.2.2    Impacts and Mitigation

The proposed Project would result primarily in temporary, short-term impacts on land use during construction. Construction activities would require the temporary and short-term removal of existing agricultural land from crop and forage production within the construction footprint. During construction, temporary impacts such as soil compaction and crop damage are possible along the construction ROW. Mitigation measures to minimize impacts such as topsoil segregation and decompaction practices would be fully implemented in accordance with the ECP and SWPPP. Upon the completion of construction activities, the Project Area would be restored and returned to pre-construction land use.

As mentioned above, much of the cropland within the Corps flowage easements uses pivot irrigation systems.  Dakota Access would coordinate with all landowners on acceptable methods for construction

51

Environmental Assessment
Dakota Access Pipeline Project
September 2015

and restoration, including potential impacts to irrigated fields. Compensatory damages would be paid accordingly.

The nearest residence to the project on the flowage easements is approximately 1,750 feet east of the pipe centerline.  Temporary impacts on nearby residences could include inconvenience caused by noise and dust generated from construction equipment and traffic congestion associated with the transport of equipment, materials, and construction workers. Impacts from noise and dust during construction would diminish with distance from these areas and would be limited to the time of construction which would typically occur during daylight hours.

The primary impact on family farms would be the loss of standing crops and use of the land within the work area for the seasons during which DAPL Project-related activities occur, as well as potential diminished yields for a few years following construction.  Dakota Access proposes to implement mitigation measures to minimize these potential impacts as described in the ECP.  Dakota Access would repair surface drains and drainage tiles disturbed during ROW preparation, construction, and maintenance activities. Dakota Access would repair or replace fences and gates removed or damaged as a result of ROW preparation, construction, or maintenance activities.

At Lake Oahe, primary impact on ranching operations would be temporary prohibition of livestock grazing in the construction ROW, workspace areas, and restrictions on livestock movement across the construction ROW and workspace areas during construction. Given the narrow, linear nature of the DAPL Project and the alignment of the pipeline along property boundaries, livestock grazing reductions and livestock movement restrictions would be minor. Long-term or permanent impacts on family ranches are not anticipated. Following construction and restoration, the work area would be restored and ranching would be allowed to continue over the operational ROW. Landowners would be compensated for temporary loss of land and lower yields. Grazing activities would return to normal after Revegetation of the disturbed areas.

Once in operation, a permanent 50 foot ROW would be maintained along the entire Project except at segments of the ROW above the HDD profile on the flowage easements (between the HDD workspace and the river shore) that would be maintained by clearing woody vegetation over a 30 foot corridor (a 50 foot easement would still be obtained).  Maintenance would include the removal of any large trees and shrubs; agricultural land use would not be impacted by maintenance activities in this area. Trees would be protected by Dakota Access in a manner compatible with the safe operation, maintenance, and inspection of the pipeline.  Applicable regulations would be adhered to regarding tree and shrub removal from along the route.  Field surveys have confirmed that no shelter belts would be impacted within the Project Area or Connected Actions.  .

**Tables 3-11** and **3-12** below detail the acreage of land use impacts associated with the proposed Project.

52

Environmental Assessment
Dakota Access Pipeline Project
September 2015

| Table 3-11 Land Use Impacts on the Flowage Easements Project Area and Connected Action | | |
|---|---|---|
| Land Use | Construction Workspace (acres) [1] | Permanent ROW (acres) [2] |
| Agricultural Land | 54.0 | 15.1 |
| Developed | 1.6 | 0.8 |
| Open Space | 6.0 | 2.0 |
| Total | 61.3 | 17.9 |

[1] Construction Workspace includes the permanent ROW.
[2] Permanent ROW includes the 50-foot permanent easement and the 30-foot maintenance easement.

| Table 3-12 Land Use Impacts on the Federal Lands Project Area and Connected Action | | | |
|---|---|---|---|
| Land Use | Construction Workspace (acres) | Connected Action - Permanent ROW (acres) | Federal Lands - Permanent ROW (acres)[1] |
| Agricultural Land | 0.0 | 0.0 | 0.1 |
| Open Space | 15.5 | 1.1 | 1.0 |
| Total | 15.5 | 1.1 | 1.2 |

[1] Land Use Impacts on federal lands are limited to the maintained 50 foot permanent easement and do not include approximately 6.3 acres of permanent easement beneath the HDD profile within the banks of Lake Oahe.

Dakota Access would obtain and comply with applicable state regulations, county permits, and zoning and land use regulations. Permits may include, but are not limited to, grade and fill permits, ditch crossing permits, road and utility permits, and conditional use permits. Dakota Access would retain one or more EIs to monitor compliance with environmental conditions of county permits.

### 3.6.3   Recreation and Special Interest Areas

#### 3.6.3.1   Affected Environment

Generally, recreation and special interest areas include federal, state, or county parks and forests; conservation lands; wildlife habitat management areas; hunter management areas; natural landmarks; scenic byways; designated trails; recreational rivers; and campgrounds. Nearby recreational opportunities in the vicinity of the Proposed Action Area and the Connected Action areas include Wildlife Management Areas (WMAs), Lake Oahe, and the Missouri River, none of which are being impacted by the construction, although the HDD would cross under Lake Oahe itself.

The Missouri River and its shoreline are open to the public and used for recreational activities such as boating, swimming, and fishing. Because the flowage easements are federally regulated and privately owned, there is very limited, if any, recreational opportunities within the flowage easements. Additionally, there is little boating and open water angling on the entire upper end of Lake Sakakawea

USACE_DAPL0074176

Environmental Assessment
Dakota Access Pipeline Project
September 2015

because of lack of access and extremely turbid water throughout much of the recreational season (USACE, 2007).

Lake Oahe's 2,250 mile shoreline is open to the public and offers a variety of opportunities to outdoor recreationists such as fishing, swimming, sightseeing, camping, and picnicking. More than 1.5 million visitors enjoy Lake Oahe's recreation facilities each year. Fishing is the major recreational activity of visitors to the Oahe project, with 44% of visitors engaging in this activity (USACE, 2010c).

There are no public boat access sites, marinas, or public swimming beaches within one mile of the flowage easements or federal lands crossings. There are no designated state parks or recreation areas, historic trails, scenic by-ways, designated wilderness or natural areas or other sensitive land uses that would be affected by the crossings (North Dakota Parks and Recreation Department, 2014).

At the flowage easement crossing, the closest Nationwide Rivers Inventory (NRI) segment is a one mile stretch of the Missouri River within the Fort Union Trading Post National Historic Site, which is about 9.2 river miles upstream from the crossing. At the federal lands crossing, the closest NRI segment is Square Butte Creek to the Oliver/Mercer County Line, which is about 50 river miles upstream from the Project Area (National Park Service, 2009).

North Dakota has approximately 54,373 miles of river, but no designated wild & scenic rivers USFWS et al., 2014).

## Wildlife Management Areas

The North Dakota Game and Fish Department manages the Trenton and Overlook WMAs; neither of which are crossed by the proposed Project.  The Trenton WMA encompasses 2,647 acres and is located southwest of Williston near Trenton, along the Missouri River and Lake Sakakawea. About 13.55 acres of the Trenton WMA extends into the eastern portion of flowage easement LL3440E (**Figure 6**) but the closest edge is approximately 800 feet from the HDD workspace.  This area is largely primitive and the landscape has been allowed to develop naturally. The WMA provides recreational opportunities for fishing and hunting waterfowl, deer, and pheasants. The Overlook WMA encompasses 32 acres and is located 6.5 miles north of Cartwright, about 1,430 feet west of the HDD entry point in McKenzie County.  The Overlook WMA is only accessible by boat and is used for hunting deer.

The Oahe WMA is located along Missouri River and Oahe Reservoir, about 17 miles south of Bismarck (USGS, 2014b).  The proposed pipeline at the Lake Oahe crossing is about 14.5 miles south of the Oahe WMA.

## Water Quality and Recreation

Section 303(d) of the CWA requires states to submit their lists of water quality limited waterbodies. This list has become known as the "TMDL list" or "Section 303(d) list." A TMDL is the amount of a particular pollutant a stream, lake, estuary, or other waterbody can "handle" without violating State water quality standards. The final 2014 Section 303(d) list, which was submitted to Environmental Protection Agency (EPA) as part of the integrated Section 305(b) water quality assessment report and Section 303(d) TMDL list, includes a list of waterbodies not meeting water quality standards and which need TMDLs.

54

USACE_DAPL0074177

Environmental Assessment
Dakota Access Pipeline Project
September 2015

Lake Sakakawea is on the 2014 Section 303(d) list of impaired waters as not supporting fish consumption because of high levels of methyl-mercury; however, Lake Sakakawea would not be crossed or otherwise impacted as a result of Project activities on the flowage easements.  Lake Oahe is not listed as needing a TMDL and fully supports recreational use (North Dakota Department of Health, 2015).  Because Lake Oahe already meets the state water quality standards, the Proposed and Connected Action Areas are not anticipated result in impacts that would cause an impairment of water quality or the designated use of Lake Oahe.

**Wilderness Areas**

The Wilderness Act of 1964 defines wilderness as lands that may contain ecological, geological, scientific, educational, scenic or historical value. There are three designated wilderness areas within North Dakota: Chase Lake, Lostwood, and Theodore Roosevelt Wilderness Areas. There are no designated wilderness areas, and no designated Nature Preserves or Natural Areas within one mile of either crossing (Wilderness Institute, 2014).

### 3.6.3.2    Impacts and Mitigation

The recreational enjoyment of wildlife (such as hunting or bird watching) may be temporarily affected by construction activities, depending on season and location. However, this effect would be short-term.

Recreationists may observe ROW clearing along the river banks. Because the pipeline would cross underneath the river via the HDD method, there would be no disruption to the course or cross-current of the river, and would not impact lake/river recreationists.

## 3.7    Cultural and Historic Resources and Native American Consultations

Section 106 of the National Historic Preservation Act of 1966 (NHPA), as amended, and implemented by 36 CFR Part 800, requires Federal lead agencies to assess the effects of permitted actions on historic properties.  Historic properties are defined in the NHPA as prehistoric and historic archaeological sites, standing structures, or other historic resources listed in, or eligible for listing in the National Register of Historic Places (NRHP).

Under the "no action" alternative, Dakota Access would not construct the proposed Project and no impacts on cultural and historic resources would occur.  However, If the objectives of the Project are to be met under the "no action" alternative, other projects and activities would be required and these projects could result in their own impacts on cultural and historic resources, which would likely be similar to or greater than the proposed Project.  Nevertheless, the impacts associated with a future project developed in response to the "no action" alternative are unknown, while no impacts on cultural and historic resources would occur as a result of the Proposed Action, as described in the sections below.

As detailed in Appendix I, an Archaeological Resource Protection Act (ARPA) permit was not required for any fee title or federal lands as these lands were determined through the Class I literature search to have been extensively surveyed for cultural resources.  Subsequent conversations with Corps personnel indicated that these surveys were of sufficient intensity and no further assessment of these properties was warranted.  For All Class III survey investigations were conducted on private property where land

55

USACE_DAPL0074178

Environmental Assessment
Dakota Access Pipeline Project
September 2015

access was voluntarily given by landowners.   Cultural surveys were conducted in 2014 and were completed during the 2015 survey season.  **Appendix I** contains the Cultural Resources Report which details the results of the Class I literature review, survey methodology, and survey results with management recommendations.   The cultural resources investigations were supervised by Principal Investigators who are permitted by the State Historical Society of North Dakota (SHSND).

### 3.7.1    Cultural Resources Studies

Based on data compiled from previously executed archaeological investigations it is recognized that much of the region has been inhabited by human populations for approximately 12,000 years. Throughout much of the state the recorded prehistoric occupations range from Paleoindian Period encampments to Late Prehistoric Period sites. Multiple sites have been explored that suggest the area was inhabited by societies adapted for lifestyles on the Plains and in the various geographical regions of the state dating back to 6000 BC. The current Project Areas have a moderate to high probability for archaeological deposits based on proximity to permanent water sources, topography, lack of significant ground disturbances, and depositional processes.

#### 3.7.1.1    Affected Environment

Cultural resources background studies and field surveys were conducted for the flowage easement and federally-owned lands traversed by the Project Area. The background studies determined that one previously recorded site is mapped within the portion of the 400-ft survey corridor that traverses the flowage easements.  Additionally, portions of the flowage easement Project Area have been subject to previous surveys (Larson et al., 1987).  Site 32WI1367, also known as the Buford-Trenton Irrigation System (BTIS), is a National Register nominated cultural resource consisting of a pumping plant, main canal, and associated irrigation components.  The BTIS construction began in 1940 and continued through the 1950's managed by the Department of Interior, Work Progress Administration, and the Farm Security Administration. The proposed Project intersects with one of the extant irrigation canals listed as a contributing element of the BTIS in the northeastern corner of Section 30 of Township 152 North, Range 103 West.

The background review for the portion of the Project area that traverses federal lands determined the federal lands have been previously surveyed for cultural resources, and eight (8) previously recorded cultural resource sites are mapped within the 400-ft environmental survey corridor.  Five of these sites (32MOx0004, 32MO0054, 32MO0060, 32MO0061, and 32MO0259) are located in Morton County, on the western side of the Lake Oahe.  The remaining three sites (32EM0019, 32EM0021, and 32EM0221) are located in Emmons County, on the eastern side of Lake Oahe. These sites are all situated between the banks of Lake Oahe and will be entirely avoided as the proposed HDD workspace would be positioned beyond the mapped boundaries of these sites.

The Class II/Class III cultural resource inventory of the proposed Project Area was conducted in accordance with the *North Dakota SHPO Guidelines Manual for Cultural Resources Inventory Projects* (SHSND, 2012). As outlined in Appendix I, systematic survey methods employed by field crews included surface inspection and shovel probing.  Surface inspection was conducted in areas with surface visibility greater than 10 percent along fixed 15 m (49 ft) interval transects.  Shovel probes were excavated on a 30 m grid in areas

USACE_DAPL0074179

Environmental Assessment
Dakota Access Pipeline Project
September 2015

with less than 10 percent surface visibility.  In general, shovel probing was employed minimally to document soil profile data as the majority of these areas are dominated by expansive agricultural pastures with high surface visibility.

The survey of the flowage easements resulted in the assessment of the portion of Site 32WI1367 within the survey corridor, and the documentation of a new prehistoric site (32MZ2874) located on the southern banks of the Missouri River.  Dakota Access would entirely avoid impacting this NRHP-eligible canal feature by installing the pipe via HDD in this area.  The HDD workspace would be off-set a sufficient distance to ensure that no components or associated features of this canal would be adversely impacted.  Regarding site 32MZ2874 on the south side of the Missouri River, the HDD workspace has been designed in order to avoid impacts to this site.  Exclusionary fencing would be installed along the eastern border of the HDD workspace during drilling activities to prevent inadvertent impacts or trespassing.   No additional cultural resources were documented within the portion of the Project area that traverses the flowage easements.

A Class II/Class III Archaeological Survey was also conducted within a 400-foot environmental survey corridor, and along a 100-foot-wide potential stringing corridor across federal lands.  Survey investigations across the federal lands resulted in the documentation of one new archaeological site (32MO570).  This site consists of a singular lithic flake in isolated contexts and is recommended as not eligible for listing in the National Register of Historic Places (NRHP) and no further work is warranted.

These survey investigations did not include a revisit of the 7 previously recorded sites mapped directly adjacent to the Lake Oahe banks.  The HDD workspaces for the Project are off-set from the banks of the lake by a sufficient distance to entirely avoid all seven of these previously recorded archaeological sites.

A more thorough discussion of the cultural setting, relevant previous studies, as well as geologic and geomorphic analysis of the region, and results of the current survey can be referenced in Appendix I.

As mentioned previously, survey investigations were restricted to those properties where land access was voluntarily given by landowners.  As detailed in Appendix I, an Archaeological Resource Protection Act (ARPA) permit was not required for any fee title or federal lands as all Class II/III surveys were conducted exclusively across private lands.  Should significant modifications to workspace design require impacts to federal lands, Dakota Access would afford the district commander or their agent the opportunity to review ARPA or other antiquities permits that may be required to assess direct impacts to federal lands.  Access to the shoreline for water acquisition is not required on Corps fee-lands.

### 3.7.1.2   Impacts and Mitigation

Dakota Access has conducted Class III inventory surveys throughout the 400-foot-wide survey corridor, and 100-foot-wide pullback string.  Regarding the NRHP-eligible BTIS (site 32WI1367), the Project proposes to traverse one historic canal feature that has been determined to be an eligible component of the site.  Impacts to this feature would be avoided via HDD to ensure the integrity of construction design for these historic-age features is preserved.  This management recommendation has been included as a viable avoidance option in the Class III report submitted to both the ND SHPOs office that the USACE regional archaeological staff.  To date, the SHPO has deferred consultation to the regional USACE archaeologist and has not provided comment regarding these avoidance options.

57

Environmental Assessment
Dakota Access Pipeline Project
September 2015

There are no other previously or newly recorded historic properties identified on or near the flowage easements that are crossed by the Project. Although there are seven previously documented cultural sites within the 400-foot survey corridor in the vicinity of the Lake Oahe crossing, these sites would not be adversely impacted by the Project. HDD workspaces, as well as staging and stringing areas would be positioned in excess of 100 feet beyond the mapped boundaries of these previously recorded sites. Specifically, the western HDD workspace would be located approximately 630 feet west of previously cultural resource sites, and the eastern HDD workspace would be located 230 feet east of the mapped cultural resources sites. Additionally, Class III survey efforts conducted within the Project workspace directly adjacent to these site boundaries were negative for cultural resources thus confirming that no cultural components associated with these sites stretch into the currently defined workspace areas. Overview maps depicting workspace design in relation to these previously recorded sites is provided in Appendix I.

In accordance with Section 106 of the NHPA, Dakota Access has made a good faith effort to identify significant historic properties within the Project area. Based on the result of these efforts, no properties consisted to be eligible, or potentially eligible for listing in the National Register of Historic Places (NRHP) would be adversely impacted by the proposed Project or Connected Action.

Dakota Access' UDP was developed (**Appendix F**) for use during all DAPL Project construction activities which describes actions that would be taken in the event of a previously unrecorded cultural resource site is discovered during construction activities. The UDP explicitly calls for work to stop until the correct authority or agency can be contacted and the find can be properly evaluated.

### 3.7.2   Native American Consultations

In October 2014, Dakota Access met with representatives of the Standing Rock Sioux Tribe and the Tribal Historic Preservation Office (THPO) of the Standing Rock Sioux Tribe to informally introduce the Project, and inquire about any potential areas of interest or cultural importance traversed by the Project. This tribal coordination was meant as a good faith effort to involve potential stakeholders in early routing evaluation. Formal consultation with federally-recognized tribal entities for those portions of the Project on federal or fee titled lands has not been conducted per Section 106 of the National Historic Preservation Act (NHPA), which requires government to government consultations with tribal entities.

### 3.8   Social and Economic Conditions

Under the "no action" alternative, Dakota Access would not construct the proposed Project and no impacts on social and economic conditions would occur. However, If the objectives of the Project are to be met under the "no action" alternative, other projects and activities would be required and these projects would result in their own impacts on social and economic conditions, which would likely be similar to or greater than the proposed Project. Nevertheless, the impacts associated with a future project developed in response to the "no action" alternative are unknown, while primarily beneficial impacts on social and economic conditions would occur as a result of the Proposed Action, as described in the sections below.

The overall Project is a $3.78 billion dollar investment directly impacting the local, regional, and national labor force by creating nearly 12,000 construction jobs. As a matter of practice and their promise as part

58

USACE_DAPL0074181

Environmental Assessment
Dakota Access Pipeline Project
September 2015

of this Project, Dakota Access would utilize American labor to build the pipeline. Dakota Access has teamed up with the various craft and labor unions in the project regions and nationally to ensure the Project is constructed by highly qualified and experienced local and regional labor resources. These well-paying construction jobs would create considerable labor income and state income tax revenue – including the generation of more than $13.4 million in ad valorem taxes. Upon authorization, the Project would put welders, mechanics, electricians, pipefitters, heavy equipment operators, and others within the heavy construction industry to work.

### 3.8.1    Demographics, Employment, and Income

#### 3.8.1.1    Affected Environment

Population, employment, and economic data were collected using Census tracts within a 0.5 mile radius of the Proposed Action.

Two Census tracts were identified in the vicinity of the flowage easement crossing, including CT9625 in McKenzie County and CT9535 in Williams County. The total population for CT9625 in McKenzie County is 1,504 and 1,540 for CT9535 in Williams County. There are a 557 and 618, respectively, households in the effected Census tracts in McKenzie and Williams counties. Unemployment in McKenzie County CT9625 is 1.2% and in Williams County CT 9535 is 1.7%. For those who are employed, agriculture employs the largest number of people in both Census tracts, followed by educational services, health care and social assistance fields. Construction is the third largest industry that employs residents in the two Census tracts.

Near the Lake Oahe crossing, two Census tracts were identified for this EA, including CT9665 in Emmons County and CT204 in Morton County. The total population for CT9665 in Emmons County is 3,521 and 3,063 for CT204 in Morton County. There are 1,634 and 1,236, respectively, households in the effected Census tracts in Emmons and Morton counties. Unemployment in Emmons County CT9665 is 4.9% and in Morton County CT204 is 1.5%. For those who are employed, agriculture employs the largest number of people CT9665 in Emmons County, followed by educational services, health care and social assistance fields. Construction is the third largest industry that employs residents in CT9665 in Emmons County. Educational services, and health care and social assistance is the leading industry employer in CT204 in Morton County followed by agriculture. Retail trade is the third largest industry employing residents in CT204 in Morton County.

#### 3.8.1.2    Impacts and Mitigation

The Project is assumed to have a short construction window with a small number of construction workers dedicated to these crossings. It is possible that counties within the Project Area could experience short-term temporary effects to the local economy through induced spending from construction employees working on the crossing. No residential homes or farms would be relocated resulting from the proposed action. Additionally, no demographic changes in the Census tracts affected are anticipated because no permanent employees would be created as a result of the Proposed Action.

The Project also has tremendous secondary and sustainable economic benefits to the United States by supporting energy independence, increasing employment opportunities, and adding to demand in many manufacturing sectors, which would be a boost to the overall economy. When considering the economic

59

Environmental Assessment
Dakota Access Pipeline Project
September 2015

impact and benefit, once U.S. workers are employed on the Project, consistent with most mega-infrastructure projects, the workers would spend their earnings in the communities where they work and live, resulting in multiplied economic impacts that would be nearly $5 billion just during the construction phase. This economic impact would affect manufacturing in many domestic sectors such as the following examples. It result in new vehicles being purchased, which positively impacts the auto industry. It would result in new homes being built, which improves and increases the housing construction, resale, and lending business located in the region and across the U.S. It impacts the food industry by requiring more food services and products to be delivered and consumed in the DAPL Project region. The list could continue with a description of many secondary benefits, but in summary, the economic impact to the U.S. as well as the immediate region where the pipeline is located is tremendous and critical to keep Americans employed and our economy moving forward.

## 3.9     Environmental Justice

Under the "no action" alternative, Dakota Access would not construct the proposed Project and no environmental justice impacts would occur.  However, If the objectives of the Project are to be met under the "no action" alternative, other projects and activities would be required and these projects could result in their own environmental injustice impacts, which would likely be similar to or greater than the proposed Project.  Nevertheless, the impacts associated with a future project developed in response to the "no action" alternative are unknown, while no disproportional impacts on minority or low-income populations would occur as a result of the Proposed Action, as described in the sections below.

### 3.9.1     Affected Environment

EO 12898, *Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations*, requires all federal agencies to identify and address disproportionately high and adverse human health or environmental of their programs and policies on minority and low-income populations and communities. The CEQ guidance suggests that an environmental justice population may be identified if "the minority population percentage of the affected area exceeds 50%, or if the minority population percentage of the affected area is meaningfully greater than the minority population in the general population or other appropriate unit of geographic analysis" (CEQ, 1997).  The CEQ defines low-income populations based on an annual statistical poverty threshold.  In 2013, the poverty threshold for the 48 contiguous states for an individual under the age of 65 living alone was $12,119 (U.S. Census Bureau, 2014).  In this analysis, low-income populations were identified when the percentage of the population living below the poverty rate exceeded the U.S. average, which is 14.9%. EPA has identified ten communities across the U.S. termed Environmental Justice Showcase Communities where EPA has committed to address environmental justice challenges existing in those communities.

### 3.9.2     Impacts and Mitigation

No appreciable minority or low-income populations exist in these Census tracts at either crossing (**Tables 3-13** through **3-16**). Therefore, this topic was omitted from further analysis in this EA.

60

Environmental Assessment
Dakota Access Pipeline Project
September 2015

| Table 3-13 Minority Population Statistics for the Flowage Easements Project Area and Connected Action | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Percent | | | | | | | |
| Location | Total Population | White Alone[1] | Black | NA/AN[2] | Asian Alone | Pacific Islander | Two or More Races | Other | Hispanic or Latino[3] |
| **FEDERAL** | | | | | | | | | |
| United States | 309,138,711 | 63.7 | 12.2 | 0.7 | 4.8 | 0.2 | 2 | 0.2 | 16.4 |
| **STATE** | | | | | | | | | |
| North Dakota | 676,253 | 90.0 | 1.2 | 5.3 | 1.0 | 0.1 | 1.7 | 0.7 | 2.1 |
| **COUNTY** | | | | | | | | | |
| McKenzie County | 6,692 | 76.6 | 0.2 | 20.4 | 0.6 | 0.0 | 1.6 | 0.6 | 2.7 |
| Williams County | 23,287 | 91.5 | 0.2 | 5.0 | 0.3 | 0.1 | 1.7 | 1.2 | 2.3 |
| **LOCAL** | | | | | | | | | |
| McKenzie County | | | | | | | | | |
| CT9625 | 1,418 | 98.4 | 0.0 | 0.8 | 0.2 | 0.0 | 0.3 | 0.3 | 1.2 |
| Williams County | | | | | | | | | |
| CT9535 | 24,563 | 91.4 | 0.4 | 5.0 | 0.5 | 0.0 | 1.4 | 1.4 | 2.5 |

Source: U.S. Census Bureau, American Community Survey (2008-2012 5-year estimates).
[1] White Alone, not Hispanic or Latino.
[2] NA/AN: Native American/Alaska Native.
[3] Hispanic or Latino is ethnicity not race, although is still considered in this analysis.

| Table 3-14 Low-Income Population Statistics for the Flowage Easements Project Area and Connected Action | | |
|---|---|---|
| Location | Median Household Income ($) | Persons Below the Poverty Level (%) |
| **FEDERAL** | | |
| United States | 53,046 | 14.9 |
| **STATE** | | |
| North Dakota | 51,641 | 12.1 |
| **COUNTY** | | |
| McKenzie County | 61,893 | 13.2 |
| Williams County | 69,617 | 8.1 |
| **LOCAL** | | |
| McKenzie County | | |
| CT9625 | 65,650 | 6.1 |
| Williams County | | |
| CT9535 | 72,500 | 9.9 |

Source: U.S. Census Bureau, American Community Survey (2008-2012 5-year estimates).

61

USACE_DAPL0074184

Environmental Assessment
Dakota Access Pipeline Project
September 2015

No Environmental Justice Showcase Communities potentially affected by the Proposed Action are located within the federal lands or flowage easement Project Area (EPA, 2012).

| Table 3-15 Minority Population Statistics for the Federal Lands Project Area | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Location | Total Population | Percent | | | | | | | |
| | | White Alone[1] | Black | NA/AN[2] | Asian Alone | Pacific Islander | Two or More Races | Other | Hispanic or Latino[3] |
| **FEDERAL** | | | | | | | | | |
| United States | 309,138,711 | 63.7 | 12.2 | 0.7 | 4.8 | 0.2 | 2 | 0.2 | 16.4 |
| **STATE** | | | | | | | | | |
| North Dakota | 676,253 | 90.0 | 1.2 | 5.3 | 1.0 | 0.1 | 1.7 | 0.7 | 2.1 |
| **COUNTY** | | | | | | | | | |
| Emmons County | 3,544 | 99.4 | 0.0 | 0.3 | 0.0 | 0.0 | 0.3 | 0.1 | 0.2 |
| Morton County | 27,439 | 93.8 | 0.5 | 3.7 | 0.2 | 0.0 | 1.3 | 0.5 | 1.5 |
| **LOCAL** | | | | | | | | | |
| Emmons County | | | | | | | | | |
| CT9665 | 3,521 | 98.7 | 0.0 | 0.1 | 0.4 | 0 | 0.8 | 0.1 | 0.2 |
| Morton County | | | | | | | | | |
| CT204 | 3,063 | 97.6 | 0.0 | 1.7 | 0.0 | 0.0 | 0.7 | 0.0 | 0.0 |

Source: U.S. Census Bureau, American Community Survey (2008-2012 5-year estimates).
[1] White Alone, not Hispanic or Latino.
[2] NA/AN: Native American/Alaska Native.
[3] Hispanic or Latino is ethnicity not race, although is still considered in this analysis.

| Table 3-16 Low-Income Population Statistics for the Federal Lands Project Area | | |
|---|---|---|
| Location | Median Household Income ($) | Persons Below the Poverty Level (%) |
| **FEDERAL** | | |
| United States | 53,046 | 14.9 |
| **STATE** | | |
| North Dakota | 51,641 | 12.1 |
| **COUNTY** | | |
| Emmons County | 37,304 | 14.7 |
| Morton County | 57,988 | 8.8 |
| **LOCAL** | | |
| Emmons County | | |
| CT9665 | 37,304 | 14.7 |
| Morton County | | |
| CT0204 | 78,135 | 5.0 |

Source: U.S. Census Bureau, American Community Survey (2008-2012 5-year estimates).

USACE_DAPL0074185

Environmental Assessment
Dakota Access Pipeline Project
September 2015

## 3.10    Hazardous Waste

The EPA (2015) defines hazardous waste as waste that is dangerous or potentially harmful to our health or the environment, occurring as liquids, solids, gases, or sludges.  They can be generated through the disposal of commercial products, such as cleaning fluids or pesticides, or manufacturing processes. Improper management and disposal of hazardous substances can lead to pollution of groundwater or other drinking water supplies and the contamination of surface water and soil.  The primary federal regulations for the management and disposal of hazardous substances are the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) and the Resource Conservation and Recovery Act (RCRA).

A review of regulated facilities for hazardous materials along the Project corridor was conducted by searching online records maintained by the EPA (2014).  Presently, there are no recognized Radiation Information Database, Brownfields, Superfund, Toxic Release Inventory, or air emission sites within one mile of the flowage easements and Lake Oahe crossings.  No operating sensitive receptors, such as schools or hospitals, are reported within at least one mile.  Additionally, there are no NPDES discharge sites within one mile of the Project Areas.

With the Proposed Action, there is potential for temporary impacts to public safety from hazardous material use.  Other hazards to worker safety may also exist along the Project corridor, but do not pose a significant impact.  Because there were no regulated sites found within the one-mile search radius of the Project Area, no impacts to the Project, Project media, or worker safety are expected.  In the unlikely event contamination is encountered during construction, the UDP **(Appendix F)** would be implemented to protect people and the environment and avoid or minimize any effects from unearthing the material.

Any hazardous materials discovered, generated, or used during construction would be managed and disposed of in accordance with applicable local, tribal, state, and federal regulations. Should emergency response be required during construction, the contractor would have some of their own trained or contracted responders, and local response teams would be expected to assist.

Dakota Access would comply with any laws, regulations, conditions, or instructions issued by the EPA, or any Federal, state, or local governmental agency having jurisdiction to abate or prevent pollution, such as the RCRA, and State hazardous waste management rules.

## 3.11    Reliability and Safety

The PHMSA, a federal agency within the U.S. DOT is the primary federal regulatory agency responsible for ensuring the safety of America's energy pipelines, including crude oil pipeline systems.  As a part of that responsibility, PHMSA established regulatory requirements for the construction, operation, maintenance, monitoring, inspection, and repair of liquid pipeline systems.

Construction activities could present safety risks to those performing the activities, residents and other pedestrians in the neighborhood. Given the low population density of the area, risks would be limited to workers involved with the Project. All activities would be conducted in a safe manner in accordance with the standards specified in the Occupational Safety and Health Administration (OSHA) regulations.

63

USACE_DAPL0074186

Environmental Assessment
Dakota Access Pipeline Project
September 2015

To prevent pipeline failures resulting in inadvertent releases, Dakota Access would construct and maintain the pipeline to meet or exceed industry and governmental requirements and standards. Specifically, the steel pipe would meet PHMSA specifications under 49 CFR § 195, follow standards issued by the American Society of Mechanical Engineers, National Association for Corrosion Engineers and American Petroleum Institute (API). Once installed, the pipeline would be subjected to testing to verify its integrity and compliance with specifications, including hydrostatic pressure testing at the crossings, checking coating integrity, and X-ray inspection of the welds. The pipeline would be placed into service only after inspection to verify compliance with all construction standards and requirements. Dakota Access would maintain and inspect the pipeline in accordance with PHMSA regulations, industry codes and prudent pipeline operating protocols and techniques. The pipeline ROW would be patrolled and inspected by air every 10 days, weather permitting, but at least every three weeks and not less than 26 times per year, to check for abnormal conditions or dangerous activities, such as unauthorized excavation along the pipeline route.

As previously discussed, Dakota Access is currently drafting a Facility Response Plan, in accordance with 49 CFR 194, which details the procedures to be implemented in the event of an inadvertent pipeline release and would be in place prior to commencing transportation of crude oil. Dakota Access anticipates submitting the Facility Response Plan to PHMSA for review and approval in the third quarter of 2016 by PHMSA and would provide a copy to the Corps at this time.

Following completion of construction and throughout operation of the Project facilities, the Operator and qualified contractors would maintain emergency response equipment and personnel at strategic points along the pipeline route. These personnel would be trained to respond to pipeline emergencies as well as in the National Incident Management System (NIMS) Incident Command System (ICS). Additionally, contracts would be in place with oil spill response companies that have the capability to mobilize to support cleanup and remediation efforts in the event of a pipeline release. The operator would also coordinate with local emergency responders in preventing and responding to any pipeline related problems. These activities would include conducting and hosting, over a period of time, emergency response drills with both Dakota Access employees and local emergency responders along the pipeline route.

In addition to the testing and inspection measures listed above, Dakota Access would utilize a supervisory control and data acquisition (SCADA) system to provide constant remote oversight of the pipeline facilities. Power for the SCADA system would be provided from an existing power grid. In the event of a power outage, a 500 watt Uninterruptable Power Supply would supply low voltage power to the Programmable Logic Controller and communication equipment. Communication with the SCADA system would be accomplished via satellite (Hughes Global Network) and telephone (4G cellular [ATT] or landline depending on availability/coverage). Both forms of communication are continually engaged to poll information from these sites for 100% reliable remote monitoring / operation of these sites through the SCADA system to the Operations Control Center (OCC) in Sugarland, Texas (a backup control room is located in Bryan, Texas), and are proven to have the least potential for interruption during pipeline operations.

The SCADA system would alert Dakota Access' OCC Operator, located in Sugarland, Texas (a backup control room is located in Bryan, Texas), of rapid drops in pressure, who would then activate the controls as necessary and initiate procedures for an appropriate response. Leak Warn, a leading software program

64

USACE_DAPL0074187

Environmental Assessment
Dakota Access Pipeline Project
September 2015

for monitoring pipelines, is being tailored to the pipeline facilities, in accordance with Pipeline and Hazardous Materials Safety Administration requirements. The Operator would utilize a Computational Pipeline Monitoring System (CPM) to monitor the pipeline for leaks. The CPM is a state-of-the-art pipeline monitoring tool and features a real-time transient model that is based on pipeline pressure, flow, and temperature data, which is polled from various field instruments every 6 seconds and updates the model calculations to detect pipeline system variations every 30 seconds. After the system is tuned, this state-of-the-art CPM system is capable of detecting leaks down to 1 percent or better of the pipeline flow rate within a time span of approximately 1 hour or less and capable of providing rupture detection within 1 to 3 minutes. In the event that a leak is confirmed through verification, pump station shutdown would be initiated within a predetermined amount of time to effectuate. Next, the remotely controlled isolation valves (mainline valve sites would be installed on both sides of large waterbody crossings for isolation in the event of an emergency shutdown), which are operable from the OCC, would be closed. These valves have a closure time of no greater than three (3) minutes. Monitoring of the pipeline segments installed via HDD would be accomplished in the same manner as those segments installed by conventional methods (i.e., SCADA, internal inspection devices, and aerial patrols). Typically, repairs are not made on any section of pipe greater than 10 to 20 feet below the ground surface depending on the repair needed. If a material impact was on the pipeline below the 10-foot depth, operation of the system would be modified accordingly (e.g., reduce operating pressure) or the line would be re-drilled. If inspections identify an anomaly, requirements would be followed to comply with U.S. DOT requirements.

## 3.12    Air Quality and Noise

Under the "no action" alternative, Dakota Access would not construct the proposed Project and no impacts on air quality and noise would occur. However, if the objectives of the Project are to be met under the "no action" alternative, other projects and activities would be required and these projects would result in their own impacts on air quality and noise, which would likely be similar to or greater than the proposed Project. Nevertheless, the impacts associated with a future project developed in response to the "no action" alternative are unknown, while only temporary and minor impacts on air quality and noise would occur as a result of the Proposed Action, as described in the sections below.

### 3.12.1  Air Quality

#### 3.12.1.1  Affected Environment

The Clean Air Act (CAA) of 1970 requires that states adopt ambient air quality standards. The CAA (42 USC 7401 et seq.) establishes ambient air quality standards, permit requirements for both stationary and mobile sources, and standards for acid deposition and stratospheric ozone ($O_3$) protection. The standards have been established in order to protect the public from potentially harmful amounts of pollutants. Under the CAA, the EPA establishes primary and secondary air quality standards. Primary air quality standards protect public health, including the health of "sensitive populations, such as people with asthma, children, and older adults." Secondary air quality standards protect public welfare by promoting ecosystem health, and preventing decreased visibility and damage to crops and buildings.

According to the EPA, North Dakota has no nonattainment areas for criteria pollutants. The Bismarck air quality monitoring station in Burleigh County is located approximately 23 miles north-northwest of the Lake Oahe crossing. The Bismarck air quality monitoring station measures sulfur dioxide, nitrogen dioxide,

65

Environmental Assessment
Dakota Access Pipeline Project
September 2015

particulate matter, ground-level ozone, and meteorological data (North Dakota Department of Health, 2013).  The Williston air quality monitoring station in Williams County is located approximately 18 miles northeast of the flowage easement crossing.  The Williston air quality monitoring station measures particulate matter, ground-level ozone, and meteorological data.  The monitoring objective of both stations is to measure population exposure to air quality parameters.

Monitoring data for these stations from 2003-2013 show pollutant levels for sulfur dioxide, nitrogen dioxide, ozone, and particulate matter did not exceed state or deferral ambient air quality standards at any of the state-operated monitoring sites (North Dakota Department of Health, 2013).

### 3.12.1.2  Impacts and Mitigation

With the Proposed Action, no long-term impacts to air quality would occur; the proposed pipeline would not emit any criteria air pollutants.. Short-term impacts to air quality may occur during construction phase of the Project. The contribution of the Project to greenhouse gas emissions during construction would be considered a minor indirect impact to climate change.

During construction, emissions from fuel-burning internal combustion engines (e.g., transportation trucks, heavy equipment, drill rigs, etc.) would temporarily increase the levels of some of the criteria pollutants, including carbon monoxide, nitrogen dioxide, ozone, particulate matter, and non-criteria pollutants such as volatile organic compounds. Construction of the Lake Oahe crossing is likely to take six to eight weeks to complete.  Conventional pipeline construction across the flowage easements would take approximately two weeks and activities at the HDD exit point for crossing the Missouri River on the flowage easement LL3440E would likely operate for four to six weeks.  To reduce the emission of criteria pollutants, fuel-burning equipment running times would be kept to a minimum and engines would be properly maintained. This temporary increase in emissions is not expected to impact air quality or visibility in the region long-term.

## 3.12.2  Noise

### 3.12.2.1  Affected Environment

Sound is a sequence of waves of pressure that propagates through compressible media such as air or water. When sound becomes excessive, annoying, or unwanted it is referred to as noise.

Decibels (dB) are the units of measurement used to quantify the intensity of noise. To account for the human ear's sensitivity to low level noises, the decibel values are corrected for human hearing to weighted values known as decibels of the A-weighted scale (dBA; see **Table 3-17**).  The EPA has set values that should not be exceeded.  While the primary responsibility of regulating noise was transferred from the EPA to state and local governments in 1981, the Noise Control Act of 1972 and the Quiet Communities Act of 1978 are still in effect.

66

Environmental Assessment
Dakota Access Pipeline Project
September 2015

| Table 3-17 Noise Values | | |
|---|---|---|
| Area | Noise Level | Effect |
| All areas | Leq (24) < 70 dBA | Hearing |
| Outdoors in residential areas and farms where people spend varying amounts of time in which quiet is a basis for use | Ldn < 55 dBA | Outdoor activity interference and annoyance |
| Outdoor areas where people spend limited time such as school yards, playgrounds, etc. | Leq (24) < 55 dBA | Outdoor activity interference and annoyance |
| Indoor residential areas | Ldn < 45 dBA | Indoor activity interference and annoyance |
| Indoor areas with human activities such as schools, etc. | Leq (24) < 45 dBA | Indoor activity interference and annoyance |

Source: (The Engineering ToolBox, 2015)
Leq: 24-hr equivalent sound level
Ldn: day-night average sound level

The dominant land use in the proposed Project Area is agricultural.  The Day-Night Average Sound ($L_{dn}$) level for agricultural crop land is 44 dBA, and rural residential is 39 dBA (The Engineering ToolBox, 2015).

### 3.12.2.2  Impacts and Mitigation

Construction of the Project would temporarily affect the noise levels on and around the flowage easement and federal lands crossing areas. Construction would cause temporary increases in the ambient sound environment in the areas immediately surrounding active construction. The use of heavy equipment or trucks would be the primary noise source during construction and excavation. The level of impact would vary by equipment type, duration of construction activity and the distance between the noise source and the receptor.  Construction activities would typically be limited only to daytime hours.  Potential exceptions include work determined necessary based on weather conditions, safety considerations, and/or critical stages of the HDD [e.g. if pausing for the night would put the drill at risk of closing or jamming].

Once constructed and in-service, normal pipeline operations are not audible and noise impacts would be limited to the short-term construction window.  Dakota Access would mitigate noise impacts by limiting equipment running times and the duration of Project construction to the minimum amount necessary to complete the Project.  Noisy construction activities would typically be limited to the least noise-sensitive times of day (daytime only).

It is not anticipated that the temporary increase in ambient sound levels associated with construction would result in a significant noise impact.

USACE_DAPL0074190

Environmental Assessment
Dakota Access Pipeline Project
September 2015

## 4.0    CUMULATIVE IMPACTS

Cumulative impacts to the environment result from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts may result from individually minor but collectively significant actions taking place over a period of time 40 CFR Part 1508.

Consultation with the North Dakota Public Service Commission (NDPSC) personnel, and subsequent evaluation of its online resources, provided a systematic source of information that was useful for evaluating cumulative impacts.  Although the NDPSC does not maintain a centralized repository for energy infrastructure development projects, it provides a summary of siting applications, which offers one metric of energy project development (excluding gathering lines), particularly over time (NDPSC, 2012a).  The siting application summary (NDPSC, 2012b) contains records starting in 1996.  The number of statewide siting applications increases markedly starting in 2007, coinciding with development of the Bakken Formation oil field.  Prior to that, only three to four applications would typically be submitted on an annual basis (NDPSC, 2012a).

Past actions in the vicinity of the Project include oil and gas development and associated infrastructure, utility installation, and agriculture.  These past activities most likely have had effects on soils, water resources, vegetation, wildlife, land use, visual resources, paleontological resources, and cultural resources.  The Dakota Access Project route was sited to minimize green-space impacts by co-locating with existing utility corridors over much of its length.  As a result, the flowage easement crossing, as designed, would be co-located with a Oneok/TransCanada natural gas pipeline and the Lake Oahe HDD would be co-located with a natural gas pipeline and a 345 kV power line.  At both of these locations, the predominant land use is agriculture.  In addition to ongoing agricultural practices and the expansion of regional oil and gas development activities, cumulative impacts associated with the Dakota Access Project as whole were also considered.

Cumulative impacts were evaluated for the following resources and were determined to be negligible or nonexistent based on past and foreseeable future actions in the Project Area and the minor and temporary contribution of the Project to effects on these resources:

- Geology and Soils                                    Section 4.1
- Water and Aquatic Life Resources                     Section 4.2
- Vegetation, Agriculture, and Range Resources         Section 4.3
- Threatened, Endangered, Candidate, and Proposed Species   Section 4.4
- Wildlife Resources                                   Section 4.5
- Land Use and Recreation                              Section 4.6
- Cultural and Historic Resources and Native American Consultations   Section 4.7
- Social and Economic Conditions                       Section 4.8
- Transportation and Traffic                           Section 4.9
- Environmental Justice                                Section 4.10
- Air Quality and Noise                                Section 4.11

USACE_DAPL0074191

Environmental Assessment
Dakota Access Pipeline Project
September 2015

## 4.1    Geology and Soils

The continued development of oil and gas exploration and production in the region at its current level increases the potential for adverse cumulative impacts to geologic resources.  Cumulative impacts could occur when future utilities seek to be co-located within existing corridors or alternatively when greenfield development occurs in landslide prone or highly erodible areas. However, with the proper implementation of reclamation and restoration BMPs these impacts can be reduced.

A second potential cumulative impact to geologic resources is the continued exploitation of the mineral resource which could lead to complete depletion of the resource. The mineral resource is understood to be finite. The effect would be primarily economic to the various entities with financial interests; secondarily there could be indirect impacts, potentially beneficial, associated with technological advances within the industry that would facilitate the recovery of mineral resources that cannot be recovered currently.

Agricultural practices throughout the region as well as the thousands of miles of gathering pipelines that may be built in the region on an annual basis could contribute to cumulative impacts on soils.  Agricultural practices can result in increased erosion and runoff when soils are exposed for long periods such as when fields are fallow or prior to seeding. Impacts to soils as a result of pipeline installation are typically associated with excavation activities which may result in compaction and erosion when soils are exposed prior to revegetation. Impacts to soils as a result of the Project would be mitigated through the implementation of BMPs which may include topsoil segregation, erosion controls, and decompaction. Furthermore, adherence to NPDES permits would require adequate design, grading, and use of BMPs to ensure that erosion and sediment control measures are properly utilized. Generally, because of the utilization of top soil segregation and erosion controls, as well as the minimal workspace requirements and minimum duration of exposed excavations during construction of the Project, the cumulative impacts on soils resulting from construction of the Project when combined with agricultural practices and other pipeline installations would not be significant.

No impacts on mineral extraction, mining, or other deeper geologic resources would be cumulative, since these uses of geologic resources (i.e., mining) do not occur in the Project Area. Clearing and grading associated with construction of the Project and other projects in the vicinity could increase soil erosion in the area. Because the direct effects would be localized and limited primarily to the period of construction, cumulative impacts on geology, soils, and sediments would only occur if other Projects were constructed at the same time and place as the proposed Project facilities.

## 4.2    Water and Aquatic Life Resources

Impacts on water resources (i.e., groundwater, surface waters, wetlands) associated with the Project would be avoided, temporary, and/or minor, as all surface waterbodies would be crossed via trenchless methods (i.e., HDD or bore), no permanent fill or loss of wetlands are anticipated, and potential spill-related impacts would be avoided or greatly reduced by regulating fuel storage and refueling activities and by requiring immediate cleanup should a spill or leak occur.

Recently completed construction or current construction within the vicinity of the proposed Project could extend the period of exposure of soils as a result of incomplete revegetation.  These exposed soils may

69

USACE_DAPL0074192

Environmental Assessment
Dakota Access Pipeline Project
September 2015

increase the potential for soil erosion or sediment transport via overland flow during precipitation events resulting in sedimentation in surface waterbodies.  These increased loads could have the potential to temporarily impact water quality, wetlands, and sensitive fish eggs, fish fry, and invertebrates inhabiting waterbodies in the Project watersheds.  However, all projects, including the Dakota Access Project as a whole, are subject to regulation by the USACE under the CWA.  By installing the pipeline using the HDD technique at the Missouri River and Lake Oahe crossings, as well as other crossings associated with the Dakota Access Project as a whole, and implementing the erosion and sediment control measures specified in the ECP (**Appendix G**) and SWPPP (**Appendix A**), the potential for increased sediment loading from terrestrial sources is minimized and the cumulative effect is considered to be negligible.

In addition to water quality impacts associated with sediment loading from erosion and run-off, an inadvertent release of non-hazardous drilling mud could occur during HDD activities, including those at Lake Oahe and the Missouri River.  The likelihood of inadvertent releases of drilling mud is greatly minimized through thorough geotechnical analysis and detailed design/mitigation plans at each crossing and careful monitoring of drilling mud returns and pressure during HDD activities.  If an inadvertent release were to occur within a waterbody during HDD activities, such as those at the Missouri River and Lake Oahe crossings, impacts on water quality and aquatic resources would be minor.  Drilling mud is non-hazardous and impacts on water quality and aquatic resources would be akin to those associated with sediment loading.  Due to the quantity of drilling mud used in relation to the size of waterbodies typically crossed via HDD, impacts would be temporary and mitigated through implementation of an HDD Contingency Plan (**Appendix B**)  Impacts on all waterbodies crossed by the Dakota Access Project in its entirety would be minimized or avoided via HDD and/or use of erosion and sediment control measures; thereby minimizing the potential for cumulative impacts on water and aquatic life resources.

Impacts on water and aquatic life resources associated with sediment loading, including potential inadvertent releases of non-hazardous drilling mud, as a result of the proposed Project and the Dakota Access Project as a whole would be temporary and short term.  Therefore, these impacts, when evaluated with other oil and gas development and infrastructure projects in the region and agricultural practices, would result in minor cumulative impacts on water and aquatic life resources.

Spills or leaks of hazardous liquids during construction and operation of the proposed Project, or other projects in the vicinity, have the potential to result in long-term impacts on surface and groundwater resources as well as aquatic life resources.  However, construction impacts would be mitigated by the proper design and implementation of BMPs would ensure avoidance, minimization, and/or mitigation of potential impacts on water resources and aquatic resources, as required by the various regulating agencies that have jurisdiction over the project.  Operational risks are being mitigated by the Project design; the Project would be designed to meet or exceed the applicable federal regulations as detailed in Sec 3.10- Reliability and Safety.  Therefore, the potential cumulative impacts on water resources and aquatic resources resulting from spills would be minor.

In addition, while construction and operation of the Project along with the other potential projects and activities could result in cumulative impacts on existing wetlands in the Project watersheds, regulation of activities under the CWA by the Corps requires permitting and mitigation for wetland impacts so that there would be no net loss in the regional wetland resources.  Therefore, cumulative impacts on wetland resources in the Project Area would be minimal.

70

Environmental Assessment
Dakota Access Pipeline Project
September 2015

## 4.3    Vegetation, Agriculture, and Range Resources

As described within Section 3.3.1, all vegetation disturbed by construction within the flowage easements and the Project Area/Connected Actions of the federal lands would be restored to pre-construction conditions following the completion of construction activities, with the exception of one PFO wetland located within the permanent ROW on the flowage easements that would be converted to shrub-scrub or herbaceous wetlands.

No forest fragmentation would occur as a result of construction and operation of the Project within the flowage easements and the Project Area/Connected Actions of the federal lands.  No interior (core) forest habitat is crossed by the Project, and the only wooded area that would be permanently impacted by the Project include one PFO wetland (0.05 acre) located within the permanent ROW on the flowage easements between HDD boxes.  However, much of the forest and PFO wetlands in the vicinity of the Project area have already been fragmented by agricultural activities, roads, and other commercial or industrial developments.  Further, construction of the proposed Project facilities would not result in the permanent loss of wetland features.  Although trees within a 30-foot corridor centered on the pipeline that could compromise the integrity of the pipeline coating would be selectively removed throughout the operational life of the Project, this portion of the PFO wetland impacted by proposed Project would be converted to PEM or PSS and allowed to revegetate with scrub-shrub or herbaceous species.  Therefore, further fragmentation of wetlands or creation of new forest-edge habitat as a result of the Project would be negligible.

Regionally, the greatest impact to the native vegetative community is associated with past and current agricultural practices.  Pipeline projects, however, impact a relatively small area in relation to the total landscape, as these impacts are typically short in duration and temporary in nature.  Examples of impacts to vegetation, agriculture, and range resources could include introduction of non-native plants and/or noxious weeds, habitat fragmentation, decreased vegetative structure, reduced populations below critical threshold levels, sedimentation or degradation of surface waters, erosion, and siltation.  However, the implementation of BMPs outlined in the SWPPP (**Appendix A**) and ECP (**Appendix G**) and reclamation of disturbed areas with native vegetation would reduce the chances of adverse individual or cumulative impacts.  In addition, while other projects' pipeline corridors may require clearing of forested areas and potential habitat fragmentation, temporary workspace areas would be able to revegetate upon completion of construction.  Further, these projects would be located in a region of North Dakota that is dominated by open or agricultural land, thereby minimizing the potential for permanent habitat fragmentation.

## 4.4    Threatened, Endangered, Candidate, and Proposed Species

As required by the Endangered Species Act, the status of each species listed as threatened or endangered is evaluated every 5 years by USFWS to assess its recovery and determine if a change in its listing status is warranted.  Where available, these documents were utilized to identify the potential for ongoing regional oil and gas development to significantly threaten the species listed in the Project area.  For species in which a 5-Year Review was not available, Dakota Access utilized the species Recovery Plan and/or Final Rule to evaluate potential threats on the species resulting from regional oil and gas development.

USACE_DAPL0074194

Environmental Assessment
Dakota Access Pipeline Project
September 2015

Species for which no suitable habitat is present in the Project Area or Connected Action Area, such the as black-footed ferret, Dakota skipper, and gray wolf, were not evaluated, as the Project would not contribute to cumulative impacts on these species.  Further, the northern long-eared bat was not evaluated since the species is not provided federal protection in the Project Area or Connected Action Area under the Interim 4(d) Rule; this area is well outside of the published White-Nose Syndrome Buffer Zone.

Habitat loss and modification are the primary threats to the continued existence of pallid sturgeon, interior least tern, rufa red knot, whooping crane, and piping plover.  The potential cumulative impacts from oil and gas activities in the region on the current listing or potential elevated future listing of these five species are discussed in detail below.

The USFWS (2014c) Revised Recovery Plan for the Pallid Sturgeon (*Scaphirhynchus albus*) specifically addresses the potential effects of energy development such as oil and gas pipelines on pallid sturgeon.  It states that while a rupture of a pipeline within sturgeon habitat could pose a threat, the impacts would be localized and the magnitude of the impact would be dependent on the quantity and timing of the material released.  It is highly unlikely that a cumulative impact resulting from a spill or leak would occur, as it would require multiple pipelines in the same general area to experience anomalous events simultaneously.  Even if this were to occur, these impacts would be localized and temporary and would likely not result in a significant impact on the recovery of pallid sturgeon, as a whole.

According to the Final Rule (79 FR 73706) for the rufa red knot (USFWS, 2014b) and the USFWS (2007) International Recovery Plan for the Whooping Crane (*Grus americana*), the USFWS considers oil and gas activities as a secondary threat, especially near the coast (primarily in southeast Texas in the wintering range).  Potential threats to these species along the Central Flyway migratory route in the region of the Project include loss of stopover habitat from conversion of natural wetlands (e.g., prairie potholes) to croplands and development (including oil and gas exploration).  The Project would not result in any loss of stopover habitat for either the whooping crane or rufa red knot; therefore, it would not contribute to cumulative impacts on either species as result of regional oil and gas activities.

The USFWS does not address oil and gas activities, including potential spills, as a potential or ongoing threat to the interior least tern in either the 5-year review, or the recovery plan (USFWS, 2013e).  The primary threat to interior least terns and the cause of the initial population declines resulted from river channelization, impoundments, and changes in river flow resulting in loss of suitable habitat throughout their range.

The USFWS (2009) 5-Year Review for the piping plover does specifically address threats from oil and gas activities in North Dakota.  However, impacts from oil and gas activities that are threatening piping plover are associated with the development of oil and gas exploration wells located near the alkali lakes habitat, which accounts for 83% of the U.S. Northern Great Plains piping plover breeding habitat.  The Proposed Action is not located within the vicinity of any of these areas and would therefore not contribute to cumulative impacts on piping plovers resulting from oil and gas activities.

Based on the pipeline route, and the utilization of HDDs, the proposed Project is not likely to impact any habitat utilized by listed species, including aquatic species as discussed in Section 4.2.  The co-location of utilities in established corridors, the proper implementation of erosion control devices, compliance with

72

USACE_DAPL0074195

Environmental Assessment
Dakota Access Pipeline Project
September 2015

permits issued for regulated activities, and rapid, thorough, and environmentally appropriate reclamation efforts are industry standards that, when applied consistently, on a regional basis, would minimize cumulative impacts now and in the future.

## 4.5    Wildlife Resources

Regionally, the greatest impacts to wildlife (past, present or future) can be associated with agricultural development.  Agricultural land use replaced the existing natural diversity with the monoculture row crops.  The practice also introduced noxious weeds, soil pests, and other exotics, which all had significant cumulative impacts on regional wildlife.  Relative to the habitat and land use impacts associated with past agricultural activities, the proposed Project impacts (as well as those associated with the oil and gas industry on a regional basis) would be nominal.  This is due to the short duration and small scale of the proposed Project relative to the regional landscape and the large scale of agricultural activities in the region.

The Project would not permanently alter the character of the majority of available habitats as most Project-related impacts are expected to be temporary (see Section 4.3 for a discussion of vegetation impacts associated with the Project and the Dakota Access Project as a whole). Possible temporary, short-term impacts on wildlife as result of the Project include the displacement of some mobile individuals to similar, adjacent habitats during construction activities.  Further, while other oil and gas projects' pipeline corridors may require clearing of forested habitat (if present), once construction is complete, temporary workspace areas would be able to revegetate.  In addition, the permanent easement would be allowed to revegetate with herbaceous species, which provides habitat to a variety of species that utilize herbaceous and edge habitats.  When analyzed on a regional basis, these impacts do not change significantly in magnitude when compared to the current and historic impacts previously imposed upon the regional wildlife by agricultural development.  Therefore, further habitat fragmentation as a result of the proposed Project or other oil and gas developments in the region would be negligible and is not anticipated to significantly contribute to cumulative effects on wildlife.

## 4.6    Land Use and Recreation

Regional oil and gas development and related activities could cause an impact to land use and recreation in the Project area.  However, incremental increases are not anticipated based on the design of this Project and BMPs that would be implemented to restore the impacted area.  Temporary impacts to land use would potentially occur during the period of active construction but areas would revert to preconstruction use following restoration, except for a small amount of land converted for aboveground facilities.  Because construction would be short term and land use conversion would be minimal, the cumulative impact on land use as a result of the Project would be temporary and minor.

The flowage easement crossing would be located in an area with a greater density of prior development, while the Lake Oahe crossing would be located in an area with relatively little surface development.  That said, since the proposed Project has been co-located with existing pipelines the additional impact incurred by the Project would be negligible if restored as proposed.

73

USACE_DAPL0074196

Environmental Assessment
Dakota Access Pipeline Project
September 2015

**4.7      Cultural and Historic Resources and Native American Consultations**

Dakota Access would implement measures to avoid or mitigate adverse effects to cultural resources that have been determined, in consultation with the federal land managing agencies, NDSHPO, and Native American tribes, to be eligible for listing in the National Register of Historic Places (NRHP).  In areas where NRHP-eligible sites are mapped directly adjacent to workspace, Dakota Access would install exclusionary fencing along the outer workspace boundary during construction to prevent inadvertent trespassing by construction staff or vehicles.  These areas would be classified generically as sensitive environmental areas, and would be closely monitored by Environmental Inspection (EI) staff.  If an unanticipated discovery occurs during construction, Dakota Access would follow the measures described in its UDP (**Appendix F**).

Although the possibility of an unanticipated discovery is low based on the negative findings of the field survey efforts, the measures outlined in the UDP includes a thorough notification protocol which would ensure that the necessary cultural resources specialists and agency personnel are involved to appropriately address the nature significance and of the find.  The Project is not anticipated to impact cultural resources; therefore, cumulative impacts associated with the Project would not occur.

**4.8      Social and Economic Conditions**

Construction of the overall DAPL Project would contribute more than $1 billion in direct spending just for materials – the majority of which would be purchased here in the U.S. Fifty-seven percent of the pipe, the majority of the valves, fittings, valve actuators, and the majority of the remaining materials would be manufactured in the U.S., creating significant opportunities for regional and national manufacturing. In addition to manufactured goods and services, the Project would provide $195 million in easement payments to the landowners whose property is crossed by the proposed pipeline.

The proposed Project would have a relatively short construction window with a small number of construction workers dedicated to the crossings.  It is possible that nearby towns could experience short-term temporary increases to the local economy through induced spending from construction employees working on the crossings.  No residential homes or farms would be relocated resulting from the proposed action. Additionally, no demographic changes in the Census tracts affected within the Project counties are anticipated because no permanent employees would be created as a result of the proposed Project. Therefore, the only indirect socioeconomic impacts from the Project are likely to be related to the temporary influx of workers, such as increased demand for housing and the secondary economic benefits discussed in Section 4.10.

The regional population has dramatically increased over the last seven year period due to oil and gas development; concentrated in the area of the flowage easement crossing.  The majority of the current available and transient labor force in the region is involved in the exploration and production of the resources, or construction of related infrastructure, both of which are labor intensive efforts though temporary in nature.  Well rigs are mobile and the number of available drilling leases is limited as well as the mineral resource itself. For these reasons the labor pool associated with the exploration and production of the resource are considered to be a temporary impact.

USACE_DAPL0074197

Environmental Assessment
Dakota Access Pipeline Project
September 2015

Regarding cumulative impacts to socioeconomic resources, the Project would minimally provide a benefit to local merchants and vendors as well as providing potential temporary employment opportunities to the local workforce.   As such, no substantive negative direct, indirect, or cumulative impacts to socioeconomic resources would result from the Proposed Action.

## 4.9     Transportation and Traffic

As discussed in Section 3.3, roads throughout North Dakota have received a sharp increase in truck traffic due to increased oil and gas activity.   The greater amount of traffic has led to a decline in the transportation infrastructure and a decrease in road safety throughout the state.   Additional oil and gas development and production may continue to contribute to cumulative effects on roads in the vicinity of the Project Area requiring a higher frequency of road maintenance and repair on public roadways.

Construction of the project would temporarily increase traffic in the immediate vicinity of the Project Area.  This increase in traffic would be temporary and is not expected to result in significant impacts to North Dakota's transportation infrastructure.   Road improvements such as grading would be made as necessary and any impacts resulting from Dakota Access's use would be repaired in accordance with applicable local permits.  Traffic interruptions would be minimized to the extent practical and would result in insignificant, temporary cumulative impacts on regional transportation resources as it would be localized to the immediate vicinity of the Project Area and major delivery routes.

During operations of the Project, there is expected to be a positive effect on traffic resources in North Dakota.  Once in operation, DAPL plans to transport 450,000 bpd of crude oil via pipeline which would significantly reduce the demand for the commercial trucking of crude oil on county, state and interstate highways.  It is anticipated that the cumulative effects of the Project and other future pipeline projects would be beneficial to the transportation infrastructure in North Dakota by decreasing oil hauled by truck traffic and therefore reducing wear and tear on roads and highways.

## 4.10     Environmental Justice

The proposed Project is being co-located with existing utilities and across USACE easements and fee owned property.  Additionally, the holders of the mineral rights and landowners in the Project area have witnessed a recent windfall from the oil and gas developments in the region.  For these reasons, we conclude that no substantive cumulative impacts to minority or low-income populations would result from the proposed Project.

## 4.11     Air Quality and Noise

No operation emissions are associated with the Project activities, as no major aboveground facilities would be constructed in these areas.   Potential cumulative impacts on air quality would result from concurrent construction of the Project and other development projects in the region.   Impacts on air quality associated with construction of the Project would be temporary and short-term; therefore, even if construction of other projects were concurrent with this Project, cumulative construction-related air quality impacts would be negligible.   .

75

USACE_DAPL0074198

Environmental Assessment
Dakota Access Pipeline Project
September 2015

Construction of the Project, including aboveground facilities, would affect ambient noise levels at some nearby residences during active construction. The noise impact of the pipeline construction would primarily originate from the HDD equipment and would be highly localized to the HDD entry and exit sites. However, because the duration of Project construction would be temporary, the contribution of the Project to cumulative impacts on noise would be negligible.



76

USACE_DAPL0074199

Environmental Assessment
Dakota Access Pipeline Project
September 2015

## 5.0   IRREVERSIBLE AND IRRETRIEVABLE COMMITMENT OF RESOURCES

As required by NEPA, any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented, must be addressed in the EA.  Irreversible commitments of resources result in a loss of future options.  Commitments of resources which are irreversible are those resources which are destroyed or consumed and are neither renewable nor recoverable for use by future generations.  Examples of irreversible commitments of resources include consumption of petroleum-based fuels or minerals and destruction cultural resources.  Irretrievable commitments of resources result in a loss of productivity.  Commitments of resources which are irretrievable occur when the productive use or value of a renewable resource is lost for a period of time.  For example, timber or soil productivity may be lost for a period of time resulting in an irretrievable loss of production, but the action is reversible.

Construction activities associated with the Project would result in the consumption of materials such as aluminum, steel, other metals, wood, gravel, sand, plastics, and various forms of petroleum-based fuels, the use of which would constitute an irreversible commitment of resources.  Most of these materials are nonrenewable and would be irreversibly committed if not recycled or reused during maintenance or at the end of the life of the Project.

Areas of vegetation removal or conversion along the permanent right-of-way, such as areas where trees or shrubs were established prior to construction but would be maintained in an herbaceous state during operation, would represent an irretrievable commitment of resources.  Additionally, erosion, compaction, or an overall loss of soil productivity could occur if these impacts are not properly mitigated.  Use of water for dust control and hydrostatic testing would also be irretrievable.  Other irretrievable commitments of resources could occur if areas temporarily impacted by construction were not restored.

Overall, there would be a very minimal commitment of irreversible and/or irretrievable resources as a result of this Project since the majority of impacts would be temporary and would occur within agricultural land.  Additionally, irreversible and/or irretrievable commitments of resources would be minimized through the mitigation measures for the affected environments identified throughout this EA.

77

USACE_DAPL0074200

Environmental Assessment
Dakota Access Pipeline Project
September 2015

## 6.0    MITIGATION SUMMARY

Dakota Access has selected the Proposed Action to minimize impacts to natural/cultural resources. System and routing alternatives were considered for the entire DAPL Project in order to meet purpose and need, design criteria and construction requirements, while minimizing potential impacts to the existing environment and socioeconomic setting.  Impacts to the environment would be temporary and not significant as a result of avoiding, minimizing and mitigation any potential impacts.  The majority of potential impacts would be mitigated by HDD technology which would bore beneath resources and allow pipeline construction to proceed with the least amount of impacts possible.  Dakota Access has would also implement general mitigation measures such as those described in the ECP.  The ECP has been developed based on decades of experience implementing BMPs during construction in accordance with generally accepted industry practices for linear infrastructure and cross-county pipelines.  It is intended to meet or exceed federal, state, and local environmental protection and erosion control requirements, specifications and practices.  The ECP describes current construction techniques and mitigation measures that would be employed to minimize the effects of construction on environmental resources.  Some of the basic procedures identified in the ECP are listed below:

- BMPs designed to minimize the effects of construction on environmental resources;
- Temporary and permanent erosion and sediment control measures;
- Soil handling procedures designed to preserve the integrity of the soil (e.g., topsoil segregation, decompaction, etc.);
- Wetland and waterbody crossing and stabilization procedures
- Wildlife and livestock mitigation measures
- Restoration and revegetaion procedures
- Refueling and waste management procedures
- Weed management procedures
- Winter construction practices
- Stormwater management procedures

Dakota Access incorporates environmental requirements into all construction specifications and the ECP would be included in contract documents and enforced as such throughout the proposed action.  The construction contractor(s) must comply with all applicable permits and plans during all phases of construction.  In addition to the ECP, the Proposed Action would be constructed in accordance to the measures detailed in Dakota Access' SWPPP, SPCCC, HD Construction Plan, HDD Contingency Plan, and UDP.

To further ensure compliance with permits, plans, obligations, and commitments, Dakota Access would have full-time EIs to monitor construction and compliance.  The EIs would be responsible for observing construction activities to verify that work is carried out in accordance with environmental permit requirements and ensure that designed avoidance and mitigation measures are properly executed during construction.

No additional mitigation measures were identified for geology and soils; water resources; vegetation, agriculture, and range resources; wildlife resources; aquatic resources; land use and recreation; cultural and historic resources, social and economic conditions; environmental justice; or air and noise.  General

USACE_DAPL0074201

Environmental Assessment
Dakota Access Pipeline Project
September 2015

mitigation measures, as described in sections 3.1 through 3.7, or avoidance associated with the trenchless installation (i.e., HDD or bore) of the proposed pipeline are expected to mitigate adverse impacts to resources.



79

USACE_DAPL0074202

Environmental Assessment
Dakota Access Pipeline Project
September 2015

### 7.0 FEDERAL, TRIBAL, STATE, AND LOCAL AGENCY CONSULTATION AND COORDINATION

The following is a listing of all individuals and agencies consulted during preparation of the EA regardless of whether a response was received. On March 30, 2015, Dakota Access sent letters to interested parties (indicated by the Corps) requesting comments on the federal actions associated with crossing Corps flowage easements and Corps owned and managed federal land. A sample request for comment letter sent to individuals and agencies consulted, along with the mailing list and comments received, is included in **Appendix J**. **Appendix K** contains the Notice of Availability of the Draft EA for comment. **Table 7-1** includes a summary of agency personnel consulted.

| Table 7-1 Agency/Entity Consultation List | | | |
|---|---|---|---|
| Agency/Entity | Name | Address | Date Received/ Relevant EA Section |
| American Rivers | Kristen McDonald | 1101 14th Ave. NW STE 1400 Washington, DC 20005-5637 | Pending |
| Bureau of Indian Affairs - Fort Berthold Agency | Howard Bemer | PO Box 370 New Town, ND 58763 | Pending |
| Bureau of Indian Affairs - Great Plains Regional Office | William Benjamin | 115 Fourth Avenue S.E. Aberdeen, SD 57401 | Pending |
| Bureau of Indian Affairs- Fort Berthold Agency | Earl Silk | P.O. Box 370 New Town, ND 58763 | Pending |
| Bureau of Indian Affairs- Standing Rock | Robert Demery | P.O. Box E Fort Yates, ND 58538 | Pending |
| Bureau of Land Management | Rick Rymerson | 99 23rd Avenue West, Suite A Dickinson, ND 58601 | Pending |
| Dakota Prairie Grasslands | Dennis Neitzke | 1200 Missouri Ave Bismarck, ND 58504 | Pending |
| Dakota Resource Council | Mark Trechock | P.O. Box 1095 Dickinson, ND 58601 | Pending |
| Bismarck-Mandan Development Association | Brian Ritter | 400 East Broadway Avenue, Suite 417 Bismarck, ND 58501 | Pending |
| Morton County Commissioners | Dawn Rhone | 210 2nd Ave NW Mandan, ND 58554 | Pending |
| Morton County Extension Agent | Kari Presler | 210 2nd Ave NW Mandan, ND 58554-3158 | Pending |
| Morton County Weed Board | Wayne Carter | 2916 37th St. NW Mandan, ND 58554 | Pending |
| Emmons County Commissioners | Marlys Ohlhauser | P.O. Box 129 Linton, ND 58552 | Pending |
| Emmons County Extension Agent | Connie Job | Courthouse, Box 278 Linton, ND 58552-0278 | Pending |
| Emmons County Weed Board | Sam Renschler | 510 Sampson Ave. Linton, ND 58552 | Pending |

USACE_DAPL0074203

Environmental Assessment
Dakota Access Pipeline Project
September 2015

| Table 7-1 | | | |
|---|---|---|---|
| **Agency/Entity Consultation List** | | | |
| **Agency/Entity** | **Name** | **Address** | **Date Received/ Relevant EA Section** |
| Williams County Commissioners | Beth Innis | 205 East Broadway PO Box 2047 Williston, ND 58802-2047 | Pending |
| Williams County Extension Agent | | 302 East Broadway PO Box 1109 Williston, ND 58802-1109 | Pending |
| Williams County Weed Board | Jim Basaraba | 109 Main St Williston, ND 58801-6018 | Pending |
| National Audubon Society State Office | Genevieve Thompson | 118 Broadway, Suite 512 Fargo, ND 58102 | Pending |
| Natural Resources Conservation Service | Kyle Hartel | PO Box 583 Watford City, ND 58854 | Pending |
| Natural Resources Conservation Service | Michele R. Doyle | 2540 Overlook Lane Mandan, ND 58554-1593 | Pending |
| Natural Resources Conservation Service | Jennifer M. H. Vetter | 318 Broadway St. S Linton, ND 58552-7612 | Pending |
| Natural Resources Conservation Service | David Schmidt | 1106 West 2nd St Williston, ND 58801-5804 | Pending |
| NDSU Dept of Soil Science-Department Chair | | NDSU Dept 7680 PO Box 6050 Fargo, ND 58108-6050 | Pending |
| North Dakota Council of Humane Societies | Leo Keelan | 1948 Anderson Drive Minot, ND 58701 | Pending |
| North Dakota Department of Health | Peter Wax | 600 East Boulevard Bismarck, ND 58505 | Pending |
| North Dakota Farm Bureau | | 4900 Ottawa Street Bismarck, ND 58503 | Pending |
| North Dakota Forest Service | Larry Kotchman | 307 1st Street East Bottineau, ND 58318-1100 | April 22, 2015/ Section 2.0 and Section 3.5 |
| North Dakota Game & Fish Department | Steve Dyke | 100 N. Bismarck Expressway Bismarck,  ND  58501-5095 | Pending |
| North Dakota Game & Fish Department | Dave Fryda | 406 Dakota Ave Riverdale, ND 58565 | Pending |
| North Dakota Game & Fish Department | Bruce Kreft | 100 North Bismarck Expressway Bismarck,  ND  58501-5095 | Pending |
| North Dakota Game & Fish Department | Kent Luttschwager | 13932 West Front Street Williston,  ND 58801-8602 | Pending |
| North Dakota Game & Fish Department | Fred Ryckman | 406 Dakota Ave Riverdale, ND  58565 | Pending |
| North Dakota Game & Fish Department | Terry Steinwand | 100 North Bismarck Expressway Bismarck, ND 58501-5095 | Pending |

81

Environmental Assessment
Dakota Access Pipeline Project
September 2015

| Table 7-1 | | | |
|-----------|---|---|---|
| **Agency/Entity Consultation List** | | | |
| **Agency/Entity** | **Name** | **Address** | **Date Received/ Relevant EA Section** |
| North Dakota Industrial Commission - Oil and Gas Division | Lynn Helms | 600 East Boulevard Bismarck, ND 58505 | April 16, 2015/ Section 3.1.2, Section 3.1.3, and Section 3.1.4 |
| North Dakota Industrial Commission - Oil and Gas Division | Bruce E. Hicks | 600 East Boulevard Bismarck, ND 58505 | Pending |
| North Dakota Land Department | Mike Brand | 1707 North 9th St. P.O. Box 5523 Bismarck, ND 58506-5523 | Pending |
| North Dakota Parks & Recreation Department | Kathy Duttenhefner | 1600 East Century Avenue, Suite 3 Bismarck, ND 58503-0649 | April 20, 2015/ Section 3.3.1, Section 3.4 and Section 3.5. |
| North Dakota Petroleum Council | Ron Ness | P.O Box 1395 Bismarck, ND 58502 | Pending |
| North Dakota State Historical Society | Susan Quinnell | 612 East Boulevard Ave. Bismarck, ND 58505 | April 2, 2015/ Section 3.7.1 |
| North Dakota State Water Commission | John Paczkowski | 900 East Boulevard Ave. Bismarck, ND 58505-0850 | Pending |
| North Dakota Tourism Division | Sarah Otte Coleman | P.O. Box 2057 Bismarck, ND 58502-2057 | Pending |
| U.S. Army Corps of Engineers, Regulatory Office | Daniel Cimarosti | 1513 12th St. SE Bismarck, ND 58504 | Pending |
| U.S. Fish and Wildlife Service, North Dakota Field Office | Scott Larson | 3425 Miriam Avenue Bismarck, ND 58501-7926 | Pending |
| USDA-APHIS-WS | Philip Mastrangelo | 2110 Miriam Drive, Suite A Bismarck, ND 58501 | Pending |
| USDA-Natural Resources Conservation Service- North Dakota State Office | Mary Podoll | 220 East Rosser Avenue, Room 270 Bismarck, ND  58502-5020 | April 13, 2015/ Section 3.1.5 and Section 3.2.3 |
| USDOI-Office of Surface Mining Reclamation and Enforcement-Dick Cheney Federal Building | Jeffrey Fleischman | P.O. Box 11018, 150 East B Street, Rm 1018 Casper, WY  82602 | April 13, 2015/ Section 1.1 |
| U.S. Army Corps of Engineers | Omaha District; CENWO-PM-AA | 1616 Capitol Avenue Omaha, NE 68101-4901 | Pending |
| North Dakota Parks & Recreation Department | Mr. Jesse Hanson | 1600 E. Century Ave. Suite 3 Bismarck, ND 58503-0649" | Pending |
| North Dakota Chapter of the Wildlife Society | Mr. Kory Richardson | PO Box 1442 Bismarck, ND 58502 | Pending |

82

USACE_DAPL0074205

Environmental Assessment
Dakota Access Pipeline Project
September 2015

| Table 7-1 | | | |
|---|---|---|---|
| Agency/Entity Consultation List | | | |
| Agency/Entity | Name | Address | Date Received/ Relevant EA Section |
| Sierra Club - North Dakota Office | Mr. Blaine Nordwall | 311 East Thayer Ave Suite 113 Bismarck, ND 58501 | Pending |



83

USACE_DAPL0074206

Environmental Assessment
Dakota Access Pipeline Project
September 2015

## 8.0     STATUS OF ENVIRONMENTAL COMPLIANCE

**Table 8-1** is a listing of environmental protection statutes and other environmental requirements, as well as the status of Applicant compliance with these statutes  and requirements, regarding this EA.

| Table 8-1 Environmental Permits, Approvals, and Consultations ||||
|---|---|---|---|
| Jurisdiction | Permit or Authorization | Status | Requirement or Action |
| **Federal** ||||
| Corps | RHA, Section 10 | Pending, Application Submitted Dec 2014 | RHA, Section 10: Missouri River/Lake Oahe |
| Corps – Omaha District | Section 404 CWA | Pending, Application Submitted Dec 2014 | NWP 12, Section 404 Waters with PCN |
| | Survey permission, geotechnical investigation | Received April 2015 | Survey permission, geotechnical investigation |
| | Title 30 Rights-of-Way for pipelines through Federal Lands and Temporary Construction License | Pending | Real Estate Agreement and EA for Crossing the Missouri River/Lake Oahe (Fee title Lands on both sides of river/lake) |
| | Flowage Easement Consent to Cross | Pending | Consent to Cross |
| USFWS | Section 7 Endangered Species Act (ESA) Consultation | Pending | Compliance under 404 Permit NWP 12 Joint Application |
| Bureau of Reclamation | Letter of consent to cross irrigation works | Pending | BOR water conveyance facilities, near cities of Buford and Trenton, ND |
| **State** ||||
| North Dakota Public Service Commission (NDPSC) | North Dakota Energy Conversion and Transmission Facility Siting Act: Certificate of Corridor and Route | Application Submitted December 2014 | Siting Application, PU-14-842 |
| North Dakota Department of Health | Section 401 Water Quality Certification | Pending | Automatic with NWP 12 |
| | Hydrostatic Test Water Discharge Permit No. NDG07-0000 | Application to be submitted Q4 2015 | Obtain permit coverage prior to discharge |

84

USACE_DAPL0074207

Environmental Assessment
Dakota Access Pipeline Project
September 2015

| Table 8-1 | | | |
| --- | --- | --- | --- |
| Environmental Permits, Approvals, and Consultations | | | |
| Jurisdiction | Permit or Authorization | Status | Requirement or Action |
| | North Dakota Pollutant Discharge Elimination System (NDPDES) Construction Stormwater General Permit (NDR10-0000) | Application to be submitted Q3 2015 | Obtain permit coverage |

**Table 8-2** provides a summary of the environmental mitigation measures discussed throughout this EA that Dakota Access has committed to as part of the Project design to avoid or minimize potential impacts on environmental and human resources throughout construction and operation activities.



USACE_DAPL0074208

Environmental Assessment
Dakota Access Pipeline Project
September 2015

| Table 8-2 Summary of Environmental Impact Avoidance and Mitigation Measures | |
|---|---|
| **Resource** | **Environmental Avoidance/Mitigation Measures** |
| Geology and Soils | To protect the terrain of the Project Area and Connected Actions, Dakota Access would, to the extent feasible, restore the areas affected by pipeline construction to pre-construction contours and similar vegetation (excepting trees within approximately 15 feet of the centerline).  Pre-construction and as-built surveys would be completed and provided to the Garrison Project. |
| | Although not anticipated, if blasting is found to be necessary, Dakota Access would follow procedures specified in its Blasting Plan (Appendix E). |
| | Dakota Access, in accordance with North Dakota One Call, would require that the construction contractor, prior to initiating any ground disturbance activities, identify all underground utilities to minimize the potential for encountering buried utility structures. |
| | Dakota Access has completed a geotechnical analysis of the flowage easement and federal land crossing sites to facilitate engineering and design, including selection of appropriate materials and construction methods to limit any environmental impacts attributable to landslides. |
| | The proposed pipeline would be designed and constructed to meet or exceed industry specifications, which would effectively mitigate the effects of fault movement, landslides, subsidence, and subsidence. |
| | In the event paleontological resources are discovered during construction, Dakota Access would implement measures outlined in its Unanticipated Discoveries Plan Cultural Resources, Human Remains, Paleontological Resources and Contaminated Media (UDP) (Appendix F) to avoid further impacts to these resources. |
| | If any vertebrate fossils are found during pipeline construction, Dakota Access would immediately cease construction activities and notify the appropriate agency personnel, including the North Dakota state paleontologist as well as the USACE archaeologist.  The appropriate authorities would determine the significance of the find and prescribe the mitigation procedures to be completed prior to resuming pipeline construction. |
| | Dakota Access would minimize or avoid impacts on soils by implementing the mitigation measures described in the DAPL Project's SPCC, SWPPP, and ECP as well as requirements of applicable state and federal permits. These documents would be included as contract documents and enforced as such throughout the DAPL Project. |
| | To minimize potential impacts on soil productivity, topsoil would be separated during trench excavation in agricultural land, and if applicable, other areas where soil productivity is an important consideration. Unless otherwise requested by the landowner, topsoil in cropland would be removed to a maximum depth of 12 inches from the trench and spoil storage area and stored separately from the trench spoil. After the trench is backfilled, topsoil would be returned to its approximate original location in the soil horizon. |
| | Compaction of agricultural soils would be minimized by restricting construction activities during periods of prolonged rainfall. Where unacceptable levels of compaction occur in agricultural lands, a chisel plow or other deep tillage equipment would be utilized to loosen the soil. |

86

USACE_DAPL0074209

Environmental Assessment
Dakota Access Pipeline Project
September 2015

| Table 8-2 | |
|---|---|
| Summary of Environmental Impact Avoidance and Mitigation Measures | |
| **Resource** | **Environmental Avoidance/Mitigation Measures** |
| | Dakota Access would retain environmental inspectors (EIs) to monitor the contractor's compliance with applicable requirements to protect soil resources during construction of the DAPL Project. The Garrison Project would be notified if the EIs have concerns on the Project Area or Connected Action Area. |
| | The HDD workspace sites would be cleared, graded and matted as needed to minimize rutting and compaction. |
| | Permanent impacts to soils would be avoided through the application of BMPs during construction, restoration, and post-construction revegetation management, as outlined in the ECP (Appendix G). |
| Water Resources | Impacts to Lake Oahe and the Missouri River would be minimized by using HDD construction methods to install the proposed pipeline underneath the Missouri River and Lake Oahe. |
| | The HDD Contractor plans to install steel surface casing, where defined in the site specific HDD plans, to reduce the probability of an inadvertent release when the drill bit is working near the surface. |
| | The drilling mud and cuttings would be disposed of in accordance with applicable laws and regulations, likely in an existing landfill or by land farming. |
| | Dakota Access would conduct all HDD work according to the HDD Construction Plan (Appendix B) that it has prepared, and implement the HDD Contingency Plan (Appendix B) in the event of an inadvertent release. |
| | The Missouri River water withdrawal activity would comply with all applicable permit conditions and regulations, including the specifications on permitted intake structures outlined in the USACE's Regional Conditions for North Dakota applicable to Nationwide Permit 12 (Utility Line Activities). This regional condition requires that the applicant 1) utilize an intake screen with a maximum mesh opening of ¼-inch, 2) wire, Johnson-like screens must have a maximum distance between wires of 1/8-inch, 3) water velocity at the intake screen shall not exceed ½-foot per second, 4) intake structure shall be floating, and 5) at the beginning of pumping, the intake shall be placed over water with a minimum depth of 20 feet. |
| | The barge/float required for water withdrawal from the Missouri River would be fitted with a secondary containment structure, and the pump would be placed within this structure to contain accidental spills of fuels. The intake hose would be suspended by floats within the water column and screened to prevent impingement entrainment of foreign objects and aquatic species. |
| | Water discharges associated with hydrostatic testing on Corps flowage easements would be conducted in accordance with applicable permits. Hydrostatic test water discharges would not occur on Corps fee property. |
| | Dakota Access would conduct trench dewatering and hydrostatic test discharges in a manner consistent with the North Dakota Pollutant Discharge Elimination System (NDPDES) General Permit NDG-070000, as applicable. |
| | Discharged hydrostatic test water would not contain additives unless written approval is received from Dakota Access and applicable permits authorize such additives. |
| | Where appropriate, water would be discharged into an energy dissipation and/or filtering device as described in Dakota Access' SWPPP (Appendix A) to remove sediment and to reduce the erosive energy of the discharge. |

USACE_DAPL0074210

Environmental Assessment
Dakota Access Pipeline Project
September 2015

| Table 8-2 | |
| --- | --- |
| Summary of Environmental Impact Avoidance and Mitigation Measures | |
| Resource | Environmental Avoidance/Mitigation Measures |
| | Impacts to waterbodies would be minimized by conducting pipeline construction activities in accordance with applicable regulatory requirements and waterbody construction procedures described in Section 2.3.2.8 and the ECP. |
| | Fuel and all other hazardous materials would be stored in accordance with the requirements of Dakota Access' SPCC, SWPPP, and ECP. These documents also describe response, containment, and cleanup measures. |
| | EIs would monitor compliance with applicable waterbody protection requirements during construction of the facilities. The Project ECP (Appendix G) and SWPPP (Appendix A) describe additional mitigation measures and contains illustrations of how sediment control devices should be utilized. |
| | Dakota Access would maintain a vegetative buffer until the actual crossing of the waterbody takes place. |
| | Temporary sediment control measures, such as silt fence, would minimize the introduction of sediment into waterbodies during construction and minimize the movement of spoil and sediment from surface runoff during and after construction. |
| | Dewatering activities would be conducted in accordance with applicable permits and Dakota Access' SWPPP, and ECP. |
| | All surface drainage contours and vegetation would be returned as closely as practical to preconstruction conditions. |
| | The potential for groundwater contamination would be avoided by implementing the protective measures set forth in the Project specific SPCCs prepared by the contractor and in Dakota Access' SPCC Plan (Appendix A). |
| | In the event of a leak, Dakota Access would work aggressively to isolate the source through the use of remote-controlled shut-off valves, initiate cleanup activities, and contact the appropriate federal and state authorities to coordinate leak containment and cleanup.  Dakota Access proposes to meet or exceed all applicable regulations and requirements for pipeline design, construction, and operation. |
| | Construction workspace on the flowage easements has been selected based on an absence of wetlands within the Project area. |
| | Dakota Access is in the process of obtaining verification for use of Nationwide Permit 12 for the crossings of both the Missouri River and Lake Oahe Section 10 waterbodies. |
| | The Project ECP and SWPPP specify several measures to protect wetlands and waterbodies from becoming polluted with fuels or other hazardous materials during construction. This plan prohibits the storage of fuel or other hazardous materials within 100 feet of a wetland or waterbody. The ECP also specifies that equipment must be refueled at least 100 feet from waterbodies unless, due to site-specific conditions, there is no practical alternative such as the proposed pumping intake structure located on the barge at the Missouri River Crossing.  In that case, the contractor must implement site-specific protective measures and containment procedures described in the ECP. Contractors would be required to provide trained personnel, appropriate equipment, and materials to contain and clean up releases of fuel, lubricating oil, or hydraulic fluid that result from equipment failure or other circumstances. |

88

USACE_DAPL0074211

Environmental Assessment
Dakota Access Pipeline Project
September 2015

| Table 8-2 |
| :--: |
| Summary of Environmental Impact Avoidance and Mitigation Measures |

| Resource | Environmental Avoidance/Mitigation Measures |
| :--: | :-- |
| | The Project has been designed in accordance with accepted floodplain management practices; no impacts to floodplain elevations or velocities are anticipated. Following construction, disturbed areas would be restored to pre-construction grades and contours as practical. |
| | If necessary, soil displaced by the installation of the 24-inch pipeline on the flowage easements would be removed from the floodplain and hauled to an upland location in order to ensure original floodplain elevations are restored. |
| | Remotely operated above-ground mainline valve sites would be installed on both sides of the Missouri River and Lake Oahe crossings for isolation in the event of an emergency shutdown. |
| | Impacts to cultivated crops make up the majority of temporary impacts and would return to cultivated crops post-construction. |
| | Within areas disturbed by construction of the Project, and not being actively cultivated, including the flowage easement Project Area, Dakota Access would implement active revegetation measures and rapid colonization by annual and perennial herbaceous species to restore most vegetative cover within the first growing season. |
| | In areas that require permanent revegetation, Dakota Access would specify appropriate seed mixes, application rates, and seeding dates, taking into account recommendations of appropriate state and federal agencies and landowner requests. |
| | In non-agricultural areas, vegetation cleared from ATWS would be allowed to revegetate after construction depending on arrangements with the landowner. |
| | Temporary revegetation measures may also be implemented to quickly establish ground cover to minimize the potential for soil erosion and noxious weeds to establish. A temporary seed mix may be applied in these situations. The Project ECP (Appendix G) contains more details regarding temporary revegetation. |
| | When constructing in agricultural areas, a minimum of 1 foot of topsoil (organic layer) would be stripped from the trench line and stockpiled separately from trench spoil to preserve the native seed stock.  The ECP contains additional details regarding topsoil segregation. |
| | At stream approaches, the contractor would leave a 20-foot buffer of undisturbed herbaceous vegetation on all stream banks during initial clearing, except where grading is needed for bridge installation or where restricted by applicable regulations and/or permit conditions. |
| | Dakota Access would work with County Weed Boards to ensure the Project ECP contains relevant and necessary mitigation measures that would be implemented to prevent the spread of noxious weed species during construction and operation of the Project. |
| | Herbaceous cover would be seeded on disturbed upland areas during restoration and it is expected that pre-existing herbaceous and shrub habitats would quickly reestablish themselves. |
| | In the unlikely event that a listed species is encountered on the Project at Corps owned lands during construction, construction activities would stop and the Corps would be contacted. |

89

USACE_DAPL0074212

Environmental Assessment
Dakota Access Pipeline Project
September 2015

| Table 8-2 | |
|---|---|
| Summary of Environmental Impact Avoidance and Mitigation Measures | |
| **Resource** | **Environmental Avoidance/Mitigation Measures** |
| Wildlife Resources | Herbaceous cover would be seeded on disturbed upland areas during restoration and it is expected that pre-existing herbaceous and shrub habitats would quickly reestablish themselves. |
| | In the unlikely event that a listed species is encountered on the Project at Corps owned lands during construction, construction activities would stop and the Corps would be contacted. |
| | Installation and removal of the temporary waterline on the flowage easements are anticipated to be complete prior to nesting season; therefore, impacts on the interior least tern and piping plover are not anticipated. However, if the water withdrawal activities are not able to be completed prior to nesting season as expected, Dakota Access would conduct surveys prior to placement of the waterline to confirm the presence/absence of these species within the pipeline ROW.  If these species are nesting within the Project Area, Dakota Access would postpone water withdrawal activities at the Missouri River until these species have left the area. |
| | Direct impacts on potentially suitable habitat for the interior least tern and piping plover at the Missouri River and Lake Oahe would be avoided by crossing the waterbodies via HDD. |
| | Lake Oahe would be crossed using a HDD construction method, avoiding impacts on potential migrating rufa red knot loafing habitat. |
| | Impacts on the pallid sturgeon or suitable habitat present within the Missouri River would be avoided by implementing the conditions on permitted intake structures outlined in the USACE's Regional Conditions for North Dakota applicable to Nationwide Permit 12 (Utility Line Activities) and as described in the USFWS Recovery Plan for the Pallid Sturgeon. |
| | Impacts on the pallid sturgeon or suitable habitat present within Lake Oahe would be avoided by crossing the lake via HDD. |
| Aquatic Resources | A successfully completed HDD crossing would avoid aquatic resource impacts to Lake Oahe since the pipeline would be installed without disturbing the aquatic and benthic environments. |
| | All HDD operations conducted for the Missouri River and Lake Oahe crossings would adhere to the HDD Contingency Plan and applicable permit conditions to reduce the likelihood of an inadvertent release to minimize and mitigate environmental impacts.  Dakota Access' construction contractor would ensure that the appropriate response personnel and containment equipment are available onsite to effectively implement the HDD Contingency Plan. |
| | Water withdrawal activities at the Missouri River would be conducted in accordance with all applicable permit conditions and regulations and in a manner that would not reduce water flow to a point that would impair flow or impact aquatic life. |
| | Intake screens and floats would also be utilized during the withdrawal of water from the Missouri River to prevent entrainment of aquatic life and avoid impacts on aquatic resources. |
| | The potential for impacts on aquatic resources associated with accidental fuel spills or leaks during the withdrawal of water from the Missouri River would be avoided or minimized by placing the pump within a secondary containment structure on the barge. |

90

USACE_DAPL0074213

Environmental Assessment
Dakota Access Pipeline Project
September 2015

| Table 8-2 Summary of Environmental Impact Avoidance and Mitigation Measures | |
|---|---|
| **Resource** | **Environmental Avoidance/Mitigation Measures** |
| | For portions of the pipeline installed beneath the lake, the depth of the pipeline profile, the increased wall thickness of the pipe, the installation of remotely operated valves on both sides of the river crossing, monitoring of the system 24/7, aerial patrols, and in-line inspection, would further limit the potential for an inadvertent release into the river. |
| | Adherence to the Geographic Response Plans for Lake Oahe and the Missouri River would minimize potential impacts on aquatic wildlife from potential spills during the operation of the pipeline. |
| | In the event of a leak, Dakota Access would work aggressively to contain the leak, initiate cleanup activities, and contact the appropriate authorities, including the Corps. |
| Land Use and Recreation | Mitigation measures to minimize impacts to soils, such as topsoil segregation and decompaction practices, would be fully implemented in accordance with the ECP and SWPPP. |
| | Dakota Access would coordinate with all landowners on acceptable methods for construction and restoration, including potential impacts to irrigated fields. |
| | Dakota Access would repair surface drains and drainage tiles disturbed during ROW preparation, construction, and maintenance activities. |
| | Dakota Access would repair or replace fences and gates removed or damaged as a result of ROW preparation, construction, or maintenance activities. |
| | Following construction and restoration, the work area would be restored and ranching would be allowed to continue over the operational ROW. Landowners would be compensated for temporary loss of land and lower yields. Grazing activities would return to normal after revegetation of the disturbed areas. |
| | Trees would be protected by Dakota Access in a manner compatible with the safe operation, maintenance, and inspection of the pipeline.  Applicable regulations would be adhered to regarding tree and shrub removal from along the route. |
| | Dakota Access would obtain and comply with applicable state regulations, county permits, and zoning and land use regulations. Permits may include, but are not limited to, grade and fill permits, ditch crossing permits, road and utility permits, and conditional use permits. Dakota Access would retain one or more EIs to monitor compliance with environmental conditions of county permits. |
| Cultural and Historic Resources | In accordance with Section 106 of the NHPA, Dakota Access has made a good faith effort to identify significant historic properties within the Project area.  Based on the result of these efforts, no properties consisted to be eligible, or potentially eligible for listing in the National Register of Historic Places (NRHP) would be adversely impacted by the proposed Project or Connected Action. |
| | Impacts to the NRHP-eligible BTIS (site 32WI1367) would be avoided via HDD to ensure the integrity of construction design for these historic-age features is preserved. |
| | HDD workspaces, as well as staging and stringing areas, would be positioned in excess of 100 feet beyond the mapped boundaries of the previously recorded cultural sites in the vicinity of the Lake Oahe crossing. |

91

Environmental Assessment
Dakota Access Pipeline Project
September 2015

| Table 8-2 Summary of Environmental Impact Avoidance and Mitigation Measures | |
|---|---|
| **Resource** | **Environmental Avoidance/Mitigation Measures** |
| | Dakota Access' UDP was developed (Appendix F) for use during all DAPL Project construction activities which describes actions that would be taken in the event of a previously unrecorded cultural resource site is discovered during construction activities. The UDP explicitly calls for work to stop until the correct authority or agency can be contacted and the find can be properly evaluated. |
| Social and Economic Conditions | No residential homes or farms would be relocated resulting from the proposed action. |
| | No demographic changes in the Census tracts affected are anticipated, because no permanent employees would be created as a result of the Proposed Action. |
| Hazardous Waste | In the unlikely event contamination is encountered during construction, the UDP (Appendix F) would be implemented to protect people and the environment and avoid or minimize any effects from unearthing the material. |
| | Any hazardous materials discovered, generated, or used during construction would be managed and disposed of in accordance with applicable local, tribal, state, and federal regulations. Should emergency response be required during construction, the contractor would have some of their own trained or contracted responders, and local response teams would be expected to assist. |
| | Dakota Access would comply with all applicable laws and regulations to abate or prevent pollution, such as the RCRA, and State hazardous waste management rules. |
| Reliability and Safety | All activities would be conducted in a safe manner in accordance with the standards specified in the OSHA regulations. |
| | To prevent pipeline failures resulting in inadvertent releases, Dakota Access would construct and maintain the pipeline to meet or exceed industry and governmental requirements and standards. Specifically, the steel pipe would meet PHMSA specifications under 49 CFR § 195, follow standards issued by the American Society of Mechanical Engineers, National Association for Corrosion Engineers and American Petroleum Institute (API). |
| | Dakota Access would maintain and inspect the pipeline in accordance with PHMSA regulations, industry codes and prudent pipeline operating protocols and techniques. The pipeline ROW would be patrolled and inspected by air every 10 days, weather permitting, but at least every three weeks and not less than 26 times per year, to check for abnormal conditions or dangerous activities, such as unauthorized excavation along the pipeline route. |
| | Dakota Access is currently drafting a Facility Response Plan, in accordance with 49 CFR 194, which details the procedures to be implemented in the event of an inadvertent pipeline release and would be in place prior to commencing transportation of crude oil. |
| | Following completion of construction and throughout operation of the Project facilities, the Operator and qualified contractors would maintain emergency response equipment and personnel at strategic points along the pipeline route. |
| | Contracts would be in place with oil spill response companies that have the capability to mobilize to support cleanup and remediation efforts in the event of a pipeline release. The operator would also coordinate with local emergency responders in preventing and responding to any pipeline related problems. |
| | A SCADA system would be utilized to provide constant remote oversight of the Project facilities. |

USACE_DAPL0074215

Environmental Assessment
Dakota Access Pipeline Project
September 2015

| Table 8-2 | |
|---|---|
| Summary of Environmental Impact Avoidance and Mitigation Measures | |
| Resource | Environmental Avoidance/Mitigation Measures |
| | A Computational Pipeline Monitoring System (CPM) would be utilized to monitor the pipeline for leaks. |
| | LeakWarn is being tailored to the Project facilities, in accordance with PHMSA requirements, to monitor the pipeline for leaks. |
| Air Quality and Noise | To reduce the emission of criteria pollutants, fuel-burning equipment running times would be kept to a minimum and engines would be properly maintained. |
| | Dakota Access would mitigate noise impacts by limiting equipment running times and the duration of Project construction to the minimum amount necessary to complete the Project.  Noisy construction activities would typically be limited to the least noise-sensitive times of day (daytime). |



93

Environmental Assessment
Dakota Access Pipeline Project
September 2015

## 9.0    LIST OF PREPARERS AND REVIEWERS

Dakota Access, in cooperation with the USACE Preparers, reviewers, consultants and Federal officials include the following:

| Table 9-1 | | |
|---|---|---|
| List of Preparers and Reviewers | | |
| **Name** | **Title** | **Agency** |
| Johnathan Shelman | Environmental Resource Specialist | Corps of Engineers, Omaha District |
| Brent Cossette | Natural Resource Specialist, Environmental Stewardship | Corps of Engineers, Omaha District |
| Monica Howard | Director Environmental Sciences | Dakota Access, LLC |
| Jonathan Fredland | Environmental Specialist | Perennial Environmental Services, LLC |
| Ashley Thompson | Environmental Specialist | Perennial Environmental Services, LLC |
| Dennis Woods | Managing Partner | Perennial Environmental Services, LLC |

94

Environmental Assessment
Dakota Access Pipeline Project
September 2015

## 10.0    ACRONYMS, INITIALS, AND ABBREVIATIONS

| | |
|---|---|
| ANSI | American National Standards Institute |
| API | American Petroleum Institute |
| ATWS | Additional Temporary Workspace |
| BMP | Best Management Practice |
| bpd | barrels per day |
| BTIS | Buford-Trenton Irrigation System |
| CAA | Clean Air Act |
| CERCLA | Comprehensive Environmental Response Compensation and Liability Act |
| CEQ | Council on Environmental Quality |
| CFR | Code of Federal Regulations |
| Corps | U.S. Army Corps of Engineers |
| Company | Energy Transfer Company |
| CWA | Clean Water Act |
| DA | Department of the Army |
| dB | Decibels |
| Dakota Access | Dakota Access, LLC |
| DAPL | Dakota Access Pipeline |
| DOT | Department of Transportation |
| EA | Environmental Assessment |
| ECP | Environmental Construction Plan |
| ECD | Erosion Control Device |
| EI | Environmental Inspector |
| EO | Executive Order |
| EPA | U.S. Environmental Protection Agency |
| ESA | Endangered Species Act |
| FEMA | Federal Emergency Management Agency |
| FIRM | Flood Insurance rate Maps |
| FPPA | Farmland Protection Policy Act |
| FRFM | Flood Risk and Floodplain Management Section |

95

USACE_DAPL0074218

Environmental Assessment
Dakota Access Pipeline Project
September 2015

| | |
|---|---|
| g | gravitational acceleration |
| GIS | Geographic Information System |
| HDD | Horizontal Directional Drilling |
| MSL | Mean Sea Level |
| NDPSC | North Dakota Public Service Commission |
| NDPDES | North Dakota Pollutant Discharge Elimination System |
| NDSHPO | North Dakota State Historic Preservation Office |
| NDPRD | North Dakota Parks and Recreation Department |
| NEPA | National Environmental Preservation Act |
| NFIP | National Flood Insurance Program |
| NHPA | National Historic Preservation Act |
| NLCD | National Land Cover Dataset |
| NPDES | National Pollutant Discharge Elimination System |
| NPS | U.S. National Park Service |
| NRCS | Natural Resources Conservation Service |
| NRHP | National Register of Historic Places |
| NRI | Nationwide Rivers Inventory |
| NSF | National Science Foundation |
| NWI | National Wetland Inventory |
| NWP | Nationwide Permit |
| NWSRS | National Wild and Scenic River System |
| OSHA | Occupational Safety and Health Administration |
| PA | Programmatic Agreement |
| PEM | Palustrine Emergent |
| PFO | Palustrine Forested |
| PHMSA | Pipeline and Hazardous Materials Safety Administration |
| PL | Public Law |
| Project | Dakota Access Pipeline Project |
| RCRA | Resource Conservation and Recovery Act |
| RHA | Rivers and Harbors Act |

96

USACE_DAPL0074219

Environmental Assessment
Dakota Access Pipeline Project
September 2015

| ROW | Right-of-Way |
|-----|--------------|
| SPCC | Spill Prevention, Control and Countermeasure Plan |
| SWPPP | Stormwater Pollution Prevention Plan |
| THPO | Tribal Historic Preservation Office |
| UDP | Unanticipated Discoveries Plan Cultural Resources, Human Remains, Paleontological Resources and Contaminated Media |
| USDA | U.S. Department of Agriculture |
| USFS | U.S. Forest Service |
| USFWS | U.S. Fish and Wildlife Service |
| USGS | U.S. Geological Survey |
| WEG | Wind Erodibility Group |
| WMA | Wildlife Management Area |

97

USACE_DAPL0074220

Environmental Assessment
Dakota Access Pipeline Project
September 2015

## 11.0    REFERENCES

Ackerman, D.J.  1980.  Ground-Water Resources of Morton County, North Dakota, North Dakota Geological Survey Bulletin 7Z – Part III, 51 pp.

Armstrong, C.A.  1978.  Ground-Water Resources of Emmons County, North Dakota, North Dakota Geological Survey Bulletin 66—Part III, 43 pp.

Armstrong, C.A.  1969.  Geology and Ground Water Resources, Williams County, North Dakota, Part III—Hydrology, North Dakota Geological Survey Bulletin 48, 82 pp.

Bachman, J. 2014.  North Dakota's Downside to the Oil Boom: Traffic Deaths.  Businessweek. Available at: http://www.businessweek.com/articles/2014-06-09/north-dakotas-downside-to-the-oil-boom-traffic-deaths.

Black-footed Ferret Recovery Implementation Team.  2011.  Black-footed ferret.  Available at http://www.blackfootedferret.org/.

Carlson, C.G.  1985.  Geology of McKenzie County, North Dakota.  North Dakota Geological Survey Bulletin 80—Part I. 48 pp.

Clayton, L.  1980.  Geologic Map of North Dakota: USGS, Scale 1:500K.

Cochrane, J.F. and P. Delphey.  2002.  Status Assessment and Conservation Guidelines; Dakota Skipper *Hesperia dacotae* (Skinner) (Lepidoptera: Hesperiidae); Iowa, Minnesota, North Dakota, South Dakota, Manitoba, Saskatchewan.  p.80.  U.S. Fish and Wildlife Service, Twin Cities Field Office, Minnesota.

Council on Environmental Quality.  1997.  Environmental Justice: Guidance under the National Environmental Policy Act.  Executive Office of the President, Washington, D.C.

Cowardin, L. M., V. Carter, F.C. Golet, and E.D. LaRoe.  1979.  Classification of wetlands and deepwater habitats of the United States.  U.S. Department of the Interior, Fish and Wildlife Service, Office of Biological Services, Washington, D.C.

Croft, M.G.  1985.  Ground-Water Resources of McKenzie County, North Dakota, North Dakota Geological Survey Bulletin 80—Part III, 57 p.

Dana, R.  1997.  Characterization of three Dakota skipper sites in Minnesota.  p.17.  Minnesota Department of Natural Resources, Natural Heritage and Nongame Research Program, St. Paul.

Dana, R.  1991.  Conservation management of the prairie skippers *Hesperia dacotae* and *Hesperia ottoe*: Basic biology and threat of mortality during prescribed burning in spring. Station Bulletin.  p.63.  Minnesota Agricultural Experiment Station, University of Minnesota, St. Paul.

Defenders of Wildlife.  2014.  Fact Sheet: Black-footed ferret.  Available at http://www.defenders.org/black-footed-ferret/basic-facts.

Federal Emergency Management Agency.  1987.  Flood Insurance Rate Map (3803270100A), Unincorporated Areas, Emmons County, North Dakota.

USACE_DAPL0074221

Environmental Assessment
Dakota Access Pipeline Project
September 2015

Florip, E.  2014.  Proposed Oil Terminal Would Be Biggest In Volume.  The Columbian.  Available at: http://www.columbian.com/news/2014/nov/24/proposed-oil-terminal-biggest-volume-vancouver/.

Freers, T.F.  1970.  Geology and Ground Water Resources, Williams County, North Dakota, Part 1— Geology, North Dakota Geological Survey Bulletin 48, 54 pp.

Fritelli, J.  2014.  U.S. Rail Transportation of Crude Oil: Background and Issues for Congress.  Congressional Research Service.  Available at: http://fas.org/sgp/crs/misc/R43390.pdf.

Fuller, T.  1989.  Population dynamics of wolves in North-Central Minnesota.  Wildlife Monographs 105:3-41.

GeoEngineers.  2014.  Preliminary Geology and Geologic Hazards Evaluation, ETC Dakota Access Pipeline, North Dakota, South Dakota, Iowa, Illinois, 28 p.

Gratto-Trevor, C.L., G. Beyersbergen, H.L. Dickson, P. Erickson, R. MacFarlane, M. Raillard, and T. Sadler.  2001.  Prairie Canada Shorebird Conservation Plan. Prairie Habitat Joint Venture, Canadian Wildlife Service.  Edmonton, Alberta.

Hoberg, T. and C. Gause.  1992.  Reptiles and amphibians of North Dakota.  North Dakota Outdoors 55(1):7-19.  Jamestown, ND: Northern Prairie Wildlife Research Center Available at: http://www.npwrc.usgs.gov/resource/herps/amrepnd/index.htm.

Hoganson, J.S.  2006.  Prehistoric Life of North Dakota, North Dakota Geological Survey.  Available at: https://www.dmr.nd.gov/ndfossil/Poster/poster.asp.

Hoganson, J.S. and J. Campbell.  2002.  Paleontology of Theodore Roosevelt National Park, North Dakota Geological Survey North Dakota Notes No. 9.  Available at: https://www.dmr.nd.gov/ndgs/ndnotes/ndn9_h.htm.

Horwath, B., and C. Owings.  2014.  No Keystone XL Means More Oil By Rail, Report Says.  Oil Patch Dispatch.  Available at: http://oilpatchdispatch.areavoices.com/2014/01/31/no-keystone-xl-means-more-oil-by-rail-report-says/.

Krause, T.D.  2015.  Flood Risk and Floodplain Management Section; Memorandum for CENWO-OD-E, Executive Order 11988 and NWDR 1110-2-5 Compliance Memo for the Proposed Dakota Access Pipeline (DAPL) Project in Williams County, North Dakota, across Flowage and Saturation Easements.

Kringstad, J.  2014.  Energy Development and Transmission Committee.  North Dakota Pipeline Authority.  Available at: https://ndpipelines.files.wordpress.com/2012/04/kringstad-edt-7-8-2014.pdf.

Larson, Thomas K., Kurt P. Schweigert, Keith H. Dueholm, Paul H. Sanders, and Dori Penny.  1987.  A Cultural Resource Inventory of the Right Bank of Lake Oahe in Morton and Sioux Counties, North Dakota.  Larson-Tibesar Associates, Inc., Laramie, Wyoming.  Submitted to the USACE, Omaha.

Licht, D.S. and S.H. Fritts.  1994.  Gray wolf (Canis lupus) occurrences in the Dakotas. American Midland Naturalist 132:74-81.

Lichvar, R.W., M. Butterwick, N.C. Melvin, and W.N. Kirchner.  2014.  The National Wetland Plant List: 2014 Update of Wetland Ratings.  Phytoneuron 2014-41: 1-42.

USACE_DAPL0074222

Environmental Assessment
Dakota Access Pipeline Project
September 2015

McCabe, T.L.  1981.  The Dakota skipper, *Hesperia dacotae* (Skinner): range and biology with special reference to North Dakota.  Journal of the Lepidopterists' Society 35(3):179-193.

Mech, L.D.  1974.  *Canis lupus*.  Mammalian Species 37:1-6.

Morton County.  2014.  Morton County Zoning Map.  Available at http://tinyurl.com/mortonzoningmap.

Multi-Resolution Land Characteristics Consortium.  2011.  National Land Cover Database.  Available at: http://www.mrlc.gov/nlcd2011.php.

Murphy, E.C.  2006.  Lignite Reserves, Williston 100K Sheet, North Dakota, North Dakota Geological Survey.  Available at: https://www.dmr.nd.gov/ndgs/Coalmaps/pdf/100K/wlst_100k_c.pdf.

National Park Service.  2009.  Nationwide Rivers Inventory.  Available at http://www.nps.gov/ncrc/programs/rtca/nri/states/nd.html.

Natural Resources Conservation Service.  2015.  Web Soil Survey. Available at http://websoilsurvey.nrcs.usda.gov/.

Natural Resources Conservation Service.  2013.  Farmland Protection Policy Act Annual Report for FY 2012.

Natural Resources Conservation Service.  2008.  Lake Sakakawea 10110101, 8-Digit Hydrologic Unit Profile.  Available at http://www.nrcs.usda.gov/Internet/FSE_DOCUMENTS/nrcs141p2_001513.pdf.

Natural Resources Conservation Service.  2006.  Land Resource Regions and Major Land Resource Areas of the United States, the Caribbean, and the Pacific Basin.  Available at http://www.nrcs.usda.gov/wps/portal/nrcs/detail/soils/survey/?cid=nrcs142p2_053624.

Nixon, R.  2014.  Grain Piles Up, Waiting For A Ride, As Trains Move North Dakota Oil.  New York Times.  Available at: http://www.nytimes.com/2014/08/26/us/grain-piles-up-waiting-for-a-ride-as-trains-move-north-dakota-oil.html.

North Dakota Department of Agriculture.  2014a.  Noxious Weeds.  Available at: http://www.nd.gov/ndda/program/noxious-weeds.

North Dakota Department of Agriculture.  2014b.  Endangered Species Descriptions.  Available at: http://www.nd.gov/ndda/program-info/endangered-species-protection/endangered-species-descriptions.

North Dakota Department of Health.  2015.  North Dakota 2014 Integrated Section 305(b) Water Quality Assessment Report and Section 303(d) List of Waters Needing Total Maximum Daily Loads.  Available at: https://www.ndhealth.gov/wq/sw/Z7_Publications/IntegratedReports/2014_North_Dakota_Integrated_Report_Final_20150428.pdf.

North Dakota Department of Health.  2013.  North Dakota Air Quality Monitoring Data Summary 2013.  Available at https://www.ndhealth.gov/aq/AmbientMonitoring.htm.

North Dakota Department of Mineral Resources.  2015.  Oil and Gas Division, Oil and Gas ArcIMS Viewer.  Available at: https://www.dmr.nd.gov/OaGIMS/viewer.htm.

North Dakota GIS Hub Data Portal.  2010.  Earthquake Locations.  Available at: https://apps.nd.gov/hubdataportal/srv/en/main.home.

USACE_DAPL0074223

Environmental Assessment
Dakota Access Pipeline Project
September 2015

North Dakota Parks and Recreation Department.  2014.  North Dakota Parks and Recreation Department Home Page.  Available at http://www.parkrec.nd.gov/index.html#1.

Radbruch-Hall, D.H., R.B. Colton, W.E. Davies, I. Lucchitta, B.A. Skipp, and D.J. Varnes.  1982.  Landslide Overview Map of the Conterminous United States, USGS Landslide Hazards Program.  Available at: http://landslides.usgs.gov/hazards/nationalmap/.

Royer, R.A. and G.M. Marrone.  1992.  Conservation status of the Dakota skipper (*Hesperia dacotae*) in North and South Dakota.  p.44.  U.S. Fish and Wildlife Service.  Denver, Colorado.

Sieler, Steve.  July 6, 2015.  State Soil Liaison, Natural Resources Conservation Service, North Dakota.  Personal Communication with Amy Williams, Staff Biologist, Perennial Environmental, LLC.

The Engineering ToolBox.  2015.  Ldn – Day and Night Sound Level.  Available at: http://www.engineeringtoolbox.com/sound-level-d_719.html.

U.S. Army Corps of Engineers.  2014.  National Levee Database.  Available at: http://nld.usace.army.mil/egis/f?p=471:1:.

U.S. Army Corps of Engineers.  2012.  Omaha District, North Dakota Regulatory Office. Nationwide Permit Regional Conditions for North Dakota.  Available at: http://www.nwo.usace.army.mil/Missions/RegulatoryProgram/NorthDakota.aspx.

U.S. Army Corps of Engineers. 2010a. Summary of Engineering Data – Missouri River Main Stem System.

U.S. Army Corps of Engineers. 2010b. Regional Supplement to the Corps of Engineers Wetland Delineation Manual: Great Plains Region (Version 2.0).  ERDC/EL TR-10-1, U.S. Army Engineer Research and Development Center, Vicksburg, MS.

U.S. Army Corps of Engineers. 2010c.  Oahe Dam/Lake Oahe Final Master Plan.  Missouri River, South Dakota and North Dakota. Design Memorandum MO-224.

U.S. Army Corps of Engineers.  2007.  Garrison Dam/Lake Sakakawea Master Plan with Integrated Programmatic Environmental Assessment, Missouri River, North Dakota. Update of Design Memorandum MGR-107D.

U.S. Army Corps of Engineers.  1987.  Corps of Engineers Wetland Delineation Manual, Technical Report Y-87-1, U.S. Army Engineer Waterways Experiment Station, Vicksburg, MS.

U.S. Census Bureau.  2014.  American Fact Finder. Available at: http://factfinder.census.gov/faces/nav/jsf/pages/index.xhtml.

U.S. Department of Transportation.  2015.  Transportation Accidents by Mode.  Office of the Assistant Secretary for Research and Technology.  Available at: http://www.rita.dot.gov/bts/sites/rita.dot.gov.bts/files/publications/national_transportation_statistics/html/table_02_03.html.

U.S. Department of Transportation.  2014.  Pocket Guide to Large Truck and Bus Statistics. Federal Motor Carrier Safety Administration.  Available at: http://www.fmcsa.dot.gov/sites/fmcsa.dot.gov/files/docs/FMCSA%20Pocket%20Guide%20to%20Large%20Truck%20and%20Bus%20Statistics%20-%202014%20-%20508C.pdf.

USACE_DAPL0074224

Environmental Assessment
Dakota Access Pipeline Project
September 2015

U.S. Environmental Protection Agency.  2015.  Hazardous Waste Website.  Available at: http://www.epa.gov/osw/hazard/index.htm.

U.S. Environmental Protection Agency.  2014.  Enviromapper for Envirofacts.  http://epa.gov/emefdata/em4ef.home.

U.S. Environmental Protection Agency.  2012.  Environmental Justice Showcase Communities.  Available at: http://www.epa.gov/environmentaljustice/grants/ej-showcase.html.

U.S. Fish and Wildlife Service.  2015.  Endangered and Threatened Wildlife and Plants; Threatened Species Status for the Northern Long-Eared Bat With 4(d) Rule; Final Rule and Interim Rule.  80 Federal Register 17973.

U.S. Fish and Wildlife Service.  2014a.  Species profile: Whooping Crane (*Grus americana*). Environmental Conservation Online System.  Available at: http://ecos.fws.gov/speciesProfile/profile/speciesProfile.action?spcode=B003.

U.S. Fish and Wildlife Service.  2014b.  Endangered and Threatened Wildlife and Plants; Threatened Species Status for the Rufa Red Knot; Final Rule. 79 FR 73705.

U.S. Fish and Wildlife Service.  2014c.  Revised recovery plan for the Pallid sturgeon (*Scaphirhynchus albus*).  Denver, Colorado: Mountain-Prairie Region, U.S. Fish and Wildlife Service.

U.S. Fish and Wildlife Service.  2014d.  Species profile: Black-footed ferret (*Mustela nigripes*).  Environmental Conservation Online System.  Available at: http://ecos.fws.gov/speciesProfile/profile/speciesProfile?spcode=A004.

U.S. Fish and Wildlife Service.  2014e.  Species profile: Gray wolf (*Canis lupus*).  Environmental Conservation Online System.  Available at: http://ecos.fws.gov/tess_public/SpeciesReport.do?lead=6&listingType=L.

U.S. Fish and Wildlife Service.  2014f.  Revised Recovery Plan for the Pallid Sturgeon (*Scaphirhynchus albus*).  Available at: http://ecos.fws.gov/docs/recovery_plan/Pallid%20Sturgeon%20Recovery%20Plan%20First%20Revision%20signed%20version%20012914_3.pdf.

U.S. Fish and Wildlife Service.  2013a.  Western prairie fringed orchid (*Platanthera praeclara*). Available at: http://www.fws.gov/northdakotafieldoffice/endspecies/species/western_prairie_fringed_orchid.htm.

U.S. Fish and Wildlife Service.  2013b.  North Dakota Field Office; Least Tern (*Sterna antillarum*). Available at: http://www.fws.gov/northdakotafieldoffice/endspecies/species/least_tern.htm.

U.S. Fish and Wildlife Service.  2013c.  North Dakota Field Office; Black-footed ferret (*Mustela nigripes*).  Available at: http://www.fws.gov/northdakotafieldoffice/endspecies/species/black-footed_ferret.htm.

U.S. Fish and Wildlife Service.  2013d.  Endangered and Threatened Wildlife and Plants; Threatened status for Dakota skipper and Endangered Status for Poweshiek skipperling; and Designation of critical habitat for the Dakota skipper and Poweshiek skipperling. Proposed Rule. 78 Federal Register 63574.

USACE_DAPL0074225

Environmental Assessment
Dakota Access Pipeline Project
September 2015

U.S. Fish and Wildlife Service.  2013e.  Interior Least Tern (*Sternula antillarum*) 5-Year Review: Summary and Evaluation.  Available at: http://www.fws.gov/southeast/5yearReviews/5yearreviews/interiorLeastTern5yrReivew102413.pdf.

U.S. Fish and Wildlife Service.  2012.  Endangered Species: Piping Plover.  Available at: http://www.fws.gov/mountainprairie/species/birds/pipingplover/.

U.S. Fish and Wildlife Service.  2011.  Species Assessment and Listing Priority Assignment Form, Dakota Skipper.  p.49.  Washington, DC.

U.S. Fish and Wildlife Service.  2007.  International Recovery Plan Whooping Crane (*Grus americana*), Third Revision.  Available at: http://ecos.fws.gov/docs/recovery_plan/070604_v4.pdf.

U.S. Fish and Wildlife Service.  2006.  Designating the Western Great Lakes Population of Gray Wolves as a Distinct Population Segment: Removing the Western Great Lakes Distinct Population Segment of the Gray Wolf from the List of Endangered and Threatened Wildlife.  71 Federal Register 15266.

U.S. Fish and Wildlife Service, National Park Service, Bureau of Land Management, and U.S. Forest Service.  2014.  National Wild and Scenic Rivers System.  Available at http://www.rivers.gov/north-dakota.php.

U.S. Geological Survey.  2014a.  North Dakota 2014 Seismic Hazard Map, USGS Earthquake Hazards Program.  Available at: http://earthquake.usgs.gov/earthquakes/states/north_dakota/hazards.php.

U.S. Geological Survey.  2014b.  Northern Prairie Wildlife Research Center.  North Dakota Wildlife Management Area Guide - WMAs by County.  Available at http://www.npwrc.usgs.gov/resource/wildlife/wmaguide/county.htm.

Weary, D.J. and D.H. Doctor.  2014.  Karst in the United States: A Digital Map Compilation and Database, USGS Open-File Report 2014-1156, 23 p.

Wilderness Institute.  2014.  List of Wilderness Areas by Location. University of Montana, College of Forestry and Conservation.  Available at http://www.wilderness.net/NWPS/stateView?state=ND.  Accessed November 2014.

USACE_DAPL0074226

# EXHIBIT L

# ENVIRONMENTAL ASSESSMENT
## Dakota Access Pipeline Project Crossings of Flowage Easements and Federal Lands

**Prepared on behalf of:**

## U.S. Army Corps of Engineers – Omaha District
1616 Capitol Avenue, Suite 9000
Omaha, NE 68102

**July 2016**

USACE_DAPL0071220

Environmental Assessment
Dakota Access Pipeline Project
July 2016

# TABLE OF CONTENTS

EXECUTIVE SUMMARY ........................................................................................................1

**1.0   INTRODUCTION ............................................................................................3**
    1.1    DAPL Project ......................................................................................... 3
    1.2    Purpose and Need................................................................................... 3
    1.3    Authority and Scope of the EA................................................................. 3

**2.0   ALTERNATIVES ..............................................................................................5**
    2.1    Alternatives Considered but Eliminated from Detailed Analysis......................... 5
            2.1.1    Alternative 1 – Modification of Existing Infrastructure .................................5
            2.1.2    Alternative 2 – Trucking Transportation Alternative...............................5
            2.1.3    Alternative 3 – Rail Transportation Alternative........................................6
            2.1.4    Alternative 4 – Route Alternatives.......................................................7
            2.1.5    Alternative 5 – Major Waterbody Crossing Method Alternatives.....................12
    2.2    No Action Alternative ............................................................................ 13
    2.3    The Proposed Action (Preferred Alternative) ................................................ 13
            2.3.1    Location and Detailed Description of the Proposed Action ...............................13
            2.3.2    Description of Construction Techniques and Construction Mitigation Measures ........................................................................................... 17

**3.0   THE AFFECTED ENVIRONMENT AND POTENTIAL ENVIRONMENTAL IMPACTS OF THE PROPOSED ACTION AND NO ACTION ALTERNATIVE ...............................................................23**
    3.1    Geology and Soils................................................................................ 23
            3.1.1    Geology ........................................................................................ 23
            3.1.2    Mineral Resources .......................................................................... 25
            3.1.3    Geologic Hazards ........................................................................... 26
             3.1.4    Paleontology ................................................................................. 28
            3.1.5    Soils ............................................................................................ 29
    3.2    Water Resources ................................................................................. 35
            3.2.1    Surface Waters .............................................................................. 35
            3.2.2    Groundwater................................................................................. 44
            3.2.3    Wetlands ...................................................................................... 49
            3.2.4    Floodplain .................................................................................... 51
            3.2.5    Levees ......................................................................................... 52
    3.3    Vegetation, Agriculture, and Range Resources .......................................... 52
            3.3.1    Vegetation.................................................................................... 52
            3.3.2    Invasive and Noxious Weeds ............................................................. 56
            3.3.3    Threatened, Endangered, Candidate, and Proposed Plant Species ...................57
    3.4    Wildlife Resources ............................................................................... 57
             3.4.1    Recreationally and Economically Important Species and Nongame Wildlife......57
            3.4.2    Threatened, Endangered, Candidate, and Proposed Wildlife Species ...............58
    3.5    Aquatic Resources .............................................................................. 68
            3.5.1    Habitat and Communities................................................................. 68
    3.6    Land Use and Recreation ...................................................................... 70
            3.6.1    Land Ownership ............................................................................. 70
            3.6.2    Land Use....................................................................................... 71

USACE_DAPL0071221

Environmental Assessment
Dakota Access Pipeline Project
July 2016

|  |  | 3.6.3 | Recreation and Special Interest Areas | 73 |
|  | 3.7 | Cultural and Historic Resources and Native American Consultations | | 75 |
|  |  | 3.7.1 | Cultural Resources Studies | 76 |
|  |  | 3.7.2 | Native American Consultations | 79 |
|  | 3.8 | Social and Economic Conditions | | 80 |
|  |  | 3.8.1 | Demographics, Employment, Income and Economic Justice | 80 |
|  | 3.9 | Environmental Justice | | 84 |
|  |  | 3.9.1 | Affected Environment | 84 |
|  |  | 3.9.2 | Impacts and Mitigation | 85 |
|  | 3.10 | Hazardous Waste | | 87 |
|  | 3.11 | Reliability and Safety | | 88 |
|  | 3.12 | Air Quality and Noise | | 94 |
|  |  | 3.12.1 | Air Quality | 95 |
|  |  | 3.12.2 | Noise | 96 |
| **4.0** | **CUMULATIVE IMPACTS** | | | **98** |
|  | 4.1 | Geology and Soils | | 99 |
|  | 4.2 | Water and Aquatic Life Resources | | 100 |
|  | 4.3 | Vegetation, Agriculture, and Range Resources | | 101 |
|  | 4.4 | Threatened, Endangered, Candidate, and Proposed Species | | 102 |
|  |  | 4.4.1 | Interior Least Tern | 102 |
|  |  | 4.4.2 | Whooping Crane | 103 |
|  |  | 4.4.3 | Piping Plover | 103 |
|  |  | 4.4.4 | Rufa Red Knot | 103 |
|  |  | 4.4.5 | Pallid Sturgeon | 103 |
|  |  | 4.4.6 | Conclusion | 104 |
|  | 4.5 | Wildlife Resources | | 104 |
|  | 4.6 | Land Use and Recreation | | 104 |
|  | 4.7 | Cultural and Historic Resources and Native American Consultations | | 105 |
|  | 4.8 | Social and Economic Conditions | | 105 |
|  | 4.9 | Transportation and Traffic | | 106 |
|  | 4.10 | Environmental Justice | | 107 |
|  | 4.11 | Air Quality and Noise | | 107 |
| **5.0** | **IRREVERSIBLE AND IRRETRIEVABLE COMMITMENT OF RESOURCES** | | | **108** |
| **6.0** | **MITIGATION SUMMARY** | | | **109** |
| **7.0** | **FEDERAL, TRIBAL, STATE, AND LOCAL AGENCY CONSULTATION AND COORDINATION** | | | **111** |
| **8.0** | **STATUS OF ENVIRONMENTAL COMPLIANCE** | | | **115** |
| **9.0** | **LIST OF PREPARERS AND REVIEWERS** | | | **126** |
| **10.0** | **ACRONYMS, INITIALS, AND ABBREVIATIONS** | | | **128** |
| **11.0** | **REFERENCES** | | | **131** |
| **12.0** | **FIGURES** | | | **139** |

USACE_DAPL0071222

Environmental Assessment
Dakota Access Pipeline Project
July 2016

## LIST OF TABLES

**Table 2-1:**     North Bismarck Route alternative Evaluation
**Table 2-2:**     North Bismarck Route alternative cost comparison
**Table 2-3:**     Flowage Easements and Federal Land Crossings
**Table 2-4:**     Environmental Assessment Areas of Interest
**Table 3-1:**     Soil Types Mapped on the Flowage Easements Project Area
**Table 3-2:**     Soil Types Mapped on the Federal Lands Project Area and Connected Action
**Table 3-3:**     Soil Impacts on the Flowage Easements Project Area
**Table 3-4:**     Soil Impacts on the Federal Lands Project Area and Connected Action
**Table 3-5**      Waterbodies within the Flowage Easements Project Area
**Table 3-6**      Waterbodies within the Federal Lands Project Area and Connected Action
**Table 3-7:**     Estimated Benzene Concentrations Following a Hypothetical Crude Oil Spill at Project River Crossings
**Table 3-8:**     Wetlands within the Flowage Easements Project Area
**Table 3-9:**     Land Cover Impacts on the Flowage Easements Project Area
**Table 3-10:**    Land Cover Impacts on the Federal Lands Project Area and Connected Action
**Table 3-11:**    Federally Listed Species with Potential to Occur within the Project Area and Connected Action
**Table 3-12:**    Land Use Impacts on the Flowage Easements Project Area
**Table 3-13:**    Land Use Impacts on the Federal Lands Project Area and Connected Action
**Table 3-14:**    Minority and Low-Income Population Statistics for the Flowage Easements Project Area
**Table 3-15:**    Minority and Low-Income Population Statistics for the Federal Lands Project Area
**Table 3-16:**    Noise Values
**Table 7-1:**     Comments Received
**Table 8-1:**     Environmental Permits, Approvals, and Consultations
**Table 8-2:**     Summary of Environmental Impact Avoidance and Mitigation Measures

**Table 9-1:**     List of Reviewers and Preparers

## LIST OF FIGURES

**Figure 1:**     Project Location—Federal Lands and Flowage Easements
**Figure 2:**     Project Layout—Flowage Easements
**Figure 3:**     Project Layout—Federal Lands
**Figure 4:**     Soils—Flowage Easements
**Figure 5:**     Soils—Federal Lands
**Figure 6:**     Natural Resources—Flowage Easements
**Figure 7:**     Natural Resources—Federal Lands
**Figure 8:**     Cultural Resources—Flowage Easements
**Figure 9:**     Cultural Resources—Federal Lands
**Figure 10:**    Land Cover—Flowage Easements
**Figure 11:**    Land Cover—Federal Lands
**Figure 12:**    Route Alternative—Missouri River Crossing
**Figure 13:**    Route Alternative—Lake Oahe Crossing
**Figure 14:**    Cross-Section Diagram of Lake Oahe HDD Crossing

USACE_DAPL0071223

Environmental Assessment
Dakota Access Pipeline Project
July 2016

**Figure 15:**   Cross-Section Diagram of Missouri River HDD Crossing
**Figure 16:**   Whooping Crane Migration Corridor

**LIST OF APPENDICES**

**Appendix A:**   Stormwater Pollution Prevention Plan (SWPPP)/Spill Prevention Control and
                  Countermeasure (SPCC) Plan
**Appendix B:**   HDD Construction Plan - and HDD Contingency Plan
**Appendix C:**   Right-of-Way (ROW) Configurations and Typical Construction Details
**Appendix D:**   Geotechnical Reports
**Appendix E:**   Blasting Plan
**Appendix F:**   Unanticipated Discoveries Plan Cultural Resources, Human Remains, Paleontological
                  Resources and Contaminated Media (UDP)
**Appendix G:**   Environmental Construction Plan (ECP)
**Appendix H:**   Project Maps and HDD Cross-Sections
**Appendix I:**   Cultural Resources Report (Confidential-Not for Public Release)
**Appendix J:**   Sample Scoping Letter, Distribution List, and Comments Received
**Appendix K:**   Notice of Availability of Draft Environmental Assessment (EA) for Comment
**Appendix L:**   Draft Facility Response Plan
**Appendix M:**   Sovereign Lands Permits issued by the North Dakota Office of the State Engineer

USACE_DAPL0071224

Environmental Assessment
Dakota Access Pipeline Project
July 2016

**EXECUTIVE SUMMARY**

In accordance with the National Environmental Policy Act (NEPA) and implementing regulations, the following Environmental Assessment (EA) has been prepared to evaluate the effects of the United States Army Corps of Engineers (USACE), Omaha District (District) granting permission to Dakota Access, LLC (Dakota Access) to place a portion of the Dakota Access Pipeline Project (DAPL Project) on federal real property interests acquired and managed for the Garrison Dam/Lake Sakakawea and Oahe Dam/Lake Oahe Projects in North Dakota.  Section 14 of the Rivers and Harbors Act of 1899, codified 33 U.S.C. Section 408 (Section 408), authorizes the Corps to grant permission to Dakota Access to modify federal flood control and navigation projects, provided the modifications are not injurious to the public interest and will not impair the usefulness of the projects.  The EA addresses the purpose and need of the pipeline, as well as the location and method of installation of the pipeline, but the analysis is limited to the effects of allowing the pipeline to cross federal flowage easements near Lake Sakakawea and federally owned lands at Lake Oahe in North Dakota, to determine whether the placement of the pipeline on federal real property interests is injurious to the public interest or will impair the usefulness of the federal projects.

This EA was prepared by Dakota Access on behalf of the Corps in compliance with the NEPA Act of 1969; the Council on Environmental Quality (CEQ) Regulations (40 CFR 1500-1508); Corps of Engineers Regulation ER 200-2-2 (33 CFR Part 230), and related environmental compliance requirements, including the Section 106 of the National Historic Preservation Act (Section 106).  Tribes, Tribal Historic Preservation Offices, State Historic Preservation Offices, the Advisory Council on Historic Preservation, and interested parties were consulted by representatives from Dakota Access and the Corps Omaha District as required by the Programmatic Agreement and the National Historic Preservation Act.

This EA was prepared in accordance with CEQ regulations in Section 1506.5(a) and 1506.5(b), which allow an applicant to prepare an EA for federal actions.  The Corps has independently evaluated and verified the information and analysis undertaken in this EA and takes full responsibility for the scope and content contained herein.

The Corps published a draft EA on December 8, 2015, on the U.S. Army Corps of Engineers (USACE) Omaha District  website  (http://www.nwo.usace.army.mil/Missions/CivilWorks/Planning/ProjectReports.aspx) and hard copies were made available at public libraries in Bismarck, Williston, and Pierre.   Additionally, notifications where made to cooperating agencies, other federal, state and local agencies, and signatory and non-signatory Tribes to the Omaha Corps District Programmatic Agreement.

The Corps received comments from 20 reviewers in response to the Draft EA, primarily from individuals believed to be members of the Standing Rock Sioux Tribe, and two sets of comments from EPA. These comments relate to topics in the EA. The Corps fully considered and responded to these comments. There is no new, significant information on environmental effects as a result of these comments. As such, neither a supplemental nor a revised EA will be published for further public review nor are additional NEPA compliance actions required prior to the Corps making a decision on the proposed action.

Impacts on the environment resulting from the placement of the pipeline on federal real property interests is anticipated to be temporary and not significant as a result of Dakota Access's efforts to avoid, minimize, and mitigate potential impacts.  Dakota Access will comply with all applicable local, state, and

1

USACE_DAPL0071225

Environmental Assessment
Dakota Access Pipeline Project
July 2016

federal regulations and permits associated with the construction and operation of the pipeline, which is not expected to have any significant direct, indirect, or cumulative impacts on the environment.

2

USACE_DAPL0071226

Environmental Assessment
Dakota Access Pipeline Project
July 2016

# 1.0   INTRODUCTION

Dakota Access is proposing to construct a new crude oil pipeline that would provide transportation service from the Bakken and Three Forks plays in North Dakota through portions of South Dakota and Iowa to a terminus in Patoka, Illinois (Figure 1).  In coordination with the U.S. Army Corps of Engineers, the Applicant, Dakota Access, LLC (Dakota Access), as the non-federal representative for compliance with the NEPA of 1969, the CEQ Regulations (40 CFR 1500-1508), Corps of Engineers Regulation ER 200-2-2 (33 CFR Part 230), and related environmental compliance requirements, prepared this Environmental Assessment to analyze whether the Corps could grant Section 408 permissions for the placement of Dakota Access Pipeline Project (DAPL Project) on federal flowage easements near the upper end of Lake Sakakawea, and federally owned lands at Lake Oahe in North Dakota ("the Requester's Preferred Alternative" or "Proposed Action").  Areas that are potentially impacted by construction and/or operation of the Proposed Action are referred to herein as the Project Area.

## 1.1   DAPL Project

The DAPL Project is an approximately 1,100-mile long crude oil pipeline project beginning near Stanley, North Dakota, and ending at Patoka, Illinois.  The DAPL project, as proposed and being evaluated herein, would cross federal flowage easements near the upper end of Lake Sakakawea north of the Missouri River in Williams County, North Dakota, and federally owned lands at Lake Oahe in Morton and Emmons counties, North Dakota. The EA analysis is limited to these portions of the pipeline only.

## 1.2   Purpose and Need

The purpose and need of the federal action is to determine whether USACE may grant permission for Dakota Access to place the pipeline on federal real property interests acquired and managed by USACE for the Garrison Dam/Lake Sakakawea and Oahe Dam/Lake Oahe projects.  Section 408 authorizes the Corps to grant permission to Dakota Access to modify federal flood control and navigation projects, provided the modifications are not injurious to the public interest and will not impair the usefulness of the projects. The EA addresses the purpose and need of the pipeline, as well as the location and method of installation of the pipeline, but the analysis is limited to the effects of allowing the pipeline to cross federal flowage easements near the upper end of Lake Sakakawea and federally owned lands at Lake Oahe in North Dakota.

## 1.3   Authority and Scope of the EA

The proposed crossings of Corps-owned lands and easements would require the Corps to grant the Section 408 permissions as well as real estate outgrants.  Therefore, the scope of this EA is limited to the crossings of Corps-owned lands and flowage easements.  As noted below, separate Corps authorizations are being sought for Section 404, Section 10, and Section 408 crossings on other portions of the DAPL route. Those actions are not discussed in the EA.

The Proposed Action does not qualify for a Categorical Exclusion from NEPA documentation as defined by ER 200-2-2, 4 March 1998 paragraph 9.  Thus, this EA has been prepared as required under NEPA to determine potential impacts that may occur as result of implementing the Proposed Action.  If it is determined that no significant impacts would be incurred after implementing the mitigation measures

USACE_DAPL0071227

Environmental Assessment
Dakota Access Pipeline Project
July 2016

described within this document, the USACE would issue a finding of no significant impact (FONSI). If it is determined that significant impacts would be incurred as a result of construction and/or operations of the Proposed Action, an environmental impact statement (EIS) would be prepared to further evaluate the Proposed Action under NEPA.

This effect analysis is being completed in accordance with CEQ regulations in Section CFR 1506.5(b), which allow an applicant to prepare an EA for a federal action in coordination with the lead federal agency (i.e., Corps). The Corps will use the information in the EA to make a final determination whether to grant the required Section 408 permissions using the information contained herein. The Corps independently evaluated and verified the information and analysis undertaken in this EA and takes full responsibility for its scope and content.

4

USACE_DAPL0071228

Environmental Assessment
Dakota Access Pipeline Project
July 2016

## 2.0   ALTERNATIVES

Dakota Access proposes the DAPL Project to efficiently and safely transport at least 570,000 barrels of crude oil per day (bpd) from the Bakken and Three Forks production region in North Dakota to a crude oil market hub located near Patoka, Illinois, and ultimately to refineries located in the Midwest and the Gulf Coast, where 80% of the U.S. refining capabilities exist. Because the Corps can only grant permission for the modification of a federal project if it would not be injurious to the public interest, the EA evaluated alternatives to the construction of the pipeline as a whole, as well as the alignment of the pipeline and method for installation on federal property. The alternatives were compared using the proposed purpose of the DAPL project. The EA also analyzed the potential for the pipeline to impair the usefulness of the federal projects.

## 2.1   Alternatives Considered but Eliminated from Detailed Analysis

### 2.1.1   Alternative 1 – Modification of Existing Infrastructure

There are no other major interstate pipelines that would meet the purpose and need of the Project.  The DAPL Project would be Energy Transfer's (Company's) first asset in the state.  For this reason, the manipulation of operating pressures or additional of pump stations to increase transport capacity in pipelines or altering existing infrastructure to increase storage and transport capacity are not viable options to meet the  purpose and need of the Project.

### 2.1.2   Alternative 2 – Trucking Transportation Alternative

 While trucking is instrumental in the gathering and distribution of crude on a limited scale, trucking as an alternative for transporting volume of crude oil the distances planned for the DAPL Project is not viable. Based on data recorded by the North Dakota Pipeline Authority as recently as November of 2015, approximately 1% of the crude oil in the Williston Basin is transported via truck out of the Williston Basin due to a lack of transport capacity (Kringstad, 2016).  Factors such as road safety, roadway capacity, and a lack of reliability due to seasonal constraints, in addition to other logistical issues involving availability of labor force, trailer truck capacity, and economics, all contribute to truck transportation not being a realistic alternative.

A sharp increase in traffic on North Dakota roads as a result of the rapid expansion in the number of commercial trucks linked to the oil industry speaks to the issues associated with road safety.  In 2012, the Federal Motor Carrier Safety Administration reported a traffic fatality rate in North Dakota of 0.48 per million vehicle miles traveled, with 48 deaths involving a bus or large truck, far surpassing any other state (U.S. Department of Transportation [DOT], 2014).  In the pre-boom years of 2001 to 2005, there was an average of only 13 annual deaths involving commercial trucks.  Furthermore, the economic cost of severe truck crashes has more than doubled between 2008 and 2012.  Much of the increase in the fatality rate can be attributed to the energy production boom, along with the fact that the state's infrastructure still consists of single-lane, rural, and unpaved roads in many areas (Bachman, 2014).  Harsh winter weather and seasonal road restrictions compromise the reliability of truck transportation even further. Based on the above, a pipeline is a safer and more economical alternative than trucking for the volumes transported and distances covered by the DAPL Project.

5

Environmental Assessment
Dakota Access Pipeline Project
July 2016

Assuming the average oil tanker truck is capable of holding about 220 barrels of oil, the transportation of the initial capacity of the proposed Project (450,000 bpd), would require a total of 2,045 (450,000/220) full trucks to depart the proposed tank terminals daily, and more than 85 (2,045/24) trucks would have to be filled every hour with a 24-hour/day operation.  Time spent in transit, loading/offloading, and additional time for maintenance would add to the number of trucks needed to offset for the DAPL Project. For a trucking mode, an increase in daily truck traffic would lead to an increase in the degradation of public roads as well as contribute to the noise pollution adjacent to the roads.  For both truck and rail modes, an increase in exhaust would be anticipated due to truck and locomotive combustion.  An increase in air pollution would also be anticipated from potential releases during the filling operations for trucks or rail cars.

Analysis of infrastructure considerations (the burden of thousands of additional trucks on county, state, and interstate highways, as well as the loading and offloading facilities that would have to be constructed which would incur their own environmental impacts), economic considerations (e.g., labor costs, purchase and maintenance of hauling equipment, fuel, public infrastructure, etc.), and reliability considerations (e.g., weather, mechanical, manpower, road closures) all contribute to making the truck transportation alternative unviable.

### 2.1.3    Alternative 3 – Rail Transportation Alternative

Reliance on rail as a transportation method in the Williston Basin has drastically increased in recent years, carrying a negligible percentage of the overall market share as recently as 2010 to nearly 60% of the overall market share by mid-2014 (Nixon, 2014).  The rise in the use of rail as a primary transportation method has been driven in large part by the rapid increase in production of crude oil coupled with a lack of pipeline capacity to account for additional supplies.

Negative impacts from the growth in popularity of rail as a method of long-distance transportation of crude oil include delays that disrupt the agricultural sector, reductions in coal-fired power plant inventories, and significant production issues in the food production industry.  In August 2014, reports filed with the federal government indicated that the Burlington Northern Santa Fe Railway had a backlog of 1,336 rail cars waiting to ship grain and other products, while Canadian Pacific Railway had a backlog of nearly 1,000 cars (Nixon, 2014).  For industries, such as those listed, in which the use of pipelines is not an option, the only viable alternative would be increased reliance on trucking, which would exacerbate some of the issues listed in the section above.

Assuming a carrying capacity of 600 barrels per car, a total of 750 rail cars would be required to depart the tank terminal daily to transport 450,000 barrels of crude oil to its final destination.  Loading and offloading 750 rail cars in a day would require servicing more than 31 rail cars per hour.  With an assumption of 125 rail cars per train, six trains would have to depart the tank terminal every day.  With 10 to 12 trains currently leaving the state per day carrying Bakken crude, the DAPL Project would represent a 50 to 60% increase in the number of trains transporting crude oil out of the state, likely exacerbating issues with delays (Horwath and Owings, 2014).

Rail operations on the scale of the DAPL Project do not exist in the U.S.  An oil-by-rail facility designed to handle an average of 360,000 bpd has been proposed in the Port of Vancouver, Washington.  Known as the Vancouver Energy proposal, the project would be the largest rail terminal in the country (Florip, 2014).

6

USACE_DAPL0071230

Environmental Assessment
Dakota Access Pipeline Project
July 2016

A rail transportation alternative to handle the volumes of the DAPL Project would require the design and construction of 125 to 158% of that of the Vancouver Energy proposal.  A facility of this size would incur its own environmental consequences.

From a safety standpoint, railroad transport consistently reports a substantially higher number of transportation accidents than pipelines (DOT, 2005).  A series of major accidents taking place in 2013 to 2014 in Canada and the U.S. has heightened concern about the risks involved in shipping crude by rail (Fritelli, 2014).

Increases in rail traffic necessary to transport the volume of crude oil proposed by the DAPL project would increase the emissions of combustion products due the use of diesel engines which could have an adverse impact on air quality in the region.   This alternative would also directly affect communities along utilized rail lines by increasing noise and creating transportation delays due to the substantial increasing rail traffic across railroad crossings of roads.

While rail tanker cars are a vital part of the short-haul distribution network for crude oil, pipelines are a more reliable, safer, and more economical alternative for the large volumes transported and long distances covered by the DAPL Project.   This alternative would create delays on the rail lines due to the substantial increase in rail traffic, resulting in shipping delays in other industries such as agriculture that cannot rely on pipeline transportation.  Furthermore, the purpose and need of the Project would not be attainable with the current oil-by-rail infrastructure in the country because rail loading facilities of sufficient size do not exist. As such, rail transportation is not considered a viable alternative.

## 2.1.4    Alternative 4 – Route Alternatives

Although this EA is limited to the pipeline placement on federal real property interests administered by the Corps, major route alternatives were evaluated for the pipeline route as a whole.  During the DAPL Project fatal flaw analysis and early routing process, Dakota Access utilized a sophisticated and proprietary Geographic Information System (GIS)-based routing program to determine the pipeline route based on multiple publicly available and purchased datasets.  Datasets utilized during the Project routing analysis included engineering (e.g., existing pipelines, railroads, karst, powerlines, etc.), environmental (e.g., critical habitat, fault lines, state parks, national forests, brownfields, national registry of historic places, etc.), and land (e.g., fee owned federal lands, federal easements, dams, airports, cemeteries, schools, mining, tribal lands, and military installations, etc.).

Each of these datasets was weighted based on the risk (e.g., low, moderate, or high based on a scale of 1,000) associated with crossing or following certain features.  In general, the route for the pipeline would follow features identified as low risk, avoid or minimize crossing features identified as moderate risk, and exclude features identified as high risk.  For example, the existing pipelines dataset was weighted as a low risk feature, so that the routing tool followed existing pipelines to the extent possible to minimize potential impacts.  An example of a high risk feature is the national park dataset.  Since national parks were weighted for the DAPL Project as high risk, the GIS routing program excluded any national parks from the pipeline route to avoid impacts on these federal lands.  In addition, the routing program established a buffer between the proposed route and certain types of land, such as maintaining a 0.5-mile buffer from tribal lands.

7

USACE_DAPL0071231

Environmental Assessment
Dakota Access Pipeline Project
July 2016

**Route Alternative for the Crossing of Flowage Easements at the Missouri River**

Early in the routing process Dakota Access performed a cursory route evaluation to attempt crossing the Missouri River at a location that does not contain flowage easements. This would dictate moving the centerline west of the flowage easements in Williams County. This alternative was not carried forward through the environmental consequences analysis, given that this would require approximately eight additional miles of pipe, an exceedance of an additional 130 acres of workspace, and another major river crossing (Yellowstone River) in addition to the Missouri River. Furthermore, other state and federal properties are located along the river west of the confluence of Missouri and Yellowstone Rivers.

**Route Alternative for the Crossing of Federal Lands at Lake Oahe**

Early in the routing phase of the DAPL Project, Dakota Access considered but eliminated an alternative centerline that originated in Stanley, North Dakota, within Mountrail County, where it connected to customer receipt points and headed southwest through Williams County and crossed the Missouri River approximately 8.5 miles east of the Yellowstone River and Missouri River confluence (**Figure 12**). The centerline then headed southeast across the state and crossed Lake Oahe approximately 10 miles north of Bismarck (**Figure 13**), where it then headed south again and entered South Dakota approximately 35 miles east of Lake Oahe in McIntosh County. In addition to other evaluation criteria listed in Table 2.1, the route alternative was in proximity to and/or crossing multiple conservation easements, habitat management areas, National Wildlife Refuges, state trust lands, waterfowl production areas, and private tribal lands.

As a result of public input and comment during this EA process, additional desktop evaluation of the North Bismarck alternative portion of the early route (**Figure 13**) was undertaken. The comparison of this alternative to the preferred route is included in **Tables 2-1** and **2-2** contained herein. As illustrated in the tables, the data substantiates eliminating this route as a viable alternative. While the alternative does avoid Corps fee owned land at Lake Oahe; therefore, would not require a Corps real estate outgrant or Corps EA review, approximately 11-miles of length would be added to the pipeline route, consisting of roughly 165 additional acres of impact, multiple additional road crossings, waterbody and wetland crossings, etc. In addition to the criteria shown in the tables, due to the proximity to Bismarck, the North Bismarck route alternative crossed through or in close proximity to several wellhead source water protection areas that are identified and avoided in order to protect areas that contribute water to municipal water supply wells. The route was also severely constrained by the North Dakota Public Service Commission's 500-ft residential buffer requirement at multiple locations. Furthermore, this route alternative crossed other populated PHMSA high consequence areas (HCAs), that are not present on the preferred route. Pipeline safety regulations use the concept of HCAs to identify specific locales where a release from a pipeline could have the most significant adverse consequences.

8

USACE_DAPL0071232

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 2-1 Alternatives Evaluation Matrix Between Preferred Crossing at Lake Oahe and Alternative Crossing North of Bismarck | | | |
|---|---|---|---|
| **Evaluation Factors** | **ALTERNATIVE ROUTE Crossing North of Bismarck** | **PREFERRED ROUTE Crossing at Lake Oahe** | **PREFERRED COMPARED TO ALTERNATIVE ROUTE** |
| Total Overall Route Mileage | | | |
| Total Mileage | 111.0 | 100.4 | -10.6 |
| Collocation | | | |
| Pipeline (mi) | 0.0 | 34.6 | +34.6 |
| Powerline (mi) | 2.9 | 6.1 | +3.2 |
| *Overall Corridor Collocation (%)* | 3% | 41% | +38% |
| Amount of Greenfield Crossed (non-collocated areas-mi) | 108.1 | 59.6 | -48.4 |
| Existing Pipeline Crossing (count) | | | |
| Crossing Count | 6 | 10 | +4 |
| Floodplain 100 Year | | | |
| Floodplain Crossings (Count) | 13 | 2 | -11 |
| Total Mileage | 1.4 | 0.2 | -1.2 |
| Land Cover Types (mi) | | | |
| Agriculture | 42.5 | 36.1 | -6.4 |
| Developed/Low Intensity | 0.2 | 0.1 | -0.1 |
| Developed/Open Space | 6.6 | 2.0 | -4.6 |
| Grass/Pasture | 59.3 | 60.7 | +1.4 |
| Land Ownership Potential Conflicts | | | |
| USACE Reservoirs - Lake Oahe | 0 | 1 | +1 |
| Flowlines - NHD* | | | |
| Waterbody Count | 149 | 116 | -33 |

9

USACE_DAPL0071233

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 2-1 Alternatives Evaluation Matrix Between Preferred Crossing at Lake Oahe and Alternative Crossing North of Bismarck | | | |
|---|---|---|---|
| Evaluation Factors | ALTERNATIVE ROUTE Crossing North of Bismarck | PREFERRED ROUTE Crossing at Lake Oahe | PREFERRED COMPARED TO ALTERNATIVE ROUTE |
| Waterbodies- NHD* | | | |
| Perennial | 3 | 1 | -2 |
| Intermittent | 1 | 0 | -1 |
| NWI Wetland (count) | | | |
| Freshwater Emergent Wetland | 26 | 5 | -21 |
| Freshwater Forested/Shrub Wetland | 1 | 0 | -1 |
| Freshwater Pond | 2 | 0 | -2 |
| PHMSA Populated Areas Dissolved (mi) | | | |
| Ecological HCA | 2.6 | 2.6 | 0 |
| Highly Populated Areas | 0 | 0 | 0 |
| Other Populated Areas | 1.6 | 0 | -1.6 |
| Drinking Water HCA | 0 | 0 | 0 |
| Powerline Crossing | | | |
| Total Crossing Count | 14 | 13 | -1 |
| Transportation Crossing | | | |
| Total Crossing Count | 139 | 112 | -27 |

* Flowline and waterbody crossings from the U.S. Geological Survey (USGS) National Hydrography Dataset

10

USACE_DAPL0071234

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 2-2 Construction Cost Comparison Between Crossing at Lake Oahe and Alternative Crossing North of Bismarck | | | | | |
|---|---|---|---|---|---|
| | ALTERNATIVE ROUTE Crossing North of Bismarck | | PREFERRED ROUTE Crossing at Lake Oahe | | |
| Length of Segment | 111.0 | miles | 100.4 | miles | |
| | 585,974 | feet | 530,112 | feet | |
| Cost for Road/Railroad Bores | | | | | |
| Number of Road/Railroad Bores | 139 | bores | 112 | bores | |
| Total Cost for Road Bores (at $34,600/bore) | $ 4,809,400 | USD | $ 3,875,200 | | |
| Cost of Installation for Non-HDD Areas | | | | | |
| Length of Pipeline Non-HDD | 580,008 | feet | 522,312 | feet | |
| Total Cost for Installation of Non-HDD Section | $ 201,262,915 | USD | $ 181,242,264 | USD | |
| Horizontal Directional Drill (HDD) Across Mo River/Lake Oahe | | | | | |
| Length of HDD | 5,966 | feet | 7,800 | feet | |
| Total Cost of HDD Crossing | $ 7,696,140 | USD | $ 10,062,000 | USD | |
| Cost of Geotechnical Investigation | | | | | |
| | $ 140,000 | USD | $110,000 | USD | |
| Aboveground Facility Costs | | | | | |
| Mainline Valves Needed (one per each 10 mile segment) | 11 | valves | 10 | valves | |
| Total Cost of Mainline Valves (at $450,000/valve location) | $ 4,995,000 | USD | $ 4,500,000 | USD | |
| Right-of-Way Acquisition Costs (at $37/foot) | $ 21,681,053 | USD | $ 19,614,144 | USD | |
| Additional Cost Including Engineering and Consultants (at $131,000/mile) | $ 14,538,380 | USD | $ 13,152,400 | USD | |
| Total Cost of Alternative | $ 255,122,888 | USD | $ 232,556,008 | USD | |

11

USACE_DAPL0071235

Environmental Assessment
Dakota Access Pipeline Project
July 2016

A negative number indicates that the value for the proposed action is less than the value for the population that the proposed action is being compared to.

## 2.1.5    Alternative 5 – Major Waterbody Crossing Method Alternatives

Once an optimal route was selected based on the evaluation of impacts discussed in Section 2.1.3, Dakota Access then identified the preferred major waterbody crossing construction method that would meet the purpose and need while minimizing impacts to resources.  Pipeline construction methods utilized at waterbody crossings are highly dependent on the characteristics of the waterbody encountered.  A variety of waterbody crossing techniques were considered during the DAPL Project planning stages for the crossings of major waterbodies, including Dam and Pump, Flume, Open-Cut, and Horizontal Directional Drill.

### Dry Crossings Methods

Two different techniques, including dam and pump and flume crossing methods, are typically used on waterbody crossings well under 100 feet in width and require a temporary diversion of flow within the waterbody.  Because of the large volume of water within the Missouri River system, it is not feasible to temporarily divert the water either by pump or flume, and these methods were ruled out of consideration for the crossing of the Missouri River and Lake Oahe.

### Wet Open-Cut Crossing Method

Aside from trenchless or HDD crossing techniques, the only feasible crossing method from a constructability standpoint for the major waterbodies associated with the Proposed Action is the wet open-cut crossing method, in which flow would be maintained throughout installation of the pipeline. This method of construction would require the construction right-of-way (ROW) to extend right up to the waterbody itself, allowing equipment to operate from the banks of the waterbody to excavate a trench. The sensitive habitat adjacent to the banks of the waterbodies would be cleared of vegetation and graded to create a safe and level workspace that could accommodate excavation equipment and spoil storage for the duration of the open-cut installation (approximately 6 months).  Since the widths of the Missouri River and Lake Oahe at the crossing locations is such that operating trenching equipment entirely from the banks would not be possible, trench excavation in the waterbodies would require equipment operating from barges.  Furthermore, the depth of the waterbodies crossed (15 to 25 feet) exceeds the reach of a backhoe, and the use of mechanical dragline dredgers would be necessary.  Spoil dredged from the bottom of the waterbody would be stored on a spoil barge or otherwise temporarily stockpiled in the waterbody itself.  This method of excavation would greatly influence the overall sediment load generated in the waterbody for the duration of the installation.  The generation of a downstream turbidity plume would have a direct effect on the aquatic habitat of the waterbody.  In addition, the operation of equipment within and on the banks of the waterbody has the potential for adverse effects on surface water quality (i.e., potential contamination of surface water resources from fuel or leaks from the equipment).  Compared to trenchless technology, the open-cut method would incur far greater impacts on sensitive habitat located on both the banks of the waterbodies and within the waterbodies.  Therefore, this method of construction was eliminated from consideration.

USACE_DAPL0071236

Environmental Assessment
Dakota Access Pipeline Project
July 2016

The trenchless construction method known as HDD was selected as the preferred construction method of the Proposed Action, because this method of construction involves far less impacts on resources. In addition, the Garrison Project – Lake Sakakawea Oil and Gas Management Plan explicitly states that: Oil and gas pipelines should use directional drilling technology to traverse beneath sensitive habitat areas. Further information regarding the HDD construction method is provided in Section 2.3.2.6 below.

## 2.2    No Action Alternative

Under the "no action" alternative, Dakota Access would not construct the DAPL Project. The "no action" alternative would not provide the infrastructure necessary to transport light sweet crude oil to refining facilities. In northwest North Dakota, exploration and production of oil is a major economic activity, with crude oil production being the primary mineral resource of interest. Although the "no action" alternative itself would not incur direct environmental impacts, it would also not address the existing demand to transport crude oil to refining facilities. Market demands would likely compel shippers to rely on alternative methods of crude oil transport such as truck or rail. Although, both the truck and rail alternatives are not sufficient to meet the purpose and need of the Project due to the lack of available infrastructure and other limitations described in Sections 2.1.3 and 2.1.4, it is reasonable to assume that truck and rail traffic would increase if the "no action" alternative were implemented. These alternative shipping methods would adversely affect resources as described in Sections 2.1.3 and 2.1.4 and throughout this EA.

It is purely speculative to predict the resulting effects and actions that could be taken by another company or Dakota Access' shippers and any associated direct or indirect environmental impacts in response to the "no action" alternative. However, if this alternative is implemented, it is likely that other methods of transporting crude oil to the marketplace would be implemented and anticipated effects of the "no action" alternative has been carried forward in the environmental analysis of this EA to provide a comparison between it and the impacts of implementing the Preferred Alternative.

## 2.3    The Proposed Action (Preferred Alternative)

### 2.3.1    Location and Detailed Description of the Proposed Action

The DAPL Project originates near Stanley, North Dakota, traversing westerly northwest of Williston then turning south, crossing the Missouri River and traverses southeasterly across the state, exiting through the central portion of the southern border. Dakota Access proposes to construct the pipeline, ranging in size from 12 to 30 inches in diameter, so that the majority of lands crossed would be privately-owned lands. The locations for collecting product into the proposed system were largely fixed based on the location of existing terminals. The first of the six fixed input locations is located at the pipeline's origin near the town of Stanley in Mountrail County. Three other input locations exist near the towns of Ramberg, Epping, and Trenton in Williams County. Two additional collection points are located south of the proposed Missouri River crossing on the flowage easements in McKenzie County near the towns of Waterford City and Johnson's Corner. Connecting the input locations was largely a matter of minimizing length and maximizing the avoidance of sensitive features, developments, public lands, and constructability issues (e.g., steep terrain, potholes, excessive bedrock, etc.), as discussed above in Section 2.1.4 Route Alternatives. Based on the location of the collection points, crossing the Missouri River (Lake Sakakawea) was unavoidable. The selected crossing location of the Proposed Action avoids federally-

13

USACE_DAPL0071237

Environmental Assessment
Dakota Access Pipeline Project
July 2016

owned lands to the extent practical, is at a narrow width of the river upstream of the wider Lake Sakakawea, and minimizes impacts on sensitive resources (e.g., piping plover critical habitat, eagle nests, etc.). The pipeline is 24 inches in diameter where it crosses approximately 14,942 feet (2.83 miles) of the Corps flowage easements at the Missouri River and is 30 inches in diameter where it crosses approximately 1,109 feet (0.21 mile) of the Corps-owned federal lands at Lake Oahe.

Within North Dakota, the proposed Supply pipeline crosses seven tracts of flowage easement retained by the Corps located north of the Missouri River in Williams County (**Figure 2**). The proposed DAPL Project Mainline route travels through land owned and managed by the Corps on both sides of the Lake Oahe crossing at the border between Morton and Emmons counties, approximately 0.55 mile north of the northern boundary of the Standing Rock Sioux Reservation (**Figure 3**).

The following narrative relates to **Figures 1** through **3** in Section 12.0 and is provided to assist the reader in identifying the Project Area under consideration in this analysis. **Purple polygons** indicate real estate interests; either the flowage easements that the Corps has with private landowners upstream of Lake Sakakawea, or the fee title lands that the Corps has on the upper end of Lake Oahe. The **red hyphenated line** shows the DAPL Project centerline as it approaches Federal property at the Lake Oahe crossing and temporary workspace areas. The **straight solid redline** indicates the HDD pipeline that will go beneath Corps managed federal surfaces and is the Project Area being considered as part of the Federal action to issue a real estate easement. The **yellow polygon** indicates workspace where temporary work is proposed to be completed that directly supports the HDD installation of the pipeline underneath the river/reservoir. Temporary activities that would occur in this workspace include: welding together pipe, inspecting and testing the pipeline to ensure no leaks are present prior to preparing to install beneath the river/reservoir at both locations.

Potential impacts have to be evaluated in temporary workspace, as actions completed here are directly connected to the ability for the applicant to complete the proposed project (both the **purple and yellow polygons**). Further, these actions are directly connected to the federal decision to allow an easement for the pipeline to cross federal lands in this area. Notice that the Corps is not analyzing the effects of the **red hyphenated line** (DAPL centerline) at the Lake Oahe crossing as it is outside the EA review area. This is an important difference compared to the flowage easement location where temporary work happens to coincide with the orientation of the flowage easements perpendicular to the Missouri River. Therefore, temporary workspace required for portions of the pipeline installed via conventional (non-HDD) methods on the flowage easements is included in the EA review area.

The flowage easements and Corps owned lands associated with the Proposed Action, and the associated Project impact acreages, expressed as construction workspace, are identified in **Table 2-3** below.

| Table 2-3 Flowage Easements and Federal Land Crossings | | |
|---|---|---|
| **Grant of Easement Document Number** | **County** | **Construction Workspace Within Tract (acres)** |
| **Flowage Easements** | | |
| LL3440E | Williams | 9.4 |
| LL3483E-1 | Williams | 10.8 |

14

USACE_DAPL0071238

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 2-3 Flowage Easements and Federal Land Crossings | | |
|---|---|---|
| Grant of Easement Document Number | County | Construction Workspace Within Tract (acres) |
| **Flowage Easements** | | |
| LL3453E | Williams | 10.7 |
| LL3430E | Williams | 5.0 |
| LL3450E-2 | Williams | 5.2 |
| LL3431E | Williams | 14.7 |
| LL3426E-2 | Williams | 3.4 |
| **Total Acres** | -- | **59.2** |
| **Federally-Owned Lands** | | |
| Federal Land | Morton | 0.4 |
| Federal Land | Emmons | 0.8 |
| **Total Acres** | -- | **1.2** |

The EA review area includes areas within the Corps flowage easements and federal lands that are potentially impacted by construction and/or operation of the DAPL Project.  The EA review area is hereafter referred to as the Project Area(s).  Actions that occur outside of the flowage easements and the federal lands at the Lake Oahe crossing are considered Connected Actions.  Connected Actions are those actions that are "closely related" and "should be discussed" in the same NEPA document (40 CFR § 1508.25 (a)(i)).  Actions are connected if they automatically trigger other actions that may require an EA, cannot or will not proceed unless other actions are taken previously or simultaneously or if the actions are interdependent parts of a larger action and depend upon the large action for their justification (40 CFR § 1508.25 (a)(i, ii, iii)).  Connected Actions are limited to actions that are currently proposed (ripe for decision).  Actions that are not yet proposed are not Connected Actions, but may need to be analyzed in the cumulative effects analysis if they are reasonably foreseeable.  The only Connected Actions at each individual crossing location associated with the Proposed Action are those that relate to the HDD workspace at the Missouri River crossing and the HDD workspace, HDD stringing area, and the permanent easement on private lands in the vicinity of the Lake Oahe crossing.  The two federal permissions are not connected actions because the locations of each crossing are independent of one another and the location of the first does not dictate the location of the second.

Dakota Access initially proposed an isolation valve to be located within the flowage easements (easement LL3453E); however, the Omaha District has assessed the potential for open water and ice jam flooding within the vicinity of the Project Area in the "Reconnaissance Report, Missouri River, Buford-Trenton Irrigation District, North Dakota" and based on the findings the valve would be located within an area that has the potential to be submerged or damaged by ice jam flooding.  Therefore, the valve has been removed from the Project Area.

The Project Area and Connected Actions analyzed within this EA for both crossings are outlined in **Table 2-4**, which identifies land status (private, Federal or Easement) and provides associated acreages.

USACE_DAPL0071239

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 2-4 Environmental Assessment Areas of Interest | | | |
|---|---|---|---|
| **Action/Activity** | **Federal/ Private Land** | **EA Review** | **Acres** |
| **Flowage Easements—Williams County** | | | |
| Construction ROW within Corps flowage easements | Private; Federal Easement | Project Area | 58.0 |
| HDD workspace (exit point) within Corps flowage easement | Private; Federal Easement | Project Area | 1.2 |
| Permanent easement over HDD profile within Corps flowage easement and placement of temporary waterline | Private; Federal Easement | Project Area | 1.2 |
| **Flowage Easements Connected Actions – McKenzie County** | | | |
| HDD workspace (entry point) on private land | Private | Connected Action | 2.0 |
| **Federal Lands and Connected Actions - Morton County** | | | |
| HDD workspace (exit point) on private land | Private | Connected Action | 1.2 |
| HDD stringing area on private land | Private | Connected Action | 13.1 |
| Permanent easement over HDD profile on private land between HDD workspace (exit point) and federal lands | Private | Connected Action | 0.8 |
| Permanent easement over HDD profile on federal lands | Federal | Project Area | 0.4 |
| **Federal Lands and Connected Actions - Emmons County** | | | |
| Permanent easement over HDD profile on federal land | Federal | Project Area | 0.8 |
| Permanent easement over HDD profile on private land between federal land and HDD workspace (entry point) | Private | Connected Action | 0.3 |
| HDD workspace (entry point) on private land | Private | Connected Action | 1.2 |
| **Lake Oahe** | | | |
| Permanent easement over HDD profile across Lake Oahe | N/A | Project Area | 6.3 |

### 2.3.1.1    Flowage Easements

The Missouri River HDD is located just upstream of Lake Sakakawea and downstream of the confluence of the Yellowstone and Missouri rivers.  The proposed crossing of flowage easements near upper Lake Sakakawea (flowage easements) is located in Sections 7, 18, 19, and 30, Township 152 North, Range 103 West, in Williams County, North Dakota (**Figure 2**).  The proposed pipeline is routed parallel to an existing buried natural gas pipeline and associated valve sites, which cross the Missouri River and flowage easements just west of the proposed Dakota Access pipeline.

The HDD exit workspace would be located on a flowage easement tract.  Access to the Project Area on the flowage easements would be via the construction ROW from an existing road (38th Street NW).  No additional temporary access roads would be required.  The Connected Action at the flowage easements includes the HDD entry workspace, located on the south side of the Missouri River on private lands in McKenzie County.  Access to the HDD entry workspace will be via the existing access road located adjacent to the HDD entry workspace.  No additional temporary access roads would be required.

16

Environmental Assessment
Dakota Access Pipeline Project
July 2016

### 2.3.1.2   Federal Lands

The proposed crossing of federally-owned tracts at Lake Oahe (federal lands) is located in Section 10, Township 134 North, Range 79 West in Morton County, North Dakota, and Section 11, Township 134 North, Range 79 West in Emmons County, North Dakota (**Figure 3**).  The proposed pipeline is routed to parallel existing linear infrastructure (an overhead powerline and a buried natural gas pipeline) in this area.  The HDD entry and exit point workspaces and stringing area would be located on private land outside of the federal lands and are considered Connected Actions in this analysis.  HDD design reflects a crossing length of approximately 7,500 feet, of which approximately 5,420 feet occurs beneath the bed of Lake Oahe.

## 2.3.2   Description of Construction Techniques and Construction Mitigation Measures

All facilities associated with the Proposed Action would be designed, constructed, tested, operated, and maintained in accordance with the U.S. DOT regulations in Title 49 CFR Part 195.  Dakota Access is currently developing project-specific plans and would implement best management practices (BMPs) to mitigate for potential construction-related impacts associated with stormwater runoff.  This includes implementation of their Stormwater Pollution Prevention Plan (SWPPP; see **Appendix A**), which includes the Spill Prevention Control and Countermeasure Plan (SPCC Plan) as an appendix.  Additionally, Dakota Access would implement their HDD Construction Plan and HDD Contingency Plan (HDD Construction/Contingency Plan; see **Appendix B**) for inadvertent release of drilling mud during HDD construction work at wetland and waterbody crossings to protect sensitive resources from such releases. The Proposed Action would be constructed via a combination of conventional and specialized construction procedures, as described below.

### 2.3.2.1   Clearing and Grading

Prior to commencement of ground-disturbing activities, a standard survey and stakeout would be conducted to identify ROW and workspace boundaries and to locate existing foreign utility lines within the construction ROW.  Following completion of the surveys, the construction ROW would be cleared of vegetation and debris. Clearing of wetlands is limited to removal of woody debris in the forested wetlands above the HDD profile on the north bank of the Missouri River within the flowage easements.  Stumps would be cut flush with the ground and left in place, as described in Section 3.2.3. Cleared vegetation and debris along the ROW would be disposed of in accordance with federal, state, and local regulations either by burning, chipping and spreading, or transportation to a commercial disposal facility.  Where necessary, to contain disturbed soils during clearing and grading in upland areas, and to minimize potential erosion and sedimentation of wetlands and waterbodies, temporary erosion control devices (ECDs) would be installed prior to initial ground disturbance and maintained throughout construction.  Vegetative buffers would be left where practical at all waterbody crossings to limit the exposure and impact to these features.  Final clearing would take place immediately prior to crossing the feature rather than advance.

### 2.3.2.2   Trenching

Trenching involves excavation of a ditch for pipeline placement and is accomplished through the use of a trenching machine, backhoe, or similar equipment.  Trench spoil would be deposited adjacent to each trench within the construction work areas, with topsoil segregation utilized where necessary based on

17

USACE_DAPL0071241

Environmental Assessment
Dakota Access Pipeline Project
July 2016

land use (see the typical ROW configuration drawings in **Appendix C**). In standard conditions, the trench would be excavated to an appropriate depth to allow for a minimum of 36 inches of cover over the pipe. Ground disturbance associated with conventional pipeline construction is generally limited to approximately 6 to 10 feet below the existing ground surface. Typically the bottom of the trench would be cut at least 12 inches greater than the width of the pipe. The width at the top of the trench would vary to allow the side slopes to adapt to local conditions at the time of construction.

### 2.3.2.3   Pipe Stringing, Bending, and Welding

Following preparation of the trench, the new pipe would be strung and distributed along the ROW parallel to the trench. Depending on available workspace, some pipe may be fabricated off-site and transported to the ROW in differing lengths or configurations. Pipe would be bent by hydraulic bending machines, as necessary, to conform the pipe to the trench. Once in place along the ROW, pipe lengths would be aligned, bends fabricated, and joints welded together on skids (i.e., temporary supports). Welding would be performed in accordance with the American Petroleum Institute Standards, PHMSA pipeline safety regulations, and Company welding specifications. All welds would be coated for corrosion protection and visually and radiographically inspected to ensure there are no defects. Segments of completed pipeline would undergo hydrostatic pressure testing as described in Sections 3.2.1.2 and 3.11.

### 2.3.2.4   Pipeline Installation and Trench Backfilling

Completed sections of pipe would be lifted off the temporary supports by side boom tractors or similar equipment and placed into the trench. Prior to lowering-in, the trench would be visually inspected to ensure that it is free of rock and other debris that could damage the pipe or the coating. Additionally, the pipe and the trench would be inspected to ensure that the configurations are compatible. Tie-in welding and pipeline coating would occur within the trench to join the newly lowered-in section with the previously installed sections of pipe. Following this activity, the trench would be backfilled with the previously excavated material and crowned to approximately 6 inches above its original elevation to compensate for subsequent settling.

### 2.3.2.5   Clean-up and Restoration

Following pipeline installation and backfilling, disturbed areas would be restored and graded to pre-construction contours as closely as practicable. Construction debris and organic refuse unsuitable for distribution over the construction ROW would be disposed of at appropriate facilities in accordance with applicable regulations. Permanent ECDs would be installed as appropriate, and revegetation measures would be applied in accordance with the Environmental Construction Plan (ECP; see **Appendix G**), SWPPP, and requirements of applicable state and federal permits.

### 2.3.2.6   Major Waterbody Crossing Method

As previously discussed, the preferred waterbody crossing technique for the Proposed Action is the HDD method. The HDD method allows for construction across a feature without the excavation of a trench by drilling a hole significantly below conventional pipeline depth and pulling the pipeline through the pre-drilled hole. As described in subsequent sections of this document and in greater detail in the HDD Construction Plan (**Appendix B**), by utilizing the trenchless technology, Dakota Access would minimize

18

USACE_DAPL0071242

Environmental Assessment
Dakota Access Pipeline Project
July 2016

impacts to resources within and adjacent to the waterbodies crossed and reduce the anticipated duration of the crossing.  The HDD equipment would be staged well outside of the riparian area, avoiding impacts on the steep banks, cultural resources, and sensitive habitat immediately adjacent to the waterbody. Cross sections of the Missouri River and Lake Oahe HDDs are provided in **Figure 14** and **Figure 15**.

Depending on the HDD equipment utilized, to help guide the drill bit along the pipeline ROW, electric-grid guide wires may be laid along the predetermined HDD route.  In thickly vegetated areas, a small path may be cut to accommodate laying the electric-grid guide wires.  Once the electric-grid guide wires are installed, the directional drilling rig would drill a small diameter pilot hole along the prescribed profile. Following the completion of the pilot hole, reaming tools would be utilized to enlarge the hole to accommodate the pipeline diameter.  The reaming tools would be attached to the drill string at the exit point and would then be rotated and drawn back to incrementally enlarge the pilot hole.  During this process, drilling fluid consisting of primarily bentonite clay and water would be continuously pumped into the pilot hole to remove cuttings and maintain the integrity of the hole.  When the hole has been sufficiently enlarged, a prefabricated segment of pipe would be attached behind the reaming tool on the exit side of the crossing and pulled back through the drill hole towards the drill rig.

Fluid pressures can build up within the borehole during HDD operations.  In some instances, this can result in hydraulic fracturing of the substrate and subsequent migration of drilling fluids either into the waterway or to the land surface—this is known as a "frac-out."  The depth of the proposed HDD profiles below the beds of the surface waters to be crossed would minimize the potential for frac-outs to occur.  Additionally, precautions would be taken during all phases of the drilling operation.  A high quality drilling fluid would be used to maintain and protect the integrity of the borehole during the entire HDD operation until the final pipe pull is completed.  The HDD Construction Plan (**Appendix B**) includes more details regarding HDD construction technology and methods.  The work would be performed by an experienced drilling contractor, Michels Directional Crossings, a Division of Michels Corporation, that is knowledgeable in effective HDD practices, including maintaining proper drilling rate, drilling fluid composition, pumping rate of the drilling fluid, pull-back rate, and pumping rate on the back ream, and adjusting these as appropriate for the conditions.

The potential for river channel changes associated with water erosion and scour were considered when selecting the major waterbody crossing methods and locations.  Dakota Access has coordinated with the North Dakota Office of the State Engineer as part of the Sovereign Lands Permitting Process to verify adequate depths for the pipe to be buried relative to geomorphological movements for the Lake Oahe and the Missouri River crossings.  Accordingly, the professional engineering firm evaluating HDD depths for the Proposed Action, GeoEngineers, has performed a scour analysis in order to evaluate the scour risk to the proposed pipeline during 100- and 500-year discharge events for the Lake Oahe and the Missouri River crossings.

The proposed HDD profile under Lake Oahe is designed to provide 92 feet of cover below the bottom of the lake.  Because of the depth of the pipe below the waterbody, and the ponded condition of Lake Oahe, this crossing is at a low risk to geomorphologic movements at the proposed crossing.   The North Dakota Office of the State Engineer has issued Sovereign Lands Permit for the Lake Oahe crossing.  A copy of the permit is included in Appendix M.

19

Environmental Assessment
Dakota Access Pipeline Project
July 2016

The Missouri River HDD profile is designed to provide a minimum of 36 feet of cover at the crossing location beneath the lowest point of the Missouri River. This crossing has less proposed cover between the bottom of the waterbody and the top of the buried pipe and it is an active channel. As part of the Sovereign Lands Permitting Process with the Office of the State Engineer, conservative assumptions were utilized in the analysis of the Missouri River HDD design profile as a factor of safety. For example, the proposed crossing is not located at a bend in the channel and is located over 3,000 feet downstream of the nearest upstream channel bend. An analysis of historic photographs of the proposed crossing show that the upstream bend has been stable and in the same location and that the potential downstream migration of this bend is highly unlikely. However, although bend scour is not likely to propagate downstream to the proposed crossing, to be conservative in their evaluation GeoEngineers assumed that the bend could migrate downstream and negatively influence the crossing.

GeoEngineers estimated the maximum bend scour at the proposed pipeline to be 23 to 25 feet for the 100- and 500-year peak flow events, respectively. The bend scour at the crossing location would not be additive for successive storms as long-term degradation is assumed to be zero. Historic aerial imagery and recent Google Earth imagery indicates bar building and deposition of sediments in the Project Area, representing a dynamic sediment environment. This equates to a high likelihood that there is an adequate upstream sediment supply and likely minimal long term degradation at the proposed crossing location. In general terms, if the area over the pipeline was to experience a large scour event from one large storm event (up to 23 feet of scour during the 500-year peak flow event following the conservative assumptions), this area would be filled in/covered after the storm event by deposition of sediments from upstream and potential exposure of the pipeline would be negligible.

In addition to bend scour, there is potential for contraction scour that occurs when channel width varies within a short reach of the river. There is a small contraction upstream of the proposed crossing at the downstream end of the bend approximately 3,000 feet upstream. The DAPL proposed crossing is not located in a contraction, but actually a small expansion and the contraction point is not likely to migrate downstream to the proposed crossing. However, to be conservative in their analysis as an additional factor of safety, GeoEngineers assumed that the contraction scour upstream of the proposed crossing could migrate downstream to the proposed crossing location. Based on this conservative assumption, contraction scour estimates for the 100-year discharge event are approximately 9 feet. This 100-year contraction scour depth is greater than what would occur during the 500-year event as flood waters spreading across the floodplain actually reduce contraction and therefore reduce the contraction scour depth.

Combining the conservative assumptions from above, the maximum estimated total potential scour depth at the proposed Missouri River HDD site would occur during a 100-year flood event. This conservatively assumes "worst case" that both the bend scour and the contraction scour migrate downstream and are both realized directly over the pipeline crossing at the same time. Under this scenario, the bend scour would create a scour of 23 feet and the contraction scour would contribute another 9 feet creating the maximum estimated total potential scour depth of 32 feet below the existing channel elevation during a 100-year flood event. To assess the factor of safety applied using these assumptions, GeoEngineers utilized general scour equations that take into account bend and contraction scour and compared them to the total scour estimated using the Maynord equation for bend scour and Laursen's live-bed contraction scour equation. Utilizing the Blodgett equation, Lacey equation, and Blench equation for

20

Environmental Assessment
Dakota Access Pipeline Project
July 2016

general scour, the estimated general scour at the proposed pipeline crossing ranges between 14 to 23 feet for the 100- and 500-year peak flow events.  This results in a total factor of safety of 1.4 to 2.3 for total scour at the proposed crossing.

Based upon their calculated worst-case scenario scour estimate, GeoEngineers considers the risk of scour occurring down to the level of the proposed pipeline to be low and the proposed Missouri River HDD design profile to be appropriate.  The North Dakota Office of the State Engineer has issued Sovereign Lands Permit for the Missouri River crossing.  A copy of the permit is included in Appendix M.

### 2.3.2.7    Minor Waterbody Crossing Methods

There are no minor waterbodies crossed by the pipeline on Corps Fee Lands.  All minor waterbodies encountered on the flowage easements have been identified as falling under the jurisdiction of the Buford/Trenton Irrigation District (BTID) and, in compliance with their regulations, would be crossed via trenchless pipeline construction methods (bores).  Dakota Access is working through the BTID permitting and approval process separately.  One intermittent waterbody has been identified on the south side of the Missouri River crossing, within the connected action area but outside of the flowage easements, and within the HDD workspace.  Temporary impacts to this waterbody would be mitigated during construction with a customized HDD equipment configuration, including the placement of temporary matting/bridging over the feature as necessary to maintain natural water flow during construction, and installation of appropriate ECDs.  Therefore, impacts on surface waters and adjacent sensitive habitat would be minimized by eliminating open-cut pipeline installations and in-stream work for all crossed waterbodies.

### 2.3.2.8    Wetland Crossings

As discussed in Section 3.2.3 below, the only wetlands that would be crossed by the Proposed Action are located within the permanent easement between HDD workspace and the Missouri River on the flowage easements.  As such, no wetlands would be impacted by construction or operation of the facilities within the Project Area/Connected Actions of the federal lands, and no trenching within wetlands would occur within the Project Area on the flowage easements.  A temporary waterline would be laid aboveground, across the wetlands located between the HDD workspace and the north bank of the Missouri River on flowage easement LL3440E (**Figure 6-B**).  No ground disturbing activity would be required for installation of the temporary waterline.   A more detailed discussion regarding wetlands is provided in Section 3.2.3.

### 2.3.2.9    Operation and Maintenance

Following completion of construction, a 50-foot-wide permanent easement that is generally centered on the pipeline (25 feet on either side of the centerline) would be retained along the pipeline route.  The 50-foot-wide easement would be maintained by the Operator in an herbaceous state (cleared of large diameter woody vegetation) to facilitate inspection of the pipeline, operational maintenance, and compliance with the federal pipeline safety regulations.  This 50-foot-wide maintained corridor would be reduced to a 30-foot-wide corridor centered on the proposed pipeline within the wetland area north of the Missouri River in Corps Flowage Easement LL3440E (**Figure 6-B**).

Maintenance of the permanent ROW would entail periodic vegetation clearing measures, in accordance with PHMSA regulation for pipeline inspection.  This may involve selective tree cutting and periodic

USACE_DAPL0071245

Environmental Assessment
Dakota Access Pipeline Project
July 2016

mowing.  The use of herbicides would not occur on Corps Fee Lands without obtaining prior approval from the Corps.  Vegetation maintenance of the ROW in areas of active cropland is not expected to occur due to agricultural practices.

22

USACE_DAPL0071246

Environmental Assessment
Dakota Access Pipeline Project
July 2016

### 3.0    THE AFFECTED ENVIRONMENT AND POTENTIAL ENVIRONMENTAL IMPACTS OF THE PROPOSED ACTION AND NO ACTION ALTERNATIVE

## 3.1    Geology and Soils

Under the "no action" alternative, Dakota Access would not construct the DAPL Project and no impacts on geology and soils would occur.  However, if the objectives of the DAPL Project are to be met under the "no action" alternative, other projects and activities would be required and these projects would result in their own impacts on geology and soils, which would likely be similar to or greater than the DAPL Project. If the Project is not constructed, less reliable shipping methods such as truck or rail could result in an adverse effect on geology and soils due to increases in transportation accidents and future construction of infrastructure necessary to support these methods (i.e. additional loading/offloading facilities, rail spurs, etc.).

### 3.1.1    Geology

#### 3.1.1.1    Affected Environment

The Corps flowage easements to be crossed extend approximately 2.83 miles north of the Missouri River in Williams County (**Figure 2**).  Conventional open trench construction methods would be used to install the pipeline on approximately 13,553 feet of the 14,953 feet of flowage easements.  The remaining 1,400 feet would be installed via HDD for the adjacent Missouri River crossing.  The easements and Connected Action lie within the Missouri River valley and floodplain on top of the Quaternary Oahe Formation (Clayton, 1980).  The Oahe Formation is comprised of unconsolidated sediments, including clay, sand, silt, and gravel, with some dispersed organic material.  Geotechnical borings placed on both sides of the river, ranging in depth from 75 to 95 feet below ground surface, confirm the presence of unconsolidated sand, gravel, and clay to at least these depths.  At this location, the Oahe Formation unconformably overlies the Paleocene Bullion Creek Formation, which is made up of silt, sand, clay, sandstone, and lignite, and is the uppermost part of a thick sequence of early Tertiary and late Mesozoic sedimentary formations.  Well borehole data from McKenzie County indicates that this sequence occurs in excess of 15,000 feet thick in certain locations (Freers, 1970).  No soil borings were obtained below the Missouri River crossing because the banks of the Missouri River the length of the crossing is sufficiently short (930 feet) to allow for a comprehensive geotechnical analysis without testing directly beneath the river itself.

The flowage easements crossed by the Proposed Action and area crossed by the Connected Action occur within the Great Plains Physiographic Province, which is characterized by a broad expanse of flat land in the central portion of the U.S.  The easements and the Missouri River Project Area lie within an area where physiography is characterized by low-relief alluvial and floodplain deposits and range in elevation from 1,856 to 1,879 feet above mean sea level (MSL).

The bedrock geology of the Lake Oahe crossing area is characterized by Cretaceous sedimentary formations (Clayton, 1980).  The Fox Hills Formation (sandstone and shale) overlies the Pierre Formation (shale), which has been exposed through erosion along the axis of the Lake Oahe reservoir of the Missouri River.  The surficial geology is characterized by alluvium within the valley and dune deposits moving in an eastward direction.  This was corroborated by geotechnical soil borings that were placed on private lands

23

USACE_DAPL0071247

Environmental Assessment
Dakota Access Pipeline Project
July 2016

on both sides of Lake Oahe that indicate the presence of sands and clays to depths ranging from at least 150 to 235 feet below ground surface (**Appendix D**).

The Lake Oahe crossing area also lies within the Great Plains Physiographic Province. On the west side of Lake Oahe, the federal land tracts range in elevation from 1,609 to 1,712 feet above MSL. The HDD exit point workspace ranges from 1,699 to 1,711 feet MSL, and the stringing area ranges from 1,671 to 1,766 feet MSL. On the east side of Lake Oahe, the federal lands range in elevation from 1,613 to 1,664 feet MSL, and the HDD entry point workspace ranges from 1,636 to 1,644 feet MSL.

### 3.1.1.2    Impacts and Mitigation

To protect the terrain of the Project Area and Connected Actions, Dakota Access would, to the extent feasible, restore the areas affected by pipeline construction to pre-construction contours and similar vegetation (excepting trees within approximately 15 feet of the centerline). Pre-construction and as-built surveys would be completed and provided to the Garrison Project.

Construction of the pipeline on the flowage easements and Connected Action at the Missouri River crossing would result in minor impacts on topography and geology, and no unique geologic features that have received state or federal protection would be impacted within the Corps flowage easements or Connected Action.

The impacts attributable to the HDD would not be significant. Vibrations produced during the HDD process are not of a magnitude that would cause any impacts to geologic features or other resources. Any vibrations associated with the drilling process would be limited to the immediate vicinity of the drilling equipment on the surface and downhole. The vibrations produced from the downhole tooling are of a very low magnitude and are attenuated very quickly by the formation such that vibrations are not felt at the surface. A vibration monitoring analysis conducted by GeoEngineers in 2009 found that peak particle velocities were less than 0.07 inches/second within approximately 50 feet of HDD operations. These velocities are well below that which would cause any structural impacts and moreover, the recorded vibrations were, in fact, imperceptible to human senses (GeoEngineers, 2009). Primary impacts of open trench installation within the Corps flowage easements or Connected Action would be limited to construction activities and consist of temporary alteration due to grading and trenching operations.

Construction of the pipeline at the Lake Oahe crossing would not result in adverse impacts on topography or geology on federal lands of the Project Area. Similarly, construction impacts on topography and geology from the Connected Actions would be low to non-existent. No unique geologic features would be impacted by any aspect of the HDD installation.

No impacts on topography or geology would occur during operations.

Based on recently obtained geotechnical analysis, no blasting would be expected to occur in association with pipeline installation on the Project Area or Connected Actions, given that the HDD would be conducted in unconsolidated or loosely indurated sediments, as described in Section 3.1.1.1. Although not anticipated, if blasting is found to be necessary, Dakota Access would follow procedures specified in its Blasting Plan (**Appendix E**).

24

Environmental Assessment
Dakota Access Pipeline Project
July 2016

### 3.1.2    Mineral Resources

#### 3.1.2.1    Affected Environment

Williams and McKenzie counties have numerous mineral resources that include petroleum, lignite, halite, sand and gravel, and scoria.  Scoria, sediments baked from the in situ combustion of lignite (Carlson, 1985), is commonly used to surface roads.  Although lignite occurs throughout Williams and McKenzie Counties, there are no lignite beds in the vicinity of the Corps flowage easement crossings (Murphy, 2006; 2007).  A review of aerial photographic and USGS 1:24K topographic coverage indicates that there are no sand, gravel, or scoria pits within 1.5 miles of the Corps flowage easement crossing areas.

Two oil/gas wells are located within the Corps flowage easements (LL3440E), but neither occur within 150 feet of the proposed HDD workspace.  In addition, no oil/gas wells are located within 150 feet of the Connected Action at the Missouri River (North Dakota Department of Mineral Resources, 2015).  Impacts within 150 feet of the Project was used following the Federal Energy Regulatory Commission (FERC) guidelines for the evaluation of construction impacts to well integrity.  Although the Project is not under the jurisdiction of the FERC, FERC guidance was deemed to be an appropriate distance for this evaluation.

The primary mineral resources of Morton and Emmons counties are sand and gravel aggregates.  The older Cretaceous sediments in the vicinity of the Lake Oahe crossing (i.e., scoria) do not contain economical deposits of fossil fuels.  Although lignite occurs in Morton County, no lignite beds were identified in the vicinity of the Lake Oahe crossing.  A review of aerial photographic and USGS 1:24K topographic coverage indicates that there are no sand, gravel, or scoria pits within 1.5 miles of the Lake Oahe crossing.

Since Morton and Emmons Counties are located outside the areal extent of the Bakken Formation, there is little to no development of oil/gas resources.  This is reflected in the fact that no oil/gas wells were located within 150 feet of the federal lands or HDD workspace and stringing area.  However, the proposed pipeline would be co-located with an existing buried natural gas pipeline and an overhead electric transmission line across the lake.

#### 3.1.2.2    Impacts and Mitigation

As noted previously, mineral resources, including lignite, halite, sand and gravel, and scoria occur within the region around the Corps flowage easements and Connected Action; however, the only commercially exploited mineral resources in the direct vicinity of the route are oil and gas, as evidenced by the two wells found within the Corps flowage easements.  These wells would not be impacted by the Proposed Action due to proposed conventional construction methods and distance from the wells.  No impacts on any mineral resources are expected as a result of the proposed flowage easement crossings or Connected Action.

The Proposed Action does not cross active mining areas nor any oil or gas wells and facilities in the vicinity of Lake Oahe.  No impacts to any mineral resources are expected as a result of the proposed Lake Oahe crossing.

25

USACE_DAPL0071249

Environmental Assessment
Dakota Access Pipeline Project
July 2016

Dakota Access, in accordance with North Dakota One Call, would require that the construction contractor, prior to initiating any ground disturbance activities, identify all underground utilities to minimize the potential for encountering buried utility structures.  Accordingly, the Proposed Action is not expected to have any impact on mineral resources, because there would be no additional surface disturbance required beyond that used for construction.

### 3.1.3   Geologic Hazards

#### 3.1.3.1   Affected Environment

**Earthquakes and Seismic Hazards**

The Project Area, traverses terrain that overall is geologically stable.  The potential seismic hazard was assessed by evaluating the USGS 2014 Seismic Hazard Map.  According to the Seismic Hazard Map, an earthquake that has a 2% chance of being exceeded in a 50-year period would result in peak ground accelerations (PGAs) of 2 to 4 percent gravity (g) in the Project Area and Connected Actions (USGS, 2014a).

Ground movement from an earthquake of this magnitude may cause a light perceived shaking but is not expected to cause any structural damage.  The low seismic hazard of the Project Area is further corroborated by the relatively low number of earthquakes that have historically occurred in North Dakota (North Dakota GIS Hub Data Portal, 2010).

**Landslides**

Landslides refer to the gravity-induced downward and outward movement of slope-forming materials and pose the greatest risk to facilities on or near steep slopes or on soil materials that are susceptible to failure particularly in response to earthquakes or heavy precipitation.  A map developed by the USGS that illustrates the regional potential for the occurrence of landslides was used to evaluate the Project Area for landslide incidence and susceptibility (Radbruch et al., 1982).

Portions of the Project Area within the Corps flowage easements are moderately susceptible to landslides. This includes 59.2 acres (100%) of construction workspace, of which 17.0 acres lies within the 50-foot-wide permanent easement, and 0.55 acre occurs within the 30-foot-wide maintained corridor above the HDD profile within the Corps flowage easement (which would not have surface disturbance aside from selective tree cutting and roots would remain in place).  The HDD entry point on the south side of the Missouri River outside of the flowage easements is considered the Connected Action.  The HDD entry workspace is approximately 2.0 acres and is also moderately susceptible to landslides.

As designed, the Proposed Action does not require any surface impacts to the federally owned lands at Lake Oahe, although , 0.4 acre of the permanent easement through the federal property on the west side of the Lake Oahe (Morton County) is classified as having a high incidence of landslides.  Slopes greater than 25% in the Project Area within federal lands are not found on the east side of Lake Oahe (Emmons County) and comprise less than 0.02 acre on the west side.  Activities related to the HDD crossing outside of the federal lands at the Lake Oahe crossing are considered Connected Actions.  On the west side of Lake Oahe, 1.2 acres of the HDD workspace (exit point) and 13.1 acres of the pipe stringing area are designated as having a high incidence for landslides.  Additionally, the stringing area encompasses

26

USACE_DAPL0071250

Environmental Assessment
Dakota Access Pipeline Project
July 2016

approximately 1.8 acres of land that is classified as highly susceptible to landslides.  Approximately 0.9 acre within the stringing area has slopes exceeding 25%.  Approximately 1.2 acres of the HDD entry point workspace on the east side of Lake Oahe is designated as having a high incidence of landslides, but there are no slopes within either the east or west HDD workspace that exceed 25%.

**Karst and Subsidence**

Geologic terrane beneath the flowage easements as well as the Connected Actions has potential for karst development owing to the presence of evaporite deposits, consisting of gypsum, salt, anhydrite, and/or potash (Weary and Doctor, 2014).  These deposits range in age from Devonian to Jurassic and occur at depths ranging from 900 to 3,700 meters (3,000 to 12,000 feet).  Fresh water must be present for the necessary dissolution to occur for karst development.  However, since fresh water is not likely to be found at these depths, dissolution and karst development are not likely to occur (Ackerman, 1980).  Even if karst conditions were to develop, any physiographic expression at the ground surface would be negligible given the great depth of these formations.

Geologic terrane beneath the federal lands crossings as well as the HDD workspaces at Lake Oahe area may have potential for karst development due to deposits of gypsum and other evaporates (Weary and Doctor, 2014).  However, a review of topographic and aerial photographic coverages as well as geotechnical testing gave no indication of karst feature development, and no documentation was found to indicate that karst features have actually developed in this area.  Furthermore, an existing buried pipeline and overhead electric transmission line also cross in this location, and no information was found indicating those utilities have been impacted by karst.

Land subsidence may be caused by mining, underlying karst features, and extraction of fluids, such as oil or groundwater.  No surface subsidence effects are expected to be incurred in the Project Area since no mines, oil/gas wells, water wells, or karst development have been identified in the Project Area.  Moreover, despite the fact that oil and gas production has occurred for decades in the Williston Basin, no surface subsidence effects have been documented in that area and, therefore, are not expected to impact the Project Areas within or near the margin of the Williston Basin.

### 3.1.3.2   Impacts and Mitigation

Although landslides can represent a significant geologic hazard during construction and operation of the pipeline, the pipeline would be installed via the HDD to significantly reduce ground disturbing activities in areas with steep slopes (greater than 25%), effectively mitigating the risk.

As previously discussed, no ground disturbing activities would occur within the Project Area on the federal lands.  Ground disturbing activities associated with the HDD workspace and pipe stringing area would be required as part of the Connected Action; however, these activities would consist of clearing and grading only and would occur, at the closest distance, 1,040 feet from the bank of Lake Oahe.  As such, no trenching or excavation activities would occur within the Project Area or Connected Action of the federal lands, thereby reducing the potential for erosion and off-site sedimentation which could otherwise occur as a result of side-slope trench excavation methods and accumulation of water within the trench.

27

Environmental Assessment
Dakota Access Pipeline Project
July 2016

To further mitigate impacts during construction, Dakota Access would utilize erosion and sediment control devices in accordance with the ECP and SWPPP, and in compliance with the National Pollutant Discharge Elimination System (NPDES) program, during construction in these areas with slopes greater than 25%. Dakota Access would install sediment barriers (e.g., silt fence) at the base of slopes and along the sides of slopes, as necessary, to prevent potential siltation downslope of the construction area from entering waterbodies.

Temporary ECDs would be maintained until the areas disturbed by construction have been successfully revegetated or are replaced with permanent ECDs. Following the completion of construction activities, disturbed areas would be restored and graded to pre-construction contours as closely as practical. In order to minimize the potential for future slip or landslide events during operation of the Proposed Action, Dakota Access may install permanent ECDs in addition to performing regular restoration and revegetation activities. Permanent ECDs would be installed in accordance with revegetation measures outlined in the ECP, SWPPP, and specific landowner requests. The effectiveness of revegetation and permanent ECDs would be monitored by Dakota Access' operating personnel during the long-term operation and maintenance of the Proposed Action facilities. Therefore, construction and operation of the Proposed Action facilities on the Project Area and Connected Action of the federal lands would not be expected to increase the potential for significant landslide or slip events or result in adverse impacts on aquatic life resources within Lake Oahe.

Dakota Access has completed a geotechnical analysis of the flowage easement and federal land crossing sites to facilitate engineering and design, including selection of appropriate materials and construction methods to limit any environmental impacts attributable to landslides. Results of the geotechnical analysis are included in **Appendix D**.

The strength and ductility of a properly designed pipeline would allow it to span a considerable distance without compromising its integrity in the event of a landslide or other ground movement, such as subsidence. Arc-welded steel pipelines are the most resistant type of piping, vulnerable only to very large and abrupt ground displacement (e.g., earthquakes, severe landslides) and are generally highly resistant to moderate amounts of permanent deformation. This strength and ductility effectively mitigates the effects of fault movement, landslides, and subsidence. Therefore, by implementing the mitigation measures presented here, impacts on the pipeline from geologic hazards are expected to be minimal.

No impacts associated with seismic activity within the Project Area are anticipated. Due to the limited potential for large, seismically induced ground movements, there is minimal risk of earthquake-related impacts on the pipeline. Therefore, no mitigation beyond designing the proposed pipeline to currently accepted industry specifications is necessary.

### 3.1.4    Paleontology

#### 3.1.4.1    Affected Environment

The surficial geology at the Missouri River crossing is dominated by Quaternary glacial drift materials within the floodplain overlying the Bullion Creek and Sentinel Butte Formations. These bedrock formations have been known to contain wide variety of fossils, including fossilized wood and tree stumps,

28

mollusks, leaves, and insects (Hoganson and Campbell, 2002).  Additionally, vertebrate fossils have been found, including turtles, crocodile-like champosaurs, and bear-like titanoides.

The surficial geology at the Lake Oahe crossing is also characterized by Quaternary glacial drift materials; however, it is underlain by the Fox Hills and Pierre Formations.  These formations could contain diverse fossils, including marine reptiles (e.g., mosasaurs, plesiosaurs, sea turtles), fish (e.g., sharks and rays), birds, and invertebrates (Hoganson, 2006).

While there is potential for the bedrock formations underlying the Missouri River and Lake Oahe crossings to contain fossils, all activities, including HDDs, would only penetrate the surficial geology that is dominated by unconsolidated sediments, as evidenced in the geotechnical report provided in **Appendix D**. The potential for encountering fossils in these unconsolidated sediments at the Missouri River and Lake Oahe crossings is low, as fossils are primarily found in sedimentary rock.

### 3.1.4.2    Impacts and Mitigation

Activities associated with pipeline construction that have the potential to impact paleontological resources are clearing, grading, and trenching, as well as site preparation for HDD operations.  The paleontological resources of concern pertaining to construction of the Proposed Action are vertebrate fossils that may be present in the Paleocene bedrock sediments, and to a lesser degree, in Quaternary alluvium since this type of deposit only rarely contains vertebrate fossils.

In the event paleontological resources are discovered during construction, Dakota Access would implement measures outlined in its Unanticipated Discoveries Plan Cultural Resources, Human Remains, Paleontological Resources and Contaminated Media (UDP) (**Appendix F**) to avoid further impacts on these resources.

Invertebrate fossils are considered to be insignificant, and mitigation measures would not be required, should they be encountered.  However, if vertebrate fossils are found during pipeline construction, Dakota Access would immediately cease construction activities and notify appropriate agency personnel, including the North Dakota state paleontologist as well as the Corps archaeologist.  The appropriate authorities would determine the significance of the find and prescribe the mitigation procedures to be completed prior to resuming pipeline construction.

Operation of the pipeline would not disturb paleontological resources.

### 3.1.5    Soils

#### 3.1.5.1    Affected Environment

Dakota Access identified and assessed soil characteristics in the Project Area and Connected Actions using the Soil Survey Geographic Database, which is a digital version of the original county soil surveys developed by the Natural Resources Conservation Service  (NRCS) for use with GIS (NRCS, 2015).  The areas are located within the Rolling Soft Shale Plain of North Dakota, South Dakota, and Montana.  The dominant soil orders in the Rolling Soft Shale Plain are Mollisols and Entisols, which are shallow to very deep, generally somewhat excessively drained and loamy or clayey (NRCS, 2006).

USACE_DAPL0071253

Environmental Assessment
Dakota Access Pipeline Project
July 2016

The flowage easements and Connected Action are within Zone A of the Missouri River floodplain.  Soils within the Project Area are formed out of alluvium deposited by the river over time.  Slopes throughout this Project Area are very flat, ranging from 0-2%.  Approximately 94% of the flowage easement Project Area and Connected Action would be located within either Scorio silty clay or Lohler silty clay (**Table 3-1, Figure 4**).  The Scorio and Lohler silty clay soils are moderately well drained and formed in clayey alluvium.  In the case of the Scorio silty clay, the clay alluvium is deposited over a loam alluvium.  The Scorio and Lohler soils are identified as Hydrologic Soil Group C, which have slow infiltration rates when thoroughly wet and a slow rate of water transmission.  The average depth to the water table across the majority of this Project Area is 4.25 feet.  The soils within the flowage easements experience occasional flooding but are not generally ponded.  Soil boring data is provided in (**Appendix D**).

| Table 3-1 Soil Types Mapped on the Flowage Easements Project Area and Connected Action | | | | | | |
|---|---|---|---|---|---|---|
| **Soil Map Unit** | **Soil Map Unit Name** | **Project Area (acres) [1]** | **Farmland Rating** | **Hydrologic Group [2] (infiltration)** | **Hydric Rating [3]** | **Wind Erodibility Group [4]** |
| E4039A | Mckeen loam, 0-1% slopes, frequently flooded | 0.1 | None | B/D | 96% | 4L |
| E4051A | Trembles fine sandy loam, slightly wet, 0-1% slopes, occasionally flooded | 0.5 | Farmland of Statewide Importance | A | 0% | 3 |
| E4103A | Lohler silty clay, saline, 0-1% slopes, occasionally flooded | 0.9 | None | C | 0% | 4 |
| E4106A | Lohler silty clay, slightly wet, 0-2% slopes, occasionally flooded | 27.8 | Farmland of Statewide Importance | C | 5% | 4 |
| E4159A | Scorio silty clay, slightly wet, 0-2% slopes, occasionally flooded | 29.9 | Farmland of Statewide Importance | C | 0% | 4 |
| E2725F | Arikara-Shambo-Cabba loams, 9-70% slopes | 2.0 | None | B | 0% | 6 |
| EW | Water | 0.3 | None | N/A | N/A | N/A |
| **Total** | | **61.5** | **--** | | | |

[1]  The Project Area includes the construction workspace (58.0 acres) and 30-foot maintenance easement (1.0 acre) located on the flowage easements as well as the Connected Action workspace (2.0 acres).
[2]  Hydrologic Soil Groups are used to estimate runoff from precipitation: A = high infiltration rate, low runoff potential; B = moderate infiltration rate; C = slow infiltration rate; D = very slow infiltration rate, high runoff potential.
[3]  Hydric Rating: Hydric (100%), Hydric (66-99%), Hydric (33-65%), Hydric (1-32%), Not Hydric (0%).
[4]  Wind erodibility group in cultivated areas: Group 1 are the most susceptible to wind erosion, and those assigned to group 8 are the least susceptible. 4L indicates calcareous soils.

30

USACE_DAPL0071254

Environmental Assessment
Dakota Access Pipeline Project
July 2016

The predominant soil type at the federal lands at Lake Oahe is the Flasher-Vebar-Parshall complex.  This complex would comprise 7.5 acres (34%) of the Project Area and Connected Action (**Table 3-2, Figure 5**).  The Flasher-Vebar-Parshall complex contains 36% Flasher or similar soils, 22% Vebar or similar soils, 15% Parshall or similar soils, and 27% minor components.  The Flasher-Vebar-Parshall complex is formed from sandy residuum weathered from sandstone and is steep within the Project Area and Connected Action, with slopes ranging from 9 to 35% (NRCS, 2015).  The Flasher-Vebar-Parshall complex is Hydrologic Soil Group D, which has very slow infiltration (high runoff potential) when thoroughly wet.  The depth to the water table is greater than 6.5 feet.  A majority of the soils within the Project Area and Connected Action are neither frequently flooded nor frequently ponded.

| Table 3-2 Soil Types Mapped on the Federal Lands Project Area and Connected Action | | | | | | |
|---|---|---|---|---|---|---|
| Soil Map Unit | Soil Map Unit Name | Project Area (acres) [1] | Farmland Rating | Hydrologic Group [2] (infiltration) | Hydric Rating [3] | Wind Erodibility Group [4] |
| E0623B | Grail-Belfield clay loams, 2-6% slopes | 2.9 | Farmland of Statewide Importance | C | 0% | 6 |
| E0701F | Dogtooth-Janesburg-Cabba complex, 6-35% slopes | 0.8 | None | D | 3% | 6 |
| E1423F | Flasher-Vebar-Parshall complex, 9-35% slopes | 5.8 | None | D | 0% | 2 |
| E1823A | Parshall fine sandy loam, 0-2% slopes | 0.7 | Farmland of Statewide Importance | A | 0% | 3 |
| E2601C | Amor-Cabba loams, 6-9% slopes | 0.3 | None | C | 0% | 6 |
| E2803B | Amor-Shambo loams, 3-6% slopes | 2.0 | Farmland of Statewide Importance | C | 0% | 6 |
| E3802B | Linton-Mandan silt loams, 2-6% slopes | 2.6 | Farmland of Statewide Importance | B | 0% | 5 |
| E3813A | Grassna silt loam, loess, 1-2% slopes | 1.7 | Prime Farmland | B | 2% | 6 |
| E3813B | Grassna silt loam, loess, 2-6% slopes | 0.5 | Prime Farmland | B | 2% | 6 |
| E4139A | Korchea-Fluvaquents complex, channeled, 0-2% slopes, frequently flooded | 0.4 | None | B | 43% | 4L |
| EW /E49999 | Water | 6.4 | None | N/A | N/A | N/A |
| Total | | 24.1 | -- | | | |

31

USACE_DAPL0071255

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 3-2 | | | | | | |
|---|---|---|---|---|---|---|
| Soil Types Mapped on the Federal Lands Project Area and Connected Action | | | | | | |
| Soil Map Unit | Soil Map Unit Name | Project Area (acres) [1] | Farmland Rating | Hydrologic Group [2] (infiltration) | Hydric Rating [3] | Wind Erodibility Group [4] |

[1]  The Project Area includes Connected Action areas.
[2]  Hydrologic Soil Groups are used to estimate runoff from precipitation: A = high infiltration rate, low runoff potential; B = moderate infiltration rate; C = slow infiltration rate; D = very slow infiltration rate, high runoff potential.
[3]  Hydric Rating: Hydric (100%), Hydric (66-99%), Hydric (33-65%), Hydric (1-32%), Not Hydric (0%).
[4]  Wind erodibility group in cultivated areas: Group 1 are the most susceptible to wind erosion, and those assigned to group 8 are the least susceptible. 4L indicates calcareous soils.

**Prime Farmland**

Prime farmland has the best combination of physical and chemical characteristics for producing food, feed, forage, fiber, and oilseed crops and is available for these uses.  Other soils that do not meet the criteria for prime farmland may be considered farmland of statewide importance.  These soils may produce high yields of crops when managed appropriately (NRCS, 2013).  Climate is the primary limiting factor preventing farmland of statewide importance in North Dakota from being considered prime farmland; therefore, specific management techniques or other soil amendments cannot elevate farmland of statewide importance to a prime farmland designation (Sieler, 2015).

Within the flowage easements and Connected Action, 95% of soils are considered farmland of statewide importance, and none of the soils are considered prime farmland.  Approximately 9.5% of the soils on the federal lands, consisting only of Grassna silt loams, are considered prime farmland.  Additionally, Linton-Mandan silt loam and Armo-Sambo loam, which comprise 25% of the soils on federal lands, are designated as farmland of statewide importance.  The remaining soils do not have a farmland designation.

### 3.1.5.2   Impacts and Mitigation

Pipeline construction activities such as clearing, grading, trench excavation, and backfilling, as well as the movement of construction equipment along the ROW may result in temporary impacts on soil resources.  Clearing removes protective cover and exposes soil to the effects of wind and precipitation, which may increase the potential for soil erosion and movement of sediments into sensitive environmental areas.  Grading and equipment traffic may compact soil, reducing porosity and percolation rates, which could result in increased runoff potential and decreased soil productivity.  Trench excavation and backfilling could lead to a mixing of topsoil and subsoil and may introduce rocks to the soil surface from deeper soil horizons.

Dakota Access would minimize or avoid these impacts on soils by implementing the mitigation measures described in the DAPL Project's SPCC, SWPPP, and ECP as well as requirements of applicable state and federal permits.  These documents would be included as contract documents and enforced as such throughout the DAPL Project.  As a result, impacts on soils as a result of the Proposed Action are expected to be insignificant.

32

USACE_DAPL0071256

Environmental Assessment
Dakota Access Pipeline Project
July 2016

Temporary erosion and sedimentation control measures may include installation of silt fence, straw bales, slope breakers, trench breakers, erosion control fabric, and mulch.

To minimize potential impacts on soil productivity, topsoil would be separated during trench excavation in agricultural land, and if applicable, other areas where soil productivity is an important consideration. Unless otherwise requested by the landowner, topsoil in cropland would be removed to a maximum depth of 12 inches from the trench and spoil storage area and stored separately from the trench spoil.  After the trench is backfilled, topsoil would be returned to its approximate original location in the soil horizon.

Compaction of agricultural soils would be minimized by restricting construction activities during periods of prolonged rainfall.  Where unacceptable levels of compaction occur in agricultural lands, a chisel plow or other deep tillage equipment would be utilized to loosen the soil.

Dakota Access would retain environmental inspectors (EIs) to monitor the contractor's compliance with applicable requirements to protect soil resources during construction of the DAPL Project.  The Garrison Project would be notified if the EIs document non-compliant activities by the contractor(s) on the Project Area or Connected Action Areas.

Soils would be temporarily disturbed within HDD workspaces during construction at the Missouri River and Lake Oahe crossings.  Primary impacts attributable through open trench installation within the Corps flowage easements and Connected Action would be limited to construction activities and consist of temporary alteration of the construction ROW due to grading and trenching operations.  **Tables 3-3** and **3-4** present the soil types that would be impacted by construction and maintenance activities.   By implementing BMPs and recognized construction methods identified in the ECP (**Appendix G**), impacts to soils should be limited.

Additionally, temporary workspace used for staging HDD operations would impact soils, particularly in association with the HDD entry excavation pit (approximately 5 feet to 15 feet across).  The pits would contain the drilling fluid that would be circulated through the borehole during drilling operations and the cuttings that are removed from the borehole.  All drilling mud and cuttings would be disposed at an approved location on non-federal lands, which may include land farming on private property or disposal at a licensed disposal facility.  Drilling fluid pits at the HDD entry and exit workspaces would be backfilled and the area returned as closely as practical to pre-construction conditions.   Dakota Access would implement the erosion control measures described in the SWPPP (**Appendix A**).  The HDD workspace sites would be cleared, graded and matted as needed to avoid rutting and minimize compaction.

There would be no soil disturbance outside of the construction workspace.  Permanent impacts on soils would be avoided through the implementation of BMPs during construction, restoration, and post-construction revegetation management.   A more complete description of BMPs and recognized construction methods can be found in the ECP (**Appendix G**).

There would be no conversion of prime farmland soils to non-agricultural use.

33

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 3-3 Soil Impacts on the Flowage Easements Project Area and Connected Action | | | | |
|---|---|---|---|---|
| Soil Map Unit | Map Unit Name | Project Area Temporary Impacts (acres) | Connected Action Temporary Impacts (acres) | Permanent Impacts (acres) |
| E4039A | McKeen loam, 0-1% slopes, frequently flooded | 0.1 | 0 | 0 |
| E4051A | Trembles fine sandy loam, slightly wet, 0-1% slopes, occasionally flooded | 0.5 | 0 | 0 |
| E4103A | Lohler silty clay, saline, 0-1% slopes, occasionally flooded | 0.9 | 0 | 0 |
| E4106A | Lohler silty clay, slightly wet, 0-2% slopes, occasionally flooded | 27.8 | 0 | 0 |
| E4159A | Scorio silty clay, slightly wet, 0-2% slopes, occasionally flooded | 29.9 | 0 | 0 |
| E2725F | Arikara-Shambo-Cabba loams, 9-70% slopes | 0 | 2.0 | 0 |
| | Total | 59.3 | 2.0 | 0 |

| Table 3-4 Soil Impacts on the Federal Lands Project Area and Connected Action | | | | |
|---|---|---|---|---|
| Soil Map Unit | Map Unit Name | Project Area Temporary Impacts (acres) | Connected Action Temporary Impacts (acres) | Total Impact Acres[1] |
| E0623B | Grail-Belfield clay loams, 2-6% slopes | 0 | 2.9 | 2.9 |
| E0701F | Dogtooth-Janesburg-Cabba complex, 6-35% slopes | 0 | 0.8 | 0.8 |
| E1423F | Flasher-Vebar-Parshall complex, 9-35% slopes | 0.4 | 5.4 | 5.8 |
| E1823A | Parshall fine sandy loam, 0-2% slopes | 0 | 0.7 | 0.7 |
| E2601C | Amor-Cabba loams, 6-9% slopes | 0 | 0.3 | 0.3 |
| E2803B | Amor-Shambo loams, 3-6% slopes | 0 | 2.0 | 2.0 |
| E3802B | Linton-Mandan silt loams, 2-6% slopes | 0 | 2.6 | 2.6 |
| E3813A | Grassna silt loam, loess, 1-2% slopes | 0.7 | 1.0 | 1.7 |
| E3813B | Grassna silt loam, loess, 2-6% slopes | 0 | 0.5 | 0.5 |
| E4139A | Korchea-Fluvaquents complex, channeled,0-2% slopes, frequently flooded | 0 | 0.4 | 0.4 |
| EW | Water | 0.1 | 0 | 0.1 |
| | Total | 1.2 | 16.6 | 17.8 |

[1] All soil impacts on Federal Lands and Connected Action at Lake Oahe are considered to be temporary.

34

USACE_DAPL0071258

Environmental Assessment
Dakota Access Pipeline Project
July 2016

## 3.2    Water Resources

Under the "no action" alternative, Dakota Access would not construct the DAPL Project, and no impacts on water resources would occur.  However, if the objectives of the DAPL Project are to be met under the "no action" alternative, other projects and activities would be required and these projects would result in their own impacts on water resources, which would likely be similar to or greater than the DAPL Project. Less reliable shipping methods such as truck or rail could result in an adverse effect on water resources due to increases in transportation accidents and future construction of infrastructure necessary to support these methods (i.e. additional loading/offloading facilities, rail spurs, etc.).

### 3.2.1    Surface Waters

#### 3.2.1.1    Affected Environment

The Missouri River is a large perennial river and forms the border between Williams and McKenzie counties.  The flowage easements are located on the north side of Lake Sakakawea in the Lake Sakakawea sub-basin (HUC 11010101) within the Upper Missouri River Basin.  All drainage patterns from the flowage easements flow east and south towards and into the Missouri River/Lake Sakakawea ending at the Garrison Dam.  Once released from the dam, water flows south into the Missouri River (NRCS, 2008).

Lake Oahe is a large reservoir formed behind the Oahe Dam on the Missouri River.  Lake Oahe forms the border between Morton and Emmons counties.  The northern boundary of the Standing Rock Sioux Reservation is located in Sioux County, North Dakota approximately 0.55 mile south of the DAPL Project Area.  The Project Area is located in the Upper Lake Oahe Watershed (HUC 10130102) within the Missouri River Basin and adjoins both sides of Lake Oahe at the crossing.

The Oahe Dam/Lake Oahe project is part of the chain of Missouri River main stem lakes authorized in the Flood Control Act of 1944.  The Oahe Dam is located 6 miles north of Pierre, South Dakota and was placed into operation in 1962.  The dam and associated reservoir (Lake Oahe) are congressionally authorized to provide flood control, hydroelectric power, navigation, irrigation, fish and wildlife enhancement, municipal water supply, water quality, and recreational opportunities to the residents of both South Dakota and North Dakota.  At maximum normal operating pool level (1,617 feet MSL), Lake Oahe extends roughly 231 miles from the Oahe Dam in South Dakota to near Bismarck, North Dakota.  At this level, the lake covers approximately 360,000 acres.  At elevation 1,607.5 feet MSL base flood control elevation, the lake has over 2,250 miles of shoreline.

Lake Oahe can be divided into three segments based on the character of the lake.  The Project Area is located within the northern segment.  The northern segment extends north from the North Dakota/South Dakota state line to the upstream Oahe Dam/Lake Oahe project boundary near Bismarck, North Dakota. This segment is more river-like in appearance and is characterized by both submerged and emergent snags, sandbars, many shallow areas, and a definite current (USACE, 2010a).

Dakota Access conducted field and desktop delineations of the Project Area/Connected Action on the flowage easements and the Project Area/Connected Action of the federal lands.  Field surveys took place upon permission to access the properties in order to verify desktop delineations and ensure that the most accurate, up-to-date data is used for Section 404 of the CWA and/or Section 10 of the RHA permit filings.

35

There are four waterbodies (one perennial stream and three ephemeral ditches) within the Project Area on the flowage easements and one intermittent waterbody within the Connected Action **(Figure 6)**. The Project Area and Connected Action of the federal lands encompass two waterbodies (one lake [Lake Oahe] and one ephemeral stream) **(Figure 7)**. Waterbody ID, type, surface water classification, and approximate milepost (MP) are summarized in **Table 3-5** and **Table 3-6**.

### 3.2.1.2    Impacts and Mitigation

Direct and indirect impacts on Lake Oahe and the Missouri River would be minimized by using HDD construction methods to install the proposed pipeline underneath the Missouri River and Lake Oahe. At the Missouri River crossing, a 24-inch pipeline would be installed at least 36 feet below the bottom of the Missouri River. At Lake Oahe, a 30-inch pipeline would be installed approximately 140 to 210 feet below the ground surface of federal lands and approximately 92 feet below the bottom of Lake Oahe (**Appendix H**). Additional documentation elaborating on the rationale used to determine suitable HDD depth is provided in Appendix D. Appendix M includes the Sovereign Lands Permits issued by the North Dakota Office of the State Engineer.

The primary impact that could occur as a result of an HDD is an inadvertent release of drilling fluid directly or indirectly into the waterbody. Drilling fluid (also referred to as drilling mud) is primarily comprised of water. However, bentonite clay is added to the water to enhance lubricating, spoil transport and caking properties of the drilling fluid. Bentonite is a naturally occurring, non-toxic, inert substance that meets National Science Foundation (NSF)/American National Standards Institute (ANSI) Standard 60 Drinking Water Additives Standards and is frequently used for drilling potable water wells. The potential exists for drilling fluid to leak through previously unidentified fractures in the material underlying the river bed. Potential release sources of the drilling fluid include the drilling fluid entry/exit pit(s) and the directional borehole itself, which is maintained under pressure to keep it open. The probability of an inadvertent release is greatest when the drill bit is working near the surface (i.e., near the entry and exit points). To alleviate this concern, the HDD Contractor plans to install steel surface casing at both the entry and exit locations of the Lake Oahe crossing. Because the HDD entry and exit points would be set back from the banks of the Missouri River (approximately 1,400 feet north and 300 feet south) and Lake Oahe (approximately 900 feet east and 1,100 feet west) the potential for an inadvertent release to occur in the water would be minimized. Additionally, geotechnical investigations conducted by Dakota Access indicated that the drill path is not located in materials where there is a high probability of an inadvertent release of drilling fluids that would reach ground surface or enter Lake Oahe. Therefore, the potential for inadvertently released drilling fluids to enter any waterbody from below or from the shoreline is low. No downstream impacts to Sovereign Nations from inadvertent release of drilling fluid are anticipated.

The drilling mud and cuttings would be disposed of in accordance with applicable laws and regulations, likely in an existing landfill or by land farming. Final disposition would be negotiated with the facility or private landowner prior to disposal. Dakota Access would conduct all HDD work according to the HDD Construction Plan (**Appendix B**), and would implement the HDD Contingency Plan (**Appendix B**) in the event of an inadvertent release. The HDD Construction Plan establishes a 24-hour a day monitoring program for monitoring and detection of inadvertent releases, including monitoring for loss of drilling fluids. The HDD Contingency Plan describes monitoring and mitigation procedures for any inadvertent release of drilling mud into the waterbody or areas adjacent to the waterbody and includes procedures to contain and clean up inadvertent releases.

USACE_DAPL0071260

Environmental Assessment
Dakota Access Pipeline Project
July 2016

Dakota Access plans to hydrostatically test the HDD pipeline segments prior to installation at the Lake Oahe and Missouri River crossings.  Hydrostatic testing involves filling the new pipeline segments with water acquired in accordance with applicable permits, raising the internal pressure level, and holding that pressure for a specific period of time per U.S. DOT requirements.

Dakota Access is requesting permission to withdraw water from the Missouri River that would be required for installation of the HDD and hydrostatic testing of the pipeline at the Missouri River crossing. Approximately 470,000 gallons of water would be required for activities associated with the installation of HDD and the hydrostatic testing of HDD pipeline segment.  Dakota Access intends to submit an application to the North Dakota State Water Commission, Water Appropriations Department for a Temporary Water Permit.  The exact number and size of the withdrawal pumps would be determined as a result of the limits imposed by the Temporary Water Permit.  The withdrawal activity would comply with all applicable permit conditions and regulations, including the specifications on permitted intake structures outlined in the Corps' Regional Conditions for North Dakota applicable to NWP 12 (Utility Line Activities) (Corps, 2012).  This regional condition requires that the applicant 1) utilize an intake screen with a maximum mesh opening of ¼-inch; 2) wire, Johnson-like screens must have a maximum distance between wires of 1/8-inch; 3) water velocity at the intake screen shall not exceed ½-foot per second; 4) intake structure shall be floating; and 5) at the beginning of pumping, the intake shall be placed over water with a minimum depth of 20 feet.

The Acquisition point would coincide with the proposed pipeline crossing of the Missouri River.  An 8"x 8" Power Associates 2500 Single Stage Pump would be set on a barge or float anchored just offshore at the proposed permanent easement.  The barge/float would be approximately 12 feet wide by 14 feet long and fitted with a secondary containment structure (an Eagle 4Drum Flexible Containment SpillNest-T8103 or similar).  The pump, capable of withdrawing 2,400 gallons per minute withdrawal and 120 feet of head pressure, would be placed within the secondary containment on the barge/float.

The pump's flexible intake hose would be 8 inches in diameter and connect the screened intake to the pump.  The screened intake (approximately the size of a 55 gallon drum) would be suspended by floats (approximately the size of a tire) within the water column and would be screened to prevent impingement entrainment of foreign objects and aquatic life.  A hard 8-inch diameter take-way pipe extending from the pump would push the water to the top of bank then to the HDD equipment or pipeline section.  This temporary waterline would be laid by hand on top of the ground surface within the permanent ROW, and thus would not require any ground disturbance or trench excavation.  The waterline, barge, pump, and associated equipment would be removed following completion of construction activities.  A depiction of the layout of the barge, pump, and waterline is provided in **Figure 6-B**.

Water needed for HDD construction and hydrostatic testing at the Lake Oahe Crossing in Emmons and Morton counties, North Dakota would not be obtained from Lake Oahe.  Required water would instead be obtained from an alternate surface water, groundwater, or commercial source and transported to the Project Area via water trucks.  Water trucks would not be required to cross Corps Fee Lands.  Prior to construction, Dakota Access would identify a water source for construction activities at the Lake Oahe crossing in accordance with all applicable permits and regulations.

Water discharges associated with hydrostatic testing on Corps flowage easements would be conducted in accordance with applicable permits.  Hydrostatic test water discharges would not occur on Corps fee

37

USACE_DAPL0071261

Environmental Assessment
Dakota Access Pipeline Project
July 2016

property.  Dakota Access would conduct trench dewatering and hydrostatic test discharges in a manner consistent with the North Dakota Pollutant Discharge Elimination System (NDPDES) General Permit NDG-070000.  Discharged hydrostatic test water would not contain additives unless written approval is received from Dakota Access and applicable permits authorize such additives.   EIs would monitor permit compliance.  Where appropriate, water would be discharged into an energy dissipation and/or filtering device, as described in Dakota Access' SWPPP (**Appendix A**) to remove sediment and to reduce the erosive energy of the discharge.

Of the five waterbodies located within the flowage easements Project Area and Connected Action, one ephemeral ditch (d-k8-wi-011) is located within the portion of the Project Area that would be crossed via the Missouri River HDD; therefore, no trenching would occur within this feature.  However, a temporary waterline would be installed across this feature to transport surface water from the Missouri River to the HDD equipment.  The temporary waterline would be laid on top of the ground surface, and no grading or ground disturbance in the vicinity of the waterbody crossed by the waterline would be required.  The hard pipe segments would be hand-carried down the slope and assembled by hand.  No tracked or wheeled equipment would be necessary for construction or removal of the temporary aboveground waterline.  Four waterbodies would be temporarily impacted by pipeline construction.   However, impacts on waterbodies would be minimized by conducting pipeline construction activities in accordance with applicable regulatory requirements and implementing trenchless waterbody construction procedures, as described in sections 2.3.2.6 and 2.3.2.7 and the ECP.

No waterbody would be permanently drained or filled as part of the DAPL Project, and effects on waterbodies are expected to be short-term and minor.  Dakota Access would restore the area as close to its previous state and naturally functioning condition as practicable.  Additionally, Dakota Access would take measures described in Dakota Access' SPCC, SWPPP (Appendix A), and ECP (Appendix G) to minimize the potential for surface water contamination from an inadvertent spill of fuel or hazardous liquids during refueling or maintenance of construction equipment or during operation of aboveground facilities.  Fuel and all other hazardous materials would be stored in accordance with the requirements of Dakota Access' SPCC, SWPPP, and ECP.  These documents also describe response, containment, and cleanup measures.

Drinking water intakes located downstream from the Missouri River and Lake Oahe crossings could be at risk if there was a release that reached these bodies of water in the vicinity of the intake structures.  The Standing Rock Sioux Reservation is located south of the Lake Oahe Project Area and the majority of reservation residents depend on wells for water supply (Standing Rock Sioux Tribe, 2016).  However, the Standing Rock Sioux also have intake structures within the river downstream of the Lake Oahe Project Area.

In order to maintain the integrity of the pipeline, prevent Project losses, and protect the general public and the environment, the operator will inspect, exercise, and deploy Company-owned protective and response equipment in accordance with the National Preparedness for Response Exercise Program (PREP) guidelines.  However, in the unlikely event of a pipeline leak, response measures to protect the users of downstream intakes will be implemented to minimize risks to water supplies.  Dakota Access would be responsible party for implementing the response actions in accordance with Geographical Response Plan (GRP) and the Facility Response Plan (FRP).  The potential for a spill to compromise a potable water supply intake would be continually evaluated as part of the response action.  Alternative sources would be included as part of the contingency planning.  Shutting down certain intakes and utilizing others or

38

USACE_DAPL0071262

different drinking water sources or bottled water will be evaluated as part of this process.  The Federal On-Scene Incident Commander (USEPA) would be responsible for assimilating and approving the response actions under the Unified Command.  Dakota Access maintains financial responsibility for the duration of the response actions.  The Dakota Access has prepared a FRP that includes measures such as notifications to surrounding communities, affected governments, and utilities in the event of an inadvertent pipeline release.

The FRP complies with the applicable requirements of the Oil Pollution Act of 1990 (OPA 90), and has been prepared in accordance with the National Oil and Hazardous Substances Pollution Contingency Plan (NCP) and the Mid-Missouri Sub-Area Contingency Plan (SACP).  Specifically, this Plan is intended to satisfy the applicable requirements of:

- Pipeline and Hazardous Materials Safety Administration, U.S. Department of Transportation requirements for an OPA 90 plan (49 CFR 194)
- South Dakota Environmental Protection Oil Pipeline Plan Requirements (34A-18).
- American Petroleum Industry (API) RP 1174 - Recommended Practice for Pipeline Emergency Preparedness and Response.
- North Dakota Administrative Code 69-09-03-02

The operator has contractually secured personnel and equipment necessary to respond, to the maximum extent practicable, to a worst case discharge or a substantial threat of such discharge.  The operator requires an annual certification from each Oil Spill Response Organization (OSRO) to assure compliance with the National PREP guidelines.  Each listed OSRO has its own response equipment, including containment booms, absorbents, boats, and vacuum trucks.

Sub-freezing temperatures during the winter months could cause ice to form on the surface of Lake Oahe and the Missouri River.  This layer of ice could impede the deployment of traditional containment booms.  However, the ice itself often serves as a natural barrier to the spread of oil (Dickens 2011).  Pockets of oil naturally contained by the ice can be drilled to and removed using vacuum trucks.  Dakota Access's contracted professional emergency responders are prepared to respond under winter conditions so that response procedures can be carried out in accordance PHMSA operational regulations.  Therefore, a release during winter conditions is anticipated to have lesser impacts to water resources, particularly with respect to area of extent, as compared to a release during the warmer months.

A copy of the Draft FRP for the Dakota Access Pipeline North Response Zone is included in Appendix L. Dakota Access anticipates submitting this plan to PHMSA for review and approval in the third quarter of 2016 and will provide a copy of the updated draft to the Corps concurrent with the submittal to PHMSA.  The FRP would be in place prior to operating the DAPL Project in accordance with PHMSA and federal regulations.

USACE_DAPL0071263

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| colspan="8" | **Table 3-5**<br>**Waterbodies within the Flowage Easements Project Area and Connected Action** |
| **MP** | **Waterbody ID** | **Waterbody Type** | **Flow Type** | **Delineation Source** | **Class of Aquatic Resource** | **ND Surface Water Classification** | **Area of Impact** |
| 92.7 | d-k8-wi-013 | Ditch | Ephemeral | Field | §404 | III | Construction and Permanent ROW |
| 92.77 | s-k8-wi-002 | Stream | Perennial | Field | §404 | III | Construction and Permanent ROW |
| 93.23 | d-k8-wi-007 | Ditch | Ephemeral | Field | §404 | III | Construction and Permanent ROW |
| 94.64 | d-k8-wi-011 | Ditch | Ephemeral | Field | §404 | III | Permanent ROW over HDD Profile (Temporary Waterline) |
| 94.9 | s-m10-wi-001/s-k2-mk-001 | Stream | Perennial | Field | §10 | I | Construction and Permanent ROW |
| 95.1 | s-k2-mk-002 | Stream | Intermittent | Field | §404 | III | Construction and Permanent ROW |

Surface water classifications from North Dakota Administrative Code 33-16-02.1-09:

Class I Streams: quality of the waters in this class shall be suitable for the propagation or protection, or both, of resident fish species and other aquatic biota and for swimming, boating, and other water recreation. The quality of the waters shall be suitable for irrigation, stock watering, and wildlife without injurious effects. After treatment consisting of coagulation, settling, filtration, and chlorination, or equivalent treatment processes, the water quality shall meet the bacteriological, physical, and chemical requirements of the department for municipal or domestic use.

Class III Streams: The quality of the waters in this class shall be suitable for agricultural and industrial uses. Streams in this class generally have low average flows with prolonged periods of no flow. During periods of no flow, they are of limited value for recreation and fish and aquatic biota. The quality of these waters must be maintained to protect secondary contact recreation uses (e.g. wading), fish and aquatic biota, and wildlife uses.

The only surface waterbody identified on the federal lands Project Area is Lake Oahe (s-kc4-em-001/s-kc4-mo-002), which would be avoided via HDD. The pipe stringing corridor (Connected Action) at Lake Oahe crosses two drainageways that are indicated on the National Hydrography Dataset. Field delineations carried out by Dakota Access identified one ephemeral stream (s-kc-4-mo-004) associated with these two drainageways that intersect the pipe stringing corridor of the Connected Action. Impacts on the delineated waterbody would be entirely within the pipe stringing additional temporary workspace (ATWS) and are expected to be avoided by bridging the waterways for equipment and vehicle traffic during pipe stringing, fabrication and pullback. No trenching would occur within the pipe stringing ATWS. While limited grading may be necessary within the pipe stringing ATWS, no grading would be expected to occur within the waterbody itself. Vegetation may be mowed/brush-hogged, however, no root masses are anticipated to be removed. Revegetation of these areas would be in accordance with the North

USACE_DAPL0071264

Environmental Assessment
Dakota Access Pipeline Project
July 2016

Dakota tree and shrub regulations and would not be impacted during operation of the Proposed Action. No trees are expected to be cleared on Corps fee-owned lands.

| MP | Waterbody ID | Waterbody Type | Flow Type | Delineation Source | Class of Aquatic Resource | ND Surface Water Classification | Area of Impact |
|---|---|---|---|---|---|---|---|
| 166.3 | s-kc4-em-001 / s-kc4-mo-002 | Lake (Lake Oahe) | N/A | Field | §10 | I | Project Area – Permanent ROW over HDD Profile |
| 166 | s-kc4-mo-004 | Stream | Ephemeral | Field | §404 | III | Connected Action – HDD Stringing Area |

**Table 3-6**
**Waterbodies within the Federal Lands Project Area and Connected Action**

Surface water classifications from North Dakota Administrative Code 33-16-02.1-09:

Class I Streams:  quality of the waters in this class shall be suitable for the propagation or protection, or both, of resident fish species and other aquatic biota and for swimming, boating, and other water recreation.  The quality of the waters shall be suitable for irrigation, stock watering, and wildlife without injurious effects.  After treatment consisting of coagulation, settling, filtration, and chlorination, or equivalent treatment processes, the water quality shall meet the bacteriological, physical, and chemical requirements of the department for municipal or domestic use.

Class III Streams:  The quality of the waters in this class shall be suitable for agricultural and industrial uses.  Streams in this class generally have low average flows with prolonged periods of no flow.  During periods of no flow, they are of limited value for recreation and fish and aquatic biota.  The quality of these waters must be maintained to protect secondary contact recreation uses (e.g. wading), fish and aquatic biota, and wildlife uses.

Environmental Inspectors would monitor compliance with applicable waterbody protection requirements during construction of the facilities.  The ECP (**Appendix G**) and SWPPP (**Appendix A**) describe additional mitigation measures and contain illustrations of how sediment control devices are typically installed at waterbody crossings.  Additionally, Dakota Access would maintain a vegetative buffer until the actual crossing of the waterbody takes place.  Temporary sediment control measures, such as silt fence installed at each crossing, would minimize the introduction of sediment into waterbodies during construction and minimize the movement of spoil and sediment from surface runoff during and after construction.  Permanent erosion control measures, such as vegetation and installation of slope breakers, would effectively stabilize riparian zones.  Dakota Access would stabilize stream banks disturbed during construction using methods as directed by applicable state and/or federal permits.  Trenching and dewatering activities used in construction of the proposed pipeline could temporarily alter surface drainage patterns.  However, these impacts are expected to be localized and temporary, since the contours and vegetation would be returned as closely as practical to pre-construction conditions.  Dewatering activities would be conducted in accordance with applicable permits and Dakota Access' SWPPP and ECP.

All construction equipment utilized on or in waters of the state would be subject to inspection by the Department in accordance with the North Dakota Administrative Code (Title 30, Article 3, Chapter 6-01).  Further, Dakota Access would implement required measures including the removal of all aquatic

41

USACE_DAPL0071265

vegetation from vessels, motors, trailers, or construction equipment.  All water would be drained from bilges or confined spaces.  All Aquatic Nuisance Species will be removed from equipment in accordance with the North Dakota Administrative Code (Title 30, Article 3, Chapter 6).  The contractor or his agents or subcontractors must provide the North Dakota Game and Fish Department a reasonable opportunity to inspect any and all vehicles, vessels, pumps and equipment that will be used in the project in or on the waters of the state prior to those items being launched or placed in the waters of the state.

**Water Intake Mitigation Measures**

In the unlikely event of a release during pipeline operations, drinking and irrigation water intakes located downstream from the Missouri River and Lake Oahe crossings could be at risk if hydrocarbons were to reach these bodies of water in the vicinity of the intake structures.  In order to minimize the risk of a pipeline leak and protect the users of downstream intakes, Dakota Access will implement the design and operation measures summarized below as well as all other measures described throughout this EA and in the FRP.

- Pipe specifications that meet or exceed applicable regulations, with a quality assurance program for pipe manufacturers
- Use of the highest quality external pipe coatings (fusion bond epoxy or FBE) to reduce the risk of corrosion, and stress corrosion cracking.
- Active Cathodic Protection applied to the pipeline and facilities
- Four feet of soil cover will be provided over the buried pipeline on either side of the HDD crossings.  The proposed HDD profiles under the Missouri River and Lake Oahe are designed to provide a minimum of 36 feet and 92 feet of cover below the water bodies, respectively.   .
- Pipeline system inspection and testing programs will be implemented prior to operation to ensure the pipeline is built in accordance with the standards and specifications.
- Non-destructive testing of 100 percent of girth welds
- Hydrostatic testing of the pipeline to 125% percent of the Maximum Operating Pressure (MOP).
- A continuous SCADA pipeline monitoring that remotely measures changes in pressure and volume on a continual basis at all valve and pump stations, is immediately analyzed to determine potential product releases anywhere on the pipeline system.
  - Pipeline variables are the parameters pertaining to SCADA systems, instrumentation, fluid properties, physical attributes of pipelines, pressure, temperature, and flowrate
  - Includes pressure transmitters to monitor flowing pressure in real-time and alarm in the event of adverse pressure changes due to potential leaks / releases
  - Includes custody transfer quality meters to monitor pipeline Receipts / Deliveries in real-time and alarm in the event of flowrate discrepancies due to potential leaks / releases
- Leak Detection System - LeakWarn - A Computational Pipeline Monitoring System (CPM) to monitor the pipeline for leaks via computational algorithms performed on a continual basis.
  - Includes separate ultrasonic meters at each pump station to continuously verify and compare flowrates along the pipeline in real-time as part of a leak detection system.
  - This measurement data is immediately analyzed to determine potential product releases anywhere on the pipeline system.
  - The mathematical algorithms are based on physics and abide by the conservation principles of mass, momentum and energy.

42

USACE_DAPL0071266

Environmental Assessment
Dakota Access Pipeline Project
July 2016

- Periodic pipeline integrity inspection programs using internal inspection tools to detect pipeline diameter anomalies indicating excavation damage, and loss of wall thickness from corrosion.
- Periodic above-ground Close Interval Surveys (CIS) conducted along the pipeline.
- Aerial surveillance inspections will be conducted 26 times per year (not to exceed 3 weeks apart) to detect leaks and spills as early as possible, and to identify potential third-party activities that could damage the pipeline.
- Mainline valves are installed along the pipeline route to reduce or avoid spill effects to PHMSA-defined HCAs.
- Periodic landowner outreach and the implementation of a Public Awareness program
- Participation in "One-Call" and "Before You Dig" notification systems.


Immediately upon discovery of a release of oil that could impact the Missouri River or Lake Oahe, Dakota Access will initiate emergency response efforts, including containment and recovery.

Site-specific GRPs have been developed for the Missouri River and Lake Oahe crossings. These security sensitive documents, submitted to the USACE as Privileged and Confidential, identify site-specific resources and response measures for an immediate, safe, and effective response to a release of crude oil from the Dakota Access Pipeline with the potential to impact the Missouri River near these two crossings. Response measures include, but are not limited to, the deployment of containment or diversionary booms at predetermined locations and oil collection/recovery activities to prevent further migration of crude oil.

Emergency response notifications will be made to Federal, State, and Local agencies and tribal officials as outlined in the FRP. Dakota Access and its contractors will work with Federal, State, local and Tribal officials to protect downstream water intakes. To minimize potential impacts to intakes, protection and mitigation measures will be implemented in cooperation with intake operators.

Dakota Access will identify an all-weather access and collection point downstream of both the Missouri River crossing and Lake Oahe crossing. At each location, Dakota Access will provide an equipment storage facility that includes a permanent storage area for winter and open water spill response equipment. Dakota Access would coordinate with the USACE and any other applicable stakeholders to obtain all necessary permits and approvals prior to construction for any ground disturbing activities associated with these facilities.

Dakota Access will conduct emergency response drills/exercises at both the Missouri River crossing near Williston and the crossing at Lake Oahe. These exercises will include both open water and ice response activities. Regulatory and stakeholder participation will be encouraged and solicited for the exercises. Section 3.2.2.2 Impacts and Mitigation Remediation, Section 3.11 Reliability and Safety and the FRP (Appendix L) contain more detail regarding spill prevention, detection and response measures. The emergency response drills/exercises are further discussed in Section 3.11.

43

USACE_DAPL0071267

Environmental Assessment
Dakota Access Pipeline Project
July 2016

### 3.2.2    Groundwater

#### 3.2.2.1    Affected Environment

Groundwater occurs within the Project Area of the Corps flowage easements and federal lands in both glacial drift and bedrock aquifers.  Although bedrock aquifers tend to have a greater distribution and be more continuous than Quaternary aquifers, Quaternary aquifers typically provide higher yields to wells.

Groundwater in the bedrock aquifers flows towards the Missouri River and Lake Oahe, a regional groundwater discharge zone.  The water table within phreatic aquifers, which may include both Quaternary and bedrock formations, is typically a subdued replica of the surface topography.  Although groundwater flow directions may vary widely particularly within localized flow regimes, overall regional flow of groundwater in the phreatic aquifer would be to the Missouri River and Lake Oahe.

The most economically important aquifers in the vicinity of the Corps flowage easements are the Cretaceous Dakota Group, the Tertiary Fort Union Group (which includes the Sentinel Butte and Bullion/Tongue River Formations), and glacial drift aquifers of the Quaternary Period (Armstrong, 1969). The glacial drift aquifers are relatively thin at the Project Area, except where they occur in buried or present-day bedrock valleys.  In the absence of Quaternary aquifers, members of the Paleocene Fort Union Group commonly serve as the shallowest aquifer.  Individual aquifer members of the Fort Union Group include, in descending order, the Sentinel Butte, Tongue River, Cannonball, and Ludlow Formations (Croft, 1985).  Other bedrock aquifers of economic importance in the flowage easement region are the late Cretaceous Hell's Creek and Fox Hills Aquifer system and the Cretaceous Dakota Group.

Three domestic wells and six observation wells (one of which has been destroyed) are located on the flowage easements, but occur outside of the Project Area.  The closest well to the proposed pipeline centerline is a domestic well located approximately 430 feet from the centerline.  The flowage easements or Connected Action do not overlie any source water protection areas.

The most economically important aquifers in Morton and Emmons counties, where the federal lands along Lake Oahe are located, include aquifers within the Cretaceous Fox Hills and Hell Creek Formations; the Tertiary Fort Union Group, which includes the Cannonball and Ludlow Formations, Tongue River Formation, and Sentinel Butte Formation (northwest part of the county only); and alluvial and glacial drift aquifers of the Quaternary Period (Ackerman, 1980; Armstrong, 1978).  The Pierre Formation is considered the base of the active near-surface aquifers, because it is thick and relatively impervious.

No water wells are located within 150 feet of the federal lands or Connected Actions at the Lake Oahe crossing.  Impacts within 150 feet of the Project was used following the Federal Energy Regulatory Commission (FERC) guidelines for the evaluation of construction impacts to water wells and springs. Although the Project is not under the jurisdiction of the FERC, FERC guidance was deemed to be an appropriate distance for this evaluation.  Additionally, none of the Project Area or Connected Action overlie any source water protection areas.

44

USACE_DAPL0071268

Environmental Assessment
Dakota Access Pipeline Project
July 2016

### 3.2.2.2    Impacts and Mitigation

Ground disturbance associated with conventional pipeline construction is generally limited to approximately 6 to 10 feet below the existing ground surface.  Where excavation penetrates the water table, potential groundwater impacts from pipeline construction are primarily limited to the radius of influence around the excavation profile.

Construction activities, such as trenching, dewatering, and backfilling that encounter shallow aquifers would cause minor direct and indirect impacts via fluctuations in groundwater levels and/or increased turbidity within the aquifer adjacent to the activity due to dewatering activities.  Dewatering would consist of a single or series of submersible pumps that would be lowered into the pipe trench to review excess water to facilitate pipe installation.   In cases of greater water infiltration, well pointing (a series of dewatering points along the outside of the trench connected in series to a pump to enable effective dewatering of the trench) may be used.  These impacts are temporary (only while the trench is open) and highly localized as the infiltration of the dewatered groundwater is in the immediate vicinity of the dewatering activity.

Construction and dewatering activities are not expected to have a significant direct or indirect effect on regional groundwater flow patterns.  Shallow aquifers would quickly reestablish equilibrium if disturbed, and turbidity levels would rapidly subside.  Consequently, the effects of construction would be minor and short-term.  Impacts on deeper aquifers are not anticipated.

The introduction of contaminants to groundwater due to accidental spills of construction-related chemicals, fuels, or hydraulic fluid could have an adverse effect on groundwater quality.  Spill-related impacts from construction activities are typically associated with improper fuel storage, equipment refueling, and equipment maintenance.  Dakota Access' SPCC Plan outlines measures that would be implemented to avoid, minimize, prevent, and respond to releases of fuels and other hazardous substances during construction and includes measures for cleanup, documentation, and reporting of spills (**Appendix A**).  Project-specific SPCCs would be developed by the selected contractor and implemented throughout construction.  By implementing the protective measures set forth in these plans, groundwater contamination due to construction activities is not anticipated.  The draft SPCC is included as Appendix B of **Appendix A** (SWPPP); the project-specific plan to be developed by the Contractor would meet or exceed all conditions presented in the draft plan.

Accidental releases from the pipeline system during operations could potentially affect groundwater. Although most components of crude oil are relatively insoluble (Neff and Anderson, 1981), crude oil released into soil can migrate toward water where certain constituents can dissolve into groundwater or surface water in limited amounts.  As a liquid, the product would travel along the path of least resistance both laterally and vertically at a rate determined by a number of factors including volume released, soil conditions (permeability, porosity, moisture, etc.), depth to groundwater, and the speed and effectiveness of response and remediation measures.

The DAPL Project would transport light sweet crude oil from the middle Bakken and upper Three Forks formations (Bakken).  The Energy Information Administration (EIA) categorizes light sweet crude oil as having an API gravity between 35° and 50° and less than 0.3 wt % sulfur.  API gravity is a measure of how heavy or light liquid oil is compared to water: if its API gravity is greater than 10, it is lighter and floats on

45

USACE_DAPL0071269

Environmental Assessment
Dakota Access Pipeline Project
July 2016

water.  The oil extracted from the Bakken has an API gravity generally between 40° and 43° and a sulfur content of less than 0.2 weight percentage (wt %) (Turner, Mason and Company, 2014).  Therefore, the Bakken oil has properties that fall within the mid-range of light sweet crude.

Most crude oil constituents are not very soluble in water.  The dissolved concentration of water soluble compounds (e.g., benzene) is not controlled by the amount of oil in contact with the water, but by the concentration of the specific constituent in the oil (Charbeneau et al., 2000; Charbeneau, 2003; Freeze and Cherry, 1979).  Studies of 69 crude oils found that benzene was the only aromatic or polycyclic aromatic hydrocarbon compound tested that is capable of exceeding the 0.005 ppm groundwater protection threshold values for drinking water (i.e., maximum contaminant levels (MCLs) or Water Health Based Limits) (Kerr et al., 1999 as cited in O'Reilly et al., 2001).

In aquatic environments, crude oil's toxicity is a function of the concentration of its constituent compounds and their toxic effects, along with their solubility (and bioavailability) in water. Based on the combination of toxicity, solubility, and bioavailability, benzene is commonly considered to pose the greatest toxicity threat from crude oil spills (Muller, 1987).  The lowest acute toxicity threshold for aquatic organisms for benzene is 7.4 ppm based on standardized toxicity tests (USEPA, 2016).  .

Accordingly, theoretical concentrations of benzene in river water for a range of potential DAPL Project spills at the two pipeline river crossings are presented in **Table 3-7**.  An assumption of a 1-hour release period for the entire spill volume at each location was used.   The following additional conservative assumptions were developed to estimate potential spill effects for planning purposes:

- The entire volume of a crude oil spill was released due to a catastrophic failure of the pipeline and reached the waterbody;
- Complete, instantaneous mixing occurred;
- The entire benzene content of the crude oil was solubilized into the water column; and
- The receptor is located at the immediate site of the crude oil spill and there is no loss due to evaporation or degradation.

The conservative analysis presented in **Table 3-7** includes a range of values from 4 barrels to 10,000 barrels spilled.  However, examination of the PHMSA dataset from 2002 to 2015 (PHMSA, 2016) indicates that the majority of actual pipeline spills are relatively small and fifty percent of the spills consist of 4 bbls or less.  The spill volume would be likely small due to a number of factors including:

- Most releases are not caused by full ruptures of the pipeline;
- The overburden on the HDD section of the pipeline or the compacted back-fill over a buried pipeline restricts the volume that could be released during a spill and restricts the affected area; and
- Due to anti-siphoning effects, a full gravity drain-down between valve locations on either side of the river crossings rarely occurs.

As indicated in **Table 3-7**, the acute toxicity threshold for aquatic organisms for benzene of 7.4 ppm is not exceeded under any of the hypothetical spill volume scenarios.  The most probable spill volume (4 barrels

46

USACE_DAPL0071270

Environmental Assessment
Dakota Access Pipeline Project
July 2016

or less) does not yield benzene concentrations that exceed the drinking water criteria even with the ultra conservative mixing assumptions.  It should be noted that under real life conditions, the spill and mixing events outlined by the assumptions are beyond physical actualities.  Therefore the use of the upper ranges of spill volumes and the concentrations in the table is limited and is not recommended beyond this NEPA analysis.

| | | | | Estimated Benzene Concentration in Surface Water (ppm) | | | |
|---|---|---|---|---|---|---|---|
| **Table 3-7** **Estimated Benzene Concentrations Following a Hypothetical Crude Oil Spill at Project River Crossings** | | | | | | | |
| River Crossing | River Flow (cfs) | Acute Toxicity Threshold (ppm) | Benzene MCL (ppm) | Very Small Spill: 4 bbl | Small Spill: 100 bbl | Moderate Spill: 1,000 bbl | Large Spill: 10,000 bbl |
| Missouri River | 20,374 | 7.4 | 0.005 | 0.00075 | 0.019 | 0.19 | 1.88 |
| Lake Oahe | 22,484 | 7.4 | 0.005 | 0.00068 | 0.017 | 0.17 | 1.70 |

*Notes:*
- Adapted from Stantec, 2015
- Estimated concentration is based on release of benzene into water over a 1-hour period with uniform mixing conditions.
- Concentrations are based on a 0.28 percent by volume benzene content of the transported material (Marathon Oil 2010).
- bbl - An oil barrel defined as 42 US gallons,
- MCL - Maximum contaminant levels
- ppm – Parts per million
- cfs – Cubic feet per second
- Stream flows are measured mean discharge from the gage stations closest to the pipeline crossings located on the Missouri River at Williston (USGS Station 06330000) and Bismarck (USGS Station 06342500)(USGS 2016; 2016b).

Sub-freezing temperatures during the winter months could cause ice to form on the surface of Lake Oahe and the Missouri River.  This layer of ice will trap oil released below the lake's surface and prevent benzene evaporation from occurring. Therefore, during the winter, evaporative loss will be negligible, and will allow a longer contact between the crude oil and the water column. Additionally, natural undulations in the bottom of the ice will trap the material and reduce horizontal spreading, potentially causing very localized impacts to organisms in prolonged contact with the near-surface water (e.g., phytoplankton) (Dickens 2011). Exposure to fish deeper in the water column would not likely experience adverse impacts. The natural containment of winter releases facilitates cleanup efforts as the pockets of oil can be drilled to and removed using vacuum trucks. Thus, winter releases are predicted to have lower impacts, particularly with respect to area of extent, as compared to releases occurring during the warmer seasons.

USACE_DAPL0071271

If no active ground water remediation activities were undertaken (see discussion below), dispersion, evaporation, dissolution, sorption, photodegradation, biodegradation, and natural attenuation ultimately would allow a return to preexisting conditions in both soil and groundwater.

**Remediation**

As part of the pipeline operation, which is regulated by the PHMSA, Dakota Access has an ongoing maintenance, inspection, and integrity testing program to monitor the safety of the pipeline system. Monitoring activities include constant remote oversight of the entire system 24/7/365 from the control center, routine inspection of the cathodic protection system, and the use of inspection tools that travel through the inside of the pipeline to check pipe integrity (see Section 3.11 for additional information regarding reliability and safety and the proposed methods for monitoring the Proposed Action facilities). Dakota Access also performs regular aerial flyovers to inspect the pipeline ROW. In the event of a leak, Dakota Access would work aggressively to isolate the source through the use of remote-controlled shut-off valves, initiate cleanup activities, and contact the appropriate federal and state authorities to coordinate leak containment and cleanup. To prevent pipeline failures resulting in inadvertent releases, Dakota Access would construct and maintain the pipeline to meet or exceed industry and governmental requirements and standards. Specifically, the steel pipe would meet PHMSA specifications under 49 CFR § 195, follow standards issued by the American Society of Mechanical Engineers, National Association for Corrosion Engineers and API. Once installed, the pipeline would be subjected to testing to verify its integrity and compliance with specifications, including hydrostatic pressure testing at the crossings, checking coating integrity, and X-ray inspection of the welds. The pipeline would be placed into service only after inspection to verify compliance with all construction standards and requirements. Dakota Access would maintain and inspect the pipeline in accordance with PHMSA regulations, industry codes and prudent pipeline operating protocols and techniques. The pipeline ROW would be patrolled and inspected by air every 10 days, weather permitting, but at least every three weeks and not less than 26 times per year, to check for abnormal conditions or dangerous activities, such as unauthorized excavation along the pipeline route.

While a release of crude oil into groundwater or a surface waterbody has the potential to cause environmental impacts, the likelihood of such an event is very low. Dakota Access has detailed provisions for protecting and mitigating potential impacts to water resources in Section 3.11 Reliability and Safety. Emergency response and remediation efforts have the potential for dramatically reducing the appreciable adverse environmental effects.

In the unlikely event of a spill during operations of the pipeline, impacts to water resources would be further mitigated by following the cleanup procedures and remediation activities described in the Dakota Access' FRP (**Appendix L**).

Specific clean-up procedures and remediation activities would be determined by groundwater remediation specialists within Dakota Access and contracted professional consultants. Each groundwater mitigation situation is unique and will be treated according to the actual circumstances present.

The first step in the mitigation process consists of the delineation of the plume to define the nature and extent of the release. If appropriate, Dakota Access would recover product as soon as practical to prevent the spread of contamination using excavators to remove the impacted soils, oil skimmers installed within

USACE_DAPL0071272

Environmental Assessment
Dakota Access Pipeline Project
July 2016

collection wells, pumps, and storage containers or vacuum trucks at collection areas or some other method appropriate for the site conditions.

Dakota Access would develop a groundwater remediation plan in coordination with the North Dakota Department of Health and other responsible federal, state or other governmental authorities. The proposed groundwater remediation system would be designed to treat the impacted groundwater by removing the released oil, converting it into harmless products, monitoring natural attenuation, etc.

Released product can often be physically removed from groundwater by several methodologies. The pump and treat method is one of the most widely used physical methods of ground water remediation and consists of pumping the groundwater to surface and then using either biological or chemical treatments to remove the oil. Another common method of removing floating hydrocarbon contaminants is the use of a monitoring-well oil skimmer. This method utilized a belt material with a strong affinity for hydrocarbons to bring the oil to the surface where it can be removed. A dual-phase vacuum extraction removes both contaminated groundwater and soil vapor. A high-vacuum extraction well is installed with its screened section in the zone of contaminated soils and groundwater to remove contaminants from above and below the water table. Released product can also be removed from groundwater by applying various chemical methodologies including ozone and oxygen gas injection, surfactant enhanced recovery, Biological treatment techniques can also be utilized including bioventing and bioaugmentation.

The ground water treatment remediation plan would be selected in coordination with the North Dakota Department of Health and other responsible governmental authorities and may utilize a combination of technologies.

A preliminary evaluation of geology indicates that groundwater within the floodplain throughout most of the Corps flowage easements is less than 6.5 feet deep (GeoEngineers, 2014). The pipeline would be installed in saturated sediments as part of the HDD crossing of Lake Oahe. Due to the nature of HDD methodology, this construction method is inherently not a risk to groundwater resources and uses benign substances (bentonite and water) to penetrate through soil, rock, and groundwater. Construction of the Project Area and Connected Action would not be expected to result in significant negative direct or indirect impacts on groundwater resources.

### 3.2.3   Wetlands

#### 3.2.3.1   Affected Environment

Wetland data for the Project Areas was derived from desktop analyses along the entire route and verified by field delineations. Using data from the U.S. Fish & Wildlife Service's (USFWS) National Wetlands Inventory (NWI) dataset, aerial imagery, and topography, an experienced biologist applied professional judgment to create polygon coverage in GIS to define the areal extent of wetlands. These areas have been field-verified to ensure that the most accurate, up-to-date data is being used for permit filings.

The field wetland investigations were conducted using the on-site methodology set forth in the 1987 Corps of Engineers Wetland Delineation Manual and the 2010 Regional Supplement to the Corps of Engineers Wetland Delineation Manual: Great Plains Region (USACE, 1987; 2010b). In addition to the 1987 Manual and the Regional Supplement, wetland areas were examined through analysis of the

49

Environmental Assessment
Dakota Access Pipeline Project
July 2016

vegetation, soils, and hydrology, as described in the Classification of Wetland and Deepwater Habitats of the U.S. and The National Wetland Plant List (Cowardin et al., 1979; Lichvar et al., 2014).

### 3.2.3.2    Impacts and Mitigation

The routing analysis utilized to determine the crossing locations was designed to avoid impacts to sensitive environmental resources including wetlands. Construction workspace on the flowage easements has been selected based on an absence of wetlands within the Project Area and, as confirmed by field verification in 2015, no wetlands would be impacted by trench excavation within the construction ROW, ATWS, HDD workspace, or HDD stringing corridor on the flowage easements or Connected Action.

The field wetland investigations conducted by Dakota Access results identified four wetlands located within the permanent easement on the flowage easements (w-m10-wi-001_PSS, w-m10-wi-001_PEM, w-m10-wi-001_PFO, and w-m10-wi-002_PSS). These wetlands occur in the portion of the Project Area on the flowage easements that would be constructed via HDD; therefore, no trenching would occur within these wetlands. However, following construction, a 30-foot-wide corridor centered on the proposed pipeline would be maintained in non-forested state to facilitate inspections of the pipeline, operational maintenance, and compliance with the federal pipeline safety regulations. The 30 foot permanent ROW would encompass a total of approximately 0.30 acre of the four wetlands. One of these wetlands (w-m10-wi-001_PFO), approximately 0.05 acre, is classified as a palustrine forested (PFO) wetland and would be converted to shrub-scrub or herbaceous wetland as a result of the Proposed Action since trees would be routinely removed for the life of the pipeline. The remaining palustrine emergent (PEM) wetland (w-m10-wi-001_PEM) and two palustrine scrub-shrub (PSS) wetlands (w-m10-wi-001_PSS and w-m10-wi-002_PSS), comprising a total of 0.25 acres of the permanent pipeline easement, may require infrequent vegetation clearing of encroaching woody vegetation but would otherwise remain in their natural state. Dakota Access is in the process of obtaining verification for use of NWP 12 for the crossings of wetlands and waterbodies associated with DAPL Project.

Pending approval and receipt of applicable permits and easement permission, a temporary waterline would be installed between the shoreline and the HDD workspace on the flowage easements within the permanent ROW (**Figure 6-B**), in order to supply the HDD equipment with water needed for drilling fluid preparation and hydrostatic testing. The temporary waterline would be laid on top of the surface, and no ground disturbance of the four wetland features along the permanent easement is anticipated. The hard pipe segments would be hand-carried down the slope and assembled by hand. No tracked or wheeled equipment would be necessary for construction or removal of the temporary aboveground pipeline. No excavation or disturbance of wetlands or the river bank is anticipated.

**Table 3-8** summarizes wetlands within the flowage easements that occur within the permanent ROW, which is 30-feet-wide centered on the centerline over the HDD profile and 50-feet-wide elsewhere.

No wetlands would be impacted by the HDD workspace on private land and the permanent ROW on federal land at the crossing of Lake Oahe, because no wetlands exist within the Project Area and Connected Action Area at the Lake Oahe Crossing.

The ECP and SWPPP specify several measures to protect wetlands and waterbodies from becoming polluted with fuels or other hazardous materials during construction. These plans prohibit the storage of

USACE_DAPL0071274

Environmental Assessment
Dakota Access Pipeline Project
July 2016

fuel or other hazardous materials within 100 feet of a wetland or waterbody.  The ECP also specifies that equipment must be refueled at least 100 feet from waterbodies unless, due to site-specific conditions, there is no practical alternative such as the proposed pumping intake structure located on the barge at the Missouri River Crossing.  In that case, the contractor must implement site-specific protective measures and containment procedures described in the ECP.  Contractors would be required to provide trained personnel, appropriate equipment, and materials to contain and clean up releases of fuel, lubricating oil, or hydraulic fluid that result from equipment failure or other circumstances in accordance with containment plans as described above.

| Table 3-8 Wetlands within the Flowage Easements Project Area | | | | | | |
|---|---|---|---|---|---|---|
| MP | Wetland ID | Wetland Type | Pre-Construction Notice? | Delineation Source | Area (acres) | Impacted Area [1] |
| 94.7 | w-m10-wi-001 | Palustrine Scrub-Shrub | No | Field | 0.07 | Permanent ROW over HDD Profile |
| 94.7 | w-m10-wi-001 | Palustrine Emergent | No | Field | 0.04 | Permanent ROW over HDD Profile |
| 94.8 | w-m10-wi-001 | Palustrine Forested | No | Field | 0.05 | Permanent ROW over HDD Profile |
| 94.9 | w-m10-wi-002 | Palustrine Scrub-Shrub | No | Field | 0.14 | Permanent ROW over HDD Profile |

### 3.2.4    Floodplain

#### 3.2.4.1    Affected Environment

Floodplains refer to the 100-year floodplain, as defined by Federal Emergency Management Agency (FEMA), and as shown on Flood Insurance Rate Maps (FIRM) or Flood Hazard Boundary Maps for all communities participating in the National Flood Insurance Program (NFIP).  The 100-year floodplain is an area subjected to inundation by the 1% chance of an annual flood event.  Executive Order (EO) 11988 (Floodplain Management) requires federal agencies to avoid direct or indirect support of development within the 100-year floodplain whenever there is a practical alternative.

According to the FEMA FIRM map, the seven flowage easements are located within Zone A (the 100-year floodplain) of the Missouri River in Williams County.  A FEMA flood map is not available for the Connected Action within McKenzie County.  The Lake Oahe crossing in Emmons County is located in Zone D, which is an area of undetermined, but possible flood hazards (FEMA, 1987).  FEMA has not completed a study to determine flood hazards for Morton County; therefore, a flood map has not been published at this time.

#### 3.2.4.2    Impacts and Mitigation

The Proposed Action has been designed in accordance with accepted floodplain management practices; therefore, no impacts on floodplain elevations or velocities are anticipated.  Following construction,

51

disturbed areas would be restored to pre-construction grades and contours, as practical.  If necessary, soil displaced by installation of the 24-inch pipeline on the flowage easements would be removed from the floodplain and hauled to an upland location in order to ensure original floodplain elevations are restored

The Corps Omaha District Flood Risk and Floodplain Management Section (FRFM) is responsible for coordinating compliance with the requirements of EO 11988.  The FRFM reviewed the proposed pipeline plans for the portion of the DAPL Project that crosses the flowage easements for compliance with Appendix A (Typical Cut and Fill Volumes for Land Development Proposals) of NWDR 1110-2-5, Land Development Guidance at Corps Reservoir Projects, and found that the lowest elevation of the Proposed Action on the flowage easements (1872.25 feet MSL) would be above the Garrison flood control pool maximum operation elevation (1854.0 feet MSL).  Therefore, there would be no adverse impacts on the operation of the Garrison flood control pool.  Provided that the site topography is left at its natural ground elevation after construction and all excess material is hauled off site, the FRFM concluded that there are no flood risk and floodplain management concerns associated with the Proposed Action.  On April 7, 2015 the FRFM provided Dakota Access with a memorandum verifying compliance under EO 1198 and recommending approval of the Proposed Action (Krause, 2015).

## 3.2.5   Levees

Based on a search of the Corps National Levee Database and FEMA FIRM maps, no levees are located within 10 miles of the Lake Oahe or flowage easement crossings (Corps, 2014).  Because no levees are located within 10 miles of either crossing, construction of the Proposed Action is not expected to impact levees.

## 3.3      Vegetation, Agriculture, and Range Resources

Under the "no action" alternative, Dakota Access would not construct the proposed DAPL Project and no impacts on vegetation, agriculture, and range resources would occur.  However, if the objectives of the DAPL Project are to be met under the "no action" alternative, other projects and activities would be required and these projects would result in their own impacts on vegetation, agriculture, and range resources, which would likely be similar to or greater than the DAPL Project.  Impacts associated with a future project developed in response to the "no action" alternative are unknown, while only temporary and minor impacts or insignificant permanent impacts on vegetation, agriculture, and range resources would occur as a result of the Proposed Action, as described in the sections below.

### 3.3.1    Vegetation

#### 3.3.1.1    Affected Environment

Land cover was analyzed for the flowage easements and federal lands and associated Connected Actions based on the 2011 USGS National Land Cover Dataset (NLCD) and was field-verified where access was available.  Land cover on the flowage easements is comprised mostly of cultivated crops, which include corn, sugar beets, alfalfa, soybeans, and spring wheat.  Other present land cover types include developed areas, which are primarily roads, pasture/hay/grassland areas that are interspersed with the cultivated crops, emergent wetlands, woody wetlands, mixed forest and deciduous forest associated with the Missouri River.

USACE_DAPL0071276

Environmental Assessment
Dakota Access Pipeline Project
July 2016

Land cover on the federal lands is comprised of cultivated crops, emergent herbaceous wetlands, grassland/herbaceous, and open water.  Over half of the area of the tracts is characterized as grassland/herbaceous, which primarily occurs on the west side of Lake Oahe.  Cultivated cropland consists mainly of oats and canola on the east side of the Lake.

A description of each land cover type encountered at both crossing areas is provided below.

**Cultivated Crop**

The cultivated cropland community is characterized by land used for the production of annual crops, such as corn and soybeans.  This class includes all land being actively tilled.

**Deciduous Forest**

Deciduous forest typically includes trees that are greater than 16 feet tall.  More than 75% of the tree species in this land cover class shed foliage simultaneously in response to seasonal change.

**Mixed Forest**

Mixed forest are generally areas dominated by trees generally greater than 5 meters tall, and greater than 20% of total vegetation cover.  The vegetation cover within mixed forest typically does not have either deciduous or evergreen species greater than 75% of the total tree cover.

**Developed/Open Space**

The developed/open space community type is dominated by lawn grasses and may include some developed areas and roads.  Impervious surfaces account for less than 20% of the total cover.  This class would typically include minor roads and associated ditches.

**Developed/Low Intensity**

The developed/low intensity community includes areas with a mixture of constructed material and vegetation.  These areas most commonly include single-family housing units.  Developed/low intensity in the Project Area is associated with impervious surfaces of larger roads.

**Emergent Herbaceous Wetland**

Refer to Section 3.2.3, which provides a description of data obtained during delineations of the wetlands that would be impacted by the Proposed Action.

**Woody Wetlands**

Refer to Section 4.2.3, which provides a description of data obtained during delineations of the wetlands that would be impacted by the Proposed Action.

USACE_DAPL0071277

Environmental Assessment
Dakota Access Pipeline Project
July 2016

## Grassland/Herbaceous

The grassland/herbaceous community is dominated by graminoid or herbaceous vegetation. These areas are not subject to intensive management such as tilling but can be utilized for grazing.

## Pasture/Hay

The pasture/hay community type consists of areas of grasses, legumes, or grass-legume mixtures planted for livestock grazing or the production of seed or hay crops, typically on a perennial cycle.

## Open Water

The open water cover type includes areas of open water. This land cover type is associated with Lake Oahe and the Missouri River.

### 3.3.1.2   Impacts and Mitigation

Temporary impacts on land cover would occur in essentially all areas within the construction footprint of the Project Area and Connected Actions, the vast majority of which would return to pre-construction land cover upon completion of construction. One exception is at the flowage easement Project Area in forested areas along the permanent easement Impacts on cultivated crops make up the majority of temporary impacts and would return to cultivated crops post-construction.

**Tables 3-9** and **3-10** show land cover types impacted by construction and maintenance activities. A description of each category is provided below.

| Table 3-9 Land Cover Impacts on the Flowage Easements Project Area and Connected Action | | | | |
|---|---|---|---|---|
| Land Cover Type | Connected Action- Construction Workspace (acres) | Connected Action- Permanent ROW (acres) | Construction Workspace (acres) [1] | Permanent ROW (acres) |
| Cultivated Crops | 0 | 0 | 47.4 | 13.3 |
| Deciduous Forest | 0.9 | 0.2 | 0 | 0 |
| Developed, Low Intensity | 0 | 0 | 0.4 | 0.4 |
| Developed, Open Space | 0.1 | 0.01 | 1.2 | 0.4 |
| Emergent Herbaceous Wetlands | 0 | 0 | 0.9 | 0.4 |
| Hay/Pasture | 0 | 0 | 6.6 | 1.8 |
| Grassland/Herbaceous | 0.1 | 0 | 1.7 | 0.5 |
| Mixed Forest | 0.2 | 0.03 | 0 | 0 |
| Open Water | 0.7 | 0.1 | 0 | 0 |
| Woody Wetlands | 0 | 0 | 1.4 | 0.8 |
| **Total** | **2.0** | **0.3** | **59.3** | **17.6** |

[1]   Construction workspace includes permanent ROW.

USACE_DAPL0071278

Environmental Assessment
Dakota Access Pipeline Project
July 2016

Permanent impacts on land cover in the federal lands would be limited to the permanent ROW and involve limited tree removal within the permanent easement.  Impacts on land cover as part of the Connected Action would occur on private lands and include the HDD workspaces, stringing area, and the permanent easements between the HDD workspaces and federal lands.

| Table 3-10 Land Cover Impacts on the Federal Lands Project Area and Connected Action | | | |
|---|---|---|---|
| Land Cover | Connected Action– Construction Workspace (acres) | Connected Action– Permanent ROW (acres) | Federal Lands Permanent ROW (acres) [1] |
| Cultivated Crops | 0.0 | 0.0 | 0.1 |
| Emergent Herbaceous Wetlands | 0.0 | 0.0 | 0.4 |
| Woody Wetlands | 0.2 | 0.0 | 0.0 |
| Grassland/ Herbaceous | 15.3 | 1.1 | 0.6 |
| Total | 15.5 | 1.1 | 1.2 |

[1]  Land cover impacts on federal lands are limited to the maintained 50-foot permanent easement and do not include approximately 6.3 acres of permanent easement over the HDD profile across Lake Oahe.  Land cover within the banks of Lake Oahe (open water, woody wetlands, and emergent herbaceous wetlands) would not be disturbed during construction.

**Measures to Protect Vegetation**

Dakota Access would clear the ROW to the extent necessary to assure suitable access for construction, safe operation, and maintenance of the DAPL Project.  Clearing of herbaceous vegetation during construction is anticipated to result in short-term impacts.  Within areas disturbed by construction in the flowage easements Project Area and Connected Actions, Dakota Access would implement active revegetation measures and rapid colonization by annual and perennial herbaceous species to restore most vegetative cover within the first growing season.  In areas that require permanent revegetation, Dakota Access would utilize an NRCS native seed mix that has been selected for the Proposed Action based on the North Dakota State University Extension Service Publication, *Successful Reclamation of Lands Disturbed by Oil and Gas Development and Infrastructure Construction*.  .  Ground disturbing activities would not occur on Corps fee-owned lands; therefore, reseeding is not anticipated in these areas.  However, if reseeding were to become necessary on Corps fee-owned lands, all activities would be conducted in accordance with applicable Lake Oahe or Garrison Project revegetation guidelines.

In non-agricultural areas, vegetation cleared from ATWS would be allowed to revegetate after construction depending on arrangements with the landowner.  Consequently, significant changes in cover types are not anticipated.  Revegetation would allow wildlife species to return to the area after construction is completed.  Temporary revegetation measures may also be implemented to quickly establish ground cover to minimize the potential for soil erosion and noxious weeds to establish.  A temporary seed mix may be applied in these situations.  Revegetation of trees and shrubs would take

USACE_DAPL0071279

Environmental Assessment
Dakota Access Pipeline Project
July 2016

place in accordance with the North Dakota tree and shrub regulations.  The ECP (**Appendix G**) contains more details regarding temporary revegetation.

After completion of waterbody crossings, Dakota Access would revegetate disturbed stream banks in accordance with the ECP, SWPPP, and requirements of applicable state and federal permits.  When constructing in agricultural areas, up to 1 foot of topsoil (organic layer) would be stripped from the trench line and stockpiled separately from trench spoil to preserve the native seed stock.  The ECP contains additional details regarding topsoil segregation.

At stream approaches, the Contractor would leave a 20-foot buffer of undisturbed herbaceous vegetation on all stream banks during initial clearing, except where grading is needed for bridge installation or where restricted by applicable regulations and/or permit conditions.

### 3.3.2   Invasive and Noxious Weeds

#### 3.3.2.1   Affected Environment

The state of North Dakota has 11 state-listed noxious and invasive weeds ("invasive species").  The species listed are: Russian knapweed (*Acroptilon repens*), absinth wormwood (*Artemisia absinthium*), musk thistle (*Carduus nutans*), diffuse knapweed (*Centaurea diffusa*), yellow toadflax (*Linaria vulgaris*), spotted knapweed (*Centaurea maculosa*), Canada thistle (*Cirsium arvense*), leafy spurge (*Euphorbia esula*), dalmatian toadflax (*Linaria dalmatica*), purple loosestrife (*Lythrum salicaria*), and saltcedar (*Tamarix chinensis*).  These state invasive species are controlled and regulated under North Dakota Law (NDCC § 4.1-47-02) (North Dakota Department of Agriculture, 2014a).

Each county in North Dakota has a County Weed Board, which consists of a regulation committee to manage noxious and invasive weeds.  Each of these county boards is responsible for the addition of county-specific invasive species to the state-listed species.  Additional noxious weeds are listed in McKenzie County including field bindweed (*Convolvulus arvensis*), burdock (*Arctium* sp.), black hendane (*Hyoscyamus niger*), houndstongue (*Cynoglossum officinale*), and yellow starthistle (*Centaurea solstitialis*).  No additional invasive species have been identified for listing in Williams, Morton, and Emmons counties.

#### 3.3.2.2   Environmental Impact and Mitigation

Dakota Access sent notifications to the McKenzie, Williams, Morton, and Emmons counties weed boards describing the Proposed Action and requesting any guidance regarding the known locations of noxious and invasive weeds pertaining to that county.  Dakota Access would work with the county weed boards to ensure the ECP contains relevant and necessary mitigation measures that would be implemented to prevent the spread of noxious weed species during construction and operation of the Proposed Action.

USACE_DAPL0071280

Environmental Assessment
Dakota Access Pipeline Project
July 2016

### 3.3.3   Threatened, Endangered, Candidate, and Proposed Plant Species

#### 3.3.3.1   Affected Environment

There is one federally-listed plant species in North Dakota, the threatened western prairie fringed orchid. This plant species is associated with high quality moist, tall grass prairie.  Most of the orchids in North Dakota are located in the Sheyenne National Grasslands in Ransom and Richland counties in the southeastern corner of the state.   The population at Sheyenne National Grasslands is the largest population left in the world, with over 7,000 orchids (USFWS, 2013a).

North Dakota does not have a state threatened and endangered species program or track plant species that are not federally listed.

#### 3.3.3.2   Impacts and Mitigation

There are no known records of western prairie fringed orchids in the Project Area counties, and no suitable habitat was documented; therefore, no effect on the western prairie fringed orchid is expected as a result of the proposed undertaking.  In the unlikely event that any are observed during construction on federal lands, work would stop and the Corps would be contacted.

### 3.4   Wildlife Resources

Under the "no action" alternative, Dakota Access would not construct the DAPL Project, and no impacts on wildlife resources would occur.  However, if the objectives of the DAPL Project are to be met under the "no action" alternative, other projects and activities would be required and these projects would result in their own impacts on wildlife resources, which would likely be similar to or greater than the DAPL Project. Impacts associated with a future project developed in response to the "no action" alternative are unknown, while only temporary and minor impacts, if any, on wildlife resources would occur as a result of the Proposed Action, as described in the sections below.

#### 3.4.1   Recreationally and Economically Important Species and Nongame Wildlife

##### 3.4.1.1   Affected Environment

The Proposed Action region is home to a large number of mammal and bird species.  Big game species that occur in the Proposed Action region include pronghorn and white-tailed deer.  Game birds potentially using the types of wildlife habitat in the Project Area include the ruffed grouse, sharp-tailed grouse, pheasant, woodcock, snipe, and doves.  Furbearers and predators potentially occurring within the Project Area include coyote, beaver, badger, red fox, raccoon, bobcat, fisher, mink, weasel, and muskrat. Potential small mammal species occurring within the habitat types associated with the Project Area include pocket gopher, skunk, and white-tailed jackrabbit.

Waterfowl and shorebird species potentially occurring within the Project Area include mallards, pintails, American wigeon, blue-winged teal, western grebe, California gull, Canada goose, common tern, killdeer, Wilson's phalarope, and lesser yellowlegs.  Numerous songbirds, including the American goldfinch, black-

USACE_DAPL0071281

capped chickadee, cedar waxwing, clay-colored sparrow, lark bunting, song sparrow, tree swallow, western kingbird, western meadowlark, and yellow warbler can be expected to occur in the Project Area.

Numerous species of reptiles and amphibians may also occur within the Project Area. Some amphibian species that may be expected to occur in the Project Area include the northern leopard frog, tiger salamander, and western chorus frog. Reptile species that may be expected to occur within the Project Area include common snapping turtle, western painted turtle, common garter snake, and racer (Hoberg and Gause, 1992).

### 3.4.1.2   Impacts and Mitigation

Temporary impacts on wildlife could occur during construction due to clearing of vegetation and movement of construction equipment along the ROW. The ROW and ATWS would remain relatively clear of vegetation until restoration is completed. Most wildlife, including the larger and more mobile animals, would disperse from the Project Area as construction activities approach. Displaced species may recolonize in adjacent, undisturbed areas, or reestablish in their previously occupied habitats after construction has been completed and suitable habitat is restored. Some smaller, less mobile wildlife species such as amphibians, reptiles, and small mammals have the potential to be directly impacted during clearing and grading activities, but given the limited extent of the proposed crossing, measurable impacts are not anticipated. No impacts to treaty fishing and hunting rights are anticipated due to construction within the Project Area or Connected Actions.

Herbaceous cover would be seeded on disturbed upland areas during restoration, and it is expected that pre-existing herbaceous and shrub habitats would quickly reestablish themselves. Consequently, it is expected that the wildlife species that use these habitats would also return within one growing season of construction completion. Routine clearing of the permanent easement to improve visibility and remove encroaching trees would be performed in compliance with PHMSA requirements. The lack of trees reestablishing would be the only potential long-term impact to wildlife that depends on forested communities. This impact is expected to be negligible, as it only pertains to extremely small portions of the permanent easement and very little forested habitat is present within the Project Area and Connected Actions.

### 3.4.2   Threatened, Endangered, Candidate, and Proposed Wildlife Species

The Endangered Species Act (ESA) directs all federal agencies to work to conserve endangered and threatened species. Crossing the Corps flowage easements and federal lands triggers the consultation procedures of section 7 of the ESA. This section serves as the Biological Evaluation or written analysis documenting the Corps' conclusions and the rationale to support those conclusions regarding the effects of the Proposed Action on protected wildlife resources. The Bald Eagle (*Haliaeetus leucocephalus*) was removed from the federal list of threatened and endangered species on August 9, 2007 and is no longer protected under the ESA. However, the bald eagle is provided protection under the Bald and Golden Eagle Protection Act (BGEPA) and the Migratory Bird Treaty Act (MBTA), which prohibits disturbance of eagles and other raptors. In order to ensure compliance with these acts, Dakota Access obtained USFWS and state agency data regarding known eagle nests in the vicinity of the Missouri River and Lake Oahe crossings from the North Dakota Game and Fish Department, who houses the eagle location database. The Proposed Action and Connected action will be over 1,000 feet from known or historic eagle nesting areas.

USACE_DAPL0071282

Environmental Assessment
Dakota Access Pipeline Project
July 2016

Based on the known nest data, there are no eagle nests within the USFWS National Bald Eagle Management Guidelines recommend nest buffers of 660 feet for linear construction activities if the activity will be visible from the nest and 330 feet if the activity will not be visible from the nest (USFWS, 2007).  These guidelines are intended to help the public minimize impacts to bald eagles, particularly where they may constitute "disturbance", which is prohibited by the BGEPA. Given the distance from known eagle nesting areas, and the mitigation of use of the HDD method for both the Missouri and Lake Oahe crossings, the Proposed Action is not anticipated to have any effect on Bald or Golden eagles

### 3.4.2.1    Affected Environment

Nine federally listed species have been identified in Williams, McKenzie, Morton, and Emmons counties. Designated critical habitat for the piping plover also occurs in each of the four counties.  The USFWS concurred with the Corps effect determinations included below in Section 3.4.2.2 for all listed species within the EA review area.

**Interior Least Tern**

In North Dakota, the interior least tern (*Sterna antillarum*) utilizes sparsely vegetated sandbars on the Missouri River.  Birds nest, raise young, and relax on barren river sandbars.  In North Dakota, the least tern is found mainly on the Missouri River from Garrison Dam south to Lake Oahe and on the Missouri and Yellowstone Rivers upstream of Lake Sakakawea.  Approximately 100 pairs breed in North Dakota during the summer before flying to coastal areas of Central and South American and the Caribbean Islands (USFWS, 2013b).

**Whooping Crane**

Whooping cranes (*Grus Americana*) embark on a bi-annual migration from summer nesting and breeding grounds in Wood Buffalo National Park in northern Alberta to the barrier islands and coastal marshes of the Aransas National Wildlife Refuge on the Gulf Coast of Texas.  Twice yearly in the spring and fall, whooping cranes migrate along the Central Flyway, a migratory corridor approximately 220 miles wide and 2,400 miles in length.  The Central Flyway includes eastern Montana and portions of North Dakota, South Dakota, Nebraska, Kansas, Oklahoma, and eastern Texas (USFWS, 2014a) (**Figure 16**).  During the migration, cranes make numerous stops, roosting for short durations in large shallow marshes, and feeding in harvested grain fields.  Approximately 75% of the whooping crane sightings in North Dakota occur within the Central Flyway.  The primary threats to whooping cranes are power lines, illegal hunting, and habitat loss.

**Black-footed Ferret**

The black-footed ferret (*Mustela nigripes*) is a small member of the Mustelidae family native to North American shortgrass and mixed grass prairie.  Prairie dogs make up approximately 90% of the black-footed ferret diet and as such, the species is associated almost exclusively with large complexes of prairie dog towns (USFWS, 2013c; Black-footed Ferret Recovery Implementation Team [BFFRIT], 2011).  Black-footed ferrets are fossorial, nocturnal predators, spending the majority of their time underground in prairie dog burrows, leaving only to hunt (BIFFRIT, 2011).  Once thought to be extirpated in the wild, captive-born

USACE_DAPL0071283

Environmental Assessment
Dakota Access Pipeline Project
July 2016

individuals have been reintroduced to 21 sites in Wyoming, Montana, South Dakota, Colorado, Utah, Kansas, New Mexico, and Arizona since 1991 (USFWS, 2013c).

**Gray Wolf**

A habitat generalist, the gray wolf (*Canis lupus*) historically occupied most habitat types in North America. They show little preference for one cover type over another and successfully utilize alpine, forest, grassland, shrubland, and woodland habitats across their range (Mech, 1974). Once thought to require wilderness areas with little to no human disturbance, recent range expansions have demonstrated the species' ability to tolerate higher rates of anthropogenic development than previously thought. Given abundant prey and low rates of human-caused mortality, wolves can survive in proximity to human-dominated environments (Fuller, 1989).

**Northern Long-eared Bat**

Northern long-eared bats (*Myotis septentrionalis*) occur throughout the eastern and north-central U.S. Eastern populations have declined significantly in recent years as a result of white-nose syndrome (WNS), a contagious fungal infection. Although historically less common in the western portion of its range than in the northern portion, northern long-eared bats occur throughout North Dakota. Habitat throughout its range includes caves and abandoned mines during the winter and hardwood or mixed forests for roosting and foraging during the summer (USFWS, 2015).

Northern long-eared bats may roost singly or in colonies in cavities, crevices, hollows, or beneath the bark of live and dead trees and/or snags, regardless of tree species. They prefer trees with a diameter at breast height of at least 3 inches. Less frequently, Northern long-eared bats have been observed roosting in man-made structures such as sheds or barns. Northern long-eared bats primarily forage at dusk on insects in forests, but will occasionally forage over small forest clearings and water (USFWS, 2015).

**Piping Plover**

Piping plovers (*Charadrius melodus*) are shore birds that inhabit areas near water, preferring river sandbars and alkali wetlands in the Great Plains for nesting, foraging, sheltering, brood-rearing, and dispersal. Piping plovers winter along large coastal sand or mudflats near a sandy beaches throughout the southeastern U.S. Critical Habitat for the piping plover is designated along the Missouri River system throughout North Dakota (USFWS, 2012).

**Dakota Skipper**

The Dakota skipper (*Hesperia dacotae*) is a small butterfly found in dry-mesic and wet-mesic tallgrass and mesic mixed grass prairie remnants characterized by alkaline and composite soils. The Dakota skipper is a habitat specialist requiring high-quality prairie habitat (i.e., grasslands or discrete patches of habitat within grasslands that are predominantly native and that have not been tilled). Only 146 populations are documented in three states and two Canadian provinces (McCabe, 1981; Royer and Marrone, 1992; Cochrane and Delphey, 2002; USFWS, 2011; 2013d). Remaining populations vary in size and density and for the most part are not influenced by dispersal between populations (McCabe, 1981; Dana, 1991; Dana, 1997; Cochrane and Delphey, 2002). The species overwinters at the base of grasses in the soil of the site

60

USACE_DAPL0071284

Environmental Assessment
Dakota Access Pipeline Project
July 2016

which they inhabit.  In North Dakota, the skipper typically occupies both wet-mesic and dry-mesic prairie (Royer and Marrone, 1992; Cochrane and Delphey, 2002).  The current status of the Dakota skipper in the state is considered tenuous, and most populations are considered vulnerable due to their extremely isolated nature.

**Rufa Red Knot**

The rufa red knot (*Calidris canutus rufa*) is a large sandpiper noted for its long-distance migration between summer breeding grounds in the Arctic and wintering areas at high latitudes in the Southern Hemisphere (USFWS, 2014b).  Some rufa red knots wintering in the northwestern Gulf of Mexico migrate through interior North America during both spring and fall and use stopover sites in the Northern Great Plains.  During spring and fall migrations, rufa red knots are typically found in marine habitats along the Pacific and Atlantic coasts of North America, generally preferring sandy coastal habitats at or near tidal inlets or the mouths of bays and estuaries.  However, some migrating rufa red knots use sandbars and sandy shore and beach habitats along large rivers and reservoirs of the interior of North America.  This area contains the Atlantic, Mississippi, and Central Flyways (USFWS, 2014g). The species also heavily relies on exposed substrate at wetland edges for stopover habitat, and the suitability of a wetland for rufa red knots depends on water levels and may vary annually (Gratto-Trevor et al., 2001).

**Pallid Sturgeon**

Pallid sturgeon (*Scaphirhynchus albus*) prefer benthic environments associated with swift waters of large turbid, free-flowing rivers with braided channels, dynamic flow patterns, periodic flooding of terrestrial habitats, and extensive microhabitat diversity.  Pallid sturgeon inhabit the Missouri and Mississippi Rivers from Montana to Louisiana and have been documented in the Missouri River downstream from the Fort Peck Dam in Montana to the headwaters of Lake Sakakawea, North Dakota, and downstream from Garrison Dam, North Dakota to the headwaters of Lake Oahe, South Dakota (USFWS, 2014c).  Pallid sturgeon populations are fragmented by dams on the Missouri River and are very scarce in the Lake Oahe portion of the Missouri River.

### 3.4.2.2    Impacts and Mitigation

Dakota Access conducted pedestrian surveys of the workspace within the Project Area at the flowage easements in September 2014 and July 2015 and at the Lake Oahe crossing in April 2015 to assess suitable habitat for listed species.  Given the limited scope of the Proposed Action, minimization measures, and the implementation of specialized construction techniques, the Corps has determined that the Proposed Action would have no effect on the black-footed ferret, gray wolf, northern long-eared bat, and Dakota skipper within the Project Area.  The Corps also determined that the Proposed Action may affect, but is not likely to adversely affect the interior least tern, whooping crane, piping plover, rufa red knot, and pallid sturgeon in the Project Area.  The effect determination for these species that may be affected, but are not likely to be adversely affected was concurred with in a letter received from the USFWS on May 2, 2016.  A Biological Opinion (BO) associated with other portions of the DAPL Project, outside of the EA review area, was issued by the USFWS on May 31, 2016 but is not applicable to this document.  **Table 3-11** lists the impact determinations of the protected species with potential to occur within the Project Area and Connected Action.  A summary of habitat evaluations and the basis for the determination of impacts for each listed species is provided below.

61

USACE_DAPL0071285

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 3-11 Federally Listed Species with Potential to Occur within the Project Area and Connected Action | | | | | | |
|---|---|---|---|---|---|---|
| Species | Status | County | | | | Impact Determination |
| | | Williams | McKenzie | Morton | Emmons | |
| Interior Least Tern | Endangered | X | X | X | X | May Affect, Not Likely to Adversely Affect |
| Whooping Crane | Endangered | X | X | X | X | May Affect, Not Likely to Adversely Affect |
| Black-footed Ferret | Endangered | | X | X | | No Effect |
| Gray Wolf | Endangered | X | X | X | | No Effect |
| Northern Long-eared Bat | Threatened | X | X | X | X | No Effect |
| Piping Plover | Threatened | X | X | X | X | May Affect, Not Likely to Adversely Affect |
| Dakota Skipper | Threatened | | X | X | X | No Effect |
| Rufa Red Knot | Threatened | X | X | X | X | May Affect, Not Likely to Adversely Affect |
| Pallid Sturgeon | Endangered | X | X | X | X | May Affect, Not Likely to Adversely Affect |

**Interior Least Tern**

Suitable habitat may exist for interior least terns at the Missouri River and at the Lake Oahe crossing depending on precipitation and seasonal flow variations as exposed sand/gravel bars suitable for nesting may be present. Dakota Access proposes to cross the Missouri River and Lake Oahe utilizing the HDD construction method. Pipeline installation via HDD will avoid in-stream disturbance that would otherwise occur if the pipe was installed via the traditional open-cut method, as described in Section 2.1.4.

Potential sources for indirect impacts on interior least terns include the inadvertent release of non-toxic bentonite mud (used for lubricating the drill path) into the waterbody or nesting habitat and noise associated with the drilling equipment. Dakota Access conducted geotechnical analyses at each of the proposed HDD crossings and designed the HDD to minimize the likelihood that the drilling mud is inadvertently released. While the likelihood of an inadvertent release has been minimized to the maximum extent practicable, were it to occur, implementation of Dakota Access' HDD Contingency Plan (**Appendix B**) would minimize any potential impacts on interior least terns by quickly and efficiently containing and removing the released, non-toxic mud.

Operation of the HDD equipment will result in a temporary increase in noise in the immediate vicinity of the HDD activities. Although the HDD entry and exit sites are located more than 960 feet from any suitable interior least tern habitat, it is possible that the activities would be audible if interior least terns are nesting in the area. However, Atwood et al. (1977) found that noise associated with human activities (an airfield in the case of the referenced study) did not affect site fidelity or nesting success of least terns. Similarly, Hillman et al. (2015) found that noise from military and civilian overflights did not impact nest success and that restricting human disturbance to greater than 50 meters (164 feet) from colony boundaries mitigated

62

Environmental Assessment
Dakota Access Pipeline Project
July 2016

adverse impacts to nesting birds.  Noise associated with aircraft overflights at low altitudes in the Hillman et al. (2015) study were a minimum of 67.7 decibels (A-weighted) (dBA), greater than the anticipated sound levels generated by HDD equipment.  Noise studies conducted at the proposed HDD entry and exit locations indicate that sound levels would be less than 60 dBA at approximately 600 feet from the equipment.  Therefore, noise associated with the HDD crossings of the Missouri River and Lake Oahe may affect, but are not likely to adversely affect interior least terns potentially nesting in the area.

Dakota Access plans to withdrawal water from the Missouri River, which is required for activities associated with the installation of the HDD and the hydrostatic testing of the HDD segment.  A temporary waterline would be installed at the Missouri River between the shoreline and the HDD workspace on the flowage easements within the permanent ROW (**Figure 6-B**).  The temporary waterline would be laid by hand on top of the surface, and no tracked or wheeled equipment would be necessary for installation or removal of the temporary aboveground waterline.  No disturbance of the river banks is anticipated.  Additionally, installation and removal of the waterline are anticipated to be complete prior to nesting season; therefore, no impacts on the interior least tern are anticipated to occur at the Missouri River.  If the water withdrawal activities are not able to be completed prior to nesting season, Dakota Access would conduct surveys prior to placement of the waterline to confirm the presence/absence of interior least terns within the pipeline ROW.  If interior least terns are nesting within the pipeline ROW, Dakota Access would postpone water withdrawal activities and contact the Corps and USFWS.  Work would only resume when the USFWS has given permission following a survey to ensure interior least terns would no longer be affected.  No water withdrawal from or access to Lake Oahe is required to complete the Lake Oahe crossing.

As discussed in Section 2.3.2 above, Dakota Access would routinely maintain its 30 to 50-foot-wide permanent easement, including periodic mowing and removal of woody vegetation.  Because suitable interior least tern nesting habitat is on unvegetated flats within the Missouri River and Lake Oahe, routine maintenance activities would not occur within suitable habitat.  During operation of the pipeline, in the unlikely event that a leak or spill were to occur and reach interior least tern habitat, Dakota Access would implement its FRP and strictly adhere to PHMSA regulations.

Based on the avoidance and minimization measures, literature review, field investigations, and habitat types present in the proposed Project Area, USACE has determined that the Proposed Action may affect, but is not likely to adversely affect the interior least tern.

**Whooping Crane**

In North Dakota, whooping cranes are only present during the twice-yearly migration between winter grounds and summer nesting sites.  As the whooping crane is a migrant and does not breed in North Dakota, the species cannot be confirmed as present in or absent from the Project Area.  The results of the habitat assessment field surveys indicate that the Project Area may contain suitable stopover habitat (i.e., agricultural fields).  It is anticipated that whooping cranes would avoid the Project Area during active construction, as they tend to avoid areas with human disturbance (Howe, 1989; USFWS, 1994; Lewis and Slack, 2008).  The noise and land disturbance from construction activities during the migration periods would likely cause birds to choose more suitable landing and overnight roosting locations away from construction activities given the abundance of similar habitat throughout the migration corridor in North Dakota and in the general vicinity of the Project Area.

63

Environmental Assessment
Dakota Access Pipeline Project
July 2016

While there is potential for individuals to land in the Project Area during construction, work would halt if a whooping crane is observed within the Project Area and would not resume until the bird leaves the area. Additionally, Dakota Access would notify the Corps and USFWS of the observation. The presence of construction activities within potentially suitable stopover habitat during migration could disturb whooping cranes in the area or cause flying whooping cranes to avoid the area and select other suitable stopover habitat. Due to the abundance of available stopover habitat along the North Dakota migration corridor and in the vicinity of the Project Area (USFWS, 2009a), impacts would be negligible. As illustrated in **Figure 16**, the Project Area represents a minute fraction of the whooping crane migration corridor in North Dakota.

As discussed in Section 2.3.2 above, Dakota Access would routinely maintain its 30 to 50-foot-wide permanent easement, including periodic mowing and removal of woody vegetation. As whooping cranes utilize open fields and emergent wetlands for stopover habitat, affects from maintenance activities would be minimal and would be similar to those described above during construction activities. If whooping cranes were observed in the area during maintenance activities, maintenance personnel would suspend activities until the cranes leave the area. Similarly, if maintenance activities are ongoing at the time of migration, whooping cranes would likely avoid the disturbance area.

In order for whooping cranes to be affected by a spill or leak during operation, an individual would have to be present when the leak or spill occurred or land in the spill itself. Due to the strict adherence to PHMSA regulations designed to prevent spills and leaks during operation, the short timeframe that whooping cranes are present during migration, and the abundance of available stopover habitat along the migration corridor in North Dakota (USFWS, 2009a), the measures implemented by Dakota Access in the event of a leak in accordance with the FRP, such occurrences are unlikely.

Based on the avoidance and minimization measures, literature review, field investigations, and habitat types present in the Project Area, USACE has determined that the Proposed Action may affect, but is not likely to adversely affect the whooping crane.

**Black-footed Ferret**

No suitable black-footed ferret habitat is present in the Project areas. The black-footed ferret has been recorded in Morton County; however, based on occurrence data received from North Dakota Parks and Recreation, there are no documented occurrences within the vicinity of the Proposed Action. Further, it is believed that black-footed ferrets have been extirpated from North Dakota, and no reintroductions have occurred in the state (USFWS, 2013f; North Dakota Game and Fish Department, 2012). Due to the lack of suitable habitat and the distance of the Project areas from known black-footed ferret occurrences, construction, operation, and maintenance activities associated with the Proposed Action would have no effect on black-footed ferrets.

**Gray Wolf**

The gray wolf is listed as endangered in all three counties of the Proposed Action areas in North Dakota (south and west of the Missouri River upstream to Lake Sakakawea and west of the centerline of Highway 83 from Lake Sakakawea to the Canadian border). Wolves in eastern North Dakota are part of the Great Lakes Distinct Population Segment that was delisted by the USFWS in January 2012 (USFWS, 2014e).

64

USACE_DAPL0071288

North Dakota does not currently have an established breeding population (North Dakota Department of Agriculture, 2014b).  Observations of wolves are sporadic, and it is believed that these individuals are dispersers from adjacent populations (i.e., from Minnesota and Manitoba) (USFWS, 2006; Licht and Fritts, 1994).  Given the unlikely occurrence and high mobility of this species, construction, operation and maintenance activities associated with the Proposed Action would have no effect on gray wolves.

**Northern Long-eared Bat**

The northern long-eared bat is currently listed by the USFWS as threatened in North Dakota.  On April 2, 2015, the USFWS published the final listing in the Federal Registrar with an effective date of May 4, 2015.  The USFWS listed the northern long-eared bat as threatened and chose to exercise the option of issuing an interim 4(d) rule to allow for more flexible implementation of the ESA and "to tailor prohibitions to those that make the most sense for protecting and managing at-risk species."  In areas outside of the 150-mile WNS buffer zone, incidental take from lawful activities is not prohibited.  The State of North Dakota currently falls outside of the WNS 150-mile buffer zone.  Per the exemptions of the interim 4(d) rule, construction, operation and maintenance activities associated with the Proposed Action would have no effect on the northern long-eared bat (USFWS, 2015).

**Piping Plover**

Due to the similarity in life history and habitat requirements, impacts on piping plovers would be similar to those discussed in above for the interior least tern.  Suitable habitat may exist for piping plover at the Missouri River and at the Lake Oahe crossing, depending on precipitation and seasonal flow variations, as exposed sand/gravel bars suitable for nesting may be present.  These areas are also designated as critical habitat for this species under the ESA.  Dakota Access proposes to cross the Missouri River and Lake Oahe utilizing the HDD construction method.  Pipeline installation via HDD will avoid in-stream disturbance that would otherwise occur if the pipe was installed via the traditional open-cut method, as described in Section 2.1.4.

Potential sources for indirect impacts on piping plovers include the inadvertent release of non-toxic bentonite mud (used for lubricating the drill path) into the waterbody or nesting habitat and noise associated with the drilling equipment.  Dakota Access conducted geotechnical analyses at each of the proposed HDD crossings and designed the HDD to minimize the likelihood that the drilling mud is inadvertently released.  While the likelihood of an inadvertent release has been minimized to the maximum extent practicable, were it to occur, implementation of Dakota Access' HDD Contingency Plan would minimize any potential impacts on piping plovers by quickly and efficiently containing and removing the released, non-toxic mud.

Operation of the HDD equipment will result in a temporary increase in noise in the immediate vicinity of the HDD activities.  Although the HDD entry and exit sites are located more than 960 feet from any suitable piping plover habitat, it is possible that the activities would be audible if piping plovers are nesting in the area.  However, piping plovers are frequently observed nesting in and around active sand and gravel mines and do not appear to be deterred by elevated noise levels associated with the operation of equipment (Marcus et al., 2008; Brown et al., 2013).

USACE_DAPL0071289

Environmental Assessment
Dakota Access Pipeline Project
July 2016

As discussed for the interior least tern above, impacts associated with installation of the temporary waterline at the Missouri River required for activities associated with the installation of the HDD and the hydrostatic testing of the HDD segment would be avoided.  If the water withdrawal activities are not able to be completed prior to nesting season as expected, Dakota Access would conduct surveys prior to placement of the waterline to confirm the presence/absence of piping plovers within the pipeline ROW.  If piping plovers are nesting within the pipeline ROW, Dakota Access would postpone water withdrawal activities and contact the USFWS and the Corps.  Work would only resume when the USFWS has given permission following a survey to ensure piping plovers would no longer be affected.  No water withdrawal from or access to Lake Oahe is required to complete the Lake Oahe crossing.

As discussed in Section 2.3.2 above, Dakota Access would routinely maintain its 30 to 50-foot-wide permanent easement, including periodic mowing and removal of woody vegetation.  Because suitable piping plover nesting habitat is on unvegetated flats within the Missouri River and Lake Oahe, routine maintenance activities would not occur in suitable piping plover habitat.  In the unlikely event that a leak or spill occurs and reaches piping plover habitat during operation of the pipeline, Dakota Access would implement its FRP and strictly adhere to PHMSA regulations.

Based on the avoidance and minimization measures, literature review, field investigations, and habitat types present in the Project Area, USACE has determined that the Proposed Action may affect, but is not likely to adversely affect the piping plover.

**Dakota Skipper**

There is no suitable Dakota skipper habitat within the Project Area based on species occurrence and grassland analysis.  As such, construction, operation and maintenance activities associated with the Proposed Action would have no effect on this species.

**Rufa Red Knot**

Rufa red knots do not nest in the Project Area and only occur as an occasional migrant.  During spring and fall migrations, the rufa red knot has the potential to occur in North Dakota.  Migrating rufa red knot would likely only occur at migratory stopover habitat (suitable shoreline and sandy beach habitat along major rivers, streams, waterbodies, and wetlands) for a brief amount of time (24 hours or less).  The results of the habitat assessment field surveys indicate that potentially suitable stopover habitat (sandbar and beach habitats) for migrating rufa red knots is present at the Lake Oahe crossing.  Lake Oahe would be crossed using the HDD construction method, and thus would avoid direct impacts on potentially suitable rufa red knot stopover habitat.  While direct impacts to the rufa red knot migratory habitat would be avoided through the HDD construction method at Lake Oahe, indirect impacts could occur due to potential disturbance during construction (i.e., noise or an inadvertent release of non-toxic drilling mud).

During construction, noise associated with the HDD may act as deterrent to rufa red knots potentially migrating through the area.  These individuals may have to travel to other suitable stopover habitat in the area (e.g., upstream or downstream of the Proposed Action area).  Similarly, if an inadvertent release of non-toxic drilling mud were to occur when rufa red knots were present, it could cause individuals to relocate to nearby habitat.

66

USACE_DAPL0071290

Environmental Assessment
Dakota Access Pipeline Project
July 2016

As discussed in Section 2.3.2 above, Dakota Access would routinely maintain its 30 to 50-foot-wide permanent easement, including periodic mowing and removal of woody vegetation.  As rufa red knots utilize suitable shoreline and sandy beach habitat along major rivers, streams, waterbodies, and wetlands for stopover habitat, effects from maintenance activities would be negligible and would be similar to those described above during construction activities.   If rufa red knots were present in the area during maintenance activities they would likely relocate to nearby suitable habitat.  Similarly, if maintenance activities are ongoing at the time of migration, rufa red knots would likely avoid the disturbance area.

In order for rufa red knots to be affected by a spill or leak during operation, an individual would have to be present when the leak or spill occurred or stop on the spill or leak.  Due to the strict adherence to PHMSA regulations designed to prevent spills and leaks during operation and the short timeframe that rufa red knots are present during migration, such occurrences are unlikely.

Based on the avoidance and minimization measures, literature review, field investigations, and habitat types present in the Project Area, USACE has determined that the Proposed Action may affect, but is not likely to adversely affect the rufa red knot.

**Pallid Sturgeon**

Suitable habitat for the pallid sturgeon occurs at the Missouri River and Lake Oahe crossings.  Impacts on suitable habitat would be avoided by crossing these waterbodies via HDD.  As discussed in for the interior least tern above, pipeline installation via HDD will avoid in-stream disturbance that would otherwise occur if the pipe was installed via the traditional open-cut method.

Dakota Access has also minimized the potential for pallid sturgeon to be indirectly affected by the HDD installation across the Missouri River and Lake Oahe.  The only potential source for indirect impacts on pallid sturgeon associated with the HDDs is an inadvertent release of non-toxic bentonite mud (used for lubricating the drill path) into the waterbody.  Dakota Access conducted geotechnical analyses at each of the proposed HDD crossings and designed the HDD to minimize the likelihood that the drilling mud is inadvertently released.   While the likelihood of an inadvertent release has been minimized to the maximum extent practicable, were it to occur, implementation of Dakota Access' HDD Contingency Plan would minimize any potential impacts on pallid sturgeon by quickly and efficiently containing and removing the released, non-toxic mud.

Dakota Access plans to withdraw water from the Missouri River for installation activities and hydrostatic testing of the HDD segment for the Missouri River.  However, potential impacts on the pallid sturgeon or suitable habitat present within the Missouri River would be avoided by implementing the conditions for permitted intake structures outlined in the Corps' Regional Conditions for North Dakota applicable to NWP 12 Utility Line Activities (Corps, 2012) (see Section 3.2.1.2) and as described in the USFWS Recovery Plan for the Pallid Sturgeon (USFWS, 2014f).  No water withdrawal from or access to Lake Oahe is required to complete the Lake Oahe crossing.  The HDD construction method, application of the HDD Contingency Plan, and implementation of the Corps' conditions for the intake structure within the Missouri River would avoid and minimize potential impacts to the pallid sturgeon.

Maintenance activities will not occur within the Missouri River or Lake Oahe; therefore, no impacts on pallid sturgeon would occur.  The depth of the pipeline below the respective rivers and the design and

67

USACE_DAPL0071291

operation measures that meet or exceed the respective PHMSA regulations make a release into either waterbody extremely unlikely.  However, in the unlikely event a leak or spill was to occur and reach the Missouri River or Lake Oahe, impacts would be localized.  If pallid sturgeon were present in the area where the spill or leak occurred, they would likely relocate outside of the contaminated area.  Further, oil floats and, as pallid sturgeon are bottom dwellers primarily inhabiting the lower water column (USFWS, 2014c), impacts on pallid sturgeon in the event of a spill, would be minimal.

Based on the avoidance and minimization measures, literature review, field investigations, and habitat types present in the Project Area, USACE has determined that the Proposed Action may affect, but is not likely to adversely affect the pallid sturgeon.

## 3.5     Aquatic Resources

Under the "no action" alternative, Dakota Access would not construct the DAPL Project, and no impacts on aquatic resources would occur.  However, if the objectives of the DAPL Project are to be met under the "no action" alternative, other projects and activities would be required and these projects would result in their own impacts on aquatic resources, which would likely be similar to or greater than the proposed DAPL Project.  Impacts associated with a future project developed in response to the "no action" alternative are unknown, while only temporary and minor impacts, if any, on aquatic resources would occur as a result of the Proposed Action, as described in the sections below.

### 3.5.1    Habitat and Communities

#### 3.5.1.1    Affected Environment

West of Williston, the Missouri River is a braided channel varying in width from 800 feet to over 1,500 feet, with sand bars in many locations.  The Yellowstone River confluence with the Missouri River is approximately 20 miles west of Williston and 3.5 river miles upstream from the proposed Missouri crossing.  East of Williston, the Missouri River feeds into Lake Sakakawea, the third largest man-made lake in the U.S. formed by the Garrison Dam, several hundred miles downstream.  This portion of the Missouri River is home to several fish species, including cutthroat trout, rainbow trout, brown trout, walleye, northern, and sauger.  Amphibians are found along the shores and nearby riparian areas of the Missouri River.  Common species found near the Missouri River crossing include Woodhouse's toad, the northern leopard frog, and western chorus frog (Hoberg and Gause, 1992).

Lake Oahe is a 232-mile-long reservoir that extends upriver from the Oahe Dam on the Missouri River from Pierre, South Dakota, to Bismarck, North Dakota.  Approximately three-quarters of a mile south of the proposed pipeline crossing is the confluence of the Cannonball River into the Missouri.  This portion of the Missouri River is home to several fish species, including walleye, northern pike, and channel catfish. Amphibians are found along the shores and nearby riparian areas of Missouri River.  Common species found near the Lake Oahe crossing include the Great Plains toad, Woodhouse's toad, northern leopard frog, and tiger salamander (Hoberg and Gause, 1992).

USACE_DAPL0071292

Environmental Assessment
Dakota Access Pipeline Project
July 2016

### 3.5.1.2   Impacts and Mitigation

The Missouri River, including Lake Oahe, is the only waterbody that would be crossed by the Proposed Action with aquatic resources that have potential to be impacted by the Proposed Action.

All subsurface disturbing activities would be set back from the banks of Lake Oahe at the HDD entry point. This provides a buffer of undisturbed land between active construction and the Lake.  There is potential, although very low due to setbacks of approximately 1,100 feet on the west bank and 900 feet on the east bank, for sediment to be transported from the workspace into the river during precipitation events, which could increase the local turbidity and sediment load in the lake.  These increased loads have potential to temporarily affect sensitive fish eggs, fish fry, and invertebrates inhabiting the river.  However, sediment levels would quickly attenuate both over time and distance and would not adversely affect resident fish populations or permanently alter existing habitat.  By also implementing the erosion and sediment control measures specified in the ECP (**Appendix G**) and SWPPP (**Appendix A**), the potential for sediment transport is likely avoided or minimized.  Following construction, the ROW would be restored, revegetated, maintained in an herbaceous or scrub-shrub state, and monitored in accordance with applicable regulations and permit conditions.

A successfully completed HDD crossing would minimize environmental impacts on Lake Oahe since the pipeline would be installed without disturbing the aquatic and benthic environments.  However, crossings via HDD carry a low risk of an inadvertent release of drilling mud, composed primarily of bentonite (a naturally occurring fine clay) slurry.  Increased levels of sedimentation and turbidity from an inadvertent release could adversely affect fish eggs, juvenile fish survival, benthic community diversity and health, and spawning habitat.  Dakota Access' HDD Construction/Contingency Plan (**Appendix B**) establishes monitoring procedures and prescribes measures to be implemented to minimize the impact in the event it occurs.  All HDD operations conducted for crossing the Lake Oahe would adhere to the HDD Contingency Plan and applicable permit conditions to reduce the likelihood of an inadvertent release to minimize and mitigate environmental impacts.  Dakota Access' construction contractor would ensure that the appropriate response personnel and containment equipment are available onsite to effectively implement the HDD Contingency Plan.

In addition to the crossing of Lake Oahe, aquatic resources could also be impacted during water withdrawal from the Missouri River, which is required for activities associated with the installation of HDD and the hydrostatic testing of HDD pipeline segment located on the flowage easements.  However, water withdrawal activities would be conducted in accordance with all applicable permit conditions and regulations and in a manner that would not reduce water flow to a point that would impair flow or impact aquatic life.  Intake screens and floats would also be utilized, as previously discussed in Section 3.2.1.2, to prevent entrainment of aquatic life and avoid impacts on aquatic resources.  In addition, by placing the pump within a secondary containment structure on the barge, the potential for impacts on aquatic resources associated with accidental fuel spills or leaks is likely avoided or minimized.

The primary issue related to impacts on the aquatic environment from operation of the Proposed Action would be related to a release from the pipeline.  For portions of the pipeline installed beneath the lake, the depth of the pipeline profile, increased wall thickness of the pipe, installation of remotely operated valves on both sides of the river crossing, and monitoring of the system 24/7 would further limit the potential for an inadvertent release into the waterbody.  As a result, operations activities are not

69

USACE_DAPL0071293

Environmental Assessment
Dakota Access Pipeline Project
July 2016

anticipated to impact aquatic resources or their habitat.  Adherence to the Dakota Access FRP would minimize potential impacts on aquatic wildlife from potential spills during the operation of the pipeline. In the event of a leak, Dakota Access would work aggressively to contain the leak, initiate cleanup activities, and contact the appropriate authorities, including the Corps.   The FRP is discussed under Section 3.2.1.2 and a draft of the FRP is included in Appendix L.

## 3.6     Land Use and Recreation

Under the "no action" alternative, Dakota Access would not construct the DAPL Project, and no impacts on land use and recreation would occur.  However, if the objectives of the DAPL Project are to be met under the "no action" alternative, other projects and activities would be required and these projects would result in their own impacts on land use and recreation, which would likely be similar to or greater than the DAPL Project.  The impacts associated with a future project developed in response to the "no action" alternative are unknown, while only temporary and minor impacts or insignificant permanent impacts on land use and recreation would occur as a result of the Proposed Action, as described in the sections below.

### 3.6.1     Land Ownership

The proposed 24-inch pipeline would cross seven contiguous Corps flowage easements over eight privately-owned parcels (**Figure 2**) that are associated with the Buford-Trenton-Irrigation District (Garrison Dam).  Based upon Corps-provided easement documents and mapping, the distance across the flowage easements on the north side of the Missouri River in Williams County is approximately 14,953 feet (2.83 miles).

The flowage easements allow the Government to flood and saturate the land, surface, and subsurface of these properties.   Generally, these easements prohibit the construction of structures for human habitation; provide that any other structures require written approval by the Corps; and provide that no mineral exploration, excavation or placement of fill material may occur on the easement area without the prior approval of the Corps.

The proposed pipeline route would also cross federal lands on the east and west banks of Lake Oahe in Morton and Emmons counties.  The distance from the western boundary of federally-owned lands to the eastern boundary of federally-owned lands on both sides of the lake, including the width of the lake, at the proposed crossing location is approximately 6,450 feet.  The proposed pipeline would be routed to parallel existing linear infrastructure (an overhead power line and a buried gas transmission pipeline) across Lake Oahe in the same area.  The HDD entry and exit points, measuring approximately 200 by 250 feet, would be located on private lands, as would the stringing corridor required to facilitate the installation.  The northern boundary of the Standing Rock Sioux Reservation is located approximately 0.55 mile south of the Lake Oahe Project Area.

Dakota Access is securing a 50-foot-wide permanent easement that is generally centered on the pipeline (25 feet on either side of the centerline).  Within the 50-foot-wide easement, a 30-foot corridor free of large woody vegetation, located within flowage easement LL3440E on the north bank of the Missouri River, would be required to allow for a clear line of sight once construction is completed to perform visual inspections during operation of the pipeline.  The corridor would be maintained in a vegetative state.

USACE_DAPL0071294

Environmental Assessment
Dakota Access Pipeline Project
July 2016

## 3.6.2   Land Use

### 3.6.2.1   Affected Environment

Land use within the Project Area was assigned a classification based on the principal land characteristic in a given area.   Aerial photography, the National Land Cover Database (Multi-Resolution Land Characteristics Consortium, 2011), the Morton County Zoning Map (Morton County, 2014), and the Williams County Comprehensive Plan were used to identify and classify general land use for the Project Area (**Figures 10** and **11**).

**Agricultural Land**

Agriculture is the primary land use within the Project Area.   These lands are primarily used for ranching and cultivating crops.   Agricultural lands allows for land uses such as farming, ranching, animal feeding operations, grain storage, and related functions.   Agricultural land within the flowage easements are primarily pivot irrigated cropland (i.e., areas used for production of annual crops such as corn and soybeans).

**Developed Land**

Developed land includes open space around structures such as homes, farmsteads, outbuildings, well sites, and areas associated with roads and ditches.

**Open Space**

Open space includes all land that is not agriculture or developed; namely wetlands, open water, grasslands, and scrub-shrub.   Open space is found primarily along the river banks.   See sections 3.2 and 3.3 for a discussion on water resources and vegetation.

### 3.6.2.2   Impacts and Mitigation

The Proposed Action would result primarily in temporary, short-term impacts on land use during construction.   Construction activities would require the temporary and short-term removal of existing agricultural land from crop and forage production within the construction footprint.   During construction, temporary impacts such as soil compaction and crop damage are possible along the construction ROW. Mitigation measures to minimize impacts such as topsoil segregation and decompaction practices would be fully implemented in accordance with the ECP and SWPPP.   Upon the completion of construction activities, the Project Area would be restored and returned to pre-construction land use.

As mentioned above, much of the cropland within the Corps flowage easements uses pivot irrigation systems.   Dakota Access would coordinate with all landowners on acceptable methods for construction and restoration, including potential impacts to irrigated fields.   Compensatory damages would be paid accordingly.

The nearest residence to the Proposed Action on the flowage easements is approximately 1,750 feet east of the pipe centerline.   Temporary impacts on nearby residences could include inconvenience caused by

USACE_DAPL0071295

Environmental Assessment
Dakota Access Pipeline Project
July 2016

noise and dust generated from construction equipment and traffic congestion associated with the transport of equipment, materials, and construction workers. Impacts from noise and dust during construction would diminish with distance from these areas and would be limited to the time of construction which would typically occur during daylight hours.

The primary impact on family farms would be the loss of standing crops and use of the land within the work area for the seasons during which DAPL Project-related activities occur, as well as potential diminished yields for a few years following construction. Dakota Access proposes to implement mitigation measures to minimize these potential impacts as described in the ECP. Dakota Access would repair surface drains and drainage tiles disturbed during ROW preparation, construction, and maintenance activities. Dakota Access would repair or replace fences and gates removed or damaged as a result of ROW preparation, construction, or maintenance activities.

At Lake Oahe, primary impact on ranching operations would be temporary prohibition of livestock grazing in the construction ROW, workspace areas, and restrictions on livestock movement across the construction ROW and workspace areas during construction. Given the narrow, linear nature of the DAPL Project and the alignment of the pipeline along property boundaries, livestock grazing reductions and livestock movement restrictions would be minor. Long-term or permanent impacts on family ranches are not anticipated. Following construction and restoration, the work area would be restored and ranching would be allowed to continue over the operational ROW. Landowners would be compensated for temporary loss of land and lower yields. Grazing activities would return to normal after Revegetation of the disturbed areas.

Once in operation, a permanent 50-foot ROW would be maintained except at segments of the ROW above the HDD profile on the flowage easements (between the HDD workspace and the river shore) that would be maintained by clearing woody vegetation over a 30 foot corridor (a 50 foot easement would still be obtained). Maintenance would include the removal of any large trees and shrubs; agricultural land use would not be impacted by maintenance activities in this area. Trees outside of the ROW would be protected by Dakota Access in a manner compatible with the safe operation, maintenance, and inspection of the pipeline. Applicable regulations would be adhered to regarding tree and shrub removal from along the route. Field surveys have confirmed that no shelter belts would be impacted within the Project Area or Connected Actions.

Tables **3-12** and **3-13** below detail the acreage of land use impacts associated with the Proposed Action.

| Table 3-12 Land Use Impacts on the Flowage Easements Project Area and Connected Action | | |
|---|---|---|
| Land Use | Construction Workspace (acres) [1] | Permanent ROW (acres) [2] |
| Agricultural Land | 54.0 | 15.1 |
| Developed | 1.6 | 0.8 |
| Open Space | 6.0 | 2.0 |
| Total | 61.3 | 17.9 |

[1]  Construction Workspace includes the permanent ROW.
[2]  Permanent ROW includes the 50-foot permanent easement and the 30-foot maintenance easement.

72

USACE_DAPL0071296

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 3-13 | | | |
| Land Use Impacts on the Federal Lands Project Area and Connected Action | | | |
| Land Use | Construction Workspace (acres) | Connected Action - Permanent ROW (acres) | Federal Lands - Permanent ROW (acres)[1] |
|---|---|---|---|
| Agricultural Land | 0.0 | 0.0 | 0.1 |
| Open Space | 15.5 | 1.1 | 1.0 |
| Total | 15.5 | 1.1 | 1.2 |

[1]   Land Use Impacts on federal lands are limited to the maintained 50 foot permanent easement and do not include approximately 6.3 acres of permanent easement beneath the HDD profile within the banks of Lake Oahe.

Dakota Access would obtain and comply with applicable state regulations, county permits, and zoning and land use regulations.  Permits may include, but are not limited to, grade and fill permits, ditch crossing permits, road and utility permits, and conditional use permits.  Dakota Access would retain one or more EIs to monitor compliance with environmental conditions of county permits.

### 3.6.3   Recreation and Special Interest Areas

#### 3.6.3.1   Affected Environment

Generally, recreation and special interest areas include federal, state, or county parks and forests; conservation lands; wildlife habitat management areas; hunter management areas; natural landmarks; scenic byways; designated trails; recreational rivers; and campgrounds.   Nearby recreational opportunities in the vicinity of the Project Area and the Connected Action include Wildlife Management Areas (WMAs), Lake Oahe, and the Missouri River, none of which are being impacted by the construction, although the HDD would cross under Lake Oahe itself.

The Missouri River and its shoreline are open to the public and used for recreational activities such as boating, swimming, and fishing.  Because the flowage easements are federally regulated and privately owned, there is very limited, if any, recreational opportunities within the flowage easements. Additionally, there is little boating and open water angling on the entire upper end of Lake Sakakawea because of lack of access and extremely turbid water throughout much of the recreational season (USACE, 2007).

Lake Oahe's 2,250 mile shoreline is open to the public and offers a variety of opportunities to outdoor recreationists such as fishing, swimming, sightseeing, camping, and picnicking.  More than 1.5 million visitors enjoy Lake Oahe's recreation facilities each year.  Fishing is the major recreational activity of visitors to the Oahe project, with 44% of visitors engaging in this activity (USACE, 2010c).

There are no public boat access sites, marinas, or public swimming beaches within one mile of the flowage easements or federal lands crossings.  There are no designated state parks or recreation areas, historic

73

USACE_DAPL0071297

Environmental Assessment
Dakota Access Pipeline Project
July 2016

trails, scenic by-ways, designated wilderness or natural areas or other sensitive land uses that would be affected by the crossings (North Dakota Parks and Recreation Department, 2014).

At the flowage easement crossing, the closest Nationwide Rivers Inventory (NRI) segment is a one mile stretch of the Missouri River within the Fort Union Trading Post National Historic Site, which is about 9.2 river miles upstream from the crossing.  At the federal lands crossing, the closest NRI segment is Square Butte Creek to the Oliver/Mercer County Line, which is about 50 river miles upstream from the Project Area (National Park Service, 2009).

North Dakota has approximately 54,373 miles of river, but no designated wild & scenic rivers (USFWS et al., 2014).

**Wildlife Management Areas**

The North Dakota Game and Fish Department manages the Trenton and Overlook WMAs; neither of which are crossed by the Proposed Action.  The Trenton WMA encompasses 2,647 acres and is located southwest of Williston near Trenton, along the Missouri River and Lake Sakakawea.  About 13.55 acres of the Trenton WMA extends into the eastern portion of flowage easement LL3440E (**Figure 6**) but the closest edge is approximately 800 feet from the HDD workspace.  This area is largely primitive and the landscape has been allowed to develop naturally.  The WMA provides recreational opportunities for fishing and hunting waterfowl, deer, and pheasants.  The Overlook WMA encompasses 32 acres and is located 6.5 miles north of Cartwright, about 1,430 feet west of the HDD entry point in McKenzie County. The Overlook WMA is only accessible by boat and is used for hunting deer.

The Oahe WMA is located along Missouri River and Oahe Reservoir, about 17 miles south of Bismarck (USGS, 2014b).  The proposed pipeline at the Lake Oahe crossing is about 14.5 miles south of the Oahe WMA.

**Water Quality and Recreation**

Section 303(d) of the CWA requires states to submit their lists of water quality limited waterbodies.  This list has become known as the "TMDL list" or "Section 303(d) list." A TMDL is the amount of a particular pollutant a stream, lake, estuary, or other waterbody can "handle" without violating State water quality standards.  The final 2014 Section 303(d) list, which was submitted to Environmental Protection Agency (EPA) as part of the integrated Section 305(b) water quality assessment report and Section 303(d) TMDL list, includes a list of waterbodies not meeting water quality standards and those for which a TMDL is needed.

Lake Sakakawea is on the 2014 Section 303(d) list of impaired waters as not supporting fish consumption because of high levels of methyl-mercury; however, Lake Sakakawea would not be crossed or otherwise impacted as a result of the Proposed Action on the flowage easements.  Lake Oahe is not listed as needing a TMDL and fully supports recreational use (North Dakota Department of Health, 2015).  Because Lake Oahe already meets the state water quality standards, the Proposed and Connected Action Areas are not anticipated to result in impacts that would cause an impairment of water quality or the designated use of Lake Oahe.

74

USACE_DAPL0071298

Environmental Assessment
Dakota Access Pipeline Project
July 2016

**Wilderness Areas**

The Wilderness Act of 1964 defines wilderness as lands that may contain ecological, geological, scientific, educational, scenic or historical value.  There are three designated wilderness areas within North Dakota: Chase Lake, Lostwood, and Theodore Roosevelt Wilderness Areas.  There are no designated wilderness areas, and no designated Nature Preserves or Natural Areas within one mile of either crossing (Wilderness Institute, 2014).

**Standing Rock Sioux Reservation**

The Standing Rock Sioux Reservation is situated at the border of South Dakota and North Dakota, approximately 0.55 miles south of the Lake Oahe Project Area.  The Cannon Ball River is located along the northern border of the Standing Rock Sioux Reservation in Sioux County, North Dakota.  The western border of the reservation ends at the Perkins County, South Dakota and Adams County, North Dakota lines, while the Missouri River is the eastern border of the reservation.  The southern border of the reservation is located within Dewey and Ziebach counties in South Dakota.  The total land area of the Standing Rock Sioux Reservation is 2.3 million acres and of that, 1,408,061 million is tribally owned.  The Standing Rock Sioux Tribal members are descendants of the Teton and Yankton Bands of the Lakota/Dakota Nations (Standing Rock Sioux Tribe, 2016).  Some of the many attractions within the reservation include Sitting Bull Grave Site, Standing Rock Monument, Fort Manuel, Lewis and Clark Legacy Trail, and the Standing Rock Tribal Office (Standing Rock Tourism, 2016).  The terrain of the reservation consists of river valleys, lakes, woodlands, prairies, and rolling hills.  Big game on the reservation includes white tail deer, mule deer and antelope, while small game includes jackrabbit, cottontail, and squirrel (Standing Rock Sioux Tribe and Standing Rock Sioux Tribe Game & Fish Department, 2016).

### 3.6.3.2    Impacts and Mitigation

The recreational enjoyment of wildlife (such as hunting or bird watching) may be temporarily affected by construction activities, depending on season and location.  However, this effect would be short-term.

Recreationists may observe ROW clearing along the river banks.  Because the pipeline would cross underneath the river via the HDD method, there would be no disruption to the course or cross-current of the river, and would not impact lake/river recreationists.

## 3.7    Cultural and Historic Resources and Native American Consultations

Section 106 of the National Historic Preservation Act of 1966 (NHPA), as amended, and implemented by 36 CFR Part 800, requires Federal lead agencies to assess the effects of permitted actions on historic properties.  Historic properties are defined in the NHPA as prehistoric and historic archaeological sites, standing structures, or other historic resources listed in, or eligible for listing in the National Register of Historic Places (NRHP).

Under the "no action" alternative, Dakota Access would not construct the DAPL Project and no impacts on cultural and historic resources would occur.  However, If the objectives of the DAPL Project are to be met under the "no action" alternative, other projects and activities would be required and these projects could result in their own impacts on cultural and historic resources, which would likely be similar to or

USACE_DAPL0071299

Environmental Assessment
Dakota Access Pipeline Project
July 2016

greater than the DAPL Project. The "no action" alternative would likely result in an increase in truck and rail traffic that could have an adverse effect on cultural, historic and Native American resources. Furthermore, impacts to resources associated with these methods may not be identified and evaluated because the protections afforded under Section 106 of the NHPA would not apply unless a federal permit were to be required.

## 3.7.1    Cultural Resources Studies

The scope of the cultural resource analysis was designed to be commensurate with the Proposed Action. The Proposed Action is to authorize the crossing of federal flowage easements near the upper end of Lake Sakakawea north of the Missouri River in Williams County, North Dakota and federally owned lands at Lake Oahe in Morton and Emmons counties, North Dakota.

The cultural resource information for the Project Area, and for areas in the vicinity of the Proposed Action (to provide context) was obtained through a combination of cultural resources investigations commissioned by Dakota Access on private lands within a 400-foot-wide linear corridor as defined by the DAPL centerline and previous cultural investigations conducted on private lands adjacent to the Proposed Action area, and previous cultural investigations conducted on federal lands.    New cultural resources investigations were not conducted on federal lands as part of the Proposed Action, as no impacts are anticipated to occur on federal lands.

Based on data compiled from previously executed archaeological investigations, it is recognized that much of the region has been inhabited by human populations for approximately 12,000 years.  Throughout much of the state the recorded prehistoric occupations range from Paleoindian Period encampments to Late Prehistoric Period sites.  Multiple sites have been explored that suggest the area was inhabited by societies adapted for lifestyles on the Plains and in the various geographical regions of the state dating back to 6000 BC.  The current Project Area has a moderate to high probability for archaeological deposits based on proximity to permanent water sources, topography, lack of significant ground disturbances, and depositional processes.

### 3.7.1.1    Affected Environment

**Flowage Easements, Williams County, North Dakota**

The Missouri River is a large perennial river that serves as the border between Williams and McKenzie counties, North Dakota.  The flowage easements consist of a series of expansive agricultural fields located on the northern side of the River.  While the individual tracts are privately owned, the USACE maintains easement rights across these tracts to facilitate floodwater control throughout the region.  The DAPL Project proposes to traverse certain sections of these easements, and install the pipeline via HDD under the Missouri River.  As these tracts are federally managed, cultural resources investigations were conducted in accordance with Section 106 of the NHPA, and in compliance with the North Dakota State Historic Preservation Office (NDSHPO) Guidelines Manual for Cultural Resources Inventory Projects (SHSND, 2012).  Specifically, the cultural resources investigations were confined to a 400-foot-wide linear corridor (*survey corridor*), as defined by the DAPL centerline.  Prior to field investigations, a Class I literature and records search was conducted within an expanded *study area corridor*, which extended for a mile on either side of the DAPL centerline.  The Class I literature review determined that the DAPL survey

76

Environmental Assessment
Dakota Access Pipeline Project
July 2016

corridor traverses one previously recorded site (32WI1367), and that portions of the DAPL survey corridor have been subject to previous surveys (Larson et al. 1987). Site 32WI1367, also known as the Buford-Trenton Irrigation System (BTIS), is a National Register nominated cultural resource consisting of a pumping plant, main canal, and associated irrigation components. The BTIS construction began in 1940 and continued through the 1950's managed by the Department of Interior, Work Progress Administration, and the Farm Security Administration. The DAPL survey corridor traverses one of the extant irrigation canals listed as a contributing element of the BTIS in the northeastern corner of Section 30 of Township 152 North, Range 103 West.

The Class II/III inventory investigations within the DAPL survey corridor across the flowage easements consisted of a combination of pedestrian surveys and shovel probing. Archaeologists walked along fixed transects spaced 30 m (98 ft.) apart within the survey corridor, and systematically excavated shovel probes across high probability settings, or in areas with low surface visibility. The Class II/III investigations resulted in the revisit of the portion of Site 32WI1367 within the survey corridor, and the documentation of a new prehistoric site (32MZ2874) located on the southern banks of the Missouri River (Appendix I). The assessment of site 32WI1367 consisted of mapping and documentation of the canal feature. No artifacts, evidence of features, or other undocumented components were noted. Dakota Access has designed an HDD to install the pipeline below this canal feature. Additionally, the HDD workspace would be off-set a sufficient distance to ensure that no components or associated features of this canal would be adversely impacted.

As site 32MZ2874 is located on the southern banks of the Missouri River, it is not located on USACE-managed flowage easement tracts. However, the site is referenced herein given its proximity to the workspace associated with HDD of the Missouri River. Site 32MZ2874 is a small prehistoric artifact scatter that is recommended as unevaluated for listing in the NRHP pending further testing investigations. The HDD workspace on the southern banks of the Missouri River has been designed to avoid impacting this site and is situated beyond the mapped site boundary. Exclusionary fencing would be installed along the eastern border of the HDD workspace during drilling activities to prevent inadvertent impacts or trespassing.

**Federal Lands – Lake Oahe Crossing: Morton and Emmons Counties, North Dakota**

The proposed crossing of federally-owned tracts at Lake Oahe is located in Section 10, Township 134 North, Range 79 West in Morton County, North Dakota, and Section 11, Township 134 North, Range 79 West in Emmons County, North Dakota (see **Figure 3**). Dakota Access proposes to install the pipeline via HDD below Lake Oahe, and the HDD entry and exit point workspaces and stringing area would be located on private land beyond the boundary of the federal lands. While no activities associated with the Proposed Action will occur on the surface of federal lands, the HDD entry and exit point workspaces and stringing areas are considered Connected Actions, and as such were subject to cultural resources investigations in accordance with Section 106 of the NHPA, and in compliance with the NDSHPO Guidelines (SHSND, 2012). No new cultural resources investigations of any kind were conducted on federal lands in association with the DAPL project as no impacts are anticipated to occur between the HDD workspaces on either side of Lake Oahe. However, previous cultural resource surveys of USACE managed lands are cited in the report; Dakota Access Pipeline Project, Class II/III Cultural Resources Inventory of the Crossings of Flowage Easements and Federal Lands. Prepared collaboratively for Dakota Access, LLC in March of 2016 (Landt and McCord 2016). This report is contained in Appendix I.

77

Environmental Assessment
Dakota Access Pipeline Project
July 2016

Prior to field investigations, a Class I literature and records search was conducted within an expanded study area corridor, which extended for a mile on either side of the DAPL centerline. The Class I literature review determined that no previously recorded sites are located on the private lands within the Connected Action areas (i.e., HDD workspaces and stringing area). A total of 43 previously recorded cultural resources are located within the study area corridor. Of these, 18 are located in Morton County and the remaining 25 are located in Emmons County. These consist of isolated finds and site leads (i.e., resources reported to the SHSND without field verification), prehistoric artifact scatters, and historic resources. A total of 10 of the previously recorded sites within the study area corridor are located on federal lands directly adjacent to the banks of Lake Oahe and the Cannonball River. Specifically, seven of these sites (32MO0001, 32MOx0004, 32MO0054, 32MO0060, 32MO0061, 32MO0064, and 32MO0259) are located in Morton County, on the western side of the Lake Oahe. The remaining three sites (32EM0019, 32EM0021, and 32EM0221) are located in Emmons County, on the eastern side of Lake Oahe. A more comprehensive discussion of these sites and associated mapping detail is provided in Appendix I.

The Class II/III inventory investigations at Lake Oahe took place exclusively within the Connected Action areas located on private lands beyond the limits federal lands (i.e., HDD workspaces and stringing area). The Class II/III inventory investigations within the Connected Action areas associated with the Lake Oahe crossing consisted of a combination of pedestrian surveys and shovel probing. Archaeologists walked along fixed transects spaced 30 m (98 ft.) apart within the survey corridor, and systematically excavated shovel probes across high probability settings, or in areas with low surface visibility. The Class II/III investigations within the Connected Action areas resulted in the documentation of one new archaeological site (32MO570). This site consists of a singular lithic flake in isolated contexts and is recommended as not eligible for listing in the NRHP and no further work is warranted.

### 3.7.1.2   Impacts and Mitigation

The impacts attributable to the HDD on cultural resources would not be significant. The geotechnical analysis performed to support the HDD crossings supports the lack of anticipated impacts due to vibrations related to construction and HDD activities. Vibrations produced during the HDD process are not of a magnitude that would cause any impacts to cultural resources. Vibrations associated with the drilling process would be limited to the immediate vicinity of the drilling equipment on the surface and downhole. The vibrations produced from the downhole tooling are of a very low magnitude and are attenuated very quickly by the formation such that vibrations are never felt at the surface. A vibration monitoring analysis conducted by GeoEngineers in 2009 found that peak particle velocities were less than 0.07 inches/second within approximately 50 feet of HDD operations. These velocities are well below that which would cause any structural impacts and moreover, the recorded vibrations were, in fact, imperceptible to human senses (GeoEngineers, 2009).

**Flowage Easements**

Dakota Access has conducted Class II/III inventory surveys within the 400-foot-wide survey corridor across the flowage easements. The survey investigations resulted in the revisit of site 32WI1367 on the northern side of the Missouri River, and the documentation of site 32MZ2874 on the southern banks of the Missouri River. Impacts to site 32WI1367 would be avoided via HDD to ensure the integrity of construction design for these historic-age features is preserved. Additionally, no impacts to site 32MZ2874 are anticipated to occur as the HDD workspace is located beyond the site boundaries. These management

78

USACE_DAPL0071302

recommendations have been included as viable avoidance options in the Class II/III report submitted to the USACE regional archaeological staff.  A more thorough discussion of the cultural setting, relevant previous studies, as well as geologic and geomorphic analysis of the region, and results of the current survey with associated mapping detail can be referenced in Appendix I.

**Federal Lands**

Dakota Access has conducted Class II/III inventory surveys within the Connected Action areas on private lands associated with the Lake Oahe crossing.  These investigations resulted in the documentation of one prehistoric site consisting of a singular lithic artifact (32MO570).  This site is recommended as not eligible for listing in the NRHP.  No additional cultural resources were documented within the Connected Action areas associated with the Lake Oahe crossing.  While the Class I background review determined that eight previously recorded sites are located on federal lands, no evidence of these sites was encountered within the Connected Action areas on private lands.

Dakota Access' UDP was developed (Appendix F) for use during all DAPL Project construction activities regardless of jurisdiction or landownership.  The UDP describes actions that would take place in the event that an undocumented cultural resource site is discovered during construction activities.  The UDP explicitly calls for work to stop until the correct authority or agency can be contacted and the find can be properly evaluated.

### 3.7.2    Native American Consultations

The 2004 Programmatic Agreement for the Operation and Management of the Missouri River Main Stem System for Compliance with the National Historic Preservation Act, as amended, (PA) was developed to address challenges associated with cultural and historic resource impacts involved with the ongoing operation and maintenance of the Missouri River system of main stem dams.  This agreement outlines the processes through which affected Tribes, agencies and interested parties are consulted by the Corps on issues that may affect important historic and cultural resources.  These processes are essential to fulfill the Corps' Tribal Trust Responsibilities and also comply with Section 106 of the NHPA.

The United States Department of Defense recognizes its trust responsibilities to federally recognized Indian Tribes and has established an American Indian and Native Alaskan Trust policy that directs its agencies, including the Corps, to work with Tribes in a manner that incorporates tribal needs, traditional resources, stewardship practices, and the development of viable working relationships.  In addition, EO 13175, Consultation and Coordination with Indian Tribal Governments (EO 13175), outlines policy and criteria regarding the establishment of "regular and meaningful consultation and collaboration with tribal officials in the development of Federal policies that have tribal implications, and are responsible for strengthening the government-to-government relationship between the United States and Indian tribes" (https://www.whitehouse.gov/the-press-office/memorandum-tribal-consultation-signed-president).

EO 13175 continues with the following; "History has shown that failure to include the voices of tribal officials in formulating policy affecting their communities has all too often led to undesirable and, at times, devastating and tragic results.  By contrast, meaningful dialogue between Federal officials and tribal officials has greatly improved Federal policy toward Indian tribes.  Consultation is a critical ingredient of a

USACE_DAPL0071303

Environmental Assessment
Dakota Access Pipeline Project
July 2016

sound and productive Federal-tribal relationship". These concepts are reflected in the Omaha District's PA/Section 106 coordination/consultation process.

Section 106 coordination/consultation was initiated for the Proposed Action beginning in October 2014, with an information letter regarding a preliminary geo-testing of the proposed Oahe crossing alignment. Per the Omaha District's usual process, this letter was sent to Tribes, THPOs, SHPOs, agencies and interested parties, soliciting information relevant to the Proposed Action. Subsequently, the same process was utilized in circulating information and pertinent data for the installation of the Oahe pipeline crossing, in the form of a letter distributed in July 2015. The USACE recommended a "No Historic Properties Subject to Effect" Determination to the North Dakota SHPO and the SHPO concurred on April 22, 2016.

## 3.8    Social and Economic Conditions

Under the "no action" alternative, Dakota Access would not construct the DAPL Project and no impacts on social and economic conditions would occur. Although the impacts associated with a future project developed in response to the "no action" alternative are unknown, if the objectives of the DAPL Project are to be met under the "no action" alternative, other projects and activities would likely be required (e.g. transportation of oil by truck or rail). Alternative shipping methods would likely result in their own impacts on social and economic conditions, such as increases in vehicular accidents and personal injury, worsening traffic congestion, and increased infrastructure deterioration.

The overall DAPL Project is a $3.78 billion dollar investment directly impacting the local, regional, and national labor force by creating nearly 12,000 construction jobs. Dakota Access has publically committed to utilizing American labor to build the pipeline. Dakota Access has teamed up with the various craft and labor unions in the DAPL Project regions and nationally to ensure the DAPL Project is constructed by highly qualified and experienced local and regional labor resources. These construction jobs would create considerable labor income and state income tax revenue – including the generation of more than $13.4 million in ad valorem taxes. Upon authorization, the DAPL Project would put welders, mechanics, electricians, pipefitters, heavy equipment operators, and others within the heavy construction industry to work.

### 3.8.1    Demographics, Employment, Income and Economic Justice

#### 3.8.1.1    Affected Environment

The Proposed Action at the flowage easements and the Missouri River are in McKenzie County and Williams County. The two census tracts (CT) crossed are CT9625 and CT 9535, respectively. Demographic information including population, income, and employment statistics for these census tracts, counties in the general geographic area, and the state of North Dakota are provided in **Table 3-14**. The industries employing the greatest number of persons in these census tracts is agriculture followed by educational services health care and social assistance fields; and construction.

At the Lake Oahe crossing, two Census tracts are crossed, CT9665 in Emmons County and CT204 in Morton County. Demographic information including population, income, and employment statistics for these census tracts, counties, and the state of North Dakota are provided in **Table 3-15**. The top three industries

USACE_DAPL0071304

Environmental Assessment
Dakota Access Pipeline Project
July 2016

providing employment in Emmons County are agriculture followed by educational services, health care and social assistance fields, and then construction. Educational services, health care and social assistance are the leading industry employers in CT204 in Morton County followed by agriculture and retail trade. Although not directly affected by the Proposed Action or Connected Action Areas, Sioux County borders the Missouri River to the west and is south of the Lake Oahe crossing point. Due to proximity of this county to the project, it has been incorporated as part of the geographical area for the county baseline data for analysis purposes relating to the Lake Oahe crossing.

### 3.8.1.2   Impacts and Mitigation

The Proposed Action is assumed to have a short construction window with a small number of construction workers dedicated to these crossings. It is possible that counties within the general Project Area (McKenzie, Williams, Morton, Emmons, and Sioux) could experience short-term temporary effects to the local economy through induced spending from construction employees working on the crossing. No residential homes or farms would be relocated resulting from the proposed action. Additionally, no demographic changes in the Census tracts affected or the counties representing in the geographical area are anticipated because no permanent employment would be created as a result of the Proposed Action.

The DAPL Project also has tremendous secondary and sustainable economic benefits to the United States by supporting energy independence, increasing employment opportunities, and adding to demand in many manufacturing sectors, which would be a boost to the overall economy. When considering the economic impact and benefit, once U.S. workers are employed on the DAPL Project, consistent with most infrastructure projects, the workers would spend their earnings in the communities where they work and live, resulting in multiplied economic impacts that would be nearly $5 billion just during the construction phase. This economic impact would affect manufacturing in many domestic sectors such as the following examples. It results in new vehicles being purchased, which positively impacts the auto industry. It would result in new homes being built, which improves and increases the housing construction, resale, and lending business located in the region and across the U.S. It impacts the food industry by requiring more food services and products to be delivered and consumed in the DAPL Project region. And it delivers abundant American energy to U.S. markets, thereby enhancing supply. The list could continue with a description of many secondary benefits, but in summary, the economic impact to the U.S. as well as the immediate region where the pipeline is located is considerable.

USACE_DAPL0071305

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 3-14 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Minority and Low Income Population Statistics for the Flowage Easements Project Area and Connected Action** | | | | | | | | | | |
| **Geographic Area** | **Total Population** | **Percent** | | | | | | | | |
| | | **White** | **Black or African Am.** | **Am. Indian and Alaska Native** | **Asian** | **Native Hawaiian and Other Pacific Islander** | **Some Other Race** | **Two or More Races** | **Total Minority Population** | **Persons Below the Poverty Level** |
| **State** | | | | | | | | | | |
| North Dakota | 704,925 | 89.20 | 1.53 | 5.25 | 1.15 | 0.04 | 0.73 | 2.10 | 10.80 | 11.9 |
| **Counties Within Baseline Analysis (Baseline Area)** | | | | | | | | | | |
| McKenzie | 8,333 | 78.98 | 0.22 | 17.16 | 0.60 | 0.00 | 1.04 | 2.00 | 21.02 | 14.6 |
| Williams | 27,066 | 90.76 | 1.12 | 4.16 | 0.55 | 0.03 | 1.27 | 2.12 | 9.24 | 8.2 |
| **Average** | **17,700** | **84.87** | **0.67** | **10.66** | **0.58** | **0.01** | **1.16** | **2.06** | **15.13** | **11.40** |
| **Proposed Action Area** | | | | | | | | | | |
| CT9625 | 1,522 | 97.50 | 0.00 | 1.05 | 0.20 | 0.00 | 0.53 | 0.72 | 2.5 | 5.8 |
| CT9535 | 1,708 | 74.41 | 0.47 | 17.15 | 0.00 | 0.00 | 0.00 | 7.96 | 25.59 | 7.7 |
| **Average** | **1,615** | **85.96** | **0.23** | **9.10** | **0.10** | **0.00** | **0.26** | **4.34** | **14.04** | **6.75** |
| **State Comparison to Proposed Action Area** | | | | | | | | | | |
| Proposed Action | -703,310 | -3.24 | -1.30 | 3.86 | -1.05 | -0.04 | -0.46 | 2.24 | 3.24 | -5.15 |
| **County Comparison to Proposed Action Area** | | | | | | | | | | |
| Proposed Action | -16,085 | 1.09 | -0.43 | -1.56 | -0.48 | -0.01 | -0.89 | 2.28 | -1.09 | -4.65 |

Source: U.S. Census Bureau, American Community Survey (2010-2014 5-year estimates).
Note: totals may not sum across the table due to rounding used in data collection.

82

USACE_DAPL0071306

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 3-15 Minority and Low Income Population Statistics for Federal Lands Project Area | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Geographic Area | Total Population | Percent | | | | | | | | |
| | | White | Black or African Am. | Am. Indian and Alaska Native | Asian | Native Hawaiian and Other Pacific Islander | Some Other Race | Two or More Races | Total Minority Population | Persons Below the Poverty Level |
| **State** | | | | | | | | | | |
| North Dakota | 704,925 | 89.20 | 1.53 | 5.25 | 1.15 | 0.04 | 0.73 | 2.10 | 10.80 | 11.9 |
| **Counties Within Baseline Analysis (Baseline Area)** | | | | | | | | | | |
| Morton | 27,439 | 93.98 | 0.50 | 3.70 | 0.20 | 0.00 | 0.50 | 1.30 | 6.20 | 8.7 |
| Emmons | 3,491 | 99.28 | 0.00 | 0.23 | 0.17 | 0.00 | 0.00 | 0.32 | 0.72 | 13.5 |
| Sioux | 4,317 | 13.67 | 0.02 | 82.26 | 0.25 | 0.07 | 0.53 | 3.20 | 86.33 | 36.4 |
| **Average** | **15,465** | **68.98** | **0.17** | **28.73** | **0.21** | **0.02** | **0.34** | **1.60** | **31.08** | **58.6** |
| **Proposed Action Area** | | | | | | | | | | |
| CT204 | 3,143 | 96.5 | 0 | 1.4 | 0 | 0 | 0.8 | 1.3 | 3.5 | 4.4 |
| CT9665 | 3,491 | 99.3 | 0 | 0.2 | 0.2 | 0 | 0 | 0.3 | 0.7 | 13.5 |
| **Average** | **3,317** | **97.88** | **0.00** | **0.83** | **0.09** | **0.00** | **0.40** | **0.81** | **2.12** | **8.95** |
| **State Comparison to Proposed Action Area** | | | | | | | | | | |
| Proposed Action | -701,608 | 8.68 | -1.53 | -4.42 | -1.07 | -0.04 | -0.33 | -1.29 | -8.68 | 49.65 |
| **Baseline Area Comparison to Proposed Action Area** | | | | | | | | | | |
| Proposed Action | -12,148 | 28.90 | -0.17 | -27.90 | -0.12 | -0.02 | 0.05 | -0.79 | -28.96 | -2.95 |

Source: U.S. Census Bureau, American Community Survey (2010-2014 5-year estimates).
Note: totals may not sum across the table due to rounding used in data collection.

83

Environmental Assessment
Dakota Access Pipeline Project
July 2016

## 3.9      Environmental Justice

EO 12898, *Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations*, requires federal agencies to identify and address disproportionately high and adverse human health or environmental of their programs and policies on minority and low-income populations and communities and Indian tribes.  The CEQ guidance suggests that an environmental justice population may be identified if "the minority population percentage of the affected area exceeds 50%, or if the minority population percentage of the affected area is meaningfully greater than the minority population in the general population or other appropriate unit of geographic analysis" (CEQ, 1997).  The CEQ defines low-income populations based on an annual statistical poverty threshold.  In 2013, the poverty threshold for the 48 contiguous states for an individual under the age of 65 living alone was $12,119 (U.S. Census Bureau, 2014).

Under the "no action" alternative, Dakota Access would not construct the proposed Project and no environmental justice impacts would occur.  However, If the objectives of the Project are to be met under the "no action" alternative, other projects and activities would be required and these projects could result in their own environmental injustice impacts, which would likely be similar to or greater than the proposed Project.  It is reasonable to assume that alternative methods of crude oil transportation would be relied on to meet market demands.  Minority or low income communities along utilized rail lines or truck routes could be affected by increasing noise and creating transportation delays due to the substantial increasing truck traffic on county, state and interstate highways as well as rail traffic across railroad crossings.     .

### 3.9.1     Affected Environment

Transportation projects, such as under the Federal Transit Administration, and natural gas pipeline projects under the Federal Energy Regulatory Commission (e.g. Docket Nos. CP12-507-000 and CP12-508-000, DOE FE 12-97-LNG, and FERC/EIS-0252F), typically use a 0.5 mile buffer area to examine Environmental Justice effects.  The census tracts crossed by the Proposed Action encompass an area greater than 0.5 mile radius for the project; therefore additional census tracts were not evaluated.

Since two census tracts are within 0.5 mile of the Flowage Easements at the Missouri River, and another two census tracts are located within 0.5 mile of the federal lands at Lake Oahe, an average of the demographic data from two respective census tracts was compared to the average demographic data of the counties in the general vicinity of each crossing as well as the state of North Dakota demographic data.

For the Flowage easements and Missouri River crossing, which are generally centrally located within McKenzie and Williams Counties, the averaged data from those two counties was used to obtain the Baseline Area data set.

Lake Oahe crossing is generally centrally located within Emmons County on the east side of the Lake, however it is near the southern boundary of Morton County.  Therefore Sioux County (located greater than 0.5 miles) was included in the geographical area of the Lake Oahe.  Thus Morton, Emmons, and Sioux county data was averaged to obtain the Baseline Area data set.

USACE_DAPL0071308

Environmental Assessment
Dakota Access Pipeline Project
July 2016

### 3.9.2    Impacts and Mitigation

For analyzing impacts to the minority and low income populations at the Proposed Action Area at the flowage easements and Missouri River Crossing, Census Tracts CT9625 and CT9535 were compared to the averaged county baseline (McKenzie and Williams Counties – "Baseline Area") data and then to the state data to determine if there were any siting concerns relative to Environmental Justice.

The minority population of the Proposed Action Area at the Missouri River is greater than the state as a whole (3% greater) but lower than surrounding county geographical area (1% lower).  Neither of these differences is considered meaningful.

The percentage of the population below the poverty level for the Proposed Action Area at the Missouri River is 5% lower than the state as a whole and also 5% lower than surrounding county geographical area. These differences are not considered meaningful.

For analyzing impacts to the minority and low income populations at the Lake Oahe Crossings, data for the averaged Census Tracts (CT204 and CT9665) was compared to the averaged county baseline (Morton, Emmons and Sioux – "Baseline Area") for the county geographical area (Morton, Emmons, and Sioux Counties – "Baseline Area") data and then to the state to determine if there were any siting concerns relative to Environmental Justice.

Based on this analysis, the minority population of the Proposed Action Area at Lake Oahe is lower than the state as a whole (9% lower).  Although the average minority population of the counties geographical baseline is greater than the state as a whole, the minority population in the averaged census tract of the Proposed Action Area at Lake Oahe is much lower than surrounding county geographical area.   In this case, the census tracts associated with the Proposed Action Area at Lake Oahe have a meaningfully lower minority percentage (29% lower) than the Baseline Area consisting of the three county area.

No appreciable minority or low-income populations exist within the Census tracts directly affected by the Proposed Action at either crossing (**Tables 3-14 and 3-15**).  No local community with appreciable minority or low-income populations exists at either the crossing of federal lands or flowage easements (**Tables 3-14** and **3-15**).   Based on this analysis, there is no concern regarding environmental justice to minority populations at the Proposed Action Area at the Missouri River Crossing or at Lake Oahe.

### 3.9.2.1    Standing Rock Sioux Reservation

It is recognized that the Standing Rock Sioux Tribe is downstream of the Lake Oahe Crossing, which has a high population of minorities and low-income residents.  Dakota Access and the Corps sought to engage Tribal representatives in the vicinity of the Proposed Action, and especially the Standing Rock Sioux Tribe, in discussion as to the nature of the Project, cultural resource concerns and the Lake Oahe crossing.  The initial contact by Dakota Access with the Standing Rock Sioux Tribe was in October of 2014 with additional contacts and subsequent meetings occurring through March 2016.  Direct and Indirect impacts from the Proposed and Connected Actions will not affect members of the Standing Rock Sioux Tribe or the Tribal reservation.  The Lake Oahe crossing will be installed via HDD beneath the river from private lands adjacent to Corps owned lands to avoid impacts to environmental resources (e.g. water, soil, cultural resources, vegetation, etc.).  The HDD drilling process is an expensive technique that itself is a mitigation

USACE_DAPL0071309

Environmental Assessment
Dakota Access Pipeline Project
July 2016

measure with no anticipated effects to the environment including vibration or frac-out within or outside of the Proposed Action for the short duration of the construction project (see sections 2.3.2.6 and 3.1.1.2 for additional information).

As discussed in more detail in sections of this Environmental Assessment (i.e. Section 2.3.1), Dakota Access utilized a complex routing model to examine alignment options for the Project and an array of environmentally protective criteria were used to cite the Project.  Perhaps most important for purposes of this analysis, are the citing criteria that require the avoidance of Tribal reservations and federal lands.  Since the route must cross the Missouri River, it was not practicable to fully avoid federal land (see discussion in Section 2.1.3), and hence the necessity for this EA.  However, maintaining a minimum distance of 0.5 mile from Tribal land, consistent with other federal citing criteria, avoided tribal land as a mitigation and routing measure.  Furthermore, the Proposed Action, and hence the route and installation methods, is at a distance sufficient such that there are no direct or indirect impacts to Tribal lands, members or protected cultural resources.

Another primary consideration in routing included a preference for co-locating the route with existing infrastructure.  The Proposed Action is co-located with existing power and pipe lines across Lake Oahe and partially co-located with a gas line at the flowage easements and Missouri River.  As examples, the routing model affirmatively excludes such locations as Tribal lands, National Registry Historic Places, wilderness, parks, landmarks and an array of other special needs areas.

As a result of this routing criteria, the nature of the action (construction associated with laying an underground oil pipeline), the short term duration of effects, construction and operation on private lands, the concurrent reclamation activities, state of the art construction techniques, use of high quality materials and standards that meet or exceed federal standards, there will be no direct or indirect effects to the Standing Rock Sioux tribe.  This includes a lack of impact to its lands, cultural artifacts, water quality or quantity, treaty hunting and fishing rights, environmental quality, or socio-economic status.  Therefore, there is no resulting adverse or disproportionate impacts of the Proposed Action with respect to Environmental Justice considerations.

The Standing Rock Sioux Reservation boundary is over 0.5 miles south of the Lake Oahe Project Area crossing.  Based on aerial imagery, the closest residence on the Standing Rock Sioux Reservation is a rural residence located greater than 1.5 miles from the Lake Oahe Project Area Crossing.  This distance is well beyond any federal or state siting criteria.  The North Dakota Energy Conversion and Transmission Facility Siting Act Exclusion and Avoidance Areas Criteria (49-22-05.1) establishes an avoidance setback requirement of 500 feet from inhabited rural residences.

The pipeline route expressly and intentionally does not cross the Standing Rock Sioux Reservation and is not considered an Environmental Justice issue.  If were it determined that there would be some effects to the Standing Rock Sioux Tribe as a low income, minority population, it would not disproportionately or predominately bear impacts from the Proposed Actions (the impacts will actually disproportionately affect private lands, non-low income populations and non-minority populations).   The impacts along the Missouri River and the Lake Oahe crossing are not disproportionate to the tribe.  The Missouri River crossing is on private lands with private lands and US federal lands downstream; the nearest reservation is Fort Berthold approximately 50 miles due east and Standing Rock Reservation is approximately 160 miles southeast. The Lake Oahe HDD crosses under US Federal lands from lands that are privately owned;

86

USACE_DAPL0071310

Environmental Assessment
Dakota Access Pipeline Project
July 2016

private lands continue downstream of the crossing on the east side of the Lake and Standing Rock Reservation (0.55 miles). Thus, the impacts at best can be said to be equivalent between tribal lands and private landowners at the Lake Oahe crossing. As stated above, linear projects typically use a 0.5 mile buffer area to examine Environmental Justice effects. There are no low-income, minority or tribal lands within 0.5 mile of the Proposed Action.

Concerns have been expressed regarding an inadvertent release reaching intake structures on Lake Oahe. Given the engineering design, proposed installation methodology, quality of material selected, operations measures and response plans the risk of an inadvertent release in, or reaching, Lake Oahe is extremely low. While the locations of water intakes is not public information for disclosure in this document, there are private and/or non-tribal intakes closer to the Lake Oahe crossing than any intakes owned by the tribe; further demonstrating the lack of disproportionate impacts of an inadvertent release to the Tribe and the reservation. We understand that due to the rural nature of this area, tribal drinking water supplies are obtained from a combination of wells and surface water. The siting and construction of oil pipelines upstream of drinking water intakes is not uncommon throughout the United States and is not considered an Environmental Justice issue. In the unlikely event of a release, sufficient time exists to close the nearest intake valve to avoid human impact.

Dakota Access has committed to plan for the protection of this and other water crossings and associated water intakes as part of its emergency preparedness protocol and in accordance with PHMSA requirements outlined in 49 CFR §§ 194 and 195 (see section 3.11 for further detail). Tribal representatives have been identified for early contact along with other federal, state and local governments by the Corps as well as independently by the applicant.

Based on the above sections, it has been determined that there are no environmental justice issues or concerns resulting from the Proposed Action.

**3.10    Hazardous Waste**

The EPA (2015) defines hazardous waste as waste that is dangerous or potentially harmful to human health or the environment, occurring as liquids, solids, gases, or sludges. They can be generated through the disposal of commercial products, such as cleaning fluids or pesticides, or manufacturing processes. Improper management and disposal of hazardous substances can lead to pollution of groundwater or other drinking water supplies and the contamination of surface water and soil. The primary federal regulations for the management and disposal of hazardous substances are the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) and the Resource Conservation and Recovery Act (RCRA).

A review of regulated facilities for hazardous materials along the Proposed Action corridor was conducted by searching online records maintained by the EPA (2014). Presently, there are no recognized Radiation Information Database, Brownfields, Superfund, Toxic Release Inventory, or air emission sites within one mile of the flowage easements and Lake Oahe crossings. No operating sensitive receptors, such as schools or hospitals, are reported within at least one mile. Additionally, there are no NPDES discharge sites within one mile of the Project Areas.

USACE_DAPL0071311

Environmental Assessment
Dakota Access Pipeline Project
July 2016

With the Proposed Action, there is potential for temporary impacts to public safety from hazardous material use. Other hazards to worker safety may also exist along the Proposed Action corridor, but do not pose a significant impact. Because there were no regulated sites found within the one-mile search radius of the Project Area, no impacts to the Proposed Action, Proposed Action media, or worker safety are expected. In the unlikely event contamination is encountered during construction, the UDP **(Appendix F)** would be implemented to protect people and the environment and avoid or minimize any effects from unearthing the material.

Any hazardous materials discovered, generated, or used during construction would be managed and disposed of in accordance with applicable local, tribal, state, and federal regulations. Should emergency response be required during construction, the contractor would have some of their own trained or contracted responders, and local response teams would be expected to assist.

Dakota Access would comply with any laws, regulations, conditions, or instructions issued by the EPA, or any Federal, state, or local governmental agency having jurisdiction to abate or prevent pollution, such as the RCRA, and State hazardous waste management rules.

## 3.11    Reliability and Safety

The PHMSA, a federal agency within the U.S. DOT is the primary federal regulatory agency responsible for ensuring the safety of America's energy pipelines, including crude oil pipeline systems. As a part of that responsibility, PHMSA established regulatory requirements for the construction, operation, maintenance, monitoring, inspection, and repair of liquid pipeline systems.

Construction activities could present safety risks to those performing the activities, residents and other pedestrians in the neighborhood. Given the low population density of the area, risks would be limited to workers involved with the Proposed Action. All activities would be conducted in a safe manner in accordance with the standards specified in the Occupational Safety and Health Administration (OSHA) regulations.

To prevent pipeline failures resulting in inadvertent releases, Dakota Access would construct and maintain the pipeline to meet or exceed industry and governmental requirements and standards. Specifically, the steel pipe would meet PHMSA specifications under 49 CFR § 195, follow standards issued by the American Society of Mechanical Engineers, National Association for Corrosion Engineers and API. Once installed, the pipeline would be subjected to testing to verify its integrity and compliance with specifications, including hydrostatic pressure testing at the crossings, checking coating integrity, and X-ray inspection of the welds. The pipeline would be placed into service only after inspection to verify compliance with all construction standards and requirements. Dakota Access would maintain and inspect the pipeline in accordance with PHMSA regulations, industry codes and prudent pipeline operating protocols and techniques. The pipeline ROW would be patrolled and inspected by air every 10 days, weather permitting, but at least every three weeks and not less than 26 times per year, to check for abnormal conditions or dangerous activities, such as unauthorized excavation along the pipeline route.

As discussed in Section 3.2.1.2, Dakota Access has drafted a FRP, in accordance with 49 CFR 194, which details the procedures to be implemented in the event of an inadvertent pipeline release and would be in

USACE_DAPL0071312

Environmental Assessment
Dakota Access Pipeline Project
July 2016

place prior to commencing transportation of crude oil.  The FRP is discussed under Section 3.2.1.2 and a draft of the FRP is included in Appendix L.

Following completion of construction and throughout operation of the Proposed Action facilities, the Operator and qualified contractors would maintain emergency response equipment and personnel at strategic points along the pipeline route.  These personnel would be trained to respond to pipeline emergencies as well as in the National Incident Management System (NIMS) Incident Command System (ICS).  Additionally, contracts would be in place with oil spill response companies that have the capability to mobilize to support cleanup and remediation efforts in the event of a pipeline release.  The Operator would also coordinate with local emergency responders in preventing and responding to any pipeline related problems.  These activities would include conducting and hosting, over a period of time, emergency response drills with both Dakota Access employees and local emergency responders along the pipeline route.

Dakota Access will conduct emergency response drills/exercises in accordance with PREP, which is recognized, and approved, by the EPA, US Coast Guard, and PHMSA.  These emergency response exercises will consist of annual table top exercises and equipment deployment drills.  Dakota Access is committed to conducting a worst case discharge full scale exercise at either the Missouri River crossing near Williston or the crossing at Lake Oahe once every 6 years and will include both open water and ice response.  Dakota Access will alternate the location and type of exercise.  Regulatory and stakeholder participation will be encouraged and solicited for the exercises.

In addition to the testing and inspection measures listed above, Dakota Access would utilize a supervisory control and data acquisition (SCADA) system to provide constant remote oversight of the pipeline facilities.  Power for the SCADA system would be provided from an existing power grid.  In the event of a power outage, a 500 watt Uninterruptable Power Supply would supply low voltage power to the Programmable Logic Controller and communication equipment.  Communication with the SCADA system would be accomplished via satellite (Hughes Global Network) and telephone (4G cellular [ATT] or landline depending on availability/coverage).  Both forms of communication are continually engaged to poll information from these sites for 100% reliable remote monitoring / operation of these sites through the SCADA system to the Operations Control Center (OCC) in Sugarland, Texas (a backup control room is located in Bryan, Texas), and are proven to have the least potential for interruption during pipeline operations.

If an alarm criteria threshold is met, the SCADA system would alert Dakota Access' OCC Operators, located in Sugarland and Bryan, Texas, of rapid drops in pressure, who would then activate the controls as necessary and initiate procedures for an appropriate response.  The OCC prioritizes and responds to all alarms in accordance with the control room management regulations referenced in PHMSA CFR 195.446 (e).  This regulation requires that the OCC Operator have a SCADA system alarm management plan; in general, the plan must include review of the SCADA alarm operations to ensure alarms support safe pipeline operations, identify any required maintenance that may affect safety at least once every calendar month, verify correct safety-related alarm values and descriptions at least once every calendar year when associated field equipment are changed or calibrated, determine effectiveness of the alarm management plan through a yearly review, and monitor content and volume of activity at least once a calendar year to assure controllers have adequate time to review incoming alarms.  Leak Warn, a leading software program for monitoring pipelines, is being tailored to the pipeline facilities, in accordance with Pipeline and

89

Environmental Assessment
Dakota Access Pipeline Project
July 2016

Hazardous Materials Safety Administration requirements. The Operator would utilize a Computational Pipeline Monitoring System (CPM) to monitor the pipeline for leaks. The CPM is a state-of-the-art pipeline monitoring tool and features a real-time transient model that is based on pipeline pressure, flow, and temperature data, which is polled from various field instruments every 6 seconds and updates the model calculations to detect pipeline system variations every 30 seconds. After the system is tuned, this state-of-the-art CPM system is capable of detecting leaks down to 1 percent or better of the pipeline flow rate within a time span of approximately 1 hour or less and capable of providing rupture detection within 1 to 3 minutes. State–of-the-art leak detection equipment and software utilized during operations or the pipeline will be updated per federal standards in accordance with PHMSA requirements. In the event that a leak is confirmed through verification, pump station shutdown would be initiated within a predetermined amount of time to effectuate. Next, the remotely controlled isolation valves (mainline valve sites would be installed on both sides of large waterbody crossings for isolation in the event of an emergency shutdown), which are operable from the OCC, would be closed. These valves have a closure time of no greater than three (3) minutes. Monitoring of the pipeline segments installed via HDD would be accomplished in the same manner as those segments installed by conventional methods (i.e., SCADA, internal inspection devices, and aerial patrols). Typically, repairs are not made on any section of pipe greater than 10 to 20 feet below the ground surface depending on the repair needed. If a material impact was on the pipeline below the 10-foot depth, operation of the system would be modified accordingly (e.g., reduce operating pressure) or the line would be re-drilled. If inspections identify an anomaly, requirements would be followed to comply with U.S. DOT requirements.

In the unlikely event of a leak during operations of the pipeline, the Operator would implement the response measures described in the FRP. Below is a list of typical response activities. However, each spill mitigation situation is unique and will be treated according to the actual spill circumstances present at the time of release.

Notification: The Operator will conduct notifications in accordance with federal and state guidelines. These guidelines, along with additional notification forms/procedures are presented in Appendix B of the FRP. Local government response agencies would be notified first followed by federal and state agencies as well as surrounding communities, and governments (including tribal governments and utilities) in accordance with the relevant provisions of the FRP and relevant law. Response notification to such entities as the National Response Center, PHMSA, EPA, USACE, and affected state regulatory entities will be made in accordance with the requirements dictated by the incident type. A complete list of required notifications is included in the FRP. In accordance with PHMSA policy, the FRP will be updated every five years or sooner if there are material changes to the Plan.

Mobilize Response Equipment: Emergency equipment would be available to allow personnel to respond safely and quickly to emergency situations. Company-owned equipment will be inspected and exercised in accordance with PREP guidelines and would be mobilized and deployed by the Operator from strategic staging locations along the pipeline. Additionally, the operator will contractually secure OSROs to provide trained personnel and equipment necessary to respond, to the maximum extent practicable, to a worst case discharge or substantial threat of such discharge. At a minimum, each OSRO will have a containment booms, absorbents, boats, and vacuum trucks available. A complete list of equipment and list of trained personnel necessary to continue operations of the equipment and staff the oil spill removal organization for each of the OSRO contractors is included in the FRP.

USACE_DAPL0071314

Environmental Assessment
Dakota Access Pipeline Project
July 2016

Response Activities:  Following incident command protocols, the Operator would work in unison to cooperate with and assist fire, police and other first responders when implementing actions to protect personnel, public safety and the environment.  The FRP includes a spill response checklist which lists activities that could be conducted during a spill which would be modified to best address the specific circumstances of a spill event.  Incident response activities may include: initiating spill assessment procedures including surveillance operations, trajectory calculations, and spill volume estimating; berming or deployment of containment and/or sorbent booms; lining shorelines with sorbent or diversion booms to reduce impacts; and recovering contained product as soon as possible to prevent the spread of contamination using appropriate hoses, skimmers, pumps, and storage containers or vacuum trucks at collection areas.  The response activities would continue until an appropriate level of cleanup is obtained as provided by the responsible federal, state or other governmental authorities.  The nature and location of the incident will affect the regulatory and notification requirements, for which more detail is provided in the FRP.  Incidents involving discharges to navigable waters are governed the Oil Pollution Act of 1990.

Dakota Access will implement numerous measures to minimize the risk of a pipeline leak and protect the users of downstream intakes:

1) Spill Prevention, Leak Detection and Spill Response Measures:

Based on a worst case discharge (WCD) scenario specific to Lake Sakakawea and Lake Oahe, calculated by guidance in 49 CFR § 194.105, a largest possible release volume was determined specific to the segment of the pipeline that would cross Corps-managed lands. This calculation was based on environmental assumptions such as air temperature, wind direction/probability and wind speeds that were averaged from data over a one-year period derived from the  U.S. Geological Survey National Hydrological Dataset (NHD, version 2). This information was extrapolated into a 24-hour model. The WCD, at the end of the 24-hour period, produced a surface oil slick attenuation distance, volume remaining in the water column, volume that would be ashore and the volume would evaporate within this timeframe. It is important to note, this WCD scenario is also calculated on the assumption that the pipeline is on top of the river verses HDD. Because the proposed pipeline would be installed at a minimum depth of 36 feet below the Missouri River above Lake Sakakawea and 92 feet below the lakebed of Lake Oahe, there is a greater response time combined with the use of the automated SCADA system.

While the potential risk for a WCD scenario is low, such a spill would result in high consequences. Review and approval of the overall regional FRP, which encompasses the regional DAPL Pipeline response strategies in the event of an oil spill, is the responsibility and jurisdiction of PHMSA. Federal regulations 49 CFR 194 specify minimum requirements of such an FRP. For the proposed project, the DAPL Pipeline FRP will be required to align with the content and directions identified in the Mid-Missouri Sub-Area Contingency Plan.  A tactical GRP specific to a response strategy for Lake Sakakawea and Lake Oahe was provided by the applicant and includes specific response strategies and equipment for all affected water. Both the FRP and GRP will be finalized after construction and be submitted to the USACE for review and the incorporation of USACE comments prior to submittal to PHMSA.

Within these response plans, DAPL training exercise program would be consistent with the exercise requirements as outlined in the PREP Guidelines that were developed by the U.S. Coast Guard in conjunction with PHMSA and EPA. Training exercises include quarterly notification exercise, annual

USACE_DAPL0071315

Environmental Assessment
Dakota Access Pipeline Project
July 2016

tabletop exercises to include a WCD scenario every three years, annual facility-owned equipment deployment exercises annual contractor exercises and unannounced exercises by government agencies.

The applicant has committed to additional full scale open water and full scale winter/ice exercises that will be conducted at Lake Sakakawea and Lake Oahe. A full scale exercise will occur once every 3 years (triennial cycle) with the location and type of exercise occurring on alternating schedules (e.g. open water exercise at Oahe the first triennial cycle, followed by winter exercise at Sakakawea the following triennial cycle, followed by a winter exercise at Oahe the following triennial cycle, etc.). Stakeholder (federal, state, local, and Tribal) involvement will be solicited for each exercise. The first exercise will occur within the first 3 years after the pipeline becomes operational.

2) Risk Analysis

While an oil spill is considered unlikely and a high precaution to minimize the chances has been taken, it is still considered a low risk/high consequence event. A risk analysis conducted by DAPL addressed nine industry-recognized pipeline integrity threat categories in combination with public and environmental impact that could occur in the event of a release into Lake Sakakawea and Lake Oahe. These threat categories include the following: 1) third-party damage, 2) external corrosion, 3) internal corrosion, 4) pipe manufacturing defects, 5) construction related defects 6) incorrect operations, 7) equipment failure, 8) stress corrosion cracking and 9) natural forces. DAPL derived the following analysis risk process from the W. Kent Muhlbauer Relative Index Methodology (2004), in accordance with 49 CFR 195.452 "Hazardous Liquid Pipelines in High Consequence Area", API RP 1160 "Managing System Integrity for Hazardous Liquid Pipelines", and ASME B31.8S "Managing System Integrity of Gas Pipelines".

1 - Third Party Damage

Pipeline failure due to third party damage is ranked low for the Missouri River above Lake Sakakawea and Lake Oahe (36 and 92 feet below the river and lakebed, respectively). The only third party damage that would threaten this portion of the pipeline would be another HDD in the same location of the DAPL Pipeline. Due to tracking technological advances such as submeter accuracy, a permanent and accurate record of the proposed pipeline would be documented so no such possibility of another pipeline being placed via HDD in the same location would occur.

2 - External Corrosion

Pipeline failure for the portion of the proposed project that crosses Lake Sakakawea is classified as low. The potential is ranked low due to the high performance external coating system that is being used (heavy epoxy-concrete abrasion resistant layer over fusion bonded epoxy) and deep well cathodic protection. This portion of the pipeline is constructed with a thicker wall pipe compared to segments of the pipeline in upland-classified areas. A conservative corrosion growth rate was determined to take 70 years before a through-wall metal loss could occur. Because in-line inspection metal loss detection tools run every five years, external corrosion activity would be detected and mitigated prior to it becoming an integrity threat.

3 - Internal Corrosion

92

Pipeline failure due to the internal corrosion threat for the portion of the proposed project that would cross Lake Sakakawea is ranked low. Causes of internal corrosion would be due to accumulation of water and solids in low spots of the pipeline. However, DAPL internal corrosion mitigation program for the entire DAPL pipeline include chemical analysis of the crude product stream, pipeline operations (maintenance of minimum flow rates that keep entrained water and solids moving through the system), a maintenance pigging program, wall pipe design and in-line inspection performed every five years. The potential does exist, but successful implementation and continual monitoring of the effectiveness of the above programs will mitigate the risk. As with the external corrosion threat, the internal corrosion would be detected and mitigated prior to it becoming an integrity threat.

### 4 - Pipe Manufacturing Defects

Pipeline failure due to manufacturing defects is considered low for the portion of the pipeline that crosses Lake Sakakawea and Lake Oahe. Upon completion of construction and prior to the commissioning of the pipeline, the segment of the pipeline crossing Corps-managed lands would be hydrostatically strength-tested for eight hours at 1,800 psig which would be 1.25 times greater than the 1,440 MAOP. Should any strength-related defects be found in the pipe as a result of the hydrostatic test, this segment of the pipeline would have been over-pressured by more than two-times to have a potential effect on those defects. An over-pressure event of this magnitude is not likely with the equipment installed.

### 5 - Construction Related Defects

Pipeline failure for the segment that crosses under Lake Sakakawea due to construction related defects is categorized as low. All pipe joints would be welded by qualified welders and the required 100% girth weld radiography would provide a two-dimensional grayscale image of the weld. After construction and prior to commissioning of the pipeline, the hydrostatic testing would be performed. After the drill string is installed and prior to the line being put into service, an in-line inspection tool would be ran to identify an injurious mechanical damage that may have gone undetected during construction.

### 6 - Incorrect Operations

Pipeline failure due to incorrect operations (e.g. overpressure event caused by human error) is ranked low for the section of the pipeline that crosses Lake Sakakawea and Lake Oahe. This section of the DAPL pipeline has a design factor nearly 2-times greater than the maximum allowable operating pressure (1440 psig) of the pipeline. In addition, the system is controlled and monitored 24 hours a day, 365 days a year by experienced controllers in the control center in Sugarland, Texas. The system is designed with instruments and pressure relief systems to minimize the opportunity for overpressure.

### 7 - Equipment Failure

Pipeline failure due to equipment failure for the section of the pipeline that crosses the Missouri River above Lake Sakakawea and Lake Oahe are categorized as low. The only equipment located in this section of the pipeline are the shut-off valves on either side of the Missouri River above Lake Sakakawea and Lake Oahe which are remotely operated. These valves are secured in perimeter fencing.

### 8 - Stress Corrosion Cracking

USACE_DAPL0071317

Environmental Assessment
Dakota Access Pipeline Project
July 2016

The potential for pipeline failure due to stress corrosion cracking for the portion of the pipe that crosses the Missouri River above Lake Sakakawea and Lake Oahe is ranked as low because this section will operate at a low stress and is externally coated with a fusion bond epoxy coating.

### 9 - Natural Forces

The potential for pipeline failure due to natural forces is ranked low for the segment of the pipeline that crosses Lake Sakakawea and Lake Oahe. The National Pipeline Mapping System, maintained by PHMSA, rates this geographic location for natural hazards as the following: Hurricane- Low; Earthquake- Low; Flood- High and; Landslide-High. Erosion of cover/ exposure of the pipeline to debris during flood conditions is highly unlikely due to the depth of cover at the Missouri River and Lake Oahe crossings (36 feet and 92 feet below the river and lakebed, respectively). In addition, landslide/ creep of the pipeline is highly unlikely as the pipe is at a depth below that which would be affected by land movement.

### 10 - Consequences

In the event that a pipeline failure occurs and product is released into the Missouri River at either crossing, the worst case consequence scenario is ranked high because several drinking water intake High Consequence Areas (HCAs) and multiple ecologically sensitive HCAs could be impacted. To minimize the impact of a release (e.g. size and spread) the pipeline will continuously be monitored by a real-time monitoring and leak detection system , which is considered to be the best available technology; motor operated isolation and/or check valves are installed on either side of the Missouri River above Lake Sakakawea and Lake Oahe which can be actuated to close as soon as a leak is detected;  PHMSA-approved FRP will be in place, all weather access and collection points will be staged strategically downstream of each lake crossing, and DAPL has committed to additional full scale open water and full scale winter/ice exercises that will be conducted at Lake Sakakawea and Lake Oahe. A full scale exercise will occur once every 3 years (triennial cycle) with the location and type of exercise occurring on alternating schedules (e.g. open water exercise at Oahe the first triennial cycle, followed by winter exercise at Sakakawea the following triennial cycle, followed by a winter exercise at Oahe the following triennial cycle, etc.). Stakeholder (federal, state, local, and Tribal) involvement will be solicited for each exercise. The first exercise will occur within the first 3 years after the pipeline becomes operational.

## 3.12   Air Quality and Noise

Under the "no action" alternative, Dakota Access would not construct the DAPL Project and no impacts on air quality and noise would occur.  However, If the objectives of the DAPL Project are to be met under the "no action" alternative, other projects and activities would be required and these projects would result in their own impacts on air quality and noise, which would likely be similar to or greater than the DAPL Project.  If the "no action" alternative is implemented and the Project is not constructed, shippers will likely rely on truck or rail to transport crude oil.  Additional road and rail traffic necessary to transport the volume of crude oil proposed by the DAPL project would increase the emissions of combustion products due to the potential releases during the filling operations of trucks or rail cars and the use of diesel engines.  These would be recurring inputs into the environment which could have an adverse impact on air quality in the region.   Similarly, an increase in noise from truck and rail traffic would be widespread

USACE_DAPL0071318

Environmental Assessment
Dakota Access Pipeline Project
July 2016

and long term as opposed to the noise impacts of the preferred action which are temporary and primarily limited to the vicinity of the construction workspace.

## 3.12.1   Air Quality

### 3.12.1.1   Affected Environment

The Clean Air Act (CAA) of 1970 requires that states adopt ambient air quality standards.  The CAA (42 USC 7401 et seq.) establishes ambient air quality standards, permit requirements for both stationary and mobile sources, and standards for acid deposition and stratospheric ozone (O3) protection.  The standards have been established in order to protect the public from potentially harmful amounts of pollutants. Under the CAA, the EPA establishes primary and secondary air quality standards.  Primary air quality standards protect public health, including the health of "sensitive populations, such as people with asthma, children, and older adults." Secondary air quality standards protect public welfare by promoting ecosystem health, and preventing decreased visibility and damage to crops and buildings.

According to the EPA, North Dakota has no nonattainment areas for criteria pollutants.  The Bismarck air quality monitoring station in Burleigh County is located approximately 23 miles north-northwest of the Lake Oahe crossing.  The Bismarck air quality monitoring station measures sulfur dioxide, nitrogen dioxide, particulate matter, ground-level ozone, and meteorological data (North Dakota Department of Health, 2013).  The Williston air quality monitoring station in Williams County is located approximately 18 miles northeast of the flowage easement crossing.  The Williston air quality monitoring station measures particulate matter, ground-level ozone, and meteorological data.  The monitoring objective of both stations is to measure population exposure to air quality parameters.

Monitoring data for these stations from 2003-2013 show pollutant levels for sulfur dioxide, nitrogen dioxide, ozone, and particulate matter did not exceed state or deferral ambient air quality standards at any of the state-operated monitoring sites (North Dakota Department of Health, 2013).

### 3.12.1.2   Impacts and Mitigation

With the Proposed Action, no long-term impacts to air quality would occur; the proposed pipeline would not emit any criteria air pollutants.  Short-term impacts to air quality may occur during construction phase of the Proposed Action.  The contribution of the Proposed Action to greenhouse gas emissions during construction would be considered a minor indirect impact to climate change.

During construction, emissions from fuel-burning internal combustion engines (e.g., transportation trucks, heavy equipment, drill rigs, etc.) would temporarily increase the levels of some criteria pollutants, including carbon monoxide, nitrogen dioxide, ozone, particulate matter, and non-criteria pollutants such as volatile organic compounds.  Construction of the Lake Oahe crossing is likely to take six to eight weeks to complete.  Conventional pipeline construction across the flowage easements would take approximately two weeks and activities at the HDD exit point for crossing the Missouri River on the flowage easement LL3440E would likely operate for four to six weeks.  To reduce the emission of criteria pollutants, fuel-burning equipment running times would be kept to a minimum and engines would be properly maintained.  This temporary increase in emissions is not expected to impact air quality or visibility in the region long-term.

USACE_DAPL0071319

Environmental Assessment
Dakota Access Pipeline Project
July 2016

### 3.12.2 Noise

#### 3.12.2.1 Affected Environment

Sound is a sequence of waves of pressure that propagates through compressible media such as air or water.  When sound becomes excessive, annoying, or unwanted it is referred to as noise.

Decibels (dB) are the units of measurement used to quantify the intensity of noise.  To account for the human ear's sensitivity to low level noises, the decibel values are corrected for human hearing to weighted values known as decibels of the A-weighted scale (dBA; see **Table 3-16**).  The EPA has set values that should not be exceeded.  While the primary responsibility of regulating noise was transferred from the EPA to state and local governments in 1981, the Noise Control Act of 1972 and the Quiet Communities Act of 1978 are still in effect.

| Table 3-16 Noise Values | | |
|---|---|---|
| **Area** | **Noise Level** | **Effect** |
| All areas | Leq (24) < 70 dBA | Hearing |
| Outdoors in residential areas and farms where people spend varying amounts of time in which quiet is a basis for use | Ldn < 55 dBA | Outdoor activity interference and annoyance |
| Outdoor areas where people spend limited time such as school yards, playgrounds, etc. | Leq (24) < 55 dBA | Outdoor activity interference and annoyance |
| Indoor residential areas | Ldn < 45 dBA | Indoor activity interference and annoyance |
| Indoor areas with human activities such as schools, etc. | Leq (24) < 45 dBA | Indoor activity interference and annoyance |

Source: (The Engineering ToolBox, 2015)
Leq: 24-hr equivalent sound level
Ldn: day-night average sound level

The dominant land use in the proposed Project Area is agricultural.  The Day-Night Average Sound (Ldn) level for agricultural crop land is 44 dBA, and rural residential is 39 dBA (The Engineering ToolBox, 2015).

#### 3.12.2.2 Impacts and Mitigation

Construction of the Proposed Action would temporarily affect the noise levels on and around the flowage easement and federal lands crossing areas.  Construction would cause temporary increases in the ambient sound environment in the areas immediately surrounding active construction.  The use of heavy equipment or trucks would be the primary noise source during construction and excavation.  The level of impact would vary by equipment type, duration of construction activity and the distance between the noise source and the receptor.  Construction activities would typically be limited only to daytime hours.  Potential exceptions include work determined necessary based on weather conditions, safety

USACE_DAPL0071320

Environmental Assessment
Dakota Access Pipeline Project
July 2016

considerations, and/or critical stages of the HDD [e.g. if pausing for the night would put the drill at risk of closing or jamming].

Once constructed and in-service, normal pipeline operations are not audible and noise impacts would be limited to the short-term construction window.  Dakota Access would mitigate noise impacts by limiting equipment running times and the duration of Proposed Action construction to the minimum amount necessary to complete the Proposed Action.  Noisy construction activities would typically be limited to the least noise-sensitive times of day (daytime only).

It is not anticipated that the temporary increase in ambient sound levels associated with construction would result in a significant noise impact.

97

USACE_DAPL0071321

Environmental Assessment
Dakota Access Pipeline Project
July 2016

## 4.0   CUMULATIVE IMPACTS

Cumulative impacts to the environment result from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.  Cumulative impacts may result from individually minor but collectively significant actions taking place over a period of time 40 CFR Part 1508.

Consultation with the North Dakota Public Service Commission (NDPSC) personnel, and subsequent evaluation of its online resources, provided a systematic source of information that was useful for evaluating cumulative impacts.  Although the NDPSC does not maintain a centralized repository for energy infrastructure development projects, it provides a summary of siting applications, which offers one metric of energy project development (excluding gathering lines), particularly over time (NDPSC, 2012a).  The siting application summary (NDPSC, 2012b) contains records starting in 1996.  The number of statewide siting applications increases markedly starting in 2007, coinciding with development of the Bakken Formation oil field.  Prior to that, only three to four applications would typically be submitted on an annual basis (NDPSC, 2012a).

Past actions in the vicinity of the Proposed Action include oil and gas development and associated infrastructure, utility installation, and agriculture.  These past activities most likely have had effects on soils, water resources, vegetation, wildlife, land use, visual resources, paleontological resources, and cultural resources.  The DAPL Project route was sited to minimize green-space impacts by co-locating with existing utility corridors over much of its length.  As a result, the flowage easement crossing, as designed, would be co-located with a Oneok/TransCanada natural gas pipeline and the Lake Oahe HDD would be co-located with a natural gas pipeline and a 345 kV power line.  At both of these locations, the predominant land use is agriculture.  In addition to ongoing agricultural practices and the expansion of regional oil and gas development activities, cumulative impacts associated with the DAPL Project as whole were also considered.

If the Corps approval of the Proposed Action markedly changed the rate at which the oil and gas industry grows, or facilitated a rapid increase in production, then the changes in the industry's rate of growth and the associated environmental consequences could be considered along with the effects of the Proposed Action as a cumulative impact and would need to be quantified in this EA.  However, according to Bruce Hicks, North Dakota Industrial Commission's Department of Mineral Resources Oil and Gas Division, the critical factors limiting the rate at which the industry grows within North Dakota is the availability of drill rigs and hydrofracing crews (U.S. Army Corps of Engineers, 2011).  Because the availability of rigs and crews is the critical factor affecting the growth of the industry in the region, approval of the Proposed Action is not anticipated to have a cumulative impact of increasing production or reliance upon non-renewable resources.

Cumulative impacts were evaluated for the following resources and were determined to be negligible or nonexistent based on past and foreseeable future actions in the Project Area and the minor and temporary contribution of the Proposed Action to effects on these resources:

- Geology and Soils                                            Section 4.1
- Water and Aquatic Life Resources                            Section 4.2

USACE_DAPL0071322

- Vegetation, Agriculture, and Range Resources                                Section 4.3
- Threatened, Endangered, Candidate, and Proposed Species          Section 4.4
- Wildlife Resources                                                                      Section 4.5
- Land Use and Recreation                                                           Section 4.6
- Cultural and Historic Resources and Native American Consultations   Section 4.7
- Social and Economic Conditions                                                 Section 4.8
- Transportation and Traffic                                                         Section 4.9
- Environmental Justice                                                               Section 4.10
- Air Quality and Noise                                                                Section 4.11

## 4.1    Geology and Soils

The continued development of oil and gas exploration and production in the region at its current level increases the potential for adverse cumulative impacts to geologic and soil resources.  Cumulative impacts could occur when future utilities seek to be co-located within existing corridors or alternatively when greenfield development occurs in landslide prone or highly erodible areas.  However, with the proper implementation of reclamation and restoration BMPs these impacts can be reduced.

Another potential cumulative impact to geologic resources is the continued development of the mineral resource, which could lead to its depletion.  The mineral resource is understood to be finite.  The effect would be primarily economic to the various entities with financial interests; secondarily there could be indirect impacts, potentially beneficial, associated with technological advances within the industry that would facilitate the recovery of mineral resources that cannot be recovered currently.

Agricultural practices throughout the region as well as the thousands of miles of gathering pipelines that may be built in the region could contribute to cumulative impacts on soils.  Agricultural practices can result in increased erosion and runoff when soils are exposed for long periods such as when fields are fallow or prior to seeding.  Impacts to soils as a result of pipeline installation are temporary and typically associated with excavation activities which may result in compaction and erosion when soils are exposed prior to revegetation.   Impacts to soils as a result of the Proposed Action would be mitigated through the implementation of BMPs which may include topsoil segregation, erosion controls, and decompaction.  Furthermore, adherence to NPDES stormwater permits would require adequate design, grading, and use of BMPs to ensure that erosion and sediment control measures are properly utilized.  Generally, because of the utilization of top soil segregation and erosion controls, as well as the minimal workspace requirements and minimum duration of exposed excavations during construction of the Proposed Action, the cumulative impacts on soils when combined with agricultural practices and other pipeline installations would not be significant.

No impacts on mineral extraction, mining, or other deeper geologic resources would be cumulative, since these uses of geologic resources (i.e., mining) do not occur in the Project Area.  Clearing and grading associated with construction of the Proposed Action and other projects in the vicinity could increase soil erosion in the area.  The introduction of contaminants to groundwater due to accidental spills of construction-related chemicals, fuels, or hydraulic fluid could have an adverse effect on groundwater quality.  Because the direct effects would be localized and limited primarily to the period of construction,

USACE_DAPL0071323

Environmental Assessment
Dakota Access Pipeline Project
July 2016

cumulative impacts on geology, soils, and sediments would only occur if other projects were constructed at the same time and place as the Proposed Action facilities.

There are smaller diameter, unregulated, crude oil gathering lines that have leaked and affected soil and ground/surface water. These pre-existing lines have limited cathodic protection (external corrosion protection) and as such they are not routinely monitored. The Proposed Action is the construction of a regulated large diameter crude oil transmission line and, as discussed throughout this document, is highly regulated and monitored. The cumulative impacts of this pipeline are minimized by the regulatory criteria, the monitoring, protections and response implemented by Dakota Access during the operation of the pipeline.

## 4.2    Water and Aquatic Life Resources

Cumulative impacts on water resources (i.e., groundwater, surface waters, wetlands) associated with the Proposed Action would be avoided, temporary, and/or minor, as all surface waterbodies would be crossed via trenchless methods (i.e., HDD or bore), no permanent fill or loss of wetlands are anticipated, and potential spill-related impacts would be avoided or greatly reduced by regulating fuel storage and refueling activities and by requiring immediate cleanup should a spill or leak occur. Spill response and remediation measures associated with construction activities are discussed in detail in Dakota Access' SWPP, SPCC and ECP.

Recently completed construction or current construction within the vicinity of the Project Area could extend the period of exposure of soils as a result of incomplete revegetation. These exposed soils may increase the potential for soil erosion or sediment transport via overland flow during precipitation events resulting in sedimentation in surface waterbodies. These increased loads could have the potential to temporarily impact water quality, wetlands, and sensitive fish eggs, fish fry, and invertebrates inhabiting waterbodies in the Project Area watersheds. However, all projects, including the DAPL Project as a whole, are subject to regulation by the USACE under the CWA. By installing the pipeline using the HDD technique at the Missouri River and Lake Oahe crossings, as well as other crossings associated with the DAPL Project as a whole, and implementing the erosion and sediment control measures specified in the ECP (**Appendix G**) and SWPPP (**Appendix A**), the potential for increased sediment loading from terrestrial sources is minimized and the cumulative effect is considered to be negligible.

In addition to water quality impacts associated with sediment loading from erosion and run-off, an inadvertent release of non-hazardous drilling mud could occur during HDD activities, including those at Lake Oahe and the Missouri River. The likelihood of inadvertent releases of drilling mud is greatly minimized through thorough geotechnical analysis and detailed design/mitigation plans at each crossing and careful monitoring of drilling mud returns and pressure during HDD activities. If an inadvertent release were to occur within a waterbody during HDD activities, such as those at the Missouri River and Lake Oahe crossings, impacts on water quality and aquatic resources would be minor. Drilling mud is non-hazardous and impacts on water quality and aquatic resources would be akin to those associated with sediment loading. Due to the quantity of drilling mud used in relation to the size of waterbodies typically crossed via HDD, impacts would be temporary and mitigated through implementation of an HDD Contingency Plan (**Appendix B**) Impacts on all waterbodies crossed by the DAPL Project in its entirety would be minimized or avoided via HDD and/or use of erosion and sediment control measures; thereby minimizing the potential for cumulative impacts on water and aquatic life resources.

100

Environmental Assessment
Dakota Access Pipeline Project
July 2016

Impacts on water and aquatic life resources associated with sediment loading, including potential inadvertent releases of non-hazardous drilling mud, as a result of the Proposed Action and the DAPL Project as a whole would be temporary and short-term.  Therefore, these impacts, when evaluated with other oil and gas development and infrastructure projects in the region and agricultural practices, would result in minor cumulative impacts on water and aquatic life resources.

Spills or leaks of hazardous liquids during construction and operation of the Proposed Action, or other projects in the vicinity, have the potential to result in long-term impacts on surface and groundwater resources as well as aquatic life resources.  However, construction impacts would be mitigated by the proper design and implementation of BMPs would ensure avoidance, minimization, and/or mitigation of potential impacts on water resources and aquatic resources, as required by the various regulating agencies that have jurisdiction over the DAPL Project.  Operational risks are being mitigated by DAPL Project design to meet or exceed the applicable federal regulations as detailed in Sec 3.11- Reliability and Safety. In the unlikely event of an unanticipated release during operations of the pipeline, the effects would be remediated following the cleanup procedures and remediation activities described in Section 3.2.2.2.Therefore, the potential cumulative impacts from the Proposed Action on water resources and aquatic resources resulting from spills would be minor.

In addition, while construction and operation of the Proposed Action along with the other potential projects and activities could result in cumulative impacts on existing wetlands in the Project Area watersheds, regulation of activities under the CWA by the Corps requires permitting and mitigation for wetland impacts so that there would be no net loss in the regional wetland resources.  Therefore, cumulative impacts on wetland resources in the Project Area would be minimal.

## 4.3     Vegetation, Agriculture, and Range Resources

As described within Section 3.3.1, all vegetation disturbed by construction within the flowage easements and the Project Area/Connected Actions of the federal lands would be restored to pre-construction conditions following the completion of construction activities, with the exception of one PFO wetland located within the permanent ROW on the flowage easements that would be converted to shrub-scrub or herbaceous wetlands.

No forest fragmentation would occur as a result of construction and operation of the Proposed Action.  No interior (core) forest habitat is crossed by the Proposed Action, and the only wooded area that would be permanently impacted by the Proposed Action include one PFO wetland (0.05 acre) located within the permanent ROW on the flowage easements between HDD boxes.  However, much of the forest and PFO wetlands in the vicinity of the Project Area have already been fragmented by agricultural activities, roads, and other commercial or industrial developments.  Further, construction of the Proposed Action facilities would not result in the permanent loss of wetland features.  Although trees within a 30-foot corridor centered on the pipeline that could compromise the integrity of the pipeline coating would be selectively removed throughout the operational life of the Proposed Action, this portion of the PFO wetland impacted by the Proposed Action would be converted to PEM or PSS and allowed to revegetate with scrub-shrub or herbaceous species.  Therefore, further fragmentation of wetlands or creation of new forest-edge habitat as a result of the Proposed Action would be negligible.

101

Environmental Assessment
Dakota Access Pipeline Project
July 2016

Generally, the greatest impact to the native vegetative community is associated with past and current agricultural practices. Pipeline projects impact a relatively small area in relation to the total landscape, as these impacts are typically short in duration and temporary in nature. Examples of impacts to vegetation, agriculture, and range resources could include introduction of non-native plants and/or noxious weeds, habitat fragmentation, altered vegetative structure, reduced population sizes below critical threshold levels, sedimentation or degradation of surface waters, erosion, and siltation. However, the implementation of BMPs outlined in the SWPPP (**Appendix A**) and ECP (**Appendix G**) and reclamation of disturbed areas with native vegetation would reduce the chances of adverse individual or cumulative impacts. In addition, while other project pipeline corridors may require clearing of forested areas and potential habitat fragmentation, temporary workspace areas would be revegetated upon completion of construction. Further, these projects would be located in a region of North Dakota that is dominated by open or agricultural land, thereby minimizing the potential for permanent habitat fragmentation. Regionally, there have been releases of hazardous material from unregulated, smaller diameter gathering pipelines that have had an adverse effect on vegetation, agriculture and range resources. In the unlikely event of an unanticipated release during operations of the pipeline, the effects would be remediated following the cleanup procedures and remediation activities described in Section 3.11. Therefore, the potential cumulative impacts from the Proposed Action on vegetation, agriculture and range resources would be minor.

## 4.4    Threatened, Endangered, Candidate, and Proposed Species

As required by the ESA, the status of each species listed as threatened or endangered is evaluated every 5 years by USFWS to assess its recovery and determine if a change in its listing status is warranted. Where available, these documents were utilized to identify the potential for ongoing regional oil and gas development to significantly threaten the species listed in the Project area. For species in which a 5-Year Review was not available, Dakota Access utilized the species Recovery Plan and/or Final Rule to evaluate potential threats on the species resulting from regional oil and gas development.

Species for which no suitable habitat is present in the Project Area or Connected Action Area, such as the black-footed ferret, Dakota skipper, and gray wolf, were not evaluated, as the Proposed Action would not contribute to cumulative impacts on these species. Further, the northern long-eared bat was not evaluated since the species is not provided federal protection in the Project Area or Connected Action Area under the Interim 4(d) Rule; this area is well outside of the published White-Nose Syndrome Buffer Zone.

Habitat loss and modification are the primary threats to the continued existence of interior least tern, whooping crane, piping plover, rufa red knot, and pallid sturgeon. The potential cumulative impacts from oil and gas activities in the region on the current listing or potential elevated future listing of these five species are discussed in detail below.

### 4.4.1    Interior Least Tern

The USFWS does not address oil and gas activities, including potential spills, as a potential or ongoing threat to the interior least tern in either the 5-year review, or the recovery plan (USFWS, 2013e). The primary threat to interior least terns and the cause of the initial population declines resulted from river

102

Environmental Assessment
Dakota Access Pipeline Project
July 2016

channelization, impoundments, and changes in river flow resulting in loss of suitable habitat throughout their range.

### 4.4.2   Whooping Crane

According to the USFWS (2007) International Recovery Plan for the Whooping Crane (*Grus Americana*) the USFWS considers oil and gas activities as a secondary threat, especially within the wintering range in the southeast United States.   Potential threats on whooping cranes along the Central Flyway migratory route in the region of the Proposed Action include loss of stopover habitat from conversion of natural wetlands (e.g., prairie potholes) to croplands, as well as development activities associated with natural gas and oil production.   The Proposed Action would not result in any loss of stopover habitat for the whooping crane; therefore, it would not contribute to cumulative impacts on the species.

### 4.4.3   Piping Plover

The USFWS (2009b) 5-Year Review for the piping plover does specifically address threats from oil and gas activities in North Dakota.   However, impacts from oil and gas activities that are threatening piping plover are associated with the development of oil and gas exploration wells located near the alkali lakes habitat, which accounts for 83% of the U.S. Northern Great Plains piping plover breeding habitat.   The Proposed Action is not located within the vicinity of any of these areas and would therefore not contribute to cumulative impacts on piping plovers.

### 4.4.4   Rufa Red Knot

According to the Final Rule (79 FR 73706) for the rufa red knot (USFWS, 2014b), the USFWS considers oil and gas activities as a secondary threat, especially near the coast (primarily in southeast Texas in the wintering range).   Potential threats to these species along the Central Flyway migratory route in the region of the Proposed Action include loss of stopover habitat from conversion of natural wetlands (e.g., prairie potholes) to croplands and development (including oil and gas exploration).   The Proposed Action would not result in any loss of stopover habitat for the rufa red knot; therefore, it would not contribute to cumulative impacts on the species.

### 4.4.5   Pallid Sturgeon

The USFWS (2014c) Revised Recovery Plan for the Pallid Sturgeon (*Scaphirhynchus albus*) specifically addresses the potential effects of energy development such as oil and gas pipelines on pallid sturgeon.   It states that while a rupture of a pipeline within sturgeon habitat could pose a threat, the impacts would be localized and the magnitude of the impact would be dependent on the quantity and timing of the material released.   It is highly unlikely that a cumulative impact resulting from a spill or leak would occur, as it would require multiple pipelines in the same general area to experience anomalous events simultaneously.   Even if this were to occur, these impacts would be localized and temporary and would likely not result in a significant impact on the recovery of pallid sturgeon, as a whole, as it is found in other waterbodies and in other regions throughout its range (USFWS, 2014c).

103

USACE_DAPL0071327

#### 4.4.6    Conclusion

The collocation of utilities in established corridors; the proper implementation of erosion control devices; compliance with permits issued for regulated activities; and rapid, thorough, environmentally appropriate reclamation efforts, and design and operation of projects to meet or exceed regulatory requirements are industry standards that, when applied consistently, on a regional basis, would minimize cumulative impacts now and in the future.  Based on the pipeline route, and the utilization of HDDs, the Proposed Action is not likely to have any permanent adverse impacts to habitat utilized by listed species, including aquatic species as discussed in Section 3.4.  Therefore, the Proposed Action will not have a cumulative effect on listed species.

### 4.5    Wildlife Resources

Regionally, the greatest impacts to wildlife (past, present or future) can be associated with agricultural development.  Agricultural land use replaced the existing natural diversity with the monoculture row crops.  The practice also introduced noxious weeds, soil pests, and other exotics, which all had significant cumulative impacts on regional wildlife.  Relative to the habitat and land use impacts associated with past agricultural activities, the Proposed Action impacts, as well as those associated with the oil and gas industry on a regional basis and Connected Actions would be nominal.  This is due to the short duration and small scale of the Proposed Action relative to the regional landscape and the large scale of agricultural activities in the region.

The Proposed Action would not permanently alter the character of the majority of available habitats as most impacts are expected to be temporary (see Section 4.3 for a discussion of vegetation impacts associated with the Proposed Action and the DAPL Project as a whole).  Possible temporary, short-term impacts on wildlife include the temporary displacement of some mobile individuals to similar, adjacent habitats during construction activities.  Further, while other oil and gas projects' pipeline corridors may require clearing of forested habitat (if present), once construction is complete, temporary workspace areas would be able to revegetate.  In addition, the permanent easement would be allowed to revegetate with herbaceous species, which provides habitat to a variety of species that utilize herbaceous and edge habitats.  When analyzed on a regional basis, these impacts do not change significantly in magnitude when compared to the current and historic impacts previously imposed upon the regional wildlife by agricultural development.  Therefore, further habitat fragmentation as a result of the Proposed Action or other oil and gas developments in the region would be negligible and is not anticipated to significantly contribute to cumulative effects on wildlife.

### 4.6    Land Use and Recreation

Regional oil and gas development and related activities could cause an impact to land use and recreation in the Project Area.  However, increased impacts are not anticipated based on the design of the DAPL Project and BMPs that would be implemented to restore the impacted area.  Temporary impacts to land use would potentially occur during the period of active construction but areas would revert to preconstruction use following restoration.  Because construction would be short term and land use conversion would be minimal, the cumulative impact on land use as a result of the Proposed Action would be temporary and minor.

USACE_DAPL0071328

Environmental Assessment
Dakota Access Pipeline Project
July 2016

The flowage easement crossing would be located in an area with a greater density of prior development, while the Lake Oahe crossing would be located in an area with relatively little surface development. That said, since the Proposed Action has been co-located with existing pipelines the additional impact incurred by the Proposed Action would be negligible if restored as proposed.

The potential cumulative impacts from the Proposed Action on land use and recreation resources resulting from spills would be minor. Although there have been releases of hazardous material from small diameter, unregulated gathering pipelines that have had an adverse effect on land use and recreation resources, it is highly unlikely for an unanticipated release to occur within the EA review area during operations of the DAPL pipeline, which is subject to DOT construction regulations and pipeline leak detection monitoring guidelines.

In the event of an unanticipated release during operations of the pipeline, the effects would be remediated following the cleanup procedures and remediation activities described in Section 3.11. Cumulatively, the impacts associated with land use and recreation resources would be minimal.

## 4.7    Cultural and Historic Resources and Native American Consultations

Dakota Access would implement measures to avoid or mitigate adverse effects to cultural resources that have been determined, in consultation with the federal land managing agencies, NDSHPO, and Native American tribes, to be eligible for listing in the NRHP. At the one potential NRHP-eligible site mapped adjacent to the workspace within the EA review area, Dakota Access would install exclusionary fencing along the outer workspace boundary during construction to prevent inadvertent trespassing by construction staff or vehicles. This area would be classified generically as sensitive environmental areas, and would be closely monitored by EI staff. If an unanticipated discovery occurs during construction, Dakota Access would follow the measures described in its UDP (**Appendix F**).

Although the possibility of an unanticipated discovery is low based on the negative findings of the field survey efforts in the Project Area, the measures outlined in the UDP includes a thorough notification protocol which would ensure that the necessary cultural resources specialists and agency personnel are involved to appropriately address the nature and significance and of the find. The Proposed Action is not anticipated to impact cultural resources; therefore, cumulative impacts associated with the Proposed Action would not occur.

## 4.8    Social and Economic Conditions

Construction of the overall DAPL Project would contribute more than $1 billion in direct spending just for materials – the majority of which would be purchased in the U.S. Fifty-seven percent of the pipe; the majority of the valves, fittings, valve actuators; and the majority of the remaining materials would be manufactured in the U.S., creating significant opportunities for regional and national manufacturing. In addition to manufactured goods and services, the DAPL Project would provide $195 million in easement payments to the landowners whose property is crossed by the DAPL Project.

USACE_DAPL0071329

The Proposed Action would have a relatively short construction window with a small number of construction workers dedicated to the crossings.  It is possible that nearby towns could experience short-term temporary increases to the local economy through induced spending from construction employees working on the Proposed Action.  No residential homes or farms would be relocated as a result of the Proposed Action.  Additionally, no demographic changes in the Census tracts affected within the Project Area counties are anticipated because no permanent employees would be created as a result of the Proposed Action.  Therefore, the only indirect socioeconomic impacts from the Proposed Action are likely to be related to the temporary influx of workers, such as increased demand for short term housing and the secondary economic benefits discussed in Section 4.10.

The regional population has dramatically increased over the last seven year period due to oil and gas development; concentrated in the Project Area.  The majority of the current available and transient labor force in the region is involved in the exploration and production of the resources, or construction of related infrastructure, both of which are labor intensive efforts though temporary in nature.  Well rigs are mobile and the number of available drilling leases is limited as well as the mineral resource itself.  For these reasons the labor pool effects associated with the exploration and production of the resource are considered to be a temporary impact.

Regarding cumulative impacts to socioeconomic resources, the Proposed Action would provide a benefit to local merchants and vendors as well as providing potential temporary employment opportunities to the local workforce.  As such, no substantive negative direct, indirect, or cumulative impacts to socioeconomic resources would result from the Proposed Action.

## 4.9    Transportation and Traffic

As discussed in Section 3.3, roads throughout North Dakota have received a sharp increase in truck traffic due to increased oil and gas activity.  The greater amount of traffic has led to a decline in the transportation infrastructure and a decrease in road safety throughout the state.  Additional oil and gas development and production may continue to contribute to cumulative effects on roads in the vicinity of the Project Area requiring a higher frequency of road maintenance and repair on public roadways.

Cumulative impacts from construction of the Proposed Action would temporarily increase traffic in the immediate vicinity of the Project Area.  This increase in traffic would be temporary and is not expected to result in significant impacts to North Dakota's transportation infrastructure.  Road improvements such as grading would be made as necessary and any impacts resulting from Dakota Access's use would be repaired in accordance with applicable local permits.  Traffic interruptions would be minimized to the extent practical and would result in insignificant, temporary cumulative impacts on regional transportation resources as it would be localized to the immediate vicinity of the Project Area and major delivery routes.

During operations of the Proposed Action, there is expected to be a positive effect on traffic resources in North Dakota.  Once in operation, Dakota Access plans to transport 450,000 bpd of crude oil via pipeline which would significantly reduce the demand for the commercial trucking of crude oil on county, state and interstate highways.  It is anticipated that the cumulative effects of the DAPL Project and other future pipeline projects would be beneficial to the transportation infrastructure in North Dakota by decreasing oil hauled by truck traffic and therefore reducing wear and tear on roads and highways.

USACE_DAPL0071330

Environmental Assessment
Dakota Access Pipeline Project
July 2016

## 4.10     Environmental Justice

The Proposed Action and Connected Actions and associated cumulative effects where practicable have been co-located with existing utilities and across USACE easements and fee owned property.  The DAPL Project avoids crossing Tribal reservation lands across its entire length.  There are no reasonable past, present or reasonably foreseeable actions that together with these Proposed Actions will have a cumulative significant adverse effect on the environment or a disproportionate impact on low income or minority populations, including the Standing Rock Sioux or other tribes in or around the Project.

Additionally, the holders of the mineral rights and landowners in the region, including particular tribes and tribal members, have witnessed a recent windfall from oil and gas development.  Oil and gas development generally occurs on private land with permission of the landowner.  Given this ascent, there is no disproportionate impact to low income, minority or tribal populations benefited by the Environmental Justice policy.  The DAPL Project was routed to avoid sensitive lands and populations, including tribal lands, and areas and does not have a disproportionate impact on any low income, minority or tribal population benefited by Environmental Justice policy, as discussed in section 3.9, above.  For these reasons, the Proposed Action and its associated cumulative actions and effects have no significant cumulative impact to low-income, minority or tribal populations.

## 4.11     Air Quality and Noise

No operation emissions are associated with the Proposed Action, as no major aboveground facilities would be constructed in the Project Area.  Potential cumulative impacts on air quality would result from concurrent construction of the Project and other development projects in the region.  Cumulative impacts on air quality associated with construction of the Proposed Action would be temporary and short-term; therefore, even if construction of other projects were concurrent with the Proposed Action, cumulative construction-related air quality impacts would be negligible.

Construction of the Proposed Action would affect ambient noise levels at some nearby residences during active construction.  The noise impact of the pipeline construction would primarily originate from the HDD equipment and would be highly localized to the HDD entry and exit sites.  However, because the duration of construction would be short-term, the contribution of the Proposed Action to cumulative impacts on noise would be negligible.

USACE_DAPL0071331

Environmental Assessment
Dakota Access Pipeline Project
July 2016

## 5.0    IRREVERSIBLE AND IRRETRIEVABLE COMMITMENT OF RESOURCES

As required by NEPA, irreversible and irretrievable commitments of resources involved in the Proposed Action should it be implemented, must be addressed in the EA.  Irreversible commitments of resources result in a loss of future options.  Commitments of resources which are irreversible are those resources which are destroyed or consumed and are neither renewable nor recoverable for use by future generations.  Examples of irreversible commitments of resources include consumption of petroleum-based fuels or minerals and destruction cultural resources.  Irretrievable commitments of resources result in a loss of productivity.  Commitments of resources which are irretrievable occur when the productive use or value of a renewable resource is lost for a period of time.  For example, timber or soil productivity may be lost for a period of time resulting in an irretrievable loss of production, but the action is reversible.

Construction activities associated with the Proposed Action would result in the consumption of materials such as aluminum, steel, other metals, wood, gravel, sand, plastics, and various forms of petroleum-based fuels, the use of which would constitute an irreversible commitment of resources.  Most of these materials are nonrenewable and would be irreversibly committed if not recycled or reused during maintenance or at the end of the life of the Proposed Action.

Areas of vegetation removal or conversion along the permanent right-of-way, such as areas where trees or shrubs were established prior to construction but would be maintained in an herbaceous state during operation, would represent an irretrievable commitment of resources.  Additionally, erosion, compaction, or an overall loss of soil productivity could occur if these impacts are not properly mitigated.  Use of water for dust control and hydrostatic testing would also be irretrievable.  Other irretrievable commitments of resources could occur if areas temporarily impacted by construction were not restored.

Overall, there would be a very minimal commitment of irreversible and/or irretrievable resources as a result of the Proposed Action since the majority of impacts would be temporary and would occur within agricultural land.  Additionally, irreversible and/or irretrievable commitments of resources would be minimized through the mitigation measures for the affected environments identified throughout this EA.

USACE_DAPL0071332

Environmental Assessment
Dakota Access Pipeline Project
July 2016

## 6.0     MITIGATION SUMMARY

Dakota Access has selected the Proposed Action to minimize impacts to natural/cultural resources as summarized in Table 8-2. System and routing alternatives were considered for the entire DAPL Project in order to meet purpose and need, design criteria and construction requirements, while minimizing potential impacts to the existing environment and socioeconomic setting. Impacts to the environment would be temporary and not significant as a result of avoiding, minimizing and mitigation any potential impacts. The majority of potential impacts would be mitigated by HDD technology which would bore beneath resources and allow pipeline construction to proceed with the least amount of impacts possible. Dakota Access has would also implement general mitigation measures such as those described in the ECP (**Appendix G**). The ECP has been developed based on decades of experience implementing BMPs during construction in accordance with generally accepted industry practices for linear infrastructure and cross-county pipelines. It is intended to meet or exceed federal, state, and local environmental protection and erosion control requirements, specifications and practices. The ECP describes current construction techniques and mitigation measures that would be employed to minimize the effects of construction on environmental resources. Some of the basic procedures identified in the ECP are listed below:

- BMPs designed to minimize the effects of construction on environmental resources;
- Temporary and permanent erosion and sediment control measures;
- Soil handling procedures designed to preserve the integrity of the soil (e.g., topsoil segregation, decompaction, etc.);
- Wetland and waterbody crossing and stabilization procedures
- Wildlife and livestock mitigation measures
- Restoration and revegetation procedures
- Refueling and waste management procedures
- Weed management procedures
- Winter construction practices
- Stormwater management procedures

Dakota Access incorporates environmental requirements into all construction specifications and the ECP would be included in contract documents and enforced as such throughout the proposed action. The construction contractor(s) must comply with all applicable permits and plans during all phases of construction. In addition to the ECP, the Proposed Action would be constructed in accordance to the measures detailed in Dakota Access' SWPPP, SPCC, HD Construction Plan, HDD Contingency Plan, and UDP.

To further ensure compliance with permits, plans, obligations, and commitments, Dakota Access would have full-time EIs to monitor construction and compliance. The EIs would be responsible for observing construction activities to verify that work is carried out in accordance with environmental permit requirements and ensure that designed avoidance and mitigation measures are properly executed during construction.

No additional mitigation measures were identified for geology and soils; water resources; vegetation, agriculture, and range resources; wildlife resources; aquatic resources; land use and recreation; cultural and historic resources, social and economic conditions; environmental justice; or air and noise. General

USACE_DAPL0071333

Environmental Assessment
Dakota Access Pipeline Project
July 2016

mitigation measures, as described in sections 3.1 through 3.7, or avoidance associated with the trenchless installation (i.e., HDD or bore) of the proposed pipeline are expected to mitigate adverse impacts to resources.

110

USACE_DAPL0071334

Environmental Assessment
Dakota Access Pipeline Project
July 2016

## 7.0    FEDERAL, TRIBAL, STATE, AND LOCAL AGENCY CONSULTATION AND COORDINATION

The following is a listing of all individuals and agencies consulted during preparation of the EA regardless of whether a response was received.  On March 30, 2015, Dakota Access sent letters to interested parties (indicated by the Corps) requesting comments on the federal actions associated with crossing Corps flowage easements and Corps owned and managed federal land.  A sample request for comment letter sent to individuals and agencies consulted, along with the mailing list and comments received, is included in **Appendix J**.  **Appendix K** contains the Notice of Availability of the Draft EA for comment.  **Table 7-1** includes a summary of agency personnel consulted.

| Table 7-1 Agency/Entity Consultation List | | | |
|---|---|---|---|
| **Agency/Entity** | **Name** | **Address** | **Date Received/ Relevant EA Section** |
| American Rivers | Kristen McDonald | 1101 14th Ave. NW STE 1400 Washington, DC 20005-5637 | N/A |
| Bureau of Indian Affairs - Fort Berthold Agency | Howard Bemer | PO Box 370 New Town, ND 58763 | N/A |
| Bureau of Indian Affairs - Great Plains Regional Office | William Benjamin | 115 Fourth Avenue S.E. Aberdeen, SD 57401 | N/A |
| Bureau of Indian Affairs-Fort Berthold Agency | Earl Silk | P.O. Box 370 New Town, ND 58763 | N/A |
| Bureau of Indian Affairs-Standing Rock | Robert Demery | P.O. Box E Fort Yates, ND 58538 | N/A |
| Bureau of Land Management | Rick Rymerson | 99 23rd Avenue West, Suite A Dickinson, ND 58601 | N/A |
| Dakota Prairie Grasslands | Dennis Neitzke | 1200 Missouri Ave Bismarck, ND 58504 | N/A |
| Dakota Resource Council | Mark Trechock | P.O. Box 1095 Dickinson, ND 58601 | N/A |
| Bismarck-Mandan Development Association | Brian Ritter | 400 East Broadway Avenue, Suite 417 Bismarck, ND 58501 | N/A |
| Morton County Commissioners | Dawn Rhone | 210 2nd Ave NW Mandan, ND 58554 | N/A |
| Morton County Extension Agent | Kari Presler | 210 2nd Ave NW Mandan, ND 58554-3158 | N/A |
| Morton County Weed Board | Wayne Carter | 2916 37th St. NW Mandan, ND 58554 | N/A |
| Emmons County Commissioners | Marlys Ohlhauser | P.O. Box 129 Linton, ND 58552 | N/A |
| Emmons County Extension Agent | Connie Job | Courthouse, Box 278 Linton, ND 58552-0278 | N/A |

111

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 7-1 | | | |
|---|---|---|---|
| **Agency/Entity Consultation List** | | | |
| **Agency/Entity** | **Name** | **Address** | **Date Received/ Relevant EA Section** |
| Emmons County Weed Board | Sam Renschler | 510 Sampson Ave. Linton, ND 58552 | N/A |
| Williams County Commissioners | Beth Innis | 205 East Broadway PO Box 2047 Williston, ND 58802-2047 | N/A |
| Williams County Extension Agent | | 302 East Broadway PO Box 1109 Williston, ND 58802-1109 | N/A |
| Williams County Weed Board | Jim Basaraba | 109 Main St Williston, ND 58801-6018 | N/A |
| National Audubon Society State Office | Genevieve Thompson | 118 Broadway, Suite 512 Fargo, ND 58102 | N/A |
| Natural Resources Conservation Service | Kyle Hartel | PO Box 583 Watford City, ND 58854 | N/A |
| Natural Resources Conservation Service | Michele R. Doyle | 2540 Overlook Lane Mandan, ND 58554-1593 | N/A |
| Natural Resources Conservation Service | Jennifer M. H. Vetter | 318 Broadway St. S Linton, ND 58552-7612 | N/A |
| Natural Resources Conservation Service | David Schmidt | 1106 West 2nd St Williston, ND 58801-5804 | N/A |
| NDSU Dept of Soil Science-Department Chair | | NDSU Dept 7680 PO Box 6050 Fargo, ND 58108-6050 | N/A |
| North Dakota Council of Humane Societies | Leo Keelan | 1948 Anderson Drive Minot, ND 58701 | N/A |
| North Dakota Department of Health | Peter Wax | 600 East Boulevard Bismarck, ND 58505 | N/A |
| North Dakota Farm Bureau | | 4900 Ottawa Street Bismarck, ND 58503 | N/A |
| North Dakota Forest Service | Larry Kotchman | 307 1st Street East Bottineau, ND 58318-1100 | April 22, 2015/ Section 2.0 and Section 3.5 |
| North Dakota Game & Fish Department | Steve Dyke | 100 N. Bismarck Expressway Bismarck, ND 58501-5095 | N/A |
| North Dakota Game & Fish Department | Dave Fryda | 406 Dakota Ave Riverdale, ND 58565 | N/A |
| North Dakota Game & Fish Department | Bruce Kreft | 100 North Bismarck Expressway Bismarck, ND 58501-5095 | N/A |

USACE_DAPL0071336

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 7-1 Agency/Entity Consultation List | | | |
|---|---|---|---|
| Agency/Entity | Name | Address | Date Received/ Relevant EA Section |
| North Dakota Game & Fish Department | Kent Luttschwager | 13932 West Front Street Williston, ND 58801-8602 | N/A |
| North Dakota Game & Fish Department | Fred Ryckman | 406 Dakota Ave Riverdale, ND 58565 | N/A |
| North Dakota Game & Fish Department | Terry Steinwand | 100 North Bismarck Expressway Bismarck, ND 58501-5095 | N/A |
| North Dakota Industrial Commission - Oil and Gas Division | Lynn Helms | 600 East Boulevard Bismarck, ND 58505 | April 16, 2015/ Section 3.1.2, Section 3.1.3, and Section 3.1.4 |
| North Dakota Industrial Commission - Oil and Gas Division | Bruce E. Hicks | 600 East Boulevard Bismarck, ND 58505 | N/A |
| North Dakota Land Department | Mike Brand | 1707 North 9th St. P.O. Box 5523 Bismarck, ND 58506-5523 | N/A |
| North Dakota Parks & Recreation Department | Kathy Duttenhefner | 1600 East Century Avenue, Suite 3 Bismarck, ND 58503-0649 | April 20, 2015/ Section 3.3.1, Section 3.4 and Section 3.5. |
| North Dakota Petroleum Council | Ron Ness | P.O Box 1395 Bismarck, ND 58502 | N/A |
| North Dakota State Historical Society | Susan Quinnell | 612 East Boulevard Ave. Bismarck, ND 58505 | April 2, 2015/ Section 3.7.1 |
| North Dakota State Water Commission | John Paczkowski | 900 East Boulevard Ave. Bismarck, ND 58505-0850 | N/A |
| North Dakota Tourism Division | Sarah Otte Coleman | P.O. Box 2057 Bismarck, ND 58502-2057 | N/A |
| U.S. Army Corps of Engineers, Regulatory Office | Daniel Cimarosti | 1513 12th St. SE Bismarck, ND 58504 | N/A |
| U.S. Fish and Wildlife Service, North Dakota Field Office | Scott Larson | 3425 Miriam Avenue Bismarck, ND 58501-7926 | N/A |
| USDA-APHIS-WS | Philip Mastrangelo | 2110 Miriam Drive, Suite A Bismarck, ND 58501 | N/A |
| USDA-Natural Resources Conservation Service-North Dakota State Office | Mary Podoll | 220 East Rosser Avenue, Room 270 Bismarck, ND 58502-5020 | April 13, 2015/ Section 3.1.5 and Section 3.2.3 |
| USDOI-Office of Surface Mining Reclamation and Enforcement-Dick Cheney Federal Building | Jeffrey Fleischman | P.O. Box 11018, 150 East B Street, Rm 1018 Casper, WY 82602 | April 13, 2015/ Section 1.1 |

USACE_DAPL0071337

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 7-1 Agency/Entity Consultation List | | | |
|---|---|---|---|
| Agency/Entity | Name | Address | Date Received/ Relevant EA Section |
| U.S. Army Corps of Engineers | Omaha District; CENWO-PM-AA | 1616 Capitol Avenue Omaha, NE 68101-4901 | N/A |
| North Dakota Parks & Recreation Department | Mr. Jesse Hanson | 1600 E. Century Ave. Suite 3 Bismarck, ND 58503-0649" | N/A |
| North Dakota Chapter of the Wildlife Society | Mr. Kory Richardson | PO Box 1442 Bismarck, ND 58502 | N/A |
| Sierra Club - North Dakota Office | Mr. Blaine Nordwall | 311 East Thayer Ave Suite 113 Bismarck, ND 58501 | N/A |

USACE_DAPL0071338

Environmental Assessment
Dakota Access Pipeline Project
July 2016

## 8.0     STATUS OF ENVIRONMENTAL COMPLIANCE

**Table 8-1** is a listing of environmental protection statutes and other environmental requirements, as well as the status of Applicant compliance with these statutes and requirements, regarding this EA.

| Table 8-1 Environmental Permits, Approvals, and Consultations | | | |
|---|---|---|---|
| **Jurisdiction** | **Permit or Authorization** | **Status** | **Requirement or Action** |
| **Federal** | | | |
| Corps | RHA, Section 10 | Pending, Application Submitted Dec 2014 | RHA, Section 10: Missouri River/Lake Oahe |
| Corps – Omaha District | Section 404 CWA | Pending, Application Submitted Dec 2014 | NWP 12, Section 404 Waters with PCN |
| | Survey permission, geotechnical investigation | Received April 2015 | Survey permission, geotechnical investigation |
| | Title 30 Rights-of-Way for pipelines through Federal Lands and Temporary Construction License | Pending | Real Estate Outgrant and EA for Crossing the Missouri River/Lake Oahe (Fee title Lands on both sides of river/lake) |
| | Flowage Easement Consent to Cross | Pending | Consent to Cross |
| USFWS | Section 7 Endangered Species Act (ESA) Consultation | Received May 2016 | Compliance under 404 Permit NWP 12 Joint Application |
| Bureau of Reclamation | Letter of consent to cross irrigation works | Received December 2015 | BOR water conveyance facilities, near cities of Buford and Trenton, ND |
| **State** | | | |
| North Dakota Public Service Commission (NDPSC) | North Dakota Energy Conversion and Transmission Facility Siting Act: Certificate of Corridor and Route | Received January 2016 | Siting Application, PU-14-842 |
| North Dakota Office of the State Engineer | Sovereign Land Permit | Permits Received April 2016 | Crossing Permits for the Lake Oahe and the Missouri River Crossings |
| State Historical Society of North Dakota | Section 106 NHPA | Received April 2016 | Section 106 Concurrence/Consultation |

115

USACE_DAPL0071339

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 8-1 Environmental Permits, Approvals, and Consultations | | | |
|---|---|---|---|
| **Jurisdiction** | **Permit or Authorization** | **Status** | **Requirement or Action** |
| North Dakota Department of Health | Section 401 Water Quality Certification | Pending | Automatic with NWP 12 |
| | Hydrostatic Test Water Discharge Permit No. NDG07-0000 | Permits Received May 2016 | Obtain permit coverage prior to discharge |
| | North Dakota Pollutant Discharge Elimination System (NDPDES) Construction Stormwater General Permit (NDR10-0000) | Permit Received April 2016 | Obtain permit coverage |

**Table 8-2** provides a summary of the environmental mitigation measures discussed throughout this EA that Dakota Access has committed to as part of the Proposed Action design to avoid or minimize potential impacts on environmental and human resources throughout construction and operation activities.

116

USACE_DAPL0071340

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 8-2 |
|---|
| **Summary of Environmental Impact Avoidance and Mitigation Measures** |

| Resource | Environmental Avoidance/Mitigation Measures |
|---|---|
| Geology and Soils | To protect the terrain of the Project Area and Connected Actions, Dakota Access would, to the extent feasible, restore the areas affected by pipeline construction to pre-construction contours and similar vegetation (excepting trees within approximately 15 feet of the centerline).  Pre-construction and as-built surveys would be completed and provided to the Garrison Project. |
| | Although not anticipated, if blasting is found to be necessary, Dakota Access would follow procedures specified in its Blasting Plan (Appendix E). |
| | Dakota Access, in accordance with North Dakota One Call, would require that the construction contractor, prior to initiating any ground disturbance activities, identify all underground utilities to minimize the potential for encountering buried utility structures. |
| | Dakota Access has completed a geotechnical analysis of the flowage easement and federal land crossing sites to facilitate engineering and design, including selection of appropriate materials and construction methods to limit any environmental impacts attributable to landslides. |
| | The proposed pipeline would be designed and constructed to meet or exceed industry specifications, which would effectively mitigate the effects of fault movement, landslides, subsidence, and subsidence. |
| | In the event paleontological resources are discovered during construction, Dakota Access would implement measures outlined in its Unanticipated Discoveries Plan Cultural Resources, Human Remains, Paleontological Resources and Contaminated Media (UDP) (Appendix F) to avoid further impacts to these resources. |
| | If any vertebrate fossils are found during pipeline construction, Dakota Access would immediately cease construction activities and notify the appropriate agency personnel, including the North Dakota state paleontologist as well as the USACE archaeologist.  The appropriate authorities would determine the significance of the find and prescribe the mitigation procedures to be completed prior to resuming pipeline construction. |
| | Dakota Access would minimize or avoid impacts on soils by implementing the mitigation measures described in the DAPL Project's SPCC, SWPPP, and ECP as well as requirements of applicable state and federal permits.  These documents would be included as contract documents and enforced as such throughout the DAPL Project. |
| | To minimize potential impacts on soil productivity, topsoil would be separated during trench excavation in agricultural land, and if applicable, other areas where soil productivity is an important consideration.  Unless otherwise requested by the landowner, topsoil in cropland would be removed to a maximum depth of 12 inches from the trench and spoil storage area and stored separately from the trench spoil.  After the trench is backfilled, topsoil would be returned to its approximate original location in the soil horizon. |

USACE_DAPL0071341

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 8-2 | |
|---|---|
| Summary of Environmental Impact Avoidance and Mitigation Measures | |
| **Resource** | **Environmental Avoidance/Mitigation Measures** |
| | Compaction of agricultural soils would be minimized by restricting construction activities during periods of prolonged rainfall.  Where unacceptable levels of compaction occur in agricultural lands, a chisel plow or other deep tillage equipment would be utilized to loosen the soil. |
| | Dakota Access would retain EIs to monitor the contractor's compliance with applicable requirements to protect soil resources during construction of the DAPL Project.  The Garrison Project would be notified if the EIs have concerns on the Project Area or Connected Action Area. |
| | The HDD workspace sites would be cleared, graded and matted as needed to minimize rutting and compaction. |
| | Permanent impacts to soils would be avoided through the application of BMPs during construction, restoration, and post-construction revegetation management, as outlined in the ECP (Appendix G). |
| Water Resources | Impacts to Lake Oahe and the Missouri River would be minimized by using HDD construction methods to install the proposed pipeline underneath the Missouri River and Lake Oahe. |
| | The HDD Contractor plans to install steel surface casing, where defined in the site specific HDD plans, to reduce the probability of an inadvertent release when the drill bit is working near the surface. |
| | The drilling mud and cuttings would be disposed of in accordance with applicable laws and regulations, likely in an existing landfill or by land farming. |
| | Dakota Access would conduct all HDD work according to the HDD Construction Plan (Appendix B) that it has prepared, and implement the HDD Contingency Plan (Appendix B) in the event of an inadvertent release. |
| | The Missouri River water withdrawal activity would comply with all applicable permit conditions and regulations, including the specifications on permitted intake structures outlined in the USACE's Regional Conditions for North Dakota applicable to NWP 12 (Utility Line Activities).  This regional condition requires that the applicant 1) utilize an intake screen with a maximum mesh opening of ¼-inch, 2) wire, Johnson-like screens must have a maximum distance between wires of 1/8-inch, 3) water velocity at the intake screen shall not exceed ½-foot per second, 4) intake structure shall be floating, and 5) at the beginning of pumping, the intake shall be placed over water with a minimum depth of 20 feet. |
| | The barge/float required for water withdrawal from the Missouri River would be fitted with a secondary containment structure, and the pump would be placed within this structure to contain accidental spills of fuels.  The intake hose would be suspended by floats within the water column and screened to prevent impingement entrainment of foreign objects and aquatic species. |
| | Water discharges associated with hydrostatic testing on Corps flowage easements would be conducted in accordance with applicable permits.  Hydrostatic test water discharges would not occur on Corps fee property. |

118

USACE_DAPL0071342

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 8-2 |
|---|
| **Summary of Environmental Impact Avoidance and Mitigation Measures** |

| Resource | Environmental Avoidance/Mitigation Measures |
|---|---|
| | Dakota Access would conduct trench dewatering and hydrostatic test discharges in a manner consistent with the North Dakota Pollutant Discharge Elimination System (NDPDES) General Permit NDG-070000, as applicable. |
| | Discharged hydrostatic test water would not contain additives unless written approval is received from Dakota Access and applicable permits authorize such additives. |
| | Where appropriate, water would be discharged into an energy dissipation and/or filtering device as described in Dakota Access' SWPPP (Appendix A) to remove sediment and to reduce the erosive energy of the discharge. |
| | Impacts to waterbodies would be minimized by conducting pipeline construction activities in accordance with applicable regulatory requirements and waterbody construction procedures described in Section 2.3.2.8 and the ECP. |
| | Fuel and all other hazardous materials would be stored in accordance with the requirements of Dakota Access' SPCC, SWPPP, and ECP. These documents also describe response, containment, and cleanup measures. |
| | EIs would monitor compliance with applicable waterbody protection requirements during construction of the facilities. The Project ECP (Appendix G) and SWPPP (Appendix A) describe additional mitigation measures and contains illustrations of how sediment control devices should be utilized. |
| | Dakota Access would maintain a vegetative buffer until the actual crossing of the waterbody takes place. |
| | Temporary sediment control measures, such as silt fence, would minimize the introduction of sediment into waterbodies during construction and minimize the movement of spoil and sediment from surface runoff during and after construction. |
| | Dewatering activities would be conducted in accordance with applicable permits and Dakota Access' SWPPP, and ECP. |
| | All surface drainage contours and vegetation would be returned as closely as practical to preconstruction conditions. |
| | The potential for groundwater contamination would be avoided by implementing the protective measures set forth in the Project specific SPCCs prepared by the contractor and in Dakota Access' SPCC Plan (Appendix A). |
| | In the event of a leak, Dakota Access would work aggressively to isolate the source through the use of remote-controlled shut-off valves, initiate cleanup activities, and contact the appropriate federal and state authorities to coordinate leak containment and cleanup. Dakota Access proposes to meet or exceed all applicable regulations and requirements for pipeline design, construction, and operation. |
| | Construction workspace on the flowage easements has been selected based on an absence of wetlands within the Project area. |
| | Dakota Access is in the process of obtaining verification for use of NWP 12 for the crossings of both the Missouri River and Lake Oahe Section 10 waterbodies. |

119

USACE_DAPL0071343

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 8-2 Summary of Environmental Impact Avoidance and Mitigation Measures ||
|---|---|
| **Resource** | **Environmental Avoidance/Mitigation Measures** |
| | The Project ECP and SWPPP specify several measures to protect wetlands and waterbodies from becoming polluted with fuels or other hazardous materials during construction.  This plan prohibits the storage of fuel or other hazardous materials within 100 feet of a wetland or waterbody.  The ECP also specifies that equipment must be refueled at least 100 feet from waterbodies unless, due to site-specific conditions, there is no practical alternative such as the proposed pumping intake structure located on the barge at the Missouri River Crossing.  In that case, the contractor must implement site-specific protective measures and containment procedures described in the ECP.  Contractors would be required to provide trained personnel, appropriate equipment, and materials to contain and clean up releases of fuel, lubricating oil, or hydraulic fluid that result from equipment failure or other circumstances. |
| | The Project has been designed in accordance with accepted floodplain management practices; no impacts to floodplain elevations or velocities are anticipated.  Following construction, disturbed areas would be restored to pre-construction grades and contours as practical. |
| | If necessary, soil displaced by the installation of the 24-inch pipeline on the flowage easements would be removed from the floodplain and hauled to an upland location in order to ensure original floodplain elevations are restored. |
| | Remotely operated above-ground mainline valve sites would be installed on both sides of the Missouri River and Lake Oahe crossings for isolation in the event of an emergency shutdown. |
| | Dakota Access will identify an all-weather access and collection point downstream of both the Missouri River crossing and Lake Oahe crossing.  At each location, Dakota Access will provide an equipment storage facility that includes a permanent storage area for winter and open water spill response equipment. |
| | Impacts to cultivated crops make up the majority of temporary impacts and would return to cultivated crops post-construction. |
| | Within areas disturbed by construction of the Project, and not being actively cultivated, including the flowage easement Project Area, Dakota Access would implement active revegetation measures and rapid colonization by annual and perennial herbaceous species to restore most vegetative cover within the first growing season. |
| | In areas that require permanent revegetation, Dakota Access would specify appropriate seed mixes, application rates, and seeding dates, taking into account recommendations of appropriate state and federal agencies and landowner requests. |
| | In non-agricultural areas, vegetation cleared from ATWS would be allowed to revegetate after construction depending on arrangements with the landowner. |
| | Temporary revegetation measures may also be implemented to quickly establish ground cover to minimize the potential for soil erosion and noxious weeds to establish.  A temporary seed mix may be applied in these situations.  The Project ECP (Appendix G) contains more details regarding temporary revegetation. |

USACE_DAPL0071344

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 8-2 | |
|---|---|
| **Summary of Environmental Impact Avoidance and Mitigation Measures** | |
| **Resource** | **Environmental Avoidance/Mitigation Measures** |
| | When constructing in agricultural areas, a minimum of 1 foot of topsoil (organic layer) would be stripped from the trench line and stockpiled separately from trench spoil to preserve the native seed stock.  The ECP contains additional details regarding topsoil segregation. |
| | At stream approaches, the contractor would leave a 20-foot buffer of undisturbed herbaceous vegetation on all stream banks during initial clearing, except where grading is needed for bridge installation or where restricted by applicable regulations and/or permit conditions. |
| | Dakota Access would work with County Weed Boards to ensure the Project ECP contains relevant and necessary mitigation measures that would be implemented to prevent the spread of noxious weed species during construction and operation of the Project. |
| | Herbaceous cover would be seeded on disturbed upland areas during restoration and it is expected that pre-existing herbaceous and shrub habitats would quickly reestablish themselves. |
| | In the unlikely event that a listed species is encountered on the Project at Corps owned lands during construction, construction activities would stop and the Corps would be contacted. |
| Wildlife Resources | Herbaceous cover would be seeded on disturbed upland areas during restoration and it is expected that pre-existing herbaceous and shrub habitats would quickly reestablish themselves. |
| | In the unlikely event that a listed species is encountered on the Project at Corps owned lands during construction, construction activities would stop and the Corps would be contacted. |
| | Installation and removal of the temporary waterline on the flowage easements are anticipated to be complete prior to nesting season; therefore, impacts on the interior least tern and piping plover are not anticipated.  However, if the water withdrawal activities are not able to be completed prior to nesting season as expected, Dakota Access would conduct surveys prior to placement of the waterline to confirm the presence/absence of these species within the pipeline ROW.  If these species are nesting within the Project Area, Dakota Access would postpone water withdrawal activities at the Missouri River until these species have left the area. |
| | Direct impacts on potentially suitable habitat for the interior least tern and piping plover at the Missouri River and Lake Oahe would be avoided by crossing the waterbodies via HDD. |
| | Lake Oahe would be crossed using a HDD construction method, avoiding impacts on potential migrating rufa red knot loafing habitat. |
| | Impacts on the pallid sturgeon or suitable habitat present within the Missouri River would be avoided by implementing the conditions on permitted intake structures outlined in the USACE's Regional Conditions for North Dakota applicable to NWP 12 (Utility Line Activities) and as described in the USFWS Recovery Plan for the Pallid Sturgeon. |

121

USACE_DAPL0071345

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 8-2 Summary of Environmental Impact Avoidance and Mitigation Measures | |
|---|---|
| **Resource** | **Environmental Avoidance/Mitigation Measures** |
| | Impacts on the pallid sturgeon or suitable habitat present within Lake Oahe would be avoided by crossing the lake via HDD. |
| Aquatic Resources | A successfully completed HDD crossing would avoid aquatic resource impacts to Lake Oahe since the pipeline would be installed without disturbing the aquatic and benthic environments. |
| | All construction equipment utilized on or in waters of the state would be subject to inspection by the Department in accordance with the North Dakota Administrative Code (Title 30, Article 3, Chapter 6-01).  Further, Dakota Access would implement required measures including the removal of all aquatic vegetation from vessels, motors, trailers, or construction equipment.  All water would be drained from bilges or confined spaces.  All Aquatic Nuisance Species will be removed from equipment in accordance with the North Dakota Administrative Code (Title 30, Article 3, Chapter 6). |
| | All HDD operations conducted for the Missouri River and Lake Oahe crossings would adhere to the HDD Contingency Plan and applicable permit conditions to reduce the likelihood of an inadvertent release to minimize and mitigate environmental impacts.  Dakota Access' construction contractor would ensure that the appropriate response personnel and containment equipment are available onsite to effectively implement the HDD Contingency Plan. |
| | Water withdrawal activities at the Missouri River would be conducted in accordance with all applicable permit conditions and regulations and in a manner that would not reduce water flow to a point that would impair flow or impact aquatic life. |
| | Intake screens and floats would also be utilized during the withdrawal of water from the Missouri River to prevent entrainment of aquatic life and avoid impacts on aquatic resources. |
| | The potential for impacts on aquatic resources associated with accidental fuel spills or leaks during the withdrawal of water from the Missouri River would be avoided or minimized by placing the pump within a secondary containment structure on the barge. |
| | For portions of the pipeline installed beneath the lake, the depth of the pipeline profile, the increased wall thickness of the pipe, the installation of remotely operated valves on both sides of the river crossing, monitoring of the system 24/7, aerial patrols, and in-line inspection, would further limit the potential for an inadvertent release into the river. |
| | Adherence to the GRPs for Lake Oahe and the Missouri River would minimize potential impacts on aquatic wildlife from potential spills during the operation of the pipeline. |

USACE_DAPL0071346

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 8-2 Summary of Environmental Impact Avoidance and Mitigation Measures | |
|---|---|
| **Resource** | **Environmental Avoidance/Mitigation Measures** |
| | Conduct emergency response drills/exercises in accordance with the National Preparedness for Response Exercise Program (PREP) consisting of table top exercises and equipment deployment drills. Dakota Access has committed to additional full scale open water and full scale winter/ice exercises that will be conducted at Lake Sakakawea and Lake Oahe. A full scale exercise will occur once every 3 years (triennial cycle) with the location and type of exercise occurring on alternating schedules (e.g. open water exercise at Oahe the first triennial cycle, followed by winter exercise at Sakakawea the following triennial cycle, followed by a winter exercise at Oahe the following triennial cycle, etc.). Stakeholder (federal, state, local, and Tribal) involvement will be solicited for each exercise. The first exercise will occur within the first 3 years after the pipeline becomes operational. |
| | In the event of a leak, Dakota Access would work aggressively to contain the leak, initiate cleanup activities, and contact the appropriate authorities, including the Corps. |
| Land Use and Recreation | Mitigation measures to minimize impacts to soils, such as topsoil segregation and decompaction practices, would be fully implemented in accordance with the ECP and SWPPP. |
| | Dakota Access would coordinate with all landowners on acceptable methods for construction and restoration, including potential impacts to irrigated fields. |
| | Dakota Access would repair surface drains and drainage tiles disturbed during ROW preparation, construction, and maintenance activities. |
| | Dakota Access would repair or replace fences and gates removed or damaged as a result of ROW preparation, construction, or maintenance activities. |
| | Following construction and restoration, the work area would be restored and ranching would be allowed to continue over the operational ROW. Landowners would be compensated for temporary loss of land and lower yields. Grazing activities would return to normal after revegetation of the disturbed areas. |
| | Trees would be protected by Dakota Access in a manner compatible with the safe operation, maintenance, and inspection of the pipeline. Applicable regulations would be adhered to regarding tree and shrub removal from along the route. |
| | Dakota Access would obtain and comply with applicable state regulations, county permits, and zoning and land use regulations. Permits may include, but are not limited to, grade and fill permits, ditch crossing permits, road and utility permits, and conditional use permits. Dakota Access would retain one or more EIs to monitor compliance with environmental conditions of county permits. |
| Cultural and Historic Resources | In accordance with Section 106 of the NHPA, Dakota Access has made a good faith effort to identify significant historic properties within the Project area. Based on the result of these efforts, no properties consisted to be eligible, or potentially eligible for listing in the NRHP would be adversely impacted by the proposed Project or Connected Action. |

123

USACE_DAPL0071347

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 8-2 Summary of Environmental Impact Avoidance and Mitigation Measures ||
|---|---|
| **Resource** | **Environmental Avoidance/Mitigation Measures** |
| | Impacts to the NRHP-eligible BTIS (site 32WI1367) would be avoided via HDD to ensure the integrity of construction design for these historic-age features is preserved. |
| | HDD workspaces, as well as staging and stringing areas, would be positioned in excess of 100 feet beyond the mapped boundaries of the previously recorded cultural sites in the vicinity of the Lake Oahe crossing. |
| | Dakota Access' UDP was developed (Appendix F) for use during all DAPL Project construction activities which describes actions that would be taken in the event of a previously unrecorded cultural resource site is discovered during construction activities.  The UDP explicitly calls for work to stop until the correct authority or agency can be contacted and the find can be properly evaluated. |
| | The USACE will conduct archeological monitoring of construction for the HDD activities on both sides of Lake Oahe. |
| Social and Economic Conditions | No residential homes or farms would be relocated resulting from the proposed action. |
| | No demographic changes in the Census tracts affected are anticipated, because no permanent employees would be created as a result of the Proposed Action. |
| Hazardous Waste | In the unlikely event contamination is encountered during construction, the UDP (Appendix F) would be implemented to protect people and the environment and avoid or minimize any effects from unearthing the material. |
| | Any hazardous materials discovered, generated, or used during construction would be managed and disposed of in accordance with applicable local, tribal, state, and federal regulations.  Should emergency response be required during construction, the contractor would have some of their own trained or contracted responders, and local response teams would be expected to assist. |
| | Dakota Access would comply with all applicable laws and regulations to abate or prevent pollution, such as the RCRA, and State hazardous waste management rules. |
| Reliability and Safety | All activities would be conducted in a safe manner in accordance with the standards specified in the OSHA regulations. |
| | To prevent pipeline failures resulting in inadvertent releases, Dakota Access would construct and maintain the pipeline to meet or exceed industry and governmental requirements and standards.  Specifically, the steel pipe would meet PHMSA specifications under 49 CFR § 195, follow standards issued by the American Society of Mechanical Engineers, National Association for Corrosion Engineers and API. |
| | Dakota Access would maintain and inspect the pipeline in accordance with PHMSA regulations, industry codes and prudent pipeline operating protocols and techniques.  The pipeline ROW would be patrolled and inspected by air every 10 days, weather permitting, but at least every three weeks and not less than 26 times per year, to check for abnormal conditions or dangerous activities, such as unauthorized excavation along the pipeline route. |

124

USACE_DAPL0071348

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 8-2 Summary of Environmental Impact Avoidance and Mitigation Measures | |
|---|---|
| **Resource** | **Environmental Avoidance/Mitigation Measures** |
| | Dakota Access is currently drafting a FRP, in accordance with 49 CFR 194, which details the procedures to be implemented in the event of an inadvertent pipeline release and would be in place prior to commencing transportation of crude oil. |
| | Following completion of construction and throughout operation of the Project facilities, the Operator and qualified contractors would maintain emergency response equipment and personnel at strategic points along the pipeline route. |
| | Contracts would be in place with oil spill response companies that have the capability to mobilize to support cleanup and remediation efforts in the event of a pipeline release.  The operator would also coordinate with local emergency responders in preventing and responding to any pipeline related problems. |
| | A SCADA system would be utilized to provide constant remote oversight of the Project facilities. |
| | A Computational Pipeline Monitoring System (CPM) would be utilized to monitor the pipeline for leaks. |
| | LeakWarn is being tailored to the Project facilities, in accordance with PHMSA requirements, to monitor the pipeline for leaks. |
| Air Quality and Noise | To reduce the emission of criteria pollutants, fuel-burning equipment running times would be kept to a minimum and engines would be properly maintained. |
| | Dakota Access would mitigate noise impacts by limiting equipment running times and the duration of Project construction to the minimum amount necessary to complete the Project.  Noisy construction activities would typically be limited to the least noise-sensitive times of day (daytime). |

125

USACE_DAPL0071349

Environmental Assessment
Dakota Access Pipeline Project
July 2016

## 9.0     LIST OF PREPARERS AND REVIEWERS

Dakota Access, in cooperation with the USACE Preparers, reviewers, consultants and Federal officials include the following:

| Table 9-1 | | |
|---|---|---|
| List of Preparers and Reviewers | | |
| **Name** | **Title/Office** | **Agency** |
| Omaha District Planning Staff | Environmental Resource Specialist | Corps of Engineers, Omaha District |
| Omaha District Operations Staff | Natural Resource Specialist, Environmental Stewardship | Corps of Engineers, Omaha District |
| Garrison Project Archaeologist | Garrison Dam / Lake Sakakawea Project | Corps of Engineers, Omaha District |
| Bismarck Regulatory Chief | Operations Division | Corps of Engineers, Omaha District |
| Oahe Project Archaeologist | Oahe Dam and Lake Project | Corps of Engineers, Omaha District |
| Omaha District Operations Branch Chief | Operations Division | Corps of Engineers, Omaha District |
| Omaha District Project Engineer | Flood Risk and Floodplain Management Section | Corps of Engineers, Omaha District |
| Garrison Project Staff | Garrison Dam | Corps of Engineers, Omaha District |
| Omaha District Planning Chief | Planning Branch | Corps of Engineers, Omaha District |
| Garrison Operations Project Manager | Garrison Dam / Lake Sakakawea Project | Corps of Engineers, Omaha District |
| Omaha District Real Estate Branch Chief | Real Estate Division | Corps of Engineers, Omaha District |
| Omaha District Cultural Resources | Planning Branch | Corps of Engineers, Omaha District |
| Oahe Project Staff | Oahe Dam | Corps of Engineers, Omaha District |
| Oahe Project Operation Project Manager | Operations Division | Corps of Engineers, Omaha District |
| Omaha District Geotechnical Engineers | Geotechnical Branch | Corps of Engineers, Omaha District |
| Omaha District Attorney | Office of Counsel | Corps of Engineers, Omaha District |
| Omaha District Regulatory Staff | Operations Division | Corps of Engineers, Omaha District |
| Monica Howard | Director Environmental Sciences | Dakota Access, LLC |
| Jonathan Fredland | Environmental Specialist | Perennial Environmental Services, LLC |
| Ashley Thompson | Environmental Specialist | Perennial Environmental Services, LLC |

126

USACE_DAPL0071350

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 9-1 | | |
|-----------|---|---|
| List of Preparers and Reviewers | | |
| Name | Title/Office | Agency |
| Dennis Woods | Managing Partner | Perennial Environmental Services, LLC |

127

USACE_DAPL0071351

Environmental Assessment
Dakota Access Pipeline Project
July 2016

## 10.0    ACRONYMS, INITIALS, AND ABBREVIATIONS

| | |
|---|---|
| ANSI | American National Standards Institute |
| API | American Petroleum Institute |
| ATWS | Additional Temporary Workspace |
| BMP | Best Management Practice |
| bpd | barrels per day |
| BTIS | Buford-Trenton Irrigation System |
| CAA | Clean Air Act |
| CERCLA | Comprehensive Environmental Response Compensation and Liability Act |
| CEQ | Council on Environmental Quality |
| CFR | Code of Federal Regulations |
| Corps | U.S. Army Corps of Engineers |
| Company | Energy Transfer Company |
| CWA | Clean Water Act |
| DA | Department of the Army |
| dB | Decibels |
| Dakota Access | Dakota Access, LLC |
| DAPL Project | Dakota Access Pipeline Project |
| DOT | Department of Transportation |
| EA | Environmental Assessment |
| ECP | Environmental Construction Plan |
| ECD | Erosion Control Device |
| EI | Environmental Inspector |
| EO | Executive Order |
| EPA | U.S. Environmental Protection Agency |
| ESA | Endangered Species Act |
| FEMA | Federal Emergency Management Agency |

128

USACE_DAPL0071352

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| | |
|---|---|
| FERC | Federal Energy Regulatory Commission |
| FIRM | Flood Insurance rate Maps |
| FRP | Facility Response Plan |
| FRFM | Flood Risk and Floodplain Management Section |
| g | gravitational acceleration |
| GIS | Geographic Information System |
| GRP | Geographical Response Plan |
| HDD | Horizontal Directional Drilling |
| MP | milepost |
| MSL | Mean Sea Level |
| NDPSC | North Dakota Public Service Commission |
| NDPDES | North Dakota Pollutant Discharge Elimination System |
| NDSHPO | North Dakota State Historic Preservation Office |
| NEPA | National Environmental Preservation Act |
| NFIP | National Flood Insurance Program |
| NHPA | National Historic Preservation Act |
| NLCD | National Land Cover Dataset |
| NPDES | National Pollutant Discharge Elimination System |
| NPS | U.S. National Park Service |
| NRCS | Natural Resources Conservation Service |
| NRHP | National Register of Historic Places |
| NRI | Nationwide Rivers Inventory |
| NSF | National Science Foundation |
| NWI | National Wetland Inventory |
| NWP | Nationwide Permit |
| OSHA | Occupational Safety and Health Administration |
| OSRO | Oil Spill Response Organization |

129

USACE_DAPL0071353

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| | |
|---|---|
| PA | Programmatic Agreement |
| PEM | Palustrine Emergent |
| PFO | Palustrine Forested |
| PHMSA | Pipeline and Hazardous Materials Safety Administration |
| PREP | National Preparedness for Response Exercise Program |
| Project Area | Areas that are potentially impacted by construction and/or operation of the Proposed Action |
| Proposed Action | Crossing of federal flowage easements near the upper end of Lake Sakakawea north of the Missouri River in Williams County, North Dakota and federally owned lands at Lake Oahe in Morton and Emmons counties, North Dakota |
| RCRA | Resource Conservation and Recovery Act |
| RHA | Rivers and Harbors Act |
| ROW | Right-of-Way |
| SPCC | Spill Prevention, Control and Countermeasure Plan |
| SWPPP | Stormwater Pollution Prevention Plan |
| THPO | Tribal Historic Preservation Office |
| UDP | Unanticipated Discoveries Plan Cultural Resources, Human Remains, Paleontological Resources and Contaminated Media |
| USACE | U.S. Army Corps of Engineers |
| USDA | U.S. Department of Agriculture |
| USFWS | U.S. Fish and Wildlife Service |
| USGS | U.S. Geological Survey |
| WMA | Wildlife Management Area |

USACE_DAPL0071354

Environmental Assessment
Dakota Access Pipeline Project
July 2016

## 11.0   REFERENCES

Ackerman, D.J.  1980.  Ground-Water Resources of Morton County, North Dakota, North Dakota
Geological Survey Bulletin 7Z – Part III, 51 pp.

Armstrong, C.A.  1978.  Ground-Water Resources of Emmons County, North Dakota, North Dakota
Geological Survey Bulletin 66—Part III, 43 pp.

Armstrong, C.A.  1969.  Geology and Ground Water Resources, Williams County, North Dakota, Part III—
Hydrology, North Dakota Geological Survey Bulletin 48, 82 pp.

Atwood, J.L., P.D. Jorgensen, R. M. Jurek, and T.D. Manolis.  1977.  California Least Tern Census and
Nesting Survey, 1977, Pages 44, California Department of Fish and Game.

Bachman, J. 2014.  North Dakota's Downside to the Oil Boom: Traffic Deaths.  Businessweek. Available
at: http://www.businessweek.com/articles/2014-06-09/north-dakotas-downside-to-the-oil-
boom-traffic-deaths.

Black-footed Ferret Recovery Implementation Team.  2011.  Black-footed ferret.  Available at
http://www.blackfootedferret.org/.

Brown, M.B., J.G. Jorgensen, and L.R. Dinan.  2013.  2013 Interior Least Tern and Piping Plover
Monitoring, Research, Management, and Outreach Report for the Lower Platte River, Nebraska.
Joint report of the Tern and Plover Conservation Partnership and the Nongame Bird Program of
the Nebraska Game and Parks Commission.  Lincoln, NE.

Carlson, C.G.  1985.  Geology of McKenzie County, North Dakota.  North Dakota Geological Survey
Bulletin 80—Part I. 48 pp.

Charbeneau, R. J. 2003. Models for Design of Free-Product Recovery Systems for Petroleum
Hydrocarbon Liquids. American Petroleum Institute, Publication 4729. Washington, D.C. August
2003.

Charbeneau, R. J., R. T. Johns, L. W. Lake, and M. McAdams. 2000. Free-product recovery of petroleum
liquid hydrocarbon liquids. Ground Water Monitoring and Remediation 20(3):147-158.

Clayton, L.  1980.  Geologic Map of North Dakota: USGS, Scale 1:500K.

Cochrane, J.F. and P. Delphey.  2002.  Status Assessment and Conservation Guidelines; Dakota Skipper
*Hesperia dacotae* (Skinner) (Lepidoptera: Hesperiidae); Iowa, Minnesota, North Dakota, South
Dakota, Manitoba, Saskatchewan.  p.80.  U.S. Fish and Wildlife Service, Twin Cities Field Office,
Minnesota.

Council on Environmental Quality.  1997.  Environmental Justice: Guidance under the National
Environmental Policy Act.  Executive Office of the President, Washington, D.C.

Cowardin, L. M., V. Carter, F.C. Golet, and E.D. LaRoe.  1979.  Classification of wetlands and deepwater
habitats of the United States.  U.S. Department of the Interior, Fish and Wildlife Service, Office
of Biological Services, Washington, D.C.

Croft, M.G.  1985.  Ground-Water Resources of McKenzie County, North Dakota, North Dakota
Geological Survey Bulletin 80—Part III, 57 p.

131

USACE_DAPL0071355

Environmental Assessment
Dakota Access Pipeline Project
July 2016

Dana, R.  1997.  Characterization of three Dakota skipper sites in Minnesota.  p.17.  Minnesota Department of Natural Resources, Natural Heritage and Nongame Research Program, St. Paul.

Dana, R.  1991.  Conservation management of the prairie skippers *Hesperia dacotae* and *Hesperia ottoe*: Basic biology and threat of mortality during prescribed burning in spring. Station Bulletin.  p.63.  Minnesota Agricultural Experiment Station, University of Minnesota, St. Paul.

Dickens, D. 2011. Behavior of Oil Spills in Ice and Implications for Arctic Spill Response.  Arctic Technology Conference, Houston, Texas, February 7-9, 2011.

Federal Emergency Management Agency.  1987.  Flood Insurance Rate Map (3803270100A), Unincorporated Areas, Emmons County, North Dakota.

Florip, E.  2014.  Proposed Oil Terminal Would Be Biggest In Volume.  The Columbian.  Available at: http://www.columbian.com/news/2014/nov/24/proposed-oil-terminal-biggest-volume-vancouver/.

Freeze, R. A. and J. A. Cherry. 1979. Groundwater. Prentice Hall, Inc. Englewood Cliffs, New Jersey., 604 pp.

Freers, T.F.  1970.  Geology and Ground Water Resources, Williams County, North Dakota, Part 1—Geology, North Dakota Geological Survey Bulletin 48, 54 pp.

Fritelli, J.  2014.  U.S. Rail Transportation of Crude Oil: Background and Issues for Congress.  Congressional Research Service.  Available at: http://fas.org/sgp/crs/misc/R43390.pdf.

Fuller, T.  1989.  Population dynamics of wolves in North-Central Minnesota.  Wildlife Monographs 105:3-41.

GeoEngineers.  2009.  Vibration Monitoring Report, Bridgewood 22-Inch-Diameter Class Change, Merrilville, Indiana.

GeoEngineers.  2014.  Preliminary Geology and Geologic Hazards Evaluation, ETC Dakota Access Pipeline, North Dakota, South Dakota, Iowa, Illinois, 28 p.

Gratto-Trevor, C.L., G. Beyersbergen, H.L. Dickson, P. Erickson, R. MacFarlane, M. Raillard, and T. Sadler.  2001.  Prairie Canada Shorebird Conservation Plan. Prairie Habitat Joint Venture, Canadian Wildlife Service.  Edmonton, Alberta.

Hillman, M.D., S.M. Karpanty, J.D. Fraser, and A. Derose-Wilson.  2015.  Effects of Aircraft and Recreation on Colonial Waterbird Nesting Behavior.  The Journal of Wildlife Management 79(7):1192-1198.

Hoberg, T. and C. Gause.  1992.  Reptiles and amphibians of North Dakota.  North Dakota Outdoors 55(1):7-19.  Jamestown, ND: Northern Prairie Wildlife Research Center Available at: http://www.npwrc.usgs.gov/resource/herps/amrepnd/index.htm.

Hoganson, J.S.  2006.  Prehistoric Life of North Dakota, North Dakota Geological Survey.  Available at: https://www.dmr.nd.gov/ndfossil/Poster/poster.asp.

Hoganson, J.S. and J. Campbell.  2002.  Paleontology of Theodore Roosevelt National Park, North Dakota Geological Survey North Dakota Notes No. 9.  Available at: https://www.dmr.nd.gov/ndgs/ndnotes/ndn9_h.htm.

USACE_DAPL0071356

Environmental Assessment
Dakota Access Pipeline Project
July 2016

Horwath, B., and C. Owings.  2014.  No Keystone XL Means More Oil By Rail, Report Says.  Oil Patch
    Dispatch.  Available at: http://oilpatchdispatch.areavoices.com/2014/01/31/no-keystone-xl-
    means-more-oil-by-rail-report-says/.

Howe, M.A.  1989.  Migration of radio-marked whooping cranes from the Aransas-Wood Buffalo
    population: Patterns of habitat use, behavior, and survival.  U.S. Fish and Wildlife Service,
    Technical Report 21.

Kerr, J. M., H. R. Melton, S. J. McMillen, R. I. Magaw, and G. Naughton. 1999. Polyaromatic hydrocarbon
    content of crude oils around the world. In: SPE/EPS Exploration and Production Environmental
    Conference, SPE 52724 as cited in O'Reilly et al. 2001.

Krause, T.D.  2015.  Flood Risk and Floodplain Management Section; Memorandum for CENWO-OD-E,
    Executive Order 11988 and NWDR 1110-2-5 Compliance Memo for the Proposed Dakota Access
    Pipeline (DAPL) Project in Williams County, North Dakota, across Flowage and Saturation
    Easements.

Kringstad, J. 2016. Energy Development and Transmission Committee. North Dakota Pipeline
    Authority. Available at: https://ndpipelines.files.wordpress.com/2012/04/kringstad-slides-
    edtfeb-3-2016.pdf.

Landt, M.J. and B. McCord.  2016.  Class II/III Cultural Resources Inventory of the Crossings of Flowage
    Easements and Federal Lands.  Alpine Archaeological Consultants, Inc and Gray & Pape, Inc.

Larson, Thomas K., Kurt P. Schweigert, Keith H. Dueholm, Paul H. Sanders, and Dori Penny.  1987.  A
    Cultural Resource Inventory of the Right Bank of Lake Oahe in Morton and Sioux Counties, North
    Dakota.  Larson-Tibesar Associates, Inc., Laramie, Wyoming.  Submitted to the USACE, Omaha.

Lewis, T.E., and R.D. Slack.  2008.  Whooping Cranes and Human Disturbance: An Historical Perspective
    and Literature Review.  North American Crane Workshop Proceedings.  Paper 182.

Licht, D.S. and S.H. Fritts.  1994.  Gray wolf (*Canis lupus*) occurrences in the Dakotas. American Midland
    Naturalist 132:74-81.

Lichvar, R.W., M. Butterwick, N.C. Melvin, and W.N. Kirchner.  2014.  The National Wetland Plant List:
    2014 Update of Wetland Ratings.  Phytoneuron 2014-41: 1-42.

Marathon Oil. 2010. Bakken Oil Storage Tank Emission Models. Presented by Paul Peacock, March 23,
    2010. Internet website: http://www.ndoil.org/image/cache/Peacock_-
    _March_23_2010._ppt.pdf

Marcus, J.F., J.J. Dinan, R.J. Johnson, E.E. Blankenship, and J.L. Lackey.  2007.  Directing nest site
    selection of Least Terns and Piping Plovers.  Waterbirds 30:251-258.

McCabe, T.L.  1981.  The Dakota skipper, *Hesperia dacotae* (Skinner): range and biology with special
    reference to North Dakota.  Journal of the Lepidopterists' Society 35(3):179-193.

Mech, L.D.  1974.  *Canis lupus*.  Mammalian Species 37:1-6.

Morton County.  2014.  Morton County Zoning Map.  Available at http://tinyurl.com/mortonzoningmap.

Muller, H. 1987. Hydrocarbons in the freshwater environment. A Literature Review. Arch.
    Hydrobiol. Beih. Ergebn. Limnol 24:1-69.

USACE_DAPL0071357

Environmental Assessment
Dakota Access Pipeline Project
July 2016

Multi-Resolution Land Characteristics Consortium.  2011.  National Land Cover Database.  Available at: http://www.mrlc.gov/nlcd2011.php.

Murphy, E.C.  2006.  Lignite Reserves, Williston 100K Sheet, North Dakota, North Dakota Geological Survey.  Available at: https://www.dmr.nd.gov/ndgs/Coalmaps/pdf/100K/wlst_100k_c.pdf.

National Park Service.  2009.  Nationwide Rivers Inventory.  Available at http://www.nps.gov/ncrc/programs/rtca/nri/states/nd.html.

Natural Resources Conservation Service.  2015.  Web Soil Survey. Available at http://websoilsurvey.nrcs.usda.gov/.

Natural Resources Conservation Service.  2013.  Farmland Protection Policy Act Annual Report for FY 2012.

Natural Resources Conservation Service.  2008.  Lake Sakakawea 10110101, 8-Digit Hydrologic Unit Profile.  Available at http://www.nrcs.usda.gov/Internet/FSE_DOCUMENTS/nrcs141p2_001513.pdf.

Natural Resources Conservation Service.  2006.  Land Resource Regions and Major Land Resource Areas of the United States, the Caribbean, and the Pacific Basin.  Available at http://www.nrcs.usda.gov/wps/portal/nrcs/detail/soils/survey/?cid=nrcs142p2_053624.

Neff, J. M. and J. W. Anderson. 1981. Response of Marine Animals to Petroleum and Specific Hydrocarbons. Applied Science Publishers, London. 177 pp.

Nixon, R.  2014.  Grain Piles Up, Waiting For A Ride, As Trains Move North Dakota Oil.  New York Times.  Available at: http://www.nytimes.com/2014/08/26/us/grain-piles-up-waiting-for-a-ride-as-trains-move-north-dakota-oil.html.

North Dakota Department of Agriculture.  2014a.  Noxious Weeds.  Available at: http://www.nd.gov/ndda/program/noxious-weeds.

North Dakota Department of Agriculture.  2014b.  Endangered Species Descriptions.  Available at: http://www.nd.gov/ndda/program-info/endangered-species-protection/endangered-species-descriptions.

North Dakota Energy Conversion and Transmission Facility Siting Act, North Dakota Administrative Code 49-22-05.1 Available at:  http://www.legis.nd.gov/cencode/t49c22.pdf?20160408183906.

North Dakota Department of Health.  2015.  North Dakota 2014 Integrated Section 305(b) Water Quality Assessment Report and Section 303(d) List of Waters Needing Total Maximum Daily Loads.  Available at: https://www.ndhealth.gov/wq/sw/Z7_Publications/IntegratedReports/2014_North_Dakota_Integrated_Report_Final_20150428.pdf.

North Dakota Department of Health.  2013.  North Dakota Air Quality Monitoring Data Summary 2013.  Available at https://www.ndhealth.gov/aq/AmbientMonitoring.htm.

North Dakota Department of Mineral Resources.  2015.  Oil and Gas Division, Oil and Gas ArcIMS Viewer.  Available at: https://www.dmr.nd.gov/OaGIMS/viewer.htm.

USACE_DAPL0071358

Environmental Assessment
Dakota Access Pipeline Project
July 2016

North Dakota Game and Fish Department.  2012.  Black-footed Ferret.  Available at:
        http://gf.nd.gov/wildlife/fish-wildlife/id/mammals/carnivores/ferret.

North Dakota GIS Hub Data Portal.  2010.  Earthquake Locations.  Available at:
        https://apps.nd.gov/hubdataportal/srv/en/main.home.

North Dakota Parks and Recreation Department.  2014.  North Dakota Parks and Recreation Department
        Home Page.  Available at http://www.parkrec.nd.gov/index.html#1.

Radbruch-Hall, D.H., R.B. Colton, W.E. Davies, I. Lucchitta, B.A. Skipp, and D.J. Varnes.  1982.  Landslide
        Overview Map of the Conterminous United States, USGS Landslide Hazards Program.  Available
        at: http://landslides.usgs.gov/hazards/nationalmap/.

Royer, R.A. and G.M. Marrone.  1992.  Conservation status of the Dakota skipper (*Hesperia dacotae*) in
        North and South Dakota.  p.44.  U.S. Fish and Wildlife Service.  Denver, Colorado.

Sieler, Steve.  July 6, 2015.  State Soil Liaison, Natural Resources Conservation Service, North Dakota.
        Personal Communication with Amy Williams, Staff Biologist, Perennial Environmental, LLC.

Standing Rock Sioux Tribe. 2016.  Environmental Profile. Available at:
        http://standingrock.org/environmental-profile/.

Standing Rock Sioux Tribe Game & Fish Department. 2016. Dates and Fees.  Available at:
        http://gameandfish.standingrock.org/dates-and-fees/.

Standing Rock Tourism. 2016. Attractions.  Available at:
        http://www.standingrocktourism.com/information/events.asp.The Engineering ToolBox.  2015.
        Ldn – Day and Night Sound Level.  Available at: http://www.engineeringtoolbox.com/sound-
        level-d_719.html.

Turner, Mason and Company, 2014. The North Dakota Petroleum Council Study on Bakken Crude
        Properties. Prepared for the North Dakota Petroleum Council.

U.S. Army Corps of Engineers.  2014.  National Levee Database.  Available at:
        http://nld.usace.army.mil/egis/f?p=471:1:.

U.S. Army Corps of Engineers.  2012.  Omaha District, North Dakota Regulatory Office. Nationwide
        Permit Regional Conditions for North Dakota.  Available at:
        http://www.nwo.usace.army.mil/Missions/RegulatoryProgram/NorthDakota.aspx.

U.S. Army Corps of Engineers.  2011. Omaha District, Garrison Dam/Lake Sakakawea Project North
        Dakota Surplus Water Report. Available at:
        http://www.swc.nd.gov/pdfs/corps_final_surplus_storage_lake_sakakawea.pdf.

U.S. Army Corps of Engineers. 2010a. Summary of Engineering Data – Missouri River Main Stem System.

U.S. Army Corps of Engineers. 2010b. Regional Supplement to the Corps of Engineers Wetland
        Delineation Manual: Great Plains Region (Version 2.0).  ERDC/EL TR-10-1, U.S. Army Engineer
        Research and Development Center, Vicksburg, MS.

U.S. Army Corps of Engineers.  2010c. Oahe Dam/Lake Oahe Final Master Plan.  Missouri River, South
        Dakota and North Dakota. Design Memorandum MO-224.

USACE_DAPL0071359

Environmental Assessment
Dakota Access Pipeline Project
July 2016

U.S. Army Corps of Engineers.  2007.  Garrison Dam/Lake Sakakawea Master Plan with Integrated Programmatic Environmental Assessment, Missouri River, North Dakota. Update of Design Memorandum MGR-107D.

U.S. Army Corps of Engineers.  1987.  Corps of Engineers Wetland Delineation Manual, Technical Report Y-87-1, U.S. Army Engineer Waterways Experiment Station, Vicksburg, MS.

U.S. Census Bureau.  2014.  American Fact Finder. Available at: http://factfinder.census.gov/faces/nav/jsf/pages/index.xhtml.

U.S. Department of Transportation.  2015.  Transportation Accidents by Mode.  Office of the Assistant Secretary for Research and Technology.  Available at: http://www.rita.dot.gov/bts/sites/rita.dot.gov.bts/files/publications/national_transportation_statistics/html/table_02_03.html.

U.S. Department of Transportation.  2014.  Pocket Guide to Large Truck and Bus Statistics. Federal Motor Carrier Safety Administration.  Available at: http://www.fmcsa.dot.gov/sites/fmcsa.dot.gov/files/docs/FMCSA%20Pocket%20Guide%20to%20Large%20Truck%20and%20Bus%20Statistics%20-%202014%20-%20508C.pdf.

U.S. Environmental Protection Agency.  2015.  Hazardous Waste Website.  Available at: http://www.epa.gov/osw/hazard/index.htm.

U.S. Environmental Protection Agency.  2014.  Enviromapper for Envirofacts. http://epa.gov/emefdata/em4ef.home.

U.S. Environmental Protection Agency.  2012.  Environmental Justice Showcase Communities.  Available at: http://www.epa.gov/environmentaljustice/grants/ej-showcase.html.

U.S. Environmental Protection Agency. 2016. ECOTOX User Guide: ECOTOXicology Database System. Version 4.0. Available: http:/www.epa.gov/ecotox/

U.S. Fish and Wildlife Service (USFWS). 2007. National Bald Eagle Management Guidelines. Arlington, VA.  May 2007.

U.S. Fish and Wildlife Service.  2015.  Endangered and Threatened Wildlife and Plants; Threatened Species Status for the Northern Long-Eared Bat With 4(d) Rule; Final Rule and Interim Rule.  80 Federal Register 17973.

U.S. Fish and Wildlife Service.  2014a.  Species profile: Whooping Crane (*Grus americana*). Environmental Conservation Online System.  Available at: http://ecos.fws.gov/speciesProfile/profile/speciesProfile.action?spcode=B003.

U.S. Fish and Wildlife Service.  2014b.  Endangered and Threatened Wildlife and Plants; Threatened Species Status for the Rufa Red Knot; Final Rule. 79 FR 73705.

U.S. Fish and Wildlife Service.  2014c.  Revised recovery plan for the Pallid sturgeon (*Scaphirhynchus albus*).  Denver, Colorado: Mountain-Prairie Region, U.S. Fish and Wildlife Service.

U.S. Fish and Wildlife Service.  2014d.  Species profile: Black-footed ferret (*Mustela nigripes*). Environmental Conservation Online System.  Available at: http://ecos.fws.gov/speciesProfile/profile/speciesProfile?spcode=A004.

USACE_DAPL0071360

Environmental Assessment
Dakota Access Pipeline Project
July 2016

U.S. Fish and Wildlife Service.  2014e.  Species profile: Gray wolf (*Canis lupus*).  Environmental Conservation Online System.  Available at: http://ecos.fws.gov/tess_public/SpeciesReport.do?lead=6&listingType=L.

U.S. Fish and Wildlife Service.  2014f.  Revised Recovery Plan for the Pallid Sturgeon (*Scaphirhynchus albus*).  Available at: http://ecos.fws.gov/docs/recovery_plan/Pallid%20Sturgeon%20Recovery%20Plan%20First%20Revision%20signed%20version%20012914_3.pdf.

U.S. Fish and Wildlife Service.  2014g. Rufa Red Knot Background Information and Threats Assessment.Available at: http://www.fws.gov/northeast/redknot/pdf/20141125_REKN_FL_supplemental_doc_FINAL.pdf.

U.S. Fish and Wildlife Service.  2013a.  Western prairie fringed orchid (*Platanthera praeclara*). Available at: http://www.fws.gov/northdakotafieldoffice/endspecies/species/western_prairie_fringed_orchid.htm.

U.S. Fish and Wildlife Service.  2013b.  North Dakota Field Office; Least Tern (*Sterna antillarum*).  Available at: http://www.fws.gov/northdakotafieldoffice/endspecies/species/least_tern.htm.

U.S. Fish and Wildlife Service.  2013c.  North Dakota Field Office; Black-footed ferret (*Mustela nigripes*).  Available at: http://www.fws.gov/northdakotafieldoffice/endspecies/species/black-footed_ferret.htm.

U.S. Fish and Wildlife Service.  2013d.  Endangered and Threatened Wildlife and Plants; Threatened status for Dakota skipper and Endangered Status for Poweshiek skipperling; and Designation of critical habitat for the Dakota skipper and Poweshiek skipperling. Proposed Rule.  78 Federal Register 63574.

U.S. Fish and Wildlife Service.  2013e.  Interior Least Tern (*Sternula antillarum*) 5-Year Review: Summary and Evaluation.  Available at: http://www.fws.gov/southeast/5yearReviews/5yearreviews/interiorLeastTern5yrReivew102413.pdf.

U.S. Fish and Wildlife Service.  2013f.  Black-footed Ferret Draft Recovery Plan, Second Revision.  Available at: https://www.fws.gov/mountain-prairie/species/mammals/blackfootedferret/2013DraftRevisedRecoveryPlan.pdf.

U.S. Fish and Wildlife Service.  2012.  Endangered Species: Piping Plover.  Available at: http://www.fws.gov/mountainprairie/species/birds/pipingplover/.

U.S. Fish and Wildlife Service.  2009a.  Whooping Cranes and Wind Development – An Issue Paper.  Available at: http://www.fws.gov/southwest/es/oklahoma/documents/te_species/wind%20power/whooping%20crane%20and%20wind%20development%20fws%20issue%20paper%20-%20final%20%20april%202009.pdf

U.S. Fish and Wildlife Service.  2009b.  Piping Plover (*Charadrius melodus*) 5-Year Review: Summary and Evaluation. Available at:

USACE_DAPL0071361

Environmental Assessment
Dakota Access Pipeline Project
July 2016

http://www.fws.gov/northeast/endangered/PDF/Piping_Plover_five_year_review_and_summary.pdf

U.S. Fish and Wildlife Service.  2007.  International Recovery Plan Whooping Crane (*Grus americana*), Third Revision.  Available at: http://ecos.fws.gov/docs/recovery_plan/070604_v4.pdf.

U.S. Fish and Wildlife Service.  1994.  Whooping Crane Recovery Plan.  Available at: https://www.fws.gov/southwest/es/arizona/Documents/RecoveryPlans/WhoopingCrane.pdf.

U.S. Fish and Wildlife Service, National Park Service, Bureau of Land Management, and U.S. Forest Service.  2014.  National Wild and Scenic Rivers System.  Available at http://www.rivers.gov/north-dakota.php.

U.S. Geological Survey.  2014a. North Dakota 2014 Seismic Hazard Map, USGS Earthquake Hazards Program.  Available at: http://earthquake.usgs.gov/earthquakes/states/north_dakota/hazards.php.

U.S. Geological Survey.  2014b. Northern Prairie Wildlife Research Center.  North Dakota Wildlife Management Area Guide - WMAs by County.  Available at http://www.npwrc.usgs.gov/resource/wildlife/wmaguide/county.htm.

U.S. Geological Survey. 2016. National Water Information System data available on the World Wide Web (USGS Water Data for the Nation), accessed May 9, 2016 at http://waterdata.usgs.gov/nwis/dvstat?referred_module=sw&site_no=06330000&por_06330000_2=720709,00060,2,1928-10-01,1965-07-31&format=html_table&stat_cds=mean_va&date_format=YYYY-MM-DD&rdb_compression=file&submitted_form=parameter_selection_list.

USGS. 2016b. National Water Information System data available on the World Wide Web (USGS Water Data for the Nation), accessed May 9, 2016 at http://nwis.waterdata.usgs.gov/nd/nwis/uv?cb_00060=on&format=gif_stats&site_no=06342500&period=3143&begin_date=2007-10-01&end_date=2016-05-09.

Weary, D.J. and D.H. Doctor.  2014.  Karst in the United States: A Digital Map Compilation and Database, USGS Open-File Report 2014-1156, 23 p.

Wilderness Institute.  2014.  List of Wilderness Areas by Location. University of Montana, College of Forestry and Conservation.  Available at http://www.wilderness.net/NWPS/stateView?state=ND.  Accessed November 2014.

USACE_DAPL0071362

Environmental Assessment
Dakota Access Pipeline Project
July 2016

## 12.0   FIGURES

**Figure 1:**     Project Location—Federal Lands and Flowage Easements
**Figure 2:**     Project Layout—Flowage Easements
**Figure 3:**     Project Layout—Federal Lands
**Figure 4:**     Soils—Flowage Easements
**Figure 5:**     Soils—Federal Lands
**Figure 6:**     Natural Resources—Flowage Easements
**Figure 7:**     Natural Resources—Federal Lands
**Figure 8:**     Cultural Resources—Flowage Easements
**Figure 9:**     Cultural Resources—Federal Lands
**Figure 10:**    Land Cover—Flowage Easements
**Figure 11:**    Land Cover—Federal Lands
**Figure 12:**    Route Alternative—Missouri River Crossing
**Figure 13:**    Route Alternative—Lake Oahe Crossing
**Figure 14:**    HDD Cross Section—Missouri River Crossing
**Figure 15:**    HDD Cross Section—Lake Oahe Crossing
**Figure 16:**    Whooping Crane—Central Flyway

USACE_DAPL0071363



Williams
Mountrial
Flowage Easements
McKenzie

**Montana**

**North Dakota**

**Minnesota**

Dunn
Mercer

Morton

Federal Land

Emmons

**South Dakota**

North Dakota
Minnesota
Michigan
Wisconsin
South Dakota
Iowa
Nebraska
Illinois
Kansas
Missouri

— Proposed DAPL Centerline

DAKOTA ACCESS, LLC

**Dakota Access Pipeline Project**
**Figure 1**
**Project Location**
**Federal Lands and Flowage Easements**

0    40    Miles

1:2,534,400

UTM 83-14F    Date: April, 2015

Path: P:\GIS\Client\ETC_EnergyTransfer\DakotaAccess_DAPL\Maps\ENV\ND_FlowEasements\01_ND_ProjectLocation_Land.mxd
Source: ArcGIS Online Mapping

USACE_DAPL0071364



Dakota Access Pipeline Project
Figure 2
Project Layout
Flowage Easements
Williams County, North Dakota

DAKOTA ACCESS, LLC

Milepost
Barge Location With Pumping Intake Structure*
Temporary Above Ground Waterline
Project Centerline
DAPL Centerline
Workspace
USACE Flowage Easements

* Barge location dependant on water level

1:26,400
UTM83-13F          Date: August, 2015

0   2,200 Feet

USACE_DAPL0071365





Milepost
Project Centerline
DAPL Centerline
Workspace
USACE Flowage Easements
NRCS Soil

North Dakota

DAKOTA ACCESS, LLC

**Dakota Access Pipeline Project**
**Figure 4-A**
**Soils**
**Flowage Easements**
**Williams County, North Dakota**

| Page 1 of 2 | 1:15,000 |
| UTM83-13F | Date: August, 2015 |

0    1,200
Feet

Path: P:\GIS\Client\ETC_EnergyTransfer\DakotaAccess_DAPL\Maps\ENV\ND_FlowEasements\04ND_A_FlowEasement.mxd

USACE_DAPL0071367



Milepost
Barge Location With Pumping Intake Structure
Temporary Above Ground Waterline
Project Centerline
DAPL Centerline
Workspace
USACE Flowage Easements
NRCS Soil

North Dakota

DAKOTA ACCESS, LLC

Dakota Access Pipeline Project
Figure 4-B
Soils
Flowage Easements
Williams County, North Dakota

| Page 2 of 2 | 1:15,000 |
| UTM83-13F | Date: August, 2015 |

0    1,200
Feet

Path: P:\GIS\Client\ETC_EnergyTransfer\DakotaAccess_DAPL\Maps\ENV\ND_FlowEasements\04ND_B_FlowEasement.mxd

USACE_DAPL0071368



Dakota Access Pipeline Project
Figure 5
Soils
Federal Lands
Morton County and
Emmons County, North Dakota

**Legend:**
- Milepost
- Project Centerline
- DAPL Centerline
- Workspace
- USACE Federal Lands
- NRCS Soils
- Standing Rock Sioux Reservation

DAKOTA ACCESS, LLC

1:21,000
UTM 83-14F          Date: February, 2016

0    1,750 Feet

Path: P:\GIS\Client\ETC_EnergyTransfer\DakotaAccess_DAPL\Maps\ENV\ND_FlowEasements\05ND_LakeOahe_Land.mxd
Source: ArcGIS Online Mapping

USACE_DAPL0071369



Milepost
Project Centerline
DAPL Centerline
Workspace
Field Delineated Waterbody
Field Delineated PEM Wetland
Field Delineated PFO Wetland
Field Delineated PSS Wetland
USACE Flowage Easements

DAKOTA ACCESS, LLC

**Dakota Access Pipeline Project
Figure 6-A
Natural Resources
Flowage Easements
Williams County, North Dakota**

| Page 1 of 2 | 1:15,000 |
| UTM83-13F | Date: August, 2015 |

0    1,200
Feet

Path: P:\GIS\Client\ETC_EnergyTransfer\DakotaAccess_DAPL\Maps\ENV\ND_FlowEasements\06ND_A_FlowEasementNaturalResources.mxd

USACE_DAPL0071370



LL3430E

LL3453E

93.5

94

LL3483E-1

94.5

LL3440E

d-k8-wl-011
w-m10-wl-001_PSS
w-m10-wl-001_PEM
w-m10-wl-001_PEM
w-m10-wl-001_PSS
w-m10-wl-001_PFO
w-m10-wl-002_PSS

95
s-k2-mk-001

e-k2-mk-002

Missouri River

North Dakota

Legend:
● Milepost
▮ Barge Location With Pumping Intake Structure
━ Project Centerline
┅ DAPL Centerline
= = Temporary Above Ground Waterline
▭ Workspace
━ Field Delineated Waterbody
▮ Field Delineated PEM Wetland
▮ Field Delineated PFO Wetland
▮ Field Delineated PSS Wetland
▭ USACE Flowage Easements

**DAKOTA ACCESS, LLC**

**Dakota Access Pipeline Project
Figure 6-B
Natural Resources
Flowage Easements
Williams County, North Dakota**

| Page 2 of 2 | 1:15,000 |
| UTM83-13F | Date: August, 2015 |

0    1,200
Feet

Path: P:\GIS\Client\ETC_EnergyTransfer\DakotaAccess_DAPL\Maps\ENV\ND_FlowEasements\06ND_B_FlowEasementNaturalResources.mxd

USACE_DAPL0071371



Dakota Access Pipeline Project
Figure 7
Natural Resources
Federal Lands
Morton County and
Emmons County, North Dakota

DAKOTA ACCESS, LLC

Legend:
- Milepost
- Project Centerline
- DAPL Centerline
- Field Delineated Waterbody
- Workspace
- USACE Federal Lands
- Standing Rock Sioux Reservation

0   1,750
Feet

1:21,000
UTM 83-14F        Date: February, 2016

Path: P:\GIS\Client\ETC_EnergyTransfer\DakotaAccess_DAPL\Maps\ENV\ND_FlowEasements\07ND_LakeOahe_NaturalResources.mxd
Source: ArcGIS Online Mapping

USACE_DAPL0071372



USACE_DAPL0071373



Milepost
Project Centerline
DAPL Centerline
USACE Federal Lands
Project Archaeological Survey
Workspace
Standing Rock Sioux Reservation

North Dakota

DAKOTA ACCESS, LLC

Dakota Access Pipeline Project
Figure 9
Cultural Resources
Federal Lands
Morton County and
Emmons County, North Dakota

| | 1:21,000 |
| UTM 83-14F | Date: June, 2016 |

0    1,750
Feet

Path: P:\GIS\Client\ETC_EnergyTransfer\DakotaAccess_DAPL\Maps\ENV\ND_FlowEasements\09ND_LakeOahe_CR.mxd
Source: ArcGIS Online Mapping

USACE_DAPL0071374



Cultivated Crops
Developed, Low Intensity
Developed, Open Space
Emergent Herbaceous Wetlands
Grassland/Herbaceous
Open Water
Pasture/Hay
Shrub/Scrub
Woody Wetlands

LL3426E-2
LL3431E
LL3426E-2
LL3450E-2
LL3430E
LL3453E
LL3483E-1

92
92.5
93
93.5

North Dakota

● Milepost
▬ Project Centerline
▬ ▬ DAPL Centerline
☐ Workspace
☐ USACE Flowage Easements

DAKOTA ACCESS, LLC

**Dakota Access Pipeline Project**
**Figure 10-A**
**Landcover**
**Flowage Easements**
**Williams County, North Dakota**

| Page 1 of 2 | 1:15,000 |
|---|---|
| UTM83-13F | Date: August, 2015 |

0    1,200
Feet

Path: P:\GIS\Client\ETC_EnergyTransfer\DakotaAccess_DAPL\Maps\ENV\ND_FlowEasements\10ND_A_Landcover.mxd

USACE_DAPL0071375



**Dakota Access Pipeline Project**
**Figure 10-B**
**Landcover**
**Flowage Easements**
**Williams County, North Dakota**

| Page 2 of 2 | 1:15,000 |
| UTM83-13F | Date: September, 2015 |

Path: P:\GIS\Client\ETC_EnergyTransfer\DakotaAccess_DAPL\Maps\ENV\ND_FlowEasements\10ND_B_Landcover.mxd

USACE_DAPL0071376



**North Dakota**

Legend:
- Cultivated Crops
- Deciduous Forest
- Developed, Open Space
- Emergent Herbaceous Wetlands
- Grassland/Herbaceous
- Open Water
- Woody Wetlands

- Milepost
- Project Centerline
- DAPL Centerline
- Workspace
- USACE Federal Lands
- Standing Rock Sioux Reservation

0   1,750
Feet

DAKOTA ACCESS, LLC

**Dakota Access Pipeline Project**
**Figure 11**
**Landcover**
**Federal Lands**
**Morton County and**
**Emmons County, North Dakota**

| 1:21,000 | |
| --- | --- |
| UTM 83-14F | Date: February, 2016 |

Path: P:\GIS\Client\ETC_EnergyTransfer\DakotaAccess_DAPL\Maps\ENV\ND_FlowEasements\11ND_LakeOahe_Landcover.mxd
Source: ArcGIS Online Mapping

USACE_DAPL0071377



Legend:
- Preferred Alternative
- Route Alternarive
- USACE Garrison Flowage Easements
- Other Government Lands

North Dakota

DAKOTA ACCESS, LLC

**Dakota Access Pipeline Project**
**Figure 12**
**Route Alternative**
**Missouri River Crossing**
**Williams County, North Dakota**

| 1:400,000 | |
| NAD 1983 UTM Zone 14N | Date: July, 2015 |

0  2  4  8 Miles

Path: P:\GIS\Client\ETC_EnergyTransfer\DakotaAccess_DAPL\Maps\ENV\ND_FlowEasements\12ND_Missouri_R_Xing.mxd

USACE_DAPL0071378



Preferred Alternative
Route Alternarive
USACE Garrison Flowage Easements
Standing Rock Sioux Reservation
USACE Lake Oahe Fee-Owned Land
Other Government Lands

North Dakota

DAKOTA ACCESS, LLC

**Dakota Access Pipeline Project
Figure 13
Route Alternative
Lake Oahe Crossing
Emmons & Morton Counties, North Dakota**

1:696,293

NAD 1983 UTM Zone 14N        Date: April, 2016

0  2  4      8
                Miles

Path: P:\GIS\Client\ETC_EnergyTransfer\DakotaAccess_DAPL\Maps\ENV\ND_FlowEasements\13ND_Lake_Oahe_Xing_update20160412.mxd

## FIGURE 14



**CROSS-SECTION DIAGRAM OF LAKE OAHE HDD CROSSING**

USACE_DAPL0071380

## FIGURE 15



CROSS-SECTION DIAGRAM OF MISSOUR RIVER HDD CROSSING

USACE_DAPL0071381



Williams

Flowage Easements

McKenzie

**Montana**

**North Dakota**

**Minnesota**

Morton

Federal Land

Emmons

**South Dakota**

☐ DAPL Action Area

▨ Whooping Crane Migration Corridor

Whooping Crane Migration Corridor from Whooping Cranes & Wind
Development - An Issue Paper By Regions 2 and 6, U. S. Fish and
Wildlife Service April 2009 (Stehn, T, and T. Wassenich. 2008.
Whooping crane collisions with power lines: an issue paper.
2006 North American Crane Workshop. In press.)

0        40
▬▬▬▬ Miles

**DAKOTA ACCESS, LLC**

Figure 16
**Dakota Access Pipeline Project**
**USACE ND Flowage Easement/408 Areas**

**Whooping Crane Migration Corridor**

| | 1:2,800,000 |
|---|---|
| UTM 83-14F | Date: March, 2016 |

Path: P:\GIS\Client\ETC_EnergyTransfer\DakotaAccess_DAPL\Maps\ENV\WoopingCrane\01_ND_ProjectLocation_Land.mxd
Source: ArcGIS Online Mapping

USACE_DAPL0071382

# EXHIBIT M

**MITIGATED FINDING OF NO SIGNIFICANT IMPACT**

**ENVIRONMENTAL ASSESSMENT**
**DAKOTA ACCESS PIPELINE PROJECT**
**WILLIAMS, MORTON, AND EMMONS COUNTIES, NORTH DAKOTA**

**Introduction:**   In accordance with the National Environmental Policy Act (NEPA) and its implementing regulations, an Environmental Assessment (EA) was prepared to evaluate the potential effects of the United States Army Corps of Engineers (USACE), Omaha District (District), granting permission under Section 14 of the Rivers and Harbors Act of 1899, codified 33 U.S.C. Section 408 (Section 408), to Dakota Access, L.L.C. (Dakota Access) to allow the proposed Dakota Access Pipeline (DAPL) Project to cross federal real property interests administered by the District.   Specifically, the DAPL project would cross federal flowage easements near the upper end of Lake Sakakawea, north of the Missouri River in Williams County, North Dakota, and federally-owned property at Lake Oahe in Morton and Emmons counties, North Dakota.   Dakota Access proposes the DAPL Project to efficiently and safely transport at least 570,000 barrels of crude oil per day (bpd) from the Bakken and Three Forks production region in North Dakota to a crude oil market hub located near Patoka, Illinois, and ultimately to refineries located in the Midwest and the Gulf Coast, where 80% of the U.S. refining capabilities exist.

The EA follows guidelines promulgated by the Council on Environmental Quality (CEQ) for implementing the procedural provisions of NEPA (40 Code of Federal Regulations [CFR] 1500-1508 and Corps regulation ER 200-2-2 [33 CFR 230]). This action is being completed in accordance with CEQ regulations in Section 1506.5(a) and 1506.5(b), which allow an applicant to prepare an EA for federal actions.   The Corps has independently evaluated and verified the information and analysis undertaken in the EA and takes full responsibility for the scope and content contained herein. Corps offices involved with the preparation and review of this document are provided in Section 9.0 of the EA.

**Purpose and Need:**   The purpose and need of the federal action is to determine whether USACE may grant permission for Dakota Access to place the pipeline on federal real property interests acquired and managed by USACE for the Garrison Dam/Lake Sakakawea and Oahe Dam/Lake Oahe projects.   Section 408 authorizes the Corps to grant permission to Dakota Access to modify federal flood control and navigation projects, provided the modifications are not injurious to the public interest and will not impair the usefulness of the projects. The EA addresses the purpose and need of the pipeline, as well as the location and method of installation of the pipeline, but the analysis is limited to the effects of allowing the pipeline to cross federal flowage easements near the upper end of Lake Sakakawea, and federally owned lands at Lake Oahe in North Dakota.

**Project Summary:**   The proposed DAPL project is an approximately 1,100 long crude oil pipeline which would begin near Stanley, North Dakota, and end at Patoka, Illinois. In North Dakota, there are two pipeline segments, including the 148-mile Supply Line and the 210-mile Mainline, which total approximately 358 miles across seven counties (Mountrail, Williams, McKenzie, Dunn, Mercer, Morton, and Emmons). The diameter of the pipeline increases incrementally at designated tank terminals from 12 inches to 20, 24, and ultimately, 30 inches. The DAPL pipeline is co-

1

USACE_DAPL0071174

located with existing pipelines and other linear facilities previously installed on the federal real property interests over which the District has administrative and regulatory authority.

The portion of the DAPL project relevant to the EA and this FONSI is the portion that Dakota Access proposes to construct on Corps-owned lands and flowage easements. The construction requires real estate actions and Section 10 permits and Section 408 permissions. The EA and this Finding of No Significant Impact deal exclusively with granting the Section 408 permissions. More detailed information is available in Section 1.0 of the EA.

**Requester's Preferred Alternative:** The Requester's Preferred Alternative, identified in the EA as the Proposed Action, is the construction of the DAPL project on Corps real property interests as discussed in the Preferred Alternative in the EA. Implementation of the Requester's Preferred Alternative would involve the installation of 2.83 miles of a 24-inch diameter pipeline through seven tracts over which the Corps acquired flowage easements for the operation of the Garrison Dam/Lake Sakakawea Project, and 0.21 miles of a 30 inch diameter pipeline on federal property administered by the District for the Oahe Dam/Lake Oahe Project. As proposed, Dakota Access would trench the pipeline on federal flowage easements and install the pipeline via HDD under the Missouri River and Lake Oahe.

**Alternatives:** There is the potential for daily production in excess of 570,000 barrels per day in the Bakken and Three Forks production area, but there is no existing pipeline infrastructure sufficient to transport that volume of crude oil from North Dakota to the refineries. Because the Corps can only grant permission for the modification of a federal project if it would not be injurious to the public interest, the EA evaluated alternatives to the construction of the pipeline as a whole, as well as the alignment of the pipeline and method for installation on federal property. The EA also analyzed the potential for the pipeline to impair the usefulness of the federal projects.

More information on the alternatives analysis is included in Section 2.0 of the EA.

**Summary of Environmental Impact:** As discussed in the Biological Opinion and the EA, the Proposed Action would result in no adverse impacts to any federally-listed threatened or endangered species or their habitats. The U.S Fish and Wildlife Service has concurred that the portions of the DAPL project that cross federal real property interests administered by the District will have either "No Effect" or "May Affect, But Not Likely to Adversely Affect" on listed species.

The Standing Rock Sioux Tribe (SRST) and other tribal governments object to the pipeline and its alignment because the proposed route crosses under Lake Oahe a few miles upstream of the SRST water intakes. Tribes are concerned that a leak or rupture would contaminate the river, including the SRST's drinking water. The tribes argue the District did not adequately consult on the DAPL pipeline alignment. The EA establishes that the District made a good faith effort to consult with the tribes and that it considered all tribal comments. In addition, the pipeline will be located under Lake Oahe, and Dakota Access has developed response and action plans, and will include several monitoring systems, shut-off valves and other safety features to minimize the risk of spills and reduce or remediate any potential damages.

USACE_DAPL0071175

**Summary of Cultural Impacts:** Tribes are also concerned that the installation of the pipeline and a potential leak or rupture could damage or destroy cultural and sacred resources in the area. The District referenced a Class I Literature Review performed by Dakota Access, as well as existing Corps of Engineers Class III surveys and the North Dakota State Historic Preservation Office (SHPO) Guidelines Manual for Cultural Resources Inventory Projects as part of the National Historic Preservation Act (NHPA) Section 106 evaluation. Section 106 consultation/coordination with Tribal governments and members, THPOs, the SHPO, the Advisory Council on Historic Preservation (ACHP), and other interested parties began in September 2014. The Corps conducted formal government-to-government consultation with tribal representatives via meetings; site visits; distribution of pertinent information; conference calls, and emails in order to inform tribal governments and private members, and to better understand their concerns. The Corps' EA administrative record details over 250 interactions between District and Dakota Access representatives and consulting parties (Tribes, THPOs, the SHPO, ACHP, and interested parties) for the DAPL project. All information received during the Section 106 process was considered during the Corps decision-making process.

Ultimately, the District made a "No Historic Properties Affected" determination, with which the North Dakota SHPO concurred in a letter dated April 26, 2016. By letter dated June 2, 2016, the ACHP disputed the District's finding under 36 C.F.R. Section 800.4(d)(iv)(A) and requested the ASA(CW) to prepare a summary of the decision and a rationale for the finding. In a final agency decision sent to the ACHP by letter dated July 25, 2016, the ASA(CW) affirmed the agency decision and fulfilled USACE Section 106 responsibilities for the Proposed Action.

**Mitigation Measures:** The District coordinated closely with Dakota Access to avoid, mitigate and minimize potential impacts of the Proposed Action so that the pipeline would not impair the usefulness of the projects and the impacts to the environment would be temporary and not significant. The majority of potential impacts would be mitigated by HDD technology, by which Dakota Access would install the pipeline beneath sensitive resources without surface disturbance, and allow pipeline construction to proceed with the fewest possible impacts. Additional mitigation measures are set out in the Environmental Construction Plan; the Stormwater Pollution Prevention Plan; the Spill Prevention, Control, and Countermeasure Plan; the HDD Construction Plan; the HDD Contingency Plan; the Unanticipated Cultural Resources Discovery Plan, and the Geographical Response Plan. Unavoidable impacts to land use and vegetation would be temporary and land would return to current land use once construction is complete. No long-term impacts are anticipated to any resources. Social and noise impacts to rural residents in the general vicinity would be minimal as construction would be completed during daylight hours and the locations are remote from most populated areas. See Section 6.0 in the EA for more details on best management practices and mitigation measures to which the applicant has committed for the Proposed Action. Dakota Access must comply with all of the measures in Table 8-2 of the EA, which will be attached to the District real estate instrument(s).

**Conditions of Easement (Lake Oahe crossing) and Consent to Modify Flowage Easements (Missouri River crossing):** The following conditions will be placed on real estate outgrants:

3

USACE_DAPL0071176

a. All environmental commitments outlined in <u>Section 6.0 and Table 8-2 of the EA</u> must be followed and incorporated by reference.

b. The pipeline must be maintained and operated per ASME B31.3, B31.4, B31.8, CFR 192, CFR 195, API 1104, and related codes.

c. Cathodic Protection will be utilized and maintained per applicable codes and Dakota Access' Operations and Maintenance Manual. Wall thickness testing will be performed on a five-year interval through the use of in-line inspection. The periodic in-line inspection will be performed in-lieu of periodic hydrologic tests. Inspection reports must be sent to the Operation Project Managers (OPMs) at the Oahe and Garrison Project Offices.

d. The Facility Response Plan will be submitted to the Corps for review prior to the operation of the pipeline.

e. All plans not final at the time the EA is complete will be submitted to the Corps for review and the incorporation of Corps comments prior to submittal to U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration.

   These plans include, but are not limited to the following:

   1. Geographical Response Plan;
   2. Operations and Maintenance Manual;
   3. Risk Assessment (Integrity Management Plan); and,
   4. Spill Models (Using the National Hydrography Dataset by the USGS)

f. Any plans that have been updated in condition "e" listed above must be sent to Corps Environmental Compliance Coordinators at the Omaha District Office, and the OPMs at the Oahe and Garrison Project Offices within one year of completion of the update.

g. Dakota Access must provide as-built drawings for both crossings to the Corps' Section 408 Coordinator at the Omaha District Office and the OPMs at both the Oahe and Garrison Project Offices within six months of the completion of pipeline construction.

h. Commitment for Training Exercises:
   a. Dakota Access must conduct full scale open water and full scale winter/ice exercises at Lake Sakakawea and Lake Oahe. A full scale exercise will occur once every 3 years (triennial cycle) with the location and type of exercise occurring on alternating schedules (e.g. open water exercise at Oahe the first triennial cycle, followed by winter exercise at Lake Sakakawea the following triennial cycle, followed by a winter exercise at Lake Oahe the following triennial cycle, etc.). The first exercise will occur within the first 3 years after the pipeline becomes operational.

USACE_DAPL0071177

    b. To facilitate Corps staff involvement, Dakota Access must notify the Corps Environmental Compliance Coordinators at the Omaha District Office, Oahe and Garrison Project Offices at least ninety (90) days prior to initiation of the training exercises. Dakota Access must also solicit the participation of key stakeholders (federal, state, local, and Tribal) in these exercises.

i. Within one year of operation of the pipeline, Dakota Access must provide for all-weather access and collection points downstream of the HDD crossings at Lake Oahe and Lake Sakakawea. Dakota Access must provide an equipment storage facility for each crossing on non-federal lands that includes a fenced permanent storage area for winter and open water spill response equipment. The storage facility should be placed in a strategic location near existing facilities that would support access to the water in both high and low water conditions. Dakota Access will coordinate with the Corps and any other applicable stakeholders to obtain all necessary permits and approvals prior to construction for any ground disturbing activities associated with these facilities. The storage facility should contain sufficient response equipment at a minimum to mitigate an unintended worst case release for this crossing.

**Coordination and Public Review:**

The Corps published a draft EA on December 8, 2015, on the Corps Omaha District website (http://www.nwo.Corps.army.mil/Missions/CivilWorks/Planning/ProjectReports.aspx). Additionally, notifications were made to cooperating agencies, other federal, state and local agencies, and signatory and non-signatory Tribes to the District Section 106 Programmatic Agreement. Notices of availability were included in the Public Notice section of the Bismarck Tribune, Williston Herald, and Capital Journal on December 8, 2015. The notice stated that the EA would be available for viewing on the Corps website, and that hard copies would be available at the Bismarck Public Library, Williston Community Library, and the Rawlins Municipal Library in Pierre, North Dakota. The draft EA was available for public comment through January 8, 2016, and comments were accepted through January 11, 2016.

The Corps fully considered and responded to comments received, and made additional clarifications within the EA as necessary. No significant comments remain unresolved. More information on how the comments received during the review process were addressed is presented in Appendix J of the EA. Because all comments have been resolved, neither a supplemental nor a revised EA will be offered for further public review, and no further NEPA compliance actions are required prior to the District granting the Section 408 permission for the Proposed Action. The proposed pipeline route and installation method were selected to minimize impacts to sensitive resources, and the applicant is required to comply with all applicable federal, state, and local laws and regulations, all management and response plans referenced in the EA, as well as the conditions attached to the Corps outgrants.

**Cumulative Impacts:** Cumulative impacts to the environment result from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.

USACE_DAPL0071178

Cumulative impacts may result from individually minor but collectively significant actions taking place over a period of time. In Section 4.0, the EA addresses cumulative impacts on: Geology and Soils Section; Water and Aquatic Life Resources; Vegetation, Agriculture, and Range Resources; Threatened, Endangered, Candidate, and Proposed Species; Wildlife Resources; Land Use and Recreation; Cultural and Historic Resources; Social and Economic Conditions; Transportation and Traffic; Environmental Justice, and Air Quality and Noise.

The alignment of the pipeline was selected because it will be co-located within existing utility corridors and be installed on federal real property interests using the HDD method. This avoids impacts to formerly undisturbed areas and surface resources. In addition, the District placed conditions and safeguards on the Proposed Action as the pipeline crosses federal real property interests to minimize potential effects of the placement and operation and maintenance of the pipeline. Therefore, this project will have insignificant incremental impact to other past, ongoing, or reasonably future actions of a similar nature.

**Conclusion:** I have evaluated the anticipated environmental, economic, cultural, and social effects, and any cumulative effects of the Proposed Action and determined that the Proposed Action is not injurious to the public interest and will not impair the usefulness of the federal projects. Moreover, for the reasons stated herein and discussed in greater detail in the Environmental Assessment, the District granting the referenced Section 408 permissions does not constitute a major federal action that would significantly affect the quality of the human environment. As a result, I have determined that preparation of an Environmental Impact Statement is not required. This conclusion and the processes and documents supporting it are in compliance with all applicable laws, executive orders, regulations and guidelines.


2 5 JUL 2016
_____
Date

John W. Henderson, P.E.
Colonel, Corps of Engineers
District Commander

6

USACE_DAPL0071179

# EXHIBIT S



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, OMAHA DISTRICT
1616 CAPITOL AVENUE
OMAHA NE  68102-4901

REPLY TO
ATTENTION OF

CENWO

MEMORANDUM FOR RECORD

SUBJECT:  Application for an Easement for an Oil Pipeline to Cross U.S. Army Corps of Engineers-Managed Federal Land at Lake Oahe, North Dakota


1.  <u>References</u>.

    a.  30 U.S.C. § 185, Rights-of-way for Pipelines through Federal Lands.

    b.  33 U.S.C. § 408, Taking Possession of, Use of, or Injury to Harbor or River Improvements.

    c.  Engineering Regulation 405-1-12, Real Estate Handbook, September 30, 1994.

    d.  Engineering Regulation 1130-2-550, Recreation Operations and Maintenance Policies, September 30, 2013.

    e.  Engineering Circular 1165-2-216, Policy and Procedural Guidance for Processing Requests to Alter U.S. Army Corps of Engineers Civil Works Projects Pursuant to 33 U.S.C. 408, June 21, 2016.

    f.  CEMP-CR/CECC-R, Memorandum, Subject: Real Estate Guidance Letter No. 27 – Official U.S. Army Corps of Engineers Real Estate Policy, October 29, 2008.

    g.  Notice of Availability, Dakota Access Lake Oahe Crossing, December 03, 2016.

2.  <u>Purpose</u>.  The purpose of this memorandum is to document the U.S. Army Corps of Engineers (Corps) decision on the Dakota Access, LLC (Dakota Access) application for an easement to cross Corps-managed federal lands at Lake Oahe, North Dakota.  See the attached Unexecuted Easement, Exhibit A, for a map of the area that would be covered by the easement.

3.  <u>Authority</u>.  Congress authorized "appropriate agency head[s]" to grant rights-of-way or easements through federal lands for oil pipelines in the Mineral Leasing Act.  30 U.S.C. § 185(a).  Congress outlined how agencies were to exercise their discretion under this authority -- before granting a right-of-way, agencies must impose conditions, including requirements to control or prevent damage to the environment, public or private property, hazards to public health and safety, and measures to protect the interests of individuals living in the general area who rely on certain natural resources in the area for subsistence.  30 U.S.C. § 185(h)(2).  Further,


Printed on  Recycled Paper

CENWO

SUBJECT:  Application for an Easement for an Oil Pipeline to Cross U.S. Army Corps of Engineers-Managed Federal Land at Lake Oahe, North Dakota

section 185 requires agencies to impose requirements for the operation of pipelines that "protect the public from sudden ruptures and slow degradation of the pipeline."  30 U.S.C. § 185(g).

4.  <u>Background</u>.  The Corps received an application for an easement on October 21, 2014 from Dakota Access.  Specifically, the application requested an easement for a 30-inch diameter light crude oil pipeline.  The approximately 1,168 mile Dakota Access Pipeline (DAPL) will connect the Bakken and Three Forks oil production region in North Dakota to an existing crude oil market hub near Patoka, Illinois.  The pipeline crosses three Corps districts: Omaha, Rock Island and St. Louis.  The Corps was required to consider three categories of requests submitted by Dakota Access for: (1) individual verifications that activities at more than 200 locations along the DAPL route satisfied the terms and conditions of Nationwide Permit (NWP) 12 (under the Clean Water Act, 33 U.S.C. § 1344, or the Rivers and Harbors Act of 1899, 33 U.S.C. § 403), which authorizes activities required for the construction of utility lines in federally-regulated waters; (2) a real estate easement to lay the pipeline under a Corps-managed lake (Lake Oahe) and adjacent Corps-managed property; and (3) permissions to cross or lay the pipeline in seven locations used by the Corps for navigation or flood control under section 14 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 408 (section 408).  Of the total length of the pipeline, only approximately three percent of the route is subject to Corps jurisdiction.

The pipeline would cross Lake Oahe at approximately one-half mile upstream of the northern boundary of the Standing Rock Sioux Tribe's (SRST's) reservation.  Dakota Access would use a technique called horizontal directional drilling (HDD) to place the pipeline approximately 92 feet below the lake bed.  The Corps would need to provide Dakota Access with three separate permissions for this specific crossing.  Dakota Access required and received verification that the crossing meets the terms and conditions of NWP 12.  Because the pipeline would cross Corps-managed property, section 408 required the Corps to "grant permission for the alteration or permanent occupation or use of [the project] when in the judgment of the Secretary such occupation or use will not be injurious to the public interest and will not impair the usefulness of such work."  33 U.S.C. § 408.  Finally, the Corps would need to grant Dakota Access an easement (*i.e.,* a "right-of-way") because the pipeline would cross Corps-managed federal property.  30 U.S.C. § 185(a).

The Omaha District prepared environmental documentation under NEPA to support the required section 408 permission to cross Lake Oahe.  The District published a draft EA on December 8, 2015, which was circulated for public comment.  See 40 C.F.R. § 1508.9 (defining EAs).  After reviewing the comments received, the Corps published the final EA and a Finding of No Significant Impact (FONSI) for the crossing on July 25, 2016.  See 40 C.F.R. § 1508.13 (defining FONSIs).  The Corps must now take action on the application for an easement by Dakota Access.

5.  <u>General Policy Evaluation</u>.  The Corps evaluated the Dakota Access application as a policy matter under the Non-Recreational Outgrant Policy at ER 1130-2-550, Chapter 17.

USACE_ESMT000653

CENWO

SUBJECT:  Application for an Easement for an Oil Pipeline to Cross U.S. Army Corps of Engineers-Managed Federal Land at Lake Oahe, North Dakota

a. ER 1130-2-550 requires that the Corps determine that "[t]he impact associated with an individual action or the accumulated impact of a series of actions must not adversely impact the capability of the project to generate the benefits for which the project was congressionally authorized, constructed, and is operated" before granting an easement.  ER 1130-2-550, paras. 17-3 and 17-9.b.(1) (2013).

The Lake Oahe project was authorized by the Flood Control Act of 1944, Public Law 78- 534, along with four other Missouri River main stem projects.  The five reservoirs are elements of a plan for the development of the Missouri River main stem.  The main stem plan is a component of the comprehensive river basin development program in the Missouri River Basin, the Pick-Sloan Plan.  Formed from separate proposals recommended by the Bureau of Reclamation and the Corps, the Pick-Sloan Plan was one of the first plans nationwide that recognized the role of tributary basins and the importance of comprehensive planning in flood control.  The Congressionally-authorized purposes of the Lake Oahe project include flood control, navigation, hydropower, recreation, water supply, and water quality.

The Omaha District found that the proposed DAPL crossing at Lake Oahe "will not impair the usefulness" of the Lake Oahe project when the District granted permission to impact the project under 33 U.S.C. 408.  FONSI at p. 6 (July 25, 2016) and District Commander's Approval of Section 408 Decision Document (July 21, 2016).  This finding is supported by the Final EA that was issued on July 25, 2016 and various memoranda supporting the District Commander's Section 408 approval.  The analysis supporting the grant of permission under 33 U.S.C. 408 is adopted in support of the Corps finding that granting an easement for the pipeline to cross Lake Oahe will not adversely impact the capability of the project to generate the benefits for which the project was Congressionally authorized.

b. Corps policy is to evaluate whether the proposed easement would be "[c]onsistent with complete land use classifications and resource objectives identified in the approved project master plan."  ER 1130-2-550, para. 17-9 b.(3).  The Corps has reviewed the proposed easement and has determined that it is consistent with the Final Oahe Dam/Lake Oahe Master Plan (September 2010).

c. Corps policy is to evaluate whether there is no viable alternative to utilization of public lands and waters.  ER 1130-2-550, para. 17-9 b.(2).  Corps policy specifically lists pipelines as examples of instances where there is no viable alternative.  Here, that policy is supported by the alternatives analysis in the Final EA.  See Final EA at Section 2.0, Alternatives.  Accordingly, the Corps finds here that there is no viable alternative to utilization of Corps-managed public lands at Lake Oahe.

d. Corps policy requires that the grant of the easement must be consistent with the applicable appendices to ER 1130-2-550.  ER 1130-2-550, para. 17-9b.(4).  The applicable appendices are Appendix E, General Outgrant Application Information, Appendix F, National Environmental Policy Act (NEPA) Guidance, Appendix G, Mitigation Guidance, and Appendix H, Additional Guidance for Specific Outgrant Applications.  The applicant submitted the materials that are

USACE_ESMT000654

CENWO

SUBJECT:  Application for an Easement for an Oil Pipeline to Cross U.S. Army Corps of Engineers-Managed Federal Land at Lake Oahe, North Dakota

required in Appendix E.  The Corps' evaluation of the proposed pipeline crossing at Lake Oahe complied with NEPA requirements upon the completion of the Final EA and FONSI, thereby meeting the requirements of ER 1130-2-550, Appendix F.  The easement will also comply with the mitigation guidance in Appendix G.  The Final EA outlined the various mitigation measures that the applicant will undertake.  Final EA at Table 8-2.  Further, various mitigation measures are conditions in Unexecuted Easement.  *See* Unexecuted Easement para. 2 b. and Exhibit "D," Special Conditions.  The applicant complied with the portion of Appendix H relevant to oil pipelines.  Appendix H, para. f, requires the applicant to make certain disclosures of ownership. The applicant made the ownership disclosures in its application and has provided updated information to the Corps as recently as December 2, 2016.  *See* Dakota Access, LLC, Standard Form 299, Application for Transportation and Utility Systems and Facilities on Federal Lands, Attachment, Section I, at pp.1-2 (submitted June 29, 2015).

e.  Corps policy is to grant an easement when it is in the public interest.  ER 1130-2-550, para. 17-9b.(5).  The Omaha District found that the proposed DAPL crossing of the Corps project at Lake Oahe "will not be injurious to the public interest" when the District granted permission to impact the project under 33 U.S.C. 408.  FONSI at p. 6 and District Commander's Approval of Section 408 Decision Document (July 21, 2016).  This finding is supported by the Final EA that was issued on July 25, 2016 and various memoranda supporting the District Commander's Section 408 approval.  The analysis of the public interest supporting the grant of permission under 33 U.S.C. 408 is adopted in support of the Corps finding that granting an easement for the pipeline to cross Lake Oahe is in the public interest.

f.  Corps policy is to determine whether the applicant has a demonstrated need for the project. ER 1130-2-550, at para. 17-9b.(6).  As described in the Dakota Access application, the overall project purpose or need is to move a supply of crude oil from the Bakken and Three Forks production region in North Dakota to a crude oil market hub located near Patoka, Illinois. Dakota Access, LLC, Standard Form 299, Application for Transportation and Utility Systems and Facilities on Federal Lands, at p. 6 (submitted June 29, 2015).  The overall pipeline project will improve overall safety to the public and the environment by reducing crude oil shipped by truck and by rail and significantly increase the amount shipped by pipeline.  As stated above, Dakota Access has shown that there is no viable alternative to crossing the federal project.  The Corps finds that the applicant has a demonstrated need for the project.

g.  Corps policy is determine whether the applicant has the technical and financial capabilities to comply with the easement's consideration, mitigation and administrative expenses.  ER 1130-2-550, at para. 17-9b.(7)&(8).  The applicant's parent company, Energy Transfer, has completed more than 30 capital projects over $50 million.  Energy Transfer Capital Projects in Excess of US$ 50 million, 2006-2014 (provided Dec, 2, 2016).  Many of these projects were pipelines of 30 inches or more in diameter.  *Id.*  The Corps finds that the parent company's completion of those projects demonstrates that the applicant possess the technical and financial capabilities to comply with the easement.

USACE_ESMT000655

CENWO

SUBJECT:  Application for an Easement for an Oil Pipeline to Cross U.S. Army Corps of Engineers-Managed Federal Land at Lake Oahe, North Dakota

h.  Corps policy is that it will coordinate and consult with federally-recognized Native American tribes when reservation lands are involved.  ER 1130-2-550, para. 17-3.  The proposed DAPL crossing at Lake Oahe is not on reservation lands; therefore, by policy there is no requirement to coordinate with any federally-recognized tribe.  However, the Corps reached out to the SRST to coordinate and consult on the DAPL project.  As established in the analyses set forth in the Final EA, the Corps attempted to engage in meaningful discussions with the SRST on numerous occasions about the nature of the project, cultural resources, and the Lake Oahe crossing beginning in October 2014 and continuing through March 2016.  Final EA at 85; see also *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*. No. 16-cv-01534, Memorandum Opinion Denying Plaintiff's Request for Preliminary Injunction, Docket No. 39 at 48 (D.C. Dist. Sept. 9, 2016)(finding that, on the preliminary injunction record, the Corps exceeded its NHPA obligations at many sites).

The Department of the Army also invited the SRST to engage in additional discussions about whether to grant this easement.  See Letter from The Honorable Jo-Ellen Darcy, Assistant Secretary of the Army (Civil Works) to The Honorable Dave Archambault II, Chairman, Standing Rock Sioux Tribe, dated November 14, 2016.  Specifically, the Army invited the SRST to engage in discussion with the Corps concerning the following topics:

• Potential conditions in an easement for the pipeline crossing, which would further reduce the risk of a spill or rupture, hasten detection and response, or otherwise enhance the protection of Lake Oahe, the Tribe's water supplies, and its treaty rights;
• With such conditions, the risk to the Tribe of a spill from the pipeline crossing Lake Oahe at the proposed location; and
• In light of such conditions, whether to grant an easement for the pipeline to cross Lake Oahe at the location currently proposed.

On November 22, 2016, the Corps extended an offer to the SRST to discuss those topics and to seek conditions that would address the Tribe's concerns.  Letter from COL John W. Henderson, District Commander, to Mr. Dave Archambault II, Chairman, SRST, dated November 22, 2016.  The SRST responded the following day, November 23, 2016, stating that "[t]he Tribe's fundamental position remains clear -- the easement to cross Lake Oahe at the Tribe's doorstep must be denied," but added that, "I am willing to talk further with you, including on issues relating to pipeline safety.  But for such discussions to be productive, it is my view that they must take place in the context of the Tribe's basic position regarding the pipeline and the Lake Oahe crossing."  Letter from Mr. Dave Archambault II, Chairman, SRST, to COL John W. Henderson, District Commander, dated November 23, 2016.  In this letter, the Tribe requested that the Corps:

. . . [P]rovide the Tribe with the information sought in our expert's October 28, 2016 report.  The information provided should be sure to include: 1) Comprehensive construction and design documentation that includes piping, instrumentation, control system and electrical design; 2) Documentation that lists the industry codes, standards and recommended practices that have been adopted and applied to the design,

USACE_ESMT000656

CENWO

SUBJECT:  Application for an Easement for an Oil Pipeline to Cross U.S. Army Corps of Engineers-Managed Federal Land at Lake Oahe, North Dakota

> construction and operation of the Dakota Access Pipeline project.  Include both codes and standards required by regulation and recommended practices applicable to the project adopted and applied voluntarily; 3) Material specifications including analysis of selected grade of pipe, wall thickness, pipe yield strength, corrosion allowance, ductility, pipe and weld coating systems and stress induced by installation of the pipe; and 4) Data and source materials underlying and relied on in any risk analysis.  We are continuing to consult with pipeline experts who may have additional questions, but our experts cannot proceed without the fundamental baseline.

Letter from Mr. Dave Archambault II, Chairman, SRST, to COL John W. Henderson, District Commander, dated November 23, 2016.

On December 2, 2016, representatives of the SRST, Dakota Access, and the Corps met to discuss the Tribe's request, along with potential terms and conditions that could be placed in the easement.

Accordingly, the Corps finds that it provided more than adequate coordination and consultation with the federally-recognized SRST, in accordance with ER 1130-2-550, para. 17-3, despite the fact that SRST reservation lands are not involved and the SRST reservation would not be directly impacted by the easement.

   i.  The Corps finds that granting Dakota Access an easement for the pipeline to cross Lake Oahe would be consistent with the Corps policy on non-recreational outgrants, ER 1130-2-550, Chapter 17, and Omaha District policy.

6.  <u>Specific Statutory Findings</u>.  An easement must meet the statutory requirements of 30 U.S.C. § 185.  Additionally, the grant of an easement must be consistent with Corps policy implementing that statute.  See Reference 1.c., ER 405-1-12, 8-182 (1994).

   a.  The Corps must determine that the proposed easement will not be inconsistent with the authorized purposes of the federal project.  30 U.S.C. § 185(b)(1).  As discussed above, at para. 5.a., pp.2-3, the proposed easement would not be inconsistent with the authorized purposes of the Lake Oahe project.

   b.  The Corps cannot grant an easement if the width of the easement exceeds 50 feet plus the ground occupied by the pipeline and related facilities, unless it is determined that a wider right-of-way is necessary for operation and maintenance after construction, for protection of the environment, or for public safety.  The width of the requested easement will not exceed 50 feet, plus the ground occupied by the pipeline.  See attached Unexecuted Easement at p.1 (stating width of a right-of-way being 50 feet plus the ground occupied by the pipeline (that is, the pipe and its related facilities).

6

USACE_ESMT000657

CENWO

SUBJECT:  Application for an Easement for an Oil Pipeline to Cross U.S. Army Corps of Engineers-Managed Federal Land at Lake Oahe, North Dakota

c.  Any special requirements for safe operation of the pipeline or related facilities should be imposed.  See Exhibit D to the Unexecuted Easement containing special conditions addressed during discussions on December 2, 2016.

d.  The Corps is required to impose necessary stipulations to prevent or control damage to the environment, including fish and wildlife habitat, damage to public or private property, and hazards to public health and safety; and require restoration, revegetation, and curtailment of erosion of the surface of the land when deemed appropriate.  See 30 U.S.C. § 185(h)(2); ER 1130-2-550, para. 17-5, Mitigation, and App. G, Mitigation Guidance (2013).  The proposed easement requires mitigation and has added special conditions to the easement to mitigate any impacts to the environment.  See Unexecuted Easement, at para. 2.b., and Exhibit D to the Unexecuted Easement, Special Conditions.

e.  The Corps is required by statute to obtain ownership information from the applicant.  30 U.S.C. § 185(i).  The applicant made these disclosures in its application and has provided updated information to the Corps as recently as December 2, 2016.  *See* Dakota Access, LLC, Standard Form 299, Application for Transportation and Utility Systems and Facilities on Federal Lands, Attachment, Section I, at pp.1-2 (submitted June 29, 2015).

f.  The Corps is required by statute to determine whether applicant has the technical and financial capability to construct, operate, maintain, and terminate the project for which the permit or right-of-way is requested, in accordance with this law.  30 U.S.C. § 185(j).  As discussed previously in this memorandum, the Corps is satisfied that the applicant has the required technical and financial capability.

g.  The statute requires the Corps to provide federal, state, and local governments, as well as the public, the opportunity to comment on the easement application.  30 U.S.C. § 185(k).  Corps policy is that no further comment periods are necessary if the pipeline proposal and related aspects have previously been scrutinized through NEPA procedures.  ER 405-1-12, para. 8-182c.(8) (1994).  The Corps provided a public comment period for the NEPA process that evaluated the DAPL crossing at Lake Oahe.  Thus, this process satisfied the public comment requirement in 30 U.S.C. § 185(k).  See Final EA, App. J.

h.  The Corps must also include certain other conditions required by statute and policy.  The grantee must pay all costs of environmental assessment and monitoring.  ER 405-1-12, para. 8-182c.(5) (1994).  This is included in the attached Unexecuted Easement at para. 2.c and in the Special Conditions in Exhibit D.  The Corps must also be reimbursed for costs and be paid consideration for the easement.  30 U.S.C. § 185(l).  This requirement is included in the attached Unexecuted Easement at para. 2.a. and 2.c.  The easement cannot be for a term of more than 30 years.  30 U.S.C. § 185(n).  The attached Unexecuted Easement is limited to a term of 30 years.  *See* Unexecuted Easement at para. 1.  The easement must also contain certain language about suspension or termination of the easement.  30 U.S.C. § 185(o).  This requirement is included in the attached Unexecuted Easement at para. 16.  The easement must also contain a condition that allows for the joint use of the easement area for other easements granted under 30 U.S.C. § 185.

7

USACE_ESMT000658

CENWO

SUBJECT:  Application for an Easement for an Oil Pipeline to Cross U.S. Army Corps of Engineers-Managed Federal Land at Lake Oahe, North Dakota

30 U.S.C. § 185(p).  This requirement is included in the attached Unexecuted Easement at para. 13.  The easement must also contain certain common carrier requirements.  30 U.S.C. § 185(r). Those requirements are satisfied in the attached Unexecuted Easement at para. 6.  The easement is also required to address matters concerning liability.  30 U.S.C. § 185(x); ER 405-1-12, para. 8-182c.(16).  Those matters are addressed in the attached Unexecuted Easement at para. 12.

   i.  The District Engineer may require the holder of a license or right-of-way to furnish a satisfactory bond or other security for all or any of the obligations imposed by terms and conditions of the license, right-of-way, or regulations.  This requirement is discretionary.  The attached Unexecuted Easement does not include the requirement to furnish a bond or other security.

   j.  The Corps is required by statute and policy to consider state standards for pipeline construction where the right-of-way crosses federal and non-federal lands, and where the state standards for pipeline construction are more stringent than federal standards, the former will be required.  30 U.S.C. § 185(v); ER 405-1-12, para. 8-182c.(8)  The Corps has considered the relevant state standards.  *See*, for example, Final EA at 8 (discussing North Dakota residential buffer requirements) and App. M, State of North Dakota Sovereign Land Permit for the Lake Oahe Crossing, S-1951.

   k.  The Corps is required to utilize easements in common with other pipelines to the extent practical.  30 U.S.C. § 185(p).  This proposed DAPL crossing at Lake Oahe is co-located with an existing natural gas pipeline crossing, as depicted on the following map:



Final EA at 1008.

   l.  Based on the foregoing information, and after reviewing the attached Unexecuted Easement, including the special conditions discussed by the applicant, Dakota Access, and representatives of the SRST, and included in Exhibit D to the Unexecuted Easement, I have determined that that issuance of the attached Unexecuted Easement to Dakota Access would be consistent with the statutory requirements at 30 U.S.C. § 185.

USACE_ESMT000659

CENWO

SUBJECT:  Application for an Easement for an Oil Pipeline to Cross U.S. Army Corps of Engineers-Managed Federal Land at Lake Oahe, North Dakota

7.  The Corps of Engineers, through the Department of the Army, is required by statute to notify Congress when an application is received and when the Corps is going to grant an easement for a pipeline that is greater than 24 inches in diameter.  30 U.S.C. § 185(w).  The Army notified Congress of the application on September 13, 2015.  In accordance with this memorandum, I recommend that the Army notify Congress that the Corps intends to grant the attached easement to Dakota Access.

8.  After notification to Congress, the Omaha District intends to execute and issue the easement to Dakota Access.

Encl

JOHN W. HENDERSON, P.E.
Colonel, Engineer
Omaha District Commander

9

USACE_ESMT000660

# EXHIBIT Y

DACW45-2-16-8059

## DEPARTMENT OF THE ARMY
## EASEMENT FOR FUEL CARRYING PIPELINE RIGHT-OF-WAY
## LOCATED ON
## LAKE OAHE PROJECT
## MORTON AND EMMONS COUNTIES, NORTH DAKOTA

This Easement is made on behalf of **THE UNITED STATES OF AMERICA** (the "United States"), between **THE SECRETARY OF THE ARMY**, acting by and through the Chief, Real Estate Division, U.S. Army Engineer District, Omaha, hereinafter referred to as the "Grantor," under and by virtue of the authority vested in Title 30, United States Code, Section 185, and **DAKOTA ACCESS, LLC, a Limited Liability Company, duly organized and existing under and by virtue of the laws of the State of Delaware, with its principal office at 1300 Main, Houston, Texas 77002,** hereinafter referred to as the "Grantee."

**NOW THEREFORE:**

The Grantor, for good and valuable consideration set forth below, the receipt and sufficiency of all of which are hereby acknowledged, upon and subject to the terms, covenants and conditions set forth in this Easement for right-of-way, does hereby:

Grant and convey to Grantee, an easement for a fuel carrying pipeline right-of-way for the installation, construction, operation, maintenance, repair, replacement and termination of a **thirty-inch (30) diameter, horizontal directional drill (HDD) buried oil pipeline for the purpose of transporting crude oil**, and related facilities, hereinafter collectively referred to as the "Facilities," over, across, in and upon lands of the United States **at and under Lake Oahe and the Lake Oahe Project**, as identified in **Exhibits "A" and "B,"** hereinafter referred to as the "Premises," and which are attached hereto and made a part hereof; with the width of a right-of-way being fifty (50) feet plus the ground occupied by the pipeline (that is, the pipe and its related facilities);

Make no claim of title during the term of this Easement to any Facilities of whatever nature located, constructed, or placed on the Premises by the Grantee.

USACE_ESMT000001

DACW45-2-16-8059

**THIS EASEMENT** is granted subject to the following conditions.

**1.     TERM**

This easement is hereby granted for a term of **Thirty Years**, beginning on the date of execution by the Grantor and ending thirty (30) years from the date of execution by the Grantor.

The Grantor shall renew this Easement in accordance with the provisions of 30 U.S.C. § 185, so long as the project is in commercial operation and is operated and maintained in accordance with all of the provisions of this Easement and applicable law. The Grantor prior to renewing this Easement must receive from the Grantee written notice of its intent to seek renewal or extension not less than one year prior to the Easement expiration or termination date and all plans, contracts, agreements, or other information or material which the Grantor deems necessary to determine whether a right-of-way shall be renewed and the terms and conditions which should be included in the right-of-way.

**2.     CONSIDERATION, MITIGATION, AND DAMAGES**

a. As consideration for this Easement, the Grantee shall pay cash consideration in advance to the Grantor in the amount of **Eight Thousand Fifty and No/100 Dollars ($8,050.00), payable annually on or before the anniversary date of the beginning of this easement**.

b. The Grantee will mitigate damages caused to the Premises, surrounding areas, or to the **Lake Oahe Project**, during initial installation and construction of the Facilities, and damages caused during operation, maintenance, or subsequent construction work, and complete all site restoration in accordance with the Mitigation/Restoration Plan submitted by Grantee on file in the U.S. Army Engineer District, **Omaha, specifically referenced in the Grantee's pipeline Environmental Assessment ("EA") in Section 3.3.2.5 "Clean-up and Restoration," and further outlined in the Stormwater Pollution Prevention Plan ("SWPPP") presented in Appendix A of the EA and the Environmental Construction Plan presented in Appendix G of the EA**.

c. The Grantee shall reimburse the Grantor in advance for the costs incurred in monitoring the construction, operation, maintenance, and termination of the pipeline and related facilities on the Premises in the amount of **Seven Hundred Fifty and No/100 Dollars ($750.00) payable annually on or before the anniversary date of the beginning of the Easement**.

d. Any checks or drafts payable to the Grantor will be made to the order of the **"FAO-USAED, OMAHA"**, and delivered to **USAED, Omaha, ATTN:  CENWO-RE, 1616 Capitol Avenue, Omaha, Nebraska  68102**.

e. Any payments due under the terms of this Easement must be paid on or before the date that they are due to avoid the mandatory sanctions imposed by the Debt Collection Act of 1982, as amended (31 U.S.C. Section 3717). This statute requires the imposition of an interest charge for the late payment of debts owed to the United States; an administrative charge to cover the costs of processing and handling delinquent debts; and the assessment of an additional penalty charge on any portion of a debt that is more than 90 days past due.

## 3.   NOTICES

All correspondence and notices to be given pursuant to this Easement shall be in writing and addressed, if to the Grantee, to **DAKOTA ACCESS LLC, 1300 Main Street, Houston, Texas 77002** and, if to the Grantor, to the **U. S. Army Engineer District, Omaha, Attention: Chief, Real Estate Division, 1616 Capitol Avenue, Omaha, Nebraska 68102,** or as may from time to time otherwise be directed by the parties. Notices shall be mailed by certified mail, postage prepaid, return receipt requested, addressed to the addresses above. The effective date of the notice shall be the earlier of the actual date of receipt or the date the addressee is notified of the attempted delivery of the certified mail, whether or not the addressee actually accepts delivery.

## 4.   AUTHORIZED REPRESENTATIVE

Except as otherwise specifically provided, any reference herein to "Grantor" or "Chief, Real Estate Division" shall include their duly authorized representatives. Any reference to "Grantee" shall include assignees, transferees and their duly authorized representatives.

## 5.   SUPERVISION BY THE GRANTOR

a. The installation and/or operation and maintenance of said pipeline shall be accomplished without cost or expense to the United States under the general supervision and subject to the approval of the Grantor's representative having immediate jurisdiction over the property, hereinafter designated as "said officer," and in such manner as not to endanger personnel or property of the United States on the said United States land or obstruct travel on any road thereon. The Grantee shall have the right of ingress and egress for such purposes, subject to approval of access by said officer.

b. The use and occupation of said Premises incident to the exercise of the privileges hereby granted shall be subject to such rules and regulations as the said officer may from time to time prescribe.

## 6.   APPLICABLE LAWS AND REGULATIONS

The Grantee shall construct, operate, maintain, and terminate the said pipeline in accordance applicable federal, state, county, and municipal laws, regulations, and ordinances. As required by 30 U.S.C. § 185, the Grantee shall construct, operate, and

USACE_ESMT000003

DACW45-2-16-8059

maintain the Facilities as common carriers.  The pipeline installation shall be in accordance with the U.S. Department of Transportation's Minimum Federal Safety Standards and any other applicable federal or state safety requirements.

### 7.  CONDITION OF PREMISES

The Grantee acknowledges that it has inspected the Premises, knows its condition, and understands that the same is granted without any representations or warranties whatsoever and without any obligation on the part of the United States.

### 8.  INSPECTION AND REPAIRS

a.  Upon completion of any phase of the pipeline project which causes damage to the Premises, the Grantee shall restore said damage immediately, at the Grantee's own expense, to the same condition in which they existed prior to the commencement of such work, to the satisfaction of the said officer.

b.  The Grantee shall supervise the said pipeline and cause it to be inspected at reasonable intervals, and shall immediately repair any defects or leaks found by such inspection, or when requested by the Grantor to repair any defects or leaks.

### 9.  PROTECTION OF GOVERNMENT PROPERTY

The Grantee shall be responsible for any damage that may be caused to the property of the United States by the activities of the Grantee under this Easement and shall exercise due diligence in the protection of all property located on the Premises against fire or damage from any and all other causes.  Any property of the United States damaged or destroyed by the Grantee incident to the exercise of the privileges herein granted shall be promptly repaired or replaced by the Grantee to a condition satisfactory to the Grantor, or at the election of the Grantor, reimbursement made therefor by the Grantee in an amount to reimburse for the loss satisfactory to the Grantor.

### 10.  RIGHT TO ENTER

a.  The right is reserved to the Grantor, the United States, its officers, agents, and employees to enter upon the premises at any time and for any purpose necessary or convenient in connection with government purposes, to make inspections, to remove timber or other material, except property of the Grantee, to flood the Premises, to manipulate the level of the lake or pool in any manner whatsoever and/or to make any other use of the lands as may be necessary in connection with government purposes, and the Grantee shall have no claim for damages on account thereof against the Grantor, the United States or any officer, agent, or employee thereof.

b.  If the entry will involve removal of timber or other material, or heavy equipment, the Grantor will provide reasonable notice to Grantee of any such entry or use so that Grantee may take any necessary measures to assure the safety of its pipeline and

USACE_ESMT000004

any personnel of the United States working in proximity to such pipeline. Grantee will ensure that Grantor has emergency contact information.

## 11.    TRANSFERS AND ASSIGNMENTS

Without prior written approval by the Grantor, the Grantee shall neither transfer nor assign this Easement or any part thereof nor grant any interest, privilege or license whatsoever in connection with this Easement. The provisions and conditions of this Easement shall extend to and be binding upon and shall inure to the benefit of the representatives, successors and assigns of the Grantee.

## 12.    INDEMNITY

a. The Grantee shall be strictly liable to the United States for damage or injury which may arise from or be incident to the activities of the Grantee under this Easement, or for damages to the property of the Grantee, or for damages to the property or injuries to the person of the Grantee's officers, agents, or employees or others who may be on the Premises at their invitation or the invitation of any one of them, and the Grantee shall hold the United States harmless from any and all such claims not including damages due to the fault or negligence of the United States or its contractors. Grantee shall exercise due diligence in the protection of all property located on the Premises.

b. All owners of any interest in, and all affiliates or subsidiaries of the Grantee shall be liable to the United States in the event that a claim for damage or injury cannot be collected from the Grantee. Liability without fault hereunder shall be limited to **Ten Million and No/100 Dollars ($10,000,000.00)** for any one incident. Liability of such Grantee for damages in excess **Ten Million and No/100 Dollars ($10,000,000.00)** shall be in accord with ordinary rules of negligence. However, this condition shall not impose strict liability on the Grantee for damage or injury resulting from (a) an act of war or force majeure, or (b) negligence of the United States. In any case where liability without fault is imposed pursuant to this condition and the damage or injuries involved were caused by the negligence of a third party, the rules of subrogation shall apply in accordance with the law of the jurisdiction where the damage or injury occurred.

c. The Grantee does hereby accept liability, if any, imposed by Federal and state statutes to third parties for injuries incurred in connection with the use and occupancy of the pipeline right-of-way.

## 13.    SUBJECT TO EASEMENTS

a. This Easement is subject to all other existing easements, or those subsequently granted as well as established access routes for roadways and utilities located, or to be located, on the Premises.

b. To minimize adverse environmental impacts and the proliferation of separate rights-of-way across federal lands, the utilization of rights-of-way in common shall be

USACE_ESMT000005

required to the extent practical, and this Easement hereby reserves to the Grantor the right to grant additional rights-of-way or permits for compatible uses on or adjacent to the Premises.

c. Provided that the proposed grant of any new easement or route will be coordinated with the Grantee, and easements will not be granted which will, in the opinion of the Grantor, interfere with the use of the Premises by the Grantee.

## 14.    REQUIRED SERVICES

This condition was deleted.

## 15.    RELOCATION OF FACILITIES

In the event all or any portion of said Premises occupied by said Facilities shall be needed by the United States, or in the event the existence of said Facilities shall be considered detrimental to governmental activities, the Grantee shall, from time to time, upon notice to do so, and as often as so notified, promptly seek authorization from the Federal Energy Regulatory Commission, or other applicable entity, to remove said Facilities, or portion thereof, to such other location or locations on said Premises as may be designated by the Grantor.  In the event said Facilities shall not be removed or relocated within ninety (90) days after any aforesaid notice, the Grantor, after receipt of required approvals, may cause the same to be done at the expense of the Grantee.

## 16.    SUSPENSION OR TERMINATION

a. Abandonment of the Easement herein granted or noncompliance with any provisions of this Easement or applicable provisions of 30 U.S.C. 185 may be grounds for suspension or termination of the right of way if (a) after due notice to the Grantee, (b) a reasonable opportunity to comply with this Easement or applicable provisions of 30 U.S.C. § 185, and (c) an appropriate administrative proceeding pursuant to 5 U.S.C. § 554, the Grantor determines that any such ground exists that suspension or termination is justified.  No administrative proceeding shall be required where the Easement by its terms provides that it terminates on the occurrence of a fixed or agreed upon condition, event, or time.

b. If the Grantor determines that an immediate temporary suspension of activities within the Premises is necessary to protect public health or safety or the environment, the Grantor may abate such activities prior to an administrative proceeding.

c. Deliberate failure of the Grantee to use the Easement for the purpose for which it was granted or renewed for any continuous two-year period shall constitute a presumption of abandonment of the Easement; provided, that where the failure to use the right-of-way is due to circumstances not within the Grantee's control, the Grantor is not required to commence proceedings to suspend or terminate the right-of-way.

Version Dated 3 December 2016

USACE_ESMT000006

DACW45-2-16-8059

### 17.   SOIL AND WATER CONSERVATION

The Grantee shall maintain, in a manner satisfactory to said officer, all soil and water conservation structures that may be in existence upon said Premises at the beginning of or that may be constructed by the Grantee during the term of this Easement, and the Grantee shall take appropriate measures to prevent or control soil erosion within the right-of-way herein granted.  Any soil erosion occurring outside the Premises resulting from the activities of the Grantee shall be corrected by the Grantee as directed by said officer.

### 18.   ENVIRONMENTAL PROTECTION

a.  Within the limits of their respective legal powers, the parties hereto shall protect the Premises against pollution of its air, ground, and water.  The Grantee shall promptly comply with any laws, regulations, conditions, or instructions affecting the activity hereby authorized if and when issued by the Environmental Protection Agency, or any federal, state, interstate, or local governmental agency having jurisdiction to abate or prevent pollution.  The disposal of any toxic or hazardous materials within the Premises is strictly prohibited.  Such regulations, conditions, or instructions in effect or prescribed by the said Environmental Protection Agency or any federal, state, interstate, or local governmental agency are hereby made a condition of this Easement.  The Grantee shall not discharge waste or effluent from the Premises in such a manner that the discharge will contaminate streams or other bodies of water or otherwise become a public nuisance.

b.  The use of any pesticides or herbicides within the Premises shall be in conformance with all applicable federal, state, and local laws and regulations.  The Grantee must obtain approval in writing from said officer before any pesticides or herbicides are applied to the Premises.

c.  The Grantee will use all reasonable means available to protect the environment and natural resources, and where damage nonetheless occurs arising from the Grantee's activities, the Grantee shall be liable to restore the damaged resources.

### 19.   ENVIRONMENTAL CONDITION OF PROPERTY

An Environmental Condition of Property (ECP) documenting the known history of the property with regard to the storage, release, or disposal of hazardous substances thereon, is attached hereto and made a part hereof as **Exhibit "C."**  Upon expiration, revocation, or termination of this Easement, another ECP shall be prepared which will document the environmental condition of the property at that time.  A comparison of the two studies will assist the said officer in determining any environmental restoration requirements.  Any such requirements will be completed by the Grantee in accordance with the condition on **RESTORATION**.

Version Dated 3 December 2016

USACE_ESMT000007

DACW45-2-16-8059

### 20.   HISTORIC PRESERVATION

The Grantee shall not remove or disturb, or cause or permit to be removed or disturbed, any historical, archeological, architectural or other cultural artifacts, relics, vestiges, remains or objects of antiquity. In the event such items are discovered on the Premises, the Grantee shall immediately notify the Grantor, and the site and the material shall be protected by the Grantee from further disturbance until the Grantor gives clearance to proceed.

### 21.   NON-DISCRIMINATION

The Grantee shall not discriminate against any person or persons or exclude them from participation in the Grantee's operations, programs or activities conducted on the Premises because of race, color, religion, sex, sexual orientation, gender identity, age, handicap, or national origin, pursuant to Executive Order 13672, 21 July 2014. The Grantee will comply with the Americans with Disabilities Act and attendant Americans with Disabilities Act Accessibility Guidelines (ADAAG) published by the Architectural and Transportation Barriers Compliance Board. The Grantee shall comply with Department of Justice rules on non-discrimination.

### 22.   HAZARDOUS WASTE MANAGEMENT

The Grantee will not store or dispose of non-DoD hazardous materials on the premises unless authorized under 10 U.S.C. § 2692, *Storage, Treatment, and Disposal of Non-Defense Toxic and Hazardous Materials*. The Grantee shall strictly comply with the hazardous waste management requirements under the Resource Conservation and Recovery Act and the applicable state hazardous waste management rules, including proper hazardous waste characterization, labeling, storage, disposal and documentation requirements. Except as specifically authorized by the Grantor in writing, the Grantee must provide, at its own expense such hazardous waste management facilities as needed to maintain compliance with all laws and regulations. Army hazardous waste management facilities will not be available to the Grantee.

### 23.   HAZARDOUS WASTE OR FUEL SPILL

The Grantee shall submit to the Grantor and maintain, thereafter, a plan for responding to hazardous water, fuel, and other chemical spills prior to commencement of use of the Premises. Such plan shall be independent of the Government's spill contingency plan and, except for initial fire response and/or spill containment, shall not rely on use of project personnel or equipment. Should the Grantor provide any personnel or equipment, whether for initial fire response and/or spill containment, or otherwise on request of the Grantee or because the Grantee was not, in the opinion of the said officer, conducting timely clean-up actions, the Grantee agrees to reimburse the Grantor for its costs.

USACE_ESMT000008

DACW45-2-16-8059

24.    **RESTORATION**

On or before the expiration or termination of this Easement, the Grantee shall, without expense to the United States, and within such time as the Grantor may indicate, remove said Facilities and restore the Premises to the satisfaction of the Grantor.  In the event the Grantee shall fail, neglect or refuse to remove said Facilities and restore the Premises, the Grantor shall have the option to take over said Facilities without compensation, or to remove said Facilities and perform the restoration at the expense of the Grantee, and the Grantee shall have no claim for damages against the United States or its officers or agents for such action.  This provision is subject to all regulatory requirements and approvals covering any of the activities described in this condition.

25.    **DISCLAIMER**

It is understood that this instrument is effective only insofar as the rights of the United States in the said property are concerned, and that the Grantee shall obtain such permission as may be necessary on account of any other existing rights.  It is also understood that the granting of this Easement does not eliminate the necessity of obtaining any Department of the Army permit that may be required pursuant to the provisions of Section 10 of the Rivers and Harbors Act of March 3, 1899 (30 Stat. 1151; 33 U.S.C. § 403), Section 404 of the Clean Water Act (33 U.S.C. § 1344), or any other permit or license which may be required by federal, state or local statute in connection with the use of the Premises.  The grant of this Easement pursuant to 30 U.S.C. § 185 shall grant no immunity from the operation of the federal antitrust laws.

26.    **OTHER AGENCY AGREEMENTS**

It is understood that the provision of the Easement shall not abrogate or interfere with any agreements or commitments made or entered into between the Grantee and any other agency of the United States with regard to financial aid to the Grantee in connection with the installation, operation, or maintenance of said pipeline.

27.    **CONSTRUCTION, OPERATION AND REHABILITATION PLAN**

In compliance with 30 U.S.C. § 185, the Grantee will follow the plan(s) of construction, operation, and rehabilitation submitted to the Grantor prior to the execution of this Easement, on file in the **U.S. Army Engineer District, Omaha District. Restoration will be in accordance with Section 3.3.2.5 of the EA "Clean-up and Restoration" and further outlined in the SWPPP and the Environmental Construction Plan presented in Appendices "A" and "G," respectively, of the EA. Ground disturbing activities will not occur on Corps-managed lands; therefore, reseeding is not anticipated in those areas.  However, if reseeding were to become necessary on Corps-managed lands, all activities shall be conducted in accordance with applicable Lake Oahe revegetation guidelines.**

USACE_ESMT000009

DACW45-2-16-8059

## 28.   FEDERAL ENERGY REGULATORY COMMISSION ORDER ISSUING CERTIFICATES

The Grantee shall comply with the conditions set forth in the Federal Energy Regulatory Commission's Order Issuing Certificate **dated December 24, 2014, as applicable, to Docket No. OR14-42-00, Dakota Access LLC.**

## 29.   SPECIAL CONDITIONS

See attached **Exhibit "D"** for the Special Conditions for this Easement.

## 30.   EXECUTIVE ORDER 13658

a.  Any reference in this section to "prime contractor" or "contractor" shall mean the Grantee and any reference to "contract" shall refer to the Easement.

b.  It has been determined that this contract is not subject to Executive Order 13658 or the regulations issued by the Secretary of Labor in 29 CFR part 10 pursuant to the Executive Order.

c.  If a duly authorized representative of the United States discovers or determines whether before or subsequent to executing this contract, that an erroneous determination regarding the applicability of Executive Order 13658 was made, contractor, to the extent permitted by law, agrees to indemnify and hold harmless the Unites States, its officers, agents, and employees, for and from any and all liabilities, losses, claims, expenses, suits, fines, penalties, judgments, demands or actions, costs, fees, and damages directly or indirectly arising out of, caused by, related to, resulting from or in any way predicated upon, in whole or in part, the erroneous Executive Order 13658 determination.  This includes contractor releasing any claim or entitlement it would otherwise have to an equitable adjustment to the contract and indemnifying and holding harmless the United States form the claims of subcontractors and contractor employees.

USACE_ESMT000010

DACW45-2-16-8059

**IN WITNESS WHEREOF,** I have hereunto set my hand to this Easement by authority of the Secretary of the Army, this _8 th_ day of _February_ 2017.

**DAVID V. CHIPMAN**
Chief, Real Estate Division, Omaha District
Real Estate Contracting Officer

## ACKNOWLEDGMENT

STATE OF _Nebraska_ )

) ss:

COUNTY OF _Douglas_ )

    **PERSONALLY APPEARED BEFORE ME,** the undersigned authority in and for said County and State, within my jurisdiction, the within named **David V. Chipman,** who acknowledged that he is the Chief of Real Estate Division, U.S. Army Engineer District, Omaha, and that in said capacity he executed the above and foregoing **Department of the Army Easement for Fuel Carrying Pipeline Right-Of-Way** by authority of the Secretary of the Army for the purposes therein expressed and as the act and deed of the United States of America.

    **GIVEN UNDER MY HAND AND SEAL,** this _8th_ day of _February_ , **2017.**

(SEAL)



General Notary - State of Nebraska
**JOSHUA D. ANDREWS**
My Comm. Exp. Aug. 27, 2018.

NOTARY PUBLIC

My Commission Expires:

_August 27, 2018_

Version Dated 3 December 2016

DACW45-2-16-8059

**THIS EASEMENT** is also executed by the Grantee this _8th_ day of _FEBRUARY_, 2017.

**DAKOTA ACCESS LLC**

**Robert Rose**
Vice President, Land and Right of Way

**ACKNOWLEDGMENT**

STATE OF _Texas_ )
                        ) ss:
COUNTY OF _Harris_ )

**PERSONALLY APPEARED BEFORE ME,** the undersigned authority in and for the county and state, on this _8th_ day of _February_, 2017, within my jurisdiction, the within named **Robert Rose**, who acknowledged that he is **Vice President, Land and Right of Way, DAKOTA ACCESS LLC** a Delaware Limited Liability Company, and that for and on behalf of the said company, and as its act and deed he executed the above and foregoing **Department of the Army Easement for Fuel Carrying Pipeline Right-Of-Way,** having been duly authorized by said company so to do.

(SEAL)

```
DONNA WALTERS
Notary Public, State of Texas
Comm. Expires 03-04-2020
Notary ID 2342771
```

NOTARY PUBLIC

My Commission Expires:

_3|4|20_

## CERTIFICATE OF AUTHORITY

I hereby certify that I am the _____Secretary_____ of
*(Secretary or Attesting Officer)*
the organization named in the foregoing agreement with the United States of

America; that said organization is organized under the laws of the State of

_____Delaware_____; that the seal, if applicable, affixed to said instrument
*(State)*
is the seal of said organization; that _____Robert   Rose_____
*(Name of Officer)*
who signed said agreement was then *Vice President - Land and Right of Way* of said
*(Title of Officer)*
organization and has been duly authorized to sign the foregoing agreement on

behalf of said organization, binding said organization to the terms therein.

I, as the Secretary/Attesting Officer, hereby attest to the validity of the

Signature of said Officer; and that said signature affixed to such agreement is

genuine.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal,

if applicable, of said organization, this _8th_ day of _February_ , ~~2013~~ **2017**.


X _____

*Secretary or Attesting Officer*


_____Dakota Access, LLC_____
*Corporation or Organization*


*This form certifies that the person signing the attached instrument has the authority to do so. The signature of the
Secretary/Attesting Officer and the individual signing the attached instrument cannot be the same.*

**MRO Form 851** (21 Aug 02) (Edition dated 1 Oct 91 is obsolete)



**DAKOTA ACCESS LLC**
**ROW ACCOUNT**
8111 WESTCHESTER DRIVE
DALLAS, TX 75225

WELLS FARGO    Wells Fargo Bank, N.A.

008854

56-382/412

DATE January 24, 2017

PAY Eight thousand, eight hundred and 00/100        DOLLARS $ 8,800.00

FAO-USAED

TO THE ORDER OF

Micah Rorie

---

**DAKOTA ACCESS LLC**

DETACH AND RETAIN THIS STATEMENT
THE ATTACHED CHECK IS IN PAYMENT OF ITEMS DESCRIBED BELOW.
IF NOT CORRECT PLEASE NOTIFY US PROMPTLY. NO RECEIPT DESIRED.

008854

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 01-24-17 | Permanent Easement across Lake Oahe on USACE property located in Morton County and Emmons County, North Dakota. | 8,800.00 |
| | ND-mo-198.000, 199.900, ND-EM-001.100; A.F.E. 48000000002 | Total $8,800.00 |

USACE_ESMT000014



Proposed Pipeline Easement

# OAHE DAM AND RESERVOIR

0   600   1,200   2,400
Feet

N
W — E
S



Date: 28-May-2015

Disclaimer: The Government furnishes this data and the recipient accepts and uses it with the express understanding that the United States Government makes no warranties, expressed or implied, concerning the accuracy, completeness, reliability, usability, or suitability for any particular purpose of the information and data furnished. The United States shall be under no liability whatsoever to any person by reason of any use made thereof. Data displayed on this map are approximations derived from GIS layers and should NOT be used in place of survey data or legal land descriptions.

Path: (regsi1)\re2\jesse\bob_incontro\Oahe\DAPL_Easement\DAPL_Easement.mxd

## Legend

▪▪▪ Project Boundary (Fee)
━━━ 50' Wide Proposed Easement (±7.37 Acres)
☐ Tracts
☐ Sec ions
☐ Counties



Pipeline Crossing

EXHBIT "A" ATTACHED TO AND
MADE A PART OF DACW45-2-16-8059

USACE_Esmt000015

## METES AND BOUNDS DESCRIPTION
## CENTERLINE 50' WIDE PERMANENT EASEMENT

Being a centerline description located in the Section 10, Township 134 North, Range 79 West of the 5th  P.M., in Morton and Emmons County, North Dakota and Section 11, Township 134 North, Range 79 West  of the 5th P.M., in Emmons County, North Dakota, and crossing the following tracts of land and described  as follows:

Basis of Bearing:
Bearing are based on UTM Zone 14 Grid North.

Tracts of land:
Tract 1: Portion of Lot 4 and Lot 7; Book 125, Page 395; Deed Records, Morton County.
Tract 2: Lake Oahe.
Tract 3: Portion of the N1/2 of Section 11; Civil Case No. 406; Probate Records, Emmons County.

**COMMENCING** at a 3/8-inch iron rod found for the Northwest corner of said Section 10;

**THENCE**, crossing said Section 10, South 46 degrees 08 minutes 26 seconds East a distance of 3,664.72 feet to the west line of said United States of America Tract 1 for the **POINT OF BEGINNING** of this  centerline description;

**THENCE**, crossing the United States of America tracts and through said Section 10 and said Section 11,  North 83 degrees 59 minutes 34 seconds East a distance of 6,420.72 feet to the east line of said United  States of America Tract 3 for the **TERMINAL POINT** of this centerline description, from which a 1-inch   USGS monument found on said east line bears South 01 degrees 17 minutes 30 seconds West a distance of 296.68 feet.   Said centerline having a length of 6,420.72 feet, 389.14 rods, and said fifty foot (50') wide.

Permanent Easement containing 7.37 acres of land.

Wood Group Mustang, Inc.
17325 Park Row
Houston, Texas 77084
(832) 809-8000
April 23, 2015
Job No. 103957

**Exhibit "B"**
**DACW45-2-16-8059**

## ENVIRONMENTAL CONDITION OF PROPERTY
Helpful instructions for ECP are located at:
https://v3.nwo.usace.army.mil/intranet/od-tn/policypage/policies/RE/ECP%20Instructions.pdf

This form covers Purpose, Site Location, Current Use of Property and adjacent property, Historical Use of Property and Adjacent Property, User provided Information, Site Reconnaissance, and Records Search and Interviews.  Specific Records Search and Interview information will be provided in sections 4.0 and 5.0. Pictures, Maps, Record and Interview information are appendices.

| Project Name: | DACW#: | Address/location: |
|---|---|---|
| Dakota Access Pipeline Project | Pending | Lake Oahe, Morton and Emmons Counties, North Dakota, Approx. 3.5 miles North of Cannonball, North Dakota. |

### 1.0 Purpose

Construct, install and operate an approximate 1,100 mile long crude oil pipeline from near Stanley, North Dakota to Patoka, Illinois.  The main trunk line of 30 inch diameter pipe will cross government fee owned property at the Oahe Reservoir.  The pipeline will transfer crude oil from the Bakken oil production area in North Dakota to a crude oil transportation terminal in Illinois.

### 2.0 Site Description

### 2.1 Property Legal Description and Site Address:

NE 1/4 Section 10, T134 N, R79 W, Morton County, North Dakota-Lat 46.43783, Long 100.59806 and NE 1/4 Section 11, T134 N, R79 W, Emmons County, North Dakota- Lat. 46.439908, Long. 100.576745

### 2.2 Site and Vicinity General Characteristics:

The proposed DAPL pipeline will cross the Oahe Reservoir and lies within the Missouri River corridor and flood plane.  The pipeline and corresponding easement band of 30 to 50 feet wide for construction and subsequent operation and maintenance will occur on gently rolling hills and in significant elevation relief in the transition zones of upland to river bed.  Land use on the west side of the reservoir is primarily native grasses and legumes with minimal amount of herbaceous and shrub vegetation, while on the east side is native grasses and minor amounts of tillage and farming with scattered herbaceous vegetation.  More specific information on land features, vegetation, geology, and environmental features are addressed in the current Draft Environmental Assessment.  The proposed pipeline is to be installed by horizontal directional boring (HDD) will be underground below Lake Oahe, with the boring entrance and exit located in the uplands on the west side and east side respectively.  The pipeline crossing will occur in a corridor that currently has an existing overhead 500 KV power line crossing administered by Basin Electric Cooperative and an underground 42 inch diameter natural gas line crossing administered by Northern Border Pipeline.

### 3.0 General Site Setting

| Yes answers must be documented.  Records and interviews must be documented. | | | |
|---|---|---|---|
| **a.  Current and Past use of Property:** | | | |
| (1)(a)  Is the property used for industrial use? | | | |
| Record Search and/or Interview: | ☐ Yes | ☑ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ☑ No | |
| (1)(b)  Is any adjoining property used for an industrial use?  For the purposes of this inquiry, adjoining | | | |

EXHIBIT "C"
USACE_ESMT000017
DACW45-2-16-8059

ENVIRONMENTAL CONDITION OF PROPERTY, CON'T

| | | | | |
|---|---|---|---|---|
| | property is considered to be property located within a quarter mile of the subject property and individual properties located within a mile of the subject property that exhibit a potential for environmental concern. | | | |
| | Record Search and/or Interview: Existing easements for overhead power line and underground gas line. | ■ Yes | ☐ No | ☐ Unk |
| | Observed during site visit: Existing power line observed. | ■ Yes | ☐ No | |
| | (2)(a)  Did you observe evidence or do you have any prior knowledge that the property has been used for an industrial use in the past? | | | |
| | Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| | Observed during site visit: | ☐ Yes | ■ No | |
| | (2)(b)  Did you observe evidence or do you have any prior knowledge that any adjoining property has been used for an industrial use in the past? | | | |
| | Record Search and/or Interview: Existing easements for overhead power line and underground gas line. | ■ Yes | ☐ No | ☐ Unk |
| | Observed during site visit: Existing power line observed. | ■ Yes | ☐ No | |
| | (3)(a)  Is the property used as a gasoline station, motor repair facility, dry cleaners, photo developing laboratory, junkyard, or landfill, or as a waste treatment, storage, disposal, processing, or recycling facility (if applicable, identify which)? | | | |
| | Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| | Observed during site visit: | ☐ Yes | ■ No | |
| | (3)(b)  Is any adjoining property used as a gasoline station, motor repair facility, dry cleaners, photo developing laboratory, junkyard, or landfill, or as a waste treatment, storage, disposal, processing, or recycling facility (if applicable, identify which)? | | | |
| | Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| | Observed during site visit: | ☐ Yes | ■ No | |
| | (4)(a)  Did you observe evidence or do you have any prior knowledge that the property has been used as a gasoline station, motor repair facility, dry cleaners, photo developing laboratory, junkyard, or landfill, or as a waste treatment, storage, disposal, processing, or recycling facility (if applicable, identify which)? | | | |
| | Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| | Observed during site visit: | ☐ Yes | ■ No | |
| | (4)(b)  Did you observe evidence or do you have any prior knowledge that any adjoining property has been used as a gasoline station, motor repair facility, dry cleaners, photo developing laboratory, junkyard, or landfill, or as a waste treatment, storage, disposal, processing, or recycling facility (if applicable, identify which)? | | | |
| | Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| | Observed during site visit: | ☐ Yes | ■ No | |
| **b.  Specific Property Conditions/Exterior Observations** | | | | |
| | (5)(a)  Are there currently any damaged or discarded automotive or industrial batteries, pesticides, paints, or other chemicals, hazardous substances or petroleum products in individual containers of >5 gal (19 L) in volume or 50 gal (190 L) in the aggregate, stored on or used at the property or at the facility? | | | |
| | Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| | Observed during site visit: | ☐ Yes | ■ No | |
| | (5)(b)  Did you observe evidence or do you have any prior knowledge that there have been previously any damaged or discarded automotive or industrial batteries, pesticides, paints, or other chemicals, hazardous substances or petroleum products in individual containers of >5 gal (19 L) in volume or 50 gal (190 L) in the aggregate, stored on or used at the property or at the facility? | | | |

Page | 2

USACE_ESMT000018

ENVIRONMENTAL CONDITION OF PROPERTY, CON'T

| | Yes | No | Unk |
|---|---|---|---|
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| (6)(a)  Are there currently any industrial drums (typically 55 gal (208 L)) or sacks of chemicals located on the property or facility? | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| (6)(b)  Did you observe evidence or do you have any prior knowledge that there have been previously any industrial drums (typically 55 gal (208 L)) or sacks of chemicals located on the property or facility? | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| (7)(a)  Did you observe evidence or do you have any prior knowledge that fill dirt has been brought onto the property that originated from a contaminated site? | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| (8)(a)  Are there currently any pits, ponds, or lagoons located on the property in connection with waste treatment or waste disposal? | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| (8)(b)  Did you observe evidence or do you have any prior knowledge that there have been previously, any pits, ponds, or lagoons located on the property in connection with waste treatment or waste disposal? | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| (9)(a)  Is there currently any stained soil on the property? | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| (9)(b)  Did you observe evidence or do you have any prior knowledge that there have been previously, any stained soil on the property? | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| (10)(a)  Are there currently any registered or unregistered storage tanks (above or underground) located on the property? | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| (10)(b)  Did you observe evidence or do you have any prior knowledge that there have been previously, any registered or unregistered storage tanks (above or underground) located on the property? | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| (11)(a)  Are there currently any vent pipes, fill pipes, or access ways indicating a fill pipe protruding from the ground on the property or adjacent to any structure located on the property? | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| (11)(b)  Did you observe evidence or do you have any prior knowledge that there have been previously, | | | |

USACE_ESMT000019

ENVIRONMENTAL CONDITION OF PROPERTY, CON'T

| | | | | |
|---|---|---|---|---|
| any vent pipes, fill pipes, or access ways indicating a fill pipe protruding from the ground on the property or adjacent to any structure located on the property? | | | | |
| Record Search and/or Interview: | ☐ Yes | ☑ No | ☐ Unk | |
| Observed during site visit: | ☐ Yes | ☑ No | | |
| (12)(a)  Are there currently any strong, pungent, or noxious odors located on the property? | | | | |
| Record Search and/or Interview: | ☐ Yes | ☑ No | ☐ Unk | |
| Observed during site visit: | ☐ Yes | ☑ No | | |
| (12)(b)  Did you observe evidence or do you have any prior knowledge that there have been previously, any strong, pungent, or noxious odors located on the property? | | | | |
| Record Search and/or Interview: | ☐ Yes | ☑ No | ☐ Unk | |
| Observed during site visit: | ☐ Yes | ☑ No | | |
| (13)(a)  Are there currently any standing surface water, pools or sumps containing liquids likely to be hazardous substances or petroleum products, located on the property? | | | | |
| Record Search and/or Interview: | ☐ Yes | ☑ No | ☐ Unk | |
| Observed during site visit: | ☐ Yes | ☑ No | | |
| (13)(b)  Did you observe evidence or do you have any prior knowledge that there have been previously, any standing surface water, pools or sumps containing liquids likely to be hazardous substances or petroleum products located on the property? | | | | |
| Record Search and/or Interview: | ☐ Yes | ☑ No | ☐ Unk | |
| Observed during site visit: | ☐ Yes | ☑ No | | |
| **c.  Facility Conditions or Interior Observations** | | | | |
| (c.)(1) Are there facilities currently on site?   See comments below, no enclosed struct. | ☑ Yes | ☐ No | ☐ Unk | |
| (c.)(2) Is there evidence or prior knowledge of facilities previously on site? | ☐ Yes | ☑ No | ☐ Unk | |
| If answers (c.)(1) and (c.)(2) are No, than questions 14-16 are | | | | ☐ N/A |
| (14)(a)  Is there currently evidence of leaks, releases or staining by substances other than water, or foul odors, associated with any flooring, drains, walls, ceilings, or exposed grounds on the property? | | | | |
| Record Search and/or Interview: | ☐ Yes | ☑ No | ☐ Unk | |
| Observed during site visit: | ☐ Yes | ☑ No | | |
| (14)(b)  Did you observe evidence or do you have any prior knowledge that there have been previously any leaks, releases or staining by substances other than water, or foul odors, associated with any flooring, drains, walls, ceilings, or exposed grounds on the property, infrastructure Conditions | | | | |
| Record Search and/or Interview: | ☐ Yes | ☑ No | ☐ Unk | |
| Observed during site visit: | ☐ Yes | ☑ No | | |
| (15)  Describe the means of heating and cooling the buildings on the property, including the fuel source for heating and cooling. | | | | |

The facility that is adjacent to the proposed pipeline site is an overhead high voltage power line and on the west and east side of the Oahe Reservoir there is a secured area of above ground piping, valves and controls for the underground gas line.  No enclosed buildings exist, or have existed, on the Government property under consideration for the proposed DAPL oil pipeline to my knowledge.

| | |
|---|---|
| (16)  Describe sumps or drains visually and/or physically observed or identified from the interviews that are present in the buildings on the property. | |
| N/A | |

**d.  Infrastructure Conditions**

(17)  Identify the source of potable water for the property.

USACE_ESMT000020

## ENVIRONMENTAL CONDITION OF PROPERTY, CON'T

| N/A | | | | |
|---|---|---|---|---|
| | | | | |

| (18) Identify the sewage disposal for the property. | | | | |
|---|---|---|---|---|

| N/A | | | | |
|---|---|---|---|---|

| (19)(a) If the property is served by a private well or non-public water system, is there evidence or do you have prior knowledge that contaminants have been have been identified in the well or system that exceed guidelines applicable to the water system? | | | | |
|---|---|---|---|---|
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |

| (19)(b) If the property is served by a private well or non-public water system is there evidence or do you have prior knowledge that the well has been designated as contaminated by any government environmental/health agency? | | | | |
|---|---|---|---|---|
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |

| (19)(c) Does the property discharge waste water (not including sanitary waste or storm water) onto or adjacent to the property and/or into a storm water system? | | | | |
|---|---|---|---|---|
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |

| (19)(d) Does the property discharge waste water (not including sanitary waste or storm water) onto or adjacent to the property and/or into a sanitary sewer system? | | | | |
|---|---|---|---|---|
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |

| (20)(a) Has there been a discharge of any substance or material from the property that might contaminate the public water system? | | | | |
|---|---|---|---|---|
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |

| (20)(b) Is the property known to be served by asbestos cement mains, lead containing lines, or piping that uses copper and/or lead solder? | | | | |
|---|---|---|---|---|
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |

| (21)(a) Is the property served by a private/nonpublic water system that has been found to be contaminated in excess of drinking water guidelines or otherwise contaminated? | | | | |
|---|---|---|---|---|
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |

### e. CERCLA and Related Liability

| (22) Is there any knowledge of environmental remediation orders or agreements applicable to the property or any facility located on the property? | | | | |
|---|---|---|---|---|
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |

| (23)(a) Is there information on the past existence of hazardous substances or petroleum products with respect to the property or any facility located on the property? | | | | |
|---|---|---|---|---|

USACE_ESMT000021

## ENVIRONMENTAL CONDITION OF PROPERTY, CON'T

| | | | | |
|---|---|---|---|---|
| Record Search and/or Interview: Draft Env. Assess., | ☐ Yes | ☑ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ☑ No | |
| (23)(b)  Is there information on the current existence of hazardous substances or petroleum products with respect to the property or any facility located on the property? | | | |
| Record Search and/or Interview: | ☐ Yes | ☑ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ☑ No | |
| (23)(c)  Is there information on the past existence of environmental violations with respect to the property or any facility located on the property? | | | |
| Record Search and/or Interview: | ☐ Yes | ☑ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ☑ No | |
| (23)(d)  Is there information on the current existence of environmental violations with respect to the property or any facility located on the property? | | | |
| Record Search and/or Interview: | ☐ Yes | ☑ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ☑ No | |
| (24)  Is there any knowledge of any environmental site assessment of the property or facility that indicated the presence of hazardous substances or petroleum products on, or contamination of, the property or recommended further assessment of the property? | | | |
| Record Search and/or Interview: | ☐ Yes | ☑ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ☑ No | |
| (25)  Is there any knowledge of any past, threatened, or pending lawsuits or administrative proceedings concerning a release or threatened release of any hazardous substances or petroleum products involving the property by any owner or occupant of the property? | | | |
| Record Search and/or Interview: | ☐ Yes | ☑ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ☑ No | |
| (26)  Is there any prior knowledge that any hazardous substances or petroleum products, unidentified waste materials, tires, automotive or industrial batteries, or any other waste materials have been dumped above grade, buried and or burned on the property? | | | |
| Record Search and/or Interview: | ☐ Yes | ☑ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ☑ No | |

| | | | | |
|---|---|---|---|---|
| **3.1  TOXIC SUBSTANCES CONTROL ACT (TSCA):** | | | | |
| a.  Is there a transformer, capacitor, or any hydraulic equipment known to contain or likely to contain polychlorinated biphenyls (PCBs) or any records indicating the presence of such? | | | |
| Record Search and/or Interview: | ☐ Yes | ☑ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ☑ No | |

| | | | | |
|---|---|---|---|---|
| **3.2  ASBESTOS ABATEMENT AND INSPECTION:** | | | | |
| | | If no facilities then ☑ N/A | | |
| a.  Were any of the facilities located on the property constructed prior to 1980? | | | |
| Record Search and/or Interview: | ☐ Yes | ☐ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ☐ No | |
| b.  Have all facilities on the property been inspected by a certified asbestos abatement team? | | | |
| Record Search and/or Interview: | ☐ Yes | ☐ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ☐ No | |

USACE_ESMT000022

## ENVIRONMENTAL CONDITION OF PROPERTY, CON'T

| | | | | |
|---|---|---|---|---|
| c. Is there any documented evidence of asbestos (e.g., tests, surveys, management plan) in any of the facilities on the property? | | | | |
| Record Search and/or Interview: | ☐ Yes | ☐ No | ☐ Unk | |
| Observed during site visit: | ☐ Yes | ☐ No | | |
| d. Has all friable asbestos on the property or within facilities on the property been removed or become subject to an Operation and Maintenance (O&M) program so that it does not create the potential for human exposure? | | | | |
| Record Search and/or Interview: | ☐ Yes | ☐ No | ☐ Unk | |
| Observed during site visit: | ☐ Yes | ☐ No | | |
| e. Does the site survey of pre-1980 construction identify potential asbestos containing materials (e.g., boiler insulation, floor tiles, building siding, shingles, roofing felt, wall and ceiling insulation, acoustical ceiling tiles, window putty, fuse boxes, heat reflectors, air duct lining)? | | | | |
| Record Search and/or Interview: | ☐ Yes | ☐ No | ☐ Unk | |
| Observed during site visit: | ☐ Yes | ☐ No | | |

| 3.3 LEAD-BASED PAINT ABATEMENT AND INSPECTION: | | | | |
|---|---|---|---|---|
| If there were never structures then ☑ N/A | | | | |
| a. Were any structures or facilities on the property constructed prior to 1979? | | | | |
| Record Search and/or Interview: | ☐ Yes | ☐ No | ☐ Unk | |
| Observed during site visit: | ☐ Yes | ☐ No | | |
| b. Has a screening test been conducted on the property for lead-based paint? | | | | |
| Record Search and/or Interview: | ☐ Yes | ☐ No | ☐ Unk | |
| Observed during site visit: | ☐ Yes | ☐ No | | |
| c. Did the results of the screening tests identify lead-based paint? | | | | |
| Record Search and/or Interview: | ☐ Yes | ☐ No | ☐ Unk | |
| Observed during site visit: | ☐ Yes | ☐ No | | |
| d. Is any of the on-site paint peeling or chipped? | | | | |
| Record Search and/or Interview: | ☐ Yes | ☐ No | ☐ Unk | |
| Observed during site visit: | ☐ Yes | ☐ No | | |

| 3.4 FEDERAL INSECTICIDE, FUNGICIDE, AND RODENTICIDE ACT (FIFRA): | | | | |
|---|---|---|---|---|
| a. Are there or has there been any pesticides, fungicides, or herbicides used on the property? | | | | |
| Record Search and/or Interview: | ☐ Yes | ☐ No | ☑ Unk | |
| Observed during site visit: | ☐ Yes | ☑ No | | |
| b. In greater than household quantities? | | | | |
| Record Search and/or Interview: | ☐ Yes | ☐ No | ☑ Unk | |
| Observed during site visit: | ☐ Yes | ☑ No | | |
| c. Applied not in accordance with the manufacturers recommendations? | | | | |
| Record Search and/or Interview: | ☐ Yes | ☐ No | ☑ Unk | |
| Observed during site visit: | ☐ Yes | ☑ No | | |
| d. Are there or has there been any pesticides, fungicides, or herbicides stored onsite? | | | | |
| Record Search and/or Interview: | ☐ Yes | ☐ No | ☑ Unk | |
| Observed during site visit: | ☐ Yes | ☑ No | | |

USACE_ESMT000023

**ENVIRONMENTAL CONDITION OF PROPERTY, CON'T**

| e. In greater than house-hold quantities? | | | |
|---|---|---|---|
| Record Search and/or Interview: | ☐ Yes | ☐ No | ■ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| f. Have there been reports or evidence of a spill of any pesticides, fungicides, or herbicides on the property? | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |

| **3.5 MEDICAL/BIOHAZARDOUS WASTE:** | | | |
|---|---|---|---|
| a. Has the property been used for chemical or biological testing? | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| b. Has the property been used for burying medical or biohazardous waste? | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |

| **3.6 MUNITIONS AND EXPLOSIVES OF CONCERN** (MEC - i.e., military munitions that may pose unique explosives safety risks, including: (A) unexploded ordnance (UXO), as defined in 10 U.S.C. 2710(e)(9); (B) discarded military munitions (DMM), as defined in 10 U.S.C. 2710(e)(2); or (C) munitions constituents (e.g., TNT, RDX), as defined in 10 U.S.C. 2710(e)(3), present in high enough concentrations to pose an explosive hazard.) | | | |
|---|---|---|---|
| a. Have any citizen complaints or local law enforcement actions occurred regarding MEC on the property? | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| b. Has the site served as a small arms test range or otherwise to service weapons? | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| c. Are any ranges, berms, open burning/open detonation (OB/OD), training, or impact areas onsite? | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |

| **3.7 RADIOLOGICAL SUBSTANCES:** | | | |
|---|---|---|---|
| a. Has the property ever been suspected to contain radioactive waste, including mixed waste? | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| b. Have radiological substances ever been used or services provided on the property? | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| c. Has the property been surveyed for radon? | | | |
| Record Search and/or Interview: | ☐ Yes | ☐ No | ■ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| d. Did the radon survey indicate test results above 4 pCi/l (pico curies/liter)? | | | |
| Record Search and/or Interview: | ☐ Yes | ☐ No | ■ Unk |

USACE_ESMT000024

**ENVIRONMENTAL CONDITION OF PROPERTY, CON'T**

| | | | |
|---|---|---|---|
| Observed during site visit: | ☐ Yes | ■ No | |
| e. If a radon survey has not been conducted does the vicinity exhibit radon above 4 pCi/l (pico curies/liter)? | | | |
| Record Search and/or Interview: | ☐ Yes | ☐ No | ■ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| f. Do records indicate that nearby structures have elevated indoor levels of radon? | | | |
| Record Search and/or Interview: | ☐ Yes | ☐ No | ■ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |

**3.8 Clean Air Act**

| | | | |
|---|---|---|---|
| a. Does the facility emit air pollutants into the environment? | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| b. Is the facility a type for which new standards of performance (NSPS) have been promulgated? See 40 C.F.R. Part 60 for a list of new source categories and applicable standards. | | | |
| Record Search and/or Interview: Draft Env. Assess., EPA, SD Dept. Health | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| c. Is the facility in violation or has the facility been in violation of the NSPS or the permit? | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| d. Is the facility located in a nonattainment area? | | | |
| Record Search and/or Interview: Draft Env. Assess., EPA. | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| e. Will the facility be subject to maximum attainable control technology (MACT)? | | | |
| Record Search and/or Interview: | ☐ Yes | ☐ No | ■ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| f. Is the capital expenditure required to meet the requirements of emissions reductions in the new Clean Air Act, i.e., is the facility required to reduce emissions because it is a non-attainment area? | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| g. Does the facility incinerate any wastes of any kind? | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |

**3.9 ADDITIONAL ISSUES:**

| | | | |
|---|---|---|---|
| a. Does the property exhibit any stressed vegetation or diseased wildlife? | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| b. Does the property have erosion problems (i.e., gullies, arroyos, sediment loading during storms)? | | | |
| Record Search and/or Interview: Erosion along shoreline | ■ Yes | ☐ No | ☐ Unk |
| Observed during site visit: of the Oahe Reservoir. | ■ Yes | ☐ No | |
| c. Are there any floodplains or wetlands? | | | |

USACE_ESMT000025

## ENVIRONMENTAL CONDITION OF PROPERTY, CON'T

| | | | | |
|---|---|---|---|---|
| Record Search and/or Interview: Draft Env. Assess., not impacted. | ■ Yes | ☐ No | ☐ Unk |
| Observed during site visit: Wetland Map Attached. No impact. | ■ Yes | ☐ No | |
| d. Are there any sinkholes? | | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| e. Are there any valuable mineral resources? | | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| f. Is mold present in facilities on the property? | | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |

### 3.10 OTHER CONDITIONS:

Are there any other conditions that exist on the property that should be considered in the decision to outgrant? Describe.

No other conditions on the property of the proposed installation-DAPL Pipeline.  However, the proposed project is in close proximity of two other approver crossings-1. Overhead Power Line, 2. Underground Gas Line.

### 3.11 ADDITIONAL COMMENTS:

The two existing utility lines have existing authorization and are regulated for installation, maintenance and operation.  Several of the answers in Section 3 and 4  were obtained from a record search of the DRAFT ENVIRONMENTAL ASSESSMENT and PROPOSED PLANS AND SPECIFICATIONS.  FINAL ANSWERS MAY BE CHANGED OR CONFIRMED UPON THE FINALIZATION OF THE DRAFT ENVIRONMENTAL ASSESSMENT, PLANS AND SPECIFICATIONS.

### 4.0 GOVERNMENT RECORDS/HISTORICAL RESOURCES INQUIRY

a. Do any of the following Federal Government record systems list the property or any property within the search distance noted below:

| Federal Government Source | Approximate Minimum Search Distance, miles (kilometers) | Response | |
|---|---|---|---|
| Federal NPL site list | 1.0 (1.6) | ☐ Yes | ■ No |
| Federal CERCLIS list | 0.5 (0.8) | ☐ Yes | ■ No |
| Federal CERCLIS NFRAP site list | property and adjoining properties | ☐ Yes | ■ No |
| Federal RCRA CORRACTS TSD facilities list | 1.0 (1.6) | ☐ Yes | ■ No |
| Federal RCRA non-CORRACTS TSD facilities list | 0.5 (0.8) | ☐ Yes | ■ No |
| Federal RCRA generators list | property and adjoining properties | ☐ Yes | ■ No |
| Federal ERNS list | property only | ☐ Yes | ■ No |

b. Do any of the following state record systems list the property or any property within the search distance noted below:

| State lists of hazardous waste sites identified for investigation or remediation | Approximate Minimum Search Distance, miles (kilometers) | Response | |
|---|---|---|---|
| State – Equivalent NPL | 1.0 (1.6) | ☐ Yes | ■ No |

Page | 10

USACE_ESMT000026

## ENVIRONMENTAL CONDITION OF PROPERTY, CON'T

| | | | |
|---|---|---|---|
| State – Equivalent CERCLIS | 0.5 (0.8) | ☐ Yes | ■ No |
| State landfill and/or solid waste disposal lists | 0.5 (0.8) | ☐ Yes | ■ No |
| State leaking UST lists | 0.5 (0.8) | ☐ Yes | ■ No |
| State registered UST lists | property and adjoining properties | ☐ Yes | ■ No |
| c. Based upon a review of fire insurance maps or consultation with the local fire department serving the property, are any buildings or other improvements on the property or on any adjoining property identified as having been used for industrial use or uses likely to lead to contamination of the property? Please state remarks below. | | ☐ Yes | ■ No |

Remarks: The two adjoining utilities, overhead power line and underground gas pipeline, are improvements that are associated with industrial use. These may have uses and operational equipment that could lead to contamination of the adjoining property. The respective utility companies would be responsible for any contamination of their leased property and for compliance with applicable environmental regulations..

**5.0 Interviews**

| | Name | Position |
|---|---|---|
| 1 | Phil Sheffield | Oahe Lake Manager, Operations Div., CENWO-OD-OA |
| 2 | Francis Kuhn | Riverdale Realty Specialist, Real Estate Div., CECO-C-RAQ |
| 3 | Brent Cossette | Natural Resources Specialist, Omaha District, CENWO-OD-TN |
| 4 | Richard Harnois | Archeologist, Operations Div., CENWO-OD-OA |
| 5 | | |
| 6 | | |

**6.0 Records**

| | |
|---|---|
| 1 | COE Oahe Project Real Estate Files and Records. |
| 2 | COE Omaha Distric Real Estate Files |
| 3 | DAPL Final Draft Environmental Assessment, 2016.05.10, with Appendices. |
| 4 | US Environmental Protection Agency Database |
| 5 | North Dakota Dept. of Health Database |
| 6 | |

**7.0** We have performed a Phase I Environmental Site Assessment in conformance with the scope and limitations of ASTM Practice E 1527 of Sections 10 & 11, T134 N, R79 W the property. Any exceptions to, or deletions from this practice are described in Section N/A of this report. This assessment has revealed no evidence of recognized environmental conditions in connection with the property.

Environmental Professional (Print) William Harlon, RF

Environmental Professional's Signature HARLON.WILLIAM.D.III.1258312887 Digitally signed by HARLON.WILLIAM.D.III.1258312887 DN: c=US, o=U.S. Government, ou=DoD, ou=PKI, ou=USA, cn=HARLON.WILLIAM.D.III.1258312887 Date: 2016.05.20 08:58:01 -05'00' | Date 5/20/16

**8.0 CERTIFICATIONS:**

15.a. The Environmental Professional Completing this report:

Name: William D. Harlon III

Title: Envrionmental Compliance Coordinator

Organization: US Army Corps of Engineers, Omaha District

Address: 1616 Capitol Avenue, Omaha Nebraska 68102

Phone number: (402) 995-2500

Date: 5/20/16

Qualifications: B.S. Forest Science with 13+ years of environmental compliance experience

## ENVIRONMENTAL CONDITION OF PROPERTY, CON'T

| |
|---|
| "[I, We] declare that, to the best of [my our] professional knowledge and belief, [I, we] meet the definition of Environmental professional as defined in 312.10 of 40 CFR 312 and [I, We] have the specific qualifications based on education, training, and experience to assess a property of the nature, history and setting of the subject property.  [I, We] have developed and performed the all appropriate inquiries in conformance with the standards and practices set forth in 40 CFR Part 312." |

## 9.0  RECOMMENDATION:

☑ I recommend that the proposed real estate outgrant be approved and that the action proceed.

☐ I do not recommend that the proposed real estate outgrant be approved and recommend that no further review and processing be done.

| OPM/ECC Signature | STASCH.ERIC.D.1231345589 | Digitally signed by STASCH.ERIC.D.1231345589<br>DN: c=US, o=U.S. Government, ou=DoD, ou=PKI, ou=USA,<br>cn=STASCH.ERIC.D.1231345589<br>Date: 2016.05.13 14:01:06 -05'00' | Date | 13 May 2016 |
|---|---|---|---|---|

USACE_ESMT000028

ENVIRONMENTAL CONDITION OF PROPERTY, CON'T

## Appendix A
## Aerial Photographs

| Aerial Photo Date | Flight Date | Source | Item or Feature Observed |
|---|---|---|---|
| Aug., 2015 | Unknown | Google Earth | Project Location, south central North Dakota |
| Unknown | | Map-Draft Env. Assess. | Detailed L. Oahe pipeline crossing map. |
| 09/28/2015 | #1 | On Site | Existing Condtions, West Side of Lake |
| 09/28/2015 | #2 | On Site | Existing Condtions, West Side of Lake |
| 09/28/2015 | #3 | On Site | Existing Conditions, East Side of Lake |
| 09/28/2015 | #4 | On Site | Existing Conditions, East Side of Lake |
| 09/28/2015 | #5 | On Site | Existing Conditions, East Side of Lake |
| Aug., 2014 | Unknown | Google Earth | Nat. Wetland Inventory Map |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

USACE_ESMT000029



## DAPL Pipe Line Crossing

Morton and Emmons County, North Dakota
Sec 10, R134N, R79W / Sec. 11, T134N, R79W







OAHE PROJECT AREA
DAPL Pipeline Crossing Map

USACE_ESMT000031

DAPL LAKE OAHE CROSSING



Pipeline HDD Crossing, West side of Lake Oahe, Photo-West to East.    1



Pipeline HDD Approximate Entrance Point, West side of Lake Oahe, Photo-West to East   # 2

USACE_ESMT000032

P 16

DAPL LAKE OAHE CROSSING



Pipeline HDD Crossing, East Side of Lake Oahe, Photo East to West.  # 3



Pipeline HDD Crossing, Approximate Exit Point, East Side of Lake Oahe, Photo East to West. # 4

USACE_ESMT000033

DAPL LAKE OAHE CROSSING



DAPL Pipeline Alignment to East, East Side of Lake Oahe, Photo West to East.     # 5

# OAHE PROJECT, DAPL PIPELINE CROSSING
## National Wetlands Inventory Map



Wetland Types

- Estuarine and Marine Deepwater
- Estuarine and Marine Wetland
- Freshwater Emergent Wetland
- Freshwater Forested/Shrub Wetland
- Freshwater Pond
- Lake
- Other
- Riverine

DAPL Pipe Line

OAHE DAPL ECP

RE-CERTIFICATION

This addendum to the Draft DAPL ECP of May, 2016 is to certify that the Environmental Conditions of the Property has been reviewed and updated within 180 days of the certification date of May 13, 2016.  Based upon recent visual assessments and review of the site, I certify that all conditions are unchanged from the date of the documentation.

Eric D. Stasch

Operations Project Manager

_20 May 2016_

Date

USACE_ESMT000036

## SPECIAL CONDITIONS
## LAKE OAHE, EASEMENT NO DACW45-2-16-8059

| Condition | |
|---|---|
| **1.** | **Procedures and Specifications:** For the pipeline segments crossing Lake Oahe and its "could affect" High Consequence Areas ("could affect" HCAs) (as defined in 49 CFR § 195.450), Grantee must meet the U.S. Army Corp of Engineers easement special conditions by developing, implementing, and maintaining for the duration of the easement all easement special conditions in specifications and procedures for the design, construction, testing, operation and maintenance specifications and procedures as required in 49 CFR §§ 195.100, 195.202, 195.302, and 195.402 and this easement.<br><br>For the purposes of these special conditions, "pipeline segment" is defined as Lake Oahe and the "could affect" HCAs noted in EA for the vicinity of Lake Oahe.. |
| **2.** | Grantee will conduct all HDD work according to the HDD Construction Plan [August 18, 2015] (Final EA, Appendix B) that it has prepared, and implement the HDD Contingency Plan [March 11, 2011] (Appendix B) in the event of an inadvertent release. |
| **3.** | Grantee is not authorized to discharge hydrostatic test water under this easement. |
| **4.** | Grantee will follow response, containment, mitigation measures, and cleanup measures described in SPCC, SWPPP, and ECP. |
| **5.** | Grantee will use temporary sediment control measures, such as silt fence, to minimize the introduction of sediment into waterbodies during construction and minimize the movement of spoil and sediment from surface runoff during and after construction. |
| **6.** | Grantee will return all surface drainage contours and vegetation to preconstruction conditions as much as practical. |
| **7.** | Grantee will avoid groundwater contamination by implementing the protective measures set forth in the Project specific spill prevention, control and Countermeasures prepared by the contractor and in the Spill Prevention, Control and Countermeasure Plan [December 2014] (Final EA, Appendix A). |
| | |
| | **Documentation Conditions** |
| **8.** | The Grantee will submit the Facility Response Plan to the Oahe OPM for review prior to the operation of the pipeline. |
| **9.** | The Grantee will submit all plans not final at the time this easement is granted to the Oahe OPM for review and the incorporation of U.S. Army Corps of Engineers comments prior to the Grantee's submittal to the Pipeline and Hazardous Management Safety Administration. These plans include, but are not limited to the following:<br>   a.  Geographical Response Plan,<br>   b.  Operations and Maintenance Manual,<br>   c.  Risk Assessment (Integrity Management Plan), and<br>   d.  Spill Models (Using the National Hydrography Dataset by the U.S. Geological Survey) |
| **10.** | The Grantee must send any updated plans in the Facility Response Plan to the Oahe OPM for review by the U.S. Army Corps of Engineers Environmental Compliance Coordinators at the Omaha District Office and the Oahe Project Office within one year of the update. |

**EXHIBIT "D"**
**DACW45-2-16-8059**
USACE_ESMT000037

| 11. | The Grantee shall provide as-built drawings for the crossing at Lake Oahe to the Oahe OPM within 6 months of the completion of pipeline construction. |
|---|---|
| 12. | All records demonstrating compliance with these easement conditions herein must be maintained for the duration of the easement. |
| | |
| | **Pipeline Safety Conditions (Construction)** |
| 13. | **Pipeline Design Factor** - **Pipelines:** Pipe installed must comply with a design factor of 0.50 or lower in the Lake Oahe crossing and "could affect" HCAs. |
| 14. | **Pipe Girth Weld – Nondestructive Tests:** Grantee must nondestructively test <u>all girth welds</u> in accordance with 49 CFR §§ 195.228, 195.230 and 195.234. |
| 15. | **Pressure Test Level:** The pre-in-service hydrostatic test for mainline pipe must be to a pressure producing a hoop stress of either: a minimum 100% specified minimum yield strength (SMYS) or a minimum of 1.25 times maximum operating pressure (MOP) for eight (8) continuous hours for pipeline segments using a design factor of 0.50 or less. |
| 16. | **Assessment of Test Failures:** Any pipe failure occurring during the pre-in service hydrostatic test must undergo a root cause failure analysis to include a metallurgical examination of the failed pipe. The results of this examination must preclude a systemic pipeline material issue and the results must be reported to the Operations Project Manager at the Oahe Project Office (Oahe OPM) within 60 days of the failure. |
| 17. | **Coatings for Trenchless Installation:** Coatings used for directional bore, slick bore and other trenchless installation methods must be capable of resisting abrasion and other damage that may occur due to rocks and other obstructions encountered in this installation technique. |
| 18. | **Pipe Coating:** Pipe coatings must be non-shielding to cathodic protection (CP). Coatings such as tape and shrink sleeves would be shielding coatings to CP that protects the pipe from external corrosion. The application of a corrosion resistant coating to the steel pipe must be performed according to a coating application quality control program. The program must address pipe surface cleanliness standards, blast cleaning, application temperature control, adhesion, cathodic disbondment, moisture permeation, bending, minimum coating thickness, coating imperfections and coating repair. |
| 19. | **Field Coating:** Field joint coatings must be non-shielding to CP. Grantee must implement field girth weld joint coating application specification and quality standards to ensure pipe surface cleanliness, application temperature control, adhesion quality, cathodic disbondment, moisture permeation, bending, minimum coating thickness, holiday detection and repair quality. Field coating applicators must use valid qualified coating procedures and be trained to use these procedures. |
| 20. | **Construction Coating Survey after Installation:** Promptly after a ditch for the pipeline is backfilled, but not later than three months after placing the pipeline in service, the operator must perform an assessment to ensure integrity of the coating using direct current voltage gradient (DCVG) or alternating current voltage gradient (ACVG). The operator must repair any coating damage classified as moderate or severe (voltage drop greater than 35% for DCVG or 50 dBµV for ACVG) in accordance with section 4 and Appendix A of NACE SP0502-2008 (or latest edition referenced in 49 CFR § 195.3) within six months of the assessment. |
| 21. | **Mainline Valve(s) with Remote Control or Automatic Shutdown:** |

|   | |
|---|---|
|   | a. Mainline valves with remote control or automatic shutdown for water crossings and reservoirs must be installed on either side of the crossing and additional mainline valves(s) installed either upstream, downstream, or both to protect the water body from the "could affect" HCA on either side of the water crossing. Mainline valves must either be located outside of the flood plain or have valve actuators and other control equipment installed so as to not be impacted by flood conditions.<br><br>b. Mainline valves with remote control or automatic shutdown must contain transit inhibit switches that prevent the valves from shutting at a rate (and in conjunction with pumps being shutdown) so that no pressure surges can occur, or other damage caused by unintended valve closures or too fast of a closure.<br><br>c. Mainline valves must be remotely controlled and actuated or automatic shutdown, and the Supervisory Control and Data Acquisition (SCADA) system must be capable of closing the valve and monitoring the valve position, upstream pressure and downstream pressure so as to minimize the response time in the case of a failure.  Remote power backup is required to ensure communications are maintained during inclement weather.  Mainline valves must be capable of closure at all times.  If it is impracticable to install a remote controlled valve, Grantee must submit a valve design and installation plan to the appropriate Oahe OPM to confirm the alternative approach provides an equivalent level of safety.<br><br>d. Mainline valves in the pipeline segment must have actuation capability (i.e., remote control shut-off, automatic shut-off, manual shut-off where personnel are in proximity, or alternative equivalent technology) to ensure pipeline ruptures are promptly mitigated based upon maximum valve shut-off times, location, and spacing specified.<br><br>e. For each mainline valve that is a remote-control shut-off or automatic shut-off valve, the operator must conduct a point-to-point verification between SCADA displays and the mainline valve, sensors, and communications equipment in accordance with 49 CFR § 195.446(c) and (e), or an equivalent verification. |
| 22. | **Supervisory Control and Data Acquisition (SCADA) System:**  Grantee must develop, install, operate, and maintain a SCADA system to provide remote monitoring and control of the entire pipeline segment in accordance with 49 CFR Part 195 requirements. |
| 23. | **Computational Pipeline Monitoring (CPM) Leak Detection:** The pipeline segment must have a computational pipeline monitoring (CPM) leak detection system in accordance with 49 CFR § 195.134 and must have adequate pressure sensors at pump stations, laterals, mainline valves and liquid flow volume measurement along the pipeline at inflows, outflows and spaced along the pipeline to perform accurate leak detection.  The pipeline segment must be operated as a continuously pressurized pipeline (with no pressure, slack line pipeline segments).  If the pipeline segment is operated as a slack line pipeline segment, an operating plan must be developed, reviewed by a responsible third party independent expert engineering company and submitted to the Oahe OPM for "no objection" prior to being implemented by Grantee. |
| 24. | Grantee will minimize or avoid impacts on soils by implementing the mitigation measures described in the DAPL Project's Spill Prevention Control and Countermeasure Plan [December 2014] (SPCC), Storm water Pollution Prevention Plan[July 2015] (SWPPP), and Environmental Construction Plan [April 2015 (ECP) as well as requirements of applicable state and federal permits. |

| | |
|---|---|
| | **Pipeline Safety Conditions (Operation)** |
| **25.** | **Overpressure Protection Control:** Grantee must limit mainline pipeline segment overpressure protection to a maximum of 110% maximum operating pressure (MOP) during surge events consistent with 49 CFR § 195.406(b). Before commencing operation, Grantee must perform a surge analysis showing how the pipeline segment will be operated to be consistent with these overpressure protection conditions. Grantee shall equip the pipeline with field devices to prevent overpressure conditions. Remotely actuated valves or automatic shutoff valves should be fitted with devices that will stop the transit (intentional or uncommanded) of the mainline valve should an overpressure condition occur or an impending overpressure condition is expected. Sufficient pressure sensors, on both the upstream and downside side of valves, must be installed to ensure that an overpressure situation does not occur. Sufficient pressure sensors must be installed along the pipeline to conduct real time hydraulic modeling, and which can be used to conduct a surge analysis to determine whether pipeline segments have experienced an overpressure condition. |
| **26.** | **Cathodic Protection:** The initial Cathodic Protection system must be operational within six (6) months of placing a pipeline segment in service. Cathodic Protection will be operated and maintained per applicable codes and the Grantee's 'Operations and Maintenance Manual'. Wall thickness testing will be performed in-lieu of periodic hydro tests. The Grantee shall send the inspection reports to the Operations Project Manager at the Oahe Project Office (hereinafter the Oahe OPM)." |
| **27.** | **Interference Current Surveys:** Interference surveys must be performed over the entire pipeline segment within six months of placing the pipeline in service to ensure compliance with applicable NACE International Standard Practice 0169-2007 (2007 or the latest version incorporated by reference in § 195.3) and 0177 (2007 or the latest NACE standard version, since NACE SP 0177 is not incorporated by reference in 49 CFR § 195.3) (NACE SP 0169-2007 and SP 0177) for interference current levels. If interference currents are found, Grantee must determine if there have been any adverse effects on the pipeline and mitigate such effects as necessary as required below.<br><br>The interference current mitigation program for the pipeline segment must include:<br>1) As frequently as needed, including when new or uprated high voltage alternating current power lines greater than or equal to 69 kVA or electrical substations are co-located near the pipeline, but not to exceed every seven years conduct an interference survey (at times when static or dynamic voltages are at the highest values for a time period of at least 24-hours) to detect the presence and level of any electrical current that could impact external corrosion where interference is suspected;<br>2) Analyze the results of the survey to identify locations where interference currents are greater than or equal to 20 Amps per meter squared; and<br>3) a remedial action plan and apply for any necessary permits within four months of completion of the inspection or testing that identified the presence of deleterious electrical stray current.<br>4) Implement remedial actions to protect the pipeline segment from detrimental interference currents. Remedial actions must be completed promptly, but no later than one year after completion of the survey, or as soon as practicable after obtaining necessary permits. Remedial action means the implementation of measures including, but not limited to, |

| | |
|---|---|
| | additional grounding along the pipeline to reduce interference currents below 20 Amps per meter squared. The following criteria shall be used to determine when remedial actions are required.<br><br>    a)  AC-induced corrosion does not occur at AC densities less than 20 A/m2 (1.9 A/ft2). The operator shall monitor these locations per (a) above.<br>    b)  AC corrosion is unpredictable for AC densities between 20 to 100 A/m2 (1.9 to 9.3 A/ft2). These locations require an engineering assessment to determine if remediation is required.<br>    c)  AC corrosion occurs at current densities greater than 100 A/m2 (9.3 A/ft2). These areas require mitigation. Any location that is determined to require mitigation must be mitigated to reduce the AC current density to less than 20 A/m2. |
| 28. | **Corrosion Surveys:**  Grantee must complete corrosion surveys for the pipeline segment within six (6) months of placing the respective CP system(s) in operation to ensure adequate external corrosion protection per NACE RP 0169-2007.  The survey shall also address the proper number and location of CP test stations as well as alternating current (AC) interference mitigation and AC grounding programs per NACE RP 0177.  At least one (1) CP test station must be located within each "could affect" HCA with a maximum spacing between test stations of one-half mile. |
| 29. | **Initial Inline Inspection (ILI):**  Within three (3) years of placing a pipeline segment in service, Grantee must perform a baseline ILI using a high-resolution Magnetic Flux Leakage (HR-MFL) tool, high resolution (HR) deformation tool, and an ultrasonic crack detection tool or equivalent of each. |
| 30. | **ILI Deformation Tool:**  Grantee must perform a high resolution deformation tool run after completion of the hydrostatic strength test and backfill of the pipeline segment and prior to placing the pipeline segment in service.  Grantee must remediate pipe in accordance with 49 CFR Part 195 and Subpart O.  All expanded pipe must be remediated in accordance with PHMSA's "Interim Guidelines for Confirming Pipe Strength in Pipe Susceptible to Low Yield Strength for Liquid Pipeline" dated October 6, 2009 or any subsequent PHMSA update to this guideline. |
| 31. | **Future ILI:**  Future ILI inspections must be based upon pipeline segment integrity threats and must include as a minimum of a high-resolution Magnetic Flux Leakage (MFL) tool, high resolution deformation tool, and an ultrasonic crack detection tool or equivalent of each.  ILI inspections must be performed on the entire pipeline segment on a frequency consistent with 49 CFR § 195.452(j)(3) assessment intervals or on a frequency determined by fatigue studies or anomalies found that are indicative of actual operating conditions.<br><br>    1)  Conduct periodic close interval surveys (CIS) along the entire pipeline segment with current interrupted to confirm voltage drops in association with periodic ILI assessments under § 195.452(j)(3).  Pipeline segments under Lake Oahe would not be able to CIS due to water segment and depth of directional drill across Lake Oahe.<br>    2)  CIS must be conducted within three (3) months of running ILI surveys when using a five (5) year ILI frequency, not to exceed sixty-eight (68) months, in accordance with 49 CFR § 195.452 (j) (3) assessment intervals.<br>CIS findings must be integrated into ILI Tool findings. |
| 32. | **Internal Corrosion:** Grantee must limit basic sediment and water (BS&W) to 0.5% by volume and report BS&W testing results to Ain the annual report.  Grantee must report upset conditions causing BS&W level excursions above the limit on the annual report. |

| | |
|---|---|
| | 1) Grantee must run cleaning pigs twice in the first year and as necessary in succeeding years based on the analysis of oil constituents, liquid test results, weight loss coupons located in areas with the greatest internal corrosion threat and other internal corrosion threats.  At a minimum in the succeeding years following the first year Grantee must run cleaning pigs every five years unless analysis necessitates earlier action.<br>2) Liquids collected during cleaning pig runs, such as BS&W, must be sampled, analyzed and internal corrosion mitigation plans developed based upon lab test results.<br>3) Grantee shall review the program at least quarterly based upon the crude oil quality and implement adjustments to monitor for, and mitigate the presence of, deleterious crude oil stream constituents. |
| **33.** | **Pipeline Patrolling:** Grantee must patrol the pipeline segment right-of-way on a two (2) week interval but not exceeding three (3) weeks, for at least twenty-six (26) times each calendar year, to inspect for excavation activities, ground movement, unstable soil, wash outs, leakage, or other activities or conditions affecting the safe operation of the pipeline segment. |
| **34.** | The Grantee shall conduct the following training exercises:<br><br>1) A full scale open water and a full scale winter/ice exercises at Lake Sakakawea and Lake Oahe.  A full scale exercise will occur once every 3 years (triennial cycle) with the location and type of exercise occurring on alternating schedules (e.g. open water exercise at Lake Oahe the first triennial cycle, followed by winter exercise at Lake Sakakawea the following triennial cycle, followed by a winter exercise at Lake Oahe the following triennial cycle, etc.). The first exercise will occur within the first 3 years after the pipeline becomes operational.<br><br>2) To facilitate USACE staff involvement, the Grantee shall notify the USACE Environmental Compliance Coordinators at the Omaha District Office and the Oahe Project Office at least ninety (90) days prior to initiation of the training exercises.  The Grantee shall also solicit the participation of key stakeholders (federal, state, local, and Tribal) in these exercises. |
| **35.** | Within 1 month following the pipeline becoming operational, the Grantee shall provide for an all-weather access and collection point downstream of the HDD crossing at Lake Oahe.  The Grantee shall provide an equipment storage facility on non-federal lands that includes a fenced permanent storage area for winter and open water spill response equipment.  The storage facility should be placed in a strategic location and near existing facilities that would support access to the water.  The Grantee will coordinate with the USACE and any other applicable stakeholders to obtain all necessary permits and approvals prior to construction for any ground disturbing activities associated with these facilities. The storage facility should contain sufficient response equipment at a minimum to mitigate an unintended worst case release for this Lake crossing. |
| | |
| | **Overall Condition from EA** |
| **36.** | Grantee is generally responsible for commitments made and mitigation measures in the Final Environmental Assessment, Grantee Pipeline Project Crossing of Flowage Easements and Federal Lands (July 2016), including all Plans includes within Appendices thereof, even if they are not specifically made as a condition to this easement. |

# EXHIBIT DD

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **STANDING ROCK SIOUX TRIBE,** | ) | |
| | ) | **Case No. 1:16-cv-1534-JEB** |
| **Plaintiff,** | ) | |
| **v.** | ) | |
| | ) | |
| **U.S. ARMY CORPS OF ENGINEERS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

# DECLARATION OF MARTHA S. CHIEPLY

In accordance with the provisions of 28 U.S.C. 1746, I, Martha S. Chieply, declare that the following statements are true and correct to the best of my knowledge, information, and belief and are based upon my personal knowledge and/or my review of information contained in the records of the United States Army Corps of Engineers ("Corps") or supplied by current employees:

1. I am currently employed as the Regulatory Branch Chief, Omaha District, Northwestern Division, for the United States Army Corps of Engineers (USACE or Corps), Omaha District. I have served in this capacity since April 2006. Prior to this assignment, I was the Mississippi Valley Division Appeals Review Officer, USACE.

2. I graduated from North Carolina State University in 1983 with a Bachelor's of Science degree in Forestry.

3. As part of my normal duties as the Omaha District Regulatory Branch Chief, I am responsible for the oversight and execution of the permit and enforcement program under the regulatory authority of the Clean Water Act and the Rivers and Harbors Act for the

Omaha District, USACE. I managed the staff assigned to evaluate the Preconstruction

Notifications (PCN) submitted by Dakota Access L. L. C. (Dakota Access or Applicant)

for the Dakota Access Pipeline (DAPL) project for areas within the Omaha District area

of responsibility. I signed letters, initiated emails, and led coordination meetings with

USACE Regulatory Chiefs; District Tribal Liaisons; Corps personnel, and other Federal

and State Resource agencies involved in the DAPL project. I was the signatory for the

July 25, 2016 Nationwide Permit (NWP) #12 verifications for twelve (12) regulated

crossings subject to the USACE, Omaha District, authority for which the Applicant

provided PCNs.[1] I was also responsible for ensuring that the Omaha District coordinated

on the DAPL project with resource agencies, tribes and other consulting parties in a

timely and transparent manner, in compliance with applicable laws and regulations.

4. The DAPL project is a proposed 1,170-mile crude oil pipeline from the Bakken and

Three Forks production region of North Dakota to Patoka, Illinois. The proposed project

will cross approximately 200 waters of the United States (WOUS) within areas managed

by three Corps Districts (Omaha, Rock Island, and St. Louis). Each crossing qualifies for

NWP #12 for Utility Lines. Each District is responsible for ensuring activity verified

under a NWP is in compliance with Section 106 of the National Historic Preservation Act

---

[1] The Applicant originally submitted approximately 209 PCNs (86 were subject to the authority of the St. Louis District, approximately 110 were subject to the authority of the Rock Island District, and 13 were subject to the Omaha District). Five PCNs were withdrawn for a variety of reasons resulting in a total of 202 PCNs verified by the three Corps Districts (82 verifications in the St. Louis District, approximately 108 verifications in the Rock Island District, and 12 verifications in the Omaha District). The Applicant withdrew four PCNs under the authority of the St. Louis District after relocating the crossings to an area where a PCN was not required. The Applicant withdrew two PCNs under the authority of the Rock Island District and one PCN under the authority of the Omaha District after the Applicant elected to pursue HDD to avoid impacts to historic properties.

(NHPA).  The Omaha District's efforts to fulfill its obligations under the NHPA are as follows.

5.  On November 9, 2009, the Omaha District sent to all tribes, including the Standing Rock Sioux Tribe and the Cheyenne River Sioux Tribe, a letter providing early notification of anticipated reissuance of the 2012 Nationwide Permits (NWP) and information regarding the reissuance process to facilitate better understanding and streamline coordination (Exhibit 1).  Contact was initiated with both tribes as noted by a March 3, 2010, Omaha District Tribal Coordination Final Report prepared by Mr. Jim Winters.  The purpose was to discuss the NWPs.  Mr. Winters talked to Ms. Donna Peterson and Mr. Robert Walters of the Cheyenne River Sioux Tribe and Mr. Brandon Eagleshield and Mr. Byron Olsen of the Standing Rock Sioux Tribe.  Through the letters, the Corps explained the Nationwide Permit program and sought to exchange information and gain insight into the tribes' vision and concerns about the Corps Nationwide Permit Program.  Tribal input could inform modifications to the NWP by prompting the Districts to add regional conditions or decide not to use all or part of the NWP based on region-specific issues and/or concerns.

6.  On October 22, 2010, Headquarters, USACE issued a memorandum to all USACE Divisions and Districts to provide support for government to government consultation with Tribal nations across the country for Nationwide Permit (NWP) 2012 reauthorization.  The memorandum provided background on NWP rulemaking efforts, materials and a draft template to use to inform Tribal nations of the NWP 2012 reauthorization rulemaking process and invited formal consultation with the Tribes. (Exhibit 2).

7. On February 16, 2011 the Omaha District sent the Standing Rock Sioux Tribe and the Cheyenne River Sioux Tribe a letter and invitation to begin consultation on the proposal to reissue the NWPs. (Exhibit 3). Additional contact was initiated by email on March 8, 2012 to Cheyenne River Sioux Tribe and March 9, 2012 to Stand Rock Sioux Tribe to provide information on the finalized 2012 NWPs.

8. In June 2014, representatives from Dakota Access met with Mr. Jason Renschler, the North Dakota Regulatory Office Project Manager, to inform him of the Applicant's plans to construct the DAPL pipeline. At that time, Mr. Renschler informed the Applicant of the Corps process for coordinating activities proposed for Corps project lands. In particular, Mr. Renschler stressed the importance of Tribal coordination and mentioned the *Programmatic Agreement for the Operation and Management of the Missouri River Main Stem System for Compliance with the National Historic Preservation Act*, dated March 19, 2004 (Programmatic Agreement or PA), which defines the District's process to consult and coordinate with affected Tribes (this includes PA signatory Tribes and Tribes who may have an interest in the area or action but did not sign the PA), SHPOs, THPOs, the Advisory Council for Historic Preservation (ACHP) and other consulting parties on a proposed action. Information provided through the PA process was utilized to inform Regulatory personnel in Section 106 compliance determinations for Preconstruction Notification's (PCNs) received on the DAPL project. Omaha District Operations, Natural Resource personnel are primarily responsible for implementing the PA.

9. On October 2, 2014 a meeting was scheduled  at  the SRST Ft. Yates reservation with the Standing Rock Sioux Tribe, Dakota Access personnel, and Mr. Jason Renschler.  Mr.

Renschler arrived at the meeting on time but was informed by the Tribal Chairman, Mr. David Archambault, that the meeting had started earlier than planned and was over. Chairman Archambault gave Mr. Renschler a copy of the meeting materials Dakota Access personnel had provided to the Tribe.

10. On December 29, 2014, the Applicant submitted five PCNs for NWP #12 for the DAPL project to the North Dakota Regulatory Office (NDRO). (Exhibit 4). Ultimately, three of the PCNs were withdrawn (ND PCN#1, 3, and 5), leaving two PCNs in North Dakota. ND PCN#1 was previously reviewed by the USACE and determined to be an isolated, non-jurisdictional waterbody and not subject to Section 404. ND PCN#3, which crossed the Little Missouri River, had been incorrectly identified as requiring verification under Section 10 of the Rivers and Harbor Act, when it was subject only to Section 404 of the Clean Water Act. Later, DAPL changed the construction methodology from open trench to Horizontal Directional Drilling (HDD), which did not require a Section 404 permit because there would be no discharge of dredged or fill material into federally-regulated waters. Finally, ND PCN#5 was field verified and determined to not require a PCN because it had less than .5 acres of wetland impacts. The two remaining PCNs were ND PCN#2, which consisted of HDD crossing of the Missouri River at the Garrison Project at Lake Sakakawea, and ND PCN #4 which involved an HDD crossing of the Missouri River at Lake Oahe. The Missouri River is a Section 10 water of the US and the crossings required verification of NWP #12.

11. By letter dated February 5, 2015, the NDRO informed the Applicant that the PCN #12 package for the DAPL project was incomplete and additional information was needed for PCN #2, 3, 4, and 5, which were still being considered at that time. (Exhibit 5). In a

previous telephone conversation the NDRO had already informed the Applicant that PCN#1 did not require a PCN. As detailed in the letter, additional site specific information was needed to consider the PCN package to be complete and to determine impacts.

12. By letter dated March 20, 2015, the Applicant submitted a PCN for NWP #6 (Survey Activities) authorization for proposed geo-technical exploration activities for the Lake Oahe crossing (ND PCN#4) to the Omaha District, Lake Oahe Project, Natural Resources Office (NRO). The NDRO evaluated the application, determined the conditions for verifying the NWP were met and notified NRO on April 3, 2015 that it was appropriate to process the NWP #6 for the geo-technical borings. NDRO issued a NWP verification dated April 1, 2015. (Exhibit 6).

13. By letter dated March 25, 2015, the Applicant responded to the February 5, 2015 NDRO letter with additional information on the DAPL crossings. The NDRO could not verify the NWP #12 until the NRO completed its review of the crossings under the NHPA and the Endangered Species Act. USACE initiated Endangered Species Act (ESA) consultation with the U.S. Fish and Wildlife Service (USFWS) on December 29, 2015. A revised Biological Assessment was provided to the USFWS on March 28, 2016. The USFWS provided an ESA concurrence letter on May 2, 2016. Section 106 required the Corps to consult with Tribes, the North and South Dakota State Historic Preservation Offices and the ACHP.

14. By letter dated September 3, 2015, the Omaha District Commander invited tribes across the entire proposed pipeline footprint to initiate Section 106 consultation for those PCNs submitted by DAPL. (Exhibit 7). The time frame between receipt of information from

DAPL on the crossings and September entail further coordination with DAPL on aspects of the project. The letter to the Standing Rock Sioux Tribe had additional language acknowledging previous Standing Rock Sioux Tribe (SRST) letters in response to the geo-technical exploration. (Exhibit 8).

15. I signed a similar letter dated February 17, 2015, to notify tribes, including the SRST and the CRST, of the PCN applications provided by DAPL and invited the tribes to consult with the USACE. (Exhibit 9). Where the USACE had email addresses for Tribal contacts, Mr. Matt Bilodeau (later Mr. Aaron Sandine) emailed letters to those contacts and attempted to contact the tribes to verify receipt of the February 17, 2015 letter. Telephone log entries were completed for all contacts with Tribes; approximately 6 calls.

16. Mr. Matt Bilodeau, Project Manager Omaha District Regulatory, contacted the CRST by phone March 12, 2015. Mr. Steve Vance verified that the tribe had received the invitation to consult. He stated that he had concerns with project, that it might be difficult for the tribe to provide comments because of Tribal leadership changes, and thought the tribe might want to consult.

17. By letter dated November 20, 2015 and email dated November 17, 2015, the Corps notified all tribes of a general Tribal Meeting in Sioux Falls, South Dakota on December 8-9, 2015. (Exhibit 10). The list of Tribes was compiled from a list of federally listed tribes within the Omaha, St. Louis, and Rock Island Districts. The letter went to all tribes and included a link to a FTP site which contained all of the Applicant's cultural resources survey material.

18. Five tribes, including the CRST, attended the Sioux Falls meeting, but tribal representatives stated that they did not consider it to be consultation. (Exhibit 11). We

were informed that only one tribe was able to access the material on the FTP site, although the reason for this was unclear.  Dakota Access personnel also attended the meeting and later provided the tribes with hard copies of the tribal cultural survey information and electronic copies stored on flash drives.  The tribes committed to review the cultural information and participate in a second Tribal meeting to be held January 25, 2016 at Sioux Falls.

19. In a letter to me dated December 8, 2015, SRST Archeologist, Dr. Kelly Morgan, indicated that the SRST was interested in consultation, but mentioned that the Corps had not adequately addressed issues previously raised by SRST THPO and had not scheduled government to government consultation between Colonel Henderson and Chairman Archambault.  She listed specific points the tribe wished to discuss, including its opposition to bore testing, the fact that she did not concur in the "No Historic Properties Affected" determination from Mr. Richard Harnois, Omaha District Archeologist, and their request that a Class III Cultural Resources survey and EIS be completed by the Corps.  She declined to participate in the tribal consultation in Sioux Falls, South Dakota the Corps had scheduled because she claimed that the Corps had not consulted with the SRST.  She stated that the pipeline should be federalized because it would cross U.S. Fish and Wildlife easements and accused the Corps of circumventing the Section 106 process. She stressed that cultural sites and the SRST's water supply were at risk from the DAPL project.

20. By letter dated January 8, 2016, the SRST provided comments to the Draft Environmental Assessment on the Dakota Access Pipeline Project, Crossing of Flowage Easements and Federal Lands.  The EA was being prepared to support the 33 U.S.C.

Section 408 permission and easement to authorize the Applicant to cross under Lake

Oahe, but was relevant to the regulatory discussion because I could not verify NWP #12

until the Section 408 permission was granted. Ultimately, consultation for the

verifications was consolidated with consultation for the Section 408 permission.

21. A second Tribal meeting was held on January 25, 2016 in Sioux Falls. In a January 7,

2016 email the Applicant notified USACE of the meeting location and indicated Dakota

Access personnel were calling all of the Tribes on the USACE and USFWS list to notify

them of the meeting. The Applicant provided email notice on January 12, 2016 to all

listed tribes, including the Standing Rock Sioux Tribe and Cheyenne River Sioux Tribe.

The purpose of the meeting was to continue communication and discussion of the DAPL

project and obtain input from the Tribes regarding their review of the Applicant's cultural

resource survey. The SRST attended the meeting. Transcripts from this meeting were

prepared and provided by a February 17, 2016 email to all tribes. The Tribes requested

another meeting with the Omaha District Commander and the Regulatory Chiefs from all

three Districts. The Ponca Tribe offered to host. Tribes also requested that Dakota

Access personnel not attend the meeting.

22. By February 4, 2016 letter and February 11, 2016 email, the USACE invited all tribes to

a third general Tribal Meeting to obtain input from Tribes on cultural resources of Tribal

interest which was held at Niobrara, Nebraska, at the Ponca Tribal Headquarters on

February 18-19, 2016. (Exhibit 12). The Omaha District Commander, Colonel

Henderson, officiated the meeting along with the Regulatory Chiefs from Omaha, Rock

Island, and St. Louis Districts. Dr. Kelly Morgan, Standing Rock Sioux Tribe THPO

Tribal Archeologist, and Mr. Steve Vance, Cheyenne River Sioux Tribe THPO, attended.

Dakota Access personnel did not participate in the discussions, but at the end of the meeting, the Dakota Access Project Manager, Ms. Monica Howard, was allowed in the meeting room to answer questions along with the Dakota Access Vice President, Mr. Joey Mahmoud, who participated by teleconference.

23. On February 19, 2016, the USACE sent its draft meeting notes from the Niobrara meeting to the host Ponca Tribe who provided them to the other Tribes.  On March 25, 2016, the Corps provided the final meeting notes to all tribes by letter.  The Tribes requested that they be provided the opportunity to conduct Tribal Surveys and be granted access for Tribal monitoring during construction.

24. After the Niobrara meeting the same day (February 19, 2016) Corps personnel (Mr. Matt McCullor, Mr. Joel Ames, and I) agreed to meet again with the SRST and CRST together.  Both Dr. Morgan and Mr. Vance wanted to discuss specific cultural resource issues of importance to their Tribes.  At that meeting, the SRST expressed concerns regarding Tribal cultural resources at the James River Crossing (SD PCN #4) and that cultural resources would be impacted by the HDD activities under a site which could contain burials.  Based on Tribal surveys of SD PCN #4 the USACE archeologist confirmed presence of cultural resources.  Upon USACE direction DAPL agreed to move the alignment.

25. I have reviewed Document 6-59 in Standing Rock Sioux Tribe v. United States Army Corps of Engineers, Case 1:16:cv-01534 JEB.  Document 6-59 is a map that reflects a previously-proposed alignment of the pipeline, SD PCN#4. USACE Corps Archeologist, Mr. Matt McCullor, surveyed the location depicted in Document 6-59 on March 18, 2016 in conjunction with Ms. Sara Childers, THPO for the Upper Sioux Community, and

identified cultural resources in the area.  Previous cultural surveys by the Applicant also identified cultural resources in the vicinity of the proposed pipeline alignment.  Based upon the results of that survey, I directed Dakota Access to realign the pipeline away from Tribal identified cultural resources.  Dakota Access rerouted the pipeline to the south so that it no longer traverses the location depicted in Document 6-59.  Mr. McCullor and Ms. Childers surveyed the new route on May 4, 2016 and identified no cultural resources.

26. There were four USACE meetings with the Standing Rock Sioux Tribe.  The first was held on the Tribal reservation at Fort Yates on January 22, 2016 between USACE personnel, Chairman Archambault, and other members of the SRST.  Colonel Henderson participated in three meetings with the SRST; the first on February 26, 2016, the second on April 29, 2016, and third on May 14, 2016.

27. In letters dated February 9, 2016 and March 15, 2016, the ACHP joined the DAPL Section 106 consultation effort as a consulting agency.  After this notice, the District copied the ACHP on all letters and emails to Tribes.

28. By letter dated March 2, 2016, USACE provided the Tribes, including the Standing Rock Sioux Tribe and the Cheyenne River Sioux Tribe, the opportunity to conduct surveys at PCN locations where the landowner allowed tribal access.  (Exhibit 13).  Some landowners specifically denied access to tribal members for surveys, but tribal surveys were made available at 7 of the 11 PCNs in North Dakota and South Dakota.  The Upper Sioux Tribe conducted tribal surveys for all North and South Dakota PCNs where access was allowed.  The Osage Tribe conducted surveys in other DAPL permit areas outside of Omaha District.

29. In a letter dated March 22, 2016, the Standing Rock Sioux Tribe acknowledged receipt of the USACE March 2, 2016 letter and urged the USACE to expand its review of the DAPL project  by redefining the area of potential impacts (APE) consistent with  36 CFR Section 800.16(d).  Their letter indicated that until 'genuine compliance' with Section 106 process DAPL occurred, the Standing Rock Sioux Tribe Historic Preservation Office would not send Traditional Cultural Specialists to participate in partial compliance efforts.  In my email response dated March 22, 2016, I acknowledged receipt of the Tribe's letter and detailed the rationale for the USACE definition of Permit Area and reiterate that the Corps has no jurisdiction outside the permit area.  I expressed regret that the Tribe declined the opportunity to participate in Tribal surveys, but welcomed any knowledge or information regarding historic properties, including sites of religious significance, that the Tribe would share with the USACE.  (Exhibit 14).

30. The SRST relented, however, and tribal representatives surveyed the Lake Oahe crossing with USACE archeologist Mr. Rick Harnois on March 7 and 22, 2016 and May 10, 2016.

31. By letter dated March 24, 2016, from the SRST to Lowry A. Crook, Principal Deputy Assistant Secretary for Civil Works and Colonel John Henderson, the SRST provided supplemental comments to the Draft Environmental Assessment on the Dakota Access Pipeline Project, Crossing of Flowage Easements and Federal Lands.  The USACE fully considered the SRST comments.

32. By letter dated May 17, 2016, the SRST provided objections and input to the USACE April 22, 2016 finding of No Historic Properties Subject to Affect."  In a letter dated June 2, 2016, the ACHP requested Ms. Jo-Ellen Darcy, Assistant Secretary of the Army for Civil Works (ASA(CW)) to review the Corps findings.  By letter dated June 13, 2016, I

confirmed receipt of SRST letter and provided a recent Question and Answer summary.

Additionally I committed to provide the Ms. Darcy's response to the ACHP letter when I

received it.

33. By letter dated May 6, 2016, the ACHP provided additional questions relating to the

DAPL permit area, tribal consultation, consulting parties, timing, federal agency

coordination, and the next steps.  In a letter dated May 13, 2016, Colonel Henderson

provided a response, emphasized that consultation was still underway, and communicated

the Corps' commitment to fulfilling its obligations under Section 106.  (Exhibit 15).

34. By letter dated May 19, 2016 the Cheyenne River Sioux Tribe (CRST) provided

comments and concerns in response to the USACE April 22, 2016 finding of No Historic

Properties Subject to Affect."  By letter dated June 13, 2016, I confirmed receipt of the

tribe's letter and provided a Question and Answer summary to answer questions on

procedural and technical questions.

35. By letter dated June 2, 2016, to all tribes I provided additional information in response to

questions regarding the DAPL pipeline.  A copy of the letter went to the SRST and

CRST.

36. By letter dated June 3, 2016 the CRST objected to the DAPL project, indicated the

USACE Environmental Assessment failed to analyze issues regarding the protection of

the Tribe's cultural resources, and failed to initiate or satisfy its consultation obligations.

By letter dated June 22, 2016, I confirmed receipt of the tribe's letter and provided a

Question and Answer summary to answer procedural and technical questions.

37. Corps archeologist, Mr. Matt McCullor, reviewed the Applicant's cultural survey

information and, by Memorandum for the Record dated July 7, 2016, concluded there

was No Effect to historic properties as a result of any non-reporting PCN crossings. (Exhibit 16).

38. By letter dated June 30, 2016, the SRST provided additional comments regarding the Corps' consultation efforts and activities that may be occurring under NWP #12 crossings where pre-construction notifications were not required. By letter dated 25 July 2016, I provided a copy of Ms. Darcy's reply to the ACHP's letter, enclosed a Question and Answer summary to answer procedural and technical questions, and conveyed that USACE consultation with tribes is only required for activities that have the potential to affect historic properties of religious or cultural significance to tribes.

39. In response to tribal comments and concerns provided to the District during its Section 106 consultation efforts, the District made tribal monitoring during construction a condition of the North Dakota and South Dakota PCNs verifications. The seven tribes who provided input, Osage, Ponca, Cheyenne River Sioux Tribe, Flandreau Santee Sioux Tribe, Upper Sioux Tribe, Yankton Sioux Tribe, and SRST were invited by letter dated July 8, 2016 and provided the opportunity to send a tribal representative to participate in Tribal monitoring during pipeline construction. The CRST and SRST elected to participate. The NWP verifications required Dakota Access to provide the tribal representatives notice of 5 days and 48 hours before initiation of construction activities.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on   August 18, 2016                        .

CHIEPLY.MARTHA.S.1230524919  Digitally signed by CHIEPLY.MARTHA.S.1230524919
DN: c=US, o=U.S. Government, ou=DoD, ou=PKI, ou=USA, cn=CHIEPLY.MARTHA.S.1230524919
Date: 2016.08.18 16:57:06 -05'00'
_____, in Omaha, Nebraska.

Martha Chieply

15

Case 1:16-cv-01534-JEB  Document 21-18  Filed 08/18/16  Page 10 of 11

# EXHIBIT 1

Chiefly 0001



REPLY TO
ATTENTION OF

**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, OMAHA DISTRICT
1616 CAPITOL AVENUE
OMAHA NEBRASKA 68102-4901

NOV  9  2009

District Commander

Mr. Joseph Brings Plenty, Chairperson
Cheyenne River Sioux Tribe
PO Box 590
Eagle Butte, South Dakota  57625

Dear Mr. Brings Plenty:

The Omaha District is continuing its effort to strengthen our relationships and partnerships with the Tribes by sharing the following information about the U.S. Army Corps of Engineers (Corps) Regulatory Program. The Omaha District recognizes the government-to-government relationship with Tribes and views Tribal coordination as a unique and necessary process. We view Tribal coordination as a process for initiating and carrying out discussion between the Omaha District Staff and the Tribes in a manner that is meaningful to the Tribes and the Omaha District.

The Omaha Regulatory Office is currently contacting each Tribe to provide an early notification of the anticipated reissuance of Corps Nationwide Permits. Our intention is to provide information about the Nationwide Permits and the reissuance process to facilitate better understanding and streamline coordination. It is important to have this informational exchange at this time to help us gain insight into your vision and concerns about the Corps' Nationwide Permitting Program. Your viewpoints on this matter are important to us.

The Nationwide Permits are a type of General Permit issued at the national level that allows a streamlined review process for activities with small or low impacts. Oversight of the Nationwide Permits is within the authority of the Corps' Regulatory Program and is administered by the District Regulatory Offices. The District can modify the Nationwide Permits with regional conditions, or decide not to use all or part of the Nationwide Permits altogether.

The Corps published the reissuance of the Nationwide Permits in the Federal Register on March 12, 2007. Enclosed is a copy of the Nationwide Permits and their applicable general conditions. The Nationwide Permits expire on March 18, 2012. Prior to expiration, the Corps will publish in the Federal Register their proposal to reissue and modify the Nationwide Permits and solicit comments. This will most likely occur in early 2011. At that time, we will be coordinating the reissuance of the Nationwide Permits with federally recognized Tribes on actions that may impact cultural resources of importance to the Tribes. Enclosed is a graph which shows the types of activities that are most often authorized by a Nationwide Permit in the Omaha District.

- 2 -

Some of the Nationwide Permit activities require preconstruction notification to the Regulatory Offices prior to proceeding with the activity. For these activities, additional efforts will be made to assure that Tribes are consulted on geographic areas that are of Tribal interest prior to the Omaha District providing a letter of verification to the applicant that the project may go forward under a Nationwide Permit. However, in accordance with Nationwide Permit General Condition 18, Historic Properties, the Corps must notify the applicant within 45 days of receipt of a complete pre-construction notification whether National Historic Preservation Act, Section 106 consultation is required. Therefore, in order for the Omaha District to ensure compliance with General Condition 18, we would like to develop coordination procedures with you.

We are inviting you to participate in government-to-government consultation to coordinate our Nationwide Permit procedures. If you would like to meet with my staff to discuss coordination procedures, please contact Martha Chieply, Regulatory Branch Chief (402-995-2451), James Winters, Regulatory Specialist (701- 220-6152) or Joel Ames, Tribal Liaison (402-995-2909), to arrange a meeting date and location.

Sincerely,

SIGNED
COL ROBERT J. RUCH
Robert J. Ruch
Colonel, Corps of Engineers
District Commander

Goldsberry/CENWO-OD-RF

Thomas/CENWO-OD-RE

Chieply/CENWO-OD-R

Schenk/CENWO-OD

Ames/CENWO-SA-NA

Totten/CENWO-OC

O'Hara/CENWO-XA

Jones/CENWO-DD

Ruch/CENWO-DE

Enclosures

CF:
CENWO-OD-R (Winters)
CENWO-SA-NA (Ames)



REPLY TO
ATTENTION OF

**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, OMAHA DISTRICT
1616 CAPITOL AVENUE
OMAHA NEBRASKA 68102-4901

District Commander

Ms. Waste'Win Young, Acting THPO
Standing Rock Sioux Tribe
Administration Service Center, Building #1
North Standing Rock Avenue
Fort Yates, North Dakota 58538

Dear Ms. Young:

The Omaha District is continuing its effort to strengthen our relationships and partnerships with the Tribes by sharing the following information about the U.S. Army Corps of Engineers (Corps) Regulatory Program. The Omaha District recognizes the government-to-government relationship with Tribes and views Tribal coordination as a unique and necessary process. We view Tribal coordination as a process for initiating and carrying out discussion between the Omaha District Staff and the Tribes in a manner that is meaningful to the Tribes and the Omaha District.

The Omaha Regulatory Office is currently contacting each Tribe to provide an early notification of the anticipated reissuance of Corps Nationwide Permits. Our intention is to provide information about the Nationwide Permits and the reissuance process to facilitate better understanding and streamline coordination. It is important to have this informational exchange at this time to help us gain insight into your vision and concerns about the Corps' Nationwide Permitting Program. Your viewpoints on this matter are important to us.

The Nationwide Permits are a type of General Permit issued at the national level that allows a streamlined review process for activities with small or low impacts. Oversight of the Nationwide Permits is within the authority of the Corps' Regulatory Program and is administered by the District Regulatory Offices. The District can modify the Nationwide Permits with regional conditions, or decide not to use all or part of the Nationwide Permits altogether.

The Corps published the reissuance of the Nationwide Permits in the Federal Register on March 12, 2007. Enclosed is a copy of the Nationwide Permits and their applicable general conditions. The Nationwide Permits expire on March 18, 2012. Prior to expiration, the Corps will publish in the Federal Register their proposal to reissue and modify the Nationwide Permits and solicit comments. This will most likely occur in early 2011. At that time, we will be coordinating the reissuance of the Nationwide Permits with federally recognized Tribes on actions that may impact cultural resources of

Chiefly 0004

- 2 -

Some of the Nationwide Permit activities require preconstruction notification to the Regulatory Offices prior to proceeding with the activity. For these activities, additional efforts will be made to assure that Tribes are consulted on geographic areas that are of Tribal interest prior to the Omaha District providing a letter of verification to the applicant that the project may go forward under a Nationwide Permit. However, in accordance with Nationwide Permit General Condition 18, Historic Properties, the Corps must notify the applicant within 45 days of receipt of a complete pre-construction notification whether National Historic Preservation Act, Section 106 consultation is required. Therefore, in order for the Omaha District to ensure compliance with General Condition 18, we would like to develop coordination procedures with you.

We are inviting you to participate in government-to-government consultation to coordinate our Nationwide Permit procedures. If you would like to meet with my staff to discuss coordination procedures, please contact Martha Chieply, Regulatory Branch Chief (402-995-2451), James Winters, Regulatory Specialist (701- 220-6152) or Joel Ames, Tribal Liaison (402-995-2909), to arrange a meeting date and location.

Sincerely,

**SIGNED**
**COL ROBERT J. RUCH**
Robert J. Ruch
Colonel, Corps of Engineers
District Commander

Goldsberry/CENWO-OD-RF

Thomas/CENWO-OD-RB

Chieply/CENWO-OD-R

Schenk/CENWO-OD

Ames/CENWO-SA-NA

Totten/CENWO-OC

O'Hara/CENWO-XA

Jones/CENWO-DD

Ruch/CENWO-DE

Enclosures

CF:
CENWO-OD-R (Winters)
CENWO-SA-NA (Ames)

Chieply 0005

# EXHIBIT 2

Chieply 0006



**DEPARTMENT OF THE ARMY**
U.S. ARMY CORPS OF ENGINEERS
441 G STREET NW
WASHINGTON, D.C. 20314-1000

OCT 2 2 2010

CECW-CO

MEMORANDUM FOR ALL MAJOR SUBORDINATE COMMANDS, DISTRICT COMMANDS

SUBJECT: Tribal Consultation Procedures for the Reissuance of the Regulatory Community of Practice's Nationwide Permit Program (33 CFR 330)

C.D.R.₅

1. Purpose: To provide internal guidance for Tribal Consultation for the Reissuance of the Regulatory Program's Nationwide Permit Program.

2. Background:

   a. The United States Army Corps of Engineers, Headquarters, Regulatory Community of Practice (CoP) has begun the process of reissuing the Nationwide Permit Program (NWP). In accordance with regulation, the Corps is required to reissue its NWPs every five years. This process involves formal interagency vetting and rulemaking. The current NWPs were issued in 2007 and are scheduled to expire in March of 2012. In order to comply with our regulations and to ensure that the reissued NWPs are in place prior to the expiration of the 2007 NWPs, the HQUSACE Regulatory CoP has begun the rulemaking process. According to schedule, the Corps will submit the draft rule to the Office of Management and Budget in the fall of 2010.

   b. As part of this rulemaking process, the Corps is required, by law, to consult, on a government-to-government basis, with all federally recognized Tribal Nations. Such consultation is required by the National Historic Preservation Act as amended, the 1998 Department of Defense American Indian and Alaska Native Policy, and Corps Policy Guidance Letter 57.

3. Guidance:

   a. To comply with the requirements identified above, the Corps is preparing to initiate government-to-government consultation with Tribal Nations across the country. Through this consultation effort, we will openly engage the Tribes in the process to reissue the NWPs. I am also requesting that all Division and District commanders fully support this undertaking to ensure successful consultation. We will provide assistance through the HQUSACE Regulatory CoP by providing guidance to the Division and District Commanders on Tribal consultation procedures and protocol as it pertains to the NWP reissuance effort. Attached to this memorandum, please find a Regulatory Program Fact Sheet, a Nationwide Permit Program Fact Sheet and a draft template

Chiefly 0007

CECW-CO
SUBJECT: Tribal Consultation Procedures for the Reissuance of the Regulatory Community of
Practice's Nationwide Permit Program (33 CFR 330)

letter. I am asking that each District Commander identify the Tribal Nations in their district's
area of responsibility and prepare a letter, in accordance with the attached template, outlining the
rulemaking process and inviting formal consultation with the Tribes. The attached fact sheets
should accompany the letter.

b. As of the date of this memorandum, we are unable to provide the Tribes with a document
on which they could comment; however, we anticipate that we will be able to provide the Tribes
with a post-vetted copy of the draft Nationwide Permits *prior* to its publication in the Federal
Register. As we progress through the rulemaking process, we will continue to provide guidance
to the Divisions and Districts regarding consultation procedures and protocol and will provide
documents for review and comment as soon as they are available.

4. To facilitate this process, each District Commander should identify the Division and/or
District Tribal Liaison and a Regulatory point of contact. The Tribal Liaison and the Regulatory
contact should work together to develop a consultation protocol best suited for the Tribes in their
area of responsibility. Formal consultation will likely involve face-to-face meetings with the
Tribes located within Division/District boundaries. Every effort should be made to invite the
Tribes to participate in these meetings in order to ensure meaningful and effective consultation.

5. HQUSACE is actively engaged in this effort and will support the Divisions' implementation
of this extremely important endeavor. The point of contact for this action is Margaret Gaffney-
Smith at (202) 761-8560.

Encl

*Tranalled for your
support!*

WILLIAM T. GRISOLI
Major General, USA
Deputy Commanding General
 for Civil and Emergency Operations

## Olson, David B HQ02

| | |
|---|---|
| **From:** | Ensch, Michael G HQ02 |
| **Sent:** | Wednesday, October 27, 2010 12:57 AM |
| **To:** | CDL-All-Division-Commanders; CDL-All-District-DEs |
| **Cc:** | DLL-MSC-OPERATIONS CHIEFS; DLL-DISTRICT-OPERATIONS CHIEFS; CDL-REG-CHIEFS; Gaffney-Smith, Margaret E; Moyer, Jennifer A HQ02; Stockton, Steven L HQ02; Grisoli, William T MG HQ02; Stockdale, Earl H HQ02; Wood, Lance D HQ02 |
| **Subject:** | Reissuance of Regulatory Nationwide Permits: Memo to MSC Cdr's and DE's concerning Tribal Consultation |
| **Attachments:** | Tribal Consultation Procedures Memorandum 22 October 2010.pdf |

Commanders:

The attached memorandum, dated 22 Oct 10, is provided to support government to government consultation with Tribal nations across the country for Nationwide Permit (NWP) 2012 reauthorization.  The memorandum provides background on NWP rulemaking efforts, provides materials and a draft template for you to use to inform Tribal nations of the NWP 2012 reauthorization rulemaking process and invites formal consultation on this activity with the Tribes.

The Corps HQ Reg CoP is currently involved with OMB in the formal interagency vetting process.  When the OMB process is complete, the Regulatory CoP will prepare the federal register notice for the proposed NWPs.  Although we cannot provide the proposed document to the Tribes at this time, we anticipate that we will be able to provide the Tribes with a post-vetted copy of the proposed NWPs PRIOR to its publication in the Federal Register.

As we progress through the rulemaking process, we will continue to provide guidance to all of you and your Regulatory team regarding consultation procedures and protocol and will provide the relevant documents for review and comment as soon as they are available.

Your attention to this important element of our NWP renewal process is appreciated.

Regards,

Mike

Michael G. Ensch, SES
Chief, Operations & Regulatory CoP
  and Lakes & Rivers Division RIT
HQUSACE, CECW-LRD
441 G St, NW    Rm 3E92
Washington, DC  20314

Work (202) 761-1983
Cell (703) 386-6102

Chieply 0009



**DEPARTMENT OF THE ARMY**
Insert Letterhead

REPLY TO
ATTENTION OF

District Commander                          DATE


TRIBAL NATION CONTACT/THPO
ADDRESS

Dear:

The U.S. Army Corps of Engineers (Corps) is continuing our effort to strengthen our relationships and partnerships with the Tribes by sharing the following information about the Corps Regulatory Program. The Corps recognizes the importance of government-to-government relationship with Tribes and views Tribal coordination as a unique and necessary process for initiating and carrying out discussions between Corps Staff and the Tribes, in a manner that is meaningful to the Tribes and the Corps.

The INSERT DISTRICT Office is currently contacting each Tribe within our area of responsibility to provide an early notification of the anticipated reissuance of the Corps Nationwide Permits. Our intention is to provide information about the Nationwide Permit Program and what is involved in the reissuance process to facilitate a better understanding of the program. It is important to have this informational exchange at this time to help us gain insight into your vision and concerns about the Corps Nationwide Permit Program. Your viewpoints on this matter are important to us.

Nationwide Permits are a type of General Permit issued at the national level that provides a streamlined review process for activities with minimal impacts on the aquatic environment. Oversight of the Nationwide Permit Program is within the authority of the Corps Regulatory Program and is administered by the individual District Regulatory Offices. Districts can modify the Nationwide Permits by adding with regional conditions, or, they may decide not to use all or part of the Nationwide Permits based on region-specific issues and/or concerns.

The current Corps Nationwide Permits were published in the Federal Register on March 12, 2007. Enclosed is a copy of the Nationwide Permits and their applicable general conditions. By regulation, the Nationwide Permits must be reissued every five years. The reissuance process involves an opportunity for agency, Tribal and public review and comment. The current Nationwide Permits will expire on March 18, 2012. Prior to expiration, the Corps will publish, in the Federal Register, its proposal to reissue and/or modify the Nationwide Permits and will solicit comments. This will most likely occur in early 2011. At that time, we will be coordinating the reissuance of the Nationwide Permits with federally recognized Tribes on actions that may impact cultural resources of importance to the Tribes, and for 401 water quality certification for Tribes that have that responsibility.

We will soon be inviting you to participate in government-to-government consultation to coordinate our Nationwide Permit procedures.  If you would like to meet with me or my staff to discuss coordination procedures, please contact INSERT CHIEF, Regulatory Branch Chief at to arrange a meeting date and location.

<div style="margin-left:40%">

Sincerely,



DISTRICT COMMANDER
Colonel, Corps of Engineers
District Commander

</div>

Enclosures

# REGULATORY PROGRAM OVERVIEW

- The Corps Regulatory Program implements Section 10 of the Rivers and Harbors Act of 1899 and Section 404 of the Clean Water Act.

- The Regulatory Program typically receives over 90,000 permit applications per year.

- The Corps is neither a proponent nor an opponent of any permit proposal.

- The Corps supports the national goal of balancing the need for economic development with the need to protect the aquatic environment.



- Authorization of work performed within waters of the U.S. can fall within one of several types of permits. The two most common are Nationwide Permits and Individual Permits.

- Nationwide Permits authorize activities that have minimal effect on the aquatic environment.

- Individual permits are required for those projects that exceed the minimal thresholds set up in the Nationwide Permits. A public notice is issued to solicit public interest review along with other federal, state, Tribal and local agencies' comments.

- Regulators have between 45 to 120 days to complete their reviews.

- The Regulatory Program adheres to the Corps' Tribal Policy Principles [http://www.usace.army.mil/CECW/TribalIssues/Pages/tribal_policy.aspx].



- The Regulatory Program has a responsibility to comply with the National Historic Preservation Act, the 1998 Department of Defense American Indian and Alaska Native Policy, and Corps Policy Guidance Letter 57.The Regulatory Program continues to search for ways to involve Tribes in programs, projects and other activities that would enhance communication and collaboration on permit actions in an effort to minimize adverse impacts to resources important to the Tribes.

Chiefly 0012

**UNITED STATES ARMY CORPS OF ENGINEERS**
**REGULTORY PROGRAM**
**REISSUANCE OF NATIONWIDE PERMITS**
**GOVERNMENT TO GOVERNMENT CONSULTATION**

- The U.S. Army Corps of Engineers (Corps) is continuing its effort to strengthen our relationships with the Tribes as it pertains to the Regulatory Program and the **Nationwide Permits**.

- **Nationwide permits** are a type of general permit issued by the Chief of Engineers that are intended to regulate with little, if any, delay or paperwork, certain activities having minimal impacts. Per regulation, the Nationwide Permits must be reissued every five years. The reissuance process involves a full interagency and public interest review.

- Our intention, as an agency, is to collaborate with the Tribes regarding the **Nationwide Permit Program** and the reissuance process to facilitate better information exchange.

- The current **Nationwide Permits** will expire on March 18, 2012.



- Prior to expiration, the Corps will publish its proposal to reissue and modify the Nationwide Permits and solicit comments. This will occur in early 2011. Tribes may follow the reissuance process by accessing either their local District or Corps Headquarters websites (found below).

- The Corps Districts will continue to coordinate on the reissuance of the **Nationwide Permits** with each federally recognized Tribe on actions that may affect resources of importance to the Tribes.

- Some **Nationwide Permit** activities require a preconstruction notification to the Corps prior to proceeding with an activity. For those activities, additional efforts will be made to ensure that Tribes are consulted on activities that would occur within geographic areas that are of Tribal interest.

Corps Headquarters, Regulatory http://www.usace.army.mil/CECW/Pages/cecwo_reg.aspx

Chiefly 0013

# EXHIBIT 3

Chiefly 0014



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, OMAHA DISTRICT
1616 CAPITOL AVENUE
OMAHA NEBRASKA 68102-4901

REPLY TO
ATTENTION OF

FEB 16 2011

District Commander

Mr. Charles W. Murphy, Chairman
Standing Rock Sioux Tribe
P.O. Box D
Fort Yates, North Dakota 58538

Dear Mr. Murphy:

Later this month, the U.S. Army Corps of Engineers (Corps) will publish its proposal to reissue the Nationwide Permits (NWPs) in the Federal Register. The Corps NWPs are developed pursuant to Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act of 1899.

In November 2009, I provided you with information pertaining to the Corps' Regulatory Program and the NWPs. The Corps is very pleased to be able to provide you the proposed NWPs prior to their publication in the Federal Register, along with information comparing the current NWPs with the proposed NWPs. We are also providing you a copy of the Omaha District's proposed draft regional conditions.

Please consider this letter our invitation to begin consultation on the proposal to reissue the NWPs. We look forward to consulting with you on a government-to-government basis on this issue, in accordance with the Department of Defense American Indian and Alaska Native Policy. Please let me know if you are interested in consulting and the extent to which you wish to participate. We will provide a Corps representative at consultation and fact-finding meetings, and we will fully consider any information you wish to provide. Please advise me if you wish to enter into consultation and how best to proceed to address tribal rights and resources, at the address above.

If you have any questions, or if we can be of further assistance, please feel free to contact Mr. Joel Ames, Tribal Liaison at (402) 995-2909; or by email at Joel.O.Ames@usace.army.mil; or Mr. James Winters, at (701) 250-4280; or by email at James.L.Winters@usace.army.mil.

Sincerely,

Robert J. Ruch
Colonel, Corps of Engineers
District Commander

Enclosures
As stated

Chiefly 0015

Copies Furnished:

Mr. Mike Faith, Vice Chairman
Standing Rock Sioux Tribe
P.O. Box D
Fort Yates, North Dakota 58538

Mr. Troy Davis, Director
Standing Rock Sioux Tribe
Tribal Environmental Protection Agency
P.O. Box D
Fort Yates, North Dakota 58538

Mr. Waste'Win Young, THPO
Standing Rock Sioux Tribe
Cultural Program
P.O. Box D
Fort Yates, North Dakota 58538



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, OMAHA DISTRICT
1616 CAPITOL AVENUE
OMAHA NEBRASKA 68102-4901

REPLY TO
ATTENTION OF

FEB 1 6 2011

District Commander

Mr. Kevin Keckler, Chairman
Cheyenne River Sioux Tribe
P.O. Box 590
Eagle Butte, South Dakota 57625

Dear Mr. Keckler:

Later this month, the U.S. Army Corps of Engineers (Corps) will publish its proposal to reissue the Nationwide Permits (NWPs) in the Federal Register. The Corps NWPs are developed pursuant to Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act of 1899.

In November 2009, I provided you with information pertaining to the Corps' Regulatory Program and the NWPs. The Corps is very pleased to be able to provide you the proposed NWPs prior to their publication in the Federal Register, along with information comparing the current NWPs with the proposed NWPs. We are also providing you a copy of the Omaha District's proposed draft regional conditions.

Please consider this letter our invitation to begin consultation on the proposal to reissue the NWPs. We look forward to consulting with you on a government-to-government basis on this issue, in accordance with the Department of Defense American Indian and Alaska Native Policy. Please let me know if you are interested in consulting and the extent to which you wish to participate. We will provide a Corps representative at consultation and fact-finding meetings, and we will fully consider any information you wish to provide. Please advise me if you wish to enter into consultation and how best to proceed to address tribal rights and resources, at the address above.

If you have any questions, or if we can be of further assistance, please feel free to contact Mr. Joel Ames, Tribal Liaison at (402) 995-2909; or by email at Joel.O.Ames@usace.army.mil; or Mr. James Winters, at (701) 250-4280; or by email at James.L.Winters@usace.army.mil.

Sincerely,

Robert J. Ruch
Colonel, Corps of Engineers
District Commander

Enclosures
As stated

Chiefly 0017

- 2 -

Copies Furnished:

Mr. Ted Knife, Jr., Vice Chairman
Cheyenne River Sioux Tribe
P.O. Box 590
Eagle Butte, South Dakota 57625

Mr. David Nelson, Director
Cheyenne River Sioux Tribe
Environmental Protection
P.O. Box 590
Eagle Butte, South Dakota 57625

Ms. Donna Petersen, Director/THPO
Cheyenne River Sioux Tribe
Cultural Program
P.O. Box 590
Eagle Butte, South Dakota 57625

Mr. Carlyle Ducheneaux, Wetlands/Water Contact
Cheyenne River Sioux Tribe
Environmental Protection
P.O. Box 590
Eagle Butte, South Dakota 57625

Mr. Robert Walters
Cheyenne River Sioux Tribe
P.O. Box 590
Eagle Butte, South Dakota 57625

Chiefly 0018

Cheyenne River Sioux Tribe.txt
From:       Winters, James L NWO
Sent:       Thursday, March 08, 2012 2:45 PM
To:         'kevin.keckler@Yahoo.com'
Cc:         'cpadmin@lakotanetwork.com'; 'steve.vance@crst-nsn.gov';
'wildbio@lakotanetwork.com'; 'ndrdir@lakotanetwork.com';
'Halley.maynard@crst-nsn.gov'; Ames, Joel O NWO; Goldsberry, Cheryl S
NWO
Subject:       FW: U.S. Army Corps of Engineers - Nationwide Permit Reissuance -
(2012) -
(South Dakota) (Cheyenne River Sioux Tribe)
Attachments:    Tribal_Information_Fact_Sheet_NWP_8March2012.docx

This message is sent on behalf of Ms. Martha S. Chieply, Chief, Regulatory
Program, Omaha District, U.S. Army Corps of Engineers (USACE).

Honorable Chairman Keckler:

The Army Corps of Engineers has completed the 2012 nationwide permit
reauthorization process and the Omaha District has developed regional
conditions for the nationwide permits based on input from the Tribes,
agencies, and the public.  The final nationwide permits (NWPs) were published
in the Federal Register on February 21, 2012.  Based on discussions with our
stakeholders concerning the NWPs, we have finalized the regional conditions
that apply in Montana, North Dakota, South Dakota, Nebraska, Colorado, and
Wyoming to ensure the NWPs result in only minimal individual and cumulative
impacts and address the region-specific issues and/or concerns.  I am
providing a summary sheet entitled Tribal Information Fact Sheet, 2012
Nationwide Permits, dated March 7, 2012, which is attached to this email.

Additionally, information concerning the final NWPs can be found on the
Headquarters USACE website at
http://www.usace.army.mil/Missions/CivilWorks/RegulatoryProgramandPermits/Nati
onwidePermits.aspx.  This website contains the 2012 nationwide permits,
summary sheets, fact sheets, and the 2012 final decision documents.  In
addition, the final regional conditions that apply to Omaha District are
located on our district website at http://www.nwo.usace.army.mil/html/od-
r/regwebpg.htm.

We appreciate your effort in working with us throughout this process.  If you
would like to meet with our Regulatory staff to discuss the final nationwide
permits and regional conditions or if you have any questions, please contact
Mr. James Luther Winters, Regulatory Special Projects Manager at (701) 220-
6152,  Ms. Martha Chieply, Chief, Regulatory Branch at (402) 995-2451, or Mr.
Joel Ames, District Tribal Liaison at (402) 995-2909.

Respectfully,

James Luther Winters
Special Assistant, Regulatory/Operations U.S. Army Corps of Engineers, Omaha
(701) 220-6152
james.l.winters@usace.army.mil

Chieply 0019

Standing Rock Sioux Tribe.txt

From:       Winters, James L NWO
Sent:       Friday, March 09, 2012 1:12 PM
To:         'cwmurphy@standingrock.org'
Cc:         'wyoung@standingrock.org'; 'tclouthier@standingrock.org';
'troyalphonse@hotmail.com'; 'jkelly@standingrock.org';
'eironeyes@standingrock.org'; Ames, Joel O NWO; Goldsberry, Cheryl S
NWO
Subject:        FW: U.S. Army Corps of Engineers - Nationwide Permit Reissuance -
(2012) -
(North Dakota) (Standing Rock Sioux Tribe)
Attachments:    Tribal_Information_Fact_Sheet_NWP_8March2012.docx

This message is sent on behalf of Ms. Martha S. Chieply, Chief, Regulatory
Program, Omaha District, U.S. Army Corps of Engineers (USACE).

Honorable Chairman Murphy:

The Army Corps of Engineers has completed the 2012 nationwide permit
reauthorization process and the Omaha District has developed regional
conditions for the nationwide permits based on input from the Tribes,
agencies, and the public.  The final nationwide permits (NWPs) were published
in the Federal Register on February 21, 2012.  Based on discussions with our
stakeholders concerning the NWPs, we have finalized the regional conditions
that apply in Montana, North Dakota, South Dakota, Nebraska, Colorado, and
Wyoming to ensure the NWPs result in only minimal individual and cumulative
impacts and address the region-specific issues and/or concerns.  I am
providing a summary sheet entitled Tribal Information Fact Sheet, 2012
Nationwide Permits, dated March 7, 2012, which is attached to this email.

Additionally, information concerning the final NWPs can be found on the
Headquarters USACE website at
http://www.usace.army.mil/Missions/CivilWorks/RegulatoryProgramandPermits/Nati
onwidePermits.aspx.  This website contains the 2012 nationwide permits,
summary sheets, fact sheets, and the 2012 final decision documents.  In
addition, the final regional conditions that apply to Omaha District are
located on our district website at http://www.nwo.usace.army.mil/html/od-
r/regwebpg.htm.

We appreciate your effort in working with us throughout this process.  If you
would like to meet with our Regulatory staff to discuss the final nationwide
permits and regional conditions or if you have any questions, please contact
Mr. James Luther Winters, Regulatory Special Projects Manager at (701) 220-
6152,  Ms. Martha Chieply, Chief, Regulatory Branch at (402) 995-2451, or Mr.
Joel Ames, District Tribal Liaison at (402) 995-2909.

Respectfully,

James Luther Winters
Special Assistant, Regulatory/Operations U.S. Army Corps of Engineers, Omaha
(701) 220-6152
james.l.winters@usace.army.mil

Chieply 0020

# EXHIBIT 4

Chiepiy 0021

 **DAKOTA ACCESS, LLC**



**VIA EMAIL AND U.S MAIL**

December 24, 2014

Mr. Jason Renschler, Project Manager
U.S. Army Corps of Engineers
Omaha District – North Dakota Regulatory Office
1513 South 12th Street
Bismarck, North Dakota 58504
Jason.J.Renschler@usace.army.mil

Re:    **Pre-Construction Notification for Nationwide Permit 12 and Section 10
       Crossing Application
       Dakota Access Pipeline Project, North Dakota**

Dear Mr. Renschler:

Dakota Access, LLC in coordination with Merjent, Inc. submits this letter and the attached information as a pre-construction notification (PCN) for Nationwide Permit 12 (NWP) for Utility Line Activities and Section 10 crossing application. The Dakota Access Pipeline Project (DAPL Project) traverses parts of North Dakota, South Dakota, Iowa, and Illinois for a total length of approximately 1,150 miles. Dakota Access proposes to construct approximately 358 miles of a 12- to 30-inch-diameter pipeline, pump stations at tank terminal facilities, and other ancillary facilities in North Dakota. The operator of the DAPL Project will be DAPL-ETCO Operations Management, LLC. The enclosed information only pertains to the facilities in North Dakota, specifically in Mountrail, Williams, McKenzie, Dunn, Mercer, Morton, and Emmons Counties (**Attachment 1**).

To assist you in your evaluation of this preconstruction notification and Section 10 application, the following sections provide a general Project description; a summary of field assessments conducted for the Project to date; a description of the proposed construction procedures; and a summary of impacts on Waters of the United States (WOUS) requiring a PCN. Dakota Access is requesting a jurisdictional determination (JD) as part of this PCN and Section 10 submittal; the JD form is included as an attachment, as referenced below. Attached you will also find:

1:    **Project Mapping**
      a.  Project Overview Maps
      b.  Site-specific PCN Review Area Crossing Maps
      c.  Typical Right-of-Way Configuration Drawings
2:    **PCN Delineation Details**
      Wetland Delineation Memorandum (Data Sheets and Photo Log)
3:    **Engineering Form 4345 (Section 10 and PCNs)**
4:    **Jurisdictional Form (ND COE Omaha District Format)**
5:    **Table 2 PCN Crossing Table**
6:    **Threatened and Endangered Species Summary Memorandum**
7:    **Cultural Resources PCN Summary Memorandum**

Chiefly 0022

Dakota Access Pipeline Project                NWP 12 PCN and Section 10, NORTH DAKOTA

Permittee:                                    Environmental Consultant:
Dakota Access, LLC                            Merjent, Inc.
c/o Monica Howard                             c/o Jim Arndt
1300 Main Street, Room 14.030                 800 Washington Avenue, Suite 315
Houston, TX 77002                             Minneapolis, MN 55401
713-989-7186                                  612-924-3987
Monica.Howard@energytransfer.com              jarndt@merjent.com

## NOTIFICATION

In accordance with General Condition 31 (Notification) of the U.S. Army Corps of Engineers (USACE) nationwide permit program and State of North Dakota NWP Regional Conditions (2012) for NWP 12; Dakota Access is required under NWP 12 to submit a PCN to the USACE because the following criteria are met: the activity will involve mechanized land clearing in forested wetlands, crossing a Section 10 waterbody, impacts on features will exceed 500 feet, a utility line is placed within, or parallel to a stream bed of a Water of the United States, there will be a loss of greater than 1/10th of an acre in a Water of the United States, a permanent access road crossing will be greater than 500 feet in a Water of the United States, and permanent access roads will be constructed using impervious materials in Water of the United States. Project impacts are provided herein and in the attachments to this submittal. **Table 1** summarizes impacts to wetlands and waterbodies.

| Table 1<br>Summary of Wetland and Waterbody Impacts | | | | | |
|---|---|---|---|---|---|
| State | Feature Type | Construction Impacts | | Conversion of PFO to PSS/PEM | |
| | | Number of Features Impacted | Acreage/ linear feet | Number of Features Converted | Acreage |
| North Dakota | PFO | 0 | 0 ac | 4 | 0.96 ac |
| | PEM | 7 | 10.12 ac | 0 | 0 ac |
| | PSS | 0 | 0 ac | 0 | 0 ac |
| | Streams | 4 | 6,675 LF [a] | 0 | 0 LF |
| | Ponds | 1 | 0.9 ac | 0 | 0 ac |

[a] All PCN streams in North Dakota will be crossed using HDD crossing methods.

2

Chiefly 0023

## PROJECT DESCRIPTION

The pipeline facilities associated with the Project in North Dakota will involve the construction and operation of approximately 358 miles of new 12- to 30-inch-diameter pipeline, pump stations located within tank terminal facilities, and other ancillary facilities. In North Dakota, the Project consists of two main pipeline components (Supply Line and Mainline) and six (6) tank/pump stations, and spans seven North Dakota counties. The Supply Line pipe diameter will range from 12 to 30 inches, and the Mainline will be 30 inches in diameter. The Supply Line route, which will commence near Stanley and head west and then south around Lake Sakakawea, ultimately terminates at Johnson's Corner west of Watford City. This approximate 148-mile-long Supply Line will connect six (6) planned tank facilities and pump stations. At Johnson's Corner, the Supply Line terminates and the 30-inch-diameter Mainline commences heading in a general southeast direction approximately 210 miles before crossing the state line at the Emmons County, ND/Campbell County, SD border. The Project then traverses South Dakota, Iowa, and Illinois, terminating in Patoka, where it will interconnect with the existing tank hub and to the Energy Transfer Crude Oil Pipeline Project.

The proposed pipelines will be constructed primarily through agriculture and open land as well as some industrial, residential, and forest land uses. The PCN areas crossed by the Project are located within the Buford, Cannon Ball, Stanley, Westfield, Herreid NW, and Lost Bridge U.S. Geological Survey topographic quadrangles.

### Purpose and Need

The DAPL Project's purpose is to move an economical, abundant, reliable, and domestic supply of crude oil from the Bakken and Three Forks production region in North Dakota to a crude oil market hub located near Patoka, Illinois. The Dakota Access Pipeline is being designed to safely carry 570,000 bpd or more of light sweet crude (approximately 450,000 bpd initially) through the states of North Dakota, South Dakota, Iowa, and Illinois and ultimately terminating in Patoka, Illinois. From the Patoka hub, the crude oil will be transported by other pipelines to refineries located in the Midwest and the Gulf Coast where 80 percent of the U.S. refining capabilities exist today to further our Country's goal of energy independence.

Dakota Access has secured binding long-term transportation and deficiency contracts from multiple committed shippers to support development of the Dakota Access Pipeline with a crude oil transportation capacity of approximately 450,000 bpd, with ninety percent (90%) of the transportation capacity subscribed by those committed shippers and the remaining ten percent (10%) of the transportation capacity reserved for walk-up shippers. Transportation service on the Dakota Access Pipeline shall be provided by Dakota Access pursuant to the Interstate Commerce Act and in accordance with the rules and regulations of the Federal Energy Regulatory Commission for common carrier crude oil pipeline transportation service thereunder. Subscriptions from committed shippers were obtained by Dakota Access in connection with an initial open season that ran from March 12 to May 23, 2014, and an expansion open season that commenced on September 23, 2014, and will conclude in December of 2014.

3

Chiefly 0024

In addition to moving the crude from the production region, the project purpose can be summed up in four major categories:

1. First, the DAPL Project will improve overall safety to the public and environment. It will reduce crude oil shipped by truck and by rail and increase the amount shipped by pipeline. Pipelines are the safest and most efficient means to transport crude oil, according to statistics compiled by the United States Department of Transportation. Pipelines are heavily regulated and are subject to intense scrutiny and oversight. Time and time again, pipelines have proven to be the safest and most reliable form of transporting oil.

2. Second, the DAPL Project will play a role in increasing America's energy independence. The pipeline is a means to transport domestic produced crude oil to support United States consumers' energy demand. The United States still imports half of the oil it consumes per day, and the pipeline will provide a critical link to help close the gap between what we produce as a country and what we consume.

3. Third, the DAPL Project will create another reliable transportation route for crude oil from the Bakken. The Bakken and Three Forks production area has witnessed a significant increase in the production of crude oil, from 309,000 bpd in 2010 to more than 1 million bpd in 2014. Through the DAPL Project, Midwest and Gulf Coast refineries will have better access to more reliable United States crude oil production to be used to meet United States consumers' need for gasoline, diesel fuel, and other petroleum products.

4. Finally, the DAPL Project will ease transportation constraints for agricultural products. The DAPL Project will free-up rail capacity for the transportation of crops and other commodities currently held up by crude oil cargos. For example, a lack of rail capacity to move grain out of South Dakota has resulted in tariffs on grain railcars increasing from $50 to nearly $1,400 per car. These cost increases can carve up to $1.00 from every bushel of corn shipped.

The pipeline will not only provide a long term safe, reliable and energy efficient option to move crude oil out of the Bakken and Three Forks production area to continue to enhance America's energy independence, it will also provide direct benefits to communities located along and near the DAPL Project route. These benefits will include, but are not limited to, providing: temporary construction employment; full time, local jobs to operate and maintain the pipeline; ROW payments; additional sales tax revenues from the sale of goods and services during construction and long term to operate and maintain the pipeline; annual State and local community revenue from property taxes; and long term support of regional contractors, manufacturers, distributers, and retailers through ongoing purchase of goods and services to operate and maintain the DAPL Project.

Briefly, the DAPL Project will deliver domestically produced crude oil from the abundant Bakken and Three Forks production area to United States refineries where the crude oil will be refined into products to meet consumers' need for fuels (e.g., gasoline, diesel, and kerosene), and after further processing, for crude oil derivative products (e.g., plastics, paints, and chemicals). The overall DAPL Project is a $3.78 billion dollar investment directly impacting the local, regional, and national labor force by creating nearly 12,000 construction jobs. As a matter of practice and our promise as part of

Chiefly 0025

this project, Dakota Access will utilize American labor to build the pipeline. Dakota Access has teamed up with the various craft and labor unions in the project regions and nationally to ensure the DAPL Project is constructed by highly qualified and experienced local and regional labor resources. These well-paying construction jobs will create considerable labor income and state income tax revenue – including the generation of more than $13.4 million in ad valorem taxes. Upon authorization, the DAPL Project will put welders, mechanics, electricians, pipefitters, heavy equipment operators, and others within the heavy construction industry to work.

Construction of the DAPL Project will also contribute more than $1 billion in direct spending just for materials – the majority of which will be purchased here in the United States. Fifty-seven percent of the pipe, the majority of the valves, fittings, valve actuators, and the majority of the remaining materials will be manufactured in the United States, creating significant opportunities for regional and national manufacturing. In addition to manufactured goods and services, the DAPL Project will provide $195 million in easement payments to the landowners whose property is crossed by the proposed pipeline.

Overall, the DAPL Project's purpose is to provide an efficient, safe, and reliable transportation solution to move crude oil from the Bakken and Three Forks production areas to United States markets, which meets the need to improve United States energy independence and provide a more reliable supply of crude oil to United States refineries for processing to meet domestic needs for fuels and other petroleum derivative products. It also has tremendous secondary and sustainable economic benefits to the United States by supporting energy independence, increasing employment opportunities, and adding to demand in many manufacturing sectors, which will be a boost to the overall economy. When considering the economic impact and benefit, once United States workers are employed on the DAPL Project, consistent with most mega-infrastructure projects, the workers will spend their earnings in the communities where they work and live, resulting in multiplied economic impacts that will be nearly $5 billion just during the construction phase. This economic impact will affect manufacturing in many domestic sectors such as the following examples. It will result in new vehicles being purchased, which positively impacts the auto industry. It will result in new homes being built, which improves and increases the housing construction, resale, and lending business located in the region and across the United States. It impacts the food industry by requiring more food services and products to be delivered and consumed in the DAPL Project region. The list could continue with a description of many secondary benefits, but in summary, the economic impact to the United States as well as the immediate region where the pipeline is located is tremendous and critical to keep Americans employed and our economy moving forward.

### Pipeline Facilities

Construction of the new pipeline will require a typical construction right-of-way (ROW) width of 125 feet in uplands, 100 feet in non-forested wetlands, 85 feet in forested areas (wetlands and uplands), and up to 150 feet in agricultural areas. Typical ROW configurations are indicated in **Attachment 1e**. For non-forested wetlands, the construction ROW will be split into a 50-foot working side and 50-foot spoil side through the wetland area. In forested wetlands, the construction ROW will also have a 50-foot working side, but a reduced 35-foot spoil side. Following construction, a 50-foot-wide permanent easement will be retained in all the above described circumstances, in forested wetlands, only 30 of these 50 feet will be maintained in an herbaceous state in an effort to minimize impacts.

Chiefly 0026

### Additional Temporary Workspace (ATWS)

Where necessary, Dakota Access will utilize ATWS outside of their construction ROW to facilitate specialized construction procedures, such as horizontal directional drills (HDDs); railroad, road, wetland, waterbody, and foreign utility line crossings; areas where topsoil segregation is required; tie-ins with existing pipeline facilities; areas with steep side slopes; and pipeline crossovers. These ATWS will be allowed to revert to pre-existing conditions following construction activities, so there will be no permanent impacts on these areas. ATWSs proposed to facilitate wetland and waterbody crossings are depicted on the drawings provided for review in **Attachment 1b**. Dakota Access understands that these ATWSs will be part of the permit limits established by the USACE.

### Staging & Contractor Yards

During construction of the pipeline, the contractor will require off-ROW areas for the storage of pipe and equipment necessary for construction of Project facilities. These staging and contractor yards will be near the Project at locations with convenient and safe access to the Project areas. While these areas have not been identified at this early design stage, effort will be taken to identify and select yards that have been previously disturbed by human activity but do not have an ongoing land use that would preclude Project usage. In the unlikely event that any of these locations require PCN, Dakota Access will provide respective information to the USACE.

### Access Roads

Dakota Access will utilize existing public and private roads to access the pipeline ROW and aboveground facilities to the extent practicable. Existing roads utilized will include paved, gravel, or pasture roads, and other conveyances. Some roads will require modification or improvement to facilitate safe access for construction equipment and personnel. The Project may require construction of new temporary and permanent roads to provide access to the new pipeline both during construction and for future pipeline maintenance activities. Access roads have not been thoroughly defined during this early design phase, but in the unlikely event any of these roads would require PCN, Dakota Access will provide respective information to the USACE.

### Aboveground Facilities

Aboveground facilities associated with the Project include six new pump stations (located within planned tank terminal facilities for the Project), pigging facilities (launchers and receivers), and multiple mainline valve locations in North Dakota. Dakota Access is sighting these facilities outside of WOUS. In the event any of these locations require PCN, Dakota Access will provide respective information to the USACE.

Chieply 0027

## PROJECT IMPACT SUMMARY

Dakota Access has evaluated the Project route for WOUS as well as threatened and endangered species and cultural resources. These evaluations are described below.

### Waters of the United States, Section 10 Crossings, Crossings greater than 500 feet, and Crossing within, or Parallel to Streambeds

Wetland and waterbody delineations of the proposed route in areas where survey permission was granted by landowners was conducted by Merjent, Inc. in accordance with the USACE Wetland Delineation Manual (Technical Report Y-87-1) and Regional Supplement to the Corps of Engineers Wetland Delineation Manual: Great Plains Region (Version 2.0). Wetlands and waterbodies along the route were identified during the field delineation, and a list of features requiring PCN is provided in **Table 1**. A wetland delineation memo is included in **Attachment 2**, which provides results of field surveys in 2014 for PCN areas. The two Section 10 crossings (e.g., Missouri River PCN Review Area 2 and Lake Oahe PCN Review Area 4) are also PCNs. Completed USACE Engineering Form 4345 for each PCN is included in **Attachment 3**. Additionally, an overall ND DAPL Project Jurisdictional Form is attached in **Attachment 4**.

National Wetland Inventory (NWI) and National Hydrography Dataset (NHD) data sets, along with aerial interpretation, topography, and soils evaluation, were used to identify potential PCN areas where survey permission was not granted. To supplement this analysis on tracts where access has not been granted, Dakota Access intends to fly the route and provide LiDAR information to aid in your review of the Project. It is estimated that the LiDAR will be available in March 2015; Dakota Access will supplement this application as needed based on our evaluation of that data.

The proposed Project workspace crosses 18 features requiring PCN in North Dakota within 5 total review areas. Of the 18 features crossed by the Project, 10 are being avoided via HDD based on the current design. A summary of the Project's wetland and waterbody impacts in North Dakota is provided in **Attachment 5 – Table 2**.

### Threatened and Endangered Species

An analysis regarding threatened and endangered species habitat was performed for the Project in areas where desktop analysis indicated presence of applicable habitat, where survey permission was granted by landowners, and within the survey season window in 2014. Habitat surveys were conducted for the Project, and the results of these surveys are provided in the attached threatened and endangered (T&E) summary memorandum (**Attachment 6**). Eight federally listed species are listed within the Project area in North Dakota. Of these, suitable habitat is present for four species within some of the PCN Review Areas (see **Attachment 5 – Table 2**). The Project would have *no effect* on or is *not likely to adversely effect*, three of these species (i.e., piping plover, least tern, and pallid sturgeon) given the employment of particular construction methods and/or use of timing restrictions. Dakota Access has been working with the multiple U.S. Fish & Wildlife Service (USFWS) field offices to define the process for consultations on this Project; the USFWS Rock Island field office has been determined the lead USFWS office. Dakota Access will copy your office on any USFWS correspondence related to this Project.

Chiefly 0028

### Cultural Resources

Phase I cultural resource assessments were conducted for potentially jurisdictional areas on the Project (e.g., PCNs) where survey permission was granted by landowners, and within the survey season window in 2014. Surveys were performed in accordance with Appendix C of 33 CFR Part 325, Section 106 of the National Historic Preservation Act of 1966 (Public Law [PL] 89-665), as amended; it's implementing regulations, "Protection of Historic and Cultural Properties" (36 CFR 800); the National Environmental Policy Act of 1969 (PL 91-190. 83 Stat. 852); and the guidelines set forth by the North Dakota State Historic Preservation Office (ND SHPO).

The objectives of the Phase I cultural resource assessment are as follows: confirm known and previously recorded cultural sites within the survey corridor (400 feet wide, 200 feet on either side of proposed pipeline alignment); locate cultural resource sites within the permit area as defined by the USACE; delineate the vertical and horizontal extent of any newly identified sites; relocate and/or evaluate previously identified sites recorded with the ND SHPO; provide a preliminary evaluation of each site's eligibility for listing in the National Register of Historic Places; and assess the potential for the Project to affect historic properties or other sensitive cultural resources.

In summary, the construction workspaces within PCN Review Area 1 has been surveyed for cultural resources and does not contain archaeological sites. Therefore, it is the opinion of Merjent that the proposed undertaking will have no effect on NRHP-eligible sites in these areas, and recommends that no additional archaeological investigations of PCN Review Area 1 is warranted.

Archaeological resources are present at PCN Review Areas 2. It is anticipated that impacts to these sites will be avoided through HDD construction methodology and use of exclusion fencing during construction.

Archeological analysis is complete at PCN Area 4, previously recorded sites were not relocated within the project footprint and no additional sites were found. It is the opinion of Merjent that the proposed undertaking will have no effect on NRHP-eligible sites in this area, and recommends no additional archaeological investigation of PCN Review Area 4.

Archaeological survey is incomplete at PCN Review Areas 3 and 5. Therefore, Merjent recommends inventory of those areas according to the guidelines in the North Dakota SHPO Guidelines Manual for Cultural Resource Inventory Projects, Revised Edition (2012). It is anticipated that this will take place in 2015 as soon as conditions are suitable. Results will be promptly provided to supplement this report.

A detailed summary of the findings and memorandum to the ND SHPO are provided as **Attachment 7**.

Chieply 0029

## CONSTRUCTION PROCEDURES

All facilities associated with the Project will be designed, constructed, tested, operated, and maintained in accordance with the U.S. Department of Transportation (DOT) regulations in Title 49 CFR Part 195. Dakota Access is currently developing Project-specific plans and will implement Best Management Practices (BMPs) to mitigate for potential construction-related impacts associated with stormwater runoff. Additionally, Dakota Access will implement their Stormwater Pollution Prevention Plan (SWPPP), Spill Prevention Control and Countermeasure Plan (SPPC Plan), and their Horizontal Directional Drill (HDD) Contingency Plan for inadvertent release of drilling mud during HDD construction work at wetland and waterbody crossings to protect sensitive resources from such releases. The Project will be constructed via a combination of conventional and specialized construction procedures as described below.

### Clearing and Grading

Prior to commencement of ground-disturbing activities, a standard survey and stakeout will be conducted to identify ROW and workspace boundaries and to locate existing foreign utility lines within the construction ROW. Following the completion of the surveys, the construction ROW will be cleared of vegetation and debris. Within wetlands, stumps will be cut flush with the ground and left in place except where removal is necessary to facilitate the creation of a safe and level workspace. Cleared vegetation and debris along the ROW will be disposed of in accordance with federal, state, and local regulations either by burning, chipping and spreading, or transportation to a commercial disposal facility. Where necessary, to contain disturbed soils during clearing and grading in upland areas, and to minimize potential erosion and sedimentation of wetlands and waterbodies, temporary erosion control devices (ECDs) will be installed prior to initial ground disturbance and will be maintained throughout construction. Vegetative buffers will be left where practical at all wetland and waterbody crossings to limit the exposure and impact to these features. Final clearing would take place immediately prior to crossing the feature rather than advance.

### Trenching

Trenching involves excavation of a ditch for pipeline placement and is accomplished through the use of a trenching machine, backhoe, or similar equipment. Trench spoil will be deposited adjacent to each trench within the construction work areas with topsoil segregation utilized where necessary based on land use (see the typical ROW configuration drawings in **Attachment 1c**). In standard conditions, the trench will be excavated to an appropriate depth to allow for a minimum of 36 inches of cover over the pipe. Typically the bottom of the trench will be cut at least 12 inches greater than the width of the pipe. The width at the top of the trench will vary to allow the side slopes to adapt to local conditions at the time of construction.

### Pipe Stringing, Bending, and Welding

Following preparation of the trench, the new pipe will be strung and distributed along the ROW parallel to the trench. Depending on available workspace, some pipe may be fabricated off-site and transported to the ROW in differing lengths or configurations. Pipe will be bent by hydraulic bending machines, as necessary, to conform the pipe to the trench. Once in place along the ROW, pipe lengths

9

will be aligned, bends fabricated, and joints welded together on skids (i.e., temporary supports). Welding will be performed in accordance with the American Petroleum Institute Standards, DOT-PHMSA pipeline safety regulations, and company welding specifications. All welds will be coated for corrosion protection and visually and radiographically inspected to ensure there are no defects.

### Pipeline Installation and Trench Backfilling

Completed sections of pipe will be lifted off the temporary supports by side boom tractors or similar equipment and placed into the trench. Prior to lowering-in, the trench will be visually inspected to ensure that it is free of rock and other debris that could damage the pipe or the coating. Additionally, the pipe and the trench will be inspected to ensure that the configurations are compatible. Tie-in welding and pipeline coating will occur within the trench to join the newly lowered-in section with the previously installed sections of pipe. Following this activity, the trench will be backfilled with the previously excavated material and crowned to approximately 6 inches above its original elevation to compensate for subsequent settling.

### Waterbody Crossings

#### *Open-Cut*

Construction methods utilized at waterbody crossings are highly dependent on the characteristics of the waterbody encountered. Barring any sensitive resources or restrictions, the majority of minor and intermediate waterbodies will typically be crossed via the conventional open-cut method. This method employs the same general construction procedures that were described above for upland pipeline construction. Equipment will operate from the banks of the waterbody to the maximum extent practicable to excavate a trench. Flow will be maintained at all times. Excavated material from the trench will be placed on the bank above the ordinary high water mark for use as backfill. The pipe segment will be prefabricated and weighted, as necessary, to provide negative buoyancy and placed below scour depth. Typical backfill cover requirements will be met, contours will be restored within the waterbody, and the banks will be stabilized via seeding and/or the installation of erosion control matting or riprap. Excess excavated materials will be distributed in an upland area in accordance with applicable regulations.

Impacts on water quality will be minimized through the implementation of BMPs. The pipeline trench will be excavated immediately prior to pipe installation to limit the duration of construction within the waterbody to the extent practical. Excavated materials will be stored no less than 10 feet from the edge of the waterbody and temporary ECDs will be utilized to prevent the sediment from re-entering the waterbody.

#### *Flume*

The flume crossing method is an alternative to the open-cut method in which water flow is temporarily directed through one or more flume pipes placed over the excavation area. The use of the flume(s) allows trenching and pipeline installation to occur primarily under dry conditions without significant disruption of water flow.

Chieply 0031

### Dam and Pump

The dam and pump crossing method is similar to the flume crossing method in that it is an alternative to the open-cut method that allows trenching and pipeline installation to occur under relatively dry conditions with minimal impact to water flow. This method involves the temporary installation of dams (consisting of sandbags, bladders, or other impervious materials) upstream and downstream of the proposed crossing. Pumps are then used to dewater the excavation area and to transport the water flow around the construction work area.

### Horizontal Directional Drill (HDD)

The HDD method allows for construction across a feature without the excavation of a trench, by drilling a hole significantly below conventional pipeline depth, and pulling the pipeline through the pre-drilled hole. Dakota Access will utilize HDDs at several locations to avoid direct impacts to resources, such as wetlands and waterbodies, and/or to avoid areas in which constructability by conventional means is not feasible.

Depending on the HDD equipment utilized, to help guide the drill bit along the pipeline ROW, electric-grid wires may be laid along the predetermined HDD route. In thickly vegetated areas, a small path may be cut to accommodate laying the electric-grid guide wires (no large diameter vegetation would be cleared for this purpose). Once the electric grid guide wires are installed, the directional drilling rig will drill a small diameter pilot hole along the prescribed profile.

Following the completion of the pilot hole, reaming tools will be utilized to enlarge the hole to accommodate the pipeline diameter. The reaming tools will be attached to the drill string at the exit point and will then be rotated and drawn back to incrementally enlarge the pilot hole. During this process, drilling mud consisting of bentonite clay and water will be continuously pumped into the pilot hole to remove cuttings and maintain the integrity of the hole. When the hole has been sufficiently enlarged, a prefabricated segment of pipe will be attached behind the reaming tool on the exit side of the crossing and pulled back through the drill hole towards the drill rig.

### Wetland Crossings

As depicted on the enclosed typical construction drawings (**Attachment 1b**), the construction ROW width will be limited to 85 feet in PFO wetlands and 100 feet in PEM/PSS wetlands during construction activities. Operation of construction equipment through wetlands will be limited to only that necessary for each stage of pipe installation (e.g., clearing, trenching). Topsoil segregation techniques will be utilized in unsaturated wetlands to preserve the seed bank and allow for expedited successful restoration of the disturbed area.

### Conventional Lay

Wetland crossings for the Project may be accomplished via the conventional lay method in accordance with all applicable permit conditions. Construction techniques for this method are similar to the open-cut method in upland areas; however, top soil segregation techniques will be utilized to facilitate revegetation following the completion of construction activities. In some cases, site-specific conditions may not support construction equipment, but the area is still proposed for the conventional lay crossing method. In these instances construction mats will be used to minimize disturbances to wetland hydrology and maintain soil structure.

Chieply 0032

## AVOIDANCE, MINIMIZATION, AND MITIGATION

Due to the length of the proposed Project, impacts on all WOUSs, including wetlands, could not be avoided. Dakota Access performed a thorough routing analysis incorporating greater than 50 data sets in an effort to avoid and minimize impacts resulting from the Project while optimizing the route. Following this initial effort, the route was further refined to avoid and minimize crossing regulated features based on aerial interpretation and flight reconnaissance. Additionally, as field surveys were performed, additional minor route deviations were incorporated to increase our avoidance and minimization of impacts. The HDD crossing method is proposed to avoid 7 wetlands and 3 waterbodies as depicted in **Table 3.**

As previously noted, Dakota Access will reduce the construction ROW width from 125-150 feet in uplands to 85-100 feet in all wetlands to minimize Project impacts. All areas disturbed by construction, excluding aboveground facilities and some access roads, will be restored to preconstruction contours and conditions. While a 50-foot permanent easement will be secured along the pipeline, only 30 feet will be maintained via routine mowing in compliance with federal regulations in forested wetlands to reduce the long-term impacts on these features.

Dakota Access is proposing no net loss of wetlands as result of the Project. Dakota Access proposes to mitigate for the permanent conversion of PFO wetlands to herbaceous/scrub shrub wetlands and will continue to work with USACE to determine the appropriate type and quantity of mitigation for the Project's impacts. All impacts on waterbodies and PEM/PSS wetlands will be temporary in nature as these features will be returned to pre-construction conditions upon completion of the Project; and therefore no mitigation is proposed for these impacts.

| Table 3 | | | |
|---|---|---|---|
| Features Avoided Through Design or HDD | | | |
| Dakota Access Pipeline Project (North Dakota) | | | |
| County | HUC | Feature Name | Feature Type |
| Williams/ McKenzie | 10110101 Lake Sakakawea | w-d-wi-011 | PFO |
| | | w-d-wi-012 | PEM |
| | | w-d-wi-013 | PFO |
| | | w-d-wi-014 | PEM |
| | | s-k2-mk-001 | R2UB |
| Dunn | 10110205 Lower Little Missouri | w-d-du-001 | PFO |
| | | w-d-du-002 | PEM |
| | | s-d-du-001 | R2UB |
| | | w-d-du-003 | PFO |
| Morton/Emmons | 10130102 Upper Lake Oahe | s-d-mo-010 | R2UB |

Chiefly 0033

Dakota Access Pipeline Project                    NWP 12 PCN and Section 10 - NORTH DAKOTA

## AUTHORIZATION REQUEST

As outlined above, the proposed Project will impact a total of 3 waterbodies and 14 wetlands in North Dakota. Additionally, only two Section 10 waterbodies – the Missouri River (Williams and McKenzie Counties) and the Missouri River/Lake Oahe (Morton and Emmons Counties) – would be crossed via HDD with no impact below the ordinary high water mark. The affected WOUSs that require a PCN under NWP 12 are indicated in **Attachment 2**, which details the following information: waterbody/wetland ID, wetland/waterbody type, location, impact acreages, and Section 10 or 404 classifications. The attached Project mapping depicts the PCN features located within the Project area as well as the location of each crossing (see **Attachment 1**).

This letter and its attachments constitute the PCN and Section 10 crossings for the proposed Project in North Dakota. Dakota Access appreciates your efforts to review and process this request for authorization. Proposed construction for this Project is scheduled to begin in January 2016 so your timely review of this application is appreciated.

If we can be of any assistance during your review, please do not hesitate to contact Monica Howard at 713-898-8222, 713-989-7186 or monica.howard@energytransfer.com or Jim Arndt at 612-924-3987 or jarndt@merjent.com.

Sincerely,

**Dakota Access, LLC**                                    **Merjent, Inc.**

Monica Howard                                            Jim Arndt
Director Environmental Sciences                          Senior Permit Analyst


cc:    Martha Chieply, Chief of Regulatory Programs, USACE Omaha District


Attachments:  1  Project Mapping (Project Overview Maps, Site-Specific Crossing Drawings, and
                 Typical ROW Configuration Drawings
              2  PCN Delineation Details (PCN Impact Tables, Wetland Delineation Memorandum)
              3  Engineering Form 4345 (Section 10 and PCNs)
              4  Preliminary Jurisdictional Form (ND COE Omaha District Format)
              5  Table 2 PCN Crossing Table
              6  Threatened and Endangered Species Summary Memorandum
              7  Cultural Resources PCN Summary Memorandum

Chieply 0034

# EXHIBIT 5

Chiefly 0035



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, OMAHA DISTRICT
NORTH DAKOTA REGULATORY OFFICE
1513 SOUTH 12TH STREET
BISMARCK ND 58504-6640
February 5, 2015

[NWO-2014-2177-BIS]

Mr. James Arndt
Merjent, Inc.
800 Washington Avenue North, Suite 315
Minneapolis, Minnesota 55401

Dear Mr. Arndt:

We have assigned number **NWO-2014-2177-BIS** to your application, on behalf of Dakota Access, LLC, requesting Department of the Army (DA) authorization under Section 10 of the Rivers and Harbors Act and Section 404 of the Clean Water Act. Please reference this number when you write or call us regarding your application. ***Please note that this acknowledgement of receipt of your pre-construction notification does not authorize commencement of work on your activity***

The current project proposal consists of the construction of approximately 358-miles of new pipeline in North Dakota. This proposed project is located in several Sections, Townships and Ranges in portions of Mountrail, Williams, McKenzie, Dunn, Mercer, Morton and Emmons Counties, North Dakota. As currently proposed, the scope of the proposed project and associated impacts indicate that the application will be processed as a Nationwide Permit (NWP). To complete the evaluation of your proposal, the following information is required for a complete pre-construction notification:

(1) PCN Area 2: Based on information submitted, it appears that the entry/exit point for the proposed HDD on the South side of the Missouri River is located within a tributary drainage feature. Please provide site specific details (wetland delineation) regarding the workspace associated with this crossing.

(2) PCN Area 3: Please identify the workspace and any site specific details for the proposed HDD crossing of the Little Missouri River, including the entry and exit points.

(3) PCN Area 4: Please provide site specific information for the location of the workspace on each side of the proposed HDD of the Missouri River, Lake Oahe crossing. Based on information submitted, it appears there is tributary drainage system(s) that may be impacted by the large workspace required to prepare and stage the approximate 5,500-linear foot segment of pipeline for this Missouri River, Lake Oahe crossing.

(4) PCN Area 5: In order to determine the wetland impacts associated with this proposed crossing, we are requesting that a field delineation be completed on the identified impact area, in accordance with the 1987 USACE Wetland Delineation Manual and USACE March 2010 Regional Supplement: Great Plains Region (Version 2.0). Once this information is received, a jurisdictional determination will be completed for the area, as requested in your pre-construction notification.

In addition, the two Missouri River crossings in North Dakota will require further review by the Corps Planning and Operations Branches, e.g., Real Estate Easement and Section 408 reviews. It is our understanding that these are currently being completed. It is also this offices understanding that geo-technical investigative borings will likely be completed at each of the proposed Missouri River crossings. Please be advised that pending on the exact details and locations of those borings, a Corps Regulatory NWP verification may also be required prior to conducting that work.

It is requested that the additional information be provided to this office within 60 days of the date of this letter (**April 6, 2015**). Please note that should you fail to provide the requested information or request additional time to gather the information prior to the 60-day time frame, this office will assume you no longer wish to pursue the project and the pre-construction notification will be withdrawn. If we can be of further assistance or should you have any questions regarding our program, please do not hesitate to contact this office by letter or phone at (701) 255-0015 ext. 2010.

Sincerely

Jason Renschler
Project Manager
North Dakota Regulatory Office

CF: Dakota Access, LLC (Monica Howard)

Chiefly 0037

# EXHIBIT 6

Chiefly 0038

CENWO-OD-RND (1200a)                                      April 3, 2015

MEMORANDUM FOR: CENWO-OD-OA-N (Phillip Sheffield)

SUBJECT:    Regulatory response to Dakota Access, LLC (DAPL), Geotechnical borings for
            proposed pipeline crossing of Lake Oahe.
            Project no. NWO-2014-2177-BIS.

1. Attached is the final Section 10/404 Regulatory determination for the Dakota Access pipeline
project, proposed geotechnical borings in Lake Oahe. The borings will be conducted in
Sections 10 and 11, Township 134 North, Range 79 West, Emmomns County, North Dakota.

2. Questions regarding this determination should be directed to Jason Renschler, Project
Manager, from this office.

3. For your action.


                                        Jason Renschler
                                        Regulatory Project Manager
                                        North Dakota


Enclosure
- 1 NWP w/Fact Sheet conditions.



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, OMAHA DISTRICT
NORTH DAKOTA REGULATORY OFFICE
1513 SOUTH 12TH STREET
BISMARCK ND 58504-6640

April 1, 2015

North Dakota Regulatory Office

[NWO-2014-2177-BIS]
Regcenter/255-0015

Ms. Monica Howard
Dakota Access, LLC
1300 Main Street
Houston, Texas 77002

Dear Ms. Howard:

We have reviewed your request for Department of the Army (DA) authorization for the proposed geotechnical borings in the Lake Oahe Reservoir, outside the main channel of the Missouri River. These borings are associated with the Dakota Access Pipeline project for the proposed Missouri River - Lake Oahe crossing. Project includes conducting four geotechnical borings in the lake bed utilizing pontoon-mounted, truck mounted and / or all-terrain drilling equipment with barge or platform equipment. Bore holes would range in depth of approximately 50 to 200 feet below ground surface. Once borings are complete, each borehole will be backfilled with cement-bentonite and all casings removed. The borings will be located on Lake Oahe lands at approximate Missouri River mile 1270.0, in Sections 10 and 11, Township 134 North, Range 79 West, Emmons County, North Dakota.

We have prepared a preliminary jurisdictional determination (JD) for the site which is a written indication that the waters in the project area may be jurisdictional waters of the United States. Such waters have been treated as jurisdictional for purposes of computation of impacts and compensatory mitigation requirements. If you concur with the preliminary JD, please sign it and return it to the letterhead address. If you believe the preliminary JD is inaccurate, you may request this office complete an approved JD prior to commencement of any work in waters of the US. An approved JD is an official determination regarding the presence or absence of such waters. Completion of an approved JD may require coordination with the US Environmental Protection Agency.

If you do not want the Corps to complete an approved JD, you may proceed with the proposed geotechnical boring projects in accordance with the terms and conditions of DA Nationwide Permit No. 6 found in the February 21, 2012 Federal Register (77 FR 10184), Reissuance of Nationwide Permits. Enclosed is a fact sheet that fully describes this Nationwide Permit and lists the General, Regional and Water Quality Certification Conditions that must be adhered to for this authorization to remain valid.

Chiefly 0040

This determination is applicable only to the permit program administered by the US Army Corps of Engineers. It does not eliminate the need to obtain other applicable Federal, State, Tribal and local permits as required. Please note that deviations from the original plans and specifications of the project could require additional authorization from this office.

Dakota Access, LLP is responsible for all work accomplished in accordance with the terms and conditions of this nationwide permit. If a contractor or other authorized representative will be accomplishing the work authorized by this nationwide permit, it is recommended that they be provided a copy of this letter and the attached conditions so that they are aware of the limitations of the nationwide permit. Failure to comply with all the terms and conditions of this authorization, including the Regional Conditions for NWP #12, may result in an enforcement action.

In compliance with General Condition 30, you are required to submit the following project compliance certification within thirty (30) days of project completion. [Please check all applicable statements.]

[ ] I certify that I have completed the project as permitted.
[ ] I certify that I have completed a modified version of the project.
[ ] I certify that I have completed all required mitigation.


**Permittee's Signature:**_____**Date:**_____


This verification will be valid until **March 18, 2017**. If the nationwide permit is modified, suspended, or revoked prior to this date, but is reissued without modification or the activity complies with any subsequent modification, this authorization remains valid until the expiration date. All of the existing nationwide permits are scheduled to be modified, reissued, or revoked prior to March 18, 2017. It is incumbent upon you to remain informed of changes to the nationwide permits. We will issue a public notice when the nationwide permits are reissued. Furthermore, if you commence or are under contract to commence this activity before the date that the relevant nationwide permit is modified or revoked, you will have twelve (12) months from the date of the modification or revocation to complete the activity under the present terms and conditions.

The Omaha District, North Dakota Regulatory Office is committed to providing quality and timely service to our customers. In an effort to improve customer service, please take a moment to complete out Customer Service Survey found on our website at http://corpsmapu.usace.army.mil/cm_apex/f?p=regulatory_survey. If you do not have Internet access, you may call and request a paper copy of the survey that you can complete and return to us by mail or fax.

Chiesly 0041

If you have any questions concerning this determination, please contact Mr. Jason Renschler of this office by letter or telephone at (701) 255-0015 and reference Nationwide Permit number **NWO-2014-2177-BIS**.

Sincerely,

Daniel E. Cimarosti
Regulatory Program Manager
North Dakota

Enclosure
 - Fact Sheet #6
 - preliminary JD

CF: CENWO-OD-OA (Bismarck/Gabrysh)
     CENWO-RE-C (Bismarck/Kuhn)

Chieply 0042

# EXHIBIT 7

Chiefly 0043



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, OMAHA DISTRICT
1616 Capitol AVE
OMAHA, NEBRASKA 68102-9000

SEP 3, 2015

District Commander

Cheyenne River Sioux Tribe
Mr. Harold Frazier, Chairman
PO Box 590, 2001 North Main St
Eagle Butte, SD 57625

Dear Chairman Frazier:

    The U.S. Army Corps of Engineers (Corps) Regulatory Branch has received
Preconstruction Notifications (PCNs) associated with the proposed Dakota Access
Pipeline Project (DAPL).   The proposed approximate 1,150-mile, 30-inch diameter,
crude oil pipeline would extend from Stanley, North Dakota through South Dakota and
Iowa to a delivery point at Patoka, Illinois.  The purpose of this letter is to initiate Section
106 consultation and review, determine your interest in consulting on this undertaking
for those portions subject to the Corps jurisdiction, and to gather information that will
assist the Corps in identifying historic properties.

    The majority of the proposed 1,150-mile pipeline would be located in upland areas
not requiring Corps authorization under Sections 10 or 404, and over which the Corps
does not have control or responsibility.  The Corps has regulatory authority and
responsibility for those portions of the pipeline that require authorization under Section
10 of the Rivers and Harbors Act (33 U.S.C. 401 et seq.) and Section 404 of the Clean
Water Act (33 U.S.C. 1344).  When linear projects cross a single or multiple water
bodies several times at separate and distant locations, each crossing is considered a
single and complete project for purposes of nationwide permit authorization. Under our
Regulatory authority, we are currently evaluating 209 single and complete crossings
requiring PCN's.  The locations of the PCN areas are enclosed along with an overall
DAPL fact sheet, points of contact and maps. DAPL has voluntarily started
archaeological surveys for the project.  The Cultural Resource Inventory Reports that
have been submitted to the Corps are available at the following ftp location
 ftp://ftp.perennialenv.com/  (User: EnergyTransfer, password: DAPL). Besides those
provided at the FTP site, the Corps will make those survey results available to Section
106 consulting parties for review and comment as DAPL provides them.

    The  Corps will consult on those areas comprising the waters of the United States
that will be directly affected by the proposed work or structures and uplands affected as
a result of authorizing the work or structures.  Corps regulations implementing the
National Historic Preservation Act may be found at 33 C.F.R. 325, App. C.

Subparagraph 1.g.(1) defines the "permit area" as those areas comprising waters of the United States that will be directly affected by the work or structure, and uplands directly affected as a result of the authorization of the work or structure.  Activities undertaken

outside the waters of the United States must meet all of 3 requirements set out in subparagraphs 1.g.(1)(i.)-(iii). Crossings of Section 10 navigable waters include the Missouri, James, Des Moines, Mississippi, and Illinois rivers. DAPL is also currently working with the Districts to obtain the necessary easements for crossing federal lands, as well as modifications of Corps projects pursuant to Section 14 of the Rivers and Harbors Act Appropriation Act of 1899 (33 U.S.C. § 408) (Section 408).

The DAPL project crosses 3 Corps Districts (Omaha, Rock Island and St. Louis). While each district will make permit decisions for those proposed regulated crossings in their district, the Omaha District is the lead Corps District in its oversight role in all coordination, permit evaluation, and compliance activities. Regulatory points of contact are Martha Chieply, Omaha District Regulatory Chief Martha.S.Chieply@usace.army.mil ; (402) 995-2451 and Jason Renschler, Project Manager Jason.J.Renschler@usace.army.mil ; (701) 255-0015, ext 2010. Please note that previous consultation on the project has also been initiated as part of the Corps Section 408 review process for the areas located on Corps Project Lands.

Please let the Corps know if you would like to consult on this undertaking. In addition, the Corps requests information that will assist us in identifying historic properties. The Corps would like to know if you have any knowledge or concerns regarding historic properties, including sites of religious importance, at the project locations you would like the Corps to consider. If there are any known Traditional Cultural Properties within those areas, please notify us by September 30, 2015. The Corps will treat any information provided with the greatest confidentiality.

We request your engagement and/or comments by September 30, 2015. If you are interested in participating in consultation for this proposal or desire additional information, please contact Mr. Joel Ames, Tribal Liaison Joel.O.Ames@usace.army.mil (402) 945-2909. Should you have site specific concerns regarding the project please contact Roberta Hayworth (St. Louis District) Roberta.L.Hayworth@usace.army.mil (314) 331-8833 or Ron Deiss (Rock Island District) Ronald.W.Deiss@usace.army.mil (309) 794-5185.

Sincerely,

John W. Henderson, P.E.
Colonel, Corps of Engineers
District Commander









**DAPL Project
South Dakota**

Page 3

DAKOTA ACCESS, LLC
Chieply 0050

DAPL Terminals

Dakota Access Pipeline

Project Counties

Project States

1 inch = 50 miles

Miles
0    25    50

Service Layer Credits: Sources: Esri, HERE,
DeLorme, USGS, Intermap, increment P

South
Dakota





| | A | B | C | D | E |
|---|---|---|---|---|---|
| 1 | Mile | Longitude | Latitude | County | WOUS |
| 2 | State of North Dakota - Omaha District | | | | |
| 3 | 6.34 | -102.477 | 48.292 | Mountrail | Unnamed Tributary |
| 4 | 16.55 | -102.859 | 47.6021 | Dunn | Little Missouri River |
| 5 | 96.78 | -103.9057 | 47.9601 | Williams | Missouri River |
| 6 | 164.89 | -100.5871 | 46.4386 | Morton | Lake Oahe/Missouri River |
| 7 | 204.81 | -100.1361 | 46.001 | Emmons | Unnamed Tributary |
| 8 | | | | | |
| 9 | State of South Dakota - Omaha District | | | | |
| 10 | 256.72 | -99.48468 | 45.4822 | Edmunds | Unnamed Wetland |
| 11 | 310.6 | -98.70515 | 45.0023 | Spink | Unnamed Wetland |
| 12 | 315.74 | -98.65283 | 44.9416 | Spink | Unnamed Wetland |
| 13 | 315.88 | -98.65067 | 44.9396 | Spink | Unnamed Wetland |
| 14 | 348.11 | -98.27189 | 44.6138 | Beadle | James River |
| 15 | 348.94 | -98.25483 | 44.6132 | Beadle | Unnamed Wetland |
| 16 | 363.19 | -98.00938 | 44.5371 | Beadle | Shue Creek |
| 17 | 371.12 | -97.90718 | 44.4533 | Beadle | Middle Pearl Creek |
| 18 | 385.96 | -97.69944 | 44.3041 | Kingsbury | Redstone Creek |
| 19 | 391.83 | -97.6172 | 44.2462 | Kingsbury | Rock Creek |
| 20 | 395.14 | -97.56862 | 44.2122 | Kingsbury | Unnamed Wetland |
| 21 | 415.83 | -97.31892 | 43.9849 | Lake | East Fork Vermillion River |
| 22 | 421.85 | -97.23034 | 43.9268 | Lake | Unnamed Wetland |
| 23 | 430.21 | -97.13393 | 43.8381 | McCook | Unnamed Wetland |
| 24 | 430.86 | -97.13119 | 43.8291 | McCook | Unnamed Wetland |
| 25 | 478.48 | -96.58128 | 43.3699 | Lincoln | Unnamed Wetland |
| 26 | 481.79 | -96.52635 | 43.345 | Lincoln | Big Sioux River |
| 27 | | | | | |
| 28 | States of Iowa & Illinois - Rock Island District | | | | |
| 29 | 497.3 | -96.267 | 43.233 | Sioux, IA | PFO Wetland |
| 30 | 497.9 | -96.258 | 43.232 | Sioux, IA | PFO Wetland |
| 31 | 546.5 | -95.511 | 42.827 | Cherokee, IA | PFO Wetland |
| 32 | 639.5 | -93.966 | 42.169 | Boone, IA | PFO Wetland/Des Moines R. |
| 33 | 685.3 | -93.307 | 41.77 | Jasper, IA | PFO Wetland |
| 34 | 693 | -93.191 | 41.712 | Jasper, IA | PEM Wetland>500' |
| 35 | 702.9 | -93.05 | 41.634 | Jasper, IA | PFO Wetland |
| 36 | 735.9 | -92.573 | 41.337 | Mahaska, IA | PEM Wetland>500' |
| 37 | 736.1 | -92.568 | 41.333 | Mahaska, IA | PEM Wetland>500' |
| 38 | 737 | -92.56 | 41.325 | Mahaska, IA | PEM Wetland>500' |
| 39 | 739.1 | -92.533 | 41.305 | Mahaska, IA | PFO Wetland |
| 40 | 766.8 | -92.176 | 41.038 | Jefferson, IA | PFO Wetland |
| 41 | 767.3 | -92.174 | 41.031 | Jefferson, IA | PFO Wetland |
| 42 | 795.1 | -91.761 | 40.802 | Van Buren, IA | PFO Wetland |
| 43 | 777.1 | -92.042 | 40.941 | Jefferson, IA | PFO Wetland |
| 44 | 820.1 | -91.483 | 40.541 | Lee, IA | PFO Wetland |
| 45 | 825.5 | -91.409 | 40.488 | Lee, IA | PFO Wetland |
| 46 | 828 | -91.377 | 40.476 | Lee, IA | Mississippi River |
| 47 | 828 | -91.363 | 40.475 | Hancock, IL | Mississippi River |
| 48 | 856.5 | -90.9781 | 40.2067 | Hancock, IL | PFO Wetland |
| 49 | 857.5 | -90.9653 | 40.194 | Hancock, IL | PFO Wetland |
| 50 | 861 | -90.9273 | 40.1535 | Adams, IL | Cultural Site |
| 51 | 862.5 | -90.9082 | 40.1357 | Schuyler, IL | PFO Wetland |
| 52 | | | | | |
| 53 | State of Illinois - St. Louis District | | | | |
| 54 | 882 | -90.763 | 39.967 | Brown | Trib to Dry Fork |
| 55 | 892 | -90.62 | 39.899 | Brown | Trib to Camp Creek |
| 56 | 896 | -90.597 | 39.839 | Brown | Unnamed Ditch |
| 57 | 896.5 | -90.594 | 39.834 | Brown | Unnamed Ditch |
| 58 | 898 | -90.584 | 39.811 | Brown | Il River |
| 59 | 898 | -90.583 | 39.81 | Brown | IL River |
| 60 | 898.5 | -90.58 | 39.808 | Brown | IL River |
| 61 | 900.5 | -90.551 | 39.788 | Scott | Unnamed Ditch |
| 62 | 900.5 | -90.55 | 39.788 | Scott | Coon Run |
| 63 | 900.5 | -90.549 | 39.788 | Scott | Coon Run |
| 64 | 900.5 | -90.549 | 39.787 | Scott | Coon Run |
| 65 | 956 | -89.82 | 39.286 | Macoupin | Macoupin Creek |
| 66 | 1008 | -89.163 | 38.863 | Fayette | Kaskaskia |
| 67 | 1010 | -89.144 | 38.847 | Fayette | Wetland Kaskaskia |
| 68 | 1010 | -89.144 | 38.847 | Fayette | Cassar Creek |
| 69 | 1010 | -89.141 | 38.843 | Fayette | Wetland Steve Creek |

Chieply 0053



# Dakota Access Pipeline
## Permitting Process in Illinois

## U.S. ARMY CORPS OF ENGINEERS

**Congressional Districts:** IL-13, 15, 18

## BUILDING STRONG®

### Description

Dakota Access, LLC, is proposing to construct an 1,134-mile pipeline system to carry up to 570,000 barrels per day of U.S. light sweet crude (450,000 barrels per day initially) from the rapidly expanding Bakken and Three Forks production region of North Dakota through the states of North Dakota, South Dakota, Iowa and Illinois terminating at a crude oil hub near Patoka, Illinois, with various potential points of destination along the pipeline. The pipeline crosses four states within the boundaries of three U.S. Army Corps of Engineers Districts (Omaha District, Rock Island District, and St. Louis District).



### Pipeline Details in Illinois

The Dakota Access pipeline in Illinois will consist of approximately 177 miles of 30-inch diameter pipeline and one terminal to interconnect with existing pipelines in Illinois for shipment to processing facilities and refineries in the Midwest and the Gulf Coast to reach U.S. customers.

### Pipeline Right of Way and Footprint in Illinois

The Dakota Access pipeline will cross the counties of Hancock, Schuyler, Adams, Brown, Pike, Scott, Morgan, Macoupin, Montgomery, Scott, Fayette, and Marion counties. The expected terminal is in Patoka, Illinois. The pipeline will parallel existing pipelines, power lines or existing roads where possible. During construction, an additional 25 -100 feet of workspace may be needed adjacent to a 50-foot permanent easement. The pipeline will be covered by a minimum of 36 inches of soil and more if it crosses under roads, rivers, lakes or streams. On agricultural land, the pipeline will be buried under a minimum of 48 inches of soil, drain tiles will be crossed with a minimum of 24 inches of separation between the pipe and the drain tile, and topsoil will be segregated during construction to a minimum of 12 inches or in accordance with landowner requirements.

### U.S. Army Corps of Engineers' Role

The U.S. Army Corps of Engineers is not evaluating the complete 1,134-mile pipeline as its regulatory authority is limited to waters of the United States. If the entire pipeline was constructed in a stream, river, wetland, or other jurisdictional water body, the Corps would evaluate the construction of the entire pipeline. However, in the case of this pipeline, the majority of the pipeline is being constructed in uplands, outside of the Corps' regulatory authority.

The Corps is evaluating Dakota Access, LLC, permit requests for segments of the pipeline that cross waters of the United States. These crossings comprise a small percentage of the overall pipeline project. Department of the Army permits will be required under Section 404 of the Clean Water Act and Sections 10 and 408 of the Rivers and Harbors Act. Section 404 and/or Section 10 for crossings of waters of the United States (streams, rivers, wetlands), including navigable rivers such as the Missouri, Des Moines, Mississippi, and Illinois rivers; Section 408 for alteration, occupation or use of a Corps civil works project. The Corps' Omaha District evaluates permit requests in North Dakota and South Dakota. The Corps' Rock Island District evaluates permit requests in Iowa. The Rock Island and St. Louis Districts share permit evaluation authority in portions of Illinois.

Chieply 0054



# Dakota Access Pipeline
Permitting Process in Illinois

## U.S. ARMY CORPS OF ENGINEERS

**BUILDING STRONG**®

### Rock Island and St. Louis District's Role

The Rock Island and St. Louis Districts have received applications from Dakota Access, LLC, requesting verification of work in waters of the United States in association with construction of segments of the 30-inch diameter crude oil pipeline in Illinois within the Rock Island and St. Louis District's regulatory boundaries (50 miles within Rock Island District, 127 miles within St. Louis District).

In the information received, Dakota Access, LLC, is currently requesting verification, under Nationwide Permit (NWP) 12 (Utility Line Activities), for 15 areas involving crossings of regulated water bodies in Illinois including the Mississippi River and Illinois River (five areas within Rock Island District; ten areas within St. Louis District.) In accordance with Department of the Army regulations, we are evaluating each separate, and distant, water body crossing as a single and complete project, and will make final determinations regarding compliance of the activities with NWP 12 once our evaluation is complete. If any work in waters, including navigable rivers and wetlands, is authorized under NWP 12, such work must be completed according to the terms of the permit, as well as all general terms of the nationwide permits, regional conditions and any special conditions that are determined to be necessary. If any work in waters does not fall within the terms and conditions of NWP 12, the applicant will be advised of procedures for applying for an Individual Permit.

## Rock Island and St. Louis District's Permit Evaluation

The Districts will evaluate the water body crossings to ensure the construction activity does not adversely impact the water body. The Districts' evaluation will look at any impacts the crossing segments may have on navigation. The Corps does not regulate pipelines, or monitor and enforce compliance with pipeline safety regulations. These items may be addressed by the respective states and other federal agencies.

## Environmental Impact Statement

The Districts are evaluating the applicant's request to verify segments of the pipeline in Illinois under NWP 12. Activities authorized under the 2012 Nationwide Permits have been evaluated and documented in accordance with the National Environmental Policy Act with a finding of no significant impact; therefore, an Environmental Impact Statement is not required. If a segment does not meet the terms and conditions of NWP 12, that segment must be evaluated as an Individual Permit and an Environmental Assessment will be required.

## Public Comment

If pipeline segments are verified under NWP 12, there will not be a public comment period. If a segment does not meet the terms and conditions of NWP 12 and must be evaluated as an Individual Permit, there will be an opportunity to comment on that segment. Additional information regarding the U.S. Army Corps of Engineers' role in permitting the Dakota Access, LLC, pipeline can be obtained by contacting the appropriate Corps office.

North and South Dakota:

USACE, Omaha District
Regulatory Branch
8901 South 154th Street
Omaha, NE 68138-3635
Phone: (402) 896-0896

Iowa and Illinois:

USACE, Rock Island District
Regulatory Branch
Clock Tower Building
P.O. Box 2004
Rock Island, IL 61204-2004
Phone: (309) 794-5669

Illinois:

USACE, St. Louis District
Regulatory Branch
1222 Spruce Street
St. Louis MO 63103-2833
Phone: (314) 331-8575

UPDATE: February 10, 2015

**U.S. ARMY CORPS OF ENGINEERS – ROCK ISLAND DISTRICT**
www.mvr.usace.army.mil
**U.S. ARMY CORPS OF ENGINEERS – ST. LOUIS DISTRICT**
www.mvs.usace.army.mil



# Dakota Access Pipeline
### Permitting Process in Iowa

## U.S. ARMY CORPS OF ENGINEERS

**BUILDING STRONG.**

**Congressional Districts:** IA-2, 3, 4

## Description

Dakota Access, LLC, is proposing to construct an 1,134-mile pipeline system to carry up to 570,000 barrels per day of U.S. light sweet crude (450,000 barrels per day initially) from the rapidly expanding Bakken and Three Forks production region of North Dakota through the states of North Dakota, South Dakota, Iowa and Illinois terminating at a crude oil hub near Patoka, Illinois, with various potential points of destination along the pipeline. The pipeline crosses four states within the boundaries of three U.S. Army Corps of Engineers Districts (Omaha District, Rock Island District, and St. Louis District).



## Pipeline Details in Iowa

The Dakota Access pipeline in Iowa will consist of approximately 346 miles of 30-inch diameter pipeline and one pump station to interconnect with existing pipelines in Illinois for shipment to processing facilities and refineries in the Midwest and the Gulf Coast to reach U.S. customers.

## Pipeline Right of Way and Footprint in Iowa

The Dakota Access pipeline will cross the counties of Lyon, Sioux, O'Brien, Cherokee, Buena Vista Sac, Calhoun, Webster, Boone, Story (pump station location), Polk, Jasper, Mahaska Keokuk, Wapello, Jefferson, Van Buren, and Lee. The pipeline will parallel existing pipelines, power lines or existing roads where possible. During construction, an additional 25 -100 feet of workspace may be needed adjacent to a 50-foot permanent easement. The pipeline will be covered by a minimum of 36 inches of soil and more if it crosses under roads, rivers, lakes or streams. On agricultural land, the pipeline will be buried under a minimum of 48 inches of soil, drain tiles will be crossed with a minimum of 24 inches of separation between the pipe and the drain tile, and topsoil will be segregated during construction to a minimum of 12 inches or in accordance with landowner requirements.

## U.S. Army Corps of Engineers' Role

The U.S. Army Corps of Engineers is not evaluating the complete 1,134-mile pipeline as its regulatory authority is limited to waters of the United States. If the entire pipeline was constructed in a stream, river, wetland, or other jurisdictional water body, the Corps would evaluate the construction of the entire pipeline. However, in the case of this pipeline, the majority of the pipeline is being constructed in uplands, outside of the Corps' regulatory authority.

The Corps is evaluating Dakota Access, LLC, permit requests for segments of the pipeline that cross waters of the United States. These crossings comprise a small percentage of the overall pipeline project. Department of the Army permits will be required under both Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act for crossings of waters of the United States (streams, rivers, wetlands), including navigable rivers such as the Missouri River, Des Moines River, Mississippi River, and the Illinois River. The Corps' Omaha District evaluates permit requests in North Dakota and South Dakota. The Corps' Rock Island District evaluates permit requests in Iowa. The Rock Island and St. Louis Districts share permit evaluation authority in portions of Illinois.

Chieply 0056



# Dakota Access Pipeline

Permitting Process in Iowa

**U.S. ARMY CORPS OF ENGINEERS**        **BUILDING STRONG®**

## Rock Island District's Role

The Rock Island District has received an application from Dakota Access, LLC, requesting verification of work in waters of the United States in association with construction of segments of the 30-inch diameter crude oil pipeline across Iowa within the Rock Island District's regulatory boundaries.

In the information received, Dakota Access, LLC, is currently requesting verification, under Nationwide Permit (NWP) 12 (Utility Line Activities), for 17 areas involving crossings of regulated water bodies in Iowa including the Des Moines River and Mississippi River. In accordance with Department of the Army regulations, we are evaluating each separate, and distant, water body crossing as a single and complete project, and will make final determinations regarding compliance of the activities with NWP 12 once our evaluation is complete. If any work in waters, including navigable rivers and wetlands, is authorized under NWP 12, such work must be completed according to the terms of the permit, as well as all general terms of the nationwide permits, regional conditions and any special conditions that are determined to be necessary. If any work in waters does not fall within the terms and conditions of NWP 12, the applicant will be advised of procedures for applying for an Individual Permit.

## Rock Island District's Permit Evaluation

The Rock Island District will evaluate the water body crossings to ensure the construction activity does not adversely impact the water body. The District's evaluation will look at any impacts the crossing segments may have on navigation. The Corps does not regulate pipelines, or monitor and enforce compliance with pipeline safety regulations. These items may be addressed by the respective states and other federal agencies.

## Environmental Impact Statement

The Rock Island District is evaluating the applicant's request to verify segments of the pipeline in Iowa and Illinois under NWP 12. Activities authorized under the 2012 Nationwide Permits have been evaluated and documented in accordance with the National Environmental Policy Act with a finding of no significant impact; therefore, an Environmental Impact Statement is not required. If a segment does not meet the terms and conditions of NWP 12, that segment must be evaluated as an Individual Permit and an Environmental Assessment will be required.

## Public Comment

If pipeline segments are verified under NWP 12, there will not be a public comment period. If a segment does not meet the terms and conditions of NWP 12 and must be evaluated as an Individual Permit, there will be an opportunity to comment on that segment. Additional information regarding the U.S. Army Corps of Engineers' role in permitting the Dakota Access, LLC, pipeline can be obtained by contacting the appropriate Corps office.

North and South Dakota:

USACE, Omaha District
Regulatory Branch
8901 South 154th Street
Omaha, NE 68138-3635
Phone: (402) 896-0896

Iowa and Illinois:

USACE, Rock Island District
Regulatory Branch
Clock Tower Building
P.O. Box 2004
Rock Island, IL 61204-2004
Phone: (309) 794-5669

Illinois:

USACE, St. Louis District
Regulatory Branch
1222 Spruce Street
St. Louis MO 63103-2833
Phone: (314) 331-8575

UPDATE: February 10, 2015

**U.S. ARMY CORPS OF ENGINEERS – ROCK ISLAND DISTRICT**
CLOCK TOWER BUILDING – P.O. BOX 2004 – ROCK ISLAND, IL 61204
www.mvr.usace.army.mil

Chiefly 0057



# Dakota Access Pipeline
Permitting Process in North Dakota

## U.S. ARMY CORPS OF ENGINEERS

**BUILDING STRONG**●

**Congressional Districts:** ND-1

## Description

Dakota Access, LLC, is proposing to construct an 1,134-mile pipeline system to carry up to 570,000 barrels per day of U.S. light sweet crude (450,000 barrels per day initially) from the rapidly expanding Bakken and Three Forks production region of North Dakota through the states of North Dakota, South Dakota, Iowa and Illinois terminating at a crude oil hub near Patoka, Illinois, with various potential points of destination along the pipeline. The pipeline crosses four states within the boundaries of three U.S. Army Corps of Engineers Districts (Omaha District, Rock Island District, and St. Louis District).

## Pipeline Details in North Dakota

The Dakota Access pipeline in North Dakota would consist of approximately 143 miles of oil gathering pipelines and 200 miles of larger 30-inch diameter transmission pipeline to interconnect with existing pipelines in Illinois for shipment to processing facilities and refineries in the Midwest and the Gulf Coast to reach U.S. customers.

## Pipeline Right of Way and Footprint in North Dakota

The Dakota Access pipeline would start with a terminal in the Stanley area, and run west with five more terminals in Ramberg Station, Epping, Trenton, Watford City and Johnsons Corner before becoming a transmission line going through Williston, the Watford City area, south of Bismarck crossing the Missouri River again north of Cannon Ball. The pipeline will parallel existing pipelines, power lines or existing roads where possible. During construction, an additional 25 -100 feet of workspace may be needed adjacent to a 50-foot permanent easement. The pipeline will be covered by a minimum of 36 inches of soil and more if it crosses under roads, rivers, lakes or streams. On agricultural land, the pipeline will be buried under a minimum of 48 inches of soil, drain tiles will be crossed with a minimum of 24 inches of separation between the pipe and the drain tile, and topsoil will be segregated during construction to a minimum of 12 inches or in accordance with landowner requirements.

## U.S. Army Corps of Engineers' Role

The U.S. Army Corps of Engineers is not evaluating the complete 1,134-mile pipeline as its regulatory authority is limited to waters of the United States. If the entire pipeline was constructed in a stream, river, wetland, or other jurisdictional water body, the Corps would evaluate the construction of the entire pipeline. However, in the case of this pipeline, the majority of the pipeline is being constructed in uplands, outside of the Corps' regulatory authority.

The Corps is evaluating Dakota Access, LLC, permit requests for segments of the pipeline that cross waters of the United States. These crossings comprise a small percentage of the overall pipeline project. Department of the Army permits will be required under Section 404 of the Clean Water Act and Sections 10 and 408 of the Rivers and Harbors Act. Section 404 and/or Section 10 for crossings of waters of the United States (streams, rivers, wetlands), including navigable rivers such as the Missouri, Des Moines, Mississippi, and Illinois rivers; Section 408 for alteration, occupation or use of a Corps civil works project. The Corps' Omaha District evaluates permit requests in North Dakota and South Dakota. The Corps' Rock Island District evaluates permit requests in Iowa. The Rock Island and St. Louis Districts share permit evaluation authority in portions of Illinois.



# Dakota Access Pipeline
## Permitting Process in North Dakota

**U.S. ARMY CORPS OF ENGINEERS**                    **BUILDING STRONG.**

## Omaha District's Role

The Omaha District has received an application from Dakota Access, LLC, requesting verification of work in waters of the United States in association with construction of segments of the 30-inch diameter crude oil pipeline in North Dakota within the Omaha District's regulatory boundaries.

In the information received, Dakota Access, LLC, is currently requesting verification of 2 crossings of regulated water bodies under Nationwide Permit (NWP) 12 (utility line activities) in North Dakota – both being the Missouri River crossings. In accordance with Department of the Army regulations, we are evaluating each separate, and distant, water body crossing as a single and complete project, and will make final determinations regarding compliance of the activities with NWP 12 once our evaluation is complete. If any work in waters, including navigable rivers and wetlands, is authorized under NWP 12, such work must be completed according to the terms of the permit, as well as all general terms of the nationwide permits, regional conditions and any special conditions that are determined to be necessary. If any work in waters does not fall within the terms and conditions of NWP 12, the applicant will be advised of procedures for applying for an Individual Permit.

## Omaha District's Permit Evaluation

The Omaha District will evaluate the water body crossings to ensure the construction activity does not adversely impact the water body. The District's evaluation will look at any impacts the crossing segments may have on navigation. The Corps does not regulate pipelines, or monitor and enforce compliance with pipeline safety regulations. These items may be addressed by the respective states and other federal agencies.

## Environmental Impact Statement

The Omaha District is evaluating the applicant's request to verify segments of the pipeline in North Dakota under NWP 12. Activities authorized under the 2012 Nationwide Permits have been evaluated and documented in accordance with the National Environmental Policy Act with a finding of no significant impact; therefore, an Environmental Impact Statement is not required. If a segment does not meet the terms and conditions of NWP 12, that segment must be evaluated as an Individual Permit and an Environmental Assessment will be required.

## Public Comment

If pipeline segments are verified under NWP 12, there will not be a public comment period. If a segment does not meet the terms and conditions of NWP 12 and must be evaluated as an Individual Permit, there will be an opportunity to comment on that segment. Additional information regarding the U.S. Army Corps of Engineers' role in permitting the Dakota Access, LLC, pipeline can be obtained by contacting the appropriate Corps office.

North and South Dakota:

USACE, Omaha District
Regulatory Branch
1616 Capitol Avenue – Suite 9000
Omaha, NE  68102
Phone: (402) 995-2469

Iowa and Illinois:

USACE, Rock Island District
Regulatory Branch
Clock Tower Building
P.O. Box 2004
Rock Island, IL  61204-2004
Phone: (309) 794-5669

Illinois:

USACE, St. Louis District
Regulatory Branch
1222 Spruce Street
St. Louis MO  63103-2833
Phone: (314) 331-8575

UPDATE: February 11, 2015

---

**U.S. ARMY CORPS OF ENGINEERS – OMAHA DISTRICT**
1616 CAPITOL AVENUE – SUITE 9000 – OMAHA, NE 68102
www.nwo.usace.army.mil

Chieply 0059



# Dakota Access Pipeline
Permitting Process in South Dakota

**U.S. ARMY CORPS OF ENGINEERS**          **BUILDING STRONG.**

**Congressional Districts:** SD-1

## Description

Dakota Access, LLC, is proposing to construct an 1,134-mile pipeline system to carry up to 570,000 barrels per day of U.S. light sweet crude (450,000 barrels per day initially) from the rapidly expanding Bakken and Three Forks production region of North Dakota through the states of North Dakota, South Dakota, Iowa and Illinois terminating at a crude oil hub near Patoka, Illinois, with various potential points of destination along the pipeline. The pipeline crosses four states within the boundaries of three U.S. Army Corps of Engineers Districts (Omaha District, Rock Island District, and St. Louis District).



## Pipeline Details in South Dakota

The Dakota Access pipeline in South Dakota would consist of approximately 273 miles of a 30-inch diameter transmission pipeline, one pump station, and other ancillary facilities to ultimately interconnect with existing pipelines in Illinois for shipment to processing facilities and refineries in the Midwest and the Gulf Coast to reach U.S. customers.

## Pipeline Right of Way and Footprint in South Dakota

The Dakota Access pipeline enters South Dakota in Campbell County and will cross McPherson, Edmunds, Faulk, Spink, Beadle, Kingsbury, Miner, Lake, McCook, Minnehaha, Turner, and Lincoln Counties. The pipeline exits South Dakota just south of Sioux Falls where it crosses the Big Sioux River into Iowa. The pipeline will parallel existing pipelines, power lines or existing roads where possible. During construction, an additional 25 -100 feet of workspace may be needed adjacent to a 50-foot permanent easement. The pipeline will be covered by a minimum of 36 inches of soil and more if it crosses under roads, rivers, lakes or streams. On agricultural land, the pipeline will be buried under a minimum of 48 inches of soil, drain tiles will be crossed with a minimum of 24 inches of separation between the pipe and the drain tile, and topsoil will be segregated during construction to a minimum of 12 inches or in accordance with landowner requirements.

## U.S. Army Corps of Engineers' Role

The U.S. Army Corps of Engineers is not evaluating the complete 1,134-mile pipeline as its regulatory authority is limited to waters of the United States. If the entire pipeline was constructed in a stream, river, wetland, or other jurisdictional water body, the Corps would evaluate the construction of the entire pipeline. However, in the case of this pipeline, the majority of the pipeline is being constructed in uplands, outside of the Corps' regulatory authority.

The Corps is evaluating Dakota Access, LLC, permit requests for segments of the pipeline that cross waters of the United States. These crossings comprise a small percentage of the overall pipeline project. Department of the Army permits will be required under both Section 404 of the Clean Water Act and Sections 10 of the Rivers and Harbors Act. Section 404 and/or Section 10 for crossings of waters of the United States (streams, rivers, wetlands), including navigable rivers such as the Missouri River, Des Moines River, Mississippi River, and Illinois Rivers. The Corps' Omaha District evaluates permit requests in North Dakota and South Dakota. The Corps' Rock Island District evaluates permit requests in Iowa. The Rock Island and St. Louis Districts share permit evaluation authority in portions of Illinois.



# Dakota Access Pipeline
Permitting Process in South Dakota

## U.S. ARMY CORPS OF ENGINEERS

**BUILDING STRONG.**

### Omaha District's Role

The Omaha District has received an application from Dakota Access, LLC, requesting verification of work in waters of the United States in association with construction of segments of the 30-inch diameter crude oil pipeline in North Dakota within the Omaha District's regulatory boundaries.

In the information received, Dakota Access, LLC, is currently requesting verification of 12 crossings of regulated water bodies under Nationwide Permit (NWP) 12 (utility line activities) in South Dakota. In accordance with Department of the Army regulations, we are evaluating each separate, and distant, water body crossing as a single and complete project, and will make final determinations regarding compliance of the activities with NWP 12 once our evaluation is complete. If any work in waters, including navigable rivers and wetlands, is authorized under NWP 12, such work must be completed according to the terms of the permit, as well as all general terms of the nationwide permits, regional conditions and any special conditions that are determined to be necessary. If any work in waters does not fall within the terms and conditions of NWP 12, the applicant will be advised of procedures for applying for an Individual Permit.

## Omaha District's Permit Evaluation

The Omaha District will evaluate the water body crossings to ensure the construction activity does not adversely impact the water body. The District's evaluation will look at any impacts the crossing segments may have on navigation. The Corps does not regulate pipelines, or monitor and enforce compliance with pipeline safety regulations. These items may be addressed by the respective states and other federal agencies.

## Environmental Impact Statement

The Omaha District is evaluating the applicant's request to verify segments of the pipeline in South Dakota under NWP 12. Activities authorized under the 2012 Nationwide Permits have been evaluated and documented in accordance with the National Environmental Policy Act with a finding of no significant impact; therefore, an Environmental Impact Statement is not required. If a segment does not meet the terms and conditions of NWP 12, that segment must be evaluated as an Individual Permit and an Environmental Assessment will be required.

## Public Comment

If pipeline segments are verified under NWP 12, there will not be a public comment period. If a segment does not meet the terms and conditions of NWP 12 and must be evaluated as an Individual Permit, there will be an opportunity to comment on that segment. Additional information regarding the U.S. Army Corps of Engineers' role in permitting the Dakota Access, LLC, pipeline can be obtained by contacting the appropriate Corps office.

North and South Dakota:

USACE, Omaha District
Regulatory Branch
1616 Capitol Avenue – Suite 9000
Omaha, NE 68102
Phone: (402) 995-2469

Iowa and Illinois:

USACE, Rock Island District
Regulatory Branch
Clock Tower Building
P.O. Box 2004
Rock Island, IL 61204-2004
Phone: (309) 794-5669

Illinois:

USACE, St. Louis District
Regulatory Branch
1222 Spruce Street
St. Louis MO 63103-2833
Phone: (314) 331-8575

UPDATE: February 11, 2015

**U.S. ARMY CORPS OF ENGINEERS – OMAHA DISTRICT**
1616 CAPITOL AVENUE – SUITE 9000 – OMAHA, NE 68102
www.nwo.usace.army.mil

Chieply 0061

# U.S. Army Corps of Engineers Regulatory Program Points of Contacts For Dakota Access Pipeline Activities

## Mississippi Valley Division

US Army Corps of Engineers (CEMVD-PD-OD)
1400 Walnut Street
Vicksburg, Mississippi        39180-3262

Ms. Tonya L. Acuff
Regulatory Program Manager
601-634-5821;        Fax:  601-634-5816
Email:  tonya.l.acuff@usace.army.mil

**Rock Island District**
US Army Corps of Engineers (CEMVR-OD-P)
1500 Rock Island Drive
Rock Island, Illinois            61201

Mr. Gary W. Lenz (District POC)
Regulatory Chief
309-794-5370;
Email:  gary.w.lenz@usace.army.mil

**St. Louis District**
US Army Corps of Engineers (CEMVS-OD-F)
1222 Spruce Street
St. Louis, Missouri              63103

Mr. Danny D. Mcclendon (District POC)
Regulatory Chief
314-331-8574;        Fax:  314-331-8741
Email:  danny.d.mcclendon@usace.army.mil

## Great Lakes and Ohio River Division

US Army Corps of Engineers (CELRD-PD)
550 Main Street, Room 10032
Cincinnati, Ohio        45202-3222

Ms. Suzanne L. Chubb
Regulatory Program Manager
513-684-7261
Email:  suzanne.l.chubb@usace.army.mil

**Louisville District**
US Army Corps of Engineers (CELRL-OP-F)
600 Martin Luther King Jr. Place
Louisville, Kentucky       40202

Ms. Lee Ann Devine
Regulatory Chief
Phone #; 502-315-6692     Fax:  (502) 315-6697
Email:  lee.anne.devine@usace.army.mil

Mr. Michael S. Ricketts (District POC)
West Section Chief
812-853-0472;        Fax:  (812) 858-2678
Email:   michael.s.ricketts@usace.army.mil

**<u>Northwestern Division</u>**
US Army Corps of Engineers (CENWD-PDS)
1125 NW Couch Street, Suite 500
Portland, Oregon     97208-2870

Mr. David W. Gesl
Regulatory Program Manager
503-808-3825;        Fax:  503-808-3725
Email:  david.w.gesl@usace.army.mil

**Omaha District (Lead District)**
US Army Corps of Engineers (CENWO-OD-R)
1616 Capitol Avenue
Omaha, Nebraska   68102

Ms. Martha S. Chieply (District POC)
Regulatory Chief
402-995-2451;        Fax:  402-995-2879
Email:  martha.s.chieply@usace.army.mil

Mr. Joel O. Ames (District-wide Tribal Liaison)
420-995-2451;        Fax:  402-995-2013
Email:  joel.o.ames@usace.army.mil

**North Dakota Regulatory Field Office (CENWO-OD-RND)**
Mr. Jason J. Renschler (ND POC)
Regulatory Project Manager
North Dakota Regulatory Office
1513 South 12th Street
Bismarck, North Dakota     58504
701-255-0015 Ext 2010;    Fax:  402-255-4917
Email:  jason.j.renschler@usace.army.mil

**South Dakota Regulatory Field Office (CENWO-OD-RSD)**
Mr. Jeff Breckenridge (SD POC)
Regulatory Project Manager
South Dakota Regulatory Office
28563 Powerhouse Road
Pierre, South Dakota          58501
605-945-3384;               Fax:  605-224-5945
Email:  jeff.l.breckenridge@usace.army.mil

Chiespy 0065

|  | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | PCN Area | Mile | Longitude | Latitude | County | WOUS |
| 2 | **State of North Dakota – Omaha District** | | | | | |
| 3 | 2 | 96.78 | -103.9057 | 47.9601 | Williams | Missouri River |
| 4 | 4 | 164.89 | -100.5871 | 46.4386 | Morton | Lake Oahe/Missouri River |
| 5 | | | | | | |
| 6 | | | | | | |
| 7 | **State of South Dakota – Omaha District** | | | | | |
| 8 | 3 | 315.74 | -98.6528 | 44.9416 | Spink | Unnamed Wetland |
| 9 | 3 | 315.88 | -98.6507 | 44.9396 | Spink | Unnamed Wetland |
| 10 | 17 | 335.35 | -98.4308 | 44.7613 | Spink | Unnamed Wetland |
| 11 | 4 | 352.27 | -98.2336 | 44.5880 | Beadle | James River |
| 12 | 6 | 363.19 | -98.0094 | 44.5371 | Beadle | Shue Creek |
| 13 | 7 | 371.12 | -97.9072 | 44.4533 | Beadle | Middle Pearl Creek |
| 14 | 8 | 385.96 | -97.6994 | 44.3041 | Kingsbury | Redstone Creek |
| 15 | 9 | 391.83 | -97.6172 | 44.2462 | Kingsbury | Rock Creek |
| 16 | 10 | 395.14 | -97.5686 | 44.2122 | Kingsbury | Unnamed Wetland |
| 17 | 12 | 421.85 | -97.2303 | 43.9268 | Lake | Unnamed Wetland |
| 18 | 13 | 430.21 | -97.1339 | 43.8381 | McCook | Unnamed Wetland |
| 19 | 14 | 430.86 | -97.1312 | 43.8291 | McCook | Unnamed Wetland |
| 20 | | | | | | |
| 21 | | | | | | |
| 22 | **State of Iowa – Rock Island District** | | | | | |
| 23 | 1 | 485.2 | 43.3398 | -96.5133 | Lyon | Unnamed Wetland |
| 24 | 1 | 485.2 | 43.3400 | -96.5132 | Lyon | Tributary to Big Sioux River |
| 25 | 2 | 486.0 | 43.3319 | -96.5016 | Lyon | Tributary to Big Sioux River |
| 26 | 3 | 500.2 | 43.2325 | -96.2671 | Sioux | Unnamed Wetland |
| 27 | 4 | 500.7 | 43.2319 | -96.2584 | Sioux | Unnamed Wetland |
| 28 | 5 | 549.5 | 42.8267 | -95.5109 | Cherokee | Unnamed Wetland |
| 29 | 6 | 550 | 42.8244 | -95.5016 | Cherokee | Unnamed Wetland |
| 30 | 6 | 550 | 42.8243 | -95.5020 | Cherokee | Tributary to Little Sioux River |
| 31 | 7 | 596.3 | 42.4756 | -94.7473 | Calhoun | West Fork Camp Creek |
| 32 | 8 | 600.4 | 42.4483 | -94.6792 | Calhoun | Camp Creek |
| 33 | PCN Area | Mile | Longitude | Latitude | County | WOUS |
| 34 | **State of Iowa – Rock Island District cont.** | | | | | |
| 35 | 9 | 604.9 | 42.4220 | -94.5975 | Calhoun | Lake Creek |
| 36 | 10 | 608.9 | 42.3918 | -94.5348 | Calhoun | Purgatory Creek |
| 37 | 11 | 610.4 | 42.3896 | -94.5054 | Calhoun | West Cedar Creek |
| 38 | 12 | 613.7 | 42.3728 | -94.4458 | Calhoun | East Cedar Creek |
| 39 | 13 | 617.8 | 42.3368 | -94.3849 | Webster | Hardin Creek |
| 40 | 14 | 622 | 42.3075 | -94.3135 | Webster | West Buttrick Creek |
| 41 | 15 | 627 | 42.2731 | -94.2298 | Webster | Tributary to East Buttrick Creek |
| 42 | 16 | 628.7 | 42.2609 | -94.2016 | Webster | East Buttrick Creek |
| 43 | 17 | 642 | 42.1699 | -93.9760 | Boone | Tributary to the Des Moines River |
| 44 | 17A | 642 | 42.1699 | -93.9810 | Boone | Tributary to the Des Moines River |

Chiesry 0066

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 45 | 18 | 642.5 | 42.1685 | -93.9662 | Boone | Unnamed Wetland |
| 46 | | 642.5 | 42.1687 | -93.9661 | Boone | Des Moines River |
| 47 | 19 | 643.5 | 42.1657 | -93.9466 | Boone | Tributary to Mineral Branch |
| 48 | 20 | 666.7 | 41.9559 | -93.6318 | Story | Walnut Creek |
| 49 | 21 | 671.9 | 41.9073 | -93.5629 | Story | Ballard Creek |
| 50 | 22 | 672.6 | 41.9018 | -93.5531 | Story | Tributary to Ballard Creek |
| 51 | 23 | 688.9 | 41.7696 | -93.3068 | Jasper | Tributary to Indian Creek |
| 52 | 24 | 692.1 | 41.7380 | -93.2690 | Jasper | Tributary to Indian Creek |
| 53 | 25 | 692.4 | 41.7368 | -93.2633 | Jasper | Tributary to Indian Creek |
| 54 | 26 | 692.9 | 41.7345 | -93.2538 | Jasper | Tributary to Indian Creek |
| 55 | 27 | 696.7 | 41.7115 | -93.1914 | Jasper | Unnamed Wetland |
| 56 | | 698.9 | 41.6992 | -93.1525 | Jasper | Unnamed Wetland |
| 57 | 28 | 698.9 | 41.6991 | -93.1530 | Jasper | Tributary to Prairie Creek |
| 58 | | 706.5 | 41.6338 | -93.0505 | Jasper | Unnamed Wetland |
| 59 | 29 | 706.6 | 41.6338 | -93.0499 | Jasper | Unnamed Wetland |
| 60 | | 706.6 | 41.6333 | -93.0502 | Jasper | Unnamed Wetland |
| 61 | 30 | 707.2 | 41.6263 | -93.0453 | Jasper | Tributary to the South Skunk River |
| 62 | 31 | 736.4 | 41.3692 | -92.6190 | Mahaska | Tributary to the South Skunk River |
| 63 | | 739.8 | 41.3368 | -92.5729 | Mahaska | Unnamed Wetland |
| 64 | 32 | 740.2 | 41.3331 | -92.5678 | Mahaska | Unnamed Wetland |
| 65 | PCN Area | Mile | Longitude | Latitude | County | WOUS |
| 66 | State of Iowa – Rock Island District cont. | | | | | |
| 67 | 33 | 740.9 | 41.3247 | -92.5596 | Mahaska | Unnamed Wetland |
| 68 | 34 | 743 | 41.3048 | -92.5332 | Mahaska | Unnamed Wetland |
| 69 | 35 | 747 | 41.2559 | -92.5010 | Mahaska | Tributary to Snyder Creek |
| 70 | 36 | 751.7 | 41.2223 | -92.4285 | Mahaska | Tributary to Olive Branch |
| 71 | 37 | 765.9 | 41.0890 | -92.2355 | Wapello | Tributary to Wolf Creek |
| 72 | 38 | 766.8 | 41.0807 | -92.2227 | Wapello | Tributary to Cedar Creek |
| 73 | 39 | 768.4 | 41.0649 | -92.2002 | Wapello | Tributary to Cedar Creek |
| 74 | 40 | 770.3 | 41.0429 | -92.1794 | Jefferson | Tributary to Cedar Creek |
| 75 | 41 | 771.2 | 41.0312 | -92.1741 | Jefferson | Unnamed Wetland |
| 76 | | 771.3 | 41.0305 | -92.1742 | Jefferson | Tributary to Honey Creek |
| 77 | 42 | 775.1 | 40.9920 | -92.1318 | Jefferson | Tributary to Rock Creek |
| 78 | 43 | 776.9 | 40.9774 | -92.1035 | Jefferson | Bonell Creek |
| 79 | 44 | 777.6 | 40.9718 | -92.0927 | Jefferson | Tributary to Bonell Creek |
| 80 | 48 | 789.5 | 40.8833 | -91.9077 | Van Buren | Tributary to Cedar Creek |
| 81 | 49 | 789.6 | 40.8819 | -91.9059 | Van Buren | Tributary to Cedar Creek |
| 82 | 51 | 795.2 | 40.8337 | -91.8227 | Van Buren | Tributary to Little Cedar Creek |
| 83 | 52 | 795.6 | 40.8310 | -91.8170 | Van Buren | Tributary to Little Cedar Creek |
| 84 | 53 | 799.2 | 40.8024 | -91.7608 | Van Buren | Unnamed Wetland |
| 85 | 54 | 800.1 | 40.7942 | -91.7471 | Van Buren | Tributary to Little Cedar Creek |
| 86 | | 780.8 | 40.9427 | -92.0452 | Jefferson | East Branch Lick Creek |
| 87 | 45 | 781 | 40.9412 | -92.0423 | Jefferson | Unnamed Wetland |
| 88 | 46 | 781 | 40.9412 | -92.0422 | Jefferson | Tributary to East Branch Lick Creek |
| 89 | 47 | 781.9 | 40.9343 | -92.0281 | Jefferson | Unnamed Wetland |

Chiapdy 0067

| # | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 90 | | 781.9 | 40.9345 | -92.0274 | Jefferson | Tributary to East Branch Lick Creek |
| 91 | 50 | 793.1 | 40.8513 | -91.8541 | Van Buren | Unnamed Wetland |
| 92 | 57 | 823.8 | 40.5451 | -91.4881 | Lee | Tributary to Sugar Creek |
| 93 | 58 | 824.3 | 40.5405 | -91.4828 | Lee | Unnamed Wetland |
| 94 | | 824.3 | 40.5406 | -91.4825 | Lee | Tributary to Sugar Creek |
| 95 | 59 | 825.1 | 40.5317 | -91.4724 | Lee | Tributary to Sugar Creek |
| 96 | 55 | 817.6 | 40.6204 | -91.5333 | Lee | Tributary to Painter Creek |
| 97 | PCN Area | Mile | Longitude | Latitude | County | WOUS |
| 98 | State of Iowa - Rock Island District cont. | | | | | |
| 99 | 56 | 817.9 | 40.6165 | -91.5339 | Lee | Tributary to Painter Creek |
| 100 | 60 | 829.8 | 40.4879 | -91.4087 | Lee | Unnamed Wetland |
| 101 | | 830.4 | 40.4850 | -91.3975 | Lee | Unnamed Wetland |
| 102 | 61 | 830.4 | 40.4848 | -91.3976 | Lee | Tributary to Lamaleca Creek |
| 103 | 62 | 831 | 40.4801 | -91.3870 | Lee | Tributary to Lamaleca Creek |
| 104 | 63 | 831.3 | 40.4780 | -91.3839 | Lee | Tributary to Lamaleca Creek |
| 105 | 64 | 831.4 | 40.4756 | -91.3768 | Lee | Mississippi River |
| 106 | | | | | | |
| 107 | | | | | | |
| 108 | PCN Area | Mile | Longitude | Latitude | County | WOUS |
| 109 | State of Illinois - Rock Island | | | | | |
| 110 | 1 | 832.5 | 40.4752 | -91.3640 | Hancock | Mississippi River |
| 111 | 2 | 834.5 | 40.4717 | -91.3290 | Hancock | Unnamed Wetland |
| 112 | | 835 | 40.4692 | -91.3240 | Hancock | Tributary to Larry Creek |
| 113 | 3 | 835 | 40.4693 | -91.3240 | Hancock | Tributary to Larry Creek |
| 114 | | 835 | 40.4691 | -91.3240 | Hancock | Tributary to Larry Creek |
| 115 | 4 | 842 | 40.4077 | -91.2140 | Hancock | Tributary to West Fork Bear Creek |
| 116 | 5 | 845.5 | 40.3777 | -91.1630 | Hancock | Bear Creek |
| 117 | | 849 | 40.3397 | -91.1160 | Hancock | Unnamed Wetland |
| 118 | | 849 | 40.3392 | -91.1160 | Hancock | Unnamed Wetland |
| 119 | 6 | 849 | 40.3396 | -91.1160 | Hancock | Tributary to Meadow Ditch |
| 120 | | 849 | 40.3395 | -91.1160 | Hancock | Tributary to Meadow Ditch |
| 121 | 7 | 850.5 | 40.3209 | -91.0980 | Hancock | Bronson Creek |
| 122 | 8 | 852.5 | 40.3016 | -91.0780 | Hancock | Tributary to Bronson Creek |
| 123 | 9 | 852.5 | 40.2987 | -91.0750 | Hancock | Tributary to Bronson Creek |
| 124 | 10 | 853.5 | 40.2920 | -91.0680 | Hancock | Tributary to Bronson Creek |
| 125 | 11 | 854.5 | 40.2803 | -91.0550 | Hancock | Tributary to Panther Creek |
| 126 | 12 | 855 | 40.2761 | -91.0500 | Hancock | Tributary to Panther Creek |
| 127 | | | | | | |
| 128 | PCN Area | Mile | Longitude | Latitude | County | WOUS |
| 129 | State of Illinois - Rock Island cont. | | | | | |
| 130 | 13 | 855 | 40.2715 | -91.0460 | Hancock | Tributary to Panther Creek |
| 131 | | 855 | 40.2714 | -91.0460 | Hancock | Tributary to Panther Creek |
| 132 | | 855.5 | 40.2655 | -91.0400 | Hancock | Tributary to Panther Creek |

Case 1:16-cv-01534-JEB   Document 21-18   Filed 08/18/16   Page 83 of 117

Chisay 0068

| A | B | C | D | E | F |
|---|---|---|---|---|---|
| 133 | 855.5 | 40.2648 | -91.0390 | Hancock | Tributary to Panther Creek |
| 134 | 856 | 40.2628 | -91.0370 | Hancock | Unnamed Wetland |
| 14 | 856 | 40.2650 | -91.0390 | Hancock | Tributary to Panther Creek |
| 136 | 856 | 40.2642 | -91.0380 | Hancock | Tributary to Panther Creek |
| 137 | 856 | 40.2619 | -91.0360 | Hancock | Panther Creek |
| 138 | 860.5 | 40.2134 | -90.9860 | Hancock | Tributary to Williams Creek |
| 139 15 | 860.5 | 40.2127 | -90.9840 | Hancock | Tributary to Williams Creek |
| 140 | 861 | 40.2067 | -90.9790 | Hancock | Unnamed Wetland |
| 141 16 | 861 | 40.2063 | -90.9780 | Hancock | Williams creek |
| 142 17 | 861 | 40.2036 | -90.9750 | Hancock | Tributary to Williams Creek |
| 143 | 861.5 | 40.2007 | -90.9720 | Hancock | Tributary to Williams Creek |
| 144 18 | 861.5 | 40.1998 | -90.9710 | Hancock | Tributary to Williams Creek |
| 145 | 862 | 40.1940 | -90.9660 | Hancock | Unnamed Wetland |
| 146 19 | 862 | 40.1940 | -90.9660 | Hancock | Tributary to Williams Creek |
| 147 20 | 862.5 | 40.1910 | -90.9630 | Adams | Tributary to Williams Creek |
| 148 | 864.5 | 40.1698 | -90.9420 | Adams | Tributary to Cedar Creek |
| 149 | 864.5 | 40.1693 | -90.9420 | Adams | Tributary to Cedar Creek |
| 150 21 | 864.5 | 40.1683 | -90.9420 | Adams | Cedar Creek |
| 151 | 864.5 | 40.1680 | -90.9419 | Adams | Tributary to Cedar Creek |
| 152 22 | 866 | 40.1514 | -90.9250 | Adams | Tributary to S Branch to Cedar Creek |
| 153 | 866 | 40.1536 | -90.9270 | Adams | S Branch to Cedar Creek |
| 154 23 | 867.5 | 40.1360 | -90.9080 | Schuyler | Unnamed Wetland |
| 155 | 867.5 | 40.1360 | -90.9080 | Schuyler | South Fork Creek |
| 156 | 868 | 40.1310 | -90.9000 | Schuyler | Unnamed Wetland |
| 157 24 | 868 | 40.1300 | -90.9000 | Schuyler | Unnamed Wetland |
| 158 | 868 | 40.1300 | -90.9000 | Schuyler | Tributary to Missouri Creek |
| 159 | 868 | 40.1280 | -90.8990 | Schuyler | Tributary to Missouri Creek |
| **PCN Area** | **Mile** | **Longitude** | **Latitude** | **County** | **WOUS** |
| 161 | State of Illinois - Rock Island cont. | | | | |
| 162 25 | 868.5 | 40.1258 | -90.8940 | Schuyler | Tributary to Missouri Creek |
| 163 | 868.5 | 40.1249 | -90.8930 | Schuyler | Tributary to Missouri Creek |
| 164 26 | 869 | 40.1220 | -90.8900 | Schuyler | Tributary to Missouri Creek |
| 165 27 | 869 | 40.1181 | -90.8880 | Schuyler | Tributary to Missouri Creek |
| 166 28 | 869.5 | 40.1142 | -90.8860 | Schuyler | Tributary to Missouri Creek |
| 167 29 | 869.5 | 40.1115 | -90.8840 | Schuyler | Tributary to Missouri Creek |
| 168 30 | 870.5 | 40.1020 | -90.8740 | Brown | Missouri Creek |
| 169 | 871 | 40.0977 | -90.8700 | Brown | Unnamed Wetland |
| 170 31 | 871 | 40.0975 | -90.8700 | Brown | Tributary to Missouri Creek |
| 171 32 | 871 | 40.0940 | -90.8680 | Brown | Tributary to Missouri Creek |
| 172 33 | 872 | 40.0867 | -90.8610 | Brown | Tributary to Missouri Creek |
| 173 | 872 | 40.0845 | -90.8550 | Brown | Tributary to Missouri Creek |
| 174 | 872 | 40.0845 | -90.8560 | Brown | Tributary to Missouri Creek |
| 175 | 872 | 40.0839 | -90.8550 | Brown | Tributary to Missouri Creek |
| 176 34 | 872 | 40.0846 | -90.8550 | Brown | Tributary to Missouri Creek |
| 177 | 872.5 | 40.0828 | -90.8530 | Brown | Tributary to Missouri Creek |

Chiepiy 0069

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 178 | | 872.5 | 40.0826 | -90.8530 | Brown | Tributary to Missouri Creek |
| 179 | | 872.5 | 40.0797 | -90.8500 | Brown | Tributary to Missouri Creek |
| 180 | 35 | 872.5 | 40.0798 | -90.8500 | Brown | Tributary to Missouri Creek |
| 181 | | 872.5 | 40.0796 | -90.8500 | Brown | Tributary to Missouri Creek |
| 182 | | 873 | 40.0732 | -90.8440 | Brown | Tributary to Little Missouri Creek |
| 183 | 36 | 873.5 | 40.0717 | -90.8420 | Brown | Tributary to Little Missouri Creek |
| 184 | | 874 | 40.0653 | -90.8350 | Brown | Tributary to Little Missouri Creek |
| 185 | 37 | 874 | 40.0630 | -90.8320 | Brown | Tributary to Little Missouri Creek |
| 186 | 38 | 874.5 | 40.0599 | -90.8290 | Brown | Unnamed Wetland |
| 187 | 39 | 874.5 | 40.0605 | -90.8300 | Brown | Little Missouri Creek |
| 188 | | 874.5 | 40.0567 | -90.8260 | Brown | Tributary to Little Missouri Creek |
| 189 | 40 | 874.5 | 40.0563 | -90.8250 | Brown | Tributary to Little Missouri Creek |
| 190 | | 874.5 | 40.0580 | -90.8270 | Brown | Tributary to Little Missouri Creek |
| 191 | | 874.5 | 40.0575 | -90.8270 | Brown | Tributary to Little Missouri Creek |
| 192 | PCN Area | Mile | Longitude | Latitude | County | WOUS |
| 193 | State of Illinois - Rock Island cont. | | | | | |
| 194 | 41 | 875 | 40.0498 | -90.8200 | Brown | Tributary to South Branch Little Missouri Creek |
| 195 | | 875 | 40.0496 | -90.8200 | Brown | Tributary to South Branch Little Missouri Creek |
| 196 | 42 | 875.5 | 40.0480 | -90.8180 | Brown | Tributary to South Branch Little Missouri Creek |
| 197 | | 875.5 | 40.0461 | -90.8150 | Brown | Tributary to South Branch Little Missouri Creek |
| 198 | | 875.5 | 40.0460 | -90.8150 | Brown | Tributary to South Branch Little Missouri Creek |
| 199 | | 875.5 | 40.0457 | -90.8150 | Brown | Tributary to South Branch Little Missouri Creek |
| 200 | 43 | 875.5 | 40.0444 | -90.8130 | Brown | Tributary to South Branch Little Missouri Creek |
| 201 | | 875.5 | 40.0445 | -90.8140 | Brown | Tributary to South Branch Little Missouri Creek |
| 202 | | 876 | 40.0437 | -90.8130 | Brown | Tributary to South Branch Little Missouri Creek |
| 203 | | 876 | 40.0432 | -90.8120 | Brown | Tributary to South Branch Little Missouri Creek |
| 204 | 44 | 876 | 40.0401 | -90.8080 | Brown | South Branch Little Missouri Creek |
| 205 | 45 | 879.5 | 40.0004 | -90.7920 | Brown | West Creek |
| 206 | | | | | | |
| 207 | | | | | | |
| 208 | State of Illinois - St. Louis District | | | | | |
| 209 | 1 | 881 | 39.9790 | -90.7860 | Brown | Tributary to Dry Fork |
| 210 | 2 | 883 | 39.9668 | -90.7636 | Brown | Tributary to Dry Fork |
| 211 | | 883 | 39.9668 | -90.7632 | Brown | Tributary to Dry Fork |
| 212 | 3 | 886.5 | 39.9337 | -90.7084 | Brown | Tributary to Camp Creek |
| 213 | | 888 | 39.9184 | -90.6896 | Brown | Unnamed Wetland |
| 214 | 4 | 888 | 39.9183 | -90.6897 | Brown | Tributary to Camp Creek |
| 215 | 5 | 888.5 | 39.9143 | -90.6842 | Brown | Tributary |
| 216 | 6 | 889 | 39.9125 | -90.6760 | Brown | Tributary to Camp Creek |
| 217 | 7 | 889.5 | 39.9120 | -90.6670 | Brown | Tributary to Camp Creek |
| 218 | 8 | 890 | 39.9120 | -90.6590 | Brown | Tributary to Camp Creek |
| 219 | 9 | 890.5 | 39.9110 | -90.6470 | Brown | Tributary to Camp Creek |
| 220 | 10 | 892 | 39.9010 | -90.6240 | Brown | Tributary to Camp Creek |
| 221 | | 892.5 | 39.8980 | -90.6190 | Brown | Unnamed Wetland |
| 222 | 11 | 892.5 | 39.8990 | -90.6200 | Brown | Tributary to Camp Creek |

Chiapsy 0070

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 223 | | | | | | |
| 224 | PCN Area | Mile | Longitude | Latitude | County | WOUS |
| 225 | State of Illinois - St. Louis District cont. | | | | | |
| 226 | | 899 | 39.8110 | -90.5840 | Pike | Unnamed Wetland |
| 227 | 12 | 899.5 | 39.8090 | -90.5800 | Morgan | Unnamed Wetland |
| 228 | | 889 | 39.8110 | -90.5820 | Pike/Morgan | Illinois River |
| 229 | 13 | 903 | 39.7720 | -90.5280 | Scott | Tributary to Eagle Run |
| 230 | | 904 | 39.7585 | -90.5107 | Scott | Tributary to Wolf Run |
| 231 | 14 | 904 | 39.7587 | -90.5110 | Scott | Tributary to Wolf Run |
| 232 | | 904 | 39.7588 | -90.5113 | Scott | Tributary to Wolf Run |
| 233 | | 904.5 | 39.7548 | -90.5061 | Scott | Tributary to Wolf Run |
| 234 | | 904.5 | 39.7553 | -90.5067 | Scott | Tributary to Wolf Run |
| 235 | 15 | 904.5 | 39.7559 | -90.5075 | Scott | Tributary to Wolf Run |
| 236 | | 904.5 | 39.7563 | -90.5080 | Scott | Tributary to Wolf Run |
| 237 | 16 | 905.5 | 39.7463 | -90.4945 | Scott | Tributary to Wolf Run |
| 238 | | 905.5 | 39.7459 | -90.4935 | Scott | Tributary to Wolf Run |
| 239 | 17 | 905.5 | 39.7443 | -90.4897 | Scott | Tributary to Wolf Run |
| 240 | 18 | 906.5 | 39.7346 | -90.4719 | Scott | Tributary to Mauvaise Terre Creek |
| 241 | | 906.5 | 39.7343 | -90.4713 | Scott | Tributary to Mauvaise Terre Creek |
| 242 | 19 | 907 | 39.7321 | -90.4683 | Scott | Tributary to Mauvaise Terre Creek |
| 243 | | 907 | 39.7311 | -90.4667 | Scott | Tributary to Mauvaise Terre Creek |
| 244 | | 910 | 39.7086 | -90.4250 | Scott | Plum Creek |
| 245 | 20 | 910 | 39.7083 | -90.4246 | Scott | Tributary to Plum Creek |
| 246 | 21 | 912 | 39.6877 | -90.3955 | Scott | Tributary to Walnut Creek |
| 247 | 22 | 915 | 39.6620 | -90.3525 | Scott | Tributary to Sandy Creek |
| 248 | | 915 | 39.6613 | -90.3515 | Scott | Tributary to Sandy Creek |
| 249 | 23 | 915.5 | 39.6540 | -90.3460 | Scott | Tributary to Sandy Creek |
| 250 | 24 | 916 | 39.6525 | -90.3418 | Scott | Tributary to Sandy Creek |
| 251 | 25 | 916 | 39.6514 | -90.3378 | Morgan | Tributary to Sandy Creek |
| 252 | | 917 | 39.6453 | -90.3261 | Morgan | Tributary to Brush Fork |
| 253 | | 917 | 39.6465 | -90.3268 | Morgan | Tributary to Brush Fork |
| 254 | 26 | 917 | 39.6452 | -90.3260 | Morgan | Tributary to Brush Fork |
| 255 | | 917 | 39.6480 | -90.3288 | Morgan | Tributary to Brush Fork |
| 256 | PCN Area | Mile | Longitude | Latitude | County | WOUS |
| 257 | State of Illinois - St. Louis District cont. | | | | | |
| 258 | 27 | 917.5 | 39.6399 | -90.3176 | Morgan | Tributary to Brush Fork |
| 259 | | 917.5 | 39.6399 | -90.3178 | Morgan | Brushy Fork |
| 260 | | 920 | 39.6289 | -90.2781 | Morgan | Unnamed Wetland |
| 261 | 29 | 920 | 39.6301 | -90.2796 | Morgan | Tributary to Spoon Creek |
| 262 | | 920 | 39.6290 | -90.2781 | Morgan | Tributary to Spoon Creek |
| 263 | | 925 | 39.5830 | -90.2166 | Morgan | Coal Creek |
| 264 | 30 | 925 | 39.5830 | -90.2159 | Morgan | Coal Creek |
| 265 | 31 | 925.5 | 39.5764 | -90.2049 | Morgan | Tributary to Lick Creek |
| 266 | | 925.5 | 39.5766 | -90.2054 | Morgan | Lick Creek |

Chiefly 0071

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| | | | | | | |
| 267 | 32 | 927 | 39.5591 | -90.1870 | Morgan | Tributary to Lick Creek |
| 268 | 33 | 928 | 39.5567 | -90.1761 | Morgan | Tributary to Little Apple Creek |
| 269 | 34 | 928 | 39.5543 | -90.1708 | Morgan | Little Apple Creek |
| 270 | 35 | 928.5 | 39.5500 | -90.1680 | Morgan | Tributary to Little Apple Creek |
| 271 | 36 | 929 | 39.5480 | -90.1640 | Morgan | Tributary to Little Apple Creek |
| 272 | | 929 | 39.5462 | -90.1601 | Morgan | Tributary to Little Apple Creek |
| 273 | 37 | 929 | 39.5455 | -90.1589 | Morgan | Tributary to Little Apple Creek |
| 274 | 38 | 930 | 39.5377 | -90.1466 | Morgan | Tributary to Little Apple Creek |
| 275 | | 930.5 | 39.5344 | -90.1408 | Morgan | Unnamed Wetland |
| 276 | 39 | 930.5 | 39.5345 | -90.1408 | Morgan | Tributary to Left Fork Apple Creek |
| 277 | | 930.5 | 39.5343 | -90.1401 | Morgan | Tributary to Left Fork Apple Creek |
| 278 | | 930.5 | 39.5326 | -90.1337 | Morgan | Tributary to Left Fork Apple Creek |
| 279 | | 931 | 39.5316 | -90.1312 | Morgan | Unnamed Wetland |
| 280 | 40 | 931 | 39.5306 | -90.1285 | Morgan | Tributary to Left Fork Apple Creek |
| 281 | | 931 | 39.5318 | -90.1317 | Morgan | Left Fork Apple Creek |
| 282 | 41 | 931.5 | 39.5286 | -90.1252 | Morgan | Tributary to Left Fork Apple Creek |
| 283 | | 931.5 | 39.5278 | -90.1239 | Morgan | Tributary to Left Fork Apple Creek |
| 284 | 42 | 931.5 | 39.5240 | -90.1250 | Morgan | Tributary to Left Fork Apple Creek |
| 285 | | | | | | |
| 286 | | | | | | |
| 287 | | | | | | |
| 288 | PCN Area | Mile | Longitude | Latitude | County | WOUS |
| 289 | State of Illinois - St. Louis District cont. | | | | | |
| 290 | | 932.5 | 39.5190 | -90.1100 | Macoupin | Baxter Branch |
| 291 | | 932.5 | 39.5190 | -90.1100 | Macoupin | Tributary to Baxter Branch |
| 292 | 43 | 932.5 | 39.5190 | -90.1100 | Macoupin | Tributary to Baxter Branch |
| 293 | | 932.5 | 39.5190 | -90.1100 | Macoupin | Tributary to Baxter Branch |
| 294 | | 933 | 39.5120 | -90.1001 | Macoupin | Unnamed Wetland |
| 295 | 44 | 933.5 | 39.5114 | -90.0979 | Macoupin | Apple Creek |
| 296 | 45 | 935.5 | 39.4873 | -90.0768 | Macoupin | Tributary to Panther Creek |
| 297 | | 939 | 39.4624 | -90.0198 | Macoupin | Unnamed Wetland |
| 298 | | 939 | 39.4619 | -90.0185 | Macoupin | Tributary to Solomon Creek |
| 299 | 46 | 939 | 39.4617 | -90.0177 | Macoupin | Tributary to Solomon Creek |
| 300 | | 939 | 39.4622 | -90.0195 | Macoupin | Tributary to Solomon Creek |
| 301 | | 940 | 39.4548 | -90.0022 | Macoupin | Tributary to Solomon Creek |
| 302 | 47 | 940.5 | 39.4534 | -89.9995 | Macoupin | Solomon Creek |
| 303 | | 940.5 | 39.4520 | -89.9967 | Macoupin | Tributary to Solomon Creek |
| 304 | | 943.5 | 39.4323 | -89.9533 | Macoupin | Nassa Creek |
| 305 | | 943.5 | 39.4309 | -89.9505 | Macoupin | Tributary to Nassa Creek |
| 306 | 48 | 944 | 39.4290 | -89.9472 | Macoupin | Tributary to Nassa Creek |
| 307 | | 944 | 39.4293 | -89.9478 | Macoupin | Tributary to Nassa Creek |
| 308 | | 944 | 39.4301 | -89.9489 | Macoupin | Tributary to Nassa Creek |
| 309 | | 945 | 39.4159 | -89.9314 | Macoupin | Tributary to Otter Creek |
| 310 | 49 | 945.5 | 39.4150 | -89.9299 | Macoupin | Tributary to Otter Creek |
| 311 | 50 | 946.5 | 39.3990 | -89.9189 | Macoupin | Otter Creek |

Chispiy 0072

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 312 | 51 | 956.5 | 39.2859 | -89.8198 | Macoupin | Macoupin Creek |
| 313 | 52 | 957.5 | 39.2831 | -89.8077 | Macoupin | Unnamed Wetland |
| 314 | 53 | 963.5 | 39.2134 | -89.7446 | Macoupin | Tributary to Honey Creek |
| 315 | 54 | 967.5 | 39.1572 | -89.7317 | Macoupin | Cahokia Creek |
| 316 | 55 | 973.5 | 39.0950 | -89.6734 | Montgomery | Tributary to Lake Fork |
| 317 | 56 | 977.5 | 39.0512 | -89.6170 | Montgomery | Tributary to Grave Branch |
| 318 | | 978 | 39.0512 | -89.6155 | Montgomery | Unnamed Wetland |
| 319 | 57 | 978.5 | 39.0470 | -89.6013 | Montgomery | Tributary to Lake Fork |
| 320 | PCN Area | Mile | Longitude | Latitude | County | WOUS |
| 321 | State of Illinois - St. Louis District cont. | | | | | |
| 322 | 58 | 979 | 39.0470 | -89.5960 | Montgomery | Tributary to Lake Fork |
| 323 | | 979 | 39.0470 | -89.5960 | Montgomery | Tributary to Lake Fork |
| 324 | | 979 | 39.0470 | -89.5960 | Montgomery | Unnamed Wetland |
| 325 | | 979.5 | 39.0480 | -89.5880 | Montgomery | Tributary to Lake Fork |
| 326 | 59 | 979.5 | 39.0470 | -89.5890 | Montgomery | Unnamed Wetland |
| 327 | | 979.5 | 39.0470 | -89.5880 | Montgomery | Unnamed Wetland |
| 328 | 60 | 980 | 39.0464 | -89.5744 | Montgomery | Tributary to Lake Fork |
| 329 | | 981 | 39.0461 | -89.5611 | Montgomery | Unnamed Wetland |
| 330 | 61 | 981 | 39.0461 | -89.5603 | Montgomery | Tributary to Shoal Creek |
| 331 | 62 | 981.5 | 39.0461 | -89.5508 | Montgomery | Shoal Creek |
| 332 | 63 | 983 | 39.0434 | -89.5198 | Montgomery | Tributary to Panama Creek |
| 333 | 64 | 984.5 | 39.0450 | -89.4970 | Montgomery | Unnamed Wetland |
| 334 | 65 | 989 | 39.0381 | -89.4196 | Montgomery | Unnamed Wetland |
| 335 | 66 | 991.5 | 39.0110 | -89.4030 | Bond | Tributary to East Fork Shoal Creek |
| 336 | 67 | 992 | 39.0050 | -89.3920 | Bond | Tributary to East Fork Shoal Creek |
| 337 | | 992 | 39.0050 | -89.3920 | Bond | Unnamed Wetland |
| 338 | 68 | 993 | 38.9985 | -89.3801 | Bond | Tributary |
| 339 | | 993 | 38.9978 | -89.3778 | Bond | Tributary |
| 340 | | 994.5 | 38.9880 | -89.3490 | Bond | Unnamed Wetland |
| 341 | 69 | 994.5 | 38.9880 | -89.3500 | Bond | Tributary to Dry Branch |
| 342 | | 994.5 | 38.9880 | -89.3490 | Bond | Dry Branch |
| 343 | | 994.5 | 38.9870 | -89.3470 | Bond | Tributary to Dry Branch |
| 344 | | 994.5 | 38.9880 | -89.3490 | Bond | Unnamed Wetland |
| 345 | | 994.5 | 38.9880 | -89.3470 | Bond | Unnamed Wetland |
| 346 | 70 | 995 | 38.9830 | -89.3400 | Bond | Tributary to Dry Branch |
| 347 | | 995 | 38.9830 | -89.3400 | Bond | Tributary to Dry Branch |
| 348 | 71 | 995.5 | 38.9816 | -89.3359 | Bond | Tributary to Dry Branch |
| 349 | 72 | 997.5 | 38.9657 | -89.3107 | Bond | Kingsbury Branch |
| 350 | | | | | | |
| 351 | | | | | | |
| 352 | PCN Area | Mile | Longitude | Latitude | County | WOUS |
| 353 | State of Illinois - St. Louis District cont. | | | | | |
| 354 | | 1002.5 | 38.9200 | -89.2390 | Fayette | Hurricane Creek |
| 355 | | 1002.5 | 38.9210 | -89.2390 | Fayette | Tributary to Hurricane Creek |

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| | | Mile | Longitude | Latitude | County | WQUS |
| 356 | 73 | 1002.5 | 38.9210 | -89.2390 | Fayette | Unnamed Wetland |
| 357 | | 1002.5 | 38.9210 | -89.2390 | Fayette | Unnamed Wetland |
| 358 | | 1002.5 | 38.9210 | -89.2400 | Fayette | Unnamed Wetland |
| 359 | 74 | 1003 | 38.9140 | -89.2311 | Fayette | Tributary to Hurricane Creek |
| 360 | | 1003.5 | 38.9104 | -89.2256 | Fayette | Unnamed Wetland |
| 361 | 75 | 1003.5 | 38.9089 | -89.2235 | Fayette | Tributary to Hurricane Creek |
| 362 | | 1003.5 | 38.9085 | -89.2228 | Fayette | Tributary to Hurricane Creek |
| 363 | | 1003.5 | 38.9083 | -89.2225 | Fayette | Tributary to Hurricane Creek |
| 364 | 76 | 1004 | 38.9051 | -89.2177 | Fayette | Unnamed Wetland |
| 365 | | 1004 | 38.9052 | -89.2177 | Fayette | Tributary to Hurricane Creek |
| 366 | 77 | 1006.5 | 38.8778 | -89.1894 | Fayette | Tributary to Buck Creek |
| 367 | | 1010 | 38.8620 | -89.1530 | Fayette | Tributary to Kaskaskia River |
| 368 | | 1010 | 38.8590 | -89.1520 | Fayette | Unnamed Wetland |
| 369 | | 1010 | 38.8590 | -89.1510 | Fayette | Unnamed Wetland |
| 370 | | 1010 | 38.8570 | -89.1490 | Fayette | Unnamed Wetland |
| 371 | | 1010 | 38.8550 | -89.1480 | Fayette | Unnamed Wetland |
| 372 | | 1010 | 38.8540 | -89.1480 | Fayette | Unnamed Wetland |
| 373 | | 1010 | 38.8540 | -89.1480 | Fayette | Unnamed Wetland |
| 374 | | 1010.5 | 38.8520 | -89.1460 | Fayette | Unnamed Wetland |
| 375 | | 1010.5 | 38.8490 | -89.1450 | Fayette | Unnamed Wetland |
| 376 | | 1011 | 38.8480 | -89.1430 | Fayette | Cassie Creek |
| 377 | | 1011 | 38.3470 | -89.1430 | Fayette | Unnamed Wetland |
| 378 | | 1011 | 38.8470 | -89.1420 | Fayette | Unnamed Wetland |
| 379 | | 1011 | 38.8460 | -89.1420 | Fayette | Unnamed Wetland |
| 380 | | 1011 | 38.8440 | -89.1420 | Fayette | Unnamed Wetland |
| 381 | | 1011 | 38.8430 | -89.1420 | Fayette | Unnamed Wetland |
| 382 | | 1011 | 38.8460 | -89.1420 | Fayette | Unnamed Wetland |
| 383 | 79 | 1011.5 | 38.8360 | -89.1330 | Fayette | Tributary to Steve Creek |
| 384 | PCN Area | Mile | Longitude | Latitude | County | WQUS |
| 385 | State of Illinois - St. Louis District cont. | | | | | |
| 386 | 80 | 1011.5 | 38.8340 | -89.1300 | Fayette | Unnamed Wetland |
| 387 | | 1011.5 | 38.8340 | -89.1300 | Fayette | Steve Creek |
| 388 | 81 | 1012.5 | 38.8230 | -89.1220 | Marion | Flat Creek |
| 389 | | 1012.5 | 38.8200 | -89.1220 | Marion | Unnamed Wetland |
| 390 | 82 | 1012.5 | 38.8200 | -89.1220 | Marion | Tributary to Flat Creek |
| 391 | 83 | 1015 | 38.7935 | -89.0972 | Marion | Tributary to North Fork Kaskaskia River |
| 392 | | 1015 | 38.7938 | -89.0978 | Marion | Tributary to North Fork Kaskaskia River |
| 393 | | 1015 | 38.7909 | -89.0923 | Marion | Tributary to North Fork Kaskaskia River |
| 394 | 84 | 1015.5 | 38.7903 | -89.0910 | Marion | Unnamed Wetland |
| 395 | | 1015.5 | 38.7909 | -89.0923 | Marion | Unnamed Wetland |
| 396 | | 1016.5 | 38.7850 | -89.0740 | Marion | Tributary to North Fork Kaskaskia River |
| 397 | 85 | 1016.5 | 38.7850 | -89.0740 | Marion | Unnamed Wetland |
| 398 | | 1016.5 | 38.7850 | -89.0740 | Marion | Unnamed Wetland |
| 399 | | 1017.5 | 38.7800 | -89.0650 | Marion | Unnamed Wetland |
| 400 | 86 | 1017.5 | 38.7800 | -89.0650 | Marion | North Fork Kaskaskia River |

# EXHIBIT 8

Chiefly 0074



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, OMAHA DISTRICT
1616 Capitol AVE
OMAHA, NEBRASKA 68102-9000

District Commander                    SEP 0 3 2015

Standing Rock Sioux Tribe
Mr. Dave Archambault II, Chairman
Building #1 North Standing Rock Ave
P.O. Box D
Ft Yates, ND 58538

Dear Chairman Archambault II:

    The U.S. Army Corps of Engineers (Corps) Regulatory Branch has received
Preconstruction Notifications (PCNs) associated with the proposed Dakota Access
Pipeline Project (DAPL).   The proposed approximate 1,150-mile, 30-inch diameter,
crude oil pipeline would extend from Stanley, North Dakota through South Dakota and
Iowa to a delivery point at Patoka, Illinois.  The purpose of this letter is to initiate Section
106 consultation and review, determine your interest in consulting on this undertaking
for those portions subject to the Corps jurisdiction, and to gather information that will
assist the Corps in identifying historic properties.

    The majority of the proposed 1,150-mile pipeline would be located in upland areas
not requiring Corps authorization under Sections 10 or 404, and over which the Corps
does not have control or responsibility.  The Corps has regulatory authority and
responsibility for those portions of the pipeline that require authorization under Section
10 of the Rivers and Harbors Act (33 U.S.C. 401 et seq.) and Section 404 of the Clean
Water Act (33 U.S.C. 1344).  When linear projects cross a single or multiple water
bodies several times at separate and distant locations, each crossing is considered a
single and complete project for purposes of nationwide permit authorization. Under our
Regulatory authority, we are currently evaluating 209 single and complete crossings
requiring PCNs.  The locations of the PCN areas along with an overall DAPL fact sheet,
points of contact and maps are enclosed. DAPL has voluntarily started archaeological
surveys for the project.  The Cultural Resource Inventory Reports that have been
submitted to the Corps are available at the following ftp location
ftp://ftp.perennialenv.com/  (User: EnergyTransfer, password: DAPL).  Besides those
provided at the FTP site, the Corps will make those survey results available to Section
106 consulting parties for review and comment as DAPL provides them.

The Corps will consult on those areas comprising the waters of the United States that will be directly affected by the proposed work or structures and uplands affected as a result of authorizing the work or structures. Corps regulations implementing the National Historic Preservation Act may be found at 33 C.F.R. 325, App. C. Subparagraph 1.g.(1) defines the "permit area" as those areas comprising waters of the United States that will be directly affected by the work or structure, and uplands directly affected as a result of the authorization of the work or structure. Activities undertaken outside the waters of the United States must meet all of 3 requirements set out in subparagraphs 1.g.(1)(i.)-(iii). Crossings of Section 10 navigable waters include the Missouri, James, Des Moines, Mississippi, and Illinois rivers. DAPL is also currently working with the Districts to obtain the necessary easements for crossing federal lands, as well as modifications of Corps projects pursuant to Section 14 of the Rivers and Harbors Appropriation Act of 1899 (33 U.S.C. § 408) (Section 408).

In addition, we acknowledge receipt of your recent letters, outlined concerns and interest in formal consultation regarding the proposed DAPL project, including your letter dated August 19, 2015. The Corps' Omaha District has received a total of 14 PCN's associated with the proposed DAPL project, including the 2 Missouri River Crossings.

The DAPL project crosses three Corps Districts (Omaha, Rock Island and St. Louis). While each district will make permit decisions for those proposed regulated crossings in their district, the Omaha District is the lead Corps District in its oversight role in all coordination, permit evaluation, and compliance activities. Regulatory points of contact are Martha Chieply, Omaha District Regulatory Chief Martha.S.Chieply@usace.army.mil (402) 995-2451 and Jason Renschler, Project Manager Jason.J.Renschler@usace.army.mil (701) 255-0015, ext 2010. Please note that previous consultation on the project has also been initiated as part of the Corps Section 408 review process for the areas located on Corps Project lands.

Please let the Corps know if you would like to consult on this undertaking. In addition, the Corps requests information that will assist us in identifying historic properties. The Corps would like to know if you have any knowledge or concerns regarding historic properties, including sites of religious importance, at the project locations you would like the Corps to consider. If there are any known Traditional Cultural Properties within these areas, please notify us by September 30, 2015. The Corps will treat any information provided with the greatest confidentiality.

We request your engagement and/or comments by September 30, 2015. If you are interested in participating in consultation for this proposal or desire additional information, please contact Mr. Joel Ames, Tribal Liaison Joel.O.Ames@usace.army.mil (402) 945-2909). Should you have site specific concerns regarding the project please contact Roberta Hayworth (St. Louis District) Roberta.L.Hayworth@usace.army.mil (314) 331-8833 or Ron Deiss (Rock Island District) Ronald.W.Deiss@usace.army.mil (309) 794-5185.

Sincerely,

John W. Henderson, P.E.
Colonel, Corps of Engineers
District Commander

# EXHIBIT 9

Chiefly 0078



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, OMAHA DISTRICT
1616 CAPITOL AVENUE
OMAHA NE 68102-4901

February 17, 2015

Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation
Darrell Curly Youpee THPO
P.O. Box 1027
Poplar, MT 59255

Dear Mr. Youpee,

The U.S. Army Corps of Engineers (USACE) is currently evaluating pre-construction notifications (PCN's) from Dakota Access Pipeline Project (DAPL) consultants for portions of the overall pipeline project that required submittal of a notification for work in waters of the United States, in accordance with Section 10 of the Rivers and Harbors Act (33 U.S.C. 401 et seq.) and Section 404 of the Clean Water Act (33 U.S.C. 1344). DAPL is an approximate 1,100-mile, 30-inch diameter, proposed crude oil pipeline, which would extend from the Bakken production area near Stanley, North Dakota through South Dakota and Iowa to a delivery point at Patoka, Illinois, thus affecting three Corps Districts (Omaha, Rock Island, St. Louis). To date, USACE has received 55-PCN's. The location of the PCN areas is enclosed.

The USACE permitting process is the only Federal action associated with the project and therefore USACE is solely responsible for conducting consultation with interested Tribes in accordance with Section 106 of the National Historic Preservation Act. The purpose of this letter is to initiate Section 106 consultation and review, determine your interest in consulting on this undertaking, and to gather information that will assist the Corps in identifying historic properties.

Please note the Corps is neither funding nor constructing the proposed pipeline and would have permitting authority over only a very small percentage of the overall 1,100-mile pipeline project. The majority of the work in association with construction of the pipeline will occur in uplands and not waters of the United States. Navigable waters crossings include the Missouri, James, Big Sioux, Des Moines, Mississippi, and Illinois rivers.

Our regulations define the extent of the federal action as the "permit area" (33 CFR Part 325, Appendix C). This definition requires some interpretation but generally for pipelines it includes waters of the U.S. and adjacent upland areas that are dependent on the location of the crossing. The project proponent is conducting Class III surveys for cultural resources along the route. Proper identification of all historic properties, including sites of religious and cultural significance, or traditional cultural properties (TCP), in the permit area is an essential element of those surveys.

Please let us know if you would like to consult on this undertaking and if you have any information that will assist us in identifying historic properties. We would like to know if you have any knowledge or concerns regarding cultural resources, sites of religious importance, or TCPs you would like the Corps to consider. The Corps will treat any information provided with the greatest confidentiality. We request your comments prior to **March 30, 2015**, to help facilitate a timely Section 106 review.

Enclosed you will find the current proposed alignment provided by the applicant. Additional information about the project can be obtained at http://www.energytransfer.com/ops_copp.aspx. If you are interested in participating in coordination for this proposed project, please contact Mr. Joel Ames, Tribal Liaison, by email at joel.o.ames@usace.army.mil or Ms. Devetta Hill, Field Support Section, at devetta.a.hill@usace.army.mil or by phone at (402) 995-2462.

Thank you for participating in this early consultation effort concerning the Dakota Access Pipeline Project. We look forward to future consultation after surveys are completed. Please contact me at Martha.S.Chieply@usace.army.mil or by calling (402) 995-2451 if you have any questions.

Sincerely,

Martha S. Chieply
Chief, Regulatory Branch
Operations Division

Enclosures

# EXHIBIT 10

Chieply 0081



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, OMAHA DISTRICT
1616 CAPITOL AVENUE
OMAHA NE  68102-4901

November 20, 2015

Cheyenne River Sioux Tribe
Mr. Harold Frazier, Chairman
PO Box 590, 2001 North Main St
Eagle Butte, SD 57625

Dear Chairman Frazier:

I am writing you as a follow-up to previous correspondence you have received regarding the Dakota Access Pipeline Project (DAPL), a linear pipeline affecting North Dakota, South Dakota, Iowa and Illinois. As a reminder, DAPL is a proposed 1,100-mile, 30-inch diameter, crude oil pipeline which would extend from Stanley, North Dakota through South Dakota and Iowa to a delivery point at Patoka, Illinois, thus affecting three Corps of Engineers (Corps) Districts (Omaha, Rock Island and St. Louis).

The Omaha District Regulatory Division is the lead Corps District for this proposed project.  The Corps has regulatory authority and responsibility for those portions of the pipeline that require authorization under Section 10 of the Rivers and Harbors Act (33 U.S.C. 401 et seq.) and Section 404 of the Clean Water Act (33 U.S.C. 1344). The majority of the proposed 1,150-mile pipeline would be located in upland areas not requiring Corps authorization under Sections 10 or 404, and over which the Corps does not have control or responsibility.  When linear projects cross a single or multiple water bodies several times at separate and distant locations, each crossing is considered a single and complete project for purposes of nationwide permit authorization. Under our Regulatory authority we are evaluating approximately 209 single and complete crossings requiring Pre-Construction Notifications (PCNs).

The purpose of this letter is to notify you of a National Historic Preservation Act (NHPA) Section 106 consultation meeting that will be taking place.  We will be holding an initial consultation meeting on 8 and 9 Dec at the Sheraton Hotel in Sioux Falls, South Dakota. A block of rooms have been reserved for December 7 and 8, 2015 under the name Energy Transfer.  Please make reservations by December 2, 2015. Energy Transfer has covered the cost of lodging and will cover travel as well as providing Breakfast and lunch during the meetings for a representative of your Tribe.  To make reservations please call the Sheraton Hotel at (605) 331-0100.  Should you have question regarding cost reimbursement, please contact Monica Howard at Monica.Howard@energytransfer.com, or by phone at (713) 898-8222.  Be sure to keep all receipts associated with your travel.

Your assistance in identification of all historic properties, including sites of religious and cultural significance, or traditional cultural properties (TCP) in the PCN areas is critical to determining the effect of this project.  My staff is anxious to hear from your

Tribe of any culturally significant concerns that may affect these areas. The Corps will treat historic property information as sensitive and will not disseminate to the public.

If you are interested in participating in consultation for this proposed project, please contact please contact Monica Howard at Monica.Howard@energytransfer.com, or by phone at (713) 898-8222. Regulatory Technical point of contacts are Chief of Regulatory Ms. Martha Chieply at Martha.S.Chieply@usace.army.mil, (402) 995-2451 and Regulatory Project Manager, Mr. Jason Renschler by phone (701) 255-0015 or by email Jason.J.Renschler@usace.army.mil.

Thank you for participating in this consultation effort, we look forward to working with you.

Sincerely,

Martha S. Chieply
Regulatory Chief, Omaha District

# EXHIBIT 11

Chieply 0084

Dakota Access Tribal Consultation Meeting
Sioux Falls, SD
December 8, 2015

| Name | Affiliation | Email Address | Phone |
|---|---|---|---|
| Joel Ames | USACE | | |
| Martha Chieply | USACE | | |
| Dan Cimarosti | USACE | | |
| Jeff Breckenridge | USACE | | |
| Brent Cossette | USACE | | |
| Jackie Rodges | Osage | | |
| Lance Foster | THPO – Iowa Tribe of KS & NE | | |
| James Walks Along | THPO – No clay | | |
| Jim Whitted | SWO | | |
| Wayne Cloud | SWO | | |
| Ben Rhodd | Rosebud Sioux Tribe | | |
| Russell Eagle Bear | Rosebud Sioux Tribe | | |
| Paula Antoine | Rosebud Sioux Tribe | | |
| Steve Vance | THPO – Cheyenne River Sioux Tribe | | |
| Joey Mahmoud | Dakota Access | | |
| Monica Howard | Dakota Access | | |
| Abby Peyton | Perennial Environmental | | |

Randy Teboe

Michele Dippel

# EXHIBIT 12

Chiefly 0086



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, OMAHA DISTRICT
1616 CAPITOL AVENUE
OMAHA NE 68102-4901

February 4, 2016

Standing Rock Sioux Tribe
Chairman Dave Archambault II
Building #1 North Standing Rock Ave
P.O. Box D
Ft Yates, ND 58538

Chairman Dave Archambault II:

I am writing you as a follow-up to some previous email correspondence you have received regarding the Dakota Access Pipeline Project (DAPL) and an agreed upon follow-up tribal consultation meeting that was discussed at the January 25, 2016 Sioux Falls tribal meeting. DAPL is a proposed 1,100-mile, 30-inch diameter, crude oil pipeline which would extend from Stanley, North Dakota through South Dakota and Iowa to a delivery point at Patoka, Illinois, thus affecting three Corps of Engineers (Corps) Districts (Omaha, Rock Island and St. Louis).

The purpose of this letter is to notify you that the follow-up consultation meeting will be taking place on 18-19 February. The meeting will be in Niobrara Nebraska, at the Ponca tribal headquarters building, 2523 Woodbine Street, Niobrara Nebraska, 68760, and phone (402) 857-3391. As requested by the Tribes, this is a consultation meeting between the Tribes and Federal Representatives only. Both the USFWS and USACE will be in attendance.

Lodging arrangement for tribal representatives are being coordinated by DAPL as well as reimbursement of travel costs and meals to be provided on the first day of the meeting. A block of rooms at the Ohyia Casino, 53142 Highway 12, Niobrara, NE 68760, and phone (402) 857-3860 have been reserved for February 18 and 19 under the name Dakota Access. Please make reservations by 12 February. To ensure reimbursement and food by Dakota Access each tribe should contact Ms. Michelle Dippel (512) 539-6909, or email at Michelle.dippel@hdrinc.com. Ms. Dippel is also the contact if tribes traveling longer distances need lodging reservations for February 17th.

Your assistance is critical in the Corps determination of the effect of this project by providing information or identification of all historic properties, including sites of religious and cultural significance, or traditional cultural properties (TCP) that may be in in the Regulatory Section 404 preconstruction notification areas and or the Corps Section 408 areas. The Corps will treat historic property information as sensitive and will not disseminate to the public.

2

If you are interested in making reservation or requesting travel reimbursement please contact Michelle Dippel at Michelle.dippel@hdrinc.com or by phone (512) 539-6909. The Corps Regulatory Technical point of contacts are Chief of Regulatory Ms. Martha Chieply at Martha.S.Chieply@usace.army.mil (402) 995-2451 or the Regulatory Project Manager, Jason Renschler (701) 255-0015 x2010. Information provided will be forwarded to Omaha, Rock Island, and St. Louis local contacts. Thank you for participating in this consultation effort, we look forward to working with you.

Sincerely,

Martha S. Chieply
Regulatory Chief, Omaha District

# EXHIBIT 13

Chiefly 0089



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, OMAHA DISTRICT
1616 Capitol AVE
OMAHA, NEBRASKA 68102-9000

March 2, 2016

Absentee-Shawnee Tribe
Governor Edwina Butler-Wolfe
2025 S. Gordon Cooper Drive,
Shawnee, Oklahoma 74810

Dear Governor Edwina Butler-Wolfe:

Recognizing that tribes have special expertise in assessing the presence and potential eligibility of historic properties that may possess religious and cultural significance, the U.S. Army Corps of Engineers (Corps) Regulatory Branch is notifying you of an opportunity to conduct Tribal surveys at Preconstruction Notification (PCN) permit areas associated with the proposed Dakota Access Pipeline Project (DAPL). The purpose of this letter is to continue our responsibilities under Section 106 of the National Historic Preservation Act to identify possible historic properties of religious and cultural significance in PCN permit areas subject to Corps jurisdiction. DAPL has agreed to coordinate the Tribal surveys on PCN permit areas to supplement the previously provided Cultural Resource Inventory Reports and/or provide the opportunity for the tribes to monitor the construction activities. DAPL will be responsible for coordinating the tribal surveys in the PCN permit areas that are of interest to you.

Transparency between Tribes, DAPL and the Corps is critical to this success of this effort. If you or your Tribe are interested in conducting a survey or monitoring construction activities please provide the following information by emailing the Corps Omaha District Tribal Liaison, Joel Ames at joel.o.ames@usace.army.mil, by March 22, 2016.

1.   Name of Tribe
2.   Name of lead Surveyor/Monitor
3.   Contact information (phone numbers, email, address, etc.)
4.   Sites name/number your Tribe is interested in surveying/monitoring.

The Corps Omaha District Tribal Liaison will provide this information to DAPL, who will be responsible for all site visit logistics and schedule. Early identification of the locations is greatly appreciated to give DAPL the opportunity to secure landowner permission. To accurately document Tribal comments and/or concerns, after the site visit we are requesting Tribes provide us comments and concerns in writing. If your tribe is interested in this opportunity, please contact Corps Omaha District Tribal Liaison, Joel Ames at joel.o.ames@usace.army.mil or (402) 995-2909.

Should you have site specific PCN concerns within the St Louis District please contact Roberta Hayworth at roberta.l.hayworth@usace.army.mil, (314) 331-8833 or for the Rock Island District please contact Ron Deiss at ronald.w.deiss@usace.army.mil, (309) 794-5185.

Sincerely,

Martha S Chieply

Martha S. Chieply
Regulatory Chief, Omaha District

# EXHIBIT 14

Chieply 0091

| From: | Chieply, Martha S NWO |
| --- | --- |
| To: | "Jon Eagle"; Ames, Joel O NWO; "Valerie Hauser"; "John Eddins"; "Anthony G. Lopez" |
| Cc: | Dave Archambault, II; Dean DePountis; Peter Capossela; Curtis McKay; Kelly Morgan; LaDonna Allard; Jenkins, Paul C (Chris) NWS; Breckenridge, Jeff L NWO |
| Subject: | SRST letter- DAPL |
| Date: | Tuesday, March 22, 2016 4:28:00 PM |
| Attachments: | 2303_001.pdf |

Hello Mr Eagle,

Thank you for your letter dated March 22, 2016 concerning the adequacy of survey for the proposed Dakota Access Pipeline (DAPL).  You stated your position "that the entire length of the pipeline route" is "subject to section 106 of the National Historic Preservation Act".   The Corps respectfully disagrees with this position.  In this regard, it is important to note the Corps doesn't regulate or oversee the construction of pipelines, and the Corps' regulatory control is limited to only a small portion of the land and waterways that the pipeline traverses.  In addition, no statute authorizes the federal government to oversee construction of domestic oil pipelines.

The U.S. Army Corps of Engineers (Corps) is required to follow the procedures of Appendix C of 33 CFR 325 (Appendix C) for the protection of historic properties.  According to these regulations, the Corps only has authority over the Permit Area.  The Permit Area is defined as "those areas comprising the waters of the United States that will be directly affected by the proposed work or structures and uplands directly affected as a result of authorizing the work or structures" (Appendix C. I(g)).   Appendix C also states that three tests must be met to include land outside "waters of the United States" in the permit area.  To include uplands in the permit area, the work must be directly associated, integrally related, and would not occur but for the in-water authorized activity.

In response to your request that the Corps redefine the area of potential effects, it is important to reiterate the Corps has no jurisdiction outside the permit area.  The Corps' permitting actions are only regarding a small part of a much larger pipeline project; we have no control or responsibility over the larger project, and we don't regulate the larger action.  Therefore, the Corps does not have sufficient control and responsibility to extend jurisdiction to the entire pipeline.  However, Appendix C does allow the Corps to consider the potential effects outside the permit area to known historic properties but "the Corps is not responsible for identifying or assessing potentially eligible historic properties outside the permit area" (Appendix C. 5(f) ).   The Corps fully intends to comply with these procedural requirements.

The Corps recognizes that tribes have special expertise in assessing the eligibility of historic properties that may possess religious and cultural significance, and therefore we worked with DAPL to provide you with the opportunity take part in surveys at the Preconstruction Notification permit areas.  I'm sorry to hear that have chosen to decline this opportunity, but we still welcome any knowledge or information regarding historic properties, including sites of religious significance, that you would like to share with the Corps. The Corps will treat any information provided with the greatest confidentiality.

We are emailing our response as we wanted to get back to you immediately upon receipt of your letter and will follow up with a letter.  Should the SRST decide to change its position regarding participation in surveying various PCN crossing, please notify Joel Ames by 1200 March 23rd.

Respectfully

Martha S. Chieply
Omaha Regulatory
1616 Capitol Avenue
Omaha, NE  68102-4901

Martha.S.Chieply@usace.army.mil

402 995-2451 - Office
402 926-9613 - Blackberry

-----Original Message-----
From: Jon Eagle [mailto:j.eagle@standingrock.org]
Sent: Tuesday, March 22, 2016 10:16 AM
To: Ames, Joel O NWO <Joel.O.Ames@usace.army.mil>; Chieply, Martha S NWO
<Martha.S.Chieply@usace.army.mil>
Cc: Dave Archambault, II <darchambaultII@standingrock.org>; Dean DePountis <ddepountis@standingrock.org>;
Peter Capossela <pcapossela@nu-world.com>; Curtis McKay <cmckay@standingrock.org>; Kelly Morgan
<kmorgan@standingrock.org>; LaDonna Allard <lallard@standingrock.org>
Subject: [EXTERNAL] FW: Attached Image

Good morning,


I want to thank you for taking time out of your busy schedules to visit with my staff and I during your recent visit to
Standing Rock.  I am sincerely looking forward to working with you.


Jon Eagle Sr.

Tribal Historic Preservation Officer

Standing Rock Sioux Tribe

PO Box D

Fort Yates, ND 58538

(701) 854-8645; FAX (701) 854-2138


"Le makoce ki teunkilapi sni ki hehan un lakotapi kte sni."


From: SR THPO [mailto:thpo.copier@standingrock.org]
Sent: Tuesday, March 22, 2016 10:13 AM
To: Jon Eagle
Subject: Attached Image



**T**RIBAL HISTORIC PRESERVATION OFFICE
**S**TANDING ROCK SIOUX TRIBE
Administrative Service Center
North Standing Rock Avenue
Fort Yates, N.D. 58538
Tel: (701) 854-2120
Fax: (701) 854-2138

March 22, 2016

Martha S. Chieply
Chief, Regulatory Branch
U.S. Army Corps of Engineers
Omaha District
1616 Capitol Avenue
Omaha, Nebraska 68102-4901

Attention:     CENWO-OD-R

RE:    Dakota Access PCN Tribal Survey Involvement

Dear Ms. Chieply:

The Standing Rock Sioux Tribal Historic Preservation Office remains concerned with the incomplete surveys for the proposed Dakota Access Pipeline (DAPL). We are taking the position that the entire length of the pipeline route contains historic properties subject to section 106 of the National Historic Preservation Act, 16 U.S.C. §470f, but these valuable cultural resources have been neither identified nor evaluated, as required. 36 CFR §§800.2 and 800.3. Until the Corps of Engineers demonstrates that it shall properly identify and evaluate DAPL's impacts on all affected historic properties of Lakota/Dakota origin along the pipeline route, our office shall not participate in the limited field surveys.

Under the regulations of the Advisory Council on Historic Preservation, "Federal agencies should be aware that frequently historic properties of religious and cultural significance are located on ancestral, aboriginal, or ceded lands of Indian tribes and should consider this when complying with (NHPA section 106)."   36 CFR 800.2(C)(2)(D). Most of the DAPL pipeline route crosses Lakota/Dakota aboriginal land, so the expansive consultation and identification requirements apply.  As the Advisory Council advised the Corps of Engineers, "We urge the Corps to consider *expanding its review of this undertaking* by redefining the area of potential impacts (APE) consistent with 36 CFR Section 800.16(d)." (Letter of Reid J. Nelson to Col. John W. Henderson, March 15, 2016, emphasis added).

The Advisory Council has made clear that the Corps of Engineers must expand the APE and implement more effective consultation, in order to properly identify, evaluate and



**TRIBAL HISTORIC PRESERVATION OFFICE**
**STANDING ROCK SIOUX TRIBE**
Administrative Service Center
North Standing Rock Avenue
Fort Yates, N.D. 58538
Tel: (701) 854-2120
Fax: (701) 854-2138

resolve adverse effects on historic properties affected by DAPL. I look forward to working with your office and the ACHP for genuine compliance with the section 106 process on DAPL. Until that occurs, the Standing Rock Sioux Tribe Historic Preservation Office will not be sending out any Traditional Cultural Specialists to participate in partial compliance efforts.

Thank you for helping to protect our cultural resources and Tribal heritage. If you have any questions, please feel free to contact me.

Sincerely,

STANDING ROCK SIOUX TRIBE

Jon Eagle
THPO Director

Chieply 0095



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, OMAHA DISTRICT
1616 Capitol AVE
OMAHA, NEBRASKA 68102-9000

March 2, 2016

Absentee-Shawnee Tribe
Governor Edwina Butler-Wolfe
2025 S. Gordon Cooper Drive,
Shawnee, Oklahoma 74810

Dear Governor Edwina Butler-Wolfe:

Recognizing that tribes have special expertise in assessing the presence and potential eligibility of historic properties that may possess religious and cultural significance, the U.S. Army Corps of Engineers (Corps) Regulatory Branch is notifying you of an opportunity to conduct Tribal surveys at Preconstruction Notification (PCN) permit areas associated with the proposed Dakota Access Pipeline Project (DAPL). The purpose of this letter is to continue our responsibilities under Section 106 of the National Historic Preservation Act to identify possible historic properties of religious and cultural significance in PCN permit areas subject to Corps jurisdiction. DAPL has agreed to coordinate the Tribal surveys on PCN permit areas to supplement the previously provided Cultural Resource Inventory Reports and/or provide the opportunity for the tribes to monitor the construction activities. DAPL will be responsible for coordinating the tribal surveys in the PCN permit areas that are of interest to you.

Transparency between Tribes, DAPL and the Corps is critical to this success of this effort. If you or your Tribe are interested in conducting a survey or monitoring construction activities please provide the following information by emailing the Corps Omaha District Tribal Liaison, Joel Ames at joel.o.ames@usace.army.mil, by March 22, 2016.

1.   Name of Tribe
2.   Name of lead Surveyor/Monitor
3.   Contact information (phone numbers, email, address, etc.)
4.   Sites name/number your Tribe is interested in surveying/monitoring.

The Corps Omaha District Tribal Liaison will provide this information to DAPL, who will be responsible for all site visit logistics and schedule. Early identification of the locations is greatly appreciated to give DAPL the opportunity to secure landowner permission. To accurately document Tribal comments and/or concerns, after the site visit we are requesting Tribes provide us comments and concerns in writing. If your tribe is interested in this opportunity, please contact Corps Omaha District Tribal Liaison, Joel Ames at joel.o.ames@usace.army.mil or (402) 995-2909.

Should you have site specific PCN concerns within the St Louis District please contact Roberta Hayworth at roberta.l.hayworth@usace.army.mil, (314) 331-8833 or for the Rock Island District please contact Ron Deiss at ronald.w.deiss@usace.army.mil, (309) 794-5185.

Sincerely,

*Martha S Chieply*

Martha S. Chieply
Regulatory Chief, Omaha District

# EXHIBIT 15

Chieply 0097



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, OMAHA DISTRICT
1616 Capitol AVE
OMAHA, NEBRASKA 68102-9000

1 8 MAY 2016

District Commander

Reid J. Nelson, Director
Office of Federal Agency Programs
Advisory Council on Historic Preservation
401 F Street, NW, Suite 308
Washington, DC 20001-2637

Dear Mr. Nelson:

This letter is in response to your letter dated May 6, 2016 concerning the Dakota Access Pipeline Project (DAPL).  You provided further clarification of the Advisory Council on Historic Preservation (ACHP's) observations regarding the Corps of Engineers' (Corps) coordination and consultation of the Section 106 review for this undertaking and recommended further steps the Corps should take to adequately consider effects to historic properties.

We appreciate that the ACHP recognized the Corps' position that it is considering each linear crossing to be a single and complete undertaking for the purposes of the Nationwide Permit (NWP) verification and the Corps' limited jurisdiction in its determination of "area of potential effects" (APE).  For those areas where the Corps has jurisdiction, we have actively consulted with and have given full consideration to all comments and information provided by the ACHP, Tribes, Tribal Historic Preservation Offices (THPOs), State Historic Preservation Offices (SHPOs) and the public.

Your letter suggests that the water crossings enable or even determine the placement of the project's Rights of Way.  DAPL has endeavored to avoid waterways and waters of the United States, and the crossing of jurisdictional waters does not determine pipeline alignment. By utilizing methods such as Hydraulic Directional Drilling, which avoids the discharge of dredged or fill material in waters of the United States, less than 3% of the total pipeline is subject to the Corps' jurisdiction. It is our understanding that the federal oversight by the Farm Service Agency and the United States Fish and Wildlife Service (USFWS) results in actions over an even smaller percentages of the overall pipeline.  These limited federal actions do not justify a greater Federal effort to identify and evaluate historic properties.  However, as a courtesy, the Corps has taken efforts to involve the USFWS and include it in consultation efforts to ensure a transparent and streamlined review.

Your letter references the clearing of trees at some Preconstruction Notification (PCN) crossings in Iowa.  The Corps was recently made aware of the tree clearing, and our review of the circumstances surrounding the tree cutting does not indicate the action was undertaken to intentionally avoid the requirements of Section 106.  DAPL has

already completed cultural resource surveys at many of these locations and has worked with the Corps to facilitate additional surveys by the Tribes.  We have no evidence to indicate that Section 110(k) applies in this situation.

It is important to note that consultation efforts are still ongoing, and the Corps is responding and analyzing all new information received from Tribes, SHPO, ACHP and other consulting parties.  Recognizing the Tribes' special expertise, the Corps has taken specific steps to identify Tribes that may ascribe religious and cultural significance to historic property and invited them to participate in Section 106 consultation.  In addition to the Missouri River Programmatic Agreement coordination procedures, which reached out to 29 Tribes and four SHPO's, additional measures were taken to ensure additional Tribes were consulted with and were given the opportunity to provide input.  Tribes were provided cultural resource survey information for the entire pipeline in mid-December with reasonable review periods.  Along with separate consultation efforts for every Tribe requesting consultation, three dedicated consultation meetings were held with federally recognized Tribes.  Tribes were provided the opportunity to conduct Tribal surveys for portions of the areas subject to the Corps jurisdiction where access was granted by the land owner.  The Corps continues to consider all information received from consultation/meetings, interactions during tribal surveys, and survey reports to inform our decisions.

The Corps fully understands the requirements of the Section 106 process and its obligation to consult with interested parties in determining the effects of our undertakings.  We recognize there has been some difficulty in providing Mr. Daniel Higginbottom all of the information that he wants.  Mr. Higginbottom, a professional archeologist with the State Historical Society of Iowa, recused himself from this project review due to his family ownership of property within a minor segment of the pipeline corridor.  He has requested, however, the location of all PCNs in Iowa on the basis of general research interests. The Corps has made a good faith effort to obtain specific locational information associated with Mr. Higginbottom's research interests so that we could provide impact assessments associated with specific PCN verifications. Mr. Higginbottom has not provided the specificity needed to address his research interests or the necessary documentation to obtain any information beyond that which impacts land holdings associated with the Darlene Higginbottom Irrevocable Trust. The Corps solicited specific comments from Mr. Higginbottom over a period of four months and terminated his opportunity for review and comment as a consulting party on May 6, 2016, due to the fact that the coordination was not productive.

The Corps of Engineers is committed to fulfilling its obligations under Section 106 and will continue to actively consult and give full consideration to all input provided by the ACHP, Tribes, THPOs, SHPOs and the public.  Acknowledging the government to government relationship between the Corps and Tribes and our trust responsibility, we have sought and will continue to engage in consultation and consideration of comments from Tribes.  Should you have any questions or wish to discuss this matter further, please contact Ms. Martha Chieply, Regulatory Chief, at (402) 995-2451 or martha.s.chieply@usace.army.mil, or Mr. Larry Janis, Natural Resources and Recreation Branch Chief, at (402) 995-2440, or larry.d.janis@usace.army.mil.

Sincerely,

John W. Henderson, P.E.
Colonel, Corps of Engineers
District Commander

# EXHIBIT 16

Chiefly 0101

DATE:  July 7, 2016

SUBJECT:  McCullor's Review of DAPL's Cultural Resource Survey Report for MFR.


I, Matt McCullor, received a copy of DAPL's Cultural Resource Survey Report the week prior to the TDY in Sioux Falls, SD concerning the DAPL project (25 Jan 16.  Since receipt of the report covering areas within the Omaha District, and a week after the Sioux Falls Consultation meeting, I reviewed the report.  I received access to other portions of the report from DAPL and performed a quick review of those portions.

The reports for the Omaha District titled "Level III Intensive Cultural Resources Survey for Dakota Access Pipeline Project for Campbell, McPherson, Edmunds, Faulk, Spink, Beadle, Kingsbury, Miner, Lake, McCook, Minnehaha, Turner, and Lincoln Counties, South Dakota" and "Dakota Access, LLC Dakota Access Pipeline Project (ND) 2014 Dakota Access Class II/III Cultural Resources Inventory."  During review of reports, nothing drew my attention except the crossing of the James River (PCN 4).  No crossings would cause affects to Historic Properties, except for the crossing of the James River.

From time to time, I reviewed the report that covered the Omaha District.  These reviews were to remind myself of the findings at each PCN and to understand the areas the Upper Sioux Community would be surveying.

In summary, I reviewed all the report sections I had access to that concerned river crossings (both PCN and non-PCN crossings) for the DAPL Project, especially the areas in the Omaha District.  No Non-PCN crossing caused concerns about affects to Historic Properties.

# EXHIBIT EE

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

STANDING ROCK SIOUX TRIBE, )
                                         )
                                         )     **Case No. 1:16-cv-1534-JEB**
                 **Plaintiff,**   )
                                         )
v.                                        )
                                         )
U.S. ARMY CORPS OF ENGINEERS, )
                                         )
                **Defendant.**   )
                                         )

**DECLARATION OF JOEL AMES**

In accordance with the provisions of 28 U.S.C. 1746, I, Joel Ames, declare that the

following statements are true and correct to the best of my knowledge, information, and belief

and are based upon my personal knowledge and/or my review of information contained in the

records of the United States Army Corps of Engineers ("Corps") or supplied by current

employees:

1. I am currently employed as the Tribal Liaison for the United States Army Corps of

    Engineers (USACE), Omaha District (Omaha District). I have served in this capacity

    since November of 2003.

2. I received my Environmental and Emergency Management education while serving as an

    Environment Specialist in the United States Navy, Naval Submarine Base, New London,

    Connecticut from 1991 until I retired in 1995.

3. From 1996 until 2003, I was the Department of Defense (DoD) Regional Environment

    Compliance Officer (RECO) and Federal On-Scene Coordinator for Commander,

    Northeast Region. At the same time, I was the DoD representative to the Canada/United

1

States Joint Response Team, where I led the effort to engage Tribes and get their input in various Regional and Trans-border Emergency Response Plans to prepare for possible oil or chemical releases that crossed national borders. I was also selected to assist DoD to develop the American Indian and Alaska Native Policy with the White House Domestic Policy Office to comply with President Clinton's Executive Order 13175. In this position I worked with various Tribal and DoD representatives in the development of the policy language. This document was signed by William S. Cohen, Secretary of Defense, 20 October 1998.

4. As part of my normal duties as Tribal Liaison at the Omaha District, I advise the Commander, Department Heads, Branch Chiefs and Program Managers on all matters associated with Tribal coordination and consultation. I am also responsible for outreach, coordination, and consultation with Tribes in connection with Omaha District actions related to pipelines, water intakes, Missouri River water management, bombing ranges and munitions cleanup, flood prevention, and in-situ response actions.

5. As the Omaha District Tribal Liaison for the Dakota Access Pipeline (DAPL) project, I assisted the District's efforts to consult with Tribes under Section 106 of the National Historic Preservation Act (NHPA), to inform affected tribes about the DAPL project, and to coordinate communication with the tribes via email, phone, text messages and letters. My effort in this regard began on or about September 17, 2014, when I was asked to assist in scheduling a consultation meeting as requested by Ms. Waste' Win Young, the Standing Rock Sioux Tribe (SRST) Tribal Historic Preservation Officer (THPO).

6. Between September 17 and October 22, 2014, I made numerous phone calls and sent several e-mail and text messages to Ms. Young and the Chairman's Secretary in an effort to secure a meeting date.

7. I scheduled a meeting for November 6, 2014 at the SRST HQ building in Ft Yates, North Dakota, between the Omaha District Engineer, Colonel Cross, and his staff, including the District Counsel, a Corps archeologist, the Lake Oahe Project Manager, the Chief of Real Estate, Omaha District and the Chief of the Omaha District Recreation and Natural Resources Branch and the Tribal Chairman and the Tribal Council. We discussed a number of important items like water rights, treaties, Corps/Tribal Relations, a water taxi, impacts from the construction of the dams and reservoirs and the return of tribal lands. However, we did not discuss the DAPL project because Ms. Young, the SRST THPO, did not attend the meeting.

8. I continued my efforts to schedule a meeting with Ms. Young, but was unsuccessful until February 10, 2015, when Ms. Young and I attended an unrelated regulatory meeting in Billings, Montana. At that time, Ms. Young informed me that she was currently working directly with the applicant and did not need to consult with the Corps at that time.

9. In a letter dated February 25, 2015, Ms. Young contacted Ms. Martha Chiesly, Regulatory Branch Chief, Omaha District, regarding geo-technical exploration activities proposed by Dakota Access for the Lake Oahe crossing. Ms. Young was concerned the exploration activities posed a risk to possible burials and other cultural resources in the area. After that, I made periodic efforts to schedule a consultation meeting, but we could not find a date when both the Colonel and the Chairman were available. On June 24, 2015, I learned that Ms. Young was on a Temporary Leave of Absence and would return

3

on approximately July 27. As far as I could ascertain, there was no one empowered to act as the THPO while she was unavailable.

10. In a letter dated August 19, 2015, Omaha District Commander, Colonel John Henderson, responded to the Standing Rock Sioux Tribal Chairman Dave Archambault's concerns associated with the DAPL project and I unsuccessfully attempted to schedule a consultation meeting with the Tribe.

11. By letter dated September 3, 2015, to Chairman Archambault, Omaha District Commander, Colonel John Henderson, referenced preconstruction notifications (PCNs) submitted by Dakota Access for the DAPL project in order to initiate consultation on the project. A map with the PCN locations and a DAPL fact sheet were included with the letter. In addition, the letter described the Corps' limited jurisdiction over the project, acknowledged the tribe's previous letters, requested information on specific sites of concerns, and invited the tribe to consult on the project. Colonel Henderson requested a response by September 30, 2015.

12. In a letter dated September 28, 2015 to Colonel Henderson, Ms. Young responded to the Colonel's September 3, 2015 letter to Chairman Archambault and welcomed the initiation of consultation, but stated the Corps had not provided adequate response to her previous consultation concerns. She mentioned the tribe should have been consulted before Dakota Access began archeological surveys and before the bore testing occurred. She concluded that it was "clear" the Corps was attempting to circumvent the Section 106 process. Ms. Young claimed that the tribe had been excluded from the Section 106 process of consultation, identification and resolution of adverse effects and was concerned about the irreparable damage to known sites if the ancillary facilities, staging

4

areas and roads were built without adequate buffers. Finally, she accused the Corps of piecemealing the project to avoid reviewing the entire pipeline, and again request an EIS be prepared for the project.

13. On September 29, 2015, I spoke with Chairman Archambault by phone and arranged a meeting between the Corps and the Tribe to be held in Pierre, South Dakota on October 28, 2015. The Chairman told me that he would send his Vice Chair along with a few Council Members and his THPO. Soon after I attempted to coordinate the logistics and agenda for the meeting, but was unsuccessful. On October 26, the Tribal Archeologist, Ms. Kelly Morgan, notified me by phone and e-mail that the meeting was canceled because nobody from the tribe was available to attend.

14. In an email dated October 26, 2015, after several email attempts to schedule a meeting with the SRST, Dr. Morgan postponed a meeting that had been tentatively scheduled for early November. She stated that she looked forward to a meeting between the Colonel "in a few months."

15. I renewed my efforts to schedule another meeting with the SRST and also invited tribal representatives to participate in a larger meeting with representatives from several tribes to be held on December 8, 2015 in Sioux Falls, South Dakota (phone calls and emails to the Chairman and his Secretary). In a phone call in early November, Chairman Archambault indicated he would send a tribal representative to the general meeting. However, immediately prior to the meeting, he informed me by phone that the SRST would not send a representative to the meeting because Ms. Young no longer worked for the SRST. In the same call, I requested a meeting with the Chairman and he instructed me to work with him and his Secretary to arrange a date to meet.

16. I also spoke to Mr. Steve Vance, the CRST SHPO during this meeting and committed to provide him additional information regarding the surveys conducted by Energy Transfer. He was concerned that tribal members were not present during those surveys.

17. In light of my unsuccessful attempts to schedule a meeting, Colonel Henderson requested the Omaha District Deputy Commander, LTC Michael D. Sexton, attempt to schedule a meeting. No tribal representative returned his calls.

18. In a letter dated January 8, 2016, Chairman Archambault provided the following comments on the Draft EA for the DAPL project: The Corps did not consult with the SRST; the Draft EA fails to properly address cultural, historic and archeological resource issues; the draft EA fails to properly address the potential for environmental damage to waters which are critically important to the Tribe and its members, and the draft EA fails to properly address Environmental Justice.

19. In early January 2016, I learned that Ron His Horse Is Thunder was the new SRST THPO and began working with him to arrange a consultation meeting, ultimately scheduled for January 22, 2016. Because Mr. Horse Is Thunder informed me the Chairman would not attend the meeting we scheduled a staff-level meeting between the SRST and Omaha District for January 22, 2016 at the SRST Headquarters Building in Ft. Yates, North Dakota. Colonel Henderson did not attend the meeting.

20. However, when we arrived for the January 22 meeting, we were informed that the Chairman and some non-staff tribal members wished to participate in the meeting. After introductions, Chairman Archambault gave his opening remarks. One of the first things he said was that he did not consider the meeting to be a Government to Government (G2G) Consultation. He mentioned recent visits to the reservation by President and Ms.

6

Obama and the Secretary of the Interior and concluded that G2G consultation would require either the President of the United States or the Secretary of Interior. Nonetheless, the meeting was productive and information gathered from the participants was later used to further develop the Draft Environmental Assessment (EA) associated with the Oahe crossing.

21. In a letter dated January 27, 2016, to Martha Chieply and me, Chairman Archambault referenced the January 22, 2016 meeting with Corps representatives and requested a written response to 12 questions posed in the letter.

22. On February 4, 2016, I began coordinating a follow-up meeting with the larger group of potentially affected Tribes, including the SRST. On February 10, while attempting to schedule another consultation meeting between the District Commander and the SRST Chairman, as discussed in the January 22 meeting.

23. On February 8, 2016, I received a voicemail message from the CRST Chairman, Harold Frazier, requesting that I contact him, although he did not tell me the nature of his call. I responded to his call on February 9, 2016, but he was unavailable and I left a message with his secretary.

24. I called Chairman Frazier again on February 10, 2016, but he was unavailable so I left another message with the Tribal Secretary. I also attempted to reach him on his cell phone, but I was unable to leave a voicemail there.

25. Also on February 10, 2016, Ron His Horse Is Thunder emailed me to tell me he was no longer the SRST THPO and that the new THPO was Jon Eagle.

26. Chairman Frazier did not return my calls, and I called again the following week but he was still unavailable. During the meeting in Niobrara, on February 18 and 19, 2016, the

CRST THPO, Mr. Steve Vance, stated that he would like the Corps to consult with his Tribe. I explained to him that I had been attempting to make that arrangement with the Chairman but needed some assistance in getting a timeframe. He agreed to help make it happen.

27. I arranged a meeting with the SRST on February 26, 2016, also at the tribal headquarters in Ft Yates, North Dakota. Again, Chairman Archambault opened the meeting by informing the Commander and District participants that the Tribe did not consider the meeting to constitute consultation. During this meeting, Chairman Archambault stressed the economic and cultural importance of the area immediately above and near the proposed Lake Oahe crossing. He was particularly concerned that the draft EA did not address the area or the reservation. At the meeting, Corps representatives committed to continue to accept and consider tribal comments, provide Dakota Access application documents which were legally releasable and would impose additional conditions on the pipeline, like double walled pipes, shutoff valves on each side of the crossing and fiber optic monitoring of the pipeline.

28. By letter dated February 29, 2016 to Colonel Henderson, Chairman Archambault referenced the February 26, 2016 meeting with the Colonel in which he showed the Colonel the area of the Oahe crossing and explained the devastating effect an oil spill would have on the reservation. He listed five commitments the Colonel made at the meeting. The Chairman closed by stating the dialogue was productive but that the Corps did not conduct meaningful and timely consultation as evidenced by the fact the draft EA did not take the reservation into consideration at all. He repeated the SRST's request for the completion of an EIS.

8

29. On March 3, 2016, at the request of the SRST, a meeting was held at USACE HQ between SRST Representatives, and the Principal Deputy ASA(CW), and other Corps staff.

30. Colonel Henderson responded to Chairman Archambault's February 29, 2016 letter in a letter dated March 18, 2016. In an attachment, he responded to the commitments and comments in the Chairman's letter.

31. In a letter to Martha Chieply, dated March 22, 2016, the SRST THPO, Mr. Jon Eagle, urged the Omaha District to expand the Section 106 consultation and review to the entire pipeline. Ms. Chieply responded in an email dated March 22, 2016 and explained that the Corps was limited in its authority and the scope of its jurisdiction and must review each crossing as a separate and complete project.

32. In a letter dated March 24, 2016, addressed to Colonel Henderson and Lowry A. Crook, Principal Deputy Assistant for Civil Works, and copied to Chip Smith in the Office of the Assistant Secretary of the Army for Civil Works, Chairman Archambault presented supplemental comments on the DAPL project. The Chairman reemphasized the importance of the Missouri River and the surrounding area to the SRST and offered what appears to be a legal opinion discussing the Corps processes in relation to the DAPL project.

33. Another meeting between Colonel Henderson and Chairman Archambault was held at the Tribal casino in South Dakota on April 29, 2016. Once again the Chairman expressed the Tribe's opinion that the meeting did not constitute consultation.

34. In a letter dated May 6, 2016 to Chairman Frazier, Colonel Henderson addresses the Mr. Vance's request for a meeting and my unsuccessful attempts to schedule it. He stressed

9

that he takes tribal requests to meet and discuss the DAPL project seriously and expressed his hope that a meeting would be scheduled.

35. In a letter dated May 11, 2016, Chairman Archambault referenced the April 29 meeting and requested that Omaha District Counsel meet with tribal attorneys to discuss specifics of the DAPL pipeline. The Omaha District Counsel was willing to discuss general procedural matters but not specific issues concerning the consideration of the DAPL project. The Chairman felt such a limited discussion would be unproductive but offered to schedule a substantive discussion if the Corps changed its position. The attorneys ultimately participated in a conference call in which they discussed general matters.

36. On Saturday, 14 May 2016, Colonel Henderson, the Chairman, and I met in Omaha to have additional discussions regarding the project and the path forward. Further communications continued until July 25, 2016, when the EA and Finding of No Significant Impact were signed and the final decision was made on the Nationwide Permit #12 verifications.

37. In a June 3, 2016 letter to the Omaha District CRST Chairman Frazier argued that the EA failed to meaningfully analyze tribal cultural issues and that the Corps had not fulfilled its obligation to consult with the CRST because it did not consult before the draft EA was published or before Dakota Access performed cultural resources surveys on the pipeline alignment. He also stated that the general tribal meetings were not consultation with the CRST. He concluded that the Corps failed to initiate or satisfy its consultation obligations and requested the immediate initiation of consultation with the CRST.

38. In a June 22, 2016 letter to Chairman Frazier, Colonel Henderson responded to the Chairman's request for consultation by mentioning that I had spoken with Vice-Chairman LeBeau on April 29, 2016, after the SRST consultation in an attempt to schedule a meeting. He referenced his May 6 letter. He included Questions and Answers in response to any questions the Chairman may have. Finally, he committed to providing Chairman Frazier with a copy of the ASA(CW) response to the ACHP as soon as it became available.

39. In a letter dated July 25, 2016, CRST Chairman Frazier objected to alleged illegal and unauthorized intrusions into tribal sovereignty because the Corps allegedly failed to adequately consult on the DAPL project. He requested the Corps complete an EIS and give due consideration to the comments of the tribes of the Great Plains.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on _18 Aug 2016_ .

_____ , in Omaha, Nebraska.

Joel Ames

11

# EXHIBIT FF



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, OMAHA DISTRICT
1616 CAPITOL AVEUNE
OMAHA NE 68102

**MAY 06 2016**

District Commander

Mr. Harold Frazier, Chairman
Cheyenne River Sioux Tribe
PO Box 590
Eagle Butte, South Dakota 57625

Dear Chairman Frazier:

At a recent Dakota Access Pipeline (DAPL) meeting, Mr. Steve Vance, Cheyenne River Sioux Tribe Tribal Historic Preservation Officer requested a meeting. In trying to coordinate the meeting, Mr. Joel Ames, Omaha District Tribal Liaison indicated that you had left him a voicemail confirming your interest in meeting. Unfortunately it appears we have been unsuccessful in identifying any potential meeting dates.

I take requests to meet with Tribes seriously and would like to meet to discuss not only the DAPL project, but any other topics you may want to discuss. My hope is that we can arrange a meeting prior to making a decision on the DAPL project, but in the meantime we will continue to work with your staff as we progress forward.

I seek opportunities such as this to work collaboratively on matters of mutual interest. If you have any additional questions or concerns, please contact me or Mr. Joel Ames at 402-995-2909, or via e-mail at joel.o.ames@usace.army.mil.

Sincerely,

John W. Henderson, P.E.
Colonel, Corps of Engineers
District Commander

USACE_DAPL0064300

# EXHIBIT GG

From:     "Ames. Joel O NWO" <NWO>
To:       Henderson
          "John W COL" <NWO:>
CC:       Wilson
          Cody <NWO:>
Date:     5/3/2016 8:25:40 AM
Subject:  FW: [EXTERNAL] Re: Another Letter

---

Sir, FYSA, I have heard back from the YST THPO this morning. In the below string you will see that he was unaware of the letter we received. I'll continue to reach out to the Chairman........Joel

-----Original Message-----
From: Ames, Joel O NWO
Sent: Tuesday, May 03, 2016 8:22 AM
To: 'Perry Little'
Subject: RE: [EXTERNAL] Re: Another Letter

Once again, Thank You Perry, I'll keep you posted if I hear back from him...........Joel

-----Original Message-----
From: Perry Little [mailto:yst.thpo@gmail.com]
Sent: Tuesday, May 03, 2016 8:17 AM
To: Ames, Joel O NWO
Subject: Re: [EXTERNAL] Re: Another Letter

no I don't and I haven't seen him this morning.

On Tue, May 3, 2016 at 7:52 AM, Ames, Joel O NWO > wrote:

USACE_DAPL0064317

Perry,

Thanks for the information. I have called the Chairman and also sent him a text message, have not received a response. Do you have the Chairman's e-mail address? We were hoping that a meeting could be set up with you and the Chairman and Corps representatives in the near future, at the project office. Would you be able to assist with that?............Joel

-----Original Message-----
From: Perry Little [mailto:yst.thpo@gmail.com ]
Sent: Tuesday, May 03, 2016 7:45 AM
To: Ames, Joel O NWO >
Subject: [EXTERNAL] Re: Another Letter

I don't know who wrote this maybe faith youll need to contact Robert himself on this I have no idea sorry

On Mon, May 2, 2016 at 11:22 AM, Ames, Joel O NWO > > wrote:

Perry,

We just received this letter from the Chairman. As you know, we have been try to arrange this meeting. Please contact Cody and I so we can work the arrangements. Thanks in advance...............Joel

--

Pidamaya!

Perry Little

THPO Director
605-384-3641 ext. 1033
605-469-5538 or 605-469-6056
Blockedwww.yanktonsiouxtribe.net



--

Pidamaya!

Perry Little
THPO Director
605-384-3641 ext. 1033
605-469-5538 or 605-469-6056
Blockedwww.yanktonsiouxtribe.net

USACE_DAPL0064319

# EXHIBIT HH

Mnicoujou                          Itazipco          **CHEYENNE RIVER SIOUX TRIBE**
                                                    **Cultural Preservation Office**
                                                     PO BOX 590 98 S. Willow St.
                                                     Eagle Butte, South Dakota 57625
                                                     Telephone: (605) 964-7554
                                                     Fax:  (605) 964-7552

                                                    **Steven Vance**
                                                    **Tribal Historic Preservation Officer**
                                                     stevev.crstpres@outlook.com

Siha Sapa                          Oohenumpa

Date:  May 19, 2016

Colonel John Henderson
District Engineer
Omaha District
Department of the Army
U.S. Army Corps of Engineers,
1616 Capitol Avenue, Suite 9000
Omaha, Nebraska 68102

The Cheyenne River Sioux Tribe (CRST) submits these concerns and comments to the
proposed Dakota Access Pipeline (DAPL) project.

In a letter dated April 22, 2016 from the Department of the Army US Army Corps of
Engineers (USACE), was of "concurrence with our "Not Eligible" and "No Historic
Properties Affected" determination. This was sent to Ms. Fern Swenson, North Dakota
Deputy State Historic Preservation Officer (SHPO), requesting concurrence.

I disagree with the evaluation of Not Eligible and disagree with the determination of No
Historic Properties Affected. CRST Tribal Historic Preservation Officer (THPO), states
that all Native cultural properties or sites are Eligible and the proposed project will have
Adverse Effects to those cultural resources.

The USACE has made statements that they have conducted Section 106 Consultation
with Tribes. The CRST THPO has received emails and maybe a couple telephone calls
and disagrees that this method is not meaningful consultation. In Niobrara, Nebraska on
February 18-19, 2016, I verbally invited USACE staff to discuss the proposed DAPL
application with our Tribal Council, face-to-face.

I asked for this to occur because USACE titled the two (2), previous meetings in Sioux
Falls as consultation. Again I repeat from the letter sent by the USACE Omaha District
on November 19, 2015 that CRST comments are "in the comment resolution stage". I
have not received response on the comments from the Standing Rock Sioux Tribe
(SRST), on April 8, 2015 (not August 21, 2015), comments I supported. I don't know if
these was a response to SRST but I also supported the concerns and was not notified of
any response. If there was a response I am requesting a copy.

Again, briefly are the comments from SRST:

- Opposed to any geotechnical boring.
- Mitigation for site 32MO0001, an earth lodge village.
- The current Environmental Assessment (EA) in insufficient for oil pipelines.
- A request that an Environmental Impact Statement (EIS) be completed.
- A Class III Archaeological Study, with Tribal involvement, be conducted.
- Risks of disturbing burials by dredging the Missouri, other tributaries.
- Disagrees with the "No Historic Properties Affected" determination.
- Concerns for all residents along the proposed route of the quality of water.

I thought USACE would respond to my letter at the first meeting held in Sioux Falls, South Dakota on December 8, 2015. Instead the Tribes at this meeting was given an agenda and USACE allowed the applicant, Energy Transfers, to give a presentation of their proposed project. While Tribes had no material of the presentation USACE told the Tribes that they sent an email to access the reports through a site but none of the Tribes could access the site. USACE staff also stated that there was issues in getting access to the site. USACE deemed this meeting as consultation. This was not conducted with the interest of the Tribes in mind. I request response to my comments on August 17, 2015.

US Fish and Wildlife (USFWS), was not in attendance at this meeting in Sioux Falls, SD. USACE said they informed them of the meeting but they were unable to attend. This was a request from me that they be present. The meeting was almost useless.

After reviewing the studies conducted in 1980, 1983, 2009, and 2014 by Merjent, Inc., Alpine Archaeological Consultants, Inc., and Gray & Pape, Inc., all of which are non-Tribal archaeological firms. I disagreed with the determination of cultural site as Not Eligible submitted by Merjent Inc. This determination is of the European point of view, not the Native view and is non-compliance to Section 106 as Tribes have not been offered opportunity to survey. I request the same opportunity for Tribal identification.

I disagreed with the applicant addressing affects to Native cultural resources. This is also true for the several archaeological firms who have made identification and evaluation of cultural resources without Tribal involvement. Consultation before identification.

I request the other agencies participate in the Section 106 Consultation, such as US Environmental Protection Agency (USEPA). The eastern boundaries of CRST is the Missouri River/Oahe Dam, which is downstream of the proposed crossing. Contaminant from the proposed Horizontal Directional Drilling (HDD), will have effects to not just the few navigable rivers in the report but all streams, creeks, and other channels where water. There is still the subsurface water sources that have not been mentioned. USACE cannot address these concerns then so USEPA should.

February 2016 EPA was issued guidance by issuing the EPA Policy on Consultation and Coordination with Indian Tribes. This is guidance for discussing Tribal treaty rights and affects to water and air quality from projects which will effect Tribes, downstream or nearby, such as DAPL.

Colonel Henderson stated in the meeting in Nebraska that the Bureau of Indian Affairs (BIA), was involved. This is information that was not shared with Tribes and it came as a surprise to Tribes. I responded that BIA is also a federal agency. The question is how, when, where, and why is BIA involved?

This being an oil pipeline I request the Department of Energy (DOE), or Federal Energy Regulatory Commission (FERC), participate in addressing the proposed pipeline.

With multiple agencies mentioned, USACE, USFWS, BIA, DOE, FERC, USEPA, BLM, (maybe Rural Utilities Service), and the multiple resources that would have potential effects, I request that the Bureau of Land Management (BLM), be participating.

I continue to disagree with USACE using Appendix C as it is outdated and confusing when responding to comments and concerns of water and water quality. Colonel Henderson stated in a letter to ACHP on April 11, 2016 (Appendix C);

> "..the Corps regulatory offices only have authority over the permit area, which is defined as "those areas comprising the waters of the United States that will be directly affected by the proposed work or structures and uplands directly affected as a result of authorizing the work or structures".

> He further states "… the Corps cannot redefine the area of potential effects. However, Appendix C does allow the Corps to consider the potential effects outside the permit area to known historic properties, but the Corps is not responsible for identifying or assessing potential eligible historic properties outside the permit area".

USACE comments for the Area of Potential Effect (page 2):

> "… the HDD construction is considered a federal undertaking and thus subject to the terms of the Missouri River Programmatic Agreement and Section 106. Any construction activity related to the HDD installation is considered as part of this undertaking, regardless of land ownership."

USACE comments on Section 106 Consultation (page 7):

> "Solicitation for consultation and comments for the DAPL Oahe Crossing Project was initiated in an information letter dated 22 July, 2015."

Again I will reflect on the "informational" meeting in Niobrara, Nebraska. I asked Colonel Henderson when the USACE deem that consultation has started. He responded with "Consultation starts when Tribes say it starts". I questioned it again. This time he responded "Officially it started September 2015". And yet the letter on April 22, 2016 states, page 7, "Solicitation for consultation and comment for the DAPL Oahe Crossing Project was initiated in an information letter dated 22 July, 2015".

I continue to say that there has been no meaningful Tribal consultation with USACE and USFWS, who finally attended the Niobrara, Nebraska meeting, on this proposed project. There has been thousands of pages of reports, studies, information, proposed route (with no alternatives), produced and proposed by Energy Transfers, contract archaeologists,

USACE_DAPL0067925

USACE, USFWS, but no consideration of involving Tribes until December 2015. There has been no productive progress for the concerns or comments from Tribes.

The letter also states (bottom of page 7):

> "While some of these comments overlapped those made in direct response to the cultural resources review, the majority concerned larger issues, often related to the pipeline project as a whole and were beyond the scope of the Oahe crossing action. As such, these comments are not addressed in this effort".

Where we are at this point with USACE on the proposed DAPL is still at the beginning. So how it is that USACE can submit a letter to the ND SHPO for concurrence with their Not Eligible and No Historic Properties Affected?

USACE, as the designated lead agency for DAPL, cannot address all issues of concern. Trying to conclude the consultation is premature and a violation of federal mandates and compliances. I request FERC or BLM be the lead federal agency. USACE has not met the "good faith effort" nor have USACE kept the interest of Tribes in mind.


Respectfully,




Cc; Chairman Harold Frazier
      file

# EXHIBIT II

**Mnicoujou**                    **Itazipco**

**CHEYENNE RIVER SIOUX TRIBE**
**Cultural Preservation Office**
PO BOX 590 98 S. Willow St.
Eagle Butte, South Dakota 57625
Telephone: (605) 964-7554
Fax:  (605) 964-7552

**Steven Vance**
**Tribal Historic Preservation Officer**
stevev.crstpres@outlook.com

**Siha Sapa**                    **Oohenumpa**

Date:  May 2, 2016

Richard Harnois
Sr. Field Archaeologist
Department of the Army
Corps of Engineers, Omaha District
Oahe Project
28563 Powerhouse Road
Pierre, SD 57501-6174

The Cheyenne River Sioux Tribe (CRST) submits these concerns and comments to the proposed Dakota Access Pipeline (DAPL) project.

Information received April 28, 2016 from the Department of the Army US Army Corps of Engineers (USACE), was of "concurrence with our "Not Eligible" and "No Historic Properties Affected" determination. This was sent to Ms. Fern Swenson Deputy State Historic Preservation Officer (SHPO), and copy to me.

I disagree with the evaluation of Not Eligible and disagree with the determination of No Historic Properties Affected. CRST THPO states that all Native cultural findings are Eligible and the proposed project will have Adverse Effects to cultural resources.

The USACE continues to make statements that they have consulted with Tribes. All that CRST has been receiving are emails and maybe a phone call. USACE has been asked by the THPO to schedule a meeting with CRST Tribal Council. This was at the meeting in Niobrara, Nebraska on February 18-19, 2016.

I asked for this to occur because USACE titled the two (2), previous meetings in Sioux Falls as consultation. Again I repeat from the letter sent by the USACE Omaha District on November 19, 2015 that CRST comments are "in the comment resolution stage". I have yet to be contacted on the comments from the Standing Rock Sioux Tribe (SRST), on April 8, 2015 and CRST THPO comments on August 17, 2015.

Again, briefly are the comments from SRST:

- Opposed to any geotechnical boring.
- Mitigation for site 32MO0001, an earth lodge village.

- The current Environmental Assessment (EA) in insufficient for oil pipelines.
- A request that an Environmental Impact Statement (EIS) be completed.
- A Class III Archaeological Study, with Tribal involvement, be conducted.
- Risks of disturbing burials by dredging the Missouri, other tributaries.
- Disagrees with the "No Historic Properties Affected" determination.
- Concerns for all residents along the proposed route of the quality of water.

CRST THPO requested Tribal participation after reviewing that studies were conducted in 1980, 1983, and 2009 without Section 106 Consultation.

I disagreed with the determination of Not Eligible because of this same non-compliance to Section 106.

I disagreed with the applicant addressing affects to cultural resources. This is also true for the several archaeological firms who have made identification and evaluation without Section 106 Consultation.

I request the other agencies participate in the Section 106 Consultation, such as US Environmental Protection Agency (USEPA). Contaminant from the proposed DAPL will spill into not just the few navigable rivers but all streams, creeks, and other channels where water, or rain, can travel into all waters crossed. If USACE can not address these concerns then USEPA should.

Just to mention that Colonel Henderson stated in the meeting in Nebraska that the Bureau of Indian Affairs (BIA), was involved. I responded that BIA is also a federal agency.

I also request that the Bureau of Land Management (BLM), be participating as the question of "surface and sub-surface" management.

To date these have not been addressed or responded to me.

I also continue to disagree with USACE Appendix C as outdated and confusing when responding to comments and concerns of water and water quality. Colonel Henderson stated in a letter to ACHP on April 11, 2016 (Appendix C);

> "...the Corps regulatory offices only have authority over the permit area, which is defined as "those areas comprising the waters of the United States that will be directly affected by the proposed work or structures and uplands directly affected as a result of authorizing the work or structures".

> He further states "... the Corps cannot redefine the area of potential effects. However, Appendix C does allow the Corps to consider the potential effects outside the permit area to known historic properties, but the Corps is not responsible for identifying or assessing potential eligible historic properties outside the permit area".

I am requesting that the USACE utilize 36 CFR 800 for consultation, not Appendix C or let BLM take the lead and initiate the proper and respectful consultation Tribes have been

USACE_DAPL0068221

requesting. USACE has not met the "good faith effort" nor have USACE kept the interest of Tribes in mind.
Back to the April 22 letter.

USACE comments for the Area of Potential Effect (page 2):

"… the HDD construction is considered a federal undertaking and thus subject to the terms of the Missouri River Programmatic Agreement and Section 106. Any construction activity related to the HDD installation is considered as part of this undertaking, regardless of land ownership."

USACE comments on Section 106 Consultation (page 7):

"Solicitation for consultation and comments for the DAPL Oahe Crossing Project was initiated in an information letter dated 22 July, 2015."

Again I will reflect on the "informational" meeting in Niobrara, Nebraska. I asked Colonel Henderson when the USACE deem that consultation has started. He responded with "Consultation starts when Tribes say it starts". I would not accept this and questioned it again. This time he responded "Officially it started September 2015".

I continue to say that there has been no meaningful consultation with USACE and US Fish and Wildlife Service (USFWS), on this proposed project. There has been thousands of pages of reports, studies, information, proposed route (with no alternatives), and so on. There has been no productive progress for the concerns or comments from Tribes.

The letter also states (bottom of page 7):

"While some of these comments overlapped those made in direct response to the cultural resources review, the majority concerned larger issues, often related to the pipeline project as a whole and were beyond the scope of the Oahe crossing action. As such, these comments are not addressed in this effort".

For where we are at this point with the proposed DAPL is still at the beginning. So how it is that USACE can submit a letter to the ND SHPO for concurrence with their Not Eligible and No Historic Properties Affected?


Respectfully,



Cc; file
CRST Chairman Harold Frazier

USACE_DAPL0068222

# EXHIBIT JJ



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, OMAHA DISTRICT
1616 CAPITOL AVENUE
OMAHA NE 68102-4901

REPLY TO
ATTENTION OF

JUN 22 2016

District Commander

Harold C. Frazier, Chairman
Cheyenne River Sioux Tribe
PO Box 590
Eagle Butte, SD 57625

Dear Chairman Frazier,

I am writing to confirm receipt of your letter dated June 3, 2016 regarding the Dakota Access Pipeline (DAPL). The U.S. Army Corps of Engineers is committed to meaningful and transparent consultation with our Tribal partners. Efforts to arrange a meeting have continued. On April 29 2016, Mr. Ames spoke with Vice-chairman LeBeau, at the conclusion of a SRST Meeting, in an attempt to arrange a meeting. Additionally, on May 6, 2016 I sent you a letter (attached) addressing your Tribes request, neither action has received a response.

To best address the concerns in your letter, I am providing you a recent Question and Answer summary from the consultation meetings that have been held over the past months. I hope this will clarify some of the procedural and technical questions you posed.

Additionally, the Advisory Council on Historic Preservation sent an inquiry (attached) to Ms. Jo-Ellen Darcy, the Assistant Secretary of the Army for Civil Works and the Agency Head. In that letter, similar questions were raised about Section 106 and consultation as were raised in your letter. I will ensure you receive a copy of Ms. Darcy's response, who will respond shortly.

My staff is always available to answer questions. Please contact Ms. Martha Chieply at (402) 995-2451 if you have any questions.

Sincerely,

John W. Henderson, P.E.
Colonel, Corps of Engineers
District Commander

Enclosures

Printed on Recycled Paper

USACE_DAPL0064062

# EXHIBIT KK



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, OMAHA DISTRICT
1616 CAPITOL AVENUE
OMAHA NE 68102-4901

June 13, 2016

Steven Vance
Cheyenne River Sioux Tribe
Cultural Preservation Office
PO Box 590 98 S Willow St.
Eagle Butte, SD 57625

Dear Mr. Vance,

On behalf of the Commander I am writing to confirm receipt of your letter dated May 19, 2016, regarding the Dakota Access Pipeline Project (DAPL). The U.S. Army Corps of Engineers is committed to meaningful and transparent consultation with our Tribal partners.

In order to address several of the concerns from your letter, I am providing you a recent Question and Answer summary from the Consultation meetings that have been held over the past months. I hope this document will provide answers to your procedural and technical questions, including how Tribal comments will be considered and addressed in the Environmental Assessment (EA) process.

Additionally, the Advisory Council on Historic Preservation (ACHP) sent an inquiry letter to the Assistant Secretary of the Army for Civil Works (ASACW) Ms. Jo-Ellen Darcy, see attached. Their inquiries have elevated this project to the Agency Head, therefore the ASACW will respond to the ACHP. A response is being prepared to address those concerns. I will ensure you receive a copy of Ms. Darcy's response.

My staff is always available to answer questions. Please contact Ms. Martha Chieply at (402) 995-2451 if you have any questions.

Sincerely,

*Martha S Chieply*

Martha S. Chieply
Chief, Regulatory Branch
Omaha District

Enclosure



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, OMAHA DISTRICT
1616 CAPITOL AVENUE
OMAHA NE 68102-4901

June 2, 2016

I am writing you to follow-up to multiple previous consultation correspondences and meetings between January and February 2016 with the several Tribal representatives regarding the Dakota Access Pipeline Project (DAPL), a linear pipeline affecting North Dakota, South Dakota, Iowa and Illinois. As a reminder, DAPL is a proposed 1,100-mile, 30-inch diameter, crude oil pipeline which would extend from Stanley, North Dakota through South Dakota and Iowa to a delivery point at Patoka, Illinois, thus requiring a review by three Corps of Engineers (Corps) Districts (Omaha, Rock Island and St. Louis).

The Omaha District is the lead Corps District on regulatory compliance for this proposed project. The Corps has regulatory authority and responsibility for those portions of the pipeline that require authorization under Section 10 of the Rivers and Harbors Act (33 U.S.C. 401 et seq.) and Section 404 of the Clean Water Act (33 U.S.C. 1344). However, the majority of the proposed 1100-mile pipeline would be located in upland areas not requiring Corps authorization under Sections 10 or 404, and over which the Corps does not have control or responsibility. When linear projects cross a single or multiple water bodies several times at separate and distant locations, each crossing is considered a single and complete project for purposes of Nationwide Permit authorization. Under our Regulatory authority, we are currently evaluating approximately 209 single and complete crossings requiring Pre-Construction Notifications (PCNs).

As explained above, the purpose of this letter is to provide additional information in response to numerous questions that have been posed to the Corps over the past six months. Please find attached the Question and Answer fact sheet for the Dakota Access Pipeline Project.

Regulatory Technical point of contacts are Chief of Regulatory Ms. Martha Chieply at Martha.S.Chieply@usace.army.mil or 402-995-2451 and Regulatory Project Manager, Mr. Jason Renschler at Jason.J.Renschler@usace.army.mil or 701-255-0015 extension 2010.

Sincerely,

Martha S. Chieply
Chief, Regulatory Branch
Omaha District

Enclosure

## Responses to Questions

***1. What are the specific actions that the Corps is considering regarding the Dakota Access Pipeline, beyond the draft EA? For example, if you proceed along the EA track (rather than preparing a full EIS), we assume you would finalize an EA, and prepare a FONSI. Is that correct? Beyond that, are you contemplating an easement across Corps lands, a 404 permit, a 408 permit, and/or a verification that the project qualifies under Nationwide Permit 12? Please let us know all of the actions contemplated by the Corps on this proposed project.***

There are four actions that the applicant, Dakota Access, has requested from the United States Army Corps of Engineers (Corps).  The first is for permits under Section 10 of the Rivers and Harbors Act and Section 404 of the Clean Water Act (Section 10/404), for 209 proposed jurisdictional crossings of waters of the United States in the states of North Dakota, South Dakota, Iowa and Illinois.  The second is a consent to cross flowage easements held by the Corps at Lake Sakakawea, ND and Carlyle Reservoir, IL. The third is for easements to cross federal property administered by the Corps for a flood control and navigation project at Lake Oahe, ND. The fourth is permission to cross the west levee of the Illinois River, the Illinois River navigation channel, and the east levee of the Illinois River in Pike, Morgan, and Scott Counties, Illinois. Regarding these last three actions requested by the applicant, the Corps must evaluate the placement of the pipeline on Corps project lands and flowage easements and potential impacts to levees under 33 USC 408 (Section 408) to determine if the use or occupation will be injurious to the public interest or impair the usefulness of the project(s).

As part of this Section 408 review process, the Omaha and St. Louis Districts prepared Environmental Assessments (EA) to determine whether these proposed federal actions (granting permissions for various crossings under Section 408) have the potential to cause significant environmental effects.  If it is determined that the actions will not have significant environmental impacts, a Finding of No Significant Impact (FONSI) will be signed.  If either EA determines that the environmental impacts of the proposed federal action will be significant, an Environmental Impact Statement would be prepared.  If the Corps is able to sign a FONSI, and the Section 408 determinations show the action will not be injurious to the public interest and will not impair the usefulness of the Corps projects, then the Corps would issue the appropriate real estate interests to allow the installation of the pipeline on Corps managed property in North Dakota and Illinois. Corps Regulatory offices in Omaha, St Louis, and Rock Island Districts are evaluating whether they can verify the proposed jurisdictional crossings under Nationwide Permit 12.

## ***2. What is your expected timeline for decision making?***

The processes under NEPA, Section 408, Section 10 of the Rivers and Harbors Act, and Section 404 of the Clean Water Act (Section 10/404), for 209 proposed jurisdictional crossings of waters of the United States in the states of North Dakota,

South Dakota, Iowa and Illinois are all ongoing, so the timeline and schedule are dependent on the completion of these processes.

**3. How will the concerns and information provided by the Tribe, including the comments on the draft EA be incorporated into the Corps' process? Which Corps official will decide what will be done in response to the points raised by the Tribe?**

The Corps will consider all comments received from the tribes and public and will address them in the final EA and decision document. The information is used to assist in making a determination under NEPA, Section 408, and Sections 404/10. As it currently stands, each District Commander will have the final decision on the NEPA decision documents, Section 408 determinations, and Sections 404/10 for the areas under his jurisdiction.

**4. The draft EA assumes that the project will use horizontal directional drilling (HDD). But in certain other projects, the proponent proposed HDD, but later found that to be infeasible. Has the Corps considered the possibility that HDD would not be feasible at the proposed Lake Oahe crossing, and that a different approach, that requires dredging, would be necessary? Would that make a difference in your assessment of the environmental risks of the proposal?**

The Corps considered the possibility that horizontal directional drilling (HDD) may not be feasible at the proposed site and requested that the applicant complete a geotechnical investigation (borings) to determine feasibility. GeoEngineers, a DAPL subcontractor, drafted a preliminary HDD design report, which presented the results of the site exploration program and HDD design to the Corps on August 12, 2015. GeoEngineers later provided a revised HDD design report, dated August 28, 2015, which addressed Corps comments. Finally, in November 2015, GeoEngineers provided an addendum which detailed the hydraulic fracture analysis calculations. Results from the investigation are discussed in the EA and the geotechnical reports are included as Appendix D. Based on this information, it was determined that HDD is a feasible construction method. If HDD is determined to be infeasible, the Corps would reassess the project.

**5. The draft EA assumes that HDD will not disturb cultural resources. But certainly HDD of this magnitude will cause tremors that impact the ground above, below and extending to the side of the actual drilling. What is the basis on which the draft EA suggests that HDD will not damage cultural resources?**

The potential impacts from vibrations produced during the HDD process are not normally addressed in EAs. DAPL's and GeoEngineer's experience with HDD construction indicate the vibrations produced during the drilling process are not of a magnitude to impact natural features, cultural resource features or structures. Any vibrations associated with the drilling process would be limited to the immediate vicinity of the drilling equipment on the surface and downhole. The vibrations produced by

equipment at the surface are no more than any other type of civil earthwork project. Vibrations produced from the downhole tooling are of a very low magnitude and are attenuated very quickly by the formation such that vibrations are not felt at the surface. GeoEngineers performed vibration monitoring at one HDD site where adjacent homeowners were concerned about vibration from the construction activities and the results of the vibration monitoring indicated the vibrations were imperceptible to human senses and the peak particle velocities were less than 0.07 inches/second, which are well below that which would cause structural impacts. A set of those recorded vibrations can be provided, if desired. Based on this information, it is not anticipated that the vibrations during construction will have a perceptible impact to cultural resources.

**6. Has the Corps considered whether it would be reasonable and appropriate to require Dakota Access to provide financial assurances, in the form of a permanent fund or otherwise, to address potential oil spill damages? If that has not been considered, why not? More broadly, in light of the history of oil spills across the country, how can Dakota Access effectively assure us that our water will be safe?**

Financial assurances have been considered, but the Corps does not have authority to require Dakota Access to provide such assurances. The Corps appreciates the Tribe's concerns about the potential impacts related to releases from the pipeline. However, the portions of the pipeline installed beneath the lake will be 92 feet deep. In addition, the Corps required an increased wall thickness of the pipe, installation of remotely operated valves on both sides of the river crossing, and monitoring of the system 24/7 to further limit the potential for an inadvertent release into Lake Oahe. Moreover, Dakota Access will adhere to the Dakota Access Facility Response Plan (to be issued before the DAPL project is put into operation in accordance with Department of Transportation, Pipeline and Hazardous Materials Safety Administration (PHMSA) and federal regulations) which will minimize impacts on the water body from potential spills during the operation of the pipeline. Finally, in the event of an inadvertent release, Dakota Access would follow their Facility Response Plan provisions, work aggressively to contain the leak, initiate cleanup activities, and contact the appropriate authorities, including the Tribe, in a timely manner.

**7. Why does the draft EA not show the Reservation on its maps and not mention the Reservation in its text? And why are potential on-Reservation impacts of the proposed pipeline ignored in the draft EA?**

The draft EA did not identify the Standing Rock Sioux reservation because the reservation was outside the scope of the EA. In response to the Standing Rock Sioux Tribe's comments, the Corps has broaden the scope of the EA to include the Standing Rock Sioux Tribe Reservation. The on-reservation impacts were not in the draft of the EA for the same reason. This will also be corrected in the EA.

USACE_DAPL0064124

**8. With regard to the "Class II/Class III Cultural Resources Inventory of the Crossings of Flowage Easements and Federal Lands" ("Inventory") for the Dakota Access project, why was the April 2015 draft prepared by Merjent, but the November 2015 draft was prepared by Gray & Pape? Who did the actual investigation for this report?**

Dakota Access initially retained 4 consultants, with a different consultant assigned to lead the field work for each state (North Dakota, South Dakota, Illinois, and Iowa). Merjent was initially assigned as the consultant for North Dakota and completed a large portion of the field investigations and submitted the associated reports. After the consultant staff was reduced to two companies (one for ND and SD and another for IA and IL), the follow-on work was completed by Gray & Pape. The change in consultants did not result in any significant change to the nature or quality of project deliverables. As noted above, Merjent prepared and submitted the necessary reports based on their fieldwork. Agency comments related to Merjent's draft reports were primarily editorial in nature and did not result in changes to National Register of Historic Places' (NRHP) recommendations for recorded archaeological resources. Agency recommended changes to subsequent draft reports were incorporated as appropriate. The authors who addressed agency comments are identified in the revised report covers.

**9. Beyond review of the cultural resources work done in the 1980's for the Northern Border Pipeline, what independent investigation and field work was done regarding cultural resources in the preparation of the draft Inventory and the draft EA? When was that work done, and who did it?**

The majority of the Class II/III investigations for the survey area were conducted by Merjent. However, a revisit of site 32MO00259 was conducted by Gray & Pape in the 2015 field season. No evidence of site 32MO00259 was documented within the project survey corridor by either consultant. Cultural resource investigations were conducted by professional cultural resource specialists from Merjent and from Gray & Pape following established research guidelines. Research methodology/ reporting has been independently reviewed and accepted by the North Dakota State Historic Preservation Office. The Class II/III investigations were conducted between August and November of 2014.

**10. Are the standards and practices for identifying and evaluating cultural resources the same today as they were in the early 1980's? If not, how did the Corps take that into account in the draft EA?**

The current standards and guidelines for survey investigations in North Dakota were formally adopted in 2013. These standards supersede both the 1981 and the 2006 versions of the state manual. The Class II/III investigations detailed in the draft inventory report were conducted in compliance with the 2013 state manual. Corps project lands were not resurveyed because they will not be impacted by the DAPL project.

**11. In discussing the economic impact of the proposed pipeline, the draft EA says "in summary, the economic impact to the U.S. as well as the immediate region where the pipeline is located is tremendous and critical to keep Americans employed and our economy moving forward." Draft EA at 60. Is that the position of Dakota Access or the Corps? If that is the Corps' position, on what basis was that determination made? Did the Corps consider whether the proposed pipeline is economically viable in the context of collapsing oil prices? Did the Corps consider whether reliance on fossils fuels is detrimental to the national interest because of climate change?**

While Dakota Access played a major role in preparing the draft EA, the final NEPA decision document will represent the position of the Corps. The conclusion that the pipeline could have a positive economic impact is based on the fact that the overall project is a $3.78 billion dollar investment directly impacting the local, regional, and national labor forces by potentially creating thousands of temporary construction jobs. Dakota Access is working with the various craft and labor unions to ensure the project is constructed using highly qualified and experienced local and regional labor resources. These construction jobs would likely create considerable labor income and state income tax revenue. No demographic changes in the Standing Rock Sioux Reservation, located approximately 0.55 mile south of the Lake Oahe Project, are anticipated because no permanent employment would be created as a result of the DAPL project.

The proposed pipeline will be economically viable even with collapsing oil prices because nine shippers have executed long-term transportation and deficiency contracts for capacity on the pipeline, and have contractually committed to pay Dakota Access for the availability of transportation service, even during periods when that transportation service is not actually utilized by the committed shipper. This provides Dakota Access material financial security during periods of low commodity prices and ensures the viability of the project notwithstanding price volatility in crude oil markets.

Finally, the DAPL project will not have a significant impact on the nation's reliance on fossil fuels because the project will not increase crude oil production. Instead, it will transport the volume of oil already in production in a more efficient and safer manner. Moreover, this project does not have any appreciable impact on aggregate supply and demand for crude oil or refined products, whether in the U.S. or globally.

**12. What is the depth of the HDD at the two Missouri River crossings?**

The anticipated HDD depth at the Missouri River crossing near Williston, ND is 33 feet. The anticipated HDD depth at the Missouri River crossing on Lake Oahe is 92 feet.

**13. How close is the Dakota Access Pipeline to the existing natural gas pipeline at the Missouri River Crossing near Lake Oahe?**

The proposed Dakota Access Pipeline will be approximately 314 feet to the north of the existing pipeline crossing the Missouri River at Lake Oahe at the location of the HDD

exit point on the west side of the river.  The proposed Dakota Access Pipeline angles closer to the existing pipeline as it crosses the Missouri River and will be approximately 78 feet to the north of the existing pipeline crossing at the location of the HDD exit point on the east side of the river.

### 14. What is the Corps going to do to protect cultural resources?

The Corps will follow all applicable federal regulations to meet the requirements of Section 106 of the National Historic Preservation Act.  In addition to the surveys the applicant has completed, the Corps acknowledges the government to government relationship between the Corps and the Tribes and our trust responsibilities, and we have sought and will continue to engage in consultation.  We have held three comprehensive consultation meetings, met with individual tribes, and attempted to accommodate specific requests.  As a result of these meetings, we have received information from the Tribes that is being considered prior to making a final decision.

### 15.  How many regulatory permits will be issued for each state?

The Corps is reviewing 209 pre-construction notifications (PCN's) that have been submitted for the proposed project.  They include 2 in North Dakota, 11 in South Dakota, 65 in Iowa and 131 in Illinois.

### 16.  How do you fix a leak in a pipeline underground?

Addressing a pipeline leak is very dependent on the nature and location of the leak.  In all cases, the leaking section would first be isolated by stopping the flow of oil by means of shutting off the pumps and closing the valves.  Product within the pipeline segment would be removed from the isolated segment utilizing a variety of methods which could include a vacuum system to draw the remaining product to a vacuum truck or by pushing the crude forward with a specialized pipeline tool.  Depending on the location of the leak and type of failure, the compromised section of pipe would either be repaired by Department of Transportation, American Petroleum Institute, or industry approved methodologies or removed and replaced with new pipe in the same location or a new section installed immediately adjacent to the failed section.  In general, if the pipeline had been conventionally installed where the leak occurred, the pipeline would be excavated and the leaking section would be repaired or replaced by cutting the section out and replacing it with a new section.  If the leak occurred within a non-typical section, i.e. a bore or HDD, the section would likely be replaced by the same construction method adjacent to the original at a slight offset.  The old pipe section would then be removed where feasible or cleaned, cut, capped, filled with an inert gas (nitrogen) or water and left in place.

### 17.  How deep will the pipeline be in the wetland areas?

No wetlands are present within the Project Area and Connected Action at the Lake Oahe crossing based on the wetland delineation field surveys conducted in 2015.

The 2015 field wetland investigations identified four wetlands located within the permanent easement on the flowage easements at the Missouri River crossing. These wetlands occur over the centerline of a buried pipe associated with a HDD. As such, the pipeline would be approximately 69 feet below the surface where the wetlands are located.

Many of the 209 proposed jurisdictional crossings of waters of the United States in the states of North Dakota, South Dakota, Iowa and Illinois contain wetland areas. These wetland areas will be crossed in accordance with 49 CFR Part 195.248 which requires a minimum of 48 inches of cover over the pipe.

### 18. What is Iowa DNR doing?

We prefer not to speculate on the actions of another agency, therefore we would suggest contacting the DNR.

### 19. What is DAPL's plan if there is a discovery on private lands?

Dakota Access' Unanticipated Discovery Plan (UDP) was developed for use during all DAPL Project construction activities regardless of jurisdiction or landownership. The UDP has been reviewed and approved by the State Historical Society of North Dakota and describes notification and actions that would take place in the event that an undocumented cultural resource is discovered during construction activities. The UDP explicitly calls for work to stop until the correct authority or agency can be contacted and the find can be properly evaluated. This approved UDP is included as Appendix F of the EA.

### 20. How many wetlands will be trenched?

Construction workspace on the flowage easements has been selected based on an absence of wetlands within the Project Area and, as confirmed by field surveys in 2015, no wetlands would be impacted by trench excavation within the construction ROW, ATWS, HDD workspace, or HDD stringing corridor on the flowage easements or Connected Action.   Surface impacts to wetland areas would be limited to periodic maintenance of the 50-ft operational right-of-way to keep this area free of woody vegetation greater than 3 inches in diameter at breast height or 20 feet tall and in compliance with PHMSA regulations.

No wetlands would be impacted by the HDD workspace on private land and the permanent ROW on federal land at the crossing of Lake Oahe, because no wetlands exist within the Project Area and Connected Action Area at the Lake Oahe Crossing.

Many of the 209 proposed jurisdictional crossings of waters of the United States in the states of North Dakota, South Dakota, Iowa and Illinois contain wetland areas. Dakota

USACE_DAPL0064128

Access will utilize HDDs at several locations to avoid direct impacts to resources, such as wetlands and waterbodies, and/or to avoid areas in which constructability by conventional means is not feasible.   Barring any sensitive resources or restrictions, the majority of minor and intermediate waterbodies including wetlands will typically be crossed via the conventional open-cut trench and backfill method.

### 21.  What is the makeup of the river bottom?

In general, the subsurface conditions encountered in the borings at the Northern Missouri River crossing were consistent with published geology for the area, consisting of very loose to medium dense sand with varying amounts of silt and gravel, medium dense to very dense gravel with varying amounts of silt and sand, very soft to hard silt and hard clay.

In general, the Southern Missouri River crossing the subsurface conditions encountered in the borings were consistent with the published geology of the area, consisting predominantly of medium stiff to hard clay with varying amount of sand, overlaid by medium dense to very dense sand with varying amounts of silt, clay and gravel.

### 22.  Were any artifacts collected on Federal Lands during the surveys?

No artifacts were collected on Federal lands.

### 23.  Who is in charge of overseeing the pipeline construction?

There are four levels of observations and oversight of construction.  First, the Department of Transportation, PHMSA and its direct hire inspectors have the federal oversight responsibility for the installation of the pipeline to ensure its conformance to the Federal DOT standards pursuant to 49 CFR Part 195.  Second, the North Dakota Public Services Commission has hired an independent engineer and inspection outfit called Keitu Engineers & Consultants that will have direct oversight and review of all construction activities for the project.  Third, the USACE has both regulatory oversight and Section 408 oversight to inspect and ensure compliance with the various approvals granted for the pipeline in conformance with the permits and approvals granted from the USACE.  Last, the company has the overall responsibility and accountability of the installation to insure all construction activities conform to the plans, specifications, permits and approvals for the pipeline.  To ensure this process, Dakota Access has identified two project managers who are employed by Dakota Access that are responsible and accountable for the project in North Dakota plus there will be multiple craft inspectors (environmental, archaeological, welding, mechanical, civil, drilling, and restoration inspectors) who will oversee the day-to-day construction activities.

### 24.  Can we have a MOU for inadvertent discoveries?

The Nationwide Permit verifications that are being reviewed have General Conditions that address inadvertent discoveries.  Specifically Nationwide Permit General Condition #21 *"Discovery of Previously Unknown Remains and Artifacts"* address's this concern. In regards to crossings, Omaha District has a standard operating procedure for the discovery of human remains.

USACE_DAPL0064130



Milford Wayne Donaldson, FAIA
Chairman

Teresa Leger de Fernandez
Vice Chairman

John M. Fowler
Executive Director

*Preserving America's Heritage*

June 2, 2016

The Honorable Jo-Ellen Darcy
Assistant Secretary of the Army (Civil Works)
108 Army Pentagon
Washington, DC 20310-0108

Ref:    Dakota Access Pipeline Project

Dear Ms. Darcy:

On May 19, 2016, the Advisory Council on Historic Preservation (ACHP) sent a letter to Lieutenant General Thomas P. Bostick, Commanding General and Chief of Engineers for the Corps of Engineers, regarding our objection to effect determinations made by the Corps for the referenced undertaking pursuant to Section 106 of the National Historic Preservation Act (NHPA) (54 U.S.C. § 300101 et seq.) and its implementing regulations, "Protection of Historic Properties" (36 C.F.R. Part 800). I wanted to share a copy of the enclosed letter with you.

Subsequent to conveying our letter to Lieutenant General Bostick, the ACHP met with Energy Transfer, the project proponent, at their request on May 25, 2016, to discuss their involvement in the Dakota Access Pipeline Project (DAPL). We advised Energy Transfer of our desire for the Corps to participate in this meeting, but, unfortunately, no Corps representatives attended.

Energy Transfer representatives shared with ACHP staff an overview of the company, the purpose and need for DAPL, and the efforts it had undertaken to identify historic properties and contact federally recognized Indian tribes interested in areas along the anticipated project corridor. We understand that planning for DAPL dates to 2012. Energy Transfer indicated it spent extensive time and resources to identify historic properties, particularly archaeological sites. This information was provided to Indian tribes in 2014 and 2015 so they could share any concerns and make known their interest in investigating areas along the right-of-way. We were advised that consultants for the company had surveyed approximately 95 percent of the project right-of-way for the presence of historic properties, including the portions of the project outside of Corps and U.S. Fish and Wildlife (FWS) jurisdiction.

We appreciated receiving this information, however, it does not change the conclusions outlined in our letters regarding shortcomings in the Section 106 review carried out by the Corps and FWS. We continue to disagree with the Corps' findings regarding effects on historic properties and believe a comprehensive Programmatic Agreement (PA), as we recommended to Lieutenant General Bostick, be developed. The Corps should consider how the information gathered by Energy Transfer, as well as the information submitted to the Corps by the Indian tribes, could be used to support the PA. Such a PA could address multiple procedural issues including the following:

ADVISORY COUNCIL ON HISTORIC PRESERVATION

401 F Street NW, Suite 308 • Washington, DC 20001-2637
Phone: 202-517-0200 • Fax: 202-517-6381 • achp@achp.gov • www.achp.gov

USACE_DAPL0064131

- Recognition of varying jurisdiction and authority over components of the DAPL Project;
- Completion of an appropriate identification effort and analysis of effects;
- Phasing of the Section 106 reviews to facilitate tribal assistance in identification of properties of concern to the tribes; and
- Consideration of effects to historic properties in portions of the undertaking outside the Corps' jurisdiction.

We look forward to assisting the Corps in this endeavor should it choose to resolve our objection by developing such an agreement. However, we recognize that, per 36 CFR § 800.5(c )(3) of our regulations, the final decision regarding the effects on historic properties is the responsibility of the Corps.

Should you have any questions or wish to discuss this matter further, please contact Reid Nelson at (202) 517-0206, or by e-mail at rnelson@achp.gov.

Sincerely,

John M. Fowler
Executive Director

Enclosure

# EXHIBIT LL

## Operations Division
## Real Estate Routing and Review

Project:                Dakota Access Pipeline Consent (Garrison) and Easement (Oahe)

Date Received:          5/26/2016

POC Field Office:       Wade Spooner/Jeremy Thury
POC District Office:    Brent Cossette

| | Concur | Concur (Comments Attached) | Non-concur (Comments Attached) | Not Applicable | Date | Signature |
|---|---|---|---|---|---|---|
| Environmental Compliance, OD-TN | | ✓ | | | HARLON.WILLIAM.D.III.125831288 7 | |
| Sustainability, OD-TN | | | | ✓ | COSSETTE.BRENT.JAMES.1249364289 | |
| Environmental Stewardship, OD-TN | ✓ | | | | COSSETTE.BRENT.JAMES.1249364289 | |
| Master Plan, OD-TN | ✓ | | | | GRUNDMAN.JONAS.L.13879 47155 | Digitally signed by GRUNDMAN.JONAS.L.1387947155 ... |
| Recreation, OD-TN | | | | ✓ | 03Jun16 | KEY.HAROLD.M.1231026947 |
| Water Quality, ED-HA | ✓ | | | | DINKEL.BRENT.ALLEN.1474049333 | |
| NWDR 1110-2-5 Land Development, ED-HB | ✓ | | | | KRAUSE.TONY.DEAN.1282509551 | |
| Hydraulics, ED-HD | ✓ | | | | MILLER.CURTIS.J.1257728443 | |
| Geotechnical Engineering, ED-G | ✓ | | | | LANG.DEAN.T.1147761313 | |
| River and Reservoir Engineering, ED-HF | | | | ✓ | PRIDAL.DANIEL.B.1231204730 | |
| Geology, ED-GG | ✓ | | | | WAGNER.JASON.L.1249731869 | |
| Mechanical, ED-DA | | ✓ | | | SMITH.MICHAEL.T.1277678086 | |
| Dam Safety, ED-GB | | | | ✓ | WORDEN.ROBERT.J.1231346097 | |
| Section 106, PM-AE | ✓ | | | | BRANDON.DAVID.A.1231349819 | |
| 408 Review | ✓ | | | | | |
| NEPA, Eric Laux | ✓ | | | | LAUX.ERIC.A.1231341427 | |
| Chief, OD-TN: ~~Kelly Crane~~ Luke Wallace | ✓ | | | | | |
| Chief, OD-T: Larry D. Janis | ✓ | | | | | |

USACE_DAPL0071180



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, OMAHA DISTRICT
1616 CAPITOL AVENUE
OMAHA NE 68102-4901

REPLY TO
ATTENTION OF

CENWO-OD-T                                                                          10 June 2016

MEMORANDUM FOR Commander, U.S. Army Corps of Engineers, Omaha District (Henderson)

SUBJECT: Dakota Access Pipeline Project, Garrison Project (Consent Flowage Easements), Oahe Project
(Easement)

1. References:

   a. EC 1165-2-216, Policy and Procedural Guidance for Processing Requests to Alter US
Army Corps of Engineers Civil Works Project Pursuant to 33 USC 408.

   b. NWDR 1110-2-5, Land Development Guidance at Corps Reservoir Projects

2. In accordance with reference 1.a., enclosed for District-level approval is the proposal for
modification and alteration of the Garrison Project on Corps fee property. The modification has
undergone an agency review (ATR) by the Omaha District (NWO) and is recommended for
approval as the request has been determined to not be injurious to the public interest and not
impair the usefulness of work built by the United States.

3. Background:

   a. The Dakota Access, LLC, (Dakota Access) is requesting an easement on Corps-
owned lands with a 30- inch light crude oil pipeline. The pipeline will cross under the
Missouri River (Lake Sakakawea) via horizontal directional drill (HDD) and continues south
to Lake Oahe and crosses under Lake Oahe with a second HDD. The project will begin
near Stanley, North Dakota and end at Patoka, Illinois. The total length of the pipeline is
about 1,100 miles.

   b. Corps technical reviewers have reviewed and have determined the request to not be
injurious to the public interest and not impair the usefulness of work built by the United
States.

4. The point of contact for this project and/or issues regarding this application is
Mr. Brent Cossette, Natural Resources Specialist, CENWO-OD-TN, 402-995-2712 or
brent.j.cossette@usace.army.mil .

3 Encls                                              LARRY D. JANIS
1. Summary of Findings                               Chief, Recreation and Natural Resources Branch
2. Technical Review Package
3. Finding of No Significant Impact

Printed on Recycled Paper

CENWO-OD-T
SUBJECT: Dakota Access Pipeline Project, Garrison Project (Consent Flowage Easements),
Oahe Project (Easement)

### DISTRICT COMMANDER'S APPROVAL
### OF
### SECTION 408 DECISION DOCUMENT

I attest that the Decision Document for the Dakota Access Pipeline Project is consistent with Army policy, and has been reviewed for legal sufficiency by District Counsel. Accordingly, I approve this Decision Document.

2 5 JUL 2016

JOHN W. HENDERSON                                    Date
Colonel, Corps of Engineers
District Commander

2

USACE_DAPL0071182

## OMAHA DISTRICT, CORPS OF ENGINEERS
## CERTIFICATION CHECKLIST

TO ALTER US ARMY CORPS OF ENGINEERS CIVIL WORKS PROJECTS PURSUANT TO
33 USC 408

Dakota Access Pipeline Project, Garrison (Consent Flowage Easements), Oahe Project (Easement)

The Dakota Access, LLC, (Dakota Access) is requesting an easement on Corps-owned lands with a 30- inch light crude oil pipeline. The pipeline will cross under the Missouri River (Lake Sakakawea) via horizontal directional drill (HDD) and continues south to Lake Oahe and crosses under Lake Oahe with a second HDD. The project will begin near Stanley, North Dakota and end at Patoka, Illinois. The total length of the pipeline is about 1,100 miles.

33 U.S.C. § 408 prohibits non-federal entities from building over, altering, destroying, injuring or in any manner whatever impairing the usefulness of any work built by the United States for the preservation and improvement of navigable waters or to prevent floods. Before any construction, including horizontal drilling and laying pipeline, may commence within the boundaries of the Corps projects, the Secretary of the Army must grant permission for such alteration, occupation or use of navigation and flood control structures when in the judgment of the Secretary such occupation or use will not be injurious to the public interest and will not impair the usefulness of such work.

The proposed activities will not impair the usefulness of a USACE project and are not injurious to the public interest.

| Office | Representing Authorized Purpose for Project | Not injurious to public interest or Project Purposes | | | Comments (Attached) | Signature/Date |
|---|---|---|---|---|---|---|
| | | Concur | Non-Concur | N/A | | |
| Operations | Recreation | | | ✓ | See N/A on Request Package | COSSETTE.BRENT.JAMES.1249364289 |
| Operations | Fish & Wildlife | ✓ | | | | COSSETTE.BRENT.JAMES.1249364289 |
| Operations | Water Supply | ✓ | | | | RIEF.AMEE.LURENE.1512990173 |
| Operations | Navigation | | | ✓ | | MELLEMA.GREGORY.J.1231349096 |
| Engineering | Flood Risk Reduction | ✓ | | | | TAYLOR.RICHARD.J |
| Operations | Water Quality | ✓ | | | | DINKEL.BRENT.ALLEN.1474049333 |
| Operations | Hydropower | | | ✓ | | MELLEMA.GREGORY.J.1231349096 |
| Planning (ENV) | NEPA Coverage for All | ✓ | | | | LAUX.ERIC.A.1231341427 |
| Real Estate | All | ✓ | | | | NOEL.RICK.L.1231350426 |
| Section 408 Coordinator | All | ✓ | | | | But J. Cossette 7/19/2016 |
| Office of Counsel Certification | All | ✓ | | | | |
| Chief OD-TN | All | ✓ | | | | |
| Chief OD-T | All | ✓ | | | | |

USACE_DAPL0071183

## SUMMARY OF FINDINGS
## PURSUANT 33 USC 408 and EC 1165-2-216

### Dakota Access Pipeline Project, Garrison Project (Consent Flowage Easements), Oahe Project (Easement)

**Summary of Rationale and Conclusion (EC 1165-2-216, Par 7(c)(5)(a)):** The Dakota Access, LLC, is requesting an easement on Corps-owned lands with a 30- inch light crude oil pipeline. The pipeline will cross under the Missouri River (Lake Sakakawea) via horizontal directional drill (HDD) and continues south to Lake Oahe and crosses under Lake Oahe with a second HDD. The project will begin near Stanley, North Dakota and end at Patoka, Illinois. The total length of the pipeline is about 1,100 miles.

**Written Request (EC 1165-2-216, Par 7(c)(5)(b)):** See attached.

**Project History, Description, and Authorization (EC 1165-2-216, Par 7(c)(5)(c&d)):** The Garrison Dam/Lake Sakakawea Project was authorized on December 22nd, 1944, by the Flood Control Act of 1944, Public Law 534, 78th Congress, 2nd session, along with four other Missouri River main stem projects. The project was authorized for flood control, navigation, irrigation, hydropower, municipal and industrial water supply, fish and wildlife, recreation and other purposes.

The Oahe Project was authorized by the Flood Control Act of 1944, Public Law 534, 78th Congress, 2nd Session, along with four other Missouri River main stem projects – Gavins Point, Fort Randall, Big Bend, and Garrison. These five reservoirs are elements of a plan for the development of the Missouri River main stem.

**Section 408 Determination:** The Section 408 ATRT recommending a Section 408 determination consists of subject matter experts in the following offices: operations, real estate, regulatory, office of counsel, engineering, planning, and emergency management.

1. Impact to the Usefulness of the USACE Project Determination (EC 1165-2-216, Par 7(c)(5)(e)): Due to the proposed pipeline request, the ATRT members determined this request will not limit the ability of either the Garrison or Oahe Projects to function as authorized and will not compromise or change any authorized project conditions, purposes, or outputs. Reference attached memos of the request package.

2. Injurious to the Public Interest Determination (EC 1165-2-216, Par 7(c)(5)(f)): The ATRT members considered all mitigation measures in the environmental assessment along with conditions for the easement and believe this development will not be injurious to the public interest.

**Policy Compliance Certification (EC 1165-2-216, Par 7(c)(5)(g)):** Each ATRT member has reviewed this request in accordance with applicable policies and regulations. Please see attached certification checklist.

USACE_DAPL0071184

**Certification of Legal Sufficiency (EC 1165-2-216, Par 7(c)(5)(h)):** District Office of Counsel concurs that the proposal meets all legal and policy requirements. See attached certification checklist.

**Certification of Adequate Real Estate Documentation (EC 1165-2-216, Par 7(c)(5)(i)):** Chief of the District Real Estate Division concurs that the real estate documentation is adequate. See attached certification checklist.

**USACE Studies (EC 1165-2-216, Par 7(c)(5)(j)):** There are no ongoing USACE studies that relate to this proposed request.

**Operations & Maintenance (O&M) Manual (EC 1165-2-216, Par 7(c)(5)(k)):** There will be no assumed responsibilities or costs for USACE for this proposed request, therefore, no changes or impacts will occur to the O&M Manual. Dakota Access LLC will be responsible to O&M per their Corps easement.

**Project Partnership Agreement (PPA) or Cooperative Agreement Changes (EC 1165-2-216, Par 7(c)(5)(l)):** Not applicable.

**Environmental Compliance (EC 1165-2-216, Par 7(c)(5)(m)):** A decision on a Section 408 request is a federal action, and therefore subject to the National Environmental Policy Act (NEPA) and other environmental compliance requirements. An Environmental Assessment was conducted and is attached.

**Finding of No Significant Impact (FONSI)/Record of Decision (ROD) (EC 1165-2-216, Par 7(c)(5)(n)):** The proposed request was reviewed in accordance with NEPA regulations and was found to need an environmental assessment. A mitigated FONSI was issued and is attached.

**Funds Pursuant Section 214 (EC 1165-2-216, Par 7(c)(5)(o)):** Not applicable.

**Final Conclusions or Information (EC 1165-2-216, Par 7(c)(5)(p)):**

Section 408 Decision Level: Certain proposed alterations, once recommended by the District and Division Commanders, will require a final decision by the Director of Civil Works at HQUSACE if any of the seven questions listed in the EC 1165-2-216 are answered "yes". None of the questions were answered "yes" for this proposal; therefore, a Section 408 decision may be rendered by the District Commander.

Brent Cossette
Section 408 Coordinator, Corps of Engineers
Omaha District

7/19/2016
Date

**APPENDIX B-1**
**Vicinity Map of Proposed Request Located on Garrison Project, ND**



USACE_DAPL0071186



USACE_DAPL0071187

## Section 408 Determination Checklist

**Determination Checklist**
US Army Corps of Engineers, Omaha District
Per EC 1165-2-216

| Exemptions | |
|---|---|
| ☐ | Alterations performed by District as part of a federally authorized project. |
| ☐ | Alterations performed by the non-federal Sponsor that are specified in the Operations, Maintenance, Repair, Replacement, and Rehabilitation Manual, including repair, replacement, and rehabilitation alterations described under §5 l of ER 1110-2-401. |
| ☐ | Routine Operations and Maintenance activities specified in the O&M manual. |
| ☐ | Alterations compliant with an approved Project Master Plan, Shoreline Management Plan, or Operational Management Plan. |
| ☐ | Real Estate Outgrants issued to implement an approved Project Master Plan, Shoreline Management Plan, or Operational Management Plan. |
| ☐ | Alterations included within Real Estate Outgrants issued pursuant to the procedures in ER/EP 1130-2-550, Chapters 16 or 17, except for alterations that need to be reviewed in accordance to Appendix B-E of EC 1165-2-216. |
| ☐ | Alterations undertaken by a non-federal sponsor as an in kind contribution for an authorized USACE project pursuant to an executed project partnership agreement. |
| ☐ | Requests for alterations received by District for review or coordination before 31 July 2014, however, requests for alterations received prior to 31 July 2014 will continue to be reviewed under EC 1165-2-214 and prior 33 USC 408 reviews. |
| **Categorical Permissions** | |
| ☐ | *(list currently being compiled for approval)* |

| HQUSACE Decision Level | | |
|---|---|---|
| **yes** | **no** | |
| ☐ | ✔ | Does the proposed alteration require a Type II IEPR (Safety Assurance Review) reference EC 1165-2-214? |
| ☐ | ✔ | Does the proposed alteration require an Environmental Impact Statement (EIS) in which USACE is the lead agency? |
| ☐ | ✔ | Does the proposed alteration change how the USACE project will meet its authorized purpose? |
| ☐ | ✔ | Does the proposed alteration preclude or negatively impact alternatives for a current General Investigation (GI) or other study? |
| ☐ | ✔ | Is the non-federal sponsor for a USACE project proposing to undertake the alteration as in-kind contributions eligible for credit under Section 221 of Flood Control Act of 1970, as amended? |
| ☐ | ✔ | Is the proposed alteration for installation of hydropower facilities? |
| ☐ | ✔ | Is there a desire for USACE to assume operations and maintenance responsibilities of the proposed navigation alteration pursuant to Section 204(f) of Water Resources Development Act (WRDA) of 1986? |
| **District/Division Decision Level** | | |
| ✔ | | Request is not applicable in any of the above categories and recommendation is for District Level Section 408 Determination. |
| ☐ | | Request is not applicable in any of the above categories and recommendation is for Division Level Section 408 Determination. |

**Requester Checklist**
Section 408 Written Requests
US Army Corps of Engineers, Omaha District

General: Requester is responsible for providing all information that identifies as necessary to satisfy all applicable federal laws, executive orders, regulations, policies, and ordinances.

| | |
|---|---|
| Written Request (EC 1165-2-216 Par 7(c)(2)) | |
| Complete Description: | [ X ] drawings, sketches, maps, and plans sufficient to determine the purpose, scope, and location |
| Also Pursuing Section 10/404/103 permits? | [ ] No<br>[ X ] Yes |
| Indicate if also seeking: | [ ] credit under Section 221 of the Flood Control Act of 1970<br>[ ] credit under Section 204(f) of WRDA 1986<br>[ X ] Not Applicable – Not Applicable |
| Will require the use of federally owned real property? | [ ] No<br>[ X ] Yes, this request requires the use of federally-owned real property or property owned by the non-federal sponsor. |
| Is there a non-federal sponsor? | [ X ] No<br>[ ] Yes, the request originates from the non-federal sponsor<br>[ ] Yes, a written statement from the non-federal sponsor endorsing the alteration is included |
| Required Documentation for All Requests (EC 1165-2-216 Par 7(c)(3)) | |
| Technical Analysis and Design | [ X ] project design is at 60% or more of final design |
| Hydrologic and Hydraulics System Performance Analysis | [ X ] No, not required and justification included – Proposes project is located above the flood pool with no potential hydrologic impacts, therefore, performance analysis is not applicable.<br>[ ] Yes |
| Environmental Compliance | [ X ] NEPA completed and attached<br>[ X ] EA completed and attached (if applicable)<br>[ ] EIS completed and attached (if applicable)<br>[ ] Additional environmental compliance requirements included |
| Description of Real Estate Requirements | [ ] Included in a completed Right of Availability checklist<br>[ X ] Included in the written request<br>[ ] Not Applicable |
| Executive Order 11988 Considerations | [ ] Sufficient information is included in the written request.<br>[ X ] Not Applicable - Alteration will not be located within flood plain. |
| Requester Review Plan | [ X ] No requester review plan is needed.<br>[ ] A requester review plan was determined necessary by District and is included.<br>[ ] Request requires a Type II IEPR and requester review plan is required and is included. |
| Operations & Maintenance | [ X ] no O&M will be necessary<br>[ ] O&M will be necessary and USACE will assume; justification for augmenting O&M is provided<br>[ ] O&M will be necessary and will be performed by the non-federal sponsor; information for updating the O&M manual is provided |
| Other Information | [ X ] USACE determines no other information is required from requester<br>[ ] USACE determines other information is required and is attached in the submittal |
| For Dams and Reservoirs   - See Attached Engineering Memos | |
| See EC 1165-2-216, Appendix B Part B-4 Requirements | |
| For Non-Federal Hydropower Development at USACE Facilities (N/A) | |
| See EC 1165-2-216, Appendix C Part C-4 Requirements | |
| For Levee, Floodwall or Flood Risk Management Channel Projects (N/A) | |
| See EC 1165-2-216, Appendix D Part D-4 Requirements | |
| For Navigation Channels, Jetties, Bridges, and other Features (N/A) | |
| See EC 1165-2-216, Appendix E Part E-4 Requirements | |

USACE_DAPL0071189



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, OMAHA DISTRICT
1616 CAPITOL AVENUE
OMAHA NE 68102-4901

CENWO-OD-TN

10 June 2016

MEMORANDUM FOR RECORD

SUBJECT: Dakota Access Pipeline Consent to Flowage Easements – Garrison Project

1. Dakota Access, LLC, (Dakota Access) is requesting a consent to multiple flowage easements at Lake Sakakawea for a 24 inch light crude oil pipeline.

The pipeline would cross under the Missouri River via horizontal directional drill (HDD) and continue south to Lake Oahe and cross Lake Oahe with a second HDD. The project will begin near Stanley, North Dakota and end at Patoka, Illinois. The total length of the pipeline is about 1,100 miles.

Relative to the Garrison Project Office, Dakota Access is requesting a consent to flowage easement for a 24 inch diameter light crude oil pipeline.

2. Please place the following special conditions on the consent to easement:

   a. All environmental commitments in the Environmental Assessment and Finding of No Significant Impact must be conducted and incorporated by reference.

   b. Pipeline must be maintained and operated per ASME B31.3, B31.4, B31.8, CFR 192, CFR 195, API 1104, and related codes.

   c. Cathodic Protection will be operated and maintained per applicable codes and Dakota Access's Operations and Maintenance Manual. Wall thickness testing will be performed on a 5 year interval through the use of in-line inspection. The periodic in-line inspection will be performed in-lieu of periodic hydro tests. Inspection reports must be sent to the Garrison Project Office.

   d. The Facility Response Plan will be submitted to the United States Army Corps of Engineers (USACE) for review prior to the operation of the pipeline.

   e. All plans not final at the time the Environmental Assessment is complete will be submitted to the USACE for review and the incorporation of USACE comments prior to submittal to PHMSA.

   These plans include, but are not limited to the;
       a. Geographical Response Plan
       b. Operations and Maintenance Manual
       c. Risk Assessment (Integrity Management Plan)


Printed on Recycled Paper

    d. Spill Models (Using the National Hydrography Dataset by the USGS)

f. Any plans that have been updated in condition "d" must be sent to USACE Environmental Compliance Coordinators at the Omaha District Office and the Garrison Project Office within one year of the update.

g. Must provide as-built drawings for the crossing of the Missouri River to the USACE Section 408 Coordinator Omaha District Office and the Operations Project Manager Garrison Project Office within 6 months of the completion of pipeline construction.

h. Commitment for Training Exercises:
    a. Must conduct full scale open water and full scale winter/ice exercises that at Lake Sakakawea and Lake Oahe. A full scale exercise will occur once every 3 years (triennial cycle) with the location and type of exercise occurring on alternating schedules (e.g. open water exercise at Oahe the first triennial cycle, followed by winter exercise at Sakakawea the following triennial cycle, followed by a winter exercise at Oahe the following triennial cycle, etc.). The first exercise will occur within the first 3 years after the pipeline becomes operational.

    b. To facilitate USACE staff involvement, Dakota Access must notify the USACE Environmental Compliance Coordinators at the Omaha District Office and the Garrison Project Office at least ninety (90) days prior to initiation of the training exercises. Dakota Access must also solicit the participation of key stakeholders (federal, state, local, and Tribal) in these exercises.

i. Within one year of operation of the pipeline, DAPL must provide for an all-weather access and collection point downstream of the Lake Sakakawea Missouri River HDD crossing. DAPL must provide an equipment storage facility on non-federal lands that includes a fenced permanent storage area for winter and open water spill response equipment. The storage facility should be placed in a strategic location and near existing facilities that would support access to the water. DAPL would coordinate with the USACE and any other applicable stakeholders to obtain all necessary permits and approvals prior to construction for any ground disturbing activities associated with these facilities. The storage facility should contain sufficient response equipment at a minimum to mitigate an unintended worst case release for this crossing.

BRENT J. COSSETTE
Section 408 Coordinator, Omaha District



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, OMAHA DISTRICT
GARRISON PROJECT OFFICE
PO BOX 527
RIVERDALE, NORTH DAKOTA 58565-0527

CENWO-OD-GA                                                     19 May 2016

MEMORANDUM THRU

Garrison Project Office, Omaha District (CENWO-OD-GA), (Lindquist)

Recreation and Natural Resource Branch, Omaha District, Corps of Engineers
(CENWO-OD-TN), (Cossette)

FOR Real Estate Branch, Omaha District, Corps of Engineers (CENWO-RE), (Noel)

SUBJECT: Dakota Access, LLC. Construction of Dakota Access Pipeline (DAPL)
crossing flowage easements LL3440E, LL3483E-1, LL3453E, LL3430E, LL3450E-2,
LL3431E & LL3426E-2 north of Lake Sakakawea/Missouri River in Williams Counties,
ND.

1. An application has been submitted to the U.S. Army Corps of Engineers (USACE)
   Garrison Project Office by Dakota Access, LLC to receive a Consent to Easement
   for the construction, operation, & maintenance of 1,100 miles of 12-30" diameter
   crude oil pipeline under Lake Sakakawea in Williams Counties.

   1. The 24" dia. Pipeline is proposed to cross sections 7, 18, 19 & 30
      Township 153N, Range 103W on USACE flowage easements LL3440E,
      LL3483E-1, LL3453E, LL3430E, LL34350E-2, LL3431E & LL3426E-2 on
      the North side of Lake Sakakawea/ Missouri River for 2.83 miles.

   2. Construction workspace needed to trench in pipeline and stage HDD
      boring site within flowage easements totals 59.3 ac.

2. The proposed installation for this project is to open cut and trench on flowage
   easements and cross the river using HDD.

3. Review by Natural Resource staff indicated the following conditions:

USACE_DAPL0071192

1. No impacts to USACE fee title land is proposed. All activity proposed is located on USACE flowage easement on private land.

2. All environmental commitments in the Environmental Assessment, Finding of No Significant Impact, and Plan of Development submitted by Dakota Access and all conservation recommendations in the Biological Opinion as applicable and are hereby incorporated by reference

3. This pipeline is also crossing the Missouri River for .21 miles on Corps Fee title land at Lake Oahe. This segment of the project is not reflected in this memo and was not reviewed by the Garrison Project Office.

4. An Environmental Assessment has been completed on the flowage easement crossing and is currently being reviewed by USACE within the project and Omaha district office.

4. Garrison Project Natural Resource Staff recommends consent to easement. Point of contact is Jeremy J. Thury. Phone: 701-654-7761.

5. For Your Action.

Encl
ROA packet

ALFRED C. STONESIFER
Supervisory Natural Resource Specialist

CONCURRENCES:

a. CENWO-OD-GA concurs with the above recommendation.

Signature: _____

Todd J. Lindquist
Operation Project Manager

2

USACE_DAPL0071193

Garrison Project, ND

Date: _24 May 2016_

b. CENWO-OD-T concurs with the finding of no significant environmental concerns and the recommendations for resolution of the encroachments, based on the attached documentation.

Signature: _____

Larry D. Janis
Chief, Recreation and Natural Resource Branch
Omaha District

Date: _7/19/16_

2



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, OMAHA DISTRICT
GARRISON PROJECT OFFICE
PO BOX 527
RIVERDALE, NORTH DAKOTA 58565-0527

CENWO-OD-GA                                                     19 May 2016

MEMORANDUM THRU

Garrison Project Office, Omaha District (CENWO-OD-GA), (Lindquist)

Recreation and Natural Resource Branch, Omaha District, Corps of Engineers
(CENWO-OD-TN), (Cossette)

FOR Real Estate Branch, Omaha District, Corps of Engineers (CENWO-RE), (Noel)

SUBJECT:  Dakota Access, LLC. Construction of Dakota Access Pipeline (DAPL)
crossing flowage easements LL3440E, LL3483E-1, LL3453E, LL3430E, LL3450E-2,
LL3431E & LL3426E-2 north of Lake Sakakawea/Missouri River in Williams Counties,
ND.

1.  An application has been submitted to the U.S. Army Corps of Engineers (USACE)
    Garrison Project Office by Dakota Access, LLC to receive a Consent to Easement
    for the construction, operation, & maintenance of 1,100 miles of 12-30" diameter
    crude oil pipeline under Lake Sakakawea in Williams Counties.

    1.  The 24" dia. Pipeline is proposed to cross sections 7, 18, 19 & 30
        Township 153N, Range 103W on USACE flowage easements LL3440E,
        LL3483E-1, LL3453E, LL3430E, LL34350E-2, LL3431E & LL3426E-2 on
        the North side of Lake Sakakawea/ Missouri River for 2.83 miles.

    2.  Construction workspace needed to trench in pipeline and stage HDD
        boring site within flowage easements totals 59.3 ac.

2.  The proposed installation for this project is to open cut and trench on flowage
    easements and cross the river using HDD.

3.  Review by Natural Resource staff indicated the following conditions:

1. No impacts to USACE fee title land is proposed.  All activity proposed is located on USACE flowage easement on private land.

2. All environmental commitments in the Environmental Assessment, Finding of No Significant Impact, and Plan of Development submitted by Dakota Access and all conservation recommendations in the Biological Opinion as applicable and are hereby incorporated by reference

3. This pipeline is also crossing the Missouri River for .21 miles on Corps Fee title land at Lake Oahe.  This segment of the project is not reflected in this memo and was not reviewed by the Garrison Project Office.

4. An Environmental Assessment has been completed on the flowage easement crossing and is currently being reviewed by USACE within the project and Omaha district office.

4. Garrison Project Natural Resource Staff recommends consent to easement. Point of contact is Jeremy J. Thury. Phone: 701-654-7761.

5. For Your Action.

Encl
ROA packet

ALFRED C. STONESIFER
Supervisory Natural Resource Specialist

CONCURRENCES:

a. CENWO-OD-GA concurs with the above recommendation.

Signature: _Todd J. Lindquist_

Todd J. Lindquist
Operation Project Manager

2

USACE_DAPL0071196

Garrison Project, ND

Date: _24 May 2016_

b.  CENWO-OD-T concurs with the finding of no significant environmental concerns and the recommendations for resolution of the encroachments, based on the attached documentation.

Signature: _____

Larry D. Janis
Chief, Recreation and Natural Resource Branch
Omaha District

Date:_____

USACE_DAPL0071197



**VIA EMAIL**

October 7, 2015

Brent Cossette
Natural Resource Specialist
Environmental Stewardship
CENWO-OD-TN
United States Army Corps of Engineers, Omaha District
1616 Capital Avenue, Suite 9000
Omaha, NE  68102
Brent.J.Cossette@usace.army.mil

Re:     **Updated Request for Consent to Easement Across Flowage and Saturation
        Easements for the Proposed Dakota Access Pipeline Project in Williams County,
        North Dakota**

Dear Mr. Cossette:

Dakota Access, LLC, (Dakota Access) is proposing the Dakota Access Pipeline (DAPL) Project;
an approximate 1,100 mile long, 12- to 30-inch diameter light crude oil pipeline project
beginning near Stanley, North Dakota, and routing through South Dakota, Iowa and ending at
Patoka, Illinois.

DAPL is proposed to cross private lands which the U.S. Corps of Engineers (Corps) has seven
flowage and saturation easements over (**Figure 1**), associated with the Buford-Trenton-
Irrigation District (Garrison Dam) and north of Lake Sakakawea/ Missouri River.  It is
understood that due to these crossings, the Corps will need to provide consent to easement
for the pipeline to be constructed and installed on lands where Corps has easements.

Dakota Access has performed environmental and geotechnical analysis of the subsurface at
these crossings to determine environmental features and feasible crossing methods.  It is
anticipated that the pipeline will cross the flowage easements via conventional
trench/backfill method; this additionally includes a portion of the planned horizontal
directional drill (HDD) entry point for the Lake Sakakawea/Missouri River crossing (**Figure 2**).

The purpose of this letter is to provide an update to the formal request for initiation of the
Corps consent to easement process dated March 9, 2015.  The following provides additional
information regarding this request.

USACE_DAPL0071198


DAKOTA ACCESS, LLC

**DAPL Project Crossing Corps Easements**

The proposed 24-inch diameter pipeline in this location of the DAPL Project will cross seven (7) contiguous Corps flowage and saturation easements on the north side of Lake Sakakawea/Missouri River for approximately 2.97 miles.  The proposed pipeline will cross Corps easements identified below in the respective section, township, range and county and as depicted in the attached **Figures 1 and 2**.

| County | Tract No. | Township | Range | Section |
|---|---|---|---|---|
| Williams | LL3440E | 152N | 103W | 19, 20, 29, 30 |
| | LL3483E-1 | 152N | 103W | 19, 20 |
| | LL3453E | 152N | 103W | 18,  19 |
| | LL3430E | 152N | 103W | 18, 19 |
| | LL3450E-2 | 152N | 103W | 18 |
| | LL3431E | 152N | 103W | 7, 18 |
| | LL3426E-2 | 152N | 103W | 7 |

Dakota Access is securing a 50 foot wide permanent easement along the entire Project alignment that is generally centered on the pipeline (i.e. 25 feet on either side of the centerline).  Based upon Corps provided easement documents and mapping, Dakota Access understands that the distance across Corps flowage and saturation easement areas north of the Missouri River is approximately 15,692 feet (2.97 miles).

Dakota Access performed a geotechnical boring program to assess soil and geology to assist with design of the HDD (**Figure 2**).  Two soil borings were advanced on the property where Corps has easements.  The plan is to establish the HDD entry point on the north side of the river and the HDD exit point on the south side of the river.  A temporary workspace, which measures approximately 200 feet by 250 feet will be used on the Corps easements to facilitate the Missouri River HDD on the north side of the river.   The HDD will result in approximately 1,570 feet of pipeline on Corps easements.

For activities associated with the installation of HDD and the hydrostatic testing of the HDD segment, Dakota Access plans to withdrawal water from the Missouri River.  Acquisition points would coincide with the proposed pipeline crossing of the river.  The pump will be set on a barge or float anchored just offshore of each bank at the proposed permanent easement.  The barge/float would be approximately 12 feet wide by 14 feet long and fitted with a secondary containment structure.  The pump's intake hose will be eight inches in diameter and connect the screened intake to the pump.  The intake hose will push the water from the pump to the top of bank and then to the HDD equipment or pipeline section.  The

USACE_DAPL0071199



intake hose would be temporarily (during construction only) located within the 50-foot permanent pipeline easement (Figure 2). No ground disturbance along the permanent easement is anticipated.

Dakota Access plans to install remaining pipeline using conventional open-cut construction methods on Corps flowage and saturation easement lands north of the HDD entry point. After pipeline installation is completed there will be no above ground facilities associated with the pipeline. The proposed typical construction easement for the DAPL is 150 feet wide (and includes the 50 feet of permanent easement as indicated in **Figure 3**). Additional temporary workspace is included at road crossings and change in pipe alignment. All dimensions and additional construction information are included in the Environmental Assessment (EA).

We appreciate your assistance with this request for Corps consent to cross flowage and saturation easement areas north of the Missouri River. We understand the March 9, 2015 formal DAPL Project request for consent to easement from the Corps officially initiated the Corps real estate process. We further understand that the environmental review for crossing these easements will be combined with the environmental review for the proposed DAPL crossing of the Corps owned lands at Lake Oahe.

Should you have any questions or comments, or require any other information for this request, please contact me at 713.989.7186, Monica.Howard@energytransfer.com, or at Dakota Access, LLC, c/o Monica Howard, 1300 Main Street Rm 14.030, Houston, TX 77002.

Sincerely,

**Dakota Access, LLC**

Monica Howard
Director Environmental Sciences

Enc.   Figure 1 – Corps Flowage and Saturation Easement Areas Crossed by Proposed DAPL Project
Figure 2 – DAPL Project Layout
Figure 3 – DAPL Project Typical ROW Configuration

USACE_DAPL0071200

CENWO-ED-G                                                   1 0 DEC 2015

MEMORANDUM THRU CHIEF, ENGINEERING DIVISION

MEMORANDUM FOR CENWO-OD-TN/COSSETTE

SUBJECT: Dakota Access Pipeline Project Crossing of Lake Oahe

The U.S. Army Corps of Engineers (USACE), Omaha District (Corps) received an Applicant's Technical Supplement for a proposed Dakota Access Pipeline Horizontal Directional Drilling (HDD) crossing of Lake Oahe in Morton and Emmons Counties, North Dakota for the installation of a 30" diameter steel pipeline for transportation of crude oil from the Bakken and Three Forks plays in North Dakota and South Dakota to points east.

Oahe Dam, including Lake Oahe, is a congressionally authorized and federally constructed project along the Missouri River. The US Army Corps of Engineers maintains and operates Oahe Dam and Lake Oahe, in cooperation with other agencies. The Corps has a congressionally mandated responsibility to ensure that the federally constructed projects are appropriately operated and maintained. No improvements shall be passed over, under, or through the walls, levees, improved channels or floodways; nor shall any excavation or construction be permitted within the limits of the projects right-of-way, nor shall any change be made in any feature of the works without prior approval of the Corps. The US Army Corps of Engineers Regulation ER 200-2-2 (33 CR Part 230) applies.

All (13) geotechnical comments by Mr. Dean Lang and Mr. Jason Wagner that were generated during the technical review have been entered into a log. Once the comments were satisfactorily addressed by the Engineer-of-Record, Dakota Access LLC and GeoEngineers, they were closed out. Technical record of comments and responses, follow-up comments and responses, etc., are kept in Projnet.

Dakota Access LLC and GeoEngineers will fully implement all required and agreed upon technical changes, as has been recorded by the review process in Projnet.

Dakota Access LLC and GeoEngineers are responsible for amending the Operations & Maintenance (O&M) Manual for the project to reflect the as-built conditions for any permanent modifications or encroachments. The amendment to the O&M Manual is required to be provided to the Corps for record keeping purposes within 60 days of completion of construction. The Corps can provide guidance on developing an addendum to the O&M Manual, upon request.

The comments herein pertain only to the geotechnical and flowable easement issues related HDD and Geotechnical investigations in the floodway and do not constitute USACE approval of any permits that may be required.

CENWO-ED-G
SUBJECT:  Dakota Access Pipeline Project Crossing of Lake Oahe

If you have any questions, please contact Mr. Dean Lang at (402) 995-2231, Mr. Jason Wagner at (402) 995-2276, or the undersigned at (402) 995-2218.

DAVID P. RAY P.E.
Chief, Geotechnical Engineering
and Sciences Branch

2

USACE_DAPL0071202

CENWO-ED-DA                                            18 December 2015

MEMORANDUM FOR CENWO-OD-TN (Cossette)

SUBJECT:    Dakota Access Pipeline (DAPL) Review

1. The U.S. Army Corps of Engineers, Omaha District (Corps) received an Applicant's
   Technical Supplement for proposed Dakota Access Pipeline (DAPL) Horizontal
   Directional Drilling (HDD) plan for the installation of steel pipeline below Lake
   Sakakawea, North Dakota, for transportation of crude oil.

2. Garrison Dam, including Lake Sakakawea, is a congressionally authorized and federally
   constructed project along the Missouri River. The US Army Corps of Engineers (Corps)
   maintains and operates Garrison Dam and Lake Sakakawea in cooperation with other
   Federal agencies.

3. The Corps has a congressionally mandated responsibility to ensure that the federally
   constructed projects are appropriately operated and maintained. No improvements shall
   be passed over, under or through the walls, levees, improved channels or floodways, nor
   shall any excavation or construction be permitted within the limits of the project right-of-
   way, nor shall any change be made in any feature of the works without prior approval of
   the Corps.

4. Mechanical aspects of this project were reviewed by Michael T. Smith, Design Branch
   Mechanical Section Chief, and all mechanical comments generated during the technical
   review were entered into the ProjNet / DrChecks. Once the comments were satisfactorily
   addressed by the Engineer-of-Record (Jonathan Fredland), they were closed out in
   ProjNet/DrChecks. Technical record of comments and responses, follow-up comments
   and follow-up responses, etc. is kept in ProjNet / DrChecks.

5. The Engineer-of-Record will fully implement all required and agreed upon technical
   changes, as has been recorded by ProjNet / DrChecks review process.

6. The Engineer-of-Record is responsible for amending the O&M Manual for the project to
   reflect the as-built conditions for any permanent modifications or encroachments. The
   amendment to the O&M Manual is required to be provided to the Corps for record
   keeping purposes within 60 days of completion of construction. The Corps can provide
   guidance on developing an addendum to the O&M Manual, upon request.

7. The comments herein pertain only to the mechanical issues related to pipeline lake
   crossing and do not constitute Corps of Engineers' approval of any permits that may be
   required.

8. If you have any questions, please contact Michael T. Smith at 402-995-2133.

Michael T. Smith, P.E.
Chief, Design Branch Mechanical Section
US Army Corps of Engineers, Omaha District

USACE_DAPL0071204

CENWO-ED-HA                                                    04 November 2015

MEMORANDUM FOR CENWO-OD-TN

SUBJECT:  Water Quality Team Review of Draft Environmental Assessment for
Dakota Access Pipeline Project Crossings of Flowage Easements and Federal Lands.

1.  The Omaha District Water Quality Team (WQ) is responsible for coordinating
compliance with the guidance and requirements set forth in the U.S. Army Corps of
Engineers' Engineering Regulation – ER 1110-2-8154, "Water Quality and
Environmental Management for Corps Civil Works Projects".  The guiding principles
taken from ER 1110-2-8154 serve as the basis for surface water quality management
activities in the Omaha District.  WQ has reviewed the Draft Environmental
Assessment for Dakota Access Pipeline Project Crossings of Flowage Easements and
Federal Lands and has no comments at this time.  Additional documentation
supporting ER 1110-2-8154 is provided in the comments below.

2.  The Corps' water quality management authority is founded on the Federal Water
Pollution Control Act (FWPCA) of 1948 and its amendments including the Clean
Water Act (CWA) of 1977 and the Water Quality Act of 1987. The FWPCA
Amendments of 1972 (PL 92-500) strongly affirm the Federal interest in water
quality. Executive Order 12088, Federal Compliance with Pollution Control
Standards, dated 13-October-1978, requires compliance by Federal facilities and
activities with applicable pollution control standards in the same manner as any
non-Federal entity.

3.  The ultimate responsibility to control water quantity and quality at all Corps projects
rests with the Corps.

4.  If you have any questions or comments regarding this review, please me at (402)
995-2347.

John Hargrave
Limnologist
Omaha District Water Control and Water Quality
Section
Hydrologic Engineering Branch
Engineering Division



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, OMAHA DISTRICT
1616 CAPITOL AVENUE
OMAHA NE 68102-4901

CENWO-ED-HB                                                                9 March 2016

MEMORANDUM FOR CENWO-OD-TN (Cossette)

SUBJECT: Executive Order 11988 and NWDR 1110-2-5 Compliance Memo for the Proposed Dakota Access Pipeline (DAPL) Project in Williams County, North Dakota, across Flowage and Saturation Easements

1. The Omaha District Flood Risk and Floodplain Management Section (FRFM) is responsible for coordinating the compliance with the requirements of Executive Order 11988 (Flood Plain Management). FRFM reviewed the updated proposed project submittal by Mrs. Monica Howard originally submitted March 2015, and as found it to be in compliance with EO 11988. Executive Order 11988 is applicable to all planning, design, and construction civil works projects, activities under the operation and maintenance program, and to real estate program (ER 1165-2-26). Specific to alteration of civil works projects EO 11988 compliance is identified in EC1165-2-216 in Section 7.c.(3).ix.(e) and Section 7.c.(4)(b).

2. The proposed project is approximately 1,100 miles long, 12- to 30-inch diameter light crude oil underground pipeline beginning near Stanley, North Dakota and routing through South Dakota, Iowa and ending at Patoka, Illinois. This review is for the portion of the proposed project that crosses seven USACE flowage and saturation easements (LL3440E, LL3483E-1, LL3453E, LL3430E, LL3450E-O, LL34316E, and LL3426E-2) for approximately 3 miles, with a portion of it within the Garrison Dam flood control pool.

3. The following comments are outlined using the review criteria identified in ER 1165-2-26:

   a. Determine if the proposed action is in the base floodplain: The project is located in Williams County, North Dakota which participates in the National Flood Insurance Program (NFIP). The portion of the proposed pipeline that crosses the USACE flowage and saturation easements is in the Zone A Special Flood Hazard Area (SFHA) shown on Map Panel 3803120025A.

   b. Identify and evaluate practicable alternatives to the action or to location of the action: The proposed project is functionally dependent on its location in the floodplain.

   c. Advise the general public in the affected area and obtain their views and comments : It should be ensured that the proposed project is in compliance with



Printed on Recycled Paper

USACE_DAPL0071206

CENWO-ED-HB
SUBJECT: Executive Order 11988 and NWDR 1110-2-5 Compliance Memo for the
Proposed Dakota Access Pipeline (DAPL) Project in Williams County, North Dakota,
across Flowage and Saturation Easements

floodplain management criteria of Williams County and the State of North Dakota.  It is
recommended that the applicant obtain a local floodplain permit prior to construction.

 d.  Identify beneficial and adverse impacts due to the action:  The proposed pipeline
has no adverse impacts on the operation of the Garrison flood control pool (see the
below comments for compliance with NWDR 1110-2-5).

 e.  Identify the potential for the project to induce development in the base
floodplain:  Because this project will not change zoning or restrictions, the project is not
expected to have any impact on development potential within the Zone A SFHA.

 f.  Determine viable methods to minimize any adverse impacts:

  (1)  Provided that the site topography is left at its natural ground elevation after
construction, the proposed project should not adversely impact the USACE flowage and
saturation easements.

  (2)  Flood-related problems should not occur if the pipeline is buried far enough
below the beds of the Missouri River to prevent exposure due to streambed erosion
during periods of high flood flows.

  (3)  The shutoff valve location presented in the original proposal was identified as
a potential issue, but has since been addressed and removed according to Dakota
Access Pipeline Project Figure 6-B, dated August 2015.

4.  Plans for the proposed pipeline were reviewed for compliance with appendix A
(Typical Cut and Fill Volumes for Land Development Proposals) of NWDR 1110-2-5,
Land Development Guidance at Corps Reservoir Projects.  Provided that the site
topography is left at its natural ground elevation after construction and all excess
material is hauled off site, there are no flood risk and floodplain management concerns
from this office and therefore the proposed project is recommended for approval.

USACE_DAPL0071207

CENWO-ED-HB
SUBJECT:  Executive Order 11988 and NWDR 1110-2-5 Compliance Memo for the
Proposed Dakota Access Pipeline (DAPL) Project in Williams County, North Dakota,
across Flowage and Saturation Easements

5.  The comments herein pertain only to flood risk and floodplain management
concerns.  If you have any questions, please contact Mr. Brennan Beam at (402) 995-
2317 or myself at (402) 995-2322.

TONY D. KRAUSE, P. E., CFM
Chief, Flood Risk and Floodplain
   Management Section
Hydrologic Engineering Branch
Engineering Division

3

**U.S. ARMY CORPS OF ENGINEERS OMAHA DISTRICT**
**NEPA CONSIDERATION CHECKLIST for PROJECT ACTIONS**

| Project Name: GARRISON PROJECT LAKE SAKAKAWEA | Address/Location: 7,18,19,20,29, & 30  152N-103W |
|---|---|

| Brief Description of Proposed Action: |
|---|
| CROSSING OF FLOWAGE EASEMENT WITH 12"-30" CRUDE OIL PIPELINE. |

|  |  |  | INITIAL |
|---|---|---|---|
| 1. The proposed action would have significant adverse effects on public health or safety. | YES ☐ | NO ☒ | JT |
| 2. The proposed action is in a location with unique geographic characteristics such as historical or paleontological resources | YES ☐ | NO ☐ |  |
| 3. An Archaeologist reviewed this federal undertaking for cultural clearance. See attached documentation or copy of official email. | YES ☐ | NO ☐ |  |
| 4. The proposed action would adversely affect park, recreation, or refuge lands; principle drinking water aquifers; wetlands; floodplain; prime or unique farmlands; or ecologically significant or critical habitat areas. | YES ☐ | NO ☒ | JT |
| 5. The proposed action would have highly controversial environmental effects. | YES ☐ | NO ☒ | JT |
| 6. The proposed action would have highly uncertain environmental effects or involve unique or unknown environmental risks. | YES ☐ | NO ☒ | JT |
| 7. The proposed action would establish a precedent for future action or represents a decision in principle about a future consideration with significant environmental effects. | YES ☐ | NO ☒ | JT |
| 8. The proposed action is related to other actions with individually insignificant, but cumulatively significant environmental effects. | YES ☒ | NO ☐ | JT |
| 9. The proposed action would adversely affect properties listed or eligible for listing in the National Register of Historic Places. See attached documentation or copy of official email. | YES ☐ | NO ☐ |  |
| 10. The proposed action would affect either directly or indirectly, a species included or proposed to be included on the list of endangered or threatened species. Attach USFWS concurrence. | YES ☐ | NO ☐ |  |
| 11. The proposed action may violate Federal, State, Local or Tribal law or regulation imposed for the protection of the environment or imposed to ensure compliance with Executive Order 11988 (Floodplain Management), EO 11990 (Protection of Wetlands), Wild or Scenic Rivers Act, or the Fish and Wildlife Coordination Act. | YES ☐ | NO ☒ | JT |
| 12. The proposed action is in conformance with the project Master Plan and or the project OMP. | YES ☐ | NO ☒ | JT |
| 13. There is evidence of hazardous or toxic materials, which were stored on, disposed of on, or have otherwise contaminated the subject property. | YES ☐ | NO ☒ | JT |
| 14. The proposed action requires a Regulatory Section 10 404 permit. Can still be categorically excluded. | YES ☒ | NO ☐ | JT |
| 15. The proposed action involves surface disturbance greater than one (1) acre –Can still be categorically excluded but may need a NPDES permit. Consult with District or Project ECC if there is a question. | YES ☒ | NO ☐ | JT |
| 16. This action requires that the affected Tribes be consulted per the Programmatic Agreement for the operation and management of the Missouri River main stem system for compliance with the National Historic Preservation Act. Can still be categorically excluded. See attached documentation. | YES ☐ | NO ☐ |  |

**IT HAS BEEN DETERMINED THAT THE PROPOSED ACTION:**

☐ Qualifies for a Categorical Exclusion in accordance with ER 200-2-2 Paragraph 9 dated March 4, 1988. (Check list on page 2)

☑ Is adequately covered in an existing EA (Environmental Assessment) or EIS (Environmental Impact Statement) entitled

| Dakota Access Pipeline EA    June 2016 | and dated |
|---|---|

☐ Requires mitigative measures (attach description).

☐ May not be categorically excluded - Proposal forwarded to Omaha District Office (CENWO-OD-TN) for further review.

| Signature of Preparer | Date 3/18/16 | Phone 701-654-7761 |
|---|---|---|
| Operations Manager | 5/23/16 | Date |

9/11/2009 CENWO OD FORM

1/2

## Rogers, Richard R NWO

| | |
|---|---|
| **From:** | Cain, David I NWO |
| **Sent:** | Monday, December 07, 2015 2:31 PM |
| **To:** | Cossette, Brent NWO |
| **Cc:** | Crane, Kelly A NWO; Lindquist, Todd J NWO; Spooner, Wade D NWO; Harnois, Richard D NWO; Price, Julie A NWO; Maier, Megan M NWO; Rogers, Richard R NWO |
| **Subject:** | RE: DAPL Tribal Admin Record (UNCLASSIFIED) |
| **Attachments:** | Garrison O&G Pipeline update02172015.pdf; Document1.docx |

Classification: UNCLASSIFIED
Caveats: NONE

Brent,

The only connection to DAPL we have had officially was the use of flowage easement lands. It had been determined that we do not have jurisdiction on lands we do not have access to. Formal Consultation was not initiated for the DAPL proposal due to the determination that the Regulatory Branch would have the lead role. This being said, due to the involvement with the civil works branch the proposal was mentioned in an oil and gas update PA letter dated February 17, 2015. The project was listed with Hess Hawkeye, Bakkenlink, Bakken Bridge, Paradigm Sakakawea, North Dakota Pipeline/Enbridge Western Expansion; the other currently proposed pipelines.

I must emphasize consultation was not officially initiated by the Garrison office for the DAPL pipeline. It is my understanding that the only consultation that has been officially initiated is for the Oahe Geotechnical Investigation, which is a separate project all together from the pipeline project. I do not want to speak for the Oahe Archaeologists, so Rick and Megan, please correct me if I'm speaking out of turn. However, I have been made aware, indirectly, that a G to G meeting had been arranged for the DAPL project in Sioux Falls, but the generic document attached above is the only documentation I have of the meeting, so I can't tell you if we have already had this meeting or if it has yet to even be officiated.

David I. Cain
Lead Field Archeologist
USACE, Garrison Project
201 1st Street
Riverdale, ND 58565
Office:(701)654-7706

-----Original Message-----
From: Cossette, Brent NWO
Sent: Monday, December 07, 2015 1:05 PM
To: Harnois, Richard D NWO; Cain, David I NWO; Price, Julie A NWO
Cc: Crane, Kelly A NWO
Subject: DAPL Tribal Admin Record (UNCLASSIFIED)

CLASSIFICATION: UNCLASSIFIED

All:

1

USACE_DAPL0071210

## Rogers, Richard R NWO

| | |
|---|---|
| **From:** | Cain, David I NWO |
| **Sent:** | Monday, December 07, 2015 2:31 PM |
| **To:** | Cossette, Brent NWO |
| **Cc:** | Crane, Kelly A NWO; Lindquist, Todd J NWO; Spooner, Wade D NWO; Harnois, Richard D NWO; Price, Julie A NWO; Maier, Megan M NWO; Rogers, Richard R NWO |
| **Subject:** | RE: DAPL Tribal Admin Record (UNCLASSIFIED) |
| **Attachments:** | Garrison O&G Pipeline update02172015.pdf; Document1.docx |

Classification: UNCLASSIFIED
Caveats: NONE

Brent,
The only connection to DAPL we have had officially was the use of flowage easement lands. It had been determined that we do not have jurisdiction on lands we do not have access to. Formal Consultation was not initiated for the DAPL proposal due to the determination that the Regulatory Branch would have the lead role. This being said, due to the involvement with the civil works branch the proposal was mentioned in an oil and gas update PA letter dated February 17, 2015. The project was listed with Hess Hawkeye, Bakkenlink, Bakken Bridge, Paradigm Sakakawea, North Dakota Pipeline/Enbridge Western Expansion; the other currently proposed pipelines.

I must emphasize consultation was not officially initiated by the Garrison office for the DAPL pipeline. It is my understanding that the only consultation that has been officially initiated is for the Oahe Geotechnical Investigation, which is a separate project all together from the pipeline project. I do not want to speak for the Oahe Archaeologists, so Rick and Megan, please correct me if I'm speaking out of turn. However, I have been made aware, indirectly, that a G to G meeting had been arranged for the DAPL project in Sioux Falls, but the generic document attached above is the only documentation I have of the meeting, so I can't tell you if we have already had this meeting or if it has yet to even be officiated.


David I. Cain
Lead Field Archeologist
USACE, Garrison Project
201 1st Street
Riverdale, ND 58565
Office:(701)654-7706




-----Original Message-----
From: Cossette, Brent NWO
Sent: Monday, December 07, 2015 1:05 PM
To: Harnois, Richard D NWO; Cain, David I NWO; Price, Julie A NWO
Cc: Crane, Kelly A NWO
Subject: DAPL Tribal Admin Record (UNCLASSIFIED)

CLASSIFICATION: UNCLASSIFIED


All:

USACE_DAPL0071211



**Figure 1**
**Corps Flowage and Saturation Easement Areas**
**Crossed by Proposed Dakota**
**Access Pipeline Project**

0   1,000   2,000 Feet
1 inch = 2,000 feet

DAKOTA ACCESS, LLC
For Environmental Purposes Only

— Proposed Centerline
☐ Corps Flowage Easement Areas

USACE_DAPL0071212



USACE_DAPL0071213



NOTES:
① DEPTH OF TOPSOIL SEGREGATED BASED UPON SITE-SPECIFIC CONDITIONS.

| C | 12/12/14 | RER | ISSUED FOR REVIEW | |
| B | 12/12/14 | RER | ISSUED FOR REVIEW | |
| A | 9/16/14 | MR | ISSUED FOR REVIEW | |
| REV. | DATE | BY | DESCRIPTION | CHK. |
| | PROJECT NO. | | 10395700 | |

## TYPICAL RIGHT-OF-WAY CONFIGURATION

### UPLAND CONSTRUCTION FULL WIDTH TOPSOIL SEGREGATION

| DRAWN BY: MR | DATE: 09/15/14 | DWG. NO. | REV. |
| CHECKED BY: RL | DATE: 09/15/14 | **Figure 3** | C |
| SCALE: N.T.S. | APP.: | | |

USACE_DAPL0071214

# EXHIBIT MM



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, OMAHA DISTRICT
OAHE PROJECT
28563 POWERHOUSE ROAD
PIERRE SD 57501-6174

October 24, 2014

REPLY TO
ATTENTION OF :
Field Archeologists

«Prefix» «FirstMiddle_Name» «Last_Name»
«Title»
«Organization»
«Address1»
«City», «State» «Zip»

Dear «Salutation» «Last_Name»:

The U.S. Army Corps of Engineers, Oahe Project Office, has received a request from Dakota Access LLC to conduct soil borings related to the Dakota Access Pipeline (DAPL) project. The proposed soil borings will take place in Section 10 and 11, Township 134 N, Range 79 West, Morton and Emmons Counties, North Dakota.

The proposed activity will involve drilling seven (7) 4" diameter holes approximately 130-165' below the ground surface. The purpose of the soil bores is to evaluate subsurface stratigraphy in order to determine feasibility for a potential horizontal directional drill under the Missouri River related to the DAPL project. Once the bores are complete they will be backfilled with a mixture of cement-bentonite grout. The upper 2-3 feet will be backfilled with native soil. The area of disturbance anticipated for each bore hole is 10' in diameter.

The equipment used for this project will include a truck-mounted and all-terrain-mounted drilling rig. This equipment will be operated from a barge at the underwater locations. Access to the onshore bore locations will be along existing roads and two-track trails (see attached map).

The Area of Potential Effect (APE) for this action will include the six bore tests located within the USACE boundary and the access routes leading to the onshore bore locations See attached map).

A search of USACE cultural files indicates three recorded cultural sites within the project APE.

| Site Number | Site Name | Site Type | NR Status |
|---|---|---|---|
| 32EM0019 | | Historic Farmstead | Unevaluated |
| 32EMX0072 | | Isolated Find/Flake | Not Eligible |
| 32EMX0071 | | Isolated Find/Flake | Not Eligible |

USACE_DAPL0067130

The following sites area located OUTSIDE the project area but within a one-mile radius.

| Site Number | Site Name | Site Type | NR Status |
| --- | --- | --- | --- |
| 32EM0094 | | Artifact Scatter | Unevaluated |
| 32EM0021 | | Artifact Scatter | Unevaluated |
| 32EM0093 | | Historic Farmstead | Unevaluated |
| 32EM0172 | | Historic Foundation | Unevaluated |
| 32MO0130 | | Artifact Scatter | Unevaluated |
| 32MO0001 | North Cannonball Site | Earthlodge Village | Eligible |
| 32MO0054 | Donahue Farmstead | Historic Farmstead | Unevaluated |
| 32MO1081 | | Historic Artifact Scatter | Unevaluated |
| 32MO0200 | | Railroad Grade/Turntable | Unevaluated |

If you have any comments or concerns regarding this project and wish to consult on this matter, please respond in writing no later than 11/24/14.  Please reference "DAPL test bores" in or correspondence. If you have any questions please contact Richard Harnois at (605) 945-3406 or via email at richard.d.harnois@usace.army.mil

Sincerely,

Richard D. Harnois
Sr. Field Archaeologist
Oahe Project

USACE_DAPL0067131

**References Cited**

Larson, Thomas, Kurt Schweigert  and Keith H. Dueholm Et Al.,
1986     *A Cultural Resource Inventory of the Left Bank of Lake Oahe: Burleigh and Emmons Counties, North Dakota.*  Larson-Tibesar Associates Laramie, WY.

Larson, Thomas, Kurt Schweigert  and Keith H. Dueholm Et Al.,
1987     *A Cultural Resource Inventory of the Right Bank of Lake Oahe in Morton and Sioux Counties North Dakota.* Larson-Tibesar Associates Laramie, WY.

Slessman, Scott, Vanesa Zietz, Zonna Barnes Et Al.,
2010     A *Cultural Resources Inventory of U.S. Army Corps of Engineers Managed Lands on Lake Oahe, Burleigh, Morton , Emmons and Sioux Counties, North Dakota.*  SWCA Consultants

Root, Matthew J. and Cynthia Kordecki
1983     *The Cannonball Region. In Archaeology of the Northern Border Pipeline, North Dakota; Survey and Background Information.* University of North Dakota, Grand Forks.

USACE_DAPL0067132

General Project Location



Operations/Regulatory GIS Unit
2003    Lake Oahe Boating and Recreation Guide. U.S. Army Corps of Engineers, Omaha District, Omaha.

USACE_DAPL0067133



## Legend

⊗ boring locations
— Access Route
☐ Cultural Resources
— Approx. COE Boundary

N

**Soil Boring Test Locations**

DAPL pipeline

0.25    0    0.25    0.5
━━━━━━━━━━━━━━━━━ Miles

Disclaimer: The United States government and USACE furnishes this data and the recipient accepts and uses it with the express understanding that the
government makes no warranties, expressed, or implied, concerning the accuracy, completeness, reliability, usability, or suitability for any particular purpose of the
information and data furnished. The United States shall be under no liability whatsoever to any person by reason of any use made thereof.
Data displayed on this map are approximations derived from GIS layers and should not be used in place of survey data or legal land descriptions

2012 NAIP Imagery

| Field Archaeologist |
| CENWO-OD-OA |

| Produced By | Megan Maier |
| Production Date | 14 Oct 14 |
| Revised By | |
| Revision Date | |

**US Army Corps of Engineers**
Omaha District

File Location
F:\GPS Projects\Oahe\north dakota\Pipeline\DAPL.mxd

Hwy 1806
Hwy 1804
Cannonball River

32MO0109
32MO0094
32MO0097
32EM0094
32EMXX0072
32EM0019
32EM0023
32EM01T2
32EMIF0604
32EMIF0603
32MO1081
32MO0200

USACE_DAPL067134

# PROGRAMMATIC AGREEMENT FOR THE OPERATIONS AND MANAGEMENT OF THE MISSOUR RIVER MAINSTEM SYSTEM GENERAL DISTRIBUTION LIST

Updated 9 May 2014

| P/CF | S | Organization | Last Name | First/Middle Name | Title |
|------|---|--------------|-----------|-------------------|-------|
| P | NS | Oglala Sioux Tribe | Brewer | Bryan | President |
| P | NS | Oglala Sioux Tribe | Mesteth | Wilmer | Tribal Historic Preservation Officer |
| P | S | Omaha Tribe of Nebraska | Parker | Thomas | Tribal Historic Preservation Officer |
| CF | S | Omaha Tribe of Nebraska | Wolfe | Clifford | Chairman |
| P | S | Ponca Tribe of Nebraska | Teboe | Randy | Director of Cultural Affairs |
| CF | S | Ponca Tribe of Nebraska | Wright | Jeremy | Vice Chairman |
| P | NS | Rosebud Sioux Tribe | Scott | Cyril | President |
| CF | NS | Rosebud Sioux Tribe | Eagle Bear | Russell | Tribal Historic Preservation Officer |
| P | S | Sac and Fox Nation of Missouri in Kansas and Nebraska | Robidoux | Bridgette | Chairperson |
| P | NS | Sac and Fox Nation of Oklahoma | Massey | Sandra | Historic Preservation Officer |
| P | S | Santee Sioux Nation | Thomas | Rick | Tribal Historic Preservation Officer |
| CF | S | Santee Sioux Nation, | Trudell | Roger | Chairman |
| P | S | Sisseton-Wahpeton Sioux Tribe | Shepherd | Robert | Chairman |
| CF | S | Sisseton-Wahpeton Sioux Tribe | Desrosiers | Dianne | Tribal Historic Preservation Officer |
| P | S | South Dakota Department of Game, Fish and Parks | Coughlin | Paul | Habitat Management Program Administrator, Wildlife Division |
| P | S | South Dakota Department of Game, Fish and Parks | Williams | Dennis | Environmental and Cultural Resources Specialist |
| CF | S | South Dakota Department of Game, Fish and Parks | Vonk | Jeffrey R. | Secretary |
| P | S | South Dakota State Historical Society | Hoskinson-Olson | Paige | Historical Archaeologist Review and Compliance Coordinator |
| CF | S | South Dakota State Historical Society | Vogt | Jay D. | State Historic Preservation Officer |
| P | NS | Spirit Lake Sioux Tribe | McDonald | Leander "Russ" | Chairman |
| P | NS | Standing Rock Sioux Tribe | Archambault II | Dave | Chairman |
| P | NS | Standing Rock Sioux Tribe | Young | Waste' Win | Tribal Historic Preservation Officer |
| P | S | Turtle Mountain Band of Chippewa | McCloud | Richard | Chairman |
| P | S | Turtle Mountain Band of Chippewa | Nadeau | Bruce | Tribal Historic Preservation Officer |
| P | S | Winnebago Tribe of Nebraska | Blackhawk | John | Chairman |
| CF | S | Winnebago Tribe of Nebraska | Snyder | Darwin | Tribal Council Member |
| P | NS | Yankton Sioux Tribe | Flying Hawk | Robert | Chairman |
| P | NS | Yankton Sioux Tribe | Miller | Lyle | Tribal Historic Preservation Officer |
| CF | NS | Yankton Sioux Tribe | Archambeau | Jean | Vice Chairwoman |

| P | Shading designates the Primary point of contact for all PA actions |
|---|---|
| CF | Copy furnished of the letter sent to Primary point of contact for same Tribe/Agency |
| S/NS | Denotes Signatory (S) or Non-Signatory (NS) |

USACE_DAPL0067135

# PROGRAMMATIC AGREEMENT FOR THE OPERATIONS AND MANAGEMENT OF THE MISSOUR RIVER MAINSTEM SYSTEM GENERAL DISTRIBUTION LIST
Updated 9 May 2014

| P/CF | S | Organization | Last Name | First/Middle Name | Title |
|---|---|---|---|---|---|
| P | NS | Oglala Sioux Tribe | Brewer | Bryan | President |
| P | NS | Oglala Sioux Tribe | Mesteth | Wilmer | Tribal Historic Preservation Officer |
| P | S | Omaha Tribe of Nebraska | Parker | Thomas | Tribal Historic Preservation Officer |
| CF | S | Omaha Tribe of Nebraska | Wolfe | Clifford | Chairman |
| P | S | Ponca Tribe of Nebraska | Teboe | Randy | Director of Cultural Affairs |
| CF | S | Ponca Tribe of Nebraska | Wright | Jeremy | Vice Chairman |
| P | S | Rosebud Sioux Tribe | Scott | Cyril | President |
| CF | NS | Rosebud Sioux Tribe | Eagle Bear | Russell | Tribal Historic Preservation Officer |
| P | S | Sac and Fox Nation of Missouri in Kansas and Nebraska | Robidoux | Bridgette | Chairperson |
| P | NS | Sac and Fox Nation of Oklahoma | Massey | Sandra | Historic Preservation Officer |
| P | S | Santee Sioux Nation | Thomas | Rick | Tribal Historic Preservation Officer |
| CF | S | Santee Sioux Nation, | Trudell | Roger | Chairman |
| P | S | Sisseton-Wahpeton Sioux Tribe | Shepherd | Robert | Chairman |
| CF | S | Sisseton-Wahpeton Sioux Tribe | Desrosiers | Dianne | Tribal Historic Preservation Officer |
| P | S | South Dakota Department of Game, Fish and Parks | Coughlin | Paul | Habitat Management Program Administrator, Wildlife Division |
| P | S | South Dakota Department of Game, Fish and Parks | Williams | Dennis | Environmental and Cultural Resources Specialist |
| CF | S | South Dakota Department of Game, Fish and Parks | Vonk | Jeffrey R. | Secretary |
| P | S | South Dakota State Historical Society | Hoskinson-Olson | Paige | Historical Archeologist Review and Compliance Coordinator |
| CF | S | South Dakota State Historical Society | Vogt | Jay D. | State Historic Preservation Officer |
| P | NS | Spirit Lake Sioux Tribe | McDonald | Leander "Russ" | Chairman |
| P | NS | Standing Rock Sioux Tribe | Archambault II | Dave | Chairman |
| P | NS | Standing Rock Sioux Tribe | Young | Waste' Win | Tribal Historic Preservation Officer |
| P | S | Turtle Mountain Band of Chippewa | McCloud | Richard | Chairman |
| P | S | Turtle Mountain Band of Chippewa | Nadeau | Bruce | Tribal Historic Preservation Officer |
| P | S | Winnebago Tribe of Nebraska | Blackhawk | John | Chairman |
| CF | S | Winnebago Tribe of Nebraska | Snyder | Darwin | Tribal Council Member |
| P | NS | Yankton Sioux Tribe | Flying Hawk | Robert | Chairman |
| P | NS | Yankton Sioux Tribe | Miller | Lyle | Tribal Historic Preservation Officer |
| CF | NS | Yankton Sioux Tribe | Archambeau | Jean | Vice Chairwoman |

| P | Shading designates the Primary point of contact for all PA actions. |
|---|---|
| CF | Copy furnished of the letter sent to Primary point of contact for same Tribe/Agency. |
| S/NS | Denotes Signatory (S) or Non-Signatory (NS) |

USACE_DAPL0067136

# EXHIBIT NN

**Mnicoujou**                          **Itazipco**



**Siha Sapa**                          **Oohenumpa**

**CHEYENNE RIVER SIOUX TRIBE**
**Cultural Preservation Office**
PO BOX 590 98 S. Willow St.
Eagle Butte, South Dakota 57625
Telephone: (605) 964-7554
Fax:  (605) 964-7552

**Steven Vance**
**Tribal Historic Preservation Officer**
**stevev.crstpres@outlook.com**

Date:  August 17, 2015

Richard Harnois
Sr. Field Archaeologist
Department of the Army
Corps of Engineers, Omaha District
Oahe Project
28563 Powerhouse Road
Pierre, SD 57501-6174

The Cheyenne River Sioux Tribe (CRST) appreciates the opportunity to comment to the proposed Dakota Access Pipeline (DAPL) project.

Information received from the Corp on October 29, 2014 was of proposed soil boring in Section 10 and 11, Township 134N, Range 79 W, Morton and Emmons Counties, North Dakota.

A formal comment was sent to Martha Chieply, Regulatory Chief for the Corp by the Tribal Historic Preservation Officer (THPO) of Standing Rock Sioux Tribe (SRST), Waste Win Young. Specific questions, concerns, suggestions, and requests were stated in the letter.

- Opposed to any geotechnical boring.
- Mitigation for site 32MO0001, an earth lodge village.
- The current Environmental Assessment (EA) in insufficient for oil pipelines.
- A request that an Environmental Impact Statement (EIS) be completed.
- A Class III Archaeological Study, with Tribal involvement, be conducted.
- Risks of disturbing burials by dredging the Missouri, other tributaries.
- Disagrees with the "No Historic Properties Affected" determination.
- Concerns for all residents along the proposed route of the quality of water.

Has any of these been addressed?

Respectfully she shared the comments with other THPO's that have ancestral connection to the location mentioned.

USACE_DAPL0069815

As THPO for CRST I support the comments submitted by THPO Waste Win Young and thought this would have initiated more dialog between agencies and Tribes. I assumed the Corp would have involved more of the Tribes with aboriginal association to the proposed project by offering a field visit or an opportunity to conduct a "Tribal Survey". The letter from the Corp dated October 24, 2014 noted 9 unevaluated sites, 2 not eligible, and 1 eligible. Studies were conducted in 1980, 1983, and 2009. Again no Tribal participation.

I have objection to the process of identification conducted by past and present companies who are contracted by proponents of applicants. Their archaeologists continue to state that Tribes migrated to this continent. Similar to the Columbus story, these do not reflect to the Oceti Sakowin.

Examples that discredit this would be buffalo skulls dating 500 – 10,000 years old with charcoal in them. Projectile points (arrow heads) dating to 8,000 years old. They may have no meaning to scientists and other disciplines but these match Tribal history and culture of the Northern Plains Indigenous People.

The reason for mentioning this is the few sites identified are unevaluated or not eligible. The two (2) "isolated find/flake" as not eligible I disagree with. Again the evaluation and determination was without Tribal involvement and reflect the European view.

DAPL cannot address the affects to cultural and historical resources, Sacred sites (water included), Traditional Cultural Properties, Properties of Cultural or Religious Significant to Tribe, etc., of the proposed pipeline when they have not been properly identified.

Another concern of mine is the question of the "Appendix C" of 33 CFR Part 325 that determines the permit area. I asked this of the Advisory Council on Historic Preservation (ACHP) and they also question it. ACHP needs to be invited into the discussion.

The other agencies not participating is a question. The proposed route crosses many bodies of water and birds have to land in these waters. There has been a concern of why birds have been slowly changing their migratory route by slowly moving west to travel north. Again a natural cycle Native Nations monitor. I sense it is from modern development that affects waterbodies. Fish and Wildlife needs to be in the discussion.

CRST has concern of all the bodies of water proposed to be crossed, not just the Missouri. Other crossing (horizontal directional drilling/boring), of creeks, streams, lakes, or rivers will all eventually empty into Lake Oahe. Which will then travel on to the Mississippi and the Gulf. This is not a local concern but a global concern.

These bodies of water were utilized by Natives and were "bloodlines" of survival when traveling across this land. Today America calls them Interstate Highways or Freeways.

Recent findings of the quality of pipes have serious concerns. Pipe that have been placed in fields and stored for numerous months are questioned of their condition by the time they are to be placed underground. There are specific timeframes these pipes are to be inspected for corrosion and prepared with a protective coating prior to installation. Photos of pipe stored for up to two (2) years by companies show no coating. These pipes sit stacked on top of each other, four pipes high, through all extremes of weather conditions in the northern plains area. Rodents and other animals have made nests or homes inside

USACE_DAPL0069816

the bottom pipes. Their waste deposits are corrosive. Birds have nested and defecated on the pipe which is also corrosive.

The welding also is a recent discovery on pipe previously buried and proposed to be buried. Welds have been examined and there is discovery of faulty welding. The difference from one welder finishing a shift and the next welder coming on have discrepancies. Fractures as long as six feet have been welded shut instead of replacing them. When these defects are brought to the attention of the company the person or persons reporting is usually terminated and replaced.

The aggressive pace this company has conducted itself brings these to question. It is not "if" the pipe will leak but "when". The long term effects of a leak or major spill will remain with local residence and those downstream, while companies move on.

The northern hemisphere of this continent has been long inhabited by numerous Native Nations and their travels took them into each other's territory. This happened long before the arrival of European immigrants and explorers. These Tribes maintained their own order as to where they would establish their territory or encampments. These homes were never permanent as homes are today. As Tribes traveled and bartered between each other their journey could take them far to the north into today Canada. They would also journey far south into now South America. These travels would span over several years and decades. Modern day studies attempt to portray these travels as annual, they are wrong.

The Tribes who were here before this managed to move about with little disturbance from other Nations, until the arrival of European and Spanish people. Tribes treated the land as a living being which they lived in harmony with. They did not disrupt the way the land evolved over time, they adjusted. The Spirit that came from Earth strengthened the Spirit in their bodies and respect was shown for this. Today this energy of Spirit is missing in the research of history. I will state that all Native sites identified have "feeling", one of the criterion for eligibility.

Never will the real history of this continent be discovered under the means of how this country wishes to educate people. Scientists continue to report theories when most of them were taught by their parents of a "creation".

We will continue to pass oral tradition and Creation Stories amongst our own, praying their generation will have better opportunity from the present.

CRST request continued communication with this proposed project.

Respectfully

*Steve Vance*


Cc; file

USACE_DAPL0069817

# EXHIBIT OO



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, OMAHA DISTRICT
1616 Capitol AVE
OMAHA, NEBRASKA 68102-9000

SEP 3, 2015

District Commander

Cheyenne River Sioux Tribe
Mr. Harold Frazier, Chairman
PO Box 590, 2001 North Main St
Eagle Butte, SD 57625

Dear Chairman Frazier:

The U.S. Army Corps of Engineers (Corps) Regulatory Branch has received Preconstruction Notifications (PCNs) associated with the proposed Dakota Access Pipeline Project (DAPL).   The proposed approximate 1,150-mile, 30-inch diameter, crude oil pipeline would extend from Stanley, North Dakota through South Dakota and Iowa to a delivery point at Patoka, Illinois.  The purpose of this letter is to initiate Section 106 consultation and review, determine your interest in consulting on this undertaking for those portions subject to the Corps jurisdiction, and to gather information that will assist the Corps in identifying historic properties.

The majority of the proposed 1,150-mile pipeline would be located in upland areas not requiring Corps authorization under Sections 10 or 404, and over which the Corps does not have control or responsibility.  The Corps has regulatory authority and responsibility for those portions of the pipeline that require authorization under Section 10 of the Rivers and Harbors Act (33 U.S.C. 401 et seq.) and Section 404 of the Clean Water Act (33 U.S.C. 1344).  When linear projects cross a single or multiple water bodies several times at separate and distant locations, each crossing is considered a single and complete project for purposes of nationwide permit authorization. Under our Regulatory authority, we are currently evaluating 209 single and complete crossings requiring PCN's.  The locations of the PCN areas are enclosed along with an overall DAPL fact sheet, points of contact and maps. DAPL has voluntarily started archaeological surveys for the project.  The Cultural Resource Inventory Reports that have been submitted to the Corps are available at the following ftp location .ftp://ftp.perennialenv.com/. (User: EnergyTransfer, password: DAPL). Besides those provided at the FTP site, the Corps will make those survey results available to Section 106 consulting parties for review and comment as DAPL provides them.

The  Corps will consult on those areas comprising the waters of the United States that will be directly affected by the proposed work or structures and uplands affected as a result of authorizing the work or structures.  Corps regulations implementing the National Historic Preservation Act may be found at 33 C.F.R. 325, App. C.

Subparagraph 1.g.(1) defines the "permit area" as those areas comprising waters of the United States that will be directly affected by the work or structure, and uplands directly affected as a result of the authorization of the work or structure.  Activities undertaken

outside the waters of the United States must meet all of 3 requirements set out in subparagraphs 1.g.(1)(i.)-(iii). Crossings of Section 10 navigable waters include the Missouri, James, Des Moines, Mississippi, and Illinois rivers.  DAPL is also currently working with the Districts to obtain the necessary easements for crossing federal lands, as well as modifications of Corps projects pursuant to Section 14 of the Rivers and Harbors Act Appropriation Act of 1899 (33 U.S.C. § 408) (Section 408).

The DAPL project crosses 3 Corps Districts (Omaha, Rock Island and St. Louis). While each district will make permit decisions for those proposed regulated crossings in their district, the Omaha District is the lead Corps District in its oversight role in all coordination, permit evaluation, and compliance activities.  Regulatory points of contact are Martha Chieply, Omaha District Regulatory Chief Martha.S.Chieply@usace.army.mil.; (402) 995-2451 and Jason Renschler, Project Manager Jason.J.Renschler@usace.army.mil.; (701) 255-0015, ext 2010.   Please note that previous consultation on the project has also been initiated as part of the Corps Section 408 review process for the areas located on Corps Project Lands.

Please let the Corps know if you would like to consult on this undertaking. In addition, the Corps requests information that will assist us in identifying historic properties.  The Corps would like to know if you have any knowledge or concerns regarding historic properties, including sites of religious importance, at the project locations you would like the Corps to consider.  If there are any known Traditional Cultural Properties within those areas, please notify us by September 30, 2015.  The Corps will treat any information provided with the greatest confidentiality.

We request your engagement and/or comments by September 30, 2015.   If you are interested in participating in consultation for this proposal or desire additional information, please contact Mr. Joel Ames, Tribal Liaison Joel.O.Ames@usace.army.mil. (402) 945-2909).  Should you have site specific concerns regarding the project please contact Roberta Hayworth (St. Louis District) Roberta.L.Hayworth@usace.army.mil. (314) 331-8833 or Ron Deiss (Rock Island District) Ronald.W.Deiss@usace.army.mil. (309) 794-5185.

Sincerely,

John W. Henderson, P.E.
Colonel, Corps of Engineers
District Commander

Dakota Access / ETCOP

Bakken Supply Area

Patoka

Nederland

**Legend**
★ Project Receipt Points
........ Dakota Access Pipeline
—— Energy Transfer Crude Oil Pipeline

Please Note: This map is being provided for indicative purposes only and Energy Transfer Partners, L.P. does not hereby guaranty or warrant any particular route or project scope, which may be subject to change. Routing and project scope remain subject to the terms of the Open Season Documentation.

USACE_DAPL0069761



★ DAPL Terminals
╍╍ Dakota Access Pipeline
■ Project Counties
▢ Project States

**DAPL Project**

Page 1

DAKOTA ACCESS, LLC

USACE_DAPL0069762



USACE_DAPL0069763







| | A | B | C | D | E |
|---|---|---|---|---|---|
| 1 | Mile | Longitude | Latitude | County | WOUS |
| 2 | State of North Dakota - Omaha District | | | | |
| 3 | 6.34 | -102.477 | 48.292 | Mountrail | Unnamed Tributary |
| 4 | 16.55 | -102.859 | 47.6021 | Dunn | Little Missouri River |
| 5 | 96.78 | -103.9057 | 47.9601 | Williams | Missouri River |
| 6 | 164.89 | -100.5871 | 46.4386 | Morton | Lake Oahe/Missouri River |
| 7 | 204.81 | -100.1361 | 46.001 | Emmons | Unnamed Tributary |
| 8 | | | | | |
| 9 | State of South Dakota - Omaha District | | | | |
| 10 | 256.72 | -99.48468 | 45.4822 | Edmunds | Unnamed Wetland |
| 11 | 310.6 | -98.70515 | 45.0023 | Spink | Unnamed Wetland |
| 12 | 315.74 | -98.65283 | 44.9416 | Spink | Unnamed Wetland |
| 13 | 315.88 | -98.65067 | 44.9396 | Spink | Unnamed Wetland |
| 14 | 348.11 | -98.27189 | 44.6138 | Beadle | James River |
| 15 | 348.94 | -98.25483 | 44.6132 | Beadle | Unnamed Wetland |
| 16 | 363.19 | -98.00938 | 44.5371 | Beadle | Shue Creek |
| 17 | 371.12 | -97.90718 | 44.4533 | Beadle | Middle Pearl Creek |
| 18 | 385.96 | -97.69944 | 44.3041 | Kingsbury | Redstone Creek |
| 19 | 391.83 | -97.6172 | 44.2462 | Kingsbury | Rock Creek |
| 20 | 395.14 | -97.56862 | 44.2122 | Kingsbury | Unnamed Wetland |
| 21 | 415.83 | -97.31892 | 43.9849 | Lake | East Fork Vermillion River |
| 22 | 421.85 | -97.23034 | 43.9268 | Lake | Unnamed Wetland |
| 23 | 430.21 | -97.13393 | 43.8381 | McCook | Unnamed Wetland |
| 24 | 430.86 | -97.13119 | 43.8291 | McCook | Unnamed Wetland |
| 25 | 478.48 | -96.58128 | 43.3699 | Lincoln | Unnamed Wetland |
| 26 | 481.79 | -96.52635 | 43.345 | Lincoln | Big Sioux River |
| 27 | | | | | |
| 28 | States of Iowa & Illinois - Rock Island District | | | | |
| 29 | 497.3 | -96.267 | 43.233 | Sioux, IA | PFO Wetland |
| 30 | 497.9 | -96.258 | 43.232 | Sioux, IA | PFO Wetland |
| 31 | 546.5 | -95.511 | 42.827 | Cherokee, IA | PFO Wetland |
| 32 | 639.5 | -93.966 | 42.169 | Boone, IA | PFO Wetland/Des Moines R. |
| 33 | 685.3 | -93.307 | 41.77 | Jasper, IA | PFO Wetland |
| 34 | 693 | -93.191 | 41.712 | Jasper, IA | PEM Wetland>500' |
| 35 | 702.9 | -93.05 | 41.634 | Jasper, IA | PFO Wetland |
| 36 | 735.9 | -92.573 | 41.337 | Mahaska, IA | PEM Wetland>500' |
| 37 | 736.1 | -92.568 | 41.333 | Mahaska, IA | PEM Wetland>500' |
| 38 | 737 | -92.56 | 41.325 | Mahaska, IA | PEM Wetland>500' |
| 39 | 739.1 | -92.533 | 41.305 | Mahaska, IA | PFO Wetland |
| 40 | 766.8 | -92.176 | 41.038 | Jefferson, IA | PFO Wetland |
| 41 | 767.3 | -92.174 | 41.031 | Jefferson, IA | PFO Wetland |
| 42 | 795.1 | -91.761 | 40.802 | Van Buren, IA | PFO Wetland |
| 43 | 777.1 | -92.042 | 40.941 | Jefferson, IA | PFO Wetland |
| 44 | 820.1 | -91.483 | 40.541 | Lee, IA | PFO Wetland |
| 45 | 825.5 | -91.409 | 40.488 | Lee, IA | PFO Wetland |
| 46 | 828 | -91.377 | 40.476 | Lee, IA | Mississippi River |
| 47 | 828 | -91.363 | 40.475 | Hancock, IL | Mississippi River |
| 48 | 856.5 | -90.9781 | 40.2067 | Hancock, IL | PFO Wetland |
| 49 | 857.5 | -90.9653 | 40.194 | Hancock, IL | PFO Wetland |
| 50 | 861 | -90.9273 | 40.1535 | Adams, IL | Cultural Site |
| 51 | 862.5 | -90.9082 | 40.1357 | Schuyler, IL | PFO Wetland |
| 52 | | | | | |
| 53 | State of Illinois - St. Louis District | | | | |
| 54 | 882 | -90.763 | 39.967 | Brown | Trib to Dry Fork |
| 55 | 892 | -90.62 | 39.899 | Brown | Trib to Camp Creek |
| 56 | 896 | -90.597 | 39.839 | Brown | Unnamed Ditch |
| 57 | 896.5 | -90.594 | 39.834 | Brown | Unnamed Ditch |
| 58 | 898 | -90.584 | 39.811 | Brown | Il River |
| 59 | 898 | -90.583 | 39.81 | Brown | IL River |
| 60 | 898.5 | -90.58 | 39.808 | Brown | IL River |
| 61 | 900.5 | -90.551 | 39.788 | Scott | Unnamed Ditch |
| 62 | 900.5 | -90.55 | 39.788 | Scott | Coon Run |
| 63 | 900.5 | -90.549 | 39.788 | Scott | Coon Run |
| 64 | 900.5 | -90.549 | 39.787 | Scott | Coon Run |
| 65 | 956 | -89.82 | 39.286 | Macoupin | Macoupin Creek |
| 66 | 1008 | -89.163 | 38.863 | Fayette | Kaskaskia |
| 67 | 1010 | -89.144 | 38.847 | Fayette | Wetland Kaskaskia |
| 68 | 1010 | -89.144 | 38.847 | Fayette | Cassar Creek |
| 69 | 1010 | -89.141 | 38.843 | Fayette | Wetland Steve Creek |

USACE_DAPL0069767



# Dakota Access Pipeline
Permitting Process in Illinois

## U.S. ARMY CORPS OF ENGINEERS

**Congressional Districts:** IL-13, 15, 18

## BUILDING STRONG®

### Description

Dakota Access, LLC, is proposing to construct an 1,134-mile pipeline system to carry up to 570,000 barrels per day of U.S. light sweet crude (450,000 barrels per day initially) from the rapidly expanding Bakken and Three Forks production region of North Dakota through the states of North Dakota, South Dakota, Iowa and Illinois terminating at a crude oil hub near Patoka, Illinois, with various potential points of destination along the pipeline. The pipeline crosses four states within the boundaries of three U.S. Army Corps of Engineers Districts (Omaha District, Rock Island District, and St. Louis District).

### Pipeline Details in Illinois

The Dakota Access pipeline in Illinois will consist of approximately 177 miles of 30-inch diameter pipeline and one terminal to interconnect with existing pipelines in Illinois for shipment to processing facilities and refineries in the Midwest and the Gulf Coast to reach U.S. customers.

### Pipeline Right of Way and Footprint in Illinois

The Dakota Access pipeline will cross the counties of Hancock, Schuyler, Adams, Brown, Pike, Scott, Morgan, Macoupin, Montgomery, Scott, Fayette, and Marion counties. The expected terminal is in Patoka, Illinois. The pipeline will parallel existing pipelines, power lines or existing roads where possible. During construction, an additional 25 -100 feet of workspace may be needed adjacent to a 50-foot permanent easement. The pipeline will be covered by a minimum of 36 inches of soil and more if it crosses under roads, rivers, lakes or streams. On agricultural land, the pipeline will be buried under a minimum of 48 inches of soil, drain tiles will be crossed with a minimum of 24 inches of separation between the pipe and the drain tile, and topsoil will be segregated during construction to a minimum of 12 inches or in accordance with landowner requirements.

### U.S. Army Corps of Engineers' Role

The U.S. Army Corps of Engineers is not evaluating the complete 1,134-mile pipeline as its regulatory authority is limited to waters of the United States. If the entire pipeline was constructed in a stream, river, wetland, or other jurisdictional water body, the Corps would evaluate the construction of the entire pipeline. However, in the case of this pipeline, the majority of the pipeline is being constructed in uplands, outside of the Corps' regulatory authority.

The Corps is evaluating Dakota Access, LLC, permit requests for segments of the pipeline that cross waters of the United States. These crossings comprise a small percentage of the overall pipeline project. Department of the Army permits will be required under Section 404 of the Clean Water Act and Sections 10 and 408 of the Rivers and Harbors Act. Section 404 and/or Section 10 for crossings of waters of the United States (streams, rivers, wetlands), including navigable rivers such as the Missouri, Des Moines, Mississippi, and Illinois rivers; Section 408 for alteration, occupation or use of a Corps civil works project. The Corps' Omaha District evaluates permit requests in North Dakota and South Dakota. The Corps' Rock Island District evaluates permit requests in Iowa. The Rock Island and St. Louis Districts share permit evaluation authority in portions of Illinois.



# Dakota Access Pipeline

Permitting Process in Illinois

## U.S. ARMY CORPS OF ENGINEERS

**BUILDING STRONG.**

### Rock Island and St. Louis District's Role

The Rock Island and St. Louis Districts have received applications from Dakota Access, LLC, requesting verification of work in waters of the United States in association with construction of segments of the 30-inch diameter crude oil pipeline in Illinois within the Rock Island and St. Louis District's regulatory boundaries (50 miles within Rock Island District, 127 miles within St. Louis District).

In the information received, Dakota Access, LLC, is currently requesting verification, under Nationwide Permit (NWP) 12 (Utility Line Activities), for 15 areas involving crossings of regulated water bodies in Illinois including the Mississippi River and Illinois River (five areas within Rock Island District; ten areas within St. Louis District.) In accordance with Department of the Army regulations, we are evaluating each separate, and distant, water body crossing as a single and complete project, and will make final determinations regarding compliance of the activities with NWP 12 once our evaluation is complete. If any work in waters, including navigable rivers and wetlands, is authorized under NWP 12, such work must be completed according to the terms of the permit, as well as all general terms of the nationwide permits, regional conditions and any special conditions that are determined to be necessary. If any work in waters does not fall within the terms and conditions of NWP 12, the applicant will be advised of procedures for applying for an Individual Permit.

### Rock Island and St. Louis District's Permit Evaluation

The Districts will evaluate the water body crossings to ensure the construction activity does not adversely impact the water body. The Districts' evaluation will look at any impacts the crossing segments may have on navigation. The Corps does not regulate pipelines, or monitor and enforce compliance with pipeline safety regulations. These items may be addressed by the respective states and other federal agencies.

### Environmental Impact Statement

The Districts are evaluating the applicant's request to verify segments of the pipeline in Illinois under NWP 12. Activities authorized under the 2012 Nationwide Permits have been evaluated and documented in accordance with the National Environmental Policy Act with a finding of no significant impact; therefore, an Environmental Impact Statement is not required. If a segment does not meet the terms and conditions of NWP 12, that segment must be evaluated as an Individual Permit and an Environmental Assessment will be required.

### Public Comment

If pipeline segments are verified under NWP 12, there will not be a public comment period. If a segment does not meet the terms and conditions of NWP 12 and must be evaluated as an Individual Permit, there will be an opportunity to comment on that segment. Additional information regarding the U.S. Army Corps of Engineers' role in permitting the Dakota Access, LLC, pipeline can be obtained by contacting the appropriate Corps office.

| North and South Dakota: | Iowa and Illinois: | Illinois: |
|---|---|---|
| USACE, Omaha District | USACE, Rock Island District | USACE, St. Louis District |
| Regulatory Branch | Regulatory Branch | Regulatory Branch |
| 8901 South 154th Street | Clock Tower Building | 1222 Spruce Street |
| Omaha, NE 68138-3635 | P.O. Box 2004 | St. Louis MO 63103-2833 |
| Phone: (402) 896-0896 | Rock Island, IL 61204-2004 | Phone: (314) 331-8575 |
| | Phone: (309) 794-5669 | |

UPDATE: February 10, 2015

**U.S. ARMY CORPS OF ENGINEERS – ROCK ISLAND DISTRICT**
www.mvr.usace.army.mil
**U.S. ARMY CORPS OF ENGINEERS – ST. LOUIS DISTRICT**
www.mvs.usace.army.mil

USACE_DAPL0069769



# Dakota Access Pipeline
## Permitting Process in Iowa

**U.S. ARMY CORPS OF ENGINEERS**                    **BUILDING STRONG.**

**Congressional Districts:** IA-2, 3, 4

### Description

Dakota Access, LLC, is proposing to construct an 1,134-mile pipeline system to carry up to 570,000 barrels per day of U.S. light sweet crude (450,000 barrels per day initially) from the rapidly expanding Bakken and Three Forks production region of North Dakota through the states of North Dakota, South Dakota, Iowa and Illinois terminating at a crude oil hub near Patoka, Illinois, with various potential points of destination along the pipeline. The pipeline crosses five states within the boundaries of three U.S. Army Corps of Engineers Districts (Omaha District, Rock Island District, and St. Louis District).



### Pipeline Details in Iowa

The Dakota Access pipeline in Iowa will consist of approximately 346 miles of 30-inch diameter pipeline and one pump station to interconnect with existing pipelines in Illinois for shipment to processing facilities and refineries in the Midwest and the Gulf Coast to reach U.S. customers.

### Pipeline Right of Way and Footprint in Iowa

The Dakota Access pipeline will cross the counties of Lyon, Sioux, O'Brien, Cherokee, Buena Vista Sac, Calhoun, Webster, Boone, Story (pump station location), Polk, Jasper, Mahaska Keokuk, Wapelio, Jefferson, Van Buren, and Lee. The pipeline will parallel existing pipelines, power lines or existing roads where possible. During construction, an additional 25 -100 feet of workspace may be needed adjacent to a 50-foot permanent easement. The pipeline will be covered by a minimum of 36 inches of soil and more if it crosses under roads, rivers, lakes or streams. On agricultural land, the pipeline will be buried under a minimum of 48 inches of soil, drain tiles will be crossed with a minimum of 24 inches of separation between the pipe and the drain tile, and topsoil will be segregated during construction to a minimum of 12 inches or in accordance with landowner requirements.

### U.S. Army Corps of Engineers' Role

The U.S. Army Corps of Engineers is not evaluating the complete 1,134-mile pipeline as its regulatory authority is limited to waters of the United States. If the entire pipeline was constructed in a stream, river, wetland, or other jurisdictional water body, the Corps would evaluate the construction of the entire pipeline. However, in the case of this pipeline, the majority of the pipeline is being constructed in uplands, outside of the Corps' regulatory authority.

The Corps is evaluating Dakota Access, LLC, permit requests for segments of the pipeline that cross waters of the United States. These crossings comprise a small percentage of the overall pipeline project. Department of the Army permits will be required under both Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act for crossings of waters of the United States (streams, rivers, wetlands), including navigable rivers such as the Missouri River, Des Moines River, Mississippi River, and the Illinois River. The Corps' Omaha District evaluates permit requests in North Dakota and South Dakota. The Corps' Rock Island District evaluates permit requests in Iowa. The Rock Island and St. Louis Districts share permit evaluation authority in portions of Illinois.

USACE_DAPL0069770



# Dakota Access Pipeline

Permitting Process in Iowa

**U.S. ARMY CORPS OF ENGINEERS**                    **BUILDING STRONG.**

### Rock Island District's Role

The Rock Island District has received an application from Dakota Access, LLC, requesting verification of work in waters of the United States in association with construction of segments of the 30-inch diameter crude oil pipeline across Iowa within the Rock Island District's regulatory boundaries.

In the information received, Dakota Access, LLC, is currently requesting verification, under Nationwide Permit (NWP) 12 (Utility Line Activities), for 17 areas involving crossings of regulated water bodies in Iowa including the Des Moines River and Mississippi River. In accordance with Department of the Army regulations, we are evaluating each separate, and distant, water body crossing as a single and complete project, and will make final determinations regarding compliance of the activities with NWP 12 once our evaluation is complete. If any work in waters, including navigable rivers and wetlands, is authorized under NWP 12, such work must be completed according to the terms of the permit, as well as all general terms of the nationwide permits, regional conditions and any special conditions that are determined to be necessary. If any work in waters does not fall within the terms and conditions of NWP 12, the applicant will be advised of procedures for applying for an Individual Permit.

### Rock Island District's Permit Evaluation

The Rock Island District will evaluate the water body crossings to ensure the construction activity does not adversely impact the water body. The District's evaluation will look at any impacts the crossing segments may have on navigation. The Corps does not regulate pipelines, or monitor and enforce compliance with pipeline safety regulations. These items may be addressed by the respective states and other federal agencies.

### Environmental Impact Statement

The Rock Island District is evaluating the applicant's request to verify segments of the pipeline in Iowa and Illinois under NWP 12. Activities authorized under the 2012 Nationwide Permits have been evaluated and documented in accordance with the National Environmental Policy Act with a finding of no significant impact; therefore, an Environmental Impact Statement is not required. If a segment does not meet the terms and conditions of NWP 12, that segment must be evaluated as an Individual Permit and an Environmental Assessment will be required.

### Public Comment

If pipeline segments are verified under NWP 12, there will not be a public comment period. If a segment does not meet the terms and conditions of NWP 12 and must be evaluated as an Individual Permit, there will be an opportunity to comment on that segment. Additional information regarding the U.S. Army Corps of Engineers' role in permitting the Dakota Access, LLC, pipeline can be obtained by contacting the appropriate Corps office.

| North and South Dakota: | Iowa and Illinois: | Illinois: |
|---|---|---|
| USACE, Omaha District | USACE, Rock Island District | USACE, St. Louis District |
| Regulatory Branch | Regulatory Branch | Regulatory Branch |
| 8901 South 154th Street | Clock Tower Building | 1222 Spruce Street |
| Omaha, NE 68138-3635 | P.O. Box 2004 | St. Louis MO 63103-2833 |
| Phone: (402) 896-0896 | Rock Island, IL 61204-2004 | Phone: (314) 331-8575 |
|  | Phone: (309) 794-5669 |  |

UPDATE: February 10, 2015

USACE_DAPL0069771



# Dakota Access Pipeline
## Permitting Process in North Dakota

**U.S. ARMY CORPS OF ENGINEERS**                    **BUILDING STRONG®**

**Congressional Districts:** ND-1

## Description

Dakota Access, LLC, is proposing to construct an 1,134-mile pipeline system to carry up to 570,000 barrels per day of U.S. light sweet crude (450,000 barrels per day initially) from the rapidly expanding Bakken and Three Forks production region of North Dakota through the states of North Dakota, South Dakota, Iowa and Illinois terminating at a crude oil hub near Patoka, Illinois, with various potential points of destination along the pipeline. The pipeline crosses four states within the boundaries of three U.S. Army Corps of Engineers Districts (Omaha District, Rock Island District, and St. Louis District).

## Pipeline Details in North Dakota

The Dakota Access pipeline in North Dakota would consist of approximately 143 miles of oil gathering pipelines and 200 miles of larger 30-inch diameter transmission pipeline to interconnect with existing pipelines in Illinois for shipment to processing facilities and refineries in the Midwest and the Gulf Coast to reach U.S. customers.

## Pipeline Right of Way and Footprint in North Dakota

The Dakota Access pipeline would start with a terminal in the Stanley area, and run west with five more terminals in Ramberg Station, Epping, Trenton, Watford City and Johnsons Corner before becoming a transmission line going through Williston, the Watford City area, south of Bismarck crossing the Missouri River again north of Cannon Ball. The pipeline will parallel existing pipelines, power lines or existing roads where possible. During construction, an additional 25 -100 feet of workspace may be needed adjacent to a 50-foot permanent easement. The pipeline will be covered by a minimum of 36 inches of soil and more if it crosses under roads, rivers, lakes or streams. On agricultural land, the pipeline will be buried under a minimum of 48 inches of soil, drain tiles will be crossed with a minimum of 24 inches of separation between the pipe and the drain tile, and topsoil will be segregated during construction to a minimum of 12 inches or in accordance with landowner requirements.

## U.S. Army Corps of Engineers' Role

The U.S. Army Corps of Engineers is not evaluating the complete 1,134-mile pipeline as its regulatory authority is limited to waters of the United States. If the entire pipeline was constructed in a stream, river, wetland, or other jurisdictional water body, the Corps would evaluate the construction of the entire pipeline. However, in the case of this pipeline, the majority of the pipeline is being constructed in uplands, outside of the Corps' regulatory authority.

The Corps is evaluating Dakota Access, LLC, permit requests for segments of the pipeline that cross waters of the United States. These crossings comprise a small percentage of the overall pipeline project. Department of the Army permits will be required under Section 404 of the Clean Water Act and Sections 10 and 408 of the Rivers and Harbors Act. Section 404 and/or Section 10 for crossings of waters of the United States (streams, rivers, wetlands), including navigable rivers such as the Missouri, Des Moines, Mississippi, and Illinois rivers; Section 408 for alteration, occupation or use of a Corps civil works project. The Corps' Omaha District evaluates permit requests in North Dakota and South Dakota. The Corps' Rock Island District evaluates permit requests in Iowa. The Rock Island and St. Louis Districts share permit evaluation authority in portions of Illinois.

USACE_DAPL0069772



# Dakota Access Pipeline
Permitting Process in North Dakota

**U.S. ARMY CORPS OF ENGINEERS**                    **BUILDING STRONG.**

## Omaha District's Role

The Omaha District has received an application from Dakota Access, LLC, requesting verification of work in waters of the United States in association with construction of segments of the 30-inch diameter crude oil pipeline in North Dakota within the Omaha District's regulatory boundaries.

In the information received, Dakota Access, LLC, is currently requesting verification of 2 crossings of regulated water bodies under Nationwide Permit (NWP) 12 (utility line activities) in North Dakota – both being the Missouri River crossings. In accordance with Department of the Army regulations, we are evaluating each separate, and distant, water body crossing as a single and complete project, and will make final determinations regarding compliance of the activities with NWP 12 once our evaluation is complete. If any work in waters, including navigable rivers and wetlands, is authorized under NWP 12, such work must be completed according to the terms of the permit, as well as all general terms of the nationwide permits, regional conditions and any special conditions that are determined to be necessary. If any work in waters does not fall within the terms and conditions of NWP 12, the applicant will be advised of procedures for applying for an Individual Permit.

## Omaha District's Permit Evaluation

The Omaha District will evaluate the water body crossings to ensure the construction activity does not adversely impact the water body. The District's evaluation will look at any impacts the crossing segments may have on navigation. The Corps does not regulate pipelines, or monitor and enforce compliance with pipeline safety regulations. These items may be addressed by the respective states and other federal agencies.

## Environmental Impact Statement

The Omaha District is evaluating the applicant's request to verify segments of the pipeline in North Dakota under NWP 12. Activities authorized under the 2012 Nationwide Permits have been evaluated and documented in accordance with the National Environmental Policy Act with a finding of no significant impact; therefore, an Environmental Impact Statement is not required. If a segment does not meet the terms and conditions of NWP 12, that segment must be evaluated as an Individual Permit and an Environmental Assessment will be required.

## Public Comment

If pipeline segments are verified under NWP 12, there will not be a public comment period. If a segment does not meet the terms and conditions of NWP 12 and must be evaluated as an Individual Permit, there will be an opportunity to comment on that segment. Additional information regarding the U.S. Army Corps of Engineers' role in permitting the Dakota Access, LLC, pipeline can be obtained by contacting the appropriate Corps office.

North and South Dakota:

USACE, Omaha District
Regulatory Branch
1616 Capitol Avenue – Suite 9000
Omaha, NE  68102
Phone: (402) 995-2469

Iowa and Illinois:

USACE, Rock Island District
Regulatory Branch
Clock Tower Building
P.O. Box 2004
Rock Island, IL  61204-2004
Phone: (309) 794-5669

Illinois:

USACE, St. Louis District
Regulatory Branch
1222 Spruce Street
St. Louis MO  63103-2833
Phone: (314) 331-8575

UPDATE: February 11, 2015

**U.S. ARMY CORPS OF ENGINEERS – OMAHA DISTRICT**
1616 CAPITOL AVENUE – SUITE 9000 – OMAHA, NE 68102
www.nwo.usace.army.mil

USACE_DAPL0069773



# Dakota Access Pipeline
Permitting Process in South Dakota

**U.S. ARMY CORPS OF ENGINEERS**                    **BUILDING STRONG.**

**Congressional Districts:** SD-1

## Description

Dakota Access, LLC, is proposing to construct an 1,134-mile
pipeline system to carry up to 570,000 barrels per day of
U.S. light sweet crude (450,000 barrels per day initially) from
the rapidly expanding Bakken and Three Forks production
region of North Dakota through the states of North Dakota,
South Dakota, Iowa and Illinois terminating at a crude oil
hub near Patoka, Illinois, with various potential points of
destination along the pipeline. The pipeline crosses four
states within the boundaries of three U.S. Army Corps of
Engineers Districts (Omaha District, Rock Island District,
and St. Louis District).



## Pipeline Details in South Dakota

The Dakota Access pipeline in South Dakota would consist of approximately 273 miles of a 30-inch diameter
transmission pipeline, one pump station, and other ancillary facilities to ultimately interconnect with existing
pipelines in Illinois for shipment to processing facilities and refineries in the Midwest and the Gulf Coast to reach
U.S. customers.

## Pipeline Right of Way and Footprint in South Dakota

The Dakota Access pipeline enters South Dakota in Campbell County and will cross McPherson, Edmunds,
Faulk, Spink, Beadle, Kingsbury, Miner, Lake, McCook, Minnehaha, Turner, and Lincoln Counties.  The pipeline
exits South Dakota just south of Sioux Falls where it crosses the Big Sioux River into Iowa. The pipeline will
parallel existing pipelines, power lines or existing roads where possible. During construction, an additional 25 -100
feet of workspace may be needed adjacent to a 50-foot permanent easement. The pipeline will be covered by a
minimum of 36 inches of soil and more if it crosses under roads, rivers, lakes or streams. On agricultural land, the
pipeline will be buried under a minimum of 48 inches of soil, drain tiles will be crossed with a minimum of 24
inches of separation between the pipe and the drain tile, and topsoil will be segregated during construction to a
minimum of 12 inches or in accordance with landowner requirements.

## U.S. Army Corps of Engineers' Role

The U.S. Army Corps of Engineers is not evaluating the complete 1,134-mile pipeline as its regulatory authority is
limited to waters of the United States. If the entire pipeline was constructed in a stream, river, wetland, or other
jurisdictional water body, the Corps would evaluate the construction of the entire pipeline. However, in the case of
this pipeline, the majority of the pipeline is being constructed in uplands, outside of the Corps' regulatory authority.

The Corps is evaluating Dakota Access, LLC, permit requests for segments of the pipeline that cross waters of
the United States. These crossings comprise a small percentage of the overall pipeline project. Department of the
Army permits will be required under both Section 404 of the Clean Water Act and Sections 10 of the Rivers and
Harbors Act. Section 404 and/or Section 10 for crossings of waters of the United States (streams, rivers,
wetlands), including navigable rivers such as the Missouri River, Des Moines River, Mississippi River, and Illinois
Rivers. The Corps' Omaha District evaluates permit requests in North Dakota and South Dakota. The Corps'
Rock Island District evaluates permit requests in Iowa. The Rock Island and St. Louis Districts share permit
evaluation authority in portions of Illinois.



# Dakota Access Pipeline
Permitting Process in South Dakota

**U.S. ARMY CORPS OF ENGINEERS**                                    **BUILDING STRONG**

## Omaha District's Role

The Omaha District has received an application from Dakota Access, LLC, requesting verification of work in waters of the United States in association with construction of segments of the 30-inch diameter crude oil pipeline in North Dakota within the Omaha District's regulatory boundaries.

In the information received, Dakota Access, LLC, is currently requesting verification of 12 crossings of regulated water bodies under Nationwide Permit (NWP) 12 (utility line activities) in South Dakota.  In accordance with Department of the Army regulations, we are evaluating each separate, and distant, water body crossing as a single and complete project, and will make final determinations regarding compliance of the activities with NWP 12 once our evaluation is complete. If any work in waters, including navigable rivers and wetlands, is authorized under NWP 12, such work must be completed according to the terms of the permit, as well as all general terms of the nationwide permits, regional conditions and any special conditions that are determined to be necessary. If any work in waters does not fall within the terms and conditions of NWP 12, the applicant will be advised of procedures for applying for an Individual Permit.

## Omaha District's Permit Evaluation

The Omaha District will evaluate the water body crossings to ensure the construction activity does not adversely impact the water body. The District's evaluation will look at any impacts the crossing segments may have on navigation. The Corps does not regulate pipelines, or monitor and enforce compliance with pipeline safety regulations. These items may be addressed by the respective states and other federal agencies.

## Environmental Impact Statement

The Omaha District is evaluating the applicant's request to verify segments of the pipeline in South Dakota under NWP 12. Activities authorized under the 2012 Nationwide Permits have been evaluated and documented in accordance with the National Environmental Policy Act with a finding of no significant impact; therefore, an Environmental Impact Statement is not required. If a segment does not meet the terms and conditions of NWP 12, that segment must be evaluated as an Individual Permit and an Environmental Assessment will be required.

## Public Comment

If pipeline segments are verified under NWP 12, there will not be a public comment period. If a segment does not meet the terms and conditions of NWP 12 and must be evaluated as an Individual Permit, there will be an opportunity to comment on that segment. Additional information regarding the U.S. Army Corps of Engineers' role in permitting the Dakota Access, LLC, pipeline can be obtained by contacting the appropriate Corps office.

North and South Dakota:

USACE, Omaha District
Regulatory Branch
1616 Capitol Avenue – Suite 9000
Omaha, NE  68102
Phone: (402) 995-2469

Iowa and Illinois:

USACE, Rock Island District
Regulatory Branch
Clock Tower Building
P.O. Box 2004
Rock Island, IL  61204-2004
Phone: (309) 794-5669

Illinois:

USACE, St. Louis District
Regulatory Branch
1222 Spruce Street
St. Louis MO  63103-2833
Phone: (314) 331-8575

UPDATE: February 11, 2015

**U.S. ARMY CORPS OF ENGINEERS – OMAHA DISTRICT**
1616 CAPITOL AVENUE – SUITE 9000 – OMAHA, NE 68102
www.nwo.usace.army.mil

USACE_DAPL0069775

**U.S. Army Corps of Engineers Regulatory Program Points of Contacts
For Dakota Access Pipeline Activities**

<u>**Mississippi Valley Division**</u>
US Army Corps of Engineers (CEMVD-PD-OD)
1400 Walnut Street
Vicksburg, Mississippi        39180-3262

Ms. Tonya L. Acuff
Regulatory Program Manager
601-634-5821;       Fax:  601-634-5816
Email:  tonya.l.acuff@usace.army.mil

**Rock Island District**
US Army Corps of Engineers (CEMVR-OD-P)
1500 Rock Island Drive
Rock Island, Illinois          61201

Mr. Gary W. Lenz (District POC)
Regulatory Chief
309-794-5370;
Email:  gary.w.lenz@usace.army.mil

**St. Louis District**
US Army Corps of Engineers (CEMVS-OD-F)
1222 Spruce Street
St. Louis, Missouri            63103

Mr. Danny D. Mcclendon (District POC)
Regulatory Chief
314-331-8574;       Fax:  314-331-8741
Email:  danny.d.mcclendon@usace.army.mil

<u>**Great Lakes and Ohio River Division**</u>
US Army Corps of Engineers (CELRD-PD)
550 Main Street, Room 10032
Cincinnati, Ohio       45202-3222

Ms. Suzanne L. Chubb
Regulatory Program Manager
513-684-7261
Email:  suzanne.l.chubb@usace.army.mil

**Louisville District**
US Army Corps of Engineers (CELRL-OP-F)
600 Martin Luther King Jr. Place
Louisville, Kentucky        40202

Ms. Lee Ann Devine
Regulatory Chief
Phone #; 502-315-6692     Fax:  (502) 315-6697
Email:  lee.anne.devine@usace.army.mil

Mr. Michael S. Ricketts (District POC)
West Section Chief
812-853-0472;       Fax:  (812) 858-2678
Email:   michael.s.ricketts@usace.army.mil

**Northwestern Division**
US Army Corps of Engineers (CENWD-PDS)
1125 NW Couch Street, Suite 500
Portland, Oregon     97208-2870

Mr. David W. Gesl
Regulatory Program Manager
503-808-3825;       Fax:  503-808-3725
Email:  david.w.gesl@usace.army.mil

**Omaha District (Lead District)**
US Army Corps of Engineers (CENWO-OD-R)
1616 Capitol Avenue
Omaha, Nebraska   68102

Ms. Martha S. Chieply (District POC)
Regulatory Chief
402-995-2451;       Fax:  402-995-2879
Email:  martha.s.chieply@usace.army.mil

Mr. Joel O. Ames (District-wide Tribal Liaison)
420-995-2451;       Fax:  402-995-2013
Email:  joel.o.ames@usace.army.mil

USACE_DAPL0069777

**North Dakota Regulatory Field Office (CENWO-OD-RND)**
Mr. Jason J. Renschler (ND POC)
Regulatory Project Manager
North Dakota Regulatory Office
1513 South 12th Street
Bismarck, North Dakota     58504
701-255-0015 Ext 2010;     Fax:  402-255-4917
Email:  jason.j.renschler@usace.army.mil

**South Dakota Regulatory Field Office (CENWO-OD-RSD)**
Mr. Jeff Breckenridge (SD POC)
Regulatory Project Manager
South Dakota Regulatory Office
28563 Powerhouse Road
Pierre, South Dakota     58501
605-945-3384;     Fax:  605-224-5945
Email:  jeff.l.breckenridge@usace.army.mil

USACE_DAPL0069778

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | PCN Area | Mile | Longitude | Latitude | County | WOUS |
| 2 | State of North Dakota - Omaha Dsitrict | | | | | |
| 3 | 2 | 96.78 | -103.9057 | 47.9601 | Williams | Missouri River |
| 4 | 4 | 164.89 | -100.5871 | 46.4386 | Morton | Lake Oahe/Missouri River |
| 5 | | | | | | |
| 6 | | | | | | |
| 7 | State of South Dakota - Omaha District | | | | | |
| 8 | 3 | 315.74 | -98.6528 | 44.9416 | Spink | Unnamed Wetland |
| 9 | | 315.88 | -98.6507 | 44.9396 | Spink | Unnamed Wetland |
| 10 | 17 | 335.35 | -98.4308 | 44.7613 | Spink | Unnamed Wetland |
| 11 | 4 | 352.27 | -98.2336 | 44.5880 | Beadle | James River |
| 12 | 6 | 363.19 | -98.0094 | 44.5371 | Beadle | Shue Creek |
| 13 | 7 | 371.12 | -97.9072 | 44.4533 | Beadle | Middle Pearl Creek |
| 14 | 8 | 385.96 | -97.6994 | 44.3041 | Kingsbury | Redstone Creek |
| 15 | 9 | 391.83 | -97.6172 | 44.2462 | Kingsbury | Rock Creek |
| 16 | 10 | 395.14 | -97.5686 | 44.2122 | Kingsbury | Unnamed Wetland |
| 17 | 12 | 421.85 | -97.2303 | 43.9268 | Lake | Unnamed Wetland |
| 18 | 13 | 430.21 | -97.1339 | 43.8381 | McCook | Unnamed Wetland |
| 19 | 14 | 430.86 | -97.1312 | 43.8291 | McCook | Unnamed Wetland |
| 20 | | | | | | |
| 21 | | | | | | |
| 22 | State of Iowa - Rock Island District | | | | | |
| 23 | 1 | 485.2 | 43.3398 | -96.5133 | Lyon | Unnamed Wetland |
| 24 | | 485.2 | 43.3400 | -96.5132 | Lyon | Tributary to Big Sioux River |
| 25 | 2 | 486.0 | 43.3319 | -96.5016 | Lyon | Tributary to Big Sioux River |
| 26 | 3 | 500.2 | 43.2325 | -96.2671 | Sioux | Unnamed Wetland |
| 27 | 4 | 500.7 | 43.2319 | -96.2584 | Sioux | Unnamed Wetland |
| 28 | 5 | 549.5 | 42.8267 | -95.5109 | Cherokee | Unnamed Wetland |
| 29 | 6 | 550 | 42.8244 | -95.5016 | Cherokee | Unnamed Wetland |
| 30 | | 550 | 42.8243 | -95.5020 | Cherokee | Tributary to Little Sioux River |
| 31 | 7 | 596.3 | 42.4756 | -94.7473 | Calhoun | West Fork Camp Creek |
| 32 | 8 | 600.4 | 42.4483 | -94.6792 | Calhoun | Camp Creek |
| 33 | PCN Area | Mile | Longitude | Latitude | County | WOUS |
| 34 | State of Iowa - Rock Island District cont. | | | | | |
| 35 | 9 | 604.9 | 42.4220 | -94.5975 | Calhoun | Lake Creek |
| 36 | 10 | 608.9 | 42.3918 | -94.5348 | Calhoun | Purgatory Creek |
| 37 | 11 | 610.4 | 42.3896 | -94.5054 | Calhoun | West Cedar Creek |
| 38 | 12 | 613.7 | 42.3728 | -94.4458 | Calhoun | East Cedar Creek |
| 39 | 13 | 617.8 | 42.3368 | -94.3849 | Webster | Hardin Creek |
| 40 | 14 | 622 | 42.3075 | -94.3135 | Webster | West Buttrick Creek |
| 41 | 15 | 627 | 42.2731 | -94.2298 | Webster | Tributary to East Buttrick Creek |
| 42 | 16 | 628.7 | 42.2609 | -94.2016 | Webster | East Buttrick Creek |
| 43 | 17 | 642 | 42.1699 | -93.9760 | Boone | Tributary to the Des Moines River |
| 44 | 17A | 642 | 42.1699 | -93.9810 | Boone | Tributary to the Des Moines River |

USACE_DAPL0069779

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 45 | 18 | 642.5 | 42.1685 | -93.9662 | Boone | Unnamed Wetland |
| 46 | | 642.5 | 42.1687 | -93.9661 | Boone | Des Moines River |
| 47 | 19 | 643.5 | 42.1657 | -93.9466 | Boone | Tributary to Mineral Branch |
| 48 | 20 | 666.7 | 41.9559 | -93.6318 | Story | Walnut Creek |
| 49 | 21 | 671.9 | 41.9073 | -93.5629 | Story | Ballard Creek |
| 50 | 22 | 672.6 | 41.9018 | -93.5531 | Story | Tributary to Ballard Creek |
| 51 | 23 | 688.9 | 41.7696 | -93.3068 | Jasper | Tributary to Indian Creek |
| 52 | 24 | 692.1 | 41.7380 | -93.2690 | Jasper | Tributary to Indian Creek |
| 53 | 25 | 692.4 | 41.7368 | -93.2633 | Jasper | Tributary to Indian Creek |
| 54 | 26 | 692.9 | 41.7345 | -93.2538 | Jasper | Tributary to Indian Creek |
| 55 | 27 | 696.7 | 41.7115 | -93.1914 | Jasper | Unnamed Wetland |
| 56 | 28 | 698.9 | 41.6992 | -93.1525 | Jasper | Unnamed Wetland |
| 57 | | 698.9 | 41.6991 | -93.1530 | Jasper | Tributary to Prairie Creek |
| 58 | 29 | 706.5 | 41.6338 | -93.0505 | Jasper | Unnamed Wetland |
| 59 | | 706.6 | 41.6338 | -93.0499 | Jasper | Unnamed Wetland |
| 60 | | 706.6 | 41.6333 | -93.0502 | Jasper | Unnamed Wetland |
| 61 | 30 | 707.2 | 41.6263 | -93.0453 | Jasper | Tributary to the South Skunk River |
| 62 | 31 | 736.4 | 41.3692 | -92.6190 | Mahaska | Tributary to the South Skunk River |
| 63 | 32 | 739.8 | 41.3368 | -92.5729 | Mahaska | Unnamed Wetland |
| 64 | | 740.2 | 41.3331 | -92.5678 | Mahaska | Unnamed Wetland |
| 65 | PCN Area | Mile | Longitude | Latitude | County | WOUS |
| 66 | State of Iowa - Rock Island District cont. | | | | | |
| 67 | 33 | 740.9 | 41.3247 | -92.5596 | Mahaska | Unnamed Wetland |
| 68 | 34 | 743 | 41.3048 | -92.5332 | Mahaska | Unnamed Wetland |
| 69 | 35 | 747 | 41.2559 | -92.5010 | Mahaska | Tributary to Snyder Creek |
| 70 | 36 | 751.7 | 41.2223 | -92.4285 | Mahaska | Tributary to Olive Branch |
| 71 | 37 | 765.9 | 41.0890 | -92.2355 | Wapello | Tributary to Wolf Creek |
| 72 | 38 | 766.8 | 41.0807 | -92.2227 | Wapello | Tributary to Cedar Creek |
| 73 | 39 | 768.4 | 41.0649 | -92.2002 | Wapello | Tributary to Cedar Creek |
| 74 | 40 | 770.3 | 41.0429 | -92.1794 | Jefferson | Tributary to Cedar Creek |
| 75 | 41 | 771.2 | 41.0312 | -92.1741 | Jefferson | Unnamed Wetland |
| 76 | | 771.3 | 41.0305 | -92.1742 | Jefferson | Tributary to Honey Creek |
| 77 | 42 | 775.1 | 40.9920 | -92.1318 | Jefferson | Tributary to Rock Creek |
| 78 | 43 | 776.9 | 40.9774 | -92.1035 | Jefferson | Bonell Creek |
| 79 | 44 | 777.6 | 40.9718 | -92.0927 | Jefferson | Tributary to Bonell Creek |
| 80 | 48 | 789.5 | 40.8833 | -91.9077 | Van Buren | Tributary to Cedar Creek |
| 81 | 49 | 789.6 | 40.8819 | -91.9059 | Van Buren | Tributary to Cedar Creek |
| 82 | 51 | 795.2 | 40.8337 | -91.8227 | Van Buren | Tributary to Little Cedar Creek |
| 83 | 52 | 795.6 | 40.8310 | -91.8170 | Van Buren | Tributary to Little Cedar Creek |
| 84 | 53 | 799.2 | 40.8024 | -91.7608 | Van Buren | Unnamed Wetland |
| 85 | 54 | 800.1 | 40.7942 | -91.7471 | Van Buren | Tributary to Little Cedar Creek |
| 86 | 45 | 780.8 | 40.9427 | -92.0452 | Jefferson | East Branch Lick Creek |
| 87 | 46 | 781 | 40.9412 | -92.0423 | Jefferson | Unnamed Wetland |
| 88 | | 781 | 40.9412 | -92.0422 | Jefferson | Tributary to East Branch Lick Creek |
| 89 | 47 | 781.9 | 40.9343 | -92.0281 | Jefferson | Unnamed Wetland |

USACE_DAPL0069780

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 90 | 49 | 781.9 | 40.9345 | -92.0274 | Jefferson | Tributary to East Branch Lick Creek |
| 91 | 50 | 793.1 | 40.8513 | -91.8541 | Van Buren | Unnamed Wetland |
| 92 | 57 | 823.8 | 40.5451 | -91.4881 | Lee | Tributary to Sugar Creek |
| 93 | 58 | 824.3 | 40.5405 | -91.4828 | Lee | Unnamed Wetland |
| 94 | | 824.3 | 40.5406 | -91.4825 | Lee | Tributary to Sugar Creek |
| 95 | 59 | 825.1 | 40.5317 | -91.4724 | Lee | Tributary to Sugar Creek |
| 96 | 55 | 817.6 | 40.6204 | -91.5333 | Lee | Tributary to Painter Creek |
| 97 | PCN Area | Mile | Longitude | Latitude | County | WOUS |
| 98 | State of Iowa - Rock Island District cont. | | | | | |
| 99 | 56 | 817.9 | 40.6165 | -91.5339 | Lee | Tributary to Painter Creek |
| 100 | 60 | 829.8 | 40.4879 | -91.4087 | Lee | Unnamed Wetland |
| 101 | 61 | 830.4 | 40.4850 | -91.3975 | Lee | Unnamed Wetland |
| 102 | | 830.4 | 40.4848 | -91.3976 | Lee | Tributary to Lamalees Creek |
| 103 | 62 | 831 | 40.4801 | -91.3870 | Lee | Tributary to Lamalees Creek |
| 104 | 63 | 831.3 | 40.4780 | -91.3839 | Lee | Tributary to Lamalees Creek |
| 105 | 64 | 831.4 | 40.4756 | -91.3768 | Lee | Mississippi River |
| 106 | | | | | | |
| 107 | | | | | | |
| 108 | PCN Area | Mile | Longitude | Latitude | County | WOUS |
| 109 | State of Illinois - Rock Island | | | | | |
| 110 | 1 | 832.5 | 40.4752 | -91.3640 | Hancock | Mississippi River |
| 111 | 2 | 834.5 | 40.4717 | -91.3290 | Hancock | Unnamed Wetland |
| 112 | 3 | 835 | 40.4692 | -91.3240 | Hancock | Tributary to Larry Creek |
| 113 | | 835 | 40.4693 | -91.3240 | Hancock | Tributary to Larry Creek |
| 114 | | 835 | 40.4691 | -91.3240 | Hancock | Tributary to Larry Creek |
| 115 | 4 | 842 | 40.4077 | -91.2140 | Hancock | Tributary to West Fork Bear Creek |
| 116 | 5 | 845.5 | 40.3777 | -91.1630 | Hancock | Bear Creek |
| 117 | 6 | 849 | 40.3397 | -91.1160 | Hancock | Unnamed Wetland |
| 118 | | 849 | 40.3392 | -91.1160 | Hancock | Unnamed Wetland |
| 119 | | 849 | 40.3396 | -91.1160 | Hancock | Tributary to Meadow Ditch |
| 120 | | 849 | 40.3395 | -91.1160 | Hancock | Tributary to Meadow Ditch |
| 121 | 7 | 850.5 | 40.3209 | -91.0980 | Hancock | Bronson Creek |
| 122 | 8 | 852.5 | 40.3016 | -91.0780 | Hancock | Tributary to Bronson Creek |
| 123 | 9 | 852.5 | 40.2987 | -91.0750 | Hancock | Tributary to Bronson Creek |
| 124 | 10 | 853.5 | 40.2920 | -91.0680 | Hancock | Tributary to Bronson Creek |
| 125 | 11 | 854.5 | 40.2803 | -91.0550 | Hancock | Tributary to Panther Creek |
| 126 | 12 | 855 | 40.2761 | -91.0500 | Hancock | Tributary to Panther Creek |
| 127 | | | | | | |
| 128 | PCN Area | Mile | Longitude | Latitude | County | WOUS |
| 129 | State of Illinois - Rock Island cont. | | | | | |
| 130 | 13 | 855 | 40.2715 | -91.0460 | Hancock | Tributary to Panther Creek |
| 131 | | 855 | 40.2714 | -91.0460 | Hancock | Tributary to Panther Creek |
| 132 | | 855.5 | 40.2655 | -91.0400 | Hancock | Tributary to Panther Creek |

USACE_DAPL0069781

|  | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 133 |  | 855.5 | 40.2648 | -91.0390 | Hancock | Tributary to Panther Creek |
| 134 | 14 | 856 | 40.2628 | -91.0370 | Hancock | Unnamed Wetland |
| 135 |  | 856 | 40.2650 | -91.0390 | Hancock | Tributary to Panther Creek |
| 136 |  | 856 | 40.2642 | -91.0380 | Hancock | Tributary to Panther Creek |
| 137 |  | 856 | 40.2619 | -91.0360 | Hancock | Panther Creek |
| 138 | 15 | 860.5 | 40.2134 | -90.9860 | Hancock | Tributary to Williams Creek |
| 139 |  | 860.5 | 40.2127 | -90.9840 | Hancock | Tributary to Williams Creek |
| 140 | 16 | 861 | 40.2067 | -90.9780 | Hancock | Unnamed Wetland |
| 141 |  | 861 | 40.2063 | -90.9780 | Hancock | Williams creek |
| 142 | 17 | 861 | 40.2036 | -90.9750 | Hancock | Tributary to Williams Creek |
| 143 | 18 | 861.5 | 40.2007 | -90.9720 | Hancock | Tributary to Williams Creek |
| 144 |  | 861.5 | 40.1998 | -90.9710 | Hancock | Tributary to Williams Creek |
| 145 | 19 | 862 | 40.1940 | -90.9660 | Hancock | Unnamed Wetland |
| 146 |  | 862 | 40.1940 | -90.9660 | Hancock | Tributary to Williams Creek |
| 147 | 20 | 862.5 | 40.1910 | -90.9630 | Adams | Tributary to Williams Creek |
| 148 |  | 864.5 | 40.1698 | -90.9420 | Adams | Tributary to Cedar Creek |
| 149 | 21 | 864.5 | 40.1693 | -90.9420 | Adams | Tributary to Cedar Creek |
| 150 |  | 864.5 | 40.1683 | -90.9420 | Adams | Cedar Creek |
| 151 |  | 864.5 | 40.1680 | -90.9419 | Adams | Tributary to Cedar Creek |
| 152 | 22 | 866 | 40.1514 | -90.9250 | Adams | Tributary to S Branch to Cedar Creek |
| 153 |  | 866 | 40.1536 | -90.9270 | Adams | S Branch to Cedar Creek |
| 154 | 23 | 867.5 | 40.1360 | -90.9080 | Schuyler | Unnamed Wetland |
| 155 |  | 867.5 | 40.1360 | -90.9080 | Schuyler | South Fork Creek |
| 156 |  | 868 | 40.1310 | -90.9000 | Schuyler | Unnamed Wetland |
| 157 | 24 | 868 | 40.1300 | -90.9000 | Schuyler | Unnamed Wetland |
| 158 |  | 868 | 40.1300 | -90.9000 | Schuyler | Tributary to Missouri Creek |
| 159 |  | 868 | 40.1280 | -90.8990 | Schuyler | Tributary to Missouri Creek |
| 160 | PCN Area | Mile | Longitude | Latitude | County | WOUS |
| 161 | State of Illinois - Rock Island cont. | | | | | |
| 162 | 25 | 868.5 | 40.1258 | -90.8940 | Schuyler | Tributary to Missouri Creek |
| 163 |  | 868.5 | 40.1249 | -90.8930 | Schuyler | Tributary to Missouri Creek |
| 164 | 26 | 869 | 40.1220 | -90.8900 | Schuyler | Tributary to Missouri Creek |
| 165 | 27 | 869 | 40.1181 | -90.8880 | Schuyler | Tributary to Missouri Creek |
| 166 | 28 | 869.5 | 40.1142 | -90.8860 | Schuyler | Tributary to Missouri Creek |
| 167 | 29 | 869.5 | 40.1115 | -90.8840 | Schuyler | Tributary to Missouri Creek |
| 168 | 30 | 870.5 | 40.1020 | -90.8740 | Brown | Missouri Creek |
| 169 | 31 | 871 | 40.0977 | -90.8700 | Brown | Unnamed Wetland |
| 170 |  | 871 | 40.0975 | -90.8700 | Brown | Tributary to Missouri Creek |
| 171 | 32 | 871 | 40.0940 | -90.8680 | Brown | Tributary to Missouri Creek |
| 172 | 33 | 872 | 40.0867 | -90.8610 | Brown | Tributary to Missouri Creek |
| 173 |  | 872 | 40.0845 | -90.8550 | Brown | Tributary to Missouri Creek |
| 174 |  | 872 | 40.0845 | -90.8560 | Brown | Tributary to Missouri Creek |
| 175 | 34 | 872 | 40.0839 | -90.8550 | Brown | Tributary to Missouri Creek |
| 176 |  | 872 | 40.0846 | -90.8550 | Brown | Tributary to Missouri Creek |
| 177 |  | 872.5 | 40.0828 | -90.8530 | Brown | Tributary to Missouri Creek |

USACE_DAPL0069782

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 178 | | 872.5 | 40.0826 | -90.8530 | Brown | Tributary to Missouri Creek |
| 179 | | 872.5 | 40.0797 | -90.8500 | Brown | Tributary to Missouri Creek |
| 180 | 35 | 872.5 | 40.0798 | -90.8500 | Brown | Tributary to Missouri Creek |
| 181 | | 872.5 | 40.0796 | -90.8500 | Brown | Tributary to Missouri Creek |
| 182 | 36 | 873 | 40.0732 | -90.8440 | Brown | Tributary to Little Missouri Creek |
| 183 | | 873.5 | 40.0717 | -90.8420 | Brown | Tributary to Little Missouri Creek |
| 184 | 37 | 874 | 40.0653 | -90.8350 | Brown | Tributary to Little Missouri Creek |
| 185 | 38 | 874 | 40.0630 | -90.8320 | Brown | Tributary to Little Missouri Creek |
| 186 | 39 | 874.5 | 40.0599 | -90.8290 | Brown | Unnamed Wetland |
| 187 | | 874.5 | 40.0605 | -90.8300 | Brown | Little Missouri Creek |
| 188 | | 874.5 | 40.0567 | -90.8260 | Brown | Tributary to Little Missouri Creek |
| 189 | 40 | 874.5 | 40.0563 | -90.8250 | Brown | Tributary to Little Missouri Creek |
| 190 | | 874.5 | 40.0580 | -90.8270 | Brown | Tributary to Little Missouri Creek |
| 191 | | 874.5 | 40.0575 | -90.8270 | Brown | Tributary to Little Missouri Creek |
| 192 | PCN Area | Mile | Longitude | Latitude | County | WOUS |
| 193 | State of Illinois - Rock Island cont. | | | | | |
| 194 | 41 | 875 | 40.0498 | -90.8200 | Brown | Tributary to South Branch Little Missouri Creek |
| 195 | | 875 | 40.0496 | -90.8200 | Brown | Tributary to South Branch Little Missouri Creek |
| 196 | 42 | 875.5 | 40.0480 | -90.8180 | Brown | Tributary to South Branch Little Missouri Creek |
| 197 | | 875.5 | 40.0461 | -90.8150 | Brown | Tributary to South Branch Little Missouri Creek |
| 198 | | 875.5 | 40.0460 | -90.8150 | Brown | Tributary to South Branch Little Missouri Creek |
| 199 | | 875.5 | 40.0457 | -90.8150 | Brown | Tributary to South Branch Little Missouri Creek |
| 200 | 43 | 875.5 | 40.0444 | -90.8130 | Brown | Tributary to South Branch Little Missouri Creek |
| 201 | | 875.5 | 40.0445 | -90.8140 | Brown | Tributary to South Branch Little Missouri Creek |
| 202 | | 876 | 40.0437 | -90.8130 | Brown | Tributary to South Branch Little Missouri Creek |
| 203 | | 876 | 40.0432 | -90.8120 | Brown | Tributary to South Branch Little Missouri Creek |
| 204 | 44 | 876 | 40.0401 | -90.8080 | Brown | South Branch Little Missouri Creek |
| 205 | 45 | 879.5 | 40.0004 | -90.7920 | Brown | West Creek |
| 206 | | | | | | |
| 207 | | | | | | |
| 208 | State of Illinois - St. Louis District | | | | | |
| 209 | 1 | 881 | 39.9790 | -90.7860 | Brown | Tributary to Dry Fork |
| 210 | 2 | 883 | 39.9668 | -90.7636 | Brown | Tributary to Dry Fork |
| 211 | | 883 | 39.9668 | -90.7632 | Brown | Tributary to Dry Fork |
| 212 | 3 | 886.5 | 39.9337 | -90.7084 | Brown | Tributary to Camp Creek |
| 213 | 4 | 888 | 39.9184 | -90.6896 | Brown | Unnamed Wetland |
| 214 | | 888 | 39.9183 | -90.6897 | Brown | Tributary to Camp Creek |
| 215 | 5 | 888.5 | 39.9143 | -90.6842 | Brown | Tributary |
| 216 | 6 | 889 | 39.9125 | -90.6760 | Brown | Tributary to Camp Creek |
| 217 | 7 | 889.5 | 39.9120 | -90.6670 | Brown | Tributary to Camp Creek |
| 218 | 8 | 890 | 39.9120 | -90.6590 | Brown | Tributary to Camp Creek |
| 219 | 9 | 890.5 | 39.9110 | -90.6470 | Brown | Tributary to Camp Creek |
| 220 | 10 | 892 | 39.9010 | -90.6240 | Brown | Tributary to Camp Creek |
| 221 | 11 | 892.5 | 39.8980 | -90.6190 | Brown | Unnamed Wetland |
| 222 | | 892.5 | 39.8990 | -90.6200 | Brown | Tributary to Camp Creek |

USACE_DAPL0069783

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 223 | | | | | | |
| 224 | PCN Area | Mile | Longitude | Latitude | County | WOUS |
| 225 | State of Illinois - St. Louis District cont. | | | | | |
| 226 | | 899 | 39.8110 | -90.5840 | Pike | Unnamed Wetland |
| 227 | 12 | 899.5 | 39.8090 | -90.5800 | Morgan | Unnamed Wetland |
| 228 | | 889 | 39.8110 | -90.5820 | Pike/Morgan | Illinois River |
| 229 | 13 | 903 | 39.7720 | -90.5280 | Scott | Tributary to Eagle Run |
| 230 | | 904 | 39.7585 | -90.5107 | Scott | Tributary to Wolf Run |
| 231 | 14 | 904 | 39.7587 | -90.5110 | Scott | Tributary to Wolf Run |
| 232 | | 904 | 39.7588 | -90.5113 | Scott | Tributary to Wolf Run |
| 233 | | 904.5 | 39.7548 | -90.5061 | Scott | Tributary to Wolf Run |
| 234 | | 904.5 | 39.7553 | -90.5067 | Scott | Tributary to Wolf Run |
| 235 | 15 | 904.5 | 39.7559 | -90.5075 | Scott | Tributary to Wolf Run |
| 236 | | 904.5 | 39.7563 | -90.5080 | Scott | Tributary to Wolf Run |
| 237 | | 905.5 | 39.7463 | -90.4945 | Scott | Tributary to Wolf Run |
| 238 | 16 | 905.5 | 39.7459 | -90.4935 | Scott | Tributary to Wolf Run |
| 239 | 17 | 905.5 | 39.7443 | -90.4897 | Scott | Tributary to Wolf Run |
| 240 | 18 | 906.5 | 39.7346 | -90.4719 | Scott | Tributary to Mauvaise Terre Creek |
| 241 | | 906.5 | 39.7343 | -90.4713 | Scott | Tributary to Mauvaise Terre Creek |
| 242 | 19 | 907 | 39.7321 | -90.4683 | Scott | Tributary to Mauvaise Terre Creek |
| 243 | | 907 | 39.7311 | -90.4667 | Scott | Tributary to Mauvaise Terre Creek |
| 244 | 20 | 910 | 39.7086 | -90.4250 | Scott | Plum Creek |
| 245 | | 910 | 39.7083 | -90.4246 | Scott | Tributary to Plum Creek |
| 246 | 21 | 912 | 39.6877 | -90.3955 | Scott | Tributary to Walnut Creek |
| 247 | 22 | 915 | 39.6620 | -90.3525 | Scott | Tributary to Sandy Creek |
| 248 | | 915 | 39.6613 | -90.3515 | Scott | Tributary to Sandy Creek |
| 249 | 23 | 915.5 | 39.6540 | -90.3460 | Scott | Tributary to Sandy Creek |
| 250 | 24 | 916 | 39.6525 | -90.3418 | Scott | Tributary to Sandy Creek |
| 251 | 25 | 916 | 39.6514 | -90.3378 | Morgan | Tributary to Sandy Creek |
| 252 | | 917 | 39.6453 | -90.3261 | Morgan | Tributary to Brush Fork |
| 253 | 26 | 917 | 39.6465 | -90.3268 | Morgan | Tributary to Brush Fork |
| 254 | | 917 | 39.6452 | -90.3260 | Morgan | Tributary to Brush Fork |
| 255 | | 917 | 39.6480 | -90.3288 | Morgan | Tributary to Brush Fork |
| 256 | PCN Area | Mile | Longitude | Latitude | County | WOUS |
| 257 | State of Illinois - St. Louis District cont. | | | | | |
| 258 | 27 | 917.5 | 39.6399 | -90.3176 | Morgan | Tributary to Brush Fork |
| 259 | | 917.5 | 39.6399 | -90.3178 | Morgan | Brushy Fork |
| 260 | | 920 | 39.6289 | -90.2781 | Morgan | Unnamed Wetland |
| 261 | 29 | 920 | 39.6301 | -90.2796 | Morgan | Tributary to Spoon Creek |
| 262 | | 920 | 39.6290 | -90.2781 | Morgan | Tributary to Spoon Creek |
| 263 | 30 | 925 | 39.5830 | -90.2166 | Morgan | Coal Creek |
| 264 | | 925 | 39.5830 | -90.2159 | Morgan | Coal Creek |
| 265 | 31 | 925.5 | 39.5764 | -90.2049 | Morgan | Tributary to Lick Creek |
| 266 | | 925.5 | 39.5766 | -90.2054 | Morgan | Lick Creek |

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 267 | 32 | 927 | 39.5591 | -90.1870 | Morgan | Tributary to Lick Creek |
| 268 | 33 | 928 | 39.5567 | -90.1761 | Morgan | Tributary to Little Apple Creek |
| 269 | 34 | 928 | 39.5543 | -90.1708 | Morgan | Little Apple Creek |
| 270 | 35 | 928.5 | 39.5500 | -90.1680 | Morgan | Tributary to Little Apple Creek |
| 271 | 36 | 929 | 39.5480 | -90.1640 | Morgan | Tributary to Little Apple Creek |
| 272 | 37 | 929 | 39.5462 | -90.1601 | Morgan | Tributary to Little Apple Creek |
| 273 | | 929 | 39.5455 | -90.1589 | Morgan | Tributary to Little Apple Creek |
| 274 | 38 | 930 | 39.5377 | -90.1466 | Morgan | Tributary to Little Apple Creek |
| 275 | | 930.5 | 39.5344 | -90.1408 | Morgan | Unnamed Wetland |
| 276 | 39 | 930.5 | 39.5345 | -90.1408 | Morgan | Tributary to Left Fork Apple Creek |
| 277 | | 930.5 | 39.5343 | -90.1401 | Morgan | Tributary to Left Fork Apple Creek |
| 278 | | 930.5 | 39.5326 | -90.1337 | Morgan | Tributary to Left Fork Apple Creek |
| 279 | 40 | 931 | 39.5316 | -90.1312 | Morgan | Unnamed Wetland |
| 280 | | 931 | 39.5306 | -90.1285 | Morgan | Tributary to Left Fork Apple Creek |
| 281 | | 931 | 39.5318 | -90.1317 | Morgan | Left Fork Apple Creek |
| 282 | 41 | 931.5 | 39.5286 | -90.1252 | Morgan | Tributary to Left Fork Apple Creek |
| 283 | | 931.5 | 39.5278 | -90.1239 | Morgan | Tributary to Left Fork Apple Creek |
| 284 | 42 | 931.5 | 39.5240 | -90.1250 | Morgan | Tributary to Left Fork Apple Creek |
| 285 | | | | | | |
| 286 | | | | | | |
| 287 | | | | | | |
| 288 | PCN Area | Mile | Longitude | Latitude | County | WOUS |
| 289 | State of Illinois - St. Louis District cont. | | | | | |
| 290 | | 932.5 | 39.5190 | -90.1100 | Macoupin | Baitter Branch |
| 291 | 43 | 932.5 | 39.5190 | -90.1100 | Macoupin | Tributary to Baitter Branch |
| 292 | | 932.5 | 39.5190 | -90.1100 | Macoupin | Tributary to Baitter Branch |
| 293 | | 932.5 | 39.5190 | -90.1100 | Macoupin | Tributary to Baitter Branch |
| 294 | 44 | 933 | 39.5120 | -90.1001 | Macoupin | Unnamed Wetland |
| 295 | | 933.5 | 39.5114 | -90.0979 | Macoupin | Apple Creek |
| 296 | 45 | 935.5 | 39.4873 | -90.0768 | Macoupin | Tributary to Panther Creek |
| 297 | | 939 | 39.4624 | -90.0198 | Macoupin | Unnamed Wetland |
| 298 | 46 | 939 | 39.4619 | -90.0185 | Macoupin | Tributary to Solomon Creek |
| 299 | | 939 | 39.4617 | -90.0177 | Macoupin | Tributary to Solomon Creek |
| 300 | | 939 | 39.4622 | -90.0195 | Macoupin | Tributary to Solomon Creek |
| 301 | | 940 | 39.4548 | -90.0022 | Macoupin | Tributary to Solomon Creek |
| 302 | 47 | 940.5 | 39.4534 | -89.9995 | Macoupin | Solomon Creek |
| 303 | | 940.5 | 39.4520 | -89.9967 | Macoupin | Tributary to Solomon Creek |
| 304 | | 943.5 | 39.4323 | -89.9533 | Macoupin | Nassa Creek |
| 305 | | 943.5 | 39.4309 | -89.9505 | Macoupin | Tributary to Nassa Creek |
| 306 | 48 | 944 | 39.4290 | -89.9472 | Macoupin | Tributary to Nassa Creek |
| 307 | | 944 | 39.4293 | -89.9478 | Macoupin | Tributary to Nassa Creek |
| 308 | | 944 | 39.4301 | -89.9489 | Macoupin | Tributary to Nassa Creek |
| 309 | 49 | 945 | 39.4159 | -89.9314 | Macoupin | Tributary to Otter Creek |
| 310 | | 945.5 | 39.4150 | -89.9299 | Macoupin | Tributary to Otter Creek |
| 311 | 50 | 946.5 | 39.3990 | -89.9189 | Macoupin | Otter Creek |

|   | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 312 | 51 | 956.5 | 39.2859 | -89.8198 | Macoupin | Macoupin Creek |
| 313 | 52 | 957.5 | 39.2831 | -89.8077 | Macoupin | Unnamed Wetland |
| 314 | 53 | 963.5 | 39.2134 | -89.7446 | Macoupin | Tributary to Honey Creek |
| 315 | 54 | 967.5 | 39.1572 | -89.7317 | Macoupin | Cahokia Creek |
| 316 | 55 | 973.5 | 39.0950 | -89.6734 | Montgomery | Tributary to Lake Fork |
| 317 | 56 | 977.5 | 39.0512 | -89.6170 | Montgomery | Tributary to Grave Branch |
| 318 |   | 978 | 39.0512 | -89.6155 | Montgomery | Unnamed Wetland |
| 319 | 57 | 978.5 | 39.0470 | -89.6013 | Montgomery | Tributary to Lake Fork |
| 320 | **PCN Area** | **Mile** | **Longitude** | **Latitude** | **County** | **WOUS** |
| 321 | **State of Illinois - St. Louis District cont.** | | | | | |
| 322 | 58 | 979 | 39.0470 | -89.5960 | Montgomery | Tributary to Lake Fork |
| 323 |   | 979 | 39.0470 | -89.5960 | Montgomery | Tributary to Lake Fork |
| 324 |   | 979 | 39.0470 | -89.5960 | Montgomery | Unnamed Wetland |
| 325 | 59 | 979.5 | 39.0480 | -89.5880 | Montgomery | Tributary to Lake Fork |
| 326 |   | 979.5 | 39.0470 | -89.5890 | Montgomery | Unnamed Wetland |
| 327 |   | 979.5 | 39.0470 | -89.5880 | Montgomery | Unnamed Wetland |
| 328 | 60 | 980 | 39.0464 | -89.5744 | Montgomery | Tributary to Lake Fork |
| 329 | 61 | 981 | 39.0461 | -89.5611 | Montgomery | Unnamed Wetland |
| 330 |   | 981 | 39.0461 | -89.5603 | Montgomery | Tributary to Shoal Creek |
| 331 | 62 | 981.5 | 39.0461 | -89.5508 | Montgomery | Shoal Creek |
| 332 | 63 | 983 | 39.0434 | -89.5198 | Montgomery | Tributary to Panama Creek |
| 333 | 64 | 984.5 | 39.0450 | -89.4970 | Montgomery | Unnamed Wetland |
| 334 | 65 | 989 | 39.0381 | -89.4196 | Montgomery | Unnamed Wetland |
| 335 | 66 | 991.5 | 39.0110 | -89.4030 | Bond | Tributary to East Fork Shoal Creek |
| 336 | 67 | 992 | 39.0050 | -89.3920 | Bond | Tributary to East Fork Shoal Creek |
| 337 |   | 992 | 39.0050 | -89.3920 | Bond | Unnamed Wetland |
| 338 | 68 | 993 | 38.9985 | -89.3801 | Bond | Tributary |
| 339 |   | 993 | 38.9978 | -89.3778 | Bond | Tributary |
| 340 |   | 994.5 | 38.9880 | -89.3490 | Bond | Unnamed Wetland |
| 341 |   | 994.5 | 38.9880 | -89.3500 | Bond | Tributary to Dry Branch |
| 342 | 69 | 994.5 | 38.9880 | -89.3490 | Bond | Dry Branch |
| 343 |   | 994.5 | 38.9870 | -89.3470 | Bond | Tributary to Dry Branch |
| 344 |   | 994.5 | 38.9880 | -89.3490 | Bond | Unnamed Wetland |
| 345 |   | 994.5 | 38.9880 | -89.3470 | Bond | Unnamed Wetland |
| 346 | 70 | 995 | 38.9830 | -89.3400 | Bond | Tributary to Dry Branch |
| 347 |   | 995 | 38.9830 | -89.3400 | Bond | Tributary to Dry Branch |
| 348 | 71 | 995.5 | 38.9816 | -89.3359 | Bond | Tributary to Dry Branch |
| 349 | 72 | 997.5 | 38.9657 | -89.3107 | Bond | Kingsbury Branch |
| 350 |   |   |   |   |   |   |
| 351 |   |   |   |   |   |   |
| 352 | **PCN Area** | **Mile** | **Longitude** | **Latitude** | **County** | **WOUS** |
| 353 | **State of Illinois - St. Louis District cont.** | | | | | |
| 354 |   | 1002.5 | 38.9200 | -89.2390 | Fayette | Hurricane Creek |
| 355 |   | 1002.5 | 38.9210 | -89.2390 | Fayette | Tributary to Hurricane Creek |

USACE_DAPL0069786

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 356 | 73 | 1002.5 | 38.9210 | -89.2390 | Fayette | Unnamed Wetland |
| 357 | | 1002.5 | 38.9210 | -89.2390 | Fayette | Unnamed Wetland |
| 358 | | 1002.5 | 38.9210 | -89.2400 | Fayette | Unnamed Wetland |
| 359 | 74 | 1003 | 38.9140 | -89.2311 | Fayette | Tributary to Hurricane Creek |
| 360 | | 1003.5 | 38.9104 | -89.2256 | Fayette | Unnamed Wetland |
| 361 | 75 | 1003.5 | 38.9089 | -89.2235 | Fayette | Tributary to Hurricane Creek |
| 362 | | 1003.5 | 38.9085 | -89.2228 | Fayette | Tributary to Hurricane Creek |
| 363 | | 1003.5 | 38.9083 | -89.2225 | Fayette | Tributary to Hurricane Creek |
| 364 | 76 | 1004 | 38.9051 | -89.2177 | Fayette | Unnamed Wetland |
| 365 | | 1004 | 38.9052 | -89.2177 | Fayette | Tributary to Hurricane Creek |
| 366 | 77 | 1006.5 | 38.8778 | -89.1894 | Fayette | Tributary to Buck Creek |
| 367 | | 1010 | 38.8620 | -89.1530 | Fayette | Tributary to Kaskaskia River |
| 368 | | 1010 | 38.8590 | -89.1520 | Fayette | Unnamed Wetland |
| 369 | | 1010 | 38.8590 | -89.1510 | Fayette | Unnamed Wetland |
| 370 | | 1010 | 38.8570 | -89.1490 | Fayette | Unnamed Wetland |
| 371 | | 1010 | 38.8550 | -89.1480 | Fayette | Unnamed Wetland |
| 372 | | 1010 | 38.8540 | -89.1480 | Fayette | Unnamed Wetland |
| 373 | | 1010 | 38.8540 | -89.1480 | Fayette | Unnamed Wetland |
| 374 | 78 | 1010.5 | 38.8520 | -89.1460 | Fayette | Unnamed Wetland |
| 375 | | 1010.5 | 38.8490 | -89.1450 | Fayette | Unnamed Wetland |
| 376 | | 1011 | 38.8480 | -89.1430 | Fayette | Cassar Creek |
| 377 | | 1011 | 38.3470 | -89.1430 | Fayette | Unnamed Wetland |
| 378 | | 1011 | 38.8470 | -89.1420 | Fayette | Unnamed Wetland |
| 379 | | 1011 | 38.8460 | -89.1420 | Fayette | Unnamed Wetland |
| 380 | | 1011 | 38.8440 | -89.1420 | Fayette | Unnamed Wetland |
| 381 | | 1011 | 38.8430 | -89.1420 | Fayette | Unnamed Wetland |
| 382 | | 1011 | 38.8460 | -89.1420 | Fayette | Unnamed Wetland |
| 383 | 79 | 1011.5 | 38.8360 | -89.1330 | Fayette | Tributary to Steve Creek |
| 384 | PCN Area | Mile | Longitude | Latitude | Conty | WOUS |
| 385 | State of Illinois - St. Louis District cont. | | | | | |
| 386 | 80 | 1011.5 | 38.8340 | -89.1300 | Fayette | Unnamed Wetland |
| 387 | | 1011.5 | 38.8340 | -89.1300 | Fayette | Steve Creek |
| 388 | 81 | 1012.5 | 38.8230 | -89.1220 | Marion | Flat Creek |
| 389 | 82 | 1012.5 | 38.8200 | -89.1220 | Marion | Unnamed Wetland |
| 390 | | 1012.5 | 38.8200 | -89.1220 | Marion | Tributary to Flat Creek |
| 391 | 83 | 1015 | 38.7935 | -89.0972 | Marion | Tributary to North Fork Kaskaskia River |
| 392 | | 1015 | 38.7938 | -89.0978 | Marion | Tributary to North Fork Kaskaskia River |
| 393 | | 1015 | 38.7909 | -89.0923 | Marion | Tributary to North Fork Kaskaskia River |
| 394 | 84 | 1015.5 | 38.7903 | -89.0910 | Marion | Unnamed Wetland |
| 395 | | 1015.5 | 38.7909 | -89.0923 | Marion | Unnamed Wetland |
| 396 | 85 | 1016.5 | 38.7850 | -89.0740 | Marion | Tributary to North Fork Kaskaskia River |
| 397 | | 1016.5 | 38.7850 | -89.0740 | Marion | Unnamed Wetland |
| 398 | | 1016.5 | 38.7850 | -89.0740 | Marion | Unnamed Wetland |
| 399 | 86 | 1017.5 | 38.7800 | -89.0650 | Marion | Unnamed Wetland |
| 400 | | 1017.5 | 38.7800 | -89.0650 | Marion | North Fork Kaskaskia River |

USACE_DAPL0069787

# EXHIBIT PP

From:       "Ames. Joel O NWO" <NWO>
To:         "CRST Chairman Frazier" <haroldcfrazier@yahoo.com>
CC:
Date:       3/7/2016 9:41:40 AM
Subject: RE: Phone Call

Hello Chairman,
I hope all is going well for you. Are you free to speak this week, what would be a good time to reach you. Thanks in advance............Joel


-----Original Message-----
From: Ames, Joel O NWO
Sent: Wednesday, March 02, 2016 7:54 AM
To: 'CRST Chairman Frazier'
Subject: RE: Phone Call
Importance: High

Chairman,
Will you have some time to talk today, if so, what is the best time to reach you?.............Joel


-----Original Message-----
From: Ames, Joel O NWO
Sent: Friday, February 26, 2016 7:38 AM
To: 'CRST Chairman Frazier'
Subject: FW: Phone Call

Hello Chairman,
I was wondering if you might have some time to chat this morning, I'm in the office until 1100 today, then traveling the afternoon. If there is a good time to speak please let me know. Thanks in advance..........Joel

USACE_DAPL0066310

-----Original Message-----
From: Ames, Joel O NWO
Sent: Tuesday, February 23, 2016 11:27 AM
To: 'CRST Chairman Frazier'
Subject: RE: Phone Call

Chairman,
Are you available to speak sometime today. I tried calling you a while ago............Joel


-----Original Message-----
From: Ames, Joel O NWO
Sent: Monday, February 22, 2016 7:17 AM
To: CRST Chairman Frazier
Subject: Phone Call

Hello Chairman,
I hope all is going well for you. What is a good time to reach you today? I know we have been playing phone tag for a bit........Joel


Tribal Liaison
USACE Omaha District
1616 Capitol Ave, Suite 9000
Omaha, NE 68102-4901
Voicemail (402) 995-2909
Fax (402) 995-2013
joel.o.ames@usace.army.mil

http://www.nwo.usace.army.mil/About/TribalNations.aspx

Facebook: www.facebook.com/OmahaUSACE
Google: www.glpl.us/OmahaUSACE
Twitter: www.twitter.com/OmahaUSACE

# EXHIBIT QQ

From:    "Ames. Joel O NWO" <NWO>
To:      Janis
        "Larry D NWO:" <Price>
        "Julie A" <NWO>
CC:
Date:   5/9/2016 11:25:48 AM
Subject: CRST - DAPL

---

Larry/Julie,
I forgot to tell you earlier, when we were up meeting with the SRST the past Friday, I had an opportunity to speak with Ryman Le Beau (CRST V-Chairman). During the conversation I told him that we had been attempting to reach the Chairman and asked that he let him know we are still willing to meet. Not sure if he passed that on but did want to let you know............Joel


Tribal Liaison
USACE Omaha District
1616 Capitol Ave, Suite 9000
Omaha, NE 68102-4901
Voicemail (402) 995-2909
Fax (402) 995-2013
joel.o.ames@usace.army.mil

http://www.nwo.usace.army.mil/About/TribalNations.aspx

Facebook: www.facebook.com/OmahaUSACE
Google: www.glpl.us/OmahaUSACE
Twitter: www.twitter.com/OmahaUSACE

USACE_DAPL0064289

# EXHIBIT RR



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, OMAHA DISTRICT
1616 CAPITOL AVENUE
OMAHA NE 68102-4901

December 4, 2013

Planning, Programs, and Project Management Division

«Prefix» «FirstMiddle_Name» «Last_Name», «Suffix»«Title»
«Organization»
«Address1»
«Address2»
«City», «State» «Zip»

Dear «Salutation» «Last_Name»:

An environmental assessment has been prepared by the U.S. Army Corps of Engineers' Omaha District (Corps) to evaluate potential environmental impacts from construction and operation of a crude oil pipeline across private lands encumbered by federal flowage easements and land owned by the federal government under the management by the US Army Corps of Engineers.

Dakota Access, LLC proposes to construct and operate the Dakota Access Pipeline Project (Project). The proposed Project would connect the Bakken and Three Forks crude oil production areas in North Dakota to existing infrastructure in Illinois. In North Dakota, the Project crosses Corps federal flowage easements at the Missouri River upstream of Lake Sakakawea in Williams County and Corps managed federal land at Lake Oahe in Morton and Emmons counties. The pipeline is 24 inches in diameter where it crosses approximately 2.83 miles of the flowage easements at the Missouri River and is 30 inches in diameter where it crosses approximately 0.21 miles at Lake Oahe. The applicant intends to horizontally directionally drill beneath both waterbody crossings. General information about the project supplied by the applicant is located on-line at http://www.daplpipelinefacts.com/.

The Omaha District is seeking Tribal and public comments on the environmental assessment for these two project areas. Comments must be received by January 7, 2016 and can be provided to:

U.S. Army Corps of Engineers, Omaha District;
Attn: John Shelman,
CENWO-PM-AC\402-995-2708
1616 Capitol Avenue
Omaha, NE 68102
johnathan.a.shelman@usace.army.mil


Printed on Recycled Paper

- 2 -

A hard copy can be request from Mr. Shelman, however copies will be available at the following public libraries:

Bismarck Public Library        Williston Community Library        Rawlins Municipal Library
515 N. Fifth Street            1302 Davidson Dr.                  1000 East Church Street
Bismarck, ND 58501            Williston, ND 58801               Pierre, SD 57501

We appreciate your cooperation in the review of this Environmental Assessment. We look forward to finalizing this portion of the Dakota Access Pipeline Project.

Sincerely,

Eric A. Laux
Chief, Environmental Resources and Missouri
River Recovery Program Plan Formulation Section

- 3 -

Copy Furnished: (Electronic Distribution)

CENWO-PM (Amy McClean)
CENWO-PM- AC (Eric Laux)
CENWO-PM-AC (Matthew Vandenberg)
CENWO-OD-TN (Jolene Hulsing)
CENWO-OD-TN (Chris Whiehl)
CENWO-OD-T (Larry Janis)
CENWO-D (Kathryn Schenk)
CENWO-OD-FR (Cody Wilson)
CENWO-OD-FR (Tom Curran)

USACE_DAPL0067168

# EXHIBIT SS



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, OMAHA DISTRICT
1616 CAPITOL AVENUE
OMAHA NE  68102-4901

February 17, 2015

Mr. Steve Vance
Cheyenne River Sioux Tribe, THPO
PO Box 590
Eagle Butte,  SD  57625

Dear Mr. Vance,

    The U.S. Army Corps of Engineers (USACE) is currently evaluating pre-construction notifications (PCN's) from Dakota Access Pipeline Project (DAPL) consultants for portions of the overall pipeline project that required submittal of a notification for work in waters of the United States, in accordance with Section 10 of the Rivers and Harbors Act (33 U.S.C. 401 et seq.) and Section 404 of the Clean Water Act (33 U.S.C. 1344). DAPL is an approximate 1,100-mile, 30-inch diameter, proposed crude oil pipeline, which would extend from the Bakken production area near Stanley, North Dakota through South Dakota and Iowa to a delivery point at Patoka, Illinois, thus affecting three Corps Districts (Omaha, Rock Island, St. Louis).  To date, USACE has received 55-PCN's.  The location of the PCN areas is enclosed.

    The USACE permitting process is the only Federal action associated with the project and therefore USACE is solely responsible for conducting consultation with interested Tribes in accordance with Section 106 of the National Historic Preservation Act.   The purpose of this letter is to initiate Section 106 consultation and review, determine your interest in consulting on this undertaking, and to gather information that will assist the Corps in identifying historic properties.

    Please note the Corps is neither funding nor constructing the proposed pipeline and would have permitting authority over only a very small percentage of the overall 1,100-mile pipeline project.  The majority of the work in association with construction of the pipeline will occur in uplands and not waters of the United States.  Navigable waters crossings include the Missouri, James, Big Sioux, Des Moines, Mississippi, and Illinois rivers.

    Our regulations define the extent of the federal action as the "permit area" (33 CFR Part 325, Appendix C).  This definition requires some interpretation but generally for pipelines it includes waters of the U.S. and adjacent upland areas that are dependent on the location of the crossing.  The project proponent is conducting Class III surveys for cultural resources along the route.  Proper identification of all historic properties, including sites of religious and cultural significance, or traditional cultural properties (TCP), in the permit area is an essential element of those surveys.

Please let us know if you would like to consult on this undertaking and if you have any information that will assist us in identifying historic properties.   We would like to know if you have any knowledge or concerns regarding cultural resources, sites of religious importance, or TCPs you would like the Corps to consider.  The Corps will treat any information provided with the greatest confidentiality.  We request your comments prior to **March 30, 2015**, to help facilitate a timely Section 106 review.

Enclosed you will find the current proposed alignment provided by the applicant.  Additional information about the project can be obtained at http://www.energytransfer.com/ops_copp.aspx.  If you are interested in participating in coordination for this proposed project, please contact Mr. Joel Ames, Tribal Liaison, by email at joel.o.ames@usace.army.mil or Ms. Devetta Hill, Field Support Section, at devetta.a.hill@usace.army.mil or by phone at (402) 995-2462.

Thank you for participating in this early consultation effort concerning the Dakota Access Pipeline Project.  We look forward to future consultation after surveys are completed.  Please contact me at Martha.S.Chieply@usace.army.mil or by calling (402) 995-2451 if you have any questions.

Sincerely,

Martha S. Chieply
Chief, Regulatory Branch
Operations Division

Enclosures

USACE_DAPL0070664

# EXHIBIT TT

| | |
|---|---|
| **From:** | Breckenridge, Jeff L NWO |
| **To:** | Hill, Devetta A NWO; Ames, Joel O NWO |
| **Cc:** | Lawrence, Karen L NWO; Renschler, Jason J NWO; Harnois, Richard D NWO |
| **Subject:** | RE: DAPL (UNCLASSIFIED) |
| **Date:** | Monday, March 23, 2015 10:25:00 AM |

Classification: UNCLASSIFIED
Caveats: NONE

All,
I talked to Steve Vance this morning. Below is a summary of his comments.
1. The Cheyenne River Sioux Tribe (CRST) is requesting formal Tribal Consultation.
2. CRST wants to be involved in the Section 106 process (Consultation, Identification, Evaluation, & Determination). They want to be involved in the scoping and review of Level III Cultural Surveys, etc.
3. He would like to review any EA's/NEPA documentation for the project
4. I tried to explain the Corps limited involvement with the entire pipeline route. He felt that they could work with the SHPOs to review the entire route.

Steve was on his way to Minneapolis for a cultural review of another pipeline coming out of Canada through Minnesota and wanted to make sure his comments got to us before the March 30th deadline.

Jeffrey L. Breckenridge, P.E.
Regulatory Project Manager
South Dakota Regulatory Office


-----Original Message-----
From: Hill, Devetta A NWO
Sent: Thursday, March 19, 2015 1:26 PM
To: Breckenridge, Jeff L NWO; Ames, Joel O NWO
Cc: Lawrence, Karen L NWO
Subject: DAPL (UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: NONE

All,

I got a call today from Steve Vance, the THPO for the Cheyenne River Sioux Tribe. He received the letter and is interested in commenting on the project. He said he could be reached at 605.200.0650.

Thanks

Devetta Hill
U.S. Army Corps of Engineers
Omaha District
1616 Capitol Avenue
Omaha, NE 68102-4901
402.995.2462

Just because the monkey is off your back doesn't mean the circus has left town.


Classification: UNCLASSIFIED

Caveats: NONE


Classification: UNCLASSIFIED
Caveats: NONE

USACE_DAPL0070575

# EXHIBIT UU



## Experience List – Greater than 7,000 feet

OIL AND GAS · DEEP FOUNDATIONS · SEWER AND WATER · HEAVY CIVIL · COMMUNICATIONS · POWER DELIVERY · RAILWAY WORK · RENEWABLE ENERGY · TRANSPORTATION · MATERIALS

### MICHELS DIRECTIONAL CROSSINGS

| Date | Utility | Prime Contractor | Diameter of Bore | Length | Location |
|------|---------|------------------|------------------|--------|----------|
| **2016** | **ENERGY TRANSFER COMPANY (OIL)** | **PRECISION PIPELINE** | **30" STEEL** | **7,282'** | **MISSISSIPPI RIVER SANDUSKY, IA & NAUVOO, IL** |
| 2016 | PARADIGM MIDSTREAM (GAS) | MICHELS DIRECTIONAL CROSSINGS | 16" STEEL | 11,397' | LAKE SAKAKAWEA - SOUTH NEW TOWN, ND |
| 2016 | PARADIGM MIDSTREAM (OIL) | MICHELS DIRECTIONAL CROSSINGS | 16" STEEL | 11,229' | LAKE SAKAKAWEA - NORTH NEW TOWN, ND |
| 2016 | TRANSCANADA (OIL) | MICHELS CANADA | 12" STEEL | 7,228' | ATHABASCA RIVER FORT MCKAY, ALBERTA, CANADA |
| 2015 | MARTIN OPERATING PARTNERS (GAS) | EMS (ENERGY MAINTENANCE SERVICES) | 12" STEEL | 11,548' | UNION CANAL & MARTIN BARGE CANAL BEAUMONT, TX |
| **2015** | **TRANSCANADA (OIL)** | **MICHELS CANADA** | **42" STEEL** | **7,205'** | **ATHABASCA RIVER FORT MCMURRAY, AB, CANADA** |
| 2015 | ENTERPRISE PRODUCTS PIPELINE COMPANY (GAS) | WILLBROS | 24" STEEL | 7,432' | HOUSTON SHIP CHANNEL MORGAN'S POINT, TX |
| 2015 | MAGELLAN MIDSTREAM PARTNERS, L.P. (OIL) | SOUTHERN PIPELINE | 12" STEEL | 11,563' | HOLLAND BOTTOMS WETLANDS JACKSONVILLE, AR |
| 2015 | PHILLIPS 66 (OIL) | TROY CONSTRUCTION | 18" STEEL | 12,459' | HOUSTON SHIP CHANNEL BAYTOWN, TX |
| 2014 | PHILLIPS 66 (OIL) | MICHELS DIRECTIONAL CROSSINGS | 8" STEEL | 7,321' | MP 49.3 BILLINGS, MT |
| **2014** | **ENBRIDGE ENERGY FLANAGAN SOUTH PIPELINE (OIL)** | **MICHELS PIPELINE** | **36" STEEL** | **9,040'** | **MISSISSIPPI RIVER & LEVEES QUINCY, IL/MO** |

**Bold print denotes crude oil pipelines that (1) are of at least the same circumference as the Lake Oahe pipeline, (2) run beneath freshwater bodies, and (3) are longer than the HDD portion of the Lake Oahe crossing.**

| 2013 | SCANA | UTEC | 8" STEEL | 7,177' | WATER TO WATER E-F<br>CHARLESTON, SC |
| 2013 | SCANA | UTEC | 8" STEEL | 7,304' | LAND TO WATER D-E<br>CHARLESTON, SC |
| 2013 | TEXAS EASTERN TRANSMISSION (GAS) | MICHELS DIRECTIONAL CROSSINGS | 30" STEEL | 8,101' | KILL VAN KULL<br>BERGEN PT. NJ/NY |
| 2012 | AT&T COMMUNICATIONS | MICHELS COMMUNICATION | 8" STEEL | 10,053' | POTOMAC RIVER<br>FORT BELVOR, VA/MD |
| 2012 | CONOCOPHILLIPS PIPELINE (OIL) | PILCHUCK CONTRACTORS | 8" STEEL | 12,902' | MP66<br>BIG HORN COUNTY, WYOLA, MT |
| 2011 | ENTERPRISE PRODUCTS OPERATING (GAS) | MICHELS DIRECTIONAL CROSSINGS | 8" STEEL | 7,020' | MISSOURI RIVER<br>DECATUR, NE |
| 2011 | ENTERPRISE PRODUCTS OPERATING (NITROGEN) | MICHELS DIRECTIONAL CROSSINGS | 8" STEEL | 7,002' | MISSOURI RIVER<br>DECATUR, NE |
| 2011 | ENTERPRISE PRODUCTS OPERATING (AMMONIA) | MICHELS DIRECTIONAL CROSSINGS | 8" STEEL | 7,019' | MISSOURI RIVER<br>DECATUR, NE |
| 2010 | CAROLINA GAS TRANSMISSION (GAS) | CAROLINA GAS TRANSMISSION | 16" STEEL | 9,931' | COOPER RIVER<br>CHARLESTON, SC |
| 2006 | OKALOOSA GAS DISTRICT FLORIDA (GAS) | PATTERSON & WILDER CONSTRUCTION | 10" STEEL | 8,400' | WALTON COUNTY<br>OKALOOSA, FL |
| 2005 | GAZ METROPOLITAN (GAS) | MICHELS CANADA | 20" STEEL | 7,455' | ST. LAWRENCE SEAWAY<br>TROIS-RIVIERIES QUEBEC, CANADA |
| 2004 | SOUTH CAROLINA GAS AND ELECTRIC COMPANY | MICHELS DIRECTIONAL CROSSINGS | 8" STEEL | 7,074' | COOPER RIVER<br>CHARLESTON, SC |
| 2004 | SOUTH CAROLINA GAS AND ELECTRIC COMPANY | JACOBS CONSTRUCTION SERVICES | 8" STEEL | 7,025' | COOPER RIVER<br>CHARLESTON, SC |

**Bold print denotes crude oil pipelines that (1) are of at least the same circumference as the Lake Oahe pipeline, (2) run beneath freshwater bodies, and (3) are longer than the HDD portion of the Lake Oahe crossing.**

# EXHIBIT VV

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE, | ) |
| | ) |
| | ) **Case No. 1:16-cv-1534-JEB** |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| U.S. ARMY CORPS OF ENGINEERS, | ) |
| | ) |
| Defendant. | ) |

_____

## DECLARATION OF JONATHAN SHELMAN


In accordance with the provisions of 28 U.S.C. 1746, I, Johnathan Shelman, declare that the following statements are true and correct to the best of my knowledge, information, and belief and are based upon my personal knowledge and/or my review of information contained in the records of the United States Army Corps of Engineers ("Corps") or supplied by current employees:

1. I am currently employed as the Environmental Resource Specialist for the United States Army Corps of Engineers (USACE), Omaha District (Omaha District). I have served in this capacity since 2009. Prior to this assignment, I was an environmental scientist for Jacobson Helgoth Consultants, an environmental engineering consulting firm in Omaha, Nebraska.

2. I graduated from the University of Nebraska at Omaha in 2003 with an environmental science degree.

3. As part of my normal duties as an Environmental Resource Specialist, I am responsible for ensuring the Omaha District is compliant with NEPA and other environmental

regulations. Specifically, in preparing or overseeing the preparation of NEPA documents, I am responsible for: determining the scope of the project, developing alternatives that meet the purpose and need of the project, screening alternatives to determine which alternatives can be logically excluded or which ones should be carried through the environmental consequences analysis, completing the affected environment, environmental and cumulative impact analysis, assuring that all federal, state, local agencies and Tribal entities are solicited for their opinion on the preferred and other alternatives, revising the document to address any concerns, and finally assessing whether significant impacts to the human environment would occur as a result of a federal decision that would warrant the preparation of an Environmental Impact Statement.

4. I oversee NEPA compliance for the Dakota Access Pipeline (DAPL) project. Under careful Corps oversight, an Environmental Assessment was prepared by a third party consulting firm, Perennial Environmental. The EA analyzed the effects of activities required for the construction of the DAPL on federal lands with regards to potential impacts to Corps Civil Works projects, specifically on lands encumbered by federal flowage easements upstream of Lake Sakakawea and through federally owned property at Lake Oahe. The EA was required to support the 33 U.S.C. § 408 permission to authorize the pipeline to cross over real property interests acquired and managed by the Corps for the Garrison Dam/Lake Sakakawea and Oahe Dam/Lake Oahe flood control and navigation projects. The EA analyzes "whether the placement of the pipeline on federal real property interests is injurious to the public interest or will impair the usefulness of the federal projects." See EA page 1.

5. The preparation of the EA was completed in accordance with 40 CFR § 1506.5(a)-(b), which authorizes the Corps to allow an applicant to prepare an EA. Although an applicant prepares the EA, the Corps is ultimately responsible for evaluating the environmental issues and the scope of the content of the EA.

6. I was a member of the project delivery team that independently evaluated and verified the information and analysis undertaken in the EA. The Corps has taken full responsibility for the scope and content of the EA.

7. Scoping letters were sent March 30, 2015 to numerous federal, state and local agencies including many non-government entities. Similar letters were sent to over 20 tribes on October 24, 2015 in accordance with the *Programmatic Agreement for the Operation and Management of the Missouri River Main Stem System for Compliance with the National Historic Preservation Act*, dated March 19, 2004 (Programmatic Agreement or PA) the Corps has with Tribes within the Missouri River basin. Although the Standing Rock Sioux Tribe is not a signatory to this agreement, Richard Harnois, Senior Field Archaeologist for the USACE, Omaha District, Oahe Project, sent a letter to the SRST on the same date. This scoping letter described the two proposed crossings within the flowage easements upstream of Lake Sakakawea and through federal land at Lake Oahe and solicited comments that would be considered in the EA. All comments received during scoping were addressed in the EA.

8. The draft EA was released for public review on December 8, 2015. It was made available on the Corps website and at the Bismarck, ND, Williston, ND and Pierre, SD public libraries with a request for comments to be received by January 8, 2016. Notifications were mailed to all signatories of the PA, which includes the Cheyenne

River Sioux Tribe, and the Standing Rock Sioux Tribes who are, again, not included in the PA. Comments were received from several Tribal Nations near the beginning of January 2016, including from Standing Rock Sioux Tribe, Three Affiliated Tribes and the Northern Cheyenne Tribe.

9. Appendix J of the Final EA synopsizes the comments received on the draft EA and shows how and where they were addressed in the EA. The Standing Rock Sioux Tribe is listed on the Index of Commenters as Commenter #15. SRST comments are addressed on pages 7-10 and pages 15-19 of the Summary of Comments Received.

10. Tribal comments were carefully considered and the draft EA was substantially modified in several places in response to the comments received as documented in the final EA released in July 2016. For example, in response to several comments from tribal members of the Fort Berthold Reservation expressing concern regarding a response plan in the event of a release, the Corps added additional information on how DAPL would respond to an inadvertent release to Section 3.2.1.2 and Section 3.11. In addition, the Corps added the Draft Facility Response Plan as Appendix L to the EA which is described in more detail in paragraph 13. Impacts from winter/ice conditions was added to Section 3.2.1.2 in response to another comment from a member of the Fort Berthold Reservation.

11. The draft EA did not include a discussion of the SRST reservation because the crossing was outside the reservation boundaries. In response to comments submitted by the SRST, the final EA contains a substantive discussion of the reservation, (see Section 2.3.1) tribal water intakes (see added text at Section 3.2.1.2 describing potential risk and mitigation measures associated with drinking water intakes downstream of the Missouri

4

River and Lake Oahe crossings) and Environmental Justice Impacts (see added text in Section 3.9.2 discussing potentially affected Tribal Nations). Section 3.7 of the EA was also revised to include a discussion of vibration associated with construction equipment on cultural resources in response to a comment submitted by the SRST.

12. A more robust analysis of alternative route alignments was also completed and calculated the amount of undisturbed ground and environmental resources that would be impacted by not collocating the pipeline with existing linear infrastructure (See Section 2.1.4 and Table 2-1 in the EA).

13. In addition, the Corps required Dakota Access to provide additional documents during the Corps' review of the project in response to concerns about the safety of the pipeline and the possibility of a leak contaminating the Missouri River and the SRST's water supply. These documents included a Facility Response Plan (Appendix L) which outlines spill detection; lists parties to be notified (including the SRST); describes activities associated with a spill response, containment and recovery of spill methods; training procedures; worst-case discharge maps; and associated reference materials. Dakota Access also provided an Unanticipated Discoveries Plan (Appendix F) and an Emergency Response Plan. These documents became conditions of the Corps outgrants to assure that Dakota Access safely constructs, operates and maintains the DAPL project to protect Lakes Sakakawea and Oahe, the quality of water in the Missouri River and the areas surrounding and downstream of the crossings.

14. Following the revision of the EA, the project delivery team concluded that there would not be significant impacts to the human environment as a result of modifying federal flowage easements or allowing an easement on federal property. The Omaha District Commander, Colonel John Henderson, was briefed by multiple branch chiefs within the Omaha District and decided that an Environmental Impact Statement was not required and signed a Mitigated Finding of No Significant Impact (FONSI). The FONSI also reiterated the conditions of the easements (See pages 3-5 of the FONSI), which focused on the mitigation measures the Corps relied on in rendering the impact determination.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____18 August 2016_____.

SHELMAN.JOHNAT HAN.A.1103408101
Digitally signed by SHELMAN.JOHNATHAN.A.1103408101
DN: c=US, o=U.S. Government, ou=DoD, ou=PKI, ou=USA, cn=SHELMAN.JOHNATHAN.A.1103408101
Date: 2016.08.18 15:30:07 -05'00'

_____, in Omaha, Nebraska.

Johnathan Shelman