UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STANDING ROCK SIOUX TRIBE,** *et al.*, <br><br> **Plaintiffs,** <br><br> v. <br><br> **U.S. ARMY CORPS OF ENGINEERS,** *et al.*, <br><br> **Defendants.** | Civil Action No. 16-1534 (JEB) |

**MEMORANDUM OPINION**

After the Standing Rock and Cheyenne River Sioux Tribes filed suit to challenge the U.S. Army Corps of Engineers' authorization of the construction of the Dakota Access Pipeline in federally regulated waters, the Corps prepared an administrative record for its July 2016 permitting decisions. Defendant-Intervenor Dakota Access LLC has now filed a Motion for a Protective Order in which it asks the Court to shield portions of eleven documents in that record from public disclosure based on its concern that terrorists or other individuals looking to damage the pipeline could use such information to inflict environmental injury. The Corps opposes the Motion in part, and the Tribes oppose it in full. As the Court concludes that Dakota Access has largely failed to meet its burden to show good cause for such an order, it will deny the Motion in the main, but grant it as to parts of five of the eleven documents.

**I.    Background**

On November 10, 2016, the Corps lodged the administrative record for its July 25, 2016, decisions related to the permitting of the Dakota Access Pipeline (DAPL). See ECF No. 55. It initially withheld from its production 31 documents that Dakota Access had identified as

1

containing confidential information warranting protection. See ECF No. 95 (Mot.) at 2 n.1; ECF No. 146 (Corps Opp.) at 2. Upon further consideration, Dakota Access narrowed its concern to eleven documents. See Mot. at 2 & n.1. It filed a Motion for a Protective Order on February 1, 2017, asking the Court to withhold portions of those documents from public disclosure.

The eleven documents at issue fall into three categories:

> (1) a set of five documents entitled "Spill Model Discussion," prepared for five different pipeline locations (two in North Dakota and three in Illinois); (2) a set of five corresponding geographic response plans; and (3) a single prevention and response plan prepared by Dakota Access's Horizontal Directional Drilling contractor.

ECF No. 161 (Reply) at 3. Within those documents, Dakota Access asks the Court to protect "geographic information that specifically details pipeline infrastructure routes through private land" and "spill response information that specifically details pipeline features, capacity, flow rate, transportation, and related emergency response information, safeguards, and plans in certain sensitive locations along the [DAPL] route." Mot. at 2. Dakota Access believes that the information "pinpoints locations where intentional damage to an oil pipeline would generate the greatest harm, and . . . reveals in great detail the manner in which the authorities would try to respond to that damage." Id. at 1. It therefore worries that "terrorists or others with . . . malicious intent" will use the information to damage the pipeline in ways that maximize environmental harm. Id. at 3.

The Corps opposes redacting or otherwise withholding from public disclosure the five geographic-response plans and the HDD prevention-and-response plan, but consents to a limited set of redactions to the five spill-model discussions. See Corps Opp. at 1-2, 4. The Tribes oppose any withholding. See ECF No. 150-1 (Tribes Opp.) at 3. To be clear, all disputed documents have been provided in full to the Tribes' counsel so that they may be cited in the

pending summary-judgment briefing. Id. at 4.

**II.     Analysis**

Dakota Access offers three bases on which certain details in the eleven documents should be protected from public disclosure: (1) the information constitutes Sensitive Security Information; (2) the information constitutes Critical Infrastructure Information; and (3) the information should be withheld pursuant to Federal Rule of Civil Procedure 26(c). The Court addresses each in turn.

