Document Number: DAPL 002



**GEOGRAPHICAL RESPONSE PLAN**
**PIPELINE CROSSING AT THE MISSOURI RIVER**
**EMMONS COUNTY, NORTH DAKOTA**

**DAKOTA ACCESS, LLC**
**1300 MAIN STREET**
**HOUSTON, TX 77002**

**VERSION 1**
**AUGUST 2015**

## Purpose

The purpose of this Geographical Response Plan (GRP) is to provide tactical response information and migration measures to aid in an effective response in the event of a crude oil release from the Dakota Access Pipeline with the potential to impact the Missouri River near Cannon Ball, North Dakota and Lake Oahe. This GRP is not intended to replace any policies, procedures, and/or response actions as stated in the respective Facility Response Plan.

## Summary

This GRP identifies resources and response measures for an immediate, safe, and effective response to a release of crude oil from the Dakota Access Pipeline with the potential to impact the Missouri River near Cannon Ball, North Dakota. Response measures include, but are not limited to, the deployment of containment boom at predetermined locations and oil collection/recovery activities to prevent further migration of crude oil.

## Notification Overview

In the event of a suspected or confirmed release, the Area Manager/Incident Commander, or their designee, will initiate the following notifications:

| Organization | Contact Number |
|---|---|
| **Dakota Access Personnel** | |
| Senior Manager – Pipeline Operations | TBD |
| Manager – Pipeline Operations | TBD |
| Supervisor – Pipeline Operations | TBD |
| Emergency Response Specialist | TBD |
| Health/Safety Specialist | TBD |
| DOT Compliance Specialist | TBD |
| **Local Government Agencies** | |
| Emmons County Sherriff | 701-254-4411 |
| Emmons County Fire | 701-422-3377 |
| LEPC (Emergency Manager) | 701-254-4807 |
| **Response Contractors/ Contractors** | |
| Safety Kleen | 701-222-8262 |
| Clean Harbors | 701-774-2201 |
| National Response Corporation | 800-899-4672 |

Release notifications to state and federal agencies should be conducted in accordance with the Facility Response Plan and in consultation with the Emergency Response and DOT Compliance Specialists.

**Response and Mitigation Measures**

For releases that impact surface waters and/or drainage features leading to surface water, the following response and mitigation measures may be employed:

- If the release reaches the Missouri River, deploy containment and/or deflection boom as identified on the respective ICS 204 Assignment Lists.
- Product that has been contained may be recovered using appropriate hoses, skimmers, pumps, and storage containers or vacuum trucks at collections areas as identified on the respective ICS 204 Assignment Lists.
- For releases in drainage features leading to surface water, earthen berms should be constructed outside of the impacted area and used to contain the release.
- Drainage crossings for roads or railways can be utilized as collection points using dams or berms.
- Where available, construct underflow dams to contain product in flowing water.
- Provide Frac Tanks in the vicinity of collection areas as identified on the respective ICS 204 Assignment Lists.

For releases to soils only and that have not impacted surface water, the following response and mitigation measures may be employed:

- If there is a threat of rain in the forecast, impacted soils may be pushed into a pile to expose non-impacted soil to the atmosphere or cover impacted area with plastic and have adequate containment and recovery in place in the event of run off.
- If no rain is forecast, containment should be constructed around impacted soils or, at a minimum, down gradient of the impacted soils.
- Spreading of spilled product may be controlled by absorbing liquid with sand, earth, clay, fly ash, cement powder, peat moss, saw dust, straw, commercial sorbents, or other compatible substances.
- Once used, sorbent materials may pose the same hazards as the spilled product
- Remove contained products as soon as possible to prevent the spread of contamination. Use surface dikes or barriers where groundwater contamination is possible or line collection basins with compatible impervious material.

**Plan Contents**

Below is a description of the attached maps and ICS 204 Assignment Lists:

- Aerial overview of the Dakota Access Pipeline Missouri River crossing.
- ICS 204 Assignment List – recommended location of deflection/containment booms in the Missouri River nearest the pipeline crossing.

- ICS 204 Assignment List – recommended location of first collection point nearest the Missouri River pipeline crossing.
- Aerial overview of the recommended location of deflection/containment boom in the Missouri River nearest the pipeline crossing.  Potential driving/access routes are highlighted for reference.
- ICS 204 Assignment List – recommended location of downstream deflection/containment booms in the Missouri River.
- ICS 204 Assignment List – recommended location of downstream collection area in close proximity to the second set of deflection/containment booms.
- Aerial overview of the recommended location for the downstream deflection/containment booms in the Missouri River and associated collection area.  Potential driving/access routes are highlighted for reference.
- ICS 204 Assignment List – recommended location of the farthest downstream deflection/containment booms in the Missouri River.
- ICS 204 Assignment List – recommended location of the farthest downstream collection area in close proximity to the third set of deflection/containment booms.
- Aerial overview of the recommended location for the farthest downstream deflection/containment booms in the Missouri River and associated collection area. Potential driving/access routes are highlighted for reference.

CONFIDENTIAL

Geographical Response Plan Overview - Missouri River - Lake Oahe



| 1. Incident Name | 2. Operational Period (Date/Time) | **Assignment List**<br>**ICS 204-OS** |
|---|---|---|
| 3. Branch | 4. Division/Group<br>Boat Task Force | |

| 5. Operations Personnel | Name | Affiliation | Contact #(s) |
|---|---|---|---|
| Operations Section Chief | | | |
| Branch Director | | | |
| Division/Group Supervisor | | | |

**6. Resources Assigned This Period**       "X" indicates 204a attachment with special instructions

| Resource Identifier | Leader | Contact Info # | # or Persons | Reporting info/Notes/Remarks | |
|---|---|---|---|---|---|
| 1,200' 18" Containment Boom | | | | | ☐ |
| Anchors (20) | | | | | ☐ |
| Buoys (10) | | | | | ☐ |
| 21' Boat (2) | | | | | ☐ |
| Absorbent Pad (5 bundles) | | | | | ☐ |
| Absorbent Boom (1000') | | | | | ☐ |

**7. Assignments**

Deploy deflection and/or containment boom in the Missouri River to aid in product recovery.

**Safety Note:**
Slip, trip and fall hazard.   Proper PPE is required.

| 8. Site # | 9. Closest City | 10. County | 11. Latitude | 12. Longitude |
|---|---|---|---|---|
| 1 | Cannon Ball, ND | Emmons | 46.38841 | -100.580395 |

| 13. Site Information | |
|---|---|
| Missouri River. The booming site is approximately 3 miles downstream of the DAPL Missouri River crossing as indicated by the Lat/Lon above. The river varies in width from 600' to 900' at this location. Numerous sand bars are located between the pipeline crossing and this booming location. | **13. Closest Boat Ramp**<br>46.268117 -100.580239 |
| | **14. Distance From Ramp**<br>8.0 miles |
| | **15. Boat Type**<br>Medium to shallow draft work boats |

| 16. Directions to booming location: | 17. Closest Airport |
|---|---|
| From the pipeline intersection with HWY 1806, proceed south on HWY 1806 for approximately 4.5 miles until arriving to 71st ST. Proceed east on 71st ST for 2 miles until arriving at the intersection with Weasel ST. Proceed east on Weasel ST arriving at the river bank. | Bismarck |
| | **18. Closest Hospital**<br>Linton Hospital |

| 19. Contact Numbers | | 20. Dimension of Dock |
|---|---|---|
| Safety Kleen | 701-222-8262 | 30'X65' |
| Clean Harbors | 701-774-2201 | **21. Water depth** |
| National Response Corporation | 800-899-4672 | |
| Emmons County Sherriff | 701-254-4411 | 7 to 24 feet. |
| Emmons County Fire | 701-422-3377 | |
| LEPC (Emergency Manager) | 701-254-4807 | **23. # of Personnel** |
| | | 8 |

**24. Booming Strategy Recommendation**

    Deploy deflection boom to aid in deflecting product to the collection area on the west side of the Missouri River.



| 29. Prepared By: | 30.Reveiwed by (PSC): | 31. Reviewed by (OSC): | |
|---|---|---|---|
| Assignment List | ICS 204 OS (Geographic Response Plan) | | Project Updated: |

*Response strategies may need to be modified to account for changes due to seasonality, weather conditions, spill characteristics, tides and any other pertinent considerations.*

| 1. Incident Name | 2. Operational Period (Date/Time) | **Assignment List** **ICS 204-OS** |
|---|---|---|

| 3. Branch | 4. Division/Group Shoreline Recovery |
|---|---|

| 5. Operations Personnel | Name | Affiliation | Contact #(s) |
|---|---|---|---|
| Operations Section Chief | | | |
| Branch Director | | | |
| Division/Group Supervisor | | | |

**6. Resources Assigned This Period**                "X" indicates 204a attachment with special instructions

| Resource Identifier | Leader | Contact Info # | # or Persons | Reporting info/Notes/Remarks | |
|---|---|---|---|---|---|
| 70 bbl Vacuum Truck (2) | | | | | ☐ |
| 130 bbl Vacuum Truck | | | | | ☐ |
| Drum Skimmer (3) | | | | | ☐ |
| Frac Tank (2) | | | | | ☐ |
| | | | | | ☐ |
| | | | | | ☐ |

**7. Assignments**

Recover product collected by deflection booms.

**Safety Note:**

Slip, trip and fall hazard.    Proper PPE is required.

| 8. Site # | 9. Closest City | 10. County | 11. Latitude | 12. Longitude |
|---|---|---|---|---|
| 1 | Cannon Ball, ND | Emmons | 46.38841 | -100.580395 |

| 13. Site Information | 13. Closest Boat Ramp |
|---|---|
| The collection site is located on the east side of Cannon Ball, ND off of Weasel St. A field that is adjacent to the river can potentially be used for collection and staging activites. The filed is approximately 300' X 600' in size. | 46.268117  -100.580239 |
| | **14. Distance From Ramp** |
| | 8.0 miles |
| | **15. Boat Type** |
| | Medium to shallow draft work boats |

| 16. Directions to collection  location: | 17. Closest Airport |
|---|---|
| From the pipeline intersection with HWY 1806, proceed south on HWY 1806 for approximately 4.5 miles until arriving to 71st ST. Proceed east on 71st ST for 2 miles until arriving at the intersection with Weasel ST. Proceed east on Weasel ST arriving at the river bank. | Bismarck |
| | **18. Closest Hospital** |
| | Linton Hospital |

| 19. Contact Numbers | | 20. Dimension of Dock |
|---|---|---|
| Safety Kleen | 701-222-8262 | 30'X65' |
| Clean Harbors | 701-774-2201 | **21. Water depth** |
| National Response Corporation | 800-899-4672 | |
| Emmons County Sherriff | 701-254-4411 | 7 to 24 feet. |
| Emmons County Fire | 701-422-3377 | |
| LEPC (Emergency Manager) | 701-254-4807 | **23. # of Personnel** |
| | | 8 |

**24. Strategy Recommendation:**    Use the collection area to recover any product and store collected product in the 130 bbl vacuum truck until frac tanks arrive.



| 29. Prepared By: | 30.Reviewed by (PSC): | 31. Reviewed by (OSC): | |
|---|---|---|---|
| **Assignment List** | **ICS 204 OS (Geographic Response Plan)** | | **Project Updated:** |

*Response strategies may need to be modified to account for changes due to seasonality, weather conditions, spill characteristics, tides and any other pertinent considerations.*

Booming and Collection Site #1



USACE_DAPL0074740

| 1. Incident Name | 2. Operational Period (Date/Time) | Assignment List ICS 204-OS |
|---|---|---|
| 3. Branch | 4. Division/Group Boat Task Force | |

| 5. Operations Personnel | Name | Affiliation | Contact #(s) |
|---|---|---|---|
| Operations Section Chief | | | |
| Branch Director | | | |
| Division/Group Supervisor | | | |

**6. Resources Assigned This Period**  "X" indicates 204a attachment with special instructions

| Resource Identifier | Leader | Contact Info # | # or Persons | Reporting info/Notes/Remarks | |
|---|---|---|---|---|---|
| 1,200' 18" Containment Boom | | | | | ☐ |
| Anchors (20) | | | | | ☐ |
| Buoys (10) | | | | | ☐ |
| 21' Boat (2) | | | | | ☐ |
| Absorbent Pad (5 bundles) | | | | | ☐ |
| Absorbent Boom (1000') | | | | | ☐ |

**7. Assignments**

Deploy deflection and/or containment boom in the Missouri River to aid in product recovery.

**Safety Note:**
 Slip, trip and fall hazard.   Proper PPE is required.

| 8. Site # | 9. Closest City | 10. County | 11. Latitude | 12. Longitude |
|---|---|---|---|---|
| 2 | Emmons, ND | Emmons | 46.27119 | -100.581912 |

**13. Site Information**

Missouri River. The booming site is approximately 11 miles downstream of the DAPL Missouri River crossing as indicated by the Lat/Lon above. The river varies in width from 600' to 900' at this location.

**13. Closest Boat Ramp**
46.268117  -100.580239

**14. Distance From Ramp**
0.2 miles

**15. Boat Type**
Medium to shallow draft work boats

**16. Directions to booming location:**
From the intersection of  HWY 1806 & 80th ST, proceed east on 80th ST for approximately 3.3 miles until arriving at the RV park. Proceed through the RV park for approximately 1.0 mile until the river bank is reached.

**17. Closest Airport**
Bismarck

**18. Closest Hospital**
Linton Hospital

**19. Contact Numbers**

| | |
|---|---|
| Safety Kleen | 701-222-8262 |
| Clean Harbors | 701-774-2201 |
| National Response Corporation | 800-899-4672 |
| Emmons County Sherriff | 701-254-4411 |
| Emmons County Fire | 701-422-3377 |
| LEPC (Emergency Manager) | 701-254-4807 |

**20. Dimension of Dock**
30'X60'

**21. Water depth**

7 to 24 feet.

**23. # of Personnel**
8

**24. Booming Strategy Recommendation**
     Deploy deflection boom to aid in deflecting product to the collection area on the west side of the Missouri River.



| 29. Prepared By: | 30.Reviewed by (PSC): | 31. Reviewed by (OSC): | |
|---|---|---|---|
| **Assignment List** | **ICS 204 OS (Geographic Response Plan)** | | **Project Updated:** |

*Response strategies may need to be modified to account for changes due to seasonality, weather conditions, spill characteristics, tides and any other pertinent considerations.*

| 1. Incident Name | 2. Operational Period (Date/Time) | **Assignment List**<br>**ICS 204-OS** |
|---|---|---|
| 3. Branch | 4. Division/Group<br>Shoreline Recovery | |

| 5. Operations Personnel | Name | Affiliation | Contact #(s) |
|---|---|---|---|
| Operations Section Chief | | | |
| Branch Director | | | |
| Division/Group Supervisor | | | |

**6. Resources Assigned This Period** — "X" indicates 204a attachment with special instructions

| Resource Identifier | Leader | Contact Info # | # or Persons | Reporting info/Notes/Remarks | |
|---|---|---|---|---|---|
| 70 bbl Vacuum Truck (2) | | | | | ☐ |
| 130 bbl Vacuum Truck | | | | | ☐ |
| Drum Skimmer (3) | | | | | ☐ |
| Frac Tank (2) | | | | | ☐ |
| | | | | | ☐ |
| | | | | | ☐ |

**7. Assignments**

Recover product collected by deflection booms.

**Safety Note:**
Slip, trip and fall hazard.    Proper PPE is required.

| 8. Site # | 9. Closest City | 10. County | 11. Latitude | 12. Longitude |
|---|---|---|---|---|
| 2 | Emmons, ND | Emmons | 46.27119 | -100.581912 |

| 13. Site Information | |
|---|---|
| The collection/staging area is located on on the north end of the RV park as indicated by the Lat/Lon above. The identified collection/staging area is a flat area near the shoreline measuring 500' X 1000'. | **13. Closest Boat Ramp**<br>46.268117  -100.580239<br>**14. Distance From Ramp**<br>0.2 miles<br>**15. Boat Type**<br>Medium to shallow draft work boats |

| **16. Directions to collection location:**<br>From the intersection of  HWY 1806 & 80th ST, proceed east on 80th ST for approximatelty 3.3 miles until arriving at the RV park. Proceed through the RV park for approximately 1.0 mile until the river bank is reached. | **17. Closest Airport**<br>Bismarck<br>**18. Closest Hospital**<br>Linton Hospital |
|---|---|

| **19. Contact Numbers** | | **20. Dimension of Dock**<br>30'X60' |
|---|---|---|
| Safety Kleen | 701-222-8262 | **21. Water depth** |
| Clean Harbors | 701-774-2201 | |
| National Response Corporation | 800-899-4672 | |
| Emmons County Sherriff | 701-254-4411 | 7 to 24 feet. |
| Emmons County Fire | 701-422-3377 | |
| LEPC (Emergency Manager) | 701-254-4807 | **23. # of Personnel**<br>8 |

**24. Booming Strategy Recommendation**     Use the collection area to recover any product and store collected product in the 130 bbl vacuum truck until frac tanks arrive.



| 29. Prepared By: | 30.Reviewed by (PSC): | 31. Reviewed by (OSC): |
|---|---|---|
| **Assignment List** | **ICS 204 OS (Geographic Response Plan)** | **Project Updated:** |

*Response strategies may need to be modified to account for changes due to seasonality, weather conditions, spill characteristics, tides and any other pertinent considerations.*

Booming and Collection Site #2



| 1. Incident Name | 2. Operational Period (Date/Time) | **Assignment List**<br>**ICS 204-OS** |
|---|---|---|
| **3. Branch** | **4. Division/Group**<br>Boat Task Force | |

**5. Operations Personnel**

| | Name | Affiliation | Contact #(s) |
|---|---|---|---|
| Operations Section Chief | | | |
| Branch Director | | | |
| Division/Group Supervisor | | | |

**6. Resources Assigned This Period**          "X" indicates 204a attachment with special instructions

| Resource Identifier | Leader | Contact Info # | # or Persons | Reporting info/Notes/Remarks | |
|---|---|---|---|---|---|
| 1,200' 18" Containment Boom | | | | | ☐ |
| Anchors (20) | | | | | ☐ |
| Buoys (10) | | | | | ☐ |
| 21' Boat (2) | | | | | ☐ |
| Absorbent Pad (5 bundles) | | | | | ☐ |
| Absorbent Boom (1000') | | | | | ☐ |

**7. Assignments**

Deploy deflection and/or containment boom in the Missouri River to aid in product recovery.

<span style="color:red">**Safety Note:**</span>
 Slip, trip and fall hazard.    Proper PPE is required.

| 8. Site #<br>3 | 9. Closest City<br>Fort Yates, ND | 10. County<br>Emmons | 11. Latitude<br>46.141563 | 12. Longitude<br>-100.644527 |
|---|---|---|---|---|

| **13. Site Information**<br><br>Missouri River. The booming site is approximately 20 miles downstream of the DAPL Missouri River crossing as indicated by the Lat/Lon above. The river varies in width from 600' to 900' at this location. | **13. Closest Boat Ramp**<br>46.102537  -100.628587 |
|---|---|
| | **14. Distance From Ramp**<br>2.8 miles |
| | **15. Boat Type**<br>Medium to shallow draft work boats |
| **16. Directions to booming location:**<br><br>From the intersection of HYW 1806 &  N. Loans Him Arrow Loop, proceed east along the loop for river bank for 1.5 miles and proceed east onto an un-named road. Proceed until the river is reached. | **17. Closest Airport**<br>Bismarck |
| | **18. Closest Hospital**<br>Linton Hospital |
| **19. Contact Numbers** | **20. Dimension of Dock**<br>20'X50' |
| Safety Kleen                         701-222-8262 | **21. Water depth** |
| Clean Harbors                       701-774-2201 | |
| National Response Corporation   800-899-4672 | 7 to 24 feet. |
| Emmons County Sherriff           701-254-4411 | |
| Emmons County Fire                 701-422-3377 | |
| LEPC (Emergency Manager)       701-254-4807 | **23. # of Personnel**<br>8 |

**24. Booming Strategy Recommendation**

          Deploy deflection boom to aid in deflecting product to the collection area on the west side of the Missouri River.



| 29. Prepared By: | 30.Reveiwed by (PSC): | 31. Reviewed by (OSC): | |
|---|---|---|---|
| **Assignment List** | **ICS 204 OS (Geographic Response Plan)** | | **Project Updated:** |

<span style="color:red">*Response strategies may need to be modified to account for changes due to seasonality, weather conditions, spill characteristics, tides and any other pertinent considerations."</span>

| 1. Incident Name | 2. Operational Period (Date/Time) | Assignment List<br>ICS 204-OS |
|---|---|---|
| 3. Branch | 4. Division/Group<br>Shoreline Recovery | |

| 5. Operations Personnel | Name | Affiliation | Contact #(s) |
|---|---|---|---|
| Operations Section Chief | | | |
| Branch Director | | | |
| Division/Group Supervisor | | | |

**6. Resources Assigned This Period**  "X" indicates 204a attachment with special instructions

| Resource Identifier | Leader | Contact Info  # | # or Persons | Reporting info/Notes/Remarks | |
|---|---|---|---|---|---|
| 70 bbl Vacuum Truck (2) | | | | | ☐ |
| 130 bbl Vacuum Truck | | | | | ☐ |
| Drum Skimmer (3) | | | | | ☐ |
| Frac Tank (2) | | | | | ☐ |
| | | | | | ☐ |
| | | | | | ☐ |

**7. Assignments**

Recover product collected by deflection booms.

**Safety Note:**
Slip, trip and fall hazard.   Proper PPE is required.

| 8. Site #<br>3 | 9. Closest City<br>Fort Yates, ND | 10. County<br>Emmons | 11. Latitude<br>49.139899 | 12. Longitude<br>-100.645703 |
|---|---|---|---|---|

| 13. Site Information<br><br>The collection area is located on the west side of the Missouri River as indicated by the Lat/Lon above. The identified collection area is a flat area near the shoreline. | **13. Closest Boat Ramp**<br>46.102537  -100.628587 |
|---|---|
| | **14. Distance From Ramp**<br>2.8 miles |
| | **15. Boat Type**<br>Medium to shallow draft work boats |
| **16. Directions to collection location:**<br>FFrom the intersection of HYW 1806 & N. Loans Him Arrow Loop, proceed east along the loop for river bank for 1.5 miles and proceed east onto an un-named road. Proceed until the river is reached. | **17. Closest Airport**<br>Bismarck |
| | **18. Closest Hospital**<br>Linton Hospital |
| **19. Contact Numbers**<br>Safety Kleen                                       701-222-8262<br>Clean Harbors                                   701-774-2201<br>National Response Corporation        800-899-4672<br>Emmons County Sherriff                   701-254-4411<br>Emmons County Fire                         701-422-3377<br>LEPC (Emergency Manager)            701-254-4807 | **20. Dimension of Dock**<br>20'X50' |
| | **21. Water depth**<br><br>7 to 24 feet. |
| | **23. # of Personnel**<br>8 |

**24. Booming Strategy Recommendation**    Use the collection area to recover any product and store collected product in the 130 bbl vacuum truck until frac tanks arrive.



| 29. Prepared By: | 30.Reviewed by (PSC): | 31. Reviewed by (OSC): | |
|---|---|---|---|
| **Assignment List** | **ICS 204 OS (Geographic Response Plan)** | | **Project Updated:** |

*Response strategies may need to be modified to account for changes due to seasonality, weather conditions, spill characteristics, tides and any other pertinent considerations.*

Booming and Collection Site #3



USACE_DAPL0074746

**APPENDIX A**

**Stormwater Pollution Prevention Plan**
**And**
**Spill Prevention Control and Countermeasure Plan**

USACE_DAPL0074980

# DAKOTA ACCESS PIPELINE (DAPL) PROJECT NORTH DAKOTA

## Stormwater Pollution Prevention Plan



July 2015

# TABLE OF CONTENTS

1.0   Introduction ........................................................................................................... 1

1.1   Plan Purpose ................................................................................................. 1

1.2   Project Name, Owner/Operator, and Purpose ............................................. 1

1.3   Responsibility for Implementation .............................................................. 1

2.0   Site Description .................................................................................................... 2

2.1   Construction Site Estimates ........................................................................ 2

2.2   Sequence of Major Soil Disturbing Events ................................................. 2

2.3   Soils, Slopes, Vegetation, and Drainage Patterns ...................................... 3

2.4   Receiving Waters ......................................................................................... 3

2.5   Potential Sources of Pollution .................................................................... 3

3.0   Controls ................................................................................................................ 4

3.1   Erosion and Sediment Controls .................................................................. 5

3.1.1   Sediment Barriers .......................................................................... 5

3.1.2   Stabilization Practices ................................................................... 6

3.1.2.1   Upland Areas ................................................................ 6

3.1.2.2   Revegetation and Seeding ............................................ 7

3.1.2.3   Wetland Restoration ..................................................... 8

3.1.2.4   Riparian Areas .............................................................. 8

3.1.2.5   Slope Protection ........................................................... 8

3.1.3   Other Surface Applications .......................................................... 9

3.1.3.1   Mulch ........................................................................... 9

3.1.3.2   Matting/Netting ............................................................ 10

3.2   Stormwater Management ............................................................................. 10

3.3   Other Controls ............................................................................................. 10

3.3.1   Waste Materials ............................................................................. 10

3.3.2   Offsite Vehicle Tracking ............................................................... 11

3.3.3   Dust Control .................................................................................. 11

4.0   Maintenance ......................................................................................................... 12

5.0   Inspections and Records ...................................................................................... 12

5.1   Inspection Schedule .................................................................................... 12

5.2   Required Records ......................................................................................... 13

5.2.1   SWPPP Inspection Form ............................................................... 13

USACE_DAPL0074982

    5.2.2    Corrective Action/Maintenance Log........................................................ 14

6.0    Training.............................................................................................. 14

7.0    SWPPP Certification........................................................................... 14

    7.1    Company's Certification ................................................................... 14

    7.2    Delegation of Authority ................................................................... 15

8.0    Plan Modification.............................................................................. 15

9.0    Records Retention ............................................................................. 15



USACE_DAPL0074983

## LIST OF APPENDICES

| | |
|---|---|
| Appendix A | Best Management Practices Figures |
| Appendix B | Spill Prevention Control and Countermeasures Plan |
| Appendix C | SWPPP Inspection Forms |
| Appendix D | Corrective Action/Maintenance Log |
| Appendix E | SWPPP Revision Record |
| Appendix F | Delegation of Authority Form |
| Appendix G | Notice of Intent to Obtain Coverage (pending) |
| Appendix H | NDPDES Construction General Permit NDR10-0000 |



USACE_DAPL0074984

## 1.0 Introduction

Dakota Access, LLC (COMPANY) will implement this Stormwater Pollution Prevention Plan (SWPPP) during construction of the Dakota Access Pipeline (DAPL) Project (Project) in North Dakota.

## 1.1 Plan Purpose

This SWPPP has been prepared in compliance with the requirements of the North Dakota Pollutant Discharge Elimination System (NDPDES) General Permit for Stormwater Discharges from Construction Activities (Permit Number NDR10-0000). The North Dakota Department of Health (NDDH) authorizes permits to discharge under the NDPDES rules. The primary purpose of the SWPPP is to minimize the impacts of stormwater runoff during Project construction activities through the implementation of Best Management Practices (BMP). The SWPPP shall identify potential sources of pollution associated with construction activity, and to ensure practices are implemented and maintained to reduce the contributions of pollutants in stormwater discharges to waters of the state and storm sewer systems.

## 1.2 Project Name, Owner/Operator, and Purpose

Project Name:        Dakota Access Pipeline (DAPL) Project

Project Owner:       Dakota Access, LLC
                     1300 Main Street
                     Houston, TX 77002

Project Operator:    DAPL-ETCO Operations Management, LLC
                     1300 Main Street
                     Houston, TX 77002

Project Contact:     Mr. Joey Mahmoud
                     Senior Vice President – Engineering
                     Dakota Access, LLC
                     1300 Main Street
                     Houston, TX 77002
                     Telephone: (713) 989-2710

Project Purpose: The COMPANY's primary objective for the proposed Project is to allow for transport of approximately 400,000BPD of crude oil between Stanley, ND and Patoka, IL. The crude oil transported will provide supplemental crude oil supply for markets in the United States. In addition, the proposed project will open railroad transport for other products produced locally that otherwise would not be accessible to other markets.

## 1.3 Responsibility for Implementation

The Environmental Inspectors (EI) are responsible for directing, and inspecting efforts regarding implementation of the SWPPP and will fulfill the responsibilities as described herein. As stated in the construction contract or as otherwise agreed, once selected, the Construction Contractor (Contractor) will be responsible for all or part of the implementation of the SWPPP as described herein. The Contractor is responsible for providing necessary labor and equipment to implement and maintain the BMPs identified in this SWPPP and related plans; conducting workforce training as necessary; and performing and documenting regular inspection, maintenance, and repair of BMPs.

USACE_DAPL0074985

## 2.0 Site Description

The DAPL Project consists of a Supply Line and a Mainline Transmission Pipeline for transmission of crude oil (see Figure 1). The Supply Line commences at Stanley, North Dakota and ends at Johnson Corner, North Dakota. There are six proposed tank facilities along the Supply System, namely Stanley, Ramberg, Epping, Trenton, Watford City, and Johnson Corner. At each tank facility there will also be metering, pumping, and pigging facilities. The Mainline Transmission Pipeline begins at Johnson Corner, North Dakota and ends southeast of the proposed Illinois Patoka Custody Transfer and Metering Station. Once completed, the DAPL will traverse approximately 358 miles in North Dakota, crossing 8 counties.

There will be mainline valve sites on both sides of major water body and major highway crossings and other high consequence areas as necessary for isolation in the event of emergency shutdown. In addition to the mainline valves, three pump stations and one custody transfer metering station will also be installed along the Mainline Transmission Pipeline. Launcher and Receiver traps will also be installed along the Mainline Transmission Pipeline.

### 2.1 Construction Site Estimates

The COMPANY proposes to install the new pipeline within a variable-width construction right-of-way (ROW). Actual workspace width will depend on site engineering and available workspace constraints. In upland areas, the pipeline will be installed using a construction right-of-way varying in width from 75 feet to 150 feet wide depending on soil conditions, vegetation types, and landowner specifications (see Appendix A). In emergent non-saturated wetland areas, the construction ROW width may be reduced to 100 feet (see Appendix A); in saturated and/or forested, and/or scrub shrub wetlands, upland forested areas, or other sensitive areas as conditioned in permits, the construction workspace may be reduced to 85 feet (see Appendix A). Additional temporary workspace will be required to facilitate crossings of other utilities, roads, railways, waterbodies, and wetlands, etc. At all locations, 50 feet of the construction ROW (generally 25 feet on either side of the centerline of the pipeline) will be secured for permanent easement to facilitate pipeline operations, inspection, and integrity management. All pump stations in North Dakota will be located with new tank terminal facilities on the Supply Line. ATWS at these locations will be acquired as necessary. In total, approximately 7,146 acres of workspace would be impacted by construction activities in North Dakota.

### 2.2 Sequence of Major Soil Disturbing Events

Construction of the Project is scheduled to being in early 2016 and is scheduled to be competed in the Fall of 2016. The timing of the construction activities performed by the Contractor and discussed in this section will vary but are estimated to be less than four months in any one area of the ROW, with periods of inactivity between various construction phases. The following represents a typical sequence of major soil-disturbing events during the Project:

- Installation of stabilized construction entrances and surface water (including wetlands) protection BMPs.
- Clearing of the Project ROW area as necessary. This may include clearing of brush and trees to create ROW needed for temporary workspace, soil storage, construction activities, and areas needed for access to particular construction sites within the Project area.
- Topsoil removal and storage.

USACE_DAPL0074986

- Grading of the Project ROW as necessary.  Areas of the ROW, including temporary workspace may be graded to allow the safe passage of equipment and meet the bending limitations of the pipe.
- Installation of additional BMPs for erosion and stormwater management, as needed.
- Pipe stringing, bending, welding, and testing.
- Excavation of ditch (trackhoes or similar equipment will be used to excavate the ditch to the required depth).
- Installation of pipe in ditch.
- Tie-ins of the sections of pipeline which will be welded together in the ditch.
- Backfilling the ditch line (excavated soil will be used to cover the pipe).
- Hydrostatic testing of the pipeline as necessary.
- Removal of temporary erosion/sediment controls when other construction activity is completed and final stabilization is achieved.

## 2.3 Soils, Slopes, Vegetation, and Drainage Patterns

The Project Route traverses varying terrain, from nearly level agricultural land to rugged badlands. Soil textures vary widely depending on location.  Reference the U.S. Department of Agriculture Natural Resources Conservation Service's soil maps and soil survey information for more specific soil information.

Approximately half the soils crossed by the Project have gentle to rolling slopes, between 25 to 30 percent are steep, and greater than 15 percent have average slopes greater than 15 percent.  Natural habitats within the State include prairie, wetlands, riparian areas, woodlands, and badlands. Agricultural lands are a common type of land cover along the DAPL Project route and encompass crops that include wheat (e.g., winter, Durham, and spring), corn, soy beans, sunflowers, flaxseed, alfalfa, and canola.

The construction of the pipeline will not alter surface drainage patterns. Streams, swales, ditches, and other natural drains will be restored to pre-construction contours after construction is complete. The pipe will be installed to depths that will not interfere with flow or future maintenance efforts by landowners or the drainage authority.

## 2.4 Receiving Waters

The Project crosses various ditches, streams, rivers and wetlands.  A comprehensive wetland and waterbody delineation survey has been conducted along the entire Project route and the location of delineated wetlands and waterbodies are indicated on the construction drawings.

Waterbodies crossed by the project, including drainage ditches and conveyance systems, will be inspected for evidence of sediment deposition by erosion.  If sediment deposits are found within surface waterbodies, the Contractor will remove sediment and stabilize the area no less than 7 calendar days after the discovery unless precluded by legal, regulatory or physical access constraints.  If precluded, all reasonable efforts will be made to obtain access and removal and stabilization shall take place within 7 calendar days after access is secured.

## 2.5 Potential Sources of Pollution

Potential pollutants sources expected to be encountered during construction are identified below. Dakota Access will implement BMPs described in this document to avoid or control these potential pollutants during all phases of construction.

USACE_DAPL0074987

- <u>Soils</u>:  The primary pollutant sources are disturbed soils within the work areas and unpaved roads that could potentially result in increased sedimentation during rain events.
- <u>Petroleum Products</u>:  Petroleum products necessary to operate, fuel, and maintain construction equipment is a potential pollutant common to all constructions projects.  See Section 3.3.1 of this document for more detail regarding management practices that will be followed for potential hazardous and petroleum-based pollutants.
- <u>Dust</u>:  Fugitive dust or particulate matter discharged into the atmosphere due to construction activity is a potential source of pollution for the Project.  Section 3.3.3 provides details on management practices for controlling dust pollution.
- <u>Wastes</u>:  Waste generated on the ROW and in other work areas includes human waste, food-related wastes, litter, lumber, metal shavings, rope, etc.  All waste generated by the Contractor will be collected and properly disposed of on a routine bases.  See Section 3.3.1 for a more detailed discretion on Waste management practices.

## 3.0 Controls

This section describes controls used to prevent or control stormwater pollution.  The COMPANY BMPs are based on the current best accepted practices endorsed by the American Gas Association, Gas Research Institute, Association of Pipeline Contractors, EPA, and USACE. Appendix A contains diagrams showing typical installation of BMPs.

The Project's EI is responsible for ensuring the Contractor conducts all activities in accordance with the SWPPP.  The EI will coordinate with the Contractor regarding the scheduling, typeand placement of BMPs. The appropriate locations, spacing, and type of BMP installation will be determined in the field based on site conditions, including seasonal conditions, soil types, anticipated precipitation events, topography, etc.  As such the location of BMPs will continually change as construction progresses and are not shown on the Project maps.  BMP typicals are provided in Appendix A.   The Contractor will stabilized disturbed portions of the site as soon as possible with appropriate BMPs, but in no case more than 14 days after construction activity has temporarily or permanently ceased on any portion of the site.

The following represents a typical sequence of major soil-disturbing events during the Project and the control measures that will be implemented.

- Clearing of the Project area as necessary.  This may include clearing of brush and trees in the ROW, in areas adjacent to the ROW needed for soil storage, and/or in areas needed for access to particular construction sites within the Project area.  Under the direction of the EI, the Contractor will implement such measures as temporary slope breakers, silt fencing, and hay/straw bales prior to any soil-disturbing activities, and will install additional BMPs for erosion and stormwater management, as needed based on existing site conditions.
- Topsoil Removal and Storage.  To minimize potential impacts on soil productivity, topsoil will be segregated during trench excavation in agricultural land, unsaturated wetlands, and if applicable, other areas where soil productivity is an important consideration.  Unless otherwise requested by the landowner, topsoil will be removed to a maximum depth of 12 inches from the trench and spoil storage area and stored separately from the trench spoil in accordance with figures provided in Appendix A.  After the trench is backfilled, topsoil will be returned to its approximate original location in the soil horizon.
- Grading of the Project area as necessary.  Grading of the ROW may be necessary in areas where a level or tiered workspace is required to facilitate a safe working environment.

USACE_DAPL0074988

Areas where grading occurs will be undertaken with the understanding that original contours and drainage patterns shall be re-established to the extent practicable following construction. On steep slopes, or wherever erosion potential is high, temporary erosion control measures such as temporary slope breakers, silt fencing, and hay/straw bales will be implemented by the Contractor. Additional BMPs for erosion and stormwater management will be installed as needed based on existing site conditions.

- Excavation of ditch (trackhoes or similar equipment will be used to excavate the ditch to the required depth). The Contractor will implement such measures as temporary slope breakers, silt fencing, and hay/straw bales prior to excavation activities, and will install additional BMPs for erosion and stormwater management, as needed based on existing site conditions.
- Backfilling the ditch line (excavated soil will be used to cover the pipe). The Contractor will implement such measures as temporary slope breakers, silt fencing, and hay/straw bales prior to backfilling, and will install additional BMPs for erosion and stormwater management, as needed based on existing site conditions.
- Performing cleanup and stabilization. This phase will begin after backfilling and will continue throughout the remainder of the Project's construction. This phase will include minor grading to level small areas, and revegetation. Project areas to be stabilized by vegetation will be seeded and mulched.
- The Contractor will remove temporary erosion/sediment controls when other construction activity is completed and final stabilization is achieved.

## 3.1 Erosion and Sediment Controls

Dakota Access will use Industry Best Management Practices to prevent or control stormwater pollution. BMPs were designed and selected to meet the following goals and objectives during implementation:

- The construction phase erosion and sediment controls are designed to retain sediment on-site to the greatest extent practicable.
- Control measures must be properly selected, installed, and maintained in accordance with the manufacturer's specifications and good engineering practices.
- If sediment escapes the Project area, off-site accumulations of sediment must be removed at a frequency sufficient to minimize off-site impact (e.g., fugitive sediment in street could be washed into storm sewers by the next rain and/or pose a safety hazard to users of public streets).

### 3.1.1 Sediment Barriers

Sediment barriers will consist of silt fence, hay/straw bales, or other appropriate materials. Sediment barriers will be installed in accordance with figures provided in Appendix A and as necessary to prevent erosion and sediment laden runoff from stormwater discharges. These measures will remain in place until permanent revegetation measures have been judged successful. Silt fence and hay bale structures will also be used to control erosion and sedimentation for hydrostatic test water discharges.

Both silt fences and hay/straw bales will be installed according to the manufacturer's instructions where site conditions allow. Otherwise, the silt fence will be imbedded in the ground a minimum of 6 inches. Where two sections are joined, they will be overlapped a minimum of 6 inches. Accumulated sediment will be removed regularly and the silt fencing inspected to ensure the

USACE_DAPL0074989

bottom of the silt fence remains imbedded in the ground.  A sufficient stockpile of silt fence will be maintained on-site for emergency use.

These barriers are required after the initial disturbance of the soil and are typically installed at the following locations:

- At the outlet of a temporary slope breaker when vegetation is not enough to control erosion.
- Along banks of waterbodies between the graded ROW and the waterbody after clearing.
- Downslope of any stockpiled soil in the vicinity of waterbodies and wetlands.
- At the base of slopes adjacent to road crossings where vegetation has been disturbed.
- At sideslope and downslope boundaries of the construction where runoff is not otherwise directed by temporary slope breakers.
- In the ROW at boundaries between wetlands and adjacent disturbed upland areas to prevent flow of sediment into the wetland where runoff is not otherwise directed by a temporary slope breaker.
- At the edge of the ROW to prevent siltation of ponds, wetlands, or other waterbodies adjacent to the downslope of the ROW or as necessary to contain spoil and sediment within the ROW.
- For hydrostatic test water discharges, the water should be released directly into the silt fence/hay bale structures in conjunction with other approved velocity dissipating devices.

### 3.1.2 Stabilization Practices

The stabilization measures of the pipeline ROW incorporate permanent erosion and sedimentation measures.  However, in the event that final restoration cannot be implemented immediately post-construction, temporary erosion and sedimentation control measures will be employed as specified by the EI until the weather is suitable for final cleanup.

#### 3.1.2.1   Upland Areas

Temporary Stabilization:

- Temporary stabilization measures will be initiated as soon as practicable in portions of the ROW where construction activities have temporarily or permanently ceased and will not resume for a period exceeding 14 calendar days.  Stabilization will be completed as soon as practical, but no later than 14 calendar days after initiation of the soil stabilization. Where the initiation of stabilization measures by the 14th day is precluded by weather, stabilization measures will be initiated as soon as machinery is able to access the ROW.
- For slopes with a grade of 3:1 or greater, stabilization will be initiated immediately once activities have been completed or temporarily ceased.  In these areas, stabilization will be completed as soon as practicable but no later than 7 calendar days after the initiation of soil stabilization.
- In the event that construction is completed more than 30 days before the seeding season for perennial vegetation, areas adjacent to waterbodies will be mulched with 3 tons/acre of straw, or its equivalent, to a minimum of 100 feet on either side of the waterbody.  With landowner permission, a temporary seed mix or cover crop may be applied when the native/preferred seed mix cannot be planted until the next growing season. Recommendations for cover crop seeding can be found in Section 9.3 of this plan.

USACE_DAPL0074990

- Temporary sediment barriers may be removed from an area when that area is successfully revegetated (i.e., if the ROW surface condition is similar to adjacent undisturbed lands) or if is replaced with a permanent sediment barrier.

Permanent Stabilization:

- Erosion and sedimentation control practices (installation of structures, revegetation, and maintenance practices) will be implemented to minimize the potential for soil erosion or sedimentation of streams and to restore the ROW and any other disturbed areas. Final grading will be as soon as possible after backfilling of the trench (including the installation of permanent erosion control measures in the areas of steep slopes only), weather permitting.
- The ROW on off-road sections will be graded to preconstruction contours, as practical, with a small crown of soil left over the ditch to compensate for settling, as approved by the EI. Openings will be left in the completed crown to restore lateral surface drainage to preconstruction patterns.
- Where topsoil has been segregated, the topsoil will be spread back along the ROW in an even layer.
- Fences that were cut and replaced by gaps during construction will be repaired to at least their equivalent state during preconstruction activities.
- Permanent slope breakers will be constructed after final grading and prior to seeding in accordance with the applicable regulations to replace temporary barriers at pedestrian, trail, road, waterbody, and wetland crossings.

### 3.1.2.2  Revegetation and Seeding

Revegetation and Seeding of the ROW will be accomplished as follows unless otherwise instructed by applicable permits or land managing agency requirements:

- The ROW will be seeded after final grading in accordance with NRCS recommended seed mixes and seeding dates, weather and soil conditions permitting. Slopes steeper than 3:1 will be seeded immediately after final grading in accordance with recommended seeding dates, weather permitting.
- If seeding cannot be done soon after final grading, temporary erosion and sediment controls will be used and seeding of permanent cover may be postponed to the beginning of the next seeding season. Meanwhile, temporary stabilization measures (such as cover crop planting or mulching) will be implemented as appropriate.
- Only certified, weed-free, seed will be used for reseeding. Seed will be purchased in accordance with the Pure Live Seed (PLS) specifications for seed mixes and used within 12 months of testing.
- The seedbed will be prepared to a depth of 3 to 4 inches using appropriate equipment to provide a firm, smooth seedbed that is free of debris. Where broadcast or hydro seeding is to be done, the seedbed will be prepared as necessary to ensure sites for seeds to lodge and germinate.
- The seed will be uniformly applied and covered 0.5 to 1 inch deep, depending on seed size and as recommended by the NRCS or required by applicable land managing agencies. A seed drill equipped with cultipacker is preferred, but broadcast or hydro seeding can be used at double the recommended seeding rates. Where broadcast seeding is used, the seedbed will be firmed with a cultipacker, roller, or similar method after seeding.

USACE_DAPL0074991

- Other alternative seed mixes specifically requested by the landowner or land-managing agency may be used.
- Areas that are seeded after the recommended seeding date may be mulched if permitted.
- Turf, ornamental shrubs, and other landscaping materials will be restored in accordance with landowner agreements. Selection is based on adaptation of plants to the soils and climate, ease of establishment, suitability for specific use, longevity or ability to re-seed, maintenance required, aesthetic values, and landowner agreement. Personnel familiar with local horticultural and turf establishment practices must perform the restoration work.
- In general, soil additives or amendments (specifically fertilizing) are not recommended to establish native seed mixes as they can enhance exotic grasses and annual weed growth, thereby reducing the chances of success. Should potentially problematic soil characteristics be identified during pre-construction surveys or during post-construction restoration activities, soils will be assessed for nutrient balance and soil nutrient amendments will be applied as needed to meet specific restoration objectives. In areas of improved pasture or active agricultural, Dakota Access will work with landowners to achieve their specific revegetation goals, which may require soil amendments. No amendments will be utilized in wetlands and/or other sensitive environmental features without the express recommendation of resource agencies.

### 3.1.2.3 Wetland Restoration

COMPANY's approach to wetland mitigation and restoration involves a combination of impact minimization during construction, substrate and hydrology restoration, and vegetation establishment involving successful natural processes as a key component.

- The construction workspace for the Project will be been designed to limit impacts to wetlands.
- During the restoration phase, segregated topsoil will be replaced over the trenchline and wetland contours and drainage patterns will be restored to approximate original condition. Surface rocks and boulders that had been windrowed during the construction phase will be distributed in a natural pre-construction configuration in the temporary work areas. Following restoration of the substrate, wetlands will be allowed to revegetated naturally or seeded as directed by regulatory agencies.

### 3.1.2.4 Riparian Areas

Riparian areas are defined as "on or pertaining to the bank of a natural course of water" (stream, pond, lake, or wetland). The EPA defines "riparian areas" as areas adjacent to streams and lakes where the high water table creates distinct soil and vegetative characteristics from the adjacent uplands.

- Following installation of the pipeline, stream banks and riparian areas will be re-contoured and stabilized. Banks will typically be stabilized with an herbaceous mixture and erosion control fabric such as jute netting. Rock riprap may be used to stabilize particularly erosive or unstable areas at the recommendation/approval of the state agencies and by the USACE.

### 3.1.2.5 Slope Protection

The duration of exposed soils on steep slopes (those which are 15 percent or greater in grade) will be minimized to the extent possible. For slopes with a grade of 3:1 or greater, stabilization must be initiated immediately once activities have been completed or temporarily ceased. Stabilization

USACE_DAPL0074992

must be completed as soon as practicable, but no later than seven (7) calendar days after the initiation of soil stabilization.

For pipeline construction in areas with sloping terrain, COMPANY will use permanent trench plugs for soil stabilization in accordance with the specifications on the typicals attached in Appendix A.

<u>Temporary and Permanent Slope Breakers</u>

Temporary and permanent slope breakers (water bars/terraces) will be installed as necessary (at the EI's discretion) diagonally across the ROW on slopes to control erosion by reducing and shortening the velocity, length and concentration of runoff according to the figures provided in Appendix A.  These breakers will divert water to a well-vegetated area.  If a vegetated area is not available, erosion control barriers will be installed to filter the runoff at the outlet of the slope breakers and off of the construction ROW.  Silt fence, hay/straw bales, or sandbags may be used in place of temporary slope breakers at the discretion of the EI.

Temporary slope breakers may be installed on slopes greater than 5 percent where the base of the slope is less than 50 feet from waterbody, wetland, or road crossings at the following spacing:

| Slope Percent | Spacing (feet) |
|---|---|
| 5 – 15 | 300 |
| >15 – 30 | 200 |
| >30 | 100 or as necessary |

Spacing for permanent slope breakers will typically be the same as those for temporary slope breakers, however, land use and landowner specifications may alter the configuration and spacing.  Slope breaker spacing may also be modified to correspond with slope breakers from adjacent facilities.

### 3.1.3 Other Surface Applications

Other surface applications will be applied as outlined below unless otherwise instructed by applicable permits or land managing agency requirements:

#### 3.1.3.1   Mulch

Mulch (weed-free straw, wood fiber hydromulch, or a functional equivalent) will be applied to disturbed areas during restoration and seeding (except for actively cultivated land and wetlands) if requested by the landowner or land managing agency, if specified by the applicable permits or licenses, or deemed appropriate by the Contractor.  Mulch is a suitable control measure in combination with other restoration techniques on: slopes greater than 5 percent; dry, sandy areas that can blow or wash away (EI decision).

Mulch will be free of noxious weeds as listed in applicable state laws.  Sources will be approved by Dakota Access prior to purchase.

When applied, mulch will be applied at a minimum rate of 2 tons per acre to cover at least 75 percent of the ground surface.  If mulch is to be applied before seeding, the rate shall be increased to 3 tons per acre on slopes within 100 feet of waterbodies and wetlands unless otherwise stipulated

USACE_DAPL0074993

by permit conditions.  Mulch may be uniformly distributed by a mechanical mulch blower or by hand.  Mulch will be anchored/crimped using a mulch-anchoring tool, disc set in the straight position to minimize loss by wind and water as site conditions allow or other acceptable means to achieve the desired cover.

### 3.1.3.2   Matting/Netting

Matting or netting consists of jute, wood excelsior, or similar materials, and will be installed by the Contractor to anchor mulch and stabilize the surface of the soil during the critical period of vegetative establishment, where directed by the EI.

Matting or netting will be applied to critical, sensitive areas (e.g., steep slopes, banks of waterbodies, bar ditches) as specified by the EI.  On waterbody banks, the matting or netting will be installed at the time of the final bank re-contouring.  In the event that erosion control fabric is not readily available, the Contractor will temporarily use mulch anchored via crimping (or some other means) or hydromulch until the erosion control fabric material becomes available. Matting or netting will be anchored with pegs or staples as recommended by the manufacturer.

## 3.2 Stormwater Management

Stormwater management will be conducted through stormwater flow attenuation, velocity dissipation devices, and water filtration.  COMPANY's construction procedures describe the criteria for placement and use of stormwater control methods/devices.  The EI will have the authority to determine the location of these controls.

When water accumulates in the trench or other areas within the workspace (via groundwater infiltration or precipitation), it will be dewatered using pump(s) or well pointing.  The water will be discharged to an upland area, utilizing the appropriate sediment filtration/energy dissipation device, within or adjacent to the approved workspace (see Appendix A).  Discharges devices will designed to minimize the release of sediment and the potential for erosion.  Adequate BMPs will be installed where necessary to minimize erosion due to the discharge.  Dewatering devices will typically be located on the edge of the construction ROW in a well vegetated area.

Dewatering activities shall be inspected daily by construction personnel.  The inspection will include the dewatering site, areas where BMPs are being implemented and the discharge location. A record shall be maintained to document the inspections of the dewatering operations and actions taken to correct any problems that may be identified.  See Section 5.0 for additional details on requirements for inspection documentation.

## 3.3 Other Controls

### 3.3.1 Waste Materials

The Contractor will properly handle, store and dispose of all solid and hazardous materials and wastes that are used or generated by the Contractor as a result of the Project.  The Contractor will determine if the materials and wastes associated with the Project classify as hazardous materials and/or wastes in accordance with applicable federal and/or state criteria.  Upon request by Dakota Access, the Contractor will provide documentation to substantiate findings of the regulatory status of materials and/or wastes used and/or generated as a result of the Project.

- Trash, litter, and debris will be collected for off-site disposal; it will not be discarded along the ROW.  Refuse will be disposed of according to state and local regulations.

USACE_DAPL0074994

- Solid waste that contains (or at any time contained) oil, grease, solvents, or other petroleum products, falls within the scope of the oil and hazardous substances control, cleanup, and disposal procedures of COMPANY's Spill Prevention Control and Countermeasures (SPCC) plan.  This material shall be segregated for handling and disposal as hazardous waste under the provisions of the plan.  If a Contractor generates a hazardous waste from materials they have brought on-site (e.g., paint clean-up solvents, waste paints, etc.), then the Contractor is responsible for proper waste collection, storage and disposal in accordance with all applicable regulations.  The Contractor remains responsible for the proper handling, storage and disposal of the hazardous waste.  Any release of the hazardous waste as a result of the improper handling, storage or disposal by the Contractor in this instance is the responsibility of the Contractor to rectify to the satisfaction of Dakota Access and all applicable regulatory agencies
- Concrete washout wastewater shall be contained in a leak-proof container or leak-proof pit and will not be discharged into waterbodies, storm sewer systems, or curb and gutter systems.  Containers must be designed and maintained so that overflows cannot occur due to inadequate sizing, precipitation events or snowmelt.
- If herbicides or pesticides are to be used for vegetation maintenance, the applications of those substances will be in accordance with applicable landowner and land management or state agency specifications.  COMPANY will not use herbicides or pesticides in or within 100 feet of any waterbody except as specified by the appropriate land management or state agency.

### 3.3.2 Offsite Vehicle Tracking

Construction site egress locations must be inspected for evidence of sediment being tracked offsite by vehicles ore equipment onto paved surfaces.  Accumulation of tracked and deposited sediment will be by the Contractor from all off-site paved surfaces by the end of the work day, shift or if applicable, within a shorter time specified by local authorities or the department.

- A stabilized construction entrance will be used, if appropriate, to reduce vehicle tracking of soil and sediments.  Access to the ROW will normally be from existing public roads.  Attempts will be made to locate roadway crossings/access points to ensure that safe and accessible conditions exist throughout the construction phase.  Use of 25-foot-long crushed stone access pads, sweeping, culvert installation, matting, and other forms of rutting protection may be used subject to local permit conditions.  Periodic sweeping and scraping will remove sediment tracked onto public roads.  If crushed stone access pads are used in active agricultural areas, the stone will be placed on a synthetic fabric to facilitate later removal.
- The stabilized construction entrances will be installed before clearing and grading. Once other construction activities permanently cease in an area, that area will be stabilized by reseeding and/or mulching as needed.  Once revegetation has been judged successful, temporary erosion/sediment control structures will be removed.

### 3.3.3 Dust Control

Dust control activities will occur throughout the project area, as needed to minimize impacts from dust generated by construction equipment and traffic across exposed soils.  These activities will be performed using primarily water spraying trucks in construction work areas and on access roads.

USACE_DAPL0074995

## 4.0 Maintenance

Erosion and sediment control measures and other protective measures identified in this SWPPP must be maintained in effective operating condition. If site inspections required by Section 5.0 of this SWPPP identify erosion control devices that are not operating properly, maintenance shall be performed by the Contractor within 24 hours, or before the next anticipated storm event (whichever is soonest) to maintain the continued effectiveness of erosion controls. If maintenance prior to the next anticipated storm event is impractical, maintenance must be scheduled and accomplished as soon as practicable. Temporary sediment barriers will remain in place until permanent revegetation measures have been judged successful.

Sediment must be removed from all control devices similar to, and including silt fence, or fiber rolls when sediments approaches ½ the height of the device and within 24 hours of discovery, or as soon as field conditions allow access. Drainage and removal from sediment basins must be completed when the depth of the sediment reaches ½ the storage volume and within 72 hours of discovery, or as soon as field conditions allow access.

Maintenance activities will be recorded in the Corrective Action/Maintenance Log (Appendix D) as described in Section 5.2.2.

## 5.0 Inspections and Records

The Project area will be inspected regularly by the EI staff to ensure that environmental protection measures are correctly installed and properly maintained. Inspection will include all areas of the Project area that are exposed to precipitation. Sedimentation and erosion measures identified in this plan must be inspected to ensure they are functioning properly. Discharge locations will be inspected to determine if erosion control measures are effective. Locations where vehicles and equipment access the Project area must be inspected for evidence of off-site sediment tracking. Based on inspection results, the pollution prevention measures described in this plan will be revised to address inadequacies that are discovered.

### 5.1 Inspection Schedule

Inspections shall be performed by the EI in all disturbed areas of the Project that have not been finally stabilized (including areas used for storage of materials that are exposed to precipitation, staging areas, temporary contractor yards, access roads, structural control measures and locations where vehicles enter or exit the site). Inspections shall be conducted as follows:

- Inspection shall occur at least once every 14 calendar days and within 24 hours after any storm event of greater than 0.25 inches of rain per 24–hour period. On-site rain gauges or the nearest National Weather Service precipitation gauge stations will be used to quantify storm events.
- In addition to inspection of disturbed areas, all dewatering activities shall be inspected daily. The inspection must include the dewatering site, areas where BMPs are being implemented and the discharge location. Documentation of dewatering inspections and actions taken to correct any problems that may be identified will be included in the inspection records.

The frequency of inspections may be reduced if:

USACE_DAPL0074996

- Adverse conditions, such as flooding, high winds, tornadoes, electrical storms, or site access constraints, etc. prohibit inspections.  Once site access becomes available, inspections would resume and a description of why the inspections where temporarily suspended will be included in the next inspection report.
- Runoff is unlikely due to winter conditions (e.g., site is covered with snow, ice or the ground is frozen).  Required inspections and maintenance will resume as soon as runoff occurs or the ground begins to thaw at the site.  The inspection records will include freeze/thaw and runoff dates if inspections are suspended.
- Completed areas that have been stabilized but do not meet the vegetative cover criteria for final stabilization may be inspected once per month.

Inspections will continue until final stabilization is achieved.  Final stabilization is accomplished when:

- all soil disturbing activities at the site have been completed and all soils are stabilized by a uniform perennial vegetative cover with a density of at least70 percent of the pre-existing cover over the entire pervious surface area; or
- in areas of the state receiving less than 20 inches of rain on average annually, permanent or degradable erosion control measures (e.g., rolled erosion control product) and stabilization methods are selected, designed, and installed along with an appropriate seed base to provide erosion control for at least three years and achieve at least 70 percent of the pre-existing vegetative cover within three (3) years without active maintenance; and
- all drainage ditches, constructed to drain water from the site after construction is complete are stabilized to preclude erosion;
- all temporary erosion prevention and sediment controls BMPs must be removed as part of the site final stabilization; and
- all sediment has been removed from conveyances and temporary sedimentation basins that will be used as permanent water quality management basins.

Once final stabilization has been achieved on portions of the ROW, all activity under this plan, including inspections, will cease for those areas and a Notice of Termination (NOT) would be filed with the NDDH.  Areas considered to have achieved final stabilization will be documented in the SWPPP records (Appendix C).  The above description of final stabilization achievement is consistent with the characterization of final stabilization in the NDDH General Permit for Stormwater Discharges.  However, Dakota Access will strive to exceed the NDDH requirements and achieve 80 percent vegetative cover.

**5.2 Required Records**

**5.2.1 SWPPP Inspection Form**

An inspection report for each inspection will be completed by the Contractor and provided to the EI for all inspections conducted during construction.  A Site Inspection Form is contained within Appendix C and includes:

- Date and time of inspections;
- Name of person(s) conducting inspections;
- Findings of inspections, including recommendations and schedule for corrective actions;
- The date when an area is stabilized, temporarily or permanently;
- The date when construction activities cease in an area, temporarily or permanently;

USACE_DAPL0074997

- The dates when major grading activities occur in a particular area;
- Date and amount of all rainfall events greater than 0.25 inches in 24 hours; and
- Documentation that the SWPPP has been amended when changes are made to the BMPs in response to inspections.

### 5.2.2 Corrective Action/Maintenance Log

In addition to inspection reports a corrective action or maintenance log will be kept to document activities performed based on inspection reports.  The Corrective Action/Maintenance Log (Appendix D) will be maintained with this Plan and will include:

- BMP corrected and corrective actions taken;
- Date and time of corrective action; and
- Name of person(s) performing corrective actions.

## 6.0 Training

Prior to construction, all Project personnel will be trained on environmental permit requirements and environmental construction procedures described in this plan including correct design, installation, function, maintenance and removal of BMPs.  Upon receiving training, onsite personnel will sign an acknowledgment of having a working understanding of the purpose of the SWPPP and that they are committed to implementing stormwater management procedures during construction.  Training will be provided annually at a minimum and as new employees or responsible parties are hired on.  As directed by Dakota Access, supplemental training courses may be required to ensure compliance with the SWPPP and applicable regulatory permit requirements.  EI staff and Contractor personnel responsible for performing site inspections will receive additional training and must demonstrate an understanding of what, when and how to properly record inspections described in this plan.

## 7.0 SWPPP Certification

### 7.1 Company's Certification

Dakota Access has prepared this SWPPP in compliance with the requirements of the North Dakota Pollutant Discharge Elimination System (NDPDES) General Permit for Discharges for Large and Small Construction Activities (Permit Number NDR 10-1000) as administered by the NDDH. Dakota Access is responsible for implementing the provisions of this operations control over the construction plans and specifications.

**Owner:**

**Dakota Access, LLC**
**1300 Main Street**
**Houston, TX 77002**

I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted.  Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate,

USACE_DAPL0074998

and complete.  I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

Signed: _____     Date:_____

Print Name: _____

Title: _____

Company: _____

## 7.2 Delegation of Authority

Dakota Access will own and operate the pipeline, however, construction of the pipeline and associated facilities will be performed by independent Contractors and inspectors hired by Dakota Access.   These Contractors and inspectors will have day-to-day responsibility to ensure compliance with this SWPPP.   Dakota Access grants authority to the named parties on the Delegation of Authority Form (Appendix F) to act on its behalf on all matters pertaining to this SWPPP.  The signed Delegation of Authority Form(s) shall be kept with this SWPPP at all times.

## 8.0 Plan Modification

This plan may need to be modified and/or updated based on information and experience gathered during actual construction activities (e.g., include or modify BMPs designed to correct problems, etc.).  If changes to the design, construction, or maintenance that can have significant effect on the potential for discharging pollutants in stormwater at a site occur, this plan should be modified accordingly.  In addition, if the plan proves to be ineffective in controlling pollutants, meeting regulatory requirements or providing adequate protection to resources, any necessary modifications to the application of the practices presented in this plan will be made.  SWPPP modifications and dates of the modifications shall be recorded on the SWPPP Revision Record found in Appendix E.

## 9.0 Records Retention

The EIs will attach Site Inspection Forms (Appendix B-1) and update the Corrective Action/Maintenance Log in Appendix D of this plan.  The most current version of the SWPPP will be maintained in a readily available location.  Electronic copies of SWPPP records are acceptable if the records can be accessed on-site.  Prior to the onset of construction, a copy of the completed and signed Notice of Intent (NOI) and a copy of the NPDES General Permit for Stormwater Discharges (NDR10-0000) will be included as Appendices B-6 and B-7 respectively.   A NOT will be filed with the NDDH once final stabilization is achieved and kept with the SWPPP records.  All records will be retained as part of the SWPPP for at least three years from the date the Project area is considered finally stabilized and the NOT is filed.

USACE_DAPL0074999

# APPENDIX A

# BEST MANAGEMENT PRACTICES FIGURES



**TYPICAL BORED CROSSINGS CONTROL DETAILS**

SILT FENCE OR SUITABLE RETAINING BERM

DITCH

SPOIL PILE

ROAD BORE

LIMITS OF WORKSPACE

PITS FOR BORING AND RECEIVING. SEE SPECIFIC ROAD CROSSING PLAN AND PROFILE FOR DETAILS AND LOCATIONS

ROADWAY

EXCAVATION

PIPELINE DITCH

SILT FENCE (AS REQUIRED) TO PREVENT SILTATION ON ROAD OR ROAD DITCH

FLUME PIPE

15' ±

25' ±

ACCESS RAMP FOR ENTRANCE & EXIT OR EQUIPMENT & VEHICLES

THIS DOCUMENT IS ISSUED FOR INTERIM REVIEW AND IS NOT TO BE USED FOR CONSTRUCTION, BIDDING, OR PERMITTING PURPOSES.

NOTES:
1. SEE DRAWING FOR EQUIPMENT CROSSING DETAILS.
2. SEE ALIGNMENT SHEETS FOR EXTRA WORKSPACE REQUIREMENTS FOR EACH SPECIFIC ROAD.

**DAPL/ETCOP**

**TYPICAL BORED CROSSING CONTROL DETAILS**

| REV. | DATE | BY | DESCRIPTION | CHK. |
|------|------|-----|-------------|------|
| A | 08/14 | DAH | ISSUED FOR REVIEW | |

PROJECT NO. 10395700

| | | |
|---|---|---|
| DRAWN BY: DAH | DATE: 08/05/14 | DWG. NO. |
| CHECKED BY: DAH | DATE: 08/05/14 | **P12-1** |
| SCALE: N.T.S. | APP.: | |

REV. **A**

USACE_DAPL0075001



CHANNEL

STRAW BALE AND/OR SILT FENCE

CENTER OF STREAM

WORK AREA

ROCK OR MAT BRIDGE

CULVERT PIPE(S)

FLOW

THIS DOCUMENT IS ISSUED FOR INTERIM REVIEW AND IS NOT TO BE USED FOR CONSTRUCTION, BIDDING, OR PERMITTING PURPOSES.

NOTE:
1. USE AS MANY CULVERT PIPE(S) AS REQUIRED TO ENSURE NORMAL STREAM FLOW IS NOT OBSTRUCTED BY ROCK OR MAT BRIDGE.

# DAPL/ETCOP

| REV. | DATE | BY | DESCRIPTION | CHK. |
|---|---|---|---|---|
| | | | | |
| A | 08/14 | DAH | ISSUED FOR REVIEW | |

PROJECT NO. 10395700

TYPICAL ROCK OR MAT BRIDGE WITH CULVERTS

| DRAWN BY: DAH | DATE: 08/05/14 | DWG. NO. | REV. |
|---|---|---|---|
| CHECKED BY: DAH | DATE: 08/05/14 | | |
| SCALE: N.T.S. | APP.: | P12-2 | A |

USACE_DAPL0075002

THIS DOCUMENT IS ISSUED FOR INTERIM REVIEW AND IS NOT TO BE USED FOR CONSTRUCTION, BIDDING, OR PERMITTING PURPOSES.



PROFILE

## NOTES:

1. STRAW BALE SEDIMENT BARRIERS MAY BE INSTALLED AT THE FOLLOWING LOCATIONS:
   - THE BASE OF ALL SLOPES ABOVE ROADS, SPRINGS, WETLANDS, IMPOUNDMENTS AND STREAMS;
   - THE DOWNSLOPE RIGHT-OF-WAY EDGE WHERE ANY OF THE ABOVE-MENTIONED LOCATIONS ARE ADJACENT TO THE RIGHT-OF-WAY;
   - BETWEEN TOPSOIL/SPOIL STOCKPILES AND STREAMS OR WETLANDS AS NEEDED;
   - ALONG R.O.W. BOUNDARIES IN WETLAND CONSTRUCTION;
   - ACROSS CONSTRUCTION R.O.W. AT ALL WATERBODY CROSSINGS;
   - AS SPECIFIED IN THE SPILL PREVENTION, CONTAINMENT, AND COUNTERMEASURE PLAN;
   - AS DIRECTED BY THE INSPECTOR.

2. STRAW BALE SEDIMENT BARRIERS SHALL CONSIST OF A ROW OF STRAW BALES, PLACED ON THE FIBER-CUT EDGE (TIES NOT IN CONTACT WITH THE GROUND). BALES SHALL BE TIGHTLY ABUTTED TO ONE ANOTHER.  THE BARRIER SHALL BE ONE BALE HIGH.  ONLY CERTIFIED "NOXIOUS WEED-FREE" STRAW SHALL BE USED WHENEVER POSSIBLE.

3. ENTRENCH ("KEY") STRAW BALES INTO THE GROUND TO A DEPTH OF 4" EXCEPT IN FROZEN, SATURATED, OR EXTREMELY ROCKY SOILS.  PLACE PARENT MATERIAL ON UPSTREAM SIDE OF STRAW BALES TO PREVENT UNDERMINING.

4. WALK ON STRAW BALES TO INSURE ADEQUATE BALE-TO-SOIL CONTACT.

5. ANCHOR STRAW BALES SECURELY IN PLACE WITH TWO WOODEN OR STEEL REBAR STAKES DRIVEN THROUGH THE TOPS OF THE BALES.  THE STAKES SHALL PENETRATE THE GROUND A DISTANCE OF 12" UNLESS ROCK OR AN IMPERMEABLE LAYER IS ENCOUNTERED:
   - THE FIRST, CENTER AND END BALES OF THE BARRIER SHALL HAVE STAKES DRIVEN VERTICALLY THROUGH THE BALE;
   - BALES, OTHER THAN THOSE LOCATED AT THE ENDS OR CENTER OF THE BARRIER, SHALL HAVE THE FIRST STAKE DRIVEN THROUGH THE TOP OF THE BALE AT AN ANGLE SO THAT THE STAKE PASSES THROUGH THE PREVIOUSLY PLACED BALE, IN ORDER TO PROVIDE TIGHT CONTACT BETWEEN BALES.  THE SECOND STAKE SHALL BE DRIVEN VERTICALLY THROUGH THE TOP OF THE BALE.

## DAPL/ETCOP

### EROSION CONTROL STRAW BALE SEDIMENT BARRIER

| REV. | DATE | BY | DESCRIPTION | CHK. |
|------|------|----|-------------|------|
| | | | | |
| | | | | |
| A | 08/14 | DAH | ISSUED FOR REVIEW | |

PROJECT NO.   10395700

| | |
|---|---|
| DRAWN BY: DAH | DATE: 08/05/14 |
| CHECKED BY: DAH | DATE: 08/05/14 |
| SCALE: N.T.S. | APP.: |

DWG. NO. **P12-3**

REV. **A**

USACE_DAPL0075003



**PLAN**
N.T.S.

**CROSS SECTION**
N.T.S.

THIS DOCUMENT IS ISSUED FOR INTERIM REVIEW AND IS NOT TO BE USED FOR CONSTRUCTION, BIDDING, OR PERMITTING PURPOSES.

**NOTES:**
1. IMMEDIATELY REPAIR TILE IF WATER IS FLOWING THROUGH TILE AT TIME OF TRENCHING.
2. SCREEN ALL EXPOSED ENDS OF TILE LINES.

# DAPL/ETCOP

**DRAINAGE AND IRRIGATION**
**TEMPORARY DRAIN TILE REPAIR (TDR)**

| A | 08/14 | DAH | ISSUED FOR REVIEW | |
|---|---|---|---|---|
| REV. | DATE | BY | DESCRIPTION | CHK. |

PROJECT NO.   10395700

| | |
|---|---|
| DRAWN BY: DAH | DATE: 08/05/14 |
| CHECKED BY: DAH | DATE: 08/05/14 |
| SCALE: N.T.S. | APP.: |

| DWG. NO. | REV. |
|---|---|
| P12−4 | A |

USACE_DAPL0075004



TYPICAL DRAIN TILE INSTALLATION
FOR CROSS TRENCH DRAINAGE

AGRICULTURAL CROPLAND

LATERAL INTERCEPT DRAIN LINE

DITCH BREAKER

PIPELINE

MAIN OUTLET TILE DRAIN LINE

DIRECTION OF GRAVITY FLOW OF INTERCEPTED SOIL–WATER

**NOTES:**

1. CROSS TRENCH DRAINAGE MAY BE UTILIZED IN SLOPING AREAS OR IN AGRICULTURAL CROPLAND AREAS WHERE REQUIRED.
2. FINAL ALIGNMENT OF TILE LINES TO BE BASED ON OUTLETTING FOR GRAVITY FLOW.

THIS DOCUMENT IS ISSUED FOR INTERIM REVIEW AND IS NOT TO BE USED FOR CONSTRUCTION, BIDDING, OR PERMITTING PURPOSES.

| REV. | DATE | BY | DESCRIPTION | CHK. |
|------|------|-----|-------------|------|
| A | 08/14 | DAH | ISSUED FOR REVIEW | |

PROJECT NO.   10395700

## DAPL/ETCOP

TYPICAL DRAIN TILE INSTALLATION
FOR CROSS TRENCH DRAINAGE

| DRAWN BY: DAH | DATE: 08/07/14 | DWG. NO. | REV. |
|---------------|----------------|----------|------|
| CHECKED BY: DAH | DATE: 08/07/14 | **P12–5** | **A** |
| SCALE: N.T.S. | APP.: | | |

USACE_DAPL0075005

## DRAIN TILE RESTORATION



VOID BETWEEN PLASTIC DRAINAGE TUBING AND RIGID SUPPORT PIPE TO BE SEALED WITH PLASTIC REDUCER OR APPROVED EQUAL

PERFORATED, CORRUGATED STEEL ASPHALT–COATED SUPPORT PIPE

NATURAL GROUND

EXISTING DRAIN TILE

3'–0" MIN. EACH SIDE

1'–0"

PIPELINE

INSTALL INSERT COUPLING INTO EACH END OF EXISTING TILE AND ATTACH CONTINUOS LENGTH OF PLASTIC DRAINAGE TUBING THROUGH RIGID SUPPORT PIPE

BACKFILL TO BE TAMPED IN 6" LAYERS BENEATH AND AROUND CORRUGATED PIPE

END OF PIPE TO BEAR ON UNDISTURBED SOIL FOR A MIN. OF 3'–0" OR 1 BAG OF SACKRETE (TO BE WETTED DOWN)

| TUBING SIZE | CORRUGATED PIPE SIZE |
|---|---|
| 4" | 6" |
| 6" | 8" |
| 8" | 10" |
| 10" | 12" |
| 12" | 16" |
| 16" | 20" |

THIS DOCUMENT IS ISSUED FOR INTERIM REVIEW AND IS NOT TO BE USED FOR CONSTRUCTION, BIDDING, OR PERMITTING PURPOSES.

### NOTES:

1. ALL CORRUGATED PIPE TO BE OF 16 GAUGE GALVANIZED STEEL

2. PLASTIC DRAINAGE TUBING AND CORRUGATED PIPE TO BE INSTALLED SO THAT THE HOLES ARE CENTERED ON EACH SIDE OF THE BOTTOM OF PIPE

3. ALL MATERIAL TO BE CONTRACTOR SUPPLIED.

# DAPL/ETCOP

DRAIN TILE RESTORATION

| A | 08/14 | DAH | ISSUED FOR REVIEW | |
|---|---|---|---|---|
| REV. | DATE | BY | DESCRIPTION | CHK. |

PROJECT NO. 10395700

| DRAWN BY: DAH | DATE: 08/07/14 | DWG. NO. | REV. |
|---|---|---|---|
| CHECKED BY: DAH | DATE: 08/07/14 | P12–6 | A |
| SCALE: N.T.S. | APP.: | | |

USACE_DAPL0075006



THIS DOCUMENT IS ISSUED FOR INTERIM REVIEW AND IS NOT TO BE USED FOR CONSTRUCTION, BIDDING, OR PERMITTING PURPOSES.

| | | | | | |
|---|---|---|---|---|---|
| A | 08/14 | DAH | ISSUED FOR REVIEW | | |
| REV. | DATE | BY | DESCRIPTION | CHK. | |

PROJECT NO.    10395700

## DAPL/ETCOP

### TEMPORARY FENCE DETAIL FOR WOVEN WIRE & BARBED WIRE FENCES

| DRAWN BY: DAH | DATE: 08/07/14 | DWG. NO. | REV. |
|---|---|---|---|
| CHECKED BY: DAH | DATE: 08/07/14 | | |
| SCALE: N.T.S. | APP.: | P12-7 | A |

USACE_DAPL0075007



FILE: R:\Projects\10395\DISCIPLINE\CAD\DRAWINGS\99-TYPICAL\10395700-P12-8.dwg  PLOT DATE: 8/7/2014  BY:  ROBLEDO, RAMON

THIS DOCUMENT IS ISSUED FOR INTERIM REVIEW AND IS NOT TO BE USED FOR CONSTRUCTION, BIDDING, OR PERMITTING PURPOSES.

NOTES:

1. ALL NEW FENCE POSTS MUST EXTEND A MINIMUM OF 2' BELOW GRADE & HAVE A HEIGHT EQUAL TO EXISTING POSTS.
2. POST TO BE A MAXIMUM OF 10' CENTER TO CENTER.
3. POST AT EACH END OF REPAIRED SECTION TO BE H BRACED TO THE ADJOINING POSTS.
4. ALL FENCES SHALL BE REPAIRED WITH NEW WIRE OF LIKE MESH AS EXISTING FENCE , OR WIRE MATCHING EXISTING GAUGE AND SPECIFICATIONS & OF THE SAME NUMBER OF STRANDS & NUMBER OF WIRES EXISTING ON THE FENCE PRIOR TO CONSTRUCTION OF THE PIPELINE.
5. ALL POST ON PERMANENT RIGHT OF WAY TO BE PAINTED PER COMPANY PAINTING SPECIFICATIONS.

WRAP #7 WIRE MIN. OF 3 TURNS AROUND EACH POST AND STAPLE FIRMLY.

NOTCH FENCE POSTS MIN. OF 1" & NAIL BRACE FIRMLY.

TWIST WIRES TO TIGHTEN (TYP.)

6'-0"

DETAIL "1"
N.T.S.

| | | | | | |
|---|---|---|---|---|---|
| A | 08/14 | DAH | ISSUED FOR REVIEW | | |
| REV. | DATE | BY | DESCRIPTION | | CHK. |

PROJECT NO.    10395700

DAPL/ETCOP

WOVEN WIRE & BARBED WIRE FENCE
REPLACEMENT FENCE DETAIL

| DRAWN BY: DAH | DATE: 08/07/14 | DWG. NO. | REV. |
|---|---|---|---|
| CHECKED BY: DAH | DATE: 08/07/14 | | |
| SCALE: N.T.S. | APP.: | P12-8 | A |

USACE_DAPL0075008



**PLAN — TEMPORARY STREAM DIVERSION**
N.T.S.

**SECTION "A—A"**
N.T.S.

NOTES:
1. CONTRACTOR SHALL MAINTAIN STREAM FLOW AT ALL TIMES.
2. ALL SANDBAGS, CRUSHED STONE AND FILL SHALL BE REMOVED
   AFTER INSTALLATION OF CROSSING AND STREAM BED AND BANKS
   SHALL BE RESTORED TO ORIGINAL SHAPE AND ELEVATION.
3. LIMIT OF DISTURBANCE TO BE 30' LONG x 15' WIDE (450 S.F. TOTAL).
4. STAGING AREAS: MATERIALS AND EQUIPMENT TO BE STAGED ALONG
   ABANDONED ROAD BED IN THE UPLANDS.
5. USE WET MEADOW SEED MIX AS SPECIFIED IN LANDSCAPING DETAILS
   TO RESEED ALL DISTURBED AREAS.

THIS DOCUMENT IS ISSUED
FOR INTERIM REVIEW AND
IS NOT TO BE USED FOR
CONSTRUCTION, BIDDING,
OR PERMITTING PURPOSES.

| | | | | |
|---|---|---|---|---|
| A | 08/14 | DAH | ISSUED FOR REVIEW | |
| REV. | DATE | BY | DESCRIPTION | CHK. |

PROJECT NO.   **10395700**

# DAPL/ETCOP

PROPOSED PIPELINE
TEMPORARY STREAM DIVERSION

| | | |
|---|---|---|
| DRAWN BY: DAH | DATE: 08/07/14 | DWG. NO. |
| CHECKED BY: DAH | DATE: 08/07/14 | |
| SCALE: N.T.S. | APP.: | **P12—9** |

REV.

**A**

USACE_DAPL0075009



REBAR, STEEL PICKET
OR 2" X 2" WOODEN
STAKE

STRAW BALE
2' X 2' X 4'

FLOW ⟶

4" VERTICAL FACE

## EMBEDDING DETAIL

FLOW

SECURELY TIED BALES PLACED
ON THE CONTOUR

ANGLE FIRST
STAKE TOWARD
PREVIOUSLY
LAID BALE

2 REBARS, STEEL PICKETTS, OR 2" X 2"
STAKES 1 1/2' TO 2' IN GROUND

THIS DOCUMENT IS ISSUED
FOR INTERIM REVIEW AND
IS NOT TO BE USED FOR
CONSTRUCTION, BIDDING,
OR PERMITTING PURPOSES.

FILE: R:\Projects\10395700\DISCIPLINE\CAD\DRAWINGS\99-TYPICAL\10395700-P12-10.dwg PLOT DATE: 8/7/2014 BY: ROBLEDO, RAMON

| REV. | DATE | BY | DESCRIPTION | CHK. |
|---|---|---|---|---|
| A | 08/14 | DAH | ISSUED FOR REVIEW | |

PROJECT NO. 10395700

# DAPL/ETCOP

## TYPICAL STRAW BALE FILTER

| | | | |
|---|---|---|---|
| DRAWN BY: DAH | DATE: 08/07/14 | DWG. NO. | REV. |
| CHECKED BY: DAH | DATE: 08/07/14 | | |
| SCALE: N.T.S. | APP.: | P12-010 | A |

USACE_DAPL0075010

## INSTALLATIONS AT VEHICLE CROSSINGS OF WATERBODIES AND WETLANDS



**PLAN**

**PROFILE**

### NOTES:

1. PLACE STRAW BALES SO THEY ARE EFFECTIVE BUT DO NOT HINDER CONSTRUCTION.  IF NECESSARY, A 15' GAP IN STRAW BALE BARRIERS SHALL BE PROVIDED, AS NEEDED, TO ACCOMMODATE TRAFFIC ON TEMPORARY CONSTRUCTION ROADS.  THE GAP SHALL BE CLOSED AT THE END OF EACH WORK DAY USING STRAW BALE BARRIERS, OR A DRIVABLE EARTH BERM TIED INTO ADJACENT STRAW BALES.  THE BALES USED TO CLOSE THE GAP SHALL BE PLACED ON THE UPHILL SIDE OF THE STRAW BALE BARRIER, THE END BALES OF THE GAP SEGMENT SHALL OVERLAP A MINIMUM OF 12".

2. A MAINTAINED DRIVABLE EARTH BERM MAY BE INSTALLED ACROSS VEHICLE CROSSING IN LIEU OF STRAW BALES DURING ACTIVE CONSTRUCTION.

3. BERM MUST BE TIED INTO STRAW BALES.

4. BERM MUST BE MAINTAINED TO ENSURE SEDIMENT TRAPPING CAPACITY.

5. WHEN ACTIVE CONSTRUCTION IS COMPLETE, INSTALL STRAW BALES ACROSS ENTIRE R.O.W.

6. MONITOR FOR UNDERMINING OR FLOW—AROUND.  INSPECT BALE POSITION TO ASSURE THAT THEY REMAIN CLOSE TOGETHER.  MAINTAIN STRAW BALE BARRIERS BY REPLACING DAMAGED BALES AND REMOVING SEDIMENT LOAD. WHEN SEDIMENT LOAD IS GREATER THAN 40%  BEHIND THE BARRIER, SEDIMENT SHALL BE REMOVED AND PLACED IN AN AREA WHERE IT SHALL NOT REENTER THE BARRIER OR A WATERWAY.  IF SEDIMENT BEHIND STRAW BALE BARRIERS CANNOT BE REMOVED, A SECOND ROW OF BALES SHALL BE INSTALLED UPSLOPE OF THE BARRIER.

7. WHERE STRAW BALES AND SILT FENCE ARE INSTALLED AS A UNIT, THE STRAW BALES SHALL BE INSTALLED ON THE DOWN SLOPE SIDE OF THE SILT FENCE.

8. EROSION CONTROL STRUCTURES SHALL BE INSPECTED DAILY IN AREAS OF ACTIVE CONSTRUCTION. STRUCTURES SHALL BE INSPECTED WEEKLY AT INACTIVE CONSTRUCTION AREAS AND WITHIN 24 HOURS OF EACH RAINFALL EVENT WITH 0.5 INCH OR MORE.  STRUCTURES SHALL BE REPAIRED AS NECESSARY.

9. STRAW BALE BARRIERS SHALL BE REMOVED ONLY AS DIRECTED BY THE PIPELINE INSPECTOR.

THIS DOCUMENT IS ISSUED FOR INTERIM REVIEW AND IS NOT TO BE USED FOR CONSTRUCTION, BIDDING, OR PERMITTING PURPOSES.

| REV. | DATE | BY | DESCRIPTION | CHK. |
|---|---|---|---|---|
| | | | | |
| | | | | |
| A | 08/14 | DAH | ISSUED FOR REVIEW | |

PROJECT NO.   10395700

## DAPL/ETCOP

### EROSION CONTROL
### STRAW BALE SEDIMENT BARRIER

| | | | |
|---|---|---|---|
| DRAWN BY: DAH | DATE: 08/07/14 | DWG. NO. | REV. |
| CHECKED BY: DAH | DATE: 0/07/14 | | |
| SCALE: N.T.S. | APP.: | P12—11 | A |

USACE_DAPL0075011



**SECTION A-A**

**PLAN VIEW**

THIS DOCUMENT IS ISSUED FOR INTERIM REVIEW AND IS NOT TO BE USED FOR CONSTRUCTION, BIDDING, OR PERMITTING PURPOSES.

## NOTES:

1. STREAM BANK RIPRAP STRUCTURES SHALL CONSIST OF A LAYER OF STONE UNDERLAIN WITH APPROVED GEOTEXTILE FILTER FABRIC OR A GRAVEL FILTER BLANKET DESIGNED TO PROTECT AND STABILIZE AREAS PRONE TO EROSION.

2. GRAVEL FILTER BLANKET SHALL MEET THE FOLLOWING SPECIFICATIONS:
   • HAVE A PERMEABILITY GREATER THAN THAT OF THE SUBGRADE SOIL;
   • IF A WELL-GRADED GRAVEL OR SAND-GRAVEL LAYER IS USED, THE LAYER SHALL BE A MINIMUM OF 6" THICK AND SPREAD IN A UNIFORM LAYER OVER THE SUBGRADE;
   • IF WATER TURBULENCE COULD RESULT IN EROSION OF BANK MATERIAL BETWEEN LARGE ROCKS (AS DETERMINED BY THE REPRESENTATIVE ENVIRONMENTAL INSPECTOR), A GEOTEXTILE FILTER FABRIC SHALL BE USED BETWEEN THE GRAVEL LAYER AND THE RIPRAP.

3. THE GEOTEXTILE FILTER FABRIC SHALL BE PERMATEX 4000 SERIES OR AN APPROVED EQUIVALENT MEETING THE FOLLOWING SPECIFICATIONS:

   (A) BE COMMERCIAL QUALITY NONWOVEN FABRIC DESIGNED FOR RIPRAP UNDERLAYMENT;
   (B) BE A MINIMUM OF 20 MILS IN THICKNESS;
   (C) HAVE A GRAB STRENGTH BETWEEN 90 TO 120 POUNDS;
   (D) HAVE A GREATER THAN 4% OPEN AREA (U.S. STANDARD SIEVE NUMBER 100 (0.15 MM.);
   (E) HAVE A DENSITY OF 8 oz. PER SQUARE YARD.

4. THE USE OF RIPRAP SHALL BE LIMITED TO AREAS WHERE FLOWING CONDITIONS PREVENT EFFECTIVE VEGETATIVE STABILIZATION TECHNIQUES.

| REV. | DATE | BY | DESCRIPTION | CHK. |
|------|------|-----|-------------|------|
| A | 08/14 | DAH | ISSUED FOR REVIEW | |

PROJECT NO.  10395700

## DAPL/ETCOP

**EROSION CONTROL RIPRAP AT WATERBODY BANKS**

| DRAWN BY: DAH | DATE: 08/07/14 | DWG. NO. | REV. |
|---------------|----------------|----------|------|
| CHECKED BY: DAH | DATE: 08/07/14 | P12–12 | A |
| SCALE: N.T.S. | APP.: | | |

USACE_DAPL0075012



FILE: R:\Projects\10395700\DISCIPLINE\CAD\DRAWINGS\99-TYPICAL\10395700-P12-13.dwg PLOT DATE: 8/7/2014 BY: ROBLEDO, RAMON

HAY BALES OR EARTH BERMS
AT TOP OF SLOPE

SPOIL

DIRECTION OF FLOW

UNDISTURBED

HAY BALES ON STEEPER SLOPES

NATURAL

WORK AREA

DITCH

SPOIL

HAY BALES OR EARTH
BERM DIVERSIONS

HAY BALES ON
MIDSPAN POSITIONS

GROUND

HAY BALE OR SILT
FENCE SEDIMENT TRAP

200' MAX. SPACING

DITCH

SPOIL

WORK AREA

THIS DOCUMENT IS ISSUED
FOR INTERIM REVIEW AND
IS NOT TO BE USED FOR
CONSTRUCTION, BIDDING,
OR PERMITTING PURPOSES.

| A | 08/14 | DAH | ISSUED FOR REVIEW | |
|---|---|---|---|---|
| REV. | DATE | BY | DESCRIPTION | CHK. |

PROJECT NO.     10395700

# DAPL/ETCOP

## TEMPORARY S&E CONTROL MEASURES
## SLOPE DIRECTION WITH SLOPE
## SLOPE PERCENT >15%

| DRAWN BY: DAH | DATE: 08/05/14 | DWG. NO. | REV. |
|---|---|---|---|
| CHECKED BY: DAH | DATE: 08/05/14 | | |
| SCALE: N.T.S. | APP.: | P12-13 | A |

USACE_DAPL0075013



THIS DOCUMENT IS ISSUED FOR INTERIM REVIEW AND IS NOT TO BE USED FOR CONSTRUCTION, BIDDING, OR PERMITTING PURPOSES.

POLES

COUPLER

POLE

FILTER FABRIC

FILTER FABRIC

BACKFILL (COMPACTED)

SEE DETAIL "A"

NATIVE SOIL

FILTER FABRIC

POST

WIRE

4"

4"

DETAIL "A"

FILE: R:\Projects\10395700\DISCIPLINE\CAD\DRAWINGS\99−TYPICAL\10395700−P12−14.dwg PLOT DATE: 8/8/2014 BY: ROBLEDO, RAMON

| A | 08/14 | DAH | ISSUED FOR REVIEW | |
|---|---|---|---|---|
| REV. | DATE | BY | DESCRIPTION | CHK. |

PROJECT NO. 10395700

DAPL/ETCOP

TYPICAL SILT FENCE

| DRAWN BY: DAH | DATE: 08/07/14 | DWG. NO. | REV. |
|---|---|---|---|
| CHECKED BY: DAH | DATE: 08/07/14 | | |
| SCALE: N.T.S. | APP.: | P12−14 | A |



## NOTE:

1. GENERALLY WHEN A LONG SEDIMENT BARRIER IS REQUIRED, SILT FENCE WILL BE UTILIZED RATHER THAN STRAW BALES AT:

- THE BASE OF ALL SLOPES ABOVE ROADS, SPRINGS, WETLANDS, IMPOUNDMENTS AND PERENNIAL AND INTERMITTENT STREAMS.
- THE DOWN SLOPE RIGHT—OF—WAY EDGE WHERE ANY OF THE ABOVE MENTIONED LOCATIONS ARE ADJACENT TO THE RIGHT—OF—WAY.
- BETWEEN TOPSOIL/SPOIL STOCKPILES AND PERENNIAL OR INTERMITTENT STREAMS OR WETLANDS WHERE BUFFER ZONE REQUIREMENTS CANNOT BE MET.
- ALONG R.O.W. BOUNDARIES OF WETLAND CONSTRUCTION.
- ACROSS CONSTRUCTION R.O.W. AT ALL WATERBODY CROSSINGS.
- AS SPECIFIED IN THE SPILL PREVENTION, CONTAINMENT, AND COUNTERMEASURE PLAN.
- AS DIRECTED BY THE INSPECTOR.

2. THE SILT FENCE SHALL BE CONSTRUCTED AS FOLLOWS:

- FABRIC USED FOR THE SILT FENCE SHALL BE A "STANDARD STRENGTH" GEOTEXTILE, SUCH AS MIRAFI 100X OR AN APPROVED EQUIVALENT.
- THE FABRIC SHALL BE CUT FROM A CONTINUOUS FABRIC ROLL.
- THE HEIGHT OF THE FENCE SHALL NOT EXCEED 36".
- SPLICES SHALL ONLY BE DONE AT POSTS AND SHALL CONSIST OF A MINIMUM OF 6" OF OVERLAP WITH BOTH ENDS SECURED TO THE POST.
- POSTS SHALL BE POSITIONED A MAXIMUM OF 5' APART.
- POSTS SHALL CONSIST OF 2"X2" WOODEN STAKES OF SUFFICIENT LENGTH TO EXTEND A MINIMUM OF 12" INTO THE GROUND.
- FABRIC SHALL BE STAPLED OR WIRED TO POSTS A MAXIMUM OF EVERY 9".

<div style="float:right; border:1px solid;">
THIS DOCUMENT IS ISSUED FOR INTERIM REVIEW AND IS NOT TO BE USED FOR CONSTRUCTION, BIDDING, OR PERMITTING PURPOSES.
</div>

3. THE SILT FENCE SHALL BE INSTALLED AS SPECIFIED BY THE MANUFACTURER OR AS FOLLOWS:

- A TRENCH, 4" WIDE AND 4" DEEP, SHALL BE EXCAVATED ALONG THE CONTOUR. THE POST SHALL BE DRIVEN INTO THE BOTTOM OF THE TRENCH ON THE DOWSTREAM SIDE OF THE FILTER FABRIC. THE TRENCH SHALL BE BACK FILLED AND COMPACTED, ENSURING 4" OF FENCE IS BURIED WITHIN THE TRENCH.
- IN AREAS WHERE THE TERRAIN IS TOO ROCKY FOR TRENCHING, A 4" GROUND FLAP WITH ROCK FILL TO HOLD IT IN PLACE SHALL BE USED.

FILE: R:\Projects\10395700\DISCIPLINE\CAD\DRAWINGS\99—TYPICAL\10395700—P12—15.dwg   PLOT DATE: 8/8/2014   BY: HERNANDEZ, DANIEL

| | | | | | |
|---|---|---|---|---|---|
| | | | | | **DAPL/ETCOP** |
| A | 08/14 | DAH | ISSUED FOR REVIEW | | **EROSION CONTROL SILT FENCE SEDIMENT BARRIER** |
| REV. | DATE | BY | DESCRIPTION | CHK. | |

| PROJECT NO. | 10395700 |
|---|---|

| | | | | |
|---|---|---|---|---|
| DRAWN BY: DAH | DATE: 08/07/14 | DWG. NO. | | REV. |
| CHECKED BY: DAH | DATE: 08/07/14 | | **P12—15** | **A** |
| SCALE: N.T.S. | APP.: | | | |

USACE_DAPL0075015



SILT FENCE

FLOW

TOP OF
GROUND

4"

4"

KEY FABRIC ALONG
TRENCH AWAY FROM STRAW
BALES.  BACKFILL AND TAMP.

STAKED STRAW
BALES

PROTECTED
RESOURCE
AREA

THIS DOCUMENT IS ISSUED
FOR INTERIM REVIEW AND
IS NOT TO BE USED FOR
CONSTRUCTION, BIDDING,
OR PERMITTING PURPOSES.

NOTE:

1.   WHERE EXTREMELY ERODIBLE SOIL CONDITIONS EXIST AND AT THE DIRECTION OF
THE INSPECTOR, A COMBINED STRAW BALE AND SILT FENCE SEDIMENT CONTROL BARRIER
SHALL BE INSTALLED.

| REV. | DATE | BY | DESCRIPTION | CHK. |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
| A | 08/14 | DAH | ISSUED  FOR  REVIEW |  |

PROJECT NO.          10395700

## DAPL/ETCOP

### EROSION CONTROL STRAW BALE AND SILT FENCE

| DRAWN BY: DAH | DATE: 08/07/14 | DWG. NO. | REV. |
|---|---|---|---|
| CHECKED BY: DAH | DATE: 08/07/14 | | |
| SCALE: N.T.S. | APP.: | P12—16 | A |

USACE_DAPL0075016



THIS DOCUMENT IS ISSUED FOR INTERIM REVIEW AND IS NOT TO BE USED FOR CONSTRUCTION, BIDDING, OR PERMITTING PURPOSES.

NOTES:

1. CONSTRUCTION RIGHT–OF–WAY WILL TYPICALLY BE 150 FEET WIDE CONSISTING OF 50 FEET PERMANENT EASEMENT AND UP TO 100 FEET OF TEMPORARY WORKSPACE. EXTRA TEMPORARY WORK SPACE WILL BE NECESSARY AT MAJOR ROAD, RAIL AND RIVER CROSSINGS AND OTHER SPECIAL CIRCUMSTANCES, AS REQUIRED. CERTAIN SITUATIONS MAY REQUIRE A NARROWER WIDTH.

2. UTILIZE THE "TRENCH ONLY" TOPSOIL SALVAGE METHOD AT LOCATIONS SUCH AS RIPARIAN AREAS OR UNMANAGED WOODLAND, WHERE IDENTIFIED ON THE CONSTRUCTION DRAWINGS, OR AS DIRECTED BY THE PIPELINE INSPECTOR.

3. THE TRENCH ONLY METHOD IS NOT TO BE USED ON AGRICULTURAL LAND EXCEPT AS DIRECTED BY THE INSPECTOR (PER LANDOWNER REQUEST).

4. FOR TRENCH ONLY STRIPPING, THE STRIPPED AREA SHALL BE WIDE ENOUGH TO ACCOMMODATE TRENCHING EQUIPMENT.

5. DEPTH OF TOPSOIL STRIPPING IS A MINIMUM OF 12 INCHES.

6. STOCKPILE TOPSOIL AS SHOWN OR IN ANY CONFIGURATION APPROVED BY THE PIPELINE INSPECTOR. KEEP TOPSOIL AND SPOIL PILES CLEAN OF ALL CONSTRUCTION DEBRIS. MAINTAIN A MINIMUM 12 INCHES OF SEPERATION BETWEEN TOPSOIL AND TRENCH SPOIL PILES.

7. LEAVE GAPS IN TOPSOIL AND SPOIL PILES AT OBVIOUS DRAINAGES. DO NOT PUSH UPLAND SOILS INTO CREEKS OR WETLANDS. DO NOT USE TOPSOIL FOR PADDING.

8. AVOID SCALPING VEGETATED GROUND SURFACE WHEN BACKFILLING SPOIL AND TOPSOIL PILES.

9. SAME LAYOUT APPLIES WHERE CONSTRUCTION R.O.W. DOES NOT ABUT EXISTING R.O.W.

10. TEMPORARILY SUSPEND TOPSOIL HANDLING OPERATIONS DURING INORDINATELY WINDY CONDITIONS UNTIL MITIGATIVE MEASURES TO MINIMIZE WIND EROSION CAN BE IMPLEMENTED.

11. TOPSOIL AND TRENCH SPOIL RELATIVE POSITIONS CAN, AS DIRECTED BY THE PIPELINE INSPECTOR, BE REVERSED.

| REV. | DATE | BY | DESCRIPTION | CHK. |
|------|------|-----|-------------|------|
| B | 8/20/14 | DAH | ISSUED FOR REVIEW | |
| A | 8/08/14 | DAH | ISSUED FOR REVIEW | |

PROJECT NO.   10395700

**DAPL/ETCOP**

CONSTRUCTION RIGHT–OF–WAY ARRANGEMENT

| DRAWN BY: DAH | DATE: 08/07/14 | DWG. NO. | REV. |
|---------------|----------------|----------|------|
| CHECKED BY: DAH | DATE: 08/07/14 | | |
| SCALE: N.T.S. | APP.: | P12–17 | B |

USACE_DAPL0075017



## PLAN

## PROFILE

### NOTES:

1. SET UP DRILLING EQUIPMENT A MINIMUM OF 300 FEET FROM THE EDGE OF THE WATERCOURSE. DO NOT CLEAR OR GRADE WITHIN THE 100 FOOT ZONE.

2. ENSURE THAT ONLY BENTONITE BASED DRILLING MUD IS USED.  DO NOT ALLOW THE USE OF ANY ADDITIVES TO THE DRILLING MUD WITHOUT THE APPROVAL OF THE APPROPRIATE REGULATORY AUTHORITIES AND CLIENTS REPRESENTATIVE.

3. INSTALL SUITABLE DRILLING MUD TANKS OR SUMPS TO PREVENT CONTAMINATION OF WATERCOURSE.

4. INSTALL BERMS DOWNSLOPE FROM THE DRILL ENTRY AND ANTICIPATED EXIT POINTS TO CONTAIN ANY RELEASE OF DRILLING MUD.

5. DISPOSE OF DRILLING MUD IN ACCORDANCE WITH THE APPROPRIATE REGULATORY AUTHORITY REQUIREMENTS.

THIS DOCUMENT IS ISSUED FOR INTERIM REVIEW AND IS NOT TO BE USED FOR CONSTRUCTION, BIDDING, OR PERMITTING PURPOSES.

**DAPL/ETCOP**

**WATERBODY CROSSING HORIZANTAL DIRECTIONAL DRILL**

| REV. | DATE | BY | DESCRIPTION | CHK. |
|------|------|-----|-------------|------|
| A | 08/14 | DAH | ISSUED FOR REVIEW | |

PROJECT NO.   10395700

| | |
|---|---|
| DRAWN BY: DAH | DATE: 08/07/14 |
| CHECKED BY: DAH | DATE: 08/07/14 |
| SCALE: N.T.S. | APP.: |

DWG. NO.   **P12-18**   REV.   **A**

USACE_DAPL0075018

FILE: R:\Projects\10395700\DISCIPLINE\CAD\DRAWINGS\99-TYPICAL\10395700-P12-18.dwg  PLOT DATE: 8/7/2014  BY: ROBLEDO, RAMON

FILE: R:\Projects\10395700\DISCIPLINE\CAD\DRAWINGS\99–TYPICAL\10395700–P12–19.dwg PLOT DATE: 8/7/2014 BY: ROBLEDO, RAMON



**PLAN VIEW**
N.T.S.

THIS DOCUMENT IS ISSUED
FOR INTERIM REVIEW AND
IS NOT TO BE USED FOR
CONSTRUCTION, BIDDING,
OR PERMITTING PURPOSES.



**PROFILE**
N.T.S.

**NOTES:**

1. STRIP TOPSOIL FROM BELLHOLE AREA IN UNMANAGED WOODLANDS. STRIP TOPSOIL FROM THE BELLHOLE AND SPOIL STORAGE AREA ON AGRICULTURAL LAND.

2. EXCAVATE BELLHOLE, STORING TRENCH SPOIL ON OPPOSITE SIDE OF RIGHT–OF–WAY FROM TOPSOIL, OR ADJACENT TO TOPSOIL MAINTAINING A 12" MINIMUM SEPARATION TO AVOID MIXING TOPSOIL AND TRENCH SPOIL.

3. AFTER COMPLETION OF PIPE TIE–INS, BACKFILL AND COMPACT. LEAVE A CROWN TO ALLOW FOR SUBSIDENCE.

4. INSTALL TEMPORARY EROSION CONTROL PROCEDURES AS SPECIFIED BY THE PIPELINE INSPECTOR.

| REV. | DATE | BY | DESCRIPTION | CHK. |
|------|------|-----|-------------|------|
| A | 08/14 | DAH | ISSUED FOR REVIEW | |

| | |
|---|---|
| PROJECT NO. | 10395700 |

# DAPL/ETCOP

## TOPSOIL SALVAGE CROSSING BORE (CB)

| DRAWN BY: DAH | DATE: 08/07/14 | DWG. NO. | REV. |
|---------------|----------------|----------|------|
| CHECKED BY: DAH | DATE: 08/07/14 | **P12–19** | **A** |
| SCALE: N.T.S. | APP.: | | |

USACE_DAPL0075019



**PLAN**

**PROFILE**

THIS DOCUMENT IS ISSUED FOR INTERIM REVIEW AND IS NOT TO BE USED FOR CONSTRUCTION, BIDDING, OR PERMITTING PURPOSES.

FILE: R:\Projects\10395700\DISCIPLINE\CAD\DRAWINGS\99–TYPICAL\10395700–P12–20.dwg  PLOT DATE:  8/8/2014  BY:  ROBLEDO, RAMON

## NOTES:

1. THIS TYPE OF BRIDGE IS GENERALLY USED ON WIDE, CROSSINGS.

2. BRIDGE SHALL BE ANCHORED AND/OR TIED OFF TO ANCHOR BLOCKS FOR STABILITY.

3. IF REQUIRED, UTILIZE APPROACH FILLS OF CLEAN ROCK MATERIAL, SWAMP MATS, SKIDS OR OTHER SUITABLE MATERIALS TO AVOID CUTTING THE BANKS WHEREVER FEASIBLE.  ENSURE ADEQUATE FREEBOARD.  ENSURE THAT FILL MATERIAL, IF USED, DOES NOT SPILL INTO WATERCOURSE.

4. CONSTRUCT SEDIMENT BARRIERS ACROSS THE ENTIRE CONSTRUCTION R.O.W. TO PREVENT SILT LADEN WATER AND SPOIL FORM FLOWING BACK INTO WATERBODY.  BARRIERS MAY BE TEMPORARILY REMOVED TO ALLOW CONSTRUCTION ACTIVITIES BUT MUST BE REPLACED BY THE END OF EACH WORK DAY.  SILT FENCE, STRAW BALES OR SANDBAGS MAY BE USED INTERCHANGEABLY.

5. REMOVE FLOATING BRIDGES  AS SOON AS POSSIBLE AFTER PERMANENT SEEDING UNLESS OTHERWISE DIRECTED BY REPRESENTATIVE. THE STRUCTURE IS TO BE REMOVED IF THERE IS MORE THAN ONE MONTH BETWEEN FINAL GRADING AND SEEDING, AND ALTERNATIVE ACCESS TO THE CONSTRUCTION R.O.W. IS AVAILABLE.

6. DISPOSE OF A ROCK AS DIRECTED BY COMPANY REPRESENTATIVE.

7. RESTORE AND STABILIZE BED AND BANKS TO APPROXIMATE PRE-CONSTRUCTION CONDITIONS.

| REV. | DATE | BY | DESCRIPTION | CHK. |
|------|------|-----|-------------|------|
| A | 08/14 | DAH | ISSUED FOR REVIEW | |
| | | | | |

PROJECT NO.   10395700

# DAPL/ETCOP

### PROPOSED PIPELINE
### WATERBODY  BRIDGE FLEXI FLOAT TYPE (FF)

| DRAWN BY: DAH | DATE: 08/07/14 | DWG. NO. | REV. |
|---------------|----------------|----------|------|
| CHECKED  BY: DAH | DATE: 08/07/14 | **P12–20** | **A** |
| SCALE: N.T.S. | APP.: | | |

USACE_DAPL0075020



**PLAN**

**PROFILE**

THIS DOCUMENT IS ISSUED FOR INTERIM REVIEW AND IS NOT TO BE USED FOR CONSTRUCTION, BIDDING, OR PERMITTING PURPOSES.

## NOTES:

1. THIS TYPE OF BRIDGE IS GENERALLY USED ON NARROW CROSSINGS, LESS THAN 20 FEET WIDE WITH APPROPRIATE BANK CONFIGURATION.  MULTIPLE MATS MAY BE LAYERED FOR HEAVIER EQUIPMENT CROSSINGS.

2. BRIDGE SHALL BE TEMPORARILY REMOVED IF HIGH WATER RENDERS IT UNSAFE TO USE.

3. IF REQUIRED, UTILIZE APPROACH FILLS OF CLEAN ROCK MATERIAL, SWAMP MATS, SKIDS OR OTHER SUITABLE MATERIALS TO AVOID CUTTING THE BANKS WHEREVER FEASIBLE.  ENSURE ADEQUATE FREEBOARD.  ENSURE THAT FILL MATERIAL, IF USED, DOES NOT SPILL INTO WATERCOURSE INCLUDING REMOVAL OF DIRT FROM DECK DURING OPERATION.

4. CONSTRUCT SEDIMENT BARRIERS ACROSS THE ENTIRE CONSTRUCTION R.O.W. TO PREVENT SILT LADEN WATER AND SPOIL FORM FLOWING BACK INTO WATERBODY.  BARRIERS MAY BE TEMPORARILY REMOVED TO ALLOW CONSTRUCTION ACTIVITIES BUT MUST BE REPLACED BY THE END OF EACH WORK DAY.  SILT FENCE, STRAW BALES OR SANDBAGS MAY BE USED INTERCHANGEABLY.

5. REMOVE TIMBER MATS AS SOON AS POSSIBLE AFTER PERMANENT SEEDING UNLESS OTHERWISE DIRECTED BY REPRESENTATIVE. THE STRUCTURE IS TO BE REMOVED IF THERE IS MORE THAN ONE MONTH BETWEEN FINAL GRADING AND SEEDING, AND ALTERNATIVE ACCESS TO THE CONSTRUCTION R.O.W. IS AVAILABLE.

6. DISPOSE OF A ROCK AS DIRECTED BY COMPANY REPRESENTATIVE.

7. RESTORE AND STABILIZE BED AND BANKS TO APPROXIMATE PRE-CONSTRUCTION CONDITIONS.

FILE: R:\Projects\10395700\DISCIPLINE\CAD\DRAWINGS\99-TYPICAL\10395700-P12-21.dwg  PLOT DATE:  8/8/2014  BY:  ROBLEDO, RAMON

| | | | | | |
|---|---|---|---|---|---|
| A | 08/14 | DAH | ISSUED FOR REVIEW | | |
| REV. | DATE | BY | DESCRIPTION | CHK. | |
| PROJECT NO. | | **10395700** | | | |

# DAPL/ETCOP

## PROPOSED PIPELINE
## WATERBODY BRIDGE TIMBER MAT (TM)

| DRAWN BY: DAH | DATE: 08/07/14 | DWG. NO. | REV. |
|---|---|---|---|
| CHECKED BY: DAH | DATE: 08/07/14 | | |
| SCALE: N.T.S. | APP.: | **P12-21** | **A** |

USACE_DAPL0075021



**TYPICAL HYDROSTATIC TEST DEWATERING INTO STREAM**
N.T.S.

Labels within figure: BACKFILLED TRENCH, PIPELINE, TRENCH, DISCHARGE LINE, STREAM, RIGHT-OF-WAY, 1" PRESSURE RELIEF, HYDROSTATIC TEST HEADER

NOTES:
1. PRESSURE IS RELEASED INITIALLY THROUGH 1" PRESSURE RELIEF.
   WATER IS THEN RELEASED THROUGH DISCHARGE LINE TO COMPANY APPROVED
   METHOD OF DISSIPATION WATER.
2. COMPANY MAY ALSO APPROVE OTHER METHODS OF DISSIPATING WATER.
3. THIS METHOD MAY ALSO BE INITIATED WHEN PUMPING WATER FROM DITCH.

THIS DOCUMENT IS ISSUED
FOR INTERIM REVIEW AND
IS NOT TO BE USED FOR
CONSTRUCTION, BIDDING,
OR PERMITTING PURPOSES.

FILE: R:\Projects\10395700\DISCIPLINE\CAD\DRAWINGS\99-TYPICAL\10395700-P12-22.dwg PLOT DATE: 8/7/2014 BY: ROBLEDO, RAMON

## DAPL/ETCOP

### TYPICAL HYDROSTATIC TEST DEWATERING INTO STREAM

| REV. | DATE | BY | DESCRIPTION | CHK. |
|------|------|-----|-------------|------|
| A | 08/14 | DAH | ISSUED FOR REVIEW | |

PROJECT NO.   10395700

| | |
|---|---|
| DRAWN BY: DAH | DATE: 08/07/14 |
| CHECKED BY: DAH | DATE: 08/07/14 |
| SCALE: N.T.S. | APP.: |

DWG. NO.   P12—22   REV. A

USACE_DAPL0075022

## PIPELINE MARKING TAPE INSTALLATION

### SINGLE R.O.W.



| PIPE DIA. | TAPE WIDTH | "A" |
|-----------|------------|-----|
| 6" | 24" | 12" |
| 8" | 24" | 12" |
| 10" | 24" | 12" |
| 12" | 24" | 12" |
| 14" | 24" | 12" |
| 16" | 24" | 12" |

### DOUBLE R.O.W.



| PIPE DIA. | TAPE WIDTH | "A" |
|-----------|------------|-----|
| 20" | 24" | 25" |
| 24" | 24" | 25" |
| 30" | 24" | 25" |
| 34" | 24" | 25" |
| 36" | 24" | 25" |
| 42" | 24" | 26" |
| 48" | 24" | 36" |

### NOTES:

1. PIPELINE MARKING TAPE SHALL BE INSTALLED AT OPEN CUT ROAD AND IN-GROUND UTILITY CROSSINGS AND AT ALL CLASS 2, 3 & 4 LOCATIONS, OR AS DIRECTED BY COMPANY.

2. TAPE IS TO BE INSTALLED 1 FOOT (1') BELOW GRADE EXCEPT IN AGRICULTURAL AREAS, WHERE IT SHALL BE LAID 1'-8" BELOW GRADE. FOR CONVENIENCE, TAPE CAN BE INSTALLED LEVEL AT ROAD CROSSINGS, 1 FOOT (1') BELOW ROAD DITCHES.

3. TAPE IS TO BE INSTALLED ACROSS AND 15 FEET (15') UPSTREAM AND DOWNSTREAM OR ROAD OR UTILITY RIGHT'S-OF-WAY, INCLUDING EXPOSED PORTION OF BORED CROSSINGS.

4. TAPE IS TO BE INSTALLED 15 FEET (15') UPSTREAM AND DOWNSTREAM OF UTILITY CROSSING IF NO RIGHT-OF-WAY EXISTS.

5. TOP OF BACKFILL SHALL BE AS LEVEL AS POSSIBLE PRIOR TO INSTALLATION OF TAPE.

6. GAP BETWEEN ADJACENT TAPES SHALL BE 2".

THIS DOCUMENT IS ISSUED FOR INTERIM REVIEW AND IS NOT TO BE USED FOR CONSTRUCTION, BIDDING, OR PERMITTING PURPOSES.

FILE: R:\Projects\10395700\DISCIPLINE\CAD\DRAWINGS\99-TYPICAL\10395700-P12-23.dwg PLOT DATE: 8/7/2014 BY: ROBLEDO, RAMON

## DAPL/ETCOP

### PIPELINE MARKING TAPE INSTALLATION

| REV. | DATE | BY | DESCRIPTION | CHK. |
|------|------|-----|-------------|------|
| A | 08/14 | DAH | ISSUED FOR REVIEW | |

PROJECT NO.   10395700

| DRAWN BY: DAH | DATE:08/07/14 | DWG. NO. | REV. |
|---------------|---------------|----------|------|
| CHECKED BY: DAH | DATE:08/07/14 | P12-23 | A |
| SCALE: N.T.S. | APP.: | | |

USACE_DAPL0075023



**PLAN**
N.T.S.

**PROFILE**
N.T.S.

NOTES:

1. CONTRACTOR TO NOTIFY EXISTING PIPELINE/UTILITY COMPANY PRIOR TO INSTALLATION OF CROSSING RAMP.

2. LENGTH OF RAMP TO VARY IN ACCORDANCE WITH CROSSING ANGLE. MINIMUM CROSSING ANGLE TO BE 45 DEGREES.

3. VEHICLES OR EQUIPMENT USING CROSSINGS SHALL PROCEED SLOWLY & WITH CAUTION TO MINIMIZE IMPACT LOADING & REDUCTION ON DEPTH OF COVER OVER PIPELINE/UTILITY.

4. ON COMPLETION OF CONSTRUCTION, CONTRACTOR TO REMOVE COMPLETE RAMP & RESTORE AREA TO THE SATISFACTION OF THE EXISTING PIPELINE/UTILITY COMPANY & THE CLIENT INSPECTOR.

5. GEOTEXTILE FABRIC (& GEOTEXTILE GRID WHERE REQUIRED) SHALL BE INSTALLED TO PROTECT NATIVE TOP SOIL AS DIRECTED BY THE CLIENT INSPECTOR WHEN IMPORTED GRANULAR FILL, NATIVE SUBSOIL FILL OR MATTING TIMBER MATERIAL IS UTILIZED.  IMPORTED GRANULAR FILL MATERIAL OR NATIVE SUBSOIL FILL MATERIAL TO BE REMOVED & DISPOSED OF AS DIRECTED BY THE CLIENT INSPECTOR.

THIS DOCUMENT IS ISSUED FOR INTERIM REVIEW AND IS NOT TO BE USED FOR CONSTRUCTION, BIDDING, OR PERMITTING PURPOSES.

FILE: R:\Projects\10395700\DISCIPLINE\CAD\DRAWINGS\99-TYPICAL\10395700-P12-24.dwg PLOT DATE: 8/7/2014 BY: ROBLEDO, RAMON

| REV. | DATE | BY | DESCRIPTION | CHK. |
|------|------|-----|-------------|------|
| | | | | |
| | | | | |
| | | | | |
| A | 08/14 | DAH | ISSUED FOR REVIEW | |

PROJECT NO.   10395700

**DAPL/ETCOP**

TYPICAL TEMPORARY CROSSING RAMP OVER EXISTING PIPELINE/UTILITY

| DRAWN BY: DAH | DATE: 08/07/14 | DWG. NO. | REV. |
|---------------|----------------|----------|------|
| CHECKED BY: DAH | DATE: 08/07/14 | **P12–24** | **A** |
| SCALE: N.T.S. | APP.: | | |

USACE_DAPL0075024

## TYPICAL PAVED ROAD CROSSING CONTROL DETAILS



ROADSIDE DITCH

℄ PAVED ROAD

FLUME PIPE

TIRES AND/OR PLYWOOD MATS FOR EQUIPMENT CROSSING

15' MIN.

EDGE OF PAVEMENT

25' MIN.

SILT FENCE

FILE: R:\Projects\10395700\DISCIPLINE\CAD\DRAWINGS\99—TYPICAL\10395700—P12—25.dwg PLOT DATE: 8/7/2014 BY: ROBLEDO, RAMON

### NOTES:

CRUSHED STONE RAMP (WITH FABRIC MAT IN AGRICULTURAL AREAS) TO CONSTRUCTED FOR ENTRANCE AND EXIT OF VEHICLES AND EQUIPMENT.

ALL VEHICLES SHALL TRAVEL ON ACCESS RAMP WHEN ENTERING OR EXITING THE RIGHT—OF—WAY.

THIS DOCUMENT IS ISSUED FOR INTERIM REVIEW AND IS NOT TO BE USED FOR CONSTRUCTION, BIDDING, OR PERMITTING PURPOSES.

| REV. | DATE | BY | DESCRIPTION | CHK. |
|------|------|-----|-------------|------|
| A | 08/14 | DAH | ISSUED FOR REVIEW | |

PROJECT NO. 10395700

## DAPL/ETCOP

### TYPICAL PAVED ROAD CROSSING CONTROL DETAILS

| | | | |
|---|---|---|---|
| DRAWN BY: DAH | DATE: 08/07/14 | DWG. NO. | REV. |
| CHECKED BY: DAH | DATE: 08/07/14 | | |
| SCALE: N.T.S. | APP.: | **P12—25** | **A** |

USACE_DAPL0075025



FILE: R:\Projects\10395700\DISCIPLINE\CAD\DRAWINGS\99-TYPICAL\10395700-P12-26.dwg  PLOT DATE:  8/8/2014  BY:  HERNANDEZ, DANIEL

TREES

WETLAND BOUNDARY

LIMIT OF PERMANENT R.O.W.

SPOIL AREA

EXCAVATED TRENCH

WORK PAD

**PLAN**
N.T.S.

WORK PAD
AS REQUIRED

SPOIL PILE

℄ PIPELINE

SADDLE WEIGHTS
(IF REQUIRED)

INSTALLED PIPE

**CROSS SECTION THROUGH RIGHT-OF-WAY**

THIS DOCUMENT IS ISSUED
FOR INTERIM REVIEW AND
IS NOT TO BE USED FOR
CONSTRUCTION, BIDDING,
OR PERMITTING PURPOSES.

**NOTES**
1. WORK PAD AND / OR EQUIPMENT MATS TO BE INSTALLED AS REQUIRED.
2. STUMPS TO BE REMOVED FROM WORKING RIGHT-OF-WAY.

| REV. | DATE | BY | DESCRIPTION | CHK. |
|------|------|-----|-------------|------|
| A | 08/14 | DAH | ISSUED FOR REVIEW | |

PROJECT NO.   10395700

# DAPL/ETCOP

## FORESTED WETLAND

| DRAWN BY: DAH | DATE: 08/07/14 | DWG. NO. | REV. |
|---------------|----------------|----------|------|
| CHECKED BY: DAH | DATE: 08/07/14 | P12-26 | A |
| SCALE: N.T.S. | APP.: | | |

USACE_DAPL0075026



WETLAND BOUNDARY

TEMPORARY WORKSPACE

SPOIL AREA

WOOD MATS

EXCAVATED TRENCH

WORK PAD

ADDITIONAL WORKSPACE

PLAN
N.T.S.

LOG RIP-RAP TO BE PLACED
PERPENDICULAR TO TRENCH

WOOD MATS MOVED AHEAD OF
BACKHOE AS TRENCH IS EXCAVATED

℄ PIPELINE

SPOIL PILE

INSTALLED PIPE

CROSS SECTION THROUGH RIGHT-OF-WAY

NOTES
1. WORK PAD OF RIP-RAP CONSTRUCTED FOR ACCESS OF TRACKED EQUIPMENT ONLY.
2. PIPE SECTION TO BE FABRICATED  IN WORK AREA AND CARRIED INTO WETLAND.
3. ACCESS FOR VEHICLES AROUND WETLAND.
4. TRENCH TO BE EXCAVATED BY BACKHOE POSITIONED ON WOOD MATS.

THIS DOCUMENT IS ISSUED
FOR INTERIM REVIEW AND
IS NOT TO BE USED FOR
CONSTRUCTION, BIDDING,
OR PERMITTING PURPOSES.

DAPL/ETCOP

SATURATED WETLAND

| REV. | DATE | BY | DESCRIPTION | CHK. |
|------|------|-----|-------------|------|
| A | 08/14 | DAH | ISSUED FOR REVIEW | |

PROJECT NO.   10395700

| DRAWN BY: DAH | DATE: 08/07/14 | DWG. NO. | REV. |
|---------------|----------------|----------|------|
| CHECKED BY: DAH | DATE: 08/07/14 | P12-27 | A |
| SCALE: N.T.S. | APP.: | | |

FILE: R:\Projects\10395700\DISCIPLINE\CAD DRAWINGS\99-TYPICAL\10395700-P12-27.dwg PLOT DATE: 8/8/2014 BY: HERNANDEZ, DANIEL

USACE_DAPL0075027



**PLAN**
N.T.S.

**CROSS SECTION THROUGH RIGHT-OF-WAY**

NOTES
1. WORK PAD OF LOG RIP-RAP AND / OR FILTER CLOTH WITH GRANULAR MATERIAL TO BE CONSTRUCTED FOR ACCESS FOR ALL EQUIPMENT.
2. TRENCH TO BE EXCAVATED BY BACKHOE POSITIONED ON WOOD MATS.
3. PIPE TO BE FABRICATED ON WORK PAD WITHIN WETLAND.

THIS DOCUMENT IS ISSUED FOR INTERIM REVIEW AND IS NOT TO BE USED FOR CONSTRUCTION, BIDDING, OR PERMITTING PURPOSES.

FILE: R:\Projects\10395700\DISCIPLINE\CAD\DRAWINGS\99-TYPICAL\10395700-P12-28.dwg PLOT DATE: 8/8/2014 BY: HERNANDEZ, DANIEL

**DAPL/ETCOP**

**SATURATED WETLAND**

| A | 08/14 | DAH | ISSUED FOR REVIEW | |
|---|---|---|---|---|
| REV. | DATE | BY | DESCRIPTION | CHK. |

PROJECT NO.   10395700

| DRAWN BY: DAH | DATE: 08/07/14 | DWG. NO. | REV. |
|---|---|---|---|
| CHECKED BY: DAH | DATE: 08/07/14 | **P12-28** | **A** |
| SCALE: N.T.S. | APP.: | | |

USACE_DAPL0075028



WETLAND BOUNDARY

TEMPORARY WORKSPACE

SPOIL AREA

EXCAVATED TRENCH

**PLAN**
N.T.S.

DITCH WATER TO BE PUMPED
INTO HAY BALE APRON OR
VEGETATION IF SADDLE
WEIGHTS ARE TO BE UTILIZED

WOOD MATS MOVED AHEAD OF
BACKHOE AS TRENCH IS EXCAVATED

℄ PIPELINE

SPOIL PILE

VEGETATIVE
MAT/TOPSOIL

INSTALLED PIPE

SADDLE WEIGHT

**CROSS SECTION THROUGH RIGHT-OF-WAY**

THIS DOCUMENT IS ISSUED
FOR INTERIM REVIEW AND
IS NOT TO BE USED FOR
CONSTRUCTION, BIDDING,
OR PERMITTING PURPOSES.

**NOTES**
1. NO-WORK PAD NECESSARY. ACCESS FOR ALL EQUIPMENT AND VEHICLES THROUGH WETLANDS.
2. PIPE SECTION FABRICATED WITHIN WETLAND.
3. TOPSOIL/VEGETATIVE MAT STRIPPED INTO SPOIL PILE AND IN VICINITY OF TRENCH.

FILE: R:\Projects\10395700\DISCIPLINE\CAD\DRAWINGS\99-TYPICAL\10395700-P12-29.dwg  PLOT DATE:  8/8/2014  BY:  HERNANDEZ, DANIEL

# DAPL/ETCOP

## NON-SATURATED WETLAND

| A | 08/14 | DAH | ISSUED FOR REVIEW | |
|---|---|---|---|---|
| REV. | DATE | BY | DESCRIPTION | CHK. |

PROJECT NO.   **10395700**

| DRAWN BY: DAH | DATE: 08/07/14 | DWG. NO. | REV. |
|---|---|---|---|
| CHECKED BY: DAH | DATE: 08/07/14 | | |
| SCALE: N.T.S. | APP.: | **P12-29** | **A** |

USACE_DAPL0075029



FILE: R:\Projects\10395700\DISCIPLINE\CAD\DRAWINGS\99-TYPICAL\10395700-P12-30.dwg PLOT DATE: 8/8/2014 BY: HERNANDEZ, DANIEL

WETLAND BOUNDARY

TEMPORARY WORKSPACE

SPOIL AREA

WOOD MATS

EXCAVATED TRENCH

WORK PAD

**PLAN**
N.T.S.

DITCH WATER TO BE PUMPED
INTO HAY BALE APRON OR
VEGETATION IF SADDLE
WEIGHTS ARE TO BE UTILIZED

FILTER CLOTH OVERLAIN WITH
CLEAN GRANULAR MATERIAL

WOOD MATS MOVED AHEAD OF
BACKHOE AS TRENCH IS EXCAVATED

SPOIL PILE

℄ PIPELINE

INSTALLED PIPE

**CROSS SECTION THROUGH RIGHT-OF-WAY**

THIS DOCUMENT IS ISSUED
FOR INTERIM REVIEW AND
IS NOT TO BE USED FOR
CONSTRUCTION, BIDDING,
OR PERMITTING PURPOSES.

**NOTES**
1. WORK PAD OF FILTER CLOTH WITH GRANULAR MATERIAL TO BE CONSTRUCTED
   FOR ACCESS OF ALL EQUIPMENT AND VEHICLES.
2. PIPE TO BE FABRICATED ON WORK PAD WITHIN WETLAND.
3. TRENCH TO BE EXCAVATED BY BACKHOE POSITIONED ON WOOD MATS.

| | | | | | |
|---|---|---|---|---|---|
| A | 08/14 | DAH | ISSUED FOR REVIEW | | |
| REV. | DATE | BY | DESCRIPTION | | CHK. |

PROJECT NO.   **10395700**

## DAPL/ETCOP

### NON-SATURATED WETLAND

| | | | |
|---|---|---|---|
| DRAWN BY: DAH | DATE: 08/07/14 | DWG. NO. | REV. |
| CHECKED BY: DAH | DATE: 08/07/14 | | |
| SCALE: N.T.S. | APP.: | **P12-30** | **A** |

USACE_DAPL0075030



NOTE:
DEPTH OF TOPSOIL STRIPPING IS A MINIMUM OF 12 INCHES.

THIS DOCUMENT IS ISSUED
FOR INTERIM REVIEW AND
IS NOT TO BE USED FOR
CONSTRUCTION, BIDDING,
OR PERMITTING PURPOSES.

| REV. | DATE | BY | DESCRIPTION | CHK. |
|------|------|-----|-------------|------|
| A | 8/20/14 | DAH | ISSUED FOR REVIEW | |

PROJECT NO.   10395700

# DAPL/ETCOP

## CONSTRUCTION RIGHT-OF-WAY ARRANGEMENT

| | |
|---|---|
| DRAWN BY: DAH | DATE: 08/18/14 |
| CHECKED BY: DAH | DATE: 08/18/14 |
| SCALE: N.T.S. | APP.: |

DWG. NO.   P12-31

REV.   A

USACE_DAPL0075031

# APPENDIX B

## SPILL PREVENTION, CONTROL, AND COUNTERMEASURES PLAN
(Final plan to be furnished by the Contractor and will meet or exceed the draft plan)



**DAKOTA ACCESS, LLC**
An ENERGY TRANSFER Company

# Dakota Access Pipeline (DAPL) Project

## SPILL PREVENTION, CONTAINMENT, AND COUNTERMEASURES PLAN



WOOD GROUP MUSTANG

**Document No.:  DAPL-WGM-GN000-HSE-PLN-0002**

**Project No.: 10395700**

| REV | DATE | DESCRIPTION | ORIG | CHK | APPR |
|-----|------|-------------|------|-----|------|
| A | 8-27-2014 | Issued for Review | JCD | JW | DJ |
| B | 9-11-2014 | Issue for Approval | JCD | JW | DJ |
| C | 12-12-2014 | Revised | JCD | JW | DJ |
|   |   |   |   |   |   |
|   |   |   |   |   |   |

USACE_DAPL0075033

| Dakota Access, LLC and Energy Transfer Crude Oil Pipeline, LLC | DAPL and ETCOP Projects | DAPL-WGM-GN000-HSE-PLN-0002 | |  |
|---|---|---|---|---|
| | | Rev. | B | |

## TABLE OF CONTENTS

**Section**          **Page**

1.0 INTRODUCTION ................................................................................................. 1
2.0 PLANNING AND PREVENTION........................................................................... 1
     2.1   Roles And Responsibilities........................................................................ 1
         2.1.1   Spill Coordinator ........................................................................ 1
         2.1.2   Environmental Manager .............................................................. 2
         2.1.3   Field Construction Manager ........................................................ 2
         2.1.4   Authorized Personnel ................................................................. 3
         2.1.5   Construction Superintendent ...................................................... 3
         2.1.6   Construction Personnel .............................................................. 3
         2.1.7   Responsibility of Administration .................................................. 3
3.0 GENERAL BEST MANAGEMENT PRACTICES ................................................... 3
     3.1   Typical Fuels, Lubricants And Hazardous Materials ......................................... 3
     3.2   Preventive Actions ......................................................................................... 4
         3.2.1   Storage, Refueling, and Lubrication Areas ................................. 4
         3.2.2   Special Refueling Activities ........................................................ 4
         3.2.3   Contingency Supplies................................................................. 5
         3.2.4   Waste Removal .......................................................................... 5
     3.3   Notifications.................................................................................................. 5
     3.4   Hazardous Materials Spill Response Training.................................................. 5
     3.5   Contractor's Waste Disposal .......................................................................... 6
     3.6   Mitigation Actions ......................................................................................... 6
         3.6.1   Control of Spills or Releases ..................................................... 6
         3.6.2   Notifications ............................................................................... 6
         3.6.3   Cleanup and Disposal Actions.................................................... 6
         3.6.4   Records ..................................................................................... 7
4.0 SPILL PROCEDURE ........................................................................................... 7
     4.1   Reportable Quantity Spills ............................................................................. 7
     4.2   Immediate Spill Response Actions ................................................................. 7
     4.3   Reporting Requirements ................................................................................ 10
     4.4   Disposal of Cleanup Debris and Materials ...................................................... 10
     4.5   Determination of Spill Boundaries in the Absence of Visible Traces ............. 10
     4.6   Cleanup Requirements .................................................................................. 11
         4.6.1   General Requirements: ............................................................... 11
         4.6.2   Effect of Emergency or Adverse Weather .................................. 11
     4.7   Records......................................................................................................... 12
     4.8   Responsibility for Procedure ......................................................................... 12

USACE_DAPL0075034

| Dakota Access, LLC and Energy Transfer Crude Oil Pipeline, LLC | DAPL and ETCOP Projects | DAPL-WGM-GN000-HSE-PLN-0002 | |  |
|---|---|---|---|---|
| | | Rev. | B | |

## APPENDICES

APPENDIX A - Construction Spill Report Form

APPENDIX B - Reportable Quantities

APPENDIX C - State Requirements for Reporting

APPENDIX D - Handling Containers and Drums

APPENDIX E – DOT-Approved Containers

APPENDIX F - Inspection of Waste Drums and Containers

APPENDIX G - Typical Petroleum Storage and Handling Volumes on a Construction Spread

APPENDIX H - Emergency Response Contractors; Disposal and Treatment Facilities

USACE_DAPL0075035

| Dakota Access, LLC and Energy Transfer Crude Oil Pipeline, LLC | DAPL and ETCOP Projects | DAPL-WGM-GN000-HSE-PLN-0002 | |  |
|---|---|---|---|---|
| | | Rev. | B | |

## 1.0   INTRODUCTION

Dakota Access, LLC (COMPANY) has developed this Spill Prevention, Containment, and Countermeasures (SPCC) Plan for the Dakota Access Pipeline Project (Project) to provide preventative and mitigative measures to minimize the environmental impact associated with inadvertent spills or releases of fuel, lubricant, or hazardous materials during construction of the Project. These measures will be implemented by the construction contractor or inspection staff (unless otherwise indicated) during construction of the Project.  Each construction contractor (Contractor) on the Project will be required to prepare a job-specific SPCC Plan which will be submitted prior to the commencement of construction.

## 2.0   PLANNING AND PREVENTION

COMPANY requires its Contractors to implement proper planning and preventive measures to minimize the likelihood of spills, and to quickly and successfully clean up a spill, should one occur.   COMPANY has developed this SPCC Plan to set forth minimum standards for handling and storing regulated substances and for cleaning up spills.   Potential sources of construction-related spills include storage tank leaks, machinery and equipment failure, and fuel handling and transfer accidents.   The Contractor will be responsible for implementing, at a minimum, the following planning and prevention measures.

## 2.1   ROLES AND RESPONSIBILITIES

### 2.1.1   Spill Coordinator

- A Spill Coordinator shall be designated and employed by the Contractor, subject to approval.

- The Spill Coordinator shall mobilize on-site personnel, equipment, and materials for containment and/or cleanup commensurate with the extent of the spill.

- The Spill Coordinator shall assist the appropriate Emergency Response Contractor (Appendix H) and monitor containment activities to ensure that the actions are consistent with the requirements of this SPCC Plan.

- The Spill Coordinator and/or Chief Environmental Inspector or the Field Construction Manager, in consultation with appropriate agencies, shall determine when it is necessary to evacuate spill sites to safeguard human health.

- The Spill Coordinator shall notify the Environmental Manager and Chief Environmental Inspector immediately of any spill.

- The Spill Coordinator will assist the Chief Environmental Inspector in completion of a spill report form.

USACE_DAPL0075036

| Dakota Access, LLC and Energy Transfer Crude Oil Pipeline, LLC | DAPL and ETCOP Projects | DAPL-WGM-GN000-HSE-PLN-0002 | | WOOD GROUP MUSTANG |
|---|---|---|---|---|
| | | Rev. | B | |

- The Spill Coordinator will identify available Emergency Response Contractors, who are subject to approval.

- The Spill Coordinator should not contact an agency regarding a spill without authorization from the Environmental Manager and/or Chief Environmental Inspector.

## 2.1.2  Environmental Manager

- The "Environmental Manager" referred to in this SPCC Plan will be a designated COMPANY employee or a third-party Designee.

- The Environmental Manager will have a Chief Inspector located at the construction sites.  The Chief Inspector may act on the behalf of the Environmental Manager on certain issues that will be defined before construction is started.

- The Chief Inspector will monitor the Contractor's compliance with the provisions of this SPCC Plan.

- All "reportable spills" must be reported immediately to the Construction Manager, Environmental Manager, and Chief Inspector ("reportable spills" will be defined by state-specific guidelines.  See Appendix C).  The Chief Inspector, with assistance from the Spill Coordinator, is responsible for completing a Spill Report Form (Appendix A) within 24 hours of the occurrence of a reportable spill.

- The Spill Coordinator and/or Environmental Manager or the Project Manager, in consultation with appropriate agencies, shall determine when it is necessary to evacuate spill sites to safeguard human health.

- The Environmental Manager will promptly report spills to the appropriate federal, state, and local agencies as required and coordinate with these agencies regarding contacting additional parties or agencies.

## 2.1.3  Field Construction Manager

- The "Field Construction Manager" referred to in this SPCC Plan will be the Chief Inspector, a designated COMPANY employee, or a third-party designee who is responsible for the management of construction activities on this Project (representing the Construction Manager for COMPANY).

- The Field Construction Manager is the initial point of contact of the Spill Coordinator when a spill occurs, and determines the containment measures that may be required.

- The Field Construction Manager is responsible for documenting the general information regarding any spills such as work stoppages, injuries, fires, and the extent of exposure to workers on the site.

USACE_DAPL0075037

| Dakota Access, LLC and Energy Transfer Crude Oil Pipeline, LLC | DAPL and ETCOP Projects | DAPL-WGM-GN000-HSE-PLN-0002 | | WOOD GROUP MUSTANG |
|---|---|---|---|---|
| | | Rev. | B | |

- The Field Construction Manager is responsible for coordinating any emergency response services that may be required such as the Fire Department, the Sheriff Department, or for contacting Emergency Response Contractors.

### 2.1.4  Authorized Personnel

- Authorized Personnel are representatives of the Contractor who are designated to handle fuel, lubricants, or other regulated substances.
- Authorized Personnel shall be familiar with the requirements of the SPCC Plan and the consequences of non-compliance.

### 2.1.5  Construction Superintendent

The Contractor's Construction Superintendent or representative must immediately notify the Environmental Manager and Chief Inspector of any spill of a petroleum product or hazardous liquid, regardless of volume.

### 2.1.6  Construction Personnel

- Construction Personnel are representatives of the Contractor involved with installation of the Project.
- Construction Personnel shall notify the Construction Superintendent or Spill Coordinator immediately of any spill of a petroleum product or hazardous liquid, regardless of volume.

### 2.1.7  Responsibility of Administration

The Contractor is responsible for the administration of its SPCC Plan.

## 3.0  GENERAL BEST MANAGEMENT PRACTICES

### 3.1  TYPICAL FUELS, LUBRICANTS AND HAZARDOUS MATERIALS

The table in Appendix G identifies fuels, lubricants and coolants generally present on pipeline construction spreads and identifies typical total volumes, storage, and transportation methods.  Contractors will have appropriate Material Safety Data Sheets (MSDS) on-site as required by the Occupational Safety and Health Administration (OSHA).

USACE_DAPL0075038

| Dakota Access, LLC and Energy Transfer Crude Oil Pipeline, LLC | DAPL and ETCOP Projects | DAPL-WGM-GN000-HSE-PLN-0002 | | WOOD GROUP MUSTANG |
|---|---|---|---|---|
| | | Rev. | B | |

## 3.2   PREVENTIVE ACTIONS

The following preventive actions and procedures will be accomplished prior to construction.

### 3.2.1  Storage, Refueling, and Lubrication Areas

Contractors will designate and establish storage, refueling, and lubrication areas prior to construction which will minimize the environmental and safety impacts associated with inadvertent releases of fuel, lubricants, or hazardous substances, as per the following guidelines.

- Refueling and storing potentially hazardous materials will not occur within a 150-foot radius of any private wells or within a 400-foot radius of any municipal or community water supply wells.

- Storage of fuel, lubricants, or hazardous materials within 100 feet of perennial waterbodies, wetland boundaries, or within a municipal watershed will not be conducted.

- No hazardous or potentially hazardous materials, other than essential equipment fuel (*e.g.*, gasoline and diesel fuel) or standard lubricants (*e.g.,* engine oils and grease) will be transported into the right-of-way or construction area without Environmental Manager coordination and approval.

- All petroleum products used by the Contractor necessary for fueling and maintenance of construction equipment shall be stored at a well-maintained and supervised location.  Diesel fuel, gasoline, and lubricating oils shall be stored in bermed and lined containment structures or other approved fabricated containment reservoirs.

- All vehicle maintenance waste (oils and lubricants) shall be collected in proper containers within the designated storage, refueling, and lubrication areas.  Vehicle washing will be conducted in an area that will ensure that none of the wash water enters any waterbody or wetland.  All vehicle wastes will be properly disposed of at facilities permitted to receive hydrocarbon vehicle waste.

### 3.2.2  Special Refueling Activities

When unique conditions require refueling within 100 feet of the banks of a waterbody, a wetland boundary, or within any municipal watersheds, this activity must be approved in advance by the Environmental Inspector following a review that no reasonable alternatives exist and incorporation of any necessary additional emergency response measures.  At a minimum, the review will consider the environmental risks of relocating equipment to an authorized refuel/lubrication area verses risks involved with refuel/lubrication in-place.  Additional emergency response measures include availability

USACE_DAPL0075039

| Dakota Access, LLC and Energy Transfer Crude Oil Pipeline, LLC | DAPL and ETCOP Projects | DAPL-WGM-GN000-HSE-PLN-0002 | |  |
|---|---|---|---|---|
| | | Rev. | B | |

absorbent materials or other secondary spill containment materials for immediate application prior to commencing refueling activities.

### 3.2.3  Contingency Supplies

Each construction crew shall have on-hand sufficient supplies of absorbent materials, barrier material, and DOT-approved containers to allow for rapid containment and recovery of any potential spill.

### 3.2.4  Waste Removal

Standing procedures and individual responsibilities regarding excavation, transport, and off-site disposal of any soil material contaminated by a spill will be established prior to construction.

## 3.3    NOTIFICATIONS

Whenever any spill of a hazardous or potentially hazardous substance occurs, the Environmental Manager will be notified.  The Environmental Manager will help direct further response actions in accordance with EPA guidelines and assist throughout the cleanup and disposal of wastes.

## 3.4    HAZARDOUS MATERIALS SPILL RESPONSE TRAINING

The Contractor shall instruct construction personnel in the operation and maintenance of equipment to prevent an accidental discharge or spill of fuel, oil, and lubricants. Personnel shall also be made aware of the pollution control laws, rules, and regulations applicable to their work.

A spill prevention briefing shall be scheduled and conducted by the Contractor prior to the initiation of construction to assure adequate understanding of this SPCC Plan.  The topics to be addressed at the briefing shall include the following:

- SPCC Plan contents;
- Possible equipment failure and malfunction;
- Precautionary measures;
- Standard operating procedures in case of a spill;
- Equipment, materials, and supplies to be maintained by the Contractor and made available for cleanup of a spill.

USACE_DAPL0075040

| Dakota Access, LLC and Energy Transfer Crude Oil Pipeline, LLC | DAPL and ETCOP Projects | DAPL-WGM-GN000-HSE-PLN-0002 | |  |
|---|---|---|---|---|
| | | Rev. | B | |

## 3.5   CONTRACTOR'S WASTE DISPOSAL

All wastes generated during construction shall be stored at the Contractor's Field Warehouse, or other approved collection site, in DOT-approved containers.

## 3.6   MITIGATION ACTIONS

The following guidelines specify the procedures used to control a release, notify appropriate officials, clean up waste, and document corrective actions.

### 3.6.1   Control of Spills or Releases

Controlling spills and releases shall be accomplished by stopping or segregating the source of the release, using the required stockpiled materials to contain the spill and, if warranted, stopping operations within the affected areas.

### 3.6.2   Notifications

The Contractor shall first notify the Environmental Manager and Chief Inspector of <u>any</u> spill.  If the spill is of a reportable quantity, the Environmental Manager shall notify the required agencies, and, if the situation warrants, the Field Construction Manager shall notify the appropriate local police, fire department, and/or area residents.

The Contractor shall have designated employees' on-call 24-hours-per-day for notification of the emergency response companies referenced in Appendix H.

### 3.6.3   Cleanup and Disposal Actions

The Contractor's Spill Coordinator will direct cleanup of all releases.   Contaminated soils, absorbent materials, and other waste generated by the spill/release will be placed in DOT-approved storage/shipping containers (see Appendix E).   The containers will be labeled indicating the contents and placed in a designated accumulation point for disposal.   Depending on the type of waste generated, the containers shall be transported and disposed of in accordance with appropriate EPA disposal criteria by permitted transporters and disposers.

In the event that a fuel spill occurs within a controlled containment dike, in lieu of a pump/valve drainage system, the Contractor shall immediately engage a certified vacuum cleanup service in the vicinity.

Arrangements shall be made for spill cleanup vacuum services within various vicinities. These companies will be on-call 24-hours-per-day to provide emergency cleanup services, as required by the Contractor.

USACE_DAPL0075041

| Dakota Access, LLC and Energy Transfer Crude Oil Pipeline, LLC | DAPL and ETCOP Projects | DAPL-WGM-GN000-HSE-PLN-0002 | | WOOD GROUP MUSTANG |
|---|---|---|---|---|
| | | Rev. | B | |

### 3.6.4  Records

The Contractor shall maintain written records of all actions taken during the course of a spill event.

## 4.0  SPILL PROCEDURE

### 4.1  REPORTABLE QUANTITY SPILLS

Unless otherwise directed, the reporting, disposal, and pre-cleanup sampling requirements in this section apply to all spills of reportable quantities (Appendix C).

### 4.2  IMMEDIATE SPILL RESPONSE ACTIONS

The Contractor shall implement this SPCC Plan using the following steps in response to a spill of hazardous materials:

Immediate Safeguards

- Evacuate the area of personnel, if warranted.
- Stop operation of affected equipment/area, if warranted.
- Turn off utilities to the area, if necessary.
- Cordon the area to prevent entry of unnecessary personnel or equipment.  Establish a single point of ingress and egress to control access to the spill area.
- Take whatever steps possible to eliminate the source of the leak or spill (e.g., shut off valves, upright containers, stop pumps).
- Accumulate as much information as possible as to the nature and size of the spill. Use the Construction Spill Report Form (see Appendix A) for the type of information required.

Spill Event Log Establishment

Documentation of all spill-related activities will include the following information in the log:

- Time and date of initial notification of spill and approximate time the spill occurred.
- Start and completion time of all key activities.
- A detailed description of all activities undertaken and identification of personnel accomplishing these activities.

USACE_DAPL0075042

| Dakota Access, LLC and Energy Transfer Crude Oil Pipeline, LLC | DAPL and ETCOP Projects | DAPL-WGM-GN000-HSE-PLN-0002 | | WOOD GROUP MUSTANG |
|---|---|---|---|---|
| | | Rev. | B | |

- Note time of all correspondence, personnel involved with the correspondence, and nature of the correspondence.
- The log shall be maintained until initial actions to clean up the spill are complete (approximately 24 hours, unless conditions extend the response to the emergency).

Notifications

All notifications shall be accomplished at the direction of the Spill Coordinator or Construction Director.

- Notify the Environmental Manager of any spill and provide the necessary information by using the Construction Spill Report Form (Appendix A).
- Make other Contractor and Company and agency notifications per the SPCC Plan, or as instructed by the Environmental Manager and Section 4.3, Reporting Requirements, of this Plan.
- Notify local police, fire department or hazardous material units, if assistance is necessary.
- Notify local residents, if necessary.

Spill Control

For spills on land or pavement:

- Plug all storm drains the spill may gain access to.
- Construct terrace dam or ditch to stop the spill's flow.
- Scatter hay, straw, sand, absorbent pads, or other similar materials to absorb the spill.
- If free-standing fluid is present, actions can be taken to skim fluids and place into DOT-approved containers.

For spills on water:

- Ensure that all possible efforts are made to limit the migration of the surface spill until properly equipped cleanup teams can arrive.
- Create a back current to limit out-flow of material.
- Use absorbent floats and/or booms, if available.

USACE_DAPL0075043

| Dakota Access, LLC and Energy Transfer Crude Oil Pipeline, LLC | DAPL and ETCOP Projects | DAPL-WGM-GN000-HSE-PLN-0002 | | WOOD GROUP MUSTANG |
|---|---|---|---|---|
| | | Rev. | B | |

- Create shoreline earth berms to prevent spill from reaching surface waters.  Use skimmers, pumps or available absorbent materials to remove spill from water, should spill breach berms.

Area Spill Cleanup

- Follow site cleanup and decontamination requirements which are provided in this SPCC Plan.
- Remove cleanup debris from spill area.  Basic guidance is provided in Section 4.4, Disposal of Cleanup Debris and Materials.

Spill Materials Disposal

All spill material shall be disposed of in accordance with EPA Regulations.   General guidance is provided in Section 4.6, Cleanup Requirements.

USACE_DAPL0075044

| Dakota Access, LLC and Energy Transfer Crude Oil Pipeline, LLC | DAPL and ETCOP Projects | DAPL-WGM-GN000-HSE-PLN-0002 | |  |
|---|---|---|---|---|
| | | Rev. | B | |

## 4.3    REPORTING REQUIREMENTS

The following reporting requirements by the Contractor are required in addition to applicable reporting requirements under the Clean Water Act (CWA), Toxic Substances Control Act (TSCA), or the Comprehensive Environmental Response Compensation and Liability Act (CERCLA) and other documents which establish the SPCC reporting requirements.

Notify the Environmental Manager and Chief Inspector in the event of <u>any</u> leaks or spills. Use the Construction Spill Report Form (see Appendix A) for providing necessary information.  The Chief Inspector will provide guidance based on the potential impact of the spill.

## 4.4    DISPOSAL OF CLEANUP DEBRIS AND MATERIALS

All contaminated soils, solvents, rags, and other materials resulting from the cleanup actions will be properly stored, labeled, and disposed of in accordance with the appropriate EPA regulations.  Some general guidance follows:

- Soils and/or other contaminated materials shall be placed in DOT-approved sealed containers.
- Containers shall be labeled with required waste label(s), dated, and inventoried.
- Containers may be stored at the construction site in the identified staging areas for up to 90 days.
- All containers shall be disposed of in accordance with EPA Regulations using permitted transporters and permitted disposal facilities.
- All hazardous waste containers shall be properly manifested prior to departure from the construction area.  The Contractor and ETC will maintain all manifest records with the Project file for at least three years after the containers were shipped for disposal.

## 4.5    DETERMINATION OF SPILL BOUNDARIES IN THE ABSENCE OF VISIBLE TRACES

For spills where there are insufficient visible traces, yet there is evidence of a leak or spill, the boundaries of the spill shall be determined using a statistically based sampling scheme.  The Environmental Manager will provide sampling assistance.

USACE_DAPL0075045

| Dakota Access, LLC and Energy Transfer Crude Oil Pipeline, LLC | DAPL and ETCOP Projects | DAPL-WGM-GN000-HSE-PLN-0002 | | WOOD GROUP MUSTANG |
|---|---|---|---|---|
| | | Rev. | B | |

## 4.6   CLEANUP REQUIREMENTS

### 4.6.1  General Requirements:

- All soil within the spill area (i.e., visible traces of soil and a buffer of one lateral foot around the visible traces) must be excavated.

- All excavation material shall be disposed of as mentioned in Section 4.4, Disposal of Cleanup Debris and Materials, and the appropriate EPA Regulations.

- All cleanup soil and wastes shall be collected in DOT-approved containers.   See Appendix E for a listing of approved containers.

- Appendix D contains guidance on how to manage the area used to temporarily store waste containers.

- Appendix F contains guidance on inspection procedures for stored waste containers required by EPA Regulations.

- The ground shall be restored to its original configuration by back-filling with clean soil.

- Cleanup requirements of a spill area shall be completed within 48 hours after notification or knowledge of the spill.

### 4.6.2  Effect of Emergency or Adverse Weather

Completion of cleanup may be delayed beyond 48 hours in case of circumstances including, but not limited to:

- Civil emergency;

- Adverse weather conditions;

- Lack of access to the site;

- Emergency operating conditions.

- The occurrence of a spill on a weekend or after-hours. Overtime costs are not acceptable reasons to delay response.

- Completion of cleanup may be delayed only for the duration of the adverse conditions.   If the adverse weather conditions, or time lapse due to other emergencies, have left insufficient visible traces, a statistically based sampling scheme to determine the spill boundaries will be developed and implemented.

USACE_DAPL0075046

| Dakota Access, LLC and Energy Transfer Crude Oil Pipeline, LLC | DAPL and ETCOP Projects | DAPL-WGM-GN000-HSE-PLN-0002 | |  |
|---|---|---|---|---|
| | | Rev. | B | |

## 4.7   RECORDS

All records that document spill events and corrective actions taken will be maintained in the project files for three years from the date the corrective actions were completed. Documentation and certification of area decontamination shall be conducted upon completion of and during all cleanup operations.   The records and certifications shall be completed, as follows:

- Identification of the source of the spill (e.g., type of equipment or container).

- Estimated or actual date and time of the spill occurrence.

- The date and time cleanup was completed or terminated (if cleanup was delayed by emergency or adverse weather, the nature and duration of the delay).

- A brief description of the spill location.

- Pre-cleanup sampling data used to establish the spill boundaries if required due to insufficient visible traces, and a brief description of the sampling methodology used to establish the spill boundaries.

- A brief description of the solid surfaces cleaned and of the wash/rinse method used.

- Approximate depth of soil excavation and the amount of soil removed.

- A certification statement signed by the Construction Director, Spill Coordinator, and the Environmental Manager stating the cleanup requirements have been met and the information contained in the record is true to the best of his/her knowledge.

- The estimated cost of pre- or post-cleanup and sampling by man-hours, dollars, or both.

## 4.8   RESPONSIBILITY FOR PROCEDURE

Address any questions to the Environmental Manager (name and address to be announced).

USACE_DAPL0075047

# APPENDIX A
## CONSTRUCTION SPILL REPORT FORM

Date of Spill:_____    Date of Spill Discovery:_____

Time of Spill:_____    Time of Spill Discovery:_____

Location Name:_____    Region:_____

Name and Title of Discoverer:_____

Type of material spilled and manufacturer's name:_____

Legal Description of spill location:_____

Directions from nearest community:_____

Estimated volume of spill:_____ Estimated Material Recovered:_____

Weather Conditions:_____

Topography and surface conditions of spill site:_____

Spill medium (pavement, sandy soil, water, etc.):_____

Proximity of spill to surface waters: _____

Did the spill reach a waterbody?            _____ Yes _____ No

If so, was a sheen present?            _____ Yes _____ No

Describe the causes and circumstances resulting in the spill:_____
_____
_____

Describe the extent of observed contamination, both horizontal and vertical (i.e., spill-stained soil in a 5-foot radius to a depth of 1 inch): _____
_____
_____

Describe immediate spill control and/or cleanup methods used and implementation schedule:
_____

Current status of cleanup actions:_____

Name/Company/Address/Phone Number for the following:

Construction Superintendent:_____
_____

Spill Coordinator:_____
_____

Environmental Manager:_____
_____

Person Who Reported the Spill:_____
_____

Environmental Inspector:_____
_____

Form completed by:_____ Date:_____

*Spill Coordinator must complete this for any spill, regardless of size, and submit the form to the Environmental Manager and Chief Environmental Inspector within 24 hours of the occurrence.*

**APPENDIX B**
**REPORTABLE QUANTITIES**

**PURPOSE:**

    This procedure identifies reportable quantities for releases of oil or hazardous substances in accordance with the CERCLA of 1980, the CWA, the Oil Pollution Act of 1990 (OPA 90) and the TSCA.

**RESPONSIBILITY FOR ADMINISTRATION:**

    Contractor's Spill Coordinator is responsible for administration of this procedure.

**GENERAL:**

    I.    Reportable quantity is the quantity of a release which requires notification of an agency.

    II.    Any amount of oil spill into navigable waters is reportable. Oil spills onto land may be required to be reported, depending upon quantity spilled and state regulations. Refer to Appendix C.

    III.    Appendix C lists Reportable Quantities (RQs) specified by the EPA.

    IV.    RQs for Toxic Hazardous Wastes are based on the toxic contaminant. The RQ means the quantity of the waste, not the quantity of the toxic contaminant. If toxic waste has two or more contaminants, the RQ is based on the lowest RQ for those contaminants.

**PROCEDURES:**

    I.    If oil is discharged into or upon the navigable waters of the United States, or adjoining shorelines:

        A.    Report the spill to the National Response Center (800) 424-8802.

        B.    Submit a written report within 60 days to the EPA Regional Administrator and the state agency, if the project has discharged quantities of oil into or upon the navigable waters of the United States or adjoining shorelines, which:

            1.    Is more than 1,000 gallons of oil in a single spill event; or

            2.    Is in harmful quantities as defined by 40 CFR Part 110, Oil Pollution Prevention regulations, in two spill events occurring within a twelve month period. Harmful quantity includes a film or sheen or discoloration of the surface of the water or adjoining shorelines or a sludge or emulsion deposited beneath the surface of the water or upon adjoining shorelines.

        C.    The report to the EPA Regional Administrator and the state agency will include:

            1.    Name of facility;

            2.    Name(s) of the owner or operator of the facility;

            3.    Location of the facility;

            4.    Date and year of initial facility operation;

            5.    Maximum storage or handling capacity of the facility and normal daily throughput;

6. Description of facility, including maps, flow diagrams and topographical maps;

7. A complete copy of the SPCC Plan with amendments;

8. The cause of the spill, including a failure analysis of the system or subsystem in which the failure occurred;

9. The corrective actions and/or countermeasures taken, including description of equipment repairs and replacements;

10. Additional preventive measures taken or contemplated to minimize the possibility of recurrence; and,

11. Any additional information the EPA Regional Administrator may require pertinent to the SPCC Plan or spill event.

II. If a hazardous waste or hazardous substance has been released into the environment in quantities equal to or in excess of reportable quantities listed in 40 CFR 302, the NRC must be notified.

A. Contact the required agencies with the pertinent spill information.

B. Provide verbal notification of the following information:

1. Name and telephone number of reporter;

2. Name and address of facility;

3. Type of substance discharged;

4. Quantity of substance discharged;

5. Location of discharge;

6. Actions the person reporting the discharge proposes to take to contain, cleanup and remove the substances, if any; and,

7. Any other information concerning the discharge which may be requested by the Agency at the time of notification.

III.

A. If a hazardous waste, hazardous substance or extremely hazardous substance has been released in quantities equal to or in excess of reportable quantities the State Emergency Planning Commission and Local Emergency Planning Committee must be notified. Contact the required agencies with the pertinent spill information as soon as possible.

B. Submit a written report on the incident to the appropriate state and local agency. The report will include the following:

1. Name, address and telephone number of the owner or operator;

2. Name, address and telephone number of the facility;

3. Date, time and type of incident;

4. Name and quantity of material(s) involved;

5. The extent of injuries, if any;

6. An assessment of actual or potential hazards to human health or the environment, where this is applicable;

7. Assessment of the scope and magnitude of the spill;

8.     Description of the immediate actions that have been taken and the estimated quantity and disposition of recovered material that resulted from the incident; and,

9.     Provide an implementation schedule for undertaking suggested measures to eliminate the spill.

Spill incident reports will be maintained in the project files for a minimum period of three years.



## APPENDIX C
## STATE REQUIREMENTS

These guidelines are intended to help the Environmental Manager determine what is a reportable spill.  In addition to the guidelines listed below, any substantial natural gas release which could cause an agency to initiate an unneeded emergency response should be considered reportable. The Environmental Manager and Spill Coordinator shall maintain a copy of federal reportable quantities (RQs) established under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA). A complete list of CERCLA-regulated hazardous substances and associated RQs are listed in Table 302.4 in 40 CFR § 302.4. This list can also be found online at: http://www.epa.gov/ceppo/pubs/title3.pdf.

**State Specific Reporting Requirements**

The state-specific minimum quantities for mandatory reporting of spills have not been established for the State of North Dakota.  All spills which may potentially impact waters of the state, either surface water or groundwater, must be reported.  This includes all substances, not just "hazardous materials."

## APPENDIX D
## HANDLING CONTAINERS AND DRUMS

**PURPOSE:**

This procedure provides general requirements for the design of areas used to store containers and drums, in accordance with EPA regulations 40 CFR Part 112 and 40 CFR Part 265.170.

**RESPONSIBILITY FOR ADMINISTRATION:**

The Contractor's Spill Coordinator will be responsible for this procedure.

**GENERAL:**

I.      This procedure covers container and drum storage areas storing oils and petroleum distillates and non-permitted Hazardous Waste container and drum storage areas.

II.     It is not necessary to permit Hazardous Waste container and storage areas if the waste is stored for less than 90 days.  Secondary containment is not required for non-permitted Hazardous Waste container and drum storage areas.

**PROCEDURE:**

I.      All containers and drums must be stored to avoid contact with the ground and standing water and protected to prevent rupture or leakage and to facilitate inspection.

II.     The areas with containers and drums in which oil and petroleum distillate are stored and have the potential to be spilled off site must be designed to contain spills and releases.   Appropriate secondary containment may include dikes, berms or retaining walls sufficiently impermeable ($10^{-5}$ centimeters per second) to contain spill oils.

III.    The following applies to hazardous waste containers and drums:

A.      Containers and drums holding ignitable or reactive Hazardous Waste must be stored at least 50 feet from the property line of boundary. Follow manufacturers' instructions regarding appropriate storage of product containers and drums.

B.      Hazardous Waste containers and drums must be separated and protected from incompatible materials by means of dike, berm, retaining wall or other approved means.  Incompatible materials are wastes which, when mixed, can produce effects which are harmful to human health and the environment, such as (1) heat and pressure, (2) fire or explosion, (3) violent reaction, (4) toxic fumes or, (5) flammable fumes.

C.      Hazardous Waste containers and drums must be inspected weekly. That inspection shall be documented, as per requirements listed in Appendix F.

IV.   The Contractor shall comply with all rules for Hazardous Waste Generators for satellite accumulation under 40 CFR 262.24(c)(1)(ii):

A.   Mark each container with the words "Hazardous Waste."

B.   Containers must be in good condition and kept closed except when adding or emptying waste.  In addition, containers must not contain waste that is incompatible with the containers.

V.   Conditionally Exempt Small Quantity Generators and Small Quantity Generators of Hazardous Waste must comply with the following:

A.   Meet all conditions outlined in Procedure Section II.

B.   Mark each drum or container with the words "Hazardous Waste."

C.   Label each drum or container with the date it is first used and the date it is last used.

## RECORDS:

Storage area inspection records must be kept with the project files for a minimum period of three (3) years.

## RESPONSIBILITY FOR PROCEDURE:

Address any questions to the Environmental Manager (Name and address to be announced.)

**APPENDIX E**
**DOT-APPROVED CONTAINERS**

**PURPOSE:**

This procedure provides a listing of containers which have been approved by the EPA for storage of contaminated materials or wastes.  These drums may be ordered from drum suppliers by specification number:

I.      Specification 5 - steel barrel or drum with removable head:
        A.      Body seams welded;
        B.      Chime (reinforced rim) reinforced;
        C.      Heads closed by 12 gauge bolted ring with drop forged lugs;
        D.      Marked "DOT-5."

II.     Specification 5B - steel barrel or drum with removable head:
        A.      Body seams welded;
        B.      Chime (reinforced rim) reinforced;
        C.      Heads closed by 12 gauge bolted ring with drop forged lugs;
        D.      Marked "DOT-5B."

III.    Specification 6D Overpack: cylindrical steel overpack, straight sided, for inside plastic container.  Specification 6D Overpack must be used with the specification 2S of 2SL plastic container.

IV.     Specification 2S - polyethylene container:
        A.      No removable heads;
        B.      Constructed with new polyethylene resin;
        C.      Marked "DOT-2S;"
        D.      Must fit snugly in overpack container (Spec. 6D).

V.      Specification 2SL - molded or thermoformed polyethylene container:
        A.      No removable heads;
        B.      Constructed with new polyethylene resin;
        C.      Marked "DOT-2SL;"
        D.      Must fit snugly in overpack container (Spec. 6D).

VI.     Specification 17C - single trip container, steel drum:
        A.      Removable heads are authorized;
        B.      Crowned head;
        C.      Heads closed by 12 gauge bolted ring with drop forged lugs;
        D.      Marked "DOT-17C."

USACE_DAPL0075055

## APPENDIX F
## INSPECTION OF WASTE DRUMS AND CONTAINERS

**PURPOSE:**

This procedure outlines inspection requirements for waste drums and containers as required by Federal Regulations 40 CFR 262 - 265 and 40 CFR 761.

**RESPONSIBILITY:**

The Contractor's Spill Coordinator is responsible for implementation of this procedure.

**GENERAL:**

I.   Drums and containers used to store hazardous substances and wastes shall be inspected for leaks, malfunctions, deterioration, operator errors and discharges which may lead to a release into the environment or a threat to human health.

II.  If problems are discovered during the inspection, remedial action shall be taken immediately. The action taken will be noted on the inspection report form.

**PROCEDURE:**

I.   Each waste drum and container shall be inspected and records maintained on a Waste Container Inspection Form. Inspection records shall include the date and time of the inspection, the name of the inspector, observations and the date and nature of any problems, repairs and remedial action.

   A.   Waste drum and container storage areas shall be inspected weekly for the following:

      1.   Leaking containers, deterioration of containers and deterioration of the spill containment system.

      2.   Drums and containers shall be properly labeled and dated.

      3.   Drums and containers shall be stored on pallets or drum racks.

   B.   If a drum or container is leaking, the incident shall be recorded on the inspection form and immediately cleaned up according to the SPCC Plan.

**RECORDS:**

I.   Inspection records shall be maintained in the project files for three (3) years from the date of inspection.

II.  A report of the remedial action taken for leaks shall be prepared and kept with either the original inspection forms, inspection log or in the records of the project. These records shall be maintained for three (3) years with the project files.

**RESPONSIBILITY FOR PROCEDURE:**

Address any questions to the Company Environmental Manager (Name and address to be announced.)

USACE_DAPL0075056

| WASTE CONTAINER INSPECTION FORM | | |
|---|---|---|
| Facility:_____ | Type of Container:_____ | |
| Date | Deficiencies Noted | Inspected By |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

SPCC DRAFT

# APPENDIX G
# TYPICAL PETROLEUM STORAGE AND HANDLING VOLUMES ON CONSTRUCTION SPREAD

|  | Fluids | Typical Amounts | Storage | Typical Transport Mode |
|---|---|---|---|---|
| Fuels | Diesel | 6,000-12,000 Gallons | 1-3 Tanks or Tankers stored at Contractor locations<br><br>5 gallon cans, 100 gallon storage in pickups, etc. | 1-3 Fuel Trucks,<br><br>1-3 "Fuel Skids" |
|  | Military Aviation Kerosene [1] | 6,000-12,000 Gallons |  |  |
|  | Kerosene [1] | 6,000-12,000 Gallons |  |  |
|  | Gasoline | 5,000 Gallons |  |  |
| Lubricant | Engine Oil | < 500 Gallons | Bulk Storage or Retail Packaging at Contractor Yard Warehouse | 1-3 "Grease" Trucks |
|  | Transmission/ Drive Train Oil | < 500 Gallons |  |  |
|  | Hydraulic Oil | < 500 Gallons |  |  |
|  | Gear Oil | < 500 Gallons |  |  |
|  | Lubricating Grease | 20-30 cases of 24 cans per case |  |  |
| Coolants | Ethylene Glycol | 100 Gallons |  |  |
|  | Propylene Glycol | 100 Gallons |  |  |

[1] Used straight or as additives only in extremely cold weather.

**APPENDIX H**
**EMERGENCY RESPONSE CONTRACTORS; DISPOSAL AND TREATMENT FACILITIES**

The Contractor must dispose of all wastes according to applicable state and local requirements.   A listing of potential Emergency Spill Response Contractors and waste disposal facilities is provided below. This list was developed from state-wide databases. This list represents firms operating at the time the data base was produced.   These firms are not necessarily endorsed by COMPANY.  The Contractor is responsible for verifying if a contractor or facility is currently operating under appropriate permits or licenses. Selection of an Emergency Response Contractor or disposal facility is subject to approval.  The Contractor is responsible for ensuring wastes are disposed of properly.

Spill Response Contractors located along the proposed route will be determined during project planning.

# APPENDIX C

## SWPPP INSPECTION FORMS

USACE_DAPL0075060

Dakota Access Pipeline Project 1 of 2

## SWPPP Inspection Form - Construction

Project Name: <u>Dakota Access Pipeline Project</u>  Coverage Number: <u>NDR10-000</u>

Inspector: _____  Date: _____  Time: _____

Precipitation Amount: _____  Date: _____

**Location of Inspection** (station numbers or MP) _____

Areas Inspected (Choose Applicable):  ☐ Active areas

☐ Stabilized areas with less than 70% cover

☐ Areas that have achieved final stabilization

Is there evidence of, or the potential for, pollutants entering drainage systems or waters of the state from:

- Material Storage Areas    ☐ Y  ☐ N
- Vehicle Maintenance Areas    ☐ Y  ☐ N

**Observations / Corrective Actions:**

_____

_____

_____

| | | |
|---|---|---|
| ☐ Y ☐ N | | Have all erosion and sediment controls and best management practices identified in the plan been installed or implemented? |
| ☐ Y ☐ N | | Are erosion and sediment controls operating correctly and in serviceable condition? |
| ☐ Y ☐ N | | Are erosion and sediment controls operating consistently and effectively? |
| ☐ Y ☐ N | | Are there any devices similar to silt fence or fiber rolls where sediment has reached more than 1/2 the height of the device? (Removal and repairs must be made within 24 hours.) |
| ☐ Y ☐ N | | Are there any sediment basins where collected sediment has reduced the storage capacity by 1/2? (Drainage and removal must be completed within 72 hours.) |
| ☐ Y ☐ N | | Is there evidence of sediment deposits in surface waters, drainage ditches or other stormwater conveyance systems? (Removal and stabilization must be completed within 7 days unless prohibited by legal, regulatory or physical access constrains. All reasonable efforts must be made to obtain access. Once permission is granted, removal must take place within 7 days.) |
| ☐ Y ☐ N ☐ NA | | Is there evidence of sediment being tracked off-site by vehicles or equipment? (Sediment tracked or deposited on paved surfaces must be removed within 24 hours.) |
| ☐ Y ☐ N | | Is there evidence of sediment depositing off-site other than in surface waters, drainage ditches and stormwater conveyance systems? (Sediment must be recovered in a manner and frequency sufficient to minimize off-site impacts – for example, sediment could wash away during the next precipitation event.) |
| ☐ Y ☐ N ☐ NA | | Is stormwater flow distributed evenly over vegetative buffers? |
| ☐ Y ☐ N ☐ NA | | Is sediment accumulating in vegetative buffers? |
| ☐ Y ☐ N ☐ NA | | Are rills forming within vegetative buffers? (If vegetative buffers are silted covered, contain rills or are otherwise rendered ineffective, other erosion and sediment controls must be implemented. Eroded areas must be repaired and stabilized.) |
| ☐ Y ☐ N | | Are litter, debris, chemicals and parts being managed properly to minimize stormwater pollution? |
| ☐ Y ☐ N | | Are liquid or soluble materials like oil, fuel, paint, etc., properly stored to prevent spills, leaks or other discharges? |

USACE_DAPL0075061

| ☐ Y   ☐ N | Is there evidence of concrete wash water discharging to waters of the state, storm sewer systems or onto adjacent properties? |
|---|---|
| ☐ Y   ☐ N | Is there evidence of wastewater from processing operations or sanitary facilities (i.e., portable toilets) discharging from the site?<br><br>(These types of discharges are not covered by the construction general permit, NDR10-0000. They must be stopped immediately if they are not covered by another type of permit. The following non-stormwater discharges are allowable if the appropriate prevention measures are in place:  fire-fighting, fire hydrant flushing, potable water line flushing, infrequent building and equipment wash down without detergents, uncontaminated foundation drains, springs, lawn watering and air conditioning condensate. Please note that discharges from temporary dewatering activities, such as hydrostatic testing or disinfection of new pipelines may require coverage under the temporary dewatering general permit, NDG07-0000.) |
| ☐ Y   ☐ N | Is there evidence of wash water from tools or equipment draining to waters of the state, drainage ditches or storm sewer systems? |
| ☐ Y   ☐ N   ☐ NA | Are permanent stormwater management measures (e.g., oil-water separators, rain gardens) functioning properly? |
| ☐ Y   ☐ N   ☐ NA | Are dewatering structures/BMPs properly utilized for stormwater dewatering activities? |
| _____ gallons | Approximate volume of any discharged stormwater (if applicable) |

**Corrective Actions and Schedule:**

_____

_____

_____

➢ Are best management practices effective to minimize the discharge      ☐ Y    ☐ N
  of sediment from the site?

➢ Do best management practices need to be adjusted?      ☐ Y    ☐ N

➢ Are additional best management practices needed?      ☐ Y    ☐ N

**Comments:**

_____

_____

_____

**List all spills, leaks or hose-breaks that have occurred since the last inspection:**

| -Size | -Location | -Was it reportable? | -Was it reported? |
|---|---|---|---|
| _____ | _____ | ☐ Y   ☐ N | ☐ Y   ☐ N |
| _____ | _____ | ☐ Y   ☐ N | ☐ Y   ☐ N |
| _____ | _____ | ☐ Y   ☐ N | ☐ Y   ☐ N |

➢ Were Spill Prevention Procedures adequate?      ☐ Y    ☐ N

➢ What Spill Response Procedures were used? _____

**Comments**

_____

_____

_____

➢ Has the ECP been updated as a result of this inspection?      ☐ Y    ☐ N

➢ Has the Site Map been updated as a result of this inspection?      ☐ Y    ☐ N

USACE_DAPL0075062

**APPENDIX D**

**CORRECTIVE ACTION / MAINTENANCE LOG**

USACE_DAPL0075063

**Dakota Access Pipeline Project**
**Corrective Action/Maintenance Log**

Project Name: <u>Dakota Access Pipeline Project</u>   Coverage Number: <u>NDR10-000</u>

| Inspection Date (required action identified) | Inspector Name(s) | Location | Description of BMP or Protection Measures Deficiency and Corrective Action/Maintenance Required | Responsible Party to Perform Corrective Action | Date Action Taken |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

USACE_DAPL0075064

**APPENDIX E**

**SWPPP REVISION RECORD**

USACE_DAPL0075065

Dakota Access Pipeline Project
SWPPP Revision Record

Project Name: <u>Dakota Access Pipeline Project</u> Coverage Number: <u>NDR10-000</u>

| Revision No. | Date of Revision | Section of ECP Revised | Description of ECP Revision | Revision Prepared by (Name and Title) |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

USACE_DAPL0075066

**APPENDIX F**

**DELEGATION OF AUTHORITY FORM**

# Delegation of Authority Form

## Delegation of Authority

I, _____ (name), hereby designate the person or specifically described position below to be a duly authorized representative for the purpose of overseeing compliance with environmental requirements, including the Construction General Permit, at the _____ construction site. The designee is authorized to sign any reports, storm water pollution prevention plans and all other documents required by the permit.

_____ (name of person or position)
_____ (company)
_____ (address)
_____ (city, state, zip)
_____ (phone)

By signing this authorization, I confirm that I meet the requirements to make such a designation as set forth in _____ (Reference State Permit), and that the designee above meets the definition of a "duly authorized representative" as set forth in _____ (Reference State Permit).

I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gathered and evaluated the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

**Name:** _____

**Company:** _____

**Title:** _____

**Signature:** _____     **Date:** _____

Storm Water Pollution Prevention Plan

# APPENDIX G

# NOTICE OF INTENT TO OBTAIN COVERAGE UNDER NDPES GENERAL PERMIT
## (pending)

# APPENDIX H

## NDPDES CONSTRUCTION GENERAL PERMIT NDR10-0000

USACE_DAPL0075070

Permit No:        NDR10-0000
Effective Date:   April 01, 2015
Expiration Date:  March 31, 2020

## AUTHORIZATION TO DISCHARGE UNDER THE

## NORTH DAKOTA POLLUTANT DISCHARGE ELIMINATION SYSTEM

In compliance with Chapter 33-16-01 of the North Dakota Department of Health rules as promulgated under Chapter 61-28 (North Dakota Water Pollution Control Act) of the North Dakota Century Code,

Facilities both qualifying for and satisfying the requirements identified in Part I of the permit

are authorized to discharge stormwater associated with **construction activity**

to waters of the state

in accordance with conditions set forth in this permit.

This permit and the authorization to discharge shall expire at midnight,

March 31, 2020.

Signed this ____ day of _____ , ____ .

_____
Karl H. Rockeman, P.E.
Director
Division of Water Quality

BP 2014.06.12

## Table of Contents

I.    PERMIT COVERAGE AND LIMITATIONS ....................................................................... 3

   A.   Discharges Covered ............................................................................................... 3

   B.   Discharges Not Covered ........................................................................................ 4

   C.   Obtaining Coverage and Authorization Effective Date ........................................... 4

   D.   Application (Notice of Intent) Process .................................................................... 5

   E.   Notice of Termination (NOT) .................................................................................. 6

   F.   Transfer of Ownership or Control ........................................................................... 6

II.   STORMWATER DISCHARGE REQUIREMENTS ............................................................ 7

   A.   Prohibition of Non-Stormwater Discharges ............................................................ 7

   B.   Releases in Excess of Reportable Quantities ........................................................ 7

   C.   Stormwater Pollution Prevention Plans .................................................................. 7

   D.   Local Requirements .............................................................................................. 13

   E.   Final Stabilization ................................................................................................. 13

III.  SELF MONITORING AND REPORTING ....................................................................... 14

   A.   Inspection and Maintenance Requirements ......................................................... 14

   B.   Records Location .................................................................................................. 16

IV.   STANDARD CONDITIONS ........................................................................................... 17

   A.   COMPLIANCE RESPONSIBILITIES .................................................................... 17

   B.   GENERAL REQUIREMENTS .............................................................................. 20

V.    DEFINITIONS ............................................................................................................... 22

Appendix 1 – Erosion and Sediment Control Requirements ................................................... 25

USACE_DAPL0075072

# I. PERMIT COVERAGE AND LIMITATIONS

## A. Discharges Covered

1. This permit applies to all areas within the state of North Dakota, except for those areas defined as Indian Country.  Construction activity located within Indian Country within the state of North Dakota must obtain a permit through the United States Environmental Protection Agency. If the construction activity is located with the jurisdiction of the state of North Dakota, and the United States Environmental Protection Agency, a permit must be obtained from both regulatory entities.

2. This permit applies to stormwater discharges associated with construction activity and small construction activity as defined in Title 40 of the Code of Federal Regulations (CFR), Parts 122.26(b)(14)(x) and (b)(15), respectively.  The reference to construction activity in this permit includes both large construction activity and small construction activity as described below.

   a. Large construction activity includes clearing, grading and excavation, that disturbs land of equal to or greater than five (5) acres and includes the disturbance of less than five (5) acres of total land area that is a part of a larger common plan of development or sale if the larger common plan will ultimately disturb five (5) acres or more.

   b. Small construction activity includes clearing, grading and excavation, that disturbs land of equal to or greater than one (1) acre, and includes the disturbance of less than one (1) acre of total land area that is part of a larger common plan of development or sale if the larger common plan will ultimately disturb equal to or greater that one (1) and less than five (5) acres.

   c. Discharges of stormwater from oil and gas exploration, production, processing or treatment operations, or transmission facilities composed of contaminated runoff by contact with or that has come into contact with, any overburden, raw material, intermediate products, finished product, byproduct, or waste products located on the site of such operations.

3. Stormwater discharges from support activities (e.g., equipment staging yards, material storage areas, excavated material disposal areas, borrow areas) may be covered by this permit as part of a related construction site. The support activities may only be in association with one project.  If the support activity is associated with more than one project, a separate stormwater permit (Industrial or mining, extraction or paving material preparation) is required.

4. Certain non-stormwater discharges from facilities covered by this permit and meeting the requirements specified in Part II(A).

5. Stormwater discharges from construction activity covered by the previous permit, issued October 12, 2009, where a notice has been submitted to obtain coverage under this permit.

6. Projects which have obtained coverage under this permit shall amend and implement a Stormwater Pollution Prevention Plan (SWPPP) that meets the requirements of this permit within ninety (90) days of the effective date of this permit.

7. Discharges from dewatering activities related to construction activities (discharges of uncontaminated stormwater).

8. Local Authority.  This permit does not preempt or supersede the authority of local agencies or operators of municipal separate storm sewer systems to prohibit, restrict, or control discharges of stormwater to storm sewer systems or other water courses within their jurisdiction.

## B.  Discharges Not Covered

1. Stormwater discharges associated with industrial activity from any source other than construction activities described in Part I(A).

2. Post-construction discharges from industrial activity that originate from the site after construction activities have been completed at the site.  Industrial and post-construction stormwater discharges may need to be covered by a separate stormwater permit.

3. The placement of fill into waters of the state requiring local, state, or federal authorizations (such as U.S. Army Corps of Engineers Section 404 permits).

4. This permit does not substitute for obligations under the National Environmental Policy Act (NEPA), Endangered Species Act (ESA), Wild and Scenic Rivers Act, or National Historic Preservation Act (NHPA), it is your responsibility to ensure the project and resulting discharges comply with the respective requirements.

5. Discharges to waters for which there is a total maximum daily load (TMDL) allocation for sediment and/or parameters associated with sediment transport are not covered unless you develop a Stormwater Pollution Prevention plan (SWPPP) that is consistent with the assumptions and requirements in the approved TMDL.  To be eligible for coverage under this general permit, the SWPPP must incorporate the conditions applicable to the discharge necessary for consistency with the assumptions, allocations and requirements of the TMDL.  If a specific numeric wasteload allocation has been established that would apply to discharges from construction activity, the permittee must incorporate that allocation into the SWPPP and implement necessary steps to meet that allocation.  Information about TMDL allocations may be found at the following website: www.ndhealth.gov/WQ/SW/Z2_TMDL/default.htm.

6. Stormwater discharges that the department determines will cause, or have the reasonable potential to cause or contribute to a violation of the standards for quality for waters of the state (North Dakota Administrative Code (N.D.A.C.) 33-16-02.1).

7. Discharges from hydrostatic testing, well points, water line disinfection and treatment of gasoline or diesel contaminated groundwater.

8. Discharges of wash water using detergents, wastewater, or sanitary waste.

## C.  Obtaining Coverage and Authorization Effective Date

1. To obtain authorization under this general permit for stormwater discharges you must submit a complete application and develop a SWPPP in accordance with Part II(C) of this permit.  A SWPPP must be in place as a condition of the permit and a copy of the SWPPP must be retained by the permittee.

2. Permit coverage will become effective seven (7) days after you submit a complete application unless otherwise notified by the department (based on the department receipt date).

3. Upon the effective date of permit coverage you, as the permit applicant, are authorized to discharge stormwater from eligible activities under the terms and conditions of this permit.

### D. Application (Notice of Intent) Process

1. You must use a Notice of Intent (NOI) to complete your application. An NOI form (or a replacement application form) is available at the following website: www.ndhealth.gov/WQ/Storm/Construction/ConstructionHome.htm.

2. Application Content and Conditions.

    a. The owner, or owner jointly with the operator (usually the general contractor), shall submit a completed application for this permit. The owner is responsible for compliance with all terms and conditions of this permit. The operator has day to day supervision of construction activities and is jointly responsible with the owner for compliance with the permit conditions as they pertain to the construction activities delegated to the operator.

    b. The application (Notice of Intent) shall contain, at a minimum, the following information:

        (1) Owner name, mailing address and phone number;
        (2) Project contact name and phone number;
        (3) Project/site name;
        (4) Project/site location (street address; section, township, range; or latitude and longitude) and county;
        (5) A brief description of the construction activity;
        (6) The anticipated start date and the anticipated completion date for the project (if known);
        (7) The estimated total area of the site and the total area of disturbance in acres;
        (8) The name of receiving water(s), or the name of the municipal storm sewer system and receiving water(s);
        (9) The signature of the applicant(s), owner (and operator if co-applicants) signed in accordance with the signatory requirements in Part IV(A)(6) of this permit.

    c. A SWPPP (Part II(C)) for the project must be prepared and available for review, upon request, by the department at the time of application. A partially complete plan is acceptable when it clearly identifies the item(s) to be completed, the person(s) responsible for completing the item(s) and the deadline for completing the item(s). The SWPPP must be completed prior to the start of construction (or the applicable construction phase). You are not required to submit the SWPPP with the application unless otherwise notified by the department.

3. For residential construction activity occurring within a common plan of development (such as a subdivision) subject to the permit requirements, coverage may be obtained by the following:

    a. The owner of the lot(s) shall submit one (1) NOI for all of the owner's construction activity within the common plan of development, or

    b. The operator, such as a homebuilder who may represent one (1) or more lot owners, shall submit one (1) NOI for all of the operator's construction activity within each addition of the common plan of development.

        In addition, a SWPPP must be developed and implemented for the permittee's activities within the common plan of development. Additional phases of the common plan of development may be included under the initial application and permit coverage provided the SWPPP is amended to include the additional area or phases.

4. For oil and gas exploration, production, processing, treatment operations, or transmission facilities, which discharge contaminated stormwater, permit applications may be submitted for individual project sites or for an area of operations such as well field or by county.

5. Completed applications and any reports required by this permit shall be submitted to:

North Dakota Department of Health
Division of Water Quality
918 East Divide Avenue
Bismarck, ND 58501-1947

## E. Notice of Termination (NOT)

1. Permittees wishing to terminate coverage under this permit must submit a Notice of Termination (NOT) or other written request identifying the facility, reason why the permit is no longer needed and signed in accordance with Part IV(A)(6) of this permit.  Compliance with the conditions of this permit is required until a NOT is submitted to the department.

2. Permittees may only submit a NOT after one of the following conditions have been met:

   a. Final stabilization (Part II(E)) has been achieved on all portions of the site for which the permittee is responsible.

   b. Another owner/operator/permittee has assumed control, in accordance with the transfer provisions (Part I(F)), over all areas of the site that have not achieved final stabilization.

   c. For residential construction only, a NOT is not required for each lot that is sold, transferred, or has achieved final stabilization.  The permittee must modify their SWPPP to indicate that permit coverage is no longer required for that lot.  The SWPPP shall indicate the reason why coverage is no longer needed and the date the lot was sold, transferred, or achieved final stabilization.  In order to terminate coverage, all lots under the control of the owner or operator must be sold, transferred, or achieved final stabilization (Part II(E)).

## F. Transfer of Ownership or Control

1. When the owner or operator of a construction project changes, the new owner or operator must submit a written request for permit transfer/modification within fourteen (14) days of assuming control of the site or commencing work on-site, or of the legal transfer, sale or closing on the property; except as provided in Part I(F)(2).  Late submittals will not be rejected; however the department reserves the right to take enforcement for any unpermitted discharges or permit noncompliance.  For stormwater discharges from construction activities where the owner or operator changes, the new owner or operator can implement the original SWPPP created for the project or develop and implement their own SWPPP.   Permittee(s) shall ensure either directly or through coordination with other operators that their SWPPP meets all terms and conditions of this permit and that their activities do not interfere with another party's erosion and sediment control practices.

2. A permit transfer/modification request is not required for the legal transfer, sale or closing on a property between permittees covered by this permit.  Examples include the sale of a property parcel from a developer to a builder, or the transfer of an easement from a developer to a local government authority.  If the new party is not covered by this permit at the time of transfer or sale, then the new owner/operator must submit a completed application/NOI within 14 days of assuming control of the site.

## II. STORMWATER DISCHARGE REQUIREMENTS

### A. Prohibition of Non-Stormwater Discharges

The discharge of wastewater is not authorized by this permit.  The following sources of non-stormwater discharges are allowed if they are not a significant source of pollution and are identified in the SWPPP: fire-fighting, fire hydrant flushing, potable water line flushing, equipment wash down without detergents or hazardous cleaning products, uncontaminated foundation drains, springs, surface water, lawn watering, chemical treatment of stormwater and air conditioning condensate. Impervious surface wash water may not be directed into any surface water or storm drain inlet unless appropriate pollution prevention measures have been implemented.  Discharges may not come into contact with oil and grease deposits or any other toxic or hazardous materials (unless cleaned up using dry clean-up methods).   The SWPPP must include a description of the pollution prevention measures to be implemented while non-stormwater discharges are occurring.

If chemical treatment for sediment removal is intended to be used on-site, the permittee shall provide the department with the information outlined in Appendix 1(A)(14) of this permit for approval prior to use.  This information shall be provided to the department no later than sixty (60) days prior to use.

### B. Releases in Excess of Reportable Quantities

This permit does not relieve the permittee of the reporting requirements of 40 CFR 110, 40 CFR 117, and 40 CFR 302, nor the reporting requirements found in Chapter 33-16-02.1 of the North Dakota Administrative Code.  Any releases which meet any reporting requirement, must be reported to the agencies identified in Part IV(A)(7).

### C. Stormwater Pollution Prevention Plans

All permittees shall implement a SWPPP for any construction activity requiring this permit until final stabilization is achieved.  The SWPPP and revisions are subject to review by the department.  The objectives of the SWPPP is to identify potential sources of sediment and other sources of pollution associated with construction activity, and to ensure practices are implemented and maintained to reduce the contribution of pollutants in stormwater discharges from the construction site to waters of the state and storm sewer systems.  Stormwater management documents developed under other regulatory programs may be included or incorporated by reference in the SWPPP, or used in whole as a SWPPP if it meets the requirements of this part.

The SWPPP may identify more than one permittee and may specify the responsibilities of each permittee by task, area, and/or timing.  Permittees may coordinate and prepare more than one SWPPP to accomplish this.  However, in the event there is a requirement under the SWPPP for which responsibility is ambiguous or is not included in the SWPPP, each permittee shall be responsible for implementation of that requirement.  Each permittee is responsible for assuring that their activities do not render another permittee's controls ineffective.

The SWPPP must incorporate the requirements provided in Appendix 1 and shall include the following information.

1. **Site Description**.  Each plan shall provide a description of the construction activity and potential sources of pollution as indicated below:

    a. A description of the overall project and the type of construction activity;

b.  Estimates of the total area of the site and the total area that is expected to be disturbed by excavation, grading, grubbing, or other activities during the life of the project;

c.  A proposed timetable/schedule, or chart, of activities that includes major phases/stages, BMP implementation, BMP removal, disturbances, and stabilization for major portions of the site;

d.  A description of the soil within the disturbed area(s);

e.  The name of the surface water(s) and municipal storm sewer system at or near the disturbed area that will receive stormwater runoff from the project site; and

f.  A site map which indicates the following items as applicable (more than one (1) map may be needed).  If an item is not applicable, provide rationale describing why the item is not applicable to the construction activity:

   1)  Project boundaries;
   2)  Areas of ground disturbance during each phase/stage of the project;
   3)  Areas where disturbance will not occur, such as avoidance areas (e.g. wetlands, critical habitat, Threatened and Endangered Species, etc);
   4)  Drainage patterns including: flow direction (run-on and runoff);
   5)  Dividing lines, discharge points, and storm sewer system inlets which the site drains to or may be affected by the activity;
   6)  Pre-existing and final grades;
   7)  Location of all temporary and permanent sediment and erosion controls during each particular phase;
   8)  Location of any stormwater conveyances such as: retention ponds, detention ponds, ditches, pipes, swales, stormwater diversions, culverts, and ditch blocks;
   9)  Location of potential sources of pollution (e.g. portable toilets, trash receptacles, etc.);
   10) Location of soil stockpiles;
   11) Identify steep slopes;
   12) Surface waters, including an aerial extent of wetland acreage;
   13) Location of surface water crossings;
   14) Locations where stormwater is discharged to surface waters;
   15) Location of dewatering discharge points;
   16) Locations of where chemical treatment of stormwater will be performed, including discharge points;
   17) Fueling locations, vehicle and equipment maintenance areas, designated wash water collection site, lubricant and chemical storage, paint storage, material storage, staging areas, and debris collection area;
   18) Location of any impervious surfaces upon completion of construction; and
   19) Where included as part of the project, the site maps for off-site concrete/asphalt batch plants, equipment staging areas, borrow sites or excavated fill material disposal sites.  Site maps must show items 1 through 18 of this section.

g.  Projects that discharge stormwater which flows to a water body listed as impaired under section 303(d) of the Federal Clean Water Act due to sediment, suspended solids or turbidity must identify the water body and impairment in the SWPPP.  The Department's 303(d) list may be found at the following website under Integrated Reports: www.ndhealth.gov/WQ/SW/Z2_TMDL/Integrated_Reports/B_Integrated_Reports.htm.

h.  For water bodies which have a TMDL, the SWPPP must describe and conform to the Waste Load Allocations (WLA) of the water body as per Part II(C)(4)(g) of this permit.  Information about TMDL allocations may be found at the following website: www.ndhealth.gov/WQ/SW/Z2_TMDL/default.htm.

2. **Narrative.** The SWPPP must include a narrative description of the selected operational controls and sediment and erosion controls as outlined in Part II(C)(3), Part II(C)(4), and Appendix 1 of this permit.  When applicable, a description of the requirements for any additional environmental regulations (federal) and local requirements related to the project, as it relates to waters of the state, must also be included or incorporated by reference (e.g. The Wild and Scenic Rivers Act, The National Historic Preservation Act, The Endangered Species Act, Fish and Wildlife Coordination Act, National Environmental Policy Act, Section 404 of the Clean Water Act, etc.).

The narrative shall describe at a minimum:

   a. The installation, removal (if applicable), and maintenance requirements of selected Best Management Practices (BMPs) for each phase/stage of construction activity;
   b. The rationale for the selection of all BMPs (calculations should be included if appropriate);
   c. Whether selected BMPs are temporary or permanent;
   d. Any descriptions of infeasibility or explanations as required in Part II, Part III(A), and Appendix 1 of this permit.

3. **Operational Controls**.  The SWPPP shall describe the BMPs used in day to day operations on the project site that reduce the contribution of pollutants in stormwater runoff.

   a. The SWPPP must identify a person knowledgeable and experienced in the application of erosion and sediment control BMPs who will oversee the implementation of the SWPPP, and the installation, inspection and maintenance of the erosion and sediment control BMPs before and during construction, until a NOT is filed or the permit is transferred.  A knowledgeable and experienced person is someone who meets the requirements of Part II(C)(3)(e) of this permit.

   The owner shall develop a chain of responsibility with all operators on the site to ensure that the SWPPP will be implemented and stay in effect until the construction project is complete, the entire site has undergone final stabilization, and a NOT has been submitted to the department.

   b. The SWPPP must include a description of good housekeeping practices used to maintain a clean and orderly site.  The SWPPP shall describe how litter, debris, chemicals and parts will be handled to minimize exposure to stormwater.  The SWPPP also shall describe what measures will be used to reduce and remove sediment tracked off-site by vehicles or equipment.  In addition, the SWPPP shall describe methods which will be used to reduce the generation of dust.

   c. The SWPPP shall describe preventative maintenance practices used to ensure the proper operation of erosion and sediment control devices (e.g., fiber rolls, erosion control blankets and silt fences) and equipment used or stored on site.  The SWPPP shall describe proper inspection procedures for ensuring proper operation of erosion and sediment control devices.

   d. The SWPPP shall describe spill prevention and response procedures where potential spills can occur.  Specific handling procedures, storage requirements, spill containment, cleanup procedures, and disposal must be identified.  Storage structures for petroleum products and other chemicals shall have adequate leak and spill protection to prevent any spilled materials from entering waters of the state or storm sewer systems.

   The potential discharge of hazardous substances in stormwater discharges shall be minimized by including measures onsite, detailed in the SWPPP to prevent and respond to releases of hazardous substances.  If a reportable quantity release occurs, the SWPPP shall be revised to prevent the reoccurrence of such a release.

USACE_DAPL0075079

e.  The SWPP shall outline how employees and responsible parties shall be trained on the implementation of the SWPPP.  Training must be provided at least annually, as new employees or responsible parties are hired or as necessary to ensure compliance with the SWPPP and the general permit.  Employees and responsible parties include individuals who are responsible for design, installation, maintenance and repair of stormwater controls and conducting inspections.

1)  On-site personnel must understand the requirements of this permit as it pertains to their role in implementing the SWPPP.  On-site personnel must know:

a.  The purpose of the SWPPP, requirements of the SWPPP, and how the SWPPP will be implemented;

b.  The location of all BMPs identified in the SWPPP; and

c.  Correct installation, function, maintenance and removal (if applicable) of BMPs identified in the SWPPP.

2)  Personnel responsible for performing site inspections must understand when inspections must be conducted (Part III(A)), what must be inspected (Part II(C)(7), how to record findings, when to initiate corrective actions, and properly document corrective actions.

3)  Maintenance personnel must understand when maintenance must be performed on BMPs in order to maintain properly functioning BMPs and what needs to be recorded for corrective actions/maintenance records in accordance with Part III(A)(5) of this permit.

f.  The SWPPP must describe how concrete grindings and slurry will be managed.  Wastewater from concrete washout, cleanout or washout from: stucco, paint, joint compound, and other building materials shall not be discharged to waters of the state, storm sewer systems or curb and gutter systems.

1)  Wash water must be collected in leak-proof containers or leak-proof pits.  Containers or pits must be designed and maintained so that overflows cannot occur due to inadequate sizing, precipitation events, or snowmelt.

g.  The SWPPP shall describe any dewatering activities planned at the site.  Dewatering or basin draining (e.g., pumped discharges, trench/ditch cuts for drainage) related to the permitted activity must be managed with appropriate BMPs, such that the discharge does not adversely affect the receiving water.  The following conditions apply to dewatering activities:

1)  Dewatering is limited to un-contaminated stormwater, surface water, and groundwater that may collect on-site and those sources identified in Part II(A), if they are not a significant source of pollution.  A separate permit must be obtained to discharge water from other sources such as hydrostatic testing of pipes, tanks, or other similar vessels; disinfection of potable water lines; pump testing of water wells; and the treatment of gasoline or diesel contaminated groundwater or surface water.

2)  The permittee(s) must operate the discharge to minimize the release of sediment and provide adequate BMPs where necessary to minimize erosion due to the discharge.  Discharges must not lead to the deposition of sediment within stormwater conveyance systems or surface waters.  Discharges must not cause or potentially cause a visible plume within a surface water body.

3) When dewatering, utilize structures or BMPs which allow for draw down to occur from the surface of the water, unless infeasible.  If infeasible, documentation must be provided in the SWPPP.  In addition, you must describe what BMP(s) will be used in its place.

4) In addition to the inspection requirements in Part III, dewatering activities shall be inspected daily. The inspection must include the dewatering site, areas where BMPs are being implemented and the discharge location.  A record shall be maintained to document the inspections of the dewatering operation and actions taken to correct any problems that may be identified.

   a.   Records shall contain at a minimum:

      i.   Date and time of the inspection,
      ii.   Inspector name,
      iii.   Approximate volume of water discharged,
      iv.   Findings of the inspection, including recommendations and schedule for corrective actions;
      v.   Corrective actions taken (including dates, times, and party completing maintenance activities); and
      vi.   Documentation that the SWPPP has been amended when changes are made to the dewatering activity in response to inspections.

5) Local authorities may require specific BMPs for discharges affecting their storm sewer system.

4. **Erosion and Sediment Controls**.  Erosion and sediment controls and stabilization requirements must be implemented for each major phase of site activity (e.g., clearing, grading, building, and landscaping phases). A description of the erosion and sediment controls and site stabilization methods must be provided in accordance with Part II(C)(2) of this permit.  Erosion and sediment controls, and site stabilization must conform to the requirements provided in Appendix 1.  The description and implementation of controls shall address the following minimum components:

a. The selection of erosion and sediment controls, and site stabilization shall consider the following:

   1. The expected amount, frequency, intensity, and duration of precipitation events;

   2. The nature of stormwater run-on and runoff from the site as well as changes during, and as a result of, construction activity. This includes changes to impervious surfaces, slopes, seasonal changes, and drainage features on-site;

   3. Channelized flow, must be handled in order to minimize erosion at outlets and to minimize impacts to downstream receiving waters;

   4. Soil types (wind and water erodibility, and settling time); and

   5. Seasonal conditions.

b. Sediment basins, or an appropriate combination of equivalent sediment controls such as smaller sediment basins and/or sediment traps, silt fences, fiber logs, vegetative buffer strips, berms, etc., are required for all down slope boundaries of the disturbance area and for those side slope boundaries as may be appropriate for site conditions.

c. Temporary or permanent erosion protection and stabilization (such as cover crop planting or mulching) must be initiated immediately, as described in Appendix 1(A), for all exposed soil areas where activities have been completed or temporarily ceased.

d. All control measures must be properly selected, installed and maintained in accordance with the manufacturer's specifications and good engineering practices. If periodic inspections or other information indicates a control has been used inappropriately or incorrectly, the permittee must replace or modify the control for site situations. Corrective actions must be made prior to the next anticipated rainfall event of within 24 hours of discovery (whichever comes first) or as soon as field conditions allow. Documentation must be provided in the maintenance records if field conditions do not allow access along with a plan of action for performing maintenance activities.

The permittee may deviate from the manufacturer's specifications and erosion and sediment control requirements in Appendix 1 if they provide justification for the deviation and document the rationale for the deviation in the SWPPP. Any deviation must provide equivalent erosion and sediment control.

e. If sediment escapes from the site, off-site accumulations of sediment must be removed in a manner and frequency sufficient to minimize off-site impacts as outlined in Appendix 1(B). The SWPPP must be modified to prevent further sediment deposition off-site.

f. Stormwater controls are expected to withstand and function properly during precipitation events of up to the 2-year, 24-hour storm event. Visible erosion and/or off-site sediment deposition from such storm events should be minimal. The 2-year, 24-hour rainfall event in North Dakota ranges from about 1.9 inches in the west to 2.3 inches in the east.

g. For projects that discharge stormwater which flows to a water body for which there is a TMDL allocation for sediment and/or parameters associated with sediment transport, the SWPPP must be consistent with the assumptions, allocations, and requirements in the approved TMDL. If a TMDL specifies certain BMPs or controls to meet a WLA applicable to the project's discharges, the BMPs or controls must be incorporated into the SWPPP. Information about TMDL allocations may be found at the following website: www.ndhealth.gov/WQ/SW/Z2_TMDL/default.htm.

5. **Stormwater Management**. The SWPPP must identify permanent practices incorporated into the project to control pollutants in stormwater discharges occurring after construction operations have been completed.

a. Identify stormwater ponds; flow reduction methods; infiltration of runoff on-site; sequential systems which combine several practices or other post-construction stormwater management features.

b. Identify velocity / energy dissipation devices placed at discharge locations and appropriate erosion protection for outfall channels and ditches.

c. Maintenance for on-site stormwater management features is the responsibility of the permittee until the NOT is submitted or the feature is accepted by the party responsible for long term maintenance.

d. The design, installation and use of stormwater management features must comply with applicable local, state or federal requirements.

6. **Maintenance**.  All erosion and sediment control measures and other protective measures identified in the SWPPP must be maintained in effective operating condition.  The SWPPP must indicate, as appropriate, the maintenance or clean out interval for sediment controls.  If site inspections, required in Part III of this permit, identify BMPs that are not operating effectively, maintenance shall be arranged and accomplished in accordance to Appendix 1 or as soon as practicable.

7. **Inspections**.  The SWPPP must provide for site inspections as outlined in Part III.  The permittee shall ensure that personnel conducting site inspections are familiar with permit conditions and the proper installation and operation of control measures.  Inspectors must be knowledgeable in their role of the SWPPP, as outlined in Part II(C)(3)(e) of this permit.  The erosion and sediment control measures and stabilized areas identified in the SWPPP shall be observed to ensure they are operating correctly and in serviceable condition.  Inspections shall include areas used for storage of materials, permanent stormwater control measures and vehicle maintenance areas.  These areas shall be inspected for evidence of, or the potential for, pollutants entering a drainage system.  If necessary, the plan shall be revised based on the observations and deficiencies noted during the inspection.

8. **SWPPP Review and Revisions**.

    a.  The SWPPP shall be signed in accordance with the Signatory Requirements, Part IV(A)(6), and retained on-site for the duration of activity as outlined in Part III(B).

    b.  The permittee shall make the SWPPP available upon request to the department, EPA, or, in the case of discharges to a municipal storm sewer system, the operator of the municipal system.

    c.  The permittee shall amend the SWPPP whenever there is a change in design, construction, operation, maintenance, or BMPs.  The SWPPP shall be amended if the plan is found to be ineffective in controlling pollutants present in stormwater. The SWPPP shall be amended as soon as practicable.

## D.  Local Requirements

All stormwater discharges must comply with the requirements, policies, or guidelines of municipalities and other local agencies as applicable to the construction site.  Any discharges to a storm sewer, ditch or other water course under the jurisdiction of a municipality must comply with any specific conditions or BMPs required by the municipality or agency.

## E.  Final Stabilization

The permittee(s) must ensure final stabilization of the site.  The permittee(s) should submit a NOT within 30 days after final stabilization has been achieved, or another owner/operator (permittee) has assumed control according to Part I(F) for all areas of the site that have not undergone final stabilization.  Final stabilization can be achieved in one of the following ways.

1. All soil disturbing activities at the site have been completed and all soils must be stabilized by a uniform perennial vegetative cover with a density of 70 percent of the pre-existing cover over the entire pervious surface area, or other equivalent means necessary to prevent soil failure under erosive conditions and;

    a.  All drainage ditches, constructed to drain water from the site after construction is complete, must be stabilized to preclude erosion;

USACE_DAPL0075083

b.  All temporary erosion prevention and sediment control BMPs (such as silt fence) must be removed as part of the site final stabilization; and

c.  The permittee(s) must remove all sediment from conveyances and temporary sedimentation basins that will be used as permanent water quality management basins.  Sediment must be stabilized to prevent it from being washed into basins, conveyances or drainage ways discharging off-site or to surface waters.  The cleanout of permanent basins must be sufficient to return the basin to design capacity.

2.  For areas of the state where the average annual rainfall is less than 20 inches, all soil disturbing activities at the site have been completed and erosion control measures (e.g., degradable rolled erosion control product) and stabilization methods are selected, designed, and installed along with an appropriate seed base to provide erosion control for at least three years and achieve 70 percent of the pre-existing vegetative cover within three (3) years without active maintenance.  Sites must meet the criteria outlined in items 1(a), (b), and (c) above.

3.  Disturbed areas on land used for agricultural purposes that are restored to their pre-construction agricultural use are not subject to these final stabilization criteria.  If the construction activity removed standing crop, the area must be restored in accordance with the landowner.

Areas disturbed that were not previously used for agricultural activities, such as buffer strips immediately adjacent to waters of the state, and areas which are not being returned to their pre-disturbance use must meet the final stabilization criteria in (1) or (2) above.

4.  For residential construction only, final stabilization may be achieved when soil is stabilized (see Appendix 1(A)(3)) and down gradient perimeter control for individual lots has been implemented and the residence has been transferred to the homeowner.  Additionally, the permittee must distribute a "homeowner fact sheet" to the homeowner to inform the homeowner of the need for, and benefits of, final stabilization.  The permittee also must demonstrate that the homeowner received the fact sheet.

## III.  SELF MONITORING AND REPORTING

### A.  Inspection and Maintenance Requirements

1.  Inspections shall be performed by or under the direction of the permittee at least once every 14 calendar days and within 24 hours after any storm event of greater than 0.25 inches of rain per 24-hour period.  Inspections are only required during normal working hours.  The permittee shall use a rain gauge on-site or utilize the nearest National Weather Service precipitation gauge station.  Rain gauge locations or stations must be representative of the site.

a.  "Within 24 hours after any storm event greater than 0.25 inches rain per 24-hour period" means that you are required to conduct an inspection within 24 hours once a storm event has produced 0.25 inches, even if the storm event is still continuing.  If there is a storm event at your site that continues for multiple days, and each day of the storm produces 0.25 inches or more rain, you are required to conduct an inspection within 24 hours of the first day of the storm and within 24 hours after the end of the storm.

2. There may be times when a site inspection may not be practical at the specified time.  Adverse climatic conditions, such as flooding, high winds, tornadoes, electrical storms, site access constraints, etc., may prohibit inspections. The permittee must include a description of why the inspection(s) could not be performed at the designated time in the next inspection record.  If an inspection is delayed due to adverse weather conditions or rain events outside normal working hours, an inspection must be conducted during the next working day, or as conditions allow.

3. Some erosion and sediment control measures may require more frequent inspection based on location (e.g., sensitive areas or waters of the state) or as a result of recurring maintenance issues. Erosion or sediment control measures found in need of maintenance between inspections must be repaired or supplemented with appropriate measures as soon as practicable.  Erosion and sediment control measures which require more frequent inspection based on location or as a result of recurring maintenance issues must be identified in the SWPPP.

4. All inspections conducted during construction must be recorded in writing and these records must be retained in accordance with Part III(B).  Records of each inspection activity shall include:

   a.  Date and time of inspections;

   b.  Name of person(s) conducting inspections;

   c.  Findings of inspections, including recommendations and schedule for corrective actions;

   d.  Date and amount of all rainfall events greater than 1/4 inch (0.25 inches) in 24 hours; and

   e.  Documentation that the SWPPP has been amended when changes are made to BMPs in response to inspections.

   f.  All inspection reports shall be signed in accordance with Part IV(A)(6) of this permit.

5. Corrective actions (maintenance activities) performed during construction must be recorded in writing and these records must be retained in accordance with Part III(B).  Records for maintenance activity shall include:

   a.  Best Management Practice corrected;

   b.  Date and time of corrective action;

   c.  Name of person(s) performing corrective actions;

   d.  Corrective actions taken; and

   e.  Corrective actions/maintenance records shall be signed in accordance with Part IV(A)(6) of this permit.

6. Completed areas that have been stabilized but do not meet the 70 percent perennial vegetative cover criteria for final stabilization may be inspected once per month.  Inspections may be suspended for parts of the construction site that meet final stabilization requirements of Part II(E) of this permit.  The SWPPP must update to identify any areas which meet this condition.

7. Inspections may be suspended where earthwork has been suspended due to frozen ground conditions.  The required inspections and maintenance must resume as soon as runoff occurs or the ground begins to thaw at the site.  The permittee must record freeze/thaw and runoff dates as part of the inspection records.

## B.  Records Location

A copy of the completed and signed NOI, coverage letter from the department, SWPPP, site inspection records, and this general permit shall be kept at the site of the construction activity in a field office, trailer, shed, or in a vehicle that is on-site during normal working hours.  If the site does not have a reasonable on-site location, then the documents must be retained at a readily available alternative location; preferably with the individual responsible for overseeing the implementation of the SWPPP.  Electronic copies of records are acceptable if the records can be accessed on-site.  If the site is inactive, then the documents may be stored at a local office.  Permittees should avoid using personal electronic devices for storing electronic records.

USACE_DAPL0075086

## IV. STANDARD CONDITIONS

### A. COMPLIANCE RESPONSIBILITIES BP 2014.12.08

**1. Duty to Comply**
The permittee must comply with all conditions of this permit. Any permit noncompliance constitutes a violation of the Act and is grounds for enforcement action; for permit termination, revocation and reissuance, or modification; or for denial of a permit renewal application.

**2. Proper Operation and Maintenance**
The permittee shall at all times maintain in good working order and operate as efficiently as possible all treatment or control facilities or systems installed or used by the permittee to achieve compliance with the terms and conditions of this permit. If necessary to achieve compliance with the conditions of this permit, this shall include the operation and maintenance of backup or auxiliary systems.

**3. Planned Changes**
The department shall be given advance notice of any planned changes at the permitted facility or of an activity which may result in permit noncompliance. Any anticipated facility expansions, production increase, or process modifications which might result in new, different, or increased discharges of pollutants shall be reported to the department as soon as possible. Changes which may result in a facility being designated a "new source" as determined in 40 CFR 122.29(b) shall also be reported.

**4. Duty to Provide Information**
The permittee shall furnish to the department, within a reasonable time, any information which the department may request to determine whether cause exists for modifying, revoking and reissuing, or terminating this permit, or to determine compliance with this permit. The permittee shall also furnish to the department, upon request, copies of records required to be kept by this permit. When a permittee becomes aware that it failed to submit any relevant facts or submitted incorrect information in a permit application or any report, it shall promptly submit such facts or information.

**5. Records Retention**
All records and information (including calibration and maintenance) required by this permit shall be kept for at least three years or longer if requested by the department or EPA.

**6. Signatory Requirements**
All applications, reports, or information submitted to the department shall be signed and certified.

All permit applications shall be signed by a responsible corporate officer, a general partner, or a principal executive officer or ranking elected official.

All reports required by the permit and other information requested by the department shall be signed by a person described above or by a duly authorized representative of that person. A person is a duly authorized representative only if:

a. The authorization is made in writing by a person described above and submitted to the department; and

b. The authorization specifies either an individual or a position having responsibility for the overall operation of the regulated facility, such as the position of plant manager, superintendent, position of equivalent responsibility, or an individual or position having overall responsibility for environmental matters.

If an authorization under 6. Signatory Requirements is no longer accurate for any reason, a new authorization satisfying the above requirements must be submitted to the department prior to or together with any reports, information, or applications to be signed by an authorized representative.

USACE_DAPL0075087

Any person signing a document under this section shall make the following certification:

"I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

## 7.  Twenty-four Hour Notice of Noncompliance Reporting

1.  The permittee shall report any noncompliance which may endanger health or the environment. Any information shall be provided orally as soon as possible, but no later than twenty-four (24) hours from the time the permittee first became aware of the circumstances.  The following occurrences of noncompliance shall be included in the oral report to the department at 701.328.5210:

    a.  Any lagoon cell overflow or any unanticipated bypass which exceeds any effluent limitation in the permit under <u>8. Bypass of Treatment Facilities</u>;

    b.  Any upset which exceeds any effluent limitation in the permit under <u>9. Upset Conditions</u>; or

    c.  Violation of any daily maximum effluent or instantaneous discharge limitation for any of the pollutants listed in the permit.

2.  A written submission shall also be provided within five days of the time that the permittee became aware of the circumstances.  The written submission shall contain:

    a.  A description of the noncompliance and its cause;

    b.  The period of noncompliance, including exact dates and times;

    c.  The estimated time noncompliance is expected to continue if it has not been corrected; and

    d.  Steps taken or planned to reduce, eliminate, and prevent recurrence of the noncompliance.

    Reports shall be submitted to the address in **Part I(D) Application (Notice of Intent) Process**. The department may waive the written report on a case by case basis if the oral report has been received within 24 hours by the department at 701.328.5210 as identified above.

    All other instances of noncompliance shall be reported no later than at the time of the next Discharge Monitoring Report submittal.  The report shall include the four items listed in this subsection.

## 8.  Bypass of Treatment Facilities
1.  <u>Bypass not exceeding limitations</u>.  The permittee may allow any bypass to occur which does not cause effluent limitations to be exceeded, but only if it also is for essential maintenance to assure efficient operation.  These bypasses are not subject to any of the following provisions in this section.

Bypass exceeding limitations-notification requirements.

   a. Anticipated Bypass.  If the permittee knows in advance of the need for a bypass, it shall submit prior notice, if possible at least ten (10) days before the date of bypass.

   b. Unanticipated Bypass.  The permittee shall submit notice of an unanticipated bypass as required under 7. Twenty-four Hour Notice of Noncompliance Reporting.

2. Prohibition of Bypass.  Bypass is prohibited, and the department may take enforcement action against a permittee for bypass, unless:

   a. Bypass was unavoidable to prevent loss of life, personal injury, or severe property damage;

   b. There were no feasible alternatives to the bypass, such as the use of auxiliary treatment facilities, retention of untreated wastes, or maintenance during normal periods of equipment downtime.  This condition is not satisfied if adequate back-up equipment should have been installed in the exercise of reasonable engineering judgment to prevent a bypass which occurred during normal periods of equipment downtime or preventive maintenance; and

   c. The permittee submitted notices as required under the 8(a). Anticipated Bypass subsection of this section.

The department may approve an anticipated bypass, after considering its adverse effects, if the department determines that it will meet the three (3) conditions listed above.

## 9. Upset Conditions

An upset constitutes an affirmative defense to an action brought for noncompliance with erosion and sediment or site stabilization methods if the requirements of the following paragraph are met. No determination made during administrative review of claims that noncompliance was caused by upset, and before an action for noncompliance, is final administrative action subject to judicial review.

A permittee who wishes to establish the affirmative defense of upset shall demonstrate, through properly signed, contemporaneous operating logs, or other relevant evidence that:

1. An upset occurred and the permittee can identify its cause(s);

2. The permitted facility was, at the time being, properly operated;

3. The permittee submitted notice of the upset as required under 7. Twenty-four Hour Notice of Noncompliance Reporting and

4. The permittee complied with any remedial measures required under 10. Duty to Mitigate.

In any enforcement proceeding, the permittee seeking to establish the occurrence of an upset has the burden of proof.

## 10. Duty to Mitigate

The permittee shall take all reasonable steps to minimize or prevent any discharge or sludge use or disposal in violation of this permit which has a reasonable likelihood of adversely affecting human health or the environment.  The permittee, at the department's request, shall provide accelerated or additional monitoring as necessary to determine the nature and impact of any discharge.

## 11. Removed Materials

Collected screenings, grit, solids, sludges, or other pollutants removed in the course of treatment shall be buried or disposed of in such a manner to prevent any pollutant from entering any waters of the state or creating a health hazard.

### 12. Duty to Reapply

Any request to have this permit renewed should be made 15 days prior to its expiration date.

## B. GENERAL REQUIREMENTS

### 1. Inspection and Entry

The permittee shall allow department and EPA representatives, at reasonable times and upon the presentation of credentials if requested, to enter the permittee's premises to inspect the construction activity and monitoring equipment, to sample any discharges, and to have access to and copy any records required to be kept by this permit.

### 2. Availability of Reports

Except for data determined to be confidential under 40 CFR Part 2, all reports prepared in accordance with the terms of this permit shall be available for public inspection at the offices of the department and EPA.  As required by the Act, permit applications, permits, and effluent data shall not be considered confidential.

### 3. Transfers

This permit is not transferable except upon the filing of a Transfer/Modification request (Part I(F)) by the new party.  The current permit holder should inform the new controller, operator, or owner of the existence of this permit and also notify the Department of the possible change.

### 4. New Limitations or Prohibitions

The permittee shall comply with any effluent standards or prohibitions established under Section 306(a), Section 307(a), or Section 405 of the Act for any pollutant (toxic or conventional) present in the discharge or removed substances within the time identified in the regulations even if the permit has not yet been modified to incorporate the requirements.

### 5. Permit Actions

This permit may be modified, revoked and reissued, or terminated for cause.  This includes the establishment of limitations or prohibitions based on changes to Water Quality Standards, the development and approval of waste load allocation plans, the development or revision to water quality management plans, or the establishment of prohibitions or more stringent limitations for toxic or conventional pollutants and/or sewage sludges.  The filing of a request by the permittee for a permit modification, revocation and reissuance, or termination, or a notification of planned changes or anticipated noncompliance does not stay any permit condition.

### 6. Need to Halt or Reduce Activity Not a Defense

It shall not be a defense for a permittee in an enforcement action that it would have been necessary to halt or reduce the permitted activity in order to maintain compliance with the conditions of this permit.

### 7. State Laws

Nothing in this permit shall be construed to preclude the institution of legal action or relieve the permittee from any responsibilities, liabilities, or penalties established pursuant to any applicable state law or regulation preserved under Section 510 of the Act.

### 8. Oil and Hazardous Substance Liability

Nothing in this permit shall be construed to preclude the institution of any legal action or relieve the permittee from any responsibilities, liabilities, or penalties to which the permittee is or may be subject under Section 311 of the Act.

### 9. Property Rights

The issuance of this permit does not convey any property rights of any sort, nor any exclusive privileges, nor does it authorize any injury to private property or any invasion of personal rights, nor any infringement of federal, state or local laws or regulations.

**10. Severability**
   The provisions of this permit are severable, and if any provision of this permit or the application of any provision of this permit to any circumstance is held invalid, the application of such provision to other circumstances and the remainder of this permit shall not be affected thereby.

USACE_DAPL0075091

## V.  DEFINITIONS Permit Specific BP 2009.02.05

"303(d) List" or "Section 303(d) List" means a list of North Dakota's water quality-limited waters needing total maximum daily loads or TMDLs developed to comply with section 303(d) of the Clean Water Act.  A copy of the latest integrated report is available on the state's web site at:
www.ndhealth.gov/WQ/SW/Z2_TMDL/Integrated_Reports/B_Integrated_Reports.htm.

"Act" means the Clean Water Act.

"Bankfull" means the channel is filled to the top of one or both of its banks.

"BMP" or "Best Management Practices" means schedules of activities, prohibitions of practices, maintenance procedures, and other management practices to prevent or reduce the pollution of waters of the state.  BMPs also include treatment requirements, operating procedures and practices to control construction site runoff, spillage or leaks, sludge or waste disposal, or drainage from raw material storage.

"Bypass" means the intentional diversion of waste streams from any portion of a treatment facility.

"Common Plan of Development or Sale" means a contiguous area where multiple separate and distinct land disturbing activities may be taking place at different times, on different schedules, but under one proposed plan.  One plan is broadly defined to include design, permit application, advertisement or physical demarcation indicating that land-disturbing activities may occur.

"Construction Activity" means construction activity as defined in 40 CFR part 122.26(b)(14)(x) and small construction activity as defined in 40 CFR part 122.26(b)(15).  This includes a disturbance to the land that results in a change in topography, existing soil cover (both vegetative and non-vegetative), or the existing soil topography that may result in accelerated stormwater runoff, leading to soil erosion and movement of sediment into surface waters or drainage systems.  Examples of construction activity may include clearing, grading, filling and excavating.  Construction activity includes the disturbance of less than one acre of total land area that is part of a larger common plan of development or sale if the larger common plan will ultimately disturb one (1) acre or more.  Construction activity does not include routine maintenance that is performed to maintain the original line and grade, hydraulic capacity, or original purpose of the facility.

"Department" means the North Dakota Department of Health, Division of Water Quality.

"Energy Dissipation" means methods employed at pipe outlets to prevent erosion.  Examples include, but are not limited to: concrete aprons, riprap, splash pads, and gabions that are designed to prevent erosion.

"Indian Country" means (1) All land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and including rights-of-way running through the reservations; (2)  All dependent Indian communities within the borders of the United States whether within the originally or subsequently acquired territory thereof, and whether within or without the limits of a state; and (3) All Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

"Infeasible" means not technologically possible or not economically practicable and achievable in light of best industry practices.

"Immediately" means as soon as practicable, but no later than the end of the next work day, following the day when the earth-disturbing activities have temporarily or permanently ceased.

"Large Construction Activity" means land disturbance of equal to or greater than five (5) acres.  Large construction activity also includes the disturbance of less than one acre of total land area that is part of a larger common plan of development or sale, if the larger common plan will ultimately disturb equal to or greater that five acres.

"Normal Wetted Perimeter" means the area of a conveyance, such as a ditch, channel, or pipe that is in contact with water during flow events that are expected to occur once every year.

"Non-Stormwater Discharges" means discharges other than stormwater.  The term includes both process and non-process sources.  Process wastewater sources that require a separate NDPDES permit include, but are not limited to industrial processes, domestic facilities and cooling water.  Non-stormwater sources that may be addressed in this permit include, but are not limited to: fire-fighting, fire hydrant flushing, potable water line flushing, equipment wash down without detergents or hazardous cleaning products, uncontaminated foundation drains, springs, surface water, lawn watering, chemical treatment of stormwater and air conditioning condensate.

"Operator" means the person (usually the general contractor) designated by the owner who has day to day operational control and/or the ability to modify project plans and specifications related to the SWPPP.  The person must be knowledgeable in those areas of the permit for which the operator is responsible and must perform those responsibilities in a workmanlike manner.

"Owner" means the person or party possessing the title of the land on which the construction activities will occur; or if the construction activity is for a lease holder, the party or individual identified as the lease holder; or the contracting government agency responsible for the construction activity.

"Permanently Ceased" means clearing and excavation within any area of your construction site that will not include permanent structures has been completed.

"Permanent Cover" means final stabilization.  Examples include grass, gravel, asphalt, and concrete.

"Severe Property Damage" means substantial physical damage to property, damage to best management practices which causes them to become inoperable, or substantial and permanent loss of natural resources which can reasonably be expected to occur in the absence of a bypass.  Severe property damage does not mean economic loss caused by delays in construction.

"Significant Materials" includes, but is not limited to: raw materials; fuels; materials such as solvents, detergents, and plastic pellets; finished materials such as metallic products; hazardous substances designated under Section 101(14) of CERCLA; any chemical the facility is required to report pursuant to Section 313 of Title III of SARA; fertilizers; pesticides; and waste products such as ashes, slag and sludge that have the potential to be released with stormwater discharges.

"Significant Spills" includes, but is not limited to: releases of oil or hazardous substances in excess of reportable quantities under Section 311 of the Clean Water Act (see 40 CFR 110.10 and CFR 117.21) or Section 102 of CERCLA (see 40 CFR 302.4).

"Small Construction Activity" means land disturbance of equal to or greater than one acre and less than five acres.  Small construction activity also includes the disturbance of less than one acre of total land area that is part of a larger common plan of development or sale, if the larger common plan will ultimately disturb equal to or greater than one and less than five acres

"Stabilized" means the exposed ground surface has been covered by appropriate materials such as mulch, staked sod, riprap, erosion control blanket, or other material that prevents erosion from occurring.  Grass seeding alone is not stabilization. Snow cover and frozen ground conditions are not considered stabilized.

USACE_DAPL0075093

"Steep Slopes" means slopes which are fifteen (15) percent or greater in grade.

"Stormwater" means stormwater runoff, snow melt runoff, and surface runoff and drainage.

"Stormwater Associated with Industrial Activity" means stormwater runoff, snow melt runoff, or surface runoff and drainage from industrial activities as defined in 40 CFR 122.26(b)(14).

"Stormwater Associated with Small Construction Activity" means the discharge of stormwater from:

(i) Construction activities including clearing, grading, and excavating that result in land disturbance of equal to or greater than once acre and less than five acres.  Small construction activity also includes the disturbance of less than one acre of total land area that is part of a larger common plan of development or sale if the larger common plan will ultimately disturb equal to or greater than one and less than five acres.  Small construction activity does not include routine maintenance that is performed to maintain the original line and grade, hydraulic capacity, or original purpose of the facility.

(ii) Any other construction activity designated by EPA or the department, based on the potential for contribution to a violation of a water quality standard or for significant contribution of pollutants to waters of the state.

"Temporarily Ceased" means clearing, grading, and excavation within any area of the site that will not include permanent structures, will not resume (i.e., the land will be idle) for a period of 14 or more calendar days, but such activities will resume in the future.

"Temporary Erosion Protection" means methods employed to prevent erosion.  Examples of temporary cover include; mulch, straw, erosion control blanket, wood chips, tackifiers, and erosion netting.

"Upset" means an exceptional incident in which there is unintentional and temporary noncompliance with permit requirements because of factors beyond the reasonable control of the permittee.  An upset does not include noncompliance to the extent caused by operational error, improperly designed erosion and sediment controls or site stabilization methods, inadequate erosion and sediment controls or site stabilization methods, lack of preventive maintenance, or careless or improper operation.

"Waters of the State" means any and all surface waters that are contained in or flow in or through the state of North Dakota as defined in NDCC 61-28-02.  This definition includes all water courses, even if they are usually dry.

"You" means the owner, operator or permittee as appropriate.

**Appendix 1 – Erosion and Sediment Control Requirements**
Requirements for designing, implementing and maintaining erosion and sediment controls.

## A. Erosion and Sediment Control Practices

1. Sites using temporary (or permanent) sediment basins must meet the following requirements:

   a. Sediment basins shall be designed for a calculated volume of runoff from a 2-year, 24-hour storm per acre drained to the basin and provides not less than 1,800 cubic feet of sediment storage below the invert of the outlet pipe from each acre drained to the basin; or

   b. Basins shall be sized to provide 3,600 cubic feet of sediment storage below the invert of the outlet pipe per acre drained to the basin if calculations are not performed.

   c. Basin outlets must be designed to avoid short-circuiting and the discharge of floating debris. Basins must be designed with the ability to allow complete basin drawdown for maintenance activities. Basins must release the storage volume in at least 24 hours. Outlet structures must be designed to withdraw water from the surface, unless not practicable. If not practicable, rationale must be provided in the SWPPP. The basin must have a stabilized emergency overflow to prevent failure of pond integrity. Energy dissipation must be provided for the basin outlet.

2. Erosion, sediment, and stabilization practices shall be provided. Erosion, sediment and stabilization practices include such things as: silt fences, fiber logs, vegetative buffer strips, erosion control blankets, mulch, hydro-seeding combined with mulch or tackifiers, etc.

3. All exposed soil areas must be stabilized (see definitions). Stabilization must be initiated immediately where activities have been permanently or temporarily ceased on any portion of the site and will not resume for a period exceeding fourteen (14) calendar days. Stabilization must be completed as soon as practicable, but no later than fourteen (14) calendar days after the initiation of soil stabilization. Temporary stockpiles without significant silt, clay or organic components (e.g., clean aggregate stockpiles, demolition concrete stockpiles, sand stockpiles) are exempt from this requirement.

   a. For slopes with a grade of 3:1 or greater, stabilization must be initiated immediately once activities have been completed or temporarily ceased. Stabilization must be completed as soon as practicable, but no later than seven (7) calendar days after the initiation of soil stabilization.

4. Temporary soil stockpiles must have effective sediment controls, and cannot be placed in surface waters, including stormwater conveyances such as curb and gutter systems, or conduits and ditches.

5. The normal wetted perimeter of any temporary or permanent drainage ditch that drains water from a construction site, or diverts water around a site, must be stabilized at least 200 linear feet from the property edge, or from the point of discharge to any surface water. Stabilization shall be completed prior to connection with a surface water. Any remaining portion of the temporary or permanent drainage ditch must be stabilized within fourteen (14) calendar days for portions which construction activities have temporarily or permanently ceased.

6. If stabilization requirements cannot be met due to circumstances beyond the control of the permittee, the permittee may comply with following:

   a. If vegetative stabilization is to be used, immediately initiate, and within 14 calendars days complete, the installation of temporary non-vegetated stabilization; or

   b. Complete all methods of initiating stabilization as soon as conditions or circumstances allow.

If any conditions in parts a or b above are encountered, the permittee must document the circumstances which prevented you from meeting the stabilization requirements in the SWPPP of this paragraph and provide a schedule in the SWPPP which will be followed in order to meet the stabilization requirements.

Permittees are responsible for implementing winter stabilization methods during frozen ground conditions if the site was not stabilized prior to the ground freezing.

7. Stream diversions or any temporary or permanent drainage ditch or trench, which will have continuous flow, shall be stabilized with appropriate controls prior to connection with any surface water. The entire area (channel and bank) of the stream diversion or temporary or permanent drainage ditch, or trench, must be appropriately stabilized to bankfull height.

8. While working in or around surface waters, sediment and erosion controls must be used above the anticipated level of the surface water. Floating silt curtain does not satisfy the down slope and side slope boundary requirements in Part II(C)(4)(b) of this permit, unless the construction activity is on or below the elevation of the surface water. The floating silt curtain must be placed as close to shore as possible. Sediment control must be installed where exposed soils drain to the surface water immediately after construction activity along the waterline has been completed.

9. Pipe and culvert outlets must be provided with energy dissipation within 24 hours of connection to a surface water.

10. Splash pads and/or downspout extensions must be provided for roof drains to prevent erosion from roof runoff.

11. All storm drain inlets in the immediate vicinity of the construction site must be protected by appropriate BMPs during construction until all disturbed areas and stockpiles with the potential to discharge to the inlet have been stabilized. This includes storm drain inlets which may be affected by sediment tracked onto paved surfaces by vehicles or equipment.

12. Inlet protection devices are a last line of control – erosion and sediment control practices must be used on-site. Inlet protection devices must conform to local ordinances or regulations. In general, inlet protection devices need to provide for adequate drainage to prevent excessive roadway flooding. Inlet protection may be removed for a particular inlet if a specific concern (i.e., street flooding/freezing, snow removal) has been identified and documented in the SWPPP. In this situation, additional erosion and sediment control practices, or stabilization methods must be used to supplement the loss of the inlet protection device to prevent sediment from entering the storm sewer system.

13. Vegetated buffers must have a minimum width of 1 foot for every 5 feet of disturbed area that drains to the buffer. The width of the buffer shall have a slope of 5 percent or less and the area draining to the buffer shall have a slope of 6 percent or less. Concentrated flows should be minimized throughout the buffer.

Buffers shall consist of dense grassy vegetation, 3 to 12 inches tall with uniform coverage over 90 percent of the buffer. Woody vegetation shall not be counted for the 90 percent coverage. No more than 10 percent of the overall buffer may be comprised of woody vegetation.

14. A 50 foot natural buffer or equivalent erosion and sediment controls must be provided when a project is within 50 feet of a surface water and stormwater flows to the surface water. If equivalent erosion and sediment controls are used, rationale for using equivalent controls must be provided in the SWPPP.

If working within 100 feet of a surface water listed as impaired for sediment, suspended solids or turbidity, a 100 foot natural buffer or equivalent sediment and erosion controls must be provided.  If equivalent erosion and sediment controls are to be used, rationale for using equivalent controls must be provided in the SWPPP.

15. If the permittee(s) intend to use chemical treatment for sediment removal, they must be used in accordance with the manufacturer's specifications.  Treatment chemicals must be selected appropriately for the anticipated soil particle size and characteristics of the stormwater (pH, turbidity, flow rate of stormwater flowing into the chemical treatment system, etc.). A description of the chemical treatment process must be included in the SWPPP.

   a. To ensure selection and management of chemicals minimize the potential for harmful effects in the discharge, the permittee shall provide a written request to the department for review and approval. Additional monitoring and reporting may be required as a condition for the approval to discharge.

   A request to discharge chemically treated water shall include all of the following information and be provided sixty (60) days prior to use:

      i. Material Safety Data Sheet/Safety Data Sheet (MSDS/SDS);
      ii. Proposed water additive discharge concentration;
      iii. Discharge frequency (i.e., number of hours per day and number of days per year);
      iv. Monitoring point for product discharge;
      v. Type of removal treatment, if any, that the water additive receives prior to discharge;
      vi. Product function (e.g., coagulant, flocculant, etc.);
      vii. A 48-hour $LC_{50}$ or $EC_{50}$ for a North American freshwater planktonic crustacean (*Ceriodaphnia* sp., *Daphnia* sp., or *Simocephalus* sp.); and
      viii. Results for a toxicity test for one other North American freshwater aquatic species (other than a planktonic crustacean).

   b. Discharges from the chemical treatment of stormwater must not cause a violation of the standards of quality for waters of the state (N.D.A.C. § 33-16-02.1).  The discharge must meet the dewatering or basin draining requirements provided in Part II(C)(3)(g) of this permit.

16. Minimize the duration of exposed soils on steep slopes.

## B. Maintenance Requirements for Erosion and Sediment Controls

1. All erosion prevention and sediment control BMPs must be inspected to ensure integrity and effectiveness. All nonfunctional BMPs must be repaired, replaced, maintained or supplemented with functional BMPs.  If a nonfunctioning BMP is supplemented, the nonfunctional BMP shall be removed.  Corrective actions must be made prior to the next anticipated rainfall event or within 24 hours of discovery (whichever comes first), or as soon as field conditions allow access.  Documentation must be provided in the maintenance records if field conditions do not allow access along with a plan of action for performing maintenance activities.

   Permittee(s) must investigate and comply with the following inspection and maintenance requirements:

   a. All control devices similar to, and including, silt fence or fiber rolls must be repaired, replaced, maintained or supplemented when they become nonfunctional (torn from posts, visible tears, etc.). Collected sediment must be removed as it approaches 1/2 of the above ground capacity of the control device.

   b. Fiber rolls must be replaced when 1/2 of the original above ground height of the device when it was installed has been lost as a result of flattening or other damage.

c. Sedimentation basins must be drained and the sediment removed when the depth of sediment collected in the basin reaches 1/2 the storage volume.  Drainage and removal must be completed within 72 hours of discovery, or as soon as field conditions allow access. Documentation must be provided in the maintenance records if field conditions do not allow access along with a plan of action for performing maintenance activities.

d. Maintenance and cleaning of inlet protection devices must be performed when sediment accumulates, the filter becomes clogged, and/or performance is compromised.

2. Surface waters, including drainage ditches and conveyance systems, must be inspected for evidence of sediment deposited by erosion.  Permittees must remove all deltas and sediment deposits in surface waters, drainage ways, catch basins, and other drainage systems.  Areas where sediment removal results in exposed soil must be stabilized.  Removal and stabilization must take place immediately, but no more than, seven (7) calendar days after the discovery unless precluded by legal, regulatory or physical access constraints.  Permittees shall use all reasonable efforts to obtain access.  If precluded, removal and stabilization shall take place immediately, but no more than, seven (7) calendar days after obtaining access.  Permittees are responsible for contacting all local, regional, state, and federal authorities, and receiving any applicable permits prior to conducting any work.

3. Vehicle tracking of sediment from the site must be minimized by BMPs.  This may include having a designated egress with aggregate surfacing from the site or by designating off-site parking.  Permittees are responsible for (or making the arrangements for) street sweeping and/or scraping if BMPs are not adequate to prevent sediment from being tracked onto the street from the site.

Construction site egress locations must be inspected for evidence of sediment being tracked offsite by vehicles or equipment onto paved surfaces.  Accumulations of tracked and deposited sediment must be removed from all off-site paved surfaces by the end of the work day, shift or if applicable, within a shorter time specified by local authorities or the department.

4. If sediment escapes the construction site, off-site accumulations of sediment must be removed in a manner and at a frequency sufficient to minimize off-site impacts (e.g., fugitive sediment in streets could be washed into storm sewers by the next rain event and/or pose a safety hazard to users of public streets).

5. Vegetative buffers must be inspected for proper distribution of flows, sediment accumulation and signs of rill formation.  If a buffer becomes silt covered, contains rills, or is otherwise rendered ineffective, other control measures shall be implemented.  Eroded areas shall be repaired and stabilized within 24 hours of discovery, or as soon as conditions allow access.  Documentation must be provided in the maintenance records if field conditions do not allow access along with a plan of action for performing maintenance activities.

## C.  Operational Controls

1. Properly handle construction debris and waste materials.

a. Debris and waste must be handled appropriately until disposal.  Litter and debris shall be collected and stored to reduce the potential for wind and water to carry the materials off-site or leachate discharging from a site.  Collected material shall be taken to the appropriate facility for disposal or recycling.

b. Liquid or soluble materials including oil, fuel, paint and any other hazardous substances must be properly stored, to prevent spills, leaks or other discharges.  Restricted access to storage areas must be provided to prevent vandalism.  Storage and disposal of liquid or soluble material must be in compliance with applicable regulations.

USACE_DAPL0075098

2. Wash water containments must be cleaned out (solids and liquid) before 80 percent of storage capacity is attained.

3. Best management practices used in surface waters must be cleaned immediately upon removal from surface waters to prevent the transfer of aquatic nuisance species.

USACE_DAPL0075099



**VIA EMAIL**

March 3, 2015

Brent Cossette
Natural Resource Specialist
Environmental Stewardship
CENWO-OD-TN
United States Army Corps of Engineers, Omaha District
1616 Capital Avenue, Suite 9000
Omaha, NE 68102
Brent.J.Cossette@usace.army.mil

Re:     **Request for Consent to Easement Across Flowage and Saturation Easements for the
Proposed Dakota Access Pipeline Project in Williams County, North Dakota**

Dear Mr. Cossette:

Dakota Access, LLC, (Dakota Access) is proposing the Dakota Access Pipeline (DAPL) Project; an approximate 1,100 mile long, 12- to 30-inch diameter light crude oil pipeline project beginning near Stanley, North Dakota, and routing through South Dakota, Iowa and ending at Patoka, Illinois.

DAPL is proposed to cross private lands which the U.S. Corps of Engineers (Corps) has six flowage and saturation easements over (**Figure 1**), associated with the Buford-Trenton-Irrigation District (Garrison Dam) and north of Lake Sakakawea/ Missouri River. It is understood that due to these crossings, the Corps will need to provide consent to easement for the pipeline to be constructed and installed on lands where Corps has easements.

Dakota Access has or is currently securing access rights on these private lands to perform environmental and/or geotechnical analysis of the subsurface at these crossings to determine environmental features and feasible crossing methods. It is currently anticipated that the pipeline will cross the flowage easements via conventional trench/backfill method; this additionally includes a portion of the planned Horizontal Directional Drill (HDD) entry point for the Lake Sakakawea/Missouri River crossing (**Figure 2**).

The purpose of this letter is to formally request the Corps consent to easement process be initiated. The following provides additional information regarding this request.

USACE_DAPL0075355



**DAPL Project Crossing Corps Easements**

The proposed 24-inch diameter pipeline in this location of the DAPL Project will cross six (6) contiguous Corps flowage and saturation easements on the north side of Lake Sakakawea/Missouri River for approximate 2.67 miles. The proposed pipeline will cross Corps easements identified below in the respective section, township, range and county and as depicted in the attached **Figures 1 and 2**.

| County | Tract # | Township | Range | Section |
|---|---|---|---|---|
| Williams | LL3440E | 152N | 103W | 19, 20, 29, 30 |
| | LL3483E-1 | 152N | 103W | 19, 20 |
| | LL3453E | 152N | 103W | 18, 19 |
| | LL3430E | 152N | 103W | 18, 19 |
| | LL3450E-2 | 152N | 103W | 18 |
| | LL3431E | 152N | 103W | 7, 18 |

> **Commented [bjc1]:** Figure 2a DAPL Proposed Crossing of Flow Easements looks to crossing into flowage easement LL3426E-2. The pipeline and work space is leaving flowage easement LL3431E to avoid impacts within flowage easement LL3465E, but to do that it crosses into flowage easement LL3426E-2 (T152N R103W Sec. 7)

Dakota Access is securing a 50 foot wide permanent easement along the entire Project alignment that is generally centered on the pipeline (i.e. 25 feet on either side of the centerline). Based upon Corps provided easement documents and mapping, Dakota Access understands that the distance across Corps flowage and saturation easement areas north of the Missouri River is approximately 14,098 feet. The final length of the requested consent to cross easement will be determined upon final design of the DAPL crossing subsequent to performing a geotechnical analysis.

Dakota Access performed a geotechnical boring program to assess soil and geology to assist with design of the HDD (**Figure 2**). Two soil borings were advanced on the property where Corps has easements. At this time, the conceptual plan is to establish the HDD entry point on the north side of the river and the HDD exit point on the south side of the river. A temporary workspace, which measures approximately 200 feet by 250 feet will be used on the Corps easements to facilitate the Missouri River HDD on the north side of the river. The HDD will result in approximately 570 feet of pipeline on Corps easements.

Dakota Access plans to install remaining pipeline using conventional open-cut construction methods on Corps flowage and saturation easement lands north of the HDD entry point. After pipeline installation is completed there will be no above ground facilities associated with the pipeline in these locations with the exception of a remote operated Mainline Valve (MLV) to be located near the HDD entry point (**Figure 2**). Dakota Access will match the existing elevations after the pipeline is installed and no fill above existing elevation is expected. The proposed typical construction easement for the DAPL is 150 feet wide (and includes the 50 feet of permanent easement as indicated in **Figure 3**). Additional temporary

USACE_DAPL0075356


DAKOTA ACCESS, LLC

workspace is included at road crossings, change in pipe alignment and installation of facilities. All dimensions will be firmed up in the Environmental Assessment (EA) to be prepared based on design that is currently ongoing and additional construction information will be provided in the EA.

One above-ground valve site is planned to be installed with the pipeline, which planned to be located in a farm field just south of 39th Street Northwest (**Figure 2**). The footprint for the valve site measure approximately 50 feet by 75 feet within the permanent easement for the pipeline. The valve site will be completed with a graveled surface and boundary fence; access will be provided through the farm field off of 39th Street NW. A typical layout for the valve site is attached (**Figure 4**).

We appreciate your assistance with this request for Corps consent to cross flowage and saturation easement areas north of the Missouri River. We understand this formal DAPL Project request for consent to easement from the Corps will officially initiate the Corps real estate process. We further understand that the environmental review for crossing these easements will be combined with the environmental review for the proposed DAPL crossing of the Corps owned lands at Lake Oahe.

Should you have any questions or comments, or require any other information for this request, please contact me at 713.989.7186, Monica.Howard@energytransfer.com, or at Dakota Access, LLC, c/o Monica Howard, 1300 Main Street Rm 14.030, Houston, TX 77002.

Sincerely,

**Dakota Access, LLC**

Monica Howard
Director Environmental Sciences

cc:     Joe Sedarski, Merjent, Inc.

Enc.    Figure 1 – Corps Flowage and Saturation Easement Areas Crossed by Proposed DAPL
        Project
        Figure 2 – DAPL Project Crossing Features
        Figure 3 – DAPL Project Typical ROW Configuration
        Figure 4 – DAPL Project Typical Piping Plan and Elevation - Mainline Valve Pipeline

USACE_DAPL0075357



USACE_DAPL0075358



Iowa Tribe of Kansas and Nebraska
3345 B Thrasher Road
White Cloud, KS  66094
(785) 595-3258 or (785) 595-3259
Fax: (785) 595-6610

Mr. John M. Fowler, Executive Director
Advisory Council on Historic Preservation
401 F Street NW, Suite 308
Washington DC 20001-2637

March 22, 2016

Hanwepi (Good day),

My name is Lance Foster, Tribal Historic Preservation Officer for, and
enrolled member of, the Iowa Tribe of Kansas and Nebraska, a federally-
recognized tribe with traditional homelands in the states of Iowa (which was
named after us), Illinois, Minnesota, Wisconsin, South Dakota, Nebraska,
Kansas, and Missouri. I am writing you to express our concerns about the
Dakota Access Pipeline which follows a route through North and South Dakota,
Iowa, and Illinois.  Not only does this project threaten the lands, waters,
and natural resources of our ancestral homelands, it threatens the cultural
and spiritual well-being of our traditional sites, spiritual places and
burials, and ancestral landscapes.

We understand that the United States Army Corps of Engineers (Corps) must
issue federal permits for this project and therefore  must  comply with the
requirements of federal laws including the National Environment Policy Act
(NEPA, 42 U.S.C. § 4321 *et seq.*), the federal Clean Water Act (CWA, 33 U.S.C.
§§ 1251-1387), Threatened and Endangered Species Act (TESA, 16 U.S.C.  § 1531
*et seq.*), American Indian Religious Freedom Act (AIRFA, 42 U.S.C. §§ 1996 &
1996a), Executive Orders 130007, 13175, and 12898, and section 106 of the
National Historic Preservation Act (NHPA, 16 U.S.C. 470 *et seq.*).  Moreover,
since the project will traverse federal lands, the Native American Graves
Protection and Repatriation Act (NAGPRA, 25 U.S.C. 3001-3013), the
Archaeological Resource Protection Act (ARPA, 16 U.S.C.  §§ 470aa-470mm) may
also apply. We have heard that other federal agencies including the U.S. Fish
and Wildlife Service and USDA Farm Service Agency also have certain regulatory
responsibilities triggered by the construction of this project.  However their
individual and/or collective roles are unknown.

The tribal nations with ancestral lands along this route have received
numerous project documents from the Corps and applicant and have been invited

USACE_DAPL0080015



Iowa Tribe of Kansas and Nebraska
3345 B Thrasher Road
White Cloud, KS 66094
(785) 595-3258 or (785) 595-3259
Fax: (785) 595-6610

to attend informational meetings.  However, from our point of view, the permitting process, to date, has been rushed, chaotic and segmented; and coordination has suffered from a lack of clear and useful information, reliable technical assistance, and open exchange of information among *all* stakeholders.  It has been our experience that lacking these essential elements, due process breaks down and compliance with all of the above-cited authorities cannot be achieved in good faith.   The Iowa Tribe does not engage in nation-to-nation consultation in this manner and our tribe considers this approach to be insensitive and not in keeping with the intent of federal law.

There are many aspects of this project that do not appear to be consistent with our understanding of the section 106 review and compliance process. First among them is why the Corps is not permitting the entire pipeline?  The Corps claims that their jurisdiction only applies to the permit area defined by the Clean Water Act, but we have found nothing in the Advisory Council's 36 CFR 800 rules that limits the federal agency's section 106 responsibilities to a narrowly defined permit area established by an unrelated federal law. Since the pipeline segments that fall outside of the permit area would not exist without those located within the permit area, it stands to reason that the entire pipeline should fall under the Corps' regulatory purview and effects on historic properties should be considered along the entire route.  We cannot help but conclude that the Corps' area of potential effect is inconsistent with the Advisory Council's rules and we object to how it is presently defined. We consider the jurisdictional area of potential effect to be the *entire* pipe route, compressor stations and other operational appurtenances, construction staging and storage areas, utility routes, and property ingress/egress routes.

We also question the Corps' efforts to identify and evaluate significant historic properties within the area of potential effect. We have not been consulted in an appropriate manner about the presence of traditional cultural properties, sites, or landscapes vital to our identity and spiritual well-being.

The Dakota Access Pipeline is a complex project, but it is moving on a regulatory fast track with no other purpose than to accommodate the applicant's construction schedule.  This is being done at the expense of due process, and, we fear, with an irresponsible disregard for significant Native American sites and landscapes.  Therefore, in accordance with 36 CFR 800,

Appendix A the Iowa Tribe of Kansas and Nebraska formally requests that the Advisory Council on Historic Preservation enter the section 106 process on the permitting of the Dakota Access Pipeline and specifically sites criteria (c) (1-4) as relevant to this case, to ensure the legal process is followed.  It

USACE_DAPL0080016

Iowa Tribe of Kansas and Nebraska
3345 B Thrasher Road
White Cloud, KS  66094
(785) 595-3258 or (785) 595-3259
Fax: (785) 595-6610

is our desire to enter into a programmatic agreement with ACHP, the Army Corps
of Engineers, the Iowa SHPO, and the Dakota Access Pipeline company, that
outlines consultation protocols, procedures for identifying all manner of
significant cultural/historic properties, and appropriate procedures in the
event of unanticipated discoveries. We also formally request that the ACHP
look into matter to see that the process has been properly followed.

Thank you for your consideration.  We respectfully await your response.

Warigroxi (Thank you),

Lance M. Foster
Tribal Historic Preservation Office
Iowa Tribe of Kansas and Nebraska
3345 B. Thrasher Road, White Cloud, KS  66094
Phone: (785) 595-3258  /  Fax: (785) 595-6610   /  Email:   lfoster@iowas.org

Cc:   President Barack Obama
      Valerie Hauser, Advisory Council on Historic Preservation
      A. Guy Lopez, Advisory Council on Historic Preservation
      D. Bambi Kraus, NATHPO
      Steve King, Deputy State Historic Preservation Officer, Iowa
      John Doershuk, Iowa State Archaeologist
      Martha S. Chieply, NWO, Regulatory, U.S. Army Corps of Engineers

USACE_DAPL0080017

**Steele, Abigail A MVR**

| | |
|---|---|
| **From:** | Chieply, Martha S NWO |
| **Sent:** | Wednesday, July 13, 2016 11:25 AM |
| **To:** | Hayes, Michael D MVR; Henke, Amy C MVS; Renschler, Jason J NWO |
| **Cc:** | Mcclendon, Danny D MVS; Lenz, Gary W (Ward) MVR |
| **Subject:** | FW: DAPL- Tribal Monitoring |
| **Attachments:** | 8July2016_tribalmonitoring_attachments.pdf; Cheyenne River Sioux 8July2016.pdf |

CRST

-----Original Message-----
From: Chieply, Martha S NWO
Sent: Friday, July 08, 2016 2:42 PM
To: Steve Vance <stevev.crstpres@outlook.com>
Cc: 'Valerie Hauser' <vhauser@achp.gov>; 'John Eddins' <jeddins@achp.gov>; 'Anthony G. Lopez' <alopez@achp.gov>;
'rnelson@achp.gov' <rnelson@achp.gov>; Ames, Joel O NWO <Joel.O.Ames@usace.army.mil>; Janis, Larry D NWO
<Larry.D.Janis@usace.army.mil>; Breckenridge, Jeff L NWO <Jeff.L.Breckenridge@usace.army.mil>; Renschler, Jason J
NWO <Jason.J.Renschler@usace.army.mil>; Lenz, Gary W (Ward) MVR <Ward.Lenz@usace.army.mil>; Hayes, Michael D
MVR <Michael.D.Hayes@usace.army.mil>; Vollman, Brant J MVR <Brant.J.Vollman@usace.army.mil>
Subject: RE: DAPL- Tribal Monitoring

Mr. Vance-  please see our letter regarding the opportunity to participate in Tribal monitoring in the event Nationwide
Permit verifications are authorized.

Please contact either me or Ward Lenz if you have questions.

Martha S. Chieply
Omaha Regulatory
1616 Capitol Avenue
Omaha, NE  68102-4901

Martha.S.Chieply@usace.army.mil

402 995-2451 - Office
402 926-9613 - Blackberry

1

USACE_DAPL0086333



**DEPARTMENT OF THE ARMY**
**OMAHA DISTRICT, CORPS OF ENGINEERS**
**1616 CAPITOL AVE., STE 9000**
**OMAHA, NEBRASKA 68102**

December 23, 2014

REPLY TO
ATTENTION OF

Civil Works Branch

Ms. Monica Howard
Director Environmental Sciences
1300 Main Street Rm 14.030
Houston, TX 77002

Dear Ms. Howard:

I have received your request for an outgrant on U.S. Army Corps of Engineers (Corps) lands located at the Lake Oahe Project in North Dakota. You will be required to pay fair market value consideration and administrative expenses incurred by the Army in entering into this outgrant in accordance with the Mineral Leasing Act of 1920.

The administrative expenses will need to be paid prior to our review of your request and are estimated to be $120,000. Typically administrative expenses cover internal review and, if approved, document preparation, supporting internal or contractor-provided determination of value, surveys, maps, legal descriptions and environmental, cultural, and historical assessments. For the administrative expenses, please send a check payable to USACE, Omaha District at 1616 Capitol Avenue, Omaha, NE 68102, ATTN: CENWO-RM-F. Upon receipt, we will initiate a full review of your requested action. Fair market value consideration will be assessed prior to the outgrant being issued and is not included in the administrative expenses.

In the event this action is either not finalized or fully completed, all remaining monies will be refunded back to you. Please note that (1) payment of administrative expenses in no way ensures a favorable disposition to your proposal and (2) if actual administrative expenses are greater than the above estimate, you will be so notified and required to pay that amount before we can continue to work on the action.

If you have any questions, please contact Brent Cossette at 402-995-2712.

Sincerely,

*D.V.C.*
On behalf of
Rick Noel
Chief, Civil Works Branch
Real Estate Division

OAHE0000016

UNITED STATES OF AMERICA
TRACT NO'S.: ND-MO-198.000, ND-MO-199.000, LAKE OAHE, AND ND-EM-001.100

## METES AND BOUNDS DESCRIPTION
## CENTERLINE 50' WIDE PERMANENT EASEMENT

Being a centerline description located in the Section 10, Township 134 North, Range 79 West of the 5th P.M., in Morton and Emmons County, North Dakota and Section 11, Township 134 North, Range 79 West of the 5th P.M., in Emmons County, North Dakota, and crossing the following tracts of land and described as follows:

Basis of Bearing:
Bearing are based on UTM Zone 14 Grid North.

Tracts of land:
Tract 1: Portion of Lot 4 and Lot 7; Book 125, Page 395; Deed Records, Morton County.
Tract 2: Lake Oahe.
Tract 3: Portion of the N1/2 of Section 11; Civil Case No. 406; Probate Records, Emmons County.

**COMMENCING** at a 3/8-inch iron rod found for the Northwest corner of said Section 10;

**THENCE**, crossing said Section 10, South 46 degrees 08 minutes 26 seconds East a distance of 3,664.72 feet to the west line of said United States of America Tract 1 for the **POINT OF BEGINNING** of this centerline description;

**THENCE**, crossing the United States of America tracts and through said Section 10 and said Section 11, North 83 degrees 59 minutes 34 seconds East a distance of 6,420.72 feet to the east line of said United States of America Tract 3 for the **TERMINAL POINT** of this centerline description, from which a 1-inch USGS monument found on said east line bears South 01 degrees 17 minutes 30 seconds West a distance of 296.68 feet. Said centerline having a length of 6,420.72 feet, 389.14 rods, and said fifty foot (50') wide Permanent Easement containing 7.37 acres of land.

Wood Group Mustang, Inc.
17325 Park Row
Houston, Texas 77084
(832) 809-8000
April 23, 2015
Job No. 103957

PAGE 1 OF 1

OAHE0000028



**VIA CERTIFIED MAIL and EMAIL**

October 21, 2014

Brent Cossette
Natural Resource Specialist
Environmental Stewardship
CENWO-OD-TN
United States Army Corps of Engineers, Omaha District
1616 Capital Avenue, Suite 9000
Omaha, NE  68102
Brent.J.Cossette@usace.army.mil

**Re:    Request for Pipeline Easement and Temporary Construction License for the Proposed Dakota Access Pipeline Project at Lake Oahe**

Dear Mr. Cossette:

Dakota Access, LLC, is proposing the Dakota Access Pipeline (DAPL) Project; an approximate 1,100 mile long, 30-inch diameter light crude oil pipeline project beginning near Stanley, North Dakota, and routing through South Dakota, Iowa and ending at Patoka, Illinois.  DAPL is proposed to cross the Missouri River (Lake Oahe) on the boarder of Morton and Emmons Counties in North Dakota. Dakota Access understands that this crossing involves COE owned and controlled lands on both sides of this waterbody (**Figure 1**).

Dakota Access is currently securing access rights on private and COE lands to perform geotechnical analysis of the subsurface at this crossing to determine a feasible crossing method.  It is currently anticipated that the pipeline will cross Lake Oahe via Horizontal Directional Drill (HDD).  The proposed pipeline is routed across the Lake where two linear utilities already exist, an overhead powerline and a buried natural gas pipeline.

The purpose of this letter is to formally request the COE easement process be initiated as well as the process for DAPL to secure a temporary construction license.

**DAPL Project Crossing and Easement Information**
The proposed pipeline will cross Lake Oahe and COE lands on both the east and west side of the waterbody.  The proposed crossing is located in Section 10, Township 134 North, Range 79 West in Morton County, North Dakota, and Section 11, Township 134 North, Range 79 West in Emmons County, North Dakota (**Figure 1**).

OAHE0000034



Dakota Access is securing a 50 foot wide permanent easement along the entire Project alignment that is generally centered on the pipeline (i.e. 25 feet on either side of the centerline).  Dakota Access understands that the distance from the western boundary of COE owned lands to the eastern boundary of COE lands on both sides of the lake at the proposed crossing location is approximately 6,450 feet.  The final length of the requested easement will be determined upon final design of the crossing subsequent to performing a geotechnical analysis.

A temporary construction license is also requested at this time due to the current uncertainty of the HDD layout and if any conventional pipeline installation will be required, if either or both the HDD entry/exit point would be located within COE lands, if access to the waterbody would be required for temporary water rights, etc.  The proposed typical construction easement for the DAPL is 150 feet wide (and includes the 50 feet of permanent easement). HDD entry/exit points are typically 200 feet or 250 feet square.  All dimensions will be firmed up in the Environmental Assessment to be prepared based on design that is currently ongoing.

We appreciate your assistance with this request for a permanent easement and temporary construction license at Lake Oahe. We understand this formal DAPL Project request for a pipeline easement and temporary construction license from the COE will officially initiate the COE easement process. Should you have any questions or comments, or require any other information for this request, please contact me at 713.989.7186, Monica.Howard@energytransfer.com, or at Dakota Access, LLC, c/o Monica Howard, 1300 Main Street Rm 14.030, Houston, TX 77002.

Sincerely,

**Dakota Access, LLC**

Monica Howard
Director Environmental Sciences

cc:    Phillip Sheffield, COE Natural Resource Manager Oahe Project

Enc.    Figure 1 – Preliminary Proposed Easement at Missouri River/Lake Oahe

OAHE0000035



Proposed 50ft Easement Inset

**Figure 1**
Dakota Access, LLC
Dakota Access Pipeline Project

at Missouri River/Lake Oahe

0   1,000   2,000
Feet
1 inch = 2,000 feet

○ Milepost
⋀ Route
▭ Tracts
▨ Proposed 50ft Easement

merjent
For Environmental Review Purposes Only

OAHE0000036

| STANDARD FORM 299 (05/2009)<br>Prescribed by DOI/USDA/DOT<br>P.L. 96-487 and Federal<br>Register Notice 5-22-95 | APPLICATION FOR TRANSPORTATION AND<br>UTILITY SYSTEMS AND FACILITIES<br>ON FEDERAL LANDS | FORM APPROVED<br>OMB Control Number: 0596-0082<br>Expiration Date: 1/31/2017 |
|---|---|---|

|  |  | FOR AGENCY USE ONLY |
|---|---|---|
| NOTE: Before completing and filing the application, the applicant should completely review this package and schedule a preapplication meeting with representatives of the agency responsible for processing the application. Each agency may have specific and unique requirements to be met in preparing and processing the application. Many times, with the help of the agency representative, the application can be completed at the preapplication meeting. | | Application Number |
| | | Date Filed |
| 1. Name and address of applicant *(include zip code)*<br><br>Dakota Access, LLC<br>1300 Main Street<br>Houston, TX 77002 | 2. Name, title, and address of authorized agent if different from item 1 *(include zip code)* | 3. Telephone (area code)<br>713-989-2710<br>Applicant<br>Joey Mahmoud<br>Authorized Agent |

| 4. As applicant are you? *(check one)* | 5. Specify what application is for: *(check one)* |
|---|---|
| a. ☐ Individual | a. ☒ New authorization |
| b. ☒ Corporation* | b. ☐ Renewing existing authorization No. |
| c. ☐ Partnership/Association* | c. ☐ Amend existing authorization No. |
| d. ☐ State Government/State Agency | d. ☐ Assign existing authorization No. |
| e. ☐ Local Government | e. ☐ Existing use for which no authorization has been received * |
| f. ☐ Federal Agency | f. ☐ Other* |
| * If checked, complete supplemental page | * If checked, provide details under item 7 |

6. If an individual, or partnership are you a citizen(s) of the United States?   ☐ Yes   ☐ No

7. Project description (describe in detail): (a) Type of system or facility, *(e.g., canal, pipeline, road)*; (b) related structures and facilities; (c) physical specifications *(Length, width, grading, etc.)*; (d) term of years needed: (e) time of year of use or operation; (f) Volume or amount of product to be transported; (g) duration and timing of construction; and (h) temporary work areas needed for construction *(Attach additional sheets, if additional space is needed.)*

a) Crude oil pipeline

b) There are no related surface structures or facilities on the federally owned land, the pipeline will be installed below the surface via horizontal directional drill (HDD). Additional details are provided within Section 1.1.2 of the Draft EA.

c) The length of the pipeline on the federally owned property at Lake Oahe is collectively 1,109 feet and is 30 inches in diameter. A 50-foot permanent easement along the centerline of the HDD will be maintained.

d) In perpetuity. However, statute limits each term to maximum of 30 years with option to renew.

e) All year long.

f) 570,000 barrels per day (bpd) or more of crude oil (approximately 450,000 bpd initially).

g) Construction is anticipated to begin in late 2015/early 2016, the HDD beneath the federally owned lands is anticipated to take 2-3 months.

h) The federally owned property will be crossed via HDD; there is no workspace proposed for construction, just the 50-foot permanent easement.

| 8. Attach a map covering area and show location of project proposal |
|---|
| 9. State or Local government approval:   ☐ Attached   ☒ Applied for   ☐ Not Required |
| 10. Nonreturnable application fee:   ☐ Attached   ☒ Not required |
| 11. Does project cross international boundary or affect international waterways?   ☐ Yes   ☒ No   *(if "yes," indicate on map)* |

12. Give statement of your technical and financial capability to construct, operate, maintain, and terminate system for which authorization is being requested.

Dakota Access has secured binding long-term transportation and deficiency contracts from multiple committed shippers to support development of the Dakota Access Pipeline with a crude oil transportation capacity of approximately 450,000 bpd, with ninety percent (90%) of the transportation capacity subscribed by those committed shippers and the remaining ten percent (10%) of the transportation capacity reserved for walk-up shippers.

STANDARD FORM 299 (REV. 5/2009)

13a. Describe other reasonable alternative routes and modes considered.

Multiple alternatives for the pipeline were evaluated. These include evaluation of potential route alternatives, altering existing infrastructure to increase storage and transport capacity, trucking transportation, and rail transportation. See Section 3.0 of the Draft EA for additional information on alternatives.

b. Why were these alternatives not selected?

The Company does not own or operate any existing facilities in North Dakota, for this reason there is not existing infrastructure that is a viable option to meet the Project's objectives or shippers' demands, truck and rail transportation are not economical and safe alternatives compared to a pipeline. Section 3.0 of Draft EA includes alternatives details.

c. Give explanation as t o why it is necessary to cross Federal Lands.

Due to the prevalence of federally owned properties in North Dakota, and the need to connect to customer receipt points, federally owned property could not be avoided without relocating the pipeline onto other sensitive properties. Section 3.0 of the Draft EA provides additional details.

14. List authorizations and pending applications filed for similar projects which may provide information to the authorizing agency. *(Specify number, date, code, or name)*

Consent to Easements are being requested for crossing USACE flowage easements in ND and IL. Authorization from the USACE under Section 404 (CWA), Section 10 (RHA), and some also for Section 408 for drilling the Missouri River, Des Moines River, Mississippi River, Illinois River (none of which are located on federal lands)

15. Provide statement of need for project, including the economic feasibility and items such as: (a) cost of proposal (construction, operation, and maintenance); (b) estimated cost of next best alternative; and (c) expected public benefits.

See attachment.

16. Describe probable effects on the population in the area, including the social and economic aspects, and the rural lifestyles.

The HDD will have a short construction window (2-3 months) with a small number of construction workers dedicated to the crossing at the federally owned property. No residential homes or farms would be relocated resulting from the proposed action. Sections 4.8, 4.9, 5.9, and 5.10 of the Draft EA provide additional details.

17. Describe likely environmental effects that the proposed project will have on: (a) air quality; (b) visual impact; (c) surface and ground water quality and quantity; (d) the control or structural change on any stream or other body of water; (e) existing noise levels; and (f) the surface of the land, including vegetation, permafrost, soil, and soil stability.

See attachment.

18. Describe the probable effects that the proposed project will have on (a) populations of fish, plantlife, wildlife, and marine life, including threatened and endangered species; and (b) marine mammals, including hunting, capturing, collecting, or killing these animals.

See attachment.

19. State whether any hazardous material, as defined in this paragraph, will be used, produced, transported or stored on or within the right-of-way or any of the right-of-way facilities, or used in the construction, operation, maintenance or termination of the right-of-way or any of its facilities. "Hazardous material" means any substance, pollutant or contaminant that is listed as hazardous under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. 9601 et seq., and its regulations. The definition of hazardous substances under CERCLA includes any "hazardous waste" as defined in the Resource Conservation and Recovery Act of 1976 (RCRA), as amended, 42 U.S.C. 6901 et seq., and its regulations. The term hazardous materials also includes any nuclear or byproduct material as defined by the Atomic Energy Act of 1954, as amended, 42 U.S.C. 2011 et seq. The term does not include petroleum, including crude oil or any fraction thereof that is not otherwise specifically listed or designated as a hazardous substance under CERCLA Section 101(14), 42 U.S.C. 9601(14), nor does the term include natural gas.

No hazardous material is proposed to be used, transported or stored on or within the right-of-way.

20. Name all the Department(s)/Agency(ies) where this application is being filed.

U.S Army Corps of Engineers, Omaha District, Real Estate Division

I HEREBY CERTIFY, That I am of legal age and authorized to do business in the State and that I have personally examined the information contained in the application and believe that the information submitted is correct to the best of my knowledge.

| Signature of Applicant | Date |
| --- | --- |
|  | 06/29/2015 |

Title 18. U.S.C. Section 1001. makes it a crime for any person knowingly and willfully to make to any department or agency of the United States any false, fictitious, or fraudulent statements or representations as to any matter within its jurisdiction.

OAHE0000203

| SUPPLEMENTAL | | |
|---|---|---|
| NOTE: The responsible agency(ies) will provide instructions | CHECK APPROPRIATE BLOCK | |
| **I - PRIVATE CORPORATIONS** | ATTACHED | FILED* |
| a.  Articles of Incorporation | ☒ | ☐ |
| b.  Corporation Bylaws | ☒ | ☐ |
| c.  A certification from the State showing the corporation is in good standing and is entitled to operate within the State | ☒ | ☐ |
| d   Copy of resolution authorizing filing | ☒ | ☐ |
| e.  The name and address of each shareholder owning 3 percent or more of the shares, together with the number and percentage of any class of voting shares of the entity which such shareholder is authorized to vote and the name and address of each affiliate of the entity together with, in the case of an affiliate controlled by the entity, the number of shares and the percentage of any class of voting stock of that affiliate owned, directly or indirectly, by that entity, and in the case of an affiliate which controls that entity, the number of shares and the percentage of any class of voting stock of that entity owned, directly or indirectly, by the affiliate. | ☒ | ☐ |
| f.  If application is for an oil or gas pipeline, describe any related right- of-way or temporary use permit applications, and identify previous applications. | ☒ | ☐ |
| g.  If application is for an oil and gas pipeline, identify all Federal lands by agency impacted by proposal. | ☒ | ☐ |
| **II - PUBLIC CORPORATIONS** | | |
| a.  Copy of law forming corporation | ☐ | ☐ |
| b.  Proof of organization | ☐ | ☐ |
| c.  Copy of Bylaws | ☐ | ☐ |
| d.  Copy of resolution authorizing filing | ☐ | ☐ |
| e.  If application is for an oil or gas pipeline, provide information required by item "I - f" and "I - g" above. | ☐ | ☐ |
| **III - PARTNERSHIP OR OTHER UNINCORPORATED ENTITY** | | |
| a.  Articles of association, if any | ☐ | ☐ |
| b.  If one partner is authorized to sign, resolution authorizing action is | ☐ | ☐ |
| c.  Name and address of each participant, partner, association, or other | ☐ | ☐ |
| d.  If application is for an oil or gas pipeline, provide information required by item "I - f" and "I - g" above. | ☐ | ☐ |

*If the required information is already filed with the agency processing this application and is current, check block entitled "Filed." Provide the file identification information (e.g., number, date, code, name). If not on file or current, attach the requested information.

**STANDARD FORM 299** (REV. 5/2009) **PAGE 4**

OAHE0000204

## NOTICES

Note: This applies to the Department of Agriculture/Forest Service (FS)

This information is needed by the Forest Service to evaluate the requests to use National Forest System lands and manage those lands to protect natural resources, administer the use, and ensure public health and safety. This information is required to obtain or retain a benefit. The authority for that requirement is provided by the Organic Act of 1897 and the Federal Land Policy and Management Act of 1976, which authorize the secretary of Agriculture to promulgate rules and regulations for authorizing and managing National Forest System lands. These statutes, along with the Term Permit Act, National Forest Ski Area Permit Act, Granger-Thye Act, Mineral Leasing Act, Alaska Term Permit Act, Act of September 3, 1954, Wilderness Act, National Forest Roads and Trails Act, Act of November 16, 1973, Archeological Resources Protection Act, and Alaska National Interest Lands Conservation Act, authorize the Secretary of Agriculture to issue authorizations or the use and occupancy of National Forest System lands. The Secretary of Agriculture's regulations at 36 CFR Part 251, Subpart B, establish procedures for issuing those authorizations.

## BURDEN AND NONDISCRIMINATION STATEMENTS

*According to the Paperwork Reduction Act of 1995, an agency may not conduct or sponsor, and a person is not required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0596-0082. The time required to complete this information collection is estimated to average 8 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.*

*The U.S. Department of Agriculture (USDA) prohibits discrimination in all its programs and activities on the basis of race, color, national origin, age, disability, and where applicable, sex, marital status, familial status, parental status, religion, sexual orientation, genetic information, political beliefs, reprisal, or because all or part of an individual's income is derived from any public assistance. (Not all prohibited bases apply to all programs.) Persons with disabilities who require alternative means for communication of program information (Braille, large print, audiotape, etc.) should contact USDA's TARGET Center at 202-720- 2600 (voice and TDD).*

*To file a complaint of discrimination, write USDA, Director, Office of Civil Rights, 1400 Independence Avenue, SW, Washington, DC 20250-9410 or call toll free (866) 632-9992 (voice). TDD users can contact USDA through local relay or the Federal relay at (800) 877-8339 (TDD) or (866) 377-8642 (relay voice). USDA is an equal opportunity provider and employer.*

The Privacy Act of 1974 (5 U.S.C. 552a) and the Freedom of Information Act (5 U.S.C. 552) govern the confidentiality to be provided for information received by the Forest Service.

OAHE0000205

Dakota Access Pipeline Project
Project Layout
Federal Lands
Morton County and
Emmons County, North Dakota

DAKOTA ACCESS, LLC

Milepost
Project Centerline
DAPL Centerline
Workspace
USACE Federal Lands

North Dakota

0    1,750
Feet

1:21,000

UTM 83-14F    Date: April, 2015

Path: P:\GIS\Client\ETC_EnergyTransfer\DakotaAccess_DAPL\Maps\ENV\ND_FlowEasements\03ND_LakeOahe_LandLayout.mxd
Source: ArcGIS Online Mapping

OAHE0000206

# Dakota Access, LLC  SF299 – Additional Information Pages 1 and 2

**Block 15.**

The overall Project purpose is to move an economical, abundant, reliable, and domestic supply of crude oil from the Bakken and Three Forks production region in North Dakota to a crude oil market hub located near Patoka, Illinois. The Dakota Access Pipeline is being designed to safely carry 570,000 barrels per day (bpd) or more of crude oil (approximately 450,000 bpd initially) through the states of North Dakota, South Dakota, Iowa, and Illinois and ultimately terminating in Patoka, Illinois. From the Patoka hub, the crude oil will be transported by other pipelines to refineries located in the Midwest and the Gulf Coast where 80% of the U.S. refining capabilities exist today to further our Country's goal of energy independence. See Section 1.2 of the Draft EA for additional details on the purpose and need.

a)      The estimated cost to construct the entire Project is $3.8 billion; the North Dakota portion of the Project is estimated to cost $1.4 billion. During the construction stage of the pipeline project, North Dakota land owners will receive approximately $57 Million in "easement and damages" payments to reimburse them for the restoration and use of their land. Once in operation, the pipeline will generate about $13 Million in local property taxes.

b)      Route alternatives assessed and evaluated were not expected to have a materially different cost from the proposed. The alternatives were largely not selected as a result of other environmental and schedule limiting factors.

c)      The Project will improve overall safety to the public and environment. It will reduce crude oil shipped by truck and by rail and significantly increase the amount shipped by pipeline. Pipelines are the safest and most efficient means to transport crude oil, according to statistics compiled by the United States Department of Transportation. Pipelines are heavily regulated and are subject to intense scrutiny and oversight. Time and time again, pipelines have proven to be the safest and most reliable form of transporting oil.

**Block 17.**

a)      With respect to the HDD of federal lands, no long-term impacts to air quality would occur. Short-term impacts to air quality would occur during the drilling activities as a result of the use of equipment with combustion engines, however this is considered a minor indirect impact to climate change. See Sections 4.12.1 and 5.11 within the Draft EA for additional details on air quality.

b)      There are no aboveground facilities associated with the Project within or adjacent to the federally owned property. Therefore, there will be no effect on visual resources.

c)      Impacts to Lake Oahe would be avoided by using HDD construction methods to install the proposed pipeline underneath Lake Oahe. The primary impact that could occur as a result of a HDD is an inadvertent release of drilling fluid directly or indirectly into the water body. Dakota Access will conduct all HDD work according to the HDD Construction Plan to monitor activities to avoid a frac-out. In the event of an inadvertent release, the HDD Contingency Plan would be implemented.

The pipeline will be installed in saturated sediments as part of the HDD crossing of Lake Oahe. Due to the nature of HDD methodology, it is inherently not a risk to groundwater resources, uses benign substances (bentonite and water) to penetrate through soil, rock, and groundwater. See Sections 4.2.2 and 5.2 of the Draft EA for additional information on groundwater. Construction of the pipeline at the federally owned property is not expected to significantly negatively impact groundwater resources.

d)      No control or structural change will occur to any stream or body of water.

1

OAHE0000207

# Dakota Access, LLC  SF299 – Additional Information Pages 1 and 2

e)      Construction would cause temporary increases in the ambient sound environment in the areas immediately surrounding active construction (largely the HDD entry and exit points on private lands). The use of heavy equipment or trucks would be the primary noise source during construction and excavation.      It is not anticipated that the temporary increase in ambient sound levels associated with construction would result in a significant noise impact.  And no residences or noise sensitive areas are expected to be impacted based on location/distance.

f)      Construction of the pipeline at the federal property crossing would result in no impacts on the surface of the land as a result of drilling the tracts.

The HDD at the federally owned property crossing would result in no surface impacts; therefore no impacts to soils are expected.  Additional information on soils is included in Sections 4.1.5 and 5.1 of the Draft EA.

Temporary impacts to land cover will occur in essentially all areas within the construction footprint; since the crossing at the federally owned property only consists of the HDD, no impacts to land cover are expected.  See Sections 4.3 and 5.3 for additional details on vegetation.

**Block 18.**
a)      The federally owned property will be crossed via HDD.   Impacts to wildlife on the federal property are not expected since there will be no surface impacts.

Given the limited scope of this Project, minimization measures, and the implementation of specialized construction techniques, Dakota Access has determined that the Project will have no effect or is not likely to adversely affect all of the federally listed threatened and endangered species in the Project area of the federally owned property.   See Sections 4.4, 5.4, 5.5, and 5.6 of the Draft EA for additional information on wildlife and federally listed species.

b)      No marine mammals are located within the Project area.

OAHE0000208

# Dakota Access, LLC  SF299 – Attachment/Additional
# Section I – Private Corporations (Page 4)

a.   Articles of Incorporation.  A Certificate of Formation, the LLC equivalent of the Articles of Incorporation, is attached.

b.   Corporation By-Laws.  Not applicable.

c.   Certificate from the State.  Attached.

d.   Authorization of Filing.
     Authorization for filings is pursuant to Section 7.4.1 of the Construction Management Agreement (CMA) dated October 15, 2014 between Dakota Access, LLC and DAPL-ETCO Construction Management, LLC (the "Construction Manager").

   **7.4.1 Government Reports.** *Prior to the Final Acceptance of any Applicable Facility, other than with respect to any tariff-related filings or reports, Construction Manager shall Manage the preparation and filing of any reports required by any Governmental Authority having jurisdiction over any Segment of such Applicable Facility for which Final Acceptance has not occurred, including any such reports required in connection with the Management of the Design, Procurement and Construction of such Applicable Facility.*

e.   Ownership Information:
     Dakota Access, LLC is a Delaware limited liability company with its principal offices at 3738 Oak Lawn Avenue, Dallas, Texas 75219. The membership interest of Dakota Access, LLC is owned 75 percent by Dakota Access Holdings, LLC and the remaining 25 percent is owned by Phillips 66 DAPL Holdings LLC.
     Dakota Access Holdings, LLC is owned 100 percent by Energy Transfer Partners, L.P. ("ETP"), a master limited partnership publicly traded on the New York Stock Exchange ("NYSE"). Energy Transfer Equity, L.P. ("ETE"), also a master limited partnership publicly traded on the NYSE, indirectly owns the general partner of ETP and certain of that partnership's limited partner units. ETP owns the general partner of Sunoco Logistics Partners, L.P. ("SXL") and certain of its limited partner units. (ETE and ETP are together referred to herein as "Energy Transfer"). Energy Transfer maintains its corporate headquarters at 3738 Oak Lawn Avenue, Dallas, Texas 75219 and SXL maintains its corporate headquarters at 1818 Market Street, Philadelphia, PA 19103.

     ETP and SXL have reached an agreement in principle for the transfer to SXL of an indirect 30% interest in Dakota Access, LLC.

     Phillips 66 Company holds a 100 percent indirect interest in Phillips 66 DAPL Holdings LLC. Phillips 66 Company is 100 percent owned by Phillips 66, a Delaware corporation.

OAHE0000209

## Dakota Access, LLC  SF299 — Attachment/Additional
## Section I – Private Corporations (Page 4)

Phillips 66 maintains its corporate headquarters at 3010 Briarpark Drive, Houston, Texas 77042.

f.  Related Right-of-Way or Temporary Use Applications.
    Consent to Easements are being requested for crossing USACE flowage easements in ND and IL.

g.  Federal Lands.
    No other federally owned lands are crossed by the project.

OAHE0000210



*The First State*

PAGE   1

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT
COPY OF THE CERTIFICATE OF FORMATION OF "DAKOTA ACCESS, LLC",
FILED IN THIS OFFICE ON THE FIFTH DAY OF MARCH, A.D. 2014, AT
2:27 O'CLOCK P.M.

5493070   8100

140290951

You may verify this certificate online
at corp.delaware.gov/authver.shtml

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 1182953

DATE: 03-05-14

OAHE0000211

03/05/2014 2:25 PM FAX  +916489/290    _  . Energy Transfer Partners                    @0006/0006

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 02:27 PM 03/05/2014*
*FILED 02:27 PM 03/05/2014*
*SRV 140290951 – 5493070 FILE*

### STATE OF DELAWARE
### LIMITED LIABILITY COMPANY
### CERTIFICATE OF FORMATION
### OF
### DAKOTA ACCESS, LLC

The undersigned, a natural person, for the purpose of forming a limited liability company under the Delaware Limited Liability Company Act, does hereby execute this Certificate of Formation:

1. The name of the limited liability company is Dakota Access, LLC (the "*Company*").

2. The address of its registered office in the State of Delaware is: 2711 Centerville Road, Suite 400, in the City of Wilmington, County of New Castle, Delaware 19808. The name of its registered agent at such address is Corporation Service Company.

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Formation of Dakota Access, LLC this 5th day of March, 2014.

Organizer:

*Peggy J. Harrison*
Peggy J. Harrison

OAHE0000212

# *State of North Dakota*
## SECRETARY OF STATE



### CERTIFICATE OF GOOD STANDING
### OF

DAKOTA ACCESS, LLC

The undersigned, as Secretary of State of the State of North Dakota, hereby certifies that DAKOTA ACCESS, LLC,  a   FOREIGN LIMITED LIABILITY COMPANY,  authorized to transact business in the State of North Dakota on March 20, 2014, and according to the records of this office as of this date, has paid all fees due this office as required by North Dakota statutes governing a FOREIGN LIMITED LIABILITY COMPANY.

ACCORDINGLY the undersigned, as such Secretary of State, and by virtue of the authority vested in him by law, hereby issues this Certificate of Good Standing to

DAKOTA ACCESS, LLC

Issued:  June 16, 2015

Alvin A. Jaeger
Secretary of State

| | |
|---|---|
| **From:** | Godinez, Enrique NWD |
| **To:** | Chipman, David V NWO; Noel, Rick L NWO; Simpson, Amanda M NWO |
| **Cc:** | Czarnecki, Todd L NWD |
| **Subject:** | FW: RE PGL 27 Congressional Notification for Dakota Access Application (UNCLASSIFIED) |
| **Date:** | Thursday, September 10, 2015 10:22:14 AM |
| **Attachments:** | Hon Murkowski-Mineral Leasing.pdf |
| | Hon Bishop-Mineral Leasing.pdf |
| | Hon Grijalva-Mineral Leasing.pdf |
| | Hon Cantwell-Mineral Leasing.pdf |

Classification: UNCLASSIFIED
Caveats: NONE

Amanda and Chiefs:

Below and attached are copies of the congressional notification letters for Dakota Access pipeline.

Thanks,

Enrique Godinez
Real Estate Office 4B-01
Northwestern Division
Tel 503-808-3871
BB 503-961-5890


-----Original Message-----
From: Nettles, Theodore L HQ
Sent: Thursday, September 10, 2015 4:22 AM
To: Godinez, Enrique NWD
Subject: RE: RE PGL 27 Congressional Notification for Dakota Access Application (UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: NONE

Enrique:

Attached for your records are the DASA signed letters that went over to the committees.

v/r
ted

Theodore (Ted) Nettles
Realty Specialist
Directorate of Military Programs
Real Estate Community of Practice
3R64
441 G. Street NW
Washington, DC 20314-1000
Office: 202-761-5542
Email: Theodore.L.Nettles@usace.army.mil


-----Original Message-----
From: Godinez, Enrique NWD

OAHE0000246

Sent: Friday, July 10, 2015 6:12 PM
To: Nettles, Theodore L HQ
Cc: Czarnecki, Todd L NWD
Subject: RE PGL 27 Congressional Notification for Dakota Access Application (UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: NONE

Ted:

I hope by the time your receive this you had a nice weekend.  Please accept this email and the attached as NWD's transmittal of NWO's package to forward to DASA for the corresponding initial congressional notification required under Real Estate Policy Guidance Letter 27.  I've added this action to the NWD/HQUSACE tracker that I will share with you Monday morning for our regularly scheduled call.

Encl 3 to the attached NWO memo is enclosed here in MSWord.  I'm not sure who signs the DASA letter, but I can change it upon your direction.

Thanks,
Enrique Godinez
Real Estate Office 4B-01
Northwestern Division
Tel 503-808-3871
BB 503-961-5890




-----Original Message-----
From: Simpson, Amanda M NWO
Sent: Tuesday, June 30, 2015 11:37 AM
To: Godinez, Enrique NWD
Cc: Chipman, David V NWO; Noel, Rick L NWO
Subject: RE: Congressional Notification (UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: NONE

Mr. Godinez,

Please see attached SF299 application for Dakota Access, LLC. If you have any comments or questions, please feel free to contact me 402.995.2837. Thank you.

Respectfully,

Amanda M. Simpson
US Army Corps of Engineers
Realty Specialist, Omaha District
402.995.2837

-----Original Message-----
From: Godinez, Enrique NWD
Sent: Wednesday, April 22, 2015 1:28 PM
To: Simpson, Amanda M NWO
Cc: Chipman, David V NWO; Noel, Rick L NWO
Subject: RE: Congressional Notification (UNCLASSIFIED)

OAHE0000247

Classification: UNCLASSIFIED
Caveats: NONE

Amanda:

Please look at paragraph 3d of REPGL27 and provide me the SF299 application that should have accompanied the Dakota Access LLC letter attached in your 7 Apr 15 Memo to NWD.  As required by the last sentence of paragraph 3(a)(1) of the REPGL, we are required to include a copy of said application with the initial congressional notification.

Feel free to call me if you have any questions.

Thanks,
Enrique Godinez
Real Estate Office 4B-01
Northwestern Division
Tel 503-808-3871
BB 503-961-5890

-----Original Message-----
From: Simpson, Amanda M NWO
Sent: Wednesday, April 08, 2015 9:29 AM
To: Godinez, Enrique NWD
Cc: Chipman, David V NWO; Noel, Rick L NWO
Subject: Congressional Notification (UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: NONE

Enrique,

Please see attached application request from Dakota Access, LLC for a 30 inch diameter pipeline carrying light crude oil crossing approximately 7.51 acres of land over Government property at Lake Oahe Dam and Reservoir in North Dakota. I have also attached congressional notification letters for your review and approval and to forward onto Headquarters and the Office of the Assistant Secretary of the Army (Installations, Energy and Environment) for their signature.

If you would like an original copy, please let me know and we can mail you a copy. Thank you very much.

Respectfully,

Amanda M. Simpson
U.S. Army Corps of Engineers
Realty Specialist
Omaha District
Phone: 402-995-2837

Classification: UNCLASSIFIED
Caveats: NONE

Classification: UNCLASSIFIED
Caveats: NONE

OAHE0000248

Classification: UNCLASSIFIED
Caveats: NONE


Classification: UNCLASSIFIED
Caveats: NONE


Classification: UNCLASSIFIED
Caveats: NONE


Classification: UNCLASSIFIED
Caveats: NONE

OAHE0000249



**DEPARTMENT OF THE ARMY**
OFFICE OF THE ASSISTANT SECRETARY OF THE ARMY
INSTALLATIONS, ENERGY AND ENVIRONMENT
110 ARMY PENTAGON
WASHINGTON DC 20310-0110

SEP 0 3 2015

The Honorable Rob Bishop
Chairman, Committee on Natural Resources
United States House of Representatives
123 Cannon Building
Washington, D.C. 20515

Dear Chairman Bishop:

Pursuant to the Mineral Leasing Act of 1920, as amended (30 U.S.C. §185 (w)), the Army is providing notice that Dakota Access LLC, a Delaware limited liability company, with its principal office located at 3738 Oak Lawn Ave, Dallas, Texas, operating as a subsidiary of Energy Transfer Partners and authorized to do business in the State of North Dakota, has filed an application with the Army for an easement. The applicant is requesting to cross approximately 7.51 acres of Government land located at Lake Oahe Dam and Reservoir, North Dakota for the installation, construction, operation, maintenance, and repair of a 30-inch diameter underground light crude oil pipeline. A large portion of the line would be buried under Lake Oahe. A license may also be granted for construction purposes.

A similar letter is being sent to the Honorable Raúl Grijalva, Ranking Member, Committee on Natural Resources, House of Representatives; the Honorable Lisa Murkowski, Chairman, Committee on Energy and Natural Resources, United States Senate; and the Honorable Maria Cantwell, Ranking Member, Committee on Energy and Natural Resources, United States Senate.

If you have questions on this action, LTC Rance Lee, Office of the Chief of Legislative Liaison, may be reached at 703-697-2417.

Sincerely,

Paul D. Cramer
Deputy Assistant Secretary of the Army
(Installations, Housing and Partnerships)

Enclosure



**DEPARTMENT OF THE ARMY**
OFFICE OF THE ASSISTANT SECRETARY OF THE ARMY
INSTALLATIONS, ENERGY AND ENVIRONMENT
110 ARMY PENTAGON
WASHINGTON DC 20310-0110

SEP 0 3 2015

The Honorable Maria Cantwell
Ranking Member, Committee on Energy and Natural Resources
United States Senate
511 Hart Senate Office Building
Washington, D.C. 20510

Dear Senator Cantwell:

Pursuant to the Mineral Leasing Act of 1920, as amended (30 U.S.C. §185 (w)), the Army is providing notice that Dakota Access LLC, a Delaware limited liability company, with its principal office located at 3738 Oak Lawn Ave, Dallas, Texas, operating as a subsidiary of Energy Transfer Partners and authorized to do business in the State of North Dakota, has filed an application with the Army for an easement. The applicant is requesting to cross approximately 7.51 acres of Government land located at Lake Oahe Dam and Reservoir, North Dakota for the installation, construction, operation, maintenance, and repair of a 30-inch diameter underground light crude oil pipeline. A large portion of the line would be buried under Lake Oahe. A license may also be granted for construction purposes.

A similar letter is being sent to the Honorable Lisa Murkowski, Chairman, Committee on Energy and Natural Resources, United States Senate; the Honorable Rob Bishop, Chairman, Committee on Natural Resources, United States House of Representatives; and the Honorable Raúl Grijalva, Ranking Member, Committee on Natural Resources, House of Representatives.

If you have questions on this action, LTC Rance Lee, Office of the Chief of Legislative Liaison, may be reached at 703-697-2417.

Sincerely,

Paul D. Cramer
Deputy Assistant Secretary of the Army
(Installations, Housing and Partnerships)

Enclosure

**DEPARTMENT OF THE ARMY**
OFFICE OF THE ASSISTANT SECRETARY OF THE ARMY
INSTALLATIONS, ENERGY AND ENVIRONMENT
110 ARMY PENTAGON
WASHINGTON DC 20310-0110

SEP 0 3 2015

The Honorable Raúl Grijalva
Ranking Member, Committee on Natural Resources
United States House of Representatives
1511 Longworth House Office Building
Washington, D.C. 20515

Dear Representative Grijalva:

Pursuant to the Mineral Leasing Act of 1920, as amended (30 U.S.C. §185 (w)), the Army is providing notice that Dakota Access LLC, a Delaware limited liability company, with its principal office located at 3738 Oak Lawn Ave, Dallas, Texas, operating as a subsidiary of Energy Transfer Partners and authorized to do business in the State of North Dakota, has filed an application with the Army for an easement. The applicant is requesting to cross approximately 7.51 acres of Government land located at Lake Oahe Dam and Reservoir, North Dakota for the installation, construction, operation, maintenance, and repair of a 30-inch diameter underground light crude oil pipeline. A large portion of the line would be buried under Lake Oahe. A license may also be granted for construction purposes.

A similar letter is being sent to the Honorable Rob Bishop, Chairman, Committee on Natural Resources, United States House of Representatives; the Honorable Lisa Murkowski, Chairman, Committee on Energy and Natural Resources, United States Senate; and the Honorable Maria Cantwell, Ranking Member, Committee on Energy and Natural Resources, United States Senate.

If you have questions on this action, LTC Rance Lee, Office of the Chief of Legislative Liaison, may be reached at 703-697-2417.

Sincerely,

Paul D. Cramer
Deputy Assistant Secretary of the Army
(Installations, Housing and Partnerships)

Enclosure

OAHE0000252



**DEPARTMENT OF THE ARMY**
OFFICE OF THE ASSISTANT SECRETARY OF THE ARMY
INSTALLATIONS, ENERGY AND ENVIRONMENT
110 ARMY PENTAGON
WASHINGTON DC 20310-0110



SEP 0 3 2015

The Honorable Lisa Murkowski,
Chairman, Committee on Energy and Natural Resources
United States Senate
709 Hart Senate Building
Washington, D.C. 20510

Dear Madam Chairwoman:

Pursuant to the Mineral Leasing Act of 1920, as amended (30 U.S.C. §185 (w)), the Army is providing notice that Dakota Access LLC, a Delaware limited liability company, with its principal office located at 3738 Oak Lawn Ave, Dallas, Texas, operating as a subsidiary of Energy Transfer Partners and authorized to do business in the State of North Dakota, has filed an application with the Army for an easement. The applicant is requesting to cross approximately 7.51 acres of Government land located at Lake Oahe Dam and Reservoir, North Dakota for the installation, construction, operation, maintenance, and repair of a 30-inch diameter underground light crude oil pipeline. A large portion of the line would be buried under Lake Oahe. A license may also be granted for construction purposes.

A similar letter is being sent to the Honorable Rob Bishop, Chairman, Committee on Natural Resources, United States House of Representatives; the Honorable Raúl Grijalva, Ranking Member, Committee on Natural Resources, House of Representatives; and the Honorable Maria Cantwell, Ranking Member, Committee on Energy and Natural Resources, United States Senate.

If you have questions on this action, LTC Rance Lee, Office of the Chief of Legislative Liaison, may be reached at 703-697-2417.

Sincerely,

Paul D. Cramer
Deputy Assistant Secretary of the Army
(Installations, Housing and Partnerships)

Enclosure

| | |
|---|---|
| **From:** | Simpson, Amanda M NWO |
| **To:** | Noel, Rick L NWO |
| **Subject:** | FW: DAPL pipeline flowage easement language (UNCLASSIFIED) |
| **Date:** | Thursday, September 24, 2015 3:36:51 PM |
| **Attachments:** | flowage easement estate.jpg |
| | 3453E flowage easement tract - consent to easement.pdf |

Classification: UNCLASSIFIED
Caveats: NONE

Rick,

Please see below email from Melissa (RE Specialist in St. Louis) and see attached flowage easement language for their tracts vs ours. Our flowage easement language states:

"...; provided further that any exploration or exploitation of oil, gas and minerals shall be subject to Federal and State laws with respect to pollution and shall not create floatable debris, reserving, however, to the landowner, their heirs and assigns, all such rights and privileges as may be used and enjoyed without interfering the rights and easements hereby acquired..."

I am going to share our flowage easement language with her. Since the language in our easement states "..any exploration or exploitation of oil, gas and minerals shall be subject to Federal and State laws.." I am assuming the consent to easement is necessary in our case. Is this correct? Do you have any comments you would like to provide Melissa? Please let me know. Thanks!

Respectfully,

Amanda M. Simpson
US Army Corps of Engineers
Realty Specialist, Omaha District
402.995.2837

-----Original Message-----
From: Hoerner, Melissa L MVS
Sent: Thursday, September 24, 2015 2:41 PM
To: Simpson, Amanda M NWO
Cc: Asbed, Jeffrey E MVS
Subject: DAPL pipeline flowage easement language

Hi, Amanda:

Attached is the first page of a flowage easement deed along the proposed pipeline route. All 11 tracts contain the same language: "...; and provided further that no structures of any type except as may be required for the exploration, development and recovery of minerals including oil, gas and solids shall be constructed on the land without prior written approval...".

The initial response I received from OC included, in part, the following: "My interpretation would be that flowage easement language excepting structures for the "development" of oil would include building structures to create a pipeline for the transportation of oil. The Dakota Pipeline will be developing a wider usage for the oil by constructing a pipeline that will transport the oil to a hub (Patoka, Illinois) where it can be further transported and utilized. That is my plain meaning interpretation of the language within the flowage easements."

However, OC also asked that I coordinate with other Districts where the pipeline may be crossing flowage easement to compare the language in the easements, and if others shared this language, make sure we answered consistently.

OAHE0000254

I'd really appreciate if you could check out the language in your flowage easement deeds to see if they share this exception.

Thanks for your help!
Lynn


Classification: UNCLASSIFIED
Caveats: NONE

| From: | Noel, Rick L NWO |
|---|---|
| To: | Godinez, Enrique NWD |
| Cc: | Chipman, David V NWO; Simpson, Amanda M NWO |
| Subject: | RE: 2nd Congressional Notification for Dakota Access Application |
| Date: | Thursday, July 21, 2016 8:34:00 AM |
| Attachments: | DAPL Draft Easement.doc |
| | DAPL Information Paper.docx |
| | DAPL Project Map.pdf |

Enrique

Attached is draft easement, information paper and project map (a more specific map showing the lake crossing will be attached to the easement).

I am not familiar with that website to upload docs but will see if I can find someone who is.

Rick L. Noel
Chief, Civil Branch, Real Estate Division
Real Estate Contracting Officer
USAED, Omaha
402-995-2832 (phone)
402-995-2826 (fax)
rick.l.noel@usace.army.mil

-----Original Message-----
From: Godinez, Enrique NWD
Sent: Wednesday, July 20, 2016 4:51 PM
To: Noel, Rick L NWO <Rick.L.Noel@usace.army.mil>
Cc: Chipman, David V NWO <David.V.Chipman@usace.army.mil>; Simpson, Amanda M NWO <Amanda.M.Simpson@usace.army.mil>
Subject: RE: 2nd Congressional Notification for Dakota Access Application

Rick:

Thank you very much for the heads up on this matter.  Memo looks good.  Please take advantage of https://safe.amrdec.army.mil to send the EA and any other big documents via electronic means instead of a CD; you can send it directly to Ted and me at the same time and it is quicker than overnighting a CD.

Also, consider sending me the draft easement language, and info paper ASAP so I can start looking at it.  I will have to get Counsel's blessing here remotely as he'll be traveling next week so anything I can discuss with him before travel would be appreciated.

Thanks,
Enrique Godinez
Real Estate Office 4B-01
Northwestern Division
Tel 503-808-3871
BB 503-961-5890

OAHE0000464

-----Original Message-----
From: Noel, Rick L NWO
Sent: Tuesday, July 19, 2016 2:05 PM
To: Godinez, Enrique NWD <Enrique.Godinez@usace.army.mil>
Cc: Chipman, David V NWO <David.V.Chipman@usace.army.mil>; Simpson, Amanda M NWO
<Amanda.M.Simpson@usace.army.mil>
Subject: RE: 2nd Congressional Notification for Dakota Access Application
Importance: High


Enrique

FYI, sounds like the FONSI/Section 408 will be signed by the Commander in the next couple days so we will be on
a hot seat at that point (see attached message).  Based on Ted's response below, I will not ask DAPL to sign the
easement and will forward to NWD along with the draft Congressional notices as soon as I pull everything together.
If the decision occurs, I will send it overnight early next week. Attached is my draft transmittal.  Please look it over
and let me know if it is missing anything.  As to the EA, it is nearly 2,000 pages so my plan is to enclose it on a CD
rather than a hard copy.  I will be happy to follow up the hard copy with an electronic copy of anything you want.


Rick L. Noel
Chief, Civil Branch, Real Estate Division
Real Estate Contracting Officer
USAED, Omaha
402-995-2832 (phone)
402-995-2826 (fax)
rick.l.noel@usace.army.mil




-----Original Message-----
From: Nettles, Theodore L HQ
Sent: Monday, July 18, 2016 8:20 AM
To: Godinez, Enrique NWD <Enrique.Godinez@usace.army.mil>
Cc: Noel, Rick L NWO <Rick.L.Noel@usace.army.mil>
Subject: RE: 2nd Congressional Notification for Dakota Access Application


Enrique:

A final-negotiated easement without their signature will work.

v/r
ted

Theodore (Ted) Nettles
Realty Specialist
Directorate of Military Programs
Real Estate Community of Practice
3R64
441 G. Street NW
Washington, DC 20314-1000
Office: 202-761-5542
Email: Theodore.L.Nettles@usace.army.mil



-----Original Message-----
From: Godinez, Enrique NWD

OAHE0000465

Sent: Thursday, July 14, 2016 3:30 PM
To: Nettles, Theodore L HQ <Theodore.L.Nettles@usace.army.mil>
Cc: Noel, Rick L NWO <Rick.L.Noel@usace.army.mil>
Subject: 2nd Congressional Notification for Dakota Access Application

Ted:  NWO is almost ready to send up the chain the 2nd notification required under PGL 27 for subject.  NWO would like to know if they should include a copy of the easement with Dakota Access' signature, or would you rather get a final-negotiated easement without their signature.  The RECO would sign for the Government after the required waiting period.

Let me know if you want to talk about this.

Thanks,

Enrique Godinez
Real Estate Office 4B-01
Northwestern Division
Tel 503-808-3871
BB 503-961-5890

-----Original Message-----
From: Nettles, Theodore L HQ
Sent: Thursday, September 10, 2015 4:22 AM
To: Godinez, Enrique NWD <Enrique.Godinez@usace.army.mil>
Subject: RE: RE PGL 27 Congressional Notification for Dakota Access Application (UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: NONE

Enrique:

Attached for your records are the DASA signed letters that went over to the committees.

v/r
ted

Theodore (Ted) Nettles
Realty Specialist
Directorate of Military Programs
Real Estate Community of Practice
3R64
441 G. Street NW
Washington, DC 20314-1000
Office: 202-761-5542
Email: Theodore.L.Nettles@usace.army.mil

-----Original Message-----
From: Godinez, Enrique NWD
Sent: Friday, July 10, 2015 6:12 PM
To: Nettles, Theodore L HQ
Cc: Czarnecki, Todd L NWD
Subject: RE PGL 27 Congressional Notification for Dakota Access Application (UNCLASSIFIED)

Classification: UNCLASSIFIED

OAHE0000466

Caveats: NONE

Ted:

I hope by the time your receive this you had a nice weekend.  Please accept this email and the attached as NWD's transmittal of NWO's package to forward to DASA for the corresponding initial congressional notification required under Real Estate Policy Guidance Letter 27.  I've added this action to the NWD/HQUSACE tracker that I will share with you Monday morning for our regularly scheduled call.

Encl 3 to the attached NWO memo is enclosed here in MSWord.  I'm not sure who signs the DASA letter, but I can change it upon your direction.

Thanks,
Enrique Godinez
Real Estate Office 4B-01
Northwestern Division
Tel 503-808-3871
BB 503-961-5890

-----Original Message-----
From: Simpson, Amanda M NWO
Sent: Tuesday, June 30, 2015 11:37 AM
To: Godinez, Enrique NWD
Cc: Chipman, David V NWO; Noel, Rick L NWO
Subject: RE: Congressional Notification (UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: NONE

Mr. Godinez,

Please see attached SF299 application for Dakota Access, LLC. If you have any comments or questions, please feel free to contact me 402.995.2837. Thank you.

Respectfully,

Amanda M. Simpson
US Army Corps of Engineers
Realty Specialist, Omaha District
402.995.2837

-----Original Message-----
From: Godinez, Enrique NWD
Sent: Wednesday, April 22, 2015 1:28 PM
To: Simpson, Amanda M NWO
Cc: Chipman, David V NWO; Noel, Rick L NWO
Subject: RE: Congressional Notification (UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: NONE

Amanda:

Please look at paragraph 3d of REPGL27 and provide me the SF299 application that should have accompanied the

OAHE0000467

Dakota Access LLC letter attached in your 7 Apr 15 Memo to NWD.  As required by the last sentence of paragraph 3(a)(1) of the REPGL, we are required to include a copy of said application with the initial congressional notification.

Feel free to call me if you have any questions.

Thanks,
Enrique Godinez
Real Estate Office 4B-01
Northwestern Division
Tel 503-808-3871
BB 503-961-5890

-----Original Message-----
From: Simpson, Amanda M NWO
Sent: Wednesday, April 08, 2015 9:29 AM
To: Godinez, Enrique NWD
Cc: Chipman, David V NWO; Noel, Rick L NWO
Subject: Congressional Notification (UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: NONE

Enrique,

Please see attached application request from Dakota Access, LLC for a 30 inch diameter pipeline carrying light crude oil crossing approximately 7.51 acres of land over Government property at Lake Oahe Dam and Reservoir in North Dakota. I have also attached congressional notification letters for your review and approval and to forward onto Headquarters and the Office of the Assistant Secretary of the Army (Installations, Energy and Environment) for their signature.

If you would like an original copy, please let me know and we can mail you a copy. Thank you very much.

Respectfully,

Amanda M. Simpson
U.S. Army Corps of Engineers
Realty Specialist
Omaha District
Phone: 402-995-2837

Classification: UNCLASSIFIED
Caveats: NONE

Classification: UNCLASSIFIED
Caveats: NONE

Classification: UNCLASSIFIED
Caveats: NONE

OAHE0000468

Classification: UNCLASSIFIED
Caveats: NONE


Classification: UNCLASSIFIED
Caveats: NONE

OAHE0000469

DACW45-2-16-8059

# DEPARTMENT OF THE ARMY
## EASEMENT FOR FUEL CARRYING PIPELINE RIGHT-OF-WAY

### LOCATED ON

### LAKE OAHE PROJECT

### MORTON AND EMMONS COUNTIES, NORTH DAKOTA

This Easement is made on behalf of **THE UNITED STATES OF AMERICA** (the "United States"), between **THE SECRETARY OF THE ARMY**, acting by and through the Chief, Real Estate Division, U.S. Army Engineer District, Omaha District, hereinafter referred to as the "Grantor", under and by virtue of the authority vested in Title 30, United States Code, Section 185, and **DAKOTA ACCESS, LLC, a Limited Liability Company, duly organized and existing under and by virtue of the laws of the State of Delaware, with its principal office at 1300 Main, Houston, Texas 77002,** hereinafter referred to as the "Grantee."

**NOW THEREFORE:**

The Grantor, for good and valuable consideration set forth below, the receipt and sufficiency of all of which are hereby acknowledged, upon and subject to the terms, covenants and conditions set forth in this Easement for right-of-way, does hereby:

Grant and convey to Grantee, an easement for a fuel carrying pipeline right-of-way for the installation, construction, operation, maintenance, repair, replacement and termination of a **thirty inch ( "30") diameter, horizontal directional drill (HDD) buried oil pipeline for the purpose of transporting crude oil**, and related facilities, hereinafter collectively referred to as the "Facilities", over, across, in and upon lands of the United States **at and under Lake Oahe and the Lake Oahe Project**, as identified in **EXHIBITS "A" and "B"**, hereinafter referred to as the "Premises", and which is attached hereto and made a part hereof; with the width of a right-of-way being fifty feet plus the ground occupied by the pipeline (that is, the pipe and its related facilities);

Make no claim of title during the term of this Easement to any Facilities of whatever nature located, constructed, or placed on the Premises by the Grantee.

OAHE0000470

DACW45-2-16-8059

**THIS EASEMENT** is granted subject to the following conditions.

1.      **TERM**

This easement is hereby granted for a term of **Thirty Years**, beginning on the date of execution by the Grantor and ending thirty (30) years from the date of execution by the Grantor.

The Grantor shall renew this Easement in accordance with the provisions of 30 U.S.C. § 185, so long as the project is in commercial operation and is operated and maintained in accordance with all of the provisions of this Easement and applicable law. The Grantor prior to renewing this Easement must receive from the Grantee written notice of its intent to seek renewal or extension not less than one year prior to the Easement expiration or termination date and all plans, contracts, agreements, or other information or material which the Grantor deems necessary to determine whether a right-of-way shall be renewed and the terms and conditions which should be included in the right-of-way.

2.      **CONSIDERATION, MITIGATION, AND DAMAGES**

a.  As consideration for this Easement, the Grantee shall pay cash consideration in advance to the Grantor in the amount of **One Hundred Twenty Six Thousand Five Hundred and No/100 ($126,500.00)**.

b.  The Grantee will mitigate damages caused to the Premises, surrounding areas, or to the **Lake Oahe Project**, during initial installation and construction of the Facilities, and damages caused during operation, maintenance, or subsequent construction work, and complete all site restoration in accordance with the Mitigation / Restoration Plan submitted by Grantee on file in the U.S. Army Engineer District, **Omaha, specifically referenced in the Grantee's pipeline Environmental Assessment ("EA") in Section 3.3.2.5 "Clean-up and Restoration", and further outlined in the Stormwater Pollution Prevention Plan ("SWPPP) presented in Appendix A of the EA and the Environmental Construction Plan presented in Appendix G of the EA**.

c.  The Grantee shall reimburse the Grantor in advance for the costs incurred in monitoring the construction, operation, maintenance, and termination of the pipeline and related facilities on the Premises in the amount of **Two Thousand Two Hundred Fifty and No/100 Dollars ($2,250.00)**.

d.  Any cash payments to the Grantor will be made to the order of the **"FAO-USAED, OMAHA"**, and delivered to **USAED, Omaha, ATTN:  CENWO-RE, 1616 Capitol Avenue, Omaha, Nebraska  68102**.

e.  Any payments due under the terms of this easement must be paid on or before the date they are due in order to avoid the mandatory sanctions imposed by the Debt Collection Act of 1982, as amended (31 U.S.C. Section 3717).  This statute requires the

OAHE0000471

DACW45-2-16-8059

imposition of an interest charge for the late payment of debts owed to the United States; an administrative charge to cover the costs of processing and handling delinquent debts; and the assessment of an additional penalty charge on any portion of a debt that is more than 90 days past due.

3.      **NOTICES**

All correspondence and notices to be given pursuant to this easement shall be in writing and addressed, if to the Grantee, to **DAKOTA ACCESS LLC, 1300 Main Street, Houston, Texas 77002** and, if to the Grantor, to the **U. S. Army Engineer District, Omaha, Attention: Chief, Real Estate Division, 1616 Capitol Avenue, Omaha, Nebraska 68102,** or as may from time to time otherwise be directed by the parties.  Notices shall be mailed by certified mail, postage prepaid, return receipt requested, addressed to the addresses above.  The effective date of the notice shall be the earlier of the actual date of receipt or the date the addressee is notified of the attempted delivery of the certified mail, whether or not the addressee actually accepts delivery.

4.      **AUTHORIZED REPRESENTATIVE**

Except as otherwise specifically provided, any reference herein to "Grantor" or "Chief, Real Estate Division" shall include their duly authorized representatives.  Any reference to "Grantee" shall include assignees, transferees and their duly authorized representatives.

5.      **SUPERVISION BY THE GRANTOR**

a. The installation and/or operation and maintenance of said pipeline shall be accomplished without cost or expense to the United States under the general supervision and subject to the approval of the Grantor's representative having immediate jurisdiction over the property, hereinafter designated as **"said officer,"** and in such manner as not to endanger personnel or property of the United States on the said United States land or obstruct travel on any road thereon.  The Grantee shall have the right of ingress and egress for such purposes, subject to approval of access by said officer.

b. The use and occupation of said Premises incident to the exercise of the privileges hereby granted shall be subject to such rules and regulations as the said officer may from time to time prescribe.

6.      **APPLICABLE LAWS AND REGULATIONS**

The Grantee shall construct, operate, maintain, and terminate the said pipeline in accordance applicable Federal, state, county, and municipal laws, regulations, and ordinances.  As required by 30 U.S.C. § 185, the Grantee shall construct, operate, and maintain the Facilities as common carriers.  The pipeline installation shall be in accordance with the U.S. Department of Transportation's Minimum Federal Safety Standards and any other applicable Federal or state safety requirements.

OAHE0000472

DACW45-2-16-8059

7.    **CONDITION OF PREMISES**

The Grantee acknowledges that it has inspected the premises, knows its condition, and understands that the same is granted without any representations or warranties whatsoever and without any obligation on the part of the United States.

8.    **INSPECTION AND REPAIRS**

a.  Upon completion of any phase of the pipeline project which causes damage to the Premises, the Grantee shall restore said damage immediately, at the Grantee's own expense, to the same condition in which they existed prior to the commencement of such work, to the satisfaction of the said officer.

b.  The Grantee shall supervise the said pipeline and cause it to be inspected at reasonable intervals, and shall immediately repair any defects or leaks found by such inspection, or when requested by the Grantor to repair any defects or leaks.

9.    **PROTECTION OF GOVERNMENT PROPERTY**

The Grantee shall be responsible for any damage that may be caused to the property of the United States by the activities of the Grantee under this Easement and shall exercise due diligence in the protection of all property located on the Premises against fire or damage from any and all other causes.  Any property of the United States damaged or destroyed by the Grantee incident to the exercise of the privileges herein granted shall be promptly repaired or replaced by the Grantee to a condition satisfactory to the Grantor, or at the election of the Grantor, reimbursement made therefore by the Grantee in an amount to reimburse for the loss satisfactory to the Grantor.

10.    **RIGHT TO ENTER**

a.  The right is reserved to the Grantor, the United States, its officers, agents, and employees to enter upon the premises at any time and for any purpose necessary or convenient in connection with government purposes, to make inspections, to remove timber or other material, except property of the Grantee, to flood the premises, to manipulate the level of the lake or pool in any manner whatsoever and/or to make any other use of the lands as may be necessary in connection with government purposes, and the Grantee shall have no claim for damages on account thereof against the Grantor, the United States or any officer, agent, or employee thereof.

b.  If the entry will involve removal of timber or other material, or heavy equipment, the Grantor will provide reasonable notice to Grantee of any such entry or use so that Grantee may take any necessary measures to assure the safety of its pipeline and any personnel of the United States working in proximity to such pipeline.  Grantee will ensure that Grantor has emergency contact information.

4

OAHE0000473

## 11.   TRANSFERS AND ASSIGNMENTS

Without prior written approval by the Grantor, the Grantee shall neither transfer nor assign this Easement or any part thereof nor grant any interest, privilege or license whatsoever in connection with this Easement.  The provisions and conditions of this Easement shall extend to and be binding upon and shall inure to the benefit of the representatives, successors and assigns of the Grantee.

## 12.   INDEMNITY

a.  The Grantee shall be strictly liable to the United States for damage or injury which may arise from or be incident to the activities of the Grantee under this easement, or for damages to the property of the Grantee, or for damages to the property or injuries to the person of the Grantee's officers, agents, or employees or others who may be on the premises at their invitation or the invitation of any one of them, and the Grantee shall hold the United States harmless from any and all such claims not including damages due to the fault or negligence of the United States or its contractors.   Grantee shall exercise due diligence in the protection of all property located on the Premises.

b.  All owners of any interest in, and all affiliates or subsidiaries of the Grantee shall be liable to the United States in the event that a claim for damage or injury cannot be collected from the Grantee.  Liability without fault hereunder shall be limited to **Ten Million and No/100 ($10,000,000.00)** for any one incident. Liability of such Grantee for damages in excess **Ten Million and No/100 ($10,000,000.00) shall** be in accord with ordinary rules of negligence.  However, this condition shall not impose strict liability on the Grantee for damage or injury resulting from (a) an act of war or force majeure, or (b) negligence of the United States.  In any case where liability without fault is imposed pursuant to this condition and the damage or injuries involved were caused by the negligence of a third party, the rules of subrogation shall apply in accordance with the law of the jurisdiction where the damage or injury occurred.

c.  The Grantee does hereby accept liability, if any, imposed by Federal and state statutes to third parties for injuries incurred in connection with the use and occupancy of the pipeline right-of-way.

## 13.   SUBJECT TO EASEMENTS

a.  This Easement is subject to all other existing easements, or those subsequently granted as well as established access routes for roadways and utilities located, or to be located, on the Premises.

b.  In order to minimize adverse environmental impacts and the proliferation of separate rights-of-way across Federal lands, the utilization of rights-of-way in common shall be required to the extent practical, and this Easement hereby reserves to the Grantor the right to grant additional rights-of-way or permits for compatible uses on or adjacent to the Premises.

5

OAHE0000474

DACW45-2-16-8059

c.  Provided that the proposed grant of any new easement or route will be coordinated with the Grantee, and easements will not be granted which will, in the opinion of the Grantor, interfere with the use of the premises by the Grantee.

## 14.    REQUIRED SERVICES

*This condition was deleted.*

## 15.    RELOCATION OF FACILITIES

In the event all or any portion of said Premises occupied by said Facilities shall be needed by the United States, or in the event the existence of said Facilities shall be considered detrimental to governmental activities, the Grantee shall, from time to time, upon notice to do so, and as often as so notified, promptly seek authorization from the Federal Energy Regulatory Commission, or other applicable entity, to remove said Facilities, or portion thereof, to such other location or locations on said Premises as may be designated by the Grantor. And in the event said Facilities shall not be removed or relocated within ninety (90) days after any aforesaid notice, the Grantor, after receipt of required approvals, may cause the same to be done at the expense of the Grantee.

## 16.    SUSPENSION OR TERMINATION

a.  Abandonment of the Easement herein granted or noncompliance with any provisions of this Easement or applicable provisions of 30 U.S.C. 185 may be grounds for suspension or termination of the right of way if (a) after due notice to the Grantee, (b) a reasonable opportunity to comply with this Easement or applicable provisions of 30 U.S.C. §185, and (c) an appropriate administrative proceeding pursuant to 5 U.S.C. §554, the Grantor determines that any such ground exists that suspension or termination is justified.  No administrative proceeding shall be required where the Easement by its terms provides that it terminates on the occurrence of a fixed or agreed upon condition, event, or time.

b.  If the Grantor determines that an immediate temporary suspension of activities within the Premises is necessary to protect public health or safety or the environment, the Grantor may abate such activities prior to an administrative proceeding.

c.  Deliberate failure of the Grantee to use the Easement for the purpose for which it was granted or renewed for any continuous two-year period shall constitute a presumption of abandonment of the Easement; provided, that where the failure to use the right-of-way is due to circumstances not within the Grantee's control, the Grantor is not required to commence proceedings to suspend or terminate the right-of-way.

6

OAHE0000475

DACW45-2-16-8059

**17.    SOIL AND WATER CONSERVATION**

The Grantee shall maintain, in a manner satisfactory to said officer, all soil and water conservation structures that may be in existence upon said premises at the beginning of or that may be constructed by the Grantee during the term of this Easement, and the Grantee shall take appropriate measures to prevent or control soil erosion within the right-of-way herein granted.  Any soil erosion occurring outside the premises resulting from the activities of the Grantee shall be corrected by the Grantee as directed by said officer.

**18.    ENVIRONMENTAL PROTECTION**

a.  Within the limits of their respective legal powers, the parties hereto shall protect the premises against pollution of its air, ground, and water.  The Grantee shall promptly comply with any laws, regulations, conditions, or instructions affecting the activity hereby authorized if and when issued by the Environmental Protection Agency, or any Federal, state, interstate, or local governmental agency having jurisdiction to abate or prevent pollution.  The disposal of any toxic or hazardous materials within the premises is strictly prohibited.  Such regulations, conditions, or instructions in effect or prescribed by the said Environmental Protection Agency or any Federal, state, interstate, or local governmental agency are hereby made a condition of this Easement.  The Grantee shall not discharge waste or effluent from the premises in such a manner that the discharge will contaminate streams or other bodies of water or otherwise become a public nuisance.

b.  The use of any pesticides or herbicides within the premises shall be in conformance with all applicable Federal, state, and local laws and regulations.  The Grantee must obtain approval in writing from said officer before any pesticides or herbicides are applied to the premises.

c.  The Grantee will use all reasonable means available to protect the environment and natural resources, and where damage nonetheless occurs arising from the Grantee's activities, the Grantee shall be liable to restore the damaged resources.

**19.    ENVIRONMENTAL CONDITION OF PROPERTY**

An Environmental Condition of Property (ECP) documenting the known history of the property with regard to the storage, release, or disposal of hazardous substances thereon, is attached hereto and made a part hereof as **Exhibit "C"**.  Upon expiration, revocation, or termination of this Easement, another ECP shall be prepared which will document the environmental condition of the property at that time.  A comparison of the two studies will assist the said officer in determining any environmental restoration requirements.  Any such requirements will be completed by the Grantee in accordance with the condition on **RESTORATION**.

OAHE0000476

DACW45-2-16-8059

### 20.   HISTORIC PRESERVATION

The Grantee shall not remove or disturb, or cause or permit to be removed or disturbed, any historical, archeological, architectural or other cultural artifacts, relics, vestiges, remains or objects of antiquity. In the event such items are discovered on the Premises, the Grantee shall immediately notify the Grantor, and the site and the material shall be protected by the Grantee from further disturbance until the Grantor gives clearance to proceed.

### 21.   NON-DISCRIMINATION

The Grantee shall not discriminate against any person or persons because of race, color, age, sex, handicap, national origin, or religion in the conduct of operations on the premises.

### 22.   HAZARDOUS WASTE MANAGEMENT

The Grantee will not store or dispose of non-DoD hazardous materials on the premises unless authorized under 10 U.S.C. §2692, *Storage, Treatment, and Disposal of Non-Defense Toxic and Hazardous Materials*. The Grantee shall strictly comply with the hazardous waste management requirements under the Resource Conservation and Recovery Act and the applicable State hazardous waste management rules, including proper hazardous waste characterization, labeling, storage, disposal and documentation requirements. Except as specifically authorized by the Grantor in writing, the Grantee must provide, at its own expense such hazardous waste management facilities as needed to maintain compliance with all laws and regulations. Army hazardous waste management facilities will not be available to the Grantee.

### 23.   HAZARDOUS WASTE OR FUEL SPILL

The Grantee shall submit to the Grantor and maintain, thereafter, a plan for responding to hazardous water, fuel, and other chemical spills prior to commencement of use of the premises. Such plan shall be independent of the Government's Spill contingency plan and, except for initial fire response and/or spill containment, shall not rely on use of project personnel or equipment. Should the Grantor provide any personnel or equipment, whether for initial fire response and/or spill containment, or otherwise on request of the Grantee or because the Grantee was not, in the opinion of the said officer, conducting timely clean-up actions, the Grantee agrees to reimburse the Grantor for its costs.

### 24.   RESTORATION

On or before the expiration or termination of this easement, the Grantee shall, without expense to the United States, and within such time as the Grantor may indicate, remove said Facilities and restore the Premises to the satisfaction of the Grantor. In the event the Grantee shall fail, neglect or refuse to remove said Facilities and restore the

8

Premises, the Grantor shall have the option to take over said Facilities without compensation, or to remove said Facilities and perform the restoration at the expense of the Grantee, and the Grantee shall have no claim for damages against the United States or its officers or agents for such action.  This provision is subject to all regulatory requirements and approvals covering any of the activities described in this Condition.

## 25.   DISCLAIMER

That it is understood that this instrument is effective only insofar as the rights of the United States in the said property are concerned, and that the Grantee shall obtain such permission as may be necessary on account of any other existing rights. It is understood that the granting of this Easement does not eliminate the necessity of obtaining any Department of the Army permit which may be required pursuant to the provisions of Section 10 of the Rivers and Harbors Act of March 3, 1899 (30 Stat. 1151; 33 U.S.C. § 403), Section 404 of the Clean Water Act (33 U.S.C. § 1344), or any other permit or license which may be required by Federal, state or local statute in connection with the use of the premises.  The grant of this Easement pursuant to 30 U.S.C. § 185 shall grant no immunity from the operation of the Federal antitrust laws.

## 26.   OTHER AGENCY AGREEMENTS

It is understood that the provision of the Easement shall not abrogate or interfere with any agreements or commitments made or entered into between the Grantee and any other agency of the United States with regard to financial aid to the Grantee in connection with the installation, operation, or maintenance of said pipeline.

## 27.   CONSTRUCTION, OPERATION AND REHABILITATION PLAN

In compliance with 30 U.S.C. § 185, the Grantee will follow the plan(s) of construction, operation, and rehabilitation submitted to the Grantor prior to the execution of this Easement, on file in the **U.S. Army Engineer District, Omaha District. Restoration will be in accordance with Section 3.3.2.5 of the EA "Clean-up and Restoration" and further outlined in the SWPPP and the Environmental Construction Plan presented in Appendices "A" and "G", respectively, of the EA. Ground disturbing activities will not occur on Corps managed lands; therefore, reseeding is not anticipated in those areas.  However, if reseeding were to become necessary on Corps managed lands, all activities shall be conducted in accordance with applicable Lake Oahe revegation guidelines.**

## 28.   FEDERAL ENERGY REGULATORY COMMISSION ORDER ISSUING CERTIFICATES

The Grantee shall comply with the conditions set forth in the Federal Energy Regulatory Commission's Order Issuing Certificate **dated December 24, 2014, as applicable, to Docket No. OR14-42-00, Dakota Access LLC.**

OAHE0000478

DACW45-2-16-8059

## 29.   SITE SPECIFIC CONDITIONS

a.  All environmental commitments in the Environmental Assessment and Finding of No Significant Impact must be satisfied by the Grantee and are incorporated herein by reference.

b.  The pipeline must be maintained and operated per ASME B31.3, B31.4, B31.8, CFR 192, CFR 195, API 1104, and related codes.

c.  Cathodic Protection will be operated and maintained per applicable codes and the Grantee's "Operations and Maintenance Manual". Wall thickness testing will be performed on a 5 year interval through the use of in-line inspection. The periodic in-line inspection will be performed in-lieu of periodic hydro tests. The Grantee shall send the inspection reports to the Oahe Project Office.

d.  The Facility Response Plan will be submitted to the United States Army Corps of Engineers (USACE) for review prior to the operation of the pipeline.

e.  All plans not final at the time the Environmental Assessment is complete will be submitted to the USACE for review and the incorporation of USACE comments prior to submittal to the Pipeline and Hazardous Management Safety Administration. These plans include, but are not limited to the following:   Geographical Response Plan, Operations and Maintenance Manual, Risk Assessment (Integrity Management Plan) and Spill Models (Using the National Hydrography Dataset by the USGS)

f.  Any plans that have been updated in the "Facility Response Plan" must be sent to USACE Environmental Compliance Coordinators at the Omaha District Office and the Oahe Project Office within one year of the update.

g.  The Grantee shall provide as-built drawings for the crossing at Lake Oahe to the USACE Section 408 Coordinator Omaha District Office and the Operations Project Manager Oahe Project Office within 6 months of the completion of pipeline construction.

h.  The Grantee shall conduct the following training exercises:

(1)  A full scale open water and a full scale winter/ice exercises at Lake Sakakawea and Lake Oahe. A full scale exercise will occur once every 3 years (triennial cycle) with the location and type of exercise occurring on alternating schedules (e.g. open water exercise at Lake Oahe the first triennial cycle, followed by winter exercise at Lake Sakakawea the following triennial cycle, followed by a winter exercise at Lake Oahe the following triennial cycle, etc.). The first exercise will occur within the first 3 years after the pipeline becomes operational.

(2)  To facilitate USACE staff involvement, the Grantee shall notify the USACE Environmental Compliance Coordinators at the Omaha District Office and the Oahe Project Office at least ninety (90) days prior to initiation of the training exercises.  The

OAHE0000479

**DACW45-2-16-8059**

Grantee shall also solicit the participation of key stakeholders (federal, state, local, and Tribal) in these exercises.

i.  Within one year following the pipeline becoming operational, the Grantee shall provide for an all-weather access and collection point downstream of the HDD crossing at Lake Oahe.  The Grantee shall provide an equipment storage facility on non-federal lands that includes a fenced permanent storage area for winter and open water spill response equipment.  The storage facility should be placed in a strategic location and near existing facilities that would support access to the water.  The Grantee will coordinate with the USACE and any other applicable stakeholders to obtain all necessary permits and approvals prior to construction for any ground disturbing activities associated with these facilities. The storage facility should contain sufficient response equipment at a minimum to mitigate an unintended worst case release for this Lake crossing.

**THIS EASEMENT** is not subject to Title 10, United States Code, Section 2662, as amended.

11

OAHE0000480

DACW45-2-16-8059

**IN WITNESS WHEREOF,** I have hereunto set my hand to this Easement by authority of the Secretary of the Army, this _____ day of _____ 2016.

_____
**DAVID V. CHIPMAN**
Chief, Real Estate Division
Real Estate Contracting Officer

**ACKNOWLEDGMENT**

STATE OF NEBRASKA    )
                     ) ss:
COUNTY OF DOUGLAS  )

**PERSONALLY APPEARED BEFORE ME,** the undersigned authority in and for said County and State, within my jurisdiction, the within named **David V. Chipman,** who acknowledged that he is the Chief of Real Estate Division, U.S. Army Engineer District, Omaha, and that in said capacity she executed the above and foregoing **Department of the Army Easement for Fuel Carrying Pipeline Right-Of-Way** by authority of the Secretary of the Army for the purposes therein expressed and as the act and deed of the United States of America.

**GIVEN UNDER MY HAND AND SEAL,** this _____ day of _____, **2016.**

(SEAL)

_____
NOTARY PUBLIC

My Commission Expires:

_____

12

DACW45-2-16-8059

**THIS EASEMENT** is also executed by the Grantee this_____ day of
_____, 2016.

**DAKOTA ACCESS LLC**

_____

**Robert Rose**
Vice President, Land and Right of Way

## ACKNOWLEDGMENT

STATE OF     _____     )
                              ) ss:
COUNTY OF     _____     )

      **PERSONALLY APPEARED BEFORE ME,** the undersigned authority in and
for the county and state, on this _____ day of _____, 2016, within my
jurisdiction, the within named **Robert Rose**, who acknowledged that he is **Vice
President, Land and Right of Way, DAKOTA ACCESS LLC** a Delaware Limited
Liability Company, and that for and on behalf of the said company, and as its act and
deed she executed the above and foregoing **Department of the Army Easement for
Fuel Carrying Pipeline Right-Of-Way,** having been duly authorized by said company
so to do.

(SEAL)

_____
NOTARY PUBLIC

My Commission Expires:

_____

13

| | |
|---|---|
| **From:** | Howard, Monica |
| **To:** | Simpson, Amanda M NWO |
| **Cc:** | Cossette, Brent NWO; steve.rowe@hdrinc.com; Dennis Woods (dwoods@perennialenv.com); athompson@perennialenv.com |
| **Subject:** | [EXTERNAL] RE: Congressional Notification (UNCLASSIFIED) |
| **Date:** | Monday, June 15, 2015 12:23:14 PM |

Great. Thank you for the clarification.

Sent via the Samsung GALAXY S®4 Active™, an AT&T 4G LTE smartphone

-------- Original message --------
From: "Simpson, Amanda M NWO"
Date:06/15/2015 9:12 AM (GMT-07:00)
To: "Howard, Monica"
Cc: "Cossette, Brent NWO" ,steve.rowe@hdrinc.com,"Dennis Woods (dwoods@perennialenv.com)"
,athompson@perennialenv.com
Subject: RE: Congressional Notification (UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: NONE

Monica,

#10 on the SF299 is referring to the $120,000 in administrative costs already submitted to the Corps (please
reference attached letter from December 2014). For purposes of the form, you can check "Not required" as we have
already received these funds from you. Please let me know if you have any further comments or questions. Thank
you.

Respectfully,

Amanda M. Simpson
US Army Corps of Engineers
Realty Specialist, Omaha District
402.995.2837

-----Original Message-----
From: Howard, Monica [mailto:Monica.Howard@energytransfer.com]
Sent: Friday, June 12, 2015 10:29 AM
To: Simpson, Amanda M NWO
Cc: Cossette, Brent NWO; steve.rowe@hdrinc.com; Dennis Woods (dwoods@perennialenv.com);
athompson@perennialenv.com
Subject: [EXTERNAL] RE: Congressional Notification (UNCLASSIFIED)

Amanda, can you please clarify if this congressional notification is for the federal owned lands crossing only, or do
we need to account for the flowage easements as well. Either way, we should have the majority of this for you
today. We are still having a few issues with getting the appropriate information for I-Private contractors.

Lastly, can you please provide any clarification on how we need to respond to "10. Nonreturnable application fee".
Is that required? If so, how much?

Thank you.

Monica Howard

OAHE0000625

Director Environmental Sciences
713-989-7186 (o)
713-898-8222 (c)

-----Original Message-----
From: Simpson, Amanda M NWO [mailto:Amanda.M.Simpson@usace.army.mil]
Sent: Tuesday, April 28, 2015 9:39 AM
To: Howard, Monica
Cc: Cossette, Brent NWO
Subject: Congressional Notification (UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: NONE

Mrs. Howard,

Hello, my name is Amanda Simpson and I am one of the Realty Specialists working on the Dakota Access Pipeline Project.  Along with the application from Dakota Access LLC, the congressional notification we send up to our HQ Office through Division is required to have Standard Form 299 filled out by the applicant (see attached).  Can your office fill this out please and email it back to me? If you have any questions, please call or email me, thank you.

Respectfully,

Amanda M. Simpson
U.S. Army Corps of Engineers
Realty Specialist
Omaha District
Phone: 402-995-2837

Classification: UNCLASSIFIED
Caveats: NONE

Classification: UNCLASSIFIED
Caveats: NONE

Private and confidential as detailed here: http://www.energytransfer.com/mail_disclaimer.aspx
<http://www.energytransfer.com/mail_disclaimer.aspx>  .  If you cannot access the link, please e-mail sender.

Classification: UNCLASSIFIED
Caveats: NONE

Private and confidential as detailed here <http://www.energytransfer.com/mail_disclaimer.aspx> . If you cannot access hyperlink, please e-mail sender.

| From: | Stewart. Paul B CIV USARMY HODA ASA IEE (US) |
|---|---|
| To: | Nettles. Theodore L HQ |
| Subject: | [EXTERNAL] RE: Lake Oahe Dakota Access Pipeline Easement COngressional Notification (UNCLASSIFIED) |
| Date: | Wednesday, August 05, 2015 12:58:45 PM |

Ok, I will ask them if that's something they see a need for going forward.

-----Original Message-----
From: Nettles, Theodore L HQ [mailto:Theodore.L.Nettles@usace.army.mil]
Sent: Wednesday, August 05, 2015 11:35 AM
To: Stewart, Paul B CIV USARMY HQDA ASA IEE (US) <paul.b.stewart1.civ@mail.mil>
Subject: RE: Lake Oahe Dakota Access Pipeline Easement COngressional Notification (UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: NONE

Paul:

I put ASA(CW) on the memo since the pipeline builder is requesting to run it through the footprint of a CW project. My intent on the pipeline package and the annexation was to provide them with some visibility of RE actions.

v/r
ted

Theodore (Ted) Nettles
Realty Specialist
Directorate of Military Programs
Real Estate Community of Practice
3R64
441 G. Street NW
Washington, DC 20314-1000
Office: 202-761-5542
Email: Theodore.L.Nettles@usace.army.mil

-----Original Message-----
From: Stewart, Paul B CIV USARMY HQDA ASA IEE (US) [mailto:paul.b.stewart1.civ@mail.mil]
Sent: Wednesday, August 05, 2015 11:10 AM
To: Nettles, Theodore L HQ
Subject: [EXTERNAL] RE: Lake Oahe Dakota Access Pipeline Easement COngressional Notification (UNCLASSIFIED)

Ted - I left you a voicemail on this subject yesterday. Question is whether ASA CW had requested to see these pipeline notifications or if there's other requirement for their review?  I don't have an issue with them reviewing (if they want), but I don't think they have done so in the past and it doesn't appear required by AR. Annexation as well, are we getting their chop for a specific reason?

-----Original Message-----
From: Nettles, Theodore L HQ [mailto:Theodore.L.Nettles@usace.army.mil]
Sent: Tuesday, August 04, 2015 10:46 PM
To: Smith, Bruce A CIV (US) <bruce.a.smith138.civ@mail.mil>; Dacosta-Chisley, Sharron H CIV (US) <sharron.h.dacosta-chisley.civ@mail.mil>
Cc: Redmond, Clayton L HQ02 <Clayton.L.Redmond2@usace.army.mil>; Stewart, Paul B CIV USARMY HQDA ASA IEE (US) <paul.b.stewart1.civ@mail.mil>
Subject: RE: Lake Oahe Dakota Access Pipeline Easement COngressional Notification (UNCLASSIFIED)

OAHE0001138

Classification: UNCLASSIFIED
Caveats: NONE

Bruce:  Got it.

Sharron:  Please let me know if you have any questions.

Thank you both.

v/r
ted

Theodore (Ted) Nettles
Realty Specialist
Directorate of Military Programs
Real Estate Community of Practice
3R64
441 G. Street NW
Washington, DC 20314-1000
Office: 202-761-5542
Email: Theodore.L.Nettles@usace.army.mil


-----Original Message-----
From: Smith, Bruce A CIV (US) [mailto:bruce.a.smith138.civ@mail.mil]
Sent: Tuesday, August 04, 2015 11:02 AM
To: Nettles, Theodore L HQ; Stewart, Paul B CIV USARMY HQDA ASA IEE (US)
Cc: Redmond, Clayton L HQ02; DaCosta-Chisley, Sharron H HQDA
Subject: [EXTERNAL] RE: Lake Oahe Dakota Access Pipeline Easement COngressional Notification (UNCLASSIFIED)

Ted - Sharron Dacosta-Chisley will be the POC on for this action.



Bruce A. Smith
Assistant for Interagency and International Affairs Office of the Assistant Secretary of the Army (Civil Works)
108 Army Pentagon (3E441)
Washington, DC 20310-0108
Office: (703) 697-6985
Cell: (571) 338-5939
Fax: (703) 695-1386
Fax: (703) 697-7401
bruce.a.smith138.civ@mail.mil
bruce.a.smith138.civ@mail.smil.mil
bruce.a.smith2@us.army.smil.mil


-----Original Message-----
From: Nettles, Theodore L HQ [mailto:Theodore.L.Nettles@usace.army.mil]
Sent: Monday, August 03, 2015 2:59 PM
To: Stewart, Paul B CIV USARMY HQDA ASA IEE (US) <paul.b.stewart1.civ@mail.mil>; Smith, Bruce A CIV (US) <bruce.a.smith138.civ@mail.mil>
Cc: Redmond, Clayton L HQ02 <Clayton.L.Redmond2@usace.army.mil>
Subject: Lake Oahe Dakota Access Pipeline Easement COngressional Noticification (UNCLASSIFIED)

OAHE0001139

Classification: UNCLASSIFIED
Caveats: NONE

Paul and Bruce:

Attached is CEMP-CR memo and package for Congressional Notification - Easement applicant request, Tracts 3214, 3215, 3218, 3219-1, and 3225, Lake Oahe Dam and Reservoir, North Dakota.

Attached is an application from Dakota Access, LLC for a 30 inch diameter pipeline carrying light crude oil crossing approximately 7.51 acres of land over Tracts 3214, 3215, 3218, 3219-1, and 3225 at the Lake Oahe Dam and Reservoir.  The proposed pipeline will cross Lake Oahe and Government property on both the east and west side of Lake Oahe.  The proposed crossing is located in Section 10, Township 134 North, Range 79 West in Morton County, North Dakota, and Section 11, Township 134 North, Range 79 West in Emmons County, North Dakota. A map depicting the location of the right-of-way across the project is also attached.

Per RE PGL 27, draft Congressional notification letters are attached for your review.

If you have any questions or if you need a hard copy of this package please call or email.

v/r
ted

Theodore (Ted) Nettles
Realty Specialist
Directorate of Military Programs
Real Estate Community of Practice
3R64
441 G. Street NW
Washington, DC 20314-1000
Office: 202-761-5542
Email: Theodore.L.Nettles@usace.army.mil


Classification: UNCLASSIFIED
Caveats: NONE


Classification: UNCLASSIFIED
Caveats: NONE


Classification: UNCLASSIFIED
Caveats: NONE



0 1,000 2,000 Feet

1 inch = 2,000 feet

N

merjent

For Environmental Review Purposes Only

**Figure 1**
**Dakota Access, LLC**
**Dakota Access Pipeline Project**

at Missouri River/Lake Oahe

○ Milepost
Route
Tracts
Proposed 50ft Easement