STANDING ROCK SIOUX TRIBE, *et al.*,

    Plaintiffs,

      v.

U.S. ARMY CORPS OF ENGINEERS, *et al.*,

    Defendants.

Civil Action No. 16-1534 (JEB)

## MEMORANDUM OPINION

Designed to transport oil from the Bakken oil fields in North Dakota to a storage hub in southern Illinois, the Dakota Access Pipeline (DAPL) has also borne substantial controversy in its wake. Most significant has been the opposition from Indian tribes whose reservations lie in close proximity to the pipeline's crossing of the Missouri River at Lake Oahe. To block Dakota Access LLC's construction of that last segment and its operation of DAPL, the Standing Rock Sioux Tribe filed this suit in July 2016, and the Cheyenne River Sioux Tribe intervened shortly thereafter.

The Tribes have since mounted two substantial legal challenges to DAPL, neither of which yielded success. The first contended that the grading and clearing of land for the pipeline threatened sites of cultural and historical significance, and that the U.S. Army Corps of Engineers had flouted its duty to engage in tribal consultations pursuant to the National Historic Preservation Act. See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs (Standing Rock I), 205 F. Supp. 3d 4, 7 (D.D.C. 2016). The second maintained that the presence of oil in the pipeline under Lake Oahe would desecrate sacred waters and make it impossible for the Tribes to

freely exercise their religious beliefs, thus violating the Religious Freedom Restoration Act.  See

Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs (Standing Rock II), No. 16-1534, 2017

WL 908538, at *1 (D.D.C. Mar. 7, 2017).

Now that the Court has rejected these two lines of attack, Standing Rock and Cheyenne

River here take their third shot, this time zeroing in DAPL's environmental impact.  They seek

summary judgment on several counts related to the Corps' alleged failure to comply with the

National Environmental Policy Act.  In particular, the Tribes believe that the Corps did not

sufficiently consider the pipeline's environmental effects before granting permits to Dakota

Access to construct and operate DAPL under Lake Oahe, a federally regulated waterway.  This

volley meets with some degree of success.  Although the Corps substantially complied with

NEPA in many areas, the Court agrees that it did not adequately consider the impacts of an oil

spill on fishing rights, hunting rights, or environmental justice, or the degree to which the

pipeline's effects are likely to be highly controversial.

To remedy those violations, the Corps will have to reconsider those sections of its

environmental analysis upon remand by the Court.  Whether Dakota Access must cease pipeline

operations during that remand presents a separate question of the appropriate remedy, which will

be the subject of further briefing.

**Table of Contents**

I.   Background ............................................................................................................. 4

   A.   NEPA                                                                                            4
   B.   Factual History                                                                               6
   C.   Litigation                                                                                   11
      1.   Filing of Suit ............................................................................... 11
      2.   Further Consideration .................................................................... 12
      3.   A New Administration ..................................................................... 16

II.  Legal Standard ................................................................................................... 19
III. Analysis of Standing Rock's Claims ................................................................ 21

   A.   Decision Not to Prepare EIS                                                                  21
      1.   Hard Look / Convincing Case ......................................................... 22

         a.   Extent of Record                                                                       23
         b.   Spill-Risk Analysis ................................................................... 27
         c.   Impacts Analysis Re: Treaty Rights ......................................... 36

      2.   Alternatives ................................................................................... 43
      3.   Environmental Justice ................................................................... 47

   B.   Decision to Grant the Easement                                                               54
      1.   Policy Change ................................................................................ 55
      2.   Trust Responsibilities .................................................................... 59

   C.   NWP 12                                                                                        63
   D.   Remedy                                                                                        66

IV.  Analysis of Cheyenne River's Claims ............................................................. 67

   A.   Section 408 Decision                                                                          68
      1.   Impairment..................................................................................... 69
      2.   Injurious to Public Interest ........................................................... 71
      3.   Other Arguments ........................................................................... 72

   B.   Easement Decision                                                                             75
      1.   Section 185(b)(1) ........................................................................... 76
      2.   Section 185(h)(2) ........................................................................... 78
      3.   Section 185(x) ................................................................................ 79

   C.   Trust Responsibilities                                                                        80
   D.   Consultation                                                                                  81

V.   Conclusion ......................................................................................................... 91

## I.    Background

To familiarize the reader with the background information relevant to its analysis, the Court first briefly sets out the National Environmental Policy Act's statutory framework and then separately discusses the factual history and litigation to date.

### A.  NEPA

The National Environmental Policy Act, the statute under which the majority of the Tribes' claims are brought, has two aims: it "places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action," and "it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 97 (1983) (citation omitted).  NEPA's requirements are "procedural," requiring "agencies to imbue their decisionmaking, through the use of certain procedures, with our country's commitment to environmental salubrity." Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190, 193-94 (D.C. Cir. 1991).  Importantly, "NEPA does not mandate particular consequences," id. at 194, and courts are discouraged from substituting their own policy judgments for that of the agency.  See N. Slope Borough v. Andrus, 642 F.2d 589, 599 (D.C. Cir. 1980); see also Marsh v. Or. Nat. Res. Council, 490 U.S. 360, 378 (1989).  "NEPA merely prohibits uninformed — rather than unwise — agency action." Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 351 (1989).  Agency actions with adverse environmental effects can thus be NEPA compliant where "the agency has considered those effects and determined that competing policy values outweigh those costs." Ohio Valley Envtl. Coal. v. Aracoma Coal Co., 556 F.3d 177, 191 (4th Cir. 2009) (citations omitted).

Under NEPA, an agency must prepare an Environmental Impact Statement for any proposed major federal action "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). An EIS must detail the environmental impact of the proposed action, any unavoidable adverse effects, alternatives to the proposed action, the relationship between short-term uses of the environment and long-term productivity, and any irreversible commitments of resources. Id.

To determine whether an agency must prepare an EIS, it first drafts an Environmental Assessment. See 40 C.F.R. § 1501.4(b). An EA is a "concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." Id. § 1508.9(a). The EA must discuss the need for the proposal, the alternatives, the environmental impacts of the proposed action and alternatives, and the agencies and persons consulted. Id. § 1508.9(b). If, after preparing an EA, the agency determines that an EIS is not necessary, it must prepare a Finding of No Significant Impact (FONSI) setting forth the reasons why the action will not have any significant impact on the environment. Id. §§ 1501.4(e), 1508.13; cf. Grand Canyon Trust v. FAA, 290 F.3d 339, 340 (D.C. Cir. 2002) ("If any 'significant' environmental impacts might result from the proposed agency action then an EIS must be prepared before agency action is taken.") (quoting Sierra Club v. Peterson, 717 F.2d 1409, 1415 (D.C. Cir. 1983)). If the action will not have such impact because of the agency's commitment to ensure the performance of mitigation measures, the agency prepares a Mitigated FONSI. See Council on Environmental Quality, Appropriate Use of Mitigation and Monitoring and Clarifying the Appropriate Use of Mitigated Findings of No Significant Impact 2, 7 (2011), https://energy.gov/sites/prod/files/NEPA-CEQ_Mitigation_and_Monitoring_Guidance_14Jan2011.pdf. Mitigation includes "[a]voiding

an impact by not taking a certain action"; "[m]inimizing an impact by limiting the degree or magnitude of the action"; "[r]ectifying an impact by repairing, rehabilitating, or restoring the affected environment"; "[r]educing or eliminating an impact over time, through preservation and maintenance operations"; and "[c]ompensating for an impact by replacing or providing substitute resources or environments." Id. at 4-5. As will be explained below, the Corps here prepared an EA and a Mitigated FONSI. The central question this Opinion answers is whether that was sufficient.

      B. Factual History

      As those who have followed this litigation and the concomitant public debate well know, DAPL is a nearly 1,200-mile pipeline designed to move more than half a million gallons of crude oil from North Dakota to Illinois every day. Standing Rock I, 205 F. Supp. 3d at 7. Although no government approval is necessary for oil pipelines traversing private lands, it is required for those segments that cross federally regulated waters. Id. DAPL crosses such waterways at hundreds of discrete places along its route, including, most prominently, at Lake Oahe. Id.

      Created by the Corps in 1958 via a dam constructed on the Missouri River, Lake Oahe is a reservoir that spans North and South Dakota and borders the Standing Rock and Cheyenne River Sioux Reservations to the east. Id. at 13; ECF No. 172-1 (Environmental Assessment) at 35, 75; ECF No. 97-1 (CRST Second Amended Complaint), ¶ 29. DAPL crosses the Lake 0.55 miles north of the Standing Rock Reservation and 73 miles north of the Cheyenne River Reservation. See Standing Rock II, 2017 WL 908538, at *1; EA at 75. For orientation purposes, the southern border of the former Reservation also acts as the northern border of the latter. See ECF No. 117-5 (Map of Current Sioux Reservations).

Lake Oahe holds special significance for the Standing Rock and Cheyenne River Sioux Tribes. Its creation necessitated the taking of approximately 56,000 acres of some of "the best land" from Standing Rock's Reservation, as well as 104,420 acres of Cheyenne River's trust lands. See Act of Sept. 2, 1958, Pub. L. No. 85-915, 72 Stat. 1762; S. Rep. No. 102-267, at 188 (1992); Standing Rock II, 2017 WL 908538, at *16 (citing South Dakota v. Bourland, 508 U.S. 679, 683 (1993)). Today, Standing Rock members rely on Lake Oahe's waters to service "homes, a hospital, clinics, schools, businesses and government buildings throughout the Reservation" and to support agriculture and industrial activities. See ECF No. 117 (SRST MSJ) at 4. The Lake is also the primary source of water for the Cheyenne River Reservation. See CRST Second Amend. Compl., ¶ 2. Both Tribes consider the waters to be "sacred" and "central to [their] practice of religion." SRST MSJ at 4; see Standing Rock II, 2017 WL 908538, at *6, 8.

Dakota Access notified the Corps of its intent to construct a portion of DAPL under Lake Oahe in June 2014, see ECF No. 183-1 (Email from Monica Howard, Dir. Envtl. Sci., Dakota Access, to Jason Renschler, Project Manager, Corps, June 23, 2014), and first sought the Corps' approval to do so in October 2014. See ECF No. 159-1, Exh. A (Letter from Monica Howard to Brent Cossette, Nat. Resource Specialist, Corps, Oct. 21, 2014). Specifically, the Company needed three authorizations from the Corps: (1) verification that its activities satisfied the terms and conditions of Nationwide Permit 12; (2) permission under the Rivers and Harbors Act, 33 U.S.C. § 408; and (3) a real-estate easement under the Mineral Leasing Act, 30 U.S.C. § 185. See ECF No. 172-6 (Memorandum from John Henderson, Omaha District Commander & Engineer, Corps, Dec. 3, 2016), ¶ 4. The Court has previously discussed some of the details of these permitting schemes, see Standing Rock I, 205 F. Supp. 3d at 10-12, and will not repeat them here.

In December 2015, the Corps published and sought public comment on a Draft Environmental Assessment that evaluated the environmental effects of DAPL's proposed crossing of Lake Oahe and concluded that "construction of the proposed Project [was] not expected to have any significant direct, indirect, or cumulative impacts on the environment." ECF No. 6-19 (Draft EA) at 1; see EA at 1. Standing Rock promptly submitted comments touching on a range of concerns, including that the Draft EA failed to adequately address potential harm from the pipeline's construction and operations to the Lake's water and the Tribe's rights thereto; did not acknowledge the pipeline's proximity to the Reservation; insufficiently analyzed the risks of an oil spill; and did not properly address environmental-justice considerations. See ECF No. 159-1, Exh. C (SRST Comments on Draft EA, Jan. 8, 2016) at 9-17; id., Exh. D (SRST Suppl. Comments on Draft EA, Mar. 24, 2016) at 2-3. The Tribe, accordingly, asked that the Corps prepare an Environmental Impact Statement to assess the pipeline's effects, a request it had also made prior to the Draft EA's release. See ECF No. 209-6 (Notes for Feb. 18-19, 2016, Tribal Meeting) at 51; ECF No. 209-9 at 33-34 (Letter from Waste Win Young, Tribal Historic Preservation Officer, Standing Rock Sioux Tribe, to Martha Chieply, Omaha District Regulatory Branch, Corps, Feb. 25, 2015). Cheyenne River expressed similar views. See ECF No. 185-1, Exh. II (Letter from Steve Vance, Tribal Historic Preservation Officer, Cheyenne River Sioux Tribe, to Richard Harnois, Sr. Field Archaeologist, Corps, May 2, 2016); ECF No. 183-19 (Letter from Steve Vance to John Henderson, May 19, 2016); ECF No. 183-20 (Letter from Harold Frazier, Chairman, Cheyenne River Sioux Tribe, June 3, 2016).

Other federal agencies also weighed in on the Draft EA. Like the Tribes, the Department of the Interior requested that the Corps prepare an EIS, a step it believed necessary given DAPL's "potential impact on trust resources" — i.e., 800,000 acres of land held in trust for the

Tribe by Interior, as well as waters on which the Tribe and its members depend for drinking and other purposes — should a leak or spill occur. See ECF No. 209-7 at 21 (Letter from Lawrence Roberts, Acting Assistant Secretary for Indian Affairs, Dep't of Interior, to Brent Cossette, Mar. 29, 2016). Interior criticized the Corps for, *inter alia*, "not adequately justify[ing] or otherwise support[ing] its conclusion that there would be no significant impacts upon the surrounding environment and community" and not assigning a level of intensity to those potential adverse impacts that were acknowledged. Id.

The Environmental Protection Agency similarly expressed concern that the Draft EA "lack[ed] sufficient analysis of direct and indirect impacts to water resources," did not adequately address "the measures that will be required to assure that impacts from construction and operation of the pipeline are not significant," and did "not identify the related effects from the entire project segment." ECF No. 209-16 at 184 (Letter from Philip Strobel, Director of NEPA Compliance & Review Program, EPA, to Brent Cossette, Jan. 8, 2016). Although the EPA did not believe that the Draft EA "would support a FONSI," it did not call for the Corps to prepare an EIS; instead, it suggested that "information and mitigation could be added to the EA in order to support a mitigated FONSI." Id. at 187.

After "becom[ing] aware of the proximity" of DAPL to Standing Rock's Reservation, the EPA supplemented its comments. See ECF No. 209-8 at 123 (Letter from Philip Strobel to Brent Cossette, Mar. 11, 2016). It recommended that the Corps revise the Draft EA and provide a second public-comment period "to assess potential impacts to drinking water and the Standing Rock Sioux Tribe," as well as "additional concerns regarding environmental justice and emergency response actions to spills/leaks." Id. Notably, the EPA took some issue with the Draft EA's spill analysis, stating that although it indicated only a minimal spill risk associated

with the project, based on its "experience in spill response," a break or leak could significantly affect water resources. Id. at 124. Given DAPL's proposed capacity of 13,100 to 16,600 gallons per minute of crude oil and the proximity of drinking-water intakes to the Oahe crossing, the agency explained, "There would be very little time to determine if a spill or leak affecting surface waters is occurring, to notify water treatment plants and to have treatment plant staff on site to shut down the water intakes." Id. at 125. Finally, the EPA urged the Corps to expand its analysis for purposes of assessing environmental-justice considerations from "the area of construction disturbance" to "the impacts of the proposed project," and to look at route alternatives. Id. at 126; see also ECF No. 209-9 at 209 (Email "Quick Summary of Conference Call with EPA," Feb. 25, 2016) ("EPA concerned over the lack of Environmental justice — Tribal interests have not been addressed sufficiently.").

On July 25, 2016, about eight months after releasing the Draft EA, the Corps published its Final EA and a Mitigated Finding of No Significant Impact. See EA; ECF No. 172-2 (FONSI). The Final EA — like the Draft EA — was prepared by Dakota Access with involvement from the Corps, as is permitted, when certain conditions are met, by Council on Environmental Quality regulations. See EA at 1; Draft EA at 1; 40 C.F.R. § 1506.5(a)-(b). The Mitigated FONSI explained that the Corps had "coordinated closely with Dakota Access to avoid, mitigate and minimize potential impacts of the Proposed Action" — largely via horizontal directional drilling (HDD) technology — and that the Company was required to comply with a set of mitigation measures set out in the EA. See FONSI at 3. Given those measures and its evaluation of DAPL's "anticipated environmental, economic, cultural, . . . social[, and] . . . cumulative effects," the Corps concluded that the crossing at Lake Oahe would not "significantly affect the quality of the human environment," and preparation of an EIS was therefore not

required.  Id. at 6.  The Corps, accordingly, verified that the pipeline activities satisfied the terms and conditions of NWP 12 and granted permission under Section 408 of the Rivers and Harbors Act for DAPL's placement at Lake Oahe.  See ECF No. 209-9 at 149-53 (NWP 12 Permit); ECF No. 209-10 at 54 (Section 408 Permit).  The parties disagree as to whether the Corps also at that time granted an easement pursuant to the Mineral Leasing Act, 30 U.S.C. § 185.  See ECF Nos. 57, 66, 73.  For purposes of this Opinion — and consistent with its understanding throughout the litigation — the Court will assume that it did not.  Without such easement, Dakota Access could not construct the pipeline under the Lake.

C.  Litigation

1.  *Filing of Suit*

While factual backgrounds to lawsuits are often considerably more involved than the litigation itself, that is not the case here.  In part, that is because this action (as well as the 2016 election) generated significant further maneuvers.  To begin, two days after the release of the EA on July 25, 2016, Standing Rock filed this suit against the Corps for declaratory and injunctive relief pursuant to the National Historic Preservation Act, National Environmental Policy Act, Clean Water Act, and the Rivers and Harbors Act.  See ECF No. 1 (Complaint), ¶¶ 128-212. Dakota Access successfully moved to intervene in support of the Corps on August 5, see ECF No. 7, and the Cheyenne River Sioux Tribe intervened as a Plaintiff on August 10.  See ECF No. 11.  Cheyenne River then filed its own Complaint, see ECF No. 11-12, which it later amended on September 8.  See ECF No. 37.  Like Standing Rock's Complaint, Cheyenne River's pleadings stated claims under the NHPA, NEPA, CWA, and RHA, as well as for breach of trust responsibility and violations of the Flood Control Act and the Administrative Procedure Act.  Id. at 38-56.

The Tribes initially sought a preliminary injunction based solely on the NHPA, contending principally that the clearing and grading of land along the pipeline route desecrated sites sacred to them. On September 9, 2016, immediately after this Court issued its Opinion denying that motion, see Standing Rock I, 205 F. Supp. 3d at 7, the Departments of Justice, the Interior, and the Army issued a joint statement explaining that, because "important issues raised by the Standing Rock Sioux Tribe and other tribal nations and their members regarding the Dakota Access pipeline" remained, "construction of the pipeline on Army Corps land bordering or under Lake Oahe [would] not go forward" until the Army could determine whether reconsideration of any of its previous decisions regarding the Lake Oahe crossing under NEPA or other federal laws was necessary. See ECF No. 42-1 at 1. More specifically, the Corps at that time refused to grant the necessary MLA easement.

## 2. *Further Consideration*

In response to the opportunity for additional consideration, Standing Rock sent several letters to Assistant Secretary of the Army for Civil Works, Jo-Ellen Darcy, expressing its concerns regarding DAPL, the EA's spill-risk analysis, and the impact of a potential spill on hunting, fishing, and other Treaty rights. See ECF Nos. 117-11 (Sept. 22, 2016), 117-12 (Oct. 28, 2016), 117-13 (Oct. 3, 2016), 117-14 (Oct. 21, 2016). It also submitted an expert review of the EA, which concluded that it was "seriously deficient and [could not] support the finding of no significant impact, even with the proposed mitigations." ECF No. 117-15 (Accufacts, Inc. Review of EA, Oct. 28, 2016).

