# IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| and ) | |
| ) | |
| CHEYENNE RIVER SIOUX TRIBE, ) | |
| ) | |
| Plaintiff-Intervenor, ) | |
| ) | |
| v. ) | Case No. 1:16-cv-01534 (JEB) |
| ) | (consolidated with Cases No. |
| UNITED STATES ARMY CORPS OF ) | 1:16-cv-01796 & 1:17-cv-00267) |
| ENGINEERS, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| DAKOTA ACCESS, LLC, ) | |
| ) | |
| Defendant-Intervenor. ) | |

## UNITED STATES ARMY CORPS OF ENGINEERS' BRIEF REGARDING REMEDY

## I.      INTRODUCTION

Before the Court is the question of whether two United States Army Corps of Engineers' ("Corps") authorizations to construct a portion of the Dakota Access Pipeline under Lake Oahe should be vacated during remand on three discrete issues. Vacatur is unnecessary and inappropriate under both prongs of the controlling D.C. Circuit test, set out in *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146 (D.C. Cir. 1993).

- First, there is a "serious possibility" that the Corps will reach the same conclusion after fully considering the remand issues because the pipeline segment constructed approximately 100 feet under Lake Oahe is highly unlikely to spill into the lake and therefore does not significantly impact the environment. *Id.* at 150.

- Second, any vacatur of the permit decision here would impose extremely disruptive consequences. *Id.* These disruptions could include, among other things, creating additional construction-related impacts, or causing oil to be transported by rail—a mode of transportation that has its own environmental risks.

Without diminishing the concerns expressed in this Court's opinion of June 14 or conceding as to the merits of the completeness of the Corps' analysis, the United States respectfully submits that the Corps' environmental review in this case was comprehensive, with many opportunities for stakeholder involvement. After emergency injunctive relief was denied, the project was constructed and is now operational. The Corps has been found to have "largely complied with NEPA"—with only three discrete deficiencies identified by the Court. The Corps is actively evaluating the issues remanded to it by the Court and expects to complete its review of those issues by late December 2017. Vacatur on remand would be inconsistent with this circuit's precedent and would result in undue hardship and additional risks and concerns for the federal government, the pipeline owner, and the public. The Corps therefore respectfully

submits that the Court should allow its decisions relating to the already-constructed Lake Oahe

pipeline segment to remain in place while the Corps conducts its evaluations on remand.

## II.     BACKGROUND

The Standing Rock Sioux and Cheyenne River Sioux Tribes pursued several rounds of

emergency motions between August 4, 2016 and January 18, 2017.  Minute Order (Sept. 6,

2016); *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 205 F. Supp. 3d 4 (D.D.C.

2016); Minute Order (Feb. 13, 2017); *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,

No. 16-1534 (JEB), 2017 U.S. Dist. LEXIS 31967 (D.D.C. Mar. 7, 2017).  Those unsuccessful

emergency motions challenged "three authorizations" necessary for Dakota Access to construct a

portion of the Dakota Access pipeline under Corps-managed lands at Lake Oahe, North Dakota.

*See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 2017 U.S. Dist. LEXIS 91297 at

*4-5, *11 (D.D.C. June 14, 2017) ("*Standing Rock IV*").  The primary focus of those emergency

motions were alleged violations of the National Historic Preservation Act ("NHPA") and the

Religious Freedom Restoration Act ("RFRA").  This Court denied each of Plaintiffs' emergency

motions.  *Id.* at *4-5.

The Corps' February 8, 2017 decision granting Dakota Access a Mineral Leasing Act

easement under Federally-owned lands at Lake Oahe was based, in part, upon the Corps'

conclusion that the easement would not significantly impact the environment.  *See* Mem. for

Record (Feb. 7, 2017) (USACE_ESMT00100).  "Dakota Access, by late March, completed

construction of this last segment beneath Lake Oahe and began placing oil in the pipeline."

