**STANDING ROCK SIOUX TRIBE,**

    **Plaintiff,**

    **and**

**CHEYENNE RIVER SIOUX TRIBE,**

    **Plaintiff-Intervenor,**

       **v.**

**U.S. ARMY CORPS OF ENGINEERS,**

    **Defendant,**

    **and**

**DAKOTA ACCESS, LLC,**

    **Defendant-Intervenor and Cross-Claimant.**

**Civil Action No. 16-1534 (JEB) (and Consolidated Case Nos. 16-1769 and 16-267)**

<u>**MEMORANDUM OPINION**</u>

The dispute over the Dakota Access Pipeline has now taken nearly as many twists and turns as the 1,200-mile pipeline itself.  On June 14, 2017, in its third Opinion on the case, this Court held that the U.S. Army Corps of Engineers had failed to fully follow the National Environmental Protection Act when it determined that the pipeline would not have a significant environmental impact.  Although the Court found that the agency had "substantially complied" with the statute, the Opinion identified three discrete deficiencies in the Corps' analysis and

remanded the matter to the agency for further evaluation.  In doing so, the Court asked the parties to submit further briefing on the question such an action raised: what is the proper remedy during this remand period?  Specifically, the Court must determine whether or not to vacate the Corps' environmental assessment, as well as the easement granted to Dakota Access in reliance on that determination.  Without such an easement, the oil cannot flow through the pipeline.

The propriety of vacatur during remand is determined by a two-prong test that requires the Court to consider (1) the seriousness of the deficiencies in the agency action and (2) the disruptive consequences of vacating that prior approval.  As to the first, the Court ultimately concludes that the three errors identified in the prior Opinion are not fundamental or incurable flaws in the Corps' original analysis; rather, the agency has a significant possibility of justifying its prior determinations on remand.  Although the Court finds that the equities of disruption do not tip sharply in Defendants' favor on the second factor, prevailing on the first is enough here for them to avoid vacatur.

I.      **Procedural History**

The lengthy factual history of this case is set forth in this Court's prior Opinion, Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers (Standing Rock III), 2017 WL 2573994 (D.D.C. June 14, 2017), and need not be repeated here.  Suffice it to say that Plaintiffs, the Standing Rock and Cheyenne River Sioux Tribes (and other intervenors and consolidated Plaintiffs), strongly oppose the current route of the Dakota Access Pipeline (DAPL), a nearly 1,200-mile domestic pipeline running from North Dakota to Illinois.  In particular, the Tribes protest DAPL's crossing at Lake Oahe, a federally regulated body of water that borders their reservations.  Created by the Corps in 1958 via a dam constructed on the Missouri River, the

Lake is a primary source of water for the Tribes, and it is considered sacred to their spiritual practices. Id. at *3.

A.      History of Litigation

For the past fourteen months, the Tribes have attempted to prevent oil from flowing under Lake Oahe. The instant case began on July 25, 2016, when Standing Rock filed its Complaint against the Corps for declaratory and injunctive relief pursuant to the National Historic Preservation Act, National Environmental Policy Act, Clean Water Act, and the River and Harbors Act. See ECF No. 1 (SRST Complaint), ¶¶ 128-212. The following month, Dakota Access LLC successfully moved to intervene in support of the Corps, see ECF No. 7, and the Cheyenne River Sioux Tribe intervened as a Plaintiff, subsequently filing its own Complaint. See ECF No. 11-12 (CRST Complaint). The Tribes' first pass at preventing the pipeline was a motion for a preliminary injunction based solely on the NHPA, asserting that the ongoing clearing and grading of the land along DAPL's route disrupted sacred Tribal sites. See Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers (Standing Rock I), 205 F. Supp. 3d 4, 8–9 (D.D.C. 2016). On September 9, 2016, the Court denied emergency relief, and construction proceeded. Id. at 37.

On February 8, 2017, the Corps finally granted Dakota Access an easement pursuant to the Mineral Leasing Act, authorizing it to cross federal lands at Lake Oahe and complete the pipeline. See ECF No. 172-11 (Easement). The next day, Cheyenne River filed a motion for preliminary injunction and an application for a temporary restraining order, this time alleging violations of RFRA. See ECF Nos. 98, 99; Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers (Standing Rock II), 239 F. Supp. 3d 77, 81 (D.D.C. 2017), appeal dismissed, No. 17-5043, 2017 WL 4071136 (D.C. Cir. May 15, 2017). Believing these religious-freedom claims

unlikely to succeed, the Court issued a second Opinion denying the preliminary injunction.  See

Standing Rock II, 239 F. Supp. 3d at 80.

      B.     Motions for Summary Judgment

     As these emergency motions were ongoing, the parties filed cross-motions for summary

judgment.  See ECF Nos. 117 (SRST MSJ); 131 (CRST MSJ); 172 (Corps MSJ); 185 (DA MSJ).

Now focusing on their environmental claims, the Tribes challenged the Corps' decision to issue

the easement on the basis of its July 25, 2016, Environmental Assessment (EA) and Mitigated

Finding of No Significant Impact (FONSI), asserting that the agency had violated NEPA by

failing to complete an Environmental Impact Statement (EIS).  NEPA requires that federal

agencies evaluate the environmental effects of major government actions, but it does not

"mandate particular results."  Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350

(1989).  Instead, the statute "imposes only procedural requirements."  Dep't of Transp. v. Public

Citizen, 541 U.S. 752, 756 (2004).  If a project will "significantly" affect the "quality of the

human environment," NEPA requires that the agency complete a detailed EIS.  See 42 U.S.C. §

4332(C).  To determine whether or not there will be such significant effects, however, the agency

first prepares a shorter EA.  This "concise public document" discusses the need for the proposal,

the alternatives, the environmental impacts of the proposed action, and the agencies and persons

consulted.  See 40 C.F.R. § 1508.9(b).  If the EA concludes that there will be no significant

environmental impact, the agency may forgo completing a full EIS.

     This was the route chosen by the Corps in this case.  See ECF Nos. 172-1, 172-2 (EA and

FONSI).  The agency's EA and FONSI explained that, given the proposed mitigation measures

and Defendants' assessment of DAPL's "anticipated environmental, economic, cultural . . .

social[, and] cumulative effects," the pipeline's crossing at Lake Oahe would not "significantly

affect the quality of the human environment." FONSI at 6. The Tribes argued in their briefing that "[t]he Corps' conclusion that the Oahe crossing was not significant enough to warrant an EIS" was "arbitrary, capricious, and contrary to law." SRST MSJ at 17.

