**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **STANDING ROCK SIOUX TRIBE,** | |
| **Plaintiff,** | **Case No. 1:16-cv-1534-JEB** |
| **and** | **[Consolidated with 1:16-cv-1796 and 1:17-cv-267]** |
| **CHEYENNE RIVER SIOUX TRIBE,** | |
| **Intervenor-Plaintiff,** | |
| **v.** | |
| **U.S. ARMY CORPS OF ENGINEERS,** | |
| **Defendant,** | |
| **and** | |
| **DAKOTA ACCESS, LLP,** | |
| **Intervenor-Defendant.** | |

**PLAINTIFFS YANKTON SIOUX TRIBE AND ROBERT FLYING HAWK'S MOTION
FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56(a), Plaintiffs Yankton Sioux Tribe and Robert Flying Hawk,

through their attorneys, hereby move this Court for summary judgment on their claims of:

1. The United States Army Corps of Engineers ("USACE") and the United States Fish and

   Wildlife Service violated the National Environmental Policy Act ("NEPA") and acted

   arbitrarily, capriciously, and not in accordance with law by failing to analyze numerous

   connected and similar agency actions in a single NEPA document;

2. The USACE Omaha District's decision to issue an Environmental Assessment ("EA"), a

   Finding of No Significant Impacts ("FONSI"), a Section 408 Permit, and an easement

   under the Mineral Leasing Act, 30 U.S.C. § 185, without considering the potential impacts

of the construction and operation of the Dakota Access Pipeline on the Yankton Sioux

Tribe's ("Tribe") treaty rights was arbitrary, capricious, and must be held unlawful and set

aside pursuant to the APA, 5 U.S.C. § 706(2)(A); and

3. The USACE Omaha District breached its trust responsibility to the Tribe by issuing the

EA, FONSI, Section 408 permit, and easement without considering how the Tribe's treaty

rights could be affected.

In support of this Motion, Plaintiffs have attached the accompanying memorandum.

WHEREFORE, Plaintiffs Yankton Sioux Tribe and Robert Flying Hawk respectfully

request that this Court grant this motion and vacate the permits and permissions, EAs, and FONSIs

issued by Federal Defendants as described in detail in the attached memorandum of law.


Respectfully submitted this 10th day of November, 2017.


Jennifer S. Baker, OKBA# 21938
*Pro Hac Vice*
Fredericks Peebles & Morgan LLP
1900 Plaza Drive
Louisville, CO 80027
Phone: (303) 673-9600
Facsimile: (303) 673-9155
jbaker@ndnlaw.com
*Attorneys for Plaintiffs*


Jeffrey S. Rasmussen, WSBA# 21121
*Pro Hac Vice*
Fredericks Peebles & Morgan LLP
1900 Plaza Drive
Louisville, CO 80027
Phone: (303) 673-9600
Facsimile: (303) 673-9155
jrasmussin@ndnlaw.com
*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **STANDING ROCK SIOUX TRIBE,** | **Case No. 1:16-cv-1534-JEB** |
| **Plaintiff,** | **[Consolidated with 1:16-cv-1796 and 1:17-cv-267]** |
| **and** | |
| **CHEYENNE RIVER SIOUX TRIBE,** | |
| **Intervenor-Plaintiff,** | |
| **v.** | |
| **U.S. ARMY CORPS OF ENGINEERS,** | |
| **Defendant,** | |
| **and** | |
| **DAKOTA ACCESS, LLP,** | |
| **Intervenor-Defendant.** | |

**PLAINTIFFS YANKTON SIOUX TRIBE AND ROBERT FLYING HAWK'S
STATEMENT OF MATERIAL FACTS IN SUPPORT OF
MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Local Civil Rule 7(h) of the Local Rules of the U.S. District Court for the District of Columbia, Plaintiffs Yankton Sioux Tribe ("Tribe") and Robert Flying Hawk submit in support of their motion for partial summary judgment this statement of material facts as to which there is no genuine dispute.

I.     General Facts about the Parties.

1.     The Tribe is a federally-recognized Indian tribe.  25 U.S.C. § 479a; 81 Fed. Reg. 5020 (Jan. 29, 2016).

2.     Chairman Robert Flying Hawk is the Chairman of the Tribe's Business and Claims Committee, the government entity responsible for conducting the day-to-day business of the Tribe.

3.      The Tribe governs the Yankton Indian Reservation in southeastern Charles Mix County, South Dakota. *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329 (1998).

4.      Dakota Access, LLC ("Dakota Access") is the company formed to construct and own the Dakota Access Pipeline ("Pipeline"), and is the current owner and holder of all the Pipeline's federal permits, authorizations, and verifications.  Def. Intervener's Mem. in Supp. of Unopposed Mot. to Intervene in Supp. of Def's, 1-2, Aug. 5, 2016, ECF No. 7-1.

5.      The Pipeline is a more than 1,000-mile-long crude oil pipeline that runs from an area near Stanley, North Dakota, to Patoka, Illinois.  AR-9831; AR-71227; FWS-2453.[1]

6.      The Pipeline passes through the Tribe's ancestral homeland, treaty territory, and other areas of significant cultural, religious, and spiritual significance to the Tribe.  Treaty of Fort Laramie with Sioux, Etc., Sept. 17, 1851, art. 5, 11 Stat. 749, II KAPP 594, IV KAPP 1065; AR-6407 (The Pipeline enters the 1851 Treaty territory at the Heart River, at Pipeline mile post 128.3, and exits the Treaty territory at the Lake Oahe crossing, at mile post 165.9); Ex. A, Decl. of Faith Spotted Eagle ("Spotted Eagle Decl.") at ¶10.

7.      The United States Army Corps of Engineers ("USACE"), Lieutenant General Todd Semonite, Colonel John W. Henderson, Colonel Anthony Mitchell, the United States Fish and Wildlife Service ("FWS"), and Dan Ashe (collectively, "Federal Defendants") granted the various federal permissions, authorizations, and verifications required for the construction and operation of the Pipeline.  AR-71174-79; AR-9941-58.

II.      <u>Authorizations, Permissions, and Verifications Granted for the Pipeline by Federal Defendants.</u>

---

[1] Citations to AR-XXXXX is to the primary U.S. Army Corps administrative record.  Citations to EMST-XXXX are to the record for the granting of the Lake Oahe easement.  Citations to FWS-XXXX are to the Fish and Wildlife administrative record.

8.      In order to complete the Pipeline, Dakota Access needed certain authorizations, permissions, and verifications from Federal Defendants.

9.      From the USACE Omaha District, Dakota Access needed:

(1) a Section 408 Permission to cross Lake Sakakawea in North Dakota pursuant to the Rivers and Harbors At of 1899, 33 U.S.C. § 408 ("Section 408");

(2) a Section 408 Permission to cross Lake Oahe in North Dakota; and

(3) an easement to cross federal property at Lake Oahe pursuant to 30 U.S.C. § 185.

AR-71174.

10.     From the USACE St. Louis District, Dakota Access required:

(1) a Section 408 permission to cross Carlyle Lake in Illinois;

(2) a Section 408 permission to impact the Coon Run Drainage and Levee District in Illinois;

(3) a Section 408 permission to impact the McGee Creek Drainage and Levee District in Illinois; and

(4) a Section 408 permission to cross the Illinois River navigation channel in Illinois.

AR-9829.

11.     From the USACE Rock Island District, Dakota Access required a Section 408 permission to construct a horizontal directional drill ("HDD") under the Mississippi River.  AR-87256.

3

12.     Dakota Access needed authorization from the FWS for the Pipeline to cross five wetland easements and one grassland easement in North Dakota and three wetland easements and 109 grassland easements in South Dakota.  FWS-2418.

13.     Construction of the Pipeline required over 200 pre-construction notification ("PCN") verifications from the USACE St. Louis, Rock Island, and Omaha Districts for crossings of waters of the United States pursuant to Nationwide Permit 12 ("NWP 12") under Section 10 of the Rivers and Harbors Act and Section 404 of the Clean Water Act.  AR-2104-27.

14.     In December 2015, the USACE Omaha District released the Draft Environmental Assessment: Dakota Access Pipeline Project, crossings of flowage easements and federal lands ("Draft EA"), which did not mention the negative impacts that a pipeline spill could have on the Tribe's treaty rights.  AR-11982-12043.  This Draft EA was prepared by Dakota Access and submitted to the USACE in March 2015.  AR-75101-91.

15.     During the comment period for the Draft EA, comments were submitted to the USACE Omaha District explaining that the EA should document the cultural importance of the proposed crossing sites, and the proposed project's proximity to water intakes and fish and wildlife relied on by tribal members for "subsistence, cultural and religious practices."  AR-69160.

16.     A number of federal agencies also raised concerns about the Draft EA's lack of consideration of tribal interests.  For example, the U.S. Department of the Interior commented that the "potential impact on trust resources" required a full EIS.  AR-5750.  The U.S. Environmental Protection Agency ("EPA") noted that "Tribal interests have not been addressed sufficiently" in the Draft EA.  AR-68891.

17.     The EPA also asserted that the Final EA "should be expanded to disclose potential impacts to water resources and environmental or cultural sites that may be affected by potential

leaks and spills."  AR-73189; AR-74021 ("the document lacks sufficient analysis of direct and indirect impacts to water resources [and] lacks information on the measures that will be required to assure that impacts from construction and operation of the pipeline are not significant").  The EPA stated: "[w]hile the Draft EA notes that there is minimal risk of an oil spill associated with this project, our experience in spill response indicates that a break or leak in oil pipelines can result in significant impacts to water resources."  AR-73189.

18.     On July 25, 2016, the USACE Omaha District issued its Final EA and Finding of No Significant Impact ("FONSI") which analyzed the potential effects of the Pipeline crossing federal real property interests administered by the USACE Omaha District.  AR-71220; AR-71174-75.  The USACE Omaha District's Final EA was drafted by Dakota Access. AR-71220-71382.  Responses to the comments on the Draft EA were completed by companies retained by Dakota Access and Energy Transfer Partners.  AR-73186.  Additionally, the risk assessment included in the Final EA and relied upon by the USACE Omaha District was created by Dakota Access and the firm that it hired to conduct the assessment. A.R.-75101-91.  In the FONSI, the USACE Omaha District determined that granting Dakota Access the necessary Section 408 permissions for the Pipeline to make these crossings would not constitute a major federal action, and subsequently issued the requested Section 408 permissions.  AR-71190.

19.     In May 2016, the FWS published an EA, and on June 22, 2016, the FWS issued its FONSI regarding the Special Use Permit ("SUP") required for the Pipeline to cross grasslands and wetlands in North and South Dakota.   FWS-2416.

20.     In the FONSI, the FWS concluded that "allowing construction of the proposed Dakota Access Pipeline Project on privately owned lands encumbered by wetland and grassland easements under the management of the USFWS would not constitute a major federal action."

FWS-2418.  The FWS therefore concluded that an EIS would not be required, and issued the requested SUP to Dakota Access.  *Id.*

21.     On July 25, 2016, the USACE Omaha, Rock Island, and St. Louis Districts verified roughly 200 PCNs which Dakota Access had submitted to the USACE in 2014.  *Frequently Asked Questions  DAPL*,  USACE,  http://www.nwo.usace.army.mil/Media/Fact-Sheets/Fact-Sheet-Article-View/Article/749823/frequently-asked-questions-dapl/ (last visited April 28, 2017); AR-67342; AR-70686.  Dakota Access could not lawfully construct the Pipeline in the waters of the United States without these PCN verifications.  *Id.*

22.     Also on July 25, 2016, the USACE Rock Island District approved Dakota Access to construct a HDD under the Mississippi River.  AR-87256.

