**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE; YANKTON SIOUX TRIBE; ROBERT FLYING HAWK; OGLALA SIOUX TRIBE, | |
| Plaintiffs, | |
| and | |
| CHEYENNE RIVER SIOUX TRIBE, | |
| Intervenor Plaintiff, | Case No. 1:16-cv-01534-JEB |
| v. | |
| U.S. ARMY CORPS OF ENGINEERS, | |
| Defendant, | |
| and | |
| DAKOTA ACCESS, LLC, | |
| Intervenor Defendant. | |

————————————————

**SUPPLEMENTAL MEMORANDUM OF DAKOTA ACCESS, LLC
REGARDING REMAND CONDITIONS**

————————————————

Dakota Access writes solely to correct two factual assertions in Plaintiffs' brief on requested conditions during remand. *See* D.E. 293 (Tribes' Reply in Support of Remand Conditions). Plaintiffs' misstatements confirm that Court-imposed conditions are unwarranted.

In the original round of remedy briefing in July and August, Plaintiffs claimed they were in the dark as to whether emergency response equipment was in place near Lake Oahe or a geographic response plan (GRP) had been completed. D.E. 272 at 37. They therefore asked "that DAPL and the Corps be directed to immediately coordinate finalization of the GRP with the

Tribes' emergency management department, and implement spill response and preparedness ac-

tivities like equipment staging." *Id.* Dakota Access replied in August by documenting that each

of those items was already in place, in addition to a PHMSA-approved Facility Response Plan (or

FRP). D.E. 277 at 10 & Ex. 13 (Stamm Decl.) at ¶ 4. Dakota Access also offered to work volun-

tarily with Standing Rock on further response planning, adding that the Tribe remains free to "send

along descriptions of supposed 'oversights and errors'" that Plaintiffs claim to have spotted in

earlier plans. D.E. 277 at 10 n.13.

In their latest briefing, the Tribes complain that the Corps and Dakota Access "misunder-

stand the Tribes' request," which they now characterize as a supposed need for "this Court [to]

direct *the Corps* and DAPL to coordinate finalization of the spill response plans with the Tribes,

and immediately implement activities required under those plans." D.E. 293 at 6; *id.* at 7 (citing,

for the first time, a general statutory requirement for a Presidentially appointed "Area Committee"

of federal, state, and local agency personnel to work with tribal officials and others on contingency

planning). Plaintiffs make two factual representations relevant here. First, they alleged that a

completed GRP is not in place since, according to them, "DAPL itself concedes that it is still

'reviewing and revising'" it. D.E. 293 at 7. Second, Plaintiffs assert, without any citation, that

"even basic information about the worst case discharge and the response zone maps on which

response planning is based were redacted from the copies of the response plans that have been

made available to the Tribe." *Id.* at 8-9 n.4. This, they argue, is proof of the need for the Court to

step in. *Id.* at 8-9.

Both factual assertions are wrong. *First*, Dakota Access shared its *completed* Geographic

Response Plan (dated April 2017) with Elliott Ward of Standing Rock's emergency planning de-

partment on October 24, 2017, at Mr. Ward's request. *See* Ex. 1 (Borkland Decl.) at ¶ 2; *see also*

D.E. 288-1 (Borkland Decl.) at ¶ 4. Dakota Access also provided Mr. Ward with the *completed*

PHMSA-approved FRP, entitled Emergency Response Action Plan for the North Response Zone (completed February 2017 and updated April 2017).  *See* Ex. 1 at ¶ 2; *see also* D.E. 288-1 at ¶ 4.  The "reviewing and revising" language that the Tribes selectively quote from Dakota Access's earlier declaration (*see* D.E. 288-1 at ¶ 4) is a reference to the company's stated willingness to work with the Tribes "to help *enhance* our emergency capabilities in the Lake Oahe area."  D.E. 288-1 at ¶ 3 (emphasis added).  Dakota Access should not be faulted for being open to making updates to its response planning if updates are appropriate.

Second, the Tribes incorrectly assert that maps "on which response planning is based" have been withheld from them.  *See* D.E. 293 at 8-9 n.4.  As noted, Dakota Access gave Mr. Ward two sets of response plans in October—the GRP and the FRP.  D.E. 288-1 ¶ 4.  Because the Tribes do not include these plans with their brief, Dakota Access provides them as exhibits to the attached declaration.  As the Court can see for itself, Dakota Access gave the Tribes *all* of the GRP maps (a total of 10) showing how oil would be contained and collected in the event of an emergency.  Ex. A to Ex. 1 at 7-16.  The Court can also see it is *this* document—i.e., the completed GRP that the Corps specially required in the Lake Oahe easement—that "identifies resources and response measures for an immediate, safe, and effective response to a release of crude oil from the Dakota Access Pipeline with the potential to impact the Missouri River near Cannon Ball, North Dakota." *Id.* at 2.  The other document (the FRP) references different items:  18 "response zone maps" that cover the entire length of the pipeline and were redacted consistent with PHMSA guidance.  Ex. B to Ex. 1 at Appendix E (PDF page 196); D.E. 288-1 at ¶ 4.  The descriptions of these 18 maps in the FRP shows that the one including Lake Oahe contains nothing relevant to emergency response planning that isn't already known to the Tribes.  *See, e.g.*, Ex. B to Ex. 1 at 52 (PDF page 162) (describing response zone map contents).

The Tribes' litigation tactic here only reinforces why response planning, auditing of ease-ment compliance, and reporting about pipeline conditions should take place *outside* the litigation context.  Rather than turn the emergency planning process into yet another battlefront in an already lengthy docket of adversarial filings, the Tribes' emergency planning personnel can and should respond to the offer from their counterpart at Dakota Access to meet and discuss any steps that might enhance that planning.  Unfortunately, the Tribes still prefer the former route, even though a simple inquiry about the maps in the two sets of response plans would have confirmed that the Tribe has all information needed to coordinate on response planning.  Not only did the Tribes forego that inquiry, but Mr. Borkland, Dakota Access's head of response planning, still has not heard back from Mr. Ward at Standing Rock about moving forward with any response planning discussions with the Tribe despite Standing Rock's previous assertion (noted above) of a supposed need to point out oversights and errors in earlier plans, *see* D.E. 288-1 at ¶ 5 (expecting to hear from Mr. Ward after the Tribal Council's meeting on November 1 or 2), and Mr. Borkland has yet to hear anything from anyone responsible for response planning at Cheyenne River, Ex. 1 (Bork-land Decl.) at ¶ 3.

Dated:  November 20, 2017

Respectfully submitted,

 /s/ William S. Scherman

Kimberley Caine
William J. Leone
Robert D. Comer
NORTON ROSE FULBRIGHT US LLP
799 9th St. NW, Suite 1000
Washington, D.C.  20001-4501
(202) 662-0200

William S. Scherman
David Debold
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
wscherman@gibsondunn.com

*Counsel for Dakota Access, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 20th day of November, 2017, I electronically filed the foregoing

document using the CM/ECF system.  Service was accomplished by the CM/ECF system.


       /s/ William S. Scherman       
William S. Scherman
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
wscherman@gibsondunn.com

*Counsel for Dakota Access, LLC*