**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **STANDING ROCK SIOUX TRIBE,** |
| **Plaintiff,** |
| **and** |
| **CHEYENNE RIVER SIOUX TRIBE,** |
| **Plaintiff-Intervenor,** |
| **v.** |
| **U.S. ARMY CORPS OF ENGINEERS,** |
| **Defendant,** |
| **and** |
| **DAKOTA ACCESS, LLC,** |
| **Defendant-Intervenor and Cross-Claimant.** |

**Civil Action No. 16-1534 (JEB) (and Consolidated Case Nos. 16-1769 and 16-267)**

**<u>MEMORANDUM OPINION</u>**

Two months ago, this Court determined that oil could continue to flow through the Dakota Access Pipeline while the U.S. Army Corps of Engineers conducted further environmental analyses.  See Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers (Standing Rock IV), 2017 WL 4564714 (D.D.C. Oct. 11, 2017).  Although the prior Opinion declined to vacate the agency's easement approval, it left open the question of whether to impose any conditions during the remand period.  Plaintiffs, the Standing Rock and Cheyenne River

1

Sioux Tribes, have asked for a series of interim measures to monitor the ongoing operation of the pipeline. Defendants oppose such conditions, arguing that the Tribes have not demonstrated a need for injunctive relief and that the proposed measures are unnecessary during remand.

As a threshold matter, the Court concludes that the interim conditions are not a request for injunctive relief; they are instead a means by which the Court can ensure that it receives up-to-date and necessary information about the operation of the pipeline and the facts on the ground. It next determines that the requested measures, each of which is tailored to keeping the Court abreast of the conditions at Lake Oahe pending further Corps analysis, are reasonable and appropriate.

## I.      Background

As explained in prior Opinions, the parties here are engaged in a protracted dispute over the placement of the Dakota Access Pipeline (DAPL) under Lake Oahe in North Dakota. See, e.g., Standing Rock IV, 2017 WL 4564714, at *1-3. The Lake is a federally regulated body of water that borders the Tribes' reservations, and it is considered sacred within their spiritual practices. Id.

In their most recent challenge to the project, Plaintiffs alleged that the Corps had erred in its analysis of the environmental impact of the pipeline crossing, in violation of the National Environmental Policy Act. See Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers (Standing Rock III), 255 F. Supp. 3d 101 (D.D.C. June 14, 2017). The Court agreed in part and remanded the case to the Corps for further analysis. Id. at 140. In a subsequent Opinion, issued on October 11, 2017, the Court examined whether the NEPA violations warranted vacatur of the agency's decisions – and thus a stoppage in the oil flow – during remand. See Standing Rock IV, 2017 WL 4564714. Finding a "significant likelihood" that the Corps could substantiate its

prior conclusions, the Court answered that question in the negative.  Id. at *8.  In denying such relief, however, it left open the possibility of imposing other, interim conditions during remand. Id. at *12.  It ordered further briefing on the issue from both sides, which is now complete.

## II.     Analysis

### A.     Authority to Issue Conditions

The Court turns first to the matter of its authority to impose conditions during remand. As the Tribes correctly note, this question has already been decided by the prior Opinion, in which the Court found that it possessed jurisdiction to order interim remedies other than vacatur. Id. at *12 (rejecting Defendants' argument that Court lacks jurisdiction to enter interim relief). Although the Court therefore considers this matter largely settled, Defendants nonetheless continue to contend that the proposed conditions are beyond the scope of the Court's power. This is not so.

The fundamental flaw in Defendants' argument is in how they characterize the relief Plaintiffs seek.  Defendants assert that the Tribes are, in effect, asking for an injunction. According to the Corps, "Plaintiffs' request for 'alternative measures' is . . . nothing more than a request for additional injunctive relief."  ECF 287 (Corps Brief) at 1-2.  Asserting that the Tribes fail to meet the test for such a remedy, the Corps contends that Plaintiffs are not entitled to interim relief.  Id.

Yet the conditions sought do not constitute injunctive relief.  They do not affect Defendants' ongoing environmental analysis, nor do they constrain the outcome of the remand process.  Rather, they are largely a means of providing the Court with relevant information during this period.  Each of the interim conditions is tailored to address the Court's ongoing concern with the risk of a spill at Lake Oahe – a hazard that the previous Opinion described as "at the center of this Court's prior" decision to remand the matter to the Corps.  See Standing

Rock IV, 2017 WL 4564714, at *10.  Such information-gathering measures are within the

Court's managerial discretion over this pending case.  See also West Virginia v. EPA, Order, No.

