**IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| and | ) |
| | ) |
| CHEYENNE RIVER SIOUX TRIBE, | ) |
| | ) |
| Plaintiff-Intervenor, | ) |
| | ) |
| v. | ) Case No. 1:16-cv-01534 (JEB) |
| | ) [Consolidated with 1:16-cv-1796 |
| UNITED STATES ARMY CORPS OF | )  and 1:17-cv-267] |
| ENGINEERS, | ) |
| | ) |
| and | ) |
| | ) |
| UNITED STATES FISH AND | ) |
| WILDLIFE SERVICE, | ) |
| | ) |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| DAKOTA ACCESS, LLC, | ) |
| | ) |
| Defendant-Intervenor and Cross-Claimant | ) |
| | ) |

**FEDERAL DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT,
SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES
AND EXHIBITS, AND [PROPOSED] ORDER**

Pursuant to Rule 56 of the Federal rules of Civil Procedure, the United States Army

Corps of Engineers and United States Fish and Wildlife Service respectfully move for summary

judgment with respect to Plaintiffs Yankton Sioux Tribe and Robert Flying Hawk's First,

Second, Third, Fourth, Fifth, and Sixth Claims for Relief in its Complaint in *Yankton Sioux Tribe*

*v. United States*, No. 16-1796, which has been consolidated into this case.  The particular grounds

for this motion are set forth in the supporting memorandum of points and authorities and exhibits

that are appended hereto, as well as any reply memorandum that the United States may file and

any oral argument that undersigned counsel for the government may present in the event that the

Court deems oral argument to be appropriate and helpful.

Dated: January 10, 2018                    Respectfully submitted,

                                           JEFFREY H. WOOD
                                           Acting Assistant Attorney General
                                           Environment & Natural Resources Division

                           By:    */s/  Matthew Marinelli*
                                           REUBEN S. SCHIFMAN, NY Bar
                                           MATTHEW MARINELLI, IL Bar 6277967
                                           U.S. Department of Justice
                                           Natural Resources Section
                                           P.O. Box 7611
                                           Benjamin Franklin Station
                                           Washington, DC 20044
                                           Phone: (202) 305-0293 (Marinelli)
                                           Phone: (202) 305-4224 (Schifman)
                                           Fax: (202) 305-0506
                                           matthew.marinelli@usdoj.gov
                                           reuben.schifman@usdoj.gov

                                           ERICA M. ZILIOLI, D.C. Bar 488073
                                           U.S. Department of Justice
                                           Environmental Defense Section
                                           P.O. Box 7611
                                           Washington, DC 20044
                                           Phone: (202) 514-6390
                                           Fax: (202) 514-8865
                                           Erica.Zilioli@usdoj.gov

                                           *Attorneys for the United States Army Corps of*
                                           *Engineers*

                                           OF COUNSEL:

                                           MILTON BOYD
                                           MELANIE CASNER

U.S. Army Corps of Engineers
Office of Chief Counsel
Washington, DC

**CERTIFICATE OF SERVICE**

I hereby certify that, on the 10th day of January, 2018, a copy of the foregoing was filed through the Court's CM/ECF management system and electronically served on counsel of record.

*/s/  Matthew Marinelli*

Matthew Marinelli

U.S. Department of Justice
Natural Resources Section
P.O. Box 7611
Benjamin Franklin Station
Washington, DC 20044
Phone: (202) 305-0293
Fax: (202) 305-0506
matthew.marinelli@usdoj.gov

## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| and | ) |
| | ) |
| CHEYENNE RIVER SIOUX TRIBE, | ) |
| | ) |
| Plaintiff-Intervenor, | ) |
| | ) |
| v. | ) Case No. 1:16-cv-01534 (JEB) |
| | ) [Consolidated with 1:16-cv-1796 |
| UNITED STATES ARMY CORPS OF | )  and 1:17-cv-267] |
| ENGINEERS | ) |
| | ) |
| and | ) |
| | ) |
| UNITED STATES FISH AND | ) |
| WILDLIFE SERVICE, | ) |
| | ) |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| DAKOTA ACCESS, LLC, | ) |
| | ) |
| Defendant-Intervenor and Cross-Claimant | ) |
| | ) |

## FEDERAL DEFENDANTS' OPPOSITION TO YANKTON SIOUX TRIBE AND ROBERT FLYING HAWK'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................... 1

II.   FACTUAL BACKGROUND ................................................................................ 2

    A.   Agency Decisionmaking ............................................................................. 2

    B.   Yankton Sioux Tribe Treaties ..................................................................... 4

    C.   Yankton Sioux Tribe Consultation ............................................................. 5

III.  ARGUMENT ......................................................................................................... 7

    A.   The Federal Defendants Fully Complied With NEPA. ............................... 7

        1.   The Corps and FWS acted reasonably in limiting the scope
            of their environmental review to their respective
            jurisdictions ..................................................................................... 7

        2.   Plaintiffs' segmentation argument cannot succeed because
            there is no larger agency action to be segmented in this
            case................................................................................................. 10

        3.   The challenged actions are not "connected" or "similar"
            and the agencies reasonably decided not to analyze them in
            the same document........................................................................... 13

        4.   Compiling the environmental reviews into a single
            document would have no practical effect. ........................................ 17

    B.   The Corps Did Not Violate Specific Trust Responsibilities
        Identified by Statute, Regulation, or Treaty by analyzing the
        portions of the Dakota Access Pipeline within its jurisdiction........................... 18

        1.   Plaintiffs have failed to identify any treaty rights to ceded
            lands located several hundred miles from its current lands. .................. 19

        2.   Plaintiffs' claims regarding usufructuary rights allegedly
            derived from an 1851 treaty are, at best, unripe. ..................................... 23

        3.   Federal Defendants' actions did not endanger Yankton's
            treaty rights. ..................................................................................... 26

        4.   Plaintiffs' lack standing to challenge government actions
            relating to lands hundreds of miles from their lands.............................. 29

    C.   Plaintiffs' National Historic Preservation Act claims relating to
        Counts 2, 3, 4, and 5 of its Complaint should be dismissed as moot.................. 30

IV.   CONCLUSION .................................................................................................... 31

# TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Gardner*,
 387 U.S. 136 (1967) .................................................................................................... 24

*Arizona v. California*,
 373 U.S. 546 (1963) .................................................................................................... 22

*Burlington N. R.R. v. Surface Transp. Bd.*,
 75 F.3d 685 (D.C. Cir. 1996) ...................................................................................... 31

*Californians for Renewable Energy v. U.S. Dep't of Energy*,
 860 F. Supp. 2d 44 (D.D.C. 2012) .............................................................................. 30

*City of Alexandria v. Slater*,
 198 F.3d 862 (D.C.Cir.1999) ........................................................................................ 8

*Coal. on Sensible Transp., Inc. v. Dole*,
 826 F.2d 60 (D.C. Cir. 1987) ...................................................................................... 12

*Commercial Drapery Contractors, Inc. v. United States*,
 133 F.3d 1 (D.C. Cir. 1998) ........................................................................................ 27

*Del. Riverkeeper Network v. FERC*,
 753 F.3d 1304 (D.C. Cir. 2014) .................................................................. 10, 11, 12, 13

*Dep't of Transp. v. Pub. Citizen*,
 541 U.S. 752 (2004) ................................................................................................ 9, 13

*El Paso Nat. Gas Co. v. United States*,
 750 F.3d 863 (D.C. Cir. 2014) .................................................................................... 18

*Finca Santa Elena, Inc. v. U.S. Army Corps of Eng'rs*,
 62 F. Supp. 3d 1 (D.D.C. 2014) .................................................................................. 31

*Florida v. Walker*,
 No. 6:15cv555-Orl-18KRS, 2015 U.S. Dist. LEXIS 96771 (M.D. Fla. May 14, 2015) ......... 19

*Grand Canyon Trust v. FAA*,
 290 F.3d 339 (D.C. Cir. 2002) .................................................................................... 13

*Grunewald v. Jarvis*,
 776 F.3d 893 (D.C. Cir. 2015) .................................................................................... 15

*Hammond v. Norton*,
 370 F. Supp. 2d 226 (D.D.C. 2005) ............................................................................ 12

*Hopi Tribe v. United States*,
 782 F.3d 662 (Fed. Cir. 2015) .................................................................................... 22

*Ill. Commerce Comm'n v. ICC*,
   848 F.2d 1246 (D.C. Cir. 1988) ................................................................................. 17

*Ins v. Aguirre-Aguirre*,
   526 U.S. 415 (1999) ....................................................................................................... 19

*James v. U.S. Dep't of Health & Human Servs.*,
   824 F.2d 1132 (D.C. Cir. 1987) ................................................................................. 25

*Kentuckians for the Commonwealth v. U.S. Army Corps of Eng'rs*,
   746 F.3d 698 (6th Cir. 2014) ..................................................................................... 13

*Kleppe v. Sierra Club*,
   427 U.S. 390 (1976) ......................................................................................................... 8

*Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Wisconsin*,
   653 F. Supp. 1420 (W.D. Wis. 1987) ....................................................................... 21

*McBryde v. Comm. to Review Circuit Council Conduct & Disability Orders of the Judicial*
   *Conference of the U.S.*,
   264 F.3d 52 (D.C. Cir. 2001) ..................................................................................... 31

*Medellín v. Texas*,
   552 U.S. 491 (2008) ....................................................................................................... 20

*Minnesota v. Mille Lacs Band of Chippewa Indians*,
   526 U.S. 172 (1999) ....................................................................................................... 21

*Mobil Oil Expl. & Producing Se. Inc. v. United Distrib. Cos.*,
   498 U.S. 211 (1991) ....................................................................................................... 15

*Nat. Res. Def. Council, Inc. v. Hodel*,
   865 F.2d 288 (D.C. Cir. 1988) ........................................................................... 11, 16

*Nevada v. Dep't of Energy*,
   457 F.3d 78 (D.C. Cir. 2006) ............................................................................... 17, 18

*Niagara Mohawk Power Corp. v. Fed. Power Comm'n*,
   202 F.2d 190 (D.C. Cir. 1952) ................................................................................. 22

*No Oilport! v. Carter*,
   520 F. Supp. 334 (W.D. Wash. 1981) ..................................................................... 28

*Northwest Sea Farms, Inc. v. U.S. Army Corps of Engineers*,
   931 F. Supp. 1515 (W.D. Wash. 1996) ................................................................... 29

*Nucor Steel-Ark. v. Pruitt*,
   246 F. Supp. 3d 288 (D.D.C. 2017) ......................................................................... 30

*Nw. Res. Info. Ctr., Inc. v. Nat'l Marine Fisheries Serv.*,
   56 F.3d 1060 (9th Cir. 1995) ..................................................................................... 14

*Oceana, Inc. v. Evans*,
   No. Civ.A.04-0811(ESH), 2005 WL 555416 (D.D.C. Mar. 9, 2005) ...................... 8

*Ohio Forestry Ass'n v. Sierra Club*,
523 U.S. 726 (1998) ............................................................................................ 24, 25, 26

*Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*,
556 F.3d 177 (4th Cir. 2009) ............................................................................................ 13

*PDK Labs. Inc. v.DEA*,
362 F.3d 786 (D.C. Cir. 2004) ......................................................................................... 17

*Riverkeeper Network v. FERC*,
753 F.3d 1304 (D.C. Cir. 2014) ....................................................................................... 13

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989) ......................................................................................................... 18

*Safari Club Int'l v. Jewell*,
960 F. Supp. 2d 17 (D.D.C. 2013) .................................................................................... 26

*Seminole Nation v. United States*,
316 U.S. 286 (1942) ......................................................................................................... 29

*Sierra Club v. Fed. Energy Regulatory Comm'n*,
827 F.3d 36 (D.C. Cir. 2016) ............................................................................................. 8

*Sierra Club v. U.S. Army Corps of Eng'rs*,
64 F. Supp. 3d 128 (D.D.C. 2014) .................................................................................... 13

*Sierra Club v. U.S. Army Corps of Eng'rs*,
803 F.3d 31 (D.C. Cir. 2015) ......................................................................... 2, 9, 10, 13, 16

*Sierra Club, Inc. v. Bostick*,
787 F.3d 1043 (10th Cir. 2015) .......................................................................................... 9

*South Dakota v. Yankton Sioux Tribe*,
522 U.S. 329 (1998) ........................................................................................ 2, 4, 5, 22, 23

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
255 F. Supp. 3d 101 (D.D.C. 2017) ........................................................................ 24, 25, 27, 28

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
No. 16-534 (JEB), 2017 U.S. Dist. LEXIS 167569 (D.D.C. Oct. 11, 2017) ........................... 25

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
205 F.Supp.3d 4 (D.D.C. 2016) ....................................................................................... 14

*State Farm Mut. Auto. Ins. Co. v. Dole*,
802 F.2d 474 (D.C. Cir. 1986) ......................................................................................... 24

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) ................................................................................................... 29, 30

*Taxpayers Watchdog, Inc. v. Stanley*,
819 F.2d 294 (D.C. Cir. 1987) .................................................................................... 11, 14

*Theodore Roosevelt Conservation P'ship v. Salazar,*
  616 F.3d 497 (D.C. Cir. 2010) ............................................................... 27

*United States v. Anderson,*
  625 F.2d 910 (9th Cir. 1980) ................................................................. 23

*United States v. Dion,*
  476 U.S. 734 (1986) ................................................................................ 4

*United States v. Jicarilla Apache Nation,*
  564 U.S. 162 (2011) ......................................................................... 18, 29

*United States v. Navajo Nation,*
  537 U.S. 488 (2003) .................................................................... 18, 26, 29

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council,*
  435 U.S. 519 (1978) ............................................................................... 13

*Weiss v. Kempthorne,*
  580 F. Supp. 2d 184 (D.D.C. 2008) ................................................... 8, 13

*Weiss v. Sec'y of Dep't of Interior,*
  459 F. App'x 497 (6th Cir. 2012) ......................................................... 31

*Wetlands Action Network v. U.S. Corps of Eng'rs,*
  222 F.3d 1105 (9th Cir. 2000) ............................................................... 13

*Yankton Sioux Tribe v. Podhradsky,*
  606 F.3d 994 (8th Cir. 2010) ................................................................. 20

*Yankton Sioux v. United States,*
  97 Ct. Cl. 56 (1942) ......................................................................... 20, 21

**Statutes**

5 U.S.C. § 706 ........................................................................................... 17

15 U.S.C. § 717f(c)(1)(A) .......................................................................... 12

33 U.S.C. § 408 ........................................................................................... 3

Pub. L. No. 83-776, 68 Stat. 1191 ............................................................ 22

**Regulations**

40 C.F.R. § 1502.4(a) ........................................................................... 10, 11

40 C.F.R. § 1508.18(a) .............................................................................. 15

40 C.F.R. § 1508.25 ................................................................................... 13

40 C.F.R. § 1508.25(a)(1)(i)-(iii) .............................................................. 14

40 C.F.R. § 1508.25(a)(3) .......................................................................... 15

**Other Authorities**

Treaty of Ft. Laramie, 11 Stat. 749 (Sept. 17, 1851)..........................................................................4

Treaty with Yancton Tribe of Sioux, 11 Stat. 743 (Apr. 19, 1858) ...................................................4

**LIST OF EXHIBITS**

| Exhibit | Description | Cross-Reference |
|---|---|---|
| A | Environmental Assessment, Omaha District (July 2016) ("Omaha EA") | USACE_DAPL0071220-382 |
| B | St. Louis District Final Environmental Assessment and Finding of No Significant Impact  (Aug. 3, 2016) ("St. Louis EA") | USACE_DAPL0009823-958 |
| C | Memorandum for Record (July 19, 2016) ("Rock Island Memorandum") | USACE_DAPL0000003-91 |
| D | FWS Environmental Assessment: Grassland and Wetland Easement Crossings (May 2016) ("FWS EA") | USFWS_DAPL0002449-92 |
| E | FWS Finding of No Significant Impact (June 22, 2016) | USFWS_AR0002416-18 |
| F | Map | |
| G | Email from L. Gravatt, Yankton, to R. Harnois, Corps (Nov. 3, 2014) | USACE_DAPL0067125 |
| H | Tribal Consultation Spreadsheet | USACE_DAPL0005630 |
| I | Tr. of meeting in Sioux Falls, S.D. (Jan. 25, 2016) | USACE_DAPL0066575-77 |
| J | Dakota Access Tribal Consultation Meeting sign in sheet (Dec. 8, 2015) | USACE_DAPL0066810 |
| K | Letter from Chairman Flying Hawk to Col. Henderson (Mar. 17, 2016) | USACE_DAPL0064260 |
| L | Letter from Chairman Flying Hawk to Col. Henderson (Apr. 13, 2016) | USACE_DAPL0065507-13 |
| M | Letter from Chairman Flying Hawk to Col. Henderson (Apr. 29, 2016) | USACE_DAPL0064400 |
| N | Letter from Col. Henderson to Chairman Flying Hawk (May 10, 2016) | USACE_DAPL0064286 |
| O | Letter from Col. Henderson to Chairman Flying Hawk (May 6, 2016) | USACE_DAPL0064293-94 |
| P | Corps email chain (May 2, 2016) | USACE_DAPL0064320-23 |
| Q | Corps email chain (Apr. 22, 2016) | USACE_DAPL0065413-15 |
| R | Letter from Chairman Flying Hawk to Col. Henderson (June 17, 2016) | USACE_DAPL0064074 |
| S | Letter from Col. Henderson to Chairman Flying Hawk (July 15, 2016) | USACE_DAPL0063979-90 |
| T | Letter from Regional Director Hogan to Chairman Flying Hawk (Oct. 23, 2015) | USFWS_DAPL0001016-18 |
| U | Letter from Regional Director Hogan to THPO Little (Oct. 23, 2015) | USFWS_DAPL0001019-21 |
| V | List of tribes invited to February 18-19, 2015 meeting in Niobrara, Neb. | USFWS_DAPL0001977-78 |
| W | Ponca Tribe of Nebraska Dakota Access Pipe Line Meeting Sign in Sheet (Feb. 18, 2016) | USFWS_DAPL0001974-76 |

| X | Letter from Col. Hudson to Chairman Flying Hawk (Oct. 20, 2017) | |
|---|---|---|
| Y | Omaha EA, Appendix J Summary of Comments Received | USACE_DAPL0071720-76 |
| Z | Petition, ICC Docket No. 332 | |
| AA | Letter from Col. Hudson to Chairman Flying Hawk (Oct. 20, 2017) | |

## I.    INTRODUCTION

The Corps' decision to grant an easement to Dakota Access represented the culmination of over two years of detailed environmental analysis and extensive consultation efforts with numerous stakeholders, including the Yankton Sioux Tribe.  The Corps' analysis of potential impacts on seven water crossings for portions of the Dakota Access Pipeline included site-specific analysis under NEPA by three Corps District Offices.  In addition, various other crossings were approved via a previously issued Nationwide Permit for filling of wetlands with minimal individual and cumulative adverse effect to the aquatic environment.  Through multiple motions for partial summary judgment, this Court has largely upheld the Corps' decision-making under NEPA.

In addition to the Corps' administered water crossings, the Pipeline also crossed land over which the United States Fish and Wildlife Service ("FWS") holds wetland and grassland easements. Those crossings temporarily impact 71.8 acres of the 1,100 mile Pipeline route (less than 0.5 % of the entire Pipeline) and are over 60 miles from the site-specific water crossings the Corps reviewed. The Fish and Wildlife Service studied the easement crossings by preparing its own Environmental Analysis, which concluded that allowing construction on privately owned lands encumbered by wetland and grassland easements under the Service's management would not significantly affect the quality of the crossed wetland and grassland easements and would not constitute a major federal action.   Accordingly, the FWS properly concluded that no EIS was necessary.

The Yankton Sioux Tribe and Chairman Flying Hawk ("Plaintiffs") seek summary judgment on the theory that the Corps and FWS were required to create a single NEPA document for the entire Pipeline.  This contention is devoid of any legal support—neither the Corps nor FWS, alone or combined, have jurisdiction over the entire Pipeline, more than 96% of which is not on federally managed land.  Both agencies fully complied with NEPA by limiting their respective environmental reviews to areas within their jurisdiction and in which potential environmental

impacts may occur.  Despite Plaintiffs' unsupportable efforts to distinguish their claims, the D.C.

Circuit has ruled squarely on this issue, finding that agencies in another oil pipeline case "were not

obligated also to analyze the impact of the construction and operation of the entire pipeline."  *Sierra*

*Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 48–49 (D.C. Cir. 2015).  So too here.

Plaintiffs' treaty related claims fare no better.  Plaintiffs' argument that the Corps has not

considered Yankton's alleged usufructuary treaty rights relating to 38-miles of land abutting Lake

Oahe should be denied because, as the Supreme Court found, the 1858 Treaty of Washington ceded

Yankton's rights in the land at issue.  *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 334

(1998).  Simply put, Yankton fails to meet its burden of establishing that it possesses relevant

usufructuary rights, much less that the Corps has breached a trust duty relating to those rights.

Finally, the Court should grant summary judgment to the United States on Plaintiffs' claims

alleging that the Corps violated the National Historic Preservation Act and that "clearing, grading,

excavation, and construction that would occur along the duration of the Pipeline route would destroy

any historic or culturally significant sites encountered."  Compl. *Yankton Sioux Tribe v. United*

*States*, No. 16-1796 (D.D.C. Sept. 8, 2016), ECF No.1 at ¶ 139.  The Pipeline is now fully

constructed.  Plaintiffs' own allegations therefore make clear that its Claims 2 through 5 are moot.

## II.     FACTUAL BACKGROUND

### A.  <u>Agency Decisionmaking</u>

The Dakota Access Pipeline will connect the Bakken and Three Forks production region of

North Dakota to Patoka, Illinois with an approximately 1,100 mile-long pipeline.  Environmental

Assessment, Omaha District (July 2016) (Ex. A) ("Omaha EA") (USACE_71220-382).  Certain

discrete sections of the Pipeline fall under the Corps' jurisdiction and require some form of Corps

approval or rights of way over Corps-managed land.  *Id.*  In addition to the Corps' Omaha District's

Environmental Assessment that has been the subject of several rounds of briefing in this case, the

Corps completed two other NEPA processes.  The Corps' St. Louis District issued an Environmental

Assessment and Mitigated Finding of No Significant Impact for permission to cross four federal

projects or flowage easements in Illinois under Section 14 of the Rivers and Harbors Act of 1899, 33

U.S.C. § 408 ("Section 408").  St. Louis District Final Environmental Assessment and FONSI (Aug.

3, 2016) (Ex. B) ("St. Louis EA") (USACE_9823-958).  The St. Louis EA addressed four crossings

– three of which span less than 700 feet and one of which crosses federal flowage easements for

approximately 2.42 miles.  *Id*. at 10, 16.  And the Corps' Rock Island District issued a Section 408

permission for a portion of the Pipeline to cross the Mississippi River after determining that the

Section 408 permission met the terms of the Corps' NEPA categorical exclusion.  Memorandum for

Record (July 19, 2016) (Ex. C) ("Rock Island Memorandum") (USACE_3-91).  The Rock Island

Memorandum addressed a single river crossing of 4,600 feet.  *Id*. at USACE_3.

Other sections of the Pipeline traverse privately-owned lands in North and South Dakota

encumbered by easements managed by the Fish and Wildlife Service.  The FWS issued an

Environmental Assessment and Mitigated Finding of No Significant Impact on June 22, 2016.  FWS

Environmental Assessment: Grassland and Wetland Easement Crossings (May 2016) (Ex. D) ("FWS

EA") (USFWS_2449-92); FWS Finding of No Significant Impact (June 22, 2016) (Ex. E)

(USFWS_2416-18).  These documents address the FWS's recommendations to avoid its easements

entirely through rerouting and avoiding impacts to its easements through directional drilling.  *Id*.

FWS determined that "[a]ll surface impacts to grassland easements in North Dakota and South

Dakota have been avoided by route modifications or construction methods" and that the "total

temporary impacts to the wetland basins (71.8 acres) would be less than 0.6 percent of the entire"

Pipeline in North and South Dakota.  FWS EA at 18.  The EA also addresses the FWS's efforts to

consult with tribes, including Yankton.  *Id*. at 38.

**B.  Yankton Sioux Tribe Treaties**

On September 17, 1851, the United States entered into the Treaty of Fort Laramie with the Sioux and other tribes.  Treaty of Ft. Laramie, 11 Stat. 749 (Sept. 17, 1851).  That treaty provided that "the aforesaid Indian nations . . . do not surrender the privilege of hunting, fishing, or passing over any of the tracts of country heretofore described."  *Id.* at Art. 5.

On April 19, 1858, the United States and the Yankton Sioux Tribe concluded the Treaty with Yancton Tribe of Sioux.[1]  11 Stat. 743.  Article I of the Treaty of 1858 provided that Yankton "relinquish[ed] and abandon[ed] all claims and complaints about or growing out of any and all treaties heretofore made by them or other Indians, except their annuity rights under the" 1851 Treaty.  *Id.* at Art. I.   The 1858 Treaty further provided that Yankton "fully acquit[s] and release[s] the United States from all demands against them on the part of said tribe . . . except the before mentioned right of the Yanctons to receive an annuity under said treaty of Laramie, and except, also, such as are herein stipulated and provided for."  . at Art. XIV.   The 1858 Treaty explicitly protected usufructuary rights to quarry stone, preserving "the free and unrestricted use of the red pipe-stone quarry, or so much thereof as they have been accustomed to frequent and use for the purpose of procuring stone for pipes."  *Id.* at Art. VIII.   The 1858 Treaty reserved for Yankton approximately 400,000 acres of land "located in what is now the southeastern part of Charles Mix County, South Dakota."  *Yankton Sioux*, 522 U.S. at 334.

In 1894, Congress passed an act that incorporated the United States and the Yankton Sioux Tribe's agreement, providing for the allotment and sale of the approximately 400,000-acres reserved by the 1858 Treaty.  The Supreme Court addressed the extent to which the 1894 Treaty

---

[1]      "Yancton" was the "1858 spelling" of "Yankton."  *United States v. Dion*, 476 U.S. 734, 737 (1986)

preserved rights protected by the 1858 Treaty, finding that "apart from the pledge to pay

annuities, it is hard to identify any provision in the 1858 Treaty that the Tribe might have sought

to preserve, other than those plainly inconsistent with or expressly included in the 1894 Act."

*Yankton Sioux*, 522 U.S. at 348.  Yankton's current lands are located approximately four-

hundred river miles from the Lake Oahe Pipeline crossing.  Map (Ex. F).

### C. Yankton Sioux Tribe Consultation

The Corps made multiple efforts to consult with Yankton between November 3, 2014 and the

dates of the challenged agency decisions in June and July 2016.  These consultation efforts sought to

address Yankton's concerns relating to, among other things, its alleged treaty rights.

Yankton's response to the Corps' initial consultation effort was to defer commenting on

drilling test bore holes near Lake Oahe to the Standing Rock and Cheyenne River Sioux Tribes.

Email from L. Gravatt, Yankton, to R. Harnois, Corps (Nov. 3, 2014) (Ex. G) (USACE_67125);

Map.  The Corps subsequently conducted a field visit on April 2, 2015 to traditional cultural property

sites with Tribal Historic Preservation Officer ("THPO") Perry Little.  Tribal Consultation

Spreadsheet at 5 (Ex. H) (USACE_5630).

Yankton did not attend two subsequent meetings attended by other tribes. Tr. of meeting in

Sioux Falls, S.D. (Jan. 25, 2016) (Ex. I) (USACE_66575-77); Dakota Access Tribal Consultation

Meeting sign in sheet (Dec. 8, 2015) (Ex. J) (USACE_66810).

On March 17, 2016, Yankton requested a consultation meeting with the Corps on March 31,

2016.  Letter from Chairman Flying Hawk to Col. Henderson (Mar. 17, 2016) (Ex. K)

(USACE_64260).  On April 13, 2016, Yankton transmitted a letter to the Corps that generally

referenced unspecified treaty rights, but otherwise focused on the National Historic Preservation Act

and Native American Graves Protection and Repatriation Act.  Letter from Chairman Flying Hawk

to Col. Henderson (Apr. 13, 2016) (Ex. L) (USACE_65507).  Yankton sent a third letter to the Corps

on April 29, 2016 that generally addressed consultation without referencing specific treaty rights. Letter from Chairman Flying Hawk to Col. Henderson (Apr. 29, 2016) (Ex. M) (USACE_64400).

Between March 17, 2016 and May 10, 2016, the Corps made numerous efforts to meet with Yankton.  Yankton canceled the March 31, 2016 meeting and did not respond to numerous phone calls, emails, and text messages.  Letter from Col. Henderson to Chairman Flying Hawk (May 10, 2016) (Ex. N) (USACE_64286); Letter from Col. Henderson to Chairman Flying Hawk (May 6, 2016) (Ex. O) (USACE_64293-94); Corps email chain (May 2, 2016) (Ex. P) (USACE_64320-23); Corps email chain (Apr. 22, 2016) (Ex. Q) (USACE_65413-15).

On May 18, 2016, Colonel Henderson flew to Fort Randall, South Dakota and met with Yankton Chairman Flying Hawk, THPO Little, and members of Yankton's Business and Claims Committee, Treaty Steering Committee, and attorneys.  On June 17, 2016 Yankton informed the Corps that it was "finalizing its Consultation Protocols" and that "several burials" were located at unspecified pre-construction notification sites in South Dakota.  Letter from Chairman Flying Hawk to Col. Henderson (June 17, 2016) (Ex. R) (USACE_64074).  On July 8 and 15, the Corps responded by providing Yankton with information regarding monitoring PCN sites.  Letter from Col. Henderson to Chairman Flying Hawk (July 15, 2016) (Ex. S) (USACE_63979).

The FWS also sent Yankton two letters in October, 2015.  Letter from Reg'l Dir. Hogan to Chairman Flying Hawk (Oct. 23, 2015) (Ex. T) (USFWS_1016-18); Letter from Reg'l Dir. Hogan to THPO Little (Oct. 23, 2015) (Ex. U) (USFWS_1019-21); FWS EA at 38.  Yankton did not respond to those letters.  Yankton was also invited to participate in a meeting with FWS and the Corps on February 18 and 19.  List of tribes invited to Feb. 18-19, 2016 meeting in Niobrara, Neb. (Ex. V) (USFWS_1977-78).  Yankton did not attend the meeting.  Ponca Tribe of Nebraska Dakota Access Pipe Line Meeting Sign in Sheet (Feb. 18, 2016) (Ex. W) (USFWS_1974-76).

On October 20, 2017, following the Court's remand, the Corps requested information

relating to hunting and fishing, including "studies or reports on game species . . . and the designated

hunting grounds for such game in relation to Lake Oahe", and "[d]ocumentation of distinct cultural

practices of the Tribe that are connected to Lake Oahe."  Email with letter from Col. Hudson to

Chairman Flying Hawk (Oct. 20, 2017) (Ex. X).  The transmittal email was flagged as "high

importance."  *Id.*  Yankton has not yet substantively responded to the Corps' request.  *See* Resp.

to U.S. Army Corps of Eng'rs' Status Report Regarding Remand (Dec. 6, 2017), ECF No. 305;

Surreply to the Army Corps' Reply to the Yankton Sioux Tribe and Robert Flying Hawk's Resp.

to the Army Corps' Status Report Regarding Remand (Dec. 19, 2017), ECF No. 309.

## III.   ARGUMENT

### A.  The Federal Defendants Fully Complied With NEPA.[2]

Plaintiffs' argue that the Corps and FWS were required to prepare a single omnibus

document and having not done so have illegally "segmented" their analysis.  This argument

relies upon the incorrect premise that either the Corps or FWS have authority to approve the

entire Pipeline.  Neither agency has such authority, and this dooms Plaintiffs' argument.

### 1.      The Corps and FWS acted reasonably in limiting the scope of their environmental review to their respective jurisdictions.

Plaintiffs argue that the Corps and FWS acted arbitrarily and capriciously by limiting the

scope of their environmental review to the areas within their jurisdiction and not discussing the

allegedly "related" actions undertaken elsewhere.  Pls. Yankton Sioux Tribe and Robert Flying

Hawk's Mem. in Supp. Of Their Mot. For Partial Summ. J. (Nov. 10, 2017) 9, ECF No. 292 ("Pls.

---

[2]      Defendants note that Plaintiffs' arguments challenging the Lake Oahe easement issued
months after they filed their Complaint in this case are improper.  Plaintiffs' Mot. for Partial
Summ. J. (Nov. 10, 2017) ECF No. 292.  Among other things, Plaintiffs do not and could not
reference the Lake Oahe Easement in their Complaint.

Br.").  This argument has no merit, as an agency's scoping decision is entitled to deference, and

the Corps and FWS were correct in limiting their review to the areas within their jurisdiction.

Determining the scope of an NEPA review involves many line drawing exercises that

implicate agency expertise.  In particular, the "determination of the size and location of the

relevant geographic area 'requires a high level of technical expertise,' and thus 'is a task

assigned to the special competency of' the" agency.  *Sierra Club v. Fed. Energy Regulatory

Comm'n*, 827 F.3d 36, 49 (D.C. Cir. 2016) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 412,

414 (1976)); *Oceana, Inc. v. Evans*, No. Civ.A.04-0811(ESH), 2005 WL 555416, at *7 (D.D.C.

Mar. 9, 2005) ("Courts accord 'considerable deference to the agency's expertise and policy-

making role' that defined the scope of the action in the first place.") (citing *City of Alexandria v.

Slater,* 198 F.3d 862, 867 (D.C.Cir.1999)).

Here the Corps and FWS reasonably exercised their expert judgment to determine the

relevant geographic area their reviews would analyze.  Rather than analyze the entire Pipeline,

each agency analyzed the discrete environmental impacts associated with the specific crossings

they authorized.  Omaha EA (Ex. A); St. Louis EA (Ex. B); Rock Island Mem. (Ex. C); FWS EA

(Ex. D).  They reasonably did not analyze portions of the Pipeline outside of each respective

agency's jurisdiction, or outside of federal jurisdiction altogether.  However, the agencies

considered connected actions and cumulative impacts.  *See* Omaha EA at 15-16, 98-107; St.

Louis EA at 17, 83-94; Rock Island Mem. at USACE_55-56, USACE_86; FWS EA at 33-34.

NEPA does not require that the environmental review obligations of those agencies "go

beyond the scope of [their] permitting authority to review the area over which [they have] no

jurisdiction." *Weiss v. Kempthorne,* 580 F. Supp. 2d 184, 189 (D.D.C. 2008).  Thus, the FWS

was not required under NEPA to include the activities of the Corps in their environmental

reviews, or vice-versa.  And neither agency needed to analyze the impacts associated with the

Pipeline in general that were outside of either agency's jurisdiction.

This approach has been repeatedly affirmed.  In *Sierra Club*, the plaintiff argued "the

federal government was obligated to scope a NEPA analysis to the entire pipeline." 803 F.3d at

48.  That is functionally the same argument Plaintiffs advance here, by arguing the Federal

Defendants were required to "evaluate the direct, indirect, and cumulative impacts of the

Pipeline in a single NEPA document," regardless of whether these impacts were within the

jurisdiction of the agency preparing the environmental review.  Pls. Br. at 6.

This Circuit has expressly rejected this argument, holding "that the federal government

was not required to conduct NEPA analysis of the entirety of the [pipeline], including portions

not subject to federal control or permitting."  *Sierra Club*, 803 F.3d at 34.  As in this case,

> [t]he agencies' respective regulatory actions—in the form of easements, Clean
> Water Act verifications, [etc]…were limited to discrete geographic segments….
> [T]he agencies were required to conduct NEPA analysis of the foreseeable direct
> and indirect effects of those regulatory actions. However… the agencies were
> not obligated also to analyze the impact of the construction and operation of the
> entire pipeline.

*Id*.  This decision is consistent with the weight of authority that holds that "where an agency has

no ability to prevent a certain effect due to its limited statutory authority over the relevant actions

. . . the agency need not consider these effects in its EA."  *Dep't of Transp. v. Pub. Citizen*, 541

U.S. 752, 763 (2004); *see also Sierra Club, Inc. v. Bostick*, 787 F.3d 1043, 1051 (10th Cir. 2015)

(rejecting argument Corps was required to undertake NEPA analysis for the entire Gulf Coast

Pipeline before issuing discrete the verification letters).

The Corps does not have authority or jurisdiction over FWS easements, and the FWS

does not have jurisdiction over the federal property managed by the Corps.  And neither the

Corps' nor FWS's jurisdiction extends to approval of the entire Pipeline.  These basic facts refute

Plaintiffs' argument that the agencies were required to analyze actions and impacts generally associated with the Pipeline in a single NEPA document, rather than conducting appropriately scoped individual NEPA analysis commensurate with the activity each agency was undertaking.

> ## 2. Plaintiffs' segmentation argument cannot succeed because there is no larger agency action to be segmented in this case.

Plaintiffs' argument is that the Corps and FWS's approvals to allow discrete crossings of federal land or federal interests in private land are in fact a "single course of action," namely, approval of the Pipeline, and the agencies impermissibly divided this larger action approval into smaller actions. *See, e.g.*, Pls. Br. at 3, 7, 9.  However, as demonstrated above, there was no single "proposal" for the Pipeline submitted to the Corps and FWS and they did not undertake a "single course of action" of approving the Pipeline.

40 C.F.R. § 1502.4(a) applies where there is a single federal action—such as approval of a new federal highway or FERC-regulated natural gas pipeline.  There is no such action in this case.  *Sierra Club* recognized this distinction, describing impermissible segmentation as possible for "projects that are 'connected, contemporaneous, closely related, and interdependent,' *when the entire project at issue is subject to federal review."* 803 F.3d at 50 (citing *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1308 (D.C. Cir. 2014) (emphasis added)).[3]

---

[3]     Plaintiffs claim their argument is not controlled by *Sierra Club*, Pls. Br. at 16-17, as that case did not rule on the argument that the various federal approvals were connected and should have been considered together rather than "segmented."  *See Sierra Club*, 803 F.3d at 48, 51 (finding plaintiff had failed to preserve argument that connected action regulation applied and required that federal actions related to the pipeline "should have been analyzed together.").  Plaintiffs seek to make this argument here, arguing that the Corps and FWS "artificially segmented the linear Pipeline project[.]" Pls. Br. at 9.  Plaintiffs' argument, however, rests on a flawed premise that the challenged actions represent federal approval of the "Pipeline project" rather than discrete crossings of federal land or federal interests in private land, as well as a flawed reading of *Sierra Club* and the Council on Environmental Quality ("CEQ") regulations.

As discussed above, each permission granted by the Corps or FWS was a discrete agency action with a scope limited to the respective agencies' jurisdiction.  *See* Section III.A.1, above. Thus, the primary rationale for the prohibition on segmentation is entirely absent here, as this is not a case where a single larger agency action was divided into multiple actions, each of which had an insignificant environmental impact.  Plaintiffs' arguments to the contrary erroneously refer to the pipeline as a "project" or "action" that the federal defendants allegedly approved but provide no support for the claim that the Pipeline is a federal project or one that a federal agency has approval authority over.  *Cf.* Pls. Br. at 19 (alleging agencies "hid the ball" by "approving this massive Pipeline through a piecemeal segmented approach . . . ."), *id.* at 13 (refers to "agency's decision on the larger project").

Nor does Plaintiffs' claim find support in caselaw. The primary cases Plaintiffs rely on to support their argument are distinguishable from this case because they concern situations where either an agency had jurisdiction and control of an entire project—such as FERC, which approves natural gas pipelines—or where an agency had de facto approval over the entire project, for example, due to its location on primarily federal land or because of federal funding to the project. *See Del. Riverkeeper Network*, 753 F.3d at 1307 (suit against FERC which approved natural gas pipeline); *Taxpayers Watchdog, Inc. v. Stanley*, 819 F.2d 294, 296 (D.C. Cir. 1987) (suit against Urban Mass Transportation Administration, which funded construction of a rail

---

CEQ regulations provide that "[p]roposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action shall be evaluated in a single impact statement." 40 C.F.R. § 1502.4(a).  The purpose of this requirement is to "prevent agencies from dividing one project into multiple individual actions 'each of which individually has an insignificant environmental impact, but which collectively have a substantial impact.'" *Nat. Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288, 297-98 (D.C. Cir. 1988) (citation omitted).

system); *Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 62 (D.C. Cir. 1987) (suit against Federal Highway Administration which funded entire highway).

For instance, in *Delaware Riverkeeper*, four projects were reviewed and approved separately by FERC, even though FERC had jurisdiction over the entire natural gas pipeline. 753 F.3d at 1318.  As the court recognized, "FERC was responsible for the environmental review of [the gas pipeline projects] because, under the Natural Gas Act, any party seeking to construct a facility for the transportation of natural gas in interstate commerce must first obtain a certificate of public convenience and necessity from [FERC]." *Id.* at 1307 (citing 15 U.S.C. § 717f(c)(1)(A)).  FERC therefore violated NEPA by reviewing each segment of the larger federal action separately, rather than incorporating the entire federal action into one NEPA review.

Similarly, *Hammond v. Norton,* 370 F. Supp. 2d 226 (D.D.C. 2005), is distinguishable because there, BLM had effective approval over the pipeline route as "96.95 miles of [the 260-mile pipeline] would traverse federal lands" and require a permit from BLM, *id*. at 233, and, more importantly, the parties did not dispute that the project proponents "deliberately sought to segment the environmental analysis…so as to circumvent NEPA requirements."  *Id.* at 244.

In contrast, in this case neither the Corps nor FWS has authority to "approve" or "permit" the location or construction of the Pipeline project as a whole, or even any substantial portion of it.  Instead, each agency had jurisdiction over discrete and small crossings of federal land or federal interests in private land which totaled less than 4% of the entire Pipeline.  This case is therefore controlled by the long line of binding cases that hold that an agency need only analyze

the environmental impacts within its jurisdiction. *See Sierra Club*, 803 F.3d 31 (environmental

review limited to Corps' jurisdiction); *Weiss*, 580 F. Supp. 2d at 189 (citing cases).[4]

### 3. The challenged actions are not "connected" or "similar" and the agencies reasonably decided not to analyze them in the same document.[5]

Plaintiffs mistakenly rely on 40 C.F.R. § 1508.25, which defines the "scope" of an EIS[6]

as "the range of actions, alternatives, and impacts to be considered in an environmental impact

statement." 40 C.F.R. § 1508.25.  This regulation requires an agency to evaluate three types of

"actions" in an EIS, in addition to the action being proposed: "Connected actions," "Cumulative

actions," and "Similar actions." *Id.* § 1508.25(a)(1)-(3).

Even if this regulation applied to EAs and FONSIs, the challenged actions here do not

meet the regulatory definition of "connected" actions, which are actions that: "(i) Automatically

trigger other actions which may require environmental impact statements; (ii) Cannot or will not

---

[4]      *See also Kentuckians for the Commonwealth v. U.S. Army Corps of Eng'rs,* 746 F.3d 698, 710 (6th Cir. 2014) ("agencies may reasonably limit their NEPA review to only those effects proximately caused by the actions over which they have regulatory responsibility"); *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.,* 556 F.3d 177, 197 (4th Cir. 2009); and *Wetlands Action Network v. U.S. Corps of Eng'rs,* 222 F.3d 1105, 1115-18 (9th Cir. 2000) (scope of Corps' NEPA analysis properly limited by its jurisdiction over waters).

[5]      Neither Plaintiff nor any other commenter raised the argument that FWS and the Corps' actions should be considered together as "similar actions." *Dep't of Transp.,* 541 U.S. at 764-65 (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council,* 435 U.S. 519, 553 (1978)). This argument is therefore waived.

[6]      The regulation by its own terms applies not to the EAs and FONSI at issue here but to an EIS.  *See Grand Canyon Trust v. FAA*, 290 F.3d 339 (D.C. Cir. 2002) (40 C.F.R. § 1508.25 "address[es] the proper scope of an EIS, not an EA"); *Sierra Club v. U.S. Army Corps of Eng'rs*, 64 F. Supp. 3d 128, 154 n.16 (D.D.C. 2014) ("[T]he plain language of the regulation appears to apply only to an EIS").  *But see Del. Riverkeeper Network,* 753 F.3d at 1314 ("[W]hen determining the contents of an EA or an EIS, an agency must consider all 'connected actions,' 'cumulative actions,' and 'similar actions.'") (citing 40 C.F.R. § 1508.25(a))).

proceed unless other actions are taken previously or simultaneously;" or "(iii) Are interdependent parts of a larger action and depend on the larger action for their justification." 40 C.F.R. § 1508.25(a)(1)(i)-(iii).

The first category of "connected" actions does not apply—because neither the Corps' nor FWS's permissions "trigger other actions."  Plaintiffs cite to no such triggered action in the record.  With regard to the second category, there is likewise no record to support the claim that any of the permissions "cannot or will not proceed" without the other.  Plaintiffs argue that because each permission or permit facilitates the same ultimate Pipeline, they "cannot or will not proceed" without each other.  This is incorrect.  The Corps and FWS have no control over the ultimate Pipeline's route, but in the event they denied a permit to cross Corps or FWS land in one location, the Pipeline could still exist—if on a slightly different route—and indeed would still benefit from all other permissions.  *See, e.g.*, *Taxpayers Watchdog, Inc.*, 819 F.2d at 300 (finding no improper segmentation because, even if the project is the first part of a larger system, the specific project had "utility independent of any further construction," did "not foreclose future options").  At best, "each would benefit from the other's presence," but nonetheless each permission "could exist without the other."  *Nw. Res. Info. Ctr., Inc. v. Nat'l Marine Fisheries Serv.,* 56 F.3d 1060, 1068 (9th Cir. 1995).  Thus, the Corps and FWS's actions have "independent utility" and need not be addressed together in a single EIS or EA.[7]

Finally, there is no evidence that each permission and permit constitute "parts of a larger *action* and depend on the larger *action* for their justification." 40 C.F.R. § 1508.25(a)(1)(i)-(iii) .

---

[7]    As previously noted, the Pipeline was rerouted several times.  *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 205 F.Supp.3d 4, 12-14 (D.D.C. 2016).  *See also*, Letter from J. Rodgers, Osage Nation to B. Vollman, Corps (Mar. 8, 2016) (Ex. Y).

(emphasis added).  Plaintiffs argue that the permissions are part of a larger "Pipeline project" but crucially, the Pipeline project is not a federal *action*.  As explained above, neither agency is approving or constructing the Pipeline; they are merely approving several discrete crossings of federal property or federal interests in private land.  The word "action" in the regulation is read to mean the "major federal action" for which NEPA requires environmental review as discussed elsewhere in the regulations.  *See* 40 C.F.R. § 1508.18(a) ("Actions include new and continuing activities, including projects and programs entirely or partly . . . approved by federal agencies.").  Reading this regulation to require environmental review over an entire "larger action"—whether a federal action or not—would directly contradict the NEPA regulations as a whole as well as *Sierra Club.  See* Section III.A.1-2, above.

Plaintiffs also argue the discrete agency actions should have been considered in a single document because they were "similar."  The regulation does not require that result.  Defining "similar actions," CEQ regulations provide that an agency "*may* wish to analyze [similar] actions in the same impact statement," and "*should* do so when [it is] the best way to assess adequately the combined impacts of similar actions or reasonable alternatives."  40 C.F.R. § 1508.25(a)(3) (emphasis added).  First, this regulation is clearly discretionary and the agencies were reasonable to limit the scope of their reviews. *See* Section III.A.1., above.  Moreover, even if the permissions and permits all related to the same non-federal project, that would not be a sufficient reason to determine they are so similar as to necessarily be analyzed in the same statement.  *See Grunewald v. Jarvis*, 776 F.3d 893, 905-06 (D.C. Cir. 2015) ("similar goals…does not make the plans sufficiently intertwined to require concurrent NEPA analysis." (citing *Mobil Oil Expl. & Producing Se. Inc. v. United Distrib. Cos.,* 498 U.S. 211, 231 (1991)) .

Indeed, the significant differences in geographical location, impacts, and type of federal action among the challenged actions indicate that it was not arbitrary and capricious to consider each permission separately.  Crucially, the Corps and FWS permissions are not physically connected actions next to each other; rather they are spread over hundreds of miles across multiple states.  For instance, the Lake Oahe crossing is approximately 250 miles from the Lake Sakakawea crossing.  The Mississippi River crossing is more than 500 miles from either, in a different state and on a different river.  The FWS jurisdictional areas in for wetlands in both North and South Dakota are over 60 miles from Lake Oahe.  Map (Ex. F).

Similarly, each challenged action has primarily local effects limited to the specific area of federal action.  *Compare, e.g.*, FWS EA at 7 (impacts of Pipeline beneath FWS easements) *with* Omaha EA at 23-107 (impacts of Pipeline at Lake Oahe).  Plaintiff has not demonstrated how the environmental impacts associated with, for example, constructing a Pipeline underneath a wetland easement in North Dakota has impacts that are related to a Pipeline crossing the Mississippi river hundreds of miles away.  Nor has Plaintiff offered a means that the geographically disconnected actions they challenge have some "inter-regional" impact such that analyzing their impacts individually was arbitrary.  *Cf.  Nat. Res. Def. Council, Inc.*, 865 F.2d at 299 (FEIS for oil development on the outer continental shelf must address cumulative effects of connected drilling proposals in multiple geographic areas on migratory species such as whales).

As this Circuit has recognized, CEQ's connected actions regulation advises an agency to consider the "picture as a whole rather than conduct separate NEPA reviews on pieces of an agency-action jigsaw puzzle; it does not add a multitude of private pieces to the puzzle and so require review of a much larger picture." *Sierra Club*, 803 F.3d at 50.  Here, as in *Sierra Club*, there is no overall "agency-action puzzle" – no larger federal approval or action that was

allegedly segmented.  That there were several smaller actions does not require them to be

considered together.  The agencies acted reasonably in limiting their review to the areas within

their jurisdiction.

### 4. Compiling the environmental reviews into a single document would have no practical effect.

Notably, Plaintiffs identified no concrete environmental impact that was missed by the

alleged "segmenting" of the discrete permissions in this case.  Plaintiffs hint that analyzing the

permissions together would lead to a consideration of larger impacts of the Pipeline as a whole.

Pls. Br. at 8-19.  But in doing so, Plaintiffs have placed themselves in a catch-22.  If they argue

that combining the EA and FONSIs into a single document would cause consideration of a wider

range of effects of the Pipeline more broadly, then it necessarily runs afoul of *Sierra Club*.  But if

placing the discrete environmental reviews under a single document heading would not change

the analysis, then it is at best a technical error that will have no practical effect and provide

Plaintiffs with no real relief.  Thus, even if there were an APA violation, it would be

nonprejudicial or harmless error and the agency action need not be set aside.

The APA provides that, in reviewing agency action, the court "shall" take account of "the

rule of prejudicial error," 5 U.S.C. § 706, that is, whether the error caused prejudice. Courts have

applied the prejudicial error rule in the NEPA context where the proposing agency engaged in

significant environmental analysis before reaching a decision but failed to comply precisely with

NEPA procedures. *See Ill. Commerce Comm'n v. ICC*, 848 F.2d 1246, 1257 (D.C. Cir. 1988); *see*

*Nevada v. Dep't of Energy*, 457 F.3d 78, 90 (D.C. Cir. 2006); *PDK Labs. Inc. v. DEA*, 362 F.3d

786, 799 (D.C. Cir. 2004)  ("If the agency's mistake did not affect the outcome, if it did not

prejudice the petitioner, it would be senseless to vacate and remand for reconsideration.").

NEPA's goal of ensuring that relevant information is available to those participating in agency decision-making was not frustrated in this case by conducting different environmental reviews in different documents. *See Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349 (1989) (NEPA "guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision."). The many comments submitted in response to the documents as a whole manifest that the public had sufficient information to comment on the permissions and permits and no benefit would accrue from analyzing them under a single document header. *See Nevada*, 457 F.3d at 90. Plaintiffs have not identified how precisely considering all discrete agency actions together would have led to any different outcome. As such, even if failing to compile all the environmental reviews into one document was error, it was not prejudicial and is not a basis to find the agencies' actions arbitrary or capricious.

**B. The Corps Did Not Violate Specific Trust Responsibilities Identified by Statute, Regulation, or Treaty by analyzing the portions of the Dakota Access Pipeline within its jurisdiction.**

While there is a general trust relationship between the United States and Tribe, that relationship does not impose a duty on the federal government beyond complying with applicable statutes and regulations. "The trust obligations of the United States to the Indian tribes are established and governed by statute rather than the common law." *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 165 (2011). Thus, in order to bring a claim for breach of trust, Plaintiffs "must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties." *United States v. Navajo Nation,* 537 U.S. 488, 506 (2003); *El Paso Nat. Gas Co. v. United States*, 750 F.3d 863, 895 (D.C. Cir. 2014). This "analysis must train on specific rights-creating or duty-imposing statutory or regulatory prescriptions." *Id.* Thus, unless Plaintiffs identify a discrete

statute, regulation, or treaty that creates a specific duty and shows the United States has breached

that duty, there can be no claim for breach of trust.  Plaintiffs failed to identify a specific fiduciary

duty and show its violation, thus any claim premised on a breach of trust fails.  Nor do Plaintiffs offer

any compelling reason why this Court should reconsider the portions of its June 14, 2017 opinion

that address treaty rights or overrule the D.C. Circuit's *El Paso Natural Gas* decision.  *See* Pls. Br. at

30 n.4, 31 n.5.  The Court should therefore grant summary judgment in favor of the United States on

Plaintiffs' First Claim.[8]

### 1.     Plaintiffs have failed to identify any treaty rights to ceded lands located several hundred miles from its current lands.

Plaintiffs fall far short of establishing that (1) any usufructuary rights granted in the 1851

treaty of Ft. Laramie survived the 1858 Treaty of Washington; (2) that the Corps' actions relating

to the Lake Oahe crossing located hundreds of miles from Yankton's current lands—the only

federal action within the 38-mile stretch of Pipeline that Plaintiffs contends crosses Yankton's

1851 treaty lands—harms Yankton's usufructuary rights in any manner; and (3) that the Corps

failed to reasonably consult, or attempt to consult, with Yankton.

Plaintiffs' focus on the 1851 Treaty of Ft. Laramie and other treaties to which Yankton is

not a signatory is misplaced.  Plaintiffs' arguments focus almost exclusively on the 1851 Treaty

and fail to cite, much less address, numerous opinions interpreting the 1858 Treaty.  Pls. Br. at

---

[8]     While Plaintiffs' motion does not appear to rely upon the United Nations Declaration on the Rights of Indigenous Peoples, its First Claim for Relief does.  Regardless of whether Plaintiffs waived this argument, any claim based upon the UNDRIP should be dismissed.  "The United Nations Declaration on the Rights of Indigenous Peoples, which—apart from not being a federal law—is not even a legally binding instrument for those countries that voted in favor of its adoption."  *Florida v. Walker*, 2015 U.S. Dist. LEXIS 96771 (M.D. Fla. May 14, 2015); *Ins v. Aguirre-Aguirre*, 526 U.S. 415, 427 (1999) ("The U. N. Handbook may be a useful interpretative aid, but it is not binding on the Attorney General, the BIA, or United States courts.")

19-23.  The 1858 Treaty abrogated Yankton's usufructuary rights over lands that it ceded in that treaty.  This was in keeping with federal Indian policy, which "by the time of the 1858 Treaty, '. . . had shifted fully from removal to concentration on fixed reservations.'"  *Yankton Sioux Tribe v. Podhradsky*, 606 F.3d 994, 998-99 (8th Cir. 2010) (citation omitted).

The interpretation of a treaty, like the interpretation of a statute, begins with its text. *Medellín v. Texas*, 552 U.S. 491, 506 (2008).  Plaintiffs devote one paragraph to discussing a single sentence from Article I of the 1858 treaty.  Plaintiffs are simply incorrect that the 1858 Treaty ceded only land to the United States "but was silent as to usufructuary rights."  Pls. Br. at 24.  The 1858 Treaty's language makes clear that Yankton ceded certain usufructuary rights in the 11,000,000 acres of ceded land.[9]

First, Article I provided that Yankton "hereby relinquish and abandon all claims and complaints about or growing out of any and all treaties heretofore made by them or other Indians, except their annuity rights under the" 1851 Treaty.  1858 Treaty, Art. I.  As the Court of Claims found in analyzing Yankton's claims to the 1851 treaty lands, "[i]t is plain, and plaintiff concedes, that the language of Article I, standing alone, would have relinquished plaintiff's here asserted undivided interest in the large tract which was the subject of the treaty of 1851." *Yankton Sioux v. United States*, 97 Ct. Cl. 56, 64 (1942).  Moreover, the 1858 Treaty provided that Yankton "fully acquit[s] and release[s] the United States from all demands against them on the part of said tribe . . . except the before mentioned right of the Yanctons to receive an annuity under said treaty of Laramie, and except, also, such as are herein stipulated and provided for." 1858 Treaty, Art. XIV. "[T]he specific reference to the treaty of 1851, saving [Yankton's]

---

[9]      To be clear, the 1858 Treaty did not cede usufructuary rights in the approximately 400,000 acres of land in southeast South Dakota it reserved to Plaintiff.

annuity rights under that treaty, was an indication that it had in mind, when making the treaty of 1858, its rights under the treaty of 1851, and was expressly saving such of those rights as it did not intend to release.", 97 Ct. Cl. at 64.  Yankton's explicit reservation of certain rights in the same sentence in which it explicitly waived other rights guaranteed by the 1851 treaty is a clear statement that the 1858 Treaty waived certain usufructuary rights in the ceded lands.

Second, Plaintiffs are simply incorrect that the 1858 Treaty was "silent as to usufructuary rights."  Pls. Br. at 24.  The 1858 Treaty explicitly protected usufructuary rights to quarry stone in Minnesota.  It preserved for Yankton "the free and unrestricted use of the red pipe-stone quarry, or so much thereof as they have been accustomed to frequent and use for the purpose of procuring stone for pipes."  1858 Treaty, Art. VIII.  The 1858 Treaty's explicit reservation of usufructuary rights other than hunting and fishing rights renders the cases Plaintiffs rely upon, Pls. Br. at 23-24, inapposite.  *Minnesota v. Mille Lacs Band of Chippewa Indians* found that a treaty did not abrogate usufructuary rights because the entire treaty, unlike the 1858 Treaty, was "devoid of any language expressly mentioning—much less abrogating—usufructuary rights." 526 U.S. 172, 195 (1999).[10]  And *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Wisconsin*, 653 F. Supp. 1420 (W.D. Wis. 1987), does not assist Plaintiffs because the 1858 Treaty makes clear that (1) Yankton waived its 1851 Treaty rights with the exception of its right to annuities and (2) preserved limited usufructuary rights to quarry pipestone.

---

[10]     *Mille Lacs* also rested on the fact that an 1855 Treaty "contains no language providing money for the abrogation of previously held rights."  *Id.*  The 1858 Treaty at issue, in contrast, provided over $1,650,000 in consideration of Yankton's "cession, relinquishment, and agreements."  1858 Treaty, Art. IV.  Similarly, the Committee on Indian Affairs' Chairman stated during Senate debate on the Act authorizing the 1855 Treaty negotiations that the treaty would reserve to the Chippewa rights secured by former treaties.  *Mille Lacs,* 526 U.S. at 197. Plaintiffs' point to no similar language here.

In 1998, the Supreme Court explicitly addressed the rights preserved in the 1858 treaty, finding that "apart from the pledge to pay annuities, it is hard to identify any provision in the 1858 Treaty that [Yankton] might have sought to preserve, other than those plainly inconsistent with or expressly included in the 1894 Act." *Yankton Sioux*, 522 U.S. at 348.  The 1894 Act notably does not address hunting and fishing rights.

Plaintiffs simply fail to identify a retained usufructuary right in lands or waters that lie hundreds of miles from its current lands.  For example, whereas Cheyenne River retains the "right to hunt and fish in and on" Lake Oahe's shoreline, Yankton points to no treaty or statute providing it with any such rights.  *Compare* Oahe Takings Act, Pub. L. No. 83-776, 68 Stat. 1191 with Pls. Br. at 20-22.  Nor have Federal Defendants diminished any vested water rights Yankton possesses. Plaintiffs fail to even suggest how the Lake Oahe crossing located four hundred river-miles from its reservation undermines the purpose of its reservation.  *See* Pls. Br. at 22.  Regardless, vested water rights "gives the United States the power to exclude others from subsequently diverting waters that feed the reservation."  *Hopi Tribe v. United States*, 782 F.3d 662, 669 (Fed. Cir. 2015).  They do not give Yankton ownership of any particular molecules of water, either on the reservation or up- or downstream of the reservation, and are not implicated here.  *See Niagara Mohawk Power Corp. v. Fed. Power Comm'n*, 202 F.2d 190, 198 (D.C. Cir. 1952), *aff'd*, 347 U.S. 239 (1954); *Arizona v. California*, 373 U.S. 546, 600 (1963).  Plaintiffs have not demonstrated that the Corps was wrong to conclude "there are no anticipated impacts to water rights" as the Pipeline's construction or operation would not require water from Lake Oahe. Omaha EA, App. J Summ. of Comments Received (Ex. Z) (USACE_71720-26).

Plaintiffs' reliance on the Indian canon of construction is misplaced because Plaintiffs identify no ambiguity in the 1858 Treaty.  "The principle according to which ambiguities are

resolved to the benefit of Indian tribes is not . . . 'a license to disregard clear expressions of tribal and congressional intent.'" *Yankton Sioux*, 522 U.S. at 349 (citation omitted).  *See also, United States v. Anderson*, 625 F.2d 910, 915 (9th Cir. 1980) (applying canon of *inclusio unius est exclusio alterius* to Section 5 of Indian Reorganization Act).

And Plaintiffs' reliance on surrounding circumstances and subsequent interpretation of the 1858 Treaty, Pls. Br. at 24, cannot overcome the treaty's clear language.  Yankton falls far short of establishing that it has maintained and continues to maintain and exercise usufructuary rights derived from the 1851 Treaty.  To the contrary, "South Dakota 'has quite consistently exercised . . .  governmental authority over the opened lands'" *Yankton Sioux*, 522 U.S. at 357. And "the Yankton Constitution . . . defines the Tribe's territory to include only those tribal lands within the 1858 boundaries 'now owned' by the Tribe." *Id*.  Finally, the common sense interpretation of the 1858 Treaty's plain language to waive all usufructuary rights other than the right to pipestone is confirmed by Yankton's own interpretation of that language.  In Indian Claims Commission Docket No. 332, Yankton alleged that it was damaged "by the loss of its lands, [and] the loss of the use of its lands." Petition, *Yankton Sioux Tribe v. United States*, ICC Docket No. 332 at ¶ 18 (Ex. AA).[11]  The 1851 and 1858 Treaties therefore provide no basis for granting summary judgment to Plaintiffs.

## 2. Plaintiffs' claims regarding usufructuary rights allegedly derived from an 1851 treaty are, at best, unripe.

Because the Corps has not completed its remand analysis, any challenge based upon alleged treaty rights that might by analyzed in that process is not ripe for review.  The ripeness doctrine limits the power of federal courts in adjudicating disputes.  Its roots are found in both

---

[11]     Plaintiff also alleged that the Court of Claims held "that petitioner ceded all its interest in any land not expressly reserved in the treaty of April 19, 1858." *Id.* at ¶ 5(c).

the Article III requirement of "case or controversy" and prudential considerations favoring the orderly conduct of the administrative and judicial processes. *State Farm Mut. Auto. Ins. Co. v. Dole*, 802 F.2d 474, 479 (D.C. Cir. 1986). The ripeness doctrine has two purposes. "First, it is intended 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies.' Second, the doctrine is intended 'to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Id.* (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977)). Courts consider three factors in determining whether an agency decision is ripe for review: "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998). Judicial review of Yankton's alleged treaty rights prior to the Corps completing its remand process would, at a minimum, inappropriately interfere with administrative action and deprive the court, in the event that any future review is appropriate, of potentially useful factual development.

Plaintiffs base their treaty rights claims on allegation that the "pipeline traverses approximately 38 miles of territory . . . that was set aside for the Sioux by the 1851 Treaty." Pls. Br. at 19. The land at issue abuts the Lake Oahe crossing, which is hundreds of miles from Yankton's current lands. Yankton Sioux Statement of Material Facts (Nov. 10, 2017) ¶ 44, ECF No. 292.

This Court found that the Corps "failed to adequately consider the impacts of an oil spill on Standing Rock's fishing and hunting rights" in evaluating the Lake Oahe crossing and remanded to the Corps for further analysis. *Standing Rock Sioux Tribe v. United States Army*

*Corps of Eng'rs*, 255 F. Supp. 3d 101, 147 (D.D.C. 2017).  As the Court put it, "the Corps'

assessment of the impacts of a spill, although largely adequate, fell short as to fishing rights,

hunting rights, and environmental justice. Because the Corps must submit its assessment of those

impacts upon remand,. . . the Court will await receipt of such information to decide whether the

agency's conclusion that DAPL will not be injurious to the public interest was arbitrary and

capricious. *Id*. at 150.  This "task on remand is a narrow one" and requires only that the Corps

"take a 'hard look' at the impact of DAPL on only the resources themselves." *Standing Rock*

*Sioux Tribe v. U.S. Army Corps of Eng'rs*, 2017 U.S. Dist. LEXIS 167569, at *18-19 (D.D.C.

Oct. 11, 2017).  And while the Court's remand instructions focused only on Standing Rock and

Cheyenne River—the two tribes that brought motions for summary judgment prior to the Pipeline

commencing operations—the Corps provided Yankton with an opportunity to provide

information relating to its use of fishing and hunting resources.

  Yankton's failure to allow the remand process to reach its conclusion prior to filing for

summary judgment, renders its challenge to an alleged failure to analyze Yankton's treaty rights

unripe.  To be clear, the Corps explicitly requested that Yankton "participate in the remand

analysis" by providing information on hunting and fishing issues, including "studies or reports

on game species (aquatic life, birds, and mammals), estimated population, habitat, and the

designated hunting grounds for such game in relation to Lake Oahe." *See* Letter from Col.

Hudson to Chairman Flying Hawk (Oct. 20, 2017) (Ex. X).  If Yankton provides such

information, it may resolve the dispute and avoid the need for judicial intervention in this dispute

altogether. *See James v. U.S. Dep't of Health & Human Servs.*, 824 F.2d 1132, 1138 (D.C. Cir.

1987) ("in the event that the dispute is resolved at the administrative level, judicial economy will

be served"); *Ohio Forestry*, 523 U.S. at 736 ("depending upon the agency's future actions . . .

review now may turn out to have been unnecessary").  And if Yankton provides no new information, this too may assist the Court in resolving Yankton's claims relating to allegedly inadequate NEPA analysis.

Simply put, the Corps has already asked Yankton for facts relating to the Yankton's hunting and fishing activities in order to analyze the very issues on which Plaintiffs seek summary judgment.  *See Ohio Forestry Ass'n*, 523 U.S. at 733.  And Plaintiffs' claims relating to an alleged failure to analyze issues that the Corps is currently seeking to analyze on remand will ripen when that remand process concludes.  *See Safari Club Int'l v. Jewell*, 960 F. Supp. 2d 17, 60 (D.D.C. 2013) ("Since the FWS has recently completed its 12-month findings on the SCI plaintiff's delisting petition, . . . this matter is ripe for review.").  Plaintiffs' premature motion for summary judgment should be denied.

### 3.  Federal Defendants' actions did not endanger Yankton's treaty rights.

Next, Plaintiffs argue that the Pipeline endangers Yankton's treaty rights.  But Plaintiffs identify no "specific rights-creating or duty-imposing statutory or regulatory prescriptions." *Navajo Nation,* 537 U.S. at 506.  And even if Yankton established that it possessed treaty hunting and fishing rights in an area located near any challenged federal action, Plaintiffs have fallen far short of establishing that those rights have been adversely impacted by any federal action.

Plaintiffs rely exclusively on extra-record evidence to establish that their alleged rights are endangered.  Pls. Br. at 25-26.  This extra-record evidence consists of newspaper articles, a November 10, 2017 declaration attached to Plaintiffs' motion, and a February 22, 2017 declaration attached to Cheyenne River's motion for summary judgment.  The Court should strike Plaintiffs' extra-record evidence.  "The APA limits judicial review to the administrative record 'except when there has been a strong showing of bad faith or improper behavior' or when the record is so bare

that it prevents effective judicial review.'" *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 514 (D.C. Cir. 2010) (quoting *Commercial Drapery Contractors, Inc. v. United States*, 133 F.3d 1, 7 (D.C. Cir. 1998)).  The extra record evidence Plaintiffs offer was created after the actions that are the subject of their September 8, 2016 complaint.  *See Standing Rock,* 255 F. Supp. 3d at 123-124.  Plaintiffs' failure to cite to the administrative record in support of their argument that the Pipeline endangers Yankton's treaty rights is fatal to that argument.

Plaintiffs' argument that the Corps' Omaha District was required to analyze the Pipeline's impact on Yankton's treaty rights in its EA fails for several reasons.  As set forth above, this argument should be rejected either as unripe or because Yankton has no usufructuary rights near the crossings addressed in the Omaha District's EA.  Regardless, Plaintiffs are incorrect, Pls. Br. at 27, that the Corps did not analyze relevant tribal treaty rights.  The Corps analyzed the Standing Rock Sioux Tribe's use of water, hunting, and fishing.  *Standing Rock*, 255 F. Supp. 3d at 131.  Relatedly, the Corps found that, with the exception of Standing Rock, "[o]ther Tribal lands are not within reasonable proximity to the proposed action areas or its potential effects." Omaha EA, App. J Summ. of Comments Received at 14 (Ex. Z).  As the Court noted, Standing Rock's reservation is located less than a mile from the Lake Oahe crossing.  Yankton's lands are located 230 miles away.  The Corps' determination to focus on Standing Rock due to its proximity to the Lake Oahe crossing was reasonable.

And while the Corps is conducting additional review on remand, Plaintiffs fall far short of establishing that the Corps' original conclusion in the North Dakota EA that "[n]o impacts to treaty fishing and hunting rights are anticipated," was arbitrary or capricious with respect to Yankton.  Omaha EA at 58.  The Corps determined in the EA that a spill at Lake Oahe was extremely unlikely given "the engineering design, proposed installation methodology, quality of

material selected, operations measures and response plans." *Id.* at 87.  While the Corps is reviewing

on remand "the degree to which the project's effects are likely to be highly controversial"

Yankton has not identified any possibility that a low-possibility spill at Lake Oahe would impact

Yankton's lands. *See Standing Rock*, 255 F. Supp. 3d at 129, 147.

 Plaintiffs' reliance to *No Oilport! v. Carter* is misplaced for three reasons.  First, *No*

*Oilport!* addressed adjudicated rights of different tribes under different treaties.  520 F. Supp.

334, 371-73 (W.D. Wash. 1981).  Second, *No Oilport!* makes clear that it is a Tribe's

responsibility to engage and provide the Corps with information once "the public received

adequate notice of the NEPA review process." 520 F. Supp. 334, 353 (W.D. Wash. 1981).

Yankton cannot seriously contest that it received notice of the NEPA process by November 3,

2014, when it deferred commenting on test bores at Lake Oahe to Cheyenne River and Standing

Rock.  Email from L. Gravatt, Yankton, to R. Harnois, Corps (Nov. 3, 2014) (Ex. G).  And any

deficiency in the Corps' analysis of Yankton's alleged treaty rights cannot be held against the

Corps because the administrative record establishes a good faith effort to consult with Yankton

and other tribes.  *See* Section II.C., above.  Third, *No Oilport!* focused its discussion of treaty

rights on two of the eight plaintiff tribes-Lower Elwha and Tulalip, in part due to their interest in

a potentially effected salmon fishery near the proposed action.  520 F. Supp. at 356.  Similarly,

the Corps focused its EA on the Standing Rock Sioux Tribe, who submitted comments regarding

their interests in hunting and fishing in the area downstream of the crossing, and whose lands are

much closer to the Lake Oahe crossing than Yankton's.  Omaha EA at 1, 14, 38, 75, 85-87, 107.

Regardless, the Corps is further analyzing hunting and fishing issues on remand and provided

Yankton with another opportunity to provide information.

Plaintiffs' citation to *Northwest Sea Farms, Inc. v. U.S. Army Corps of Engineers* is similarly unavailing.  931 F. Supp. 1515 (W.D. Wash. 1996).  There, the Corps declined to grant a permit to operate a fish farm to a company on the basis that such an activity would interfere with adjudicated Tribal fishing rights under distinct treaties.  *Id*. at 1521.  *Sea Farms* is also distinguishable because in *Sea Farms* there was not a "risk" that the permitted activity would reduce a Tribe's right to fish—the proposed action would necessarily have this result by blocking Tribal members from accessing a "usual and accustomed" fishing spot.  *Id*. at 1518.  Plaintiffs have fallen far short of establishing that the Corps' actions here reduced any tribal right.

And Plaintiffs' suggestion that the Corps' failure to consider information Yankton never provided to the Corps is "especially egregious" in light of trust duties, Pls. Br. at 29-31, fails because Plaintiffs identified no such duties.  Plaintiffs' reliance on *Seminole Nation v. United States*, 316 U.S. 286, 296-97 (1942), Pls. Br. at 29, highlights their misinterpretation of the trust relationship.  The Supreme Court has made clear that the general trust relationship identified in *Seminole Nation* imposes no enforceable trust duties.  *Jicarilla Apache Nation*, 564 U.S. at 165. Yankton must instead identify a substantive source of law in a treaty that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties. *Id*.; *Navajo Nation,* 537 U.S. at 506.  Because Plaintiffs identified no specific duty, much less demonstrated its breach, their trust claims fail.

### 4.  Plaintiffs' lack standing to challenge government actions relating to lands hundreds of miles from their lands.

Plaintiffs relatedly fall short of establishing that they have standing.  Their alleged "informational harm," Pls. Br. at 2, 5, does not confer standing because it is a generalized grievance.  *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009).  A party seeking review must also show that it faces "actual or imminent injury."  *Id.* at 496 (quotations and citation

omitted); *see also Californians for Renewable Energy v. U.S. Dep't of Energy*, 860 F. Supp. 2d

44, 50-51 (D.D.C. 2012).  "[A]lleging a procedural violation does not excuse a plaintiff from

having to identify a related, substantive government action that actually does (or imminently

will) cause him concrete injury in order to establish standing to sue."  *Nucor Steel-Ark. v. Pruitt*,

246 F. Supp. 3d 288, 301 (D.D.C. 2017).  For environmental plaintiffs, "[a] 'vague desire to

return [to the affected land] is insufficient to satisfy the requirement of imminent injury.'"

*Californians for Renewable Energy,* 860 F. Supp. 2d at 52 (quoting *Summers*, 555 U.S. at 496).

Plaintiffs' brief and supporting declarations from do not provide a specific and concrete

plan to return or use Lake Oahe specifically or identify how any federal action causes them

harm.  Instead, the declarations mention past visits to Lake Oahe (Decl. of F. Spotted Eagle ¶¶

12, 22, ECF No. 292-1) and that unnamed tribal members "hunt, gather, and perform ceremony

with water including the Missouri River in present-day North and South Dakota." (Decl. of K.

Spotted Eagle ¶¶ 11-12, ECF No. 292-3; Decl. of F. Spotted Eagle ¶¶ 12-20; Decl. of G. Drapeau

¶ 3, ECF No. 292-2).  In contrast to Standing Rock, Plaintiffs' declarations do not establish

current or future use of the areas around Lake Oahe.  Plaintiff's generalized declarations and

failure to show concrete plans or intent to use an area such as the area of Lake Oahe located near

the Pipeline means that Plaintiffs lack standing.  *See Summers*, 555 U.S. at 495-96.

### C.     Plaintiffs' National Historic Preservation Act claims relating to Counts 2, 3, 4, and 5 of its Complaint should be dismissed as moot.

Plaintiffs' claims based upon the NHPA should be dismissed as moot.  Counts 2, 3, 4, and 5

of Plaintiffs' Complaint, Compl. at 15-25, are based upon its allegation that "clearing, grading,

excavation, and construction that would occur along the duration of the Pipeline route would destroy

any historic or culturally significant sites encountered."  Compl. ¶ 139.  The Pipeline is now fully-

constructed.  Plaintiffs' own allegations therefore make clear that its NHPA claims are moot.

"Article III confines federal courts to the resolution of actual cases or controversies, and thus prevents their passing on moot questions—ones where intervening events make it impossible to grant the prevailing party effective relief." *Burlington N. R.R. v. Surface Transp. Bd.*, 75 F.3d 685, 688 (D.C. Cir. 1996).  There is therefore a "long line of cases in the courts of appeal holding environmental challenges to completed construction projects to be moot." *Finca Santa Elena, Inc. v. U.S. Army Corps of Eng'rs*, 62 F. Supp. 3d 1, 5 (D.D.C. 2014) (citing *Weiss v. Sec'y of Dep't of Interior*, 459 F. App'x 497, 500-01 (6th Cir. 2012) (holding NEPA and NHPA claims moot because construction had been completed).  Plaintiffs' complaint makes clear that there is no relief left for the Court to grant under the NHPA because grading, excavation, and construction have been completed.  Plaintiffs' NHPA claims are therefore moot. *McBryde v. Comm. to Review Circuit Council Conduct & Disability Orders of the Judicial Conference of the U.S.*, 264 F.3d 52, 55 (D.C. Cir. 2001).[12]

## IV.    CONCLUSION

Federal Defendants fully complied with NEPA focusing their respective environmental reviews to the areas in which they have jurisdiction and in which the environmental impacts of their actions would be felt.  Plaintiffs have identified no arbitrary and capricious action, nor have Plaintiffs identified any breach of a trust duty arising from a substantive Treaty, statute, or regulation.  And Plaintiffs' NHPA-related claims are moot because the construction work that Plaintiffs claimed would destroy any historic or culturally significant sites has been completed.

---

[12]    Standing Rock acknowledged this possibility, admitting that relief would "no longer be meaningful in those areas" where Dakota Access could "demonstrate that construction (including clearing and grading) has been completed." Tribe's Reply in Supp. of Mot. for Prelim. Inj., (Aug. 22, 2016) 23-24*, ECF No. 24; *see also id*. at 19–20 ("Should DAPL be permitted to continue construction in upland areas outside of Corps jurisdiction, then the § 106 consultation process sought by the Tribe would be rendered moot.").

For the foregoing reasons, Plaintiffs' Motion for Partial Summary Judgment should be denied

and Federal Defendants' Motion for Partial Summary Judgment should be granted.

Dated: January 10, 2018               Respectfully submitted,

JEFFREY H. WOOD
Acting Assistant Attorney General
Environment & Natural Resources Division

By:     */s/  Matthew Marinelli*
REUBEN S. SCHIFMAN, NY Bar
MATTHEW MARINELLI, IL Bar 6277967
U.S. Department of Justice
Natural Resources Section
P.O. Box 7611
Benjamin Franklin Station
Washington, DC 20044
Phone: (202) 305-0293 (Marinelli)
Phone: (202) 305-4224 (Schifman)
Fax: (202) 305-0506
matthew.marinelli@usdoj.gov
reuben.schifman@usdoj.gov

ERICA M. ZILIOLI, D.C. Bar 488073
U.S. Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, DC 20044
Phone: (202) 514-6390
Fax: (202) 514-8865
Erica.Zilioli@usdoj.gov

*Attorneys for the United States Army Corps of*
*Engineers*

OF COUNSEL:

MILTON BOYD
MELANIE CASNER
U.S. Army Corps of Engineers
Office of Chief Counsel
Washington, DC

**CERTIFICATE OF SERVICE**

I hereby certify that, on the 10th day of January, 2018, a copy of the foregoing was filed through the Court's CM/ECF management system and electronically served on counsel of record.

/s/  Matthew Marinelli

Matthew Marinelli

U.S. Department of Justice
Natural Resources Section
P.O. Box 7611
Benjamin Franklin Station
Washington, DC 20044
Phone: (202) 305-0293
Fax: (202) 305-0506
matthew.marinelli@usdoj.gov

# ENVIRONMENTAL ASSESSMENT
## Dakota Access Pipeline Project
## Crossings of Flowage Easements
## and Federal Lands

**Prepared on behalf of:**

## U.S. Army Corps of Engineers – Omaha District
1616 Capitol Avenue, Suite 9000
Omaha, NE 68102

**July 2016**

USACE_DAPL0071220

Environmental Assessment
Dakota Access Pipeline Project
July 2016

# TABLE OF CONTENTS

EXECUTIVE SUMMARY ................................................................................................................1

**1.0   INTRODUCTION ...........................................................................................................3**
    1.1   DAPL Project ........................................................................................... 3
    1.2   Purpose and Need.................................................................................... 3
    1.3   Authority and Scope of the EA................................................................ 3

**2.0   ALTERNATIVES ..........................................................................................................5**
    2.1   Alternatives Considered but Eliminated from Detailed Analysis........................ 5
        2.1.1   Alternative 1 – Modification of Existing Infrastructure ......................5
        2.1.2   Alternative 2 – Trucking Transportation Alternative.........................5
        2.1.3   Alternative 3 – Rail Transportation Alternative................................6
        2.1.4   Alternative 4 – Route Alternatives...................................................7
        2.1.5   Alternative 5 – Major Waterbody Crossing Method Alternatives.....................12
    2.2   No Action Alternative ............................................................................ 13
    2.3   The Proposed Action (Preferred Alternative) .......................................... 13
        2.3.1   Location and Detailed Description of the Proposed Action ..............13
        2.3.2   Description of Construction Techniques and Construction Mitigation Measures ................................................................................................17

**3.0   THE AFFECTED ENVIRONMENT AND POTENTIAL ENVIRONMENTAL IMPACTS OF THE PROPOSED ACTION AND NO ACTION ALTERNATIVE ...............................................................23**
    3.1   Geology and Soils.................................................................................. 23
        3.1.1   Geology ........................................................................................23
        3.1.2   Mineral Resources .......................................................................25
        3.1.3   Geologic Hazards .........................................................................26
        3.1.4   Paleontology ................................................................................28
        3.1.5   Soils .............................................................................................29
    3.2   Water Resources ................................................................................... 35
        3.2.1   Surface Waters.............................................................................35
        3.2.2   Groundwater.................................................................................44
        3.2.3   Wetlands ......................................................................................49
        3.2.4   Floodplain ....................................................................................51
        3.2.5   Levees ..........................................................................................52
    3.3   Vegetation, Agriculture, and Range Resources ........................................ 52
        3.3.1   Vegetation....................................................................................52
        3.3.2   Invasive and Noxious Weeds ........................................................56
        3.3.3   Threatened, Endangered, Candidate, and Proposed Plant Species ...................57
    3.4   Wildlife Resources ................................................................................ 57
        3.4.1   Recreationally and Economically Important Species and Nongame Wildlife......57
        3.4.2   Threatened, Endangered, Candidate, and Proposed Wildlife Species ...............58
    3.5   Aquatic Resources ................................................................................ 68
        3.5.1   Habitat and Communities..............................................................68
    3.6   Land Use and Recreation ....................................................................... 70
        3.6.1   Land Ownership ...........................................................................70
        3.6.2   Land Use.......................................................................................71

USACE_DAPL0071221

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| | | 3.6.3 | Recreation and Special Interest Areas | 73 |
| | 3.7 | | Cultural and Historic Resources and Native American Consultations | 75 |
| | | 3.7.1 | Cultural Resources Studies | 76 |
| | | 3.7.2 | Native American Consultations | 79 |
| | 3.8 | | Social and Economic Conditions | 80 |
| | | 3.8.1 | Demographics, Employment, Income and Economic Justice | 80 |
| | 3.9 | | Environmental Justice | 84 |
| | | 3.9.1 | Affected Environment | 84 |
| | | 3.9.2 | Impacts and Mitigation | 85 |
| | 3.10 | | Hazardous Waste | 87 |
| | 3.11 | | Reliability and Safety | 88 |
| | 3.12 | | Air Quality and Noise | 94 |
| | | 3.12.1 | Air Quality | 95 |
| | | 3.12.2 | Noise | 96 |
| **4.0** | **CUMULATIVE IMPACTS** | | | **98** |
| | 4.1 | | Geology and Soils | 99 |
| | 4.2 | | Water and Aquatic Life Resources | 100 |
| | 4.3 | | Vegetation, Agriculture, and Range Resources | 101 |
| | 4.4 | | Threatened, Endangered, Candidate, and Proposed Species | 102 |
| | | 4.4.1 | Interior Least Tern | 102 |
| | | 4.4.2 | Whooping Crane | 103 |
| | | 4.4.3 | Piping Plover | 103 |
| | | 4.4.4 | Rufa Red Knot | 103 |
| | | 4.4.5 | Pallid Sturgeon | 103 |
| | | 4.4.6 | Conclusion | 104 |
| | 4.5 | | Wildlife Resources | 104 |
| | 4.6 | | Land Use and Recreation | 104 |
| | 4.7 | | Cultural and Historic Resources and Native American Consultations | 105 |
| | 4.8 | | Social and Economic Conditions | 105 |
| | 4.9 | | Transportation and Traffic | 106 |
| | 4.10 | | Environmental Justice | 107 |
| | 4.11 | | Air Quality and Noise | 107 |
| **5.0** | **IRREVERSIBLE AND IRRETRIEVABLE COMMITMENT OF RESOURCES** | | | **108** |
| **6.0** | **MITIGATION SUMMARY** | | | **109** |
| **7.0** | **FEDERAL, TRIBAL, STATE, AND LOCAL AGENCY CONSULTATION AND COORDINATION** | | | **111** |
| **8.0** | **STATUS OF ENVIRONMENTAL COMPLIANCE** | | | **115** |
| **9.0** | **LIST OF PREPARERS AND REVIEWERS** | | | **126** |
| **10.0** | **ACRONYMS, INITIALS, AND ABBREVIATIONS** | | | **128** |
| **11.0** | **REFERENCES** | | | **131** |
| **12.0** | **FIGURES** | | | **139** |

USACE_DAPL0071222

Environmental Assessment
Dakota Access Pipeline Project
July 2016

## LIST OF TABLES

**Table 2-1:**     North Bismarck Route alternative Evaluation
**Table 2-2:**     North Bismarck Route alternative cost comparison
**Table 2-3:**     Flowage Easements and Federal Land Crossings
**Table 2-4:**     Environmental Assessment Areas of Interest
**Table 3-1:**     Soil Types Mapped on the Flowage Easements Project Area
**Table 3-2:**     Soil Types Mapped on the Federal Lands Project Area and Connected Action
**Table 3-3:**     Soil Impacts on the Flowage Easements Project Area
**Table 3-4:**     Soil Impacts on the Federal Lands Project Area and Connected Action
**Table 3-5**       Waterbodies within the Flowage Easements Project Area
**Table 3-6**       Waterbodies within the Federal Lands Project Area and Connected Action
**Table 3-7:**     Estimated Benzene Concentrations Following a Hypothetical Crude Oil Spill at Project River Crossings
**Table 3-8:**     Wetlands within the Flowage Easements Project Area
**Table 3-9:**     Land Cover Impacts on the Flowage Easements Project Area
**Table 3-10:**   Land Cover Impacts on the Federal Lands Project Area and Connected Action
**Table 3-11:**   Federally Listed Species with Potential to Occur within the Project Area and Connected Action
**Table 3-12:**   Land Use Impacts on the Flowage Easements Project Area
**Table 3-13:**   Land Use Impacts on the Federal Lands Project Area and Connected Action
**Table 3-14:**   Minority and Low-Income Population Statistics for the Flowage Easements Project Area
**Table 3-15:**   Minority and Low-Income Population Statistics for the Federal Lands Project Area
**Table 3-16:**   Noise Values
**Table 7-1:**     Comments Received
**Table 8-1:**     Environmental Permits, Approvals, and Consultations
**Table 8-2:**     Summary of Environmental Impact Avoidance and Mitigation Measures

**Table 9-1:**     List of Reviewers and Preparers

## LIST OF FIGURES

**Figure 1:**     Project Location—Federal Lands and Flowage Easements
**Figure 2:**     Project Layout—Flowage Easements
**Figure 3:**     Project Layout—Federal Lands
**Figure 4:**     Soils—Flowage Easements
**Figure 5:**     Soils—Federal Lands
**Figure 6:**     Natural Resources—Flowage Easements
**Figure 7:**     Natural Resources—Federal Lands
**Figure 8:**     Cultural Resources—Flowage Easements
**Figure 9:**     Cultural Resources—Federal Lands
**Figure 10:**   Land Cover—Flowage Easements
**Figure 11:**   Land Cover—Federal Lands
**Figure 12:**   Route Alternative—Missouri River Crossing
**Figure 13:**   Route Alternative—Lake Oahe Crossing
**Figure 14:**   Cross-Section Diagram of Lake Oahe HDD Crossing

USACE_DAPL0071223

Environmental Assessment
Dakota Access Pipeline Project
July 2016

**Figure 15:**    Cross-Section Diagram of Missouri River HDD Crossing
**Figure 16:**    Whooping Crane Migration Corridor


**LIST OF APPENDICES**

**Appendix A:**    Stormwater Pollution Prevention Plan (SWPPP)/Spill Prevention Control and
                 Countermeasure (SPCC) Plan
**Appendix B:**    HDD Construction Plan - and HDD Contingency Plan
**Appendix C:**    Right-of-Way (ROW) Configurations and Typical Construction Details
**Appendix D**:    Geotechnical Reports
**Appendix E:**    Blasting Plan
**Appendix F:**    Unanticipated Discoveries Plan Cultural Resources, Human Remains, Paleontological
                 Resources and Contaminated Media (UDP)
**Appendix G:**    Environmental Construction Plan (ECP)
**Appendix H:**    Project Maps and HDD Cross-Sections
**Appendix I:**    Cultural Resources Report (Confidential-Not for Public Release)
**Appendix J:**    Sample Scoping Letter, Distribution List, and Comments Received
**Appendix K:**    Notice of Availability of Draft Environmental Assessment (EA) for Comment
**Appendix L:**    Draft Facility Response Plan
**Appendix M**:    Sovereign Lands Permits issued by the North Dakota Office of the State Engineer

USACE_DAPL0071224

Environmental Assessment
Dakota Access Pipeline Project
July 2016

## EXECUTIVE SUMMARY

In accordance with the National Environmental Policy Act (NEPA) and implementing regulations, the following Environmental Assessment (EA) has been prepared to evaluate the effects of the United States Army Corps of Engineers (USACE), Omaha District (District) granting permission to Dakota Access, LLC (Dakota Access) to place a portion of the Dakota Access Pipeline Project (DAPL Project) on federal real property interests acquired and managed for the Garrison Dam/Lake Sakakawea and Oahe Dam/Lake Oahe Projects in North Dakota. Section 14 of the Rivers and Harbors Act of 1899, codified 33 U.S.C. Section 408 (Section 408), authorizes the Corps to grant permission to Dakota Access to modify federal flood control and navigation projects, provided the modifications are not injurious to the public interest and will not impair the usefulness of the projects. The EA addresses the purpose and need of the pipeline, as well as the location and method of installation of the pipeline, but the analysis is limited to the effects of allowing the pipeline to cross federal flowage easements near Lake Sakakawea and federally owned lands at Lake Oahe in North Dakota, to determine whether the placement of the pipeline on federal real property interests is injurious to the public interest or will impair the usefulness of the federal projects.

This EA was prepared by Dakota Access on behalf of the Corps in compliance with the NEPA Act of 1969; the Council on Environmental Quality (CEQ) Regulations (40 CFR 1500-1508); Corps of Engineers Regulation ER 200-2-2 (33 CFR Part 230), and related environmental compliance requirements, including the Section 106 of the National Historic Preservation Act (Section 106). Tribes, Tribal Historic Preservation Offices, State Historic Preservation Offices, the Advisory Council on Historic Preservation, and interested parties were consulted by representatives from Dakota Access and the Corps Omaha District as required by the Programmatic Agreement and the National Historic Preservation Act.

This EA was prepared in accordance with CEQ regulations in Section 1506.5(a) and 1506.5(b), which allow an applicant to prepare an EA for federal actions. The Corps has independently evaluated and verified the information and analysis undertaken in this EA and takes full responsibility for the scope and content contained herein.

The Corps published a draft EA on December 8, 2015, on the U.S. Army Corps of Engineers (USACE) Omaha District website (http://www.nwo.usace.army.mil/Missions/CivilWorks/Planning/ProjectReports.aspx) and hard copies were made available at public libraries in Bismarck, Williston, and Pierre. Additionally, notifications where made to cooperating agencies, other federal, state and local agencies, and signatory and non-signatory Tribes to the Omaha Corps District Programmatic Agreement.

The Corps received comments from 20 reviewers in response to the Draft EA, primarily from individuals believed to be members of the Standing Rock Sioux Tribe, and two sets of comments from EPA. These comments relate to topics in the EA. The Corps fully considered and responded to these comments. There is no new, significant information on environmental effects as a result of these comments. As such, neither a supplemental nor a revised EA will be published for further public review nor are additional NEPA compliance actions required prior to the Corps making a decision on the proposed action.

Impacts on the environment resulting from the placement of the pipeline on federal real property interests is anticipated to be temporary and not significant as a result of Dakota Access's efforts to avoid, minimize, and mitigate potential impacts. Dakota Access will comply with all applicable local, state, and

1

USACE_DAPL0071225

Environmental Assessment
Dakota Access Pipeline Project
July 2016

federal regulations and permits associated with the construction and operation of the pipeline, which is not expected to have any significant direct, indirect, or cumulative impacts on the environment.

USACE_DAPL0071226

## 1.0    INTRODUCTION

Dakota Access is proposing to construct a new crude oil pipeline that would provide transportation service from the Bakken and Three Forks plays in North Dakota through portions of South Dakota and Iowa to a terminus in Patoka, Illinois (Figure 1).   In coordination with the U.S. Army Corps of Engineers, the Applicant, Dakota Access, LLC (Dakota Access), as the non-federal representative for compliance with the NEPA of 1969, the CEQ Regulations (40 CFR 1500-1508), Corps of Engineers Regulation ER 200-2-2 (33 CFR Part 230), and related environmental compliance requirements, prepared this Environmental Assessment to analyze whether the Corps could grant Section 408 permissions for the placement of Dakota Access Pipeline Project (DAPL Project) on federal flowage easements near the upper end of Lake Sakakawea, and federally owned lands at Lake Oahe in North Dakota ("the Requester's Preferred Alternative" or "Proposed Action").   Areas that are potentially impacted by construction and/or operation of the Proposed Action are referred to herein as the Project Area.

### 1.1    DAPL Project

The DAPL Project is an approximately 1,100-mile long crude oil pipeline project beginning near Stanley, North Dakota, and ending at Patoka, Illinois.  The DAPL project, as proposed and being evaluated herein, would cross federal flowage easements near the upper end of Lake Sakakawea north of the Missouri River in Williams County, North Dakota, and federally owned lands at Lake Oahe in Morton and Emmons counties, North Dakota. The EA analysis is limited to these portions of the pipeline only.

### 1.2    Purpose and Need

The purpose and need of the federal action is to determine whether USACE may grant permission for Dakota Access to place the pipeline on federal real property interests acquired and managed by USACE for the Garrison Dam/Lake Sakakawea and Oahe Dam/Lake Oahe projects.  Section 408 authorizes the Corps to grant permission to Dakota Access to modify federal flood control and navigation projects, provided the modifications are not injurious to the public interest and will not impair the usefulness of the projects. The EA addresses the purpose and need of the pipeline, as well as the location and method of installation of the pipeline, but the analysis is limited to the effects of allowing the pipeline to cross federal flowage easements near the upper end of Lake Sakakawea and federally owned lands at Lake Oahe in North Dakota.

### 1.3    Authority and Scope of the EA

The proposed crossings of Corps-owned lands and easements would require the Corps to grant the Section 408 permissions as well as real estate outgrants.  Therefore, the scope of this EA is limited to the crossings of Corps-owned lands and flowage easements.  As noted below, separate Corps authorizations are being sought for Section 404, Section 10, and Section 408 crossings on other portions of the DAPL route. Those actions are not discussed in the EA.

The Proposed Action does not qualify for a Categorical Exclusion from NEPA documentation as defined by ER 200-2-2, 4 March 1998 paragraph 9.  Thus, this EA has been prepared as required under NEPA to determine potential impacts that may occur as result of implementing the Proposed Action.  If it is determined that no significant impacts would be incurred after implementing the mitigation measures

USACE_DAPL0071227

Environmental Assessment
Dakota Access Pipeline Project
July 2016

described within this document, the USACE would issue a finding of no significant impact (FONSI).  If it is determined that significant impacts would be incurred as a result of construction and/or operations of the Proposed Action, an environmental impact statement (EIS) would be prepared to further evaluate the Proposed Action under NEPA.

This effect analysis is being completed in accordance with CEQ regulations in Section CFR 1506.5(b), which allow an applicant to prepare an EA for a federal action in coordination with the lead federal agency (i.e., Corps).  The Corps will use the information in the EA to make a final determination whether to grant the required Section 408 permissions using the information contained herein.  The Corps independently evaluated and verified the information and analysis undertaken in this EA and takes full responsibility for its scope and content.

USACE_DAPL0071228

Environmental Assessment
Dakota Access Pipeline Project
July 2016

## 2.0   ALTERNATIVES

Dakota Access proposes the DAPL Project to efficiently and safely transport at least 570,000 barrels of crude oil per day (bpd) from the Bakken and Three Forks production region in North Dakota to a crude oil market hub located near Patoka, Illinois, and ultimately to refineries located in the Midwest and the Gulf Coast, where 80% of the U.S. refining capabilities exist. Because the Corps can only grant permission for the modification of a federal project if it would not be injurious to the public interest, the EA evaluated alternatives to the construction of the pipeline as a whole, as well as the alignment of the pipeline and method for installation on federal property. The alternatives were compared using the proposed purpose of the DAPL project. The EA also analyzed the potential for the pipeline to impair the usefulness of the federal projects.

### 2.1   Alternatives Considered but Eliminated from Detailed Analysis

### 2.1.1   Alternative 1 – Modification of Existing Infrastructure

There are no other major interstate pipelines that would meet the purpose and need of the Project.  The DAPL Project would be Energy Transfer's (Company's) first asset in the state.  For this reason, the manipulation of operating pressures or additional of pump stations to increase transport capacity in pipelines or altering existing infrastructure to increase storage and transport capacity are not viable options to meet the  purpose and need of the Project.

### 2.1.2   Alternative 2 – Trucking Transportation Alternative

 While trucking is instrumental in the gathering and distribution of crude on a limited scale, trucking as an alternative for transporting volume of crude oil the distances planned for the DAPL Project is not viable. Based on data recorded by the North Dakota Pipeline Authority as recently as November of 2015, approximately 1% of the crude oil in the Williston Basin is transported via truck out of the Williston Basin due to a lack of transport capacity (Kringstad, 2016).  Factors such as road safety, roadway capacity, and a lack of reliability due to seasonal constraints, in addition to other logistical issues involving availability of labor force, trailer truck capacity, and economics, all contribute to truck transportation not being a realistic alternative.

A sharp increase in traffic on North Dakota roads as a result of the rapid expansion in the number of commercial trucks linked to the oil industry speaks to the issues associated with road safety.  In 2012, the Federal Motor Carrier Safety Administration reported a traffic fatality rate in North Dakota of 0.48 per million vehicle miles traveled, with 48 deaths involving a bus or large truck, far surpassing any other state (U.S. Department of Transportation [DOT], 2014).  In the pre-boom years of 2001 to 2005, there was an average of only 13 annual deaths involving commercial trucks.  Furthermore, the economic cost of severe truck crashes has more than doubled between 2008 and 2012.  Much of the increase in the fatality rate can be attributed to the energy production boom, along with the fact that the state's infrastructure still consists of single-lane, rural, and unpaved roads in many areas (Bachman, 2014).  Harsh winter weather and seasonal road restrictions compromise the reliability of truck transportation even further. Based on the above, a pipeline is a safer and more economical alternative than trucking for the volumes transported and distances covered by the DAPL Project.

USACE_DAPL0071229

Environmental Assessment
Dakota Access Pipeline Project
July 2016

Assuming the average oil tanker truck is capable of holding about 220 barrels of oil, the transportation of the initial capacity of the proposed Project (450,000 bpd), would require a total of 2,045 (450,000/220) full trucks to depart the proposed tank terminals daily, and more than 85 (2,045/24) trucks would have to be filled every hour with a 24-hour/day operation.  Time spent in transit, loading/offloading, and additional time for maintenance would add to the number of trucks needed to offset for the DAPL Project. For a trucking mode, an increase in daily truck traffic would lead to an increase in the degradation of public roads as well as contribute to the noise pollution adjacent to the roads.  For both truck and rail modes, an increase in exhaust would be anticipated due to truck and locomotive combustion.  An increase in air pollution would also be anticipated from potential releases during the filling operations for trucks or rail cars.

Analysis of infrastructure considerations (the burden of thousands of additional trucks on county, state, and interstate highways, as well as the loading and offloading facilities that would have to be constructed which would incur their own environmental impacts), economic considerations (e.g., labor costs, purchase and maintenance of hauling equipment, fuel, public infrastructure, etc.), and reliability considerations (e.g., weather, mechanical, manpower, road closures) all contribute to making the truck transportation alternative unviable.

### 2.1.3    Alternative 3 – Rail Transportation Alternative

Reliance on rail as a transportation method in the Williston Basin has drastically increased in recent years, carrying a negligible percentage of the overall market share as recently as 2010 to nearly 60% of the overall market share by mid-2014 (Nixon, 2014).  The rise in the use of rail as a primary transportation method has been driven in large part by the rapid increase in production of crude oil coupled with a lack of pipeline capacity to account for additional supplies.

Negative impacts from the growth in popularity of rail as a method of long-distance transportation of crude oil include delays that disrupt the agricultural sector, reductions in coal-fired power plant inventories, and significant production issues in the food production industry.  In August 2014, reports filed with the federal government indicated that the Burlington Northern Santa Fe Railway had a backlog of 1,336 rail cars waiting to ship grain and other products, while Canadian Pacific Railway had a backlog of nearly 1,000 cars (Nixon, 2014).  For industries, such as those listed, in which the use of pipelines is not an option, the only viable alternative would be increased reliance on trucking, which would exacerbate some of the issues listed in the section above.

Assuming a carrying capacity of 600 barrels per car, a total of 750 rail cars would be required to depart the tank terminal daily to transport 450,000 barrels of crude oil to its final destination.  Loading and offloading 750 rail cars in a day would require servicing more than 31 rail cars per hour.  With an assumption of 125 rail cars per train, six trains would have to depart the tank terminal every day.  With 10 to 12 trains currently leaving the state per day carrying Bakken crude, the DAPL Project would represent a 50 to 60% increase in the number of trains transporting crude oil out of the state, likely exacerbating issues with delays (Horwath and Owings, 2014).

Rail operations on the scale of the DAPL Project do not exist in the U.S.  An oil-by-rail facility designed to handle an average of 360,000 bpd has been proposed in the Port of Vancouver, Washington.  Known as the Vancouver Energy proposal, the project would be the largest rail terminal in the country (Florip, 2014).

USACE_DAPL0071230

Environmental Assessment
Dakota Access Pipeline Project
July 2016

A rail transportation alternative to handle the volumes of the DAPL Project would require the design and construction of 125 to 158% of that of the Vancouver Energy proposal.  A facility of this size would incur its own environmental consequences.

From a safety standpoint, railroad transport consistently reports a substantially higher number of transportation accidents than pipelines (DOT, 2005).  A series of major accidents taking place in 2013 to 2014 in Canada and the U.S. has heightened concern about the risks involved in shipping crude by rail (Fritelli, 2014).

Increases in rail traffic necessary to transport the volume of crude oil proposed by the DAPL project would increase the emissions of combustion products due the use of diesel engines which could have an adverse impact on air quality in the region.   This alternative would also directly affect communities along utilized rail lines by increasing noise and creating transportation delays due to the substantial increasing rail traffic across railroad crossings of roads.

While rail tanker cars are a vital part of the short-haul distribution network for crude oil, pipelines are a more reliable, safer, and more economical alternative for the large volumes transported and long distances covered by the DAPL Project.   This alternative would create delays on the rail lines due to the substantial increase in rail traffic, resulting in shipping delays in other industries such as agriculture that cannot rely on pipeline transportation.  Furthermore, the purpose and need of the Project would not be attainable with the current oil-by-rail infrastructure in the country because rail loading facilities of sufficient size do not exist. As such, rail transportation is not considered a viable alternative.

## 2.1.4    Alternative 4 – Route Alternatives

Although this EA is limited to the pipeline placement on federal real property interests administered by the Corps, major route alternatives were evaluated for the pipeline route as a whole.  During the DAPL Project fatal flaw analysis and early routing process, Dakota Access utilized a sophisticated and proprietary Geographic Information System (GIS)-based routing program to determine the pipeline route based on multiple publicly available and purchased datasets.  Datasets utilized during the Project routing analysis included engineering (e.g., existing pipelines, railroads, karst, powerlines, etc.), environmental (e.g., critical habitat, fault lines, state parks, national forests, brownfields, national registry of historic places, etc.), and land (e.g., fee owned federal lands, federal easements, dams, airports, cemeteries, schools, mining, tribal lands, and military installations, etc.).

Each of these datasets was weighted based on the risk (e.g., low, moderate, or high based on a scale of 1,000) associated with crossing or following certain features.  In general, the route for the pipeline would follow features identified as low risk, avoid or minimize crossing features identified as moderate risk, and exclude features identified as high risk.  For example, the existing pipelines dataset was weighted as a low risk feature, so that the routing tool followed existing pipelines to the extent possible to minimize potential impacts.  An example of a high risk feature is the national park dataset.  Since national parks were weighted for the DAPL Project as high risk, the GIS routing program excluded any national parks from the pipeline route to avoid impacts on these federal lands.  In addition, the routing program established a buffer between the proposed route and certain types of land, such as maintaining a 0.5-mile buffer from tribal lands.

7

USACE_DAPL0071231

Environmental Assessment
Dakota Access Pipeline Project
July 2016

**Route Alternative for the Crossing of Flowage Easements at the Missouri River**

Early in the routing process Dakota Access performed a cursory route evaluation to attempt crossing the Missouri River at a location that does not contain flowage easements.  This would dictate moving the centerline west of the flowage easements in Williams County.  This alternative was not carried forward through the environmental consequences analysis, given that this would require approximately eight additional miles of pipe, an exceedance of an additional 130 acres of workspace, and another major river crossing (Yellowstone River) in addition to the Missouri River.  Furthermore, other state and federal properties are located along the river west of the confluence of Missouri and Yellowstone Rivers.

**Route Alternative for the Crossing of Federal Lands at Lake Oahe**

Early in the routing phase of the DAPL Project, Dakota Access considered but eliminated an alternative centerline that originated in Stanley, North Dakota, within Mountrail County, where it connected to customer receipt points and headed southwest through Williams County and crossed the Missouri River approximately 8.5 miles east of the Yellowstone River and Missouri River confluence (**Figure 12**).  The centerline then headed southeast across the state and crossed Lake Oahe approximately 10 miles north of Bismarck (**Figure 13**), where it then headed south again and entered South Dakota approximately 35 miles east of Lake Oahe in McIntosh County.  In addition to other evaluation criteria listed in Table 2.1, the route alternative was in proximity to and/or crossing multiple conservation easements, habitat management areas, National Wildlife Refuges, state trust lands, waterfowl production areas, and private tribal lands.

As a result of public input and comment during this EA process, additional desktop evaluation of the North Bismarck alternative portion of the early route (**Figure 13**) was undertaken.  The comparison of this alternative to the preferred route is included in **Tables 2-1** and **2-2** contained herein.  As illustrated in the tables, the data substantiates eliminating this route as a viable alternative.  While the alternative does avoid Corps fee owned land at Lake Oahe; therefore, would not require a Corps real estate outgrant or Corps EA review, approximately 11-miles of length would be added to the pipeline route, consisting of roughly 165 additional acres of impact, multiple additional road crossings, waterbody and wetland crossings, etc.  In addition to the criteria shown in the tables, due to the proximity to Bismarck, the North Bismarck route alternative crossed through or in close proximity to several wellhead source water protection areas that are identified and avoided in order to protect areas that contribute water to municipal water supply wells.  The route was also severely constrained by the North Dakota Public Service Commission's 500-ft residential buffer requirement at multiple locations.  Furthermore, this route alternative crossed other populated PHMSA high consequence areas (HCAs), that are not present on the preferred route.  Pipeline safety regulations use the concept of HCAs to identify specific locales where a release from a pipeline could have the most significant adverse consequences.

8

USACE_DAPL0071232

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 2-1 Alternatives Evaluation Matrix Between Preferred Crossing at Lake Oahe and Alternative Crossing North of Bismarck | | | |
|---|---|---|---|
| **Evaluation Factors** | **ALTERNATIVE ROUTE Crossing North of Bismarck** | **PREFERRED ROUTE Crossing at Lake Oahe** | **PREFERRED COMPARED TO ALTERNATIVE ROUTE** |
| Total Overall Route Mileage | | | |
| Total Mileage | 111.0 | 100.4 | **-10.6** |
| Collocation | | | |
| Pipeline (mi) | 0.0 | 34.6 | **+34.6** |
| Powerline (mi) | 2.9 | 6.1 | **+3.2** |
| *Overall Corridor Collocation (%)* | 3% | 41% | **+38%** |
| Amount of Greenfield Crossed (non-collocated areas-mi) | 108.1 | 59.6 | **-48.4** |
| Existing Pipeline Crossing (count) | | | |
| Crossing Count | 6 | 10 | **+4** |
| Floodplain 100 Year | | | |
| Floodplain Crossings (Count) | 13 | 2 | **-11** |
| Total Mileage | 1.4 | 0.2 | **-1.2** |
| Land Cover Types (mi) | | | |
| Agriculture | 42.5 | 36.1 | **-6.4** |
| Developed/Low Intensity | 0.2 | 0.1 | **-0.1** |
| Developed/Open Space | 6.6 | 2.0 | **-4.6** |
| Grass/Pasture | 59.3 | 60.7 | **+1.4** |
| Land Ownership Potential Conflicts | | | |
| USACE Reservoirs - Lake Oahe | 0 | 1 | **+1** |
| Flowlines - NHD* | | | |
| Waterbody Count | 149 | 116 | **-33** |

9

USACE_DAPL0071233

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 2-1 | | | |
| Alternatives Evaluation Matrix Between Preferred Crossing at Lake Oahe and Alternative Crossing North of Bismarck | | | |
|---|---|---|---|
| **Evaluation Factors** | **ALTERNATIVE ROUTE Crossing North of Bismarck** | **PREFERRED ROUTE Crossing at Lake Oahe** | **PREFERRED COMPARED TO ALTERNATIVE ROUTE** |
| Waterbodies- NHD* | | | |
| Perennial | 3 | 1 | -2 |
| Intermittent | 1 | 0 | -1 |
| NWI Wetland (count) | | | |
| Freshwater Emergent Wetland | 26 | 5 | -21 |
| Freshwater Forested/Shrub Wetland | 1 | 0 | -1 |
| Freshwater Pond | 2 | 0 | -2 |
| PHMSA Populated Areas Dissolved (mi) | | | |
| Ecological HCA | 2.6 | 2.6 | 0 |
| Highly Populated Areas | 0 | 0 | 0 |
| Other Populated Areas | 1.6 | 0 | -1.6 |
| Drinking Water HCA | 0 | 0 | 0 |
| Powerline Crossing | | | |
| Total Crossing Count | 14 | 13 | -1 |
| Transportation Crossing | | | |
| Total Crossing Count | 139 | 112 | -27 |

* Flowline and waterbody crossings from the U.S. Geological Survey (USGS) National Hydrography Dataset

10

USACE_DAPL0071234

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 2-2 Construction Cost Comparison Between Crossing at Lake Oahe and Alternative Crossing North of Bismarck | | | | | |
|---|---|---|---|---|---|
| | **ALTERNATIVE ROUTE Crossing North of Bismarck** | | **PREFERRED ROUTE Crossing at Lake Oahe** | |
| Length of Segment | 111.0 | miles | 100.4 | miles |
| | 585,974 | feet | 530,112 | feet |
| Cost for Road/Railroad Bores | | | | |
| Number of Road/Railroad Bores | 139 | bores | 112 | bores |
| Total Cost for Road Bores (at $34,600/bore) | $ 4,809,400 | USD | $ 3,875,200 | |
| Cost of Installation for Non-HDD Areas | | | | |
| Length of Pipeline Non-HDD | 580,008 | feet | 522,312 | feet |
| Total Cost for Installation of Non-HDD Section | $ 201,262,915 | USD | $ 181,242,264 | USD |
| Horizontal Directional Drill (HDD) Across Mo River/Lake Oahe | | | | |
| Length of HDD | 5,966 | feet | 7,800 | feet |
| Total Cost of HDD Crossing | $ 7,696,140 | USD | $ 10,062,000 | USD |
| Cost of Geotechnical Investigation | | | | |
| | $ 140,000 | USD | $110,000 | USD |
| Aboveground Facility Costs | | | | |
| Mainline Valves Needed (one per each 10 mile segment) | 11 | valves | 10 | valves |
| Total Cost of Mainline Valves (at $450,000/valve location) | $ 4,995,000 | USD | $ 4,500,000 | USD |
| Right-of-Way Acquisition Costs (at $37/foot) | $ 21,681,053 | USD | $ 19,614,144 | USD |
| Additional Cost Including Engineering and Consultants (at $131,000/mile) | $ 14,538,380 | USD | $ 13,152,400 | USD |
| **Total Cost of Alternative** | **$ 255,122,888** | **USD** | **$ 232,556,008** | **USD** |

11

USACE_DAPL0071235

Environmental Assessment
Dakota Access Pipeline Project
July 2016

A negative number indicates that the value for the proposed action is less than the value for the population that the proposed action is being compared to.

### 2.1.5    Alternative 5 – Major Waterbody Crossing Method Alternatives

Once an optimal route was selected based on the evaluation of impacts discussed in Section 2.1.3, Dakota Access then identified the preferred major waterbody crossing construction method that would meet the purpose and need while minimizing impacts to resources.   Pipeline construction methods utilized at waterbody crossings are highly dependent on the characteristics of the waterbody encountered.  A variety of waterbody crossing techniques were considered during the DAPL Project planning stages for the crossings of major waterbodies, including Dam and Pump, Flume, Open-Cut, and Horizontal Directional Drill.

**Dry Crossings Methods**

Two different techniques, including dam and pump and flume crossing methods, are typically used on waterbody crossings well under 100 feet in width and require a temporary diversion of flow within the waterbody.  Because of the large volume of water within the Missouri River system, it is not feasible to temporarily divert the water either by pump or flume, and these methods were ruled out of consideration for the crossing of the Missouri River and Lake Oahe.

**Wet Open-Cut Crossing Method**

Aside from trenchless or HDD crossing techniques, the only feasible crossing method from a constructability standpoint for the major waterbodies associated with the Proposed Action is the wet open-cut crossing method, in which flow would be maintained throughout installation of the pipeline. This method of construction would require the construction right-of-way (ROW) to extend right up to the waterbody itself, allowing equipment to operate from the banks of the waterbody to excavate a trench. The sensitive habitat adjacent to the banks of the waterbodies would be cleared of vegetation and graded to create a safe and level workspace that could accommodate excavation equipment and spoil storage for the duration of the open-cut installation (approximately 6 months).  Since the widths of the Missouri River and Lake Oahe at the crossing locations is such that operating trenching equipment entirely from the banks would not be possible, trench excavation in the waterbodies would require equipment operating from barges.  Furthermore, the depth of the waterbodies crossed (15 to 25 feet) exceeds the reach of a backhoe, and the use of mechanical dragline dredgers would be necessary.  Spoil dredged from the bottom of the waterbody would be stored on a spoil barge or otherwise temporarily stockpiled in the waterbody itself.  This method of excavation would greatly influence the overall sediment load generated in the waterbody for the duration of the installation.  The generation of a downstream turbidity plume would have a direct effect on the aquatic habitat of the waterbody.   In addition, the operation of equipment within and on the banks of the waterbody has the potential for adverse effects on surface water quality (i.e., potential contamination of surface water resources from fuel or leaks from the equipment).  Compared to trenchless technology, the open-cut method would incur far greater impacts on sensitive habitat located on both the banks of the waterbodies and within the waterbodies.  Therefore, this method of construction was eliminated from consideration.

USACE_DAPL0071236

The trenchless construction method known as HDD was selected as the preferred construction method of the Proposed Action, because this method of construction involves far less impacts on resources.  In addition, the Garrison Project – Lake Sakakawea Oil and Gas Management Plan explicitly states that:  Oil and gas pipelines should use directional drilling technology to traverse beneath sensitive habitat areas.  Further information regarding the HDD construction method is provided in Section 2.3.2.6 below.

## 2.2   No Action Alternative

Under the "no action" alternative, Dakota Access would not construct the DAPL Project.  The "no action" alternative would not provide the infrastructure necessary to transport light sweet crude oil to refining facilities.  In northwest North Dakota, exploration and production of oil is a major economic activity, with crude oil production being the primary mineral resource of interest.  Although the "no action" alternative itself would not incur direct environmental impacts, it would also not address the existing demand to transport crude oil to refining facilities.  Market demands would likely compel shippers to rely on alternative methods of crude oil transport such as truck or rail.  Although, both the truck and rail alternatives are not sufficient to meet the purpose and need of the Project due to the lack of available infrastructure and other limitations described in Sections 2.1.3 and 2.1.4, it is reasonable to assume that truck and rail traffic would increase if the "no action" alternative were implemented.  These alternative shipping methods would adversely affect resources as described in Sections 2.1.3 and 2.1.4 and throughout this EA.

It is purely speculative to predict the resulting effects and actions that could be taken by another company or Dakota Access' shippers and any associated direct or indirect environmental impacts in response to the "no action" alternative.  However, if this alternative is implemented, it is likely that other methods of transporting crude oil to the marketplace would be implemented and anticipated effects of the "no action" alternative has been carried forward in the environmental analysis of this EA to provide a comparison between it and the impacts of implementing the Preferred Alternative.

## 2.3   The Proposed Action (Preferred Alternative)

### 2.3.1   Location and Detailed Description of the Proposed Action

The DAPL Project originates near Stanley, North Dakota, traversing westerly northwest of Williston then turning south, crossing the Missouri River and traverses southeasterly across the state, exiting through the central portion of the southern border.  Dakota Access proposes to construct the pipeline, ranging in size from 12 to 30 inches in diameter, so that the majority of lands crossed would be privately-owned lands.  The locations for collecting product into the proposed system were largely fixed based on the location of existing terminals.  The first of the six fixed input locations is located at the pipeline's origin near the town of Stanley in Mountrail County.  Three other input locations exist near the towns of Ramberg, Epping, and Trenton in Williams County.  Two additional collection points are located south of the proposed Missouri River crossing on the flowage easements in McKenzie County near the towns of Waterford City and Johnson's Corner.  Connecting the input locations was largely a matter of minimizing length and maximizing the avoidance of sensitive features, developments, public lands, and constructability issues (e.g., steep terrain, potholes, excessive bedrock, etc.), as discussed above in Section 2.1.4 Route Alternatives.  Based on the location of the collection points, crossing the Missouri River (Lake Sakakawea) was unavoidable.  The selected crossing location of the Proposed Action avoids federally-

USACE_DAPL0071237

Environmental Assessment
Dakota Access Pipeline Project
July 2016

owned lands to the extent practical, is at a narrow width of the river upstream of the wider Lake Sakakawea, and minimizes impacts on sensitive resources (e.g., piping plover critical habitat, eagle nests, etc.). The pipeline is 24 inches in diameter where it crosses approximately 14,942 feet (2.83 miles) of the Corps flowage easements at the Missouri River and is 30 inches in diameter where it crosses approximately 1,109 feet (0.21 mile) of the Corps-owned federal lands at Lake Oahe.

Within North Dakota, the proposed Supply pipeline crosses seven tracts of flowage easement retained by the Corps located north of the Missouri River in Williams County (**Figure 2**). The proposed DAPL Project Mainline route travels through land owned and managed by the Corps on both sides of the Lake Oahe crossing at the border between Morton and Emmons counties, approximately 0.55 mile north of the northern boundary of the Standing Rock Sioux Reservation (**Figure 3**).

The following narrative relates to **Figures 1** through **3** in Section 12.0 and is provided to assist the reader in identifying the Project Area under consideration in this analysis. **Purple polygons** indicate real estate interests; either the flowage easements that the Corps has with private landowners upstream of Lake Sakakawea, or the fee title lands that the Corps has on the upper end of Lake Oahe. The **red hyphenated line** shows the DAPL Project centerline as it approaches Federal property at the Lake Oahe crossing and temporary workspace areas. The **straight solid redline** indicates the HDD pipeline that will go beneath Corps managed federal surfaces and is the Project Area being considered as part of the Federal action to issue a real estate easement. The **yellow polygon** indicates workspace where temporary work is proposed to be completed that directly supports the HDD installation of the pipeline underneath the river/reservoir. Temporary activities that would occur in this workspace include: welding together pipe, inspecting and testing the pipeline to ensure no leaks are present prior to preparing to install beneath the river/reservoir at both locations.

Potential impacts have to be evaluated in temporary workspace, as actions completed here are directly connected to the ability for the applicant to complete the proposed project (both the **purple and yellow polygons**). Further, these actions are directly connected to the federal decision to allow an easement for the pipeline to cross federal lands in this area. Notice that the Corps is not analyzing the effects of the **red hyphenated line** (DAPL centerline) at the Lake Oahe crossing as it is outside the EA review area. This is an important difference compared to the flowage easement location where temporary work happens to coincide with the orientation of the flowage easements perpendicular to the Missouri River. Therefore, temporary workspace required for portions of the pipeline installed via conventional (non-HDD) methods on the flowage easements is included in the EA review area.

The flowage easements and Corps owned lands associated with the Proposed Action, and the associated Project impact acreages, expressed as construction workspace, are identified in **Table 2-3** below.

| Table 2-3 Flowage Easements and Federal Land Crossings | | |
|---|---|---|
| **Grant of Easement Document Number** | **County** | **Construction Workspace Within Tract (acres)** |
| **Flowage Easements** | | |
| LL3440E | Williams | 9.4 |
| LL3483E-1 | Williams | 10.8 |

14

USACE_DAPL0071238

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 2-3 Flowage Easements and Federal Land Crossings | | |
|---|---|---|
| **Grant of Easement Document Number** | **County** | **Construction Workspace Within Tract (acres)** |
| **Flowage Easements** | | |
| LL3453E | Williams | 10.7 |
| LL3430E | Williams | 5.0 |
| LL3450E-2 | Williams | 5.2 |
| LL3431E | Williams | 14.7 |
| LL3426E-2 | Williams | 3.4 |
| **Total Acres** | -- | **59.2** |
| **Federally-Owned Lands** | | |
| Federal Land | Morton | 0.4 |
| Federal Land | Emmons | 0.8 |
| **Total Acres** | -- | **1.2** |

The EA review area includes areas within the Corps flowage easements and federal lands that are potentially impacted by construction and/or operation of the DAPL Project.  The EA review area is hereafter referred to as the Project Area(s).  Actions that occur outside of the flowage easements and the federal lands at the Lake Oahe crossing are considered Connected Actions.  Connected Actions are those actions that are "closely related" and "should be discussed" in the same NEPA document (40 CFR § 1508.25 (a)(i)).  Actions are connected if they automatically trigger other actions that may require an EA, cannot or will not proceed unless other actions are taken previously or simultaneously or if the actions are interdependent parts of a larger action and depend upon the large action for their justification (40 CFR § 1508.25 (a)(i, ii, iii)).  Connected Actions are limited to actions that are currently proposed (ripe for decision).  Actions that are not yet proposed are not Connected Actions, but may need to be analyzed in the cumulative effects analysis if they are reasonably foreseeable.  The only Connected Actions at each individual crossing location associated with the Proposed Action are those that relate to the HDD workspace at the Missouri River crossing and the HDD workspace, HDD stringing area, and the permanent easement on private lands in the vicinity of the Lake Oahe crossing.  The two federal permissions are not connected actions because the locations of each crossing are independent of one another and the location of the first does not dictate the location of the second.

Dakota Access initially proposed an isolation valve to be located within the flowage easements (easement LL3453E); however, the Omaha District has assessed the potential for open water and ice jam flooding within the vicinity of the Project Area in the "Reconnaissance Report, Missouri River, Buford-Trenton Irrigation District, North Dakota" and based on the findings the valve would be located within an area that has the potential to be submerged or damaged by ice jam flooding.  Therefore, the valve has been removed from the Project Area.

The Project Area and Connected Actions analyzed within this EA for both crossings are outlined in **Table 2-4**, which identifies land status (private, Federal or Easement) and provides associated acreages.

15

USACE_DAPL0071239

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 2-4 Environmental Assessment Areas of Interest | | | |
|---|---|---|---|
| **Action/Activity** | **Federal/ Private Land** | **EA Review** | **Acres** |
| **Flowage Easements—Williams County** | | | |
| Construction ROW within Corps flowage easements | Private; Federal Easement | Project Area | 58.0 |
| HDD workspace (exit point) within Corps flowage easement | Private; Federal Easement | Project Area | 1.2 |
| Permanent easement over HDD profile within Corps flowage easement and placement of temporary waterline | Private; Federal Easement | Project Area | 1.2 |
| **Flowage Easements Connected Actions – McKenzie County** | | | |
| HDD workspace (entry point) on private land | Private | Connected Action | 2.0 |
| **Federal Lands and Connected Actions - Morton County** | | | |
| HDD workspace (exit point) on private land | Private | Connected Action | 1.2 |
| HDD stringing area on private land | Private | Connected Action | 13.1 |
| Permanent easement over HDD profile on private land between HDD workspace (exit point) and federal lands | Private | Connected Action | 0.8 |
| Permanent easement over HDD profile on federal lands | Federal | Project Area | 0.4 |
| **Federal Lands and Connected Actions - Emmons County** | | | |
| Permanent easement over HDD profile on federal land | Federal | Project Area | 0.8 |
| Permanent easement over HDD profile on private land between federal land and HDD workspace (entry point) | Private | Connected Action | 0.3 |
| HDD workspace (entry point) on private land | Private | Connected Action | 1.2 |
| **Lake Oahe** | | | |
| Permanent easement over HDD profile across Lake Oahe | N/A | Project Area | 6.3 |

### 2.3.1.1   Flowage Easements

The Missouri River HDD is located just upstream of Lake Sakakawea and downstream of the confluence of the Yellowstone and Missouri rivers.  The proposed crossing of flowage easements near upper Lake Sakakawea (flowage easements) is located in Sections 7, 18, 19, and 30, Township 152 North, Range 103 West, in Williams County, North Dakota (**Figure 2**).  The proposed pipeline is routed parallel to an existing buried natural gas pipeline and associated valve sites, which cross the Missouri River and flowage easements just west of the proposed Dakota Access pipeline.

The HDD exit workspace would be located on a flowage easement tract.  Access to the Project Area on the flowage easements would be via the construction ROW from an existing road (38th Street NW).  No additional temporary access roads would be required.  The Connected Action at the flowage easements includes the HDD entry workspace, located on the south side of the Missouri River on private lands in McKenzie County.  Access to the HDD entry workspace will be via the existing access road located adjacent to the HDD entry workspace.  No additional temporary access roads would be required.

USACE_DAPL0071240

Environmental Assessment
Dakota Access Pipeline Project
July 2016

### 2.3.1.2   Federal Lands

The proposed crossing of federally-owned tracts at Lake Oahe (federal lands) is located in Section 10, Township 134 North, Range 79 West in Morton County, North Dakota, and Section 11, Township 134 North, Range 79 West in Emmons County, North Dakota (**Figure 3**).  The proposed pipeline is routed to parallel existing linear infrastructure (an overhead powerline and a buried natural gas pipeline) in this area.  The HDD entry and exit point workspaces and stringing area would be located on private land outside of the federal lands and are considered Connected Actions in this analysis.  HDD design reflects a crossing length of approximately 7,500 feet, of which approximately 5,420 feet occurs beneath the bed of Lake Oahe.

## 2.3.2   Description of Construction Techniques and Construction Mitigation Measures

All facilities associated with the Proposed Action would be designed, constructed, tested, operated, and maintained in accordance with the U.S. DOT regulations in Title 49 CFR Part 195.  Dakota Access is currently developing project-specific plans and would implement best management practices (BMPs) to mitigate for potential construction-related impacts associated with stormwater runoff.  This includes implementation of their Stormwater Pollution Prevention Plan (SWPPP; see **Appendix A**), which includes the Spill Prevention Control and Countermeasure Plan (SPCC Plan) as an appendix.  Additionally, Dakota Access would implement their HDD Construction Plan and HDD Contingency Plan (HDD Construction/Contingency Plan; see **Appendix B**) for inadvertent release of drilling mud during HDD construction work at wetland and waterbody crossings to protect sensitive resources from such releases. The Proposed Action would be constructed via a combination of conventional and specialized construction procedures, as described below.

### 2.3.2.1   Clearing and Grading

Prior to commencement of ground-disturbing activities, a standard survey and stakeout would be conducted to identify ROW and workspace boundaries and to locate existing foreign utility lines within the construction ROW.  Following completion of the surveys, the construction ROW would be cleared of vegetation and debris. Clearing of wetlands is limited to removal of woody debris in the forested wetlands above the HDD profile on the north bank of the Missouri River within the flowage easements.  Stumps would be cut flush with the ground and left in place, as described in Section 3.2.3. Cleared vegetation and debris along the ROW would be disposed of in accordance with federal, state, and local regulations either by burning, chipping and spreading, or transportation to a commercial disposal facility.  Where necessary, to contain disturbed soils during clearing and grading in upland areas, and to minimize potential erosion and sedimentation of wetlands and waterbodies, temporary erosion control devices (ECDs) would be installed prior to initial ground disturbance and maintained throughout construction.  Vegetative buffers would be left where practical at all waterbody crossings to limit the exposure and impact to these features.  Final clearing would take place immediately prior to crossing the feature rather than advance.

### 2.3.2.2   Trenching

Trenching involves excavation of a ditch for pipeline placement and is accomplished through the use of a trenching machine, backhoe, or similar equipment.  Trench spoil would be deposited adjacent to each trench within the construction work areas, with topsoil segregation utilized where necessary based on

USACE_DAPL0071241

land use (see the typical ROW configuration drawings in **Appendix C**). In standard conditions, the trench would be excavated to an appropriate depth to allow for a minimum of 36 inches of cover over the pipe. Ground disturbance associated with conventional pipeline construction is generally limited to approximately 6 to 10 feet below the existing ground surface. Typically the bottom of the trench would be cut at least 12 inches greater than the width of the pipe. The width at the top of the trench would vary to allow the side slopes to adapt to local conditions at the time of construction.

### 2.3.2.3    Pipe Stringing, Bending, and Welding

Following preparation of the trench, the new pipe would be strung and distributed along the ROW parallel to the trench. Depending on available workspace, some pipe may be fabricated off-site and transported to the ROW in differing lengths or configurations. Pipe would be bent by hydraulic bending machines, as necessary, to conform the pipe to the trench. Once in place along the ROW, pipe lengths would be aligned, bends fabricated, and joints welded together on skids (i.e., temporary supports). Welding would be performed in accordance with the American Petroleum Institute Standards, PHMSA pipeline safety regulations, and Company welding specifications. All welds would be coated for corrosion protection and visually and radiographically inspected to ensure there are no defects. Segments of completed pipeline would undergo hydrostatic pressure testing as described in Sections 3.2.1.2 and 3.11.

### 2.3.2.4    Pipeline Installation and Trench Backfilling

Completed sections of pipe would be lifted off the temporary supports by side boom tractors or similar equipment and placed into the trench. Prior to lowering-in, the trench would be visually inspected to ensure that it is free of rock and other debris that could damage the pipe or the coating. Additionally, the pipe and the trench would be inspected to ensure that the configurations are compatible. Tie-in welding and pipeline coating would occur within the trench to join the newly lowered-in section with the previously installed sections of pipe. Following this activity, the trench would be backfilled with the previously excavated material and crowned to approximately 6 inches above its original elevation to compensate for subsequent settling.

### 2.3.2.5    Clean-up and Restoration

Following pipeline installation and backfilling, disturbed areas would be restored and graded to pre-construction contours as closely as practicable. Construction debris and organic refuse unsuitable for distribution over the construction ROW would be disposed of at appropriate facilities in accordance with applicable regulations. Permanent ECDs would be installed as appropriate, and revegetation measures would be applied in accordance with the Environmental Construction Plan (ECP; see **Appendix G**), SWPPP, and requirements of applicable state and federal permits.

### 2.3.2.6    Major Waterbody Crossing Method

As previously discussed, the preferred waterbody crossing technique for the Proposed Action is the HDD method. The HDD method allows for construction across a feature without the excavation of a trench by drilling a hole significantly below conventional pipeline depth and pulling the pipeline through the pre-drilled hole. As described in subsequent sections of this document and in greater detail in the HDD Construction Plan (**Appendix B**), by utilizing the trenchless technology, Dakota Access would minimize

USACE_DAPL0071242

impacts to resources within and adjacent to the waterbodies crossed and reduce the anticipated duration of the crossing.  The HDD equipment would be staged well outside of the riparian area, avoiding impacts on the steep banks, cultural resources, and sensitive habitat immediately adjacent to the waterbody.  Cross sections of the Missouri River and Lake Oahe HDDs are provided in **Figure 14** and **Figure 15**.

Depending on the HDD equipment utilized, to help guide the drill bit along the pipeline ROW, electric-grid guide wires may be laid along the predetermined HDD route.  In thickly vegetated areas, a small path may be cut to accommodate laying the electric-grid guide wires.  Once the electric-grid guide wires are installed, the directional drilling rig would drill a small diameter pilot hole along the prescribed profile.  Following the completion of the pilot hole, reaming tools would be utilized to enlarge the hole to accommodate the pipeline diameter.  The reaming tools would be attached to the drill string at the exit point and would then be rotated and drawn back to incrementally enlarge the pilot hole.  During this process, drilling fluid consisting of primarily bentonite clay and water would be continuously pumped into the pilot hole to remove cuttings and maintain the integrity of the hole.  When the hole has been sufficiently enlarged, a prefabricated segment of pipe would be attached behind the reaming tool on the exit side of the crossing and pulled back through the drill hole towards the drill rig.

Fluid pressures can build up within the borehole during HDD operations.  In some instances, this can result in hydraulic fracturing of the substrate and subsequent migration of drilling fluids either into the waterway or to the land surface—this is known as a "frac-out."  The depth of the proposed HDD profiles below the beds of the surface waters to be crossed would minimize the potential for frac-outs to occur.  Additionally, precautions would be taken during all phases of the drilling operation.  A high quality drilling fluid would be used to maintain and protect the integrity of the borehole during the entire HDD operation until the final pipe pull is completed.  The HDD Construction Plan (**Appendix B**) includes more details regarding HDD construction technology and methods.  The work would be performed by an experienced drilling contractor, Michels Directional Crossings, a Division of Michels Corporation, that is knowledgeable in effective HDD practices, including maintaining proper drilling rate, drilling fluid composition, pumping rate of the drilling fluid, pull-back rate, and pumping rate on the back ream, and adjusting these as appropriate for the conditions.

The potential for river channel changes associated with water erosion and scour were considered when selecting the major waterbody crossing methods and locations.  Dakota Access has coordinated with the North Dakota Office of the State Engineer as part of the Sovereign Lands Permitting Process to verify adequate depths for the pipe to be buried relative to geomorphological movements for the Lake Oahe and the Missouri River crossings.  Accordingly, the professional engineering firm evaluating HDD depths for the Proposed Action, GeoEngineers, has performed a scour analysis in order to evaluate the scour risk to the proposed pipeline during 100- and 500-year discharge events for the Lake Oahe and the Missouri River crossings.

The proposed HDD profile under Lake Oahe is designed to provide 92 feet of cover below the bottom of the lake.  Because of the depth of the pipe below the waterbody, and the ponded condition of Lake Oahe, this crossing is at a low risk to geomorphologic movements at the proposed crossing.   The North Dakota Office of the State Engineer has issued Sovereign Lands Permit for the Lake Oahe crossing.  A copy of the permit is included in Appendix M.

USACE_DAPL0071243

The Missouri River HDD profile is designed to provide a minimum of 36 feet of cover at the crossing location beneath the lowest point of the Missouri River. This crossing has less proposed cover between the bottom of the waterbody and the top of the buried pipe and it is an active channel. As part of the Sovereign Lands Permitting Process with the Office of the State Engineer, conservative assumptions were utilized in the analysis of the Missouri River HDD design profile as a factor of safety. For example, the proposed crossing is not located at a bend in the channel and is located over 3,000 feet downstream of the nearest upstream channel bend. An analysis of historic photographs of the proposed crossing show that the upstream bend has been stable and in the same location and that the potential downstream migration of this bend is highly unlikely. However, although bend scour is not likely to propagate downstream to the proposed crossing, to be conservative in their evaluation GeoEngineers assumed that the bend could migrate downstream and negatively influence the crossing.

GeoEngineers estimated the maximum bend scour at the proposed pipeline to be 23 to 25 feet for the 100- and 500-year peak flow events, respectively. The bend scour at the crossing location would not be additive for successive storms as long-term degradation is assumed to be zero. Historic aerial imagery and recent Google Earth imagery indicates bar building and deposition of sediments in the Project Area, representing a dynamic sediment environment. This equates to a high likelihood that there is an adequate upstream sediment supply and likely minimal long term degradation at the proposed crossing location. In general terms, if the area over the pipeline was to experience a large scour event from one large storm event (up to 23 feet of scour during the 500-year peak flow event following the conservative assumptions), this area would be filled in/covered after the storm event by deposition of sediments from upstream and potential exposure of the pipeline would be negligible.

In addition to bend scour, there is potential for contraction scour that occurs when channel width varies within a short reach of the river. There is a small contraction upstream of the proposed crossing at the downstream end of the bend approximately 3,000 feet upstream. The DAPL proposed crossing is not located in a contraction, but actually a small expansion and the contraction point is not likely to migrate downstream to the proposed crossing. However, to be conservative in their analysis as an additional factor of safety, GeoEngineers assumed that the contraction scour upstream of the proposed crossing could migrate downstream to the proposed crossing location. Based on this conservative assumption, contraction scour estimates for the 100-year discharge event are approximately 9 feet. This 100-year contraction scour depth is greater than what would occur during the 500-year event as flood waters spreading across the floodplain actually reduce contraction and therefore reduce the contraction scour depth.

Combining the conservative assumptions from above, the maximum estimated total potential scour depth at the proposed Missouri River HDD site would occur during a 100-year flood event. This conservatively assumes "worst case" that both the bend scour and the contraction scour migrate downstream and are both realized directly over the pipeline crossing at the same time. Under this scenario, the bend scour would create a scour of 23 feet and the contraction scour would contribute another 9 feet creating the maximum estimated total potential scour depth of 32 feet below the existing channel elevation during a 100-year flood event. To assess the factor of safety applied using these assumptions, GeoEngineers utilized general scour equations that take into account bend and contraction scour and compared them to the total scour estimated using the Maynord equation for bend scour and Laursen's live-bed contraction scour equation. Utilizing the Blodgett equation, Lacey equation, and Blench equation for

USACE_DAPL0071244

Environmental Assessment
Dakota Access Pipeline Project
July 2016

general scour, the estimated general scour at the proposed pipeline crossing ranges between 14 to 23 feet for the 100- and 500-year peak flow events.  This results in a total factor of safety of 1.4 to 2.3 for total scour at the proposed crossing.

Based upon their calculated worst-case scenario scour estimate, GeoEngineers considers the risk of scour occurring down to the level of the proposed pipeline to be low and the proposed Missouri River HDD design profile to be appropriate.  The North Dakota Office of the State Engineer has issued Sovereign Lands Permit for the Missouri River crossing.  A copy of the permit is included in Appendix M.

### 2.3.2.7    Minor Waterbody Crossing Methods

There are no minor waterbodies crossed by the pipeline on Corps Fee Lands.  All minor waterbodies encountered on the flowage easements have been identified as falling under the jurisdiction of the Buford/Trenton Irrigation District (BTID) and, in compliance with their regulations, would be crossed via trenchless pipeline construction methods (bores).  Dakota Access is working through the BTID permitting and approval process separately.  One intermittent waterbody has been identified on the south side of the Missouri River crossing, within the connected action area but outside of the flowage easements, and within the HDD workspace.  Temporary impacts to this waterbody would be mitigated during construction with a customized HDD equipment configuration, including the placement of temporary matting/bridging over the feature as necessary to maintain natural water flow during construction, and installation of appropriate ECDs.  Therefore, impacts on surface waters and adjacent sensitive habitat would be minimized by eliminating open-cut pipeline installations and in-stream work for all crossed waterbodies.

### 2.3.2.8    Wetland Crossings

As discussed in Section 3.2.3 below, the only wetlands that would be crossed by the Proposed Action are located within the permanent easement between HDD workspace and the Missouri River on the flowage easements.  As such, no wetlands would be impacted by construction or operation of the facilities within the Project Area/Connected Actions of the federal lands, and no trenching within wetlands would occur within the Project Area on the flowage easements.  A temporary waterline would be laid aboveground, across the wetlands located between the HDD workspace and the north bank of the Missouri River on flowage easement LL3440E (**Figure 6-B**).  No ground disturbing activity would be required for installation of the temporary waterline.   A more detailed discussion regarding wetlands is provided in Section 3.2.3.

### 2.3.2.9    Operation and Maintenance

Following completion of construction, a 50-foot-wide permanent easement that is generally centered on the pipeline (25 feet on either side of the centerline) would be retained along the pipeline route.  The 50-foot-wide easement would be maintained by the Operator in an herbaceous state (cleared of large diameter woody vegetation) to facilitate inspection of the pipeline, operational maintenance, and compliance with the federal pipeline safety regulations.  This 50-foot-wide maintained corridor would be reduced to a 30-foot-wide corridor centered on the proposed pipeline within the wetland area north of the Missouri River in Corps Flowage Easement LL3440E (**Figure 6-B**).

Maintenance of the permanent ROW would entail periodic vegetation clearing measures, in accordance with PHMSA regulation for pipeline inspection.  This may involve selective tree cutting and periodic

USACE_DAPL0071245

Environmental Assessment
Dakota Access Pipeline Project
July 2016

mowing.  The use of herbicides would not occur on Corps Fee Lands without obtaining prior approval from the Corps.  Vegetation maintenance of the ROW in areas of active cropland is not expected to occur due to agricultural practices.

22

USACE_DAPL0071246

Environmental Assessment
Dakota Access Pipeline Project
July 2016

### 3.0   THE AFFECTED ENVIRONMENT AND POTENTIAL ENVIRONMENTAL IMPACTS OF THE PROPOSED ACTION AND NO ACTION ALTERNATIVE

## 3.1   Geology and Soils

Under the "no action" alternative, Dakota Access would not construct the DAPL Project and no impacts on geology and soils would occur.  However, if the objectives of the DAPL Project are to be met under the "no action" alternative, other projects and activities would be required and these projects would result in their own impacts on geology and soils, which would likely be similar to or greater than the DAPL Project. If the Project is not constructed, less reliable shipping methods such as truck or rail could result in an adverse effect on geology and soils due to increases in transportation accidents and future construction of infrastructure necessary to support these methods (i.e. additional loading/offloading facilities, rail spurs, etc.).

## 3.1.1   Geology

### 3.1.1.1   Affected Environment

The Corps flowage easements to be crossed extend approximately 2.83 miles north of the Missouri River in Williams County (**Figure 2**).  Conventional open trench construction methods would be used to install the pipeline on approximately 13,553 feet of the 14,953 feet of flowage easements.  The remaining 1,400 feet would be installed via HDD for the adjacent Missouri River crossing.  The easements and Connected Action lie within the Missouri River valley and floodplain on top of the Quaternary Oahe Formation (Clayton, 1980).  The Oahe Formation is comprised of unconsolidated sediments, including clay, sand, silt, and gravel, with some dispersed organic material.  Geotechnical borings placed on both sides of the river, ranging in depth from 75 to 95 feet below ground surface, confirm the presence of unconsolidated sand, gravel, and clay to at least these depths.  At this location, the Oahe Formation unconformably overlies the Paleocene Bullion Creek Formation, which is made up of silt, sand, clay, sandstone, and lignite, and is the uppermost part of a thick sequence of early Tertiary and late Mesozoic sedimentary formations.  Well borehole data from McKenzie County indicates that this sequence occurs in excess of 15,000 feet thick in certain locations (Freers, 1970).  No soil borings were obtained below the Missouri River crossing because the banks of the Missouri River the length of the crossing is sufficiently short (930 feet) to allow for a comprehensive geotechnical analysis without testing directly beneath the river itself.

The flowage easements crossed by the Proposed Action and area crossed by the Connected Action occur within the Great Plains Physiographic Province, which is characterized by a broad expanse of flat land in the central portion of the U.S.  The easements and the Missouri River Project Area lie within an area where physiography is characterized by low-relief alluvial and floodplain deposits and range in elevation from 1,856 to 1,879 feet above mean sea level (MSL).

The bedrock geology of the Lake Oahe crossing area is characterized by Cretaceous sedimentary formations (Clayton, 1980).  The Fox Hills Formation (sandstone and shale) overlies the Pierre Formation (shale), which has been exposed through erosion along the axis of the Lake Oahe reservoir of the Missouri River.  The surficial geology is characterized by alluvium within the valley and dune deposits moving in an eastward direction.  This was corroborated by geotechnical soil borings that were placed on private lands

USACE_DAPL0071247

Environmental Assessment
Dakota Access Pipeline Project
July 2016

on both sides of Lake Oahe that indicate the presence of sands and clays to depths ranging from at least 150 to 235 feet below ground surface (**Appendix D**).

The Lake Oahe crossing area also lies within the Great Plains Physiographic Province.  On the west side of Lake Oahe, the federal land tracts range in elevation from 1,609 to 1,712 feet above MSL.  The HDD exit point workspace ranges from 1,699 to 1,711 feet MSL, and the stringing area ranges from 1,671 to 1,766 feet MSL.  On the east side of Lake Oahe, the federal lands range in elevation from 1,613 to 1,664 feet MSL, and the HDD entry point workspace ranges from 1,636 to 1,644 feet MSL.

### 3.1.1.2   Impacts and Mitigation

To protect the terrain of the Project Area and Connected Actions, Dakota Access would, to the extent feasible, restore the areas affected by pipeline construction to pre-construction contours and similar vegetation (excepting trees within approximately 15 feet of the centerline).  Pre-construction and as-built surveys would be completed and provided to the Garrison Project.

Construction of the pipeline on the flowage easements and Connected Action at the Missouri River crossing would result in minor impacts on topography and geology, and no unique geologic features that have received state or federal protection would be impacted within the Corps flowage easements or Connected Action.

The impacts attributable to the HDD would not be significant.  Vibrations produced during the HDD process are not of a magnitude that would cause any impacts to geologic features or other resources.  Any vibrations associated with the drilling process would be limited to the immediate vicinity of the drilling equipment on the surface and downhole.  The vibrations produced from the downhole tooling are of a very low magnitude and are attenuated very quickly by the formation such that vibrations are not felt at the surface.  A vibration monitoring analysis conducted by GeoEngineers in 2009 found that peak particle velocities were less than 0.07 inches/second within approximately 50 feet of HDD operations.  These velocities are well below that which would cause any structural impacts and moreover, the recorded vibrations were, in fact, imperceptible to human senses (GeoEngineers, 2009).  Primary impacts of open trench installation within the Corps flowage easements or Connected Action would be limited to construction activities and consist of temporary alteration due to grading and trenching operations.

Construction of the pipeline at the Lake Oahe crossing would not result in adverse impacts on topography or geology on federal lands of the Project Area.  Similarly, construction impacts on topography and geology from the Connected Actions would be low to non-existent.  No unique geologic features would be impacted by any aspect of the HDD installation.

No impacts on topography or geology would occur during operations.

Based on recently obtained geotechnical analysis, no blasting would be expected to occur in association with pipeline installation on the Project Area or Connected Actions, given that the HDD would be conducted in unconsolidated or loosely indurated sediments, as described in Section 3.1.1.1.  Although not anticipated, if blasting is found to be necessary, Dakota Access would follow procedures specified in its Blasting Plan (**Appendix E**).

USACE_DAPL0071248

Environmental Assessment
Dakota Access Pipeline Project
July 2016

### 3.1.2    Mineral Resources

#### 3.1.2.1    Affected Environment

Williams and McKenzie counties have numerous mineral resources that include petroleum, lignite, halite, sand and gravel, and scoria.  Scoria, sediments baked from the in situ combustion of lignite (Carlson, 1985), is commonly used to surface roads.  Although lignite occurs throughout Williams and McKenzie Counties, there are no lignite beds in the vicinity of the Corps flowage easement crossings (Murphy, 2006; 2007).  A review of aerial photographic and USGS 1:24K topographic coverage indicates that there are no sand, gravel, or scoria pits within 1.5 miles of the Corps flowage easement crossing areas.

Two oil/gas wells are located within the Corps flowage easements (LL3440E), but neither occur within 150 feet of the proposed HDD workspace.  In addition, no oil/gas wells are located within 150 feet of the Connected Action at the Missouri River (North Dakota Department of Mineral Resources, 2015).  Impacts within 150 feet of the Project was used following the Federal Energy Regulatory Commission (FERC) guidelines for the evaluation of construction impacts to well integrity.  Although the Project is not under the jurisdiction of the FERC, FERC guidance was deemed to be an appropriate distance for this evaluation.

The primary mineral resources of Morton and Emmons counties are sand and gravel aggregates.  The older Cretaceous sediments in the vicinity of the Lake Oahe crossing (i.e., scoria) do not contain economical deposits of fossil fuels.  Although lignite occurs in Morton County, no lignite beds were identified in the vicinity of the Lake Oahe crossing.  A review of aerial photographic and USGS 1:24K topographic coverage indicates that there are no sand, gravel, or scoria pits within 1.5 miles of the Lake Oahe crossing.

Since Morton and Emmons Counties are located outside the areal extent of the Bakken Formation, there is little to no development of oil/gas resources.  This is reflected in the fact that no oil/gas wells were located within 150 feet of the federal lands or HDD workspace and stringing area.  However, the proposed pipeline would be co-located with an existing buried natural gas pipeline and an overhead electric transmission line across the lake.

#### 3.1.2.2    Impacts and Mitigation

As noted previously, mineral resources, including lignite, halite, sand and gravel, and scoria occur within the region around the Corps flowage easements and Connected Action; however, the only commercially exploited mineral resources in the direct vicinity of the route are oil and gas, as evidenced by the two wells found within the Corps flowage easements.  These wells would not be impacted by the Proposed Action due to proposed conventional construction methods and distance from the wells.  No impacts on any mineral resources are expected as a result of the proposed flowage easement crossings or Connected Action.

The Proposed Action does not cross active mining areas nor any oil or gas wells and facilities in the vicinity of Lake Oahe.  No impacts to any mineral resources are expected as a result of the proposed Lake Oahe crossing.

25

USACE_DAPL0071249

Environmental Assessment
Dakota Access Pipeline Project
July 2016

Dakota Access, in accordance with North Dakota One Call, would require that the construction contractor, prior to initiating any ground disturbance activities, identify all underground utilities to minimize the potential for encountering buried utility structures. Accordingly, the Proposed Action is not expected to have any impact on mineral resources, because there would be no additional surface disturbance required beyond that used for construction.

### 3.1.3    Geologic Hazards

#### 3.1.3.1    Affected Environment

**Earthquakes and Seismic Hazards**

The Project Area, traverses terrain that overall is geologically stable. The potential seismic hazard was assessed by evaluating the USGS 2014 Seismic Hazard Map. According to the Seismic Hazard Map, an earthquake that has a 2% chance of being exceeded in a 50-year period would result in peak ground accelerations (PGAs) of 2 to 4 percent gravity (g) in the Project Area and Connected Actions (USGS, 2014a).

Ground movement from an earthquake of this magnitude may cause a light perceived shaking but is not expected to cause any structural damage. The low seismic hazard of the Project Area is further corroborated by the relatively low number of earthquakes that have historically occurred in North Dakota (North Dakota GIS Hub Data Portal, 2010).

**Landslides**

Landslides refer to the gravity-induced downward and outward movement of slope-forming materials and pose the greatest risk to facilities on or near steep slopes or on soil materials that are susceptible to failure particularly in response to earthquakes or heavy precipitation. A map developed by the USGS that illustrates the regional potential for the occurrence of landslides was used to evaluate the Project Area for landslide incidence and susceptibility (Radbruch et al., 1982).

Portions of the Project Area within the Corps flowage easements are moderately susceptible to landslides. This includes 59.2 acres (100%) of construction workspace, of which 17.0 acres lies within the 50-foot-wide permanent easement, and 0.55 acre occurs within the 30-foot-wide maintained corridor above the HDD profile within the Corps flowage easement (which would not have surface disturbance aside from selective tree cutting and roots would remain in place). The HDD entry point on the south side of the Missouri River outside of the flowage easements is considered the Connected Action. The HDD entry workspace is approximately 2.0 acres and is also moderately susceptible to landslides.

As designed, the Proposed Action does not require any surface impacts to the federally owned lands at Lake Oahe, although , 0.4 acre of the permanent easement through the federal property on the west side of the Lake Oahe (Morton County) is classified as having a high incidence of landslides. Slopes greater than 25% in the Project Area within federal lands are not found on the east side of Lake Oahe (Emmons County) and comprise less than 0.02 acre on the west side. Activities related to the HDD crossing outside of the federal lands at the Lake Oahe crossing are considered Connected Actions. On the west side of Lake Oahe, 1.2 acres of the HDD workspace (exit point) and 13.1 acres of the pipe stringing area are designated as having a high incidence for landslides. Additionally, the stringing area encompasses

26

USACE_DAPL0071250

Environmental Assessment
Dakota Access Pipeline Project
July 2016

approximately 1.8 acres of land that is classified as highly susceptible to landslides. Approximately 0.9 acre within the stringing area has slopes exceeding 25%. Approximately 1.2 acres of the HDD entry point workspace on the east side of Lake Oahe is designated as having a high incidence of landslides, but there are no slopes within either the east or west HDD workspace that exceed 25%.

**Karst and Subsidence**

Geologic terrane beneath the flowage easements as well as the Connected Actions has potential for karst development owing to the presence of evaporite deposits, consisting of gypsum, salt, anhydrite, and/or potash (Weary and Doctor, 2014). These deposits range in age from Devonian to Jurassic and occur at depths ranging from 900 to 3,700 meters (3,000 to 12,000 feet). Fresh water must be present for the necessary dissolution to occur for karst development. However, since fresh water is not likely to be found at these depths, dissolution and karst development are not likely to occur (Ackerman, 1980). Even if karst conditions were to develop, any physiographic expression at the ground surface would be negligible given the great depth of these formations.

Geologic terrane beneath the federal lands crossings as well as the HDD workspaces at Lake Oahe area may have potential for karst development due to deposits of gypsum and other evaporates (Weary and Doctor, 2014). However, a review of topographic and aerial photographic coverages as well as geotechnical testing gave no indication of karst feature development, and no documentation was found to indicate that karst features have actually developed in this area. Furthermore, an existing buried pipeline and overhead electric transmission line also cross in this location, and no information was found indicating those utilities have been impacted by karst.

Land subsidence may be caused by mining, underlying karst features, and extraction of fluids, such as oil or groundwater. No surface subsidence effects are expected to be incurred in the Project Area since no mines, oil/gas wells, water wells, or karst development have been identified in the Project Area. Moreover, despite the fact that oil and gas production has occurred for decades in the Williston Basin, no surface subsidence effects have been documented in that area and, therefore, are not expected to impact the Project Areas within or near the margin of the Williston Basin.

### 3.1.3.2   Impacts and Mitigation

Although landslides can represent a significant geologic hazard during construction and operation of the pipeline, the pipeline would be installed via the HDD to significantly reduce ground disturbing activities in areas with steep slopes (greater than 25%), effectively mitigating the risk.

As previously discussed, no ground disturbing activities would occur within the Project Area on the federal lands. Ground disturbing activities associated with the HDD workspace and pipe stringing area would be required as part of the Connected Action; however, these activities would consist of clearing and grading only and would occur, at the closest distance, 1,040 feet from the bank of Lake Oahe. As such, no trenching or excavation activities would occur within the Project Area or Connected Action of the federal lands, thereby reducing the potential for erosion and off-site sedimentation which could otherwise occur as a result of side-slope trench excavation methods and accumulation of water within the trench.

27

Environmental Assessment
Dakota Access Pipeline Project
July 2016

To further mitigate impacts during construction, Dakota Access would utilize erosion and sediment control devices in accordance with the ECP and SWPPP, and in compliance with the National Pollutant Discharge Elimination System (NPDES) program, during construction in these areas with slopes greater than 25%. Dakota Access would install sediment barriers (e.g., silt fence) at the base of slopes and along the sides of slopes, as necessary, to prevent potential siltation downslope of the construction area from entering waterbodies.

Temporary ECDs would be maintained until the areas disturbed by construction have been successfully revegetated or are replaced with permanent ECDs. Following the completion of construction activities, disturbed areas would be restored and graded to pre-construction contours as closely as practical. In order to minimize the potential for future slip or landslide events during operation of the Proposed Action, Dakota Access may install permanent ECDs in addition to performing regular restoration and revegetation activities. Permanent ECDs would be installed in accordance with revegetation measures outlined in the ECP, SWPPP, and specific landowner requests. The effectiveness of revegetation and permanent ECDs would be monitored by Dakota Access' operating personnel during the long-term operation and maintenance of the Proposed Action facilities. Therefore, construction and operation of the Proposed Action facilities on the Project Area and Connected Action of the federal lands would not be expected to increase the potential for significant landslide or slip events or result in adverse impacts on aquatic life resources within Lake Oahe.

Dakota Access has completed a geotechnical analysis of the flowage easement and federal land crossing sites to facilitate engineering and design, including selection of appropriate materials and construction methods to limit any environmental impacts attributable to landslides. Results of the geotechnical analysis are included in **Appendix D**.

The strength and ductility of a properly designed pipeline would allow it to span a considerable distance without compromising its integrity in the event of a landslide or other ground movement, such as subsidence. Arc-welded steel pipelines are the most resistant type of piping, vulnerable only to very large and abrupt ground displacement (e.g., earthquakes, severe landslides) and are generally highly resistant to moderate amounts of permanent deformation. This strength and ductility effectively mitigates the effects of fault movement, landslides, and subsidence. Therefore, by implementing the mitigation measures presented here, impacts on the pipeline from geologic hazards are expected to be minimal.

No impacts associated with seismic activity within the Project Area are anticipated. Due to the limited potential for large, seismically induced ground movements, there is minimal risk of earthquake-related impacts on the pipeline. Therefore, no mitigation beyond designing the proposed pipeline to currently accepted industry specifications is necessary.

### 3.1.4   Paleontology

#### 3.1.4.1   Affected Environment

The surficial geology at the Missouri River crossing is dominated by Quaternary glacial drift materials within the floodplain overlying the Bullion Creek and Sentinel Butte Formations. These bedrock formations have been known to contain wide variety of fossils, including fossilized wood and tree stumps,

USACE_DAPL0071252

Environmental Assessment
Dakota Access Pipeline Project
July 2016

mollusks, leaves, and insects (Hoganson and Campbell, 2002).  Additionally, vertebrate fossils have been found, including turtles, crocodile-like champosaurs, and bear-like titanoides.

The surficial geology at the Lake Oahe crossing is also characterized by Quaternary glacial drift materials; however, it is underlain by the Fox Hills and Pierre Formations.  These formations could contain diverse fossils, including marine reptiles (e.g., mosasaurs, plesiosaurs, sea turtles), fish (e.g., sharks and rays), birds, and invertebrates (Hoganson, 2006).

While there is potential for the bedrock formations underlying the Missouri River and Lake Oahe crossings to contain fossils, all activities, including HDDs, would only penetrate the surficial geology that is dominated by unconsolidated sediments, as evidenced in the geotechnical report provided in **Appendix D**. The potential for encountering fossils in these unconsolidated sediments at the Missouri River and Lake Oahe crossings is low, as fossils are primarily found in sedimentary rock.

### 3.1.4.2    Impacts and Mitigation

Activities associated with pipeline construction that have the potential to impact paleontological resources are clearing, grading, and trenching, as well as site preparation for HDD operations.  The paleontological resources of concern pertaining to construction of the Proposed Action are vertebrate fossils that may be present in the Paleocene bedrock sediments, and to a lesser degree, in Quaternary alluvium since this type of deposit only rarely contains vertebrate fossils.

In the event paleontological resources are discovered during construction, Dakota Access would implement measures outlined in its Unanticipated Discoveries Plan Cultural Resources, Human Remains, Paleontological Resources and Contaminated Media (UDP) (**Appendix F**) to avoid further impacts on these resources.

Invertebrate fossils are considered to be insignificant, and mitigation measures would not be required, should they be encountered.  However, if vertebrate fossils are found during pipeline construction, Dakota Access would immediately cease construction activities and notify appropriate agency personnel, including the North Dakota state paleontologist as well as the Corps archaeologist.  The appropriate authorities would determine the significance of the find and prescribe the mitigation procedures to be completed prior to resuming pipeline construction.

Operation of the pipeline would not disturb paleontological resources.

### 3.1.5    Soils

#### 3.1.5.1    Affected Environment

Dakota Access identified and assessed soil characteristics in the Project Area and Connected Actions using the Soil Survey Geographic Database, which is a digital version of the original county soil surveys developed by the Natural Resources Conservation Service  (NRCS) for use with GIS (NRCS, 2015).  The areas are located within the Rolling Soft Shale Plain of North Dakota, South Dakota, and Montana.  The dominant soil orders in the Rolling Soft Shale Plain are Mollisols and Entisols, which are shallow to very deep, generally somewhat excessively drained and loamy or clayey (NRCS, 2006).

USACE_DAPL0071253

Environmental Assessment
Dakota Access Pipeline Project
July 2016

The flowage easements and Connected Action are within Zone A of the Missouri River floodplain.  Soils within the Project Area are formed out of alluvium deposited by the river over time.  Slopes throughout this Project Area are very flat, ranging from 0-2%.  Approximately 94% of the flowage easement Project Area and Connected Action would be located within either Scorio silty clay or Lohler silty clay (**Table 3-1, Figure 4**).  The Scorio and Lohler silty clay soils are moderately well drained and formed in clayey alluvium.  In the case of the Scorio silty clay, the clay alluvium is deposited over a loam alluvium.  The Scorio and Lohler soils are identified as Hydrologic Soil Group C, which have slow infiltration rates when thoroughly wet and a slow rate of water transmission.  The average depth to the water table across the majority of this Project Area is 4.25 feet.  The soils within the flowage easements experience occasional flooding but are not generally ponded.  Soil boring data is provided in (**Appendix D**).

| Table 3-1 Soil Types Mapped on the Flowage Easements Project Area and Connected Action | | | | | | |
|---|---|---|---|---|---|---|
| Soil Map Unit | Soil Map Unit Name | Project Area (acres) [1] | Farmland Rating | Hydrologic Group [2] (infiltration) | Hydric Rating [3] | Wind Erodibility Group [4] |
| E4039A | Mckeen loam, 0-1% slopes, frequently flooded | 0.1 | None | B/D | 96% | 4L |
| E4051A | Trembles fine sandy loam, slightly wet, 0-1% slopes, occasionally flooded | 0.5 | Farmland of Statewide Importance | A | 0% | 3 |
| E4103A | Lohler silty clay, saline, 0-1% slopes, occasionally flooded | 0.9 | None | C | 0% | 4 |
| E4106A | Lohler silty clay, slightly wet, 0-2% slopes, occasionally flooded | 27.8 | Farmland of Statewide Importance | C | 5% | 4 |
| E4159A | Scorio silty clay, slightly wet, 0-2% slopes, occasionally flooded | 29.9 | Farmland of Statewide Importance | C | 0% | 4 |
| E2725F | Arikara-Shambo-Cabba loams, 9-70% slopes | 2.0 | None | B | 0% | 6 |
| EW | Water | 0.3 | None | N/A | N/A | N/A |
| | Total | 61.5 | -- | | | |

[1]  The Project Area includes the construction workspace (58.0 acres) and 30-foot maintenance easement (1.0 acre) located on the flowage easements as well as the Connected Action workspace (2.0 acres).

[2]  Hydrologic Soil Groups are used to estimate runoff from precipitation: A = high infiltration rate, low runoff potential; B = moderate infiltration rate; C = slow infiltration rate; D = very slow infiltration rate, high runoff potential.

[3]  Hydric Rating: Hydric (100%), Hydric (66-99%), Hydric (33-65%), Hydric (1-32%), Not Hydric (0%).

[4]  Wind erodibility group in cultivated areas: Group 1 are the most susceptible to wind erosion, and those assigned to group 8 are the least susceptible. 4L indicates calcareous soils.

USACE_DAPL0071254

Environmental Assessment
Dakota Access Pipeline Project
July 2016

The predominant soil type at the federal lands at Lake Oahe is the Flasher-Vebar-Parshall complex.  This complex would comprise 7.5 acres (34%) of the Project Area and Connected Action (**Table 3-2, Figure 5**). The Flasher-Vebar-Parshall complex contains 36% Flasher or similar soils, 22% Vebar or similar soils, 15% Parshall or similar soils, and 27% minor components.  The Flasher-Vebar-Parshall complex is formed from sandy residuum weathered from sandstone and is steep within the Project Area and Connected Action, with slopes ranging from 9 to 35% (NRCS, 2015).  The Flasher-Vebar-Parshall complex is Hydrologic Soil Group D, which has very slow infiltration (high runoff potential) when thoroughly wet.  The depth to the water table is greater than 6.5 feet.  A majority of the soils within the Project Area and Connected Action are neither frequently flooded nor frequently ponded.

| Table 3-2 | | | | | | |
|---|---|---|---|---|---|---|
| **Soil Types Mapped on the Federal Lands Project Area and Connected Action** | | | | | | |
| **Soil Map Unit** | **Soil Map Unit Name** | **Project Area (acres)** [1] | **Farmland Rating** | **Hydrologic Group** [2] **(infiltration)** | **Hydric Rating** [3] | **Wind Erodibility Group** [4] |
| E0623B | Grail-Belfield clay loams, 2-6% slopes | 2.9 | Farmland of Statewide Importance | C | 0% | 6 |
| E0701F | Dogtooth-Janesburg-Cabba complex, 6-35% slopes | 0.8 | None | D | 3% | 6 |
| E1423F | Flasher-Vebar-Parshall complex, 9-35% slopes | 5.8 | None | D | 0% | 2 |
| E1823A | Parshall fine sandy loam, 0-2% slopes | 0.7 | Farmland of Statewide Importance | A | 0% | 3 |
| E2601C | Amor-Cabba loams, 6-9% slopes | 0.3 | None | C | 0% | 6 |
| E2803B | Amor-Shambo loams, 3-6% slopes | 2.0 | Farmland of Statewide Importance | C | 0% | 6 |
| E3802B | Linton-Mandan silt loams, 2-6% slopes | 2.6 | Farmland of Statewide Importance | B | 0% | 5 |
| E3813A | Grassna silt loam, loess, 1-2% slopes | 1.7 | Prime Farmland | B | 2% | 6 |
| E3813B | Grassna silt loam, loess, 2-6% slopes | 0.5 | Prime Farmland | B | 2% | 6 |
| E4139A | Korchea-Fluvaquents complex, channeled, 0-2% slopes, frequently flooded | 0.4 | None | B | 43% | 4L |
| EW /E49999 | Water | 6.4 | None | N/A | N/A | N/A |
| **Total** | | **24.1** | -- | | | |

USACE_DAPL0071255

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 3-2 | | | | | | |
|---|---|---|---|---|---|---|
| Soil Types Mapped on the Federal Lands Project Area and Connected Action | | | | | | |
| Soil Map Unit | Soil Map Unit Name | Project Area (acres) [1] | Farmland Rating | Hydrologic Group [2] (infiltration) | Hydric Rating [3] | Wind Erodibility Group [4] |

[1]  The Project Area includes Connected Action areas.
[2]  Hydrologic Soil Groups are used to estimate runoff from precipitation: A = high infiltration rate, low runoff
    potential; B = moderate infiltration rate; C = slow infiltration rate; D = very slow infiltration rate, high runoff
    potential.
[3]  Hydric Rating: Hydric (100%), Hydric (66-99%), Hydric (33-65%), Hydric (1-32%), Not Hydric (0%).
[4]  Wind erodibility group in cultivated areas: Group 1 are the most susceptible to wind erosion, and those
    assigned to group 8 are the least susceptible. 4L indicates calcareous soils.

**Prime Farmland**

Prime farmland has the best combination of physical and chemical characteristics for producing food, feed, forage, fiber, and oilseed crops and is available for these uses.  Other soils that do not meet the criteria for prime farmland may be considered farmland of statewide importance.  These soils may produce high yields of crops when managed appropriately (NRCS, 2013).  Climate is the primary limiting factor preventing farmland of statewide importance in North Dakota from being considered prime farmland; therefore, specific management techniques or other soil amendments cannot elevate farmland of statewide importance to a prime farmland designation (Sieler, 2015).

Within the flowage easements and Connected Action, 95% of soils are considered farmland of statewide importance, and none of the soils are considered prime farmland.  Approximately 9.5% of the soils on the federal lands, consisting only of Grassna silt loams, are considered prime farmland.  Additionally, Linton-Mandan silt loam and Armo-Sambo loam, which comprise 25% of the soils on federal lands, are designated as farmland of statewide importance.  The remaining soils do not have a farmland designation.

### 3.1.5.2    Impacts and Mitigation

Pipeline construction activities such as clearing, grading, trench excavation, and backfilling, as well as the movement of construction equipment along the ROW may result in temporary impacts on soil resources.  Clearing removes protective cover and exposes soil to the effects of wind and precipitation, which may increase the potential for soil erosion and movement of sediments into sensitive environmental areas.  Grading and equipment traffic may compact soil, reducing porosity and percolation rates, which could result in increased runoff potential and decreased soil productivity.  Trench excavation and backfilling could lead to a mixing of topsoil and subsoil and may introduce rocks to the soil surface from deeper soil horizons.

Dakota Access would minimize or avoid these impacts on soils by implementing the mitigation measures described in the DAPL Project's SPCC, SWPPP, and ECP as well as requirements of applicable state and federal permits.  These documents would be included as contract documents and enforced as such throughout the DAPL Project.  As a result, impacts on soils as a result of the Proposed Action are expected to be insignificant.

USACE_DAPL0071256

Environmental Assessment
Dakota Access Pipeline Project
July 2016

Temporary erosion and sedimentation control measures may include installation of silt fence, straw bales, slope breakers, trench breakers, erosion control fabric, and mulch.

To minimize potential impacts on soil productivity, topsoil would be separated during trench excavation in agricultural land, and if applicable, other areas where soil productivity is an important consideration. Unless otherwise requested by the landowner, topsoil in cropland would be removed to a maximum depth of 12 inches from the trench and spoil storage area and stored separately from the trench spoil. After the trench is backfilled, topsoil would be returned to its approximate original location in the soil horizon.

Compaction of agricultural soils would be minimized by restricting construction activities during periods of prolonged rainfall. Where unacceptable levels of compaction occur in agricultural lands, a chisel plow or other deep tillage equipment would be utilized to loosen the soil.

Dakota Access would retain environmental inspectors (EIs) to monitor the contractor's compliance with applicable requirements to protect soil resources during construction of the DAPL Project. The Garrison Project would be notified if the EIs document non-compliant activities by the contractor(s) on the Project Area or Connected Action Areas.

Soils would be temporarily disturbed within HDD workspaces during construction at the Missouri River and Lake Oahe crossings. Primary impacts attributable through open trench installation within the Corps flowage easements and Connected Action would be limited to construction activities and consist of temporary alteration of the construction ROW due to grading and trenching operations. **Tables 3-3** and **3-4** present the soil types that would be impacted by construction and maintenance activities. By implementing BMPs and recognized construction methods identified in the ECP (**Appendix G**), impacts to soils should be limited.

Additionally, temporary workspace used for staging HDD operations would impact soils, particularly in association with the HDD entry excavation pit (approximately 5 feet to 15 feet across). The pits would contain the drilling fluid that would be circulated through the borehole during drilling operations and the cuttings that are removed from the borehole. All drilling mud and cuttings would be disposed at an approved location on non-federal lands, which may include land farming on private property or disposal at a licensed disposal facility. Drilling fluid pits at the HDD entry and exit workspaces would be backfilled and the area returned as closely as practical to pre-construction conditions. Dakota Access would implement the erosion control measures described in the SWPPP (**Appendix A**). The HDD workspace sites would be cleared, graded and matted as needed to avoid rutting and minimize compaction.

There would be no soil disturbance outside of the construction workspace. Permanent impacts on soils would be avoided through the implementation of BMPs during construction, restoration, and post-construction revegetation management. A more complete description of BMPs and recognized construction methods can be found in the ECP (**Appendix G**).

There would be no conversion of prime farmland soils to non-agricultural use.

USACE_DAPL0071257

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 3-3 Soil Impacts on the Flowage Easements Project Area and Connected Action | | Project Area Temporary Impacts (acres) | Connected Action Temporary Impacts (acres) | Permanent Impacts (acres) |
|---|---|---|---|---|
| **Soil Map Unit** | **Map Unit Name** | | | |
| E4039A | McKeen loam, 0-1% slopes, frequently flooded | 0.1 | 0 | 0 |
| E4051A | Trembles fine sandy loam, slightly wet, 0-1% slopes, occasionally flooded | 0.5 | 0 | 0 |
| E4103A | Lohler silty clay, saline, 0-1% slopes, occasionally flooded | 0.9 | 0 | 0 |
| E4106A | Lohler silty clay, slightly wet, 0-2% slopes, occasionally flooded | 27.8 | 0 | 0 |
| E4159A | Scorio silty clay, slightly wet, 0-2% slopes, occasionally flooded | 29.9 | 0 | 0 |
| E2725F | Arikara-Shambo-Cabba loams, 9-70% slopes | 0 | 2.0 | 0 |
| | **Total** | **59.3** | **2.0** | **0** |

| Table 3-4 Soil Impacts on the Federal Lands Project Area and Connected Action | | Project Area Temporary Impacts (acres) | Connected Action Temporary Impacts (acres) | Total Impact Acres[1] |
|---|---|---|---|---|
| **Soil Map Unit** | **Map Unit Name** | | | |
| E0623B | Grail-Belfield clay loams, 2-6% slopes | 0 | 2.9 | 2.9 |
| E0701F | Dogtooth-Janesburg-Cabba complex, 6-35% slopes | 0 | 0.8 | 0.8 |
| E1423F | Flasher-Vebar-Parshall complex, 9-35% slopes | 0.4 | 5.4 | 5.8 |
| E1823A | Parshall fine sandy loam, 0-2% slopes | 0 | 0.7 | 0.7 |
| E2601C | Amor-Cabba loams, 6-9% slopes | 0 | 0.3 | 0.3 |
| E2803B | Amor-Shambo loams, 3-6% slopes | 0 | 2.0 | 2.0 |
| E3802B | Linton-Mandan silt loams, 2-6% slopes | 0 | 2.6 | 2.6 |
| E3813A | Grassna silt loam, loess, 1-2% slopes | 0.7 | 1.0 | 1.7 |
| E3813B | Grassna silt loam, loess, 2-6% slopes | 0 | 0.5 | 0.5 |
| E4139A | Korchea-Fluvaquents complex, channeled,0-2% slopes, frequently flooded | 0 | 0.4 | 0.4 |
| EW | Water | 0.1 | 0 | 0.1 |
| | **Total** | **1.2** | **16.6** | **17.8** |

[1]  All soil impacts on Federal Lands and Connected Action at Lake Oahe are considered to be temporary.

34

USACE_DAPL0071258

Environmental Assessment
Dakota Access Pipeline Project
July 2016

## 3.2      Water Resources

Under the "no action" alternative, Dakota Access would not construct the DAPL Project, and no impacts on water resources would occur.  However, if the objectives of the DAPL Project are to be met under the "no action" alternative, other projects and activities would be required and these projects would result in their own impacts on water resources, which would likely be similar to or greater than the DAPL Project. Less reliable shipping methods such as truck or rail could result in an adverse effect on water resources due to increases in transportation accidents and future construction of infrastructure necessary to support these methods (i.e. additional loading/offloading facilities, rail spurs, etc.).

### 3.2.1   Surface Waters

#### 3.2.1.1    Affected Environment

The Missouri River is a large perennial river and forms the border between Williams and McKenzie counties.  The flowage easements are located on the north side of Lake Sakakawea in the Lake Sakakawea sub-basin (HUC 11010101) within the Upper Missouri River Basin.  All drainage patterns from the flowage easements flow east and south towards and into the Missouri River/Lake Sakakawea ending at the Garrison Dam.  Once released from the dam, water flows south into the Missouri River (NRCS, 2008).

Lake Oahe is a large reservoir formed behind the Oahe Dam on the Missouri River.  Lake Oahe forms the border between Morton and Emmons counties.  The northern boundary of the Standing Rock Sioux Reservation is located in Sioux County, North Dakota approximately 0.55 mile south of the DAPL Project Area.  The Project Area is located in the Upper Lake Oahe Watershed (HUC 10130102) within the Missouri River Basin and adjoins both sides of Lake Oahe at the crossing.

The Oahe Dam/Lake Oahe project is part of the chain of Missouri River main stem lakes authorized in the Flood Control Act of 1944.  The Oahe Dam is located 6 miles north of Pierre, South Dakota and was placed into operation in 1962.  The dam and associated reservoir (Lake Oahe) are congressionally authorized to provide flood control, hydroelectric power, navigation, irrigation, fish and wildlife enhancement, municipal water supply, water quality, and recreational opportunities to the residents of both South Dakota and North Dakota.  At maximum normal operating pool level (1,617 feet MSL), Lake Oahe extends roughly 231 miles from the Oahe Dam in South Dakota to near Bismarck, North Dakota.  At this level, the lake covers approximately 360,000 acres.  At elevation 1,607.5 feet MSL base flood control elevation, the lake has over 2,250 miles of shoreline.

Lake Oahe can be divided into three segments based on the character of the lake.  The Project Area is located within the northern segment.  The northern segment extends north from the North Dakota/South Dakota state line to the upstream Oahe Dam/Lake Oahe project boundary near Bismarck, North Dakota. This segment is more river-like in appearance and is characterized by both submerged and emergent snags, sandbars, many shallow areas, and a definite current (USACE, 2010a).

Dakota Access conducted field and desktop delineations of the Project Area/Connected Action on the flowage easements and the Project Area/Connected Action of the federal lands.  Field surveys took place upon permission to access the properties in order to verify desktop delineations and ensure that the most accurate, up-to-date data is used for Section 404 of the CWA and/or Section 10 of the RHA permit filings.

USACE_DAPL0071259

Environmental Assessment
Dakota Access Pipeline Project
July 2016

There are four waterbodies (one perennial stream and three ephemeral ditches) within the Project Area on the flowage easements and one intermittent waterbody within the Connected Action **(Figure 6)**.  The Project Area and Connected Action of the federal lands encompass two waterbodies (one lake [Lake Oahe] and one ephemeral stream) **(Figure 7)**.  Waterbody ID, type, surface water classification, and approximate milepost (MP) are summarized in **Table 3-5** and **Table 3-6**.

### 3.2.1.2    Impacts and Mitigation

Direct and indirect impacts on Lake Oahe and the Missouri River would be minimized by using HDD construction methods to install the proposed pipeline underneath the Missouri River and Lake Oahe.  At the Missouri River crossing, a 24-inch pipeline would be installed at least 36 feet below the bottom of the Missouri River.  At Lake Oahe, a 30-inch pipeline would be installed approximately 140 to 210 feet below the ground surface of federal lands and approximately 92 feet below the bottom of Lake Oahe (**Appendix H**).  Additional documentation elaborating on the rationale used to determine suitable HDD depth is provided in Appendix D.  Appendix M includes the Sovereign Lands Permits issued by the North Dakota Office of the State Engineer.

The primary impact that could occur as a result of an HDD is an inadvertent release of drilling fluid directly or indirectly into the waterbody.  Drilling fluid (also referred to as drilling mud) is primarily comprised of water.  However, bentonite clay is added to the water to enhance lubricating, spoil transport and caking properties of the drilling fluid.  Bentonite is a naturally occurring, non-toxic, inert substance that meets National Science Foundation (NSF)/American National Standards Institute (ANSI) Standard 60 Drinking Water Additives Standards and is frequently used for drilling potable water wells.  The potential exists for drilling fluid to leak through previously unidentified fractures in the material underlying the river bed.  Potential release sources of the drilling fluid include the drilling fluid entry/exit pit(s) and the directional borehole itself, which is maintained under pressure to keep it open.  The probability of an inadvertent release is greatest when the drill bit is working near the surface (i.e., near the entry and exit points).  To alleviate this concern, the HDD Contractor plans to install steel surface casing at both the entry and exit locations of the Lake Oahe crossing.  Because the HDD entry and exit points would be set back from the banks of the Missouri River (approximately 1,400 feet north and 300 feet south) and Lake Oahe (approximately 900 feet east and 1,100 feet west) the potential for an inadvertent release to occur in the water would be minimized.  Additionally, geotechnical investigations conducted by Dakota Access indicated that the drill path is not located in materials where there is a high probability of an inadvertent release of drilling fluids that would reach ground surface or enter Lake Oahe.  Therefore, the potential for inadvertently released drilling fluids to enter any waterbody from below or from the shoreline is low.  No downstream impacts to Sovereign Nations from inadvertent release of drilling fluid are anticipated.

The drilling mud and cuttings would be disposed of in accordance with applicable laws and regulations, likely in an existing landfill or by land farming.  Final disposition would be negotiated with the facility or private landowner prior to disposal.  Dakota Access would conduct all HDD work according to the HDD Construction Plan (**Appendix B**), and would implement the HDD Contingency Plan (**Appendix B**) in the event of an inadvertent release.  The HDD Construction Plan establishes a 24-hour a day monitoring program for monitoring and detection of inadvertent releases, including monitoring for loss of drilling fluids.  The HDD Contingency Plan describes monitoring and mitigation procedures for any inadvertent release of drilling mud into the waterbody or areas adjacent to the waterbody and includes procedures to contain and clean up inadvertent releases.

USACE_DAPL0071260

Environmental Assessment
Dakota Access Pipeline Project
July 2016

Dakota Access plans to hydrostatically test the HDD pipeline segments prior to installation at the Lake Oahe and Missouri River crossings.  Hydrostatic testing involves filling the new pipeline segments with water acquired in accordance with applicable permits, raising the internal pressure level, and holding that pressure for a specific period of time per U.S. DOT requirements.

Dakota Access is requesting permission to withdraw water from the Missouri River that would be required for installation of the HDD and hydrostatic testing of the pipeline at the Missouri River crossing.  Approximately 470,000 gallons of water would be required for activities associated with the installation of HDD and the hydrostatic testing of HDD pipeline segment.  Dakota Access intends to submit an application to the North Dakota State Water Commission, Water Appropriations Department for a Temporary Water Permit.  The exact number and size of the withdrawal pumps would be determined as a result of the limits imposed by the Temporary Water Permit.  The withdrawal activity would comply with all applicable permit conditions and regulations, including the specifications on permitted intake structures outlined in the Corps' Regional Conditions for North Dakota applicable to NWP 12 (Utility Line Activities) (Corps, 2012).  This regional condition requires that the applicant 1) utilize an intake screen with a maximum mesh opening of ¼-inch; 2) wire, Johnson-like screens must have a maximum distance between wires of 1/8-inch; 3) water velocity at the intake screen shall not exceed ½-foot per second; 4) intake structure shall be floating; and 5) at the beginning of pumping, the intake shall be placed over water with a minimum depth of 20 feet.

The Acquisition point would coincide with the proposed pipeline crossing of the Missouri River.  An 8"x 8" Power Associates 2500 Single Stage Pump would be set on a barge or float anchored just offshore at the proposed permanent easement.  The barge/float would be approximately 12 feet wide by 14 feet long and fitted with a secondary containment structure (an Eagle 4Drum Flexible Containment SpillNest-T8103 or similar).  The pump, capable of withdrawing 2,400 gallons per minute withdrawal and 120 feet of head pressure, would be placed within the secondary containment on the barge/float.

The pump's flexible intake hose would be 8 inches in diameter and connect the screened intake to the pump.  The screened intake (approximately the size of a 55 gallon drum) would be suspended by floats (approximately the size of a tire) within the water column and would be screened to prevent impingement entrainment of foreign objects and aquatic life.  A hard 8-inch diameter take-way pipe extending from the pump would push the water to the top of bank then to the HDD equipment or pipeline section.  This temporary waterline would be laid by hand on top of the ground surface within the permanent ROW, and thus would not require any ground disturbance or trench excavation.  The waterline, barge, pump, and associated equipment would be removed following completion of construction activities.  A depiction of the layout of the barge, pump, and waterline is provided in **Figure 6-B**.

Water needed for HDD construction and hydrostatic testing at the Lake Oahe Crossing in Emmons and Morton counties, North Dakota would not be obtained from Lake Oahe.  Required water would instead be obtained from an alternate surface water, groundwater, or commercial source and transported to the Project Area via water trucks.  Water trucks would not be required to cross Corps Fee Lands.  Prior to construction, Dakota Access would identify a water source for construction activities at the Lake Oahe crossing in accordance with all applicable permits and regulations.

Water discharges associated with hydrostatic testing on Corps flowage easements would be conducted in accordance with applicable permits.  Hydrostatic test water discharges would not occur on Corps fee

37

USACE_DAPL0071261

property.  Dakota Access would conduct trench dewatering and hydrostatic test discharges in a manner consistent with the North Dakota Pollutant Discharge Elimination System (NDPDES) General Permit NDG-070000.  Discharged hydrostatic test water would not contain additives unless written approval is received from Dakota Access and applicable permits authorize such additives.  EIs would monitor permit compliance.  Where appropriate, water would be discharged into an energy dissipation and/or filtering device, as described in Dakota Access' SWPPP (**Appendix A**) to remove sediment and to reduce the erosive energy of the discharge.

Of the five waterbodies located within the flowage easements Project Area and Connected Action, one ephemeral ditch (d-k8-wi-011) is located within the portion of the Project Area that would be crossed via the Missouri River HDD; therefore, no trenching would occur within this feature.  However, a temporary waterline would be installed across this feature to transport surface water from the Missouri River to the HDD equipment.  The temporary waterline would be laid on top of the ground surface, and no grading or ground disturbance in the vicinity of the waterbody crossed by the waterline would be required.  The hard pipe segments would be hand-carried down the slope and assembled by hand.  No tracked or wheeled equipment would be necessary for construction or removal of the temporary aboveground waterline.  Four waterbodies would be temporarily impacted by pipeline construction.  However, impacts on waterbodies would be minimized by conducting pipeline construction activities in accordance with applicable regulatory requirements and implementing trenchless waterbody construction procedures, as described in sections 2.3.2.6 and 2.3.2.7 and the ECP.

No waterbody would be permanently drained or filled as part of the DAPL Project, and effects on waterbodies are expected to be short-term and minor.  Dakota Access would restore the area as close to its previous state and naturally functioning condition as practicable.  Additionally, Dakota Access would take measures described in Dakota Access' SPCC, SWPPP (Appendix A), and ECP (Appendix G) to minimize the potential for surface water contamination from an inadvertent spill of fuel or hazardous liquids during refueling or maintenance of construction equipment or during operation of aboveground facilities.  Fuel and all other hazardous materials would be stored in accordance with the requirements of Dakota Access' SPCC, SWPPP, and ECP.  These documents also describe response, containment, and cleanup measures.

Drinking water intakes located downstream from the Missouri River and Lake Oahe crossings could be at risk if there was a release that reached these bodies of water in the vicinity of the intake structures.  The Standing Rock Sioux Reservation is located south of the Lake Oahe Project Area and the majority of reservation residents depend on wells for water supply (Standing Rock Sioux Tribe, 2016).  However, the Standing Rock Sioux also have intake structures within the river downstream of the Lake Oahe Project Area.

In order to maintain the integrity of the pipeline, prevent Project losses, and protect the general public and the environment, the operator will inspect, exercise, and deploy Company-owned protective and response equipment in accordance with the National Preparedness for Response Exercise Program (PREP) guidelines.  However, in the unlikely event of a pipeline leak, response measures to protect the users of downstream intakes will be implemented to minimize risks to water supplies.  Dakota Access would be responsible party for implementing the response actions in accordance with Geographical Response Plan (GRP) and the Facility Response Plan (FRP).  The potential for a spill to compromise a potable water supply intake would be continually evaluated as part of the response action.  Alternative sources would be included as part of the contingency planning.  Shutting down certain intakes and utilizing others or

USACE_DAPL0071262

Environmental Assessment
Dakota Access Pipeline Project
July 2016

different drinking water sources or bottled water will be evaluated as part of this process.  The Federal On-Scene Incident Commander (USEPA) would be responsible for assimilating and approving the response actions under the Unified Command.  Dakota Access maintains financial responsibility for the duration of the response actions.  The Dakota Access has prepared a FRP that includes measures such as notifications to surrounding communities, affected governments, and utilities in the event of an inadvertent pipeline release.

The FRP complies with the applicable requirements of the Oil Pollution Act of 1990 (OPA 90), and has been prepared in accordance with the National Oil and Hazardous Substances Pollution Contingency Plan (NCP) and the Mid-Missouri Sub-Area Contingency Plan (SACP).  Specifically, this Plan is intended to satisfy the applicable requirements of:

- Pipeline and Hazardous Materials Safety Administration, U.S. Department of Transportation requirements for an OPA 90 plan (49 CFR 194)
- South Dakota Environmental Protection Oil Pipeline Plan Requirements (34A-18).
- American Petroleum Industry (API) RP 1174 - Recommended Practice for Pipeline Emergency Preparedness and Response.
- North Dakota Administrative Code 69-09-03-02

The operator has contractually secured personnel and equipment necessary to respond, to the maximum extent practicable, to a worst case discharge or a substantial threat of such discharge.  The operator requires an annual certification from each Oil Spill Response Organization (OSRO) to assure compliance with the National PREP guidelines.  Each listed OSRO has its own response equipment, including containment booms, absorbents, boats, and vacuum trucks.

Sub-freezing temperatures during the winter months could cause ice to form on the surface of Lake Oahe and the Missouri River.  This layer of ice could impede the deployment of traditional containment booms.  However, the ice itself often serves as a natural barrier to the spread of oil (Dickens 2011).  Pockets of oil naturally contained by the ice can be drilled to and removed using vacuum trucks.  Dakota Access's contracted professional emergency responders are prepared to respond under winter conditions so that response procedures can be carried out in accordance PHMSA operational regulations.  Therefore, a release during winter conditions is anticipated to have lesser impacts to water resources, particularly with respect to area of extent, as compared to a release during the warmer months.

A copy of the Draft FRP for the Dakota Access Pipeline North Response Zone is included in Appendix L. Dakota Access anticipates submitting this plan to PHMSA for review and approval in the third quarter of 2016 and will provide a copy of the updated draft to the Corps concurrent with the submittal to PHMSA. The FRP would be in place prior to operating the DAPL Project in accordance with PHMSA and federal regulations.

USACE_DAPL0071263

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| colspan="8" | **Table 3-5**<br>**Waterbodies within the Flowage Easements Project Area and Connected Action** |
| **MP** | **Waterbody ID** | **Waterbody Type** | **Flow Type** | **Delineation Source** | **Class of Aquatic Resource** | **ND Surface Water Classification** | **Area of Impact** |
| 92.7 | d-k8-wi-013 | Ditch | Ephemeral | Field | §404 | III | Construction and Permanent ROW |
| 92.77 | s-k8-wi-002 | Stream | Perennial | Field | §404 | III | Construction and Permanent ROW |
| 93.23 | d-k8-wi-007 | Ditch | Ephemeral | Field | §404 | III | Construction and Permanent ROW |
| 94.64 | d-k8-wi-011 | Ditch | Ephemeral | Field | §404 | III | Permanent ROW over HDD Profile (Temporary Waterline) |
| 94.9 | s-m10-wi-001/s-k2-mk-001 | Stream | Perennial | Field | §10 | I | Construction and Permanent ROW |
| 95.1 | s-k2-mk-002 | Stream | Intermittent | Field | §404 | III | Construction and Permanent ROW |

Surface water classifications from North Dakota Administrative Code 33-16-02.1-09:

Class I Streams:  quality of the waters in this class shall be suitable for the propagation or protection, or both, of resident fish species and other aquatic biota and for swimming, boating, and other water recreation.  The quality of the waters shall be suitable for irrigation, stock watering, and wildlife without injurious effects.  After treatment consisting of coagulation, settling, filtration, and chlorination, or equivalent treatment processes, the water quality shall meet the bacteriological, physical, and chemical requirements of the department for municipal or domestic use.

Class III Streams: The quality of the waters in this class shall be suitable for agricultural and industrial uses.  Streams in this class generally have low average flows with prolonged periods of no flow.  During periods of no flow,  they are of limited value for recreation and fish and aquatic biota.  The quality of these waters must be maintained to protect secondary contact recreation uses (e.g. wading), fish and aquatic biota, and wildlife uses.

The only surface waterbody identified on the federal lands Project Area is Lake Oahe (s-kc4-em-001/s-kc4-mo-002), which would be avoided via HDD.  The pipe stringing corridor (Connected Action) at Lake Oahe crosses two drainageways that are indicated on the National Hydrography Dataset.   Field delineations carried out by Dakota Access identified one ephemeral stream (s-kc-4-mo-004) associated with these two drainageways that intersect the pipe stringing corridor of the Connected Action.  Impacts on the delineated waterbody would be entirely within the pipe stringing additional temporary workspace (ATWS) and are expected to be avoided by bridging the waterways for equipment and vehicle traffic during pipe stringing, fabrication and pullback.  No trenching would occur within the pipe stringing ATWS.  While limited grading may be necessary within the pipe stringing ATWS, no grading would be expected to occur within the waterbody itself.  Vegetation may be mowed/brush-hogged, however, no root masses are anticipated to be removed.   Revegetation of these areas would be in accordance with the North

40

USACE_DAPL0071264

Environmental Assessment
Dakota Access Pipeline Project
July 2016

Dakota tree and shrub regulations and would not be impacted during operation of the Proposed Action. No trees are expected to be cleared on Corps fee-owned lands.

| | | | | | Class of | ND Surface | |
|---|---|---|---|---|---|---|---|
| **MP** | **Waterbody ID** | **Waterbody Type** | **Flow Type** | **Delineation Source** | **Aquatic Resource** | **Water Classification** | **Area of Impact** |

**Table 3-6**
**Waterbodies within the Federal Lands Project Area and Connected Action**

| MP | Waterbody ID | Waterbody Type | Flow Type | Delineation Source | Class of Aquatic Resource | ND Surface Water Classification | Area of Impact |
|---|---|---|---|---|---|---|---|
| 166.3 | s-kc4-em-001 / s-kc4-mo-002 | Lake (Lake Oahe) | N/A | Field | §10 | I | Project Area – Permanent ROW over HDD Profile |
| 166 | s-kc4-mo-004 | Stream | Ephemeral | Field | §404 | III | Connected Action – HDD Stringing Area |

Surface water classifications from North Dakota Administrative Code 33-16-02.1-09:

Class I Streams:  quality of the waters in this class shall be suitable for the propagation or protection, or both, of resident fish species and other aquatic biota and for swimming, boating, and other water recreation.  The quality of the waters shall be suitable for irrigation, stock watering, and wildlife without injurious effects.  After treatment consisting of coagulation, settling, filtration, and chlorination, or equivalent treatment processes, the water quality shall meet the bacteriological, physical, and chemical requirements of the department for municipal or domestic use.

Class III Streams:  The quality of the waters in this class shall be suitable for agricultural and industrial uses.  Streams in this class generally have low average flows with prolonged periods of no flow.  During periods of no flow, they are of limited value for recreation and fish and aquatic biota.  The quality of these waters must be maintained to protect secondary contact recreation uses (e.g. wading), fish and aquatic biota, and wildlife uses.

Environmental Inspectors would monitor compliance with applicable waterbody protection requirements during construction of the facilities.  The ECP (**Appendix G**) and SWPPP (**Appendix A**) describe additional mitigation measures and contain illustrations of how sediment control devices are typically installed at waterbody crossings.  Additionally, Dakota Access would maintain a vegetative buffer until the actual crossing of the waterbody takes place.  Temporary sediment control measures, such as silt fence installed at each crossing, would minimize the introduction of sediment into waterbodies during construction and minimize the movement of spoil and sediment from surface runoff during and after construction. Permanent erosion control measures, such as vegetation and installation of slope breakers, would effectively stabilize riparian zones.  Dakota Access would stabilize stream banks disturbed during construction using methods as directed by applicable state and/or federal permits.  Trenching and dewatering activities used in construction of the proposed pipeline could temporarily alter surface drainage patterns.  However, these impacts are expected to be localized and temporary, since the contours and vegetation would be returned as closely as practical to pre-construction conditions. Dewatering activities would be conducted in accordance with applicable permits and Dakota Access' SWPPP and ECP.

All construction equipment utilized on or in waters of the state would be subject to inspection by the Department in accordance with the North Dakota Administrative Code (Title 30, Article 3, Chapter 6-01). Further, Dakota Access would implement required measures including the removal of all aquatic

USACE_DAPL0071265

Environmental Assessment
Dakota Access Pipeline Project
July 2016

vegetation from vessels, motors, trailers, or construction equipment.  All water would be drained from bilges or confined spaces.  All Aquatic Nuisance Species will be removed from equipment in accordance with the North Dakota Administrative Code (Title 30, Article 3, Chapter 6).  The contractor or his agents or subcontractors must provide the North Dakota Game and Fish Department a reasonable opportunity to inspect any and all vehicles, vessels, pumps and equipment that will be used in the project in or on the waters of the state prior to those items being launched or placed in the waters of the state.

## Water Intake Mitigation Measures

In the unlikely event of a release during pipeline operations, drinking and irrigation water intakes located downstream from the Missouri River and Lake Oahe crossings could be at risk if hydrocarbons were to reach these bodies of water in the vicinity of the intake structures.  In order to minimize the risk of a pipeline leak and protect the users of downstream intakes, Dakota Access will implement the design and operation measures summarized below as well as all other measures described throughout this EA and in the FRP.

- Pipe specifications that meet or exceed applicable regulations, with a quality assurance program for pipe manufacturers
- Use of the highest quality external pipe coatings (fusion bond epoxy or FBE) to reduce the risk of corrosion, and stress corrosion cracking.
- Active Cathodic Protection applied to the pipeline and facilities
- Four feet of soil cover will be provided over the buried pipeline on either side of the HDD crossings.  The proposed HDD profiles under the Missouri River and Lake Oahe are designed to provide a minimum of 36 feet and 92 feet of cover below the water bodies, respectively.   .
- Pipeline system inspection and testing programs will be implemented prior to operation to ensure the pipeline is built in accordance with the standards and specifications.
- Non-destructive testing of 100 percent of girth welds
- Hydrostatic testing of the pipeline to 125% percent of the Maximum Operating Pressure (MOP).
- A continuous SCADA pipeline monitoring that remotely measures changes in pressure and volume on a continual basis at all valve and pump stations, is immediately analyzed to determine potential product releases anywhere on the pipeline system.
  - Pipeline variables are the parameters pertaining to SCADA systems, instrumentation, fluid properties, physical attributes of pipelines, pressure, temperature, and flowrate
  - Includes pressure transmitters to monitor flowing pressure in real-time and alarm in the event of adverse pressure changes due to potential leaks / releases
  - Includes custody transfer quality meters to monitor pipeline Receipts / Deliveries in real-time and alarm in the event of flowrate discrepancies due to potential leaks / releases
- Leak Detection System - LeakWarn - A Computational Pipeline Monitoring System (CPM) to monitor the pipeline for leaks via computational algorithms performed on a continual basis.
  - Includes separate ultrasonic meters at each pump station to continuously verify and compare flowrates along the pipeline in real-time as part of a leak detection system.
  - This measurement data is immediately analyzed to determine potential product releases anywhere on the pipeline system.
  - The mathematical algorithms are based on physics and abide by the conservation principles of mass, momentum and energy.

42

USACE_DAPL0071266

Environmental Assessment
Dakota Access Pipeline Project
July 2016

- Periodic pipeline integrity inspection programs using internal inspection tools to detect pipeline diameter anomalies indicating excavation damage, and loss of wall thickness from corrosion.
- Periodic above-ground Close Interval Surveys (CIS) conducted along the pipeline.
- Aerial surveillance inspections will be conducted 26 times per year (not to exceed 3 weeks apart) to detect leaks and spills as early as possible, and to identify potential third-party activities that could damage the pipeline.
- Mainline valves are installed along the pipeline route to reduce or avoid spill effects to PHMSA-defined HCAs.
- Periodic landowner outreach and the implementation of a Public Awareness program
- Participation in "One-Call" and "Before You Dig" notification systems.

Immediately upon discovery of a release of oil that could impact the Missouri River or Lake Oahe, Dakota Access will initiate emergency response efforts, including containment and recovery.

Site-specific GRPs have been developed for the Missouri River and Lake Oahe crossings.  These security sensitive documents, submitted to the USACE as Privileged and Confidential, identify site-specific resources and response measures for an immediate, safe, and effective response to a release of crude oil from the Dakota Access Pipeline with the potential to impact the Missouri River near these two crossings. Response measures include, but are not limited to, the deployment of containment or diversionary booms at predetermined locations and oil collection/recovery activities to prevent further migration of crude oil.

Emergency response notifications will be made to Federal, State, and Local agencies and tribal officials as outlined in the FRP.  Dakota Access and its contractors will work with Federal, State, local and Tribal officials to protect downstream water intakes.  To minimize potential impacts to intakes, protection and mitigation measures will be implemented in cooperation with intake operators.

Dakota Access will identify an all-weather access and collection point downstream of both the Missouri River crossing and Lake Oahe crossing.  At each location, Dakota Access will provide an equipment storage facility that includes a permanent storage area for winter and open water spill response equipment. Dakota Access would coordinate with the USACE and any other applicable stakeholders to obtain all necessary permits and approvals prior to construction for any ground disturbing activities associated with these facilities.

Dakota Access will conduct emergency response drills/exercises at both the Missouri River crossing near Williston and the crossing at Lake Oahe.  These exercises will include both open water and ice response activities. Regulatory and stakeholder participation will be encouraged and solicited for the exercises. Section 3.2.2.2 Impacts and Mitigation Remediation, Section 3.11 Reliability and Safety and the FRP (Appendix L) contain more detail regarding spill prevention, detection and response measures.  The emergency response drills/exercises are further discussed in Section 3.11.

USACE_DAPL0071267

Environmental Assessment
Dakota Access Pipeline Project
July 2016

### 3.2.2    Groundwater

#### 3.2.2.1    Affected Environment

Groundwater occurs within the Project Area of the Corps flowage easements and federal lands in both glacial drift and bedrock aquifers.  Although bedrock aquifers tend to have a greater distribution and be more continuous than Quaternary aquifers, Quaternary aquifers typically provide higher yields to wells.

Groundwater in the bedrock aquifers flows towards the Missouri River and Lake Oahe, a regional groundwater discharge zone.  The water table within phreatic aquifers, which may include both Quaternary and bedrock formations, is typically a subdued replica of the surface topography.  Although groundwater flow directions may vary widely particularly within localized flow regimes, overall regional flow of groundwater in the phreatic aquifer would be to the Missouri River and Lake Oahe.

The most economically important aquifers in the vicinity of the Corps flowage easements are the Cretaceous Dakota Group, the Tertiary Fort Union Group (which includes the Sentinel Butte and Bullion/Tongue River Formations), and glacial drift aquifers of the Quaternary Period (Armstrong, 1969). The glacial drift aquifers are relatively thin at the Project Area, except where they occur in buried or present-day bedrock valleys.  In the absence of Quaternary aquifers, members of the Paleocene Fort Union Group commonly serve as the shallowest aquifer.  Individual aquifer members of the Fort Union Group include, in descending order, the Sentinel Butte, Tongue River, Cannonball, and Ludlow Formations (Croft, 1985).  Other bedrock aquifers of economic importance in the flowage easement region are the late Cretaceous Hell's Creek and Fox Hills Aquifer system and the Cretaceous Dakota Group.

Three domestic wells and six observation wells (one of which has been destroyed) are located on the flowage easements, but occur outside of the Project Area.  The closest well to the proposed pipeline centerline is a domestic well located approximately 430 feet from the centerline.  The flowage easements or Connected Action do not overlie any source water protection areas.

The most economically important aquifers in Morton and Emmons counties, where the federal lands along Lake Oahe are located, include aquifers within the Cretaceous Fox Hills and Hell Creek Formations; the Tertiary Fort Union Group, which includes the Cannonball and Ludlow Formations, Tongue River Formation, and Sentinel Butte Formation (northwest part of the county only); and alluvial and glacial drift aquifers of the Quaternary Period (Ackerman, 1980; Armstrong, 1978).  The Pierre Formation is considered the base of the active near-surface aquifers, because it is thick and relatively impervious.

No water wells are located within 150 feet of the federal lands or Connected Actions at the Lake Oahe crossing.  Impacts within 150 feet of the Project was used following the Federal Energy Regulatory Commission (FERC) guidelines for the evaluation of construction impacts to water wells and springs. Although the Project is not under the jurisdiction of the FERC, FERC guidance was deemed to be an appropriate distance for this evaluation.  Additionally, none of the Project Area or Connected Action overlie any source water protection areas.

USACE_DAPL0071268

Environmental Assessment
Dakota Access Pipeline Project
July 2016

### 3.2.2.2   Impacts and Mitigation

Ground disturbance associated with conventional pipeline construction is generally limited to approximately 6 to 10 feet below the existing ground surface.  Where excavation penetrates the water table, potential groundwater impacts from pipeline construction are primarily limited to the radius of influence around the excavation profile.

Construction activities, such as trenching, dewatering, and backfilling that encounter shallow aquifers would cause minor direct and indirect impacts via fluctuations in groundwater levels and/or increased turbidity within the aquifer adjacent to the activity due to dewatering activities.  Dewatering would consist of a single or series of submersible pumps that would be lowered into the pipe trench to review excess water to facilitate pipe installation.   In cases of greater water infiltration, well pointing (a series of dewatering points along the outside of the trench connected in series to a pump to enable effective dewatering of the trench) may be used.  These impacts are temporary (only while the trench is open) and highly localized as the infiltration of the dewatered groundwater is in the immediate vicinity of the dewatering activity.

Construction and dewatering activities are not expected to have a significant direct or indirect effect on regional groundwater flow patterns.  Shallow aquifers would quickly reestablish equilibrium if disturbed, and turbidity levels would rapidly subside.  Consequently, the effects of construction would be minor and short-term.  Impacts on deeper aquifers are not anticipated.

The introduction of contaminants to groundwater due to accidental spills of construction-related chemicals, fuels, or hydraulic fluid could have an adverse effect on groundwater quality.  Spill-related impacts from construction activities are typically associated with improper fuel storage, equipment refueling, and equipment maintenance.  Dakota Access' SPCC Plan outlines measures that would be implemented to avoid, minimize, prevent, and respond to releases of fuels and other hazardous substances during construction and includes measures for cleanup, documentation, and reporting of spills (**Appendix A**).  Project-specific SPCCs would be developed by the selected contractor and implemented throughout construction.  By implementing the protective measures set forth in these plans, groundwater contamination due to construction activities is not anticipated.  The draft SPCC is included as Appendix B of **Appendix A** (SWPPP); the project-specific plan to be developed by the Contractor would meet or exceed all conditions presented in the draft plan.

Accidental releases from the pipeline system during operations could potentially affect groundwater.  Although most components of crude oil are relatively insoluble (Neff and Anderson, 1981), crude oil released into soil can migrate toward water where certain constituents can dissolve into groundwater or surface water in limited amounts.  As a liquid, the product would travel along the path of least resistance both laterally and vertically at a rate determined by a number of factors including volume released, soil conditions (permeability, porosity, moisture, etc.), depth to groundwater, and the speed and effectiveness of response and remediation measures.

The DAPL Project would transport light sweet crude oil from the middle Bakken and upper Three Forks formations (Bakken).  The Energy Information Administration (EIA) categorizes light sweet crude oil as having an API gravity between 35° and 50° and less than 0.3 wt % sulfur.  API gravity is a measure of how heavy or light liquid oil is compared to water: if its API gravity is greater than 10, it is lighter and floats on

USACE_DAPL0071269

Environmental Assessment
Dakota Access Pipeline Project
July 2016

water.  The oil extracted from the Bakken has an API gravity generally between 40° and 43° and a sulfur content of less than 0.2 weight percentage (wt %) (Turner, Mason and Company, 2014).  Therefore, the Bakken oil has properties that fall within the mid-range of light sweet crude.

Most crude oil constituents are not very soluble in water.  The dissolved concentration of water soluble compounds (e.g., benzene) is not controlled by the amount of oil in contact with the water, but by the concentration of the specific constituent in the oil (Charbeneau et al., 2000; Charbeneau, 2003; Freeze and Cherry, 1979).  Studies of 69 crude oils found that benzene was the only aromatic or polycyclic aromatic hydrocarbon compound tested that is capable of exceeding the 0.005 ppm groundwater protection threshold values for drinking water (i.e., maximum contaminant levels (MCLs) or Water Health Based Limits) (Kerr et al., 1999 as cited in O'Reilly et al., 2001).

In aquatic environments, crude oil's toxicity is a function of the concentration of its constituent compounds and their toxic effects, along with their solubility (and bioavailability) in water. Based on the combination of toxicity, solubility, and bioavailability, benzene is commonly considered to pose the greatest toxicity threat from crude oil spills (Muller, 1987).  The lowest acute toxicity threshold for aquatic organisms for benzene is 7.4 ppm based on standardized toxicity tests (USEPA, 2016).  .

Accordingly, theoretical concentrations of benzene in river water for a range of potential DAPL Project spills at the two pipeline river crossings are presented in **Table 3-7**.  An assumption of a 1-hour release period for the entire spill volume at each location was used.   The following additional conservative assumptions were developed to estimate potential spill effects for planning purposes:

- The entire volume of a crude oil spill was released due to a catastrophic failure of the pipeline and reached the waterbody;
- Complete, instantaneous mixing occurred;
- The entire benzene content of the crude oil was solubilized into the water column; and
- The receptor is located at the immediate site of the crude oil spill and there is no loss due to evaporation or degradation.

The conservative analysis presented in **Table 3-7** includes a range of values from 4 barrels to 10,000 barrels spilled.  However, examination of the PHMSA dataset from 2002 to 2015 (PHMSA, 2016) indicates that the majority of actual pipeline spills are relatively small and fifty percent of the spills consist of 4 bbls or less.  The spill volume would be likely small due to a number of factors including:

- Most releases are not caused by full ruptures of the pipeline;
- The overburden on the HDD section of the pipeline or the compacted back-fill over a buried pipeline restricts the volume that could be released during a spill and restricts the affected area; and
- Due to anti-siphoning effects, a full gravity drain-down between valve locations on either side of the river crossings rarely occurs.

As indicated in **Table 3-7**, the acute toxicity threshold for aquatic organisms for benzene of 7.4 ppm is not exceeded under any of the hypothetical spill volume scenarios.  The most probable spill volume (4 barrels

46

USACE_DAPL0071270

Environmental Assessment
Dakota Access Pipeline Project
July 2016

or less) does not yield benzene concentrations that exceed the drinking water criteria even with the ultra conservative mixing assumptions.  It should be noted that under real life conditions, the spill and mixing events outlined by the assumptions are beyond physical actualities.  Therefore the use of the upper ranges of spill volumes and the concentrations in the table is limited and is not recommended beyond this NEPA analysis.

| Table 3-7 Estimated Benzene Concentrations Following a Hypothetical Crude Oil Spill at Project River Crossings | | | | | | | |
|---|---|---|---|---|---|---|---|
| River Crossing | River Flow (cfs) | Acute Toxicity Threshold (ppm) | Benzene MCL (ppm) | Estimated Benzene Concentration in Surface Water (ppm) | | | |
| | | | | Very Small Spill: 4 bbl | Small Spill: 100 bbl | Moderate Spill: 1,000 bbl | Large Spill: 10,000 bbl |
| Missouri River | 20,374 | 7.4 | 0.005 | 0.00075 | 0.019 | 0.19 | 1.88 |
| Lake Oahe | 22,484 | 7.4 | 0.005 | 0.00068 | 0.017 | 0.17 | 1.70 |

Notes:
- Adapted from Stantec, 2015
- Estimated concentration is based on release of benzene into water over a 1-hour period with uniform mixing conditions.
- Concentrations are based on a 0.28 percent by volume benzene content of the transported material (Marathon Oil 2010).
- bbl - An oil barrel defined as 42 US gallons,
- MCL - Maximum contaminant levels
- ppm – Parts per million
- cfs – Cubic feet per second
- Stream flows are measured mean discharge from the gage stations closest to the pipeline crossings located on the Missouri River at Williston (USGS Station 06330000) and Bismarck (USGS Station 06342500)(USGS 2016; 2016b).

Sub-freezing temperatures during the winter months could cause ice to form on the surface of Lake Oahe and the Missouri River.  This layer of ice will trap oil released below the lake's surface and prevent benzene evaporation from occurring. Therefore, during the winter, evaporative loss will be negligible, and will allow a longer contact between the crude oil and the water column. Additionally, natural undulations in the bottom of the ice will trap the material and reduce horizontal spreading, potentially causing very localized impacts to organisms in prolonged contact with the near-surface water (e.g., phytoplankton) (Dickens 2011). Exposure to fish deeper in the water column would not likely experience adverse impacts. The natural containment of winter releases facilitates cleanup efforts as the pockets of oil can be drilled to and removed using vacuum trucks. Thus, winter releases are predicted to have lower impacts, particularly with respect to area of extent, as compared to releases occurring during the warmer seasons.

USACE_DAPL0071271

Environmental Assessment
Dakota Access Pipeline Project
July 2016

If no active ground water remediation activities were undertaken (see discussion below), dispersion, evaporation, dissolution, sorption, photodegradation, biodegradation, and natural attenuation ultimately would allow a return to preexisting conditions in both soil and groundwater.

**Remediation**

As part of the pipeline operation, which is regulated by the PHMSA, Dakota Access has an ongoing maintenance, inspection, and integrity testing program to monitor the safety of the pipeline system. Monitoring activities include constant remote oversight of the entire system 24/7/365 from the control center, routine inspection of the cathodic protection system, and the use of inspection tools that travel through the inside of the pipeline to check pipe integrity (see Section 3.11 for additional information regarding reliability and safety and the proposed methods for monitoring the Proposed Action facilities). Dakota Access also performs regular aerial flyovers to inspect the pipeline ROW.  In the event of a leak, Dakota Access would work aggressively to isolate the source through the use of remote-controlled shut-off valves, initiate cleanup activities, and contact the appropriate federal and state authorities to coordinate leak containment and cleanup.   To prevent pipeline failures resulting in inadvertent releases, Dakota Access would construct and maintain the pipeline to meet or exceed industry and governmental requirements and standards.  Specifically, the steel pipe would meet PHMSA specifications under 49 CFR § 195, follow standards issued by the American Society of Mechanical Engineers, National Association for Corrosion Engineers and API.  Once installed, the pipeline would be subjected to testing to verify its integrity and compliance with specifications, including hydrostatic pressure testing at the crossings, checking coating integrity, and X-ray inspection of the welds.  The pipeline would be placed into service only after inspection to verify compliance with all construction standards and requirements.  Dakota Access would maintain and inspect the pipeline in accordance with PHMSA regulations, industry codes and prudent pipeline operating protocols and techniques.  The pipeline ROW would be patrolled and inspected by air every 10 days, weather permitting, but at least every three weeks and not less than 26 times per year, to check for abnormal conditions or dangerous activities, such as unauthorized excavation along the pipeline route.

While a release of crude oil into groundwater or a surface waterbody has the potential to cause environmental impacts, the likelihood of such an event is very low.  Dakota Access has detailed provisions for protecting and mitigating potential impacts to water resources in Section 3.11 Reliability and Safety. Emergency response and remediation efforts have the potential for dramatically reducing the appreciable adverse environmental effects.

In the unlikely event of a spill during operations of the pipeline, impacts to water resources would be further mitigated by following the cleanup procedures and remediation activities described in the Dakota Access' FRP (**Appendix L**).

Specific clean-up procedures and remediation activities would be determined by groundwater remediation specialists within Dakota Access and contracted professional consultants.  Each groundwater mitigation situation is unique and will be treated according to the actual circumstances present.

The first step in the mitigation process consists of the delineation of the plume to define the nature and extent of the release.  If appropriate, Dakota Access would recover product as soon as practical to prevent the spread of contamination using excavators to remove the impacted soils, oil skimmers installed within

48

USACE_DAPL0071272

Environmental Assessment
Dakota Access Pipeline Project
July 2016

collection wells, pumps, and storage containers or vacuum trucks at collection areas or some other method appropriate for the site conditions.

Dakota Access would develop a groundwater remediation plan in coordination with the North Dakota Department of Health and other responsible federal, state or other governmental authorities. The proposed groundwater remediation system would be designed to treat the impacted groundwater by removing the released oil, converting it into harmless products, monitoring natural attenuation, etc.

Released product can often be physically removed from groundwater by several methodologies. The pump and treat method is one of the most widely used physical methods of ground water remediation and consists of pumping the groundwater to surface and then using either biological or chemical treatments to remove the oil. Another common method of removing floating hydrocarbon contaminants is the use of a monitoring-well oil skimmer. This method utilized a belt material with a strong affinity for hydrocarbons to bring the oil to the surface where it can be removed. A dual-phase vacuum extraction removes both contaminated groundwater and soil vapor. A high-vacuum extraction well is installed with its screened section in the zone of contaminated soils and groundwater to remove contaminants from above and below the water table. Released product can also be removed from groundwater by applying various chemical methodologies including ozone and oxygen gas injection, surfactant enhanced recovery, Biological treatment techniques can also be utilized including bioventing and bioaugmentation.

The ground water treatment remediation plan would be selected in coordination with the North Dakota Department of Health and other responsible governmental authorities and may utilize a combination of technologies.

A preliminary evaluation of geology indicates that groundwater within the floodplain throughout most of the Corps flowage easements is less than 6.5 feet deep (GeoEngineers, 2014). The pipeline would be installed in saturated sediments as part of the HDD crossing of Lake Oahe. Due to the nature of HDD methodology, this construction method is inherently not a risk to groundwater resources and uses benign substances (bentonite and water) to penetrate through soil, rock, and groundwater. Construction of the Project Area and Connected Action would not be expected to result in significant negative direct or indirect impacts on groundwater resources.

### 3.2.3   Wetlands

#### 3.2.3.1   Affected Environment

Wetland data for the Project Areas was derived from desktop analyses along the entire route and verified by field delineations. Using data from the U.S. Fish & Wildlife Service's (USFWS) National Wetlands Inventory (NWI) dataset, aerial imagery, and topography, an experienced biologist applied professional judgment to create polygon coverage in GIS to define the areal extent of wetlands. These areas have been field-verified to ensure that the most accurate, up-to-date data is being used for permit filings.

The field wetland investigations were conducted using the on-site methodology set forth in the 1987 Corps of Engineers Wetland Delineation Manual and the 2010 Regional Supplement to the Corps of Engineers Wetland Delineation Manual: Great Plains Region (USACE, 1987; 2010b). In addition to the 1987 Manual and the Regional Supplement, wetland areas were examined through analysis of the

49

Environmental Assessment
Dakota Access Pipeline Project
July 2016

vegetation, soils, and hydrology, as described in the Classification of Wetland and Deepwater Habitats of the U.S. and The National Wetland Plant List (Cowardin et al., 1979; Lichvar et al., 2014).

### 3.2.3.2   Impacts and Mitigation

The routing analysis utilized to determine the crossing locations was designed to avoid impacts to sensitive environmental resources including wetlands.  Construction workspace on the flowage easements has been selected based on an absence of wetlands within the Project Area and, as confirmed by field verification in 2015, no wetlands would be impacted by trench excavation within the construction ROW, ATWS, HDD workspace, or HDD stringing corridor on the flowage easements or Connected Action.

The field wetland investigations conducted by Dakota Access results identified four wetlands located within the permanent easement on the flowage easements (w-m10-wi-001_PSS, w-m10-wi-001_PEM, w-m10-wi-001_PFO, and w-m10-wi-002_PSS).  These wetlands occur in the portion of the Project Area on the flowage easements that would be constructed via HDD; therefore, no trenching would occur within these wetlands.  However, following construction, a 30-foot-wide corridor centered on the proposed pipeline would be maintained in non-forested state to facilitate inspections of the pipeline, operational maintenance, and compliance with the federal pipeline safety regulations.  The 30 foot permanent ROW would encompass a total of approximately 0.30 acre of the four wetlands.  One of these wetlands (w-m10-wi-001_PFO), approximately 0.05 acre, is classified as a palustrine forested (PFO) wetland and would be converted to shrub-scrub or herbaceous wetland as a result of the Proposed Action since trees would be routinely removed for the life of the pipeline.  The remaining palustrine emergent (PEM) wetland (w-m10-wi-001_PEM) and two palustrine scrub-shrub (PSS) wetlands (w-m10-wi-001_PSS and w-m10-wi-002_PSS), comprising a total of 0.25 acres of the permanent pipeline easement, may require infrequent vegetation clearing of encroaching woody vegetation but would otherwise remain in their natural state.  Dakota Access is in the process of obtaining verification for use of NWP 12 for the crossings of wetlands and waterbodies associated with DAPL Project.

Pending approval and receipt of applicable permits and easement permission, a temporary waterline would be installed between the shoreline and the HDD workspace on the flowage easements within the permanent ROW (**Figure 6-B**), in order to supply the HDD equipment with water needed for drilling fluid preparation and hydrostatic testing.  The temporary waterline would be laid on top of the surface, and no ground disturbance of the four wetland features along the permanent easement is anticipated.  The hard pipe segments would be hand-carried down the slope and assembled by hand.  No tracked or wheeled equipment would be necessary for construction or removal of the temporary aboveground pipeline.  No excavation or disturbance of wetlands or the river bank is anticipated.

**Table 3-8** summarizes wetlands within the flowage easements that occur within the permanent ROW, which is 30-feet-wide centered on the centerline over the HDD profile and 50-feet-wide elsewhere.

No wetlands would be impacted by the HDD workspace on private land and the permanent ROW on federal land at the crossing of Lake Oahe, because no wetlands exist within the Project Area and Connected Action Area at the Lake Oahe Crossing.

The ECP and SWPPP specify several measures to protect wetlands and waterbodies from becoming polluted with fuels or other hazardous materials during construction.  These plans prohibit the storage of

USACE_DAPL0071274

Environmental Assessment
Dakota Access Pipeline Project
July 2016

fuel or other hazardous materials within 100 feet of a wetland or waterbody.  The ECP also specifies that equipment must be refueled at least 100 feet from waterbodies unless, due to site-specific conditions, there is no practical alternative such as the proposed pumping intake structure located on the barge at the Missouri River Crossing.  In that case, the contractor must implement site-specific protective measures and containment procedures described in the ECP.  Contractors would be required to provide trained personnel, appropriate equipment, and materials to contain and clean up releases of fuel, lubricating oil, or hydraulic fluid that result from equipment failure or other circumstances in accordance with containment plans as described above.

| Table 3-8 Wetlands within the Flowage Easements Project Area | | | | | | |
|---|---|---|---|---|---|---|
| MP | Wetland ID | Wetland Type | Pre-Construction Notice? | Delineation Source | Area (acres) | Impacted Area [1] |
| 94.7 | w-m10-wi-001 | Palustrine Scrub-Shrub | No | Field | 0.07 | Permanent ROW over HDD Profile |
| 94.7 | w-m10-wi-001 | Palustrine Emergent | No | Field | 0.04 | Permanent ROW over HDD Profile |
| 94.8 | w-m10-wi-001 | Palustrine Forested | No | Field | 0.05 | Permanent ROW over HDD Profile |
| 94.9 | w-m10-wi-002 | Palustrine Scrub-Shrub | No | Field | 0.14 | Permanent ROW over HDD Profile |

### 3.2.4    Floodplain

#### 3.2.4.1    Affected Environment

Floodplains refer to the 100-year floodplain, as defined by Federal Emergency Management Agency (FEMA), and as shown on Flood Insurance Rate Maps (FIRM) or Flood Hazard Boundary Maps for all communities participating in the National Flood Insurance Program (NFIP).  The 100-year floodplain is an area subjected to inundation by the 1% chance of an annual flood event.  Executive Order (EO) 11988 (Floodplain Management) requires federal agencies to avoid direct or indirect support of development within the 100-year floodplain whenever there is a practical alternative.

According to the FEMA FIRM map, the seven flowage easements are located within Zone A (the 100-year floodplain) of the Missouri River in Williams County.  A FEMA flood map is not available for the Connected Action within McKenzie County.  The Lake Oahe crossing in Emmons County is located in Zone D, which is an area of undetermined, but possible flood hazards (FEMA, 1987).  FEMA has not completed a study to determine flood hazards for Morton County; therefore, a flood map has not been published at this time.

#### 3.2.4.2    Impacts and Mitigation

The Proposed Action has been designed in accordance with accepted floodplain management practices; therefore, no impacts on floodplain elevations or velocities are anticipated.  Following construction,

51

Environmental Assessment
Dakota Access Pipeline Project
July 2016

disturbed areas would be restored to pre-construction grades and contours, as practical.  If necessary, soil displaced by installation of the 24-inch pipeline on the flowage easements would be removed from the floodplain and hauled to an upland location in order to ensure original floodplain elevations are restored

The Corps Omaha District Flood Risk and Floodplain Management Section (FRFM) is responsible for coordinating compliance with the requirements of EO 11988.  The FRFM reviewed the proposed pipeline plans for the portion of the DAPL Project that crosses the flowage easements for compliance with Appendix A (Typical Cut and Fill Volumes for Land Development Proposals) of NWDR 1110-2-5, Land Development Guidance at Corps Reservoir Projects, and found that the lowest elevation of the Proposed Action on the flowage easements (1872.25 feet MSL) would be above the Garrison flood control pool maximum operation elevation (1854.0 feet MSL).  Therefore, there would be no adverse impacts on the operation of the Garrison flood control pool.  Provided that the site topography is left at its natural ground elevation after construction and all excess material is hauled off site, the FRFM concluded that there are no flood risk and floodplain management concerns associated with the Proposed Action.  On April 7, 2015 the FRFM provided Dakota Access with a memorandum verifying compliance under EO 1198 and recommending approval of the Proposed Action (Krause, 2015).

### 3.2.5    Levees

Based on a search of the Corps National Levee Database and FEMA FIRM maps, no levees are located within 10 miles of the Lake Oahe or flowage easement crossings (Corps, 2014).  Because no levees are located within 10 miles of either crossing, construction of the Proposed Action is not expected to impact levees.

### 3.3    Vegetation, Agriculture, and Range Resources

Under the "no action" alternative, Dakota Access would not construct the proposed DAPL Project and no impacts on vegetation, agriculture, and range resources would occur.  However, if the objectives of the DAPL Project are to be met under the "no action" alternative, other projects and activities would be required and these projects would result in their own impacts on vegetation, agriculture, and range resources, which would likely be similar to or greater than the DAPL Project.  Impacts associated with a future project developed in response to the "no action" alternative are unknown, while only temporary and minor impacts or insignificant permanent impacts on vegetation, agriculture, and range resources would occur as a result of the Proposed Action, as described in the sections below.

### 3.3.1    Vegetation

#### 3.3.1.1    Affected Environment

Land cover was analyzed for the flowage easements and federal lands and associated Connected Actions based on the 2011 USGS National Land Cover Dataset (NLCD) and was field-verified where access was available.  Land cover on the flowage easements is comprised mostly of cultivated crops, which include corn, sugar beets, alfalfa, soybeans, and spring wheat.  Other present land cover types include developed areas, which are primarily roads, pasture/hay/grassland areas that are interspersed with the cultivated crops, emergent wetlands, woody wetlands, mixed forest and deciduous forest associated with the Missouri River.

USACE_DAPL0071276

Environmental Assessment
Dakota Access Pipeline Project
July 2016

Land cover on the federal lands is comprised of cultivated crops, emergent herbaceous wetlands, grassland/herbaceous, and open water.  Over half of the area of the tracts is characterized as grassland/herbaceous, which primarily occurs on the west side of Lake Oahe.  Cultivated cropland consists mainly of oats and canola on the east side of the Lake.

A description of each land cover type encountered at both crossing areas is provided below.

**Cultivated Crop**

The cultivated cropland community is characterized by land used for the production of annual crops, such as corn and soybeans.  This class includes all land being actively tilled.

**Deciduous Forest**

Deciduous forest typically includes trees that are greater than 16 feet tall.  More than 75% of the tree species in this land cover class shed foliage simultaneously in response to seasonal change.

**Mixed Forest**

Mixed forest are generally areas dominated by trees generally greater than 5 meters tall, and greater than 20% of total vegetation cover.  The vegetation cover within mixed forest typically does not have either deciduous or evergreen species greater than 75% of the total tree cover.

**Developed/Open Space**

The developed/open space community type is dominated by lawn grasses and may include some developed areas and roads.  Impervious surfaces account for less than 20% of the total cover.  This class would typically include minor roads and associated ditches.

**Developed/Low Intensity**

The developed/low intensity community includes areas with a mixture of constructed material and vegetation.  These areas most commonly include single-family housing units.  Developed/low intensity in the Project Area is associated with impervious surfaces of larger roads.

**Emergent Herbaceous Wetland**

Refer to Section 3.2.3, which provides a description of data obtained during delineations of the wetlands that would be impacted by the Proposed Action.

**Woody Wetlands**

Refer to Section 4.2.3, which provides a description of data obtained during delineations of the wetlands that would be impacted by the Proposed Action.

USACE_DAPL0071277

Environmental Assessment
Dakota Access Pipeline Project
July 2016

## Grassland/Herbaceous

The grassland/herbaceous community is dominated by graminoid or herbaceous vegetation.  These areas are not subject to intensive management such as tilling but can be utilized for grazing.

## Pasture/Hay

The pasture/hay community type consists of areas of grasses, legumes, or grass-legume mixtures planted for livestock grazing or the production of seed or hay crops, typically on a perennial cycle.

## Open Water

The open water cover type includes areas of open water.  This land cover type is associated with Lake Oahe and the Missouri River.

### 3.3.1.2   Impacts and Mitigation

Temporary impacts on land cover would occur in essentially all areas within the construction footprint of the Project Area and Connected Actions, the vast majority of which would return to pre-construction land cover upon completion of construction.  One exception is at the flowage easement Project Area in forested areas along the permanent easement Impacts on cultivated crops make up the majority of temporary impacts and would return to cultivated crops post-construction.

**Tables 3-9** and **3-10** show land cover types impacted by construction and maintenance activities.  A description of each category is provided below.

| Table 3-9 Land Cover Impacts on the Flowage Easements Project Area and Connected Action | | | | |
|---|---|---|---|---|
| **Land Cover Type** | **Connected Action- Construction Workspace (acres)** | **Connected Action- Permanent ROW (acres)** | **Construction Workspace (acres) [1]** | **Permanent ROW (acres)** |
| Cultivated Crops | 0 | 0 | 47.4 | 13.3 |
| Deciduous Forest | 0.9 | 0.2 | 0 | 0 |
| Developed, Low Intensity | 0 | 0 | 0.4 | 0.4 |
| Developed, Open Space | 0.1 | 0.01 | 1.2 | 0.4 |
| Emergent Herbaceous Wetlands | 0 | 0 | 0.9 | 0.4 |
| Hay/Pasture | 0 | 0 | 6.6 | 1.8 |
| Grassland/Herbaceous | 0.1 | 0 | 1.7 | 0.5 |
| Mixed Forest | 0.2 | 0.03 | 0 | 0 |
| Open Water | 0.7 | 0.1 | 0 | 0 |
| Woody Wetlands | 0 | 0 | 1.4 | 0.8 |
| **Total** | **2.0** | **0.3** | **59.3** | **17.6** |

[1]  Construction workspace includes permanent ROW.

USACE_DAPL0071278

Environmental Assessment
Dakota Access Pipeline Project
July 2016

Permanent impacts on land cover in the federal lands would be limited to the permanent ROW and involve limited tree removal within the permanent easement.  Impacts on land cover as part of the Connected Action would occur on private lands and include the HDD workspaces, stringing area, and the permanent easements between the HDD workspaces and federal lands.

| Table 3-10 Land Cover Impacts on the Federal Lands Project Area and Connected Action | | | |
|---|---|---|---|
| Land Cover | Connected Action– Construction Workspace (acres) | Connected Action– Permanent ROW (acres) | Federal Lands Permanent ROW (acres) [1] |
| Cultivated Crops | 0.0 | 0.0 | 0.1 |
| Emergent Herbaceous Wetlands | 0.0 | 0.0 | 0.4 |
| Woody Wetlands | 0.2 | 0.0 | 0.0 |
| Grassland/ Herbaceous | 15.3 | 1.1 | 0.6 |
| Total | 15.5 | 1.1 | 1.2 |

[1]  Land cover impacts on federal lands are limited to the maintained 50-foot permanent easement and do not include approximately 6.3 acres of permanent easement over the HDD profile across Lake Oahe.  Land cover within the banks of Lake Oahe (open water, woody wetlands, and emergent herbaceous wetlands) would not be disturbed during construction.

**Measures to Protect Vegetation**

Dakota Access would clear the ROW to the extent necessary to assure suitable access for construction, safe operation, and maintenance of the DAPL Project.  Clearing of herbaceous vegetation during construction is anticipated to result in short-term impacts.  Within areas disturbed by construction in the flowage easements Project Area and Connected Actions, Dakota Access would implement active revegetation measures and rapid colonization by annual and perennial herbaceous species to restore most vegetative cover within the first growing season.  In areas that require permanent revegetation, Dakota Access would utilize an NRCS native seed mix that has been selected for the Proposed Action based on the North Dakota State University Extension Service Publication, *Successful Reclamation of Lands Disturbed by Oil and Gas Development and Infrastructure Construction*.  .  Ground disturbing activities would not occur on Corps fee-owned lands; therefore, reseeding is not anticipated in these areas.  However, if reseeding were to become necessary on Corps fee-owned lands, all activities would be conducted in accordance with applicable Lake Oahe or Garrison Project revegetation guidelines.

In non-agricultural areas, vegetation cleared from ATWS would be allowed to revegetate after construction depending on arrangements with the landowner.  Consequently, significant changes in cover types are not anticipated.  Revegetation would allow wildlife species to return to the area after construction is completed.  Temporary revegetation measures may also be implemented to quickly establish ground cover to minimize the potential for soil erosion and noxious weeds to establish.  A temporary seed mix may be applied in these situations.  Revegetation of trees and shrubs would take

USACE_DAPL0071279

Environmental Assessment
Dakota Access Pipeline Project
July 2016

place in accordance with the North Dakota tree and shrub regulations.  The ECP (**Appendix G**) contains more details regarding temporary revegetation.

After completion of waterbody crossings, Dakota Access would revegetate disturbed stream banks in accordance with the ECP, SWPPP, and requirements of applicable state and federal permits.   When constructing in agricultural areas, up to 1 foot of topsoil (organic layer) would be stripped from the trench line and stockpiled separately from trench spoil to preserve the native seed stock.  The ECP contains additional details regarding topsoil segregation.

At stream approaches, the Contractor would leave a 20-foot buffer of undisturbed herbaceous vegetation on all stream banks during initial clearing, except where grading is needed for bridge installation or where restricted by applicable regulations and/or permit conditions.

### 3.3.2    Invasive and Noxious Weeds

#### 3.3.2.1    Affected Environment

The state of North Dakota has 11 state-listed noxious and invasive weeds ("invasive species").  The species listed are: Russian knapweed (*Acroptilon repens*), absinth wormwood (*Artemisia absinthium*), musk thistle (*Carduus nutans*), diffuse knapweed (*Centaurea diffusa*), yellow toadflax (*Linaria vulgaris*), spotted knapweed (*Centaurea maculosa*), Canada thistle (*Cirsium arvense*), leafy spurge (*Euphorbia esula*), dalmatian toadflax (*Linaria dalmatica*), purple loosestrife (*Lythrum salicaria*), and saltcedar (*Tamarix chinensis*).  These state invasive species are controlled and regulated under North Dakota Law (NDCC § 4.1-47-02) (North Dakota Department of Agriculture, 2014a).

Each county in North Dakota has a County Weed Board, which consists of a regulation committee to manage noxious and invasive weeds.  Each of these county boards is responsible for the addition of county-specific invasive species to the state-listed species.  Additional noxious weeds are listed in McKenzie County including field bindweed (*Convolvulus arvensis*), burdock (*Arctium* sp.), black hendane (*Hyoscyamus niger*), houndstongue (*Cynoglossum officinale*), and yellow starthistle (*Centaurea solstitialis*).  No additional invasive species have been identified for listing in Williams, Morton, and Emmons counties.

#### 3.3.2.2    Environmental Impact and Mitigation

Dakota Access sent notifications to the McKenzie, Williams, Morton, and Emmons counties weed boards describing the Proposed Action and requesting any guidance regarding the known locations of noxious and invasive weeds pertaining to that county.  Dakota Access would work with the county weed boards to ensure the ECP contains relevant and necessary mitigation measures that would be implemented to prevent the spread of noxious weed species during construction and operation of the Proposed Action.

USACE_DAPL0071280

Environmental Assessment
Dakota Access Pipeline Project
July 2016

### 3.3.3    Threatened, Endangered, Candidate, and Proposed Plant Species

#### 3.3.3.1    Affected Environment

There is one federally-listed plant species in North Dakota, the threatened western prairie fringed orchid. This plant species is associated with high quality moist, tall grass prairie.  Most of the orchids in North Dakota are located in the Sheyenne National Grasslands in Ransom and Richland counties in the southeastern corner of the state.   The population at Sheyenne National Grasslands is the largest population left in the world, with over 7,000 orchids (USFWS, 2013a).

North Dakota does not have a state threatened and endangered species program or track plant species that are not federally listed.

#### 3.3.3.2    Impacts and Mitigation

There are no known records of western prairie fringed orchids in the Project Area counties, and no suitable habitat was documented; therefore, no effect on the western prairie fringed orchid is expected as a result of the proposed undertaking.  In the unlikely event that any are observed during construction on federal lands, work would stop and the Corps would be contacted.

### 3.4    Wildlife Resources

Under the "no action" alternative, Dakota Access would not construct the DAPL Project, and no impacts on wildlife resources would occur.  However, if the objectives of the DAPL Project are to be met under the "no action" alternative, other projects and activities would be required and these projects would result in their own impacts on wildlife resources, which would likely be similar to or greater than the DAPL Project. Impacts associated with a future project developed in response to the "no action" alternative are unknown, while only temporary and minor impacts, if any, on wildlife resources would occur as a result of the Proposed Action, as described in the sections below.

### 3.4.1    Recreationally and Economically Important Species and Nongame Wildlife

#### 3.4.1.1    Affected Environment

The Proposed Action region is home to a large number of mammal and bird species.  Big game species that occur in the Proposed Action region include pronghorn and white-tailed deer.  Game birds potentially using the types of wildlife habitat in the Project Area include the ruffed grouse, sharp-tailed grouse, pheasant, woodcock, snipe, and doves.  Furbearers and predators potentially occurring within the Project Area include coyote, beaver, badger, red fox, raccoon, bobcat, fisher, mink, weasel, and muskrat. Potential small mammal species occurring within the habitat types associated with the Project Area include pocket gopher, skunk, and white-tailed jackrabbit.

Waterfowl and shorebird species potentially occurring within the Project Area include mallards, pintails, American wigeon, blue-winged teal, western grebe, California gull, Canada goose, common tern, killdeer, Wilson's phalarope, and lesser yellowlegs.  Numerous songbirds, including the American goldfinch, black-

USACE_DAPL0071281

Environmental Assessment
Dakota Access Pipeline Project
July 2016

capped chickadee, cedar waxwing, clay-colored sparrow, lark bunting, song sparrow, tree swallow, western kingbird, western meadowlark, and yellow warbler can be expected to occur in the Project Area.

Numerous species of reptiles and amphibians may also occur within the Project Area.  Some amphibian species that may be expected to occur in the Project Area include the northern leopard frog, tiger salamander, and western chorus frog.  Reptile species that may be expected to occur within the Project Area include common snapping turtle, western painted turtle, common garter snake, and racer (Hoberg and Gause, 1992).

### 3.4.1.2   Impacts and Mitigation

Temporary impacts on wildlife could occur during construction due to clearing of vegetation and movement of construction equipment along the ROW.  The ROW and ATWS would remain relatively clear of vegetation until restoration is completed.  Most wildlife, including the larger and more mobile animals, would disperse from the Project Area as construction activities approach.  Displaced species may recolonize in adjacent, undisturbed areas, or reestablish in their previously occupied habitats after construction has been completed and suitable habitat is restored.  Some smaller, less mobile wildlife species such as amphibians, reptiles, and small mammals have the potential to be directly impacted during clearing and grading activities, but given the limited extent of the proposed crossing, measurable impacts are not anticipated.  No impacts to treaty fishing and hunting rights are anticipated due to construction within the Project Area or Connected Actions.

Herbaceous cover would be seeded on disturbed upland areas during restoration, and it is expected that pre-existing herbaceous and shrub habitats would quickly reestablish themselves.  Consequently, it is expected that the wildlife species that use these habitats would also return within one growing season of construction completion.  Routine clearing of the permanent easement to improve visibility and remove encroaching trees would be performed in compliance with PHMSA requirements.  The lack of trees reestablishing would be the only potential long-term impact to wildlife that depends on forested communities.  This impact is expected to be negligible, as it only pertains to extremely small portions of the permanent easement and very little forested habitat is present within the Project Area and Connected Actions.

### 3.4.2   Threatened, Endangered, Candidate, and Proposed Wildlife Species

The Endangered Species Act (ESA) directs all federal agencies to work to conserve endangered and threatened species.  Crossing the Corps flowage easements and federal lands triggers the consultation procedures of section 7 of the ESA.  This section serves as the Biological Evaluation or written analysis documenting the Corps' conclusions and the rationale to support those conclusions regarding the effects of the Proposed Action on protected wildlife resources.  The Bald Eagle (*Haliaeetus leucocephalus*) was removed from the federal list of threatened and endangered species on August 9, 2007 and is no longer protected under the ESA.  However, the bald eagle is provided protection under the Bald and Golden Eagle Protection Act (BGEPA) and the Migratory Bird Treaty Act (MBTA), which prohibits disturbance of eagles and other raptors.  In order to ensure compliance with these acts, Dakota Access obtained USFWS and state agency data regarding known eagle nests in the vicinity of the Missouri River and Lake Oahe crossings from the North Dakota Game and Fish Department, who houses the eagle location database.  The Proposed Action and Connected action will be over 1,000 feet from known or historic eagle nesting areas.

USACE_DAPL0071282

Based on the known nest data, there are no eagle nests within the USFWS National Bald Eagle Management Guidelines recommend nest buffers of 660 feet for linear construction activities if the activity will be visible from the nest and 330 feet if the activity will not be visible from the nest (USFWS, 2007).  These guidelines are intended to help the public minimize impacts to bald eagles, particularly where they may constitute "disturbance", which is prohibited by the BGEPA. Given the distance from known eagle nesting areas, and the mitigation of use of the HDD method for both the Missouri and Lake Oahe crossings, the Proposed Action is not anticipated to have any effect on Bald or Golden eagles

### 3.4.2.1   Affected Environment

Nine federally listed species have been identified in Williams, McKenzie, Morton, and Emmons counties. Designated critical habitat for the piping plover also occurs in each of the four counties.  The USFWS concurred with the Corps effect determinations included below in Section 3.4.2.2 for all listed species within the EA review area.

**Interior Least Tern**

In North Dakota, the interior least tern (*Sterna antillarum*) utilizes sparsely vegetated sandbars on the Missouri River.  Birds nest, raise young, and relax on barren river sandbars.  In North Dakota, the least tern is found mainly on the Missouri River from Garrison Dam south to Lake Oahe and on the Missouri and Yellowstone Rivers upstream of Lake Sakakawea.  Approximately 100 pairs breed in North Dakota during the summer before flying to coastal areas of Central and South American and the Caribbean Islands (USFWS, 2013b).

**Whooping Crane**

Whooping cranes (*Grus Americana*) embark on a bi-annual migration from summer nesting and breeding grounds in Wood Buffalo National Park in northern Alberta to the barrier islands and coastal marshes of the Aransas National Wildlife Refuge on the Gulf Coast of Texas.  Twice yearly in the spring and fall, whooping cranes migrate along the Central Flyway, a migratory corridor approximately 220 miles wide and 2,400 miles in length.  The Central Flyway includes eastern Montana and portions of North Dakota, South Dakota, Nebraska, Kansas, Oklahoma, and eastern Texas (USFWS, 2014a) (**Figure 16**).  During the migration, cranes make numerous stops, roosting for short durations in large shallow marshes, and feeding in harvested grain fields.  Approximately 75% of the whooping crane sightings in North Dakota occur within the Central Flyway.  The primary threats to whooping cranes are power lines, illegal hunting, and habitat loss.

**Black-footed Ferret**

The black-footed ferret (*Mustela nigripes*) is a small member of the Mustelidae family native to North American shortgrass and mixed grass prairie.  Prairie dogs make up approximately 90% of the black-footed ferret diet and as such, the species is associated almost exclusively with large complexes of prairie dog towns (USFWS, 2013c; Black-footed Ferret Recovery Implementation Team [BFFRIT], 2011).  Black-footed ferrets are fossorial, nocturnal predators, spending the majority of their time underground in prairie dog burrows, leaving only to hunt (BIFFRIT, 2011).  Once thought to be extirpated in the wild, captive-born

USACE_DAPL0071283

Environmental Assessment
Dakota Access Pipeline Project
July 2016

individuals have been reintroduced to 21 sites in Wyoming, Montana, South Dakota, Colorado, Utah, Kansas, New Mexico, and Arizona since 1991 (USFWS, 2013c).

**Gray Wolf**

A habitat generalist, the gray wolf (*Canis lupus*) historically occupied most habitat types in North America. They show little preference for one cover type over another and successfully utilize alpine, forest, grassland, shrubland, and woodland habitats across their range (Mech, 1974).  Once thought to require wilderness areas with little to no human disturbance, recent range expansions have demonstrated the species' ability to tolerate higher rates of anthropogenic development than previously thought.  Given abundant prey and low rates of human-caused mortality, wolves can survive in proximity to human-dominated environments (Fuller, 1989).

**Northern Long-eared Bat**

Northern long-eared bats (*Myotis septentrionalis*) occur throughout the eastern and north-central U.S.  Eastern populations have declined significantly in recent years as a result of white-nose syndrome (WNS), a contagious fungal infection.  Although historically less common in the western portion of its range than in the northern portion, northern long-eared bats occur throughout North Dakota.  Habitat throughout its range includes caves and abandoned mines during the winter and hardwood or mixed forests for roosting and foraging during the summer (USFWS, 2015).

Northern long-eared bats may roost singly or in colonies in cavities, crevices, hollows, or beneath the bark of live and dead trees and/or snags, regardless of tree species.  They prefer trees with a diameter at breast height of at least 3 inches.  Less frequently, Northern long-eared bats have been observed roosting in man-made structures such as sheds or barns.  Northern long-eared bats primarily forage at dusk on insects in forests, but will occasionally forage over small forest clearings and water (USFWS, 2015).

**Piping Plover**

Piping plovers (*Charadrius melodus*) are shore birds that inhabit areas near water, preferring river sandbars and alkali wetlands in the Great Plains for nesting, foraging, sheltering, brood-rearing, and dispersal.  Piping plovers winter along large coastal sand or mudflats near a sandy beaches throughout the southeastern U.S.  Critical Habitat for the piping plover is designated along the Missouri River system throughout North Dakota (USFWS, 2012).

**Dakota Skipper**

The Dakota skipper (*Hesperia dacotae*) is a small butterfly found in dry-mesic and wet-mesic tallgrass and mesic mixed grass prairie remnants characterized by alkaline and composite soils.  The Dakota skipper is a habitat specialist requiring high-quality prairie habitat (i.e., grasslands or discrete patches of habitat within grasslands that are predominantly native and that have not been tilled).  Only 146 populations are documented in three states and two Canadian provinces (McCabe, 1981; Royer and Marrone, 1992; Cochrane and Delphey, 2002; USFWS, 2011; 2013d).  Remaining populations vary in size and density and for the most part are not influenced by dispersal between populations (McCabe, 1981; Dana, 1991; Dana, 1997; Cochrane and Delphey, 2002).  The species overwinters at the base of grasses in the soil of the site

USACE_DAPL0071284

which they inhabit.  In North Dakota, the skipper typically occupies both wet-mesic and dry-mesic prairie (Royer and Marrone, 1992; Cochrane and Delphey, 2002).  The current status of the Dakota skipper in the state is considered tenuous, and most populations are considered vulnerable due to their extremely isolated nature.

**Rufa Red Knot**

The rufa red knot (*Calidris canutus rufa*) is a large sandpiper noted for its long-distance migration between summer breeding grounds in the Arctic and wintering areas at high latitudes in the Southern Hemisphere (USFWS, 2014b).  Some rufa red knots wintering in the northwestern Gulf of Mexico migrate through interior North America during both spring and fall and use stopover sites in the Northern Great Plains.  During spring and fall migrations, rufa red knots are typically found in marine habitats along the Pacific and Atlantic coasts of North America, generally preferring sandy coastal habitats at or near tidal inlets or the mouths of bays and estuaries.  However, some migrating rufa red knots use sandbars and sandy shore and beach habitats along large rivers and reservoirs of the interior of North America.  This area contains the Atlantic, Mississippi, and Central Flyways (USFWS, 2014g). The species also heavily relies on exposed substrate at wetland edges for stopover habitat, and the suitability of a wetland for rufa red knots depends on water levels and may vary annually (Gratto-Trevor et al., 2001).

**Pallid Sturgeon**

Pallid sturgeon (*Scaphirhynchus albus*) prefer benthic environments associated with swift waters of large turbid, free-flowing rivers with braided channels, dynamic flow patterns, periodic flooding of terrestrial habitats, and extensive microhabitat diversity.  Pallid sturgeon inhabit the Missouri and Mississippi Rivers from Montana to Louisiana and have been documented in the Missouri River downstream from the Fort Peck Dam in Montana to the headwaters of Lake Sakakawea, North Dakota, and downstream from Garrison Dam, North Dakota to the headwaters of Lake Oahe, South Dakota (USFWS, 2014c).  Pallid sturgeon populations are fragmented by dams on the Missouri River and are very scarce in the Lake Oahe portion of the Missouri River.

### 3.4.2.2   Impacts and Mitigation

Dakota Access conducted pedestrian surveys of the workspace within the Project Area at the flowage easements in September 2014 and July 2015 and at the Lake Oahe crossing in April 2015 to assess suitable habitat for listed species.  Given the limited scope of the Proposed Action, minimization measures, and the implementation of specialized construction techniques, the Corps has determined that the Proposed Action would have no effect on the black-footed ferret, gray wolf, northern long-eared bat, and Dakota skipper within the Project Area.  The Corps also determined that the Proposed Action may affect, but is not likely to adversely affect the interior least tern, whooping crane, piping plover, rufa red knot, and pallid sturgeon in the Project Area.  The effect determination for these species that may be affected, but are not likely to be adversely affected was concurred with in a letter received from the USFWS on May 2, 2016.  A Biological Opinion (BO) associated with other portions of the DAPL Project, outside of the EA review area, was issued by the USFWS on May 31, 2016 but is not applicable to this document.  **Table 3-11** lists the impact determinations of the protected species with potential to occur within the Project Area and Connected Action.  A summary of habitat evaluations and the basis for the determination of impacts for each listed species is provided below.

USACE_DAPL0071285

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 3-11 Federally Listed Species with Potential to Occur within the Project Area and Connected Action | | | | | | |
|---|---|---|---|---|---|---|
| **Species** | **Status** | **County** | | | | **Impact Determination** |
| | | **Williams** | **McKenzie** | **Morton** | **Emmons** | |
| Interior Least Tern | Endangered | X | X | X | X | May Affect, Not Likely to Adversely Affect |
| Whooping Crane | Endangered | X | X | X | X | May Affect, Not Likely to Adversely Affect |
| Black-footed Ferret | Endangered | | X | X | | No Effect |
| Gray Wolf | Endangered | X | X | X | | No Effect |
| Northern Long-eared Bat | Threatened | X | X | X | X | No Effect |
| Piping Plover | Threatened | X | X | X | X | May Affect, Not Likely to Adversely Affect |
| Dakota Skipper | Threatened | | X | X | X | No Effect |
| Rufa Red Knot | Threatened | X | X | X | X | May Affect, Not Likely to Adversely Affect |
| Pallid Sturgeon | Endangered | X | X | X | X | May Affect, Not Likely to Adversely Affect |

**Interior Least Tern**

Suitable habitat may exist for interior least terns at the Missouri River and at the Lake Oahe crossing depending on precipitation and seasonal flow variations as exposed sand/gravel bars suitable for nesting may be present. Dakota Access proposes to cross the Missouri River and Lake Oahe utilizing the HDD construction method. Pipeline installation via HDD will avoid in-stream disturbance that would otherwise occur if the pipe was installed via the traditional open-cut method, as described in Section 2.1.4.

Potential sources for indirect impacts on interior least terns include the inadvertent release of non-toxic bentonite mud (used for lubricating the drill path) into the waterbody or nesting habitat and noise associated with the drilling equipment. Dakota Access conducted geotechnical analyses at each of the proposed HDD crossings and designed the HDD to minimize the likelihood that the drilling mud is inadvertently released. While the likelihood of an inadvertent release has been minimized to the maximum extent practicable, were it to occur, implementation of Dakota Access' HDD Contingency Plan (**Appendix B**) would minimize any potential impacts on interior least terns by quickly and efficiently containing and removing the released, non-toxic mud.

Operation of the HDD equipment will result in a temporary increase in noise in the immediate vicinity of the HDD activities. Although the HDD entry and exit sites are located more than 960 feet from any suitable interior least tern habitat, it is possible that the activities would be audible if interior least terns are nesting in the area. However, Atwood et al. (1977) found that noise associated with human activities (an airfield in the case of the referenced study) did not affect site fidelity or nesting success of least terns. Similarly, Hillman et al. (2015) found that noise from military and civilian overflights did not impact nest success and that restricting human disturbance to greater than 50 meters (164 feet) from colony boundaries mitigated

62

adverse impacts to nesting birds. Noise associated with aircraft overflights at low altitudes in the Hillman et al. (2015) study were a minimum of 67.7 decibels (A-weighted) (dBA), greater than the anticipated sound levels generated by HDD equipment. Noise studies conducted at the proposed HDD entry and exit locations indicate that sound levels would be less than 60 dBA at approximately 600 feet from the equipment. Therefore, noise associated with the HDD crossings of the Missouri River and Lake Oahe may affect, but are not likely to adversely affect interior least terns potentially nesting in the area.

Dakota Access plans to withdrawal water from the Missouri River, which is required for activities associated with the installation of the HDD and the hydrostatic testing of the HDD segment. A temporary waterline would be installed at the Missouri River between the shoreline and the HDD workspace on the flowage easements within the permanent ROW (**Figure 6-B**). The temporary waterline would be laid by hand on top of the surface, and no tracked or wheeled equipment would be necessary for installation or removal of the temporary aboveground waterline. No disturbance of the river banks is anticipated. Additionally, installation and removal of the waterline are anticipated to be complete prior to nesting season; therefore, no impacts on the interior least tern are anticipated to occur at the Missouri River. If the water withdrawal activities are not able to be completed prior to nesting season, Dakota Access would conduct surveys prior to placement of the waterline to confirm the presence/absence of interior least terns within the pipeline ROW. If interior least terns are nesting within the pipeline ROW, Dakota Access would postpone water withdrawal activities and contact the Corps and USFWS. Work would only resume when the USFWS has given permission following a survey to ensure interior least terns would no longer be affected. No water withdrawal from or access to Lake Oahe is required to complete the Lake Oahe crossing.

As discussed in Section 2.3.2 above, Dakota Access would routinely maintain its 30 to 50-foot-wide permanent easement, including periodic mowing and removal of woody vegetation. Because suitable interior least tern nesting habitat is on unvegetated flats within the Missouri River and Lake Oahe, routine maintenance activities would not occur within suitable habitat. During operation of the pipeline, in the unlikely event that a leak or spill were to occur and reach interior least tern habitat, Dakota Access would implement its FRP and strictly adhere to PHMSA regulations.

Based on the avoidance and minimization measures, literature review, field investigations, and habitat types present in the proposed Project Area, USACE has determined that the Proposed Action may affect, but is not likely to adversely affect the interior least tern.

**Whooping Crane**

In North Dakota, whooping cranes are only present during the twice-yearly migration between winter grounds and summer nesting sites. As the whooping crane is a migrant and does not breed in North Dakota, the species cannot be confirmed as present in or absent from the Project Area. The results of the habitat assessment field surveys indicate that the Project Area may contain suitable stopover habitat (i.e., agricultural fields). It is anticipated that whooping cranes would avoid the Project Area during active construction, as they tend to avoid areas with human disturbance (Howe, 1989; USFWS, 1994; Lewis and Slack, 2008). The noise and land disturbance from construction activities during the migration periods would likely cause birds to choose more suitable landing and overnight roosting locations away from construction activities given the abundance of similar habitat throughout the migration corridor in North Dakota and in the general vicinity of the Project Area.

USACE_DAPL0071287

While there is potential for individuals to land in the Project Area during construction, work would halt if a whooping crane is observed within the Project Area and would not resume until the bird leaves the area. Additionally, Dakota Access would notify the Corps and USFWS of the observation. The presence of construction activities within potentially suitable stopover habitat during migration could disturb whooping cranes in the area or cause flying whooping cranes to avoid the area and select other suitable stopover habitat. Due to the abundance of available stopover habitat along the North Dakota migration corridor and in the vicinity of the Project Area (USFWS, 2009a), impacts would be negligible. As illustrated in **Figure 16**, the Project Area represents a minute fraction of the whooping crane migration corridor in North Dakota.

As discussed in Section 2.3.2 above, Dakota Access would routinely maintain its 30 to 50-foot-wide permanent easement, including periodic mowing and removal of woody vegetation. As whooping cranes utilize open fields and emergent wetlands for stopover habitat, affects from maintenance activities would be minimal and would be similar to those described above during construction activities. If whooping cranes were observed in the area during maintenance activities, maintenance personnel would suspend activities until the cranes leave the area. Similarly, if maintenance activities are ongoing at the time of migration, whooping cranes would likely avoid the disturbance area.

In order for whooping cranes to be affected by a spill or leak during operation, an individual would have to be present when the leak or spill occurred or land in the spill itself. Due to the strict adherence to PHMSA regulations designed to prevent spills and leaks during operation, the short timeframe that whooping cranes are present during migration, and the abundance of available stopover habitat along the migration corridor in North Dakota (USFWS, 2009a), the measures implemented by Dakota Access in the event of a leak in accordance with the FRP, such occurrences are unlikely.

Based on the avoidance and minimization measures, literature review, field investigations, and habitat types present in the Project Area, USACE has determined that the Proposed Action may affect, but is not likely to adversely affect the whooping crane.

**Black-footed Ferret**

No suitable black-footed ferret habitat is present in the Project areas. The black-footed ferret has been recorded in Morton County; however, based on occurrence data received from North Dakota Parks and Recreation, there are no documented occurrences within the vicinity of the Proposed Action. Further, it is believed that black-footed ferrets have been extirpated from North Dakota, and no reintroductions have occurred in the state (USFWS, 2013f; North Dakota Game and Fish Department, 2012). Due to the lack of suitable habitat and the distance of the Project areas from known black-footed ferret occurrences, construction, operation, and maintenance activities associated with the Proposed Action would have no effect on black-footed ferrets.

**Gray Wolf**

The gray wolf is listed as endangered in all three counties of the Proposed Action areas in North Dakota (south and west of the Missouri River upstream to Lake Sakakawea and west of the centerline of Highway 83 from Lake Sakakawea to the Canadian border). Wolves in eastern North Dakota are part of the Great Lakes Distinct Population Segment that was delisted by the USFWS in January 2012 (USFWS, 2014e).

USACE_DAPL0071288

Environmental Assessment
Dakota Access Pipeline Project
July 2016

North Dakota does not currently have an established breeding population (North Dakota Department of Agriculture, 2014b). Observations of wolves are sporadic, and it is believed that these individuals are dispersers from adjacent populations (i.e., from Minnesota and Manitoba) (USFWS, 2006; Licht and Fritts, 1994). Given the unlikely occurrence and high mobility of this species, construction, operation and maintenance activities associated with the Proposed Action would have no effect on gray wolves.

**Northern Long-eared Bat**

The northern long-eared bat is currently listed by the USFWS as threatened in North Dakota. On April 2, 2015, the USFWS published the final listing in the Federal Registrar with an effective date of May 4, 2015. The USFWS listed the northern long-eared bat as threatened and chose to exercise the option of issuing an interim 4(d) rule to allow for more flexible implementation of the ESA and "to tailor prohibitions to those that make the most sense for protecting and managing at-risk species." In areas outside of the 150-mile WNS buffer zone, incidental take from lawful activities is not prohibited. The State of North Dakota currently falls outside of the WNS 150-mile buffer zone. Per the exemptions of the interim 4(d) rule, construction, operation and maintenance activities associated with the Proposed Action would have no effect on the northern long-eared bat (USFWS, 2015).

**Piping Plover**

Due to the similarity in life history and habitat requirements, impacts on piping plovers would be similar to those discussed in above for the interior least tern. Suitable habitat may exist for piping plover at the Missouri River and at the Lake Oahe crossing, depending on precipitation and seasonal flow variations, as exposed sand/gravel bars suitable for nesting may be present. These areas are also designated as critical habitat for this species under the ESA. Dakota Access proposes to cross the Missouri River and Lake Oahe utilizing the HDD construction method. Pipeline installation via HDD will avoid in-stream disturbance that would otherwise occur if the pipe was installed via the traditional open-cut method, as described in Section 2.1.4.

Potential sources for indirect impacts on piping plovers include the inadvertent release of non-toxic bentonite mud (used for lubricating the drill path) into the waterbody or nesting habitat and noise associated with the drilling equipment. Dakota Access conducted geotechnical analyses at each of the proposed HDD crossings and designed the HDD to minimize the likelihood that the drilling mud is inadvertently released. While the likelihood of an inadvertent release has been minimized to the maximum extent practicable, were it to occur, implementation of Dakota Access' HDD Contingency Plan would minimize any potential impacts on piping plovers by quickly and efficiently containing and removing the released, non-toxic mud.

Operation of the HDD equipment will result in a temporary increase in noise in the immediate vicinity of the HDD activities. Although the HDD entry and exit sites are located more than 960 feet from any suitable piping plover habitat, it is possible that the activities would be audible if piping plovers are nesting in the area. However, piping plovers are frequently observed nesting in and around active sand and gravel mines and do not appear to be deterred by elevated noise levels associated with the operation of equipment (Marcus et al., 2008; Brown et al., 2013).

65

USACE_DAPL0071289

As discussed for the interior least tern above, impacts associated with installation of the temporary waterline at the Missouri River required for activities associated with the installation of the HDD and the hydrostatic testing of the HDD segment would be avoided.  If the water withdrawal activities are not able to be completed prior to nesting season as expected, Dakota Access would conduct surveys prior to placement of the waterline to confirm the presence/absence of piping plovers within the pipeline ROW.  If piping plovers are nesting within the pipeline ROW, Dakota Access would postpone water withdrawal activities and contact the USFWS and the Corps.  Work would only resume when the USFWS has given permission following a survey to ensure piping plovers would no longer be affected.  No water withdrawal from or access to Lake Oahe is required to complete the Lake Oahe crossing.

As discussed in Section 2.3.2 above, Dakota Access would routinely maintain its 30 to 50-foot-wide permanent easement, including periodic mowing and removal of woody vegetation.  Because suitable piping plover nesting habitat is on unvegetated flats within the Missouri River and Lake Oahe, routine maintenance activities would not occur in suitable piping plover habitat.  In the unlikely event that a leak or spill occurs and reaches piping plover habitat during operation of the pipeline, Dakota Access would implement its FRP and strictly adhere to PHMSA regulations.

Based on the avoidance and minimization measures, literature review, field investigations, and habitat types present in the Project Area, USACE has determined that the Proposed Action may affect, but is not likely to adversely affect the piping plover.

**Dakota Skipper**

There is no suitable Dakota skipper habitat within the Project Area based on species occurrence and grassland analysis.  As such, construction, operation and maintenance activities associated with the Proposed Action would have no effect on this species.

**Rufa Red Knot**

Rufa red knots do not nest in the Project Area and only occur as an occasional migrant.  During spring and fall migrations, the rufa red knot has the potential to occur in North Dakota.  Migrating rufa red knot would likely only occur at migratory stopover habitat (suitable shoreline and sandy beach habitat along major rivers, streams, waterbodies, and wetlands) for a brief amount of time (24 hours or less).  The results of the habitat assessment field surveys indicate that potentially suitable stopover habitat (sandbar and beach habitats) for migrating rufa red knots is present at the Lake Oahe crossing.  Lake Oahe would be crossed using the HDD construction method, and thus would avoid direct impacts on potentially suitable rufa red knot stopover habitat.  While direct impacts to the rufa red knot migratory habitat would be avoided through the HDD construction method at Lake Oahe, indirect impacts could occur due to potential disturbance during construction (i.e., noise or an inadvertent release of non-toxic drilling mud).

During construction, noise associated with the HDD may act as deterrent to rufa red knots potentially migrating through the area.  These individuals may have to travel to other suitable stopover habitat in the area (e.g., upstream or downstream of the Proposed Action area).  Similarly, if an inadvertent release of non-toxic drilling mud were to occur when rufa red knots were present, it could cause individuals to relocate to nearby habitat.

USACE_DAPL0071290

Environmental Assessment
Dakota Access Pipeline Project
July 2016

As discussed in Section 2.3.2 above, Dakota Access would routinely maintain its 30 to 50-foot-wide permanent easement, including periodic mowing and removal of woody vegetation. As rufa red knots utilize suitable shoreline and sandy beach habitat along major rivers, streams, waterbodies, and wetlands for stopover habitat, effects from maintenance activities would be negligible and would be similar to those described above during construction activities. If rufa red knots were present in the area during maintenance activities they would likely relocate to nearby suitable habitat. Similarly, if maintenance activities are ongoing at the time of migration, rufa red knots would likely avoid the disturbance area.

In order for rufa red knots to be affected by a spill or leak during operation, an individual would have to be present when the leak or spill occurred or stop on the spill or leak. Due to the strict adherence to PHMSA regulations designed to prevent spills and leaks during operation and the short timeframe that rufa red knots are present during migration, such occurrences are unlikely.

Based on the avoidance and minimization measures, literature review, field investigations, and habitat types present in the Project Area, USACE has determined that the Proposed Action may affect, but is not likely to adversely affect the rufa red knot.

**Pallid Sturgeon**

Suitable habitat for the pallid sturgeon occurs at the Missouri River and Lake Oahe crossings. Impacts on suitable habitat would be avoided by crossing these waterbodies via HDD. As discussed in for the interior least tern above, pipeline installation via HDD will avoid in-stream disturbance that would otherwise occur if the pipe was installed via the traditional open-cut method.

Dakota Access has also minimized the potential for pallid sturgeon to be indirectly affected by the HDD installation across the Missouri River and Lake Oahe. The only potential source for indirect impacts on pallid sturgeon associated with the HDDs is an inadvertent release of non-toxic bentonite mud (used for lubricating the drill path) into the waterbody. Dakota Access conducted geotechnical analyses at each of the proposed HDD crossings and designed the HDD to minimize the likelihood that the drilling mud is inadvertently released. While the likelihood of an inadvertent release has been minimized to the maximum extent practicable, were it to occur, implementation of Dakota Access' HDD Contingency Plan would minimize any potential impacts on pallid sturgeon by quickly and efficiently containing and removing the released, non-toxic mud.

Dakota Access plans to withdraw water from the Missouri River for installation activities and hydrostatic testing of the HDD segment for the Missouri River. However, potential impacts on the pallid sturgeon or suitable habitat present within the Missouri River would be avoided by implementing the conditions for permitted intake structures outlined in the Corps' Regional Conditions for North Dakota applicable to NWP 12 Utility Line Activities (Corps, 2012) (see Section 3.2.1.2) and as described in the USFWS Recovery Plan for the Pallid Sturgeon (USFWS, 2014f). No water withdrawal from or access to Lake Oahe is required to complete the Lake Oahe crossing. The HDD construction method, application of the HDD Contingency Plan, and implementation of the Corps' conditions for the intake structure within the Missouri River would avoid and minimize potential impacts to the pallid sturgeon.

Maintenance activities will not occur within the Missouri River or Lake Oahe; therefore, no impacts on pallid sturgeon would occur. The depth of the pipeline below the respective rivers and the design and

USACE_DAPL0071291

Environmental Assessment
Dakota Access Pipeline Project
July 2016

operation measures that meet or exceed the respective PHMSA regulations make a release into either waterbody extremely unlikely.  However, in the unlikely event a leak or spill was to occur and reach the Missouri River or Lake Oahe, impacts would be localized.  If pallid sturgeon were present in the area where the spill or leak occurred, they would likely relocate outside of the contaminated area.  Further, oil floats and, as pallid sturgeon are bottom dwellers primarily inhabiting the lower water column (USFWS, 2014c), impacts on pallid sturgeon in the event of a spill, would be minimal.

Based on the avoidance and minimization measures, literature review, field investigations, and habitat types present in the Project Area, USACE has determined that the Proposed Action may affect, but is not likely to adversely affect the pallid sturgeon.

## 3.5    Aquatic Resources

Under the "no action" alternative, Dakota Access would not construct the DAPL Project, and no impacts on aquatic resources would occur.  However, if the objectives of the DAPL Project are to be met under the "no action" alternative, other projects and activities would be required and these projects would result in their own impacts on aquatic resources, which would likely be similar to or greater than the proposed DAPL Project.  Impacts associated with a future project developed in response to the "no action" alternative are unknown, while only temporary and minor impacts, if any, on aquatic resources would occur as a result of the Proposed Action, as described in the sections below.

### 3.5.1   Habitat and Communities

#### 3.5.1.1   Affected Environment

West of Williston, the Missouri River is a braided channel varying in width from 800 feet to over 1,500 feet, with sand bars in many locations.  The Yellowstone River confluence with the Missouri River is approximately 20 miles west of Williston and 3.5 river miles upstream from the proposed Missouri crossing.  East of Williston, the Missouri River feeds into Lake Sakakawea, the third largest man-made lake in the U.S. formed by the Garrison Dam, several hundred miles downstream.  This portion of the Missouri River is home to several fish species, including cutthroat trout, rainbow trout, brown trout, walleye, northern, and sauger.  Amphibians are found along the shores and nearby riparian areas of the Missouri River.  Common species found near the Missouri River crossing include Woodhouse's toad, the northern leopard frog, and western chorus frog (Hoberg and Gause, 1992).

Lake Oahe is a 232-mile-long reservoir that extends upriver from the Oahe Dam on the Missouri River from Pierre, South Dakota, to Bismarck, North Dakota.  Approximately three-quarters of a mile south of the proposed pipeline crossing is the confluence of the Cannonball River into the Missouri.  This portion of the Missouri River is home to several fish species, including walleye, northern pike, and channel catfish. Amphibians are found along the shores and nearby riparian areas of Missouri River.  Common species found near the Lake Oahe crossing include the Great Plains toad, Woodhouse's toad, northern leopard frog, and tiger salamander (Hoberg and Gause, 1992).

USACE_DAPL0071292

Environmental Assessment
Dakota Access Pipeline Project
July 2016

### 3.5.1.2   Impacts and Mitigation

The Missouri River, including Lake Oahe, is the only waterbody that would be crossed by the Proposed Action with aquatic resources that have potential to be impacted by the Proposed Action.

All subsurface disturbing activities would be set back from the banks of Lake Oahe at the HDD entry point. This provides a buffer of undisturbed land between active construction and the Lake.  There is potential, although very low due to setbacks of approximately 1,100 feet on the west bank and 900 feet on the east bank, for sediment to be transported from the workspace into the river during precipitation events, which could increase the local turbidity and sediment load in the lake.  These increased loads have potential to temporarily affect sensitive fish eggs, fish fry, and invertebrates inhabiting the river.  However, sediment levels would quickly attenuate both over time and distance and would not adversely affect resident fish populations or permanently alter existing habitat.  By also implementing the erosion and sediment control measures specified in the ECP (**Appendix G**) and SWPPP (**Appendix A**), the potential for sediment transport is likely avoided or minimized.  Following construction, the ROW would be restored, revegetated, maintained in an herbaceous or scrub-shrub state, and monitored in accordance with applicable regulations and permit conditions.

A successfully completed HDD crossing would minimize environmental impacts on Lake Oahe since the pipeline would be installed without disturbing the aquatic and benthic environments.  However, crossings via HDD carry a low risk of an inadvertent release of drilling mud, composed primarily of bentonite (a naturally occurring fine clay) slurry.  Increased levels of sedimentation and turbidity from an inadvertent release could adversely affect fish eggs, juvenile fish survival, benthic community diversity and health, and spawning habitat.  Dakota Access' HDD Construction/Contingency Plan (**Appendix B**) establishes monitoring procedures and prescribes measures to be implemented to minimize the impact in the event it occurs.  All HDD operations conducted for crossing the Lake Oahe would adhere to the HDD Contingency Plan and applicable permit conditions to reduce the likelihood of an inadvertent release to minimize and mitigate environmental impacts.  Dakota Access' construction contractor would ensure that the appropriate response personnel and containment equipment are available onsite to effectively implement the HDD Contingency Plan.

In addition to the crossing of Lake Oahe, aquatic resources could also be impacted during water withdrawal from the Missouri River, which is required for activities associated with the installation of HDD and the hydrostatic testing of HDD pipeline segment located on the flowage easements.  However, water withdrawal activities would be conducted in accordance with all applicable permit conditions and regulations and in a manner that would not reduce water flow to a point that would impair flow or impact aquatic life.  Intake screens and floats would also be utilized, as previously discussed in Section 3.2.1.2, to prevent entrainment of aquatic life and avoid impacts on aquatic resources.  In addition, by placing the pump within a secondary containment structure on the barge, the potential for impacts on aquatic resources associated with accidental fuel spills or leaks is likely avoided or minimized.

The primary issue related to impacts on the aquatic environment from operation of the Proposed Action would be related to a release from the pipeline.  For portions of the pipeline installed beneath the lake, the depth of the pipeline profile, increased wall thickness of the pipe, installation of remotely operated valves on both sides of the river crossing, and monitoring of the system 24/7 would further limit the potential for an inadvertent release into the waterbody.  As a result, operations activities are not

USACE_DAPL0071293

Environmental Assessment
Dakota Access Pipeline Project
July 2016

anticipated to impact aquatic resources or their habitat.  Adherence to the Dakota Access FRP would minimize potential impacts on aquatic wildlife from potential spills during the operation of the pipeline. In the event of a leak, Dakota Access would work aggressively to contain the leak, initiate cleanup activities, and contact the appropriate authorities, including the Corps.   The FRP is discussed under Section 3.2.1.2 and a draft of the FRP is included in Appendix L.

## 3.6      Land Use and Recreation

Under the "no action" alternative, Dakota Access would not construct the DAPL Project, and no impacts on land use and recreation would occur.  However, if the objectives of the DAPL Project are to be met under the "no action" alternative, other projects and activities would be required and these projects would result in their own impacts on land use and recreation, which would likely be similar to or greater than the DAPL Project.  The impacts associated with a future project developed in response to the "no action" alternative are unknown, while only temporary and minor impacts or insignificant permanent impacts on land use and recreation would occur as a result of the Proposed Action, as described in the sections below.

### 3.6.1     Land Ownership

The proposed 24-inch pipeline would cross seven contiguous Corps flowage easements over eight privately-owned parcels (**Figure 2**) that are associated with the Buford-Trenton-Irrigation District (Garrison Dam).  Based upon Corps-provided easement documents and mapping, the distance across the flowage easements on the north side of the Missouri River in Williams County is approximately 14,953 feet (2.83 miles).

The flowage easements allow the Government to flood and saturate the land, surface, and subsurface of these properties.   Generally, these easements prohibit the construction of structures for human habitation; provide that any other structures require written approval by the Corps; and provide that no mineral exploration, excavation or placement of fill material may occur on the easement area without the prior approval of the Corps.

The proposed pipeline route would also cross federal lands on the east and west banks of Lake Oahe in Morton and Emmons counties.  The distance from the western boundary of federally-owned lands to the eastern boundary of federally-owned lands on both sides of the lake, including the width of the lake, at the proposed crossing location is approximately 6,450 feet.  The proposed pipeline would be routed to parallel existing linear infrastructure (an overhead power line and a buried gas transmission pipeline) across Lake Oahe in the same area.  The HDD entry and exit points, measuring approximately 200 by 250 feet, would be located on private lands, as would the stringing corridor required to facilitate the installation.  The northern boundary of the Standing Rock Sioux Reservation is located approximately 0.55 mile south of the Lake Oahe Project Area.

Dakota Access is securing a 50-foot-wide permanent easement that is generally centered on the pipeline (25 feet on either side of the centerline).  Within the 50-foot-wide easement, a 30-foot corridor free of large woody vegetation, located within flowage easement LL3440E on the north bank of the Missouri River, would be required to allow for a clear line of sight once construction is completed to perform visual inspections during operation of the pipeline.  The corridor would be maintained in a vegetative state.

USACE_DAPL0071294

Environmental Assessment
Dakota Access Pipeline Project
July 2016

### 3.6.2    Land Use

#### 3.6.2.1    Affected Environment

Land use within the Project Area was assigned a classification based on the principal land characteristic in a given area.   Aerial photography, the National Land Cover Database (Multi-Resolution Land Characteristics Consortium, 2011), the Morton County Zoning Map (Morton County, 2014), and the Williams County Comprehensive Plan were used to identify and classify general land use for the Project Area (**Figures 10** and **11**).

**Agricultural Land**

Agriculture is the primary land use within the Project Area.  These lands are primarily used for ranching and cultivating crops.  Agricultural lands allows for land uses such as farming, ranching, animal feeding operations, grain storage, and related functions.  Agricultural land within the flowage easements are primarily pivot irrigated cropland (i.e., areas used for production of annual crops such as corn and soybeans).

**Developed Land**

Developed land includes open space around structures such as homes, farmsteads, outbuildings, well sites, and areas associated with roads and ditches.

**Open Space**

Open space includes all land that is not agriculture or developed; namely wetlands, open water, grasslands, and scrub-shrub.  Open space is found primarily along the river banks.  See sections 3.2 and 3.3 for a discussion on water resources and vegetation.

#### 3.6.2.2    Impacts and Mitigation

The Proposed Action would result primarily in temporary, short-term impacts on land use during construction.  Construction activities would require the temporary and short-term removal of existing agricultural land from crop and forage production within the construction footprint.  During construction, temporary impacts such as soil compaction and crop damage are possible along the construction ROW. Mitigation measures to minimize impacts such as topsoil segregation and decompaction practices would be fully implemented in accordance with the ECP and SWPPP.  Upon the completion of construction activities, the Project Area would be restored and returned to pre-construction land use.

As mentioned above, much of the cropland within the Corps flowage easements uses pivot irrigation systems.  Dakota Access would coordinate with all landowners on acceptable methods for construction and restoration, including potential impacts to irrigated fields.  Compensatory damages would be paid accordingly.

The nearest residence to the Proposed Action on the flowage easements is approximately 1,750 feet east of the pipe centerline.  Temporary impacts on nearby residences could include inconvenience caused by

USACE_DAPL0071295

Environmental Assessment
Dakota Access Pipeline Project
July 2016

noise and dust generated from construction equipment and traffic congestion associated with the transport of equipment, materials, and construction workers. Impacts from noise and dust during construction would diminish with distance from these areas and would be limited to the time of construction which would typically occur during daylight hours.

The primary impact on family farms would be the loss of standing crops and use of the land within the work area for the seasons during which DAPL Project-related activities occur, as well as potential diminished yields for a few years following construction. Dakota Access proposes to implement mitigation measures to minimize these potential impacts as described in the ECP. Dakota Access would repair surface drains and drainage tiles disturbed during ROW preparation, construction, and maintenance activities. Dakota Access would repair or replace fences and gates removed or damaged as a result of ROW preparation, construction, or maintenance activities.

At Lake Oahe, primary impact on ranching operations would be temporary prohibition of livestock grazing in the construction ROW, workspace areas, and restrictions on livestock movement across the construction ROW and workspace areas during construction. Given the narrow, linear nature of the DAPL Project and the alignment of the pipeline along property boundaries, livestock grazing reductions and livestock movement restrictions would be minor. Long-term or permanent impacts on family ranches are not anticipated. Following construction and restoration, the work area would be restored and ranching would be allowed to continue over the operational ROW. Landowners would be compensated for temporary loss of land and lower yields. Grazing activities would return to normal after Revegetation of the disturbed areas.

Once in operation, a permanent 50-foot ROW would be maintained except at segments of the ROW above the HDD profile on the flowage easements (between the HDD workspace and the river shore) that would be maintained by clearing woody vegetation over a 30 foot corridor (a 50 foot easement would still be obtained). Maintenance would include the removal of any large trees and shrubs; agricultural land use would not be impacted by maintenance activities in this area. Trees outside of the ROW would be protected by Dakota Access in a manner compatible with the safe operation, maintenance, and inspection of the pipeline. Applicable regulations would be adhered to regarding tree and shrub removal from along the route. Field surveys have confirmed that no shelter belts would be impacted within the Project Area or Connected Actions.

Tables **3-12** and **3-13** below detail the acreage of land use impacts associated with the Proposed Action.

| Table 3-12 Land Use Impacts on the Flowage Easements Project Area and Connected Action | | |
|---|---|---|
| Land Use | Construction Workspace (acres) [1] | Permanent ROW (acres) [2] |
| Agricultural Land | 54.0 | 15.1 |
| Developed | 1.6 | 0.8 |
| Open Space | 6.0 | 2.0 |
| Total | 61.3 | 17.9 |

[1] Construction Workspace includes the permanent ROW.

[2] Permanent ROW includes the 50-foot permanent easement and the 30-foot maintenance easement.

72

USACE_DAPL0071296

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 3-13 Land Use Impacts on the Federal Lands Project Area and Connected Action | | | |
|---|---|---|---|
| Land Use | Construction Workspace (acres) | Connected Action - Permanent ROW (acres) | Federal Lands - Permanent ROW (acres)[1] |
| Agricultural Land | 0.0 | 0.0 | 0.1 |
| Open Space | 15.5 | 1.1 | 1.0 |
| Total | 15.5 | 1.1 | 1.2 |

[1]   Land Use Impacts on federal lands are limited to the maintained 50 foot permanent easement and do not include approximately 6.3 acres of permanent easement beneath the HDD profile within the banks of Lake Oahe.

Dakota Access would obtain and comply with applicable state regulations, county permits, and zoning and land use regulations.  Permits may include, but are not limited to, grade and fill permits, ditch crossing permits, road and utility permits, and conditional use permits.  Dakota Access would retain one or more EIs to monitor compliance with environmental conditions of county permits.

### 3.6.3    Recreation and Special Interest Areas

#### 3.6.3.1    Affected Environment

Generally, recreation and special interest areas include federal, state, or county parks and forests; conservation lands; wildlife habitat management areas; hunter management areas; natural landmarks; scenic byways; designated trails; recreational rivers; and campgrounds.   Nearby recreational opportunities in the vicinity of the Project Area and the Connected Action include Wildlife Management Areas (WMAs), Lake Oahe, and the Missouri River, none of which are being impacted by the construction, although the HDD would cross under Lake Oahe itself.

The Missouri River and its shoreline are open to the public and used for recreational activities such as boating, swimming, and fishing.  Because the flowage easements are federally regulated and privately owned, there is very limited, if any, recreational opportunities within the flowage easements. Additionally, there is little boating and open water angling on the entire upper end of Lake Sakakawea because of lack of access and extremely turbid water throughout much of the recreational season (USACE, 2007).

Lake Oahe's 2,250 mile shoreline is open to the public and offers a variety of opportunities to outdoor recreationists such as fishing, swimming, sightseeing, camping, and picnicking.  More than 1.5 million visitors enjoy Lake Oahe's recreation facilities each year.  Fishing is the major recreational activity of visitors to the Oahe project, with 44% of visitors engaging in this activity (USACE, 2010c).

There are no public boat access sites, marinas, or public swimming beaches within one mile of the flowage easements or federal lands crossings.  There are no designated state parks or recreation areas, historic

USACE_DAPL0071297

trails, scenic by-ways, designated wilderness or natural areas or other sensitive land uses that would be affected by the crossings (North Dakota Parks and Recreation Department, 2014).

At the flowage easement crossing, the closest Nationwide Rivers Inventory (NRI) segment is a one mile stretch of the Missouri River within the Fort Union Trading Post National Historic Site, which is about 9.2 river miles upstream from the crossing.  At the federal lands crossing, the closest NRI segment is Square Butte Creek to the Oliver/Mercer County Line, which is about 50 river miles upstream from the Project Area (National Park Service, 2009).

North Dakota has approximately 54,373 miles of river, but no designated wild & scenic rivers (USFWS et al., 2014).

**Wildlife Management Areas**

The North Dakota Game and Fish Department manages the Trenton and Overlook WMAs; neither of which are crossed by the Proposed Action.  The Trenton WMA encompasses 2,647 acres and is located southwest of Williston near Trenton, along the Missouri River and Lake Sakakawea.  About 13.55 acres of the Trenton WMA extends into the eastern portion of flowage easement LL3440E (**Figure 6**) but the closest edge is approximately 800 feet from the HDD workspace.  This area is largely primitive and the landscape has been allowed to develop naturally.  The WMA provides recreational opportunities for fishing and hunting waterfowl, deer, and pheasants.  The Overlook WMA encompasses 32 acres and is located 6.5 miles north of Cartwright, about 1,430 feet west of the HDD entry point in McKenzie County. The Overlook WMA is only accessible by boat and is used for hunting deer.

The Oahe WMA is located along Missouri River and Oahe Reservoir, about 17 miles south of Bismarck (USGS, 2014b).  The proposed pipeline at the Lake Oahe crossing is about 14.5 miles south of the Oahe WMA.

**Water Quality and Recreation**

Section 303(d) of the CWA requires states to submit their lists of water quality limited waterbodies.  This list has become known as the "TMDL list" or "Section 303(d) list." A TMDL is the amount of a particular pollutant a stream, lake, estuary, or other waterbody can "handle" without violating State water quality standards.  The final 2014 Section 303(d) list, which was submitted to Environmental Protection Agency (EPA) as part of the integrated Section 305(b) water quality assessment report and Section 303(d) TMDL list, includes a list of waterbodies not meeting water quality standards and those for which a TMDL is needed.

Lake Sakakawea is on the 2014 Section 303(d) list of impaired waters as not supporting fish consumption because of high levels of methyl-mercury; however, Lake Sakakawea would not be crossed or otherwise impacted as a result of the Proposed Action on the flowage easements.  Lake Oahe is not listed as needing a TMDL and fully supports recreational use (North Dakota Department of Health, 2015).  Because Lake Oahe already meets the state water quality standards, the Proposed and Connected Action Areas are not anticipated to result in impacts that would cause an impairment of water quality or the designated use of Lake Oahe.

USACE_DAPL0071298

Environmental Assessment
Dakota Access Pipeline Project
July 2016

**Wilderness Areas**

The Wilderness Act of 1964 defines wilderness as lands that may contain ecological, geological, scientific, educational, scenic or historical value.  There are three designated wilderness areas within North Dakota: Chase Lake, Lostwood, and Theodore Roosevelt Wilderness Areas.  There are no designated wilderness areas, and no designated Nature Preserves or Natural Areas within one mile of either crossing (Wilderness Institute, 2014).

**Standing Rock Sioux Reservation**

The Standing Rock Sioux Reservation is situated at the border of South Dakota and North Dakota, approximately 0.55 miles south of the Lake Oahe Project Area.  The Cannon Ball River is located along the northern border of the Standing Rock Sioux Reservation in Sioux County, North Dakota.  The western border of the reservation ends at the Perkins County, South Dakota and Adams County, North Dakota lines, while the Missouri River is the eastern border of the reservation.  The southern border of the reservation is located within Dewey and Ziebach counties in South Dakota.  The total land area of the Standing Rock Sioux Reservation is 2.3 million acres and of that, 1,408,061 million is tribally owned.  The Standing Rock Sioux Tribal members are descendants of the Teton and Yankton Bands of the Lakota/Dakota Nations (Standing Rock Sioux Tribe, 2016).  Some of the many attractions within the reservation include Sitting Bull Grave Site, Standing Rock Monument, Fort Manuel, Lewis and Clark Legacy Trail, and the Standing Rock Tribal Office (Standing Rock Tourism, 2016).  The terrain of the reservation consists of river valleys, lakes, woodlands, prairies, and rolling hills.  Big game on the reservation includes white tail deer, mule deer and antelope, while small game includes jackrabbit, cottontail, and squirrel (Standing Rock Sioux Tribe and Standing Rock Sioux Tribe Game & Fish Department, 2016).

### 3.6.3.2    Impacts and Mitigation

The recreational enjoyment of wildlife (such as hunting or bird watching) may be temporarily affected by construction activities, depending on season and location.  However, this effect would be short-term.

Recreationists may observe ROW clearing along the river banks.  Because the pipeline would cross underneath the river via the HDD method, there would be no disruption to the course or cross-current of the river, and would not impact lake/river recreationists.

## 3.7     Cultural and Historic Resources and Native American Consultations

Section 106 of the National Historic Preservation Act of 1966 (NHPA), as amended, and implemented by 36 CFR Part 800, requires Federal lead agencies to assess the effects of permitted actions on historic properties.  Historic properties are defined in the NHPA as prehistoric and historic archaeological sites, standing structures, or other historic resources listed in, or eligible for listing in the National Register of Historic Places (NRHP).

Under the "no action" alternative, Dakota Access would not construct the DAPL Project and no impacts on cultural and historic resources would occur.  However, If the objectives of the DAPL Project are to be met under the "no action" alternative, other projects and activities would be required and these projects could result in their own impacts on cultural and historic resources, which would likely be similar to or

USACE_DAPL0071299

Environmental Assessment
Dakota Access Pipeline Project
July 2016

greater than the DAPL Project. The "no action" alternative would likely result in an increase in truck and rail traffic that could have an adverse effect on cultural, historic and Native American resources. Furthermore, impacts to resources associated with these methods may not be identified and evaluated because the protections afforded under Section 106 of the NHPA would not apply unless a federal permit were to be required.

### 3.7.1   Cultural Resources Studies

The scope of the cultural resource analysis was designed to be commensurate with the Proposed Action. The Proposed Action is to authorize the crossing of federal flowage easements near the upper end of Lake Sakakawea north of the Missouri River in Williams County, North Dakota and federally owned lands at Lake Oahe in Morton and Emmons counties, North Dakota.

The cultural resource information for the Project Area, and for areas in the vicinity of the Proposed Action (to provide context) was obtained through a combination of cultural resources investigations commissioned by Dakota Access on private lands within a 400-foot-wide linear corridor as defined by the DAPL centerline and previous cultural investigations conducted on private lands adjacent to the Proposed Action area, and previous cultural investigations conducted on federal lands.   New cultural resources investigations were not conducted on federal lands as part of the Proposed Action, as no impacts are anticipated to occur on federal lands.

Based on data compiled from previously executed archaeological investigations, it is recognized that much of the region has been inhabited by human populations for approximately 12,000 years.   Throughout much of the state the recorded prehistoric occupations range from Paleoindian Period encampments to Late Prehistoric Period sites.   Multiple sites have been explored that suggest the area was inhabited by societies adapted for lifestyles on the Plains and in the various geographical regions of the state dating back to 6000 BC.   The current Project Area has a moderate to high probability for archaeological deposits based on proximity to permanent water sources, topography, lack of significant ground disturbances, and depositional processes.

#### 3.7.1.1   Affected Environment

**Flowage Easements, Williams County, North Dakota**

The Missouri River is a large perennial river that serves as the border between Williams and McKenzie counties, North Dakota. The flowage easements consist of a series of expansive agricultural fields located on the northern side of the River. While the individual tracts are privately owned, the USACE maintains easement rights across these tracts to facilitate floodwater control throughout the region. The DAPL Project proposes to traverse certain sections of these easements, and install the pipeline via HDD under the Missouri River. As these tracts are federally managed, cultural resources investigations were conducted in accordance with Section 106 of the NHPA, and in compliance with the North Dakota State Historic Preservation Office (NDSHPO) Guidelines Manual for Cultural Resources Inventory Projects (SHSND, 2012). Specifically, the cultural resources investigations were confined to a 400-foot-wide linear corridor (*survey corridor*), as defined by the DAPL centerline. Prior to field investigations, a Class I literature and records search was conducted within an expanded *study area corridor*, which extended for a mile on either side of the DAPL centerline. The Class I literature review determined that the DAPL survey

USACE_DAPL0071300

Environmental Assessment
Dakota Access Pipeline Project
July 2016

corridor traverses one previously recorded site (32WI1367), and that portions of the DAPL survey corridor have been subject to previous surveys (Larson et al. 1987). Site 32WI1367, also known as the Buford-Trenton Irrigation System (BTIS), is a National Register nominated cultural resource consisting of a pumping plant, main canal, and associated irrigation components. The BTIS construction began in 1940 and continued through the 1950's managed by the Department of Interior, Work Progress Administration, and the Farm Security Administration. The DAPL survey corridor traverses one of the extant irrigation canals listed as a contributing element of the BTIS in the northeastern corner of Section 30 of Township 152 North, Range 103 West.

The Class II/III inventory investigations within the DAPL survey corridor across the flowage easements consisted of a combination of pedestrian surveys and shovel probing. Archaeologists walked along fixed transects spaced 30 m (98 ft.) apart within the survey corridor, and systematically excavated shovel probes across high probability settings, or in areas with low surface visibility. The Class II/III investigations resulted in the revisit of the portion of Site 32WI1367 within the survey corridor, and the documentation of a new prehistoric site (32MZ2874) located on the southern banks of the Missouri River (Appendix I). The assessment of site 32WI1367 consisted of mapping and documentation of the canal feature. No artifacts, evidence of features, or other undocumented components were noted. Dakota Access has designed an HDD to install the pipeline below this canal feature. Additionally, the HDD workspace would be off-set a sufficient distance to ensure that no components or associated features of this canal would be adversely impacted.

As site 32MZ2874 is located on the southern banks of the Missouri River, it is not located on USACE-managed flowage easement tracts. However, the site is referenced herein given its proximity to the workspace associated with HDD of the Missouri River. Site 32MZ2874 is a small prehistoric artifact scatter that is recommended as unevaluated for listing in the NRHP pending further testing investigations. The HDD workspace on the southern banks of the Missouri River has been designed to avoid impacting this site and is situated beyond the mapped site boundary. Exclusionary fencing would be installed along the eastern border of the HDD workspace during drilling activities to prevent inadvertent impacts or trespassing.

**Federal Lands – Lake Oahe Crossing: Morton and Emmons Counties, North Dakota**

The proposed crossing of federally-owned tracts at Lake Oahe is located in Section 10, Township 134 North, Range 79 West in Morton County, North Dakota, and Section 11, Township 134 North, Range 79 West in Emmons County, North Dakota (see **Figure 3**). Dakota Access proposes to install the pipeline via HDD below Lake Oahe, and the HDD entry and exit point workspaces and stringing area would be located on private land beyond the boundary of the federal lands. While no activities associated with the Proposed Action will occur on the surface of federal lands, the HDD entry and exit point workspaces and stringing areas are considered Connected Actions, and as such were subject to cultural resources investigations in accordance with Section 106 of the NHPA, and in compliance with the NDSHPO Guidelines (SHSND, 2012). No new cultural resources investigations of any kind were conducted on federal lands in association with the DAPL project as no impacts are anticipated to occur between the HDD workspaces on either side of Lake Oahe. However, previous cultural resource surveys of USACE managed lands are cited in the report; Dakota Access Pipeline Project, Class II/III Cultural Resources Inventory of the Crossings of Flowage Easements and Federal Lands. Prepared collaboratively for Dakota Access, LLC in March of 2016 (Landt and McCord 2016). This report is contained in Appendix I.

USACE_DAPL0071301

Environmental Assessment
Dakota Access Pipeline Project
July 2016

Prior to field investigations, a Class I literature and records search was conducted within an expanded study area corridor, which extended for a mile on either side of the DAPL centerline. The Class I literature review determined that no previously recorded sites are located on the private lands within the Connected Action areas (i.e., HDD workspaces and stringing area). A total of 43 previously recorded cultural resources are located within the study area corridor. Of these, 18 are located in Morton County and the remaining 25 are located in Emmons County. These consist of isolated finds and site leads (i.e., resources reported to the SHSND without field verification), prehistoric artifact scatters, and historic resources. A total of 10 of the previously recorded sites within the study area corridor are located on federal lands directly adjacent to the banks of Lake Oahe and the Cannonball River. Specifically, seven of these sites (32MO0001, 32MOx0004, 32MO0054, 32MO0060, 32MO0061, 32MO0064, and 32MO0259) are located in Morton County, on the western side of the Lake Oahe. The remaining three sites (32EM0019, 32EM0021, and 32EM0221) are located in Emmons County, on the eastern side of Lake Oahe. A more comprehensive discussion of these sites and associated mapping detail is provided in Appendix I.

The Class II/III inventory investigations at Lake Oahe took place exclusively within the Connected Action areas located on private lands beyond the limits federal lands (i.e., HDD workspaces and stringing area). The Class II/III inventory investigations within the Connected Action areas associated with the Lake Oahe crossing consisted of a combination of pedestrian surveys and shovel probing. Archaeologists walked along fixed transects spaced 30 m (98 ft.) apart within the survey corridor, and systematically excavated shovel probes across high probability settings, or in areas with low surface visibility. The Class II/III investigations within the Connected Action areas resulted in the documentation of one new archaeological site (32MO570). This site consists of a singular lithic flake in isolated contexts and is recommended as not eligible for listing in the NRHP and no further work is warranted.

### 3.7.1.2   Impacts and Mitigation

The impacts attributable to the HDD on cultural resources would not be significant. The geotechnical analysis performed to support the HDD crossings supports the lack of anticipated impacts due to vibrations related to construction and HDD activities. Vibrations produced during the HDD process are not of a magnitude that would cause any impacts to cultural resources. Vibrations associated with the drilling process would be limited to the immediate vicinity of the drilling equipment on the surface and downhole. The vibrations produced from the downhole tooling are of a very low magnitude and are attenuated very quickly by the formation such that vibrations are never felt at the surface. A vibration monitoring analysis conducted by GeoEngineers in 2009 found that peak particle velocities were less than 0.07 inches/second within approximately 50 feet of HDD operations. These velocities are well below that which would cause any structural impacts and moreover, the recorded vibrations were, in fact, imperceptible to human senses (GeoEngineers, 2009).

**Flowage Easements**

Dakota Access has conducted Class II/III inventory surveys within the 400-foot-wide survey corridor across the flowage easements. The survey investigations resulted in the revisit of site 32WI1367 on the northern side of the Missouri River, and the documentation of site 32MZ2874 on the southern banks of the Missouri River. Impacts to site 32WI1367 would be avoided via HDD to ensure the integrity of construction design for these historic-age features is preserved. Additionally, no impacts to site 32MZ2874 are anticipated to occur as the HDD workspace is located beyond the site boundaries. These management

USACE_DAPL0071302

Environmental Assessment
Dakota Access Pipeline Project
July 2016

recommendations have been included as viable avoidance options in the Class II/III report submitted to the USACE regional archaeological staff.  A more thorough discussion of the cultural setting, relevant previous studies, as well as geologic and geomorphic analysis of the region, and results of the current survey with associated mapping detail can be referenced in Appendix I.

**Federal Lands**

Dakota Access has conducted Class II/III inventory surveys within the Connected Action areas on private lands associated with the Lake Oahe crossing.  These investigations resulted in the documentation of one prehistoric site consisting of a singular lithic artifact (32MO570).  This site is recommended as not eligible for listing in the NRHP.  No additional cultural resources were documented within the Connected Action areas associated with the Lake Oahe crossing.  While the Class I background review determined that eight previously recorded sites are located on federal lands, no evidence of these sites was encountered within the Connected Action areas on private lands.

Dakota Access' UDP was developed (Appendix F) for use during all DAPL Project construction activities regardless of jurisdiction or landownership.  The UDP describes actions that would take place in the event that an undocumented cultural resource site is discovered during construction activities.  The UDP explicitly calls for work to stop until the correct authority or agency can be contacted and the find can be properly evaluated.

**3.7.2    Native American Consultations**

The 2004 Programmatic Agreement for the Operation and Management of the Missouri River Main Stem System for Compliance with the National Historic Preservation Act, as amended, (PA) was developed to address challenges associated with cultural and historic resource impacts involved with the ongoing operation and maintenance of the Missouri River system of main stem dams.  This agreement outlines the processes through which affected Tribes, agencies and interested parties are consulted by the Corps on issues that may affect important historic and cultural resources.  These processes are essential to fulfill the Corps' Tribal Trust Responsibilities and also comply with Section 106 of the NHPA.

The United States Department of Defense recognizes its trust responsibilities to federally recognized Indian Tribes and has established an American Indian and Native Alaskan Trust policy that directs its agencies, including the Corps, to work with Tribes in a manner that incorporates tribal needs, traditional resources, stewardship practices, and the development of viable working relationships.  In addition, EO 13175, Consultation and Coordination with Indian Tribal Governments (EO 13175), outlines policy and criteria regarding the establishment of "regular and meaningful consultation and collaboration with tribal officials in the development of Federal policies that have tribal implications, and are responsible for strengthening the government-to-government relationship between the United States and Indian tribes" (https://www.whitehouse.gov/the-press-office/memorandum-tribal-consultation-signed-president).

EO 13175 continues with the following; "History has shown that failure to include the voices of tribal officials in formulating policy affecting their communities has all too often led to undesirable and, at times, devastating and tragic results.  By contrast, meaningful dialogue between Federal officials and tribal officials has greatly improved Federal policy toward Indian tribes.  Consultation is a critical ingredient of a

USACE_DAPL0071303

sound and productive Federal-tribal relationship". These concepts are reflected in the Omaha District's PA/Section 106 coordination/consultation process.

Section 106 coordination/consultation was initiated for the Proposed Action beginning in October 2014, with an information letter regarding a preliminary geo-testing of the proposed Oahe crossing alignment. Per the Omaha District's usual process, this letter was sent to Tribes, THPOs, SHPOs, agencies and interested parties, soliciting information relevant to the Proposed Action. Subsequently, the same process was utilized in circulating information and pertinent data for the installation of the Oahe pipeline crossing, in the form of a letter distributed in July 2015. The USACE recommended a "No Historic Properties Subject to Effect" Determination to the North Dakota SHPO and the SHPO concurred on April 22, 2016.

## 3.8    Social and Economic Conditions

Under the "no action" alternative, Dakota Access would not construct the DAPL Project and no impacts on social and economic conditions would occur. Although the impacts associated with a future project developed in response to the "no action" alternative are unknown, if the objectives of the DAPL Project are to be met under the "no action" alternative, other projects and activities would likely be required (e.g. transportation of oil by truck or rail). Alternative shipping methods would likely result in their own impacts on social and economic conditions, such as increases in vehicular accidents and personal injury, worsening traffic congestion, and increased infrastructure deterioration.

The overall DAPL Project is a $3.78 billion dollar investment directly impacting the local, regional, and national labor force by creating nearly 12,000 construction jobs. Dakota Access has publically committed to utilizing American labor to build the pipeline. Dakota Access has teamed up with the various craft and labor unions in the DAPL Project regions and nationally to ensure the DAPL Project is constructed by highly qualified and experienced local and regional labor resources. These construction jobs would create considerable labor income and state income tax revenue – including the generation of more than $13.4 million in ad valorem taxes. Upon authorization, the DAPL Project would put welders, mechanics, electricians, pipefitters, heavy equipment operators, and others within the heavy construction industry to work.

### 3.8.1    Demographics, Employment, Income and Economic Justice

#### 3.8.1.1    Affected Environment

The Proposed Action at the flowage easements and the Missouri River are in McKenzie County and Williams County. The two census tracts (CT) crossed are CT9625 and CT 9535, respectively. Demographic information including population, income, and employment statistics for these census tracts, counties in the general geographic area, and the state of North Dakota are provided in **Table 3-14**. The industries employing the greatest number of persons in these census tracts is agriculture followed by educational services health care and social assistance fields; and construction.

At the Lake Oahe crossing, two Census tracts are crossed, CT9665 in Emmons County and CT204 in Morton County. Demographic information including population, income, and employment statistics for these census tracts, counties, and the state of North Dakota are provided in **Table 3-15**. The top three industries

USACE_DAPL0071304

Environmental Assessment
Dakota Access Pipeline Project
July 2016

providing employment in Emmons County are agriculture followed by educational services, health care and social assistance fields, and then construction.  Educational services, health care and social assistance are the leading industry employers in CT204 in Morton County followed by agriculture and retail trade. Although not directly affected by the Proposed Action or Connected Action Areas, Sioux County borders the Missouri River to the west and is south of the Lake Oahe crossing point.  Due to proximity of this county to the project, it has been incorporated as part of the geographical area for the county baseline data for analysis purposes relating to the Lake Oahe crossing.

### 3.8.1.2   Impacts and Mitigation

The Proposed Action is assumed to have a short construction window with a small number of construction workers dedicated to these crossings.  It is possible that counties within the general Project Area (McKenzie, Williams, Morton, Emmons, and Sioux) could experience short-term temporary effects to the local economy through induced spending from construction employees working on the crossing.  No residential homes or farms would be relocated resulting from the proposed action.  Additionally, no demographic changes in the Census tracts affected or the counties representing in the geographical area are anticipated because no permanent employment would be created as a result of the Proposed Action.

The DAPL Project also has tremendous secondary and sustainable economic benefits to the United States by supporting energy independence, increasing employment opportunities, and adding to demand in many manufacturing sectors, which would be a boost to the overall economy.  When considering the economic impact and benefit, once U.S. workers are employed on the DAPL Project, consistent with most infrastructure projects, the workers would spend their earnings in the communities where they work and live, resulting in multiplied economic impacts that would be nearly $5 billion just during the construction phase.  This economic impact would affect manufacturing in many domestic sectors such as the following examples.  It results in new vehicles being purchased, which positively impacts the auto industry.  It would result in new homes being built, which improves and increases the housing construction, resale, and lending business located in the region and across the U.S.  It impacts the food industry by requiring more food services and products to be delivered and consumed in the DAPL Project region.  And it delivers abundant American energy to U.S. markets, thereby enhancing supply.  The list could continue with a description of many secondary benefits, but in summary, the economic impact to the U.S. as well as the immediate region where the pipeline is located is considerable.

USACE_DAPL0071305

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 3-14 |||||||||||
| Minority and Low Income Population Statistics for the Flowage Easements Project Area and Connected Action |||||||||||
| Geographic Area | Total Population | Percent |||||||||
| | | White | Black or African Am. | Am. Indian and Alaska Native | Asian | Native Hawaiian and Other Pacific Islander | Some Other Race | Two or More Races | Total Minority Population | Persons Below the Poverty Level |
| State |||||||||||
| North Dakota | 704,925 | 89.20 | 1.53 | 5.25 | 1.15 | 0.04 | 0.73 | 2.10 | 10.80 | 11.9 |
| Counties Within Baseline Analysis (Baseline Area) |||||||||||
| McKenzie | 8,333 | 78.98 | 0.22 | 17.16 | 0.60 | 0.00 | 1.04 | 2.00 | 21.02 | 14.6 |
| Williams | 27,066 | 90.76 | 1.12 | 4.16 | 0.55 | 0.03 | 1.27 | 2.12 | 9.24 | 8.2 |
| Average | 17,700 | 84.87 | 0.67 | 10.66 | 0.58 | 0.01 | 1.16 | 2.06 | 15.13 | 11.40 |
| Proposed Action Area |||||||||||
| CT9625 | 1,522 | 97.50 | 0.00 | 1.05 | 0.20 | 0.00 | 0.53 | 0.72 | 2.5 | 5.8 |
| CT9535 | 1,708 | 74.41 | 0.47 | 17.15 | 0.00 | 0.00 | 0.00 | 7.96 | 25.59 | 7.7 |
| Average | 1,615 | 85.96 | 0.23 | 9.10 | 0.10 | 0.00 | 0.26 | 4.34 | 14.04 | 6.75 |
| State Comparison to Proposed Action Area |||||||||||
| Proposed Action | -703,310 | -3.24 | -1.30 | 3.86 | -1.05 | -0.04 | -0.46 | 2.24 | 3.24 | -5.15 |
| County Comparison to Proposed Action Area |||||||||||
| Proposed Action | -16,085 | 1.09 | -0.43 | -1.56 | -0.48 | -0.01 | -0.89 | 2.28 | -1.09 | -4.65 |

Source: U.S. Census Bureau, American Community Survey (2010-2014 5-year estimates).
Note: totals may not sum across the table due to rounding used in data collection.

82

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 3-15 Minority and Low Income Population Statistics for Federal Lands Project Area | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Geographic Area | Total Population | Percent | | | | | | | | |
| | | White | Black or African Am. | Am. Indian and Alaska Native | Asian | Native Hawaiian and Other Pacific Islander | Some Other Race | Two or More Races | Total Minority Population | Persons Below the Poverty Level |
| **State** | | | | | | | | | | |
| North Dakota | 704,925 | 89.20 | 1.53 | 5.25 | 1.15 | 0.04 | 0.73 | 2.10 | 10.80 | 11.9 |
| **Counties Within Baseline Analysis (Baseline Area)** | | | | | | | | | | |
| Morton | 27,439 | 93.98 | 0.50 | 3.70 | 0.20 | 0.00 | 0.50 | 1.30 | 6.20 | 8.7 |
| Emmons | 3,491 | 99.28 | 0.00 | 0.23 | 0.17 | 0.00 | 0.00 | 0.32 | 0.72 | 13.5 |
| Sioux | 4,317 | 13.67 | 0.02 | 82.26 | 0.25 | 0.07 | 0.53 | 3.20 | 86.33 | 36.4 |
| **Average** | **15,465** | **68.98** | **0.17** | **28.73** | **0.21** | **0.02** | **0.34** | **1.60** | **31.08** | **58.6** |
| **Proposed Action Area** | | | | | | | | | | |
| CT204 | 3,143 | 96.5 | 0 | 1.4 | 0 | 0 | 0.8 | 1.3 | 3.5 | 4.4 |
| CT9665 | 3,491 | 99.3 | 0 | 0.2 | 0.2 | 0 | 0 | 0.3 | 0.7 | 13.5 |
| **Average** | **3,317** | **97.88** | **0.00** | **0.83** | **0.09** | **0.00** | **0.40** | **0.81** | **2.12** | **8.95** |
| **State Comparison to Proposed Action Area** | | | | | | | | | | |
| Proposed Action | -701,608 | 8.68 | -1.53 | -4.42 | -1.07 | -0.04 | -0.33 | -1.29 | -8.68 | 49.65 |
| **Baseline Area Comparison to Proposed Action Area** | | | | | | | | | | |
| Proposed Action | -12,148 | 28.90 | -0.17 | -27.90 | -0.12 | -0.02 | 0.05 | -0.79 | -28.96 | -2.95 |

Source: U.S. Census Bureau, American Community Survey (2010-2014 5-year estimates).
Note: totals may not sum across the table due to rounding used in data collection.

83

USACE_DAPL0071307

Environmental Assessment
Dakota Access Pipeline Project
July 2016

## 3.9     Environmental Justice

EO 12898, *Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations*, requires federal agencies to identify and address disproportionately high and adverse human health or environmental of their programs and policies on minority and low-income populations and communities and Indian tribes.  The CEQ guidance suggests that an environmental justice population may be identified if "the minority population percentage of the affected area exceeds 50%, or if the minority population percentage of the affected area is meaningfully greater than the minority population in the general population or other appropriate unit of geographic analysis" (CEQ, 1997).  The CEQ defines low-income populations based on an annual statistical poverty threshold.  In 2013, the poverty threshold for the 48 contiguous states for an individual under the age of 65 living alone was $12,119 (U.S. Census Bureau, 2014).

Under the "no action" alternative, Dakota Access would not construct the proposed Project and no environmental justice impacts would occur.  However, If the objectives of the Project are to be met under the "no action" alternative, other projects and activities would be required and these projects could result in their own environmental injustice impacts, which would likely be similar to or greater than the proposed Project.  It is reasonable to assume that alternative methods of crude oil transportation would be relied on to meet market demands.  Minority or low income communities along utilized rail lines or truck routes could be affected by increasing noise and creating transportation delays due to the substantial increasing truck traffic on county, state and interstate highways as well as rail traffic across railroad crossings.     .

### 3.9.1     Affected Environment

Transportation projects, such as under the Federal Transit Administration, and natural gas pipeline projects under the Federal Energy Regulatory Commission (e.g. Docket Nos. CP12-507-000 and CP12-508-000, DOE FE 12-97-LNG, and FERC/EIS-0252F), typically use a 0.5 mile buffer area to examine Environmental Justice effects.  The census tracts crossed by the Proposed Action encompass an area greater than 0.5 mile radius for the project; therefore additional census tracts were not evaluated.

Since two census tracts are within 0.5 mile of the Flowage Easements at the Missouri River, and another two census tracts are located within 0.5 mile of the federal lands at Lake Oahe, an average of the demographic data from two respective census tracts was compared to the average demographic data of the counties in the general vicinity of each crossing as well as the state of North Dakota demographic data.

For the Flowage easements and Missouri River crossing, which are generally centrally located within McKenzie and Williams Counties, the averaged data from those two counties was used to obtain the Baseline Area data set.

Lake Oahe crossing is generally centrally located within Emmons County on the east side of the Lake, however it is near the southern boundary of Morton County.  Therefore Sioux County (located greater than 0.5 miles) was included in the geographical area of the Lake Oahe.  Thus Morton, Emmons, and Sioux county data was averaged to obtain the Baseline Area data set.

USACE_DAPL0071308

Environmental Assessment
Dakota Access Pipeline Project
July 2016

### 3.9.2   Impacts and Mitigation

For analyzing impacts to the minority and low income populations at the Proposed Action Area at the flowage easements and Missouri River Crossing, Census Tracts CT9625 and CT9535 were compared to the averaged county baseline (McKenzie and Williams Counties – "Baseline Area") data and then to the state data to determine if there were any siting concerns relative to Environmental Justice.

The minority population of the Proposed Action Area at the Missouri River is greater than the state as a whole (3% greater) but lower than surrounding county geographical area (1% lower).  Neither of these differences is considered meaningful.

The percentage of the population below the poverty level for the Proposed Action Area at the Missouri River is 5% lower than the state as a whole and also 5% lower than surrounding county geographical area. These differences are not considered meaningful.

For analyzing impacts to the minority and low income populations at the Lake Oahe Crossings, data for the averaged Census Tracts (CT204 and CT9665) was compared to the averaged county baseline (Morton, Emmons and Sioux – "Baseline Area") for the county geographical area (Morton, Emmons, and Sioux Counties – "Baseline Area") data and then to the state to determine if there were any siting concerns relative to Environmental Justice.

Based on this analysis, the minority population of the Proposed Action Area at Lake Oahe is lower than the state as a whole (9% lower).  Although the average minority population of the counties geographical baseline is greater than the state as a whole, the minority population in the averaged census tract of the Proposed Action Area at Lake Oahe is much lower than surrounding county geographical area.   In this case, the census tracts associated with the Proposed Action Area at Lake Oahe have a meaningfully lower minority percentage (29% lower) than the Baseline Area consisting of the three county area.

No appreciable minority or low-income populations exist within the Census tracts directly affected by the Proposed Action at either crossing (**Tables 3-14 and 3-15**).  No local community with appreciable minority or low-income populations exists at either the crossing of federal lands or flowage easements (**Tables 3-14** and **3-15**).   Based on this analysis, there is no concern regarding environmental justice to minority populations at the Proposed Action Area at the Missouri River Crossing or at Lake Oahe.

### 3.9.2.1   Standing Rock Sioux Reservation

It is recognized that the Standing Rock Sioux Tribe is downstream of the Lake Oahe Crossing, which has a high population of minorities and low-income residents.  Dakota Access and the Corps sought to engage Tribal representatives in the vicinity of the Proposed Action, and especially the Standing Rock Sioux Tribe, in discussion as to the nature of the Project, cultural resource concerns and the Lake Oahe crossing.  The initial contact by Dakota Access with the Standing Rock Sioux Tribe was in October of 2014 with additional contacts and subsequent meetings occurring through March 2016.  Direct and Indirect impacts from the Proposed and Connected Actions will not affect members of the Standing Rock Sioux Tribe or the Tribal reservation.  The Lake Oahe crossing will be installed via HDD beneath the river from private lands adjacent to Corps owned lands to avoid impacts to environmental resources (e.g. water, soil, cultural resources, vegetation, etc.).  The HDD drilling process is an expensive technique that itself is a mitigation

USACE_DAPL0071309

Environmental Assessment
Dakota Access Pipeline Project
July 2016

measure with no anticipated effects to the environment including vibration or frac-out within or outside of the Proposed Action for the short duration of the construction project (see sections 2.3.2.6 and 3.1.1.2 for additional information).

As discussed in more detail in sections of this Environmental Assessment (i.e. Section 2.3.1), Dakota Access utilized a complex routing model to examine alignment options for the Project and an array of environmentally protective criteria were used to cite the Project.  Perhaps most important for purposes of this analysis, are the citing criteria that require the avoidance of Tribal reservations and federal lands. Since the route must cross the Missouri River, it was not practicable to fully avoid federal land (see discussion in Section 2.1.3), and hence the necessity for this EA.  However, maintaining a minimum distance of 0.5 mile from Tribal land, consistent with other federal citing criteria, avoided tribal land as a mitigation and routing measure.  Furthermore, the Proposed Action, and hence the route and installation methods, is at a distance sufficient such that there are no direct or indirect impacts to Tribal lands, members or protected cultural resources.

Another primary consideration in routing included a preference for co-locating the route with existing infrastructure.  The Proposed Action is co-located with existing power and pipe lines across Lake Oahe and partially co-located with a gas line at the flowage easements and Missouri River.  As examples, the routing model affirmatively excludes such locations as Tribal lands, National Registry Historic Places, wilderness, parks, landmarks and an array of other special needs areas.

As a result of this routing criteria, the nature of the action (construction associated with laying an underground oil pipeline), the short term duration of effects, construction and operation on private lands, the concurrent reclamation activities, state of the art construction techniques, use of high quality materials and standards that meet or exceed federal standards, there will be no direct or indirect effects to the Standing Rock Sioux tribe.  This includes a lack of impact to its lands, cultural artifacts, water quality or quantity, treaty hunting and fishing rights, environmental quality, or socio-economic status.  Therefore, there is no resulting adverse or disproportionate impacts of the Proposed Action with respect to Environmental Justice considerations.

The Standing Rock Sioux Reservation boundary is over 0.5 miles south of the Lake Oahe Project Area crossing.  Based on aerial imagery, the closest residence on the Standing Rock Sioux Reservation is a rural residence located greater than 1.5 miles from the Lake Oahe Project Area Crossing.  This distance is well beyond any federal or state siting criteria.  The North Dakota Energy Conversion and Transmission Facility Siting Act Exclusion and Avoidance Areas Criteria (49-22-05.1) establishes an avoidance setback requirement of 500 feet from inhabited rural residences.

The pipeline route expressly and intentionally does not cross the Standing Rock Sioux Reservation and is not considered an Environmental Justice issue.  If it were it determined that there would be some effects to the Standing Rock Sioux Tribe as a low income, minority population, it would not disproportionately or predominately bear impacts from the Proposed Actions (the impacts will actually disproportionately affect private lands, non-low income populations and non-minority populations).   The impacts along the Missouri River and the Lake Oahe crossing are not disproportionate to the tribe.  The Missouri River crossing is on private lands with private lands and US federal lands downstream; the nearest reservation is Fort Berthold approximately 50 miles due east and Standing Rock Reservation is approximately 160 miles southeast. The Lake Oahe HDD crosses under US Federal lands from lands that are privately owned;

86

Environmental Assessment
Dakota Access Pipeline Project
July 2016

private lands continue downstream of the crossing on the east side of the Lake and Standing Rock Reservation (0.55 miles). Thus, the impacts at best can be said to be equivalent between tribal lands and private landowners at the Lake Oahe crossing. As stated above, linear projects typically use a 0.5 mile buffer area to examine Environmental Justice effects. There are no low-income, minority or tribal lands within 0.5 mile of the Proposed Action.

Concerns have been expressed regarding an inadvertent release reaching intake structures on Lake Oahe. Given the engineering design, proposed installation methodology, quality of material selected, operations measures and response plans the risk of an inadvertent release in, or reaching, Lake Oahe is extremely low. While the locations of water intakes is not public information for disclosure in this document, there are private and/or non-tribal intakes closer to the Lake Oahe crossing than any intakes owned by the tribe; further demonstrating the lack of disproportionate impacts of an inadvertent release to the Tribe and the reservation. We understand that due to the rural nature of this area, tribal drinking water supplies are obtained from a combination of wells and surface water. The siting and construction of oil pipelines upstream of drinking water intakes is not uncommon throughout the United States and is not considered an Environmental Justice issue. In the unlikely event of a release, sufficient time exists to close the nearest intake valve to avoid human impact.

Dakota Access has committed to plan for the protection of this and other water crossings and associated water intakes as part of its emergency preparedness protocol and in accordance with PHMSA requirements outlined in 49 CFR §§ 194 and 195 (see section 3.11 for further detail). Tribal representatives have been identified for early contact along with other federal, state and local governments by the Corps as well as independently by the applicant.

Based on the above sections, it has been determined that there are no environmental justice issues or concerns resulting from the Proposed Action.

## 3.10    Hazardous Waste

The EPA (2015) defines hazardous waste as waste that is dangerous or potentially harmful to human health or the environment, occurring as liquids, solids, gases, or sludges. They can be generated through the disposal of commercial products, such as cleaning fluids or pesticides, or manufacturing processes. Improper management and disposal of hazardous substances can lead to pollution of groundwater or other drinking water supplies and the contamination of surface water and soil. The primary federal regulations for the management and disposal of hazardous substances are the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) and the Resource Conservation and Recovery Act (RCRA).

A review of regulated facilities for hazardous materials along the Proposed Action corridor was conducted by searching online records maintained by the EPA (2014). Presently, there are no recognized Radiation Information Database, Brownfields, Superfund, Toxic Release Inventory, or air emission sites within one mile of the flowage easements and Lake Oahe crossings. No operating sensitive receptors, such as schools or hospitals, are reported within at least one mile. Additionally, there are no NPDES discharge sites within one mile of the Project Areas.

USACE_DAPL0071311

Environmental Assessment
Dakota Access Pipeline Project
July 2016

With the Proposed Action, there is potential for temporary impacts to public safety from hazardous material use.  Other hazards to worker safety may also exist along the Proposed Action corridor, but do not pose a significant impact.  Because there were no regulated sites found within the one-mile search radius of the Project Area, no impacts to the Proposed Action, Proposed Action media, or worker safety are expected.  In the unlikely event contamination is encountered during construction, the UDP **(Appendix F)** would be implemented to protect people and the environment and avoid or minimize any effects from unearthing the material.

Any hazardous materials discovered, generated, or used during construction would be managed and disposed of in accordance with applicable local, tribal, state, and federal regulations.  Should emergency response be required during construction, the contractor would have some of their own trained or contracted responders, and local response teams would be expected to assist.

Dakota Access would comply with any laws, regulations, conditions, or instructions issued by the EPA, or any Federal, state, or local governmental agency having jurisdiction to abate or prevent pollution, such as the RCRA, and State hazardous waste management rules.

## 3.11    Reliability and Safety

The PHMSA, a federal agency within the U.S. DOT is the primary federal regulatory agency responsible for ensuring the safety of America's energy pipelines, including crude oil pipeline systems.  As a part of that responsibility, PHMSA established regulatory requirements for the construction, operation, maintenance, monitoring, inspection, and repair of liquid pipeline systems.

Construction activities could present safety risks to those performing the activities, residents and other pedestrians in the neighborhood.  Given the low population density of the area, risks would be limited to workers involved with the Proposed Action.  All activities would be conducted in a safe manner in accordance with the standards specified in the Occupational Safety and Health Administration (OSHA) regulations.

To prevent pipeline failures resulting in inadvertent releases, Dakota Access would construct and maintain the pipeline to meet or exceed industry and governmental requirements and standards.  Specifically, the steel pipe would meet PHMSA specifications under 49 CFR § 195, follow standards issued by the American Society of Mechanical Engineers, National Association for Corrosion Engineers and API.  Once installed, the pipeline would be subjected to testing to verify its integrity and compliance with specifications, including hydrostatic pressure testing at the crossings, checking coating integrity, and X-ray inspection of the welds.  The pipeline would be placed into service only after inspection to verify compliance with all construction standards and requirements.  Dakota Access would maintain and inspect the pipeline in accordance with PHMSA regulations, industry codes and prudent pipeline operating protocols and techniques.  The pipeline ROW would be patrolled and inspected by air every 10 days, weather permitting, but at least every three weeks and not less than 26 times per year, to check for abnormal conditions or dangerous activities, such as unauthorized excavation along the pipeline route.

As discussed in Section 3.2.1.2, Dakota Access has drafted a FRP, in accordance with 49 CFR 194, which details the procedures to be implemented in the event of an inadvertent pipeline release and would be in

USACE_DAPL0071312

Environmental Assessment
Dakota Access Pipeline Project
July 2016

place prior to commencing transportation of crude oil.  The FRP is discussed under Section 3.2.1.2 and a draft of the FRP is included in Appendix L.

Following completion of construction and throughout operation of the Proposed Action facilities, the Operator and qualified contractors would maintain emergency response equipment and personnel at strategic points along the pipeline route.  These personnel would be trained to respond to pipeline emergencies as well as in the National Incident Management System (NIMS) Incident Command System (ICS).  Additionally, contracts would be in place with oil spill response companies that have the capability to mobilize to support cleanup and remediation efforts in the event of a pipeline release.  The Operator would also coordinate with local emergency responders in preventing and responding to any pipeline related problems.  These activities would include conducting and hosting, over a period of time, emergency response drills with both Dakota Access employees and local emergency responders along the pipeline route.

Dakota Access will conduct emergency response drills/exercises in accordance with PREP, which is recognized, and approved, by the EPA, US Coast Guard, and PHMSA.  These emergency response exercises will consist of annual table top exercises and equipment deployment drills.  Dakota Access is committed to conducting a worst case discharge full scale exercise at either the Missouri River crossing near Williston or the crossing at Lake Oahe once every 6 years and will include both open water and ice response.  Dakota Access will alternate the location and type of exercise.  Regulatory and stakeholder participation will be encouraged and solicited for the exercises.

In addition to the testing and inspection measures listed above, Dakota Access would utilize a supervisory control and data acquisition (SCADA) system to provide constant remote oversight of the pipeline facilities.  Power for the SCADA system would be provided from an existing power grid.  In the event of a power outage, a 500 watt Uninterruptable Power Supply would supply low voltage power to the Programmable Logic Controller and communication equipment.  Communication with the SCADA system would be accomplished via satellite (Hughes Global Network) and telephone (4G cellular [ATT] or landline depending on availability/coverage).  Both forms of communication are continually engaged to poll information from these sites for 100% reliable remote monitoring / operation of these sites through the SCADA system to the Operations Control Center (OCC) in Sugarland, Texas (a backup control room is located in Bryan, Texas), and are proven to have the least potential for interruption during pipeline operations.

If an alarm criteria threshold is met, the SCADA system would alert Dakota Access' OCC Operators, located in Sugarland and Bryan, Texas, of rapid drops in pressure, who would then activate the controls as necessary and initiate procedures for an appropriate response.  The OCC prioritizes and responds to all alarms in accordance with the control room management regulations referenced in PHMSA CFR 195.446 (e).  This regulation requires that the OCC Operator have a SCADA system alarm management plan; in general, the plan must include review of the SCADA alarm operations to ensure alarms support safe pipeline operations, identify any required maintenance that may affect safety at least once every calendar month, verify correct safety-related alarm values and descriptions at least once every calendar year when associated field equipment are changed or calibrated, determine effectiveness of the alarm management plan through a yearly review, and monitor content and volume of activity at least once a calendar year to assure controllers have adequate time to review incoming alarms.  Leak Warn, a leading software program for monitoring pipelines, is being tailored to the pipeline facilities, in accordance with Pipeline and

89

Environmental Assessment
Dakota Access Pipeline Project
July 2016

Hazardous Materials Safety Administration requirements.  The Operator would utilize a Computational Pipeline Monitoring System (CPM) to monitor the pipeline for leaks.  The CPM is a state-of-the-art pipeline monitoring tool and features a real-time transient model that is based on pipeline pressure, flow, and temperature data, which is polled from various field instruments every 6 seconds and updates the model calculations to detect pipeline system variations every 30 seconds.  After the system is tuned, this state-of-the-art CPM system is capable of detecting leaks down to 1 percent or better of the pipeline flow rate within a time span of approximately 1 hour or less and capable of providing rupture detection within 1 to 3 minutes.  State–of-the-art leak detection equipment and software utilized during operations or the pipeline will be updated per federal standards in accordance with PHMSA requirements.  In the event that a leak is confirmed through verification, pump station shutdown would be initiated within a predetermined amount of time to effectuate.  Next, the remotely controlled isolation valves (mainline valve sites would be installed on both sides of large waterbody crossings for isolation in the event of an emergency shutdown), which are operable from the OCC, would be closed.  These valves have a closure time of no greater than three (3) minutes.  Monitoring of the pipeline segments installed via HDD would be accomplished in the same manner as those segments installed by conventional methods (i.e., SCADA, internal inspection devices, and aerial patrols).  Typically, repairs are not made on any section of pipe greater than 10 to 20 feet below the ground surface depending on the repair needed.  If a material impact was on the pipeline below the 10-foot depth, operation of the system would be modified accordingly (e.g., reduce operating pressure) or the line would be re-drilled.   If inspections identify an anomaly, requirements would be followed to comply with U.S. DOT requirements.

In the unlikely event of a leak during operations of the pipeline, the Operator would implement the response measures described in the FRP.  Below is a list of typical response activities.  However, each spill mitigation situation is unique and will be treated according to the actual spill circumstances present at the time of release.

Notification:  The Operator will conduct notifications in accordance with federal and state guidelines.  These guidelines, along with additional notification forms/procedures are presented in Appendix B of the FRP.  Local government response agencies would be notified first followed by federal and state agencies as well as surrounding communities, and governments (including tribal governments and utilities) in accordance with the relevant provisions of the FRP and relevant law.   Response notification to such entities as the National Response Center, PHMSA, EPA, USACE, and affected state regulatory entities will be made in accordance with the requirements dictated by the incident type.  A complete list of required notifications is included in the FRP.  In accordance with PHMSA policy, the FRP will be updated every five years or sooner if there are material changes to the Plan.

Mobilize Response Equipment:  Emergency equipment would be available to allow personnel to respond safely and quickly to emergency situations.  Company-owned equipment will be inspected and exercised in accordance with PREP guidelines and would be mobilized and deployed by the Operator from strategic staging locations along the pipeline.  Additionally, the operator will contractually secure OSROs to provide trained personnel and equipment necessary to respond, to the maximum extent practicable, to a worst case discharge or substantial threat of such discharge.  At a minimum, each OSRO will have a containment booms, absorbents, boats, and vacuum trucks available.  A complete list of equipment and list of trained personnel necessary to continue operations of the equipment and staff the oil spill removal organization for each of the OSRO contractors is included in the FRP.

USACE_DAPL0071314

Environmental Assessment
Dakota Access Pipeline Project
July 2016

Response Activities:  Following incident command protocols, the Operator would work in unison to cooperate with and assist fire, police and other first responders when implementing actions to protect personnel, public safety and the environment.  The FRP includes a spill response checklist which lists activities that could be conducted during a spill which would be modified to best address the specific circumstances of a spill event.   Incident response activities may include: initiating spill assessment procedures including surveillance operations, trajectory calculations, and spill volume estimating; berming or deployment of containment and/or sorbent booms; lining shorelines with sorbent or diversion booms to reduce impacts; and recovering contained product as soon as possible to prevent the spread of contamination using appropriate hoses, skimmers, pumps, and storage containers or vacuum trucks at collection areas.  The response activities would continue until an appropriate level of cleanup is obtained as provided by the responsible federal, state or other governmental authorities.  The nature and location of the incident will affect the regulatory and notification requirements, for which more detail is provided in the FRP.  Incidents involving discharges to navigable waters are governed the Oil Pollution Act of 1990.

Dakota Access will implement numerous measures to minimize the risk of a pipeline leak and protect the users of downstream intakes:

1) Spill Prevention, Leak Detection and Spill Response Measures:

Based on a worst case discharge (WCD) scenario specific to Lake Sakakawea and Lake Oahe, calculated by guidance in 49 CFR § 194.105, a largest possible release volume was determined specific to the segment of the pipeline that would cross Corps-managed lands. This calculation was based on environmental assumptions such as air temperature, wind direction/probability and wind speeds that were averaged from data over a one-year period derived from the  U.S. Geological Survey National Hydrological Dataset (NHD, version 2). This information was extrapolated into a 24-hour model. The WCD, at the end of the 24-hour period, produced a surface oil slick attenuation distance, volume remaining in the water column, volume that would be ashore and the volume would evaporate within this timeframe. It is important to note, this WCD scenario is also calculated on the assumption that the pipeline is on top of the river verses HDD. Because the proposed pipeline would be installed at a minimum depth of 36 feet below the Missouri River above Lake Sakakawea and 92 feet below the lakebed of Lake Oahe, there is a greater response time combined with the use of the automated SCADA system.

While the potential risk for a WCD scenario is low, such a spill would result in high consequences. Review and approval of the overall regional FRP, which encompasses the regional DAPL Pipeline response strategies in the event of an oil spill, is the responsibility and jurisdiction of PHMSA. Federal regulations 49 CFR 194 specify minimum requirements of such an FRP. For the proposed project, the DAPL Pipeline FRP will be required to align with the content and directions identified in the Mid-Missouri Sub-Area Contingency Plan.  A tactical GRP specific to a response strategy for Lake Sakakawea and Lake Oahe was provided by the applicant and includes specific response strategies and equipment for all affected water. Both the FRP and GRP will be finalized after construction and be submitted to the USACE for review and the incorporation of USACE comments prior to submittal to PHMSA.

Within these response plans, DAPL training exercise program would be consistent with the exercise requirements as outlined in the PREP Guidelines that were developed by the U.S. Coast Guard in conjunction with PHMSA and EPA. Training exercises include quarterly notification exercise, annual

USACE_DAPL0071315

Environmental Assessment
Dakota Access Pipeline Project
July 2016

tabletop exercises to include a WCD scenario every three years, annual facility-owned equipment deployment exercises annual contractor exercises and unannounced exercises by government agencies.

The applicant has committed to additional full scale open water and full scale winter/ice exercises that will be conducted at Lake Sakakawea and Lake Oahe. A full scale exercise will occur once every 3 years (triennial cycle) with the location and type of exercise occurring on alternating schedules (e.g. open water exercise at Oahe the first triennial cycle, followed by winter exercise at Sakakawea the following triennial cycle, followed by a winter exercise at Oahe the following triennial cycle, etc.). Stakeholder (federal, state, local, and Tribal) involvement will be solicited for each exercise. The first exercise will occur within the first 3 years after the pipeline becomes operational.

2) Risk Analysis

While an oil spill is considered unlikely and a high precaution to minimize the chances has been taken, it is still considered a low risk/high consequence event. A risk analysis conducted by DAPL addressed nine industry-recognized pipeline integrity threat categories in combination with public and environmental impact that could occur in the event of a release into Lake Sakakawea and Lake Oahe. These threat categories include the following: 1) third-party damage, 2) external corrosion, 3) internal corrosion, 4) pipe manufacturing defects, 5) construction related defects 6) incorrect operations, 7) equipment failure, 8) stress corrosion cracking and 9) natural forces. DAPL derived the following analysis risk process from the W. Kent Muhlbauer Relative Index Methodology (2004), in accordance with 49 CFR 195.452 "Hazardous Liquid Pipelines in High Consequence Area", API RP 1160 "Managing System Integrity for Hazardous Liquid Pipelines", and ASME B31.8S "Managing System Integrity of Gas Pipelines".

1 - Third Party Damage

Pipeline failure due to third party damage is ranked low for the Missouri River above Lake Sakakawea and Lake Oahe (36 and 92 feet below the river and lakebed, respectively). The only third party damage that would threaten this portion of the pipeline would be another HDD in the same location of the DAPL Pipeline. Due to tracking technological advances such as submeter accuracy, a permanent and accurate record of the proposed pipeline would be documented so no such possibility of another pipeline being placed via HDD in the same location would occur.

2 - External Corrosion

Pipeline failure for the portion of the proposed project that crosses Lake Sakakawea is classified as low. The potential is ranked low due to the high performance external coating system that is being used (heavy epoxy-concrete abrasion resistant layer over fusion bonded epoxy) and deep well cathodic protection. This portion of the pipeline is constructed with a thicker wall pipe compared to segments of the pipeline in upland-classified areas. A conservative corrosion growth rate was determined to take 70 years before a through-wall metal loss could occur. Because in-line inspection metal loss detection tools run every five years, external corrosion activity would be detected and mitigated prior to it becoming an integrity threat.

3 - Internal Corrosion

USACE_DAPL0071316

Environmental Assessment
Dakota Access Pipeline Project
July 2016

Pipeline failure due to the internal corrosion threat for the portion of the proposed project that would cross Lake Sakakawea is ranked low. Causes of internal corrosion would be due to accumulation of water and solids in low spots of the pipeline. However, DAPL internal corrosion mitigation program for the entire DAPL pipeline include chemical analysis of the crude product stream, pipeline operations (maintenance of minimum flow rates that keep entrained water and solids moving through the system), a maintenance pigging program, wall pipe design and in-line inspection performed every five years. The potential does exist, but successful implementation and continual monitoring of the effectiveness of the above programs will mitigate the risk. As with the external corrosion threat, the internal corrosion would be detected and mitigated prior to it becoming an integrity threat.

### 4 - Pipe Manufacturing Defects

Pipeline failure due to manufacturing defects is considered low for the portion of the pipeline that crosses Lake Sakakawea and Lake Oahe. Upon completion of construction and prior to the commissioning of the pipeline, the segment of the pipeline crossing Corps-managed lands would be hydrostatically strength-tested for eight hours at 1,800 psig which would be 1.25 times greater than the 1,440 MAOP. Should any strength-related defects be found in the pipe as a result of the hydrostatic test, this segment of the pipeline would have been over-pressured by more than two-times to have a potential effect on those defects. An over-pressure event of this magnitude is not likely with the equipment installed.

### 5 - Construction Related Defects

Pipeline failure for the segment that crosses under Lake Sakakawea due to construction related defects is categorized as low. All pipe joints would be welded by qualified welders and the required 100% girth weld radiography would provide a two-dimensional grayscale image of the weld. After construction and prior to commissioning of the pipeline, the hydrostatic testing would be performed. After the drill string is installed and prior to the line being put into service, an in-line inspection tool would be ran to identify an injurious mechanical damage that may have gone undetected during construction.

### 6 - Incorrect Operations

Pipeline failure due to incorrect operations (e.g. overpressure event caused by human error) is ranked low for the section of the pipeline that crosses Lake Sakakawea and Lake Oahe. This section of the DAPL pipeline has a design factor nearly 2-times greater than the maximum allowable operating pressure (1440 psig) of the pipeline. In addition, the system is controlled and monitored 24 hours a day, 365 days a year by experienced controllers in the control center in Sugarland, Texas. The system is designed with instruments and pressure relief systems to minimize the opportunity for overpressure.

### 7 - Equipment Failure

Pipeline failure due to equipment failure for the section of the pipeline that crosses the Missouri River above Lake Sakakawea and Lake Oahe are categorized as low. The only equipment located in this section of the pipeline are the shut-off valves on either side of the Missouri River above Lake Sakakawea and Lake Oahe which are remotely operated. These valves are secured in perimeter fencing.

### 8 - Stress Corrosion Cracking

USACE_DAPL0071317

Environmental Assessment
Dakota Access Pipeline Project
July 2016

The potential for pipeline failure due to stress corrosion cracking for the portion of the pipe that crosses the Missouri River above Lake Sakakawea and Lake Oahe is ranked as low because this section will operate at a low stress and is externally coated with a fusion bond epoxy coating.

### 9 - Natural Forces

The potential for pipeline failure due to natural forces is ranked low for the segment of the pipeline that crosses Lake Sakakawea and Lake Oahe. The National Pipeline Mapping System, maintained by PHMSA, rates this geographic location for natural hazards as the following: Hurricane- Low; Earthquake- Low; Flood- High and; Landslide-High. Erosion of cover/ exposure of the pipeline to debris during flood conditions is highly unlikely due to the depth of cover at the Missouri River and Lake Oahe crossings (36 feet and 92 feet below the river and lakebed, respectively). In addition, landslide/ creep of the pipeline is highly unlikely as the pipe is at a depth below that which would be affected by land movement.

### 10 - Consequences

In the event that a pipeline failure occurs and product is released into the Missouri River at either crossing, the worst case consequence scenario is ranked high because several drinking water intake High Consequence Areas (HCAs) and multiple ecologically sensitive HCAs could be impacted. To minimize the impact of a release (e.g. size and spread) the pipeline will continuously be monitored by a real-time monitoring and leak detection system , which is considered to be the best available technology; motor operated isolation and/or check valves are installed on either side of the Missouri River above Lake Sakakawea and Lake Oahe which can be actuated to close as soon as a leak is detected;  PHMSA-approved FRP will be in place, all weather access and collection points will be staged strategically downstream of each lake crossing, and DAPL has committed to additional full scale open water and full scale winter/ice exercises that will be conducted at Lake Sakakawea and Lake Oahe. A full scale exercise will occur once every 3 years (triennial cycle) with the location and type of exercise occurring on alternating schedules (e.g. open water exercise at Oahe the first triennial cycle, followed by winter exercise at Sakakawea the following triennial cycle, followed by a winter exercise at Oahe the following triennial cycle, etc.). Stakeholder (federal, state, local, and Tribal) involvement will be solicited for each exercise. The first exercise will occur within the first 3 years after the pipeline becomes operational.

## 3.12    Air Quality and Noise

Under the "no action" alternative, Dakota Access would not construct the DAPL Project and no impacts on air quality and noise would occur.  However, If the objectives of the DAPL Project are to be met under the "no action" alternative, other projects and activities would be required and these projects would result in their own impacts on air quality and noise, which would likely be similar to or greater than the DAPL Project.  If the "no action" alternative is implemented and the Project is not constructed, shippers will likely rely on truck or rail to transport crude oil.  Additional road and rail traffic necessary to transport the volume of crude oil proposed by the DAPL project would increase the emissions of combustion products due to the potential releases during the filling operations of trucks or rail cars and the use of diesel engines.  These would be recurring inputs into the environment which could have an adverse impact on air quality in the region.   Similarly, an increase in noise from truck and rail traffic would be widespread

USACE_DAPL0071318

Environmental Assessment
Dakota Access Pipeline Project
July 2016

and long term as opposed to the noise impacts of the preferred action which are temporary and primarily limited to the vicinity of the construction workspace.

### 3.12.1  Air Quality

#### 3.12.1.1  Affected Environment

The Clean Air Act (CAA) of 1970 requires that states adopt ambient air quality standards.  The CAA (42 USC 7401 et seq.) establishes ambient air quality standards, permit requirements for both stationary and mobile sources, and standards for acid deposition and stratospheric ozone (O3) protection.  The standards have been established in order to protect the public from potentially harmful amounts of pollutants. Under the CAA, the EPA establishes primary and secondary air quality standards.  Primary air quality standards protect public health, including the health of "sensitive populations, such as people with asthma, children, and older adults." Secondary air quality standards protect public welfare by promoting ecosystem health, and preventing decreased visibility and damage to crops and buildings.

According to the EPA, North Dakota has no nonattainment areas for criteria pollutants.  The Bismarck air quality monitoring station in Burleigh County is located approximately 23 miles north-northwest of the Lake Oahe crossing.  The Bismarck air quality monitoring station measures sulfur dioxide, nitrogen dioxide, particulate matter, ground-level ozone, and meteorological data (North Dakota Department of Health, 2013).  The Williston air quality monitoring station in Williams County is located approximately 18 miles northeast of the flowage easement crossing.   The Williston air quality monitoring station measures particulate matter, ground-level ozone, and meteorological data.   The monitoring objective of both stations is to measure population exposure to air quality parameters.

Monitoring data for these stations from 2003-2013 show pollutant levels for sulfur dioxide, nitrogen dioxide, ozone, and particulate matter did not exceed state or deferral ambient air quality standards at any of the state-operated monitoring sites (North Dakota Department of Health, 2013).

#### 3.12.1.2  Impacts and Mitigation

With the Proposed Action, no long-term impacts to air quality would occur; the proposed pipeline would not emit any criteria air pollutants.  Short-term impacts to air quality may occur during construction phase of the Proposed Action.  The contribution of the Proposed Action to greenhouse gas emissions during construction would be considered a minor indirect impact to climate change.

During construction, emissions from fuel-burning internal combustion engines (e.g., transportation trucks, heavy equipment, drill rigs, etc.) would temporarily increase the levels of some criteria pollutants, including carbon monoxide, nitrogen dioxide, ozone, particulate matter, and non-criteria pollutants such as volatile organic compounds.  Construction of the Lake Oahe crossing is likely to take six to eight weeks to complete.  Conventional pipeline construction across the flowage easements would take approximately two weeks and activities at the HDD exit point for crossing the Missouri River on the flowage easement LL3440E would likely operate for four to six weeks.  To reduce the emission of criteria pollutants, fuel-burning equipment running times would be kept to a minimum and engines would be properly maintained.  This temporary increase in emissions is not expected to impact air quality or visibility in the region long-term.

95

USACE_DAPL0071319

Environmental Assessment
Dakota Access Pipeline Project
July 2016

### 3.12.2   Noise

#### 3.12.2.1   Affected Environment

Sound is a sequence of waves of pressure that propagates through compressible media such as air or water.  When sound becomes excessive, annoying, or unwanted it is referred to as noise.

Decibels (dB) are the units of measurement used to quantify the intensity of noise.  To account for the human ear's sensitivity to low level noises, the decibel values are corrected for human hearing to weighted values known as decibels of the A-weighted scale (dBA; see **Table 3-16**).  The EPA has set values that should not be exceeded.  While the primary responsibility of regulating noise was transferred from the EPA to state and local governments in 1981, the Noise Control Act of 1972 and the Quiet Communities Act of 1978 are still in effect.

| Table 3-16 Noise Values | | |
|---|---|---|
| **Area** | **Noise Level** | **Effect** |
| All areas | Leq (24) < 70 dBA | Hearing |
| Outdoors in residential areas and farms where people spend varying amounts of time in which quiet is a basis for use | Ldn < 55 dBA | Outdoor activity interference and annoyance |
| Outdoor areas where people spend limited time such as school yards, playgrounds, etc. | Leq (24) < 55 dBA | Outdoor activity interference and annoyance |
| Indoor residential areas | Ldn < 45 dBA | Indoor activity interference and annoyance |
| Indoor areas with human activities such as schools, etc. | Leq (24) < 45 dBA | Indoor activity interference and annoyance |

Source: (The Engineering ToolBox, 2015)
Leq: 24-hr equivalent sound level
Ldn: day-night average sound level

The dominant land use in the proposed Project Area is agricultural.  The Day-Night Average Sound (Ldn) level for agricultural crop land is 44 dBA, and rural residential is 39 dBA (The Engineering ToolBox, 2015).

#### 3.12.2.2   Impacts and Mitigation

Construction of the Proposed Action would temporarily affect the noise levels on and around the flowage easement and federal lands crossing areas.  Construction would cause temporary increases in the ambient sound environment in the areas immediately surrounding active construction.  The use of heavy equipment or trucks would be the primary noise source during construction and excavation.  The level of impact would vary by equipment type, duration of construction activity and the distance between the noise source and the receptor.  Construction activities would typically be limited only to daytime hours.  Potential exceptions include work determined necessary based on weather conditions, safety

96

Environmental Assessment
Dakota Access Pipeline Project
July 2016

considerations, and/or critical stages of the HDD [e.g. if pausing for the night would put the drill at risk of closing or jamming].

Once constructed and in-service, normal pipeline operations are not audible and noise impacts would be limited to the short-term construction window.  Dakota Access would mitigate noise impacts by limiting equipment running times and the duration of Proposed Action construction to the minimum amount necessary to complete the Proposed Action.  Noisy construction activities would typically be limited to the least noise-sensitive times of day (daytime only).

It is not anticipated that the temporary increase in ambient sound levels associated with construction would result in a significant noise impact.

97

USACE_DAPL0071321

Environmental Assessment
Dakota Access Pipeline Project
July 2016

## 4.0    CUMULATIVE IMPACTS

Cumulative impacts to the environment result from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.  Cumulative impacts may result from individually minor but collectively significant actions taking place over a period of time 40 CFR Part 1508.

Consultation with the North Dakota Public Service Commission (NDPSC) personnel, and subsequent evaluation of its online resources, provided a systematic source of information that was useful for evaluating cumulative impacts.  Although the NDPSC does not maintain a centralized repository for energy infrastructure development projects, it provides a summary of siting applications, which offers one metric of energy project development (excluding gathering lines), particularly over time (NDPSC, 2012a).  The siting application summary (NDPSC, 2012b) contains records starting in 1996.  The number of statewide siting applications increases markedly starting in 2007, coinciding with development of the Bakken Formation oil field.  Prior to that, only three to four applications would typically be submitted on an annual basis (NDPSC, 2012a).

Past actions in the vicinity of the Proposed Action include oil and gas development and associated infrastructure, utility installation, and agriculture.  These past activities most likely have had effects on soils, water resources, vegetation, wildlife, land use, visual resources, paleontological resources, and cultural resources.  The DAPL Project route was sited to minimize green-space impacts by co-locating with existing utility corridors over much of its length.  As a result, the flowage easement crossing, as designed, would be co-located with a Oneok/TransCanada natural gas pipeline and the Lake Oahe HDD would be co-located with a natural gas pipeline and a 345 kV power line.  At both of these locations, the predominant land use is agriculture.  In addition to ongoing agricultural practices and the expansion of regional oil and gas development activities, cumulative impacts associated with the DAPL Project as whole were also considered.

If the Corps approval of the Proposed Action markedly changed the rate at which the oil and gas industry grows, or facilitated a rapid increase in production, then the changes in the industry's rate of growth and the associated environmental consequences could be considered along with the effects of the Proposed Action as a cumulative impact and would need to be quantified in this EA.  However, according to Bruce Hicks, North Dakota Industrial Commission's Department of Mineral Resources Oil and Gas Division, the critical factors limiting the rate at which the industry grows within North Dakota is the availability of drill rigs and hydrofracing crews (U.S. Army Corps of Engineers, 2011).  Because the availability of rigs and crews is the critical factor affecting the growth of the industry in the region, approval of the Proposed Action is not anticipated to have a cumulative impact of increasing production or reliance upon non-renewable resources.

Cumulative impacts were evaluated for the following resources and were determined to be negligible or nonexistent based on past and foreseeable future actions in the Project Area and the minor and temporary contribution of the Proposed Action to effects on these resources:

- Geology and Soils                                    Section 4.1
- Water and Aquatic Life Resources                     Section 4.2

USACE_DAPL0071322

Environmental Assessment
Dakota Access Pipeline Project
July 2016

- Vegetation, Agriculture, and Range Resources                                    Section 4.3
- Threatened, Endangered, Candidate, and Proposed Species           Section 4.4
- Wildlife Resources                                                                              Section 4.5
- Land Use and Recreation                                                              Section 4.6
- Cultural and Historic Resources and Native American Consultations    Section 4.7
- Social and Economic Conditions                                                   Section 4.8
- Transportation and Traffic                                                            Section 4.9
- Environmental Justice                                                                    Section 4.10
- Air Quality and Noise                                                                     Section 4.11

## 4.1    Geology and Soils

The continued development of oil and gas exploration and production in the region at its current level increases the potential for adverse cumulative impacts to geologic and soil resources.  Cumulative impacts could occur when future utilities seek to be co-located within existing corridors or alternatively when greenfield development occurs in landslide prone or highly erodible areas.  However, with the proper implementation of reclamation and restoration BMPs these impacts can be reduced.

Another potential cumulative impact to geologic resources is the continued development of the mineral resource, which could lead to its depletion.  The mineral resource is understood to be finite.  The effect would be primarily economic to the various entities with financial interests; secondarily there could be indirect impacts, potentially beneficial, associated with technological advances within the industry that would facilitate the recovery of mineral resources that cannot be recovered currently.

Agricultural practices throughout the region as well as the thousands of miles of gathering pipelines that may be built in the region could contribute to cumulative impacts on soils.  Agricultural practices can result in increased erosion and runoff when soils are exposed for long periods such as when fields are fallow or prior to seeding.  Impacts to soils as a result of pipeline installation are temporary and typically associated with excavation activities which may result in compaction and erosion when soils are exposed prior to revegetation.   Impacts to soils as a result of the Proposed Action would be mitigated through the implementation of BMPs which may include topsoil segregation, erosion controls, and decompaction. Furthermore, adherence to NPDES stormwater permits would require adequate design, grading, and use of BMPs to ensure that erosion and sediment control measures are properly utilized.  Generally, because of the utilization of top soil segregation and erosion controls, as well as the minimal workspace requirements and minimum duration of exposed excavations during construction of the Proposed Action, the cumulative impacts on soils when combined with agricultural practices and other pipeline installations would not be significant.

No impacts on mineral extraction, mining, or other deeper geologic resources would be cumulative, since these uses of geologic resources (*i.e.,* mining) do not occur in the Project Area.  Clearing and grading associated with construction of the Proposed Action and other projects in the vicinity could increase soil erosion in the area.  The introduction of contaminants to groundwater due to accidental spills of construction-related chemicals, fuels, or hydraulic fluid could have an adverse effect on groundwater quality.  Because the direct effects would be localized and limited primarily to the period of construction,

USACE_DAPL0071323

cumulative impacts on geology, soils, and sediments would only occur if other projects were constructed at the same time and place as the Proposed Action facilities.

There are smaller diameter, unregulated, crude oil gathering lines that have leaked and affected soil and ground/surface water.   These pre-existing lines have limited cathodic protection (external corrosion protection) and as such they are not routinely monitored.  The Proposed Action is the construction of a regulated large diameter crude oil transmission line and, as discussed throughout this document, is highly regulated and monitored.  The cumulative impacts of this pipeline are minimized by the regulatory criteria, the monitoring, protections and response implemented by Dakota Access during the operation of the pipeline.

## 4.2    Water and Aquatic Life Resources

Cumulative impacts on water resources (i.e., groundwater, surface waters, wetlands) associated with the Proposed Action would be avoided, temporary, and/or minor, as all surface waterbodies would be crossed via trenchless methods (i.e., HDD or bore), no permanent fill or loss of wetlands are anticipated, and potential spill-related impacts would be avoided or greatly reduced by regulating fuel storage and refueling activities and by requiring immediate cleanup should a spill or leak occur.  Spill response and remediation measures associated with construction activities are discussed in detail in Dakota Access' SWPP, SPCC and ECP.

Recently completed construction or current construction within the vicinity of the Project Area could extend the period of exposure of soils as a result of incomplete revegetation.  These exposed soils may increase the potential for soil erosion or sediment transport via overland flow during precipitation events resulting in sedimentation in surface waterbodies.  These increased loads could have the potential to temporarily impact water quality, wetlands, and sensitive fish eggs, fish fry, and invertebrates inhabiting waterbodies in the Project Area watersheds.  However, all projects, including the DAPL Project as a whole, are subject to regulation by the USACE under the CWA.  By installing the pipeline using the HDD technique at the Missouri River and Lake Oahe crossings, as well as other crossings associated with the DAPL Project as a whole, and implementing the erosion and sediment control measures specified in the ECP (**Appendix G**) and SWPPP (**Appendix A**), the potential for increased sediment loading from terrestrial sources is minimized and the cumulative effect is considered to be negligible.

In addition to water quality impacts associated with sediment loading from erosion and run-off, an inadvertent release of non-hazardous drilling mud could occur during HDD activities, including those at Lake Oahe and the Missouri River.  The likelihood of inadvertent releases of drilling mud is greatly minimized through thorough geotechnical analysis and detailed design/mitigation plans at each crossing and careful monitoring of drilling mud returns and pressure during HDD activities.  If an inadvertent release were to occur within a waterbody during HDD activities, such as those at the Missouri River and Lake Oahe crossings, impacts on water quality and aquatic resources would be minor.  Drilling mud is non-hazardous and impacts on water quality and aquatic resources would be akin to those associated with sediment loading.  Due to the quantity of drilling mud used in relation to the size of waterbodies typically crossed via HDD, impacts would be temporary and mitigated through implementation of an HDD Contingency Plan (**Appendix B**) Impacts on all waterbodies crossed by the DAPL Project in its entirety would be minimized or avoided via HDD and/or use of erosion and sediment control measures; thereby minimizing the potential for cumulative impacts on water and aquatic life resources.

USACE_DAPL0071324

Environmental Assessment
Dakota Access Pipeline Project
July 2016

Impacts on water and aquatic life resources associated with sediment loading, including potential inadvertent releases of non-hazardous drilling mud, as a result of the Proposed Action and the DAPL Project as a whole would be temporary and short-term.  Therefore, these impacts, when evaluated with other oil and gas development and infrastructure projects in the region and agricultural practices, would result in minor cumulative impacts on water and aquatic life resources.

Spills or leaks of hazardous liquids during construction and operation of the Proposed Action, or other projects in the vicinity, have the potential to result in long-term impacts on surface and groundwater resources as well as aquatic life resources.  However, construction impacts would be mitigated by the proper design and implementation of BMPs would ensure avoidance, minimization, and/or mitigation of potential impacts on water resources and aquatic resources, as required by the various regulating agencies that have jurisdiction over the DAPL Project.  Operational risks are being mitigated by DAPL Project design to meet or exceed the applicable federal regulations as detailed in Sec 3.11- Reliability and Safety. In the unlikely event of an unanticipated release during operations of the pipeline, the effects would be remediated following the cleanup procedures and remediation activities described in Section 3.2.2.2.Therefore, the potential cumulative impacts from the Proposed Action on water resources and aquatic resources resulting from spills would be minor.

In addition, while construction and operation of the Proposed Action along with the other potential projects and activities could result in cumulative impacts on existing wetlands in the Project Area watersheds, regulation of activities under the CWA by the Corps requires permitting and mitigation for wetland impacts so that there would be no net loss in the regional wetland resources.  Therefore, cumulative impacts on wetland resources in the Project Area would be minimal.

## 4.3     Vegetation, Agriculture, and Range Resources

As described within Section 3.3.1, all vegetation disturbed by construction within the flowage easements and the Project Area/Connected Actions of the federal lands would be restored to pre-construction conditions following the completion of construction activities, with the exception of one PFO wetland located within the permanent ROW on the flowage easements that would be converted to shrub-scrub or herbaceous wetlands.

No forest fragmentation would occur as a result of construction and operation of the Proposed Action. No interior (core) forest habitat is crossed by the Proposed Action, and the only wooded area that would be permanently impacted by the Proposed Action include one PFO wetland (0.05 acre) located within the permanent ROW on the flowage easements between HDD boxes.  However, much of the forest and PFO wetlands in the vicinity of the Project Area have already been fragmented by agricultural activities, roads, and other commercial or industrial developments.  Further, construction of the Proposed Action facilities would not result in the permanent loss of wetland features.  Although trees within a 30-foot corridor centered on the pipeline that could compromise the integrity of the pipeline coating would be selectively removed throughout the operational life of the Proposed Action, this portion of the PFO wetland impacted by the Proposed Action would be converted to PEM or PSS and allowed to revegetate with scrub-shrub or herbaceous species.  Therefore, further fragmentation of wetlands or creation of new forest-edge habitat as a result of the Proposed Action would be negligible.

USACE_DAPL0071325

Generally, the greatest impact to the native vegetative community is associated with past and current agricultural practices.  Pipeline projects impact a relatively small area in relation to the total landscape, as these impacts are typically short in duration and temporary in nature.  Examples of impacts to vegetation, agriculture, and range resources could include introduction of non-native plants and/or noxious weeds, habitat fragmentation, altered vegetative structure, reduced population sizes below critical threshold levels, sedimentation or degradation of surface waters, erosion, and siltation.   However, the implementation of BMPs outlined in the SWPPP (**Appendix A**) and ECP (**Appendix G**) and reclamation of disturbed areas with native vegetation would reduce the chances of adverse individual or cumulative impacts.  In addition, while other project pipeline corridors may require clearing of forested areas and potential habitat fragmentation, temporary workspace areas would be revegetated upon completion of construction.  Further, these projects would be located in a region of North Dakota that is dominated by open or agricultural land, thereby minimizing the potential for permanent habitat fragmentation. Regionally, there have been releases of hazardous material from unregulated, smaller diameter gathering pipelines that have had an adverse effect on vegetation, agriculture and range resources.  In the unlikely event of an unanticipated release during operations of the pipeline, the effects would be remediated following the cleanup procedures and remediation activities described in Section 3.11.  Therefore, the potential cumulative impacts from the Proposed Action on vegetation, agriculture and range resources would be minor.

## 4.4    Threatened, Endangered, Candidate, and Proposed Species

As required by the ESA, the status of each species listed as threatened or endangered is evaluated every 5 years by USFWS to assess its recovery and determine if a change in its listing status is warranted.  Where available, these documents were utilized to identify the potential for ongoing regional oil and gas development to significantly threaten the species listed in the Project area.  For species in which a 5-Year Review was not available, Dakota Access utilized the species Recovery Plan and/or Final Rule to evaluate potential threats on the species resulting from regional oil and gas development.

Species for which no suitable habitat is present in the Project Area or Connected Action Area, such as the black-footed ferret, Dakota skipper, and gray wolf, were not evaluated, as the Proposed Action would not contribute to cumulative impacts on these species.   Further, the northern long-eared bat was not evaluated since the species is not provided federal protection in the Project Area or Connected Action Area under the Interim 4(d) Rule; this area is well outside of the published White-Nose Syndrome Buffer Zone.

Habitat loss and modification are the primary threats to the continued existence of interior least tern, whooping crane, piping plover, rufa red knot, and pallid sturgeon.  The potential cumulative impacts from oil and gas activities in the region on the current listing or potential elevated future listing of these five species are discussed in detail below.

### 4.4.1    Interior Least Tern

The USFWS does not address oil and gas activities, including potential spills, as a potential or ongoing threat to the interior least tern in either the 5-year review, or the recovery plan (USFWS, 2013e).  The primary threat to interior least terns and the cause of the initial population declines resulted from river

USACE_DAPL0071326

Environmental Assessment
Dakota Access Pipeline Project
July 2016

channelization, impoundments, and changes in river flow resulting in loss of suitable habitat throughout their range.

### 4.4.2   Whooping Crane

According to the USFWS (2007) International Recovery Plan for the Whooping Crane (*Grus Americana*) the USFWS considers oil and gas activities as a secondary threat, especially within the wintering range in the southeast United States.  Potential threats on whooping cranes along the Central Flyway migratory route in the region of the Proposed Action include loss of stopover habitat from conversion of natural wetlands (e.g., prairie potholes) to croplands, as well as development activities associated with natural gas and oil production.  The Proposed Action would not result in any loss of stopover habitat for the whooping crane; therefore, it would not contribute to cumulative impacts on the species.

### 4.4.3   Piping Plover

The USFWS (2009b) 5-Year Review for the piping plover does specifically address threats from oil and gas activities in North Dakota.  However, impacts from oil and gas activities that are threatening piping plover are associated with the development of oil and gas exploration wells located near the alkali lakes habitat, which accounts for 83% of the U.S. Northern Great Plains piping plover breeding habitat.  The Proposed Action is not located within the vicinity of any of these areas and would therefore not contribute to cumulative impacts on piping plovers.

### 4.4.4   Rufa Red Knot

According to the Final Rule (79 FR 73706) for the rufa red knot (USFWS, 2014b), the USFWS considers oil and gas activities as a secondary threat, especially near the coast (primarily in southeast Texas in the wintering range).  Potential threats to these species along the Central Flyway migratory route in the region of the Proposed Action include loss of stopover habitat from conversion of natural wetlands (e.g., prairie potholes) to croplands and development (including oil and gas exploration).  The Proposed Action would not result in any loss of stopover habitat for the rufa red knot; therefore, it would not contribute to cumulative impacts on the species.

### 4.4.5   Pallid Sturgeon

The USFWS (2014c) Revised Recovery Plan for the Pallid Sturgeon (*Scaphirhynchus albus*) specifically addresses the potential effects of energy development such as oil and gas pipelines on pallid sturgeon.  It states that while a rupture of a pipeline within sturgeon habitat could pose a threat, the impacts would be localized and the magnitude of the impact would be dependent on the quantity and timing of the material released.  It is highly unlikely that a cumulative impact resulting from a spill or leak would occur, as it would require multiple pipelines in the same general area to experience anomalous events simultaneously.  Even if this were to occur, these impacts would be localized and temporary and would likely not result in a significant impact on the recovery of pallid sturgeon, as a whole, as it is found in other waterbodies and in other regions throughout its range (USFWS, 2014c).

USACE_DAPL0071327

Environmental Assessment
Dakota Access Pipeline Project
July 2016

#### 4.4.6    Conclusion

The collocation of utilities in established corridors; the proper implementation of erosion control devices; compliance with permits issued for regulated activities; and rapid, thorough, environmentally appropriate reclamation efforts, and design and operation of projects to meet or exceed regulatory requirements are industry standards that, when applied consistently, on a regional basis, would minimize cumulative impacts now and in the future.   Based on the pipeline route, and the utilization of HDDs, the Proposed Action is not likely to have any permanent adverse impacts to habitat utilized by listed species, including aquatic species as discussed in Section 3.4.   Therefore, the Proposed Action will not have a cumulative effect on listed species.

### 4.5    Wildlife Resources

Regionally, the greatest impacts to wildlife (past, present or future) can be associated with agricultural development.   Agricultural land use replaced the existing natural diversity with the monoculture row crops.   The practice also introduced noxious weeds, soil pests, and other exotics, which all had significant cumulative impacts on regional wildlife.   Relative to the habitat and land use impacts associated with past agricultural activities, the Proposed Action impacts, as well as those associated with the oil and gas industry on a regional basis and Connected Actions would be nominal.   This is due to the short duration and small scale of the Proposed Action relative to the regional landscape and the large scale of agricultural activities in the region.

The Proposed Action would not permanently alter the character of the majority of available habitats as most impacts are expected to be temporary (see Section 4.3 for a discussion of vegetation impacts associated with the Proposed Action and the DAPL Project as a whole).   Possible temporary, short-term impacts on wildlife include the temporary displacement of some mobile individuals to similar, adjacent habitats during construction activities.   Further, while other oil and gas projects' pipeline corridors may require clearing of forested habitat (if present), once construction is complete, temporary workspace areas would be able to revegetate.   In addition, the permanent easement would be allowed to revegetate with herbaceous species, which provides habitat to a variety of species that utilize herbaceous and edge habitats.   When analyzed on a regional basis, these impacts do not change significantly in magnitude when compared to the current and historic impacts previously imposed upon the regional wildlife by agricultural development.   Therefore, further habitat fragmentation as a result of the Proposed Action or other oil and gas developments in the region would be negligible and is not anticipated to significantly contribute to cumulative effects on wildlife.

### 4.6    Land Use and Recreation

Regional oil and gas development and related activities could cause an impact to land use and recreation in the Project Area.   However, increased impacts are not anticipated based on the design of the DAPL Project and BMPs that would be implemented to restore the impacted area.   Temporary impacts to land use would potentially occur during the period of active construction but areas would revert to preconstruction use following restoration.   Because construction would be short term and land use conversion would be minimal, the cumulative impact on land use as a result of the Proposed Action would be temporary and minor.

USACE_DAPL0071328

Environmental Assessment
Dakota Access Pipeline Project
July 2016

The flowage easement crossing would be located in an area with a greater density of prior development, while the Lake Oahe crossing would be located in an area with relatively little surface development. That said, since the Proposed Action has been co-located with existing pipelines the additional impact incurred by the Proposed Action would be negligible if restored as proposed.

The potential cumulative impacts from the Proposed Action on land use and recreation resources resulting from spills would be minor. Although there have been releases of hazardous material from small diameter, unregulated gathering pipelines that have had an adverse effect on land use and recreation resources, it is highly unlikely for an unanticipated release to occur within the EA review area during operations of the DAPL pipeline, which is subject to DOT construction regulations and pipeline leak detection monitoring guidelines.

In the event of an unanticipated release during operations of the pipeline, the effects would be remediated following the cleanup procedures and remediation activities described in Section 3.11. Cumulatively, the impacts associated with land use and recreation resources would be minimal.

## 4.7 Cultural and Historic Resources and Native American Consultations

Dakota Access would implement measures to avoid or mitigate adverse effects to cultural resources that have been determined, in consultation with the federal land managing agencies, NDSHPO, and Native American tribes, to be eligible for listing in the NRHP. At the one potential NRHP-eligible site mapped adjacent to the workspace within the EA review area, Dakota Access would install exclusionary fencing along the outer workspace boundary during construction to prevent inadvertent trespassing by construction staff or vehicles. This area would be classified generically as sensitive environmental areas, and would be closely monitored by EI staff. If an unanticipated discovery occurs during construction, Dakota Access would follow the measures described in its UDP (**Appendix F**).

Although the possibility of an unanticipated discovery is low based on the negative findings of the field survey efforts in the Project Area, the measures outlined in the UDP includes a thorough notification protocol which would ensure that the necessary cultural resources specialists and agency personnel are involved to appropriately address the nature and significance and of the find. The Proposed Action is not anticipated to impact cultural resources; therefore, cumulative impacts associated with the Proposed Action would not occur.

## 4.8 Social and Economic Conditions

Construction of the overall DAPL Project would contribute more than $1 billion in direct spending just for materials – the majority of which would be purchased in the U.S. Fifty-seven percent of the pipe; the majority of the valves, fittings, valve actuators; and the majority of the remaining materials would be manufactured in the U.S., creating significant opportunities for regional and national manufacturing. In addition to manufactured goods and services, the DAPL Project would provide $195 million in easement payments to the landowners whose property is crossed by the DAPL Project.

USACE_DAPL0071329

Environmental Assessment
Dakota Access Pipeline Project
July 2016

The Proposed Action would have a relatively short construction window with a small number of construction workers dedicated to the crossings.  It is possible that nearby towns could experience short-term temporary increases to the local economy through induced spending from construction employees working on the Proposed Action.  No residential homes or farms would be relocated as a result of the Proposed Action.  Additionally, no demographic changes in the Census tracts affected within the Project Area counties are anticipated because no permanent employees would be created as a result of the Proposed Action.  Therefore, the only indirect socioeconomic impacts from the Proposed Action are likely to be related to the temporary influx of workers, such as increased demand for short term housing and the secondary economic benefits discussed in Section 4.10.

The regional population has dramatically increased over the last seven year period due to oil and gas development; concentrated in the Project Area.  The majority of the current available and transient labor force in the region is involved in the exploration and production of the resources, or construction of related infrastructure, both of which are labor intensive efforts though temporary in nature.  Well rigs are mobile and the number of available drilling leases is limited as well as the mineral resource itself.  For these reasons the labor pool effects associated with the exploration and production of the resource are considered to be a temporary impact.

Regarding cumulative impacts to socioeconomic resources, the Proposed Action would provide a benefit to local merchants and vendors as well as providing potential temporary employment opportunities to the local workforce.   As such, no substantive negative direct, indirect, or cumulative impacts to socioeconomic resources would result from the Proposed Action.

## 4.9    Transportation and Traffic

As discussed in Section 3.3, roads throughout North Dakota have received a sharp increase in truck traffic due to increased oil and gas activity.  The greater amount of traffic has led to a decline in the transportation infrastructure and a decrease in road safety throughout the state.  Additional oil and gas development and production may continue to contribute to cumulative effects on roads in the vicinity of the Project Area requiring a higher frequency of road maintenance and repair on public roadways.

Cumulative impacts from construction of the Proposed Action would temporarily increase traffic in the immediate vicinity of the Project Area.  This increase in traffic would be temporary and is not expected to result in significant impacts to North Dakota's transportation infrastructure.  Road improvements such as grading would be made as necessary and any impacts resulting from Dakota Access's use would be repaired in accordance with applicable local permits.  Traffic interruptions would be minimized to the extent practical and would result in insignificant, temporary cumulative impacts on regional transportation resources as it would be localized to the immediate vicinity of the Project Area and major delivery routes.

During operations of the Proposed Action, there is expected to be a positive effect on traffic resources in North Dakota.  Once in operation, Dakota Access plans to transport 450,000 bpd of crude oil via pipeline which would significantly reduce the demand for the commercial trucking of crude oil on county, state and interstate highways.  It is anticipated that the cumulative effects of the DAPL Project and other future pipeline projects would be beneficial to the transportation infrastructure in North Dakota by decreasing oil hauled by truck traffic and therefore reducing wear and tear on roads and highways.

USACE_DAPL0071330

Environmental Assessment
Dakota Access Pipeline Project
July 2016

## 4.10   Environmental Justice

The Proposed Action and Connected Actions and associated cumulative effects where practicable have been co-located with existing utilities and across USACE easements and fee owned property.  The DAPL Project avoids crossing Tribal reservation lands across its entire length.  There are no reasonable past, present or reasonably foreseeable actions that together with these Proposed Actions will have a cumulative significant adverse effect on the environment or a disproportionate impact on low income or minority populations, including the Standing Rock Sioux or other tribes in or around the Project.

Additionally, the holders of the mineral rights and landowners in the region, including particular tribes and tribal members, have witnessed a recent windfall from oil and gas development.  Oil and gas development generally occurs on private land with permission of the landowner.  Given this ascent, there is no disproportionate impact to low income, minority or tribal populations benefited by the Environmental Justice policy.  The DAPL Project was routed to avoid sensitive lands and populations, including tribal lands, and areas and does not have a disproportionate impact on any low income, minority or tribal population benefited by Environmental Justice policy, as discussed in section 3.9, above.  For these reasons, the Proposed Action and its associated cumulative actions and effects have no significant cumulative impact to low-income, minority or tribal populations.

## 4.11   Air Quality and Noise

No operation emissions are associated with the Proposed Action, as no major aboveground facilities would be constructed in the Project Area.  Potential cumulative impacts on air quality would result from concurrent construction of the Project and other development projects in the region.  Cumulative impacts on air quality associated with construction of the Proposed Action would be temporary and short-term; therefore, even if construction of other projects were concurrent with the Proposed Action, cumulative construction-related air quality impacts would be negligible.

Construction of the Proposed Action would affect ambient noise levels at some nearby residences during active construction.  The noise impact of the pipeline construction would primarily originate from the HDD equipment and would be highly localized to the HDD entry and exit sites.  However, because the duration of construction would be short-term, the contribution of the Proposed Action to cumulative impacts on noise would be negligible.

USACE_DAPL0071331

Environmental Assessment
Dakota Access Pipeline Project
July 2016

## 5.0    IRREVERSIBLE AND IRRETRIEVABLE COMMITMENT OF RESOURCES

As required by NEPA, irreversible and irretrievable commitments of resources involved in the Proposed Action should it be implemented, must be addressed in the EA.  Irreversible commitments of resources result in a loss of future options.  Commitments of resources which are irreversible are those resources which are destroyed or consumed and are neither renewable nor recoverable for use by future generations.  Examples of irreversible commitments of resources include consumption of petroleum-based fuels or minerals and destruction cultural resources.  Irretrievable commitments of resources result in a loss of productivity.  Commitments of resources which are irretrievable occur when the productive use or value of a renewable resource is lost for a period of time.  For example, timber or soil productivity may be lost for a period of time resulting in an irretrievable loss of production, but the action is reversible.

Construction activities associated with the Proposed Action would result in the consumption of materials such as aluminum, steel, other metals, wood, gravel, sand, plastics, and various forms of petroleum-based fuels, the use of which would constitute an irreversible commitment of resources.  Most of these materials are nonrenewable and would be irreversibly committed if not recycled or reused during maintenance or at the end of the life of the Proposed Action.

Areas of vegetation removal or conversion along the permanent right-of-way, such as areas where trees or shrubs were established prior to construction but would be maintained in an herbaceous state during operation, would represent an irretrievable commitment of resources.  Additionally, erosion, compaction, or an overall loss of soil productivity could occur if these impacts are not properly mitigated.  Use of water for dust control and hydrostatic testing would also be irretrievable.  Other irretrievable commitments of resources could occur if areas temporarily impacted by construction were not restored.

Overall, there would be a very minimal commitment of irreversible and/or irretrievable resources as a result of the Proposed Action since the majority of impacts would be temporary and would occur within agricultural land.  Additionally, irreversible and/or irretrievable commitments of resources would be minimized through the mitigation measures for the affected environments identified throughout this EA.

USACE_DAPL0071332

Environmental Assessment
Dakota Access Pipeline Project
July 2016

## 6.0   MITIGATION SUMMARY

Dakota Access has selected the Proposed Action to minimize impacts to natural/cultural resources as summarized in Table 8-2.  System and routing alternatives were considered for the entire DAPL Project in order to meet purpose and need, design criteria and construction requirements, while minimizing potential impacts to the existing environment and socioeconomic setting.  Impacts to the environment would be temporary and not significant as a result of avoiding, minimizing and mitigation any potential impacts.  The majority of potential impacts would be mitigated by HDD technology which would bore beneath resources and allow pipeline construction to proceed with the least amount of impacts possible. Dakota Access has would also implement general mitigation measures such as those described in the ECP (**Appendix G**).  The ECP has been developed based on decades of experience implementing BMPs during construction in accordance with generally accepted industry practices for linear infrastructure and cross-county pipelines.  It is intended to meet or exceed federal, state, and local environmental protection and erosion control requirements, specifications and practices.  The ECP describes current construction techniques and mitigation measures that would be employed to minimize the effects of construction on environmental resources.  Some of the basic procedures identified in the ECP are listed below:

- BMPs designed to minimize the effects of construction on environmental resources;
- Temporary and permanent erosion and sediment control measures;
- Soil handling procedures designed to preserve the integrity of the soil (e.g., topsoil segregation, decompaction, etc.);
- Wetland and waterbody crossing and stabilization procedures
- Wildlife and livestock mitigation measures
- Restoration and revegetation procedures
- Refueling and waste management procedures
- Weed management procedures
- Winter construction practices
- Stormwater management procedures

Dakota Access incorporates environmental requirements into all construction specifications and the ECP would be included in contract documents and enforced as such throughout the proposed action.  The construction contractor(s) must comply with all applicable permits and plans during all phases of construction.  In addition to the ECP, the Proposed Action would be constructed in accordance to the measures detailed in Dakota Access' SWPPP, SPCC, HD Construction Plan, HDD Contingency Plan, and UDP.

To further ensure compliance with permits, plans, obligations, and commitments, Dakota Access would have full-time EIs to monitor construction and compliance.  The EIs would be responsible for observing construction activities to verify that work is carried out in accordance with environmental permit requirements and ensure that designed avoidance and mitigation measures are properly executed during construction.

No additional mitigation measures were identified for geology and soils; water resources; vegetation, agriculture, and range resources; wildlife resources; aquatic resources; land use and recreation; cultural and historic resources, social and economic conditions; environmental justice; or air and noise.  General

USACE_DAPL0071333

Environmental Assessment
Dakota Access Pipeline Project
July 2016

mitigation measures, as described in sections 3.1 through 3.7, or avoidance associated with the trenchless installation (i.e., HDD or bore) of the proposed pipeline are expected to mitigate adverse impacts to resources.

USACE_DAPL0071334

Environmental Assessment
Dakota Access Pipeline Project
July 2016

## 7.0   FEDERAL, TRIBAL, STATE, AND LOCAL AGENCY CONSULTATION AND COORDINATION

The following is a listing of all individuals and agencies consulted during preparation of the EA regardless of whether a response was received.  On March 30, 2015, Dakota Access sent letters to interested parties (indicated by the Corps) requesting comments on the federal actions associated with crossing Corps flowage easements and Corps owned and managed federal land.  A sample request for comment letter sent to individuals and agencies consulted, along with the mailing list and comments received, is included in **Appendix J**.  **Appendix K** contains the Notice of Availability of the Draft EA for comment.  **Table 7-1** includes a summary of agency personnel consulted.

| Table 7-1 Agency/Entity Consultation List | | | |
|---|---|---|---|
| **Agency/Entity** | **Name** | **Address** | **Date Received/ Relevant EA Section** |
| American Rivers | Kristen McDonald | 1101 14th Ave. NW STE 1400 Washington, DC 20005-5637 | N/A |
| Bureau of Indian Affairs - Fort Berthold Agency | Howard Bemer | PO Box 370 New Town, ND 58763 | N/A |
| Bureau of Indian Affairs - Great Plains Regional Office | William Benjamin | 115 Fourth Avenue S.E. Aberdeen, SD 57401 | N/A |
| Bureau of Indian Affairs-Fort Berthold Agency | Earl Silk | P.O. Box 370 New Town, ND 58763 | N/A |
| Bureau of Indian Affairs-Standing Rock | Robert Demery | P.O. Box E Fort Yates, ND 58538 | N/A |
| Bureau of Land Management | Rick Rymerson | 99 23rd Avenue West, Suite A Dickinson, ND 58601 | N/A |
| Dakota Prairie Grasslands | Dennis Neitzke | 1200 Missouri Ave Bismarck, ND 58504 | N/A |
| Dakota Resource Council | Mark Trechock | P.O. Box 1095 Dickinson, ND 58601 | N/A |
| Bismarck-Mandan Development Association | Brian Ritter | 400 East Broadway Avenue, Suite 417 Bismarck, ND 58501 | N/A |
| Morton County Commissioners | Dawn Rhone | 210 2nd Ave NW Mandan, ND 58554 | N/A |
| Morton County Extension Agent | Kari Presler | 210 2nd Ave NW Mandan, ND 58554-3158 | N/A |
| Morton County Weed Board | Wayne Carter | 2916 37th St. NW Mandan, ND 58554 | N/A |
| Emmons County Commissioners | Marlys Ohlhauser | P.O. Box 129 Linton, ND 58552 | N/A |
| Emmons County Extension Agent | Connie Job | Courthouse, Box 278 Linton, ND 58552-0278 | N/A |

USACE_DAPL0071335

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 7-1 Agency/Entity Consultation List | | | |
|---|---|---|---|
| **Agency/Entity** | **Name** | **Address** | **Date Received/ Relevant EA Section** |
| Emmons County Weed Board | Sam Renschler | 510 Sampson Ave. Linton, ND 58552 | N/A |
| Williams County Commissioners | Beth Innis | 205 East Broadway PO Box 2047 Williston, ND 58802-2047 | N/A |
| Williams County Extension Agent | | 302 East Broadway PO Box 1109 Williston, ND 58802-1109 | N/A |
| Williams County Weed Board | Jim Basaraba | 109 Main St Williston, ND 58801-6018 | N/A |
| National Audubon Society State Office | Genevieve Thompson | 118 Broadway, Suite 512 Fargo, ND 58102 | N/A |
| Natural Resources Conservation Service | Kyle Hartel | PO Box 583 Watford City, ND 58854 | N/A |
| Natural Resources Conservation Service | Michele R. Doyle | 2540 Overlook Lane Mandan, ND 58554-1593 | N/A |
| Natural Resources Conservation Service | Jennifer M. H. Vetter | 318 Broadway St. S Linton, ND 58552-7612 | N/A |
| Natural Resources Conservation Service | David Schmidt | 1106 West 2nd St Williston, ND 58801-5804 | N/A |
| NDSU Dept of Soil Science-Department Chair | | NDSU Dept 7680 PO Box 6050 Fargo, ND 58108-6050 | N/A |
| North Dakota Council of Humane Societies | Leo Keelan | 1948 Anderson Drive Minot, ND 58701 | N/A |
| North Dakota Department of Health | Peter Wax | 600 East Boulevard Bismarck, ND 58505 | N/A |
| North Dakota Farm Bureau | | 4900 Ottawa Street Bismarck, ND 58503 | N/A |
| North Dakota Forest Service | Larry Kotchman | 307 1st Street East Bottineau, ND 58318-1100 | April 22, 2015/ Section 2.0 and Section 3.5 |
| North Dakota Game & Fish Department | Steve Dyke | 100 N. Bismarck Expressway Bismarck, ND 58501-5095 | N/A |
| North Dakota Game & Fish Department | Dave Fryda | 406 Dakota Ave Riverdale, ND 58565 | N/A |
| North Dakota Game & Fish Department | Bruce Kreft | 100 North Bismarck Expressway Bismarck, ND 58501-5095 | N/A |

USACE_DAPL0071336

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 7-1 Agency/Entity Consultation List | | | |
|---|---|---|---|
| Agency/Entity | Name | Address | Date Received/ Relevant EA Section |
| North Dakota Game & Fish Department | Kent Luttschwager | 13932 West Front Street Williston, ND 58801-8602 | N/A |
| North Dakota Game & Fish Department | Fred Ryckman | 406 Dakota Ave Riverdale, ND 58565 | N/A |
| North Dakota Game & Fish Department | Terry Steinwand | 100 North Bismarck Expressway Bismarck, ND 58501-5095 | N/A |
| North Dakota Industrial Commission - Oil and Gas Division | Lynn Helms | 600 East Boulevard Bismarck, ND 58505 | April 16, 2015/ Section 3.1.2, Section 3.1.3, and Section 3.1.4 |
| North Dakota Industrial Commission - Oil and Gas Division | Bruce E. Hicks | 600 East Boulevard Bismarck, ND 58505 | N/A |
| North Dakota Land Department | Mike Brand | 1707 North 9th St. P.O. Box 5523 Bismarck, ND 58506-5523 | N/A |
| North Dakota Parks & Recreation Department | Kathy Duttenhefner | 1600 East Century Avenue, Suite 3 Bismarck, ND 58503-0649 | April 20, 2015/ Section 3.3.1, Section 3.4 and Section 3.5. |
| North Dakota Petroleum Council | Ron Ness | P.O Box 1395 Bismarck, ND 58502 | N/A |
| North Dakota State Historical Society | Susan Quinnell | 612 East Boulevard Ave. Bismarck, ND 58505 | April 2, 2015/ Section 3.7.1 |
| North Dakota State Water Commission | John Paczkowski | 900 East Boulevard Ave. Bismarck, ND 58505-0850 | N/A |
| North Dakota Tourism Division | Sarah Otte Coleman | P.O. Box 2057 Bismarck, ND 58502-2057 | N/A |
| U.S. Army Corps of Engineers, Regulatory Office | Daniel Cimarosti | 1513 12th St. SE Bismarck, ND 58504 | N/A |
| U.S. Fish and Wildlife Service, North Dakota Field Office | Scott Larson | 3425 Miriam Avenue Bismarck, ND 58501-7926 | N/A |
| USDA-APHIS-WS | Philip Mastrangelo | 2110 Miriam Drive, Suite A Bismarck, ND 58501 | N/A |
| USDA-Natural Resources Conservation Service-North Dakota State Office | Mary Podoll | 220 East Rosser Avenue, Room 270 Bismarck, ND 58502-5020 | April 13, 2015/ Section 3.1.5 and Section 3.2.3 |
| USDOI-Office of Surface Mining Reclamation and Enforcement-Dick Cheney Federal Building | Jeffrey Fleischman | P.O. Box 11018, 150 East B Street, Rm 1018 Casper, WY 82602 | April 13, 2015/ Section 1.1 |

USACE_DAPL0071337

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 7-1 | | | |
|-----------|---|---|---|
| Agency/Entity Consultation List | | | |
| **Agency/Entity** | **Name** | **Address** | **Date Received/ Relevant EA Section** |
| U.S. Army Corps of Engineers | Omaha District; CENWO-PM-AA | 1616 Capitol Avenue Omaha, NE 68101-4901 | N/A |
| North Dakota Parks & Recreation Department | Mr. Jesse Hanson | 1600 E. Century Ave. Suite 3 Bismarck, ND 58503-0649" | N/A |
| North Dakota Chapter of the Wildlife Society | Mr. Kory Richardson | PO Box 1442 Bismarck, ND 58502 | N/A |
| Sierra Club - North Dakota Office | Mr. Blaine Nordwall | 311 East Thayer Ave Suite 113 Bismarck, ND 58501 | N/A |

114

USACE_DAPL0071338

Environmental Assessment
Dakota Access Pipeline Project
July 2016

## 8.0    STATUS OF ENVIRONMENTAL COMPLIANCE

**Table 8-1** is a listing of environmental protection statutes and other environmental requirements, as well as the status of Applicant compliance with these statutes and requirements, regarding this EA.

| Table 8-1 Environmental Permits, Approvals, and Consultations | | | |
|---|---|---|---|
| **Jurisdiction** | **Permit or Authorization** | **Status** | **Requirement or Action** |
| **Federal** | | | |
| Corps | RHA, Section 10 | Pending, Application Submitted Dec 2014 | RHA, Section 10: Missouri River/Lake Oahe |
| Corps – Omaha District | Section 404 CWA | Pending, Application Submitted Dec 2014 | NWP 12, Section 404 Waters with PCN |
| | Survey permission, geotechnical investigation | Received April 2015 | Survey permission, geotechnical investigation |
| | Title 30 Rights-of-Way for pipelines through Federal Lands and Temporary Construction License | Pending | Real Estate Outgrant and EA for Crossing the Missouri River/Lake Oahe (Fee title Lands on both sides of river/lake) |
| | Flowage Easement Consent to Cross | Pending | Consent to Cross |
| USFWS | Section 7 Endangered Species Act (ESA) Consultation | Received May 2016 | Compliance under 404 Permit NWP 12 Joint Application |
| Bureau of Reclamation | Letter of consent to cross irrigation works | Received December 2015 | BOR water conveyance facilities, near cities of Buford and Trenton, ND |
| **State** | | | |
| North Dakota Public Service Commission (NDPSC) | North Dakota Energy Conversion and Transmission Facility Siting Act: Certificate of Corridor and Route | Received January 2016 | Siting Application, PU-14-842 |
| North Dakota Office of the State Engineer | Sovereign Land Permit | Permits Received April 2016 | Crossing Permits for the Lake Oahe and the Missouri River Crossings |
| State Historical Society of North Dakota | Section 106 NHPA | Received April 2016 | Section 106 Concurrence/Consultation |

115

USACE_DAPL0071339

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 8-1 Environmental Permits, Approvals, and Consultations | | | |
|---|---|---|---|
| **Jurisdiction** | **Permit or Authorization** | **Status** | **Requirement or Action** |
| North Dakota Department of Health | Section 401 Water Quality Certification | Pending | Automatic with NWP 12 |
| | Hydrostatic Test Water Discharge Permit No. NDG07-0000 | Permits Received May 2016 | Obtain permit coverage prior to discharge |
| | North Dakota Pollutant Discharge Elimination System (NDPDES) Construction Stormwater General Permit (NDR10-0000) | Permit Received April 2016 | Obtain permit coverage |

**Table 8-2** provides a summary of the environmental mitigation measures discussed throughout this EA that Dakota Access has committed to as part of the Proposed Action design to avoid or minimize potential impacts on environmental and human resources throughout construction and operation activities.

116

USACE_DAPL0071340

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 8-2 Summary of Environmental Impact Avoidance and Mitigation Measures | |
|---|---|
| **Resource** | **Environmental Avoidance/Mitigation Measures** |
| Geology and Soils | To protect the terrain of the Project Area and Connected Actions, Dakota Access would, to the extent feasible, restore the areas affected by pipeline construction to pre-construction contours and similar vegetation (excepting trees within approximately 15 feet of the centerline).  Pre-construction and as-built surveys would be completed and provided to the Garrison Project. |
| | Although not anticipated, if blasting is found to be necessary, Dakota Access would follow procedures specified in its Blasting Plan (Appendix E). |
| | Dakota Access, in accordance with North Dakota One Call, would require that the construction contractor, prior to initiating any ground disturbance activities, identify all underground utilities to minimize the potential for encountering buried utility structures. |
| | Dakota Access has completed a geotechnical analysis of the flowage easement and federal land crossing sites to facilitate engineering and design, including selection of appropriate materials and construction methods to limit any environmental impacts attributable to landslides. |
| | The proposed pipeline would be designed and constructed to meet or exceed industry specifications, which would effectively mitigate the effects of fault movement, landslides, subsidence, and subsidence. |
| | In the event paleontological resources are discovered during construction, Dakota Access would implement measures outlined in its Unanticipated Discoveries Plan Cultural Resources, Human Remains, Paleontological Resources and Contaminated Media (UDP) (Appendix F) to avoid further impacts to these resources. |
| | If any vertebrate fossils are found during pipeline construction, Dakota Access would immediately cease construction activities and notify the appropriate agency personnel, including the North Dakota state paleontologist as well as the USACE archaeologist.  The appropriate authorities would determine the significance of the find and prescribe the mitigation procedures to be completed prior to resuming pipeline construction. |
| | Dakota Access would minimize or avoid impacts on soils by implementing the mitigation measures described in the DAPL Project's SPCC, SWPPP, and ECP as well as requirements of applicable state and federal permits.  These documents would be included as contract documents and enforced as such throughout the DAPL Project. |
| | To minimize potential impacts on soil productivity, topsoil would be separated during trench excavation in agricultural land, and if applicable, other areas where soil productivity is an important consideration.  Unless otherwise requested by the landowner, topsoil in cropland would be removed to a maximum depth of 12 inches from the trench and spoil storage area and stored separately from the trench spoil.  After the trench is backfilled, topsoil would be returned to its approximate original location in the soil horizon. |

USACE_DAPL0071341

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 8-2 | |
|---|---|
| Summary of Environmental Impact Avoidance and Mitigation Measures | |
| **Resource** | **Environmental Avoidance/Mitigation Measures** |
| | Compaction of agricultural soils would be minimized by restricting construction activities during periods of prolonged rainfall.  Where unacceptable levels of compaction occur in agricultural lands, a chisel plow or other deep tillage equipment would be utilized to loosen the soil. |
| | Dakota Access would retain EIs to monitor the contractor's compliance with applicable requirements to protect soil resources during construction of the DAPL Project.  The Garrison Project would be notified if the EIs have concerns on the Project Area or Connected Action Area. |
| | The HDD workspace sites would be cleared, graded and matted as needed to minimize rutting and compaction. |
| | Permanent impacts to soils would be avoided through the application of BMPs during construction, restoration, and post-construction revegetation management, as outlined in the ECP (Appendix G). |
| Water Resources | Impacts to Lake Oahe and the Missouri River would be minimized by using HDD construction methods to install the proposed pipeline underneath the Missouri River and Lake Oahe. |
| | The HDD Contractor plans to install steel surface casing, where defined in the site specific HDD plans, to reduce the probability of an inadvertent release when the drill bit is working near the surface. |
| | The drilling mud and cuttings would be disposed of in accordance with applicable laws and regulations, likely in an existing landfill or by land farming. |
| | Dakota Access would conduct all HDD work according to the HDD Construction Plan (Appendix B) that it has prepared, and implement the HDD Contingency Plan (Appendix B) in the event of an inadvertent release. |
| | The Missouri River water withdrawal activity would comply with all applicable permit conditions and regulations, including the specifications on permitted intake structures outlined in the USACE's Regional Conditions for North Dakota applicable to NWP 12 (Utility Line Activities).  This regional condition requires that the applicant 1) utilize an intake screen with a maximum mesh opening of ¼-inch, 2) wire, Johnson-like screens must have a maximum distance between wires of 1/8-inch, 3) water velocity at the intake screen shall not exceed ½-foot per second, 4) intake structure shall be floating, and 5) at the beginning of pumping, the intake shall be placed over water with a minimum depth of 20 feet. |
| | The barge/float required for water withdrawal from the Missouri River would be fitted with a secondary containment structure, and the pump would be placed within this structure to contain accidental spills of fuels.  The intake hose would be suspended by floats within the water column and screened to prevent impingement entrainment of foreign objects and aquatic species. |
| | Water discharges associated with hydrostatic testing on Corps flowage easements would be conducted in accordance with applicable permits.  Hydrostatic test water discharges would not occur on Corps fee property. |

118

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 8-2 | |
| --- | --- |
| Summary of Environmental Impact Avoidance and Mitigation Measures | |
| Resource | Environmental Avoidance/Mitigation Measures |
| | Dakota Access would conduct trench dewatering and hydrostatic test discharges in a manner consistent with the North Dakota Pollutant Discharge Elimination System (NDPDES) General Permit NDG-070000, as applicable. |
| | Discharged hydrostatic test water would not contain additives unless written approval is received from Dakota Access and applicable permits authorize such additives. |
| | Where appropriate, water would be discharged into an energy dissipation and/or filtering device as described in Dakota Access' SWPPP (Appendix A) to remove sediment and to reduce the erosive energy of the discharge. |
| | Impacts to waterbodies would be minimized by conducting pipeline construction activities in accordance with applicable regulatory requirements and waterbody construction procedures described in Section 2.3.2.8 and the ECP. |
| | Fuel and all other hazardous materials would be stored in accordance with the requirements of Dakota Access' SPCC, SWPPP, and ECP.  These documents also describe response, containment, and cleanup measures. |
| | EIs would monitor compliance with applicable waterbody protection requirements during construction of the facilities. The Project ECP (Appendix G) and SWPPP (Appendix A) describe additional mitigation measures and contains illustrations of how sediment control devices should be utilized. |
| | Dakota Access would maintain a vegetative buffer until the actual crossing of the waterbody takes place. |
| | Temporary sediment control measures, such as silt fence, would minimize the introduction of sediment into waterbodies during construction and minimize the movement of spoil and sediment from surface runoff during and after construction. |
| | Dewatering activities would be conducted in accordance with applicable permits and Dakota Access' SWPPP, and ECP. |
| | All surface drainage contours and vegetation would be returned as closely as practical to preconstruction conditions. |
| | The potential for groundwater contamination would be avoided by implementing the protective measures set forth in the Project specific SPCCs prepared by the contractor and in Dakota Access' SPCC Plan (Appendix A). |
| | In the event of a leak, Dakota Access would work aggressively to isolate the source through the use of remote-controlled shut-off valves, initiate cleanup activities, and contact the appropriate federal and state authorities to coordinate leak containment and cleanup.  Dakota Access proposes to meet or exceed all applicable regulations and requirements for pipeline design, construction, and operation. |
| | Construction workspace on the flowage easements has been selected based on an absence of wetlands within the Project area. |
| | Dakota Access is in the process of obtaining verification for use of NWP 12 for the crossings of both the Missouri River and Lake Oahe Section 10 waterbodies. |

119

USACE_DAPL0071343

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 8-2 |
| Summary of Environmental Impact Avoidance and Mitigation Measures |

| Resource | Environmental Avoidance/Mitigation Measures |
|---|---|
| | The Project ECP and SWPPP specify several measures to protect wetlands and waterbodies from becoming polluted with fuels or other hazardous materials during construction.  This plan prohibits the storage of fuel or other hazardous materials within 100 feet of a wetland or waterbody.  The ECP also specifies that equipment must be refueled at least 100 feet from waterbodies unless, due to site-specific conditions, there is no practical alternative such as the proposed pumping intake structure located on the barge at the Missouri River Crossing.  In that case, the contractor must implement site-specific protective measures and containment procedures described in the ECP.  Contractors would be required to provide trained personnel, appropriate equipment, and materials to contain and clean up releases of fuel, lubricating oil, or hydraulic fluid that result from equipment failure or other circumstances. |
| | The Project has been designed in accordance with accepted floodplain management practices; no impacts to floodplain elevations or velocities are anticipated.  Following construction, disturbed areas would be restored to pre-construction grades and contours as practical. |
| | If necessary, soil displaced by the installation of the 24-inch pipeline on the flowage easements would be removed from the floodplain and hauled to an upland location in order to ensure original floodplain elevations are restored. |
| | Remotely operated above-ground mainline valve sites would be installed on both sides of the Missouri River and Lake Oahe crossings for isolation in the event of an emergency shutdown. |
| | Dakota Access will identify an all-weather access and collection point downstream of both the Missouri River crossing and Lake Oahe crossing.  At each location, Dakota Access will provide an equipment storage facility that includes a permanent storage area for winter and open water spill response equipment. |
| | Impacts to cultivated crops make up the majority of temporary impacts and would return to cultivated crops post-construction. |
| | Within areas disturbed by construction of the Project, and not being actively cultivated, including the flowage easement Project Area, Dakota Access would implement active revegetation measures and rapid colonization by annual and perennial herbaceous species to restore most vegetative cover within the first growing season. |
| | In areas that require permanent revegetation, Dakota Access would specify appropriate seed mixes, application rates, and seeding dates, taking into account recommendations of appropriate state and federal agencies and landowner requests. |
| | In non-agricultural areas, vegetation cleared from ATWS would be allowed to revegetate after construction depending on arrangements with the landowner. |
| | Temporary revegetation measures may also be implemented to quickly establish ground cover to minimize the potential for soil erosion and noxious weeds to establish.  A temporary seed mix may be applied in these situations. The Project ECP (Appendix G) contains more details regarding temporary revegetation. |

USACE_DAPL0071344

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 8-2 | |
|---|---|
| **Summary of Environmental Impact Avoidance and Mitigation Measures** | |
| **Resource** | **Environmental Avoidance/Mitigation Measures** |
| | When constructing in agricultural areas, a minimum of 1 foot of topsoil (organic layer) would be stripped from the trench line and stockpiled separately from trench spoil to preserve the native seed stock.  The ECP contains additional details regarding topsoil segregation. |
| | At stream approaches, the contractor would leave a 20-foot buffer of undisturbed herbaceous vegetation on all stream banks during initial clearing, except where grading is needed for bridge installation or where restricted by applicable regulations and/or permit conditions. |
| | Dakota Access would work with County Weed Boards to ensure the Project ECP contains relevant and necessary mitigation measures that would be implemented to prevent the spread of noxious weed species during construction and operation of the Project. |
| | Herbaceous cover would be seeded on disturbed upland areas during restoration and it is expected that pre-existing herbaceous and shrub habitats would quickly reestablish themselves. |
| | In the unlikely event that a listed species is encountered on the Project at Corps owned lands during construction, construction activities would stop and the Corps would be contacted. |
| Wildlife Resources | Herbaceous cover would be seeded on disturbed upland areas during restoration and it is expected that pre-existing herbaceous and shrub habitats would quickly reestablish themselves. |
| | In the unlikely event that a listed species is encountered on the Project at Corps owned lands during construction, construction activities would stop and the Corps would be contacted. |
| | Installation and removal of the temporary waterline on the flowage easements are anticipated to be complete prior to nesting season; therefore, impacts on the interior least tern and piping plover are not anticipated.  However, if the water withdrawal activities are not able to be completed prior to nesting season as expected, Dakota Access would conduct surveys prior to placement of the waterline to confirm the presence/absence of these species within the pipeline ROW.  If these species are nesting within the Project Area, Dakota Access would postpone water withdrawal activities at the Missouri River until these species have left the area. |
| | Direct impacts on potentially suitable habitat for the interior least tern and piping plover at the Missouri River and Lake Oahe would be avoided by crossing the waterbodies via HDD. |
| | Lake Oahe would be crossed using a HDD construction method, avoiding impacts on potential migrating rufa red knot loafing habitat. |
| | Impacts on the pallid sturgeon or suitable habitat present within the Missouri River would be avoided by implementing the conditions on permitted intake structures outlined in the USACE's Regional Conditions for North Dakota applicable to NWP 12 (Utility Line Activities) and as described in the USFWS Recovery Plan for the Pallid Sturgeon. |

121

USACE_DAPL0071345

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 8-2 | |
| :---: | :---: |
| Summary of Environmental Impact Avoidance and Mitigation Measures | |
| Resource | Environmental Avoidance/Mitigation Measures |
| | Impacts on the pallid sturgeon or suitable habitat present within Lake Oahe would be avoided by crossing the lake via HDD. |
| Aquatic Resources | A successfully completed HDD crossing would avoid aquatic resource impacts to Lake Oahe since the pipeline would be installed without disturbing the aquatic and benthic environments. |
| | All construction equipment utilized on or in waters of the state would be subject to inspection by the Department in accordance with the North Dakota Administrative Code (Title 30, Article 3, Chapter 6-01).  Further, Dakota Access would implement required measures including the removal of all aquatic vegetation from vessels, motors, trailers, or construction equipment.  All water would be drained from bilges or confined spaces.  All Aquatic Nuisance Species will be removed from equipment in accordance with the North Dakota Administrative Code (Title 30, Article 3, Chapter 6). |
| | All HDD operations conducted for the Missouri River and Lake Oahe crossings would adhere to the HDD Contingency Plan and applicable permit conditions to reduce the likelihood of an inadvertent release to minimize and mitigate environmental impacts.  Dakota Access' construction contractor would ensure that the appropriate response personnel and containment equipment are available onsite to effectively implement the HDD Contingency Plan. |
| | Water withdrawal activities at the Missouri River would be conducted in accordance with all applicable permit conditions and regulations and in a manner that would not reduce water flow to a point that would impair flow or impact aquatic life. |
| | Intake screens and floats would also be utilized during the withdrawal of water from the Missouri River to prevent entrainment of aquatic life and avoid impacts on aquatic resources. |
| | The potential for impacts on aquatic resources associated with accidental fuel spills or leaks during the withdrawal of water from the Missouri River would be avoided or minimized by placing the pump within a secondary containment structure on the barge. |
| | For portions of the pipeline installed beneath the lake, the depth of the pipeline profile, the increased wall thickness of the pipe, the installation of remotely operated valves on both sides of the river crossing, monitoring of the system 24/7, aerial patrols, and in-line inspection, would further limit the potential for an inadvertent release into the river. |
| | Adherence to the GRPs for Lake Oahe and the Missouri River would minimize potential impacts on aquatic wildlife from potential spills during the operation of the pipeline. |

USACE_DAPL0071346

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 8-2 | |
|---|---|
| **Summary of Environmental Impact Avoidance and Mitigation Measures** | |
| **Resource** | **Environmental Avoidance/Mitigation Measures** |
| | Conduct emergency response drills/exercises in accordance with the National Preparedness for Response Exercise Program (PREP) consisting of table top exercises and equipment deployment drills.  Dakota Access has committed to additional full scale open water and full scale winter/ice exercises that will be conducted at Lake Sakakawea and Lake Oahe. A full scale exercise will occur once every 3 years (triennial cycle) with the location and type of exercise occurring on alternating schedules (e.g. open water exercise at Oahe the first triennial cycle, followed by winter exercise at Sakakawea the following triennial cycle, followed by a winter exercise at Oahe the following triennial cycle, etc.). Stakeholder (federal, state, local, and Tribal) involvement will be solicited for each exercise. The first exercise will occur within the first 3 years after the pipeline becomes operational. |
| | In the event of a leak, Dakota Access would work aggressively to contain the leak, initiate cleanup activities, and contact the appropriate authorities, including the Corps. |
| Land Use and Recreation | Mitigation measures to minimize impacts to soils, such as topsoil segregation and decompaction practices, would be fully implemented in accordance with the ECP and SWPPP. |
| | Dakota Access would coordinate with all landowners on acceptable methods for construction and restoration, including potential impacts to irrigated fields. |
| | Dakota Access would repair surface drains and drainage tiles disturbed during ROW preparation, construction, and maintenance activities. |
| | Dakota Access would repair or replace fences and gates removed or damaged as a result of ROW preparation, construction, or maintenance activities. |
| | Following construction and restoration, the work area would be restored and ranching would be allowed to continue over the operational ROW.  Landowners would be compensated for temporary loss of land and lower yields.  Grazing activities would return to normal after revegetation of the disturbed areas. |
| | Trees would be protected by Dakota Access in a manner compatible with the safe operation, maintenance, and inspection of the pipeline.  Applicable regulations would be adhered to regarding tree and shrub removal from along the route. |
| | Dakota Access would obtain and comply with applicable state regulations, county permits, and zoning and land use regulations.  Permits may include, but are not limited to, grade and fill permits, ditch crossing permits, road and utility permits, and conditional use permits.  Dakota Access would retain one or more EIs to monitor compliance with environmental conditions of county permits. |
| Cultural and Historic Resources | In accordance with Section 106 of the NHPA, Dakota Access has made a good faith effort to identify significant historic properties within the Project area.  Based on the result of these efforts, no properties consisted to be eligible, or potentially eligible for listing in the NRHP would be adversely impacted by the proposed Project or Connected Action. |

USACE_DAPL0071347

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 8-2 | |
|---|---|
| Summary of Environmental Impact Avoidance and Mitigation Measures | |
| **Resource** | **Environmental Avoidance/Mitigation Measures** |
| | Impacts to the NRHP-eligible BTIS (site 32WI1367) would be avoided via HDD to ensure the integrity of construction design for these historic-age features is preserved. |
| | HDD workspaces, as well as staging and stringing areas, would be positioned in excess of 100 feet beyond the mapped boundaries of the previously recorded cultural sites in the vicinity of the Lake Oahe crossing. |
| | Dakota Access' UDP was developed (Appendix F) for use during all DAPL Project construction activities which describes actions that would be taken in the event of a previously unrecorded cultural resource site is discovered during construction activities.  The UDP explicitly calls for work to stop until the correct authority or agency can be contacted and the find can be properly evaluated. |
| | The USACE will conduct archeological monitoring of construction for the HDD activities on both sides of Lake Oahe. |
| Social and Economic Conditions | No residential homes or farms would be relocated resulting from the proposed action. |
| | No demographic changes in the Census tracts affected are anticipated, because no permanent employees would be created as a result of the Proposed Action. |
| Hazardous Waste | In the unlikely event contamination is encountered during construction, the UDP (Appendix F) would be implemented to protect people and the environment and avoid or minimize any effects from unearthing the material. |
| | Any hazardous materials discovered, generated, or used during construction would be managed and disposed of in accordance with applicable local, tribal, state, and federal regulations.  Should emergency response be required during construction, the contractor would have some of their own trained or contracted responders, and local response teams would be expected to assist. |
| | Dakota Access would comply with all applicable laws and regulations to abate or prevent pollution, such as the RCRA, and State hazardous waste management rules. |
| Reliability and Safety | All activities would be conducted in a safe manner in accordance with the standards specified in the OSHA regulations. |
| | To prevent pipeline failures resulting in inadvertent releases, Dakota Access would construct and maintain the pipeline to meet or exceed industry and governmental requirements and standards.  Specifically, the steel pipe would meet PHMSA specifications under 49 CFR § 195, follow standards issued by the American Society of Mechanical Engineers, National Association for Corrosion Engineers and API. |
| | Dakota Access would maintain and inspect the pipeline in accordance with PHMSA regulations, industry codes and prudent pipeline operating protocols and techniques.  The pipeline ROW would be patrolled and inspected by air every 10 days, weather permitting, but at least every three weeks and not less than 26 times per year, to check for abnormal conditions or dangerous activities, such as unauthorized excavation along the pipeline route. |

USACE_DAPL0071348

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 8-2 | |
|---|---|
| **Summary of Environmental Impact Avoidance and Mitigation Measures** | |
| **Resource** | **Environmental Avoidance/Mitigation Measures** |
| | Dakota Access is currently drafting a FRP, in accordance with 49 CFR 194, which details the procedures to be implemented in the event of an inadvertent pipeline release and would be in place prior to commencing transportation of crude oil. |
| | Following completion of construction and throughout operation of the Project facilities, the Operator and qualified contractors would maintain emergency response equipment and personnel at strategic points along the pipeline route. |
| | Contracts would be in place with oil spill response companies that have the capability to mobilize to support cleanup and remediation efforts in the event of a pipeline release.  The operator would also coordinate with local emergency responders in preventing and responding to any pipeline related problems. |
| | A SCADA system would be utilized to provide constant remote oversight of the Project facilities. |
| | A Computational Pipeline Monitoring System (CPM) would be utilized to monitor the pipeline for leaks. |
| | LeakWarn is being tailored to the Project facilities, in accordance with PHMSA requirements, to monitor the pipeline for leaks. |
| Air Quality and Noise | To reduce the emission of criteria pollutants, fuel-burning equipment running times would be kept to a minimum and engines would be properly maintained. |
| | Dakota Access would mitigate noise impacts by limiting equipment running times and the duration of Project construction to the minimum amount necessary to complete the Project.  Noisy construction activities would typically be limited to the least noise-sensitive times of day (daytime). |

125

USACE_DAPL0071349

Environmental Assessment
Dakota Access Pipeline Project
July 2016

## 9.0    LIST OF PREPARERS AND REVIEWERS

Dakota Access, in cooperation with the USACE Preparers, reviewers, consultants and Federal officials include the following:

| Table 9-1 List of Preparers and Reviewers | | |
|---|---|---|
| **Name** | **Title/Office** | **Agency** |
| Omaha District Planning Staff | Environmental Resource Specialist | Corps of Engineers, Omaha District |
| Omaha District Operations Staff | Natural Resource Specialist, Environmental Stewardship | Corps of Engineers, Omaha District |
| Garrison Project Archaeologist | Garrison Dam / Lake Sakakawea Project | Corps of Engineers, Omaha District |
| Bismarck Regulatory Chief | Operations Division | Corps of Engineers, Omaha District |
| Oahe Project Archaeologist | Oahe Dam and Lake Project | Corps of Engineers, Omaha District |
| Omaha District Operations Branch Chief | Operations Division | Corps of Engineers, Omaha District |
| Omaha District Project Engineer | Flood Risk and Floodplain Management Section | Corps of Engineers, Omaha District |
| Garrison Project Staff | Garrison Dam | Corps of Engineers, Omaha District |
| Omaha District Planning Chief | Planning Branch | Corps of Engineers, Omaha District |
| Garrison Operations Project Manager | Garrison Dam / Lake Sakakawea Project | Corps of Engineers, Omaha District |
| Omaha District Real Estate Branch Chief | Real Estate Division | Corps of Engineers, Omaha District |
| Omaha District Cultural Resources | Planning Branch | Corps of Engineers, Omaha District |
| Oahe Project Staff | Oahe Dam | Corps of Engineers, Omaha District |
| Oahe Project Operation Project Manager | Operations Division | Corps of Engineers, Omaha District |
| Omaha District Geotechnical Engineers | Geotechnical Branch | Corps of Engineers, Omaha District |
| Omaha District Attorney | Office of Counsel | Corps of Engineers, Omaha District |
| Omaha District Regulatory Staff | Operations Division | Corps of Engineers, Omaha District |
| Monica Howard | Director Environmental Sciences | Dakota Access, LLC |
| Jonathan Fredland | Environmental Specialist | Perennial Environmental Services, LLC |
| Ashley Thompson | Environmental Specialist | Perennial Environmental Services, LLC |

126

USACE_DAPL0071350

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 9-1 | | |
| List of Preparers and Reviewers | | |
| Name | Title/Office | Agency |
|---|---|---|
| Dennis Woods | Managing Partner | Perennial Environmental Services, LLC |

USACE_DAPL0071351

Environmental Assessment
Dakota Access Pipeline Project
July 2016

## 10.0    ACRONYMS, INITIALS, AND ABBREVIATIONS

| | |
|---|---|
| ANSI | American National Standards Institute |
| API | American Petroleum Institute |
| ATWS | Additional Temporary Workspace |
| BMP | Best Management Practice |
| bpd | barrels per day |
| BTIS | Buford-Trenton Irrigation System |
| CAA | Clean Air Act |
| CERCLA | Comprehensive Environmental Response Compensation and Liability Act |
| CEQ | Council on Environmental Quality |
| CFR | Code of Federal Regulations |
| Corps | U.S. Army Corps of Engineers |
| Company | Energy Transfer Company |
| CWA | Clean Water Act |
| DA | Department of the Army |
| dB | Decibels |
| Dakota Access | Dakota Access, LLC |
| DAPL Project | Dakota Access Pipeline Project |
| DOT | Department of Transportation |
| EA | Environmental Assessment |
| ECP | Environmental Construction Plan |
| ECD | Erosion Control Device |
| EI | Environmental Inspector |
| EO | Executive Order |
| EPA | U.S. Environmental Protection Agency |
| ESA | Endangered Species Act |
| FEMA | Federal Emergency Management Agency |

128

USACE_DAPL0071352

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| | |
|---|---|
| FERC | Federal Energy Regulatory Commission |
| FIRM | Flood Insurance rate Maps |
| FRP | Facility Response Plan |
| FRFM | Flood Risk and Floodplain Management Section |
| g | gravitational acceleration |
| GIS | Geographic Information System |
| GRP | Geographical Response Plan |
| HDD | Horizontal Directional Drilling |
| MP | milepost |
| MSL | Mean Sea Level |
| NDPSC | North Dakota Public Service Commission |
| NDPDES | North Dakota Pollutant Discharge Elimination System |
| NDSHPO | North Dakota State Historic Preservation Office |
| NEPA | National Environmental Preservation Act |
| NFIP | National Flood Insurance Program |
| NHPA | National Historic Preservation Act |
| NLCD | National Land Cover Dataset |
| NPDES | National Pollutant Discharge Elimination System |
| NPS | U.S. National Park Service |
| NRCS | Natural Resources Conservation Service |
| NRHP | National Register of Historic Places |
| NRI | Nationwide Rivers Inventory |
| NSF | National Science Foundation |
| NWI | National Wetland Inventory |
| NWP | Nationwide Permit |
| OSHA | Occupational Safety and Health Administration |
| OSRO | Oil Spill Response Organization |

USACE_DAPL0071353

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| | |
|---|---|
| PA | Programmatic Agreement |
| PEM | Palustrine Emergent |
| PFO | Palustrine Forested |
| PHMSA | Pipeline and Hazardous Materials Safety Administration |
| PREP | National Preparedness for Response Exercise Program |
| Project Area | Areas that are potentially impacted by construction and/or operation of the Proposed Action |
| Proposed Action | Crossing of federal flowage easements near the upper end of Lake Sakakawea north of the Missouri River in Williams County, North Dakota and federally owned lands at Lake Oahe in Morton and Emmons counties, North Dakota |
| RCRA | Resource Conservation and Recovery Act |
| RHA | Rivers and Harbors Act |
| ROW | Right-of-Way |
| SPCC | Spill Prevention, Control and Countermeasure Plan |
| SWPPP | Stormwater Pollution Prevention Plan |
| THPO | Tribal Historic Preservation Office |
| UDP | Unanticipated Discoveries Plan Cultural Resources, Human Remains, Paleontological Resources and Contaminated Media |
| USACE | U.S. Army Corps of Engineers |
| USDA | U.S. Department of Agriculture |
| USFWS | U.S. Fish and Wildlife Service |
| USGS | U.S. Geological Survey |
| WMA | Wildlife Management Area |

USACE_DAPL0071354

Environmental Assessment
Dakota Access Pipeline Project
July 2016

## 11.0   REFERENCES

Ackerman, D.J.  1980.  Ground-Water Resources of Morton County, North Dakota, North Dakota
    Geological Survey Bulletin 7Z – Part III, 51 pp.

Armstrong, C.A.  1978.  Ground-Water Resources of Emmons County, North Dakota, North Dakota
    Geological Survey Bulletin 66—Part III, 43 pp.

Armstrong, C.A.  1969.  Geology and Ground Water Resources, Williams County, North Dakota, Part III—
    Hydrology, North Dakota Geological Survey Bulletin 48, 82 pp.

Atwood, J.L., P.D. Jorgensen, R. M. Jurek, and T.D. Manolis.  1977.  California Least Tern Census and
    Nesting Survey, 1977, Pages 44, California Department of Fish and Game.

Bachman, J. 2014.  North Dakota's Downside to the Oil Boom: Traffic Deaths.  Businessweek. Available
    at: http://www.businessweek.com/articles/2014-06-09/north-dakotas-downside-to-the-oil-
    boom-traffic-deaths.

Black-footed Ferret Recovery Implementation Team.  2011.  Black-footed ferret.  Available at
    http://www.blackfootedferret.org/.

Brown, M.B., J.G. Jorgensen, and L.R. Dinan.  2013.  2013 Interior Least Tern and Piping Plover
    Monitoring, Research, Management, and Outreach Report for the Lower Platte River, Nebraska.
    Joint report of the Tern and Plover Conservation Partnership and the Nongame Bird Program of
    the Nebraska Game and Parks Commission.  Lincoln, NE.

Carlson, C.G.  1985.  Geology of McKenzie County, North Dakota.  North Dakota Geological Survey
    Bulletin 80—Part I. 48 pp.

Charbeneau, R. J. 2003. Models for Design of Free-Product Recovery Systems for Petroleum
    Hydrocarbon Liquids. American Petroleum Institute, Publication 4729. Washington, D.C. August
    2003.

Charbeneau, R. J., R. T. Johns, L. W. Lake, and M. McAdams. 2000. Free-product recovery of petroleum
    liquid hydrocarbon liquids. Ground Water Monitoring and Remediation 20(3):147-158.

Clayton, L.  1980.  Geologic Map of North Dakota: USGS, Scale 1:500K.

Cochrane, J.F. and P. Delphey.  2002.  Status Assessment and Conservation Guidelines; Dakota Skipper
    *Hesperia dacotae* (Skinner) (Lepidoptera: Hesperiidae); Iowa, Minnesota, North Dakota, South
    Dakota, Manitoba, Saskatchewan.  p.80.  U.S. Fish and Wildlife Service, Twin Cities Field Office,
    Minnesota.

Council on Environmental Quality.  1997.  Environmental Justice: Guidance under the National
    Environmental Policy Act.  Executive Office of the President, Washington, D.C.

Cowardin, L. M., V. Carter, F.C. Golet, and E.D. LaRoe.  1979.  Classification of wetlands and deepwater
    habitats of the United States.  U.S. Department of the Interior, Fish and Wildlife Service, Office
    of Biological Services, Washington, D.C.

Croft, M.G.  1985.  Ground-Water Resources of McKenzie County, North Dakota, North Dakota
    Geological Survey Bulletin 80—Part III, 57 p.

USACE_DAPL0071355

Environmental Assessment
Dakota Access Pipeline Project
July 2016

Dana, R.  1997.  Characterization of three Dakota skipper sites in Minnesota.  p.17.  Minnesota Department of Natural Resources, Natural Heritage and Nongame Research Program, St. Paul.

Dana, R.  1991.  Conservation management of the prairie skippers *Hesperia dacotae* and *Hesperia ottoe*: Basic biology and threat of mortality during prescribed burning in spring. Station Bulletin.  p.63. Minnesota Agricultural Experiment Station, University of Minnesota, St. Paul.

Dickens, D. 2011. Behavior of Oil Spills in Ice and Implications for Arctic Spill Response.  Arctic Technology Conference, Houston, Texas, February 7-9, 2011.

Federal Emergency Management Agency.  1987.  Flood Insurance Rate Map (3803270100A), Unincorporated Areas, Emmons County, North Dakota.

Florip, E.  2014.  Proposed Oil Terminal Would Be Biggest In Volume.  The Columbian.  Available at: http://www.columbian.com/news/2014/nov/24/proposed-oil-terminal-biggest-volume-vancouver/.

Freeze, R. A. and J. A. Cherry. 1979. Groundwater. Prentice Hall, Inc. Englewood Cliffs, New Jersey., 604 pp.

Freers, T.F.  1970.  Geology and Ground Water Resources, Williams County, North Dakota, Part 1— Geology, North Dakota Geological Survey Bulletin 48, 54 pp.

Fritelli, J.  2014.  U.S. Rail Transportation of Crude Oil: Background and Issues for Congress. Congressional Research Service.  Available at: http://fas.org/sgp/crs/misc/R43390.pdf.

Fuller, T.  1989.  Population dynamics of wolves in North-Central Minnesota.  Wildlife Monographs 105:3-41.

GeoEngineers.  2009.  Vibration Monitoring Report, Bridgewood 22-Inch-Diameter Class Change, Merrilville, Indiana.

GeoEngineers.  2014.  Preliminary Geology and Geologic Hazards Evaluation, ETC Dakota Access Pipeline, North Dakota, South Dakota, Iowa, Illinois, 28 p.

Gratto-Trevor, C.L., G. Beyersbergen, H.L. Dickson, P. Erickson, R. MacFarlane, M. Raillard, and T. Sadler. 2001. Prairie Canada Shorebird Conservation Plan. Prairie Habitat Joint Venture, Canadian Wildlife Service.  Edmonton, Alberta.

Hillman, M.D., S.M. Karpanty, J.D. Fraser, and A. Derose-Wilson.  2015.  Effects of Aircraft and Recreation on Colonial Waterbird Nesting Behavior.  The Journal of Wildlife Management 79(7):1192-1198.

Hoberg, T. and C. Gause.  1992.  Reptiles and amphibians of North Dakota.  North Dakota Outdoors 55(1):7-19.  Jamestown, ND: Northern Prairie Wildlife Research Center Available at: http://www.npwrc.usgs.gov/resource/herps/amrepnd/index.htm.

Hoganson, J.S.  2006.  Prehistoric Life of North Dakota, North Dakota Geological Survey.  Available at: https://www.dmr.nd.gov/ndfossil/Poster/poster.asp.

Hoganson, J.S. and J. Campbell.  2002.  Paleontology of Theodore Roosevelt National Park, North Dakota Geological Survey North Dakota Notes No. 9.  Available at: https://www.dmr.nd.gov/ndgs/ndnotes/ndn9_h.htm.

USACE_DAPL0071356

Horwath, B., and C. Owings.  2014.  No Keystone XL Means More Oil By Rail, Report Says.  Oil Patch Dispatch.  Available at: http://oilpatchdispatch.areavoices.com/2014/01/31/no-keystone-xl-means-more-oil-by-rail-report-says/.

Howe, M.A.  1989.  Migration of radio-marked whooping cranes from the Aransas-Wood Buffalo population: Patterns of habitat use, behavior, and survival.  U.S. Fish and Wildlife Service, Technical Report 21.

Kerr, J. M., H. R. Melton, S. J. McMillen, R. I. Magaw, and G. Naughton. 1999. Polyaromatic hydrocarbon content of crude oils around the world. In: SPE/EPS Exploration and Production Environmental Conference, SPE 52724 as cited in O'Reilly et al. 2001.

Krause, T.D.  2015.  Flood Risk and Floodplain Management Section; Memorandum for CENWO-OD-E, Executive Order 11988 and NWDR 1110-2-5 Compliance Memo for the Proposed Dakota Access Pipeline (DAPL) Project in Williams County, North Dakota, across Flowage and Saturation Easements.

Kringstad, J. 2016. Energy Development and Transmission Committee. North Dakota Pipeline Authority. Available at: https://ndpipelines.files.wordpress.com/2012/04/kringstad-slides-edtfeb-3-2016.pdf.

Landt, M.J. and B. McCord.  2016.  Class II/III Cultural Resources Inventory of the Crossings of Flowage Easements and Federal Lands.  Alpine Archaeological Consultants, Inc and Gray & Pape, Inc.

Larson, Thomas K., Kurt P. Schweigert, Keith H. Dueholm, Paul H. Sanders, and Dori Penny.  1987.  A Cultural Resource Inventory of the Right Bank of Lake Oahe in Morton and Sioux Counties, North Dakota.  Larson-Tibesar Associates, Inc., Laramie, Wyoming.  Submitted to the USACE, Omaha.

Lewis, T.E., and R.D. Slack.  2008.  Whooping Cranes and Human Disturbance: An Historical Perspective and Literature Review.  North American Crane Workshop Proceedings.  Paper 182.

Licht, D.S. and S.H. Fritts.  1994.  Gray wolf (*Canis lupus*) occurrences in the Dakotas. American Midland Naturalist 132:74-81.

Lichvar, R.W., M. Butterwick, N.C. Melvin, and W.N. Kirchner.  2014.  The National Wetland Plant List: 2014 Update of Wetland Ratings.  Phytoneuron 2014-41: 1-42.

Marathon Oil. 2010. Bakken Oil Storage Tank Emission Models. Presented by Paul Peacock, March 23, 2010. Internet website: http://www.ndoil.org/image/cache/Peacock_-_March_23_2010._ppt.pdf

Marcus, J.F., J.J. Dinan, R.J. Johnson, E.E. Blankenship, and J.L. Lackey.  2007.  Directing nest site selection of Least Terns and Piping Plovers.  Waterbirds 30:251-258.

McCabe, T.L.  1981.  The Dakota skipper, *Hesperia dacotae* (Skinner): range and biology with special reference to North Dakota.  Journal of the Lepidopterists' Society 35(3):179-193.

Mech, L.D.  1974.  *Canis lupus*.  Mammalian Species 37:1-6.

Morton County.  2014.  Morton County Zoning Map.  Available at http://tinyurl.com/mortonzoningmap.

Muller, H. 1987. Hydrocarbons in the freshwater environment. A Literature Review. Arch. Hydrobiol. Beih. Ergebn. Limnol 24:1-69.

USACE_DAPL0071357

Environmental Assessment
Dakota Access Pipeline Project
July 2016

Multi-Resolution Land Characteristics Consortium.  2011.  National Land Cover Database.  Available at: http://www.mrlc.gov/nlcd2011.php.

Murphy, E.C.  2006.  Lignite Reserves, Williston 100K Sheet, North Dakota, North Dakota Geological Survey.  Available at: https://www.dmr.nd.gov/ndgs/Coalmaps/pdf/100K/wlst_100k_c.pdf.

National Park Service.  2009.  Nationwide Rivers Inventory.  Available at http://www.nps.gov/ncrc/programs/rtca/nri/states/nd.html.

Natural Resources Conservation Service.  2015.  Web Soil Survey. Available at http://websoilsurvey.nrcs.usda.gov/.

Natural Resources Conservation Service.  2013.  Farmland Protection Policy Act Annual Report for FY 2012.

Natural Resources Conservation Service.  2008.  Lake Sakakawea 10110101, 8-Digit Hydrologic Unit Profile.  Available at http://www.nrcs.usda.gov/Internet/FSE_DOCUMENTS/nrcs141p2_001513.pdf.

Natural Resources Conservation Service.  2006.  Land Resource Regions and Major Land Resource Areas of the United States, the Caribbean, and the Pacific Basin.  Available at http://www.nrcs.usda.gov/wps/portal/nrcs/detail/soils/survey/?cid=nrcs142p2_053624.

Neff, J. M. and J. W. Anderson. 1981. Response of Marine Animals to Petroleum and Specific Hydrocarbons. Applied Science Publishers, London. 177 pp.

Nixon, R.  2014.  Grain Piles Up, Waiting For A Ride, As Trains Move North Dakota Oil.  New York Times.  Available at: http://www.nytimes.com/2014/08/26/us/grain-piles-up-waiting-for-a-ride-as-trains-move-north-dakota-oil.html.

North Dakota Department of Agriculture.  2014a.  Noxious Weeds.  Available at: http://www.nd.gov/ndda/program/noxious-weeds.

North Dakota Department of Agriculture.  2014b.  Endangered Species Descriptions.  Available at: http://www.nd.gov/ndda/program-info/endangered-species-protection/endangered-species-descriptions.

North Dakota Energy Conversion and Transmission Facility Siting Act, North Dakota Administrative Code 49-22-05.1 Available at:  http://www.legis.nd.gov/cencode/t49c22.pdf?20160408183906.

North Dakota Department of Health.  2015.  North Dakota 2014 Integrated Section 305(b) Water Quality Assessment Report and Section 303(d) List of Waters Needing Total Maximum Daily Loads.  Available at: https://www.ndhealth.gov/wq/sw/Z7_Publications/IntegratedReports/2014_North_Dakota_Integrated_Report_Final_20150428.pdf.

North Dakota Department of Health.  2013.  North Dakota Air Quality Monitoring Data Summary 2013.  Available at https://www.ndhealth.gov/aq/AmbientMonitoring.htm.

North Dakota Department of Mineral Resources.  2015.  Oil and Gas Division, Oil and Gas ArcIMS Viewer.  Available at: https://www.dmr.nd.gov/OaGIMS/viewer.htm.

USACE_DAPL0071358

Environmental Assessment
Dakota Access Pipeline Project
July 2016

North Dakota Game and Fish Department.  2012.  Black-footed Ferret.  Available at: http://gf.nd.gov/wildlife/fish-wildlife/id/mammals/carnivores/ferret.

North Dakota GIS Hub Data Portal.  2010.  Earthquake Locations.  Available at: https://apps.nd.gov/hubdataportal/srv/en/main.home.

North Dakota Parks and Recreation Department.  2014.  North Dakota Parks and Recreation Department Home Page.  Available at http://www.parkrec.nd.gov/index.html#1.

Radbruch-Hall, D.H., R.B. Colton, W.E. Davies, I. Lucchitta, B.A. Skipp, and D.J. Varnes.  1982.  Landslide Overview Map of the Conterminous United States, USGS Landslide Hazards Program.  Available at: http://landslides.usgs.gov/hazards/nationalmap/.

Royer, R.A. and G.M. Marrone.  1992.  Conservation status of the Dakota skipper (*Hesperia dacotae*) in North and South Dakota.  p.44.  U.S. Fish and Wildlife Service.  Denver, Colorado.

Sieler, Steve.  July 6, 2015.  State Soil Liaison, Natural Resources Conservation Service, North Dakota.  Personal Communication with Amy Williams, Staff Biologist, Perennial Environmental, LLC.

Standing Rock Sioux Tribe. 2016.  Environmental Profile. Available at: http://standingrock.org/environmental-profile/.

Standing Rock Sioux Tribe Game & Fish Department. 2016. Dates and Fees.  Available at: http://gameandfish.standingrock.org/dates-and-fees/.

Standing Rock Tourism. 2016. Attractions.  Available at: http://www.standingrocktourism.com/information/events.asp.The Engineering ToolBox.  2015. Ldn – Day and Night Sound Level.  Available at: http://www.engineeringtoolbox.com/sound-level-d_719.html.

Turner, Mason and Company, 2014. The North Dakota Petroleum Council Study on Bakken Crude Properties. Prepared for the North Dakota Petroleum Council.

U.S. Army Corps of Engineers.  2014.  National Levee Database.  Available at: http://nld.usace.army.mil/egis/f?p=471:1:.

U.S. Army Corps of Engineers.  2012.  Omaha District, North Dakota Regulatory Office. Nationwide Permit Regional Conditions for North Dakota.  Available at: http://www.nwo.usace.army.mil/Missions/RegulatoryProgram/NorthDakota.aspx.

U.S. Army Corps of Engineers.  2011. Omaha District, Garrison Dam/Lake Sakakawea Project North Dakota Surplus Water Report. Available at: http://www.swc.nd.gov/pdfs/corps_final_surplus_storage_lake_sakakawea.pdf.

U.S. Army Corps of Engineers. 2010a. Summary of Engineering Data – Missouri River Main Stem System.

U.S. Army Corps of Engineers. 2010b. Regional Supplement to the Corps of Engineers Wetland Delineation Manual: Great Plains Region (Version 2.0).  ERDC/EL TR-10-1, U.S. Army Engineer Research and Development Center, Vicksburg, MS.

U.S. Army Corps of Engineers.  2010c. Oahe Dam/Lake Oahe Final Master Plan.  Missouri River, South Dakota and North Dakota. Design Memorandum MO-224.

USACE_DAPL0071359

Environmental Assessment
Dakota Access Pipeline Project
July 2016

U.S. Army Corps of Engineers.  2007.  Garrison Dam/Lake Sakakawea Master Plan with Integrated Programmatic Environmental Assessment, Missouri River, North Dakota. Update of Design Memorandum MGR-107D.

U.S. Army Corps of Engineers.  1987.  Corps of Engineers Wetland Delineation Manual, Technical Report Y-87-1, U.S. Army Engineer Waterways Experiment Station, Vicksburg, MS.

U.S. Census Bureau.  2014.  American Fact Finder. Available at: http://factfinder.census.gov/faces/nav/jsf/pages/index.xhtml.

U.S. Department of Transportation.  2015.  Transportation Accidents by Mode.  Office of the Assistant Secretary for Research and Technology.  Available at: http://www.rita.dot.gov/bts/sites/rita.dot.gov.bts/files/publications/national_transportation_statistics/html/table_02_03.html.

U.S. Department of Transportation.  2014.  Pocket Guide to Large Truck and Bus Statistics. Federal Motor Carrier Safety Administration.  Available at: http://www.fmcsa.dot.gov/sites/fmcsa.dot.gov/files/docs/FMCSA%20Pocket%20Guide%20to%20Large%20Truck%20and%20Bus%20Statistics%20-%202014%20-%20508C.pdf.

U.S. Environmental Protection Agency.  2015.  Hazardous Waste Website.  Available at: http://www.epa.gov/osw/hazard/index.htm.

U.S. Environmental Protection Agency.  2014.  Enviromapper for Envirofacts. http://epa.gov/emefdata/em4ef.home.

U.S. Environmental Protection Agency.  2012.  Environmental Justice Showcase Communities.  Available at: http://www.epa.gov/environmentaljustice/grants/ej-showcase.html.

U.S. Environmental Protection Agency. 2016. ECOTOX User Guide: ECOTOXicology Database System. Version 4.0. Available: http:/www.epa.gov/ecotox/

U.S. Fish and Wildlife Service (USFWS). 2007. National Bald Eagle Management Guidelines. Arlington, VA.  May 2007.

U.S. Fish and Wildlife Service.  2015.  Endangered and Threatened Wildlife and Plants; Threatened Species Status for the Northern Long-Eared Bat With 4(d) Rule; Final Rule and Interim Rule.  80 Federal Register 17973.

U.S. Fish and Wildlife Service.  2014a.  Species profile: Whooping Crane (*Grus americana*). Environmental Conservation Online System.  Available at: http://ecos.fws.gov/speciesProfile/profile/speciesProfile.action?spcode=B003.

U.S. Fish and Wildlife Service.  2014b.  Endangered and Threatened Wildlife and Plants; Threatened Species Status for the Rufa Red Knot; Final Rule. 79 FR 73705.

U.S. Fish and Wildlife Service.  2014c.  Revised recovery plan for the Pallid sturgeon (*Scaphirhynchus albus*).  Denver, Colorado: Mountain-Prairie Region, U.S. Fish and Wildlife Service.

U.S. Fish and Wildlife Service.  2014d.  Species profile: Black-footed ferret (*Mustela nigripes*). Environmental Conservation Online System.  Available at: http://ecos.fws.gov/speciesProfile/profile/speciesProfile?spcode=A004.

USACE_DAPL0071360

U.S. Fish and Wildlife Service.  2014e.  Species profile: Gray wolf (*Canis lupus*).  Environmental
Conservation Online System.  Available at:
http://ecos.fws.gov/tess_public/SpeciesReport.do?lead=6&listingType=L.

U.S. Fish and Wildlife Service.  2014f.  Revised Recovery Plan for the Pallid Sturgeon (*Scaphirhynchus
albus*).  Available at:
http://ecos.fws.gov/docs/recovery_plan/Pallid%20Sturgeon%20Recovery%20Plan%20First%20R
evision%20signed%20version%20012914_3.pdf.

U.S. Fish and Wildlife Service.  2014g. Rufa Red Knot Background Information and Threats
Assessment.Available at:
http://www.fws.gov/northeast/redknot/pdf/20141125_REKN_FL_supplemental_doc_FINAL.pdf.

U.S. Fish and Wildlife Service.  2013a.  Western prairie fringed orchid (*Platanthera praeclara*). Available
at:
http://www.fws.gov/northdakotafieldoffice/endspecies/species/western_prairie_fringed_orchi
d.htm.

U.S. Fish and Wildlife Service.  2013b.  North Dakota Field Office; Least Tern (*Sterna antillarum*).
Available at: http://www.fws.gov/northdakotafieldoffice/endspecies/species/least_tern.htm.

U.S. Fish and Wildlife Service.  2013c.  North Dakota Field Office; Black-footed ferret (*Mustela nigripes*).
Available at: http://www.fws.gov/northdakotafieldoffice/endspecies/species/black-
footed_ferret.htm.

U.S. Fish and Wildlife Service.  2013d.  Endangered and Threatened Wildlife and Plants; Threatened
status for Dakota skipper and Endangered Status for Poweshiek skipperling; and Designation of
critical habitat for the Dakota skipper and Poweshiek skipperling. Proposed Rule.  78 Federal
Register 63574.

U.S. Fish and Wildlife Service.  2013e.  Interior Least Tern (*Sternula antillarum*) 5-Year Review: Summary
and Evaluation.  Available at:
http://www.fws.gov/southeast/5yearReviews/5yearreviews/interiorLeastTern5yrReivew102413
.pdf.

U.S. Fish and Wildlife Service.  2013f.  Black-footed Ferret Draft Recovery Plan, Second Revision.
Available at: https://www.fws.gov/mountain-
prairie/species/mammals/blackfootedferret/2013DraftRevisedRecoveryPlan.pdf.

U.S. Fish and Wildlife Service.  2012.  Endangered Species: Piping Plover.  Available at:
http://www.fws.gov/mountainprairie/species/birds/pipingplover/.

U.S. Fish and Wildlife Service.  2009a.  Whooping Cranes and Wind Development – An Issue Paper.
Available at:
http://www.fws.gov/southwest/es/oklahoma/documents/te_species/wind%20power/whoopin
g%20crane%20and%20wind%20development%20fws%20issue%20paper%20-
%20final%20%20april%202009.pdf

U.S. Fish and Wildlife Service.  2009b.  Piping Plover (*Charadrius melodus*) 5-Year Review: Summary and
Evaluation. Available at:

USACE_DAPL0071361

Environmental Assessment
Dakota Access Pipeline Project
July 2016

http://www.fws.gov/northeast/endangered/PDF/Piping_Plover_five_year_review_and_summary.pdf

U.S. Fish and Wildlife Service.  2007.  International Recovery Plan Whooping Crane (*Grus americana*), Third Revision.  Available at: http://ecos.fws.gov/docs/recovery_plan/070604_v4.pdf.

U.S. Fish and Wildlife Service.  1994.  Whooping Crane Recovery Plan.  Available at: https://www.fws.gov/southwest/es/arizona/Documents/RecoveryPlans/WhoopingCrane.pdf.

U.S. Fish and Wildlife Service, National Park Service, Bureau of Land Management, and U.S. Forest Service.  2014.  National Wild and Scenic Rivers System.  Available at http://www.rivers.gov/north-dakota.php.

U.S. Geological Survey.  2014a. North Dakota 2014 Seismic Hazard Map, USGS Earthquake Hazards Program.  Available at: http://earthquake.usgs.gov/earthquakes/states/north_dakota/hazards.php.

U.S. Geological Survey.  2014b. Northern Prairie Wildlife Research Center.  North Dakota Wildlife Management Area Guide - WMAs by County.  Available at http://www.npwrc.usgs.gov/resource/wildlife/wmaguide/county.htm.

U.S. Geological Survey. 2016. National Water Information System data available on the World Wide Web (USGS Water Data for the Nation), accessed May 9, 2016 at http://waterdata.usgs.gov/nwis/dvstat?referred_module=sw&site_no=06330000&por_06330000_2=720709,00060,2,1928-10-01,1965-07-31&format=html_table&stat_cds=mean_va&date_format=YYYY-MM-DD&rdb_compression=file&submitted_form=parameter_selection_list.

USGS. 2016b. National Water Information System data available on the World Wide Web (USGS Water Data for the Nation), accessed May 9, 2016 at http://nwis.waterdata.usgs.gov/nd/nwis/uv?cb_00060=on&format=gif_stats&site_no=06342500&period=3143&begin_date=2007-10-01&end_date=2016-05-09.

Weary, D.J. and D.H. Doctor.  2014.  Karst in the United States: A Digital Map Compilation and Database, USGS Open-File Report 2014-1156, 23 p.

Wilderness Institute.  2014.  List of Wilderness Areas by Location. University of Montana, College of Forestry and Conservation.  Available at http://www.wilderness.net/NWPS/stateView?state=ND.  Accessed November 2014.

USACE_DAPL0071362

Environmental Assessment
Dakota Access Pipeline Project
July 2016

## 12.0 FIGURES

**Figure 1:**      Project Location—Federal Lands and Flowage Easements
**Figure 2:**      Project Layout—Flowage Easements
**Figure 3:**      Project Layout—Federal Lands
**Figure 4:**      Soils—Flowage Easements
**Figure 5:**      Soils—Federal Lands
**Figure 6:**      Natural Resources—Flowage Easements
**Figure 7:**      Natural Resources—Federal Lands
**Figure 8:**      Cultural Resources—Flowage Easements
**Figure 9:**      Cultural Resources—Federal Lands
**Figure 10:**     Land Cover—Flowage Easements
**Figure 11:**     Land Cover—Federal Lands
**Figure 12:**     Route Alternative—Missouri River Crossing
**Figure 13:**     Route Alternative—Lake Oahe Crossing
**Figure 14:**     HDD Cross Section—Missouri River Crossing
**Figure 15:**     HDD Cross Section—Lake Oahe Crossing
**Figure 16:**     Whooping Crane—Central Flyway

USACE_DAPL0071363



Dakota Access Pipeline Project
Figure 1
Project Location
Federal Lands and Flowage Easements

DAKOTA ACCESS, LLC

Proposed DAPL Centerline

0    40   Miles

1:2,534,400

UTM 83-14F    Date: April, 2015

Path: P:\GIS\Client\ETC_EnergyTransfer\DakotaAccess_DAPL\Maps\ENV\ND_FlowEasements\01_ND_ProjectLocation_Land.mxd
Source: ArcGIS Online Mapping

USACE_DAPL0071364



- Milepost
- Barge Location With Pumping Intake Structure*
- Temporary Above Ground Waterline
- Project Centerline
- DAPL Centerline
- Workspace
- USACE Flowage Easements

* Barge location dependant on water level

DAKOTA ACCESS, LLC

**Dakota Access Pipeline Project**
**Figure 2**
**Project Layout**
**Flowage Easements**
**Williams County, North Dakoda**

| | |
|---|---|
| | 1:26,400 |
| UTM83-13F | Date: August, 2015 |

Path: P:\GIS\Client\ETC_EnergyTransfer\DakotaAccess_DAPL\Maps\ENV\ND_FlowEasements\02ND_FlowEasement_Layout.mxd







North Dakota

Milepost
Barge Location With Pumping Intake Structure
Temporary Above Ground Waterline
Project Centerline
DAPL Centerline
Workspace
USACE Flowage Easements
NRCS Soil

DAKOTA ACCESS, LLC

Dakota Access Pipeline Project
Figure 4-B
Soils
Flowage Easements
Williams County, North Dakota

| Page 2 of 2 | 1:15,000 |
| UTM83-13F | Date: August, 2015 |

0   1,200 Feet

Path: P:\GIS\Client\ETC_EnergyTransfer\DakotaAccess_DAPL\Maps\ENV\ND_FlowEasements\04ND_B_FlowEasement.mxd

USACE_DAPL0071368



- Milepost
- Project Centerline
- DAPL Centerline
- Workspace
- USACE Federal Lands
- NRCS Soils
- Standing Rock Sioux Reservation

0 1,750 Feet

DAKOTA ACCESS, LLC

**Dakota Access Pipeline Project**
**Figure 5**
**Soils**
**Federal Lands**
**Morton County and**
**Emmons County, North Dakota**

| | |
|---|---|
| | 1:21,000 |
| UTM 83-14F | Date: February, 2016 |

Path: P:\GIS\Client\ETC_EnergyTransfer\DakotaAccess_DAPL\Maps\ENV\ND_FlowEasements\05ND_LakeOahe_Land.mxd
Source: ArcGIS Online Mapping







- Milepost
- Project Centerline
- DAPL Centerline
- Workspace
- Field Delineated Waterbody
- Field Delineated PEM Wetland
- Field Delineated PFO Wetland
- Field Delineated PSS Wetland
- USACE Flowage Easements

0 1,200 Feet

DAKOTA ACCESS, LLC

**Dakota Access Pipeline Project**
**Figure 6-A**
**Natural Resources**
**Flowage Easements**
**Williams County, North Dakota**

| Page 1 of 2 | 1:15,000 |
|---|---|
| UTM83-13F | Date: August, 2015 |

Path: P:\GIS\Client\ETC_EnergyTransfer\DakotaAccess_DAPL\Maps\ENV\ND_FlowEasements\06ND_A_FlowEasementNaturalResources.mxd

Milepost
Barge Location With Pumping Intake Structure
Project Centerline
DAPL Centerline
Temporary Above Ground Waterline
Workspace
Field Delineated Waterbody
Field Delineated PEM Wetland
Field Delineated PFO Wetland
Field Delineated PSS Wetland
USACE Flowage Easements

0 1,200 Feet

DAKOTA ACCESS, LLC

**Dakota Access Pipeline Project**
**Figure 6-B**
**Natural Resources**
**Flowage Easements**
**Williams County, North Dakota**

| Page 2 of 2 | 1:15,000 |
|---|---|
| UTM83-13F | Date: August, 2015 |

Path: P:\GIS\Client\ETC_EnergyTransfer\DakotaAccess_DAPL\Maps\ENV\ND_FlowEasements\06ND_B_FlowEasementNaturalResources.mxd

Dakota Access, LLC

**Dakota Access Pipeline Project**
**Figure 7**
**Natural Resources**
**Federal Lands**
**Morton County and**
**Emmons County, North Dakota**

Legend:
- Milepost
- Project Centerline
- DAPL Centerline
- Field Delineated Waterbody
- Workspace
- USACE Federal Lands
- Standing Rock Sioux Reservation

North Dakota

0   1,750 Feet

1:21,000

UTM 83-14F   Date: February, 2016

USACE_DAPL0071372



Milepost
Barge Location With Pumping Intake Structure*
Temporary Above Ground Waterline
Project Centerline
DAPL Centerline
Workspace
USACE Flowage Easements
Project Archaeological Survey

North Dakota

DAKOTA ACCESS, LLC

**Dakota Access Pipeline Project
Figure 8
Cultural Resources
Flowage Easements
Williams County, North Dakota**

| | 1:26,400 |
|---|---|
| UTM83-13F | Date: June, 2016 |

0    2,200
Feet

Path: P:\GIS\Client\ETC_EnergyTransfer\DakotaAccess_DAPL\Maps\ENV\ND_FlowEasements\08ND_CR.mxd

USACE_DAPL0071373



USACE_DAPL0071374



- Milepost
- Project Centerline
- DAPL Centerline
- Workspace
- USACE Flowage Easements

0 1,200 Feet

DAKOTA ACCESS, LLC

**Dakota Access Pipeline Project**
**Figure 10-A**
**Landcover**
**Flowage Easements**
**Williams County, North Dakota**

| Page 1 of 2 | 1:15,000 |
|---|---|
| UTM83-13F | Date: August, 2015 |

Path: P:\GIS\Client\ETC_EnergyTransfer\DakotaAccess_DAPL\Maps\ENV\ND_FlowEasements\10ND_A_Landcover.mxd



LL3430E

93.5

LL3453E

94

LL3483E-1

94.5

LL3440E

95

Cultivated Crops
Deciduous Forest
Developed, Low Intensity
Developed, Open Space
Emergent Herbaceous Wetlands
Grassland/Herbaceous
Mixed Forest
Open Water
Pasture/Hay
Shrub/Scrub
Woody Wetlands

North Dakota

Barge Location With Pumping Intake Structure
Milepost
Temporary Above Ground Waterline
Project Centerline
DAPL Centerline
Workspace
USACE Flowage Easements

DAKOTA ACCESS, LLC

Dakota Access Pipeline Project
Figure 10-B
Landcover
Flowage Easements
Williams County, North Dakota

| Page 2 of 2 | 1:15,000 |
|---|---|
| UTM83-13F | Date: September, 2015 |

0       1,200
        Feet

Path: P:\GIS\Client\ETC_EnergyTransfer\DakotaAccess_DAPL\Maps\ENV\ND_FlowEasements\10ND_B_Landcover.mxd

USACE_DAPL0071376



Milepost
Project Centerline
DAPL Centerline
Workspace
USACE Federal Lands
Standing Rock Sioux Reservation

0 1,750 Feet

DAKOTA ACCESS, LLC

**Dakota Access Pipeline Project**
**Figure 11**
**Landcover**
**Federal Lands**
**Morton County and**
**Emmons County, North Dakota**

| | |
|---|---|
| | 1:21,000 |
| UTM 83-14F | Date: February, 2016 |

Path: P:\GIS\Client\ETC_EnergyTransfer\DakotaAccess_DAPL\Maps\ENV\ND_FlowEasements\11ND_LakeOahe_Landcover.mxd
Source: ArcGIS Online Mapping



Dakota Access Pipeline Project
**Figure 12**
**Route Alternative**
**Missouri River Crossing**
**Williams County, North Dakota**

Legend:
— Preferred Alternative
— Route Alternarive
— USACE Garrison Flowage Easements
— Other Government Lands

DAKOTA ACCESS, LLC

1:400,000
NAD 1983 UTM Zone 14N        Date: July, 2015

Path: P:\GIS\Client\ETC_EnergyTransfer\DakotaAccess_DAPL\Maps\ENV\ND_FlowEasements\12ND_Missouri_R_Xing.mxd

USACE_DAPL0071378



Preferred Alternative
Route Alternarive
USACE Garrison Flowage Easements
Standing Rock Sioux Reservation
USACE Lake Oahe Fee-Owned Land
Other Government Lands

North Dakota

DAKOTA ACCESS, LLC

**Dakota Access Pipeline Project
Figure 13
Route Alternative
Lake Oahe Crossing
Emmons & Morton Counties, North Dakota**

1:696,293

NAD 1983 UTM Zone 14N

Date: April, 2016

0  2  4      8
Miles

Path: P:\GIS\Client\ETC_EnergyTransfer\DakotaAccess_DAPL\Maps\ENV\ND_FlowEasements\13ND_Lake_Oahe_Xing_update20160412.mxd

USACE_DAPL0071379

FIGURE 14



CROSS-SECTION DIAGRAM OF LAKE OAHE HDD CROSSING

USACE_DAPL0071380

FIGURE 15



CROSS-SECTION DIAGRAM OF MISSOUR RIVER HDD CROSSING

USACE_DAPL0071381



DAPL Action Area

Whooping Crane Migration Corridor

Whooping Crane Migration Corridor from Whooping Cranes & Wind Development - An Issue Paper By Regions 2 and 6, U. S. Fish and Wildlife Service April 2009 (Stehn, T, and T. Wassenich. 2008. Whooping crane collisions with power lines: an issue paper. 2006 North American Crane Workshop. In press.)

0 40 Miles

DAKOTA ACCESS, LLC

Figure 16

**Dakota Access Pipeline Project**

**USACE ND Flowage Easement/408 Areas**

**Whooping Crane Migration Corridor**

| | |
|---|---|
| | 1:2,800,000 |
| UTM 83-14F | Date: March, 2016 |

Path: P:\GIS\Client\ETC_EnergyTransfer\DakotaAccess_DAPL\Maps\ENV\WoopingCrane\01_ND_ProjectLocation_Land.mxd
Source: ArcGIS Online Mapping

# FINAL
# ENVIRONMENTAL ASSESSMENT

# Dakota Access Pipeline Project
# Section 408
# Consent for Crossing Federally Authorized
# Projects and Federal Flowage Easements

**Prepared by:**

## Dakota Access, LLC
1300 Main Street
Houston, TX 77002

**Prepared for:**

## U.S. Army Corps of Engineers
## St. Louis District
1222 Spruce Street
St. Louis, MO 63103

**August 2016**

USACE_DAPL0009823

This page was intentionally left blank

USACE_DAPL0009824

# TABLE OF CONTENTS

EXECUTIVE SUMMARY ........................................................................................................**7**

**1. INTRODUCTION** ...........................................................................................................**9**
    1.1. DAPL Project Location ........................................................................................ 9
    1.2. Purpose and Need of the DAPL Project and the USACE Proposed Action .............................. 9
    1.3. Authority and Scope of the EA .................................................................................. 9

**2. ALTERNATIVES** ...........................................................................................................**12**
    2.1. Alternatives Considered but Eliminated from Detailed Analysis ................................... 12
        2.1.1. Alternative 1 – Modification of Existing Infrastructure Alternative ................... 12
        2.1.2. Alternative 2 – Trucking Transportation Alternative ................................. 12
        2.1.3. Alternative 3 – Rail Transportation Alternative ...................................... 13
        2.1.4. Alternative 4 – Route Alternatives .................................................. 14
        2.1.5. Alternative 5 – Major Waterbody Crossing Alternatives ............................ 14
    2.2. No Action Alternative ........................................................................................ 15
    2.3. The Proposed Pipeline Action (Requester's Preferred Alternative) .............................. 16
        2.3.1. Location and Detailed Description of the Proposed Action .......................... 16
        2.3.2. Description of Construction Techniques and Construction Mitigation Measures 19

**3. THE AFFECTED ENVIRONMENT AND POTENTIAL ENVIRONMENTAL IMPACTS OF THE PROPOSED ACTION AND NO ACTION ALTERNATIVES** ........................................................**24**
    3.1. Topography, Geology and Soils ............................................................................ 24
        3.1.1. Topography and Geology ............................................................ 24
        3.1.2. Geologic Hazards .................................................................... 25
        3.1.3. Soils .................................................................................. 27
    3.2. Water Resources ............................................................................................. 31
        3.2.1. Surface Waters ...................................................................... 31
        3.2.2. Groundwater ........................................................................ 35
        3.2.3. Wild and Scenic River Act .......................................................... 38
        3.2.4. Wetlands ............................................................................. 38
        3.2.5. Floodplain ............................................................................ 41
        3.2.6. Levees ................................................................................ 42
    3.3. Vegetation, Agriculture, and Range Resources ........................................................ 43
        3.3.1. Vegetation ........................................................................... 43
        3.3.2. Wildlife Resources .................................................................. 45
        3.3.3. Recreationally and Economically Important Species and Nongame Wildlife ....... 45
    3.4. Aquatic Resources ........................................................................................... 47
        3.4.1. Habitat and Communities ........................................................... 47
    3.5. Threatened, Endangered, Candidate, and Proposed Species .......................................... 49
        3.5.1. Affected Environment ............................................................... 49
        3.5.2. Impacts and Mitigation ............................................................. 53
    3.6. Fish and Wildlife Coordination Act ...................................................................... 60
    3.7. Bald and Golden Eagle Protection Act .................................................................. 61
    3.8. Land Use and Recreation .................................................................................. 61
        3.8.1. Land Ownership ..................................................................... 62
        3.8.2. Land Use .............................................................................. 62
        3.8.3. Recreation and Special Interest Areas ............................................. 63

USACE_DAPL0009825

3.9. Cultural and Historic Resources and Native American Consultations .................................... 65
    3.9.1. Cultural Resources Studies................................................................................. 66
    3.9.2. Native American Consultations ......................................................................... 68
3.10. Social and Economic Conditions and Environmental Justice ............................................... 69
    3.10.1. Demographics, Population and Employment ................................................... 69
    3.10.2. Environmental Justice ...................................................................................... 70
3.11. Hazardous, Toxic, and Radioactive Wastes ......................................................................... 72
3.12. Reliability and Safety............................................................................................................ 73
3.13. Air Quality and Noise ........................................................................................................... 76
    3.13.1. Air Quality ........................................................................................................ 76
    3.13.2. Noise ................................................................................................................ 77
3.14. Climate Change .................................................................................................................... 78
    3.14.1. Affected Environment ...................................................................................... 79
    3.14.2. Impacts and Mitigation .................................................................................... 79

4. CUMULATIVE IMPACTS .............................................................................................................. 83
4.1. Scoping ................................................................................................................................. 83
4.2. Affected Environment............................................................................................................ 84
4.3. Environmental Consequences .............................................................................................. 85
    4.3.1. Geology and Soils .............................................................................................. 85
    4.3.2. Water and Aquatic Life Resources .................................................................... 86
    4.3.3. Vegetation, Agriculture, and Range Resources ................................................ 87
    4.3.4. Threatened, Endangered, Candidate, and Proposed Species............................ 88
    4.3.5. Wildlife Resources............................................................................................. 92
    4.3.6. Land Use and Recreation .................................................................................. 92
    4.3.7. Cultural and Historic Resources ....................................................................... 93
    4.3.8. Social and Economic Conditions ....................................................................... 93
    4.3.9. Transportation and Traffic ................................................................................ 93
    4.3.10. Air Quality and Noise ...................................................................................... 94

5. IRREVERSIBLE AND IRRETRIEVABLE COMMITMENT OF RESOURCES........................................... 95
5.1. USACE ................................................................................................................................... 95
5.2. DAPL ..................................................................................................................................... 95

6. MITIGATION SUMMARY .............................................................................................................. 96

7. FEDERAL, TRIBAL, STATE, AND LOCAL AGENCY CONSULTATION AND COORDINATION .................. 97

8. STATUS OF ENVIRONMENTAL COMPLIANCE ............................................................................. 100

9. LIST OF PREPARERS AND REVIEWERS ........................................................................................ 110

10. ACRONYMS, INITIALS, AND ABBREVIATIONS ........................................................................... 111

11. REFERENCES ............................................................................................................................ 113

USACE_DAPL0009826

# LIST OF TABLES

**Table 1** - Usace Project and Flowage Easements Crossed by the Proposed Action ....................................... 17

**Table 2** - Environmental Assessment Areas of Interest.............................................................................. 18

**Table 3** - Soil Types Mapped within the Proposed Action Area ................................................................. 27

**Table 4** - Waterbodies within the Proposed Action / Connected Action Areas ......................................... 35

**Table 5** - Wetlands Crossed within the Proposed Action Area .................................................................. 40

**Table 6** - Federally Listed Species with Potential to occur within the Proposed Action Areas .................. 54

**Table 7** - Population and Employment ..................................................................................................... 70

**Table 8** - Minority Population Statistics.................................................................................................... 71

**Table 9** - Low-Income Population Statistics............................................................................................... 72

**Table 10** - Noise Values.......................................................................................................................... 78

**Table 11** - CEQ'S 11-Step Approach for Assessing Cumulative Impacts .................................................... 83

**Table 12** - Checklist for Identifying Potential Cumulative Effects of the Proposed Action ........................ 84

**Table 13** - Agency/Entity Consultation List.............................................................................................. 97

**Table 14** - Environmental Permits, Approvals, and Consultations ........................................................... 100

**Table 15** - Summary of Environmental Impact Avoidance and Mitigation Measures.............................. 101

**Table 16** - List of Preparers and Reviewers............................................................................................. 110

# LIST OF FIGURES

**Figure EA-1.** Water Resources Region 07: Upper Mississippi Region Boundary. ....................................... 80

**Figure EA-2.** Summary Matrix of Observed and Projected Climate Trends and Literary Consensus. ......... 81

USACE_DAPL0009827

# LIST OF APPENDICES

**Appendix A** - Project Maps

**Appendix B** - Stormwater Pollution Prevention Plan (SWPPP)/ Best Management Practices Figures /Spill Prevention Control and Countermeasure (SPCC) Plan

**Appendix C** - HDD Construction Plan / HDD Contingency Plan

**Appendix D** - Right-of-Way (ROW) Configurations and Typical Construction Details

**Appendix E** - HDD Design Reports, HDD Cross-Sections, and Geotechnical Reports

**Appendix F** - Blasting Plan

**Appendix G** - Draft Facility Response Plan

**Appendix H** - Agricultural Impact Mitigation Agreement between Dakota Access, LLC and the Illinois Department of Agriculture

**Appendix I** - Unanticipated Discoveries Plan Cultural Resources, Human Remains, Paleontological Resources and Contaminated Media (UDP)

**Appendix J** - Section 408 Public Notice, Distribution List, and Summary of Comments Received

**Appendix K** - Environmental Compliance Coordination

USACE_DAPL0009828

## EXECUTIVE SUMMARY

In accordance with the National Environmental Policy Act (NEPA) and implementing regulations, the following Environmental Assessment (EA) has been prepared to evaluate the effects of the Dakota Access, LLC (Dakota Access) Dakota Access Pipeline Project (DAPL Project), which would cross lands containing projects funded or authorized by the federal government or cross lands that have federal government flowage easements under management by the U.S. Army Corps of Engineers (USACE) (Proposed Action). Specifically, the Proposed Action is to authorize the crossing of federal USACE projects including McGee Creek levee west of the Illinois River (Pike County, IL), the navigation channel of the Illinois River (Pike and Morgan counties, IL), the Coon Run levees east of the Illinois River (specifically Coon Run Northwest levee and Coon Run Southeast levee) (Scott County, IL), and where the proposed pipeline would cross USACE flowage easements north of Carlyle Lake (Fayette County, IL) approximately 3.5 miles west of the town of Shobonier, IL. Although outside of the scope of this EA, DAPL will plan for the protection of other crossings and associated water intakes as part of their emergency preparedness protocol in accordance with Pipeline and Hazardous Materials Safety Administration (PHMSA) requirements outlined in 49 CFR 194.

This EA was prepared by Dakota Access for the Proposed Action on behalf of the USACE as the non-federal representative for compliance with the National Environmental Policy Act of 1969, the Council on Environmental Quality (CEQ) Regulations (40 Code of Federal Regulations (CFR) 1500-15-8), Corps of Engineers Regulation ER 200-2-2 (33 CFR Part 230), and related environmental compliance requirements for these crossings, National Historic Preservation Act (Section 106). Tribes, Tribal Historic Preservation Offices, State Historic Preservation Offices, the Advisory Council on Historic Preservation, and interested parties were consulted by Dakota Access, LLC and the USACE St. Louis District.

The USACE adopts this EA and incorporates findings within as part of stipulations to issue Section 408 consent to cross flowage easements (federal actions) to Dakota Access as the Proposed Action. This EA is being prepared in accordance with CEQ regulations in Section 1506.5(a) and 1506.5(b), which allow an applicant to prepare an EA for federal actions.

Based upon "No Action", extensive route analysis, route and system alternatives - including the preferred route, system options, and various transportation options, the Requester's Preferred Alternative was chosen, because it best meets the purpose and need while avoiding, minimizing, and mitigating environmental impacts. It would also follow the greatest length of existing disturbed linear utility corridors, traverse property whose landowners have previously granted permissions for similar projects, and would minimize the number of permanent above ground launchers/receivers and valve sites.

Impacts on the environment as a result of the Proposed Action would be temporary and not substantial as a result of avoiding, minimizing, and mitigating any potential impacts. Impacts on the McGee Creek levee, Illinois River navigation channel, and Coon Run levees are avoided by installing the pipeline via horizontal directional drill (HDD) beneath the features. Similarly, within the federal flowage easements north of Carlyle Lake, impacts to the Kaskaskia River and adjacent wetlands would be avoided by HDD. Impacts to wetland areas within the Proposed Action Areas/Connected Action Areas are limited to vegetation maintenance in the permanent pipeline easement. No known cultural resources would be impacted by the Proposed Action. Dakota Access would comply with all applicable local, state, and federal regulations and permits associated with the construction and operation of the Proposed Action.

USACE_DAPL0009829

This page was intentionally left blank

USACE_DAPL0009830

## 1. INTRODUCTION

Dakota Access is proposing to construct a new crude oil pipeline that would provide transportation service from points of origin in the Bakken and Three Forks plays in North Dakota through portions of South Dakota and Iowa to a terminus in Patoka, Illinois (Appendix A – Figure 1).  The operator of the Project is DAPL-ETCO Operations Management, LLC.  In coordination with the U.S. Army Corps of Engineers (USACE), the Applicant, Dakota Access, LLC (Dakota Access) as the non-federal representative for compliance with the National Environmental Policy Act of 1969 (NEPA), the Council on Environmental Quality (CEQ) Regulations (40 Code of Federal Regulations (CFR) 1500-15-08), Corps of Engineers Regulation ER 200-2-2 (33 CFR Part 230), and related environmental compliance requirements, prepared this Environmental Assessment (EA) to evaluate the potential effects of the Dakota Access Pipeline Project (**DAPL Project**), which would cross lands containing projects funded by the federal government or cross lands that have federal government flowage easements under management by the U.S. Army Corps of Engineers (**Proposed Action**) near the Illinois River in Pike, Morgan, and Scott counties, Illinois, and near the Kaskaskia River in Fayette County, Illinois.  Areas that are potentially impacted by construction and/or operation of the Proposed Action are referred to herein as the **Proposed Action Area(s)**.

### 1.1.  DAPL Project Location

The DAPL Project is an approximately 1,134 mile, 12-30-inch long crude oil pipeline project beginning near Stanley, North Dakota, and ending at Patoka, Illinois.  In Illinois, the prosed 30-inch pipeline enters the state at the crossing of the Mississippi River in Hancock County and then extends approximately 186 miles to the southeast, terminating near Patoka in Marion County, Illinois (Appendix A – Figures 2 and 3).  The Proposed Action Areas/Connected Action Areas under consideration in this analysis are described in Section 2.3.

### 1.2.  Purpose and Need of the DAPL Project and the USACE Proposed Action

The purpose of the proposed DAPL Project is to efficiently and safely transport sweet crude oil from the Bakken and Three Forks production region in North Dakota to a crude oil market hub located near Patoka, Illinois.  The Dakota Access Pipeline is being designed to safely carry up to 570,000 barrels per day (bpd) of crude oil (approximately 450,000 bpd initially).  From the Patoka hub, the crude oil would be transported by other pipelines to refineries located in the Midwest and the Gulf Coast, where 80% of the U.S. refining capabilities exist today.  These refineries are depend on a reliable shipment of crude oil to produce gasoline, diesel fuel, and other petroleum products for U.S. consumers.

The Proposed USACE Action is to issue permission under Section 14 of the Rivers and Harbors Act of 1899, codified 33 U.S.C. Section 408 (Section 408) for the applicant to cross lands containing projects funded by the federal government or cross lands that have federal government flowage easements (levees, river navigation channels, flowage easements) under management by the U.S. Army Corps of Engineers - St. Louis District.  These crossings have been determined by the applicant to constitute a portion of the most environmentally protective routing for the DAPL Project.

### 1.3.  Authority and Scope of the EA

*Authority* – The proposed DAPL Project crossings of USACE projects, as well as consent to cross the flowage easement north of Carlyle Lake, would require permissions from the USACE, which are the federal actions associated with this EA.  This authority derives from 33 U.S.C. Section 408, which requires USACE to give

USACE_DAPL0009831

permission before any entity may use, occupy or alter[1] a federal project constructed for navigation or flood control.  Therefore, the scope of this EA is limited to the crossings of lands containing projects funded by the federal government or lands that have federal government flowage easements under management by the U.S. Army Corps of Engineers - St. Louis District that would require Section 408 permission by USACE.

Scoping - To obtain comments on the Proposed Action, and to identify concerns that may need to be addressed in this EA, USACE issued a public notice of the Section 408 review of the DAPL Proposed Action on 5 January 2016.  Further, tribes, Tribal Historic Preservation Offices, State Historic Preservation Offices, the Advisory Council on Historic Preservation, and interested parties were consulted by USACE St. Louis District personnel.

Scope – The scope of the this EA is limited to the proposed crossings (Proposed Action Areas/Connected Action Areas) of the McGee Creek levee west of the Illinois River (Pike County, IL), the navigation channel of the Illinois River (Pike and Morgan counties, IL), the Coon Run levees east of the Illinois River (specifically Coon Run Northwest levee and Coon Run Southeast levee) (Scott County, IL), and where the proposed pipeline would cross USACE flowage easements north of Carlyle Lake (Fayette County, IL) approximately 3.5 miles west of the town of Shobonier, IL.

Permissions – Before the pipeline may be installed, USACE must first determine that the construction, operation and maintenance of the pipeline within the areas of USACE authority will not be injurious to the public interest and will not impair the usefulness of the federal navigation and flood risk management projects.

---

[1]33 U.S.C. Section 408 provides as follows:

> It shall not be lawful for any person or persons to take possession of or make use of for any purpose, or build upon, alter, deface, destroy, move, injure, obstruct by fastening vessels thereto or otherwise, or in any manner whatever impair the usefulness of any sea wall, bulkhead, jetty, dike, levee, wharf, pier, or other work built by the United States, or any piece of plant, floating or otherwise, used in the construction of such work under the control of the United States, in whole or in part, for the preservation and improvement of any of its navigable waters or to prevent floods, or as boundary marks, tide gauges, surveying stations, buoys, or other established marks, nor remove for ballast or other purposes any stone or other material composing such works: *Provided,* That the Secretary of the Army may, on the recommendation of the Chief of Engineers, grant permission for the temporary occupation or use of any of the aforementioned public works when in his judgment such occupation or use will not be injurious to the public interest: *Provided further,* That the Secretary may, on the recommendation of the Chief of Engineers, grant permission for the alteration or permanent occupation or use of any of the aforementioned public works when in the judgment of the Secretary such occupation or use will not be injurious to the public interest and will not impair the usefulness of such work.

USACE_DAPL0009832

*NEPA Compliance* – The Proposed Action does not qualify for a Categorical Exclusion from NEPA documentation as defined by ER 200-2-2, 4 March 1998 paragraph 9.  Thus, this EA has been prepared as required under NEPA to determine potential impacts that may occur as result of implementing the Proposed Action.  If it is determined that no significant impacts would be incurred after implementing the mitigation measures described within this document, USACE would issue a finding of no significant impact (FONSI).  If it is determined that significant impacts would be incurred as a result of construction and/or operations of the Proposed Action, an environmental impact statement (EIS) would have to be prepared to further evaluate the Proposed Action under NEPA.

This environmental assessment is being completed in accordance with CEQ regulations in Section CFR 1506.5(b), which allow an applicant to prepare an EA for a federal action in coordination with the lead federal agency (i.e., Corps or USACE).  The USACE will make a final determination regarding compliance of the activities with NEPA and Section 408 with the completed information contained herein.

USACE_DAPL0009833

## 2. ALTERNATIVES

The alternatives available to the St. Louis District in responding to the request are limited because of limited federal control and responsibility for the DAPL Project.  If a determination is made that environmental impacts, including mitigation and appropriate measures to minimize environmental impacts, are acceptable, the Proposed Action may be approved.  For this reason, alternatives addressed in detail in this EA include a "No Action" Alternative and Proposed Action Alternative (Requester's Preferred Alternative).

### 2.1.  Alternatives Considered but Eliminated from Detailed Analysis

### 2.1.1.  Alternative 1 – Modification of Existing Infrastructure Alternative

The parent company of Dakota Access, Energy Transfer Company (Company) is one of the largest and most diversified investment grade limited partnerships in the United States with approximately 71,000 miles of pipeline assets today (Energy Transfer, 2014).  The Company and its partners have a presence in more than half of the contiguous United States; including some existing assets in Illinois.  The Company does not own or operate any existing facilities connecting to the Bakken shale; the DAPL Project will be the Company's first asset to do so.  For this reason, the manipulation of operating pressures to increase transport capacity in pipelines or altering existing infrastructure to increase storage and transport capacity are not viable options to meet the DAPL Project's objectives or shippers' demands of transporting crude from the Bakken.   Dakota Access, Energy Transfer Company asserts that there are no other major interstate pipelines that would meet the purpose and need of the DAPL Project.  For this reason, the manipulation of operating pressures or additional of pump stations to increase transport capacity in pipelines or altering existing infrastructure to increase storage and transport capacity are not viable options to meet the purpose and need of the DAPL Project.

### 2.1.2.  Alternative 2 – Trucking Transportation Alternative

Currently, due to a lack of transport capacity in the Williston Basin, approximately 1% of the crude oil is moved via truck (Kringstad, 2014).  While trucking is instrumental in the gathering and distribution of crude on a limited scale, trucking as an alternative for transporting the volume of crude oil the distances planned for the DAPL Project is not viable.  Factors such as road safety, roadway capacity, and a lack of reliability due to seasonal constraints, in addition to other logistical issues involving availability of labor force, trailer truck capacity, and economics, all contribute to truck transportation not being a realistic alternative.

A sharp increase in traffic on North Dakota roads as a result of the rapid expansion in the number of commercial trucks linked to the oil industry has affected road safety.  In 2012, the Federal Motor Carrier Safety Administration reported a traffic fatality rate in North Dakota of 0.48 per million vehicle miles traveled, with 48 deaths involving a bus or large truck, far surpassing any other state (U.S. Department of Transportation [DOT], 2014).  In the pre-boom years of 2001 to 2005, there was an average of only 13 annual deaths involving commercial trucks.  Furthermore, the economic cost of severe truck crashes has more than doubled between 2008 and 2012.  Much of the increase in the fatality rate can be attributed to the energy production boom, along with the fact that the state's infrastructure still consists of single-lane, rural, and unpaved roads in many areas (Bachman, 2014).  Harsh winter weather and seasonal road restrictions compromise the reliability of truck transportation even further.

USACE_DAPL0009834

To meet shippers' demands, Dakota Access plans to transport up to 570,000 bpd (450,000 bpd initially) approximately 1,134 miles across four states.  A pipeline is a safer and more economical alternative than trucking for the volumes transported and distances covered by the DAPL Project.  Assuming the average oil tanker truck is capable of holding about 220 barrels of oil, the transportation of the initial 450,000 bpd would require a total of 2,045 (450,000/220) full trucks to depart the proposed tank terminals daily, and more than 85 (2,045/24) trucks would have to be filled every hour with a 24-hour/day operation.  Time spent in transit, loading/offloading, and additional time for maintenance would add to the number of trucks needed for the DAPL Project.

Analysis of infrastructure considerations (the burden of thousands of additional trucks on county, state, and interstate highways, as well as the loading and offloading facilities that would have to be constructed), economic considerations (e.g., labor costs, purchase and maintenance of hauling equipment, fuel, public infrastructure, etc.), and reliability considerations (e.g., weather, mechanical, manpower, road closures) indicate that the truck transportation alternative would not be a viable alternative.

### 2.1.3.  Alternative 3 – Rail Transportation Alternative

Reliance on rail as a transportation method in the Williston Basin has drastically increased in recent years, from carrying a negligible percentage of the overall market share in 2010 to nearly 60% of the overall market share by mid-2014 (Nixon, 2014).  The rise in the use of rail as a primary transportation method has been driven in large part by the rapid increase in production of crude oil coupled with a lack of pipeline capacity to transport the additional supplies.

Challenges from the growth in popularity of rail as a method of long-distance transportation of crude oil include delays that disrupt the agricultural sector, reductions in coal-fired power plant inventories, and significant production issues in the food production industry.  In August 2014, reports filed with the federal government indicated that the Burlington Northern Santa Fe Railway had a backlog of 1,336 rail cars waiting to ship grain and other products, while Canadian Pacific Railway had a backlog of nearly 1,000 cars (Nixon, 2014).  For these industries, the use of pipelines is not an option.  Thus, further increasing demand for rail transportation would likely result in an increased reliance on trucking for these industries, which would exacerbate some of the issues listed in the section above.

Assuming a carrying capacity of 600 barrels per car, 750 rail cars would be required to collectively depart the tank terminals daily to transport the initial volume of 450,000 barrels of crude oil to its final destination.  Loading and offloading 750 rail cars in a day would require servicing more than 31 rail cars per hour.  With an assumption of 125 rail cars per train, 6 trains would have to depart the tank terminal every day.  With 10 to 12 trains currently leaving the state per day carrying Bakken crude, the DAPL Project would represent a 50 to 60% increase in the number of trains transporting crude oil out of the state, likely exacerbating issues with delays (Horwath and Owings, 2014).

Rail operations on the scale that could transport the volume of crude oil proposed by the DAPL Project do not exist in the U.S.  An oil-by-rail facility designed to handle an average of 360,000 bpd has been proposed in the Port of Vancouver, Washington.  Known as the Vancouver Energy proposal, the project would be the largest rail terminal in the country (Florip, 2014).   A rail transportation alternative to handle the volumes of the DAPL Project would require the design and construction of 125 to 158% of that of the Vancouver Energy proposal.

From a safety standpoint, the number of transportation accidents associated with railroad transport is consistently substantially higher than that associated with pipelines (DOT, 2015).  A series of major

EA-13

USACE_DAPL0009835

accidents taking place in 2013 to 2014 in Canada and the U.S. has heightened concern about the risks involved in shipping crude by rail (Fritelli, 2014).

While rail tanker cars are a vital part of the short-haul distribution network for crude oil, pipelines are a more reliable, safer, and more economical alternative for the large volumes transported and long distances (DOT, 2015), such as distances covered by the DAPL Project.  As such, rail transportation is not considered a viable alternative.

## 2.1.4.  Alternative 4 – Route Alternatives

Major route alternatives were evaluated for the pipeline route as a whole.  During the DAPL Project fatal flaw analysis and early routing process, Dakota Access utilized a sophisticated and proprietary Geographic Information System (GIS)-based routing program to determine the pipeline route based on multiple publicly available and purchased datasets.  Datasets utilized during the DAPL Project routing analysis included engineering (e.g., existing pipelines, railroads, karst, powerlines, etc.), environmental (e.g., critical habitat, fault lines, state parks, national forests, brownfields, national registry of historic places, etc.), and land use (e.g., fee owned federal lands, federal easements, dams, airports, cemeteries, schools, mining, and military installations, etc.).

Each of these datasets were weighted based on the risk (e.g., low, moderate, or high based on a scale of 1,000) associated with crossing or following certain features.  In general, the route for the pipeline would follow features identified as low risk, avoid or minimize crossing features identified as moderate risk, and exclude features identified as high risk.  For example, the dataset showing existing pipeline locations was weighted as a low risk feature, so that the routing tool followed existing pipelines to the extent possible to minimize potential impacts.  An example of a high risk feature is the national park dataset.  Since national parks were weighted as high risk, the GIS routing program excluded any national parks from the pipeline route to avoid impacts on these federal lands.

In this manner, the preferred alternative was identified through the GIS-based routing program and required only minor adjustments based on observed field conditions during onsite surveys and engineering/design.  This method of alternative route selection does not approach route alternative assessment in the traditional sense (e.g., physically mapping alternatives), but rather evaluates a multitude of datasets that are considered during the initial analysis.  This analysis results in a preferred alternative that, if field surveys validate, meets the same objective of locating the alignment in the most environmentally, socially, and economically suitable corridor.

## 2.1.5.  Alternative 5 – Major Waterbody Crossing Alternatives

Once an optimal route was selected based on the evaluation of impacts discussed in Section 2.1.3, Dakota Access then identified the preferred major waterbody crossing construction method that would meet the purpose and need while reducing impacts to resources.  Pipeline construction methods utilized at waterbody crossings are highly dependent on the characteristics of the waterbody encountered.  During the DAPL Project planning stages, a variety of waterbody crossing techniques were considered, including dam and pump, flume, open-cut, and Horizontal Directional Drill (HDD).

Three possible waterbody crossing methods involving the excavation of a trench on the bottom of the waterbody are typically employed on pipeline construction projects: dam and pump, flume, and wet open-cut.  The dam and pump and flume crossing methods are typically used on waterbody crossings well under 100 feet in width and require a temporary diversion of flow within the waterbody.  Because of the large

USACE_DAPL0009836

volume of water within the Illinois and Kaskaskia River systems, it is not reasonable to temporarily divert the water either by pump or flume, and these methods were eliminated from consideration for the crossings of the Illinois River and the Kaskaskia River.

In the wet open-cut crossing method, flow would be maintained throughout installation of the pipeline. This method of construction would require the construction right-of-way (ROW) to extend right up to the waterbody itself, allowing equipment to operate from the banks of the waterbody and excavate a trench. The banks of the waterbody would be cleared of vegetation and graded to create a safe and level workspace that could accommodate excavation equipment and spoil storage for the duration of the open-cut installation.  Since the widths of the Illinois River and the Kaskaskia River are such that operating trenching equipment entirely from the banks would not be possible, trench excavation in the waterbodies would require equipment to operate from barges.  Furthermore, the depth of the waterbodies crossed (15 to 25 feet) exceeds the reach of a backhoe, and the use of mechanical dragline dredgers would be necessary. Spoil dredged from the bottom of the waterbody would be stored on a spoil barge or otherwise temporarily stockpiled in the waterbody itself.  This method of excavation would drastically increase the overall sediment load generated in the waterbody for the duration of the installation.  The generation of a downstream turbidity plume would have a direct effect on the aquatic habitat of the waterbody.  In addition, the operation of equipment within and on the banks of the waterbody has the potential for adverse effects on surface water quality (i.e., potential contamination of surface water resources from fuel or leaks from the equipment). Furthermore, equipment operating at and within the waterbody would require exclusion of other water-based activities in the area (i.e. recreation, commercial traffic, etc.). Compared to trenchless technology, the wet open-cut method would incur far greater impacts on habitat located both on the banks and within the waterbodies.  Therefore, this method of construction was eliminated from consideration.

The trenchless construction method known as HDD was selected as the preferred construction method to cross major rivers because it would result in fewer impacts on resources.  Further information regarding the HDD construction method is provided in Section 2.3.2.6.

## 2.2.  No Action Alternative

Under the "No Action" alternative, Dakota Access would not construct the DAPL Project.  The "No Action" alternative would not provide the infrastructure necessary to transport light sweet crude oil to refining facilities.  In northwest North Dakota, exploration and production of oil is a major economic activity, with crude oil production being the primary mineral resource of interest.  Although the "No Action" alternative itself would not incur environmental impacts, it would also not address the existing demand to transport crude oil to refining facilities.

It is purely speculative to predict the resulting effects and actions that could be taken by another company or Dakota Access' shippers and any associated direct or indirect environmental impacts in response to the "No Action" alternative.  However, the "No Action" alternative has been carried forward in the environmental analysis of this EA to provide a comparison between it and the impacts of implementing the Requester's Preferred Alternative.

USACE_DAPL0009837

### 2.3.  The Proposed Pipeline Action (Requester's Preferred Alternative)

### 2.3.1.  Location and Detailed Description of the Proposed Action

Dakota Access proposes to construct the 30-inch-diameter pipeline within the USACE - St. Louis District so that the majority of lands crossed would be privately-owned lands.  Selecting the alignment was largely a matter of minimizing length and maximizing the avoidance of sensitive features, developments, public lands, and constructability issues (e.g., steep terrain, potholes, excessive bedrock, etc.).  Because of the location of the McGee Creek levee, Illinois River, and Coon Run levees, and the federal flowage easements north of Carlyle Lake, avoidance of these areas was not feasible.  The selected crossing location of the Proposed Action avoids USACE projects and flowage easements to the extent practicable.  The Proposed Action crosses the McGee Creek levee for approximately 290 feet, the Illinois River for approximately 700 feet, the Coon Run levees for approximately 450 feet (Appendix A – Figures 4-2a, 4-2b), and federal flowage easement tracts north of Carlyle Lake for approximately 12,778 feet (2.42 miles) (Appendix A – Figure 4-2c).

### 2.3.1.1.  Proposed Action Area Maps

The following narratives relate to Figures 4-2a through 4-4c in Appendix A and are provided to assist the reader in identifying the Proposed Action Areas/Connected Action Areas under consideration in this analysis.

The **dashed red line** shows the DAPL Project centerline as it approaches the USACE project areas.  The **solid red line** indicates the pipeline that will go beneath USACE project areas.  The **yellow polygon** indicates workspace where temporary work is proposed to be completed that directly supports the HDD installation of the pipeline underneath the Illinois and Kaskaskia Rivers, as well as the trenched area within the Carlyle Lake flowage easement area.  Areas within the **yellow polygons** are the Proposed Action Areas/Connected Action Areas being considered as part of the federal action to issue a Section 408 consent.  Temporary activities that would occur in this workspace include: connecting and welding together pipe, inspecting and testing the pipeline to ensure no leaks are present prior to preparing for installation.  Potential impacts must be evaluated in workspaces associated with the pipeline crossings of USACE projects and flowage easement lands (Connected Action Areas), since activities conducted there are directly connected to the applicant's ability to complete the Proposed Action.  Further, these activities are directly connected to the federal decision to grant consent for the pipeline to cross USACE projects in these areas.

Notice that the USACE is not analyzing the effects of the **dashed red line** (DAPL centerline) outside of the yellow polygon between the HDD exit point for the McGee Creek levee / Illinois River crossing (Appendix A – Figures 4-2a, 4-3a, and 4-4a) and the HDD entry point for the Coon Run levees crossing (Appendix A – Figures 4-2b, 4-3b, and 4-4b), as it does not exist as a result of the federal action.  Likewise, the USACE is not analyzing the effects of the **dashed red line** (DAPL centerline) outside of the yellow polygon outside of the Carlyle Lake flowage easement boundaries (**solid green line**), as it does not exist as a result of the federal action (Appendix A – Figures 4-2c, 4-3c, and 4-4c).  **Purple polygons** indicate real estate interests; specifically the flowage easements that the USACE has with private landowners upstream of Carlyle Lake (Figures 4-2c, 4-3c, and 4-4c).

The Proposed Action Areas/Connected Action Areas under consideration in this analysis are described in more detail in Sections 2.3.1.2 and 2.3.1.3.

USACE_DAPL0009838

Table 1 identifies the construction workspace for the Proposed Action which is necessary to cross the USACE projects and flowage easements.  Table 2 identifies land status (private, or federal easement) and provides associated acreages for the Proposed Action Areas/Connected Action Areas analyzed within this EA.

| Table 1 USACE Project and Flowage Easements Crossed by the Proposed Action | | |
|---|---|---|
| **USACE Projects** | **County** | **Construction Workspace Within Action Areas (acres)** |
| McGee Creek Levee | Pike | 1.14[1] |
| Illinois River | Pike, Morgan | |
| Coon Run Levees | Scott | 0.52[1] |
| **Total Acres** | | **1.66** |
| **USACE Flowage Easements** | | |
| Tract No. 1881E | Fayette | 2.03 |
| Tract No. 1818E | Fayette | 0.80 |
| Tract No. 1819E | Fayette | 1.72 |
| Tract No. 1820E | Fayette | 3.96 |
| Tract No. 1821E | Fayette | 1.14 |
| Tract No. 1807E | Fayette | 8.39 |
| Tract No. 1735E | Fayette | 7.41 |
| Tract No. 1734E | Fayette | 0.53 |
| Tract No. 1743E | Fayette | 1.76 |
| Tract No. 1742E | Fayette | 1.17 |
| Tract No. 1741E-2 | Fayette | 1.43 |
| **Total Acres** | | **30.34** |

[1]Feature will be crossed by HDD; however, the 50-ft.-wide permanent right-of-way (ROW) may be used to layout guidance wires for the HDD.

The EA review area includes areas within USACE project lands and USACE flowage easements that are potentially impacted by construction and/or operation of the DAPL Project.  The EA review area is hereafter referred to as the Proposed Action Area(s) and/ or the Proposed Action Areas/Connected Action Areas.  Actions that occur outside of the USACE project lands and flowage easements that are directly related to the Proposed Action are considered **Connected Actions**.  Connected Actions are those actions that are "closely related" and "should be discussed" in the same NEPA document (40 CFR § 1508.25 (a)(i)).  Actions are connected if they automatically trigger other actions that may require an EA, cannot or will not proceed unless other actions are taken previously or simultaneously or if the actions are interdependent parts of a larger action and depend upon the large action for their justification (40 CFR § 1508.25 (a)(i, ii, iii)).  Connected Actions are limited to actions that are currently proposed (ripe for decision).  Actions that are not yet proposed are not Connected Actions, but may need to be analyzed in the cumulative effects analysis if they are reasonably foreseeable.  The Connected Actions associated with the Proposed Action are those that relate to the HDD workspace and stringing areas at the McGee Creek levee, Illinois River, and Coon Run levees crossings; in addition to three proposed temporary access roads that would be utilized to access the HDD workspaces.  The Connected Actions associated with crossing the federal flowage easements in Fayette County are the HDD stringing area that extends to the west of the western HDD entry/exit point of the Kaskaskia River crossing and two temporary access roads.  The Kaskaskia River HDD stringing area extends to the west, outside of the federal flowage easement tracts.

USACE_DAPL0009839

| Table 2<br>Environmental Assessment Areas of Interest | | | |
|---|---|---|---|
| **Action/Activity** | **Federal/ Private Land** | **EA Review** | **Acres** |
| **USACE Project – McGee Creek Levee and Illinois River – Pike, Morgan, and Scott Counties** | | | |
| Section 408 consent - HDD profile across the McGee Creek levee | Private; Federal Consent | Action Area | 0.33 |
| Section 408 consent - HDD profile across the Illinois River | Unknown | Action Area | 0.81 |
| HDD workspace and stringing area necessary to complete the HDD across the McGee Creek levee and Illinois River | Private | Connected Action | 17.86 |
| Temporary access road to access HDD workspace west of Illinois River | Private | Connected Action | 0.12 |
| Temporary access road to access HDD workspace east of Illinois River | Private | Connected Action | 0.12 |
| **USACE Project – Coon Run Levees – Scott County** | | | |
| Section 408 consent - HDD profile across the Coon Run levees | Private; Federal Consent | Action Area | 0.52 |
| HDD workspace and stringing area necessary to complete the HDD crossing the Coon Run levees and Illinois River | Private | Connected Action | 17.18 |
| Temporary access road to access HDD workspace on the west side of the levee | Private | Connected Action | 0.13 |
| **USACE Flowage Easements  - Fayette County** | | | |
| Construction ROW within USACE flowage easements | Private; Federal Easement | Action Area | 30.34 |
| Temporary access road to access HDD workspace and alignment west of the Kaskaskia River | Private; Federal Easement | Action Area | 0.95 |
| Temporary access road to access HDD workspace and alignment east of the Kaskaskia River | Private; Federal Easement | Action Area | 2.1 |
| HDD stringing area necessary to complete the HDD across the Kaskaskia River | Private | Connected Action | 4.95 |

### 2.3.1.2. Proposed Federal Action Areas

The proposed 30" DAPL crossing of the McGee Creek levee and Illinois River is located in Section 12, Township 3 South, Range 2 West in Pike County, Illinois, and Sections 28, 33, 34, and 5, Township 16 North, Range 13 West in in Morgan and Scott Counties, Illinois.  The HDD design reflects a crossing length of approximately 6,500 feet at the McGee Creek levee and Illinois River, of which approximately 990 feet occurs beneath the McGee Creek levee (290 feet) and Illinois River (700 feet) (Appendix A – Figures 4-2a, 4-3a, 4-4a).

USACE_DAPL0009840

The proposed 30" DAPL crossing of the Coon Run levees is location in Sections 3 and 4, Township 16 North, Range 13 West in Scott County, Illinois.  The HDD of the Coon Run levees reflects a crossing length of approximately 4,341 feet, of which approximately 450 feet occurs beneath the Coon Run levees (Appendix A – Figures 4-2b, 4-3b, 4-4b).

The HDD entry and exit point workspaces, stringing areas, and temporary access roads would be located on private land outside of the USACE project areas and are considered Connected Actions in this analysis. Between HDD entry/exit points Dakota Access would acquire a 50-foot-wide permanent easement, but within forested areas, only 30-feet would be maintained in an herbaceous/scrub shrub state to accommodate line inspections.

### 2.3.1.3. Federal Flowage Easement Area

The federal flowage easements north of Carlyle Lake are agreements between private landowners and USACE to allow for valley storage of floodwaters that may exceed the capacity of Carlyle Lake to the south and prevent downstream flood events within the Illinois River basin.  The proposed 30" DAPL crosses approximately 12,778 feet (2.42 mile) of the federal flowage easements in Fayette County in Sections 22, 23, 24, and 25, Township 5 North, Range 1 West.  The two temporary access roads, totaling 2,061 feet (0.39 mile) and 4,580 feet (0.87 mile) would be utilized for construction access to the HDD workspace and alignment on the west and east sides of the Kaskaskia River, respectively (Appendix A – Figures 2c, 3c, 4c).

### 2.3.2.  Description of Construction Techniques and Construction Mitigation Measures

All facilities associated with the DAPL Project would be designed, constructed, tested, operated, and maintained in accordance with the U.S. Department of Transportation (DOT) regulations in Title 49 CFR Part 195.   Dakota Access is currently developing Project-specific plans and would implement best management practices (BMPs) to mitigate for potential construction-related impacts associated with stormwater runoff.  This includes implementation of their Stormwater Pollution Prevention Plan (SWPPP; see Appendix B), which includes Best Management Practices Figures and the Spill Prevention Control and Countermeasure Plan (SPCC Plan) as appendices.  Additionally, Dakota Access would implement their HDD Construction Plan (HDD Construction; see Appendix C) to avoid inadvertent release of drilling mud during HDD construction work at wetland and waterbody crossings to protect sensitive resources from such releases.  The Proposed Action would be constructed via a combination of conventional and specialized construction procedures, as described below.

### 2.3.2.1.  Clearing and Grading

Prior to commencement of ground-disturbing activities, a standard survey and stakeout would be conducted to identify ROW and workspace boundaries and to locate existing foreign utility lines within the construction ROW.  Following completion of the surveys, the construction ROW would be cleared of vegetation and debris.  Clearing of woody vegetation within wetlands would be limited to the proposed permanent DAPL easement within the HDD profile of the Illinois River and Kaskaskia River, and within the construction workspace within the federal flowage easements.  Cleared vegetation and debris along the ROW would be disposed of in accordance with federal, state, and local regulations either by burning, chipping and spreading, or transportation to a commercial disposal facility.  Where necessary, to contain disturbed soils during clearing and grading in upland areas, and to minimize potential erosion and sedimentation of wetlands and waterbodies, temporary erosion control devices (ECDs) would be installed prior to initial ground disturbance and maintained throughout construction.  Vegetative buffers would be

USACE_DAPL0009841

left where practical at all wetland and waterbody crossings to limit the exposure and impact to these features; clearing these buffers would take place just prior to crossing the feature. Final clearing would take place immediately prior to crossing the feature rather than advance.

## 2.3.2.2. Trenching

Trenching involves excavation of a ditch for pipeline placement and is accomplished through the use of a trenching machine, backhoe, or similar equipment. Trench spoil would be deposited adjacent to each trench within the construction work areas, with topsoil segregation utilized where necessary based on land use (see the typical ROW configuration drawings in Appendix D). In standard conditions, the trench would be excavated to an appropriate depth to allow for a minimum of 36 inches of cover over the pipe. Ground disturbance associated with conventional pipeline construction is generally limited to approximately 6 to 10 feet below the existing ground surface. Typically, the bottom of the trench would be cut at least 12 inches greater than the width of the pipe. The width at the top of the trench would vary to allow the side slopes to adapt to local conditions at the time of construction.

## 2.3.2.3. Pipe Stringing, Bending, and Welding

Following preparation of the trench, the new pipe would be strung and distributed along the ROW parallel to the trench. Depending on available workspace, some pipe may be fabricated off-site and transported to the ROW in differing lengths or configurations. Pipe would be bent by hydraulic bending machines, as necessary, to conform the pipe to the trench. Once in place along the ROW, pipe lengths would be aligned, bends fabricated, and joints welded together on skids (i.e., temporary supports). Welding would be performed in accordance with the American Petroleum Institute Standards, Pipeline and Hazardous Materials Safety Administration (PHMSA) pipeline safety regulations, and company welding specifications. All welds would be coated for corrosion protection and visually and radiographically inspected to ensure there are no defects. Segments of completed pipeline would undergo hydrostatic pressure testing prior to being placed in service as described in Sections 3.2.1.2 and 3.12.

## 2.3.2.4. Pipeline Installation and Trench Backfilling

Completed sections of pipe would be lifted off the temporary supports by side boom tractors or similar equipment and placed into the trench. Prior to lowering-in, the trench would be visually inspected to ensure that it is free of rock and other debris that could damage the pipe or the coating. Additionally, the pipe and the trench would be inspected to ensure that the configurations are compatible. Tie-in welding and pipeline coating would occur within the trench to join the newly lowered-in section with the previously installed sections of pipe. Following this activity, the trench would be backfilled with the previously excavated material and crowned to approximately 6 inches above its original elevation to compensate for subsequent settling.

## 2.3.2.5. Clean-up and Restoration

Following pipeline installation and backfilling, disturbed areas would be restored and graded to pre-construction contours as closely as practicable. Construction debris and organic refuse unsuitable for distribution over the construction ROW would be disposed of at appropriate facilities in accordance with applicable regulations. Permanent ECDs would be installed as appropriate, and revegetation measures would be applied in accordance with the SWPPP, and requirements of applicable state and federal permits.

USACE_DAPL0009842

**2.3.2.6.  Major Waterbody Crossing Method**

As previously discussed, the preferred waterbody crossing technique for the Proposed Action is the HDD method.  The HDD method allows for construction across a feature without the excavation of a trench by drilling a hole significantly below conventional pipeline depth and pulling the pipeline through the pre-drilled hole.  As described in subsequent sections of this document and in greater detail in the HDD Construction Plan (Appendix C), and the HDD Design Reports (Appendix E) by utilizing this trenchless technology, Dakota Access would minimize impacts to resources within and adjacent to the waterbodies crossed and reduce the anticipated duration of the crossing.  The HDD equipment would be staged well outside of riparian areas, avoiding impacts on the steep banks, cultural resources, and sensitive habitat immediately adjacent to the waterbody.  Cross sections of the Illinois River and Kaskaskia River HDDs are provided in Appendix E – Drawing  W_29004_C100064 and Appendix E – Drawing W_29004_C100078.

Depending on the HDD equipment utilized, to help guide the drill bit along the pipeline ROW, electric-grid guide wires may be laid along the predetermined HDD route.  In thickly vegetated areas, a small path may be cut to accommodate laying the electric-grid guide wires.  Once the electric-grid guide wires are installed, the directional drilling rig would drill a small diameter pilot hole along the prescribed profile.  Following the completion of the pilot hole, reaming tools would be utilized to enlarge the hole to accommodate the pipeline diameter.  The reaming tools would be attached to the drill string at the exit point and would then be rotated and drawn back to incrementally enlarge the pilot hole.  During this process, drilling fluid consisting of primarily bentonite clay and water would be continuously pumped into the pilot hole to remove cuttings and maintain the integrity of the hole.  When the hole has been sufficiently enlarged, a prefabricated segment of pipe would be attached behind the reaming tool on the exit side of the crossing and pulled back through the drill hole towards the drill rig.

Fluid pressures can build up within the borehole during HDD operations.  In some instances, this can result in hydraulic fracturing of the substrate and subsequent migration of drilling fluids either into the waterway or to the land surface—this is known as a "frac-out."  The depth of the proposed HDD profiles below the beds of the surface waters to be crossed would minimize the potential for frac-outs to occur.  Additionally, precautions would be taken during all phases of the drilling operation.  A high quality drilling fluid would be used to maintain and protect the integrity of the borehole during the entire HDD operation until the final pipe pull is completed.  As part of the Section 408 permission review, the USACE has reviewed the technical specifications of the HDD designs across USACE projects.  The HDD Design Report (Appendix E) includes more details regarding HDD construction technology and methods.  Further, the work would be performed by an experienced drilling contractor that is knowledgeable in effective HDD practices, including maintaining proper drilling rate, drilling fluid composition, pumping rate of the drilling fluid, pull-back rate, and pumping rate on the back ream, and adjusting these as appropriate for the conditions.

The potential for river channel changes associated with water erosion and scour were considered when selecting the major waterbody crossing methods and locations.  The professional engineering firm evaluating HDD depths for the Proposed Action, GeoEngineers, evaluated the scour risk to the proposed pipeline during 100- and 500-year discharge events for the Illinois River and Kaskaskia River crossings.

The proposed HDD profile under the Illinois River is designed to provide 40 feet of cover below the bottom of the river.  GeoEngineers considered scour potential due to long-term degradation, contraction, channel bend and scour due to conveyance restriction from piers or abutments.  The Illinois River at the proposed pipeline crossing is not subject to channel contraction, a significant channel bend or local scour conditions as a result of piers, abutments or channel crossing structures.  Therefore, the scour potential due to those

USACE_DAPL0009843

factors is negligible.  To provide a qualitative assessment of scour risk GeoEngineers followed field-based regression data using material size published by Blodgett in 1986 and summarized in the NRCS Technical Supplement 14B published in 2007.  An approximate maximum scour depth between 10 and 12 feet is indicated for the channel bed material identified in the GeoEngineers borings for the Proposed Action reach.  Because of the depth of the pipe below the waterbody, and the condition of the Illinois River, this crossing is at a low risk to geomorphologic movements at the proposed crossing.

The Kaskaskia River HDD profile is designed to provide a minimum of 36 feet of cover at the crossing location beneath the lowest point of the river bed.  This crossing has less proposed cover between the bottom of the waterbody and the top of the buried pipe than the crossing depth proposed for the Illinois River identified above.  The Kaskaskia River is a highly sinuous channel within an approximate 1,500-foot floodplain.  The river channel is subject to active lateral migration and planform modification as evident from the numerous meander scrolls and oxbow wetlands.  The anticipated long-term degradation of the floodplain is limited because this Proposed Action reach has the ability to expend erosive energy laterally rather than vertically.  Much like the proposed Illinois River crossing, the Kaskaskia River crossing is not subject to channel contraction, a significant channel bend or local scour conditions as a result of piers, abutments or channel crossing structures. Therefore, the scour potential due to those factors is negligible. To provide a qualitative assessment of scour risk GeoEngineers followed field-based regression data using material size published by Blodgett in 1986 and summarized in the NRCS Technical Supplement 14B published in 2007.  An approximate maximum scour depth up to 15 feet is indicated for the channel bed material identified in the GeoEngineers borings for the Proposed Action reach.  Because of the depth of the pipe below the waterbody, and the condition of the Kaskaskia River, this crossing is at a low risk to geomorphologic movements at the proposed crossing.

Based upon their calculated worst-case scenario scour estimate, GeoEngineers considers the risk of scour occurring down to the level of the proposed pipeline to be low and the proposed Illinois and Kaskaskia River HDD design profiles to be appropriate.

## 2.3.2.7.  Minor Waterbody Crossing Methods

The minor waterbodies crossed by the pipeline  in association with the crossings of the McGee Creek levee, Illinois River, and Coon Run levees would be crossed in the same HDD profiles that cross the Illinois River and the Coon Run levees.  One minor waterbody west of the Kaskaskia River would be crossed in the same profile of the HDD for the Kaskaskia River.  Other minor waterbodies encountered on the federal flowage easements would be crossed by open-cut construction methods.  One intermittent tributary to the Kaskaskia River would be crossed by the HDD pull-string area on the west side of the Kaskaskia River. Additionally, one ephemeral, one intermittent, and one perennial waterbody (Cassar Creek) have been identified within the federal flowage easements, east of the Kaskaskia River crossing.  To cross these waterbodies, equipment would operate from the banks of the waterbody to the maximum extent practicable to excavate a trench.  Flow would be maintained at all times.  Excavated material from the trench would be placed on the bank above the ordinary high water mark for use as backfill.  The pipe segment would be prefabricated and weighted, as necessary, to provide negative buoyancy and placed below scour depth. Typical backfill cover requirements would be met, contours would be restored within the waterbody, and the banks would be stabilized via seeding and/or the installation of erosion control matting or riprap.  Excess excavated materials would be distributed in an upland area in accordance with applicable regulations.

USACE_DAPL0009844

## 2.3.2.8.  Wetland Crossings

Wetlands that would be crossed in the Proposed Action Area are located within the permanent DAPL easement between HDD workspace of the McGee Creek levee and Illinois River, and on the federal flowage easements north of Carlyle Lake.  Wetland impacts would be temporary with the exception of permanent conversion impacts of forested wetlands to emergent wetlands over the permanent ROW.  A more detailed discussion regarding wetlands is provided in Section 3.2.4.

## 2.3.2.9.  Operation and Maintenance

Following completion of construction, a 50-foot-wide permanent DAPL easement that is generally centered on the pipeline (25 feet on either side of the centerline) would be retained along the pipeline route.  The 50-foot-wide DAPL easement would be maintained by the Operator in an herbaceous state (cleared of large diameter woody vegetation) to facilitate inspection of the pipeline, operational maintenance, and compliance with the federal pipeline safety regulations.  This 50-foot-wide maintained corridor would be reduced to a 30-foot-wide corridor centered on the proposed pipeline within forested wetland areas within the HDD profile of the Illinois River and within flowage easements north of Carlyle Lake (Appendix A – Figure 4-4c).

Maintenance of the permanent ROW would entail periodic vegetation clearing measures, in accordance with PHMSA regulation for pipeline inspection.  This may involve selective tree cutting and periodic mowing.  Vegetation maintenance of the ROW in areas of active cropland is not expected to occur due to agricultural practices.

USACE_DAPL0009845

## 3. THE AFFECTED ENVIRONMENT AND POTENTIAL ENVIRONMENTAL IMPACTS OF THE PROPOSED ACTION AND NO ACTION ALTERNATIVES

### 3.1. Topography, Geology and Soils

Under the "No Action" Alternative, Dakota Access would not construct the DAPL Project and no impacts on geology and soils would occur.  However, if the objectives of the DAPL Project are to be met under the "No Action" Alternative, other projects and activities would be required and these projects would result in their own impacts on geology and soils, which would likely be similar to or greater than the Proposed Action.   Nevertheless, the impacts associated with a future project developed in response to the "No Action" Alternative are unknown, while only minor and temporary impacts, if any, on geological resources and soils would occur as a result of the Proposed Action, as described in the sections below.

### 3.1.1.  Topography and Geology

#### 3.1.1.1.  Affected Environment

The bedrock geology along the Illinois River and associated McGee Creek levee and Coon Run levees crossings is characterized by Pennsylvanian and Mississippian-age sedimentary formations (Kolata, 2005). The Pennsylvanian formations, Carbondale Formation and Tradewater Formation, consist of sandstones and shales with occurrences of coal.  The Mississippian formations, Warsaw Formation, Salem Limestone, Meppen Limestone, Fern Glen Formation, and Burlington-Keokuk Limestone, consist primarily of limestones with some dolostone lithologies.  The bedrock is covered in the crossing area with alluvium and glacial drift deposits (clays, silts, sand and gravel deposits) at depths ranging from approximately 50 to greater than 100 feet below ground surface (Piskin and Berstrom, 1975).

The proposed Illinois River and associated levee crossing lies within the Dissected Till Plains Section of the Central Lowlands Physiographic Province.  On the east side of the Illinois River topography ranges in elevation from 609 to 420 feet above mean sea level (MSL).  The HDD exit point workspace ranges from 426 to 445 feet MSL.

The bedrock geology along the federal flowage easements north of Carlyle Lake is characterized by Pennsylvanian-age sedimentary formations (Kolata, 2005).  The Pennsylvanian-age Bond Formation consists of sandstones and shales with occurrences of coal.  The bedrock is covered in the crossing area with alluvium and glacial drift deposits (clays, silts, sand, and gravel deposits) at depths ranging from approximately 50 to greater than 100 feet below ground surface (Piskin and Berstrom, 1975).

The proposed crossing within the federal flowage easements lies within the Dissected Till Plains Section of the Central Lowlands Physiographic Province.  The topography ranges in elevation from 460 on the east to 472 feet above MSL on the west.

#### 3.1.1.2.  Impacts and Mitigation

To protect the terrain of the Proposed Action Areas/Connected Action Areas, Dakota Access would, to the extent feasible, restore the areas affected by pipeline construction to pre-construction contours and similar vegetation (excepting trees within approximately 15 feet of the centerline).

USACE_DAPL0009846

Construction of the pipeline in the Proposed Action Areas/Connected Action Areas would result in minor impacts on topography and geology, and no unique geologic features that have received state or federal protection would be impacted within these areas.

The impacts attributable to the HDD would not be significant.  Vibrations produced during the HDD process are not of a magnitude that would cause any impacts to geologic features or other resources.  Any vibrations associated with the drilling process would be limited to the immediate vicinity of the drilling equipment on the surface and downhole.  The vibrations produced from the downhole tooling are of a very low magnitude and are attenuated very quickly by the formation such that vibrations are not felt at the surface.  A vibration monitoring analysis conducted by GeoEngineers in 2009 found that peak particle velocities were less than 0.07 inches/second within approximately 50 feet of HDD operations.  These velocities are well below that which would cause any structural impacts and moreover, the recorded vibrations were, in fact, imperceptible to human senses (GeoEngineers, 2009).  Primary impacts of open trench installation within the USACE flowage easements or Connected Action would be limited to construction activities and consist of temporary alteration due to grading and trenching operations.

Construction of the Proposed Action would not result in adverse impacts on topography or geology on USACE project lands or federal flowage easements of the Proposed Action Area/Connected Action Areas.  Similarly, construction impacts on topography and geology from the Connected Actions would be low to non-existent.  No unique geologic features would be impacted by any aspect of the HDD installation.

No impacts on topography or geology would occur during operations.

Based on recently obtained geotechnical analysis, no blasting would be expected to occur in association with pipeline installation on the Proposed Action Area or Connected Actions, given that the HDD would be conducted in alluvium and glacial drift deposits, as described in Section 3.1.1.1.  Although not anticipated, if blasting is found to be necessary, Dakota Access would follow procedures specified in its Blasting Plan (Appendix F).

### 3.1.2.  Geologic Hazards

### 3.1.2.1.  Affected Environment

### Earthquakes and Seismic Hazards

Earthquakes occur in Illinois about once every year; however damaging quakes are much less frequent.  Minor damage from Illinois earthquakes is reported about once every 20 years.  The potential seismic hazard was assessed by evaluating the USGS 2014 Seismic Hazard Map.  According to the Seismic Hazard Map, an earthquake that has a 2% chance of being exceeded in a 50-year period would result in peak ground accelerations (PGAs) of 8 to 20 percent gravity (g) in the Proposed Action Areas/Connected Action Areas (USGS, 2014).

Ground movement from an earthquake of this magnitude may cause a light perceived shaking but is not expected to cause any structural damage (USGS 2016).  The low seismic hazard of the Proposed Action Area is further corroborated by the relatively low number of earthquakes that have historically occurred in the areas of interest in Illinois (ISGS, 2016).

USACE_DAPL0009847

**Landslides**

Landslides refer to the gravity-induced downward and outward movement of slope-forming materials and pose the greatest risk to facilities on or near steep slopes or on soil materials that are susceptible to failure, particularly in response to earthquakes or heavy precipitation.  A map developed by the USGS that illustrates the regional potential for the occurrence of landslides was used to evaluate the Proposed Action Areas for landslide incidence and susceptibility (Radbruch et al., 1982).  Analysis of this map showed that both the USACE projects and the flowage easement areas are in an area categorized as having a low incidence of landslides.

**Karst and Subsidence**

Karst topography occurs in Illinois where the bedrock lithology consists of carbonate rocks (limestone and dolomite) and the drift thickness is typically less than 50 feet.  Geologic terrain beneath the flowage easement consists of predominantly noncarbonated bedrock with drift thickness of 50 feet or greater (Weibel and Panno, 1997); therefore, there is little risk of impact due to karst topography in this area.

Geologic terrain beneath the USACE projects (levees) and associated HDD workspace areas may have potential for karst development due to deposits of limestone and other carbonate bedrock formations (Weibel and Panno, 1997).  However, a review of bedrock geology data indicated that the drift thickness in this area was 50 feet or greater, which greatly reduces the risk of impacts due to karst topography.  Additionally, a review of topographic and aerial photographic coverages as well as geotechnical testing gave no indication of karst feature development, and no documentation was found to indicate that karst features have actually developed in this area.

Land subsidence may be caused by mining, underlying karst features, and extraction of fluids, such as oil or groundwater.  No surface subsidence effects are expected to be incurred in the Proposed Action Area since no mines, oil/gas wells, water wells, or karst development have been identified in the vicinity.

### 3.1.2.2.  Impacts and Mitigation

Though potential impacts associated with geologic hazards is low, Dakota Access would utilize erosion and sediment control devices in accordance with the SWPPP, and in compliance with the National Pollutant Discharge Elimination System (NPDES) program, during construction in these areas with slopes greater than 25%.   Dakota Access would install sediment barriers (e.g., silt fence) at the base of slopes and along the sides of slopes, as necessary, to prevent potential siltation downslope of the construction area from entering waterbodies.

Temporary erosion control devices (ECDs) would be maintained until the areas disturbed by construction have been successfully revegetated or are replaced with permanent ECDs.  Following the completion of construction activities, disturbed areas would be restored and graded to pre-construction contours as closely as practical.  In order to minimize the potential for future slip or landslide events during operation of the Proposed Action, Dakota Access may install permanent ECDs in addition to performing regular restoration and revegetation activities.   Permanent ECDs would be installed in accordance with revegetation measures outlined in the SWPPP, and specific landowner requests.  The effectiveness of revegetation and permanent ECDs would be monitored by Dakota Access' operating personnel during the long-term operation and maintenance of the Proposed Action facilities.   Therefore, construction and operation of the Proposed Action would not be expected to increase the potential for significant landslide or slip events or result in adverse impacts on aquatic life or resources within the Proposed Action Areas.

USACE_DAPL0009848

The strength and ductility of a properly designed pipeline would allow it to span a considerable distance without compromising its integrity in the event of a landslide or other ground movement, such as subsidence. Arc-welded steel pipelines are the most resistant type of piping, vulnerable only to very large and abrupt ground displacement (e.g., earthquakes, severe landslides) and are generally highly resistant to moderate amounts of permanent deformation. This strength and ductility effectively mitigates the effects of fault movement, landslides, and subsidence. Therefore impacts on the pipeline from geologic hazards are expected to be minimal.

No impacts associated with seismic activity within the Proposed Action Area are anticipated. Due to the limited potential for large, seismically induced ground movements, there is minimal risk of earthquake-related impacts on the pipeline. No impacts associated with landslides or subsidence within the Proposed Action Area are anticipated, and no areas have a slope that meets or exceeds 25%. Additionally, no impacts due to karst topography within the Proposed Action Area are anticipated. Therefore, no mitigation beyond designing the proposed pipeline to currently accepted industry specifications is necessary.

### 3.1.3. Soils

### 3.1.3.1. Affected Environment

Dakota Access identified and assessed soil characteristics in the Proposed Action Area using the Soil Survey Geographic Database, which is a digital version of the original county soil surveys developed by the U.S. Department of Agriculture (USDA) Natural Resources Conservation Service (NRCS) for use with geographic information systems (GIS) (USDA, 2015). The Proposed Action Areas in Pike, Morgan, and Scott Counties are within the Central Mississippi Valley Wooded Slopes. The Proposed Action Area in Fayette County is within the Central Claypan Areas. The dominant soil orders in the Central Mississippi Valley Wooded Slopes, Northern Part, are Alfisols, Entisols, Inceptisols, and Mollisols which are very deep, poorly drained to excessively drained, and loamy, silty, or clayey. The dominant soil orders in the Central Claypan Areas are Alfisols which are generally very deep, well drained to poorly drained, and loamy or clayey (USDA, 2006). Table 3 lists the map soil types within the Proposed Action Areas/Connected Action Areas. Mapped soils can be seen in Appendix A – Figures 4-3a-4-3c.

| Table 3 Soil Types Mapped within the Proposed Action Area | | | | | | |
|---|---|---|---|---|---|---|
| Soil Map Unit | Soil Map Unit Name | Proposed Action Area (acres)[1] | Farmland Rating | Hydrologic Group[2] (infiltration) | Hydric Rating[3] | Wind Erodibility Group[4] |
| 8302A | Ambraw clay loam, 0 to 2 percent slopes, occasionally flooded | 0.39 | Prime farmland if drained | C/D | 95% | 6 |
| 8070A | Beaucoup silty clay loam, 0 to 2 percent slopes, occasionally flooded | 0.39 | Prime farmland if drained | C/D | 90% | 6 |

USACE_DAPL0009849

| Table 3 Soil Types Mapped within the Proposed Action Area | | | | | | |
|---|---|---|---|---|---|---|
| Soil Map Unit | Soil Map Unit Name | Proposed Action Area (acres)[1] | Farmland Rating | Hydrologic Group[2] (infiltration) | Hydric Rating[3] | Wind Erodibility Group[4] |
| 3070 | Beaucoup silty clay loam, frequently flooded | 6.64 | Prime farmland if drained and either protected from flooding or not frequently flooded during the growing season | C/D | 100% | 6 |
| 1070L | Beaucoup silty clay loam, undrained, 0 to 2 percent slopes, frequently flooded, long duration | 1.38 | Not prime farmland | C/D | 85% | 6 |
| 8070A | Beaucoup silty clay loam, 0 to 2 percent slopes, occasionally flooded | 1.98 | Prime farmland | C/D | 90% | 6 |
| 134B | Camden silt loam, 2 to 5 percent slopes | 1.67 | Prime farmland | B | 0% | 6 |
| 8071A | Darwin silt clay, 0 to 2 percent slopes, occasionally flooded | 1.31 | Prime farmland if drained | D | 85% | 4 |
| 8180A | Dupo silt loam, 0 to 2 percent slopes, occasionally flooded | 0.09 | Prime farmland | C/D | 6% | 5 |
| 8F | Hickory silt loam, 18 to 35 percent slopes | 0.26 | Not prime farmland | B | 0% | 5 |
| 1426 | Karnak silty clay loam, wet | 3.01 | Not prime farmland | C/D | 100% | 8 |
| 7081A | Littleton silt loam, 0 to 2 percent slopes, rarely flooded | 1.68 | Prime farmland | B/D | 2% | 6 |
| 200A | Orio loam, 0 to 2 percent slopes | 0.40 | Prime farmland if drained | C/D | 98% | 5 |
| 3288 | Petrolia silt loam, frequently flooded | 7.10 | Prime farmland if drained and either protected from flooding or not frequently flooded during the growing season | C/D | 100% | 6 |
| 54B | Plainfield sand, 1 to 7 percent slopes | 7.14 | Farmland of statewide importance | A | 2% | 1 |
| 54D | Plainfield sand, 7 to 15 percent slopes | 1.46 | Farmland of statewide importance | A | 2% | 1 |

USACE_DAPL0009850

Final Environmental Assessment - Dakota Access Pipeline Project, Illinois -August 2016

| Table 3 | | | | | | |
|---------|---|---|---|---|---|---|
| **Soil Types Mapped within the Proposed Action Area** | | | | | | |
| Soil Map Unit | Soil Map Unit Name | Proposed Action Area (acres)[1] | Farmland Rating | Hydrologic Group[2] (infiltration) | Hydric Rating[3] | Wind Erodibility Group[4] |
| 430A | Raddle silt loam, 0 to 3 percent slopes | 1.10 | Prime farmland | B | 0% | 6 |
| 3073A | Ross silt loam, 0 to 2 percent slopes, frequently flooded | 0.27 | Prime farmland if protected from flooding or not frequently flooded during the growing season | B | 7% | 5 |
| 88B | Sparta loamy sand, 1 to 6 percent slopes | 4.23 | Farmland of statewide importance | A | 1% | 2 |
| 588A | Sparta loamy sand, loamy substratum, 0 to 2 percent slopes | 0.76 | Farmland of statewide importance | A | 0% | 2 |
| 3284 | Tice silt loam, frequently flooded | 1.16 | Prime farmland if drained and either protected from flooding or not frequently flooded during the growing season | C | 0% | 6 |
| 3404L | Titus silty clay loam, 0 to 2 percent slopes, frequently flooded, long duration | 0.36 | Not prime farmland | C/D | 100% | 4 |
| 8404A | Titus silty clay loam, 0 to 2 percent slopes, occasionally flooded | 1.70 | Prime farmland if drained | C/D | 90% | 4 |
| 3333 | Wakeland silt loam, frequently flooded | 9.17 | Prime farmland if drained and either protected from flooding or not frequently flooded during the growing season | C | 0% | 5 |
| 333A | Wakeland silty loam, 0 to 2 percent slopes, frequently flooded | 0.49 | Prime farmland if drained and either protected from flooding or not frequently flooded during the growing season | B/D | 5% | 5 |

EA-29

USACE_DAPL0009851

| Table 3 Soil Types Mapped within the Proposed Action Area | | | | | | |
|---|---|---|---|---|---|---|
| Soil Map Unit | Soil Map Unit Name | Proposed Action Area (acres)[1] | Farmland Rating | Hydrologic Group[2] (infiltration) | Hydric Rating[3] | Wind Erodibility Group[4] |
| 3333L | Wakeland silty loam, 0 to 2 percent slopes, frequently flooded, long duration | 0.54 | Not prime farmland | B/D | 95% | 5 |
| W | Water | 1.07 | Not prime farmland | NA | 0% | NA |
| 7037A | Worthen silt loam, 0 to 2 percent slopes, rarely flooded | 4.13 | Prime farmland | B | 3% | 5 |
| | Total | 59.85 | -- | | | |

[1]The Proposed Action Area includes Connected Action Areas.

[2]Hydrologic Soil Groups are used to estimate runoff from precipitation: A = high infiltration rate, low runoff potential; B = moderate infiltration rate; C = slow infiltration rate; D = very slow infiltration rate, high runoff potential.

[3]Hydric Rating: Hydric (100%), Hydric (66-99%), Hydric (33-65%), Hydric (1-32%), Not Hydric (0%).

[4]Wind erodibility group in cultivated areas: Group 1 are the most susceptible to wind erosion, and those assigned to group 8 are the least susceptible. 4L indicates calcareous soils.


### 3.1.3.2. Impacts and Mitigation

Pipeline construction activities such as clearing, grading, trench excavation, and backfilling, as well as the movement of construction equipment along the ROW may result in impacts on soil resources. Clearing removes protective cover and exposes soil to the effects of wind and precipitation, which may increase the potential for soil erosion and movement of sediments into sensitive environmental areas. Grading and equipment traffic may compact soil, reducing porosity and percolation rates, which could result in increased runoff potential and decreased soil productivity. Trench excavation and backfilling could lead to a mixing of topsoil and subsoil and may introduce rocks to the soil surface from deeper soil horizons.

Dakota Access would minimize or avoid these impacts on soils by implementing the mitigation measures described in the DAPL Project's SWPPP as well as requirements of applicable state and federal permits. These documents would be included as contract documents and enforced as such throughout the DAPL Project. As a result, impacts on soils as a result of the Proposed Action are expected to be insignificant.

Temporary erosion and sedimentation control measures may include installation of silt fence, straw bales, slope breakers, trench breakers, erosion control fabric, and mulch.

To minimize potential impacts on soil productivity, topsoil would be separated during trench excavation in agricultural land, and if applicable, other areas where soil productivity is an important consideration. Unless otherwise requested by the landowner, topsoil in cropland would be removed to a maximum depth of 12 inches from the trench and spoil storage area and stored separately from the trench spoil. After the trench is backfilled, topsoil would be returned to its approximate original location in the soil horizon.

USACE_DAPL0009852

Compaction of agricultural soils would be minimized by restricting construction activities during periods of prolonged rainfall. Where unacceptable levels of compaction occur in agricultural lands, a chisel plow or other deep tillage equipment would be utilized to loosen the soil.

Soils would be temporarily disturbed within HDD workspaces during construction at the McGee Creek levee, Illinois River, and Coon Run levees crossings. Primary impacts attributable through open trench installation within the USACE flowage easements and Connected Action Areas would be limited to construction activities and consist of temporary alteration of the construction ROW due to grading and trenching operations. By implementing BMPs and recognized construction methods (Appendix B), impacts to soils should be limited.

Additionally, temporary workspace used for staging HDD operations would impact soils, particularly in association with the HDD entry excavation pit (approximately 5 feet to 15 feet across). The pits would contain the drilling fluid that would be circulated through the borehole during drilling operations and the cuttings that are removed from the borehole. All drilling mud and cuttings would be disposed at an approved location on non-federal lands, which may include land farming on private property or disposal at a licensed disposal facility. Drilling mud and cuttings would not be disposed in waters of the U.S. Drilling fluid pits at the HDD entry and exit workspaces would be backfilled and the area returned as closely as practical to pre-construction conditions. Dakota Access would implement the erosion control measures described in their SWPPP (Appendix B). The HDD workspace sites would be cleared, graded and matted as needed to avoid rutting and minimize compaction.

There would be no soil disturbance outside of the construction workspace. Permanent impacts on soils would be avoided through the implementation of BMPs during construction, restoration, and post-construction revegetation management. Dakota Access would retain environmental inspectors (EIs) to monitor the contractor's compliance with applicable requirements to protect soil resources during construction of the DAPL Project.

There would be no conversion of prime farmland soils to non-agricultural use.

## 3.2. Water Resources

Under the "No Action" Alternative, Dakota Access would not construct the DAPL Project, and no impacts on water resources would occur. However, if the objectives of the DAPL Project are to be met under the "No Action" Alternative, other projects and activities would be required and these projects would result in their own impacts on water resources, which would likely be similar to or greater than the DAPL Project. Nevertheless, the impacts associated with a future project developed in response to the "No Action" Alternative are unknown, while only temporary and minor impacts or insignificant permanent impacts on water resources would occur as a result of the Proposed Action, as described in the sections below.

### 3.2.1. Surface Waters

### 3.2.1.1. Affected Environment

Dakota Access conducted field and desktop delineations of the Proposed Action Areas/Connected Action Areas on the flowage easements and the Proposed Action Areas/Connected Action Areas of the USACE project lands. Field surveys took place upon permission to access the properties in order to verify desktop delineations and ensure that the most accurate, up-to-date data is used for Section 404 of the CWA and/or Section 10 of the RHA permit filings. Dakota Access identified 12 waterbodies within the Proposed Action

USACE_DAPL0009853

Areas/Connected Action Areas (Appendix A – Figures 4-4a-c).  These waterbodies include the Illinois River, a large perennial river that forms the border between Pike and Morgan Counties; and the Kaskaskia River, a perennial river, within Fayette County, as well as smaller tributaries to the Illinois and Kaskaskia Rivers.

### 3.2.1.2.  Impacts and Mitigation

Direct and indirect impacts to all but three water bodies within the Proposed Action Areas/Connected Action Areas would be minimized by using HDD construction methods to install the proposed pipeline underneath the Illinois and Kaskaskia Rivers.  At the Illinois River crossing, the pipeline would be installed a minimum of 40 feet below the bottom of the Illinois River and a minimum of 58 feet below the associated unnamed tributary.  The pipeline would be installed a minimum of 57 feet below the waterbodies associated with the Coon Run levees of the Illinois River.  The pipeline would be installed a minimum of 36 feet below the Kaskaskia River and associated unnamed tributary.  Where perennial waterbodies are open cut, the pipeline will be installed a minimum of 5 feet below the bottom of the channel.  Additional documentation elaborating on the rationale used to determine suitable HDD depth is provided in Appendix E.

The primary impact that could occur as a result of an HDD is an inadvertent release of drilling fluid directly or indirectly into the waterbody.  Drilling fluid (also referred to as drilling mud) is primarily comprised of water.  However, bentonite clay is added to the water to enhance lubricating, spoil transport and caking properties of the drilling fluid.  Bentonite is a naturally occurring, non-toxic, inert substance that meets National Science Foundation (NSF)/American National Standards Institute (ANSI) Standard 60 Drinking Water Additives Standards and is frequently used for drilling potable water wells.  The potential exists for the drilling fluid to leak through previously unidentified fractures in the material underlying the river beds. Potential release sources of the drilling fluid include the drilling fluid entry/exit pit(s) and the directional borehole itself, which is maintained under pressure to keep it open.  The probability of an inadvertent release is greatest when the drill bit is working near the surface (i.e., near the entry and exit points). Because the HDD entry and exit points would be set back from the banks of the Illinois River (approximately 0.55 miles from the west bank and 0.63 miles from the east bank) and the Kaskaskia River (approximately 0.47 miles from the west bank and 0.22 miles from the east bank) the potential for an inadvertent release to occur in the water would be minimized.  Additionally, geotechnical investigations conducted by Dakota Access indicated that the drill path is not located in materials that suggest a high probability of an inadvertent release of drilling fluids that would reach ground surface or enter the waterbodies.  Therefore, the potential for inadvertently released drilling fluids to enter any waterbody from below or from the shoreline is low.

The drilling mud and cuttings would be disposed of in accordance with applicable laws and regulations, likely in an existing landfill or by land farming.  Final disposition would be negotiated with the facility or private landowner prior to disposal.  Dakota Access would conduct HDD work according to their HDD Construction Plan (Appendix C), and implement the HDD Contingency Plan (Appendix C) in the event of an inadvertent release.  The HDD Construction Plan establishes a 24-hour a day monitoring program for monitoring and detection of inadvertent releases, including monitoring for loss of drilling fluids.  The HDD Contingency Plan describes monitoring and mitigation procedures for any inadvertent release of drilling mud into the waterbody or areas adjacent to the waterbody and includes procedures to contain and clean up inadvertent releases (Appendix C).

Dakota Access plans to hydrostatically test the HDD pipeline segments both before and after installation at the Illinois and Kaskaskia River crossings.  Hydrostatic pre-testing involves filling the new pipeline

USACE_DAPL0009854

segments with water acquired in accordance with applicable permits, raising the internal pressure level, and holding that pressure for a specific period of time per U.S. DOT requirements.

Dakota Access is proposing to use surface water from the Illinois River and the Kaskaskia River to facilitate installation of the HDD and hydrostatic testing of the pipeline at the McGee Creek levee, Illinois River, Coon Run levees, and Kaskaskia River HDD crossings.  Up to 1,000,000 gallons of water may be used from the Illinois River and up to 500,000 gallons of water may be used from the Kaskaskia River.  The acquisition points would coincide with the proposed pipeline crossing points, but would not require the installation of temporary water lines or use of equipment over levees.  In order to get water to the Coon Run levees HDD pipeline segment, the water would be transported by truck since a temporary water line would be too long and would cross the Coon Run levees.  Water would be pumped using an 8" x 8" Power Associates 2500 Single Stage Pump, or equivalent, set on the bank of the rivers within secondary containment.  The pump would be capable of withdrawing 2,400 gallons per minute and 120 fee of head pressure. Temporary use of surface water in the state of Illinois does not require a permit.

Water discharges associated with hydrostatic testing within the Proposed Action Areas/Connected Action Areas would be conducted in accordance with applicable permits.  Dakota Access would conduct trench dewatering and hydrostatic test discharges in a manner consistent with the DAPL Project SWPPP. Discharged hydrostatic test water would not contain additives unless written approval is received from Dakota Access and applicable permits authorize such additives.  EIs would monitor permit compliance. Water would be discharged in upland areas through an energy dissipation and/or filtering device, as described in Dakota Access' SWPPP (Appendix B), to remove sediment and reduce the erosive energy of the discharge water and allow the water to infiltrate into the ground.  No impacts to surface waters are anticipated through the discharge of water.

Three waterbodies within the flowage easements Proposed Action Areas/Connected Action Areas (unnamed tributary to Kaskaskia River [s-b10-fa-04], Cassar Creek [s-b1-fa-11], and unnamed tributary to Cassar Creek [S_BM-12_FA_2] would be temporarily impacted by pipeline construction.  Impacts to these waterbodies would be minimized by reducing the construction ROW width to 85 feet instead of the typical 150 feet width.   In addition, pipeline construction activities would follow applicable regulatory requirements.

No waterbody would be permanently drained or filled as part of the DAPL Project, and effects on waterbodies are expected to be short-term and minor.  Dakota Access would restore the area as close to pre-construction contours and naturally functioning condition as practicable.  Additionally, Dakota Access would take measures to minimize the potential for surface water contamination from an inadvertent spill of fuel or hazardous liquids during refueling or maintenance of construction equipment.  Fuel and all other hazardous materials would be stored in accordance with the requirements of Dakota Access' Spill Prevention, Control, and Countermeasures (SPCC) and, SWPPP.  These documents also describe response, containment, and cleanup measures.

In order to maintain the integrity of the pipeline, prevent product losses, and protect the general public, Dakota Access will inspect and exercise company-owned equipment in accordance with the National Preparedness for Response Exercise Program (PREP) guidelines.  However, in the unlikely event of a pipeline leak once in operation, response measures to protect the users of downstream drinking water intakes will be implemented.  The operator has prepared a Geographical Response Plan (GRP) and Facility Response Plan (FRP, Appendix G) that includes measures such as notifying surrounding communities, affected governments, and utilities in the event of an inadvertent pipeline release.  The FRP is intended

USACE_DAPL0009855

to satisfy the applicable requirements of the Oil Pollution Act of 1990 (OPA 90), and has been prepared in accordance with the National Oil and Hazardous Substances Pollution Contingency Plan (NCP), the Sioux land Sub-Area Contingency Plan and the Upper Mississippi River Spill Response and Resource Plan. Specifically, this Plan is intended to satisfy the applicable requirements of:

- Pipeline and Hazardous Materials Safety Administration (PHMSA), U.S. Department of Transportation requirements for an OPA 90 plan (49 CFR 194)

- American Petroleum Industry (API) RP 1174 - Recommended Practice for Pipeline Emergency Preparedness and Response.

The operator has contractually secured personnel and equipment necessary to respond, to the maximum extent practicable, to a worst case discharge or a substantial threat of such discharge. The operator requires an annual certification from each Oil Spill Response Organization (OSRO) to maintain compliance with the National PREP guidelines. Each listed OSRO has its own response equipment, including containment booms, absorbents, boats, and vacuum trucks.

Dakota Access would maintain and inspect the pipeline in accordance with PHMSA regulations, industry codes, and prudent pipeline operating protocols and techniques. The pipeline ROW would be patrolled and inspected by air every 10 days, weather permitting, but at least every 3 weeks and no fewer than 26 times per year, to check for abnormal conditions or dangerous activities, such as unauthorized excavation along the pipeline route. Monitoring of the pipeline segments installed via HDD would be accomplished in the same manner as those segments installed by conventional methods (i.e., SCADA, internal inspection devices, and aerial patrols). Typically, repairs are not made on any section of pipe greater than 10 to 20 feet below the ground surface depending on the repair needed; if a material impact were to occur on the pipeline below the 10-foot depth, operation of the system would be modified accordingly (e.g., reduce operating pressure) or the line would be re-drilled. If inspections were to identify an anomaly, the operator would comply with U.S. DOT requirements to address the anomaly.

EIs would monitor compliance with applicable waterbody protection requirements during construction of the pipeline. The SWPPP (Appendix B) describes additional mitigation measures and contain illustrations of how sediment control devices are typically installed at waterbody crossings. Additionally, Dakota Access would maintain a vegetative buffer until the actual crossing of the waterbody takes place. Temporary sediment control measures, such as silt fence installed at each crossing, would minimize the introduction of sediment into waterbodies during construction and minimize the movement of spoil and sediment from surface runoff during and after construction. Permanent erosion control measures, such as vegetation and installation of slope breakers, would effectively stabilize riparian zones. Dakota Access would stabilize stream banks disturbed during construction using methods as directed by applicable state and/or federal permits. Trenching and dewatering activities used in construction of the proposed pipeline could temporarily alter surface drainage patterns. However, these impacts are expected to be localized and temporary, since the contours and vegetation would be returned as closely as practical to pre-construction conditions. Dewatering activities would be conducted in accordance with applicable permits and Dakota Access' SWPPP. Refer to Table 4 for a summary of waterbody crossings by the Proposed Action within the Proposed Action/Connected Action Areas.

USACE_DAPL0009856

Final Environmental Assessment - Dakota Access Pipeline Project, Illinois -August 2016

| Table 4 Waterbodies within the Proposed Action / Connected Action Areas | | | | | |
|---|---|---|---|---|---|
| Name | Waterbody ID | Flow Type | Class of Aquatic Resource | Crossing Method | Area of Impact |
| Unnamed Tributary to Illinois River | S_BM-4_PL_6 | Perennial | §404 | HDD | Permanent ROW over HDD Profile |
| Illinois River | S-DT-167 | Perennial | §10, §404 | HDD | Permanent ROW over HDD Profile |
| Unnamed Tributary to Coon Run | S_BM-7_SC_14 | Intermittent | §404 | HDD | Permanent ROW over HDD Profile |
| Coon Run | S_BM-7_SC_15 | Perennial | §404 | HDD | Permanent ROW over HDD Profile |
| Unnamed Tributary to Coon Run | S_BM-2_SC_3 | Intermittent | §404 | HDD | Permanent ROW over HDD Profile |
| Unnamed Tributary to Coon Run | S_BM-12_SC_1 | Intermittent | §404 | HDD | Permanent ROW over HDD Profile |
| Unnamed Tributary to Kaskaskia River | S_BM-3_FA_2 | Intermittent | §404 | N/A | Construction ROW (crossed in pull string area for HDD of Kaskaskia River) |
| Unnamed Tributary to Kaskaskia River | s-b1-fa-08 | Ephemeral | §404 | HDD | Permanent ROW over HDD Profile |
| Kaskaskia River | S-BM-2_FA_1 | Perennial | §404 | HDD | Permanent ROW over HDD Profile |
| Unnamed Tributary to Kaskaskia River | s-b10-fa-04 | Intermittent | §404 | Open Cut | Construction and Permanent ROW |
| Cassar Creek | s-b1-fa-11 | Perennial | §404 | Open Cut | Construction and Permanent ROW |
| Unnamed Tributary to Cassar Creek | S_BM-12_FA_2 | Ephemeral | §404 | Open Cut | Construction and Permanent ROW |

### 3.2.2. Groundwater

### 3.2.2.1. Affected Environment

Groundwater occurs within the Proposed Action Area of the USACE flowage easements and USACE project lands as both sand and gravel aquifers and bedrock aquifers (Illinois State Water Survey [ISWS], 2015). Although bedrock aquifers tend to have a greater distribution and be more continuous than sand and gravel aquifers, sand and gravel aquifers typically provide higher yields (ISWS, 2015). In Illinois sand and

USACE_DAPL0009857

gravel aquifers are the most important aquifers as they are the largest water source for domestic use, readily accessible due to their shallower nature, and they yield the largest volume of water (Voelker and Clarke, 1986; ISWS, 2015).

No water wells are located within the Proposed Action/Connected Action Areas.  Additionally, no water source protection areas occur within the Proposed Action/Connected Action Areas.

### 3.2.2.2.  Impacts and Mitigation

Ground disturbance associated with conventional pipeline construction is generally limited to approximately 6 to 10 feet below the existing ground surface.  Where excavation penetrates the water table, potential groundwater impacts from pipeline construction are primarily limited to the radius of influence around the excavation profile.

Construction activities, such as trenching, dewatering, and backfilling that encounter shallow aquifers would cause minor fluctuations in groundwater levels and/or increased turbidity within the aquifer adjacent to the activity due to dewatering activities.  Dewatering would consist of a single or series of submersible pumps that would be lowered into the pipe trench to remove excess water to facilitate pipe installation.  In cases of greater water infiltration, well pointing (a series of dewatering points along the outside of the trench connected in series to a pump to enable effective dewatering of the trench) may be used.  These impacts are temporary (only while the trench is open) and highly localized as the infiltration of the dewatered groundwater is in the immediate vicinity of the dewatering activity.

Construction and dewatering activities are not expected to have a significant effect on regional groundwater flow patterns.  Shallow aquifers would quickly reestablish equilibrium if disturbed, and turbidity levels would rapidly subside.  Consequently, the effects of construction would be minor and short-term.  Impacts on deeper aquifers are not anticipated.

The introduction of contaminants to groundwater due to accidental spills of construction-related chemicals, fuels, or hydraulic fluid could have an adverse effect on groundwater quality.  Spill-related impacts from construction activities are typically associated with improper fuel storage, equipment refueling, and equipment maintenance.  Dakota Access' SPCC Plan outlines measures that would be implemented to avoid, minimize, prevent, and respond to releases of fuels and other hazardous substances during construction and includes measures for cleanup, documentation, and reporting of spills (Appendix B).  Action-specific SPCCs would be developed by the selected contractor and implemented throughout construction.  By implementing the protective measures set forth in these plans, groundwater contamination due to construction activities is not anticipated.  The draft SPCC is included as Appendix B of Appendix B (SWPPP); the Proposed Action-specific plan to be developed by the Contractor would meet or exceed all conditions presented in the draft plan.

Accidental releases from the pipeline system during operations could potentially affect groundwater. Although most components of crude oil are relatively insoluble (Neff and Anderson, 1981), crude oil released into soil can migrate toward water where certain constituents can dissolve into groundwater or surface water in limited amounts.  As a liquid, the product would travel along the path of least resistance both laterally and vertically at a rate determined by a number of factors including volume released, soil conditions (permeability, porosity, moisture, etc.), depth to groundwater, and the speed and effectiveness of response and remediation measures.

USACE_DAPL0009858

The DAPL Project would transport light sweet crude oil from the middle Bakken and upper Three Forks formations (Bakken).  The Energy Information Administration (EIA) categorizes light sweet crude oil as having an American Petroleum Institute (API) gravity between 35° and 50° and less than 0.3 wt % sulfur.  API gravity is a measure of how heavy or light liquid oil is compared to water: if its API gravity is greater than 10, it is lighter and floats on water.  The oil extracted from the Bakken has an API gravity generally between 40° and 43° and a sulfur content of less than 0.2 weight percentage (wt %) (Turner, Mason and Company, 2014).  Therefore, the Bakken oil has properties that fall within the mid-range of light sweet crude.

Most crude oil constituents are not very soluble in water.  The dissolved concentration of water soluble compounds (e.g., benzene) is not controlled by the amount of oil in contact with the water, but by the concentration of the specific constituent in the oil (Charbeneau et al., 2000; Charbeneau, 2003; Freeze and Cherry, 1979).  Studies of 69 crude oils found that benzene was the only aromatic or polycyclic aromatic hydrocarbon (PAH) compound tested that is capable of exceeding groundwater protection threshold values for drinking water (i.e., Maximum Contaminant Level or Water Health Based Limits) (Kerr et al., 1999 as cited in O'Reilly et al., 2001).

If no active ground water remediation activities were undertaken (see discussion below), dispersion, evaporation, dissolution, sorption, photodegradation, biodegradation, and natural attenuation ultimately would allow a return to preexisting conditions in both soil and groundwater.

**Remediation**

As part of the pipeline operation, which is regulated by the PHMSA, Dakota Access has an ongoing maintenance, inspection, and integrity testing program to monitor the safety of the pipeline system.  Monitoring activities include constant remote oversight of the entire system 24/7/365 from the control center, routine inspection of the cathodic protection system, and the use of inspection tools that travel through the inside of the pipeline to check pipe integrity (see Section 3.12 for additional information regarding reliability and safety and the proposed methods for monitoring the Proposed Action facilities).  Dakota Access also performs regular aerial flyovers to inspect the pipeline ROW.  In the event of a leak, Dakota Access would work aggressively to isolate the source through the use of remote-controlled shut-off valves, initiate cleanup activities, and contact the appropriate federal and state authorities to coordinate leak containment and cleanup.  Dakota Access proposes to meet or exceed all applicable regulations and requirements for pipeline design, construction, and operation.

While a release of crude oil into groundwater or a surface waterbody has the potential to cause temporary environmental impacts, the likelihood of such an event is very low.  Dakota Access has detailed provisions for protecting and mitigating potential impacts to water resources in Section 3.12 Reliability and Safety.  Emergency response and remediation efforts have the potential for dramatically reducing the appreciable adverse environmental effects.

In the unlikely event of a spill during operations of the pipeline, impacts to water resources would be further mitigated by following the cleanup procedures and remediation activities described in the Dakota Access' FRP (Appendix G).

Specific clean-up procedures and remediation activities would be determined by groundwater remediation specialists within Dakota Access and contracted professional consultants.  Each groundwater mitigation situation is unique and will be treated according to the actual circumstances present.

USACE_DAPL0009859

The first step in the mitigation process consists of the delineation of the plume to define the nature and extent of the release.  If appropriate, Dakota Access would recover product as soon as practical to prevent the spread of contamination using excavators to remove the impacted soils, oil skimmers installed within collection wells, pumps, and storage containers or vacuum trucks at collection areas or some other method appropriate for the site conditions.

Dakota Access would develop a groundwater remediation plan in coordination with responsible federal, state or other governmental authorities.  The proposed groundwater remediation system would be designed to treat the impacted groundwater by removing the released oil, converting it into harmless products, monitoring natural attenuation, etc.

Released product can often be physically removed from groundwater by several methodologies.  The pump and treat method is one of the most widely used physical methods of ground water remediation and consists of pumping the groundwater to surface and then using either biological or chemical treatments to remove the oil.  Another common method of removing floating hydrocarbon contaminants is the use of a monitoring-well oil skimmer.  This method utilized a belt material with a strong affinity for hydrocarbons to bring the oil to the surface where it can be removed.  A dual-phase vacuum extraction removes both contaminated groundwater and soil vapor.  A high-vacuum extraction well is installed with its screened section in the zone of contaminated soils and groundwater to remove contaminants from above and below the water table.  Released product can also be removed from groundwater by applying various chemical methodologies including ozone and oxygen gas injection, surfactant enhanced recovery, Biological treatment techniques can also be utilized including bioventing and bioaugmentation.

The ground water treatment remediation plan would be selected in coordination with responsible governmental authorities and may utilize a combination of technologies.

A preliminary evaluation of water well depths indicates that groundwater level in the vicinity of the Proposed Action Areas/Connected Action Areas ranges from approximately 23 feet to over 130 feet deep (Illinois State Geological Survey [ISGS], 2015).  Due to the nature of HDD methodology, this construction method is inherently not a risk to groundwater resources and uses benign substances (bentonite and water) to penetrate through soil, rock, and groundwater.  Installation of the pipeline in the Proposed Action Areas/Connected Action Areas would not be expected to result in significant negative impacts on groundwater resources.

### 3.2.3.  Wild and Scenic River Act

The Vermilion River (Middle Fork, located within Champaign and Vermillion Counties), is the only water body designated as wild and scenic within the state of Illinois (National Wild and Scenic River Council, 2016).  The Proposed Action Area is not located within the vicinity (greater than 100 miles) of the Middle Fork of Vermilion River, thus no impacts to wild and scenic rivers is anticipated.

### 3.2.4.  Wetlands

### 3.2.4.1.  Affected Environment

Wetland data for the Proposed Action Areas was derived from desktop analyses along the entire route and verified by field delineations.  Using data from the U.S. Fish & Wildlife Service's (USFWS) National Wetlands Inventory (NWI) dataset, aerial imagery, and topography, an experienced biologist applied

USACE_DAPL0009860

professional judgment to create polygon coverage in GIS to define the extent of wetlands.  These areas have been field-verified so that the most accurate, up-to-date data is being used for permit filings.

The field wetland investigations were conducted using the on-site methodology set forth in the 1987 Corps of Engineers Wetland Delineation Manual and the 2010 Regional Supplement to the Corps of Engineers Wetland Delineation Manual: Midwest Region (USACE, 1987; 2010).  In addition to the 1987 Manual and the Regional Supplement, wetland areas were examined through analysis of the vegetation, soils, and hydrology, as described in the Classification of Wetland and Deepwater Habitats of the U.S. and The National Wetland Plant List (Cowardin et al., 1979; Lichvar et al., 2014).

### 3.2.4.2. Impacts and Mitigation

The routing analysis utilized to determine the crossing locations was designed to avoid impacts to sensitive environmental resources including wetlands, where practicable.  If potential wetlands within the Proposed Action Areas/Connected Action Areas were confirmed during the 2014-2015 field verification and avoidance was not feasible, construction workspace was reduced to the extent practicable to minimize impacts.

The field wetland investigations conducted by Dakota Access identified palustrine emergent (PEM), palustrine scrub-shrub (PSS), palustrine forested (PFO) wetlands within the Proposed Action Areas/Connected Action Areas.  The wetlands associated with the Illinois River Proposed Action Areas/Connected Action Areas and the wetlands associated with the Kaskaskia River would be crossed via HDD; therefore, no trenching would occur within these wetlands.  However, in the PFO wetlands the 50-foot-wide permanent DAPL easement, centered over the pipeline, would be cleared and maintained to facilitate inspections of the pipeline, operational maintenance, and compliance with the federal pipeline safety regulations.  The remaining wetlands would be crossed via traditional open cut trench construction method.  Following construction, Dakota Access would restore the construction ROW as close to pre-construction contours and naturally functioning condition as practicable.  The temporary construction workspace would be allowed to revert to pre-construction conditions, however, the 50-foot-wide permanent DAPL easement, centered over the pipeline, may require infrequent maintenance clearing of encroaching woody vegetation to facilitate inspections of the pipeline, operational maintenance, and compliance with the federal pipeline safety regulations.  Refer to Table 5 for a list wetlands crossed in the Proposed Action Areas/Connected Action Areas.

No wetlands would be permanently drained or filled in the Proposed Action Areas/Connected Action Areas.  Impacts to PEM wetlands are expected to be short-term and minor.  Impacts to the PFO wetlands outside of the 50-foot permanent DAPL easement are expected to be temporary and recovery to these wetlands would occur over time with the regrowth of trees via natural succession.  The conversion of PFO wetlands to PEM wetlands would be permanent within a 30-foot maintained corridor.  Temporary impacts and permanent conversion impacts to PFO wetlands would be offset through mitigation at an approved site authorized by the USACE Regulatory Branch.  Additionally, Dakota Access would take measures to minimize the potential for contamination from an inadvertent spill of fuel or hazardous liquids during refueling or maintenance of construction equipment within wetlands.  Fuel and all other hazardous materials would be stored in accordance with the requirements of Dakota Access' SPCC, and SWPPP (Appendix B).  These documents also describe response, containment, and cleanup measures.

USACE_DAPL0009861

Final Environmental Assessment - Dakota Access Pipeline Project, Illinois -August 2016

| ID | Type | Crossing Method | Impacts | | |
|---|---|---|---|---|---|
| | | | Area | Type | Acres |
| w-b3-pi-01 | PFO | HDD | Permanent ROW over HDD Profile | Conversion of PFO to PEM | 0.19 |
| w-b7-mo-01 | PFO | HDD | Permanent ROW over HDD Profile | Conversion of PFO to PEM | 0.97 |
| W_BM-7_SC_4 | PEM | HDD | Permanent ROW over HDD Profile | Avoided by HDD | 0.0 |
| W_BM-2_SC_1 | PEM | HDD | Permanent ROW over HDD Profile | Avoided by HDD | 0.0 |
| W_BM-2_SC_2 | PEM | HDD | Permanent ROW over HDD Profile | Avoided by HDD | 0.0 |
| W_BM-3_FA_1 | PEM | HDD | Construction ROW | Temporary | 0.29 |
| | | | Permanent ROW over HDD profile | Avoided by HDD | 0.0 |
| W_BM-3_FA_2 | PSS | HDD | Permanent ROW over HDD profile | Avoided by HDD | 0.0 |
| W_BM-3_FA_4 | PUB | HDD | Permanent ROW over HDD profile | Avoided by HDD | 0.0 |
| W_BM-12_FA_5 | PEM | HDD | Permanent ROW over HDD profile | Avoided by HDD | 0.0 |
| W_BM-12_FA_6 | PSS | HDD | Permanent ROW over HDD profile | Avoided by HDD | 0.0 |
| W_BM-2_FA_1 | PSS | HDD | Permanent ROW over HDD profile | Avoided by HDD | 0.0 |
| W_BM-2_FA_2 | PUB | HDD | Permanent ROW over HDD profile | Avoided by HDD | 0.0 |
| W_BM-2_FA_3 | PFO | Open Cut | Construction and Permanent ROW | Conversion of PFO to PEM within Permanent ROW | 0.37 |
| | | | | Temporary within Construction ROW | 0.59 |
| W_BM-2_FA_5 | PEM | Open Cut | Construction and Permanent ROW | Temporary within Construction ROW | 3.21 |
| w-b1-fa-07 (Part 1) | PFO | Open Cut | Construction and Permanent ROW | Conversion of PFO to PEM within Permanent ROW | 0.63 |
| | | | | Temporary within Construction ROW | 0.99 |
| W_BM-2_FA_6 | PEM | Open Cut | Construction and Permanent ROW | Temporary within Construction ROW | 1.27 |
| w-b1-fa-07 (Part 2) | PFO | Open Cut | Construction and Permanent ROW | Conversion of PFO to PEM within Permanent ROW | 0.17 |
| | | | | Temporary within Construction ROW | 0.3 |
| W_BM-2_FA_7 | PEM | Open Cut | Construction and Permanent ROW | Temporary | 0.08 |
| w-b1-fa-07 (Part 3) | PFO | Open Cut | Construction and Permanent ROW | Conversion of PFO to PEM within Permanent ROW | 1.03 |
| | | | | Temporary within Construction ROW | 2.18 |
| w-b1-fa-07 (Part 1) | PEM | Open Cut | Construction and Permanent ROW | Temporary | 3.41 |
| w-b1-fa-07 (Part 4) | PFO | Open Cut | Construction and Permanent ROW | Conversion of PFO to PEM within Permanent ROW | 0.55 |
| | | | | Temporary within Construction ROW | 0.96 |
| w-b1-fa-07 (Part 2) | PEM | Open Cut | Construction and Permanent ROW | Temporary | 0.25 |
| W_DT_FA_9 | PEM | Open Cut | Construction and Permanent ROW | Temporary | 3.38 |
| W_BM-3_FA_9 | PEM | Open Cut | Construction and Permanent ROW | Temporary | 1.15 |
| W_BM-7_FA_6 | PEM | Open Cut | Construction and Permanent ROW | Temporary | 0.54 |

**Table 5
Wetlands Crossed within the Proposed Action Areas/Connected Action Areas**

USACE_DAPL0009862

| ID | Type | Crossing Method | Impacts | | |
|---|---|---|---|---|---|
| | | | Area | Type | Acres |
| W_BM-7_FA_5 | PFO | Open Cut | Construction and Permanent ROW | Conversion of PFO to PEM within Permanent ROW | 0.2 |
| | | | | Temporary within Construction ROW | 0.34 |
| | | | Totals | Conversion of PFO to PEM within the Permanent ROW | 4.11 |
| | | | | Temporary Impacts to PFO within the Construction ROW | 5.36 |
| | | | | Temporary Impacts to PEM within the Construction ROW | 13.58 |

**Table 5**
**Wetlands Crossed within the Proposed Action Areas/Connected Action Areas**

EIs would monitor compliance with applicable wetland protection requirements during construction of the pipeline. The DAPL Project SPCC and SWPPP describe additional mitigation measures and contain illustrations of how sediment control devices are typically installed at wetland crossings. Temporary sediment control measures, such as silt fence installed at each crossing, would minimize the introduction of sediment into wetlands during construction and minimize the movement of spoil and sediment from surface runoff during and after construction. Trenching and dewatering activities used in construction of the proposed pipeline could temporarily alter surface drainage patterns. However, these impacts are expected to be localized and temporary, since the contours and vegetation would be returned as closely as practical to pre-construction conditions. Dewatering activities would be conducted in accordance with applicable permits and Dakota Access' SWPPP (Appendix B).

Compensatory mitigation would be provided as required for temporary impacts and permanent conversion impacts to PFO wetlands. Impacts to wetlands would be offset through mitigation at an approved site authorized by the USACE Regulatory Branch (specifically the Middle Kaskaskia Mitigation Site, Clinton County, IL). The St. Louis Regulatory Branch is currently reviewing sites for authorization under Nationwide Permit 12 and will determine the appropriate mitigation as a condition of the permit verification. With the implementation of the measures above, impacts to wetlands in the vicinity of the levees and flowage easement crossings would be minimized. For compliance with Executive Order 11990 on Protection of Wetlands, there is no practicable alternative to construction in wetlands at the USACE project crossings.

### 3.2.5. Floodplain

### 3.2.5.1. Affected Environment

Floodplains refer to the 100-year floodplain, as defined by Federal Emergency Management Agency (FEMA), and as shown on Flood Insurance Rate Maps (FIRM) or Flood Hazard Boundary Maps for all communities participating in the National Flood Insurance Program (NFIP). The 100-year floodplain is an area subjected to inundation by the 1% chance of an annual flood event. Executive Order (EO) 11988 (Floodplain Management), as amended by EO 13690, requires federal agencies to avoid direct or indirect support of development within the 100-year floodplain whenever there is a practical alternative.

USACE_DAPL0009863

According to the FEMA FIRM map, approximately 22,402 feet of the Proposed Action Areas/Connected Action Areas is located within Zone A (the 100-year floodplain) of the Illinois River in Pike and Morgan Counties, and approximately 12,790 feet is located within the federal flowage easements north of Carlyle Lake.

### 3.2.5.2.  Impacts and Mitigation

The Proposed Action has been designed in accordance with accepted floodplain management practices; therefore, no impacts on floodplain elevations or velocities are anticipated.  Following construction, disturbed areas would be restored to pre-construction grades and contours, as practical.  Any soil displaced by installation of the 30-inch pipeline within the Proposed Action Areas/Connected Action Areas would be removed from the floodplain and hauled to an upland location in order to ensure original floodplain elevations are restored.  Avoidance of the floodplain would require lengthy and costly rerouting. Measures have been taken to minimize impacts to the floodplain and restoration to original contour would mean that the Proposed Action is not anticipated to have an effect on flood elevations.  As a result, there is no practicable alternative to construction of the Dakota Access pipeline in the floodplain of the Illinois and Kaskaskia Rivers.

The Corps St. Louis District Hydrologic Engineering Section reviewed the proposed pipeline plans for the portion of the DAPL Project in the vicinity of the Illinois and Kaskaskia Rivers for  compliance with the requirements of EO 11988 (Floodplain Management).  Provided that the site topography is left at its natural ground elevation after construction and all excess material is hauled off site, the Hydrologic Engineering Section concluded that there are no flood risk and floodplain management concerns associated with the Proposed Action.

### 3.2.6.  Levees

### 3.2.6.1.  Affected Environment

Based on a search of the USACE National Levee Database and FEMA FIRM maps, three levees are crossed by the Proposed Action: the McGee Creek levee of the Illinois River, and the Coon Run levees of the Illinois River (specifically Coon Run Northwest levee and Coon Run Southeast levee).  The McGee Creek levee is managed by and situated on land owned by the McGee Levee and Drainage District.  The Coon Run levees are situated on private property but managed by the Coon River Drainage District.

### 3.2.6.2.  Impacts and Mitigation

Because of the use of HDD construction methods to install the pipeline well below ground level, construction of the Dakota Access pipeline is not anticipated to have an effect on the operation of the McGee Creek or Coon Run levees.  Dakota Access met with the McGee Creek Drainage and Levee District and the Coon Run Drainage and Levee District (collectively referred to as "Districts") on 23 March 2016 to provide information and discuss the proposed pipeline crossings of each levee.  The Districts retained Klingner & Associates, P.C. (Klingner) to provide an independent review of the proposed HDDs at each levee.  Letters requesting additional information were received from Klingner on 26 April 2016 and responses were provided in correspondence dated 29 April 29 2016.  As required by EC 1165-2-116, written statements endorsing the proposed alteration from the non-federal sponsors, the Levee Districts, must be received prior to issuing the 408 permission.

USACE_DAPL0009864

## 3.3. Vegetation, Agriculture, and Range Resources

Under the "No Action" Alternative, Dakota Access would not construct the DAPL Project and no impacts on vegetation, agriculture, and range resources would occur. However, if the objectives of the DAPL Project are to be met under the "No Action" Alternative, other projects and activities would be required and these projects would result in their own impacts on vegetation, agriculture, and range resources, which would likely be similar to or greater than the Proposed Action. Nevertheless, the impacts associated with a future project developed in response to the "No Action" Alternative are unknown, while only temporary and minor impacts or insignificant permanent impacts on vegetation, agriculture, and range resources would occur as a result of the Proposed Action, as described in the sections below.

### 3.3.1. Vegetation

### 3.3.1.1. Affected Environment

Land cover was analyzed for the USACE flowage easements, USACE projects, and associated Connected Actions based on the 2011 U.S. Geological Survey (USGS) National Land Cover Dataset (NLCD) and was field-verified where access was available. Land cover on the Proposed Action Areas/Connected Action Areas is comprised mostly of cultivated crops and deciduous forest. Other present land cover types include developed areas, which are primarily roads, pasture/hay/grassland areas, open waters, woody wetlands, and emergent herbaceous wetlands. A description of each land cover type encountered within the Proposed Action Areas/Connected Action Areas is provided below.

### Cultivated Crop

The cultivated cropland community is characterized by land used for the production of annual crops, such as corn and soybeans. This class includes all land being actively tilled.

### Deciduous Forest

Deciduous forest typically includes trees that are greater than 16 feet tall. More than 75% of the tree species in this land cover class shed foliage simultaneously in response to seasonal change.

### Developed/Open Space

The developed/open space community type is dominated by lawn grasses and may include some developed areas and roads. Impervious surfaces account for less than 20% of the total cover. This class would typically include minor roads and associated ditches.

### Developed/Low Intensity

The developed/low intensity community includes areas with a mixture of constructed material and vegetation. These areas most commonly include single-family housing units. Developed/low intensity areas in the Proposed Action Areas/Connected Action Areas are associated with impervious surfaces of larger roads.

USACE_DAPL0009865

**Emergent Herbaceous Wetland**

Refer to Section 3.2.4, which provides a description of data obtained during delineations of the wetlands that would be impacted by the Proposed Action.

**Woody Wetlands**

Refer to Section 3.2.4, which provides a description of data obtained during delineations of the wetlands that would be impacted by the Proposed Action.

**Pasture/Hay**

The pasture/hay community type consists of areas of grasses, legumes, or grass-legume mixtures planted for livestock grazing or the production of seed or hay crops, typically on a perennial cycle.

**Open Water**

The open water cover type includes areas of open water.  This land cover type is associated with Illinois River and the Kaskaskia River.

### 3.3.1.2. Impacts and Mitigation

Temporary impacts on land cover would occur in essentially all areas within the construction footprint of the Proposed Action Areas, the vast majority of which would return to pre-construction land cover upon completion of construction.  One exception is at the flowage easement Proposed Action Areas in forested areas along the permanent DAPL easement.  This ROW would be maintained to prevent the regrowth of trees in the permanent DAPL easement.  Impacts on cultivated crops make up the majority of temporary impacts and would return to cultivated crops post-construction.

Permanent impacts on land cover would be limited to the permanent ROW and is limited to routine vegetation maintenance including tree removal.  Impacts on land cover as part of the Connected Action would occur on private lands and include the HDD workspaces, stringing area, and the permanent DAPL easements between the HDD workspaces.

**Measures to Protect Vegetation**

Dakota Access would clear the ROW to the extent necessary to assure suitable access for construction, safe operation, and maintenance of the DAPL Project.  Clearing of herbaceous vegetation during construction is anticipated to result in short-term impacts.  Within areas disturbed by construction of the DAPL Project, including the flowage easements Proposed Action Area, Dakota Access would implement active revegetation measures and rapid colonization by annual and perennial herbaceous species to restore most vegetative cover within the first growing season.  In areas that require permanent revegetation, Dakota Access would specify appropriate seed mixes, application rates, and seeding dates, taking into account recommendations of appropriate state and federal agencies and landowner requests. Ground disturbing activities would not occur on the McGee Creek levee or Coon Run levees; therefore, reseeding is not anticipated in these areas.  However, if reseeding were to become necessary on the USACE projects, all activities would be conducted in accordance with requirements set by the USACE.

USACE_DAPL0009866

In non-agricultural areas, vegetation cleared from additional temporary workspace (ATWS) would be allowed to revegetate after construction depending on arrangements with the landowner. Consequently, significant changes in cover types are not anticipated. Revegetation would allow wildlife species to return to the area after construction is completed. Temporary revegetation measures may also be implemented to quickly establish ground cover to minimize the potential for soil erosion and noxious weeds to establish. A temporary seed mix may be applied in these situations.

After completion of waterbody crossings, Dakota Access would revegetate disturbed stream banks in accordance with the requirements of applicable state and federal permits. When constructing in agricultural areas, up to 1 foot of topsoil (organic layer) would be stripped from the trench line and stockpiled separately from trench spoil to preserve the native seed stock.

Plants listed under the Section 7 of the Endangered Species Act (ESA) are discussed in Section 3.5 – Threatened, Endangered, Candidate, and Proposed Species.

### 3.3.2. Wildlife Resources

Under the "No Action" Alternative, Dakota Access would not construct the DAPL Project, and no impacts on wildlife resources would occur. However, if the objectives of the DAPL Project are to be met under the "No Action" Alternative, other projects and activities would be required and these projects would result in their own impacts on wildlife resources, which would likely be similar to or greater than the DAPL Project. Nevertheless, the impacts associated with a future project developed in response to the "No Action" Alternative are unknown, while only temporary and minor impacts, if any, on wildlife resources would occur as a result of the Proposed Action, as described in the sections below.

### 3.3.3. Recreationally and Economically Important Species and Nongame Wildlife

### 3.3.3.1. Affected Environment

The Proposed Action region is home to diverse wildlife including a large number of mammal and bird species. Wildlife may be valued in a variety of capacities such as hunting and conservation, preservation, observation, and study. The primary big game species found in the Proposed Action Areas/Connected Action Areas is the white-tailed deer (*Odocoileus virginianus*). Furbearers and predators potentially occurring within the Area include coyote (*Canis latrans*), North American Beaver (*Castor canadensis*), American Badger (*Taxidea taxus*), Red Fox (*Vulpes vulpes*), Raccoon (*Procyon lotor*), Bobcat (*Lynx rufus*), American Mink (*Neovison vison*), Least Weasel (*Mustela nivalis*), and Muskrat (*Ondatra zibethicus*). Potential small mammal species occurring within the habitat types associated with the Proposed Action Areas/Connected Action Areas include Deer Mouse (*Peromyscus maniculatus*), Plains Pocket Gopher (*Geomys bursarius*), Striped Skunk (*Mephitis mephitis*), and Eastern Cottontail (*Sylvilagus floridanus*).

Avian species that may potentially use habitat occurring within the vicinity of the Proposed Action Areas/Connected Action Areas include Neotropical migrants, waterfowl, shorebirds, wading birds, and raptors, among others. The Proposed Action Areas/Connected Action Areas are within the Mississippi Flyway that is used by species for migration, stop-over habitat, nesting, brood rearing, and wintering. Migratory birds potentially using the habitat in the Proposed Action Areas/Connected Action Areas include the Acadian Flycatcher (*Empidonax virescens*), Bald Eagle (*Haliaeetus leucocephalus*), Bell's Vireo (*Vireo bellii*), Black-billed Cuckoo (*Coccyzus erythropthalmus*), Black-crowned Night-heron (*Nycticorax nycticorax*), Blue-winged Warbler (*Vermivora pinus*), Cerulean Warbler (*Dendroica cerulean*), Dickcissel (*Spiza americana*), Field Sparrow (*Spizella pusilla*), Fox Sparrow (*Passerella iliaca*), Henslow's Sparrow

USACE_DAPL0009867

(*Ammodramus henslowii*), Kentucky Warbler (*Oporornis formosus*), Least Bittern (*Ixobrychus exilis*), Loggerhead Shrike (*Lanius ludovicianus*), Northern Flicker (*Colaptes auratus*), Peregrine Falcon (*Falco peregrinus*), Pied-billed Grebe (*Podilymbus podiceps*), Prothonotary Warbler (*Protonotaria citrea*), Red-headed Woodpecker (*Melanerpes erythrocephalus*, Rusty Blackbird (*Euphagus carolinus*), Short-eared Owl (*Asio flammeus*), Willow Flycatcher (*Empidonax traillii*), Wood Thrush (*Hylocichla mustelina*), and Worm Eating Warbler (*Helmitheros vermivorum*).  Game birds potentially using the habitat in the Proposed Action Areas/Connected Action Areas include the Wild Turkey (*Meleagris gallapavo*), northern bobwhite (*Colinus virginianus*), American Woodcock (*Scolopax minor*), Common Snipe (*Gallinago gallinago*), and Mourning Dove (*Zenaida macroura*).  The diversity of avian species that may seasonally, periodically, or incidentally occur within the Proposed Action Areas/Connected Action Areas is high.

Numerous species of reptiles and amphibians may also occur within the vicinity of the Proposed Action Areas/Connected Action Areas.  Some amphibian species that may be expected to occur in the vicinity of the Proposed Action Areas/Connected Action Areas include the Northern Leopard Frog (*Lithobates pipiens*), Tiger Salamander (*Ambystoma tigrinum*), and Chorus Frog (*Pseudacris* spp.).  Reptile species that may be expected to occur within the Proposed Action Areas/Connected Action Areas include Common Snapping Turtle (*Chelydra serpentina*), Painted Turtle (*Chrysemys picta*), Common Garter Snake (*Thamnophis sirtalis*), and Southern Black Racer (*Coluber constrictor priapus*) among others (Hoberg and Gause, 1992).

### 3.3.3.2.  Impacts and Mitigation

Temporary impacts on wildlife could occur during construction due to clearing of vegetation and movement of construction equipment along the ROW.  The ROW and ATWS would remain relatively clear of vegetation until restoration is completed.  Most wildlife, including the larger and more mobile animals, would disperse from the Proposed Action Areas/Connected Action Areas as construction activities approach.  Displaced species may recolonize in adjacent, undisturbed areas, or reestablish in their previously occupied habitats after construction has been completed and suitable habitat is restored.  Some smaller, less mobile wildlife species such as amphibians, reptiles, and small mammals have the potential to be directly impacted during clearing and grading activities, but given the limited extent of the proposed crossing, measurable impacts are not anticipated.

Herbaceous cover would be seeded on disturbed upland areas during restoration, and it is expected that pre-existing herbaceous vegetation and shrub habitats would quickly reestablish themselves.  Consequently, it is expected that the wildlife species that use these habitats would also return within one growing season of construction completion.  Routine clearing of the permanent DAPL easement to improve visibility and remove encroaching trees would be performed in compliance with PHMSA requirements.  The permanent conversion of areas with trees to herbaceous cover would be a potential long-term impact to wildlife (i.e. habitat fragmentation caused by the ROW).  This impact is expected to be minimal, as it pertains to extremely small portions of the permanent DAPL easement (30-foot-wide DAPL easement through forested wetlands) as compared to the available adjacent undisturbed habitats.  While fragmentation of habitat can be a concern for some species, the narrow width of the 30-foot-wide maintained corridor is not anticipated to create an impassible barrier for wildlife that utilize these habitats.  Further, some wildlife species may benefit by increased diversity of vegetation that would grow within and adjacent to the maintained ROW.  Overall, impacts to wildlife in the Proposed Action Areas and Connected Action Areas are anticipated to be very small.  Impacts to recreation or other usage of wildlife and the existing habitats by people would be negligible as a result of the small areas of impact relative to the amount of suitable habitat in surrounding areas.

USACE_DAPL0009868

Wildlife listed under the Section 7 of the Endangered Species Act (ESA) are discussed in Section 3.5 – Threatened, Endangered, Candidate, and Proposed Species.

## 3.4. Aquatic Resources

Under the "No Action" Alternative, Dakota Access would not construct the DAPL Project, and no impacts on aquatic resources would occur.  However, if the objectives of the DAPL Project are to be met under the "No Action" Alternative, other projects and activities would be required and these projects would result in their own impacts on aquatic resources, which would likely be similar to or greater than the DAPL Project.  Nevertheless, the impacts associated with a future project developed in response to the "No Action" Alternative are unknown, while only temporary and minor impacts, if any, on aquatic resources would occur as a result of the Proposed Action, as described in the sections below.

### 3.4.1. Habitat and Communities

#### 3.4.1.1. Affected Environment

The Proposed Action crosses the Illinois River approximately 1.8 miles southwest of Meredosia.  At this location, the crossing distance of the Illinois River is approximately 700 feet.  The channel of the Illinois River is well defined and slow-moving.  The Illinois River confluence with the Mississippi River is approximately 70 miles south of proposed Illinois River crossing location.  The Illinois River has shown an improved fishery since the late 1970s and is home to several fish species, including black crappie, bluegill, brown bullhead, channel catfish, largemouth bass, sauger, walleye, white bass, and white crappie (Illinois Department of Natural Resources [ILDNR], 2015a).  In addition, the Proposed Action crosses an unnamed perennial tributary to the Illinois River.  This channelized feature functions as a drainage ditch within an agricultural setting, and will be crossed by HDD in conjunction with the Illinois River crossing.  Coon Run, which also functions as and agricultural drainage ditch is situated between the Coon Run levees.  Coon Run and three intermittent tributaries would be crossed by HDD in conjunction with the crossing of the Coon Run levees.

The Proposed Action crosses the Kaskaskia River approximately 3.75 miles west of Shobonier.  At this location, the crossing distance of the Kaskaskia River is approximately 90 feet.  The Kaskaskia River is the largest stream found entirely within the state of Illinois.  The Proposed Action crosses the Kaskaskia River upstream from the Carlyle Lake reservoir.  The Kaskaskia River supports several fish species, including black crappie, blue catfish, bluegill, channel catfish, crappie, flathead catfish, largemouth bass, sauger, smallmouth bass, walleye, and white bass (ILDNR, 2015b).  One ephemeral tributary to the Kaskaskia River would be crossed in conjunction with the HDD of the river itself.  Two intermittent tributaries to the Kaskaskia River would also be crossed to the east and west of the HDD area.  These intermittent features appear to be channelized relict stream channels that primarily function as agricultural drainage ditches.  Cassar Creek (a perennial stream) and an ephemeral tributary to Cassar Creek are crossed by the Proposed Action to the south and east of the Kaskaskia River crossing.  Cassar Creek provides similar aquatic habitat as the Kaskaskia River, though on a smaller scale and is not likely to support as vibrant of a fishery.  Amphibians can be found along the shores and nearby riparian areas of the Illinois and Kaskaskia Rivers, as well as the smaller waterways and ditches.

#### 3.4.1.2. Impacts and Mitigation

The Illinois River, Coon Run, Kaskaskia River, Cassar Creek, and their tributaries are aquatic resources that have potential to be impacted by the Proposed Action.  At the Illinois River, Coon Run, and Kaskaskia River

USACE_DAPL0009869

crossings, subsurface disturbing activities would be set back from the river/stream banks at the HDD entry and exit locations.  This provides a buffer of undisturbed land between active construction and the rivers. Along the Illinois River, the setbacks are approximately 0.55 miles from the west bank and 0.63 miles from the east bank.  For the Kaskaskia River, the setbacks are approximately 0.47 miles from the west bank and 0.22 miles from the east bank.  These setbacks essentially eliminate the risk for sediment to be transported from the workspace into the rivers during precipitation events.  Turbidity, if it reaches the waterbodies, could increase the local turbidity and sediment load which have potential to temporarily affect sensitive fish eggs, fish fry, and invertebrates inhabiting the river.  However, sediment levels would quickly attenuate both over time and distance and would not adversely affect resident fish populations or permanently alter existing habitat.  By also implementing the erosion and sediment control measures specified in the in the SWPPP (Appendix B), the potential for sediment transport is likely avoided or minimized.  Following construction, the ROW would be restored, revegetated, maintained in an herbaceous or scrub-shrub state, and monitored in accordance with applicable regulations and permit conditions.

A successfully completed HDD crossing would minimize environmental impacts on the Illinois River and its tributary, Coon Run and its tributaries, and the Kaskaskia River and a tributary.  Each of these features and method of crossing is detailed in Table 4.  Since the pipeline would be installed without disturbing the aquatic and benthic environments of these features, no impacts are anticipated.  However, crossings via HDD carry a low risk of an inadvertent release of drilling mud, composed primarily of bentonite (a naturally occurring fine clay) slurry.  Increased levels of sedimentation and turbidity from an inadvertent release could adversely affect fish eggs, juvenile fish survival, benthic community diversity and health, and spawning habitat.  Dakota Access' HDD Construction/Contingency Plan (Appendix C) establishes monitoring procedures and prescribes measures to be implemented to minimize the impact in the event it occurs.  All HDD operations conducted for crossings the Illinois River and Kaskaskia River would adhere to the HDD Contingency Plan and applicable permit conditions to reduce the likelihood of an inadvertent release to minimize and mitigate environmental impacts.  Dakota Access' construction contractor would ensure that the appropriate response personnel and containment equipment are available onsite to effectively implement the HDD Contingency Plan.

Two unnamed tributaries to the Kaskaskia River, Cassar Creek, and a tributary to Cassar Creek (see Table 4) all drain into the Kaskaskia River within the federal flowage easements in Fayette County.  To cross these waterbodies, equipment would operate from the banks of the stream to the maximum extent practicable to excavate a trench.  Flow would be maintained at all times and BMPs would be utilized to avoid or minimize the potential for sedimentation within the channel.  Excavated material from the trench would be placed on the bank above the ordinary high water mark for use as backfill.  The pipe segment would be prefabricated and weighted, as necessary, to provide negative buoyancy and placed below scour depth.  Typical backfill cover requirements would be met, contours would be restored within the waterbody, and the banks would be stabilized via seeding and/or the installation of erosion control matting or riprap.  Excess excavated materials would be distributed in an upland area in accordance with applicable regulations.

In addition to the crossing of these water bodies, aquatic resources could also be impacted during water withdrawal from the Illinois and Kaskaskia Rivers, which is required for activities associated with the installation of HDD and the hydrostatic testing of HDD pipeline segment located on the flowage easements.  However, water withdrawal activities would be conducted in accordance with all applicable permit conditions and regulations and in a manner that would not reduce water flow to a point that would impair flow or impact aquatic life.  Intake screens and floats would also be utilized to prevent entrainment

USACE_DAPL0009870

of aquatic life and avoid impacts on aquatic resources.  In addition, by placing the pump within a secondary containment structure on the barge, the potential for impacts on aquatic resources associated with accidental fuel spills or leaks is likely avoided or minimized.

The primary issue related to impacts on the aquatic environment from operation of the Proposed Action would be related to releases from the pipeline.  For portions of the pipeline installed beneath the Illinois River and Kaskaskia River, the depth of the pipeline profile, increased wall thickness of the pipe, installation of remotely operated valves on both sides of the river crossing, and monitoring of the system 24/7 would further limit the potential for an inadvertent release into the waterbody.  As a result, operations activities are not anticipated to impact aquatic resources or their habitat.  Adherence to the Dakota Access FRP, which is under development and would be issued prior to operating the Proposed Action, in accordance with PHMSA and federal regulations, would minimize potential impacts on aquatic wildlife from potential spills during the operation of the pipeline.  In the event of a leak, Dakota Access would work aggressively to contain the leak, initiate cleanup activities, and contact the appropriate authorities, including USACE.  The FRP is discussed under Section 3.2.1.2 and a draft of the FRP is included in Appendix G.

## 3.5.  Threatened, Endangered, Candidate, and Proposed Species

The Endangered Species Act (ESA) directs all federal agencies to work to conserve species listed as endangered and threatened.  The DAPL Project ROW includes crossing USACE projects and flowage easements, thus triggering consultation under Section 7 of the ESA.  This section serves as the Biological Assessment or written analysis documenting the USACE conclusions and the rationale to support those conclusions regarding the effects of the Proposed Action on federally protected plant and wildlife resources within the Proposed Action Areas/Connected Action Areas.

### 3.5.1.  Affected Environment

Nine federally listed species have been identified in the USACE St. Louis District Action Areas within Pike, Morgan, Scott, and Fayette counties, Illinois.  Of the nine federally listed species, there are three mammals, two mussels, one bird, and three plants.  Additionally, one candidate inspect species is listed in Fayette County, Illinois.  Species lists were obtained from the USFWS website (https://www.fws.gov/midwest/endangered/section7/sppranges/illinois-cty.html) on 12 January 2016, and the USFWS Information for Planning and Conservation website (IPaC; https://ecos.fws.gov/ipac) on 4 February 2016.

### 3.5.1.1.  Northern Long-Eared Bat

Northern Long-Eared Bats (*Myotis septentrionalis*), listed as federally threatened, occur throughout the eastern and north-central U.S.  Eastern populations have declined significantly in recent years as a result of white-nose syndrome (WNS), a contagious fungal infection.  While the Northern Long-Eared Bat is known or likely to occur within the four counties crossed by the Proposed Action Areas/Interrelated Activity Areas (Pike, Morgan, Scott, and Fayette Counties), no critical habitat has been designated in these counties.  Habitat throughout its range includes caves and abandoned mines during the winter and hardwood or mixed forests for roosting and foraging during the summer (USFWS, 2015).

Northern Long-Eared Bats may roost singly or in colonies in cavities, crevices, hollows, or beneath the bark of live and dead trees and/or snags, regardless of tree species.  They prefer trees with a diameter at breast height (dbh) of at least 3 inches.  Less frequently, Northern Long-Eared Bats have been observed roosting

USACE_DAPL0009871

in man-made structures such as sheds or barns.  Northern Long-Eared Bats primarily forage at dusk on insects in forests, but will occasionally forage over small forest clearings and water (USFWS, 2015).  The primary threat to the Northern Long-Eared Bat is WNS.  The disease is caused by the fungus *Pseudogymnoascus destructans* which colonizes the bat's skin.  No obvious treatment or means of preventing transmission is known, and some species have declined >90% within five years of the disease reaching a site.

Impacts to hibernacula, loss or degradation of summer habitat, and wind farm operation may become important factors affecting this bat's viability until ways to address white-nose syndrome are found.  However, no significant population declines have been observed due to these sources.

### 3.5.1.2. Indiana Bat

The Indiana Bat (*Myotis sodalis*), listed as federally endangered, has a range in the U.S. spanning from Iowa to Virginia, and from Maine to as far south as Alabama.  The Indiana Bat is known or likely to occur within the four counties crossed by the Proposed Action Areas/Connected Action Areas (Pike, Morgan, Scott, and Fayette Counties); however no critical habitat has been designated in these counties.

In addition to the preferred wintering habitat of caves, Indiana Bats will also utilize using abandoned mines and other cavelike man-made structures as hibernacula (USFWS, 2009).  In the spring, the bats can migrate hundreds of miles to their summer habitats, with females departing the hibernacula before the males (USFWS, 2007).  Females form maternity colonies that include 10 to 20 roost trees, and generally only use up to three of the trees as primary roost sites.  The females return to the same roost trees each year, and are thought to replace lost primary roost sites with one of the other 10 to 20 roost trees used the previous year (USFWS, 2007).  Researchers have documented female Indiana Bats as having a preference for dead or dying deciduous trees with slabs of exfoliating bark or narrow cracks within the tree.  Male Indiana Bats usually remain closer to their hibernaculum, using a wider variety of roosting sites than females.  Unlike females, males are mostly solitary when roosting in the summer and are found roosting in smaller trees more often than females (USFWS, 2007).  The Indiana Bat population has suffered from habitat loss/degradation, forest fragmentation, winter disturbance, and environmental contaminants like insecticides, oil spills, WNS, and polychlorinated biphenyls (PCBs).

### 3.5.1.3. Gray Bat

The range of the Gray Bat (*Myotis grisescens*), listed as Federally endangered, is concentrated in the limestone karst areas of the southeastern states of Alabama, Kentucky, Arkansas, Missouri, and Tennessee, and some have been found in Indiana (USFWS, 2009b; USFWS, 1982).  It is known or likely to occur within one Illinois County crossed by the Proposed Action Areas/Interrelated Activity Areas (Pike County), and no critical habitat for the Gray Bat has been designated in the county.  Cave disturbance by humans is a major issue threatening this species; habitat loss to flooding and commercialization of caves negatively impacts the Gray Bat (USFWS, 2009b; USFWS, 2014a).

Gray Bats migrate to their hibernacula in the fall, and mate September through October (NatureServe, 2014).  These bats roost in cooler caves in the winter and warmer caves in the summer; in the winter, Gray Bats hibernate in deep vertical caves that trap large amounts of cold air (USFWS, 2009b).  Typically, bats select summer caves located near open waters such as streams, rivers, or lakes.  Gray Bats are opportunistic insectivores, mostly feeding on aquatic insects and as such rely heavily on water bodies as foraging habitat, tending to feed within 10 feet of the water's surface (NatureServe, 2014; USFWS, 2009b).

USACE_DAPL0009872

### 3.5.1.4.  Higgins Eye Pearlymussel

Higgins Eye Pearlymussel (*Lampsilis higginsii*), listed as Federally endangered, occurs in the Upper Mississippi River drainage, and prefers large freshwater rivers with deep water and velocities less than 1 meter per second (USFWS, 2004a).  In the Proposed Action Areas/Interrelated Activity Areas, the mussel is known or likely to occur in the Pike County.  No occurrences of Higgins Eye Pearlymussel have been recorded within the Proposed Action Areas/Interrelated Activity Areas in Illinois.  Critical habitat for the Higgins Eye Pearlymussel has not been designated in any of the counties that are crossed by the Proposed Action.

Higgins Eye Pearlymussel occur in a variety of stable substrates ranging from boulders to sand; however, they do not occupy areas with firmly packed clay, flocculent silt, organic material, bedrock, concrete, or unstable sand.  Current threats to the Higgins Eye Pearlymussel include habitat alteration, water quality, commercial harvest or illegal poaching, and the invasive zebra mussel (*Dreissena polymorpha*).  The zebra mussel is a threat because it can attach to the Higgins Eye Pearlymussel shell and inhibit movement, burrowing, and opening or closing of shells.  The zebra mussel also competes with the Higgins Eye Pearlymussel and other native mussel species for food (USFWS, 2004a; USFWS, 2004b).

### 3.5.1.5.  Spectaclecase Mussel

Historically, the Spectaclecase Mussel (*Cumberlandia monodonta*), listed as Federally endangered, occurred in at least 44 streams in the Mississippi, Ohio, and Missouri River basins in 14 states, however, is now believed to be found in a total of 20 waterways within 14 states, including Illinois (USFWS, 2014b; USFWS, 2014c).  Within the Proposed Action Areas/Interrelated Activity Areas it is known or likely to occur in Pike County.  No occurrences of Spectaclecase Mussel have been recorded within the proposed DAPL ROW in Illinois.

The Spectaclecase Mussel occurs in a variety of substrates including mud, sand, gravel, cobble, and boulders in relatively shallow riffles and shoals with a slow to swift current.  Spectaclecase Mussels are typically found aggregated in firm mud between large rocks; however, they have been occasionally documented in tree stumps, root masses, and in beds of rooted vegetation.  The decline of the Spectaclecase Mussel population is attributed to habitat loss and degradation including impoundments, channelization, chemical contaminants, mining, and sedimentation.

### 3.5.1.6.  Piping Plover

Piping Plovers (*Charadrius melodus*), listed as Federally endangered, are shore birds that inhabit areas near water, preferring river sandbars and alkali wetlands in the Great Plains for nesting, foraging, sheltering, brood-rearing, and dispersal.  Piping Plovers winter along large coastal sand or mudflats near a sandy beaches throughout the southeastern U.S.  Of the four counties within the Proposed Action Areas/Interrelated Activity Areas, the Piping Plover is only known or likely to occur in Fayette County.  No critical habitat been designated in or near the Proposed Action Areas/Interrelated Activity Areas.

### 3.5.1.7.  Decurrent False Aster

The Decurrent False Aster (*Boltonia decurrens*) was federally listed as threatened by the USFWS on November 14, 1988 (USFWS, 1988a).  This species is a herbaceous early successional floodplain plant that colonizes disturbed sites along the Illinois River and its confluence with the Mississippi River (USFWS, 1988a).  Within counties crossed by the Proposed Action, the Decurrent False Aster is only known or likely

USACE_DAPL0009873

to occur within Pike, Morgan and Scott Counties.  No occurrences of Decurrent False Aster, or any designated critical habitat, have been recorded within the Proposed Action Areas/Interrelated Activity Areas.

Adaptations exhibited through the life history of the Decurrent False Aster only allows for a narrow species distribution defined by the floodplain of the Illinois River (USFWS, 2012a).  Therefore, the preferred habitat of this species is characterized as disturbed ground bordering sloughs, ditches, ponds, wet prairies, shallow marshes, and open forests associated with the river (USFWS, 1988a).  The Decurrent False Aster relies on regular flooding events, not only for seed dispersal, but for the creation of new habitat as the result of the removal of competing species (USFWS, 1990).

Historically, the range of the Decurrent False Aster spanned approximately 250 miles along the Illinois River, ranging from LaSalle, Illinois, to the Mississippi-Illinois River confluence (USFWS, 1988a).  An Illinois River survey conducted in 1989 located 18 communities of Decurrent False Aster within Jersey, Scott, Cass, Morgan, Schuyler, Fulton, Tazewell, and Marshall Counties, and along the Mississippi River in St. Clair County (USFWS, 1990).  Surveys conducted in 2002 revealed an increase of up to 26 Decurrent False Aster populations; however, the number of individual plants has decreased from more than 1 million to 378,887 (USFWS, 2012a).

### 3.5.1.8.  Eastern Prairie Fringed Orchid

The Eastern Prairie Fringed Orchid (*Platanthera leucophaea*) was federally listed as threatened under the ESA on September 28, 1989 (USFWS, 2010).  The Eastern Prairie Fringed Orchid is known or likely to occur within all four Illinois counties crossed by the Proposed Action (Pike, Morgan, Scott, and Fayette Counties).  No occurrences of Eastern Prairie Fringed Orchid, or any designated critical habitat, have been recorded within the Proposed Action Areas/Interrelated Activity Areas.

This species inhabits a wide variety of areas, ranging from mesic prairie to wetlands such as sedge meadows, marsh edges, and bogs (USFWS, 1999).  An area with full sunlight, grassy habitat, and minimal woody encroachment is ideal for the Eastern Prairie Fringed Orchid (USFWS, 2005).  Additionally, this species requires habitat that is not periodically disturbed (e.g., no row-crop agriculture or herbicide usage).  Historically, this orchid existed in 33 Illinois counties, but now occurs in only six counties near Chicago, with single populations found in cemetery prairies located in eastern and west-central Illinois counties (USFWS, 1999).

Threats to the success of this species consist of converting suitable habitat to croplands and pasture, herbicide usage on ROWs, land alteration by ditching and diking, woody vegetation encroachment, competition from invasive plant species, and poaching and trampling by people (Michigan Natural Features Inventory [MNFI], 2000; USFWS, 2010).  Currently, active management by physically removing brush and weeds or prescribing burns are the best options for controlling Eastern Prairie Fringed Orchid habitat depending on the level of woody vegetation encroachment and presence of specific invasive species (USFWS, 2010).

### 3.5.1.9.  Prairie Bush Clover

The Prairie Bush Clover (*Lespedeza leptostachya*) was listed as threatened on January 9, 1987 (USFWS, 1988b).  The Prairie Bush Clover is known or likely to occur within one Illinois county crossed by the Proposed Action (Fayette County).  No occurrences of Prairie Bush Clover, or any designated critical habitat, have been recorded within the Proposed Action Areas/Interrelated Activity Areas.

USACE_DAPL0009874

Ideal habitat for the Prairie Bush Clover appears to be dry-mesic prairie consisting of fine silty loam, fine sandy loam, or clay loam with a gentle slope facing north.  This species is capable of inhabiting both undisturbed and disturbed areas (USFWS, 1988b).  The range of the Prairie Bush Clover is specific to the tallgrass prairie region of the Midwest.  Today, this species can be found in the states of Iowa, Illinois, Minnesota, and Wisconsin (Minnesota Department of Natural Resources [MNDNR], 2015).

The majority of these plants are found close to the Des Moines River Valley in southwestern Minnesota and the Iowa lakes region in northwestern Iowa (MNDNR, 2015).  Threats for survival of the Prairie Bush Clover consist of habitat conversion, livestock grazing, herbicide application, small population size, succession, low recruitment, invasive species, and gravel mining/extraction (USFWS, 2009c).

### 3.5.1.10.  Rattlesnake-Master Borer Moth

The Rattlesnake-Master Borer Moth (*Papaipema eryngii*), listed as a candidate species, is a large chocolate-colored moth with bold white orbicular and axillary markings.  The Rattlesnake-Master Borer Moth occurs in 16 populations in five states, including Arkansas, Illinois, Kentucky, North Carolina and Oklahoma.  Within the Proposed Action Areas/Interrelated Activity Areas, the Rattlesnake-Master Borer Moth may be found in Fayette County.  The moth is named for its reliance on the rattlesnake-master (*Eryngium yuccifolium*), a prairie plant which is its only food source.  Adult borer moths lay their eggs in the vicinity of the plant in the fall where the eggs overwinter in the prairie duff.  In the spring, larvae emerge from the eggs and feed on leaves of the rattlesnake-master until they are ready to burrow into the root of the plant.  The moth stays in the burrow until late summer when it pupates and adults emerge again in mid-September.  Rattlesnake-Master Borer Moths depend on undisturbed prairie that contains their food source, and loss of prairie habitat to other land uses is likely causing populations to decline.  A population of 100-1000 rattlesnake-master plants need to be present for the Rattlesnake-Master Borer Moth to persist (USDA, 2003).

### 3.5.2.  Impacts and Mitigation

Dakota Access conducted pedestrian surveys of the workspace within the Action Areas between September 2014 and July 2015 to assess suitable habitat for listed species.  Given the limited scope of this Proposed Action, minimization measures, and the implementation of specialized construction techniques, USACE has determined that the Proposed Action would have "*no effect*" on the Gray Bat, Higgins Eye Pearlymussel, Spectaclecase Mussel, Piping Plover, Decurrent False Aster, Eastern Prairie Fringed Orchid, Prairie Bush Clover, and Rattlesnake-Master Borer Moth within the Proposed Action Areas/Interrelated Activity Areas.  In addition, USACE has determined that the Proposed Action "*may affect, but is not likely to adversely affect*" the Northern Long-Eared Bat and Indian Bat within the Proposed Action Areas/Interrelated Activity Areas.  Table 6 lists the impact determinations of the protected species with potential to occur within the Proposed Action Areas and Interrelated Activity Area.  A summary of habitat evaluations and the basis for the determination of impacts for each listed species is provided below.

USACE_DAPL0009875

| Table 6 Federally Listed Species with Potential to Occur within the  Proposed Action Areas/Interrelated Activity Areas | | | | | | |
|---|---|---|---|---|---|---|
| Species | Status | County Listed | | | | Impact Determination |
| | | Pike | Morgan | Scott | Fayette | |
| **Mammals** | | | | | | |
| Northern Long-Eared Bat | Threatened | X | X | X | X | May affect, not likely to adversely affect |
| Indiana Bat | Endangered | X | X | X | X | May affect, not likely to adversely affect |
| Gray Bat | Endangered | X | | | | No Effect |
| **Mussels** | | | | | | |
| Higgins Eye Pearlymussel | Endangered | X | | | | No Effect |
| Spectaclecase Mussel | Endangered | X | | | | No Effect |
| **Birds** | | | | | | |
| Piping Plover | Endangered | | | | X | No Effect |
| **Plants** | | | | | | |
| Decurrent False Aster | Threatened | X | X | X | | No Effect |
| Eastern Prairie Fringed Orchid | Threatened | X | X | X | X | No Effect |
| Prairie Bush Clover | Threatened | | | | X | No Effect |
| **Insects** | | | | | | |
| Rattlesnake-Master Borer Moth | Candidate | | | | X | No Effect |

### 3.5.2.1.  Northern Long-Eared Bat

The USFWS published the final 4(d) rule for the Northern Long-Eared Bat in the *Federal Register* on January 14, 2016.  The Northern Long-Eared Bat 4(d) rule prohibits incidental take that may occur from tree removal activities within 150 feet of a known occupied maternity roost tree during the pup season (June 1 to July 31) or within a 1/4 mile of a hibernation site, year round.

The Proposed Action Areas/Interrelated Activity Areas in Illinois are within the WNS buffer zone.  As such, habitat assessments and acoustic and mist net surveys were completed by Dakota Access in the Summer of 2015 to assess the potential for the Northern Long-Eared Bat to occur in the Proposed Action Areas/Interrelated Activity Areas, the USFWS was coordinated with in performing these surveys.  The results of the habitat assessment field surveys within the Proposed Action Areas/Interrelated Activity Areas indicate that potential roosting habitat for Northern Long-Eared Bats is present within the pipeline ROW within the profile of the HDD alignment underneath the forested banks of the Illinois River in Pike and Morgan Counties, and as it crosses the federal flowage easements north of Carlyle Lake in Fayette County.  Acoustic and mist-net surveys were conducted to determine presence of the Northern Long-Eared Bat.  Based on the results of these evaluations, no active roost trees and no Northern Long-Eared Bat colonies were identified within the Proposed Action Areas/Interrelated Activity Areas.  To further minimize the potential for impacts to this species, wintertime clearing, between 1 October and 31 March,

USACE_DAPL0009876

would be performed to remove potential roost trees identified within the Proposed Action Areas/Interrelated Activity Areas, provided all regulatory, landowner, and access to these trees is available.

The decline of populations of Northern Long-Eared Bats is largely attributed to the spread of WNS. The operation and maintenance of the DAPL within Proposed Action Areas/Interrelated Activity Areas would not further contribute to the spread of WNS and is not anticipated to result in incidental take in violation of the final 4(d) rule. Following construction, the pipeline ROW would be restored to pre-construction contours and elevations and allowed to return to original land-uses within Proposed Action Areas/Interrelated Activity Areas. Maintenance of the ROW would be limited to preventing the regrowth of trees within a 50-foot-wide permanent DAPL easement, limited to 30-feet in forested wetland areas. Dakota Access has also engineered and designed the pipeline to meet or exceed the requirements of 49 CFR 195, as administered by PHMSA. In the unlikely event of a leak or spill, Dakota Access would follow the procedures outlined in their FRP. Containment and remediation of spills would prevent long-term detrimental effects to potential habitats that may be viable to support the Northern Long-Eared Bat. Further, since no known maternity colonies or hibernacula are known to occur within the Proposed Action Areas/Interrelated Activity Areas, the unlikely event of a spill or leak during operation is not anticipated to adversely affect maternity roosts or hibernacula of the Northern Long-Eared Bat.

Based on the avoidance and minimization measures, literature reviews, field investigations, and habitat types present in the Proposed Action Areas/Interrelated Activity Areas, USACE has determined that the proposed Action "*may affect, but is not likely to adversely affect*" the Northern Long-Eared Bat.

### 3.5.2.2. Indiana Bat

The habitat assessment field surveys within Proposed Action Areas/Interrelated Activity Areas in Illinois indicate that potential roosting habitat for the Indiana Bat (live trees and dead or dying trees with loose bark, exfoliating bark, cracks, crevices, hollows, or cavities) is present within the proposed DAPL ROW within the profile of the HDD alignment underneath the forested banks of the Illinois River in Pike and Morgan Counties, and as it crosses the federal flowage easements north of Carlyle Lake in Fayette County. Acoustic and mist-net surveys were conducted to determine presence of the Indiana Bat. Based on the results of these evaluations, no active roost trees or Indiana Bat colonies were identified within the Proposed Action Areas/Interrelated Activity Areas. To further minimize the potential for impacts to this species, wintertime clearing, between 1 October and 31 March, would be performed to remove potential roost trees within the Proposed Action Areas/Interrelated Activity Areas, provided all regulatory, landowner, and access to these trees is available.

Following construction the pipeline ROW would be restored to pre-construction contours and elevations and allowed to return to original land-uses within Proposed Action Areas/Interrelated Activity Areas. Maintenance of the ROW would be limited to preventing the regrowth of trees within a 50-foot-wide permanent DAPL easement, limited to 30 feet in forested wetland areas. Dakota Access has also engineered and designed the pipeline to meet or exceed the requirements of 49 CFR 195, as administered by PHMSA. In the unlikely event of a leak or spill, Dakota Access would follow the procedures outlined in their FRP. Containment and remediation of spills would prevent long-term detrimental effects to potential habitats that may be viable to support the Indiana Bat. Further, since no maternity colonies or hibernacula are known to occur within the Proposed Action Areas/Interrelated Activity Areas, the unlikely event of a spill or leak during operation is not anticipated to adversely affect maternity roosts or hibernacula of the Indiana Bat.

USACE_DAPL0009877

Based on the avoidance and minimization measures, literature reviews, field investigations, and habitat types present in the Proposed Action Areas, USACE has determined that the Proposed Action *"may affect, but is not likely to adversely affect"* the Indiana Bat.

### 3.5.2.3. Gray Bat

The results of the habitat assessment field surveys indicate that no potential habitat would be affected by the Proposed Action.  Furthermore, no known Gray Bat roost caves have been previously documented within the Proposed Action Areas/Interrelated Activity Areas and no caves were identified during field investigations.  Additionally, no known sinkholes, indicated of karst terrain were are known to occur within the Proposed Action Areas/Interrelated Activity Areas (Davies, 1984).

Following construction the pipeline ROW would be restored to pre-construction contours and elevations and allowed to return to original land-uses within Proposed Action Areas/Interrelated Activity Areas.  Maintenance of the ROW would be limited to preventing the regrowth of trees within a 50-foot-wide permanent DAPL easement, limited to 30-feet in forested wetland areas.  Dakota Access has also engineered and designed the pipeline to meet or exceed the requirements of 49 CFR 195, as administered by PHMSA.  In the unlikely event of a leak or spill, Dakota Access would follow the procedures outlined in their FRP.  Since no potential roost caves or karst features are located within the Proposed Action Areas/Interrelated Activity Areas, the unlikely event of a leak or spill is not expected to impact the Gray Bat.

Based on the avoidance and minimization measures, literature reviews, field investigations, and habitat types present in the Proposed Action Areas/Interrelated Activity Areas, USACE has determined that the Proposed Action would have *"no effect"* on the Gray Bat.

### 3.5.2.4. Higgins Eye Pearlymussel

The results of habitat assessment field surveys indicate that potentially suitable habitat for the Higgins Eye Pearlymussel is only present where the Proposed Action crosses the Illinois River in Pike County.  Additionally, an **Eco**logical **C**ompliance **A**ssessment **T**ool (EcoCAT) assessment was conducted on 2 February 2016 for the Section 408 Proposed Action Areas/Interrelated Activity Areas.  The results contained no records of Higgins Eye Pearlymussels in the vicinity of the Proposed Action location.  The Illinois River would be crossed using a HDD construction method, avoiding impacts to the Higgins Eye Pearlymussel and its potential habitat.  Additionally, The HDD profile was designed to a depth to help provide adequate clearance under the McGee Creek levee, the Illinois River (GeoEngineers, 2015a), and the Coon Run levees (GeoEngineers, 2015b), thereby reducing the risk of experiencing inadvertent drilling fluid returns in the vicinity of these features.  In addition, the bottom tangent of the HDD profile for the Coon run levees was sloped slightly to attempt to increase the depth of the profile yet still avoid intersecting the soil/bedrock interface below (GeoEngineers, 2015b).

Following construction the pipeline ROW would be restored to pre-construction contours and elevations and allowed to return to original land-uses within Proposed Action Areas/Interrelated Activity Areas.  The permanent DAPL easement for the section of pipeline installed by HDD under the Illinois River would only be maintained to prevent the regrowth of trees.  No required maintenance activities would result in instream impacts or impacts to the bed or adjacent banks of the Illinois River.  In addition, Dakota Access has also engineered and designed the pipeline to meet or exceed the requirements of 49 CFR 195, as administered by PHMSA.  In the case of HDD crossings, Dakota Access will be providing line pipe steel with a 0.625-inch wall thickness.  This thicker line pipe provides would allow a higher operating pressure that

USACE_DAPL0009878

is approximately 46% stronger than the thickness required by regulation (Wood Group Mustang, 2015). It is unlikely that a leak or spill would occur with the Proposed Action Areas/Interrelated Activity Areas and even less likely to occur in the HDD areas.

Based on the avoidance and minimization measures, literature reviews, field investigations, and EcoCAT results for the Proposed Action Areas/Interrelated Activity Areas, USACE has determined that the Proposed Action would have *"no effect"* on the Higgins Eye Pearlymussel.

### 3.5.2.5.  Spectaclecase Mussel

The results of habitat assessment field surveys indicate that potentially suitable habitat for the Spectaclecase Mussel is only present where the Proposed Action crosses the Illinois River in Pike County, Illinois.  Additionally, an EcoCAT assessment was conducted on 2 February 2016 for the Section 408 Proposed Action Areas/Interrelated Activity Areas.  The results contained no records of Spectaclecase Mussels in the vicinity of the Proposed Action location.  The Illinois River would be crossed using a HDD construction method, avoiding impacts to the Spectaclecase Mussel and its potential habitat. Additionally, The HDD profile was designed to a depth to help provide adequate clearance under the McGee Creek levee, the Illinois River (GeoEngineers, 2015a), and the Coon Run levees (GeoEngineers, 2015b), thereby reducing the risk of experiencing inadvertent drilling fluid returns in the vicinity of these features.  In addition, the bottom tangent of the HDD profile for the Coon run levees was sloped slightly to attempt to increase the depth of the profile yet still avoid intersecting the soil/bedrock interface below (GeoEngineers, 2015b).

Following construction the pipeline ROW would be restored to pre-construction contours and elevations and allowed to return to original land-uses within Proposed Action Areas/Interrelated Activity Areas.  The permanent DAPL easement for the section of pipeline installed by HDD under the Illinois River would only be maintained to prevent the regrowth of trees.  No required maintenance activities would result in impacts to the bed or adjacent banks of the Illinois River.  In addition, Dakota Access has also engineered and designed the pipeline to meet or exceed the requirements of 49 CFR 195, as administered by PHMSA.  In the case of HDD crossings, Dakota Access will be providing line pipe steel with a 0.625-inch wall thickness.  This thicker line pipe provides would allow a higher operating pressure that is approximately 46% stronger than the thickness required by regulation (Wood Group Mustang, 2015).  It is unlikely that a leak or spill would occur with the Proposed Action Areas/Interrelated Activity Areas and even less likely to occur in the HDD areas.

Based on the avoidance and minimization measures, literature reviews, field investigations, and EcoCAT results for the Proposed Action Areas/Interrelated Activity Areas, USACE has determined that the Proposed Action would have *"no effect"* on the Spectaclecase Mussel.

### 3.5.2.6.  Piping Plover

The Piping Plover nests on sparsely vegetated sandbars and beaches of large rivers and is known or likely to occur within Fayette County.  Based on the results of the habitat assessment field surveys, the proposed DAPL does not cross potential habitat for the Piping Plover.  It is more probable that potentially suitable habitats for the Piping Plover are located more than five miles to the south of the Proposed Action Areas/Interrelated Activity Areas in Fayette County, along the shorelines of Carlyle Lake.  Additionally, an EcoCAT assessment was conducted on 2 February 2016 for the proposed Section 408 Action Areas.  The results contained no records of Piping Plovers in the vicinity of the Proposed Action location.  The Kaskaskia River would be crossed using a HDD construction method.

USACE_DAPL0009879

Following construction the pipeline ROW would be restored to pre-construction contours and elevations and allowed to return to original land-uses within Proposed Action Areas/Interrelated Activity Areas. Maintenance of the ROW would be limited to preventing the regrowth of trees within a 50-foot-wide permanent DAPL easement, limited to 30-feet in forested wetland areas. Dakota Access has also engineered and designed the pipeline to meet or exceed the requirements of 49 CFR 195, as administered by PHMSA. In the unlikely event of a leak or spill, Dakota Access would follow the procedures outlined in their FRP. Containment and remediation of spills would prevent long-term detrimental effects to potential habitats that may be viable to support the Piping Plover 5 miles south at Carlyle Lake. Since no potential habitat for Piping Plover is located within the Proposed Action Areas/Interrelated Activity Areas, the unlikely event of a leak or spill would not be expected to impact suitable habitats for the Piping Plover.

Based on the avoidance and minimization measures, literature reviews, field investigations, and EcoCAT results for the Proposed Action Areas/Interrelated Activity Areas, USACE has determined that the proposed would have *"no effect"* on the Piping Plover.

### 3.5.2.7. Decurrent False Aster

The McGee Creek levee, Illinois River, and the Coon Run levees would be crossed using a HDD construction method. No occurrences of Decurrent False Aster, or any designated critical habitat, have been recorded within the Proposed Action Areas/Interrelated Activity Areas. Additionally, an EcoCAT assessment was conducted on 2 February 2016 for the proposed Section 408 Action Area. The results contained no records of Decurrent False Aster in the vicinity of the Proposed Action Areas/Interrelated Activity Areas.

The habitat assessment field surveys indicate that preferred habitat for the Decurrent False Aster would not be affected by the Proposed Action. The Proposed Action occurs primarily in agricultural fields, restored grassland, and forested areas within the known range of this species.

Following construction the pipeline ROW would be restored to pre-construction contours and elevations and allowed to return to original land-uses within the Proposed Actions Areas/Interrelated Activity Areas. The permanent DAPL easement for the section of pipeline installed by HDD under the McGee Creek levee, Illinois River, and the Coon Run levees would only be maintained to prevent the regrowth of trees. No required maintenance activities would result in impacts to the banks of the Illinois River. In addition, Dakota Access has also engineered and designed the pipeline to meet or exceed the requirements of 49 CFR 195, as administered by PHMSA. In the case of HDD crossings, Dakota Access will be providing line pipe steel with a 0.625-inch wall thickness. This thicker line pipe provides would allow a higher operating pressure that is approximately 46% stronger than the thickness required by regulation (Wood Group Mustang, 2015). It is unlikely that a leak or spill would occur with the Proposed Action Areas/Interrelated Activity Areas and even less likely to occur in the HDD areas.

Based on the avoidance and minimization measures, literature reviews, field investigations, EcoCAT results, and habitat types present in the Proposed Action Areas/Interrelated Activity Areas, USACE has determined that the Proposed Action would have *"no effect"* on the Decurrent False Aster.

### 3.5.2.8. Eastern Prairie Fringed Orchid

The McGee Creek levee, Illinois River, the Coon Run levees, and the Kaskaskia River would be crossed using a HDD construction method. The remainder of the proposed pipeline alignment within the flowage easement north of Carlyle Lake would be trenched. No occurrences of Eastern Prairie Fringed Orchid, or any designated critical habitat, have been recorded within the Proposed Action Areas/Interrelated Activity

USACE_DAPL0009880

Areas.  Additionally, an EcoCAT assessment was conducted on 2 February 2016 for the Section 408 Action Areas/Interrelated Activity Areas.  The results contained no records of Eastern Prairie Fringed Orchid in the vicinity of the Proposed Action Areas/Interrelated Activity Areas.  Furthermore, the habitat assessment field surveys indicate that preferred habitat for the Eastern Prairie Fringed Orchid would not be affected by the Proposed Action.  The Proposed Action occurs primarily in agricultural fields, restored grasslands, and forested areas within the known range of this species.  Following construction, the pipeline ROW would be restored to pre-construction contours and elevations and allowed to return to original land-uses within Proposed Action Areas/Interrelated Activity Areas.  Maintenance of the ROW would be limited to preventing the regrowth of trees within a 50-foot-wide permanent DAPL easement, limited to 30-feet in forested wetland areas.  Dakota Access has also engineered and designed the pipeline to meet or exceed the requirements of 49 CFR 195, as administered by PHMSA.  In the unlikely event of a leak or spill, Dakota Access would follow the procedures outlined in their FRP.  Since no potential habitat for the Eastern Prairie Fringed Orchid is located within the Proposed Action Areas/Interrelated Activity Areas, the unlikely event of a leak or spill would not be expected to impact suitable habitats for the Eastern Prairie Fringed Orchid.

Based on the avoidance and minimization measures, literature reviews, field investigations, EcoCAT results, and habitat types present in the Proposed Action Areas/Interrelated Activity Areas, USACE has determined that the Proposed Action would have *"no effect"* on the Eastern Prairie Fringed Orchid.

### 3.5.2.9.  Prairie Bush Clover

The Kaskaskia River would be crossed using a HDD construction method.  The remainder of the proposed pipeline alignment within the flowage easement north of Carlyle Lake would be trenched.  No occurrences of Prairie Bush Clover, or any designated critical habitat, have been recorded within the Proposed Action Areas/Interrelated Activity Areas.  Additionally, an EcoCAT assessment was conducted on 2 February 2016 for the proposed Section 408 Action Areas.  The results contained no records of Prairie Bush Clover in the vicinity of the Proposed Action Areas/Interrelated Activity Areas.  Furthermore, the habitat assessment field surveys indicate that preferred habitat for Prairie Bush Clover would not be affected by the Proposed Action.  The Proposed Action occurs primarily in agricultural fields, restored grasslands, and forested areas within the known range of this species.

Following construction, the pipeline ROW would be restored to pre-construction contours and elevations and allowed to return to original land-uses within Proposed Action Areas/Interrelated Activity Areas.  Maintenance of the ROW would be limited to preventing the regrowth of trees within a 50-foot-wide permanent DAPL easement, limited to 30-feet in forested wetland areas.  Dakota Access has also engineered and designed the pipeline to meet or exceed the requirements of 49 CFR 195, as administered by PHMSA.  In the unlikely event of a leak or spill, Dakota Access would follow the procedures outlined in their FRP.  Since no potential habitat for Prairie Bush Clover is located within the Proposed Action Areas/Interrelated Activity Areas, the unlikely event of a leak or spill would not be expected to impact suitable habitats for Prairie Bush Clover.

Based on the avoidance and minimization measures, literature reviews, field investigations, EcoCAT results, and habitat types present in the Proposed Action Areas/Interrelated Activity Areas, USACE has determined that the Proposed Action would have *"no effect"* on the Prairie Bush Clover.

USACE_DAPL0009881

#### 3.5.2.10.  Rattlesnake-Master Borer Moth

The Kaskaskia River would be crossed using a HDD construction method.  The remainder of the proposed pipeline alignment within the flowage easement north of Carlyle Lake would be trenched.  The Rattlesnake-Master Borer Moth utilizes the rattlesnake master plant species for breeding purposes and is known or likely to occur within Fayette County.  Based on the results of the habitat assessment field surveys, the Proposed Action Areas/Interrelated Activity Areas does not cross habitat containing the rattlesnake master plant species, or undisturbed mesic or wet-mesic prairies that would likely support this species.  Dominant vegetation communities within Proposed Action Areas/Interrelated Activity Areas in Fayette County are agricultural, bottomland forest, or emergent wetland communities that are subjected to intense seasonal flooding for recreational hunting purposes.

Following construction, the pipeline ROW would be restored to pre-construction contours and elevations and allowed to return to original land-uses within Proposed Action Areas/Interrelated Activity Areas.  Maintenance of the ROW would be limited to preventing the regrowth of trees within a 50-foot-wide permanent DAPL easement, limited to 30-feet in forested wetland areas.  Dakota Access has also engineered and designed the pipeline to meet or exceed the requirements of 49 CFR 195, as administered by PHMSA.  In the unlikely event of a leak or spill, Dakota Access would follow the procedures outlined in their FRP.  Since no potential habitat for the Rattlesnake-Master Borer Moth is located within the Proposed Action Areas/Interrelated Activity Areas, the unlikely event of a leak or spill would not be expected to impact suitable habitats for the Rattlesnake-Master Borer Moth.

Based on literature reviews, field investigations, and lack of appropriate habitat type present in the Proposed Action Areas/Interrelated Activity Areas, USACE has determined that the Proposed Action would have *"no effect"* on the Rattlesnake-Master Borer Moth.

#### 3.5.2.11.  Endangered Species Act Coordination

A separate Biological Assessment document, dated March 2016, was coordinated with the USFWS in order to expedite compliance with the ESA.  In a letter from the U.S. Fish and Wildlife Service dated 2 May 2016, the Service concurred with the determination that the project "*may affect, but is not likely to adversely affect*" the Indiana Bat.  The Service considers section 7(a)(2) consultation to be completed for this species.  Furthermore, the Service found that the Northern Long-Eared Bat is likely to be adversely affected by the DAPL Project, but that this project will not result in prohibited  incidental take, and its effects are covered by the Programmatic Biological Opinion dated 5 January 2016.  Thus, no additional consultation is needed for the Northern Long-Eared Bat unless: (1) new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not considered in the consultation; (2) the action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the consultation; or (3) a new species is listed or critical habitat is designated that may be affected by this project.  The response letter from the USFWS can be found in Appendix K.

### 3.6.  Fish and Wildlife Coordination Act

The amendments enacted in 1946 to the Fish and Wildlife Coordination Act require consultation with the USFWS for the purpose of preventing loss of and damage to wildlife resources.  The USACE issued a public notice of the Section 408 review of the Proposed Action on 5 January 2016.  The public notice provides the USFWS with the opportunity to provide recommendations under the Fish and Wildlife Coordination Act concerning the Proposed Action.  No recommendations were received from the USFWS by the expiration date of the public notice (5 February 2016), thus, full compliance with the Fish and Wildlife

USACE_DAPL0009882

Coordination Act is inferred.  Furthermore, Dakota Access has consulted with the USFWS for technical assistance to determine appropriate measures necessary to minimize and avoid impacts to wildlife resources.

## 3.7.  Bald and Golden Eagle Protection Act

The Bald and Golden Eagle Protection Act (16 U.S.C. 668-668c), of 1940 as amended, prohibits anyone, without a permit issued by the Secretary of the Interior, from the "take" of bald eagles, including their parts, nests, or eggs.  The Act provides criminal penalties for persons who "take, possess, sell, purchase, barter, offer to sell, purchase or barter, transport, export or import, at any time or any manner, any bald eagle ... [or any golden eagle], alive or dead, or any part, nest, or egg thereof."  The Act defines "take" as "pursue, shoot, shoot at, poison, wound, kill, capture, trap, collect, molest or disturb."

The U.S. Fish and Wildlife Service developed the National Bald Eagle Management Guidelines (USFWS 2007) to provide landowners, land managers, and others with information and recommendations regarding how to minimize potential impacts to bald eagles, particularly where such impacts may constitute disturbance.  For purposes of the National Bald Eagle Management Guidelines, "disturb" means: "to agitate or bother a bald or golden eagle to a degree that causes, or is likely to cause, based on the best scientific information available,

1.  injury to an eagle,
2.  a decrease in its productivity, by substantially interfering with normal breeding, feeding, or sheltering behavior, or
3.  nest abandonment, by substantially interfering with normal breeding, feeding, or sheltering behavior."

This definition also covers impacts that result from human-induced alterations initiated around a previously used nest site during a time when eagles are not present, if, upon the eagle's return, such alterations agitate or bother an eagle to a degree that interferes with or interrupts normal breeding, feeding or sheltering habits, and causes injury, death or nest abandonment.

Although initial field investigations did not identify bald eagles or their nests within the Proposed Action Areas/Connected Action Areas, the USFWS will be contacted immediately if nests are encountered at any time, per the National Bald Eagle Management Guidelines.  The National Bald Eagle Management Guidelines will be followed throughout the construction, operation and maintenance of the Proposed Action.

## 3.8.  Land Use and Recreation

Under the "No Action" Alternative, Dakota Access would not construct the DAPL Project, and no impacts on land use and recreation would occur.  However, if the objectives of the DAPL Project are to be met under the "No Action" Alternative, other projects and activities would be required and these projects would result in their own impacts on land use and recreation, which would likely be similar to or greater than the DAPL Project.  Nevertheless, the impacts associated with a future project developed in response to the "No Action" Alternative are unknown, while only temporary and minor impacts or insignificant permanent impacts on land use and recreation would occur as a result of the Proposed Action, as described in the sections below.

USACE_DAPL0009883

### 3.8.1.  Land Ownership

The Proposed Action would cross three USACE projects in Pike, Morgan and Scott counties, Illinois.  These USACE projects include the McGee Creek levee of the Illinois River, owned and managed by the McGee Levee and Drainage District; the Illinois River; and the Coon Run levees of the Illinois River, situated on private property but managed by the Coon River Drainage District.

Additionally, the proposed 30-inch pipeline would cross fourteen contiguous USACE flowage easements over seventeen privately-owned parcels to the north of Carlyle Lake.  Based upon recorded easement documents and mapping, the distance across the flowage easements near the Kaskaskia River in Fayette County is approximately 12,778 feet (2.42 miles).  The flowage easements allow the Government to flood and saturate the land, surface, and subsurface of these properties.

### 3.8.2.  Land Use

### 3.8.2.1.  Affected Environment

Land use within the Proposed Action Areas/Connected Action Areas was assigned a classification based on the principal land characteristic in a given area.  Aerial photography, the National Land Cover Database (Multi-Resolution Land Characteristics Consortium, 2011) was used to identify and classify general land use for the Proposed Action Areas.

### Agricultural Land

Agriculture is the primary land use within the Proposed Action Areas/Connected Action Areas.  These lands are primarily used for cultivating crops.  Agricultural lands allows for land uses such as farming, ranching, animal feeding operations, grain storage, and related functions.  Agricultural land within the Proposed Action Areas include both pivot irrigated and non-irrigated cropland of corn (*Zea mays*) and soybean (*Glycine max*).

### Developed Land

Developed land includes open space around structures such as homes, farmsteads, outbuildings, well sites, and areas associated with roads and ditches.  Little developed land would be affected by the Proposed Action.

### Open Space

Open space includes all land that is not agriculture or developed; namely wetlands, open water, grasslands, scrub-shrub, and forested lands.  Open space is found primarily along the river banks and adjacent floodplains.  The largest section of open space affected by the Proposed Action occurs within the USACE flowage easements.  See Sections 3.2 and 3.3 for a discussion on water resources and vegetation.

### 3.8.2.2.  Impacts and Mitigation

The Proposed Action would result primarily in temporary, short-term impacts on land use during construction.  Construction activities would require the temporary and short-term removal of existing agricultural land from crop and forage production within the construction footprint.  During construction, temporary impacts such as soil compaction and crop damage are possible along the construction ROW.

USACE_DAPL0009884

Mitigation measures to minimize impacts such as topsoil segregation and decompaction practices would be implemented in accordance with the SWPPP.  Upon the completion of construction activities, the Proposed Action Areas/Connected Action Areas would be restored and returned to pre-construction land use.

As mentioned above, a pivot irrigation system is present within the pipeline pull-string section associated with the HDD of the Illinois River and McGee Creek levee.  This workspace is considered a Connected Action.  Other agricultural lands crossed by the Proposed Action are non-irrigated fields.  Dakota Access would coordinate with all landowners on acceptable methods for construction and restoration, including potential impacts to irrigated and non-irrigated fields.  Compensatory damages would be paid accordingly.

The nearest residence to the Proposed Action on the flowage easements is approximately 360 feet east of the pipe centerline.  Temporary impacts on nearby residences could include inconvenience caused by noise and dust generated from construction equipment and traffic congestion associated with the transport of equipment, materials, and construction workers.  Impacts from noise and dust during construction would diminish with distance from these areas and would be limited to the time of construction which would typically occur during daylight hours.

The primary impact on farms would be the loss of standing crops and use of the land within the work area for the seasons during which the proposed DAPL Project-related activities occur, as well as potential diminished yields for a few years following construction.  Dakota Access proposes to implement mitigation measures to minimize these potential impacts as described in the "Agricultural Impact Mitigation Agreement ("AIMA") between Dakota Access, LLC ("Dakota Access") and the Illinois (Appendix H).  Dakota Access would repair surface drains and drainage tiles disturbed during ROW preparation, construction, and maintenance activities.  Dakota Access would repair or replace fences and gates removed or damaged as a result of ROW preparation, construction, or maintenance activities.

Once in operation, a permanent 50-foot ROW would be maintained except at segments of the ROW above the HDD profile and farmed tracts that would be maintained by clearing woody vegetation over a 30 foot corridor (a 50 foot DAPL easement would still be obtained).  Maintenance would include the removal of any large trees and shrubs.  Trees outside of the ROW would be protected by Dakota Access in a manner compatible with the safe operation, maintenance, and inspection of the pipeline.  Dakota Access would obtain and comply with applicable state regulations, county permits, and zoning and land use regulations.  Permits may include, but are not limited to, grade and fill permits, ditch crossing permits, road and utility permits, and conditional use permits.  Dakota Access would retain one or more EIs to monitor compliance with environmental conditions of permits.

### 3.8.3.  Recreation and Special Interest Areas

### 3.8.3.1.  Affected Environment

Generally, recreation and special interest areas include federal, state, or county parks and forests; conservation lands; wildlife habitat management areas; hunter management areas; natural landmarks; scenic byways; designated trails; recreational rivers; and campgrounds.  Nearby recreational opportunities in the vicinity of the Proposed Action Areas/Connected Action Areas include the Illinois River, the Kaskaskia River, Carlyle Lake, National Wildlife Refuges, and State Fish and Wildlife Areas, none of which are being impacted by the construction, although the HDD would cross under the Illinois and Kaskaskia Rivers.

USACE_DAPL0009885

The Illinois River and Kaskaskia River are open to the public and used for recreational activities such as boating, swimming, and fishing.  Because the Carlyle Lake flowage easements around the Kaskaskia River are federally regulated and privately owned, there is very limited recreational opportunities for the public within the flowage easements.  Privately operated waterfowl hunting recreational opportunities exist within the Carlyle Lake flowage easements.

**Meredosia National Wildlife Refuge**

The Meredosia National Wildlife Refuge is a 5,255-acre national wildlife refuge, located along the east side of the Illinois River in Cass and Morgan counties, about 50 miles west of Springfield, IL.  It is positioned in the upper end of the Alton navigation pool in an area that was historically known for its ability to sustain fish and wildlife.  Land management programs are designed and administered to promote migratory bird, fish, and resident wildlife habitat in the Illinois River basin, while providing increased public recreation and educational opportunities.  When complete, the refuge will include a combination of high quality backwater lake, bottomland forest, prairie, seasonal wetland, and permanent marsh habitat.  As a functioning floodplain wetland complex, the refuge will pay a vital role in perpetuating biological diversity in the Illinois River basin.  The proposed pipeline at the Illinois River crossing is about 1.7 miles south of the Meredosia National Wildlife Refuge.

**Carlyle Lake State Fish and Wildlife Area**

The Carlyle Lake State Fish and Wildlife Area is located approximately 60 miles east of St. Louis, MO, near Vandalia, IL.  The area is at the northern end of Carlyle Lake and at the southwestern tip of Fayette County.  Carlyle Lake is a 26,000-acre multipurpose lake administered by the U.S. Army Corps of Engineers.  The Illinois Department of Natural Resources has a 25-year lease on part of the USACE property to conduct a variety of habitat management measures aimed at increasing food, shelter and nesting areas for numerous wildlife species.

Recreational opportunities abound on the lake and at Eldon Hazlet State Park, at the southern end of the lake.  At the Fish and Wildlife Area, activities revolve mainly around enjoying the beauty and solitude of nature as visitors birdwatch, fish, and hunt.  The federal lease land and state property provide almost 9,500 acres of wildlife habitat.  The Fish and Wildlife Area is has great habitat diversity: approximately 2,000 acres of woodland, 5,800 acres of open water and wetlands, 200 acres of grassland and 1,500 acres of cropland planted for wildlife food and cover.

The proposed pipeline at the Kaskaskia River crossing and flowage easement area is about 6 miles northeast of the Carlyle Lake State Fish and Wildlife Area.

**Illinois Natural Areas Inventory Sites**

The Illinois Natural Heritage Database shows the following protected resources may be in the vicinity of the Proposed Action location: George Smith Bed INAI Site and Woods Lake Bed INAI Site in Pike County, and the Meredosia Docks Bed INAI Site and the National Starch Bed INAI Site in Morgan County.

**Water Quality and Recreation**

Section 303(d) of the CWA requires states to submit their lists of water quality limited waterbodies.  This list has become known as the "TMDL list" (Total Maximum Daily Load) or "Section 303(d) list".  A TMDL is

USACE_DAPL0009886

the amount of a particular pollutant a stream, lake, estuary, or other waterbody can "handle" without violating State water quality standards.  The final 2014 Section 303(d) list, which was submitted to Environmental Protection Agency (EPA) as part of the integrated Section 305(b) water quality assessment report and Section 303(d) TMDL list, includes a list of waterbodies not meeting water quality standards and those for which a TMDL is needed.

Carlyle Lake is on the 2016 Section 303(d) list of impaired waters as not supporting fish consumption because of high levels of mercury, and for aesthetic quality due to high total phosphorus and high total suspended solids (USEPA 2016).

The Illinois River is on the 2016 Section 303(d) list of impaired waters for primary contact for recreation due to fecal coliform and for not supporting fish consumption due to mercury and polychlorinated biphenyls at the HDD crossing location.

The Kaskaskia River is on the 2016 Section 303(d) list of impaired waters for public and food processing water supplies because of atrazine levels; primary contact for recreation due to fecal coliform; and for not supporting fish consumption due to mercury levels at the HDD crossing location.

### 3.8.3.2.  Impacts and Mitigation

The recreational enjoyment of wildlife (such as hunting, fishing or bird watching) may be temporarily affected by construction activities, depending on season and location.  However, this effect would be short-term and limited to construction only.  Recreationists may observe ROW clearing along the river banks of the Illinois and Kaskaskia Rivers.  Because the pipeline would cross underneath the each of these rivers via the HDD method, there would be no disruption to the course or cross-current of the river, and would not impact recreationists.

No impacts to areas of special interests such as the Meredosia National Wildlife Refuge, Carlyle Lake State Fish and Wildlife Area, or Illinois Natural Areas Inventory Sites would occur as a result of the construction of the Proposed Action.  Construction activities will occur over a short period of time and would not occur within visible or audible proximity to any of these areas.

During operation of the pipeline, no effects to recreational opportunities or special interest areas are anticipated.

### 3.9.  Cultural and Historic Resources and Native American Consultations

Section 106 of the National Historic Preservation Act of 1966 (NHPA), as amended, and implemented by 36 CFR Part 800, requires federal lead agencies to assess the effects of permitted actions on historic properties.  Historic properties are defined in the NHPA as prehistoric and historic archaeological sites, standing structures, or other historic resources listed in, or eligible for listing in the National Register of Historic Places (NRHP).

Under the "No Action" Alternative, Dakota Access would not construct the DAPL Project and no impacts on cultural and historic resources would occur.  However, If the objectives of the DAPL Project are to be met under the "No Action" Alternative, other projects and activities would be required and these projects could result in their own impacts on cultural and historic resources, which would likely be similar to or greater than the DAPL Project.  Nevertheless, the impacts associated with a future project developed in

USACE_DAPL0009887

response to the "No Action" Alternative are unknown, while no impacts on cultural and historic resources would occur as a result of the Proposed Action, as described in the sections below.

### 3.9.1.  Cultural Resources Studies

The scope of the cultural resource analysis was designed to be commensurate with the Proposed Action. The Proposed Action is to authorize the crossing of USACE project land near the Illinois and Kaskaskia Rivers in Pike and Morgan counties, IL, and federal flowage easements north of the upper end of Carlyle Lake in Fayette County, IL.

The cultural resources assessment was conducted in compliance with provisions of the following:

- Section 106 of the National Historic Preservation Act of 1966 (Title 54 U.S. Code), as amended;
- Protection of Historic and Cultural Properties (36 CFR 800);
- National Environmental Policy Act of 1969 (Public Law 91-190. 83 Stat. 852);
- Illinois State Agency Historic Resources Preservation Act of 1990 (20 Illinois Compiled Statutes [ILCS] 3420);
- Illinois Archaeological and Paleontological Resources Protection Act (20 ILCS 3435);
- Illinois Human Skeletal Remains Protection Act (20 ILCS 3440); and
- Illinois State Historic Preservation Office Guidelines for Archaeological Surveys/Reports.

### 3.9.1.1.  Affected Environment

A check of previously-recorded cultural resources was undertaken within a 1.6-kilometer (km) (1.0-mile) radius of the Proposed Action Areas/Connected Action Areas prior to the commencement of fieldwork. Online databases were consulted, including the National Historic Landmark list and the National Register of Historic Places.  The Historic and Architectural Resources Geographic Information System (HARGIS), maintained by the Illinois Historic Preservation Agency (IHPA), was consulted for locational and other information regarding historic buildings, historic engineering structures, and cemeteries.  The Illinois Inventory of Archaeological Sites geodatabase, maintained by the Illinois State Museum, was consulted for locational and other data regarding recorded archaeological sites and previously-reported archaeological surveys and excavations.  The Illinois Cultural Resource Management Report Database, maintained by the University of Illinois, was consulted for detailed information available in previous reports.  General Land Office maps were researched at the Federal Township Plats website maintained by the Illinois Secretary of State.  Old county plat maps and atlases were researched at the Illinois State Library and the Galesburg Public Library.

The research goals include the identification of historic properties significant at the national, state, regional, or local level within the Proposed Action Areas/Connected Action Areas and collecting sufficient site-specific data to utilize in project planning.  Each archaeological resource documented within the Proposed Action corridor during the course of the Phase I survey was evaluated using the NRHP criteria for evaluation (36 CFR 60.4).

Field methods employed during the Phase I archaeological survey consisted of a combination of systematic shovel testing and pedestrian survey with visual inspection within the 400-foot-wide Proposed Action survey corridor.

USACE_DAPL0009888

Where ground surface visibility was less than 25%, shovel tests were positioned at 15-meter (m) (98-foot) grid or transect intervals. Racketing shovel tests were excavated at intervals of 5 m (16 feet) outward from positive shovel tests along the periphery of each identified site to determine the site boundaries within the Proposed Action corridor. All shovel tests were excavated to a depth of at least 10 centimeters (cm) (3.9 inches) into the sterile subsoil. Backdirt was screened through 0.625-cm (0.25-inch) hardware cloth, with all recovered artifacts bagged and recorded by shovel test number. All artifacts recovered from shovel tests were bagged in accordance with provenience. A profile of every positive shovel test was recorded, and artifact contents were recorded for all positive shovel tests. The locations of all shovel tests were recorded using the ArcGIS Collector Application with an iPad and portable GPS unit.

Areas in which the ground surface visibility exceeded 25% or slope exceeded 15% were subjected to pedestrian survey with visual inspection. The ground surface was inspected at 5 m transect intervals. Where cultural material was encountered, the survey interval was reduced to 2.5 m (8.2 feet) to improve artifact recovery and help determine site boundaries. Artifacts recovered during pedestrian survey were bagged according to provenience. Surface find locations and/or concentrations and site boundaries were mapped using the ArcGIS Collector Application with an iPad and portable GPS unit.

In addition to standard archaeological survey, deep testing operations were undertaken to assess the potential for deeply-buried archaeological deposits in the subject areas. This work was directed by a geomorphologist and was involved the excavation of piston cores, hand auger cores, and backhoe trenches along the proposed DAPL centerline. Stratigraphy exposed in these exploratory excavations was then interpreted to develop an understanding of the potential for former (prehistoric) living surfaces in light of documented depositional sequences.

The literature review determined that 46 archaeological sites are mapped within a one mile radius of the Proposed Action Areas/Connected Action Areas. These sites consist of 41 historic or prehistoric artifact scatters and five prehistoric burial mound sites. Prior to the DAPL survey, none of these sites had been assessed to determine NRHP eligibility. Of these 46 sites, only one (11ST176) is mapped within the Proposed Action Areas/Connected Action Areas, and it is recommended as not eligible for NRHP listing.

## 3.9.1.2. Impacts and Mitigation

Phase I archaeological survey and deep testing within the Proposed Action and Connected Action Areas in Illinois was undertaken between December of 2014 and August of 2015. Six prehistoric sites, 11FY591, 11ST176, 11ST582, 11ST599, IIFY42 , and 11ST192 are within the Proposed Action and Connected Action Areas. Sites 11FY591 11ST176, and 11ST582 would be crossed by an HDD and the pipeline would pass deeply below each site, no archaeological deposits would be impacted. Site 11ST599 is not eligible but is adjacent to the pull string area of the Coon Run levees HDD. Site 11FY42 was recommended as not eligible and IHPA concurred in a letter dated 3 March 2016. Site 11ST192 would only be crossed by a construction-matted travel lane that would be used to access the east side of the Coon Run levees HDD workspace area. Deep testing found no evidence for deeply buried sites or buried landforms suitable for the preservation of prehistoric cultural horizons. No further work is recommended for the USACE projects or flowage easements traversed by the Proposed Action in Illinois. IHPA concurred with these findings by stamped concurrence dated April 4, 2016. Coordination letters can be found in Appendix K.

In accordance with Section 106 of the NHPA, Dakota Access has made a good faith effort to identify significant historic properties within the Proposed Action Areas/Connected Action Areas. Based on the

USACE_DAPL0009889

result of these efforts, no properties consisted to be eligible, or potentially eligible for listing in the National Register of Historic Places (NRHP) would be adversely impacted by the Proposed Action or Connected Actions.

Dakota Access' Unanticipated Discovery Plan (UDP) was developed (Appendix I) for use during all DAPL Project construction activities regardless of jurisdiction or landownership.  The UDP describes actions that would take place in the event that an undocumented cultural resource site is discovered during construction activities.  The UDP explicitly calls for work to stop until the correct authority or agency can be contacted and the find can be properly evaluated.

### 3.9.2.  Native American Consultations

The DAPL pipeline crosses over three Districts (Omaha, Rock Island, and St. Louis).  This EA discusses the tribal consultation for the Proposed Action Areas/Connected Action Areas located within the St. Louis District boundaries.  The USACE initiated formal consultation with all tribes (over 70) for the DAPL pipeline on 3 September 2015.  On 22 January 2016, the St. Louis District sent a second letter to the 28 tribes the St. Louis District consults with, with information on all permit areas including the Proposed Action Areas/Connected Action Areas, asking the tribes to let the USACE St. Louis District if they would like to enter into consultation on any of the areas.  A third letter was sent to all tribes on 2 March 2016, asking all tribes to let the USACE St. Louis District know which areas or sites they wanted to monitor.

The Osage Nation, by letter dated February 3, 2016, notified the St. Louis District of their concerns regarding the proposed DAPL crossings at the Illinois River navigable channel at Milepost 901, Coon Run Levee, McGee Creek Levee, and the Carlyle Lake flowage easements in Pike, Morgan, Scott, and Fayette counties, Illinois.

The Osage Nation raised questions on one of the three sites located in the Coon River levees Proposed Action Areas/Connected Action Areas.  Three sites were identified: one site was recommended not eligible and the IHPA concurred in a letter dated 3 March 2016; the second site that was recommended not eligible is being avoided.  The Osage Nation wanted the third site avoided, but after an explanation on how the HDD is done and that the site would not be disturbed, The Osage Nation stated verbally they would not enter into consultation on this site but would like to monitor the area during the placement of the pipe.

The Osage Nation had concerns for one of the sites at the Proposed Action Areas/Connected Action Areas located at the Carlyle Lake flowage easement.  Two sites were identified in the vicinity of the Proposed Action Areas/Connected Action Areas, however one is outside of the Proposed Action/Connected Action footprint.  Both sites were recommended as not eligible and the IHPA concurred in a letter dated 3 March 2016.  The one site located outside the footprint will be avoided and The Osage Tribe stated verbally they would not enter into consultation on the Proposed Action Areas/Connected Action Areas at Carlyle Lake.

No other tribe has indicated they would like to consult on the Proposed Action Areas/Connected Action Areas that cross the St. Louis District.  Tribal consultation is complete for the Section 408 Proposed Action Areas.  The Osage Nation will be informed when the HDD is occurring at the single site they want to monitor, and arrangements will be made for them to send a representative.  Coordination letters can be found in Appendix K.

USACE_DAPL0009890

## 3.10.  Social and Economic Conditions and Environmental Justice

Under the "No Action" Alternative, Dakota Access would not construct the DAPL Project and no impacts on social and economic conditions or environmental justice would occur.  However, If the objectives of the DAPL Project are to be met under the "No Action" Alternative, other projects and activities would be required (e.g. transportation of oil by truck or rail) and these projects would result in their own social and economic conditions impacts and environmental justice impacts, which would likely be similar to or greater than the DAPL Project.  Nevertheless, the impacts associated with a future project developed in response to the "No Action" Alternative are unknown, while primarily beneficial impacts on social and economic conditions and environmental justice would occur as a result of the Proposed Action, as described in the sections below.

The overall DAPL Project is a $3.78 billion dollar investment directly impacting the local, regional, and national labor force by creating nearly 12,000 construction jobs.  Dakota Access has publically committed to utilizing American labor to build the pipeline.  Dakota Access has teamed up with the various craft and labor unions in the DAPL Project regions and nationally to ensure the DAPL Project is constructed by highly qualified and experienced local and regional labor resources.  These construction jobs would create considerable labor income and state income tax revenue – including the generation of more than $16.4 million in state sales tax and an estimated $3.0 million in local sales tax during construction.  The estimated property tax to be paid in Illinois the first year of operation is $750,000.  If authorized, the DAPL Project would put welders, mechanics, electricians, pipefitters, heavy equipment operators, and others within the heavy construction industry to work.

### 3.10.1.  Demographics, Population and Employment

### 3.10.1.1.  Affected Environment

Population and employment data were collected using census tracts which are crossed by the Proposed Action.  The Illinois River crossing is in a rural agricultural area in Morgan, Pike, and Scott counties, and no towns or cities are close to the pipeline route.  However, the town of Meredosia is 1.4 mile northeast of the pipeline crossing and contains public elementary, junior, and high schools.  The town of Bluffs is 1.2 miles south of the pipeline crossing of State Route 100 and contains a high school.  The Kaskaskia River crossing is in a rural agricultural area in Fayette County southwest of Vandalia and is not near any population centers, schools, or other areas with concentrations of children.

The unemployment rate in the counties ranges from 6.2 to 11.1 percent, compared to 10.0 percent unemployment in the state as a whole.  In the census tracts for the Proposed Action, the unemployment rate ranges from 4.3 to 12.9 percent.  Census tracts 9510 and 9706 both have unemployment rates that are very slightly (1.8 percentage points) higher than those of their respective counties.

### 3.10.1.2.  Impacts and Mitigation

The Proposed Action is assumed to have a short construction window with a small number of construction workers dedicated to these crossings.  It is possible that counties within the Proposed Action Areas/Connected Action Areas could experience short-term temporary effects to the local economy through induced spending from construction employees working on the crossings.  No residential homes or farms would be relocated as a result of the Proposed Action.  In compliance with Executive Order 13045, Protection of Children from Environmental Health and Safety Risks, the pipeline crossings would not be

USACE_DAPL0009891

near any facilities where children are present and would not constitute an environmental health and safety risk that may disproportionately affect children.

The total population, households, and unemployment rate of the four counties and census tracts are provided in Table 7.

| Table 7 Population and Employment | | | |
|---|---|---|---|
| Geographic Area | Total Population | Households | Unemployment Rate (2010) |
| STATE | | | |
| Illinois | 12,868,747 | 4,778,633 | 10.0 |
| COUNTY | | | |
| Fayette County | 22,041 | 7,981 | 11.1 |
| Morgan County | 35,272 | 13,961 | 8.8 |
| Pike County | 16,244 | 6,675 | 6.2 |
| Scott County | 5,260 | 2,074 | 8.9 |
| CENSUS TRACT | | | |
| 9510 (Fayette Co.) | 2,240 | 865 | 12.9 |
| 9514 (Morgan Co.) | 2,675 | 1,142 | 8.5 |
| 9524 (Pike Co.) | 2,913 | 1,273 | 4.3 |
| 9706 (Scott Co.) | 1,935 | 705 | 10.7 |

Source: U.S. Census Bureau, American Community Survey (2010-2014 5-year estimates).

## 3.10.2. Environmental Justice

Executive Order 12898, *Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations*, requires all federal agencies to identify and address disproportionately high and adverse human health or environmental effects of their programs and policies on minority and low-income populations and communities. The CEQ guidance suggests that an environmental justice population may be identified if "the minority population percentage of the affected area exceeds 50 percent, or if the minority population percentage of the affected area is meaningfully greater than the minority population in the general population or other appropriate unit of geographic analysis" (CEQ, 1997).

### 3.10.2.1. Affected Environment

For this Proposed Action, minority and low-income populations were identified by determining the percentage of minority and low-income residents for the census tracts crossed by the Proposed Action. Morgan, Pike, and Scott Counties and the State of Illinois were selected as comparison areas. Low-income populations were identified based on poverty rates for the populations of these census tracts. For this analysis, an increase of at least 10 percentage points indicates a minority or low-income population that is "meaningfully greater" than the general population in the comparison areas.

All four counties and all four census tracts have smaller percentages of minority populations compared to the state as a whole (Table 8). Census tract 9510 in Fayette County and census tract 9514 in Morgan

USACE_DAPL0009892

County have smaller percent minority populations overall and in each minority population category, relative to their respective counties.  Census tract 9524 has a smaller percent minority population overall relative to Pike County, and only a slightly higher (less than 1 percent) percent of individuals reporting as two or more races or reporting as Hispanic or Latino (of any race).  Census tract 9706 has only a slightly higher (1.5 percent) percent minority population overall relative to Scott County, and a slightly higher (2.5 percent) percent of individuals reporting Hispanic or Latino (of any race).

| Table 8 Minority Population Statistics | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Geographic Area | Total Population | Percent[1] | | | | | | | |
| | | White Alone (not Hispanic or Latino) | Black or African Am. | Am. Indian and Alaska Native | Asian | Native Hawaiian and Other Pacific Islander | Some Other Race | Two or More Races | Hispanic or Latino (of any race) |
| STATE | | | | | | | | | |
| Illinois | 12,868,747 | 62.9 | 14.4 | 0.2 | 4.9 | 0.0 | 5.8 | 2.2 | 16.3 |
| COUNTY | | | | | | | | | |
| Fayette County | 22,041 | 94.6 | 3.0 | 0.1 | 0.2 | 0.0 | 0.2 | 0.8 | 1.6 |
| Morgan County | 35,272 | 89.5 | 6.2 | 0.1 | 0.3 | 0.0 | 0.1 | 1.9 | 2.2 |
| Pike County | 16,244 | 95.9 | 1.1 | 0.6 | 0.4 | 0.0 | 0.2 | 1.0 | 1.2 |
| Scott County | 5,260 | 97.5 | 0.0 | 0.1 | 0.2 | 0.0 | 0.0 | 0.8 | 1.5 |
| CENSUS TRACT | | | | | | | | | |
| 9510 (Fayette Co.) | 2,240 | 98.6 | 0.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.4 | 1.1 |
| 9514 (Morgan Co.) | 2,675 | 98.5 | 0.1 | 0.1 | 0.0 | 0.0 | 0.1 | 1.1 | 0.3 |
| 9524 (Pike Co.) | 2,913 | 96.2 | 0.7 | 0.2 | 0.0 | 0.0 | 0.2 | 1.6 | 1.7 |
| 9706 (Scott Co.) | 1,935 | 96.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 4.0 |

Source: U.S. Census Bureau, American Community Survey (2010-2014 5-year estimates).
[1] Totals do not add to 100 percent because Hispanic or Latino is an ethnicity, not race; therefore, it is possible for an individual to be both Hispanic or Latino and be a member of a minority race.

The poverty rate in both Morgan and Scott Counties is less than or equal to the poverty rate in the State as a whole.  In Fayette County and Pike County, the poverty rate is slightly higher (2 percentage points or less) than it is in the State as a whole.  In all four of the census tracts, the poverty rate is lower than it is in both the respective counties and in the State as a whole (Table 9).

USACE_DAPL0009893

| Table 9 Low-Income Population Statistics | | |
|---|---|---|
| Geographic Area | Median Household Income ($) | Persons Below the Poverty Level (%) |
| STATE | | |
| Illinois | 57,166 | 14.4 |
| COUNTY | | |
| Fayette County | 44,603 | 16.4 |
| Morgan County | 46,524 | 14.4 |
| Pike County | 38,740 | 15.3 |
| Scott County | 48,500 | 13.9 |
| CENSUS TRACT | | |
| 9510 (Fayette Co.) | 47,875 | 8.5 |
| 9514 (Morgan Co.) | 43,578 | 9.8 |
| 9524 (Pike Co.) | 38,373 | 13.4 |
| 9706 (Scott Co.) | 52,535 | 11.5 |

Source: U.S. Census Bureau, American Community Survey (2010-2014 5-year estimates).

### 3.10.2.2.  Impacts and Mitigation

For compliance with Executive Order 12898 on Environmental Justice, the pipeline corridor does not cross any communities with minority or low-income populations that are "meaningfully greater" than the minority or low-income populations in the general population.   As discussed above, the areas crossed by the Proposed Action have minority populations that are less than, equal too, or slightly higher (1.5 to 2.5 percent higher) than the minority populations in the respective counties.   Thus, the census tracts crossed by the Proposed Action do not include minority populations that are "meaningfully greater" than the minority populations in the general population.

The areas crossed by the Proposed Action have poverty rates less than, equal too, or slightly higher (2 percentage points) than poverty rates in the State as a whole.   Thus, the census tracts crossed by the Proposed Action do not include low income populations that are "meaningfully greater" than the low income populations in the general population.

Thus, the Proposed Action would not disproportionately affect identified minority or low-income populations.

### 3.11.  Hazardous, Toxic, and Radioactive Wastes

The EPA (2015) defines hazardous waste as waste that is dangerous or potentially harmful to our health or the environment, occurring as liquids, solids, gases, or sludges.   They can be generated through the disposal of commercial products, such as cleaning fluids or pesticides, or manufacturing processes. Improper management and disposal of hazardous substances can lead to pollution of groundwater or other drinking water supplies and the contamination of surface water and soil.   The primary federal regulations for the management and disposal of hazardous substances are the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) and the Resource Conservation and Recovery Act (RCRA).

USACE_DAPL0009894

A review of regulated facilities for hazardous materials along the Proposed Action corridor was conducted by searching online records at the EPA NEPA Assist Tool (EPA, 2015).  Presently, there are no recognized Radiation Information Database, Brownfields, or Superfund sites within one mile of the corridor in Fayette, Morgan, Pike, or Scott Counties.  However, on the south side of Meredosia and about 3,000 feet from the closest pipeline route, Celanese Ltd., Ameren Meredosia Power Station, and the Meredosia Terminal are on the Toxic Release Inventory and registered under the Toxic Substances Control Act as handling regulated chemicals.  These sites also generate air emissions and maintain NPDES discharge permits.  No operating sensitive receptors, such as schools or hospitals, are reported within at least one mile of the Proposed Action Areas/Connected Action Areas.

Within the Proposed Action Areas/Connected Action Areas, there is potential for temporary impacts to public safety from hazardous material use.  Other hazards to worker safety may also exist along the Proposed Action corridor, but do not pose a significant impact.  Because there were no regulated brownfield or Superfund sites found within the one-mile search radius of the Proposed Action Areas/Connected Action Areas, no impacts to the Proposed Action, Proposed Action media, or worker safety are expected.  In the unlikely event contamination is encountered during construction, the UDP (Appendix I) would be implemented to protect people and the environment and avoid or minimize any effects from unearthing the material.

Any hazardous materials discovered, generated, or used during construction would be managed and disposed of in accordance with the DAPL Project's SPCC plan and Unanticipated Discovery Plan as well as the applicable local, tribal, state, and federal regulations.  Should emergency response be required during construction, the contractor would have some of their own trained or contracted responders, and local response teams would be expected to assist.

Dakota Access would comply with any laws, regulations, conditions, or instructions issued by the EPA, or any federal, state, or local governmental agency having jurisdiction to abate or prevent pollution, such as the RCRA, and State hazardous waste management rules.

## 3.12.  Reliability and Safety

The PHMSA, a federal agency within the U.S. DOT is the primary regulatory agency responsible for ensuring the safety of America's energy pipelines, including crude oil pipeline systems.  As a part of that responsibility, PHMSA established regulatory requirements for the construction, operation, maintenance, monitoring, inspection, and repair of liquid pipeline systems.

Construction activities could present safety risks to those performing activities, residents and other pedestrians in the neighborhood.  Given the low population density of the area, safety risks during construction would be limited to workers involved with the Proposed Action.  All activities would be conducted in a safe manner in accordance with the standards specified in the Occupational Safety and Health Administration (OSHA) regulations.

To prevent pipeline failures resulting in inadvertent releases, Dakota Access would construct and maintain the pipeline to meet or exceed industry and governmental requirements and standards.  Specifically, the steel pipe would meet PHMSA specifications under 49 CFR § 195, follow standards issued by the American Society of Mechanical Engineers, National Association for Corrosion Engineers and American Petroleum Institute (API).  Once installed, the pipeline would be subjected to testing to verify its integrity and compliance with specifications, including hydrostatic pressure testing at the crossings, checking coating integrity, and X-ray inspection of the welds.  The pipeline would be placed into service only after

USACE_DAPL0009895

inspection to verify compliance with all construction standards and requirements. Dakota Access would maintain and inspect the pipeline in accordance with PHMSA regulations, industry codes and prudent pipeline operating protocols and techniques. The pipeline ROW would be patrolled and inspected by air every 10 days, weather permitting, but at least every three weeks and not less than 26 times per year, to check for abnormal conditions or dangerous activities, such as unauthorized excavation along the pipeline route.

Dakota Access has drafted a FRP, in accordance with 49 CFR 194, which details the procedures to be implemented in the event of an inadvertent pipeline release and would be in place prior to commencing transportation of crude oil. The FRP is discussed under Section 3.2.1.2 and a draft of the FRP is included in Appendix G.

Following completion of construction and throughout operation of the Proposed Action facilities, the Operator and qualified contractors would maintain emergency response equipment and personnel at strategic points along the pipeline route. These personnel would be trained to respond to pipeline emergencies as well as in the National Incident Management System (NIMS) Incident Command System (ICS). Additionally, contracts would be in place with oil spill response companies that have the capability to mobilize to support cleanup and remediation efforts in the event of a pipeline release. The Operator would also coordinate with local emergency responders in preventing and responding to any pipeline related problems. These activities would include conducting and hosting, over a period of time, emergency response drills with both Dakota Access employees and local emergency responders along the pipeline route.

Dakota Access will conduct emergency response drills/exercises in accordance with the National Preparedness for Response Exercise Program (PREP), which is recognized, and approved, by the EPA, US Coast Guard, and PHMSA. These emergency response exercises will consist of annual table top exercises and equipment deployment drills. Regulatory and stakeholder participation will be encouraged and solicited for the exercises.

In addition to the testing and inspection measures listed above, Dakota Access would utilize a supervisory control and data acquisition (SCADA) system to provide constant remote oversight of the pipeline facilities. Power for the SCADA system would be provided from an existing power grid. In the event of a power outage, a 500 watt Uninterruptable Power Supply would supply low voltage power to the Programmable Logic Controller and communication equipment. Communication with the SCADA system would be accomplished via satellite (Hughes Global Network) and telephone (4G cellular [ATT] or landline depending on availability/coverage). Both forms of communication are continually engaged to poll information from these sites for 100% reliable remote monitoring / operation of these sites through the SCADA system to the Operations Control Center (OCC) in Sugarland, Texas (a backup control room is located in Bryan, Texas), and are proven to have the least potential for interruption during pipeline operations.

If an alarm criteria threshold is met, the SCADA system would alert Dakota Access' OCC Operators, located in Sugarland and Bryan, Texas, of rapid drops in pressure, who would then activate the controls as necessary and initiate procedures for an appropriate response. The OCC prioritizes and responds to all alarms in accordance with the control room management regulations referenced in PHMSA CFR 195.446 (e). This regulation requires that the OCC Operator have a SCADA system alarm management plan; in general, the plan must include review of the SCADA alarm operations to ensure alarms support safe pipeline operations, identify any required maintenance that may affect safety at least once every calendar

USACE_DAPL0009896

month, verify correct safety-related alarm values and descriptions at least once every calendar year when associated field equipment are changed or calibrated, determine effectiveness of the alarm management plan through a yearly review, and monitor content and volume of activity at least once a calendar year to assure controllers have adequate time to review incoming alarms.  Leak Warn, a leading software program for monitoring pipelines, is being tailored to the pipeline facilities, in accordance with Pipeline and Hazardous Materials Safety Administration requirements.  The Operator would utilize a Computational Pipeline Monitoring System (CPM) to monitor the pipeline for leaks.  The CPM is a state-of-the-art pipeline monitoring tool and features a real-time transient model that is based on pipeline pressure, flow, and temperature data, which is polled from various field instruments every 6 seconds and updates the model calculations to detect pipeline system variations every 30 seconds.  After the system is tuned, this state-of-the-art CPM system is capable of detecting leaks down to 1 percent or better of the pipeline flow rate within a time span of approximately 1 hour or less and capable of providing rupture detection within 1 to 3 minutes.  State–of-the-art leak detection equipment and software utilized during operations or the pipeline will be updated per federal standards in accordance with PHMSA requirements.  In the event that a leak is confirmed through verification, pump station shutdown would be initiated within a predetermined amount of time to effectuate.  Next, the remotely controlled isolation valves (mainline valve sites would be installed on both sides of large waterbody crossings for isolation in the event of an emergency shutdown), which are operable from the OCC, would be closed.  These valves have a closure time of no greater than three (3) minutes.  Monitoring of the pipeline segments installed via HDD would be accomplished in the same manner as those segments installed by conventional methods (i.e., SCADA, internal inspection devices, and aerial patrols).  Typically, repairs are not made on any section of pipe greater than 10 to 20 feet below the ground surface depending on the repair needed.  If a material impact was on the pipeline below the 10-foot depth, operation of the system would be modified accordingly (e.g., reduce operating pressure) or the line would be re-drilled.   If inspections identify an anomaly, requirements would be followed to comply with U.S. DOT requirements.

In the unlikely event of a leak during operations of the pipeline, the Operator would implement the response measures described in the FRP.   Below is a list of typical response activities.   However, each spill mitigation situation is unique and will be treated according to the actual spill circumstances present at the time of release.

Notification:  The Operator will conduct notifications in accordance with federal and state guidelines.  These guidelines, along with additional notification forms/procedures are presented in Appendix B of the FRP (Appendix G).   Local government response agencies would be notified first followed by federal and state agencies as well as surrounding communities, and governments (including tribal governments and utilities) in accordance with the relevant provisions of the FRP and relevant law.  Response notification to such entities as the National Response Center, PHMSA, EPA, USACE, and affected state regulatory entities will be made in accordance with the requirements dictated by the incident type.  A complete list of required notifications is included in the FRP.  In accordance with PHMSA policy, the FRP will be updated every five years or sooner if there are material changes to the Plan.

Mobilize Response Equipment:  Emergency equipment would be available to allow personnel to respond safely and quickly to emergency situations.  Company-owned equipment will be inspected and exercised in accordance with PREP guidelines and would be mobilized and deployed by the Operator from strategic staging locations along the pipeline.  Additionally, the operator will contractually secure OSROs to provide trained personnel and equipment necessary to respond, to the maximum extent practicable, to a worst case discharge or substantial threat of such discharge.  At a minimum, each OSRO will have a containment booms, absorbents, boats, and vacuum trucks available.  A complete list of equipment and list of trained

USACE_DAPL0009897

personnel necessary to continue operations of the equipment and staff the oil spill removal organization for each of the OSRO contractors is included in the FRP.

Response Activities: Following incident command protocols, the Operator would work in unison to cooperate with and assist fire, police and other first responders when implementing actions to protect personnel, public safety and the environment. The FRP includes a spill response checklist which lists activities that could be conducted during a spill which would be modified to best address the specific circumstances of a spill event. Incident response activities may include: initiating spill assessment procedures including surveillance operations, trajectory calculations, and spill volume estimating; berming or deployment of containment and/or sorbent booms; lining shorelines with sorbent or diversion booms to reduce impacts; and recovering contained product as soon as possible to prevent the spread of contamination using appropriate hoses, skimmers, pumps, and storage containers or vacuum trucks at collection areas. The response activities would continue until an appropriate level of cleanup is obtained as provided by the responsible federal, state, or other governmental authorities. The nature and location of the incident will affect the regulatory and notification requirements, for which more detail is provided in the FRP. Incidents involving discharges to navigable waters are governed the Oil Pollution Act of 1990.

## 3.13. Air Quality and Noise

Under the "No Action" Alternative, Dakota Access would not construct the DAPL Project and no impacts on air quality and noise would occur. However, If the objectives of the DAPL Project are to be met under the "No Action" Alternative, other projects and activities would be required and these projects would result in their own impacts on air quality and noise, which would likely be similar to or greater than the DAPL Project. Nevertheless, the impacts associated with a future project developed in response to the "No Action" Alternative are unknown, while only temporary and minor impacts on air quality and noise would occur as a result of the Proposed Action, as described in the sections below.

### 3.13.1. Air Quality

#### 3.13.1.1. Affected Environment

The Clean Air Act (CAA) of 1970 requires that states adopt ambient air quality standards. The CAA (42 USC 7401 et seq.) establishes National Ambient Air Quality Standards (NAAQS) for six criteria pollutants (carbon monoxide, ozone, lead, nitrogen dioxide, sulfur dioxide, particulate matter with diameter less than 10 ($PM_{10}$) and fine particulate matter ($PM_{2.5}$), permit requirements for both stationary and mobile sources, and standards for acid deposition and stratospheric ozone ($O_3$) protection. The standards have been established in order to protect the public from potentially harmful amounts of pollutants. Under the CAA, the EPA establishes primary and secondary air quality standards. Primary air quality standards protect public health, including the health of "sensitive populations, such as people with asthma, children, and older adults." Secondary air quality standards protect public welfare by promoting ecosystem health, and preventing decreased visibility and damage to crops and buildings.

According to the EPA's Green Book Nonattainment Area website, Pike County, Morgan County, Scott County, and Fayette County are attainment areas as of October 1, 2015 for criteria pollutants. There are no criteria pollutant monitoring stations in the above listed counties. According to the Illinois Ambient Air Monitoring 2016 Network Plan (Illinois Environmental Protection Agency Bureau of Air [IEPABA], September 2015), the surrounding monitoring stations are located in Quincy, Adams County; Springfield, Sangamon County; Nilwood, Macoupin County; Jerseyville, Jersey County; Effingham, Effingham County and Maryville, Madison County.

USACE_DAPL0009898

The Illinois Ambient Air Monitoring 2015 and 2016 Network Plan shows Quincy, Effingham and Maryville monitoring stations monitoring only ozone (IEPABA, September 2015; IEPABA, August 2014).  The Nilwood monitoring station monitors both sulfur dioxide and ozone.  The Jerseyville monitoring station monitors $PM_{2.5}$ and ozone.  There are two monitoring stations in Springfield in the 2016 Network Plan; one station monitors particulate matter ($PM_{2.5}$) and the other station monitors ozone.  In the 2015 Network Plan, a third Springfield station is present and it monitors $SO_2$.  The primary objective of the monitors located in Quincy, Effingham, Maryville and Springfield is to measure population exposure to air quality parameters.  The Nilwood and Jerseyville monitoring stations primary objective is transport between populated areas.

The EPA Design Value website provides the detailed criteria pollutant 2014 Design Value Reports.  The Design Value Reports contain design values which are location air quality statistics designed to be consistent with the NAAQS.  The monitoring site design value history from 2003 to 2015 provided in the Design Value Reports can be compared against the NAAQS values to determine if an EPA Air Quality Standard has been exceeded.  It is important to note that the information in these reports can change after publication.  At the time of the report, the monitoring data for the stations listed above show pollutant levels for ozone (8-hour) and particulate matter ($PM_{2.5}$) did exceed the EPA Air Quality Standards.  The pollutant levels for sulfur dioxide (1-hour) did not exceed the EPA Air Quality Standards.

### 3.13.1.2.  Impacts and Mitigation

Within the Proposed Action Areas/Connected Action Areas, no long-term impacts to air quality would occur; the proposed pipeline would not emit any criteria air pollutants and is entirely underground.  Short-term impacts to air quality may occur during construction phase of the Proposed Action.  The contribution of the Proposed Action to greenhouse gas emissions during construction would be considered a minor indirect impact to climate change.

During construction, emissions from fuel-burning internal combustion engines (e.g., transportation trucks, heavy equipment, drill rigs, etc.) would temporarily increase the levels of some of the criteria pollutants, including carbon monoxide, nitrogen dioxide, ozone, particulate matter, and non-criteria pollutants such as volatile organic compounds.  Construction of the HDD across the McGee Creek levee, the Illinois River, and the Coon Run levees is likely to take eight to twelve weeks to complete.  Conventional pipeline construction across the federal flowage easements would take approximately one month to complete.  To reduce the emission of criteria pollutants, fuel-burning equipment running times would be kept to a minimum and engines would be properly maintained.  This temporary increase in emissions is not expected to impact air quality or visibility in the region long-term.

### 3.13.2.  Noise

Sound is a sequence of waves of pressure that propagates through compressible media such as air or water.  When sound becomes excessive, annoying, or unwanted it is referred to as noise.

Decibels (dB) are the units of measurement used to quantify the intensity of noise.  To account for the human ear's sensitivity to low level noises, the decibel values are corrected for human hearing to weighted values known as decibels of the A-weighted scale (dBA; see Table 10).  The EPA has set values that should not be exceeded.  While the primary responsibility of regulating noise was transferred from the EPA to state and local governments in 1981, the Noise Control Act of 1972 and the Quiet Communities Act of 1978 are still in effect.

USACE_DAPL0009899

| Table 10 Noise Values | | |
|---|---|---|
| **Area** | **Noise Level** | **Effect** |
| All areas | $L_{eq}$ (24) < 70 dBA | Hearing |
| Outdoors in residential areas and farms where people spend varying amounts of time in which quiet is a basis for use | $L_{dn}$ < 55 dBA | Outdoor activity interference and annoyance |
| Outdoor areas where people spend limited time such as school yards, playgrounds, etc. | $L_{eq}$ (24) < 55 dBA | Outdoor activity interference and annoyance |
| Indoor residential areas | $L_{dn}$ < 45 dBA | Indoor activity interference and annoyance |
| Indoor areas with human activities such as schools, etc. | $L_{eq}$ (24) < 45 dBA | Indoor activity interference and annoyance |

Source: The Engineering ToolBox, 2015; $L_{eq}$: 24-hr equivalent sound level; $L_{dn}$: day-night average sound level

### 3.13.2.1.  Affected Environment

The dominant land use in the Proposed Action Areas/Connected Action Areas is agricultural in Pike, Morgan, and Scott counties, and primarily forested in Fayette County.  The Day-Night Average Sound (Ldn) level for agricultural crop land is 44 dBA, and rural residential is 39 dBA (The Engineering ToolBox, 2015).

### 3.13.2.2.  Impacts and Mitigation

Construction of the Proposed Action would temporarily affect the noise levels on and around the Proposed Action Areas/Connected Action Areas.  Construction would cause temporary increases in the ambient sound environment in the areas immediately surrounding active construction.  The use of heavy equipment or trucks would be the primary noise source during construction and excavation.  The level of impact would vary by equipment type, duration of construction activity and the distance between the noise source and the receptor.  Construction activities would typically be limited only to daytime hours. Potential exceptions include work determined necessary based on weather conditions, safety considerations, and/or critical stages of the HDD [e.g. if pausing for the night would put the drill at risk of closing or jamming].

Once constructed and in-service, normal pipeline operations are not audible.  Dakota Access would mitigate noise impacts by limiting equipment running times and the duration of Proposed Action construction to the minimum amount necessary to complete the Proposed Action.  Noisy construction activities would typically be limited to the least noise-sensitive times of day (daytime only).

Based on the setting of the Proposed Action Areas/Connected Action Areas, it is not anticipated that the temporary increase in ambient sound levels associated with construction would result in a significant noise impact.

### 3.14.  Climate Change

Climate change is a fundamental environmental issue, and is a particularly complex challenge given its global nature and inherent interrelationships among its sources, causation, mechanisms of action, and impacts.  Climate change science is evolving, and is only briefly summarized here.  In 1970, the level of

USACE_DAPL0009900

atmospheric carbon dioxide was estimated at 325 parts per million (ppm) (CEQ, 1970). Since 1970, the concentration of atmospheric carbon dioxide has increased at a rate of about 1.6 ppm per year (1970-2012) to approximately 396 ppm in December 2014 (current globally averaged value). Based on the United States Global Change Research Program as well as other scientific records, it is now well established that rising global atmospheric greenhouse gas emission concentrations are significantly affecting the Earth's climate (USACE, 2015).

### 3.14.1. Affected Environment

Illinois has a climate characterized by marked seasonal and latitudinal variation in temperature and precipitation. Summers are warm and humid, spring and autumn are mild, and winters are cold with snowfall accumulations. Average annual temperatures vary across latitude, from 48° F in the north to 58° F in the south. Average annual precipitation ranges from 32 inches in the north to over 48 inches in the south. Average annual snowfall ranges from 36 inches in the north to less than 10 inches in the south. The average freeze-free season ranges from 160 days in the north to more than 190 days in the south. Severe weather systems are a major factor impacting the Illinois climate, with thunderstorms providing 50 to 60 percent of annual precipitation. The polar jet stream is often located over Illinois, delivering cold weather and heavy snowfall in winter (Chagnon et al., 2004).

### 3.14.2. Impacts and Mitigation

The approach at USACE is to consider the questions in need of climate change information at the geospatial scale where the driving climate models retain the climate change signal. At present, USACE judges that the regional, sub-continental climate signals projected by the driving climate models are coherent and useful at the scale of the 2-digit HUC (Water Resources Region) (Figure EA-1). Within Water Resources Region 07, the general consensus in the recent literature points toward moderate increases in temperature and precipitation, and streamflow over the past century. In some studies, and some locations, statistically significant trends have been quantified. In other studies and locales within the Upper Mississippi Region, apparent trends are merely observed graphically but not statistically quantified. There has also been some evidence presented of increased frequency in the occurrence of extreme storm events (Villarini et al., 2013). Lastly, a transition point in climate data trends, where rates of increase changed significantly, was identified by multiple authors at approximately 1970 (USACE, 2015).

There is strong consensus in the literature that air temperatures will increase in the study region, and throughout the country, over the next century. The studies reviewed here generally agree on an increase in mean annual air temperature of approximately 2 to 6 ºC (3.6 to 10.8 ºF) by the latter half of the 21st century in the Upper Mississippi Region. Reasonable consensus is also seen in the literature with respect to projected increases in extreme temperature events, including more frequent, longer, and more intense summer heat waves in the long term future compared to the recent past (USACE, 2015).

Projections of precipitation found in a majority of the studies forecast an increase in annual precipitation and in the frequency of large storm events. However, there is some evidence presented that the northern portion of the Upper Mississippi Region will experience a slight decrease in annual precipitation. Additionally, seasonal deviations from the general projection patter have been presented, with some studies indicating a potential for drier summers. Lastly, despite projected precipitation increases, droughts are also projected to increase in the basin as a result of increased temperature and ET rates (USACE, 2015).

USACE_DAPL0009901



**Figure EA-1.** Water Resources Region 07: Upper Mississippi Region Boundary.

USACE_DAPL0009902

A clear consensus is lacking in the hydrologic projection literature.  Projections generated by coupling Global Climate Models (GCMs) with macro scale hydrologic models in some cases indicate a reduction in future streamflow but in other cases indicate a potential increase in streamflow.  Of the limited number of studies reviewed here, more results point toward the latter than the former, particularly during the critical summer months (USACE, 2015).

The trends and literary consensus of observed and projected primary variables noted above have been summarized for reference and comparison in Figure EA-2 (USACE, 2015).



**Figure EA-2.** Summary matrix of observed and projected climate trends and literary consensus.

USACE_DAPL0009903

Temperature extremes, increased precipitation, and increased severe weather associated with climate change are likely to impact human well-being and economic growth across the Midwest.  In Illinois, 20 to 30 deaths each year are attributed to severe weather including floods, winter storms, tornados, and lightning.  Heat and cold waves in Illinois cause even more deaths than severe weather, with an average of 74 deaths per year attributed to heat and 18 deaths each year attributed to cold.  Heavy precipitation in Illinois has increased since the 1940s, causing increases in peak river flood levels.  Annual flood losses in Illinois have averaged $257 million annually since 1983, and have increased steadily since the 1950s.  Much of the economy in central Illinois relies on agriculture, which is dependent upon climate and timely precipitation.  Increased evapotranspiration rates and frequency of severe weather could damage crops.  Conversely, a lengthened frost-free season and increased precipitation may increase crop yields.

The Proposed Action has no emission sources during operation of the DAPL Project in the Proposed Action Areas/Connected Action Areas and would therefore not emit Green House Gases (GHG).  Short-term emissions of GHG will occur during construction phase of the Proposed Action, but the contribution of the Proposed Action to GHG during construction would be considered a minor indirect impact to climate change.

During construction, emissions from fuel-burning internal combustion engines (e.g., transportation trucks, heavy equipment, drill rigs, etc.) would emit GHG.  Construction of the HDDs across the McGee Creek levee, the Illinois River, and the Coon Run levees is likely to take eight to twelve weeks to complete.  Conventional pipeline construction across the federal flowage easements would take approximately one month to complete.  To reduce the emission of GHG, fuel-burning equipment running times would be kept to a minimum and engines would be properly maintained.  This temporary increase in emissions is not expected to impact local or regional climate long-term.

Carbon dioxide is sequestered from the air by growing vegetation and emitted by decomposing vegetation.  In the Proposed Action Areas/Connected Action Areas, the primary land cover is cultivated cropland and deciduous forest.  Vegetation within the 50-foot permanent ROW will be cleared and maintained to prevent re-growth of trees.  The effect of tree clearing on GHG remains uncertain.  Because growing vegetation sequesters carbon dioxide, clearing of vegetation may cause an increase of GHG.  Conversely, where emissions due to vegetative decomposition exceed sequestration due to vegetative growth, tree harvest may be an important climate change mitigation strategy (Bellassen and Luyssaert, 2014).  To minimize impacts on vegetation, additional temporary workspace would be restored to pre-impact conditions.  Based on the avoidance measures being implemented, vegetation clearing for the Proposed Action is not expected to impact local or regional climate long-term.

Dakota Access does not extract or produce any product.  Dakota Access would provide a pipeline that is a safe and efficient logistical link between supply and demand for oil and petroleum products.  A pipeline is a more efficient way to ship the supply to the demand because they ship only the product itself, where trains, trucks, and ships also require energy to move the heavy container.  Not only the transportation via tanks, trucks and ships generate GHG emissions, but the loading and unloading of the product could also emit GHG emissions depending on the product loaded/unloaded and controls in place.  More broadly, shipping oil from North Dakota to domestic refineries also requires much less total shipping distance than importing the oil from the Middle East, Africa, or South America (or even Alaska).  Given that pipelines are more efficient means of transporting crude oil, the Proposed Action is likely to have a net positive impact on carbon emissions.

USACE_DAPL0009904

## 4. CUMULATIVE IMPACTS

Cumulative impacts to the environment result from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (federal or non-federal) or person undertakes such other actions.  Cumulative impacts may result from individually minor but collectively significant actions taking place over a period of time 40 CFR Part 1508.  Cumulative impacts are studied to enable the public, decision-makers, and project proponents to consider the "big picture" effects of a project on the community and the environment.  In a broad sense, all impacts on affected resources are probably cumulative; however, the role of the analyst is to narrow the focus of the cumulative effects analysis to important issues of national, regional, or local significance (CEQ, 1997).

The Council on Environmental Quality (CEQ) issued a manual entitled *Considering Cumulative Effects Under the National Environmental Policy Act* (1997).  This manual presents an 11 step procedure for addressing cumulative impact analysis.  The cumulative effects analysis for the Proposed Action followed these 11 steps, shown in Table 11.  The following subsections address scoping, the affected environment, and environmental consequences for the Proposed Action.

| Table 11 CEQ's 11-Step Approach for Assessing Cumulative Impacts | |
|---|---|
| **Component** | **Steps** |
| Scoping | 1. Identify resources |
| | 2. Define the study area for each resource |
| | 3. Define time frame for analysis |
| | 4. Identify other actions affecting the resources |
| Describing the Affected Environment | 5. Characterize resource in terms of its response to |
| | 6. Characterize stresses in relation to thresholds |
| | 7. Define baseline conditions |
| Determining the Environmental Consequences | 8. Identify cause-and-effect relationships |
| | 9. Determine magnitude and significance of |
| | 10. Assess the need for mitigation of significant |
| | 11. Monitor and adapt management accordingly |

## 4.1. Scoping

Past actions in the Proposed Action Areas/Connected Action Areas predominantly include agriculture and flood risk reduction projects, such as the construction of flood risk reduction levees, acquisition of flowage easements, and seasonal flooding for recreational hunting use.  Limited industrial activity adjacent to the Illinois River is present and is considered for its potential incremental impact to resources that could be affected by the Proposed Action at the Illinois River.  Each of these past activities most likely have had impacts on soils, water resources, vegetation, wildlife, land use, visual resources, paleontological resources, and cultural resources.  The DAPL Project route was sited to minimize green-space impacts by co-locating with existing utility corridors where practicable.  However, within the Proposed Action Areas/Connected Action Areas addressed in the EA, co-location with existing rights-of-way was not an available option and therefore the route was selected to minimize impacts to the environment by minimizing the distance and crossing locations of sensitive resources.

USACE_DAPL0009905

The geographic limits for this analysis included portions of Pike, Morgan, and Scott Counties within the Illinois River floodplain.  For the Proposed Action Areas/Connected Action Areas in Fayette County, the geographic analysis is bounded by the limits of the USACE flowage easements at Carlyle Lake.  However, for determining cumulative impacts to resources that extend beyond these boundaries the distribution of resource affected was considered when assessing environmental consequences.  The timeframe for analysis considers impacts from past actions and anticipated from construction through the operational life of the Proposed Action, or potential influence to the affected resources based on an indefinite term of operation.

Chapter 3 provides a description of the existing condition each resource considered.  To identify reasonably foreseeable actions, or actions or projects with a reasonable expectation of actually happening, as opposed to potential developments expected only on the basis of speculation, USACE was able to review current and past actions that have sought authorization through the Regulatory Program.  No reasonably foreseeable actions have been identified that would contribute to cumulative impacts to the resources within the Proposed Action Areas/Connected Action Areas.

## 4.2. Affected Environment

The following sections describe the results of the impact analysis for each of the resources considered in Section 3.0.  Table 12 is a checklist identifying potential incremental cumulative impacts to resources affected by the Proposed Action.  If a resource was not identified to have a cumulative impact then the resource was not discussed in detail in Section 4.3, Environmental Consequences.  The cumulative impact analysis considers future conditions as follows:

- Without the Proposed Action – No USACE Action
- With the Proposed Action – Requester's Preferred Alternative

| Table 12 Checklist for Identifying Potential Cumulative Impacts of the Proposed Action | | | | | | | |
|---|---|---|---|---|---|---|---|
| Resource | Without Proposed Action | With Proposed Action | | Past Actions | Other Present Actions | Other Future Actions | Proposed Action's Incremental Cumulative Impact |
| | | Construction | Operation | | | | |
| Geology and Soils | ♦ | S[1] | ♦ | M | ♦ | ♦ | ♦ |
| Water and Aquatic Life Resources | ♦ | S[1] | ♦ | M | + | ♦ | ♦ |
| Vegetation, Agriculture, and Range Resources | ♦ | S | S | M | ♦ | ♦ | S |
| Threatened and Endangered Species | ♦ | S | ♦ | M | ♦ | S | ♦ |
| Wildlife Resources | ♦ | S | ♦ | M | ♦ | ♦ | ♦ |
| Land Use and Recreation | ♦ | S[1] | ♦ | M | ♦ | ♦ | ♦ |

USACE_DAPL0009906

| | | With Proposed Action | | | | | Proposed |
| Resource | Without Proposed Action | Construction | Operation | Past Actions | Other Present Actions | Other Future Actions | Action's Incremental Cumulative Impact |
|---|---|---|---|---|---|---|---|
| Cultural and Historical Resources and Native American Consultations | ◆ | ◆ | ◆ | M | ◆ | ◆ | ◆ |
| Social and Economic Conditions | S | + | + | ◆ | ◆ | ◆ | + |
| Transportation and Traffic | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ | ◆ |
| Air Quality and Noise | ◆ | S¹ | ◆ | S | ◆ | ◆ | ◆ |

*Table 12 — Checklist for Identifying Potential Cumulative Impacts of the Proposed Action*

KEY: ◆ = no change       S = slight adverse impact       $S^1$ = temporary, slight adverse impact
M = moderate adverse impact       H = high adverse impact       + = beneficial impact

## 4.3. Environmental Consequences

Based on the evaluations of past, present, and future actions that could have a cumulative impact on resources affected by the Proposed Action, it was determined that a slight adverse impact to vegetation resources and a beneficial impact to social and economic conditions would occur if the Proposed Action is developed.  Other resources considered and listed in Table 12 are anticipated to have no incremental cumulative impact when evaluated with past, present, and future actions.

### 4.3.1. Geology and Soils

The continued development of oil and gas exploration and production in the region at its current level increases the potential for adverse cumulative impacts to geologic resources.  Cumulative impacts could occur when future utilities seek to be co-located within existing corridors or alternatively when greenfield development occurs in landslide prone or highly erodible areas.   However, with the proper implementation of reclamation and restoration BMPs these impacts can be reduced.

A second potential cumulative impact to geologic resources is the continued exploitation of the mineral resource which could lead to complete depletion of the resource.  The mineral resource is understood to be finite.   The effect would be primarily economic to the various entities with financial interests; secondarily there could be indirect impacts, potentially beneficial, associated with technological advances within the industry that would facilitate the recovery of mineral resources that cannot currently be recovered.

Agricultural practices throughout the region could contribute to cumulative impacts on soils.  Agricultural practices can result in increased erosion and runoff when soils are exposed for long periods such as when fields are fallow or prior to seeding.  Impacts to soils as a result of pipeline installation are typically

USACE_DAPL0009907

associated with excavation activities which may result in compaction and erosion when soils are exposed prior to revegetation.  Impacts to soils as a result of the pipeline construction would be mitigated through the implementation of BMPs which may include topsoil segregation, erosion controls, and decompaction. Furthermore, adherence to NPDES permits would require adequate design, grading, and use of BMPs to ensure that erosion and sediment control measures are properly utilized.  Generally, because of the utilization of top soil segregation and erosion controls, as well as the minimal workspace requirements and minimum duration of exposed excavations during construction of the Proposed Action, the cumulative impacts on soils resulting from construction of the Proposed Action when combined with agricultural practices and other pipeline installations would not be significant.

No impacts on mineral extraction, mining, or other deeper geologic resources would be cumulative, since these uses of geologic resources (*i.e.,* mining) do not occur in the Proposed Action Areas/Connected Action Areas.  Clearing and grading associated with construction of the Proposed Action and other projects in the vicinity could increase soil erosion in the area.  The introduction of contaminants to groundwater due to accidental spills of construction-related chemicals, fuels, or hydraulic fluid could have an adverse effect on groundwater quality.  Because the direct effects would be localized and limited primarily to the period of construction, cumulative impacts on geology, soils, and sediments would only occur if other projects were constructed at the same time and place as the Proposed Action.

There are smaller diameter, unregulated, crude oil gathering lines that have leaked and affected soil and ground/surface water.  These pre-existing lines have limited cathodic protection (external corrosion protection) and as such they are not routinely monitored.  The DAPL Project is the construction of a regulated large diameter crude oil transmission line and, as discussed throughout this document, is highly regulated and monitored.  The cumulative impacts of this pipeline are minimized by the regulatory criteria, the monitoring, protections and response implemented by Dakota Access during the operation of the pipeline.

## 4.3.2. Water and Aquatic Life Resources

Cumulative impacts on water resources (i.e., groundwater, surface waters, wetlands) associated with the Proposed Action would be avoided, temporary, and/or minor, as all surface waterbodies would be crossed via trenchless methods (i.e., HDD or bore), no permanent fill or loss of wetlands are anticipated, and potential spill-related impacts would be avoided or greatly reduced by regulating fuel storage and refueling activities and by requiring immediate cleanup should a spill or leak occur.  Spill response and remediation measures associated with construction activities are discussed in detail in Dakota Access' SWPP and SPCC (Appendix B).

Recently completed construction or current construction within the vicinity of the Proposed Action could extend the period of exposure of soils as a result of incomplete revegetation.  These exposed soils may increase the potential for soil erosion or sediment transport via overland flow during precipitation events resulting in sedimentation in surface waterbodies.  These increased loads could have the potential to temporarily impact water quality, wetlands, and sensitive fish eggs, fish fry, and invertebrates inhabiting waterbodies within the Proposed Action Areas/Connected Action Areas watersheds.  However, all projects, including the Dakota Access Project as a whole, are subject to regulation by the USACE under the CWA.  By installing the pipeline using the HDD technique at the two major rivers crossed in the Proposed Action Areas/Connected Action Areas and implementing the erosion and sediment control measures specified in the SWPPP (Appendix B), the potential for increased sediment loading from terrestrial sources is minimized and the cumulative impact is considered to be negligible.

USACE_DAPL0009908

In addition to water quality impacts associated with sediment loading from erosion and run-off, an inadvertent release of non-hazardous drilling mud could occur during HDD activities. The likelihood of inadvertent releases of drilling mud is greatly minimized through thorough geotechnical analysis and detailed design/mitigation plans at each crossing and careful monitoring of drilling mud returns and pressure during HDD activities. If an inadvertent release were to occur within the Proposed Action Areas during HDD activities, impacts on water quality and aquatic resources would be minor. Drilling mud is non-hazardous and impacts on water quality and aquatic resources would be akin to those associated with sediment loading. Due to the quantity of drilling mud used in relation to the size of waterbodies typically crossed via HDD, impacts would be temporary and mitigated through implementation of an HDD Contingency Plan (Appendix C). Impacts on all waterbodies crossed by the Dakota Access Project in its entirety would be minimized or avoided via HDD and/or use of erosion and sediment control measures; thereby minimizing the potential for cumulative impacts on water and aquatic life resources.

Impacts on water and aquatic life resources associated with sediment loading, including potential inadvertent releases of non-hazardous drilling mud, as a result of the Proposed Action would be temporary and short term. Therefore, these impacts, when evaluated with other oil and gas development and infrastructure projects in the region, would result in minor cumulative impacts on water and aquatic life resources.

Spills or leaks of hazardous liquids during construction and operation of the Proposed Action, or other projects in the vicinity, have the potential to result in long-term impacts on surface and groundwater resources as well as aquatic life resources. However, construction impacts would be mitigated by the proper design and implementation of BMPs and ensure avoidance, minimization, and/or mitigation of potential impacts on water resources and aquatic resources, as required by the various regulating agencies that have jurisdiction over the DAPL Project. Operational risks are being mitigated by the DAPL Project design; the Proposed Action would be designed to meet or exceed the applicable federal regulations as detailed in Sec 3.12 - Reliability and Safety. Therefore, the potential cumulative impacts on water resources and aquatic resources resulting from spills would be minor.

In addition, while construction and operation of the Proposed Action along with the other potential projects and activities could result in cumulative impacts on existing wetlands in the Proposed Action Areas/Connected Action Areas watersheds, regulation of activities under the CWA by the Corps requires permitting and mitigation for wetland impacts so that there would be no net loss in the regional wetland resources. Therefore, cumulative impacts on wetland resources in the Proposed Action Areas/Connected Action Areas would be minimal.

### 4.3.3. Vegetation, Agriculture, and Range Resources

Land cover in the Proposed Action Areas/Connected Action Areas is comprised mostly of cultivated crops and deciduous forest. Other present land cover types include pasture/hay/grassland areas, open waters, woody wetlands, emergent herbaceous wetlands, and small developed areas, which are primarily roads. Regionally, the greatest impact to the native vegetative community is associated with past and current agricultural practices. Examples of general impacts (from any type of project) to vegetation, agriculture, and range resources could include introduction of non-native plants and/or noxious weeds, habitat fragmentation, decreased vegetative structure, reduced populations below critical threshold levels, sedimentation or degradation of surface waters, erosion, and siltation. Modification of vegetation resources, when considered with impacts of past actions, may result in a slight adverse impact to vegetation resources.

USACE_DAPL0009909

Temporary impacts to land cover would occur in essentially all areas within the construction footprint, the vast majority of which would return to pre-construction conditions following construction. Therefore, long-term impact to agricultural or range lands is not expected, as those areas would be restored and allowed to return to pre-construction land use practices. The only exception is within the forested areas along the permanent DAPL easement that intersects the federal flowage easements north of Carlyle Lake. While trees would be cleared within the construction workspace to accommodate construction, a 30-foot-wide ROW would be maintained to prevent the regrowth of trees in the future. Other areas temporarily impacted during construction would be returned to pre-construction contours and allowed to revegetate to natural conditions. The resulting overall cumulative impact to vegetation, agriculture, and range resources is considered slight when compared to overall available resources in the region, and the negligible impact anticipated to these resources from present or future actions.

### 4.3.4.  Threatened, Endangered, Candidate, and Proposed Species

As required by the Endangered Species Act, the status of each species listed as threatened or endangered is evaluated every 5 years by USFWS to assess its recovery and determine if a change in its listing status is warranted. Where available, these documents were utilized to identify the potential for ongoing regional oil and gas development to significantly threaten the species listed in the Proposed Action Areas/Connected Action Areas. For species in which a 5-Year Review was not available, Dakota Access utilized the species Recovery Plan and/or Final Rule to evaluate potential threats on the species resulting from regional oil and gas development.

Habitat loss and modification are the primary threats to the continued existence of Piping Plover, Decurrent False Aster, Eastern Prairie Fringed Orchid, Prairie Bush Clover, Higgins Eye Pearlymussel, Spectaclecase Mussel, Gray Bat, Indiana Bat, and Rattlesnake-Master Borer Moth. Cumulative impacts to the Northern Long-Eared Bat are a result of white noise syndrome, a fungal disease associated with the mortality of bats across North America. The potential cumulative impacts from oil and gas activities in the region on the current listing or potential elevated future listing of these ten species are discussed in detail below.

### 4.3.4.1.  Northern Long-Eared Bat

The USFWS has issued the Final 4(d) rule, for the Northern Long-Eared Bat, to allow for more flexible implementation of the ESA and "to tailor prohibitions to those that make the most sense for protecting and managing at-risk species." The implementation of the Final 4(d) rule for the Northern Long-Eared Bat exempts certain activities within the WNS buffer zone – those areas within 150 miles of WNS-positive counties – provided certain conservation measures are implemented. In areas outside of the 150-mile WNS buffer zone, incidental take from lawful activities is not prohibited. Incidental take is also not prohibited within the WNS buffer for lawful activities outside of a 0.25-mile radius from known hibernacula. The 4(d) rule does prohibit incidental take that may occur from tree removal activities within 150 feet of a known occupied maternity roost tree. The construction, maintenance and operation of the DAPL Project within Proposed Action Areas/Connected Action Areas would not further contribute to the spread of WNS and is not anticipated to result in incidental take in violation of the final 4(d) rule. Further, since no known maternity colonies or hibernacula are known to occur within the Proposed Action Areas/Connected Action Areas, the unlikely event of a spill or leak during operation is not anticipated to adversely affect the Northern Long-Eared Bat and, the Proposed Action would not contribute to cumulative impacts to this species. Additionally, the DAPL Project is undergoing ESA Section 7 evaluation with respect a 408 action in North Dakota, where the Northern Long-Eared Bat may occur. The Proposed

USACE_DAPL0009910

Action Areas/Connected Action Areas in North Dakota is outside of the WNS buffer zone and incidental take from lawful activities is not prohibited. Therefore, it is not expected that the combined impacts of the Proposed Actions in North Dakota and Illinois would contribute to cumulative impacts to the species.

### 4.3.4.2. Indiana Bat

The USFWS (2007) Draft Recovery Plan for the Indiana Bat (*Myotis sodalis*) specifically addresses the potential impacts of energy development such as oil spills, production wells, and pipeline leaks on Indiana Bat. It states that oil pits from well productions and spills into waterways or sinkholes leading into a hibernacula may pose a threat. The Indiana Bat 5-Year Review (2009a) also indicates that environmental impacts, including oil spills, may cause potential impacts on the species. Since no known maternity colonies or hibernacula are located within the Proposed Action Areas/Connected Action Areas, the unlikely event of a spill or leak would not be expected to impact these habitats. To further minimize the potential for impacts to this species, potential roosting and foraging habitat in the Proposed Action Areas/Connected Action Areas will be cleared in the winter. Therefore, the Proposed Action would not result in further loss of maternal or hibernacula habitats for the Indiana Bat and would therefore not contribute to cumulative impacts to this species.

### 4.3.4.3. Gray Bat

The USFWS does not specifically address oil and gas activities as a potential or ongoing threat for the Gray Bat in the 5-Year Review (2009b). Historically, the Gray Bat's decline can be contributed to the result of human disturbances (i.e. vandalism and disturbances to hibernacula and maternity caves). In addition to human disturbances, the decline of the Gray Bat can also be contributed to natural and man-made flooding (of caves and mines), impoundments of waterways, and contamination from pesticides (USFWS, 2009b). This species lives in caves year-round. In the summer, they roost in caves which are scattered along rivers. No caves or mines were identified in the Proposed Action Areas/Connected Action Areas. The Proposed Action is not anticipated to result in the further loss of potential habitats for the Gray Bat and would therefore not contribute to cumulative impacts to this species.

### 4.3.4.4. Higgins Eye Pearlymussel

According to the USFWS, a portion of the range of the Higgins Eye Pearlymussel is on the Mississippi River north of Lock and Dam 19 at Keokuk, Iowa (USFWS, 2012b). However, the remaining stronghold of the species in the Mississippi River is located at Cordova, Illinois, approximately 130 river miles north of the pipeline crossing. The USFWS does not specifically address oil and gas activities as a potential or ongoing threat for the Higgins Eye Pearlymussel in the 5-Year Review (2006). The primary threats to the Higgins Eye Pearlymussel are impoundments, particularly the locks and dams on the Mississippi, degraded water quality due to sedimentation and toxic contaminants, disease and predation, and invasive non-native species (USFWS, 2006). Adult mussels are easily harmed by toxins and degraded water quality from pollution because they are sedentary. Pollution from accidental spills may directly kill mussels, but they may also indirectly harm Higgins Eye Pearlymussel by reducing water quality, affecting the ability of surviving mussels to reproduce, and lowering the numbers of host fish. In Illinois, potentially suitable habitat for the Higgins Eye Pearlymussel is only present where the Proposed Action crosses the Illinois River in Pike County. The Illinois River would be crossed using a HDD construction method, where Dakota Access would be providing line pipe steel with a 0.625-inch wall thickness. This thicker line pipe provides would allow a higher operating pressure that is approximately 46% stronger than the thickness required by regulation (Wood Group Mustang, 2015). It is unlikely that a leak or spill would occur with the

USACE_DAPL0009911

Proposed Action Areas/Connected Action Areas and even less likely to occur in the HDD areas. Additionally, the pipeline would be placed at least 40 feet below the riverbed, thereby avoiding impacts to the Higgins Eye Pearlymussel and its potential habitat. The Proposed Action is not anticipated to result in further loss of potential habitats for the Higgins Eye Pearlymussel and would therefore not contribute to cumulative impacts to this species.

### 4.3.4.5.  Spectaclecase Mussel

The USFWS does not specifically address oil and gas activities, as a potential or ongoing threat for the Spectaclecase Mussel in the Recovery Outline (USFWS, 2014b).  The primary decline for the species is habitat loss as a result of impoundments, channelization, chemical contaminants, mining, and sedimentation (USFWS, 2014b).  Adult mussels are easily harmed by toxins and degraded water quality from pollution because they are sedentary.  Pollution from accidental spills may directly kill mussels, but they may also indirectly harm spectaclecase by reducing water quality, affecting the ability of surviving mussels to reproduce, and lowering the numbers of host fish.  In Illinois, potentially suitable habitat for the Spectaclecase Mussel is only present where the Proposed Action crosses the Illinois River in Pike County.  The Illinois River would be crossed using a HDD construction method, where Dakota Access would be providing line pipe steel with a 0.625-inch wall thickness.  This thicker line pipe provides would allow a higher operating pressure that is approximately 46% stronger than the thickness required by regulation (Wood Group Mustang, 2015).  It is unlikely that a leak or spill would occur with the Proposed Action Areas and even less likely to occur in the HDD areas.  Additionally, the pipeline would be placed at least 40 feet below the riverbed, thereby avoiding impacts to the Spectaclecase Mussel and its potential habitat.  The Proposed Action is not anticipated to result in further loss of potential habitats for the Spectaclecase Mussel and would therefore not contribute to cumulative impacts to this species.

### 4.3.4.6.  Piping Plover

The USFWS (2009d) 5-Year Review for the Piping Plover does specifically address threats from oil and gas activities.  However, impacts from oil and gas activities that are threatening Piping Plover are associated with the development of oil and gas exploration wells located near the alkali lakes habitat, which accounts for 83% of the U.S. Northern Great Plains Piping Plover breeding habitat.  The Proposed Action is not located within the vicinity of any of these areas and would therefore not contribute to cumulative impacts on Piping Plovers.  The Proposed Action is not expected to have any permanent impacts on Piping Plover habitat during construction or operation, and in the unlikely event of a spill or leak, impacts would be localized.  Therefore, the Proposed Action is not expected to have a cumulative impact to the Piping Plover.  Additionally, the DAPL Project also underwent ESA Section 7 evaluation with respect to a 408 action in North Dakota, where the Piping Plover is also listed.  However, because no suitable Piping Plover habitat is present in the 408 Action Areas in Illinois, the USACE made a "*no effect*" determination for Illinois and a "*may affect, but is not likely to adversely affect*" the piping plover for North Dakota.  The USFWS concurred with this determination in a letter dated 2 May 2016.  Therefore, it is not expected that the combined impacts of the North Dakota and Illinois 408 actions would contribute to cumulative adverse impacts on Piping Plovers.

### 4.3.4.7.  Decurrent False Aster

The USFWS does not specifically address oil and gas activities as a potential or ongoing threat for the Decurrent False Aster in either the 5-Year Review (2012a) or the Recovery Plan (1990).  Dramatic changes in the flood cycle this last century due to the construction of navigation dams and agricultural levees

USACE_DAPL0009912

threatens the Decurrent False Aster (USFWS, 1990).  Impoundment of the Illinois River prolongs high water events during the growing season reducing available habitat and leading to the decline of the species (USFWS, 2012a).  Additionally, the majority of this species' preferred habitat has been eliminated by agricultural processes, such as draining wet prairies for use as cropland (USFWS, 1988a).  The Proposed Action would not result in further loss of potential habitats for the Decurrent False Aster and would therefore not contribute to cumulative impacts to this species.

### 4.3.4.8.  Eastern Prairie Fringed Orchid

The USFWS does not specifically address oil and gas activities as a potential or ongoing threat for the Eastern Prairie Fringed Orchid in the Recovery Plan (1999).  Historically, the Eastern Prairie Fringed Orchid's early decline was a result of the conversion of the species natural habitat to cropland and pasture.  Currently, this species is in decline from the drainage and development on wetlands and the encroachment of woody vegetation and non-native species (USFWS, 2015b).  The Proposed Action would not result in further loss of potential habitats for the Eastern Prairie Fringed Orchid and would therefore not contribute to cumulative impacts to this species.

### 4.3.4.9.  Prairie Bush Clover

The USFWS does not specifically address oil and gas activities as a potential or ongoing threat for the Prairie Bush Clover in the Recovery Plan (1988b).  Agricultural practices, including row crops and herbicides, have contributed to the decline of this species.  In addition, encroachment of woody species, loss of pollination species, disease, predation, fires, and grazing have all contributed to this species' decline (USFWS, 1988b).  The Proposed Action is not anticipated to result in further loss of potential habitats for the Prairie Bush Clover and would therefore not contribute to cumulative impacts to this species.

### 4.3.4.10.  Rattlesnake-Master Borer Moth

The USFWS does not specifically address oil and gas activities, as a potential or ongoing threat for the Rattlesnake-Master Borer Moth in the Federal Register Notice of 12-Month Finding: Listing Warranted but Precluded (2013).  The conversion of prairie for agricultural use has caused the greatest decline in this species.  The grazing of livestock, flooding, invasive species, and successional plants have also been a contributing factor to habitat loss for this species (USFWS, 2013).  The Proposed Action would not result in further loss of potential habitats for the Rattlesnake-Master Borer Moth and would therefore not contribute to cumulative impacts to this species.

Based on the pipeline route and the utilization of HDDs, the Proposed Action is not likely to contribute to cumulative impacts to the listed species, including aquatic species as discussed in Section 3.4.  The co-location of utilities in established corridors, the proper implementation of erosion control devices, compliance with permits issued for regulated activities, and rapid, thorough, and environmentally appropriate reclamation efforts are industry standards that, when applied consistently, on a regional basis, would minimize cumulative impacts now and in the future.  In addition, enhanced measures for the design and operation of the Proposed Action meet, and often exceed, applicable regulations which further reduces the risk for a spill or leak.

USACE_DAPL0009913

#### 4.3.5.  Wildlife Resources

Regionally, the greatest impacts to wildlife (past, present or future) can be associated with agricultural development.  Agricultural land use replaced the existing natural diversity with the monoculture row crops.  The practice also introduced noxious weeds, soil pests, and other exotics, which all had significant cumulative impacts on regional wildlife.  Relative to the habitat and land use impacts associated with past agricultural activities, the Proposed Action impacts, as well as those associated with the oil and gas industry on a regional basis and Connected Actions would be nominal.  This is due to the short duration and small scale of the Proposed Action relative to the regional landscape and the large scale of agricultural activities in the region.

The Proposed Action would not permanently alter the character of the majority of available habitats as most impacts are expected to be temporary (see Section 4.3.3 for a discussion of vegetation impacts associated with the Proposed Action).  Possible temporary, short-term impacts on wildlife include the temporary displacement of some mobile individuals to similar, adjacent habitats during construction activities.  Further, while other oil and gas projects' pipeline corridors may require clearing of forested habitat (if present), once construction is complete, temporary workspace areas would be able to revegetate.  In addition, the permanent easement would be allowed to revegetate with herbaceous species, which provides habitat to a variety of species that utilize herbaceous and edge habitats.  When analyzed on a regional basis, these impacts do not change significantly in magnitude when compared to the current and historic impacts previously imposed upon the regional wildlife by agricultural development.  Therefore, further habitat fragmentation as a result of the Proposed Action or other oil and gas developments in the region would be negligible and is not anticipated to significantly contribute to cumulative effects on wildlife.

#### 4.3.6.  Land Use and Recreation

Regional oil and gas development and related activities could cause temporary, short-term impacts to land use and recreation in the Proposed Action Areas/Connected Action Areas.  However, incremental increases are not anticipated based on the design of this Proposed Action and BMPs that would be implemented to restore the impacted area.  Temporary impacts to land use would potentially occur during the period of active construction, but areas would revert to preconstruction use following restoration.  Because construction would be short term and land use conversion would be minimal, the cumulative impact on land use as a result of the Proposed Action would be temporary and minor.

No impacts to areas of special interests such as the Meredosia National Wildlife Refuge, Carlyle Lake State Fish and Wildlife Area, or Illinois Natural Areas Inventory Sites would occur as a result of the construction of the Proposed Action.  Construction activities would occur over a short period of time and would not occur within visible or audible proximity to any of these areas.

The potential cumulative impacts from the Proposed Action on land use and recreation resources resulting from spills would be minor.  Although there have been releases of hazardous material from small diameter, unregulated gathering pipelines that have had an adverse effect on land use and recreation resources, it is highly unlikely for an unanticipated release to occur within the Proposed Action Areas/Connected Action Areas during operations of the DAPL pipeline, which is subject to DOT construction regulations and pipeline leak detection monitoring guidelines.

USACE_DAPL0009914

In the event of an unanticipated release during operations of the pipeline, the effects would be remediated following the cleanup procedures and remediation activities described in Section 3.12. Cumulatively, the impacts associated with land use and recreation resources would be minimal.

### 4.3.7.  Cultural and Historic Resources

Dakota Access would implement measures to avoid or mitigate adverse effects to cultural resources that have been determined, in consultation with the federal land managing agencies, Illinois SHPO, and Native American tribes, to be eligible for listing in the NRHP.  In areas where NRHP-eligible sites are mapped directly adjacent to workspace, Dakota Access would install exclusionary fencing along the outer workspace boundary during construction to prevent inadvertent trespassing by construction staff or vehicles.  These areas would be classified generically as sensitive resource areas, and would be closely monitored by Environmental Inspection staff.  If an unanticipated discovery occurs during construction, Dakota Access would follow the measures described in its UDP (**Appendix I**).

Dakota Access' UDP was developed (**Appendix I**) for use during all DAPL Project construction activities regardless of jurisdiction or landownership.  The UDP describes actions that would take place in the event that an undocumented cultural resource site is discovered during construction activities.  The UDP explicitly calls for work to stop until the correct authority or agency can be contacted and the find can be properly evaluated.

### 4.3.8.  Social and Economic Conditions

Population, employment, and economic data were collected using Census tracts which are crossed by the Proposed Action and presented in Section 3.10.1.  The Proposed Action Areas/Connected Action Areas are in a rural agricultural setting in Morgan, Pike, Scott, and Fayette counties in Illinois.  Based on the review of the baseline information within the Proposed Action Areas/Connected Action Areas, the cumulative impact to social and economic conditions would be limited to construction and operation of the Proposed Action.  Other past, present and future actions would not be expected to result in incremental cumulative impacts to social and economic conditions.

The Proposed Action would result in employment opportunities for the local workforce during construction.  In addition to paid wages, secondary beneficial impacts to the local economy would result through spending at local businesses that provide goods and services to the construction workforce. During operation of the Proposed Action, Dakota Access would pay ad valorem taxes that would benefit the state of Illinois and the local economies.  As such, development of the Proposed Action would have a beneficial impact to the social and economic conditions in the region.

### 4.3.9.  Transportation and Traffic

Cumulative impacts from construction of the Proposed Action would temporarily increase traffic in the immediate vicinity of the Proposed Action Areas/Connected Action Areas.  This increase in traffic would be temporary and is not expected to result in significant impacts to Illinois' transportation infrastructure. Road improvements such as grading would be made as necessary and any impacts resulting from Dakota Access's use would be repaired in accordance with applicable local permits.  Traffic interruptions would be minimized to the extent practical and would result in insignificant, temporary cumulative impacts on regional transportation resources as it would be localized to the immediate vicinity of the Proposed Action Areas/Connected Action Areas and major delivery routes.

USACE_DAPL0009915

During operations of the Proposed Action, there is expected to be a positive effect on traffic resources in Illinois.  Once in operation, Dakota Access plans to transport up to 570,000 bpd of crude oil via pipeline which would significantly reduce the demand for the commercial trucking of crude oil on county, state and interstate highways.  It is anticipated that the cumulative effects of the DAPL Project and other future pipeline projects would be beneficial to the transportation infrastructure in Illinois by decreasing oil hauled by truck traffic and therefore reducing wear and tear on roads and highways.

### 4.3.10.  Air Quality and Noise

Potential cumulative impacts on air quality would result from concurrent construction of the Proposed Action and other development projects in the region.  Impacts on air quality associated with construction of the Proposed Action would be temporary and short-term; therefore, even if construction of other projects were concurrent with the Proposed Action, cumulative construction-related air quality impacts would be negligible.

Construction of the Proposed Action would affect ambient noise levels at some nearby residences during active construction. The noise impact of the pipeline construction would primarily originate from the HDD equipment and would be highly localized to the HDD entry and exit sites.  However, because the duration of construction would be temporary, the contribution of the Proposed Action to cumulative impacts on noise would be negligible.

During construction of the Proposed Action, emissions from fuel-burning internal combustion engines (e.g., transportation trucks, heavy equipment, drill rigs, etc.) would emit GHG.  Construction of the HDDs across the McGee Creek levee, the Illinois River, and the Coon Run levees are likely to take eight to twelve weeks to complete.  Conventional pipeline construction across the federal flowage easements north of Carlyle Lake would take approximately one month to complete.  To reduce the emission of GHG, fuel-burning equipment running times would be kept to a minimum and engines would be properly maintained.  This temporary increase in emissions is not expected to impact local or regional climate long-term.

USACE_DAPL0009916

## 5. IRREVERSIBLE AND IRRETRIEVABLE COMMITMENT OF RESOURCES

As required by NEPA, irreversible and irretrievable commitments of resources involved in the Proposed Action should it be implemented, must be addressed in the EA.  Irreversible commitments of resources result in a loss of future options.  Commitments of resources which are irreversible are those resources which are destroyed or consumed and are neither renewable nor recoverable for use by future generations.  Examples of irreversible commitments of resources include consumption of petroleum-based fuels or minerals and destruction cultural resources.  Irretrievable commitments of resources result in a loss of productivity.  Commitments of resources are irretrievable occur when the productive use or value of a renewable resource is lost for a period of time.  For example, timber or soil productivity may be lost for a period of time resulting in an irretrievable loss of production, but the action is reversible.

### 5.1.  USACE

Aside from the commitment of funds, labor, and office materials for document preparation, there would be no irreversible or irretrievable resource commitments due to the Proposed Action (authorization to cross federal USACE projects and flowage easement).

### 5.2.  DAPL

Construction activities associated with the Proposed Action would result in the consumption of materials such as aluminum, steel, other metals, wood, gravel, sand, plastics, and various forms of petroleum-based fuels, the use of which would constitute an irreversible commitment of resources.  Most of these materials are nonrenewable and would be irreversibly committed if not recycled or reused during maintenance or at the end of the life of the Proposed Action.

Areas of vegetation removal or conversion along the permanent right-of-way, such as areas where trees or shrubs were established prior to construction but would be maintained in an herbaceous state during operation, would represent an irretrievable commitment of resources.  Additionally, erosion, compaction, or an overall loss of soil productivity could occur if these impacts are not properly mitigated.  Use of water for dust control and hydrostatic testing would also be irretrievable.  Other irretrievable commitments of resources could occur if areas temporarily impacted by construction were not restored.

Overall, there would be a very minimal commitment of irreversible and/or irretrievable resources as a result of the Proposed Action since the majority of impacts would be temporary and would occur within agricultural land.  Additionally, irreversible and/or irretrievable commitments of resources would be minimized through the mitigation measures for the affected environments identified throughout this EA.

USACE_DAPL0009917

## 6. MITIGATION SUMMARY

Dakota Access has selected the Proposed Action to minimize impacts to natural/cultural resources. System and routing alternatives were considered for the entire DAPL Project in order to meet purpose and need, design criteria and construction requirements, while minimizing potential impacts to the existing environment and socioeconomic setting. Impacts to the environment would be temporary and not significant as a result of avoiding, minimizing and mitigation of any potential impacts. The majority of potential impacts would be mitigated by HDD technology which would bore beneath resources and allow pipeline construction to proceed with the least amount of impacts possible. Dakota Access has would also implement general mitigation measures such as those described in the SWPPP. The SWPPP has been developed based on decades of experience implementing BMPs during construction in accordance with generally accepted industry practices for linear infrastructure and cross-county pipelines. It is intended to meet or exceed federal, state, and local environmental protection and erosion control requirements, specifications and practices. The SWPPP and SPCC describe current construction techniques and mitigation measures that would be employed to minimize the effects of construction on environmental resources. Some of the basic procedures identified in the SWPPP and SPCC are listed below:

- BMPs designed to minimize the effects of construction on environmental resources;
- Temporary and permanent erosion and sediment control measures;
- Soil handling procedures designed to preserve the integrity of the soil (e.g., topsoil segregation, decompaction, etc.);
- Wetland and waterbody crossing and stabilization procedures
- Restoration and revegetation procedures
- Refueling and waste management procedures
- Stormwater management procedures

Dakota Access incorporates environmental requirements into all construction specifications and the SWPPP would be included in contract documents and enforced as such throughout the Proposed Action. The construction contractor(s) must comply with all applicable permits and plans during all phases of construction. In addition to the SWPPP, the Proposed Action would be constructed in accordance to the measures detailed in Dakota Access' SPCC, HD Construction Plan, HDD Contingency Plan, and UDP.

To further ensure compliance with permits, plans, obligations, and commitments, Dakota Access would have full-time EIs to monitor construction and compliance. The EIs would be responsible for observing construction activities to verify that work is carried out in accordance with environmental permit requirements and ensure that designed avoidance and mitigation measures are properly executed during construction.

Mitigation measures were identified for geology and soils; water resources; vegetation, agriculture, and range resources; wildlife resources; aquatic resources; land use and recreation; cultural and historic resources, social and economic conditions; environmental justice; or air and noise. These mitigation measures, as described in Sections 3.1 through 3.14, or avoidance associated with the trenchless installation (i.e., HDD or bore) of the proposed pipeline are expected to mitigate adverse impacts to resources.

USACE_DAPL0009918

## 7.  FEDERAL, TRIBAL, STATE, AND LOCAL AGENCY CONSULTATION AND COORDINATION

A Public Notice announcing the preparation of a NEPA document and solicitation of comments from the public; federal, state, and local agencies and officials; Indian Tribes; and other interested parties in order to consider and evaluate the impacts of the proposed activity was posted by the USACE from 5 January 2016 through 5 February 5 2016.   A copy of this Public Notice and the Distribution List, as well as Comments received and Responses, are provided in Appendix J.  In addition to the  Public Notice, the USACE consulted with the Illinois Historic Preservation Agency, the USFWS, and the Illinois Department of Natural Resources, as well as Native American groups to solicit comments for the Proposed Action within the  USACE Section 408 Proposed Action Areas/Connected Action Areas (see Appendix K).   Table 13 includes a listing of individuals and agencies consulted during preparation of the EA regardless of whether a response was  received.

| Table 13 Agency/Entity Consultation List | | | |
|---|---|---|---|
| Agency/Entity | Name | Address | Date Received |
| Delaware Tribe of Indians | Chief Chester Brooks | 5100 Tuxedo Blvd Bartlesville, Oklahoma 74006 | No Response |
| Delaware Nation, Oklahoma | President Kerry Holton | P.O. Box 825 Anadarko, Oklahoma  73005 | No Response |
| Ho-Chunk Nation of Wisconsin | President Wilfrid Cleveland | P.O. Box 667 Black River Falls, Wisconsin 54675 | No Response |
| Winnebago Tribe of Nebraska | Chairwoman Darla Lapointe | P.O. Box 687 Winnebago, Nebraska 68071 | Received response on Mar 14, 2016 |
| Sac & Fox Nation, Oklahoma | Principal Chief Kay Rhodes | 920883 S. Hwy. 99 Building A Stroud, Oklahoma 74079 | No Response |
| Sac & Fox Tribe of the Mississippi in Iowa | Chairman Tony Wanatee | 349 Meskwaki Road Tama, Iowa  52339 | Received response on Mar 17, 2016 |
| Sac & Fox Nation of Missouri in Kansas and Nebraska | Chairman Edmore Green | 305 N. Main Street Hiawatha, Kansas  66434 | No Response |
| Kickapoo Tribe of Oklahoma | Chairman David Pacheoco | P.O. Box 70 McCloud, Oklahoma  74851 | No Response |
| Kickapoo Tribe of Indians of the Kickapoo Reservation in Kansas | Chairman Lester Randall | P.O. Box 271 Horton, Kansas  66439 | No Response |
| Hannahville Indian Community, Michigan | Chairman Kenneth Meshigand | N14911 Hannahville Blvd. Rd. Wilson, Michigan  49896-9728 | No Response |

USACE_DAPL0009919

| Table 13 Agency/Entity Consultation List | | | |
|---|---|---|---|
| **Agency/Entity** | **Name** | **Address** | **Date Received** |
| Citizen Potawatomi Nation, Oklahoma | Chairman John Barrett | 1601 S. Gordon Cooper Drive Shawnee, Oklahoma 74801 | No Response |
| Forest County Potawatomi Community, Wisconsin | Chairman Harold Frank | P.O. Box 340 Crandon, Wisconsin 54520 | No Response |
| Pokagon Band of Potawatomi Indians, Michigan and Indiana | Chairman John P. Warren | P.O. Box 180 Dowagiac, Michigan 49047 | No Response |
| Nottawaseppi Band Huron of the Potawatomi, Michigan | Chairman Homer Mandoka | 2221—1 ½ Mile Road Fulton, Michigan 49052 | No Response |
| Prairie Band Potawatomi Nation | Chairwoman Liana Onnen | Government Center 16281 Q Road Mayetta, Kansas 66509 | No Response |
| Match-e-be-nash-she-wish Band of Potawatomi Indians of Michigan | Chairman D.K. Sprague | P.O. Box 218 Dorr, Michigan 49323 | No Response |
| Peoria Tribe of Indians of Oklahoma | Chief John Froman | P.O. Box 1527 118 S. Eight Tribes Trail Miami, Oklahoma 74355 | No Response |
| The Quapaw Tribe of Indians | Chairman John Berrey | P.O. Box 765 Quapaw, Oklahoma 74363 | No Response |
| Miami Tribe of Oklahoma | Chief Douglas Lankford | P.O. Box 1326 202 S. Eight Tribes Trail Miami, Oklahoma 74355 | Received response on March 1, 2016 |
| The Osage Nation | Principle Chief Geoffrey Standing Bear | P.O. Box 779 Pawhuska, Oklahoma 74056 | Received response on Feb 2, 2016 |
| Iowa Tribe of Kansas and Nebraska | Chairman Tim Rhodd | 3345 Thrasher Road # 8 White Cloud, Kansas 66094 | Received response on Jan 29, 2016 |
| Iowa Tribe of Oklahoma | Chairman Bobby Walkup | Route 1, Box 721 Perkins, Oklahoma 74059 | No Response |
| Absentee-Shawnee Tribe of Indians of Oklahoma | Governor Edwina Butler-Wolfe | 2025 S. Gordon Cooper Drive Shawnee, Oklahoma 74810-9381 | No Response |
| Eastern Shawnee Tribe of Oklahoma | Chief Glenna J. Wallace | P.O. Box 350 Seneca, Missouri 64865 | No Response |

USACE_DAPL0009920

| Table 13 Agency/Entity Consultation List | | | |
|---|---|---|---|
| **Agency/Entity** | **Name** | **Address** | **Date Received** |
| Shawnee Tribe | Chairman Ron Sparkman | P.O. Box 189 Miami, Oklahoma  74355 | No Response |
| Cherokee Nation | Principal Chief Bill John Baker | P.O. Box 948 Tahlequah, Oklahoma  74465 | No Response |
| United Keetoowah Band of Cherokee Indians in Oklahoma | Chief George Wickliffe | P.O. Box 746 Tahlequah, Oklahoma  74464 | Received response on Feb 27, 2016 |
| Delaware Tribe of Indians | Chief Chester Brooks | 5100 Tuxedo Blvd Bartlesville, Oklahoma 74006 | No Response |
| Delaware Nation, Oklahoma | President Kerry Holton | P.O. Box 825 Anadarko, Oklahoma  73005 | No Response |
| U.S. Fish and Wildlife Service | Kraig McPeek Project Leader Illinois and Iowa Field Office | Illinois/Iowa Ecological Services Field Office 1511 47111 Avenue Moline, IL 61265 | Received response on 2 May 2016 |
| Illinois Historic Preservation Agency | Dr. Rachel Leibowitz | Illinois Historic Preservation Agency 1 Old State Capital Plaza Springfield, Illinois 62701-1507 | Received responses on 21 March and 28 March 2016 |
| Illinois Department of Natural Resources | Dr. James Herkert, Director Office of Resource Conservation | One Natural Resources Way Springfield, Illinois 62702-1271 | Received response on 25 February 2016 |
| McGee Creek Drainage & Levee District | Len L. Wiese, Chairman | R.R #1, Box 86 168 1425E Ave. Versailles, IL 62378-2130 | Received response on 28 July 2016 |
| Coon Run Drainage & Levee District | Mr. Tom Burrus, Chairman | 826 Arenzville Road Arenzville, IL 62611 | Awaiting response |

* For interested parties notified by e-mail, see Appendix J.

USACE_DAPL0009921

## 8. STATUS OF ENVIRONMENTAL COMPLIANCE

Table 14 is a listing of environmental protection statutes and other environmental requirements, as well as the status of Applicant compliance with these statutes  and requirements, regarding the Proposed Action covered by this EA.

| Table 14 — Environmental Permits, Approvals, and Consultations | | | | |
|---|---|---|---|---|
| Jurisdiction | Guidance | Status | Requirement or Action | Degree of Compliance |
| **Federal Statutes** | | | | |
| USACE | Clean Water Act, as Amended 33 U.S.C. 466 et seq, Section 404 | Filed: 12/30/2014; 03/27/2015 | NWP 12, Section 404 Waters | PC[2] |
| | Rivers and Harbors Acts, as Amended 33 U.S.C. 401, 403, 407 et seq. | Filed: 12/30/2014; 03/27/2015 | NWP 12, Section 10 Waters | PC[2] |
| USACE | National Environmental Policy Act, as Amended, 42 U.S.C. 4321, et seq. | Pending | Compliance under 408 Permission | PC[3] |
| USEPA | Clean Air Act, as Amended, 42 U.S.C. 7609 | Complete | Compliance under 408 Permission | FC |
| USDOA | Farmland Protection Policy Act, 7 U.S.C. 4201, et seq. | Complete | Compliance under 408 Permission | FC |
| USFS | Wild and Scenic River Act, 16 U.S.C. 1271, et seq. | Complete | Compliance under 408 Permission | FC |
| USFWS | Endangered Species Act, as Amended, 16 U.S.C. 1531. et seq. | Pending | Compliance under 404/10/408 Permit / Permission | FC |
| USFWS | Fish and Wildlife Coordination Act, as Amended, 16 U.S.C. 4601, et seq. | Complete | Compliance under 408 Permission | FC |
| USFWS | Bald Eagle Protection Act, 16 U.S.C. 668-668c | Complete | Compliance under 408 Permission | FC |
| **State** | | | | |
| Illinois Commerce Commission | Certificate of Public Convenience and Necessity | Clearance Date: 12/22/2015 | State Certificate | FC |
| Illinois Environmental Protection Agency | NDPES Individual Permit for Discharges for Hydrostatic Test Water | Filed: 4/28/2016 | Compliance for state permit | PC[2] |

USACE_DAPL0009922

**Table 14**
**Environmental Permits, Approvals, and Consultations**

| Jurisdiction | Guidance | Status | Requirement or Action | Degree of Compliance |
|---|---|---|---|---|
| Illinois Environmental Protection Agency | Clean Water Act, as Amended 33 U.S.C. 466 et seq. Section 401 | Pending | Compliance under 401 Permit | PC[2] |
| Illinois Department of Natural Resources | State Listed Threatened and Endangered Species Consultation/Clearance (Incidental Take Permit) | Clearance Date: 2/25/2016 | State-listed species | FC |
| Illinois Historic Protection Agency (IHPA- Illinois SHPO) | Consultation and Inventory Permit; National Historic Preservation Act Section 106 Consultation/Compliance | Clearance Date: 3/30/2016 | Compliance under 404/10/408 Permit / Permission | FC |

FC = Full Compliance, PC = Partial Compliance.
1. Full compliance will be attained after all required archaeological investigations, reports and coordination have been completed.
2. Full compliance will be attained upon completion of any permitting requirements or coordination with other agencies.
3. Full compliance will be attained upon completion and signing of NEPA documents.

Table 15 provides a summary of the environmental mitigation measures discussed throughout this EA that Dakota Access has committed to as part of the Proposed Action design to avoid or minimize potential impacts on environmental and human resources throughout construction and operation activities.

**Table 15**
**Summary of Environmental Impact Avoidance and Mitigation Measures**

| Resource | Environmental Avoidance/Mitigation Measures |
|---|---|
| Geology and Soils | To protect the terrain of the Proposed Action Areas/Connected Action Areas, Dakota Access would, to the extent feasible, restore the areas affected by pipeline construction to pre-construction contours and similar vegetation (excepting trees within approximately 15 feet of the centerline).  Pre-construction and as-built surveys would be completed and provided to the Garrison Project. |
| | Although not anticipated, if blasting is found to be necessary, Dakota Access would follow procedures specified in its Blasting Plan (Appendix F). |
| | Dakota Access, in accordance with Illinois One-Call (Julie), would require that the construction contractor, prior to initiating any ground disturbance activities, identify all underground utilities to minimize the potential for encountering buried utility structures. |

USACE_DAPL0009923

| Table 15 | |
| --- | --- |
| Summary of Environmental Impact Avoidance and Mitigation Measures | |
| **Resource** | **Environmental Avoidance/Mitigation Measures** |
| | Dakota Access has completed a geotechnical analysis of the HDDs crossing the Illinois River and McGee Creek Levee, the Illinois Coon Run Levees, and the Kaskaskia River to facilitate engineering and design, including selection of appropriate materials and construction methods to limit any environmental impacts. |
| | The proposed pipeline would be designed and constructed to meet or exceed industry specifications, which would effectively mitigate the effects of fault movement, landslides, subsidence, and subsidence. |
| | In the event paleontological resources are discovered during construction, Dakota Access would implement measures outlined in its Unanticipated Discoveries Plan Cultural Resources, Human Remains, Paleontological Resources and Contaminated Media (UDP) (Appendix I) to avoid further impacts to these resources. |
| | If any vertebrate fossils are found during pipeline construction, Dakota Access would immediately cease construction activities and notify the appropriate agency personnel, including the Illinois State Historic Preservation Officer.  The appropriate authorities would determine the significance of the find and prescribe the mitigation procedures to be completed prior to resuming pipeline construction. |
| | Dakota Access would minimize or avoid impacts on soils by implementing the mitigation measures described in the DAPL Project's SPCC, SWPPP, and AIMP as well as requirements of applicable state and federal permits.  These documents would be included as contract documents and enforced as such throughout the DAPL Project. |
| | To minimize potential impacts on soil productivity, topsoil would be separated during trench excavation in agricultural land, and if applicable, other areas where soil productivity is an important consideration.  Unless otherwise requested by the landowner, topsoil in cropland would be removed to a maximum depth of 12 inches from the trench and spoil storage area and stored separately from the trench spoil.  After the trench is backfilled, topsoil would be returned to its approximate original location in the soil horizon. |
| | Compaction of agricultural soils would be minimized by restricting construction activities during periods of prolonged rainfall.  Where unacceptable levels of compaction occur in agricultural lands, a chisel plow or other deep tillage equipment would be utilized to loosen the soil. |
| | Dakota Access would retain environmental inspectors (EIs) to monitor the contractor's compliance with applicable requirements to protect soil resources during construction of the DAPL Project. |
| | The HDD workspace sites would be cleared, graded and matted as needed to minimize rutting and compaction. |

USACE_DAPL0009924

| Table 15 Summary of Environmental Impact Avoidance and Mitigation Measures | |
|---|---|
| **Resource** | **Environmental Avoidance/Mitigation Measures** |
| | Permanent impacts to soils would be avoided through the application of BMPs during construction, restoration, and post-construction revegetation management, as outlined in the SWPPP (Appendix B). |
| **Water Resources** | Impacts to the Illinois and Kaskaskia Rivers would be minimized by using HDD construction methods to install the proposed pipeline underneath these rivers. |
| | The HDD Contractor plans to install steel surface casing, where defined in the site specific HDD plans, to reduce the probability of an inadvertent release when the drill bit is working near the surface. |
| | The drilling mud and cuttings would be disposed of in accordance with applicable laws and regulations, likely through beneficial use by land farming. |
| | Dakota Access would conduct all HDD work according to the HDD Construction Plan that it has prepared, and implement the HDD Contingency Plan in the event of an inadvertent release. |
| | Water withdrawal from the Illinois or Kaskaskia Rivers would comply with all applicable permit conditions and regulations. Temporary water pumps would be placed within secondary containment to contain accidental spills of fuels. The intake hose would be suspended by floats within the water column and screened to prevent impingement entrainment of foreign objects and aquatic species. |
| | Water discharges associated with hydrostatic testing would be conducted in accordance with applicable permits. |
| | Discharged hydrostatic test water would not contain additives. |
| | Where appropriate, water would be discharged into an energy dissipation and/or filtering device as described in Dakota Access' SWPPP (Appendix B) to remove sediment and to reduce the erosive energy of the discharge. |
| | Fuel and all other hazardous materials would be stored in accordance with the requirements of Dakota Access' SPCC and SWPPP. These documents also describe response, containment, and cleanup measures. |
| | EIs would monitor compliance with applicable waterbody protection requirements during construction of the facilities. The DAPL Project SWPPP (Appendix B) describes additional mitigation measures and contains illustrations of how sediment control devices should be utilized. |
| | Dakota Access would maintain a vegetative buffer until the actual crossing of the waterbody takes place. |
| | Temporary sediment control measures, such as silt fence, would minimize the introduction of sediment into waterbodies during construction and minimize the movement of spoil and sediment from surface runoff during and after construction. |
| | Dewatering activities would be conducted in accordance with applicable permits and Dakota Access' SWPPP. |

USACE_DAPL0009925

| Table 15 Summary of Environmental Impact Avoidance and Mitigation Measures | |
|---|---|
| **Resource** | **Environmental Avoidance/Mitigation Measures** |
| | All surface drainage contours and vegetation would be returned as closely as practical to preconstruction conditions. |
| | The potential for groundwater contamination would be avoided by implementing the protective measures set forth in the DAPL Project specific SPCCs prepared by the contractor and in Dakota Access' SPCC Plan (Appendix B). |
| | In the event of a leak, Dakota Access would work aggressively to isolate the source through the use of remote-controlled shut-off valves, initiate cleanup activities, and contact the appropriate federal and state authorities to coordinate leak containment and cleanup.  Dakota Access proposes to meet or exceed all applicable regulations and requirements for pipeline design, construction, and operation. |
| | Construction workspace on the flowage easements has been selected to minimize impacts to forested wetlands, reducing the normal construction workspace from 125 feet to 85 feet wide. |
| | Unavoidable impacts to forest wetlands will be offset through mitigation.  Dakota Access will mitigate temporary impacts to forested wetlands at a mitigation to impact ratio of 1.5:1 and permanent conversion to forested wetlands at mitigation to impact ratio of 2:1. |
| | Dakota Access is in the process of obtaining verification for use of Nationwide Permit 12 for the crossing of the Illinois River (Section 10 authorization) and for crossing of wetlands and streams (Section 404) within the Carlyle Lake flowage easements. |
| | The DAPL Project SWPPP and SPCC specify several measures to protect wetlands and waterbodies from becoming polluted with fuels or other hazardous materials during construction.  This plan prohibits the storage of fuel or other hazardous materials within 100 feet of a wetland or waterbody.  The SPCC also specifies that equipment must be refueled at least 100 feet from waterbodies unless, due to site-specific conditions, there is no practical alternative. In that case, the contractor must implement site-specific protective measures and containment procedures described in the SPCC.  Contractors would be required to provide trained personnel, appropriate equipment, and materials to contain and clean up releases of fuel, lubricating oil, or hydraulic fluid that result from equipment failure or other circumstances. |
| | The DAPL Project has been designed in accordance with accepted floodplain management practices; no impacts to floodplain elevations or velocities are anticipated.  Following construction, disturbed areas would be restored to pre-construction grades and contours as practical. |
| | If necessary, soil displaced by the installation of the 24-inch pipeline on the flowage easements would be removed from the floodplain and hauled to an upland location in order to ensure original floodplain elevations are restored. |

USACE_DAPL0009926

Final Environmental Assessment - Dakota Access Pipeline Project, Illinois -August 2016

| Table 15 Summary of Environmental Impact Avoidance and Mitigation Measures | |
| --- | --- |
| **Resource** | **Environmental Avoidance/Mitigation Measures** |
| | Remotely operated above-ground mainline valve sites would be installed on both sides of the Illinois River and Carlyle Lake flowage easements crossings for isolation in the event of an emergency shutdown. |
| **Vegetation, Agriculture, and Range Resources** | Within areas disturbed by construction of the DAPL Project, and not being actively cultivated, including the Carlyle lake flowage easements, Dakota Access would implement active revegetation measures and rapid colonization by annual and perennial herbaceous species to restore most vegetative cover within the first growing season. |
| | In areas that require permanent revegetation, Dakota Access would specify appropriate seed mixes, application rates, and seeding dates, taking into account recommendations of appropriate state and federal agencies and landowner requests. |
| | In non-agricultural areas, vegetation cleared from ATWS would be allowed to revegetate after construction depending on arrangements with the landowner. |
| | Temporary revegetation measures may also be implemented to quickly establish ground cover to minimize the potential for soil erosion and noxious weeds to establish.  A temporary seed mix may be applied in these situations. |
| | When constructing in agricultural areas, a minimum of 1 foot of topsoil (organic layer) would be stripped from the trench line and stockpiled separately from trench spoil to preserve the native seed stock. |
| | At stream approaches, the contractor would leave a minimum of a 10-foot buffer (up to 30-foot depending on site conditions at the time of clearing) of undisturbed herbaceous vegetation on all stream banks during initial clearing, except where grading is needed for bridge installation or where restricted by applicable regulations and/or permit conditions. |
| | Herbaceous cover would be seeded on disturbed upland areas during restoration and it is expected that pre-existing herbaceous and shrub habitats would quickly reestablish themselves. |
| **Wildlife Resources** | In the unlikely event that a listed species is encountered within the Proposed Action Area during construction, construction activities would stop and the USFWS would be contacted. |
| | Herbaceous cover would be seeded on disturbed upland areas during restoration and it is expected that pre-existing herbaceous and shrub habitats would quickly reestablish themselves. |
| | In the unlikely event that a listed species is encountered during construction, construction activities would stop and the USFWS would be contacted. |
| | Potential roosting habitat for the Indiana Bat and Northern Long-Eared Bat would be removed in the wintertime (between October 1 and March 31) to avoid adverse impacts to these species |

USACE_DAPL0009927

Final Environmental Assessment - Dakota Access Pipeline Project, Illinois -August 2016

| Table 15 Summary of Environmental Impact Avoidance and Mitigation Measures | |
|---|---|
| **Resource** | **Environmental Avoidance/Mitigation Measures** |
| Aquatic Resources | A successfully completed HDD crossing would avoid aquatic resource impacts to the Illinois and Kaskaskia rivers since the pipeline would be installed without disturbing the aquatic and benthic environments. |
| | HDD operations conducted for the Illinois River and McGee Creek Levee, Coon Run Levees, and Kaskaskia River crossings would adhere to the HDD Contingency Plan and applicable permit conditions to reduce the likelihood of an inadvertent release to minimize and mitigate environmental impacts.  Dakota Access' construction contractor would ensure that the appropriate response personnel and containment equipment are available onsite to effectively implement the HDD Contingency Plan. |
| | Water withdrawal activities at the Illinois and Kaskaskia River would be conducted in accordance with all applicable permit conditions and regulations and in a manner that would not reduce water flow to a point that would impair flow or impact aquatic life. |
| | Intake screens and floats would also be utilized during the withdrawal of water from the Illinois River and Kaskaskia River to prevent entrainment of aquatic life and avoid impacts on aquatic resources. |
| | The potential for impacts on aquatic resources associated with accidental fuel spills or leaks during the withdrawal of water from the Illinois and Kaskaskia Rivers would be avoided or minimized by placing the pump within a secondary containment structure. |
| | For portions of the pipeline installed by HDD, the depth of the pipeline profile, the increased wall thickness of the pipe, the installation of remotely operated valves on both sides of the river crossing, monitoring of the system 24/7, aerial patrols, and in-line inspection, would further limit the potential for an inadvertent release into the Illinois or Kaskaskia Rivers. |
| | Adherence to the Geographic Response Plans for Illinois River, Coon Run Levee, and Kaskaskia River would minimize potential impacts on aquatic wildlife from potential spills during the operation of the pipeline. |
| | Conduct emergency response drills/exercises in accordance with the National Preparedness for Response Exercise Program (PREP) consisting of table top exercises and equipment deployment drills.  Dakota Access is committed to conducting a worst case discharge full scale exercise at either the Illinois or Kaskaskia River once every 6 years and will include both open water and ice response.  Dakota Access will alternate the location and type of exercise. |
| | In the event of a leak, Dakota Access would work aggressively to contain the leak, initiate cleanup activities, and contact the appropriate authorities, including the Corps. |

USACE_DAPL0009928

| Table 15 | |
| --- | --- |
| **Summary of Environmental Impact Avoidance and Mitigation Measures** | |
| **Resource** | **Environmental Avoidance/Mitigation Measures** |
| Land Use and Recreation | Mitigation measures to minimize impacts to soils, such as topsoil segregation and decompaction practices, would be fully implemented in accordance with the SWPPP. |
| | Dakota Access would coordinate with all landowners on acceptable methods for construction and restoration, including potential impacts to irrigated fields. |
| | Dakota Access would repair surface drains and drainage tiles disturbed during ROW preparation, construction, and maintenance activities. |
| | Dakota Access would repair or replace fences and gates removed or damaged as a result of ROW preparation, construction, or maintenance activities. |
| | Following construction and restoration, the work area would be restored and farming would be allowed to continue over the operational ROW.  Landowners would be compensated for temporary loss of land and lower yields.  Grazing activities would return to normal after revegetation of the disturbed areas. |
| | Trees would be protected by Dakota Access in a manner compatible with the safe operation, maintenance, and inspection of the pipeline.  Applicable regulations would be adhered to regarding tree and shrub removal from along the route. |
| | Dakota Access would obtain and comply with applicable state regulations, county permits, and zoning and land use regulations.  Permits may include, but are not limited to, grade and fill permits, ditch crossing permits, road and utility permits, and conditional use permits.  Dakota Access would retain one or more EIs to monitor compliance with environmental conditions of county permits. |
| Cultural and Historic Resources | In accordance with Section 106 of the NHPA, Dakota Access has made a good faith effort to identify significant historic properties within the Proposed Action Area.  Based on the result of these efforts, no properties considered to be eligible, or potentially eligible for listing in the National Register of Historic Places (NRHP) would be adversely impacted by the Proposed Action or Connected Action. |
| | Impacts to a potentially NRHP-eligible site, 11ST582, would be avoided via HDD. |
| | Impacts to a potentially NRHP eligible site, 11ST192, would be avoided by crossing a portion of the site with a timber-mat travel lane in an active agricultural field.  No subsurface disturbance within this site would be allowed in order to preserve any buried cultural deposits that may occur at this location. |
| | Dakota Access' UDP was developed (Appendix I) for use during all DAPL Project construction activities which describes actions that would be taken in the event of a previously unrecorded cultural resource site is discovered during construction activities.  The UDP explicitly calls for work to stop until the correct authority or agency can be contacted and the find can be properly evaluated. |
| Social and Economic Conditions | No residential homes or farms would be relocated resulting from the Proposed Action. |
| | No demographic changes in the Census tracts affected are anticipated, because no permanent employees would be created as a result of the Proposed Action. |

USACE_DAPL0009929

Final Environmental Assessment - Dakota Access Pipeline Project, Illinois -August 2016

| Table 15 | |
|---|---|
| **Summary of Environmental Impact Avoidance and Mitigation Measures** | |
| **Resource** | **Environmental Avoidance/Mitigation Measures** |
| **Hazardous Waste** | In the unlikely event contamination is encountered during construction, the UDP (Appendix I) would be implemented to protect people and the environment and avoid or minimize any effects from unearthing the material. |
| | Any hazardous materials discovered, generated, or used during construction would be managed and disposed of in accordance with applicable local, tribal, state, and federal regulations.  Should emergency response be required during construction, the contractor would have some of their own trained or contracted responders, and local response teams would be expected to assist. |
| | Dakota Access would comply with all applicable laws and regulations to abate or prevent pollution, such as the RCRA, and State hazardous waste management rules. |
| **Reliability and Safety** | All activities would be conducted in a safe manner in accordance with the standards specified in the OSHA regulations. |
| | To prevent pipeline failures resulting in inadvertent releases, Dakota Access would construct and maintain the pipeline to meet or exceed industry and governmental requirements and standards.  Specifically, the steel pipe would meet PHMSA specifications under 49 CFR § 195, follow standards issued by the American Society of Mechanical Engineers, National Association for Corrosion Engineers and American Petroleum Institute (API). |
| | Dakota Access would maintain and inspect the pipeline in accordance with PHMSA regulations, industry codes and prudent pipeline operating protocols and techniques.  The pipeline ROW would be patrolled and inspected by air every 10 days, weather permitting, but at least every three weeks and not less than 26 times per year, to check for abnormal conditions or dangerous activities, such as unauthorized excavation along the pipeline route. |
| | Dakota Access is currently drafting a Facility Response Plan, in accordance with 49 CFR 194, which details the procedures to be implemented in the event of an inadvertent pipeline release and would be in place prior to commencing transportation of crude oil. |
| | Following completion of construction and throughout operation of the DAPL Project facilities, the Operator and qualified contractors would maintain emergency response equipment and personnel at strategic points along the pipeline route. |
| | Contracts would be in place with oil spill response companies that have the capability to mobilize to support cleanup and remediation efforts in the event of a pipeline release.  The operator would also coordinate with local emergency responders in preventing and responding to any pipeline related problems. |
| | A SCADA system would be utilized to provide constant remote oversight of the DAPL Project facilities. |
| | A Computational Pipeline Monitoring System (CPM) would be utilized to monitor the pipeline for leaks. |

USACE_DAPL0009930

Final Environmental Assessment - Dakota Access Pipeline Project, Illinois -August 2016

| Table 15 Summary of Environmental Impact Avoidance and Mitigation Measures | |
|---|---|
| **Resource** | **Environmental Avoidance/Mitigation Measures** |
| | LeakWarn is being tailored to the DAPL Project facilities, in accordance with PHMSA requirements, to monitor the pipeline for leaks. |
| Air Quality and Noise | To reduce the emission of criteria pollutants, fuel-burning equipment running times would be kept to a minimum and engines would be properly maintained. |
| | Dakota Access would mitigate noise impacts by limiting equipment running times and the duration of construction to the minimum amount necessary to complete the Proposed Action.  Noisy construction activities would typically be limited to the least noise-sensitive times of day (daytime). |

USACE_DAPL0009931

## 9. LIST OF PREPARERS AND REVIEWERS

Dakota Access, in cooperation with the USACE Preparers, reviewers, consultants and federal officials include the following (Table 16):

| Table 16 List of Preparers and Reviewers | | |
|---|---|---|
| **Name** | **Title/Office** | **Agency** |
| St. Louis District Planning Staff | Ecologist, Environmental Compliance Section | USACE, St. Louis District |
| St. Louis District Regulatory Staff | Regulatory Project Manager, Regulatory Branch | USACE, St. Louis District |
| Rock Island District Cultural Resources Staff | Archaeologist, Regulatory Branch | USACE, Rock Island District |
| St. Louis District Tribal Resources Staff | Cultural Anthropologist, Curation and Archives Analysis Branch | USACE, St. Louis District |
| St. Louis District Geotechnical Engineers | Regional Technical Specialist, Geotechnical Branch | USACE, St. Louis District |
| St. Louis District Engineering & Construction Division Engineers | Program Manager, Levee Safety | USACE, St. Louis District |
| St. Louis District Operations Staff | Natural Resources Specialist | USACE, St. Louis District |
| St. Louis District Readiness Branch Staff | Program Manager, Readiness Branch | USACE, St. Louis District |
| St. Louis District Real Estate Branch Staff | Real Estate Division | USACE, St. Louis District |
| St. Louis District Attorney | Office of Counsel | USACE, St. Louis District |
| Monica Howard | Director Environmental Sciences | Dakota Access, LLC |
| Marc Hess | Environmental Specialist | Burns & McDonnell |
| Lane Martinez | Environmental Specialist | Burns & McDonnell |
| Nathan Olday | Environmental Project Manager | Burns & McDonnell |

USACE_DAPL0009932

## 10.  ACRONYMS, INITIALS, AND ABBREVIATIONS

| | |
|---|---|
| ANSI | American National Standards Institute |
| API | American Petroleum Institute |
| ATWS | additional temporary workspace |
| BMPs | best management practices |
| bpd | barrels per day |
| CAA | Clean Air Act |
| CEQ | Council on Environmental Quality |
| CERCLA | Comprehensive Environmental Response, Compensation, and Liability Act |
| CFR | Code of Federal Regulations |
| cm | centimeter |
| Company | Energy Transfer Company |
| Corps | U.S. Army Corps of Engineers |
| CPM | Computational Pipeline Monitoring System |
| CWA | Clean Water Act |
| DA | Department of the Army |
| Dakota Access | Dakota Access, LLC |
| DAPL | Dakota Access Pipeline |
| dB | decibels |
| dbh | diameter at breast height |
| DOT | Department of Transportation |
| EA | Environmental Assessment |
| ECDs | erosion control devices |
| ECP | erosion control plan |
| EI | Environmental Inspector |
| EO | Executive Order |
| ESA | Endangered Species Act |
| FEMA | Federal Emergency Management Agency |
| FIRM | Flood Insurance Rate Maps |
| GIS | geographic information systems |
| HARGIS | Historic and Architectural Resources Geographic Information System |
| HDD | horizontal directional drill |
| ICS | Incident Command System |
| IEPABA | Illinois Environmental Protection Agency Bureau of Air |
| IHPA | Illinois Historic Preservation Agency |
| ILDNR | Illinois Department of Natural Resources |
| $L_{dn}$ | Day-Night Average Sound |
| m | meter |
| MNDNR | Minnesota Department of Natural Resources |
| MNFI | Michigan Natural Features Inventory |
| MSL | mean sea level |

USACE_DAPL0009933

| | |
|---|---|
| NAAQS | National Ambient Air Quality Standards |
| NEPA | National Environmental Policy Act |
| NFIP | National Flood Insurance Program |
| NHPA | National Historic Preservation Act |
| NIMS | National Incident Management System |
| NLCD | National Land Cover Dataset |
| NRCS | Natural Resources Conservation Service |
| NRHP | National Registry of Historic Places |
| NSF | National Science Foundation |
| NWI | National Wetland Inventory |
| NWP 12 | Nationwide Permit 12 |
| OCC | Operations Control Center |
| OSHA | Occupational Safety and Health Administration |
| PA | Programmatic Agreement |
| PEM | palustrine emergent |
| PFO | palustrine forested |
| PHMSA | Pipeline and Hazardous Materials Safety Administration |
| PSS | palustrine scrub-shrub |
| RCRA | Resource Conservation and Recovery Act |
| RHA | Rivers and Harbors Act |
| ROW | right-of-way |
| SCADA | supervisory control and data acquisition |
| SPCC | Spill Prevention, Control, and Countermeasure |
| SRST | Standing Rock Sioux Tribe |
| SWPPP | Stormwater Pollution Prevention Plan |
| THPO | Tribal Historic Preservation Office |
| UDP | Unanticipated Discoveries Plan |
| USACE | U.S. Army Corps of Engineers |
| USDA | U.S. Department of Agriculture |
| USFWS | U.S. Fish and Wildlife Service |
| USGS | U.S. Geological Survey |
| WNS | white nose syndrome |

USACE_DAPL0009934

## 11. REFERENCES

Ackerman, D.J. 1980. *Ground-Water Resources of Morton County, North Dakota*. North Dakota Geological Survey Bulletin 7Z – Part III, 51 pp.

Bachman, J. 2014. North Dakota's Downside to the Oil Boom: Traffic Deaths. *Businessweek*. Retrieved from http://www.businessweek.com/articles/2014-06-09/north-dakotas-downside-to-the-oil-boom-traffic-deaths.

Bellassen and Luyssaert. 2014. Carbon Sequestration: Managing Forests in Uncertain Times. *Nature*, 506:153-155.

Burgess, A. 2012. *Animal Diversity Web:* Myotis sodalis. Retrieved February 2015 from http://animaldiversity.org/accounts/Myotis_sodalis/.

Changnon, S. A., J. R. Angel, and K. E. Kunkel. 2004. *Illinois Climate Atlas*. Illinois State Water Survey, Champaign, Illinois.

Council on Environmental Quality (CEQ). 1970. *Environmental Quality, The First Annual Report of the Council on Environmental Quality*. Retrieved from http://files.eric.ed.gov/fulltext/ED062109.pdf.

Council on Environmental Quality (CEQ). 1997. *Environmental Justice: Guidance under the National Environmental Policy Act*. Washington, D.C.: Executive Office of the President.

Cowardin, L. M., V. Carter, F.C. Golet, and E.D. LaRoe. 1979. *Classification of wetlands and deepwater habitats of the United States*. Washington, D.C.: U.S. Department of the Interior, Fish and Wildlife Service, Office of Biological Services.

Davies et. al. 1984. Engineering Aspects of Karst. Retrieved March 2016 from http://pubs.usgs.gov/of/2004/1352/.

GeoEngineers Horizontal Directional Drill Design Services. 2015a. *Dakota Access Pipeline Project, Illinois River HDD, Pike and Morgan Counties, Illinois*. For Dakota Access, LLC. August 7, 2015.

GeoEngineers Horizontal Directional Drill Design Services. 2015b. *Dakota Access Pipeline Project, Illinois River East Levee HDD, Scott County, Illinois*. For Dakota Access, LLC. August 6, 2015.

Energy Transfer. 2014. *Company Overview*. Retrieved November 2014 from http://www.energytransfer.com/company_overview.aspx.

The Engineering ToolBox. 2015. *Ldn – Day and Night Sound Level*. Retrieved from http://www.engineeringtoolbox.com/sound-level-d_719.html.

Environmental Protection Agency (EPA). 2015. *NEPA Assist Tool*. Retrieved 17 December 2015 from http://nepassisttool.epa.gov/nepassist/entry.aspx.

Florip, E. 2014. Proposed Oil Terminal Would Be Biggest In Volume. *The Columbian*. Retrieved from http://www.columbian.com/news/2014/nov/24/proposed-oil-terminal-biggest-volume-vancouver/.

Fritelli, J. 2014. *U.S. Rail Transportation of Crude Oil: Background and Issues for Congress*. Congressional Research Service. Retrieved from http://fas.org/sgp/crs/misc/R43390.pdf.

USACE_DAPL0009935

Hoberg, T. and C. Gause. 1992. Reptiles and amphibians of North Dakota. *North Dakota Outdoors*, 55(1):7-19. Jamestown, ND: Northern Prairie Wildlife Research Center. Retrieved from http://www.npwrc.usgs.gov/resource/herps/amrepnd/index.htm.

Horwath, B., and C. Owings. 2014. No Keystone XL Means More Oil By Rail, Report Says. *Oil Patch Dispatch*. Retrieved from http://oilpatchdispatch.areavoices.com/2014/01/31/no-keystone-xl-means-more-oil-by-rail-report-says/.

Illinois Department of Natural Resources (ILDNR). 2015a. *I FISH ILLINOIS.ORG - Illinois River*. Retrieved December 2015 from http://www.ifishillinois.org/profiles/Illinois.php.

Illinois Department of Natural Resources (ILDNR). 2015b. *I FISH ILLINOIS.ORG - Kaskaskia River*. Retrieved December 2015 from http://www.ifishillinois.org/profiles/Kaskaskia.php.

Illinois Environmental Protection Agency Bureau of Air. 2014, August. *Illinois Ambient Air Monitoring 2015 Network Plan*. Retrieved from http://epa.state.il.us/air/monitoring/2015/air-monitoring-network-plan.pdf.

Illinois Environmental Protection Agency Bureau of Air. 2015, September. *Illinois Ambient Air Monitoring 2016 Network Plan*. Retrieved from http://www.epa.illinois.gov/Assets/iepa/air/monitoring/2016/air-monitoring-network-plan.pdf.

Illinois State Geological Survey (ISGS). 2015. *Illinois Water Well Interactive Map*. Retrieved December 2015 from https://www.isgs.illinois.edu/ilwater.

Illinois State Geological Survey (ISGS). 2016. Earthquakes in Illinois: 1795-2015. Available at: http://isgs.illinois.edu/earthquakes

Illinois State Water Survey (ISWS). 2015. *Groundwater*. Retrieved December 2015 from http://www.isws.illinois.edu/wsp/wsground.asp.

Kolata, D.R. 2005. *Bedrock Geology Map of Illinois*. IMAP 14. Illinois State Geological Survey.

Kringstad, J. 2014. *Energy Development and Transmission Committee*. North Dakota Pipeline Authority. Retrieved from https://ndpipelines.files.wordpress.com/2012/04/kringstad-edt-7-8-2014.pdf.

Lichvar, R.W., M. Butterwick, N.C. Melvin, and W.N. Kirchner. 2014. The National Wetland Plant List: 2014 Update of Wetland Ratings. *Phytoneuron*, 2014-41: 1-42.

Michigan Natural Features Inventory. 2000. *Special plant abstract for* Platanthera leucophaea *(eastern prairie fringed-orchid)*. Retrieved February 2015 from http://mnfi.anr.msu.edu/abstracts/botany/platanthera_leucophaea.pdf.

Minnesota Department of Natural Resources (MNDNR). 2015. *Prairie Bush Clover: A threatened midwestern prairie plant.* Retrieved February 2015 from http://files.dnr.state.mn.us/natural_resources/ets/prairie_bush_clover.pdf.

Multi-Resolution Land Characteristics Consortium. 2011. *National Land Cover Database*. Retrieved from http://www.mrlc.gov/nlcd2011.php.

USACE_DAPL0009936

National Park Service. 2015. *Sleeping Bear Dunes: Nature & Science: Piping Plovers*. Retrieved February 2015 from http://www.nps.gov/slbe/naturescience/pipingplover.htm.

National Wild and Scenic Rivers System. 2016. *Illinois*. Retrieved January 2016 from http://www.rivers.gov/illinois.php.

NatureServe. 2014. *NatureServe Explorer*. Retrieved February 2015 from http://explorer. natureserve.org/.

Nixon, R. 2014. Grain Piles Up, Waiting for A Ride, As Trains Move North Dakota Oil. *New York Times*. Retrieved from http://www.nytimes.com/2014/08/26/us/grain-piles-up-waiting-for-a-ride-as-trains-move-north-dakota-oil.html.

North Dakota GIS Hub Data Portal. 2010. *Earthquake Locations*. Retrieved from https://apps.nd.gov/ hubdataportal/srv/en/main.home.

Piskin, K. and R.E. Bergstrom. 1975. *Glacial Drift in Illinois: Thickness and Character*. Illinois State Geological Survey, Circular 490.

Radbruch-Hall, D.H., R.B. Colton, W.E. Davies, I. Lucchitta, B.A. Skipp, and D.J. Varnes. 1982. *Landslide Overview Map of the Conterminous United States*. USGS Landslide Hazards Program. Retrieved from http://landslides.usgs.gov/hazards/nationalmap/.

U.S. Army Corps of Engineers (USACE). 1987. *Corps of Engineers Wetland Delineation Manual*. Technical Report Y-87-1. Vicksburg, MS: U.S. Army Engineer Waterways Experiment Station.

U.S. Army Corps of Engineers (USACE). 2010. *Regional Supplement to the Corps of Engineers Wetland Delineation Manual: Great Plains Region (Version 2.0)*. ERDC/EL TR-10-1. Vicksburg, MS: U.S. Army Engineer Research and Development Center.

U. S. Army Corps of Engineers (USACE). 2015. *Recent U.S. Climate Change and Hydrology Literature Applicable to U.S. Army Corps of Engineers Missions – Water Resources Region 07, Upper Mississippi*. Civil Works Technical Report, CWTS-2015-13. Washington, D.C.

U.S. Census Bureau. 2015. American Factfinder. Retrieved 17 December 17 2015 from http://factfinder.census.gov/faces/nav/jsf/pages/index.xhtml.

U.S. Department of Agriculture (USDA), Forest Service. 2003. *Conservation Assessment for Eryngium Root Borer (*Papaipema eryngii*)*. Retrieved January 2016 from http://www.fs.usda.gov/ Internet/FSE_DOCUMENTS/fsm91_054244.pdf.

U.S. Department of Agriculture (USDA), Natural Resources Conservation Service. 2006. *Land Resource Regions and Major Land Resource Areas of the United States, the Caribbean, and the Pacific Basin*. USDA Handbook 296.

U.S. Department of Agriculture (USDA), Natural Resources Conservation Service. 2015. *Soil Survey Geographic Database*. Retrieved December 2015 from http://www.nrcs.usda.gov/wps/ portal/nrcs/main/soils/survey/geo/.

USACE_DAPL0009937

U.S. Department of Transportation. 2014. *Pocket Guide to Large Truck and Bus Statistics*. Federal Motor Carrier Safety Administration. Retrieved from http://www.fmcsa.dot.gov/sites/fmcsa.dot.gov/files/docs/FMCSA%20Pocket%20Guide%20to%20Large%20Truck%20and%20Bus%20Statistics%20-%202014%20-%20508C.pdf.

U.S. Department of Transportation. 2015. *Transportation Accidents by Mode*. Office of the Assistant Secretary for Research and Technology. Retrieved from http://www.rita.dot.gov/bts/sites/rita.dot.gov.bts/files/publications/national_transportation_statistics/html/table_02_03.html.

U.S. Environmental Protection Agency (USEPA).  Appendix A-2. Illinois' 2016 303(d) List (sorted by name).  Retrieved from http://www.epa.illinois.gov/Assets/iepa/water-quality/watershed-management/tmdls/2016/303-d-list/appendix-a2.pdf on 30 April 2016.

U.S. Fish and Wildlife Service (USFWS). 1982. *Gray Bat Recovery Plan*. Retrieved February 2015 from http://ecos.fws.gov/docs/recovery_plan/820701.pdf.

U.S. Fish and Wildlife Service (USFWS). 1988a. *Federal Register: Endangered and Threatened Wildlife and Plants; Determination of Threatened Status for* Boltonia decurrens *(Decurrent False Aster), Final rule*. Retrieved February 2015 from http://ecos.fws.gov/docs/federal_register/fr1499.pdf.

U.S. Fish and Wildlife Service (USFWS). 1988b. *Recovery Plan for Prairie Bush Clover (*Lespedeza leptostachya*)*. Retrieved February 2015 from http://ecos.fws.gov/docs/recovery_plan/881006.pdf.

U.S. Fish and Wildlife Service (USFWS). 1990. *Decurrent False Aster (*Boltonia decurrens*) Recovery Plan*. Retrieved February 2015 from http://ecos.fws.gov/docs/recovery_plan/900928c.pdf.

U.S. Fish and Wildlife Service (USFWS). 1999. *Eastern Prairie Fringed Orchid (*Platanthera leucophaea*) Recovery Plan*. Retrieved February 2015 from http://www.fws.gov/midwest/endangered/plants/pdf/epfoplan.pdf.

U.S. Fish and Wildlife Service (USFWS). 2001. *Piping Plover Fact Sheet*. Retrieved February 2015 from http://www.fws.gov/midwest/endangered/pipingplover/pipingpl.html.

U.S. Fish and Wildlife Service (USFWS). 2004a. *Higgins Eye Pearlymussel (*Lampsilis higginsii*) Recovery Plan: First Revision*. Retrieved February 2015 from http://www.fws.gov/midwest/mussel/documents/higgins_eye_recovery_plan_ first_revision.pdf.

U.S. Fish and Wildlife Service (USFWS). 2004b. *South Dakota Field Office: Higgins Eye Pearlymussel*. Retrieved February 2015 from http://www.fws.gov/southdakotafieldoffice/hepm-facts.pdf.

U.S. Fish and Wildlife Service (USFWS). 2005. *Eastern Prairie Fringed Orchid (*Platanthera leucophaea*) Fact Sheet*. Retrieved February 2015 from http://www.fws.gov/midwest/endangered/plants/epfo.html.

U.S. Fish and Wildlife Service (USFWS). 2006. *Higgins Eye (*Lampsilis higginsii*) 5-Year Review: Summary and Evaluation*. Retrieved February 2015 from http://www.fws.gov/midwest/endangered/clams/pdf/hepm5year06.pdf.

USACE_DAPL0009938

U.S. Fish and Wildlife Service (USFWS). 2007. *Indiana Bat (*Myotis sodalis*) Draft Recovery Plan: First Revision*. Retrieved February 2015 from http://www.fws.gov/midwest/endangered/mammals/inba/pdf/inba_fnldrftrecpln_apr07.pdf.

U.S. Fish and Wildlife Service (USFWS). 2009a. *Indiana Bat (*Myotis sodalis*) 5-Year Review: Summary and Evaluation*. Retrieved February 2015 from http://www.fws.gov/Midwest/Endangered/recovery/5yr_rev/pdf/INBA5Yr 30Sept2009.pdf.

U.S. Fish and Wildlife Service (USFWS). 2009b. *Gray Bat (*Myotis grisescens*) 5-Year Review: Summary and Evaluation*. Retrieved February 2015 from http://www.fws.gov/ecos/ajax/docs/five_year_review/doc2625.pdf.

U.S. Fish and Wildlife Service (USFWS). 2009c. *Spotlight Species Action Plan* Lespedeza leptostachya *(Prairie Bush Clover)*. Retrieved February 2015 from http://ecos.fws.gov/docs/action_plans/doc3032.pdf.

U.S. Fish and Wildlife Service (USFWS). 2009d. *Piping Plover (*Charadrius melodus*) 5-Year Review: Summary and Evaluation.* Retrieved February 2015 from http://www.fws.gov/northeast/endangered/PDF/Piping_Plover_five_year_review_and_summary.pdf.

U.S. Fish and Wildlife Service (USFWS). 2010. *Eastern Prairie Fringed Orchid (*Platanthera leucophaea*) 5-Year Review: Summary and Evaluation*. Retrieved February 2015 from http://ecos.fws.gov/docs/five_year_review/doc3273. %20prairie%20fringed%20orchid_Final%20081610.pdf.

U.S. Fish and Wildlife Service (USFWS). 2012a. *Decurrent False Aster (*Boltonia decurrens*) 5-Year Review: Summary and Evaluation*. Retrieved February 2015 from http://ecos.fws.gov/docs/five_year_review/doc4044.pdf.

U.S. Fish and Wildlife Service. 2012b. *Higgins Eye Pearlymussel* Lampsilis higginsii. Retrieved February 2015 from http://www.fws.gov/midwest/endangered/clams/higginseye/higgins_fs.html.

U.S. Fish and Wildlife Service (USFWS). 2013. *Federal Register Notice of 12-Month Finding: Listing Warranted but Precluded.* Retrieved March 2016 from http://www.fws.gov/midwest/endangered/insects/rmbm/pdf/rmbmFR12mnthFndng14Aug2013.pdf.

U.S. Fish and Wildlife Service (USFWS). 2014a. *Gray Bat (*Myotis grisescens*) Fact Sheet*. Retrieved February 2015 from https://www.fws.gov/ midwest/endangered/mammals/grbat_fc.html.

U.S. Fish and Wildlife Service (USFWS). 2014b. *Recovery Outline for the Spectaclecase Mussel (*Cumberlandia monodonta*)*. Retrieved February 2015 from http://www.fws.gov/midwest/endangered/clams/spectaclecase/pdf/ SpectaclecaseRecoveryOutline.pdf.

U.S. Fish and Wildlife Service (USFWS). 2014c. *Spectaclecase (a freshwater mussel)* Cumberlandia monodonta *Fact Sheet*. Retrieved February 2015 from http://www.fws.gov/midwest/endangered/clams/spectaclecase/ SpectaclecaseFactSheetMarch2012.html.

U.S. Fish and Wildlife Service (USFWS). 2015a. *Endangered Species: Northern Long-Eared Bat* Myotis septentrionalis. Retrieved February 2015 from http://www.fws.gov/Midwest/endangered/mammals/nlba/index.html.

USACE_DAPL0009939

U.S. Fish and Wildlife Service. 2015b. *Eastern Prairie Fringed Orchid (*Platanthera leucophaea*) Fact Sheet.* Retrieved March 2016 from http://www.fws.gov/midwest/endangered/plants/epfo.html.

U.S. Geological Survey (USGS). 2014. *Illinois 2014 Seismic Hazard Map.* USGS Earthquake Hazards Program. Retrieved from http://earthquake.usgs.gov/earthquakes/states/illinois/hazards.php

U.S. Geological Survey (USGS). 2016. ShakeMap Scientific Background. http://earthquake.usgs.gov/earthquakes/shakemap/background.php

Villarini, G., J.A. Smith, and G.A. Vecchi. 2013. Changing frequency of heavy rainfall over the central United States. *Journal of Climate*, 26:351-357.

Voelker, D. C. and R. P. Clarke. 1986. *National Water Summary 1986 – Ground-Water Quality: Illinois.* Retrieved from http://il.water.usgs.gov/pubs/wsp2325.pdf.

Weary, D.J. and D.H. Doctor. 2014. *Karst in the United States: A Digital Map Compilation and Database.* USGS Open-File Report 2014-1156, 23 p.

Weibel, Pius C. and Samuel V. Panno. 1997. *Karst Terrains and Carbonate Rocks of Illinois.* Available at http://isgs.illinois.edu/sites/isgs/files/maps/statewide/imap8.pdf.

Wood Group Mustang. 2016. *Dakota Access Pipeline, Illinois and Kaskaskia River HDD Crossing for Dakota Access, LLC.* February 10, 2016.

USACE_DAPL0009940

## MITIGATED FINDING OF NO SIGNIFICANT IMPACT

### DAKOTA ACCESS PIPELINE PROJECT – SECTION 408
### CROSSINGS OF FEDERAL PROJECTS AND FLOWAGE EASEMENTS
### PIKE, MORGAN, SCOTT, AND FAYETTE COUNTIES, ILLINOIS

**I. Introduction:** I have reviewed and evaluated the documents concerning the proposed crossings of USACE – St. Louis District projects and flowage easements by a 30" crude oil pipeline to be constructed by the proponent, Dakota Access, LLC. The Dakota Access Pipeline (DAPL) Project crossings of lands containing projects funded or authorized by the federal government or crossing of lands that have federal government flowage easements under management by the U.S. Army Corps of Engineers (USACE) – St. Louis District) would require permissions from USACE – St. Louis District, which are the federal actions associated with the EA, dated August 2016. This authority derives from 33 U.S.C. Section 408, which requires USACE to give permission before any entity may use, occupy or alter a federal project constructed for navigation or flood control. Therefore, the scope of the EA is limited to the crossings of USACE – St. Louis District projects and flowage easements that would require consent by USACE – St. Louis District, including the proposed crossings of the McGee Creek levee west of the Illinois River (Pike County, IL), the navigation channel of the Illinois River (Pike and Morgan counties, IL), the Coon Run levees east of the Illinois River (specifically Coon Run Northwest levee and Coon Run Southeast levee) (Scott County, IL), and where the proposed pipeline would cross USACE – St. Louis District flowage easements north of Carlyle Lake (Fayette County, IL) approximately 3.5 miles west of the town of Shobonier, IL.

The EA was prepared by Dakota Access for the Proposed Action on behalf of the USACE – St. Louis District as the non-federal representative for compliance with the National Environmental Policy Act of 1969, the Council on Environmental Quality (CEQ) Regulations (40 Code of Federal Regulations (CFR) 1500-15-8), Corps of Engineers Regulation ER 200-2-2 (33 CFR Part 230), and related environmental compliance requirements for these crossings, National Historic Preservation Act (Section 106). Tribes, Tribal Historic Preservation Offices, State Historic Preservation Offices, the Advisory Council on Historic Preservation, and interested parties were consulted by Dakota Access, LLC and the USACE – St. Louis District.

The USACE – St. Louis District adopts this EA and incorporates findings within as part of stipulations to issue a Section 408 permission to cross lands containing projects funded or authorized by the federal government or crossing of lands that have federal government flowage easements under management by the U.S. Army Corps of Engineers to Dakota Access as the Proposed Action. The EA was prepared in accordance with CEQ regulations in Section 1506.5(a) and 1506.5(b), which allow an applicant to prepare an EA for federal actions.

**II. Proposed Federal Action:** The Proposed Action involves evaluating the potential effects of the Dakota Access Pipeline Project (**DAPL Project**), which would cross lands containing projects funded by the federal government or cross lands that have federal government flowage easements under management by the USACE – St. Louis District (**Proposed Action**) near the Illinois River in Pike, Morgan, and Scott counties, Illinois, and near the Kaskaskia River in Fayette County, Illinois. Specifically, this includes the following:

- The proposed DAPL Horizontal Directional Drill (HDD) crossing of the McGee Creek levee and the Illinois River reflects a total crossing length of approximately 6,500 feet, of which approximately 290 feet occurs beneath the McGee Creek levee, and approximately 700 feet occurs beneath Illinois River. The proposed HDD profile under the Illinois River is designed to provide 40 feet of

USACE_DAPL0009941

cover below the bottom of the river. The pipeline would be installed a minimum of 68 below the McGee Creek levee.

- The proposed DAPL HDD crossing of the Coon Run levees reflects a crossing length of approximately 4,341 feet, of which approximately 450 feet occurs beneath the Coon Run levees. The pipeline would be installed a minimum of 57 feet below the Coon Run levees.

- The proposed DAPL pipeline crosses approximately 12,778 feet (2.42 mile) of the USACE – St. Louis District flowage easements north of Carlyle Lake, by both HDD and underground placement via traditional trenching/backfilling operations. The pipeline would be installed a minimum of 36 feet below the Kaskaskia River. In standard conditions, pipeline installed via traditional trench methods within the USACE – St. Louis District flowage easements north of Carlyle Lake would be installed a minimum of 36 inches deep.

- Connected Actions include temporary access roads, construction workspace and HDD stringing areas associated with the Section 408 Proposed Action Areas.

**III. Purpose and Need:** The DAPL Project purpose is to efficiently and safely transport crude oil from the Bakken and Three Forks production region in northwest North Dakota to a crude oil market hub located near Patoka, Illinois. The Dakota Access Pipeline is being designed to safely carry up to 570,000 barrels per day (bpd) or more of crude oil (approximately 450,000 bpd initially) through the states of North Dakota, South Dakota, Iowa, and Illinois and ultimately terminating in Patoka, Illinois. From the Patoka hub, the crude oil would be transported by other pipelines to refineries located in the Midwest and the Gulf Coast, where 80% of the U.S. refining capabilities exist today to further the country's goal of energy independence and support the U.S. consumer's energy demand.

**IV. Alternatives:**  One modification of existing infrastructure (Alternative 1) and two different transportation (trucking (Alternative 2) and rail (Alternative 3) alternatives were screened out from detailed consideration due to safety, reliability, and infrastructure concerns, all of which would create a greater environmental impact in meeting the purpose and need of the DAPL Project.

Major route alternatives (Alternative 4) were evaluated for the pipeline route as a whole. Datasets utilized during the DAPL Project routing analysis included engineering (e.g., existing pipelines, railroads, karst, powerlines, etc.), environmental (e.g., critical habitat, fault lines, state parks, national forests, brownfields, national registry of historic places, etc.), and land use (e.g., fee owned federal lands, federal easements, dams, airports, cemeteries, schools, mining, and military installations, etc.). Each of these datasets were weighted based on the risk (e.g., low, moderate, or high based on a scale of 1,000) associated with crossing or following certain features. In general, the route for the pipeline would follow features identified as low risk, avoid or minimize crossing features identified as moderate risk, and exclude features identified as high risk. In this way, the preferred alternative was identified through the GIS-based routing program and required minor adjustments based on observed field conditions during onsite surveys and engineering/design.

Four major waterbody crossing methods (Alternative 5) were analyzed: Dam and Pump, Flume, Wet Open-Cut, and Horizontal Directional Drill (HDD). The Dam and Pump, and Flume methods were screened out due to the large volume of water that would need to be diverted. Of the remaining two methods, it was determined that the Open-Cut method would increase environmental impacts and that the HDD method reduced these impacts and was the preferred option to cross major waterbodies.

USACE_DAPL0009942

The two remaining alternatives evaluated include: (1) the No Action Alternative; and (2) Approve the Applicant's Proposed Pipeline Action (crossing the McGee Creek levee for approximately 290 feet, the Illinois River for approximately 700 feet, the Coon Run levees for approximately 450 feet, and crossing federal flowage easement tracts north of Carlyle Lake for approximately 12,778 feet (2.42 miles)) (Requester's Preferred Alternative).  More information on the alternative analysis is included in Section 2.0 of the EA.

**V. Summary of Environmental Impact:** The possible consequences of the No Action and the Requester's Preferred Alternative have been studied for physical, environmental, cultural, social and economic effects. Significant factors evaluated as part of this review include:

a. *Topography and Geology.*  Construction of the Proposed Action and Connected Actions would not result in adverse impacts on topography or geology on USACE – St. Louis District project lands or federal flowage easements of the Proposed Action Areas/Connected Action Areas.  No unique geologic features would be impacted by any aspect of the HDD installation.  No impacts on topography or geology would occur during operations.

b. *Geologic Hazards.*  No impacts associated with karst topography, seismic activity, landslides or subsidence within the Proposed Action Areas/Connected Action Areas are anticipated.  No areas have a slope that meets or exceeds 25%.

c. *Soils.*  There would be no soil disturbance outside of the construction workspace.  Permanent impacts on soils would be avoided through the implementation of Best Management Practices (BMP) during construction, restoration, and post-construction revegetation management. Additionally, there would be no conversion of prime farmland soils to non-agricultural use.  A summary of Environmental Impact Avoidance and Mitigation Measures can be found in Table 15 of the EA, which is attached also attached to this FONSI, and the Best Management Practices Figures can be found in Appendix B.

d. *Surface Waters.*  Direct and indirect impacts would be minimized by using HDD construction methods to install the proposed pipeline underneath the Illinois and Kaskaskia Rivers.  At the Illinois River crossing, the pipeline would be installed a minimum of 40 feet below the bottom of the Illinois River and a minimum of 58 feet below the associated unnamed tributary.  The pipeline would be installed a minimum of 57 feet below the waterbodies associated with the Coon Run levees of the Illinois River.  The pipeline would be installed a minimum of 36 feet below the Kaskaskia River and an associated unnamed tributary.  Where perennial waterbodies are open cut, the pipeline will be installed a minimum of 5 feet below the bottom of the channel.  The potential for inadvertently released drilling fluids to enter any waterbody from below or from the shoreline is low.  No impacts to surface waters are anticipated through the discharge of water used for hydrostatic testing.  In the unlikely event of a pipeline leak once in operation, response measures to protect the users of downstream drinking water intakes will be implemented.  A draft Facility Response Plan (FRP) can be found in Appendix G.

e. *Ground Waters.*  Installation of the pipeline in the Proposed Action Areas/Connected Action Areas would not be expected to result in significant negative impacts on groundwater resources. Construction and dewatering activities are not expected to have a significant effect on regional groundwater flow patterns. Impacts on deeper aquifers are not anticipated. The introduction of contaminants to groundwater due to accidental spills of construction-related chemicals, fuels, or

USACE_DAPL0009943

hydraulic fluid could have an adverse effect on groundwater quality. Accidental releases from the pipeline system during operations could potentially affect groundwater. In the unlikely event of a spill during pipeline operations, impacts to water resources would be mitigated by following the cleanup procedures and remediation activities described in the Dakota Access' draft FRP. A draft Facility Response Plan (FRP) can be found in Appendix G. By implementing the protective measures set forth in these plans, groundwater contamination due to construction activities is not anticipated.

f.   *Wild and Scenic Rivers.*  The Proposed Action Areas/Connected Action Areas are located more than 100 miles from the Middle Fork of Vermilion River, the only water body designated as wild and scenic within the state of Illinois. Thus, no impacts to wild and scenic river resources would occur.

g.   *Wetlands.*  No wetlands would be permanently drained or filled in the Proposed Action Areas/Connected Action Areas. Impacts to many wetland areas would be avoided by HDD. Compensatory mitigation would be provided as required for temporary impacts (5.36 acres of palustrine forested wetland; 13.58 acres of palustrine emergent wetland) and permanent conversion impacts to palustrine forested wetlands (4.11 acres). Impacts to wetlands would be offset through mitigation at the Middle Kaskaskia Mitigation Site, Clinton County, IL. The St. Louis Regulatory Branch is currently reviewing sites for authorization under Nationwide Permit 12 and will determine the appropriate mitigation as a condition of the permit verification. With the implementation of the measures above, impacts to wetlands in the vicinity of the levees and flowage easement crossings would be minimized.

h.   *Floodplain.*  The USACE – St. Louis District Hydrologic Engineering Section reviewed the proposed pipeline plans for the portion of the DAPL Project in the vicinity of the Illinois and Kaskaskia Rivers for compliance with the requirements of EO 11988 (Floodplain Management). Provided that the site topography is left at its natural ground elevation after construction and all excess material is hauled off site, the Hydrologic Engineering Section concluded that there are no flood risk or floodplain management concerns associated with the Proposed Action.

i.   *Levees.*  Because of the use of HDD construction methods to install the pipeline well below ground level, construction of the Dakota Access pipeline is not anticipated to have an effect on the operation of the McGee Creek or Coon Run levees.

j.   *Vegetation, Agriculture, and Range Resources.*  Temporary impacts on land cover would occur in essentially all areas within the construction footprint of the Proposed Action Areas and Connected Actions, the vast majority of which would return to pre-construction land cover upon completion of construction. Impacts on cultivated crops make up the majority of temporary impacts and would return to cultivated crops post-construction. Permanent impacts on land cover would be limited to the permanent ROW and is limited to routine vegetation maintenance including tree removal. Agricultural Mitigation measures can be found in Appendix H.

k.   *Wildlife Resources.*  Temporary impacts on wildlife could occur during construction due to clearing of vegetation and movement of construction equipment along the ROW. The ROW and temporary workspaces would remain relatively clear of vegetation until restoration is completed. Most mobile wildlife would disperse from the Proposed Action Areas/Connected Action Areas as

USACE_DAPL0009944

construction activities approach. Some less mobile wildlife species such as amphibians, reptiles, and small mammals, have the potential to be directly impacted during clearing and grading activities. Overall, impacts to wildlife in the Proposed Action Areas and Connected Actions areas are anticipated to be very small.

l.  *Aquatic Resources.* The HDD setbacks along the Illinois River are approximately 0.55 miles from the west bank and 0.63 miles from the east bank. For the Kaskaskia River, the HDD setbacks are approximately 0.47 miles from the west bank and 0.22 miles from the east bank. These setbacks greatly minimize the risk for sediment transport from the workspace into the rivers during precipitation events. Crossings via HDD carry a low risk of an inadvertent release of drilling mud, composed primarily of bentonite slurry. Increased levels of sedimentation and turbidity from an inadvertent release could adversely affect fish eggs, juvenile fish survival, benthic community diversity and health, and spawning habitat. Pipeline installed via HDD would not disturb the aquatic and benthic environments, thus no impacts are anticipated. Impacts to the aquatic environment due to unintended oil releases from the pipeline during operation have the potential to occur. For portions of the pipeline installed beneath the Illinois and Kaskaskia rivers, pipeline depth and wall thickness, installation of remotely operated valves on both sides of the river crossings, and monitoring of the system 24/7 would limit the potential for an inadvertent release into the waterbodies. Additionally, operation in accordance with PHMSA and federal regulations, would minimize potential impacts on aquatic wildlife from potential spills during the operation of the pipeline. In the event of a leak, Dakota Access would work aggressively to contain the leak, initiate cleanup activities, and contact the appropriate authorities, including USACE – St. Louis District. Thus, operations activities are not anticipated to impact aquatic resources or their habitat. Specific response and mitigation plans can be found in Appendices B, C, and G.

m. *Threatened, Endangered, Candidate, and Proposed Species.* Nine Federally listed and one candidate species have been identified in the USACE – St. Louis District Proposed Action Areas/Connected Action Areas within Pike, Morgan, Scott, and Fayette counties, Illinois. Based on the avoidance and minimization measures, literature reviews, field investigations, and habitat types present in the Proposed Action Areas, USACE – St. Louis District determined that the proposed Action *"may affect, but is not likely to adversely affect"* the Northern Long-eared Bat (*Myotis septentrionalis* – threatened) and the Indiana Bat (*Myotis sodalis* – endangered); and would have *"no effect"* on the Gray Bat (*Myotis grisescens* – endangered), Higgins Eye Pearlymussel (*Lampsilis higginsii* – endangered), Spectaclecase Mussel (*Cumberlandia monodonta* – endangered), Piping Plover (*Charadrius melodus* – endangered), Decurrent False Aster (*Boltonia decurrens* – threatened), Eastern Prairie Fringed Orchid (*Platanthera leucophaea* – threatened), Prairie Bush Clover (*Lespedeza leptostachya* – threatened), and Rattlesnake-Master Borer Moth (*Papaipema eryngii* – candidate).

In a letter from the U.S. Fish and Wildlife Service dated 2 May 2016, the Service concurred with the determination that the project *"may affect, but is not likely to adversely affect"* the Indiana Bat. The Service considers section 7(a)(2) consultation to be completed for this species. Furthermore, the Service found that the Northern Long-Eared Bat is likely to be adversely affected by the DAPL Project, but that this project will not result in prohibited incidental take, and its effects are covered by the Programmatic Biological Opinion dated 5 January 2016. Thus, no additional consultation is needed for the Northern Long-Eared Bat unless: (1) new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an

USACE_DAPL0009945

extent not considered in the consultation; (2) the action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the consultation; or (3) a new species is listed or critical habitat is designated that may be affected by this project. The Biological Assessment response letter from the USFWS can be found in Appendix K.

n. *Bald Eagles.* If Bald eagles are found nesting in large trees in or near the project area, the proponent has agreed to follow the National Bald Eagle Management Guidelines during construction to avoid and minimize any project-related impacts to this bird.

o. *Land Use.* The Proposed Action would result primarily in temporary, short-term impacts on land use during construction. Construction activities would require the temporary and short-term removal of existing agricultural land from crop and forage production within the construction footprint. Temporary impacts on nearby residences could include inconvenience caused by traffic congestion associated with the transport of equipment, materials, and construction workers. Once in operation, a permanent 50-foot ROW would be maintained, except at segments of the ROW above the HDD profile and farmed tracts, which would be maintained by clearing woody vegetation over only a 30 foot corridor.

p. *Recreation.* The recreational enjoyment of wildlife (such as hunting, fishing or bird watching) may be temporarily affected by construction activities, depending on season and location. However, this effect would be short-term and limited to construction only. No impacts to areas of special interests such as the Meredosia National Wildlife Refuge, Carlyle Lake State Fish and Wildlife Area, or Illinois Natural Areas Inventory Sites would occur as a result of the construction or operation of the Proposed Action.

q. *Cultural and Historic Resources.* Phase I archaeological survey and deep testing within the Proposed Action and Connected Action Areas in Illinois was undertaken between December of 2014 and August of 2015. Six prehistoric sites were identified within these areas. Three of the sites would be crossed by HDD, with the pipeline passing deeply below each site; thus no archaeological deposits would be impacted. The forth site was not eligible. The fifth site was recommended as not eligible and IHPA concurred in a letter dated 3 March 2016. The final site would only be crossed by a construction-matted travel lane that would be used to access the east side of the Coon Run levees HDD workspace area. Deep testing of this site found no evidence for deeply buried sites or buried landforms suitable for the preservation of prehistoric cultural horizons. No further work is recommended for the USACE – St. Louis District projects or flowage easements traversed by the Proposed Action in Illinois. Additionally, correspondence occurred between Mr. John M. Fowler, Executive Director of the Advisory Council on Historic Preservation and Ms. Jo-Ellen Darcy, Assistant Secretary of the Army (Civil Works). In conclusion, no properties considered to be eligible, or potentially eligible for listing in the National Register of Historic Places would be adversely impacted by the Proposed Action or Connected Actions. Coordination letters can be found in Appendix K.

r. *Native American Consultations.* The USACE initiated formal consultation with all tribes (over 70) for the DAPL pipeline on 3 September 2015. Additionally, the 29 tribes the St. Louis District consults with were sent letters dated 22 January 2016 and 2 March 2016 requesting that they notify the St. Louis District of any concerns. An agency/entity consultation list can be found in Table 13 of the EA. At the proposed Illinois River and McGee Creek levee crossing, no Tribe has

USACE_DAPL0009946

indicated that they would like to enter into consultation or monitor the Proposed Action Areas/Connected Action Areas. At the Coon River levees Proposed Action Areas/Connected Action Areas, the Osage Nation stated verbally they would not enter into consultation on a site located in vicinity, but would like to monitor the area during the placement of the pipe. At the Proposed Action Areas/Connected Action Areas at the Carlyle Lake flowage easement, the Osage Tribe stated verbally they would not enter into consultation on a site located in vicinity. Tribal consultation is complete for the Section 408 Proposed Action Areas/Connected Action Areas. The Osage Nation will be informed when the HDD is occurring at the single site they desire to monitor in the Coon River levees Proposed Action Areas/Connected Action Areas, and arrangements will be made for them to send a representative. Additionally, correspondence occurred between Mr. John M. Fowler, Executive Director of the Advisory Council on Historic Preservation and Ms. Jo-Ellen Darcy, Assistant Secretary of the Army (Civil Works). <u>Coordination letters can be found in Appendix K.</u>

s. *Social and Economic Conditions.* Counties within the Proposed Action Areas/Connected Action Areas could experience short-term temporary beneficial effects to the local economy through induced spending from construction employees working on the crossings. No residential homes or farms would be relocated as a result of the Proposed Action. In compliance with Executive Order 13045, Protection of Children from Environmental Health and Safety Risks, the pipeline crossings would not be near any facilities where children are present and would not constitute an environmental health and safety risk that may disproportionately affect children.

t. *Environmental Justice.* The Proposed Action Areas/Connected Action Areas have minority populations that are less than, equal too, or slightly higher (1.5 to 2.5 percent higher) than the minority populations in the respective counties. The Proposed Action Areas/Connected Action Areas have poverty rates less than, equal too, or slightly higher (2 percentage points) than poverty rates in the State as a whole. Thus, the census tracts crossed by the Proposed Action do not include minority or low income populations that are "meaningfully greater" than the minority or low income populations in the general population, and the Proposed Action would not disproportionately affect identified minority or low-income populations.

u. *Hazardous, Toxic, and Radioactive Wastes.* Presently, there are no recognized Radiation Information Database, Brownfields, or Superfund sites within one mile of the corridor in Fayette, Morgan, Pike, or Scott Counties. However, on the south side of Meredosia and about 3,000 feet from the closest pipeline route, Celanese Ltd., Ameren Meredosia Power Station, and the Meredosia Terminal are on the Toxic Release Inventory and registered under the Toxic Substances Control Act as handling regulated chemicals. No operating sensitive receptors, such as schools or hospitals, are reported within at least one mile of the Proposed Action Areas/Connected Action Areas. Within the Proposed Action Areas/Connected Action Areas, there is potential for temporary impacts to public safety from hazardous material use. Other hazards to worker safety may also exist along the Proposed Action corridor, but do not pose a significant impact. Any hazardous materials discovered, generated, or used during construction would be managed and disposed of in accordance with the DAPL Project's SPCC plan and Unanticipated Discovery Plan as well as the applicable local, tribal, state, and federal regulations. <u>Plans can be found in Appendices B and I.</u>

USACE_DAPL0009947

v. *Reliability and Safety*.  Construction activities could present safety risks to those performing activities, residents and other pedestrians in the neighborhood. Given the low population density of the area, safety risks during construction would be limited to workers involved with the Proposed Action.  To prevent pipeline failures resulting in inadvertent releases, Dakota Access would construct and maintain the pipeline to meet or exceed industry and governmental requirements and standards.  Dakota Access would utilize a supervisory control and data acquisition (SCADA) system to provide constant remote oversight of the pipeline facilities. Throughout operation of the DAPL Project, the Operator and qualified contractors would maintain emergency response equipment and personnel at strategic points along the pipeline route. In the unlikely event of a leak during operations of the pipeline, the Operator would implement the response measures described in the Facility Response Plan.  Emergency equipment would be available to allow personnel to respond safely and quickly to emergency situations.  Following incident command protocols, the Operator would work in unison to cooperate with and assist fire, police and other first responders when implementing actions to protect personnel, public safety and the environment. Specific response and mitigation plans can be found in Appendices B, C, and G.

w. *Air Quality*.  Within the Proposed Action Areas/Connected Action Areas, no long-term impacts to air quality would occur; the proposed pipeline would not emit any criteria air pollutants and is entirely underground.  Construction of the HDD across the McGee Creek levee, the Illinois River, and the Coon Run levees is likely to take eight to twelve weeks to complete. Conventional pipeline construction across the federal flowage easements would take approximately one month to complete.  To reduce the emission of criteria pollutants, fuel-burning equipment running times would be kept to a minimum and engines would be properly maintained. This temporary increase in emissions is not expected to impact air quality or visibility in the region long-term.

x. *Noise*.  Construction would cause temporary increases in the ambient sound environment in the areas immediately surrounding active construction.  The use of heavy equipment or trucks would be the primary noise source during construction and excavation.  The level of impact would vary by equipment type, duration of construction activity and the distance between the noise source and the receptor.  Noisy construction activities would typically be limited to the least noise-sensitive times of day (daytime only).  Once constructed and in-service, normal pipeline operations are not audible.

y. *Climate Change*.  During construction, emissions from fuel-burning internal combustion engines (e.g., transportation trucks, heavy equipment, drill rigs, etc.) would emit Green House Gases (GHG). To reduce the emission of GHG, fuel-burning equipment running times would be kept to a minimum and engines would be properly maintained. This temporary increase in emissions is not expected to impact local or regional climate long-term. The Proposed Action has no emission sources during operation of the DAPL Project in the Proposed Action Areas/Connected Action Areas and would therefore not emit GHG.

Dakota Access does not extract or produce any product, and would only provide a pipeline that is a safe and efficient logistical link between supply and demand for oil and petroleum products. A pipeline is a more efficient way to ship the supply to the demand because they ship only the product itself, where trains, trucks, and ships also require energy to move the heavy container. Not only the transportation via tanks, trucks and ships generate GHG emissions, but the loading

USACE_DAPL0009948

and unloading of the product could also emit GHG emissions depending on the product loaded/unloaded and controls in place. More broadly, shipping oil from North Dakota to domestic refineries also requires much less total shipping distance than importing the oil from the Middle East, Africa, or South America (or even Alaska).

z. *Cumulative Impacts.* For the proposed action, key resources of concern include impacts to geology and soils, water and aquatic life resources, vegetation, agriculture, and range resources, federally threatened and endangered species, wildlife resources, land use and recreation, cultural and historical resources and Native American consultations, social and economic conditions, transportation and traffic, and air quality and noise. Based on the evaluations of past, present, and future actions that could have a cumulative impact on resources affected by the Proposed Action, it was determined that a slight adverse effect to vegetation resources and a beneficial effect to social and economic conditions would occur if permission is given for the Proposed Action. Other resources considered and listed in Table 12 of the EA are anticipated to have no incremental cumulative impact when evaluated with past, present, and future actions.

**VI. Mitigation Measures:** Impacts to the environment would be temporary and not significant as a result of avoiding, minimizing and mitigating any potential impacts. The majority of potential impacts would be mitigated by HDD technology, which would install the pipeline beneath resources without surface disturbance and allow pipeline construction to proceed with the least amount of impacts possible. Additional mitigation measures within the Stormwater Pollution Prevention Plan, Spill Prevention, Control, and Countermeasure Plan, HDD Construction Plan, HDD Contingency Plan, Unanticipated Cultural Resources Discovery Plan and Geographical Response Plans will be followed to prevent environmental and cultural resource impacts. Impacts to land use and vegetation would be temporary and land would be allowed to return to current land use once construction is complete. No long term impacts are anticipated to any resources. Social and noise impacts to rural residents in the general vicinity would be minimal as construction would be completed during daylight hours and the locations are remote from most populated areas. See Section 6.0 in the EA for more details on best management practices and mitigation measures the applicant has committed to adhere to for this Proposed Action.

**VII. Environmental Compliance.** Compliance with Section 404 of the Clean Water Act, and Section 10 of the Rivers and Harbors Act will be achieved with verification of the applicant's Pre-Construction Notifications (PCNs) for Nationwide Permit #12 for Utility Lines at separate and distant waterbody crossings. Compliance with Section 401 for Illinois, will be achieved by including the required conditions from the Illinois EPA in the permit verification letter for the applicant's PCNs for Nationwide Permit #12 for Utility Lines. Compliance with Section 106 of the National Historic Preservation Act has been achieved by coordination with the Illinois State Historic Preservation Office, which provided concurrence letters dated 21 and 28 March 2016. The U.S. Fish and Wildlife Service has reviewed the Biological Assessment and provided a response letter to fulfill compliance with the Endangered Species Act. The public notice provided the USFWS with the opportunity to provide recommendations under the Fish and Wildlife Coordination Act concerning the Proposed Action. No recommendations were received from the USFWS by the expiration date of the public notice (5 February 2016), thus the USACE is deemed to be in full compliance with the Fish and Wildlife Coordination Act. Furthermore, Dakota Access has consulted with the USFWS for technical assistance to determine appropriate measures necessary to minimize and avoid impacts to wildlife resources. The Illinois Department of Natural Resources provided an Authorization for Incidental take and Implementation Agreement to Dakota Access Pipeline, LLC, signed 25 February 2016. Compliance with the National Environmental Policy Act will be achieved with the signing of this document.

USACE_DAPL0009949

The project compliance with all other applicable laws and regulations is documented in Table 14 of the EA.

## VIII. Coordination and Public Review

On 5 January 2016, the St. Louis District posted a Public Notice on the USACE – St. Louis District website describing the proposed project in adequate detail, and disclosing that the agency would prepare NEPA documentation. Through the Public Notice, the District solicited meaningful comments from the public; Federal, state, and local agencies and officials; Indian Tribes; and other interested parties in order to consider and evaluate the impacts of the proposed activity. Comments were accepted from 5 January 2016 through 5 February 5 2016. A copy of this Public Notice is provided in Appendix J. In addition to the Public Notice, the USACE consulted with the Illinois Historic Preservation Agency, the USFWS, and the Illinois Department of Natural Resources to solicit comments for the Proposed Action within the USACE Section 408 Proposed Action Areas/Connected Action Areas (see Appendix K). The USACE also conducted tribal consultations (see Appendix K). Table 13 of the EA includes a listing of individuals and agencies consulted during preparation of the EA regardless of whether a response was received.

The USACE – St. Louis District fully considered comments received and made additional clarifications within the EA as necessary. No significant comments remain unresolved. More information on how the comments received during the review process were addressed is presented in Appendix J of the EA. Because all comments have been addressed, no additional NEPA compliance actions are required prior to the USACE – St. Louis District making a decision to complete federal actions authorizing work within the scope of analysis presented within the EA. The Requester's Preferred Alternative has been designed in such a way as to minimize impacts to sensitive resources and the applicant has agreed to comply with all applicable federal, state, and local laws and regulations.

## IX. Conclusion.

Based on the disclosure of the impacts associated with the Proposed Action contained within the draft EA, it is my determination that providing permission to cross lands containing projects funded by the federal government or lands that have federal government flowage easements under management by the U.S. Army Corps of Engineers – St. Louis District for constructing portions of the proposed Dakota Access Pipeline Project would not constitute a major federal action that would significantly affect the quality of the human environment. I have determined that preparation of an Environmental Impact Statement is not required.

_3 January 2016_
_____
Date

_Anthony Mitchell_
_____
Anthony P. Mitchell
Colonel, U.S. Army
District Commander

USACE_DAPL0009950

| Table 15 Summary of Environmental Impact Avoidance and Mitigation Measures | |
|---|---|
| **Resource** | **Environmental Avoidance/Mitigation Measures** |
| Geology and Soils | To protect the terrain of the Proposed Action Areas/Connected Action Areas, Dakota Access would, to the extent feasible, restore the areas affected by pipeline construction to pre-construction contours and similar vegetation (excepting trees within approximately 15 feet of the centerline). Pre-construction and as-built surveys would be completed and provided to the Garrison Project. |
| | Although not anticipated, if blasting is found to be necessary, Dakota Access would follow procedures specified in its Blasting Plan (Appendix F). |
| | Dakota Access, in accordance with Illinois One-Call (Julie), would require that the construction contractor, prior to initiating any ground disturbance activities, identify all underground utilities to minimize the potential for encountering buried utility structures. |
| | Dakota Access has completed a geotechnical analysis of the HDDs crossing the Illinois River and McGee Creek Levee, the Illinois Coon Run Levees, and the Kaskaskia River to facilitate engineering and design, including selection of appropriate materials and construction methods to limit any environmental impacts. |
| | The proposed pipeline would be designed and constructed to meet or exceed industry specifications, which would effectively mitigate the effects of fault movement, landslides, subsidence, and subsidence. |
| | In the event paleontological resources are discovered during construction, Dakota Access would implement measures outlined in its Unanticipated Discoveries Plan Cultural Resources, Human Remains, Paleontological Resources and Contaminated Media (UDP) (Appendix I) to avoid further impacts to these resources. |
| | If any vertebrate fossils are found during pipeline construction, Dakota Access would immediately cease construction activities and notify the appropriate agency personnel, including the Illinois State Historic Preservation Officer. The appropriate authorities would determine the significance of the find and prescribe the mitigation procedures to be completed prior to resuming pipeline construction. |
| | Dakota Access would minimize or avoid impacts on soils by implementing the mitigation measures described in the DAPL Project's SPCC, SWPPP, and AIMP as well as requirements of applicable state and federal permits. These documents would be included as contract documents and enforced as such throughout the DAPL Project. |

USACE_DAPL0009951

| Table 15 | |
|---|---|
| **Summary of Environmental Impact Avoidance and Mitigation Measures** | |
| **Resource** | **Environmental Avoidance/Mitigation Measures** |
| | To minimize potential impacts on soil productivity, topsoil would be separated during trench excavation in agricultural land, and if applicable, other areas where soil productivity is an important consideration.  Unless otherwise requested by the landowner, topsoil in cropland would be removed to a maximum depth of 12 inches from the trench and spoil storage area and stored separately from the trench spoil.  After the trench is backfilled, topsoil would be returned to its approximate original location in the soil horizon. |
| | Compaction of agricultural soils would be minimized by restricting construction activities during periods of prolonged rainfall.  Where unacceptable levels of compaction occur in agricultural lands, a chisel plow or other deep tillage equipment would be utilized to loosen the soil. |
| | Dakota Access would retain environmental inspectors (EIs) to monitor the contractor's compliance with applicable requirements to protect soil resources during construction of the DAPL Project. |
| | The HDD workspace sites would be cleared, graded and matted as needed to minimize rutting and compaction. |
| | Permanent impacts to soils would be avoided through the application of BMPs during construction, restoration, and post-construction revegetation management, as outlined in the SWPPP (Appendix B). |
| **Water Resources** | Impacts to the Illinois and Kaskaskia Rivers would be minimized by using HDD construction methods to install the proposed pipeline underneath these rivers. |
| | The HDD Contractor plans to install steel surface casing, where defined in the site specific HDD plans, to reduce the probability of an inadvertent release when the drill bit is working near the surface. |
| | The drilling mud and cuttings would be disposed of in accordance with applicable laws and regulations, likely through beneficial use by land farming. |
| | Dakota Access would conduct all HDD work according to the HDD Construction Plan that it has prepared, and implement the HDD Contingency Plan in the event of an inadvertent release. |
| | Water withdrawal from the Illinois or Kaskaskia Rivers would comply with all applicable permit conditions and regulations. Temporary water pumps would be placed within secondary containment to contain accidental spills of fuels.  The intake hose would be suspended by floats within the water column and screened to prevent impingement entrainment of foreign objects and aquatic species. |
| | Water discharges associated with hydrostatic testing would be conducted in accordance with applicable permits. |
| | Discharged hydrostatic test water would not contain additives. |
| | Where appropriate, water would be discharged into an energy dissipation and/or filtering device as described in Dakota Access' SWPPP (Appendix B) to remove sediment and to reduce the erosive energy of the discharge. |

USACE_DAPL0009952

| Table 15 Summary of Environmental Impact Avoidance and Mitigation Measures | |
|---|---|
| **Resource** | **Environmental Avoidance/Mitigation Measures** |
| | Fuel and all other hazardous materials would be stored in accordance with the requirements of Dakota Access' SPCC and SWPPP. These documents also describe response, containment, and cleanup measures. |
| | EIs would monitor compliance with applicable waterbody protection requirements during construction of the facilities. The DAPL Project SWPPP (Appendix B) describes additional mitigation measures and contains illustrations of how sediment control devices should be utilized. |
| | Dakota Access would maintain a vegetative buffer until the actual crossing of the waterbody takes place. |
| | Temporary sediment control measures, such as silt fence, would minimize the introduction of sediment into waterbodies during construction and minimize the movement of spoil and sediment from surface runoff during and after construction. |
| | Dewatering activities would be conducted in accordance with applicable permits and Dakota Access' SWPPP. |
| | All surface drainage contours and vegetation would be returned as closely as practical to preconstruction conditions. |
| | The potential for groundwater contamination would be avoided by implementing the protective measures set forth in the DAPL Project specific SPCCs prepared by the contractor and in Dakota Access' SPCC Plan (Appendix B). |
| | In the event of a leak, Dakota Access would work aggressively to isolate the source through the use of remote-controlled shut-off valves, initiate cleanup activities, and contact the appropriate federal and state authorities to coordinate leak containment and cleanup. Dakota Access proposes to meet or exceed all applicable regulations and requirements for pipeline design, construction, and operation. |
| | Construction workspace on the flowage easements has been selected to minimize impacts to forested wetlands, reducing the normal construction workspace from 125 feet to 85 feet wide. |
| | Unavoidable impacts to forest wetlands will be offset through mitigation. Dakota Access will mitigate temporary impacts to forested wetlands at a mitigation to impact ratio of 1.5:1 and permanent conversion to forested wetlands at mitigation to impact ratio of 2:1. |
| | Dakota Access is in the process of obtaining verification for use of Nationwide Permit 12 for the crossing of the Illinois River (Section 10 authorization) and for crossing of wetlands and streams (Section 404) within the Carlyle Lake flowage easements. |

USACE_DAPL0009953

| Table 15 |
| Summary of Environmental Impact Avoidance and Mitigation Measures |

| Resource | Environmental Avoidance/Mitigation Measures |
|---|---|
| | The DAPL Project SWPPP and SPCC specify several measures to protect wetlands and waterbodies from becoming polluted with fuels or other hazardous materials during construction.  This plan prohibits the storage of fuel or other hazardous materials within 100 feet of a wetland or waterbody.  The SPCC also specifies that equipment must be refueled at least 100 feet from waterbodies unless, due to site-specific conditions, there is no practical alternative. In that case, the contractor must implement site-specific protective measures and containment procedures described in the SPCC.  Contractors would be required to provide trained personnel, appropriate equipment, and materials to contain and clean up releases of fuel, lubricating oil, or hydraulic fluid that result from equipment failure or other circumstances. |
| | The DAPL Project has been designed in accordance with accepted floodplain management practices; no impacts to floodplain elevations or velocities are anticipated.  Following construction, disturbed areas would be restored to pre-construction grades and contours as practical. |
| | If necessary, soil displaced by the installation of the 24-inch pipeline on the flowage easements would be removed from the floodplain and hauled to an upland location in order to ensure original floodplain elevations are restored. |
| | Remotely operated above-ground mainline valve sites would be installed on both sides of the Illinois River and Carlyle Lake flowage easements crossings for isolation in the event of an emergency shutdown. |
| Vegetation, Agriculture, and Range Resources | Within areas disturbed by construction of the DAPL Project, and not being actively cultivated, including the Carlyle lake flowage easements, Dakota Access would implement active revegetation measures and rapid colonization by annual and perennial herbaceous species to restore most vegetative cover within the first growing season. |
| | In areas that require permanent revegetation, Dakota Access would specify appropriate seed mixes, application rates, and seeding dates, taking into account recommendations of appropriate state and federal agencies and landowner requests. |
| | In non-agricultural areas, vegetation cleared from ATWS would be allowed to revegetate after construction depending on arrangements with the landowner. |
| | Temporary revegetation measures may also be implemented to quickly establish ground cover to minimize the potential for soil erosion and noxious weeds to establish.  A temporary seed mix may be applied in these situations. |
| | When constructing in agricultural areas, a minimum of 1 foot of topsoil (organic layer) would be stripped from the trench line and stockpiled separately from trench spoil to preserve the native seed stock. |

USACE_DAPL0009954

| Table 15 Summary of Environmental Impact Avoidance and Mitigation Measures | |
|---|---|
| **Resource** | **Environmental Avoidance/Mitigation Measures** |
| | At stream approaches, the contractor would leave a minimum of a 10-foot buffer (up to 30-foot depending on site conditions at the time of clearing) of undisturbed herbaceous vegetation on all stream banks during initial clearing, except where grading is needed for bridge installation or where restricted by applicable regulations and/or permit conditions. |
| | Herbaceous cover would be seeded on disturbed upland areas during restoration and it is expected that pre-existing herbaceous and shrub habitats would quickly reestablish themselves. |
| **Wildlife Resources** | In the unlikely event that a listed species is encountered within the Proposed Action Area during construction, construction activities would stop and the USFWS would be contacted. |
| | Herbaceous cover would be seeded on disturbed upland areas during restoration and it is expected that pre-existing herbaceous and shrub habitats would quickly reestablish themselves. |
| | In the unlikely event that a listed species is encountered during construction, construction activities would stop and the USFWS would be contacted. |
| | Potential roosting habitat for the Indiana Bat and Northern Long-Eared Bat would be removed in the wintertime (between October 1 and March 31) to avoid adverse impacts to these species |
| **Aquatic Resources** | A successfully completed HDD crossing would avoid aquatic resource impacts to the Illinois and Kaskaskia rivers since the pipeline would be installed without disturbing the aquatic and benthic environments. |
| | HDD operations conducted for the Illinois River and McGee Creek Levee, Coon Run Levees, and Kaskaskia River crossings would adhere to the HDD Contingency Plan and applicable permit conditions to reduce the likelihood of an inadvertent release to minimize and mitigate environmental impacts. Dakota Access' construction contractor would ensure that the appropriate response personnel and containment equipment are available onsite to effectively implement the HDD Contingency Plan. |
| | Water withdrawal activities at the Illinois and Kaskaskia River would be conducted in accordance with all applicable permit conditions and regulations and in a manner that would not reduce water flow to a point that would impair flow or impact aquatic life. |
| | Intake screens and floats would also be utilized during the withdrawal of water from the Illinois River and Kaskaskia River to prevent entrainment of aquatic life and avoid impacts on aquatic resources. |
| | The potential for impacts on aquatic resources associated with accidental fuel spills or leaks during the withdrawal of water from the Illinois and Kaskaskia Rivers would be avoided or minimized by placing the pump within a secondary containment structure. |

USACE_DAPL0009955

| Table 15 | |
|---|---|
| **Summary of Environmental Impact Avoidance and Mitigation Measures** | |
| **Resource** | **Environmental Avoidance/Mitigation Measures** |
| | For portions of the pipeline installed by HDD, the depth of the pipeline profile, the increased wall thickness of the pipe, the installation of remotely operated valves on both sides of the river crossing, monitoring of the system 24/7, aerial patrols, and in-line inspection, would further limit the potential for an inadvertent release into the Illinois or Kaskaskia Rivers. |
| | Adherence to the Geographic Response Plans for Illinois River, Coon Run Levee, and Kaskaskia River would minimize potential impacts on aquatic wildlife from potential spills during the operation of the pipeline. |
| | Conduct emergency response drills/exercises in accordance with the National Preparedness for Response Exercise Program (PREP) consisting of table top exercises and equipment deployment drills. Dakota Access is committed to conducting a worst case discharge full scale exercise at either the Illinois or Kaskaskia River once every 6 years and will include both open water and ice response. Dakota Access will alternate the location and type of exercise. |
| | In the event of a leak, Dakota Access would work aggressively to contain the leak, initiate cleanup activities, and contact the appropriate authorities, including the Corps. |
| **Land Use and Recreation** | Mitigation measures to minimize impacts to soils, such as topsoil segregation and decompaction practices, would be fully implemented in accordance with the SWPPP. |
| | Dakota Access would coordinate with all landowners on acceptable methods for construction and restoration, including potential impacts to irrigated fields. |
| | Dakota Access would repair surface drains and drainage tiles disturbed during ROW preparation, construction, and maintenance activities. |
| | Dakota Access would repair or replace fences and gates removed or damaged as a result of ROW preparation, construction, or maintenance activities. |
| | Following construction and restoration, the work area would be restored and farming would be allowed to continue over the operational ROW. Landowners would be compensated for temporary loss of land and lower yields. Grazing activities would return to normal after revegetation of the disturbed areas. |
| | Trees would be protected by Dakota Access in a manner compatible with the safe operation, maintenance, and inspection of the pipeline. Applicable regulations would be adhered to regarding tree and shrub removal from along the route. |
| | Dakota Access would obtain and comply with applicable state regulations, county permits, and zoning and land use regulations. Permits may include, but are not limited to, grade and fill permits, ditch crossing permits, road and utility permits, and conditional use permits. Dakota Access would retain one or more EIs to monitor compliance with environmental conditions of county permits. |

USACE_DAPL0009956

| Table 15 Summary of Environmental Impact Avoidance and Mitigation Measures | |
|---|---|
| **Resource** | **Environmental Avoidance/Mitigation Measures** |
| **Cultural and Historic Resources** | In accordance with Section 106 of the NHPA, Dakota Access has made a good faith effort to identify significant historic properties within the Proposed Action Area. Based on the result of these efforts, no properties considered to be eligible, or potentially eligible for listing in the National Register of Historic Places (NRHP) would be adversely impacted by the Proposed Action or Connected Action. |
| | Impacts to a potentially NRHP-eligible site, 11ST582, would be avoided via HDD. |
| | Impacts to a potentially NRHP eligible site, 11ST192, would be avoided by crossing a portion of the site with a timber-mat travel lane in an active agricultural field. No subsurface disturbance within this site would be allowed in order to preserve any buried cultural deposits that may occur at this location. |
| | Dakota Access' UDP was developed (Appendix I) for use during all DAPL Project construction activities which describes actions that would be taken in the event of a previously unrecorded cultural resource site is discovered during construction activities. The UDP explicitly calls for work to stop until the correct authority or agency can be contacted and the find can be properly evaluated. |
| **Social and Economic Conditions** | No residential homes or farms would be relocated resulting from the Proposed Action. |
| | No demographic changes in the Census tracts affected are anticipated, because no permanent employees would be created as a result of the Proposed Action. |
| **Hazardous Waste** | In the unlikely event contamination is encountered during construction, the UDP (Appendix I) would be implemented to protect people and the environment and avoid or minimize any effects from unearthing the material. |
| | Any hazardous materials discovered, generated, or used during construction would be managed and disposed of in accordance with applicable local, tribal, state, and federal regulations. Should emergency response be required during construction, the contractor would have some of their own trained or contracted responders, and local response teams would be expected to assist. |
| | Dakota Access would comply with all applicable laws and regulations to abate or prevent pollution, such as the RCRA, and State hazardous waste management rules. |
| **Reliability and Safety** | All activities would be conducted in a safe manner in accordance with the standards specified in the OSHA regulations. |
| | To prevent pipeline failures resulting in inadvertent releases, Dakota Access would construct and maintain the pipeline to meet or exceed industry and governmental requirements and standards. Specifically, the steel pipe would meet PHMSA specifications under 49 CFR § 195, follow standards issued by the American Society of Mechanical Engineers, National Association for Corrosion Engineers and American Petroleum Institute (API). |

USACE_DAPL0009957

| Table 15 Summary of Environmental Impact Avoidance and Mitigation Measures | |
| --- | --- |
| **Resource** | **Environmental Avoidance/Mitigation Measures** |
| | Dakota Access would maintain and inspect the pipeline in accordance with PHMSA regulations, industry codes and prudent pipeline operating protocols and techniques. The pipeline ROW would be patrolled and inspected by air every 10 days, weather permitting, but at least every three weeks and not less than 26 times per year, to check for abnormal conditions or dangerous activities, such as unauthorized excavation along the pipeline route. |
| | Dakota Access is currently drafting a Facility Response Plan, in accordance with 49 CFR 194, which details the procedures to be implemented in the event of an inadvertent pipeline release and would be in place prior to commencing transportation of crude oil. |
| | Following completion of construction and throughout operation of the DAPL Project facilities, the Operator and qualified contractors would maintain emergency response equipment and personnel at strategic points along the pipeline route. |
| | Contracts would be in place with oil spill response companies that have the capability to mobilize to support cleanup and remediation efforts in the event of a pipeline release. The operator would also coordinate with local emergency responders in preventing and responding to any pipeline related problems. |
| | A SCADA system would be utilized to provide constant remote oversight of the DAPL Project facilities. |
| | A Computational Pipeline Monitoring System (CPM) would be utilized to monitor the pipeline for leaks. |
| | LeakWarn is being tailored to the DAPL Project facilities, in accordance with PHMSA requirements, to monitor the pipeline for leaks. |
| Air Quality and Noise | To reduce the emission of criteria pollutants, fuel-burning equipment running times would be kept to a minimum and engines would be properly maintained. |
| | Dakota Access would mitigate noise impacts by limiting equipment running times and the duration of construction to the minimum amount necessary to complete the Proposed Action. Noisy construction activities would typically be limited to the least noise-sensitive times of day (daytime). |

USACE_DAPL0009958

MEMORANDUM FOR RECORD                                      19 July 2016

SUBJECT:   MVR Alteration #2016-896, Dakota Access Pipeline Summary of Findings

## 1. Overview.

### (a) General Description

The proposed project involves construction of a new 30" crude oil pipeline directionally drilled under the Mississippi River navigation channel near River Mile 369.8.

### (b) Agency Technical Review Team

Per EC 1165-2-216, Policy and Procedural Guidance for Processing Requests to Alter US Army Corps of Engineers Civil Works Project Pursuant to 33 USC 408, 30 September 2015, paragraph 7.b. page 8, "in order to grant permission under Section 408, USACE must determine that the proposed alteration does not impair the usefulness of the United States Army Corps of Engineers (USACE) project, which includes retaining the project's authorized purpose, and is not injurious to the public interest. Because proposed alterations vary in size, level of complexity, and potential impacts, the procedures and required information to make such a determination are intended to be scalable. Based on the proposed alteration, districts will determine data, analyses and documentation necessary in order to make a determination regarding whether or not the proposed alteration does not impair the usefulness of the project and is not injurious to the public interest. Requirements for data, analyses and documentation may be subject to change as additional information about the Section 408 proposal is developed and reviewed." For this proposed project, the Agency Technical Review (ATR) team was scaled to include the following reviewers: Section 408 coordinator, operations personnel, geotechnical engineer, hydraulic engineer, environmental planning personnel, USACE regulatory project manager, and real-estate personnel.

## 2. Summary of Findings.

### (a) Summary of rationale and conclusions for recommending approval or denial:

The US Army Corps of Engineers has reviewed the proposed Dakota Access Pipeline in accordance with EC 1165-2-216. Approval for the proposal is recommended because it has been determined that the proposed action will not be injurious to the public's interest or impair the usefulness of the federal navigation channel.

The proposed project falls within our 408 jurisdiction. Engineering Circular EC 1165-2-216 (EC) paragraph 6.c. page 2 states that it "applies to alterations proposed within the lands and real property interests identified and acquired for the USACE project and to lands available for USACE projects under the navigation servitude." The Dakota Access Pipeline project will cross the Mississippi River near river mile 369.8. In the general vicinity of river mile 369.8 USACE is authorized to operate and maintain a navigation channel of at least a width of 300 feet and depth of 9 feet. The current river profile at this locations is approximately 4600 feet wide with an approximate max depth of 25 feet at flat pool. (See Figure 1 and 2) Under the navigational servitude, USACE has the authority to maintain the channel from the ordinary high water mark on the left descending bank to the ordinary high water mark on the right descending bank. MVR's review under 33 USC 408 (Section 408) was limited to the potential alteration to the navigation channel within lands available to

USACE under navigational servitude. There are no Federal real estate interests at this location, and there are no other USACE constructed projects within the MVR area of operation that will be altered by the pipeline and would warrant additional Section 408 review.

In order to construct the pipeline at the proposed Mississippi River location, the applicant is required to obtain a USACE regulatory permit under Section 10 of the Rivers and Harbors Act (Section 10) in addition to a Section 408 permission. The jurisdiction of Section 10 is typically ordinary high water mark on left descending bank to the ordinary high water mark on the right descending bank of Section 10 waters. USACE extended the project review area under Section 10 to the horizontal directional drill insertion area to the horizontal drill extraction area. USACE has determined that the proposed pipeline meets the criteria for Nationwide Permit 12 under Section 10. Nationwide Permit 12 utilizes pre-established criteria and NEPA documentation that allows the USACE to verify that a proposal falls under an already issued permit. Since the USACE regulatory permit jurisdiction at the Mississippi River under Section 10 encompassed the Section 408 jurisdiction, environmental compliance coordination for both the Section 10 permit and Section 408 permission was performed by the USACE regulatory program. USACE has demonstrated compliance at the Mississippi River crossing with Section 106 of the National Historic Preservation Act, Endangered Species Act, and National Environmental Policy Act for the proposed Mississippi River crossing.

Appendix E of EC 1165-2-216 provides USACE supplemental review guidance for potential alterations to navigation channels. Per paragraph E-3b (2), the proposed alteration meets the criteria of a Category 2 navigation alteration.

Paragraph E-3b (2) (a) of Appendix E allows for the Rock Island District to create project specific setback limits to facilitate an expedited district-led agency technical review for Category 2 channel alterations. While Rock Island District does not have a pre-defined set back limit at Mississippi River mile 369.8, the ATR team considered the factors in that paragraph and determined that the proposed location and depth of the new pipeline exceeds any theoretical set back that would be established at this river mile. In accordance with paragraph (a) on page E-3 of the EC, since the proposed alteration exceeds theoretical setback limits, the ATR team determined that the proposed pipeline would likely not impact the federal navigation project nor be injurious to the public interest under Section 408. The ATR team was able to quickly and easily review the proposed alteration and determine the proposed pipeline will have no effect on the navigational channel.

Furthermore, paragraph E-4b(2) provides for items such as "utility line crossings" the determination can be made "quickly and easily" whether the proposed work will affect the project "and thereby recommend Section 408 approval." It is USACE's determination that this is such an instance.

*(b) Written request:*

A letter, from Monica Howard with Dakota Access, LLC, requesting Section 408 permission for the proposed pipeline is attached. A copy of this letter is attached at Tab A.

*(c) A physical and functional description of the existing project, including a map:*

A physical and functional description and plan set, including a map have been provided by the applicant and is attached at Tab B.

USACE_DAPL0000004

*(d) Project history and authorization:*

The formal authorization for the U.S. Army Corps of Engineers to perform operate and maintain a navigation channel on the Mississippi River was set forth in the Rivers and Harbors Act of 1927, as modified by the Rivers and Harbors Act of 1930, and as further modified by the Rivers and Harbors Act of 1935.

Prior to the federal 9ft. navigation project on the Mississippi River, the construction of the Keokuk Dam and Power Plant was completed in 1913. The Keokuk Dam and Power Plant create the river pool that the proposed pipeline will cross. Since the existing dam allowed for river depth greater than what was federally authorized, USACE was not required to obtain additional land or easements to create the channel near river mile 369.8. Eventually, the lock and dry dock were turned over to the U.S. Army Corps of Engineers, while the dam remained privately owned.

*(e) Impact to the usefulness of the USACE project determination:*

Based on the USACE navigation agency technical review and in accordance with paragraph E-3b (2) (a) of the EC, since the proposed alteration exceeds theoretical setback limits, the ATR team determined that the proposed pipeline "will likely not impact the federal navigation project."

Per the applicant's submitted plans, the proposed pipeline will be constructed in bedrock 72 feet below the bottom of the river channel. The river channel has an approximate max depth of 25 feet at flat pool. (See Figure1 and 2). USACE has an operation and maintenance requirement to maintain a 300 ft by 9 ft deep channel within the lands authorized to USACE under navigational servitude. Typical operation and maintenance activities include mechanical or hydraulic dredging of the river bottom when the authorized channel no longer exceeds the minimum dimensions. When performing dredging activities, USACE typically dredges to a max depth of 11 feet deep and an allowable width. The proposed pipeline depth will ensure that it does not impact USACE operation and maintenance activities now or in the future. Furthermore, the depth and proposed installation method will help ensure that it does not impede navigation.

Attached at Tab C are the review memorandums from USACE Operations Division, Geotechnical Engineering Branch, and Hydrologic and Hydraulic Engineer Branch, and coordination meeting minutes for record from May 2, 2016.

*(f) Injurious to the public interest determination:*

Based on the USACE navigation agency technical review and in accordance with paragraph E-3b (2) (a) of the EC, since the proposed alteration exceeds theoretical setback limits, the ATR team determines that the proposed pipeline would likely not be injurious to the public interest under the factors listed at Paragraph 7c(4)(b)(ii).

*(g) Policy Compliance certification:*

The Section 408 coordinator has reviewed the proposed alteration for compliance with EC 1165-2-216 and the Rock Island District Procedural Review Plan, dated 8 October 2015.

*(h) Certification of Legal Sufficiency from District Office of Counsel:*

The proposed alteration and final approval letter was reviewed by Office of Counsel. The Certification of Legal Review is located at Tab D.

*(i) Certification by the Chief of the District Real Estate Division that the real estate documentation is adequate:*

The proposal does not involve Rock Island District Corps of Engineers administered land; therefore, no Certification by the Chief of the District Real Estate Division is required. Attached at Tab E is a review memorandum from USACE Real Estate Division.

*(j) A description of any related, ongoing USACE studies (if applicable), including how the proposed alteration may impact those studies:*

The proposed activity will not affect any ongoing USACE studies.

*(k) Summary of any changes to the O&M manual. If the district has determined that USACE would assume O&M responsibilities as part of its responsibilities for the USACE project, include the rationale and any anticipated increase in USACE O&M costs.*

Operation and maintenance responsibility of the pipeline is the responsibility of the applicant. USACE will not assume any operation and maintenance responsibilities. The proposal will also not affect USACE's authorized navigation operation and maintenance activities at this location.

*(l) Summary of any changes to a project partnership agreement (PPA) or local cooperation agreement (if applicable):*

Not applicable.

*(m) Applicable environmental compliance documentation including but not limited to NEPA documentation, Endangered Species Act (ESA) documentation, and other necessary documentation:*

Attached at Tab F is a memorandum from the USACE Planning Division indicating the following:

The proposed action on the Illinois side of the Mississippi River crossing meets the terms and conditions of a No Adverse Effect determination on sites 11HA25 and 11HA978 through avoidance measures in accordance with Section 106 of the NHPA and its implementing regulation 36 CFR 800.5(b). The proposed action on the Iowa side of the Mississippi River crossing meets the terms and conditions of a No Adverse Effect determination on site 13LE955 through avoidance measures in accordance with Section 106 of the NHPA and its implementing regulations 36 CFR 800.5(b). Further evaluation under Section 106 of the National Historic Preservation Act (NHPA) is not warranted.

The proposed activity meets the criteria of Nationwide Permit (NWP) 12, to be authorized under Section 10 of the Rivers and Harbor's Act of 1899. The MVR Regulatory Branch under separate memo documents the reasons the activity meets the terms and conditions of NWP 12. For National Environmental Policy Act compliance, the NWP 12 Decision Document includes an environmental assessment and Finding of No Significant Impact (dated 13 February, 2012). Since the DAPL Mississippi River crossing meets the terms and conditions of NWP 12, it also complies with the associated 2012 NWP NEPA decision document. In addition, the proposed action meets the terms and conditions of the Corp's

USACE_DAPL0000006

NEPA implementing regulation's categorical exclusion (ER 200-2-2, para 9(h)2(33CFR230)). Therefore the project is excluded from further consideration under the NEPA, and further consultation under NEPA is not warranted.

This action would have no effect on any listed species protected under the Endangered Species Act.

*(n) Finding of No Significant Impact (FONSI) or Record of Decision (ROD)*

A record of consideration was prepared by USACE. USACE has determined the proposed activity is categorically excluded from further consideration under the National Environmental Policy Act and ER 200-2-2, para 9(h)2, and further consultation under NEPA is not warranted. Since the proposed activity is categorically excluded under NEPA a Finding of No Significant Impact or Record of Decision is not required.

Attached at Tab G is the record of consideration.

*(o) Summary of the acceptance and use of funds pursuant to Section 214 or Section 139(j), if applicable, as outlined in Appendix G:*

USACE did not accept funds pursuant to Section 214 or Section 139(j).

*(p) Any additional final conclusions or information, including any associated controversial issues:*

There are none or "No additional final conclusions or information, including any associated controversial issues."

Paul St. Louis
Section 408 Coordinator

Concur_____

Non-Concur_____

Craig S. Baumgartner
Colonel, US Army
Commander & District Engineer



*Figure 1*

USACE_DAPL0000008



Figure 2

USACE_DAPL0000009

**Tab A**

USACE_DAPL0000010



**DAKOTA ACCESS, LLC**

1300 Main Street
Houston, TX 77002
713-989-2000

January 13, 2016

Paul St. Louis
U.S. Army Corps of Engineers
Rock Island District
P.O. Box 2004
Rock Island, IL 61204

**Re:   Section 408 Review - Mississippi River Crossing**
**Dakota Access Pipeline Project**
**US Army Corps of Engineers Permit No. CEMVR-OD-P-2014-1313**
**Lee County, Iowa, and Hancock County, Illinois**

Dear Mr. St. Louis,

Dakota Access, LLC (Dakota Access) is providing this letter in response to a request for information for the proposed crossing of the Mississippi River by the Dakota Access Pipeline (DAPL) Project, which would consist of the installation of a new proposed 30-inch-diameter crude oil pipeline under the river (see enclosed Vicinity Map). The U.S. Army Corps of Engineers (USACE) has been reviewing this proposed crossing for authorization under Section 10 of the Rivers and Harbors Act, through verification under Nationwide Permit 12, since March 26, 2015.

On October 8, 2015, the USACE notified Dakota Access that a Section 408 Permit would be required for the proposed crossing of the Mississippi River. The agency requested an updated plan and profile exhibit to process the 408 permit, which Dakota Access subsequently provided via e-mail on October 9, 2015. A copy of this email and exhibit is enclosed. Numerous conversations have taken place since that e-mail where the agency indicated that the crossing was being reviewed in accords with 408 and Dakota Access requested any comments. To date none have been received.

On January 13, 2016, Dakota Access was informed that a formal request to process the 408 is needed. Please accept this letter as the formal request for the USACE Emergency Management Division to complete the review process and issue a Section 408 Permit to construct the DAPL Project across the Mississippi River as shown on the attached exhibit and discussed since October 2015. Dakota Access anticipates starting construction very soon and appreciates your agency's timely response to this request; specifically we request any outstanding questions or comments be received by Friday, January 15 so that we may respond in a timely manner for efficient issuance of the permit.

1

USACE_DAPL0000011

Mr. Paul St. Louis
January 13, 2016

Thank you for your assistance with this project, if you require any additional information please contact me at (713) 898-8222 or monica.howard@energytransfer.com.

**Dakota Access, LLC**

Monica Howard
Director Environmental Sciences

cc:     Michael Hayes – U.S. Army Corps of Engineers
        Adam Broad – Dakota Access
        Jack Edwards – Dakota Access
        Nathan Olday – Burns & McDonnell

enclosures

2

USACE_DAPL0000012

Mississippi River
Lat: 40.47█
Long: -91.36█

Nauvoo
Nauvoo State Park

Montrose

IOWA

ILLINOIS

Ferris

Deer Run Golf Course

Keokuk          Hamilton          Elvaston

— Proposed Pipeline

2   1   0   2
Miles

NORTH

≡ DAKOTA ACCESS, LLC

Dakota Access Pipeline Project
Dakota Access, LLC
Section 408 Review Area
Mississippi River

USACE_DAPL0000013

Source: Esri, Dakota Access, LLC; DigitalGlobe, GeoEye, Earthstar Geographics, CNES/Airbus DS, USDA, USGS; and Burns & McDonnell Engineering Company, Inc.

Issued: 1/12/2016

| | |
|---|---|
| **From:** | Olday, Nathan A |
| **To:** | "Hayes, Michael D MVR"; Howard, Monica |
| **Cc:** | St. Louis, Paul F MVR |
| **Subject:** | RE: DAPL Mississippi River crossing (UNCLASSIFIED) |
| **Date:** | Friday, October 09, 2015 4:53:00 PM |
| **Attachments:** | Mississippi River HDD_IFB_REV B.PDF |

Mike,

Please find attached the updated Plan and Profile exhibit requested for the Mississippi River. I did have an opportunity to speak with Paul this morning and he helped to explain the requirement for this review. One question that we did have was the timing necessary to complete a 408 review/permit at this location. Would this permit be issued concurrent with the Section 10 permit for this crossing?

Thank you.

Nathan Olday
Office: (832) 214-1999
Mobile: (281) 460-5706


-----Original Message-----
From: Hayes, Michael D MVR [mailto:Michael.D.Hayes@usace.army.mil]
Sent: Thursday, October 08, 2015 2:26 PM
To: Howard, Monica
Cc: Olday, Nathan A; St. Louis, Paul F MVR
Subject: DAPL Mississippi River crossing (UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: NONE

Monica: I've been informed by Paul St. Louis of our Emergency Management Division that a 408 review/permit will be required for DAPL's Mississippi River crossing between Lee County, Iowa and Hancock County, Illinois. I'm told that 'construction' drawings (as opposed to the "NOT FOR CONSTRUCTION FOR DISCUSSION ONLY" drawing I have on file) will be require for that process. Please submit the drawings to me and I will pass on to Paul. If you've questions contact Paul at 309/794-5204. Thanks, Mike Hayes

Classification: UNCLASSIFIED
Caveats: NONE

USACE_DAPL0000014



NOTE: THIS IS A FULL SIZE DRAWING THAT IS INTENDED
TO BE PRINTED ON A 24" X 36" SHEET OF PAPER.

USACE_DAPL0000015



USACE_DAPL0000016

USACE_DAPL0000017

Notes.
1. The locations of all features shown are approximate.
2. This drawing is for information purposes. It is intended to assist in showing features discussed in an attached document. GeoEngineers, Inc. can not guarantee the accuracy and content of electronic files. The master file is stored by GeoEngineers, Inc. and will serve as the official record of this communication.
3. Refer to the boring logs in the accompanying report for more detailed soil descriptions.
4. GeoEngineers, Inc. has not verified the field location of the existing utilities.

Reference: Ground surface DEM (1/3 and 1/9 Arc Second) downloaded from http://NationalMap.Gov
Ground surface survey provided by Wood Group Mustang, Inc.
Aerial image taken from Google Earth Pro© 2015, licensed to GeoEngineers, Inc., image dated 08/19/13.
Shape files provided by Contract Land Staff, LLC.

PLAN

600' 0 600'

SCALE IN FEET

NOT FOR CONSTRUCTION

**LEGEND:**

- Boring Location
- Major Contour - 20' Interval
- Minor Contour - 5' Interval

**DAKOTA ACCESS PIPELINE PROJECT**

PROPOSED 30" PIPELINE
MISSISSIPPI RIVER HDD
LEE COUNTY, IA & HANCOCK COUNTY, IL

GEOENGINEERS

FIGURE 2

Tab B

USACE_DAPL0000018



USACE_DAPL0000019



NOTE: THIS IS A FULL SIZE DRAWING THAT IS INTENDED TO BE PRINTED ON A 24" X 36" SHEET OF PAPER.

ISSUED FOR BID

GEOENGINEERS

DAKOTA ACCESS PIPELINE PROJECT
SITE PLAN AND PROFILE
PROPOSED 30" PIPELINE
MISSISSIPPI RIVER HDD
LEE COUNTY, IA AND HANCOCK COUNTY, IL

USACE_DAPL0000020



NOTE: THIS IS A FULL SIZE DRAWING THAT IS INTENDED
TO BE PRINTED ON A 24" X 36" SHEET OF PAPER.

PLAN

ISSUED FOR BID

DAKOTA ACCESS PIPELINE PROJECT
STRINGING WORKSPACE
PROPOSED 30" PIPELINE
MISSISSIPPI RIVER HDD
LEE COUNTY, IA AND HANCOCK COUNTY, IL

GeoEngineers

2 of 2

USACE_DAPL0000021

## St. Louis, Paul F MVR

| | |
|---|---|
| **From:** | Olday, Nathan A <naolday@burnsmcd.com> |
| **Sent:** | Thursday, February 04, 2016 9:06 AM |
| **To:** | Vollman, Brant J MVR; St. Louis, Paul F MVR; Hayes, Michael D MVR |
| **Cc:** | Howard, Monica; Martinez, Lane S |
| **Subject:** | [EXTERNAL] Mississippi River HDD layout |
| **Attachments:** | Mississippi River HDD.PDF |

Brant and Paul,

Attached is a plan view of the Mississippi River that depicts a slightly modified alignment for this drill.  This revision is being assessed as a result of a request of the Illinois SHPO to avoid placing the alignment beneath the cultural site on the east bank of the river.  Prior to making this alignment final we wanted to request a preliminary review from the USACE to make sure that this would not unnecessarily complicate any other ongoing reviews/permits that are currently underway.  If this was to have an adverse effect to the schedule for the 408/10 permit we would like to understand those potential ramifications now.

If possible please let me know if you foresee any significant complications that could result.  This change is being explored in an effort to expedite the review and accommodate concerns expressed by the Illinois SHPO.  The change is minor enough that it would not change any of the other information, or engineering specifications, already provided the USACE for review.

Thank you.

Nathan Olday

Burns & McDonnell

Environmental Studies and Permitting

1700 West Loop South, Suite 1500

Houston, TX 77027

Office: (832) 214-1999

Mobile: (281) 460-5706

naolday@burnsmcd.com <mailto:naolday@burnsmcd.com>

www.burnsmcd.com <http://www.burnsmcd.com/>

1

USACE_DAPL0000023



NOT FOR CONSTRUCTION

**PLAN**

SCALE IN FEET

**LEGEND:**

Boring Location

Major Contour - 20' Interval

Minor Contour - 5' Interval

**DAKOTA ACCESS PIPELINE PROJECT**

PROPOSED 30" PIPELINE

MISSISSIPPI RIVER HDD

LEE COUNTY, IA & HANCOCK COUNTY, IL.

**GEOENGINEERS**   **FIGURE 2**



**WOOD GROUP MUSTANG**

Wood Group Mustang, Inc.
17325 Park Row
Houston, Texas 77084

January 28ᵗʰ 2016

Dakota Access Pipeline
Mississippi River HDD Crossing

**Introduction**

This Memorandum is provided in response to a request from Dakota Access Pipeline (DAPL) to outline and detail the design and operational considerations being undertaken to ensure the integrity of the pipeline as it passes underneath the Mississippi River. The primary concern expressed by the governing regulatory agency is to protect the Mississippi River by preventing any inadvertent release of crude oil during operations.

**Pipeline Design**

The Department of Transportation (49 CFR 195.107) requires that the line pipe wall thicknesses be determined utilizing the following industry-recognized equation (Barlow's Formula):

$$P = \frac{(2 \times S \times t)}{D} \times F \times E$$

$P$ = *Design pressure, psi*
$D$ = *Nominal pipeline diameter, inches (in this case, 30 inches)*
$S$ = *Yield strength of the steel, psi – (in this case 70,000 psi)*
$t$ = *Wall thickness, inches (for the majority of the 30" mainline, we are providing 0.429" line pipe)*
$F$ = *Design Factor = 0.72 (per Section 195.107)*
$E$ = *Longitudinal joint factor = 1.0 (per Section 195.107)*

Based on using the above formula, a Maximum Operating Pressure of 1,440 psi was established for the entire DAPL 30" mainline.

In the case of all HDD crossings, however, DAPL will be providing line pipe steel with a 0.625" wall thickness. This thicker line pipe provides for a much higher operating pressure of 2,100 psi - which is 46% stronger than the thickness required by the DOT regulations.

In addition to providing thicker line pipe steel for all HDD crossings, the pipe for each HDD crossing will be hydro-tested for 4 hours before the pipeline segment is pulled into position and an additional 8 hours after the pipe has been pulled into position. The hydro-test pressure for the specific HDD segment under the Mississippi River will be 1.25 times the aforementioned 2,100 psi – or 2,625 psi. This means that the line pipe segment underneath the Mississippi River will be pre-tested to 1.82 times the actual operating pressure before it is even installed and certified for service.

On both ends of buried HDD crossings, which always span much further beyond the banks of the river, DAPL will provide the normal 0.429" wall thickness line pipe as per the DOT regulation.

The DOT regulations further require that waterbodies such as the Mississippi River be protected on both sides by installing valves. DAPL has exceeded this federal regulation by choosing to install remotely-operated ball valves on both sides of the Mississippi River to minimize any impacts due to an inadvertent

USACE_DAPL0000024

release. The valve located on the west side of the Mississippi River is approximately 950 feet from the west bank and the valve located on the east side of the Mississippi River is approximately ½-mile from the east bank.

Finally, as part of the construction process, every weld joint will be 100% radiographically examined for defects and repaired where required. At the conclusion of the project, before any crude oil is placed into the pipeline, the pipeline will again be hydro-tested to ensure the integrity of the completed pipeline.

**Corrosion Protection**

The design of the entire Dakota Access Pipeline system is also governed by an Integrity Management Plan (IMP) which incorporates a comprehensive impressed-current cathodic protection system, external Fusion Bonded Epoxy steel coating, and an Abrasion Resistant Overlay for HDD crossings – all integrated to minimize external corrosion. The IMP also includes a provision for monitoring the internal surface of the line pipe.

**Pipeline Operation**

The pipeline will also be monitored by a Supervisory Control and Data Acquisition (SCADA) system which can detect leaks and alert a Control and Operations Center to de-energize the mainline pumps and close the remotely-operated valves as required to block-in any suspected line segment. Additionally, metering systems along the DAPL pipeline continuously verify volumetric flows at multiple points to ensure that no crude oil is being released. And in the event of a suspected incident, actions to de-energizing and isolate the pipeline will commence immediately.

DAPL has also committed to conducting periodic pipeline inspections using internal tools that will detect dents and changes in wall thickness. These periodic inspections will ensure that any pipeline defect is discovered long before the integrity of the pipeline is compromised.

Finally, DAPL will participate in the "One-Call" and "Before You Dig" notification programs, as well as any public awareness campaigns.

**Conclusion:**

The Dakota Access Pipeline has been constructed in full-compliance with the requirements of 49 CFR 195, and in special areas, such as the HDD crossing underneath the Mississippi River, the DOT requirements have been exceeded.

USACE_DAPL0000025



**GEOENGINEERS**                                                                  **Memorandum**

3050 South Delaware, Springfield, Missouri 65804, Telephone: 417.831.9700, Fax: 417.831.9777                    www.geoengineers.com

| | |
|---|---|
| **To:** | Adam Broad – Dakota Access<br>Monica Howard – Dakota Access |
| **From:** | Mark Miller, PE – GeoEngineers, Inc.<br>Jon Robison, PE – GeoEngineers, Inc. |
| **Date:** | December 15, 2015 |
| **File:** | 18782-011-01 |
| **Subject:** | DAPL – Cultural Site along Mississippi River HDD Alignment - Inadvertent Returns Risk Assessment |

*(seal: JONATHAN L. ROBISON, 062-057300 LICENSED PROFESSIONAL ENGINEER OF ILLINOIS, 15. Dec - 2015)*

### INTRODUCTION

This memorandum is in response to a request from Dakota Access Pipeline (DAPL) to evaluate the risk of drilling fluid surfacing and impacting a cultural site with burial mounds located on the east bank of the Mississippi River during Horizontal Directional Drilling (HDD) activities associated with the planned pipeline installation across the Mississippi River. We understand that the regulatory agencies have concerns that inadvertent drilling fluid returns could adversely impact the referenced cultural site. The proposed HDD and cultural sites are shown on the attached HDD design drawing.

As part of our services on the project, we previously provided a geotechnical data report titled, "Geotechnical Data Report, Dakota Access Pipeline Project, Mississippi River HDD, Lee County Iowa and Hancock County, Illinois," dated June 12, 2015 and an HDD design report titled, "Horizontal Directional Drill Design Services, Mississippi River HDD, Lee County Iowa and Hancock County, Illinois," dated July 2, 2015. This memorandum references those reports.

### INADVERTENT DRILLING FLUID RETURNS RISK ASSESMENT

As part of our site investigation, we explored subsurface conditions at the site by drilling seven geotechnical borings (MS-B-1 through MS-B-7) to depths of up to approximately 190 feet below ground surface (bgs) adjacent to the alignment of the proposed Mississippi River HDD. In general, the subsurface conditions encountered in the borings were consistent with the published geology for the area, consisting of silt and sand with gravel overlying limestone with interbedded shale, sandstone, and chert of generally good to excellent quality and unconfined compressive strengths ranging from approximately 2,000 to 9,000 pound per square inch (psi).

On the east bank of the Mississippi River, the proposed HDD alignment passes beneath a cultural site and approximately 300 feet north of the nearest burial mound. In the vicinity of the cultural area and burial mound the drill profile is in excess of 100 feet bgs. The subsurface conditions along the HDD profile on the east bank of the river are characterized by borings MS-B-5 and MS-B-7 and generally consist of good to excellent quality limestone with unconfined compressive strengths ranging from approximately 2,200 to 4,350 psi.

In our opinion, the risk of inadvertent drilling fluid returns impacting the cultural site is very low because the drill profile in this area is situated within competent limestone bedrock with shear strengths that far exceed

Disclaimer: Any electronic form, facsimile or hard copy of the original document (email, text, table, and/or figure), if provided, and any attachments are only a copy of the original document. The original document is stored by GeoEngineers, Inc. and will serve as the official document of record.

USACE_DAPL0000026

Memorandum to Adam Broad and Monica Howard
December 15, 2015
Page 2

the drilling fluid pressures anticipated during HDD operations.  Downhole annular drilling fluid pressures for this installation are not expected to exceed approximately 250 psi, therefore the risk of hydraulically fracturing the formation such that drilling fluid migrates to the surface is very low.

Additionally, we considered the risk of formational drilling fluid loss, or migration of drilling fluid into the surrounding rock formation through pre-existing fractures and voids.  Formational fluid loss can also lead to inadvertent drilling fluid returns, however due to the high quality of the rock formation and the distance the fluid would need to travel to surface within the cultural area, we judge the risk of formational drilling fluid loss leading to inadvertent drilling fluid returns within the cultural site to also be very low.

**CONCLUSION**

In our opinion, the risk of inadvertent drilling fluid returns impacting the cultural site located on the east bank of the river is very low because of the high quality, high strength limestone bedrock through which the HDD profile passes and the depth of the drill profile below ground surface.

If you have questions or need additional information please feel free to contact us.

Attachments:
HDD Design Drawing



NOTE: THIS IS A FULL SIZE DRAWING THAT IS INTENDED
TO BE PRINTED ON A 24" X 36" SHEET OF PAPER.

USACE_DAPL0000028



USACE_DAPL0000029


GEOENGINEERS

**Memorandum**

3050 South Delaware, Springfield, Missouri 65804, Telephone: 417.831.9700, Fax: 417.831.9777

www.geoengineers.com

| **To:** | Adam Broad – Dakota Access |
| | Monica Howard – Dakota Access |
| **From:** | Mark Miller, PE – GeoEngineers, Inc. |
| | Jon Robison, PE – GeoEngineers, Inc. |
| **Date:** | January 27, 2016 |
| **File:** | 18782-011-01 |
| **Subject:** | DAPL – Mississippi River HDD - Inadvertent Returns Risk Assessment Summary |

**Attachment:** HDD Design Drawing

### INTRODUCTION

This memorandum is provided in response to a request from Dakota Access Pipeline (DAPL) to evaluate the risk of drilling fluid surfacing and impacting the Mississippi River during Horizontal Directional Drilling (HDD) activities associated with the planned pipeline installation across the Mississippi River. We understand that the regulatory agencies have concerns that inadvertent drilling fluid returns could adversely impact the river and the aquatic life in it. The proposed HDD is shown on the attached HDD design drawing.

As part of our services on the project, we previously provided a geotechnical data report titled, "Geotechnical Data Report, Dakota Access Pipeline Project, Mississippi River HDD, Lee County Iowa and Hancock County, Illinois," dated June 12, 2015 and an HDD design report titled, "Horizontal Directional Drill Design Services, Mississippi River HDD, Lee County Iowa and Hancock County, Illinois," dated July 2, 2015. This memorandum references those reports.

### INADVERTENT DRILLING FLUID RETURNS RISK ASSESMENT

As part of our site investigation, we explored subsurface conditions at the site by drilling seven geotechnical borings (MS-B-1 through MS-B-7) to depths of up to approximately 190 feet below ground surface (bgs) adjacent to the alignment of the proposed Mississippi River HDD. In general, the subsurface conditions encountered in the borings were consistent with the published geology for the area, consisting of silt and sand with gravel overlying limestone with interbedded shale, sandstone, and chert of generally good to excellent quality and unconfined compressive strengths ranging from approximately 2,000 to 9,000 pound per square inch (psi).

The horizontal length of the proposed HDD is 7,250 feet with approximately 4,900 feet of the alignment passing beneath the Mississippi River. Because of the relatively shallow depth of the bedrock, all but about 400 feet of the HDD profile will be situated within the limestone bedrock described above. The portions of the HDD profile that are situated within the overburden soils are located in upland areas within about 200 feet of the entry and exit points. Beneath the river channel, the profile is designed at depths ranging from approximately 68 to 88 feet below the mudline, in generally excellent quality limestone bedrock.

In our opinion, the risk of inadvertent drilling fluid returns impacting the river during construction is very low because the drill profile beneath the river channel is situated within competent limestone bedrock with shear

Disclaimer: Any electronic form, facsimile or hard copy of the original document (email, text, table, and/or figure), if provided, and any attachments are only a copy of the original document. The original document is stored by GeoEngineers, Inc. and will serve as the official document of record.

USACE_DAPL0000030

Memorandum to Adam Broad and Monica Howard
January 27, 2016
Page 2

strengths that far exceed the anticipated drilling fluid pressures (roughly 250 pounds per square inch) during HDD operations.

Additionally, we considered the risk of formational drilling fluid loss, or migration of drilling fluid into the surrounding rock formation through pre-existing fractures and voids. Formational fluid loss can also lead to inadvertent drilling fluid returns, however due to the high quality of the rock formation and the distance the fluid would need to travel to reach the surface, we judge the risk of formational drilling fluid loss leading to inadvertent drilling fluid returns to also be very low.

Considering a longer-term operations perspective, the installation of the pipeline in the limestone bedrock beneath the river acts to protect the pipeline and should essentially eliminate the risk of future damage or leakage as a result of river scour or third-party damage due to the significant amount of competent bedrock that would have to be penetrated or removed before the pipe would be exposed. In addition, the pipe specified for the installation exceeds the minimum required by the latest version of the Code of Federal Regulations (CFR), Title 49, Part 195, as administered by the Pipeline and Hazardous Materials Safety Administration. Prior to being placed into operation the pipeline would be hydrostatically pressure tested to verify the pipeline's integrity. Furthermore, the pipe to be installed is capable of an operating pressure of 2,100 pounds per square inch (psi) while the operating pressure of the Dakota Access Pipeline (DAPL) will be 1,440 psi.

**CONCLUSION**

In our opinion, the risk of inadvertent drilling fluid returns impacting the river during construction is very low because of the high quality, high strength limestone bedrock through which the HDD profile passes and the depth of the drill profile below the river bottom. In addition, the risk of future damage or leakage as a result of river scour or third-party damage is also very low as a result of the pipe being installed in the bedrock and the robust pipe specification used for this installation.

If you have questions or need additional information please feel free to contact us.

USACE_DAPL0000031



NOTE: THIS IS A FULL SIZE DRAWING THAT IS INTENDED
TO BE PRINTED ON A 24" X 36" SHEET OF PAPER.

USACE_DAPL0000032



USACE_DAPL0000033

Tab C

USACE_DAPL0000034

MEMORANDUM FOR RECORD 19 January 2016

SUBJECT: Project Alteration #2016-896 Mississippi River RM 369.8, Dakota Access Pipeline

The proposal alteration places the pipeline infrastructure well below the navigation channel.  There
should be no negative impacts to the Corps' dredging program or to Navigation interests.

*1-19-2016*

Jon Klingman
Chief, Channel Maintenance Section
Technical Support Branch, Operations Division

USACE_DAPL0000035

MEMORANDUM FOR RECORD                                          05 February 2016


SUBJECT: Project Alteration # 2016-896 Mississippi River DAPL


1. Review comments
    a. The Federal navigation channel is the only Federal project within the vicinity of the
       modification work scope.  The proposed drilling profile is embedded in competent bedrock
       and is designed to stay at least 68 feet from the channel or banks of the Mississippi River.

2. Recommendations to proposed plan
    a. The proposed modification has no effect on the Federal project.
    b. Approval is recommended.


                                  //s//
                                  Matthew E. Stewart, P.E.
                                  CEMVR-EC-G
                                  309-794-5288

USACE_DAPL0000036

CEMVR-EC-G

27 January 2016

MEMORANDUM FOR RECORD

SUBJECT: Dakota Access Pipeline (DAPL) – Cultural Site along Mississippi River HDD Alignment – Inadvertent Returns Risk Assessment

References:

*Memorandum – DAPL – Cultural Site along Mississippi River HDD Alignment – Inadvertent Returns Risk Assessment, GeoEngineers, 15 December 2015*

General

1. The Geotechnical Branch, Rock Island District (COE) was asked to review the referenced memo to determine a position on the findings. The Rock Island District has not constructed a federal project within area of impact for the DAPL Project. The only Federal project within the zone of impact is the Federal Navigation Channel. Other Federal agencies have expressed concerns that inadvertent fluid returns during Horizontal Directional Drilling (HDD) may result in impacts to cultural sites and mussel beds in the vicinity, specifically on the east bank of the Mississippi River and within the channel, respectively.

2. The findings presented by GeoEngineers with respect to regional geology, quality of rock, and compressive strengths are in line with our understanding of the region. Hydro-fracturing risk is low as described in the GeoEngineers memorandum. The greater concern would be migration of drilling fluids into the formation through existing flaws in the rock. Although this risk is higher than hydro-fracturing, the COE agrees with GeoEngineers that due to the quality of this formation the risk is relatively low.

3. Although all risk cannot be ruled out, the COE is of the opinion, like GeoEngineers, that the risk of inadvertent drilling fluid returns impacting the cultural site is low.

Matt Stewart
Geotechnical Branch
Rock Island District, USACE

MEMORANDUM FOR RECORD                                          22 January 2016

THRU

     EC-H – kjl 1/22/16
     EC-HH – tjh 1/22/16

SUBJECT: 2018-896 HH Review of Dakota Access Pipeline crossing the Mississippi River at RM 369.8.

1.  Information identifying the project modification being reviewed.

    a.  Project Description:  Dakota Access LLC 30-inch pipeline crossing of Mississippi River at RM 369.8.

    b.  Package From:  Dakota Access LLC / GeoEngineers

    c.  Application Dated: 13 January 2016

    d.  ProjectWise Address:  2016-896  Dakota Access Pipeline HH Memo.docx

2.  Comments from EC-HH in response to proposed revision.

    a.  EC-HH has no objections to the project. The pipe will be directional drilled +/- 70 feet below the federal navigation project on the Mississippi River at RM 369.8 (Sandusky, IA). There are no other federal projects in the vicinity.  This modification will not impair the usefulness of the federal navigation project/mission.


                       /s/
                    Toby Hunemuller
                    Chief, Hydrologic Engineering Section
                    CEMVR-EC-HH
                    309-794-5422

USACE_DAPL0000038

# MEETING ROSTER

**US Army Corps of Engineers·**
**Rock Island District**

**Date Held:** 5/2/2016

**Subject/Purpose:** DAPL Section 408 Final Review

**Time Held:** 0900          **Time Adjourned:** 0945

| Name of Attendee | Company/Office Symbol | Telephone Number |
|---|---|---|
| 1. Paul St. Louis | USACE - EM | x5208 |
| 2. Jim Ross | USACE - PD-C | x5540 |
| 3. _illegible_ | CC | _illegible_ |
| 4. Tug Ninemillin | EC-HH | 5222 |
| 5. _illegible_ | _illegible_ | _illegible_ |
| 6. Tom Heinold | OD | 5401 |
| 7. Mark DeHaan | OD-T | 5853 |
| 8. Mike Hayes | OD-P | 5372 |
| 9. Joe Jordan | PD-C | 5791 |
| 10. | | |
| 11. | | |
| 12. | | |
| 13. | | |
| 14. | | |
| 15. | | |
| 16. | | |
| 17. | | |
| 18. | | |

USACE_DAPL0000039

USACE

MINUTES FOR RECORD

Date and Time: 2 May 2016 at 0900

Location: Emergency Management Conference Room

SUBJECT: Final Coordination of Dakota Access 408 Review and Statement of Findings

1. Meeting roster is attached.

2. Paul St. Louis, Rock Island District Section 408 Coordinator, went over the project location and submitted plans. He verified with each person that they have adequately reviewed the project, including the 4 February 2016 revised alignment.

3. The participants discussed the Section 408 review area and agreed that the only USACE project at the pipe crossing location on the Mississippi River is the navigation channel. USACE authority is limited to lands available under navigational servitude. Tom Heinold, Rock Island District Deputy Operations Manager, confirmed lands available under navigational servitude is bank to bank.

4. Jason Appel, Rock Island District Real-Estate, confirmed USACE does not own any lands or real property at the pipe crossing location on the Mississippi River or adjacent to the Mississippi.

5. Mike Hayes, Regulatory Section Chief, confirmed that coordination under Section 106 of the NHPA and ESA had been completed for the proposed pipeline where it crosses the Mississippi River. He stated the area of coordination was from the HDD entrance point on the west bank of the Mississippi River to the HDD exit point on the east bank of the Mississippi River.

6. The participants discussed that during their review they were able to quickly review the proposal and determine that it would not affect the federal navigation project due to the depth and location. In addition, the 6 items to consider when establishing navigation project setbacks, written on page E-3 of EC1165-2-216, were discussed. The participants agreed that these items were considered during their Section 408 review, and that the proposed pipeline location exceeded any requirements that would be generated from the six considerations.

7. In addition, to the 6 criteria on page E-3 of EC 1165-2-216, the participants discussed potential impacts to the navigation channel from spills and pipeline operation and maintenance requirements. The participants agreed that since the in place proposed pipeline will not affect the navigation project or USACE's operation and maintenance responsibilities it is not in the USACE's authority to verify pipeline design or approve spill response plans. Rather it is USACE's responsibility to ensure the applicant agrees to follow the governing laws for pipeline design and construction. The applicant provided a memo to USACE on 28th January 2016, from

USACE_DAPL0000040

Wood Group Mustang, Inc. stating, "The Dakota Access Pipeline has been constructed in full-compliance with the requirements with the requirements of 49 CFR 195, and in special areas, such as the HDD crossing underneath the Mississippi River, the DOT requirements have been exceeded." The participants also agreed that the Section 408 permission letter should clearly state that the applicant must adhere to all federal, state, and local laws and regulations.

8. The participants concluded the meeting by discussing items to add and recommended changes to the final statement of findings. It was agreed that the document would be revised and then reviewed by the team.

9. Meeting adjourned at 09:45.

Tab D

USACE_DAPL0000042

Certification of Legal Sufficiency from Office of Counsel

The draft Section 408 Permission for MVR Alteration #2016-896, Dakota Access Pipeline, has been fully reviewed by the Office of Counsel, Rock Island District and is legally sufficient.

Reviewed by:

Date:   5/19/16

USACE_DAPL0000043

**Tab E**

USACE_DAPL0000044

MEMORANDUM FOR RECORD                                           15 January 2016

SUBJECT: Project Alteration #2016-896 Mississippi River RM 369.8, Dakota Access Pipeline

The proposal does not involve Rock Island District Corps of Engineers administered land; therefore, no further Corps real estate coordination is necessary.

APPEL.JASON.CON  Digitally signed by
                 APPEL.JASON.CONRAD.1293834586
RAD.1293834586   DN: c=US, o=U.S. Government, ou=DoD
                 ou=PKI, ou=USA,
                 cn=APPEL.JASON.CONRAD.1293834586
                 Date: 2016.01.15 11:48:02 -06'00'

JASON APPEL
Realty Specialist
Planning & Acquisition Branch
Regional Real Estate Division North
Rock Island District

Tab F

USACE_DAPL0000046

CEMVP-PD-C

July 19, 2016
Ross/5540

MEMORANDUM FOR RECORD:

SUBJECT: Mississippi River Dakota Access Pipeline (DAPL) Crossing, Lee County, IA to Hancock County, IL, 2016-896

1.  The proposed action on the Illinois side of the Mississippi River crossing meets the terms and conditions of a No Adverse Effect determination on sites 11HA25 and 11HA978 through avoidance measures in accordance with Section 106 of the NHPA and its implementing regulation 36 CFR 800.5(b). The proposed action on the Iowa side of the Mississippi River crossing meets the terms and conditions of a No Adverse Effect determination on site 13LE955 through avoidance measures in accordance with Section 106 of the NHPA and its implementing regulations 36 CFR 800.5(b). Further evaluation under Section 106 of the National Historic Preservation Act (NHPA) is not warranted.

2.  The proposed activity meets the Nationwide Permit (NWP) #12 criteria, to be authorized under Section 10 of the Rivers and Harbor's Act of 1899. The MVR Regulatory Office under separate memo documents the reasons the activity meets the terms and conditions of NWP #12. For National Environmental Policy Act compliance, the NWP #12 Decision Document includes an environmental assessment and Finding of No Significant Impact (dated February 13, 2012). Since the DAPL Mississippi River Crossing meets the terms and conditions of NWP #12, it also complies with the associated 2012 NWP NEPA decision document. In addition, the proposed action meets the terms and conditions of the Corps NEPA implementing regulation's categorical exclusion (ER 200-2-2, para 9(h)2 (33CFR230)). Therefore the project is excluded from further consideration under the NEPA and further consultation under NEPA is not warranted.

3.  This action would have no effect on any listed species protected under the Endangered Species Act.

ROSS.JAMES.S
.1231088128

Digitally signed by
ROSS.JAMES.S.1231088128
DN: c=US, o=U.S. Government,
ou=DoD, ou=PKI, ou=USA,
cn=ROSS.JAMES.S.1231088128
Date: 2016.07.19 14:46:18-05:00'

Jim Ross
Section Chief
Environmental Compliance Section



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, ROCK ISLAND DISTRICT
PO BOX 2004 CLOCK TOWER BUILDING
ROCK ISLAND, ILLINOIS  61204-2004

**RECEIVED**

MAR 1 1 2016

PRESERVATION SERVICES

REPLY TO
ATTENTION OF

March 2, 2016

Regulatory Division

Subject:  CEMVR-OD-P-2014-1313

Dr. Rachel Leibowitz
Illinois Historic Preservation Agency
1 Old State Capital Plaza
Springfield, Illinois  62701-1507

IHPA REVIEW
H/A
AC _Concu ar_
AR
File

Dear Dr. Leibowitz:

The U.S. Army Corps of Engineers, Rock Island District (District) has received
Preconstruction Notifications (PCNs) associated with a proposed Dakota Access Pipeline Project
(DAPL). The proposed 1,100-mile, 30-inch diameter, crude oil pipeline would extend from
Stanley, North Dakota through South Dakota and Iowa to a delivery point at Patoka, Illinois.
IHPA Log #s 012101515 and 010072815 have also been assigned previously to the project.
Please reference Corps Permit Application No. CEMVR-OD-P-2014-1313 in your
correspondence.   PCN #1

The District has received a revised plan for the Mississippi River crossing (Rock Island
District PCN - Enclosure 1). We have reviewed the revised plans and determined that the
applicant has relocated the alignment of the proposed crossing so as to avoid archaeological sites
11HA25 and 11HA978. Both of these sites have been previously identified as eligible for listing
on the National Register of Historic Places.

With regard to the permit area addressed in this letter, it is the opinion of the District that
there will be **no adverse effect** by the issuance of the permit based on the applicant's plans to
avoid sites. As these are revised plans that have been reviewed previously, the District requests
your response within 15 days from the receipt of this letter.

If we do not hear from you within this time, we will proceed with our final decision [33 CFR
325, Appendix C 7(b) and 36 CFR 800.3(c)(4)].

Should you have any questions, please contact our Regulatory Branch by letter, telephone or
email Mr. Brant Vollman at 309/794-5380 or brant.j.vollman@usace.army.mil.

Sincerely,

*Ward Lenz*

*for* Mike Hayes
Project Manager
Regulatory Branch

# CONCUR

By: _Rachel Leibowitz_
Deputy State Historic Preservation Officer

Date: __3-18-16__

## Vollman, Brant J MVR

| | |
|---|---|
| **From:** | King, Steve [DCA] <Steven.King@iowa.gov> |
| **Sent:** | Tuesday, April 05, 2016 10:28 AM |
| **To:** | Vollman, Brant J MVR; Olday, Nathan A |
| **Cc:** | Doershuk, John F; Gourley, Kathy [DCA]; SHPO106 [DCA] |
| **Subject:** | [EXTERNAL] COE CEMVR-OD-P-2014-1313 Dakota Access Pipeline |
| **Attachments:** | CAS Archaeology Reviews for 18 Revised Reports for Dakota Access Pipeline.pdf; 29 March 2016 letter.pdf |

Mr. Vollman and Mr. Olday,

**COE CEMVR-OD-P-2014-1313 Dakota Access Pipeline**

**R&C Number:**    **RC#141000103 &151013027**

**SHPO Finding: No Historic Properties Affected**

Our consultant Jon Sellars of Consulting Archaeological Services has reviewed the additional submittals for the above referenced undertaking. We concur with the finding of **No Historic Properties Affected** based on the USACE's additional submittal of information concerning the above referenced project with cover letter dated March 29, 2016 which we received on April 4, 2016.

Burns and McDonnell Report-Area 4, Sioux County, Iowa (R&C #151084064).
Burns and McDonnell Report-Area 9, Calhoun County, Iowa (R&C #151013027).
Burns and McDonnell Report-Area 14, Webster County, Iowa (R&C #151094029).
Burns and McDonnell Report-Area 18, Boone County, Iowa (R&C #151008069).
Burns and McDonnell Report-Area 19, Boone County, Iowa (R&C #151008070).
Burns and McDonnell Report-Area 24, Jasper County, Iowa (R&C #151050072).
Burns and McDonnell Report-Area 26, Jasper County, Iowa (R&C #151050074).
Burns and McDonnell Report-Area 28, Jasper County, Iowa (R&C #151050075).
Burns and McDonnell Report-Area 29, Jasper County, Iowa (R&C #151050076).
Burns and McDonnell Report-Area 31, Mahaska County, Iowa (R&C #151062077).
Burns and McDonnell Report-Area 32, Mahaska County, Iowa (R&C #151062078).
Burns and McDonnell Report-Area 36, Mahaska County, Iowa (R&C #151062079).
Burns and McDonnell Report-Area 40, Jefferson and Wapello Counties, Iowa (R&C #151000080).
Burns and McDonnell Report-Area 58, Lee County, Iowa (R&C #151056030).
Burns and McDonnell Report-Area 60, Lee County, Iowa (R&C #151056085).
Burns and McDonnell Report-Area 61, Lee County, Iowa (R&C #151056083).
Burns and McDonnell Report-Area 63, Lee County, Iowa (R&C #151056031).

**SHPO Finding: No Effect of Properties**

Burns and McDonnell Report-Area 64, Lee County, Iowa (R&C #151056086).    Mississippi Crossing (Iowa)

**Steve King**
Deputy State Historic Preservation Officer
steve.king@iowa.gov | 515.281.4013 | 515.865.7538-cell

1

USACE_DAPL0000050

| PCN Review Area | Section, Township, Range | County | Milepost | USACE Cultural Resources Requirement | Cultural Resource | USACE Eligibility Determination | Original USACE recommendations | SHPO Response 11 January 2016 | SHPO Response 26 January 2016 | SHPO Response 5 April 2016 | USACE recommendations (29 March 2016) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 4 | S10T97NR46W | Sioux | 500.7 | Yes, based on soils / topography / sites-surveys in area | No | | No historic properties affected  (NHPA) | | More Info | Concur - NHPA | NHPA |
| 5 | S36T93NR40W | Cherokee | 549.5 | Yes, based on soils / topography / sites-surveys in area | No | | No historic properties affected  (NHPA) | | Concur w/ conditional NAE | | NHPA |
| 6 | S31T93NR39W | Cherokee | 550 | Yes, based on soils / topography / sites-surveys in area | No | | No historic properties affected  (NHPA) | | Concur w/ conditional NAE | | NHPA |
| 9 | S20T88NR32W | Calhoun | 604.9 | Yes, based on soils / surveys in area | No | | No historic properties affected  (NHPA) | More Info | | Concur - NHPA | NHPA |
| 10 | S35T88NR32W | Calhoun | 608.9 | Yes - already have survey | 13CH61 | Not eligible | No historic properties affected  (NHPA) | Concur - NHPA | | | |
| 14 | S35T87NR30W | Webster | 622 | Yes, based on soils / surveys in area | No | | No historic properties affected  (NHPA) | More Info | | Concur - NHPA | NHPA |
| 17 | S15T85NR27W | Boone | 642 | Yes, based on soils / topography / sites-surveys in area | No | | No historic properties affected  (NHPA) | | Concur - NHPA | | |
| 17A | S15T85NR27W | Boone | 642 | Yes, based on soils / topography / sites-surveys in area* | No | | No historic properties affected  (NHPA) | | Concur - NHPA | | |
| 18 | S14T85NR27W | Boone | 642.5 | Yes, based on soils / topography / sites-surveys in area | No | | No historic properties affected  (NHPA) | | More Info | Concur - NHPA | NHPA |
| 19 | S24T85NR27W | Boone | 643.5 | Yes, based on soils / topography / sites-surveys in area | No | | No historic properties affected  (NHPA) | | More Info | Concur - NHPA | NHPA |
| 23 | S4T80NR21W | Jasper | 688.9 | Yes, based on soils / topography / sites-surveys in area | No | | No historic properties affected  (NHPA) | | More Info | | - * - |
| 24 | S14T80NR21W | Jasper | 692.1 | Yes, based on soils / topography / sites-surveys in area | No | | No historic properties affected  (NHPA) | | More Info | Concur - NHPA | NHPA |
| 25 | S14T80NR21W | Jasper | 692.4 | Yes, based on soils / topography / sites-surveys in area | No | | No historic properties affected  (NHPA) | | More Info | | - * - |
| 26 | S14T80NR21W | Jasper | 692.9 | Yes, based on soils / topography / sites-surveys in area | No | | No historic properties affected  (NHPA) | | More Info | Concur - NHPA | NHPA |

USACE_DAPL0000051

| PCN Review Area | Section, Township, Range | County | Milepost | USACE Cultural Resources Requirement | Cultural Resource | USACE Eligibility Determination | Original USACE recommendations | SHPO Response 11 January 2016 | SHPO Response 26 January 2016 | | USACE recomendations (29 March 2016) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 28 | S35T80NR20W | Jasper | 698.9 | Yes, based on soils / topography / sites-surveys in area | No | | No historic properties affected (NHPA) | | More Info | Concur - NHPA | NHPA |
| 29 | S22T79NR19W | Jasper | 706.5 | Yes, based on soils / topography / sites-surveys in area | No | | No historic properties affected (NHPA) | | More Info | Concur - NHPA | NHPA |
| 31 | S20T76NR15W | Mahaska | 736.4 | Yes, based on soils / topography / sites-surveys in area | No | | No historic properties affected (NHPA) | | More Info | Concur - NHPA | NHPA |
| 32 | S34T76NR15W | Mahaska | 739.8 | Yes, based on soils / surveys in area | No | | No historic properties affected (NHPA) | | More Info | Concur - NHPA | NHPA |
| 36 | S12T74NR14W | Mahaska | 751.7 | Yes, based on soils / topography / sites-surveys in area | No | | No historic properties affected (NHPA) | | More Info | Concur - NHPA | NHPA |
| 40 | S18T72NR1W | Jefferson | 770.3 | Yes, based on soils / topography / sites-surveys in area | No | | No historic properties affected (NHPA) | | More Info | Concur - NHPA | NHPA |
| 41 | S19T72NR1W | Jefferson | 771.2 | Yes, based on soils / topography / sites-surveys in area | No | | No historic properties affected (NHPA) | | Concur - NHPA | |
| 55 | S10T67NR06W | Lee | 817.6 | Yes, based on soils / topography / sites-surveys in area | No | | No historic properties affected (NHPA) | | Concur - NHPA | |
| 56 | S10T67NR06W | Lee | 817.9 | Yes, based on soils / topography / sites-surveys in area | No | | No historic properties affected (NHPA) | | Concur - NHPA | |
| 58 | S6T66NR05W | Lee | 824.3 | Yes, based on soils / topography / sites-surveys in area | 13LE954 | Not eligible | No historic properties affected (NHPA) | More Info | | Concur - NHPA | NHPA |
| 60 | S26T66NR05W | Lee | 829.8 | Yes, based on soils / topography / sites-surveys in area | No | | No historic properties affected (NHPA) | | More Info | Concur - NHPA | NHPA |
| 61 | S26T66NR05W | Lee | 830.4 | Yes, based on soils / topography / sites-surveys in area | No | | No historic properties affected (NHPA) | | More Info | Concur - NHPA | NHPA |
| 62 | S25T66NR05W | Lee | 831 | Yes, based on soils / topography / sites-surveys in area | No | | No historic properties affected (NHPA) | | Concur - NHPA | |
| 63 | S36T66NR05W | Lee | 831.3 | Yes, based on soils / topography / sites-surveys in area | 13LE956 | Not eligible | No historic properties affected (NHPA) | More Info | | Concur - NHPA | NHPA |

USACE_DAPL0000052

| 64 | S31T66NR04W | Lee | 831.4 | Yes, based on soils / topography / sites-surveys in area | 13LE955 | Phase II or avoid | No historic properties affected - Site to be avoided by directional bore | | NAE if site avoided | Concur - NAE | NAE |



## TRIBAL HISTORIC PRESERVATION OFFICE

**Date:  March 8, 2016**                                      **File: 1516-780IL.-10**

**RE:     USACE, CEMVR-OD-P-2014-1313 Dakota Access Pipeline Mississippi River Crossing**

USACE – Rock Island District
Brant Vollman
PO Box 2004 Clock Tower Building
Rock Island, IL 61204-2004

Dear Mr. Vollman,

The Osage Nation Historic Preservation Office has received notification and accompanying information
for the proposed pipeline reroute at the Mississippi River crossing for the Dakota Access Pipeline to
avoid sites 11HA25 and 11HA978. The Osage Nation Historic Preservation Office concurs with the
pipeline reroute will have "No Adverse Effect" upon nearby cultural resources.

Should you have any questions or need any additional information, please feel free to contact me at the
number listed below. Thank you for consulting with the Osage Nation on this matter.

Sincerely,

Jackie Rodgers
Archaeologist

627 Grandview, Pawhuska, OK 74056, (918) 287-5328, Fax (918) 287-5376

USACE_DAPL0000053

Tab G

USACE_DAPL0000054

## U.S. Army Corps of Engineers - Rock Island District

### NEPA CHECKLIST for RECORD of ENVIRONMENTAL CONSIDERATION

**Project:** Dakota Access Proposed Pipeline - Mississippi River Crossing  408 Review #2016-896

**Location of Proposed Action:** Pool 19, RM 369.8

**Phone:** 309-794-5791          **Proponent:** Dakota Access, LCC, Monica Howard, (713) 898-8222

**Brief Description of Proposed Action:** Applicant will install an oil pipeline using directional boring under the 9-foot navigation channel through an area of bedrock more than 75-feet below the ground surface.

**Signature of Proponent:**

| ER 200-2-2 provides for a review of the following criteria for "categorical exclusion" to determine if exceptions may apply for the proposed action. If any of the following are checked "Yes", then a categorical exclusion may not apply. Forward the proposal to the Rock Island District Office (CEMVR-PD-C) for further analysis and/or concurrence with determination. Additional information on page 2 | YES | NO |
|---|---|---|
| 1. The proposed action would have significant adverse effects on public health or safety. | ☐ | ☑ |
| 2. The proposed action would adversely affect such unique geographic characteristics as historical, cultural, or paleontological resources; park, recreation, or refuge lands; principle drinking water aquifers, wetlands; floodplain; or ecologically significant or critical habitat areas. | ☐ | ☑ |
| 3. The proposed action would have highly controversial environmental effects. | ☐ | ☑ |
| 4. The proposed action would have highly uncertain environmental effects or involve unique or unknown environmental risks. | ☐ | ☑ |
| 5. The proposed action would establish a precedent for future action or represents a decision in principle about a future consideration with significant environmental effects. | ☐ | ☑ |
| 6. The proposed action is related to other actions with individually insignificant, but cumulatively significant environmental effects. | ☐ | ☑ |
| 7. The proposed action would adversely affect properties listed or eligible for listing in the National Register of Historic Places. | ☐ | ☑ |
| 8. The proposed action would affect either directly or indirectly, a species included or proposed to be included on the list of endangered or threatened species. | ☐ | ☑ |
| 9. The proposed action may violate Federal, State, Local or Tribal law or regulation imposed for the protection of the environment or imposed to ensure compliance with Executive Order (EO) 11988 (Floodplain Management), EO 11990 (Protection of Wetlands), or the Fish and Wildlife Coordination Act. | ☐ | ☑ |
| 10. The proposed action is in nonconformance with the project Master Plan, the project OMP, or the project Shoreline Management Plan. | ☐ | ☑ |
| 11. The proposed action involves surface disturbance greater than one acre — Can still be categorically excluded but may need a NPDES permit or CWA 404 permit. | ☐ | ☑ |
| 12. There is evidence of hazardous or toxic materials, which were stored on, disposed of on, or have otherwise contaminated the subject property. | ☐ | ☑ |

If any of the above were YES, state/attach additional detail on page 2.

**JORDAN.JOSEPH.W.1231243808**  Digitally signed by JORDAN JOSEPH W 1231243808
DN: c=US, o=U.S. Government, ou=DoD, ou=PKI, cn=JORDAN JOSEPH W 1231243808
Date: 2016.02.24 07:04:38 -06'00'

Signature of Reviewer _____  Date

IT HAS BEEN RECOMMENDED THE PROPOSED ACTION:
[☑] Qualifies for a Categorical Exclusion in accordance with ER 200-2-2 Paragraph 9 (h)2 dated March 4, 1988.
[☐] Is adequately covered in an existing EA or EIS entitled _____ and dated
[☐] May not be categorically excluded - Proposal forwarded to Rock Island District Office (PD-C) for further review.

**ROSS.JAMES.S.1231088128**  Digitally signed by ROSS JAMES S.1231088128
DN: c=US, o=U.S. Government, ou=DoD, ou=PKI, ou=USA, cn=ROSS JAMES S 1231088128
Date: 2016.05.10 15:51:54 -05'00'

Signature of Environmental Compliance Chief _____  Date

USACE_DAPL0000055

-2-

Additional Information:

1. Attached is a map showing the project location.

2. Attached is a letter indicating Dakota Access, LCC is the project proponent.  This letter serves is in lieu of a electronic signature on the first page.

3. The District determined Categorical Exclusion, 33 CFR 230, paragraph 9(h)2, was appropriate for the following reasons:

   a.) PD-C anticipates no significant environmental impacts from the river crossing beyond what is accepted for a categorical exclusion use.

   b.) If there are minor impacts, they would be similar to those in addressed in ER 200-2-2, paragraph 9(h)2, which addresses Minor utility distribution and collection lines, including irrigation.

   c.)  This project would have no environmental impacts including indirect impacts and cumulative impacts in or near the the Corps of Engineer jurisdictional project boundaries.

USACE_DAPL0000056

Notes.
1. The locations of all features shown are approximate.
2. This drawing is for information purposes. It is intended to assist in showing features discussed in an attached document. GeoEngineers, Inc. can not guarantee the accuracy and content of electronic files. The master file is stored by GeoEngineers, Inc. and will serve as the official record of this communication.
3. Refer to the boring logs in the accompanying report for more detailed soil descriptions.
4. GeoEngineers, Inc. has not verified the field location of the existing utilities.

Reference: Ground surface DEM (1/3 and 1/9 Arc Second) downloaded from http://NationalMap.Gov
Ground surface survey provided by Wood Group Mustang, Inc.
Aerial image taken from Google Earth Pro© 2015, licensed to GeoEngineers, Inc., image dated 08/19/13
Shape files provided by Contract Land Staff, LLC.

PLAN

600' 0 600'

SCALE IN FEET

NOT FOR CONSTRUCTION

**LEGEND:**

- Boring Location
- Major Contour - 20' Interval
- Minor Contour - 5' Interval

**DAKOTA ACCESS PIPELINE PROJECT**

PROPOSED 30" PIPELINE
MISSISSIPPI RIVER HDD
LEE COUNTY, IA & HANCOCK COUNTY, IL

GEOENGINEERS

FIGURE 2



**DAKOTA ACCESS, LLC**

1300 Main Street
Houston, TX 77002
713-989-2000

January 13, 2016

Paul St. Louis
U.S. Army Corps of Engineers
Rock Island District
P.O. Box 2004
Rock Island, IL 61204

Re:  **Section 408 Review - Mississippi River Crossing**
**Dakota Access Pipeline Project**
**US Army Corps of Engineers Permit No. CEMVR-OD-P-2014-1313**
**Lee County, Iowa, and Hancock County, Illinois**

Dear Mr. St. Louis,

Dakota Access, LLC (Dakota Access) is providing this letter in response to a request for information for the proposed crossing of the Mississippi River by the Dakota Access Pipeline (DAPL) Project, which would consist of the installation of a new proposed 30-inch-diameter crude oil pipeline under the river (see enclosed Vicinity Map). The U.S. Army Corps of Engineers (USACE) has been reviewing this proposed crossing for authorization under Section 10 of the Rivers and Harbors Act, through verification under Nationwide Permit 12, since March 26, 2015.

On October 8, 2015, the USACE notified Dakota Access that a Section 408 Permit would be required for the proposed crossing of the Mississippi River. The agency requested an updated plan and profile exhibit to process the 408 permit, which Dakota Access subsequently provided via e-mail on October 9, 2015. A copy of this email and exhibit is enclosed. Numerous conversations have taken place since that e-mail where the agency indicated that the crossing was being reviewed in accords with 408 and Dakota Access requested any comments. To date none have been received.

On January 13, 2016, Dakota Access was informed that a formal request to process the 408 is needed. Please accept this letter as the formal request for the USACE Emergency Management Division to complete the review process and issue a Section 408 Permit to construct the DAPL Project across the Mississippi River as shown on the attached exhibit and discussed since October 2015. Dakota Access anticipates starting construction very soon and appreciates your agency's timely response to this request; specifically we request any outstanding questions or comments be received by Friday, January 15 so that we may respond in a timely manner for efficient issuance of the permit.

1

USACE_DAPL0000058

Mr. Paul St. Louis
January 13, 2016


Thank you for your assistance with this project, if you require any additional information please contact me at (713) 898-8222 or monica.howard@energytransfer.com.

**Dakota Access, LLC**


Monica Howard
Director Environmental Sciences

cc:    Michael Hayes – U.S. Army Corps of Engineers
       Adam Broad – Dakota Access
       Jack Edwards – Dakota Access
       Nathan Olday – Burns & McDonnell

enclosures

2

USACE_DAPL0000059

Mississippi River
Lat: 40.4█
Long: -91.3█

USACE_DAPL0000060

Proposed Pipeline

2    1    0    2
Miles

NORTH

DAKOTA ACCESS, LLC

Dakota Access Pipeline Project
Dakota Access, LLC
Section 408 Review Area
Mississippi River

Source: Esri, Dakota Access, LLC; DigitalGlobe, GeoEye, Earthstar Geographics, CNES/Airbus DS, USDA, USGS; and Burns & McDonnell Engineering Company, Inc.

Issued: 1/12/2016

| From: | Olday, Nathan A |
| To: | "Hayes, Michael D MVR"; Howard, Monica |
| Cc: | St. Louis, Paul F MVR |
| Subject: | RE: DAPL Mississippi River crossing (UNCLASSIFIED) |
| Date: | Friday, October 09, 2015 4:53:00 PM |
| Attachments: | Mississippi River HDD IFB REV B.PDF |

Mike,

Please find attached the updated Plan and Profile exhibit requested for the Mississippi River. I did have an opportunity to speak with Paul this morning and he helped to explain the requirement for this review. One question that we did have was the timing necessary to complete a 408 review/permit at this location. Would this permit be issued concurrent with the Section 10 permit for this crossing?

Thank you.

Nathan Olday
Office: (832) 214-1999
Mobile: (281) 460-5706

-----Original Message-----
From: Hayes, Michael D MVR [mailto:Michael.D.Hayes@usace.army.mil]
Sent: Thursday, October 08, 2015 2:26 PM
To: Howard, Monica
Cc: Olday, Nathan A; St. Louis, Paul F MVR
Subject: DAPL Mississippi River crossing (UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: NONE

Monica: I've been informed by Paul St. Louis of our Emergency Management Division that a 408 review/permit will be required for DAPL's Mississippi River crossing between Lee County, Iowa and Hancock County, Illinois. I'm told that 'construction' drawings (as opposed to the "NOT FOR CONSTRUCTION FOR DISCUSSION ONLY" drawing I have on file) will be require for that process. Please submit the drawings to me and I will pass on to Paul. If you've questions contact Paul at 309/794-5204. Thanks, Mike Hayes

Classification: UNCLASSIFIED
Caveats: NONE

USACE_DAPL0000061



PLAN

PROFILE

NOTE: THIS IS A FULL SIZE DRAWING THAT IS INTENDED
TO BE PRINTED ON A 24" X 36" SHEET OF PAPER.

ISSUED FOR BID

GeoEngineers

DAKOTA ACCESS PIPELINE PROJECT
SITE PLAN AND PROFILE
PROPOSED 30" PIPELINE
MISSISSIPPI RIVER HDD
LEE COUNTY, IA AND HANCOCK COUNTY, IL

USACE_DAPL0000062

USACE_DAPL0000063



NOTE: THIS IS A FULL SIZE DRAWING THAT IS INTENDED
TO BE PRINTED ON A 24" X 36" SHEET OF PAPER.

**ISSUED FOR BID**

DAKOTA ACCESS PIPELINE PROJECT
STRINGING WORKSPACE
PROPOSED 30" PIPELINE
MISSISSIPPI RIVER HDD
LEE COUNTY, IA AND HANCOCK COUNTY, IL

**Tab H**

USACE_DAPL0000064

CEMVR-EM

Date:  13 January 2016

Memorandum For: In-House Project Modification Review

Does this alteration generate a "yes" response to the questions outlined in EC1165-2-216 paragraph 6.t?

**Chief's Signature**

| | | | Yes | No | Comments |
|---|---|---|---|---|---|
| OD-T | DeHaan | FAE/OD-T | | [signature] | See memorandum. |
| | | Suspense: 29 January 2016 | | | |
| EC-DG | N/A | | | | |
| EC-DS | N/A | | | | |
| EC-H | Landwehr | | | [signature] | See memorandum. |
| EC-G | Stewart | | | [signature] | See memorandum |
| EC | Kirkeeng | Track | | [signature] | See above |
| | | Suspense: 29 January 2016 | | | |
| PD-C | Ross | | | [signature] | See memorandum |
| | | Suspense: 29 January 2016 | | | |
| OD-P | M. Hayes | | | [signature] | |
| | | Suspense: 29January 2016 | | | |
| RE | Appel | | | [signature] | no comments |
| | | Suspense: 29 January 2016 | | | |
| 408 Coord. | St. Louis | | | [signature] | ATR Complete |
| | | Suspense: 2 February 2016 | | | |

**Subject:**

2016-896 Mississippi River RM 369.8, Dakota Access Pipeline

**Alteration Desription:**

Dakota Access Pipeline through Burns & McDonnell is seeking permission to construct an oil pipeline beneath the Mississippi River Channel at river mile 369.8. The pipe will be directionally drilled approximately 70 feet below the bottom of the river.

**Submittal From:**  Burns & McDonnell on behalf of Dakota Access
**Application Dated:**  10/9/2015 (initial Correspondence through e-mail.
**Received In EM:**  10/9/2015
**Flood Response Area:** N/A
**408 POC:** St. Louis x5208

Note: Each reviewer shall create a memorandum upon completion of their review. A comment or no comment memorandum should be saved in ProjectWise. If unable to place the memorandum in the Projectwise folder please contact Paul St. Louis ext. 5208.

USACE_DAPL0000065

2016-896 – Additional information showing FWS, CG, and other agency coordination.  Not part of Summary of Findings.

USACE_DAPL0000066

**St. Louis, Paul F MVR**

| | |
|---|---|
| **From:** | Hayes, Michael D MVR |
| **Sent:** | Thursday, October 01, 2015 1:34 PM |
| **To:** | St. Louis, Paul F MVR |
| **Subject:** | DAPL Mississippi Crossing (UNCLASSIFIED) |
| **Attachments:** | Dakota Access proposes to construct a 30.docx |
| | |
| **Categories:** | Red Category |

Classification: UNCLASSIFIED
Caveats: NONE

Paul Does this give you what you need?  mh

Classification: UNCLASSIFIED
Caveats: NONE

1

USACE_DAPL0000067

Dakota Access proposes to construct a 30-inch diameter pipeline beneath the Mississippi River at approximate River Mile 369.8, crossing from Lee County, Iowa into Hancock County, Illinois. The Pipeline will be placed by horizontal directional drill, and will lie approximately 72 feet below the river bottom at the crossing location. The crossing of a Section Water will be covered under Item 12 of the nationwide permits. An environmental assessment and finding of No Significant Impact", has been prepared for each of the nationwide permits. The Corps' Regulatory Branch has determined the crossing will have 'no effect' on threatened and endangered species or Critical Habitat and will result in 'no effect' on Cultural Resources.

## Hayes, Michael D MVR

| | |
|---|---|
| **From:** | Hayes, Michael D MVR |
| **Sent:** | Thursday, January 22, 2015 10:12 AM |
| **To:** | Heinold, Thomas D MVR |
| **Cc:** | DeHaan, Henry C MVR |
| **Subject:** | RE: Dakota Access Pipeline beneath Mississppi R. (UNCLASSIFIED) |

Classification: UNCLASSIFIED
Caveats: NONE

Tom: You are correct-no activity within the channel.  I have solicited comments from Jon Klingman/Karl Schmitz as well as the Coast Guard.  mh

-----Original Message-----
From: Heinold, Thomas D MVR
Sent: Thursday, January 22, 2015 10:08 AM
To: Hayes, Michael D MVR
Cc: DeHaan, Henry C MVR
Subject: FW: Dakota Access Pipeline beneath Mississppi R. (UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: NONE

Thanks, Mike.  It's deep enough that there shouldn't be any impact to navigation.  Safe to assume that there wouldn't be any physical activity actually in the river for this?  Also sharing w/ Hank in case it should appear on future Navigation Charts (not sure what the criteria are for something to go on a Nav Chart -- of course, it has to exist first, but beyond that... will let Hank's experts weigh in as applicable).  :-)

-Tom

-----Original Message-----
From: Hayes, Michael D MVR
Sent: Thursday, January 22, 2015 9:50 AM
To: Heinold, Thomas D MVR
Subject: FW: Dakota Access Pipeline beneath Mississppi R. (UNCLASSIFIED)

Tom: I see Mike's not in. So I'm copying you on this-fyi.  mh

-----Original Message-----
From: Hayes, Michael D MVR
Sent: Thursday, January 22, 2015 9:46 AM
To: 'jason.j.jessup@uscg.mil'
Cc: Cox, Michael D MVR; Klingman, Jon A MVR
Subject: Dakota Access Pipeline beneath Mississppi R. (UNCLASSIFIED)

Jason: As discussed by telephone, I have attached a vicinity map and a plan/profile drawing of a proposed 30" diameter crude oil pipeline (to be horizontally directionally drilled) beneath the Mississippi River for your review and comment.  The project would be located at approximate River Mile 369.8.  Please respond within 10 days of the date of this email with your comments/concerns.

Mike Hayes, Project Manager 309/794-5367

Classification: UNCLASSIFIED

1

USACE_DAPL0000069

**Hayes, Michael D MVR**

| | |
|---|---|
| **From:** | Hayes, Michael D MVR |
| **Sent:** | Thursday, January 22, 2015 9:46 AM |
| **To:** | 'jason.j.jessup@uscg.mil' |
| **Cc:** | Cox, Michael D MVR; Klingman, Jon A MVR |
| **Subject:** | Dakota Access Pipeline beneath Mississppi R. (UNCLASSIFIED) |
| **Attachments:** | Mississippi Crossing.pdf; River Crossing Plan-Profile (DAPL Pipeline).pdf |

Classification: UNCLASSIFIED
Caveats: NONE

Jason: As discussed by telephone, I have attached a vicinity map and a plan/profile drawing
of a proposed 30" diameter crude oil pipeline (to be horizontally directionally drilled)
beneath the Mississippi River for your review and comment.  The project would be located at
approximate River Mile 369.8.  Please respond within 10 days of the date of this email with
your comments/concerns.

Mike Hayes, Project Manager 309/794-5367

Classification: UNCLASSIFIED
Caveats: NONE

USACE_DAPL0000070

## Hayes, Michael D MVR

| | |
|---|---|
| **From:** | Delaney, Kassie E MST1 [Kassie.E.Delaney@uscg.mil] |
| **Sent:** | Thursday, January 29, 2015 1:37 PM |
| **To:** | Hayes, Michael D MVR |
| **Subject:** | [EXTERNAL] RE: Comments on Des Moines River Horizontal Directional Drill (UNCLASSIFIED) |

Mr. Hayes

I will only need the info for the Mississippi River crossing.

Respectfully,
MST1 Kassie Delaney
Sector Upper Mississippi River
1222 Spruce St.
St. Louis, MO 63103
Work: 314-269-2573


-----Original Message-----
From: Hayes, Michael D MVR [mailto:Michael.D.Hayes@usace.army.mil]
Sent: Thursday, January 29, 2015 1:05 PM
To: Delaney, Kassie E MST1
Subject: RE: Comments on Des Moines River Horizontal Directional Drill (UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: NONE

Kassie:  Will do. Is this applicable to both the Des Moines and Mississippi crossings?  mh

-----Original Message-----
From: Delaney, Kassie E MST1 [mailto:Kassie.E.Delaney@uscg.mil]
Sent: Thursday, January 29, 2015 10:53 AM
To: Hayes, Michael D MVR
Subject: [EXTERNAL] RE: Comments on Des Moines River Horizontal Directional Drill
(UNCLASSIFIED)

Mr. Hayes,

Please ensure the appropriate parties contact our office a minimum of 48 hours prior to start
of the operation to allow the drafting a release of a broadcast notice to mariners. During
this notification our office will need to know the dates and approximant times of the work.

Have a great day.

Respectfully,
MST1 Kassie Delaney
Sector Upper Mississippi River
1222 Spruce St.
St. Louis, MO 63103
Work: 314-269-2573


-----Original Message-----
From: Hayes, Michael D MVR [mailto:Michael.D.Hayes@usace.army.mil]

1

USACE_DAPL0000071

Sent: Wednesday, January 28, 2015 3:42 PM
To: DeHaan, Henry C MVR; Jessup, Jason J LCDR
Cc: Schmitz, Karl B MVR; Delaney, Kassie E MST1
Subject: Comments on Des Moines River Horizontal Directional Drill (UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: NONE

All:  Earlier, I requested your comments on Dakota Access Pipeline's directional Drill
beneath the Mississippi River.  I've been asked to allow you the opportunity to comment on
their Des Moines River crossing as well since this is a Section 10 water (although with no
commercial navigation).  The crossing is located in Section 14, Twp. 85N, Range 27W in Boone
County.  Again this a 30" diameter steel pipe that will transport crude oil.  Please respond
within 7 days of the date of this email with any comments.  If you do not comment, we will
assume no objection.

Kassie: In response to your question concerning the need to impede river traffic on the
Mississippi during construction, the project proponent has informed me that won't be
necessary, but a notice to mariners might be appropriate.

Mike Hayes 309/794-5367

Classification: UNCLASSIFIED
Caveats: NONE


Classification: UNCLASSIFIED
Caveats: NONE

2

USACE_DAPL0000072

Horizontal Directional Drill Location

USACE_DAPL0000073



USACE_DAPL0000074

## St. Louis, Paul F MVR

| | |
|---|---|
| **From:** | Lenz, Gary W (Ward) MVR |
| **Sent:** | Wednesday, December 30, 2015 12:04 PM |
| **To:** | Baumgartner, Craig S COL MVR |
| **Cc:** | Cox, Michael D MVR; Segura, Daniel LTC MVR; Heinold, Thomas D MVR; Meden, Gary R MVR; Hamilton, Dennis W MVR; Fournier, Mari K MVR; Hayes, Michael D MVR; Jones, Donna M MVR; St. Louis, Paul F MVR |
| **Subject:** | DAPL pipeline Biological Assessment (BA) |
| **Attachments:** | DAPL transmittal ltr.pdf |
| | |
| **Categories:** | Red Category |

Sir, FYI the Regulatory Biological Assessment (BA) has been finalized. Omaha District put together a cover letter (attached), and is mailing out the BA package to the U.S. Fish & Wildlife Service today on behalf of all three Districts. In accordance with informal consultation procedures, we are requesting the Service to concur with a "may affect, not likely to adversely affect" for the following three species: Indiana Bat, Northern Long-eared bat, and the Topeka Shiner.

Ward

Ward Lenz
Chief, Regulatory Branch
Rock Island District
U.S. Army Corps of Engineers
1500 Rock Island Drive
Rock Island, IL 61201
Ph. 309-794-5370

1

USACE_DAPL0000075



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, OMAHA DISTRICT
1616 CAPITOL AVENUE
OMAHA NE 68102-4901
December 30, 2015

USACE – Omaha District Office
Regulatory Branch

Kraig McPeek
U.S. Fish and Wildlife Service
Rock Island Field Office
1511 47th Avenue
Moline, IL 61265

RE: Dakota Access Pipeline, Biological Assessment Transmittal

Dear Mr. McPeek:

Dakota Access, LLC (DAPL) has applied for Department of the Army (DA) authorization for a proposed pipeline project that would traverse approximately 1,168-miles across parts of North Dakota, South Dakota, Iowa and Illinois. Segments of the pipeline will be subject to DA authorization under Section 404 of the Clean Water Act and/or Section 10 of the Rivers and Harbors Act. To this end, DAPL has submitted a number of pre-construction notifications along the proposed pipeline route that are subject to DA authorization (Corps "action areas").

In accordance with the informal consultation procedures under Section 7 of the Endangered Species Act (ESA), we request concurrence with our determinations within Corps action areas that the proposed action "may affect, not likely to adversely affect" the following species:

Indiana bat (Myotis sodalis)
Northern long-eared bat (Myotis septentrionalis)
Topeka shiner (Notropis tokepa)

The enclosed Biological Assessment (BA) is specific to species federally listed under the Endangered Species Act.

It is the Corps' understanding that the information from the Indiana and Northern Long-Eared Bat Summer 2015 Survey Report (developed by DAPL) has already been submitted to your office by DAPL. If you would like electronic copies of any of the attached information, please contact this office.



Printed on Recycled Paper

If you would like to further discuss this project, please contact either Jason Renschler, Project Manager at the North Dakota Regulatory Office (701) 255-0015 ext. 2010 or myself  at this office by letter or telephone at (402) 995-2451.

Sincerely,

CHIEPLY.MARTHA.S.1    Digitally signed by CHIEPLY.MARTHA.S.1230524919
230524919                         DN: c=US, o=U.S. Government, ou=DoD, ou=PKI,
                                        ou=USA, cn=CHIEPLY.MARTHA.S.1230524919
                                        Date: 2015.12.29 16:26:18 -06'00'

Martha Chieply
Regulatory Branch Chief
Omaha District Office


Enclosures
 - Biological Assessment
 - Appendix C (outside Corps Action Areas)



CF:  CEMVR-OP-P (Lenz)
      CEMVS-OP-F (Henke)
      CEMVR-OD-PP (Hayes)
      CEMVS-OD-F (Mcclendon)
      CENWO-OD-RF (Latka)
      CENWO-OD-RSD (Breckenridge)
      CENWO-OD-RND (Renschler)

USACE_DAPL0000077

**Hayes, Michael D MVR**

| | |
|---|---|
| **From:** | Hayes, Michael D MVR |
| **Sent:** | Thursday, January 22, 2015 10:12 AM |
| **To:** | Heinold, Thomas D MVR |
| **Cc:** | DeHaan, Henry C MVR |
| **Subject:** | RE: Dakota Access Pipeline beneath Mississppi R. (UNCLASSIFIED) |

Classification: UNCLASSIFIED
Caveats: NONE

Tom: You are correct-no activity within the channel.  I have solicited comments from Jon Klingman/Karl Schmitz as well as the Coast Guard.  mh

-----Original Message-----
From: Heinold, Thomas D MVR
Sent: Thursday, January 22, 2015 10:08 AM
To: Hayes, Michael D MVR
Cc: DeHaan, Henry C MVR
Subject: FW: Dakota Access Pipeline beneath Mississppi R. (UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: NONE

Thanks, Mike.  It's deep enough that there shouldn't be any impact to navigation.  Safe to assume that there wouldn't be any physical activity actually in the river for this?  Also sharing w/ Hank in case it should appear on future Navigation Charts (not sure what the criteria are for something to go on a Nav Chart -- of course, it has to exist first, but beyond that... will let Hank's experts weigh in as applicable).  :-)

-Tom

-----Original Message-----
From: Hayes, Michael D MVR
Sent: Thursday, January 22, 2015 9:50 AM
To: Heinold, Thomas D MVR
Subject: FW: Dakota Access Pipeline beneath Mississppi R. (UNCLASSIFIED)

Tom: I see Mike's not in. So I'm copying you on this-fyi.  mh

-----Original Message-----
From: Hayes, Michael D MVR
Sent: Thursday, January 22, 2015 9:46 AM
To: 'jason.j.jessup@uscg.mil'
Cc: Cox, Michael D MVR; Klingman, Jon A MVR
Subject: Dakota Access Pipeline beneath Mississppi R. (UNCLASSIFIED)

Jason: As discussed by telephone, I have attached a vicinity map and a plan/profile drawing of a proposed 30" diameter crude oil pipeline (to be horizontally directionally drilled) beneath the Mississippi River for your review and comment.  The project would be located at approximate River Mile 369.8.  Please respond within 10 days of the date of this email with your comments/concerns.

Mike Hayes, Project Manager 309/794-5367

Classification: UNCLASSIFIED

1

USACE_DAPL0000078

**Hayes, Michael D MVR**

| | |
|---|---|
| **From:** | Hayes, Michael D MVR |
| **Sent:** | Thursday, January 22, 2015 9:46 AM |
| **To:** | 'jason.j.jessup@uscg.mil' |
| **Cc:** | Cox, Michael D MVR; Klingman, Jon A MVR |
| **Subject:** | Dakota Access Pipeline beneath Mississppi R. (UNCLASSIFIED) |
| **Attachments:** | Mississippi Crossing.pdf; River Crossing Plan-Profile (DAPL Pipeline).pdf |

Classification: UNCLASSIFIED
Caveats: NONE

Jason: As discussed by telephone, I have attached a vicinity map and a plan/profile drawing of a proposed 30" diameter crude oil pipeline (to be horizontally directionally drilled) beneath the Mississippi River for your review and comment.  The project would be located at approximate River Mile 369.8.  Please respond within 10 days of the date of this email with your comments/concerns.

Mike Hayes, Project Manager 309/794-5367

Classification: UNCLASSIFIED
Caveats: NONE

1

USACE_DAPL0000079

## Hayes, Michael D MVR

| | |
|---|---|
| **From:** | Delaney, Kassie E MST1 [Kassie.E.Delaney@uscg.mil] |
| **Sent:** | Thursday, January 29, 2015 1:37 PM |
| **To:** | Hayes, Michael D MVR |
| **Subject:** | [EXTERNAL] RE: Comments on Des Moines River Horizontal Directional Drill (UNCLASSIFIED) |

Mr. Hayes

I will only need the info for the Mississippi River crossing.

Respectfully,
MST1 Kassie Delaney
Sector Upper Mississippi River
1222 Spruce St.
St. Louis, MO 63103
Work: 314-269-2573


-----Original Message-----
From: Hayes, Michael D MVR [mailto:Michael.D.Hayes@usace.army.mil]
Sent: Thursday, January 29, 2015 1:05 PM
To: Delaney, Kassie E MST1
Subject: RE: Comments on Des Moines River Horizontal Directional Drill (UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: NONE

Kassie:  Will do. Is this applicable to both the Des Moines and Mississippi crossings?  mh

-----Original Message-----
From: Delaney, Kassie E MST1 [mailto:Kassie.E.Delaney@uscg.mil]
Sent: Thursday, January 29, 2015 10:53 AM
To: Hayes, Michael D MVR
Subject: [EXTERNAL] RE: Comments on Des Moines River Horizontal Directional Drill (UNCLASSIFIED)

Mr. Hayes,

Please ensure the appropriate parties contact our office a minimum of 48 hours prior to start of the operation to allow the drafting a release of a broadcast notice to mariners. During this notification our office will need to know the dates and approximant times of the work.

Have a great day.

Respectfully,
MST1 Kassie Delaney
Sector Upper Mississippi River
1222 Spruce St.
St. Louis, MO 63103
Work: 314-269-2573


-----Original Message-----
From: Hayes, Michael D MVR [mailto:Michael.D.Hayes@usace.army.mil]

1

Sent: Wednesday, January 28, 2015 3:42 PM
To: DeHaan, Henry C MVR; Jessup, Jason J LCDR
Cc: Schmitz, Karl B MVR; Delaney, Kassie E MST1
Subject: Comments on Des Moines River Horizontal Directional Drill (UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: NONE


All:  Earlier, I requested your comments on Dakota Access Pipeline's directional Drill
beneath the Mississippi River.  I've been asked to allow you the opportunity to comment on
their Des Moines River crossing as well since this is a Section 10 water (although with no
commercial navigation).  The crossing is located in Section 14, Twp. 85N, Range 27W in Boone
County.  Again this a 30" diameter steel pipe that will transport crude oil.  Please respond
within 7 days of the date of this email with any comments.  If you do not comment, we will
assume no objection.

Kassie: In response to your question concerning the need to impede river traffic on the
Mississippi during construction, the project proponent has informed me that won't be
necessary, but a notice to mariners might be appropriate.

Mike Hayes 309/794-5367

Classification: UNCLASSIFIED
Caveats: NONE



Classification: UNCLASSIFIED
Caveats: NONE

2

Horizontal Directional Drill Location

USACE_DAPL0000082



PROFILE

600' 0 600'
HORIZONTAL SCALE IN FEET

100' 0 100'
VERTICAL SCALE IN FEET

Notes:
1. The locations of all features shown are approximate.
2. This drawing is for information purposes. It is intended to assist in showing features discussed in an attached document. GeoEngineers, Inc. can not guarantee the accuracy and content of electronic files. The master file is stored by GeoEngineers, Inc. and will serve as the official record of this communication.
3. GeoEngineers, Inc. has not verified the field location of the existing utilities.

Reference: Ground surface DEM (1/3 and 1/9 Arc Second) downloaded from http://NationalMap.Gov
Ground surface survey provided by Wood Group Mustang, Inc.
Aerial image taken from Google Earth Pro, licensed to GeoEngineers, Inc., image dated 08/19/13
Wetland base files provided by Contract Land Staff, LLC.

NOT FOR CONSTRUCTION
FOR DISCUSSION ONLY

**LEGEND:**

Proposed Boring Location
Major Contour - 25' Interval
Minor Contour - 5' Interval

**ETC - DAKOTA ACCESS PIPELINE PROJECT**
**CONCEPTUAL SITE PLAN AND PROFILE**

PROPOSED 30" PIPELINE
MISSISSIPPI RIVER HDD
LEE COUNTY, IA & HANCOCK COUNTY, IL

GEOENGINEERS

**FIGURE 2A**

USACE_DAPL0000083

## St. Louis, Paul F MVR

| | |
|---|---|
| **From:** | Dirks, Bryan J MVS |
| **Sent:** | Thursday, October 01, 2015 7:49 AM |
| **To:** | St. Louis, Paul F MVR; Hunn, Matthew J MVS |
| **Cc:** | Delp, Rodney L MVR |
| **Subject:** | RE: DAPL Review Plan (UNCLASSIFIED) |
| | |
| **Categories:** | Red Category |

```
Classification: UNCLASSIFIED
Caveats: NONE

We aren't doing a project specific plan.  It is a district level review so it will follow the
district procedural review plan.

Bryan

-----Original Message-----
From: St. Louis, Paul F MVR
Sent: Wednesday, September 30, 2015 3:21 PM
To: Hunn, Matthew J MVS; Dirks, Bryan J MVS
Cc: Delp, Rodney L MVR
Subject: DAPL Review Plan (UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: NONE

Hi Matt and Bryan,

Will you please send me your 408 review plan for the DAPL project?

Thanks,

Paul F. St. Louis
United States Army Corps of Engineers
Desk: 309-794-5208
Cell: 309-781-0182


Classification: UNCLASSIFIED
Caveats: NONE


Classification: UNCLASSIFIED
Caveats: NONE
```

1

USACE_DAPL0000084



**DEPARTMENT OF THE ARMY**
OFFICE OF THE ASSISTANT SECRETARY
CIVIL WORKS
108 ARMY PENTAGON
WASHINGTON DC 20310-0108

JUL 2 5 2016

Mr. John M. Fowler
Executive Director
Advisory Council on Historic Preservation
401 F Street, NW, Suite 308
Washington, D.C.  20001-2637

Dear Mr. Fowler:

This is in response to your letter dated June 2, 2016, concerning the U.S. Army Corps of Engineers compliance with Section 106 of the National Historic Preservation Act (Section 106) and associated effects determinations of "No Historic Properties Affected" and "No Adverse Effect" for the Corps undertakings associated with the Dakota Access Pipeline Project (DAPL). Elements of the DAPL require Department of Army authorization pursuant to Section 10 of the Rivers and Harbors Act (Section 10) and/or Section 404 of the Clean Water Act (Section 404), and permission pursuant to Section 14 of the Rivers and Harbors Act (Section 408).

It is the Council's opinion that the Corps effects determinations are incorrect and so you have requested that I, as the head of the agency, take into account the Council's opinion, in accordance with 36 C.F.R. § 800.4(d)(1)(iv)(B) and 36 C.F.R. § 800.5(c)(3)(ii)(A), prior to reaching any final decisions. I have fully considered your advisory comments and recommendations, which I discuss further in the enclosure.

After consideration of your letter and further review of the actions taken by the Omaha District, Rock Island District, and St. Louis District Commanders to comply with Section 106, the determinations of "No Historic Properties Affected" and "No Adverse Effect" as made by the Corps prior to the date of your letter are affirmed. As such, per 36 C.F.R. § 800.4(d)(1)(iv)(C) and 36 C.F.R. § 800.5(c)(3)(ii)(B), with the submission of this letter to your office, the State Historic Preservation Office, and other consulting parties, the Corps responsibilities for these undertakings under Section 106 are fulfilled, with details provided in the enclosure.

If you have additional questions, please contact Mr. Chip Smith, Assistant for Environment, Tribal, and Regulatory Affairs, at (703) 693-3655 or Charles.R.Smith567.civ@mail.mil.

Very truly yours,

Jo-Ellen Darcy
Assistant Secretary of the Army
(Civil Works)

Enclosure

USACE_DAPL0000085

Enclosure:  ASA(CW) CONSIDERATION OF ACHP COMMENTS

**The purpose of this enclosure is to provide more detail to respond to ACHP Comments and the ASA(CW) determination.**

**Section 10/Section 404 Undertaking and Area of Potential Effects.**
I understand that ACHP is of the opinion that agencies are responsible for evaluating impacts associated with the "larger undertaking." The Corps disagrees. Under 36 CFR 800.3(a), a federal agency must determine if "the proposed federal action is an undertaking." For purposes of the Corps Regulatory Program, and in the case of the proposed DAPL, the federal actions are the pending decisions regarding verification of the applicant's Pre-Construction Notifications (PCNs) for Nationwide Permit #12 for Utility Lines at separate and distant waterbody crossings, which are subject to Corps jurisdiction pursuant to Section 10 and Section 404. Each of these separate federal actions are undertakings, and the Corps Regulatory Program utilizes 33 CFR 325 Appendix C to comply with Section 106. The definition of undertaking under both ACHP's and the Corps regulations is consistent.

The Corps also understands the ACHP disagrees with the Corps delineation of the area of potential effect (APE) for these particular undertakings. Again, ACHP asserts that the Corps is responsible for defining the APE based on a "larger undertaking." Rather, the districts appropriately determined the APE based on the activities being considered for verification under Nationwide Permit #12, i.e. the undertakings. Please note, although the Corps does not use the term APE in its regulations, our evaluation includes both the permit area and indirect effects outside the permit area, which is equivalent to the APE.

The ACHP is of the opinion that the Corps violated procedural steps by consulting on each of the separate undertakings instead of consulting on what ACHP believes is a single undertaking. I disagree with that opinion for the reasons explained above. Further, the Corps has an obligation to consult in a timely manner on each of its undertakings and initiated consultation as information became available regarding each undertaking. The Corps was still cognizant of the fact that there were numerous undertakings that required consultation, which had workload implications for all parties involved. In order to ease that burden, the Corps made every effort to consolidate consultation requests to the extent the agency was able. The Corps fully complied with all procedural steps regarding the consultation process for each undertaking.

The ACHP has asked the Corps to "consider the overall level of federal involvement in relationship to this undertaking" and suggested "the involvement of the Corps, US Fish and Wildlife Service, and the Farm Service Agency provides the basis for the federal agencies to consider further their obligation to take into account the effects of the larger undertaking on historic properties." The Corps has considered this and has coordinated with other federal agencies to determine the level of federal involvement. Approximately 3% of the total pipeline is subject to the Corps jurisdiction. It is the Corps understanding that the federal involvement by the Farm Service Agency and the United States Fish and Wildlife Service results in actions that comprise very small percentages as well. Cumulatively, these limited federal actions do not provide sufficient support to federalize an essentially private action nor, by extension, consider the entire project a federal undertaking subject to Section 106. Further, there is no overlap of the Corps' PCNs for Nationwide Permit #12 with the other agencies' undertakings. Under these circumstances there is no compelling reason for one

ASA(CW) CONSIDERATION OF ACHP COMMENTS

agency to exercise the option to act as the lead for the Section 106 consultations or to develop a comprehensive Programmatic Agreement (PA) to coordinate each agency's Section 106 compliance.

## Section 10/Section 404 Tribal Consultation and Identification Effort

The ACHP has expressed the opinion that the Corps has not adequately consulted with federally recognized Tribes "in the development of the scope of the effort to identify and evaluate historic properties" and in the "assessment of eligibility and effects on properties of religious and cultural significance." The ACHP has also stated the "Corps appears to have focused only on archaeological sites in PCN areas and consideration of their eligibility for inclusion on the National Register of Historic Places under Criterion D". Finally, the ACHP has expressed the opinion that "the Corps has not engaged appropriately with the tribes in order to identify Traditional Cultural Properties (TCPs) such as this and other properties of religious and cultural significance to tribes."

I have previously clarified the Corps undertakings and APEs. For the portions of the DAPL project that are Corps undertakings, i.e. PCNs, and in recognition of the Tribes' special expertise, the Corps had taken specific steps to identify Tribes who may want to be involved in our efforts to identify historic properties, including sites of religious and cultural significance. Those Tribes were notified and invited to participate in the Section 106 process and to provide information. They were also provided cultural resource survey information for the entire pipeline in mid-December 2015, and afforded reasonable review periods. Along with individual consultation efforts for every Tribe accepting our request to consult, four dedicated consultation meetings were held with Tribes. At their request, Tribes were provided the opportunity to conduct surveys for portions of the areas subject to the Corps jurisdiction where access was granted by the land owner. While the Corps supports the applicant's efforts to gain access for tribal members to all the requested PCN locations, the Corps has no authority to mandate or require access to private property and cannot compel private land owners to permit access by Tribal members. The Corps districts are currently working with the applicant and Tribes to develop a tribal monitoring plan in order to effectively respond to any potential inadvertent discoveries at PCN locations during construction.

## Omaha District – Section 10/Section 404

The following outlines additional actions taken by the Omaha District on the PCNs subject to Section 10/Section 404.

The Omaha District is reviewing a total of 13 PCNs, 2 in North Dakota and 11 in South Dakota. This includes three Section 10 crossings. By letter dated May 13, 2016, the Omaha District provided the South Dakota SHPO, Tribes, and ACHP its determinations of "no effect" (a term which is commonly used as an abbreviated version of "no historic properties affected"), as applicable, for all but one PCN in South Dakota (referred to as PCN #3). The district received comments from the South Dakota SHPO and three Tribal Chairmen and Tribal representatives. None of these comments specifically objected to the Corps' effects determinations for the PCNs, but, rather, disagreed generally with the Corps

- 2 -

USACE_DAPL0000087

ASA(CW) CONSIDERATION OF ACHP COMMENTS

compliance with Section 106 for reasons similar to those outlined in your letter, e.g. definition of undertaking and APE, and which I have already addressed in my response.

For two PCNs in North Dakota the Omaha District also followed the consultation process outlined in the *Programmatic Agreement for the Operations and Management of the Missouri River Main Stem System for Compliance with the National Historic Preservation Act, as amended (MRPA)* to meet its Section 106 responsibilities. Using the MRPA consultation process the Corps reached out to both signatory and non-signatory Tribes and their representatives, sharing information, seeking input and offering an opportunity to participate in the determination. The MRPA consultation process was initiated in October 2014, with an information letter regarding preliminary geotechnical testing for the Oahe crossing alignment location. Per the MRPA consultation process, this letter was sent to Tribes and their representatives, North Dakota and South Dakota SHPOs, agencies and interested parties, including the ACHP, soliciting information relevant to this portion of the project. Subsequently, the same process was used in circulating information and pertinent data for the two PCNs in North Dakota in a letter distributed in July 2015. In addition to the letters, the Corps made numerous attempts to contact by phone, e-mail or other methods those Tribes that requested more information or consultation. Omaha District has previously provided an early version of the administrative record to your agency for review. In a letter dated April 22, 2016, the Omaha District provided its effects determinations and rationale to the ACHP. The North Dakota SHPO concurred with those determinations on April 26, 2016.

By letter dated June 17, 2016, the Omaha District provided the South Dakota SHPO, Tribes, and ACHP its determination of "no effect" for the remaining one PCN (PCN #3) location in South Dakota. Because this determination was made following my receipt of your June 2, 2016 letter, this determination was not elevated to me and will continue to be addressed by the District.

## Omaha District - Section 408

The following outlines additional information to address ACHP's concerns and actions undertaken by the Omaha District for Section 408.

### Undertaking and Area of Potential Effects
33 USC 408 (Section 408) prohibits the use, occupation or alteration of federal navigation or flood control works without prior permission from the Secretary of the Army or his designee. Section 408 permission may only be granted if such use, occupation or alteration would not be injurious to the public interest and would not impair the usefulness of the federal project. Section 408 applies to alterations proposed within the lands and real property interests identified and acquired for the Corps project and to lands available for Corps projects under the navigation servitude. The DAPL project crosses two areas over which the Corps has a real property interest (flowage easement and fee title lands) within the Omaha District boundaries and for which it conducted Section 408 reviews and prepared an environmental assessment (EA). The total area of potential effects for the Section 408 reviews in the draft EA included jurisdictional lands and any immediate direct impacts associated with the pipeline crossing such as staging areas.

- 3 -

USACE_DAPL0000088

ASA(CW) CONSIDERATION OF ACHP COMMENTS

**Tribal Consultation and Identification Effort**

As previously discussed, the Omaha District consulted with the Tribes and solicited comments from Tribes and the public on the draft EA for the Omaha District 408 actions. In conjunction with Corps Omaha Regulatory, and detailed in the aforementioned Omaha District Section 10/Section 404 discussion on Tribal Consultation, the Corps held multiple meetings and site visits with Tribes. The Corps considered all comments received and modified the draft EA accordingly. Some of the revisions included expanding the EA to cover any connected action areas (e.g. preparation and testing areas of pipeline that would occupy lands with federal interest) and requiring robust spill prevention and response plans. The Corps Section 408 "no effect" determinations were made on April 22, 2016. The "no effect" determination letter was sent to both the Missouri River Programmatic Agreement (MRPA) signatories and non-signatories, North Dakota State Historic Preservation Office, and ACHP. Concurrence from the North Dakota State Historic Preservation Office was received on April 26, 2016. This process and coordination was guided by the MRPA, which was signed by a representative from the ACHP.

In the May 19, 2016 ACHP letter to Lieutenant General Thomas P. Bostick, referenced in your June 2, 2016 letter, you asked about identification of Traditional Cultural Properties (TCPs) and how the Corps addressed the Standing Rock Sioux Tribe (SRST) sacred site. As part of the consultation/compliance effort for the Missouri River crossing, Omaha District, Oahe Project cultural resources personnel reviewed previously completed TCP survey information (one study conducted by the SRST representative) in addition to recent information supplied directly by the SRST. None of these properties, including the aforementioned sacred sites, were located in areas of planned disturbance within the area of potential effects. Field visits conducted with SRST representatives provided no additional information to indicate the presence of TCPs in areas of planned disturbance within the area of potential effects. . No other Tribes identified any TCPs.

## Rock Island District- Section 10/Section 404

The following outlines actions in addition to joint efforts by Omaha, St. Louis, and Rock Island specifically taken by the Rock Island District on the PCNs subject to compliance with Section 10/Section 404.

The Rock Island District is reviewing a total of 108 PCNs, 63 in Iowa, and 45 in Illinois; this includes horizontal directional drilling (HDD) under two Section 10 waters, the Des Moines River and Mississippi River. As information became available regarding potential effects to historic properties from these PCNs, the Rock Island District provided the Illinois SHPO, the Iowa SHPO, and the ACHP its determinations of "no historic properties affected" and "no adverse effect," as applicable. The Rock Island District also coordinated these determinations with multiple Tribes. The district's effects determinations are appropriate because the applicant has been able to avoid impacting all identified historic properties through either construction re-design and/or rerouting. For the PCNs in Illinois, the Illinois SHPO concurred with the Corps effects determination and Tribal concerns have also been resolved.

- 4 -

USACE_DAPL0000089

ASA(CW) CONSIDERATION OF ACHP COMMENTS

The district received requests from the Iowa SHPO for additional survey work at 19 PCN locations in Iowa.   The district reviewed these requests and ultimately required the applicant to conduct additional survey work at seventeen PCN locations, the results of which reaffirmed that no historic properties were present.  For two other PCN locations, the Corps determined additional survey work would not be required, but to further demonstrate a reasonable and good faith effort, the district is requiring archaeological monitoring during construction at those sites.

The district also received requests from the Upper Sioux Community to conduct additional tribal survey work at various locations.  The district was able to work with DAPL to obtain landowner permission at some, but not all, of the locations.  The Upper Sioux Community provided to the district a copy of their survey results for the sites they were able to access, and the Tribe's findings appear to further support the district's findings.

**Rock Island District- Section 408**
The Rock Island District is reviewing the alteration to the Mississippi River navigation channel under Section 408 as part of the DAPL pipeline.  This crossing also required authorization under Section 10.  Rock Island District determined, through consultation, that the activity would have no adverse effect on historic properties since the proposed pipeline would be drilled over 70 feet below the bottom of the river and would be re-routed to avoid potential impacts.  The Illinois SHPO concurred with this determination.  The district coordinated this determination with the Osage Nation, who also agreed.  In addition, there are no federal real estate interests at this crossing and there are no other Section 408 alterations within the Rock Island District.

**St. Louis District – Section 404/10**

The following outlines actions in addition to joint efforts by Omaha, St. Louis, and Rock Island specifically taken by the St. Louis District on PCNs subject to compliance with Section 10/ Section 404.

The St. Louis District is reviewing a total of 86 PCNs in Illinois under Section 404.  In addition, one PCN includes HDD under the Illinois River, a Section 10 water.  The district determined that certain PCNs would result in "no historic properties affected" or "no adverse effect" and consulted with the Illinois SHPO accordingly, combining consultation requests with the Rock Island District, when appropriate, in order to reduce the consultation burden on the Illinois SHPO.  Again, the district's effects determinations are appropriate because the applicant has been able to avoid impacting all identified historic properties through either construction re-design and/or rerouting.  In March 2016, the Illinois SHPO and ACHP were sent additional information supporting the district's effects determinations.  The Illinois SHPO concurred with the district's determinations.

USACE_DAPL0000090

ASA(CW) CONSIDERATION OF ACHP COMMENTS

In addition to the tribal notification and consultation previously described, in January 2016, the St. Louis District requested consultation with Tribes in the St. Louis area of responsibility and consulted with Tribes who accepted that request. Based on consultation with the Tribes, the St. Louis District's effects determinations did not change but the district will require tribal monitoring at those PCN locations where landowner permission has been received.

## St. Louis District – Section 408
The following outlines actions in addition to joint efforts by Omaha, St. Louis, and Rock Island specifically taken by the St. Louis District for compliance with Section 408.

The DAPL project crosses several areas where the Corps has a real property interest: the McGee Creek levee, the Coon Run levees, the Illinois River navigation channel, and the Carlyle Lake flowage easement. The St. Louis District is reviewing the alteration to these areas under Section 408. The Proposed Action Areas and Connected Action Areas included the areas of construction impact as well as areas with other impacts associated with the pipeline crossing such as staging areas and access roads. By letters dated March 21, 2016 and March 28, 2016, the St. Louis District provided the Illinois SHPO its determinations of "no effect" for the Section 408 Proposed Action Areas and Connected Action Areas. Consultation with the Illinois SHPO is complete. The Tribes were sent letters from the St. Louis District regarding the Section 408 areas in January and March of 2016 asking if they would like to enter into consultation on, or monitor any of the sites. No Tribe has indicated that they would like to enter into consultation or monitor the sites located at the Illinois River or the McGee Creek levee. The Osage Nation had concerns for one site in the flowage easement at Carlyle Lake and for three sites in the Coon Run levees. However, they stated verbally that they would not enter into consultation on any of these sites but would like to monitor placement of pipe at one site in the Coon Run levee Proposed Action Areas and Connected Action Areas. Tribal consultation is complete for all Section 408 areas and the Osage Nation will be informed when the HDD is occurring at the site they want to monitor and arrangements will be made for them to send a representative.

## Summary of ACHP Comment Consideration

The Corps determinations of "No Effect/No Historic Properties Affected" and "No Adverse Effect" are affirmed. The Corps has made a reasonable and good faith effort to identify historic properties that potentially would be affected by the proposed undertakings. The Corps has carried out extensive efforts to consult with Tribes and address their concerns. The Corps worked with the applicant, in good faith and to the best of its ability, to facilitate access to the PCN areas to allow Tribal surveys. As mentioned previously, there is no overlap of the Corps' PCNs with the other Federal agencies' undertakings. Under these circumstances there is no need for one agency to act as the lead for the Section 106 consultations or to develop a comprehensive Programmatic Agreement to coordinate each agency's Section 106 compliance. The Corps has fully complied with Section 106 of the National Historic Preservation Act.

- 6 -

USACE_DAPL0000091

DAKOTA ACCESS PIPELINE PROJECT



U.S. FISH AND WILDLIFE SERVICE
ENVIRONMENTAL ASSESSMENT
GRASSLAND AND WETLAND EASEMENT CROSSINGS

May 2016

USFWS_DAPL0002449

# TABLE OF CONTENTS

1.0     PROJECT INTRODUCTION .................................................................................. 5

2.0     PURPOSE AND NEED.......................................................................................... 7

2.1     Scope of Analysis.......................................................................................... 7

3.0     PROJECT SUMMARY ......................................................................................... 7

3.1     Project Construction ..................................................................................... 12

3.2     Project Timeline ........................................................................................... 12

4.0     ALTERNATIVES .................................................................................................. 13

4.1     Route Alternatives Considered.................................................................... 13

4.1.1     Route Alternative 1 ............................................................................ 13

4.1.2     Route Alternative 2 (Preferred) ........................................................ 13

4.2     Alternatives Considered and Dismissed ..................................................... 15

4.2.1     No Action Alternative ....................................................................... 15

4.2.2     System Alternatives .......................................................................... 15

4.2.3     Trucking Transportation Alternative ................................................ 15

4.2.4     Rail Transportation Alternative ........................................................ 16

5.0     AFFECTED ENVIRONMENT ............................................................................. 17

5.1     Grassland Easements .................................................................................... 17

5.2     Wetland Easements ....................................................................................... 18

6.0     RESOURCES WITHIN AFFECTED ENVIRONMENT ..................................... 19

6.1     Vegetation ..................................................................................................... 19

6.2     Water Quality ................................................................................................ 20

6.3     Air Quality .................................................................................................... 20

6.4     Threatened and Endangered Species............................................................ 21

6.5     Cultural Resources ........................................................................................ 28

7.0     MITIGATIVE MEASURES.................................................................................. 31

8.0     POTENTIAL FUTURE IMPACTS FROM OPERATIONS ................................. 33

9.0     CUMULATIVE EFFECTS ................................................................................... 33

9.1     Vegetation ..................................................................................................... 34

9.2     Water Quality ................................................................................................ 34

9.3     Air Quality .................................................................................................... 34

9.4     Threatened and Endangered Species............................................................ 34

USFWS_DAPL0002450

9.5     Cultural Resources ............................................................................................... 35

10.0    COORDINATION AND CONSULTATION ................................................................ 35

    10.1    USFWS Section 106 Consultation ............................................................. 37

    10.2    Public Comments Considered ..................................................................... 39

    10.3    List of Preparers and Agencies Consulted................................................. 40

REFERENCES ...................................................................................................................... 42

## LIST OF TABLES

Table 4-1 USFWS Wetland Management Districts Crossed by the Dakota Access Pipeline
        Project ................................................................................................................... 14

Table 6-1 Federally Threatened and Endangered Species within the Dakota Access North Dakota
        and South Dakota USFWS Easements Project Area ........................................... 22

Table 6-2 Archaeological Sites Revisited in North Dakota............................................... 30

Table 6-3 Archaeological Sites and Historical Structures Identified................................. 31

Table 10-1 Dakota Access Pipeline Project Environmental/Regulatory Permits........................ 35

Table 10-2 List of Preparers and Reviewers..................................................................... 40

## LIST OF FIGURES

Figure 1.  Vicinity Map of Project area. ............................................................................. 6

Figure 2.  USFWS Easement Density Map of North Dakota and South Dakota with Project
        centerline................................................................................................................ 9

Figure 3.  North Dakota USFWS Easements Overview within Project Area............................. 10

Figure 4.  South Dakota USFWS Easements Overview within Project Area............................. 11

## LIST OF APPENDICES

Appendix A- List of Datasets Utilized in the GIS Routing Program for the Dakota Access
        Project; USFWS Easements Route Alternative Maps

Appendix B- North Dakota and South Dakota Project Maps with USFWS Easements; Air
        Bridge Sketch

Appendix C- Dakota Access Pipeline, Endangered Species Act Section 7 Consultation

USFWS_DAPL0002451

## ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| APEs | Areas of Potential Effects |
| BMPs | best management practices |
| bopd | barrels of oil per day |
| cm | centimeters |
| Company | Energy Transfer Company |
| EA | Environmental Assessment |
| ESA | Endangered Species Act |
| FRP | Facilities Response Plan |
| GIS | Geographic Information System |
| HDD | horizontal directional drill |
| km | kilometers |
| L/R | launcher and receiver |
| m | meters |
| MP | milepost |
| NDHI | North Dakota Heritage Inventory |
| NHPA | National Historic Preservation Act |
| NPDES | National Pollutant Discharge Elimination System |
| NRHP | National Register of Historic Places |
| NWR | National Wildlife Refuge |
| PHMSA | Pipeline and Hazardous Materials Safety Administration |
| Project | Dakota Access Pipeline Project |
| ROW | right-of-way |
| SDNHP | South Dakota Natural Heritage Program |
| SHPO | State Historic Preservation Officer |
| SUP | Special Use Permit |
| T&E | threatened and endangered |
| USACE | U.S. Army Corps of Engineers |
| USFWS | U.S. Fish and Wildlife Service |
| WMD | Wetland Management District |

USFWS_DAPL0002452

## 1.0  PROJECT INTRODUCTION

Dakota Access, LLC (Dakota Access), is proposing to construct the Dakota Access Pipeline Project (Project). Dakota Access Pipeline− Energy Transfer Crude Oil Operations Management, LLC will operate the Project. The overall proposed Project is an approximate 1,150-mile-long, 12-inch to 30-inch diameter pipeline that would connect the rapidly expanding Bakken and Three Forks production areas in North Dakota to existing crude infrastructure in Illinois. The Project originates in the northwest portion of North Dakota and traverses southeast through South Dakota, Iowa, and Illinois and terminates at the existing Patoka, Illinois hub (Figure 1). The pipeline is proposed to transport approximately 450,000 barrels of oil per day (bopd) initially, with an anticipated capacity 570,000 bopd or more. Once the crude arrives at the existing tank farms in Patoka, shippers would be able to access and distribute their crude to multiple markets, including Midwest and Gulf Coast markets via existing and proposed pipeline infrastructure.

Dakota Access has secured binding long-term transportation and deficiency contracts from multiple committed shippers to support development of the Project with a crude oil transportation capacity of approximately 450,000 bopd, with ninety percent (90%) of the transportation capacity subscribed by those committed shippers and the remaining ten percent (10%) of the transportation capacity reserved for walk-up shippers. Transportation service on the Dakota Access Pipeline shall be provided by Dakota Access pursuant to the Interstate Commerce Act of 1887 in accordance with the rules and regulations of the Federal Energy Regulatory Commission (18 CFR Parts 341-349) for common carrier crude oil pipeline transportation service, and the Pipeline and Hazardous Materials Safety Administration (PHMSA) (49 CFR Parts 190-199) regulations thereunder. Subscriptions from committed shippers were obtained by Dakota Access in connection with an initial open season that ran from March 12 to May 23, 2014, and an expansion open season that commenced on September 23, 2014, and concluded in mid-December of 2014.

USFWS_DAPL0002453

DAKOTA ACCESS PIPELINE PROJECT



**Figure 1.  Vicinity Map of Project area.**

USFWS_DAPL0002454

## 2.0  PURPOSE AND NEED

The Project crosses regions in North Dakota and South Dakota that contain grassland and wetland easements managed by the U.S. Fish and Wildlife Service (USFWS) National Wildlife Refuge (NWR) System.   Ten USFWS wetland management districts (WMDs) are within the state of North Dakota and five districts are within South Dakota.   The proposed Project crosses two districts within North Dakota and four districts within South Dakota.   Dakota Access is in the process of acquiring permits from the U.S. Army Corps of Engineers (USACE) for crossing jurisdictional waters of the U.S., and the respective State public utility agencies to construct the Project.

This Environmental Assessment (EA) was developed specifically to address potential impacts to the USFWS wetland and grassland easements within the Project area.   A significant effort was made to avoid USFWS easements; however, due to the length of the project and the vast presence of easements in the area avoidance of all easements was not feasible.   This EA is in accordance with section 102(2)(C) of the National Environmental Policy Act (42 U.S.C. § 4321) and the National Wildlife Refuge System Administration Act of 1966, as amended (16 U.S.C. § 668dd-668ee), to obtain a Special Use Permit (SUP) to construct.   The permitting requirements and conditions are set forth in 50 CFR Part 29.

### 2.1  Scope of Analysis

The Project crosses both grassland and wetland easements within North Dakota and South Dakota.   Grassland easements are an agreement between the landowner and the USFWS to keep their land in grass and limit the time of year for mowing, haying and grass seed harvest.   Wetland easements are an agreement between the landowner and the USFWS to protect wetlands from being drained, leveled, filled, or burned.   The USFWS has jurisdiction of the surface of the grassland included in the boundary of the grassland easement and the USFWS defined wetland basins within the wetland easements.   Based on the USFWS jurisdiction, the scope of analysis within this EA is limited to the grassland easements and wetland basins crossed by the Project, which encompasses less than 1% of the total North Dakota and South Dakota Project area.

## 3.0  PROJECT SUMMARY

### North Dakota

Based on USFWS easement location data obtained by Dakota Access in July and November 2014, and February 2015, the North Dakota Project area is in an area of the state with a relatively low concentration of USFWS easements (Figures 2 and 3).   The Project in North Dakota totals approximately 358 miles of pipeline and six tank terminal sites.   There are two main underground pipeline components, the Supply Line (148 miles), which connects the six tank terminal sites, and the Mainline (210 miles).   The Project begins in Mountrail County and heads west through Williams County then continues in a southeast direction through McKenzie, Dunn, Mercer, Morton and Emmons counties.   The diameter of the pipeline increases incrementally at designated tank terminals from 12 inches to 20, 24 and ultimately 30 inches.

At the discharge site of the Johnson Corner tank terminal and pump station, the 30-inch diameter Mainline commences and heads into a generally southeast direction.   The Mainline portion of the Project within North Dakota is approximately 210 miles long before exiting the state in Emmons County.   In North Dakota, the Project traverses two WMDs; Lostwood and Long Lake.

USFWS_DAPL0002455

**South Dakota**

The eastern half of the state of South Dakota where the Project crosses has a high concentration of easements (Figures 2 and 4).   The Project enters South Dakota in Campbell County approximately 17 miles east of the Missouri River, and continues southeast through McPherson, Edmunds, Faulk, Spink, Beadle, Kingsbury, Miner, Lake, McCook, Minnehaha, Turner, and Lincoln counties for a combined total of approximately 272 miles.   The Project crosses the Big Sioux River approximately 14 miles south of Sioux Falls, and continues in a southeast direction through Iowa.   The Project spans four WMDs in South Dakota: Sand Lake, Huron, Madison, and Lake Andes.

USFWS_DAPL0002456

USFWS EA WETLAND AND GRASSLAND EASEMENTS                          DAKOTA ACCESS PIPELINE PROJECT



Figure 2.  USFWS Easement Density Map of North Dakota and South Dakota with Project centerline.

9

USFWS_DAPL0002457

USFWS EA WETLAND AND GRASSLAND EASEMENTS                    DAKOTA ACCESS PIPELINE PROJECT



**Figure 3.  North Dakota USFWS Easements Overview within Project Area.**

USFWS_DAPL0002458

USFWS EA WETLAND AND GRASSLAND EASEMENTS                    DAKOTA ACCESS PIPELINE PROJECT



**Figure 4.  South Dakota USFWS Easements Overview within Project Area.**

USFWS_DAPL0002459

## 3.1   Project Construction

### Pipeline

Construction of the new pipeline would require a typical construction right-of-way (ROW) width of 125 feet in uplands, 100 feet in non-forested wetlands, 85 feet in forested areas (wetlands and uplands), and up to 150 feet in agricultural areas.  Following construction, a 50-foot wide permanent easement would be retained along the pipeline.  Where necessary, Dakota Access would utilize additional temporary workspace outside of the construction ROW to facilitate specialized construction procedures, such as horizontal directional drills (HDD); railroad, road, wetland, waterbody, and foreign utility line crossings; tie-ins with existing pipeline facilities; areas with steep side slopes; and pipeline crossovers.

### Aboveground Facilities

In North Dakota, six tank terminals/pump stations are located along Supply Line in Mountrail, Williams and McKenzie counties.  There is only one pump station located within the state of South Dakota, in Spink County, approximately seven miles southeast of Redfield.  All tank terminals and pump stations have been sited outside of USFWS easements.

Valves used to isolate specific sections of pipeline and minimize crude release in the event of an emergency would be located throughout the pipeline, including 20 throughout the Supply Line in North Dakota, 25 throughout the Mainline in North Dakota, and 40 along the pipeline in South Dakota.  The permanent valve sites would be constructed within the 50-foot permanently maintained ROW, and be approximately 75-feet-long and 50-feet-wide.  The spacing intervals between the valves along the ROW are based upon the location of the high consequence areas, federal regulations, and permit requirements.  All valves would have remote actuators so that in the unlikely event of an emergency, these valves can be quickly activated from the operational control room to isolate sections of the pipeline to minimize environmental impacts.  All valves have been situated outside of USFWS grassland easements and USFWS protected wetland basins within USFWS wetland easements to avoid permanent impacts.

All pipeline segments will allow the passage of internal inspection devices (i.e. pig), which are capable of detecting internal and external anomalies in the pipe such as corrosion, dents, and scratches.  Pipeline internal inspection technology has improved significantly in recent years. Pig launcher/receivers (L/Rs) are designed to launch and receive internal inspection devices for routing maintenance during operation of the system.  A total of six L/Rs would be located along the pipeline within North Dakota (at four of the six tank terminal sites and two along the mainline), and a total of three L/Rs would be installed in South Dakota.  L/Rs are 200-feet-wide by 400-feet-long.  These L/R stations are not located within USFWS grassland easements or USFWS protected wetland basins within wetland easements to avoid permanent impacts.

## 3.2   Project Timeline

Dakota Access anticipates starting construction in the spring of 2016 as soon as applicable permits and approvals have been issued.  Commissioning of the facilities should occur in October 2016 for in-service by December 2016.  Restoration activities will continue as necessary to ensure proper restoration of the disturbed areas.

USFWS_DAPL0002460

## 4.0 ALTERNATIVES

### 4.1 Route Alternatives Considered

Dakota Access utilized a sophisticated and proprietary Geographic Information System (GIS) based routing program to determine the baseline pipeline route based on multiple publicly available and purchased datasets. Datasets utilized during the Project GIS routing analysis included engineering (e.g., existing pipelines, railroads, karst, and power lines, etc.), environmental (e.g., critical habitat, fault lines, state parks, national forests, brownfields, national registry of historic places, etc.), and land (e.g., dams, airports, cemeteries, schools, mining, and military installations, etc.).

Each of these datasets were weighted based on the risk (e.g., low, moderate, or high; however on a scale of 0 to 1000) associated with crossing or following certain features. Appendix A includes a list of every dataset utilized in the GIS routing program and the weight scale set for each dataset for the Project. In general, the preferred route for the pipeline would follow features identified as low risk, avoid or minimize crossing features identified as moderate risk, and exclude features identified as high risk. For example, the existing pipelines dataset was weighted as a low risk feature in the GIS routing program so that the routing tool followed existing pipelines to the extent possible to minimize potential impacts. An example of a high risk feature of the datasets utilized in the GIS routing program is the federally designated critical habitat dataset. Since federally designated critical habitat was weighted for this Project as high risk, the GIS routing program excluded any critical habitat from the baseline pipeline route to avoid impacts.

### 4.1.1 Route Alternative 1

Dakota Access obtained USFWS easement location data in July 2014 when identified during the Project fatal flaw analysis and initial coordination with the USFWS. The baseline centerline route (Route Alternative 1) (Appendix A) was the output of the GIS routing analysis described above in Section 4.1, and was submitted to the USFWS WMDs in September 2014 for initial review of grassland and wetland easements crossed by the pipeline based on the July 2014 easement location data. The baseline route crossed 131 USFWS easements (seven easements within North Dakota and 124 easements within South Dakota). Dakota Access and the lead USFWS WMD (Sand Lake WMD) had an intensive route review in October 2014 of the baseline route and easements crossed to determine avoidance and minimization. During this review, the USFWS made recommendations on avoiding and minimizing impacts to the easements crossed by the Project. Grassland easements were prioritized for avoidance. At the time of investigation of Route Alternative 1, the USFWS did not have field verified data on protected wetland basins within the wetland easements. However an attempt was made by the USFWS and Dakota Access to identify potential wetland basins within the wetland easements through desktop analysis. Extensive coordination and review identified areas where Dakota Access could make route modifications to avoid and minimize potential impacts to USFWS easements (Appendix A).

### 4.1.2 Route Alternative 2 (Preferred)

Route Alternative 2 (Appendix A) is the preferred route which is the result of incorporating route modifications based on USFWS avoidance and minimization recommendations of potential impacts to grassland and wetland easements of Route Alternative 1. The Project crosses an area

USFWS_DAPL0002461

in South Dakota with a high concentration of USFWS easements, compared to the relatively low concentration of easements within the North Dakota Project area (Figures 2, 3, and 4).  Due to the density of easements within the states of North Dakota and South Dakota (Figure 2), complete avoidance of crossing all USFWS easements was not feasible.

As stated above in Section 4.1.1, Route Alternative 1 crossed through seven easements within the Long Lake WMD, all located within Emmons County, North Dakota.  Since these easement locations were identified early on in the design phase of the Project, Dakota Access was able to adjust the centerline route and avoid all easements in North Dakota (located in the Long Lake WMD).  Route Alternative 1 crossed 131 USFWS easements, through the route modifications discussed above in Section 4.1.1 Dakota Access reduced the number of easements crossed by the preferred route to 112 easements (three grassland easements and 109 wetland easements) in South Dakota.  Potential impacts to wetland basins were determined through desktop analysis as stated in Section 4.1.1.  Since the USFWS had not field verified wetland basins at the time of Route Alternative 1 modifications, wetland basin impacts minimized by route modifications incorporated into the preferred route are unaccounted.

Updated easement data for the Project area acquired in February 2015 disclosed six new easements that would be crossed within the Lostwood WMD in North Dakota.  The six new easements consist of five wetland easements and one grassland easement.  At the time this easement data was acquired, Dakota Access was unable to route the pipeline around these easements.  The newly identified easements make the total easements crossed by the preferred route within North Dakota and South Dakota 118 (one grassland easement and five wetland easements within North Dakota and three grassland easements and 109 wetland easements within South Dakota).  The counties crossed within the USFWS WMDs, miles of pipeline within the WMDs, and the number of easements crossed within each WMDs for the preferred route is outlined in Table 4-1 below.

| Table 4-1<br>USFWS Wetland Management Districts Crossed by the Dakota Access Pipeline Project ||||
|---|---|---|---|
| Wetland Management District | Counties Crossed Within the District | Approximate Miles Crossed within WMD | Number of Easements[1] Crossed Within Each WMD |
| **North Dakota** ||||
| Lostwood | Mountrail and Williams | 98.2 | 6 |
| Long Lake | Emmons | 45.7 | 0 |
| **South Dakota** ||||
| Sand Lake | Campbell, McPherson, Edmunds, Faulk, and Spink | 136.0 | 99 |
| Huron | Beadle | 30.2 | 0 |
| Madison | Kingsbury, Miner, Lake, McCook, and Minnehaha | 81.5 | 13 |
| Lake Andes | Turner and Lincoln | 25.7 | 0 |
| [1] Numbers represent easement tracts crossed, not jurisdictional crossings. ||||

While Dakota Access was unable to reroute completely around four (one in North Dakota and three in South Dakota) grassland easements due to constructability limitations, USFWS recommended avoidance of the grassland easements, therefore Dakota Access adjusted the proposed construction techniques at the grassland easements (i.e. bore or HDD).  Therefore all surface impacts to grassland easements are avoided by the preferred route.

USFWS_DAPL0002462

The preferred route most closely meets the objectives of the Project, while minimizing potential impacts to the environment and USFWS easements. Dakota Access has coordinated with the USFWS throughout the Project design phase to avoid and minimize potential impacts to USFWS grassland and wetland easements. Additional details on the preferred route and potential impacts to grassland and wetland easements are provided in Section 5.0.

## 4.2    Alternatives Considered and Dismissed

The following alternatives were considered but immediately dismissed due to the reasons described below for each alternative.

### 4.2.1    No Action Alternative

The proposed Project would not be built if the "no action" alternative were pursued. The "no action" alternative would not provide the infrastructure necessary to transport light sweet crude oil to refining facilities. In northwest North Dakota, exploration and production of oil is a major economic activity, with crude oil production being the primary mineral resource of interest. Although the "no action" alternative itself would not incur environmental impacts, it would also not address the existing demand to transport crude oil to refining facilities, likely leading to alternative pipeline project development proposals.

### 4.2.2    System Alternatives

The parent company of Dakota Access, Energy Transfer Company (Company) is one of the largest and most diversified investment grade limited partnerships in the United States with approximately 71,000 miles of pipeline assets today (Energy Transfer, 2014). The Company and its partners have a presence in more than half of the contiguous United States; however, the Company does not own or operate any existing facilities in North or South Dakota. The Project will be the Company's first asset in the Dakotas. For this reason, the manipulation of operating pressures to increase transport capacity in pipelines or altering existing infrastructure to increase storage and transport capacity are not viable options to meet the Project's objectives or shippers' demands.

### 4.2.3    Trucking Transportation Alternative

Currently, due to a lack of transport capacity in the Williston Basin, approximately 1% of the crude oil is moved via truck (Kringstad, 2014). While trucking is instrumental in the gathering and distribution of crude on a limited scale, trucking as an alternative for transporting the volume of crude oil the distances planned for the Project is not viable. Factors such as road safety, roadway capacity, and a lack of reliability due to seasonal constraints, in addition to other logistical issues involving availability of labor force, trailer truck capacity, and economics, all contribute to truck transportation not being a realistic alternative.

A sharp increase in traffic on North Dakota roads as a result of the rapid expansion in the number of commercial trucks linked to the oil industry speaks to the issues associated with road safety. In 2012, the Federal Motor Carrier Safety Administration reported a traffic fatality rate in North Dakota of 0.48 per million vehicle miles traveled, with 48 deaths involving a bus or large truck, far surpassing any other state (U.S. Department of Transportation, 2014). In the pre-boom years of 2001 to 2005, there was an average of only 13 annual deaths involving commercial trucks. Furthermore, the economic cost of severe truck crashes has more than doubled between 2008 and 2012. Much of the increase in the fatality rate can be attributed to the energy production boom,

USFWS_DAPL0002463

along with the fact that the state's infrastructure still consists of single-lane, rural, and unpaved roads in many areas (Bachman, 2014). Harsh winter weather and seasonal road restrictions compromise the reliability of truck transportation even further.

To meet shippers' demands, Dakota Access plans to transport 450,000 bpd approximately 1,150 miles across four states. A pipeline is a safer and more economical alternative than trucking for the volumes transported and distances covered by the Project. Assuming the average oil tanker truck is capable of holding about 220 barrels of oil, the transportation of 450,000 bpd would require a total of 2,045 (450,000/220) full trucks to depart the proposed tank terminals daily; more than 85 (2,045/24) trucks would have to be filled every hour with a 24-hour/day operation. Time spent in transit, loading/offloading, and additional time for maintenance would add to the number of trucks needed to offset for the Project.

Analysis of infrastructure considerations (the burden of thousands of additional trucks on county, state, and interstate highways, as well as the loading and offloading facilities that would have to be constructed), economic considerations (e.g., labor costs, purchase and maintenance of hauling equipment, fuel, public infrastructure, etc.), and reliability considerations (e.g., weather, mechanical, manpower, road closures) all contribute to making the truck transportation alternative unviable.

### 4.2.4   Rail Transportation Alternative

Reliance on rail as a transportation method in the Williston Basin has drastically increased in recent years, carrying a negligible percentage of the overall market share as recently as 2010 to nearly 60% of the overall market share by mid-2014 (Kringstad, 2014). The rise in the use of rail as a primary transportation method has been driven in large part by the rapid increase in production of crude oil coupled with a lack of pipeline capacity to account for additional supplies.

Negative impacts from the growth in popularity of rail as a method of long-distance transportation of crude oil include delays that disrupt the agricultural sector, reductions in coal-fired power plant inventories, and significant production issues in the food production industry. In August 2014, reports filed with the federal government indicated that the Burlington Northern Santa Fe Railway had a backlog of 1,336 rail cars waiting to ship grain and other products while Canadian Pacific Railway had a backlog of nearly 1,000 cars (Nixon, 2014). For industries, such as those listed, in which the use of pipelines is not an option the only viable alternative would be increased reliance on trucking, which would exacerbate some of the issues listed in the section above.

Assuming a carrying capacity of 600 barrels per car, a total of 750 rail cars would be required to depart the tank terminal daily to transport 450,000 barrels of crude oil to its final destination. Loading and offloading 750 rail cars in a day would require servicing more than 31 rail cars per hour. With an assumption of 125 rail cars per train, 6 trains would have to depart the tank terminal every day; with 10 to 12 trains currently leaving the state per day carrying Bakken crude, the Project would represent a 50 to 60% increase in the number of trains transporting crude oil out of the state, likely exacerbating issues with delays (Howarth and Owings, 2014).

Rail operations on the scale of the Project do not exist in the United States. An oil-by-rail facility designed to handle an average of 360,000 bpd has been proposed in the Port of Vancouver, Washington. Known as the Vancouver Energy proposal, the project would be the

USFWS_DAPL0002464

largest rail terminal in the country (Florip, 2014). A rail transportation alternative to handle the volumes of the Project would require the design and construction of 125 to 158% of that of the Vancouver Energy proposal.

From a safety standpoint, railroad transport consistently reports a substantially higher number of transportation accidents than pipelines (USDOT, 2015). A series of major accidents taking place in 2013 to 2014 in Canada and the United States has heightened concern about the risks involved in shipping crude by rail (Fritelli, 2014).

While rail tanker cars are a vital part of the short-haul distribution network for crude oil, pipelines are a more reliable, safer, and more economical alternative for the large volumes transported and long distances covered by the Project. As such, the rail transportation alternative is not considered a viable alternative.

## 5.0  AFFECTED ENVIRONMENT

The Project crosses both grassland and wetland easements within North Dakota and South Dakota. Grassland easements are an agreement between the landowner and the USFWS to keep their land in grass and limit the time of year for mowing, haying and grass seed harvest. Wetland easements are an agreement between the landowner and the USFWS to protect wetlands from being drained, leveled, filled, or burned. Both grassland and wetland easements are to provide and protect waterfowl habitat, and other wildlife that utilize similar habitats. In addition to habitat, these easements aim to protect the functions and values that these habitats provide to the surrounding areas.

## 5.1  Grassland Easements

As stated previously, initial coordination between USFWS and Dakota Access identified avoidance of grassland easements as priority. Dakota Access adjusted the Project alignment to avoid crossing all grassland easements, except for three within South Dakota and one within North Dakota.

The three South Dakota grassland easements are located in Campbell County at milepost (MP) 235.3, Spink County at MP 330.2, and one in Minnehaha County at MP 438.5 (Appendix B, pages 12, 42, and 51). However, due to USFWS concerns regarding potential impacts to the grassland easements, Dakota Access changed the proposed construction methods at these crossings to avoid surface disturbance and potential impacts. The grassland easements in Campbell (MP 235.3), Spink (MP 330.2), and Minnehaha counties (MP 438.5) are crossed at the corner of the easement tracts and adjacent to road crossings. Dakota Access modified the construction methods at these three locations and plans to bore under the road and continue the bore under the grassland easement to avoid surface impacts. Therefore, impacts to these three grassland easements identified early in the design phase within South Dakota will be avoided.

An additional grassland easement was identified in the February 2015 USFWS easement data located in Mountrail County, North Dakota at Supply Line MP 12.3 (Appendix B, page 6). This grassland easement is large in size and no reasonable route around it is available; however, through coordination with the USFWS, Dakota Access has adjusted the centerline to route through the shortest distance of the grassland easement, and proposes to cross this easement via HDD. Due to the size of this easement, transporting equipment across the easement to facilitate construction of the Project is required. To minimize potential impacts to the grassland easement, Dakota Access will install air bridge matting (Appendix B, page 53 includes an air bridge sketch)

USFWS_DAPL0002465

to be utilized as the designated travel lane for construction equipment. The air bridge travel lane will be located on an existing two-track road, approximately 250 feet north of the centerline. The use of air bridge matting will avoid potential soil compaction and ruts from equipment transport. Therefore, no adverse surface impacts to this grassland easement will result from the Project.

All surface impacts to grassland easements in North Dakota and South Dakota have been avoided by route modifications or construction methods.

## 5.2   Wetland Easements

Throughout the design and permitting process, Dakota Access coordinated with the USFWS to minimize crossing wetland easements to the extent practicable. As stated previously in Section 4.1.2, all easements were completely routed around and avoided within North Dakota initially. However, the February 2015 easement data revealed five new wetland easements within the Project area on the Supply Line in North Dakota. The five wetland easements within North Dakota have been verified (through both field and desktop reviews) by the USFWS, and electronic files of these wetland basins were provided to Dakota Access. Four of the five wetland easements crossed contain protected wetland basins (11 wetland basins within Project footprint) within the Project area, and total approximately 2.5 acres of protected wetland basins to be temporarily impacted by the Project within North Dakota (Appendix B, pages 3-8).

The USFWS field verified all wetland basins within easements within South Dakota and provided electronic files of these wetland basins to Dakota Access. This data was utilized to further minimize potential impacts of the preferred route to wetland basins through Project design to the extent practicable, which is illustrated in Appendix B (pages 9-52) mapping.

In South Dakota, the preferred route crosses 109 wetland easements with approximately 200 wetland basins field verified by the USFWS within the Project area (Appendix B, pages 9-52). Draft workspace in February of 2015 avoided approximately 36 of these basins. Utilizing the USFWS field verified wetland basins data; Dakota Access further edited workspace and was able to avoid an additional 18 basins. This avoidance and minimization through Project design reduced the total number of basins crossed to 146. At approximately 40 of the 146 wetland basin locations Project delineated wetlands, based on the Regional Supplements to the Corps of Engineers Wetland Delineation Manual: Great Plains and Midwest Regions (USACE, 2010) and the routine determination guidelines provided in the USACE Wetland Delineation Manual (Technical Report Y-87-1), matched with the USFWS wetland basins. Potential impacts at these locations were minimized through reduction in workspace (i.e. neckdown the construction corridor width from 150 feet to 100 feet), therefore minimizing impacts to these areas. Of the 109 wetland easements crossed in South Dakota, the Project crosses protected wetland basins at only 60 of the wetland easements. Wetland basins were avoided at the remaining 49 wetland easement crossed by the Project. Incorporating the avoidance and minimization of all wetland basins within South Dakota, Project construction would temporarily impact a total of approximately 69.3 acres of wetland basins within USFWS easements through construction.

Total temporary impacts to wetland basins within USFWS easements in North Dakota and South Dakota is 71.8 acres. The total temporary impacts to the wetland basins (71.8 acres) would be less than 0.6 percent of the entire North Dakota and South Dakota Project footprint.

USFWS_DAPL0002466

## 6.0  RESOURCES WITHIN AFFECTED ENVIRONMENT

The following sections evaluate the resources and potential impacts within the affected environment within the scope of this EA; including vegetation, water quality, air quality, threatened and endangered species, and cultural resources.  Each section includes a conclusion on potential impacts to the resources discussed.

### 6.1  Vegetation

Vegetation community types that occur within the affected environment were identified, described, and delineated based on field activities and aerial photography.  The vegetation communities crossed within the affected environment include agriculture, native grassland, and wetlands.  Dominant species identified within the grassland easement in North Dakota included Kentucky bluegrass (*Poa pratensis*), smooth brome (*Bromus inermis*), crested wheatgrass (*Agropyron cristatum*), little bluestem (*Schizachyrium scoparium*), western snowberry (*Symphoricarpos occidentalis*), and prairie rose (*Rosa arkansana*).  Dominant species within the grassland easements crossed in South Dakota included Kentucky bluegrass, smooth brome, yellow sweetclover (*Melilotus officinalis*), intermediate wheatgrass (*Thinopyrum intermedium*), and curlycup gumweed (*Grindelia squarrosa*).  Dominant wetland vegetation identified within the wetland basins in North Dakota included broadleaf cattail (*Typha latifolia*), prairie cordgrass (*Spartina pectinata*), foxtail barley (*Hordeum jubatum*), sedge (*Carex* sp.), slimstem reedgrass (*Calamagrostis stricta*), water smartweed (*Persicaria amphibia*), and reed canarygrass (*Phalaris arundinacea*).  The dominant species identified within the South Dakota wetland basins included prairie cordgrass, spikerush (*Eleocharis* sp.), foxtail barley, sedge, rough barnyardgrass (*Echinochloa muricata*), American water plantain (*Alisma subcordatum*), and swamp smartweed (*Polygonum hydropiperoides*).  Upland vegetation including Kentucky bluegrass, smooth brome, alfalfa and agricultural crop (soybeans) were also identified within the South Dakota USFWS wetland basins.

Temporary impacts to vegetation will occur during construction.  To protect the terrain of the Project area, Dakota Access will restore the areas affected by pipeline construction to pre-construction contours, mitigation measures to limit disturbance of vegetation within grassland and wetland easements are discussed further in Section 7.0.

### Noxious Weeds

The state of North Dakota has 11 state listed noxious and invasive weeds.  The species listed are: Russian knapweed (*Acroptilon repens*), absinth wormwood (*Artemisia absinthium*), musk thistle (*Carduus nutans*), diffuse knapweed (*Centaurea diffusa*), yellow toadflax (*Linaria vulgaris*), spotted knapweed (*Centaurea maculosa*), Canada thistle (*Cirsium arvense*), leafy spurge (*Euphorbia esula*), dalmatian toadflax (*Linaria dalmatica*), purple loosestrife (*Lythrum salicaria*), and saltcedar (*Tamarix chinensis*).  These state invasive species are regulated under North Dakota Law (North Dakota Century Code § 4.1-47-02).

The South Dakota state noxious weed list is found in South Dakota Codified Law (Chapter 38-22).  There are currently seven noxious weeds on the state list, which include Russian knapweed, whitetop (*Cardaria draba*), Canada thistle, leafy spurge, purple loosestrife, saltcedar, and perennial sowthistle (*Sonchus arvensis*).  Under the law, it is a landowner's legal responsibility to manage noxious weeds on their lands.  Local county governments have the responsibility for the implementation and enforcement of weed management.

USFWS_DAPL0002467

Construction activities resulting in surface disturbance may contribute to the spread of noxious weeds.  Noxious weeds have the potential to increase in disturbed areas along the ROW where construction occurs.  Mitigation measures to limit disturbance of vegetation are discussed further in Section 7.0.

## 6.2   Water Quality

Dakota Access has submitted Nationwide Permit 12 Pre Construction Notifications to the USACE for authorization to discharge fill within USACE jurisdictional wetlands and waterbodies under Sections 404/401 of the Clean Water Act.  Additionally, specialized methods for crossing wetlands and waterbodies including expedited timing for construction and restoration and implementation of erosion control devices are utilized to minimize impacts within and adjacent to the wetland basins, these are discussed further in Section 7.0.  Further, Dakota Access will acquire any required state and local water quality permits to construct the Project.  Therefore, impacts beyond direct, temporary construction impacts to water quality due to the Project are not anticipated.

PHMSA administers the national regulatory program to ensure safe transportation of crude oil and other hazardous materials by pipelines.  PHMSA develops safety regulations and risk management approaches to encompass safety in pipeline design, construction, testing, operation, maintenance, and pipeline facilities emergency response.  Dakota Access has asked for no waivers from PHMSA for the construction and operation of the pipeline.  Dakota Access will meet or exceed all federal laws and regulations.

PHMSA prescribes pipeline design and operational requirements that limit the risk of accidental crude oil releases from pipelines.  Dakota Access will submit a Project-specific Facilities Response Plan (FRP) prior to operation to PHMSA for approval in accordance with applicable regulations.

In the unlikely event of a pipeline release, Dakota Access will initiate its FRP to contain and clean up the spill.  To minimize impacts to aquatic resources, appropriate remedial measures will be implemented to meet federal and state standards designed to ensure protection of aquatic biota.

Compliance with federal regulations, the location of valves, spill containment measures, and the FRP will minimize adverse effects to public safety and to the environment.  PHMSA promulgates and enforces federal pipeline safety standards for hazardous liquids pipelines at 49 CFR Parts 194 and 195.  These regulations are intended to ensure public protection and to prevent accidents and failures.  49 CFR Part 195 specifically addresses petroleum pipeline safety issues and specifies material selection, qualification, minimum design requirements; and protection from internal, external, and atmospheric corrosion.

In conclusion, wetland and waterbody construction crossing methods, implementation of erosion control devices, and PHMSA requirements would minimize potential impacts to water quality from construction and operation of the Project.

## 6.3   Air Quality

Air quality impacts within the scope of this EA include potential air emissions during construction.  Potential emissions during construction would be from mobile sources.  Mobile sources of emissions are the tailpipe emissions from employee commuter vehicles and construction equipment to be used during construction of the pipeline.  No permitting is

USFWS_DAPL0002468

required for mobile sources.  Mobile source emissions from construction of the pipeline would be temporary; therefore impacts to air quality from the construction of the Project are not anticipated.

## 6.4    Threatened and Endangered Species

Informal consultation for federally threatened and endangered (T&E) species under section 7 of the Endangered Species Act (ESA) within the Project area occurred with the local USFWS Ecological Services Field Offices in Bismarck, North Dakota, Pierre, South Dakota, and the Rock Island Ecological Services Field Office in Moline, Illinois, the lead for federally listed species for the entire Dakota Access Project.  Section 7 consultations for federal T&E species were complete for the interrelated and interdependent activities associated with the entire Project (North Dakota, South Dakota, Iowa, and Illinois) as part of the Army Corp of Engineers permitting process (Appendix C).  For the purpose of this EA, only species that are listed within the counties crossed by the Project within North Dakota and South Dakota where easements are crossed will be discussed, since all USFWS easement crossings for the Project only occur within these states.  These T&E species within the affected environment are addressed in the following sections and were included in the section 7 informal consultation completed for the entire Project.

A total of 9 T&E species are listed as threatened, endangered or candidate within the North Dakota and South Dakota Project area that crosses USFWS easements.  Table 6-1 below provides a comprehensive list of listed species, counties they are listed in, and effect determination for the affected environment.  No critical habitat is crossed by the Project within the affected environment.  Based on the habitat requirements for the 9 federally listed T&E species, it has been determined that the Project would have no effect on any of the listed species within the affected environment.  Of the 9 listed species, the whooping crane (*Grus americana*) and the piping plover (*Charadrius melodus*) may utilize habitat on wetland easements, and the Dakota skipper (*Hesperia dacotae*) and Sprague's pipit (*Charadrius melodus*) may utilize the grassland easement habitats.  Therefore these four species and their habitat requirements are described further below and provide justification for the no effect determination for the affected environment.  The T&E species information will be updated throughout pre-construction and construction based on continued consultations.

USFWS_DAPL0002469

USFWS EA WETLAND AND GRASSLAND EASEMENTS                                          DAKOTA ACCESS PIPELINE PROJECT

| Table 6-1 Federally Threatened and Endangered Species within the Dakota Access North Dakota and South Dakota USFWS Easements Project Area | | | | | |
|---|---|---|---|---|---|
| Common Name | Scientific Name | Federal Status | North Dakota | South Dakota | Effect Determination |
| **Mammals** | | | | | |
| Gray wolf | *Canis lupus* | E | Mountrail, Williams | Not Listed | No effect |
| Northern long-eared bat | *Myotis septentrionalis* | T | Mountrail,  Williams | Campbell, Edmunds, Faulk, Kingsbury, Lake, McPherson, Miner, Minnehaha, Spink | No effect |
| **Birds** | | | | | |
| Least tern | *Sterna antillarum* | E | Mountrail, Williams | Campbell | No effect |
| Piping plover | *Charadrius melodus* | T | Mountrail, Williams | Campbell, Kingsbury | No effect |
| Rufa red knot | *Calidris canutus rufa* | T | Mountrail,  Williams | Campbell, Edmunds, Faulk, Kingsbury, McPherson, Miner, Spink | No effect |
| Sprague's pipit | *Anthus spragueii* | C | Mountrail, Williams | Campbell, McPherson | No effect |
| Whooping crane | *Grus americana* | E | Mountrail, Williams | Campbell, Edmunds, Faulk, Kingsbury, Lake, McPherson, Miner, Minnehaha, Spink | No effect |
| **Invertebrates** | | | | | |
| Dakota skipper | *Hesperia dacotae* | T | Mountrail | Edmunds, McPherson | No effect |
| **Plants** | | | | | |
| Western prairie fringed orchid | *Platanthera praeclara* | T | Not Listed | Lake, Miner, Minnehaha | No effect |
| Abbreviations: E: Endangered T: Threatened C: Candidate | | | | | |

USFWS_DAPL0002470

## Whooping Crane

*Biology*

The whooping crane was federally-listed as endangered under the ESA on March 11, 1967 (USFWS, 2012a). The crane is a large migratory bird species with a long neck and legs, reaching a height of 51 to 63 inches (Esch, 2012). Whooping cranes have primarily white plumage with black primary wing feathers and legs. The crown, lore, and malar areas consist of bare skin covered with few short black bristly feathers (USFWS, 2015a). This species has a bright red crown and the lore and malar areas are generally dark grayish black with some red. Juveniles are distinct with blotches of cinnamon or brown in their white plumage and visible feathers on their heads, contrary to bare skin observed on adults' heads. The bills of whooping cranes have a gray or olive coloration with a pinkish base. Differentiating between male and female whooping cranes is difficult since they share similar physical characteristics, but males (16 pounds) on average weigh more than females (14 pounds) (Esch, 2012).

There are currently four distinct populations of whooping cranes in the wild, with the only natural population migrating between Wood Buffalo National Park in Alberta, Canada and the Aransas National Wildlife Refuge along the Texas coast. The other three populations consist of the following: 1) an experimental population migrating between Wisconsin and Florida; 2) a reintroduced experimental non-migratory population in central Florida; and (3) a non-migratory population in Louisiana (USFWS, 2012a). The previously mentioned natural population has steadily increased an average of 4.6 percent annually (USFWS, 2012a). Historically, this population wintered solely in the Aransas National Wildlife Refuge, but recent reports have spotted whooping cranes in other suitable Texas coastal areas and even inland Central Texas (Texas Parks and Wildlife Department, 2014). As of the spring of 2011, this population of whooping cranes consisted of 279 individuals (USFWS, 2012a).

The natural whooping crane population travels a defined migration corridor between summer and winter habitats. This corridor begins in the Northwest Territories of Canada and passes southeast through the center of North Dakota, South Dakota, Nebraska, Kansas, Oklahoma, and ends at the Texas coast (USFWS, 2012a). Autumn migrations run from mid-September until mid-November, whereas the spring migration begins in late-March or early April and lasts until early May (USFWS, 2015a). Throughout its journey, whooping cranes inhabit various areas, including croplands and palustrine wetlands reaching less than four hectare in size. During the nesting season in the summer, this species relies on poorly drained potholes and wetlands for nesting areas. In the winter, estuarine marshes, bays, and tidal flats are primary habitat (USFWS, 2012a). In general, whooping cranes prefer open areas near water and vegetation (Esch, 2012).

Reproduction occurs once a year during the summer in late April to mid-May, with chicks hatching about a month after eggs are laid (USFWS, 2015a). Generally, two eggs are laid per nest and parents will take turns incubating the nest. The chicks will be cared for until they are nine months old, feeding on worms and insects provided by the parents. At two or three years of age whooping cranes choose a mate for life, and can sexually reproduce between four and five years old (Esch, 2012). Once mature, this species consumes a variety of foods. In the winter, whooping cranes will eat primarily blue crabs, wolfberry fruits, and clams, occasionally consuming acorns, snails, crayfish, and insects when food is scarce. In the summer, whooping cranes eat insects, frogs, rodents, small birds, minnows, and berries. During migration, this

USFWS_DAPL0002471

species consumes a combination of foods eaten in the winter and summer, in addition to plant tubers and agricultural grains (USFWS, 2015a).

The whooping crane's population numbers are low primarily due to human population growth. The construction of roads, buildings, power lines, towers, and wind turbines have drained crucial wetlands utilized by this species in its migration corridor. In addition, a decrease in river flows has contributed to habitat degradation of riverine migration habitat (USFWS, 2012a). Furthermore, efforts to introduce birds raised in captivity with hopes of steadily increasing whooping crane numbers in the wild have struggled when it comes time for breeding and raising chicks (USFWS, 2012a).

*Habitat Assessment*

The North Dakota and South Dakota Project area is within the migratory range of this species (Cornell Lab of Ornithology, 2014). Based on South Dakota Natural Heritage Program (SDNHP) and North Dakota Heritage Inventory (NDHI) data, only one whooping crane occurrence record is located in Kingsbury County, South Dakota approximately one mile from the Project area (NDHI and SDNHP, 2014). While the Project area within North Dakota and South Dakota may provide suitable stopover habitat for migrating whooping cranes, this species is highly mobile and would likely avoid construction. Therefore, no effect on this species within the affected environment is anticipated.

## **Sprague's Pipit**

*Biology*

The Sprague's pipit was listed to the USFWS Candidate Species List on September 15, 2010 (USFWS, 2010). This species is a small prairie bird, approximately 4 to 6 inches in length with sandy brown feathers with black streaks and two blurred white wing bars. Sprague's pipit has a large eye-ring and a short, thin bill (USFWS, 2014a). The upper mandible is black, while the lower mandible is light tan with a black tip. Male and female Sprague's pipit are similar in appearance, however the males fly high in the air for a territorial flight display (USFWS, 2014a).

The Sprague's pipit breeds in the northern prairies of the Great Plains and winters from September-April in Arizona, New Mexico, Texas, Oklahoma, Arkansas, Mississippi, Louisiana, and Northern Mexico (National Audubon Society, 2014). This species prefers grassland with good drainage, few shrubs, and high visibility. Native grasses like wheatgrass, June grass, blue grama, Canby blue, green needle grass, smooth brome, and crested wheat are ideal for the Sprague's pipit (Javier, 2007). Native grasslands with at least 75 percent native cover, and an approximate minimum grassland size requirement of 358 acres. This species has not been observed in grasslands less than approximately 72 acres in size (USFWS, 2014a). Non-native pasturelands and cultivated lands are not likely to be utilized for nesting by the Sprague's pipit (USFWS, 2010). The Sprague's pipit is well camouflaged in the prairie grasses and will walk or run while foraging or avoiding predators, unless flushed from the grass and forced to flight (Javier, 2007). This species primarily consumes arthropods, but will eat seeds during migration and wintering (National Audubon Society, 2014).

Breeding habitat range includes parts of Canada, Montana, North Dakota, and the northern portions of South Dakota. Breeding season can extend from April through mid-May (USFWS, 2010). This species is a ground nesting bird that utilizes mid-height grasslands with little bare ground during and creates nests of dead grass within depressions in the ground (NatureServe,

USFWS_DAPL0002472

2014).  Sprague's pipit raise one to two broods with an approximate clutch size is four or five eggs (NatureServe, 2014).  Brooding and incubation is mainly by females, although males may also brood and incubate the eggs and clutch (USFWS, 2010).

Sprague's pipit migratory habitat includes the Great Plains and south to Mexico.  The majority of the population is believed to winter in Mexico, most of the U.S. migratory sightings have been in Texas (USFWS, 2014a).  The migratory habitat may include grassland areas similar to breeding habitat, agricultural areas, and pasture (USFWS, 2010).

The loss of native prairie habitat from conversion to agricultural uses is identified as one of the main reasons for decline of this species (Cornell Lab of Ornithology, 2014).

*Habitat Assessment*

All of the North Dakota Project area is within the breeding range of this species.  Only a small northern portion of the South Dakota Project area is within the breeding range, while the majority of the South Dakota Project area is within the migratory range of the Sprague's pipit.  Dakota Access has avoided impacts to all grassland easements crossed by the Project within North Dakota and South Dakota by adjusting the pipeline alignment and incorporating alternative crossing methods (i.e. boring, HDD) at these locations so that there are no surface impacts to potential breeding habitat within the grassland easements.  Since the grassland easement crossings are adjacent to existing roads and disturbance, indirect impacts from noise during construction is not anticipated.  As stated previously, since the migratory habitat of this species may include agricultural areas and pasture, the majority of the South Dakota Project area may provide suitable migratory habitat (USFWS, 2010).  While the Project area within South Dakota may provide suitable stopover habitat for migrating Sprague's pipit, this species is highly mobile and would likely avoid construction.  Therefore, no effect on this species within the affected environment is anticipated.

## **Piping Plover**

*Biology*

The piping plover was listed to the USFWS Threatened and Endangered Species List on December 11, 1985 (USFWS, 2009).  The classification of threatened or endangered status is dependent on location, where Northern Great Plains and the Atlantic Gulf Coast populations are listed as threatened, while the Great Lakes population is listed as endangered.  All three populations are considered threatened throughout their wintering range (USFWS, 2009).  The piping plover is a robin sized shorebird characterized in the summer by a black neck band and black forehead ring, a sandy colored back, a white underside, thin featherless orange legs, and a robust black and orange beak.  During the winter and non-breeding months, both the neck band and forehead ring are difficult to observe and the legs may take on a more yellowed color (USFWS, 2013; USFWS, 2012b).

There are three geographically distinct breeding populations of piping plover found in the Northern Great Plains, the Great Lakes, and the Atlantic Coast (USFWS, 2009).  All three populations share a common coastal wintering range which extends from the Carolinas, south to the Yucatan (USFWS, 2009).  In 2001 and 2002, critical habitat was designated for the Great Lakes and Northern Great Plains breeding populations, as well as for all wintering areas within the U.S. (USFWS, 2009).  The Great Lakes critical habitat spans 201 miles of shoreline within the states that border the Great Lakes.  Critical habitat for the Northern Great Plains population

USFWS_DAPL0002473

was created in 2005, and spans about 183,000 acres and 1,200 miles of river from Montana to Minnesota, south to Nebraska (USFWS, 2009). In 2012, research found about 1,300 pairs of piping plovers present in the Northern Great Plains population (USFWS, 2009). There were about 60 pairs in Montana, 650 pairs in North Dakota (located mainly on the Missouri River), approximately 150 pairs in each South Dakota and Nebraska, two pairs in Minnesota, and less than ten pairs in Colorado, Kansas, and Iowa combined (USFWS, 2009). The piping plover inhabits areas near water, preferring river sandbars and alkali wetlands for nesting in the Great Plains and gravelly shorelines in the Great Lakes region (USFWS, 2013). For wintering, the piping plover resides on large coastal sand or mudflats near a sandy beach (USFWS, 2013).

Breeding season for the piping plover spans from late March through April (Texas Parks and Wildlife Department, 2015). The birds make nests on the ground on thinly vegetated sand or gravel beaches and dunes approximately 150 to 300 feet apart (USFWS, 2009; USFWS, 2013). The nests for the Northern Great Plains population are generally located along alkali lakes, rivers, and reservoir shorelines that are gravelly and lack sand dunes (USFWS, 2009). The piping plover has been documented utilizing vegetated nesting sites on occasion, nesting within cottonwood saplings along the Missouri River (USFWS, 2009). Typically, this species nests at the water's edge, but during drought years they have been noted to nest as far as 1,000 feet away from the edge of the water (USFWS, 2009). Each nest contains three to four eggs that are incubated by both sexes and hatch in approximately 30 days. In the event that eggs are destroyed early in the breeding season, oftentimes a second batch of eggs will be laid. Protective behavior is often exhibited by the piping plover, feigning a broken wing to lead a predator away when it comes too close to the nest. Chicks will also make use of natural camouflage and hide in the event that danger presents itself. Both the male and female feed the young a diet consisting of freshwater and marine invertebrates until about four weeks after hatching, at which point the chicks will fledge (National Park Service, 2015; Texas Parks and Wildlife Department, 2015; USFWS, 2013).

The diet of piping plovers consists of worms, fly larvae, beetles, crustaceans, mollusks, and other invertebrates (USFWS, 2013). Birds forage near lakeshore or ocean, plucking prey out of the sand (USFWS, 2013). Studies suggest that food availability is dependent on the specific habitat used by the bird; however, more research is needed to determine the exact diets of these birds (USFWS, 2009).

The piping plover has declined due to habitat loss and degradation. Development of coastal beaches has led to a loss of traditional nesting locations, and the increased presence of people in these environments contributes to piping plover nest abandonment or accidental crushing of eggs and young by vehicular or pedestrian traffic. Pet harassment and an increase in predation from raccoons, gulls, foxes and other opportunistic species that readily adapt to man's development activities are also detrimental to piping plover populations (National Park Service, 2015; USFWS, 2001).

*Habitat Assessment*

Dakota Access conducted baseline habitat assessments and identified some alkaline wetlands within the North Dakota Project area that could provide potentially suitable piping plover habitat. However, none of these alkaline wetlands are located within the wetland easements; therefore, no effect on this species within the affected environment is anticipated.

USFWS_DAPL0002474

## Dakota Skipper

### Biology

The Dakota skipper was listed under the ESA on October 23, 2014 (USFWS, 2014c). This species is a small to medium-sized butterfly with a one to 1.3-inch wingspan (Xerces Society, 2015). Like other species of skippers, it has a thick body, recurved antennae and fast powerful flight patterns (USFWS, 2014b). The upper side of the male's wing is tawny-orange to brown color with a prominent mark on the forewing; the lower surface is dusty yellow-orange. The upper side of the female's wing is darker brown with tawny-orange spots and a few white spots on the forewing margin; the lower side is gray-brown with a faint white spot band across the middle (USFWS, 2014b). The Dakota skipper is often confused with the Ottoe skipper (*Hesperia ottoe*), however the Ottoe skipper is larger overall with longer wings (Xerces Society, 2015).

Historically, scientists recorded Dakota skippers from northeast Illinois to Southern Saskatchewan; however, their actual historical range is not known due to extensive destruction of native prairies that preceded biological surveys. The species likely lived throughout the unbroken, vast grasslands of the north-central United States and south-central Canada (USFWS, 2014b). The Dakota skipper is now extirpated in Illinois and Iowa. The last remaining stronghold for the species in the United States appears to be in western Minnesota, northeastern South Dakota, and most of North Dakota (United States Geological Survey [USGS], 2013). It is now scattered throughout this range in small isolated communities where undisturbed native prairie remains. The most significant populations are in areas that straddle the border between tallgrass and mixed-grass prairies (USFWS, 2014b).

Dakota skippers have specific habitat requirements for untilled, remnant high quality prairie habitats that are dominated by native grasses that contain a high diversity of native forbs (USFWS, 2014c). The species live in two types of prairies. Moist bluestems prairies, characterized by smooth camas (*Zygadenus elegans*), wood lily (*Lilium philadephicum*), and harebell (*Campanula rotundifolia*), and upland prairies, characterized by bluestem, needlegrass and purple coneflower (*Echinacea angustifolia*) (USFWS, 2014b). The species depends on a diversity of native plants endemic to tallgrass and mixed-grasses prairies. Adult butterflies feed on nectar from native prairie wildflowers and coneflowers (USGS, 2013). Therefore, when nonnative and woody plant species become dominate, populations decline due to insufficient sources of larval food and nectar for adults (USFWS, 2014c).

The Dakota skipper changes from the larva state to the butterfly state in mid-June. Once the butterflies have mated, females lay eggs on a variety of plants from approximately mid-June through early July. The eggs then hatch in seven to ten days (USGS, 2013). The Dakota skipper butterfly then dies around the end of June; only one generation is produced each year (USGS, 2013).

Habitat destruction is the primary threat to Dakota skipper populations, which have declined dramatically due to the widespread conversion of native prairie to farms, ranches and other land uses. Along with conversion of native prairies, grazing by livestock can have devastating effects on skipper populations. If not properly managed, long-term grazing can easily destroy the prairie grasses vital to skipper habitat. Along with the above mentioned threats to native habitats the introduction and development of wind energy farms have become a new threat to Dakota skipper populations (MNDNR, 2015). The USFWS along with state agencies are working with private

USFWS_DAPL0002475

landowners to conserve native prairie habitats through a variety of management tools including haying, prescribed burns and managed grazing practices (USFWS, 2014b).

*Habitat Assessment*

Dakota Access has avoided impacts to all grassland easements crossed by the Project within North Dakota and South Dakota by adjusting the pipeline alignment and incorporating alternative crossing methods (i.e. boring, HDD) at these locations so that there are no surface impacts. Therefore no effect on this species within the affected environment is anticipated.

## 6.5   Cultural Resources

The cultural resources assessment was conducted in compliance with provisions of the following:

- National Historic Preservation Act (NHPA) of 1966 (as amended);
- North Dakota Century Code 23-06-27;
- North Dakota State Historic Preservation Office (SHPO) Guidelines Manual for Cultural Resource Inventory Projects (State Historic Society of North Dakota 2012);
- South Dakota Codified Law 1-19A-11.1(11.1), and;
- South Dakota Guidelines for Compliance with the NHPA (South Dakota State Historical Society 2012).

The objective of these investigations was to identify and record the extent and temporal affiliation of cultural resources and to assess their potential eligibility for inclusion in the National Register of Historic Places (NRHP).

## **Methods**

*Literature Review*

A site files check of the South Dakota SHPO Historic Sites Survey, the South Dakota State Historical Society's Cultural Resource Geographic Research Information, and the Archaeology and Historic Preservation Division of the State Historical Society of North Dakota for previous cultural resources surveys, previously recorded archaeological sites, cemeteries, bridges, structures, and historic districts within a 1.6-kilometer (km) (1.0-mile) radius of the project area was conducted prior to the commencement of fieldwork. Subsequent literature reviews were conducted for route variations.

*Field Surveys*

The research goals include the identification of historic properties significant at the national, state, regional, or local level within the Project area and collecting sufficient site-specific data to utilize in project planning. Each archaeological resource documented within project corridor during the course of this Phase I survey was evaluated using the NRHP criteria for evaluation (36 CFR 60.4).

Archaeological field methods during the Class III (North Dakota) / Level III (South Dakota) intensive cultural resources survey consisted of a combination of systematic shovel testing and pedestrian survey with visual inspection within the 400-foot-wide Project corridor.

Where surface visibility was less than 30%, shovel tests were positioned at 30-meters (m) (98-feet) intervals along four linear transects spaced 30 m (98 feet) apart. Radial shovel tests were

USFWS_DAPL0002476

excavated at an interval of 5 to 10 m (16 to 33 feet) from positive shovel tests along the periphery of each identified site to determine the site boundaries within the project corridor. All shovel tests were excavated to a depth of at least 10 centimeters (cm) (3.9 inches) into the underlying subsoil. Removed soils were screened through 0.625-cm (0.25-inches) hardware cloth, with all recovered artifacts bagged and recorded by shovel test number. All artifacts recovered from shovel tests were bagged in accordance with provenience. A profile of every shovel test was drawn, and artifact contents were recorded for all positive shovel tests. The location of all shovel tests also was recorded using the ArcGIS Collector Application with an iPad and a hand-held GPS unit.

Areas in which the surface visibility exceeded 30% or slope exceeded 15% were subjected to a pedestrian survey with visual inspection. The ground surface was inspected at the same intervals as that described above for shovel testing. When cultural material was encountered, the survey interval was reduced to between 10 and 15 m (33 and 50 feet) to help delimit site boundaries. Artifacts recovered during visual inspection were bagged according to provenience and artifact locations and/or concentrations and the site boundaries were mapped using the ArcGIS Collector Application with an iPad and a hand-held GPS unit.

## Results – North Dakota

*Literature Review*

The Class I Literature Review determined that 33 archaeological sites are mapped within a mile radius of the USFWS wetland and grassland easements. These sites consist of 19 historic or prehistoric artifact scatters, 3 historic farmsteads, and 11 site leads (historic mines or quarries) that have not been formally assessed to determine NRHP eligibility. Of these sites, only four (32MNx334, 32MN1339, 32MN1340, and 32MNx929) are mapped within the Project survey corridor, and all of these sites were recommended as unevaluated pending additional survey investigations.

*Field Surveys*

A Class II/III cultural resources inventory of the USFWS wetland and grassland easements in Mountrail and Williams Counties, North Dakota was conducted between August of 2014 and April of 2015. The surveys resulted in the revisit of four previously recorded sites. Of these sites, no evidence of site 32MN334 was encountered. The other three resources (32MN0929, 32MN1339 and 32MN1340) are stone features that are unevaluated for listing in the National Register of Historic Places. The field surveys verified the boundaries of these three sites within the survey corridor, and the Project workspace was subsequently modified to avoid impacts to these sites. To ensure the protection of these sites, exclusionary fencing will be placed along the outer workspace boundary, and an Environmental Inspector will monitor construction activities to ensure that no impacts occur to these features. No additional cultural resources were encountered during the field efforts, and no further work is recommended for the USFWS wetland and grassland easements traversed by the Project in North Dakota (Table 6-2).

USFWS_DAPL0002477

| Table 6-2 Archaeological Sites Revisited in North Dakota | | | | | |
|---|---|---|---|---|---|
| Site No. | County | MP | Site Type | Cultural Affiliation | Preliminary NRHP Recommendations |
| Archaeological Sites | | | | | |
| 32MNx334 | Mountrail | 8.0 | Artifact scatter | Unknown – no evidence of site encountered | Not eligible |
| 32MN929 | Mountrail | 7.6 | Stone features (cairns) | Unknown | Unevaluated – avoided by modification to project workspace |
| 32MN1339 | Mountrail | 7.6 | Prehistoric stone feature | Unknown | Unevaluated – outside Project workspace |
| 32MN1340 | Mountrail | 7.6 | Prehistoric stone feature | Unknown | Unevaluated – outside Project workspace |

## Results – South Dakota

### Literature Review

The literature review identified 106 previous surveys, 66 archaeological sites, 108 structures, and seven cemeteries within a 1.6-km (1-mile) radius of the USFWS jurisdictional areas. The 66 previous archaeological sites consisted of 39 prehistoric sites, 26 historic-age sites, and one multi-component site. Five of the sites were identified as eligible for inclusion in the NRHP and one was identified as listed on the NRHP. None of the sites are located within the USFWS jurisdictional areas.

### Field Surveys

A Level III Intensive Cultural Resources Survey was conducted between August 19, 2014, and April 15, 2015. A total of 146 wetland basins were surveyed for cultural resources resulting in the documentation of five newly recorded archaeological sites (39CA0282, 39ED2007, 39FK0112, 39KB0041, and 39KB2003) (Table 6-3). Site 39CA0282 contains prehistoric stone circles, while Site 39KB0041 is a prehistoric isolated find. Site 39FK0112 is a historical farmstead/homestead, and Sites 39ED2007 and 39KB2003 are historical rail lines. Sites 39KB0041 and 39FK0112 are recommended as not eligible for inclusion in the NRHP and no further work is recommended. Sites 39CA0282, 39ED2007, and 39KB2003 are recommended as eligible for inclusion in the NRHP; however, sites 39ED2007 and 39KB2003 will be avoided by HDD. Site 39CA0282 is located beyond Project workspace boundary and will not be impacted by construction. The site will be avoided and exclusionary fencing will be installed along the outer workspace boundary to ensure that inadvertent impacts do not occur to the site during construction. Based on the results of the field effort, no further work is recommended for the USFWS wetland easements traversed by the Project in South Dakota.

USFWS_DAPL0002478

| Table 6-3 Archaeological Sites and Historical Structures Identified | | | | | |
|---|---|---|---|---|---|
| Field Site No. | County | MP | Site Type | Cultural Affiliation | Preliminary NRHP Recommendations |
| **Archaeological Sites** | | | | | |
| 39CA0282 | Campbell | 234.8 | Stone Circle | Native American | Eligible – Beyond Project workspace |
| 39ED2007 | Edmunds | 262.1 | Chicago Milwaukee St. Paul and Pacific Railroad | Euro American | Eligible – Avoided by bore |
| 39FK0112 | Faulk | 301.7 | Historical Farmstead/Homestead | Euro American | Not Eligible |
| 39KB2003 | Kingsbury | 381.1 | North Western Railroad | Euro American | Eligible – Avoided by bore |
| 39KB0041 | Kingsbury | 382.5 | Isolated Find | Prehistoric | Not Eligible |

## 7.0  MITIGATIVE MEASURES

Dakota Access has avoided surface impacts to grassland easements through construction design (i.e. bore and/or HDD), and the USFWS SUP will contain specific guidance on how operation practices may occur within the grassland easements if needed.

Dakota Access has designed the Project to avoid permanent fill in wetlands. Aboveground facilities have been sited outside of USFWS grassland easements and protected basins within wetland easements, resulting in no permanent impacts to these USFWS protected areas. Temporary impacts to wetlands will be limited to the construction phase.

During initial routing and through the alternatives evaluation process, Dakota Access has worked to avoid and minimize impacts to wetlands. Where impacts were unavoidable, Dakota Access will implement best management practices (BMPs) to ensure that the wetland is restored post-construction in accordance with regulations and permits. BMPs will be specified in the SUP for Project construction and  may inlcude: minimizing disturbed areas; controlling stormwater flow; stabilizing soils; protecting slopes; establishing perimeter controls and sediment barriers; retaining sediment on site; controlling dewatering practices; and establishing stabilized construction access.

The method of pipeline construction in wetlands will depend largely on the stability of the soils at the time of construction. If wetland soils are not excessively saturated at the time of construction and can support construction equipment on equipment mats, timber mats, or straw mats, construction will occur in a manner similar to conventional upland cross-country construction techniques. Several modifications and limitations to conventional upland construction procedures can be implemented during wetland construction to reduce the impacts to wetland hydrology and soil structure, ensure the integrity of the pipeline within the feature, and also to facilitate restoration.

Construction equipment working in wetlands will be limited to that essential for proper installation. In areas where there is no reasonable access to the ROW except through wetlands, non-essential equipment will be allowed to travel along the prescribed travel path across wetlands. The refueling of equipment, storage of fuel, lubricants or hazardous materials within

USFWS_DAPL0002479

100 feet of a wetland is not to be conducted unless no reasonable alternative exists and additional containment measures are implemented. Additionally, the USFWS SUP will contain specific guidance on refueling sites and how potential spills will be handled.

Erosion control devices such as silt fence and staked straw bales will be installed and maintained as necessary to minimize the potential for sediment runoff into wetlands. Sediment barriers will be installed across the full width of the construction ROW at the base of slopes adjacent to wetland boundaries. Silt fence and/or straw bales installed across the working side of the ROW may be removed during active construction but will be replaced after each pass or at the end of the working day. In some cases a compacted earthen berm (drivable berms) may be suitable as a sediment barrier adjacent to the wetland in lieu of removable sediment barriers. Compacted earthen berms would be constructed in a manner that would allow vehicles and equipment to cross the sediment barrier without damaging the berms effectiveness to minimized sediment runoff. If an earthen berm is breached by the crossing of heavy equipment, the berm would be repaired immediately or gaps would be closed by the installation of temporary sediment barriers (i.e. silt fence and/or straw bales). Sediment barriers will also be installed within wetlands along the edge of the ROW, where necessary, to minimize the potential for sediment to run off the construction ROW and into wetland areas outside the work area. If trench dewatering is necessary in wetlands, silt-laden trench water will be discharged into an energy dissipation/sediment filtration device, such as a geotextile filter bag or straw bale structure, to minimize the potential for erosion and sedimentation.

Where wetland soils are saturated and/or inundated, the pipeline may be installed using the push-pull technique. The push-pull technique will involve stringing and welding the pipeline outside of the wetland and excavating and backfilling the trench using a backhoe supported by equipment mats or timber mats. The prefabricated pipeline will be installed in the wetland by equipping it with buoys and pushing or pulling it across the water-filled trench. After the pipeline is floated into place, the floats will be removed and the pipeline will sink into place. Most pipe installed in wetlands will be coated with concrete or equipped with set-on weights to provide negative buoyancy. Additionally, trench plugs will be installed as needed at the entry and exit points of the feature to facilitate restoration of the subsurface hydrology and prevent the pipeline trench from inadvertently draining the feature.

Because little or no grading will occur in wetlands, restoration of contours will be accomplished during backfilling. Prior to backfilling, trench plugs will be installed where necessary to prevent subsurface drainage of water from wetlands. In areas where topsoil has been segregated from subsoil, the subsoil will be backfilled first, followed by the topsoil. Construction in wetlands under wet conditions may require use of equipment mats, timber mats, gravel fill, geotextile fabric, and/or straw mats which will be removed following backfilling.

Where wetlands are located at the base of slopes outside of cultivated fields, permanent slope breakers will be constructed across the ROW in upland areas adjacent to the wetland boundary. Temporary sediment barriers will be installed where necessary until revegetation of adjacent upland areas is successful as defined within the USFWS SUP. Once revegetation is successful, sediment barriers will be removed from the ROW and disposed of properly.

In order to mitigate the spread of any noxious weeds, Dakota Access will likely implement BMPs and weed control practices during construction and operation. Mitigation measures may include: treating known noxious weed infestations prior to ground disturbance, immediately

USFWS_DAPL0002480

reseeding following construction, and using weed-free seed in reclamation activities and erosion control materials.

## 8.0  POTENTIAL FUTURE IMPACTS FROM OPERATIONS

As stated previously in Section 3.1, no aboveground structures would be located within a USFWS grassland easement or wetland basin within a wetland easement.  Therefore there will be no ongoing operations or future maintenance to aboveground structures within the USFWS easements.

Following completion of construction, the 50-foot-wide permanent ROW easement along the entire Project alignment (generally centered on the pipeline 25 feet on either side of the centerline) would be retained along the pipeline route.  The 50-foot-wide easement would be maintained in an herbaceous state (cleared of large diameter woody vegetation) to facilitate inspection of the pipeline, operational maintenance, and compliance with the federal pipeline safety regulations.  Maintenance of the permanent ROW would entail periodic vegetation clearing measures, in accordance with PHMSA regulation for pipeline inspection.  This may involve selective tree cutting and periodic mowing.  However, since the wetland basins within the Project area are all herbaceous, no habitat conversion would occur.  Vegetation maintenance of the ROW in areas of active cropland is not expected to occur due to agricultural practices.

Future repair or maintenance to the pipeline may be required by Dakota Access.  Any pipeline work that would need to occur within a grassland easement or wetland basin within a wetland easement would be coordinated with the USFWS as outlined within the SUP.  Potential impacts to easements would be limited to repair or maintenance to the pipeline and would be temporary in nature, similar to the temporary impacts described within the EA for the construction of the pipeline.  Therefore, potential future impacts from operation of the pipeline are not anticipated.

## 9.0  CUMULATIVE EFFECTS

Cumulative impacts to the environment result from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts may result from individually minor but collectively significant actions taking place over a period of time 40 CFR Part 1508.

Past actions in the vicinity of the Project may include oil and gas development and associated infrastructure, utility installation, and agriculture.  These past activities most likely have had effects on soils, water resources, vegetation, wildlife, land use, visual resources, and cultural resources.  At the majority of the USFWS wetland basin crossings the predominant land use is agriculture.  In addition to ongoing agricultural practices and the expansion of regional oil and gas development activities, cumulative impacts associated with the Dakota Access Project as whole were also considered.

Cumulative impacts were evaluated for the following resources and were determined to be negligible or nonexistent based on past and foreseeable future actions in the Project area and the minor and temporary contribution of the Project to effects on these resources:

- Vegetation                                   Section 9.1
- Water Quality                              Section 9.2
- Air Quality                                  Section 9.3
- Threatened and Endangered Species          Section 9.4

USFWS_DAPL0002481

- Cultural Resources                                     Section 9.5

## 9.1   Vegetation

As described within Section 6.1 and 7.0, all vegetation disturbed by construction within the affected environment would be restored to pre-construction conditions following the completion of construction activities.  No forest fragmentation would occur as a result of construction and operation of the Project within the affected environment, since all USFWS wetland basin crossings are herbaceous.

Regionally, the greatest impact to the native vegetative community is associated with past and current agricultural practices.  Pipeline projects, however, impact a relatively small area in relation to the total landscape, as these impacts are typically short in duration and temporary in nature.  However, the implementation of BMPs outlined in Section 7.0 would reduce the cumulative impacts.

## 9.2   Water Quality

As stated in Section 6.2, impacts on water quality associated with the affected environment would be temporary and/or minor, since no permanent fill or loss of wetlands are anticipated, and potential spill-related impacts would be avoided or greatly reduced by compliance with federal regulations, the location of valves, spill containment measures, and the FRP will minimize adverse effects to public safety and to the environment.

Spills or leaks of hazardous liquids during construction and operation of the proposed Project, or other projects in the vicinity, have the potential to result in long-term impacts on water quality.  However, construction impacts would be mitigated by the proper design and implementation of BMPs would ensure avoidance, minimization, and/or mitigation of potential impacts on water quality as required by the various regulating agencies (i.e. PHMSA).  Operational risks are being mitigated by the Project design; the Project would be designed to meet or exceed the applicable regulations.  Therefore, the potential cumulative impacts on water quality resulting from spills would be minor.

In addition, while construction and operation of the Project along with the other potential projects and activities could result in cumulative impacts on existing wetlands/water quality in the Project watersheds, USACE regulation of activities under the Clean Water Act requires permitting and mitigation for wetland impacts so that there would be no regional net loss of wetlands.  Therefore, cumulative impacts to water quality from Project construction would be minimal.

## 9.3   Air Quality

Potential cumulative impacts on air quality would result from concurrent construction of the Project and other development projects in the region.  Impacts on air quality associated with construction of the Project would be temporary and short-term as discussed in Section 6.3; therefore, even if construction of other projects were concurrent with this Project, cumulative construction-related air quality impacts would be negligible.

## 9.4   Threatened and Endangered Species

As stated in Section 6.4, it has been determined that the Project would have no effect on any of the listed species within the affected environment.  Therefore, the Project would not contribute to cumulative impacts to the listed species within the affected environment.

USFWS_DAPL0002482

## 9.5   Cultural Resources

The Project is not anticipated to impact cultural resources within the affected environment; therefore, the Project would not contribute to cumulative impacts to the cultural resources.

## 10.0  COORDINATION AND CONSULTATION

Dakota Access is in the process of permitting the overall Project through multiple federal and state agencies within each state crossed by the Project (North Dakota, South Dakota, Iowa and Illinois).   Table 10-1 below includes a comprehensive list of ongoing federal and state coordination/consultation.

| Table 10-1 Dakota Access Pipeline Project Environmental/Regulatory Permits | |
| --- | --- |
| **Agency/Responsible Party** | **Coordination/Consultation** |
| **NORTH DAKOTA** | |
| **Federal** | |
| USACE Omaha District – North Dakota Regulatory Office | Nationwide Permit 12- Section 404/10 Wetlands and Waterbodies |
| | Archaeological Resources Protection Act, Section 106 consultation, tribal consultation |
| USACE Omaha District | EA for crossing the Missouri River/Lake Oahe (private lands encumbered by federal flowage easements and federal land managed by the USACE) |
| | Title 30 Rights-of-Way for pipelines through federal lands, Temporary Construction License and COE Flowage Easement Consent to cross |
| USFWS, North Dakota Ecological Services Field Office and NWR | ESA Section 7 Consultations |
| | EA for Wetland and Grassland Easement crossings – SUP for construction |
| | NHPA Section 106 review and consultation for USFWS Easement crossings |
| U.S Bureau of Reclamation | Letter of consent to cross irrigation works |
| **State** | |
| North Dakota Public Service Commission (PSC) | North Dakota Energy Conversion and Transmission Facility Siting Act: Certificate of Corridor and Route |
| North Dakota Department of Health, Division of Water Quality | National Pollutant Discharge Elimination System - Stormwater Construction General Permit |
| | National Pollutant Discharge Elimination System – General Permit for Discharges of Hydrostatic Test Water, if into waters of the U.S. |
| | §401 Individual Water Quality Certification |
| North Dakota State Water Commission | Surface Water Withdrawal Permit |
| | Sovereign Land Permit |
| State Historical Society of North Dakota; SHPO | Inventory Permit required for State-owned lands (North Dakota Century Code [NDCC] 53-03) ; Section 106 of NHPA consultation/compliance |

USFWS_DAPL0002483

**Table 10-1**
**Dakota Access Pipeline Project Environmental/Regulatory Permits**

| Agency/Responsible Party | Coordination/Consultation |
|---|---|
| **SOUTH DAKOTA** | |
| **Federal** | |
| USACE, Omaha District – South Dakota Regulatory Office | Nationwide Permit 12- Section 404 Wetlands and Waterbodies |
| USFWS, South Dakota Ecological Services Field Office and NWR | ESA Section 7 Consultation |
| | EA for wetland and grassland easement crossings – SUP for construction |
| | NHPA Section 106 review and consultation for USFWS easement crossings |
| **State** | |
| South Dakota Public Utilities Commission | Energy Conversion and Transmission Facilities Act- Siting Permit |
| South Dakota Department of Environment and Natural Resources | National Pollutant Discharge Elimination System (NPDES) General Permit for Discharges of Hydrostatic Test Water |
| | Surface Water Withdrawal Permit |
| South Dakota State Historical Society; SHPO | NHPA (Archeological and Historic Preservation Act), Section 106 consultation |
| **IOWA** | |
| **Federal** | |
| USACE, Rock Island District | Nationwide Permit 12- Section 404/10 Wetlands and Waterbodies |
| USFWS, Rock Island Ecological Services Field Office | ESA Section 7 Consultation |
| **State** | |
| Iowa Utilities Board | Hazardous Liquid Pipeline Authorization |
| Iowa Department of Natural Resources | Sovereign Lands Permits |
| | Floodplain Permit |
| | Protected species consultation |
| | Temporary water withdrawal permit |
| | Hydrostatic test discharge permit |
| Iowa (SHPO) | NHPA, Section 106 consultation |
| **ILLINOIS** | |
| **Federal** | |
| USACE, Rock Island District | Nationwide Permit 12- Section 404/10 Wetlands and Waterbodies |
| USACE, St. Louis District | Nationwide Permit 12- Section 404/10 Wetlands and Waterbodies |

USFWS_DAPL0002484

| Table 10-1 Dakota Access Pipeline Project Environmental/Regulatory Permits | |
| --- | --- |
| **Agency/Responsible Party** | **Coordination/Consultation** |
| | EA for Section 408, Illinois River levees crossing and USACE Flowage Easements |
| USFWS, Rock Island Ecological Services Field Office | ESA Section 7 Consultation |
| **State** | |
| Illinois Commerce Commission | Certificate of Public Convenience and Necessity |
| Illinois Environmental Protection Agency | NPDES Individual Permit for Discharges of Hydrostatic Test Water into waters of the U.S. |
| Illinois Department of Natural Resources | State Listed Threatened and Endangered Species Consultation/Clearance |
| Illinois Historic Preservation Agency (IHPA-Illinois SHPO) | Consultation and Inventory Permit required for State-owned lands (20 ILCS 3435/3); Section 106 of NHPA consultation/compliance |

As listed in Table 10-1 above, there are multiple federal actions occurring concurrently as a result of the Project. The USACE-Omaha District is the lead federal agency for the USACE interests in the Project, although all impacts to jurisdictional wetlands and waterbodies are also coordinated through the respective local USACE offices.

In addition to the EA for the USFWS wetland and grassland easement SUP in North Dakota and South Dakota, an EA for the USACE in North Dakota is being finalized and already completed the public comment review for the crossing of private lands encumbered by federal flowage easements and land owned by the federal government under the management by the USACE. Also, the Project crosses USACE levees and flowage easements at the Illinois River within the St. Louis District; therefore an EA is currently being drafted for these crossings. Section 106 consultations are occurring for each USACE Project area included within the scope of the EAs, in addition to the federal and state permitting processes (Table 10-1) as required. The Section 106 consultation process for USFWS is described in detail below.

## 10.1  USFWS Section 106 Consultation

Consultation for purposes of Section 106 begins with a federal agency's determination whether the proposed Federal action is an undertaking as defined at 36 CFR Section 800.16(y), and if so, whether it is the type of activity that has the potential to affect historic properties.

Undertaking means a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including those carried out by or on behalf of a Federal agency; those carried out with Federal financial assistance; and those requiring a Federal permit, license or approval.

With regard to the Project, the proposed USFWS action that is subject to Section 106 review is the issuance of a SUP allowing the Project to extend across USFWS grassland easements and wetland basins – the areas for which rights were conveyed to the USFWS from landowners for protective purpose.

The Advisory Council on Historic Preservation (ACHP) has provided guidance clarifying that consultation regarding permitting, licensing and assistance actions can differ from federal property management undertakings in terms of the limitations of a federal agency to control the

USFWS_DAPL0002485

actions of applicants (ACHP, 2008).  These consultation limitations pertain to a federal agency's ability to influence the applicant's actions and decisions outside the agency's permitting or approval authorities.  The federal agency can consult within the full meaning of Section 106 review for purposes of assessing the effects of issuing permits allowing the Project to cross easements, but the agency is constrained by its limited jurisdiction and authority to assume responsibility for considering effects of the Project on historic properties situated outside its easements – those areas for which rights have not been conveyed to USFWS for protection of wetlands or grasslands.

Therefore, USFWS's obligations to conduct Section 106 consultation and to consider the effects of the Project are substantially constrained to historic properties found within the jurisdictional areas of the USFWS easements and to the extent that USFWS permits dictate the location of the Project's approaches to the ingress and immediately beyond the egress points of USFWS easements.   These areas, for all intents and purposes, constitute the Areas of Potential Effects (APE) defined at Section 800.16(d) as: "…the geographic area or areas within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties, if any such properties exist. The area of potential effects is influenced by the scale and nature of an undertaking and may be different for different kinds of effects caused by the undertaking."

USFWS's APEs are those segments of the Project that are under the direct jurisdiction of the USFWS which as a consequence of its actions - the issuance of a SUP – may result in alterations in the character or use of historic properties.   Therefore, in the event a historic property is identified within an USFWS jurisdictional area, the entirety of that resource shall be considered whether within or beyond the USFWS's jurisdictional limits.

Consistent with Section 106 of the NHPA, Dakota Access has initiated review with the USFWS Regional Historic Preservation Officer (Region 6).  The Class II/III draft report for North Dakota and the Level III draft report for South Dakota were submitted to the regional USFWS archaeologist on May 5, 2015 and May 6, 2015, respectfully.  Revised cultural reports based on USFWS comments were submitted to USFWS on October 27, 2015.  In compliance with Section 106 consultation procedures, the USFWS is responsible for initiating formal consultation with the respective SHPOs and tribal entities.  The USFWS has initiated Section 106 consultation via letter dated October 23, 2015 to 21 tribes.  In addition, the USFWS has initiated consultation via letter dated October 29, 2015 to the North Dakota and South Dakota SHPOs, the Advisory Council on Historic Preservation, and the USACE.   The following tribes were sent consultation letters:

| | |
|---|---|
| Assiniboine and Sioux Tribes | Omaha Tribe of Nebraska |
| Crow Nation | Santee Sioux Nation |
| Cheyenne River Sioux Tribe | Sisseton-Wahpeton Oyate |
| Flandreau Santee Sioux Tribe | Turtle Mountain Band of Chippewa |
| Crow Creek Sioux Tribe | Spirit Lake Tribe |
| Lower Brule Sioux Tribe | Winnebago Tribe |
| Lower Sioux Indian Community | Standing Rock Sioux Tribe |
| Ponca Tribe of Nebraska | Yankton Sioux Tribe |

USFWS_DAPL0002486

| | |
|---|---|
| Northern Cheyenne Tribe | Three Affiliated Tribes |
| Prairie Island Indian Community | Oglala Sioux Tribe |
| Rosebud Sioux Tribe | |

## 10.2  Public Comments Considered

The notice of availability of the EA for public comment was published in twelve newspapers listed below within North Dakota and South Dakota on December 18, 2015:

*North Dakota-*
- Bismarck Tribune
- Williston Herald

*South Dakota-*
- Miner County Pioneer
- The New Era
- The Desmet News
- The Argus Leader
- The Salem Special
- Huron Plainsman
- Madison Daily Leader
- Roscoe Hosmer Independent
- Prairie Pioneer
- McPherson County Herald

The publication ran twice within each newspaper. The draft EA was available for viewing at the USFWS Sand Lake NWR and Madison Wetland Management District website homepages, in addition to hard copies being available at the following five libraries within North Dakota and South Dakota:

Bismarck Veterans Memorial Public Library
515 N. Fifth Street
Bismarck, ND 58501

Williston Community Library
1302 Davidson Dr.
Williston, ND 58801

Alexander Mitchell Public Library
519 South Kline Street
Aberdeen, SD 57401

Madison Public Library
209 E Center Street
Madison, SD 57042

USFWS_DAPL0002487

Sioux Falls Main Library
200 N Dakota Ave
Sioux Falls, SD 57104

A total of 18 comment letters were received during the comment review period, the last comment was received on January 22, 2016. Of the letters received, ten were in support of the Project, six included comments that were not applicable to the scope of the EA or already addressed within the EA. Two letters received included substantive comments that required edits to the EA. One commenter was concerned with the language in Section 7.0 that referenced the use of timber riprap, since the South Dakota Public Utilities Commission (PUC) permit condition 184h for the Project reads that "the use of raw timber and slash to support equipment crossings of wetlands shall be avoided". Raw timber and slash will not be used throughout construction. If required, equipment may operate off of timber mats. The text in Section 7.0 Mitigative Measures has been edited to read "timber mats" instead of "timber riprap" so that there is no confusion of terms. The second substantive letter included concerns over the scope of the environmental analysis and cumulative effects of the action. To clarify the scope of the analysis, a new section was added to the beginning of the EA (Section 2.1 Scope of Analysis) so that the reader is clear from the beginning as to what is USFWS jurisdiction and the scope of the EA. To address the commenters concerns of cumulative effects a new section was added to the EA (Section 9.0 Cumulative Effects) to evaluate the potential for cumulative effects of construction, operation and maintenance of the Project within the scope of the EA.

## 10.3  List of Preparers and Agencies Consulted

The list of agency, company, and consultant preparers and reviewers is provided in Table 10-2 below.

| Table 10-2 List of Preparers and Reviewers | | |
|---|---|---|
| **Name** | **Title/Office** | **Agency/Company** |
| Barbara Boyle | Refuge Supervisor- Regional Office | USFWS |
| Bernie Peterson | Refuge Supervisor- Regional Office | USFWS |
| Kelly Hogan | Refuge Program Specialist- Regional Office | USFWS |
| Meg VanNess | Regional Historic Preservation Officer / Archaeologist- Regional Office | USFWS |
| Harris Hoistad | Project Leader- Sand Lake NWR/WMD | USFWS |
| Kory Richardson | Deputy Project Leader-Lostwood NWR/WMD | USFWS |
| Suzanne Baird | Project Leader- Lostwood NWR/WMD | USFWS |
| Lee Albright | Project Leader- Long Lake NWR | USFWS |

USFWS_DAPL0002488

| Table 10-2 List of Preparers and Reviewers | | |
|---|---|---|
| **Name** | **Title/Office** | **Agency/Company** |
| Deborah Williams | Project Leader- Huron WMD | USFWS |
| Natoma Hansen | Project Leader- Madison WMD | USFWS |
| Michael J. Bryant | Project Leader- Lake Andes WMD | USFWS |
| Monica Howard | Director Environmental Sciences | Dakota Access, LLC |
| Dennis Woods | Managing Partner | Perennial Environmental Services, LLC |
| Ashley Thompson | Senior Biologist | Perennial Environmental Services, LLC |
| Abby Peyton | Cultural Resources Director | Perennial Environmental Services, LLC |

As discussed in Section 10.2, the draft EA was available for viewing at five public libraries, in addition to being placed on the USFWS Sand Lake NWR and Madison WMD websites for public access and review.  This provided access to the document by multiple state and local agencies and organizations.

USFWS_DAPL0002489

# REFERENCES

Advisory Council on Historic Preservation. 2008.  Section 106 Consultation Between Federal Agencies and Indian Tribes Regarding Federal Permits, Licenses, and Assistance - Questions and Answers.

Bachman, J. 2014. North Dakota's Downside to the Oil Boom: Traffic Deaths. Businessweek. http://www.businessweek.com/articles/2014-06-09/north-dakotas-downside-to-the-oil-boom-traffic-deaths.

Cornell Lab of Ornithology.  2014.  All About Birds.  http://www.allaboutbirds.org/guide/search. Accessed November and December 2014 and June 2015.

Esch, J.  2012.  Animal Diversity Web: *Grus Americana*. http://animaldiversity.org/accounts/Grus_americana/.  Accessed February 2015.

Florip, E.  2014.  Proposed Oil Terminal Would Be Biggest In Volume.  The Columbian. http://www.columbian.com/news/2014/nov/24/proposed-oil-terminal-biggest-volume-vancouver/.

Fritelli, J.  2014.  U.S. Rail Transportation of Crude Oil: Background and Issues for Congress. Congressional Research Service. http://fas.org/sgp/crs/misc/R43390.pdf.

Horwath, B. and Owings, C.  2014.  No Keystone XL Means More Oil By Rail, Report Says. Oil Patch Dispatch. http://oilpatchdispatch.areavoices.com/2014/01/31/no-keystone-xl-means-more-oil-by-rail-report-says/.

Javier, R. 2007. Animal Diversity Web: Anthus spragueii. http://animaldiversity.ummz.umich.edu/accounts/Anthus_spragueii/. Accessed November 2014.

Kringstad, J.  2014.  Energy Development and Transmission Committee.  North Dakota Pipeline Authority. https://ndpipelines.files.wordpress.com/2012/04/kringstad-edt-7-8-2014.pdf.

Minnesota Department of Natural Resources.  2015.  Rare Species Guide: Dakota Skipper (*Hesperia dacotae*). http://www.dnr.state.mn.us/rsg/profile.html?action=elementDetail&selectedElement=IILEP65140.  Accessed February 2015.

National Audubon Society. 2014. The Online Guide to North American Birds. http://birds.audubon.org/birdid. Accessed November 2014.

National Park Service.  2015.  Sleeping Bear Dunes: Nature & Science: Piping Plovers. http://www.nps.gov/slbe/naturescience/pipingplover.htm.  Accessed February 2015.

NatureServe.  2014.  NatureServe Explorer.  http://explorer.natureserve.org/.  Accessed December 2014.

USFWS_DAPL0002490

Nixon, R. 2014. Grain Piles Up, Waiting For A Ride, As Trains Move North Dakota Oil. New York Times. http://www.nytimes.com/2014/08/26/us/grain-piles-up-waiting-for-a-ride-as-trains-move-north-dakota-oil.html.

North Dakota Heritage Inventory.   2014.   North Dakota Parks and Recreation Department. Occurrence data within 2 miles of pipeline route.   Received December 2014.

South Dakota Natural Heritage Program.   2014.   South Dakota Game, Fish, and Parks, Wildlife Diversity Program.   Occurrence data within 2 miles of pipeline route.   Received July 2014.

Texas Parks and Wildlife Department. 2015. Wildlife Fact Sheets: Piping Plover (*Charadrius melodus*).  https://tpwd.texas.gov/huntwild/wild/species/piplover/.  Accessed February 2015.

Texas Parks and Wildlife Department.  2014.  Whooping Cranes Beginning Their Fall Journey to Texas.   http://tpwd.texas.gov/newsmedia/releases/?req=20141008d.   Accessed February 2015.

The Xerces Society for Invertebrate Conservation.  2015.  Skippers: Dakota Skipper (*Hesperia dacotae*).  http://www.xerces.org/dakota-skipper/.  Accessed February 2015.

U.S. Army Corps of Engineers.  2010.  Regional Supplements to Corps Delineation Manual. Great Plains Supplement and Mid-West Supplement.

U.S. Department of Transportation.  2014.  Pocket Guide to Large Truck and Bus Statistics. Federal Motor Carrier Safety Administration. http://www.fmcsa.dot.gov/sites/fmcsa.dot.gov/files/docs/FMCSA%20Pocket%20Guide%20to%20Large%20Truck%20and%20Bus%20Statistics%20-%202014%20-%20508C.pdf.

U.S. Department of Transportation.  2015. Transportation Accidents by Mode. Office of the Assistant Secretary for Research and Technology. http://www.rita.dot.gov/bts/sites/rita.dot.gov.bts/files/publications/national_transportation_statistics/html/table_02_03.html.

U.S. Fish and Wildlife Service.  2015a.  Environmental Conservation Online System: Species Profile for Whooping Crane (*Grus americana*). http://ecos.fws.gov/speciesProfile/profile/speciesProfile.action?spcode=B003.  Accessed February 2015.

U.S. Fish and Wildlife Service.  2015b.  Endangered Species: Dakota skipper (*Hesperia dacotae*).  http://www.fws.gov/midwest/Endangered/insects/dask/index.html.  Accessed February 2015.

U.S. Fish and Wildlife Service.  2014a.  U.S. Fish and Wildlife Service Species Assessment and Listing Priority Assignment Form.

USFWS_DAPL0002491

http://ecos.fws.gov/docs/candidate/assessments/2014/r6/B0GD_V01.pdf.  Accessed
November 2015.

U.S. Fish and Wildlife Service.  2014b.  Dakota Skipper (*Hesperia dacotae*) Fact Sheet.
https://www.fws.gov/midwest/endangered/insects/dask/daskFactSheet.html.  Accessed
February 2015.

U.S. Fish and Wildlife Service.  2014c.  Federal Register: Endangered and Threatened Wildlife
and Plants; Threatened Species Status for Dakota Skipper and Endangered Species Status
for Poweshiek Skipperling, Final rule.
http://www.fws.gov/midwest/Endangered/insects/dask/pdf/FRButterflyFinalListing24Oct
2014.pdf.  Accessed February 2015.

U.S. Fish and Wildlife Service.  2013.  South Dakota Field Office: Piping Plover *Charadrius
melodus*.  http://www.fws.gov/southdakotafieldoffice/PLOVER.HTM.  Accessed
February 2015.

U.S. Fish and Wildlife Service.  2012a.  Whooping Crane (*Grus americana*) 5-Year Review:
Summary  and  Evaluation.     http://ecos.fws.gov/docs/five_year_review/doc3977.pdf.
Accessed February 2015.

U.S. Fish and Wildlife Service.  2012b.  Endangered Species: Piping Plover.
http://www.fws.gov/mountain-prairie/species/birds/pipingplover/.  Accessed February
2015.

U.S. Fish and Wildlife Service.  2010.  Sprague's Pipit (*Anthus spragueii*) Conservation Plan.
http://www.fws.gov/mountain-prairie/species/birds/spraguespipit/SpraguesJS2010r4.pdf.
Accessed June 2015.

U.S. Fish and Wildlife Service.  2009.  Piping Plover (*Charadrius melodus*) 5-Year Review:
Summary and Evaluation.
http://www.fws.gov/northeast/endangered/pdf/piping_plover_five_year_review_and_sum
mary.pdf.  Accessed February 2015.

U.S. Fish and Wildlife Service.  2001.  Piping Plover Fact Sheet.
http://www.fws.gov/midwest/endangered/pipingplover/pipingpl.html.  Accessed
February 2015.

U.S. Geological Survey.  2013.  Northern Prairie Wildlife Research Center: Dakota Skipper
Butterfly (*Hesperia dacotae*).
http://www.npwrc.usgs.gov/resource/wildlife/nddanger/species/hespdaco.htm.  Accessed
February 2015.

USFWS_DAPL0002492

## FINDING OF NO SIGNIFICANT IMPACT

## DAKOTA ACCESS, LLC

## DAKOTA ACCESS PIPELINE PROJECT

## MOUNTRAIL AND WILLIAMS COUNTIES, NORTH DAKOTA AND CAMPBELL, MCPHERSON, EDMUNDS, FAULK, SPINK, KINGSBURY, MINER, LAKE, AND MINNEHAHA COUNTIES, SOUTH DAKOTA

**Introduction:** In accordance with section 102(2)(C) of the National Environmental Policy Act (42 U.S.C. § 4321) and the National Wildlife Refuge System Administration Act of 1966, as amended (16 U.S.C. § 668dd-668ee), the environmental assessment (EA) has been prepared to obtain a Special Use Permit (SUP) for the construction of the Dakota Access, LLC (Dakota Access) Dakota Access Pipeline Project (Project). The Project would cross privately owned lands encumbered by wetland and grassland easements managed by the U.S. Fish and Wildlife Service (USFWS). Specifically, the proposed Project crosses wetland and grassland easement features under USFWS jurisdiction within the Lostwood wetland management district (WMD) in North Dakota and the Sand Lake and Madison WMDs in South Dakota.

**Project Summary:** The overall proposed Project is an approximate 1,150-mile-long, 12-inch to 30-inch diameter pipeline that would connect the rapidly expanding Bakken and Three Forks production areas in North Dakota to existing crude infrastructure in Illinois. The Project originates in the northwest portion of North Dakota and traverses southeast through South Dakota, Iowa, and Illinois and terminates at the existing Patoka, Illinois hub. The pipeline is proposed to transport approximately 450,000 barrels of oil per day (bopd) initially, with an anticipated capacity 570,000 bopd or more. Once the crude arrives at the existing tank farms in Patoka, shippers would be able to access and distribute their crude to multiple markets, including Midwest and Gulf Coast markets via existing and proposed pipeline infrastructure.

**Alternatives:** Two different transportation (trucking and rail) alternatives were screened out from detailed consideration due to safety, reliability, and infrastructure concerns, all of which would create a greater impact for the purpose of the Project.

Dakota Access utilized a sophisticated and proprietary Geographic Information System (GIS) based routing program to determine the baseline pipeline route based on multiple publicly available and purchased datasets. Datasets utilized during the Project GIS routing analysis included engineering (e.g., existing pipelines, railroads, karst, and power lines, etc.), environmental (e.g., critical habitat, fault lines, state parks, national forests, brownfields, national registry of historic places, etc.), and land (e.g., dams, airports, cemeteries, schools, mining, and military installations, etc.).

Each of these datasets were weighted based on the risk (e.g., low, moderate, or high; however on a scale of 0 to 1000) associated with crossing or following certain features. In general, the preferred route for the pipeline would follow features identified as low risk, avoid or minimize crossing features identified as moderate risk, and exclude features identified as high risk.

The baseline centerline route (Route Alternative 1) was the output of the GIS routing analysis. The baseline route crossed 131 USFWS easements (seven easements within North Dakota and 124 easements within South Dakota). Dakota Access and the lead USFWS WMD (Sand Lake WMD) had an intensive route review in October 2014 of the baseline route and easements crossed to determine avoidance and minimization. During this review, the USFWS made recommendations on avoiding and minimizing impacts to the easements crossed by the Project. Grassland easements were prioritized for avoidance.

USFWS_DAPL0002416

Extensive coordination and review identified areas where Dakota Access could make route modifications to avoid and minimize potential impacts to USFWS easements (Appendix A).

**Preferred Alternative:** Implementation of the preferred alternative (Route Alternative 2) would require crossing six easements in North Dakota consisting of five wetland easements and one grassland easement all located within the Lostwood WMD. Additionally, 112 easements would be crossed in South Dakota consisting of three grassland easements and 109 wetland easements in Sand Lake and Madison WMDs. Dakota Access was unable to reroute completely around four (one in North Dakota and three in South Dakota) grassland easements due to constructability limitations, USFWS recommended avoidance of the grassland easements, therefore Dakota Access adjusted the proposed construction techniques at the grassland easements (i.e. bore or HDD). Therefore all surface impacts to grassland easements are avoided by the preferred route. The preferred route most closely meets the objectives of the Project, while minimizing potential impacts to the environment and USFWS easements

**Summary of Environmental Impact:** To avoid impacts to grassland easements Dakota Access adjusted the Project alignment to avoid crossing all grassland easements, except for three within South Dakota and one within North Dakota. The three South Dakota grassland easements are located in Campbell, Spink and Minnehaha counties; due to USFWS concerns regarding impacts to grassland easements and based on the proximity of these easements to roads or other features being crossed by a trenchless method (i.e. bore), respective bores were extended as needed to incorporate the easement and thus avoid surface impacts. The North Dakota grassland easement located in Mountrail County could not be avoided by bore; therefore, Dakota Access modified construction methods by utilizing HDD to cross the easement. Due to the size of this easement, transporting equipment across the easement to facilitate construction of the Project is required. To minimize potential impacts to the grassland easement, Dakota Access will install air bridge matting to be utilized as the designated travel lane for construction equipment. The air bridge travel lane will be located on an existing two-track road, approximately 250 feet north of the centerline. The use of air bridge matting will avoid potential soil compaction and ruts from equipment transport. Therefore, no adverse surface impacts to this grassland easement will result from the Project. All surface impacts to grassland easements in North Dakota and South Dakota have been avoided by route modifications or construction methods.

To reduce impacts to wetland easements Dakota Access minimized crossing wetland easements to the extent practicable. The preferred route will cross five wetland easements in North Dakota resulting in approximately 2.5 acres of temporary impacts. In South Dakota, the preferred route crosses 109 wetland easements with approximately 69.3 acres of temporary impacts. Total temporary impacts to wetland basins within USFWS easements in North Dakota and South Dakota is 71.8 acres. The total temporary impacts to the wetland basins (71.8 acres) would be less than 0.6 percent of the entire North Dakota and South Dakota Project footprint.

**Mitigation Measures:** All impacts to the environment would be temporary and not significant as a result of avoiding, minimizing and mitigation any potential impacts. Dakota Access has avoided surface impacts to grassland easements through construction design (i.e. bore and/or HDD), Dakota Access has designed the Project to avoid permanent fill in wetlands. Aboveground facilities have been sited outside of USFWS grassland easements and protected basins within wetland easements, resulting in no permanent impacts to these USFWS protected areas. Temporary impacts to wetlands will be limited to the construction phase. Where impacts were unavoidable, Dakota Access will implement best management practices (BMPs) to ensure that the wetland is restored post-construction in accordance with regulations and permits.

In order to mitigate the spread of any noxious weeds, Dakota Access will likely implement BMPs and weed control practices during construction and operation. Mitigation measures may include: treating known noxious weed infestations prior to ground disturbance, immediately reseeding following construction, and using weed-free seed in reclamation activities and erosion control materials.

See Section 7.0 in the EA for more details on best management practices and mitigation measures undertaken for this Project.

**Coordination and Public Review:** The notice of availability of the EA for public comment was published in twelve newspapers within North Dakota and South Dakota on December 18, 2015. Notices of availability were included in Public Notice section of the Bismarck Tribune, Williston Herald, Miner County Pioneer, The New Era, The Desmet News, The Argus Leader, The Salem Special, Huron Plainsman, Madison Daily Leader, Roscoe Hosmer Independent, Prairie Pioneer and McPherson County Herald.

The draft EA was available for viewing at the USFWS Sand Lake NWR and Madison Wetland Management District website homepages, in addition to hard copies being available at the following five libraries within North Dakota and South Dakota: Bismarck Veterans Memorial Public Library, Williston Community Liberty, Alexander Mitchell Public Library, Madison Public Library, and Sioux Falls Main Library.

All applicable comments received were addressed in the EA, and no significant comments remain unresolved. For more information on regarding comments received during the public review process, please see Section 10.2 of the EA.

**Conclusion:** After evaluating the anticipated environmental effects of the preferred alternative, it is my determination that allowing construction of the proposed Dakota Access Pipeline Project on privately owned lands encumbered by wetland and grassland easements under the management of the USFWS would not constitute a major federal action that would significantly affect the quality of the crossed wetland and grassland easements, I have determined that preparation of an Environmental Impact Statement is not required.

_____                    6/22/16
**Acting** Regional Director, Region 6                    Date
U.S. Fish and Wildlife Service



## DAPL Locations at Issue

- ◆ FWS Easements
- ▲ USACE Locations at Issue
- ▬ DAPL ROW
- — Missouri River
- ▣ Other Reservations
- ▣ Standing Rock Reservation
- ▣ Yankton Reservation
- ▢ State/Terr. Boundary

Lake Sakakawea Crossing

Lake Oahe Crossing

Cannonball ND

North Dakota

Standing Rock Reservation

South Dakota

Minnesota

Wisconsin

81 miles - approximate distance to nearest FWS EA location from Yankton Reservation

Yankton Reservation

400 miles - approximate distance measured along Missouri River center channel from Lake Oahe Crossing to Yankton Reservation

230 miles - approximate distance measured in straight line from Lake Oahe Crossing to Yankton Reservation

Wyoming

Nebraska

Colorado

Kansas

Iowa

Missouri

MISSOURI R

Illinois

Indiana

Mississippi River Crossing

Illinois River Crossing and Protection Levees

Lake Carlyle Crossings

Montana

N

0  25  50      100        150        200
Miles



**Harnois, Richard D NWO**

| | |
|---|---|
| **From:** | Lana Gravatt [yst.thpo@gmail.com] |
| **Sent:** | Monday, November 03, 2014 9:53 AM |
| **To:** | Harnois, Richard D NWO |
| **Subject:** | [EXTERNAL] DAPL test bores |

The Yankton Sioux THPO defers the above referenced project to the Cheyenne River and Standing Rock Tribes. Please contact them for any ground disturbance/monitoring. Thanks!

1

USACE_DAPL0067125

| District | USACE Name/POC | Date | Letters Received | Letters Sent | Site Visit/ Meeting | Emails | Phone Calls | Phone Calls Received | Notes |
|---|---|---|---|---|---|---|---|---|---|
| Omaha | Joel Ames | 9/17/2014 | | | | X | | | Standing Rock Sioux Tribe (SRST) - 1302 response to Waste' Win Young |
| Omaha | Joel Ames | 9/18/2014 | | | | X | | | SRST-attempts to arrange a meeting |
| Omaha | Joel Ames | 9/19/2014 | | | | X | X | | SRST-email and call with Waste' Win Youngs seeking meeting dates |
| Omaha | Joel Ames | 9/22/2014 | | | | X | | | SRST-1604 email to Waste' Win Young attempting to coordinate a meeting |
| Omaha | Joel Ames | 9/24/2014 | | | | X | | | SRST-1005 e-mail to Waste' Win Young attempting to meet 3 or 6 Nov |
| Omaha | Crossing 106/PA Price/Harnois | 10/24/2014 | | X | | | | | DAPL Crossing Boring PA information letter distributed |
| Omaha | Crossing 106/PA Price/Harnois | 12/18/2014 | | X | | | | | DAPL Crossing Boring PA determination letter distributed |
| Omaha | Joel Ames | 12/19/2014 | | | | X | | | SRST - 0854 email to Waste' Win Young requesting possible Jan 2015 meeting dates |
| Omaha | Joel Ames | 2/10/2015 | | | | | X | | SRST, face to face discussion with Waste' Win Young |
| MVS | Corps Regulatory | 2/13/2015 | | X | | | | | Mr. Joseph Blanchard - Absentee-Shawnee Tribe of Indians of Oklahoma - Called 13 Mar 2015. Left voice mail will try again later. Called 16 Mar 2015. Left voice mail. Called 18 Mar 2015. Advised he's out of town will be back tomorrow 19 Mar. Will try again then. Called 6 April 2015. Left message with receptionist asking Mr. Blanchard to call at his convenience or pass along message to  her advising if they received a copy of letter on the project  and/or are interested in commenting on the project. Receptionist called back 6 April 2015. Asked me to email copy of letter sent to Mr. Blanchard to: joseph.blanchard@astribe.com and cc Carol Butler at cabutler@astribe.com. Sent email as requested 6 April 2015. |
| MVR | Corps Regulatory | 2/13/2015 | | X | | | | | Mr. Darrell Curly Youpee THPO - 12,13, 16, 18 Mar 2015. Calls no answer. Checked tribal website for contact number 18 Mar 2015. Confirmed phone number is correct according to website. Called general tribe number 406-768-2300 on 6 April 2015. Spoke with Mr. Youpee's receptionist. She said he is in a workshop until Thursday April 9. Left my number, reason for call, i.e., to confirm receipt of letter, and request for call back. Called 16 April 2015. No answer. Found email address for Mr. Youpee on Internet Listing for THPO's nationwide. Sent an email with letter to Mr. Youpee at: cultres@nemontel.net  on 23 April 2015. Consider equivalent of confirmed call. |
| Omaha | Corps Regulatory | 2/13/2015 | | X | | | X (3/13/15) | | Mr. John Murray John.Murray@blackfeetplanning.org - Blackfeet Tribe - 13 Mar 2015.Will not be commenting on project. |
| Omaha | Corps Regulatory | 2/13/2015 | | X | | | X (4/7/15) | | Dr. Carson Murdy, Regional Archaeologist – BIA - 13 Mar 2015. Did not receive letter. Possibly because missing street address from address listed in column D. Street address is: 115 4th Ave. S.E. Confirmed rest of address is correct. Called 6 April 2015. Spoke to receptionist. She confirmed receipt of letter from project on the pipeline on 20 February. They are aware of project from North Dakota Utilities Commission communication as well. Asked her to have Dr. Murdy call if there are any questions on Corps involvement. Spoke to Dr. Murdy on 7 April 2015. He confirmed receipt of the Corps letter on the project. He wants to be kept "in the loop" on the project as it moves forward . |
| MVS | Corps Regulatory | 2/13/2015 | | X | | | X (4/6/15) | | Mr. Roy Hamilton THPO roy-hamilton@cherokee.org – Cherokee Nation - 13 Mar 2015. Left voice mail and noted will try again later. 16 Mar 2015 called. Advised Dr. Allen no longer with Cherokee Nation. Acting THPO is Mr. Roy Hamilton. Left voice mail message with Mr. Hamilton. Called 6 April 2015. Mr. Hamilton is acting POC and THPO. Asked me to email copy of letter on project. Emailed on 6 April 2015 to Mr. Hamilton at:roy-hamilton@cherokee.org Mr. Hamilton sent an email in reply on 4/6/15 stating that his tribe had no comments or concerns with the project. |
| Omaha | Corps Regulatory | 2/13/2015 | | X | | X (2/25/15) | X (3/12/15) | (3/19/15)s poke to DHill and would like to comment on this project. | STEVE VANCE THPO stevevance.crstpreservation@outlook.com – Cheyenne River Sioux Tribe - 12 Mar 2015. Confirmed receipt of letter on 17 February. Letter undated. Has asked the tribal committee he is responsible too if they want him to respond. They have concerns with project. Very lengthy project. Involves their aboriginal lands. Still questions how Corps handled Keystone Pipeline Project. Don't confuse their confirming receipt of a letter as consultation. Leadership changeover, federal appropriations, committee changes, tribal commitments, etc., will make it difficult to get comments to Corps by 30 March. May try, at best, to get an email to Omaha tribal liaison Joel Ames in interim. Will want to consult on  project. Advised Terry Little with Yanton Sioux Tribe is their new THPO. |
| Omaha | Corps Regulatory | 2/13/2015 | | X | | | X (4/6/15) | | Mr Alvin Windy Boy alvin@nei-yahw.com – Chippewa Cree Tribe of the Rocky Boys' Reservation - 13 Mar 2015. Phone number not valid. Correct number 406-395-4700. Mr. Windy Boy not available. THPO offices contacted. Advised consultation letters must be filed-posted on their website: http://www.nei-yahw.com Mr. Windy Boy called me 16 March 2015 and gave me cell phone number. Said he was in meetings all week. Called 17 Mar 2015 and spoke to  Mr. Windy Boy briefly. Said  he would call right back.  No call.  Called 18 March 2015. Voice mail box full no more calls accepted. Called on April 6, 2015 and left voice mail message. Mr. Windy Boy called me back soon after. He said his tribe IS interested in consultating on the project. He asked  me to send a copy of the letter to two people in his office that assist him on such matters, Neal Rosette and Kelsey Myers. Phone connection was poor and emails were initially were returned. Checked on line and tried to resend with copy to Mr. Windy Boy. Sent emails with copy of letter sent 17 Feb to Mr. Windy Boy to:kelsey.myers@nei-yahw.com  neal.rosette@nei-yahw.com and alvin@nei-yahw.com  Emails sent successfully. |
| MVS | Corps Regulatory | 2/13/2015 | | X | | | X (4/6/15) | | Dr. Kelli Mosteller THPO – Citizen Potawatomi Nation - 13 Mar 2015. Phone number not valid. Correct number 406-395-4700. Mr. Windy Boy not available. THPO office contacted. Advised consultation letters must be filed-posted on their website: http://www.nei-yahw.com Mr. Windy Boy called me 16 March 2015 and gave me cell phone number. Said he was in meetings all week. Called 17 Mar 2015 and spoke to Mr. Windy Boy briefly. Said  he would call right back. No call.  Called 18 March 2015. Voice mail box full no more calls accepted. Called on April 6, 2015 and left voice mail message. Mr. Windy Boy called me back soon after. He said his tribe IS interested in consultating on the project. He asked  me to send a copy of the letter to two people in his office that assist him on such matters, Neal Rosette and Kelsey Myers. Phone connection was poor and emails were initially were returned. Checked on line and tried to  resend with copy to Mr. Windy Boy. Sent emails with copy of letter sent 17 Feb to Mr. Windy Boy to:kelsey.myers@nei-yahw.com  neal.rosette@nei-yahw.com and alvin@nei-yahw.com  Emails sent successfully. |

DAPL - Appendix
Tribal Consultation Administrative Record

| District | USACE Name/POC | Date | Letters Received | Letters Sent | Site Visit/ Meeting | Emails | Phone Calls | Phone Calls Received | Notes |
|---|---|---|---|---|---|---|---|---|---|
| Omaha | Corps Regulatory | 2/13/2015 | | X | | X (2/25/15) | X (3/17/15) | | Mr. Darrell Zephier THPO darrellzethier78@gmail.com - Crow Creek Sioux Tribe - 13 Mar 2015. Left voicemail and noted will try again later. Called 17 Mar 2015 Mr. Darrell Zephier. He asked me to email a copy of the letter which I did. Enclosed attached map of county and states that will be crossed by the project. Emailed to his personal email: darrellzethier78@gmail.com |
| Omaha | Corps Regulatory | 2/13/2015 | | X | | X (2/25/15) | X (4/15/15) | X (4/15/15) | MR. EMERSON BULL CHIEF Emerson.bullchief@crow-nsn.gov emerson.bc@hotmail.com - Crow Nation - Called 13 Mar 2015. Left voicemail and noted will try again later. Mr. Bull Chief returned call and advised he was traveling. Will call after he returns to office Mr. Bull Chief returned call and advised he was traveling. Will call after he returns to office. Left voice mail message on 18 Mar 2015. Called 6 April 2015. Left voice mail message on Mr. Bull Chief voice mail. Called and spoke to Mr. Bull Chief on 15 April 2015. He confirmed receipt of letter. Did not have any comments. |
| MVS | Corps Regulatory | 2/13/2015 | | X | | | X (3/18/15) | | Ms. Nekole Alligood THPO - Delaware Nation, Oklahoma - Called 18 March 2015. Ms. Tamara Francis-Fourkiller is no longer THPO. Spoke with new THPO - Ms. Nekole Alligood. Confirmed receipt of Corps letter and will be sending out response today 18 Mar 2015. |
| MVS | Corps Regulatory | 2/13/2015 | | X | | | See Notes | | Dr. Bryce Obermeyer/Tribal Historic Preservation Officer - Delaware Tribe of Indian - Called 18 March 2015. Number listed has been disconnected no longer in service. Called tribal headquarters from website information.  Spoke to Ms. Jamie Felix - phone number 918-337-6590. Dr. Obermeyer is THPO and also professor local colige. He has no direct phone number. Ms. Felix will email message with my contact number. Could not locate letter sent to Dr. Obermeyer in Excel spread sheet of tribal contacts. Now two Deleware Tribes listed. One Oklahoma the other Kansas. |
| MVS | Corps Regulatory | 2/13/2015 | | X | | | X (4/24/15) | | Ms. Robin DuShane - Eastern Shawnee Tribe of Oklahoma - Called 18 Mar 2015. Ms. DuShane not in. Requested call back later. Called 16 April 2015. Receptionist transferred me to EXT 1845 for voice mail. Left voice mail message. Used NATHPO listing of THPO's on internet and emailed copy of letter to Ms. Dushane at: rdushane@estoo.net on 24 April 2015. |
| Omaha | Corps Regulatory | 2/13/2015 | | X | | | X (4/24/15) | | Mr. Wilfred Ferris THPO - Eastern Shoshone - Called 18 Mar 2015. Advised THPO is Mr. Wilford Ferris. Phone number 307-335-2081. Left voice mail message will try again later. Called 307-335-2081 on 16 April. Voice mail box full. Disconnected. Called back and spoke to receptionist at 307-332-4932. She gave me cell phone number 307-349-6406. Tried calling. No answer. That voice mail box also full.  Used NATHPO listing of THPO's on internet and emailed copy of letter to Mr. Wilfred Ferris at: wjferrisiii@yahoo.com on 24 April 2015. |
| MVR | Corps Regulatory | 2/13/2015 | | X | | X (2/18/15) | X (4/30/15) | | Elise Montoya THPO - Flandreau Santee Sioux Tribe of South Dakota - Called 13 Mar 2015. Left voice mail will try again later. Called 18 Mar 2015. Advised he was in the office but no answer. Left voice mail message and will try again later. Called 7 April 2015 and spoke to receptionist. She said Mr. Weston is no longer the THPO. THPO is Ms. Elise Montoya. Ms. Montoya is on travel until 9 February. Left a message on her voice mail asking if she had seen letter sent to Mr. Weston. Requested call back at her convenience. Called # listed for THPO on website 605-997-3891 on 16 April 2015. Receptionist said Ms. Montoya at lunch and transferred me to her voice mail. Left voice mail message on Ms. Montoya voice mail. Called 30 April 2015. Advised by phone receptionist Ms. Montoya email address: elise.montoya@fsst.org. Emailed a copy of the letter sent to Mr. Weston to Ms. Montoya on 30 April 2015. |
| MVS | Corps Regulatory | 2/13/2015 | | X | | | X (4/30/15) | | Ms Melissa Cook THPO - Forest County Potawatomi, Community, Wisconsin Cultural Center, Library & Museum - Called 18 Mar 2015. Left voice mail message and will try again later. Called 16 April 2015. Used number from NATHPO listing of THPO's on internet 800-960-5479 EXT 7428. Left message on voice mail for Ms. Cook. Sent an email to Ms. Cook at: melissa.cook@fcpotawatomi-nsn.gov with a copy of the 17 Feb letter on 30 April 2015. |
| MVS | Corps Regulatory | 2/13/2015 | | X | | | X  (4/7/15) | | Mr. Earl Meshigaud - Hannahville Indian Community - Called 18 Mar 2015. Automatic  phone message system does not work. weli. No extension or listing for Mr. Meshigaud. Dialing O for operator as option according to system gets response "invalid selection." Tried leaving voice message with executive council secretary Ms. Tammy Meshigaud. Will try again later. Called 7 April 2015. Spoke with Mr. Meshigaud. He wasn't sure if he saw Corps letter on project but his is busy on another issue and his tribe will not likely have any comments. He asked me to email copy of letter we sent to him which I did at: earlmeshigaud@hannahville.org. Emailed 7 April 2015. Mr. Meshigaud said he may  forward onto an associated tribe in Oklahoma. |
| MVS | Corps Regulatory | 2/13/2015 | | X | | | X (4/30/15) | | Mr. William Quackenbush THPO - Ho-Chunk Nation of Wisconsin - Called 18 Mar 2015. Not in. Left voice mail message will try again later. Called 8 April 2015. Phone receptionist said Mr. Quakenbush would not be in until Friday. Left voice mail message on Mr. Quakenbush voice mail. Called 16 April 2015. Left voice mail message on Mr. Quakenbush voice mail. Used NATHPO listing of THPO's on internet and sent an email to Mr. Quackenbush at: bill.quackenbush@ho-chunk.com with a copy of the 17 Feb letter on 30 April 2015. |
| MVR-MVS | Corps Regulatory | 2/13/2015 | | X | | X (2/18/15) | X (3/19/15) | | Lance Foster THPO - Iowa Tribe of Kansas and Nebraska - Called 13 Mar 2012. Left voice mail will try again later. Called 18 Mar 2015 left voice mail message. Mr. Lance Foster returned my call and shortly after and identified himself as the current THPO for the Iowa Tribe of Kansas and Nebraska.Replaced Mr. F. Martin Fee and Mr. Alan Kelsey previous THPO's. Mr. Kelsey and Mr. Fee are previous THPO's for the tribe. Mr. Foster asked me to email a copy of the Corps 17 February 2015 letter on the DAPL project which I did on 18 Mar 2015. Mr. Foster is at phone number listed  EXT 104. Email: lfoster@iowas.org. |
| MVS | Corps Regulatory | 2/13/2015 | | X | | | X (3/27/15) | | Dr. Bobi Roush THPO - Iowa Tribe of Oklahoma - Called 19 Mar 2015. Found website for cultural resources office and found a POC and phone number to try calling. See number added under phone column. Left a message with Ms. Bobi Roush asking if she received the Corps 17 Feb letter. Left a second voice mail message advised Dr. Roush on 25 Mar 2015. Ms. Roush returned my call on 27 March and left a voice mail message confirming receipt of the Corps letter on DAPL. She did not recall what it was about. She stated she works part time and she can be contacted by email at: broush@iowanation.org or calling her at 405-547-4360. |
| MVS | Corps Regulatory | 2/13/2015 | | X | | | X (3/19/15) | | Unknown THPO - Kickapoo Traditional Tribe of Texas - 19 Mar 2015. Tried unsuccessfully to locate a phone number and point of contact to follow up on letter sent. Unable to locate a phone number or POC. Closed out effort to contact on 19 March 2015 |

USACE_DAPL0005627

Tribal Consultation Administrative Record

| District | USACE Name/POC | Date | Letters Received | Letters Sent | Site Visit/ Meeting | Emails | Phone Calls | Phone Calls Received | Notes |
|---|---|---|---|---|---|---|---|---|---|
| MVS | Corps Regulatory | 2/13/2013 | | X | | | X (3/19/15) | | Mr. Fred Thomas POC - Kickapoo Tribe of Indians of Kansas - Called 19 Mar 2015. Left voice mail message. Will try again later. Received a call from Mr. Fred Thomas, Vice chairman for the Kickapoo Tribe of Indians of Kansason on 20 March. He said he has not seen the letter. Asked me to email a copy which I did. Emailed to: fred.thomas@ktik-nsn.gov   Mr. Thomas phone number: 785-486-2794 |
| MVR-MVS | Corps Regulatory | 2/13/2015 | | X | | | X (5/1/15) | | Mr. Kent Collier - Kickapoo Tribe of Oklahoma - Called 20 March 2015. Not in. Will try again later. Called 25 March 2015. No answer. Called 8 April 2015. Spoke to receptionist. She said number for Mr. Collier is 405-964-4227. Called no answer. Also called 405-964-2075 as listed in column to left. No answer. Called both of aforementioned numbers on 16 April 2015. No answer. Obtained Mr. Collier email from Kickapoo Tribe website. Sent email with copy of 17 letter addressed to him on 1 May 2015. |
| MVR | Corps Regulatory | 2/13/2015 | | X | | X (2/18/15) | X (4/8/15) | | Grace Goldtooth-Campos THPO - Lower Sioux Indian Community in the State of Minnesota - Called 25 March 2015. Left voice mail message Mr. Grace Goldtooth Campos. Will try again later. Called 8 April 2015. Phone number for Ms. Goldtooth Campos is 507-697-6185. Changed phone number in column to left to that number. Spoke to Ms. Goldtooth-Campos. She confirmed receipt of the Corps letter. She is putting together comments on the project. She is also interested in further consultation on the project and in participating in any meetings held on the project. |
| Omaha | Corps Regulatory | 2/13/2015 | | X | | | X (4/16/15) | | MR. ELGIN CROWS BREAST  redhawk@mhanation.com - Three Affiliated Tribes -Mandan, Hidatsa & Arikara Nation - Called 25 March 2015. Left message with receptionist. Mr. Crows Breast is  out sick this week. Called 31 Mar 2015. Left voice mail message with Mr. Elgin Crowsbreast EXT 1 at 701-862-2474. Called 10 April 2015. Left voice mail message with Extension 1 for Mr. Crowsbreast at phone number listed. Called 14 April 2015 and left voice mail message with THPO office at 701-862-2474 EXT 1 identified as Mr. Crowsbreasts' number. Also left message on cell phone listing for Mr. Crowsbreast at 701-421-8400. Also took note that two letters were sent to Mr. Crowsbreast with different name spellings. Spoke to Mr. Crows Breast on 14 April 2015. He asked me to forward a copy of the letter to him at: redhawk@mhanation.com. He confirmed tribe contact name is Three Affiliated Tribes. He also confirmed correct spelling of his last name is Crows Breast. Emailed letter to Mr. Crows Breast on 16 April 2015. |
| MVS | Corps Regulatory | 2/13/2015 | | X | | | X (3/25/15) | | Mr Todd Williamson - Match-e-be-nash-she-wish Band   of Potawatomi Indians of Michigan - Phone number listed was incorrect. Mr. Williamson phone number is 616-359-9610. Corrected in column to left. Called 25 March 2015. He does not know if they received letter. Asked me to email a copy to: todd.williamson@glt-nsn.gov  Emailed letter and msg 25 March 2015. |
| MVS | Corps Regulatory | 2/13/2015 | | X | | | X (4/13/15) | | Mr. George Strack - THPO - Miami Tribe - Called 26 March 2015. No answer. Left voice mail message. Directed to extension #2178 for Mr. Strack. No answer. Left voice mail with Miami Tribal Receptionist for Mr. Strack on 10 April 2015. Mr. Strack returned my call on April 10th stating he did receive the letter sent to him on the project. He asked me to call him at his  cell phone number: 317-625-1288. Spoke to Mr. Strack on 13 April. He confirmed receipt of Corps letter on project. Doesn't recall project being of concern to their tribal interests. Said 317 number better phone number for contacting him  on future projects. Added number to phone listing at left. |
| Omaha | Corps Regulatory | 2/13/2015 | | X | | | X (5/1/15) | | Ms. Yufna Soldier Wolf - THPO - Northern Arapaho Tribe - Called 26 March 2015. Directed to phone number for THPO office: 307-856-1628. No answer at that number. Left voice mail message. Called 10 April 2015. Left voice message with THPO office for Ms. Conrad. Called 22 April 2015 and left voice mail message for Mr. Conrad. Sent email with copy of letter to NATHPO internet listing THPO for Northern Arapaho - Ms. Darlene Conrad on 1 May 2015. Received email reply on 6 May 2015. Ms. Conrad said Ms. Yufna Soldier Wolf is THPO for Northern Arapaho tribe. Phone: 307-856-1628. Updated phone number column to the left. Ms. Soldier Wolf left voice mail on 5/7/15 indicating an interest in the project. Called her back her cell phone 307-840-0837. Advised her Omaha is point of contact on project. Gave her project manager Devetta Hill phone number as listed in February 17 letter to THPO. |
| Omaha | Corps Regulatory | 2/13/2015 | | X | | X (2/25/15) | X (4/10/15) | | Mr. James Walksalong -THPO james.walksalong@cheyennenation.com - Northern Cheyenne Nation - Called 26 March 2015. Spoke to Mr. Alfonso Spang. They have new tribal THPO - Mr. James Walksalong. He is out. Mr. Spang will look for letter and let Mr. Walksalong know about our contact when he gets back in the office. Spoke to Mr. Walksalong on 10 April 2015. He asked me to email copy of the letter to him at:James.walksalong@cheyennenation.com  Emailed letter on 10 April 2015. |
| MVS | Corps Regulatory | 2/13/2015 | | X | | | X (5/1/15) | | Mr. Jeff Chivis -THPO  jchivis@nhbpi.com - Nottawaseppi Huron Band of  Potawatomi, Michigan - Called 26 March 2015. Left voice mail message with Mr. Rodwan. Called 22 April 2015 and left voice mail message Mr. Rodwan voice mail. Checked internet listing for THPOs on 22 April. Mr. Jeff Chivis is listed as THPO for Nottawaseppi Huron Band of Potawatomi. Left voice mail message for Mr. Chivis at 269-704-8416. According to voice mail he is THPO for tribe. Sent email to Mr. Chivis at: jchivis@nhbpi.com on 1 May 2015 with a copy of the 17 February letter sent to Mr. Rodwan with the Nottawaseppi Huron Band of Potawatomi, Michigan. |
| Omaha | Corps Regulatory | 2/13/2015 | | X | | X (2/25/15) | X (3/26/15) | | Mr. Dennis Yellow Thunder - THPO  oglalathpo@goldenwest.net - Oglala Sioux Tribe - Called 26 March 2015. Spoke to Mr. Michael Catches Enemy. He is no longer the THPO. He transferred me to THPO, Mr. Dennis Yellow Thunder. Mr. Yellow Thunder believes he saw an email on the project. He asked me to forward a copy of the letter we sent to Mr. Catches Enemy. Emailed copy of letter to Mr. Yellow Thunder at: oglalathpo@goldenwest.net Received an email from Mr. Yellow Thunder on 26 March confirming receipt of the letter and advising they will required face to face meeting to consult on the project. Forwarded email to Joel Ames and Devetta Hill in Omaha. |
| MVR | Corps Regulatory | 2/13/2015 | | X | | X (2/18/15) | X (5/1/15) | | Mr. Thomas Parker - THPO thomaslp99@yahoo.com - Oglala Sioux Tribe - Called 26 March 2015. Advised by operator that Mr. Harlan is no longer THPO. Mr. Thomas Parker is THPO. Left voice mail message with Mr. Parker. Called 10 April 2015. Left voice mail message with Mr. Parker. Called 22 April 2015. Left voice mail message with Mr. Parker voice mail. Sent an email with copy of the Feb 2015 letter addressed to Mr. Harlan to Mr. Parker at NATHPO listing for THPOs at: thomaslp99@yahoo.com on 1 May 2015. |
| MVR | Corps Regulatory | 2/13/2015 | | X | | X (2/18/15) | X (4/10/15) | | Mr. James LeClair - THPO - Otoe-Missouria Tribe of Indians - Called 26 March 2015. Advised me that Mr. James LeClair is the THPO. Extension 142. No answer at that extension. Left voice mail message general delivery. Called 10 April 2015 and spoke to  Mr. LeClair. He had not seen letter. Asked me to email copy. Emailed copy of letter to Mr. LeClair at: jleclair@omtribe.org |

USACE_DAPL0005628

| District | USACE Name/POC | Date | Letters Received | Letters Sent | Site Visit/ Meeting | Emails | Phone Calls | Phone Calls Received | Notes |
|---|---|---|---|---|---|---|---|---|---|
| MVS-MVR | Corps Regulatory | 2/13/2015 | | X | | | X (3/26/15) | | Ms. Cynthia Stacy - POC - Peoria Tribe - Called 26 March 2015. Ms. Stacy. She advised there is no THPO for the tribe. She is point of contact on consultations. She recalls seeing letter but does not recall commenting on project. She will get the letter out and see if she needs to comment. She also advised her phone extension number is 31. Also, correct zipcode for their office is 74354. Corrected address and phone entries in columns to left. |
| MVS | Corps Regulatory | 2/13/2015 | | X | | | X (3/27/15) | | Mr. Marcus A. Winchester - THPO - Pokagon Band of Potawatomi Indians, Michigan and Indiana - Called 27 March 2015. Mr. Marcus Winchester is THPO. Spoke to Mr. Winchester about pipeline project. He said project is outside their historic area and they would defer to other tribes. Updated his phone number under the phone column to the left. |
| MVR | Corps Regulatory | 2/13/2015 | | X | | X (2/18/15) | X (3/19/15) | | Mr. Randy Teboe - THPO rteboe@poncatribe-ne.org - Ponca Tribe of Nebraska - 19 March 2015. Received a call from Mr. Randy Teboe the THPO for Ponca Tribe. Project. DAPL will impact tribal ancestral grounds. Will be interested in participating in consultation on the project. Emailed a copy of the letter to Mr. Robinette. Sent 17 Mar 2015 to Mr. Teboe at: rteboe@poncatribe-ne.org on 19 Mar 2015. |
| MVS | Corps Regulatory | 2/13/2015 | | X | | | X  (4/2/15) | | Ms. Hattie Mitchell - THPO - Prairie Band Potawatomi Nation - Called 27 March 2015. A Ms. Joyce Corero answered with voice mail message. Left voice mail message with Ms. Corero. Ms. Corero returned my call on 31 March 2015 and left voice mail message. She said Ms. Jancita Warrington has not been with the tribe for several years now. She referred to us Ms. Hattie Mitchell as a point of contact. Phone number 785-966-4004. Called on 31 March 2015 and got voice mail for Ms. Mitchell. Left a voice mail message. Will try again later. Spoke to Ms. Mitchell on 2 April 2015. She confirmed receipt of the Corps letter dated 17 February on the project. She is also the THPO. Updated listing to left with Ms. Hattie Mitchell as current THPO. |
| MVR | Corps Regulatory | 2/13/2015 | | X | | X (2/18/15) | X (5/4/15) | | Mr. Kyle Herdina - THPO - Prairie Island Indian Community in the State of Minnesota - Called 27 March 2015. Left voice mail message general delivery. Called 13 April. Spoke to phone receptionist. She stated Mr. Kyle Herdina is point of contact for tribal cultural resource issues. His extension is 4165. She connected me to voice mail for Mr. Herdina. Left voice mail on 13 April 2015. Left voice mail message Mr. Herdina voice mail on 22 April 2015. Located website for tribe and listing for Mr. Kyle Herdina. Sent voice mail to Mr. Herdina at: kyle.herdina@piic.org on 1 May 2015 with copy of 17 Feb 2015 letter addressed to THPO for Prairie Island Indian Community in State of Minnesota. Tried sending email three times even after confirming email address with phone receptionist. Failed to go through. On 4 May 2015 Asked phone receptionist if I could send to her and she agreed. Sent to: sarah.bartell@piic.org. She called back and confirmed receipt. Said she would forward letter to Mr. Herdina and his supervisor for reply. |
| MVS | Corps Regulatory | 2/13/2015 | | X | | | X (3/27/15) | | Mr. Everett Bandy - THPO ebandy@quapawtribe.com - Quapaw Tribe of Oklahoma - Called 27 March 2015. Spoke with Mr. Everett "Bandy" (not Brandy). Corrected name column to left). Mr. Bandy confirmed receipt of letter. Stated pipeline is outside their area of interest. Offered to provide maps to Corps for future reference on counties of interest to his tribe. Spoke with at length. Recommended sending certified letters to tribe on notifications, checking available website for current tribal historic preservation officer listings which he says is fairly accurate, and trying tribe websites for current THPO listings. (The two latter suggestions have already been followed). Mr. Bandy was very helpful. Emailed maps of project to him at: ebandy@quapawtribe.com  He said there email is very slow due to firewall so he also provided his personal email address and took a look at DAPL maps during the phone conversation. |
| Omaha | Corps Regulatory | 2/13/2015 | | X | | X (2/25/15) | X (4/13/15) | | Mr. Kade Ferris - Red Lake Band of Chippewa Indians - Called 30 March 2015. A Mr. Lee Peterson answered without identifying himself as THPO. Re-called number listed 218-679-1691. Does go to Mr. Peterson. Found number for Red Lake Tribal Office 218-679-3341. Called that number. Got voice mail for receptionist. Left voice mail message with that number looking for THPO. Called 13 April 2015. Spoke to Mr. Kade Ferris. Confirmed receipt of letter. Will defer to Sioux Tribes and Turtle Mountain Tribe located closer to the project. |
| Omaha | Corps Regulatory | 2/13/2015 | | X | | X (2/25/15) | X (5/1/15) | | Mr. Russell Eagle Bear - THPO rsstthpo.yahoo.com - Rosebud Sioux Tribe - Called 30 March 2015. Mr. Eagle Bear at lunch. Receptionist. Will try again later.Called 13 April 2015.  Called 14 April 2015. Receptionist said Mr. Eagle Bear in meeting asked me to call back in 10 minutes. Called back 20 minutes later. Receptionist said Mr. Eagle Bear and his secretary were still in a meeting. Receptionist offered to look for our letter dated 17 February and call me back if she found it to confirm they had it. Called 22 April 2015. Receptionist said Mr. Eagle Bear was in a meeting. She offered to look for letter and call back. Sent a copy of the Corps 17 Feb 2015 letter to Mr. Eagle Bear at NATHPO website listing for him as tribal THPO at: rsstthpo.yahoo.com on 1 May 2015. |
| MVS-MVR | Corps Regulatory | 2/13/2015 | | X | | | X (4/14/15) | | Mr. Gary Bahr gbahr@sacandfoxcasino.com - Sac & Fox Tribe of Missouri - Called 30 March 2015. Left voice mail message with general delivery. Also left message with receptionist at phone number 785-742-0053 for Mr. Bahr. She said would give message. See entry 53 below. Spoke to Mr. Bahr on 14 April 2015. Confirmed receipt of letter. Asked me to email another copy of letter. Otherwise, said project could go forward in their view but tribe should be contacted if any artifacts are found. Emailed another copy of the letter to Mr. Bahr at: gbahr@sacandfoxcasino.com |
| MVS-MVR | Corps Regulatory | 2/13/2015 | | X | | | Unable to contact | | Mr. Sandra Massey - Sac & Fox Nation of Oklahoma - Called 30 March 2015. Left voice mail message with receptionist. She advised Mr. Buffalo's brother in serious health situation. She will check to see if letter received. Called 14 April 2015. Spoke to Mr. Buffalo. He confirmed receipt of the Corps letter. Stated he will take another look at and if he has any comments will forward them via email. |
| MVS | Corps Regulatory | 2/13/2015 | | X | | | X (4/14/15) | | Mr. Jonathan Buffalo - POC - Sac & Fox Tribe of the Mississippi - Called 30 March 2015. Left voice mail message with receptionist. She advised Mr. Buffalo's brother in serious health situation. She will check to see if letter received. Called 14 April 2015. Spoke to Mr. Buffalo. He confirmed receipt of the Corps letter. Stated he will take another look at and if he has any comments will forward them via email. |
| MVR | Corps Regulatory | 2/13/2015 | h Bender- c | X | | | X (3/31/15) | | Judith Bender - POC - Sac and Fox Tribe of the Mississippi in Iowa - Called 31 March 2015 left voice mail message but assume receipt of tribal letter 30 Jan 2015 sufficient to confirm contact and interest. Corrected phone number column to left. Area code was not 515 as listed. Phone number for tribe is 641-484-4678. |

USACE_DAPL0005629

| District | USACE Name/POC | Date | Letters Received | Letters Sent | Site Visit/ Meeting | Emails | Phone Calls | Phone Calls Received | Notes |
|---|---|---|---|---|---|---|---|---|---|
| MVR | Corps Regulatory | 2/13/2015 | | X | | X (2/18/15) | X (4/23/15) | | Richard Thomas - THPO rick_thpo02@yahoo.com - Santee Sioux Nation - Called 402-857-334631 Mar 2015. Number is no longer in service. Called listing #56 for Mr. Thomas  402-857-2351. No answer. Called tribal office 402-857-2302. Confirmed that Mr. Thomas is THPO and number is 402-857-2351. Will try  again later. Corrected phone number listing to left. Called 14 April 2015. No answer. Called 22 April 2015. No answer. Found email address for Mr. Thomas on Internet Listing for THPO's nationwide. Sent an email with letter to Mr. Thomas at: rick_thpo02@yahoo.com on 23 April 2015. Consider equivalent of confirmed call. Received an email from Mr. Thomas on 23 April 2015 confirming receipt of Corps February 17 letter. Mr. Thomas says he is the THPO for Santee Sioux. He wants to consult on the project and a Class III survey in accordance with Section 106. He provided his office and cell phone number which are listed in the column to the left. An email sent acknowledging his email on the project was returned as undeliverable. |
| MVS | Corps Regulatory | 2/13/2015 | | X | | | X (4/23/15) | | Ms Kim Jumper - Shawnee Tribe - Called 31 Mar 2015. Receptionist said Ms. Jumper is at training and will be back in the office on Thursday. She recommended calling back Thursday at 9:30 am. Will try again then. Left a voice mail message for Ms. Jumper on 2 April 2015. Spoke to Ms. Jumper by phone on 23 April 2015. She stated she's  sure they have received letter. She will look for and get a response to Corps as soon as possible. |
| MVR-Omaha | Corps Regulatory | 2/13/2015 | | X | | X (2/25/15) | X (4/3/15) | | Ms. Dianne Derosiers - THPO dianned@swo-nsn.gov - SISSETON-WAHPETON OYATE - Called 31 Mar 2015. Receptionist said Ms. Derosiers was in a meeting. Left a message willing to return call at her convenience. Ms. Derosiers called on 3 April 2015. Their tribe wants to continue to be involved in consultation on the project. Ms. Derosiers would be interested in participating in any meeting held  on the project. She said tribal elders have been asking her about the project. She asked me to email a copy of the Corps letter and map to her attention dated 17 February 2015. Asked me to  email to dianned@swo-nsn.gov Emailed copy of letter and map to her on 3 April 2015. |
| MVR-Omaha | Corps Regulatory | 2/13/2015 | | X | | X (2/25/15) | X (4/1/15) | | Dr. Erich Longie -THPO thpo@gondtc.com - Spirit Lake Tribe of Fort Totten - Called 31 March 2015. 701-351-2175. Auto message said "Person you called have voice mail message box that has not been set up. Goodbye!" Automatically disconnected. Believe this is same point of contact an listing 861 below. Called 701-766-4221. Auto dialing system. Left a message with tribal administrative assistant who was on another call requesting assistance with correct number and POC. Called 1 April 2015. Spoke to Dr. Erich Longie. He said he believes he received our letter dated February 17, 2015. Asked me to email another to him. They are in transition of changing their notification system. Asked me to email letter and map to: THPO@gondtc.com Emailed letter addressed to Dr. Longie dated 17 Feb to that address on 1 Apr 2015. |
| Omaha | Corps Regulatory | 2/13/2015 | | X | | X (2/25/15) | X (3/24/15) | | Waste' Win Young -THPO wyoung@standingrock.org - Standing Rock Sioux Tribe - 4/8 Jason Renschler returned call of Kelly Morgan to discuss future realignments. |
| MVS | Corps Regulatory | 2/13/2015 | | X | | | X (4/14/15) | | Dr. Andrea Hunter - THPO ahunter@osagenation-nsn.gov - The Osage Nation - Called 31 Mar 2015. Left voice mail message. Person answering number not Dr. Hunter. Will try again later. Called 14 April 2015. Number listed for Dr. Hunter was incorrect. Correct number for Dr. Hunter is 918-287-5671. Added to phone column at left.  Spoke to Dr. Hunter on 14 April. She could find no record that the Corps letter was received in her office. Confirmed address is correct that letter was sent to. Dr. Hunter said they are interested in the project. Emailed a copy of the letter sent to Dr. Hunter to  her at: ahunter@osagenation-nsn.gov on 14 April. |
| Omaha | Corps Regulatory | 2/13/2015 | X (19 Feb 2015 Mr. Nadeau spoke to Joel A & Martha C. regarding 5 items. See email dated 19 Feb 3:02pm) | | | X (2/19/15) | X (3/31/15) | | MR. BRUCE NADEAU -THPO / brucefnadeau@gmail.com - Turtle Mountain Band of Chippewa Indians - Did not call in accordance with email dated 19 February 2015 noted in column to left. |
| MVS | Corps Regulatory | 2/13/2015 | | X | | Defers consultation email 2/25 | See Notes | | Ms. Lisa Larue-Baker - THPO - United Keetoowah Band of Cherokee - 2/25 email: Thank you for your recent letter regarding this project, including maps.  The United Keetoowah Band of Cherokee Indians in Oklahoma respectfully defers consultation to other federally-recognized tribes who have a historic interest in the APE. |
| MVR | Corps Regulatory | 2/13/2015 | | X | | X (2/18/15) | X (4/24/15) | | Mr. Marlow LaBatte - THPO - Upper Sioux Community - Called 1 Apr 2015. No answer. Will try again later. Called 14 April 2015. Left message with general delivery voice mail. Confirmed phone number and name of THPO as same as listed on website listing for nationwide THPO's. Called 24 April 2015 and left voice mail message with Mr. LaBatte voice mail. Followed up with email to: marlowl@uppersioux-nsn.gov |
| Omaha | Corps Regulatory | 2/13/2015 | | X | | X (4/25/15) | X (4/1/15) | | Mr. Dennis Gill, Sr.  zibe2000@hotmail.com - Wahpekute Band of Dakotah - Called 1 Apr 2015 number listeed; i.e., 605-947-3430. Message says phone disconnected or no longer in service. Attempted to find website for Wahpekute Tribe. Could not find one. |
| MVS | Corps Regulatory | 2/13/2015 | X (4/1/15) | | | | X (4/1/15) | | Ms. Emily DeLeon emily.smith@winnebagotribe.com - Winnebago Tribe of Nebraska Little Priest Tribal College - Called 1 Apr 2015. Spoke to Ms. Smith-DeLeon. She asked me to email copy of letter to emily.smith@winnebagotribe.com. Emailed the letter and map. Received an email from Ms. Emily Smith-Deleon with letter enclosed dated 1 April addressed to Martha Chieply indicating project could impact ancestral sites. Wants to be notified if that happens. Forwarded letter to project managers. I didn't have permission to save a copy of Ms. Smith-DeLeon letter to share drive under response letters. |
| MVR-Omaha | Corps Regulatory | 2/13/2015 | | X | | X (2/18/15) | X (4/2/15) | | Perry Little - THPO - Yankton Sioux Tribe of South Dakota - Called 1 Apr 2015. Spoke to receptionist. She said Mr. Gravatt and Mr. Miller are no longer with the office.There is just one point of contact. Mr. Perry Little is the THPO for the Yankton Sioux Tribe. Called 2 April 2015 and spoke to Mr. Perry Little. He is current THPO. His phone number is 605-469-6056. He said he was in the field with the Corps as we spoke looking at a TCP site. He recalled getting the Corps letter on the project dated 17 Feb. He said he will look at it when he gets in the office. |
| Omaha | Martha Chieply | 2/17/2015 | | X | | | | | SRST, Letter sent to Waste' Win Young from Regulatory (Martha Chieply). Requesting comments on PCN actions. |

Tribal Consultation Administrative Record

| District | USACE Name/POC | Date | Letters Received | Letters Sent | Site Visit/ Meeting | Emails | Phone Calls | Phone Calls Received | Notes |
|---|---|---|---|---|---|---|---|---|---|
| Omaha | Crossing 106/PA Price/Harnois | 2/18/2015 | X | | | | | | SRST THPO to Rick Harnois on soil borings and other items |
| Omaha | Crossing 106/PA Price/Harnois | 2/18/2015 | | X | | | | | DAPL Crossing PA information letter distributed |
| MVR | Corps Regulatory | 2/18/2015 | | | | X | | | Mr. Darrell Curly Youpee THPO - 12,13, 16, 18 Mar 2015. Calls no answer. Checked tribal website for contact number 18 Mar 2015. Confirmed phone number is correct according to website. Called general tribe number 406-768-2300 on 6 April 2015. Spoke with Mr. Youpee's receptionist. She said he is in a workshop until Thursday April 9.  Left my number, reason for call, i.e., to confirm receipt of letter, and request for call back. Called 16 April 2015. No answer. Found email address for Mr. Youpee on Internet Listing for THPO's nationwide. Sent an email with letter to Mr. Youpee at: cultres@nemontel.net  on 23 April 2015. Consider equivalent of confirmed call. |
| Omaha | Joel Ames | 2/25/2015 | X | | | | | | SRST THPO to Martha Chieply on soil borings and other items |
| Omaha | Crossing 106/PA Price/Harnois | 2/25/2015 | X | | | | | | DAPL Crossing comments from Cheyenne river Sioux Tribe to Martha |
| Omaha | Joel Ames | 3/30/2015 | | | | X | | | SRST-emails between Waste' Win Young and Joel Ames |
| Omaha | Joel Ames | 3/30/2015 | | | | X | | | SWST-email from Dianne indicating interest in the DAPL project |
| MVS | Corps Regulatory | | | | | | X | | Mr. Joseph Blanchard - Absentee-Shawnee Tribe of Indians of Oklahoma - Called 13 Mar 2015. Left voice mail will try again later. Called 16 March 2015. Left voice mail. Called 18 March 2015. Advised he's out of town will be back tomorrow 19 Mar. Will try again then. Called 6 April 2015. Left message with receptionist asking Mr. Blanchard to call at his convenience or pass along message to  her advising if they received a copy of letter on the project  and/or are interested in commenting on the project. Receptionist called back 6 April 2015. Asked me to email copy of letter sent to Mr. Blanchard to: joseph.blanchard@astribe.com and cc Carol Butler at cabutler@astribe.com. Sent email as requested 6 April 2015 |
| Omaha | Joel Ames- Martha Chieply | 4/8/2015 | X | | | | | | DAPL Regulatory Standing Rock Sioux Tribe follow up consultation request waste Win to Martha |
| MVR | Corps Regulatory | 4/23/2015 | | | | | X | | Mr. Darrell Curly Youpee THPO - 12,13, 16, 18 Mar 2015. Calls no answer. Checked tribal website for contact number 18 Mar 2015. Confirmed phone number is correct according to website. Called general tribe number 406-768-2300 on 6 April 2015. Spoke with Mr. Youpee's receptionist. She said he is in a workshop until Thursday April 9.  Left my number, reason for call, i.e., to confirm receipt of letter, and request for call back. Called 16 April 2015. No answer. Found email address for Mr. Youpee on Internet Listing for THPO's nationwide. Sent an email with letter to Mr. Youpee at: cultres@nemontel.net  on 23 April 2015. Consider equivalent of confirmed call. |
| Omaha | Joel Ames | 5/11/2015 | | | | X | X | | Northern Cheyenne Tribes, conversations with James WalksAlong |
| Omaha | Joel Ames | 6/2/2015 | | | | X | X | | Santee Sioux- email and discussions with James White |
| Omaha | Joel Ames | 6/24/2015 | | | | X | | | SRST-email to Waste' Win Young |
| Omaha | Joel Ames | 6/24/2015 | | | | X | | | SRST-1143 email to Waste' Win Young confirmation(1143) confirms she read it the same day, No Callback |
| Omaha | Joel Ames | 6/24/2015 | | | | X | | | SRST-1319 e-mail from Waste' Win Young indicates leave of absence until July 27 |
| Omaha | | 7/22/2015 | | X | | | | | DAPL- PA Letter sent on alignment of pipeline. |
| Omaha | Crossing 106/PA Price/Harnois | 7/22/2015 | X | | | | | | DAPL Crossing Boring Standing Rock Sioux Tribe Comments (to Rick Harnois) |
| Omaha | Joel Ames | 8/3/2015 | | X | | | | | SRST – Col. Henderson response to Chairman Archambault II letter dated 8/19/2015 |
| Omaha | Crossing 106/PA Price/Harnois | 8/7/2015 | X | | | | | | DAPL Crossing Standing Rock Sioux Tribe letter to Eric Stasch |
| Omaha | Crossing 106/PA Price/Harnois | 8/17/2015 | X | | | | | | Cheyenne River Sioux River PA comment letter received to Rick Harnois |
| Omaha | Crossing 106/PA Price/Harnois | 8/19/2015 | X | | | | | | DAPL Crossing Standing Rock Sioux Tribe letter to Col. Cross |
| Omaha | Crossing 106/PA Price/Harnois | 8/19/2015 | X | | | | | | DAPL Crossing and possibly Regulatory, Standing Rock Sioux Tribe FOIA letter to ASA Darcy |
| Omaha | Joel Ames | 8/19/2015 | | | | X | | | SRST-emails with Johnelle |
| Omaha | Crossing 106/PA Price/Harnois | 8/19/2015 | | | | X | | | DAPL Crossing Standing Rock Sioux Tribe email Kelly M to Rick Harnois not attending site walk through |
| Omaha | Crossing 106/PA Price/Harnois | 8/21/2015 | X | | | | | | DAPL Crossing Standing Rock Sioux Tribe THPO to Eric Stasch |
| Omaha | Crossing 106/PA Price/Harnois | 8/21/2015 | | X | | | | | DAPL Crossing COE Eric Stasch to Standing Rock Sioux Tribe THPO |
| Omaha | Joel Ames | 8/21/2015 | | | | X | | | SRST-email from Waste' Win Young |
| Omaha | Crossing 106/PA Price/Harnois | 8/21/2015 | | | | X | X | | SRST-Voicemail for Waste' Win Young, No Response |
| Omaha | Crossing 106/PA Price/Harnois | 8/28/2015 | X | | | | | | NDSHPO letter to Rick Harnois on PA |
| Omaha | COL Henderson | 9/3/2015 | | X | | | | | SRST-Chairman Archambault from COL Henderson.  Initiate Section 106 consultation and PCN notifications. |
| MVS | Corps Regulatory | 9/3/2015 | | | X | | | | Governor Edwina Butler-Wolfe - Absentee-Shawnee Tribe - Called 10/26/15 to ask if September 3 letter received. Receptionist said they would check and call back. Did not get a call back. Called 11/17/15. Transferred to cultural resource office "Tracy". Left voice mail message on mail box 6324. |
| Omaha & MVR | Corps Regulatory | 9/3/3025 | | | X | X (11/17/15) | X (11/17/15) | | Floyd Azure, Chairman - Assiniboine and Sioux Tribes of the Fort Peck In Montana - Called 10/26/15 to ask if September 3 letter received. Number provided 406-768-5155 did not work. Called 406-768-2300. Phone receptionist said Chairman Azure retiring November 2. Elections scheduled Oct 31. Assistant "Sidney" will check on letter and call back. Called 11/17/15. Spoke to "Sidney." She transferred me to extension 2312 secretary who handles mail. Left voice mail message. Lisa called back shortly after. Asked me to email copy of the letter to her at:lnperry_101112@yahoo.com  Sent email.  She also advised Floyd Azure was re-elected Chairman on 10/31/15. Email sent successfully. Consider confirmation that letter was received. |

USACE_DAPL0005631

| District | USACE Name/POC | Date | Letters Received | Letters Sent | Site Visit/ Meeting | Emails | Phone Calls | Phone Calls Received | Notes |
|---|---|---|---|---|---|---|---|---|---|
| Omaha | Corps Regulatory | 9/3/2015 | | X | | | | | Mr. Harry Barnes, Chairman - Blackfeet Tribe - Called 10/26/15 to ask if September 3 letter received. Automated answering machine picked up for both numbers listed Column E. Left message. Tried phone number from THPO listing used earlier this year for Mr. John Murray. Directed to planning office at 406-338-7181. Planning Office directed to assistant Chairman's office, Mr. James McNeeley at 406-338-3513. Left voice mail message. Called 11/17/15 and referenced my October 26 phone call attempt. Left a second voice mail message with Mr. McNeeley, Chairman Barnes assistant. |
| MVS | Corps Regulatory | 9/3/2015 | | X | | | | | Principal Chief Bill John Bake - Cherokee Nation - Called 10/26/15 to ask if September 3 letter received. Transferred by phone receptionist to Chief office. Left voice mail message. Called 11/17/15 and spoke to "Sandra" in chief's office. She took down information on project and my number and said she would give to chiefs assistant when they returned. |
| Omaha | Corps Regulatory | 9/3/2015 | | X | | X (11/17/15) | X (11/17/15) | | Mr. Harold Frazier, Chairman - Cheyenne River Sioux Tribe - Called 10/26/15 to ask if September 3 letter received. Message and phone number left with a chairman's assistant and they will call back. Called 11/17/15 and spoke to receptionist in Chairman's office. She confirmed receipt of a letter on September 4 but also suggested I email copy to Chairman Frazier at: HaroldCFrazier@yahoo.com Email sent successfully. Consider confirmation that letter was received. |
| MVS | Corps Regulatory | 9/3/2015 | | X | | | X (11/17/15) | | Mr. Richard Morsette, Chairman - Chippewa Cree Tribe of the Rocky Boys' Reservation - Called 10/26/15 to ask if September 3 letter received. Mr. Morsette is new chairman according to phone receptionist. Left voice mail message with Chairman's office. Called 11/17/15 and spoke with "Richard" in Chief's office. He confirmed receipt of letter and said that it had been forwarded to THPO office, attention of Alvin Windy Boy. |
| Omaha | Corps Regulatory | 9/3/2015 | | X | | | | | Chairman John Barrett - Citizen Potawatomi Nation - Called 10/26/15 to ask if September 3 letter received. Left voice mail message. Called 11/17/15. Transferred to secretary in Chief's office, Ms. Jamie Mocha. Left two messages as was unsure of first connection. |
| Omaha | Corps Regulatory | 9/3/2015 | | X | | | | | Ms. Roxanne Sazue, Chairperson - Crow Creek Sioux Tribe - Called 10/26/15 to ask if September 3 letter received. Left voice mail message. Called 11/17/15. Transferred to Chairman's office. Left voice mail message with Extension 105. Asked for call back to confirm receipt of letter. |
| Omaha | Corps Regulatory | 9/3/2015 | | X | | X (11/17/15) | X (11/17/15) | | Mr. Darin Old Coyote - Crow Nation - Called 10/26/15 to ask if September 3 letter received. No answer at either phone number listed column E. Called 11/17/15 and spoke to Ms. Rena Yellow Robe. She was not sure if letter was received. Asked me to email her a copy at: rena.yellowrobe@crownation-nsn.gov Emailed copy. Email sent successfully. Consider confirmation that letter was received. |
| MVS | Corps Regulatory | 9/3/2015 | | X | | | | | President Clifford Peacock - Delaware Nation of Oklahoma - Called 10/26/15 to ask if September 3 letter received. Transferred to another office. Left voice mail message with Ms. Diane Butler. Called 11/17/15. Transferred to Ms. Butler voice mail. Left a second voice mail message. |
| MVS | Corps Regulatory | 9/3/2015 | | X | | | X (10/26/15) | | Chief Paula Pechonick - Delaware Tribe of Indians - Called 10/26/15 to ask if September 3 letter received. Phone number listed in column E was discontinued and no longer in service. Found a number that worked 918-337-6590. There is a new tribal chief, Chief Chet Brooks. Left a voice mail message with Chief assistant Dana Merril. She called back same day and confirmed they receipt of the Corps letter. She said if we had any questions to call her at 918-337-6527. |
| MVS | Corps Regulatory | 9/3/2015 | | X | | | X (11/18/15) | | Chief Glenna J. Wallace - Eastern Shawnee Tribe of Oklahoma - Called 10/26/15 to ask if September 3 letter received. Phone message system is messed up. Left a voice mail message with Glenna J. Wallace voice mail. Called 11/18/15. Transferred to various extensions and Casino phone number 918-666-9200. Directed to phone number 918-666-5151. Left a voice mail with Ms. Glenna J. Wallace voice mail. Updated tribal phone number column E. |
| Omaha | Corps Regulatory | 9/3/2015 | | X | | | X (10/27/15) | | Mr. Darwin St. Claire, Jr. - Eastern Shoshone Tribe - Called 10/27/15 to ask if September 3 letter received. Phone number 307-332-3532 in column E has been discontinued and is no longer in service. Spoke to "Jewell" at 307-332-4932. She confirmed receipt of the letter. |
| Omaha | Corps Regulatory | 9/3/2015 | | X | | X (11/18/15) | X (11/18/15) | | Mr. Anthony Reider, Chairman - Flandreau Santee Sioux Tribe - Called 10/27/15 to ask if September 3 letter received. Spoke to Elise Montoye, administrative assistant. She will check with Garrie Kills A Hundred, tribal THPO and call back.Called 11/18/15. Spoke to Mr. Garrie Kills A Hundred. He asked me to email copy of letter to him and he will respond. Emailed to: garrie.killsahundred@fsst.org. Email sent successfully. Consider confirmation that letter was received. |
| MVS | Corps Regulatory | 9/3/2015 | | X | | | X (11/18/15) | | Chairman Harold Frank - Forest County Potawatomi - Called 10/27/15 to ask if September 3 letter received. Phone number 715-478-2903 listed in column E has been discontinued and is no longer in service. Found and called phone number 800-960-5479. Receptionist answered and transferred call to Chairman Frank's voice mail. Left a voice mail message asking if letter received. Called 11/18/15. Administrative assistant confirmed receipt of letter and said it was transferred to their council. |
| Omaha | Corps Regulatory | 9/3/2015 | | X | | | X (10/27/15) | | Mr. Mark F. Azure, President - Fort Belknap Indian Community - Called 10/27/15 to ask if September 3 letter received. Spoke to receptionist who confirmed letter was received and forwarded to THPO office. |
| MVS | Corps Regulatory | 9/3/2015 | | X | | | | | Chairman Kenneth Meshigand - Hannahville Indian Community of Michigan - Called10/27/15 to ask if September 3 letter received. Spoke to Jackie who transferred me to tribal coordinator Scott Wieting office at 906-723-2295. Left voice mail message with Mr. Wieting. Called 11/18/15. Left a second voice mail message with Mr. Scott Wieting, the tribal environmental coordinator. |

USACE_DAPL0005632

Tribal Consultation Administrative Record

| District | USACE Name/POC | Date | Letters Received | Letters Sent | Site Visit/ Meeting | Emails | Phone Calls | Phone Calls Received | Notes |
|---|---|---|---|---|---|---|---|---|---|
| MVS | Corps Regulatory | 9/3/2015 | | X | | X (11/18/15) | X (11/18/15) | | President Wilfrid Cleveland - Ho-Chunk Nation of Wisconsin - Called 10/27/15 to ask if September 3 letter received. Left voice mail message. Called 11/18/15. Spoke with phone receptionist. She recommended sending email copy of letter to executive assistant Ms. Sarah Lemieux at email: sarah.lemieux@ho-hunk.com. She also advised President Greendeer is no longer president. New president since July 2015 is Mr. Wilfried Cleveland. There were internet system outlook connections these dates. Letter in outgoing mail. Will check to see if sent.  Email sent to Ms. Lemieux successfully. Consider confirmation that letter was received. |
| MVS | Corps Regulatory | 9/3/2015 | | X | | X (11/18/15) | X (11/18/15) | | Chairman Tim Rhodd - Iowa Tribe of Kansas and Nebraska - Called 10/27/15 to ask if September 3 letter received. Left message with receptionist. Mr. Tim Rhodd returned call on October 29 and left a message asking me to call back. Called back October 29. Mr. Rhodd was on a conference call. Left second voice mail message. Called 11/18/15. Spoke to receptionist who said Mr. Rhodd on vacation until next week. Said I could email copy of the letter to Mr. Rhodd at his email address: trhodd@iowas.org There were internet system outlook connections this date. Letter in outgoing mail. Will check to see if sent. Sent email successfully. Consider confirmation that letter was received. |
| MVS | Corps Regulatory | 9/3/2015 | | X | | X (11/18/15) | X (11/18/15) | | Chairman Bobby Walkup - Iowa Tribe of Oklahoma - Called 10/27/15 to ask if September 3 letter received. Receptionist advised that Chairman Gary Pratt who letter was addressed to had passed away. New Chairman is Bobby Walkup. Left voice mail message with Chairman Walkup office. Called 11/18/15 and spoke with phone receptionist Misty. She said Mr. Walkup out of the office this week and gave me his email address:bwalkup@iowanation.org. Sent email.There were internet system outlook connections this date. Letter in outgoing mail. Will check to see if sent. Email sent successfully. Consider confirmation that letter was received. |
| MVS | Corps Regulatory | 9/3/2015 | | X | | | | | Chairman Juan Garza - Kickapoo Traditional Tribe of Texas - Called 10/27/15 to ask if September 3 letter received. Left a voice mail message with Chairman Garza voice mail. Called 11/19/15. Receptionist transferred call to extension. No one answered. Called back and spoke to receptionist. Transferred again to extension. No answer. |
| MVS & MVR | Corps Regulatory | 9/3/2015 | | X | | X (11/19/15) | X (11/19/15) | | Chairman Lester Randall - Kickapoo Tribe of Indians of Kansas - Called 10/27/15 to ask if September 3 letter received. Receptionist advised that Vice Chairman Fred Thomas is point of contact on such matters. Called Mr. Thomas office and spoke with receptionist. Mr. Thomas was not available. She will pass message along to Mr. Thomas and ask to return call. Called 11/19/15. Was adviced Mr. Thomas was point of contact but that he was not in the office. Offered to send an email copy of letter. Receptionist gave me email address for Mr. Thomas: fred.thomas@ktik-nsn.gov. Emailed letter. Email sent successfully. Consider confirmation that letter was received. Updated Chairman and tribal listing to eliminate duplicates. |
| MVS & MVR | Corps Regulatory | 9/3/2015 | | X | | X (10/27/15) | X (10/27/15) | | Chairman David Pacheco - Kickapoo Tribe of Oklahoma - Called 10/27/15 to ask if September 3 letter received. Receptionist advised Mr. Salazar is no longer tribal chairman. Mr. David Pacheco is new tribal chairman. His contact number is 405-964-7053. Spoke to "Jennifer". Jennifer asked me to email copy of letter to her at jmcginley@oktt.net. Emailed copy of letter addressed to Chairman Tony Salazar as well as letter addressed to Chairman Gilbert Salazar although likely duplicate letters sent to the same tribe. See entry #31 below. Sent 10/27/15. Email sent successfully so consider confirmation of receipt of letter. Updated information to remove duplicate and add new Chairman name...David Pacheco. |
| Omaha | Corps Regulatory | 9/3/2015 | | X | | | | | Mr. Kevin Wright, Chairman (Acting) - Lower Brule Sioux Tribe - Called 10/28/15 to ask if September 3 letter received. Receptionist advised that Chairman Michael Jandreau passed away last April. Mr. Kevin Wright is Acting Chairman. Receptionist transferred me to Chairman Wright administrative assistant, Mr. Gerald Jandreau, late Chairman Michael Jandreau son. Left a voice mail with Chairman's voice mail. Called 11/19/15. Receptionist transferred me to voice mail for "Lee". Left voice mail message asking for return call and offering to email copy of letter if needed. |
| MVR | Corps Regulatory | 9/3/2015 | | X | | X (11/19/15) | X (11/19/15) | | President Bob Larsen - Lower Sioux Indian Community in the State of Minnesota - Called 10/28/15 to ask if September 3 letter received. Receptionist advised that President Gabe Prescott has not been President for over two years now. Mr. Bob Larsen is new President. Left message President Larsen voice mail asking him or assistant return call to advise if letter received. Called 11/19/15. Receptionist said Mr. Larsen not available. Provided email address for Mr. Larsen at: robert.larsen@lowersioux.com. Emailed copy of letter. Email sent successfully. Consider confirmation letter received. Updated Chairman's name for the listing. |
| Omaha | Corps Regulatory | 9/3/2015 | | X | | X (11/19/15) | X (11/19/15) | | Mr. Mark Fox, Chairman - Mandan, Hidatsa & Arikara Nation - Called 10/28/15 to ask if September 3 letter received. Transferred to Shelby Bears Tail. Left voice mail  message. Called 11/19/15 and spoke to Ms. Norma Baker - executive assistant to Chairman. She suggested I email copy of letter to her and she will see that Chairman Fox is aware of it. Gave me her email address at: nbaker@mhanation.com Emailed copy of letter. Email sent successfully. Consider confirmation that letter was received. |
| MVS | Corps Regulatory | 9/3/2015 | | X | | | | | Chairman D.K. Sprague - Match-e-be-nash-she-wish Band of  Potawatomi Indians of Michigan - Called 10/28/15 to ask if September 3 letter received. Phone number 616-681-8803 listed in column E has been discontinued and is no longer in service. Tried directory assistance for current contact number and several phone numbers including 616-359-9610 and 616-681-0360 no longer in service and 866-564-7429 all circuits busy. Located phone number 269-397-1780 for "Gun Lake Tribe", on website www.mbp.org. Spoke to receptionist. Advised that Chairman Sprague and his assistant Ms. Cathy Buckley were not available. Transferred me to voice mail for Ms. Buckley. Left voice mail message. Called 11/19/15. Ms. Buckley was not in when I called. Told to call back in 1/2 hour. Called back 45 minutes later. Got Ms. Buckley voice mail.  Left second message on project. |

USACE_DAPL0005633

Document 31.4-4 line
Tribal Consultation Administrative Record

| District | USACE Name/POC | Date | Letters Received | Letters Sent | Site Visit/ Meeting | Emails | Phone Calls | Phone Calls Received | Notes |
|---|---|---|---|---|---|---|---|---|---|
| MVS | Corps Regulatory | 9/3/2015 | | X | | | | | Chief Douglas Lankford - Miami Tribe of Oklahoma - Called 10/28/15 to ask if September 3 letter received. Left voice mail message with receptionist. Called 11/19/15. Receptionist transferred me to assistant to Chief - Gloria Steed. Left voice mail message with Ms. Steed asking to return call and advise if letter received and offering to email copy of letter if needed. |
| Omaha | Corps Regulatory | 9/3/2015 | | X | | X (11/19/15) | X (11/19/15) | | Mr. Dean Goggles, Chairman / nathpo@northernarapaho.com - Northern Arapaho Tribe - Called 11/2/15 to ask if September 3 letter received. Receptionist said inquiry needs to be made with THPO Yufna Soldier Wolf at 307-846-1628. Receptionist took my name and number and said she would ask Ms. Soldier to call me back. Called 11/19/15 and spoke to Ms. Soldier Wolf. Offered to send her another copy of the letter. She gave me her email address: yufnanathpo@gmail.com Emailed copy of letter. Email sent successfully. Consider confirmation letter was received. |
| Omaha | Corps Regulatory | 9/3/2015 | | X | | | | | Mr. Levando Fisher, President - Northern Cheyenne Tribe - Called 11/2/15 to ask if September 3 letter received. Transferred to executive assistant office. Left voice mail message. |
| MVS | Corps Regulatory | 9/3/2015 | | X | | | X (11/2/15) | | Chairman Homer Mandoka - Nottawaseppi Huron Band of Potawatomi of Michigan - Called 11/2/15 to ask if September 3 letter received. Spoke directly with Chairman Mandoka. He stated they get a couple dozen letters each week on projects. He asked me to email a copy of the letter to him at hmandoka@nhbpi.com Emailed the September 3 letter sent to him. Email sent successfully so consider confirmation of receipt of letter. |
| Omaha | Corps Regulatory | 9/3/2015 | | X | | | X (11/2/15) | | Mr. John Yellowbird Steele, President - Oglala Sioux Tribe - Called 11/2/15 to ask if September3 letter received. Spoke to Donna assistant in President's office. She asked me to email copy of letter to President Yellowbird. Emailed 11/2/15 to JohnS@oglala.org Email sent successfully so consider confirmation of receipt of letter. |
| Omaha & MVR | Corps Regulatory | 9/3/2015 | | X | | | | | Mr. Vernon Miller - Omaha Tribe of Nebraska - Called 11/3/15 to ask if September 3 letter received. Let ring long time. Finally got voice mail Left message asking to return call. |
| MVR | Corps Regulatory | 9/3/2015 | | X | | | X (11/3/15) | | Chairman John R. Shotton /jshotton@omtribe.org - Otoe-Missouria Tribe of Indians - Called 11/3/15 to ask if September 3 letter received. Receptionist confirmed receipt of letter. Said she would remind Chairman Shotton to provide comments if he had any. |
| MVR & MVS | Corps Regulatory | 9/3/2015 | | X | | | | | Chief John Froman /jfroman@peoriatribe.com - Peoria Tribe of Indians of Oklahoma - Called 11/3/15 to ask if September 3 letter received. Transferred to Chief Froman voice mail. Left voice mail message asking if he or assistant could call back and advise whether letter was received. |
| MVS | Corps Regulatory | 9/3/2015 | | X | | X (11/3/15) | X (11/3/15) | | Chairman John P. Warren - Pokagon Band of Potawatomi Indians, Michigan and Indiana - Called 11/3/15 to ask if September 3 letter received. Transferred to Chairman and council assistant Kelly Curran. Left voice mail message with Ms. Curran asking to return call to confirm receipt of letter. Ms. Curran returned my call. Asked me to email her a copy of letter. Email sent to Ms. Curran at: kelly.curran@pokagonband-nsn.gov Email sent successfully. Consider call confirmed. |
| Omaha | Corps Regulatory | 9/3/2015 | | X | | | | | Mr. Larry Wright, Chairman - Ponca Tribe of Nebraska - Called 11/3/15 to ask if September 3 letter received. Transferred to Chairman assistant Jan Carla. Left voice mail message with Ms. Carla voice mail with purpose of call and request call back to confirm receipt of letter |
| MVS | Corps Regulatory | 9/3/2015 | | X | | | | | Chairwoman Liana Onnen - Prairie Band Potawatomi Nation Government Center - Called 11/3/15 to ask if September 3 letter received. Spoke to Chairwoman assistant Linda Ossie. She transferred me to voice mail for the THPO office which she indicated was going through personnel changes. Left voice mail message with that office stating purpose of call and requesting call back. |
| MVR | Corps Regulatory | 9/3/2015 | | X | | | | | Chairman Ron Johnson - Prairie Island Indian Community in the State of Minnesota - Called 11/3/15 to ask if September 3 letter received. Receptionist advised Victoria Winfrey is no longer president. President is Ron Johnson. Transferred to Mr. Johnson voice mail. Left message asking if he or assistant would call back to confirm receipt of letter. |
| MVS | Corps Regulatory | 9/3/2015 | | X | | | | | Chairman John Berrey - Quapaw Tribe of Indians - Called 11/3/15 to ask if September 3 letter received. Transferred to unidentified "extension 240". Left voice mail message that extension with purpose of call and requesting confirmation of receipt of letter. |
| Omaha | Corps Regulatory | 9/3/2015 | | X | | | X (11/4/15) | | Mr. William Kindle, President - Rosebud Sioux Tribe - Called 11/4/15 to ask if September 3 letter received. Letter addressed to President Scott. Mr. Scott is no longer President. New president is Mr. William "Willy" Kindle. Secretary in President's Office confirmed letter was received and forwarded to their THPO office. |
| MVS | Corps Regulatory | 9/3/2015 | | X | | | X (11/4/15) | | Chairman Edmore Green - Sac & Fox Nation of Missouri - Called 11/4/15 to ask if September 3 letter received. Noticed this is same tribe and phone number as listings 56 and 57 below. Spoke to receptionist. She said current Chairman is Edmore Green. Chairman Michael Dougherty and Chairperson Bridgette Ribidioux who September 3 letters were addressed to are past Chairpersons. Chairman Twen Barton listed in #57 below is also a past Chairman. Tribal council phone number is 785-742-0053. Talked to Administrative Assistant at extension #20 in that office. She believes letter was received and forwarded to tribal THPO Gary Bahr. She confirmed that correct address for letters sent to Chairman Edmore Green is: 305 N. Main, Reserve, Kansas 66434. Recommend this listing be updated accordingly with 785-742-0053 as contact number. Administrative Assistant offered to connect to Mr. Green voicemail. Call was disconnected twice. Reviewed earlier call (April 14, 2015) to tribe on project and discussion with Mr. Bahr. He is aware of project and recommended Corps contact if any artifacts found during construction that they contact the tribe otherwise it could move forward in their view. Recommend this contact be considered confirmation of call and listing be consolidated into one entry for Sac & Fox Nation of Missouri in in Kansas and Nebraska. |

DAPL EIS
Tribal Consultation Administrative Record

| District | USACE Name/POC | Date | Letters Received | Letters Sent | Site Visit/ Meeting | Emails | Phone Calls | Phone Calls Received | Notes |
|---|---|---|---|---|---|---|---|---|---|
| MVS | Corps Regulatory | 9/3/2015 | | X | | | | | Chairwoman Ms. Kay Rhoads - Sac & Fox Nation of Oklahoma - Called 11/4/15 to ask if September 3 letter received. Receptionist advised that Mr. Thurman who letter was addressed to is not the Tribal Chairman. Tribal Chairperson is Ms. Kay Rhoads. Receptionist transferred me to vice chairman office. Left a voice mail message that office. |
| MVS & MVR | Corps Regulatory | 9/3/2015 | | X | | | | | Chairwoman Judith Bender - Sac & Fox Tribe of Mississippi in Iowa - Called 11/4/15 to ask if September 3 letter received. Receptionist transferred call to THPO office - Ms. Mary Young Bear - who handles those letters. Call went to general delivery voice mail. Left voice mail message. |
| MVR & Omaha | Corps Regulatory | 9/3/2015 | | X | | | X (11/4/15) | | Mr. Roger Trudell, Chairman / rtrudell@santeedakota.org - Santee Sioux Nation - Called 11/4/15 to ask if September 3 letter received. Spoke with receptionist who said they log all such letters in. She took my name and number and said she would look for letter and give me a call back. Called back shortly thereafter and confirmed receipt of the letter. She said it was passed along to their THPO office. |
| MVS | Corps Regulatory | 9/3/2015 | | X | | | | | Chairman Ron Sparkma - Shawnee Tribe - Called 11/4/15 to ask if September 3 letter received. Spoke with receptionist who transferred me to Chairman office at 918-542-7774. Spoke to Heather. She transferred me back to receptionist to speak with Chairman assistant Jodee. Left voice mail message with assistant Jodee Hayes who is out of office until Monday November 9. |
| MVR & Omaha | Corps Regulatory | 9/3/2015 | | X | | | | | Chairman Robert Shepherd /roberts@swo-nsn.gov - Sisseton-Wahpeton Oyate of the Lake Traverse Reservation - Called 11/5/15 to ask if September 3 letter received. Left voice mail message on Chairman's receptionist voice mail requesting call back. |
| MVR & Omaha | Corps Regulatory | 9/3/2015 | | X | | | | | Chairperson Roger Yankton /admin@spiritlakenation.com - Spirit Lake Tribe - Same tribe and phone # as #64 above. Letter sent was addressed to Chairperson Roger Yankton. Left voice mail with adminstrive office generic answering system. |
| MVS | Corps Regulatory | 9/3/2015 | | X | | X (11/5/15) | X (11/5/15) | | Principal Chief Geoffrey Standing Bear - The Osage Nation - Called 11/5/15 to ask if September 3 letter was received. Phone number listed in Column E has been disconnected or is no longer in service. Found a number for executive office - 918-287-5582. Spoke to Chief assistant Ms. Jane Perrier. Was transferred to Historic Preservation Office. Spoke to Dr. Andrea Hunter. She suggested future communications on such projects sent to the Chief's office include a courtesy copy to her office. They did not have a record of having received the September 3 letter. According to her records, they sent an email to Joel Ames, Devetta Hill, and me (Matt Bilodeau) stating they wanted to be a consulting party. The only one she heard back from was me and that's the last they heard. She asked me to email her a copy of the letter sent to Chief Standing Bear at: ahunter@osagenation-nsn.gov. Emailed a copy of the letter to her. I recommend use of the THPO phone number for Ms. Hunter on the listing of contacts. Her number is 918-287-5671. In view of the concerns expressed, immediately passed along contact results to Martha Chieply, Regulatory Branch Chief, and Mr, Joel Ames, District tribal liaison. Email successfully sent. Based on that and subsequent exchange of emails between Joel Ames and Dr. Hunter consider call confirms receipt of letter. |
| Omaha | Corps Regulatory | 9/3/2015 | | X | | | | | Mr. Richard McCloud, Chairman - Turtle Mountain Band of Chippewa - Called 11/6/15 to ask if September 3 letter was received. Directed by automated answering system to Chairman McClouds office voice mail. Left voice mail message asking he or assistant call back to confirm receipt of letter. |
| MVS | Corps Regulatory | 9/3/2015 | | X | | | | | Chief George Wickliffe - United Keetoowah Band of Cherokee of Oklahoma - Called 11/6/15 to ask if September 3 letter was received. Phone number listed in column E has been discontinued, disconnected, or is no longer in service. Phone admin # on internet. Called 918-431-1818. Receptionist transferred me to Ms. Lisa Lareau as appropriate point of contact at 918-822-1952. Left voice mail message with Ms. Lareau requesting call back. |
| MVR | Corps Regulatory | 9/3/2015 | | X | | | X (11/6/15) | | Chairman Kevin Jensvold /kevinj@uppersiouxcommunity-nsn.gov - Upper Sioux Community - Called 11/6/15 to ask if September 3 letter was received. Receptionist transferred to executive office assistant. Spoke with Mary Jo. She believes received. Asked me to email her a copy of the letter to her at: merijo@uppersiouxcommunity-nsn.gov. Emailed a copy of the letter as requested. Email sent successfully. Consider call confirms receipt of letter. |
| Omaha | Corps Regulatory | 9/3/2015 | | X | | | | | Ms. Darla LaPointe, Chairwoman - Winnebago Tribe of Nebraska - Called 11/6/15 to ask if September 3 letter was received. Phone number listed in Column E connected to voice mail and individual that answered did not seem like correct number. Called the number listed in below 402-878-2272 which is duplicate listing. Reached the tribal office. Was advised that Chairman Blackman who letter was addressed to is no longer Chairman. Current Chairman is Ms. Darla LaPointe. Was transferred to Ms. LaPointe's voice mail. Left voice mail message requesting her or and assistant return my call to advise if letter was received. |
| Omaha | Corps Regulatory | 9/3/2015 | | X | | | | | Mr. Robert Flying Hawk, Chairman - Yankton Sioux Tribe - Called 11/6/15 to ask if September 3 letter was received. Receptionist confirmed that Mr. Robert Flying Hawk is current Chairman. Transferred me to executive office. Left voice mail message with assistant requesting call back to confirm receipt of letter. Entry #74 below is the same tribe and phone number. Evidently Mr.Cournoyer is not the Tribal Chairman at this time. It appears two letters were sent to the tribe. |
| Omaha | Corps Regulatory | 9/13/2015 | | X | | | X (11/5/15) | | Mr. Dave Archambault II, Chairman - Standing Rock Sioux Tribe - Called 11/5/15 to ask if September 3 letter received. Spoke with receptionist who then spoke to Chairman Archambault. He did not recall seeing it. She asked me to send a copy. Emailed a copy as requested to darchambaultII@standingrock.org. Email sent successfully so consider call confirms receipt of letter. |
| Omaha | Crossing 106/PA Price/Harnois | 9/16/2015 | | X | | | | | DAPL Crossing COE Eric Stasch response to Waste' Win Young letter dated 8/21/2015 |
| Omaha | Rick Harnois | 9/18/2015 | | | | X | | | SRST- Email Received from SRST Archeologist declining participation is site visit |
| Omaha | Crossing 106/PA Price/Harnois | 9/21/2015 | X | | | | | | DAPL Crossing Santee Sioux Tribe THPO request "to be advised of all correspondence". |

USACE_DAPL0005635

| District | USACE Name/POC | Date | Letters Received | Letters Sent | Site Visit/ Meeting | Emails | Phone Calls | Phone Calls Received | Notes |
|---|---|---|---|---|---|---|---|---|---|
| Omaha | Crossing 106/PA Price/Harnois | 9/21/2015 | | | X | | | | DAPL Crossing COE Julie Price update to all Tribes |
| Omaha | Crossing 106/PA Price/Harnois | 9/21/2015 | X | | | | | | DAPL Crossing site visit/walk through - notification that SRST THPO will not be attending the walk through |
| Omaha | Crossing 106/PA Price/Harnois | 9/21/2015 | | | X | | | | DAPL Crossing site visit/walk through - COE, ND SHPO and Dap Reps attended |
| Omaha | Joel Ames | 9/24/2015 | | | | X | X | | SRST-discussions with Chairman Secretary |
| Omaha | Joel Ames | 9/24/2015 | | | | X | | | SRST-email to Chairman Secretary, Waste' Win Young included |
| Omaha | Joel Ames | 9/24/2015 | | | | X | | | SRST-emails to Johnelle |
| Omaha | Regulatory | 9/28/2015 | X | | | | | | DAPL Regulatory (Chieply) Standing Rock Sioux Tribe letter to Martha C. |
| Omaha | Various | 9/28/2015 | X | | | | | | DAPL Regulatory - Standing Rock Sioux tribe Chairman Archambault II to Colonel Henderson - G2G request from |
| Omaha | COL Henderson | 9/28/2015 | X | | | | | | SRST- Letter received from Waste' Win Young |
| Omaha | Joel Ames | 9/28/2015 | | | | X | X | | SRST-discussions with Chairman Secretary |
| Omaha | Joel Ames | 9/28/2015 | | | | | X | | SRST-text msg's to Johnelle |
| Omaha | Joel Ames | 9/29/2015 | | | | X | X | | SRST-discussions with Chairman Secretary |
| Omaha | Joel Ames | 9/29/2015 | | | | X | | | SRST-email Johnelle |
| Omaha | Joel Ames | 9/29/2015 | | | | | X | | SRST-discussion with Chairman |
| Omaha | Crossing 106/PA Price | 9/29/2015 | | | | | X | | DAPL Crossing and Regulatory: General discussion and G2G request from Santee THPO |
| Omaha | Joel Ames | 10/2/2015 | | | | X | | | SRST-email Johnelle |
| Omaha | Joel Ames | 10/5/2015 | | | | X | X | | SRST-discussions with Chairman Secretary |
| Omaha | Joel Ames | 10/5/2015 | | | | X | | | SRST-emails with Johnelle |
| Omaha | Joel Ames | 10/13/2015 | | | | X | X | | SRST-attempts to reach Chairman Secretary |
| Omaha | Joel Ames | 10/13/2015 | | | | X | | | SRST-email Johnelle |
| Omaha | Joel Ames | 10/20/2015 | | | | X | X | | SRST-attempts to reach Chairman Secretary |
| Omaha | Joel Ames | 10/22/2015 | | | | X | | | NCT- emails with James WalksAlong |
| Omaha | Joel Ames | 10/26/2015 | | | | X | X | | SRST-Kelly cancels Consultation meeting |
| Omaha | Joel Ames | 10/26/2015 | | | | X | X | | SRST-attempts to reach Chairman Secretary |
| Omaha | Joel Ames | 10/26/2015 | | | | X | | | SRST-email Johnelle |
| Omaha | Joel Ames | 10/27/2015 | | | | X | | | SRST-emails with Chairman |
| Omaha | Joel Ames | 10/27/2015 | | | | X | | | SRST-emails with Johnelle |
| Omaha | Joel Ames | 11/2/2015 | | | | | X | | SRST-call to Chairman |
| Omaha | Joel Ames | 11/2/2015 | | | | | X | | SRST-call to Chairman |
| Omaha | Joel Ames | 11/6/2015 | | | | X | X | | Osage |
| Omaha | Joel Ames | 11/17/2015 | | | | X | | | E-mail notification to Tribes regarding upcoming meeting |
| Omaha | Crossing 106/PA Price/Harnois | 11/19/2015 | | X | | | | | PA letter to Tribes, notification of upcoming EA to be released for public comment |
| Omaha | Various | 11/19/2015 | X | | | | | | DAPL Standing Rock Sioux Tribe Chairman Archambault II to SAS Darcy FOIA |
| Omaha | Martha Chieply | 11/20/2015 | | X | | | | | SRST- Regulatory Chieply to CHRM Archambault. Notify of Consultation Meeting Sioux Falls,SD on 8-9 Dec. 2015. |
| Omaha | Joel Ames | 11/24/2015 | | | | X | X | | CRST-communications with Steve Vance |
| Omaha | Joel Ames | 12/2/2015 | | | | X | X | | NCT- communications with James WalksAlong |
| Omaha | Joel Ames | 12/2/2015 | | | | X | X | | NAT- attempts to reach Yufna Soldier Wolf |
| Omaha | Joel Ames | 12/7/2015 | | | | X | X | | SWST-Communications with Whitney Bursheim regarding upcoming meeting in Sioux Falls |
| Omaha | Joel Ames | 12/8/2015 | | | X | | | | Tribal Consultation Meeting, Sioux Falls, SD |
| Omaha | Martha Chieply | 12/8/2015 | X | | | | | | SRST- Letter Received from Tribal Archeologist requesting formal consultation. |
| Omaha | Joel Ames | 12/11/2015 | | | | X | | | SRST-email Johnelle |
| Omaha | Joel Ames, LTC Sexton | 12/11/2015 | | | | | X | | SRST- calls to Chairman (Col Sexton & Joel Ames) |
| Omaha | Joel Ames, LTC Sexton | 12/15/2015 | | | | | X | | SRST- call to Chairman (Col Sexton & Joel Ames) |
| Omaha | Joel Ames | 12/29/2015 | | | | X | | | SRST - emails with Johnelle |
| Omaha | Joel Ames | 12/29/2015 | | | | X | | | SRST - email Johnelle |
| Omaha | Joel Ames | 1/5/2016 | | | | X | X | | SRST - emails/calls with Ron His Horse Is Thunder |
| Omaha | Joel Ames | 1/6/2016 | | | | X | | | SRST-emails with Chairman |
| Omaha | Crossing 106/PA Price/Harnois | 1/8/2016 | X | | | | | | DAPL Crossing Standing Rock Sioux Tribe EA comments Chairman Archambault II to Brent Cossette |
| Omaha | Crossing 106/PA Price/Harnois | 1/8/2016 | X | | | | | | DAPL Crossing EA Comments from various Tribal members (? if they represent Tribal Government) |
| Omaha | Joel Ames | 1/8/2016 | | | | X | X | | SRST - emails and calls with Ron His Horse is Thunder |
| Omaha | Joel Ames | 1/11/2016 | | | | | X | | SRST - Call to Ron His Horse Is Thunder |
| Omaha | Joel Ames | 1/13/2016 | | | | X | | | SRST - email from Ron His Horse Is Thunder |
| Omaha | Joel Ames | 1/13/2016 | | | | | X | | SRST Call with Ron His Horse Is Thunder |
| Omaha | Several USACE Staff in Attendance | 1/22/2016 | | | X | | | | SRST-USACE Meeting to Discuss SRST concerns/comments on DAPL Project. |
| | | 1/25/2016 | | | X | | | | Tribes (Northern Cheyenne, Standing Rock Sioux Tribe, Osage, Ponca)-USACE-DAPL meeting to discuss SRST concerns/comments on DAPL Project. |
| Omaha | NWO staff: Price/Harnois/Cain/Warren | 8/1/2014 to present | | | | X | X | | DAPL Crossing: Numerous informal/undoc phone calls/email with Standing Rock Sioux Tribe THPO and staff as per normal course of business in which this project was discussed. |
| Omaha | NWO staff: Price/Harnois/Cain/Warren | 8/1/2014 to present | | | | X | X | | DAPL Crossing: Numerous informal/undoc phone calls/email with Cheyenne River Sioux Tribe THPO as per normal course of business in which this project was discussed. |
| Omaha | Joel Ames | 1/26/2016 | | | | X | X | X | Phone calls and e-mail to/from Randy Teboe, planning follow-up consultation meeting |

USACE_DAPL0005636

| District | USACE Name/POC | Date | Letters Received | Letters Sent | Site Visit/ Meeting | Emails | Phone Calls | Phone Calls Received | Notes |
|---|---|---|---|---|---|---|---|---|---|
| | Joel Ames | 1/27/2016 | | | | X | X | X | Phone calls and e-mail to/from Randy Teboe, planning follow-up consultation meeting |
| | Joel Ames | 1/29/2016 | | | | X | | | e-mail to/from Randy Teboe, planning follow-up consultation meeting |
| | Joel Ames | 2/1/2016 | | | | X | | | e-mail regarding Osage areas of concer |
| | Joel Ames | 2/1/2016 | | | | X | X | | Randy Teboe, coordination efforts continue |
| | Joel Ames | 2/3/2016 | | | | X | | | Randy Teboe, coordination efforts continue |
| | Joel Ames | 2/4/2016 | | | | X | | | e-mail to Tribes regarding upcoming Consultation meeting |
| | Joel Ames | 2/4/2016 | | | | X | | | e-mail to Randy, further attempts to contact PIIC |
| | Joel Ames | 2/4/2016 | | | | X | | | e-mail to Teanna Limpy (NCT) regarding up-coming DAPL Consultation |
| | Joel Ames | 2/5/2016 | | | | X | | | e-mails to/from Randy regarding meeting |
| | Joel Ames | 2/9/2016 | | | | X | | | e-mail Thomas Parker (Omaha Tribe) regarding consultation meeting |
| | Joel Ames | 2/9/2016 | | | | | X | | phone call to Chairman Frazier, follow-up from 2/8/16 call, left message with his office |
| | Joel Ames | 2/9/2016 | | | | X | | | SRST - emails to Ron and Johnelle regarding follow-up consultation with Chairman |
| | Joel Ames | 2/10/2016 | | | | X | | | SRST - emails to/from Ron **informed that Ron is no longer THPO |
| | Joel Ames | 2/10/2016 | | | | | X | | CRST- phone calls to Chairman Frazier, left message at his office, tried his cell, unable to leave message on cell |
| | Joel Ames | 2/10/2016 | | | | X | | | SRST - email to Jon Eagle (new THPO) regarding upcoming meeting |
| | Joel Ames | 2/10/2016 | | | | X | | | Osage - email to Andrea Hunter |
| | Joel Ames | 2/10/2016 | | | | X | | | Randy Toboe - meeting planning |
| | Joel Ames | 2/11/2016 | | | | X | | | email to Yufna Soldier Wolf (NA THPO) regarding consultation meeing |
| | Joel Ames | 2/11/2016 | | | | X | | | SRST - emails to/from Chairman Archambault regarding follow-up Consultation |
| | Joel Ames | 2/12/2016 | | | | X | | | SRST - email to Chairman responding to pipeline relocation question |
| | Joel Ames | 2/12/2016 | | | | X | X | | Randy Teboe, regarding DAPL meeting |
| | Joel Ames | 2/17/2016 | | | | X | | | SRST - email to Chairman regarding possible meeting date |
| | Joel Ames | 2/12/2016 | | | | X | | | SRST - email from William Perry |
| Omaha | Price/Ames | 1/22/2016 | | | X | | | | Consultation meeting between Corps and THPO, Chairman attended |
| Omaha | Ames/Chieply | 1/27/2016 | X | | | | | | SRST letter to Ames and Chieply after January consultation meeting |
| Omaha | COL Henderson | 2/25/2016 | | X | | | | | COL Henderson response to 1/27/16 SRST letter, with enclosure |
| Omaha | Chieply | 2/3/2016 | X | | | | | | ACHP letter to Henderson |
| Omaha | COL Henderson | 2/26/2016 | | X | | | | | COL Henderson response to 2/3/16 ACHP letter, with enclosures |
| Omaha | COL Henderson | 2/26/2016 | | | X | | | | Consultation meeting between COL Henderson and Chairman Archambault |
| Omaha | Larry Janis | 2/29/2016 | X | | | | | | SRST letter to COL Henderson after February consultation meeting |
| Omaha | COL Henderson | 3/18/2016 | | X | | | | | COL Henderson response to 2/29/16 SRST letter, with attachments |
| DASA | DASA Lowey Crook | 3/3/2016 | | | X | | | | Meeting between Deputy ASA and SRST officials, notes available |
| Omaha | Chieply | 3/15/2016 | X | | | | | | ACHP letter to COL Henderson |
| Omaha | COL Henderson | 4/11/2016 | | X | | | | | COL Henderson response to 3/15/16 ACHP letter, with enclosure |
| Omaha | Ames | 3/17/2016 | X | | | | | | Yankton Sioux Tribe (YST) letter to COL Henderson requesting consultation |
| Omaha | Chieply | 3/22/2016 | X | | | | | | SRST THPO letter to Chieply, will not participate in DPAL PCN Tribal survey access |
| Omaha | Janis | 3/24/2016 | X | | | | | | SRST to COL Henderson/DASA letter, supplemental comments, with attachments |
| Omaha | COL Henderson | 4/26/2016 | | X | | | | | COL Henderson response to 3/24/16 SRST supplemental comment letter |
| Omaha | Janis | 3/29/2016 | X | | | | | | SRST to COL Henderson, additional consultation request |
| Omaha | Chieply | 4/13/2016 | X | | | | | | Winnebago to Henderson, with resolution enclosure |
| Omaha | Ames | TBD | | X | | | | | COL Henderson to Cheyenne River Sioux Tribe, follow-up on consultation request |
| Omaha | Janis | TBD | | X | | | | | COL Henderson response to 4/13/16 Winnebago letter, acknowledge resolution |
| Omaha | Ames | 4/13/2016 | X | | | | | | YST to Henderson letter, request consultation |
| Omaha | COL Henderson | TBD | | X | | | | | COL Henderson to YST response to 3/17, 4/13/16 letters |
| Omaha | Tom Tracy | 4/26/2016 | X | | | | | | EarthJustice for SRST to COL Henderson DASA letter, with attachments |
| Omaha | Tracy | TBD | | X | | | | | Tom Tracy (OC) response to EarthJustice 4/26/16 letter |
| DASA | DASA Lowey Crook | TBD | | X | | | | | DASA response to Earthlustice 4/26/16 letter |
| Omaha | Ames | 4/29/2016 | X | | | | | | YST to Henderson letter, request consultation |
| Omaha | COL Henderson | TBD | | X | | | | | COL Henderson to YST response to 4/29/16 letter |

USACE_DAPL0005637

# In The Matter Of:

*Dakota Access Pipeline Public Meeting*
*Sheraton, Sioux Falls, South Dakota*

---

*January 25, 2016*

---

*Pat Beck, Court Reporter*

Original File 012516Hearing (2).txt
Min-U-Script® with Word Index

USACE_DAPL0066575

1

1      (Dakota Access Pipeline Public Meeting, Sheraton,

2          Sioux Falls, South Dakota, January 25, 2016,

3                    beginning at 8:45 a.m.)

4          MS. HOWARD:  Good morning, everyone.  Thank you

5   for taking the time to come and talk about the

6   project again.  I'm Monica Howard with Dakota

7   Access.  I'm the Director of Environmental Sciences

8   and responsible for all the environmental permitting

9   along the route.  So I think we'll just go ahead and

10  go around the room and start with introductions.  If

11  you would, just say your name and who you are

12  representing.

13         MR. MAHMOUD:  Do you want to go first, Martha?

14         MS. CHIEPLY:  Sure.  Martha Chieply, Chief of

15  Regulatory, Omaha District.  Thank you for coming.

16         MS. McQUEARY:  Pat McQueary, North Dakota,

17  Plastic Program Manager for the U.S. Army Corps of

18  Engineers, Regulatory.

19         MS. CHILDERS:  Sara Childers of Upper Sioux

20  THPO.

21         MR. DEPOUNTIS:  Dean Depountis, In-house

22  Counsel, Standing Rock Sioux Project.

23         MR. SOUNDING SIDES:  Brian Sounding Sides,

24  Northern Arapaho TPHO.

25         MR. KELLEY:  Alan Kelley, Vice Chairman of Iowa

USACE_DAPL0066576

2

1  Tribe of Kansas and Nebraska.

2       MR. AMES:  Joel Ames, Tribal Liaison, Omaha
3  District, Corps of Engineers.

4       MR. WHITTED:  Jim Whitted, Sisseton-Wahpeton
5  THPO.

6       MR. CLOUD:  Wayne Cloud, SWOTHPO as well.

7       MR. HOGAN:  Kelly Hogan, Fish and Wildlife
8  Service, Denver.

9       MR. HOISTAD:  Eric Hoistad with the U.S. Fish
10  and Wildlife Service at Sand Lake Refuge in South
11  Dakota.

12       MS. VAN NESS:  Meg Van Ness, Fish and Wildlife,
13  Denver.

14       MR. STANFILL:  Alan Stanfill, HDR.

15       MS. LIMPY:  Teanna Limpy, Northern Cheyenne
16  THPO.

17       MR. McCULLEN:  Matt McCullen, Corps of
18  Engineers.

19       MR. MAHMOUD:  My name is Joey Mahmoud with the
20  Energy Transfer, so I'm in charge of the project for
21  my company.  So I'll probably do most of the status
22  and update and talking today, so I encourage
23  everyone to be open and provide feedback and have a
24  good dialogue today.

25       MS. DIPPEL:  Michelle Dippel with HDR.

USACE_DAPL0066577

Chiefly #13

USACE_DAPL0066810

Dakota Access Tribal Consultation Meeting
Sioux Falls, SD
December 8, 2015

| Name | Affiliation | Email Address | Phone |
|---|---|---|---|
| Joel Ames | USACE | | |
| Martha Chieply | USACE | | |
| Dan Cimarosti | USACE | | |
| Jeff Breckenridge | USACE | | |
| Brent Cossette | USACE | | |
| Jackie Rodges | Osage | | |
| Lance Foster | THPO – Iowa Tribe of KS & NE | | |
| James Walks Along | THPO – No clay | | |
| Jim Whitted | SWO | | |
| Wayne Cloud | SWO | | |
| Ben Rhodd | Rosebud Sioux Tribe | | |
| Russell Eagle Bear | Rosebud Sioux Tribe | | |
| Paula Antoine | Rosebud Sioux Tribe | | |
| Steve Vance | THPO – Cheyenne River Sioux Tribe | | |
| Joey Mahmoud | Dakota Access | | |
| Monica Howard | Dakota Access | | |
| Abby Peyton | Perennial Environmental | | |

Randy Teboe

Michelle Dippel

Box 1153
Wagner, SD 57380

(605) 384-3804/384-3641
Fax (605) 384-5687



)FFICERS:
!OBERT FLYING HAWK, CHAIRMAN
ODY ZEPHIER, VICE CHAIRMAN
iLENFORD "SAM" SULLY, SECRETARY
EO O'CONNOR, TREASURER

COUNCIL:
JASON COOKE
GREGORY COURNOYER Jr.
DIANE MERRICK
ROSEANNE WADE
MONA WRIGHT

March 17, 2016

Colonel John W. Henderson, Commander

United States Army Corps of Engineers, Omaha District

1616 Capitol Ave. Suite #9000

Omaha, NE 68102

Dear Colonel:

I am writing to confirm a government to government request from the Ihanktonwan/Yankton Sioux Tribe for a "Consultation meeting regarding the Dakota Access Pipeline". My secretary Dayla Picotte called your secretary Kim Collins yesterday at which time she stated that you would be in the area on March 30th and 31st. Joel Ames was supposed to call me back today with a date and time, but we have not heard from him. Ms. Collins and I discussed the dates of March 30-31 as possible meeting timeframes. This request is based on President Clinton's Executive order emphasizing meaningful consultation between federal agencies and tribes.

In the essence of time I am requesting your presence at the Fort Randall Casino, Pickstown, SD on the Yankton Reservation @1:30 pm on March 31, 2016 (Meeting Room). Please reply as soon as possible, as our leadership entities have reserved this time slot.

Sincerely,

Robert Flying Hawk, Chairman

Yankton Sioux Tribe

Box 1153
Wagner, SD 57380

(605) 384-3804/384-3641
Fax (605) 384-5687

*OFFICERS:*
ROBERT FLYING HAWK, CHAIRMAN
JODY ZEPHIER, VICE CHAIRMAN
GLENFORD "SAM" SULLY, SECRETARY
LEO O'CONNOR, TREASURER

*COUNCIL:*
JASON COOKE
GREGORY COURNOYER Jr.
DIANE MERRICK
ROSEANNE WADE
MONA WRIGHT

April 13, 2016

District Commander
John W. Henderson, P.E.
Colonel, Corps of Engineers, Omaha District
Department of the Army
1616 Capitol Ave.
Omaha, Nebraska 68102-9000

Re: Dakota Access Pipeline Request for Consultation and Environmental Impact
Statement

Dear Colonel Henderson:

Please consider this a second urgent written request to establish a government to
government consultation with the Yankton Sioux (Ihanktonwan Oyate) in regard to our
concerns about the Dakota Access Pipeline ("DAPL") as soon as possible. This request is
based on explicit language of Executive Order 13175 which mandates "meaningful
consultation" with tribes, as well as respect for Indian tribal self-government and
sovereignty, honoring tribal treaty and other rights, and meeting federal trust
responsibilities. We have placed at least four calls with your Administrative Assistant,
Kim Collins, in order to set a date for consultation. On March 17, 2016, we sent a
certified letter requesting formal consultation with the Army Corps of Engineers
("ACOE") and your office. Subsequently, Joel Ames called Chairman Robert Flying
Hawk and informed the Chairman that he was not available on the proposed dates of
March 30-31, 2016. We emphasize that we have had prior experience with Mr. Ames
and do not wish him to be in our meetings. In fact, Mr. Ames was supposed to call the
Chairman's Secretary to see whether the 30th or 31st of March would be available but that
did not happen until a few days before the dates proposed by the Tribe.

We did receive an official correspondence March 18, 2016, from your office that did not
address our request for consultation but instead talked about Nationwide Permits which
were published in the Federal Register on February 21, 2016. We are interested in
consulting on those Nationwide Permits at a near date but our official request on March
17, 2016, pertained to the Dakota Access Pipeline which your letter did NOT address at
all. We feel that our request for government to government consultation was ignored and
our rights to such consultation have been infringed upon.

USACE_DAPL0065507

Letter to Col. John W. Henderson, P.E.
April 14, 2016
Page 2 of 7

The resources and time of the Yanktons have been consumed fighting the Keystone XL Pipeline for the last eight years, as we consider any pipeline construction through our territory to be a violation in our treaty, aboriginal, culturally affiliated, and/or unceded territory rights, dependent on the location. Our current stance against the Dakota Access Pipeline is as strong as it was against the Keystone XL pipeline, which of course we stopped.

In summary, we are for the second time officially requesting a government to government consultation immediately on the Dakota Access Pipeline on the following grounds and concerns.

1. Undoubtedly, the areas that the DAPL is seeking to traverse contain sacred sites, burials, and ceremony areas that are protected under the National Historic Preservation Act ("NHPA"). NHPA protections include consultation with tribes, which has not been conducted. This is a violation of Section 106 of the NHPA, as tribes have not examined or been part of surveys for these areas that are slated for construction in the very near future. From the Native perspective, we believe natural law protects these sites even if we do not retain contemporary title.

2. Congress has recognized treaty rights through the concept of "trust responsibility" which was established after the signing of treaties. The ACOE has violated our treaty tenets by not fulfilling its trust responsibility to protect our land and waters from harm.

3. The Supreme Court has recognized canons of treaty construction as follows:
   a. Ambiguity must be resolved in favor of the Indians.
   b. Treaties must be interpreted as the Indians understood them.
   c. Treaties must be construed liberally in favor of the Indians.

We also request that an Environmental Impact Statement ("EIS") be prepared rather than a meager Environmental Assessment ("EA") because it is necessary and mandatory for the reasons stated below.

The National Environmental Policy Act ("NEPA") requires that any federal agency contemplating a major federal action significantly affecting the quality of the human environment conduct an EIS to assemble and analyze environmental information. 42 U.S.C. § 4332(2)(C). Such a requirement maintains a national "look before you leap" policy regarding major federal actions. The EIS is supposed to protect the integrity of agency decision-making by assuring that "stubborn problems or serious criticisms have not been swept under the rug." *Silva v. Lynn*, 482 F.2d 1282, 1285 (1st Cir. 1973). Essentially, the EIS is intended to "insure a fully informed and well-considered decision." *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978).

NEPA's requirements are intended: "(1) to ensure the agency will have detailed information on significant environmental impacts when it makes its decisions; and (2) to guarantee that this information will be available to a larger audience." *Inland Empire Pub. Lands Council v. U.S. Forest Serv.*, 88 F.3d 754, 758 (9th Cir. 1996). "The NEPA process is intended to help public officials make decisions that are based on

USACE_DAPL0065508

Letter to Col. John W. Henderson, P.E.
April 14, 2016
Page 3 of 7

understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(c). NEPA requires agencies to take a "hard look" at a project's impact to the environment, enabling an analysis of the likely effects that also addresses the potential alternatives. By performing this hard look before committing to any course of action, NEPA provides critical procedural protections for resources at risk. *See Conservation Law Foundation v. Watt*, 560 F. Supp. 561, 581 (D. Mass. 1983), *aff'd by Massachusetts v. Watt*, 716 F.2d 946 (1st Cir. 1983).

In addition to taking a "hard look," NEPA requires that federal agencies also consider the cumulative environmental impacts in its environmental analyses. *See Davis v. Mineta*, 302 F.3d 1104, 1125 (10th Cir. 2002); *see also Grand Canyon Trust v. Federal Aviation Admin.*, 290 F.3d 339, 345-47 (D.C. Cir. 2002). NEPA's regulations provide that "effects" includes ecological, aesthetic, and historic impacts, "whether direct, indirect, or cumulative." 40 C.F.R. § 1508.8. "Cumulative impact" is defined as:

> the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

*Id.* § 1508.7. The fact that a project may result in even an incremental increase in the overall impact to a resource is meaningless if "there is no way to determine . . . whether [this small increase] in addition to the other [impacts], will 'significantly affect' the quality of the human environment." *Grand Canyon Trust*, 290 F.3d at 346. A cumulative impacts analysis must include "some quantified or detailed information." Without such information, neither the courts nor the public can determine whether an agency undertook the necessary "hard look" that is required. *Neighbors of Cuddy Mountain v. Forest Service*, 137 F.3d 1372, 1379 (9th Cir. 1998). "General statements about 'possible effects' and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided." *Id.* at 1380.

The Yankton Sioux Tribe requests the completion of an EIS that informs the public of the potential impacts of the project, as required by NEPA. An EIS should contain "quantified or detailed information" about the how the pipeline, in addition to the extraction process, will "significantly affect" the quality of the human environment. NEPA also requires "efforts which will prevent or eliminate damage to the environment" and "understanding of the ecological systems and natural resources." 42 U.S.C. § 4321. A thorough NEPA analysis should consider the full range of a federal project's effects including a thorough and adequate understanding of the ecological systems and natural resources that will be affected.

### Indiscriminate Effects on Indigenous populations

The United States has a track record of approving projects that indiscriminately affect the most vulnerable portions of the population. Often, these effects fall upon Native Americans. Treaty rights of Native Americans have been historically trampled under the

USACE_DAPL0065509

Letter to Col. John W. Henderson, P.E.
April 14, 2016
Page 4 of 7

pretense of "progress," however, there exists an opportunity to fully consider the effects of the proposed pipeline on the health, environment, and treaty rights of indigenous populations through the preparation of a complete EIS for the proposed project.

The purpose statement of NEPA explicitly includes preservation of "important historic, cultural, and natural aspects of our national heritage." 42 U.S.C. § 4331(b)(4); 40 C.F.R. § 1508.08(b). This requirement was expanded to include cultural and religious aspects of Indian tribal heritage in Executive Order No. 13007, which requires each executive branch agency to "(1) accommodate access to and ceremonial use of Indian sacred sites by Indian religious practitioners and (2) avoid adversely affecting the physical integrity of such sacred sites." A "sacred site" means "any specific, discrete, narrowly delineated location on Federal land that is identified by an Indian tribe, or Indian individual determined to be an appropriately authoritative representative of an Indian religion, as sacred by virtue of its established religious significance to, or ceremonial use by, an Indian religion . . . ." *Id.*

The Yankton Sioux Tribe urges an EIS that fully assesses the environmental, social, and cultural impact of the proposed pipeline from an environmental justice framework. The Environmental Protection Agency and the U.S. Council on Environmental Quality define environmental justice as the "fair treatment and meaningful involvement of all people regardless of race, color, national origin, or income with respect to the development, implementation, and enforcement of environmental laws, regulations and policies."[1] Fair treatment means that no group of people, including racial, ethnic, or socio-economic groups should bear a disproportionate share of the negative environmental consequences resulting from industrial, municipal, and commercial operations or the execution of federal, state, local, and tribal programs and policies.[2] Executive Order 12898 directs federal agencies to make environmental justice part of their mission. The Obama Administration issued guidance in 2010 prioritizing environmental justice for the EPA and directing that environmental justice be factored into every agency decision. Therefore, environmental justice must be recognized and included in consultations under NEPA. *See Hualapai and Fort Mojave Indian Tribes*, 180 IBLA 158 (Dec. 7, 2010).

The environmental justice issue is twofold: who has the most to gain and who has the most at stake. It is clear that private interests such as the oil and gas industry have the most to gain. But an EA does not address who has the most at stake. Approval of the pipeline will result in indigenous populations bearing a disproportionate share of the environmental consequences, severely impacting both the health and the culture of indigenous populations.

## **Impacts on Cultural Resources**

Cultural resources are considered significant, in the context of NEPA and NHPA discussions, if they appear to meet the criteria for listing in the National Register of

---

[1] U.S. ENVTL. PROT. AGENCY, EPA'S ACTION DEVELOPMENT PROCESS 1, 3 (2010), *available at* http:// www.epa.gov/environmentaljustice/resources/policy/considering-ej-in-rulemaking-guide-07-2010.pdf.

[2] *Id.*

USACE_DAPL0065510

Historic Places ("NRHP"). Section 106 of the NHPA requires federal agencies to consult with potentially affected parties prior to commencing a federal "undertaking" that may affect property eligible to be included in the NRHP and to consider the undertaking's effect on eligible property. 16 U.S.C. § 470f; 36 C.F.R. §§ 800.1(a), 800.2(c)(2). The NHPA is similar in purpose and scope to NEPA except that it requires consideration of historic sites, rather than the environment. *United States v. 0.95 Acres of Land*, 994 F.2d 696, 698 (9th Cir. 1993). Properties of traditional religious and cultural importance to Indian tribes may be eligible for listing on the NRHP. 16 U.S.C. § 470a(d)(6)(A). Historic properties of religious and cultural importance to tribes include traditional cultural properties ("TCPs"), and a federal agency must consult with an Indian tribe which attaches religious or cultural importance to TCPs listed on, or eligible for, listing on the NRHP that may be affected by an undertaking. 36 C.F.R. § 800.2(c)(2)(ii). Therefore, under the NHPA, federal agencies must make a reasonable and good faith effort to identify and consider the impacts of a proposed project on historic properties of significance to Indian tribes, and grant indigenous peoples "a reasonable opportunity" to identify their concerns. *Id. See also Te-Moak Tribe of W. Shoshone of Nev. V. U.S. Dep't of the Interior*, 608 F.3d 592, 608 (9th Cir. 2010).

"The NHPA involves a series of measures designed to encourage preservation of sites and structures of historic, architectural, or cultural significance." *San Carlos Apache Tribe v. United States*, 417 F.3d 1091, 1093–94 (9th Cir. 2005) (internal quotation marks and citation omitted). An important measure to encourage preservation is the consultation process, which is triggered "[w]hen an undertaking may affect properties of historic value to an Indian tribe on non-Indian lands." *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 806 (9th Cir. 1999) (quoting 36 C.F.R. § 800.1(c)(2)(iii)). Through consultation, the federal agency must "take into account the effect of [an] undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the Nation Register [of Historic Places]," 16 U.S.C. § 470f, and determine whether there will be an adverse effect, and avoid or mitigate any such effects. *See* 36 C.F.R. § 800.6.

While the undefined term "consult" can lead to differing views and conflicting judicial interpretations, the NHPA explicitly delegates authority to the Advisory Council on Historic Preservation ("Council") to promulgate regulations interpreting and implementing § 106. *Narragansett Indian Tribe v. Warwick Sewer Auth.*, 334 F.3d 161, 166 (1st Cir. 2003). Under the pertinent regulations, the agency official is responsible for initiating consultation with the tribes. 36 C.F.R. § 800.3(c). "Consultation means the process of seeking, discussing, and considering the views of other participants, and, where feasible, seeking agreement with them . . . ." 36 C.F.R. § 800.16(f). Further, "[t]he goal of consultation is to identify historic properties potentially affected by the undertaking," and to understand tribal concerns sufficiently to take into account the effects that a proposed federal undertaking may have on eligible properties. *Id.* § 800.1(a). The regulations require that consultation with Indian tribes should be respectful of tribal sovereignty and must recognize the government-to-government relationship between the Federal Government and Indian tribes and "conducted in a manner sensitive to the concerns and needs of the Indian tribe." *Id.* § 800.2.

USACE_DAPL0065511

Letter to Col. John W. Henderson, P.E.
April 14, 2016
Page 6 of 7

The NHPA consultation process has been referred to as a "complex consultative process," *Save Our Heritage, Inc. v. Fed. Aviation Admin.*, 269 F.3d 49, 61 (1st Cir. 2001), that requires agency decision-makers to "stop, look, and listen." *Muckleshoot Indian Tribe*, 177 F.3d at 805. Though the consultation does not require the agency to reach any particular outcome, it is a procedural requirement that must be initiated when a tribe considers a site that might be affected by the undertaking to have religious or cultural significance. 36 C.F.R. § 800.2(c)(2)(ii). Upon such a designation, a tribe is entitled to identify "its concerns about historic properties, advise on the identification and evaluation of historic properties, including those of traditional religious and cultural importance, articulate its views on the undertaking's effects on such properties, and participate in the resolution of adverse effects." *Id.* § 800.2(c)(2)(ii)(A).

<u>The ACOE has failed to properly involve indigenous nations on a government-to-government basis in its review of the proposed project because it has not made a good faith effort to consult with tribes including the Yankton Sioux Tribe.</u> "The agency official shall make a reasonable and good faith effort to carry out appropriate identification efforts, which may include background research, consultation, oral history interviews, sample field investigation, and field survey." *Id.* § 800.4. It is imperative that the ACOE do more than pay lip service to the consultation process to preserve and protect the cultural and spiritual resources of tribes.

In addition, the Army Corps of Engineers cannot determine the impact the proposed pipeline would have on cultural and historic sites until the affected lands have been properly surveyed. Indigenous nations have not been involved (and in the case of the Yankton Sioux Tribe, involved at all) in the surveying process or the environmental review of the proposed pipeline. Without adequate tribal consultations, the route cannot be properly surveyed because surveyors are unaware of what possesses the unique cultural and spiritual attributes important to tribes.

It is important to consult with tribes in good faith because although the regulations allow tribes to participate in the consultation process, they may not turn back the clock. *Narragansett Indian Tribe*, 334 F.3d at 167. Though consultation is not the same thing as control over a project, tribes are entitled to "identify its concerns," to "advise," to "articulate," and to "participate." 36 C.F.R. § 800.2(c)(2)(ii)(A). The Yankton Sioux Tribe feels that the ACOE's "consultations" have been inadequate and non-existent up to this point and requests a government-to-government consultation with the Army Corps of Engineers.

## Cultural Landscapes

NEPA also triggers the NHPA by requiring agencies to consider the effects of a proposed project on sites listed or eligible for listing in the NRHP or that may otherwise "cause loss or destruction of significant scientific, cultural, or historical resources." 40 C.F.R. § 1508.27(b)(8). A cultural landscape is a landscape resulting from cultural practices over historical and prehistoric times, is eligible for listing in the NRHP and it may be eligible for listing in the NRHP. National Register Bulletin 38 clarified that NHPA's reach extends to "traditional cultural properties," identifying a traditional cultural property as "one that is eligible for inclusion in the National Register because of its association with

cultural practices or beliefs of a living community that (a) are rooted in the community's history, and (b) are important in maintaining the continuing cultural identity of the community."[3] The Yankton Sioux Tribe does not believe that the EA accounts for "cultural landscapes" that are important to Indian tribes and therefore request the preparation of an EIS.

## The Native American Graves Protection and Repatriation Act

The policy of the United States is to protect and preserve the Native American right to exercise traditional religious beliefs, including access to religious or cultural sites, use and possession of sacred objects, and worship through ceremonials and traditional rites. 42 U.S.C. § 1996. The Native American Graves Protection and Repatriation Act ("NAGPRA") was enacted to safeguard "the rights of Native Americans by protecting tribal burial sites and rights to items of cultural significance to Native Americans." *Pueblo of San Ildefonso v. Ridlon*, 103 F.3d 936, 938 (10th Cir. 1996). "Cultural items protected under NAGPRA include Native American human remains, funerary objects, sacred objects, and objects of cultural patrimony." *Id.* (citing 25 U.S.C. § 3001(3)). NAGPRA is intended to rectify a history of injustice whereby Native American graves were looted, sacred objects were appropriated, and the bodies of Native Americans were desecrated.

Accordingly, the Yankton Sioux Tribe requests that the Army Corps of Engineers consult with the Tribe concerning NAGPRA issues when applicable.

In conclusion, federal law mandates that the ACOE engage in meaningful consultation with the Yankton Sioux Tribe pursuant to numerous federal statutes, Executive Orders, regulations, and agency guidance documents. Federal law further requires that the ACOE prepare an EIS for the proposed project, incorporating all requirements imposed by federal law including NEPA, NHPA, Executive Order 12898 (Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations), and Executive Order 13175 (Consultation and Coordination with Indian Tribal Governments). The Tribe requests that you promptly respond to this letter with proposed dates for our initial consultation meeting regarding DAPL, and we look forward to working with the ACOE as it prepares the EIS necessitated by the proposed project.

Sincerely,

Chairman Robert Flying Hawk

cc: Reid J. Nelson, Director, Office of Federal Agency Programs, Advisory Council on Historic Preservation

---

[3] Patricia L. Parker & Thomas F. King, Nat'l Park Serv., Guidelines for Evaluating and Documenting Traditional Cultural Properties (National Register Bulletin 38, 1990).

USACE_DAPL0065513

Box 1153
Wagner, SD 57380



(605) 384-3804/384-3641
Fax (605) 384-5687

*OFFICERS:*
ROBERT FLYING HAWK, CHAIRMAN
JODY ZEPHIER, VICE CHAIRMAN
GLENFORD "SAM" SULLY, SECRETARY
LEO O'CONNOR, TREASURER

*COUNCIL:*
JASON COOKE
GREGORY COURNOYER Jr.
DIANE MERRICK
ROSEANNE WADE
MONA WRIGHT

April 29, 2016

District Commander
John W. Henderson, P.E.
Colonel, Corps of Engineers, Omaha District
Department of the Army
1616 Capitol Ave.
Omaha, Nebraska 68102-9000

Via U.S. Mail

     Re:  Third Written Request for Consultation

Dear Colonel Henderson:

     On April 14, 2016, you spoke at the Great Plains Tribal Water Alliance 2016 Water Conference, addressing the Dakota Access Pipeline ("DAPL"). At the conclusion of your comments, Faith Spotted Eagle of the Yankton Sioux Tribe presented you with a letter from the Tribe requesting government-to-government consultation as required by federal law. This was the second written request the Yankton Sioux Tribe has made for consultation. Yankton Sioux Business and Claims Committee Member Jason Cooke, Treaty Committee Member Faith Spotted Eagle, and I left this meeting with the understanding that you would be submitting date options for a meeting with the Yankton Sioux Tribe. The Tribe is not in receipt of that follow-up from you. The Tribe reiterates its wishes to schedule a meeting with you in the near future, and proposes the following dates:

- May 10, 2016, or
- May 18, 2016

     The Tribe understands the ACOE is scheduled to meet with the Standing Rock Sioux Tribe this week to discuss the proposed DAPL, and the Tribe is encouraged by this next step. However, the Tribe wishes to impress upon the ACOE that consultation duties are not owed only to one tribe, they are owed to all affected tribes including the Yankton Sioux Tribe. The regulations implementing the National Environmental Policy Act ("NEPA") requires federal agencies to "consult early" with Indian tribes in the NEPA

USACE_DAPL0064400

Letter to Col. John W. Henderson, P.E.
April 29, 2016
Page 2 of 2

process. 40 C.F.R. § 1501.2. Section 101(d)(6)(B) of the National Historic Preservation Act ("NHPA") requires federal agencies to consult with an Indian tribe that attaches religious and cultural significance to historic properties that may be affected by an undertaking. 40 U.S.C. § 470a(d)(6). "Consultation should commence early in the planning process, in order to identify and discuss relevant preservation issues and resolve concerns about the confidentiality of information on historic properties." 36 C.F.R. § 800.2(c)(ii)(A). "Consultation with an Indian Tribe must recognize the government-to-government relationship between the Federal Government and Indian tribes." *Id.* at § 800.2(c)(ii)(C). "When Indian tribes and Native Hawaiian organizations attach religious and cultural significance to historic properties off tribal lands, section 101(d)(6)(B) of the [NHPA] requires Federal agencies to consult with such Indian tribes and Native Hawaiian organizations in the section 106 process." *Id.* at § 800.2(c)(ii)(D) (emphasis added). Pursuant to Executive Order 13175 (November 6, 2000). "[e]ach agency shall have an accountable process to ensure meaningful and timely input" in federal actions that have tribal implications. The purpose of this Executive Order is, in part, to "establish regular and meaningful consultation and collaboration with tribal officials in the development of Federal policies that have tribal implications[1]..." *Id.* In a Presidential Memorandum of November 5, 2009, issued pursuant to Executive Order 13175, President Obama declared that his Administration "is committed to regular and meaningful consultation and collaboration with tribal officials in policy decisions that have tribal implications." [2] The Department of Defense American Indian and Alaska Native Policy requires that "whenever DoD actions may have the potential to significantly affect protected tribal resources, tribal rights, or Indian lands, DoD must provide affected tribes an opportunity to participate in the decision-making process that will ensure these tribal interests are given due consideration in a manner with tribal sovereign authority" and to "[p]rovid[e] timely notice to, and consult[] with, tribal governments prior to taking any actions that may have the potential to significantly affect protected tribal resources, tribal rights, or Indian lands." The U.S. Army Corps of Engineers has its own Tribal Consultation Policy, which requires consultation to consist of "[o]pen, timely, meaningful, collaborative and effective deliberate communication process that emphasizes trust, respect and shared responsibility. "To the extent practicable and permitted by law, consultation works toward mutual consensus and begins at the earliest planning stages, before decisions are made and actions are taken..." *Id.* The Tribe understands that these requirements are not about going through the motions but that consultation must take place early in the process and must be meaningful. *See* 40 C.F.R. § 1501.2; 36 C.F.R. § 800.2(c)(ii)(A); Executive Order 13175; Memorandum for the Heads of Executive Departments and Agencies (November 5, 2009); Department of Defense American Indian and Alaska Native Policy; U.S. Army Corps of Engineers Tribal Consultation Policy. The Tribe's position is that it is owed a government-to-

---

[1] Section 1 of Executive Order 13175 defines "policies that have tribal implications" as "regulations, legislative comments or proposed legislation, and other policy statements or actions that have substantial direct effects on one or more Indian tribes, on the relationship between the Federal Government and Indian tribes, or on the distribution of power and responsibilities between the Federal Government and Indian tribes." (Emphasis added.)

[2] Pursuant to the Memorandum, "[t]he term 'policies that have tribal implications' as used in [the] memorandum are as defined in Executive Order 13175."

Letter to Col. John W. Henderson, P.E.
April 29, 2016
Page 3 of 3

government consultation or consultations on this proposed project prior to the agency's decision-making. As such, we are requesting a meeting with the ACOE prior to the ACOE decision on DAPL. We received information that an ACOE decision is projected to come down as early as next week, which would be prior to any consultation with the Yankton Sioux Tribe. We object to this timeline and again request consultation.

Please contact me as soon as possible to identify a date on which we can meet to engage in the federally-mandated consultation. I look forward to your response.

Sincerely,

Chairman Robert Flying Hawk

cc: Reid J. Nelson, Director, Office of Federal Agency Programs, Advisory Council on Historic Preservation



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, OMAHA DISTRICT
1616 CAPITOL AVENUE
OMAHA NE 68102-4901

REPLY TO
ATTENTION OF

**MAY 10 2016**

District Commander

Mr. Robert Flying Hawk, Chairman
Yankton Sioux Tribe
PO Box 1153
Wagner, SD 57380

Dear Chairman Flying Hawk:

I am writing in response to your letter dated April 29, 20126, concerning the Dakota Access Pipeline (DAPL) project and a request to meet with the U.S. Army Corps of Engineers. In your letter you indicate the Corps has not been responsive to your request to meet. It was at your request we postponed a prior meeting scheduled for March 30, 2016. I understand the importance of consultation in making informed decisions and again acknowledge your request.

Attached is a response to your March 17, 2016 and April 13, 2016 letters. Since you have been citing the National Historic Preservation Act we have been coordinating with Mr. Perry Little concerning your consultation requests, per the Business and Claims Committee direction provided in the enclosed April 2, 2015 letter. Mr. Joel Ames, Tribal Liaison, has been in contact with Mr. Little via e-mail, telephone and text messaging since March in an attempt to arrange a meeting. During this time, attempts to reach you by phone and text message have been unsuccessful. Since you have provided two dates that you would be available, I accept the May 18, 2016 date. Due to scheduling conflicts, I will plan on meeting with you late in the afternoon, preferably at Yankton, SD or the Ft Randall Project Office.

I have instructed Mr. Ames to work out the details of the meeting with Mr. Little. I look forward to meeting with you. If you have any additional questions, please contact me or Mr. Ames at 402-995-2909, or via e-mail at joel.o.ames@usace.army.mil.

Sincerely,

John W. Henderson, P.E.
Colonel, Corps of Engineers
District Commander

Enclosures

Printed on Recycled Paper



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, OMAHA DISTRICT
1616 CAPITOL AVENUE
OMAHA NE 68102-4901

MAY 0 6 2016

District Commander

Mr. Robert Flying Hawk, Chairman
Yankton Sioux Tribe
Box 1153
Wagner, South Dakota 57380

Dear Chairman:

Thank you for your March 17 and April 13, 2016 letters, concerning the Dakota Access Pipeline (DAPL) project. In your letters you requested government to government consultation. I understand the importance of consultation in making informed decisions and acknowledge your request for government to government consultation. I have instructed my staff to continue working with your staff to schedule a meeting.

You also expressed concerns with the Corps of Engineers' (Corps) interpretation and implementation of the National Environmental Policy Act (NEPA) and the National Historic Preservation Act (NHPA). The Corps is fully aware of and understands its obligation under the NEPA and the NHPA. However, it is important to note the Corps doesn't regulate or oversee the construction of pipelines, and the Corps' regulatory control is limited to only a small portion of the land and waterways that the pipeline traverses. The Corps' permitting regulations, 33 CFR Part 330.2(i) and 33 CFR Part 325 (Appendix C) specifically define our authority for linear projects such as roads, transmission lines, or pipelines. We only have jurisdiction over approximately 3% of the 1,170 miles of the pipeline.

For the two Missouri River crossing areas, I do want to clarify that the NEPA process includes categorical exclusions, Environmental Assessments (EA) and Environmental Impact Statements (EIS). The Corps is following the NEPA process by preparing an EA first, to determine if significant environmental effects result at the Missouri River Crossing locations from the proposed DAPL project. If a Finding of No Significant Impact (FONSI) can be determined an EIS would not be required.

Acknowledging the government to government relationship between the Corps and the Tribes and our trust responsibilities, we have sought and will continue to engage in consultation and consideration of your comments. We have held three comprehensive consultation meetings, met with individual tribes, and attempted to accommodate specific requests, including on the ground surveys by tribal representatives. As a result of these meetings, we have received information from the Tribes that is being considered prior to making a final decision. The Corps is and will continue to follow all


Printed on Recycled Paper

-2-

applicable federal regulations in compliance with NEPA and the NHPA Section 106 process.

I hope that we can find a mutually agreeable date to meet prior to making a decision on this project.  If you have any additional questions or concerns, please contact me or Mr. Joel Ames at 402-995-2909, or via e-mail at joel.o.ames@usace.army.mil.

Sincerely,

John W. Henderson, P.E.
Colonel, Corps of Engineers
District Commander

USACE_DAPL0064294

From:  "Ames. Joel O NWO" <NWO>
To:  Henderson
      "John W COL NWO:" <Collins>
      "Kimberly K" <NWO>
CC:  Bandeff
      "Wallace W NWO:" <Reese>
      "Arlo J MAJ NWO:" <Chieply>
      "Martha S NWO:" <Janis>
      "Larry D NWO:" <Schenk>
      "Kathryn M NWO:" <Tracy>
      "Thomas J" <NWO>
Date:  5/2/2016 3:55:34 PM
Subject: RE: Dakota Access Pipeline Consultation with the Yankton Sioux Tribe

Yes Sir,
We will work on a response to this latest letter. Currently have one routing for the previous. v/r.........Joel


-----Original Message-----
From: Henderson, John W COL NWO
Sent: Monday, May 02, 2016 3:54 PM
To: Ames, Joel O NWO ; Collins, Kimberly K NWO
Cc: Bandeff, Wallace W NWO ; Reese, Arlo J MAJ NWO ; Chieply, Martha S NWO ; Janis, Larry D NWO ; Schenk, Kathryn M NWO ; Tracy, Thomas J NWO
Subject: RE: Dakota Access Pipeline Consultation with the Yankton Sioux Tribe

Thanks Joel,

Let's get a written response back to them ASAP; thanks - should probably also cc'd the ACHP.

v/r
COL H

USACE_DAPL0064320

-----Original Message-----
From: Ames, Joel O NWO
Sent: Monday, May 02, 2016 3:49 PM
To: Henderson, John W COL NWO ; Collins, Kimberly K NWO
Cc: Bandeff, Wallace W NWO ; Reese, Arlo J MAJ NWO ; Chieply, Martha S NWO ; Janis, Larry D NWO ; Schenk, Kathryn M NWO ; Tracy, Thomas J NWO
Subject: RE: Dakota Access Pipeline Consultation with the Yankton Sioux Tribe

Sir,
I called and emailed the Tribal THPO, and have called and sent a text message to the Chairman. I also called over to the project office to see if they have had any success and their answer is also no luck in making contact. Tom and Cody were hoping that we could set up an initial meeting with the Chairman and the THPO at the project office (us included) to identify the best path forward with the Tribe. The Chairman's cellphone number is ███████████ and his THPO can be reached at ███████████ if you would like to attempt to reach them (call and or Text messaging).
v/r.............Joel


-----Original Message-----
From: Henderson, John W COL NWO
Sent: Monday, May 02, 2016 1:26 PM
To: Collins, Kimberly K NWO ; Ames, Joel O NWO
Cc: Bandeff, Wallace W NWO ; Reese, Arlo J MAJ NWO ; Ames, Joel O NWO ; Chieply, Martha S NWO ; Janis, Larry D NWO ; Schenk, Kathryn M NWO ; Tracy, Thomas J NWO
Subject: RE: Dakota Access Pipeline Consultation with the Yankton Sioux Tribe

Joel,

What is going on here? Please provide a status of this meeting by COB today. I'll call the Chairman today if we need to.

If the plane if available, let's plan for late-afternoon on the 18th.

We also need to provide a written response to this letter ASAP addressing their total lack of responsiveness for the record... which should include the date/time of our attempted interactions.

Thanks,
v/r
COL H


-----Original Message-----
From: Collins, Kimberly K NWO
Sent: Monday, May 02, 2016 11:17 AM
To: Henderson, John W COL NWO
Cc: Bandeff, Wallace W NWO ; Reese, Arlo J MAJ NWO ; Ames, Joel O NWO ; Chieply, Martha S NWO ; Janis, Larry D NWO ; Schenk, Kathryn M NWO ; Tracy, Thomas J NWO
Subject: FW: Dakota Access Pipeline Consultation with the Yankton Sioux Tribe

Sir,
You received the attached letter from the YST requesting consultation re: DAPL.

Kim

-----Original Message-----
From: Leigh Mah [mailto:LMah@ndnlaw.com]
Sent: Monday, May 02, 2016 10:33 AM
To: Collins, Kimberly K NWO
Cc: Thomasina Real Bird ; Jennifer Baker ; Ashley Klinglesmith
Subject: [EXTERNAL] Dakota Access Pipeline Consultation with the Yankton Sioux Tribe

Good morning Ms. Collins,


Attached to this email is correspondence that was mailed to Colonel Henderson and Mr. Reid Nelson. The correspondence is in regards to a consultation request about the Dakota Access Pipeline from the Yankton Sioux Tribal Business and Claims Committee.

USACE_DAPL0064322

If you have any problems opening the attachment, please do not hesitate to contact me.


Sincerely,

Leigh Mah

Legal Secretary/Paralegal

Fredericks Peebles & Morgan LLP

1900 Plaza Drive

Louisville, CO 80027-2314

Phone: 303-673-9600

Fax: 303-673-9155

lmah@ndnlaw.com

Confidentiality Notice - This e-mail transmission, and any documents, files or previous e-mail messages attached to it, may contain information that is confidential or legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that you must not read or play this transmission and that any disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is Strictly Prohibited. If you have received this transmission in error, please immediately notify the sender by telephone or return e-mail and delete the original transmission and its attachments without reading or saving in any manner. Thank you.
Federal Tax Advice Disclaimer - We are required by U. S. Treasury Regulations to inform you that, to the extent this message includes any federal tax advice, this message is not intended or written by the sender to be used, and cannot be used, for the purpose of avoiding federal tax penalties.

USACE_DAPL0064323

From:    "Ames. Joel O NWO" <NWO>
To:      Wilson
         Cody <NWO:>
CC:
Date:    4/22/2016 2:44:51 PM
Subject: Re: YST Letter (UNCLASSIFIED)

I'll try to call him also, seems something is going on there......Joel


Sent from my BlackBerry 10 smartphone on the Verizon Wireless 4G LTE network.
Original Message
From: Wilson, Cody NWO
Sent: Friday, April 22, 2016 1:13 PM
To: Janis, Larry D NWO; Ames, Joel O NWO
Cc: Price, Julie A NWO; Naylor, Steven E NWO; Breckenridge, Jeff L NWO; Chieply, Martha S NWO; Cossette, Brent NWO; Renschler, Jason J NWO; Grow, Catherine E NWO
Subject: RE: YST Letter (UNCLASSIFIED)


CLASSIFICATION: UNCLASSIFIED

FYI

I've been trying to reach Perry Little (our official POC for YST) but have been unsuccessful. I will let you know if/when that happens. Thanks for keeping me in the loop.
The first letter was not signed by the Chairman and I believe he may have indicated in a conversation with Joel that he was not even aware of it.

Cody

-----Original Message-----
From: Janis, Larry D NWO
Sent: Thursday, April 21, 2016 2:34 PM

USACE_DAPL0065413

To: Ames, Joel O NWO
Cc: Price, Julie A NWO ; Wilson, Cody NWO ; Naylor, Steven E NWO ; Breckenridge, Jeff L NWO ; Chieply, Martha S NWO ; Cossette, Brent NWO ; Renschler, Jason J NWO ; Grow, Catherine E NWO
Subject: RE: YST Letter

Joel,

Didn't hear back from you so I took the liberty of drafting responses to both the Yankton and Winnebago letters. Let me know if there are any changes or if you do not want to provide a written response. Others on the distribution feel free to provide edits. Comments by COB Monday would be appreciated.

FYI, the Standing Rock supplemental comment response letter is in routing.

Thanks,

Larry

-----Original Message-----
From: Janis, Larry D NWO
Sent: Monday, April 18, 2016 11:37 AM
To: Ames, Joel O NWO (Joel.O.Ames@usace.army.mil)
Cc: Price, Julie A NWO (Julie.A.Price@usace.army.mil) ; Wilson, Cody NWO (Cody.Wilson@usace.army.mil) ; Naylor, Steven E NWO ; Breckenridge, Jeff L NWO ; Chieply, Martha S NWO (Martha.S.Chieply@usace.army.mil) ; Cossette, Brent NWO (Brent.J.Cossette@usace.army.mil) ; Renschler, Jason J NWO
Subject: FW: YST Letter
Importance: High

Joel,

Like the Winnebago letter, I think we should respond to this letter, but am open to suggestions. If we decide to respond, who will be taking the lead? BTW did anyone respond to the March 17th letter referenced in this one? If you have a copy of the original and response (?) can you forward, please.

Thanks,

USACE_DAPL0065414

Larry

-----Original Message-----
From: Ames, Joel O NWO
Sent: Monday, April 18, 2016 10:25 AM
To: Price, Julie A NWO ; Wilson, Cody NWO ; Janis, Larry D NWO ; Chieply, Martha S NWO ; Cossette, Brent NWO
Subject: FW: YST Letter
Importance: High

All,
FYSA, we received this letter from YST during our Thursday meeting with the Tribal Water Alliance. Interestingly, as the Chairman was walking off the stage, he spoke to me and told me he wants me to work directly with him on setting up the meeting. I found it odd that he would ask me to work with him when the letter says they don't want to work with me. Makes me wonder if he had even read the letter before signing it. Cody Wilson is attempting to make contact with Perry Little (YST THPO) and get his take on what is going on. More to follow............Joel


-----Original Message-----
From: Ames, Joel O NWO
Sent: Friday, April 15, 2016 7:00 AM
To: Wilson, Cody NWO
Subject: YST Letter
Importance: High

Cody,
Per our discussion, copy of the letter. Really interesting that in paragraph 1 they note that I spoke with the Chairman and then turn around and say I didn't speak with the secretary. Please reach out to Perry and let me know what you find out. I know the Col wants to craft a response and he wants to make sure we set the record right on my efforts. I'm guessing that Perry will want to speak with the Chairman regarding the letter and its contents. I certainly hope they do something to retract the false statements about my efforts and as well as not willing to work with me..............Joel


CLASSIFICATION: UNCLASSIFIED



**Box 1153**
**Wagner, SD  57380**

**(605) 384-3804/384-3641**
**Fax (605) 384-5687**

*OFFICERS:*
**ROBERT FLYING HAWK, CHAIRMAN**
**JODY ZEPHIER, VICE CHAIRMAN**
**GLENFORD "SAM" SULLY, SECRETARY**
**LEO O'CONNOR, TREASURER**

*COUNCIL:*
**JASON COOKE**
**GREGORY COURNOYER Jr.**
**DIANE MERRICK**
**ROSEANNE WADE**
**MONA WRIGHT**

June 17, 2016

District Commander
John W. Henderson, P.E.
Colonel, Corps of Engineers, Omaha District
Department of the Army
1616 Capitol Ave.
Omaha, Nebraska 68102-9000
Fax:  (402) 779-2421
Email:  John.W.Henderson@usace.army.mil

Via U.S. Mail, Facsimile, and Email

      Re:  Follow-Up from Pre-Consultation Meeting

Dear Colonel Henderson:

      Please be advised that the Yankton Sioux Tribe has been finalizing its Consultation Protocols and those Protocols are forthcoming.  They will be provided to you shortly.

      In addition, please know that the Yankton Sioux Tribe is aware that there are several burials located at PCN's in South Dakota, and most likely in the remaining states the pipeline would cross, along the pipeline corridor.  To date, the Tribe has not been consulted regarding these burials.  We look forward to engaging in consultation with the Corps in accordance with these Protocols regarding these burials as well as a multitude of other aspects pertaining to the proposed Dakota Access Pipeline.

      Sincerely,

Chairman Robert Flying Hawk



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, OMAHA DISTRICT
1616 CAPITOL AVENUE
OMAHA NE 68102-4901

JUL 15 2016

District Commander

Mr. Robert Flying Hawk, Chairman
Yankton Sioux Tribe
Box 1153
Wagner, South Dakota 57380

Dear Chairman Flying Hawk:

Thank you for your June 17, 2016 letter informing the U.S. Army Corps of Engineers of the Yankton Sioux Tribe's continued work on its consultation protocols. We are committed to meaningful and transparent consultation with our Tribal partners.

While you continue to work on your Tribal consultation protocols, I am providing you a recent Question and Answer summary from the Consultation meetings that have been conducted over the past months. I hope this document will be beneficial for you.

I appreciate your concerns regarding the potential for undiscovered cultural resources or burials in areas subject to the Corps jurisdiction in South Dakota and Iowa. By letter dated July 8, 2016, we notified your Tribal Historic Preservation Officer that DAPL has agreed to support your Tribe's participation in monitoring efforts during construction at locations where Pre Construction Notifications were submitted to the Omaha District for proposed work in waters of the United States in North and South Dakota. As directed in that letter please contact DAPL to notify them of your Tribe's interest in participating.

Additionally, the Advisory Council on Historic Preservation (ACHP) sent an inquiry letter to the Assistant Secretary of the Army for Civil Works (ASACW), Ms. Jo-Ellen Darcy. I have attached a copy for your convenience. Ms. Darcy's office is preparing a response to address those concerns, and I will ensure you receive a copy of Ms. Darcy's response.

My staff is always available to answer questions. If you need additional information or wish to discuss this matter further, please contact Mr. Joel Ames at (402) 995-2909 or joel.o.ames@usace.army.mil. If there are specific questions on the Section 404 permitting process please contact Ms. Martha Chieply, Regulatory Branch Chief, at (402) 995-2451 or martha.s.chieply@usace.army.mil. If you have questions on the Section 408 review, please contact Mr. Larry Janis, Natural Resources and Recreation Branch Chief, at (402) 995-2440 or larry.d.janis@usace.army.mil.

Sincerely,

John W. Henderson, P.E.
Colonel, Corps of Engineers
District Commander

USACE_DAPL0063979



# United States Department of the Interior

FISH AND WILDLIFE SERVICE
Mountain-Prairie Region



IN REPLY REFER TO:
FWS/R6/Archaeology
Mail Stop 60130

MAILING ADDRESS:
Post Office Box 25486
Denver Federal Center
Denver, Colorado 80225-0486

STREET LOCATION:
134 Union Boulevard
Lakewood, Colorado 80228-1807

Chairman Robert Flying Hawk
Yankton Sioux Tribe
P.O. Box 1153
Wagner, SD  57380-1153

Dear Chairman Flying Hawk:

The U.S. Fish and Wildlife Service (Service) Mountain-Prairie Region is initiating consultation and coordination under Section 106 of the National Historic Preservation Act (NHPA) with federally-recognized tribes concerning the proposed Dakota Access Pipeline (DAPL).  This approximately 1,135 mile-long pipeline is 12–30 inches in diameter initiating in the Bakken oil field of northwest North Dakota and terminating in south-central Illinois (map enclosed).

The proposed route crosses five parcels with Service easements in two North Dakota counties (Mountrail and Williams) and 65 parcels with easements in 13 South Dakota counties (Campbell, McPherson, Edmunds, Faulk, Spink, Beadle, Kingsbury, Miner, Lake, McCook, Minnehaha, Turner, and Lincoln).  These easements are on private lands and provide the Service limited interests for the protection of the habitat.  Because the Service will be issuing a Special Use Permit, the project constitutes an undertaking as defined in the NHPA regulations (36CFR800.15(y)).  Under Section 101(d)(6)(B) of NHPA, we are requesting government-to-government consultation with the Yankton Sioux Tribe regarding potential cultural resource concerns and interests.

The Area of Potential Effect (APE) parcels in North Dakota consist of a total of 128 acres.  Of these, 96 acres were surveyed to a predominately intensive Class III level with some small portions surveyed to a reconnaissance Class II level.  The remaining 32 acres were previously surveyed for various projects between 2009-2013.  The results of the DAPL survey are documented in the report *Dakota Access Class II/III Cultural Resources Inventory of the Crossings of United States Fish and Wildlife Service Easements,* prepared by Merjent Inc., May 2015, with revisions in October 2015.  Copies of this report are available upon request as electronic files or as hard copies.

For South Dakota, the APE includes 1,126 acres of easement parcels; all of which were surveyed to a Class III level with shovel tests conducted on approximately 15% of the land with poor ground visibility.  Although small portions of the APE were previously surveyed, all areas were surveyed for this project.  The results of this survey are documented in the report *Level III Intensive Cultural Resources Survey for Dakota Access Pipeline Project, Grassland and Wetland Easement Crossings in Campbell, McPherson, Edmunds, Faulk, Spink, Beadle, Kingsbury, Miner, Lake,*

*McCook, Minnehaha, Turner, and Lincoln Counties, South Dakota*, and an addendum, prepared by Gray & Pape, Inc., May 2015, with revisions in October 2015.  As with the South Dakota documentation, reports are available upon request as electronic files or as hard copies.

One cultural resource, 32MNX0334, was previously recorded just north of the APE approximately 1.2 miles south of the town of Ross, ND, in Mountrail County.  The documentation on this resource is limited to a notation that cultural material of unknown cultural or temporal affiliation was found within a 160-acre block in 1980.  Attempts to relocate the site during the current survey were unsuccessful.  No additional cultural resources were located within the APE for the easement parcels in North Dakota.

Five cultural resources were identified during the survey of the Service easement parcels in South Dakota (39CA0282, 39ED2007, 39FK0112, 39KB0041, and 39KB2003).  Two of these resources are prehistoric: site 39CA0282 (eight miles southwest of the town of Eureka, SD) contains five prehistoric stone circles with a stone cairn and 39KB0041 (2.5 miles southeast of the town of Manchester, SD) where an isolated prehistoric Besant projectile point was found.  The other three resources consist of a historical farmstead/homestead, 39FK0112 (three miles northeast of the town of Wecota, SD) and two historical rail lines, 39ED2007 (4.5 miles west of the town of Roscoe, SD) and 39KB2003 (three miles west of the town of Manchester, SD).

Resources 39KB0041 and 39FK0112 are recommended as ineligible for inclusion in the National Register of Historic Places and no further work is recommended.  Sites 39CA0282, 39ED2007, and 39KB2003 are recommended as eligible for inclusion in the National Register of Historic Places; however, sites 39ED2007 and 39KB2003 will be avoided by horizontal directional drilling.  Site 39CA0282 is located on the edge of the survey corridor, but outside of the proposed project workspace, so will not be directly impacted by construction activities.  Exclusionary fencing will be installed along the northern border of the site, if necessary, and construction activities will be monitored by an Environmental Inspector (EI).

Your response to this letter acknowledging your interest in participating in this undertaking as a consulting party, identifying any historic properties, including Traditional Cultural Properties (TCPs) that may exist within the project's APE, and providing contact information for additional potential consultants is greatly appreciated.  Enclosed is a list of potential consulting parties who received this letter.  Any suggestions for additions or corrections to this list are welcome.

Please provide a response by December 11, 2015, so that we may discuss this undertaking.  If you do not respond within this time frame, you may request consulting party status in the future; however, the project may advance without your input.  Should you have any questions about this project, you may contact Regional Historic Preservation Officer Meg Van Ness at (303) 236-8103 or Meg_VanNess@fws.gov.

3

Thank you for your consideration of this request and please do not hesitate to contact us if you have questions or would like additional information.

Sincerely,

Regional Director

Enclosures:    Proposed pipeline route
Proposed pipeline route through North Dakota detail
Proposed pipeline route through South Dakota detail
Contacts for consultation

USFWS_DAPL0001018



# United States Department of the Interior

## FISH AND WILDLIFE SERVICE
Mountain-Prairie Region

IN REPLY REFER TO:
FWS/R6/Archaeology
Mail Stop 60130

MAILING ADDRESS:
Post Office Box 25486
Denver Federal Center
Denver, Colorado 80225-0486

STREET LOCATION:
134 Union Boulevard
Lakewood, Colorado 80228-1807

Mr. Perry Little, THPO
Yankton Sioux Tribe
P.O. Box 1153
Wagner, SD  57380-1153

Dear Mr. Little:

The U.S. Fish and Wildlife Service (Service) Mountain-Prairie Region is initiating consultation and coordination under Section 106 of the National Historic Preservation Act (NHPA) with federally-recognized tribes concerning the proposed Dakota Access Pipeline (DAPL).  This approximately 1,135 mile-long pipeline is 12–30 inches in diameter initiating in the Bakken oil field of northwest North Dakota and terminating in south-central Illinois (map enclosed).

The proposed route crosses five parcels with Service easements in two North Dakota counties (Mountrail and Williams) and 65 parcels with easements in 13 South Dakota counties (Campbell, McPherson, Edmunds, Faulk, Spink, Beadle, Kingsbury, Miner, Lake, McCook, Minnehaha, Turner, and Lincoln).  These easements are on private lands and provide the Service limited interests for the protection of the habitat.  Because the Service will be issuing a Special Use Permit, the project constitutes an undertaking as defined in the NHPA regulations (36CFR800.15(y)).  Under Section 101(d)(6)(B) of NHPA, we are requesting government-to-government consultation with the Yankton Sioux Tribe regarding potential cultural resource concerns and interests.

The Area of Potential Effect (APE) parcels in North Dakota consist of a total of 128 acres.  Of these, 96 acres were surveyed to a predominately intensive Class III level with some small portions surveyed to a reconnaissance Class II level.  The remaining 32 acres were previously surveyed for various projects between 2009-2013.  The results of the DAPL survey are documented in the report *Dakota Access Class II/III Cultural Resources Inventory of the Crossings of United States Fish and Wildlife Service Easements,* prepared by Merjent Inc., May 2015, with revisions in October 2015.  Copies of this report are available upon request as electronic files or as hard copies.

For South Dakota, the APE includes 1,126 acres of easement parcels; all of which were surveyed to a Class III level with shovel tests conducted on approximately 15% of the land with poor ground visibility.  Although small portions of the APE were previously surveyed, all areas were surveyed for this project.  The results of this survey are documented in the report *Level III Intensive Cultural Resources Survey for Dakota Access Pipeline Project, Grassland and Wetland Easement Crossings in Campbell, McPherson, Edmunds, Faulk, Spink, Beadle, Kingsbury, Miner, Lake,*

USFWS_DAPL0001019

*McCook, Minnehaha, Turner, and Lincoln Counties, South Dakota*, and an addendum, prepared by Gray & Pape, Inc., May 2015, with revisions in October 2015. As with the South Dakota documentation, reports are available upon request as electronic files or as hard copies.

One cultural resource, 32MNX0334, was previously recorded just north of the APE approximately 1.2 miles south of the town of Ross, ND, in Mountrail County. The documentation on this resource is limited to a notation that cultural material of unknown cultural or temporal affiliation was found within a 160-acre block in 1980. Attempts to relocate the site during the current survey were unsuccessful. No additional cultural resources were located within the APE for the easement parcels in North Dakota.

Five cultural resources were identified during the survey of the Service easement parcels in South Dakota (39CA0282, 39ED2007, 39FK0112, 39KB0041, and 39KB2003). Two of these resources are prehistoric: site 39CA0282 (eight miles southwest of the town of Eureka, SD) contains five prehistoric stone circles with a stone cairn and 39KB0041 (2.5 miles southeast of the town of Manchester, SD) where an isolated prehistoric Besant projectile point was found. The other three resources consist of a historical farmstead/homestead, 39FK0112 (three miles northeast of the town of Wecota, SD) and two historical rail lines, 39ED2007 (4.5 miles west of the town of Roscoe, SD) and 39KB2003 (three miles west of the town of Manchester, SD).

Resources 39KB0041 and 39FK0112 are recommended as ineligible for inclusion in the National Register of Historic Places and no further work is recommended. Sites 39CA0282, 39ED2007, and 39KB2003 are recommended as eligible for inclusion in the National Register of Historic Places; however, sites 39ED2007 and 39KB2003 will be avoided by horizontal directional drilling. Site 39CA0282 is located on the edge of the survey corridor, but outside of the proposed project workspace, so will not be directly impacted by construction activities. Exclusionary fencing will be installed along the northern border of the site, if necessary, and construction activities will be monitored by an Environmental Inspector (EI).

Your response to this letter acknowledging your interest in participating in this undertaking as a consulting party, identifying any historic properties, including Traditional Cultural Properties (TCPs) that may exist within the project's APE, and providing contact information for additional potential consultants is greatly appreciated. Enclosed is a list of potential consulting parties who received this letter. Any suggestions for additions or corrections to this list are welcome.

Please provide a response by December 11, 2015, so that we may discuss this undertaking. If you do not respond within this time frame, you may request consulting party status in the future; however, the project may advance without your input. Should you have any questions about this project, you may contact Regional Historic Preservation Officer Meg Van Ness at (303) 236-8103 or Meg_VanNess@fws.gov.

USFWS_DAPL0001020

3

Thank you for your consideration of this request and please do not hesitate to contact us if you have questions or would like additional information.

<div align="center">Sincerely,</div>

<div align="center">Regional Director</div>

Enclosures:    Proposed pipeline route
                      Proposed pipeline route through North Dakota detail
                      Proposed pipeline route through South Dakota detail
                      Contacts for consultation

**These are the people that received the January 27, 2016 e-mail from Randy Teboe notifying them of the February 18-19 DAPL meeting in Niobrara, Nebraska.**

**Addresses in blue are people we contacted in October 2015**
**Addresses in yellow indicate we contacted this tribe but maybe not this person**

| | |
|---|---|
| Osage Nation | Andrea Hunter |
| Osage Nation | JRodges@osagenation-nsn.go |
| Iowa? | lfoster@iowas.org; |
| Ponca | Shannon Wright; |
| Upper Sioux | sarac@uppersiouxcommunity-nsn.gov; |
| cultures@nemonte.net; | |
| Cheyenne River | Donnarae.petersen@crst-nsn.gov; |
| Cheyenne River | stevev.crstpres@outlook.com |
| Crow | ebullchief@crownations.net; |
| Flandreau Santee Sioux | carol.robertson@fsst.org; |
| Crow Creek Sioux | darrellzephier78@gmail.com; |
| Lower Brule Sioux | clairsgreen@yahoo.com; |
| Lower Sioux | lowersiouxthpo@gmail.com; |
| Northern Cheyenne | ncthpo@mail.cheyenne.net; |
| Prairie Island | mberger@piic.org; |
| Oglala | dennis@oglalathpo.org; |
| Rosebud Sioux | rstthpo@yahoo.com; |
| Omaha Tribe | tom.parker@omahatribe.com; |
| Winnebago Tribe of NE | rick_thpo02@yahoo.com; |
| Spirit Lake Tribe | thpo@gondtc.com; |
| Standing Rock | kmorgan@standingrock.org; |
| Three Affiliated | redhawk@mhanation.com; |
| Turtle Mt. Band of Chippewa | brucefnadeau@gmail.com; |
| Yankton Sioux | yst.thpo@gmail.com; |
| Rosebud | reaglebear@yahoo.com; |
| Absentee Shawnee of OK | llonghorn@astribe.com; |
| Blackfeet | jmflysdown@gmail.com; |
| Cherokee | bill-baker@cherokee.org; |
| Chippewa Cree | alvin@nei-yahw.com; |
| Eastern Shawnee Tribe of OK | rdushane@estoo.net; |
| Potawatomi | kelli.mosteller@potawatomi.org; |
| Potawatomi | melissa.cook@fcpotawatomi-nsn.gov; |
| Ho-Chunk Nation of WI | BQuackenbush@ho-chunk.com; |
| Miami Tribe of OK | gstack@miamination.com; |
| Northern Arapaho | yufnanathpo@gmail.com; |
| Cheyenne Nation | teanna.limpy@cheyennenation.com; |
| Nottawaseppi Huron Band of the Potawatomi | dgreen@nhbpi.com; |
| Pokagon Band of Potawatomi | marcus.winchester@pokagonband-nsn.gov; |
| Prairie Island Indian Community | kherdina@piic.org; (Kyle Herdina |
| Quapaw of OK | ebandy@quapawtribe.com; |
| Ponca Tribe of NE | thomaslp99@yahoo.com; |
| Eastern Shoshone | wjferrisiii@yahoo.com; |

Cc: Martha.S.Chieply@usace.army.mil; joel.o.ames@usace.army.mil; Harris_Hoistead@fws.gov;
Kelly_Hogan@fws.gov; meg_vanness@fws.gov
Subject: RE: Tribal Meeting

# PONCA TRIBE OF NEBRASKA

## Dakota Access Pipe Line Meeting – PTN Niobrara Headquarters

## Sign in Sheet – February 18th, 2016

## NAME:

| | |
|---|---|
| PAIGE COVEIA | pgoveja @ nei-yahw.com |
| Harris Hoistad | harris-hoistad @ fws.gov |
| Meg Van Ness | Meg—VanNess @ fws.gov |
| SHANNON WRIGHT | swright@poncatribe-ne.org |
| Michelle Dippel | michelle.dippel@hdrinc.com |
| Kelly Morgan | Kmorgan@standingrock.org |
| Julie Sage | jsage @ poncatribe-ne.org |
| Rick Thomas | rick_thp002@yahoo.com |
| Ben Rhodd | brhodd1 @ yahoo.com |
| Erich Longie | thpo @ gondtc.com |
| Dr. ANDREA A. HUNTER | ahunter@ osagenation-nsn.gov |
| Chris Boyd | tj-avery @ yahoo.com |
| Martha Campbell | Martha.Campbell1951 @yahoo |
| John Campbell | martha-Campbell1951 @ yahoo |
| MATT McCLAIR | matthew.T.McClair @ usace.army.mil |
| STEVE VANCE | Cheyenne River Sioux Tribe THPO |
| Joel Ames | USACE joel.c.ames@usace.army.mil |
| Martha S Chiesly | USACE martha S Chiesly@usace.army.mil |
| Ward Lenz | USACE gary.lenz @ usace.army.mil |

# PONCA TRIBE OF NEBRASKA

## Dakota Access Pipe Line Meeting – PTN Niobrara Headquarters

### Sign in Sheet – February 18th, 2016

## NAME:

| | | |
|---|---|---|
| Brent Hillman | USACE Rock Island | Brent.J.Ullman@USACE.army.mil |
| Danny McClendon | USACE St. Louis | danny.d.mcclendon@usace.army.mil |
| Jim Whitted | SWO THPO | JMSwhitted@yahoo.com |
| Wane T. Marks Sr. | SWO-THPO. | wnetsr@gmail.com |
| LANCE FOSTER | THPO /IOWA TRIBE KS-NB | lfoster@iowas.org |
| Ron W. Deiss | Archaeologist CEMVR PDP TRIBAL LIAISON | Ronald.w.deiss@usace.army.mil |
| Dustin Thompson | Standing Rock | jcyde8275@gmail.com |
| Travis Clarke | CRST - Attorney | tclark@ndnlaw.com |
| Kevin Fuller | Northern Cheyenne Tribe | 3firez@gmail.com |
| Brent Cossette | USACE | brent.j.cossette@usace.army.mil |

# PONCA TRIBE OF NEBRASKA

## Dakota Access Pipe Line Meeting – PTN Niobrara Headquarters

### Sign in Sheet – February 19th, 2016

**NAME:**

| | |
|---|---|
| PAIGE GOVEIA | |
| LOUIS LaROSe | |
| Kelly Morgan | |
| Chris Boyd | |
| ANDREA A. HUNTER | |
| LANCE FOSTER | |
| Erich Longie | Spirit Lake |
| Vine T. MARKS, Sr. | SWO – |
| Jim Whitted | SWO THPO |
| Ben Rhodd | RST – HPO |
| Travis Clark | CRST – Attorney |
| SHANNON WRIGHT | PTN |
| Julia Sage | PTN |
| Ryan Fulu | NC THPO |
| Alisha Bartling | Santee Sioux Nation |
| STEVE VANCE | Cheyenne River Sioux Tribe THPO |
| Brent Cossette | USACE |



**From:** Ames, Omar J CIV USARMY CENWO (US) <Joel.O.Ames@usace.army.mil>
**Date:** October 20, 2017 at 9:06:29 AM CDT
**To:** robertflyinghawk@gmail.com <robertflyinghawk@gmail.com>
**Subject:** Corrected DAPL Remand Letter
**Importance:** High

Hello Chairman,
  I bring you greetings and hope all is well.  Attached, please find the corrected DAPL Remand Letter.  Please confirm receipt.  Thank you.............Joel



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, OMAHA DISTRICT
1616 CAPITOL AVENUE
OMAHA NE 68102-4901

REPLY TO
ATTENTION OF

District Commander

Yankton Sioux Tribe Business & Claims Committee
PO BOX 1153
Wagner, SD 57380

Dear Chairman Flying Hawk & Secretary Glenford "Sam" Sully:

The purpose of this letter is to request information from the Yankton Sioux Tribe (Tribe) to help us in our review of the three issues that the U.S. District Court for the District of Columbia remanded to the U.S. Army Corps of Engineers for further review. *See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,* No. 16-1534, Memorandum Opinion (D. D.C. June 14, 2017) (ECF No. 239). Specifically, the Corps requests that the Tribe participate in the remand analysis being undertaken by the Corps by providing the following information and supporting documentation.

(1) Documentation of hunting or fishing permit reciprocity between the Tribe and the Standing Rock Sioux Tribe during the years of 2015, 2016 and 2017. Provide information describing the hunting and fishing activities, to include the geographic location of permitted hunting or fishing activities of tribal members.

(2) Any studies or reports on game species (aquatic life, birds and mammals), estimated population, habitat, and the designated hunting grounds for such game in relation to Lake Oahe.

(3) Documentation of distinct cultural practices of the Tribe that are connected to Lake Oahe. Please describe the practice, its historical origins, and how the practice is connected to Lake Oahe. Please identify any information that you believe is sensitive. To the extent allowed by applicable federal law, cultural practices information will be treated as sensitive information, and will be protected or redacted to ensure the confidentiality of the provided information.

We would appreciate receiving this information in the next thirty days. If you need additional time, please let us know. We will determine the next steps in the



Printed o Recycled Paper

-2-

remand process and whether we need any additional information from you after we receive the requested information and documentation.

Please send your response to Mr. Brent Cossette, at the above address. If you have any questions, then you may contact Mr. Cossette at brent.j.cossette@usace.army.mil or at (402) 995-2712.

Sincerely,

John L. Hudson, PE
Colonel, Corps of Engineers
District Commander

CC Counsel for Yankton:

Jennifer S. Baker
Fredericks Peebles & Morgan LLP
1900 Plaza Drive
Louisville, CO 80027





## TRIBAL HISTORIC PRESERVATION OFFICE

**Date:** **March 8, 2016**                              **File: 1516-780IL-10**

**RE:** **USACE, CEMVR-OD-P-2014-1313 Dakota Access Pipeline Mississippi River Crossing**

USACE – Rock Island District
Brant Vollman
PO Box 2004 Clock Tower Building
Rock Island, IL 61204-2004

Dear Mr. Vollman,

The Osage Nation Historic Preservation Office has received notification and accompanying information for the proposed pipeline reroute at the Mississippi River crossing for the Dakota Access Pipeline to avoid sites 11HA25 and 11HA978. The Osage Nation Historic Preservation Office concurs with the pipeline reroute will have "No Adverse Effect" upon nearby cultural resources.

Should you have any questions or need any additional information, please feel free to contact me at the number listed below.  Thank you for consulting with the Osage Nation on this matter.

Sincerely,

Jackie Rodgers
Archaeologist

627 Grandview, Pawhuska, OK 74056, (918) 287-5328, Fax (918) 287-5376

USACE_DAPL0079996

**APPENDIX J**

**Sample Scoping Letter, Distribution List
And
Comments Received**

USACE_DAPL0071720



# Solicited Comments on Dakota Access Pipeline Project Proposed Crossing of Flowage Easements Near Upper End of Lake Sakakawea and Federal Lands at Lake Oahe in North Dakota

## May 2015

Scoping Mailing List

USACE_DAPL0071722

| AGENCIES | | | |
|---|---|---|---|
| Contact Information | Date Letter was Mailed | Date Comments Received | EA Section Addressing Comment |
| American Rivers<br>Kristen McDonald<br>1101 14th Ave. NW STE 1400<br>Washington, DC 20005-5637 | 3/30/2015 | N/A | |
| Bureau of Indian Affairs - Fort Berthold Agency<br>Howard Bemer<br>Earl Silk<br>PO Box 370<br>New Town, ND 58763 | 3/30/2015 | N/A | |
| Bureau of Indian Affairs - Great Plains Regional Office<br>Benjamin William<br>115 4th Avenue Southeast<br>Aberdeen, SD 57401 | 1st mailing 3/30/2015<br>2nd mailing 4/23/2015 | N/A | |
| Bureau of Indian Affairs-Standing Rock<br>Robert Demery<br>PO Box E<br>Fort Yates, ND 58538 | 3/30/2015 | N/A | |
| Bureau of Land Management<br>Rick Rymerson<br>99 23rd Avenue West, Suite A<br>Dickinson, ND 58601 | 3/30/2015 | N/A | |
| Dakota Prairie Grasslands<br>Dennis Neitzke<br>1200 Missouri Ave.<br>Bismarck, ND 58504 | 3/30/2015 | N/A | |
| Dakota Resource Council<br>Mark Trechock<br>PO Box 1095<br>Dickinson, ND 58601 | 3/30/2015 | N/A | |
| Bismarck-Mandan Development Association<br>Brian Ritter<br>400 East Broadway Avenue, Suite 417<br>Bismarck, ND 58501 | 3/30/2015 | N/A | |
| Morton County Commissioners<br>Dawn Rhone<br>210 2nd Ave NW<br>Mandan, ND 58554 | 3/30/2015 | N/A | |

CONFIDENTIAL

| | | | |
|---|---|---|---|
| Morton County Extension Agent<br>Kari Presler<br>210 2nd Ave NW<br>Mandan, ND 58554-3158 | 3/30/2015 | N/A | |
| Morton County Weed Board<br>Wayne Carter<br>2916 37th St. NW<br>Mandan, ND 58554 | 3/30/2015 | N/A | |
| Emmons County Commissioners<br>Marlys Ohlhauser<br>PO Box 129<br>Linton, ND 58552 | 3/30/2015 | N/A | |
| Emmons County Extension Agent<br>Connie Job<br>100 SW 4th St.<br>Linton, ND 58552 | 3/30/2015 | N/A | |
| Emmons County Weed Board<br>Sam Renschler<br>510 Sampson Ave.<br>Linton, ND 58552 | 3/30/2015 | N/A | |
| Williams County Commissioner District 1<br>Martin Hanson<br>7783 141st Ave. NW<br>Zahl, ND 58856 | 3/30/2015 | N/A | |
| Williams County Extension Agent<br>302 East Broadway<br>Williston, ND 58801 | 3/30/2015 | N/A | |
| Williams County Weed Board<br>Jim Basaraba<br>109 Main St<br>Williston, ND 58801-6018 | 3/30/2015 | N/A | |
| National Audubon Society State Office<br>Genevieve Thompson<br>118 Broadway, Suite 512<br>Fargo, ND 58102 | 3/30/2015 | N/A | |
| U.S.D.A. Natural Resources Conservation Service<br>Kyle Hartel<br>PO Box 583<br>Watford City, ND 58854 | 3/30/2015 | N/A | |

USACE_DAPL0071724

| | | | |
|---|---|---|---|
| U.S.D.A. Natural Resources Conservation Service<br>Michele R. Doyle<br>2540 Overlook Lane<br>Mandan, ND 58554-1593 | 3/30/2015 | N/A | |
| U.S.D.A. Natural Resources Conservation Service<br>Jennifer M.H. Vetter<br>318 Broadway St. S<br>Linton, ND 58552-7612 | 3/30/2015 | N/A | |
| U.S.D.A. Natural Resources Conservation Service<br>David Schmidt<br>1106 West 2nd St<br>Williston, ND 58801-5804 | 3/30/2015 | N/A | |
| NDSU Dept of Soil Science-Department Chair<br>Tom DeSutter<br>214 Walster Hall, Box 6050<br>Fargo, ND 58108-6050 | 3/30/2015 | N/A | |
| North Dakota Council of Humane Societies<br>Leo Keelan<br>1948 Anderson Drive<br>Minot, ND 58701 | 3/30/2015 | N/A | |
| North Dakota Department of Health<br>Peter Wax<br>600 East Boulevard<br>Bismarck, ND 58505 | 3/30/2015 | N/A | |
| North Dakota Farm Bureau<br>Doyle Johannes<br>4900 Ottawa Street<br>Bismarck, ND 58503 | 3/30/2015 | N/A | |
| North Dakota Forest Service<br>Larry Kotchman<br>307 1st Street East<br>Bottineau, ND 58318-1100 | 3/30/2015 | 4/22/2015 | **Section 2.0 Construction Sequence and Construction Mitigation Measures; Section 3.5 Aquatic Resources** |
| North Dakota Game & Fish Department<br>Steve Dyke<br>Bruce Kreft<br>Terry Steinwand<br>100 N. Bismarck Expressway<br>Bismarck, ND 58501-5095 | 3/30/2015 | N/A | |

USACE_DAPL0071725

| | | | |
|---|---|---|---|
| North Dakota Game & Fish Department<br>Dave Fryda<br>Fred Ryckman<br>406 Dakota Ave<br>Riverdale, ND 58565 | 3/30/2015 | N/A | |
| North Dakota Game & Fish Department<br>Kent Luttschwager<br>13932 West Front Street<br>Williston, ND 58801-8602 | 3/30/2015 | N/A | |
| North Dakota Industrial Commission - Oil and Gas Div.<br>Lynn Helms<br>Bruce E. Hicks<br>600 East Boulevard<br>Bismarck, ND 58505 | 3/30/2015 | 4/16/2015 | **Section 3.1.2 Mineral Resources;<br>Section 3.1.3 Geological Hazards;<br>Section 3.1.4 Paleontology** |
| North Dakota Land Department<br>Mike Brand<br>1707 North 9th St.<br>Bismarck, ND 58501-1853 | 3/30/2015 | N/A | |
| North Dakota Parks & Recreation Department<br>Kathy Duttenhefner<br>1600 East Century Avenue, Suite 3<br>Bismarck, ND 58503-0649 | 3/30/2015 | 4/20/2015 | **Section 3.3.1 Vegetation; Section<br>3.4 Wildlife Resources; Section 3.5<br>Aquatic Resources** |
| North Dakota Petroleum Council<br>Ron Ness<br>PO Box 1395<br>Bismarck, ND 58502 | 3/30/2015 | N/A | |
| North Dakota State Historical Society<br>Susan Quinnell<br>612 East Boulevard Ave.<br>Bismarck, ND 58505 | 3/30/2015 | 4/2/2015 | **Section 3.7.1 Cultural Resources<br>Studies** |
| North Dakota State Water Commission<br>John Paczkowski<br>900 East Boulevard Ave.<br>Bismarck, ND 58505-0850 | 3/30/2015 | N/A | |
| North Dakota Tourism Division<br>Sarah Otte Coleman<br>PO Box 2057<br>Bismarck, ND 58502-2057 | 3/30/2015 | N/A | |

USACE_DAPL0071726

| | | | |
|---|---|---|---|
| U.S. Army Corps of Engineers, Regulatory Office<br>Daniel Cimarosti<br>1513 12th St. SE<br>Bismarck, ND 58504 | 3/30/2015 | N/A | |
| U.S. Fish and Wildlife Service, North Dakota Field Office<br>Scott Larson<br>3425 Miriam Avenue<br>Bismarck, ND 58501-7926 | 3/30/2015 | N/A | |
| USDA-APHIS-WS<br>Philip Mastrangelo<br>2110 Miriam Drive, Suite A<br>Bismarck, ND 58501 | 3/30/2015 | N/A | |
| USDA-Natural Resources Conservation Service-North Dakota State Office<br>Mary Podoll<br>220 East Rosser Avenue, Room 270<br>Bismarck, ND 58502-5020 | 3/30/2015 | 4/13/2015 | **Section 3.1.5 Soils; Section 3.2.3 Wetlands** |
| USDOI-Office of Surface Mining Reclamation and Enforcement-Dick Cheney Federal Building<br>Jeffrey Fleischman<br>150 East B Street, Rm 1018<br>Casper, WY 82601-7006 | 3/30/2015 | 4/13/2015 | **Section 1.1 Project Description** |
| U.S. Army Corps of Engineers Omaha District; CENWO-PM-AA<br>Tiffany Vanosdall<br>1616 Capitol Avenue<br>Omaha, NE 68101-4901 | 3/30/2015 | N/A | |
| North Dakota Parks & Recreation Department<br>Jesse Hanson<br>1600 E. Century Ave, Suite 3<br>Bismarck, ND 58503-0649 | 3/30/2015 | N/A | |
| North Dakota Chapter of the Wildlife Society<br>Kory Richardson<br>PO Box 1442<br>Bismarck, ND 58502 | 3/30/2015 | N/A | |
| Sierra Club - North Dakota Office<br>Blaine Nordwall<br>311 N. Mandan St.<br>Bismarck, North Dakota 58501 | 1st mailing 3/30/2015<br>2nd mailing 4/23/2015 | N/A | |

USACE_DAPL0071727

| LANDOWNERS | | | |
|---|---|---|---|
| Kenneth Kjos<br>1826 15th Ave.<br>Williston, ND 58801-3166 | 3/30/2015 | N/A | |
| Dennis Nelson<br>Williams Co. Highway Department<br>213 11th St W<br>Williston, ND<br>58801 | 1st mailing 3/30/2015<br>2nd mailing 5/6/2015 | N/A | |
| Ken Gardner<br>Buford Township<br>14890 39th Circle NW<br>Williston, ND 58801 | 3/30/2015 | N/A | |
| Carlen Welty<br>14859 39th Circle<br>Williston, ND 58801 | 3/30/2015 | N/A | |
| David C. Braaten<br>2201 13th Ave<br>Williston, ND 58801 | 3/30/2015 | N/A | |
| Steven Mortenson<br>14018 49th St NW<br>Williston, ND 58801 | 3/30/2015 | N/A | |
| William Dobias Family Trust<br>PO Box 105<br>Forsyth, MT 59327-0105 | 3/30/2015 | N/A | |
| David A. Meyer<br>3285 67th St<br>Flasher, ND 58535-9724 | 3/30/2015 | N/A | |
| Patricia Higgins<br>c/o Morris A. Tschider POA<br>418 East Rosser Ave, Suite 200<br>Bismarck, ND 58501-4046 | 3/30/2015 | N/A | |
| Leialoha Family Trust<br>18 Huckleberry Lane<br>Greenwich, CT 06831-3341 | 3/30/2015 | N/A | |

USACE_DAPL0071728

Scoping Letter and Figures

USACE_DAPL0071729



**VIA CERTIFIED MAIL**

March 24, 2015

[insert contact name]
[insert contact address]


Re:     **Request for Comments on Dakota Access Pipeline Project Proposed Crossing of Flowage Easements Near Upper End of Lake Sakakawea and Federal Lands at Lake Oahe in North Dakota**


Dear [insert contact name]:

Dakota Access, LLC (Project Proponent, Applicant) is proposing to construct the Dakota Access Pipeline (DAPL) Project. The overall proposed DAPL Project is an approximate 1,150 mile long light crude oil pipeline project beginning near Stanley, North Dakota, and ending at Patoka, Illinois. In North Dakota (see attached **Figure 1**) the proposed pipeline is approximately 358 miles in length and is proposed to cross flowage easements retained by the U.S. Army Corps of Engineers (Corps) near the upper end of Lake Sakakawea and on Corps managed Federal land at Lake Oahe by utilizing trench/backfill and Horizontal Directional Drill (HDD) techniques.  See attached **Figures 2a, 2b and 3** for a map of crossing locations.  The proposed crossings will require real estate actions and regulatory permits from the Corps to cross federal lands and flowage easements, which are the federal actions associated with this request for comment on the proposed Project.

**Background**

The Lake Sakakawea crossing location is proposed to be installed across Corps Flowage Easements (**Figures 2a and 2b**). The Lake Oahe crossing location will cross below lands owned by the federal government under management by the Corps (**Figure 3**).  Dakota Access, LLC is sending this letter on behalf of the Corps  as the designated non-federal representative for compliance with the National Environmental Policy Act of 1969 (NEPA), the Council on Environmental Quality (CEQ) Regulations (40 Code of Federal Regulations (CFR) 1500-15-8), Corps of Engineers Regulation ER 200-2-2 (33 CFR Part 230) and related environmental compliance requirements for these crossings.  In addition to other requirements, the Lake Sakakawea and Lake Oahe crossings portions of this Project shall comply with the National Historic Preservation Act (Section 106); Tribes, Tribal Historic Preservation Offices, State Historic Preservation Offices, Advisory Council on Historic Preservation and interested parties will be consulted with by Corps Omaha District personnel as required through their Programmatic Agreement with Tribes that reside within the Missouri River basin.

These crossings will require Department of the Army (DA) authorization under either Section 404 of the Clean Water Act (Section 404) and/or Section 10 of the Rivers and Harbors Act (Section 10).  At this time it is not known how many additional crossings may require DA authorization; however, the

CONFIDENTIAL                                          USACE_DAPL0071730



Corps will **not** have regulatory authority over the entire proposed pipeline project.  It is anticipated that the majority of the approximate 620-miles of the proposed pipeline construction in the Omaha District will occur in uplands and not impact waters of the United States.  The DA - Omaha District will evaluate each separate and distinct crossing of waters of the United States as a single and complete project, consistent with the requirements of Nationwide Permit 12 (NWP 12) for utility lines.  A single and complete project includes crossings of a single Waters of the U.S. at a specific location.

The affect analysis is being completed in accordance with CEQ regulations in Section CFR 1506.5(b), which allows an applicant to prepare an Environmental Assessment (EA) for a federal action in coordination with the lead federal agency (i.e. Corps).  The Corps will make a final determination regarding compliance of the activities with NEPA and NWP 12 once complete information is received.  The Corps will independently evaluate and verify the information and analysis undertaken in the EA and take full responsibility for the scope and content contained within.

### DAPL Project Description
*Flowage Easement Crossings Near Lake Sakakawea/Missouri River*

The proposed flowage easement crossings are located in Sections 7, 18, 19, and 30, Township 152 North, Range 103 West in Williams County, North Dakota (see attached **Figures 2a and 2b**) for a total of 2.97 miles (15,692 feet). The proposed pipeline is routed parallel to an existing buried pipeline, and associated valve sites, that crosses the Missouri River and Corps Flowage Easements just west of the DAPL pipeline. The proposed pipeline route crosses seven privately owned tracts of land which contain Corps Flowage Easements.

The majority of the pipeline would be installed using conventional trench/backfill construction methods across the easements; 14,122 feet of the total 15,692 feet across the easements.  The remainder of the footage will be drilled in association with the Lake Sakakawea/Missouri River crossing.  The HDD entry point and pipeline stringing corridor are located on the easements.  The exact HDD entry and exit locations are pending review of geotechnical investigations, but preliminary design indicates that potential HDD crossing length is approximately 2,700 feet. The HDD entry workspace would be located on one of the flowage easement tracts (Corps Easement LL3440E) north of the river. A valve used for operation of the planned pipeline would be installed near the HDD entry point on one of the flowage easement tracts. All contours would be restored to preconstruction contours and conditions, except for the valve site that would be graveled and fenced in.  All above ground structures placed within flowage easements (e.g. fill) may require excavation from the easement in order to retain flood retention as calculated when the flowage easements were obtained by the Corps.  The exact location of excavation is yet to be determined, but would be within the easement for which the valve site is retained.

*Federal Lands Crossing at Lake Oahe*

The proposed Lake Oahe crossing is located in Section 10, Township 134 North, Range 79 West in Morton County, North Dakota, and Section 11, Township 134 North, Range 79 West in Emmons County, North Dakota (**Figure 3**). The proposed pipeline is routed to parallel existing linear infrastructure (an overhead powerline and a buried pipeline) across Lake Oahe.  The exact entry and exit locations are pending review of geotechnical investigations, but preliminary design indicates an HDD crossing of 7,500 feet (**Figure 4**).

CONFIDENTIAL                                    USACE_DAPL0071731



**Request for Comment**

Dakota Access, LLC respectfully requests your comments on the proposed flowage easement crossings near Lake Sakakawea and federal lands crossing at Lake Oahe and any information you may have that will assist in evaluating potential impacts and preparation of an EA in compliance with NEPA requirements. We request information you may have regarding resources and/or concerns about the proposed Project crossing location at these locations which will be reviewed and assessed in the EA document. Specifically, if special features exist with the Project crossing areas (e.g., culturally sensitive areas, domestic water resources, sensitive wildlife habitat, noxious weeds, etc.), please let us know.

Please note that the Corps has the ultimate responsibility to determine whether or not to approve the proposed action. If approved, the Corps will decide the terms and conditions under which the Project crossing should occur (e.g. timing restrictions to reduce disturbance to wildlife, recreation or other concerns; revegetation guidelines, monitoring requirements, etc.).

Copies of correspondence received in response to this letter will be evaluated and included with the EA document to be prepared for the Project crossings. Dakota Access, LLC respectfully requests receipt of your comments within 30 calendar days of receipt of this letter.  We appreciate your assistance and timely response with this request. Should you have any questions or comments, please contact me at 713.898.8222 (cell), 713.989.7186 (office) or Monica.Howard@energytransfer.com.

Sincerely,

**Dakota Access, LLC**


Monica Howard
Director Environmental Sciences

cc:     Johnathan Shelman, Corps Environmental Resource Specialist, Omaha District


Enc.    Figure 1  Dakota Access Pipeline Project Map
        Figures 2a and 2b  Dakota Access Pipeline Project Proposed Crossing of Flowage Easements
        Near Upper End of Lake Sakakawea
        Figure 3  Dakota Access Pipeline Project Proposed Crossings of Federal Lands at Lake Oahe
        Figure 4  Dakota Access Pipeline Project Conceptual Site Plan and Profile Lake Oahe HDD

CONFIDENTIAL         USACE_DAPL0071732



Figure 1
Dakota Access Pipeline Project Map

Proposed Route Centerline

0   25   50 Miles

DAKOTA ACCESS, LLC
For Environmental Purposes Only

CONFIDENTIAL

USACE_DAPL0071733



Figure 2a
Dakota Access Pipeline Project Proposed
Crossing of Flowage Easements Near
Upper End of Lake Sakakawea

DAKOTA ACCESS, LLC
For Environmental Review Purposes Only

Legend:
○ Proposed Milepost
⊠ Proposed Valve Site (50' x 75')
— Proposed Route Centerline
▨ Proposed 50ft Permanent Easement
  HDD Workspace and Stringing Area
  Proposed Construction Workspace
  Tracts
  COE Flowage Easement Area

1 inch = 1,200 feet

0   600   1,200 Feet

CONFIDENTIAL

USACE_DAPL0071734



**Figure 2b**
**Dakota Access Pipeline Project Proposed**
**Crossing of Flowage Easements Near**
**Upper End of Lake Sakakawea**

1 inch = 1,200 feet

0   600   1,200
Feet

DAKOTA ACCESS, LLC
For Environmental Review Purposes Only

○ Proposed Milepost
⬒ Proposed Valve Site (50' x 75')
— Proposed Route Centerline
▨ Proposed 50ft Permanent Easement
▨ HDD Workspace and Stringing Area
▨ Proposed Construction Workspace
▨ Tracts
▨ COE Flowage Easement Area



**Figure 3**
Dakota Access Pipeline Project Proposed Crossings of
Federal Lands at Lake Oahe

○ Proposed Milepost
✖ Proposed Valve Site (50' x 75')
— Proposed Route Centerline
▨ Proposed 50ft Permanent Easement
▭ HDD Workspace and Stringing Area
▭ Proposed Construction Workspace
▭ Tracts

0    875    1,750
Feet
1 inch = 1,750 feet

DAKOTA ACCESS, LLC
For Environmental Review Purposes Only

CONFIDENTIAL

USACE_DAPL0071736



Notes:

1. The locations of all features shown are approximate.
2. This drawing is for information purposes. It is intended to assist in showing features discussed in an attached document. GeoEngineers, Inc. can not guarantee the accuracy and content of electronic files. The master file is stored by GeoEngineers, Inc. and will serve as the official record of this communication.
3. GeoEngineers, Inc. has not verified the field location of the existing utilities.

Reference: Ground surface DEM (1/3 Arc Second) downloaded from http://NationalMap.Gov.
Aerial image taken from Google Earth Pro © 2015, licensed to GeoEngineers, Inc., image dated 09/30/13.
Ground surface survey provided by Wood Group Mustang, inc.
Shape files provided by Contract Land Staff, LLC.

**NOT FOR CONSTRUCTION**
**FOR DISCUSSION ONLY**

**LEGEND:**

SPT (N) — TYPE OF SOIL

- Proposed Boring Location
- Major Contour - 50' Interval
- Minor Contour - 10' interval

**DAKOTA ACCESS PIPELINE PROJECT**
**CONCEPTUAL SITE PLAN AND PROFILE**

PROPOSED 30" PIPELINE
LAKE OAHE HDD
MORTON & EMMONS COUNTIES, NORTH DAKOTA

GEOENGINEERS

**FIGURE 4**

ISSUED DATE MARCH 09, 2015



PLAN

600' 0 600'
SCALE IN FEET

PROFILE

600' 0 600'
HORIZONTAL SCALE IN FEET
100' 0 100'
VERTICAL SCALE IN FEET

Notes:
1. The locations of all features shown are approximate.
2. This drawing is for information purposes. It is intended to assist in showing features discussed in an attached document. GeoEngineers, Inc. can not guarantee the accuracy and content of electronic files. The master file is stored by GeoEngineers, Inc. and will serve as the official record of this communication.
3. GeoEngineers, Inc. has not verified the field location of the existing utilities.

Reference: Ground surface DEM (1/3 Arc Second) downloaded from http://NationalMap.Gov.
Aerial image taken from Google Earth Pro © 2015, licensed to GeoEngineers, Inc., image dated 09/30/13.
Ground surface survey provided by Wood Group Mustang, Inc.
Shape files provided by Contract Land Staff, LLC.

NOT FOR CONSTRUCTION
FOR DISCUSSION ONLY

**LEGEND:**
- Proposed Boring Location
- Major Contour - 50' Interval
- Minor Contour - 10' Interval

**DAKOTA ACCESS PIPELINE PROJECT**
**CONCEPTUAL STRINGING WORKSPACE**

PROPOSED 30" PIPELINE
LAKE OAHE HDD
MORTON & EMMONS COUNTIES, NORTH DAKOTA

GEOENGINEERS

**FIGURE 4**

ISSUED DATE: MARCH 09, 2015

MAM : MWC

P:\18\1878201\101\CAD\Crossings\North Dakota\Lake Oahe\Drawings\Lake Oahe HDD Figure 2.dwg\TAB:Figure 2B modified on Mar 09, 2015 - 7:55pm

Scoping Letter
Comments Received with Responses

USACE_DAPL0071739

# NORTH DAKOTA FOREST SERVICE

*"Enhancing the Quality of Life Through Forestry"*

April 22, 2015

Monica Howard, Director Environmental Services, Dakota Access LLC
Submitted via email:  Monica.Howard@energytransfer.com

Re:     Dakota Access Pipeline Proposed Crossings at Lake Sakakawea and Lake Oahe

Dear Ms. Howard,

The North Dakota Forest Service has reviewed the information concerning the above-referenced project with regard to possible impacts on North Dakota's forest resources.  North Dakota's forests provide wildlife habitat, recreational opportunities, stabilize river banks, filter water runoff from adjacent agricultural lands, provide wood products, serve as seed sources for conservation tree production, increase the botanical diversity of the state, and provide important wildlife habitat.   We encourage the project proponent to replace any trees or shrubs removed during the construction of this project.

Native cottonwood forests occurring within the Missouri River floodplain have been identified in North Dakota's Statewide Assessment of Forest Resources and Forest Resource Strategy as high priority forest areas.  We note that the proposed project crosses through a forest of this type at the location noted as Milepost 94.5 in Figure 2b provided.  We encourage the project proponent to utilize construction techniques that will avoid or minimize disturbance of the forest in this area.

If you have any questions regarding our comments, please feel free to contact this office.

Sincerely,

Liz Smith, ND Forest Service

Cc:  Larry Kotchman, State Forester

**Liz Smith, Forestry Incentives Specialist, NDSU-ND Forest Service**
Jamestown Field Office     300 2nd Ave NE, Suite 208A     Jamestown, North Dakota 58401
701-400-8330     liz.smith@ndsu.edu   www.ndsu.edu/ndfs

     USACE_DAPL0071740

**Archived:** Thursday, April 23, 2015 9:25:39 AM
**From:** Howard, Monica
**Sent:** Wednesday, April 22, 2015 12:34:31 PM
**To:** Elizabeth Smith
**Cc:** Larry Kotchman; Dennis Woods; Ashley Thompson; Meghan.Oh@hdrinc.com
**Subject:** RE: North Dakota Forest Service Comments re: Dakota Access Pipeline
**Importance:** Normal
**Attachments:**
Dakota Access Sakakwea and Oahe .pdf ;

Ms. Smith,
Thank you for your email and comments. I want to assure you that Dakota Access will adhere to the tree and shrub replanting regulations set forth by the North Dakota Public Service Commission.  With regard to the forested area at the Missouri River, there will be no surface disturbance as a result of the project due do our horizontal directional drill beneath the river.  We will have to selectively cut trees within 15 feet of the centerline for federal operational compliance; however, I would like to note that the tree density over our alignment here is low compared to the majority of the forest along the bank (please see aerial screen shot below).



Please do not hesitate to contact me with any additional questions or concerns relative to the project.

Thank you,
**Monica Howard**
**Director Environmentai Sciences**
**713-989-7186 (o)**
**713-898-8222 (c)**

**From:** Elizabeth Smith [mailto:liz.smith@ndsu.edu]
**Sent:** Wednesday, April 22, 2015 10:42 AM
**To:** Howard, Monica
**Cc:** Larry Kotchman
**Subject:** North Dakota Eorest Service Comments re: Dakota Access Pipeline

Dear Ms. Howard,
Attached please find comments regarding the Dakota Access Pipeline Proposed Crossings at Lake Sakakawea and Lake Oahe.


Liz Smith

Forestry Incentives Specialist
NDSU-ND Forest Service
liz.smith@ndsu.edu
300 2nd Avenue NE, Suite 208A
Jamestown, ND  58401
701.400.8330





Private and confidential as detailed here. If you cannot access hyperlink, please e-mail sender.



# North Dakota Geological Survey

Edward C. Murphy - State Geologist

**Department of Mineral Resources**

Lynn D. Helms - Director

**North Dakota Industrial Commission**

www.state.nd.us/ndgs

April 16th, 2015

Monica Howard
Director of Environmental Sciences
Dakota Access, LLC

Dear Ms. Howard,

Thank you for requesting our comments. If you have not already, we encourage you to visit the North Dakota Geological Survey (NDGS) website at https://www.dmr.nd.gov/ndgs/newsletter/ which hosts a surplus of maps and information regarding the terrain you will be transecting.

Sections of the proposed pipeline will transect clay-rich terrain with drainages, ravines and coulees characterized by landslide deposits. High concentrations of landslides have been mapped in many regions along the proposed route centerline shown in Figure 1 of your document. Figure 2b also projects your route centerline within a few hundred feet of the south bank of the Missouri River (cf., the Watford City 100k map sheet on the NDGS website). Many of the landslides are older, vegetated deposits so difficult to detect, yet they may destabilize if disturbed, so we want to alert you of their locations. In places landslides exceed sizes of 200 acres. Landslide prone areas include the badlands topography and regions where nonglacial sediment such as the Sentinel Butte and Bullion Creek Formations are exposed near or at the surface. Some concentrated regions overlapping your route are the White Earth River Valley in Mountain Trail County; the Lake Sakakawea Region and the Missouri River Valley along the border of Williams and McKenzie counties; the Little Missouri River Valley in McKenzie and Dunn counties; and the Killdeer Mountain Region in Dunn County. Landslide maps can be accessed at https://www.dmr.nd.gov/ndgs/landslides/.

The pipeline will also transect terrain rich in paleontological resources and economically mineable coal deposits so we ask that you contact us if you uncover anything of note. Coal deposits are defined as economical if they meet the minimum criteria established by coal companies operating surface mines in North Dakota. Information regarding paleontological resources can be accessed at https://www.dmr.nd.gov/ndfossil/Poster/poster.asp and coal maps can be accessed at https://www.dmr.nd.gov/ndgs/Coalmaps/stanley/StanleyIndex.asp.

Please contact me if you have any questions.

Best regards,

Joe Blockland      *Joseph D. Blockland*

Geologist
North Dakota Geological Survey 600 East Boulevard Ave, Bismarck, ND 58505-0840
Phone: 701-328-8013; Email: jdblockland@nd.gov

CONFIDENTIAL                    USACE_DAPL0071743



*Jack Dalrymple, Governor*
*Mark A. Zimmerman, Director*

*1600 East Century Avenue, Suite 3*
*Bismarck, ND 58503-0649*
*Phone 701-328-5357*
*Fax 701-328-5363*
*E-mail parkrec@nd.gov*
*www.parkrec.nd.gov*

April 20, 2015

Energy Transfer
c/o Monica Howard
1300 Main Street, RM 14.030
Houston, TX 77002

Re: Dakota Access Pipeline Project

Dear Ms. Turnbow,

The North Dakota Parks and Recreation Department (the Department) has reviewed the above referenced proposed pipeline project crossing of flowage easement near upper end of Lake Sakakawea and Federal Lands at Lake Oahe in North Dakota.   Our agency scope of authority and expertise covers recreation and biological resources (in particular rare plants and ecological communities). The project as defined does not affect state park lands that we manage or Land and Water Conservation Fund recreation projects that we coordinate.

The North Dakota Natural Heritage biological conservation database has been reviewed to determine if any plant or animal species of concern or other significant ecological communities are known to occur within an approximate one-mile radius of the project area. Based on this review, we have several species of concern documented within sections and in adjacent sections to project area.  Please see the attached spreadsheet and map for more information on these occurrences.

Because this information is not based on a comprehensive inventory, there may be species of concern or otherwise significant ecological communities in the area that are not represented in the database. The lack of data for any project area cannot be construed to mean that no significant features are present. The absence of data may indicate that the project area has not been surveyed, rather than confirm that the area lacks natural heritage resources.   We defer any additional comments regarding these animal species to the ND Game and Fish Department and the US Fish and Wildlife Service.

Regarding any reclamation efforts, we recommend that any impacted areas be revegetated with species native to the project area.   It is our policy to charge out-of-state requests for data services including data retrieval, data analysis, manual and computer searches, packaging and collection of data. An invoice for services provided has been enclosed.

We appreciate your commitment to rare plant, animal and ecological community conservation, management and inter-agency cooperation to date. For additional information please contact Kathy Duttenhefner (701-328-5370 or kgduttenhefner@nd.gov) of our staff. Thank you for the opportunity to comment on this proposed project.

Sincerely,

Jesse Hanson, Manager
Planning and Natural Resources Division

R.USNDNHI*2015-030 KD4/20/2015DL4.30.2015

*Play in our backyard!*

CONFIDENTIAL

USACE_DAPL0071744

# ND Parks and Recreation Department

**ND Natural Heritage Inventory**
1600 East Century Ave., Suite 3
Bismarck, ND 58503-0649
(701) 328-5370  FAX: (701) 328-5363

# INVOICE

**INVOICE NO: 501**
**DATE: 4/20/2015**

Energy Transfer
c/o Minica Howard
1300 Main Street, Rm 14.030
Housatan, TX 77002

| CONTACT | REFERENCE NO. | DATE SHIPPED | SHIPPED VIA | F.O.B. POINT | TERMS |
|---|---|---|---|---|---|
| K.Duttenhefner | NHI_2015-0001 | 1/23/2015 | USPS | | |

| QUANTITY | DESCRIPTION | UNIT PRICE | AMOUNT |
|---|---|---|---|
| 1 | Data retrieval, data analysis, manual and computer searches, packaging and collection of data.<br><br>Project: Dakota Acess Pipeline Project | $ 60.00 | $ 60.00 |
| | SUBTOTAL | | $ 60.00 |
| | SALES TAX | | |
| | SHIPPING & HANDLING | | |
| | TOTAL DUE | | $ 60.00 |

Make all checks payable to: ND Parks and Recreation Department
If you have any questions concerning this invoice, call: Kathy Duttenhefner, (701) 328-5370

**THANK YOU FOR YOUR INTEREST IN RARE SPECIES CONSERVATION.**

| Entry Event | Fund | Dept. | Project | Activity |
|---|---|---|---|---|
| 463021 | 398 | 1508 | OR15082 | 15082 |

USACE_DAPL0071745

# North Dakota Parks and Recreation Department
## North Dakota Natural Heritage Inventory



April 2015

Rare Animal and Plant Species and Significant Ecological Communities

| State Scientific Name | State Common Name | State Rank | Global Rank | Federal Status | Township Range Section | County | Last Observation | Estimated Representation Accuracy | Precision |
|---|---|---|---|---|---|---|---|---|---|
| Macrhybopsis meeki | Sicklefin Chub | S2 | G3 | | 152N104W - 24 | McKenzie | 1994-07-07 | | S |

1

USACE_DAPL0071747

North Dakota Parks and Recreation Department
North Dakota Natural Heritage Inventory



April 2015

CONFIDENTIAL

Rare Animal and Plant Species and Significant Ecological Communities

| State Scientific Name | State Common Name | State Rank | Global Rank | Federal Status | Township Range Section | County | Last Observation | Estimated Representation Accuracy | Precision |
|---|---|---|---|---|---|---|---|---|---|
| Charadrius melodus | Piping Plover | S1S2 | G3 | LE,LT | 134N079W - 10; 134N079W - 11 | Emmons | 2002-06-09 | Medium | S |
| Cycleptus elongatus | Blue Sucker | S3 | G3G4 | | 134N079W - 10; 134N079W - 04; 134N079W - 09; 134N079W - 15; 134N079W - 14; 134N079W - 11; 134N079W - 02; 134N079W - 22; 134N079W - 03; 134N079W - 16; 134N079W - 21 | Emmons, Morton, Sioux | 1975-08-13 | | M |
| Polyodon spathula | Paddlefish | SNR | G4 | | 134N079W - 14 | Emmons | 1994-08-31 | | S |
| Polyodon spathula | Paddlefish | SNR | G4 | | 134N079W - 15; 134N079W - 11; 134N079W - 12; 134N079W - 22; 134N079W - 03; 134N079W - 13; 134N079W - 16; 134N079W - 23; 134N079W - 10; 134N079W - 14; 134N079W - 09; 134N079W - 02 | Emmons, Morton, Sioux | 1973-07-03 | | M |
| River-creek | | S1 | GNR | | 134N079W - 15 | Sioux | 1986 | | S |
| Scaphirhynchus albus | Pallid Sturgeon | S1 | G2 | LE | 134N079W - 10; 134N079W - 04; 134N079W - 09; 134N079W - 15; 134N079W - 14; 134N079W - 11; 134N079W - 02; 134N079W - 22; 134N079W - 03; 134N079W - 16; 134N079W - 21 | Emmons, Morton, Sioux | 1973-07-03 | Low | M |
| Sterna antillarum | Least Tern | S1 | G4 | PS:LE | 134N079W - 02 | Emmons | 1990-07 | Medium | S |
| Sterna antillarum | Least Tern | S1 | G4 | PS:LE | 134N079W - 10; 134N079W - 11 | Emmons | 1996-07 | Medium | S |

1

CONFIDENTIAL

**North Dakota Natural Heritage Inventory Biological and Conservation Data Disclaimer**

The quantity and quality of data collected by the North Dakota Natural Heritage Inventory are dependent on the research and observations of many individuals and organizations. In most cases, this information is not the result of comprehensive or site-specific field surveys; many natural areas in North Dakota have never been thoroughly surveyed, and new species are still being discovered.  For these reasons, the Natural Heritage Inventory cannot provide a definite statement on the presence, absence, or condition of biological elements in any part of North Dakota.  Natural Heritage data summarize the existing information known at the time of the request.  Our data are continually upgraded and information is continually being added to the database.  This data should never be regarded as final statements on the elements or areas that are being considered, nor should they be substituted for on-site surveys.

**Estimated Representation Accuracy**

Value that indicates the approximate percentage of the Element Occurrence Representation (EO Rep) that was observed to be occupied by the species or community (versus buffer area added for locational uncertainty). Use of estimated representation accuracy provides a common index for the consistent comparison of EO reps, thus helping to ensure that aggregated data are correctly analyzed and interpreted.

Very high (>95%)
High (>80%, <= 95%)
Medium (>20%, <= 80%)
Low (>0%, <= 20%)
Unknown
(null) - Not assessed

**Precision**

A single-letter code for the precision used to map the Element Occurrence (EO) on a U.S. Geological Survey (USGS) 7.5' (or 15') topographic quadrangle map, based on the previous Heritage methodology in which EOs were located on paper maps using dots.

S - Seconds: accuracy of locality mappable within a three-second radius; 100 meters from the centerpoint

M - Minute: accuracy of locality mappable within a one-minute radius; 2 km from the centerpoint

G - General: accuracy of locality mappalbe to map or place name precision only; 8 km from centerpoint

U - Unmappable

CONFIDENTIAL

**Archived:** Thursday, April 23, 2015 9:28:06 AM
**From:** Howard, Monica
**Sent:** Monday, April 13, 2015 9:39:44 AM
**To:** Sieving, John
**Cc:** Jeffrey W Fleischman; Dennis Woods; Ashley Thompson; Oh, Meghan; steve.rowe@hdrinc.com
**Subject:** RE: Request for comment Dakota Access Pipeline Project
**Importance:** Normal

Hi Mr. Sieving,

Thank you for your response.  We will follow-up as needed based on additional review of the Coyote Creek Mine.

Sincerely,
**Monica Howard**
**Director Environmental Sciences**
**713-989-7186 (o)**
**713-898-8222 (c)**

**From:** Sieving, John [mailto:jsieving@osmre.gov]
**Sent:** Monday, April 13, 2015 9:36 AM
**To:** Howard, Monica
**Cc:** Jeffrey W Fleischman
**Subject:** Request for comment Dakota Access Pipeline Project

Ms. Howard,
The Office of Surfacing Mining Reclamation and Enforcement (OSMRE), Casper Area Office, has received your request for comments concerning the Dakota Access Pipeline Project Proposed Crossing of Flowage Easements Near the Upper End of Lake Sakakawea and Federal Lands at Lake Oahe in North Dakota.  It does not appear that the project intersects any lands currently regulated by this agency. As such, this office has no comment on the proposed project.

The proposed pipeline does, however, appear to extend just southwest of the Coyote Creek Mine (Permit NACC-1302), in Mercer County, ND.  This is a new operation and has only been permitted since October of last year.  Any questions concerning this mine may be addressed to the North Dakota Public Service Commission, which is the primary regulatory authority concerning mining operations in North Dakota.

Thank you for your inquiry.  To address any further questions or follow up, feel free to contact John Sieving, Physical Scientist (307) 261-6541 or Jeff Fleischman, DFD Chief, (307) 261-6550.

--
John Sieving
Physical Scientist
Office of Surface Mining
Casper Field Office
150 East "B" St.
Casper, WY 82601
Office: (307)261-6541

USACE_DAPL0071751

Cell: (307)315-4261
jsieving@osmre.gov
Private and confidential as detailed here. If you cannot access hyperlink, please e-mail sender.

USACE_DAPL0071752



**USDA**

United States Department of Agriculture

Natural Resources
Conservation Service

PO Box 1458
Bismarck, ND
58502-1458
Voice 701.530.2000
Fax 855-813-7556

April 13, 2015

Monica Howard
Director Environmental Sciences
Dakota Access, LLC
1300 Main Street
Houston, Texas 77002

Re: Request for Comments on Dakota Access Pipeline Project Proposed
Crossing of Flowage Easements Near Upper End of Lake Sakakawea and
Federal lands at Lake Oahe in North Dakota

Dear Ms. Howard:

The Natural Resources Conservation Service (NRCS) has reviewed your letter
dated March 30, 2015, concerning a proposal to construct the Dakota Access
Pipeline (DAPL) Project.

Farmland Protection Policy Act

NRCS has a major responsibility with the Farmland Protection Policy Act
(FPPA) in documenting conversion of farmland (i.e., prime, statewide
importance and local importance) to non-agriculture use. It appears your
proposed project is not supported by federal funding, therefore, FPPA does not
apply and no further action is needed.

Wetlands

The Wetland Conservation Provisions of the 1985 Food Security Act, as
amended, provide that if a USDA participant converts a wetland for the purpose,
or to have the effect of making agricultural production possible, loss of USDA
benefits could occur. The NRCS has developed the following guidelines for the
installation of permanent structures where wetlands occur. If these guidelines are
followed the impacts to the wetland will be considered minimal allowing USDA
participants to continue to receive USDA benefits. Following are the
requirements:

> ➢ Disturbance to the wetland must be temporary.
> ➢ No drainage of wetland is allowed (temporary or permanent).
> ➢ Mechanized landscaping necessary for installation is kept to a minimum
>   and preconstruction contours are maintained.
> ➢ Temporary side cast material must be placed in such a manner not to be
>   dispersed in the wetland.
> ➢ All trenches must be backfilled to the original wetland bottom elevation.

*Helping People Help the Land*

CONFIDENTIAL                    USACE_DAPL0071753

Dakota Access, LLC
Page 2


NRCS would recommend that impacts to wetlands be avoided.

If you have additional questions pertaining to FPPA, please contact Steve Sieler, Liaison Soil Scientist, NRCS, Bismarck, ND at 701-530-2019.

Sincerely,

WADE D. BOTT
State Soil Scientist

CONFIDENTIAL



# STATE HISTORICAL SOCIETY OF NORTH DAKOTA

Jack Dalrymple
*Governor of North Dakota*

**North Dakota State Historical Board**

Calvin Grinnell
*New Town - President*

A. Ruric Todd III
*Jamestown - Vice President*

Margaret Puetz
*Bismarck- Secretary*

Albert I. Berger
*Grand Forks*

Gereld Gemtholz
*Valley City*

Diane K. Larson
*Bismarck*

Chester E Nelson, Jr.
*Bismarck*

Sara Otte Coleman
*Director*
*Tourism Division*

Kelly Schmidt
*State Treasurer*

Alvin A. Jaeger
*Secretary of State*

Mark Zimmerman
*Director*
*Parks and Recreation*
*Department*

Grant Levi
*Director*
*Department of Transportation*

Claudia J. Berg
*Director*

*Accredited by the*
*American Alliance*
*of Museums since 1986*

April 2, 2015

Ms. Monica Howard
Director Environmental Sciences
Dakota Access, LLC
Energy Transfer Company
1300 Main Street
Houston, TX 77002

**ND SHPO REF: 15-0106 COE Dakota Access Crossing of Flowage Easements Near the Upper End of Lake Sakakawea in portions of [T152N R103W Sections 7, 30, 18, 19] Williams County, North Dakota**

Dear Ms. Howard,

We reviewed your correspondence dated March 30, 2015. We recommend a Class III (pedestrian) survey of the Area of Potential Effect, as previously requested under the North Dakota Public Service Commission application from Dakota Access Pipeline.

Thank you for the opportunity to review this project to date. We look forward to review of the Class III survey. Please include the ND SHPO Reference number listed above in further correspondence for this project. If you have any questions please contact Susan Quinnell, Review and Compliance Coordinator at (701)328-3576 or squinnell@nd.gov

Sincerely,

Claudia J. Berg
State Historic Preservation Officer (North Dakota)

North Dakota Heritage Center • 612 East Boulevard Avenue, Bismarck, ND 58505-0830 • Phone: 701-328-2666 • Fax: 701-328-3710
Email: histsoc@nd.gov • Web site: http://history.nd.gov • TTY: 1-800-366-6888

CONFIDENTIAL

USACE_DAPL0071755

Draft EA Public Notice
Summary of Comments Received

USACE_DAPL0071756

**Index of Commenters**
Environmental Assessment
Dakota Access Pipeline Project
Crossings of Flowage Easements and Federal Lands

| Commenter ID # | Name/Organization of Commenter | Date of Comment |
|---|---|---|
| 1 | Curtis Jundt | 8-Jan-16 |
| 2 | Debb Stroh/Killdeer Landowner | UNK |
| 3 | EPA | 8-Jan-16 and 11-Mar-16 |
| 4 | Stanley Charging- Tribal | 8-Jan-16 |
| 5 | Thomas Abe/Fort Berthold Reservation | 8-Jan-16 |
| 6 | Amanda Bird Bear/Fort Berthold Reservation | 8-Jan-16 |
| 7 | Lisa Deville/Fort Berthold Reservation | 9-Jan-16 |
| 8 | Friends of Lake Sakakawea | 5-Jan-16 |
| 9 | Joletta Bird Bear/Fort Berthold Reservation | UNK |
| 10 | Lisa Setzepfandt | UNK |
| 11 | Midwest Alliance for Infrastructure Now Coalition | UNK |
| 12 | ND State Water Commission | 7-Jan-16 |
| 13 | Paula Graner | UNK |
| 14 | Robert Harms | 8-Jan-16 |
| 15 | Standing Rock Sioux Tribe | 8-Jan-16 and 24-Mar-16 |
| 16 | Theodora Bird Bear/Fort Berthold Reservation | 8-Jan-16 |
| 17 | Ray Barker/MHA Nation Elder | 8-Jan-16 |
| 18 | Concerned Tribal Member of the Mandan, Hidatsa & Arikara Nation/New Town, ND | 7-Jan-16 |
| 19 | North Dakota Game and Fish Department | 5-Jan-16 |
| 20 | Northern Cheyenne THPO | 6-Jan-16 |

* Note that in addition to those comments received in response to the Draft Environmental Assessment, other comments regarding this project were submitted to the USACE as part of the USACE's Regulatory Division's Section 106 Consultation, or in relation to the USACE's Omaha District Programmatic Agreement in place for the Missouri River. These comments often overlapped with comments from correspondence referenced in the above table.  No new significant additional information on environmental effects was offered as a result of comments provided in the other correspondence and topics relevant to the Environmental Assessment have already been included and are fully considered in the Environmental Assessment.

CONFIDENTIAL

Summary of Comments Received
Environmental Assessment
Dakota Access Pipeline Project
Crossings of Flowage Easements and Federal Lands

| Commenter / Comment ID | Comment | EA Section where Comment is Addressed | USACE Response |
|---|---|---|---|
| 1-1 | The company carefully considered possible route alternativeness in the EA and considered other transportation options. The route with the least impact has been chosen by the company. | N/A | No concerns with the Draft EA were identified |
| 2-1 | Dakota Access is protecting water resources.  The Missouri River and Lake Oahe will be crossed via HDD to mitigate impact during construction and operation, in addition to the monitored valves that can be closed if an anomaly is detected. | N/A | No concerns with the Draft EA were identified |
| 2-2 | Dakota Access is protecting soil resources.  Dakota Access has hired companies to assist with Project measures to minimize soil disturbances. | N/A | No concerns with the Draft EA were identified |
| 2-3 | Cultural surveys have been completed to the standards outlined in the ND SHPO Guidelines Manual for Cultural Resources Inventory Projects.  Eight sites were identified near the Missouri River and Lake Oahe, all will be avoided by HDDs. | N/A | No concerns with the Draft EA were identified |
| 3-1 | Our main concerns with Draft EA document for the North Dakota segment of Dakota Access pipeline are the document lacks sufficient analysis of direct and indirect impacts to water resources. | 3.2.1 Surface Waters and 3.2.2 Groundwater | The commenter's concerns are addressed in the Draft EA. Section 3.2 addresses water resources. Surface waters are addressed in Section 3.2.1 and groundwater resources are addressed in Section 3.2.2.  Specifically, potential impacts to surface waters are addressed in Section 3.2.2.1 and potential impacts to groundwater resources are addressed in Section 3.2.2.2.  Sections 3.2.1.2 and 3.2.2. of the Draft EA have been modified to clarify where direct and indirect impacts to water resources are addressed. |
| 3-2 | Our main concerns with Draft EA document for the North Dakota segment of Dakota Access pipeline are the document lacks information on the measures that will be required to assure that impacts from construction and operation of the pipeline are not significant. | 2.3.2 Description of Construction Techniques and Construction Mitigation Measures (Sections 2.3.2.3, and 2.3.2.9)<br>3.2.1.2<br>3.2.2.2 Impacts and Mitigation [Groundwater]<br>3.11 Reliability and Safety | Narrative related to emergency response preparedness and discussion of the Facility Response Plan has been added to Section 3.2.1.2. and Section 3.11.  A draft of the Facility Response Plan has been included in Appendix L.  Tribal contacts were added to the list of entities to be contacted in the event of an inadvertent release in Section 3.11 Reliability and Safety.   Other issues raised by the commenter were adequately addressed in the Drat EA. Sections 2.3.2.3, 2.3.2.9, and 3.2.2.2 describe that the pipeline will be constructed and operated to meet or exceed the federal regulatory requirements for the construction, operation, maintenance, monitoring, inspection, and repair of liquid pipeline systems.<br>Section 3.2.2.2 and Sections 3.11 describes maintenance, inspection, and integrity testing program to monitor the safety of the pipeline system, leak detection protection procedures, and coordination with local emergency responders. |
| 3-3 | Our main concerns with Draft EA document for the North Dakota segment of Dakota Access pipeline are the scope of the document is limited to small portions of the complete project and does not identify the related effects from the entire project segment. | 1.3 Authority and Scope of the EA<br>2.3.1 Locations and Detailed Description of the Proposed Action . | As referenced  in Section 1.3, the scope of the this EA is limited the proposed Project crossings of Corps-owned lands and flowage easements at the Missouri River and Lake Oahe crossings that would require real estate actions and regulatory permits from the Corps, which are the federal actions associated with this EA. Separate Corps authorizations are being sought for Section 404, Section 10, and Section 408 crossings along the entire DAPL route. The detailed description of the Proposed Action, including all Connected Actions are included in  Section 2.3.1. |
| 3-4 | Review of the EA was substantially limited by missing information and by limited scope of the EA including Figures 1-13, the maps showing the project layout that are referenced in document index, were not included in the posted document | Figures 1-13 | The maps were inadvertently left off of the original posting due to a formatting change to the PDF document.  The maps were added to the online file on December 11, 2015.  The EPA was notified of the posting of the figures by Brent Cossette. |
| 3-5 | Review of the EA was substantially limited by missing information and by limited scope of the EA including the EA focuses on the two small segments of Corps lands at Lake Oahe and the Missouri River above Lake Sakakawea and no information was included on the overall impact of project to water resources | 1.3 Authority and Scope of the EA<br>3.2.1 Surface Waters and 3.2.2 Groundwater | The scope of the  EA is addressed in the response to Comment 3-3 and  concern with the missing information (delay of one day) is addressed in the response to Comment 3-4.  Potential impacts to surface waters are addressed in Section 3.2.2.1 and potential impacts to groundwater resources are addressed in Section 3.2.2.2.  Based on their Comment 3-1. Sections 3.2.1.2 and 3.2.2.2 of the Draft EA have been modified to clarify where direct and indirect impacts to water resources are addressed. |
| 3-6 | Review of the EA was substantially limited by missing information and by limited scope of the EA including the analysis  of environmental impacts (except for stormwater) of constructing and operating the 358 miles of pipeline in ND | 1.3 Authority and Scope of the EA | The scope of the  EA is addressed in the response to Comment 3-3 and the missing information (delay of one day) is addressed in the response to Comment 3-4. |

CONFIDENTIAL

Summary of Comments Received
Environmental Assessment
Dakota Access Pipeline Project
Crossings of Flowage Easements and Federal Lands

| Commenter / Comment ID | Comment | EA Section where Comment is Addressed | USACE Response |
|---|---|---|---|
| 3-7 | Review of the EA was substantially limited by missing information and by limited scope of the EA including that the EA did not include potential impacts from the six proposed tank terminal sites. | 1.3 Authority and Scope of the EA<br>2.3.1 Locations and Detailed Description of the Proposed Action . | As indicated in the response comment 3-1, the scope of the this EA is limited the proposed Project crossings of Corps-owned lands and flowage easements at the Missouri River and Lake Oahe crossings that would require real estate actions and regulatory permits from the Corps, which are the federal actions associated with this EA. The Proposed Action including Connected Action areas is described in detail in Section 2.3.1. The proposed tank terminal sites are not within the proposed Project crossings of Corps-owned lands and flowage easements at the Missouri River and Lake Oahe crossings and consequently are not part of the scope of this EA. |
| 3-8 | The EA should describe the design, operational and planning measures that will be required for protection of water resources from spills and leaks. These include information on the monitoring equipment, valve locations, pipeline design measures and procedures; Dakota Access would implement to prevent and respond to leaks and spills from the pipeline and associated facilities. The analysis should also describe what measures would be in place to enable the operator(s) to quickly detect and locate leaks and spills, limit the volume of any release, and identify the maximum expected spill volume given those measures. For example, will there continuous monitoring for abnormal pressures in the pipeline? For additional details on the types of emergency preparedness measures that should be included in the EA, please see the EPA Region 8's comments on the Sakakawea Pipeline System Environmental Assessment Addendum, dated December 23, 2015 (enclosed). | 3.2.1.2 Surface Waters Impacts and Mitigation<br>3.2.2 Groundwater Impacts and Mitigation<br>3.5.1.2 Habitats and Communities<br>3.11 Reliability and Safety | DAPL's geographical response plans for the Missouri River crossings near Lake Sakakawea and Lake Oahe were developed in consideration of worst case hypothetical discharge scenarios at the Missouri River crossings. Much of the concern of the commenter was addressed in Section 3.11 Reliability and Safety of the Draft EA. Additional information was provided in Sections 3.2.2.2 Groundwater Impacts and Mitigation, 3.5.1.2 Habitats and Communities Impacts and Mitigation. The Draft EA was revised to include additional information on how DAPL would respond to inadvertent releases from the pipeline. Section 3.2.1.2. and 3.11 have been revised to include information about how DAPL would respond in the unlikely event of a pipeline leak. DAPL has prepared a Facility Response Plan (included as Appendix L) to satisfy the requirements of the applicable regulations and has contractually secured personnel and equipment necessary to respond to inadvertent releases from the pipeline. |
| 3-9 | The water resources impacts section of the EA should be expanded to discuss affected water resources and potential impacts from construction and operation of the pipeline for the segment of the pipeline covered by the North Dakota EA. For example, the EA should identify potentially affected waterbodies, designated water uses (water quality standards), identify impaired waterways, drinking water intakes and aquifers, etc. The enclosed Sakakawea Pipeline letter also provides additional details on potential water quality impacts. | 1.3 Authority and Scope of the EA<br>3.2.1 Surface Waters<br>3.2.1.2 Surface Waters Impacts and Mitigation<br>3.2.2 Groundwater<br>3.5.1 Habitat and Communities<br>3.6.3.1 Recreation and Special Interest Areas Affected Environment | The state surface water classifications have been added to Tables 3-5 and 3-6 within the Draft EA. A discussion on potential impacts to drinking water intakes has been added to the Draft EA in Section 3.2.1. A Water Intake Mitigation Measures Section has been added to the EA as a subsection in Section 3.2.1.2 Surface Waters Impacts and Mitigation. The scope of the EA is limited to the description provided in Section 1.3 Authority and Scope of the EA. The remaining concerns of the commenter were addressed in Sections 3.2.1 Surface Waters, 3.2.2 Groundwater, 3.5.1 Habitat and Communities, and 3.6.3.1 Recreation and Special Interest Areas Affected Environment within the Draft EA. |
| 3-9 | The proposed pipeline crosses several important glacial drift and alluvial aquifers. Groundwater in this area tends to be of poor quality, so the alluvial aquifers and particularly the glacial drift aquifers can be important sources of drinking and agricultural water. For more information please see the "North Dakota Source Water Assessment Program, Strategic Plan."2 The State Water Quality Commission and the USGS have also prepared a series of County Ground-Water resources. For example the Dunn County study discusses the aquifer used by the Town of Killdeer as well as other domestic and livestock groundwater uses. | 3.2.2 Groundwater<br>3.11 Reliability and Safety<br>4.2 Water and Aquatic Life Resources | Groundwater impacts are addressed within Sections 3.2.2 Groundwater and 4.2 Water and Aquatic Life Resources of the Draft EA. No significant impacts to groundwater are anticipated as described in the existing Draft EA Text: Section 3.2.2 Construction activities, such as trenching, dewatering, and backfilling that encounter shallow aquifers would cause minor direct and indirect impacts via fluctuations in groundwater levels and/or increased turbidity within the aquifer adjacent to the activity due to dewatering activities. Shallow aquifers would quickly reestablish equilibrium if disturbed, and turbidity levels would rapidly subside. Consequently, the effects of construction would be minor and short-term. Impacts on deeper aquifers are not anticipated. Impacts to ground water and aquifers from operations are addressed in section 3.11 Reliability and Safety. The state-of-the-art leak detection systems would be capable of detecting leaks down to 1 percent or better of the pipeline flow rate within a time span of approximately 1 hour or less and capable of providing rupture detection within 1 to 3 minutes. Upon leak detection, pump station shut down and isolation valve closures would minimize the potential for impacts to groundwater. |

CONFIDENTIAL

| Commenter / Comment ID | Comment | EA Section where Comment is Addressed | USACE Response |
|---|---|---|---|
| 3-10 | The EA should identify potential wetlands within the construction foot print or easement of the entire segment of the proposed pipeline. Currently, the document does not include any information on impacts to wetlands and other waters of the U.S. outside of pipeline segments on Corps Fee Land (Sections 2.3.2.7, 2.3.2.8 and 3.2.3 -- Wetlands). Estimating the proposed route (as maps were not included in the EA), it appears that the pipeline would cross a number of larger (for western North Dakota) perennial streams which may warrant site-specific delineation of Waters of the U.S. and potentially require an individual 404 permit. For example, it appears the pipeline will cross the Little Missouri River, Heart River, and Spring and Beaver Creeks. | 1.3 Authority and Scope of the EA | As indicated in the response to their Comment 3-1, The scope of the EA is limited to the description provided in Section 1.3 Authority and Scope of the EA.  Waters of the US crossed outside of the scope of the EA are permitted under Nationwide Permit 12 and not subject to evaluation in this EA.  Separate Corps authorizations are being sought for Section 404, Section 10, and Section 408 crossings along the entire DAPL route. |
| | For major pipeline projects in the western U.S., such as the Dakota Access, we typically see the proponent develop specific mitigation measures to reduce impacts to streams crossings. We have been a number of FERC EISs for natural gas pipelines that have done a good job balancing the protection of water and aquatic resources with simplifying construction requirements. We recommend the EA be revised to discuss the use of the Nationwide 404 permit to mitigate impacts to smaller wetlands/waters of the U.S. and identify additional mitigation measures and procedures for crossing perennial streams or streams that have greater potential for impacts to wetlands/waters of the U.S. or other areas of aquatic habitat. | 1.3 Authority and Scope of the EA 3.2.1.2 Surface Waters Impacts and Mitigation 3.2.3.2 Wetlands Impacts and Mitigation Appendix G | The scope of the EA is limited to the description provided in Section 1.3 Authority and Scope of the EA.  Commenter's concerns were addressed Section 3.2.1.2 Surface Waters Impacts and Mitigation.  Construction procedures were addressed in Sections 2.3.2.6 and 2.3.2.7 and the Environmental Construction Plan (ECP) (included as Appendix G). Impacts to wetlands were addressed in Section 3.2.3.2 Wetlands Impacts and Mitigation.  No wetlands would be impacted by trench excavation within the construction ROW, ATWS, HDD workspace, or HDD stringing corridor on the flowage easements or Connected Action. Note: Although FERC oversees environmental matters related to natural gas pipeline construction, FERC does not have authority over construction of oil pipelines. |
| 3-11 | Because they are integral components of the overall project, the EA should include information related to the tank farms and associated impacts. The current Draft EA does not evaluate the environmental impacts of constructing and operating six terminals stations/tank farms and 258 miles of pipelines. Specifically, we recommend a discussion of: Location of tank farms; information on whether the receiving station/tank farms have been located to avoid or reduce impacts to surface and ground waters. In particular, it would be useful to identify whether the facilities were sited over shallow groundwater resources or near any sources of drinking water or critical wildlife areas. Ideally, this EA would document that these facilities do not present a risk to aquatic or drinking water resources; and Facility design features and operational controls to avoid and minimize impacts to surface and groundwater. We note that there is an SPCC plan for construction; however, no plans were included or referenced for proposed terminals/tank farms. | 1.3 Authority and Scope of the EA | The commenter repeats concerns that are beyond the scope of the  Draft EA.  As indicated in the response to the commenter's Item 3-1,  The majority of the pipeline route and the  proposed tank terminal sites are not within the proposed Project crossings of Corps-owned lands and flowage easements at the Missouri River and Lake Oahe crossings and not part of the scope of this EA. |
| 4-1 | This was never taken to our people the council we have well do anything for a dollar. | N/A | Comment is general and does not provide a specific issue that can be addressed within the scope of the EA |
| 5-1 | Consider a more thorough review of the consequences of this project before continuing, I am against this. | N/A | Potential impacts and mitigations are described throughout the Draft EA,  Comment does not provide a specific issue that should be addressed further within the scope of the EA. |
| 6-1 | I am writing to voice my concerns regarding the pipeline that is going to be built under the Missouri Rive near New Town, ND and the Oahe, not clear on the exact locations but because pipelines are proven to be unstable, via news reports, nationwide/worldwide, and because the people of Fort Berthold seem not to know about this pipeline, at least not a majority and they seemed have been left out of the picture in order to fill some executives already overflowing pockets, this pipeline is not in our best interests. As it stands north water is contaminated and unfit to drink or use recreationally. I know the government is saying "it's okay" but I have no faith in what they say, because they lie. Now adding this pipeline to the mix without thorough acknowledgement of all hazards which come with these pipelines and without addressing the current issues is rampant misuse of your government agency.  Therefore I am against this pipeline at this time. I find it hard to believe that it must run under the water even. Thank you for allowing me to share my concerns. I hope you listen to what the people have to say who actually live there and if not enough are aware of this then it's time to get out and let them know what may be coming their way, all the hazards they are trying to sweep under the rug, or in this case, the river. | 3.2.1.2 Surface Waters Impacts and Mitigation 3.11 Reliability and Safety Appendix L Draft FRP Added | General concerns on pipeline safety  are already addressed in Section 3.11  Reliability and Safety within the Draft EA. However, for the record, the Project crossing at Missouri River is approximately 66 miles west (upstream) of the northern portion of the Fort Berthold Reservation near New Town, ND and the Project crossing at Lake Oahe is approximately 139 miles southeast of New Town, ND. The spill modeling performed on a theoretical "maximum spill volume" based on PHMSA requirements for the design of the pipeline (for the placement of valves) indicates that even a "worst case hypothetical" spill scenario (with the pipeline installed as floating on top of the Missouri River and then experiencing a "guillotine" cut at this crossing) impacts would be limited to a geographic area well upstream of the Fort Berthold Reservation located near New Town, ND. Additional information on how DAPL would respond to inadvertent releases from the pipeline has been added to Section 3.2.1.2 and Section 3.11  has been revised to include information about  how DAPL would respond in the unlikely event of a pipeline leak. The Draft Facility Response Plan has been added as Appendix L. |
| 7-1 | The Dakota Access Pipeline will cross our lands and water jeopardizing the land and soil and water as well as our primary source of public drinking water for Fort Berthold Indian Reservation in western North Dakota. Although this pipeline is a half-mile or two miles away from Missouri River that flows into Lake Sakakawea we are at risk of leakage and seepage. | 3.2.1.2 Surface Waters Impacts and Mitigation 3.11  Reliability and Safety Appendix L Draft FRP Added | General concerns on pipeline safety  are already addressed in Section 3.11  Reliability and Safety within the Draft EA. As indicated in the response to Comment 6-1, the Missouri River crossing is upstream of the  Fort Berthold Reservation is  approximately 66 miles from the northern portion of the reservation.  Even a  "worst case hypothetical" spill scenario would be limited to a geographic area well upstream of the Fort Berthold Reservation. Additional information on how DAPL would respond to inadvertent releases from the pipeline has been added to Section 3.2.1.2 and Section 3.11  has been revised to include information about  how DAPL would respond in the unlikely event of a pipeline leak. The Draft Facility Response Plan has been added as Appendix L. |

Summary of Comments Received
Environmental Assessment
Dakota Access Pipeline Project
Crossings of Flowage Easements and Federal Lands

| Commenter / Comment ID | Comment | EA Section where Comment is Addressed | USACE Response |
|---|---|---|---|
| 8-1 | In the case of other pipelines, we are encouraging shut-off valves on either side of the lake. | 3.2.2.2 Groundwater Impacts and Mitigation 3.5.1.2 Habitats and Communities 3.11 Reliability and Safety | Shut-off valves are located at periodic intervals along the pipeline including one upstream and one downstream of the Missouri River and Lake Oahe crossings.   Detection methods for spills and siting shut-off valves on either side of the crossings (Missouri River and Lake Oahe) were addressed in Sections 3.2.2.2 Groundwater Impacts and Mitigation, 3.5.1.2 Habitats and Communities Impacts and Mitigation, and 3.11 Reliability and Safety within the Draft EA.  In the event of a leak, Dakota Access would work aggressively to isolate the source through the use of remote-controlled shut-off valves, initiate cleanup activities, and contact the appropriate federal and state authorities to coordinate leak containment and cleanup. |
| 8-2 | We request that pipeline come with state-of-the-art detection systems and upgrades in those systems every five years as technology improves. | 3.11 Reliability and Safety | Discussion relative to detection systems are addressed in Section 3.11 Reliability and Safety of the Draft EA including that fact that the operator would utilize a  state-of-the-art Computational Pipeline Monitoring System (CPM) to monitor the pipeline for leaks. Leak Warn, a leading software program for monitoring pipelines, is being tailored to the pipeline facilities, in accordance with Pipeline and Hazardous Materials Safety Administration requirements.  The CPM is and features a real-time transient model that is based on pipeline pressure, flow, and temperature data, which is polled from various field instruments every 6 seconds and updates the model calculations to detect pipeline system variations every 30 seconds.  Section 3.11 Reliability and Safety has been updated to  state that  this state-of-the-art leak detections systems will be updated as required by PHMSA. |
| 9-1 | The climate of these 2 proposed hazardous pipeline locations contains sub-freezing temperatures and the lakes freeze over during winter months, when the pipeline leaks and spills, the detection will be hidden by the ice build up, and the emergency response will be hindered by the ice, as it was in the Yellowtail and Blacktail hazardous pipeline leaks and resulting spills into the waters. | 3.2.1.2 Surface Water Impacts and Mitigation 3.11 Safety and Reliability | Leak detection measures are described in Section 3.11. Impacts from winter/ice conditions has been added to Draft EA Section 3.2.1.2 Surface Waters Impacts and Mitigation. |
| 9-2 | All Tribal governments in ND should have been consulted in this process. According to documentation, none of the Tribal governments were on the established "Consultation List" and Dakota Access stated that consultation with tribes was not completed. | 3.7.1 Cultural Resources Studies 3.7.2 Native American Consultations. | Sections 3.7.1 and 3.7.2 have been revised to address this comment.  USACE tribal consultations will be complete prior to issuance of a decision document. |
| 9-3 | Any proposed federal action that anticipates environmental impact requires an Environmental Impact Statement (EIS) prior to decision making on the approval or denial of the proposed project. | N/A | Based on the Project scope an Environmental Assessment is appropriate for this level of analysis.  If, after completing the EA, it is evident that there are significant environmental impacts, an EIS could be prepared.   Text has been added to Section 1.0 to clarify that the NEPA process. |
| 9-4 | The requirements of the National Historical Preservation Act have not been incorporated in this planning process and a decision to proceed in this process violate those requirements. | 3.7.1 Cultural Resources Studies 3.7.2 Native American Consultations. | Sections 3.7.1 and 3.7.2 have been revised to address this comment.   Consultations under Section 106 of the NHPA will be completed prior to issuance of a decision document. |
| 9-5 | The identified drinking water source and the extended cost to replace the Missouri River water as the primary drinking water source for current and future ND citizens, needs to be included in the Environmental Assessment, and if it is determined that request is beyond the scope of the EA, then it needs to be addressed in the EIS which has been pushed aside in this process. | 3.2.1 Water Resources Surface Waters 3.2 .1.2 Surface Resources Impacts and Mitigation 3.10 Hazardous Waste 3.11 Reliability and Safety | The scope of the  EA is addressed in the response to Comment 3-3.  Text has  been added to Section 3.2 .1.2 Surface Resources Impacts and Mitigation that describes potential risk and mitigative measures  associated with drinking water intakes  downstream of the Missouri River and Lake Oahe crossings. Section 3.2.1.2 amended to include additional discussion identifying Dakota  Access as the responsible party for implementing the  FRP and the measures that would be taken to prevent contamination of the water supply and/or provide alternative water sources. |
| 10-1 | Rapidly increasing production in the Bakken and Three Forks region has resulted in a clear need for greater energy infrastructure capable of safely and efficiently transporting our valuable energy resources. Current reliance on accident-prone crude-by-rail transport methods is a temporary solution unsuitable to meet our long-term needs. If constructed, the Dakota Access Pipeline would relieve the burden currently being placed on rail networks and allow for a safer, more efficient means for transporting our resources. | N/A | No concerns with the Draft EA were identified. |
| 10-2 | Dakota Access has demonstrated a strong commitment to protecting and preserving our natural lands. The company has laid out detailed plans to mitigate potential impacts and employ modern technologies to avoid sensitive areas. | N/A | No concerns with the Draft EA were identified. |
| 10-3 | Once operational, Dakota Access will utilize high-tech monitoring solutions that ensure pipeline integrity and safety standards are met, or exceeded. The pipeline will be constantly monitored and routinely inspected to ensure that both communities and natural lands along the route are protected. | N/A | No concerns with the Draft EA were identified. |
| 10-4 | Dakota Access has gone through an extensive review by multiple state-level agencies and thus far has been approved by both the Illinois Commerce Commissions and South Dakota Public Utilities Commission. It has been evident from the very beginning of this process they are committed to upholding the highest construction and operational standards. | N/A | No concerns with the Draft EA were identified. |

CONFIDENTIAL

USACE_DAPL0071761

Summary of Comments Received
Environmental Assessment
Dakota Access Pipeline Project
Crossings of Flowage Easements and Federal Lands

| Commenter / Comment ID | Comment | EA Section where Comment is Addressed | USACE Response |
|---|---|---|---|
| 11-1 | Dakota Access has committed to either meet, or exceed federal standards for pipeline construction in environmental impact mitigation, and has already taken multiple steps to ensure proper safeguards are in place for both construction and operation of the pipeline. | N/A | No concerns with the Draft EA were identified. |
| 11-2 | They have shown a strong commitment to ensuring that agricultural and land concerns are fully addressed. | N/A | No concerns with the Draft EA were identified. |
| 11-3 | Pipelines offer a more secure and safer alternative of moving product to market than any other form of transportation. | N/A | No concerns with the Draft EA were identified. |
| 11-4 | Additionally, Dakota Access has committed to, use horizontal directional drilling (HDD) in areas of high consequence, such as Lake Oahe and the Missouri River, to ensure the safety the environment and the least impact possible. Other specific commitments include re-contouring land for proper drainage, re-seeding with native grasses, consideration of the location of center pivots and artesian wells, segregation of soil during the construction phase including during streambed crossings, and setbacks for stream and river crossings at and above flood stage. Construction will also be timed according to the needs of sensitive species as well as avoiding construction in winter where the frost line may disrupt efforts to properly segregate soils | N/A | No concerns with the Draft EA were identified. |
| 11-5 | Dakota Access Pipeline will employ state of the art technologies to ensure the integrity of the pipeline during operation, and the safety of the residences and environment that lie along the route. | N/A | No concerns with the Draft EA were identified. |
| 11-6 | Additionally, valves will be placed at stream, river, and lake crossings to ensure the pipe can be isolated in the event of an incident, minimizing any impact on water bodies. The pipe will be monitored from a control center and can be remotely operated, 24 hours a day, 7 days a week, 365 days a year. | N/A | No concerns with the Draft EA were identified. |
| 11-7 | The plan that Dakota Access has put forward addresses many of the areas examined through each state's permitting process and has already satisfied the Illinois Commerce Commission and South Dakota Public Utilities Commission who have since granted approval for construction. | N/A | No concerns with the Draft EA were identified. |
| 12-1 | Isolation valves will be installed at the Lake Oahe crossing (Area ID= ND-MO-193.000 in Appendix J). However, an isolation valve in the river crossing upstream of Lake Sakakawea (Area ID=LL3453E, Appendix J) was eliminated from your original plan for valve damage potential because the Omaha District of USACE mentioned potential of ice jam flooding in the area (Dakota Access, 2015). No alternative was discussed about what to do to block the pipeline leak without the isolation valve at the river crossing area after shutting down pumps. | 3.11 Reliability and Safety | Removal of the valve site in question eliminated a time-independent threat to Dakota Access Pipeline. A separate isolation valve site is included in the design and is situated at the nearest location that provides access and power, approximately 1.6 miles from the isolation valve site in question. The present design incorporates optimal response time for pipeline operations personnel. Operations personnel respond to all automated valve closures and have local ability to ensure the valve is closed. Elevation changes between the sites further mitigate pipeline spill potential. |
| 12-2 | Dakota Access said in this report, "This state-of-the-art CPM (Computational Pipeline Monitoring System) is capable of detecting leaks down to 1 percent or better of the pipeline flow rate within a time span of approximately 1 hour or less and capable of providing rupture detection within 1 to 3 minutes". The source for evaluating the performance of CPM is not clear in this report. Including historical data to show the performance of CPM in another area would make the report more responsible. | N/A | Dakota Access and the State Engineers have been in contact independently from the EA process to discuss Project activities through the Sovereign Lands Permitting Process. The predictive evaluation of performance of the CPM was done in coordination with the CPM vendor and took into account the capabilities of the monitoring program along with the number and type of data inputs to be provided. Dakota Access will have more data inputs than any of our current operational pipelines so review of historical performance on other pipelines may not be indicative of performance on the Project. Reference API RP 1130 for further detail, available from the American Petroleum Institute. |
| 12-3 | The operation control center is located in Sugarland, TX and Dakota Access is targeting 100% reliable monitoring/operation in this report. Communication between the control center and monitoring/operation is critical when an emergency happens. Dakota Access needs to show the test results for long distance communication (especially communication with local pressure sensors and shut-off valves) to make a target of 100% reliable monitoring/operation more reasonable. | 3.11 Reliability and Safety | Communication between the control center and monitoring/operation is addressed in Section 3.11 Reliability and Safety. It should be noted that Dakota Access is coordinating with the State Engineers independently from the EA process to discuss Project activities through the Sovereign Lands Permitting Process. |
| 12-4 | Dakota Access said, "At the Missouri River crossing, a 24-inch pipeline would be installed a minimum of 60 feet below the bottom of the Missouri River." However, minimum depth of cover is 34 feet below the bottom of the river in the cross section drawing for the crossing upstream of Lake Sakakawea (Appendix H). This issue should be clarified. In addition, minimum depth of cover at the Lake Oahe crossing is much deeper (92 feet) than Missouri River crossing upstream of the Lake Sakakawea. It is not clear what criteria were used to decide two different depths of cover. Including the source of the decision (calculation sheet or regulations) would be helpful to prove that Dakota Access applied reasonable criteria, and to understand why shallower cover is acceptable for the Missouri River crossing upstream of the Lake Sakakawea. | 3.2.1 Water Resources Surface Waters Appendix D | The difference in depths between the two crossings (Lake Oahe and Missouri River) are due to a combination of factors beyond minimum distance based on geomorphology including variability in geology and the geometry and distance of the HDDs from their respective entry and exit points. The design differences are detailed in the HDD engineering reports which are specific to each site and were included in Appendix D. |

CONFIDENTIAL

Summary of Comments Received
Environmental Assessment
Dakota Access Pipeline Project
Crossings of Flowage Easements and Federal Lands

| Commenter / Comment ID | Comment | EA Section where Comment is Addressed | USACE Response |
|---|---|---|---|
| 12-5 | While Dakota Access's contractor did soil core sampling below Lake Oahe, no soil boring was done below the Missouri River at the crossing upstream of Lake Sakakawea (Appendix D). The reason for excluding soil borings at that area should be mentioned in this report. | Section 3.1.1.1. Geology | Dakota Access and the State Engineers have been in contact independently from the EA process to discuss Project activities through the Sovereign Lands Permitting Process. Soil borings were conducted within Lake Oahe because the length of crossing is longer, therefore representing a different risk profile that required additional data points. The banks of the Missouri River are much closer together allowing for a comprehensive geotechnical analysis without testing beneath the river. Section 3.1.1.1 Geology has been amended to clarify. |
| 12-6 | Dakota Access mentioned maintenance and inspections of the pipeline in accordance with PHMSA regulation, industry codes and prudent pipeline operating protocols and techniques in this report. However, Dakota Access did not describe the scope of maintenance and inspection (pipe, pump, valve, sensor and computer hardware/program) associated with regulations in this report. | 3.2.2.2 Groundwater Impacts and Mitigation 3.11 Reliability and Safety | Maintenance and inspection are addressed in Sections 3.2.2.2 Groundwater Impacts and Mitigation and 3.11 Reliability and Safety in the Draft EA. 49 CFR 195, Subpart F- Operations and Maintenance describes the minimum scopes of maintenance and inspection that will be achieved by Dakota Access. |
| 12-7 | Even though Dakota Access has a CPM and emergency shutdown system, river channel changes at pipeline water crossings should be considered in the Environmental Assessment to avoid pipeline exposure. Two pipeline incidents (Polar and Silvertip pipelines) already occurred within the last 5 years in the Yellowstone River, which is a tributary of the Missouri River (USEPA, 2015; Montana DEQ 2012). Two reasons for assessing river channel changes are below. First, the environmental and economic consequences of pipeline failures at water-bodies are serious (CEPA, 2014; Montana DEQ, 2015-1). Dakota Access pipeline is designed to carry 570,000 barrels per day (16,600 gal/min) of crude oil. The amounts of oil leak to the Yellowstone River from the Polar and Silvertip pipeline incidents were approximately 30,000 gal and 63,000 gal, respectively (Montana DEQ, 2015-1; Montana DEQ 2015-2). Even if Dakota Access successfully completes emergency shutdown processes including detection of pipe rupture, turning off pumps and closing shut-off valves, the environmental and economic impacts from the oil leak may be more serious than previous pipeline incidents in the Yellowstone River. Second, river channel changes associated with water erosion are very active and unpredictable (CEPA, 2014; Rhoads et.al., 2008; Hamilton et.al., 2002). For example, the Polar (Jan. 2015) and Silvertip (Jul. 2011) pipelines were damaged and leaked due to exposure of the pipeline from water erosion (Montana DEQ, 2015-2; Montana DEQ, 2012). The Silvertip pipeline incident occurred at the peak of a 100 year flood event in 2011 (Montana DEQ, 2012). The Polar Pipeline incident occurred 3.5 years after the 2011 flood (Montana DEQ, 2015-2). A study by the USGS showed severe scouring near bridge piers of the Missouri River in ND during the 2011 flood (USGS, 2014). Comprehensive approaches for evaluating river channel changes are required to decide depth of cover instead of applying simple numerical criteria (USGS, 1999; USBLM, 2007). | N/A | DAPL has evaluated the potential for impacts due to geomorphological movements as part of its coordination with the ND Office of the State Engineer in order to as part of the Sovereign Lands Permitting Process. The results of the analysis are discussed in the response to Comment 12-8. The DAPL pipeline will be crossing the Missouri River and Lake Oahe utilizing the HDD technology whereas it is believed that the Yellowstone River pipeline crossings were installed conventionally. Conventional crossings are typically not as deep below the river bottoms and would therefore be at greater risk to channel movements. Additionally, given the method and year of the installation of the Yellowstone River pipeline crossings they may not have utilized as a pipeline as thick walled as the proposed DAPL pipeline. |
| 12-8 | Several different types of geomorphologic movements are possible in river systems including vertical channel movement (scour, degradation and aggredation), horizontal channel movement (bank erosion and encroachment) and channel relocation (avulsion and meander cutoffs)(CEPA, 2014). Those should be considered associated with flood events, especially at the Missouri River crossing upstream of Lake Sakakawea (McKenzie County side) where the minimum depth of cover is only 34 feet in the drawing (Appendix H). | 2.3.2.6 Major Waterbody Crossing Method | DAPL has been coordinating with the ND Office of the State Engineer in order to evaluate potential of impacts due to geomorphological movements as part of the Sovereign Lands Permitting Process. The proposed crossing is not located at a bend in the channel (located over 3,000 feet downstream of a bend in the channel). An analysis of historic photographs of the proposed crossing show that the upstream bend has been stable and in the same location and that the potential downstream migration of this bend is highly unlikely. However, although bend scour from the upstream bend is not likely to propagate downstream to the proposed crossing, to be conservative, the professional engineering firm evaluating HDD depths for the Project, GeoEngineers, assumed that the bend could migrate downstream. Conservative assumptions were made when evaluating the proposed crossing. GeoEngineers judges the depth to be appropriate given the location of the crossing, impacts to the pipeline below the river from vertical or horizontal scour are not expected. Text has been added to Section 2.3.2.6 to address the potential affects of scour on the pipeline during operations. |
| 12-9 | As determined by FEMA, there may be floodplains identified on a Flood Insurance Rate Map (FIRM) where this proposed project is to take place. Areas designated to be within a Special Flood Hazard Area (all Zone As), must have a permit issued from the local permitting authority, before any work may begin. FIRMS may be viewed at www.msc.fema.gov. | N/A | Flood plain permitting would be handled with the local permitting authority if applicable. |
| 13-1 | Rapidly increasing production in the Bakken and Three Forks region has resulted in a clear need for greater energy infrastructure capable of safely and efficiently transporting our valuable energy resources. Current reliance on accident-prone crude-by-rail shipment methods is a temporary solution unsuitable to meet our long-term needs. If constructed, the Dakota Access Pipeline would relieve the burden currently being placed on rail networks and allow for a safer, more efficient means for transporting our resources. | N/A | No concerns with the Draft EA were identified. |

CONFIDENTIAL

USACE_DAPL0071763

Summary of Comments Received
Environmental Assessment
Dakota Access Pipeline Project
Crossings of Flowage Easements and Federal Lands

| Commenter / Comment ID | Comment | EA Section where Comment is Addressed | USACE Response |
|---|---|---|---|
| 13-2 | Dakota Access has demonstrated a strong commitment to protecting and preserving our natural lands. The company has laid out detailed plans to mitigate potential impacts and employ modern technologies to avoid sensitive areas. | N/A | No concerns with the Draft EA were identified. |
| 13-3 | Once operational, Dakota Access will utilize high-tech monitoring solutions that ensure pipeline integrity and safety standards are met, or exceeded. The pipeline will be constantly monitored and routinely inspected to ensure that both communities and natural lands along the route are protected. | N/A | No concerns with the Draft EA were identified. |
| 13-4 | Dakota Access has gone through an extensive review by multiple state-level agencies and thus far has been approved by both the Illinois Commerce Commissions and South Dakota Public Utilities Commission. It has been evident from the very beginning of this process they are committed to upholding the highest construction and operational standards. | N/A | No concerns with the Draft EA were identified. |
| 14-1 | At the sensitive crossings (Missouri River and Lake Oahe) the company is committed to using HDD at a sufficient depth to mitigate the impact of the line to the rivers both during construction and operation.  Dakota Access is installing valves which are monitored 365 days a year, 24 hours a day and can be closed if any anomaly is detected on the line to protect our water resources. | N/A | No concerns with the Draft EA were identified. |
| 14-2 | To mitigate soil disturbances, Dakota Access has hired Duraroot and Key Agricultural Services to assist in reviewing, constructing and maintaining the line.  With measures like soil separation; erosion and sedimentation control through silt fences, trench breakers, and mulch; and minimal construction activity during prolonged rainfall to prevent compaction, Dakota Access is working to ensure the soil is disturbed as little as possible, and is productive and fertile once installation is complete. | N/A | No concerns with the Draft EA were identified. |
| 14-3 | Finally, cultural and historic resources: while these are less tangible than water and soil, they are no less important to the heritage and history of our state. Dakota Access has done on the ground surveys for over 99% of the line across all four states, including North Dakota. The surveys were done to the standards outlined in the North Dakota SHPO Guidelines Manual for Cultural Resources Inventory Projects, and have noted eight sites near the Missouri River and Lake Oahe, which will be avoided using HDD. | N/A | No concerns with the Draft EA were identified. |
| 15-1 | Despite the importance of the Tribe's interests, the U.S. Army Corps of Engineers has not initiated consultation with the Tribe as required by law. | 3.7.1  Cultural Resources Studies 3.7.2 Native American Consultations. | Sections 3.7.1 and 3.7.2 have been revised to address this comment.  USACE tribal consultations will be complete prior to issuance of a decision document. |
| 15-2 | The broad scope of the project, and the interests of the Tribe and other affected parties, require a more considered pace and more comprehensive agency decision making, including the development of a full Environmental Impact Statement. | 1.3 Authority and Scope of the EA | Based on the Project scope an Environmental Assessment is appropriate for this level of analysis.  If, after completing the EA, it is evident that there are significant environmental impacts, an EIS could be prepared.  Text has been added to Section 1.3 to clarify that the NEPA process. |
| 15-3 | Draft EA incorrectly states the Tribe's position at the meeting. Without citation to any source documentation, the draft EA asserts that at the meeting between Dakota Access and the Tribe's THPO, the THPO "indicated that the Lake Oahe HDD appeared to avoid impacts to known sites of tribal significance." Draft EA at 59. This statement is simply wrong | 3.7.2.1  Native American Consultations Additional Information | Sections 3.7.1 and 3.7.2 have been revised to address this comment.  USACE tribal consultations will be complete prior to issuance of a decision document. |
| 15-4 | The Corps should have consulted with the Tribe prior to the start of archeological surveys, and before soil bore testing at the proposed Missouri River crossing — but that did not happen. There has been no effort by the Corps to include the Tribe in connection with the identification of sites or the resolution of adverse effects. | | The Corps conducted Class III Archeology Surveys in 2010, which included the DAPL Missouri River crossing area.  Tribes were coordinated with on the scope of survey and the field investigations.  Specific to this action, NHPA Section 106 Soil Boring information letters were send to consulting parties on October 24, 2015.  NHPA Section 106 Pipeline crossing information letter was sent to consulting parties on July 22, 2015.  The applicant conducted cultural resource surveys on lands non under Corps management in 2014. |
| 15-5 | The draft EA does not mention much less address any cultural or archeological resource law other than NHPA Section 106. | 3.7.2.1  Native American Consultations Additional Information | Sections 3.7.1 and 3.7.2 have been revised to address this comment.  USACE tribal consultations will be complete prior to issuance of a decision document. |
| 15-6 | The Tribe requested that surveys, including a traditional cultural properties survey be done but received no response from the Corps. | 3.7.1.1  Cultural Resource Studies Affected Environment | NHPA Section 106 consultation is ongoing, the Corps has meet with SRST THPO and is willing to continue information exchange regarding all cultural, sacred and ceremonial sites to ensure they are identified and taken in to consideration for our final effects determination. |
| 15-7 | There are documented Lakota, Dakota, Mandan and Arikara camp sites, sacred and ceremonial sites and burials located along both the Missouri and Cannonball Rivers, including within the direct path of this proposed Pipeline. | 3.7.1.1  Cultural Resource Studies Affected Environment | NHPA Section 106 consultation is ongoing, the Corps has meet with SRST THPO and is willing to continue information exchange regarding all cultural, sacred and ceremonial sites to ensure they are identified and taken in to consideration for our final effects determination. |
| 15-8 | The draft EA also apparently excludes from consideration graves, human remains and cultural resources that may be found in burial sites. | 3.7.1.1  Cultural Resource Studies Affected Environment | NHPA Section 106 consultation is ongoing, the Corps has meet with SRST THPO and is willing to continue information exchange regarding all cultural, sacred and ceremonial sites to ensure they are identified and taken in to consideration for our final effects determination. |

CONFIDENTIAL

Summary of Comments Received
Environmental Assessment
Dakota Access Pipeline Project
Crossings of Flowage Easements and Federal Lands

| Commenter / Comment ID | Comment | EA Section where Comment is Addressed | USACE Response |
|---|---|---|---|
| 15-9 | The draft EA fails to look beyond the 400-foot survey corridor.  The Tribe has advised the Corps by letter about additional cultural and historic sites of known signicance which are at risk from the proposed Pipeline, including Cannonball Ranch which is the crossing point of the Dakota Access Pipeline. | 3.1.1.2 Geology  3.7.1.1 Cultural Resource Studies Affected Environment | NHPA Section 106 consultation is ongoing, the Corps has meet with SRST THPO and is willing to continue information exchange regarding all cultural, sacred and ceremonial sites to ensure they are identified and taken in to consideration for our final effects determination.  The scope of the Corps Cultural Resource review has been adjusted to include the bore holes directly adjacent to the Corps managed lands. Section 3.7.1.1. and  3.1.1.2 has been amended to provide additional information in response to this comment. |
| 15-10 | At the Cannonball Ranch, there are burials of notable Standing Rock memebers and their families including Maltida Galpin, Alma Parken, Louisa Degray Van Solen, and Charles Picotte, among whom are signatories on the Treaty of Fort Laramie. There is also an unmarked grave of Mrs. Harrison at the mouth of the Cannonball and Missouri Rivers. | 3.7.1.1 Cultural Resource Studies Affected Environment | NHPA Section 106 consultation is ongoing, the Corps has meet with SRST THPO and is willing to continue information exchange regarding all cultural, sacred and ceremonial sites to ensure they are identified and taken in to consideration for our final effects determination. |
| 15-11 | The draft EA provides no scientific or engineering support for these conclusions. If drilling is done to build the Pipeline, the removal of rock and earth and the operation of the heavy equipwmrin will undoubtedly displace and shift the soil beyond the project corridor itself, including in the staging area for the HDD. | 3.1.1 Geology | There is no ground movement anticipated outside of the construction areas to install the project.  The Class III cultural resources report clearly defines the area of potential effect (APE) for the project to include all areas of potential disturbance associated with the project activities.  The APE includes all temporary construction use areas, permanent easements, workspaces associated with the HDD, and any area where ground disturbance has the potential to occur.  The  lack of impact due to physical avoidance is a common and successful avoidance method in the pipeline industry.  The geotechnical analysis performed to support the HDD crossings supports the lack of anticipated impacts due to vibrations related to construction and HDD activities.  It remains the opinion of Principal Investigator that no cultural resources will be adversely impacted by the Project at either crossing.  While the landscape will be directly impacted during the installation of the pipeline, the temporary workspace and pipeline right-of-way areas will be returned to pre-existing contours. The temporary workspace areas and permanent easements has been specifically designed to avoid  impacting cultural resources.  Section 3.11 of the EA has been amended to include discussion of vibration associated with construction equipment.  Section 3.7 has been amended to include a discussion of the effects of vibration associated with construction equipment on cultural resources. |
| 15-12 | The draft EA fails to properly address the potential for environmental damage to waters which are critically important to the Tribe and its members. | 3.2 Water Resources  3.4 Wildlife Resources  3.6.3 Land Use and Recreation Recreation and Special Interest Areas  3.11 Reliability and Safety within the Draft EA. | Section 3.2.1 Surface Water, text was added to address drinking water intakes located downstream.  Impacts to waters are addressed in Sections 3.2 Water Resources, 3.4 Wildlife Resources, 3.6.3 Recreation and Special Interest Areas, and 3.11 Reliability and Safety within the Draft EA. |
| 15-13 | The draft EA does not address the environmental impacts if HDD proved to be infeasible and dredging (which would severely damage water supplies) was used instead. | 2.1.4 Alternative 4 – Major Waterbody Crossing Alternatives | The geotechnical investigations and engineering of the HDD indicate it will be successfully completed. Conventional installation (i.e. wet open-cut crossing method including the use of mechanical dragline dredgers) is discussed in section 2.1.4 Alternative 4 – Major Waterbody Crossing Alternatives.  The Draft EA concluded that compared to trenchless technology, the open-cut method would incur far greater impacts on sensitive habitat located on both the banks of the waterbodies and within the waterbodies. Therefore, wet open-cut crossing method including the use of mechanical dragline dredgers is not a feasible option being proposed by the applicant and ruled out in the alternatives analysis. |
| 15-14 | The draft EA contains no maps on which the location of the Pipeline in relation to the Reservation is even shown. As a result, the draft EA fails to discuss the potential impacts of both the construction of the Pipeline as well as its operation on the reserved water rights of the Standing Rock Sioux Tribe. | N/A | The project does not cross the reservation and  no impacts to the reservation are anticipated.  The  EA figures have been updated to show SRST reservation in relation to the pipeline route including the Lake Oahe crossing.  Many sections of the EA have been revised  to discuss the adjacent SRST as appropriate.  As the pipeline will be installed under the river, the installation and operation of the pipeline will not have direct impacts to the waterway and there are no anticipated impacts to water rights. Additionally precautions to protect impacts to the Lake during operations of the pipeline are discussed in Section  3.2. Surface Water and 3.11 Reliability and Safety.  No impacts to SRST reserved water rights are anticipated. |
| 15-15 | To the extent that this proposed Pipeline may be covered by Nationwide Permit 12, the draft EA fails to address the conditions of that permit which expressly state that "No activity or its operation may impair reserved tribal rights, including, but not limited to, reserved water rights and treaty fishing and hunting rights" (NWP 12 condition 17). | 3.11 Reliability and Safety  Section 3.4.1 Recreationaly and Economically Important Species and Nongame Wildlife  Section 3.6.3 Recreation and Special Interest Areas | Impacts to surface waters are not anticipated as a result of the Project.  The Missouri River and Lake Oahe are being crossed via HDD, therefore avoiding impacts to these waterbodies.  Dakota Access will comply with NWP 12 conditions, the commenters concerns on impairment are addressed in Section 3.11 Reliability and Safety of the Draft EA.  Text has been added to Section 3.4.1 of the EA to clarify that no impacts to treaty fishing and hunting rights will occur.  In addition, a section on the Standing Rock Sioux Reservation has been added to Section 3.6.3 Recreation and Special Interest Areas. |

CONFIDENTIAL

USACE_DAPL0071765

Summary of Comments Received
Environmental Assessment
Dakota Access Pipeline Project
Crossings of Flowage Easements and Federal Lands

| Commenter / Comment ID | Comment | EA Section where Comment is Addressed | USACE Response |
|---|---|---|---|
| 15-16 | The draft EA does not provide a sufficient analysis of the risk of pipeline leaks or spills overall, or most significantly, at the Missouri River. | 3.11 Reliability and Safety 3.2.1.2 Surface Waters Impacts and Mitigation | The commenter's concerns are address in the EA under Sections 3.11 Reliability and Safety and 3.2.1.2 Surface Waters Impacts and Mitigation. Additional information on how DAPL would respond to inadvertent releases from the pipeline has been added to Section 3.2.1.2 and Section 3.11 has been revised to include information about how DAPL would respond in the unlikely event of a pipeline leak. The Draft Facility Response Plan has been added as Appendix L. |
| 15-17 | While the draft EA recites that Dakota Access will comply with the federal pipeline safety regulations, it leaves wholly unanswered what this means — whether Dakota Access would meet safety standards under the now existing regulations, or bring the pipeline up to the standards set out in the forthcoming regulations which are intended to improve protection of the public, property, and the environment. | Section 3.11 Reliability and Safety | Dakota Access has taken efforts to construct the pipeline design and planned operations meet or exceed the existing and pending PHMSA regulations. Section 3.11 Reliability and Safety has been updated to state the state-of-the-art leak detections systems will be updated as required by PHMSA. |
| 15-18 | The current draft EA is inadequate in addressing pipeline safety as it would affect the Standing Rock Sioux Reservation, the health and safety of Tribal members, the Tribe's water rights and Reservation resources. | 3.2 Water Resources 3.4 Wildlife Resources 3.11 Reliability and Safety | The EA has been updated to discuss the Tribe's water resources in relation to the Project. As indicated in the responses to Section 15-14 and 15-15 the EA has been updated to further clarify the applicants commitment to pipeline safety and reliability in regards to effects to the Standing Rock Sioux Reservation. The project does not cross the reservation and no impacts to the reservation are anticipated. As the pipeline will be installed under the river, the installation and operation of the pipeline will not have direct impacts to the waterway and there are no anticipated impacts to water rights. Water impacts were addressed in Section 3.2 Water Resources and wildlife impacts were addressed in 3.4 Wildlife Resources. No significant impacts to the public are anticipated as a result of construction or operation of the pipeline (native Americans and non-native Americans). The risk of a leak is low given the engineering design and proposed installation methodology and the risk of a leak impacting downstream water intakes is even lower. The EA describes that In the unlikely event of a pipeline leak once in operation, response measures to protect the users of downstream intakes will be implemented. The Facility Response Plan would include notifications to surrounding communities, affected governments, and utilities in the event of an inadvertent pipeline release. The Operator would have oil spill response companies that have the capability and equipment to mobilize to support cleanup and remediation efforts in the event of a pipeline release and the operator would be responsible for any remediation. |
| 15-19 | The draft EA fails to properly address Environmental Justice. | Section 3.9.2 Environmental Justice Impacts and Mitigation. | Sections 3.9.2 and 4.10 of the EA have been revised to further clarify and address environmental justice. As outlined in Section 1.3 of the Draft EA, the EA scope is limited to the Corps flowage easements at the Missouri River and the fee owned lands at Lake Oahe. No appreciable minority or low-income populations exist in the Census tracts associated with either crossing (Tables 3-14 through 3-17 of the Draft EA). The proposed Project is being co-located with existing utilities and across USACE easements and fee owned property. The Project is over 1/2 mile from the Standing Rock Sioux Reservation and therefore does not cross the Standing Rock Sioux Reservation. The closest residence located on the Standing Rock Sioux Reservation is located approximately 1.6 miles from the Lake Oahe Project Area. Therefore, this topic was omitted from further analysis in this EA. Section 3.9.2 Environmental Justice Impacts and Mitigation has been amended to further address environmental justice. |
| | These require the agency to: "consider the composition of the affected area, to determine whether minority populations, low-income populations, or Indian tribes are present in the area affected by the proposed action, and if so whether there may be disproportionately high and adverse human health or environmental effects on minority populations, low-income populations, or Indian tribes." | Tables 3-14 and 15; 3.9.2 Environmental Justice Impacts and Mitigation. | Comment is addressed in response to comment 15-19. USACE tribal consultations will be complete prior to issuance of a decision document. |
| | These require the agency to: "develop effective public participation strategies...community participation must occur as early as possible if it is to be meaningful." | 3.7.1.1 Cultural Resource Studies Affected Environment | NHPA Section 106 consultation is ongoing, the Corps is willing to meet and discuss all cultural, sacred and ceremonial sites to ensure they are identified and taken in to consideration for our final effects determination. USACE tribal consultations will be complete prior to issuance of a decision document. |
| 15-20 | These require the agency to: "seek tribal representation in the process in a manner that is consistent with the government-to-government relationship between the United States and tribal governments, the federal government's trust responsibility to federally-recognized tribes, and any treaty rights." | 3.7.1.1 Cultural Resource Studies Affected Environment | NHPA Section 106 consultation is ongoing, the Corps is willing to meet and discuss all cultural, sacred and ceremonial sites to ensure they are identified and taken in to consideration for our final effects determination. USACE tribal consultations will be complete prior to issuance of a decision document. |

CONFIDENTIAL

USACE_DAPL0071766

Summary of Comments Received
Environmental Assessment
Dakota Access Pipeline Project
Crossings of Flowage Easements and Federal Lands

| Commenter / Comment ID | Comment | EA Section where Comment is Addressed | USACE Response |
|---|---|---|---|
| 15-21 | The draft EA instead selectively uses and then changes the geographic areas by which it evaluates the impacts of the proposed pipeline, as well as the pipeline alternatives, so that if effectively avoids the potential environmental impacts on the Tribe, the Reservation, and its people. | 1.3 Authority and Scope of the EA Tables 3-14 through 3-17 3.9.2 Environmental Justice Impacts and Mitigation. | Additional clarification is provided in Section 3.9.2 of the EA on the distance of evaluation. As referenced in Section 1.3, the scope of the this EA is limited the proposed Project crossings of Corps-owned lands and flowage easements at the Missouri River and Lake Oahe crossings that would require real estate actions and regulatory permits from the Corps, which are the federal actions associated with this EA. The detailed description of the Proposed Action, including all Connected Actions are included in Section 2.3.1 Locations and Detailed Description of the Proposed Action. No appreciable minority or low-income populations exist in these Census tracts at either crossing (Tables 3-14 through 3-17). Additionally, based on aerial imagery the closest residence located on the Standing Rock Sioux Reservation is located approximately 1.6 miles from the Lake Oahe Project Area. Therefore, this topic was omitted from further analysis in this EA. |
| 15-22 | The draft EA does not address the potential impact of the proposed pipeline route on water intakes downstream on the Standing Rock Reservation. | 3.2 Water Resources 3.2.1.2 Surface Waters Impacts and Mitigation | Text has been added to Section 3.2 .1.2 Surface Resources Impacts and Mitigation that describes potential risk and mitigative measures associated with drinking water intakes downstream of the Missouri River and Lake Oahe crossings, including the Standing Rock Sioux Reservation. A Water Intake Mitigation Measures Section has been added to the EA as a subsection in Section 3.2.1.2 Surface Waters Impacts and Mitigation. |
| 15-23 | "No appreciable minority or low-income populations exist in these Census tracts at either crossing…Therefore, this topic was omitted from further analysis in this EA," (Draft EA at 62). In fact, however, several prominent Indian families, including the Brave Bulls, McLaughlins, and Thunder Hawks, live in close proximity to the proposed pipeline, just across the Cannonball River. | 1.3 Authority and Scope of the EA, Tables 3-14 through 3-17; 3.9.2 Environmental Justice Impacts and Mitigation. | Additional clarification is provided in Section 3.9.2 of the EA on the minority and low income populations evaluation. Discussion of potentially affected Indian tribes has been added to Section 3.9.2 Environmental Justice Impacts and Mitigation. |
| 16-1 | Due to the potentially significant and cumulative adverse environmental impacts to the Missouri River/Lake Sakakawea, I am requesting that the Army Corp of Engineers order a full Environmental Impact Statement (EIS) be completed in regards to the Dakota Access hazardous liquid pipeline. | N/A | Based on the Project scope, an Environmental Assessment is appropriate for this level of analysis. If, after completing the EA, it is evident that there are significant environmental impacts, an EIS could be prepared. |
| 16-2 | For at least 4-5 months out of the year, the surface of the Missouri River/Lake Sakakawea on the Fort Berthold Indian Reservation is frozen solid. The Draft Environmental Assessment for the Dakota Access crude pipeline fails to specifically address what happens if there are leaks or explosions in the 140,000 barrel-per-day pipeline under the lakebed when thick ice covers the lake. | 3.2.1.2 Surface Waters Impacts and Mitigation | Impacts from winter/ice conditions has been added to Draft EA Section 3.2.1.2 Surface Waters Impacts and Mitigation. |
| 16-3 | In the draft EA, Dakota Access wrongly claims that because of oil& gas revenue in the area, there are no Environmental Justice or low-income, minority communities affected by this hazardous liquid pipeline. (Page 76. Section 4.1.1.). This is an invalid and incorrect assertion by Dakota Access/Energy Transfer Partners. | 1.3 Authority and Scope of the EA Tables 3-14 through 3-17 3.9.2 Environmental Justice Impacts and Mitigation. | Additional clarification has been provided in Section 4.10 of the EA. The comment is referring to Draft EA Section 4.10 Cumulative Impacts Environmental Justice which states that "the holders of mineral rights and landowners in the Project area have witnessed a recent windfall form the oil and gas development in the region" This coupled with the Project being co-located with existing utilities concludes that no substantive cumulative impacts to minority or low-income populations would result from the proposed Project. As outlined in Section 1.3 of the Draft EA, the EA scope is limited to the Corps flowage easements at the Missouri River and the fee-owned lands at Lake Oahe. No appreciable minority or low-income populations exist in the Census tracts associated with either crossing (Tables 3-14 through 3-17 of the Draft EA); therefore, would not result in a direct or indirect impact to low-income or minority communities. |
| 16-4 | The cover of the published Draft Environmental Assessment report clearly states that the Dakota Access/Energy Transfer Partners wrote this draft EA Assessment review for their own hazardous liquid pipeline - on behalf of the Army Corp of Engineers. Allowing a for-profit national corporation who will the primary and sole beneficiary of significant financial profit from this federally-approved project, to write the draft EA for their own crude pipeline, is a conflict-of-interest and unethical, according to standards in the federal government. Merely listing two (2) ACOE personnel on the list of "reviewers" at the conclusion of the Draft EA report does not assure, or imply, objectivity in the assessment written on behalf of the Army Corp of Engineers. | 9.0 List of Preparers and Reviewers | This action is being completed in accordance with CEQ regulations in Section 1506.5(a) and 1506.5(b), which allow an applicant to prepare an EA for federal actions. The Corps has independently evaluated and verified the information and analysis undertaken in this EA and takes full responsibility for the scope and content contained herein. The Corps has independently evaluated and verified the information and analysis undertaken in this EA and takes full responsibility for the scope and content. While EAs are often drafted by the applicant, the agency actively participates in review and ultimate acceptance of the document, this is a USACE issued document drafted with the assistance of the applicant. The list of reviewers in Section 9.0 List of Preparers and Reviewers has been updated to include other USACE personnel that materially participated in the review and acceptance of the document. |
| 17-1 | Remediation has not been properly addressed. Who would be accountable for contamination of the Missouri? The Missouri is the source of drinking water for many communities. | Section 3.2.1 Surface Waters 3.2.1.2 Surface Waters Impacts and Mitigation Section 3.11 Reliability and Safety | A discussion on potential impacts to drinking water intakes has been added to the Draft EA in Section 3.2.1. A Water Intake Mitigation Measures Section has been added to the EA as a subsection in 3.2.1.2 Surface Waters Impacts and Mitigation. Section 3.11 Reliability and Safety states that contracts would be in place with oil spill response companies that have the capability to mobilize to support cleanup and remediation efforts in the event of a pipeline release. The operator would be responsible for any remediation. Additional narrative related to emergency response preparedness and discussion of the Facility Response Plan has been added to Section 3.11. |

CONFIDENTIAL

USACE_DAPL0071767

Summary of Comments Received
Environmental Assessment
Dakota Access Pipeline Project
Crossings of Flowage Easements and Federal Lands

| Commenter / Comment ID | Comment | EA Section where Comment is Addressed | USACE Response |
|---|---|---|---|
| 17-2 | How many people downstream of the pipes are in favor of laying the pipes? People who have no stake in any pipeline fallout are ready to say build them 'there'. | N/A | Comment is general and does not provide a specific issue that can be addressed within the scope of the EA |
| 18-1 | Due to the non-involvement/consultation of our tribe in this project, which will have "epic" impact on our people's lives and future generations to come, should not move forward in any manner. | 3.7.1.1 Cultural Resource Studies Affected Environment | NHPA Section 106 consultation is ongoing, the Corps is willing to meet and discuss all cultural, sacred and ceremonial sites to ensure they are identified and taken in to consideration for our final effects determination. USACE tribal consultations will be complete prior to issuance of a decision document. |
| 19-1 | The applicant needs to incorporated pressure sensing block valves on both sides of the water way to help minimize a potential environmental accident. These valves should be placed as close to the waterway as possible yet out of the flood plain to reduce the potential to get damaged from ice and other floating debris. | 2.3.1 Location and Detailed Description of the Proposed Action, 3.5.1.2 Aquatic Resources Impacts and Mitigation, and 3.11 Reliability and Safety. | Valve operation and placement is discussed in sections 2.3.1 Location and Detailed Description of the Proposed Action, 3.5.1.2 Aquatic Resources Impacts and Mitigation, and 3.11 Reliability and Safety. |
| 19-2 | A maintenance schedule needs to be developed to insure the integrity of the pipe for years and decades to come. Although this may mean the pipeline needs to be shut down for a period of time, it is important to minimize the risk to the Missouri River reservoirs and their fish and wildlife resources. | 3.11 Reliability and Safety | Maintenance is described in Section 3.11 Reliability and Safety. As indicated in the Draft EA, Dakota Access has an ongoing maintenance, inspection, and integrity testing program to monitor the safety of the pipeline system. Monitoring activities include constant remote oversight of the entire system 24/7/365 from the control center, routine inspection of the cathodic protection system, and the use of inspection tools that travel the inside of the pipeline to check pipe integrity. Dakota Access would also perform regular aerial flyovers to inspect the pipeline ROW. Dakota Access would maintain and inspect the pipeline in accordance with PHMSA regulations, industry codes and prudent pipeline operating protocols and techniques. |
| 19-3 | A spill prevention and cleanup plan should be provided prior to a permit being issued. The necessary equipment to carry out the plan should be readily available in the area of the crossing to reduce the time to remedy the spill. | 3.2.1. Surface Water 3.11 Reliability and Safety | The Draft EA was revised to include additional information on how DAPL would respond to inadvertent releases from the pipeline. Section 3.2.1.2. and 3.11 has been revised to include information about how DAPL would respond in the unlikely event of a pipeline leak. DAPL has prepared a Facility Response Plan (included as Appendix L) intended to satisfy the requirements of the applicable regulations and has contractually secured personnel and equipment necessary to respond to inadvertent releases from the pipeline. Section 3.2.2.2 and Sections 3.11 describes maintenance, inspection, and integrity testing program to monitor the safety of the pipeline system, leak detection protection procedures, and coordination with local emergency responders. |
| 19-4 | The Department recommends a scour analysis be conducted to determine adequate depths for the pipe to be buried to reduce any future pipe failure caused by scour. | | DAPL has evaluated the potential for impacts due to geomorphological movements as part of its coordination with the ND Office of the State Engineer in order to  as part of the Sovereign Lands Permitting Process. The results of the analysis are discussed in the response to Comment 12-8. |
| 19-5 | Required measures include removing any and all aquatic vegetation from vessels, motors, trailers, or construction equipment; all water shall be drained from bilge(s) or confined spaces on vessels, boat motors or construction equipment; all species of ANS (this list can be found on the North Dakota Game and Fish Department website) must be removed from vessels, boat motors or construction equipment. | Section 3.2.1.2 Surface Waters Impacts and Mitigation | Section 3.2.1.2 was amended to include the following statement. Dakota Access will implement required measures including the removal of all aquatic vegetation from vessels, motors, trailers, or construction equipment. All water would be drained from bilges or confined spaces. All species of Aquatic Nuisance Species will be removed from equipment in accordance with  the North Dakota Administrative Code Chapter Title 30, Article 3, Chapter 6. |
| 19-6 | The contractor or his agents or subcontractors must provide the Department a reasonable opportunity to inspect any an all vehicles, vessels, pumps and equipment that will be used in the project in or on the waters of the state prior to those items being launched or placed in the waters of the state. | Section 3.2.1.2 Surface Waters Impacts and Mitigation | Section 3.2.1.2 was amended to include the following statement. All Project construction equipment utilized on or in waters of the state would be subject to inspection by the Department in accordance with the North Dakota Administrative Code, Title 30, Article 3, Chapter 6-01.  S |
| 19-7 | Due to the nature of the proposed project, the Department suggests implementing the following recommendations to minimize impacts to fish and wildlife resources: Any unavoidable losses of native forest or riparian forest shall be replace with similar species on a 2;1 basis by incorporating a mitigation planting into the impacted forest to complement the existing woody vegetation. | Section 3.3.1.2 Vegetation Impacts and Mitigation | Section 3.3.1.2 was amended to include the following statement. Revegetation of trees and shrubs would take place in accordance with the North Dakota tree and shrub regulations. |
| | Due to the nature of the proposed project, the Department suggests implementing the following recommendations to minimize impacts to fish and wildlife resources: Disturbed areas should be planted to a native grass mixture. | Section 3.3.1.2 Vegetation Impacts and Mitigation 4.3 Vegetation, Agriculture and Range Resources, SWPPP (Appendix A) and ECP (Appendix G) | Section 3.3.1.2 was amended to include a discussion of seed mixes. An NRCS native seed mix has been selected for the DAPL project based on North Dakota State University Extension Service Publication, Successful Reclamation of Lands Disturbed by Oil and Gas Development and Infrastructure Construction.  If reseeding were to become necessary on Corps fee-owned lands, all activities would be conducted in accordance Garrison Project seed mixes and revegetation guidelines. |
| | Due to the nature of the proposed project, the Department suggests implementing the following recommendations to minimize impacts to fish and wildlife resources: We request work not take place within the lake from April 15 to June 1 to protect the aquatic environment. | | The pipeline will be installed via HDD and will not require work-in the lake during April 15 to June 1. |

CONFIDENTIAL

USACE_DAPL0071768

Summary of Comments Received
Environmental Assessment
Dakota Access Pipeline Project
Crossings of Flowage Easements and Federal Lands

| Commenter / Comment ID | Comment | EA Section where Comment is Addressed | USACE Response |
|---|---|---|---|
| 20-1 | Have any surveys been done in the APE?  Request copy of findings. | 3.7.1 Cultural Resources Studies and Appendix I. | A description of the field surveys for the flowage easement and federally-owned lands traversed by the Project are presented in Appendix I. As described in Section 3.7.1 Cultural Resources Studies, the Class II/Class III cultural resource inventory of the proposed Project Area was conducted in accordance with the North Dakota SHPO Guidelines Manual for Cultural Resources Inventory Projects (SHSND, 2012).  As outlined in Appendix I, systematic survey methods employed by field crews included surface inspection and shovel probing. |
| 20-2 | What type of findings have archeologists determined? | 3.7.1 Cultural Resources Studies and Appendix I. | The results of the cultural resources background studies and field surveys for the flowage easement and federally-owned lands traversed by the Project are presented in Appendix I and summarized in Section 3.7.1.1. |
| 3(2)-1 | We recommend that the Draft EA be revised to assess potential impacts to drinking water and the Standing Rock Sioux Tribe.  We also recommend addressing additional concerns regarding environmental justice and emergency response actions to spills/leaks. Based on the importance of these concerns and the new information that would supplement the December 2015 Draft EA, we recommend the USACE prepare a revised Draft EA and provide a second public comment period. | Executive Summary | The Corps published a draft EA on December 8, 2015, on the USACE Omaha District website (http://www.nwo.usace.army.mil/Missions/CivilWorks/Planning/ProjectReports.aspx) and hard copies were made available at public libraries in Bismarck, Williston, and Pierre.  Additionally, notifications where made to cooperating agencies, other federal, state and local agencies, and signatory and non-signatory Tribes to the Omaha Corps District Programmatic Agreement. The Corps received comments from 20 reviewers, primarily from individuals believed to be members of the Standing Rock Sioux Tribe, and including 2 sets of comments from EPA and the SRST. These comments relate to topics in the EA. The Corps fully considered and responded to these comments. There is no new significant information on environmental effects as a result of these comments. As such, neither a supplemental or revised EA for further public review nor additional NEPA compliance actions was required prior to a decision on the proposed action. Comments from the sierra club were received after the close of the comment period, and while addressed, are not considered to be part of the administrative record. |
| 3(2)-2 | Because of the locations of the Missouri River crossings for the DAPL, we recommend additional planning be developed to protect drinking water supplies commensurate with the planning done for the USACE Sakakawea Pipeline EA. This planning should include Williston and other communities using the Missouri River above Lake Sakakawea as well as communities using the Missouri River below the Lake Oahe crossing. Although the main focus of the DAPL Draft EA are the crossings of USACE lands and easements, we recommend that the applicant's spill planning and emergency response efforts cover the entire length of the pipeline as the proposed pipeline crosses many creeks and rivers that could quickly convey a spill into the Missouri River or other water resources. | Section 1.3 Authoriy and Scope<br>Executive Summary | As referenced in Section 1.3, the scope of the this EA is limited the proposed Project crossings of Corps-owned lands and flowage easements at the Missouri River and Lake Oahe crossings that would require real estate actions and regulatory permits from the Corps, which are the federal actions associated with this EA.  Therefore, the crossings considered for this EA are limited to the Missouri River and Lake Oahe crossings.  Accordingly, text was added to Section 3.2.1 Surface Water to address drinking water intakes located downstream.  Impacts to waters are addressed in Sections 3.2 Water Resources, 3.4 Wildlife Resources, 3.6.3 Land Use and Recreation and Special Interest Areas, and 3.11 Reliability and Safety within the Draft EA.<br>Although outside of the scope of this EA, DAPL will plan for the protection of other crossings and associated water intake as part of their emergency preparedness protocol in accordance with PHMSA requirements outlined in 49 CFR 194. |
| 3(2)-3 | The revised Draft EA should disclose potential impacts to downstream water supplies from leaks and spills and include the water systems in emergency preparedness planning. | 3.2 Water Resources<br>3.2.1.2 Surface Waters Impacts and Mitigation | The Draft EA has been updated to include potential impacts to downstream water supplies from leaks and spills.  A Water Intake Mitigation Measures Section has been added to the EA as a subsection in Section 3.2.1.2 Surface Waters Impacts and Mitigation. DAPL has included the information on downstream water systems in the emergency preparedness planning.  DAPL and its contractors will work with Federal, State, local, and Tribal officials to protect downstream drinking water and irrigation water intakes.  To minimize potential impacts to intakes, protection and mitigation measures will be implemented in cooperation with intake operators.  Text regarding the flow distance and the time that it would take for the first oil from an unabated release to travel downstream and reach water intakes from the Missouri River and the Lake Oahe crossings has been incorporated into the respective Geographical Response Plans.  Contact information for downstream intake operators and the USFWS, North Dakota Game and Fish Department, South Dakota Game, Fish and Parks, the SRST, and the Three Affiliated Tribes is included in the Facility Response Plan.<br>However, worst case discharge volumes and intake locations are considered "Security Sensitive Information" by both DAPL and PHMSA and are protected from public disclosure and therefore will not be included within the EA.  This information is reserved for "Privileged and Confidential" documents utilized during training exercises.  The USEPA On-Scene Coordinator will have access to the Facility Response Plan through PHMSA. |

CONFIDENTIAL

USACE_DAPL0071769

Summary of Comments Received
Environmental Assessment
Dakota Access Pipeline Project
Crossings of Flowage Easements and Federal Lands

| Commenter / Comment ID | Comment | EA Section where Comment is Addressed | USACE Response |
|---|---|---|---|
| 3(2)-4 | We recommend that the NEPA analysis describe the typical size of leak that can be detected by SCADA, the time that would be required for detection and shutoff of the pipeline, and the size of a spill that could occur during that time period. It may be appropriate to require routine physical inspections in sensitive surface water and groundwater areas to augment the ability of the SCADA system to identify small volume leaks. For the sections of the pipeline in close proximity to sensitive water resources, we recommend consideration be given to the available alternative systems with more accurate rapid detection abilities than SCADA and establishment of a network of sentinel or monitoring wells along the pipeline, especially in sensitive areas with hydrologic connection to the Missouri River. It may be useful for the USACE and project proponent to consult with the Department of Transportation's Pipeline and Hazardous Materials Safety Administration (PHMSA) regarding pipeline leak and spill detection and emergency planning, if it has not already occurred. | Section 3.11 Reliability and Safety Section 3.2.1.2 Surface Water Impacts and Mitigation Appendix L Draft FRP | DAPL will have three methods of monitoring the pipeline during operation: 1) SCADA, 2) LeakWarn, 3) Physical Pressure and Flow Measurement. The SCADA system shows pump station and valve status. The secondary leak detection system (LeakWarn leak detection system) is a Computational Pipeline Monitoring System (CPM) used to monitor the pipeline for leaks via computational algorithms performed on a continual basis. This measurement data is immediately analyzed to determine potential product releases anywhere on the pipeline system. This state-of-the-art CPM system is capable of detecting leaks down to 1 percent or better of the pipeline flow rate within a time span of approximately 1 hour or less and capable of providing rupture detection within 1 to 3 minutes. The leak detection equipment and software utilized during operations or the pipeline will be updated per federal standards in accordance with PHMSA and American Petroleum Institute requirements. The Physical Pressure and Flow Measurement utilizes stand-alone pressure transmitters and stand-alone ultrasonic meters at each pump station to continuously verify and compare flowrates along the pipeline in real-time in conjunction with the leak detection system. Once in operation, physical observation is made along the entire length of the pipeline which includes aerial patrols at least once every 10 days. Sentimental / monitoring wells do not provide real-time feedback and would BE no advantage for monitoring this pipeline operation relative to the above detection methods.<br>The applicant and the USACE held a joint conference call on February 23, 2016 with Mr. David Lehman, US DOT PHMSA Director with Emergency Support & Security Division. Mr. Lehman has already reviewed a draft of the DAPL Facility Response Plan prepared in accordance with 49 CFR 194 supplied by the USACE. Mr. Lehman indicated that this Draft FRP was consistent with other FRPs that he had reviewed from other operators and was generally what he expected to see at this stage of a project. PHMSA will review a Final FRP which must be submitted by DAPL prior to pipeline in-service. PHMSA will supply DAPL a Letter of Authorization. The Final FRP is protected from public disclosure and therefore will not be included within the EA. However, this "Privileged and Confidential" document will be provided by PHMSA to other Federal agencies. |
| 3(2)-5 | We recommend that Dakota Access adequately plan, prepare and train for such an event and that the revised Draft EA include a requirement to work with the local water districts on spill response strategies and equipment specific to the drinking water intakes in and near the project. | Section 3.11 Reliability and Safety Section 3.2.1.2 Surface Water Impacts and Mitigation Appendix L Draft FRP | DAPL is preparing a Facility Response Plan in accordance with PHMSA 49 CFT 194. In addition to the FRP, DAPL has also developed Geographical Response Plans (GRP's) for the Missouri River and Lake Oahe crossings to facilitate a rapid and effective response during the incipient stages of a release. The GRP's include tactical response/mitigation measures, as well as maps depicting potential access, containment, and staging areas. The GRPs will be utilized during training exercises. As part of DAPLs Tier 1 leak response, DAPL will initiate emergency response efforts immediately upon discovery of a release of oil consistent with the FRP and API RP-1174 "Recommended Practice for Onshore Hazardous Liquid Pipeline Emergency Preparedness and Response", including containment and recovery. Emergency notifications will be made to Federal, State, and Local agencies and tribal officials as outlined in the FRP. DAPL and its contractors will work with Federal, State, local, and Tribal officials to protect downstream water intakes. To minimize potential impacts to intakes, protection and mitigation measures will be implemented into the respective GRPs.<br>DAPL will conduct emergency response drills/exercises in accordance with the National Preparedness for Response Exercise Program (PREP), which is recognized, and approved, by the EPA, USCG, and PHMSA. Emergency response exercises will be conducted in accordance with PREP and will include an annual table top exercise. A worst case, or alternate worst case, discharge exercise will be conducted every triennial cycle. DAPL is committed to conducting a worst case discharge exercise at either Lake Sakakawea or Lake Oahe once every 6 years and will include both open water and ice response. DAPL will alternate the location and type of exercise. Regulatory and stakeholder participation will be encouraged and solicited for the exercise.<br>To minimize potential impacts to intakes, protection and mitigation measures will be implemented in cooperation with intake operators. Information on the protection of drinking water and irrigation water intakes will be added as it becomes available into the Geographical Response Plan. |

CONFIDENTIAL

USACE_DAPL0071770

Summary of Comments Received
Environmental Assessment
Dakota Access Pipeline Project
Crossings of Flowage Easements and Federal Lands

| Commenter / Comment ID | Comment | EA Section where Comment is Addressed | USACE Response |
|---|---|---|---|
| 3(2)-6 | Further, we recommend the NEPA analysis describe additional mitigation measures regarding emergency preparedness to reduce the impacts in the event of a spill. Useful measures include the following:<br>• Emergency response plan that addresses oil spill response (including a cold weather/ice cover response) and identifies the appropriate agencies/organizations and responsible staff to contact in the event of an emergency response;<br>• Procedures for rapid notification to Public Water systems (PWS) (e.g., Williston, New Town, Fort Yates and Standing Rock PWS), and domestic well owners;<br>• Pre-positioned response assets, including equipment to address oil spills; and<br>• Spill drills and exercises that include strategies and equipment deployment. | Section 3.11 Reliability and Safety<br>Section 3.2.1.2 Surface Water Impacts and Mitigation<br>Appendix L Draft FRP | The response planning and drill frequency is addressed in the response to Comment 3(2)-5.<br>Emergency notification is addressed in the response to Comment 3(2)-5 and the FRP.<br>Impacts from winter/ice conditions has been added to Draft EA Section 3.2.1.2 Surface Waters Impacts and Mitigation. Procedures for rapid notification to downstream Public Water Systems, including the SRST, are included in the FRP.  Notification of upstream PWS are not applicable.<br>DAPL will have their own equipment and has contracted professional Oil Spill Response Organizations (OSRO's) has equipment so that response procedures can be carried out in accordance with federal response requirements including cold weather/ice conditions. Company owned response equipment is listed in the FRP.  Any specialized response equipment, beyond company owned response equipment, will be provided by OSRO's and/or contractors.  DAPL has contracted with the National Response Corporation, an international response organization, which maintains contracts with hundreds of OSRO's nationwide. Resources for all response types can be mobilized as needed.  A listing of contractor response equipment is included in the FRP and will continually be evaluated and updated as necessary.<br>Dakota Access will conduct emergency response drills/exercises in accordance with the National Preparedness for Response Exercise Program (PREP) consisting of table top exercises and equipment deployment drills.  Dakota Access is committed to conducting a worst case discharge full scale exercises at both the Missouri River crossing near Williston and the crossing at Lake Oahe and will include both open water and ice response. |
| 3(2)-7 | We recognize that except in the case of a major flood and erosion event, depth of cover surveys would not be applicable to Dakota Access's Missouri River and Lake Oahe crossings due to the use of horizontal directional drilling to bore well below the river / lake bottom; however, such surveys may be appropriate for water body crossings that will not use this drilling technique. For this project, surveys could be triggered by a historically high river stage or the observation of ice damming at the location of the pipeline crossing. We recommend that the revised Draft EA assess and discuss the potential for scour and consider the inclusion of on-going depth of cover surveys associated with hydrological  events. | 2.3.2.6 Major Waterbody Crossing Method | As referenced  in Section 1.3, the scope of the this EA is limited the proposed Project crossings of Corps-owned lands and flowage easements at the Missouri River and Lake Oahe crossings.<br>The potential for river channel changes associated with water erosion and scour were considered when selecting the major waterbody crossing methods and locations.  DAPL has coordinated with the North Dakota Office of the State Engineer as part of the Sovereign Lands Permitting Process.  The Office of the State Engineer has issued a Sovereign Lands Permit for both crossings. |
| 3(2)-8 | In responding to the 2015 Bridger Poplar Pipeline spill, we noted that the prolonged oil/water contact and lack of evaporative loss due to ice cover caused a much larger than expected concentration of dissolved-phase organics making it to the subsurface intake at the water treatment plant. This is likely a unique situation to Bakken crude released into an iced-over waterbody. Therefore, we recommend that revised Draft EA note that a winter response on ice for a spill scenario involving Bakken crude actually can be more difficult than a "typical" ice response. In addition, we recommend that Dakota Access include planning for winter response scenarios in their oil spill contingency plans, including measures to ensure that staff are adequately trained for a potential winter response and that an oil spill response organization with winter response capabilities has been identified. | Section 3.11 Reliability and Safety<br>Section 3.2.1.2 Surface Water Impacts and Mitigation<br>Appendix L Draft FRP | As noted in the response to question 3(2)-6, DAPL has their own equipment and has contracted OSROs that can carry out response procedures in accordance with federal response requirements including ice conditions.<br>DAPL is carrying 100% Bakken Crude Oil (Sweet Bakken Light). The 2015 Bridger Poplar Pipeline spill consisted of heavier crudes.<br>For spills trapped under ice, the Sweet Bakken Light would remain at the top of the water level and would not behave similar to the heavier crudes associated with the 2015 Bridger Poplar Pipeline spill.  As a result, there would be less of  a concentration of dissolved-phase organics making it to the subsurface intakes.<br>As noted in the response to comment 3(2)-8, Dakota Access will conduct site-specific ice response emergency response drills/exercises. |
| 3(2)- 9 | The Draft EA should be revised to disclose the proximity of the Standing Rock Sioux Reservation and potential impacts to resources downstream of the Lake Oahe crossing. While maps have been added to the Draft EA, no tribal lands or reservations are shown on any of the maps. The Draft EA should be revised to disclose the proximity of the Standing Rock Sioux Reservation and other tribal lands such as the Ft. Berthold and Cheyenne River Sioux Reservations. The analysis should be expanded to disclose potential impacts to water resources and environmental or cultural sites that may be affected by potential leaks and spills. | Section 2.3.1 Location and Detailed Description of the Proposed Action<br>Section 3.2.1.1 Surface Waters Affected Environment<br>Section 3.2.1.2 Surface Resources Impacts and Mitigation<br>Section 3.4.1 Recreationally and Economically Important Species and Nongame Wildlife<br>Section 3.6.1 Land Ownership<br>Section 3.6.3 Recreation and Special Interest Areas<br>Section 3.8.1.2 Demographics, Employment, and Income Impacts and Mitigation<br>Section 3.9.2 Environmental Justice Impacts and Mitigation<br>Section 3.11 Reliability and Safety<br>Section 12.0 Figures | The EA has been revised to reflect publicly available information concerning proximity of the proposed action areas to the Standing Rock Sioux and Ft. Berthold lands. Other Tribal lands are not within reasonable proximity to the proposed action areas or its potential effects. The EA continues to discuss and has expanded its discussion of potential effects to environmental site, cultural and water resources. Effects from a potential release are speculative and beyond the scope of this EA for a private funded and operated project with nominal federal interests. Federal response plans are prepared pursuant to comprehensive federal regulation, as discussed in the EA. See also the response to comment 15-15, 3(2)-7 and associated discussion in the EA. |

CONFIDENTIAL

Summary of Comments Received
Environmental Assessment
Dakota Access Pipeline Project
Crossings of Flowage Easements and Federal Lands

| Commenter / Comment ID | Comment | EA Section where Comment is Addressed | USACE Response |
|---|---|---|---|
| 3(2)-10 | We recommend a more thorough Environmental Justice (EJ) analysis be developed for the revised Draft EA. For linear construction projects, census block groups or census tracts are the preferred level of analysis rather than the county by county or state by state analysis presented in the Draft EA (pages 60, 61 &76). A screening level analysis for EJ, such as shown on EPA's EJScreen at http://ejscreen.epa.gov/mapper/, indicates there are several census block groups with substantial minority and/or low income demographics that could be potentially impacted by the project. The areas of analysis to assess potential impacts to EJ communities should correspond to the impacts of the proposed project instead of only the area of construction disturbance. For oil pipeline projects, potential impacts to EJ communities would include the effects of leaks and spills to downstream water supplies (both drinking water quality, agricultural uses, and costs) and aquatic resources such as fish and riparian vegetation used by EJ populations. In addition to analyzing potential EJ impacts, Executive Order 12898 on Environmental Justice (February 16, 1994) also requires public outreach to potentially affected EJ communities. | Section 3.9.2 Environmental Justice Impacts and Mitigation Section 4.10 Environmental Justice | The EA contains an Environmental Justice analysis that conforms with recognized practice. Neither the Project nor the proposed action areas cross tribal land. In fact, tribal land was specifically avoided as a routing mitigation measure. This private project has nominal federal interest and operational effect analysis are not required pursuant to NEPA and the Corps NEPA program. Furthermore, the project is subject to stringent federal response plan regulation, with which DAPL is complying. Predictions of future response actions is speculative and not anticipated for the Project, although comprehensive response plans will be in place pursuant to federal regulation. Additionally, the area of the Lake Oahe crossing will be installed by Horizontal Directional Drilling technique that will allow for deep burial without trenching and will substantially reduce any risk of impacts to Environmental Justice communities or populations. The Project does not anticipate any impact to water supplies along its route, and to the extent a response action is required, federal regulation will be complied with. |
| 3(2)-11 | The Draft EA also did not include any information on coordination and consultation with tribal governments other than in connection to historic and cultural resource impacts. For example, no Tribes were included in Chapter 7 (page 81) listing federal, tribal, state and local agency consultation and coordination. We recommend that Tribal consultation and coordination be more thoroughly addressed and the related information be added to the revised Draft EA. | Section 2.3.1 Location and Detailed Description of the Proposed Action Section 3.2.1.1 Surface Waters Affected Environment Section 3.2.1.2 Surface Resources Impacts and Mitigation Section 3.4.1 Recreationally and Economically Important Species and Nongame Wildlife Section 3.6.1 Land Ownership Section 3.6.3 Recreation and Special Interest Areas Section 3.8.1.2 Demographics, Employment, and Income Impacts and Mitigation Section 3.9.2 Environmental Justice Impacts and Mitigation Section 3.11 Reliability and Safety Section 12.0 Figures | Details of the extensive efforts to conduct Tribal consultation are more fully addressed in the EA. A recent letter from the Corps Omaha District to the Director, Federal Agency Programs, of the ACHP details some of these consultation efforts, including with the Standing Rock Sioux Tribe, and is now included with the EA. See Response to comment response 15-14 for a list of sections modified regarding the Standing Rock Sioux Tribe. |
| 3(2)-12 | We recommend that the discussion of the route alternatives be expanded to discuss how the preferred alternative's Missouri River crossing locations were determined and whether there are other available routes or crossing locations that would have reduced potential to water resources, especially drinking water supplies. | 2.1.3 Alternative 3 - Route Alternative | The approach to Project routing is described in Section 2.1.3 of the EA. A variety of factors were considered and weighted in the process. Impacts to "waters of the U.S." were avoided to the maximum extent practicable. All wetlands and waterbodies within the action area and connected action area were to be avoided by HDD or bore.  Part of this analysis included a preference to co-locate the Project with existing linear utility features where practicable. Given the HDD approach used for both crossings and the avoidance of impacts that results from this technique, the attempt to cross at a narrow expanse of the river further limiting risk, the reduced potential for impacts resulting from the HDD process, movement of a pump station away from the River at the request of the Corps, the necessity to cross the Missouri River in at least one location, and the federal programs governing response actions, the risk to water resources from this crossing are minimal. |
| 15(2)-1 | The draft EA assumes that there is no need to evaluate the risk of an oil spill into Lake Oahe.  Instead the draft EA merely recites that Dakota Access will "construct and maintain the pipeline to meet or exceed industry and government standards."  But this bland assertion is no substitute for a scientifically sound risk assessment of the likelihood of an oil spill and the impacts such a spill would cause. | Section 3.11 Reliability and Safety Section 3.2.1.2 Surface Water Impacts and Mitigation Appendix L Draft FRP | In Section 3.2.1.2 Surface Waters Impacts and Mitigation discusses potential impacts from a release.  Additionally, the applicant has filed "Security Sensitive Information" protected from public disclosure (and therefore not included within the EA) that evaluates the risk of an oil spill into Lake Oahe.  "Privileged and Confidential" Spill model documents for the pipeline crossings for both the Missouri River and Lake Oahe locations provide USACE staff with the results of worst case risk analysis  for spills at both of these crossings.  The spill models follow PHMSA modeling and include information on hypothetical worst case discharge volumes, intake locations and an analysis of the flow distance and the time that it would take for the first oil from an unabated release to travel downstream and reach water intakes.  This information has been used to design location-specific Geographic Response Plans for the appropriate staff to utilize during training exercises, also filed as "Privileged and Confidential".  More information on spill risk, mitigation and response measures has been added to the EA in response to comments:  3-8, 6-1, 9-5, 15-11, 15-16, 15-18, 15-22, 3(2)-4. |

CONFIDENTIAL

Summary of Comments Received
Environmental Assessment
Dakota Access Pipeline Project
Crossings of Flowage Easements and Federal Lands

| Commenter / Comment ID | Comment | EA Section where Comment is Addressed | USACE Response |
|---|---|---|---|
| 15(2)-2 | The draft EA assumes that the SRST has no stake at all in the Dakota Access pipeline. In a shocking disregard of the federal trust responsibility and the environmental justice doctrine, the draft EA completely ignores the presence of the Reservation and the interest of the Tribe. Maps in the draft EA omit the Reservation. The text of the draft EA likewise makes no mention of the Reservation notwithstanding its proximity to the proposed pipeline crossing. | Section 2.3.1 Location and Detailed Description of the Proposed Action<br>Section 3.2.1.1 Surface Waters Affected Environment<br>Section 3.2.1.2 Surface Resources Impacts and Mitigation<br>Section 3.4.1 Recreationally and Economically Important Species and Nongame Wildlife<br>Section 3.6.1 Land Ownership<br>Section 3.6.3 Recreation and Special Interest Areas<br>Section 3.8.1.2 Demographics, Employment, and Income Impacts and Mitigation<br>Section 3.9.2 Environmental Justice Impacts and Mitigation<br>Section 3.11 Reliability and Safety<br>Section 12.0 Figures | As indicated in response to comment 15-14, the EA figures have been updated to show SRST reservation in relation to the pipeline route including the Lake Oahe crossing. The project does not cross the reservation and no impacts to the reservation are anticipated. Many sections of the EA have been revised to discuss the adjacent SRST as appropriate, including Section 3.9.2, Environmental Justice Impacts and Mitigation. |
| 15(2)-3 | While the Dakota Access pipeline is a single project, with cumulative environmental impacts, there has been no effort to review the proposal in any comprehensive manner. To the contrary, the federal review process has been uncoordinated and disjointed, with different offices (including three Corps Districts) looking at limited aspects of the project as if they were wholly unrelated. | 1.3 Authority and Scope of the EA<br>2.3.1 Locations and Detailed Description of the Proposed Action . | As referenced in Section 1.3 and in response to comment 3-3, and in accordance with relative federal regulations, the scope of the this EA is limited the proposed Project crossings of Corps-owned lands and flowage easements at the Missouri River and Lake Oahe crossings that would require real estate actions and regulatory permits from the Corps, which are the federal actions associated with this EA. Separate Corps authorizations are being sought for Section 404, Section 10, and Section 408 crossings along the entire DAPL route. The detailed description of the Proposed Action, including all Connected Actions are included in Section 2.3.1. Each NEPA document associated with DAPL appropriately considers the effects of the particular action under consideration as well as indirect and cumulative effects. |
| 15(2)-4 | Major oil pipelines, with their risk of oil spills and other major effects, clearly do not meet that standard ("result in more than minimal individual or cumulative adverse environmental effects or may be contrary to public interest"), so Nationwide Permit 12 is not a proper vehicle in connection with the Dakota Access pipeline. The Corps should reject the use of Nationwide Permit 12, which is wholly unsuited to the current purpose, and should review in detail the impacts (including cumulative impacts) of the project under a single permit application. | 1.3 Authority and Scope of the EA<br>2.3.1 Locations and Detailed Description of the Proposed Action . | This EA is limited to the real estate actions required for the crossing of federal land at Lake Oahe and flowage easements at the Missouri River. These crossings require Department of the Army authorization under Section 404 and/or Section 10 of the Rivers and Harbors Act. Separate Corps authorizations are being sought for Section 404, Section 10, and Section 408 crossings along the route. Consistent with Corps policy and the requirements of NWP 12 for utility lines, the Corps Regulatory branch is evaluating each separate and distinct crossing of waters of the United States as a single and complete project. |
| 15(2)-5 | NEPA requires (at a minimum) that all of the pending federal actions regarding the Dakota Access pipeline be reviewed together. Dakota Access is seeking federal approval for a single, linear pipeline, and the various crossings of multiple rivers, wetlands and federal lands clearly constitute "connected" and "cumulative "actions under NEPA. 40 C.F.R. 1508/.25(a). Since the federal approvals Dakota Access seeks concern "physically, functionally, and financially connected and independent" components of the same project, NEPA requires that they be analyzed together. Del. Riverkeeper Network v. FERC, 753 F.3d 1304, 1308 (D.C. Cir 2014). Furthermore, a meaningful analysis of alternative, as required by NEPA, cannot be done in the context of the segmented review which is being undertaken here. | 1.3 Authority and Scope of the EA<br>2.3.1 Locations and Detailed Description of the Proposed Action . | Evaluating each separate and distinct crossing of waters of the United States as a single and complete project is consistent with Corps policy and the requirements of NWP 12 for utility lines and has been upheld by the courts for projects with minimal federal nexus. Each NEPA document associated with DAPL appropriately considers the effects of the particular action under consideration as well as indirect and cumulative effects. The Delaware Riverkeeper case cited in the comment involves whole project FERC authorization, which is not a relevant regulatory program for the DAPL project. |
| 15(2)-6 | The federal trust responsibility to tribes requires federal agencies to protect tribal rights, resources and cultures and the draft EA ignores the Corps' duties under the trust responsibility.<br>In connection with the Dakota Access proposal, in accordance with the trust responsibility the Corps should have consulted with the Tribe starting at the outset of the scoping process, and the full range of the Tribe's interests -including tribal cultural resources, the natural environment of the Reservation, and the health and safety of its people -should have been central considerations in the identification, evaluation and selection of alternative routes for the pipeline. | 3.7.1.1 Cultural Resource Studies Affected Environment | Section 106 coordination/consultation was initiated for this project beginning in October 2014, with an information letter regarding a preliminary geo-testing of the proposed Oahe crossing alignment. Per the Omaha District's usual process, this letter was sent to Tribes, THPOs, SHPOs, agencies and interested parties, soliciting information relevant to this portion of the project. Subsequently, the same process was utilized in circulating information and pertinent data for the installation of the Oahe pipeline crossing, in the form of a letter distributed in July 2015. USACE recommended to North Dakota SHPO a "No Historic Properties Subject to Effect" determination, SHPO concurred in April 22, 2016. |

CONFIDENTIAL

Summary of Comments Received
Environmental Assessment
Dakota Access Pipeline Project
Crossings of Flowage Easements and Federal Lands

| Commenter / Comment ID | Comment | EA Section where Comment is Addressed | USACE Response |
|---|---|---|---|
| 15(2)-7 | The draft EA is inconsistent with the Environmental Justice Doctrine. The draft EA mentions environmental justice, but fundamentally misapplies the doctrine. With cruel irony, the draft EA looks at a tiny area with a radius of half a mile, concludes that there are no Indians nearby, and dismisses any environmental justice concerns out of hand. Draft EA at 59-61. The reality is very different. The Reservation is less than a mile downstream from the proposed Lake Oahe crossing. The Indian community of Cannonball, ND -with some 875 residents -is located on a bluff immediately overlooking that site. [T]he presence of the Reservation and Indian people in the immediate vicinity of the proposed Lake Oahe crossing, the compelling interests of the Tribe regarding the proposed pipeline, and the disproportionate impacts an oil spill would have on the Reservation are completely ignored in the draft EA. No consideration is given to tribal rights and interests, in direct contravention to the environmental justice doctrine. | Section 3.9.2 Environmental Justice Impacts and Mitigation Section 4.10 Environmental Justice | As discussed in comment response  3(2)-11 and 15-19, Sections 3.9.2 and 4.10 of the EA have been revised to further clarify and address environmental justice concerns. Further information concerning spill response planning also has been included. The applicant avoided tribal trust lands in project design and has addressed concerns identified by the tribes in project implementation planning. |
| 15(2)-8 | The draft EA ignores vitally important facts about the Tribe. [I]n the draft EA, the Corps ignored the Tribe's history -including its Treaty history -which must inform the Corps' decision making. | Section 3.6.3 Recreation and Special Interest Areas | A discussion on the SRST has been added to the EA in Section 3.6.3.  Although the history of the SRST and treaty rights is beyond the scope of the EA, no impact to tribal treaty rights are anticipated due to construction or operation of the pipeline within the Project Area or Connected Actions. No treaty rights have been identified that would be adversely affected by project permitting, construction or operation. |
| 15(2)-9 | [T]he draft EA did not consider the potential impacts of an oil spill on the waters of Lake Oahe, which the Tribe relies on for life. Approximately 4300 persons on the Reservation are served by a Municipal, Rural and Industrial water system that obtains waters from Lake Oahe. The nearest intake for this water system is in Fort Yates, only [WITHHELD] miles downriver from the proposed crossing of Lake Oahe. The Tribe also relies on the waters of Lake Oahe for irrigating over 3000 acres of land -and the nearest intake for this purpose is just [WITHHELD] miles downriver from the proposed Lake Oahe crossing. The waters of Lake Oahe also provide habitat for fish, wildlife, and plants important to the diet and cultural and religious practices of the Tribe. | 3.2 Water Resources 3.2.1 Surface Waters 3.2.1.2 Surface Waters Impacts and Mitigation 3.4 Wildlife Resources 3.6.3 Land Use and Recreation Recreation and Special Interest Areas 3.11 Reliability and Safety | Section 3.2.1.2 Surface Waters Impacts and Mitigation has been revised to indicate that water intakes located downstream from the Lake Oahe crossing  could potentially be at risk temporarily if there was a release that reached this body of water in the vicinity of drinking water intake structures and appropriate response action had not been taken.  Additionally, a Water Intake Mitigation Measures Section has been added to the EA as a subsection in Section 3.2.1.2 Surface Waters Impacts and Mitigation. As indicated in the comment response 15(2)-1, the applicant has filed spill model information on hypothetical worst case discharge volumes, intake locations, and an analysis of the flow distance and the time that it would take for the first oil from an unabated release to travel downstream and reach water intakes and this information has been used to design location-specific Geographic Response Plans (all filed as "Privileged and Confidential"). In addition to spill response planning and exercise measures required by PHMSA, DAPL has committed to additional mitigation measures downstream of both crossings as a means to reduce impacts to water intakes and other high consequence areas. Examples of additional mitigation measures include full scale open water and ice scenario emergency response drills/exercises in accordance with the National Preparedness for Response Exercise Program (PREP) downstream of the crossings at Lake Oahe and the Missouri River.  Dakota Access will also coordinate with the USACE and any other applicable stakeholders to establish an all-weather access boat ramp and collection point downstream of both the Missouri River crossing and the Lake Oahe crossing.  Each location will be supported with a fenced equipment storage facility that includes a permanent storage area for winter and open water spill response equipment.  Each storage facility will store sufficient response equipment to mitigate an unintended worst case release into the river at each crossing and will be constructed within one year after the pipeline becomes operational. Impacts to fish, wildlife, and plants from construction in jurisdictional areas and to threatened and endangered species are addressed in Sections 3.2 Water Resources, 3.4 Wildlife Resources, 3.6.3 Land Use and Recreation Recreation and Special Interest Areas, and 3.11 Reliability and Safety and other locations within the Draft EA. |
| 15(2)-10 | The draft EA fails to discuss the fact that the Lake Oahe crossing should be designated as a "high consequence" and "unusually sensitive" area, and ignores the legal consequences that would flow from that designation. | N/A | Pipeline safety regulations use the concept of high consequence areas (HCAs) to identify specific locales and critical areas where a release could have the most significant adverse consequences.  Lake Oahe at the pipeline crossing location is defined by PHMSA as an ecologically-sensitive HCA.  DAPL has prepared a PHMSA approved spill model that considers potential interactions with all HCAs as defined by PHMSA. The spill model accounts for the presence of these and other HCAs and DAPL has designed the pipeline and developed operational parameters to reduce the risk of a release at HCAs in accordance with PHMSA requirements. |

CONFIDENTIAL

USACE_DAPL0071774

Summary of Comments Received
Environmental Assessment
Dakota Access Pipeline Project
Crossings of Flowage Easements and Federal Lands

| Commenter / Comment ID | Comment | EA Section where Comment is Addressed | USACE Response |
|---|---|---|---|
| 15(2)-11 | More detailed information is clearly needed regarding the proposed plan for the design, construction, operation, maintenance, and monitoring of the proposed pipeline. Beyond this, more is needed to address the unique and unknown risks that arise from the placement of an oil pipeline (and potential pipeline spills) in the Missouri River, which experiences widely variable water levels from year to year. The draft EA says nothing about the very substantial variations in water level that occur in Lake Oahe - which can experience years of flooding followed by years of drought. Nothing in the draft EA addresses these particular features of Lake Oahe - including how these and other unique and changing factors would impact emergency response plans. Nor is anything said about other variables, such as the ice cover on the Lake during the winter - which is commonplace in the harsh North Dakota climate. | 2.3.2 Description of Construction Techniques and Construction Mitigation Measures 3.2.1.2 Surface Waters Impacts and Mitigation 3.2.2.2 Groundwater Impacts and Mitigation 3.5.1.2 Habitats and Communities 3.11 Reliability and Safety | Detailed plans for both crossings have been reviewed and approved by USACE engineers and ND State Water Commission and Engineer.   Information regarding construction of the pipeline is provided in Section 2.3.2 of the EA.  Section 3.11 Reliability and Safety includes detailed information regarding  operation, maintenance, and monitoring of the pipeline. The Geographical Response Plans and a Facility Response Plan to address potential spill increase.  As indicated in the responses to Commenter Number 12, DAPL has been coordinating with the ND Office of the State Engineer in order to evaluate potential of impacts due to changes in river depth/ river movements as part of the Sovereign Lands Permitting Process.  Conservative assumptions were made when evaluating the proposed crossings and impacts to the pipeline below the rivers from vertical or horizontal scour are not expected and the ND Office of the State Engineer has issued Sovereign Lands Permits for both crossings.  Impacts from winter/ice conditions has been added to Draft EA Section 3.2.1.2 Surface Waters Impacts and Mitigation as discussed in response to comment 9-2. |
| 15(2)-12 | The Corps Has Not Complied With Section 106 Of The National Historic Preservation Act, Or Executive Order 13007 Regarding Indian Sacred Sites. The report of these [cultural]  matters prepared by Dakota Access's contractor for the draft EA was done without the Corps engaging in the government-to-government consultation required by Section 106 of the National Historic Preservation Act and its regulations. As a result, the draft EA omits much of the unique knowledge of the Tribe regarding cultural resources along the proposed pipeline route. | 3.7.1.1 Cultural Resource Studies Affected Environment | As stated in the draft EA, tribal coordination/consultation was not complete at the time of the Draft EA.  The Corps fully engaged the NHPA section 106 process and satisfied its tribal consultation obligations .  The Corps has demonstrated its willingness to meet and discuss all cultural, sacred and ceremonial sites to ensure they are identified and taken into consideration in the final effects determination, the NEPA process and its decision.  The applicant avoided tribal trust lands in project design and has addressed concerns identified by the tribes in project implementation planning. There are many ways to conduct tribal consultation.  It was most effective when interested tribes chose to participate in a meaningful way with the action agency in the governmental process and with the applicant and exchange information in a timely manner.  Multiple opportunities were provided to tribes and the public for input during the project development process. All requests for surveys in action areas were accomodated and requests for information received in a timely manner were addressed. |
| 15(2)-13 | The requirements of Section 106, as well as those of NEP A regarding historic properties, have not been satisfied with regard to the Dakota Access pipeline. Instead of government-to-government consultation, the Section 106 issues were handled by sending form letters to the tribes inviting them to public meetings hosted and run by the pipeline company (not the Corps). This attempt to substitute meetings with Dakota Access for consultation by the Corps, is contrary to the requirements of the law. | 3.7.1.1 Cultural Resource Studies Affected Environment | Section 106 coordination/consultation was initiated for this project beginning in October 2014, with an information letter regarding a preliminary geo-testing of the proposed Oahe crossing alignment. Per the Omaha District's usual process, this letter was sent to Tribes, THPOs, SHPOs, agencies and interested parties, soliciting information relevant to this portion of the project. Subsequently, the same process was utilized in circulating information and pertinent data for the installation of the Oahe pipeline crossing, in the form of a letter distributed in July 2015. USACE recommended to North Dakota SHPO a "No Historic Properties Subject to Effect" determination, SHPO concurred in April 22, 2016. |
| 15(2)-14 | Two Corps' archeologists came to the Reservation on March 7, 2016. At this preliminary site visit the Tribe's Historic Preservation Officer, along with the Tribe's historian and cultural specialist, showed the Corps' archeologists some of the archeological, cultural, and historic sites in the area that would be affected by the proposed pipeline. We attach here a map showing some of the areas identified by the Tribe during the March 7 site visit. See Attachment C (Map of selected cultural resource sites). Additional details and additional sites were shown during the visit itself. Throughout the site visit, the Corps' archeologists commented that they had not been aware of many of these sites, and many of the sites did not appear on any of the site maps that were being used by the Corps for the Section 106 analysis. The Corps' archaeologists expressed the view that these should be studied and documented. And this is precisely what Section 106 requires - a full Class III cultural resources survey of all these sites, in consultation with and based on the unique knowledge of the Tribe. | 3.7.1.1 Cultural Resource Studies Affected Environment | The Corps appreciates the additional information provided by the SRST THPO and the unique knowledge held by the Tribal members.  The Corps appreciates all relevant information on cultural, sacred and ceremonial sites that is not available to the Corps staff through other avenues to ensure they are identified and taken into consideration in the effects determination and Corps decision making. As discussed in response to comment 15-4, the Corps conducted Class III Archeology Surveys in 2010, which included the DAPL Lake Oahe crossing area.  Tribes were coordinated with on the scope of survey and the field investigations.  Specific to this action, NHPA Section 106 Soil Boring information letters were sent to consulting parties on October 24, 2014 and in February 2015. NHPA Section 106 Pipeline crossing information letter was sent to consulting parities on July 22, 2015.  The applicant conducted cultural resource surveys on lands not under Corps management in 2014. Site visits were conducted with cultural resources personnel from the SRST on March 7, 2016 (west side) and March 22, 2016 (east side). During the March 7th visit, the group relocated two nearby sites (32M00054 and 32M00001) and also visited a historic cemetery (Galpin) near the site of the historic Cannonball Ranch. After this visit, the SRST provided the USACE with information regarding area/sites in the vicinity of the project that they had recorded (Brave Bull Allard, 2016). All of the sites mentioned in the report are located outside of the areas ofaffect for this project. Corps archeologists have given careful consideration to the information provided by the applicant, the previous 2010 Class III Acheology Survey information, and the additional information the SRST THPO and the Corps has made the Effects Determination based on the complete body of information. Additionally, accomodations were made for a late request to survey the DAPL Lake Oahe crossing area in May 2016.  No additional items of concern were identified. |

Comments Page 18 of 19

USACE_DAPL0071775

| Commenter / Comment ID | Comment | EA Section where Comment is Addressed | USACE Response |
|---|---|---|---|
| 15(2)-15 | The [March 7] site visit also highlighted the need for a careful examination of the proposed pipeline on endangered species.<br>We also noted the presence of Bald Eagles, who although they were taken off of the endangered species list, are still protected under Federal law. The presence of the eagles marks the beginning of the annual nesting and mating that occurs on the Cannon Ball River where hundreds of have been observed in years past.<br>We have concerns about how the construction of the proposed pipeline will affect the yearly migration of not only the Eagles but also the Western Least Tern and Piping Plover. The Western Least Tern and Piping Plover are on the endangered species list and are protected under federal law. Both of the birds have been observed to nest on the island which once was a Mandan Village site. The proposed pipeline will go right under this site. | Section 3.4.2 Threatened and Endangered Species | The proposed Project is not anticipated to have any impacts on  interior least tern or pping plover as discussed in Section 3.4.2 of the EA and concurred with by the USFWS in a letter to the Corps on May 2, 2016.<br>Additionally, the Project is not anticipated to have any impacts on bald eagles as discussed in Section 3.4.2 of the EA.  DAPL obtained known Golden and Bald Eagle nest data from the North Dakota Game and Fish Department (NDGF) and all Bald and Golden Eagle nests, including those indicated by SRST, were identified to be outside of the USFWS recommended nest buffer of 660 feet for linear construction activities. |
| 15(2)-16 | For the Tribe, this is sacred ground. Under Executive Order No. 13,007, 61 Fed. Reg. 26,771 (May 24, 1996), the Corps must "avoid adversely affecting the physical integrity of such sacred sites." Id. § 1(a)(2). The trust responsibility, the NHPA, and E.O. 13,007 all require that all sites the Tribe has identified- including those that contain the remains of our ancestors - must be protected from harm. The  draft EA fails to adequately address the sacred nature of these sites. | 3.7.1.1 Cultural Resource Studies Affected Environment<br>3.7.2 3.7.2 Native American Consultations | Section 106 coordination/consultation was initiated for this project beginning in October 2014, with an information letter regarding a preliminary geo-testing of the proposed Oahe crossing alignment. Per the Omaha District's usual process, this letter was sent to Tribes, THPOs, SHPOs, agencies and interested parties, soliciting information relevant to this portion of the project. Subsequently, the same process was utilized in circulating information and pertinent data for the installation of the Oahe pipeline crossing, in the form of a letter distributed in July 2015. USACE recommended to North Dakota SHPO a "No Historic Properties Subject to Effect" determination, SHPO concurred in April 22, 2016. |

CONFIDENTIAL

Before the

# INDIAN CLAIMS COMMISSION

### No. 332

THE YANKTON SIOUX TRIBE OR BAND OF
INDIANS, *Petitioner,*

*v.*

THE UNITED STATES OF AMERICA, *Defendant*

## PETITION

ERNEST L. WILKINSON,
*Attorney of Record.*

WILKINSON, BOYDEN & CRAGUN,
FRANCIS M. GOODWIN,
*Of Counsel.*

Before the

# INDIAN CLAIMS COMMISSION

No.

THE YANKTON SIOUX TRIBE OR BAND OF
INDIANS, *Petitioner,*

*v.*

THE UNITED STATES OF AMERICA, *Defendant*

## PETITION

The petitioner respectfully represents:

1. *Parties Petitioner.* Petitioner, the Yankton Sioux
Tribe or Band, is an identifiable tribe or band of Indians
maintaining an organization known and recognized by the
Secretary of the Interior as having authority to represent
that tribe or band, and whose members generally reside
in North Dakota. Petitioner has in times past been known
as the "Yanctons of the South" and later as the "Yancton
Sioux or Dokotah" and had from time immemorial owned
or occupied the lands described in paragraph 8 hereof.

2. *Statutory Authority for Suit.* Petitioner files this
petition under and pursuant to the Act of August 13, 1946
(60 Stat. 1049), conferring jurisdiction on the Indian

2

Claims Commission to hear and adjudicate claims against the United States. No claim asserted herein nor any part thereof is included in any suit pending in the Court of Claims of the United States or in the Supreme Court of the United States; and no claim asserted herein nor any part thereof has been filed in the Court of Claims under legislation in effect August 13, 1946.

3. *Attorney's Contract.* Petitioner entered into a contract with Ernest L. Wilkinson of Washington, D. C., to prosecute its claims against the United States, which contract has been duly approved by the Commissioner of Indian Affairs for and in behalf of himself and the Secretary of the Interior, as required by law, and is in full force and effect.

4. *Petitioner Sole Owner of Claims.* Petitioner is and always has been the sole and absolute owner of the claims alleged in this petition. No person or persons other than petitioner ever had any interest therein. No assignment or transfer of any claim or claims set out herein nor any part or interest therein has ever been made. Petitioner has not been paid for any claim or claims asserted herein nor any part thereof, except as hereinafter set forth, and is justly entitled to recover thereon from the United States after the allowance of any just credits and set-offs.

5. *Prior Action by Congress and Other Departments of Defendant.* No action has been taken by Congress or by any departments of the defendant with respect to the claims made herein or with respect to compensation to petitioner, in whole or in part, for the claims herein asserted, except as follows:

(a) Treaty of Fort Laramie of September 17, 1851 (II Kapp. 594; IV Kapp. 1065), which recognized petitioner's interest in certain lands.

3

(b) Treaty of April 19, 1858 (11 Stat. 743), by which petitioner ceded certain lands, as set out hereafter.

(c) Jurisdictional Act of June 3, 1920 (41 Stat. 738), which gave the Sioux Tribe, or any bands thereof, the right to bring suit against defendant for any claim said tribe, or bands thereof, may have had against the United States. Under this act, petitioner brought suit as reported in 97 C. Cls. 56, which held, without determining what its interests were, that petitioner ceded all its interest in any land not expressly reserved in the treaty of April 19, 1858.

(d) The Act of August 13, 1946, *supra*, which provides a forum for the litigation of the petitioner's claims.

6. *Defendant Owes Fiduciary Duty.* At all times material hereto, defendant was the guardian and trustee of the property and affairs of petitioner and as such was subject to a high degree of fiduciary obligation and was required to deal fairly and honorably with it as to its property and property rights.

7. *Indians Ignorant and Defenseless.* At all times herein material, the members of petitioner tribe were uneducated, ignorant and unable to read or write, were without knowledge of market value of land or the meaning thereof, and did not know how the value of their land and rights should be determined in order to enter into an agreement with the defendant, but acted in these matters under the dominance and influence of defendant's chosen representatives, upon whose fairness and integrity they relied.

8. *Immemorial Possession.* (a) In and prior to 1851, petitioner owned or occupied the lands approximating 12,000,000 acres described as follows, the boundaries of which are set out by the then names of natural landmarks, to wit:

4

Beginning at the mouth of the Tchan-kas-an-data or Calumet or Big Sioux River; thence up the Missouri River to the mouth of the Pa-hah-wa-kan or East Medicine Knoll River; thence up said river to its head; thence in a direction to the head of the main fork of the Wan-dush-kah-for or Snake River; thence down said river to its junction with the Tchan-san-san or Jaques or James River; thence in a direct line to the northern point of Lake Kampeska; thence along the northern shore of said lake and its outlet to the junction of said outlet with the said Big Sioux River; thence down the Big Sioux River to its junction with the Missouri River, including all the islands of the Missouri River, from the mouth of the Big Sioux to the mouth of the Medicine Knoll River.

(b) In addition to the above described lands owned or occupied by petitioner, the petitioner, jointly with other tribes or bands of Sioux Indians, owned or occupied certain portions of the lands enclosed by the following boundaries, the description of which is set out by the then names of natural landmarks, to wit:

Commencing on the Mississippi River opposite the mouth of the Iowa River; thence running back two or three miles to the bluffs; thence following the said bluffs crossing Bad Axe River to the mouth of Black River and from Black River to a half-a-day's march below the falls of the Chippewa River; thence to Red Cedar River, immediately below the falls; from thence to the St. Croix River, which it strikes at a place called the standing cedar, about a day's paddle in a canoe, above the lake at the mouth of that river; thence passing between two lakes called by the Chippewas "Green Lakes," and by the Sioux "the lakes they bury the Eagles in," and from thence to the standing cedar, that "the Sioux Split," thence to Rum River, crossing it at the mouth of a small creek called Choaking Creek, a long day's march from the Mississippi; thence to a point of woods that projects into the prairie, half-a-

5

day's march from the Mississippi; thence in a straight line to the mouth of the first river which enters the Mississippi on its west side above the mouth of Sac River; thence ascending the said river (above the mouth of Sac River) to a small lake at its source; thence in a direct line to a lake at the head of Prairie River, which is supposed to enter the Crow Wing River on its south side; thence to Otter-tail Lake portage; thence to said Otter-tail Lake, and down through the middle thereof, to its outlet; thence in a direct line, so as to strike Buffalo River, half way from its source to its mouth and down the said river to the Red River; thence descending Red River to Lake Traverse; thence along the west bank of said lake to the southern extremity thereof; thence in a direct line to the junction of Kampeska Lake with the Tchan-kas-an-data or Big Sioux River; thence down the Big Sioux River to its juncture with the Missouri River; thence up the Missouri River to the mouth of the Heart River; thence up Heart River to its headwaters in that range of mountains known as the Black Hills; thence along the Black Hills to a point on the north fork of the Platte River known as Red Butte or where the road leaves the river; thence down the north fork of the Platte River to its juncture with the Missouri River; thence down the Missouri River to its juncture with the Mississippi River; thence up the Mississippi River to the point of beginning.

9. *Taking of July 23, and August 5, 1851.* On July 23, 1851 the defendant entered into a treaty with the "See-see-toan and Wah-pay-toan bands of Dakota or Sioux Indians," generally referred to as the Treaty of Traverse des Sioux, ratified February 24, 1853 (10 Stat. 949), and on August 5, 1851 the defendant entered into a treaty with the "Med-ay-wa-kan-toan and Wah-pay-koo-tay bands of Dakota or Sioux Indians," generally referred to as the Treaty of Mendota, ratified February 24, 1853 (10 Stat. 954). Said treaties purported to cede to the defendant approximately

35,000,000 acres of land, including therein lands owned or occupied by petitioner, or in the ownership or occupancy of which petitioner shared as set forth in paragraph 8 hereof.

10. After the ratification of said treaties, defendant assumed absolute control over the lands purported to be ceded, and disposed of the same, or a large part thereof, or converted them to defendant's own uses and purposes, without compensation to petitioner for its rights and interests therein, and has since failed and refused to provide petitioner any compensation therefor. As a result, petitioner has been damaged by the loss of its ownership or occupancy in a vast area of mineral, timber, grazing and agricultural lands for which petitioner received no consideration or compensation whatsoever.

11. Alternatively, defendant, under said treaties, took petitioner's interest in or title to said lands, as set forth in paragraph 10 hereof, under a mistake of law or fact by any or all parties to said treaties as to the capacity of the Indian parties thereto to cede all right, title and interest of the Indians who owned or occupied said lands and as to the value thereof and for a stipulated consideration, of which the petitioner received no part, which was one and a fraction cents per acre, a grossly inadequate and unconscionable consideration; said lands then being worth many times such amount.

12. As a result of the mistakes alleged in paragraph 11 hereof, petitioner has been damaged by the loss of its lands, the loss of the use of its lands, the loss of the use of the moneys to which it was entitled upon the taking of its lands, and otherwise damaged. If said treaties were revised to rectify said mistakes, petitioner would be made a party to the cessions made therein and the consideration paid therefor, and the consideration would be set at an amount which would be the fair and reasonable value of the

7

lands taken and petitioner would have a claim for such fair and reasonable consideration.

13. *Treaty of 1858:* On April 19, 1858 the defendant entered into a treaty with petitioner, which provided:

"Article I. The said chiefs and delegates of said tribe of Indians do hereby cede and relinquish to the United States all the lands now owned, possessed, or claimed by them, wherever situated, except four hundred thousand acres thereof, situated and described as follows, to wit—Beginning at the mouth of the Naw-izi-wa-koo-pah or Chouteau River and extending up the Missouri River thirty miles; thence due north to a point; thence easterly to a point on the said Chouteau River; thence down said river to the place of beginning, so as to include the said quantity of four hundred thousand acres. They, also, hereby relinquish and abandon all claims and complaints about or growing out of any and all treaties heretofore made by them or other Indians, except their annuity rights under the treaty of Laramie, of September 17, A.D. 1851.

"Article II. The land so ceded and relinquished by the said chiefs and delegates of the said tribe of Yanctons is and shall be known and described as follows, to wit—'Beginning at the mouth of the Tchan-kas-an-data or Calumet or Big Sioux River; thence up the Missouri River to the mouth of the Pa-hah-wa-kan or East Medicine Knoll River; thence up said river to its head; thence in a direction to the head of the main fork of the Wan-dush-kah-for or Snake River; thence down said river to its junction with the Tchan-san-san or Jaques or James River; thence in a direct line to the northern point of Lake Kampeska; thence along the northern shore of said lake and its outlet to the junction of said outlet with the said Big Sioux River; thence down the Big Sioux River to its junction with the Missouri River.' And they also cede and relinquish to the United States all their right and title to and in all the islands of the Missouri River, from the mouth

8

of the Big Sioux to the mouth of the Medicine Knoll River.
"And the said chiefs and delegates hereby stipulate and agree that all the lands embraced in said limits are their own, and that they have full and exclusive right to cede and relinquish the same to the United States.

"Article XIV. The said Yanctons do hereby fully acquit and release the United States from all demands against them on the part of said tribe, or any individual thereof, except the before mentioned right of the Yanctons to receive an annuity under said treaty of Laramie, and except, also, such as are herein stipulated and provided for."

The lands so described amounted to approximately 11,000,000 acres. As consideration for this cession, the defendant agreed in said treaty to pay to, or expend for the benefit of, petitioner, over a 50-year period, $1,600,000 as annuities in cash or goods at the direction of the President, $50,000 for subsistence on their reservation and for the purchase of stock, $10,000 for schoolhouses and education, and also to provide certain mills, shops and dwellings, cost unknown. The exact amount expended is known to defendant but unknown to petitioner, and, upon information and belief, petitioner alleges that the consideration stipulated did not at the time have a value in excess of an average of ten cents per acre for the described lands, with no consideration whatsoever for the lands set out in the Treaty of Fort Laramie of September 17, 1851, *supra*, and for other lands purported to be ceded in the treaty of 1858 which were owned or occupied by petitioner or in which petitioner had an interest as hereinabove alleged.

14. *Consideration Unconscionable.* The stipulated compensation in the treaty of 1858, *supra*, was grossly inadequate and unconscionable, considered alone for the lands described therein or for these lands combined with the

9

cession of all rights to any other lands.  The consideration
of less than ten cents per acre was grossly inadequate and
unconscionable for the lands described and bounded there-
in as of the time of the agreement; the fair and reasonable
market value thereof at that time was at least $1.25 per acre
on the average, or many times the amount stipulated in
the treaty.

15. *Mistake of Law or Fact.*  At the time the treaty of
1858, *supra,* was negotiated, as a result of the circumstances
set forth in paragraph 7 hereof, petitioner did not under-
stand, and defendant failed to explain to petitioner, the
extent, nature and legal effect of the language of the treaty
or the cession made therein; or, defendant or petitioner,
or both of them, failed to realize the extent, nature and
effect of the cession made in said treaty and the legal effect
of its language.  Thereby, the said treaty was entered into
under a mutual or unilateral mistake of law or fact by the
parties thereto as to the nature of the cession, or the amount
of land ceded, or the legal effect of the words used in said
treaty, or of the value of the said lands.  If said treaty
were revised, by reason of said mistakes, the consideration
would be set at an amount which would equal the fair
and reasonable value of the lands actually ceded and pe-
titioner would have a claim for such fair and reasonable
consideration.

16. *Duress.*  At the time of the making of the treaty
of April 19, 1858, *supra,* as a result of the circumstances
set forth in paragraph 7 hereof, as the result of the weak-
ness, distress and necessity of the petitioner and as the
result of petitioner acting under the influence and dominance
of defendant whereby defendant was able to take undue
or wrongful advantage of petitioner, the said treaty was
made under duress and should be revised.  If said treaty
were revised on grounds of duress, petitioner would have

10

a claim against defendant for an amount which would be equal to the fair and reasonable value of the lands ceded in said treaty.

17. *Fair and Honorable Dealings.* Defendant, under the circumstances set forth in paragraph 7 hereof and being under a high degree of fiduciary obligation as set forth in paragraph 6 hereof, was bound to deal fairly and honorably with the petitioner, but failed to do so in, but not limited to, the following particulars, namely:

(a) By taking under the Treaties of Traverse des Sioux, *supra*, and Mendota, *supra*, and the subsequent opening to settlement and disposal under public land laws of the estimated 35,000,000 acre tract in which the petitioner had an interest, without paying petitioner just compensation or any compensation whatever for its interest in or ownership or occupancy of, said lands.

(b) By the treaty of April 19, 1858, *supra*, by which defendant, by its own insistence on its own terms, which were most favorable to it and prejudicial to petitioner, obtained title to petitioner's lands.

(c) By the conduct of the defendant, acting through its agents, who concluded the treaty of April 19, 1858, in unfairly and dishonorably taking advantage of the friendship and trusting disposition of the petitioner and unfairly and dishonorably insisting upon the grossly inadequate and unconscionable consideration provided for in said treaty.

(d) By the defendant, acting through its agents, failing to properly advise petitioner of the nature, extent and legal effect of the treaty of April 19, 1858, *supra*, or of the value of petitioner's interest in the lands ceded thereby.

(e) By the defendant, acting through its agents, taking advantage of the needs and distress of the petitioner and

11

obtaining the petitioner's consent to the treaty of 1858, *supra*, by duress, as set out in paragraph 16 hereof.

18. *Damages Suffered.* By reason of and as a result of the wrongful acts of defendant, as set forth in paragraphs 13, 14, 15, 16, and 17 hereof, petitioner has been damaged by the loss of its lands, the loss of the use of its lands, the loss of the use of the moneys to which it was entitled upon the taking of its lands, and otherwise damaged.

19. *General Accounting.* During the entire period of dealings between petitioner and defendant, the books of account and all other records pertaining to all moneys and financial transactions of and for petitioner, and property and transactions therein other than money, have been in the exclusive possession and control of defendant, including, but not limited to, the following:

(a) From time to time defendant has been under an obligation to petitioner under various treaties, agreements and acts of Congress to pay to, or to expend for the benefit of, petitioner various sums of money.

(b) From time to time proceeds of property of petitioner, or of rents or other income therefrom, have been payable to or collected by defendant, and dealt with by it and disposed of by it.

(c) At all times during its dealings with and supervision of petitioner, defendant has been under a duty to pay interest on funds of petitioner in accordance with applicable provisions of law.

(d) At all times during its dealings with petitioner, defendant has been under a duty to pay to, or for the account or on behalf of, petitioner interest on any and all sums of petitioner's money in the hands of defendant which it retained for its own uses and purposes, whether by way of interest or principal.

12

(e) At all times during its dealings with petitioner, defendant has been under a duty, in paying out moneys belonging to petitioner and held by it or invested by it, to pay any sum or sums from the least productive funds or property of petitioner before proceeding to pay money from funds or property of greater productivity.

(f) At all times during its dealings with petitioner, defendant has been under a duty as guardian and trustee of petitioner and petitioner's property to invest funds of petitioner coming into its hands promptly and providently and to reinvest the same, and any rents, issues or profits thereof.

20. Upon information and belief, petitioner alleges that defendant from time to time has collected or received, or in the exercise of its fiduciary duties ought to have collected or received, various property, including moneys, rents, issues, profits, and hunting and fishing license fees, collected by the State of South Dakota, for or on behalf of petitioner, or defendant itself has become liable to pay moneys to or for or on behalf of petitioner, or defendant has unlawfully expended moneys held by it to be spent for the benefit of petitioner. Defendant has failed to account for its management, handling and disposition of the said moneys and properties.

21. As a result, petitioner has been damaged by having been deprived of the amount of money or value of other property, together with interest thereon, which may be shown to be owing to petitioner upon a proper accounting in accordance with the fiduciary duties and the liabilities herein set forth.

WHEREFORE, petitioner prays that it be awarded judgment against the defendant, after the allowance of all just credits and set-offs, (1) for an amount which will provide just and reasonable compensation for the interests in

13

lands taken from petitioner, as alleged in paragraphs 9 and 10 hereof, or for the revision of the treaties, as alleged in paragraphs 11 and 12 hereof, so as to make the petitioner a party to said treaties and to provide fair and reasonable consideration for petitioner's interest in the lands ceded therein; (2) for an amount which will provide fair and just compensation or fair and reasonable consideration for the lands taken from petitioner, as alleged in paragraphs 13 and 14 hereof, or for the revision of the treaty, as alleged in paragraphs 15 and 16 hereof, so as to award petitioner fair and just compensation, or fair and reasonable consideration, for the actual cession made therein; (3) for an amount which will provide petitioner with just compensation for the damages caused by the defendant's failure to deal fairly and honorably with the petitioner, as alleged in paragraph 17 hereof; (4) that defendant be required to make a full, just and complete accounting for all property or funds received or receivable and expended for and on behalf of petitioner, and for all interest paid or due to be paid on any and all funds of petitioner, and that judgment be entered for petitioner in the amount shown to be due under such an accounting; and (5) for such other relief as to the Commission may seem fair and equitable.

THE YANKTON SIOUX TRIBE OR BAND OF
INDIANS

By ERNEST L. WILKINSON,
*Attorney of Record,*
744 Jackson Place, N.W.,
Washington 6, D. C.

WILKINSON, BOYDEN & CRAGUN,
Francis M. Goodwin,
*Of Counsel.*
(6460)