**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

STANDING ROCK SIOUX TRIBE,

Plaintiff,

and

CHEYENNE RIVER SIOUX TRIBE,

Intervenor Plaintiff,

v.

U.S. ARMY CORPS OF ENGINEERS,

Defendant,

and

DAKOTA ACCESS, LLC,

Intervenor Defendant.

Civil Action No. 16-1534-JEB
(consolidated with Case Nos. 16-
1796 & 17-267)

---

**REPLY OF DAKOTA ACCESS, LLC, SUPPORTING CROSS-MOTION FOR
PARTIAL SUMMARY JUDGMENT IN FAVOR OF FEDERAL DEFENDANTS
ON CLAIMS BY YANKTON SIOUX TRIBE AND ROBERT FLYING HAWK**

---

Kimberley Caine
William J. Leone
Robert D. Comer
NORTON ROSE FULBRIGHT US LLP
799 9th St. NW, Suite 1000
Washington, D.C.  20001-4501
(202) 662-0200

William S. Scherman
David Debold
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
wscherman@gibsondunn.com

*Counsel for Dakota Access, LLC*

## INTRODUCTION

Plaintiffs' brief opposing summary judgment is remarkable for how little it addresses Dakota Access's arguments.  That failure alone dooms their claims.

One example tells it all.  Dakota Access pointed in its brief to the U.S. Army Corps of Engineers' express conclusion, consistent with Corps regulations, that the various crossings here were not "connected" and that any effects of approvals at each crossing would be localized and thus separate and distinct from effects at other crossings.  D.E. 319 at 6-7.  As Dakota Access explained, that determination is fully consistent with the Supreme Court's reasoning in cases on which the Yankton Sioux Tribe itself relies.  *Id.* at 14-18.  In one of those cases, *Kleppe v. Sierra Club*, the Court explained that agencies have broad discretion in determining the geographic region to which a National Environmental Policy Act (NEPA) document applies.  427 U.S. 390, 414 (1976) ("[D]etermination of the extent and effect of" cumulative impacts, "and particularly identification of the geographic area within which they may occur, is a task assigned to the special competency of the appropriate agencies.").  And the reason that discretion was abused in another of Yankton's cases, *NRDC v. Hodel*, is not remotely applicable here, because when it comes to possible environmental impacts this is not a situation in which "the cumulative impact of simultaneous development will be greater than the sum of development in each area considered separately."  865 F.2d 288, 297 (D.C. Cir. 1988).

Yankton ignores every bit of this.  Its consolidated reply and response does not even mention the Corps regulations on which that agency relied to make its determination that the crossings are unconnected.  Yankton's brief does not refute the broad deference owed to such a determination.  And Yankton offers not even *a theory* for how potential effects from any federal approval addressed in any one of the three environmental assessments might overlap with effects from any

approval made in either of the other two EAs.  For that and other reasons explained below and in Defendants' opening briefs, judgment should be entered against Plaintiffs on their sixth claim.

Yankton seeks to "withdraw" the other claim presented in its motion—that the Corps failed to analyze the effects of its approvals on treaty rights—choosing "not to pursue that claim at this time."  D.E. 324 at 2 ("YST Reply").  But Yankton's attempted withdrawal has no effect on the Federal Defendants' cross-motion, and Plaintiffs have no license to postpone adjudication of this claim indefinitely.  *Cf. Henok v. Chase Home Fin., LLC*, 947 F. Supp. 2d 6, 10 n.2 (D.D.C. 2013) (rejecting plaintiff's effort to "withdraw his motion for partial summary judgment" after court had determined that defendants' cross-motion for partial summary judgment was meritorious and plaintiffs' motion was not).  With no argument from Yankton in defense of this first claim in Plaintiffs' complaint, the Court should grant summary judgment against them on it as well.

Finally, Dakota Access joins in the position of the Federal Defendants on the mootness of claims 2 through 5.

## ARGUMENT

**The Corps of Engineers and Fish and Wildlife Service Acted Well Within Their Discretion When They Prepared Separate Environmental Assessments for Discrete and Independent Groups of Jurisdictional Crossings, and the NHPA Claims are Moot**

Yankton now seeks relief based on a single theory: that the Federal Defendants violated NEPA by unlawfully segmenting analysis of the Dakota Access pipeline.  Yankton continues to misread the relevant Council on Environmental Quality ("CEQ") regulations and entirely ignores the Corps's own NEPA regulations.  Yankton's position is also foreclosed by the rulings of this Court and the precedent of this Circuit.

Yankton asserts that the Federal Defendants violated 40 C.F.R. § 1508.25, the CEQ regulation on scoping.  This Court has already concluded that the Corps's analysis complied with the

scoping provisions in the context of claims grounded in the National Historic Preservation Act ("NHPA"). *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs* (*SRST I*), 205 F. Supp. 3d 4, 31-32 (D.D.C. 2016). Under D.C. Circuit precedent, the result is no different when the claims are grounded in NEPA. "Because of the 'operational similarity' between NEPA and NHPA, both of which impose procedural obligations on federal agencies after a certain threshold of federal involvement, courts treat 'major federal actions' under NEPA similarly to 'federal undertakings' under NHPA." *Karst Envtl. Educ. & Prot., Inc. v. EPA*, 475 F.3d 1291, 1295–96 (D.C. Cir. 2007). Yankton cannot avoid this Court's earlier conclusion and the controlling case law by recasting the issue as "segmentation" of "connected" or "similar" actions.

A.      Yankton continues to make completely unsupported assertions that the discrete approvals for the Dakota Access pipeline, separated by hundreds of miles, are "connected" actions, YST Reply at 10-12. That assertion is wrong. The areas under the control of Corps are remote, isolated, and only a small fraction of the complete project. *SRST I*, 205 F. Supp. 3d at 13 ("[O]nly 3% of the work needed to build the pipeline would ever require federal approval of any kind and only 1% of the pipeline was set to affect U.S. waterways . . . ."). The Federal Defendants closely examined the environmental impacts of each approval required for the pipeline and concluded that none would have a significant impact on the environment. AR 9943-49 (Ex. 8); AR FWS 2416-18 (Ex. 15); AR 71174 (Ex. 16). The mere fact that an oil pipeline requires multiple federal permits for discrete areas does not transform the entire pipeline into a federal action, nor does it transform localized impacts with no significant impact into significant actions requiring an EIS. *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 49-50 (D.C. Cir. 2015).

