IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE,<br><br>     Plaintiff,<br><br>and<br><br>CHEYENNE RIVER SIOUX TRIBE,<br><br>     Plaintiff-Intervenor,<br>  v.<br><br>U.S. ARMY CORPS OF ENGINEERS,<br><br>     Defendant-Cross<br>     Defendant,<br><br>and<br><br>DAKOTA ACCESS, LLC,<br><br>     Defendant-Intervenor-<br>     Cross Claimant. | Case No. 1:16-cv-1534-JEB<br>(and Consolidated Case Nos. 16-cv-1796<br>and 17-cv-267)<br><br>MOTION FOR CLARIFICATION RE<br>REMAND PROCESS AND REMAND<br>CONDITIONS |

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................1

FACTUAL BACKGROUND ......................................................................................................1

    A.     THE REMAND PROCESS ....................................................................................1

    B.     THE REMAND CONDITIONS ............................................................................5

           1.     Spill response planning .............................................................................5

           2.     Third Party Audit .......................................................................................6

ARGUMENT ...............................................................................................................................7

    A.     THE COURT SHOULD DIRECT THE CORPS TO PROVIDE
           RELEVANT TECHNICAL INFORMATION AND ENGAGE IN
           MEANINGFUL GOVERNMENT-TO-GOVERNMENT
           CONSULTATION WITH THE TRIBE ................................................................8

    B.     THE COURT SHOULD DIRECT THE CORPS TO PROVIDE
           RELEVANT INFORMATION REGARDING SPILL RESPONSE
           PLANNING AND ALLOW THE TRIBE TO PARTICIPATE IN THE
           PROCESS. .............................................................................................................13

    C.     THE COURT SHOULD CLARIFY THE SCOPE OF AND PROCESS
           FOR THE THIRD PARTY AUDIT. ....................................................................13

CONCLUSION ............................................................................................................................16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aiello v. Town of Brookhaven,*
149 F.Supp.2d 11 (E.D.N.Y. 2001) .......................................................................16

*American Radio Relay League, Inc. v. F.C.C.,*
524 F.3d 227 (D.C. Cir. 2008) ...............................................................................9

*Anacostia Waterkeeper v. Pruitt,*
Civ. No. 09-0098 (D.D.C. Sept. 15, 2017) .............................................10, 11, 12

*Cobell v. Norton,*
240 F.3d 1081 (D.C. Cir. 2001) ...........................................................................10

*Friends of the Earth v. Environmental Protection Agency,*
446 F.3d 140 (D.C. Cir. 2006) ...............................................................................9

*Hecht Co. v. Bowles,*
321 U.S. 321 (1944)..............................................................................................10

*Morton v. Ruiz,*
415 U.S. 199 (1974)..............................................................................................12

*National Wildlife Federation v. National Marine Fisheries Service,*
524 F.3d 917 (9th Cir. 2008) .................................................................................9

*Oglala Sioux Tribe of Indians v. Andrus,*
603 F.2d 707 (8th Cir. 1979) ...............................................................................12

*San Luis & Delta-Mendota Water Authority v. Jewell,*
747 F.3d 581 (9th Cir. 2014) ...............................................................................16

**Statutes**

16 U.S.C. § 1536(a)(2)............................................................................................9

33 U.S.C. § 1321(j)(4)(B) .......................................................................................5

**Federal Regulations**

65 Fed. Reg. 67249 (Nov. 9, 2000)........................................................................11

74 Fed. Reg. 57881 (Nov. 9, 2009)........................................................................11

## INTRODUCTION

Plaintiff Standing Rock Sioux Tribe respectfully moves for clarification of the Court's June 14 remand order (ECF 238) and its Dec. 4, 2017 order imposing conditions on operations during remand (ECF 304). The Tribe brings this motion only after months of working in good faith with defendant U.S. Army Corps of Engineers ("Corps") seeking a lawful and transparent remand process, and only after it has become clear that the remand conditions are not being implemented as intended. The situation requires direction from the Court prior to the conclusion of the remand, currently anticipated on or around April 2, 2018.

The Tribe seeks limited and particularized relief. First, the Tribe seeks an order directing the Corps to provide the Tribe with technical information it has requested relative to the remand, so that the Tribe has a reasonable opportunity to participate meaningfully prior to the completion of the remand. Further, the Corps should follow government-to-government consultation protocol in this process, as its own policies require. This relief will require postponing the April 2nd anticipated date for completion of the remand process. Second, with respect to the interim remand conditions, the Tribe requests an order directing the Corps to provide information necessary to the Tribe to participate in oil spill response planning, and an order directing relief as to the independent third-party audit, discussed further below. The Tribe anticipates that these clarifications will also necessitate postponement of the deadlines contained in this Court's Dec. 4, 2017 Order.

## FACTUAL BACKGROUND

### A.     The Remand Process

In June of last year, this Court found that the Corps' National Environmental Policy Act ("NEPA") review for the Lake Oahe crossing of the pipeline was flawed in three "significant" respects. ECF 239. The three topics on which the Court found the Corps fell short were all

issues within the special expertise of the Tribe: the input of its technical experts; the impact of an oil spill on Treaty rights; and the environmental justice implications of siting the pipeline at the Tribe's doorstep.  In a contemporaneous order, this Court remanded the challenged permits back to the Corps "for further analysis."  ECF 238.  The Court subsequently declined to vacate the permit during the remand process, but admonished the Corps not to treat the process as a "bureaucratic formality."  ECF 284 ("the Court expects the Corps not to treat remand as an exercise in filling out the proper paperwork *post hoc*").  The Corps has estimated that the remand process will be complete by April 2 of this year.  ECF 326.

The Tribe has engaged fully and in good faith with the remand process.  It has retained a full team of technical experts which has met regularly throughout the remand period, at considerable cost to the Tribe.  The Tribe recently submitted an extensive package of technical, legal, and cultural materials for the Corps to consider during the remand.  It has communicated regularly and clearly with the Corps from the start of the process, particularly with respect to its need for additional information and appropriate consultation.  However, the correspondence has been overwhelmingly one-sided, with the Corps consistently ignoring the requests of the Tribe for information and meaningful consultation.  The Tribe's participation in the remand has been correspondingly handicapped.

A few weeks after this Court's summary judgment decision, former Chairman Archambault wrote the Corps seeking an open and transparent process that respected the Tribe's special expertise on the issues in the remand:

> The proper path forward for the Corps is an open and transparent process that provides concrete and timely opportunity for participation by the Tribes and others. We urge the Corps not to handle the remand as a ministerial action to be taken behind closed doors. Such an approach would be an empty gesture that would again fall short of the requirements of law.  No good purpose is served by failing to obtain from the best source – the Tribe – the information necessary to take the hard look that the law requires. We

2

look forward to discussing this with you in more detail before any decisions are made on the process with respect to the remand.

Hasselman Decl., Ex. 1 at 2.  The letter also went into considerable detail on the need to involve the Tribe and its experts on addressing oil spill risk.  *Id*. at 5 ("Having relied on DAPL to no avail once on those critical issues, the Corps must not make the same mistake again.  Instead, the Corps should open up the process and allow the Tribe and its experts, along with independent third party experts, to provide the Corps with the necessary information to properly address oil spill risk.")  Chairman Archambault invited the Corps leadership to visit the Reservation to begin a dialogue on these important issues.

The Corps ignored this letter.  Instead, in a *pro forma* letter sent to multiple Tribes many months later, on September 25, 2017, the Corps requested a specific and limited set of information (such as number of hunting and fishing licenses), and requested a response within 30 days.  Ex. 2.  None of the topics addressed in the Tribe's letter—such as an open and transparent process and an opportunity to involve the Tribe's technical experts—was mentioned.

Chairman Archambault responded shortly thereafter.  Ex. 3.  He expressed frustration that the Corps had ignored the key issues the Tribe had previously outlined, had ignored his invitation to visit the Reservation, and had said nothing about the process or sharing of information.  The letter explained how the Corps' request for information was framed far too narrowly to address the important topics of the remand.  It further explained that the Tribe intended to provide the relevant information, and that the initial timeline would need to be revisited as a result.

Another six weeks passed without a response, during which time a new Chairman—Mike Faith—assumed office at Standing Rock.  In a brief letter dated Nov. 27, 2017, Col. Hudson at the Corps expressed a willingness to meet with the Tribe but stated that the Tribe should submit

3

any materials on remand first.  Ex. 4.  The letter set a deadline of Dec. 20, 2017 for submission of such materials.

Chairman Faith responded shortly thereafter.  Ex. 5.  By that point, this Court had granted the Tribe's request for interim relief, including greater Tribal participation in spill response planning and an independent third-party audit.  The Chairman's letter explained, yet again, how the remand process that the Corps was pursuing was a "narrow and cursory approach, fundamentally at odds with the actual breadth and significance of the issues implicated by the remand."  *Id*. at 2. The letter also provided a detailed list of specific information that the Tribe required in order to participate meaningfully in the remand, as well as any discussions around oil spill response plans.  *Id*.   As the Tribe's technical experts have explained, spill response planning without a proper understanding of the risk and dynamics of a spill is not possible, and the Tribe needed specific information within the Corps' possession in order to participate.

In a follow up letter dated January 4, 2018, Chairman Faith further explained the Corps' obligation to meaningfully consult with the Tribe and why "data requests" from the Corps did not constitute consultation.  Ex. 6.  Responding to an email from a Corps staffer demanding submission of remand materials prior to any meeting with the Colonel, Chairman Faith explained how the Corps' approach violated its own Tribal consultation processes and served only to "dismiss and disrespect" the Tribe's concerns.  Yet again, Chairman signaled a willingness to "work collaboratively with the Corps of Engineers in a government-to-government process on the remand study."  *Id*.  On Jan. 29, Col. Hudson simply replied that he looked forward to reviewing the Tribe's submission and "further consultation."  Ex. 7.

As of the date of this filing, virtually none of the requested information has been provided by the Corps.  No meaningful response to any of the Tribe's letters has ever been received.  No

in-person meetings between Corps leadership and Tribal leadership have occurred.  Government-to-government consultation has not even begun.  The Tribe furthermore remains in the dark about the exchange of information that is occurring between DAPL and the Corps.  While the Tribe has finalized its initial remand submission to the Corps, it has been forced to do so with the Corps withholding all of the key information that would provide the proper foundation for comprehensive input.  Unable to resolve the situation, the Tribe is turning to this Court for additional direction.

**B.**     **The Remand Conditions**

The picture with respect to the interim conditions imposed by this Court in December — spill response planning and the third party audit—is regrettably no better.  The Tribe continues to operate with inadequate information as a result of the Corps' secrecy, and a deep concern that the process is being subverted to avoid a meaningful outcome.

**1.**     **Spill response planning**

In its Dec. 4 Order, the Court specifically directed "the *parties*" to coordinate to finalize spill response plans affecting Tribe resources. ECF 303.  The language was no accident, as the Tribe's briefing emphasized the importance of *the Corps* taking an active role in spill response planning, and its legal obligations to do so.  *See* ECF 293 at 7 (outlining Corps legal obligations under 33 U.S.C. § 1321(j)(4)(B) to consult with Tribal officials in preparing spill response plans).  As noted above, in his Dec. 18 letter, Chairman Faith outlined a detailed list of specific information that the Tribe required in order to participate meaningfully in spill response planning. Ex. 5.  The information was developed by the Tribe's technical team, which advised the Tribe that preparation of useful spill response plans in the absence of such information was impossible.  Chairman Faith's letter also highlighted the Corps' role in facilitating the process: "It is incumbent upon the Corps of Engineers to assist with facilitating a collaborative oil spill

response plan for the Missouri River, by disclosing information that is necessary for the development of this plan."