    A.   Sensitive Security Information

After the terrorist attacks of September 11, 2001, Congress created the Transportation Security Administration and entrusted it with the authority "to shield information from disclosure when it determined the release of that information would be 'detrimental to the security of transportation.'" Lacson v. Dep't of Homeland Sec., 726 F.3d 170, 172 (D.C. Cir. 2013) (quoting Pub. L. No. 107-296, § 1601(b), 116 Stat. 2135, 2312 (2002) (codified as amended at 49 U.S.C. § 114(r))). TSA accordingly promulgated regulations regarding the protection of Sensitive Security Information. See 49 C.F.R. pt. 1520. Those regulations define SSI as "information obtained or developed in the conduct of security activities, including research and development, the disclosure of which TSA has determined would . . . [b]e detrimental to the safety of transportation." Id. § 1520.5(a). They also set forth categories of information that can constitute SSI, including "[a]ny security program or security contingency plan issued, established, required, received, or approved by [the Department of Transportation] or [the Department of Homeland Security]," and "[a]ny vulnerability assessment directed, created, held, funded, or approved by the DOT, DHS, or that will be provided to DOT or DHS in support of a Federal security program." Id. § 1520.5(b)(1), (5).

According to Dakota Access, "Oil pipelines are a transportation activity and subject to [SSI] protection," and the information it asks the Court to redact implicates "security programs," "security contingency plans," "vulnerability assessments," or "information detailing or relating to DAPL security programs, security contingency plans, and/or vulnerability assessments." Mot. at 5-6. The Chief of TSA's SSI Program, however, who has the authority to make SSI determinations, see Lacson, 726 F.3d at 173 n.1, reviewed the eleven documents Dakota Access seeks to shield and determined that they "do not contain any SSI." ECF No. 146-2 (Letter from D. Blair, TSA, to E. Zilioli, DOJ, Feb. 27, 2017). This Court lacks the power to disturb that conclusion, as federal circuit courts have exclusive jurisdiction to review TSA's SSI determinations. See 49 U.S.C. § 46110(a), (c); Elec. Privacy Info. Ctr. v. Dep't of Homeland Sec., 928 F. Supp. 2d 139, 146-47 (D.D.C. 2013). The Court therefore must reject Dakota Access's argument that the documents should be withheld on the ground that they contain SSI.

B. Critical Infrastructure Information

The Company next posits that "[c]ertain details in the documents also constitute Critical Infrastructure Information and should therefore be protected from public disclosure." Mot. at 7. The Court cannot agree.

Dakota Access relies on the Critical Infrastructures Protection Act of 2001, a statute enacted to protect physical and information infrastructures. Under that law, the term "critical infrastructure" means "systems and assets, whether physical or virtual, so vital to the United States that the incapacity or destruction of such systems and assets would have a debilitating impact on security, national economic security, national public health or safety, or any combination of those matters." 42 U.S.C. § 5195c(e). Because "DAPL is part of the national critical physical infrastructure" and the eleven documents contain information that, if made

public, "might compromise and/or undermine DAPL security protections and procedures," Dakota Access asserts, permitting their public disclosure "would risk disrupting energy sector infrastructure in subversion of the Act's purpose." Mot. at 8.

That Act does not prohibit the public disclosure of infrastructure-related information, but the Critical Infrastructure Information Act of 2002 established the Protected Critical Infrastructure Information Program, which protects from disclosure infrastructure information a company voluntarily shares with a federal agency. See 6 U.S.C. § 133. Yet that Program is of no use to the Company. Written information receives protection under the Program when it is submitted with the following label: "This information is voluntarily submitted to the Federal government in expectation of protection from disclosure as provided by the provisions of the Critical Infrastructure Information Act of 2002." 6 C.F.R. § 29.5(a)(3)(i). Dakota Access never alleges that the eleven documents contain this required statement, nor does it contend that they were subsequently marked as Protected Critical Infrastructure Information by the relevant DHS official. Id. § 29.2(g). The Court, consequently, cannot endorse this second asserted basis for the protective order.

   C. Rule 26(c)

Although success may not obtain via statute, Dakota Access is not yet out of cards. It next turns to the Federal Rules of Civil Procedure. Where a movant can show "good cause," Rule 26(c)(1) permits courts to issue protective orders to guard against "annoyance, embarrassment, oppression, or undue burden or expense." As is relevant here, courts may use such orders to "requir[e] that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way." Fed. R. Civ. P. 26(c)(1)(G).