As part of the Corps' internal-review process, its Chief Counsel prepared a memorandum concluding that the agency had "adequately considered and disclosed the environmental, cultural and other potential impacts of its actions and that its decisions were not arbitrary or capricious,"

and that "supplementation of the EA to address any new information [was] not legally required."
ECF No. 117-24 (Memorandum from David Cooper, Chief Counsel, Corps, Oct. 20, 2016)
(Cooper Memo) at 36.  He also issued a memorandum that listed 36 possible conditions to be
included in an easement that would "provide further protection from any perceived risks posed
by the pipeline crossing at Lake Oahe."  ECF No. 209-3 at 55 (Memorandum from David
Cooper, Oct. 31, 2016).

On November 14, 2016, Assistant Secretary Darcy wrote to Standing Rock and Dakota
Access to inform them that the Army had completed the review called for on September 9,
"accounting for information it . . . received from the Tribes and the pipeline company since
September," and had "concluded that its previous decisions comported with legal requirements."
ECF No. 56-1 (Letter from Jo-Ellen Darcy, Nov. 14, 2016).  Nonetheless, in light of the United
States' history with the Great Sioux Nation, the importance of Lake Oahe to Standing Rock, the
government-to-government relationship with Standing Rock, and the mandates of the Mineral
Leasing Act regarding public safety and the interests of those who rely on fish, wildlife, and
biotic resources in the general area of a requested right-of-way, see 33 U.S.C. §§ 185(g),
(h)(2)(D), (k), "the Army determined that additional discussion with the Standing Rock Sioux
Tribe and analysis [were] warranted."  Darcy Nov. 2016 Letter at 2.  The Army thus invited
Standing Rock to engage in discussions concerning "[p]otential conditions in an easement for the
pipeline crossing" that would reduce spill risk "or otherwise enhance the protection of Lake
Oahe, the Tribe's water supplies, and its treaty rights"; the impact of those conditions on spill
risk; "whether to grant an easement for the pipeline to cross Lake Oahe at the location currently
proposed" given those conditions; and anything else "the Tribe believes is relevant to the
proposed pipeline crossing or easement."  Id.  Darcy also wrote to Frazier to inform him of the

Corps' decision and to express the Corps' interest in "confer[ring] with [him] to better understand" his concerns.  See ECF No. 131-4, Attach. A (Letter from Jo-Ellen Darcy to Harold Frazier, Nov. 14, 2016); see also ECF No. 131-4 (Declaration of Harold Frazier, Feb. 22, 2017), ¶ 15.  Two days later, Darcy and other Corps officials met with representatives of the Great Plains Tribal Chairpersons' Association, including Frazier, to confirm that the November 14 letters "constituted an invitation to the [T]ribes to provide any new information . . . relevant to the Corps' consideration of the easement."  Id., ¶ 16.

During this next review phase, Standing Rock offered further comments urging the Corps to deny the easement because of the pipeline's potential harm to its water, hunting, fishing, and gathering rights.  See ECF No. 117-17 (Dec. 2, 2016).  The Oglala Sioux Tribe, which had brought a related case against the Corps that has been consolidated with Standing Rock's action, see Minute Order of Mar. 16, 2017, submitted an expert report critiquing the EA's spill-volume analysis.  See ECF No. 117-18 (EarthFax Review of EA, Dec. 2, 2016).  The Corps' Omaha District Commander met with representatives of Standing Rock and Dakota Access to review the Tribe's concerns and discuss conditions that could be imposed on an easement to reduce the risk of spill or rupture.  See ECF No. 209-5 at 1-2 (Email from Scott Spellmon, Commanding General, NW Division, Corps, to Jo-Ellen Darcy, Dec. 2, 2016).  The day after the meeting, the District Commander issued a memorandum recommending that the Corps grant an easement to Dakota Access to cross Lake Oahe.  See Henderson Memo.

The Corps also used this review phase to solicit the opinion of the Department of the Interior "on the extent to which tribal treaty rights . . . weigh in favor of or against authorizations needed for the Lake Oahe crossing."  ECF No. 117-6 (Memorandum from Hilary C. Tompkins, Solicitor, Dep't of Interior, Dec. 4, 2016) at 1.  Interior's Solicitor accordingly supplied a

memorandum concluding that the Corps had "ample legal justification to decline to issue the proposed Lake Oahe easement on the current record," and that it "would be equally justified in suspending or revoking the existing Section 408 permit as it relates to the Lake Oahe crossing." Id. at 4. Alternatively, the Solicitor recommended that the Corps not make a decision to issue the easement prior to engaging in government-to-government consultation with the Tribe; preparing an EIS to "adequately evaluate[] the existence of and potential impacts to tribal rights and interests," "consider a broader range of alternative pipeline routes," and undertake "a catastrophic spill analysis prepared by an independent expert"; and more comprehensively assessing "DAPL's impact on tribal rights, lands, and resources, including the socio-economic impacts, . . . in light of the fact that the reservation is a permanent homeland for the Tribes, as well as other federal obligations towards the Tribes." Id.

On December 4, the same day the Interior Solicitor issued her Opinion, Assistant Secretary Darcy issued a memorandum to the Corps' Commander. She explained that, to date, the Army had "not made a final decision on whether to grant the easement pursuant to [the Mineral Leasing Act]." ECF No. 172-7 (Memorandum from Jo-Ellen Darcy, Dec. 4, 2016), ¶ 6. Despite the Omaha District Commander's recommendation that the Corps do so, Darcy stated that she had "concluded that a decision on whether to authorize the Dakota Access Pipeline to cross Lake Oahe at the proposed location merits additional analysis, more rigorous exploration and evaluation of reasonable siting alternatives, and greater public and tribal participation and comments." Id., ¶ 12. "Accordingly," she continued, the Army would "not grant an easement to cross Lake Oahe at the proposed location based on the current record." Id. She directed a "robust consideration of reasonable alternatives . . . , together with analysis of potential spill risk and impacts, and treaty rights," which she thought would be "best accomplished . . . by preparing

an Environmental Impact Statement." Id. Darcy emphasized, though, that her "policy decision" did "not alter the Army's position that the Corps' prior reviews and actions have comported with legal requirements." Id., ¶ 15.

On January 18, 2017, Darcy followed up by publishing in the Federal Register a notice of intent to prepare an EIS. See 82 Fed. Reg. 5,543 (Jan. 18, 2017). Cheyenne River sent a letter to her that same day requesting that the Corps include it as a Cooperating Agency in the preparation and drafting of the EIS given the potential for the pipeline to affect the Tribe and its Reservation. See ECF No. 131-4, Attach. B (Letter from Harold Frazier to Jo-Ellen Darcy, Jan. 18, 2017).

### 3. *A New Administration*

As we all know, elections have consequences, and the government's position on the easement shifted significantly once President Trump assumed office on January 20, 2017. A Presidential Memorandum issued on January 24 directed the Secretary of the Army to instruct the Assistant Secretary of the Army for Civil Works and the Corps "to take all actions necessary and appropriate to . . . review and approve in an expedited manner, to the extent permitted by law and as warranted, and with such conditions as are necessary or appropriate, requests for approvals to construct and operate the DAPL, including easements or rights-of-way" and to "consider, to the extent permitted by law and as warranted, whether to rescind or modify" the December 4 memorandum and the Notice of Intent to Prepare an EIS. See ECF No. 172-8, § 2.

The Army completed a technical and legal review on February 3 and determined that the Final EA and FONSI "satisf[ied] the NEPA requirements for evaluating the easement required for the DAPL to cross Corps-managed federal lands at Lake Oahe" and "support[ed] a decision to grant an easement." ECF No. 172-9 (Memorandum from Todd Semonite, Lieutenant General, Corps, Feb. 3, 2017) at 10. Based on a review of the entire record, including the input received

since September 2016, the Corps also concluded that the Final EA did not require further supplementation, as there were no "substantial changes in the proposed action" or "new significant circumstances or information relevant to environmental concerns." Id. at 11 (citing 40 C.F.R. §§ 1502.9(c)(1)(i)-(ii)). The Corps thus published in the Federal Register a notice of termination of its intent to prepare an EIS, see ECF No. 95-3, provided notice to Congress of its intent to issue the easement, see ECF No. 172-10 (Congressional Notifications, Feb. 7, 2017), and did so on February 8. See ECF No. 172-11 (Easement). The final easement contains 36 conditions intended to mitigate the risk of rupture at Lake Oahe and otherwise address the Tribe's concerns. Id. at 37-43. To facilitate the Corps' granting of the easement, the Acting Secretary of the Interior withdrew the Interior Solicitor's December 4 Opinion. See ECF No. 127-15 (Memorandum from K. Jack Haugrud, Acting Secretary, Dep't of Interior, Feb. 6, 2017). Having finally been given the green light, Dakota Access, by late March, completed construction of this last segment beneath Lake Oahe and began placing oil in the pipeline. See ECF No. 191 (DA Status Report, Mar. 27, 2017). DAPL became fully operational on June 1, 2017. See Energy Transfer, Energy Transfer Announces the Bakken Pipeline Is in Service Transporting Domestic Crude Oil from the Bakken/Three Forks Production Areas, June 1, 2017, http://ir.energytransfer.com/phoenix.zhtml?c=106094&p=irol-newsArticle.

The day after the Corps granted Dakota Access the easement, Cheyenne River moved for leave to file a Second Amended Complaint, see ECF No. 97, and also filed a motion for preliminary injunction and application for a temporary restraining order, both based solely on the Religious Freedom Restoration Act. See ECF Nos. 98, 99; Standing Rock II, 2017 WL 908538, at *3. Standing Rock joined the TRO application, but not the preliminary-injunction motion. See ECF No. 107. In both filings, Cheyenne River argued that its members "believe that the

mere existence of a crude oil pipeline under the waters of Lake Oahe will desecrate those waters and render them unsuitable for use in their religious sacraments," and that DAPL "correlates with a terrible Black Snake prophesied to come into the Lakota homeland and cause destruction." Standing Rock II, 2017 WL 908538, at *3 (quoting ECF No. 98 at 2-3). After orally denying the TRO, see Minute Order of Feb. 13, 2017; ECF No. 119 (TRO Oral Arg. Tr., Feb. 13, 2017) at 29:20-30:19, the Court issued an Opinion similarly denying the preliminary-injunction motion, as it concluded that the extraordinary relief requested was not appropriate in light of the equitable doctrine of laches and Cheyenne River's unlikelihood of success on the merits. Standing Rock II, 2017 WL 908538, at *1.

In the midst of these proceedings, Standing Rock — after moving for leave to amend its Complaint to address new developments since it first filed this case in July 2016, see ECF No. 106 — filed the instant Motion for Partial Summary Judgment on claims concerning the Corps' decision not to prepare an EIS for the Lake Oahe crossing; its granting of the easement; and its permitting of the Lake Oahe crossing under NWP 12. The Corps responded with its own Cross-Motion for Partial Summary Judgment on these causes of action, see ECF No. 172 (Corps SRST MSJ), and Dakota Access filed briefs opposing Standing Rock's Motion and joining the Corps' Cross-Motion. See ECF Nos. 159 (DA SRST Opp.), 184 (Notice of Joinder), 202-1 (DA SRST Reply). Cheyenne River joined Standing Rock's Motion, see ECF No. 131 (CRST MSJ) at 8, and filed its own Motion for Partial Summary Judgment on claims concerning the Corps' decisions to grant Dakota Access a permit under Section 408 of the RHA and an easement under the MLA. The Corps and Dakota Access then cross-moved for partial summary judgment on those claims as well. See ECF No. 183 (Corps CRST MSJ); ECF No. 185 (DA CRST MSJ).

These Motions are now ripe.  Although the Tribes do not raise exactly the same causes of action, because their Motions are closely related and sometimes overlap, the Court addresses both in this Opinion, turning first to Standing Rock's claims and then to Cheyenne River's.  For purposes of their resolution, the Court has also today issued a Minute Order granting the Tribes' motions for leave to amend, such that the claims relating to post-July 2016 events are properly before it.  After setting out the governing legal standard, the Court first addresses the relevant claims raised by Standing Rock, <u>see</u> Section III, *infra*, and then turns to those asserted by Cheyenne River.  <u>See</u> Section IV, *infra*.

## II.    **Legal Standard**

The parties have cross-moved for partial summary judgment on the administrative record.  The summary-judgment standard set forth in Federal Rule of Civil Procedure 56(c), therefore, "does not apply because of the limited role of a court in reviewing the administrative record."  <u>Sierra Club v. Mainella</u>, 459 F. Supp. 2d 76, 89 (D.D.C. 2006); <u>see also</u> <u>Bloch v. Powell</u>, 227 F. Supp. 2d 25, 30 (D.D.C. 2002), <u>aff'd</u>, 348 F.3d 1060 (D.C. Cir. 2003).  "[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."  <u>Sierra Club</u>, 459 F. Supp. 2d. at 90 (quotation marks and citation omitted).  "Summary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the [Administrative Procedure Act] standard of review."  <u>Loma Linda Univ. Med. Ctr. v. Sebelius</u>, 684 F. Supp. 2d 42, 52 (D.D.C. 2010) (citation omitted), <u>aff'd</u>, 408 Fed. App'x 383 (D.C. Cir. 2010).

The Administrative Procedure Act "sets forth the full extent of judicial authority to review executive agency action for procedural correctness."  <u>FCC v. Fox Television Stations,</u>

Inc., 556 U.S. 502, 513 (2009).  It requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Agency action is arbitrary and capricious if, for example, the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins., 463 U.S. 29, 43 (1983).

This is a "narrow" standard of review, under which "a court is not to substitute its judgment for that of the agency."  Id.  Rather, the Court "will defer to the [agency's] interpretation of what [a statute] requires so long as it is 'rational and supported by the record.'"  Oceana, Inc. v. Locke, 670 F.3d 1238, 1240 (D.C. Cir. 2011) (quoting C & W Fishing Co. v. Fox, 931 F.2d 1556, 1562 (D.C. Cir. 1991)).  In other words, an agency is required to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  State Farm, 463 U.S. at 43 (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)).  Courts, accordingly, "do not defer to the agency's conclusory or unsupported suppositions," United Techs. Corp. v. Dep't of Def., 601 F.3d 557, 562 (D.C. Cir. 2010) (quoting McDonnell Douglas Corp. v. Dep't of the Air Force, 375 F.3d 1182, 1187 (D.C. Cir. 2004)), and "agency 'litigating positions' are not entitled to deference when they are merely [agency] counsel's '*post hoc* rationalizations' for agency action, advanced for the first time in the reviewing court."  Martin v. Occupational Safety & Health Review Comm'n, 499 U.S. 144, 156 (1991).  Although a reviewing court "may not supply a reasoned basis for the agency's action that the agency itself has not given," a decision

that is not fully explained may, nevertheless, be upheld "if the agency's path may reasonably be discerned." Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 285-86 (1974) (citation omitted).

## III.    Analysis of Standing Rock's Claims

As earlier noted, Standing Rock seeks summary judgment on three claims: (1) The Corps' July 25, 2016, and February 8, 2017, conclusions that the Oahe crossing did not warrant an EIS violated NEPA because the agency did not make a convincing case that no significant impacts would result and failed to take a hard look at the project's effects on Treaty rights and environmental-justice considerations; (2) The Corps' February 8, 2017, decision to grant the easement was arbitrary, capricious, and contrary to law because the Corps reversed a prior policy without reasoned justification and because the decision constituted a breach of trust responsibilities; and (3) The Corps wrongfully concluded on July 25, 2016, that the pipeline activities satisfied the terms and conditions of NWP 12. The Court addresses each in turn.

### A.    Decision Not to Prepare EIS

In reviewing an agency's decision not to issue an EIS, the Court's role is a "'limited' one, designed primarily to ensure 'that no arguably significant consequences have been ignored.'" TOMAC, Taxpayers of Michigan Against Casinos v. Norton, 433 F.3d 852, 860 (D.C. Cir. 2006) (quoting Pub. Citizen v. Nat'l Highway Traffic Safety Admin., 848 F.2d 256, 267 (D.C. Cir. 1988)). An agency's decision to issue a FONSI and thus not to prepare an EIS will be overturned only "if the decision was arbitrary, capricious, or an abuse of discretion." Sierra Club v. Peterson, 717 F.2d 1409, 1413 (D.C. Cir. 1983).

When examining the adequacy of the FONSI and the EA upon which it was based, courts must determine whether the agency:

> (1) has accurately identified the relevant environmental concern, (2) has taken a hard look at the problem in preparing its [FONSI or Environmental Assessment], (3) is able to make a convincing case for its finding of no significant impact, and (4) has shown that even if there is an impact of true significance, an EIS is unnecessary because changes or safeguards in the project sufficiently reduce the impact to a minimum.

Sierra Club v. Van Antwerp, 661 F.3d 1147, 1154 (D.C. Cir. 2011) (quoting TOMAC, 433 F.3d at 861) (internal quotation marks omitted). In so doing, courts in this circuit apply "a rule of reason to an agency's NEPA analysis" and decline to "'flyspeck' the agency's findings in search of 'any deficiency no matter how minor.'" Myersville Citizens for a Rural Cmty., Inc. v. FERC, 783 F.3d 1301, 1322–23 (D.C. Cir. 2015) (quoting Nevada v. Dep't of Energy, 457 F.3d 78, 93 (D.C. Cir. 2006)).

Standing Rock contends that the EA for DAPL "runs afoul of these standards." SRST MSJ at 19. In particular, the Tribe argues that the Corps did not take a hard look at or make a convincing case that the Lake Oahe crossing will have no significant environmental impact, and that it did not sufficiently consider route alternatives or environmental-justice implications. Id. at 19-31. For these reasons, it asserts that "[t]he Corps' conclusion that the Oahe crossing was not significant enough to warrant an EIS is arbitrary, capricious, and contrary to law." SRST MSJ at 17; see Nevada, 457 F.3d at 87 ("[Courts] apply the APA's arbitrary and capricious standard to a NEPA challenge."). The Court begins its analysis with environmental impact and then turns to alternatives and environmental justice.

### 1. *Hard Look / Convincing Case*

Pursuant to NEPA's "hard look" requirement, the agency must ensure that "the adverse environmental effects of the proposed action are adequately identified and evaluated." Robertson, 490 U.S. at 350. In evaluating the significance of a proposed action's impact, an

agency is to consider, *inter alia*, the effect on "public health or safety"; "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources"; the extent to which the environmental effects "are likely to be highly controversial" or "are highly uncertain or involve unique or unknown risks"; "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts"; and the degree to which the action "may cause loss or destruction of significant . . . cultural[] or historical resources." 40 C.F.R. § 1508.27.

The Tribe identifies several ways in which the Corps allegedly failed to take a hard look at the environmental consequences of permitting DAPL's construction and operation and to make a convincing case of no significant impact. It principally argues that the agency did not properly assess the risk of a spill under Lake Oahe or sufficiently consider the environmental impacts on Treaty rights of the construction of the pipeline or of a spill. Before proceeding to address each of the Tribe's points, however, the Court must dispense with a threshold issue.

a. Extent of Record

To substantiate many of its critiques of the EA's analysis, the Tribe relies on expert reports and other records dated <u>after</u> July 25, 2016, when the Final EA and Mitigated FONSI were published. Dakota Access argues that the Court should not consider these reports or any evidence from the Tribe that post-dates July 25.

"It is a widely accepted principle of administrative law that the courts base their review of an agency's actions on the materials that were before the agency at the time its decision was made." <u>IMS, P.C. v. Alvarez</u>, 129 F.3d 618, 623 (D.C. Cir. 1997) (listing cases). Here, in challenging the Corps' decision not to prepare an EIS, the Tribe in effect challenges authorizations made at two different times: the RHA Section 408 authorization and NWP 12

verification on July 25, 2016, and the easement approval on February 8, 2017. See ECF No. 196-1 (SRST Reply) at 3. The Section 408 and NWP 12 decisions were based on the conclusion set out in the EA and FONSI that the permissions would not have a significant impact on the environment, and the easement decision was also based on "additional review, analysis of terms and conditions for the easement, and on the Corps' decision that supplementation of the EA/FONSI was not required." Corps SRST MSJ at 10. The Corps thus decided at two junctures that an EIS was not required, and it prepared an administrative record encompassing the materials that were before it at each decision date. Although Dakota Access is technically correct that the expert reports and other evidence submitted after July 25, 2016, are outside the record for the RHA Section 408 and NWP 12 decisions, that offers them little aid. This is because the Court can review the materials before the Corps as of February 8, 2017, for purposes of evaluating the decision to grant the easement absent an EIS. The Court, consequently, will consider all materials dated up to February 8.