*Standing Rock IV*, 2017 U.S. Dist. LEXIS 91297, at *27.

In February, 2017, Standing Rock, Cheyenne River, Dakota Access, and the Corps filed

cross-motions for partial summary judgment on a large number of claims relating to the National

Environmental Policy Act ("NEPA"), the Clean Water Act, the Mineral Leasing Act, tribal rights, and environmental justice.  As discussed in detail below, on June 14, 2017 the Court largely resolved the cross-motions for partial summary judgment in the Corps' favor.  The Court granted in part and denied in part the parties' cross-motions for partial summary judgment and remanded this matter to the Corps.  The Court's opinion identified several issues for the Corps to address on remand.  *Standing Rock IV*, 2017 U.S. Dist. LEXIS 91297, at *138.

### III.    STATUS OF REMAND

Since the Court's June 14, 2017 opinion, the Corps has actively engaged in developing a remand plan to further evaluate "the impacts of an oil spill on Standing Rock's fishing and hunting rights and on environmental justice" and "the degree to which the project's effects are likely to be highly controversial in light of critiques of [the Corps'] scientific methods and data." *Id.* at *100-01, *110.  Based upon currently-available information, the Corps states the following expectations regarding the remand process:

- The Corps expects to seek information from, at a minimum, Dakota Access, Standing Rock, Cheyenne River, the Yankton Sioux Tribe, and the Oglala Sioux Tribe, and may confer with other entities, such as federal agencies, as appropriate;

- The Corps expects to complete its independent review and analysis of the remand issues in approximately four to five months and prepare a written conclusion.

The Corps anticipates that the above process will conclude between late November and December 2017.

The Corps' expectation regarding the time necessary for its remand analysis is based on the Corps' best estimates, including the Corps' expectation that all sources outside the Corps provide requested information in a timely and responsive manner.  The Corps may also modify

this expected schedule, if necessary, based upon the information it receives.  Additional

information or analysis provided by Dakota Access or the Plaintiffs, or the Corps' review of that

information or analysis, may cause the Corps to either shorten or lengthen this expected review

period.[1]  The Corps will address any such timing issues with the Court as appropriate.

## IV.   ARGUMENT

### VACATUR SHOULD BE REJECTED UNDER
### THE D.C. CIRCUIT'S *ALLIED-SIGNAL* TEST

Under the D.C. Circuit's decision in *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*,

988 F.2d 146 (D.C. Cir. 1993), an "inadequately supported" agency decision "need not

necessarily be vacated" upon remand to the agency for further analysis.  *Id.* at 150.  *Allied-Signal*

imposes a two-factor test for determining whether an agency action should be vacated upon

remand.  The first factor looks to "the seriousness of the [agency action's] deficiencies" and

whether there is a "serious possibility that the [agency] will be able to substantiate its decision on

remand."  *Id.*  The second factor looks to the disruptive consequences of vacating the decision

while on remand.  *Id.*  Both *Allied-Signal* factors militate in favor of not vacating the Lake Oahe

authorizations during the remand process for at least two reasons: (1) there is a serious

possibility that the Corps will substantiate its original decisions on remand because, among other

---

[1]      To the extent that any party seeks an order controlling the nature of the Corps' analysis
on remand, such an order is beyond this Court's jurisdiction.  *See Fed. Power Comm'n v. Idaho
Power Co.*, 344 U.S. 17, 20 (1952) ("the function of the reviewing court ends when an error of
law is laid bare.  At that point the matter once more goes to the [agency] for reconsideration."
(citation omitted)); *N. Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852, 861 (D.C. Cir. 2012)
(remanding without vacatur and stating that "[w]hen a district court reverses agency action and
determines that the agency acted unlawfully, ordinarily the appropriate course is simply to
identify a legal error and then remand to the agency, because the role of the district court in such
situations is to act as an appellate tribunal." (citation omitted)); *Cty. of Los Angeles v. Shalala*,
192 F.3d 1005, 1011-12 (D.C. Cir. 1999) ("Not only was it unnecessary for the court to retain
jurisdiction to devise a specific remedy for the Secretary to follow, but it was error to do so."
(citation omitted)).

things, the portion of the Dakota Access Pipeline buried 100 feet under Lake Oahe poses a very

low spill risk; and (2) vacating permitting decisions after projects are fully constructed and

operational imposes significant disruptive consequences.