       C.    <u>Prior Opinion and Remand</u>

       On June 14, 2017, two weeks after DAPL became fully operational, the Court granted in part and denied in part the parties' motions and remanded certain issues to the Corps. <u>See</u> <u>Standing Rock III</u>, 2017 WL 2573994, at *40. It rejected Plaintiffs' motion with respect to their claims under the Clean Water Act and the Mineral Leasing Act, and it also upheld the majority of the Corps' determinations under NEPA – including the agency's "top-line conclusion" that the risk of an oil spill was sufficiently low so as to not require an EIS. <u>Id.</u> at *12, 16. It granted the Tribes' motion, however, with respect to three discrete flaws in the Corps' environmental analysis. The Court held that the Corps had insufficiently addressed: (1) the degree to which the project's effects are likely to be highly controversial; (2) the consequences of a spill for the Tribes' fishing and hunting rights; and (3) the environmental-justice impacts of the project. <u>Id.</u> at *1. Although the Court remanded these issues to the Corps for further analysis, it did not decide whether the easement should be vacated pending such remand. Instead, it ordered the parties to submit briefing on "whether remand with or without vacatur is appropriate in light of the deficiencies herein identified and any disruptive consequences that would result given the current stage of the pipeline's operation." <u>Id.</u> at *29.

       This briefing is now complete, and the Court must determine whether or not oil may continue to flow under Lake Oahe. Although the parties dispute what, precisely, vacatur would entail, <u>see</u> ECF Nos. 277 (DA Reply) at 1 n.1; 276 (Corps Reply) at 9; 280 (Tribes Sur-reply) at 1, the prior Opinion clearly stated that vacatur would require that DAPL "cease operations"

during remand.  <u>Standing Rock III</u> at *28.  The Court therefore assumes at this stage that such a remedy would vacate the Corps' prior EA and FONSI, as well as the easement it granted to Dakota Access in reliance on these determinations.  Without this authorization, DAPL cannot lawfully continue to operate the pipeline on federal land.

## II.     Legal Standard

Under the caselaw of this Circuit, "vacating a rule or action promulgated in violation of NEPA is the standard remedy."  <u>Humane Soc. of U.S. v. Johanns</u>, 520 F. Supp. 2d 8, 37 (D.D.C. 2007) (citing <u>Am. Bioscience, Inc. v. Thompson</u>, 269 F.3d 1077, 1084 (D.C. Cir. 2001)); <u>see</u> <u>Reed v. Salazar</u>, 744 F. Supp. 2d 98, 118–20 (D.D.C. 2010) (finding NEPA violation and ordering vacatur); <u>Sierra Club v. Van Antwerp</u>, 719 F. Supp. 2d 77, 78–80 (D.D.C. 2010) (finding NEPA violation and ordering remand with partial vacatur); <u>Greater Yellowstone Coal. v. Kempthorne</u>, 577 F. Supp. 2d 183, 204–05, 210 (D.D.C. 2008) (finding NEPA violation and ordering vacatur).  Yet, although vacatur is the "presumptively appropriate remedy," it is not the only option.  <u>See</u> <u>Sierra Club</u>, 719 F. Supp. 2d at 78.  Instead, as equity requires, the reviewing court has discretion leave the agency action in place.  <u>See, e.g.</u>, <u>Advocates for Hwy. & Auto Safety v. Fed. Motor Carrier Safety Admin.</u>, 429 F.3d 1136, 1151 (D.C. Cir. 2005) (remanding without vacatur); <u>Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin.</u>, 920 F.2d 960, 966-67 (D.C. Cir. 1990) (same).

The test for whether or not a court should vacate a deficient agency action during remand comes from this Circuit's decision in <u>Allied-Signal v. U.S. Nuclear Regulatory Commission</u>, 988 F.2d 146, 150–51 (D.C. Cir. 1993).  As <u>Allied-Signal</u> explained, "[T]he decision whether to vacate depends on the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that

may itself be changed." Id. at 150-151 (internal citation omitted). Put otherwise, this Court must determine whether there is "at least a serious possibility that the [agency] will be able to substantiate its decision on remand," and whether vacatur will lead to impermissibly disruptive consequences in the interim. See Nat'l Parks Conservation Ass'n v. Jewell, 62 F. Supp. 3d 7, 20 (D.D.C. 2014); Williston Basin Interstate Pipeline Co. v. FERC, 519 F.3d 497, 504 (D.C. Cir. 2008) (declining to vacate when "significant possibility that the [agency] may find an adequate explanation for its actions"). The question for the Court today is thus whether this is the "type of case that merits departure from the presumptive remedy of vacatur." Pub. Employees for Envtl. Responsibility v. United States Fish & Wildlife Serv., 189 F. Supp. 3d 1, 2–3 (D.D.C. 2016), appeal dismissed, No. 16-5224, 2016 WL 6915561 (D.C. Cir. Oct. 31, 2016). It therefore examines the two prongs of Allied-Signal separately below, bearing in mind that "[t]here is no rule requiring either the proponent or opponent of vacatur to prevail on both factors." Shands Jacksonville Med. Ctr. v. Burwell, 139 F. Supp. 3d 240, 270 (D.D.C. 2015).

III. **Analysis**

A. Seriousness of Deficiencies

The first prong of the Allied-Signal test requires the Court to determine the "seriousness" of the deficiencies in the underlying agency action. Here, Defendants argue that the three inadequacies identified by the Court – namely, the Corps' failure to adequately address the degree to which the project's effects are likely to be highly controversial, the impacts of a spill on fish or game, and the environmental-justice impacts of a spill – are not significant deficiencies in the agency's prior analysis. See ECF No. 258 (Corps Brief). Noting that the Court previously rejected the majority of Plaintiffs' challenges, Defendants contend that there are "only a few remaining tasks for the Corps to complete on remand" in order to substantiate the prior EA. See

ECF No. 260 (DA Brief) at 19. Plaintiffs, unsurprisingly, cast the Court's Opinion in quite a different light. The Tribes assert that the Court granted their motion for summary judgment on "three grounds that go to the heart of this dispute, and that are fundamental to the Tribes and their treaty rights." ECF No. 272 (Tribes Brief) at 1. These issues, the Tribes contend, cast "considerable doubt" upon the Corps' decision to forgo a full EIS. See Tribes' Sur-reply at 10.