23.     On August 3, 2016, the USACE St. Louis District released its Final EA and FONSI pertaining to the Section 408 permissions for crossings in Illinois.  AR-9950.  In the FONSI, the USACE St. Louis District determined that providing Dakota Access with permission to cross lands containing projects funded by the federal government or lands that have federal government flowage easements under management by the USACE St. Louis District would not constitute a major federal action, and therefore found that an EIS was not required.  *Id.*

24.     On February 8, 2017, the USACE Omaha District granted an easement to Dakota Access for the Pipeline to cross USACE-owned lands at Lake Oahe, North Dakota.  ESMT-01-13.

25.     Two of the EAs for the Pipeline were prepared by separate districts of the same federal agency.  AR-71220-382; AR-9823-9940.

26.     Each EA prepared by a Federal Defendant failed to analyze the actions of the other Federal Defendants with respect to the Pipeline.  AR-71220-71832; AR-9823-9940; FWS-2449-92.

27.     With the exception of the easement to cross Lake Oahe, all of the agency actions occurred within a span of less than four months.  *Id.*

28.     Including the easement to cross Lake Oahe, all of the agency actions occurred within a span of less than ten months.  *Id.*

29.     All of the agency actions at issue pertain to the same pipeline.  *Id.*

30.     No single portion of the Pipeline has independent utility.  *Id.*

III.     <u>Facts Related to the Tribe's Treaty Rights and Trust Resources Which Can and Will Be Affected by the Pipeline.</u>

A. *The 1851 Fort Laramie Treaty.*

31.     In 1851, the Tribe, along with several other Sioux bands and indigenous nations, entered into the Treaty of Fort Laramie ("1851 Treaty") with the United States.  Treaty of Fort Laramie with the Sioux, Etc., art. 5, Sept. 17, 1851, 11 Stat. 749, II KAPP 594, IV KAPP 1065.

32.     The 1851 Treaty recognized roughly 60 million acres of the Sioux tribes' territory. *Sioux Tribe v. United States*, 500 F.2d 458, 460 (Ct. Cl. 1974).

33.     Article 5 of the 1851 Treaty described the territory of the Sioux Nation as,

commencing [at] the mouth of the White Earth River, on the Missouri River; thence in a southwesterly direction to the forks of the Platte River; thence up the north fork of the Platte River to a point known as Red Bute [sic], or where the road leaves the river; thence along the range of mountains known as the Black Hills, to the headwaters of the Heart River; thence down the Missouri River to the place of beginning."

11 Stat. 749.

34.     Article 5 of the 1851 Treaty further states that the signatory tribes "do not hereby abandon or prejudice any rights any rights or claims they may have to other lands; and further, that they do not surrender the privilege of hunting, fishing, or passing over any of the tracts of country heretofore described."  *Id.*

35.     Partially as a result of growing political pressure to open what is now southeastern South Dakota to white settlement, in the 1858 Treaty with the Yankton Sioux ("1858 Treaty"), the Tribe ceded to the United States all lands it owned, possessed, and claimed, excepting a reservation in Wagner, South Dakota.  Treaty with the Yankton Sioux, art. 1, Apr. 19, 1858, 11 Stat. 743.

36.     The 1858 Treaty ceded and conveyed the 1851 Treaty territory to the United States, but was silent as to the usufructuary rights in this territory.  *Id*.

*B. The Importance of the 1851 Treaty Territory to the Tribe.*

37.     The Tribe continues to utilize and value the 1851 Treaty Territory.  Ex. A, Spotted Eagle Decl. at ¶10.

38.     All Tribal ceremonies are conducted in the presence of water.  *Id*. at ¶13.

39.     The Tribe has viewed water, and particular the water of the Missouri River, as sacred and necessary for medicinal purposes since time immemorial.  *Id*. at ¶14, 17.

40.     Water is the Tribe's first medicine.  Ex. A, Spotted Eagle Decl. at ¶ 14; Ex. B, Decl. of Glenn Drapeau ("Drapeau Decl.") at ¶3.

41.     Tribal members perform sacred ceremonies along the banks of the Missouri River and this water must remain as pure as possible to properly conduct the Tribe's ceremonies.  Ex. A, Spotted Eagle Decl. at ¶ 15; Ex. B, Drapeau Decl. at ¶ 5.

42.     Tribal members harvest many medicines from areas near the water that rely on the water for their purity.  Ex. A, Spotted Eagle Decl. at ¶ 12.

43.     Unpolluted water is necessary for the Tribe's healing ceremonies.  Ex. B, Drapeau Decl. at ¶5.

*C. The Pipeline Endangers the Environment and Resources of the 1851 Treaty Territory.*

44.     Approximately 38 miles of the Pipeline pass through territory reserved to the Tribe through the 1851 Treaty.  AR-6407 (Heart River is at Pipeline mile post 128.3, and the Lake Oahe crossing is at mile post 165.9); Treaty of Fort Laramie with Sioux, Etc., Sept. 17, 1851, art. 5, 11 Stat. 749, II KAPP 594, IV KAPP 1065; AR-6407 (The Pipeline enters the 1851 Treaty territory at the Heart River, at Pipeline mile post 128.3, and exits the Treaty territory at the Lake Oahe crossing, at mile post 165.9).

45.     The Pipeline has already leaked at least three times.  Zak Cheney Rice, *The Dakota Access pipeline sprung 2 new leaks*, Business Insider, (May 23, 2017, 8:26 PM), http://www.businessinsider.com/the-dakota-access-pipeline-sprung-2-new-leaks-2017-5.

46.     Moreover, Sunoco Pipeline Logistics ("Sunoco"), the company responsible for operating the Pipeline, has a history of excessive spills.  Liz Hampton, *Sunoco, behind protested Dakota pipeline, tops U.S. crude spill charts*, REUTERS (Sept. 23, 2016, 5:16 PM), http://www.reuters.com/article/us-usa-pipeline-nativeamericans-safety (Sunoco "spills crude more often than any of its competitors with more than 200 leaks since 2010").

47.     An oil spill into the Missouri River at Lake Oahe is especially likely because the portion of the Pipeline running under Lake Oahe was inserted via horizontal directional drilling ("HDD").  At 7,800 feet in length, the HDD below Lake Oahe is "one of the longest bore HDDs ever attempted."  Hakan Bekar, et al*., Technical Engineering and Safety Assessment: Routing, Construction, and Operation of the Dakota Access Pipeline in North Dakota* (January 5, 2016) (Dkt 131-5,[page no. 130]).  Experts "caution that the application of an HDD construction method for distances exceeding one mile (5,280 ft) is not a standard application." *Id* at 132.  "[T]he longer the HDD, the higher the risk."  *Id*. at 128.

48.     Because the Pipeline is 92 feet below Lake Oahe, "[u]ndetectable underground leaks pose as some of the most significant environmental pollution risks throughout the life of the pipeline and potential risks increase over time through corrosion, landslide movement or other disruptive forces." *Id*. at 127.  If the Pipeline leaks under Lake Oahe, there would be no "alert for the leakage up to 5,700 barrels/day."  Cheyenne River Sioux Tribe, *Cheyenne River Sioux Tribe's Preliminary Informational Paper Concerning Dakota Access LLC'S Request for an Easement to Cross Lake Oahe, North Dakota Pursuant to 30 U.S.C. § 185* (January 18, 2017) (131-5 [page no. 161]).

49.     The Pipeline could also leak into rivers and creeks at other crossing sites.

50.     The Pipeline crosses the Heart River, which marks the northern boundary of the 1851 Treaty territory, and numerous small creeks throughout the 1851 Treaty territory that support growth of vegetation traditionally used by the Tribe.  AR-71412.

51.     Members of the Tribe continue to hunt, fish, gather, and use water where the pipeline crosses through the Tribe's Treaty territory today.  Ex. C, Declaration of Kip Spotted Eagle at ¶ 12.

52.     An oil spill into the surrounding lakes and rivers could affect water quality and significantly affect fish because of the bioaccumulation of toxicity into the food chain.  Gillian Bowser Ph.D*., Assessment and Review Dakota Access Pipeline Environmental Assessment Terrestrial and Aquatic Organisms* (January 5, 2017) (Dkt 131-5,[page no. 181]).  If a spill occurs beneath a lake or river during winter months, ice on top of that body of water could prolong detection of an oil spill.  *Id*. at 182.  Moreover, the ice would prevent benzene, a highly toxic carcinogen known to cause leukemia and other severe health problems, from evaporating.  *Id*. Cleanup following a spill could be prohibitively expensive and take years to accomplish.

Hooshang Nezafti, PhD., "*Examining the Potential Adverse Impacts of the Dakota Pipeline Crossings to the Water Quality at the Cheyenne River Sioux Tribe Water Intake in the Missouri River*," (Dkt 131-5,[page no. 201]) ("Rivers contaminated by spills can sometimes take years and hundreds of millions of dollars to remediate.").

53.     In addition to harming fish, an oil spill in the 1851 Treaty territory could also adversely affect wild game, plant life, and the water itself.

54.     Potential damage to animals from oil includes "reproductive problems, trouble digesting, and damage to the central nervous system, liver, and lungs." Brant Phillips, *Oil Pipelines and Spills*, AUBURN UNIVERSITY, http://cla.auburn.edu/ces/energy/oil-pipelines-and-spills/ (last updated Feb. 1, 2017). Just the physical contact of oil can be extremely harmful. "Even a small amount of oil on a bird's feathers can kill it," and oil on mammals' fur affects their "ability to insulate themselves, which can lead to hypothermia and death." *Id.*

55.     Even the maintenance of the right of way for the Pipeline will disturb fish and wildlife. As explained by the FWS:

> [Right of way ("ROW")] maintenance often involves the chemical or mechanical control of vegetation within the ROW contributing to the loss of native plant species diversity. Cleared ROWs may be a continued source of sedimentation into waterways. Frequent maintenance can result in soil compaction, alteration of natural landscape topography and drainage patterns, and the disruption of normal groundwater flows. Repair and maintenance activities can also disturb wildlife, result in spills and contribute to continued habitat loss.

*Oil and Gas Pipelines*, U.S. FISH & WILDLIFE SERVICE, https://www.fws.gov/ecological-services/energy-development/pipelines.html (last updated Feb. 4, 2015).

56.     An oil spill threatens the Tribe's ability to perform ceremonies for spiritual and healing purposes using water from the Missouri River because clean, uncontaminated water is essential for the Tribe's ceremonies. Ex. A, Spotted Eagle Decl. at ¶¶ 13, 14; Ex. B, Drapeau Decl.

at ¶ 5.  An oil spill would add dangerous carcinogens such as benzene to the water.  Gillian Bowser Ph.D., *Assessment and Review Dakota Access Pipeline Environmental Assessment Terrestrial and Aquatic Organisms* (January 5, 2017) (Dkt 131-5, [page no. 182]).

57.     Additionally, contaminated water could contaminate medicinal plants necessary for the Tribe's spiritual and healing ceremonies.  Ex. A, Spotted Eagle Decl. at ¶ 12.

58.     Although the operation of the Pipeline could harm Tribal treaty rights, the USACE Omaha District did not consider treaty rights in the Final EA.  AR-71220-382.

Respectfully submitted this _10_ th day of November, 2017.