15-1363 (D.C. Cir. 2017) (ordering EPA to file status reports at 30-day intervals while case held

in abeyance).

Because the interim conditions here do not affect the remand process, Defendants'

reliance on Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139 (2010), is misplaced.  The

Court there held that the district court had exceeded its authority when, after vacating the Animal

and Plant Health Inspection Service's decision to completely deregulate a genetically engineered

crop, it additionally entered an injunction preventing the agency from partially deregulating the

crop during the remand period.  Id. at 156, 158-59.  Such an injunction, the Court concluded,

interfered with the agency's authority "to decide whether and to what extent it would pursue a

partial deregulation" and thus impermissibly "pre-empt[ed] the very procedure by which the

agency could determine . . . that a limited deregulation would not pose any appreciable risk of

environmental harm."  Id. at 159, 164.  The holding in Monsanto thus resolved an issue

unconnected with the facts of this case – whether a district court may impose constraints on an

agency's authority and decisionmaking during remand.  The interim measures proposed here do

not have any such effect.

Other cases addressing the scope of a court's supervision during remand are similarly

inapposite.  These decisions all concern the imposition of injunctive relief relating to the relevant

agency's analysis or discretion on remand.  See Bennett v. Donovan, 703 F.3d 582, 588-89 (D.C.

Cir. 2013) (noting that court would not direct agency on remand "to take [a] precise series of

steps" with respect to plaintiffs' mortgage, including "accept[ing] assignment of the mortgage,

pay[ing] off the balance . . .  and then declin[ing] to foreclose"); Palisades Gen. Hosp. Inc. v.

<u>Leavitt</u>, 426 F.3d 400, 403 (D.C. Cir. 2005) (stating that district court lacked authority to "order specific relief" after vacating agency decision); <u>Berge v. United States</u>, 949 F. Supp. 2d 36, 47 (D.D.C. 2013) (noting no district court jurisdiction to "order specific relief that deprives an agency of the ability to reconsider the matter in light of the Court's decision").

Yet here, as explained in more detail below, the conditions are not constraints on the Corps' analysis or a grant of "specific relief" to the Tribes. They do not concern the scope of the remand, nor do they affect the agency's authority over the pipeline. They are instead means by which the Court can gather information about the risks posed by the pipeline pending remand and can ensure that the status quo is preserved for both sides. As discussed in the prior Opinion, such an interim remedy clearly falls within the Court's general equitable powers.

Recent events have made clear, moreover, that there is a pressing need for such ongoing monitoring. Earlier this month, the Keystone Pipeline leaked 210,000 gallons of oil in Marshall County, South Dakota. <u>See</u> Mitch Smith and Julie Bosman, <u>Keystone Pipeline Leaks 210,000 Gallons of Oil in South Dakota</u>, N.Y. TIMES (Nov. 16, 2017), <u>https://www.nytimes.com/2017/11/16 /us/keystone-pipeline-leaks-south-dakota.html</u>. The spill occurred near the boundaries of the Lake Traverse Reservation, home of the Sisseton Wahpeton Oyate Tribe, thus highlighting the potential impact of pipeline incidents on tribal lands. <u>Id.</u> Although the Court is not suggesting that a similar leak is imminent at Lake Oahe, the fact remains that there is an inherent risk with any pipeline. As stated in the prior Opinion, "[T]here is no doubt that allowing oil to flow through the pipeline during remand risks the potentially disruptive effect about which the Tribes are most concerned – a spill under Lake Oahe." <u>Standing Rock IV</u>, 2017 WL 4564714, at *10. Such incidents, the Court noted, "have the potential to wreak havoc on nearby communities and ecosystems." <u>Id.</u> at *11. In light of these concerns, it is in the Court's interests to stay

abreast of any relevant changes during the remand period and to order the parties to provide up-to-date information about the pipeline's operation.  Such reporting will allow the Court to ensure that remand without vacatur remains the appropriate remedy and to monitor any factual developments in this ongoing case.