Yankton also simply ignores the absence of any "synergistic" relationship in which "the cumulative impact of simultaneous development will be greater than the sum of development in

4

each area considered separately." *NRDC v. Hodel*, 865 F.2d 288, 297 (D.C. Cir. 1988).  As this Court has already held, the Corps did not "unlawfully segment[ ] its NEPA review of one pipeline into [three] separate components." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs* (*SRST III*), 255 F. Supp. 3d 101, 130 (D.D.C. 2017) (internal quotation marks omitted; second alteration in original).  In the same ruling, this Court also rejected the contention that the Corps failed to "consider the cumulative risk to Tribal resources resulting from the rest of the pipeline outside Lake Oahe." *Id.* at 129-30 (quotation marks omitted).

Yankton's brief merely rehashes arguments that this Court already rejected when it decided Standing Rock's and Cheyenne River's summary judgment motions.  *Compare, e.g.*, YST Reply at 20 ("[Plaintiffs] are seeking . . . a single NEPA review for all of the federal actions for the single pipeline.") *with* D.E. 117-1 at 23 n.12 ("The EA's flaws are compounded by the government's unlawful 'segmentation' of three portions of a single pipeline into totally independent NEPA processes. 40 C.F.R. § 1508.25; 33 C.F.R. § 325.1(c)(2)").  It is no surprise that Yankton can offer nothing new on this topic; Yankton never even raised a segmentation concern during the comment process.

Yankton also offers not so much as a theory for how discrete actions, each having purely local effects and no significant impact on the local environment, can combine with other discrete actions hundreds of miles away to significantly impact the environment.  Without such a showing, there is no basis to disturb the Corps's determination that none of the actions has a significant impact on the environment and therefore that no environmental impact statement is required.  *See Kleppe v. Sierra Club*, 427 U.S. 390, 414 (1976) (NEPA scoping assessment is "assigned to the special competency of the appropriate agencies").

Much of the Tribe's argument is based on a misreading of the relevant regulatory definitions. NEPA and the related regulations concern the impacts of "major federal actions," a term referring to actions or omissions that are "subject to Federal control and responsibility." 40 C.F.R. § 1508.18. Yankton quotes 40 C.F.R. § 1502.4, which suggests that multiple items should be assessed together when they cumulatively form "in effect, a single course of action." YST Reply at 8. But that regulation concerns projects in which several discrete permits, considered in the aggregate, place so much of the project under federal authority as to make the entire project a federal action. *Found. on Econ. Trends v. Lyng*, 817 F.2d 882, 884 (D.C. Cir. 1987). This Court has already held that DAPL is not such a project. *SRST I*, 205 F. Supp. 3d at 29 ("Here, the scope of the Corps' involvement was limited. It never had the ability, after all, to regulate the entire construction of a pipeline.").

The Federal Defendants' decision that the various DAPL permits were not "a single course of action" also complied fully with the governing Corps regulations, which the Tribe continues to disregard completely. Under the Corps's NEPA regulations, "a permit . . . which is merely one component of a larger project" does not place the entire project under the Corps's NEPA review if "the regulated activity comprises 'merely a link' in a corridor type project (e.g., a transportation or utility transmission project)." 33 C.F.R. pt. 325 App. B (7)(b)(1)(i).

The Corps expressly considered and rejected the premise that the discrete permits required for the pipeline were connected actions, and Yankton has no response. The Tribe never confronts the Corps's explicit conclusion that "[t]he only Connected Actions at each individual crossing location . . . are those that relate to the HDD workspace at the Missouri River crossing and the HDD workspace, HDD stringing area, and the permanent easement on private lands in the vicinity of the Lake Oahe crossing." AR 71239 (Ex. 7). The Corps directly considered the regulation that

Yankton alleges they violated, 40 C.F.R. § 1508.25(a)(i), and concluded that the discrete crossings "are not connected actions because the locations of each crossing are independent of one another and the location of the first does not dictate the location of the second." AR 71239 (Ex. 7).

The closest Yankton comes to addressing this point is its argument that the Corps's discussion of potential impacts on the Standing Rock Sioux, whose reservation extends a considerable distance from the crossing at Lake Oahe, is somehow an admission that the discrete actions have geographically dispersed impacts beyond the project crossing itself. YST Reply at 9 n.3 & 17. But that confuses the federal action and its possible effects. Of course the Corps looked beyond the crossing itself to consider where the effects of the action might be felt, and Standing Rock's reservation was included for that very purpose. AR 71308-11 (Ex. 7) (addressing environmental justice implications). And because the Corps concluded that those effects, if any, would be localized, there was no need to treat approvals at the Lake Oahe crossing as connected to approvals that were as many as hundreds of miles away.

The Federal Defendants' assessment is further supported by the CEQ's rule that multiple agencies considering discrete actions related to one project should "evaluate the proposal(s) . . . [g]eographically, including actions occurring in the same general location, such as body of water, region, or metropolitan area." 40 C.F.R. § 1502.4(c)(1). That is precisely what the Federal Defendants did—they considered impacts of all the actions within the geographic area under each office's control. Notably, these geographic areas were themselves broad, each covering multiple states. The agencies therefore cast a considerably broader net than the "body of water, region, or metropolitan area" envisioned by the CEQ. *Id.*

There also still remains no support for the Tribe's protestations that the Federal Defendants attempted to hide or minimize impacts by discussing different federal actions in different documents.   Each EA acknowledged the size of the project as a whole and each EA considered the cumulative effects of the project.[1]   AR 9905-16 (Ex. 8);[2] AR 71322-31 (Ex. 7); AR FWS 2481-83 (Ex. 9).   And each EA addressed alternatives including taking no action or shipping similar volumes of oil without any new pipeline construction.   AR 71229-31, 71237 (Ex. 7); AR FWS 2463-65 (Ex. 9); AR 9834-37 (Ex. 8).   Yankton makes a conclusory suggestion that segmentation limited consideration of alternatives but, once again, Yankton fails even to suggest what alternatives a consolidated review would have included that were not already addressed in the separate EAs.   YST Reply at 17.   Nothing was hidden, obscured, or overlooked when the Federal Defendants organized their review geographically, as the relevant CEQ regulations permit.