The Corps has simply ignored the Tribe.[1]  It never provided any of the requested information, nor even attempted to explain why it could not.  It made no meaningful effort to engage with Tribal leadership to hear their concerns about spill response.  While DAPL has offered to hold meetings with the Tribe, the Tribe has made clear that it needs certain information in order to do so.  The process appears to be at a stalemate.[2]

**2.      Third Party Audit**

Also in the Dec. 4, 2017 Order, the Court granted the Tribe's request for an "independent, third party" audit to address implementation of permit conditions and "other integrity threats."   The Court directed DAPL to select an auditor, "in consultation with the Tribes," and to complete an audit prior to April 1, 2018.  *Id*.  This process also appears to be running aground and requires clarification from this Court.

Subsequent to the Court's order, the Tribe did not hear anything further on the matter until January 11, when counsel received an email from DAPL's counsel suggesting three companies that DAPL proposed to conduct the audit.  Ex. 8.  After consulting with its technical team, the Tribe (via email from its counsel) responded that the three companies—all with close ties to DAPL's parent company, the project itself, or the industry generally—could not act as

---

[1] The day before before this motion was filed, the Tribe received a letter from the Corps and a CD containing a revised spill response plan.  While this represents some minor progress, it doesn't come close to the full set of detailed information that the Tribe requested in its Dec. 18, 2017, letter.

[2] For example, an important issue for the Tribe is the possibility that culturally significant sites—many of which are located in and around the shoreline of Lake Oahe—will be harmed during an oil spill response or even by planning activities like storage of equipment.  In a Feb. 28 letter, Chairman Faith highlighted these concerns, and reminded DAPL representatives that they could not enter the Reservation without permission.  Ex. 9.

truly independent auditors, and proposed an alternative auditor with a record of independence.

The email also expressed concern about the scope of the audit, which was to include not just

compliance with Permit conditions, but also "any other integrity threats" affecting the pipeline.

*Id*.  ("We believe that this latter phrase involves a review of the Tribe's concerns with DAPL's

risk analyses and other technical information.").  The email invited a dialogue between the

parties to resolve the issue.  *Id*.

DAPL did not respond to the Tribe's input or invitation to further discuss the scope of the

audit.  The Tribe did not hear anything further on the matter until February 20, when the auditor

recommended by the Tribe called several Tribal representatives expressing frustration that he

had been asked to review thousands of pages in a short amount of time and submit a proposal as

part of an RFP process.  The Tribe's counsel again contacted DAPL's counsel to relay this

information and inform them that the Tribe intended to respond to the auditor's messages to

clarify the process.  Ex. 10.  The email to DAPL's counsel again invited a conversation around

the "scope and process" of the audit.  *Id*.  The response received from DAPL's counsel rejected

that invitation to discuss the audit, stating that the Order requiring review of "integrity threats"

did not include the Tribe's concerns with DAPL's risk analysis and other technical information.

*Id*.  On Feb. 28, 2017, the Tribe learned that DAPL had decided against hiring the Tribe's

proposed independent auditor, presumably meaning that DAPL will be going ahead with one of

its proposed auditors, on a highly accelerated timeline, that the Tribe has previously deemed

unacceptable.

**ARGUMENT**

The remand process ordered by this Court in June of last year is in jeopardy of producing

a deeply flawed result that fails to address this Court's summary judgment order.  Similarly, the

interim conditions ordered by this Court in December are gravely off track.  The Tribe

respectfully requests that this Court clarify the Corps' duties under both orders in order to ensure that the outcome of both the remand and the interim conditions is meaningful.

**A.**     **The Court Should Direct The Corps To Provide Relevant Technical Information And Engage In Meaningful Government-To-Government Consultation With The Tribe**

At the most basic level, this entire case arose because the Corps failed to meaningfully engage with the Tribe, listen to its legitimate concerns about the siting of the pipeline at Oahe, and make a reasoned decision in light of that information. All of the flaws in the Corps' NEPA analysis at Oahe identified by this Court were closely tied to this failure: it didn't address the Tribe's technical input on spill risk, it didn't address the impacts of spills on Treaty-protected resources, and it mishandled the environmental justice analysis of siting the pipeline at the doorstep of one of the nation's most disadvantaged communities. Despite the Court's findings, the Corps appears to be poised to make the same mistakes again. It is approaching the remand in a narrow and formalistic manner that leaves no meaningful role for the Tribe. There has been no exchange of information. There has been no substantive meeting with Corps leadership. The Tribe has been afforded the opportunity to provide additional input, but otherwise has no role in the process. That is an approach that disregards the history of this case and the Court's directives, and it needs to be corrected.

The Tribe's expectations for the remand process are reasonable. It has asked the Corps for two things. First, it has asked that the information the Corps is developing on the remand— especially new technical information received from DAPL, such as the revised spill models—be shared with the Tribe so that the Tribe can meaningfully comment on it. Without that opportunity, the Corps is simply engaging in the bureaucratic formality of papering over its previous decisions with new information from DAPL that is not exposed to scrutiny. While the Tribe has prepared extensive technical input for consideration by the Corps, it is doing so at a

distinct disadvantage because it lacks access to the most relevant and up to date information.  It

makes no sense for the Tribe to be evaluating outdated spill models and other information that

are no longer being used, while the Corps is considering new spill models from DAPL that the

Tribe has never seen.  Accordingly, the Tribe asks that this Court order the Corps to share with

the Tribe all the information it has received from DAPL and other technical sources during the

remand process, and provide the Tribe with an opportunity to comment on it.

The Corps will surely argue, as it has in the past, that this Court has no authority to put

constraints on the remand.  *See* Dec. 4 Order (ECF 304), at 4-5 (citing cases).  But that is not the

law.  While this Court may not be able to cabin the Corps' discretion as the *substance* of its

ultimate decision, it is commonplace for courts to put in place *procedural* safeguards to ensure

that the remand is completed in a timely, lawful, and useful manner.  *See Friends of the Earth v.

Environmental Protection Agency*, 446 F.3d 140, 148 (D.C. Cir. 2006) ("district court retains

some remedial discretion" over remedy during remand.).  For example, in *National Wildlife

Federation v. National Marine Fisheries Service*, 524 F.3d 917, 937-38 (9th Cir. 2008), the Ninth

Circuit upheld a detailed set of conditions imposed by the District Court on a remand process,

including a requirement to produce reports in particular situations and a directive to

"collaborate" with states and Tribes that were parties to the litigation:

> This collaboration requirement is justified both as a reasonable means to ensure that
> NMFS complies with ESA's mandate that agencies 'use the best scientific and
> commercial data available' in their decision-making, 16 U.S.C. § 1536(a)(2), and as a
> reasonable procedural restriction given the history of the litigation… We hold that on this
> record, requiring consultation with states and tribes constitutes a permissible procedural
> restriction rather than an impermissible substantive restraint.

*Id.*  The decision confirms that "[c]ourts may, at least in some circumstances, require specific

actions from an agency on remand," as long as they don't actually "direct the substance" of the

process.  Similarly, in *American Radio Relay League, Inc. v. F.C.C.*, 524 F.3d 227, 242 (D.C.

Cir. 2008), the D.C. Circuit found unlawful and remanded an agency rule, and expressly directed

that the agency "afford a reasonable opportunity for public comment on the unredacted studies

on which it relied in promulgating the rule."  And in *Anacostia Waterkeeper v. Pruitt*, Civ. No.

09-0098 (D.D.C. Sept. 15, 2017), for example, Judge Bates of this Court recently directed the

EPA to do precisely what the Tribe seeks here—provide the plaintiffs with specific data and

information that is developed during the remand process.

The Tribe is not asking that this Court "constrain" the Corps' analysis, nor in any way

deprive the Corps of its ability to fully reconsider its decision in light of the Court's opinion.

Rather, it is asking that the Court impose some modest procedural safeguards that will ensure

that the remand is conducted in a lawful and transparent manner.  Accordingly, this Court is well

within its authority to direct the Corps to share the relevant information it has collected from

DAPL and other technical sources with the Tribe, so that the Tribe has an opportunity to

comment on it.  Such relief is plainly within the Court's authority.  *See generally Cobell v.

Norton*, 240 F.3d 1081, 1108 (D.C. Cir. 2001) ("Because the agencies involved delayed

performance of their legal obligations, the court was justified in fashioning equitable relief that

would ensure the vindication of plaintiffs' rights.") *citing Hecht Co. v. Bowles*, 321 U.S. 321,

329–30 (1944) ("The essence of equity jurisdiction has been the power of the Chancellor to do

equity and to mould each decree to the necessities of the particular case.  Flexibility rather than

rigidity has distinguished it.")

Second, the Tribe has asked that the Corps conduct the process pursuant to appropriate

consultation protocols.  The Corps' duty to do so is well established under governing law.  As

the Tribe has reminded the Corps several times, Executive Order 13175 explicitly requires

federal agencies to "honor treaty rights" and "ensure meaningful and timely input by tribal

officials."  65 Fed. Reg. 67249 (Nov. 9, 2000); *see also* 74 Fed. Reg. 57881 (Nov. 9, 2009)

(Presidential Memorandum) ("History has shown that the failure to include the voices of tribal

officials in formulating policy affecting their communities has all too often led to undesirable

and, at times, devastating and tragic results.")  Indeed, the Corps has a detailed Tribal

consultation policy implementing these orders.  *See* ECF 24-7.  This policy reads like a laundry

list of actions that have *not* happened during this remand.  For example, the Corps' policy states:

> USACE recognizes the sovereign status of Tribal governments *and our obligation for pre-decisional government-to-government consultation*.  *Id*. at 4 (emphasis added).[3]

> Consultation [is defined as]:  Open, timely, meaningful, collaborative and effective deliberative communication process that emphasizes trust, respect, and shared responsibility.  To the extent practicable and permitted by law, consultation works towards mutual consensus *and begins at the earliest planning phases*, before decisions are made and actions are taken… *Id*. at 6 (emphasis added).

> Consultation will be an integral, invaluable process of USACE planning and implementation.  *Id*. at 7.

> Requests for consultation by a Tribe to USACE *will be honored*. *Id*. at 8 (emphasis added).

> USACE recognizes that compliance with [statutes like NHPA and other "natural resources" laws] may not comprise the full range of consultation, nor of cultural property and resource protection.  *Id*.

> [The Corps must:] Maintain *open lines of communication* through consultation with Tribes during the decision making process for those matters that have the potential to significantly affected protected tribal resources, tribal rights (including treaty rights) and Indian lands.  *Id*. at 9 (emphasis added).

> [The Corps] will reach out…to involve Tribes in collaborative processes designed to ensure information exchange, consideration of disparate viewpoints before and during decision making… *Id*. at 12.