As a threshold matter, the Tribes note that application of Rule 26(c) to the present circumstances would be inapposite — no party is seeking the <u>discovery</u> of materials outside the administrative record; Dakota Access instead wishes to withhold from public disclosure materials <u>already included</u> in the administrative record. See Tribes Opp. at 9-10. But courts have previously approved protective orders to shield portions of administrative records from public disclosure, and the Court sees no reason it lacks the power to do so here. <u>See, e.g.</u>, <u>Raytheon Co. v. Dep't of Navy</u>, 1989 WL 550581, at *1 n.2 (D.D.C. Dec. 22, 1989); <u>Genentech, Inc. v. Bowen</u>, 1987 WL 10500, at *1-2 (D.D.C. Apr. 21, 1987).

Trial courts have "broad discretion . . . to decide when a protective order is appropriate and what degree of protection is required." <u>Seattle Times Co. v. Rhinehart</u>, 467 U.S. 20, 36 (1984). "The 'good cause' standard is a flexible one that requires an individualized balancing of the many interests that may be present in a particular case." <u>United States v. Microsoft Corp.</u>, 165 F.3d 952, 960 (D.C. Cir. 1999). Ultimately, though, the party requesting the protective order has the burden to establish that it should be granted. See <u>Ecomission Sols., LLC v. CTS Holdings, Inc.</u>, 2016 WL 4506974, at *2 (D.D.C. Aug. 26, 2016) (describing movant's burden as "heavy"); <u>Doe v. Provident Life & Accident Ins. Co.</u>, 247 F.R.D. 218, 221 (D.D.C. 2008). To do so, the movant "must make a specific demonstration of facts in support of the request as opposed to conclusory or speculative statements about the need for a protective order and the harm which will be suffered without one." <u>Alexander v. FBI</u>, 186 F.R.D. 71, 75 (D.D.C. 1998). With these principles in mind, the Court now proceeds to identify and then to balance the relevant interests of the parties.

As already noted, Dakota Access urges that a protective order is necessary to further its interest in security and energy infrastructure. It maintains that if the eleven documents are

released in full — *i.e.,* absent its proposed redactions — "persons with the malicious intent to damage the pipeline will be better able to maximize the harm that they hope to inflict." Mot. at 10-11.

The Tribes, conversely, contend that public release of the full administrative record "would greatly assist other agencies, the public, and the Tribes in understanding the basis for the Corps' conclusion that the risks and impacts of oil spills were so insignificant that no [Environmental Impact Statement] was necessary." Tribes Opp. at 2. They further argue that the documents "address matters of keen public interest" and that "public scrutiny of the documents, and analysis by independent experts and other agencies, will support [the Tribes'] public advocacy efforts regarding the pipeline." Id. at 11.

Likewise, in opposing the Motion as to the five geographic-response plans and the HDD prevention-and-response plan and consenting only to more limited redactions to the five spill-model discussions, the Corps asserts that, because "the documents in question are part of the Corps' records, there is an interest in making the information publicly available." Corps Opp. at 10.

In weighing these interests, the Court first considers whether, as the movant, Dakota Access has "ma[d]e a specific demonstration of facts in support of [its] request." Alexander, 186 F.R.D. at 75. It certainly did not do so in its first brief. The only evidence proffered therein is a news article recounting comments made in 2014 by the Association of American Railroads and the American Short Line and Regional Railroad Association to the Federal Railroad Administration opposing a federal emergency order that required railroads to share oil-train route and volume data with state emergency-response commissions given their fear that "environmental extremists" and "[f]oreign terrorists" posed risks to "the transportation of crude

oil by rail." ECF No. 92-2 (Blake Sobczak, Rail Executives Feared Terrorists Would Disrupt "Virtual Pipeline", E&E News, Jan. 24, 2017).  As this case concerns the transportation of oil by pipeline in 2017, rather than by rail in 2014, that article can hardly be said to substantiate Dakota Access's assertions of harm from disclosure of the eleven documents.