To complicate matters further, however, the Tribe wishes the Court to also review "some uncontroversial background materials (e.g., maps) and declarations from its expert" that post-date February 8. See SRST Reply at 3. It argues that such extra-record evidence comes within the "accepted exceptions to the principle that the court cannot consider information that falls outside the agency record" — namely, where "the agency failed to examine all relevant factors or to adequately explain its grounds for decision, or . . . acted in bad faith or engaged in improper behavior in reaching its decision." IMS, 129 F.3d at 624; SRST Reply at 3.

On this point, the Tribe first contends that the Corps engaged in improper behavior by withholding confidential spill-model discussions and geographic-response plans to which its post-easement expert declarations respond. See SRST Reply at 3-4. But the showing required

"to justify supplementing the record" is a "'strong'" one, <u>IMS</u>, 129 F.3d at 624 (quoting <u>Citizens to Preserve Overton Park v. Volpe</u>, 401 U.S. 402, 420 (1971)), and the Court does not find that the Tribe has made it here.  The Corps has explained that it withheld from the Tribe and the public a small number of documents supporting the EA "[b]ecause of security concerns and sensitivities."  Dec. 4 Memo, ¶ 5.  Indeed, the Court recently concluded that there was good cause to protect from public disclosure certain information in some spill-model reports that, if released, could endanger life or physical safety.  <u>Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs</u> (<u>Standing Rock III</u>), No. 16-1534, 2017 WL 1316918, at *5-6 (D.D.C. Apr. 7, 2017).  Absent a showing to the contrary, the Court thus cannot permit supplementation of the record on the ground of some withholding impropriety.

The Tribe next argues that its extra-record evidence describes how the Corps failed to examine all relevant factors and provide adequate grounds for its decision.  But "[t]his is not a case where the agency failed 'to explain administrative action [so] as to frustrate effective judicial review.'"  <u>IMS</u>, 129 F.3d at 624 (quoting <u>Camp v. Pitts</u>, 411 U.S. 138, 142-43 (1973)).  The EA addressed each factor for which the Tribe marshals extra-record evidence, even if not with the depth or ultimate conclusion the Tribe would prefer.  <u>Compare</u> SRST MSJ at 21 (criticizing Corps' failure to address "slow leaks in the HDD bore," which, based on Tribe-commissioned expert review, would be "'complicated if not impossible to clean up and likely would have significant impacts on soils' and underlying aquifers") (quoting ECF No. 117-23 (Envy Report, Jan. 5, 2017) at 14); SRST Reply at 11 ("Landslides are a major source of pipeline failures and a critical factor in route selection.") (citing ECF No. 195-4 (Corrective Action Order, Belle Fourche Pipeline Company, Dec. 20, 2016); Accufacts, Inc. Review at 3; ECF No. 120 (Sealed Declaration of Richard Kuprewicz, Feb. 12, 2017), ¶ 21); <u>id.</u> at 12 (describing EA's

failure to acknowledge "undisputed evidence" regarding failure rates of spill-detection systems) (citing ECF No. 209-5 at 110 (Letter from Sierra Club Indigenous Environmental Network, Oct. 10, 2016); Accufacts, Inc. Review at 5); id. at 12-13 ("[T]he EA fails to acknowledge that with a pipeline 90 feet underground, there is no way to discover a slow leak until the oil sheen appears on the surface of the water, at which point a massive release will have occurred that would be nearly impossible to clean up.") (citing Envy Report at 13-14; Oct. 28, 2016, SRST Letter at 5); id. at 13 (stating the EA's "startlingly optimistic times for responding to a spill after it has been detected . . . have been the subject of withering criticism") (citing Accufacts, Inc. Review at 5-6; EarthFax Report at 9; Sealed Kuprewicz Decl., ¶¶ 15-17; Envy Report at 27); id. at 13-14 ("One expert review found numerous flaws in the Corps' analysis of water quality impacts of a spill, including a failure to identify key pollutants; overstatement of flows that dilute likely pollutant impacts; use of an inappropriate standard to determine toxicity; and reliance on the wrong drinking water standard.") (citing EarthFax Report at 5-7); id. at 14 (arguing EA's treatment of impact of winter conditions on spill risk was inadequate) (citing EarthFax Report at 7-8; Oct. 28, 2016, SRST Letter at 5; ECF No. 196-2 (Declaration of Elliott Ward, Mar. 25, 2017), ¶ 12) with EA at 19, 36 (borehole leaks); 26-28 (landslides); 42, 46, 90-91 (description of leak-detection system as "capable of detecting leaks down to 1 percent or better of the pipeline flow rate within a time span of approximately 1 hour or less and capable of providing rupture detection within 1 to 3 minutes"); 36-49 (discussing impacts of spill to water quality); 39, 43, 123 (discussing impact of "[s]ub-freezing temperatures during the winter months" and means of responding to spill in winter, including identifying "all-weather access and collection point" downstream of Oahe crossing and undertaking "full scale winter/ice" emergency response drills/exercises).

Disagreement with an agency's analysis is not enough to warrant the consideration of extra-record evidence, which, after all, is "the exception, not the rule." Oceana, Inc. v. Pritzker, 126 F. Supp. 3d 110, 113 (D.D.C. 2015) (quoting Theodore Roosevelt Conservation Partnership v. Salazar, 616 F.3d 497, 514 (D.C. Cir. 2010)). As it proceeds through Standing Rock's arguments regarding the deficiencies in the EA's analysis, therefore, the Court will not engage with those contentions that turn on evidence that post-dates February 8, 2017. This procedural brush now cleared away, the Court tackles the substance of the Tribe's no-convincing-case position, beginning with spill risks and continuing to Treaty rights.

b. Spill-Risk Analysis

Although grouped under the "spill-risk" heading, Standing Rock's challenges here encompass the risk of spills, the degree of scientific controversy, and the cumulative risk of the project, each of which is analyzed separately.

i. Risk of Spill

Standing Rock first maintains that the EA understates and does not properly assess the risk of an oil spill under Lake Oahe. See SRST MSJ at 21 ("[T]he Corps falls back on a rote mantra that the risk of oil spills is low."); id. at 22 (citing Solicitor Op. at 28-29 & n.171 (noting PHMSA data shows average of over 283 significant incidents involving gas, oil, or other pipelines per year since 1996)). It argues that, although the EA repeats that the spill risk is "very low," "unlikely," or "negligible," see, e.g., EA at 48, 63, 87, it does not explain what "low" means. See SRST Reply at 9. And "to conduct a credible assessment of spill risks," the Corps should have addressed concerns relating to landslide risks, inadequate spill-detection systems, underground leaks, response times, spill volumes, water-quality analysis, and winter conditions,

id. at 11-14, and looked at portions of the pipeline entering and exiting the boreholes.  Id. at 15-16.

The EA, in fact, devotes several pages to discussing DAPL's "reliability and safety."  EA at 88-94.  The relevant section first explains that, "[t]o prevent pipeline failures resulting in inadvertent releases," DAPL will be constructed and maintained in accordance with "industry and governmental requirements and standards," including those from PHMSA, the American Society of Mechanical Engineers, the National Association for Corrosion Engineers, and the American Petroleum Industry.  Id. at 88.  After its installation, the pipeline will undergo "hydrostatic pressure testing at the crossings, checking coating integrity, and X-ray inspection of the welds."  Id.  The pipeline right-of-ways will also "be patrolled and inspected by air . . . at least every three weeks and not less than 26 times per year[] to check for abnormal conditions or dangerous activities, such as unauthorized excavation along the pipeline route."  Id.  In addition, Dakota Access plans to use "a supervisory control and data acquisition . . . system to provide constant remote oversight of the pipeline facilities," including the detection of "rapid drops in pressure," and pipeline-monitoring software to identify any leaks by tracking "pipeline pressure, flow, and temperature data" pulled every six seconds.  Id. at 89-90.  The EA reports that such a system "is capable of detecting leaks down to 1 percent or better of the pipeline flow rate within a time span of approximately 1 hour or less and capable of providing rupture detection within 1 to 3 minutes."  Id. at 90.  If a leak is detected, remotely operated valves are to be triggered and closed within three minutes.  Id.

Other courts, including this Circuit, have favorably viewed similar agency reliance on applicable regulatory standards when assessing impacts as part of a NEPA-required analysis.  See, e.g., EarthReports, Inc. v. FERC, 828 F.3d 949, 957 (D.C. Cir. 2016) (holding agency

fulfilled its NEPA obligations to evaluate ballast-water impacts by, *inter alia*, noting requirements of applicable regulatory agencies); Sierra Club v. Clinton, 746 F. Supp. 2d 1025, 1047 (D. Minn. 2010) (holding agency properly considered impacts of pipeline abandonment by referencing PHMSA regulations).

The EA then proceeds to review the basis for its conclusion that the risk of an oil spill is "low." EA at 92. Specifically, that conclusion comes from a risk analysis conducted by Dakota Access that was derived from criteria set out in "the W. Kent Muhlbauer Relative Index Methodology (2004), in accordance with 49 CFR 195.452 'Hazardous Liquid Pipelines in High Consequence Area', API RP 1160 'Managing System Integrity for Hazardous Liquid Pipelines', and ASME B31.8S 'Managing System Integrity of Gas Pipelines.'" Id. That analysis "addressed nine industry-recognized pipeline integrity threat categories": (1) third-party damage; (2) external corrosion; (3) internal corrosion; (4) pipe-manufacturing defects; (5) construction-related defects; (6) incorrect operations; (7) equipment failure; (8) stress-corrosion cracking; and (9) natural forces. Id. at 92-94.

The underlying analysis is not itself in the record, see SRST Reply at 8, but the EA summarizes its conclusions as to each of the nine factors. Although no explanation is provided, three of the nine factors — external corrosion, internal corrosion, and construction-related defects — are assessed only as to the crossing at Lake Sakakawea; the other six are applied to both Sakakawea and Oahe. See EA at 92-94. The EA's explanation of its choice of methodology and subsequent treatment of the different factors is nonetheless enough to give substance to the Corps' conclusion that the risk of a spill is low. See Sierra Club v. Watkins, 808 F. Supp. 852, 868 (D.D.C. 1991) (explaining courts should "defer to an agency's decision to use a particular risk assessment methodology that is consistent with general principles of science")

(citing <u>Sierra Club v. Dep't of Transp.</u>, 753 F.2d 120, 128-29 (D.C. Cir. 1985)).  For example, the EA explains that, at the Oahe crossing, spill risk due to third-party damage is low because the pipeline is positioned 92 feet below the lakebed; spill risk from manufacturing defects is also slim because the pipeline will be "hydrostatically strength-tested"; and spill risk from "incorrect operations (*e.g.*, overpressure event caused by human error)" is low because the pipeline is designed to withstand twice the maximum-allowable operating pressure.  <u>See</u> EA at 92-94.  The EA thus does not simply use "[a]n unbounded term" that "provides no objective standard for determining what kind of differential makes one impact more or less significant than another." <u>Mainella</u>, 459 F. Supp. 2d at 101.  Admittedly, the EA does not quantify the risk of a spill with exact numerical precision.  But in setting out the specific factors that undergirded its risk analysis and explaining their application to DAPL, the EA reasonably gives the necessary content to its top-line conclusion that the risk of a spill is low.

As noted above in the discussion of extra-record evidence, moreover, the EA did not omit discussion of borehole leaks (EA at 19, 36); landslides (EA at 26-28); leak-detection systems (EA at 42, 46, 90-91); water quality (EA at 36-49); or winter temperatures (EA at 39, 43, 123). To the extent the Tribes' experts disagree with the Corps' technical assessments or overall conclusion, such disagreements are "a classic example of a factual dispute the resolution of which implicates substantial agency expertise."  <u>Wisc. Valley Improvement Co. v. FERC</u>, 236 F.3d 738, 746 (D.C. Cir. 2001) (quoting <u>Marsh</u>, 490 U.S. at 376).  In such situations, courts "must defer to 'the informed discretion of the responsible federal agencies.'"  <u>Id.</u> at 747 (quoting <u>Marsh</u>, 490 U.S. at 377); <u>see also</u> <u>Nat'l Comm. for the New River v. FERC</u>, 373 F.3d 1323, 1327 (D.C. Cir. 2004) ("When an agency 'is evaluating scientific data within its technical expertise,'

an 'extreme degree of deference to the agency' is warranted.") (quoting <u>B&J Oil & Gas v.</u> <u>FERC</u>, 353 F.3d 71, 76 (D.C. Cir. 2004)).

### ii. Highly Controversial

Although the Court cannot agree with Standing Rock that the Corps did not adequately consider or explain its conclusion that the risk of an oil spill is low, a related position gains more traction. As explained above, CEQ regulations provide that one factor that "should be considered" in evaluating the significance of a proposed action's impact is "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial." 40 C.F.R. § 1508.27(b)(4). Standing Rock argues that evidence in the record indicated that the pipeline's effects were highly controversial, and that the Corps therefore should have concluded that the project would have significant impacts on the environment. <u>See</u> SRST MSJ at 20-21.

Such controversy is not measured by newsworthiness; instead, according to the Court of Appeals, "The term 'controversial' refers to cases where a substantial dispute exists as to the size, nature, or <u>effect</u> of the major federal action rather than to the existence of opposition to a use." <u>Town of Cave Creek, Arizona v. FAA</u>, 325 F.3d 320, 331 (D.C. Cir. 2003) (quoting <u>Found. for N. Am. Wild Sheep v. Dep't of Agric.</u>, 681 F.2d 1172, 1182 (9th Cir. 1982)). Despite that explanation, however, as other courts in this district have observed, "Just what constitutes the type of 'controversy' that requires a full EIS is not entirely clear." <u>Nat'l Parks Conservation Ass'n v. United States</u>, 177 F. Supp. 3d 1, 33 (D.D.C. 2016) (quoting <u>Nat'l Wildlife Fed'n v.</u> <u>Norton</u>, 332 F. Supp. 2d 170, 184 (D.D.C. 2004)). At a minimum, "something more is required besides the fact that some people may be highly agitated and be willing to go to court over the matter." <u>Id.</u> (quoting <u>Fund for Animals v. Frizzell</u>, 530 F.2d 982, 988 n.15 (D.C. Cir. 1975)).

"Many courts have found 'something more' to be scientific or other evidence that reveals flaws in the methods or data relied upon by the agency in reaching its conclusions." Id. (citing Nat'l Parks & Conservation Assoc. v. Babbitt, 241 F.3d 722, 736-37 (9th Cir. 2001) (holding agency action was highly controversial because "comments urg[ing] that the EA's analysis was incomplete, and the mitigation uncertain, . . . cast substantial doubt on the adequacy of the Parks Service's methodology and data," and thus the dispute went "beyond a disagreement of qualified experts over the 'reasoned conclusions' as to what the data reveal[ed]"); Nat'l Wildlife Fed'n, 332 F. Supp. 2d at 185 ("Such a controversy exists where the Corps is presented with scientific evidence specifically evaluating the environmental effects of the proposed project or calling into question the adequacy of the EA."); Fund for Animals v. Norton, 281 F. Supp. 2d 209, 235 (D.D.C. 2003) ("While plaintiffs have identified serious gaps in defendants' assessment of the local effects of the proposed action, they do not appear to have identified any scientific controversy per se as to the extent of the effects."); Sierra Club v. Van Antwerp, 719 F. Supp. 2d 58, 67-68 (D.D.C. 2010) ("While declarations were submitted to the Corps from numerous experts who claimed that [the development project] will have significant adverse impacts on Cypress Creek and its wetlands, these declarations alone fail to rise to the level of 'controversy' under NEPA."), aff'd in part, rev'd in part on other grounds, 661 F.3d 1147 (D.C. Cir. 2011), as amended (Jan. 30, 2012)); but cf. Humane Soc. of U.S. v. Dep't of Commerce, 432 F. Supp. 4, 19–20 (D.D.C. 2006) (finding agencies' decision not to prepare EIS highly controversial based on comments from plaintiff and other agencies indicating disagreement with agencies' conclusions).

Here, as evidence of controversy, Standing Rock refers only generally to "the multiple critiques of the Corps' unexamined conclusions, expert evidence indicating greater risks, and

critical comment from other federal agencies." SRST MSJ at 20-21. The Tribe does not help the Court to evaluate its argument by, for example, following these general references with specific statements made by the Tribe, agencies, or experts critiquing the Corps' methodology or data. In any event, based on its review of the record, the Court first concludes that none of the evidence before the Corps as of July 25, 2016 — including Standing Rock's comments, see ECF No. 159-1, Exh. C (SRST Comments on Draft EA, Jan. 8, 2016); id., Exh. D (SRST Suppl. Comments on Draft EA, Mar. 24, 2016); ECF No. 209-6 at 51 (Notes for Feb. 18-19, 2016, Tribal Meeting); ECF No. 209-9 at 33 (Letter from Waste Win Young to Martha Chiebly, Feb. 25, 2015), and submissions from the EPA and the Department of the Interior, see ECF No. 209-7 at 21 (Letter from Lawrence Roberts to Brent Cossette, Mar. 29, 2016), ECF No. 209-16 at 184 (Letter from Philip Strobel to Brent Cossette, Jan. 8, 2016), ECF No. 209-8 at 123 (Letter from Philip Strobel to Brent Cossette, Mar. 11, 2016), ECF No. 209-9 at 209 (Email "Quick Summary of Conference Call with EPA," Feb. 25, 2016) — suggested substantial methodological or data flaws in the Corps' analysis.

The expert reports submitted to the Corps after the Final EA was published but before the Corps again decided in February 2017 that an EIS was not required, see Semonite Memo at 14, however, do present such scientific critiques. See, e.g., EarthFax Report at 1-3 (critiquing EA for considering spill volumes from pipelines generally, rather than from pipelines with 16-inch or larger diameters, like DAPL); id. at 4 (suggesting EA used incorrect river-flow rates to assess spill impacts); id. at 5-7 (explaining EA used inappropriate benzene-concentration limits); id. at 9 (arguing EA should have included quantitative analysis of risk of failure of system components); id. at 9 (contending EA wrongly relied upon premise that emergency block valves would close immediately upon leak detection); Accufacts, Inc. Review at 7 (stating corrosion

threats should be assessed based on field readings of in-line inspection runs, not assumed rates); id. at 9-10 (arguing that complete risk analysis required, *inter alia*, consideration of pipeline elevation profile, maximum operating pressure, location of mainline valves, location and type of "critical leak detection monitoring devices by milepost").

It may well be the case that the Corps reasonably concluded that these expert reports were flawed or unreliable and thus did not actually create any substantial evidence of controversial effects. Dakota Access, for example, offers a scathing assessment of the reports' "material flaws." DA SRST Opp. at 21 n.4. But the Corps never said as much. Its February 3, 2017, memo determining that the Final EA and FONSI satisfied NEPA's requirements and supported the decision to grant the easement is devoid of any discussion of the methodological and data flaws identified in the reports. Indeed, it acknowledges receiving only Standing Rock's Accufacts, Inc. Review and wholly ignores the others. See Semonite Memo at 12. As the agency did not demonstrate that it considered, as the CEQ regulations require, the degree to which the project's effects are likely to be highly controversial, despite being presented with evidence of scientific flaws, the Court cannot conclude that the Corps made a convincing case of no significant impact or took the requisite hard look. The remedy for such violation is discussed in Section III.D, *infra*.

### iii. Cumulative Risk

Finally, the Tribe contends that the EA "fails to consider the cumulative risk imposed by the pipeline." SRST MSJ at 22 (citing 40 C.F.R. § 1508.27(b)(7) ("Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment.")). "Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what

agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7.