**A. There is a serious possibility that the Corps will be able to substantiate its July 25, 2016 and February 8, 2017 decisions on remand.**

**1. The deficiencies that the Court found in the Corps' analysis were not serious when compared with the issues on which the Court found in the Corps' favor.**

As the Court found, "the Corps' decision on July 25, 2016, and February 8, 2017, not to

issue an EIS largely complied with NEPA." *Standing Rock IV*, 2017 U.S. Dist. LEXIS 91297, at

*100. The Court rejected: (1) Standing Rock's claims that the Environmental Assessment

("EA") failed to consider the cumulative risk imposed by the pipeline, *id*. at *52-54; (2) a

substantial portion of Standing Rock's legal analysis of its treaty rights, *id*. at *54-58; (3)

Standing Rock's claims regarding the impact of construction activities on its treaty rights, *id*. at

*58-60; (4) Standing Rock's challenge to the Corps' alternatives analysis, *id*. at *66-71; (5)

Standing Rock's argument that the Corps' grant of the Lake Oahe easement arbitrarily and

capriciously reversed previous positions, *id*. at *83-90; (6) Standing Rock's and Cheyenne

River's legal analysis of applicable trust duties, *id*. at *90-96, *103-04, *123-24; (7) Standing

Rock's challenge to the Corps' Nationwide Permit 12 verification at Lake Oahe, *id*. at *96-100;

(8) Cheyenne River's claim that the Dakota Access Pipeline will impair the function of the Lake

Oahe project, *id*. at *104-08; (9) Cheyenne River's claim that "the Corps did not satisfy its

obligation to independently review the EA, *id*. at *110-14; (10) Cheyenne River's claims that the

Corps failed to satisfy Sections 185(h)(2) and 185(x) of the Mineral Leasing Act, *id*. at *118-23;

and (11) Cheyenne River's claim that the Corps failed to adequately consult with it, *id*. at *124-

38.  In sum, the Court rejected the central concerns and claims raised by Plaintiffs and largely

upheld the Corps' decisonmaking.[2]

Significantly, the Court concluded that "the EA reasonably gives the necessary content to

its top-line conclusion that the risk of a spill is low." *Standing Rock IV*, 2017 U.S. Dist. LEXIS

91297, at *46; *id*. at *45 (finding that the EA's "explanation of its choice of methodology" and

treatment of different factors relating to spill risk was "enough to give substance to the Corps'

conclusion that the risk of a spill is low" (citation omitted)).  While the Court found that there

were "substantial exceptions" to the Corps' compliance with NEPA, those exceptions do not

support vacatur on the basis that the Corps unreasonably concluded spill risk was low; moreover

"the risk of a spill was low and was further mitigated by the easement conditions."  *Id*. at *90

(citing Mem. from David Cooper, Chief Counsel, Corps, (Oct. 20, 2016) (ECF No. 117-24)).

The Court only remanded three issues to the Corps.  *Standing Rock IV,* 2017 U.S. Dist.

LEXIS 91297, at *138.  It concluded that "[w]ithout any acknowledgment of or attention to the

impact of [a potential oil spill] on the Tribe's fishing and hunting rights . . . the EA – in this

limited respect – was inadequate."  *Standing Rock IV*, 2017 U.S. Dist. LEXIS 91297 at *65-66.

Similarly, the Court faulted the Corps for failing to adequately consider the impact of a possible

oil spill on environmental justice, specifically the ½ mile area used by the Corps in this analysis.