Under Allied-Signal, the severity of an agency's errors below turns on "the extent of doubt whether [it] chose correctly." 988 F.2d at 150-51. The Court therefore must assess the likelihood that, on remand, the Corps will be able to justify its prior decision to issue an EA and FONSI, rather than preparing a full EIS. Such assessment looks at each issue in turn.

1. *Highly Controversial*

The prior Opinion found that the Corps had failed to fully consider "the degree to which [DAPL's] effects on the quality of the human environment are likely to be highly controversial." Standing Rock III, 2017 WL 2573994, at *13-14 (citing 40 C.F.R. § 1508.27(b)(4)). This factor must be addressed in "cases where a substantial dispute exists as to the size, nature, or effect of the major federal action rather than to the existence of opposition to a use." Town of Cave Creek, Arizona v. FAA, 325 F.3d 320, 331 (D.C. Cir. 2003). Here, the Court found that certain of the Tribes' expert reports submitted after July 24, 2016, created such a controversy and thus directed the Corps to address those "scientific critiques." Standing Rock III, 2017 WL 2573994, at *14. Plaintiffs contend that doing so on remand will require Defendants to "explicitly . . . find[] meritless each of the many technical criticisms and supporting data" in the expert reports. See Tribes Brief at 19. They therefore assert that the Court's holding reflects not an "easily explained oversight," but a "substantial legal flaw." Id. at 20. Defendants feel differently. The Corps argues that, as noted in the prior Opinion, the record after remand may demonstrate that

Defendants "reasonably" determined that the Tribes' reports had "material flaws." Corps Brief at 10; Standing Rock III, 2017 WL 2573994, at *14. The agency asserts, moreover, that there is a serious possibility that the 36 conditions on the existing easement already address any of the experts' legitimate concerns. See Corps Brief at 10-11.

The Court recognizes that the "lack of a reasoned explanation is a serious failing in an agency's decision, because it leaves the Court in doubt as to whether the agency chose correctly in making its decision." AARP v. United States Equal Employment Opportunity Comm'n, 2017 WL 3614430, at *16 (D.D.C. Aug. 22, 2017) (internal citation omitted). The question with respect to vacatur, however, is the extent of that doubt. See Allied–Signal, 988 F.2d at 150. In this case, the Court did not find that the expert reports submitted after July 25, 2016, presented an insurmountable obstacle to justifying the Corps' prior EA. Rather, the Opinion stated that "[i]t may well be the case that the Corps reasonably concluded that these expert reports were flawed or unreliable and thus did not actually create any substantial evidence of controversial effects." Standing Rock III, 2017 WL 2573994, at *14. What was missing, the Court found, was that the Corps "never said as much." Id.

Correcting this flaw does not require that Defendants begin anew, but only that they better articulate their reasoning below. Courts have declined to grant vacatur in similar circumstances, finding that agencies should instead be "afford[ed] a reasonable opportunity to . . . provide a reasoned explanation" of their choices. See Am. Radio Relay League, Inc. v. FCC, 524 F.3d 227, 242 (D.C. Cir. 2008); Heartland Reg'l Med. Ctr. v. Sebelius, 566 F.3d 193, 198 (D.C. Cir. 2009) ("When an agency may be able readily to cure a defect in its explanation of a decision, the first factor in Allied–Signal counsels remand without vacatur."); Black Oak Energy, LLC v. FERC., 725 F.3d 230, 244 (D.C. Cir. 2013) (declining to vacate agency action when

"plausible that [agency] can redress its failure of explanation on remand while reaching the same result"); Williston Basin, 519 F.3d at 504 (declining to vacate when "significant possibility that the [agency] may find an adequate explanation for its actions"). This Court agrees. Although the Corps must give careful consideration to the expert critiques, it is well positioned to provide such explanation on remand. Indeed, addressing the degree to which the project is likely to be highly controversial fits squarely within the realm of those "factual disputes" committed to agency expertise. See Wis. Valley Improvement Co. v. FERC, 236 F.3d 738, 746 (D.C. Cir. 2001) (citation omitted); FBME Bank Ltd. v. Lew, 209 F. Supp. 3d 299, 342 (D.D.C. 2016) (finding that the "fair likelihood that the agency will be able to make use of its expertise to justify its reliance on data and information" counsels in favor of remand without vacatur). On remand, the Corps must exercise its judgment in analyzing Plaintiffs' expert critiques. The Court finds a serious possibility that, in doing so, it will be able to substantiate the prior EA.

2. *Fishing and Hunting*

The second deficiency identified in the prior Opinion was the Corps' neglecting to properly assess the impact of an oil spill on fish and game – two resources protected by the Tribes' treaty rights. Standing Rock III, 2017 WL 2573994, at *16-17. As with the first issue, Plaintiffs assert that remedying this error will necessitate in-depth analysis through an EIS. See Tribes Brief at 21. Defendants counter that, given the minimal risk of an oil spill, there is a substantial possibility that DAPL will have "no significant impacts" on the Tribes' hunting and fishing rights. See Corps Brief at 11. They therefore maintain that the Corps will likely substantiate that DAPL's effects on fishing and hunting, if any, do not require an EIS.

On this issue, Defendants' task on remand is a narrow one. As the Court previously noted, the agency did not "wholly ignore the consequences of a possible oil spill" on the Tribes'

treaty rights.  <u>Standing Rock III</u>, 2017 WL 2573994, at *16.  The Corps' analysis fell short,

however, when it "stat[ed] simply that '[t]he primary issue related to impacts on the aquatic

environment from operation of [DAPL] would be related to a release from the pipeline,'"

without explaining "what those effects would be."  <u>Id.</u> at *17.  Likewise, although the agency

addressed the effects of pipeline <u>construction</u> on wildlife, it failed to consider the consequences

of a <u>spill</u>.  <u>Id.</u>  These two gaps in the Corps' analysis were improper under NEPA, but they are

far from incurable.  Although the Tribes assert that the record on remand will support the need

for an EIS because it "is replete with evidence of the significance of these rights to the Tribe[s],"

Tribes Brief at 20, the Court already held that NEPA does not require any such "existential-scope

analysis."  <u>Standing Rock III</u>, 2017 WL 2573994, at *15.  While the Tribes now reiterate that

they place a "high importance . . . on hunting and fishing," Tribes Brief at 21, the Corps on

remand must take a "hard look" at the impact of DAPL on only the resources themselves.