FREDERICKS PEEBLES & MORGAN LLP


Jennifer S. Baker, OKBA# 21938
*Pro Hac Vice*
Fredericks Peebles & Morgan LLP
1900 Plaza Drive
Louisville, CO 80027
Phone: (303) 673-9600
Facsimile: (303) 673-9155
jbaker@ndnlaw.com
*Attorneys for Plaintiffs*


Jeffrey S. Rasmussen, WSBA# 21121
*Pro Hac Vice*
Fredericks Peebles & Morgan LLP
1900 Plaza Drive
Louisville, CO 80027
Phone: (303) 673-9600
Facsimile: (303) 673-9155
jrasmussen@ndnlaw.com
*Attorneys for Plaintiffs*

13

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE,<br><br>Plaintiff,<br><br>and<br><br>CHEYENNE RIVER SIOUX TRIBE,<br><br>Intervenor-Plaintiff,<br><br>v.<br><br>U.S. ARMY CORPS OF ENGINEERS,<br><br>Defendant,<br><br>and<br><br>DAKOTA ACCESS, LLP,<br><br>Intervenor-Defendant. | Case No. 1:16-cv-1534-JEB<br>[Consolidated with 1:16-cv-1796 and<br>1:17-cv-267] |

**PLAINTIFFS YANKTON SIOUX TRIBE AND ROBERT FLYING HAWK'S
MEMORANDUM IN SUPPORT OF THEIR MOTION FOR
PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................ 1

HISTORY AND BACKGROUND OF THE YANKTON SIOUX TRIBE ..................... 3

LEGAL ARGUMENT........................................................................................ 5

    I.   FEDERAL DEFENDANTS VIOLATED NEPA BY FAILING
        TO ANALYZE NUMEROUS CONNECTED AND SIMILAR
        AGENCY ACTIONS IN A SINGLE NEPA DOCUMENT........................... 5

          A. Requirements of NEPA ............................................................ 7

              1.  Segmentation is Not Allowed ....................................... 7
              2.  If actions are Connected or Similar, those Actions Must be
                    Considered in One Comprehensive NEPA Analysis ........................ 8

          B. Federal Defendants Unlawfully Segmented their Review by Failing
             To Analyze Connected and Similar Actions in a Single Document ........ 9

              1.  Federal Defendants Failed to Consider Other Federal
                    Defendants' Respective Actions Relating to the Pipeline...................
                    ........................................................................................9
              2.  The Numerous Federal Agency Approvals for the Pipeline
                    are <u>Connected Actions</u> that Should Have Been Analyzed
                    in a Single NEPA Document. .................................... 11
              3.  The Numerous Federal Agency Approvals for the Pipeline
                    are <u>Similar Actions</u> that Should Have Been Analyzed in a
                    Single NEPA Document. ........................................ 14
               4.  Case Law Precedent in this Circuit is Inapposite and
                    Distinguishable.................................................. 16

    II.   THE USACE IMPROPERLY APPROVED THE PIPELINE WITHOUT
        ANALYZING ITS EFFECTS ON THE TRIBE'S TREATY RIGHTS. ..................... 19

        A.   The Tribe Possesses Usufructuary Rights Derived from
             the 1851 Treaty. ................................................ 20
         B.   Congress has Never Abrogated the Tribe's Treaty Rights..................... 22
        C.   The Pipeline Endangers the Tribe's Treaty Rights........................ 25
        D.   Because the Pipeline Threatens the Tribe's Treaty Rights,
             the USACE Omaha District was Required to Analyze the
             Pipeline's Impact on these Rights in its EA...................... 26
         E.   The USACE Omaha District's Failure to Analyze the
             Pipeline's effects on Treaty Rights was Especially Egregious
             in Light of the USACE's Trust Responsibility to the Tribe................ 29

CONCLUSION................................................................................ 31

# TABLE OF AUTHORITIES

Cases

*Am. Bird Conservancy, Inc. v. Fed. Communications Commission,*
    516 F.3d 1027, 1032 (D.C. Cir. 2008) ..................................................................... 18

*Assiniboine Indian Tribe v. United States,*
    77 Ct. Cl. 347 (Ct. Cl. 1933) ................................................................................. 21

*Coal. on Sensible Transp. Inc. v. Dole,*
    826 F.2d 60, 69 (D.C. Cir. 1987) ............................................................................ 12

*Cobell v. Norton,*
    240 F.3d 1081, 1104 (D.D.C. 2001) ....................................................................... 29

*Crow Tribe of Indians v. United States,*
    151 Ct. Cl. 281, 286 (Ct. Cl. 1960) ........................................................................ 21

*Del. Riverkeeper Network v. Fed. Energy Regulatory Comm'n,*
    753 F.3d 1304, 1313 (D.C. Cir. 2014) ............................................................. passim

*Dep't of Transp. v. Pub. Citizen,*
    541 U.S. 752, 756–57 (2004) .................................................................................... 7

*El Paso Natural Gas Co. v. United States,*
    750 F.3d 863 (D.C. Cir. 2014) .......................................................................... 30, 31

*Fla. Wildlife Fed'n v. United States Army Corps of Eng'rs,* 401 F. Supp. 2d 1298, 1313 (S. Dist.
    Fla. 2005) ............................................................................................................... 8

*Hammond v. Norton,*
    370 F. Supp. 2d 226, 244 (D.D.C. 2005) ......................................................... 7, 8, 12

*Jicarilla Apache Nation v. United States,*
    100 Fed. Cl. 726, 740 n.18 (2011) .......................................................................... 29

*Kleppe v. Sierra Club,*
    427 U.S. 390, 410 (1976) ...................................................................................... 18

*Lac Courte Oreilles Band of Lake Superior Chippewa Indians,*
    700 F.2d 341, 352 (7th Cir. 1983) ........................................................... 20, 21, 22, 23

*Menominee Tribe v. United States,*
    391 U.S. 404 (1968) .................................................................................. 20, 21, 24

*Minnesota v. Mille Lacs Band of Chippewa Indians,*
    526 U.S. 172, 202 (1999) .................................................................................. 23, 24

*Motor Vehicle Mfrs'. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 2942 (1983) ............................................................................................ 30

*Muckleshoot Indian Tribe v. Hall,*
    698 F. Supp. 1504 (W.D. Wash. 1988) ............................................................. 27, 29

*Myersville Citizens for a Rural Community, Inc. v. Fed. Energy Reg. Comm'n,*
    783 F.3d 1301, 1324-25 (D.C. Cir. 2015) ............................................................... 28

*Nat. Res. Def. Council, Inc. v. Hodel,*
    865 F.2d 288, 297 (D.C. Cir. 1988) ....................................................................... 18

*Natural Resources Defense Council, Inc. v. Hodel,*
    865 F.2d 288, 297-98 (D.C. Cir. 1988) ..................................................................... 8

*No Oilport! v. Carter,*
    520 F. Supp. 334, 356 (W.D. Wash. 1981) ...................................................... 26, 28, 29

*North Carolina v. EPA,*
    531 F.3d 896, 929 (D.C. Cir. 2008) ..................................................................31
*Northwest Sea Farms, Inc. v. United States,*
    931 F. Supp. 1515 (W.D. Wash. 1996) ........................................27,28,29,30
*Or. Dep't of Fish and Wildlife v. Klamath Indian Tribes,*
    473 U.S. 753, 766 (1985) ..................................................................................24
*PEACH v. U.S. Army Corps,*
    87 F.3d 1242, 1247 (11th Cir. 1996)................................................................. 8
*Pyramid Lake Paiute Tribe v. Morton,*
    354 F. Supp. 252 (D.D.C. 1972) ......................................................................29
*S.C. ex rel. Campbell v. O'Leary,*
    64 F.3d 892, 898-99 (4th Cir. 1995) ................................................................13
*Seminole Nation v. United States,*
    316 U.S. 286, 296-97 (1941) ............................................................................29
*Sierra Club v. United States Army Corps of Eng'rs,*
    803 F.3d 31 (D.C. Cir. 2015) ..................................................................... 16, 18
*Sioux Tribe v. United States,*
    500 F.2d 458, 460 (Ct. Cl. 1974) ...................................................................... 4
*Taxpayers Watchdog, Inc. v. Stanley,*
    819 F.2d 294, 298 (D.C. Cir. 1987) .................................................8, 12, 13, 19
*Thomas v. Peterson,*
    753 F.2d 754, 758 (9th Cir. 1985) .................................................................... 8
*United States v. Anderson,*
    591 F. Supp. 1, 5 (E.D. Wash. 1982) ...............................................................22
*United States v. Gila Valley Irrigation Dist.,*
    920 F. Supp. 1444 (D. Ariz. 1996), aff'd 117 F.3d 425 (9th Cir. 1997). ..........22

Statutes
16 U.S.C. §§ 668dd–668ee ......................................................................................10
30 U.S.C. § 185(a) ...................................................................................................10
33 U.S.C. § 408 ........................................................................................................16
42 U.S.C. § 4332(c) .................................................................................................. 7
5 U.S.C. § 706(2)(A) .............................................................................................3, 28
Administrative Procedure Act .................................................................................. 3
Rivers and Harbors Act of 1899 ...............................................................................16
Treaty with the Chippewas, 10 Stat. 1165 (1855).....................................................23

Other Authorities
Amy Dalrymple, *Pipeline plan first called for crossing north of Bismarck*, THE BISMARCK
    TRIBUNE, Aug. 18, 2016 ...................................................................................25
COHEN'S HANDBOOK OF FEDERAL INDIAN LAW, § 18.02, 1156 (Nell Newton ed. 2012 ed.) 20, 22,
    29
James H. Howard, *Yanktonai Ethnohistory and the John K. Bear Winter Count*, 21 PLAINS
    ANTHROPOLOGIST 1 (Aug. 1976) ...................................................................... 3
*Oil Pipelines and Spills*, AUBURN UNIVERSITY, http://cla.auburn.edu/ces/energy/oil-pipelines-
    and-spills/ (last updated Feb. 1, 2017)................................................................26

Samantha Wohlfeil, *Army Corps rejects permit for coal terminal at Cherry Point*, BELLINGHAM
   HERALD (May 9, 2016, 11:11 AM),
   http://www.bellinghamherald.com/news/local/article76545117.html .............................................27
U.S. ARMY CORPS OF ENG'RS, CENWS-OD-RG, NWS-2008-260 PACIFIC INTERNATIONAL
   HOLDINGS LLC (PIH) (2016) at 1 ................................................................................................28

Treatises
1858 Treaty with the Yankton Sioux.  Apr. 19, 1958, 11 Stat. 743, II KAPP 776 ...........................4
Treaty of Fort Laramie with Sioux, Etc., Sept. 17, 1851, art. 5, 11 Stat. 749, II KAPP 594, IV
   KAPP 1065...............................................................................................................................passim
Treaty with the Yankton Sioux art. 1, Apr. 19, 1858, 11 Stat. 743, II KAPP 776 ...........................24

Regulations
40 C.F.R. § 1501.4 ...............................................................................................................................7
40 C.F.R. § 1508.18(a), (b)(4).............................................................................................................7
40 C.F.R. § 1508.25...............................................................................................................8, 15, 19
40 C.F.R. § 1508.25(a)(3).....................................................................................................................9
40 C.F.R. § 1508.25.............................................................................................................................11
40 C.F.R. § 1508.27(a) .........................................................................................................................7

Constitutional Provisions
Yankton Sioux Const. pmbl. .................................................................................................................3

## INTRODUCTION

The Yankton Sioux Tribe, a federally recognized sovereign Indian tribe headquartered in Wagner, South Dakota, and Robert Flying Hawk, Chairman of the Yankton Sioux Tribe's Business and Claims Committee (collectively, "Tribe"), bring this challenge against the U.S. Army Corps of Engineers (the "USACE"), the USACE's Commanding General and Chief of Engineers, the USACE's Omaha District Commander, the USACE's St. Louis District Commander, and the United States Fish and Wildlife Service (the "FWS") (collectively, "Federal Defendants") on the grounds that Federal Defendants violated the National Environmental Policy Act ("NEPA") and the Tribe's treaty rights when they granted numerous federal authorizations, easements, and permissions necessary for the construction and maintenance of the Dakota Access Pipeline ("Pipeline").