The Corps is thus incorrect that the interim conditions are "unwarranted" and "unlikely to address Plaintiffs' stated concerns with the operation of the pipeline."  Corps Brief at 4.  Indeed, Defendants' assertion that the Tribes' "rights, resources, and land are fully protected by the existing easement" presupposes that the status quo will be maintained during the remand process. Id. at 5.  Yet without measures to ensure that Defendants share information about ongoing operations, there is no clear way for the Court, the parties, or the public to evaluate the efficacy of the extant safety measures.

B.      Interim Conditions

Plaintiffs request three specific conditions during the remand period: (1) the finalization and implementation of oil-spill response plans at Lake Oahe; (2) completion of a third-party compliance audit; and (3) public reporting of information regarding pipeline operations.  See ECF 272 (Tribes' Brief Regarding Remedy) at 36-39.  The Court agrees that each of these measures is appropriately tailored to monitoring the status of the pipeline during remand.

As to the first, the Corps contends that the Tribes and Dakota Access "either have resolved, or are in the process of resolving, the Tribe's request" and that the relief sought is therefore not "necessary because it appears that the parties have already engaged in the requested coordination."  Corps Brief at 6.  Dakota Access similarly states that it is "already coordinating" with the Tribes' emergency-management personnel.  See ECF 288 (Dakota Access Brief) at 4. The Court, of course, encourages the parties to collaborate in efforts to resolve any pipeline-

related dispute.  Yet, in light of the case's history of contested versions of discussions between Plaintiffs and Defendants, it will not rest on such representations.  Instead, the Court will order that the Corps, Dakota Access, and the Tribes coordinate to finalize spill response plans at Lake Oahe, and that the parties file such plans with the Court by April 1, 2018.  Such a condition is directly related to the risk of a spill during remand, and it is directed to keeping the Court informed as to all parties' efforts to preserve the status quo pending the Corps' further environmental analysis.

The Court will additionally impose the second requested condition – namely, the completion of a third-party compliance audit.  In contesting this measure, Dakota Access relies heavily on the ongoing authority of the Pipeline and Hazardous Materials Safety Administration to ensure DAPL's compliance with federal laws and regulations.  See DA Brief at 5-6.  The Tribes note, however, that PHMSA itself recognized the potential benefit of having an independent, third-party review.  See Tribes Brief at 10.  Defendants' assertion that such a process would be duplicative of PHMSA oversight is therefore unavailing.  As to the Tribes' involvement in the process, the Corps asserts that Plaintiffs are asking for their "own experts [to] actually participate in the audit," Corps Brief at 6, and Dakota Access contends that the Tribes are seeking to "insert[]" themselves into the process.  See DA Brief at 6.  Yet the Tribes in fact request only that they be permitted to participate in the selection of the auditor and have the opportunity to share their relevant data during the audit process.  See Tribes Brief at 10.  This seems reasonable.  The Court will therefore order that Dakota Access select an independent, third-party auditor in consultation with the Tribes.  Because these conditions are imposed in order to keep the Court informed of the circumstances at Lake Oahe pending remand, it will require that the results of this audit process be filed with the Court by April 1, 2018.

Finally, the Court will require that Dakota Access file bi-monthly reports regarding the status of the pipeline during remand, beginning at the end of this month.  With respect to this condition, the Corps contends that such reporting is "unnecessary" and "unlikely to lead to any meaningful differences in the safety of the pipeline."  Corps Brief at 7.  Yet it never explains how additional information and transparency during the remand process would not enhance public safety and the Court's understanding of the facts on the ground.  In light of Dakota Access's agreement to "voluntarily" report on many of the issues raised by the Tribes, there is similarly no concern that this condition will be unduly burdensome for the company.  See DA Brief at 7.  The Court will therefore order that Dakota Access file bi-monthly reports of any repairs or incidents occurring at the segment of the pipeline crossing Lake Oahe.

## III.   Conclusion

The Court, the parties, and the public all have an interest in ensuring that the status quo at Lake Oahe is preserved pending remand.  In order to obtain the information necessary to monitor the conditions in North Dakota, and to mitigate the risk of any potential spill, the Court will thus impose a series of interim measures.  A separate Order consistent with this Opinion will be issued this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  December 4, 2017