---

[1]   Unlike Dakota Access, which cites to the administrative record throughout its briefs, Yankton repeatedly goes beyond that record.   But in cases "where review is based on an administrative record the Court is not called upon to determine whether there is a genuine issue of material fact, but rather to test the agency action against the administrative record.   As a result the normal summary judgment procedures requiring the filing of a statement of undisputed material facts is not applicable."   *Comment*, LCvR 7(h).   Accordingly, the Tribe's statement of material facts is unnecessary and improper and should be disregarded.   None of the cases cited by the Tribe in support of its statement of fact involves an administrative law challenge to an agency action.   *See Reliance Standard Life Ins. Co. v. Matini*, No. 05-cv-1101, 2006 WL 1980260 (D.D.C. July 12, 2006) (private insurance dispute); *Evans v. Holder*, 618 F. Supp. 2d 1 (D.D.C. 2009) (Title VII employment discrimination lawsuit against FBI); *Johnson v. Wash. Gas Light Co.*, 404 F. Supp. 2d 179, 179 (D.D.C. 2005) (private wrongful termination lawsuit); *Slovinec v. Am. Univ.*, 565 F. Supp. 2d 114, 115 (D.D.C. 2008) (defamation lawsuit against private defendant); *Jones v. Rossides*, 657 F. Supp. 2d 167, 168 (D.D.C. 2009) (employment lawsuit); *Bonaparte v. U.S. Dep't of Justice*, 531 F. Supp. 2d 118, 119 (D.D.C. 2008) (FOIA dispute); *Ramey v. Darkside Prods., Inc.*, No. 02-cv-730, 2004 WL 5550485 (D.D.C. May 17, 2004) (tort lawsuit).

[2]   Courtesy copies of the administrative record documents cited in this brief were filed as exhibits to Dakota Access's opposition and cross-motion, D.E. 319-1.   Citations to these documents include the exhibit number for the cited document.

The Tribe fails to address why its own cases undermine the argument that the relevant federal approvals were "connected actions." *NRDC v. Hodel* involved review of a series of adjacent offshore drilling leases in two ecologically sensitive areas. 865 F.2d at 297. Taken together, the drilling activity in these areas had a "synergistic effect" on particular migratory species. *Id.* at 300. But Yankton points to no synergistic effects here. Each action results in only local effects with no significant impact on the environment. That is the opposite of the situation in *Hodel*, where a single analysis was needed to account for the fact that drilling on one region would cause whales and salmon to migrate to the other region under consideration. *Id.* at 297-98.

Yankton also continues to rely on *Delaware Riverkeeper Network v. FERC*, 753 F.3d 1304 (D.C. Cir. 2014), in support of its connected action argument. YST Reply at 12. But Yankton still neglects to mention that *Delaware Riverkeeper* concerned a different type of pipeline (natural gas), meaning federal review and approval was required for the entire project. 753 F.3d at 1309; *see also SRST I*, 205 F. Supp. 3d at 7. While it makes little sense to break up the assessment of a natural gas pipeline into segments when the pipeline as a whole requires a federal permit, it similarly would make little sense to force the Federal Defendants to use one document to assess approvals scattered along the length of a pipeline when more than 97% of that pipeline is beyond the authority of those Defendants. *Cf.* 33 C.F.R. pt. 325 App. B (7)(b)(3)(comprehensive review is appropriate when 30 miles of a 50-mile pipeline (60%) falls under federal authority).

Yankton's other cases are similarly unhelpful to the Tribe. *Hammond v. Norton* involved a pipeline project which passed over vast stretches of federal land. 370 F. Supp. 2d 226, 244 (D.D.C. 2005). When the BLM stated it intended to prepare an EIS for the pipeline project as a whole, the builders terminated their joint venture and applied for each half separately so that one of the two segments could get by with only an EA. *Id.* at 234. Here, by contrast, less than 3% of

the pipeline requires federal approval, and the Federal Defendants' geographic analysis was informed by their regulatory expertise, rather than some effort to evade use of an EIS.

    **B.**    Yankton is barred from arguing that the actions require a single document on the ground that they are "similar." "Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice." *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952). No commenter suggested that the Federal Defendants unlawfully segmented "similar" actions. In fact, the only commenter raising the possibility of "connected" actions quoted the regulations governing both "connected" and "similar" actions and then contended only that these were "connected' actions. AR 66247-49 (Ex. 14). No "special circumstances" excuse Yankton's failure to argue that the actions are "similar." *Appalachian Power Co. v. EPA*, 251 F.3d 1026, 1036 (D.C. Cir. 2001).

    Yankton suggests that it should be excused from its failure to participate in the agency process. The Tribe argues, first, that a party can challenge agency action on any ground that the agency actually considered even if a party other than the plaintiff brought the issue to the attention of the agency. YST Reply at 25. This is not disputed—indeed, this is why Dakota Access responded on the merits to the "connected action" challenge. Although Yankton failed to bring this issue—or any other issue—before the agency during the comment period, the Sierra Club did suggest that the various approvals were "connected actions" requiring consolidated review. AR 66247-49 (Ex. 14). But because no party contended in comments to the Federal Defendants that the actions were "similar," this exception to the normal exhaustion requirement does not revive Yankton's "similar action" challenge.

The Tribe next contends that the flaws in the permitting process are "so obvious that there is no need for a commentator to point them out specifically in order to preserve its ability to challenge a proposed action." YST Reply at 28 (quoting *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 765 (2004)). Certainly the Court will be surprised to learn that these arguments are "obvious" given the Court's prior rejection of the same arguments asserted by Yankton. *See SRST III*, 255 F. Supp. 3d at 129-30; *SRST I*, 205 F. Supp. 3d at 30-32. Yankton's argument, far from "obvious," lacks merit and does not approach the high bar necessary to show that the Federal Defendants' review was arbitrary and capricious in light of the deference owed to the agency's scoping decision, *see Kleppe*, 427 U.S. at 412, 414.