The Department of Defense also has consultation policies, which explicitly call for "meaningful

consultation and communication" with Tribes, using "government-to-government" protocols and

---

[3] Page citations are to the PDF document at ECF 24-7.

designed to engage in "good faith" throughout the decisionmaking process.  *Id*. at 19; *see also* Department of Defense Instruction 4710.02[4] (consultation should "[f]ully integrate, down to staff officers and civilian officers at the installation level, the principles and practices of meaningful consultation and communication with tribes[.]")

The Corps is violating these policies in the remand process.  Indeed, there has been no consultation at all.  Instead, months after the Court's remand order, the Corps first tersely requested a narrow and limited set of information that mostly ignored this Court's ruling.  Then, it backtracked and agreed to review whatever the Tribe submits.  But it has not ever meaningfully responded to any of the Tribe's letters, it has not provided any of the requested information, and it has set up various barriers to any meaningful in-person dialogue with Tribal leadership.  This approach all but guarantees another round of conflict over the Corps' new decision, and violates its own policies with respect to Tribal consultation.  Accordingly, this Court should direct the Corps to comply with its policies and legal obligations with respect to government-to-government consultation in carrying out the remand.  *See Oglala Sioux Tribe of Indians v. Andrus*, 603 F.2d 707, 721 (8th Cir. 1979) (Bureau of Indian Affairs failed to conduct "meaningful consultation" since it failed to comply with its own policy of consultation, which created a "justified expectation on the part of the Indian people that they will be given a meaningful opportunity to express their views before Bureau policy is made"); *cf. Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("it is incumbent upon agencies to follow their own procedures").

Both requests will mean that the remand takes longer than currently anticipated.  While the Tribe is frustrated that so little progress has been made since the Court's June 4, 2017,

---

[4] Available at http://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodi/471002p.pdf

decision remanding the decision to the Corps, the Tribe would rather the remand be done correctly even if it takes additional time.

**B.**     <u>**The Court Should Direct The Corps To Provide Relevant Information Regarding Spill Response Planning And Allow The Tribe To Participate In The Process.**</u>

The Tribe has explained to the Corps why it needs certain information before it can meaningfully engage in oil spill response planning.  The Tribe's technical team has advised the Tribe that attempting to develop spill plans without a full understanding of potential spill events, risks, and dynamics is not a useful endeavor.  Additional details on why this is so were provided in the Tribe's recent remand submission.  However, the Tribe's requests for information have been stonewalled.  The Tribe asks that the Court: a) direct the Corps to provide the information requested in the Tribe's Dec. 18 letter, Ex. 5; and b) direct the Corps to take a convening role, consistent with its obligations under the Oil Pollution Act, to engage with Tribal staff and technical consultants on developing oil spill response plans.  That consultation will necessarily include discussion of the protection of culturally significant sites alongside the river that could be affected by an oil spill.

**C.**     <u>**The Court Should Clarify The Scope Of And Process For The Third Party Audit.**</u>

It appears that little progress has been made on the third party audit since this Court's December 4, 2017, Order.  The Tribe remains deeply concerned about the lack of independence in the process, particularly given that the auditor proposed by the Tribe has been rejected and one unacceptable to the Tribe has apparently been selected.  Additionally, in any conventional audit situation, protocols and standards are worked out by the involved parties in advance.  The scope of the audit needs to be defined with precision, i.e., what is the question that the audit seeks to answer?  Equally important, the "rules" governing the parties' participation need to be established.  For example, are there rules governing *ex parte* contacts between the auditor and

the involved parties, or do all communications with the auditor need to be transparent?  What are the steps the auditor will go through to collect information, and who has rights to share information at what times?  Does any party have an opportunity to review a draft and provide comments?

Without a clear scope and without clear protocols, DAPL has construed this Court's Dec. 4 order to leave it entirely in charge of determining the question to be answered by the audit, and to allow it to engage freely engage with the auditor while shutting the Tribe out of the process. There are no safeguards to protect against an unfair process or to assure that any adverse findings find the light of day.  The result of this could well be an audit that is not just useless for its intended purpose—to provide an independent review on whether the pipeline is as safe as DAPL claims—but one that misleads the Court and the public, in a manner that could harm the Tribe's interests.

Accordingly, the Tribe asks that this Court provide additional clarification regarding the third party audit.  The Tribe's requested relief falls into three categories:  selection of auditor; scope of audit; and protocols for conducting the audit.

Selection of auditor:  The Court's December 4 Order states that an auditor must be selected "in consultation with" the Tribes.  DAPL appears to believe that this directive allows it to seek "input" from the Tribe, and then make a selection on whatever criteria it alone deems relevant.  Indeed, it appears that DAPL is moving ahead with an auditor that the Tribe has declared to be unacceptable due to conflicts of interest.  Accordingly, the Tribe seeks a clarification of the Order that an auditor must be jointly selected by the Tribe and DAPL, *i.e.,* both parties must agree.

Scope of audit:  The Pipeline and Hazardous Materials Safety Administration recommended an audit of compliance with Permit conditions, "and other integrity threats."  To the Tribe, this language provides for an independent review of the Corps' claims that the risks of spills are low and the impacts insignificant.  DAPL does not agree.  Ex. 8.  An audit that is limited to determining whether DAPL is "in compliance" with its permit would constitute a "check the box" exercise that contains no useful information.

Accordingly, the Tribe seeks clarification as to the scope of the audit to include an audit of the pipeline's physical integrity and safety management system, using well-established industry "best practices."  For example, the American Petroleum Institute ("API"), the oil industry trade association, has established various pipeline construction and safety management protocols.  For example, API-RP-1173 is a set of recommendations for pipeline safety management systems.  API-RP-1174 addresses industry best practices for oil spill response planning.  API RP 1175 addresses pipeline leak detection programs. The Tribe proposes that the Court clarify its order to state that the scope of the audit should include a review of DAPL's compliance with these established industry standards, within the physical scope of the pipeline where it could affect Tribal resources at Oahe.

Protocols:  In the absence of agreed protocols on the process for conducting the audit, the audit will lack transparency and DAPL will be able to shape both the process and the outcome.  In other audit situations, the parties reach consensus on protocols to govern the process of the audit, and standards for communicating with the auditor.  The Tribe asks that the Court direct DAPL and the Tribe to develop a joint protocol for conducting the audit, and submit it to the Court within 30 days.

Alternatively, the Court could appoint its own technical expert under F.R.E. 706 to assist in selecting an auditor and defining audit protocols and scope. There is ample precedent for using court appointed experts in such cases. *San Luis & Delta-Mendota Water Authority v. Jewell*, 747 F.3d 581, 603 (9th Cir. 2014) ("we can see no reasonable objection to the use of experts to explain the highly technical material in" environmental case); *Aiello v. Town of Brookhaven*, 149 F.Supp.2d 11, 15 (E.D.N.Y. 2001) (using Court-appointed expert in citizen Clean Water Act lawsuit). Such an approach has potential advantages, particularly given the challenges of negotiating mutually agreeable outcomes in an adversarial environment.

## CONCLUSION

For the foregoing reasons, the Tribe respectfully asks that this Court grant its motion to clarify this Court's June 5 and Dec. 4, 2017 Orders as proposed herein.

Dated: This 2nd day of March, 2018.

Respectfully submitted,

Patti A. Goldman, DCB # 398565
Jan E. Hasselman, WSBA # 29107 *Pro Hac Vice*
Stephanie Tsosie, WSBA # 49840 *Pro Hac Vice*
Earthjustice
705 Second Avenue, Suite 203
Seattle, WA  98104
Telephone:  (206) 343-7340
pgoldman@earthjustice.org
jhasselman@earthjustice.org
stsosie@earthjustice.org

*Attorneys for Plaintiff*

16

**CERTIFICATE OF SERVICE**

I hereby certify that on March 2, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of this filing to the attorneys of record and all registered participants.

*/s/ Jan E. Hasselman*
Jan E. Hasselman

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE,<br><br>                 Plaintiff,<br><br>and<br><br>CHEYENNE RIVER SIOUX TRIBE,<br><br>                 Plaintiff-Intervenor,<br>     v.<br><br>U.S. ARMY CORPS OF ENGINEERS,<br><br>                 Defendant-Cross<br>                 Defendant,<br><br>and<br><br>DAKOTA ACCESS, LLC,<br><br>                 Defendant-Intervenor-<br>                 Cross Claimant. | Case No. 1:16-cv-1534-JEB<br>(and Consolidated Case Nos. 16-cv-1796<br>and 17-cv-267)<br><br>DECLARATION OF JAN HASSELMAN<br>IN SUPPORT OF PLAINTIFF STANDING<br>ROCK SIOUX TRIBE'S MOTION FOR<br>CLARIFICATION RE REMAND<br>PROCESS AND REMAND CONDITIONS |

I, Jan Hasselman, declare as follows:

1.     I am counsel of record for plaintiff Standing Rock Sioux Tribe.  I am a member in good standing of the Washington state bar, and have been admitted to practice before this Court *pro hac vice*.

2.     Attached hereto are true and correct copies of the following materials which are relevant to the issues in this motion:

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

| | |
|---|---|
| Exhibit 1 | June 29, 2017 Letter from David Archambault, II, Chairman, Standing Rock Sioux Tribe to Douglas W. Lamont, Acting Assistant Secretary for Civil Works and Col. John Henderson, P.E., District Commander of the U.S. Army Corps of Engineers, Omaha District regarding Tribal participation on remand. |
| Exhibit 2 | September 25, 2017 Letter from Col. John L. Hudson District Commander to David Archambault, II, Chairman, Standing Rock Sioux Tribe requesting information related to the number of hunting and fishing licenses or permits issued by the Tribe. |
| Exhibit 3 | October 6, 2017 Letter from David Archambault, II, Chairman, Standing Rock Sioux Tribe to Col. John L. Hudson, District Commander regarding remand issues. |
| Exhibit 4 | November 27, 2017 Letter from Col. John L. Hudson, District Commander to Mike Faith, Chairman, Standing Rock Sioux Tribe expressing a willingness to meet with the Tribe but after the Tribe should submits any materials on remand. |
| Exhibit 5 | December 18, 2017 Letter from Mike Faith, Chairman, Standing Rock Sioux Tribe to Col. John L. Hudson, District Commander regarding the remand process and requesting information required for the Tribe to have a meaningful participation in the remand. |
| Exhibit 6 | January 4, 2018 Letter from Mike Faith, Chairman, Standing Rock Sioux Tribe to Col. John L. Hudson, District Commander explaining the Corps' obligation to meaningfully consult with the Tribe and why "data requests" from the Corps do not constitute consultation. |
| Exhibit 7 | January 29, 2018 Letter from Col. John L. Hudson, District Commander to Mike Faith, Chairman, Standing Rock Sioux Tribe stating the he was looking forward to reviewing the Tribe's submission and "further consultation." |
| Exhibit 8 | January 11-23, 2018 email thread between counsel for parties regarding selection of 3rd party independent engineering expert and a proposal of three potential experts by DAPL. |
| Exhibit 9 | February 28, 2018 Letter from Mike Faith, Chairman, Standing Rock Sioux Tribe to Energy Transfer Partners inviting a proposed meeting on Emergency Planning and Response on March 7, 2018 and requesting the release of certain documentation prior to that date; and a reminder that Tribal permission is required for entrance onto the Reservation. |

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

Exhibit 10    January 23, to February 20, 2018 email chain between counsel for
parties regarding selection of 3rd party independent engineering expert.