The Company's Reply is somewhat more helpful in this respect.  It cites an October 2016 news article that describes how climate activists broke through fences, locks, and chains to turn off the valves on five cross-border oil pipelines in an effort to oppose the Dakota Access Pipeline.  See Reply at 11 & n.4 (citing Liz Hampton & Ethan Lou, Bolt Cutters Expose Vulnerability of North America's Oil Pipeline Grid, Reuters, Oct. 12, 2016, http://www.reuters.com/article/us-usa-canada-pipelines-vulnerabilities-idUSKCN12C0BK).  Yet, although pipeline operators and safety experts interviewed for the article noted that shutting off the valves was "extremely dangerous" and risked serious ruptures, the activists apparently did not intend to cause harm to people or the environment.  See Hampton & Lou.  Rather, the protestors claimed to have "spent months studying how to safely shut the valves," even if they ultimately "underestimated the risks."  Id.  Dakota Access, conversely, expresses concern about "terrorists" and individuals with "malicious intent" who would want to use the information in the administrative record to "maximize the harm that they hope to inflict."  Mot. at 3, 10-11.  As the news article cited in the Reply does not concern people with such intent, it does not go directly to the concern animating the Motion.

Fortunately for Dakota Access, the Corps comes to its aid, at least as to the risks presented by disclosure of some of the information in the five spill-model reports.  At the Corps' request, David Lehman, the Director of the Oil Spill Preparedness and Emergency Support Division in the Office of Pipeline Safety at the Pipeline and Hazardous Materials Safety

Administration (PHMSA), a unit within the Department of Transportation, reviewed the documents marked for redaction by Dakota Access.  See ECF No. 146-1 (Declaration of David Lehman, Mar. 1, 2017), ¶¶ 2-4.  Lehman's duties include "identifying information that should be protected from public disclosure for security reasons," id., ¶ 2, and he concluded that the spill-model reports "include[] information that PHMSA would redact from public disclosure under 5 U.S.C. § 552(b)(7)(F), which protects records compiled for law enforcement purposes and that if released, could reasonably be expected to endanger the life or physical safety of any individual."  Id., ¶ 5.  Lehman accordingly identified approximately 50 redactions to the spill-model reports, which are both fewer and more targeted than the ones proposed by Dakota Access.  See ECF No. 148-1 (Corps Redactions).

Lehman's reliance on the Freedom of Information Act's Exemption 7(F) to recommend against full disclosure of the spill-model reports is permissible even though the question whether to release them did not arise in a FOIA action.  Third parties have the right to protect documents with their information from improper disclosure by the government.  See Jurewicz v. U.S. Dep't of Agric., 891 F. Supp. 2d 147, 151 (D.D.C. 2012) ("When an agency decides that no FOIA exemption applies, '[a] person whose information is about to be disclosed pursuant to a FOIA request may file a 'reverse-FOIA action' and seek to enjoin the Government from disclosing it.'") (quoting Canadian Commercial Corp. v. Dep't of Air Force, 514 F.3d 37, 39 (D.C. Cir. 2008)), aff'd, 741 F.3d 1326 (D.C. Cir. 2014); see also Chrysler Corp. v. Brown, 441 U.S. 281, 317-18 (1979) (holding that third parties can challenge under the Administrative Procedure Act agency decisions to disclose records in response to FOIA requests).

The Court thus considers the spill-model documents first and then the ones in the remaining two categories.

9

1.  *Spill-Model Discussions*

The Court has reviewed the five spill-model discussions and the proposed redactions from Dakota Access and PHMSA. Both entities would redact maps of DAPL at certain crossings, the names of pipeline segments when paired with timelines for detecting and shutting down spills, graphs of spill-risk scores at various points along the pipeline, maps of spill scenarios and predictions as to the volume of oil that would be released, the names of systems used to monitor the pipeline for leaks, and methods of communication with those monitoring systems. Compare, e.g., Corps Redactions at 6, 10, 15-17, 19-21 (AR 12402, 12406, 12411-13, 12415-17), with ECF No. 94 (Dakota Access Redactions) at 6, 10, 15-17, 19-21 (AR 12402, 12406, 12411-13, 12415-17). Dakota Access would go further and have the Court conceal the name of the crossing to which each spill-model report corresponds. Compare, e.g., Corps Redactions at 2-22 (AR 12398-418) with Dakota Access Redactions at 2-22 (AR 12398-418).