Such impacts "can result from individually minor but collectively significant actions taking place over a period of time." Id. Other pipelines cross under the Missouri River, but, the Tribe states, the EA does not analyze how the addition of DAPL compounds the overall risk of a pipeline spill in the Missouri River, nor does it consider "the cumulative risk to Tribal resources from the rest of the pipeline outside Lake Oahe." SRST MSJ at 23; see also id. at 23 n.12 (criticizing Corps for "unlawfully segmenting its NEPA review of one pipeline into [three] separate components"). This argument, like the Tribe's first in this subsection, does not succeed.

The EA devotes eleven pages to a discussion of cumulative impacts on eleven types of resources, including geology and soils, water and aquatic life, agriculture, land use, cultural and historic resources, and environmental justice. See EA at 98-107. It acknowledges at the outset that in the vicinity of the Oahe crossing are "oil and gas development and associated infrastructure, utility installation, and agriculture," and that the pipeline at the Oahe crossing is co-located with "a natural gas pipeline and a 345 kV power line." EA at 98. Although the EA does not expressly state whether the presence of other pipelines increases the risk that DAPL (or those pipelines) will rupture, it acknowledges the potential for unanticipated releases and refers back to the analysis of minimization and remediation activities to conclude that the potential cumulative impacts on water and aquatic resources from spills "would be minor." Id. at 101. It also considers the benefits of co-location, such as minimized land-use disturbance from construction. Id. at 105. The EA therefore does not simply conclude absent any actual analysis that cumulative impacts would be minimal; on the contrary, there is enough to "allow the Court to review the agency's finding." Friends of the Earth, Inc. v. U.S. Army Corps of Eng'rs, 109 F. Supp. 2d 30, 42 (D.D.C. 2000).

The Corps, moreover, was not required to consider the impacts from the whole pipeline. See Sierra Club v. U.S. Army Corps of Eng'rs, 803 F.3d 31, 34 (D.C. Cir. 2015) (holding that where federal easement and CWA permitting encompassed only five percent of pipeline's length, "the federal government was not required to conduct NEPA analysis of the entirety of the . . . pipeline, including portions not subject to federal control or permitting"); Sierra Club v. Bostick, 787 F.3d 1043, 1051-54 (10th Cir. 2015) (holding Corps was not required to prepare NEPA analysis of entire pipeline when verifying NWPs for 485-mile oil pipeline crossing over 2,000 waterways); Winnebago Tribe of Neb. v. Ray, 621 F.2d 269, 272-73 (8th Cir. 1980) (same for electric utility line). That it did not address the cumulative risk from the entire pipeline thus does not run afoul of NEPA.

c. Impacts Analysis Re: Treaty Rights

In addition to challenging the EA's analysis of the risk of a spill, Standing Rock raises concerns about its discussion of the effects of the project, including a potential spill, should one occur, on the Tribe's Treaty rights. According to Standing Rock, "NEPA requires the Army Corps to disclose and assess the suite of risks from the Lake Oahe crossing to the full range of the Tribe's Treaty rights, in the context of the Corps' heightened trust responsibilities." SRST MSJ at 24. Here, the relevant Treaty rights are those implicating water, hunting, and fishing. Id. at 25; Corps SRST MSJ at 20; see also Winters v. United States, 207 U.S. 564, 576-78 (1980) (holding that when federal government creates an Indian reservation, it impliedly reserves otherwise unappropriated water to extent necessary to accomplish purposes of reservation); Fort Laramie Treaty of 1851, art. 55, 11 Stat. 749, 1851 WL 7655 (reserving for the Sioux tribes "the privilege of hunting, fishing, or passing over" lands described in Treaty); United States v. Dion, 476 U.S. 734, 738 (1986) ("As a general rule, Indians enjoy exclusive treaty rights to hunt and

fish on lands reserved to them, unless such rights were clearly relinquished by treaty or have been modified by Congress."). The Court first explains the manner of the Corps' analysis of these rights and then turns separately to the effect of construction and the impact of a spill on such rights.

### i.   Manner of Analysis

Before turning to whether the Corps adequately considered these impacts, the Court discusses how it was required to do so. The Tribe contends that the Corps had to address these Treaty rights *qua* Treaty Rights, see SRST MSJ at 25-26; SRST Reply at 23-24, whereas the Corps asserts that it needed only to consider the effects on the resources implicated by the Treaty rights — *i.e.*, water, fish, and game. See Corps SRST MSJ at 20-21 & n.9. To explain more fully, Standing Rock believes that the Corps' position "misunderstands the Tribe's Treaty rights," which "embody the fundamental rights of a people tied to a place since time immemorial" and thus demand a more "existential" analysis. See SRST Reply at 23-24. For example, the Tribe explains that, although "[e]cological impacts to fish and game habitat and populations present one dimension" of the impacts of an oil spill on aquatic resources, "[t]he impact to Tribal members of losing the right to fish and hunt, which provides both much-needed subsistence food to people facing extensive poverty as well as a connection to cultural practices that Tribal members have engaged in since time immemorial, is a separate issue." Id.

Standing Rock may be right that the construction and operation of DAPL under Lake Oahe could affect its members in the broad and existential ways it details, but it offers no case law, statutory provisions, regulations, or other authority to support its position that NEPA requires such a sweeping analysis. The Corps, conversely, points to several cases in which courts have approved an approach consistent with its view of its NEPA obligations — *i.e.*, an

agency may assess impacts on treaty rights by analyzing the effects on a specific resource identified in the treaty. See Ground Zero Ctr. for Nonviolent Action v. Dep't of the Navy, 918 F. Supp. 2d 1132, 1152 (W.D. Wash. 2013), on reconsideration in part No. 12-1455, 2013 WL 357509 (W.D. Wash. Jan. 29, 2013) (assessing impact on tribe's treaty fishing rights by considering surveys of fish patterns and Navy's mitigation efforts); Nw. Sea Farms, Inc. v. U.S. Army Corps of Eng'rs, 931 F. Supp. 1515, 1521-22 (W.D. Wash. 1996) (explaining Corps correctly concluded that project would impair treaty fishing rights by considering impact on tribe's access to fish); No Oilport! v. Carter, 520 F. Supp. 334, 356–57 (W.D. Wash. 1981) (concluding EIS's discussion of effect of pipeline rupture on "the fish resource," including via maps, adequately evaluated project's impact on tribe's treaty fishing rights). Absent any controlling or persuasive authority to the contrary, the Court sees no basis on which to conclude that NEPA demands the type of existential-scope analysis the Tribe advocates. Rather, it is sufficient that the agency adequately analyze impacts on the resource covered by a given treaty.

The next question, then, is whether the agency's weighing of those relevant Treaty rights here — viz., water, fishing, and hunting — was adequate. The Court approaches that question by looking at the Corps' assessment of the impacts on the different Treaty rights from (1) the construction of the pipeline, and (2) an unanticipated oil spill. In so doing, the Court keeps in mind the definition of "hard look" recently articulated by the D.C. Circuit: "[A]n agency has taken a 'hard look' at the environmental impacts of a proposed action if the statement contains sufficient discussion of the relevant issues and opposing viewpoints, and the agency's decision is fully informed and well-considered." Myersville Citizens for a Rural Community, Inc. v. FERC, 783 F.3d 1301, 1324-25 (D.C. Cir. 2015).

ii. Construction

The EA discussed in several places the potential impact of DAPL's construction on water resources, fish, and wildlife at Lake Oahe. See EA at 36 (acknowledging that, during HDD-construction phase, drilling fluid could inadvertently be released "directly or indirectly into the waterbody" and discussing mitigation measures); id. at 37 (explaining water required for HDD construction and hydrostatic testing at Oahe crossing would not be obtained from Lake Oahe); id. at 38 ("No waterbody would be permanently drained or filled as part of the DAPL Project, and effects on waterbodies are expected to be short-term and minor."); id. at 45 (addressing impacts of construction activities on groundwater); id. at 50 (explaining no wetlands exist within Oahe Project Area or Connected Action Area); id. at 58 (discussing "[t]emporary impacts on wildlife" that "could occur during construction," including displacement of "larger and more mobile animals"); id. ("No impacts to treaty fishing and hunting rights are anticipated due to construction within the Project Area or Connected Actions."); id. at 69 (discussing possible adverse impacts on "fish eggs, juvenile fish survival, benthic community diversity and health, and spawning habitat," as well as "fish fry[] and invertebrates inhabiting the river," from "subsurface disturbing activities," inadvertent release of drilling mud, and water withdrawal from Missouri River); id. at 75 ("The recreational enjoyment of wildlife (such as hunting or bird watching) may be temporarily affected by construction activities, depending on season and location."). Because the EA "clearly addressed" these impacts and concluded that they would either be insignificant or could be mitigated, the Court finds that, in this respect, it was adequate. See Minisink Residents for Envtl. Pres. & Safety v. FERC, 762 F.3d 97, 112 (D.C. Cir. 2014) (finding EA adequately examined compressor-station project's impact on property values where it recognized some adverse impacts might accrue but could be mitigated).

### iii. Spill Impacts

As to the second issue — namely, the spill effects —the Tribe contends that the EA "never examined the impacts of spills on the Tribe and its Treaty rights." SRST Reply at 1. The Court agrees in part.

First, it bears noting that even though a spill is not certain to occur at Lake Oahe, the Corps still had to consider the impacts of such an event on the environment. "[A]n agency conducting an EA generally must examine both the probability of a given harm occurring <u>and</u> the consequences of that harm if it does occur." <u>New York v. Nuclear Regulatory Comm'n</u>, 681 F.3d 471, 482 (D.C. Cir. 2012). "Only if the harm in question is so 'remote and speculative' as to reduce the effective probability of its occurrence to zero may the agency dispense with the consequences portion of the analysis." <u>Id.</u> (quoting <u>Limerick Ecology Action, Inc. v. Nuclear Regulatory Comm'n</u>, 869 F.2d 719, 739 (3d Cir. 1989)). Yet, "the finding that the probability of a given harm is nonzero does not, by itself, mandate an EIS: after the agency examines the consequences of the harm in proportion to the likelihood of its occurrence, the overall expected harm could still be insignificant and thus could support a FONSI." <u>Id.</u>; <u>see also</u> <u>Gov't of the Province of Manitoba v. Salazar</u>, 691 F. Supp. 2d 37, 50 (D.D.C. 2010) ("It may be that the risk of a breach is low given the pipeline's construction, but that is not an excuse for Reclamation to refuse entirely to analyze the <u>consequences</u>. When the <u>degree</u> of potential harm could be great, *i.e.*, catastrophic, the <u>degree</u> of analysis and mitigation should also be great."); <u>Sierra Club v. Watkins</u>, 808 F. Supp. 852, 868 (D.D.C. 1991) (holding that, given disputed evidence concerning the possibility of severe accidents, an agency may not simply "refus[e] to include certain low probability risks" — it must at least "admit that such accidents are possible," determine the probability of occurrence, and "discuss[] their potential effects"). Here, the Corps did not wholly

ignore the consequences of a possible oil spill, despite its conclusion that the risk of such an event was low. On the contrary, it adequately discussed the impacts of such "a low risk/high consequence event," EA at 92, on water — but not on hunting or aquatic — resources.

As to <u>water</u> resources, the EA offered several comments. It acknowledged that, during operations, "[d]rinking water intakes located downstream from the Missouri River and Lake Oahe crossings could be at risk if there was a release that reached these bodies of water in the vicinity of the intake structures," and that "the Standing Rock Sioux . . . have intake structures within the river downstream of the Lake Oahe Project area." <u>Id.</u> at 38; <u>see also id.</u> at 42 ("In the unlikely event of a release during pipeline operations, drinking and irrigation water intakes located downstream from the Missouri River and Lake Oahe crossings could be at risk if hydrocarbons were to reach these bodies of water in the vicinity of the intake structures."); <u>id.</u> at 87 ("Concerns have been expressed regarding an inadvertent release reaching intake structures on Lake Oahe. . . . In the unlikely event of a release, sufficient time exists to close the nearest intake valve to avoid human impact."). Later, the EA further explained: "Accidental releases from the pipeline system during operations could potentially affect groundwater. . . . [C]rude oil released into soil can migrate toward water where certain constituents can dissolve into groundwater or surface water in limited amounts." <u>Id.</u> at 45.

It then presented a model estimating the concentrations of benzene, a potentially toxic compound found in crude oil, that could be released during a very small, small, moderate, or large spill at the Oahe crossing, and discussed how those results might vary during winter months when temperatures are likely to be colder. <u>Id.</u> at 46-47. Even assuming that "[t]he entire volume of a crude oil spill was released due to a catastrophic failure of the pipeline and reached the waterbody; [c]omplete, instanteous mixing occurred; [and] [t]he entire benzene content of the

crude oil was solubilized into the water column," the model concluded that under no spill scenario would the acute toxicity threshold for aquatic organisms be exceeded, and that under the "most probable spill volume," benzene concentrations would not "exceed the drinking water criteria." Id. In addition, at the conclusion of its discussion of the nine spill-risk factors previously discussed, the EA, under the header "Consequences," stated: "In the event that a pipeline failure occurs and product is released into the Missouri River at either crossing, the worst case consequence scenario is ranked high because several drinking water intake High Consequence Areas (HCAs) and multiple ecologically sensitive HCAs could be impacted." Id. at 94.

The EA is not similarly attentive, however, to the impacts of a spill on fish or game, the resources implicated by the Tribe's fishing and hunting rights. As to aquatic resources, the EA offered only a cursory nod to the potential effects of an oil spill, stating simply that "[t]he primary issue related to impacts on the aquatic environment from operation of the Proposed Action would be related to a release from the pipeline." Id. at 69. It never explained, though, what those effects would be. Instead, it simply reasoned that adherence to Dakota Access's response plan "would minimize potential impacts on aquatic wildlife." Id. at 69-70; see also id. at 101. Likewise, regarding hunting, the EA only discussed the effects of construction on "recreationally and economically important species and nongame wildlife"; it said nothing about the effects of a spill. Id. at 57-58.

Standing Rock, though, had alerted the Corps to its fishing- and hunting-related concerns after the agency published the Draft EA. See, e.g., ECF No. 159-1, Exh. C (SRST Comments on Draft EA, Jan. 8, 2016) at 13 ("[A] pipeline leak would threaten to damage . . . the fish and wildlife on which many Tribal members depend for subsistence."); ECF No. 159-1, Exh. D

(SRST Suppl. Comments on Draft EA, Mar. 24, 2016) at 15 ("The waters of Lake Oahe also provide habitat for fish, wildlife, and plants important to the diet . . . of the Tribe."). The Director of Standing Rock's Department of Game, Fish, and Wildlife Conservation, moreover, explained that many of the Tribe's members rely on fishing as "an important supplemental source of food and nutrition" and that the Tribe issued 199 family fishing permits in 2015. See ECF No. 117-16 (Declaration of Jeff Kelly, Nov. 28, 2016), ¶ 5. An oil spill, he said, could "cause extensive fish kills." Id., ¶ 12. He also spelled out the ways in which an oil spill could seriously affect game along the Oahe shoreline, including by poisoning animals that ingest, inhale, or are otherwise externally exposed to oil and preventing those birds and mammals whose feathers or fur are coated with oil from maintaining their body temperatures. Id., ¶ 13. Although the Corps did not have Kelly's declaration before it when it issued the EA in July 2016, his remarks were before the agency when it concluded that the easement could be issued based on the EA absent any supplementation.

Without any acknowledgment of or attention to the impact of an oil spill on the Tribe's fishing and hunting rights, despite Plaintiff's efforts to flag the issue, the EA — in this limited respect — was inadequate. The appropriate remedy for such omission is discussed in Section III.D, *infra*.

## 2. *Alternatives*

To comply with NEPA, an Environmental Assessment must include a "'brief discussion[]' of reasonable alternatives to the proposed action." Myersville, 783 F.3d at 1323 (quoting 40 C.F.R. § 1508.9(b)). This consideration "need not be as rigorous as the consideration of alternatives in an EIS." Id.; compare 40 C.F.R. § 1508.9(b) (requiring "brief discussion[]") with id. § 1502.14(a) (requiring agency to "[r]igorously explore and objectively

evaluate all reasonable alternatives" when EIS required).  "An alternative is 'reasonable' if it is objectively feasible as well as 'reasonable in light of [the agency's] objectives.'"  Myersville, 783 F.3d at 1323 (quoting Theodore Roosevelt Conservation P'ship v. Salazar, 661 F.3d 66, 72 (D.C. Cir. 2011)).  An agency's "specification of the range of reasonable alternatives is entitled to deference."  Id.

Standing Rock believes that the Environmental Assessment lacks an adequate consideration of such alternatives.  Specifically, the Tribe posits that the EA did not appropriately examine an alternative route that would have had the pipeline cross the Missouri River further north.  See SRST MSJ at 26, 30-31.  The Court disagrees: on this front, the EA adequately discharged the Corps' NEPA obligations.

Before settling on the current DAPL route, Dakota Access considered routing the pipeline to cross Lake Oahe approximately 10 miles north of Bismarck, North Dakota — i.e., approximately 50 miles north of its current location, which sits just 0.5 miles north of the Standing Rock Reservation.  See EA at 8, 161 (Figure 13).  The Company soon determined, however, that that route was not "a viable alternative."  Id.  The EA explains why.  A table therein compares the Bismarck and Oahe crossings in terms of overall route mileage; co-location with other pipelines and powerlines; the number of existing pipelines, floodplains, water features, and powerlines crossed; miles of agriculture, developed/low intensity, developed/open space, and grass/pasture land crossed; whether Corps-owned land would be crossed; the number of waterbodies crossed; the number of high-consequence areas affected; and the number of transportation crossings.  Id. at 9-10.  A separate table compares the two crossings in terms of total pipeline and total HDD length, as well as in terms of cost for road/railroad bores,

installation for non-HDD areas, HDD, geotechnical investigation, above-ground facilities, right-of-way acquisition, and engineering and consulting.  Id. at 11.

That data reveals that the Bismarck alternative would have required an additional 11 miles of pipeline, "consisting of roughly 165 additional acres of impact," 11 more floodplain crossings, 1 more powerline crossing, and 27 more transportation crossings.  Id. at 8-10.  In addition, it would have "crossed through or in close proximity to several wellhead source water protection areas" and "crossed other populated PHMSA high consequence areas" — i.e., "locales where a release from a pipeline could have the most significant adverse consequences" — "not present on the [selected] route."  Id. at 8.  The North Dakota Public Service Commission, moreover, requires a 500-foot residential buffer, which would have "severely constrained" the Bismarck route.  Id.  By contrast, on the Reservation, the residence closest to the pipeline at Oahe is located more than 1.5 miles away.  Id. at 86.  And finally, the Bismarck alternative would have cost nearly $33 million more and been co-located with other pipelines or utility corridors for only 3% of the route as compared to the selected route's 41%.  Id. at 9, 11.

Standing Rock largely focuses its critique on the EA's reliance on a memo prepared by DAPL consultants, which it argues offers "a one-sided analysis that considered downstream impacts for the Bismarck alternative, but not for the Oahe crossing."  SRST MSJ at 30.  But that memo, which the EA does not expressly cite, provides another reasonable basis on which the Corps could have rejected the Bismarck crossing in favor of Oahe.  It explains that the two closest municipal-water intakes to the Bismarck crossing would have been at Mandan, 7.3 miles downstream and serving 19,381 people, and Bismarck, 11.6 miles downstream and serving 65,123 people.  See ECF No. 209-16 at 18 (Memorandum from Tom Siguaw, Dakota Access, & Steve Rove, HDR Engineering, Apr. 12, 2016).  The first downstream intake from the Oahe

crossing, comparatively, is 4.2 miles downstream but is non-tribal and for agricultural use.  Id.

The second is 7.6 miles downstream and is used by Standing Rock also for agricultural purposes.

Id.  The third — and the first to be used for drinking water — is 11.1 miles downstream and

belongs to the South Central Regional Water District, which serves 3,491 people in Emmons

County, North Dakota.  Id.  The fourth — and the first Standing Rock intake for public

consumption — is 26.2 miles downstream at Fort Yates and serves 229 people in Fort Yates and

up to 4,317 in Sioux County.  Id.  The Bismarck crossing thus would have been much closer —

nearly four miles — to a drinking-water intake than the Oahe crossing.  The drinking-water

intakes near Bismarck also serve many more people than the two closest to the Oahe crossing.