*Id*. at *83.  The Court identified several critiques, which largely focused on the potential impact

of a low-possibility oil spill, raised in Plaintiffs' expert reports in requiring the Corps to further

consider "the degree to which the project's effects are likely to be highly controversial."  *Id.* at

---

[2]      The Court withheld judgment regarding "whether the agency's conclusion that DAPL will
not be injurious to the public interest was arbitrary and capricious."  *Id*. at *110.  And as discussed
at page 2, above, the Court previously denied Plaintiffs' motions for preliminary injunctions based
upon NHPA and RFRA claims.

*47-52.  Notably, the Court began its discussion of potential controversy raised by Plaintiffs'
reports by affirming that "the Court cannot agree with Standing Rock that the Corps did not
adequately consider or explain its conclusion that the risk of an oil spill is low."  *Id*. at *47.

Any inadequacy in the Corps' previous analysis of the remanded issues does not disturb
the Corps' foundational conclusion that the risk of a spill at Lake Oahe is very low.  Whether a
"serious deficiency" exists under *Allied-Signal* may be informed by risks a project imposes.  *See
Nat'l Parks Conservation Ass'n v. Jewell*, 62 F. Supp. 3d 7, 21 (D.D.C. 2014) ("Absent
consultation with the Service, there is no confirmation that the 2008 Rule would avoid
jeopardizing threatened or endangered species or adversely modifying critical habitat." (citation
omitted)).  Here, the low possibility of an oil spill means that there is little chance that Plaintiffs
will be harmed at any time, much less during the remand period, which is anticipated to be
completed by the end of the year.  This low risk, coupled with the Court's holding that the
Corps' analysis largely complied with NEPA, militates strongly in favor of finding that the
Corps' decision-making was not seriously deficient.

> **2.  There is a serious possibility that the Corps will be able to substantiate its July
> 25, 2016 and February 8, 2017 decisions on remand.**

As outlined above, the Corps will fully consider "the impacts of an oil spill on Standing
Rock's fishing and hunting rights and on environmental justice" and "the degree to which the
project's effects are likely to be highly controversial in light of critiques of its scientific methods
and data."  *Standing Rock IV*, 2017 U.S. Dist. LEXIS 91297, at *100-01.  But based upon the
substantial amount of analysis the Corps has already conducted regarding the Lake Oahe
crossing, *see id*. at *11-30, there is a serious possibility that, following this updated analysis, the
Corps will be able to substantiate its decisions for three reasons.  First, any deficiencies in the
Corps' original analysis do not detract from the foundational conclusion that the portion of the

Dakota Access pipeline that crosses approximately 100 feet under the bed of Lake Oahe is exceedingly unlikely to result in a spill into the lake. Second, the February 8, 2017 easement imposed conditions that address at least some of the issues raised in Plaintiffs' critiques of the Corps' July 25, 2017 decisions. Third, the low spill risk and relocation of Standing Rock's water intakes makes it unlikely that an oil spill will occur, much less impact Plaintiffs.

Because the Corps reasonably determined that the risk of an oil spill is low, there is a substantial possibility that upon remand the Corps will confirm its prior conclusions – that the portion of the Dakota Access pipeline installed under Lake Oahe imposes no significant risk related to the three remand issues identified by the Court.[3] For example, while the court noted that the EA considered "spill volumes from pipelines generally, rather than from pipelines with 16-inch or larger diameters, like DAPL," *id.* at *50. The Pipeline and Hazardous Materials Safety Administration's statistics do not suggest that large-diameter pipelines frequently experience large-volume spills. *See* Memo Re: DAPL – Route Comparison and Environmental Justice 6-7 (USACE_DAPL0073033, 73038-39) (Apr. 12, 2016) (citing support for the Corps' conclusion that any one-mile segment of pipeline is expected to experience a spill once every 474 years and that the vast majority of such spills discharge less than four barrels of oil). To the contrary, it is unchallenged that (1) "full diameter breaks are only likely to occur on small-diameter pipelines" and (2) the typical cause of leaks in large diameter pipelines – construction accidents – are unlikely to occur in a pipeline buried 100 feet under Lake Oahe's bed. *See* North