     Here, the record shows that the agency is well situated to conduct such an inquiry.  It has

already gathered information regarding Lake Oahe's fish and wildlife, and it has conducted a

lengthy analysis of the possible toxicity arising from various spill scenarios.  <u>See Standing Rock</u>

<u>III</u>, 2017 WL 2573994, at *17; ECF No. 172-1 at 58-59 (discussing wildlife near Lake Oahe);

104 (same); 101 (discussing exposure of Lake Oahe fish to oil spill); 47-48 (same); 45-46

(discussing potential toxic effects of spill).  On remand, the Corps must simply connect the dots.

This, then, is not a case in which the agency "must redo its analysis from the ground up."  <u>North</u>

<u>Carolina v. EPA</u>, 531 F.3d 896, 929 (D.C. Cir. 2008).  The agency already has the data it needs

to determine the impact of a spill on fish and game – indeed, it has already concluded that "under

no spill scenario would the acute toxicity threshold for aquatic organisms be exceeded."

<u>Standing Rock III</u>, 2017 WL 2573994, at *17.  The Corps, moreover, will assess the significance

of any consequences on fish and game in light of its prior determination that the risk of rupture under Lake Oahe is low. See New York v. NRC, 681 F.3d 471, 478-79 (D.C. Cir. 2012) (holding that agency "may find no significant impact if . . . the combination of probability and harm is sufficiently minimal"). The record suggests, therefore, that the Corps "may be able readily to cure a defect in its explanation of [the prior] decision." Heartland Reg'l Med. Ctr. v. Sebelius, 566 F.3d 193, 198 (D.C. Cir. 2009). Although the agency may ultimately conclude that this issue nonetheless requires a full EIS, the Court finds that there is a strong likelihood that it will instead substantiate its prior decision to issue an EA.

### 3. *Environmental Justice*

The last issue concerns the environmental-justice impacts of the Lake Oahe crossing. The Tribes challenged the selection of that site over an alternative location upstream of Bismarck, North Dakota, arguing that the Corps had failed to properly analyze whether the current placement of the pipeline could disproportionately affect low-income, minority communities. See ECF 117-19 (SRST MSJ). The Court agreed. It held that the Corps' "cursory" analysis did not "reasonably support the conclusion that the [Standing Rock Sioux] Tribe will not be disproportionately affected by an oil spill in terms of adverse human health or environmental effects." Standing Rock III, 2017 WL 2573994, at *23. In particular, the Court cast doubt upon the Corps' decision to use census tracts upstream from the Lake Oahe site – when oil spills flow downstream – and to consider the communities within only a half-mile radius of the crossing, given that the Standing Rock Reservation is located .55 miles downstream. Id. at *20-21. In light of these flaws and the "minimal" discussion of environmental justice in the EA, the Court concluded that the agency "did not properly consider the environmental-justice implications of the project." Id. at *23.

Characterizing the Corps' environmental-justice assessment as "fatally flawed," Tribes Brief at 22, Plaintiffs contend that a valid analysis would "inevitably conclude" that the pipeline disproportionately affects Native American and low-income populations, and thus would "yield a different outcome on the core question of whether an EIS is required." Id. at 23. Defendants, of course, disagree, rejoining that "given the low risk of an oil spill, it is unlikely that . . . a different buffer and environmental justice analysis" will yield a new result on remand. See Corps Brief at 10.

Although it is a closer call than the first two issues, the Court concludes that the flaws in the Corps' environmental-justice analysis do not support vacatur. The agency's action was not, in this case, so lacking as to cast serious doubt on its decision to issue an EA. The prior Opinion explicitly stated that the Corps "need not necessarily have addressed" each concern raised by the Tribes, but only that it must "offer more than a bare-bones conclusion that Standing Rock would not be disproportionately harmed by a spill." Standing Rock III, 2017 WL 2573994, at *23; see Sierra Club v. FERC, 867 F.3d 1357, 1370 (D.C. Cir. 2017) (holding that the "goal of an environmental-justice analysis is satisfied if an agency recognizes and discusses a project's impacts on predominantly-minority communities"); Latin Americans for Soc. & Econ. Dev. v. Adm'r of Fed. Highway Admin., 756 F.3d 447, 477 (6th Cir. 2014) (noting that "[e]nvironmental impacts and environmental justice issues are a consideration in agency decision making, but are not controlling"). Although the Corps must provide a more robust analysis on remand, there is reason to think that, in doing so, it has a substantial possibility of validating its prior conclusion.

Indeed, contrary to the Tribes' statement that a finding of a disproportionate impact would necessitate an EIS, the relevant agency guidance expressly contemplates the use of an EA to address such concerns. See ECF No. 117–19 (CEQ, Environmental Justice Guidance Under

the National Environmental Policy Act, Dec. 10, 1997) at 15 ("Where a potential environmental justice issue has been identified by an agency, the agency should state clearly in the EIS or EA whether, in light of all the facts and circumstances, a disproportionately high and adverse human health or environmental impact on . . . Indian tribe[s] is likely to result from the proposed action.") (emphasis added). As a result, even if Defendants did conclude on remand that a crossing at the Lake Oahe site may disproportionately affect minority or tribal populations, such an outcome would not compel the Corps to alter its prior decision to issue an EA and FONSI.

Additionally, multiple aspects of the record suggest that the Corps is likely to justify issuing an EA, rather than completing an EIS. First, as with the hunting-and-fishing analysis, the minimal risk of an oil spill under Lake Oahe reduces the likelihood that the project will have a significant impact on the surrounding communities. See Sierra Club, 867 F.3d at 1369 (upholding environmental-justice analysis when agency concluded, in part, that "the project would not have a 'high and adverse' impact on any population, meaning, in the agency's view, that it could not have a 'disproportionately high and adverse' impact on any population, marginalized or otherwise"); Allen v. Nat'l Institutes of Health, 974 F. Supp. 2d 18, 47 (D. Mass. 2013) (upholding environmental-justice analysis when project was located in area with larger low-income and minority populations, but agency concluded that "the likelihood of [adverse effects] is extremely low").