The Pipeline is a 1,172-mile-long crude oil pipeline which can transport crude oil at a rate of 570,000 barrels-per-day from the Bakken and Three Forks production regions in North Dakota to a crude oil market hub located near Patoka, Illinois, and ultimately to refineries located in the Midwest and the Gulf, poised for oil exportation. SUPP AR-1171; AR-69561.[1] The Pipeline passes through the Tribe's ancestral homeland, treaty territory, and other areas of cultural, religious, and spiritual significance to the Tribe. Treaty of Fort Laramie with Sioux, Etc., Sept. 17, 1851, art. 5, 11 Stat. 749, II KAPP 594, IV KAPP 1065; AR-6407 (The Pipeline enters the 1851 Treaty territory at Heart River, at Pipeline mile post 128.3, and exits the Treaty territory at the Lake Oahe crossing at mile post 165.9). Approximately 38 miles of the Pipeline pass through territory reserved to the Tribe through the 1851 Treaty of Fort Laramie. *Id.*

---

[1] "AR-" indicates the primary USACE administrative record. "SUPP AR-" indicates the USACE supplemental administrative record. "FWS-" indicates the FWS administrative record.

The Tribe brings this action in part due to the informational harm it suffered from Federal Defendants' failure to properly evaluate the Pipeline's environmental impacts in a single NEPA document. The Tribe also brings this action due to its concern that an inevitable oil spill from the Pipeline will irreparably harm its hunting, fishing, and water treaty rights.

In permitting the various portions of the Pipeline, Federal Defendants have granted Dakota Access, LLC ("Dakota Access") approximately ten separate approvals and more than 200 pre-construction notification ("PCN") site verifications. AR-2104-27. Moreover, four separate federal entities (the FWS and three separate Districts of the USACE) analyzed the federal actions related to the Pipeline, resulting in three separate Environmental Assessments ("EAs"). By conducting completely separate analyses over this single, large-scale project, Federal Defendants left the Tribe, other affected tribal governments, and the public with no means to truly understand or weigh in on the vast cumulative impacts this project can and will have on the human environment.

By conducting three separate EAs for the Pipeline, rather than one comprehensive NEPA document, Federal Defendants left the NEPA analysis improperly segmented and concealed the cumulative environmental impacts of the project. This issue was repeatedly raised during the comment period by individuals and federal agencies alike. For example, the DOI stated it "believe[s] that the [USACE] did not adequately explain why it was not analyzing impacts and disclosing consequences of spills *along the length of the Pipeline outside of those areas for which it is making a decision, as might be required under the definition of 'connected actions'* under 40 CFR Section 1508.25(a)(l)(iii)." AR-72159 (emphasis added). The DOI further stated its opinion that "the [USACE] did not adequately justify or otherwise support its conclusion that there would be no significant impacts upon the surrounding environment and community. USACE's conclusion was not supported by analysis or data and, where potential adverse impacts were

acknowledged, no level of intensity was assigned." *Id.* Additionally, many concerned members of the public called on the USACE to "end the segmentation of the proposed [Pipeline]" and assess "the entirety of the proposed [P]ipeline" and "the [environmental] impacts from start to finish." AR-72518–873.

This action for partial summary judgment challenges, among other things, numerous Federal authorizations and decisions including, but not limited to, the USACE Omaha District's EA/Finding of No Significant Impact ("FONSI"), the USACE St. Louis EA/FONSI, the USACE's NWP 12 verifications for more than 200 PCNs along the route of the proposed pipeline, as well as the FWS's EA/FONSI, which were conditions precedent to completing the Pipeline. Specifically, the Tribe alleges that Federal Defendants' failure to analyze the Pipeline's multiple federal approvals and subsequent impacts in a single NEPA document is arbitrary and capricious, an abuse agency discretion, a failure to act in accordance with law, and thereby a violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A).

## HISTORY AND BACKGROUND OF THE YANKTON SIOUX TRIBE

The Tribe is a federally recognized Indian tribe that is not incorporated under the Indian Reorganization Act, but rather, is governed by a constitution and by-laws duly adopted in 1932 through its General Council. Yankton Sioux Const. pmbl. The Tribe is a member band of the *Oceti Sakowin*, or "Seven Council Fires." The Tribe has approximately 9,000 enrolled members and is headquartered in Wagner, South Dakota.

During the seventeenth century, the Yankton band of the *Oceti Sakowin* began moving from eastern present-day Minnesota to present-day North Dakota and South Dakota. James H. Howard, *Yanktonai Ethnohistory and the John K. Bear Winter Count*, 21 PLAINS ANTHROPOLOGIST 1 (Aug. 1976). In 1851, the Tribe, along with several other bands of the *Oceti*

*Sakowin*, signed the Treaty of Fort Laramie ("1851 Treaty"). Treaty of Fort Laramie with Sioux, Etc., Sept. 17, 1851, art. 5, 11 Stat. 749, II KAPP 594, IV KAPP 1065. The 1851 Treaty recognized roughly 60 million acres of land for the signatory Sioux tribes. *Sioux Tribe v. United States*, 500 F.2d 458, 460 (Ct. Cl. 1974). The 1851 Treaty territory is bounded to the north by the Heart River and to the east by the Missouri River. Treaty of Fort Laramie with Sioux, Etc. Sept. 17, 1851, art. 5, 11 Stat. 749, II KAPP 594, IV KAPP 1065.

As a result of growing political pressure to open what is now southeastern South Dakota to white settlement, the United States and the Tribe subsequently entered into the 1858 Treaty with the Yankton Sioux. Apr. 19, 1958, 11 Stat. 743, II KAPP 776. In this treaty, the Tribe ceded to the United States all lands it owned, possessed, and claimed, excepting 400,000 acres in southeastern South Dakota. *Id.* at art. 1-2.

Jumping forward in time, the Tribe has continually sought to protect its interests, including interests in its treaty lands, from the serious risk of harm posed by the Pipeline. AR-64260; AR-64400-02; AR-65507-13. When the Pipeline project was being considered during the development of the EA, the Tribe repeatedly requested consultation with the USACE. AR-64400-02; AR-65507-13. Finally, in April 2016, Plaintiff Chairman Flying Hawk resorted to personally, publicly hand-delivering a written request for consultation to Colonel John Henderson, as previous correspondence requesting consultation had gone unanswered. AR-64400-02; AR-65507-13. On May 6, 2017, the USACE responded to the Tribe's request, indicating that a meeting would be scheduled for consultation.

On May 18, 2016, the USACE and the Tribe held a *pre-consultation* meeting to lay the groundwork for actual *consultation* on the agency actions. AR-64213; AR-64234-35. Colonel Henderson, representing the USACE, agreed during the pre-consultation meeting that the meeting

would not be considered "consultation." This meeting was the first and only meeting between the Tribe and the USACE regarding the EA, and as it was not consultation, there has been no consultation with the Tribe on the USACE's actions. The Tribe was in the process of developing Tribal Consultation Protocols to govern consultation between the Tribe and federal agencies at the time of the pre-consultation meeting. The USACE was notified of this fact during the pre-consultation meeting and in a follow-up letter from the Tribe indicating that the Tribal Consultation Policies were forthcoming. The USACE then reneged on its promise and issued the EA and FONSI before the Tribe had an opportunity to provide the USACE with its Tribal Consultation Protocols and engage in an actual consultation meeting with the USACE. The USACE denied the Tribe the opportunity to comment on the proposed action in time for the Tribe to provide meaningful comments that should have been considered prior to the USACE's decision.

## LEGAL ARGUMENT

I. **FEDERAL DEFENDANTS VIOLATED NEPA BY FAILING TO ANALYZE NUMEROUS CONNECTED AND SIMILAR AGENCY ACTIONS IN A SINGLE NEPA DOCUMENT.**

Frankly, no separate component of the Pipeline that was considered by Federal Defendants and analyzed in three separate NEPA documents could possibly serve a significant purpose on its own. Federal Defendants' assessment of each project component independently constitutes a fatal flaw in the NEPA analysis and effectively conceals from the public the gravity of the environmental impacts of the combined federal actions. The informational harm that stems from such inadequate NEPA analysis constitutes an ongoing injury not only to the tribal communities affected by the Pipeline but to the public as a whole, as evidenced by the multitude of comments by tribal communities, the public, and federal agencies. Further NEPA analysis in the form a comprehensive NEPA document assessing the impacts to the nearby tribal communities and cumulative environmental impacts must be conducted.

Instead of analyzing the impacts of the above-described federal actions in a *single* NEPA document, Federal Defendants unlawfully segmented their environmental analysis and generated three *separate* sets of NEPA documents; two prepared by separate USACE Districts and one by the FWS. The result was disjointed agency actions with no meaningful coordination or relation to one another. Tribal governments and communities were left to try to understand the true scope of the project on their own, including the indirect and cumulative environmental impacts.

In order to fully comply with the mandates of NEPA and its implementing regulations, the numerous federal actions and approvals necessary for construction and operation of the Pipeline must be analyzed in a *single* NEPA document. The need for a single NEPA document was repeatedly pointed out during the comment period. AR-160–61; AR-10735–45; AR-66241–50; AR-84809.

However, Federal Defendants universally dismissed the commenters' reasonable concerns and refused to fully evaluate the direct, indirect, and cumulative impacts of the Pipeline in a single NEPA document, thereby artificially constraining the scope of NEPA analysis to distinct segments of the Pipeline based on the respective agency action. In an attempt to justify this decision, Federal Defendant USACE stated that "NEPA should be commensurate with the scale and potential effects of the activity that would alter the [specific] USACE project," AR-10735, and that "[a]ctions connected to the Federal Actions of authorizing the installation of [the Pipeline] under federal levees, navigation channels, and federal flowage easements on private property, are *limited to the project components necessary to complete these crossings.*" AR-10736 (emphasis added). As demonstrated below, the inadequate NEPA process employed by Federal Defendants illustrates a fundamental misunderstanding of NEPA and its implementing regulations. By failing to fully address the environmental impacts resulting from all connected and similar federal actions, Federal

6

Defendants failed to take the required "hard look" at the direct, cumulative, and indirect impacts of the Pipeline, in direct violation of the clear language and intent of NEPA.

### A.   Requirements of NEPA.

NEPA requires the production of an environmental impact statement ("EIS") for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(c). "Federal actions," as defined under NEPA, encompass the federal government's own undertakings, such as promulgating a rule or building a public project, as well as government authorizations or support of non-federal activities, such as *approving private construction activities "by permit or other regulatory decision."* 40 C.F.R. § 1508.18(a), (b)(4) (emphasis added). Thus, NEPA requires the federal government to identify and assess in advance the likely environmental impacts of its proposed actions, including its authorization or permitting of private actions. *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756–57 (2004).

Agency actions that have a "significant" impact on the human environment normally require production of an EIS. 40 C.F.R. § 1501.4. Significance of an action "must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality." 40 C.F.R. § 1508.27(a).