**C.** Yankton's NHPA claims are moot. The NHPA is a consultation statute. The Act "does not mandate that the permitting agency take any particular preservation measures to protect these resources." *SRST I*, 205 F. Supp. 3d at 8. When the portion of a project that could conceivably impact historic resources is complete and the federal agencies involved lack the authority to unwind the project, NHPA challenges are rendered moot. *Karst Envtl. Educ. & Prot.*, 475 F.3d at 1298; *see also Springer v. U.S. Marshal*, 137 F. App'x 657, 658 (5th Cir. 2005) ("[W]hen a construction project is complete and operating, plaintiffs can obtain no meaningful judicial relief based on alleged non-compliance with NEPA, and their cases are moot."); *Neighborhood Transp. Network, Inc. v. Pena*, 42 F.3d 1169, 1172 (8th Cir. 1994) ("Construction on the 3HOV project is now finished. . . . As the case no longer presents a live controversy, the case is moot."). Indeed, the D.C. Circuit has already held that the completion of construction of the same portion of the Dakota Access pipeline rendered moot the original plaintiff's request for an injunction based on alleged NHPA violations as to that portion of the project. *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, No. 16-5259, Doc. No. 1656316 (D.C. Cir. Jan. 18, 2017).

The Dakota Access pipeline is now complete and in operation. *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, No. 16-cv-1534, 2017 WL 4564714, at *11 (D.D.C. Oct. 11, 2017) ("[C]onstruction is complete and oil is flowing . . . ."). The NHPA claims were based on allegations that the construction process would disturb culturally or historically significant sites. The requested declaratory relief was likewise focused on invalidating permissions that were needed in the construction phase. Yankton speculates that routine "maintenance or repair" could be enjoined, YST Reply at 32, but it offers no factual basis from which this Court could conclude that such activities—which would occur in the existing pipeline right-of-way created during construction—might uniquely disturb any particular protected site. There is no relief within this Court's power that would cure the NHPA injury that Yankton asserts. When "intervening events make it impossible to grant the prevailing party effective relief," a court has no choice but to dismiss claims as moot. *Burlington N. R.R. Co. v. Surface Transp. Bd.*, 75 F.3d 685, 688 (D.C. Cir. 1996).

## CONCLUSION

For the reasons stated above, the Court should deny Yankton's motion for partial summary judgment and grant summary judgment to defendants.

Dated:  February 9, 2018

Respectfully submitted,

 /s/ William S. Scherman
William S. Scherman
David Debold
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
wscherman@gibsondunn.com

Kimberley Caine
William J. Leone
Robert D. Comer
NORTON ROSE FULBRIGHT US LLP
799 9th St. NW, Suite 1000
Washington, D.C.  20001-4501
(202) 662-0200

*Counsel for Dakota Access, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 9th day of February, 2018, I electronically filed the foregoing

document using the CM/ECF system.  Service was accomplished by the CM/ECF system.

_/s/ William S. Scherman_
William S. Scherman
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
wscherman@gibsondunn.com

*Counsel for Dakota Access, LLC*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE,<br><br>                                        Plaintiff,<br><br>and<br><br>CHEYENNE RIVER SIOUX TRIBE,<br><br>                                Intervenor Plaintiff,<br><br>        v.<br><br>U.S. ARMY CORPS OF ENGINEERS,<br><br>                                        Defendant,<br><br>and<br><br>DAKOTA ACCESS, LLC,<br><br>                                Intervenor Defendant. | Civil Action No. 16-1534-JEB (consolidated with Case Nos. 16-1796 & 17-267) |

**DECLARATION OF WILLIAM S. SCHERMAN IN SUPPORT OF
REPLY OF DAKOTA ACCESS, LLC, SUPPORTING CROSS-MOTION FOR PARTIAL
SUMMARY JUDGMENT IN FAVOR OF FEDERAL DEFENDANTS ON CLAIMS BY
YANKTON SIOUX TRIBE AND ROBERT FLYING HAWK**

I, William S. Scherman, declare as follows:

1.      I am a partner with the law firm of Gibson, Dunn & Crutcher LLP, counsel of record for

Intervenor Defendant Dakota Access, LLC.  I am a member in good standing of the Bar

of this Court.

2.    The table below lists all exhibits cited in Dakota Access's response to the Yankton Sioux

Tribe's motion for partial summary and in Dakota Access's reply in support of the

Federal Defendants' cross-motion for partial summary judgment on those same claims.

The exhibits cited only in Dakota Access's reply are attached herein.

| EXHIBIT | DESCRIPTION | CITATION |
|:---:|:---:|:---:|
| | **EXHIBITS CITED IN DAKOTA ACCESS'S RESPONSE TO YANKTON SIOUX TRIBE'S MOTION FOR PARTIAL SUMMARY JUDGMENT** | |
| 1 | Letter from Robert Flying Hawk, Chairman, YST, to John Henderson, District Commander, USACE, (Apr. 13, 2016) | AR 65507 |
| 2 | Letter from Robert Flying Hawk, Chairman, YST, to John Henderson, District Commander, USACE, (June 17, 2016) | AR 64074 |
| 3 | Resolution No. 2016-064 of Yankton Sioux Tribe Business and Claims Committee *and* Letter from Robert Flying Hawk, Chairman, YST, to John Henderson, District Commander, USACE, (May 17, 2016) | AR 64236 |
| 4 | E-mail Exchange Between Joel Ames, USACE, John Henderson, District Commander, USACE, and Leigh Mah (May 2, 2016) | AR 64320 |
| 5 | Letter from Robert Flying Hawk, Chairman, YST, to John Henderson, District Commander, USACE, (Mar. 17, 2016) | AR 64260 |
| 6 | Letter from Robert Flying Hawk, Chairman, YST, to John Henderson, District Commander, USACE, (Apr. 29, 2016) | AR 64400 |
| 7 | Final Environmental Assessment Prepared by U.S. Army Corps of Engineers—Omaha District (July 2016) | AR 71220 |
| 8 | Final Environmental Assessment Prepared by U.S. Army Corps of Engineers—St. Louis District (August 2016) | AR 9823 |
| 9 | Final Environmental Assessment Prepared by U.S. Fish and Wildlife Service (May 2016) | AR FWS 2449 |
| 10 | Appendix K to Final Environmental Assessment (Omaha District) | AR 71777 |