I declare under penalty of perjury that the foregoing is true and correct.


Dated this 2nd day of March, 2018.


_____
Jan E. Hasselman

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

# Exhibit 1

Case No. 1:16-cv-1534-JEB
(and Consolidated Case Nos. 16-cv-1796 and 17-cv-267)

DECLARATION OF JAN HASSELMAN IN SUPPORT OF PLAINTIFF STANDING ROCK
SIOUX TRIBE'S MOTION FOR CLARIFICATION RE REMAND PROCESS AND
REMAND CONDITIONS



**Dave Archambault II**
*Chairman*

**TRIBAL COUNCIL
(AT LARGE)**

Paul  Archambault

Mike  Faith

Chad  Harrison

Kory  McLaughlin

Charles  Walker

Dana  Yellow  Fat

**Jesse McLaughlin**
*Vice Chairman*

**Adele M. White**
*Secretary*

**Cody TwoBears**
*Cannonball District*

**Joe Dunn**
*Long Soldier District*

**Duane Claymore**
*Wakpala District*

**Frank A. White Bull**
*Kenel District*

**Joe White Mountain Jr.**
*Bear Soldier District*

**Caroline Thompson**
*Rock Creek District*

**Robert Taken Alive**
*Running Antelope District*

**Samuel B. Harrison**
*Porcupine District*

June 29, 2017

Douglas W. Lamont
Acting Assistant Secretary for Civil Works
Office of the Assistant Secretary of the Army (Civil Works)
108 Army Pentagon
Washington, DC 20310-0108
douglas.w.lamont2.civ@mail.mil

Col. John Henderson, P.E.
District Commander
U.S. Army Corps of Engineers – Omaha District
CENWO-DE
1616 Capitol Ave, Suite 9000
Omaha, NE 68102-4901
john.w.henderson@usace.army.mil

> Re:    *Standing Rock Sioux Tribe et al. v. U.S. Army Corps of Engineers* – Tribal
> participation on remand

Dear Acting Assistant Secretary Lamont and Colonel Henderson:

I am writing to begin a dialogue with you regarding Judge Boasberg's June 14 decision in the Tribe's litigation against the Corps regarding the Dakota Access pipeline and particularly to address the importance of the Corps providing a full opportunity for Tribal participation as the Corps addresses the remand.

Douglas W. Lamont, Acting Assistant Secretary for Civil Works
Col. John Henderson, P.E., District Commander
June 29, 2017
Page 2

Judge Boasberg's decision vindicates a fundamental point that the Standing Rock Sioux Tribe has emphasized from the beginning – that the Corps cannot lawfully approve the pipeline without fully considering and protecting Tribal interests.  As Judge Boasberg's ruling makes clear, the Standing Rock Sioux Tribe, as part of the Great Sioux Nation, has important legal interests – including Treaty rights to hunt and fish – that were not properly addressed when the Corps approved the Environmental Assessment or when it granted the easement to Dakota Access to cross Lake Oahe.  And with respect to the scientific evidence of oil spill risk presented by the Tribe (which demonstrates the highly controversial nature of the effects of the project), Judge Boasberg said that "the Court cannot conclude that the Corps made a convincing case of no significant impact or took the requisite hard look."  Opinion at 34.

In light of Judge Boasberg's findings, the proper course for the Corps on remand is to undertake the Environmental Impact Statement process that the agency previously started and then abandoned.  As matters now stand, the absence of a court-approved finding of "no significant impact" means that the FONSI as written is deficient and that a hard look is required with respect to Treaty rights to hunt and fish, environmental justice, and the expert critiques of oil spill risk.  Judge Boasberg's remand to the Corps on these issues provides an opportunity for the Corps to engage in the informed and reasoned decisionmaking that the law requires – with full participation by the Tribe and the public.

With Judge Boasberg's ruling as a guidepost, where will the Corps obtain the information it needs to address the remanded issues?  Without question, it is the Tribe that has expertise on the scope and importance of Treaty hunting and fishing.  The same holds true with respect to the analysis of environmental justice – as to which the Tribe is the best source of information on the disproportionate impact an oil spill would have on the Tribe and the Reservation community.  Likewise, with respect to the scientific evidence regarding the methodological and data flaws that the Corps relied upon, the resolution of the controversy reflected in those matters requires engaging with the Tribe and its experts – not just a repetition of the Corps' unquestioning endorsement of the conclusory and deficient oil spill information provided by DAPL.

The proper path forward for the Corps is an open and transparent process that provides concrete and timely opportunity for participation by the Tribes and others.  We urge the Corps not to handle the remand as a ministerial action to be taken behind closed doors.  Such an approach would be an empty gesture that would again fall short of the requirements of law.  No good purpose is served by failing to obtain from the best source – the Tribe – the information necessary to take the hard look that the law requires.  We look forward to discussing this with you in more detail before any decisions are made on the process with respect to the remand.

Douglas W. Lamont, Acting Assistant Secretary for Civil Works
Col. John Henderson, P.E., District Commander
June 29, 2017
Page 3

With respect to Treaty hunting and fishing rights, the ruling from Judge Boasberg makes it clear that the impact of an oil spill on those rights merits significant consideration, which was not afforded in the EA, or otherwise by the Corps.  As Judge Boasberg stated:

> Standing Rock, though, had alerted the Corps to its fishing- and hunting-related concerns after the agency published the Draft EA.  See, e.g., ECF No. 159-1, Exh. C (SRST Comments on Draft EA, Jan. 8, 2016) at 13 ("[A] pipeline leak would threaten to damage . . . the fish and wildlife on which many Tribal members depend for subsistence."); ECF No. 159-1, Exh. D (SRST Suppl. Comments on Draft EA, Mar. 24, 2016) at 15 ("The waters of Lake Oahe also provide habitat for fish, wildlife, and plants important to the diet . . . of the Tribe.").  The Director of Standing Rock's Department of Game, Fish, and Wildlife Conservation, moreover, explained that many of the Tribe's members rely on fishing as "an important supplemental source of food and nutrition" and that the Tribe issued 199 family fishing permits in 2015.  See ECF No. 117-16 (Declaration of Jeff Kelly, Nov. 28, 2016), ¶ 5.  An oil spill, he said, could "cause extensive fish kills."  Id., ¶ 12.  He also spelled out the ways in which an oil spill could seriously affect game along the Oahe shoreline, including by poisoning animals that ingest, inhale, or are otherwise externally exposed to oil and preventing those birds and mammals whose feathers or fur are coated with oil from maintaining their body temperatures.  Id., ¶ 13.

Opinion at 42-43.

In addressing the impact of an oil spill on these rights, the Corps will need to consider both the sanctity and cultural significance of these rights and the practical implications for the Reservation community of the impairment of these rights in the event of an oil spill.  For the Sioux, as for other Tribes, the right to hunt and fish was central to their identity and basic to their survival in Treaty times.  *See United States v. Winans*, 198 U.S. 371, 381 (1905) (hunting and fishing were "not much less necessary to the existence of the Indians than the atmosphere they breathed").  Likewise, for Tribal members today, hunting and fishing retains its profound cultural significance.  Moreover, as a result of the high levels of unemployment and poverty that are all too prevalent on the Reservation today, for many members of the Reservation community, these Treaty hunting and fishing rights are vitally important in providing food necessary to survive the harsh Dakota winters.

For Standing Rock, the impact of an oil spill that harms game and fish will be deeply felt throughout our Reservation communities.  That impact will have multiple dimensions.  Families that rely on game and fish for subsistence will be forced to find other sources of food to survive.

Douglas W. Lamont, Acting Assistant Secretary for Civil Works
Col. John Henderson, P.E., District Commander
June 29, 2017
Page 4

The resulting threat of food deprivation and hunger will cause additional pressure on other aspects of Tribal government, as the Tribe has limited resources to serve a broad range of Tribal needs, and other Tribal programs – serving our youth, elderly and others – will be jeopardized if we must meet the immediate needs of those who are hungry because the game and fish have been killed by an oil spill.  Beyond this, harm to fish and game would cause a host of social impacts associated with the impairment of our traditional way of life – much like when the buffalo were killed off – and this would be deeply felt by our people.  These are the kinds of human impacts that the Corps did not consider in the EA – and they are issues that warrant a robust analysis informed through Tribal participation, now that the issue is again before the Corps on remand.

With respect to the environmental justice analysis, Judge Boasberg recognized that the basic question of whether the Tribe would be disproportionately impacted by an oil spill was not adequately addressed in the EA.  The use of a half mile buffer as part of the Corps' Environmental Justice analysis in the EA was roundly criticized, not just by the Tribe, but also by EPA and even the Corps' Chief Counsel – and Judge Boasberg agreed that its use was flawed.  Opinion at 50-51.

More broadly, Judge Boasberg emphasized that the "EA is silent, for instance, on the distinct cultural practices of the Tribe and the social and economic factors that might amplify its experience of the environmental effects of an oil spill."  Opinion at 54.  Here Judge Boasberg recognized that the application of environmental justice principles requires special attention to those factors that are unique to the Tribes.  Along these lines, the Tribe's health, safety, and economy deeply depend on the waters of Lake Oahe – in many ways that are particular to the Tribe.  This was illustrated by the water crisis faced by the Tribe in November 2003, when a drought and other conditions buried our water intake and caused us to suddenly be without water from Lake Oahe.  The crisis had particularly severe impacts on our children, our elders and those with serious medical conditions.  For example, without water from Lake Oahe the IHS Hospital on our Reservation was forced to close down for several days.  Dialysis patients and others who normally receive treatment on the Reservation had to be transported to Bismarck for treatment – a trip that added to the burdens of their already pressing medical problems.  The absence of water from Lake Oahe posed extensive health risks, disrupted commerce and created hardships for our people.  The 2003 water crisis demonstrates the kind of "social and economic factors" that Judge Boasberg referred to as being important with respect to environmental justice.

Likewise, for environmental justice purposes, it is not enough to merely recite the numbers of fish and game that will be killed by an oil spill – although that fact is important.  Environmental justice requires the further step of addressing how the killing of those game and fish would impact the Tribe.  What is the meaning of the loss of game and fish to Tribal society?  What cultural

Douglas W. Lamont, Acting Assistant Secretary for Civil Works
Col. John Henderson, P.E., District Commander
June 29, 2017
Page 5

practices will be impaired and how will that impact Tribal communities?  What is the economic role of subsistence hunting and fishing to the Reservation community?  To what extent do historic factors – such as the role of the United States in repeatedly breaking its promises to the Tribe, in taking Tribal lands without consent – make the availability of subsistence game and fish all the more important today?

The 1994 Executive Order on Environmental Justice specifically recognizes the importance of subsistence hunting and fishing.  Exec. Order 12,898, 59 Fed. Reg. 7629, § 4-4 (Feb. 11, 1994).  Moreover, as Judge Boasberg explained, the Council on Environmental Quality Guidance implementing that Order emphasizes that government-to-government consultation with Tribes is a hallmark of addressing environmental justice concerns where Tribes may be affected. Opinion at 48 (quoting CEQ Guidance at 14).  And this is precisely our point here – the remand requires the Corps to address environmental justice principles, which require comprehensive consideration of the particular and special ways in which proposed actions may impact tribal social and economic life – and that analysis requires tribal participation, since Tribes are uniquely situated to address those issues.