Based on its review and PHMSA's determination, the Court concludes that there is good cause to protect from public disclosure the information PHMSA redacted from the five spill-model reports. As noted, Lehman determined that this information would be withheld by PHMSA under FOIA Exemption 7(F), which permits an agency to withhold documents that were "compiled for law enforcement purposes" if their release "could reasonably be expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7)(F). That conclusion is consistent with the D.C. Circuit's recognition that, "in Exemption 7(F) cases involving documents relating to critical infrastructure, 'it is not difficult to show that disclosure may endanger the life or physical safety of any individual.'" Pub. Emps. for Envtl. Responsibility v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mexico, 740 F.3d 195, 205-06 (D.C. Cir. 2014) (quoting Milner v. Dep't of Navy, 562 U.S. 562, 582 (2011) (Alito, J., concurring))

(quotation omitted). Indeed, in <u>PEER</u>, the Court of Appeals held that inundation maps that displayed the downstream areas and populations that would be affected if certain dams located on the U.S-Mexico border were to break, the estimated time it would take for floodwater to reach downstream locations, and the peak flow times at those locations were properly withheld under Exemption 7(F). <u>Id.</u> at 200, 206. In so doing, it credited the government's explanation that disclosure of the inundation maps "would give anyone seeking to cause harm the ability to deduce the zones and populations most affected by dam failure," thus enabling "[t]errorists or criminals" to "use that information to determine whether attacking a dam would be worthwhile, which dam would provide the most attractive target, and what the likely effect of a dam break would be." <u>Id.</u> at 206 (quotation omitted). The spill-model discussions in the administrative record here are much like the inundation maps described in <u>PEER</u>.

The Court further concludes that, as to the PHMSA redactions in those five documents, the asserted interest in limiting intentionally inflicted harm outweighs the Tribes' generalized interests in public disclosure and scrutiny, particularly given that all parties in the case will have access to the full, unredacted administrative record for purposes of the summary-judgment litigation.

2. *Geographic-Response Plans and HDD Prevention-and-Response Plan*

The Court, however, does not reach the same outcome as to Dakota Access's proposed redactions to the other six documents. In the geographic-response plans, the Company suggests redacting the phone numbers of local government agencies, including the sheriff, fire department, and levee districts; the names of waterways potentially affected by spills; and maps and descriptions of potential deflection/containment booms. <u>See, e.g.</u>, Dakota Access Redactions at 81-97 (AR 12477-93). In the HDD contingency plan, Dakota Access similarly

11

requests the masking of the name, location, and mile post of each crossing at which HDD services were provided, as well as the length of HDD pipe. Id. at 117 (AR 67858). Lehman saw no reason PHMSA would redact this or any other information from the six documents, see Lehman Decl., ¶ 6, and the Court does not find that they obviously implicate the security concerns Dakota Access raises.

As already noted, Dakota Access offers very little in the way of specific facts to support its argument that terrorists or other individuals with malicious intent might use this information to craft a plan to harm the pipeline in a way that causes the greatest damage. It also does not persuasively respond to the argument from the Corps and the Tribes that much of the information in the proposed redactions is already public. See Corps Opp. at 11; Tribes Opp. at 2. The Company acknowledges that some of the information may be available, but claims that although it "poses no particular danger while standing alone," such information may nonetheless "be valuable to wrongdoers when available to them in conjunction with other information, such as details on how a spill response will be conducted at that location." Mot. at 9 n.7. Such generalities, absent further explanation or factual support, cannot suffice to justify this Court's exercise of its Rule 26(c) authority, particularly where the parties opposing the Motion have asserted reasonable interests in disclosure. See Corps Opp. at 10 (interest in making agency's own record publicly available); Tribes Opp. at 11 (interest in enabling public analysis and debate). For these reasons, the Court believes that Dakota Access has not carried its burden to show good cause for the requested protective order as to the five geographic-response plans and the HDD prevention-and-response plan.

The Court will thus deny the Motion for a Protective Order except as to the approximately 50 redactions to the five spill-model discussions proposed by PHMSA.

**III.	Conclusion**

For the foregoing reasons, the Court will grant the Motion for a Protective Order in part and deny it in part. A contemporaneous Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: April 7, 2017