This difference will be even more pronounced once construction is complete on a new water-

intake structure being built to serve all communities on the Standing Rock Reservation, as that

system will be located approximately 50 miles further downstream from the Oahe crossing than

the existing structure serving the Tribe at Fort Yates.  See Cooper Memo at 19.

This is not to say that the EA's analysis of the Bismarck alternative is without flaws.  As

the Cooper Memo points out, when counting the number of wetland and water features crossed,

the EA uses raw numbers of crossings, rather than "the total [number] of impacts measured as

acreage or linear feet," which would have given "a more accurate comparison of the route."

Cooper Memo at 9.  And although the Bismarck route would have crossed PHMSA high-

consequence areas that the Lake Oahe route does not, the Lake Oahe route also crosses high-

consequence areas.  Id.; EA at 94.  Despite these issues, by identifying and comparing several

features of the two routes as described, the EA easily clears NEPA's hurdle requiring "brief

discussion" of reasonable alternatives.

3.  *Environmental Justice*

Standing Rock next contends that the Corps' environmental-justice analysis was arbitrary and capricious.  A 1994 Executive Order requires that, "[t]o the greatest extent practicable and permitted by law," federal agencies "shall make achieving environmental justice part of [their] mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of [their] programs, policies, and activities on minority populations and low-income populations."  Exec. Order 12,898, Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations, 59 Fed. Reg. 7629 (Feb. 11, 1994), § 1-101.  The Order expressly states that it does not create a private right to judicial review, id. § 6-609, but the D.C. Circuit has permitted challenges to environmental-justice analyses under NEPA and the APA.  See Communities Against Runway Expansion, Inc. v. F.A.A., 355 F.3d 678, 689 (D.C. Cir. 2004) ("The [agency] exercised its discretion to include the environmental justice analysis in its NEPA evaluation, and that analysis therefore is properly subject to arbitrary and capricious review under the APA.").

As the EA acknowledges, see EA at 84, the Council on Environmental Quality developed guidance to assist federal agencies in ensuring that environmental-justice concerns "are effectively identified and addressed."  ECF No. 117-19 (CEQ, Environmental Justice Guidance Under the National Environmental Policy Act, Dec. 10, 1997) at 1.  That guidance instructs that agencies "should consider the composition of the affected area, to determine whether minority populations, low-income populations, or Indian tribes are present in the area affected by the proposed action, and if so whether there may be disproportionately high and adverse human health or environmental effects on minority populations, low-income populations, or Indian tribes"; "should recognize the interrelated cultural, social, occupational, historical, or economic

factors that may amplify the natural and physical environmental effects of the proposed agency action"; and "should recognize that the impacts within . . . Indian tribes may be different from impacts on the general population due to a community's distinct cultural practices." Id. at 9. "Where environments of Indian tribes may be affected," CEQ advises, "agencies must consider pertinent treaty, statutory, or executive order rights and consult with tribal governments in a manner consistent with the government-to-government relationship." Id. at 14. Finally, the "unit of geographic analysis" for the environmental-justice assessment should "be chosen so as not to artificially dilute or inflate the affected minority population." Id. at 26.

Here, the Corps defined the unit of geographic analysis for its environmental-justice assessment as a 0.5-mile radius around the crossing, yielding a focus on the two census tracts in which the HDD boreholes would be drilled — i.e., the places on either side of Lake Oahe at which the pipeline would enter the ground to pass under the water. See EA at 84. Those two census tracts were in Morton County and Emmons County; they did not include Sioux County, where the Reservation is located. Id. at 80, 83.

To identify the impact of the project on the populations in the chosen census tracts, the Corps compared the average demographic data from the two census tracts to that of "counties in the general vicinity" of the Oahe crossing — Emmons, Morton, and Sioux Counties — and to that of North Dakota generally. Id. at 84. Specifically, the Corps compared the areas by percentage of racial minorities and percentage of persons living below the poverty level. Id. at 83. That data analysis revealed that the minority population in the two census tracts was 2% — i.e., 29% lower than the minority population in the general-vicinity counties and 9% lower than the minority population in North Dakota as a whole. Id. at 83, 85. It also showed that the percentage of persons living below the poverty level in the two census tracts was 9%. Id. at 83.

The EA states that this figure was 3% lower than the impoverished population in the general-vicinity counties and 50% higher than in North Dakota as a whole.  Id.  Based on these comparisons, the EA concluded that "there is no concern regarding environmental justice to minority populations at the Proposed Action Area at . . . Lake Oahe."  Id. at 85.  In actuality, some of the EA's calculations are incorrect.  See Cooper Memo at 24 (identifying one of two errors).  Using the correct figures, the percentage of persons living below the poverty line in the two census tracts was 11% lower than in the general-vicinity counties and 3% lower than in North Dakota as a whole.  Id. at 83; Cooper Memo at 24.  (As will be seen, the calculation errors play no significant role in the outcome on this issue.)

The Tribe challenges the Corps' decision to use a 0.5-mile buffer and the resulting analysis as arbitrary and capricious gerrymandering.  See SRST MSJ at 28.  The Standing Rock Reservation is 0.55 miles — or 80 yards beyond the 0.5-mile limit — downstream of the HDD site, and the Tribe contends that there was no principled basis on which to narrowly exclude it from the bounds of the Corps' analysis.  Id. at 29.  It also notes that the two census tracts selected as the "affected area" are "mostly upstream of the crossing site" with a 98% white population.  Id.  By comparing these tracts to a baseline of three counties that included Sioux County, Standing Rock argues, the EA "compar[ed] an area that will be almost entirely unaffected by a spill from the pipeline, and where few Tribal members live, against a baseline that included a significant portion of the Reservation."  Id.  "Unsurprisingly," the Tribe observes, the "'affected area' did not have a higher population of minority and low-income people than the claimed baseline, allowing the Corps to dismiss environmental justice concerns."  Id.

The Corps and Dakota Access defend the reliance on a 0.5-mile buffer by repeating the justification given in the EA: "Transportation projects, such as under the Federal Transit

Administration, and natural gas pipeline projects under the Federal Energy Regulatory Commission . . . typically use a 0.5 mile buffer area to examine Environmental Justice effects." EA at 84; see also id. at 87 ("As stated above, linear projects typically use a 0.5 mile buffer area to examine Environmental Justice effects."); DA SRST Opp. at 29; Corps SRST MSJ at 27.

Although "[t]he 'identification of the geographic area' within which a project's impacts on the environmental resources may occur 'is a task assigned to the special competency of the appropriate agencies,'" Powder River Basin Res. Council v. BLM, 37 F. Supp. 3d 59, 75 (D.D.C. 2014) (quoting Tri-Valley CAREs v. Dep't of Energy, 671 F.3d 113, 1127 (9th Cir. 2012)) (quoting Kleppe v. Sierra Club, 427 U.S. 390, 414 (1976)), the Court is hard pressed to conclude that the Corps' selection of a 0.5-mile buffer was reasonable. DAPL is neither a transportation project nor a natural-gas pipeline; it is a crude-oil pipeline. The EA does not identify any project involving a crude-oil pipeline for which a 0.5-mile buffer was employed. The Corps, likewise, points only to other types of infrastructure projects. See Corps SRST MSJ at 27 (citing Coal. for Healthy Ports v. Coast Guard, No. 13-5347, 2015 WL 7460018, at *25 (S.D.N.Y. Nov. 24, 2015) (project to raise height of bridge); Bitters v. Fed. Highway Admin., No. 14-1646, 2016 WL 159216, at *14 (E.D. Cal. Jan. 13, 2016) (project to reintroduce vehicle traffic lanes to particular streets)).

The Corps nonetheless rejoins that there is no meaningful distinction between those projects and DAPL. Id. ("Analysis of a half-mile buffer, which is appropriate for bridges or other construction projects with street-level noise, traffic or other impacts, is certainly appropriate for the Lake Oahe crossing, where the construction is deep under the bed of Lake Oahe and is staged on private lands."); Corps SRST Reply at 13 n.3 ("[A] bridge that carries rail cars or truck traffic transporting oil or hazardous substances which could just as easily suffer low

50

probability accidents resulting in releases to the waterways underneath the bridges.").  The problem with the Corps' argument, however, is that the cases it cites did not consider an oil spill when evaluating impacts; if they had, perhaps a different geographic scope may have been selected.  Standing Rock, conversely, points to two oil-pipeline projects for which a much larger affected area was used to assess environmental-justice impacts.  See SRST MSJ at 30 n.16 (citing ECF No. 117-22 (Final Supplemental Environmental Impact Statement, Keystone XL Project) at 3.10-3) (assessing environmental-justice impacts 14 miles downstream of crossings)); SRST Reply at 25 n.23 (citing ECF No. 195-6 (Draft Supplemental Environmental Impact Statement for Line 67 Expansion, Jan. 2017) at 3.0-2 (looking at spill impacts up to 40 river-miles downstream)).

Standing Rock is not the only entity to criticize the 0.5-mile-buffer choice.  In its comments on the Draft EA, the EPA advised the Corps that "the area of analysis to assess potential impacts to EJ communities should correspond to the impacts of the proposed project instead of only the area of construction disturbance."  ECF No. 209-8 at 126 (Letter from Philip Strobel to Brent Cossette, Mar. 11, 2016).  "For oil pipeline projects, potential impacts to EJ communities would include the effects of leaks and spills to downstream water supplies (both drinking water quality, agricultural uses, and costs) and aquatic resources such as fish and riparian vegetation used by EJ populations."  Id.  Even the Corps' Chief Counsel expressed concern about the agency's geographic selection when reviewing the EA's legal sufficiency:

> The Corps' determination of the affected environment . . . can be questioned here. . . .  Sioux County is just outside the 0.5-mile pipeline buffer.  While the equally sized buffer on both sides of the pipeline seems reasonable along land areas, it is arguably less so at water areas because of the potential for water currents to carry a spill downstream.  Sioux County is located just south and downstream of the pipeline.  Thus, the SRST population present immediately outside of the proposed area or affected environment and

downstream reasonably could have been within the area identified as the affected environment in the EA. If that area was included, the EA would then determine whether there might a disproportionately high and adverse human health or environmental effect on the SRST.

Cooper Memo at 25-26.

The Corps argues that the Court need not confine its analysis to the use of a 0.5-mile buffer, however, because the EA also devoted a separate section to environmental-justice impacts on the Standing Rock Sioux Reservation. See EA at 85-87. That additional section, as it turns out, does not yield the Corps a full reprieve. The Standing Rock-focused environmental-justice section begins with the "recogni[tion] that the Standing Rock Sioux Tribe is downstream of the Lake Oahe Crossing" and "has a high population of minorities and low-income residents." Id. at 85. It first discusses impacts from the project's construction and anticipated operation, and it explains that: the crossing will be installed via HDD on private lands adjacent to Corps-owned land, HDD drilling has no anticipated environmental effects, the pipeline's route "maintain[s] a minimum distance of 0.5 mile[s] from Tribal land," and the closest residence on the Reservation to the Oahe crossing is more than 1.5 miles away. Id. at 85-86. "As a result of this routing criteria, the nature of the action (construction associated with laying an underground oil pipeline), the short term duration of effects, construction and operation on private lands, the concurrent reclamation activities, state of the art construction techniques, [and] use of high quality materials and standards that meet or exceed federal standards," the EA concludes, "there will be no direct or indirect effects to the Standing Rock Sioux Tribe. This includes a lack of impact to its lands, cultural artifacts, water quality or quantity, treaty hunting and fishing rights, environmental quality, or socio-economic status." Id. at 86. Given the absence of impacts, it

continues, "there is no resulting adverse or disproportionate impacts of the Proposed Action with respect to Environmental Justice considerations." Id.

The problem here, as the Tribe points out, is that this analysis covers only <u>construction</u> impacts, not <u>spill</u> impacts. <u>See</u> SRST Reply at 26. As to the effects from a spill (as distinct from the risk of a spill occurring), the EA's discussion is minimal:

> Concerns have been expressed regarding an inadvertent release reaching intake structures on Lake Oahe. Given the engineering design, proposed installation methodology, quality of material selected, operations measures and response plans[,] the risk of an inadvertent release in, or reaching, Lake Oahe is extremely low. While the locations of water intakes is not public information for disclosure in this document, there are private and/or non-tribal intakes closer to the Lake Oahe crossing than any intakes owned by the tribe; further demonstrating the lack of disproportionate impacts of an inadvertent release to the Tribe and the reservation. We understand that due to the rural nature of this area, tribal drinking water supplies are obtained from a combination of wells and surface area. The siting and construction of oil pipelines upstream of drinking water intakes is not uncommon throughout the United States and is not considered an Environmental Justice issue. In the unlikely event of a release, sufficient time exists to close the nearest intake valve to avoid human impact.

EA at 87. This limited analysis, the Court believes, is not enough to discharge the Corps' environmental-justice responsibilities under NEPA.

"The purpose of an environmental justice analysis is to determine whether a project will have a disproportionately adverse effect on minority and low income populations." <u>Allen v. Nat'l Institutes of Health</u>, 974 F. Supp. 2d 18, 47 (D. Mass. 2013) (quoting <u>Mid States Coal. for Progress v. Surface Transp. Bd.</u>, 345 F.3d 520, 541 (8th Cir. 2003)). The EA takes some steps toward satisfying this purpose. It acknowledges that Standing Rock, a community with a high percentage of minorities and low-income individuals, is based downstream of the Oahe crossing and could be affected by an oil spill, and it observes — without providing any specifics — that a

non-tribal community's drinking-water intake is closer to the Oahe crossing than is Standing Rock's. But these statements are not enough to reasonably support the conclusion that the Tribe will not be disproportionately affected by an oil spill in terms of adverse human health or environmental effects. See CEQ Guidance at 9.

The EA is silent, for instance, on the distinct cultural practices of the Tribe and the social and economic factors that might amplify its experience of the environmental effects of an oil spill. Id. at 9, 14. Standing Rock provides one such example in its briefing: many of its members fish, hunt, and gather for subsistence. See SRST MSJ at 41. Losing the ability to do so could seriously and disproportionately harm those individuals relative to those in nearby non-tribal communities.

The Corps need not necessarily have addressed that particular issue, but it needed to offer more than a bare-bones conclusion that Standing Rock would not be disproportionately harmed by a spill. Given the cursory nature of this aspect of the EA's analysis, the Court agrees with the Tribe that the Corps did not properly consider the environmental-justice implications of the project and thus failed to take a hard look at its environmental consequences. Once again, the remedy for such omission is considered in Section III.D, *infra*.

B.  Decision to Grant the Easement

The Tribe's second set of arguments centers around the Corps' February 8, 2017, decision to grant an easement to Dakota Access to construct and operate DAPL under Lake Oahe. As a reminder, the Corps had previously said, in a memo issued on December 4, 2016, that it would not grant such an easement based on the current record and would undertake additional analysis before making a final decision. Standing Rock first contends that the Corps' February 2017 easement decision was an arbitrary and capricious reversal of its previous

position.  It also asserts that the decision was in conflict with the Corps' trust-responsibility

obligations.  The Court addresses each in turn.

### 1. *Policy Change*

When an agency action changes or reverses a prior policy, it must "display awareness

that it <u>is</u> changing position"; it may not, *e.g.*, "depart from a prior policy *sub silentio*."  <u>FCC v.</u>

<u>Fox Television Stations, Inc.</u>, 556 U.S. 502, 515 (2009).  It also "must show that there are good

reasons for the new policy."  <u>Id.</u>  Generally, however, those reasons need not be better than the

reasons for the old policy.  To satisfy the APA's procedural-correctness requirements, it is

sufficient "that the new policy is permissible under the statute, that there are good reasons for it,

and that the agency <u>believes</u> it to be better, which the conscious change of course adequately

indicates."  <u>Id.</u>  Sometimes, though, more is required.  If the "new policy rests upon factual

findings that contradict those which underlay its prior policy," the agency must "provide a more

detailed justification than what would suffice for a new policy created on a blank slate," for "[i]t

would be arbitrary and capricious to ignore such matters."  <u>Id.</u>; <u>see also</u> <u>id.</u> at 537 (Kennedy, J.,

concurring) ("[A]n agency's decision to change course may be arbitrary and capricious if the

agency ignores or countermands its earlier factual findings without reasoned explanation for

doing so. An agency cannot simply disregard contrary or inconvenient factual determinations

that it made in the past, any more than it can ignore inconvenient facts when it writes on a blank

slate.").  The agency need not, though, "refute the factual underpinnings of its prior policy with

new factual data."  <u>United States Sugar Corp. v. Envtl. Prot. Agency</u>, 830 F.3d 579, 626 (D.C.

Cir. 2016), <u>on reh'g en banc in part</u> No. 11-1108, 2016 WL 7427434 (D.C. Cir. Dec. 23, 2016),

and <u>on reh'g en banc,</u> 2016 WL 7427453 (D.C. Cir. Dec. 23, 2016).  It is enough that it offer a

"reasoned explanation . . . for disregarding facts and circumstances that underlay . . . the prior policy." Fox, 556 U.S. at 516.

Standing Rock argues that the Corps' decision to grant the easement on February 8, 2017, was a reversal of the decision announced in the December 4, 2016, memorandum. Because the Corps "failed to address, let alone provide a reasoned explanation for, abandoning the determinations undergirding its December 4 decision to require an EIS," the Tribe contends, its action was arbitrary and capricious. See SRST MSJ at 36.

In response, the Corps and Dakota Access first argue that Fox simply does not apply: the decision to grant the easement was not a change in policy because the Corps had never denied the easement in the first place. See Corps SRST MSJ at 34; DA SRST Opp. at 32. That position, however, mischaracterizes the Tribe's argument. Standing Rock does not assert that the Corps previously denied the easement; indeed, it could not plausibly do so. Assistant Secretary Darcy clearly stated in her December 4 memo: "To date, the Army has not made a final decision on whether to grant the easement." Dec. 4 Memo, ¶ 6. Instead, Standing Rock's argument is that the Corps announced on December 4 that it would "not grant an easement to cross Lake Oahe at the proposed location based on the current record" — as "additional analysis, more rigorous exploration and evaluation of reasonable siting alternatives, and greater public and tribal participation and comments" were merited, id., ¶ 12 (emphases added) — but nonetheless granted the easement on February 8 without having undertaken such additional analysis. The reversal, then, is the decision to grant the easement on the current record — i.e., as it stood on December 4 — when the Corps had previously said it would not do so. This, the Tribe believes, was arbitrary and capricious. Standing Rock does not, it clarifies in its Reply, assail the withdrawal of the notice of intent to prepare an EIS. See SRST Reply at 30 n.24.

The Corps' reversal plainly constituted a change in "official policy." See, e.g., Alaska Oil & Gas Ass'n v. Pritzker, 840 F.3d 671, 682 (9th Cir. 2016) (applying Fox to policy change in agency's approach to assessing foreseeable threats to endangered species triggered by internal agency memorandum); Sierra Club v. Bureau of Land Management, 786 F.3d 1219, 1226 (9th Cir. 2015) (explaining Fox did not apply to an agency's "evolving analysis" that "was not a change in a published regulation or official policy"); Loving v. I.R.S., 742 F.3d 1013, 1021 (D.C. Cir. 2014) (suggesting Fox applies where initial policy was articulated via testimony to Congress and guidance document — *i.e.*, not final agency actions — and policy change was accomplished via rulemaking). As the decision to grant the easement on the record as of December 4 did not rest on new factual findings not relied upon by Darcy or ignore or countermand prior factual findings absent reasoned explanation, the Corps need only have shown good reasons for its new policy. Taking Fox's framework into account, the Court concludes that the Corps here satisfied its dictates.