---

[3]     On remand the Corps will fully consider reports submitted by Plaintiffs between July 25, 2017 and February 8, 2017. These reports formed the basis for the Court's conclusion that "the agency did not demonstrate that it considered, as the CEQ regulations require, the degree to which the project's effects are likely to be highly controversial, despite being presented with evidence of scientific flaws." *Standing Rock IV*, 2017 U.S. Dist. LEXIS 91297, at *52. But the issues identified by the Court as requiring further consideration raise the serious possibility that the Corps may reconfirm that its Lake Oahe decisions impose no significant impacts.

Dakota Missouri River Crossing Spill Model Discussion 17 of 19, USACE_DAPL0074108 (Sept. 14, 2015) ECF No. 234-1.  Because high-volume spills are exceedingly rare and the common cause of large-diameter pipeline leaks is unlikely to occur at Lake Oahe, there is a significant possibility that the required additional analysis of pipeline volume will ultimately support the Corps' original conclusion.

Moreover, it is probable that the Corps' analysis on remand of Plaintiffs' critiques relating to spill impacts will not alter the Corps' original determination that its authorizations impose no significant environmental impacts.  *Cf. Standing Rock IV*, 2017 U.S. Dist. LEXIS 91297, at *50-51 (critiquing use of allegedly incorrect river-flow rates, benzene-concentration limits and alleged failure to consider all pipeline characteristics in assessing risk).  If the risk of an oil spill is low, the risks posed by a low-possibility spill are likely low regardless of the river-flow rates, benzene-concentration, or pipeline elevation.

There is similarly a substantial possibility that the Corps already addressed certain of the issues identified in Plaintiffs' reports by imposing additional easement conditions upon Dakota Access.  There is therefore a substantial possibility that remand will lead to the Corps curing any failure to adequately explain how it addressed at least one Plaintiff's expert reports.  *See Am. Farm Bureau Fed'n v. EPA*, 559 F.3d 512, 528 (D.C. Cir. 2009) (declining vacatur, in part, because "the EPA's failure adequately to explain itself is in principle a curable defect"); *see also N. Air Cargo*, 674 F.3d at 860-61 ("appropriateness of vacating an inadequately explained agency action depends on whether . . . the agency's decision is so deficient as to raise serious doubts whether the agency can adequately justify its decision at all.").  Importantly, Standing Rock's Accufacts, Inc. report was dated October 28, 2016.  *Standing Rock IV*, 2017 U.S. Dist. LEXIS 91297, at *19.  It critiqued the Corps by "stating corrosion threats should be assessed

based on field readings of in-line inspection runs, not assumed rates." *Id*. at *51 (citing

Accufacts, Inc. Review 7).  After receiving the Accufacts, Inc. report, the Corps met with

Standing Rock and Dakota Access and imposed additional easement conditions.  *See id*. at *22,

*90.  Several easement conditions directly addressed Accufacts Inc.'s corrosion-related critiques

by requiring field readings for inspections.  Dep't of the Army Easement for Fuel Carrying

Pipeline Right-of-way Located on Lake Oahe Project at Conditions 28-32

(USACE_ESMT000041-42).[4]  To be clear, while the Court is correct that the record after

remand may demonstrate that the Corps "reasonably concluded that [certain elements of

Plaintiffs'] expert reports were flawed or unreliable," *Standing Rock IV*, 2017 U.S. Dist. LEXIS

91297 at *51, it may also demonstrate that the Corps found certain of Plaintiffs' critiques to be

reasonable **and responded by imposing certain easement conditions**.  Regardless of whether

the Corps adequately documented such conclusions, the Corps' imposition of easement

conditions that reduced an already-low spill risk raises the possibility that the Corps' will

substantiate its decision on remand.