Second, the impact of any such spill, if it were to occur, is in part mitigated by the relocation of the Standing Rock water-intake structure. The new structure is situated approximately 50 miles further downstream from the Lake Oahe crossing than the old site, and it is outside even the furthest radius suggested by Standing Rock as appropriate for evaluating the environmental-justice impacts of the pipeline. See Standing Rock III, 2017 WL 2573994, at

*19; ECF No. 117–24 (Memorandum from David Cooper, Chief Counsel, Corps, Oct. 20, 2016) at 19. Plaintiffs assert that the old intake structure is still in operation, see ECF No. 272-3 (Third Decl. of Dave Archambault, II), ¶ 10, but they cannot dispute that the new site will mitigate at least some of their concerns regarding the relative impact of a spill on the Tribes' drinking water.

Finally, the Corps' already-conducted assessment of the alternative pipeline route through Bismarck increases the likelihood that the agency will find that DAPL's environmental-justice impacts do not require an EIS. Under NEPA, the consideration of such alternative routes is relevant to the Corps' environmental-justice review on remand, as the statute requires only that the agency "grapple[] with the disparate impacts of the various possible pipeline routes." Sierra Club, 867 F.3d at 1369. As the CEQ guidance states, "The identification of a disproportionately high and adverse human health or environmental effect on a[n] . . . Indian tribe does not preclude a proposed agency action from going forward, nor does it necessarily compel a conclusion that a proposed action is environmentally unsatisfactory." CEQ at 10. "Rather, the identification of such an effect should," inter alia, "heighten agency attention to alternatives (including alternative sites)." Id.

As the prior Opinion discussed, the alternative Bismarck crossing would pass much closer to a drinking-water intake than the Lake Oahe location does. See Standing Rock III, 2017 WL 2573994, at *18-19; ECF No. 209–16 at 5 (Memorandum from Tom Siguaw, Dakota Access, & Steve Rove, HDR Engineering, Apr. 12, 2016). The two water intakes downstream from the Bismarck site serve 84,504 people, while those downstream from the Oahe intakes serve 8,037. See Standing Rock III, 2017 WL 2573994, at *18-19. Risks presented to this tenfold increase in population must, of course, be considered when the Corps evaluates the environmental-justice impacts, if any, of the Lake Oahe crossing. See Sierra Club, 867 F.3d at

1371 (noting that, in conducting its environmental-justice analysis, agency "also considered four route alternatives . . . but rejected them all, mainly on the ground that they would have had a greater overall impact on residences and populated areas"); Latin Americans for Soc. & Econ. Dev., 756 F.3d at 477 (finding that agency took requisite hard look at environmental-justice issues when it considered alternatives to avoid or minimize disproportionately high adverse impacts and "reasonably determined its priorities based on all the comparative information available"). Under NEPA, an agency is "not required to select the course of action that best serves environmental justice, only to take a 'hard look' at environmental justice issues." Sierra Club, 867 F.3d at 1368; see Latin Americans for Soc. & Econ. Dev, 756 F.3d at 476 ("Just as the [agency] is not required to select an alternative with the least environmental impact under NEPA, the [agency] is not required to select an alternative with the least environmental justice impact."). The Court finds that there is a substantial possibility that the Corps will meet this standard on remand and will substantiate its prior decision to proceed with the Lake Oahe crossing without an EIS.

In reaching this decision, however, the Court does not seek to minimize the importance of the Tribes' environmental-justice concerns. The purpose of this analysis under NEPA is to ensure that the government properly accounts for the "interrelated cultural, social, occupational, historical, or economic factors that may amplify the natural and physical environmental effects" of agency actions. See CEQ Guidance at 9. There is no doubt that our nation's history is replete with examples of Native American tribes bearing the brunt of government action. See ECF No. 270-1 (Brief of Amici Curiae Great Plains Tribal Chairmen's Association, et al.) at 6-8. And Chairman Archambault is eloquent on why the Tribes believe that this pipeline embodies another transgression. See Archambault Decl., ¶¶ 12-20. Yet the Court's role here is not to determine

the wisdom of agency action or to opine on its substantive effects. See Robertson, 490 U.S. at

351 (holding that "NEPA merely prohibits uninformed - rather than unwise - agency action").

Instead, it must consider only the Corps' likelihood on remand of fulfilling NEPA's procedural

environmental-justice requirements and justifying its prior decision.

* * *

In cases in which the agency's reasoning is "so crippled as to be unlawful," vacatur is

generally the appropriate remedy. See Radio-Television News Directors Ass'n v. FCC, 184 F.3d

872, 888 (D.C. Cir. 1999). If, however, the action is "potentially lawful but insufficiently or

inappropriately explained," remand without vacatur may instead be imposed. Id. As is evident

from the discussion above, this case falls within the latter category. Here, the Corps' decision to

produce only an EA, rather than an EIS, is "potentially lawful." The errors below were

substantial, but they do not present fundamental flaws in Defendants' reasoning. Although

Plaintiffs contend that the issues on remand go to the "heart" of their opposition to this project,

see Tribes Brief at 1, the question for vacatur is not the importance of the issue, but the extent of

the error. Here, the Court cannot say that the deficiencies in the prior EA and FONSI are

"crippling" flaws in the Corps' analysis. The Court previously found that the Corps "largely

complied" with NEPA's requirements, and it granted remand on only a narrow subset of the

Tribes' NEPA claims. See Standing Rock III, 2017 WL 2573994, at *28. The lengthy

procedural history of this case shows, moreover, that there has been nothing hasty about the

Corps' decisionmaking thus far. There is no reason to think that it will be any less thorough in

analyzing the three deficiencies on remand. In light of the agency's substantial compliance with

NEPA, the Court finds that that the Corps has a significant likelihood of being able to

substantiate its prior conclusions and determines that the first prong of the Allied-Signal

framework thus counsels in favor of remand without vacatur.

B.  Disruptive Consequences

The second consideration in determining whether to remand without vacatur is "the disruptive consequences of an interim change that may itself be changed."  Allied-Signal, 988 F. 2d at 150–51; see Conservation Law Found. v. Pritzker, 37 F. Supp. 3d 254, 271 (D.D.C. 2014). On this issue, the parties have much to say about the disruption, or lack thereof, that will result if the Court vacates the Corps' prior decisions.  As discussed below, the Court concludes that this factor weighs only slightly in favor of remand without vacatur.