### 1.   Segmentation is Not Allowed.

To fulfill its NEPA duties, an agency may not "segment" its analysis to conceal the environmental significance of a project. *Hammond v. Norton*, 370 F. Supp. 2d 226, 244 (D.D.C. 2005). An agency unlawfully segments NEPA review when it "divides connected, cumulative, or similar federal actions into separate projects and thereby fails to address the true scope and impact of the activities that should be under consideration." *Del. Riverkeeper Network v. Fed. Energy Regulatory Comm'n*, 753 F.3d 1304, 1313 (D.C. Cir. 2014). "[W]hen determining the contents of

an EA or an EIS, an agency must consider all 'connected actions,' 'cumulative actions,' and 'similar actions.'" *Id.* (citations omitted). Segmentation allows an agency to "avoid the NEPA requirement that an EIS be prepared for all major federal actions with significant environmental impacts by dividing an overall plan into component parts, each involving action with less significant environmental effects." *Taxpayers Watchdog, Inc. v. Stanley*, 819 F.2d 294, 298 (D.C. Cir. 1987). The rule against segmentation was developed to ensure that the environmental significance of a proposed project could not be concealed by segmenting components of the projects in separate NEPA evaluations. *See Hammond*, 370 F. Supp. 2d at 244; *Del. Riverkeeper*, 753 F.3d at 1313. "[T]he anti-segmentation rule is generally that an agency 'cannot "evade [its] responsibilities" under the National Environmental Policy Act by "artificially dividing a major federal action into smaller components, each without a 'significant impact.'"'" *Fla. Wildlife Fed'n v. United States Army Corps of Eng'rs*, 401 F. Supp. 2d 1298, 1313 (S. Dist. Fla. 2005) (quoting *PEACH v. U.S. Army Corps*, 87 F.3d 1242, 1247 (11th Cir. 1996)). It "is intended to prevent 'agencies from dividing one project into multiple individual actions, "each of which individually has an insignificant environmental impact, but which collectively have a substantial impact."'" *Id.* (quoting *Natural Resources Defense Council, Inc. v. Hodel*, 865 F.2d 288, 297-98 (D.C. Cir. 1988) (quoting *Thomas v. Peterson*, 753 F.2d 754, 758 (9th Cir. 1985))).

### 2.   If Actions are Connected or Similar, those Actions Must be Considered in One Comprehensive NEPA Analysis.

Accordingly, if actions are connected or similar, NEPA requires agencies to consider these actions in one comprehensive NEPA analysis. 40 C.F.R. § 1508.25. Connected actions are actions which "(i) automatically trigger other actions which may require [an EIS]; (ii) cannot or will not proceed unless other actions are taken previously or simultaneously; or (iii) are interdependent parts of a larger action and depend on the larger action for their justification." *Id.* at §

1508.25(a)(1)(i)–(iii). Similar actions are actions which, "when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography." 40 C.F.R. § 1508.25(a)(3).

**B.      Federal Defendants Unlawfully Segmented their Review by Failing to Analyze Connected and Similar Actions in a Single Document.**

"The scope of an agency's NEPA review must include both "connected actions" and "similar actions." *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1309 (D.C. Cir. 2014). "An agency impermissibly 'segments' NEPA review when it divides <u>connected</u>, cumulative, or <u>similar</u> federal actions into separate projects and thereby fails to address the true scope and impact of the activities that should be under consideration." *Del. Riverkeeper*, 753 F.3d at 1313.

Federal Defendants effectively concealed the environmental significance of the Pipeline project in violation of the anti-segmentation rule by refusing to analyze the connected and similar federal actions related to the Pipeline in a single NEPA document. Rather than undertaking the comprehensive environmental review process required by NEPA and its implementing regulations, Federal Defendants artificially segmented the linear Pipeline project into separate components confined within their respective jurisdictions. Federal Defendants relied on this segmentation to issue their respective EAs and FONSIs, while ignoring the environmentally significant impacts resulting from the connected and similar federal actions related to the Pipeline project. *See* AR-71227 (stating that "separate [USACE] authorizations are being sought for Section 404, Section 10, and Section 408 crossings on other portions of the Pipeline's route. Those actions are not discussed in the EA").

**1.      Federal Defendants Failed to Consider Other Federal Defendants' Respective Actions Relating to the Pipeline.**

9

First, the FWS issued an EA in May 2016 and a FONSI in June 2016. FWS-2449; FWS-2416. The FWS granted Dakota Access a Special Use Permit ("SUP") which authorized the crossing of five wetland easements and one grassland easement in North Dakota and three wetland easements and 109 grassland easements in South Dakota pursuant to the National Wildlife Refuge System Administration Act of 1966, as amended (16 U.S.C. §§ 668dd–668ee) and the SUP permitting requirements and conditions set forth in 50 C.F.R. Part 29. FWS-2455; FWS-2641; FWS-2744–47. The scope of the EA prepared by the FWS was "limited to the grassland easements and wetland basins crossed by the [Pipeline] Project" and, again, did not consider any other related federal authorizations regarding the Pipeline outside of the wetland and grassland easement areas. FWS-2455. The FWS EA failed to consider or assess the USACE's multiple similar and connected actions.

Second, the USACE Omaha District issued an EA and a FONSI in July of 2016 which were "limited to the crossings of [USACE]-owned lands and flowage easements" related to Lake Oahe and Lake Sakakawea in North Dakota. AR-71227. The USACE Omaha District explicitly acknowledged that "separate Corps authorizations are being sought for Section 404, Section 10, and Section 408 crossings on other portions of the DAPL route," but failed to discuss the impacts from those related actions in its EA. *Id.* Following its environmental review, the Omaha District granted the Pipeline: (1) a Section 408 permission to cross Lake Sakakawea in North Dakota; (2) a Section 408 permission to cross Lake Oahe in North Dakota; and (3) an easement to cross USACE-held land at Lake Oahe pursuant to the Mineral Leasing Act, 30 U.S.C. § 185(a) (this easement was not granted until February 8, 2017). *Id.* The USACE Omaha District's EA did not consider or assess the actions of the USACE Rock Island District, the USACE St. Louis District, or the FWS.

Third, in August of 2016, the USACE St. Louis District issued an EA and FONSI. The scope of this EA was limited to only the proposed waterbody and federal land crossings within Illinois. AR-9832. The St. Louis District granted Dakota Access (1) a Section 408 permission to cross Carlyle Lake in Illinois; (2) a Section 408 permission to impact the Coon Run Drainage and Levee District in Illinois; (3) a Section 408 permission to impact the McGee Creek Drainage and Levee District in Illinois; and (4) a Section 408 permission to cross the Illinois River navigation channel in Illinois. AR-9823; AR-9941. The EA and FONSI did not take into consideration any other related federal authorizations regarding the Pipeline outside of the District's specific localized jurisdiction. The USACE St. Louis District's EA did not consider or assess the actions of the USACE Rock Island District, the USACE Omaha District, or the FWS.

Finally, the Rock Island District granted Dakota Access a Section 408 permission to cross the Mississippi River, which was not analyzed under NEPA because it was found eligible for a categorical exclusion. The USACE Rock Island District's EA did not consider or assess the actions of the USACE Omaha District, the USACE St. Louis District, or the FWS.

In sum, Federal Defendants undertook four separate and distinct NEPA processes resulting in three separate and distinct EAs, three separate and distinct FONSIs, and one categorical exclusion classification for their own respective actions related to the Pipeline project, each of which failed to consider the other federal actions required for the project as required by NEPA.

**2.      The Numerous Federal Agency Approvals for the Pipeline are Connected Actions that Should Have Been Analyzed in a Single NEPA Document.**

NEPA and its implementing regulations required Federal Defendants to assess all of the federal actions relating to the Pipeline in a single NEPA document because such actions are "connected." 40 C.F.R. § 1508.25. Physically connected projects can only be analyzed separately if each project: "(1) has logical termini; (2) has substantial independent utility; (3) does not

foreclose the opportunity to consider alternatives; and (4) does not irretrievably commit federal funds for closely related projects." *Taxpayers Watchdog, Inc. v. Stanley*, 819 F.2d 294, 298 (D.C. Cir. 1987). Although these factors may be considered, "an agency's consideration of the proper scope of its NEPA analysis should be guided by the governing regulations." *Del. Riverkeeper Network v. Fed. Energy Regulatory Comm'n*, 753 F.3d 1304, 1315 (D.C. Cir. 2014). The presence of some but not all of these factors can still result in a finding of unlawful segmentation. *Id.* This Court has determined that the applicability of each of the *Taxpayer Watchdog* factors is largely dependent on the specific facts of the case, *see Del. Riverkeeper,* 753 F.3d at 1315, so the proper question regarding the independent utility doctrine is "whether one project will serve a significant purpose even if a second related project is not built" (*Hammond*, 370 F. Supp. 2d at 247 (citing *Coal. on Sensible Transp.*, 826 F.2d at 69)).

In cases regarding pipelines, Factor 2 (substantial independent utility) is the most crucial. The D.C. Circuit has allowed individual segments of linear projects, such as crude oil pipelines, to be analyzed in separate NEPA documents *only* if those segments have "substantial independent utility." *See Taxpayers Watchdog*, 819 F.2d at 298; *Coal. on Sensible Transp. Inc. v. Dole*, 826 F.2d 60, 69 (D.C. Cir. 1987) (applying the independent utility test to a highway project); *see Hammond v. Norton*, 370 F. Supp. 2d 226, 244 (D.D.C. 2005) (applying the independent utility test and holding that an entire 480-mile oil pipeline must be analyzed in a single NEPA document); *Del. Riverkeeper Network,* 753 F.3d at 1320 (applying the substantial utility test and holding that an agency's NEPA evaluation for a 40-mile natural gas pipeline project violated NEPA by failing to include all connected actions). The proper question regarding Factor 2 is "whether one project will serve a significant purpose even if a second related project is not built." *Hammond*, 370 F. Supp. 2d at 247.

12

Importantly, no separate component of the Pipeline considered by Federal Defendants and analyzed in the three separate EAs can possibly have independent utility. Each federal action relies on the overall Pipeline project for its justification and the Pipeline is entirely dependent on each and all of the federal authorizations at issue to proceed with Pipeline construction, operation, and maintenance. If one federal approval for the Pipeline had been denied, Pipeline construction could not have been completed and the whole project would have been rendered utterly useless. Clearly, rather than having any form of substantial independent utility, each separate component of the Pipeline requiring federal authorization(s) can only be regarded as "physically, functionally, and financially connected and interdependent" segments of the same Pipeline project. *Del. Riverkeeper Network*, 753 F.3d at 1308.

Segmentation of one phase of a larger project prior to the completion of the environmental review of the entire project constitutes impermissible segmentation if the component action has a direct and substantial probability of influencing the agency's decision on the larger project. *See S.C. ex rel. Campbell v. O'Leary*, 64 F.3d 892, 898-99 (4th Cir. 1995). Here, there is no meaningful distinction between the separate components of the Pipeline considered by Federal Defendants. Each approval issued sufficiently constrained the consideration of alternatives for the other portions of the Pipeline to mandate consideration of all approvals in a single NEPA document. The federal approval of one segment of the Pipeline clearly foreclosed the opportunity to consider other reasonable alternatives, as the approval of one segment of the Pipeline at a specific location decreased route options for other segments of the Pipeline. *See Taxpayers Watchdog*, 819 F.2d at 298.

Finally, projects should be "divided pursuant to some 'logical termini,' or rational end points." *Del. Riverkeeper Network*, 753 F.3d at 1315. For example, in *Delaware Riverkeeper*

13

*Network*, the Federal Energy Regulatory Commission ("FERC") separately reviewed four upgrades to a pipeline. The U.S. Court of Appeals for the District of Columbia Circuit found that FERC had impermissibly divided its review of one of the projects partly because the pipeline's only two logical termini were at the beginning and end of it. The court explained:

> The same cannot be said about a single pipeline on which each newly constructed part facilitates service only within the bounds of the same start and end points. There are no spurs, interchanges, or corridors connected to the Eastern Leg. There is a single pipeline running from the beginning to the end of the Eastern Leg. The pipeline is linear and physically interdependent, and it contains no physical offshoots.