| EXHIBIT | DESCRIPTION | CITATION |
|---------|-------------|----------|
| 11 | E-mail Exchange Between Edward Robles, USACE, and Brent Cossette, USACE (Dec. 11, 2015) | AR 74055 |
| 12 | Public Notice Issued by USACE St. Louis District (Jan. 5, 2016) | AR 11139 |
| 13 | E-mail and attachments from Meg VanNess, USFWS, to Kelly Morgan, SRST (Dec. 17, 2015) | AR FWS 1395 |
| 14 | Letter from Doug Hayes, Staff Attorney, Sierra Club, to John Henderson, District Commander, USACE (Mar. 21, 2016) | AR 66240 |
| | **EXHIBITS ADDITIONALLY CITED IN DAKOTA ACCESS'S REPLY IN SUPPORT OF THE FEDERAL DEFENDANTS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT** | |
| 15 | Finding of No Significant Impact, Dakota Access Pipeline Project, Mountrail and Williams Counties, North Dakota and Campbell, McPherson, Edmunds, Faulk, Spink, Kingsbury, Miner, Lake, and Minnehaha Counties, South Dakota (June 22, 2016) | AR FWS 2416 |
| 16 | Mitigated Finding of No Significant Impact, Environmental Assessment, Dakota Access Pipeline Project, Williams, Morton, and Emmons Counties, North Dakota (July 25, 2016) | AR 71174 |

Executed: February 9, 2018


/s/ William S. Scherman
William S. Scherman

# EXHIBIT 15

## FINDING OF NO SIGNIFICANT IMPACT

### DAKOTA ACCESS, LLC

### DAKOTA ACCESS PIPELINE PROJECT

### MOUNTRAIL AND WILLIAMS COUNTIES, NORTH DAKOTA AND CAMPBELL, MCPHERSON, EDMUNDS, FAULK, SPINK, KINGSBURY, MINER, LAKE, AND MINNEHAHA COUNTIES, SOUTH DAKOTA

**Introduction:**  In accordance with section 102(2)(C) of the National Environmental Policy Act (42 U.S.C. § 4321) and the National Wildlife Refuge System Administration Act of 1966, as amended (16 U.S.C. § 668dd-668ee), the environmental assessment (EA) has been prepared to obtain a Special Use Permit (SUP) for the construction of the Dakota Access, LLC (Dakota Access) Dakota Access Pipeline Project (Project).  The Project would cross privately owned lands encumbered by wetland and grassland easements managed by the U.S. Fish and Wildlife Service (USFWS).  Specifically, the proposed Project crosses wetland and grassland easement features under USFWS jurisdiction within the Lostwood wetland management district (WMD) in North Dakota and the Sand Lake and Madison WMDs in South Dakota.

**Project Summary:**  The overall proposed Project is an approximate 1,150-mile-long, 12-inch to 30-inch diameter pipeline that would connect the rapidly expanding Bakken and Three Forks production areas in North Dakota to existing crude infrastructure in Illinois.  The Project originates in the northwest portion of North Dakota and traverses southeast through South Dakota, Iowa, and Illinois and terminates at the existing Patoka, Illinois hub.  The pipeline is proposed to transport approximately 450,000 barrels of oil per day (bopd) initially, with an anticipated capacity 570,000 bopd or more.  Once the crude arrives at the existing tank farms in Patoka, shippers would be able to access and distribute their crude to multiple markets, including Midwest and Gulf Coast markets via existing and proposed pipeline infrastructure.

**Alternatives:**  Two different transportation (trucking and rail) alternatives were screened out from detailed consideration due to safety, reliability, and infrastructure concerns, all of which would create a greater impact for the purpose of the Project.

Dakota Access utilized a sophisticated and proprietary Geographic Information System (GIS) based routing program to determine the baseline pipeline route based on multiple publicly available and purchased datasets.  Datasets utilized during the Project GIS routing analysis included engineering (e.g., existing pipelines, railroads, karst, and power lines, etc.), environmental (e.g., critical habitat, fault lines, state parks, national forests, brownfields, national registry of historic places, etc.), and land (e.g., dams, airports, cemeteries, schools, mining, and  military installations, etc.).

Each of these datasets were weighted based on the risk (e.g., low, moderate, or high; however on a scale of 0 to 1000) associated with crossing or following certain features.  In general, the preferred route for the pipeline would follow features identified as low risk, avoid or minimize crossing features identified as moderate risk, and exclude features identified as high risk.

The baseline centerline route (Route Alternative 1) was the output of the GIS routing analysis.  The baseline route crossed 131 USFWS easements (seven easements within North Dakota and 124 easements within South Dakota).  Dakota Access and the lead USFWS WMD (Sand Lake WMD) had an intensive route review in October 2014 of the baseline route and easements crossed to determine avoidance and minimization.  During this review, the USFWS made recommendations on avoiding and minimizing impacts to the easements crossed by the Project.  Grassland easements were prioritized for avoidance.

Extensive coordination and review identified areas where Dakota Access could make route modifications to avoid and minimize potential impacts to USFWS easements (Appendix A).

**Preferred Alternative:** Implementation of the preferred alternative (Route Alternative 2) would require crossing six easements in North Dakota consisting of five wetland easements and one grassland easement all located within the Lostwood WMD. Additionally, 112 easements would be crossed in South Dakota consisting of three grassland easements and 109 wetland easements in Sand Lake and Madison WMDs. Dakota Access was unable to reroute completely around four (one in North Dakota and three in South Dakota) grassland easements due to constructability limitations, USFWS recommended avoidance of the grassland easements, therefore Dakota Access adjusted the proposed construction techniques at the grassland easements (i.e. bore or HDD). Therefore all surface impacts to grassland easements are avoided by the preferred route. The preferred route most closely meets the objectives of the Project, while minimizing potential impacts to the environment and USFWS easements

**Summary of Environmental Impact:** To avoid impacts to grassland easements Dakota Access adjusted the Project alignment to avoid crossing all grassland easements, except for three within South Dakota and one within North Dakota. The three South Dakota grassland easements are located in Campbell, Spink and Minnehaha counties; due to USFWS concerns regarding impacts to grassland easements and based on the proximity of these easements to roads or other features being crossed by a trenchless method (i.e. bore), respective bores were extended as needed to incorporate the easement and thus avoid surface impacts. The North Dakota grassland easement located in Mountrail County could not be avoided by bore; therefore, Dakota Access modified construction methods by utilizing HDD to cross the easement. Due to the size of this easement, transporting equipment across the easement to facilitate construction of the Project is required. To minimize potential impacts to the grassland easement, Dakota Access will install air bridge matting to be utilized as the designated travel lane for construction equipment. The air bridge travel lane will be located on an existing two-track road, approximately 250 feet north of the centerline. The use of air bridge matting will avoid potential soil compaction and ruts from equipment transport. Therefore, no adverse surface impacts to this grassland easement will result from the Project. All surface impacts to grassland easements in North Dakota and South Dakota have been avoided by route modifications or construction methods.