Judge Boasberg's ruling also focused on the significant scientific critiques presented by the Tribes, challenging the methods and data (or lack of data) relied upon by the Corps regarding the risks of oil spills.  Opinion at 31-34.  As Judge Boasberg emphasized, based on the Corps' failure to address the merits of the scientific evidence of oil spill risk presented by the Tribes, "the Court cannot conclude that the Corps made a convincing case of no significant impact or took the requisite hard look."  Opinion at 34.  In other words, Judge Boasberg found that the FONSI is invalid and not legally supported based on the Corps' handling of this issue to date.

So, how is the Corps to resolve this controversy regarding oil spill risk?  Judge Boasberg's ruling makes it clear that merely rubber-stamping the conclusory views of DAPL on this issue is insufficient in the face of significant scientific evidence to the contrary.  Experts for the Tribes raised a host of issues addressing significant methodological and data errors – as to which DAPL's comments were non-responsive or misleading.  Having relied on DAPL to no avail once on those critical issues, the Corps must not make the same mistake again.  Instead, the Corps should open up the process and allow the Tribe and its experts, along with independent third party experts, to provide the Corps with the necessary information to properly address oil spill risk.

The regulations provide that a factor supporting a determination that a proposed action is "significant," and therefore that an EIS is required is "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial."   40 C.F.R.

152991-1

Douglas W. Lamont, Acting Assistant Secretary for Civil Works
Col. John Henderson, P.E., District Commander
June 29, 2017
Page 6

§ 1508.27(b)(4).  In this case, we are beyond the phase of whether the effects of the pipeline are "likely" to be highly controversial – as Judge Boasberg has already expressly ruled that they <u>are</u> highly controversial.  That controversy arises from the fact that significant evidence has been presented "that reveals flaws in the methods or data relied upon by the agency in reaching its conclusions."  *National Parks Conservation Ass'n v. United States*, 177 F. Supp.3d 1, 33 (D.D.C. 2016) (citing *National Parks Conservation Ass'n v. Babbitt*, 241 F.3d 722, 736-37 (9th Cir. 2001). This controversy is the central feature of the longstanding dispute of the pipeline – what is the real risk of an oil spill, to the Tribes and the other 17 million people downstream?  There have already been three reported leaks by the Dakota Access pipeline – and this adverse experience in such a short time reinforces the need for comprehensive review.  While the Tribe is at risk, Dakota Access continues to leave the Tribe out with respect to response planning – and to our knowledge there are not any final Geographic Response Plans in place.

An EIS is the proper vehicle for the Corps to obtain information needed to resolve this fundamental controversy in a reasoned and fair way.  We urge you to open the process to allow the Tribes and the public to be heard so that the serious questions that have been raised on oil spill risk can be fully examined, as required by the remand.

I invite you to come to Standing Rock to discuss the remand process with us on a government to government basis.  I look forward to hearing from you as we work toward a fair resolution of this matter.

Sincerely,

Dave Archambault, II, Chairman
Standing Rock Sioux Tribe

cc:    Lieutenant General Todd T. Semonite
       Commanding General and Chief of Engineers
       Department of the Army
       U.S. Army Corps of Engineers
       441 G Street, N.W.
       Washington, D.C.  20314-1000
       Todd.T.Semonite@usace.army.mil

# Exhibit 2

Case No. 1:16-cv-1534-JEB
(and Consolidated Case Nos. 16-cv-1796 and 17-cv-267)

DECLARATION OF JAN HASSELMAN IN SUPPORT OF PLAINTIFF STANDING ROCK
SIOUX TRIBE'S MOTION FOR CLARIFICATION RE REMAND PROCESS AND
REMAND CONDITIONS



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, OMAHA DISTRICT
1616 CAPITOL AVENUE
OMAHA NE 68102-4901

SEP 25 2017

REPLY TO
ATTENTION OF

District Commander

Chairman Dave Archambault II
Standing Rock Sioux Tribe
Bldg. #1, North Standing Rock Avenue
P.O. Box D
Fort Yates, North Dakota 58538

Dear Chairman Archambault:

The purpose of this letter is to request information from the Standing Rock Sioux Tribe (Tribe) to help us in our review of the three issues that the U.S. District Court for the District of Columbia remanded to the U.S. Army Corps of Engineers for further review. *See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, No. 16-1534, Memorandum Opinion (D. D.C. June 14, 2017) (ECF No. 239). Specifically, the Corps requests that the Tribe participate in the remand analysis being undertaken by the Corps by providing the following information and supporting documentation.

(1) A summary of the number of game, fish and wildlife licenses and permits that were issued by the Tribe, to both Tribal members (resident and non-resident), members of other federally recognized Tribes, and non-members, during 2015, 2016, and 2017. The summary should include a description of the activity permitted and the classification of the license or permit (e.g., Member Game, Fish and Wildlife License for Big Game (Muzzleloader Deer/Antelope); Non-resident non-member Game, Fish and Wildlife license, Migratory Bird), the duration of the permit or license, and any other details you wish to provide.

(2) A summary of the subsistence hunting or fishing licenses or permits that have been issued by the Tribe to Tribal members during 2015, 2016, and 2017. Please also provide citations to all Tribal regulations established for permitting the taking of game, fish, wildlife, timber and plants for disabled persons or for subsistence and ceremonial purposes, and summary of any applications for, and permits issued for, the same during 2015, 2016, and 2017.



-2-

(3) Copies of all hunting or fishing proclamations for 2015, 2016, and 2017. Please also provide the number of game tags issued in 2015, 2016, and 2017, including the type of species for which the tag was issued and information on any hunting and fishing restrictions, such as size, species, season, or amount.

(4) A summary of harvest reports of game taken during 2015, 2016, and 2017, including the type of species taken, quantity of each species taken, location of where the game was taken, and the type of license or permit under which the game was taken.

(5) Documentation of hunting or fishing permit reciprocity between your Tribe and other tribes, including the Cheyenne River Sioux Tribe, Oglala Sioux Tribe or the Yankton Sioux Tribe during 2015, 2016 and 2017.

(6) Any studies or reports on game (aquatic life, birds and mammals) species, estimated population, and habitat within the Standing Rock Sioux Reservation, and the designated hunting grounds for such game, in relation to Lake Oahe.

(7) Documentation of distinct cultural practices and subsistence hunting, fishing and gathering of your Tribe that are connected to Lake Oahe. Please describe the practice, its historical origins, and how the practice is connected to Lake Oahe. Please identify any information that you believe is sensitive. To the extent allowed by applicable federal law, cultural practices information will be treated as sensitive information and will be protected or redacted to ensure the confidentiality of the provided information.

(8) Any additional demographic data on your Tribal reservation that you want the Corps to consider beyond what is obtainable from the U.S. Census.

(9) Please verify the completeness of the following list of documents as what has been provided by the Tribe to the Corps since July 25, 2016:

- Accufacts Inc., Memorandum to Jan Hasselman, Earthjustice, Re: Accufacts Review of the U.S. Army Corps of Engineers (USACE) Environmental Assessment (EA) for the Dakota Access Pipeline ("DAPL") (Oct. 28, 2016).

-3-

- Declaration of Jeff Kelly, Director of Standing Rock Sioux Tribe's Department of Game, Fish and Wildlife Conservation, (filed Feb. 14, 2017) (ECF No. 117-16).

- Second Declaration of Richard B. Kuprewicz (March 24, 2017)(ECF No. 272-1).

- Kuprewicz Report Update, filed under seal (February 12, 2017).

- Holmstrom Declaration (August 7, 2017) (ECF No. 272-4).

- Goodman Declaration (August 7, 2017)(ECF No. 272-5).

- Gillian Bowser, Ph.D., Assessment and Review Dakota Access Pipeline Environmental Assessment Terrestrial and Aquatic Organisms (Jan. 2017) (ECF No. 131-5).

We would appreciate receiving this information in the next thirty days. If you need additional time, please let us know. We will determine the next steps in the remand process and whether we need any additional information from your tribe after we receive the requested information and documentation.

Please send your response to Mr. Brent Cossette, at the above address. If you have any questions, then you may contact Mr. Cossette at brent.j.cossette@usace.army.mil or at (402) 995-2712.

Sincerely,

**SIGNED**
**COL JOHN L. HUDSON**

John L. Hudson, PE
Colonel, Corps of Engineers
District Commander

# Exhibit 3

Case No. 1:16-cv-1534-JEB
(and Consolidated Case Nos. 16-cv-1796 and 17-cv-267)

DECLARATION OF JAN HASSELMAN IN SUPPORT OF PLAINTIFF STANDING ROCK
SIOUX TRIBE'S MOTION FOR CLARIFICATION RE REMAND PROCESS AND
REMAND CONDITIONS



**Dave Archambault II**
*Chairman*

**TRIBAL COUNCIL**
**(AT LARGE)**

Paul Archambault

Mike Faith

Chad Harrison

Kory McLaughlin

Charles Walker

Dana Yellow Fat

**Jesse McLaughlin**
*Vice Chairman*

**Adele M. White**
*Secretary*

**Cody TwoBears**
*Cannonball District*

**Joe Dunn**
*Long Soldier District*

**Duane Claymore**
*Wakpala District*

**Frank A. White Bull**
*Kenel District*

**Joe White Mountain Jr.**
*Bear Soldier District*

**Caroline Thompson**
*Rock Creek District*

**Robert Taken Alive**
*Running Antelope District*

**Samuel B. Harrison**
*Porcupine District*

October 6, 2017

Col. John L. Hudson, P.E.
District Commander
U.S. Army Corps of Engineers – Omaha District
CENWO-DE
1616 Capitol Ave, Suite 9000
Omaha, NE  68102-4901
john.l.hudson@usace.army.mil

Re:     *Standing Rock Sioux Tribe et al. v. U.S. Army Corps of Engineers* – remand issues

Dear Colonel Hudson:

This will acknowledge your letter to me dated September 25, 2017.  That letter requests certain information in connection with the remand from Judge Boasberg in the Tribe's litigation against the Corps regarding the Dakota Access pipeline.  While the Tribe is working to put together the information you have requested, at this point we want to emphasize some critical points.

First, the information requested in your letter is framed far too narrowly and accordingly does not adequately address the full range of matters that are properly within the scope of the remand.  Consistent with the remand and the Tribe's rights in this matter, the Tribe intends to provide to the Corps a much broader range of information and materials to address the three issues that have been remanded – and we will not be constrained or limited by the way in which the questions were framed in your letter.  The remand requires a reconsideration by the Corps of three vitally important issues – Treaty hunting and fishing, environmental justice, and the scientific controversy surrounding oil spill risk.  The questions in your letter in many ways fail to address the heart of those issues, as we will demonstrate in our submissions to you.

153868-1

Col. John L. Hudson, P.E.
District Commander
October 6, 2017
Page 2

Second, your letter does not address the process that the Corps intends to use in connection with the remand.  In my letter to Colonel Henderson dated June 29, 2017 (copy attached), in addition to discussing the breadth of the remand, I addressed the importance of an open and transparent process.  Among other things I stated there that, "An EIS is the proper vehicle for the Corps to obtain information needed to resolve this fundamental controversy in a reasoned and fair way.  We urge you to open the process to allow the Tribes and the public to be heard so that the serious questions that have been raised on oil spill risk can be fully examined, as required by the remand."