First, the Corps displayed "awareness that it [was] changing position." Fox, 556 U.S. at 515. The February 3, 2017, memo from the Corps' Lieutenant General that recommended granting the easement acknowledged that Darcy had previously "directed the Corps to engage in additional review and analysis concerning" alternative locations, the potential risk of an oil spill and potential impacts to the Tribe, and the Tribe's treaty rights, but explained that, "[a]fter reviewing the record in its entirety and giving further consideration to the input received over the past four months, including additional review and analyses of the subjects identified by [Darcy], other federal executive offices, and the SRST, the Corps finds that the Final EA concerning the crossing of the DAPL at Lake Oahe is sufficient and does not need further supplementation." Semonite Memo at 9, 11.

Second, the Corps provided a reasoned explanation for its new policy. Darcy's memo affirmed that "the Corps' prior reviews and actions" — including the EA and FONSI — "comported with legal requirements." Dec. 4 Memo, ¶ 15. Her "policy decision" that "a more robust analysis of alternatives [could] be done and should be done" was "based on the totality of the circumstances" — namely, "the specific mandates of the Mineral Leasing Act (30 U.S.C. § 185), the involvement of historic tribal homelands, the close proximity to reservation lands that extend into the potentially affected waters, and the potential impacts on treaty hunting and fishing rights." Id. In reversing course, the Corps started from the same premise as Darcy — viz., that the EA and FONSI satisfied NEPA's requirements. See Semonite Memo at 10. It then explained that the EA "fully informed . . . the decision on whether to grant an easement under the Mineral Leasing Act." Id. Supplementation of an EA or EIS, it noted, is required by CEQ NEPA regulations only when there are "substantial changes in the proposed action that are relevant to environmental concerns" or when "significant new circumstances or information relevant to environmental concerns" emerge after an EA or EIS is final. Id. at 11 (quoting 40 C.F.R. §§ 1502.9(c)(1)(i), (ii)).

Here, the proposed action described in the EA did not change between July 2016 and February 2017. Id. The Corps also concluded that no new significant circumstances or information relevant to environmental concerns, including the federal government's trust relationship to the Tribe, the Corps' analysis of alternatives, risks from oil spills, and the impact of a spill on the Tribe's Treaty rights and water intakes, had emerged since the EA was finalized. It did so by comparing the various letters received from the Tribe after the EA was issued, including its expert report, with comments the Tribe previously submitted on the Draft EA, as well as by looking at the Corps' analysis in the Final EA, the subsequent review memos, and the

36 special conditions imposed on the easement.  Id. at 11-13.  In response to the Interior

Solicitor's memo "address[ing] a series of issues rooted in the perceived risk that the DAPL

would leak into Lake Oahe," the Corps explained that, as set out in the EA and Cooper Memo,

the risk of a spill was low and was further mitigated by the easement conditions.  Id. at 13.

By explaining why it was not compelled by the Tribe's letters, the Interior Solicitor's

Opinion, or the Corps' post-EA reviews to supplement the EA — which Darcy did not dispute

was legally sound — the Corps did enough to satisfy the APA's requirements regarding policy

reversals.

## 2. *Trust Responsibilities*

In addition to challenging the decision to grant the easement as an arbitrary-and-

capricious reversal of prior agency policy, Standing Rock contends that this and other

authorizations to cross Lake Oahe violate the Corps' trust responsibility to protect the Tribe's

Treaty rights.  This trust responsibility, the Tribe argues, is "even <u>higher</u> than the one imposed by

NEPA."  SRST MSJ at 39.  In other words, "compliance with general environmental statutes" is

not sufficient "to discharge [the Corps'] trust duty"; a greater fiduciary duty is required.  <u>See</u>

SRST Reply at 34.

As best the Court can tell from the briefing, the Tribe argues that the Corps' failure to act

in accordance with its trust-responsibility obligations renders the granting of the easement

arbitrary and capricious under the APA.  <u>See</u> SRST MSJ at 35-43 (situating discussion of Treaty

rights under heading stating "The Granting of the Easement and Other Corps Authorizations is

Arbitrary, Capricious, and Contrary to Law"); SRST Reply at 30-34 (similar).  Whether that is so

or Plaintiff intends to also state a separate breach-of-trust action, <u>see</u> ECF No. 106-1 (SRST First

Amended Complaint), ¶¶ 266-285 (stating separate claims for relief for breach of trust

responsibility and violation of APA), Standing Rock's position comes up short for the same reason.

According to the Tribe, to fulfill its trustee duties, the Corps needed to "have before it a full and comprehensive understanding of how the project impacts treaty rights and tribes." SRST MSJ at 40. It did not so have here, the Tribe asserts, because it "assumed oil spills will never happen and on that basis refused to consider the impacts of an oil spill on the Tribe's Treaty rights and resources." Id. Standing Rock further argues that the Corps did not fulfill its fiduciary obligation to share information about the project, as it withheld from the Tribe the spill assessment, spill-response plans, and environmental-justice and route analyses. Id. at 41-42.

The problem for Standing Rock, however, is that "[t]he trust obligations of the United States to the Indian tribes are established and governed by statute rather than the common law." United States v. Jicarilla Apache Nation, 564 U.S. 162, 165 (2011). To bring a breach-of-trust claim, the Tribe "must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties." United States v. Navajo Nation, 537 U.S. 488, 506 (2003). Standing Rock asserts that "[t]he federal government has a duty, arising from the Treaties and the federal trust responsibility, and reinforced in the MLA and other statutes, to protect treaty rights and resources," but it does not point in its Motion to a specific statute, treaty, executive order, or other provision that gives rise to specific fiduciary duties. See SRST MSJ at 39. In its Reply, the Tribe cites Section 185(h)(2)(D) of the Mineral Leasing Act, which provides that the Corps, "prior to granting a right-of-way or permit . . . for a new project which may have a significant impact on the environment," shall impose "requirements to protect the interests of individuals living in the general area of the right-of-way or permit who rely on the fish, wildlife, and biotic resources of

the area for subsistence purposes." 30 U.S.C. § 185(h)(2)(D); <u>see</u> SRST Reply at 36. Yet that provision does not contain any trust or fiduciary language, and, in any case, the Corps imposed such conditions on the easement. <u>See</u> Easement at 37-43. "Without an unambiguous provision by Congress that clearly outlines a federal trust responsibility, courts must appreciate that whatever fiduciary obligation otherwise exists, it is a limited one only." <u>N. Slope Borough v. Andrus</u>, 642 F.2d 589, 612 (D.C. Cir. 1980). "Thus, although the United States does owe a general trust responsibility to Indian tribes, unless there is a specific duty that has been placed on the government with respect to Indians, this responsibility is discharged by the agency's compliance with general regulations and statutes not specifically aimed at protecting Indian tribes." <u>Morongo Band of Mission Indians v. FAA</u>, 161 F.3d 569, 574 (9th Cir. 1998).

Standing Rock argues that the line of cases requiring a showing that the government owes a specific statutory fiduciary duty is limited to damages actions brought under the Indian Tucker Act, 28 U.S.C. § 1505, which waives sovereign immunity for certain claims brought by a tribe against the United States. That statute, it contends, does not apply here because "the APA establishes both the cause of action and waiver of sovereign immunity." SRST Reply at 36. Recent Circuit precedent, however, undermines such a position.

In <u>El Paso Natural Gas Company v. United States</u>, 750 F.3d 863 (D.C. Cir. 2014), the D.C. Circuit considered, *inter alia*, claims by the Navajo Nation concerning environmental hazards at uranium, waste, and dump sites. As to the Tribe's breach-of-trust cause of action, the court held that it had failed to state a claim for relief because it "ha[d] not identified a substantive source of law establishing <u>specific fiduciary duties</u>, a failure which [was] fatal to its trust claim regardless of whether [the court] read the claim as brought under the APA or under a cause of action implied by the nature of the fiduciary relationship itself." <u>Id.</u> at 892. The Navajo Nation

had argued that its breach-of-trust claim could "be maintained either (1) under the APA or (2) under a cause of action inferred from the fiduciary responsibilities undertaken by the Government." Id. The D.C. Circuit concluded that, "[o]n either conception of the claim," its inquiry would be "largely the same because, under controlling precedent, a cause of action will be inferred from a fiduciary relationship only where a plaintiff can identify specific trust duties in a statute, regulation, or treaty. And [that] analysis overlaps with the APA's requirement that a plaintiff allege 'that an agency failed to take a <u>discrete</u> agency action that it is <u>required to take</u>.'" Id. (quoting <u>Norton v. S. Utah Wilderness Alliance</u>, 542 U.S. 55, 64 (2004)).

To explain that conclusion, the court addressed the Supreme Court's case law concerning Indian trust claims and the law of the circuit. It stated, as this Court has above, "The existence of a general trust relationship between the Government and Indian tribes is long established. But this general trust relationship alone does not afford an Indian tribe with a cause of action against the Government . . . . Something more is needed." Id. (citations omitted). It then explained, "[W]e apply these same principles" derived from "Indian trust claims arising in the context of the Indian Tucker Act" to "trust claims brought under the APA." Id. at 892-93; <u>see also</u> <u>id.</u> at 895 ("These principles control here, even though the claim is for equitable relief (not money damages) and even though sovereign immunity is waived under § 702 of the APA (and not the Indian Tucker Act)." Indeed, it noted, the D.C. Circuit has "consistently relied on principles announced in Indian Tucker Act cases in trust cases not arising under the Act." Id. at 895 (citing, *e.g.*, <u>Andrus</u>, 642 F.2d at 611 ("[T]rust responsibility can only arise from a statute, treaty, or executive order."); <u>Cobell v. Norton</u>, 240 F.3d 1081, 1099 (D.C. Cir. 2001) (reiterating that fiduciary relationship depends on substantive laws and stating that "the government's obligations are rooted in and outlined by the relevant statutes and treaties")).

This Court is bound by El Paso.  It thus cannot accept the Tribe's position that "[t]he Tucker Act line of cases has no bearing on the existence of a claim here," SRST Reply at 36, or that of *amici curiae* that the APA affords broader trust enforcement than the statute.  See ECF No. 137 (Amicus Brief of Assoc. of American Indian Affairs, *et al.*) at 8.  Because Standing Rock has not identified a specific provision creating fiduciary or trust duties that the Corps violated, its breach-of-trust argument — whether considered a separate count or part of its larger APA cause of action — cannot survive.

C.  NWP 12

Standing Rock's final claim is that the Corps' decision to issue a verification that the project complied with the terms of Nationwide Permit 12 was arbitrary and capricious.  As the Court explained in a previous Opinion, the Rivers and Harbors Act forbids certain construction activities within the "navigable water of the United States" absent permission from the Corps.  See Standing Rock I, 205 F. Supp. 3d at 12 (quoting 33 U.S.C. § 403).  Because DAPL is, in part, a "structure . . . under . . . a navigable water of the United States," 33 C.F.R. § 322.3(a), Dakota Access required a permit under Section 10 of the RHA.  The Corps often authorizes such activities through a general, nationwide permit.  Standing Rock I, 205 F. Supp. 3d at 10.  Nationwide Permit 12, the general permit at issue here, authorizes "[a]ctivities required for the construction, maintenance, repair, and removal of utility lines and associated facilities in waters of the United States, provided the activity does not result in the loss of greater than 1/2-acre of waters of the United States for each single and complete project."  Reissuance of Nationwide Permits, 77 Fed. Reg. 10,184, 10,271 (Feb. 21, 2012).  On July 25, 2016, the Corps verified that the Oahe crossing would satisfy the terms and conditions of NWP 12.

To qualify for NWP authorization, a permittee must comply with certain General Conditions. General Condition 17, for example, provides that "[n]o activity or its operation may impair reserved tribal rights, including, but not limited to, reserved water rights and treaty fishing and hunting rights." 77 Fed. Reg. at 10,283. General Condition 7 states, moreover, that "[n]o activity may occur in the proximity of a public water supply intake, except where the activity is for the repair or improvement of public water supply intake structures or adjacent bank stabilization." Id. The Tribe argues that because the Oahe crossing does not comply with these conditions, it does not qualify for NWP 12. See SRST MSJ at 43-44.

The Court, however, is already remanding on certain of these issues — *e.g.*, Treaty rights and environmental-justice considerations — and the Tribe offers no other basis for concluding that the project does not comply with GCs 7 and 17.

The Corps, furthermore, asserts that it was not obligated to evaluate whether these General Conditions were satisfied prior to verifying that the project was authorized under NWP 12. See Corps SRST MSJ at 45 (citing Snoqualmie Valley Preservation Alliance v. U.S. Army Corps of Eng'rs, 683 F.3d 1155, 1164 (9th Cir. 2012) ("The nationwide permit system is designed to streamline the permitting process. We decline to impose a new requirement of a full and thorough analysis of each general condition based on documentation the Corps may or may not have.")). Instead, it explains, "[A] permittee must adhere to the General Conditions to maintain eligibility for a Nationwide Permit." Id. (citing 77 Fed. Reg. at 10,282). Standing Rock insists that it is not asking the Court to require the Corps to undertake an in-depth analysis of each General Condition prior to issuing an NWP 12 verification, but rather is simply demanding that the Corps give GCs some attention when faced with "abundant information."

SRST Reply at 43; <u>see also</u> <u>id.</u> ("While it need not necessarily conduct a 'full and thorough' analysis of each and every GC, it must deal with the information in front of it.").

The Tribe, however, offers no case law to support its position. Other district courts in this circuit, moreover, have articulated the Corps' obligations as it presents them here. <u>See Sierra Club v. U.S. Army Corps of Eng'rs</u>, 990 F. Supp. 2d 9, 27 (D.D.C. 2013) ("When a prospective permittee files a pre-clearance notice [under the general permit process], the only thing left to be done is for the Corps's district engineers to verify that the planned project does, in fact, fit within the category of activities that the Corps has already authorized."). Given the streamlining and efficiency goals behind the nationwide-permit program, this view makes sense:

> [F]orcing the Corps to perform an extensive environmental review in the verification context under NWP 12 would (i) duplicate work already performed at the nationwide permit stage in pre-clearing this category of activities; (ii) contravene the purpose of the nationwide permit process; (iii) increase exponentially the documentation a permittee must submit to the Corps, including numerous items not specifically delineated as required documentation in the General Conditions; and (iv) multiply the delay and expense associated with verifications so as to render them functionally indistinguishable from individual permit decisions, thus collapsing two conceptually distinct regulatory processes into one.

<u>Mobile Baykeeper, Inc. v. U.S. Army Corps of Eng'rs</u>, No. 14-32, 2014 WL 5307850, at *15 (S.D. Ala. Oct. 16, 2014); <u>see also</u> <u>id.</u> at *16 ("[T]he Corps was not required to study compliance with General Condition 7 before issuing NWP 12 verifications.").

The Court thus agrees that the Corps need not have investigated compliance with General Conditions 7 and 17 before issuing NWP verifications on the DAPL crossing at Lake Oahe, and that its permitting decision was not arbitrary and capricious. This conclusion, however, does not forever insulate the NWP 12 permitting decision from challenge. Dakota Access has a duty to comply with these conditions if it wishes to maintain its eligibility for a Nationwide Permit.

* * *

To summarize its conclusions on Standing Rock's claims, therefore, the Court finds that the Corps' decision on July 25, 2016, and February 3, 2017, not to issue an EIS largely complied with NEPA. Yet there are substantial exceptions: the agency failed to adequately consider the impacts of an oil spill on Standing Rock's fishing and hunting rights and on environmental justice, and in February 2017, it did not sufficiently weigh the degree to which the project's effects are likely to be highly controversial in light of critiques of its scientific methods and data.

D. Remedy

So where does that leave us? The Court turns now to the question of remedy. The cure for the Corps' NEPA violation is governed by the APA, which provides that the reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In this Circuit, vacatur is the "standard remedy" for a NEPA violation. Pub. Employees for Envtl. Responsibility v. U.S. Fish & Wildlife Serv., 189 F. Supp. 3d 1, 2 (D.D.C. 2016) (quoting Humane Soc'y of U.S. v. Johanns, 520 F. Supp. 2d 8, 37 (D.D.C. 2007)); see also Realty Income Tr. v. Eckerd, 564 F.2d 447, 456 (D.C. Cir. 1977) ("[W]hen an action is being undertaken in violation of NEPA, there is a presumption that injunctive relief should be granted against continuation of the action until the agency brings itself into compliance."). In other words, the Court would vacate DAPL's permits and easement, thus forcing it to cease operations until the Corps fully complied with the aforementioned NEPA requirements.

Such a move, of course, would carry serious consequences that a court should not lightly impose. In fact, courts have discretion to depart from that presumptive remedy and decide not to vacate an EA, FONSI, and corresponding authorizations pending NEPA compliance. Allied-

Signal, Inc. v. U.S. Nuclear Regulatory Comm'n, 988 F.2d 146, 150–51 (D.C. Cir. 1993). "The decision whether to vacate depends on 'the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed.'" Id. (quoting Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin., 920 F.2d 960, 967 (D.C. Cir. 1990)). "[A] serious possibility that the [agency] will be able to substantiate its decision on remand" cautions in favor of remanding rather than vacating. Id. at 151.

Here, Standing Rock argues that "[v]acatur is the appropriate remedy," SRST MSJ at 45, whereas Dakota Access counters that the Allied-Signal factors require remand without vacatur. See DA SRST Opp. at 44-45. These discussions, however, are quite brief, and the Corps never even addresses the issue. This is not surprising — absent knowledge of whether or to what extent the Court would remand, the parties were unable to fully address the Allied-Signal factors in their summary-judgment briefs. That mystery now solved, the Court will order the litigants to submit briefing on whether remand with or without vacatur is appropriate in light of the deficiencies herein identified and any disruptive consequences that would result given the current stage of the pipeline's operation. As is set out in a contemporaneous Order, the Court will discuss the schedule of that briefing and the remand at an upcoming status conference to be held next week.

## IV.    Analysis of Cheyenne River's Claims

The Standing Rock Sioux are not the only Tribe at the table. The Court thus now turns to Cheyenne River's Motion for Partial Summary Judgment and the Corps' and Dakota Access's Cross-Motions. Cheyenne River seeks summary judgment on four claims: (1) The Corps' issuance of the Section 408 permit was arbitrary, capricious, and unlawful; (2) The Corps'

issuance of the MLA easement was arbitrary, capricious, and unlawful; (3) The Corps' issuance of both constituted a breach of trust responsibility; and (4) The Corps issued both in violation of its pre-decisional consultation duty.

Before addressing each of these separately, a few preliminaries: First, certain aspects of these claims have been addressed in the Standing Rock analysis above — namely, the sufficiency of the EA's spill-risk analysis and the nature of the Corps' trust responsibilities — and the Court will refer back to those conclusions rather than repeat them here. Second, in light of the principles regarding extra-record evidence in administrative-law cases discussed in Section III.A.1.a, *supra*, the Court will consider only documents created on or before July 25, 2016, when evaluating the Corps' Section 408 decision and only documents created on or before February 8, 2017, when assessing the Corps' easement decision.

A.  Section 408 Decision

Section 408 of the Rivers and Harbors Act makes it unlawful for a person to "take possession of or make use of for any purpose, or build upon, alter, deface, destroy, move, injure, . . . or in any manner whatever impair the usefulness of any . . . work built by the United States, . . . in whole or in part, for the preservation and improvement of any of its navigable waters or to prevent floods." 33 U.S.C. § 408(a). The Corps "may," however, permit the alteration, permanent occupation, or use of such public works when, in its judgment, such activity (1) "will not impair the usefulness of such work" and (2) "will not be injurious to the public interest." Id. The Corps so concluded here. See ECF No. 183-9 (Section 408 Decision Package) at 6. Cheyenne River contends that those conclusions were arbitrary, capricious, and contrary to law. In evaluating that argument, the Court considers the two Section 408 factors separately.