     With respect to environmental justice and hunting and fishing issues, there is similarly a

serious possibility that the Corps will substantiate its analysis upon remand. The Corps will

specifically examine the issues the Court identified related to the ½ mile buffer and

environmental justice concerns.  *Standing Rock IV*, 2017 U.S. Dist. LEXIS 91297.  However,

given the low risk of an oil spill, it is unlikely that Plaintiffs' hunting or fishing will be impacted

in any manner, and a different buffer and environmental justice analysis will likely yield the

same result.  While the Corps expects to fully evaluate Standing Rock and Cheyenne River's

---

     [4] Cited administrative record documents are available in the Joint Appendix of
Administrative Record Citations, ECF No. 209.

hunting and fishing concerns on remand, the minimal risk of a spill raises a significant possibility

that the portion of the Dakota Access pipeline installed under Lake Oahe imposes no significant

impacts with respect to environmental justice or hunting and fishing rights.  Further, as the Court

recognized, the new Standing Rock water-intake structure is located approximately fifty miles

further downstream from the Lake Oahe crossing.  *Id.*  at *70.  This development places both

Standing Rock and Cheyenne River's water intakes outside of the fourteen-mile and forty-mile

areas that Standing Rock suggested were appropriate for evaluating the environmental justice

impacts of oil-pipeline projects.  *See id*. at *77.

**B.  Vacating the Corps' Lake Oahe decisions after construction has been completed
    would have significant disruptive consequences.**

The Court should not vacate the Corps' Lake Oahe decisions during remand because doing

so would be far more disruptive than leaving the decisions in place during an approximately five-

month-long remand process.  Because the portion of the Dakota Access pipeline at issue was

completed months ago (and given that the pipeline has been fully operational since June),

vacatur would impose at least three disruptive consequences that are not present in the typical

challenge to a project that has not yet been constructed.  First, vacatur would likely undermine

national energy policy by causing oil currently flowing through the Dakota Access pipeline to be

transported via other modes of transportation that may impose greater spill risks.  Second,

vacatur of the Lake Oahe easement would likely place Dakota Access in trespass.  Third, vacatur

might impose additional construction-related impacts or risks.  In contrast, the low risk that the

Dakota Access pipeline will spill oil into Lake Oahe means that vacatur will not disrupt, much

less harm, Plaintiffs.

As an initial matter, while vacatur may be the "standard remedy" for a NEPA violation

where a project has not yet been constructed or is not operational, this case presents the more

rare circumstance where permitted construction is complete. *Standing Rock IV*, 2017 U.S. Dist. LEXIS 91297, at *101 (citing *Public Emples. for Envtl. Responsibility v. U.S. Fish & Wildlife Serv.*, 189 F. Supp. 3d 1, 2 (D.D.C. 2016) ("*PEER*")).  *PEER* is readily distinguishable because it vacated orders allowing the future killing of double-crested cormorants.  The cases *PEER* relied on to conclude that the vacatur is the standard remedy in NEPA cases similarly addressed the prospective application of rules or agency actions rather than the situation where construction had already been completed.[5]  *PEER's* dicta regarding the general appropriateness of vacatur therefore supports the proposition that vacatur is the standard remedy when vacating government action would cause no, or minimal, disruptive consequences.  Because construction in this case is complete, vacating the Lake Oahe decisions would have greater disruptive consequences than the typical NEPA case.

Vacatur would impose risks upon the public by diverting oil from the Dakota Access pipeline to other modes of transportation with higher spill risks.  As the Corps concluded in its environmental assessment, "[f]rom a safety standpoint, railroad transport consistently reports a substantially higher number of transportation accidents than pipelines" and "[a] series of major accidents taking place in 2013 and 2014 in Canada and the U.S. has heightened concern about the risks involved in shipping crude by rail."  EA 7, USACE_DAPL0071231 (citations omitted).