1.  *Direct Disruption*

Defendants and their *amici* spend much of their briefing spelling out what they believe are potentially dire economic consequences of vacatur.  Dakota Access, for example, asserts that if the pipeline is paused, North Dakota's oil producers will face severe costs and delays.  See DA Brief at 14; ECF No. 279 (*Amici Curiae* Brief of American Fuel and Petrochemical Manufacturers) at 6 (stating that "direct financial impact" of taking DAPL out of service "would be staggering").  The company contends that other pipelines, refineries, and downstream users of the oil currently transported in DAPL would also "suffer greatly" and would be forced into "emergency arrangements" to compensate for the shutdown.  See DA Brief at 14.  The impact of vacatur, Dakota Access posits, would place in peril the jobs of all those currently involved in DAPL's operations and would prevent Dakota Access from being able to perform the contracts it has entered into with producers.  Id. at 18.  Defendants assert that such a halt in pipeline operations would also deprive state and local governments of millions of dollars in tax revenue and would undermine new industries that support DAPL operations.  See Brief of American Fuel Manufacturers, *et al.* at 8, 10.  Finally, Defendants argue that these effects would be passed on to consumers, claiming that the disruptive market effects of vacatur would have "significant ripple

effects." DA Brief at 15. In total, Dakota Access declares that issuing vacatur in this case would incur costs of hundreds of millions of dollars. Id. at 18.

The Tribes contest both the accuracy and the relevance of Defendants' economic concerns. As to the former, Plaintiffs have submitted declarations asserting that "DAPL revenues" are likely "substantially less than indicated" by Defendants and stating that a DAPL shutdown "will not result in the severe disruptions claimed by the Corps and Dakota Access." ECF No. 272-5 (Declaration of Ian Goodman), ¶¶ 41, 43. They therefore argue that the company's claims "regarding loss of revenues and other potential impacts of a DAPL shutdown should not be relied upon to determine the likely impacts" of vacatur. Id., ¶ 41. As to the latter, the Tribes question whether "financial impacts" carry "much or even any weight" when evaluating the second Allied-Signal factor in NEPA cases. See Tribes' Brief at 25.

As an initial matter, the Court rejects Plaintiffs' suggestion that it should wholly disregard the potential for financial disruption. Although this perspective has been suggested in at least one district court decision, see Ctr. for Food Safety v. Vilsack, 734 F. Supp. 2d 948, 953 (N.D. Cal. 2010), it is clear that courts in this Circuit have repeatedly considered the economic implications of vacatur – including in cases addressing environmental harms. See Am. Water Works Ass'n v. EPA, 40 F.3d 1266, 1273 (D.C. Cir. 1994) (declining to vacate rule addressing lead in drinking water in part because "vacatur would be unnecessarily disruptive to the [affected] industries"); Sierra Club v. U.S. Dep't of Agric., Rural Utilities Serv., 841 F. Supp. 2d 349, 363 (D.D.C. 2012) (NEPA decision considering potential "substantial financial loss if the Court were to vacate" under second Allied-Signal prong); Friends of the Capital Crescent Trail v. Fed. Transit Admin., 218 F. Supp. 3d 53, 60 (D.D.C. 2016) (acknowledging that "delay in [agency] project could impose significant financial costs"); see also California Communities

Against Toxics v. U.S. EPA, 688 F.3d 989, 993–94 (9th Cir. 2012) (declining to vacate in part because stopping construction of power plant would be "economically disastrous").

That the Court will consider Defendant's allegations of financial harm does not, however, mean that it will necessarily give determinative effect to such claims. Defendants' *cri de coeur* over lost profits and industrial inconvenience is not fully convincing. Such is the nature of doing business, especially in an area fraught with bureaucracy and litigation. Dakota Access began pumping oil into the pipeline with full knowledge that Plaintiffs were contesting the easement allowing them to do so. By nonetheless proceeding with its venture, the company assumed some risk of economic disruption. See ECF No. 259-2 (Declaration of David Murk), ¶ 8 (stating that impact of vacatur would not have been severe "had DAPL not begun operations in June 2017").

There is, moreover, some cause for skepticism regarding Dakota Access's predictions of economic devastation. This is not the first time the company has staked out this position – it previously claimed that <u>delays</u> in the pipeline would have disastrous economic effects. During the first preliminary-injunction briefing, the company warned that contracts for DAPL could be canceled if it was not able to start delivering oil by January 1, 2017. See ECF No. 22-1 (Declaration of Joey Mahmoud, Aug. 18, 2016), ¶¶ 69-70. Yet the pipeline did not come on line until June, and no apparent calamity ensued. See ECF 277-12 (Second Declaration of Lee Hanse), ¶ 4 (stating that "no contracts have been renegotiated or terminated"). The Court thus cannot conclude that, in the case of a halt in DAPL operations, the company would have no alternative option.

The empirical basis for Defendants' assertion that vacatur would have catastrophic economic effects is, additionally, sharply contested by the Tribes. See Goodman Decl., ¶¶ 43-48, 75 (asserting that impacts to energy systems and market due to vacatur would likely be

"small to very small").  Indeed, it is unclear from the current record how much oil is even flowing through the pipeline at this time.  Compare id., ¶¶ 19-25 (stating that DAPL appears to be operating at partial capacity) with DA Brief at 13 (claiming that DAPL carries equivalent of 500,000 barrels per day) with DA Reply at 6 (citing figure of 300,000 barrels per day).  The parties ask the Court to wade into this war of the crude-oil experts.  Yet, because it declines to rely heavily on economic impact as a justification for issuing vacatur, the Court need not resolve this factual dispute.  See Pub. Employees for Envtl. Responsibility, 189 F. Supp. 3d at 3 (stating that "absent a strong showing . . . that vacatur will unduly harm economic interests . . . [,] the Court is reluctant to rely on economic disruption" in denying vacatur).

Beyond the data, there are broader concerns with Defendants' economic claims.  Dakota Access and its amici focus almost exclusively on the financial and industrial implications of a temporary DAPL shutdown.  In doing so, they address the "potentially disruptive effects of vacatur as if they occur in a vacuum," thus giving short shrift to the "potentially disruptive effects that could flow from remand without vacatur."  Friends of the Capital Crescent Trail v. Fed. Transit Admin., 218 F. Supp. 3d 53, 60 (D.D.C. 2016).  Here, there is no doubt that allowing oil to flow through the pipeline during remand risks the potentially disruptive effect about which the Tribes are most concerned – a spill under Lake Oahe.  The likelihood of any such rupture may be low, but pausing the operation of the pipeline would mitigate even this small risk.  By emphasizing the financial impacts of vacatur, Defendants ignore the "devastating" consequences that the Tribes allege could result from remand without such a remedy in place.  See Archambault Decl., ¶ 10-11.