Similarly, the only logical termini for the Pipeline are where the project begins, near Stanley, North Dakota, and where the project ends, approximately 1,172 miles away in Patoka, Illinois. All parts of the Pipeline are physically interdependent and cannot perform their functions without the whole of the Pipeline. Because the Pipeline is a single, continuous pipeline, there are only two possible termini, the termini near Stanley, North Dakota and the termini near Patoka, Illinois. Federal Defendants' NEPA documents, however, did not use these termini in their review. Thus, like the court found in *Delaware Riverkeeper Network,* this court should find that the Federal Defendants improperly and unlawfully divided its review of multiple actions on the same pipeline.

Each segment of the Pipeline subject to federal approval cannot functionally or logically serve any form of significant purpose irrespective of the other federal actions related to the Pipeline project. Instead, each Pipeline segment is an interdependent part of the Pipeline project which depends on the overall Pipeline project for its justification. Therefore, all federal approvals for the Pipeline were connected actions that should have been considered in the same NEPA document.

### 3. The Numerous Federal Agency Approvals for the Pipeline are <u>Similar Actions</u> that Should Have Been Analyzed in a Single NEPA Document.

14

NEPA and its implementing regulations further required Federal Defendants to assess all of the federal actions relating to the Pipeline in a single NEPA document because such actions are "similar." 40 C.F.R. § 1508.25. Similar actions "have similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography." *Id.* An agency *should* analyze similar actions in the same NEPA document when doing so is "the best way to assess adequately the combined impacts of similar actions…" *Id.* Moreover, the Circuit Court for the District of Columbia has held that, "when determining the contents of an EA or an EIS, an agency *must* consider all 'connected actions,' 'cumulative actions,' and '*similar actions.*'" *Del. Riverkeeper*, 753 F.3d at 1314. Because this Court is bound by the appellate court precedent, this Court must grant the Tribe's motion if it finds that actions taken by Federal Defendants are similar.

Unlike the case with connected actions, courts have not developed a test or a list of specific factors to consider in determining whether agency actions are similar. Instead, the only express guidance on determining similar actions is found in the regulation, which identifies two types of similarities (common timing and geography). This list, however, is not exhaustive.

In the instant case, Federal Defendants' actions involved the <u>same singular pipeline</u> which would transport the <u>same crude oil</u>, rendering the actions' <u>potential impacts similar if not identical</u>. The actions took place at roughly the <u>same time</u>, and they were all originally contemplated at once because they all pertain to the same singular project that was constructed over an extremely short span of time and the actions were all taken over an extremely short span of time. With the exception of the easement granted for the Lake Oahe crossing, the federal permits and permissions for the pipeline were issued within a span of three months. Including the Lake Oahe easement, the federal actions occurred within less than nine months. Many of the actions were to issue the

same or similar types of permit. Even more telling, several of these actions were taken by the same agency – Federal Defendant USACE. For example, the USACE Rock Island District, the USACE Omaha District, and the USACE St. Louis District granted seven Section 408 permissions pursuant to the Rivers and Harbors Act of 1899, 33 U.S.C. § 408. While the geographic locations for the various agency actions are not the same, they all occurred along the same linear pipeline route. Considering all these similarities, there can be no doubt that Federal Defendants' actions were "similar." Federal Defendants, therefore, abused their discretion in deciding not to encompass their actions in a single NEPA document.

### 4.    Case Law Precedent in this Circuit is Inapposite and Distinguishable.

This Court previously addressed the pipeline segmentation issue in *Sierra Club v. United States Army Corps of Eng'rs*, 803 F.3d 31 (D.C. Cir. 2015), which is readily distinguishable from the case at bar as this case presents a distinct legal issue that was not properly before the Court in *Sierra Club*.

In *Sierra Club*, a pipeline developer proposed a 600-mile pipeline to be constructed through Illinois, Iowa, Missouri, and Oklahoma. 803 F.3d at 33. To complete pipeline construction, the pipeline required: (1) multiple USACE Districts to verify the pipeline's water crossings pursuant to NWP 12; (2) the USACE to consult with the FWS pursuant to Section 7 of the Endangered Species Act and to ultimately implement the incidental take statements via the verification decisions; and (3) easements from the USACE and the Bureau of Indian Affairs ("BIA") to cross spans of federal and Indian lands. *Id.* at 35-36. The USACE and the BIA prepared three separate EAs and FONSIs for the pipeline's crossings of federal and tribal properties. *Id.* at 38–42.

The plaintiffs in *Sierra Club* challenged the USACE's actions on the grounds, relevant here, "that various federal easements and approvals that [the pipeline developer] obtained from the

agencies gave necessary go-ahead to the Flanagan South project as a whole, and thus the *entire pipeline* was a foreseeable effect of federal action requiring public environmental scrutiny under NEPA." *Id.* at 34 (emphasis added). The plaintiffs contended that the easements granted by the federal agencies for the pipeline, the Clean Water Act verifications issued by the USACE under NWP 12, and the conditional permission granted to the pipeline developer to take endangered species in the course of constructing and maintaining the pipeline were all connected actions which triggered a requirement under NEPA that one of the agencies review the environmental impacts of the "*entire pipeline*, including portions outside the segments that the federal actions purported to address." *Id.* at 38 (emphasis added).

The court, however, held that the USACE was not required under NEPA to prepare an EIS for the entire pipeline. *Id.* at 47-49. This holding was based on the reasoning that "[t]he connected actions regulation requires agencies to review the picture as a whole..." *Id.* at 49 (emphasis added). Essentially, the Court held that because the agencies' jurisdiction only extended to small geographical segments of the pipeline, they were under no legal obligation to conduct a *pipeline-wide* NEPA analysis for the *entire pipeline project*. *Id.* at 47–48.

The court did, however, recognize the plaintiffs' argument that pursuant to the connected actions regulations, "the federal actions in this case – the easements, the other areas within federal jurisdiction – [] are connected and so should have been analyzed together." *Id.* at 51. In fact, the Court found that this argument was an "accurate statement of the connected actions doctrine." *Id.* Because the plaintiffs only asserted that some agency "should have conducted a *pipeline-wide* NEPA assessment" that included NEPA analysis for portions of the pipeline *outside of federal jurisdiction*, the plaintiffs failed to preserve the claim for less than a whole-pipeline review on

appeal. *Id.* at 44 (emphasis added). <u>The court therefore did not rule on whether the agencies were required to analyze the federal actions under the same NEPA document.</u>

It is on these grounds that this case can be distinguished from *Sierra Club*. While Federal Defendants may lack jurisdiction to undertake a NEPA analysis that encompasses the whole 1,172-mile stretch of the Pipeline, that does not excuse them from the requirement that the environmental impacts resulting from each connected and similar federal action related to the Pipeline be considered under a single NEPA document. *Nat. Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288, 297 (D.C. Cir. 1988) (stating that "[t]he purpose of this requirement is to prevent agencies from dividing one project into multiple individual actions each of which individually has an insignificant environmental impact, but which collectively have a substantial impact") (internal quotation marks omitted).

Under NEPA, when "proposals . . . that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency, their environmental consequences *must be considered together*. Only through comprehensive consideration of pending proposals can the agency evaluate different courses of action." *Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976) (emphasis added). This has been a well-established NEPA concept in the D.C. Circuit. *See Nat. Res. Def. Council*, 865 F.2d at 298, 319 (holding that an agency's failure to consider the connected, cumulative, and similar actions and their resulting environmental impacts in a single NEPA document warranted a remand); *Am. Bird Conservancy, Inc. v. Fed. Communications Commission*, 516 F.3d 1027, 1032 (D.C. Cir. 2008) (stating that agencies "should prepare a programmatic EIS if actions are 'connected,' 'cumulative,' or 'similar,' such that their environmental effects are best considered in a single impact statement").

18

The separate easements, authorizations, and permissions granted by Federal Defendants for the Pipeline project qualify as major federal actions and are all related to the same Pipeline project. Specifically, all of these federal actions are connected and similar actions which, when considered together, have a cumulatively significant impact on the human environment and must be considered in a single, unified NEPA document. Federal Defendants' production of three separate EAs and FONSIs related to the same Pipeline project is exactly the form of segmentation the anti-segmentation and independent utility doctrines were intended to prevent. By segmenting the mandatory NEPA analysis into separate components of the Pipeline project, Federal Defendants and the Pipeline developer effectively "hid the ball" from the Tribe and the public by approving this massive Pipeline through a piecemeal, segmented approach (and claiming that each segment, in its singularity, would have minimal adverse environmental impacts). Such segmentation deprived the Tribe of its right to effective participation in the NEPA process because it was being asked to consult with three separate federal agencies or agency districts through three separate, overlapping NEPA processes. This segmentation also concealed the true environmental significance of the project, thereby "creating a misleading picture of the impact of the project as a whole." *Taxpayers Watchdog*, 819 F.2d at 298–99. For the foregoing reasons, because Federal Defendants granted numerous permits, easements, and authorizations without considering the environmental impacts of those actions in a single NEPA document that took into account the connected, cumulative, and similar federal actions related to the Pipeline project, the USACE violated NEPA. 40 C.F.R. § 1508.25.

## III.   THE USACE IMPROPERLY APPROVED THE PIPELINE WITHOUT ANALYZING ITS EFFECTS ON THE TRIBE'S TREATY RIGHTS.

The Pipeline traverses approximately 38 miles of territory located in present day North Dakota that was set aside for the Sioux by the 1851 Treaty ("1851 Treaty territory"). The Tribe

retains its right to use materials necessary for subsistence ("usufructuary rights") within this territory because, as explained below, the 1851 Treaty reserved these usufructuary rights to the Tribe and these rights have never been abrogated.

Because the operation and maintenance of the Pipeline in and near this territory will harm the Tribe's usufructuary rights, the USACE Omaha District was obligated to consider the impacts of its actions to the Tribe's 1851 Treaty rights. The USACE Omaha District's July 2016 EA did not even mention the Tribe's usufructuary rights in the 1851 Treaty territory, much less analyze how the Tribe's rights would be impacted. Thus, the USACE's July 2016 EA and the resulting FONSI and permits that followed were arbitrary, capricious, an abuse of discretion, and not in accordance with law and must be held unlawful and set aside pursuant to the APA.

### A.     The Tribe Possesses Usufructuary Rights Derived from the 1851 Treaty.

Usufructuary rights are a tribe's and its members' treaty-recognized rights to use land for traditional subsistence activities such as hunting, fishing, and gathering. *Lac Courte Oreilles Band of Lake Superior Chippewa Indians*, 700 F.2d 341, 352 (7th Cir. 1983). A tribe does not need to hold title to land to possess usufructuary rights on that land. *Id.* Further, a treaty does not need to expressly reserve usufructuary rights for those rights to be retained. *Menominee Tribe v. United States*, 391 U.S. 404 (1968).

The Tribe derives a number of usufructuary rights from the 1851 Treaty. The 1851 Treaty specifically stated that the Tribe did "not surrender the privilege of hunting, fishing, or passing over any of the tracts of country heretofore described," which encompassed the 1851 Treaty territory. Treaty of Fort Laramie with Sioux, Etc. art. 5, Sept. 17, 1851, 11 Stat. 749, II KAPP 594, IV KAPP 1065. Additionally, "[w]hen a treaty reserves or grants lands to a tribe, tribal ownership necessarily includes full hunting, fishing, and gathering rights on those lands." COHEN'S HANDBOOK OF FEDERAL INDIAN LAW, § 18.02, 1156 (Nell Newton ed. 2012 ed.)

20

(hereinafter, COHEN'S HANDBOOK) (*citing Menominee Tribe v. United States*, 391 U.S. 404, 406 (1968)).  Thus, the 1851 Treaty expressly recognized the Tribe's right to continue hunting and fishing within the 1851 Treaty territory.