To reduce impacts to wetland easements Dakota Access minimized crossing wetland easements to the extent practicable. The preferred route will cross five wetland easements in North Dakota resulting in approximately 2.5 acres of temporary impacts. In South Dakota, the preferred route crosses 109 wetland easements with approximately 69.3 acres of temporary impacts. Total temporary impacts to wetland basins within USFWS easements in North Dakota and South Dakota is 71.8 acres. The total temporary impacts to the wetland basins (71.8 acres) would be less than 0.6 percent of the entire North Dakota and South Dakota Project footprint.

**Mitigation Measures:** All impacts to the environment would be temporary and not significant as a result of avoiding, minimizing and mitigation any potential impacts. Dakota Access has avoided surface impacts to grassland easements through construction design (i.e. bore and/or HDD), Dakota Access has designed the Project to avoid permanent fill in wetlands. Aboveground facilities have been sited outside of USFWS grassland easements and protected basins within wetland easements, resulting in no permanent impacts to these USFWS protected areas. Temporary impacts to wetlands will be limited to the construction phase. Where impacts were unavoidable, Dakota Access will implement best management practices (BMPs) to ensure that the wetland is restored post-construction in accordance with regulations and permits.

In order to mitigate the spread of any noxious weeds, Dakota Access will likely implement BMPs and weed control practices during construction and operation. Mitigation measures may include: treating known noxious weed infestations prior to ground disturbance, immediately reseeding following construction, and using weed-free seed in reclamation activities and erosion control materials.

See Section 7.0 in the EA for more details on best management practices and mitigation measures undertaken for this Project.

**Coordination and Public Review:** The notice of availability of the EA for public comment was published in twelve newspapers within North Dakota and South Dakota on December 18, 2015. Notices of availability were included in Public Notice section of the Bismarck Tribune, Williston Herald, Miner County Pioneer, The New Era, The Desmet News, The Argus Leader, The Salem Special, Huron Plainsman, Madison Daily Leader, Roscoe Hosmer Independent, Prairie Pioneer and McPherson County Herald.

The draft EA was available for viewing at the USFWS Sand Lake NWR and Madison Wetland Management District website homepages, in addition to hard copies being available at the following five libraries within North Dakota and South Dakota: Bismarck Veterans Memorial Public Library, Williston Community Liberty, Alexander Mitchell Public Library, Madison Public Library, and Sioux Falls Main Library.

All applicable comments received were addressed in the EA, and no significant comments remain unresolved. For more information on regarding comments received during the public review process, please see Section 10.2 of the EA.

**Conclusion:** After evaluating the anticipated environmental effects of the preferred alternative, it is my determination that allowing construction of the proposed Dakota Access Pipeline Project on privately owned lands encumbered by wetland and grassland easements under the management of the USFWS would not constitute a major federal action that would significantly affect the quality of the crossed wetland and grassland easements, I have determined that preparation of an Environmental Impact Statement is not required.

_____                    6/22/16
**Acting** Regional Director, Region 6                    Date
U.S. Fish and Wildlife Service

# EXHIBIT 16

## MITIGATED FINDING OF NO SIGNIFICANT IMPACT

### ENVIRONMENTAL ASSESSMENT
### DAKOTA ACCESS PIPELINE PROJECT
### WILLIAMS, MORTON, AND EMMONS COUNTIES, NORTH DAKOTA

**Introduction:** In accordance with the National Environmental Policy Act (NEPA) and its implementing regulations, an Environmental Assessment (EA) was prepared to evaluate the potential effects of the United States Army Corps of Engineers (USACE), Omaha District (District), granting permission under Section 14 of the Rivers and Harbors Act of 1899, codified 33 U.S.C. Section 408 (Section 408), to Dakota Access, L.L.C. (Dakota Access) to allow the proposed Dakota Access Pipeline (DAPL) Project to cross federal real property interests administered by the District. Specifically, the DAPL project would cross federal flowage easements near the upper end of Lake Sakakawea, north of the Missouri River in Williams County, North Dakota, and federally-owned property at Lake Oahe in Morton and Emmons counties, North Dakota. Dakota Access proposes the DAPL Project to efficiently and safely transport at least 570,000 barrels of crude oil per day (bpd) from the Bakken and Three Forks production region in North Dakota to a crude oil market hub located near Patoka, Illinois, and ultimately to refineries located in the Midwest and the Gulf Coast, where 80% of the U.S. refining capabilities exist.

The EA follows guidelines promulgated by the Council on Environmental Quality (CEQ) for implementing the procedural provisions of NEPA (40 Code of Federal Regulations [CFR] 1500-1508 and Corps regulation ER 200-2-2 [33 CFR 230]). This action is being completed in accordance with CEQ regulations in Section 1506.5(a) and 1506.5(b), which allow an applicant to prepare an EA for federal actions. The Corps has independently evaluated and verified the information and analysis undertaken in the EA and takes full responsibility for the scope and content contained herein. Corps offices involved with the preparation and review of this document are provided in <u>Section 9.0 of the EA.</u>

**Purpose and Need:** The purpose and need of the federal action is to determine whether USACE may grant permission for Dakota Access to place the pipeline on federal real property interests acquired and managed by USACE for the Garrison Dam/Lake Sakakawea and Oahe Dam/Lake Oahe projects. Section 408 authorizes the Corps to grant permission to Dakota Access to modify federal flood control and navigation projects, provided the modifications are not injurious to the public interest and will not impair the usefulness of the projects. The EA addresses the purpose and need of the pipeline, as well as the location and method of installation of the pipeline, but the analysis is limited to the effects of allowing the pipeline to cross federal flowage easements near the upper end of Lake Sakakawea, and federally owned lands at Lake Oahe in North Dakota.