In that letter, I further asked the Corps to come to Standing Rock, to discuss the remand process with the Tribe on a government to government basis.  Your letter unfortunately provides no indication that you intend to meet with the Tribe or provide any meaningful opportunity for government to government dialogue.  While your letter reflects at least some measure of understanding that you need basic information from the Tribe to address your duties under the remand, it stops short of providing a meaningful process for securing the needed information.  We again invite you to come to the Reservation and meet with us – and to engage in meaningful consultation.

Third, your letter does not provide any assurance that the Tribe will have the opportunity to review materials provided to you by the Dakota Access Pipeline in connection with the remand.  One of the basic deficiencies in the Corps' process to this point has been that certain critical technical information, including with respect to spill models, has not been made available.  This failure to disclose key information allowed the pipeline to be approved without adequate analysis – placing the Tribe and others at significant risk.  With the remand, the Corps has an opportunity to correct this mistake and to have a meaningful review to inform your decision.

We assume that the Corps will be seeking certain information from Dakota Access in connection with the remand.  While we do not know the full scope of such requests, whatever information the Corps seeks and obtains from Dakota Access for the remand should be shared with the Tribe.  The Tribe has a right to see what is being claimed and what the Corps is considering, and to provide appropriate technical and legal responses.  What we are seeking here in this regard is consistent with the Corps' practice regarding the information provided by the Tribe.  During the earlier phase of this matter, the Corps as you know shared with Dakota Access the information, including expert information, that the Tribe provided to the Corps.  For example, Dakota Access clearly had access to the Kuprewicz report, and provided their response to that report – and the Corps included that in the administrative record for its earlier decision.

153868-1

Col. John L. Hudson, P.E.
District Commander
October 6, 2017
Page 3

Fairness now demands that the Tribe be provided with information provided by Dakota Access, on spill models and other matters, in connection with the remand.

Fourth, in light of these and other considerations, and the overall importance and complexity of the issues involved in the remand, the deadline your letter set forth regarding a response from the Tribe should be revisited.

We look forward to hearing from you about these vitally important matters.

Sincerely,

Dave Archambault, II, Chairman
Standing Rock Sioux Tribe

Enclosure
cc:     Brent J. Cossette
        U.S. Army Corps of Engineers
        Omaha District
        CENWO-OD-TN
        1616 Capitol Avenue, Suite 9000
        Omaha, NE 68102
        brent.j.cossette@usace.army.mil

# Exhibit 4

Case No. 1:16-cv-1534-JEB
(and Consolidated Case Nos. 16-cv-1796 and 17-cv-267)

DECLARATION OF JAN HASSELMAN IN SUPPORT OF PLAINTIFF STANDING ROCK
SIOUX TRIBE'S MOTION FOR CLARIFICATION RE REMAND PROCESS AND
REMAND CONDITIONS



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, OMAHA DISTRICT
1616 CAPITOL AVENUE
OMAHA NE 68102-4901

NOV 27 2017

REPLY TO
ATTENTION OF

District Commander

Chairman Mike Faith
Standing Rock Sioux Tribe
Bldg. #1, North Standing Rock Avenue
P.O. Box D
Fort Yates, North Dakota 58538

Dear Chairman Faith:

This letter is in response to the October 6, 2017 letter from your predecessor, Chairman Archambault, regarding my September 25, 2017 letter requesting information from your Tribe to assist the Corps in its review of the three issues remanded to the Corps by the U.S. District Court for the District of Columbia in *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*. I appreciate your Tribe's willingness to participate with the Corps in the remand process.

I am willing to meet with Tribal representatives at your Reservation, but I believe the meeting would be most productive after the Corps has the opportunity to review the information your Tribe may submit in response to my letter dated September 25, 2017. In the meantime, my team and I are available to meet via teleconference to discuss any of your Tribe's questions.

Please send the requested information to Mr. Brent Cossette at the above address by December 20, 2017 so that we can maintain the schedule that we provided to the court. If you have any questions, you may contact Mr. Cossette at brent.j.cossette@usace.army.mil or at (402) 995-2712.

Sincerely,

John L. Hudson, P.E.
Colonel, Corps of Engineers
District Commander

Printed o ♻ Recycled Paper

# Exhibit 5

Case No. 1:16-cv-1534-JEB
(and Consolidated Case Nos. 16-cv-1796 and 17-cv-267)

DECLARATION OF JAN HASSELMAN IN SUPPORT OF PLAINTIFF STANDING ROCK
SIOUX TRIBE'S MOTION FOR CLARIFICATION RE REMAND PROCESS AND
REMAND CONDITIONS

Mike Faith
*Chairman*

**TRIBAL COUNCIL
(AT LARGE)**

Paul Archambault

Frank White Bull

Courtney Yellow Fat

Kory McLaughlin

Charles Walker

Dana Yellow Fat

Ira Taken Alive
*Vice Chairman*

Susan Agard
*Secretary*

John Pretty Bear
*Cannonball District*

Brandon Mauai
*Long Soldier District*

Wayne Looking Back
*Wakpala District*

Delray Demery
*Kenel District*

Joe White Mountain Jr.
*Bear Soldier District*

Caroline Thompson
*Rock Creek District*

Verdell Bobtail Bear
*Running Antelope District*

Samuel B. Harrison
*Porcupine District*

December 18, 2017

Col. John L. Hudson, P.E.
District Commander
U.S. Army Corps of Engineers – Omaha District
CENWO-DE
1616 Capitol Ave, Suite 9000
Omaha, NE  68102-4901

     Re:    *Standing Rock Sioux Tribe et al. v. U.S. Army Corps of Engineers*

Dear Colonel Hudson:

     I am writing in response to your letter of November 27, 2017.  Your letter raises a number of concerns for the Tribe regarding the process, scope and timing of the remand, and the overall fairness and legality of the approach suggested in your letter.

     Judge Boasberg's June 14 decision requires a hard look under NEPA with respect to the Treaty right to hunt and fish, principles of environmental justice, and the controversy arising from expert critique regarding oil spill risks and impacts.  As a starting point for this hard look, the Corps is required – including under its own policies – to consult on a government to government basis with Standing Rock (and the other affected Tribes) regarding the issues that must be addressed.

     But your letter (like your predecessor's September 25 letter) skips over this critical first step and instead seeks to unilaterally determine what information you will consider and when.  Rather than engaging in meaningful consultation, your letter suggests that the Corps intends to start the remand process by dictating the limited extent to which you will engage.  Further, your letter indicates that you decline to meet with the Tribe until we submit specific information requested by the Corps – despite our concerns regarding the inadequacy of the Corps' request, and the clear need for a more comprehensive approach to the remand.

Col. John L. Hudson, P.E.
District Commander
December 18, 2017
Page 2

Your letter (like the September 25, letter) suggests a cursory, narrow approach, fundamentally at odds with the actual breadth and significance of the issues implicated by the remand.  For example, while the scientifically-based controversy surrounding oil spill risk and potential impact is a central part of the remand, your letters ask for no new information at all on this broad and overarching topic – suggesting the you plan to give no meaningful consideration to any new information.  And, your letters fail to recognize that the issues remanded by Judge Boasberg are interrelated – as, among other things, the determination of worst case spill discharge (the subject of robust criticism from multiple independent experts) would have a significant impact on both hunting and fishing and environmental justice concerns.  For these and other reasons, the simple listing of questions as contained in the September 25 letter, primarily concerning number of hunting and fishing licenses, is roundly inadequate and cannot serve as the outline for a proper process.

The task at hand – addressing the issues for the remand – is vitally important and significantly broader than your letter reflects.  The Tribe is working conscientiously to address our issues of concern for the remand.  We will soon provide more details regarding our expected time frame – and we would appreciate your keeping us informed regarding any changes in the Corps' overall time frame of April 2, 2018.

There is also an important relationship between the remand and Judge Boasberg's December 4 order and opinion regarding imposing conditions during the period of the remand.  In both regards – the remand and the interim conditions – the Tribe has a right to participate.  And in both regards, the right is being unduly impaired by the Corps and DAPL withholding important information from the Tribe.  Proper consideration of both the issues of the remand, and the issues necessary for proper response planning, require spill model, risk analysis and worst case discharge information, regarding the Lake Oahe crossing – but that information has not been provided.

So, for purposes of both the remand as well as for the required collaboration on response planning, it is requested that you provide the following:

- Most current Facility Response Plan, without redactions, and with all appendices
- Most current Lake Oahe Spill Model, including scenarios analyzed and technical documentation. This should include the spill model information that the Corps has indicated to the Court that it has requested from DAPL recently
- Most current Risk Analysis specific to the Lake Oahe crossing
- Worst case discharge calculations for the Lake Oahe crossing
- Location and specifications of the Lake Oahe shut-off valves; elevation of the valves and the pipeline segment between the shut-off valves; whether they are automatic or manually or remotely operated; and calculation of the drainage volume
- DAPL Pipeline Safety Management System requirements, framework and implementation plan
- Actual response time at other ETP/Sunoco reported pipeline leaks
- Number and location of personnel at Lake Oahe
- Location and contents of oil spill response equipment staged for Oahe area spills

Col. John L. Hudson, P.E.
District Commander
December 18, 2017
Page 3

- Cathodic protection program, including design and monitoring specific to the Lake Oahe crossing
- Information on the composition of Bakken crude transported in DAPL that was utilized by ETP in the preparation of the FRP. Identify the hazards specific to the Bakken crude, including flammability and toxicity, and information on how the emergency response plans address those specific hazards.

Disclosure of this information is necessary in order for the Tribes to meaningfully participate in discussions with the Corps and Energy Transfer Partners, as directed by Judge Boasberg. It is incumbent upon the Corps of Engineers to assist with facilitating a collaborative oil spill response plan for the Missouri River, by disclosing information that is necessary for the development of this plan.

Moreover, NEPA, Executive Order 13175 and the DoD American Indian and Alaska Native Policy all require genuine government-to-government consultation on issues affecting Tribal resources, such as the study conducted by the Corps on remand. Consultation is an obligation of the Corps of Engineers – it is not conditional upon any action of the Tribe. Accordingly, I reiterate our invitation to the Standing Rock Indian Reservation, to meet and discuss this important matter.

Thank you.