1. *Impairment*

As to the first prong, the Corps' objective "is to ensure that the proposed alteration will not limit the ability of the project to function as authorized and will not compromise or change any authorized project conditions, purposes or outputs."  ECF No. 73-15 (<u>Policy and Procedural Guidance for Processing Requests to Alter US Army Corps of Eng'rs Civil Works Projects Pursuant to 33 USC 408</u>, Engineering Circular 1165-2-216 ¶ 7.c.(4)(b)i. (2015)).  To do so, "[a]ll appropriate technical analyses including geotechnical, structural, hydraulic and hydrologic, real estate, and operations and maintenance requirements, must be conducted and the technical adequacy of the design must be reviewed."  <u>Id.</u>  If the Corps concludes "at any time . . . that the usefulness of the authorized project will be negatively impacted," its inquiry ends.  <u>Id.</u>

To challenge the Corps' decision that DAPL would not impair the ability of the Lake Oahe project to function as authorized and would not compromise or change any of its conditions, purposes, or outputs, the Tribe first points to 33 U.S.C. § 701-1(b), a provision of the Flood Control Act of 1944.  Cheyenne River reads § 701-1(b) to establish that consumptive uses of Lake Oahe's waters "may not be subrogated . . . to non-consumptive uses," and that <u>no</u> activity with the potential to have an adverse effect on the water's use — *e.g.*, an oil pipeline with some potential to leak — may be lawfully authorized.  <u>See</u> CRST MSJ at 11-12.

Section 701-1(b), however, does not apply here.  That provision provides:

> <u>The use for navigation</u>, in connection with the operation and maintenance of such works herein authorized for construction, of waters arising in States lying wholly or partly west of the ninety-eighth meridian shall be only such use as does not conflict with any beneficial consumptive use, present or future, in States lying wholly or partly west of the ninety-eighth meridian, of such waters for domestic municipal, stock water, irrigation, mining, or industrial purposes.

33 U.S.C. § 701-1(b) (emphasis added). As is clear from the statutory language, the provision applies to <u>navigational</u> uses of water, which DAPL is not. <u>See also</u> 33 U.S.C. § 701-1 (stating federal policy is to "limit the authorization and construction of <u>navigation works</u> to those in which a substantial benefit to navigation will be realized therefrom and which can be operated consistently with appropriate and economic use of the waters of such rivers by other users") (emphasis added).

The Tribe next maintains that the Corps did not adequately consider the risk of an oil spill or the environmental impacts of the pipeline; as a result, it could not reasonably have concluded that DAPL would not impair the purposes of the Lake Oahe project. Cheyenne River asserts, for example, that the Corps failed to assess the risk of landslides after mitigation efforts, the effects of a landslide or earthquake, or the impacts of a spill on vegetation, recreation, water quality, or the Tribe's water intake. <u>See</u> CRST MSJ at 16-18. It also points to the Missouri River Mainstem Reservoir System Master Water Control Manual, which explains that Congress "authorized the System to be operated for the purposes of flood control, navigation, irrigation, power, water supply, water quality control, recreation, and fish and wildlife." <u>Missouri River Mainstem Reservoir System Master Water Control Manual</u>, U.S. Army Corps of Engineers (March 2006), § 1-02, http://www.nwd-mr.usace.army.mil/rcc/reports/mmanual/ MasterManual.pdf. Cheyenne River interprets the Manual to "make[] clear that the Corps lacks authority to approve an oil pipeline crossing of the Missouri River that could impair the beneficial consumptive uses of the river both present and future." CRST MSJ at 12; <u>see also</u> <u>id.</u> at 14 ("The Master Manual does not provide any authorization to the Corps to permit the use of the Mainstem System for oil pipeline rights-of-way when they place any of the authorized purposes at risk.").

As the Court explained in Section III.A.1.b, *supra*, however, considering the record as of July 25, 2016, when the Corps issued the Section 408 permit, it <u>had</u> taken a hard look at the risk of an oil spill and provided sufficient explanation to support its conclusion that such a risk was low.  The Corps' July 2016 determination that the Lake Oahe project's purposes would not be impaired by DAPL's construction and operation was therefore not arbitrary or capricious. Nothing in the Manual mandates a different result.

2.  *Injurious to Public Interest*

As to the second prong, the Corps must compare "[t]he benefits that reasonably may be expected to accrue from" a proposed alteration or use of the federal project "against its reasonably foreseeable detriments."  Engineering Circular 1165-2-216 ¶ 7.c.(4)(b)ii.  "If the potential detriments are found to outweigh the potential benefits, then it may be determined that the proposed alteration is injurious to the public interest."  <u>Id.</u>  In making that evaluation, the Corps may consider factors such as "conservation, economic development, historic properties, cultural resources, environmental impacts, water supply, water quality, flood hazards, floodplains, residual risk, induced damages, navigation, shore erosion or accretion, and recreation."  <u>Id.</u>

Cheyenne River raises two challenges to the Corps' determination that permitting DAPL to cross under Lake Oahe would not be injurious to the public interest.  First, the Tribe contends that it was improper for the Corps to consider "benefits to Dakota Access, the oil industry, and the economy generally" in assessing the public interest.  <u>See</u> CRST MSJ at 20-21 (citing EA at 105-06 (stating that DAPL's construction "would contribute more than $1 billion in direct spending" on materials and "$195 million in easement payments to landowners" with property crossed by the pipeline, and "would provide a benefit to local merchants and vendors" and

"temporary employment opportunities to the local workforce")).  This argument fares poorly.

The Corps' Policy and Procedural Guidance on Section 408 expressly permits consideration of

"economic development" in determining a proposed project's benefits.  <u>See</u> Engineering Circular

1165-2-216 ¶ 7.c.(4)(b)ii.

Second, the Tribe argues that the Corps did not explain how it "weighed the risks against

the claimed benefit," CRST Reply at 17, failed to consider the consequences from an oil spill,

<u>see</u> CRST MSJ at 18-19, did not adequately consider landslide risk or the impacts of a spill on

vegetation or recreation, <u>id.</u> at 16-17, and never considered effects on Cheyenne River or its

water intake.  <u>See</u> CRST Reply at 18-19.  This argument gains more traction because, as the

Court previously explained, <u>see</u> Sections III.A.1.c, III.A.2.b., *supra*, the Corps' assessment of the

impacts of a spill, although largely adequate, fell short as to fishing rights, hunting rights, and

environmental justice.  Because the Corps must submit its assessment of those impacts upon

remand, <u>see</u> Section III.D, *supra*, the Court will await receipt of such information to decide

whether the agency's conclusion that DAPL will not be injurious to the public interest was

arbitrary and capricious.

### 3. *Other Arguments*

Finally, in addition to its arguments regarding the impairment and public-injury prongs,

Cheyenne River asserts that the Corps' spill-risk and spill-impact conclusions were cursory, that

the permit should not have been granted absent an EIS, and that the Corps did not satisfy its

obligation to independently review the EA.  <u>See</u> CRST MSJ at 2, 10, 18-21.  The Court has

already addressed the first two of these points.  <u>See</u> Sections III.A.1, III.A.2, III.B.1, *supra*.  As

to the third, it is not persuaded.

CEQ regulations permit an applicant — here, Dakota Access — to prepare the EA as long as the agency independently evaluates the information submitted, "make[s] its own evaluation of the environmental issues[,] and take[s] responsibility for the scope and content of the environmental assessment," including its accuracy. See 40 C.F.R. § 1506.5(a)-(b). Here, the EA states that it was "prepared in accordance with" those regulations, and that the Corps "independently evaluated and verified the information and analysis undertaken in this EA and takes full responsibility for the scope and content contained herein." EA at 1. The record supports this assertion.

First, the Corps provided ample input to Dakota Access on the proper EA drafting procedure and on its substance. See ECF No. 183-3 (Email from Brent Cossette to Corps & Dakota Access Personnel, Mar. 5, 2015) (announcing start of "routine bi-weekly meetings to discuss the status of the Dakota Access Pipeline project") at 2; ECF No. 183-4 (Email from Brent Cossette to Monica Howard, Apr. 24, 2015) at 2 (advising Dakota Access that public and tribes had 30 days to submit comments, company had to address Corps' comments, Corps could not grant Section 408 permit absent certain geotech investigation, and Corps could not issue decision regarding historical properties absent concurrence of North Dakota State Historic Preservation Office); ECF No. 183-5 (Email from Brent Cossette, Sept. 18, 2015) (soliciting comments from twenty-two Corps employees on Draft EA and associated plans); ECF No. 183-12 (Email from Brent Cossette to Larry Janis, Corps, Recreation & Natural Resources Branch, May 6, 2016) (summarizing meeting with Dakota Access where Corps pushed company to use different spill-model data and disagreed with its assessment that potential impact to water intakes did not need to be in EA); ECF No. 183-11 (Email from Brent Cossette to Tom Sigauw & William Harlon, Dakota Access, May 11, 2016) (discussing need for sufficient information "to

ensure no negative impacts on irrigation and water supply"); ECF No. 212-2 (ProjNet: Environmental Review of DAPL) (record of 178 comments from Corps); ECF No. 209-16 at 147-56 (EA Comment Matrix) (spreadsheet of Corps' comments on Draft EA and Dakota Access's responses); Section 408 Decision Package at 23 (confirming Dakota Access satisfactorily addressed geotechnical comments from Corps reviewers); ECF No. 183-10 (Geotechnical Investigation Package) at 13-16.

To illustrate the meaningful back-and-forth engagement between the Corps and Dakota Access about the EA's content, the Court highlights one comment on the draft EA from the Corps and the exchange it sparked. In June 2015, a Corps official noted, "I did not see reference of a risk analysis for pipeline spills in the EA. Recommend inclusion of such analysis into the EA due to the size and scope of this transportation pipeline." ECF No. 183-6 at 24 (Comment 6139320). After Dakota Access supplied the spill model for Lake Oahe, the Corps asked the company to "include booming strategies and collection points for worst case scenario discharges" and "where [it] would gain access via water for response." Id. It also asked Dakota Access to show how spill volume and response times were calculated and to explain its plans for "cultural up front inspections/clearances at the control points." Id. at 25. Several more comments, document submissions by Dakota Access, and telephone calls between the company and the Corps followed. Id. at 25-26. The Corps only considered the initial comment in May 2016, nearly a year later, after Dakota Access agreed to insert the requested risk analysis into the EA and to adopt certain mitigation measures. Id. at 27.

Ultimately, seventeen different Corps officers are listed as having been involved in the EA's review, see EA at 126, and a range of Corps personnel reviewed the Section 408 application and certified that DAPL would not be injurious to Lake Oahe or the public interest.

See Section 408 Decision Package at 2, 5.  On this record, the Court concludes that the Corps

met its responsibility to make its own evaluation of the environmental issues and take

responsibility for the scope and content of the EA.  See City of Roseville v. Norton, 219 F. Supp.

2d 130, 165-66 (D.D.C. 2002) (holding agency satisfied 40 C.F.R. § 1506.5(a)-(b) where record

showed contractor worked with agency employees on EA and included "extensive copies of e-

mail communications between the agency staff discussing their comments on, and edits of, the

EA").

    B.  Easement Decision

Cheyenne River's next claim is that the Corps' issuance of the easement was arbitrary,

capricious, and inconsistent with the requirements of the Mineral Leasing Act, 30 U.S.C. § 185.

This stance makes minimal headway.

The Mineral Leasing Act was enacted by Congress in 1920 "to promote wise

development of [the nation's] natural resources and to obtain for the public a reasonable financial

return on assets that 'belong' to the public."  Devon Energy Corp. v. Kempthorne, 551 F.3d

1030, 1033 (D. C. Cir. 2008) (quoting California Co. v. Udall, 296 F.2d 384, 388 (D.C. Cir.

1961)).  It permits "appropriate agency head[s]" to grant "[r]ights-of-way through any Federal

lands . . . for pipeline purposes for the transportation of oil . . . to any applicant possessing" the

requisite statutory qualifications.  See 30 U.S.C. § 185(a).

The Tribe challenges the Corps' decision to grant Dakota Access a right-of-way to cross

Lake Oahe on the basis of three provisions in the MLA: (1) The Corps did not adequately

analyze whether the easement would be "inconsistent with the purposes of the reservation," as

required by 30 U.S.C. § 185(b)(1), and instead simply cross-referenced its Section 408 approval;

(2) The Corps failed to impose stipulations protecting the "interests of individuals living in the

general area . . . who rely on the fish, wildlife, and biotic resources of the area for subsistence purposes," as required by 30 U.S.C. § 185(h)(2); and (3) The Corps did not impose sufficient liability on Dakota Access, as required by 30 U.S.C. § 185(x).  <u>See</u> CRST MSJ at 37-44; CRST Reply at 20-22.  Each is discussed separately.

### 1. *Section 185(b)(1)*

Section 185(b)(1) of the MLA provides that "[a] right-of-way through a Federal reservation" — *i.e.*, federally owned or managed land, rather than a federal Indian reservation — "shall not be granted if the Secretary or agency head determines that it would be inconsistent with the purposes of the reservation."  30 U.S.C. § 185(b)(1); <u>see also</u> Corps CRST MSJ at 22 n.11.  Here, the reservation is the Lake Oahe project, and its "Congressionally-authorized purposes . . . include flood control, navigation, hydropower, recreation, water supply, and water quality."  Henderson Memo at 3.

The Tribe contends that the Corps ran afoul of Section 185(b)(1) because it did not "articulate any rationale" for its conclusion that DAPL was consistent with the purposes of the Lake Oahe project and improperly relied on the documents and analysis from its Section 408 determination in undertaking its easement decision.  <u>See</u> CRST MSJ at 40; Henderson Memo at 3 (explaining Corps' easement decision was "supported by the Final EA . . . and various memoranda supporting the District Commander's Section 408 approval").  But Cheyenne River cites no authority for the proposition that the Corps could not rely on its Section 408 decision in making its easement decision, and the Court can think of no reason why that would be so.  While the approval procedures set out in the RHA and the MLA are not identical, <u>compare</u> 33 U.S.C. § 408 <u>with</u> 30 U.S.C. § 185 — a point acknowledged by the Corps in its briefing on Dakota Access's now-dismissed cross-claim, <u>see</u> ECF No. 73 at 15-16, 21-22 — the inquiry concerning

project impairment, injury to the public interest, and inconsistency with project purpose are certainly related and largely overlapping.

Cheyenne River also contends that any pipeline for which a right-of-way is sought that has the potential to have a high negative impact necessarily "is not 'consistent' with the authorized purposes" and cannot satisfy Section 185(b)(1). See CRST MSJ at 40. In other words, the MLA requires the Corps to reject every right-of-way application that poses any level of risk of serious harm because such risk renders the right-of-way inconsistent with the purposes of the federal project. The Court cannot accept this view, which is in direct tension with the text and purpose of the statute. The MLA expressly contemplates that agencies may grant rights-of-way through federal lands for pipelines used to transport "oil, natural gas, synthetic liquid or gaseous fuels, or any refined product produced therefrom." 30 U.S.C. § 185(a). Such pipelines necessarily involve some level of risk; no reasonable engineer, scientist, or agency official could assert that a pipeline project — or any construction or transportation project, for that matter — involves absolutely zero risk. It would be nonsensical for Congress to have created a mechanism for granting rights-of-way for oil pipelines if that mechanism could never be used.

Last, in arguing that DAPL specifically is inconsistent with the purposes of the Lake Oahe project, the Tribe relies on its already-discussed position that the Corps failed to consider impacts on most of the Lake's authorized purposes and underestimated the risks posed by the pipeline. Because the Corps did not adequately consider certain effects of a spill should one occur and because it did not, as of February 8, 2017, when it granted the easement, demonstrate that it had considered the degree to which DAPL's effects are likely to be highly controversial, see Sections III.A.1.c, III.A.2.b, *supra*, the Court will reserve its ultimate conclusion on this issue until the Corps submits its additional analysis after remand.

2. *Section 185(h)(2)*

The Tribe next turns to Section 185(h)(2), which instructs that the agency in charge of granting the right-of-way

> shall issue regulations or impose stipulations which shall include, but shall not be limited to: (A) requirements for restoration, revegetation, and curtailment of erosion of the surface of the land; (B) requirements to insure that activities in connection with the right-of-way or permit will not violate applicable air and water quality standards nor related facility siting standards established by or pursuant to law; (C) requirements designed to control or prevent (i) damage to the environment (including damage to fish and wildlife habitat), (ii) damage to public or private property, and (iii) hazards to public health and safety; and (D) requirements to protect the interests of individuals living in the general area of the right-of-way or permit who rely on the fish, wildlife, and biotic resources of the area for subsistence purposes.

30 U.S.C. § 185(h)(2). According to Cheyenne River, the Corps "ignore[d] the requirement to protect the 'interests of individuals living in the general area . . . who rely on the fish, wildlife, and biotic resources of the area for subsistence purposes'" because the EA does not address impacts of an oil spill on vegetation, recreational fishing, or land-based wildlife. See CRST MSJ at 42 (quoting 30 U.S.C. § 185(h)(2)(D)); CRST Reply at 21.

The Corps, however, imposed several stipulations on the easement granted to Dakota Access. See Easement, Exh. D (listing 36 special conditions). Those conditions relate to the construction, operation, and maintenance of the pipeline in order to minimize the risk of a spill and the effects from any spill that might occur. Id. For example, the Corps has required Dakota Access to perform certain girth-weld and pressure-level tests; use specific pipe and field-joint coatings; install mainline valves to be remotely controllable and equipped with automatic-shutdown capabilities; install adequate pressure sensors; implement particular mitigation measures to avoid impacts on soils; protect against overpressure in the pipeline; install a cathodic

78

protection system within six months; perform interference and corrosion surveys within six months of DAPL's entry into operation; patrol the pipeline at least twenty-six times per year; undertake specific training exercises; establish a storage facility for spill-response equipment; keep records of spill-response plans; and adopt all mitigation measures set out in the EA. Id.

By aiming to reduce the likelihood of an oil spill and to mitigate the impacts of a spill should one occur, these requirements clearly constitute "requirements designed to control or prevent . . . damage to the environment (including damage to fish and wildlife habitat)" and "to protect the interests of individuals living in the general area . . . who rely on the fish, wildlife, and biotic resources of the area for subsistence purposes." 30 U.S.C. § 185(h)(2)(C)(i), (D). The Corps thus satisfied its responsibilities under 30 U.S.C. § 185(h)(2).

### 3. Section 185(x)

Finally, the Tribe takes issue with the liability provisions set out in the easement. The easement provides that Dakota Access "shall be strictly liable to the United States for damage or injury which may arise from or be incident to" its activities under the easement, and it limits strict-liability damages to $10 million per incident. See Easement, ¶ 12(a), (b). Liability for damages in excess of $10 million is to be determined according to "ordinary rules of negligence." Id., ¶ 12(b). The easement also contemplates liability to third parties — e.g., Standing Rock and Cheyenne River. It states: "The Grantee does hereby accept liability, if any, imposed by Federal and state statutes to third parties for injuries incurred in connection with the use and occupancy of the pipeline right-of-way." Id., ¶ 12(c). Cheyenne River contends that these liability provisions are "an abdication of [the Corps'] fiduciary responsibility to protect the resources it pervasively regulates and controls," CRST MSJ at 44, and inconsistent with the requirements of 30 U.S.C. § 185(x). See CRST Reply at 22.

Setting aside the fiduciary-duty question, which the Court deals with in Section IV.C, *infra*, the Tribe is mistaken in believing that the Corps has run afoul of 30 U.S.C. § 185(x). That provision permits the Corps to "impose stipulations specifying the extent to which holders of rights-of-way and permits under [the MLA] shall be liable to the United States for damage or injury incurred by the United States in connection with the right-of-way or permit." 30 U.S.C. § 185(x)(1). It further permits the Corps to "impose a standard of strict liability" and requires that if it does so, it must "include a maximum limitation on damages commensurate with the foreseeable risks or hazards presented." Id. § 185(x)(2), (4).