---

[5]     *See Reed v. Salazar*, 744 F. Supp. 2d 98 (D.D.C. 2010) (vacating annual funding agreement between United States and Confederated Salish & Kootenai Tribes of the Flathead Reservation for operations of National Bison Range Complex); *Sierra Club v. Van Antwerp*, 719 F. Supp. 2d 77 (D.D.C. 2010) (vacating only some of the permitted future development activities); *Greater Yellowstone Coal. v. Kempthorne*, 577 F. Supp. 2d 183 (D.D.C. 2008) (vacating Winter Use Plan permitting future recreational snowboarding); *Humane Soc'y of the U.S. v. Johanns*, 520 F. Supp. 2d 8 (D.D.C. 2007) (vacating "interim final rule" amending Federal meat inspection regulations governing horse slaughter); *Greater Yellowstone Coal. v. Bosworth*, 209 F. Supp. 2d 156 (D.D.C. 2002) (vacating bison grazing permit); *Bldg. Indus. Legal Def. Found. v. Norton*, 231 F. Supp. 2d 100 (D.D.C. 2002) (vacating final rules designating critical habitats for two species) (enjoining regulations amending essential fish habitat designations).

While the administrative record does not contain details regarding any particular rail accident, there have been multiple accidents involving trains carrying oil from North Dakota in recent years.  For example, in the 2013 Lac-Mégantic tragedy, a 72 car-train filled with Bakken crude exploded in a small town in Quebec, killing 47 people.  *See* Transportation Safety Board of Canada, Lac-Mégantic Runaway Train And Derailment Investigation Summary.[6]  The status quo is that oil is being transported by a pipeline that imposes a low spill risk, thereby "supporting energy independence, increasing employment opportunities, and adding to demand in many manufacturing sectors, which . . . boost . . . the overall economy."  EA 81, USACE_DAPL0071305.  Vacating the Corps' decisions could result in at least some portion of that oil being transported via rail.  Rail transportation imposes its own risks, including the risk of spills.  A proper weighing of the potential disruptive consequences of vacatur must therefore balance the low risk of a pipeline spill against the risks related to transporting oil by rail.  *See Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 994 (9th Cir. 2012) (remanding EPA rule without vacatur and allowing power plant construction to continue where preventing construction of power plant would increase use of diesel generators).[7]  And because rail transportation poses a higher accident risk, it increases the risk of the disruptive consequences of such an accident.

---

[6]     Available at http://www.tsb.gc.ca/eng/rapports-reports/rail/2013/r13d0054/r13d0054-r-es.asp.

[7]     Notably, *Cal. Cmtys. Against Toxics* allowed construction of a power plant to proceed, finding that "if saving a snail warrants judicial restraint . . . so does saving the power supply."  688 F.3d at 994 (internal citation omitted).  The Corps expects that Dakota Access will address the economic impact that vacatur would have on Dakota Access, but notes that at least one court has declined to vacate a Corps permitting decision where a "partnership stands to lose hundreds of thousands of dollars, if not more, if the uncertainty of a vacatur is introduced."  *Md. Native Plant Soc'y v. U.S. Army Corps of Eng'rs*, 332 F. Supp. 2d 845, 862-63 (D. Md. 2004).

Second, vacating the Lake Oahe easement now would likely place Dakota Access in violation of the Mineral Leasing Act. Standing alone, placing Dakota Access in trespass on Federally-owned, Corps-managed lands at Lake Oahe would be disruptive. Serious questions would be raised about potential remedies, if any, given that the pipeline is fully constructed. This case is therefore analogous to *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002) (remanding payment-in-kind program without vacatur where program had already been implemented). Here, because both this Court and the D.C. Circuit correctly rejected Plaintiffs' motions for preliminary relief under the National Historic Preservation Act and Religious Freedom Restoration Act, the portion of the Dakota Access pipeline under Lake Oahe was constructed and has been operating for months. This case presents the atypical situation where Plaintiffs prevailed on claims that were not raised in their first two rounds of emergency motions. Because Plaintiffs did not prevail on the first two rounds of emergency motions, the pipeline segment was constructed and the disruptive consequences of vacatur heightened.