This economic myopia ignores the fact that the possible effects of an oil spill on the Tribes' treaty rights and communities were at the center of this Court's prior Opinion.  See

Standing Rock III, 2017 WL 2573994, at *10.  Defendants unfairly downplay these concerns.

Indeed, the Corps alleges that "loss of life is notably absent from Plaintiffs' discussion of

potential worse-case spills."  Corps Reply at 8.  Yet one need only refer to the Tribes'

declarations to see that they do, in fact, assert that such drastic harms could flow from a spill

under Lake Oahe.  See ECF Nos. 117-16 (Declaration of Jeff Kelly), ¶¶ 5-9 (stating that many

Tribal members rely on hunting and fishing to survive); 272-3, Exh. B (Letter from Dave

Archambault to Acting Assistant Sec. Lamont and Colonel Henderson) at 4 (discussing serious,

life-threatening health and safety consequences of potential oil spill); 131-4 (Declaration of

Harold Frazier) (stating that water shortage on reservation previously caused "death of four

children in a house fire" due to insufficient water supply for firefighting).  Although the Court

acknowledges the potential for economic disruption, these interests do not inherently trump the

risk of environmental disruption if vacatur is withheld.  See Pub. Employees for Envtl.

Responsibility, 189 F. Supp. 3d at 3 (stating that it is "not clear that economic concerns are as

relevant in an environmental case") (emphasis added).

        The Court notes, moreover, that denying vacatur on the basis of alleged economic harm

risks creating undesirable incentives for future agency actions.  If projections of financial distress

are sufficient to prevent vacatur, the Court fears that agencies and third parties may choose to

devote as many resources as early as possible to a challenged project – and then claim disruption

in light of such investments.  Such a strategy is contrary to the purpose of NEPA, which seeks to

ensure that the government "looks before it leaps."  ECF No. 269-1 (Brief of Amici Curiae of

Law Professors and Practitioners) at 5.  Finding that vacatur's alleged financial harms are

dispositive under the second prong of Allied-Signal may encourage agencies to instead act first

and ask later.  In sum, although the Court concludes that there is likely to be some economic

disruption from vacatur, this factor does not weigh heavily in Defendants' favor under the Allied-Signal test.

2. *Alternative Transport*

In addition to asserting that vacatur would have devastating economic effects, Defendants also argue that such a remedy would not, in fact, ameliorate Plaintiffs' concerns during the remand period. Dakota Access contends that, if vacatur is granted, the oil currently flowing through the pipeline will be re-routed onto trains. See DA Brief at 15-16. The company states that this form of transport involves a greater risk of accidents and thus argues that vacatur would put the Tribes in more environmental peril than the current status quo. Id. Plaintiffs dispute both the facts and the premise of this position. The Tribes contend that there is little data supporting the proposition that train transport would be used in lieu of DAPL. They point instead to expert reports stating that, if DAPL were shut down, "much of" the crude currently flowing under Lake Oahe would "shift back to . . . other pipelines, rather than to rail." Goodman Decl., ¶ 62. The Tribes also contest the relative safety of the two modes of transport, referring to their expert's conclusion that it is "incorrect to state that pipelines are 'undeniably safer' than rail," and that pipelines such as DAPL are "capable of releasing substantially more oil than trains." Id., ¶¶ 87-88. Examining the respective routes and capacities of train lines and DAPL, the report concludes that, for the Tribes, "DAPL has [a] . . . much greater risk than does crude by rail." Id., ¶ 114. Finally, the Tribes contend that Defendants miss the mark by relying upon the overall risks presented by train transport versus pipelines. Instead, Plaintiffs contend that the Court should concern itself solely with the risk to the Tribes from DAPL and its current crossing at Lake Oahe. See Tribes' Sur-reply at 15.

In considering the transport question, both parties acknowledge that this Circuit has "previously remanded without vacatur . . . if vacating 'would at least temporarily defeat . . . the enhanced protection of the environmental values covered by [the statute at issue].'" Ctr. for Biological Diversity v. Envtl. Prot. Agency, 861 F.3d 174, 188 (D.C. Cir. 2017). In Davis Cty Solid Waste Mgmt. v. US EPA, 108 F.3d 1454 (D.C. Cir. 1997), for instance, this Circuit found emissions guidelines to be legally inadequate, but declined to vacate them during the remand process because "greater pollution emissions would occur" without leaving the guidelines in place. Id. at 1459-60. Similarly, in American Farm Bureau Federation v. EPA, 559 F.3d 512 (D.C. Cir. 2009), the court remanded but did not vacate a deficient agency standard governing air pollutants, reasoning that "vacating a standard because it may be insufficiently protective would . . . mak[e] the best an enemy of the good." Id. at 528. Put otherwise, this Circuit has recognized that, at times, a flawed agency action is better than no action at all.

Yet this is not such a case. On this record, Defendants have failed to persuade the Court that transport by train is significantly more dangerous than allowing oil to continue to flow beneath Lake Oahe. The record contains no concrete figures or substantiated studies regarding the risks presented by rail transportation versus DAPL's Lake Oahe crossing. Instead, the Court is left with vague projections such as Defendants' assertion that vacatur "could result in at least some portion" of the oil being moved via train and their broad claim that rail transport "poses a higher accident risk" than the use of pipelines. See Corps Brief at 13 (emphasis added). These forecasts do little to assure the Court that vacatur would in fact put the environment in any greater peril. See Pub. Employees for Envtl. Responsibility, 189 F. Supp. 3d at 3–4 (granting vacatur when agency's forecasted harms were imprecise or speculative). Plaintiffs and one amicus for Defendants, moreover, cast doubt on whether the oil currently flowing through the

pipeline would, in fact, be re-routed onto rail.  See Brief of Am. Fuel Manufacturers, *et al*. at 10; Goodman Decl., ¶ 62 (stating that most oil would be transferred to other pipelines).  Given that it is not "guaranteed that  . . . producers or shippers would choose in the near term to ship oil on transportation modes other than DAPL," Defendant's argument is speculative at best.  See Brief of Am. Fuel Manufacturers, *et al*. at 10.