Moreover, the 1851 Treaty was intended to create a homeland for the Tribe.  Letter from Orlando Brown, Commissioner of Indian Affairs, to Thomas Fitzpatrick, Superintendent of Indian Affairs (Aug. 16, 1849) ("There should also be a clear and definite understanding as to the general boundaries of the sections of country respectively claimed by [the signatory tribes], *as their residence and hunting grounds*.") (emphasis added); *Crow Tribe of Indians v. United States*, 151 Ct. Cl. 281, 286 (Ct. Cl. 1960) (The 1851 Treaty served as "a recognition by the United States of the Indians' title to the areas for which they are to be held responsible, and which are described as 'their respective territories.'"); *Assiniboine Indian Tribe v. United States*, 77 Ct. Cl. 347 (Ct. Cl. 1933) ("one of [the 1851 Treaty's] purposes was to give each tribe some fixed boundaries within which they should *stipulate generally to reside*.") (emphasis added).  By clearly reserving land, a respective territory, the Tribe almost certainly believed that the 1851 Treaty secured to it the ability to continue supporting itself through hunting in that territory.  *See* Letter from Comm'r L. Lea, Office Superintendent Indian Affairs to Chief Law Officer Indian Bureau, Dep't of the Interior, St. Louis (Nov. 11, 1851) in 4 Kapp. 1065.  By that same logic, the Tribe likely believed it was reserving its right to fish and gather within the 1851 Treaty territory as well.

Because the 1851 Treaty intended to establish the Tribe's residence, the Tribe necessarily has a right to water and plants to satisfy religious and medicinal purposes.  *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Wisconsin*, 653 F. Supp. 1420 (W.D. Wis. 1987).  A treaty implicitly reserves a tribe's right to materials necessary for subsistence.  *Menominee Tribe of Indians*, 391 U.S. at 406.  "Subsistence" is "the means of subsisting, or what is necessary to

support life, including food, clothing and shelter.   Materials used for religious purposes are included." *Lac Courte Oreilles Band of Lake Superior Chippewa Indians*, 653 F. Supp. at 1424 n.2 (emphasis added).

"Fulfilling the purposes of Indian reservations depends on the tribes receiving water of adequate quality as well as sufficient quantity." COHEN'S HANDBOOK OF FEDERAL INDIAN LAW, § 19.03, at 1236 (Nell Jessup Newton ed., 2012).  When a tribe has a reserved right to use certain waters for a specific purpose, it has a right to have that water be of a quality adequate to fulfill the intended use. *United States v. Anderson*, 591 F. Supp. 1, 5 (E.D. Wash. 1982); *United States v. Gila Valley Irrigation Dist.*, 920 F. Supp. 1444 (D. Ariz. 1996), aff'd 117 F.3d 425 (9th Cir. 1997).

The Tribe needs access to clean water from the Missouri River for religious purposes.  The Tribe has viewed water, and particularly the water of the Missouri River, as sacred and necessary for medicinal purposes since time immemorial.  *See* Ex. A, Decl. of Faith Spotted Eagle ("F. Spotted Eagle Decl.") at ¶11; Ex. B Decl. of G. Drapeau at ¶5-6.  Tribal members consider water to be the "first medicine."  Ex. A F. Spotted Eagle Decl. at ¶11.  The Tribe performs sacred ceremonies along the banks of the Missouri River and uses water from the river for ceremonies, many of which are performed to heal and establish or maintain well-being.  *Id.* at ¶12.  This water must remain as pure as possible to properly conduct the Tribe's ceremonies; the presence of crude oil from a pipeline leak would be devastating to the Tribe's spirituality and ceremonial purposes. *Id.* at ¶ 11.

The Tribe also needs access to plants for religious purposes.  Like the water, these plants must remain as pure as possible to properly conduct the Tribe's ceremonies.  *Id.*

For the foregoing reasons, the 1851 Treaty reserved the Tribe's subsistence rights to hunt, fish, gather, and use clean water for ceremony and healing in the 1851 Treaty territory.

**B.      Congress has Never Abrogated the Tribe's Treaty Rights.**

The Tribe retains its usufructuary rights in the 1851 Treaty territory because those rights have never been abrogated by Congress.  Although the purported plenary power of Congress enables Congress to abrogate treaty rights, Congress must clearly express its intent to do so. *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 202 (1999); *Lac Courte Oreilles Band of Lake Superior Chippewa Indians*, 700 F.2d 341, 354 (7th Cir. 1983) ("termination of treaty-recognized rights by subsequent legislation must be by *explicit* statement or must be *clear* from the surrounding circumstances or legislative history").

For example, in *Mille Lacs Band of Chippewa Indians*, the U.S. Supreme Court reviewed whether the Chippewa Indians relinquished usufructuary rights derived from their 1837 Treaty when they entered into their 1855 Treaty.  526 U.S. at 175.  Although the 1837 Treaty had guaranteed the Chippewa the privilege of hunting and fishing within all ceded lands, in 1855 the United States and the Chippewa entered into a new treaty whereby "the said Indians do further *fully and entirely relinquish and convey to the United States, any and all right, title, and interest, of whatsoever nature the same may be*, which they may now have in, and to any other lands in the Territory of Minnesota or elsewhere." Treaty with the Chippewas, 10 Stat. 1165 (1855) (emphasis added).  Looking at the historical context of the 1855 Treaty, the Court found that, despite the foregoing relinquishment language, the "1855 Treaty was a land purchase treaty and *not a treaty that also terminated usufructuary rights.*" *Mille Lacs Band of Chippewa Indians*, 526 U.S. at 199 (emphasis added).  Most importantly, the Court noted that "[t]he entire 1855 Treaty, in fact, is devoid of any language expressly mentioning—much less abrogating—usufructuary rights." *Id.* at 195.

The case at hand is similar to *Mille Lacs Band of Chippewa Indians*.  As described *supra*, the Tribe entered into the Treaty of Fort Laramie with the United States in 1851.  In 1858, the

23

Tribe entered into a treaty with the United States in which the Tribe ceded and relinquished "all the lands now owned, possessed, or claimed by them, wherever situated, except four hundred thousand acres thereof." Treaty with the Yankton Sioux art. 1, Apr. 19, 1858, 11 Stat. 743, II KAPP 776 ("1858 Treaty"). Like the 1855 Treaty with the Chippewas, the 1858 Treaty ceded and conveyed land to the United States, but was silent as to usufructuary rights.

Additionally, the surrounding circumstances and legislative history of the 1858 Treaty do not show the clear intent necessary to abrogate the Tribe's usufructuary rights in the 1851 Treaty territory. Although events surrounding the 1858 Treaty indicate that the amount of available wild game was decreasing, and the 1858 Treaty itself indicates that Tribal members were to cultivate land within the new treaty territory, there is no evidence indicating that Tribal members were to cease hunting and fishing and rely solely on agriculture. Tribal members likely intended to continue supporting themselves in part with their usufructuary rights in the 1851 Treaty territory. Because "doubts concerning the meaning of a treaty with an Indian tribe should be resolved in favor of the tribe," the 1858 Treaty should not be read to extinguish the Tribe's usufructuary rights in the 1851 Treaty territory. *Or. Dep't of Fish and Wildlife v. Klamath Indian Tribes*, 473 U.S. 753, 766 (1985); *Mille Lacs Band of Chippewa Indians*, 526 U.S. at 194 n.5, 196, 200.

Thus, the 1858 Treaty language ceding and relinquishing the Tribe's possessory interest in the 1851 Treaty territory and the circumstances surrounding the 1858 Treaty were insufficient to terminate the Tribe's usufructuary rights in the 1851 Treaty territory. This holds true even for the usufructuary rights not expressly reserved in the 1851 Treaty. *Menominee Tribe v. United States*, 391 U.S. 404 (1968) (holding that even though the 1854 Treaty did not discuss hunting and fishing rights, that these rights were not abrogated by the Termination Act of 1954). While the Tribe

ceded and conveyed to the United States its title to and possession of the 1851 Treaty territory, the Tribe maintained and continues to maintain and exercise its usufructuary rights in that territory.

### C.   The Pipeline Endangers the Tribe's Treaty Rights.

There are vast swaths of land within the 1851 Treaty territory where the Tribe can still exercise its usufructuary rights, including large tracts of North Dakota public lands which allow hunting.[2]  Additionally, the Tribe can still exercise its fishing rights and ceremonial/healing rights in the streams, creeks, and rivers which lie within this territory.

The operation and maintenance of the Pipeline threaten the Tribe's treaty rights.  Even the maintenance of the right of way for the Pipeline will disturb fish and wildlife.  See Statement of Material Facts ("SOF") at ¶55.

Pipelines inevitably leak.  In fact, the Dakota Access Pipeline has already leaked at least three times.  Zak Cheney Rice, *The Dakota Access pipeline sprung 2 new leaks*, Business Insider, (May 23, 2017, 8:26 PM), http://www.businessinsider.com/the-dakota-access-pipeline-sprung-2-new-leaks-2017-5 (the Pipeline leaked on March 3, March 5, and April 4).  In fact, the USACE was so concerned about a potential oil spill from the Pipeline polluting Bismarck, North Dakota's water source that it rerouted the Pipeline from crossing the Missouri River north of Bismarck to crossing the river directly north of the Standing Rock Sioux Tribe's reservation.  Amy Dalrymple, *Pipeline plan first called for crossing north of Bismarck*, THE BISMARCK TRIBUNE, Aug. 18, 2016.

As explained further in the Material Statement of Facts, an oil spill into the Missouri River at Lake Oahe is especially likely and potentially more damaging because the portion of the Pipeline running under Lake Oahe was inserted via horizontal directional drilling ("HDD") 92 feet below the Lake.  SOF at ¶¶48-49.  An oil spill could damage the fish and wildlife in the surrounding area.

---

[2] For purposes of this case, the Tribe is only asserting that the Pipeline harms its ability to exercise usufructuary rights on public lands, including federal, state, city, town, and county lands.

For example, a spill into the surrounding lakes and rivers could affect water quality and significantly affect fish because of the bioaccumulation of toxicity into the food chain. Cheyenne River Sioux Tribe's Mot. Summ. J., Decl. of Rollie E. Wilson, Att. A, 177. Potential damage to animals from oil includes "reproductive problems, trouble digesting, and damage to the central nervous system, liver, and lungs." Brant Phillips, *Oil Pipelines and Spills*, AUBURN UNIVERSITY, http://cla.auburn.edu/ces/energy/oil-pipelines-and-spills/ (last updated Feb. 1, 2017).

Finally, an oil spill threatens the Tribe's ability to perform ceremonies for spiritual and healing purposes using water from the Missouri River and other sources in the 1851 Treaty territory because clean, uncontaminated water is essential for the Tribe's ceremonies. Ex. A, F. Spotted Eagle Decl. at ¶11. An oil spill would add dangerous carcinogens such as benzene to the water. Cheyenne River Sioux Tribe's Mot. Summ. J., Decl. of Rollie E. Wilson, Att. A, 177. Additionally, polluted water could contaminate medicinal plants necessary for the Tribe's spiritual and healing ceremonies. An oil spill will contaminate water and the surrounding medicinal plants, preventing Tribal members from using the water and plants to perform its spiritual and healing ceremonies, in violation of the Tribe's treaty rights. The Pipeline therefore poses a grave threat to the Tribe's treaty rights that the USACE was required to consider in its EA.