**Project Summary:** The proposed DAPL project is an approximately 1,100 long crude oil pipeline which would begin near Stanley, North Dakota, and end at Patoka, Illinois. In North Dakota, there are two pipeline segments, including the 148-mile Supply Line and the 210-mile Mainline, which total approximately 358 miles across seven counties (Mountrail, Williams, McKenzie, Dunn, Mercer, Morton, and Emmons). The diameter of the pipeline increases incrementally at designated tank terminals from 12 inches to 20, 24, and ultimately, 30 inches. The DAPL pipeline is co-

USACE_DAPL0071174

located with existing pipelines and other linear facilities previously installed on the federal real property interests over which the District has administrative and regulatory authority.

The portion of the DAPL project relevant to the EA and this FONSI is the portion that Dakota Access proposes to construct on Corps-owned lands and flowage easements. The construction requires real estate actions and Section 10 permits and Section 408 permissions. The EA and this Finding of No Significant Impact deal exclusively with granting the Section 408 permissions. More detailed information is available in Section 1.0 of the EA.

**Requester's Preferred Alternative:** The Requester's Preferred Alternative, identified in the EA as the Proposed Action, is the construction of the DAPL project on Corps real property interests as discussed in the Preferred Alternative in the EA. Implementation of the Requester's Preferred Alternative would involve the installation of 2.83 miles of a 24-inch diameter pipeline through seven tracts over which the Corps acquired flowage easements for the operation of the Garrison Dam/Lake Sakakawea Project, and 0.21 miles of a 30 inch diameter pipeline on federal property administered by the District for the Oahe Dam/Lake Oahe Project. As proposed, Dakota Access would trench the pipeline on federal flowage easements and install the pipeline via HDD under the Missouri River and Lake Oahe.

**Alternatives:** There is the potential for daily production in excess of 570,000 barrels per day in the Bakken and Three Forks production area, but there is no existing pipeline infrastructure sufficient to transport that volume of crude oil from North Dakota to the refineries. Because the Corps can only grant permission for the modification of a federal project if it would not be injurious to the public interest, the EA evaluated alternatives to the construction of the pipeline as a whole, as well as the alignment of the pipeline and method for installation on federal property. The EA also analyzed the potential for the pipeline to impair the usefulness of the federal projects.

More information on the alternatives analysis is included in Section 2.0 of the EA.

**Summary of Environmental Impact:** As discussed in the Biological Opinion and the EA, the Proposed Action would result in no adverse impacts to any federally-listed threatened or endangered species or their habitats. The U.S Fish and Wildlife Service has concurred that the portions of the DAPL project that cross federal real property interests administered by the District will have either "No Effect" or "May Affect, But Not Likely to Adversely Affect" on listed species.

The Standing Rock Sioux Tribe (SRST) and other tribal governments object to the pipeline and its alignment because the proposed route crosses under Lake Oahe a few miles upstream of the SRST water intakes. Tribes are concerned that a leak or rupture would contaminate the river, including the SRST's drinking water. The tribes argue the District did not adequately consult on the DAPL pipeline alignment. The EA establishes that the District made a good faith effort to consult with the tribes and that it considered all tribal comments. In addition, the pipeline will be located under Lake Oahe, and Dakota Access has developed response and action plans, and will include several monitoring systems, shut-off valves and other safety features to minimize the risk of spills and reduce or remediate any potential damages.

2

USACE_DAPL0071175

**Summary of Cultural Impacts:** Tribes are also concerned that the installation of the pipeline and a potential leak or rupture could damage or destroy cultural and sacred resources in the area. The District referenced a Class I Literature Review performed by Dakota Access, as well as existing Corps of Engineers Class III surveys and the North Dakota State Historic Preservation Office (SHPO) Guidelines Manual for Cultural Resources Inventory Projects as part of the National Historic Preservation Act (NHPA) Section 106 evaluation.   Section 106 consultation/coordination with Tribal governments and members, THPOs, the SHPO, the Advisory Council on Historic Preservation (ACHP), and other interested parties began in September 2014. The Corps conducted formal government-to-government consultation with tribal representatives via meetings; site visits; distribution of pertinent information; conference calls, and emails in order to inform tribal governments and private members, and to better understand their concerns. The Corps' EA administrative record details over 250 interactions between District and Dakota Access representatives and consulting parties (Tribes, THPOs, the SHPO, ACHP, and interested parties) for the DAPL project. All information received during the Section 106 process was considered during the Corps decision-making process.

Ultimately, the District made a "No Historic Properties Affected" determination, with which the North Dakota SHPO concurred in a letter dated April 26, 2016. By letter dated June 2, 2016, the ACHP disputed the District's finding under 36 C.F.R. Section 800.4(d)(iv)(A) and requested the ASA(CW) to prepare a summary of the decision and a rationale for the finding. In a final agency decision sent to the ACHP by letter dated July 25, 2016, the ASA(CW) affirmed the agency decision and fulfilled USACE Section 106 responsibilities for the Proposed Action.

**Mitigation Measures:** The District coordinated closely with Dakota Access to avoid, mitigate and minimize potential impacts of the Proposed Action so that the pipeline would not impair the usefulness of the projects and the impacts to the environment would be temporary and not significant. The majority of potential impacts would be mitigated by HDD technology, by which Dakota Access would install the pipeline beneath sensitive resources without surface disturbance, and allow pipeline construction to proceed with the fewest possible impacts. Additional mitigation measures are set out in the Environmental Construction Plan; the Stormwater Pollution Prevention Plan; the Spill Prevention, Control, and Countermeasure Plan; the HDD Construction Plan; the HDD Contingency Plan; the Unanticipated Cultural Resources Discovery Plan, and the Geographical Response Plan. Unavoidable impacts to land use and vegetation would be temporary and land would return to current land use once construction is complete. No long-term impacts are anticipated to any resources. Social and noise impacts to rural residents in the general vicinity would be minimal as construction would be completed during daylight hours and the locations are remote from most populated areas. See Section 6.0 in the EA for more details on best management practices and mitigation measures to which the applicant has committed for the Proposed Action. Dakota Access must comply with all of the measures in Table 8-2 of the EA, which will be attached to the District real estate instrument(s).