Sincerely,

Mike Faith, Chairman
Standing Rock Sioux Tribe

cc:   Brent J. Cossette
      U.S. Army Corps of Engineers
      Omaha District
      CENWO-OD-TN
      1616 Capitol Avenue, Suite 9000
      Omaha, NE 68102
      brent.j.cossette@usace.army.mil

154472-1

# Exhibit 6

Case No. 1:16-cv-1534-JEB
(and Consolidated Case Nos. 16-cv-1796 and 17-cv-267)

DECLARATION OF JAN HASSELMAN IN SUPPORT OF PLAINTIFF STANDING ROCK
SIOUX TRIBE'S MOTION FOR CLARIFICATION RE REMAND PROCESS AND
REMAND CONDITIONS



**Mike Faith**
*Chairman*

**TRIBAL COUNCIL
(AT LARGE)**

Paul Archambault

Frank White Bull

Courtney Yellow Fat

Kory McLaughlin

Charles Walker

Dana Yellow Fat

**Ira Taken Alive**
*Vice Chairman*

**Susan Agard**
*Secretary*

**John Pretty Bear**
*Cannonball District*

**Brandon Mauai**
*Long Soldier District*

**Wayne Looking Back**
*Wakpala District*

**Delrey Demery**
*Kenel District*

**Joe White Mountain Jr.**
*Bear Soldier District*

**Carline Thompson**
*Rock Creek District*

**Verdell Bobtail Bear**
*Running Antelope District*

**Samuel B. Harrison**
*Porcupine District*

January 4, 2018

Col. John L. Hudson, District Commander
U.S. Army Corps of Engineers
Omaha District
1616 Capitol Avenue
Omaha, Nebraska 68102-9000

Attention:    Brent Cossette

RE:    Corps of Engineers' Consultation Requirements
    for Standing Rock Remand Analysis

Dear Col. Hudson:

I write to outline my understanding of the Corps of Engineers' obligation to consult with the Standing Rock Sioux Tribe on a government-to-government basis, on the remand study ordered by Judge Boasberg on June 14, 2017.  We have invited you to the Standing Rock Reservation for this purpose.  Unfortunately, our meeting request has gone unanswered.

Under Executive Order 13175, the Corps of Engineers is required to engage in government-to-government consultation on "issues concerning Indian tribal self-government, tribal trust resources, and Indian tribal treaty and other rights."  (65 Fed. Reg. 67249). Significantly, section 3(a) of the executive order states –

> *Agencies shall respect Indian tribal self-government and sovereignty,* **honor treaty rights** *and other rights… (and) ensure* **meaningful and timely** *input by tribal officials…*

Moreover, the *Department of Defense American Indian and Alaska Native Policy*, which implements E.O. 13175, requires the Corps of Engineers to –

> *Assess… through consultation, the effect of DoD proposed actions that may have the potential to significantly affect protected tribal resources, tribal rights and Indian lands before decisions are made.*
>
> *Provid(e) timely notice to, and consulting with, tribal governments prior to taking any actions (that) affect protected tribal resources… (and) Consulting consistent with government-to-government relations and in accordance with protocols mutually agreed to by the particular tribe and DoD, including necessary dispute resolution processes.*

The Corps' remand study involves Tribal Treaty rights, fish and wildlife resources, disproportionate impacts to Tribal resource from a Corps-permitted project, and scientific controversy over those impacts. This clearly triggers the consultation requirements of E.O. 13175 and the *DoD American Indian and Alaska Native Policy* for the remand study. Nevertheless, Omar Ames of the Corps wrote an email on January 2, stating "we feel that the Tribe needs to provide us with the requested Remand information in advance of the meeting."

The consultation requirements of E.O. 13175 and the DoD Policy may not be conditioned upon the Tribe answering any questions in advance. The Ames email and the Corps' recent correspondence dismiss and disrespect our concerns. The letter dated September 25, 2017 posed numerous questions relating to the SRST Game and Fish Program, which are unrelated to our concerns over the impacts of an oil spill on fish and wildlife. Your November 27th letter suggests that the Corps does not take seriously its consultation obligations to Standing Rock with respect to the remand study.

A data request in a letter is not consultation. The recent report of the Departments of the Interior, Army and Justice entitled *Improving Tribal Consultation and Tribal Involvement in Federal Infrastructure Decisions* (January 2017) defines Tribal consultation as follows:

> Tribal consultation is a *process* that aims to create *effective collaboration* with Tribes and inform Federal decision-makers. Consultation is built upon a government-to-government exchange of information defined in part by *meaningful dialogue* based upon trust, respect and shared responsibility. In addition, this kind of consultation has a *defined, agreed-upon purpose, subject and objective.*

(*Improving Tribal Consultation and Tribal Involvement in Federal Infrastructure Decisions*, p. 6, located at bia.gov/as-ia/raca/tribal-input-federal-infrastructure-decisions).

The Corps is not following the Department of the Army's own definition of consultation. There has been no discussion of protocols or process, for effective collaboration on the remand study. Timely consultation would involve dialogue with the Tribe on the data needs for the study, rather than a demand for marginally relevant information. By dictating to the Tribe the issues to

be considered with respect to Treaty-protected hunting and fishing, and refusing to meet with the Tribe, the Corps is violating the applicable consultation requirements for the remand study.

Moreover, the questions posed in the letter are not designed to effectively review the issues identified by Judge Boasberg in the June 14th Memorandum Opinion. In his October 11th ruling on the pipeline operation, the judge admonished the Corps to follow all applicable requirements in the preparation of the supplemental NEPA documents on remand. He explained, "(C)ompliance with NEPA cannot be reduced to a bureaucratic formality, and the Court expects the Corps not to treat the remand as an exercise in filling out the proper paperwork post hoc." By refusing to properly consult with our Tribe, the Corps is treating the remand process as a standard bureaucratic exercise – in contravention of Judge Boasberg's directive.

Nevertheless, the Standing Rock Sioux Tribe stands prepared to work collaboratively with the Corps of Engineers in a government-to-government process on the remand study. Toward that end, I reiterate my invitation to the Standing Rock Indian Reservation, to discuss issues relating to the supplemental NEPA *process*, as well as the substantive issues under review by the Corps of Engineers. These issues must include environmental justice considerations and the controversy in expert opinions on the impacts of an oil spill – matters that were totally ignored in your recent correspondence.

Thank you for your urgent attention to this matter.

Sincerely,

Mike Faith, Jr., Chairman
Standing Rock Sioux Tribe

# Exhibit 7

Case No. 1:16-cv-1534-JEB
(and Consolidated Case Nos. 16-cv-1796 and 17-cv-267)

DECLARATION OF JAN HASSELMAN IN SUPPORT OF PLAINTIFF STANDING ROCK
SIOUX TRIBE'S MOTION FOR CLARIFICATION RE REMAND PROCESS AND
REMAND CONDITIONS



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, OMAHA DISTRICT
1616 CAPITOL AVENUE
OMAHA NE  68102-4901

January 29, 2018

REPLY TO
ATTENTION

District Commander

Chairman Mike Faith
Standing Rock Sioux Tribe
Bldg. #1, North Standing Rock Avenue
P.O. Box D
Fort Yates, North Dakota 58538

Dear Chairman Faith:

Thank you for your letter, sent via e-mail and dated January 4, 2018, regarding the Corps of Engineers' (Corps) request for information from the Tribe related to the specific remand issues identified by the court in the June 14, 2017, decision in *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*.  I understand that the Tribe is in the process of collecting the information requested by the Corps.  We look forward to reviewing that information, which will help with our analysis.  I regret that the recent Government shutdown required the cancellation of our meeting on January 24, 2018.  My team and I look forward to further consultation, and being able to meet you in Bismarck on January 30, 2018.

Sincerely,

John L. Hudson, P.E.
Colonel, Corps of Engineers
District Commander

cc:
Jan E. Hasselman
Earthjustice
705 Second Avenue, Suite 203
Seattle, Washington  98104

Printed on ♲ Recycled Paper

# Exhibit 8

Case No. 1:16-cv-1534-JEB
(and Consolidated Case Nos. 16-cv-1796 and 17-cv-267)

DECLARATION OF JAN HASSELMAN IN SUPPORT OF PLAINTIFF STANDING ROCK
SIOUX TRIBE'S MOTION FOR CLARIFICATION RE REMAND PROCESS AND
REMAND CONDITIONS

| | |
|---|---|
| **From:** | Jan Hasselman |
| **To:** | "Debold, David"; Ducheneaux Nicole |
| **Cc:** | Scherman, William S.; Fleischer, Jason J. |
| **Subject:** | RE: Selection of third party independent expert engineering company |
| **Date:** | Tuesday, January 23, 2018 11:25:11 AM |

David:

Thank you for sharing the names of the auditors you have proposed.

Unfortunately, we do not believe that any of the suggested auditors meet the Court's direction for an "independent, third party auditor." All of the proposed auditors either have close ties to the oil and gas industry generally, or do ETP/DAPL specifically—putting their "independence" very much in question. Our technical team has reviewed all three closely and has grave doubts that any of them would be able to function independently for purposes of a third party audit.

For example, TRC lists ETP as a client and claims an "unparalleled record of experience in providing pipeline engineering services to the industry" (https://www.trcsolutions.com/writable/images/Pipeline-Engineering.pdf)

Wood Group worked on DAPL for ETP and authored a number of what we to view to be highly superficial risk-related documents – an obvious conflict

As to the Process Performance Improvement Consultants, they appears to be involved a lot in litigation support for oil and gas firms generally and pipeline service companies specifically

The Tribe's technical team has identified an independent party who they believe would do a good job of overseeing an independent audit. Gordon A. Aaker, PE, of Engineering Services LLP, GAA@Engineering-Experts.com. A member of the technical team I believe checked in with Mr. Aaker to determine if he was available and he said he was. We would agree to moving ahead with Mr. Aaker. If we cannot agree, I suppose we will have to return to the Court for guidance.

Additionally, we have some concerns about the scope of the audit. The original PHMSA recommendation that formed the core of our request to the Court was an audit of implementation of permit conditions and "any other integrity threats" affecting the pipeline. We believe that this latter phrase involves a review of the Tribe's concerns with DAPL's risk analyses and other technical information. A narrow review of implementation of permit conditions would not in our view be adequate. Let's see if we can discuss this issue and get some agreement on the scope of the audit before too much more time goes by.

Please let us know how you'd like to proceed.

Jan

**From:** Debold, David [mailto:DDebold@gibsondunn.com]
**Sent:** Thursday, January 11, 2018 1:49 PM
**To:** Jan Hasselman ; Ducheneaux Nicole
**Cc:** Scherman, William S. ; Fleischer, Jason J.
**Subject:** Selection of third party independent expert engineering company

Counsel:

As you know, on December 4, 2017, Judge Boasberg ordered Dakota Access to select, "with input from the Tribes," a third-party independent expert engineering company to perform a compliance audit of easement conditions, regulations, and integrity threats at Lake Oahe. Dakota Access has identified three such companies listed below.

We would appreciate any input from your clients on these potential auditors **no later than January 25, 2018**.

The three identified expert engineering companies are, in no particular order:
Process Performance Improvement Consultants, LLC
http://p-pic.com/
TRC Solutions
https://www.trcsolutions.com/
Wood Group
https://www.woodgroup.com/
Thanks, and we look forward to hearing any input you may have.
Best regards,
David
**David Debold**

GIBSON DUNN

Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W., Washington, DC 20036-5306
Tel +1 202.955.8551 • Fax +1 202.530.9682
DDebold@gibsondunn.com • www.gibsondunn.com

---

This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

---

# Exhibit 9

Case No. 1:16-cv-1534-JEB
(and Consolidated Case Nos. 16-cv-1796 and 17-cv-267)

DECLARATION OF JAN HASSELMAN IN SUPPORT OF PLAINTIFF STANDING ROCK
SIOUX TRIBE'S MOTION FOR CLARIFICATION RE REMAND PROCESS AND
REMAND CONDITIONS

Mike Faith
*Chairman*

TRIBAL COUNCIL
(AT LARGE)

Paul Archambault

Kory McLaughlin

Charles Walker

Frank White Bull

Courtney Yellow Fat

Dana Yellow Fat

Ira Taken Alive
*Vice Chairman*

Susan Agard
*Secretary*

John Pretty Bear
*Cannon Ball District*

Brandon Mauai
*Long Soldier District*

Wayne Looking Back
*Wakpala District*

Delray Demery
*Kenel District*

Joe White Mountain Jr.
*Bear Soldier District*

Caroline Thompson
*Rock Creek District*

Verdell Bobtail Bear
*Running Antelope District*

Samuel B. Harrison
*Porcupine District*

*Sent by email to Carl.borkland@Energytransfer.com*

February 28, 2018

Energy Transfer Partners, L.P.
8111 Westchester Drive
Dallas, Texas 75225

Attention:     Carl Borkland

RE:     Proposed Meeting on Emergency Planning and Response – Dakota Access Pipeline
March 7, 2018 at the Tribal Administrative Building in Fort Yates, N.D.