The Corps has complied with these requirements. Although the Tribe asserts that "Dakota Access'[s] statistics on the cost of cleanup of oil spills in the Environmental Justice Considerations Memo to the Corps demonstrates that $10 million will not begin to cover the cost of a cleanup," CRST Reply at 22 (citing ECF No. 203-1, Exh. BBB (Incident Rate Documents) at 3), that memo demonstrates just the opposite. It includes a table of PHMSA pipeline incidents between 1996 and 2015 in terms of number, fatalities, injuries, total cost in current-year dollars, barrels spilled, and net barrels lost. Between 1996 and 2015, there were 1,191 incidents with a total cost of $2,640,408,583, making the average cost per incident $2,216,968 — *i.e.*, far less than $10 million. The $10 million strict-liability-per-incident figure, then, is certainly commensurate with the foreseeable risks or hazards presented by an oil pipeline running under Lake Oahe.

C.  Trust Responsibilities

Cheyenne River's next claim is virtually identical to one pursued by Standing Rock: the Corps' issuance of the Section 408 permit and the easement violated its trust responsibility to protect the Tribe's treaty rights. Cheyenne River contends that several sources give rise to such

a fiduciary obligation: the 1851 and 1868 Fort Laramie Treaties; the Oahe Taking Act, Pub. L. 83-776, 68 Stat. 1191-1193 (1954); Winters v. United States, 207 U.S. 564 (1908); the Master Water Control Manual, § 7-01.1 (explaining one of four objectives behind development of Missouri River Mainstem Reservoir System Water Control Plan was "to fulfill the Corps' responsibilities to Federally recognized Tribes"); the Corps' "pervasive[] and exclusive control over the Missouri River . . . and the entire project area"; 25 U.S.C. § 1632(a)(5) ("The Congress hereby finds and declares that . . . it is in the interest of the United States, and it is the policy of the United States, that all Indian communities and Indian homes, new and existing, be provided with safe and adequate water supply systems and sanitary sewage waste disposal systems as soon as possible."); and 30 U.S.C. § 185(x)(1) (permitting federal agencies to impose stipulations specifying permit holder's liability to United States for damage or injury incurred in connection with permit). See CRST MSJ at 5, 31-33, 35. None of these sources, however, establishes specific fiduciary or other duties. Cheyenne River's breach-of-trust cause of action thus meets the same fate as Standing Rock's. See Section III.B.2., *supra*.

D. Consultation

Last, Cheyenne River argues that the Corps violated various duties when it granted the Section 408 permit and easement absent the requisite pre-decisional tribal consultation. See CRST MSJ at 22-30. Whereas Standing Rock — joined by Cheyenne River — brought a failure-to-consult claim in its preliminary-injunction motion under Section 106 of the National Historic Preservation Act, which requires a federal agency to consult with Indian tribes that attach cultural or religious significance to property affected by the agency's "undertakings," Standing Rock I, 205 F. Supp. 3d at 7-8, Cheyenne River here takes a different tack. Instead of

relying on the NHPA, it invokes Department of Defense Instruction 4710.02 and NEPA's implementing regulations.

The Defense Instruction sets out "procedures for DoD interactions with federally-recognized tribes" and requires all organizational entities in the Department — *e.g.*, the Corps — to "involve tribal governments early in the planning process for proposed actions that may have the potential to affect protected tribal rights, land, or resources." Department of Defense Instruction 4710.02 (2006), §§ 1, 6.6, http://www.dtic.mil/whs/directives/corres/pdf/471002p.pdf. "Early involvement," the Instruction explains, "means that a tribal government is given an opportunity to comment on a proposed action in time for the tribal government to provide meaningful comments that may affect the decision." Id. § 6.6. If an action "ha[s] the potential to <u>significantly</u> affect protected tribal resources, tribal rights, or Indian lands," the agency is to "[c]onsult with federally-recognized tribal governments on a government-to-government basis." Id. § 5.3.4 (emphasis added); <u>see also</u> id. §§ 6.1-6.5. Similarly, NEPA's implementing regulations require agencies to "consult[] early with appropriate State and local agencies and Indian tribes and with interested private persons and organizations" when actions are planned by private applicants. <u>See</u> 40 C.F.R. § 1501.2(d)(2). Based on the record of communication between the Corps and Cheyenne River in the lead-up to the EA's publication in July 2016, the Court concludes that the Corps did endeavor to consult early with the Tribe and gave it the opportunity to offer meaningful comments on the proposed crossing at Lake Oahe. It thus need not address the Corps' alternative contention that the DoD Instruction and NEPA's implementing regulations do not impose binding consultation duties. <u>See</u> Corps CRST MSJ at 39.

The Corps first contacted Cheyenne River about DAPL in October 2014, when it sent a letter with information about proposed soil borings and maps illustrating portions of the pipeline and nearby cultural sites. See ECF No. 185-1, Exh. MM (Form Letter from Corps, Oct. 24, 2014); ECF No. 185-1, Exh. NN (Letter from Steve Vance to Richard Harnois, Aug. 17, 2015) (acknowledging receipt of Corps' October 2014 letter); EA at 80. The letter invited "comments or concerns regarding this project" within 30 days, see Form Letter, but Cheyenne River did not respond until March 23, 2015, when the Corps' Regulatory Project Manager in the South Dakota Regulatory Office spoke with Steve Vance, Cheyenne River's Tribal Historic Preservation Officer, by phone. See Standing Rock II, 2017 WL 908538, at *5; ECF No. 218-2 at 154 (Email from Jeff Breckenridge, Regulatory Project Manager, South Dakota Regulatory Office, to Corps Personnel, Mar. 23, 2015). Vance stressed the Tribe's request for formal consultation, involvement in the NHPA Section 106 process, and ability "to review any EA's/NEPA documentation for the project." Id. Several months then passed, however, without any comments submitted from Cheyenne River.

Richard Harnois, the Corps' Senior Field Archaeologist, spoke with Vance on August 17, 2015, to "express[ his] concerns that [the Corps] had gotten no comments back yet." ECF No. 183-15 (Richard Harnois Notes, Aug. 17, 2015). Vance explained that he had been "promoting a coordinated response from the tribes through SRST," but Harnois encouraged the Tribes to respond individually, as "the way [the Corps] see[s] it, each response is like a vote — the more the better." Id. Vance committed to submitting a letter and requested an onsite meeting with "all of the interested tribal parties to inspect the crossing alignment and initiate a discussion of the pipeline as a whole." Id. His letter, sent that same day, acknowledged the "opportunity to comment [on] the proposed Dakota Access Pipeline . . . project," asked whether Standing Rock's

previously submitted questions and comments had been addressed, and expressed concerns about, *inter alia*, impacts of DAPL on birds, fish, and wildlife, as well as pipeline corrosion, faulty welding, and oil spills.  ECF No. 183-14 (Letter from Steve Vance to Richard Harnois, Aug. 17, 2015).  Julie Price, Manager of the Corps' Cultural Resource Program, later followed up with Vance to thank him for his letter and inform him that a copy of the Draft EA would be "distributed for Tribal . . . comments in mid-December, 2015."  ECF No. 183-17 (Letter from Julie Price, Manager, Cultural Resource Program, Corps, to Steve Vance, Nov. 19, 2015).

Around the same time Harnois was reaching out to Vance, Col. John Henderson, the Corps' Omaha District Commander, sent a letter to Harold Frazier, Cheyenne River's Chairman.  See ECF No. 218-2 at 14-16 (Letter from John Henderson to Harold Frazier, Sept. 3, 2015).  Henderson described the DAPL project and explained that the purpose of his letter was "to initiate Section 106 consultation and review, determine [Frazier's] interest in consulting, . . . and to gather information that will assist the Corps in identifying historic properties."  Id. at 14.  He also noted that DAPL was "currently working to obtain the necessary easements for crossing federal lands, as well as" authorization under Section 408 of the RHA, and advised Frazier that "consultation on the project has also been initiated as part of the Corps Section 408 review process for the areas located on Corps Project Lands."  Id. at 16.  Henderson requested "engagement and/or comments by September 30, 2015," and supplied the contact information for three different Corps officials.  Id.

Martha Chieply, the Corps' Regulatory Chief for the Omaha District, sent a follow-up letter to Frazier at the end of November 2015 to notify him of an NHPA Section 106 consultation meeting that was to be held on December 8-9, 2015, in Sioux Falls, South Dakota.  See ECF No. 183-18 (Letter from Martha Chieply to Harold Frazier, Nov. 20, 2015).  She also emphasized the

Corps' interest in hearing from the Tribe about "any culturally significant concerns that may affect" areas within the Corps' jurisdiction along the pipeline's route.  Id.

When the Corps released the Draft EA on December 8, 2015, it sent a notification to the Tribe and requested comments by January 8, 2016.  See ECF No. 185-1, Exh. VV (Declaration of Jonathan Shelman, Environmental Resource Specialist, Corps, Aug. 18, 2016), ¶ 8; EA at 1.

Shortly thereafter, Vance attended the December consultation meeting, at which five Corps officials and Dakota Access personnel were present.  See ECF No. 183-25 (Dakota Access Tribal Consultation Meeting Roster, Dec. 8, 2015); ECF No. 218-1 at 108 (DAPL Tribal Consultation Meeting Agenda); ECF No. 218-1 at 111 (Dakota Access Tribal Consultation Meeting, Dec. 8, 2015).  According to the Corps' "[s]ummary of meeting results," Dakota Access agreed to provide the Tribes with inadvertent-discovery plan drafts and "information related to spill response plans" by December 18, and the Tribes agreed to review the data within 30 days.  See ECF No. 218-1 at 112 (Email from Joel Ames, Tribal Liaison, Corps, to Corps Personnel, Dec. 10, 2015).

Vance then attended two more meetings — one on January 25, 2016, and one on February 18-19, 2016, held at Ponca Tribal Headquarters.  See ECF No. 185-1, Exh. DD (Declaration of Martha Chieply, Aug. 18, 2016), ¶¶ 21-22.  Cheyenne River maintains that "[t]he January and February 2016 meetings were . . . Section 106 meetings only," CRST Reply at 41, but the agenda for the February meeting lists a "Section 408 and Draft EA Update" to be given by "Brent Cossette, Omaha 408 Coordinator."  ECF No. 218-2 at 1 (DAPL Tribal Consultation Agenda, Feb. 18-19, 2016).  A transcript from that meeting confirms that the Corps' role under Section 408 and concerns relating to that permit were discussed.  See ECF No. 143-1 (Transcript of DAPL Meeting, Feb. 18-19, 2016) at 1, 4.  Vance also used that meeting to communicate to

the Corps the Tribe's preference that the agency undertake an EIS rather than an EA, see ECF No. 183-26 (Tribal Consultation Meeting Notes, Feb. 18-19, 2016), and its concerns about DAPL's impact on water quality, fish, and birds. See Transcript of DAPL Meeting at 3-4.

After that meeting, Chieply and two other Corps personnel "agreed to meet again" with Standing Rock and Cheyenne Rock together, as Vance and Standing Rock's Tribal Archaeologist "wanted to discuss specific cultural resource issues of importance to their Tribes." Chieply Decl, ¶ 24. As a result of concerns Standing Rock expressed at that meeting regarding certain tribal cultural resources, including burial sites, at the James River crossing, the Corps successfully urged Dakota Access to move the pipeline's route to avoid them. Id.

In addition to those meetings, the Corps vainly tried for several months to contact and meet with Chairman Frazier. In response to a voicemail Frazier left for Joel Ames, the Corps' Tribal Liaison, on February 8, Ames left several phone messages with Frazier's secretary, called his cell phone, sent multiple emails, and even asked Vance and the Tribe's Vice Chairman for help, all to no avail. See ECF No. 183-22 (Emails from Joel Ames to Harold Frazier, Feb. 22 – Mar. 7, 2016) (listing five emails from Corps to Frazier requesting phone call); ECF No. 185-1, Exh. EE (Declaration of Joel Ames, Aug. 18, 2016), ¶¶ 23-24 (describing repeated attempts to return Frazier's Feb. 8, 2016, voicemail), ¶ 26 (explaining how, in response to Vance's request that the Corps consult with Cheyenne River, he told Vance of his efforts to contact Frazier, and Vance "agreed to help make it happen"); ECF No. 218-1 at 292 (Emails between Julie Price and Larry Janis, Mar. 3, 2016) (discussing Price's communications with Vance and Frazier's secretary to arrange meeting with Frazier); ECF No. 185-1, Exh. QQ (Email from Joel Ames to Corps Personnel, May 9, 2016) (stating Ames had recently met Cheyenne River's Vice Chairman and communicated that he was trying to reach Chairman Frazier to arrange meeting).

On May 6, Henderson sent an email to Frazier explaining that the Corps had "been unsuccessful in identifying any potential meeting dates" with the Tribe and expressing his desire "to meet to discuss not only the DAPL project, but any other topics you may want to discuss." ECF No. 183-21 (Letter from John Henderson to Harold Frazier, May 6, 2016).

Vance sent two letters to the Corps in May that articulated concerns about DAPL's impact on the Tribe's historic sites, expressed frustrations with the lack of consultation to date, and repeated Standing Rock's comments that the draft EA was "insufficient for oil pipelines" and an EIS should be completed. See ECF No. 185-1, Exh. II (Letter from Steve Vance to Richard Harnois, May 2, 2016); ECF No. 183-19 (Letter from Steve Vance to John Henderson, May 19, 2016). Frazier, however, did not respond to the Corps' repeated outreach efforts until June, when he sent a letter stating that it had not initiated the requisite consultation and that the draft EA insufficiently analyzed DAPL's impact on the Tribe's cultural resources and historic sites and did not contain "proper environmental analysis." ECF No. 183-20 (Letter from Harold Frazier, June 3, 2016). The Corps responded to these letters with "recent Question and Answer summar[ies]" from recent consultation meetings that addressed, *inter alia*, actions the Corps was considering regarding DAPL, its expected decisionmaking timeline, and the impact of HDD on cultural resources. See ECF No. 183-23 (Letter from Martha Chieply to Steve Vance, June 13, 2016); ECF No. 185-1, Exh. JJ (Letter from John Henderson to Harold Frazier, June 22, 2016).

When the Corps published the EA in July 2016, it included an appendix with the various comments received in response to the public notice of the Draft EA. See ECF No. 172-4 (Appendix J) at 38-58. No comments from Cheyenne River appear in the appendix, and the EA does not list Cheyenne River as a consulting party on the EA. See EA at 111-14 (list of "all individuals and agencies consulted during preparation of the EA"). On this point, the Court must

briefly digress from its review of the communication between the Corps and the Tribe. Cheyenne River protests its exclusion from Appendix J "even though the Corps received comments from the Tribe" as evidence of "the length to which the Corps went to exclude the Tribe from its analysis." CRST MSJ at 29. Rather than responding, as Dakota Access did, that the Tribe did not submit any timely comments to the Draft EA, but rather sent letters much later, see DA CRST MSJ at 2, 5, the Corps puzzlingly accuses Cheyenne River of misstating the facts. "Appendix J explicitly states Cheyenne River provided comments and also states those comments," it asserts. See Corps CRST MSJ at 35 n.18. But the Corps cites to comments from Northern Cheyenne, an entirely different tribe. See CRST Reply at 43 n.19. The Court trusts this error is simply a clerical oversight, albeit one with unfortunate connotations regarding how distinct Tribes may be perceived.

Appendix J confusion aside, the record clearly indicates that the Corps solicited Cheyenne River's views on the DAPL project well before publishing the EA and issuing the Section 408 permit and easement, and communicated regularly with Vance and Frazier via phone calls, letters, and in-person meetings. These actions were sufficient to satisfy the early-comment and consultation goals articulated in the Defense Department Instruction and NEPA's implementing regulations.

Cheyenne River's protests to the contrary do not persuade the Court otherwise. First, the cases on which the Tribe relies to demand a more robust consultation process rest on federal statutes governing the Bureau of Indian Affairs' consultation responsibilities and the NHPA's Section 106 substantive-consultation requirements, not the DoD Instruction and NEPA. See CRST MSJ at 23-24, 27-28 (citing Wyoming v. Dep't of Interior, 136 F. Supp. 3d 1317, 1345-46 (D. Wyo. 2015), vacated and remanded sub nom. Wyoming v. Sierra Club, No. 15-8126, 2016

WL 3853806 (10th Cir. July 13, 2016); Cheyenne River Sioux Tribe v. Jewell, 205 F. Supp. 3d 1052, 1057-58 (D.S.D. 2016); Quechan Tribe of Fort Yuma Indian Reservation v. Dep't of Interior, 755 F. Supp. 2d 1104 (S.D. Cal. 2010); Yankton Sioux Tribe v. Kempthorne, 442 F. Supp. 2d 774, 784 (D.S.D. 2006)).

The Tribe also argues that many of the contacts from the Corps were focused on the protection of cultural, religious, and historic sites implicated by Section 106 of NHPA and thus cannot "constitute consultation on the impact of DAPL on trust and treaty resources under NEPA." CRST MSJ at 30; see also CRST Reply at 40. The Corps, however, repeatedly invited the Tribe to share comments on the project that went beyond Section 106 concerns. And NHPA's implementing regulations encourage federal agencies "to coordinate compliance" with Section 106 and NEPA. See 36 C.F.R. § 800.8(a)(1); see also id. ("Agencies should consider their section 106 responsibilities as early as possible in the NEPA process, and plan their public participation, analysis, and review in such a way that they can meet the purposes and requirements of both statutes in a timely and efficient manner."); Apache Survival Coal. v. United States, 21 F.3d 895, 906 (9th Cir. 1994) ("NHPA's implementing regulations contemplate that NEPA and NHPA review should be integrated closely.").

Cheyenne River further maintains that the Corps made its decision on the Section 408 permit long before the EA was published, thus truncating the time period for meaningful comment. See CRST MSJ at 24-25. Its support for that proposition is wanting. The Tribe relies, for example, on a December 10, 2015, memorandum from the Chief of the Corps' Geotechnical Engineering and Sciences Branch that it characterizes as "sign[ing] off" on the permit, and points to the lack of comments from the Water Control and Water Quality Branch on the draft EA and the absence of a "Record of Decision for the Recreation and Natural Resource

Branch."  Id. at 24-25.  The cited memo, however, simply explains that the thirteen "geotechnical comments . . . generated during the technical review" had been "satisfactorily addressed by the Engineer-of-Record, Dakota Access LLC and GeoEngineers" and so "were closed out."  ECF No. 209-10 at 73.  In direct conflict with the Tribe's early-decision claim, it states: "The comments herein pertain only to the geotechnical and flowable easement issues related [to] HDD and Geotechnical investigations in the floodway and do not constitute USACE approval of any permits that may be required."  Id. (emphasis added).  The Water Quality Branch, moreover, did review the Lake Oahe crossing.  See Section 408 Decision Package at 1.

The Tribe last argues that it could not have been adequately consulted prior to the permitting decisions because the Corps did not provide it with the Scoping Comments in Appendix J or the environmental-justice-considerations memo until December 2016, and it did not release the Spill and Analysis and Facility Response Plans to the Tribe's experts until February 2017.  See CRST MSJ at 28; CRST Reply at 40.  As the Court has previously explained, however, some of those documents were appropriately withheld from public disclosure.  Standing Rock III, 2017 WL 1316918, at *5-6.  More important, Cheyenne River does not explain how lacking access to those documents hindered its ability to meaningfully comment and consult on the EA when it was given access to the draft several months before the final version was published and offered repeated access to Corps personnel.

\* \* \*

In sum, then, the Court reaches the same decision on Cheyenne River's claims as it did on Standing Rock's.  Aside from the discrete issues that will be the subject of remand, the Court concludes that the Corps complied with its statutory responsibilities.  In addition, it will similarly

permit Cheyenne River to participate in the briefing on vacatur pending remand, as set forth in Section III.D, *supra*.

**V.    Conclusion**

For the foregoing reasons, the Court will grant in part and deny in part Standing Rock's Motion for Partial Summary Judgment and grant in part and deny in part the Corps' corresponding Cross-Motion for Partial Summary Judgment. The Court also will deny in part Cheyenne River's Motion for Partial Summary Judgment and defer a decision on those claims that may be affected by the remand ordered in response to Standing Rock's Motion. It accordingly grants in part the corresponding Cross-Motions for Partial Summary Judgment from the Corps and Dakota Access. A contemporaneous Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: June 14, 2017