Standing Rock's reliance on *Sierra Club*, ECF No. 117-1 at 45, is therefore misplaced. *Sierra Club* vacated portions of a permit because the project proponent "intend[s] on continuing development." 719 F. Supp. 2d at 80. The court accordingly vacated only the portions of the challenged permit related to future development. The *Sierra Club* court held, however, that the project proponent was "permitted to (1) complete the construction of County Road 54 and (2) continue to manage the storm water management system." *Id*. at 79-80. Essentially, *Sierra Club* stands for two common-sense propositions. First, that it can be more disruptive to vacate permitting for an infrastructure project than to allow the project to be completed. Second, that it is less disruptive to continue operating an already-constructed project than to engage in

additional construction activities.  *See also, Wilderness Watch v. U.S. Forest Serv.*, 143 F. Supp.

2d 1186, 1210 (D. Mont. 2000) (declining to order the removal of hunting and fishing lodges that

were unlawfully constructed absent evidence that there was imminent ongoing environmental

harm from the structures).  It is generally more disruptive to vacate authorizations for completed

construction than it is to prohibit construction that has not yet commenced.  Here, vacating the

easement and its associated conditions might increase future risks by disrupting inspection and

maintenance of the already-constructed pipeline segment.  *See* Dep't of the Army Easement for

Fuel Carrying Pipeline Right-of-way Located on Lake Oahe Project, Paragraph 12 (Indemnity)

(USACE_ESMT000005) and Conditions 28-29, 30-33 (USACE_ESMT000041-42).  Because

the portion of Dakota Access Pipeline at issue is both constructed and in operation, the disruptive

consequences of vacating the challenged decisions are far greater.

## IV.   CONCLUSION

The Corps respectfully submits that the Court should not vacate the Corps' July 25, 2016

and February 8, 2017 decisions authorizing Dakota Access to construct a portion of the Dakota

Access Pipeline 100 feet under the bed of Lake Oahe.  There is a serious possibility that the

Corps will substantiate its original decisions on remand, and the disruptive consequences of

vacatur during what is expected to be a short remand process, would be significant.

Dated: July 17, 2017                                        Respectfully submitted,

                                                            JEFFREY H. WOOD
                                                            Acting Assistant Attorney General
                                                            Environment & Natural Resources Division

                                                            By: */s/ Reuben S. Schifman*
                                                            REUBEN SCHIFMAN, NY BAR
                                                            MATTHEW MARINELLI, IL Bar 6277967
                                                            AMARVEER S. BRAR, CA Bar 309615
                                                            U.S. Department of Justice
                                                            Natural Resources Section

P.O. Box 7611
Benjamin Franklin Station
Washington, DC 20044
Phone: (202) 305-0479 (Brar)
Phone: (202) 305-4224 (Schifman)
Phone: (202) 305-0293 (Marinelli)
Fax: (202) 305-0506
amarveer.brar@usdoj.gov
reuben.schifman@usdoj.gov
matthew.marinelli@usdoj.gov

ERICA M. ZILIOLI, D.C. Bar 488073
U.S. Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, DC 20044
Phone: (202) 514-6390
Fax: (202) 514-8865
Erica.Zilioli@usdoj.gov

*Attorneys for the United States Army Corps
of Engineers*

OF COUNSEL:

MILTON BOYD
MELANIE CASNER
U.S. Army Corps of Engineers
Office of Chief Counsel
Washington, DC

**CERTIFICATE OF SERVICE**

      I hereby certify that, on the 17th day of July, 2017, a copy of the foregoing was filed through the Court's CM/ECF management system and electronically served on counsel of record.

*/s/ Reuben S. Schifman*
Reuben S. Schifman