What <u>is</u> clear is that accidents and spills, however they may occur, have the potential to wreak havoc on nearby communities and ecosystems.  The effects that concern the Court today are not general environmental ones throughout the Midwest, but those that may result from <u>this</u> pipeline in <u>this</u> location at Lake Oahe.  Those are the impacts that the Court found were insufficiently addressed by the Corps, and those are the impacts that Plaintiffs fear during the remand period.  For this reason, and because the Court does not find that alternative modes of transport required by vacatur, if any, will necessarily increase the risk of an oil spill, it rejects this argument against vacatur.

### 3. *Other Considerations*

The Corps also attempts to argue that vacatur here would "have greater disruptive consequences than in the typical NEPA case" because the pipeline has already been completed. <u>See</u> Corps Brief at 12.  The agency contends that vacatur is the standard remedy in NEPA cases only when it would affect the "<u>prospective</u> application of rules or agency actions," rather than situations in which the challenged outcome has already gone into effect.  <u>Id.</u>  Plaintiffs counter that this distinction finds little footing in the facts of the case.  <u>See</u> Tribes Sur-reply at 5-6.

The Tribes have the better of this dispute.  Although construction is complete and oil is flowing, Plaintiffs are not asking for the pipeline itself, or for any existing infrastructure, to be dismantled.  <u>Id</u>. at 2.  Instead, their concerns in this case, and the deficiencies identified in the

prior Opinion, involve the risks presented by the <u>continued</u> passage of oil under the Lake. This is clearly an ongoing, and prospective, event. This is thus not a case in which "[t]he egg has been scrambled and there is no apparent way to restore the status quo ante." <u>Sugar Cane Growers Coop. v. Veneman</u>, 289 F.3d 89, 97 (D.C. Cir. 2002) (remanding in lieu of vacating agency action where agency had already administered program disbursing large quantities of sugar to farmers who had already plowed under their crops). The oil may currently be flowing, but Defendants do not dispute that it could be stopped. Although courts have declined to vacate improper agency actions when doing so would be an "invitation to chaos," <u>id.</u> at 97, in this case vacatur would be, at most, an invitation to substantial inconvenience. Contracts may have to be renegotiated and alternative modes of transportation found, but there is no indication in the record that Defendants' actions under the improper EA <u>cannot</u> be undone.

Finally, the Corps' assertions regarding the timing of the remand process are also relevant to analyzing the disruption in this case. The agency now states that it anticipates completing its independent review and analysis of the remand issues by April 2018, which is several months after its initial estimate. <u>See</u> ECF No. 281 (Notice of Revised Schedule); Corps Brief at 1. This timeline aids both parties' positions with respect to the impact of vacatur. On one hand, the multiple-month period of review increases the risk that a spill will occur prior to the new analysis and thus strengthens the Tribes' assertion that such an incident could occur during the remand process. On the other hand, this timing also supports Defendants' position that vacatur would have severe disruptive effects. To vacate the easement during the remand process would stop oil from flowing under Lake Oahe for at least six months – an interruption that could cause significant harms to numerous people and entities. The remand period thus supports both sides'

arguments regarding the real-world impact of the Court's choice today, but does not dictate the outcome either way.

* * *

The second prong of <u>Allied-Signal</u>, consequently, does not counsel strongly in favor of remand without vacatur. It is undeniable that stopping the flow of oil beneath Lake Oahe will have <u>some</u> disruptive effect, but all the considerations on this prong tip only narrowly in favor of Defendants. Because the Court has concluded that the Corps' errors are likely to be cured under the first prong, it need not define the precise scale of the potential disruption. This is because in circumstances in which the first prong of <u>Allied-Signal</u> supports remand without vacatur, the second prong "is only barely relevant." <u>Fox Television Stations, Inc. v. FCC</u>, 280 F.3d 1027, 1049 (D.C. Cir. 2002), <u>opinion modified on reh'g</u>, 293 F.3d 537 (D.C. Cir. 2002). In those instances, "though the disruptive consequences of vacatur might not be great, the probability that the [agency] will be able to justify retaining [its prior decision] is sufficiently high that vacatur . . . is not appropriate." <u>Id.</u> This is such a case. The Court therefore need not rely upon disruption in deciding that vacatur is not the appropriate outcome.

C.      <u>Other Relief</u>

In their briefing the Tribes request that, if the Court declines to vacate, it instead impose a series of conditions on the continued operation of DAPL under Lake Oahe. Defendants, in their response, do not address the merits of these proposed remedies; rather, they assert only that the Court lacks jurisdiction to enter such an order. <u>See</u> Corps Brief at 4. This is not so. A reviewing court may craft relief as equity requires. <u>W. Oil & Gas Ass'n v. EPA,</u> 633 F.2d 803, 813 (9th Cir. 1980) ("[A] reviewing court has discretion to shape an equitable remedy."); <u>Montana Wilderness Ass'n v. Fry,</u> 408 F. Supp. 2d 1032, 1034 (D. Mont. 2006) ("The district court's equitable powers are broad, and it is within the court's authority to fashion a remedy that fits the

particular facts of the case before it."); <u>Sierra Forest Legacy v. Sherman</u>, 951 F. Supp. 2d 1100, 1106 (E.D. Cal. 2013) ("Vacatur is clearly a form of equitable relief that the Court may award, withhold, <u>and</u> craft to fit the circumstances of the case before it.") (emphasis added); <u>Conservation Cong. v. United States Forest Serv.</u>, 2017 U.S. Dist. LEXIS 82440, at *9 (E.D. Cal. May 26, 2017) (finding NEPA violation, declining to vacate agency decision, but enjoining Defendants from "removing any trees with 20 inches [diameter at breast height] or greater in implementing the Project").

Because Defendants should have an opportunity to express their views on the substance of Plaintiffs' requests, the Court will permit abbreviated further briefing on this issue.

**IV.      Conclusion**

In light of the "serious possibility" that the Corps will be able to substantiate its prior conclusions, the Court finds that vacatur is not the appropriate remedy in this case.  That determination does not, however, excuse Defendants from giving serious consideration to the errors identified in this Court's prior Opinion.  Compliance with NEPA cannot be reduced to a bureaucratic formality, and the Court expects the Corps not to treat remand as an exercise in filling out the proper paperwork *post hoc*.  After the agency's further work on remand, the parties may well disagree over the sufficiency of its conclusion.  If and when such a dispute arises, they will again have the opportunity to address whether Defendants have in fact fulfilled their statutory obligations.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  October 11, 2017