     **D.**     **Because the Pipeline Threatens the Tribe's Treaty Rights, the USACE Omaha District was Required to Analyze the Pipeline's Impact on these Rights in its EA.**

When an agency reviews a project which could impact a tribal treaty right, the agency must analyze the impacts of the project on those treaty rights. *See No Oilport! v. Carter*, 520 F. Supp. 334, 356 (W.D. Wash. 1981). For example, in *No Oilport!*, three tribes alleged that the EIS was inadequate in its "evaluation and consideration of the impacts of the project on [the tribes'] fishing rights." *Id.* The court reviewed the USACE's EIS and found that it specifically reviewed the

potential effect on certain tribes' treaty fishing rights, and "acknowledge[d] that a major rupture 'could result in significant loss to Native American tribal fish enterprises in western Washington.'" *Id.* Additionally, the map addendum in the EIS specifically noted the location of "salmon fisheries for the Lower Elwha and Tulalip Indians" in relation to the proposed pipeline route. *Id.* The court therefore concluded that "the EIS's treatment of the *potential effect of the project on the Indian's fishing enterprises* is informative, thorough and, perhaps most important, clearly *sets out those hazards which do exist.*" *Id.* (emphasis added). Because the USACE had clearly analyzed how the tribes' treaty rights would be impacted, the court found that the EIS satisfactorily considered the potential impact to the tribes' treaty fishing rights.

In this case, the USACE's EA and FONSI did not acknowledge that the Tribe had usufructuary rights that could be impacted by the Pipeline, much less discuss what the Pipeline's impacts on those usufructuary rights could be. The EA and FONSI never mention the potential effect of the Pipeline on the Tribe's hunting and fishing rights, or its rights to gather plants and water for ceremonial and medicinal purposes.

Additionally, the USACE must specifically analyze whether the impact to the Tribe's treaty rights in that resource will be of legal significance. *Id.* Only Congress has the power to alter tribal treaty rights. *Northwest Sea Farms, Inc.*, 931 F. Supp. at 1520; *Muckleshoot Indian Tribe v. Hall*, 698 F. Supp. 1504 (W.D. Wash. 1988). Therefore, "'[t]he [USACE] may not permit a project that abrogates treaty rights.'" Samantha Wohlfeil, *Army Corps rejects permit for coal terminal at Cherry Point*, BELLINGHAM HERALD (May 9, 2016, 11:11 AM), http://www.bellinghamherald.com/news/local/article76545117.html (quoting Col. John Buck, commander of the USACE's Seattle District.); *see also Northwest Sea Farms, Inc.*, 931 F. Supp. at 1520. To avoid abrogating treaty rights, the USACE is required conduct a *de minimis*

determination to determine whether impacts to a tribe's treaty rights will be of legal significance. U.S. ARMY CORPS OF ENG'RS, CENWS-OD-RG, NWS-2008-260 PACIFIC INTERNATIONAL HOLDINGS LLC (PIH) (2016) at 1; *see also Nw Sea Farms, Inc.*, 931 F. Supp. at 1521-22.

      "An agency has taken a 'hard look' at the environmental impacts of a proposed action if the statement contains sufficient discussion of the relevant issues and opposing viewpoints, and the agency's decision is fully informed and well-considered." *Myersville Citizens for a Rural Community, Inc. v. Fed. Energy Reg. Comm'n*, 783 F.3d 1301, 1324-25 (D.C. Cir. 2015). As explained above, the 1851 Treaty reserved to the Tribe the rights to hunt and fish, and to utilize plants and water for ceremonial and medicinal purposes. The USACE, however, did not analyze the effects the Pipeline would have on the Tribe's treaty rights in the areas where the USACE issued permits and easements to Dakota Access. In this instance, the USACE failed to even mention the Tribe's usufructuary rights which could be affected, much less analyze the "potential effect of the project on the Indian's" rights, and "lay out the hazards which do exist" to the Tribe's treaty rights. *No Oilport!,* 20 F. Supp. at 356-57. Because the EA and FONSI contained no discussion of these issues, the agency could not possibly have determined whether the potential impacts to the Tribe's treaty rights would be *de minimis*. Moreover, the agency clearly did not give the issue a "hard look" because it failed to analyze the Pipeline's potential effect on the Tribe's treaty rights at all, meaning that the agency's decision could not be fully informed and well-considered. Because the USACE failed to analyze how the Tribe's usufructuary rights would be affected in its July 2016 EA, the EA, resulting FONSI, and all subsequent permits were arbitrary, capricious, an abuse of discretion, and not in accordance with law and must be held unlawful and set aside pursuant to the APA, 5 U.S.C. § 706(2)(A).

**E.    The USACE Omaha District's Failure to Analyze the Pipeline's effects on Treaty Rights was Especially Egregious in Light of the USACE's Trust Responsibility to the Tribe.**

The USACE's decision was especially egregious because federal agencies have an enhanced responsibility to protect tribes' treaty rights. *Nw. Sea Farms, Inc.*, 931 F. Supp. 1515; *Muckleshoot Indian Tribe*, 698 F. Supp. 1504; *No Oilport! v. Carter*, 520 F. Supp. 334, 371-72 (W.D. Wash. 1981); COHEN'S HANDBOOK, *supra*, at § 18.04[3][c], 1183-84 ("In conducting, authorizing, or funding [projects outside Indian country that may affect the exercise of the tribes' treaty-reserved rights], federal agencies must take account of their fiduciary duty to ensure that tribal-reserved rights are not impaired or abrogated.").

> *In carrying out its treaty obligation* with the Indian tribes the Government is something more than a mere contracting party . . . [I]t has *charged itself with moral obligations of the highest responsibility* and trust.  Its conduct, as disclosed in the acts of those who represent it in dealings with Indians, should therefore be judged by the *most exacting fiduciary standards.*

*Seminole Nation v. United States*, 316 U.S. 286, 296-97 (1941) (emphasis added).  For this reason, even "[a]ctions that might well be considered within an agency's discretion because not 'arbitrary or capricious,' as stated in the APA, may nevertheless be held to violate the Secretary of the Interior's trust responsibility to tribes." COHEN'S HANDBOOK, *supra*, at § 5.05[3][c], 430, *citing Cobell v. Norton*, 240 F.3d 1081, 1104 (D.D.C. 2001); *Pyramid Lake Paiute Tribe v. Morton*, 354 F. Supp. 252 (D.D.C. 1972); *Jicarilla Apache Nation v. United States*, 100 Fed. Cl. 726, 740 n.18 (2011).

The USACE has a fiduciary duty to consider how its actions may affect a tribe's treaty rights.[3]  For example, in *Northwest Sea Farms, Inc*, Sea Farms asserted that the USACE failed to

---

[3] The Tribe adopts the Standing Rock Sioux Tribe's ("SRST") argument regarding an agency's enhanced responsibility to consider a tribe's treaty rights prior to taking an action that could affect

sufficiently consider treaty rights when deciding whether to permit a fish farm in a usual and accustomed fishing place of the Lummi Tribe. *Northwest Sea Farms, Inc. v. United States*, 931 F. Supp. 1515 (W.D.Wash.1996). The court found, however, that, "[i]n carrying out its fiduciary duty, it is the government's, and subsequently the [USACE's], responsibility to ensure that Indian treaty rights are given full effect." *Id.* at 1520. The court therefore held that "the [USACE] owe[d] a fiduciary duty to ensure that the Lummi Nation's treaty rights are not abrogated or impinged upon." *Id.* In permitting projects which will affect tribal rights, the USACE has a fiduciary duty stemming from the general trust relationship between the tribes and the federal government to protect those treaty rights.[4] *Id.*

If an agency "entirely failed to consider an important aspect of the problem," its action is unlawful. *See Motor Vehicle Mfrs'. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 2942 (1983). Here, the USACE had a fiduciary duty to analyze whether the Tribe's treaty rights were abrogated or impinged upon. Because the USACE failed to consider the effects of its actions on the Tribe's treaty rights, let alone mention the Tribe's treaty rights in the area, particularly in light of the USACE's trust responsibility to the Tribe, its actions in issuing the EA, FONSI, and permits were arbitrary, capricious, an abuse of discretion, and not in accordance with law and must be held unlawful and set aside pursuant to the APA.

---

those rights, as included in pages 37 through 39 of SRST's Motion for Summary Judgment. *See SRST Mot. for Summ. J.* at 34-39.

[4] The Tribe objects to this Court's holding in its June 14, 2017 Memorandum Opinion that pursuant to D.C. Circuit Court precedent in *El Paso Natural Gas Co. v. United States*, 750 F.3d 863 (D.C. Cir. 2014), a tribe "must identify a substantive source of law that establishes specific fiduciary or other duties" when it brings an APA claim. *El Paso Natural Gas Co.* is distinguishable because that case addressed a claim brought under the APA for an agency's *failure to act*. The Tribe incorporates the SRST's arguments included on pages 34 through 39 of its Motion for Summary Judgment regarding why *El Paso Natural Gas Co.* and other cases are distinguishable from the case at hand, and why treaties and the United States' trust responsibility can provide the law to apply in an APA case. *SRST Mot. for Summ. J.* at 34-39.

Additionally, the USACE breached its fiduciary duty to protect the Tribe's treaty rights by issuing the Section 408 permit and easement without even considering how the Tribe's treaty rights could be affected.[5]  Such an action was arbitrary, capricious, an abuse of discretion, and not in accordance with law and must be held unlawful and set aside pursuant to the APA.

## CONCLUSION

As the Tribe has now demonstrated, Federal Defendants violated NEPA when they issued various approvals for the Pipeline. As with the Corps' analysis of the issues already remanded to the Corps for further analysis, Federal Defendants' decisions were defective and the processes used to reach those decisions were fatally flawed. However, unlike the Corps' failures that pertain to the remanded issues, the failures described herein require more than a better articulation of their reasoning. Federal Defendants botched the NEPA process from the outset by unlawfully defining the scope of that process, the most fundamental element of a NEPA review. Substantiation of the existing EAs would be insufficient to cure this defect. The only way to comprehensively address the impacts of Federal Defendants' actions as NEPA intended is to re-initiate the NEPA process, this time in accordance with the law. This is a case in which the agencies "must redo [their] analysis from the ground up." *North Carolina v. EPA*, 531 F.3d 896, 929 (D.C. Cir. 2008). Given the massive scope of this undertaking and the number of agency actions at issue, it is highly unlikely that, had the environmental review been conducted in compliance with NEPA, Federal

---

[5] Assuming, *arguendo*, that *El Paso Natural Gas Co.* requires all breach of trust claims brought under the APA to state a specific fiduciary duty of the United States, the Tribe asserts that such a holding is incorrect. The Tribe adopts SRST's argument on why the APA does not require a party to identify a specific statute that imposes a duty on the United States, and why the Indian Tucker Act line of precedent is inapplicable. *SRST Mot. for Summ. J.* at 34-37.

Defendants would have validated their prior conclusions.   Vacatur is therefore the appropriate remedy.

For the foregoing reasons, Plaintiffs Yankton Sioux Tribe and Robert Flying Hawk respectfully request that this Court grant their motion for partial summary judgment and vacate the various permits and permissions, EAs, and FONSIs issued by Federal Defendants.

Respectfully submitted this 10th day of November, 2017.

Jennifer S. Baker, OKBA# 21938
*Pro Hac Vice*
Fredericks Peebles & Morgan LLP
1900 Plaza Drive
Louisville, CO 80027
Phone: (303) 673-9600
Facsimile: (303) 673-9155
jbaker@ndnlaw.com
*Attorneys for Plaintiffs*

Jeffrey S. Rasmussen, WSBA# 21121
*Pro Hac Vice*
Fredericks Peebles & Morgan LLP
1900 Plaza Drive
Louisville, CO 80027
Phone: (303) 673-9600
Facsimile: (303) 673-9155
jrasmussin@ndnlaw.com
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 10th day of November, 2017, a copy of the foregoing was filed electronically with the Clerk of the Court. The electronic filing prompted automatic service of the filing to all counsel of record in this case who have obtained CM/ECF passwords.

Helene A. Phelps