**Conditions of Easement (Lake Oahe crossing) and Consent to Modify Flowage Easements (Missouri River crossing):** The following conditions will be placed on real estate outgrants:

USACE_DAPL0071176

a. All environmental commitments outlined in <u>Section 6.0 and Table 8-2 of the EA</u> must be followed and incorporated by reference.

b. The pipeline must be maintained and operated per ASME B31.3, B31.4, B31.8, CFR 192, CFR 195, API 1104, and related codes.

c. Cathodic Protection will be utilized and maintained per applicable codes and Dakota Access' Operations and Maintenance Manual. Wall thickness testing will be performed on a five-year interval through the use of in-line inspection. The periodic in-line inspection will be performed in-lieu of periodic hydrologic tests. Inspection reports must be sent to the Operation Project Managers (OPMs) at the Oahe and Garrison Project Offices.

d. The Facility Response Plan will be submitted to the Corps for review prior to the operation of the pipeline.

e. All plans not final at the time the EA is complete will be submitted to the Corps for review and the incorporation of Corps comments prior to submittal to U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration.

   These plans include, but are not limited to the following:

   1. Geographical Response Plan;
   2. Operations and Maintenance Manual;
   3. Risk Assessment (Integrity Management Plan); and,
   4. Spill Models (Using the National Hydrography Dataset by the USGS)

f. Any plans that have been updated in condition "e" listed above must be sent to Corps Environmental Compliance Coordinators at the Omaha District Office, and the OPMs at the Oahe and Garrison Project Offices within one year of completion of the update.

g. Dakota Access must provide as-built drawings for both crossings to the Corps' Section 408 Coordinator at the Omaha District Office and the OPMs at both the Oahe and Garrison Project Offices within six months of the completion of pipeline construction.

h. Commitment for Training Exercises:
   a. Dakota Access must conduct full scale open water and full scale winter/ice exercises at Lake Sakakawea and Lake Oahe. A full scale exercise will occur once every 3 years (triennial cycle) with the location and type of exercise occurring on alternating schedules (e.g. open water exercise at Oahe the first triennial cycle, followed by winter exercise at Lake Sakakawea the following triennial cycle, followed by a winter exercise at Lake Oahe the following triennial cycle, etc.). The first exercise will occur within the first 3 years after the pipeline becomes operational.

4

USACE_DAPL0071177

    b.  To facilitate Corps staff involvement, Dakota Access must notify the Corps Environmental Compliance Coordinators at the Omaha District Office, Oahe and Garrison Project Offices at least ninety (90) days prior to initiation of the training exercises. Dakota Access must also solicit the participation of key stakeholders (federal, state, local, and Tribal) in these exercises.

i.  Within one year of operation of the pipeline, Dakota Access must provide for all-weather access and collection points downstream of the HDD crossings at Lake Oahe and Lake Sakakawea. Dakota Access must provide an equipment storage facility for each crossing on non-federal lands that includes a fenced permanent storage area for winter and open water spill response equipment. The storage facility should be placed in a strategic location and near existing facilities that would support access to the water in both high and low water conditions. Dakota Access will coordinate with the Corps and any other applicable stakeholders to obtain all necessary permits and approvals prior to construction for any ground disturbing activities associated with these facilities. The storage facility should contain sufficient response equipment at a minimum to mitigate an unintended worst case release for this crossing.

**Coordination and Public Review:**

The Corps published a draft EA on December 8, 2015, on the Corps Omaha District website (http://www.nwo.Corps.army.mil/Missions/CivilWorks/Planning/ProjectReports.aspx).
Additionally, notifications were made to cooperating agencies, other federal, state and local agencies, and signatory and non-signatory Tribes to the District Section 106 Programmatic Agreement. Notices of availability were included in the Public Notice section of the Bismarck Tribune, Williston Herald, and Capital Journal on December 8, 2015. The notice stated that the EA would be available for viewing on the Corps website, and that hard copies would be available at the Bismarck Public Library, Williston Community Library, and the Rawlins Municipal Library in Pierre, North Dakota. The draft EA was available for public comment through January 8, 2016, and comments were accepted through January 11, 2016.

The Corps fully considered and responded to comments received, and made additional clarifications within the EA as necessary. No significant comments remain unresolved. More information on how the comments received during the review process were addressed is presented in Appendix J of the EA. Because all comments have been resolved, neither a supplemental nor a revised EA will be offered for further public review, and no further NEPA compliance actions are required prior to the District granting the Section 408 permission for the Proposed Action. The proposed pipeline route and installation method were selected to minimize impacts to sensitive resources, and the applicant is required to comply with all applicable federal, state, and local laws and regulations, all management and response plans referenced in the EA, as well as the conditions attached to the Corps outgrants.

**Cumulative Impacts:** Cumulative impacts to the environment result from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.

USACE_DAPL0071178

Cumulative impacts may result from individually minor but collectively significant actions taking place over a period of time. In Section 4.0, the EA addresses cumulative impacts on: Geology and Soils Section; Water and Aquatic Life Resources; Vegetation, Agriculture, and Range Resources; Threatened, Endangered, Candidate, and Proposed Species; Wildlife Resources; Land Use and Recreation; Cultural and Historic Resources; Social and Economic Conditions; Transportation and Traffic; Environmental Justice, and Air Quality and Noise.

The alignment of the pipeline was selected because it will be co-located within existing utility corridors and be installed on federal real property interests using the HDD method. This avoids impacts to formerly undisturbed areas and surface resources. In addition, the District placed conditions and safeguards on the Proposed Action as the pipeline crosses federal real property interests to minimize potential effects of the placement and operation and maintenance of the pipeline. Therefore, this project will have insignificant incremental impact to other past, ongoing, or reasonably future actions of a similar nature.

**Conclusion:** I have evaluated the anticipated environmental, economic, cultural, and social effects, and any cumulative effects of the Proposed Action and determined that the Proposed Action is not injurious to the public interest and will not impair the usefulness of the federal projects. Moreover, for the reasons stated herein and discussed in greater detail in the Environmental Assessment, the District granting the referenced Section 408 permissions does not constitute a major federal action that would significantly affect the quality of the human environment. As a result, I have determined that preparation of an Environmental Impact Statement is not required. This conclusion and the processes and documents supporting it are in compliance with all applicable laws, executive orders, regulations and guidelines.


2 5 JUL 2016

Date _____

John W. Henderson, P.E.
Colonel, Corps of Engineers
District Commander

6

USACE_DAPL0071179