Dear Energy Transfer Partners, L.P.:

I write to invite you to the Standing Rock Reservation for a meeting on emergency response planning for the Dakota Access Pipeline, for March 7, 2018, at 10:00 am. This date was identified by Carl Borkland as being available for ETP. Be assured that we will take all steps to ensure that our visitors are treated respectfully, consistent with our Lakota culture.

The information relating to emergency response that has been requested by the Tribe has not been provided by ETP. As stated to you previously, the Geographic Response Plan is only one aspect of emergency planning. We would appreciate your providing the documentation requested prior to March 7, to enable us to review the information prior to the meeting.

Mr. Borkland stated in his email dated February 24th that ETP would like to go to potential clean-up sites on the Reservation. ETP will need the Tribe's permission to enter the Reservation and to traverse Tribal land. At this point, the only permission granted to ETP to enter the Reservation is invitation to meet with him in Tribal chambers.

1

There are numerous historic properties of Lakota and Dakota origin in low-lying areas along the Missouri River. We remain very concerned with the impact of an oil spill on these sites, and the clean-up and remediation that could further affect these sites. There needs to be an evaluation of the potential impacts of an oil spill and clean-up activities on these properties.

We are especially concerned with Mad Bear I and II, which are under the continuing jurisdiction of the Corps of Engineers pursuant to the consent decree in the federal *Mato Chezeka* litigation. All sites must be properly protected and impacts mitigated. As there have been no discussions or evaluation of the impacts on our cultural properties downstream from the DAPL Lake Oahe crossing, ETP personnel are not permitted on Tribal land for the purpose of conducting any field surveys, at this time.

Thank you for your attention to this matter.

Sincerely,

Mike Faith, Jr., Chairman
Standing Rock Sioux Tribe

# Exhibit 10

Case No. 1:16-cv-1534-JEB
(and Consolidated Case Nos. 16-cv-1796 and 17-cv-267)

DECLARATION OF JAN HASSELMAN IN SUPPORT OF PLAINTIFF STANDING ROCK
SIOUX TRIBE'S MOTION FOR CLARIFICATION RE REMAND PROCESS AND
REMAND CONDITIONS

| From: | Scherman, William S. |
|---|---|
| To: | Jan Hasselman; Debold, David; Ducheneaux Nicole |
| Cc: | Fleischer, Jason J.; Marinelli, Matthew (ENRD) (Matthew.Marinelli@usdoj.gov); Zilioli, Erica (ENRD) (Erica.Zilioli@usdoj.gov); William R. Perry (WPERRY@SONOSKY.COM); "Dean DePountis" |
| Subject: | RE: Selection of third party independent expert engineering company |
| Date: | Tuesday, February 20, 2018 1:09:48 PM |

Jan,

You wrote the following to us on Jan. 23:

"The Tribe's technical team has identified an independent party who they believe would do a good job of overseeing an independent audit.  Gordon A. Aaker, PE, of Engineering Services LLP, GAA@Engineering-Experts.com.  A member of the technical team I believe checked in with Mr. Aaker to determine if he was available and he said he was.  We would agree to moving ahead with Mr. Aaker."

Dakota Access reached out to Mr. Aaker and then included him in the RFP process.  Mr. Aaker has since been in dialogue with Dakota Access regarding the RFP process.  The cause of the delay in getting him information is that he still has not signed a confidentiality agreement with the company.  Even without that agreement in writing, Dakota Access recently shared the RFP documents with him.  Dakota Access will also be in touch with Mr. Aaker to discuss when he can respond, whether that timing will work given the April 1 deadline, and when he can sign the required confidentiality agreement.

It's not at all clear why Mr. Aaker would feel he needed to reach out to you to answer questions about an RFP that he received from Dakota Access (ETP).  But then we do not know how your client's technical team explained this process when they made the contact you described in the language I quoted above.

The Order directs Dakota Access to select the third-party with input from the two Tribes.  We are working in good faith to follow up with Mr. Aaker based on that input.

Finally, we do not see any need for a call to discuss the "scope" of the audit.  The scope is set forth in the Order, and the firm that is selected will be given that Order.  The Order does not require the third-party firm, as part of "assess[ing] compliance all [easement] conditions as well as other integrity threats," to conduct "a review of the Tribe's concerns with DAPL's risk analyses and other technical information," as you wrote on Jan. 23.  The Corps is addressing the various reports laying out those concerns as part of the remand process for the "highly controversial effects" topic.  As for the language used in the Order, if other threats to the integrity of the Lake Oahe segment of the pipeline are identified, the third-party firm will include those threats in its audit.

thanks
Bill

-----Original Message-----
From: Jan Hasselman [mailto:jhasselman@earthjustice.org]
Sent: Tuesday, February 20, 2018 1:44 PM
To: Debold, David <DDebold@gibsondunn.com>; Ducheneaux Nicole <NDucheneaux@ndnlaw.com>
Cc: Scherman, William S. <WScherman@gibsondunn.com>; Fleischer, Jason J. <JFleischer@gibsondunn.com>; Marinelli, Matthew (ENRD) (Matthew.Marinelli@usdoj.gov) <Matthew.Marinelli@usdoj.gov>; Zilioli, Erica (ENRD) (Erica.Zilioli@usdoj.gov) <Erica.Zilioli@usdoj.gov>; William R. Perry (WPERRY@SONOSKY.COM) <WPERRY@SONOSKY.COM>; 'Dean DePountis' <ddepountis@standingrock.org>; Jan Hasselman <jhasselman@earthjustice.org>
Subject: Re: Selection of third party independent expert engineering company

David

I never received any response to this email and as far as I know, there has been no further communication between

ETP and the Tribe regarding the audit.  We remain in the dark as to your client's intentions.

Today I received a message from Mr. Aaker, who the Tribe suggested as an independent auditor.  Mr. Aaker reported that he received 4000 pages of documents from ETP and was given 2 days to review it and prepare a proposal.  He reports that this is not possible.  He further does not understand why he is being contacted by ETP, as there appears to be some confusion about his role.  Since I have not talked to him, I don't really understand the issue.

To be clear, no one on my legal team has contacted Mr. Aaker.  (I sent him a brief email today asking him not to contact the Judge or send me any of the materials he's received, both of which he said he was considering).  He had been contacted by a member of the Tribe's staff to see if he was available to participate in the audit, but to the best of my knowledge, that was the only interaction.  I think perhaps he was under the impression that he was to be hired by the Tribe directly.

He seems to think that there is a deadline today that he needs to take action on, and has requested to speak to me.  I feel a need to contact him to explain what is going on.  I'll plan to do so in about an hour.  I'll follow up with a report of that discussion.

More broadly, I think it would be very useful to have a conversation about the scope and process for the audit so that the Tribe can have some confidence in the process, which it currently does not have.  I am available tomorrow AM and Thursday all day for such a discussion.   Please let me know.

Thanks,

Jan

_____
From: Jan Hasselman
Sent: Tuesday, January 23, 2018 11:25 AM
To: 'Debold, David'; Ducheneaux Nicole
Cc: Scherman, William S.; Fleischer, Jason J.
Subject: RE: Selection of third party independent expert engineering company

David:

Thank you for sharing the names of the auditors you have proposed.

Unfortunately, we do not believe that any of the suggested auditors meet the Court's direction for an "independent, third party auditor."  All of the proposed auditors either have close ties to the oil and gas industry generally, or do ETP/DAPL specifically—putting their "independence" very much in question.  Our technical team has reviewed all three closely and has grave doubts that any of them would be able to function independently for purposes of a third party audit.

For example, TRC lists ETP as a client and claims an "unparalleled record of experience in providing pipeline engineering services to the industry"  (https://www.trcsolutions.com/writable/images/Pipeline-Engineering.pdf)

Wood Group worked on DAPL for ETP and authored a number of what we to view to be highly superficial risk-related documents – an obvious conflict As to the Process Performance Improvement Consultants, they appears to be involved a lot in litigation support for oil and gas firms generally and pipeline service companies specifically

The Tribe's technical team has identified an independent party who they believe would do a good job of overseeing

an independent audit.  Gordon A. Aaker, PE, of Engineering Services LLP, GAA@Engineering-Experts.com.  A member of the technical team I believe checked in with Mr. Aaker to determine if he was available and he said he was.  We would agree to moving ahead with Mr. Aaker.   If we cannot agree, I suppose we will have to return to the Court for guidance.

Additionally, we have some concerns about the scope of the audit.  The original PHMSA recommendation that formed the core of our request to the Court was an audit of implementation of permit conditions and "any other integrity threats" affecting the pipeline.  We believe that this latter phrase involves a review of the Tribe's concerns with DAPL's risk analyses and other technical information.  A narrow review of implementation of permit conditions would not in our view be adequate.  Let's see if we can discuss this issue and get some agreement on the scope of the audit before too much more time goes by.

Please let us know how you'd like to proceed.

Jan

From: Debold, David [mailto:DDebold@gibsondunn.com]
Sent: Thursday, January 11, 2018 1:49 PM
To: Jan Hasselman <jhasselman@earthjustice.org>; Ducheneaux Nicole <NDucheneaux@ndnlaw.com>
Cc: Scherman, William S. <WScherman@gibsondunn.com>; Fleischer, Jason J. <JFleischer@gibsondunn.com>
Subject: Selection of third party independent expert engineering company

Counsel:

As you know, on December 4, 2017, Judge Boasberg ordered Dakota Access to select, "with input from the Tribes," a third-party independent expert engineering company to perform a compliance audit of easement conditions, regulations, and integrity threats at Lake Oahe.  Dakota Access has identified three such companies listed below.

We would appreciate any input from your clients on these potential auditors no later than January 25, 2018.

The three identified expert engineering companies are, in no particular order:

Process Performance Improvement Consultants, LLC http://p-pic.com/

TRC Solutions
https://www.trcsolutions.com/

Wood Group
https://www.woodgroup.com/

Thanks, and we look forward to hearing any input you may have.

Best regards,
David


David Debold

GIBSON DUNN

Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W., Washington, DC 20036-5306 Tel +1 202.955.8551<tel:+1%20202.955.8551> •
Fax +1 202.530.9682<tel:+1%20202.530.9682>
DDebold@gibsondunn.com<mailto:DDebold@gibsondunn.com> •
www.gibsondunn.com<http://www.gibsondunn.com/>
_____
This message may contain confidential and privileged information. If it has been sent to you in error, please reply to

advise the sender of the error and then immediately delete this message.

_____