**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

STANDING ROCK SIOUX TRIBE,

                Plaintiff,

and

CHEYENNE RIVER SIOUX TRIBE,

                Intervenor Plaintiff,

      v.

U.S. ARMY CORPS OF ENGINEERS,

                Defendant,

and

DAKOTA ACCESS, LLC,

                Intervenor Defendant.

Civil Action No. 16-1534-JEB (consolidated with Case Nos. 16-1796 & 17-267)

———————————————

**CONSOLIDATED RESPONSE BY DAKOTA ACCESS, LLC TO
(i) CHEYENNE RIVER SIOUX TRIBE'S REQUEST TO REQUIRE
MEANINGFUL CONSULTATION ON REMAND AND (ii) STANDING
ROCK SIOUX TRIBE'S MOTION TO CLARIFY**

———————————————

Kimberley Caine
William J. Leone
Robert D. Comer
NORTON ROSE FULBRIGHT US LLP
799 9th St. NW, Suite 1000
Washington, D.C.  20001-4501
(202) 662-0200

William S. Scherman
David Debold
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
wscherman@gibsondunn.com

*Counsel for Dakota Access, LLC*

**TABLE OF CONTENTS**

**Page**

INTRODUCTION .................................................................................................... 1

ARGUMENT........................................................................................................... 24

I.      Plaintiffs' Motions Are Improper Efforts to Dictate to an Agency the Manner in Which it Arrives at Final Agency Action............................................................ 24

II.     The Only Thing Missing, as Relevant to the Court's Response Planning Remand Condition, Is Participation by the Tribes ................................................. 33

III.    The Independent Third-Party Assessment Condition in this Court's December 4th Order Also Needs No Clarification ................................................................. 39

CONCLUSION ...................................................................................................... 42

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*American Radio Relay League, Inc. v. FCC,*
    524 F.3d 227 (D.C. Cir. 2008) .................................................................. 27, 28, 31

*County of Los Angeles v. Shalala,*
    192 F.3d 1005 (D.C. Cir. 1999) .................................................................. 25

*Friends of Earth, Inc. v. EPA,*
    446 F.3d 140 (D.C. Cir. 2006) .................................................................. 26

*Marshall County Health Care Auth. v. Shalala,*
    988 F.2d 1221 (D.C. Cir. 1993) .................................................................. 25

*National Wildlife Federation v. National Marine Fisheries Service,*
    524 F.3d 917 (9th Cir. 2008) .................................................................. 30

*Northern Air Cargo v. U.S. Postal Service,*
    674 F.3d 852 (D.C. Cir. 2012) .................................................................. 33

*PPG Indus., Inc. v. United States,*
    52 F.3d 363 (D.C. Cir. 1995) .................................................................. 2, 25

*Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.,*
    435 U.S. 519 (1978) .................................................................. 28

## Other Authorities

William Safire, On Language; Good-Deed Dungeon, N.Y. Times (1994)
    https://www.nytimes.com/1994/01/09/magazine/on-language-good-
    deed-dungeon.html.................................................................. 1

## Rules

L.R. Civ. 7 .................................................................. 26

## INTRODUCTION

Clare Boothe Luce once famously lamented that "no good deed goes unpunished."[1]  The United States Army Corps of Engineers surely can relate.  Its remand process after this Court's June 14, 2017 Opinion and Remand Order goes far beyond what the law requires.  As relevant here, for example, the Corps has asked all parties for various categories of information even though this Court's October 11, 2017 Opinion rejecting vacatur plainly states that the Remand Order does not *obligate* the Corps to gather *any* additional information before it decides what explanations are needed to comply with that Order.  Indeed, this Court deemed it quite likely that the pre-remand record already has everything the Corps needs on the three discrete remand topics.

Plaintiffs insist, though, on inhabiting an alternate universe.  They refuse to accept this Court's determination, and they ask the Court to turn the Corps's above-and-beyond efforts against it.  That is, their motions insist that if the Corps wants to gather more information about tribal uses of hunting and fishing resources, the Corps must not only *give Plaintiffs* other additional information but also initiate formal government-to-government consultation.  The very premise of these demands is Plaintiffs' erroneous view that the remand order requires the Corps to "draft an Environmental Impact Statement that fully addresses the three issues remanded by the court."  D.E. 327-1 at Exh. A, page 2 (July 7, 2017 Letter from Chairman Frazier to Army and Corps); *see also* D.E. 336-2 at 2 (June 29, 2017 Letter from Chairman Archambault to Army and Corps) ("In light of Judge Boasberg's findings, the proper course for the Corps on remand is to undertake an Environmental Impact Statement process that the agency previously started and then abandoned.").

---

[1]    The origin of this adage is subject to some debate, but Ms. Luce is most frequently credited with coining it.   William Safire, On Language; Good-Deed Dungeon, N.Y. Times (1994) https://www.nytimes.com/1994/01/09/magazine/on-language-good-deed-dungeon.html.

That view is erroneous, because this Court clearly rejected the argument that remand must culminate in an EIS. *See, e.g.,* D.E. 284 at 5 (explaining that the June 14 Opinion "upheld the majority of the Corps' determinations under NEPA – including the agency's 'top-line conclusion' that the risk of an oil spill was sufficiently low so as not to require an EIS"); *id*. at 11.

Apart from this insurmountable factual obstacle (*i.e.*, Plaintiffs' mistake about the required scope of the remand), the law is clear that *whenever* a court remands to an agency after deciding an Administrative Procedure Act challenge, "the court's inquiry is at an end." *PPG Indus., Inc. v. United States*, 52 F.3d 363, 365 (D.C. Cir. 1995). Thus, there is neither a factual nor a legal basis for ordering the Corps to conduct its proceedings on remand in the manner Plaintiffs urge, especially when it would extend the remand process and this lawsuit by many more months.

Standing Rock Sioux Tribe's other demands—directed at two remand conditions from this Court's December 4, 2017 Order—are similarly grounded in misstatements of both fact and law. First, Standing Rock's Motion fails to mention the detailed and well-documented timeline of events showing that each Tribe has outright refused to participate in emergency response planning meetings. Both Tribes declined an invitation to meet with Dakota Access and the Corps in December. Both also chose not to attend a response planning meeting held in January in Bismarck, North Dakota. Both came to the February meeting (also in Bismarck), but only long enough to insist that future meetings be held at each of their reservations where the discussions would be about Plaintiffs' informational demands, and *not* how to plan an emergency spill response. Both Tribes left the February meeting before Dakota Access and the Corps could provide and discuss much of the information that the Tribes claim they want. And they skipped the March meeting despite agreement yet again by both the Corps and Dakota Access to share at that meeting much of what the Tribes demanded, including the results of recent supplemental spill modeling.

Plaintiffs' months of refusal to sit down for face-to-face response-planning meetings isn't the only problem. Despite repeated opportunities for Plaintiffs to submit any concerns by email or letter, they *still* have not revealed the alleged "oversights and errors" in existing response plans that they told this Court they identified more than seven months ago. D.E. 272 at 37. Moreover, their insistence that they need access to more information before even sitting down at the meeting table is wrong for four reasons: (1) they have received each new version of the Geographic Response Plan since even before this Court's December 4 Order; (2) much of the relevant information Plaintiffs seek is *in* the same response planning materials they refuse to discuss or comment upon; (3) they have been offered the chance to go over the rest of the relevant information they seek if only they would sit down with response planning personnel for the Corps and Dakota Access; and (4) this Court has already rejected Plaintiffs' insistence that they need access to the other irrelevant information they request as a precondition to participating in response planning.

That leaves the second requirement in the December 4 Order: "Dakota Access, with input from the Tribes, shall select a third-party independent expert engineering company to review easement conditions and regulations, and to assess compliance with all such conditions as well as other integrity threats." D.E. 303 at 1-2. This language needs no "clarification." To assess compliance with easement conditions, regulations, and other integrity threats, a third-party firm need *not* go back and second-guess whether, as Standing Rock puts it, the Corps correctly concluded that "the risks of spills are low and the impacts insignificant." D.E. 336 at 15. Nor does the Order require Plaintiffs' involvement in developing a "protocol" for the audit. *Id.* Dakota Access did what the Order *does* require: It considered Plaintiffs' input on the selection of the third-party firm. Dakota Access rejected Standing Rock's recommended firm, which was plainly unsuited to the task; and it chose a firm that was not criticized by Standing Rock for its "ties" to Dakota Access or its parent.

The third-party firm that Dakota Access selected is on track to have its results ready to "be filed with the Court by April 1, 2018." D.E. 303 at 2.

Plaintiffs' motions, which seek to extend by several more months (if not longer) both the remand process and any follow-on litigation, should be denied.

## BACKGROUND

### A.      Previous Rulings Relevant to Plaintiffs' Motions

Statements this Court has already made in three of its earlier rulings are directly relevant to the two pending Motions.

1.      On June 14, 2017, this Court remanded for the Corps to address three discrete items related to the Dakota Access Pipeline's crossing beneath Lake Oahe in North Dakota: (1) the degree to which the project's effects are likely to be highly controversial; (2) the consequences of a spill for the Tribes' fishing and hunting rights; and (3) the environmental-justice impacts of the project. D.E. 239 at 34, 42-43, & 54. The Court placed no conditions on how the Corps will address each topic during remand.

2.      On October 11, 2017, the Court issued an Opinion explaining why the remand would be without vacatur. D.E. 284. That Opinion provides valuable additional insight into how the Corps is capable of addressing the three remand topics without the conditions now demanded by Plaintiffs.

The Court determined that in conducting the analysis dictated by D.C. Circuit law on vacatur, it "must assess the likelihood that, on remand, the Corps will be able to justify its prior decision to issue an EA and FONSI, rather than preparing a full EIS." *Id.* at 8. Applying that test to the three remand topics, the Court rejected Plaintiffs' views as to the seriousness of the Corps's

shortcomings and the steps needed to remedy them.  The Court reminded plaintiffs that it "previ-

ously found that the Corps 'largely complied' with NEPA's requirements, and it granted remand

on only a narrow subset of the Tribes' NEPA claims. See Standing Rock III, 2017 WL 2573994,

at *28." D.E. 284 at 17.  And rather than criticize the Corps's earlier efforts to consult with Plain-

tiffs, the Court ultimately concluded that these three shortcomings fell into the category of deci-

sions that were "potentially lawful but insufficiently or inappropriately explained." *Id.*

       a.      On the first topic, the Court explained that the Corps already has Plaintiffs' input

in the form of their experts' critiques of the pipeline.  The Court reasoned that "[a]lthough the

Corps must give careful consideration to the expert critiques, it is well positioned to provide such

explanation on remand." *Id.* at 10.  "Correcting this flaw does not require that Defendants begin

anew, but only that they better articulate their reasoning below." *Id.* at 9.

       b.      As for the second topic—spill effects on hunting and fishing resources—the Court

again disagreed with Plaintiffs, explaining that "Defendants' task on remand is a narrow one." *Id.*

at 10.  "Although the Tribes assert that the record on remand will support the need for an EIS

because it 'is replete with evidence of the significance of these rights to the Tribe[s],' Tribes Brief

at 20, the Court already held that NEPA does not require any such 'existential-scope analysis.'

Standing Rock III, 2017 WL 2573994, at *15." D.E. 284 at 11.  Adding that the Corps "already

has the data it needs to determine the impact of a spill on fish and game," *id.*, and that the Corps's

spill-effects assessment will be conducted "in light of its prior determination that the risk of rupture

under Lake Oahe is low," *id.* at 11-12, the Court concluded from the record that "the Corps 'may

be able readily to cure a defect in its explanation of [the prior] decision.'" *Id.* at 12 (citation

omitted).

       c.      Finally, on the topic of environmental justice, once again the Court found "reason

to think that," in "provid[ing] a more robust analysis on remand," the Corps "has a substantial possibility of validating its prior conclusion." D.E. 284 at 13. Indeed, "multiple aspects of the record suggest that the Corps is likely to justify issuing an EA, rather than completing an EIS." *Id.* at 14. These include: "the minimal risk of an oil spill under Lake Oahe" which "reduces the likelihood that the project will have a significant impact on the surrounding communities," *id.*, "the relocation of the Standing Rock water-intake structure," *id.*, and "the Corps' already-conducted assessment of the alternative pipeline route through Bismarck" which "increases the likelihood that the agency will find that DAPL's environmental-justice impacts do not require an EIS," *id.* at 15.

       3.     The final ruling relevant here is the December 4, 2017 Order setting three conditions during remand. The Court imposed these conditions "to keep the Court informed of the circumstances at Lake Oahe pending remand" and to "ensur[e] that the status quo at Lake Oahe is preserved" during that same period. D.E. 304 at 7-8. Standing Rock seeks "clarification" of two conditions: (1) that the parties "coordinate to finalize an oil-spill response plan affecting Tribal resources and lands at Lake Oahe," and (2) that "Dakota Access, with input from the Tribes, shall select a third-party independent expert engineering company to review easement conditions and regulations, and to assess compliance with all such conditions as well as other integrity threats." D.E. 303 at 1-2.

       The status report that the Corps filed on February 1 contemplated completing the remand process with final agency action on April 2, 2018. D.E. 326 at 2.

### B.    The Corps seeks information from all parties for possible use on remand

       Although the Corps could quite likely carry out its remand duties based solely on consideration of the pre-remand record, it has exercised its broad discretion to request various categories

of information from Dakota Access, Plaintiffs, and the other Plaintiff Tribes.  On the "highly controversial" topic, for example, the Corps has asked Dakota Access to "provide a factual and technical analysis that addresses the issues raised in" nine "reports" that the Plaintiffs tendered to either the Court or the Corps after July 25, 2016.  March 16, 2018 Declaration of William Scherman, Attach. 1.  That request ties back to the Court's observation in its June 14 Opinion that, while Dakota Access "offers a scathing assessment of the reports' 'material flaws,'" and while it "may well be the case that the Corps reasonably concluded that these expert reports were flawed or unreliable and thus did not actually create any substantial evidence of controversial effects," "the Corps never said as much."  D.E. 239 at 34.[2]

As for Plaintiffs and the other Tribes, the Corps has sought information that might assist with its remand work on the other two topics—effects of a possible spill on the Tribes' fishing and hunting rights and environmental-justice impacts on the Tribes and their members.  In particular, more than five months ago, in letters dated September 25, 2017, the Corps asked each Tribe to provide information and supporting documentation on a number of topics related to potential impacts of an oil spill on tribal resources, with emphasis on fishing and hunting (the second remand topic).  D.E. 327-1 at 22-24 (exhibit E).[3]  The requests addressed to Cheyenne River (which are substantially the same as requests to the other Tribes) included seven items relevant to fishing, hunting, and other tribal practices that rely on the waters of Lake Oahe:

---

[2]    Although the Court need not decide now whether the Corps's request was over-inclusive, Dakota Access notes that the request included documents post-dating the decision in February 2017 to issue an easement for Lake Oahe without preparing an EIS.  *See, e.g.*, D.E. 239 at 33 (ruling that Corps failed to address "scientific critiques" in "[t]he expert reports submitted to the Corps <u>after</u> the Final EA was published but <u>before</u> the Corps again decided in February 2017 that an EIS was not required").

[3]    Dakota Access has not been copied on the Tribes' correspondence with the Corps.  Thus, there may be additional back-and-forth between those parties that the Corps is better positioned to recount for this Court.

(1)  A copy of the current Cheyenne River Sioux Tribe's Hunting, Fishing & Outdoor Recreation Code and associated policy and/or guidance.

(2)  A summary of the number of the game, fish, and wildlife licenses and permits that were issued by the Tribe, to both Tribal members (resident and non-resident), members of other federally recognized Tribes, and nonmembers, during 2015, 2016, and 2017[,] . . . includ[ing] a description of the activity permitted and the classification of the license or permit (e.g. Tribal Member, Big Game; Non-resident non-member Prairie Dog), the duration of the permit or license, and any other details you wish to provide.

(3)  A summary of the subsistence hunting or fishing licenses or permits that have been issued by the Tribe to Tribal members during 2015, 2016, and 2017. . . . [and] citations to all Tribal regulations established for permitting the taking of game, fish, wildlife, timber and plants for subsistence and ceremonial purposes.

(4)  A summary of harvest reports of game taken during 2015, 2016, and 2017, including the type of species taken, quantity of each species taken, location where the game was taken, and the type of the license or permit under which the game was taken.

(5)  Documentation of hunting or fishing permit reciprocity between the Cheyenne River Sioux Tribe and the Standing Rock Sioux Tribe, during the years of 2015, 2016 and 2017.

(6)  Any studies or reports on game species (aquatic life, birds and mammals), estimated population, habitat within the Cheyenne River Sioux Reservation, and the designated hunting grounds for such game in relation to Lake Oahe.

(7)  Documentation of distinct cultural practices of the Tribe that are connected to Lake Oahe. Please describe the practice, its historical origins, and how the practice is connected to Lake Oahe. . . .

*Id.* at 22-23 (including an opportunity to submit information confidentially for item 7).  The letter to Standing Rock also invited that Tribe to submit an eighth category relevant to environmental justice:  "[a]ny additional demographic data on your Tribal reservation that you want the Corps to consider beyond what is available from the U.S. Census."  D.E. 336-3 at ECF p. 3.

The Corps asked for this information by the end of October so that it might better understand the nature and extent of tribal resources potentially at risk in the unlikely event of a spill.  In the meantime, the Corps asked Dakota Access to work on a separate request:  preparation of a

supplemental oil spill model that "takes into account the pipeline as constructed." Scherman Decl., Attach. 1 at 1. "This scenario," the Corps explained, "would be *in addition to* the hypothetical scenario that has been used [pre-remand] that assumed that the pipeline had been constructed on the top of the lake and that any rupture would be a full guillotine break." *Id.* (emphasis added). The Corps explained that because the predicted spills generated by the pre-remand model—a model dictated by PHMSA requirements—"do not correlate with the majority of spills seen in actual releases," the supplemental model would result in modeling "that does correlate with the majority of spills and takes into account how the pipeline was actually constructed." *Id.*

The Corps devised a schedule for completing remand by April 2. It requires gathering the various requested information in a timely manner so that, among other things, the spill model results can be assessed in light of the information to be provided by the various Tribes. Thus, to give just one example, the spill model helps predict if and when oil would reach a particular spot on the shoreline of the Lake; the information from Plaintiffs will help determine the extent to which the Tribes rely on that location for fishing or hunting and thus how a spill might affect those resources (*i.e.*, remand topic two).

As noted above, the Corps requested the information from the Tribes relevant to the second and third remand topics on September 25, 2017. D.E. 327-1 exh. E. The Corps requested a response within 30 days, a timeline fully consistent with Standing Rock's observation that the request was for only "a specific and limited set of information." D.E. 336 at 3. Twenty-nine days later, Cheyenne River sent a letter stating it did not expect "to complete" its responses to the listed items "until early 2018." D.E. 327-1. exh. F (Letter dated Oct. 24, 2017 from Chairman Frazier to Corps) at 2. That letter also asserted that "Dakota Access's spill modeling is vitally important to the Tribe's assessment of, among other things, impacts on our Treaty hunting and fishing rights."

*Id.* Cheyenne River therefore asked for a copy of the updated spill modeling information when the Corps receives it from Dakota Access and "90 additional days" after that "to submit our remand materials and reports, as our technical team must review and analyze that data if the Tribe is to provide a complete and accurate response to your request for information regarding the impacts on the Tribe and its members." *Id.*

Standing Rock, for its part, asserted that "the information requested" by the Corps was "framed far too narrowly" but still asked for more time to provide it. D.E. 336-4 at ECF p. 2 & 4.

The Corps replied by asking each Tribe to "submit the requested materials by December 20, 2017 so that" the Corps "can maintain the schedule that [it] provided to the Court." D.E. 327-1 exh. G (letter dated November 27, 2017 from Corps to Chairman Frazier); D.E. 336-5. Colonel Hudson, in his letter to Chairman Faith, also offered to meet with Tribal representatives at the Standing Rock reservation, stating the meeting would be most productive after receiving the information relevant to hunting and fishing rights requested in the September 25 letter. D.E. 336-5. Colonel Hudson also offered to attend a meeting in the meantime "via teleconference to discuss any of your Tribe's questions." *Id.*

Two days before the new requested response date of December 20, Cheyenne River sent a letter noting that because "the Tribe's resources and personnel are limited," it was working to have "materials and documents relevant to the substance of the remand prepared by January 30, 2018 at the earliest." D.E. 327-1 exh. H (letter dated December 18, 2017 from Chairman Frazier to Corps) at 1. The letter repeated "the Tribe's position" that it "is entitled to review the results of the spill modeling currently being prepared by Dakota Access." *Id.* Standing Rock sent its own letter on December 18. It did not say when the Tribe would provide the information requested three months earlier. Instead, it complained that the Corps "seeks to unilaterally determine what

information [the Corps] will consider and when." D.E. 336-6 at ECF p. 2. It also requested a list of documents that largely relate to the risk and possible volume of a spill. *Id.* at ECF p. 3-4.

Then, on January 4, 2018, Chairman Faith of Standing Rock wrote Colonel Hudson requesting government-to-government consultation and inexplicably asserted—despite Colonel Hudson's offer on November 27 to meet both in person and via teleconference—that the Tribe's "meeting request has gone unanswered." D.E. 336-7 at ECF p. 2. Chairman Faith's letter made no mention of the information requested in the Corps's September 25 letter. It appears that a January 24, 2018 meeting was scheduled, because on January 29, 2018, Colonel Hudson wrote to Chairman Faith extending his regrets about needing to cancel that meeting due to the Government shutdown. D.E. 336-8. Colonel Hudson also noted that the Corps was still waiting for the information it had requested in September and that he looked forward to a meeting on January 30. *Id.* Standing Rock's Motion includes no other correspondence with the Corps.

On January 30, Cheyenne River wrote to the Corps that it did not anticipate having anything to share in the way of "final remand materials until the end of February 2018." D.E. 327-1 exh. I (letter dated January 30, 2018 from Chairman Frazier to Corps) at 1 (also reiterating request for "spill modeling" and "to participate in this remand as a cooperating agency"). In its Motion, Cheyenne River represents that the Tribe "will produce to the Corps additional information and responses to the Corps' request for information no later than **March 2, 2018**." D.E. 327 at 4. The upshot is that when Cheyenne River complained in its motion of an "almost completely one-sided remand relationship between the Tribe and the Corps," *id.*, the Tribe had provided *none* of the information the Corps requested from Cheyenne River back in September—information the agency sought to determine potential effects of a spill on resources important to Cheyenne River

or its members, as contemplated by the second remand topic.[4]

### C.    Both Tribes decline to participate in Emergency Response Planning

In the meantime, both Tribes have used the emergency response planning condition in this Court's December 4 Order in much the same manner:  as a tool to demand more information from Dakota Access and the Corps with no effort to provide information of their own or otherwise participate in any helpful way in the emergency response planning efforts.  Standing Rock gives the Court a highly misleading, one-sided rendition of the facts relevant to response planning.  The full history of how the Tribes have responded to response planning efforts follows.

The **December 4, 2017** Order states:  "The parties shall coordinate to finalize an oil-spill response plan affecting Tribal resources and lands at Lake Oahe, which they shall submit to the Court by April 1, 2018."  D.E. 303 at 1.  On **December 8, 2017**, just four days after that Order issued, Carl (Gus) Borkland of Dakota Access's response planning team emailed all parties (the Corps and both Tribes) to propose an initial emergency response planning meeting.  March 16, 2018 Declaration of Carl G. Borkland, Attach. 1.  The email went to David Nelson (Cheyenne River) and Elliott Ward (Standing Rock), because the Tribes' lawyers had identified them as the proper points of contact for response planning.  Borkland suggested nine possible dates (two in mid-December and seven during the first two weeks of January) for an initial response planning meeting in Bismarck, North Dakota, near the Standing Rock Reservation.  Borkland Decl., Attach 1.  Attached to his email was the most current draft of the GRP for the Lake Oahe crossing.  *See id.*  (Borkland had already provided the previous draft of the GRP and the final Facility Response Plan to Standing Rock in October 2017.  In fact, both are on file with the Court.  D.E. 298-1 ¶ 2

---

[4]    According to the Corps, Cheyenne River *still* has not provided the requested information. D.E. 337 at 1.

(November 17, 2017 Borkland Declaration, with attachments).)  Borkland also invited the Tribes to submit any information relevant to response planning in advance of the proposed meeting. Borkland Decl., Attach. 1.

After both of the proposed December meeting dates came and went, and having received no response from either Tribe, Borkland sent another email on **December 20**, again trying to schedule the first meeting among all parties.  Borkland Decl., Attach. 2.  He added that if he did not receive a response by December 29, Dakota Access and the Corps would go ahead and choose a January meeting date.  *Id.*  As before, he invited the Tribes in the meantime to send "input about planning including any corrections you believe are needed to the draft geographic response plan." *Id.*

On **December 31**, still having received no response from either Tribe, Borkland emailed again.  He advised that the Corps and Dakota Access were both available to meet in Bismarck on January 10, 11 or 12, and he asked if any of those dates would work for the two Tribes.  Borkland Decl., Attach. 3.

Cheyenne River ignored this email too.  Standing Rock responded, but not to schedule a January meeting.  Instead, on **January 4, 2018**, Errol D. (Doug) Crow Ghost Jr. emailed a letter to Borkland and the Corps from Standing Rock Chairman Mike Faith.  Borkland Decl., Attach. 4. The letter stated that Standing Rock "will be available to meet with you in February, and willing to meet on Standing Rock."  *Id.*  Chairman Faith added, in the face of the need to complete some actual planning before April 1, that the meeting would be limited to a different purpose:  to address "information-sharing that is necessary to comply with" the December 4 Order.  *Id.*  Chairman Faith asked for a copy of the existing Facility Response Plan, even though Borkland had already pro-vided it to Elliott Ward in October, and "the data and assumptions that have been used by ETP and

the Corps of Engineers for the calculation of the maximum spill estimate for Lake Oahe." *Id.*  In addition he wanted to discuss "the hazards specific to Bakken Crude" and was "interested in lessons that may be applied to Lake Oahe, from prior Energy Transfer Partners and Sunoco oil spill responses." *Id.*

Borkland replied the following day—**January 5, 2018**— copying all parties, to advise that Dakota Access and the Corps would still go ahead with the January 11 meeting due to the "time constraints" all parties were operating under to complete a plan by April 1.  Borkland Decl., Attach. 5.  He provided meeting details and again invited both Tribes to participate if they changed their minds.  Once again he added that each Tribe should "feel free in the meantime to send me whatever information you believe is appropriate to assist in response planning," reminding them of the April 1 deadline.  *Id.*  Neither Tribe responded.

The response planning meeting went forward on **January 11, 2018** in Bismarck.  It was attended by four representatives of Dakota Access (including its contractor), three members of the Corps, and nobody from either Tribe.  Borkland Decl., Attach. 6.[5]  On **January 12**, Borkland sent an email to all parties reporting that the multi-hour meeting included "very helpful input from the Corps," and that they planned to "continue to work on gathering relevant information."  *Id.*  He added:  "We will want to go over all of it with both tribes when we meet in February to get your additional input."  *Id.*  Borkland included a reminder about the urgency of getting at least *some* input from the Tribes—"any information" at all—in the meantime:

---

[5]     Two months later, David Nelson asserted in a letter to Borkland that he had missed this meeting due to "severe weather conditions" and that Dakota Access already knew this.  Borkland Decl., Attach. 21.  But this was the first time Nelson said anything to Dakota Access about planning to attend that meeting, despite Borkland asking him ahead of time to say if he would be there.  *See* Borkland Decl. ¶ 3 & Attach. 5.  Also, weather was not a problem for those at Dakota Access and the Corps who had to travel even greater distances to attend that meeting.  Borkland Decl. ¶ 4; Minter Decl. ¶¶ 3-4.

> As I have said before, if there is any information that either tribe wants us to consider in the meantime based on your review of the existing drafts of the Geographic Response Plan or the Facility Response Plan, please feel free to send that to us before we meet in February.  This includes any errors or relevant omissions that you have identified in either plan.  One takeaway from Thursday's meeting is that we have our work cut out for us if we are going to have the best possible response plan ready by the April 1 deadline.  We expect to need at least two more meetings to accomplish that.  The sooner we get input from the tribes the better.

*Id.*  He also asked for replies "as soon as possible" with availability in early February for the next meeting and suggested setting aside "several hours so that we have the opportunity to make site visits to locations" on the Standing Rock reservation "relevant to spill planning."  *Id.*

Two weeks passed with still no response from either Tribe.  So on **January 26, 2018**, Borkland again emailed all parties asking if the Tribes were available on one of the previously proposed dates, February 8, for a 9:00 a.m. meeting in Bismarck, since that date and time worked for both Dakota Access and the Corps.  Borkland Decl., Attach. 7.  It took another week for Crow Ghost to reply.  On **February 2**, Crow Ghost emailed another letter from Chairman Faith.  Borkland Decl., Attach. 8.  Standing Rock asked for a meeting on February 8, but at a different time and location (10 a.m. at the Standing Rock Reservation), and for a different purpose:  to discuss "information-sharing."  *Id.*  Borkland responded that they would keep Bismarck as the location for this meeting due to the travel plans others had already made and other logistics.  Borkland Decl., Attach. 9.  He also proposed five dates for a March meeting and offered to travel to the Reservation at that time for a review of some of the tactical response planning areas.  *Id.*

Nine representatives of Standing Rock and one from Cheyenne River showed up at the **February 8** meeting location in Bismarck.  March 15, 2018 Declaration of Justin D. Minter ¶ 5, & Attach. 1.  A Standing Rock participant videotaped the meeting.  Minter Decl. ¶ 6.  Peter Capossela, who identified himself as an attorney for Standing Rock, said three things at the outset:  only two of the Standing Rock representatives would speak (Virgil Taken Alive and Doug Crow

Ghost); they would not be discussing emergency planning efforts at this meeting; and they were only authorized to talk about a date and location for a later meeting. *Id.* ¶ 7. In Taken Alive's statement he expressed a desire for emergency planning meetings to be held at the Standing Rock reservation in the Tribal Council's presence. *Id.* ¶ 8. Crow Ghost then read aloud a new letter from Chairman Faith that contained a list of requests for information, including the "Most current Facility Response Plan, without redactions"; the "Most current Lake Oahe Spill Model, including scenarios analyzed and technical documentation"; and various other details about the pipeline and other Energy Transfer Partner and Sunoco pipelines. Minter Decl., Attach. 2. Chairman Faith's letter concluded by advising that the persons in attendance were "only authorized to discuss the scheduling of a more formal meeting with the Tribal government officials on the Standing Rock Indian Reservation" and that the February 8 meeting "does not constitute a consultation or negotiation with the Standing Rock Tribal government." *Id.*

Cheyenne River's representative, David Nelson, hand-delivered two letters from Chairman Frazier at this February 8 meeting. Minter Decl. ¶ 10. The first started: "I am inviting Energy Transfer Partners to the Cheyenne River Sioux Tribe on February 8, 2018 which you have identified as an available date for ETP" and advised that they were "in Council in Green Grass, SD," about 150 miles away. Minter Decl., Attach. 3. Although the letter bore a date of February 7, it was being delivered for the first time that morning in Bismarck—at the February 8 meeting that Borkland had announced by email to Nelson and the other parties on January 26. Cheyenne River's letter, like that from Standing Rock, wanted "information sharing" that, according to the letter, was "mandated by judge Boasberg's December 4, 2017 order." *Id.* Cheyenne River's second letter, also dated February 7 and also addressed from Chairman Frazier to Borkland, "request[ed] that at least one additional consultation between" ETP and "the Tribe with regard to

16

Dakota Access Pipeline ('DAPL') Emergency Response Planning must occur on the Tribe's territory, the Cheyenne River Sioux Reservation."  Minter Decl., Attach. 4.

Although Chairman Faith's letter authorized the Standing Rock attendees to discuss another meeting date (and nothing more), all tribal representatives left without engaging in even that discussion.  Minter Decl. ¶¶ 11-13.  The Corps and Dakota Access used the remaining meeting time to review the latest draft of the GRP.  *Id.* ¶ 12.  Because the tribal representatives had left, it was not possible to get their input on anything in that document, which is more than 225 pages long (including the detailed appendices).  *Id.* ¶¶ 12-16.

Had the Tribes remained, they would have learned several things relevant to their demands for information.  *First*, the new draft of the GRP, which contains no redactions, had been updated to contain the relevant portions of the FRP document that the Tribes asked about.  *Second*, remote monitoring and use of the SCADA system that the Tribes asked about is discussed in the GRP.  *Third*, the composition of Bakken Crude, including flammability and toxicity, that the Tribes asked about is included in the Safety Data Sheet appended to the draft GRP that was available at the meeting.  *Fourth*, Dakota Access was prepared to discuss the location and operation of shut-off valves near Lake Oahe that the Tribes asked about, as Dakota Access already has included information about them in its filings in this case.  *Fifth*, Dakota Access conducted a "no notice" emergency response equipment deployment exercise in October 2017 with an initial response of just one hour and a full response within 3½ hours (nearly twice as quick as PHMSA's 6-hour response requirement).  *Sixth*, Dakota Access was prepared to discuss the approximate number and locations of personnel who would respond to a spill or leak at Lake Oahe, as the Tribes had requested.  All of this is documented.  *Id.* ¶¶ 12-16.

On **February 24, 2018**, still without a response from the two Tribes on their availability to

meet in March, Borkland emailed the parties reiterating the need to have a meeting that could include a visit to Standing Rock as part of the response planning.  Borkland Decl., Attach. 13.  He also stated that, as was planned for the February 8 meeting, the parties would use the March meeting to review the latest draft of the GRP, at which time Dakota Access would "provid[e] information relevant to response planning that the tribes requested in their earlier letters."  Borkland Decl., Attach. 18.

On **February 27**, Crow Ghost replied complaining that "[n]one of the information requested by the Tribe has been provided to Chairman Faith," and asked for "the documentation requested on all prior reported spills from ETP/Sunoco pipelines and the maximum spill estimate prior to the meeting."  Borkland Decl., Attach. 15.  He also stated that Dakota Access had no permission to "go to potential clean-up sites on the Reservation"; rather, "the only permission granted to ETP to enter the Reservation is Chairman Faith's invitation" for a "meeting between senior ETP/Sunoco officials and Chairman Faith in the Tribal Council chambers."  *Id.*  The next day, **February 28**, Borkland received another letter, via email, from Chairman Faith that largely repeated these points.  D.E. 336-10 (February 28, 2018 letter from Chairman Faith to ETP).  Crow Ghost's email and Chairman Faith's letter also stated that the Tribe was available to meet on March 7.  *Id.*; *see also* Borkland Decl., Attach. 17.

The February 28 letter from Chairman Faith was the first time, in all of the response planning efforts, that either Tribe shared information that might be relevant to response planning.  That is, Chairman Faith mentioned "numerous historic properties of Lakota and Dakota origin in low-lying areas along the Missouri River" and urged "an evaluation of the potential impacts of an oil spill and clean-up activities on these properties."  D.E. 336-10 at ECF p. 3.  But his letter included

no map, no GPS coordinates, and no other information that might help show *where* these "numerous" properties are.

Borkland replied the next morning—**March 1**—asking for the location and nature of these sites (including those that Chairman Faith's letter referred to as "Mad Bear I and II") as well as any other information that should be incorporated into the response planning. Borkland Decl., Attach. 18. Borkland's email also: (i) answered some of the Tribe's questions about spill scenarios; (ii) explained how some of the information that the Tribes seek is already in the GRP or would be discussed at the March 7 meeting; and (iii) stated that Dakota Access was willing to revisit at the meeting its view that other requested information was neither relevant nor necessary to response planning. *Id.* In addition, Borkland informed the Tribes that Dakota Access agreed to share the results of the recent spill modeling at the next meeting on March 7 and explain how the results have factored into the response planning. *Id.*

Neither Tribe responded to the March 1 email. And neither showed up at the **March 7** meeting. Had the Tribes participated in the March 7 meeting, they would have again been provided copies of the latest draft of the GRP. The Tribes also would have received the promised presentation summarizing the results of Dakota Access's new spill modeling. Dakota Access and the Corps spent that meeting discussing changes to the GRP since the previous meeting and reviewing the presentation of the spill model results.

Soon after the March 7 meeting started, Borkland emailed the Tribes asking if they would be attending. He also left a voicemail for Crow Ghost with the same question. Borkland Decl. ¶ 5. Crow Ghost replied to the email stating: "I'm in tribal council this morning waiting on a resolution that I will be sending to you after it passes." Borkland Decl., Attach. 20. Soon after, Crow Ghost sent the resolution and a cover letter, both of which bear the previous day's date of

March 6.  The resolution includes a lengthy set of "whereas" clauses, culminating in "**NOW THEREFORE BE IT RESOLVED,** due to the disrespectful, patronizing and unproductive communications of ETP, the Standing Rock Sioux Tribal Council directs that no meeting be held with Energy Transfer Partners at this time."  Borkland Decl., Attach. 22.  Despite the "no meeting . . . at this time" directive, the cover letter nonetheless invites ETP to a meeting at Standing Rock Tribal chambers on proposed dates in March.  *Id.*  (The resolution contains a second "resolved" clause that likewise seems to contradict this directive.  *Id.*).

Cheyenne River also emailed a letter after the March 7 meeting (and that letter, too, is instead dated March 6).  It again requests information, much of which had previously been provided or was made available at the meetings in February and March; complains about lack of timely responses to correspondence from the Tribe; and accuses Dakota Access of "continu[ing] to focus primarily on the concerns of the Standing Rock Sioux Tribe."  Borkland Decl., Attach. 21.

Standing Rock's Motion, which omits all of the detail that was just summarized, states that "some minor progress" in response planning was achieved on March 1, 2018 when the Tribe "received a letter from the Corps and a CD containing a revised spill response plan."  D.E. 336 at 6 n.1.  The Motion complains that Standing Rock received this document only "[t]he day before [the Tribe's current] motion was filed."  *Id.*  But the Tribe's Motion leaves out a material fact.  This is the *same* draft GRP that the Tribes declined to discuss—or even look at—during the response planning meeting three weeks earlier (on February 8).  Nor does Standing Rock mention that the Tribes have received every new draft of the GRP dating back before the December 4 Order.  The letter from the Corps that is mentioned in Standing Rock's Motion explains all of this, but the Tribe omitted that letter from the exhibits to its Motion, just as the Tribe's exhibits include none

of the email correspondence summarized above between all of the parties to response planning.[6]

Dakota Access remains willing to visit the Standing Rock Reservation as part of response planning efforts so that Standing Rock can help identify any areas of particular concern and assist with planning for the staging of equipment and similar logistics in the event of a spill or leak.

### D.   Dakota Access Considers Plaintiffs' Input Before Selecting a Third-Party Engineering Firm

Dakota Access identified three third-party independent expert engineering companies suitable to carry out the second condition in this Court's December 4 Order: "review easement conditions and regulations," and "assess compliance with all such conditions as well as other integrity threats." D.E. 303 at 1-2. Consistent with Dakota Access's obligation to select a company "with input from the Tribes," *id.*, on January 11, 2018, Dakota Access sought both Plaintiffs' input on

---

[6]    The Corps's letter is dated February 23, 2018 and was copied to counsel for the Tribe. Dakota Access obtained a copy (as well as a copy of a letter to Cheyenne River bearing the same date) from the Corps. Scherman Decl., Attach. 2 & 3. Significantly, the letter to Standing Rock explains that the Corps is "in the process of finishing our review of the spill model and the results submitted by Energy Transfer Partners, as well as gathering documents related to your request." Scherman Decl., Attach. 3. It then confirms that the enclosed CD contained the same response plan that the Tribes refused to discuss on February 8:

> I am enclosing copies on a disk of the draft Geographic Response Plan and Oahe Project Irrigation/Municipal Easements list that Dakota Access and the Corps were prepared to discuss and share with your representatives at the 8 February 2018 meeting in Bismarck, North Dakota. The purpose of this meeting was to comply with the Court's order for the parties to coordinate finalization of spill response plans at Lake Oahe. *See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, No. 16-1534, Order (D. D.C. Dec. 4, 2017) (ECF No. 303). However, shortly after the meeting began, the Standing Rock Sioux Tribe's representatives left the meeting with a representative from the Cheyenne Rock Sioux Tribe and therefore missed the discussion on the updated Geographical Response Plan, the intakes that exist between the crossing and Mobridge, South Dakota, and what sensitive receptors can be added to the Geographic Response Plan. We look forward to continued coordination with your Tribe and Dakota Access to finalize spill response plans at Lake Oahe.

*Id.* Standing Rock's Motion includes none of this.

each company.  D.E. 336-11 at 4 (Jan. 11 email).  On January 23, Standing Rock replied, ques-

tioning the independence of the proposed companies.  In particular, the Tribe objected that two of

the three had previously done work with Dakota Access or ETP.  As for the third—Process Per-

formance Improvement Consultants, LLC (or P-PIC)—Standing Rock noted only that the com-

pany "appears to be involved [in] a lot of litigation support for oil and gas firms generally and

pipeline service companies specifically."  *Id.* at 3 (Jan. 23 email).

Standing Rock suggested that Dakota Access consider a fourth option—Gordon A. Aaker,

PE, of Engineering Services, LLP.  *Id.* at 4.  Notably—given Standing Rock's objection to Process

Performance Improvement Consultants, LLC—Aaker's firm touts its litigation support work.

March 16, 2018 Declaration of Charles Frey ¶ 4.  Dakota Access contacted Aaker and followed

up with him to discuss the work that would be needed.  Frey Decl. ¶ 5.  Dakota Access also in-

cluded Aaker's firm in the group of four companies from which it would solicit proposals (Aaker's

plus the three firms that Dakota Access identified when seeking input from Plaintiffs).  The deliv-

ery of materials to all four firms was delayed by a week, however, because Aaker did not respond

to a request that he sign an agreement to keep proprietary and other information confidential.

March 16, 2018 Declaration of Tom Siguaw ¶ 4.  To avoid further delay, Dakota Access ultimately

sent the materials to all four firms on February 19, 2018, with the understanding that a confidenti-

ality agreement would need to be reached with Aaker.  Siguaw Decl. ¶¶ 4-6; D.E. 336-11 at 2.

When Aaker complained—through counsel for Standing Rock—that he could not complete a pro-

posal by the deadline, Dakota Access reached out to give him more time.  Frey Decl. ¶ 9; D.E.

336-11 at 2.  Mr. Aaker did not respond to Dakota Access's calls or emails, though, until *after* he

submitted his proposal. Frey Decl. ¶¶ 9, 11.

In Aaker's proposal he started by accusing Dakota Access of favoring "Energy Transfer

Partner's preferred vendor, the Wood Group."  Frey Decl., Attach. 11 at 1.  Aaker characterized

this supposed favoritism as "'Sand Bagging' or just plain 'Bid Rigging.'"  *Id.*

        The content of Aaker's proposal further demonstrated that his company was not suitable

for the task.  As noted, the remand condition requires the third-party company to assess whether

the relevant portion of the pipeline complies with the easement conditions imposed by the Corps

(including the condition to comply with relevant regulations) as well as other integrity threats.  But

rather than submit a proposal covering this sort of compliance-based assessment, Aaker has pro-

posed conducting a root-cause pipeline-failure analysis—the type of work appropriate to investi-

gating such things as a pipeline spill.  In fact, every phase of the proposal is based on what he calls

a "Root Cause Failure Analysis (RCFA) of the DAKOTA ACCESS PIPELINE INVESTIGA-

TION."  Frey Decl., Attach. 11 at 3; *see id.* at 5-6 (discussing collection techniques for "failed

components"); 6 (stating that collection of "recorded data," including "electronic dates," "is criti-

cal to the complete understanding of operating conditions at the time of failure"; discussing inter-

view techniques used to avoid "premature discussion of the cause of failure"); 7 (analysis phase

requires "build[ing] the cause chain and determine the immediate, contributing, and root causes of

the failure"); & 8 ("fundamental objective of the solution phase is to break the cause chain").[7]

While Aaker *may* be qualified to investigate pipeline leaks and offer an opinion as to their cause,

*id.* at 2 ("Our international reputation and experience is in providing failure analysis"), that is not

remotely what the Court's December 4 Order contemplates.

_____

        [7]     The summary section of Aaker's proposal, *id.* at 8, likewise shows the mismatch between
the remand condition and Aaker's qualifications and proposed approach:

> ***THE PREMATURE FAILURE OF A PIPELINE SUGGEST[S] BOTH TECHNICAL
> AND ORGANIZATIONAL FLAWS.  THE OBJECTIVE OF THIS PROJECT IS TO
> PROVIDE A PRACTICAL APPROACH TO A [ROOT CAUSE FAILURE ANALYSIS]
> AND DETERMINE THE APPROPRIATE CORRECTIVE/PREVENTIVE ACTION
> RECOMMENDATIONS NECESSARY TO AVOID FAILURES IN THE FUTURE.***

Dakota Access chose Process Performance Improvement Consultants, LLC, to conduct the assessment, and the company is working on doing so in time to meet this Court's April 1 deadline.

### E.    The Tribes Delay the Remand Process

As noted above, the Corps had planned to complete the remand process by early April. Dakota Access did what it could to keep to that schedule by responding timely to the Corps's requests for information.  According to the Corps's most recent filings, though, Plaintiffs have taken a different path.  Standing Rock did not provide information to the Corps until March 15, 2018, more than five months after the Corps requested rather specific materials related to the Tribe's use of hunting and fishing resources.  D.E. 337 at 1 n.1.  And Cheyenne River *still* has made no substantive response to the same request.  *Id.* at 1.  Nor have the Yankton or Oglala Sioux Tribes.  D.E. 338 at 2.  As a result of Plaintiffs' tactics, the Corps has been forced to delay its final action following remand.  D.E. 338 at 1-2.

## ARGUMENT

### I.    Plaintiffs' Motions Are Improper Efforts to Dictate to an Agency the Manner in Which it Arrives at Final Agency Action

The APA provides for judicial review of "final" agency action.  No doubt the various Plaintiffs will ask this Court to engage in such review again if the Corps reaffirms that the various approvals for the Dakota Access Pipeline project will not have a significant impact on the environment and are in the public interest.  Plaintiffs asks the Court to play a different role, however. They want the Court to step in—at the tail end of the remand process and before final agency action—to tell the Corps various steps it must take in completing its remand work.  Cheyenne River cites no authority for its request, and Standing Rock relies on inapt case law.  The Court should deny both Motions.

**A.**   At the status conference shortly after the Court issued its June 14, 2017 Opinion, all Plaintiffs commented on the upcoming remand process.  One argued that the Corps needed to take specific steps, contending "there needs to be public participation" and that the remand order, "at least by implication, if not by requirement under the APA, would require the comment period be reopened for some reasonable period of time."  TR June 21, 2017 at 23-24 (Bruce Afran:  "We assumed when we saw the remand order that the Army would be, by necessity, opening this back up to public comment.").  But this Court declined to require any particular process on remand, stating:  "I would expect the Corps to follow the law and follow the procedures that apply, but I'm not going to confirm what Mr. Afran believes is implicit."  *Id.* at 25.

The Court's approach—which left it to the Corps to determine in the first instance which steps it should take to address the three remand topics—is fully in line with D.C. Circuit precedent. "Under settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end:  the case must be remanded to the agency for further action consistent with the corrected legal standards."  *PPG Industries*, 52 F.3d at 365.  That is because a district court reviewing final agency action under the APA "sits as an appellate tribunal[.]"  *Id.* (quoting *Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1225 (D.C. Cir. 1993)).  Not only would it be "unnecessary for the court to retain jurisdiction to devise a specific remedy for [the agency] to follow," it would be "error to do so."  *County of Los Angeles v. Shalala*, 192 F.3d 1005, 1011 (D.C. Cir. 1999) ("Once . . . the district court held that the Secretary had misinterpreted" a statutory provision, "it should have remanded to the Secretary for further proceedings consistent with its conception of the statute.")

In the face of this settled on-point authority, Cheyenne River cites none for doing the opposite:  *i.e.*, "requir[ing] the Corps to engage in meaningful consultation by responding to the

Tribe's numerous substantive requests for information." D.E. 327 at 4. That is reason enough to deny its request.[8]  That being said, at least Cheyenne River is willing to call a spade a spade. Standing Rock, on the other hand, euphemistically titles its pleading (with emphasis added here) a "Motion for *Clarification* re Remand Process and Remand Conditions."  Clarification would be in order only if this Court *meant* to "direct[] the Corps to provide the Tribe with technical information it has requested relative to the remand," D.E. 336 at 1, but simply failed to make that intent clear.  This Court's Order—like the underlying law—is already clear.  The agency must decide how to conduct its remand, and the courts get involved again—if at all—only after final agency action.   As explained below, the cases on which Standing Rock relies to urge interference with the remand process do not permit such a thing.

    **B.**    Standing Rock starts with a case from this Circuit that deals with a different issue—*i.e.*, whether a district court can vacate or instead take some intermediate step until the agency remand process has run its separate course.  Standing Rock quotes here the statement in *Friends of Earth, Inc. v. EPA*, 446 F.3d 140, 148 (D.C. Cir. 2006), that a "district court retains some remedial discretion" when it remands to the agency.  But Standing Rock leaves out the all-important context.  The D.C. Circuit was sending the case back to the district court "with instructions to vacate EPA's approvals" of total maximum daily loads (or TMDLs) of pollutants for the Anacostia River.  The Court recognized that "neither" side in the lawsuit "want[ed] the Anacostia River to go without" the relevant "TMDLs" during agency proceedings on remand, so it simply noted that the parties were free to "move to stay the district court's order on remand to give either the District

---

    [8]    Cheyenne River's pleading is styled a "Response" to a monthly status report from the Corps, with a "Request for Meaningful Consultation On Remand" tacked on.  It fails to comply with the this Court's rules, which require Motions to be accompanied by a Statement of Points and Authorities.  L.R. Civ. 7(a).

of Columbia a reasonable opportunity to establish daily load limits or EPA a chance to amend its regulation declaring 'all pollutants . . . suitable' for daily loads." *Id.*   That is merely an example of a court rejecting complete vacatur if the result would be to defeat temporarily the environmental protections sought by the plaintiff's challenge.   *See, e.g.,* D.E. 284 at 24 ("[T]his Circuit has recognized that, at times, a flawed agency action is better than no action at all").   *Friends of Earth* goes no further than that.

The recent decision by the Honorable John D. Bates of this Court is just as distinguishable. In fact, the question there was nearly identical to that in *Friends of Earth*:  whether and under what circumstances the district court should grant an "extension of the stay of vacatur" of "EPA's Total Maximum Daily Loads ('TMDLs')" governing certain substances in the Anacostia River and its tributaries (as well as one other water body).   Once again, therefore, the issue before the court was which conditions would preserve the status quo while the agency worked toward taking the final agency action required by the remand order.   Further distinguishing that case, the stay of vacatur there had already been in effect for *seven* years, with the new extension pushing the stay into 2020.

The final case Standing Rock cites from this Circuit is inapt for a different reason.   According to the Tribe, in *American Radio Relay League, Inc. v. FCC*, 524 F.3d 227 (D.C. Cir. 2008), the Court remanded, requiring the agency to "afford a reasonable opportunity for public comment on the unredacted studies on which it relied in promulgating the rule" at issue.   D.E. 336 at 10 (quoting 524 F.3d at 242).   But that case dealt with a requirement unique to notice-and-comment rulemaking (524 F.3d at 236):  an agency may not "rely on . . . studies in a rulemaking but hide

from the public parts of the studies that may contain contrary evidence, inconvenient qualifications, or relevant expectations of the methodology imposed," *id.* at 239.  Simply put, this is not a notice-and-comment (or any other form of) rulemaking case.[9]

**C.**     Standing Rock's other problem is that it points to no case in this Circuit remotely like this one—where the agency will likely be able to satisfy the law's requirements without needing any further record development or outside input.

As to the first remand topic, this Court ruled that the Corps need only "demonstrate that it considered"—past tense—reports alleging scientific flaws in the Corps's analysis.  D.E. 239 at 34. This Court acknowledged that "[i]t may well be the case that the Corps reasonably concluded that these expert reports were flawed or unreliable and thus did not actually create any substantial evidence of controversial effects," in which case the only flaw is that "the Corps never said as much." *Id.*  "Correcting this flaw," the Court later explained, "does not require that Defendants begin anew, but only that they better articulate their reasoning below."  D.E. 284 at 9; *id.* at 10 ("Although the Corps must give careful consideration to the expert critiques, it is well positioned to provide such explanation on remand.").  Thus, remand topic one does not trigger a need to "consult" further with, or provide any information to, Plaintiffs.  Regardless of whether the Corps elects to go beyond what the law requires here, Plaintiffs are not entitled to an order forcing that agency to do so.

---

[9]     Nor is there any basis for expanding the holding in that case to the different context here. As Judge Kavanaugh wrote in his concurrence and partial dissent, the doctrine that Court applied —which pre-dates *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519 (1978)—"cannot be squared with the text of § 553 of the APA" and is not consistent with *Vermont Yankee* either.  524 F.3d at 246.  In fact, Judge Tatel wrote "separately to emphasize" his view that the disclosure of the redacted portions of agency studies was "particularly important" for a *different* reason—"failure to turn over the unredacted studies undermines [the] court's ability to perform the review function APA section 706 demands."  *Id.* at 242-43.  That concern is not present here, either, because the Tribe seeks access to materials *before* there is final agency action for a court to review.

For the Corps to satisfy its obligations on topic two—a "task on remand" that this Court called "narrow," (D.E. 284 at 10)—it likewise must simply demonstrate its "acknowledgement of" and "attention to" the effects in question (*i.e.*, "the impact of an oil spill on the Tribe's hunting and fishing rights"), D.E. 239 at 43.  Again, while the Corps has requested additional information from all Plaintiffs about the extent of their reliance on hunting and fishing resources, nothing in this Court's ruling compels the Corps to do more than give attention to—*i.e.*, take a hard look at—information it *already* had when it decided to issue the easement without an EIS.  Indeed, there would have been no basis for a remand on topic two if Plaintiffs hadn't already provided information about these effects.  This Court relied on the fact that Standing Rock "had alerted the Corps to its fishing- and hunting- related concerns after the agency published the Draft EA."  D.E. 239 at 42 (Corps "never explained . . . what those effects would be"); see also *id*. at 43 (detailing information the Corps received from the Director of Standing Rock's Department of Game, Fish, and Wildlife Conservation, "spell[ing] out the ways in which an oil spill could seriously affect game along the Oahe shoreline").

As this Court further explained in its October 11 Opinion denying vacatur, "the record shows that the agency is well situated to conduct" the "inquiry" on this second topic.  D.E. 284 at 11.  "It has already gathered information regarding Lake Oahe's fish and wildlife, and it has conducted a lengthy analysis of the possible toxicity arising from various spill scenarios." *Id.*  Because "[t]he agency already has the data it needs to determine the impact of a spill on fish and game," "[o]n remand, the Corps must simply connect the dots." *Id.*

Finally, the Corps is under no obligation to provide more information to Plaintiffs in carrying out its work on the third topic either.  This part of the Court's ruling was focused on a failure to analyze the environmental justice implications of "<u>spill</u> impacts," "as distinct from the risk of a

spill occurring" or "construction impacts." D.E. 239 at 53.  Again, the Court noted the Corps had

been "silent" on potential effects already mentioned in the record, such as Standing Rock's claim

that "many of its members fish, hunt, and gather for subsistence." *Id.* at 54.  And the Court added

that the Corps "need not necessarily have addressed that particular issue," as long as it "offer[ed]

more than a bare-bones conclusion that Standing Rock would not be disproportionately harmed by

a spill." *Id.*

All of this allowed the Court to conclude, with respect to this third topic, that "multiple

aspects of the record suggest that the Corps is likely to justify issuing an EA, rather than complet-

ing an EIS." D.E. 284 at 14-15 (noting low likelihood of spill; relocation of Standing Rock's water

intake; and the "already-conducted assessment of the alternative pipeline route through Bis-

marck").  Moreover, this Court explained, even if the Corps came to a different conclusion about

environmental justice impacts, it would not require an EIS.  That is because, "contrary to the

Tribes' statement that a finding of disproportionate impact would necessitate an EIS, the relevant

agency guidance expressly contemplates the use of an EA to address such concerns." *Id*. at 13.

The Corps can therefore conduct its environmental-justice analysis without providing more infor-

mation to—or commencing formal consultation with—Plaintiffs.[10]

---

[10]     All of this distinguishes Standing Rock's out-of-circuit authority too.  Notably absent from
*National Wildlife Federation v. National Marine Fisheries Service*, 524 F.3d 917 (9th Cir. 2008),
was any suggestion by the district court that the agency could likely correct its errors simply
through better explanations based on the existing record.  In fact, the Ninth Circuit affirmed a
"novel" requirement to consult with sovereign entities to develop items to be included in a pro-
posed action and try to narrow the issues of disagreement, *id.* at 927 & 937, in light of "the history
of the litigation," *id.* at 937.  Here, the items to be addressed on remand have been narrowly tailored
by this Court's Remand Order.  This is simply unlike the cases on which the Ninth Circuit relied,
in which "specific actions" were needed to address an agency's "persistent failure" to carry out its
duties.  And while it may feel like this case has been pending a long time, it is nothing like the
"perpetual litigation" in *National Wildlife Federation*, which dated back almost 20 years. *Id.*

Plaintiffs' arguments for a contrary outcome are based on a different—patently errone-ous—view of this Court's June 14 ruling.  Putting aside the factual errors (noted below) in their assertion that the Corps has engaged in "no exchange of information," the law governing this Court's Remand Order is simple:  until there is final agency action to review, there is no basis for assuming that any exchange of information (much less the particular information that Plaintiffs seek) is a prerequisite to lawful agency action.

Take, for example, Standing Rock's contention that it "makes no sense for the Tribe to be evaluating outdated spill models and other information that are no longer being used, while the Corps is considering new spill models from DAPL that the Tribe has never seen."  D.E. 336 at 9.  That complaint assumes, without any basis in the record (because there is no remand record yet), that the earlier spill models are "outdated" and "no longer being used."  Until the Corps reaches a final decision, it is not possible to conclude that such a decision even requires use of supplements to the earlier still-useful models.  Plaintiffs' arguments likewise assume that the additional model-ing—based on more realistic pipeline rupture scenarios—will show *more* of an effect on the envi-ronment than did the initial modeling of a guillotine cut at the surface of Lake Oahe (rather than the same effect or something less).  And it assumes the Corps will find it necessary to base any findings or ultimate determinations about the effects of a spill on the post-remand information, rather than concluding, *e.g.*, that the result would be the same whether or not it considers additional information.  And even if the Corps ultimately relies on new information from any source, the Tribes have no more entitlement to comment on that information than does any other interested person or entity.  That is because, in contrast with *American Radio Relay League,* this is not notice-and-comment rulemaking, and nothing in the APA, NEPA, or any regulation requires an agency to preview the materials on which it chooses to base final agency action.

**D.**     As alluded to above, Plaintiffs are also incorrect when they accuse the Corps of "consistently ignoring the requests of the Tribe for information[.]"  D.E. 336 at 2.  Although the Corps is better positioned to address what it has shared (and what it still plans to share before reaching final agency action), Plaintiffs have received, at a minimum:  each new version of the GRP; the final Facility Response Plan; the Oahe Project Irrigation/Municipal Easements list; and a Safety Data Sheet (appended to the GRP) detailing the composition of Bakken Crude, including flammability and toxicity.  Scherman Decl., Attach. 2-4.  The Corps further advised the Tribes in its February 23 letter that the Corps was "in the process of finishing [its] review of the [supplemental] spill model and the results submitted by Energy Transfer Partners, as well as gathering documents related to [Standing Rock's] request."  *Id.*

Separately, the Corps and Dakota Access have made other requested information available to the Tribes as part of the response planning process conducted in compliance with this Court's December 4 Order.  This includes:

(1)     the results of the supplemental spill model;

(2)     information about remote monitoring and use of the SCADA system;

(3)     the location and operation of shut-off valves near Lake Oahe;

(5)     a report of a "no notice" emergency response equipment deployment exercise in October 2017 showing a full response in nearly half the time required by PHMSA; and

(6)     details on the number and locations of personnel who would respond to a spill or leak at Lake Oahe.

*See supra* at 12-20.

In fact, at the March 7 meeting Dakota Access did exactly what it offered in its meeting invitation to the Tribes and the Corps:  it presented results from the supplemental spill model and explained how those results will inform the response planning efforts.  Minter Decl. ¶¶ 17-18.  The Corps reviewed these results and asked questions; the Tribes chose not to show up.  *Id.*

32

As explained earlier, once this Court found error on three discrete topics, it followed what is "ordinarily the appropriate course" in this Circuit, which is "simply to identify [the] legal error and then remand to the agency[.]" *Northern Air Cargo v. U.S. Postal Service*, 674 F.3d 852, 861 (D.C. Cir. 2012).  Given that the Corps has *already* shared information with the Tribes; advised the Tribes in February that it planned to share more; and joined Dakota Access in making even more available to the Tribes through the planning process for responding to spills and their potential effects on tribal resources, this is hardly the case to invent a different course.

## II.    The Only Thing Missing, as Relevant to the Court's Response Planning Remand Condition, Is Participation by the Tribes

Standing Rock's Motion omits nearly every fact this Court needs to assess the parties' various efforts to "coordinate to finalize an oil-spill response plan affecting Tribal resources and lands at Lake Oahe." D.E. 303 at 1.  The Court responded to the Tribes' complaints last summer by ordering that the Corps and Dakota Access include them in response planning discussions.  But because that order did not go as far as Plaintiffs asked, they have refused—time and time again—to participate in the discussions they requested.  The record on that point is clear.  The Corps and Dakota Access have repeatedly tried to engage the Tribes in the coordination of response planning.  They have held the planning meetings near Lake Oahe and offered to go to Standing Rock's Reservation to visit locations relevant to deployment of response equipment and protection of tribal resources.  They have made available to the Tribes—both before and at the planning meetings—copies of each iteration of the Geographic Response Plan and the final Facility Response Plan.  They have offered the Tribes multiple opportunities to submit any information, in any format the Tribes choose, that would be helpful in protecting tribal resources from effects of a spill.  The Corps and Dakota Access have also provided much of the information the Tribes have demanded, and have agreed to make even more available.  But like the approach Standing Rock took when

the Corps sought its input relevant to the National Historic Preservation Act, Plaintiffs refuse even to discuss response planning unless all of their demands about the planning process are met first. That is no ground for altering the first remand condition by tacking on a requirement to turn over information unrelated to response planning, especially given that the Court *already* declined to enter such an order the first time Standing Rock insisted on one.

**A.**     The Court imposed its emergency-response-planning condition after Plaintiffs complained they were shut out from earlier planning efforts.  For example, they told the Court that "if there is a final Geographic Response Plan ('GRP') for an oil spill at the Oahe crossing, it has never been shared with the Tribes[.]"  D.E. 280 at 18.  Thus, both the Corps and Dakota Access have given the Tribes each iteration of the GRP since October 2017—even before the December 4 Order was entered.  And the Corps and Dakota Access have made later GRP drafts available for the Tribes to review in-person, where they could ask questions and offer live input.

The Tribes' other complaint was that they had been deprived of the chance to "discuss" and "share opinions" about how a spill response would be carried out.  They stated:  "Nor have the Tribes ever had the opportunity to discuss or share opinions regarding staging of response equipment or mitigation measures."  *Id.*; *see also* D.E. 272 at 37 ("neither the Corps nor DAPL has ever communicated with the Tribes about spill response planning"); D.E. 293 at 6 (complaining that the Tribes "had been completely excluded from the planning process—even through the Tribes have emergency planning duties and staff").  The Tribes further insisted that, as a result of being excluded from response planning discussions, even "updated drafts" of the GRP "still contained oversights and errors."  D.E. 272 at 37.  Yet, fully seven months after the Tribes told this Court that the GRP was based on erroneous and incomplete information, the Tribes have not participated in the response planning discussions; have refused to "discuss or share opinions regarding

staging of response equipment or mitigation measures," *see* D.E. 280 at 18; and have ignored repeated invitations to submit *any* helpful information in *any* manner the Tribes choose. *See supra* at 12-20.

In fact, the *only* time either Tribe availed itself of these many opportunities to provide information relevant to response planning, it left out the most important information:  locations of sites that the Tribe claimed were in need of special protection. *See* D.E. 336-10 at ECF p. 3.  When Chairman Faith urged "an evaluation of the potential impacts of an oil spill and clean-up activities" at "numerous historic properties," he only vaguely described their locations as "low-lying areas along the Missouri River." *Id.*  Dakota Access promptly replied asking for location information and other details essential to incorporating these historic properties into the response planning, but was met only with more silence.  Borkland Decl., Attach. 18.  And Dakota Access cannot try to gather this information itself.  According to Chairman Faith's letter, because "there have been no discussions or evaluation of the impacts on" these and other unspecified "cultural properties down-stream from the DAPL Lake Oahe crossing, ETP personnel are not permitted on Tribal land for the purpose of conducting any field surveys, at this time."  D.E. 336-10 at ECF p. 3.  It is difficult to imagine how, if a leak were to occur, the Tribal leaders and response planning staff will be able to look their fellow Tribe members in the eye and explain that despite having several months to coordinate on response planning they elected to provide no information and engage in no discussions about protecting Tribal resources because they insisted on an all-or-nothing approach.

That approach by the Tribes to response planning should end here as it did in the NHPA context.  In its September 9, 2016 Opinion, this Court found a low likelihood of success on the merits of claims under that statute.  When it came to Standing Rock's contention that it was inad-

equately consulted about potential impacts from construction on cultural resources, this Court observed that the Corps "documented dozens of attempts to engage Standing Rock in consultations to identify historical resources at Lake Oahe and other PCN crossings." *Standing Rock I*, D.E. 39 at 48. But "the Tribe largely refused to engage in consultations." *Id.* "It chose instead to hold out for more – namely, the chance to conduct its own cultural surveys over the entire length of the pipeline." *Id.* This Court held the Tribe to its tactical decision, concluding that—despite the ill effects of that decision on the quality of the dialogue—the Corps "gave the Tribe a reasonable and good-faith opportunity to identify sites of importance to it." *Id.* at 50.[11]

The situation here is quite similar. The Tribes refuse to discuss response planning—such things as identifying particular tribal resources and sites in need of special protection, preferred locations for staging response personnel and launching emergency equipment, and availability of tribal personnel to coordinate in response efforts including training exercises—unless their experts are first allowed to review and comment on how a supplemental spill model was constructed and have access to other documents unnecessary to such planning. Importantly, the Corps and Dakota Access have made available to the Tribes a presentation of the *results* of the supplemental spill modeling so that the parties can take those results (*e.g.*, predicted timing for the spread of oil) into account in the response planning discussions. Borkland Decl., Attach. 18; Minter Decl. ¶¶ 17-18. But the Tribes refuse to meet at all unless and until they receive even more.

As Borkland informed the Tribes' response planning personnel, Dakota Access is willing to revisit its view that these other materials are unnecessary. But the Tribes refuse to have a face-

---

[11]   Plaintiffs are so unwilling to live by this Court's previous findings and rulings that Standing Rock goes so far as to make the audacious claim that "this entire case arose because the Corps failed to meaningfully engage with the Tribe[.]" D.E. 336 at 8 (also complaining, inexplicably, that the Corps failed to "listen to its legitimate concerns about the siting of the pipeline at Oahe, and make a reasoned decision in light of that information").

to-face discussion at which the parties can go over what is currently available (including many items the Tribes have requested), adjust the planning based on that information, and then have a conversation about whether and how more information might be useful.  The Tribe's requests for documents underlying modeling results that have been based on a worst-case discharge are simply unnecessary.  Response planning includes being prepared for the worst, and the *original* spill model assumed a worst case scenario that is far beyond what might ever happen at Lake Oahe in the unlikely event of a spill or leak.  In fact, the volume of oil used in that model—more than 12,000 barrels—is even greater than the volume that Plaintiffs' *own expert* hypothesizes would be released.  *Compare* AR 72253 *with* AR ESMT 625-26.  By planning for something worse than the worst real-world possibility, the emergency responders will be fully equipped to handle an actual spill or leak; and the Tribes are fully able to provide their own input with the information already available to them.[12]

**B.**    Also missing from Standing Rock's motion is any acknowledgment that Plaintiffs already asked this Court to order access to the *same* categories of information as a prerequisite to participating in the *same* response planning, and this Court *declined* to include that requirement in its December 4 Order.  In particular, when Plaintiffs asked this Court to require the parties to coordinate on emergency response planning, they included in their proposed order that the Corps must "initiate communications to set up an in-person meeting" to discuss response planning, with the following extra proposed condition:

> At least 15 days prior [to] that meeting, defendants shall provide the Tribes with all documentation necessary to engage in meaningful spill response planning, including the most current unredacted drafts of applicable facility response plans

---

[12]    As noted above, to the extent the additional information sought by the Tribes is relevant to response planning, it is in the GRP that the Tribes have declined to discuss with the Corps and Dakota Access, or it was otherwise made available as part of the response planning discussions that the Tribes have yet to take part in.

and geographic response plans, as well as documentation for any spill-related as-
sumptions embodied in those plans, and technical documents related to worst case
spill discharges and detection of low-level leaks, spill models, and emergency op-
erations such as valve shutoffs.

D.E. 293-1 at 2 (Proposed Order).

Plaintiffs grounded this request in their assertion that they could not meaningfully partici-

pate in planning for possible spills, and that they would not be able to offer input on potential harm

to hunting and fishing resources (remand topic two), without this information.  For example, the

Tribes insisted that they needed updated spill modeling information to participate in response plan-

ning.  D.E. 293 at 8 (arguing that "an adequate GRP depends on an understanding of worst case

discharges and other information developed through adequate spill modeling" and noting that

"DAPL is still at work on spill models, which are not expected to be provided to the Corps for

review prior to December").  Moreover, they argued that in order for their proposed response plan-

ning condition "to be effective, the Court should direct the Corps to make available to the Tribes

the technical documents and assumptions underlying the facility and geographic response plans,

as well as fully unredacted versions of the plans themselves." *Id.*

This Court declined to include such a requirement in its December 4 Order.  D.E. 303 at 1.

Plaintiffs did not seek reconsideration of that ruling.  Instead, just like their approach to the Re-

mand Order itself, *see supra* 6-11, they simply have refused to accept that this Court's ruling was

not the one they sought.  For the Tribes to pretend now that their requested order merely "clarifies"

the earlier one is doubly disingenuous, because that's the *same* line the Tribes used when they

asked the Court to include a document-production requirement in the December 4 Order in the

first place.  D.E. 293 at 2 ("The Tribes respectfully request that the Court impose the conditions

suggested by the Tribes, as *clarified* in the proposed order submitted herewith."  (Emphasis

added)).  The Tribes have had no legitimate basis for refusing to engage in response planning these last four months.  The Court should not reward that refusal through a *post hoc* excuse.

## III.    The Independent Third-Party Assessment Condition in this Court's December 4th Order Also Needs No Clarification

The Court required Dakota Access to select a third-party independent expert engineering company, "with input from the Tribes."  D.E. 303 at 1-2.  Dakota Access sought that input and even included Standing Rock's proposed firm when soliciting requests for proposals.  The firm that Dakota Access selected will be reviewing the easement conditions and regulations, and assessing compliance with all such conditions as well as other integrity threats.  That is exactly what the order requires.  *Id.*  ("Dakota Access, with input from the Tribes, shall select a third-party independent expert engineering company to review easement conditions and regulations, and to assess compliance with all such conditions as well as other integrity threats.").  The Court need not modify its Order.

There is no dispute that Dakota Access sought Plaintiffs' input on its selection of the third-party company.  Dakota Access did not select either of the firms that Standing Rock complained had ties to Dakota Access.  Standing Rock complained that the firm that was selected performs litigation support work for the oil and gas industry, but that is not a basis for rejecting its independence.  Were that so, accounting firms—which audit the financial results of companies—would be barred from providing defense-side litigation support.  And law firms would be unable to perform monitorship functions after government enforcement actions if they represent companies in different government enforcement actions.

Although Dakota Access had no obligation to choose any firm preferred by Plaintiffs, Aaker's proposal plainly was a mismatch for the assessment needed here.  Aaker's experience and the manner in which he proposed to proceed are suited for something different:  root cause analysis

of pipeline failures.  And there are reasons to question *his* ability to be impartial given how quickly

he jumped to the erroneous conclusion that the process was "rigged" in favor of a firm that wasn't

selected.

There also is no basis for Standing Rock to obtain a rewrite of the scope of the assessment

ordered here.  The Court ordered a third-party to look at what the easement and regulations require

and assess whether Dakota Access is in compliance.  The Order also requires the third-party com-

pany to include "other integrity threats" in its assessment.  Integrity threats in this context are

different ways in which a pipeline spill or leak might occur.  This Court explained this in its June

14 Opinion:  The risk analysis in the EA "addressed nine industry-recognized pipeline integrity

threat categories," including such things as third-party damage, corrosion, and defects in materials

or construction.  *Standing Rock III*, D.E. 239 at 29 (quoting EA).  The easement conditions already

address those nine threat categories.  In the unlikely event the third-party company identifies a

different ("other") type of threat—*i.e.*, one not already identified—it will assess that threat.  (Da-

kota Access has already been including in its bi-monthly reports whether "[a]ny new integrity

threats" are "identified during the reporting period."  D.E. 303 at 2.  Given how thorough the list

of possible threat categories is in the EA, it should come as no surprise that nothing new has been

identified.)

Standing Rock misreads the reference to "other integrity threats" as a command to the

third-party company to question whether the Corps got its risk assessment right in the July 2016

EA.  For one thing, the Order says to assess "other" integrity threats, not threats already considered

in creating the easement conditions.  Moreover, and as stated above, this Court already "upheld

the majority of the Corps' determinations under NEPA – including the agency's 'top-line conclu-

sion' that the risk of an oil spill was sufficiently low so as to not require an EIS."  D.E. 284 at 5.

The purpose of the conditions in the December 4 Order is to preserve the status quo during remand. D.E. 304 at 5.  Standing Rock's reading would turn that purpose on its head by replacing the status quo with a chance to upend the results of that earlier ruling.  And rather than have the Corps or some other federal agency conduct this re-do of the decision to grant permission, Standing Rock would delegate the task to a private party operating with no statutory or regulatory mandate.  The Order should not be expanded in that improper manner.[13]

The Court also should not require Dakota Access to go back and develop assessment protocols jointly with Plaintiffs.  The task here—at least the one this Court ordered as opposed to that which Standing Rock has in mind—is straight-forward.  Dakota Access makes information available to the third-party company so that the latter can identify the easement conditions and determine whether Dakota Access is in compliance.  P-PIC has been notified that if it has difficulty getting access to anything it believes it needs, or if it believes that maintaining independence or otherwise completing its assessment requires it to proceed in a manner that Dakota Access will not allow, it should bring the issue directly to the Court's attention.

Finally, since this Court ordered the third-party assessment, the Pipeline Safety and Hazardous Materials Administration has advised Dakota Access that it will be conducting an audit of DAPL this summer.  March 16, 2018 Declaration of Todd Nardozzi.  The Court can therefore be assured that, third-party assessment or not, the pipeline is receiving independent scrutiny.

---

[13] There also is no basis for an order that—under the guise of "clarification"—expands assessment of compliance with easement conditions or regulations to include assessment of compliance with *voluntary* practices identified by the American Petroleum Institute (API).  These API practices are not required by regulation, which explains why even the API refers to them as "recommended."  Siguaw Decl. ¶¶ 8-9.

**CONCLUSION**

For the reasons stated above, the Court should deny both Motions.

Dated:  March 16, 2018                                  Respectfully submitted,

                                                         /s/ William S. Scherman
Kimberley Caine                                         William S. Scherman
William J. Leone                                        David Debold
Robert D. Comer                                         GIBSON, DUNN & CRUTCHER LLP
NORTON ROSE FULBRIGHT US LLP                            1050 Connecticut Avenue, N.W.
799 9th St. NW, Suite 1000                              Washington, D.C.  20036
Washington, D.C.  20001-4501                            (202) 955-8500
(202) 662-0200                                          wscherman@gibsondunn.com

*Counsel for Dakota Access, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 16th day of March, 2018, I electronically filed the foregoing

document using the CM/ECF system.  Service was accomplished by the CM/ECF system.

     /s/ William S. Scherman
William S. Scherman
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
wscherman@gibsondunn.com

*Counsel for Dakota Access, LLC*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

STANDING ROCK SIOUX TRIBE,

                              Plaintiff,

and

CHEYENNE RIVER SIOUX TRIBE,

                              Intervenor Plaintiff,

            v.

U.S. ARMY CORPS OF ENGINEERS,

                              Defendant,

and

DAKOTA ACCESS, LLC,

                              Intervenor Defendant.

Civil Action No. 16-1534-JEB
(consolidated with Case Nos. 16-
1796 & 17-267)

_____

**DECLARATION OF JUSTIN D. MINTER IN SUPPORT OF
DAKOTA ACCESS, LLC'S RESPONSE TO THE MOTIONS OF STANDING ROCK
SIOUX TRIBE AND CHEYENNE RIVER SIOUX TRIBE FOR "CLARIFICATION"
AND "MEANINGFUL CONSULTATION"**

_____

1.      My name is Justin D. Minter. I am Senior Manager – Emergency Response at Energy

Transfer Partners, the parent company of Dakota Access, LLC.  I have more than 15 years of

Emergency Response, Emergency Planning, and Remediation experience in the oil industry.  I

have responded to hundreds of response actions, including soil and groundwater remediation

responses, and releases from pipelines, tanks systems and transport vehicles.  I have worked

previously on several industry work groups, including American Petroleum Institute (API)

Committees and Workgroups related to emergency planning and response activities.  As part of my job duties, I am responsible for coordinating emergency response planning for, among other projects, the Dakota Access Pipeline.  This includes development of emergency response plans and coordinating response planning with outside parties such as the U.S. Army Corps of Engineers ("USACE"), the Standing Rock Sioux Tribe and the Cheyenne River Sioux Tribe.

2.      In accordance with the Court's December 4, 2017 Order, I have worked with Carl G. Borkland to assist in coordinating Dakota Access's response planning with the USACE and the Standing Rock Sioux Tribe and Cheyenne River Sioux Tribe.

3.      As part of the coordination process, I have attended three meetings in Bismarck North Dakota regarding response planning for the Lake Oahe crossing.

4.      The first meeting occurred on January 11, 2018 and was attended by representatives of Dakota Access, including its emergency response contractor, and representatives of the USACE. Neither Standing Rock nor Cheyenne River attended.

5.      The second meeting occurred on February 8, 2018.  Representatives of Dakota Access and the USACE both attended.  In addition, nine representatives of Standing Rock and one representative from Cheyenne River briefly appeared at the meeting to hand deliver letters from each of the tribes, but did not attend or participate in the substantive portions of the meeting.  A true and correct copy of the sign-in sheet from the February 8 meeting is attached hereto as Attachment 1.

6.      One representative from Standing Rock, Everett Iron Eyes, videotaped the portion of the meeting attended by the tribes.  His name is not on the sign-in sheet, because he elected not to sign it.  Another representative, Donald Holmstron, also chose not to sign the sign-in sheet.

7.      Another representative from Standing Rock, Peter Capossela, identified himself as an

attorney, and advised that only two Standing Rock representatives would speak (Virgil Taken Alive and Doug Crow Ghost), that they were only authorized to talk about a date and location for a later meeting, and that they would not discuss emergency planning efforts at the February 8 meeting.

8.      Standing Rock representative Virgil Taken Alive expressed the desire for emergency planning meetings to be held at the Standing Rock reservation in the Tribal Council's presence.

9.      Standing Rock representative Doug Crow Ghost read aloud a letter from Standing Rock Chairman Mike Faith.  A true and correct copy of that letter is attached hereto as Attachment 2.

10.     The only representative from Cheyenne River, David Nelson, hand delivered two letters from Cheyenne River Chairman Frazier.  A true and correct copy of the first letter is attached hereto as Attachment 3, and a true and correct copy of the second letter is attached hereto as Attachment 4.

11.     Following those statements and deliveries, all tribal representatives left the February 8 meeting.  Despite Mr. Capossela's initial statement that the Standing Rock representatives were authorized to discuss another meeting date (and the statement in Chairman Faith's letter to the same effect) no tribal representatives stayed to discuss setting another meeting date.

12.     Dakota Access and the Corps then continued with the scheduled review and discussion of the latest draft of the Geographic Response Plan (GRP) for Lake Oahe.  Multiple hard copies of the GRP were available for all participants to review and take with them.  Because they had left, no tribal representatives were present for that review and discussion.

13.     Had the tribal representatives remained for the substantive portions of the February 8 meeting, they would have had access to several of the items they requested in their letters.  These include: (1) the then-current, unredacted draft of the GRP updated to incorporate relevant portions

of the Dakota Access North Response Zone Facility Response Plan; (2) remote monitoring and SCADA system information as discussed in the GRP; (3) Safety Data Sheets appended to the draft GRP regarding the composition of Bakken Crude, including flammability and toxicity; (4) the location and operation of shut-off valves near Lake Oahe; (5) the results of an unannounced emergency response equipment deployment exercise at Lake Oahe in October 2017 with an initial response of just one hour and full response within 3½ hours; and (6) the approximate number and locations of personnel who would respond to a spill or leak at Lake Oahe.

14.     The draft GRP—both the version available at the February 8 meeting and the version updated since that meeting—also takes into account, and is therefore informed by, the initial results of the new spill modeling Dakota Access has conducted as part of the remand process. The spill model assessed the potential effects of two different volumes of unmitigated release at two different locations along the Lake Oahe segment (one at the nearest valve on the Western (upstream) side of the Lake, and the other directly under the Lake). The new spill model used a three-dimensional Spill Impact Model Analysis Package (SIMAP) to assess potential downstream effects to Lake Oahe. It modeled the likely path and timing of both the hypothetical upland spills as well as the hypothetical in-water spills. Among other things, the modeling took into account environmental variability (changes in air temperature, wind and water movement, lake levels), seasonal variability, and site-specific geographic issues, using data covering a 10-year period. And, although Dakota Access is committed to responding to a release within six hours, the spill model assumed no mitigation of any kind for the entire 10-day model run.

15.     More than a thousand model runs were performed for the four scenarios. These model runs provide data regarding, among other things, how far and along what path a leak or spill might travel; how long it may take oil to reach particular locations (such as water intakes) if left

unmitigated; the maximum concentrations and durations of those concentrations at various locations (again, such as water intakes); and the extent to which an unmitigated spill will remain on the surface, become entrained in water or sediment at the bottom of the lake, degrade, evaporate, or otherwise react to the environment.

16.    If the Tribes' response planning representatives had elected to stay and review the draft of the GRP at the February 8 meeting, they could have learned about the ways in which that draft was informed by, and consistent with, the latest spill modeling results.

17.    The third meeting occurred on March 7, 2018.  Representatives of Dakota Access attended in person and the USACE attended by teleconference.  Representatives of Standing Rock and Cheyenne River did not attend.

18.    At the March 7 meeting, Dakota Access and the USACE reviewed the latest draft of the GRP and edits that had been made since the February 8 meeting.  In addition, Dakota Access and the USACE reviewed a presentation on the results of the supplemental spill modeling requested by the Corps after the Court's remand order.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed March 15, 2018

Justin Minter

# ATTACHMENT 1



# MEETING ATTENDANCE

Date ___8/02/2018___        Meeting : Geographical Response Plan – Missouri River /Lake Oahe

Time:   0900 am            Venue:   Hampton Inn, Bismarck, ND

| | Name | Organization/ Tribe/ Agency |
|---|---|---|
| 1 | Justin Minter | Energy Transfer / DAPL |
| 2 | MARK JASTER | GHD LIMITED /DAPL |
| 3 | Patrick Feiock | Corps of Engineers |
| 4 | Vernon Ryan | ETP |
| 5 | Dave Archambault | Tech Team Activities Coordinator |
| 6 | Allyson TwoBears | SRST Dept. of Env. Regulations |
| 7 | Doug CrowGhost | SRST Dept. of Water Resources |
| 8 | David Nelson | CRST DENR |
| 9 | Peter Capossela | Atty SRST |
| 10 | David KANE | SRST ADVISOR |
| 11 | Tom Mentz Sr. | Elders Preservation Council-SRST |
| 12 | Tut Ali | Elders Preservation Council-SRST |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

# ATTACHMENT 2

Mike Faith
*Chairman*

**TRIBAL COUNCIL**
**(AT LARGE)**

Paul Archambault

Kory McLaughlin

Charles Walker

Frank White Bull

Courtney Yellow Fat

Dana Yellow Fat

Ira Taken Alive
*Vice Chairman*

Susan Agard
*Secretary*

John Pretty Bear
*Cannon Ball District*

Brandon Mauai
*Long Soldier District*

Wayne Looking Back
*Wakpala District*

Delray Demery
*Kenel District*

Joe White Mountain Jr.
*Bear Soldier District*

Caroline Thompson
*Rock Creek District*

Verdell Bobtail Bear
*Running Antelope District*

Samuel B. Harrison
*Porcupine District*

*Hand Delivered on February 8, 2018*

February 8, 2018

Energy Transfer Partners, L.P.
8111 Westchester Drive
Dallas, Texas 75225

RE:    Proposed Meeting on Emergency Planning and Response – Dakota Access Pipeline

Dear Energy Transfer Partners, L.P.:

I am in receipt of Carl Borkland's February 5th electronic mail message regarding a meeting on oil spill planning in Bismarck on February 8, 2018. Mr. Borkland declined my invitation to visit the Standing Rock Reservation. (Letter to Carl Borkland, February 1, 2018).

I authorize the following persons to be present and speak on our behalf on February 8:

Doug Crow Ghost, Director, SRST Department of Water Resources
Allyson Two Bears, Director SRST EPA/DER
Everett Iron Eyes, SRST External Affairs Director
Virgil Taken Alive, Tribal elder
Tim Mentz, Sr. Tribal elder
Don Holmstron, Esq., Boulder, Colorado
David Kane, WindHorse Strategic Initiatives, LLP, Boulder, Colorado
Peter Capossela, Attorney at Law, Eugene, Oregon

1

These individuals are authorized to present this letter, and schedule a future meeting with Tribal government officials at the Tribal headquarters in Fort Yates, N.D.

Customarily, government and corporate officials and nongovernmental organizations with whom our Tribe conduct business respect certain decorum, in dealing with our sovereign nation. Our Lakota values promote respect for all persons, and we expect our friends and neighbors to show respect when conducting business with our Tribe. Carl Borkland's February 5th email responded to my invitation to Energy Transfer Partners to visit Standing Rock and meet with Tribal government officials by stating:

> Because our travel plans and logistics have already been set, we are still planning on Bismarck this Thursday, February 8 to continue our Lake Oahe spill planning. We will start the meeting at 9:00 to alow your team to travel to Bismarck. But if you arrive later that is fine. We will just continue our meeting after you arrive.
>
> We would also like to schedule another meeting in March in Bismarck. This meeting would be a plan review meeting, but we would be happy to travel to Standing Rock to review some of the tactical response planning areas.

In conducting business with our Tribe in a productive manner, a more collaborative, respectful approach is warranted. In addition, it will be helpful for there to be clarification of the roles of different Energy Transfer Partners executives. Tom Mason of Energy Transfer Equities and outside counsel Robert Comer approached me at a conference in Bismarck on January 30, seeking an immediate meeting. I explained that the proper protocol involves a meeting with Tribal government officials at Council Chambers in Fort Yates. Nevertheless, Mr. Borkland indicated in his February 5th email that ETP declined our invitation. That will limit the overall scope of discussions on February 8; as no elected Tribal officials will be present.

I would be happy to meet with senior ETP officials to discuss a collaboration process for emergency planning. In the meantime, in order to properly cooperate on emergency planning, it shall be necessary to identify the risk that our communities face from the operation of the Dakota Access Pipeline. The spill model and worst case discharge calculations are essential elements of the response plans. Accordingly, it is incumbent that Energy Transfer Partners provide the latest un-redacted Facility Response Plan (FRP), Risk Assessment and Spill Model. In order to discuss the accuracy of the FRP, provide the locations of the shut-off valves for the Lake Oahe crossing, and describe whether they are operated manually, automatically or remotely.

Additionally, any dialogue on emergency response planning will require discussion of ETP's systems for detection of a comparatively low level of oil release. It will be necessary to provide information on the ETP systems that are in place for the detection of

2

smaller leaks from the Dakota Access Pipeline. We are interested in the plans that have been developed by ETP for all credible discharge scenarios.

This includes the worst case discharge and the undetected leak discharge (ULD) values that are associated with the pipeline location and operating rates. Along with the WCD and ULD values, it will be helpful for you to provide the values and assumptions for the pipeline safety systems at the Lake Oahe crossing, which, as you know, impact the calculation of WCD and ULD. The system design details that we shall need include shutoff valves (location and controls), emergency shutdown system (ESD interlocks with pumps), and the leak detection system. This is obviously necessary in order to discuss emergency planning and remediation that in the event of an oil spill affecting the Standing Rock Indian Reservation.

We are interested in the actual response time for the reported spills from other ETP pipelines. This directly relates to the response time estimated by ETP for an oil release from DAPL. Moreover, we will need the location, number and status of available response teams. Sharing this information is necessary in order to have a productive discussion on emergency response for DAPL.

The adequacy of leak detection is another important issue for discussions on emergency planning. This is a particular concern for the segment of the pipeline inserted in the horizontal directional drilling bore beneath the bed of Lake Oahe. We will need information on the cathodic protection and the SCADA program being utilized.

The composition of Bakken crude will influence its behavior upon a release, as well as the risk and toxicity. We are interested in discussing the composition of the oil transported in the Dakota Access Pipeline. The information on the composition of the Bakken crude utilized by ETP in the FRP will be helpful.

In sum, in order to facilitate a meaningful discussion on emergency planning and response for the Dakota Access Pipeline, we request that you provide the following:

- Most current Facility Response Plan, without redactions
- Most current Lake Oahe Spill Model, including scenarios analyzed and technical documentation
- Most current Risk Analysis specific to the Lake Oahe crossing
- Worst case discharge
- Location and specifications of the Lake Oahe crossing shut-off valves; elevation of the valves and the pipeline segment between the shut-off valves; whether they are automatic or manually operated; and calculation of the drainage volume
- DAPL Pipeline Safety Management System requirements, framework and implementation plan
- Actual response time at other ETP/Sunoco reported pipeline leaks
- Number and location of personnel at Lake Oahe

3

- Cathodic protection program, including design and monitoring specific to the Lake Oahe crossing
- Information on the composition of Bakken crude transported in DAPL that was utilized by ETP in the preparation of the FRP. Identify the hazards specific to the Bakken crude, including flammability and toxicity, and information on how the emergency response plans address those specific hazards.

By providing this information, ETP will truly demonstrate good faith in working with our Tribe. Our staff and consultants are only authorized to discuss the scheduling of a more formal meeting with the Tribal government officials on the Standing Rock Indian Reservation. The February 8th meeting does not constitute a consultation or negotiation with the Standing Rock Tribal government. Thank you for your attention to this matter.

Sincerely,

Mike Faith, Jr., Chairman
Standing Rock Sioux Tribe

# ATTACHMENT 3



**CHAIRMAN**
Harold C. Frazier

**SECRETARY**
EvAnn White Feather

**TREASURER**
Benita Clark

**VICE-CHAIRMAN**
Robert Chasing Hawk, Sr.

P.O. Box 590
Eagle Butte, South Dakota 57625
Phone: (605) 964-4155
Fax: (605) 964-4151

**TRIBAL COUNCIL MEMBERS**

**DISTRICT 1**
Bernita In The Woods
Bryce In The Woods

**DISTRICT 2**
Theodore Knife, Jr.

**DISTRICT 3**
Edward Widow
John C. Kessler

**DISTRICT 4**
James L. Pearman
Kevin Keckler
Merrie Miller
Mark J. Knight

**DISTRICT 5**
Ryman LeBeau
Raymond Uses The Knife
Robert Chasing Hawk, Sr.
Derek Bartlett

**DISTRICT 6**
Tuffy Thompson
Wade Tater Ward

February 7, 2018

Carl G. Borkland
Energy Transfer Partners, L.P.
8111 Westchester Drive
Dallas, Texas 75225

Dear Mr. Borkland:

I am inviting Energy Transfer Partners to the Cheyenne River Sioux Tribe on February 8, 2018 which you have identified as an available date for ETP. We are in Council in Green Grass, SD and would be happy to meet with ETP in our meeting as is our custom and governmental procedure. This would be a great opportunity to meet and discuss your efforts with the decision makers responsible to the people of the Cheyenne River Sioux Tribe.

We believe that a meeting should involve information sharing mandated by Judge Boasberg's December 4, 2017 order. We require an unredacted Facility Response Plan, The hazards specific to the Bakken Crude transported in DAPL, as well as prior Energy Transfer Partners and Sunoco oil spill responses.

If you have any questions please feel free to call my office at (605) 964-4155 or haroldcfrazier@yahoo.com.

Sincerely,

Harold Frazier
Chairman

The blue represents the thunderclouds above the world where live the thunder birds who control the four winds. The rainbow is for the Cheyenne River Sioux people who are keepers of the Most Sacred Calf Pipe, a gift from the White Buffalo Calf Maiden. The eagle feathers at th e edges of the rim of the world represent the spotted eagle who is the protector of all Lakota. The two pipes fused together are for unity. One pipe is for the Lakota, the other for all the other Indian Nations. The yellow hoops represent the Sacred Hoop, which shall not be broken. The Sacred Calf Pipe Bu ndle in red represents Wakan Tanka – The Great Mystery. All the colors of the Lakota are visible. The red, yellow, black and white represent the fo ur major races. The blue is for heaven and the green for Mother Earth.

# ATTACHMENT 4



**CHAIRMAN**
Harold C. Frazier

**SECRETARY**
EvAnn White Feather

**TREASURER**
Benita Clark

**VICE-CHAIRMAN**
Robert Chasing Hawk

**TRIBAL COUNCIL MEMBERS**

**DISTRICT 1**
Bernita In the Woods
Bryce In the Woods

**DISTRICT 2**
Theodore Knife, Jr.

**DISTRICT 3**
Edward Widow
John Kessler

**DISTRICT 4**
Jim Pearman
Kevin Keckler
Merrie Miller-White Bull
Mark Knight

**DISTRICT 5**
Ryman LeBeau
Raymond Uses The Knife
Robert Chasing Hawk
Derek Bartlett

**DISTRICT 6**
Tuffy Thompson
Wade "Tater" Ward

P.O. Box 590
Eagle Butte, South Dakota 57625
Phone: (605) 964-4155
Fax: (605) 964-4151

February 7, 2018

## VIA EMAIL AND HAND-DELIVERY

C. Gus Borkland
VP- Environmental Projects & Emergency Planning/Response
EHS&S
Energy Transfer Partners
4041 Market Street
Aston, PA 19014

Re:     Dakota Access Pipeline – Emergency Response Planning

Dear Mr. Borkland:

The Cheyenne River Sioux Tribe ("Tribe") requests that at least one additional consultation between Energy Transfer Partners ("ETP") and the Tribe with regard to Dakota Access Pipeline ("DAPL") Emergency Response Planning must occur on the Tribe's territory, the Cheyenne River Sioux Reservation.

As you know, the present Emergency Response Planning process implicates the U.S. Army Corps of Engineers permitting process for the DAPL under federal law.   Furthermore, as acknowledged by the U.S. District Court in the ongoing lawsuit, the placement of the DAPL and impacts therefrom affect my Tribe's Treaty rights and trust resources.

The blue represents the thunderclouds above the world where live the thunder birds who control the four winds. The rainbow is for the Cheyenne River Sioux people who are keepers of the Most Sacred Calf Pipe, a gift from the White Buffalo Calf Maiden. The eagle feathers at the edges of the rim of the world represent the spotted eagle who is the protector of all Lakota. The two pipes fused together are for unity. One pipe is for the Lakota, the other for all the other Indian Nations. The yellow hoops represent the Sacred Hoop, which shall not be broken. The Sacred Calf Pipe Bundle in red represents Wakan Tanka – The Great Mystery. All the colors of the Lakota are visible. The red, yellow, black and white represent the four major races. The blue is for heaven and the green for Mother Earth.

C. Gus Borkland
February 7, 2018
Page 2

Consequently, the Tribe requests that ETP work with me to schedule a consultation regarding Emergency Response planning on the Cheyenne River Sioux Reservation, including a site visit to areas of concern on Lake Oahe.

Please contact me at your earliest convenience at 605-964-4155 or haroldcfrazier@yahoo.com.

Sincerely,

Harold Frazier, Chairman
Cheyenne River Sioux Tribe

cc:     Brent Cossette

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STANDING ROCK SIOUX TRIBE,

Plaintiff,

and

CHEYENNE RIVER SIOUX TRIBE,

Intervenor Plaintiff,

v.

U.S. ARMY CORPS OF ENGINEERS,

Defendant,

and

DAKOTA ACCESS, LLC,

Intervenor Defendant.

Civil Action No. 16-1534-JEB
(consolidated with Case Nos. 16-
1796 & 17-267)

———————————————

DECLARATION OF CARL G. BORKLAND IN SUPPORT OF
DAKOTA ACCESS, LLC'S RESPONSE TO THE MOTIONS OF STANDING ROCK
SIOUX TRIBE AND CHEYENNE RIVER SIOUX TRIBE FOR "CLARIFICATION"
AND "MEANINGFUL CONSULTATION"

———————————————

1.      My name is Carl G. Borkland. I am Vice President for Environmental Projects &

Emergency Response Planning at Energy Transfer Partners, the parent company of Dakota Access,

LLC.  I have more than 31 years of Environmental Permitting, Remediation, and Emergency

Planning/Response experience in the oil industry.   I have responded to hundreds of response

actions, including soil and groundwater remediation responses, and releases from pipelines, tanks

systems and transport vehicles.  I am a Professional Geologist in the State of Indiana, and I have

worked previously on several industry work groups, including American Petroleum Institute (API) Committees and Workgroups and International Liquid Terminal Association (ILTA) related to environmental compliance and emergency response activities. As part of my job duties, I am responsible for overseeing emergency response planning for, among other projects, the Dakota Access Pipeline. This includes supervising the coordination of response planning with outside parties such as the U.S. Army Corps of Engineers ("USACE"), the Standing Rock Sioux Tribe and the Cheyenne River Sioux Tribe.

2.      In accordance with the Court's December 4, 2017 Order, I have worked to coordinate Dakota Access's response planning with the USACE, the Standing Rock Sioux Tribe, and Cheyenne River Sioux Tribe. Attached hereto are true and correct copies of correspondence between Dakota Access, the Corps, and both Tribes:

| | |
|---|---|
| *Attachment* 1: | December 8, 2017 email from Gus Borkland to Standing Rock, Cheyenne River, and USACE with draft Geographic Response Plan; |
| *Attachment* 2: | December 20, 2017 email from Gus Borkland to Standing Rock, Cheyenne River, and USACE; |
| *Attachment* 3: | December 31, 2017 email from Gus Borkland to Standing Rock, Cheyenne River, and USACE; |
| *Attachment* 4: | January 4, 2018 email from D. Crow Ghost Jr. with letter from Standing Rock Chairman Mike Faith to Dakota Access and USACE; |
| *Attachment* 5: | January 5, 2018 email from Gus Borkland to Standing Rock, Cheyenne River, and USACE; |
| *Attachment* 6: | January 12, 2018 email from Gus Borkland to Standing Rock, Cheyenne River, and USACE; |
| *Attachment* 7: | January 26, 2018 email from Gus Borkland to Standing Rock, Cheyenne River, and USACE; |
| *Attachment* 8: | February 2, 2018 email from D. Crow Ghost Jr. with letter from Standing Rock Chairman Mike Faith to Dakota Access, Cheyenne River, and USACE; |

*Attachment* 9:   February 5, 2018 email from Gus Borkland to Standing Rock, Cheyenne River, and USACE;

*Attachment* 10:   February 6, 2018 email from David Nelson to Dakota Access;

*Attachment* 11:   February 7, 2018 email from D. Crow Ghost Jr. to Dakota Access;

*Attachment* 12:   February 7, 2018 email from Gus Borkland to Standing Rock;

*Attachment* 13:   February 24, 2018 email from Gus Borkland to Standing Rock, Cheyenne River, and USACE;

*Attachment* 14:   February 27, 2018 5:14 P.M. email from D. Crow Ghost Jr. to Dakota Access, Cheyenne River, and USACE;

*Attachment* 15:   February 27, 2018 5:27 P.M. email from D. Crow Ghost Jr. to Dakota Access, Cheyenne River, and USACE;

*Attachment* 16:   February 28, 2018 email from D. Crow Ghost Jr. to Dakota Access, Cheyenne River, and USACE;

*Attachment* 17:   February 28, 2018 email from Standing Rock to Dakota Access attaching letter from Standing Rock Chairman Mike Faith to Dakota Access;

*Attachment* 18:   March 1, 2018 email from Gus Borkland to Standing Rock, Cheyenne River, and USACE;

*Attachment* 19:   March 7, 2018 email from Gus Borkland to Standing Rock, Cheyenne River, and USACE;

*Attachment* 20:   March 7, 2018 11:39 AM email from D. Crow Ghost Jr. to Gus Borkland;

*Attachment* 21:   March 7, 2018 email from Cheyenne River to Dakota Access and USACE attaching letter from David Nelson to Gus Borkland;

*Attachment* 22:   March 7, 2018 3:32 PM email from D. Crow Ghost Jr. to Gus Borkland attaching Standing Rock Resolution;

3.      In addition to these emails and letters, on the morning of March 7, 2018, I left a voicemail message for Doug Crow Ghost Jr. asking whether Standing Rock intended to attend the already-in-progress meeting in Bismarck, North Dakota. I was expecting Crow Ghost to attend based on his February 28 email. *See* Attachment 16. Crow Ghost responded to my voicemail with an email stating that he was waiting for completion of a Tribal Council resolution, which he later emailed

3

to me. *See* Attachments 20 & 22.

4.      Further, in his March 6, 2018 letter, David Nelson of Cheyenne River wrote that "[a]s you know" "severe weather" prevented Cheyenne River representatives from attending the January 11 meeting. *See* Attachment 21. But this was the first time Mr. Nelson said that Cheyenne River had even planned to attend the January 11 meeting, let alone that the weather supposedly prevented attendance. Also, the weather did not stop persons from either the Corps or Dakota Access from attending the January 11 meeting, and all of them came from further away than the Cheyenne River reservation, including one Dakota Access employee who drove three hours that morning from Watford City, North Dakota to attend.

5.      The attachments are a complete set of all correspondence I have had with either Tribe on the topic of response planning since the Court's December 4 Order. Apart from the voicemail I left for Doug Crow Ghost Jr. on March 7, 2018, and the Tribes' brief appearance at the February 8 meeting, neither I nor others at Dakota Access have communicated with either Tribe by telephone or any other means regarding response planning.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed March 16, 2018

Carl G. Borkland

4

# ATTACHMENT 1

| From: | Borkland, Carl G <CARL.BORKLAND@energytransfer.com> |
|---|---|
| Sent: | Friday, December 8, 2017 12:49 PM |
| To: | dnelson@crstepd.org; Elliott Ward; Cossette, Brent J CIV USARMY CENWO (US) |
| Subject: | Emergency Planning Meeting |
| Attachments: | 2017_10_23_Geographical Response Plan_Lake Oahe.pdf |

All:

I will be in the lead for Dakota Access, LLC on the first condition of Judge Boasberg's December 4 Order (requiring the parties to coordinate on finalizing an oil-spill response plan affecting Tribal resources and lands at Lake Oahe). We would like to schedule a meeting to discuss the necessary steps and receive initial input from the parties on response planning. We suggest meeting in Bismarck and are available the following dates:

December  19, 20
January 3, 4, 5, 9, 10, 11, 12

Once we have responses, we will circulate a date that is mutually convenient. Also, attached to this email is the current Geographic Response Plan for the Lake Oahe crossing (with minimal redactions). If there is any information relevant to response planning that you would like us to have before we meet, please feel free to email it to me.

Thanks,



C. Gus Borkland
VP- Environmental Projects & Emergency Planning/Response
EHS&S
Energy Transfer Partners
4041 Market Street
Aston, PA 19014
O: 610.859.5419
C:  215.620.5934



**GEOGRAPHICAL RESPONSE PLAN**
**PIPELINE CROSSING AT THE MISSOURI RIVER**
**EMMONS COUNTY, NORTH DAKOTA**

**DAKOTA ACCESS, LLC**
**1300 MAIN STREET**
**HOUSTON, TX 77002**

**APRIL 2017**

**Purpose**

The purpose of this Geographical Response Plan (GRP) is to provide tactical response information and mitigation measures to aid in an effective response in the event of an unlikely release of crude oil from the Dakota Access Pipeline with the potential to impact the Missouri River near Cannon Ball, North Dakota and Lake Oahe.  This GRP is not intended to replace any policies, procedures, and/or response actions as stated in the respective Facility Response Plan (FRP).

**Summary**

This GRP identifies resources and response measures for an immediate, safe, and effective response to a release of crude oil from the Dakota Access Pipeline with the potential to impact the Missouri River near Cannon Ball, North Dakota.   Response measures include, but are not limited to, the deployment of containment or diversionary boom at predetermined locations and oil collection/recovery activities to prevent further migration of crude oil.

**Notification Overview**

In the event of a suspected or confirmed release, the Area Manager/Incident Commander, or their designee, will initiate the following notifications:

| Organization | Contact Number |
|---|---|
| **Dakota Access Personnel** | |
| Vernon Ryan<br>Senior Manager – Pipeline Operations | ███████ (Office) |
| Frazier Lewis<br>Manager – Pipeline Operations North Dakota | ███████ (Mobile) |
| Francisco Gonzales<br>Supervisor – Pipeline Operations | ███████ (Mobile) |
| Justin Minter<br>Senior Manager – Emergency Response | ███████ (Mobile) |
| Stephanie Huntington – Health/Safety Specialist | ███████ (Mobile) |
| Todd Nardozzi<br>Senior Manager – DOT Compliance | (Mobile) |
| **Local Government Agencies** | |
| Emmons County Sherriff | (701) 254-4411 |
| Emmons County Fire | (701) 422-3377 |
| LEPC (Emergency Management Coordinator) | (701) 254-4807 |
| **Response Contractors/ Contractors** | |
| Clean Harbors | (701) 586-3170 |
| SWAT Consulting | (866) 610-7928 |
| National Response Corporation | (800) 899-4672 |

| Standing Rock Sioux Tribe | |
|---|---|
| Elliot Ward, SRST Emergency Services | (701) 854-8644 |
| Dave Archambault II, SRST Chairman | (701) 854-8500 |
| Jon Eagle, SRST THPO | (701) 854-8645 |
| South Central Regional Water District | |
| Larry Kassian | (701) 258-8710 |

Release notifications to state and federal agencies should be conducted in accordance with the notification procedures as listed in the FRP and in consultation with the Emergency Response and DOT Compliance Specialists.

**Response and Mitigation Measures**

Spill on Surface Water (Missouri River/Lake Oahe)

For releases that impact surface waters and/or drainage features leading to surface water, the following response and mitigation measures may be employed:

- If the release reaches the Missouri River, deploy containment and/or deflection boom as identified on the respective ICS 204 Assignment Lists.
- Product that has been contained may be recovered using appropriate hoses, skimmers, pumps, and storage containers or vacuum trucks at collections areas as identified on the respective ICS 204 Assignment Lists.
- For releases in drainage features leading to surface water, earthen berms should be constructed outside of the impacted area and used to contain the release.
- Drainage crossings for roads or railways can be utilized as collection points using dams or berms.
- Where available, construct underflow dams to contain product in flowing water.
- Provide Frac Tanks in the vicinity of collection areas as identified on the respective ICS 204 Assignment Lists.

Based on information provided by the U.S. Army Corps of Engineers (USACE), DAPL has identified three water intakes within 11.12 miles downstream of the Missouri River/Lake Oahe crossing as indicated below and on the attached graphics.

- **Intake 1:** This intake has been identified as an agricultural use intake and is located at 46.379973° / -100.555165°
- **Intake 2:** This intake has been identified as an agricultural use intake owned and operated by the SRST, and is located at 46.332473° / -100.555233°
- **Intake 3:** This intake has been identified as the first downstream drinking water intake owned and operated by the South Central Regional Water District, and is located at 46.287806° / -100.568508°

Intakes 1 is approximately 4.2 miles downstream of the DAPL crossing and is positioned off the east bank of the Missouri River. ████████████████████████████████ ████████████████████████████████████████.  Based on the current Spill Model, the first oil from an unabated release of this volume would take an estimated 6.7 hours to travel downstream before reaching Intake 1.  If left unabated, it is estimated that oil would reach Intake 2 and Intake 3 in 11.7 hours and 17 hours respectively.  Emergency response efforts, including containment and recovery, must be initiated immediately upon discovery of a release of oil that could impact the Missouri River/Lake Oahe.   Protection and mitigation measures should be implemented immediately, in cooperation with intake operators, Federal, State, Local, and Tribal Officials, to protect and minimize potential impacts to water intakes and the environment.

Spill on Land

For releases to soils only and that have not impacted surface water, the following response and mitigation measures may be employed:

- If there is a threat of rain in the forecast, impacted soils may be pushed into a pile to expose non-impacted soil to the atmosphere or cover impacted area with plastic and have adequate containment and recovery in place in the event of run off.
- If no rain is forecast, containment should be constructed around impacted soils or, at a minimum, down gradient of the impacted soils.
- Spreading of spilled product may be controlled by absorbing liquid with sand, earth, clay, fly ash, cement powder, peat moss, saw dust, straw, commercial sorbents, or other compatible substances.
- Once used, sorbent materials may pose the same hazards as the spilled product
- Remove contained products as soon as possible to prevent the spread of contamination.  Use surface dikes or barriers where groundwater contamination is possible or line collection basins with compatible impervious material.

Spill on Ice

For releases on ice, snow or earthen berms may be constructed to contain oil.  Often, oil recovery on ice must be completed by hand using brooms, shovels, and rakes.  Manually moving the oil/snow mixture into piles for collection, where it is either vacuum or manually collected into storage containers, may expedite the recovery process.  If conditions permit, vacuum trucks or suction pumps may be used to recover pools of oil that may have collected.

Spill Under Ice

For releases under ice, ice slotting may be the most effective technique for containment and recovery.  Ice slots can be cut using chain saws, handsaws, ice augers, or some form of trencher.  In ice slotting, a J shaped outline is sketched into the ice at a 30 degree angle to the current.  The

slight J hook, or curve, is necessary at the upstream side to provide flow towards the recovery area. In general, the slot width should be 1.5 times the thickness of the ice.

A second technique is to slot the ice and use plywood to help divert oil beneath the ice to a recovery area.  In this technique, a narrow slot is made through the ice and 4' x 8' sheets of plywood, or equivalent material, are dropped into the slot to create a barrier and force the oil to follow the barrier to the collection area.  This is the same principle employed when using floating boom.

For additional response and mitigation measures, refer to the FRP and/or consult with response contractors and Federal, State, and Local responders.

**Response Equipment**

In accordance with the US Army Corps of Engineers (USACE) easement conditions, the following response equipment has been staged for responding to the Missouri River crossing near Cannon Ball, ND.

Cannon Ball Ranch

6554 HWY 1806 S., Mandan, ND 58554 (46.451667° / -100.630742°)

- 1,000 feet of 10" skirt containment boom
- 1,000 feet of 5" sorbent boom
- Boom accessories (rope, anchors & buoy's)
- Enclosed 18' response trailer
- 18' response boat with motor
- 2  portable 4 gas monitors

In addition to the response equipment listed above, the following company owned response equipment is available and should be considered when responding to an incident:

Watford City Station in North Dakota:

- 4 totes of firefighting foam
- 1 radio repeater and 12 radio's
- 1 response tent/command post
- 20 portable 4 gas monitors

Redfield Pump Station in South Dakota:

- 1,000 feet of 10" skirt containment boom
- 1,000 feet of 5" sorbent boom
- Enclosed 18' response trailer
- Boom accessories (rope, anchors & buoy's)

- 18' response boat with motor (slow water boom deployment)
- 1 radio repeater and 12 radio's
- 1 response tent/command post
- 14  portable 4 gas monitors

**Plan Contents**

Below is a description of the attached maps and ICS 204 Assignment Lists:

- Aerial overview of the Dakota Access Pipeline Missouri River crossing (20 mile spill path).
- ICS 204 Assignment List – recommended location of deflection/containment booms in the Missouri River nearest the pipeline crossing.
- ICS 204 Assignment List – recommended location of first collection point nearest the Missouri River pipeline crossing.
- Aerial overview of the recommended location of deflection/containment boom in the Missouri River nearest the pipeline crossing.  Potential driving/access routes are highlighted for reference.
- ICS 204 Assignment List – recommended location of downstream deflection/containment booms in the Missouri River.
- ICS 204 Assignment List – recommended location of downstream collection area in close proximity to the second set of deflection/containment booms.
- Aerial overview of the recommended location for the downstream deflection/containment booms in the Missouri River and associated collection area.  Potential driving/access routes are highlighted for reference.
- ICS 204 Assignment List – recommended location of the farthest downstream deflection/containment booms in the Missouri River.
- ICS 204 Assignment List – recommended location of the farthest downstream collection area in close proximity to the third set of deflection/containment booms.
- Aerial overview of the recommended location for the farthest downstream deflection/containment booms in the Missouri River and associated collection area. Potential driving/access routes are highlighted for reference.

ATTACHMENT 2

| From: | Borkland, Carl G <CARL.BORKLAND@energytransfer.com> |
|---|---|
| Sent: | Wednesday, December 20, 2017 8:11 AM |
| To: | dnelson@crstepd.org; Elliott Ward; Cossette, Brent J CIV USARMY CENWO (US) |
| Subject: | RE: Emergency Planning Meeting |

Hello everyone,

I am following up on the request for availability to meet and discuss response planning. Please advise which dates would work.  We still are willing to meet in Bismarck to make it more convenient for Standing Rock and Cheyenne River.  But if we don't have a response by December 29 with availability we will go ahead and schedule a meeting with the Corps in Omaha to start the process.  In the meantime please continue to feel free to send me input about planning including any corrections you believe are needed to the draft geographic response plan that we provided to Standing Rock and Cheyenne River.

Thank you!

 

C. Gus Borkland
VP- Environmental Projects & Emergency Planning/Response
EHS&S
Energy Transfer Partners
4041 Market Street
Aston, PA 19014
O: 610.859.5419
C:  215.620.5934

---

**From:** BORKLAND, CARL G
**Sent:** Friday, December 08, 2017 12:49 PM
**To:** 'dnelson@crstepd.org' <dnelson@crstepd.org>; 'Elliott Ward' <eward@standingrock.org>; 'Cossette, Brent J CIV USARMY CENWO (US)' <Brent.J.Cossette@usace.army.mil>
**Subject:** Emergency Planning Meeting

All:

I will be in the lead for Dakota Access, LLC on the first condition of Judge
Boasberg's December 4 Order (requiring the parties to coordinate on finalizing an

oil-spill response plan affecting Tribal resources and lands at Lake Oahe).  We would like to schedule a meeting to discuss the necessary steps and receive initial input from the parties on response planning.  We suggest meeting in Bismarck and are available the following dates:

December  19, 20
January 3, 4, 5, 9, 10, 11, 12

Once we have responses, we will circulate a date that is mutually convenient.  Also, attached to this email is the current Geographic Response Plan for the Lake Oahe crossing (with minimal redactions).  If there is any information relevant to response planning that you would like us to have before we meet, please feel free to email it to me.

Thanks,




C. Gus Borkland
VP- Environmental Projects & Emergency Planning/Response
EHS&S
Energy Transfer Partners
4041 Market Street
Aston, PA 19014
O: 610.859.5419
C:  215.620.5934

# ATTACHMENT 3

| From: | Borkland, Carl G <CARL.BORKLAND@energytransfer.com> |
|---|---|
| Sent: | Sunday, December 31, 2017 7:01 PM |
| To: | dnelson@crstepd.org; Elliott Ward |
| Cc: | Cossette, Brent J CIV USARMY CENWO (US); Todd.J.Lindquist@usace.army.mil; eric.d.stasch@usace.army.mil; Harlon, William D III CIV USARMY CENWO (US) |
| Subject: | RE: Emergency Planning Meeting |

Good evening everyone,

I am again following up and requesting your availability to meet and discuss response planning at the Lake Oahe River Crossing. We have heard back from the US Army Corp of Engineering and they are available to meeting in Bismarck on either January 10, 11 or 12. Please let me know if any of those dates will work for Standing Rock or Cheyenne River.  We will secure a meeting location in Bismarck for the team to meet.

Thank you very much.

 

C. Gus Borkland
VP- Environmental Projects & Emergency Planning/Response
EHS&S
Energy Transfer Partners
4041 Market Street
Aston, PA 19014
O: 610.859.5419
C:  215.620.5934

---

**From:** BORKLAND, CARL G
**Sent:** Wednesday, December 20, 2017 8:11 AM
**To:** 'dnelson@crstepd.org' <dnelson@crstepd.org>; 'Elliott Ward' <eward@standingrock.org>; 'Cossette, Brent J CIV USARMY CENWO (US)' <Brent.J.Cossette@usace.army.mil>
**Subject:** RE: Emergency Planning Meeting

Hello everyone,

I am following up on the request for availability to meet and discuss response planning. Please advise which dates would work.  We still are willing to meet in Bismarck to make it more convenient for Standing Rock and Cheyenne River.  But if we don't have a response by December 29 with availability we will go ahead and schedule a meeting with the Corps in Omaha to start the process.  In the meantime please continue to feel free to send me input about planning including any corrections you believe are needed to the draft geographic response plan that we provided to Standing Rock and Cheyenne River.

Thank you!




C. Gus Borkland
VP- Environmental Projects & Emergency Planning/Response
EHS&S
Energy Transfer Partners
4041 Market Street
Aston, PA 19014
O: 610.859.5419
C:  215.620.5934

---

**From:** BORKLAND, CARL G
**Sent:** Friday, December 08, 2017 12:49 PM
**To:** 'dnelson@crstepd.org' <dnelson@crstepd.org>; 'Elliott Ward' <eward@standingrock.org>; 'Cossette, Brent J CIV USARMY CENWO (US)' <Brent.J.Cossette@usace.army.mil>
**Subject:** Emergency Planning Meeting

All:

I will be in the lead for Dakota Access, LLC on the first condition of Judge Boasberg's December 4 Order (requiring the parties to coordinate on finalizing an oil-spill response plan affecting Tribal resources and lands at Lake Oahe).  We would like to schedule a meeting to discuss the necessary steps and receive initial input from the parties on response planning.  We suggest meeting in Bismarck and are available the following dates:

December  19, 20
January 3, 4, 5, 9, 10, 11, 12

Once we have responses, we will circulate a date that is mutually convenient.  Also, attached to this email is the current Geographic Response Plan for the Lake Oahe crossing (with minimal redactions).  If there is any information relevant to response planning that you would like us to have before we meet, please feel free to email it to me.

Thanks,

 

C. Gus Borkland
VP- Environmental Projects & Emergency Planning/Response
EHS&S
Energy Transfer Partners
4041 Market Street
Aston, PA 19014
O: 610.859.5419
C:  215.620.5934

# ATTACHMENT 4

| From: | Doug Crow Ghost <dcrowghost@standingrock.org> |
|---|---|
| Sent: | Thursday, January 4, 2018 5:30 PM |
| To: | Borkland, Carl G |
| Cc: | Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO; Elliott Ward; Mike Faith |
| Subject: | Emergency Planning Meeting SRST/ETP/ACOE |
| Attachments: | ETP letter 1-4-18.pdf |

Good Day Everyone,

Hope everyone had a great new year celebration and is looking forward to a great 2018!

Here is a letter from Chairman Mike Faith to Mr. Borkland for the planning of the Lake Oahe River Crossing.

The date for the SRST to be available for a meeting with ETP and ACOE will be in February.

Thanks!

**Errol D CrowGhost Jr**
Standing Rock Sioux Tribe
Department of Water Resources
Water Administrator
P.O. Box D
Fort Yates, ND. 58538
7018548534 wk
6058483919 cell
dcrowghost@standingrock.org



CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient's and may contain confidential or proprietary information covered by the Electronics Communication Privacy Act, 18 U.S.C. Sections 2510-2521. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, immediately contact the sender by reply e-mail and destroy all copies of the original message

**Mike Faith**
*Chairman*

**TRIBAL COUNCIL
(AT LARGE)**

Paul Archambault

Frank White Bull

Courtney Yellow Fat

Kory McLaughlin

Charles Walker

Dana Yellow Fat

**Ira Taken Alive**
*Vice Chairman*

**Susan Agard**
*Secretary*

**John Pretty Bear**
*Cannonball District*

**Brandon Mauai**
*Long Soldier District*

**Wayne Looking Back**
*Wakpala District*

**Delrey Demery**
*Kenel District*

**Joe White Mountain Jr.**
*Bear Soldier District*

**Carline Thompson**
*Rock Creek District*

**Verdell Bobtail Bear**
*Running Antelope District*

**Samuel B. Harrison**
*Porcupine District*

January 4, 2018

Carl G. Borkland
Energy Transfer Partners, L.P.
8111 Westchester Drive
Dallas, Texas 75225

RE:     Proposed Meeting on Emergency Planning and Response – Dakota Access Pipeline

Dear Mr. Borkland:

Thank you for contacting Mr. Elliot Ward, the Standing Rock Sioux Tribe Emergency Manager, regarding a meeting to discuss emergency response plans for the Dakota Access Pipeline. The Standing Rock Sioux Tribe remains willing to meet and discuss all aspects of Facility and Emergency Response, and Geographic Response Planning for DAPL.

I agree that we should attempt to confirm a meeting time and date as soon as possible. Our team will be available to meet with you in February, and willing to meet on Standing Rock. I have authorized Mr. Ward to communicate with you further regarding ETP's availability for the date proposed above.

The Standing Rock Sioux Tribe stands prepared to work for a collaborative response plan as ordered by Judge Boasberg. We believe a first meeting should address information-sharing that is necessary to comply with Judge Boasberg's December 4, 2017 order. It will be necessary to review the existing Facility Response Plan, and the data and assumptions that have been used by ETP and the Corps of Engineers for the calculation of the maximum spill estimate for Lake Oahe. We seek verification of the accuracy of these assumptions, as well as the operation of DAPL safety systems.

The hazards specific to the Bakken Crude transported in DAPL must be discussed, in order for our Tribe to participate in emergency response plans to address those hazards. Additionally, we are interested in lessons that may be applied to Lake Oahe, from prior Energy Transfer Partners and Sunoco oil spill responses.   This information will enable our Tribe to fully participate in the emergency planning process, as directed by Judge Boasberg.

Thank you for your attention to this matter.

Sincerely,

Mike Faith, Jr., Chairman
Standing Rock Sioux Tribe

# ATTACHMENT 5

| From: | Borkland, Carl G <CARL.BORKLAND@energytransfer.com> |
| --- | --- |
| Sent: | Friday, January 5, 2018 4:15 PM |
| To: | Doug Crow Ghost |
| Cc: | Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO; Elliott Ward; Mike Faith; dnelson@crstepd.org; Stasch, Eric D CIV USARMY CENWO (US); Cossette, Brent J CIV USARMY CENWO (US); Harlon, William D III CIV USARMY CENWO (US); Minter, Justin D |
| Subject: | RE: Emergency Planning Meeting SRST/ETP/ACOE |

Hello Errol:

Thank you for your email and letter.  We look forward to the chance to meet in February.  Because of the time constraints, we will go ahead and proceed with our response planning efforts in the meantime while we wait for tribal input.  I am also copying the Corps and Cheyenne River to bring them up to speed on meeting planning.

Dakota Access and the Corps will go ahead with our plan to meet this month in Bismarck.  Details are below.  If Cheyenne River wishes to attend (and Standing Rock is still welcome as well), please send me the names of those who will be there.  Please also provide some dates in February that will work for another meeting.  And, as I have said before, feel free in the meantime to send me whatever information you believe is appropriate to assist in response planning.  As you all know, we have an April 1 deadline for the parties to coordinate to finalize an oil-spill response plan affecting Tribal resources and lands at Lake Oahe.

Here are the logistics for the meeting next week:

Date:  January 11, 2018

Time:  8:00AM

Location:  Hampton Inn, 2020 Schafer Drive, Bismarck, ND 58501

Thank you very much!





C. Gus Borkland
VP- Environmental Projects & Emergency Planning/Response
EHS&S
Energy Transfer Partners
4041 Market Street
Aston, PA 19014
O: 610.859.5419
C: 215.620.5934

**From:** Doug Crow Ghost [mailto:dcrowghost@standingrock.org]
**Sent:** Thursday, January 04, 2018 5:30 PM
**To:** BORKLAND, CARL G <CARL.BORKLAND@energytransfer.com>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward
<eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>
**Subject:** Emergency Planning Meeting SRST/ETP/ACOE

Good Day Everyone,

Hope everyone had a great new year celebration and is looking forward to a great 2018!

Here is a letter from Chairman Mike Faith to Mr. Borkland for the planning of the Lake Oahe River
Crossing.

The date for the SRST to be available for a meeting with ETP and ACOE will be in February.

Thanks!

## Errol D CrowGhost Jr
Standing Rock Sioux Tribe
Department of Water Resources
Water Administrator
P.O. Box D
Fort Yates, ND. 58538
7018548534 wk
6058483919 cell
dcrowghost@standingrock.org



CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient's and may contain confidential or proprietary information covered by the Electronics Communication Privacy Act, 18 U.S.C. Sections 2510-2521. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, immediately contact the sender by reply e-mail and destroy all copies of the original message

# ATTACHMENT 6

| **From:** | Borkland, Carl G <CARL.BORKLAND@energytransfer.com> |
| **Sent:** | Friday, January 12, 2018 5:05 PM |
| **To:** | Doug Crow Ghost |
| **Cc:** | Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO; Elliott Ward; Mike Faith; dnelson@crstepd.org; Stasch, Eric D CIV USARMY CENWO (US); Cossette, Brent J CIV USARMY CENWO (US); Harlon, William D III CIV USARMY CENWO (US); Minter, Justin D |
| **Subject:** | RE: Emergency Planning Meeting SRST/ETP/ACOE |

All:

Three of us from Dakota Access and one of our response planning consultant representatives had a productive multi-hour meeting with three representatives from the Corps on Jan. 11.  We received very helpful input from the Corps and will continue to work on gathering relevant information.  We will want to go over all of it with both tribes when we meet in February to get your additional input.

As I have said before, if there is any information that either tribe wants us to consider in the meantime based on your review of the existing drafts of the Geographic Response Plan or the Facility Response Plan, please feel free to send that to us before we meet in February.  This includes any errors or relevant omissions that you have identified in either plan.  One takeaway from Thursday's meeting is that we have our work cut out for us if we are going to have the best possible response plan ready by the April 1 deadline.  We expect to need at least two more meetings to accomplish that.  The sooner we get input from the tribes the better.

We have not heard back from either tribe on availability in February.  Our preferred date is February 8.  Other available dates for Dakota Access are February 6, 7, or 9.  We should plan for several hours so that we have the opportunity to make site visits to locations relevant to spill planning.  Please let us know your availability as soon as possible.  April 1 will be here before we know it.

Thank you and have a nice weekend!




C. Gus Borkland
VP- Environmental Projects & Emergency Planning/Response
EHS&S
Energy Transfer Partners
4041 Market Street
Aston, PA 19014
O: 610.859.5419
C:  215.620.5934

---

**From:** BORKLAND, CARL G
**Sent:** Friday, January 05, 2018 4:15 PM
**To:** 'Doug Crow Ghost' <dcrowghost@standingrock.org>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward
<eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>; 'dnelson@crstepd.org' <dnelson@crstepd.org>;
Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil>; Cossette, Brent J CIV USARMY CENWO (US)
<Brent.J.Cossette@usace.army.mil>; Harlon, William D III CIV USARMY CENWO (US)
<William.D.Harlon@usace.army.mil>; MINTER, JUSTIN D <JUSTIN.MINTER@energytransfer.com>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

Hello Errol:

Thank you for your email and letter.  We look forward to the chance to meet in February.  Because of the time constraints, we will go ahead and proceed with our response planning efforts in the meantime while we wait for tribal input.  I am also copying the Corps and Cheyenne River to bring them up to speed on meeting planning.

Dakota Access and the Corps will go ahead with our plan to meet this month in Bismarck.  Details are below.  If Cheyenne River wishes to attend (and Standing Rock is still welcome as well), please send me the names of those who will be there.  Please also provide some dates in February that will work for another meeting.  And, as I have said before, feel free in the meantime to send me whatever information you believe is appropriate to assist in response planning.  As you all know, we have an April 1 deadline for the parties to coordinate to finalize an oil-spill response plan affecting Tribal resources and lands at Lake Oahe.

Here are the logistics for the meeting next week:

Date:  January 11, 2018

Time:  8:00AM

Location:  Hampton Inn, 2020 Schafer Drive, Bismarck, ND 58501

Thank you very much!

 

C. Gus Borkland
VP- Environmental Projects & Emergency Planning/Response
EHS&S
Energy Transfer Partners
4041 Market Street
Aston, PA 19014
O: 610.859.5419
C: 215.620.5934

**From:** Doug Crow Ghost [mailto:dcrowghost@standingrock.org]
**Sent:** Thursday, January 04, 2018 5:30 PM
**To:** BORKLAND, CARL G <CARL.BORKLAND@energytransfer.com>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward
<eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>
**Subject:** Emergency Planning Meeting SRST/ETP/ACOE

Good Day Everyone,

Hope everyone had a great new year celebration and is looking forward to a great 2018!

Here is a letter from Chairman Mike Faith to Mr. Borkland for the planning of the Lake Oahe River
Crossing.

The date for the SRST to be available for a meeting with ETP and ACOE will be in February.

Thanks!

**Errol D CrowGhost Jr**
Standing Rock Sioux Tribe
Department of Water Resources
Water Administrator
P.O. Box D
Fort Yates, ND. 58538
7018548534 wk
6058483919 cell
dcrowghost@standingrock.org



CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient's and may contain confidential or proprietary information covered by the Electronics Communication Privacy Act, 18 U.S.C. Sections 2510-2521. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, immediately contact the sender by reply e-mail and destroy all copies of the original message

# ATTACHMENT 7

| | |
|---|---|
| **From:** | Borkland, Carl G <CARL.BORKLAND@energytransfer.com> |
| **Sent:** | Friday, January 26, 2018 3:47 PM |
| **To:** | Doug Crow Ghost |
| **Cc:** | Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO; Elliott Ward; Mike Faith; dnelson@crstepd.org; Stasch, Eric D CIV USARMY CENWO (US); Cossette, Brent J CIV USARMY CENWO (US); Harlon, William D III CIV USARMY CENWO (US); Minter, Justin D |
| **Subject:** | RE: Emergency Planning Meeting SRST/ETP/ACOE |

All

I am following up to make sure we have a meeting on the calendar for February.  The Corps has confirmed availability on February 8.  We have not heard from either Tribe.  Please advise whether you can attend a February 8 meeting.

We plan to hold the meeting at the same facility as the January 11 meeting. That is the Hampton Inn located at 2020 Schafer Drive, Bismarck, ND.

Thank you very much and have a great weekend.

---

**From:** Borkland, Carl G
**Sent:** Friday, January 12, 2018 5:04 PM
**To:** 'Doug Crow Ghost' <dcrowghost@standingrock.org>
**Cc:** 'Todd.J.Lindquist@usace.army.mil' <Todd.J.Lindquist@usace.army.mil>; 'Stasch, Eric D NWO' <Eric.D.Stasch@usace.army.mil>; 'Elliott Ward' <eward@standingrock.org>; 'Mike Faith' <mfaith@standingrock.org>; 'dnelson@crstepd.org' <dnelson@crstepd.org>; 'Stasch, Eric D CIV USARMY CENWO (US)' <Eric.D.Stasch@usace.army.mil>; 'Cossette, Brent J CIV USARMY CENWO (US)' <Brent.J.Cossette@usace.army.mil>; 'Harlon, William D III CIV USARMY CENWO (US)' <William.D.Harlon@usace.army.mil>; MINTER, JUSTIN D <JUSTIN.MINTER@energytransfer.com>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

All:

Three of us from Dakota Access and one of our response planning consultant representatives had a productive multi-hour meeting with three representatives from the Corps on Jan. 11.  We received very helpful input from the Corps and will continue to work on gathering relevant information.  We will want to go over all of it with both tribes when we meet in February to get your additional input.

As I have said before, if there is any information that either tribe wants us to consider in the meantime based on your review of the existing drafts of the Geographic Response Plan or the Facility Response Plan, please feel free to send that to us before we meet in February.  This includes any errors or relevant omissions that you have identified in either plan.  One takeaway from Thursday's meeting is that we have our work cut out for us if we are going to have the best possible response plan ready by the April 1 deadline.  We expect to need at least two more meetings to accomplish that.  The sooner we get input from the tribes the better.

We have not heard back from either tribe on availability in February.  Our preferred date is February 8.  Other available dates for Dakota Access are February 6, 7, or 9.  We should plan for several hours so that we have the opportunity to make site visits to locations relevant to spill planning.  Please let us know your availability as soon as possible.  April 1 will be here before we know it.

Thank you and have a nice weekend!

 

C. Gus Borkland
VP- Environmental Projects & Emergency Planning/Response
EHS&S
Energy Transfer Partners
4041 Market Street
Aston, PA 19014
O: 610.859.5419
C:  215.620.5934

---

**From:** BORKLAND, CARL G
**Sent:** Friday, January 05, 2018 4:15 PM
**To:** 'Doug Crow Ghost' <dcrowghost@standingrock.org>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward <eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>; 'dnelson@crstepd.org' <dnelson@crstepd.org>; Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil>; Cossette, Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil>; Harlon, William D III CIV USARMY CENWO (US) <William.D.Harlon@usace.army.mil>; MINTER, JUSTIN D <JUSTIN.MINTER@energytransfer.com>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

Hello Errol:

Thank you for your email and letter.  We look forward to the chance to meet in February.  Because of the time constraints, we will go ahead and proceed with our response planning efforts in the meantime while we wait for tribal input.  I am also copying the Corps and Cheyenne River to bring them up to speed on meeting planning.

Dakota Access and the Corps will go ahead with our plan to meet this month in Bismarck.  Details are below.  If Cheyenne River wishes to attend (and Standing Rock is still welcome as well), please send me the names of those who will be there.  Please also provide some dates in February that will work for another meeting.  And, as I have said before, feel free in the meantime to send me whatever information you believe is appropriate to assist in response planning.  As you all know, we have an April 1 deadline for the parties to coordinate to finalize an oil-spill response plan affecting Tribal resources and lands at Lake Oahe.

Here are the logistics for the meeting next week:

Date:  January 11, 2018

Time:  8:00AM

Location:  Hampton Inn, 2020 Schafer Drive, Bismarck, ND 58501

Thank you very much!

 

C. Gus Borkland
VP- Environmental Projects & Emergency Planning/Response
EHS&S
Energy Transfer Partners
4041 Market Street
Aston, PA 19014
O: 610.859.5419
C:  215.620.5934

**From:** Doug Crow Ghost [mailto:dcrowghost@standingrock.org]
**Sent:** Thursday, January 04, 2018 5:30 PM
**To:** BORKLAND, CARL G <CARL.BORKLAND@energytransfer.com>

**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward <eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>
**Subject:** Emergency Planning Meeting SRST/ETP/ACOE

Good Day Everyone,

Hope everyone had a great new year celebration and is looking forward to a great 2018!

Here is a letter from Chairman Mike Faith to Mr. Borkland for the planning of the Lake Oahe River Crossing.

The date for the SRST to be available for a meeting with ETP and ACOE will be in February.

Thanks!

**Errol D CrowGhost Jr**
Standing Rock Sioux Tribe
Department of Water Resources
Water Administrator
P.O. Box D
Fort Yates, ND. 58538
7018548534 wk
6058483919 cell
dcrowghost@standingrock.org



CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient's and may contain confidential or proprietary information covered by the Electronics Communication Privacy Act, 18 U.S.C. Sections 2510-2521. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, immediately contact the sender by reply e-mail and destroy all copies of the original message

# ATTACHMENT 8

**From:** Doug Crow Ghost <dcrowghost@standingrock.org>
**Sent:** Friday, February 2, 2018 4:06 PM
**To:** Borkland, Carl G
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO; Elliott Ward; Mike Faith; dnelson@crstepd.org; Stasch, Eric D CIV USARMY CENWO (US); Everett Iron Eyes; Cossette, Brent J CIV USARMY CENWO (US); Harlon, William D III CIV USARMY CENWO (US); Minter, Justin D; Peter Capossela; Dean DePountis; Janet Thomas
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE
**Attachments:** Chairman Faith 2-2-18 ETP Letter.pdf

Mr. Borkland

Per Chairman Mike Faith letter, which is attached to this email, the SRST cordially invites Energy Transfer Partners for a meaningful discussion.
Thanks.

**Errol D CrowGhost Jr**
Standing Rock Sioux Tribe
Department of Water Resources
Water Administrator
P.O. Box D
Fort Yates, ND. 58538
7018548534 wk
6058483919 cell
dcrowghost@standingrock.org



CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient's and may contain confidential or proprietary information covered by the Electronics Communication Privacy Act, 18 U.S.C. Sections 2510-2521. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, immediately contact the sender by reply e-mail and destroy all copies of the original message

**From:** Borkland, Carl G [mailto:CARL.BORKLAND@energytransfer.com]
**Sent:** Friday, January 26, 2018 2:47 PM
**To:** Doug Crow Ghost <dcrowghost@standingrock.org>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward

<eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>; dnelson@crstepd.org; Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil>; Cossette, Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil>; Harlon, William D III CIV USARMY CENWO (US) <William.D.Harlon@usace.army.mil>; Minter, Justin D <JUSTIN.MINTER@energytransfer.com>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

All

I am following up to make sure we have a meeting on the calendar for February. The Corps has confirmed availability on February 8. We have not heard from either Tribe. Please advise whether you can attend a February 8 meeting.

We plan to hold the meeting at the same facility as the January 11 meeting. That is the Hampton Inn located at 2020 Schafer Drive, Bismarck, ND.

Thank you very much and have a great weekend.

---

**From:** Borkland, Carl G
**Sent:** Friday, January 12, 2018 5:04 PM
**To:** 'Doug Crow Ghost' <dcrowghost@standingrock.org>
**Cc:** 'Todd.J.Lindquist@usace.army.mil' <Todd.J.Lindquist@usace.army.mil>; 'Stasch, Eric D NWO' <Eric.D.Stasch@usace.army.mil>; 'Elliott Ward' <eward@standingrock.org>; 'Mike Faith' <mfaith@standingrock.org>; 'dnelson@crstepd.org' <dnelson@crstepd.org>; 'Stasch, Eric D CIV USARMY CENWO (US)' <Eric.D.Stasch@usace.army.mil>; 'Cossette, Brent J CIV USARMY CENWO (US)' <Brent.J.Cossette@usace.army.mil>; 'Harlon, William D III CIV USARMY CENWO (US)' <William.D.Harlon@usace.army.mil>; MINTER, JUSTIN D <JUSTIN.MINTER@energytransfer.com>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

All:

Three of us from Dakota Access and one of our response planning consultant representatives had a productive multi-hour meeting with three representatives from the Corps on Jan. 11. We received very helpful input from the Corps and will continue to work on gathering relevant information. We will want to go over all of it with both tribes when we meet in February to get your additional input.

As I have said before, if there is any information that either tribe wants us to consider in the meantime based on your review of the existing drafts of the Geographic Response Plan or the Facility Response Plan, please feel free to send that to us before we meet in February. This includes any errors or relevant omissions that you have identified in either plan. One takeaway from Thursday's meeting is that we have our work cut out for us if we are going to have the best

possible response plan ready by the April 1 deadline.  We expect to need at least two more meetings to accomplish that.  The sooner we get input from the tribes the better.

We have not heard back from either tribe on availability in February.  Our preferred date is February 8.  Other available dates for Dakota Access are February 6, 7, or 9.  We should plan for several hours so that we have the opportunity to make site visits to locations relevant to spill planning.  Please let us know your availability as soon as possible.  April 1 will be here before we know it.

Thank you and have a nice weekend!

 

C. Gus Borkland
VP- Environmental Projects & Emergency Planning/Response
EHS&S
Energy Transfer Partners
4041 Market Street
Aston, PA 19014
O: 610.859.5419
C:  215.620.5934

---

**From:** BORKLAND, CARL G
**Sent:** Friday, January 05, 2018 4:15 PM
**To:** 'Doug Crow Ghost' <dcrowghost@standingrock.org>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward <eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>; 'dnelson@crstepd.org' <dnelson@crstepd.org>; Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil>; Cossette, Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil>; Harlon, William D III CIV USARMY CENWO (US) <William.D.Harlon@usace.army.mil>; MINTER, JUSTIN D <JUSTIN.MINTER@energytransfer.com>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

Hello Errol:

Thank you for your email and letter.  We look forward to the chance to meet in February.  Because of the time constraints, we will go ahead and proceed with our response planning efforts in the meantime while we wait for tribal input.  I am also copying the Corps and Cheyenne River to bring them up to speed on meeting planning.

Dakota Access and the Corps will go ahead with our plan to meet this month in Bismarck. Details are below. If Cheyenne River wishes to attend (and Standing Rock is still welcome as well), please send me the names of those who will be there. Please also provide some dates in February that will work for another meeting. And, as I have said before, feel free in the meantime to send me whatever information you believe is appropriate to assist in response planning. As you all know, we have an April 1 deadline for the parties to coordinate to finalize an oil-spill response plan affecting Tribal resources and lands at Lake Oahe.

Here are the logistics for the meeting next week:

Date: January 11, 2018

Time: 8:00AM

Location: Hampton Inn, 2020 Schafer Drive, Bismarck, ND 58501

Thank you very much!

 

C. Gus Borkland
VP- Environmental Projects & Emergency Planning/Response
EHS&S
Energy Transfer Partners
4041 Market Street
Aston, PA 19014
O: 610.859.5419
C: 215.620.5934

---

**From:** Doug Crow Ghost [mailto:dcrowghost@standingrock.org]
**Sent:** Thursday, January 04, 2018 5:30 PM
**To:** BORKLAND, CARL G <CARL.BORKLAND@energytransfer.com>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward <eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>
**Subject:** Emergency Planning Meeting SRST/ETP/ACOE

Good Day Everyone,

Hope everyone had a great new year celebration and is looking forward to a great 2018!

Here is a letter from Chairman Mike Faith to Mr. Borkland for the planning of the Lake Oahe River Crossing.

The date for the SRST to be available for a meeting with ETP and ACOE will be in February.

Thanks!

**Errol D CrowGhost Jr**
Standing Rock Sioux Tribe
Department of Water Resources
Water Administrator
P.O. Box D
Fort Yates, ND. 58538
7018548534 wk
6058483919 cell
dcrowghost@standingrock.org



CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient's and may contain confidential or proprietary information covered by the Electronics Communication Privacy Act, 18 U.S.C. Sections 2510-2521. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, immediately contact the sender by reply e-mail and destroy all copies of the original message

Private and confidential as detailed here. If you cannot access hyperlink, please e-mail sender.

**Mike Faith**
*Chairman*

**TRIBAL COUNCIL**
**(AT LARGE)**

Paul Archambault

Kory McLaughlin

Charles Walker

Frank White Bull

Courtney Yellow Fat

Dana Yellow Fat

**Ira Taken Alive**
*Vice Chairman*



**Susan Agard**
*Secretary*

John Pretty Bear
*Cannon Ball District*

Brandon Mauai
*Long Soldier District*

Wayne Looking Back
*Wakpala District*

Delray Demery
*Kenel District*

Joe White Mountain Jr.
*Bear Soldier District*

Caroline Thompson
*Rock Creek District*

Verdell Bobtail Bear
*Running Antelope District*

Samuel B. Harrison
*Porcupine District*

February 2, 2018

Carl G. Borkland
Energy Transfer Partners, L.P.
8111 Westchester Drive
Dallas, Texas    75225

RE:  Proposed meeting on February 8, 20018 on Emergency Planning and Response – Dakota Access Pipeline

Dear Mr. Borkland:

Let me invite the Energy Transfer Partners to the Standing Rock Reservation for a meeting on February 8, which you have identified as an available date for ETP.  It is customary for government officials and stakeholder representatives to meet with our Tribe on our Reservation.  I propose that we meet at the Tribal Administration Building in Fort Yates, N.D. on February 8, at 10:00 a.m.  Let me assure you that your representatives will be treated with the courtesy that we extend to all visitors, consistent with our Lakota and Dakota culture.

As stated previously, we believe a first meeting should address information-sharing that is necessary to comply with Judge Boasberg's December 4, 2017 order.  It will be necessary to review the unredacted Facility Response Plan, the hazards specific to the Bakken Crude transported in DAPL, as well as prior Energy Transfer Partners and Sunoco oil spill responses.  I look forward to discussing these issues.

Thank you for your attention to this matter.

Sincerely,

Mike Faith, Jr., Chairman
Standing Rock Sioux

# ATTACHMENT 9

| **From:** | Borkland, Carl G <CARL.BORKLAND@energytransfer.com> |
| **Sent:** | Monday, February 5, 2018 9:03 AM |
| **To:** | Doug Crow Ghost |
| **Cc:** | Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO; Elliott Ward; Mike Faith; dnelson@crstepd.org; Stasch, Eric D CIV USARMY CENWO (US); Everett Iron Eyes; Cossette, Brent J CIV USARMY CENWO (US); Harlon, William D III CIV USARMY CENWO (US); Minter, Justin D; Peter Capossela; Dean DePountis; Janet Thomas |
| **Subject:** | RE: Emergency Planning Meeting SRST/ETP/ACOE |

Thanks for your email Doug. Because our travel plans and logistics have already been set, we are still planning on meeting in Bismarck this Thursday, February 8 to continue our Lake Oahe spill planning. We will start the meeting at 9:00 to allow your team to travel to Bismarck. But if you arrive later, that is fine. We will just continue our meeting after you arrive.  If either Standing Rock or Cheyenne River are able to attend, please let us know so we can make sure we have ample room.

We would also like to schedule another meeting in March in Bismarck.  This meeting would be a plan review meeting, but we would be happy to travel to Standing Rock to review some of the tactical response planning areas. Please let us know if any of these dates work for you:

March 6, 7, 8, 13, or 14

Thanks!

 

C. Gus Borkland
VP- Environmental Projects & Emergency
Planning/Response
EHS&S
Energy Transfer Partners
4041 Market Street
Aston, PA 19014
O: 610.859.5419
C:  215.620.5934

1

**From:** Doug Crow Ghost [mailto:dcrowghost@standingrock.org]
**Sent:** Friday, February 2, 2018 4:06 PM
**To:** Borkland, Carl G <CARL.BORKLAND@energytransfer.com>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward
<eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>; dnelson@crstepd.org; Stasch, Eric D CIV USARMY
CENWO (US) <Eric.D.Stasch@usace.army.mil>; Everett Iron Eyes <EVERETT.IRONEYES@standingrock.org>; Cossette,
Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil>; Harlon, William D III CIV USARMY CENWO (US)
<William.D.Harlon@usace.army.mil>; Minter, Justin D <JUSTIN.MINTER@energytransfer.com>; Peter Capossela
<pcapossela@nu-world.com>; Dean DePountis <ddepountis@standingrock.org>; Janet Thomas
<jthomas@standingrock.org>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

Mr. Borkland

Per Chairman Mike Faith letter, which is attached to this email, the SRST cordially invites Energy
Transfer Partners for a meaningful discussion.
Thanks.

## Errol D CrowGhost Jr

Standing Rock Sioux Tribe
Department of Water Resources
Water Administrator
P.O. Box D
Fort Yates, ND. 58538
7018548534 wk
6058483919 cell
dcrowghost@standingrock.org



CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient's and may contain
confidential or proprietary information covered by the Electronics Communication Privacy Act, 18 U.S.C. Sections 2510-2521. Any unauthorized review,
use, disclosure or distribution is prohibited. If you are not the intended recipient, immediately contact the sender by reply e-mail and destroy all copies of
the original message

**From:** Borkland, Carl G [mailto:CARL.BORKLAND@energytransfer.com]
**Sent:** Friday, January 26, 2018 2:47 PM
**To:** Doug Crow Ghost <dcrowghost@standingrock.org>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward
<eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>; dnelson@crstepd.org; Stasch, Eric D CIV USARMY
CENWO (US) <Eric.D.Stasch@usace.army.mil>; Cossette, Brent J CIV USARMY CENWO (US)

<Brent.J.Cossette@usace.army.mil>; Harlon, William D III CIV USARMY CENWO (US)
<William.D.Harlon@usace.army.mil>; Minter, Justin D <JUSTIN.MINTER@energytransfer.com>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

All

I am following up to make sure we have a meeting on the calendar for
February.  The Corps has confirmed availability on February 8.  We have not
heard from either Tribe.  Please advise whether you can attend a February 8
meeting.

We plan to hold the meeting at the same facility as the January 11 meeting. That
is the Hampton Inn located at 2020 Schafer Drive, Bismarck, ND.

Thank you very much and have a great weekend.

---

**From:** Borkland, Carl G
**Sent:** Friday, January 12, 2018 5:04 PM
**To:** 'Doug Crow Ghost' <dcrowghost@standingrock.org>
**Cc:** 'Todd.J.Lindquist@usace.army.mil' <Todd.J.Lindquist@usace.army.mil>; 'Stasch, Eric D NWO'
<Eric.D.Stasch@usace.army.mil>; 'Elliott Ward' <eward@standingrock.org>; 'Mike Faith' <mfaith@standingrock.org>;
'dnelson@crstepd.org' <dnelson@crstepd.org>; 'Stasch, Eric D CIV USARMY CENWO (US)'
<Eric.D.Stasch@usace.army.mil>; 'Cossette, Brent J CIV USARMY CENWO (US)' <Brent.J.Cossette@usace.army.mil>;
'Harlon, William D III CIV USARMY CENWO (US)' <William.D.Harlon@usace.army.mil>; MINTER, JUSTIN D
<JUSTIN.MINTER@energytransfer.com>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

All:

Three of us from Dakota Access and one of our response planning consultant
representatives had a productive multi-hour meeting with three representatives
from the Corps on Jan. 11.  We received very helpful input from the Corps and will
continue to work on gathering relevant information.  We will want to go over all of
it with both tribes when we meet in February to get your additional input.

As I have said before, if there is any information that either tribe wants us to
consider in the meantime based on your review of the existing drafts of the
Geographic Response Plan or the Facility Response Plan, please feel free to send
that to us before we meet in February.  This includes any errors or relevant
omissions that you have identified in either plan.  One takeaway from Thursday's
meeting is that we have our work cut out for us if we are going to have the best
possible response plan ready by the April 1 deadline.  We expect to need at least

two more meetings to accomplish that.  The sooner we get input from the tribes the better.

We have not heard back from either tribe on availability in February.  Our preferred date is February 8.  Other available dates for Dakota Access are February 6, 7, or 9.  We should plan for several hours so that we have the opportunity to make site visits to locations relevant to spill planning.  Please let us know your availability as soon as possible.  April 1 will be here before we know it.

Thank you and have a nice weekend!

 

C. Gus Borkland
VP- Environmental Projects & Emergency Planning/Response
EHS&S
Energy Transfer Partners
4041 Market Street
Aston, PA 19014
O: 610.859.5419
C:  215.620.5934

---

**From:** BORKLAND, CARL G
**Sent:** Friday, January 05, 2018 4:15 PM
**To:** 'Doug Crow Ghost' <dcrowghost@standingrock.org>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward <eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>; 'dnelson@crstepd.org' <dnelson@crstepd.org>; Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil>; Cossette, Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil>; Harlon, William D III CIV USARMY CENWO (US) <William.D.Harlon@usace.army.mil>; MINTER, JUSTIN D <JUSTIN.MINTER@energytransfer.com>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

Hello Errol:

Thank you for your email and letter.  We look forward to the chance to meet in February.  Because of the time constraints, we will go ahead and proceed with our response planning efforts in the meantime while we wait for tribal input.  I am also copying the Corps and Cheyenne River to bring them up to speed on meeting planning.

Dakota Access and the Corps will go ahead with our plan to meet this month in Bismarck.  Details are below.  If Cheyenne River wishes to attend (and Standing

Rock is still welcome as well), please send me the names of those who will be there.  Please also provide some dates in February that will work for another meeting.  And, as I have said before, feel free in the meantime to send me whatever information you believe is appropriate to assist in response planning.  As you all know, we have an April 1 deadline for the parties to coordinate to finalize an oil-spill response plan affecting Tribal resources and lands at Lake Oahe.

Here are the logistics for the meeting next week:

Date:  January 11, 2018

Time:  8:00AM

Location:  Hampton Inn, 2020 Schafer Drive, Bismarck, ND 58501

Thank you very much!

 

C. Gus Borkland
VP- Environmental Projects & Emergency Planning/Response
EHS&S
Energy Transfer Partners
4041 Market Street
Aston, PA 19014
O: 610.859.5419
C:  215.620.5934

**From:** Doug Crow Ghost [mailto:dcrowghost@standingrock.org]
**Sent:** Thursday, January 04, 2018 5:30 PM
**To:** BORKLAND, CARL G <CARL.BORKLAND@energytransfer.com>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward <eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>
**Subject:** Emergency Planning Meeting SRST/ETP/ACOE

Good Day Everyone,

Hope everyone had a great new year celebration and is looking forward to a great 2018!

Here is a letter from Chairman Mike Faith to Mr. Borkland for the planning of the Lake Oahe River Crossing.

The date for the SRST to be available for a meeting with ETP and ACOE will be in February.

Thanks!

**Errol D CrowGhost Jr**
Standing Rock Sioux Tribe
Department of Water Resources
Water Administrator
P.O. Box D
Fort Yates, ND. 58538
7018548534 wk
6058483919 cell
dcrowghost@standingrock.org



CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient's and may contain confidential or proprietary information covered by the Electronics Communication Privacy Act, 18 U.S.C. Sections 2510-2521. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, immediately contact the sender by reply e-mail and destroy all copies of the original message

Private and confidential as detailed here. If you cannot access hyperlink, please e-mail sender.

# ATTACHMENT 10

| | |
|---|---|
| **From:** | David Nelson <dnelson@crstepd.org> |
| **Sent:** | Tuesday, February 6, 2018 10:54 AM |
| **To:** | Borkland, Carl G |
| **Cc:** | 'Nicole Ducheneaux'; 'Harold Frazier'; Tracey Zephier |
| **Subject:** | RE: Emergency Planning Meeting SRST/ETP/ACOE |

Greetings, I will be traveling to the meeting in Bismarck this Thursday. The Cheyenne River Sioux Tribe will be sending a letter , I will deliver that letter on Thursday on their behalf. Thank you for your invitation. David D. Nelson, Director CRST DENR

**From:** Borkland, Carl G [mailto:CARL.BORKLAND@energytransfer.com]
**Sent:** Monday, February 05, 2018 7:03 AM
**To:** Doug Crow Ghost <dcrowghost@standingrock.org>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward <eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>; dnelson@crstepd.org; Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil>; Everett Iron Eyes <EVERETT.IRONEYES@standingrock.org>; Cossette, Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil>; Harlon, William D III CIV USARMY CENWO (US) <William.D.Harlon@usace.army.mil>; Minter, Justin D <JUSTIN.MINTER@energytransfer.com>; Peter Capossela <pcapossela@nu-world.com>; Dean DePountis <ddepountis@standingrock.org>; Janet Thomas <jthomas@standingrock.org>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

Thanks for your email Doug. Because our travel plans and logistics have already been set, we are still planning on meeting in Bismarck this Thursday, February 8 to continue our Lake Oahe spill planning. We will start the meeting at 9:00 to allow your team to travel to Bismarck. But if you arrive later, that is fine. We will just continue our meeting after you arrive.  If either Standing Rock or Cheyenne River are able to attend, please let us know so we can make sure we have ample room.

We would also like to schedule another meeting in March in Bismarck.  This meeting would be a plan review meeting, but we would be happy to travel to Standing Rock to review some of the tactical response planning areas. Please let us know if any of these dates work for you:

March 6, 7, 8, 13, or 14

Thanks!

 

C. Gus Borkland
VP- Environmental Projects & Emergency
Planning/Response
EHS&S
Energy Transfer Partners
4041 Market Street
Aston, PA 19014
O: 610.859.5419
C:  215.620.5934

**From:** Doug Crow Ghost [mailto:dcrowghost@standingrock.org]
**Sent:** Friday, February 2, 2018 4:06 PM
**To:** Borkland, Carl G <CARL.BORKLAND@energytransfer.com>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward <eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>; dnelson@crstepd.org; Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil>; Everett Iron Eyes <EVERETT.IRONEYES@standingrock.org>; Cossette, Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil>; Harlon, William D III CIV USARMY CENWO (US) <William.D.Harlon@usace.army.mil>; Minter, Justin D <JUSTIN.MINTER@energytransfer.com>; Peter Capossela <pcapossela@nu-world.com>; Dean DePountis <ddepountis@standingrock.org>; Janet Thomas <jthomas@standingrock.org>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

Mr. Borkland

Per Chairman Mike Faith letter, which is attached to this email, the SRST cordially invites Energy Transfer Partners for a meaningful discussion.
Thanks.

**Errol D CrowGhost Jr**
Standing Rock Sioux Tribe
Department of Water Resources
Water Administrator
P.O. Box D
Fort Yates, ND. 58538
7018548534 wk
6058483919 cell
dcrowghost@standingrock.org



CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient's and may contain confidential or proprietary information covered by the Electronics Communication Privacy Act, 18 U.S.C. Sections 2510-2521. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, immediately contact the sender by reply e-mail and destroy all copies of the original message

**From:** Borkland, Carl G [mailto:CARL.BORKLAND@energytransfer.com]
**Sent:** Friday, January 26, 2018 2:47 PM
**To:** Doug Crow Ghost <dcrowghost@standingrock.org>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward <eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>; dnelson@crstepd.org; Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil>; Cossette, Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil>; Harlon, William D III CIV USARMY CENWO (US) <William.D.Harlon@usace.army.mil>; Minter, Justin D <JUSTIN.MINTER@energytransfer.com>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

All

I am following up to make sure we have a meeting on the calendar for February.  The Corps has confirmed availability on February 8.  We have not heard from either Tribe.  Please advise whether you can attend a February 8 meeting.

We plan to hold the meeting at the same facility as the January 11 meeting. That is the Hampton Inn located at 2020 Schafer Drive, Bismarck, ND.

Thank you very much and have a great weekend.

**From:** Borkland, Carl G
**Sent:** Friday, January 12, 2018 5:04 PM
**To:** 'Doug Crow Ghost' <dcrowghost@standingrock.org>
**Cc:** 'Todd.J.Lindquist@usace.army.mil' <Todd.J.Lindquist@usace.army.mil>; 'Stasch, Eric D NWO' <Eric.D.Stasch@usace.army.mil>; 'Elliott Ward' <eward@standingrock.org>; 'Mike Faith' <mfaith@standingrock.org>;

'dnelson@crstepd.org' <dnelson@crstepd.org>; 'Stasch, Eric D CIV USARMY CENWO (US)'
<Eric.D.Stasch@usace.army.mil>; 'Cossette, Brent J CIV USARMY CENWO (US)' <Brent.J.Cossette@usace.army.mil>;
'Harlon, William D III CIV USARMY CENWO (US)' <William.D.Harlon@usace.army.mil>; MINTER, JUSTIN D
<JUSTIN.MINTER@energytransfer.com>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

All:

Three of us from Dakota Access and one of our response planning consultant
representatives had a productive multi-hour meeting with three representatives
from the Corps on Jan. 11.  We received very helpful input from the Corps and will
continue to work on gathering relevant information.  We will want to go over all of
it with both tribes when we meet in February to get your additional input.

As I have said before, if there is any information that either tribe wants us to
consider in the meantime based on your review of the existing drafts of the
Geographic Response Plan or the Facility Response Plan, please feel free to send
that to us before we meet in February.  This includes any errors or relevant
omissions that you have identified in either plan.  One takeaway from Thursday's
meeting is that we have our work cut out for us if we are going to have the best
possible response plan ready by the April 1 deadline.  We expect to need at least
two more meetings to accomplish that.  The sooner we get input from the tribes the
better.

We have not heard back from either tribe on availability in February.  Our
preferred date is February 8.  Other available dates for Dakota Access are
February 6, 7, or 9.  We should plan for several hours so that we have the
opportunity to make site visits to locations relevant to spill planning.  Please let us
know your availability as soon as possible.  April 1 will be here before we know it.

Thank you and have a nice weekend!

 

C. Gus Borkland
VP- Environmental Projects & Emergency Planning/Response
EHS&S
Energy Transfer Partners
4041 Market Street
Aston, PA 19014
O: 610.859.5419
C:  215.620.5934

**From:** BORKLAND, CARL G
**Sent:** Friday, January 05, 2018 4:15 PM
**To:** 'Doug Crow Ghost' <dcrowghost@standingrock.org>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward <eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>; 'dnelson@crstepd.org' <dnelson@crstepd.org>; Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil>; Cossette, Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil>; Harlon, William D III CIV USARMY CENWO (US) <William.D.Harlon@usace.army.mil>; MINTER, JUSTIN D <JUSTIN.MINTER@energytransfer.com>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

Hello Errol:

Thank you for your email and letter.  We look forward to the chance to meet in February.  Because of the time constraints, we will go ahead and proceed with our response planning efforts in the meantime while we wait for tribal input.  I am also copying the Corps and Cheyenne River to bring them up to speed on meeting planning.

Dakota Access and the Corps will go ahead with our plan to meet this month in Bismarck.  Details are below.  If Cheyenne River wishes to attend (and Standing Rock is still welcome as well), please send me the names of those who will be there.  Please also provide some dates in February that will work for another meeting.  And, as I have said before, feel free in the meantime to send me whatever information you believe is appropriate to assist in response planning.  As you all know, we have an April 1 deadline for the parties to coordinate to finalize an oil-spill response plan affecting Tribal resources and lands at Lake Oahe.

Here are the logistics for the meeting next week:

Date:  January 11, 2018

Time:  8:00AM

Location:  Hampton Inn, 2020 Schafer Drive, Bismarck, ND 58501

Thank you very much!

 

C. Gus Borkland
VP- Environmental Projects & Emergency Planning/Response
EHS&S
Energy Transfer Partners
4041 Market Street
Aston, PA 19014
O: 610.859.5419
C:  215.620.5934

**From:** Doug Crow Ghost [mailto:dcrowghost@standingrock.org]
**Sent:** Thursday, January 04, 2018 5:30 PM
**To:** BORKLAND, CARL G <CARL.BORKLAND@energytransfer.com>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward <eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>
**Subject:** Emergency Planning Meeting SRST/ETP/ACOE

Good Day Everyone,

Hope everyone had a great new year celebration and is looking forward to a great 2018!

Here is a letter from Chairman Mike Faith to Mr. Borkland for the planning of the Lake Oahe River Crossing.

The date for the SRST to be available for a meeting with ETP and ACOE will be in February.

Thanks!

**Errol D CrowGhost Jr**
Standing Rock Sioux Tribe
Department of Water Resources
Water Administrator
P.O. Box D
Fort Yates, ND. 58538
7018548534 wk
6058483919 cell
dcrowghost@standingrock.org



CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient's and may contain confidential or proprietary information covered by the Electronics Communication Privacy Act, 18 U.S.C. Sections 2510-2521. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, immediately contact the sender by reply e-mail and destroy all copies of the original message

Private and confidential as detailed here. If you cannot access hyperlink, please e-mail sender.

ATTACHMENT 11

| | |
|---|---|
| **From:** | Doug Crow Ghost <dcrowghost@standingrock.org> |
| **Sent:** | Wednesday, February 7, 2018 3:25 PM |
| **To:** | Borkland, Carl G |
| **Subject:** | RE: Emergency Planning Meeting SRST/ETP/ACOE |

What hotel are we meeting at in the morning?

**From:** Borkland, Carl G [mailto:CARL.BORKLAND@energytransfer.com]
**Sent:** Monday, February 05, 2018 8:03 AM
**To:** Doug Crow Ghost <dcrowgrock.org>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward
<eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>; dnelson@crstepd.org; Stasch, Eric D CIV USARMY
CENWO (US) <Eric.D.Stasch@usace.army.mil>; Everett Iron Eyes <EVERETT.IRONEYES@standingrock.org>; Cossette,
Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil>; Harlon, William D III CIV USARMY CENWO (US)
<William.D.Harlon@usace.army.mil>; Minter, Justin D <JUSTIN.MINTER@energytransfer.com>; Peter Capossela
<pcapossela@nu-world.com>; Dean DePountis <ddepountis@standingrock.org>; Janet Thomas
<jthomas@standingrock.org>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

Thanks for your email Doug. Because our travel plans and logistics have already been set, we are still planning on meeting in Bismarck this Thursday, February 8 to continue our Lake Oahe spill planning. We will start the meeting at 9:00 to allow your team to travel to Bismarck. But if you arrive later, that is fine. We will just continue our meeting after you arrive.  If either Standing Rock or Cheyenne River are able to attend, please let us know so we can make sure we have ample room.

We would also like to schedule another meeting in March in Bismarck.  This meeting would be a plan review meeting, but we would be happy to travel to Standing Rock to review some of the tactical response planning areas. Please let us know if any of these dates work for you:

March 6, 7, 8, 13, or 14

Thanks!

 

1

C. Gus Borkland
VP- Environmental Projects & Emergency
Planning/Response
EHS&S
Energy Transfer Partners
4041 Market Street
Aston, PA 19014
O: 610.859.5419
C: 215.620.5934

---

**From:** Doug Crow Ghost [mailto:dcrowghost@standingrock.org]
**Sent:** Friday, February 2, 2018 4:06 PM
**To:** Borkland, Carl G <CARL.BORKLAND@energytransfer.com>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward <eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>; dnelson@crstepd.org; Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil>; Everett Iron Eyes <EVERETT.IRONEYES@standingrock.org>; Cossette, Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil>; Harlon, William D III CIV USARMY CENWO (US) <William.D.Harlon@usace.army.mil>; Minter, Justin D <JUSTIN.MINTER@energytransfer.com>; Peter Capossela <pcapossela@nu-world.com>; Dean DePountis <ddepountis@standingrock.org>; Janet Thomas <jthomas@standingrock.org>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

Mr. Borkland

Per Chairman Mike Faith letter, which is attached to this email, the SRST cordially invites Energy Transfer Partners for a meaningful discussion.
Thanks.

## Errol D CrowGhost Jr

Standing Rock Sioux Tribe
Department of Water Resources
Water Administrator
P.O. Box D
Fort Yates, ND. 58538
7018548534 wk
6058483919 cell
dcrowghost@standingrock.org



    CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient's and may contain confidential or proprietary information covered by the Electronics Communication Privacy Act, 18 U.S.C. Sections 2510-2521. Any unauthorized review,

use, disclosure or distribution is prohibited. If you are not the intended recipient, immediately contact the sender by reply e-mail and destroy all copies of the original message

**From:** Borkland, Carl G [mailto:CARL.BORKLAND@energytransfer.com]
**Sent:** Friday, January 26, 2018 2:47 PM
**To:** Doug Crow Ghost <dcrowghost@standingrock.org>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward <eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>; dnelson@crstepd.org; Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil>; Cossette, Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil>; Harlon, William D III CIV USARMY CENWO (US) <William.D.Harlon@usace.army.mil>; Minter, Justin D <JUSTIN.MINTER@energytransfer.com>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

All

I am following up to make sure we have a meeting on the calendar for February. The Corps has confirmed availability on February 8. We have not heard from either Tribe. Please advise whether you can attend a February 8 meeting.

We plan to hold the meeting at the same facility as the January 11 meeting. That is the Hampton Inn located at 2020 Schafer Drive, Bismarck, ND.

Thank you very much and have a great weekend.

**From:** Borkland, Carl G
**Sent:** Friday, January 12, 2018 5:04 PM
**To:** 'Doug Crow Ghost' <dcrowghost@standingrock.org>
**Cc:** 'Todd.J.Lindquist@usace.army.mil' <Todd.J.Lindquist@usace.army.mil>; 'Stasch, Eric D NWO' <Eric.D.Stasch@usace.army.mil>; 'Elliott Ward' <eward@standingrock.org>; 'Mike Faith' <mfaith@standingrock.org>; 'dnelson@crstepd.org' <dnelson@crstepd.org>; 'Stasch, Eric D CIV USARMY CENWO (US)' <Eric.D.Stasch@usace.army.mil>; 'Cossette, Brent J CIV USARMY CENWO (US)' <Brent.J.Cossette@usace.army.mil>; 'Harlon, William D III CIV USARMY CENWO (US)' <William.D.Harlon@usace.army.mil>; MINTER, JUSTIN D <JUSTIN.MINTER@energytransfer.com>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

All:

Three of us from Dakota Access and one of our response planning consultant representatives had a productive multi-hour meeting with three representatives from the Corps on Jan. 11. We received very helpful input from the Corps and will continue to work on gathering relevant information. We will want to go over all of it with both tribes when we meet in February to get your additional input.

As I have said before, if there is any information that either tribe wants us to consider in the meantime based on your review of the existing drafts of the Geographic Response Plan or the Facility Response Plan, please feel free to send that to us before we meet in February.  This includes any errors or relevant omissions that you have identified in either plan.  One takeaway from Thursday's meeting is that we have our work cut out for us if we are going to have the best possible response plan ready by the April 1 deadline.  We expect to need at least two more meetings to accomplish that.  The sooner we get input from the tribes the better.

We have not heard back from either tribe on availability in February.  Our preferred date is February 8.  Other available dates for Dakota Access are February 6, 7, or 9.  We should plan for several hours so that we have the opportunity to make site visits to locations relevant to spill planning.  Please let us know your availability as soon as possible.  April 1 will be here before we know it.

Thank you and have a nice weekend!

 

C. Gus Borkland
VP- Environmental Projects & Emergency Planning/Response
EHS&S
Energy Transfer Partners
4041 Market Street
Aston, PA 19014
O: 610.859.5419
C:  215.620.5934

---

**From:** BORKLAND, CARL G
**Sent:** Friday, January 05, 2018 4:15 PM
**To:** 'Doug Crow Ghost' <dcrowghost@standingrock.org>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward <eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>; 'dnelson@crstepd.org' <dnelson@crstepd.org>; Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil>; Cossette, Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil>; Harlon, William D III CIV USARMY CENWO (US) <William.D.Harlon@usace.army.mil>; MINTER, JUSTIN D <JUSTIN.MINTER@energytransfer.com>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

Hello Errol:

Thank you for your email and letter.  We look forward to the chance to meet in February.  Because of the time constraints, we will go ahead and proceed with our response planning efforts in the meantime while we wait for tribal input.  I am also copying the Corps and Cheyenne River to bring them up to speed on meeting planning.

Dakota Access and the Corps will go ahead with our plan to meet this month in Bismarck.  Details are below.  If Cheyenne River wishes to attend (and Standing Rock is still welcome as well), please send me the names of those who will be there.  Please also provide some dates in February that will work for another meeting.  And, as I have said before, feel free in the meantime to send me whatever information you believe is appropriate to assist in response planning.  As you all know, we have an April 1 deadline for the parties to coordinate to finalize an oil-spill response plan affecting Tribal resources and lands at Lake Oahe.

Here are the logistics for the meeting next week:

Date:  January 11, 2018

Time:  8:00AM

Location:  Hampton Inn, 2020 Schafer Drive, Bismarck, ND 58501

Thank you very much!

 

C. Gus Borkland
VP- Environmental Projects & Emergency Planning/Response
EHS&S
Energy Transfer Partners
4041 Market Street
Aston, PA 19014
O: 610.859.5419
C:  215.620.5934

---

**From:** Doug Crow Ghost [mailto:dcrowghost@standingrock.org]
**Sent:** Thursday, January 04, 2018 5:30 PM
**To:** BORKLAND, CARL G <CARL.BORKLAND@energytransfer.com>

Cc: Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward <eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>
**Subject:** Emergency Planning Meeting SRST/ETP/ACOE

Good Day Everyone,

Hope everyone had a great new year celebration and is looking forward to a great 2018!

Here is a letter from Chairman Mike Faith to Mr. Borkland for the planning of the Lake Oahe River Crossing.

The date for the SRST to be available for a meeting with ETP and ACOE will be in February.

Thanks!

**Errol D CrowGhost Jr**
Standing Rock Sioux Tribe
Department of Water Resources
Water Administrator
P.O. Box D
Fort Yates, ND. 58538
7018548534 wk
6058483919 cell
dcrowghost@standingrock.org



CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient's and may contain confidential or proprietary information covered by the Electronics Communication Privacy Act, 18 U.S.C. Sections 2510-2521. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, immediately contact the sender by reply e-mail and destroy all copies of the original message

Private and confidential as detailed here. If you cannot access hyperlink, please e-mail sender.

# ATTACHMENT 12

| | |
|---|---|
| **From:** | Borkland, Carl G <CARL.BORKLAND@energytransfer.com> |
| **Sent:** | Wednesday, February 7, 2018 3:50 PM |
| **To:** | Doug Crow Ghost |
| **Cc:** | Minter, Justin D |
| **Subject:** | RE: Emergency Planning Meeting SRST/ETP/ACOE |

## Location:  Hampton Inn, 2020 Schafer Drive, Bismarck, ND 58501

Justin Minter will be your contact at the meeting tomorrow!

**From:** Doug Crow Ghost [mailto:dcrowghost@standingrock.org]
**Sent:** Wednesday, February 7, 2018 3:25 PM
**To:** Borkland, Carl G <CARL.BORKLAND@energytransfer.com>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

What hotel are we meeting at in the morning?

**From:** Borkland, Carl G [mailto:CARL.BORKLAND@energytransfer.com]
**Sent:** Monday, February 05, 2018 8:03 AM
**To:** Doug Crow Ghost <dcrowghost@standingrock.org>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward
<eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>; dnelson@crstepd.org; Stasch, Eric D CIV USARMY
CENWO (US) <Eric.D.Stasch@usace.army.mil>; Everett Iron Eyes <EVERETT.IRONEYES@standingrock.org>; Cossette,
Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil>; Harlon, William D III CIV USARMY CENWO (US)
<William.D.Harlon@usace.army.mil>; Minter, Justin D <JUSTIN.MINTER@energytransfer.com>; Peter Capossela
<pcapossela@nu-world.com>; Dean DePountis <ddepountis@standingrock.org>; Janet Thomas
<jthomas@standingrock.org>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

Thanks for your email Doug. Because our travel plans and logistics have already been set, we are still planning on meeting in Bismarck this Thursday, February 8 to continue our Lake Oahe spill planning. We will start the meeting at 9:00 to allow your team to travel to Bismarck. But if you arrive later, that is fine. We will just continue our meeting after you arrive.  If either Standing Rock or Cheyenne River are able to attend, please let us know so we can make sure we have ample room.

We would also like to schedule another meeting in March in Bismarck.  This meeting would be a plan review meeting, but we would be happy to travel to Standing Rock to review some of the tactical response planning areas. Please let us know if any of these dates work for you:

March 6, 7, 8, 13, or 14

Thanks!

 

C. Gus Borkland
VP- Environmental Projects & Emergency
Planning/Response
EHS&S
Energy Transfer Partners
4041 Market Street
Aston, PA 19014
O: 610.859.5419
C: 215.620.5934

---

**From:** Doug Crow Ghost [mailto:dcrowghost@standingrock.org]
**Sent:** Friday, February 2, 2018 4:06 PM
**To:** Borkland, Carl G <CARL.BORKLAND@energytransfer.com>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward <eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>; dnelson@crstepd.org; Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil>; Everett Iron Eyes <EVERETT.IRONEYES@standingrock.org>; Cossette, Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil>; Harlon, William D III CIV USARMY CENWO (US) <William.D.Harlon@usace.army.mil>; Minter, Justin D <JUSTIN.MINTER@energytransfer.com>; Peter Capossela <pcapossela@nu-world.com>; Dean DePountis <ddepountis@standingrock.org>; Janet Thomas <jthomas@standingrock.org>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

Mr. Borkland

Per Chairman Mike Faith letter, which is attached to this email, the SRST cordially invites Energy Transfer Partners for a meaningful discussion.
Thanks.

## Errol D CrowGhost Jr
Standing Rock Sioux Tribe
Department of Water Resources
Water Administrator
P.O. Box D
Fort Yates, ND. 58538
7018548534 wk
6058483919 cell
dcrowghost@standingrock.org



CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient's and may contain confidential or proprietary information covered by the Electronics Communication Privacy Act, 18 U.S.C. Sections 2510-2521. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, immediately contact the sender by reply e-mail and destroy all copies of the original message

**From:** Borkland, Carl G [mailto:CARL.BORKLAND@energytransfer.com]
**Sent:** Friday, January 26, 2018 2:47 PM
**To:** Doug Crow Ghost <dcrowghost@standingrock.org>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward <eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>; dnelson@crstepd.org; Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil>; Cossette, Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil>; Harlon, William D III CIV USARMY CENWO (US) <William.D.Harlon@usace.army.mil>; Minter, Justin D <JUSTIN.MINTER@energytransfer.com>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

All

I am following up to make sure we have a meeting on the calendar for February.  The Corps has confirmed availability on February 8.  We have not heard from either Tribe.  Please advise whether you can attend a February 8 meeting.

We plan to hold the meeting at the same facility as the January 11 meeting. That is the Hampton Inn located at 2020 Schafer Drive, Bismarck, ND.

Thank you very much and have a great weekend.

**From:** Borkland, Carl G
**Sent:** Friday, January 12, 2018 5:04 PM
**To:** 'Doug Crow Ghost' <dcrowghost@standingrock.org>
**Cc:** 'Todd.J.Lindquist@usace.army.mil' <Todd.J.Lindquist@usace.army.mil>; 'Stasch, Eric D NWO' <Eric.D.Stasch@usace.army.mil>; 'Elliott Ward' <eward@standingrock.org>; 'Mike Faith' <mfaith@standingrock.org>;

'dnelson@crstepd.org' <dnelson@crstepd.org>; 'Stasch, Eric D CIV USARMY CENWO (US)'
<Eric.D.Stasch@usace.army.mil>; 'Cossette, Brent J CIV USARMY CENWO (US)' <Brent.J.Cossette@usace.army.mil>;
'Harlon, William D III CIV USARMY CENWO (US)' <William.D.Harlon@usace.army.mil>; MINTER, JUSTIN D
<JUSTIN.MINTER@energytransfer.com>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

All:

Three of us from Dakota Access and one of our response planning consultant representatives had a productive multi-hour meeting with three representatives from the Corps on Jan. 11.  We received very helpful input from the Corps and will continue to work on gathering relevant information.  We will want to go over all of it with both tribes when we meet in February to get your additional input.

As I have said before, if there is any information that either tribe wants us to consider in the meantime based on your review of the existing drafts of the Geographic Response Plan or the Facility Response Plan, please feel free to send that to us before we meet in February.  This includes any errors or relevant omissions that you have identified in either plan.  One takeaway from Thursday's meeting is that we have our work cut out for us if we are going to have the best possible response plan ready by the April 1 deadline.  We expect to need at least two more meetings to accomplish that.  The sooner we get input from the tribes the better.

We have not heard back from either tribe on availability in February.  Our preferred date is February 8.  Other available dates for Dakota Access are February 6, 7, or 9.  We should plan for several hours so that we have the opportunity to make site visits to locations relevant to spill planning.  Please let us know your availability as soon as possible.  April 1 will be here before we know it.

Thank you and have a nice weekend!

 

C. Gus Borkland
VP- Environmental Projects & Emergency Planning/Response
EHS&S
Energy Transfer Partners
4041 Market Street
Aston, PA 19014
O: 610.859.5419
C:  215.620.5934

**From:** BORKLAND, CARL G
**Sent:** Friday, January 05, 2018 4:15 PM
**To:** 'Doug Crow Ghost' <dcrowghost@standingrock.org>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward <eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>; 'dnelson@crstepd.org' <dnelson@crstepd.org>; Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil>; Cossette, Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil>; Harlon, William D III CIV USARMY CENWO (US) <William.D.Harlon@usace.army.mil>; MINTER, JUSTIN D <JUSTIN.MINTER@energytransfer.com>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

Hello Errol:

Thank you for your email and letter.  We look forward to the chance to meet in February.  Because of the time constraints, we will go ahead and proceed with our response planning efforts in the meantime while we wait for tribal input.  I am also copying the Corps and Cheyenne River to bring them up to speed on meeting planning.

Dakota Access and the Corps will go ahead with our plan to meet this month in Bismarck.  Details are below.  If Cheyenne River wishes to attend (and Standing Rock is still welcome as well), please send me the names of those who will be there.  Please also provide some dates in February that will work for another meeting.  And, as I have said before, feel free in the meantime to send me whatever information you believe is appropriate to assist in response planning.  As you all know, we have an April 1 deadline for the parties to coordinate to finalize an oil-spill response plan affecting Tribal resources and lands at Lake Oahe.

Here are the logistics for the meeting next week:

Date:  January 11, 2018

Time:  8:00AM

Location:  Hampton Inn, 2020 Schafer Drive, Bismarck, ND 58501

Thank you very much!

 

C. Gus Borkland
VP- Environmental Projects & Emergency Planning/Response
EHS&S
Energy Transfer Partners
4041 Market Street
Aston, PA 19014
O: 610.859.5419
C:  215.620.5934

**From:** Doug Crow Ghost [mailto:dcrowghost@standingrock.org]
**Sent:** Thursday, January 04, 2018 5:30 PM
**To:** BORKLAND, CARL G <CARL.BORKLAND@energytransfer.com>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward
<eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>
**Subject:** Emergency Planning Meeting SRST/ETP/ACOE

Good Day Everyone,

Hope everyone had a great new year celebration and is looking forward to a great 2018!

Here is a letter from Chairman Mike Faith to Mr. Borkland for the planning of the Lake Oahe River
Crossing.

The date for the SRST to be available for a meeting with ETP and ACOE will be in February.

Thanks!

**Errol D CrowGhost Jr**
Standing Rock Sioux Tribe
Department of Water Resources
Water Administrator
P.O. Box D
Fort Yates, ND. 58538
7018548534 wk
6058483919 cell
dcrowghost@standingrock.org



CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient's and may contain confidential or proprietary information covered by the Electronics Communication Privacy Act, 18 U.S.C. Sections 2510-2521. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, immediately contact the sender by reply e-mail and destroy all copies of the original message

Private and confidential as detailed here. If you cannot access hyperlink, please e-mail sender.

# ATTACHMENT 13

| From: | Borkland, Carl G <CARL.BORKLAND@energytransfer.com> |
|---|---|
| Sent: | Saturday, February 24, 2018 10:10 AM |
| To: | Doug Crow Ghost |
| Cc: | Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO; Elliott Ward; Mike Faith; dnelson@crstepd.org; Stasch, Eric D CIV USARMY CENWO (US); Everett Iron Eyes; Cossette, Brent J CIV USARMY CENWO (US); Harlon, William D III CIV USARMY CENWO (US); Minter, Justin D; Peter Capossela; Dean DePountis; Janet Thomas; Feiock, Patrick D CIV USARMY CENWO (US) |
| Subject: | RE: Emergency Planning Meeting SRST/ETP/ACOE |

Good morning all,

At the meeting in Bismarck on February 8 neither Standing Rock nor Cheyenne River provided available dates for a meeting in March.  It's very important that we get this meeting scheduled.  So far we have had no input from either tribe on any of the drafts of the Geographic Response Plan or response planning more generally.

As I noted before, we propose to spend part of the March meeting visiting locations on the Standing Rock reservation that are relevant to response planning.  We also will use that meeting to review the latest draft of the GRP.  During that review we will be providing information relevant to response planning that the tribes requested in their earlier letters. This is something we are prepared to do on February 8.

Please let me know by Wednesday February 28, whether you are available to meet on either March 6, 7, or 8.

Thanks!

---

**From:** Borkland, Carl G
**Sent:** Monday, February 5, 2018 9:03 AM
**To:** Doug Crow Ghost <dcrowghost@standingrock.org>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward <eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>; dnelson@crstepd.org; Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil>; Everett Iron Eyes <EVERETT.IRONEYES@standingrock.org>; Cossette, Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil>; Harlon, William D III CIV USARMY CENWO (US) <William.D.Harlon@usace.army.mil>; Minter, Justin D <JUSTIN.MINTER@energytransfer.com>; Peter Capossela <pcapossela@nu-world.com>; Dean DePountis <ddepountis@standingrock.org>; Janet Thomas <jthomas@standingrock.org>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

Thanks for your email Doug. Because our travel plans and logistics have already been set, we are still planning on meeting in Bismarck this Thursday, February 8 to continue our Lake Oahe spill planning. We will start the meeting at 9:00 to allow your team to travel to Bismarck. But if you arrive later, that is fine. We will just continue our meeting after you arrive.  If either Standing Rock or Cheyenne River are able to attend, please let us know so we can make sure we have ample room.

We would also like to schedule another meeting in March in Bismarck.  This meeting would be a plan review meeting, but we would be happy to travel to Standing Rock to review some of the tactical response planning areas. Please let us know if any of these dates work for you:

March 6, 7, 8, 13, or 14

Thanks!

 

C. Gus Borkland
VP- Environmental Projects & Emergency
Planning/Response
EHS&S
Energy Transfer Partners
4041 Market Street
Aston, PA 19014
O: 610.859.5419
C:  215.620.5934

---

**From:** Doug Crow Ghost [mailto:dcrowghost@standingrock.org]
**Sent:** Friday, February 2, 2018 4:06 PM
**To:** Borkland, Carl G <CARL.BORKLAND@energytransfer.com>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward <eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>; dnelson@crstepd.org; Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil>; Everett Iron Eyes <EVERETT.IRONEYES@standingrock.org>; Cossette, Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil>; Harlon, William D III CIV USARMY CENWO (US) <William.D.Harlon@usace.army.mil>; Minter, Justin D <JUSTIN.MINTER@energytransfer.com>; Peter Capossela <pcapossela@nu-world.com>; Dean DePountis <ddepountis@standingrock.org>; Janet Thomas <jthomas@standingrock.org>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

Mr. Borkland

Per Chairman Mike Faith letter, which is attached to this email, the SRST cordially invites Energy Transfer Partners for a meaningful discussion.
Thanks.

**Errol D CrowGhost Jr**
Standing Rock Sioux Tribe
Department of Water Resources
Water Administrator
P.O. Box D
Fort Yates, ND. 58538
7018548534 wk
6058483919 cell
dcrowghost@standingrock.org



CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient's and may contain confidential or proprietary information covered by the Electronics Communication Privacy Act, 18 U.S.C. Sections 2510-2521. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, immediately contact the sender by reply e-mail and destroy all copies of the original message

**From:** Borkland, Carl G [mailto:CARL.BORKLAND@energytransfer.com]
**Sent:** Friday, January 26, 2018 2:47 PM
**To:** Doug Crow Ghost <dcrowghost@standingrock.org>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward <eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>; dnelson@crstepd.org; Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil>; Cossette, Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil>; Harlon, William D III CIV USARMY CENWO (US) <William.D.Harlon@usace.army.mil>; Minter, Justin D <JUSTIN.MINTER@energytransfer.com>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

All

I am following up to make sure we have a meeting on the calendar for February.  The Corps has confirmed availability on February 8.  We have not heard from either Tribe.  Please advise whether you can attend a February 8 meeting.

We plan to hold the meeting at the same facility as the January 11 meeting. That is the Hampton Inn located at 2020 Schafer Drive, Bismarck, ND.

Thank you very much and have a great weekend.

---

**From:** Borkland, Carl G
**Sent:** Friday, January 12, 2018 5:04 PM
**To:** 'Doug Crow Ghost' <dcrowghost@standingrock.org>
**Cc:** 'Todd.J.Lindquist@usace.army.mil' <Todd.J.Lindquist@usace.army.mil>; 'Stasch, Eric D NWO' <Eric.D.Stasch@usace.army.mil>; 'Elliott Ward' <eward@standingrock.org>; 'Mike Faith' <mfaith@standingrock.org>; 'dnelson@crstepd.org' <dnelson@crstepd.org>; 'Stasch, Eric D CIV USARMY CENWO (US)' <Eric.D.Stasch@usace.army.mil>; 'Cossette, Brent J CIV USARMY CENWO (US)' <Brent.J.Cossette@usace.army.mil>; 'Harlon, William D III CIV USARMY CENWO (US)' <William.D.Harlon@usace.army.mil>; MINTER, JUSTIN D <JUSTIN.MINTER@energytransfer.com>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

All:

Three of us from Dakota Access and one of our response planning consultant representatives had a productive multi-hour meeting with three representatives from the Corps on Jan. 11. We received very helpful input from the Corps and will continue to work on gathering relevant information. We will want to go over all of it with both tribes when we meet in February to get your additional input.

As I have said before, if there is any information that either tribe wants us to consider in the meantime based on your review of the existing drafts of the Geographic Response Plan or the Facility Response Plan, please feel free to send that to us before we meet in February. This includes any errors or relevant omissions that you have identified in either plan. One takeaway from Thursday's meeting is that we have our work cut out for us if we are going to have the best possible response plan ready by the April 1 deadline. We expect to need at least two more meetings to accomplish that. The sooner we get input from the tribes the better.

We have not heard back from either tribe on availability in February. Our preferred date is February 8. Other available dates for Dakota Access are February 6, 7, or 9. We should plan for several hours so that we have the opportunity to make site visits to locations relevant to spill planning. Please let us know your availability as soon as possible. April 1 will be here before we know it.

Thank you and have a nice weekend!

 

C. Gus Borkland
VP- Environmental Projects & Emergency Planning/Response
EHS&S
Energy Transfer Partners
4041 Market Street
Aston, PA 19014
O: 610.859.5419
C:  215.620.5934

---

**From:** BORKLAND, CARL G
**Sent:** Friday, January 05, 2018 4:15 PM
**To:** 'Doug Crow Ghost' <dcrowghost@standingrock.org>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward
<eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>; 'dnelson@crstepd.org' <dnelson@crstepd.org>;
Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil>; Cossette, Brent J CIV USARMY CENWO (US)
<Brent.J.Cossette@usace.army.mil>; Harlon, William D III CIV USARMY CENWO (US)
<William.D.Harlon@usace.army.mil>; MINTER, JUSTIN D <JUSTIN.MINTER@energytransfer.com>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

Hello Errol:

Thank you for your email and letter.  We look forward to the chance to meet in
February.  Because of the time constraints, we will go ahead and proceed with our
response planning efforts in the meantime while we wait for tribal input.  I am also
copying the Corps and Cheyenne River to bring them up to speed on meeting
planning.

Dakota Access and the Corps will go ahead with our plan to meet this month in
Bismarck.  Details are below.  If Cheyenne River wishes to attend (and Standing
Rock is still welcome as well), please send me the names of those who will be
there.  Please also provide some dates in February that will work for another
meeting.  And, as I have said before, feel free in the meantime to send me whatever
information you believe is appropriate to assist in response planning.  As you all
know, we have an April 1 deadline for the parties to coordinate to finalize an oil-
spill response plan affecting Tribal resources and lands at Lake Oahe.

Here are the logistics for the meeting next week:

Date:  January 11, 2018

Time:  8:00AM

Location:  Hampton Inn, 2020 Schafer Drive, Bismarck, ND 58501

Thank you very much!

 

C. Gus Borkland
VP- Environmental Projects & Emergency Planning/Response
EHS&S
Energy Transfer Partners
4041 Market Street
Aston, PA 19014
O: 610.859.5419
C: 215.620.5934

**From:** Doug Crow Ghost [mailto:dcrowghost@standingrock.org]
**Sent:** Thursday, January 04, 2018 5:30 PM
**To:** BORKLAND, CARL G <CARL.BORKLAND@energytransfer.com>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward <eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>
**Subject:** Emergency Planning Meeting SRST/ETP/ACOE

Good Day Everyone,

Hope everyone had a great new year celebration and is looking forward to a great 2018!

Here is a letter from Chairman Mike Faith to Mr. Borkland for the planning of the Lake Oahe River Crossing.

The date for the SRST to be available for a meeting with ETP and ACOE will be in February.

Thanks!

**Errol D CrowGhost Jr**
Standing Rock Sioux Tribe
Department of Water Resources
Water Administrator
P.O. Box D
Fort Yates, ND. 58538
7018548534 wk
6058483919 cell

dcrowghost@standingrock.org



CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient's and may contain confidential or proprietary information covered by the Electronics Communication Privacy Act, 18 U.S.C. Sections 2510-2521. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, immediately contact the sender by reply e-mail and destroy all copies of the original message

Private and confidential as detailed here. If you cannot access hyperlink, please e-mail sender.

ATTACHMENT 14

| | |
|---|---|
| **From:** | Doug Crow Ghost <dcrowghost@standingrock.org> |
| **Sent:** | Tuesday, February 27, 2018 5:14 PM |
| **To:** | Borkland, Carl G |
| **Cc:** | Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO; Elliott Ward; Mike Faith; dnelson@crstepd.org; Stasch, Eric D CIV USARMY CENWO (US); Everett Iron Eyes; Cossette, Brent J CIV USARMY CENWO (US); Harlon, William D III CIV USARMY CENWO (US); Minter, Justin D; Peter Capossela; Dean DePountis; Janet Thomas; Feiock, Patrick D CIV USARMY CENWO (US) |
| **Subject:** | RE: Emergency Planning Meeting SRST/ETP/ACOE |

Let's do March 6th….chairman faith is in agreeance with this date.

**From:** Borkland, Carl G [mailto:CARL.BORKLAND@energytransfer.com]
**Sent:** Saturday, February 24, 2018 9:10 AM
**To:** Doug Crow Ghost <dcrowghost@standingrock.org>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward <eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>; dnelson@crstepd.org; Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil>; Cossette, Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil>; Harlon, William D III CIV USARMY CENWO (US) <William.D.Harlon@usace.army.mil>; Minter, Justin D <JUSTIN.MINTER@energytransfer.com>; Peter Capossela <pcapossela@nu-world.com>; Dean DePountis <ddepountis@standingrock.org>; Janet Thomas <jthomas@standingrock.org>; Feiock, Patrick D CIV USARMY CENWO (US) <Patrick.D.Feiock@usace.army.mil>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

Good morning all,

At the meeting in Bismarck on February 8 neither Standing Rock nor Cheyenne River provided available dates for a meeting in March.  It's very important that we get this meeting scheduled.  So far we have had no input from either tribe on any of the drafts of the Geographic Response Plan or response planning more generally.

As I noted before, we propose to spend part of the March meeting visiting locations on the Standing Rock reservation that are relevant to response planning.  We also will use that meeting to review the latest draft of the GRP.  During that review we will be providing information relevant to response planning that the tribes requested in their earlier letters. This is something we are prepared to do on February 8.

Please let me know by Wednesday February 28, whether you are available to meet on either March 6, 7, or 8.

Thanks!

**From:** Borkland, Carl G
**Sent:** Monday, February 5, 2018 9:03 AM
**To:** Doug Crow Ghost <dcrowghost@standingrock.org>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward <eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>; dnelson@crstepd.org; Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil>; Everett Iron Eyes <EVERETT.IRONEYES@standingrock.org>; Cossette, Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil>; Harlon, William D III CIV USARMY CENWO (US) <William.D.Harlon@usace.army.mil>; Minter, Justin D <JUSTIN.MINTER@energytransfer.com>; Peter Capossela <pcapossela@nu-world.com>; Dean DePountis <ddepountis@standingrock.org>; Janet Thomas <jthomas@standingrock.org>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

Thanks for your email Doug. Because our travel plans and logistics have already been set, we are still planning on meeting in Bismarck this Thursday, February 8 to continue our Lake Oahe spill planning. We will start the meeting at 9:00 to allow your team to travel to Bismarck. But if you arrive later, that is fine. We will just continue our meeting after you arrive.  If either Standing Rock or Cheyenne River are able to attend, please let us know so we can make sure we have ample room.

We would also like to schedule another meeting in March in Bismarck.  This meeting would be a plan review meeting, but we would be happy to travel to Standing Rock to review some of the tactical response planning areas. Please let us know if any of these dates work for you:

March 6, 7, 8, 13, or 14

Thanks!

 

C. Gus Borkland
VP- Environmental Projects & Emergency Planning/Response
EHS&S
Energy Transfer Partners
4041 Market Street
Aston, PA 19014
O: 610.859.5419
C: 215.620.5934

**From:** Doug Crow Ghost [mailto:dcrowghost@standingrock.org]
**Sent:** Friday, February 2, 2018 4:06 PM
**To:** Borkland, Carl G <CARL.BORKLAND@energytransfer.com>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward <eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>; dnelson@crstepd.org; Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil>; Everett Iron Eyes <EVERETT.IRONEYES@standingrock.org>; Cossette, Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil>; Harlon, William D III CIV USARMY CENWO (US) <William.D.Harlon@usace.army.mil>; Minter, Justin D <JUSTIN.MINTER@energytransfer.com>; Peter Capossela <pcapossela@nu-world.com>; Dean DePountis <ddepountis@standingrock.org>; Janet Thomas <jthomas@standingrock.org>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

Mr. Borkland

Per Chairman Mike Faith letter, which is attached to this email, the SRST cordially invites Energy Transfer Partners for a meaningful discussion.
Thanks.

**Errol D CrowGhost Jr**
Standing Rock Sioux Tribe
Department of Water Resources
Water Administrator
P.O. Box D
Fort Yates, ND. 58538
7018548534 wk
6058483919 cell
dcrowghost@standingrock.org

CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient's and may contain confidential or proprietary information covered by the Electronics Communication Privacy Act, 18 U.S.C. Sections 2510-2521. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, immediately contact the sender by reply e-mail and destroy all copies of the original message

**From:** Borkland, Carl G [mailto:CARL.BORKLAND@energytransfer.com]
**Sent:** Friday, January 26, 2018 2:47 PM
**To:** Doug Crow Ghost <dcrowghost@standingrock.org>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward <eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>; dnelson@crstepd.org; Stasch, Eric D CIV USARMY

CENWO (US) <Eric.D.Stasch@usace.army.mil>; Cossette, Brent J CIV USARMY CENWO (US)
<Brent.J.Cossette@usace.army.mil>; Harlon, William D III CIV USARMY CENWO (US)
<William.D.Harlon@usace.army.mil>; Minter, Justin D <JUSTIN.MINTER@energytransfer.com>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

All

I am following up to make sure we have a meeting on the calendar for February.  The Corps has confirmed availability on February 8.  We have not heard from either Tribe.  Please advise whether you can attend a February 8 meeting.

We plan to hold the meeting at the same facility as the January 11 meeting. That is the Hampton Inn located at 2020 Schafer Drive, Bismarck, ND.

Thank you very much and have a great weekend.

---

**From:** Borkland, Carl G
**Sent:** Friday, January 12, 2018 5:04 PM
**To:** 'Doug Crow Ghost' <dcrowghost@standingrock.org>
**Cc:** 'Todd.J.Lindquist@usace.army.mil' <Todd.J.Lindquist@usace.army.mil>; 'Stasch, Eric D NWO'
<Eric.D.Stasch@usace.army.mil>; 'Elliott Ward' <eward@standingrock.org>; 'Mike Faith' <mfaith@standingrock.org>;
'dnelson@crstepd.org' <dnelson@crstepd.org>; 'Stasch, Eric D CIV USARMY CENWO (US)'
<Eric.D.Stasch@usace.army.mil>; 'Cossette, Brent J CIV USARMY CENWO (US)' <Brent.J.Cossette@usace.army.mil>;
'Harlon, William D III CIV USARMY CENWO (US)' <William.D.Harlon@usace.army.mil>; MINTER, JUSTIN D
<JUSTIN.MINTER@energytransfer.com>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

All:

Three of us from Dakota Access and one of our response planning consultant representatives had a productive multi-hour meeting with three representatives from the Corps on Jan. 11.  We received very helpful input from the Corps and will continue to work on gathering relevant information.  We will want to go over all of it with both tribes when we meet in February to get your additional input.

As I have said before, if there is any information that either tribe wants us to consider in the meantime based on your review of the existing drafts of the Geographic Response Plan or the Facility Response Plan, please feel free to send that to us before we meet in February.  This includes any errors or relevant omissions that you have identified in either plan.  One takeaway from Thursday's meeting is that we have our work cut out for us if we are going to have the best possible response plan ready by the April 1 deadline.  We expect to need at least

two more meetings to accomplish that.  The sooner we get input from the tribes the better.

We have not heard back from either tribe on availability in February.  Our preferred date is February 8.  Other available dates for Dakota Access are February 6, 7, or 9.  We should plan for several hours so that we have the opportunity to make site visits to locations relevant to spill planning.  Please let us know your availability as soon as possible.  April 1 will be here before we know it.

Thank you and have a nice weekend!

 

C. Gus Borkland
VP- Environmental Projects & Emergency Planning/Response
EHS&S
Energy Transfer Partners
4041 Market Street
Aston, PA 19014
O: 610.859.5419
C:  215.620.5934

---

**From:** BORKLAND, CARL G
**Sent:** Friday, January 05, 2018 4:15 PM
**To:** 'Doug Crow Ghost' <dcrowghost@standingrock.org>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward <eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>; 'dnelson@crstepd.org' <dnelson@crstepd.org>; Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil>; Cossette, Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil>; Harlon, William D III CIV USARMY CENWO (US) <William.D.Harlon@usace.army.mil>; MINTER, JUSTIN D <JUSTIN.MINTER@energytransfer.com>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

Hello Errol:

Thank you for your email and letter.  We look forward to the chance to meet in February.  Because of the time constraints, we will go ahead and proceed with our response planning efforts in the meantime while we wait for tribal input.  I am also copying the Corps and Cheyenne River to bring them up to speed on meeting planning.

Dakota Access and the Corps will go ahead with our plan to meet this month in Bismarck.  Details are below.  If Cheyenne River wishes to attend (and Standing

Rock is still welcome as well), please send me the names of those who will be there.  Please also provide some dates in February that will work for another meeting.  And, as I have said before, feel free in the meantime to send me whatever information you believe is appropriate to assist in response planning.  As you all know, we have an April 1 deadline for the parties to coordinate to finalize an oil-spill response plan affecting Tribal resources and lands at Lake Oahe.

Here are the logistics for the meeting next week:

Date:  January 11, 2018

Time:  8:00AM

Location:  Hampton Inn, 2020 Schafer Drive, Bismarck, ND 58501

Thank you very much!

 

C. Gus Borkland
VP- Environmental Projects & Emergency Planning/Response
EHS&S
Energy Transfer Partners
4041 Market Street
Aston, PA 19014
O: 610.859.5419
C:  215.620.5934

---

**From:** Doug Crow Ghost [mailto:dcrowghost@standingrock.org]
**Sent:** Thursday, January 04, 2018 5:30 PM
**To:** BORKLAND, CARL G <CARL.BORKLAND@energytransfer.com>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward <eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>
**Subject:** Emergency Planning Meeting SRST/ETP/ACOE

Good Day Everyone,

Hope everyone had a great new year celebration and is looking forward to a great 2018!

Here is a letter from Chairman Mike Faith to Mr. Borkland for the planning of the Lake Oahe River Crossing.

The date for the SRST to be available for a meeting with ETP and ACOE will be in February.

Thanks!

## Errol D CrowGhost Jr

Standing Rock Sioux Tribe
Department of Water Resources
Water Administrator
P.O. Box D
Fort Yates, ND. 58538
7018548534 wk
6058483919 cell
dcrowghost@standingrock.org



CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient's and may contain confidential or proprietary information covered by the Electronics Communication Privacy Act, 18 U.S.C. Sections 2510-2521. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, immediately contact the sender by reply e-mail and destroy all copies of the original message

Private and confidential as detailed here. If you cannot access hyperlink, please e-mail sender.

# ATTACHMENT 15

| From: | Doug Crow Ghost <dcrowghost@standingrock.org> |
|---|---|
| Sent: | Tuesday, February 27, 2018 5:27 PM |
| To: | Borkland, Carl G |
| Cc: | Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO; Elliott Ward; Mike Faith; dnelson@crstepd.org; Stasch, Eric D CIV USARMY CENWO (US); Everett Iron Eyes; Cossette, Brent J CIV USARMY CENWO (US); Harlon, William D III CIV USARMY CENWO (US); Minter, Justin D; Peter Capossela; Dean DePountis; Janet Thomas; Feiock, Patrick D CIV USARMY CENWO (US) |
| Subject: | RE: Emergency Planning Meeting SRST/ETP/ACOE |

Mr. Borkland -- Thank you for your email.  None of the information requested by the Tribe has been provided to Chairman Faith. As stated to you previously, the Geographic Response Plan is only one aspect of emergency planning.  Standing Rock would like ETP to provide the documentation requested on all prior reported spills from ETP/Sunoco pipelines and the maximum spill estimate prior to the meeting.

You stated that you would like to go to potential clean-up sites on the Reservation.  You will need the Tribe's permission to enter the Reservation and to traverse Tribal land.

The first step should be a meeting between senior ETP/Sunoco officials and Chairman Faith in the Tribal Council chambers.  Let us know the availability of ETP officials to travel to Fort Yates.  At this point, the only permission granted to ETP to enter the Reservation is Chairman Faith's invitation to meet with him in Tribal chambers.  The dates of March 6th are available.  No ETP personnel will be permitted to enter the Reservation for any other purpose, until the proper protocols are resolved.  Thank you.

---

**From:** Doug Crow Ghost
**Sent:** Tuesday, February 27, 2018 4:14 PM
**To:** 'Borkland, Carl G' <CARL.BORKLAND@energytransfer.com>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward <eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>; dnelson@crstepd.org; Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil>; Everett Iron Eyes <everett.ironeyes@standingrock.org>; Cossette, Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil>; Harlon, William D III CIV USARMY CENWO (US) <William.D.Harlon@usace.army.mil>; Minter, Justin D <JUSTIN.MINTER@energytransfer.com>; Peter Capossela <pcapossela@nu-world.com>; Dean DePountis <ddepountis@standingrock.org>; Janet Thomas <jthomas@standingrock.org>; Feiock, Patrick D CIV USARMY CENWO (US) <Patrick.D.Feiock@usace.army.mil>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

Let's do March 6th....chairman faith is in agreeance with this date.

---

**From:** Borkland, Carl G [mailto:CARL.BORKLAND@energytransfer.com]
**Sent:** Saturday, February 24, 2018 9:10 AM
**To:** Doug Crow Ghost <dcrowghost@standingrock.org>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward <eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>; dnelson@crstepd.org; Stasch, Eric D CIV USARMY

CENWO (US) <Eric.D.Stasch@usace.army.mil>; Everett Iron Eyes <EVERETT.IRONEYES@standingrock.org>; Cossette, Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil>; Harlon, William D III CIV USARMY CENWO (US) <William.D.Harlon@usace.army.mil>; Minter, Justin D <JUSTIN.MINTER@energytransfer.com>; Peter Capossela <pcapossela@nu-world.com>; Dean DePountis <ddepountis@standingrock.org>; Janet Thomas <jthomas@standingrock.org>; Feiock, Patrick D CIV USARMY CENWO (US) <Patrick.D.Feiock@usace.army.mil>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

Good morning all,

At the meeting in Bismarck on February 8 neither Standing Rock nor Cheyenne River provided available dates for a meeting in March. It's very important that we get this meeting scheduled. So far we have had no input from either tribe on any of the drafts of the Geographic Response Plan or response planning more generally.

As I noted before, we propose to spend part of the March meeting visiting locations on the Standing Rock reservation that are relevant to response planning. We also will use that meeting to review the latest draft of the GRP. During that review we will be providing information relevant to response planning that the tribes requested in their earlier letters. This is something we are prepared to do on February 8.

Please let me know by Wednesday February 28, whether you are available to meet on either March 6, 7, or 8.

Thanks!

---

**From:** Borkland, Carl G
**Sent:** Monday, February 5, 2018 9:03 AM
**To:** Doug Crow Ghost <dcrowghost@standingrock.org>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward <eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>; dnelson@crstepd.org; Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil>; Everett Iron Eyes <EVERETT.IRONEYES@standingrock.org>; Cossette, Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil>; Harlon, William D III CIV USARMY CENWO (US) <William.D.Harlon@usace.army.mil>; Minter, Justin D <JUSTIN.MINTER@energytransfer.com>; Peter Capossela <pcapossela@nu-world.com>; Dean DePountis <ddepountis@standingrock.org>; Janet Thomas <jthomas@standingrock.org>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

Thanks for your email Doug. Because our travel plans and logistics have already been set, we are still planning on meeting in Bismarck this Thursday, February 8 to continue our Lake Oahe spill planning. We will start the meeting at 9:00 to allow your team to travel to Bismarck. But if you arrive later, that is fine. We will just continue our meeting after you arrive. If either Standing Rock or Cheyenne

River are able to attend, please let us know so we can make sure we have ample room.

We would also like to schedule another meeting in March in Bismarck.  This meeting would be a plan review meeting, but we would be happy to travel to Standing Rock to review some of the tactical response planning areas. Please let us know if any of these dates work for you:

March 6, 7, 8, 13, or 14

Thanks!

 

C. Gus Borkland
VP- Environmental Projects & Emergency Planning/Response
EHS&S
Energy Transfer Partners
4041 Market Street
Aston, PA 19014
O: 610.859.5419
C:  215.620.5934

---

**From:** Doug Crow Ghost [mailto:dcrowghost@standingrock.org]
**Sent:** Friday, February 2, 2018 4:06 PM
**To:** Borkland, Carl G <CARL.BORKLAND@energytransfer.com>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward <eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>; dnelson@crstepd.org; Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil>; Everett Iron Eyes <EVERETT.IRONEYES@standingrock.org>; Cossette, Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil>; Harlon, William D III CIV USARMY CENWO (US) <William.D.Harlon@usace.army.mil>; Minter, Justin D <JUSTIN.MINTER@energytransfer.com>; Peter Capossela <pcapossela@nu-world.com>; Dean DePountis <ddepountis@standingrock.org>; Janet Thomas <jthomas@standingrock.org>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

Mr. Borkland

Per Chairman Mike Faith letter, which is attached to this email, the SRST cordially invites Energy Transfer Partners for a meaningful discussion.
Thanks.

**Errol D CrowGhost Jr**
Standing Rock Sioux Tribe

3

Department of Water Resources
Water Administrator
P.O. Box D
Fort Yates, ND. 58538
7018548534 wk
6058483919 cell
dcrowghost@standingrock.org



CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient's and may contain confidential or proprietary information covered by the Electronics Communication Privacy Act, 18 U.S.C. Sections 2510-2521. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, immediately contact the sender by reply e-mail and destroy all copies of the original message

**From:** Borkland, Carl G [mailto:CARL.BORKLAND@energytransfer.com]
**Sent:** Friday, January 26, 2018 2:47 PM
**To:** Doug Crow Ghost <dcrowghost@standingrock.org>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward <eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>; dnelson@crstepd.org; Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil>; Cossette, Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil>; Harlon, William D III CIV USARMY CENWO (US) <William.D.Harlon@usace.army.mil>; Minter, Justin D <JUSTIN.MINTER@energytransfer.com>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

All

I am following up to make sure we have a meeting on the calendar for February.  The Corps has confirmed availability on February 8.  We have not heard from either Tribe.  Please advise whether you can attend a February 8 meeting.

We plan to hold the meeting at the same facility as the January 11 meeting. That is the Hampton Inn located at 2020 Schafer Drive, Bismarck, ND.

Thank you very much and have a great weekend.

**From:** Borkland, Carl G
**Sent:** Friday, January 12, 2018 5:04 PM
**To:** 'Doug Crow Ghost' <dcrowghost@standingrock.org>
**Cc:** 'Todd.J.Lindquist@usace.army.mil' <Todd.J.Lindquist@usace.army.mil>; 'Stasch, Eric D NWO'
<Eric.D.Stasch@usace.army.mil>; 'Elliott Ward' <eward@standingrock.org>; 'Mike Faith' <mfaith@standingrock.org>;
'dnelson@crstepd.org' <dnelson@crstepd.org>; 'Stasch, Eric D CIV USARMY CENWO (US)'
<Eric.D.Stasch@usace.army.mil>; 'Cossette, Brent J CIV USARMY CENWO (US)' <Brent.J.Cossette@usace.army.mil>;
'Harlon, William D III CIV USARMY CENWO (US)' <William.D.Harlon@usace.army.mil>; MINTER, JUSTIN D
<JUSTIN.MINTER@energytransfer.com>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

All:

Three of us from Dakota Access and one of our response planning consultant representatives had a productive multi-hour meeting with three representatives from the Corps on Jan. 11.  We received very helpful input from the Corps and will continue to work on gathering relevant information.  We will want to go over all of it with both tribes when we meet in February to get your additional input.

As I have said before, if there is any information that either tribe wants us to consider in the meantime based on your review of the existing drafts of the Geographic Response Plan or the Facility Response Plan, please feel free to send that to us before we meet in February.  This includes any errors or relevant omissions that you have identified in either plan.  One takeaway from Thursday's meeting is that we have our work cut out for us if we are going to have the best possible response plan ready by the April 1 deadline.  We expect to need at least two more meetings to accomplish that.  The sooner we get input from the tribes the better.

We have not heard back from either tribe on availability in February.  Our preferred date is February 8.  Other available dates for Dakota Access are February 6, 7, or 9.  We should plan for several hours so that we have the opportunity to make site visits to locations relevant to spill planning.  Please let us know your availability as soon as possible.  April 1 will be here before we know it.

Thank you and have a nice weekend!

 

C. Gus Borkland
VP- Environmental Projects & Emergency Planning/Response
EHS&S
Energy Transfer Partners
4041 Market Street
Aston, PA 19014
O: 610.859.5419
C:  215.620.5934

---

**From:** BORKLAND, CARL G
**Sent:** Friday, January 05, 2018 4:15 PM
**To:** 'Doug Crow Ghost' <dcrowghost@standingrock.org>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward
<eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>; 'dnelson@crstepd.org' <dnelson@crstepd.org>;
Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil>; Cossette, Brent J CIV USARMY CENWO (US)
<Brent.J.Cossette@usace.army.mil>; Harlon, William D III CIV USARMY CENWO (US)
<William.D.Harlon@usace.army.mil>; MINTER, JUSTIN D <JUSTIN.MINTER@energytransfer.com>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

Hello Errol:

Thank you for your email and letter.  We look forward to the chance to meet in
February.  Because of the time constraints, we will go ahead and proceed with our
response planning efforts in the meantime while we wait for tribal input.  I am also
copying the Corps and Cheyenne River to bring them up to speed on meeting
planning.

Dakota Access and the Corps will go ahead with our plan to meet this month in
Bismarck.  Details are below.  If Cheyenne River wishes to attend (and Standing
Rock is still welcome as well), please send me the names of those who will be
there.  Please also provide some dates in February that will work for another
meeting.  And, as I have said before, feel free in the meantime to send me whatever
information you believe is appropriate to assist in response planning.  As you all
know, we have an April 1 deadline for the parties to coordinate to finalize an oil-
spill response plan affecting Tribal resources and lands at Lake Oahe.

Here are the logistics for the meeting next week:

Date:  January 11, 2018

Time:  8:00AM

Location:  Hampton Inn, 2020 Schafer Drive, Bismarck, ND 58501

Thank you very much!

 

C. Gus Borkland
VP- Environmental Projects & Emergency Planning/Response
EHS&S
Energy Transfer Partners
4041 Market Street
Aston, PA 19014
O: 610.859.5419
C: 215.620.5934

**From:** Doug Crow Ghost [mailto:dcrowghost@standingrock.org]
**Sent:** Thursday, January 04, 2018 5:30 PM
**To:** BORKLAND, CARL G <CARL.BORKLAND@energytransfer.com>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward
<eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>
**Subject:** Emergency Planning Meeting SRST/ETP/ACOE

Good Day Everyone,

Hope everyone had a great new year celebration and is looking forward to a great 2018!

Here is a letter from Chairman Mike Faith to Mr. Borkland for the planning of the Lake Oahe River
Crossing.

The date for the SRST to be available for a meeting with ETP and ACOE will be in February.

Thanks!

**Errol D CrowGhost Jr**
Standing Rock Sioux Tribe
Department of Water Resources
Water Administrator
P.O. Box D
Fort Yates, ND. 58538
7018548534 wk
6058483919 cell
dcrowghost@standingrock.org



CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient's and may contain confidential or proprietary information covered by the Electronics Communication Privacy Act, 18 U.S.C. Sections 2510-2521. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, immediately contact the sender by reply e-mail and destroy all copies of the original message

Private and confidential as detailed here. If you cannot access hyperlink, please e-mail sender.

# ATTACHMENT 16

| | |
|---|---|
| **From:** | Doug Crow Ghost <dcrowghost@standingrock.org> |
| **Sent:** | Wednesday, February 28, 2018 10:40 AM |
| **To:** | Borkland, Carl G |
| **Subject:** | Re: Emergency Planning Meeting SRST/ETP/ACOE |
| **Attachments:** | image001.gif; image003.png; image004.jpg; image005.jpg; image006.png; image007.jpg |

Mr Borkland
Sorry for the corrections on the date that was sent on previous emails, the correction on the date for our visit with ETP would be March 7th and not the 6th. My apologies for any inconvenience.

Sent from my iPhone

On Feb 27, 2018, at 4:26 PM, Doug Crow Ghost
<dcrowghost@standingrock.org<mailto:dcrowghost@standingrock.org>> wrote:

<image001.gif>
Mr. Borkland -- Thank you for your email.  None of the information requested by the Tribe has been provided to Chairman Faith. As stated to you previously, the Geographic Response Plan is only one aspect of emergency planning. Standing Rock would like ETP to provide the documentation requested on all prior reported spills from ETP/Sunoco pipelines and the maximum spill estimate prior to the meeting.

You stated that you would like to go to potential clean-up sites on the Reservation.  You will need the Tribe's permission to enter the Reservation and to traverse Tribal land.

The first step should be a meeting between senior ETP/Sunoco officials and Chairman Faith in the Tribal Council chambers.  Let us know the availability of ETP officials to travel to Fort Yates.  At this point, the only permission granted to ETP to enter the Reservation is Chairman Faith's invitation to meet with him in Tribal chambers.  The dates of March 6th are available.  No ETP personnel will be permitted to enter the Reservation for any other purpose, until the proper protocols are resolved.  Thank you.

From: Doug Crow Ghost
Sent: Tuesday, February 27, 2018 4:14 PM
To: 'Borkland, Carl G' <CARL.BORKLAND@energytransfer.com<mailto:CARL.BORKLAND@energytransfer.com>>
Cc: Todd.J.Lindquist@usace.army.mil<mailto:Todd.J.Lindquist@usace.army.mil>; Stasch, Eric D NWO
<Eric.D.Stasch@usace.army.mil<mailto:Eric.D.Stasch@usace.army.mil>>; Elliott Ward
<eward@standingrock.org<mailto:eward@standingrock.org>>; Mike Faith
<mfaith@standingrock.org<mailto:mfaith@standingrock.org>>; dnelson@crstepd.org<mailto:dnelson@crstepd.org>;
Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil<mailto:Eric.D.Stasch@usace.army.mil>>;
Everett Iron Eyes <everett.ironeyes@standingrock.org<mailto:everett.ironeyes@standingrock.org>>; Cossette, Brent J
CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil<mailto:Brent.J.Cossette@usace.army.mil>>; Harlon,
William D III CIV USARMY CENWO (US) <William.D.Harlon@usace.army.mil<mailto:William.D.Harlon@usace.army.mil>>;
Minter, Justin D <JUSTIN.MINTER@energytransfer.com<mailto:JUSTIN.MINTER@energytransfer.com>>; Peter Capossela
<pcapossela@nu-world.com<mailto:pcapossela@nu-world.com>>; Dean DePountis
<ddepountis@standingrock.org<mailto:ddepountis@standingrock.org>>; Janet Thomas

<jthomas@standingrock.org<mailto:jthomas@standingrock.org>>; Feiock, Patrick D CIV USARMY CENWO (US)
<Patrick.D.Feiock@usace.army.mil<mailto:Patrick.D.Feiock@usace.army.mil>>
Subject: RE: Emergency Planning Meeting SRST/ETP/ACOE

Let's do March 6th....chairman faith is in agreeance with this date.

From: Borkland, Carl G [mailto:CARL.BORKLAND@energytransfer.com]
Sent: Saturday, February 24, 2018 9:10 AM
To: Doug Crow Ghost <dcrowghost@standingrock.org<mailto:dcrowghost@standingrock.org>>
Cc: Todd.J.Lindquist@usace.army.mil<mailto:Todd.J.Lindquist@usace.army.mil>>; Stasch, Eric D NWO
<Eric.D.Stasch@usace.army.mil<mailto:Eric.D.Stasch@usace.army.mil>>; Elliott Ward
<eward@standingrock.org<mailto:eward@standingrock.org>>; Mike Faith
<mfaith@standingrock.org<mailto:mfaith@standingrock.org>>; dnelson@crstepd.org<mailto:dnelson@crstepd.org>;
Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil<mailto:Eric.D.Stasch@usace.army.mil>>;
Everett Iron Eyes <EVERETT.IRONEYES@standingrock.org<mailto:EVERETT.IRONEYES@standingrock.org>>; Cossette,
Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil<mailto:Brent.J.Cossette@usace.army.mil>>;
Harlon, William D III CIV USARMY CENWO (US)
<William.D.Harlon@usace.army.mil<mailto:William.D.Harlon@usace.army.mil>>; Minter, Justin D
<JUSTIN.MINTER@energytransfer.com<mailto:JUSTIN.MINTER@energytransfer.com>>; Peter Capossela
<pcapossela@nu-world.com<mailto:pcapossela@nu-world.com>>; Dean DePountis
<ddepountis@standingrock.org<mailto:ddepountis@standingrock.org>>; Janet Thomas
<jthomas@standingrock.org<mailto:jthomas@standingrock.org>>; Feiock, Patrick D CIV USARMY CENWO (US)
<Patrick.D.Feiock@usace.army.mil<mailto:Patrick.D.Feiock@usace.army.mil>>
Subject: RE: Emergency Planning Meeting SRST/ETP/ACOE

Good morning all,

At the meeting in Bismarck on February 8 neither Standing Rock nor Cheyenne River provided available dates for a
meeting in March.  It's very important that we get this meeting scheduled.  So far we have had no input from either tribe
on any of the drafts of the Geographic Response Plan or response planning more generally.

As I noted before, we propose to spend part of the March meeting visiting locations on the Standing Rock reservation
that are relevant to response planning.  We also will use that meeting to review the latest draft of the GRP.  During that
review we will be providing information relevant to response planning that the tribes requested in their earlier letters.
This is something we are prepared to do on February 8.

Please let me know by Wednesday February 28, whether you are available to meet on either March 6, 7, or 8.

Thanks!

From: Borkland, Carl G
Sent: Monday, February 5, 2018 9:03 AM
To: Doug Crow Ghost <dcrowghost@standingrock.org<mailto:dcrowghost@standingrock.org>>
Cc: Todd.J.Lindquist@usace.army.mil<mailto:Todd.J.Lindquist@usace.army.mil>>; Stasch, Eric D NWO
<Eric.D.Stasch@usace.army.mil<mailto:Eric.D.Stasch@usace.army.mil>>; Elliott Ward
<eward@standingrock.org<mailto:eward@standingrock.org>>; Mike Faith
<mfaith@standingrock.org<mailto:mfaith@standingrock.org>>; dnelson@crstepd.org<mailto:dnelson@crstepd.org>;
Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil<mailto:Eric.D.Stasch@usace.army.mil>>;
Everett Iron Eyes <EVERETT.IRONEYES@standingrock.org<mailto:EVERETT.IRONEYES@standingrock.org>>; Cossette,

Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil<mailto:Brent.J.Cossette@usace.army.mil>>;
Harlon, William D III CIV USARMY CENWO (US)
<William.D.Harlon@usace.army.mil<mailto:William.D.Harlon@usace.army.mil>>; Minter, Justin D
<JUSTIN.MINTER@energytransfer.com<mailto:JUSTIN.MINTER@energytransfer.com>>; Peter Capossela
<pcapossela@nu-world.com<mailto:pcapossela@nu-world.com>>; Dean DePountis
<ddepountis@standingrock.org<mailto:ddepountis@standingrock.org>>; Janet Thomas
<jthomas@standingrock.org<mailto:jthomas@standingrock.org>>
Subject: RE: Emergency Planning Meeting SRST/ETP/ACOE

Thanks for your email Doug. Because our travel plans and logistics have already been set, we are still planning on
meeting in Bismarck this Thursday, February 8 to continue our Lake Oahe spill planning. We will start the meeting at
9:00 to allow your team to travel to Bismarck. But if you arrive later, that is fine. We will just continue our meeting after
you arrive.  If either Standing Rock or Cheyenne River are able to attend, please let us know so we can make sure we
have ample room.

We would also like to schedule another meeting in March in Bismarck.  This meeting would be a plan review meeting,
but we would be happy to travel to Standing Rock to review some of the tactical response planning areas. Please let us
know if any of these dates work for you:

March 6, 7, 8, 13, or 14

Thanks!

<image003.png>

<image004.jpg>

C. Gus Borkland
VP- Environmental Projects & Emergency Planning/Response EHS&S Energy Transfer Partners

4041 Market Street
Aston, PA 19014

O: 610.859.5419
C:  215.620.5934

3

From: Doug Crow Ghost [mailto:dcrowghost@standingrock.org]
Sent: Friday, February 2, 2018 4:06 PM
To: Borkland, Carl G <CARL.BORKLAND@energytransfer.com<mailto:CARL.BORKLAND@energytransfer.com>>
Cc: Todd.J.Lindquist@usace.army.mil<mailto:Todd.J.Lindquist@usace.army.mil>; Stasch, Eric D NWO
<Eric.D.Stasch@usace.army.mil<mailto:Eric.D.Stasch@usace.army.mil>>; Elliott Ward
<eward@standingrock.org<mailto:eward@standingrock.org>>; Mike Faith
<mfaith@standingrock.org<mailto:mfaith@standingrock.org>>; dnelson@crstepd.org<mailto:dnelson@crstepd.org>;
Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil<mailto:Eric.D.Stasch@usace.army.mil>>;
Everett Iron Eyes <EVERETT.IRONEYES@standingrock.org<mailto:EVERETT.IRONEYES@standingrock.org>>; Cossette,
Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil<mailto:Brent.J.Cossette@usace.army.mil>>;
Harlon, William D III CIV USARMY CENWO (US)
<William.D.Harlon@usace.army.mil<mailto:William.D.Harlon@usace.army.mil>>; Minter, Justin D
<JUSTIN.MINTER@energytransfer.com<mailto:JUSTIN.MINTER@energytransfer.com>>; Peter Capossela
<pcapossela@nu-world.com<mailto:pcapossela@nu-world.com>>; Dean DePountis
<ddepountis@standingrock.org<mailto:ddepountis@standingrock.org>>; Janet Thomas
<jthomas@standingrock.org<mailto:jthomas@standingrock.org>>
Subject: RE: Emergency Planning Meeting SRST/ETP/ACOE

Mr. Borkland

Per Chairman Mike Faith letter, which is attached to this email, the SRST cordially invites Energy Transfer Partners for a
meaningful discussion.
Thanks.

Errol D CrowGhost Jr
Standing Rock Sioux Tribe
Department of Water Resources
Water Administrator
P.O. Box D
Fort Yates, ND. 58538
7018548534 wk
6058483919 cell
dcrowghost@standingrock.org<mailto:dcrowghost@standingrock.org>
<image005.jpg>

CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient's
and may contain confidential or proprietary information covered by the Electronics Communication Privacy Act, 18
U.S.C. Sections 2510-2521. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the
intended recipient, immediately contact the sender by reply e-mail and destroy all copies of the original message

From: Borkland, Carl G [mailto:CARL.BORKLAND@energytransfer.com]
Sent: Friday, January 26, 2018 2:47 PM
To: Doug Crow Ghost <dcrowghost@standingrock.org<mailto:dcrowghost@standingrock.org>>
Cc: Todd.J.Lindquist@usace.army.mil<mailto:Todd.J.Lindquist@usace.army.mil>; Stasch, Eric D NWO
<Eric.D.Stasch@usace.army.mil<mailto:Eric.D.Stasch@usace.army.mil>>; Elliott Ward
<eward@standingrock.org<mailto:eward@standingrock.org>>; Mike Faith

<mfaith@standingrock.org<mailto:mfaith@standingrock.org>>; dnelson@crstepd.org<mailto:dnelson@crstepd.org>; Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil<mailto:Eric.D.Stasch@usace.army.mil>>; Cossette, Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil<mailto:Brent.J.Cossette@usace.army.mil>>; Harlon, William D III CIV USARMY CENWO (US) <William.D.Harlon@usace.army.mil<mailto:William.D.Harlon@usace.army.mil>>; Minter, Justin D <JUSTIN.MINTER@energytransfer.com<mailto:JUSTIN.MINTER@energytransfer.com>>
Subject: RE: Emergency Planning Meeting SRST/ETP/ACOE

All

I am following up to make sure we have a meeting on the calendar for February.  The Corps has confirmed availability on February 8.  We have not heard from either Tribe.  Please advise whether you can attend a February 8 meeting.

We plan to hold the meeting at the same facility as the January 11 meeting. That is the Hampton Inn located at 2020 Schafer Drive, Bismarck, ND.

Thank you very much and have a great weekend.

From: Borkland, Carl G
Sent: Friday, January 12, 2018 5:04 PM
To: 'Doug Crow Ghost' <dcrowghost@standingrock.org<mailto:dcrowghost@standingrock.org>>
Cc: 'Todd.J.Lindquist@usace.army.mil<mailto:Todd.J.Lindquist@usace.army.mil>' <Todd.J.Lindquist@usace.army.mil<mailto:Todd.J.Lindquist@usace.army.mil>>; 'Stasch, Eric D NWO' <Eric.D.Stasch@usace.army.mil<mailto:Eric.D.Stasch@usace.army.mil>>; 'Elliott Ward' <eward@standingrock.org<mailto:eward@standingrock.org>>; 'Mike Faith' <mfaith@standingrock.org<mailto:mfaith@standingrock.org>>; 'dnelson@crstepd.org<mailto:dnelson@crstepd.org>' <dnelson@crstepd.org<mailto:dnelson@crstepd.org>>; 'Stasch, Eric D CIV USARMY CENWO (US)' <Eric.D.Stasch@usace.army.mil<mailto:Eric.D.Stasch@usace.army.mil>>; 'Cossette, Brent J CIV USARMY CENWO (US)' <Brent.J.Cossette@usace.army.mil<mailto:Brent.J.Cossette@usace.army.mil>>; 'Harlon, William D III CIV USARMY CENWO (US)' <William.D.Harlon@usace.army.mil<mailto:William.D.Harlon@usace.army.mil>>; MINTER, JUSTIN D <JUSTIN.MINTER@energytransfer.com<mailto:JUSTIN.MINTER@energytransfer.com>>
Subject: RE: Emergency Planning Meeting SRST/ETP/ACOE

All:

Three of us from Dakota Access and one of our response planning consultant representatives had a productive multi-hour meeting with three representatives from the Corps on Jan. 11.  We received very helpful input from the Corps and will continue to work on gathering relevant information.  We will want to go over all of it with both tribes when we meet in February to get your additional input.

As I have said before, if there is any information that either tribe wants us to consider in the meantime based on your review of the existing drafts of the Geographic Response Plan or the Facility Response Plan, please feel free to send that to us before we meet in February.  This includes any errors or relevant omissions that you have identified in either plan.  One takeaway from Thursday's meeting is that we have our work cut out for us if we are going to have the best possible response plan ready by the April 1 deadline.  We expect to need at least two more meetings to accomplish that.  The sooner we get input from the tribes the better.

We have not heard back from either tribe on availability in February.  Our preferred date is February 8.  Other available dates for Dakota Access are February 6, 7, or 9.  We should plan for several hours so that we have the opportunity to

make site visits to locations relevant to spill planning.  Please let us know your availability as soon as possible.  April 1 will be here before we know it.

Thank you and have a nice weekend!

<image006.png>

<image007.jpg>

C. Gus Borkland
VP- Environmental Projects & Emergency Planning/Response EHS&S Energy Transfer Partners

4041 Market Street
Aston, PA 19014

O: 610.859.5419
C:  215.620.5934

From: BORKLAND, CARL G
Sent: Friday, January 05, 2018 4:15 PM
To: 'Doug Crow Ghost' <dcrowghost@standingrock.org<mailto:dcrowghost@standingrock.org>>
Cc: Todd.J.Lindquist@usace.army.mil<mailto:Todd.J.Lindquist@usace.army.mil>; Stasch, Eric D NWO
<Eric.D.Stasch@usace.army.mil<mailto:Eric.D.Stasch@usace.army.mil>>; Elliott Ward
<eward@standingrock.org<mailto:eward@standingrock.org>>; Mike Faith
<mfaith@standingrock.org<mailto:mfaith@standingrock.org>>; 'dnelson@crstepd.org<mailto:dnelson@crstepd.org>'
<dnelson@crstepd.org<mailto:dnelson@crstepd.org>>; Stasch, Eric D CIV USARMY CENWO (US)
<Eric.D.Stasch@usace.army.mil<mailto:Eric.D.Stasch@usace.army.mil>>; Cossette, Brent J CIV USARMY CENWO (US)
<Brent.J.Cossette@usace.army.mil<mailto:Brent.J.Cossette@usace.army.mil>>; Harlon, William D III CIV USARMY

6

CENWO (US) <William.D.Harlon@usace.army.mil<mailto:William.D.Harlon@usace.army.mil>>; MINTER, JUSTIN D <JUSTIN.MINTER@energytransfer.com<mailto:JUSTIN.MINTER@energytransfer.com>>
Subject: RE: Emergency Planning Meeting SRST/ETP/ACOE

Hello Errol:

Thank you for your email and letter.  We look forward to the chance to meet in February.  Because of the time constraints, we will go ahead and proceed with our response planning efforts in the meantime while we wait for tribal input.  I am also copying the Corps and Cheyenne River to bring them up to speed on meeting planning.

Dakota Access and the Corps will go ahead with our plan to meet this month in Bismarck.  Details are below.  If Cheyenne River wishes to attend (and Standing Rock is still welcome as well), please send me the names of those who will be there.  Please also provide some dates in February that will work for another meeting.  And, as I have said before, feel free in the meantime to send me whatever information you believe is appropriate to assist in response planning.  As you all know, we have an April 1 deadline for the parties to coordinate to finalize an oil-spill response plan affecting Tribal resources and lands at Lake Oahe.

Here are the logistics for the meeting next week:

Date:  January 11, 2018

Time:  8:00AM

Location:  Hampton Inn, 2020 Schafer Drive, Bismarck, ND 58501

Thank you very much!

<image006.png>

<image007.jpg>

C. Gus Borkland
VP- Environmental Projects & Emergency Planning/Response EHS&S Energy Transfer Partners

4041 Market Street
Aston, PA 19014

O: 610.859.5419
C:  215.620.5934

From: Doug Crow Ghost [mailto:dcrowghost@standingrock.org]
Sent: Thursday, January 04, 2018 5:30 PM
To: BORKLAND, CARL G <CARL.BORKLAND@energytransfer.com<mailto:CARL.BORKLAND@energytransfer.com>>
Cc: Todd.J.Lindquist@usace.army.mil<mailto:Todd.J.Lindquist@usace.army.mil>; Stasch, Eric D NWO
<Eric.D.Stasch@usace.army.mil<mailto:Eric.D.Stasch@usace.army.mil>>; Elliott Ward
<eward@standingrock.org<mailto:eward@standingrock.org>>; Mike Faith
<mfaith@standingrock.org<mailto:mfaith@standingrock.org>>
Subject: Emergency Planning Meeting SRST/ETP/ACOE

Good Day Everyone,

Hope everyone had a great new year celebration and is looking forward to a great 2018!

Here is a letter from Chairman Mike Faith to Mr. Borkland for the planning of the Lake Oahe River Crossing.

The date for the SRST to be available for a meeting with ETP and ACOE will be in February.

Thanks!

Errol D CrowGhost Jr
Standing Rock Sioux Tribe
Department of Water Resources
Water Administrator
P.O. Box D
Fort Yates, ND. 58538
7018548534 wk
6058483919 cell
dcrowghost@standingrock.org<mailto:dcrowghost@standingrock.org>
<image005.jpg>

CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient's and may contain confidential or proprietary information covered by the Electronics Communication Privacy Act, 18 U.S.C. Sections 2510-2521. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, immediately contact the sender by reply e-mail and destroy all copies of the original message

Private and confidential as detailed here<http://www.energytransfer.com/mail_disclaimer.aspx>. If you cannot access hyperlink, please e-mail sender.

# ATTACHMENT 17

| | |
|---|---|
| **From:** | SR Chairmans Office <chairmans.copier@standingrock.org> |
| **Sent:** | Wednesday, February 28, 2018 10:41 AM |
| **To:** | Borkland, Carl G |
| **Cc:** | Doug CrowGhost; Allyson Two Bears; Everett Iron Eyes; Elliott Ward; Dean DePountis; Jeff Kelly; Janet Thomas; Peter Capossela |
| **Subject:** | Attached Image |
| **Attachments:** | 0461_001.pdf |

Mike Faith
*Chairman*

TRIBAL COUNCIL
(AT LARGE)

Paul Archambault

Kory McLaughlin

Charles Walker

Frank White Bull

Courtney Yellow Fat

Dana Yellow Fat

Ira Taken Alive
*Vice Chairman*

Susan Agard
*Secretary*

John Pretty Bear
*Cannon Ball District*

Brandon Mauai
*Long Soldier District*

Wayne Looking Back
*Wakpala District*

Delray Demery
*Kenel District*

Joe White Mountain Jr.
*Bear Soldier District*

Caroline Thompson
*Rock Creek District*

Verdell Bobtail Bear
*Running Antelope District*

Samuel B. Harrison
*Porcupine District*

*Sent by email to Carl.borkland@Energytransfer.com*

February 28, 2018

Energy Transfer Partners, L.P.
8111 Westchester Drive
Dallas, Texas 75225

Attention:     Carl Borkland

RE:     Proposed Meeting on Emergency Planning and Response – Dakota Access Pipeline
March 7, 2018 at the Tribal Administrative Building in Fort Yates, N.D.

Dear Energy Transfer Partners, L.P.:

I write to invite you to the Standing Rock Reservation for a meeting on emergency response planning for the Dakota Access Pipeline, for March 7, 2018, at 10:00 am.  This date was identified by Carl Borkland as being available for ETP.  Be assured that we will take all steps to ensure that our visitors are treated respectfully, consistent with our Lakota culture.

The information relating to emergency response that has been requested by the Tribe has not been provided by ETP.  As stated to you previously, the Geographic Response Plan is only one aspect of emergency planning.  We would appreciate your providing the documentation requested prior to March 7, to enable us to review the information prior to the meeting.

Mr. Borkland stated in his email dated February 24th that ETP would like to go to potential clean-up sites on the Reservation.  ETP will need the Tribe's permission to enter the Reservation and to traverse Tribal land.  At this point, the only permission granted to ETP to enter the Reservation is invitation to meet with him in Tribal chambers.

1

There are numerous historic properties of Lakota and Dakota origin in low-lying areas along the Missouri River. We remain very concerned with the impact of an oil spill on these sites, and the clean-up and remediation that could further affect these sites. There needs to be an evaluation of the potential impacts of an oil spill and clean-up activities on these properties.

We are especially concerned with Mad Bear I and II, which are under the continuing jurisdiction of the Corps of Engineers pursuant to the consent decree in the federal *Mato Chezeka* litigation. All sites must be properly protected and impacts mitigated. As there have been no discussions or evaluation of the impacts on our cultural properties downstream from the DAPL Lake Oahe crossing, ETP personnel are not permitted on Tribal land for the purpose of conducting any field surveys, at this time.

Thank you for your attention to this matter.

Sincerely,

Mike Faith, Jr., Chairman
Standing Rock Sioux Tribe

# ATTACHMENT 18

| | |
|---|---|
| **From:** | Borkland, Carl G <CARL.BORKLAND@energytransfer.com> |
| **Sent:** | Thursday, March 1, 2018 8:56 AM |
| **To:** | Doug Crow Ghost |
| **Cc:** | Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO; Elliott Ward; Mike Faith; dnelson@crstepd.org; Stasch, Eric D CIV USARMY CENWO (US); Everett Iron Eyes; Cossette, Brent J CIV USARMY CENWO (US); Harlon, William D III CIV USARMY CENWO (US); Minter, Justin D; Peter Capossela; Dean DePountis; Janet Thomas; Feiock, Patrick D CIV USARMY CENWO (US) |
| **Subject:** | RE: Emergency Planning Meeting SRST/ETP/ACOE |

Thank you for your email Doug.  As you know, the Geographic Response Plan is due to the court on April 1 – one month from today.  Dakota Access and the Corps have held two response planning meetings so far.  The tribes did not attend the first, held Jan. 11.  They appeared at the second, held Feb. 8, only long enough to deliver (and, in Standing Rock's case, read aloud) letters requesting information, among other things.  We are confirming availability to meet March 7.

To the extent the Tribes have requested information relevant to response planning, we are prepared to go over that information at the March meeting, just as were prepared to do so at the Feb. 8 meeting.  In fact, the draft GRP that we had available at the Feb. 8 meeting and that we will be discussing at the March 7 meeting includes a discussion of remote monitoring and SCADA systems, as well as safety data sheets showing the composition of Bakken Crude (including flammability and toxicity).  On February 8, we were also prepared to explain (1) how portions of the Facility Response Plan relevant to response planning at Lake Oahe have been incorporated into the GRP; (2) the location and operation of shut-off valves near Lake Oahe; (3) the results of an unannounced emergency response equipment deployment exercise at Lake Oahe in October 2017 with an initial response of just one hour and full response within 3½ hours; and (4) the approximate number and locations of personnel who would respond to a spill or leak at Lake Oahe.

At the March 7 meeting we are prepared to show and explain, in addition to all of that, the results of the recent spill modeling and discuss how those results are informing the response planning.  You asked about maximum spill estimates.  You have the original spill model with a worst case discharge of more than 12,000 barrels.  The more recent modeling includes a comparable amount as the worst case spill scenario, among other scenarios.  You asked for documentation about other spills at other locations.  We do not believe that information is necessary or relevant to planning at Lake Oahe.  We are open to revisit our view on that after

we have met on March 7 and gone over the GRP and the other information I just previewed.

We will not enter the reservation without Standing Rock's permission.  We will be meeting March 7 at the Ramada, 1400 E. Interchange Ave, Bismarck ND 58501.  We will start at 9:00 a.m. local time.  This will be a meeting of persons from each party who are involved in the emergency response planning.  We strongly believe that this is the sort of meeting needed to get the GRP completed by April 1.  Both tribes have instead requested meetings on their separate reservations.  You are asking for senior ETP/Sunoco officials to meet with tribal leaders.  Respectfully, that is not the type of meeting we need in order to complete the response planning task.

It is our understanding that the Corps planned to send you the GRP draft that we used at the Feb. 8 meeting.  If you do not have it and would like to make arrangements to access it through a secure FTP site, let me know.  It is a very large file so I cannot email it.  We are working on further updates to the GRP and will have a new draft available to discuss on March 7.

Finally, as I have said many times before, if you have any information you believe would be helpful to completing the response planning, including any inaccuracies or omissions you have identified in the most recent GRP draft, please send them along before the next meeting.  The only thing we have so far along those lines is a letter you sent separately today from Chairman Faith.  It mentions certain "historic properties of Lakota and Dakota origin in low-lying areas along the Missouri River."  The letter adds that there needs to be an evaluation of the potential impacts of an oil spill and clean-up activities on those properties.

Can you please send us information about the location and nature of these sites?  The letter specifically mentions "Mad Bear I and II."  It would particularly helpful if you could send us a map showing where those properties are so that we can incorporate them (and other information you are able to share about them) into the response planning.  Based on the statement in the letter that "ETP personnel are not permitted on Tribal land for the purpose of conducting any field surveys, at this time," the information I am requesting is needed if we are going to keep sites like these "properly protected" and the "impacts mitigated," as the letter requests.

Thank you

 

C. Gus Borkland
VP- Environmental Projects & Emergency
Planning/Response
EHS&S
Energy Transfer Partners
4041 Market Street
Aston, PA 19014
O: 610.859.5419
C:  215.620.5934

**From:** Doug Crow Ghost [mailto:dcrowghost@standingrock.org]
**Sent:** Tuesday, February 27, 2018 5:27 PM
**To:** Borkland, Carl G <CARL.BORKLAND@energytransfer.com>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward
<eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>; dnelson@crstepd.org; Stasch, Eric D CIV USARMY
CENWO (US) <Eric.D.Stasch@usace.army.mil>; Everett Iron Eyes <EVERETT.IRONEYES@standingrock.org>; Cossette,
Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil>; Harlon, William D III CIV USARMY CENWO (US)
<William.D.Harlon@usace.army.mil>; Minter, Justin D <JUSTIN.MINTER@energytransfer.com>; Peter Capossela
<pcapossela@nu-world.com>; Dean DePountis <ddepountis@standingrock.org>; Janet Thomas
<jthomas@standingrock.org>; Feiock, Patrick D CIV USARMY CENWO (US) <Patrick.D.Feiock@usace.army.mil>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

Mr. Borkland -- Thank you for your email.  None of the information requested by the Tribe has been
provided to Chairman Faith. As stated to you previously, the Geographic Response Plan is only one
aspect of emergency planning.  Standing Rock would like ETP to provide the documentation
requested on all prior reported spills from ETP/Sunoco pipelines and the maximum spill estimate
prior to the meeting.

You stated that you would like to go to potential clean-up sites on the Reservation.  You will need
the Tribe's permission to enter the Reservation and to traverse Tribal land.

The first step should be a meeting between senior ETP/Sunoco officials and Chairman Faith in the
Tribal Council chambers.  Let us know the availability of ETP officials to travel to Fort Yates.  At
this point, the only permission granted to ETP to enter the Reservation is Chairman Faith's
invitation to meet with him in Tribal chambers.  The dates of March 6th are available.  No ETP
personnel will be permitted to enter the Reservation for any other purpose, until the proper
protocols are resolved.  Thank you.

**From:** Doug Crow Ghost
**Sent:** Tuesday, February 27, 2018 4:14 PM
**To:** 'Borkland, Carl G' <CARL.BORKLAND@energytransfer.com>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward

<eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>; dnelson@crstepd.org>; Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil>; Elliott Ward <eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>; dnelson@crstepd.org>; Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil>; Everett Iron Eyes <everett.ironeyes@standingrock.org>; Cossette, Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil>; Harlon, William D III CIV USARMY CENWO (US) <William.D.Harlon@usace.army.mil>; Minter, Justin D <JUSTIN.MINTER@energytransfer.com>; Peter Capossela <pcapossela@nu-world.com>; Dean DePountis <ddepountis@standingrock.org>; Janet Thomas <jthomas@standingrock.org>; Feiock, Patrick D CIV USARMY CENWO (US) <Patrick.D.Feiock@usace.army.mil>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

Let's do March 6th….chairman faith is in agreeance with this date.

**From:** Borkland, Carl G [mailto:CARL.BORKLAND@energytransfer.com]
**Sent:** Saturday, February 24, 2018 9:10 AM
**To:** Doug Crow Ghost <dcrowghost@standingrock.org>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward <eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>; dnelson@crstepd.org>; Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil>; Everett Iron Eyes <EVERETT.IRONEYES@standingrock.org>; Cossette, Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil>; Harlon, William D III CIV USARMY CENWO (US) <William.D.Harlon@usace.army.mil>; Minter, Justin D <JUSTIN.MINTER@energytransfer.com>; Peter Capossela <pcapossela@nu-world.com>; Dean DePountis <ddepountis@standingrock.org>; Janet Thomas <jthomas@standingrock.org>; Feiock, Patrick D CIV USARMY CENWO (US) <Patrick.D.Feiock@usace.army.mil>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

Good morning all,

At the meeting in Bismarck on February 8 neither Standing Rock nor Cheyenne River provided available dates for a meeting in March.  It's very important that we get this meeting scheduled.  So far we have had no input from either tribe on any of the drafts of the Geographic Response Plan or response planning more generally.

As I noted before, we propose to spend part of the March meeting visiting locations on the Standing Rock reservation that are relevant to response planning.  We also will use that meeting to review the latest draft of the GRP.  During that review we will be providing information relevant to response planning that the tribes requested in their earlier letters. This is something we are prepared to do on February 8.

Please let me know by Wednesday February 28, whether you are available to meet on either March 6, 7, or 8.

Thanks!

**From:** Borkland, Carl G
**Sent:** Monday, February 5, 2018 9:03 AM
**To:** Doug Crow Ghost <dcrowghost@standingrock.org>

**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward <eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>; dnelson@crstepd.org; Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil>; Everett Iron Eyes <EVERETT.IRONEYES@standingrock.org>; Cossette, Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil>; Harlon, William D III CIV USARMY CENWO (US) <William.D.Harlon@usace.army.mil>; Minter, Justin D <JUSTIN.MINTER@energytransfer.com>; Peter Capossela <pcapossela@nu-world.com>; Dean DePountis <ddepountis@standingrock.org>; Janet Thomas <jthomas@standingrock.org>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

Thanks for your email Doug. Because our travel plans and logistics have already been set, we are still planning on meeting in Bismarck this Thursday, February 8 to continue our Lake Oahe spill planning. We will start the meeting at 9:00 to allow your team to travel to Bismarck. But if you arrive later, that is fine. We will just continue our meeting after you arrive.  If either Standing Rock or Cheyenne River are able to attend, please let us know so we can make sure we have ample room.

We would also like to schedule another meeting in March in Bismarck.  This meeting would be a plan review meeting, but we would be happy to travel to Standing Rock to review some of the tactical response planning areas. Please let us know if any of these dates work for you:

March 6, 7, 8, 13, or 14

Thanks!

 

C. Gus Borkland
VP- Environmental Projects & Emergency Planning/Response
EHS&S
Energy Transfer Partners
4041 Market Street
Aston, PA 19014
O: 610.859.5419
C:  215.620.5934

---

**From:** Doug Crow Ghost [mailto:dcrowghost@standingrock.org]
**Sent:** Friday, February 2, 2018 4:06 PM
**To:** Borkland, Carl G <CARL.BORKLAND@energytransfer.com>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward <eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>; dnelson@crstepd.org; Stasch, Eric D CIV USARMY

CENWO (US) <Eric.D.Stasch@usace.army.mil>; Everett Iron Eyes <EVERETT.IRONEYES@standingrock.org>; Cossette, Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil>; Harlon, William D III CIV USARMY CENWO (US) <William.D.Harlon@usace.army.mil>; Minter, Justin D <JUSTIN.MINTER@energytransfer.com>; Peter Capossela <pcapossela@nu-world.com>; Dean DePountis <ddepountis@standingrock.org>; Janet Thomas <jthomas@standingrock.org>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

Mr. Borkland

Per Chairman Mike Faith letter, which is attached to this email, the SRST cordially invites Energy Transfer Partners for a meaningful discussion.
Thanks.

### Errol D CrowGhost Jr
Standing Rock Sioux Tribe
Department of Water Resources
Water Administrator
P.O. Box D
Fort Yates, ND. 58538
7018548534 wk
6058483919 cell
dcrowghost@standingrock.org



CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient's and may contain confidential or proprietary information covered by the Electronics Communication Privacy Act, 18 U.S.C. Sections 2510-2521. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, immediately contact the sender by reply e-mail and destroy all copies of the original message

**From:** Borkland, Carl G [mailto:CARL.BORKLAND@energytransfer.com]
**Sent:** Friday, January 26, 2018 2:47 PM
**To:** Doug Crow Ghost <dcrowghost@standingrock.org>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward <eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>; dnelson@crstepd.org; Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil>; Cossette, Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil>; Harlon, William D III CIV USARMY CENWO (US) <William.D.Harlon@usace.army.mil>; Minter, Justin D <JUSTIN.MINTER@energytransfer.com>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

All

I am following up to make sure we have a meeting on the calendar for February.  The Corps has confirmed availability on February 8.  We have not heard from either Tribe.  Please advise whether you can attend a February 8 meeting.

We plan to hold the meeting at the same facility as the January 11 meeting. That is the Hampton Inn located at 2020 Schafer Drive, Bismarck, ND.

Thank you very much and have a great weekend.

---

**From:** Borkland, Carl G
**Sent:** Friday, January 12, 2018 5:04 PM
**To:** 'Doug Crow Ghost' <dcrowghost@standingrock.org>
**Cc:** 'Todd.J.Lindquist@usace.army.mil' <Todd.J.Lindquist@usace.army.mil>; 'Stasch, Eric D NWO' <Eric.D.Stasch@usace.army.mil>; 'Elliott Ward' <eward@standingrock.org>; 'Mike Faith' <mfaith@standingrock.org>; 'dnelson@crstepd.org' <dnelson@crstepd.org>; 'Stasch, Eric D CIV USARMY CENWO (US)' <Eric.D.Stasch@usace.army.mil>; 'Cossette, Brent J CIV USARMY CENWO (US)' <Brent.J.Cossette@usace.army.mil>; 'Harlon, William D III CIV USARMY CENWO (US)' <William.D.Harlon@usace.army.mil>; MINTER, JUSTIN D <JUSTIN.MINTER@energytransfer.com>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

All:

Three of us from Dakota Access and one of our response planning consultant representatives had a productive multi-hour meeting with three representatives from the Corps on Jan. 11.  We received very helpful input from the Corps and will continue to work on gathering relevant information.  We will want to go over all of it with both tribes when we meet in February to get your additional input.

As I have said before, if there is any information that either tribe wants us to consider in the meantime based on your review of the existing drafts of the Geographic Response Plan or the Facility Response Plan, please feel free to send that to us before we meet in February.  This includes any errors or relevant omissions that you have identified in either plan.  One takeaway from Thursday's meeting is that we have our work cut out for us if we are going to have the best possible response plan ready by the April 1 deadline.  We expect to need at least two more meetings to accomplish that.  The sooner we get input from the tribes the better.

We have not heard back from either tribe on availability in February.  Our preferred date is February 8.  Other available dates for Dakota Access are

February 6, 7, or 9.  We should plan for several hours so that we have the opportunity to make site visits to locations relevant to spill planning.  Please let us know your availability as soon as possible.  April 1 will be here before we know it.

Thank you and have a nice weekend!

 

C. Gus Borkland
VP- Environmental Projects & Emergency Planning/Response
EHS&S
Energy Transfer Partners
4041 Market Street
Aston, PA 19014
O: 610.859.5419
C:  215.620.5934

---

**From:** BORKLAND, CARL G
**Sent:** Friday, January 05, 2018 4:15 PM
**To:** 'Doug Crow Ghost' <dcrowghost@standingrock.org>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward <eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>; 'dnelson@crstepd.org' <dnelson@crstepd.org>; Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil>; Cossette, Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil>; Harlon, William D III CIV USARMY CENWO (US) <William.D.Harlon@usace.army.mil>; MINTER, JUSTIN D <JUSTIN.MINTER@energytransfer.com>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

Hello Errol:

Thank you for your email and letter.  We look forward to the chance to meet in February.  Because of the time constraints, we will go ahead and proceed with our response planning efforts in the meantime while we wait for tribal input.  I am also copying the Corps and Cheyenne River to bring them up to speed on meeting planning.

Dakota Access and the Corps will go ahead with our plan to meet this month in Bismarck.  Details are below.  If Cheyenne River wishes to attend (and Standing Rock is still welcome as well), please send me the names of those who will be there.  Please also provide some dates in February that will work for another meeting.  And, as I have said before, feel free in the meantime to send me whatever information you believe is appropriate to assist in response planning.  As you all

know, we have an April 1 deadline for the parties to coordinate to finalize an oil-spill response plan affecting Tribal resources and lands at Lake Oahe.

Here are the logistics for the meeting next week:

Date:  January 11, 2018

Time:  8:00AM

Location:  Hampton Inn, 2020 Schafer Drive, Bismarck, ND 58501

Thank you very much!

 

C. Gus Borkland
VP- Environmental Projects & Emergency Planning/Response
EHS&S
Energy Transfer Partners
4041 Market Street
Aston, PA 19014
O: 610.859.5419
C:  215.620.5934

---

**From:** Doug Crow Ghost [mailto:dcrowghost@standingrock.org]
**Sent:** Thursday, January 04, 2018 5:30 PM
**To:** BORKLAND, CARL G <CARL.BORKLAND@energytransfer.com>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward <eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>
**Subject:** Emergency Planning Meeting SRST/ETP/ACOE

Good Day Everyone,

Hope everyone had a great new year celebration and is looking forward to a great 2018!

Here is a letter from Chairman Mike Faith to Mr. Borkland for the planning of the Lake Oahe River Crossing.

The date for the SRST to be available for a meeting with ETP and ACOE will be in February.

Thanks!

**Errol D CrowGhost Jr**
Standing Rock Sioux Tribe
Department of Water Resources
Water Administrator
P.O. Box D
Fort Yates, ND. 58538
7018548534 wk
6058483919 cell
dcrowghost@standingrock.org



CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient's and may contain confidential or proprietary information covered by the Electronics Communication Privacy Act, 18 U.S.C. Sections 2510-2521. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, immediately contact the sender by reply e-mail and destroy all copies of the original message

Private and confidential as detailed here. If you cannot access hyperlink, please e-mail sender.

# ATTACHMENT 19

| | |
|---|---|
| **From:** | Borkland, Carl G <CARL.BORKLAND@energytransfer.com> |
| **Sent:** | Wednesday, March 7, 2018 11:08 AM |
| **To:** | Doug Crow Ghost |
| **Cc:** | Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO; Elliott Ward; Mike Faith; dnelson@crstepd.org; Stasch, Eric D CIV USARMY CENWO (US); Everett Iron Eyes; Cossette, Brent J CIV USARMY CENWO (US); Harlon, William D III CIV USARMY CENWO (US); Minter, Justin D; Peter Capossela; Dean DePountis; Janet Thomas; Feiock, Patrick D CIV USARMY CENWO (US) |
| **Subject:** | RE: Emergency Planning Meeting SRST/ETP/ACOE |

We have started the meeting at the Ramada Inn.  Details are below.

---

**From:** Borkland, Carl G
**Sent:** Thursday, March 1, 2018 8:56 AM
**To:** 'Doug Crow Ghost' <dcrowghost@standingrock.org>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward <eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>; dnelson@crstepd.org; Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil>; Everett Iron Eyes <EVERETT.IRONEYES@standingrock.org>; Cossette, Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil>; Harlon, William D III CIV USARMY CENWO (US) <William.D.Harlon@usace.army.mil>; Minter, Justin D <JUSTIN.MINTER@energytransfer.com>; Peter Capossela <pcapossela@nu-world.com>; Dean DePountis <ddepountis@standingrock.org>; Janet Thomas <jthomas@standingrock.org>; Feiock, Patrick D CIV USARMY CENWO (US) <Patrick.D.Feiock@usace.army.mil>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

Thank you for your email Doug.  As you know, the Geographic Response Plan is due to the court on April 1 – one month from today.  Dakota Access and the Corps have held two response planning meetings so far.  The tribes did not attend the first, held Jan. 11.  They appeared at the second, held Feb. 8, only long enough to deliver (and, in Standing Rock's case, read aloud) letters requesting information, among other things.  We are confirming availability to meet March 7.

To the extent the Tribes have requested information relevant to response planning, we are prepared to go over that information at the March meeting, just as were prepared to do so at the Feb. 8 meeting.  In fact, the draft GRP that we had available at the Feb. 8 meeting and that we will be discussing at the March 7 meeting includes a discussion of remote monitoring and SCADA systems, as well as safety data sheets showing the composition of Bakken Crude (including flammability and toxicity).  On February 8, we were also prepared to explain (1) how portions of the Facility Response Plan relevant to response planning at Lake Oahe have been incorporated into the GRP; (2) the location and operation of shut-off valves near Lake Oahe; (3) the results of an unannounced emergency response equipment deployment exercise at Lake Oahe in October 2017 with an

initial response of just one hour and full response within 3½ hours; and (4) the approximate number and locations of personnel who would respond to a spill or leak at Lake Oahe.

At the March 7 meeting we are prepared to show and explain, in addition to all of that, the results of the recent spill modeling and discuss how those results are informing the response planning.  You asked about maximum spill estimates.  You have the original spill model with a worst case discharge of more than 12,000 barrels.  The more recent modeling includes a comparable amount as the worst case spill scenario, among other scenarios.  You asked for documentation about other spills at other locations.  We do not believe that information is necessary or relevant to planning at Lake Oahe.  We are open to revisit our view on that after we have met on March 7 and gone over the GRP and the other information I just previewed.

We will not enter the reservation without Standing Rock's permission.  We will be meeting March 7 at the Ramada, 1400 E. Interchange Ave, Bismarck ND 58501.  We will start at 9:00 a.m. local time.  This will be a meeting of persons from each party who are involved in the emergency response planning.  We strongly believe that this is the sort of meeting needed to get the GRP completed by April 1.  Both tribes have instead requested meetings on their separate reservations.  You are asking for senior ETP/Sunoco officials to meet with tribal leaders.  Respectfully, that is not the type of meeting we need in order to complete the response planning task.

It is our understanding that the Corps planned to send you the GRP draft that we used at the Feb. 8 meeting.  If you do not have it and would like to make arrangements to access it through a secure FTP site, let me know.  It is a very large file so I cannot email it.  We are working on further updates to the GRP and will have a new draft available to discuss on March 7.

Finally, as I have said many times before, if you have any information you believe would be helpful to completing the response planning, including any inaccuracies or omissions you have identified in the most recent GRP draft, please send them along before the next meeting.  The only thing we have so far along those lines is a letter you sent separately today from Chairman Faith.  It mentions certain "historic properties of Lakota and Dakota origin in low-lying areas along the Missouri River."  The letter adds that there needs to be an evaluation of the potential impacts of an oil spill and clean-up activities on those properties.

Can you please send us information about the location and nature of these sites?  The letter specifically mentions "Mad Bear I and II."  It would particularly

helpful if you could send us a map showing where those properties are so that we can incorporate them (and other information you are able to share about them) into the response planning.  Based on the statement in the letter that "ETP personnel are not permitted on Tribal land for the purpose of conducting any field surveys, at this time," the information I am requesting is needed if we are going to keep sites like these "properly protected" and the "impacts mitigated," as the letter requests.

Thank you

 

C. Gus Borkland
VP- Environmental Projects & Emergency
Planning/Response
EHS&S
Energy Transfer Partners
4041 Market Street
Aston, PA 19014
O: 610.859.5419
C:  215.620.5934

**From:** Doug Crow Ghost [mailto:dcrowghost@standingrock.org]
**Sent:** Tuesday, February 27, 2018 5:27 PM
**To:** Borkland, Carl G <CARL.BORKLAND@energytransfer.com>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward <eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>; dnelson@crstepd.org; Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil>; Everett Iron Eyes <EVERETT.IRONEYES@standingrock.org>; Cossette, Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil>; Harlon, William D III CIV USARMY CENWO (US) <William.D.Harlon@usace.army.mil>; Minter, Justin D <JUSTIN.MINTER@energytransfer.com>; Peter Capossela <pcapossela@nu-world.com>; Dean DePountis <ddepountis@standingrock.org>; Janet Thomas <jthomas@standingrock.org>; Feiock, Patrick D CIV USARMY CENWO (US) <Patrick.D.Feiock@usace.army.mil>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

Mr. Borkland -- Thank you for your email.  None of the information requested by the Tribe has been provided to Chairman Faith.  As stated to you previously, the Geographic Response Plan is only one aspect of emergency planning.  Standing Rock would like ETP to provide the documentation requested on all prior reported spills from ETP/Sunoco pipelines and the maximum spill estimate prior to the meeting.

You stated that you would like to go to potential clean-up sites on the Reservation.  You will need the Tribe's permission to enter the Reservation and to traverse Tribal land.

The first step should be a meeting between senior ETP/Sunoco officials and Chairman Faith in the Tribal Council chambers.  Let us know the availability of ETP officials to travel to Fort Yates.  At this point, the only permission granted to ETP to enter the Reservation is Chairman Faith's invitation to meet with him in Tribal chambers.  The dates of March 6th are available.  No ETP personnel will be permitted to enter the Reservation for any other purpose, until the proper protocols are resolved.  Thank you.

---

**From:** Doug Crow Ghost
**Sent:** Tuesday, February 27, 2018 4:14 PM
**To:** 'Borkland, Carl G' <CARL.BORKLAND@energytransfer.com>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward <eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>; dnelson@crstepd.org; Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil>; Everett Iron Eyes <everett.ironeyes@standingrock.org>; Cossette, Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil>; Harlon, William D III CIV USARMY CENWO (US) <William.D.Harlon@usace.army.mil>; Minter, Justin D <JUSTIN.MINTER@energytransfer.com>; Peter Capossela <pcapossela@nu-world.com>; Dean DePountis <ddepountis@standingrock.org>; Janet Thomas <jthomas@standingrock.org>; Feiock, Patrick D CIV USARMY CENWO (US) <Patrick.D.Feiock@usace.army.mil>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

Let's do March 6th....chairman faith is in agreeance with this date.

---

**From:** Borkland, Carl G [mailto:CARL.BORKLAND@energytransfer.com]
**Sent:** Saturday, February 24, 2018 9:10 AM
**To:** Doug Crow Ghost <dcrowghost@standingrock.org>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward <eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>; dnelson@crstepd.org; Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil>; Everett Iron Eyes <EVERETT.IRONEYES@standingrock.org>; Cossette, Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil>; Harlon, William D III CIV USARMY CENWO (US) <William.D.Harlon@usace.army.mil>; Minter, Justin D <JUSTIN.MINTER@energytransfer.com>; Peter Capossela <pcapossela@nu-world.com>; Dean DePountis <ddepountis@standingrock.org>; Janet Thomas <jthomas@standingrock.org>; Feiock, Patrick D CIV USARMY CENWO (US) <Patrick.D.Feiock@usace.army.mil>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

Good morning all,

At the meeting in Bismarck on February 8 neither Standing Rock nor Cheyenne River provided available dates for a meeting in March.  It's very important that we get this meeting scheduled.  So far we have had no input from either tribe on any of the drafts of the Geographic Response Plan or response planning more generally.

As I noted before, we propose to spend part of the March meeting visiting locations on the Standing Rock reservation that are relevant to response planning.  We also will use that meeting to review the latest draft of the GRP.  During that review we will be providing information relevant to response planning that the tribes requested in their earlier letters. This is something we are prepared to do on February 8.

Please let me know by Wednesday February 28, whether you are available to meet on either March 6, 7, or 8.

Thanks!

---

**From:** Borkland, Carl G
**Sent:** Monday, February 5, 2018 9:03 AM
**To:** Doug Crow Ghost <dcrowghost@standingrock.org>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward <eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>; dnelson@crstepd.org; Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil>; Everett Iron Eyes <EVERETT.IRONEYES@standingrock.org>; Cossette, Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil>; Harlon, William D III CIV USARMY CENWO (US) <William.D.Harlon@usace.army.mil>; Minter, Justin D <JUSTIN.MINTER@energytransfer.com>; Peter Capossela <pcapossela@nu-world.com>; Dean DePountis <ddepountis@standingrock.org>; Janet Thomas <jthomas@standingrock.org>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

Thanks for your email Doug. Because our travel plans and logistics have already been set, we are still planning on meeting in Bismarck this Thursday, February 8 to continue our Lake Oahe spill planning. We will start the meeting at 9:00 to allow your team to travel to Bismarck. But if you arrive later, that is fine. We will just continue our meeting after you arrive.  If either Standing Rock or Cheyenne River are able to attend, please let us know so we can make sure we have ample room.

We would also like to schedule another meeting in March in Bismarck.  This meeting would be a plan review meeting, but we would be happy to travel to Standing Rock to review some of the tactical response planning areas. Please let us know if any of these dates work for you:

March 6, 7, 8, 13, or 14

Thanks!

 

C. Gus Borkland
VP- Environmental Projects & Emergency
Planning/Response
EHS&S
Energy Transfer Partners
4041 Market Street
Aston, PA 19014
O: 610.859.5419
C:  215.620.5934

---

**From:** Doug Crow Ghost [mailto:dcrowghost@standingrock.org]
**Sent:** Friday, February 2, 2018 4:06 PM
**To:** Borkland, Carl G <CARL.BORKLAND@energytransfer.com>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward <eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>; dnelson@crstepd.org; Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil>; Everett Iron Eyes <EVERETT.IRONEYES@standingrock.org>; Cossette, Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil>; Harlon, William D III CIV USARMY CENWO (US) <William.D.Harlon@usace.army.mil>; Minter, Justin D <JUSTIN.MINTER@energytransfer.com>; Peter Capossela <pcapossela@nu-world.com>; Dean DePountis <ddepountis@standingrock.org>; Janet Thomas <jthomas@standingrock.org>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

Mr. Borkland

Per Chairman Mike Faith letter, which is attached to this email, the SRST cordially invites Energy Transfer Partners for a meaningful discussion.
Thanks.

## Errol D CrowGhost Jr
Standing Rock Sioux Tribe
Department of Water Resources
Water Administrator
P.O. Box D
Fort Yates, ND. 58538
7018548534 wk
6058483919 cell
dcrowghost@standingrock.org



CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient's and may contain confidential or proprietary information covered by the Electronics Communication Privacy Act, 18 U.S.C. Sections 2510-2521. Any unauthorized review,

use, disclosure or distribution is prohibited. If you are not the intended recipient, immediately contact the sender by reply e-mail and destroy all copies of the original message

---

**From:** Borkland, Carl G [mailto:CARL.BORKLAND@energytransfer.com]
**Sent:** Friday, January 26, 2018 2:47 PM
**To:** Doug Crow Ghost <dcrowghost@standingrock.org>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward <eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>; dnelson@crstepd.org>; Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil>; Cossette, Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil>; Harlon, William D III CIV USARMY CENWO (US) <William.D.Harlon@usace.army.mil>; Minter, Justin D <JUSTIN.MINTER@energytransfer.com>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

All

I am following up to make sure we have a meeting on the calendar for February.  The Corps has confirmed availability on February 8.  We have not heard from either Tribe.  Please advise whether you can attend a February 8 meeting.

We plan to hold the meeting at the same facility as the January 11 meeting. That is the Hampton Inn located at 2020 Schafer Drive, Bismarck, ND.

Thank you very much and have a great weekend.

---

**From:** Borkland, Carl G
**Sent:** Friday, January 12, 2018 5:04 PM
**To:** 'Doug Crow Ghost' <dcrowghost@standingrock.org>
**Cc:** 'Todd.J.Lindquist@usace.army.mil' <Todd.J.Lindquist@usace.army.mil>; 'Stasch, Eric D NWO' <Eric.D.Stasch@usace.army.mil>; 'Elliott Ward' <eward@standingrock.org>; 'Mike Faith' <mfaith@standingrock.org>; 'dnelson@crstepd.org' <dnelson@crstepd.org>; 'Stasch, Eric D CIV USARMY CENWO (US)' <Eric.D.Stasch@usace.army.mil>; 'Cossette, Brent J CIV USARMY CENWO (US)' <Brent.J.Cossette@usace.army.mil>; 'Harlon, William D III CIV USARMY CENWO (US)' <William.D.Harlon@usace.army.mil>; MINTER, JUSTIN D <JUSTIN.MINTER@energytransfer.com>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

All:

Three of us from Dakota Access and one of our response planning consultant representatives had a productive multi-hour meeting with three representatives from the Corps on Jan. 11.  We received very helpful input from the Corps and will continue to work on gathering relevant information.  We will want to go over all of it with both tribes when we meet in February to get your additional input.

As I have said before, if there is any information that either tribe wants us to consider in the meantime based on your review of the existing drafts of the Geographic Response Plan or the Facility Response Plan, please feel free to send that to us before we meet in February.  This includes any errors or relevant omissions that you have identified in either plan.  One takeaway from Thursday's meeting is that we have our work cut out for us if we are going to have the best possible response plan ready by the April 1 deadline.  We expect to need at least two more meetings to accomplish that.  The sooner we get input from the tribes the better.

We have not heard back from either tribe on availability in February.  Our preferred date is February 8.  Other available dates for Dakota Access are February 6, 7, or 9.  We should plan for several hours so that we have the opportunity to make site visits to locations relevant to spill planning.  Please let us know your availability as soon as possible.  April 1 will be here before we know it.

Thank you and have a nice weekend!




C. Gus Borkland
VP- Environmental Projects & Emergency Planning/Response
EHS&S
Energy Transfer Partners
4041 Market Street
Aston, PA 19014
O: 610.859.5419
C:  215.620.5934

**From:** BORKLAND, CARL G
**Sent:** Friday, January 05, 2018 4:15 PM
**To:** 'Doug Crow Ghost' <dcrowghost@standingrock.org>
**Cc:** Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward <eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>; 'dnelson@crstepd.org' <dnelson@crstepd.org>; Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil>; Cossette, Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil>; Harlon, William D III CIV USARMY CENWO (US) <William.D.Harlon@usace.army.mil>; MINTER, JUSTIN D <JUSTIN.MINTER@energytransfer.com>
**Subject:** RE: Emergency Planning Meeting SRST/ETP/ACOE

Hello Errol:

Thank you for your email and letter.  We look forward to the chance to meet in February.  Because of the time constraints, we will go ahead and proceed with our response planning efforts in the meantime while we wait for tribal input.  I am also copying the Corps and Cheyenne River to bring them up to speed on meeting planning.

Dakota Access and the Corps will go ahead with our plan to meet this month in Bismarck.  Details are below.  If Cheyenne River wishes to attend (and Standing Rock is still welcome as well), please send me the names of those who will be there.  Please also provide some dates in February that will work for another meeting.  And, as I have said before, feel free in the meantime to send me whatever information you believe is appropriate to assist in response planning.  As you all know, we have an April 1 deadline for the parties to coordinate to finalize an oil-spill response plan affecting Tribal resources and lands at Lake Oahe.

Here are the logistics for the meeting next week:

Date:  January 11, 2018

Time:  8:00AM

Location:  Hampton Inn, 2020 Schafer Drive, Bismarck, ND 58501

Thank you very much!

 

C. Gus Borkland
VP- Environmental Projects & Emergency Planning/Response
EHS&S
Energy Transfer Partners
4041 Market Street
Aston, PA 19014
O: 610.859.5419
C:  215.620.5934

---

**From:** Doug Crow Ghost [mailto:dcrowghost@standingrock.org]
**Sent:** Thursday, January 04, 2018 5:30 PM
**To:** BORKLAND, CARL G <CARL.BORKLAND@energytransfer.com>

Cc: Todd.J.Lindquist@usace.army.mil; Stasch, Eric D NWO <Eric.D.Stasch@usace.army.mil>; Elliott Ward <eward@standingrock.org>; Mike Faith <mfaith@standingrock.org>
**Subject:** Emergency Planning Meeting SRST/ETP/ACOE

Good Day Everyone,

Hope everyone had a great new year celebration and is looking forward to a great 2018!

Here is a letter from Chairman Mike Faith to Mr. Borkland for the planning of the Lake Oahe River Crossing.

The date for the SRST to be available for a meeting with ETP and ACOE will be in February.

Thanks!

### Errol D CrowGhost Jr
Standing Rock Sioux Tribe
Department of Water Resources
Water Administrator
P.O. Box D
Fort Yates, ND. 58538
7018548534 wk
6058483919 cell
dcrowghost@standingrock.org



CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient's and may contain confidential or proprietary information covered by the Electronics Communication Privacy Act, 18 U.S.C. Sections 2510-2521. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, immediately contact the sender by reply e-mail and destroy all copies of the original message

Private and confidential as detailed here. If you cannot access hyperlink, please e-mail sender.

# ATTACHMENT 20

| | |
|---|---|
| **From:** | Doug Crow Ghost <dcrowghost@standingrock.org> |
| **Sent:** | Wednesday, March 7, 2018 11:39 AM |
| **To:** | Borkland, Carl G |
| **Subject:** | Re: Emergency Planning Meeting SRST/ETP/ACOE |
| **Attachments:** | image001.gif; image003.png; image004.jpg; image005.jpg; image006.png; image007.jpg |

I'm in tribal council this morning waiting on a resolution that I will be sending to you after it passes.
Thank you

Sent from my iPhone

On Mar 7, 2018, at 10:11 AM, Borkland, Carl G
<CARL.BORKLAND@energytransfer.com<mailto:CARL.BORKLAND@energytransfer.com>> wrote:

<image001.gif>
We have started the meeting at the Ramada Inn.  Details are below.

From: Borkland, Carl G
Sent: Thursday, March 1, 2018 8:56 AM
To: 'Doug Crow Ghost' <dcrowghost@standingrock.org<mailto:dcrowghost@standingrock.org>>
Cc: Todd.J.Lindquist@usace.army.mil<mailto:Todd.J.Lindquist@usace.army.mil>; Stasch, Eric D NWO
<Eric.D.Stasch@usace.army.mil<mailto:Eric.D.Stasch@usace.army.mil>>; Elliott Ward
<eward@standingrock.org<mailto:eward@standingrock.org>>; Mike Faith
<mfaith@standingrock.org<mailto:mfaith@standingrock.org>>; dnelson@crstepd.org<mailto:dnelson@crstepd.org>;
Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil<mailto:Eric.D.Stasch@usace.army.mil>>;
Everett Iron Eyes <EVERETT.IRONEYES@standingrock.org<mailto:EVERETT.IRONEYES@standingrock.org>>; Cossette,
Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil<mailto:Brent.J.Cossette@usace.army.mil>>;
Harlon, William D III CIV USARMY CENWO (US)
<William.D.Harlon@usace.army.mil<mailto:William.D.Harlon@usace.army.mil>>; Minter, Justin D
<JUSTIN.MINTER@energytransfer.com<mailto:JUSTIN.MINTER@energytransfer.com>>; Peter Capossela
<pcapossela@nu-world.com<mailto:pcapossela@nu-world.com>>; Dean DePountis
<ddepountis@standingrock.org<mailto:ddepountis@standingrock.org>>; Janet Thomas
<jthomas@standingrock.org<mailto:jthomas@standingrock.org>>; Feiock, Patrick D CIV USARMY CENWO (US)
<Patrick.D.Feiock@usace.army.mil<mailto:Patrick.D.Feiock@usace.army.mil>>
Subject: RE: Emergency Planning Meeting SRST/ETP/ACOE

Thank you for your email Doug.  As you know, the Geographic Response Plan is due to the court on April 1 – one month
from today.  Dakota Access and the Corps have held two response planning meetings so far.  The tribes did not attend
the first, held Jan. 11.  They appeared at the second, held Feb. 8, only long enough to deliver (and, in Standing Rock's
case, read aloud) letters requesting information, among other things.  We are confirming availability to meet March 7.

To the extent the Tribes have requested information relevant to response planning, we are prepared to go over that
information at the March meeting, just as were prepared to do so at the Feb. 8 meeting.  In fact, the draft GRP that we
had available at the Feb. 8 meeting and that we will be discussing at the March 7 meeting includes a discussion of
remote monitoring and SCADA systems, as well as safety data sheets showing the composition of Bakken Crude
(including flammability and toxicity).  On February 8, we were also prepared to explain (1) how portions of the Facility

Response Plan relevant to response planning at Lake Oahe have been incorporated into the GRP; (2) the location and operation of shut-off valves near Lake Oahe; (3) the results of an unannounced emergency response equipment deployment exercise at Lake Oahe in October 2017 with an initial response of just one hour and full response within 3½ hours; and (4) the approximate number and locations of personnel who would respond to a spill or leak at Lake Oahe.

At the March 7 meeting we are prepared to show and explain, in addition to all of that, the results of the recent spill modeling and discuss how those results are informing the response planning.  You asked about maximum spill estimates.  You have the original spill model with a worst case discharge of more than 12,000 barrels.  The more recent modeling includes a comparable amount as the worst case spill scenario, among other scenarios.  You asked for documentation about other spills at other locations.  We do not believe that information is necessary or relevant to planning at Lake Oahe.  We are open to revisit our view on that after we have met on March 7 and gone over the GRP and the other information I just previewed.

We will not enter the reservation without Standing Rock's permission.  We will be meeting March 7 at the Ramada, 1400 E. Interchange Ave, Bismarck ND 58501.  We will start at 9:00 a.m. local time.  This will be a meeting of persons from each party who are involved in the emergency response planning.  We strongly believe that this is the sort of meeting needed to get the GRP completed by April 1.  Both tribes have instead requested meetings on their separate reservations.  You are asking for senior ETP/Sunoco officials to meet with tribal leaders.  Respectfully, that is not the type of meeting we need in order to complete the response planning task.

It is our understanding that the Corps planned to send you the GRP draft that we used at the Feb. 8 meeting.  If you do not have it and would like to make arrangements to access it through a secure FTP site, let me know.  It is a very large file so I cannot email it.  We are working on further updates to the GRP and will have a new draft available to discuss on March 7.

Finally, as I have said many times before, if you have any information you believe would be helpful to completing the response planning, including any inaccuracies or omissions you have identified in the most recent GRP draft, please send them along before the next meeting.  The only thing we have so far along those lines is a letter you sent separately today from Chairman Faith.  It mentions certain "historic properties of Lakota and Dakota origin in low-lying areas along the Missouri River."  The letter adds that there needs to be an evaluation of the potential impacts of an oil spill and clean-up activities on those properties.

Can you please send us information about the location and nature of these sites?  The letter specifically mentions "Mad Bear I and II."  It would particularly helpful if you could send us a map showing where those properties are so that we can incorporate them (and other information you are able to share about them) into the response planning.  Based on the statement in the letter that "ETP personnel are not permitted on Tribal land for the purpose of conducting any field surveys, at this time," the information I am requesting is needed if we are going to keep sites like these "properly protected" and the "impacts mitigated," as the letter requests.

Thank you

<image003.png>

<image004.jpg>

C. Gus Borkland
VP- Environmental Projects & Emergency Planning/Response EHS&S Energy Transfer Partners

4041 Market Street
Aston, PA 19014

O: 610.859.5419
C:  215.620.5934

From: Doug Crow Ghost [mailto:dcrowghost@standingrock.org]
Sent: Tuesday, February 27, 2018 5:27 PM
To: Borkland, Carl G <CARL.BORKLAND@energytransfer.com<mailto:CARL.BORKLAND@energytransfer.com>>
Cc: Todd.J.Lindquist@usace.army.mil<mailto:Todd.J.Lindquist@usace.army.mil>; Stasch, Eric D NWO
<Eric.D.Stasch@usace.army.mil<mailto:Eric.D.Stasch@usace.army.mil>>; Elliott Ward
<eward@standingrock.org<mailto:eward@standingrock.org>>; Mike Faith
<mfaith@standingrock.org<mailto:mfaith@standingrock.org>>; dnelson@crstepd.org<mailto:dnelson@crstepd.org>;
Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil<mailto:Eric.D.Stasch@usace.army.mil>>;
Everett Iron Eyes <EVERETT.IRONEYES@standingrock.org<mailto:EVERETT.IRONEYES@standingrock.org>>; Cossette,
Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil<mailto:Brent.J.Cossette@usace.army.mil>>;
Harlon, William D III CIV USARMY CENWO (US)
<William.D.Harlon@usace.army.mil<mailto:William.D.Harlon@usace.army.mil>>; Minter, Justin D
<JUSTIN.MINTER@energytransfer.com<mailto:JUSTIN.MINTER@energytransfer.com>>; Peter Capossela
<pcapossela@nu-world.com<mailto:pcapossela@nu-world.com>>; Dean DePountis
<ddepountis@standingrock.org<mailto:ddepountis@standingrock.org>>; Janet Thomas
<jthomas@standingrock.org<mailto:jthomas@standingrock.org>>; Feiock, Patrick D CIV USARMY CENWO (US)
<Patrick.D.Feiock@usace.army.mil<mailto:Patrick.D.Feiock@usace.army.mil>>
Subject: RE: Emergency Planning Meeting SRST/ETP/ACOE

Mr. Borkland -- Thank you for your email.  None of the information requested by the Tribe has been provided to
Chairman Faith. As stated to you previously, the Geographic Response Plan is only one aspect of emergency planning.
Standing Rock would like ETP to provide the documentation requested on all prior reported spills from ETP/Sunoco
pipelines and the maximum spill estimate prior to the meeting.

You stated that you would like to go to potential clean-up sites on the Reservation.  You will need the Tribe's permission
to enter the Reservation and to traverse Tribal land.

The first step should be a meeting between senior ETP/Sunoco officials and Chairman Faith in the Tribal Council
chambers.  Let us know the availability of ETP officials to travel to Fort Yates.  At this point, the only permission granted
to ETP to enter the Reservation is Chairman Faith's invitation to meet with him in Tribal chambers.  The dates of March

6th are available.  No ETP personnel will be permitted to enter the Reservation for any other purpose, until the proper protocols are resolved.  Thank you.

From: Doug Crow Ghost
Sent: Tuesday, February 27, 2018 4:14 PM
To: 'Borkland, Carl G' <CARL.BORKLAND@energytransfer.com<mailto:CARL.BORKLAND@energytransfer.com>>
Cc: Todd.J.Lindquist@usace.army.mil<mailto:Todd.J.Lindquist@usace.army.mil>; Stasch, Eric D NWO
<Eric.D.Stasch@usace.army.mil<mailto:Eric.D.Stasch@usace.army.mil>>; Elliott Ward
<eward@standingrock.org<mailto:eward@standingrock.org>>; Mike Faith
<mfaith@standingrock.org<mailto:mfaith@standingrock.org>>; dnelson@crstepd.org<mailto:dnelson@crstepd.org>;
Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil<mailto:Eric.D.Stasch@usace.army.mil>>;
Everett Iron Eyes <everett.ironeyes@standingrock.org<mailto:everett.ironeyes@standingrock.org>>; Cossette, Brent J
CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil<mailto:Brent.J.Cossette@usace.army.mil>>; Harlon,
William D III CIV USARMY CENWO (US) <William.D.Harlon@usace.army.mil<mailto:William.D.Harlon@usace.army.mil>>;
Minter, Justin D <JUSTIN.MINTER@energytransfer.com<mailto:JUSTIN.MINTER@energytransfer.com>>; Peter Capossela
<pcapossela@nu-world.com<mailto:pcapossela@nu-world.com>>; Dean DePountis
<ddepountis@standingrock.org<mailto:ddepountis@standingrock.org>>; Janet Thomas
<jthomas@standingrock.org<mailto:jthomas@standingrock.org>>; Feiock, Patrick D CIV USARMY CENWO (US)
<Patrick.D.Feiock@usace.army.mil<mailto:Patrick.D.Feiock@usace.army.mil>>
Subject: RE: Emergency Planning Meeting SRST/ETP/ACOE

Let's do March 6th….chairman faith is in agreeance with this date.

From: Borkland, Carl G [mailto:CARL.BORKLAND@energytransfer.com]
Sent: Saturday, February 24, 2018 9:10 AM
To: Doug Crow Ghost <dcrowghost@standingrock.org<mailto:dcrowghost@standingrock.org>>
Cc: Todd.J.Lindquist@usace.army.mil<mailto:Todd.J.Lindquist@usace.army.mil>; Stasch, Eric D NWO
<Eric.D.Stasch@usace.army.mil<mailto:Eric.D.Stasch@usace.army.mil>>; Elliott Ward
<eward@standingrock.org<mailto:eward@standingrock.org>>; Mike Faith
<mfaith@standingrock.org<mailto:mfaith@standingrock.org>>; dnelson@crstepd.org<mailto:dnelson@crstepd.org>;
Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil<mailto:Eric.D.Stasch@usace.army.mil>>;
Everett Iron Eyes <EVERETT.IRONEYES@standingrock.org<mailto:EVERETT.IRONEYES@standingrock.org>>; Cossette,
Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil<mailto:Brent.J.Cossette@usace.army.mil>>;
Harlon, William D III CIV USARMY CENWO (US)
<William.D.Harlon@usace.army.mil<mailto:William.D.Harlon@usace.army.mil>>; Minter, Justin D
<JUSTIN.MINTER@energytransfer.com<mailto:JUSTIN.MINTER@energytransfer.com>>; Peter Capossela
<pcapossela@nu-world.com<mailto:pcapossela@nu-world.com>>; Dean DePountis
<ddepountis@standingrock.org<mailto:ddepountis@standingrock.org>>; Janet Thomas
<jthomas@standingrock.org<mailto:jthomas@standingrock.org>>; Feiock, Patrick D CIV USARMY CENWO (US)
<Patrick.D.Feiock@usace.army.mil<mailto:Patrick.D.Feiock@usace.army.mil>>
Subject: RE: Emergency Planning Meeting SRST/ETP/ACOE

Good morning all,

At the meeting in Bismarck on February 8 neither Standing Rock nor Cheyenne River provided available dates for a meeting in March.  It's very important that we get this meeting scheduled.  So far we have had no input from either tribe on any of the drafts of the Geographic Response Plan or response planning more generally.

As I noted before, we propose to spend part of the March meeting visiting locations on the Standing Rock reservation that are relevant to response planning.  We also will use that meeting to review the latest draft of the GRP.  During that

review we will be providing information relevant to response planning that the tribes requested in their earlier letters. This is something we are prepared to do on February 8.

Please let me know by Wednesday February 28, whether you are available to meet on either March 6, 7, or 8.

Thanks!

From: Borkland, Carl G
Sent: Monday, February 5, 2018 9:03 AM
To: Doug Crow Ghost <dcrowghost@standingrock.org<mailto:dcrowghost@standingrock.org>>
Cc: Todd.J.Lindquist@usace.army.mil<mailto:Todd.J.Lindquist@usace.army.mil>; Stasch, Eric D NWO
<Eric.D.Stasch@usace.army.mil<mailto:Eric.D.Stasch@usace.army.mil>>; Elliott Ward
<eward@standingrock.org<mailto:eward@standingrock.org>>; Mike Faith
<mfaith@standingrock.org<mailto:mfaith@standingrock.org>>; dnelson@crstepd.org<mailto:dnelson@crstepd.org>;
Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil<mailto:Eric.D.Stasch@usace.army.mil>>;
Everett Iron Eyes <EVERETT.IRONEYES@standingrock.org<mailto:EVERETT.IRONEYES@standingrock.org>>; Cossette,
Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil<mailto:Brent.J.Cossette@usace.army.mil>>;
Harlon, William D III CIV USARMY CENWO (US)
<William.D.Harlon@usace.army.mil<mailto:William.D.Harlon@usace.army.mil>>; Minter, Justin D
<JUSTIN.MINTER@energytransfer.com<mailto:JUSTIN.MINTER@energytransfer.com>>; Peter Capossela
<pcapossela@nu-world.com<mailto:pcapossela@nu-world.com>>; Dean DePountis
<ddepountis@standingrock.org<mailto:ddepountis@standingrock.org>>; Janet Thomas
<jthomas@standingrock.org<mailto:jthomas@standingrock.org>>
Subject: RE: Emergency Planning Meeting SRST/ETP/ACOE

Thanks for your email Doug. Because our travel plans and logistics have already been set, we are still planning on meeting in Bismarck this Thursday, February 8 to continue our Lake Oahe spill planning. We will start the meeting at 9:00 to allow your team to travel to Bismarck. But if you arrive later, that is fine. We will just continue our meeting after you arrive.  If either Standing Rock or Cheyenne River are able to attend, please let us know so we can make sure we have ample room.

We would also like to schedule another meeting in March in Bismarck.  This meeting would be a plan review meeting, but we would be happy to travel to Standing Rock to review some of the tactical response planning areas. Please let us know if any of these dates work for you:

March 6, 7, 8, 13, or 14

Thanks!

<image003.png>

<image004.jpg>

C. Gus Borkland
VP- Environmental Projects & Emergency Planning/Response EHS&S Energy Transfer Partners

4041 Market Street
Aston, PA 19014

O: 610.859.5419
C:  215.620.5934

From: Doug Crow Ghost [mailto:dcrowghost@standingrock.org]
Sent: Friday, February 2, 2018 4:06 PM
To: Borkland, Carl G <CARL.BORKLAND@energytransfer.com<mailto:CARL.BORKLAND@energytransfer.com>>
Cc: Todd.J.Lindquist@usace.army.mil<mailto:Todd.J.Lindquist@usace.army.mil>; Stasch, Eric D NWO
<Eric.D.Stasch@usace.army.mil<mailto:Eric.D.Stasch@usace.army.mil>>; Elliott Ward
<eward@standingrock.org<mailto:eward@standingrock.org>>; Mike Faith
<mfaith@standingrock.org<mailto:mfaith@standingrock.org>>; dnelson@crstepd.org<mailto:dnelson@crstepd.org>;
Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil<mailto:Eric.D.Stasch@usace.army.mil>>;
Everett Iron Eyes <EVERETT.IRONEYES@standingrock.org<mailto:EVERETT.IRONEYES@standingrock.org>>; Cossette,
Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil<mailto:Brent.J.Cossette@usace.army.mil>>;
Harlon, William D III CIV USARMY CENWO (US)
<William.D.Harlon@usace.army.mil<mailto:William.D.Harlon@usace.army.mil>>; Minter, Justin D
<JUSTIN.MINTER@energytransfer.com<mailto:JUSTIN.MINTER@energytransfer.com>>; Peter Capossela
<pcapossela@nu-world.com<mailto:pcapossela@nu-world.com>>; Dean DePountis
<ddepountis@standingrock.org<mailto:ddepountis@standingrock.org>>; Janet Thomas
<jthomas@standingrock.org<mailto:jthomas@standingrock.org>>
Subject: RE: Emergency Planning Meeting SRST/ETP/ACOE

Mr. Borkland

Per Chairman Mike Faith letter, which is attached to this email, the SRST cordially invites Energy Transfer Partners for a
meaningful discussion.
Thanks.

Errol D CrowGhost Jr
Standing Rock Sioux Tribe
Department of Water Resources
Water Administrator
P.O. Box D
Fort Yates, ND. 58538

7018548534 wk
6058483919 cell
dcrowghost@standingrock.org<mailto:dcrowghost@standingrock.org>
<image005.jpg>

CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient's and may contain confidential or proprietary information covered by the Electronics Communication Privacy Act, 18 U.S.C. Sections 2510-2521. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, immediately contact the sender by reply e-mail and destroy all copies of the original message

From: Borkland, Carl G [mailto:CARL.BORKLAND@energytransfer.com]
Sent: Friday, January 26, 2018 2:47 PM
To: Doug Crow Ghost <dcrowghost@standingrock.org<mailto:dcrowghost@standingrock.org>>
Cc: Todd.J.Lindquist@usace.army.mil<mailto:Todd.J.Lindquist@usace.army.mil>; Stasch, Eric D NWO
<Eric.D.Stasch@usace.army.mil<mailto:Eric.D.Stasch@usace.army.mil>>; Elliott Ward
<eward@standingrock.org<mailto:eward@standingrock.org>>; Mike Faith
<mfaith@standingrock.org<mailto:mfaith@standingrock.org>>; dnelson@crstepd.org<mailto:dnelson@crstepd.org>;
Stasch, Eric D CIV USARMY CENWO (US) <Eric.D.Stasch@usace.army.mil<mailto:Eric.D.Stasch@usace.army.mil>>;
Cossette, Brent J CIV USARMY CENWO (US)
<Brent.J.Cossette@usace.army.mil<mailto:Brent.J.Cossette@usace.army.mil>>; Harlon, William D III CIV USARMY
CENWO (US) <William.D.Harlon@usace.army.mil<mailto:William.D.Harlon@usace.army.mil>>; Minter, Justin D
<JUSTIN.MINTER@energytransfer.com<mailto:JUSTIN.MINTER@energytransfer.com>>
Subject: RE: Emergency Planning Meeting SRST/ETP/ACOE

All

I am following up to make sure we have a meeting on the calendar for February.  The Corps has confirmed availability on February 8.  We have not heard from either Tribe.  Please advise whether you can attend a February 8 meeting.

We plan to hold the meeting at the same facility as the January 11 meeting. That is the Hampton Inn located at 2020 Schafer Drive, Bismarck, ND.

Thank you very much and have a great weekend.

From: Borkland, Carl G
Sent: Friday, January 12, 2018 5:04 PM
To: 'Doug Crow Ghost' <dcrowghost@standingrock.org<mailto:dcrowghost@standingrock.org>>
Cc: 'Todd.J.Lindquist@usace.army.mil<mailto:Todd.J.Lindquist@usace.army.mil>'
<Todd.J.Lindquist@usace.army.mil<mailto:Todd.J.Lindquist@usace.army.mil>>; 'Stasch, Eric D NWO'
<Eric.D.Stasch@usace.army.mil<mailto:Eric.D.Stasch@usace.army.mil>>; 'Elliott Ward'
<eward@standingrock.org<mailto:eward@standingrock.org>>; 'Mike Faith'
<mfaith@standingrock.org<mailto:mfaith@standingrock.org>>; 'dnelson@crstepd.org<mailto:dnelson@crstepd.org>'
<dnelson@crstepd.org<mailto:dnelson@crstepd.org>>; 'Stasch, Eric D CIV USARMY CENWO (US)'
<Eric.D.Stasch@usace.army.mil<mailto:Eric.D.Stasch@usace.army.mil>>; 'Cossette, Brent J CIV USARMY CENWO (US)'
<Brent.J.Cossette@usace.army.mil<mailto:Brent.J.Cossette@usace.army.mil>>; 'Harlon, William D III CIV USARMY
CENWO (US)' <William.D.Harlon@usace.army.mil<mailto:William.D.Harlon@usace.army.mil>>; MINTER, JUSTIN D
<JUSTIN.MINTER@energytransfer.com<mailto:JUSTIN.MINTER@energytransfer.com>>

Subject: RE: Emergency Planning Meeting SRST/ETP/ACOE

All:

Three of us from Dakota Access and one of our response planning consultant representatives had a productive multi-hour meeting with three representatives from the Corps on Jan. 11.  We received very helpful input from the Corps and will continue to work on gathering relevant information.  We will want to go over all of it with both tribes when we meet in February to get your additional input.

As I have said before, if there is any information that either tribe wants us to consider in the meantime based on your review of the existing drafts of the Geographic Response Plan or the Facility Response Plan, please feel free to send that to us before we meet in February.  This includes any errors or relevant omissions that you have identified in either plan.  One takeaway from Thursday's meeting is that we have our work cut out for us if we are going to have the best possible response plan ready by the April 1 deadline.  We expect to need at least two more meetings to accomplish that.  The sooner we get input from the tribes the better.

We have not heard back from either tribe on availability in February.  Our preferred date is February 8.  Other available dates for Dakota Access are February 6, 7, or 9.  We should plan for several hours so that we have the opportunity to make site visits to locations relevant to spill planning.  Please let us know your availability as soon as possible.  April 1 will be here before we know it.

Thank you and have a nice weekend!

<image006.png>

<image007.jpg>

C. Gus Borkland
VP- Environmental Projects & Emergency Planning/Response EHS&S Energy Transfer Partners

4041 Market Street
Aston, PA 19014

O: 610.859.5419
C:  215.620.5934

From: BORKLAND, CARL G
Sent: Friday, January 05, 2018 4:15 PM
To: 'Doug Crow Ghost' <dcrowghost@standingrock.org<mailto:dcrowghost@standingrock.org>>
Cc: Todd.J.Lindquist@usace.army.mil<mailto:Todd.J.Lindquist@usace.army.mil>; Stasch, Eric D NWO
<Eric.D.Stasch@usace.army.mil<mailto:Eric.D.Stasch@usace.army.mil>>; Elliott Ward
<eward@standingrock.org<mailto:eward@standingrock.org>>; Mike Faith
<mfaith@standingrock.org<mailto:mfaith@standingrock.org>>; 'dnelson@crstepd.org<mailto:dnelson@crstepd.org>'
<dnelson@crstepd.org<mailto:dnelson@crstepd.org>>; Stasch, Eric D CIV USARMY CENWO (US)
<Eric.D.Stasch@usace.army.mil<mailto:Eric.D.Stasch@usace.army.mil>>; Cossette, Brent J CIV USARMY CENWO (US)
<Brent.J.Cossette@usace.army.mil<mailto:Brent.J.Cossette@usace.army.mil>>; Harlon, William D III CIV USARMY
CENWO (US) <William.D.Harlon@usace.army.mil<mailto:William.D.Harlon@usace.army.mil>>; MINTER, JUSTIN D
<JUSTIN.MINTER@energytransfer.com<mailto:JUSTIN.MINTER@energytransfer.com>>
Subject: RE: Emergency Planning Meeting SRST/ETP/ACOE

Hello Errol:

Thank you for your email and letter.  We look forward to the chance to meet in February.  Because of the time
constraints, we will go ahead and proceed with our response planning efforts in the meantime while we wait for tribal
input.  I am also copying the Corps and Cheyenne River to bring them up to speed on meeting planning.

Dakota Access and the Corps will go ahead with our plan to meet this month in Bismarck.  Details are below.  If
Cheyenne River wishes to attend (and Standing Rock is still welcome as well), please send me the names of those who
will be there.  Please also provide some dates in February that will work for another meeting.  And, as I have said before,
feel free in the meantime to send me whatever information you believe is appropriate to assist in response planning.  As
you all know, we have an April 1 deadline for the parties to coordinate to finalize an oil-spill response plan affecting
Tribal resources and lands at Lake Oahe.

Here are the logistics for the meeting next week:

Date:  January 11, 2018

Time:  8:00AM

Location:  Hampton Inn, 2020 Schafer Drive, Bismarck, ND 58501

Thank you very much!

<image006.png>

<image007.jpg>

9

C. Gus Borkland
VP- Environmental Projects & Emergency Planning/Response EHS&S Energy Transfer Partners

4041 Market Street
Aston, PA 19014

O: 610.859.5419
C:  215.620.5934

From: Doug Crow Ghost [mailto:dcrowghost@standingrock.org]
Sent: Thursday, January 04, 2018 5:30 PM
To: BORKLAND, CARL G <CARL.BORKLAND@energytransfer.com<mailto:CARL.BORKLAND@energytransfer.com>>
Cc: Todd.J.Lindquist@usace.army.mil<mailto:Todd.J.Lindquist@usace.army.mil>; Stasch, Eric D NWO
<Eric.D.Stasch@usace.army.mil<mailto:Eric.D.Stasch@usace.army.mil>>; Elliott Ward
<eward@standingrock.org<mailto:eward@standingrock.org>>; Mike Faith
<mfaith@standingrock.org<mailto:mfaith@standingrock.org>>
Subject: Emergency Planning Meeting SRST/ETP/ACOE

Good Day Everyone,

Hope everyone had a great new year celebration and is looking forward to a great 2018!

Here is a letter from Chairman Mike Faith to Mr. Borkland for the planning of the Lake Oahe River Crossing.

The date for the SRST to be available for a meeting with ETP and ACOE will be in February.

Thanks!

Errol D CrowGhost Jr

Standing Rock Sioux Tribe
Department of Water Resources
Water Administrator
P.O. Box D
Fort Yates, ND. 58538
7018548534 wk
6058483919 cell
dcrowghost@standingrock.org<mailto:dcrowghost@standingrock.org>
<image005.jpg>

CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient's and may contain confidential or proprietary information covered by the Electronics Communication Privacy Act, 18 U.S.C. Sections 2510-2521. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, immediately contact the sender by reply e-mail and destroy all copies of the original message

Private and confidential as detailed here<http://www.energytransfer.com/mail_disclaimer.aspx>. If you cannot access hyperlink, please e-mail sender.

# ATTACHMENT 21

| | |
|---|---|
| **From:** | Sarah Whitford <SWhitford@ndnlaw.com> |
| **Sent:** | Wednesday, March 7, 2018 2:04 PM |
| **To:** | Borkland, Carl G |
| **Cc:** | Nicole Ducheneaux; 'Brent.J.Cossette@usace.army.mil'; 'Joel.O.Ames@usace.army.mil'; 'john.l.hudson@usace.army.mil' |
| **Subject:** | Dakota Access Pipeline - Emergency Response Planning |
| **Attachments:** | 2018-03-07 David Nelson Letter to Gus Borkland re Emergency Response Pla....pdf |

Mr. Borkland,

Please see the attached correspondence from David D. Nelson.

Regards,



**Sarah A. Whitford**
**Legal Records/Paralegal**
Phone: 402-333-4053 | Fax: 402-333-4761
swhitford@ndnlaw.com
http://secure-web.cisco.com/1xsE-2O4GhpkWOM95GkK0xcByCgDACVcfuQnE_r
QUs2552hUr8SBOZJOmbjUPpngA9LQ_SCDJEayG_F-XN3MhKOC1m60LfR0p3
X6rZXkyOSHsg7c9qEDsE2BBhitAGQyCTSS4orXFLktsKKfUY2rhWNuzRGlXVJ
wk4oPOf9er_6yF73PC5c_W7Y430fPsyZoRS6SOR8g/http%3A%2F%2Fwww.ndnl
3610 N. 163rd Plz.
Omaha, NE 68116

The information contained in this e-mail transmission (including any accompanying attachment (s) is intended solely for its authorized recipient (s) and may be confidential and /or legally privileged.  If you are not an intended recipient, or responsible for delivering some or all of this transmission to an intended recipient, you have received this transmission in error and are hereby notified that you are strictly prohibited from reading, copying, printing, distributing, or disclosing any of the information contained in it.  In that event, please contact us immediately by telephone at 402.333.4053 or by email swhitford@ndnlaw.com and delete the original and all copies of this transmission including any attachments without reading or saving in any manner.  If you are a client of our firm, this confirms that communication to you by e-mail is an acceptable way to transmit attorney-client information.  Thank you.



**Department of Environment & Natural Resources**

PO Box 590, South Willow & Airport Rd., Eagle Butte, SD 57625

**Fax:** 605-964-1072

| | |
|---|---|
| **PPG General Assistance** | **Brownfields Response** |
| **605-964-6559** | **605-964-3102** |
| David D. Nelson | Robert Smith |
| Kelsey K. Knight | |
| | |
| **Pesticide Circuit Rider** | **106 Water Quality** |
| **605-964-6558** | **605-964-6560** |
| Jayme Mestes | Carlyle Ducheneaux |
| Delbert Longbrake | Brandee Jewett |
| Lakota S. Nordvold | Lonny White Eyes |
| | Misti Hebb |

March 6, 2018

**VIA REGULAR MAIL AND EMAIL**

C. Gus Borkland
VP- Environmental Projects & Emergency Planning/Response
Energy Transfer Partners
4041 Market Street
Aston, PA 19014
Email: carl.borkland@energytransfer.com

Re:    Dakota Access Pipeline – Emergency Response Planning

Dear Mr. Borkland,

I appreciate Dakota Access's invitation to attend a meeting on March 7, 2018 to discuss technical data related to the remand process. As you know, representatives of the Cheyenne River Sioux Tribe ("Tribe") were unable to attend your January meeting in light of severe weather conditions. Further, as your March 1, 2018 email notes, at the February meeting, the Tribes requested information and data from Dakota Access relevant to the remand prior to further discussion as well as an in-person meeting on our Reservation.

You chose to wait until nearly a month later to advise that you would not accept our invitation to meet on our Reservation and advised of a date for a meeting seven days hence. Also, as of March 1, 2018, you had not provided us with any data or information related to the remand process.

As I am sure you can appreciate, we cannot possibly attend a meeting to discuss data and analysis that Dakota Access presumably has been developing for at least the past six months without first having the opportunity to review an analyze that information. To expect us to appear at this meeting and absorb and respond to such complicated technical information without prior access to that information is unreasonable and unfair.

Further, as you are aware, my Tribe is severely lacking in resources. Unlike Dakota Access, we do not have technical experts working in-house or the kind of vast financial resources that your company enjoys. In order to properly prepare and participate in your meeting we will need, at the very least, two weeks lead time to provide the data and information you have prepared to our experts and arrange for their attendance at our meeting.

C. Gus Borkland
March 5, 2018
Page 2

Significantly, we remain concerned that Dakota Access continues to focus primarily on the concerns of the Standing Rock Sioux Tribe. I would remind you that the Court has imposed remand obligations as to both Tribes.

It is our hope to accomplish the rest of this process in an open and organized manner. In light of that, we request the following with regard to scheduling a further meeting:

1.  That Dakota Access provide a comprehensive list of any and all data, analysis, or other information that will be relevant to our upcoming meeting;

2.  That Dakota Access make any and all data, analysis, or other information that will be relevant to our upcoming meeting available to the Cheyenne River Sioux Tribe as soon as possible; and

3.  That Dakota Access work with the Tribe to schedule a meeting to discuss the above-referenced data, analysis, or other information at least two weeks after transmission.

If Dakota Access will cooperate with the Tribe on these reasonable requests, we will consent to meet with Dakota Access off-Reservation, including Bismarck, North Dakota or Pierre, South Dakota.

Please respond substantively to this correspondence no later than Friday, March 9, 2018.

Very Truly Yours,

David D. Nelson

cc:   Col. John Hudson, *via email and regular mail*
      Brent Cossette, *via email and regular mail*
      Joel Ames, *via email and regular mail*

ATTACHMENT 22

| | |
|---|---|
| **From:** | Doug Crow Ghost <dcrowghost@standingrock.org> |
| **Sent:** | Wednesday, March 7, 2018 3:32 PM |
| **To:** | Borkland, Carl G |
| **Subject:** | Fwd: Attached Image |
| **Attachments:** | 1757_001.pdf; ATT00001.htm |

Here is the resolution that standing rock tribal council made today regarding the meeting today over judges regards.

Sent from my iPhone

Begin forwarded message:

From: <waterresources.copier@standingrock.org<mailto:waterresources.copier@standingrock.org>>
Date: March 7, 2018 at 2:08:49 PM CST
To: Doug <dcrowghost@standingrock.org<mailto:dcrowghost@standingrock.org>>, tim mentz
<timmentzsr@gmail.com<mailto:timmentzsr@gmail.com>>, Peter <pcapossela@nu-world.com<mailto:pcapossela@nu-world.com>>
Subject: Attached Image



*Sent by email to Carl.borkland@Energytransfer.com*

March 6, 2018

Energy Transfer Partners, L.P.
8111 Westchester Drive
Dallas, Texas 75225

RE:     Proposed Meeting on Emergency Planning and Response – Dakota Access Pipeline

Dear Energy Transfer Partners, L.P.:

        Attached is Standing Rock Sioux Tribal Council Resolution No. 080-18.  Energy Transfer Partners should work cooperatively with our Tribe on meeting arrangements and the disclosure of important information relating to emergency management.  ETP should exhibit good faith and meet with our representatives in our Tribal chambers, as is customary, rather than obfuscate and avoid addressing our concerns.

        Per prior correspondence, I write to propose a meeting on emergency response to be held at the Standing Rock Tribal chambers, with available dates of March 13, 15 or 22. The most current Facility Response Plan and Spill Model must be provided in advance, in order to address our concerns over the adequacy of the emergency response measures that are being developed.  We will be prepared to discuss mitigation requirements for cultural resources. Please advise as to your intentions.

        Thank you for your attention to this matter.

                                    Sincerely,

                                    Mike Faith, Jr., Chairman
                                    Standing Rock Sioux Tribe

Enclosure

1

# RESOLUTION NO. 080-18

**WHEREAS**, the Standing Rock Sioux Tribe is an unincorporated Tribe of Indians, having accepted the Indian Reorganization Act of June 18, 1934, with the exception of section 16, and the recognized governing body of the Tribe is known as the Standing Rock Sioux Tribal Council; and

**WHEREAS**, the Standing Rock Sioux Tribal Council, pursuant to the Constitution of the Standing Rock Sioux Tribe, Article IV, Sections 1, (a), (b), (c), (h) and (j), is authorized to negotiate with Federal, State and local governments and others on behalf of the Tribe, to promote and protect the health, education and general welfare of the members of the Tribe and to administer such services that may contribute to the social and economic advancement of the Tribe and its members; and is further empowered to manage, protect and preserve the property of the Tribe and natural resources of the Standing Rock Sioux Reservation; and

**WHEREAS**, on February 8, 2017, the Army Corps of Engineers issued a section 408 permit and an easement to Energy Transfer Partners LLP for the massive Dakota Access Pipeline (DAPL), which crosses the Missouri River at its confluence with the Cannon Ball River, less than one-half mile from the Standing Rock Reservation, and immediately upstream from the drinking water and irrigation water intakes of the Standing Rock Sioux Tribe; and

**WHEREAS**, the Standing Rock Sioux Tribal Council enacted Resolutions 119-16 and 406-15, expressing our adamant opposition to the Dakota Access Pipeline project as jeopardizing the waters of our valuable *Mni Sose* and violating the Fort Laramie Treaties of 1851 and 1868; and

**WHEREAS**, DAPL poses an unacceptable risk to public health and welfare on the Standing Rock Indian Reservation, to the Reservation environment, and to our relatives – the fish and wildlife; to wit –

(1)     The estimates of a worst case oil release into the Missouri River and underlying aquifer are based upon unrealistic assumptions, and the environmental impacts of an oil spill may be far greater than disclosed in the *Final Environmental Assessment Dakota Access Pipeline* (July 2017). The reservoir conditions and amount of stored water in Lake Oahe at the time of a release of oil into the Missouri River will affect its impacts on fish and wildlife. The Corps of Engineers must implement its Reservoir Simulation Model to properly determine the impacts of an oil spill under the divergent reservoir conditions caused by the operation of Oahe Dam.

(2)     In 2017, the Standing Rock Sioux Tribe Department of Game and Fish prepared a report entitled MISSOURI RIVER HIGH CONSEQUENCE AREA ASSESSMENT: ESTABLISHING BASELINE ECOLOGICAL INFORMATION AND IMPACTS TO HUNTING AND FISHING FROM THE PROPOSED DAPL PIPELINE IN THE EVENT OF AN OIL SPILL IN THE MISSOURI RIVER IN NORTH DAKOTA ADJACENT TO THE STANDING ROCK RESERVATION (2017). This report documents the significant impacts of an oil spill on sensitive wetland habitat, macroinvertebrates, shellfish, fish, birds and waterfowl, as well as on mammals and big game on the Standing Rock Reservation. The report finds that subsistence hunting and fishing by Tribal members shall be adversely affected by an oil spill from DAPL.

(3)     Subsistence hunting and fishing are integral to the Lakota and Dakota way of life on the Standing Rock Reservation. The Lakota believe that all things in creation have a spirit, and are relatives to the Lakota. The stories that have been passed down for generations instruct that the land, water and living

things that depend on them are all entitled to respect. Thus, the harvesting of fish and wildlife on the Standing Rock Reservation is for subsistence purposes, and is conducted in a sustainable and respectful manner. Subsistence hunting and fishing, and our cultural norms that remain intact, are jeopardized by an oil spill from DAPL.

(4)     The Missouri River bottomlands on the Standing Rock Reservation have already been decimated by the development of Oahe Dam and Reservoir, which destroyed nearly 56,000 acres of wooded Missouri River bottomlands on the Standing Rock Indian Reservation. This land was prime wildlife habitat and farm and ranch ground. Four Tribal communities were relocated by the Corps of Engineers in 1960, from the bottomlands to the plains above bottomlands area. The construction of the Oahe Dam disrupted the Lakota and Dakota way of life on the Standing Rock Reservation. Nevertheless, the Corps of Engineers has failed to consider the cumulative impact of the potential harm from an oil spill with the loss of habitat caused by the construction and operation of Oahe Dam.

(5)     From 2006 to 2017 Energy Transfer Partners and Sunoco, which own and operate DAPL, incurred 291 hazardous liquid incidents – more pipeline than any other operator for that period in the PHMSA database – resulted in $56,590,698 in property damage. However, ETP and Sunoco prior performance was not considered in a valid risk assessment.

(6)     Recently-constructed pipelines, such as DAPL, have demonstrated a higher rate of serious oil spills. The leak detection systems and estimated pipeline shutdown times for worst case discharge (WCD) calculations can be grossly inaccurate. Spill remediation can leave a significant volume of unrecovered crude oil with the potential for persistent threats to human health and the environment.

7)     The DAPL documentation fails to identify the specific hazards of Bakken crude oil and leaves human health and the environment vulnerable to harm if not addressed. Bakken crude is extremely flammable and can pose greater health and safety risks than heavier crude oil. Vapor samples from Enbridge's Berthold, ND terminal crude storage tanks were determined contain more than 1200 ppm of hydrogen sulfide – twelve times the level immediately dangerous to life and health. Elevated concentrations of benzene in Bakken crude oil poses significant negative human health and environmental impacts. Addressing the elevated hazards of Bakken crude in the risk assessment (spill consequences) and the dangers facing emergency responders is absolutely necessary to protect lives and the environment. The Corps of Engineers has failed to do so, however.

(8)     DAPL's worst case discharge (WCD) calculations lack any documented methodology or supporting data. DAPL's informal WCD calculations take a "best case" approach and grossly underestimate the likely volume of Bakken crude oil released. This flaw underestimates the potential hazards from a release 92-feet or more under Lake Oahe. Other more realistic performance-based approaches would show a much greater WCD. DAPL's approach severely underestimates the potential WCD, leaving out important considerations from both the regulatory requirements and good practice safety guidelines. The DAPL WCD calculation 9-minute shutdown time limited to pump shutdown time is incomplete and grossly underestimates the WCD. The WCD fails to consider other alternatives such as a smaller leak below the detection limit.

(9)     DAPL lacks a detailed technical spill plan or a realistic WCD calculation – both are essential for effective emergency response planning. DAPL does not address the adverse weather impact on the WCD for the shutdown of the pipeline. Issues include harsh ND winter conditions, deep snow, extreme cold and availability and operation of the shutdown valves in extreme environments.

(10)     The Standing Rock Sioux Tribe has incurred extensive tangible and intangible costs as a direct result of DAPL. The Tribe clearly suffers disproportionate costs from the construction and operation of the pipeline. A proper accounting of the actual cost borne by the Tribe is required under Executive Order 12898 on Environmental Justice, but this has never been done; and

**WHEREAS**, there has never been a determination of DAPL's impact on the Treaty rights of the Standing Rock Sioux Tribe and Great Sioux Nation.   Standing Rock is a signatory to the Fort Laramie Treaty of September 17, 1851, and Article V defines the territory of the Great Sioux Nation as follows;

> The territory of the Sioux or Decotah Nation, commencing at the mouth of the White Earth River on the Missouri River: thence in a southwesterly direction to the forks of the Platte River; thence up the north fork of the Platte River to a point known as the Red Butte, or where the road leaves the river; thence along the mountain range known as the Black Hills, to the headwaters of the Heart River; thence down Heart River to its mouth and thence down the Missouri River to the place of beginning.  (11 Stat. 749); and

**WHEREAS**, under the Fort Laramie Treaty of April 29, 1868, the Great Sioux Reservation was established in Article II as follows:

> The United States agrees that the following district of country, to wit, viz: commencing on the east bank of the Missouri river where the 46th parallel of north latitude crosses the same, thence along low-water mark down said east bank to a point opposite where the northern line of the State of Nebraska strikes the river, thence west across said river, and along the northern line of Nebraska to the 104th degree of longitude west from Greenwich, thence north on said meridian to a point where the 46th parallel of north latitude intercepts the same, thence due east along said parallel to the place of beginning… shall be and the same is, set apart for the absolute and undisturbed use and occupation of the Indians herein named.  (15 Stat. 635); and

**WHEREAS**, under Article XVI of the Fort Laramie Treaty of 1868 –

> The United States hereby agrees and stipulates that the country north of the North Platte River and east of the summits of the Big Horn mountains shall be held and considered to be **unceded** Indian territory. (15 Stat. 639); and

**WHEREAS**, DAPL crosses the heart of the unceded Treaty land of the Standing Rock Sioux Tribe, guaranteed to be a permanent homeland under Article V of the 1851 Fort Laramie Treaty and Article II of the Fort Laramie Treaty of 1868,; and

**WHEREAS**, Energy Transfer Partners has commenced operation of the Dakota Access Pipeline and oil is flowing underneath our life-giving Missouri River; and

**WHEREAS**, the Standing Rock Sioux Tribe initiated legal action to enjoin the Dakota Access Pipeline in the case *Standing Rock Sioux Tribe v. Army Corps of Engineers*, CIV 16-1534 (JEB) D.D.C.; and

**WHEREAS**, on June 14, 2017, Judge James Boasberg granted partial summary judgment to the Standing Rock Sioux Tribe, ruling that the *Final Environmental Impact Statement* violated the National Environmental Policy Act by failing to properly evaluate:

      (1)     the potential impacts of an oil spill on the hunting and fishing rights guaranteed to the Tribe in the Fort Laramie Treaties of 1868 and 1851;

      (2)     DAPL's disproportionate impacts on the Standing Rock Sioux Tribe; and

      (3)     resolve the controversy among expert opinions on the impacts of an oil spill;

and remanded to the Corps of Engineers to prepare additional analysis of these issues (55 F.Supp. 3d 101, 140); and

**WHEREAS**, notwithstanding the violations of law, Judge Boasberg denied the Tribe's request to shut down DAPL pending the remand analysis by the Corps, and, instead, directed DAPL to collaborate with the Standing Rock Sioux Tribe on emergency planning for the Standing Rock Indian Reservation, and to conduct an independent third-party review of compliance with the applicable regulations (2017 WL 4564714); and

**WHEREAS**, the Standing Rock Sioux Tribal Council and the Standing Rock Tribal Emergency Response Commission (TERC) stand prepared to work cooperatively with Energy Transfer Partners and Sunoco in the preparation of realistic and effective facility response and emergency response plans; and

**WHEREAS**, in order to negotiate a collaborative emergency response plan, it shall be necessary for the Tribal Council and the TERC to review, in advance of any meeting or negotiation:

      (1)     *Most current Facility Response Plan, without redactions*. The FRP establishes the baseline data underlying for all emergency response activities. It is not possible to engage in oil spill response planning without the baseline information required in the FRP. For example, contingencies involving inclement weather should be fully identified, but there is no evidence of this. In any event, ETP has refused to disclose this information. (Carl Borkland, ETP, email to Doug Crow Ghost, March 1, 2018).

      (2)     *Most current Lake Oahe Spill Model*, including scenarios analyzed and technical documentation. The Corps of Engineers indicated that the permit and easement for DAPL is contingent upon development of a Spill Model. However, there is no evidence that a Spill Model has been developed by ETP, as required by the Corps. (Carl Borkland, ETP, email to Doug Crow Ghost, March 1, 2018).

      (3)     *Most current Risk Analysis* specific to the Lake Oahe crossing.

      (4)     *Worst case discharge* (WCD). The WCD estimate needs to reflect a realistic "release time." The leak detection system (LDS) and the SCADA computer monitoring system have not proven to be sufficient to provide actionable alarms in a central control room, to promptly and accurately identify a pipeline rupture and initiate shutdown of the pipeline. The release time of 9 minutes estimated by ETP is wholly unrealistic. A reasonable analysis would incorporate a realistic release time, a more nuanced interpretation of LDS and SCADA performance, and would incorporate issues such as operator confusion time, and isolation valve availability numbers. However, ETP has refused to disclose this information. There is no evidence that any of this has been done.

(5)      *Location and specifications of the Lake Oahe crossing shut-off valves*; elevation of the valves and the pipeline segment between the shut-off valves; whether they are automatic or manually operated; and calculation of the drainage volume.  The valves, actuators and controls must be carefully designed to meet the remote-safety isolation function.  The Standing Rock Tribal Council has received no quantitative verification from either ETP or the Corps of Engineers relating to the operation, test results or efficiency of the shut-off function, prompting legitimate concern that the WCD has been significantly under-stated.  The Missouri River and the Standing Rock Reservation faces far more environmental risk than disclosed by DAPL or the Corps of Engineers.  ETP correspondence indicated that it remains unwilling to provide the requested documentation. (Carl Borkland, ETP, email to Doug Crow Ghost, March 1, 2018: "we were prepared to *explain*… the location of shut-off valves…").

(6)      *DAPL Pipeline Safety Management System* requirements, framework and implementation plan.

(7)      *Actual response time at other ETP/Sunoco reported pipeline leaks.*  This is required in the applicable regulations of the Pipeline Hazardous Materials Safety Administration (PHMSA), which state that "The worst case discharge is the largest volume, in barrels (cubic meters) of… The pipeline's maximum release time, in hours, (**based on historic data**)." 49 CFR §195.105 (emphasis added). Nevertheless, ETP disrespected the Tribe's reasonable request: "You asked for documentation about other spills at other locations.  We do not believe that information is necessary or relevant to planning at Lake Oahe." (Carl Borkland, ETP, email to Doug Crow Ghost, March 1, 2018).  This leads to questions about what ETP and Sunoco have to hide about their safety record.

(8)      *Number and location of personnel at Lake Oahe.*  This information should be provided to Standing Rock and all affected communities along the Missouri River.

(9)      *Cathodic protection program, including design and monitoring specific to the Lake Oahe crossing.* This information is obviously a critical element of leak detection and emergency response.

(10)      *Information on the composition of Bakken crude transported in DAPL.* We have requested that ETP identify the hazards specific to the Bakken crude, including flammability and toxicity, and information on how the emergency response plans address those specific elevated hazards.  This information is required for the safety of fire fighters and other first responders, as well as for mitigation and dispersal processes; and

**WHEREAS**, none of this information has provided to the Standing Rock Sioux Tribe; and

**WHEREAS**, the maximum spill estimate in the FRP is based upon false and optimistic assumptions:

(1)      Any release of oil will automatically be located at the surface of Lake Oahe, although the pipeline is 92 feet below the riverbed.

(2)      The pipeline will be shut down within 9 minutes.  PHMSA has stated that "response times and shutdown times less than 10 minutes raises red flags."   Actual poor performance by Energy Transfer Partners on prior spills was ignored.

(3)      The shut-off valves will operate properly.

(4)      There will be no human error.

(5)      There will be no impacts of extreme weather, or the remote location of the Missouri River crossing.

(6)      There is inadequate information on the efficacy and operational integrity of the isolation valves.

(7)      Emergency response will perform perfectly as planned.

(8)      The novel technology relied upon will function as planned.

**WHEREAS**, ETP has failed to utilize oil industry best practices, and instead relies upon optimistic assumptions for shut-down and response times.  The FRP must be totally revised in order to calculate an honest and accurate estimate of the maximum spill in Lake Oahe.  Actual response times by ETP and Sunoco must be disclosed and incorporated into the equation.  Current estimates of the maximum spill are based on an unrealistic and overly optimistic portrayal of spill response, and are erroneous; and

**WHEREAS**, the optimistic response times portrayed by ETP are based on the assumption of no human error, as well as the performance of automated systems.  These systems must be subject to engineering testing and verification for hardware fault tolerance / redundancy; independence, separation, estimated PFD; and performance verification.  None of this information has been disclosed, however; and

**WHEREAS**, the worst case discharge scenario focuses on a catastrophic-type (complete) break 92 feet under the Lake Oahe lake bed, and there is no disclosure of the impacts of a slow leak beneath the detection limit. No rationale was provided, to justify the narrow analysis.  Given ETP's claim of no more than 21 days between Lake Oahe visual observation overflights, the Tribe estimates that 126,000 barrels could potentially be released before a spill is detected.  This discharge volume could be greater if detection is impeded by ice cover.  Additional analysis of a leak under the detection limit by ETP is required; and

**WHEREAS**, the release of oil will be impacted by the surrounding geology, hydrogeology and lake flow and volume.  This is not included in the ETP calculations.  The spill model ideally will take into effect specifics of release under a moving water body and river-specific movement of oil including pre-existing channel, eddies, concentration areas, etc.  There is a need for analysis of the likely composition of Bakken crude as it will impact spill model movement of oil, possible deposition of heavy hydrocarbons, persistence in the geologic formations; and

**WHEREAS**, the emergency response analysis must be more specific to the Lake Oahe crossing, and correlate to area-specific harm to people, wildlife, agriculture, downstream users, and cultural areas; and

**WHEREAS**, ETP has failed to implement the court order for the independent third party review in good faith. The Standing Rock Sioux Tribe identified to ETP Gordon Aaker, Jr. P.E., as a qualified, independent pipeline safety auditor.  On February 19, 2018 ETP contacted Mr. Aaker and two other firms, including the Wood Group, and provided 48 hours to submit a bid for the independent third-party review of DAPL. ETP's February 19th email stated, "DAPL will make the confidential relevant information available at its offices and at the Wood Group offices.  There are multiple files at both locations totaling ~4,000 pages;" and

**WHEREAS**, ETP's fraudulent procurement provided less than 48 hours to review 4,000 pages of materials, which was made available to one bidder (Wood Group) before it was made available to Standing Rock's recommended auditor; and

**WHEREAS**, as explained by Gordon Aaker in his email to ETP dated February 20, 2018: "It is virtually impossible to provide an adequate response in less than two working days. Additionally, the Period of Performance (23 Feb. 2018 to 23 March 2018) is woefully inadequate to assess the site, review all available documents, and then prepare an authoritative assessment. In West Texas, we call these bidding tactics as 'sand bagging' or just plain 'bid rigging;' and

**WHEREAS**, the Tribal Council's good faith efforts to comply with Judge Boasberg's December 4, 2018 order and meet with ETP to discuss emergency response planning have been met with a disrespectful, manipulative and erratic response by ETP. Chairman Faith corresponded with ETP on January 4, 2018: "I agree that we should attempt to confirm a meeting time as soon as possible. Our team will be available to meet with you in February, and is willing to meet on Standing Rock;" and

**WHEREAS**, Chairman Faith again invited ETP to visit Standing Rock in a letter dated February 2, 2018:

Let me invite the Energy Transfer Partners to the Standing Rock Reservation for a meeting on February 8, 2018, which you have identified as an available date for ETP. It is customary for government officials and stakeholder representatives to meet with our Tribe on our Reservation. I propose that we meet at the Tribal Administration Building in Fort Yates, N.D. on February 8 at 10:00 a.m. Let me assure you that your representatives will be treated with the courtesy that we extend to all visitors, consistent with our Lakota culture; and

**WHEREAS**, Chairman Faith's invitation was met by ETP with disrespect and contempt:

Because our travel plans and logistics have already been set, we are still planning on Bismarck this Thursday, February 8 to continue our Lake Oahe spill planning. We will start the meeting at 9:00 to allow your team to travel to Bismarck. But if you arrive later that is fine. We will just continue our meeting after you arrive (Email of Carl Borkland to Doug Crow Ghost, February 5, 2018); and

**WHEREAS**, Chairman Faith repeated his invitation to ETP to visit Standing Rock to discuss emergency planning, in a letter dated February 28, 2018:

I write to invite you to the Standing Rock Reservation for a meeting on emergency response planning for the Dakota Access Pipeline, for March 7, 2018, at 10:00 a.m. Be assured that we will take all steps necessary to ensure that our visitors are treated respectfully, consistent with our Lakota culture; and

**WHEREAS**, Chairman Faith's invitation was ignored and treated disrespectfully by ETP: "We will be meeting March 7 at the Ramada, 1400 E. Interchange Ave, Bismarck ND 58501. We will start at 9:00 a.m. local time." (Carl Borkland, ETP, email to Doug Crow Ghost, March 1, 2018); and

WHEREAS, ETP's repeated efforts to avoid engaging in a respectful dialogue with the Standing Rock Sioux Tribe on emergency response planning for DAPL violate Judge Boasberg's December 4, 2018 order and confirm our Tribe's concerns that ETP cannot be trusted on emergency planning, or to safely operate the Dakota Access Pipeline.

**NOW THEREFORE BE IT RESOLVED**, due to the disrespectful, patronizing and unproductive communications of ETP, the Standing Rock Sioux Tribal Council directs that no meeting be held with Energy Transfer Partners at this time.

**BE IT FURTHER RESOLVED**, that the Standing Rock Sioux Tribal Council and Tribal Emergency Response Commission stand prepared to meet with ETP and the Corps of Engineers and to engage in a genuine, good faith dialogue on Facility Response Plans and emergency response planning to protect public health and welfare on the Standing Rock Indian Reservation.

## CERTIFICATION

**We,** the undersigned, Chairman and Secretary of the Standing Rock Sioux Tribe, hereby certify that the Tribal Council is composed of 17 members, of whom **14** constituting a quorum, were present at a meeting duly and regularly called, noticed, convened and held on the **06th** day of **March, 2018**, and that the foregoing resolution was duly adopted by the affirmative vote of **14** members, with **0** opposing, and with **1** not voting. **THE CHAIRMAN'S VOTE IS NOT REQUIRED EXCEPT IN CASE OF A TIE.**

**DATED THIS** **06th** **DAY OF MARCH, 2018.**

ATTEST:

Mike Faith, Chairman
Standing Rock Sioux Tribe

Susan Agard, Secretary
Standing Rock Sioux Tribe

[OFFICIAL TRIBAL SEAL]

Meeting Date: 03/06/2018
Motion No. 50

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE,<br><br>                              Plaintiff,<br><br>and<br><br>CHEYENNE RIVER SIOUX TRIBE,<br><br>                              Intervenor Plaintiff,<br><br>          v.<br><br>U.S. ARMY CORPS OF ENGINEERS,<br><br>                              Defendant,<br><br>and<br><br>DAKOTA ACCESS, LLC,<br><br>                              Intervenor Defendant. | Civil Action No. 16-1534-JEB (consolidated with Case Nos. 16-1796 & 17-267) |

---

**DECLARATION OF CHARLES (CHUCK) FREY IN SUPPORT OF
DAKOTA ACCESS, LLC'S RESPONSE TO THE MOTIONS OF STANDING ROCK
SIOUX TRIBE AND CHEYENNE RIVER SIOUX TRIBE FOR "CLARIFICATION"
AND "MEANINGFUL CONSULTATION"**

---

1.      My name is Charles (Chuck) Frey. I am the Vice President, Liquids Engineering, for Energy Transfer Partners, the parent company of Dakota Access, LLC.  I have more than 38 years of experience in the energy transportation industry with roles of increasing responsibility for the engineering design, construction and operation of midstream and downstream facilities and assets.

2.      In accordance with the Court's December 4, 2017 Order, I have overseen the selection of "a third-party independent expert engineering company to review easement conditions and

regulations, and to assess compliance with all such conditions as well as other integrity threats."

D.E. 303 at 1-2.  As part of that process, Dakota Access has sought input from both the Standing

Rock Sioux Tribe and Cheyenne River Sioux Tribe.  Attached hereto are true and correct copies

of the correspondence between Dakota Access's attorneys and the Tribes:

| | | |
|---|---|---|
| *Attachment* 1: | January 11, 2018 email from Dakota Access's counsel to counsel for Standing Rock and Cheyenne River; | |
| *Attachment* 2: | January 23, 2018 email from Standing Rock's counsel to counsel for Dakota Access and Cheyenne River; | |
| *Attachment* 3: | January 25, 2018 email from Cheyenne River's counsel to counsel for Dakota Access and Standing Rock; | |
| *Attachment* 4: | February 20, 2018 email from Standing Rock's counsel to counsel for Dakota Access and Cheyenne River; | |
| *Attachment* 5: | February 20, 2018 email from Dakota Access's counsel to counsel for Standing Rock and Cheyenne River; | |

3.      In his January 23, 2018 email, counsel for Standing Rock suggested that Dakota Access

consider Gordon A. Aaker, PE, of Engineering Services, LLP as a potential third-party company.

Standing Rock also raised objections to Dakota Access's proposed companies.  For TRC, Standing

Rock objected that they "lis[t] ETP as a client and clai[m] an 'unparalleled record of experience

in providing pipeline engineering services to the industry.'"  For Wood Group, Standing Rock

objected that they "worked on DAPL for ETP and authored a number of what we view to be highly

superficial risk-related documents – an obvious conflict."   And for Process Performance

Improvement Consultants ("P-PIC"), Standing Rock objected that "they appear[] to be involved a

lot in litigation support for oil and gas firms generally and pipeline service companies specifically."

Cheyenne River's January 25, 2018 email simply said that they were "in agreement" with Standing

Rock's January 23 email.

4.      Standing Rock's proposed third-party, Mr. Aaker, states on his website that his

"PRIMARY BUSINESS IS 'ENGINEERING LITIGATION SUPPORT'" and that his business is also "to identify failures that are the result of poor design, incorrect use of materials and manufacturing defects or service conditions." A copy of the home page of Mr. Aaker's website is attached hereto as Attachment 6. (Due to the manner in which the website is constructed, this attachment is a series of screenshots. The website can be viewed in full at www.engineering-experts.com.)

5.     On January 30, 2018, I called Mr. Aaker to discuss the assessment. On that call, it was apparent that Mr. Aaker had a far more expansive view of the task than what the Court set forth in its December 4 Order. Mr. Aaker told me he had been in conversation with Standing Rock's representatives about the assessment. Mr. Aaker also mentioned that he had prepared a preliminary work proposal for Standing Rock. I asked him to send me that proposal and also decided to solicit a proposal from Mr. Aaker for the audit.

6.     On February 1, 2018, I emailed Mr. Aaker to follow up and again requested copies of the proposal he had prepared for Standing Rock. Mr. Aaker responded that evening that he had not been authorized to provide a copy. On February 5, 2018, I followed up again. On February 6, 2018, Mr. Aaker responded that he had "not heard back" from the tribe and was "reluctant to release anything without an approval." Attached hereto are true and correct copies of that correspondence:

> *Attachment* 7:    February 1, 2018 email from Chuck Frey to Gordon Aaker;
>
> *Attachment* 8:    February 1, 2018 email from Gordon Aaker to Chuck Frey;
>
> *Attachment* 9:    February 5, 2018 email from Chuck Frey to Gordon Aaker;
>
> *Attachment* 10:  February 6, 2018 email from Gordon Aaker to Chuck Frey.

7.     On February 12, 2018, a confidentiality agreement was sent to Mr. Aaker, but he did not respond. *See* Declaration of Tom Siguaw at ¶ 4.

8.      On February 19, 2018, solicitations were sent to all four proposed third-party firms. The materials relevant to the solicitation were attached, and information was provided about additional materials that would be available for review in the assessment itself. *See* Declaration of Tom Siguaw at ¶¶ 6-7.

9.      On February 20, 2018, we received an email from Standing Rock's counsel stating that Mr. Aaker had questions or concerns about the solicitation process, including the timeline and the number of documents available for review. *See* Attachment 4.  I called and left messages that afternoon and evening for Mr. Aaker on his office and mobile phones, but received no response until *after* Mr. Aaker submitted his proposal.

10.     Mr. Aaker submitted his proposal the evening of February 20, 2018.  A true and correct copy of Mr. Aaker's proposal is attached hereto as Attachment 11.  Mr. Aaker's proposal far exceeded the scope and cost of the other estimates received.

11.     On February 22, 2018, Mr. Aaker finally returned my calls.  When we spoke, Mr. Aaker sounded agitated and vulgar.  His first comment was that he called to be sure we could not say he was non-responsive. Among other things, he stated that the terms of our confidentiality agreement were "bullshit."  He also said that our proposed solicitation was "absurd" because he could not review 4,000 pages of documents in just a few days.  I explained that those documents were for use in the assessment itself, not for the solicitation, and that we provided that information so he could factor the review and assessment of those documents into his cost estimate.  He then complained that the scope of the Court's December 4 Order and our solicitation did not make sense to him, and that a "real proposal" would "cover the entire pipeline" and "look at the whole package."

12.     Based on, among other things, all the estimates provided in response to the solicitations,

the apparent experience and expertise of the proposed third-party companies, the input received from Standing Rock about the selection of a third-party firm, and the fact that Standing Rock's sole objection to P-PIC (one of the three firms identified by Dakota Access) also applied to Standing Rock's proposed firm, Dakota Access selected P-PIC to complete the assessment.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed March 16, 2018

Chuck Frey

# ATTACHMENT 1

| From: | Debold, David |
|---|---|
| Sent: | Thursday, January 11, 2018 4:49 PM |
| To: | Hasselman Jan; Ducheneaux Nicole |
| Cc: | Scherman, William S.; Fleischer, Jason J. |
| Subject: | Selection of third party independent expert engineering company |

Counsel:

As you know, on December 4, 2017, Judge Boasberg ordered Dakota Access to select, "with input from the Tribes," a third-party independent expert engineering company to perform a compliance audit of easement conditions, regulations, and integrity threats at Lake Oahe. Dakota Access has identified three such companies listed below.

We would appreciate any input from your clients on these potential auditors **no later than January 25, 2018**.

The three identified expert engineering companies are, in no particular order:

Process Performance Improvement Consultants, LLC
http://p-pic.com/

TRC Solutions
https://www.trcsolutions.com/

Wood Group
https://www.woodgroup.com/

Thanks, and we look forward to hearing any input you may have.

Best regards,
David

**David Debold**

GIBSON DUNN

Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W., Washington, DC 20036-5306
Tel +1 202.955.8551 • Fax +1 202.530.9682
DDebold@gibsondunn.com • www.gibsondunn.com

# ATTACHMENT 2

| | |
|---|---|
| **From:** | Jan Hasselman <jhasselman@earthjustice.org> |
| **Sent:** | Tuesday, January 23, 2018 2:25 PM |
| **To:** | Debold, David; Ducheneaux Nicole |
| **Cc:** | Scherman, William S.; Fleischer, Jason J. |
| **Subject:** | RE: Selection of third party independent expert engineering company |

David:

Thank you for sharing the names of the auditors you have proposed.

Unfortunately, we do not believe that any of the suggested auditors meet the Court's direction for an "independent, third party auditor."  All of the proposed auditors either have close ties to the oil and gas industry generally, or do ETP/DAPL specifically—putting their "independence" very much in question.  Our technical team has reviewed all three closely and has grave doubts that any of them would be able to function independently for purposes of a third party audit.

For example, TRC lists ETP as a client and claims an "unparalleled record of experience in providing pipeline engineering services to the industry"  (https://www.trcsolutions.com/writable/images/Pipeline-Engineering.pdf)

Wood Group worked on DAPL for ETP and authored a number of what we to view to be highly superficial risk-related documents – an obvious conflict
As to the Process Performance Improvement Consultants, they appears to be involved a lot in litigation support for oil and gas firms generally and pipeline service companies specifically

The Tribe's technical team has identified an independent party who they believe would do a good job of overseeing an independent audit.  Gordon A. Aaker, PE, of Engineering Services LLP, GAA@Engineering-Experts.com.  A member of the technical team I believe checked in with Mr. Aaker to determine if he was available and he said he was.  We would agree to moving ahead with Mr. Aaker.   If we cannot agree, I suppose we will have to return to the Court for guidance.

Additionally, we have some concerns about the scope of the audit.  The original PHMSA recommendation that formed the core of our request to the Court was an audit of implementation of permit conditions and "any other integrity threats" affecting the pipeline.  We believe that this latter phrase involves a review of the Tribe's concerns with DAPL's risk analyses and other technical information.  A narrow review of implementation of permit conditions would not in our view be adequate.  Let's see if we can discuss this issue and get some agreement on the scope of the audit before too much more time goes by.

Please let us know how you'd like to proceed.

Jan

---

**From:** Debold, David [mailto:DDebold@gibsondunn.com]
**Sent:** Thursday, January 11, 2018 1:49 PM
**To:** Jan Hasselman <jhasselman@earthjustice.org>; Ducheneaux Nicole <NDucheneaux@ndnlaw.com>
**Cc:** Scherman, William S. <WScherman@gibsondunn.com>; Fleischer, Jason J. <JFleischer@gibsondunn.com>
**Subject:** Selection of third party independent expert engineering company

Counsel:

As you know, on December 4, 2017, Judge Boasberg ordered Dakota Access to select, "with input from the Tribes," a third-party independent expert engineering company to perform a compliance audit of easement conditions, regulations, and integrity threats at Lake Oahe.  Dakota Access has identified three such companies listed below.

We would appreciate any input from your clients on these potential auditors **no later than January 25, 2018**.

The three identified expert engineering companies are, in no particular order:

Process Performance Improvement Consultants, LLC
http://p-pic.com/

TRC Solutions
https://www.trcsolutions.com/

Wood Group
https://www.woodgroup.com/

Thanks, and we look forward to hearing any input you may have.

Best regards,
David

**David Debold**

GIBSON DUNN

Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W., Washington, DC 20036-5306
Tel +1 202.955.8551 • Fax +1 202.530.9682
DDebold@gibsondunn.com • www.gibsondunn.com

---

This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

---

# ATTACHMENT 3

| | |
|---|---|
| **From:** | Joseph Messineo <JMessineo@ndnlaw.com> |
| **Sent:** | Thursday, January 25, 2018 2:01 PM |
| **To:** | 'Jan Hasselman'; Debold, David; Nicole Ducheneaux; Scherman, William S.; Fleischer, Jason J. |
| **Cc:** | NE Filing |
| **Subject:** | RE: Selection of third party independent expert engineering company |

All,

The Cheyenne River Sioux Tribe is in agreement with Jan's email.  Thank you.



Joseph V. Messineo
Phone: 402-333-4053
Fax: 402-333-4761
jmessineo@ndnlaw.com
www.ndnlaw.com
3610 N. 163rd Plz.
Omaha, NE 68116

The information contained in this e-mail transmission (including any accompanying attachment (s) is intended solely for its authorized recipient (s) and may be confidential and /or legally privileged.  If you are not an intended recipient, or responsible for delivering some or all of this transmission to an intended recipient, you have received this transmission in error and are hereby notified that you are strictly prohibited from reading, copying, printing, distributing, or disclosing any of the information contained in it.  In that event, please contact us immediately by telephone at 402.333.4053 or by email jmessineo@ndnlaw.com and delete the original and all copies of this transmission including any attachments without reading or saving in any manner.  If you are a client of our firm, this confirms that communication to you by e-mail is an acceptable way to transmit attorney-client information.

**Federal Tax Advice Disclaimer -** We are required by U. S. Treasury Regulations to inform you that, to the extent this message includes any federal tax advice, this message is not intended or written by the sender to be used, and cannot be used, for the purpose of avoiding federal tax penalties.Thank you.

**From:** Jan Hasselman [mailto:jhasselman@earthjustice.org]
**Sent:** Tuesday, January 23, 2018 1:25 PM
**To:** 'Debold, David' <DDebold@gibsondunn.com>; Nicole Ducheneaux <NDucheneaux@ndnlaw.com>
**Cc:** Scherman, William S. <WScherman@gibsondunn.com>; Fleischer, Jason J. <JFleischer@gibsondunn.com>
**Subject:** RE: Selection of third party independent expert engineering company

David:

Thank you for sharing the names of the auditors you have proposed.

Unfortunately, we do not believe that any of the suggested auditors meet the Court's direction for an "independent, third party auditor."  All of the proposed auditors either have close ties to the oil and gas industry generally, or do ETP/DAPL specifically—putting their "independence" very much in question.  Our technical team has reviewed all three closely and has grave doubts that any of them would be able to function independently for purposes of a third party audit.

For example, TRC lists ETP as a client and claims an "unparalleled record of experience in providing pipeline engineering services to the industry"  (https://www.trcsolutions.com/writable/images/Pipeline-Engineering.pdf)

Wood Group worked on DAPL for ETP and authored a number of what we to view to be highly superficial risk-related documents – an obvious conflict

As to the Process Performance Improvement Consultants, they appears to be involved a lot in litigation support for oil and gas firms generally and pipeline service companies specifically

The Tribe's technical team has identified an independent party who they believe would do a good job of overseeing an independent audit.  Gordon A. Aaker, PE, of Engineering Services LLP, GAA@Engineering-Experts.com.  A member of the technical team I believe checked in with Mr. Aaker to determine if he was available and he said he was.  We would agree to moving ahead with Mr. Aaker.   If we cannot agree, I suppose we will have to return to the Court for guidance.

Additionally, we have some concerns about the scope of the audit.  The original PHMSA recommendation that formed the core of our request to the Court was an audit of implementation of permit conditions and "any other integrity threats" affecting the pipeline.  We believe that this latter phrase involves a review of the Tribe's concerns with DAPL's risk analyses and other technical information.  A narrow review of implementation of permit conditions would not in our view be adequate.  Let's see if we can discuss this issue and get some agreement on the scope of the audit before too much more time goes by.

Please let us know how you'd like to proceed.

Jan

---

**From:** Debold, David [mailto:DDebold@gibsondunn.com]
**Sent:** Thursday, January 11, 2018 1:49 PM
**To:** Jan Hasselman <jhasselman@earthjustice.org>; Ducheneaux Nicole <NDucheneaux@ndnlaw.com>
**Cc:** Scherman, William S. <WScherman@gibsondunn.com>; Fleischer, Jason J. <JFleischer@gibsondunn.com>
**Subject:** Selection of third party independent expert engineering company

Counsel:

As you know, on December 4, 2017, Judge Boasberg ordered Dakota Access to select, "with input from the Tribes," a third-party independent expert engineering company to perform a compliance audit of easement conditions, regulations, and integrity threats at Lake Oahe.  Dakota Access has identified three such companies listed below.

We would appreciate any input from your clients on these potential auditors **no later than January 25, 2018**.

The three identified expert engineering companies are, in no particular order:

Process Performance Improvement Consultants, LLC
http://p-pic.com/

TRC Solutions
https://www.trcsolutions.com/

Wood Group
https://www.woodgroup.com/

Thanks, and we look forward to hearing any input you may have.

Best regards,
David

**David Debold**

GIBSON DUNN

Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W., Washington, DC 20036-5306
Tel +1 202.955.8551 • Fax +1 202.530.9682
DDebold@gibsondunn.com • www.gibsondunn.com

---

This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

---

ATTACHMENT 4

| | |
|---|---|
| **From:** | Jan Hasselman <jhasselman@earthjustice.org> |
| **Sent:** | Tuesday, February 20, 2018 1:44 PM |
| **To:** | Debold, David; Ducheneaux Nicole |
| **Cc:** | Scherman, William S.; Fleischer, Jason J.; Marinelli, Matthew (ENRD) (Matthew.Marinelli@usdoj.gov); Zilioli, Erica (ENRD) (Erica.Zilioli@usdoj.gov); William R. Perry (WPERRY@SONOSKY.COM); 'Dean DePountis'; Jan Hasselman |
| **Subject:** | Re: Selection of third party independent expert engineering company |

David

I never received any response to this email and as far as I know, there has been no further communication between ETP and the Tribe regarding the audit. We remain in the dark as to your client's intentions.

Today I received a message from Mr. Aaker, who the Tribe suggested as an independent auditor. Mr. Aaker reported that he received 4000 pages of documents from ETP and was given 2 days to review it and prepare a proposal. He reports that this is not possible. He further does not understand why he is being contacted by ETP, as there appears to be some confusion about his role. Since I have not talked to him, I don't really understand the issue.

To be clear, no one on my legal team has contacted Mr. Aaker. (I sent him a brief email today asking him not to contact the Judge or send me any of the materials he's received, both of which he said he was considering). He had been contacted by a member of the Tribe's staff to see if he was available to participate in the audit, but to the best of my knowledge, that was the only interaction. I think perhaps he was under the impression that he was to be hired by the Tribe directly.

He seems to think that there is a deadline today that he needs to take action on, and has requested to speak to me. I feel a need to contact him to explain what is going on. I'll plan to do so in about an hour. I'll follow up with a report of that discussion.

More broadly, I think it would be very useful to have a conversation about the scope and process for the audit so that the Tribe can have some confidence in the process, which it currently does not have. I am available tomorrow AM and Thursday all day for such a discussion. Please let me know.

Thanks,

Jan

_____

From: Jan Hasselman
Sent: Tuesday, January 23, 2018 11:25 AM
To: 'Debold, David'; Ducheneaux Nicole

Cc: Scherman, William S.; Fleischer, Jason J.
Subject: RE: Selection of third party independent expert engineering company

David:

Thank you for sharing the names of the auditors you have proposed.

Unfortunately, we do not believe that any of the suggested auditors meet the Court's direction for an "independent, third party auditor." All of the proposed auditors either have close ties to the oil and gas industry generally, or do ETP/DAPL specifically—putting their "independence" very much in question. Our technical team has reviewed all three closely and has grave doubts that any of them would be able to function independently for purposes of a third party audit.

For example, TRC lists ETP as a client and claims an "unparalleled record of experience in providing pipeline engineering services to the industry" (https://www.trcsolutions.com/writable/images/Pipeline-Engineering.pdf)

Wood Group worked on DAPL for ETP and authored a number of what we to view to be highly superficial risk-related documents – an obvious conflict As to the Process Performance Improvement Consultants, they appears to be involved a lot in litigation support for oil and gas firms generally and pipeline service companies specifically

The Tribe's technical team has identified an independent party who they believe would do a good job of overseeing an independent audit. Gordon A. Aaker, PE, of Engineering Services LLP, GAA@Engineering-Experts.com. A member of the technical team I believe checked in with Mr. Aaker to determine if he was available and he said he was. We would agree to moving ahead with Mr. Aaker. If we cannot agree, I suppose we will have to return to the Court for guidance.

Additionally, we have some concerns about the scope of the audit. The original PHMSA recommendation that formed the core of our request to the Court was an audit of implementation of permit conditions and "any other integrity threats" affecting the pipeline. We believe that this latter phrase involves a review of the Tribe's concerns with DAPL's risk analyses and other technical information. A narrow review of implementation of permit conditions would not in our view be adequate. Let's see if we can discuss this issue and get some agreement on the scope of the audit before too much more time goes by.

Please let us know how you'd like to proceed.

Jan

From: Debold, David [mailto:DDebold@gibsondunn.com]
Sent: Thursday, January 11, 2018 1:49 PM
To: Jan Hasselman <jhasselman@earthjustice.org>; Ducheneaux Nicole <NDucheneaux@ndnlaw.com>
Cc: Scherman, William S. <WScherman@gibsondunn.com>; Fleischer, Jason J. <JFleischer@gibsondunn.com>
Subject: Selection of third party independent expert engineering company

Counsel:

As you know, on December 4, 2017, Judge Boasberg ordered Dakota Access to select, "with input from the Tribes," a third-party independent expert engineering company to perform a compliance audit of easement conditions, regulations, and integrity threats at Lake Oahe. Dakota Access has identified three such companies listed below.

We would appreciate any input from your clients on these potential auditors no later than January 25, 2018.

The three identified expert engineering companies are, in no particular order:

Process Performance Improvement Consultants, LLC http://p-pic.com/

TRC Solutions
https://www.trcsolutions.com/

Wood Group
https://www.woodgroup.com/

Thanks, and we look forward to hearing any input you may have.

Best regards,
David

David Debold

GIBSON DUNN

Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W., Washington, DC 20036-5306 Tel +1 202.955.8551<tel:+1%20202.955.8551> • Fax +1 202.530.9682<tel:+1%20202.530.9682>
DDebold@gibsondunn.com<mailto:DDebold@gibsondunn.com> •
www.gibsondunn.com<http://www.gibsondunn.com/>
_____
This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.
_____

# ATTACHMENT 5

| | |
|---|---|
| **From:** | Scherman, William S. |
| **Sent:** | Tuesday, February 20, 2018 4:10 PM |
| **To:** | Jan Hasselman; Debold, David; Ducheneaux Nicole |
| **Cc:** | Fleischer, Jason J.; Marinelli, Matthew (ENRD) (Matthew.Marinelli@usdoj.gov); Zilioli, Erica (ENRD) (Erica.Zilioli@usdoj.gov); William R. Perry (WPERRY@SONOSKY.COM); 'Dean DePountis' |
| **Subject:** | RE: Selection of third party independent expert engineering company |

Jan,

You wrote the following to us on Jan. 23:

"The Tribe's technical team has identified an independent party who they believe would do a good job of overseeing an independent audit.  Gordon A. Aaker, PE, of Engineering Services LLP, GAA@Engineering-Experts.com.  A member of the technical team I believe checked in with Mr. Aaker to determine if he was available and he said he was.  We would agree to moving ahead with Mr. Aaker."

Dakota Access reached out to Mr. Aaker and then included him in the RFP process.  Mr. Aaker has since been in dialogue with Dakota Access regarding the RFP process.  The cause of the delay in getting him information is that he still has not signed a confidentiality agreement with the company.  Even without that agreement in writing, Dakota Access recently shared the RFP documents with him.  Dakota Access will also be in touch with Mr. Aaker to discuss when he can respond, whether that timing will work given the April 1 deadline, and when he can sign the required confidentiality agreement.

It's not at all clear why Mr. Aaker would feel he needed to reach out to you to answer questions about an RFP that he received from Dakota Access (ETP).  But then we do not know how your client's technical team explained this process when they made the contact you described in the language I quoted above.

The Order directs Dakota Access to select the third-party with input from the two Tribes.  We are working in good faith to follow up with Mr. Aaker based on that input.

Finally, we do not see any need for a call to discuss the "scope" of the audit.  The scope is set forth in the Order, and the firm that is selected will be given that Order.  The Order does not require the third-party firm, as part of "assess[ing] compliance all [easement] conditions as well as other integrity threats," to conduct "a review of the Tribe's concerns with DAPL's risk analyses and other technical information," as you wrote on Jan. 23.  The Corps is addressing the various reports laying out those concerns as part of the remand process for the "highly controversial effects" topic.  As for the language used in the Order, if other threats to the integrity of the Lake Oahe segment of the pipeline are identified, the third-party firm will include those threats in its audit.

thanks
Bill

-----Original Message-----
From: Jan Hasselman [mailto:jhasselman@earthjustice.org]
Sent: Tuesday, February 20, 2018 1:44 PM
To: Debold, David <DDebold@gibsondunn.com>; Ducheneaux Nicole <NDucheneaux@ndnlaw.com>
Cc: Scherman, William S. <WScherman@gibsondunn.com>; Fleischer, Jason J. <JFleischer@gibsondunn.com>; Marinelli, Matthew (ENRD) (Matthew.Marinelli@usdoj.gov) <Matthew.Marinelli@usdoj.gov>; Zilioli, Erica (ENRD)

(Erica.Zilioli@usdoj.gov) <Erica.Zilioli@usdoj.gov>; William R. Perry (WPERRY@SONOSKY.COM)
<WPERRY@SONOSKY.COM>; 'Dean DePountis' <ddepountis@standingrock.org>; Jan Hasselman
<jhasselman@earthjustice.org>
Subject: Re: Selection of third party independent expert engineering company

David

I never received any response to this email and as far as I know, there has been no further communication between ETP
and the Tribe regarding the audit.  We remain in the dark as to your client's intentions.

Today I received a message from Mr. Aaker, who the Tribe suggested as an independent auditor.  Mr. Aaker reported
that he received 4000 pages of documents from ETP and was given 2 days to review it and prepare a proposal.  He
reports that this is not possible.  He further does not understand why he is being contacted by ETP, as there appears to
be some confusion about his role.  Since I have not talked to him, I don't really understand the issue.

To be clear, no one on my legal team has contacted Mr. Aaker.  (I sent him a brief email today asking him not to contact
the Judge or send me any of the materials he's received, both of which he said he was considering).  He had been
contacted by a member of the Tribe's staff to see if he was available to participate in the audit, but to the best of my
knowledge, that was the only interaction.  I think perhaps he was under the impression that he was to be hired by the
Tribe directly.

He seems to think that there is a deadline today that he needs to take action on, and has requested to speak to me.  I
feel a need to contact him to explain what is going on.  I'll plan to do so in about an hour.  I'll follow up with a report of
that discussion.

More broadly, I think it would be very useful to have a conversation about the scope and process for the audit so that
the Tribe can have some confidence in the process, which it currently does not have.  I am available tomorrow AM and
Thursday all day for such a discussion.   Please let me know.

Thanks,

Jan

_____

From: Jan Hasselman
Sent: Tuesday, January 23, 2018 11:25 AM
To: 'Debold, David'; Ducheneaux Nicole
Cc: Scherman, William S.; Fleischer, Jason J.
Subject: RE: Selection of third party independent expert engineering company

David:

Thank you for sharing the names of the auditors you have proposed.

Unfortunately, we do not believe that any of the suggested auditors meet the Court's direction for an "independent, third party auditor." All of the proposed auditors either have close ties to the oil and gas industry generally, or do ETP/DAPL specifically—putting their "independence" very much in question. Our technical team has reviewed all three closely and has grave doubts that any of them would be able to function independently for purposes of a third party audit.

For example, TRC lists ETP as a client and claims an "unparalleled record of experience in providing pipeline engineering services to the industry" (https://www.trcsolutions.com/writable/images/Pipeline-Engineering.pdf)

Wood Group worked on DAPL for ETP and authored a number of what we to view to be highly superficial risk-related documents – an obvious conflict As to the Process Performance Improvement Consultants, they appears to be involved a lot in litigation support for oil and gas firms generally and pipeline service companies specifically

The Tribe's technical team has identified an independent party who they believe would do a good job of overseeing an independent audit. Gordon A. Aaker, PE, of Engineering Services LLP, GAA@Engineering-Experts.com. A member of the technical team I believe checked in with Mr. Aaker to determine if he was available and he said he was. We would agree to moving ahead with Mr. Aaker. If we cannot agree, I suppose we will have to return to the Court for guidance.

Additionally, we have some concerns about the scope of the audit. The original PHMSA recommendation that formed the core of our request to the Court was an audit of implementation of permit conditions and "any other integrity threats" affecting the pipeline. We believe that this latter phrase involves a review of the Tribe's concerns with DAPL's risk analyses and other technical information. A narrow review of implementation of permit conditions would not in our view be adequate. Let's see if we can discuss this issue and get some agreement on the scope of the audit before too much more time goes by.

Please let us know how you'd like to proceed.

Jan

From: Debold, David [mailto:DDebold@gibsondunn.com]
Sent: Thursday, January 11, 2018 1:49 PM
To: Jan Hasselman <jhasselman@earthjustice.org>; Ducheneaux Nicole <NDucheneaux@ndnlaw.com>
Cc: Scherman, William S. <WScherman@gibsondunn.com>; Fleischer, Jason J. <JFleischer@gibsondunn.com>
Subject: Selection of third party independent expert engineering company

Counsel:

As you know, on December 4, 2017, Judge Boasberg ordered Dakota Access to select, "with input from the Tribes," a third-party independent expert engineering company to perform a compliance audit of easement conditions, regulations, and integrity threats at Lake Oahe. Dakota Access has identified three such companies listed below.

We would appreciate any input from your clients on these potential auditors no later than January 25, 2018.

The three identified expert engineering companies are, in no particular order:

Process Performance Improvement Consultants, LLC http://p-pic.com/

TRC Solutions
https://www.trcsolutions.com/

Wood Group
https://www.woodgroup.com/

Thanks, and we look forward to hearing any input you may have.

Best regards,
David

David Debold

GIBSON DUNN

Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W., Washington, DC 20036-5306 Tel +1 202.955.8551<tel:+1%20202.955.8551> • Fax +1
202.530.9682<tel:+1%20202.530.9682>
DDebold@gibsondunn.com<mailto:DDebold@gibsondunn.com> •
www.gibsondunn.com<http://www.gibsondunn.com/>
_____

This message may contain confidential and privileged information. If it has been sent to you in error, please reply to
advise the sender of the error and then immediately delete this message.
_____

# ATTACHMENT 6



EMAIL G. AAKER    FAX    RESOURCES                    C. (832)418-9189 M. (281)627-3652 Sky: _ (281)668-3727    Search

HOME    SERVICES    ASSOCIATES    CURRENT OIL PRICES    CLIENTS    CONTACT    LIBRARY

**OUR PRIMARY BUSINESS IS "ENGINEERING LITIGATION SUPPORT"**

Global Services...

Gordon Aaker, Jr. P.E., President of ENGINEERING SERVICES,

has become a significant provider of litigation support through

his extensive industrial experience and knowledge of codes,

standards, and practices around the world.



**THE CORE OF EFFECTIVE LITIGATION MANAGEMENT IS GOOD COMMUNICATION WITH EVERYONE INVOLVED.**

## When you need the BEST...

Our business is to identify failures that are the result of poor design,
incorrect use of materials and manufacturing defects or service condition.

# ENGINEERING EXPERTS & CONSULTANTS

   

| CAN-DO | EXPERIENCE | KNOW-HOW | LITIGATION |
|---|---|---|---|
| ENGINEERING SERVICES, L.P., has provided engineering services and litigation support to Fortune 100 companies as well as other businesses who needed world-class expertise, from assuring project success to analyzing industry failures. Our specialities include industrial failures in the chemical, refining, oil and gas (offshore and onshore), petrochemical, energy, equipment manufacturer, pulp and paper, transportation, legal profession, as well as the private sector. | ENGINEERING SERVICES, L.P., has extensive experience, including many notable incidents. The most recent of which was the BP Deepwater Horizon – Macondo Blowout (GOM 2010), working exclusively for the Chemical Safety Board, as requested by U.S. Congress, House Energy Committee. Other clients include the United States Department of Justice and many Fortune 100 Companies. | ENGINEERING SERVICES, L.P., has proven experience to accurately identify failures that are the result of poor design, incorrect use of materials, manufacturing defects, and service conditions. From simple to complex, Root Cause Failure Analysis [RCFA] of accidents is our business primarily related to metallurgical, mechanical design, fabrication and implementation. | Gordon Aaker, Jr., P. E., President of ENGINEERING SERVICES, L.P., has become a significant provider of litigation support through his extensive industrial experience and knowledge of codes, standards, and practices. He is a recognized authority in design and construction codes, inspection standards and fabrication methods. |

HOME   SERVICES   ASSOCIATES   CURRENT OIL PRICES   CLIENTS   CONTACT   LIBRARY

RECENT INVESTIGATIONS - (CLICK ON THE PROJECT DESCRIPTION FOR MORE DETAIL)



DEEPWATER HORIZON/OIL SPILL   DRIVE SHAFT FAILURE   MARINE FAILURE   SOUTHERN PACIFIC 982

DOWN HOLE TUBING FAILURE   PIPING MANIFOLD FAILURE   TUBING FAILURE   MARINE FAILURE

EXXON TORRANCE REFINERY   CHEVRON RICHMOND REFINERY   SUBSEA PIPELINE REPAIR CLAMP   CRANE FAILURE

## GET TO KNOW US



Gordon A. Aaker, Jr., P.E., is a register professional Mechanical Engineer, and president of Engineering Services, L. P., that he founded in 1989. During his lengthy career, he has been responsible for managing notable mechanical engineering challenges worldwide. Mr. Aaker is an authority in mechanical design, fabrication codes/standards, and service conditions. He has demonstrated experience to accurately identify failures that are the result of poor design and incorrect use of materials or both. Mr. Aaker uniquely combines his HANDS ON Mechanical Engineering experiences with his academic strength as a degreed Metallurgical Engineer.

With over 35 years of industrial experience, Mr. Aaker and his colleagues guarantee world class engineering / consulting success by leaving - NO STONE UNTURNED. Mr. Aaker has been successful in determining Root Cause Failure Analysis of notable industrials failures, including the recent Deepwater Horizon disaster in the Gulf of Mexico. Mr. Aaker has authored numerous papers all the while routinely providing his services as a speaker at industrial sponsored seminars,and he has taught engineering curriculum at the university level.

## CONTACT US

**Address:**
Engineering Services, LP
P.O. Box 5811 - Kingwood - TX
- 77325-5811

**Phone:**
Office: (832) 418-9180
Fax: (713) 481-8428
Mobile: (281) 923-3638
Skype: (281) 968-0727

**Email:**
gaa@engineering-experts.com



## Engineering Services, LP.

2016 Engineering Services, LP. All Rights Reserved. Contact Engineering Services, LP for information.

# ATTACHMENT 7

| **From:** | Frey, Chuck (Charles) <chuck.frey@energytransfer.com> |
| **Sent:** | Thursday, February 1, 2018 2:33 PM |
| **To:** | gaa@engineering-experts.com |
| **Subject:** | Audit Proposal |

Gordon, this is to follow-up on our conversation yesterday and make sure you have my contact information to email items we discussed yesterday.
Thank you for taking time to discuss this project with me.

Chuck Frey, P.E.
VP Engineering
1300 Main St.
Office: 713 989 2768
Mobile: 281 216 7915
chuck.frey@energytransfer.com

# ATTACHMENT 8

**From:**           G A AAKER <GAA@ENGINEERING-EXPERTS.COM>
**Sent:**           Thursday, February 1, 2018 9:36 PM
**To:**             Frey, Chuck (Charles)
**Subject:**        RE: Audit Proposal

My apologies,

A colleague suggested I seek an approval to release the preliminary proposal.  I have been unable to confirm an approval to provide you a courtesy copy of the proposal.

I will keep you advised.

**Regards,**

**Gordon A. Aaker, Jr., P.E.**
**Failure Analysis Consultant**

  

**| Office: 832-418-9180  | Cell:  281-923-3638  | SKYPE:  281-968-0737  |**
**| Fax:  713-481-8428 | P. O. Box 5811 | Kingwood, TX | 77325 USA   |**

*This email may be confidential and/or privileged. Only the intended recipient may access or use it. If you are not the intended recipient, please delete this email and notify us promptly. We use virus scanning software but exclude all liability for viruses or similar in any attachment.*

**From:** Frey, Chuck (Charles) [mailto:chuck.frey@energytransfer.com]
**Sent:** Thursday, February 01, 2018 1:33 PM
**To:** gaa@engineering-experts.com
**Subject:** Audit Proposal

Gordon, this is to follow-up on our conversation yesterday and make sure you have my contact information to email items we discussed yesterday.
Thank you for taking time to discuss this project with me.

Chuck Frey, P.E.
VP Engineering
1300 Main St.
Office: 713 989 2768
Mobile: 281 216 7915
chuck.frey@energytransfer.com

Private and confidential as detailed here. If you cannot access hyperlink, please e-mail sender.

ATTACHMENT 9

| From: | Frey, Chuck (Charles) <chuck.frey@energytransfer.com> |
|---|---|
| Sent: | Monday, February 5, 2018 5:04 PM |
| To: | GAA@ENGINEERING-EXPERTS.COM |
| Subject: | RE: Audit Proposal |

Gordon, any movement on being able to share the preliminary proposal?

Also could you please provide your billing rates for our review?

Chuck Frey, P.E.
VP Engineering

**From:** G A AAKER [mailto:GAA@ENGINEERING-EXPERTS.COM]
**Sent:** Thursday, February 01, 2018 8:36 PM
**To:** Frey, Chuck (Charles) <chuck.frey@energytransfer.com>
**Subject:** RE: Audit Proposal

My apologies,

A colleague suggested I seek an approval to release the preliminary proposal.  I have been unable to confirm an approval to provide you a courtesy copy of the proposal.

I will keep you advised.

**Regards,**

**Gordon A. Aaker, Jr., P.E.**
**Failure Analysis Consultant**

  

| **Office: 832-418-9180  | Cell: 281-923-3638  | SKYPE:  281-968-0727  |**
| **Fax:  713-481-8428 | P. O. Box 5811 | Kingwood, TX | 77325 USA   |**

*This email may be confidential and/or privileged. Only the intended recipient may access or use it. If you are not the intended recipient, please delete this email and notify us promptly. We use virus scanning software but exclude all liability for viruses or similar in any attachment.*

**From:** Frey, Chuck (Charles) [mailto:chuck.frey@energytransfer.com]
**Sent:** Thursday, February 01, 2018 1:33 PM
**To:** gaa@engineering-experts.com
**Subject:** Audit Proposal

Gordon, this is to follow-up on our conversation yesterday and make sure you have my contact information to email items we discussed yesterday.
Thank you for taking time to discuss this project with me.

1

Chuck Frey, P.E.
VP Engineering
1300 Main St.
Office: 713 989 2768
Mobile: 281 216 7915
chuck.frey@energytransfer.com

Private and confidential as detailed here. If you cannot access hyperlink, please e-mail sender.

# ATTACHMENT 10

**From:**       G A Aaker <gaa@engineering-experts.com>
**Sent:**       Tuesday, February 6, 2018 10:02 AM
**To:**         Frey, Chuck (Charles)
**Subject:**    Proposal

Have not heard back and  I am reluctant to release anything without an approval.

Gordon Aaker, PE
Engineering  Services LP
Houston, Texas
Http://secure-web.cisco.com/1cp2u-0TDHRt96oPQyoicQUMHsB_Az2leNAVe-7X7X_pZkwr4eASlYRK-WAtXkf49-
hqMU9X57gfY0mhyyt6df9s4JaGPk7HLris2MgVdvoukyFhZTHDJCEwcI9dtGWjqIQiqnCY0DSEqI6St36pjiJ2iHjyMDmqvXPE8z
UyatuJQbHBWSTLNfael3ANF5fRQNxX4jwqhVlTJSz2WMT3DjhoDh-mGRtVqGYYviAUqVpRldX-
z4Bb0KtNpnpn7Fv8PYytTgkB1DwSNycCFP2lkA3kPazH_Pul1nUuZ_zCPJmdX20iyPJD9awd3iXkrpZ9U70lfhm4JHcQxu3diBm
BLHg/Http%3A%2F%2Fengineering-experts.com
281-923-3638

# ATTACHMENT 11

| | |
|---|---|
| **From:** | G.A.AAKER,JR.,P.E. <GAA@ENGINEERING-EXPERTS.COM> |
| **Sent:** | Tuesday, February 20, 2018 7:06 PM |
| **To:** | Siguaw, Tom |
| **Subject:** | FW: ---------RESPONSE TO YOUR REQUEST FOR A PROPOSAL-----DAPL - USACE - Remand Letter ****RFQ - THIRD PARTY INDEPENDENT EXPERT ENGINEERING COMPANY REVIEW**** ACTION REQUIRED**** |

**The proposal and related details may be found at the following link:**

http://secure-web.cisco.com/1njkxI_5na_Zr-TWkF_M-
0sg4NzQiQhplDvaY5nW6xtqHk4aerncNFvjRE3smYEiL9tGBpjD00z0sx_CQoxhKYAYmG0fprvmPVyi1Mxx2gqWzSywAF9tk0
NLuv4qJ5Zxzce-30ANE8x8to0X30E8ebJIWcpEiGonypra8iV-
2y8eGaXd67_Kgpb_Q9EM47pnWCiX8P5DNWvLNdrUbI4BKMX1XP85o0EiR1-X8Yrmjh-
ra5ONKrpXZDg4f2cLdy4J7FTooUBJ44m1XiPhjHG3cjo9A8M3JL9nbTdz00mffJhUEYoiUQZb39MRDkP0jJaYrFAEsy-
1_GDBXTFIZ4nUReA/http%3A%2F%2Fengineering-experts.com%2F16-PDF%2FGAA%2FDakota-Pipeline-Proposal.pdf

**Further, this proposal is offered in response to the email request, received from Mr. Siguaw on Monday (2/19) at 2:56 PM requesting a detailed proposal contingent upon the review of some four thousand pages of documentation residing at two different locations one of which is Energy Transfer Partners' preferred vendor, The Wood Group. It is virtually impossible to provide an adequate response in less than two working days. Additionally, the Period of Performance (23 Feb 2018 to 23 Mar 2018) is woefully inadequate to assess the site, review all available documentation, & then prepare an authoritative assessment. In West Texas, we refer to these bidding tactics as "Sand Bagging" or just plain "Bid Rigging." The sole intent of which is to limit competition and possibly stifle an independent, uncompromised review of the design through commissioning of the pipeline crossing as well as any potential changes to the current conditions.**

**When did the Wood Group receive access to these documents??**

**This proposal was prepared based on 100s of years of combined personal pipeline experience and not on any data that we were expected to review in less than 2 days.**

**Regards,**

**Gordon A. Aaker, Jr., P.E.**
**Failure Analysis Consultant**



**| Office: 832 418 9180 | Cell: 281 923 3638 | SKYPE: 281 968 0727 |**
**| Fax: 713-481-8428 | P. O. Box 5811 | Kingwood, TX | 77325 USA |**

**This email and any attached files are intended solely for the use of the person(s) to whom they are addressed and may contain information which is privileged, confidential and/or otherwise prohibited from any disclosure, copying or distribution. If you have received this communication in error, please immediately notify the sender by reply e-mail and delete the original message. Thank you.**

**From:** Siguaw, Tom [mailto:Tom.Siguaw@energytransfer.com]
**Sent:** Monday, February 19, 2018 2:56 PM
**To:** gaa@engineering-experts.com
**Cc:** Siguaw, Tom <Tom.Siguaw@energytransfer.com>
**Subject:** DAPL - USACE - Remand Letter ****RFQ - THIRD PARTY INDEPENDENT EXPERT ENGINEERING COMPANY REVIEW**** ACTION REQUIRED****
**Importance:** High

<u>**To:**</u> **Engineering Services, LP**
      **Gordon A. Aaker**: **281-923-3638**
      gaa@engineering-experts.com
      P.O. Box 5811
      Kingwood - TX - 77325-5811
      Office: (832) 418-9180

Dakota Access Pipeline (DAPL) is soliciting a Proposal for a third-party independent expert engineering company to review Dakota Access Pipeline - Lake Oahe, ND easement special conditions imposed by the US Army Corps of Engineers, and to assess compliance with all such conditions as well as other integrity threats between the valve sites closest to each shore of Lake Oahe, ND as ordered.

See the following attachments to this email:
      **Judicial Order on Remedy During Remand & Memorandum Opinion**
      **USACE Easement Special Conditions (Exhibit D)**
      **DAPL As-Built Overlay (Lake Oahe HDD Plan and Profile)**
      **DAPL As-Built Alignment Sheet (Lake Oahe Crossing Valve-to-Valve)**
**DAPL Post Construction Easement Conditions and Threat Assessment**

DAPL will make the confidential, relevant information available at its offices (1300 Main Houston, TX 77002) and at Wood Group's offices (17325 Park Row Houston, TX 77084. There are multiple files at both locations totaling ~ 4,000 pages.

Please include with your proposal the following items:
      List of personnel to be used for this Work (Review / Audit) with their respective resumes and billing rates.
      Required start date so as to complete this Work (Review / Audit) and furnish DAPL a written Final Report by **March 23, 2018**.
      Estimated total cost for this Work (Review / Audit).

<u>**Submit Proposal in writing and via email to the following**</u> --- <u>**Due 9:00 am on Thursday, February 22, 2018:**</u>
Tom Siguaw

Energy Transfer Partners
1300 Main
Ste. 14.036
Houston, TX 77002
Cell Phone: 713-249-3425
Email: tom.siguaw@energytransfer.com

You were recommended by Chuck Frey
Thanks

Tom Siguaw
Sr. Director
Energy Transfer Partners
(o) 713-989-2841
(c) 713-249-3425

Private and confidential as detailed here. If you cannot access hyperlink, please e-mail sender.



*P. O. Box 5811*
*Kingwood, Texas 77325*

*Office: 832 418 9180*
*Fax:713-481-8428*
*SKYPE: 281-968-0727*

*From the desk of G. A. Aaker, Jr., PE.*

| Prepared Specifically for: |
| :---: |
| **DC Federal District Court Judge BOASBERG - Washington, DC** |
| **DAKOTA ACCESS PIPELINE PROJECT** |
| **Independent / 3rd party Assessment-Audit / Root Cause Failure Analysis** |

February 20, 2018

Submitted via Email to: Tom Siguaw at Energy Transfer Partners
tom.siguaw@energytransfer.com

> **This proposal is offered in response to the email request, received from Mr. Siguaw on Monday (2/19) at 2:56 PM requesting a detailed proposal contingent upon the review of some four thousand pages of documentation residing at two different locations one of which is Energy Transfer Partners' preferred vendor, The Wood Group.  It is virtually impossible to provide an adequate response in less than two working days.   Additionally, the Period of Performance (23 Feb 2018 to 23 Mar 2018) is woefully inadequate to assess the site, review all available documentation, & then prepare an authoritative assessment.    In West Texas, we refer to these bidding tactics as "Sand Bagging" or just plain "Bid Rigging." The sole intent of which is to limit competition and possibly stifle an independent, uncompromised review of the design through commissioning of the pipeline crossing as well as any potential changes to the current conditions. When did the Wood Group receive the documents??**

Attention:    **DC Federal District Court Judge Boasberg**
              Washington, DC 0003

Re:     **DAKOTA ACCESS PIPELINE PROJECT**
        Independent / 3rd party Assessment-Audit / Root Cause Failure Analysis

        Engineering Services, LP, Proposal ESI18-P0920-01
        Gordon Aaker, Jr., PE
        Box 5811 Kingwood, Texas 77325
        281-923-3638

Gentlemen,

In response to your proposal request, **ENGINEERING SERVICES, LP., (ES)** offer the following for your consideration. We are offering Senior Engineering Consultants, Engineers and engineering support staff (as necessary) with proven pipeline experience to perform an INDEPENEDENT / THIRD PARTY ASSESSMENT-AUDIT of the ROOT CAUSE FAILURE ANALYSIS (RCFA) of DAKOTA ACCESS PIPELINE. This audit will include code compliance for the design, fabrication, installation, welding, nondestructive testing, and a design compliance review of procurement practices, including the design/operation parameters of the cathodic protection system.

---

**Engineering**
Services LP
*w w w . e n g i n e e r i n g - e x p e r t s . c o m*

*P. O. Box 5811*
*Kingwood, Texas 77325*

*Office:  832 418 9180*
*Fax:713-481-8428*
*SKYPE:  281-968-0727*

*From the desk of G.A. Aaker, Jr., PE.*

---

**Prepared Specifically for:**
**DC Federal District Court Judge BOASBERG - Washington, DC**
**DAKOTA ACCESS PIPELINE PROJECT**
**Independent / 3rd party Assessment-Audit / Root Cause Failure Analysis**

---

THIS IS A TIME AND MATERIALS PRELIMINARY ESTIMATE ONLY.  IT IS NOT POSSIBLE TO ESTIMATE SPECIFIC HOURS FOR EACH TASK. THE SCOPE OF WORK WILL BE DETERMINED ON "AS NEEDED" BASES WITH FULL CONCURRENCE AND PRIOR APPROVAL.   THERE ARE LIMITED PROVISIONS FOR SOME MATERIAL TESTING AND THE NORMAL HOURLY RATES HAVE BEEN SIGNIFICANTLY DISCOUNTED FROM OUR STANDARD FEE SCHEDULE.  THE DISCOUNTED FEE SCHEDULE IS AVAILABLE AT:

http://engineering-experts.com/16-PDF/GAA/GA-FEE-SCH-DISCOUNTED-DAKOTA-2018.pdf

**1.0 RELEVANT EXPERIENCE**

Our international reputation and experience is in providing failure analysis.  Relevant information regarding our extensive experience in pipelines maybe found on our company websites.
http://engineering-experts.com/index.html   and  http://engineeringservceslp.com

Further, a company brochure is available at:
http://engineering-experts.com/16-PDF/GAA/gaa-current-brochure.pdf

We have provided failure analysis to the **DEPARTMENT OF JUSTICE, ENVIRONMENTAL ENFORCEMENT DIVISION** regarding pipeline failures, and have recently provided failure analysis support to the **HOUSE OF REPRESENTATIVES, CONGRESS OF THE UNITED STATES COMMITTEE OF ENERGY AND COMMERCE** regarding the BP MACONDO incident, during the incident, and subsequently provided the RCFA.

Engineering Services, LP, prepared several reports; 2 of the reports are available for your review at:
http://www.csb.gov/macondo-blowout-and-explosion/

*Note:  The reports are located under the tab <Macondo Appendices>.*
*The bases for the Macondo video on the same page was from computer modeling that*
*we believe will be necessary for your project.  Please watch the 12-minute video.*

Additional relevant experience, include:

- **ES** documents related to BP Macondo Investigation may be found on the company website at:
  http://engineering-experts.com/csb-reports.html

- United States Chemical Safety and Hazard Investigation Board (CSB) "Report Card" indicating our performance with regards to the BP Macondo investigation:
  http://engineering-experts.com/16-PDF/GAA/REPORTCSB.pdf

---

*P. O. Box 5811*
*Kingwood, Texas 77325*

*Office:  832 418 9180*
*Fax:713-481-8428*
*SKYPE:  281-968-0727*

*From the desk of G. A. Aaker, Jr., PE.*

| |
|---|
| **Prepared Specifically for:**<br>**DC Federal District Court Judge BOASBERG - Washington, DC**<br>**DAKOTA ACCESS PIPELINE PROJECT**<br>**Independent / 3rd party Assessment-Audit / Root Cause Failure Analysis** |

- Extensive experience with pipeline calculations:
  http://engineering-experts.com/oil-and-gas-pipeline-engineering-expert.html

- Extensive experience with developing Department of Transportation (DOT) Pipeline compliance procedures:
  http://engineering-experts.com/dot-procedure-index.html

- Extensive experience includes knowledge of commonly used pipeline welding processes and the defects associated with each process:
  http://engineering-experts.com/pipeline-welding-engineering-expert.html

- Recent published paper by Gordon Aaker in World Pipeline regarding procurement of line pipe:
  http://engineering-experts.com/16-PDF/PUBLISHED/PAPER-CHECK-MARK.pdf

- Recent published paper by Gordon Aaker in World Pipeline regarding bending practices of line pipe:
  http://engineering-experts.com/16-PDF/PUBLISHED/PAPER-BENDING.pdf

- Various industrial specification prepared by **ES,** primarily related to pipeline design and fabrication:
  http://engineering-experts.com/specification-index.html

- Design and operation of the impressed cathodic protection.  Premature failure can be caused by excessive current leaving the pipeline, resulting in premature loss of the base metal.
  http://engineering-experts.com/metallurgical-cathodic-protection-engineering-expert.html

**2.0 METHODOLOGY (Basis of Estimate)**

**Introduction**

**ENGINEERING SERVICES, LP, (ES)** proposes that the Root Cause Failure Analysis (RCFA) of the DAKOTA ACCESS PIPELINE INVESTIGATION be divided into three major work phases:



*P. O. Box 5811*
*Kingwood, Texas 77325*

*Office:  832 418 9180*
*Fax:713-481-8428*
*SKYPE:  281-968-0727*

*From the desk of G. A. Aaker, Jr., PE.*

---

**Prepared Specifically for:**
**DC Federal District Court Judge BOASBERG - Washington, DC**
**DAKOTA ACCESS PIPELINE PROJECT**
**Independent / 3rd party Assessment-Audit / Root Cause Failure Analysis**

---

### PHASE 1 - COLLECTION

### PHASE 2 - ANALYSIS

### PHASE 3 - SOLUTION

Each of these steps is described below. It is best to proceed through all the phases (i.e., one should not consider solutions until the analysis is complete), but it is not a one-way path. There are plenty of reasons to possibly back up and repeat or revisit any steps in the process before proceeding further.  The failure of the DAKOTA ACCESS PIPELINE can (may) be a complicated collection of events.

The RCFA proposed by **ENGINEERING SERVICES, LP, (ES)** is not a single, sharply defined methodology; there are many different tools, processes, and philosophies of RCFA. However, most of these can be classed into five, very-broadly defined "schools" that are named here by their basic fields of origin: **SAFETY-BASED, PRODUCTION-BASED, PROCESS-BASED, FAILURE-BASED, AND SYSTEMS-BASED.**  These must be considered by **ES** in the analysis of this complex failure.

**Phase 1 Collection**

- Building a Team

  Collection - is used to describe all the work necessary to prepare for the analysis phase. Naturally, the first step is to form a team that will participate in the RCFA. Team members should have ownership of the problem, and will therefore include engineers, technicians, and operators. These team members are considered the natural team, as they have a firsthand interest in the results of the RCFA., as is the case for all parties.

  There are two main reasons why other team members will be added over the course of the investigation.

  ***FIRST, IT WILL BE NECESSARY TO BRING EXPERTISE INTO THE TEAM TO HELP RESOLVE KEY QUESTIONS OR ASSIST IN THE DEVELOPMENT OF VIABLE SOLUTIONS. THESE "EXPERT" TEAM MEMBERS DO NOT NEED TO BE PERMANENT MEMBERS, AND CAN BE RELEASED ONCE THEIR CONTRIBUTION IS COMPLETE.*** Their role is to support the investigation so that it is not halted for technical reasons.

---

*P. O. Box 5811*
*Kingwood, Texas 77325*

*Office: 832 418 9180*
*Fax:713-481-8428*
*SKYPE: 281-968-0727*

*From the desk of G. A. Aaker, Jr., PE.*

| Prepared Specifically for: |
| --- |
| **DC Federal District Court Judge BOASBERG - Washington, DC**<br>**DAKOTA ACCESS PIPELINE PROJECT**<br>**Independent / 3rd party Assessment-Audit / Root Cause Failure Analysis** |

***THE SECOND REASON TO ADD TEAM MEMBERS IS TO INCREASE THE CIRCLE OF INFLUENCE OF THE TEAM.*** As the investigation matures, it may become apparent that the real root cause lies outside of the current team's influence. For example, the investigation may point to an issue in manufacturing. In such a case, it is important to add a team member that has the desired influence (i.e., manufacturing background), so that the investigation is not prematurely halted due to organizational boundaries.

- Defining the Problem

**ES** will work closely with the all parties to define the problem as a team activity, usually requiring some amount of brainstorming to come up with just the right definition. The quality of the investigation depends heavily on the quality of the problem definition. A good problem definition is short, simple, and easy to understand. In fact, if a problem statement is complicated, it merely reflects a poor understanding of the real problem. It is important that everyone on the team understands and agrees with the problem statement.

The problem statement must also not be biased toward a specific solution. The consequence is the potential to either completely miss the real root cause, or at a minimum, miss some important contributing causes.

- Data Collection

The final portion of the collection phase is the actual data collection.  There are three common types of data:

- physical evidence,
- recorded evidence
- Personal testimony

The most critical aspect of collecting the physical evidence is to resist the urge to clean. Although it may seem desirable to provide clean, easy to handle samples to the various technical experts for review, the odds are that valuable data will be lost in the cleaning process. Cleaning these parts before the completion of the investigation will add uncertainty to the metallurgical analysis, as well as eliminate the evidence of a potential corrosive source.  There are times when it is necessary to further damage evidence just to remove it from the scene. In this case, care should be taken to not impact the actual damaged portions of the evidence.

*P. O. Box 5811*
*Kingwood, Texas 77325*

*Office: 832 418 9180*
*Fax:713-481-8428*
*SKYPE: 281-968-0727*

**Engineering Services LP**
www.engineering-experts.com

*From the desk of G. A. Aaker, Jr., PE.*

---

**Prepared Specifically for:**
**DC Federal District Court Judge BOASBERG - Washington, DC**
**DAKOTA ACCESS PIPELINE PROJECT**
**Independent / 3rd party Assessment-Audit / Root Cause Failure Analysis**

---

In addition to the failed components, it is important to the investigation to provide good, undamaged components for study as well. Undamaged parts can also be important for extracting geometric information to be used in a computer simulation (finite element analysis [FEA], computational fluid dynamics [CFD], etc.).  Depending on the type of failure, it may also be important to capture physical evidence.

***IT IS EXPERIENCE THAT WILL DETERMINE WHAT OTHER PHYSICAL EVIDENCE NEEDS TO BE RETAINED.*** If there is doubt, it is certainly better to retain the samples. They can always be discarded once the investigation is over.

Recorded evidence is the next significant type of data to be collected by members of the team. Pictures are clearly necessary for the investigation. The tendency is to take too few pictures, because at the time, it seems impossible to forget what is being witnessed. However, experience at **ES** has shown that there cannot be too many pictures. There are two good concepts to keep in mind when taking pictures. First, for each detail picture, include a series of pictures that start from a very large view, and then gradually (perhaps three steps) zooms into the desired level of detail. This technique is vital to maintaining perspective and orientation.

The other forms of recorded data such as, supervisory control and data acquisition (SCADA) is a control system architecture that uses computers, networked data communications and graphical user interfaces for high-level process supervisory management.  Since data is embedded with electronic dates, it is ideal for generating a timeline of events.  Therefore, it is critical to the complete understanding of operating conditions at the time of failure.

A review of the data related to the fabrication, testing and inspection of the pipeline is critical. This includes pipe mill test reports, welding procedure specification (WPS) & procedure qualification records (PQR), daily inspector reports, and Non-Destructive Examination (NDE) reader sheets. Further, ALL the x-ray film will likely need to be reviewed.

The other important category of data to collect is the personal testimony. Theoretically, since everyone involved is discussing the same event, all the various accounts should converge. If the information from the various personnel does not agree, it may be a sign of multiple failures. Obviously, there is significant potential for finger pointing, or at least perceived finger pointing during this phase of data collection. To minimize this perception, it is important that the interviews be conducted by a rational, coolheaded person. Sending in an irritated and irrational person to collect personal testimony will have adverse effects on the quality of the testimony. Second, it is important to stay focused only on data collection, building a consistent timeline, etc. Any premature discussion of the cause of failure will likely adversely impact the interview process.



*P. O. Box 5811*
*Kingwood, Texas 77325*

*Office:  832 418 9180*
*Fax:713-481-8428*
*SKYPE:  281-968-0727*

*From the desk of G. A. Aaker, Jr., PE.*

---

**Prepared Specifically for:**
**DC Federal District Court Judge BOASBERG - Washington, DC**
**DAKOTA ACCESS PIPELINE PROJECT**
**Independent / 3rd party Assessment-Audit / Root Cause Failure Analysis**

---

It is up to the investigating team (**ES**) to resolve all conflicts in the data, whether it is in the personal testimony, in the operator logs, etc. Unfortunately, due to the human influence, none of the data sources will be pristine. **ES** will compare all the data, filling in the gaps, and resolving the conflicts, so that a clear and consistent picture of the failure can be obtained.

**Phase 2 Analysis**

- Building the Cause Chain

   **ES** will analyze the collected data to build the cause chain and determine the immediate, contributing, and root causes of the failure. The immediate cause is typically the first one in the cause chain, thus directly leading to the failure. The root cause is the last one in the cause chain, while the contributing causes are the ones in between the immediate and the root. Although the process is referred to as root cause failure analysis, it is important to identify all the causes.

   **ES** 's experience indicates that there are some other important key points to remember during the analysis phase.

   - Follow the data—the most difficult aspect of the analysis phase is avoiding preconceived notions regarding the root cause. It is up to the team members to protect each other from this trap. The investigation team must stick to the data and exclude "gut feel" from the investigation.

   - Consider both technical and organizational causes—finding the technical answer is often difficult, but the investigation should not stop there. Organizational influences can be just as significant and must also be included in the investigation.  What appears to be operator error is most likely a broken process, missing check, or unclear expectations.

   - Concentrate on analysis—save the problem solving for the next phase. The key at this point is to identify the immediate, contributing, and root causes.

   The analysis phase is complete once the immediate, contributing, and root causes are identified. The root cause is dependent on the reach of the team. If the last contributing cause exists at a boundary that cannot be crossed (by either adding technical or organizational influence), then it is effectively the root cause. This is where the solution phase should focus. It is only of academic value to identify a root cause over which the team has no influence.

---



*P. O. Box 5811*
*Kingwood, Texas 77325*

*Office:  832 418 9180*
*Fax:713-481-8428*
*SKYPE:  281-968-0727*

*From the desk of G. A. Aaker, Jr., PE.*

| **Prepared Specifically for:** |
| --- |
| **DC Federal District Court Judge BOASBERG - Washington, DC** |
| **DAKOTA ACCESS PIPELINE PROJECT** |
| **Independent / 3rd party Assessment-Audit / Root Cause Failure Analysis** |

**Phase 3 Solution**

- Breaking the Cause Chain

**ES**'s fundamental objective of the solution phase is to break the cause chain.  This means that the quality of the solution depends heavily on the quality of the cause chain developed in the analysis phase.

Another important feature of the cause chain is that since most failures are the result of both root and contributing causes, there are usually multiple areas that can be addressed. This is important to recognize in the solution phase, as it helps to open the number of possible solutions to the original problem. It is also possible that preventing some of the contributing causes can also lead to improved reliability in other areas not presently considered.

**Summary**

***THE PREMATURE FAILURE OF A PIPELINE SUGGEST BOTH TECHNICAL AND ORGANIZATIONAL FLAWS. THE OBJECTIVE OF THIS PROJECT IS TO PROVIDE A PRACTICAL APPROACH TO A RCFA AND DETERMINE THE APPROPRIATE CORRECTIVE/PREVENTIVE ACTION RECOMMENDATIONS NECESSARY TO AVOID FAILURES IN THE FUTURE.***

Although it is unreasonable to expect perfect performance with perfect reliability, it is equally unreasonable to allow future failures to occur repeatedly, particularly, premature in the service life designed into this pipeline.

*"We cannot solve our problems with the same thinking
we used when we created them."* -Albert Einstein

RCFA starts with the COLLECTION PHASE, consisting of team forming, problem definition, and of course data collection. Next is the ANALYSIS PHASE, determining the immediate, contributing, and root causes of the defined problem. Finally, the SOLUTION PHASE consists of determining the appropriate corrective/preventive action plan that will effectively break the cause chain. In each phase of the process, there are critical steps and simple guidelines to consider that will keep the investigation focused and practical. These are the key characteristics of a successful RCFA that **ES** is proposing.



*P. O. Box 5811*
*Kingwood, Texas 77325*

*Office:  832 418 9180*
*Fax:713-481-8428*
*SKYPE:  281-968-0727*

*From the desk of G. A. Aaker, Jr., PE.*

| Prepared Specifically for: |
| :---: |
| **DC Federal District Court Judge BOASBERG - Washington, DC** |
| **DAKOTA ACCESS PIPELINE PROJECT** |
| **Independent / 3rd party Assessment-Audit / Root Cause Failure Analysis** |

From the very beginning of the investigation, **ES** would like agreement on a Table of Contents for the final report.  As data is collected and evaluated, it should immediately be incorporate into the final report, similarly to a DATA BOOK.  For example, in this industry, as we design and build equipment, we add the design and manufacturing information into a single volume referred to as a: **DATA BOOK**.  When the equipment is ready for shipment the DATA BOOK is reviewed for completion and then, and only then is the equipment released for shipped.

**3.0 PAST PERFORMANCE**

ES has successfully provided this type of services in the past.  Historically, that service has been provided to private industry, where we are bound by confidentiality agreements and may not make any specific references to the projects.  A few notable projects that we can refer to include:  Phillips incident in Pasadena, Texas (1990), PEPCON Rocket Fuel Plant in Henderson, Nevada (1989), DOJ Environmental Enforcements Division (1999) and House of Representatives, Congress of the United States Committee of Energy and Commerce (Congressman Waxman's Office) regarding the BP incident (2010) in the GOM.

| Reference | Title | Project* | Contact Info |
| :--- | :--- | :--- | :---: |
| Mr. Neal Prescott | Executive Director of Subsea Development with Fluor Corp. | Enserch Garden Banks 387 and 441, BP Troika, Amerada Hess Pipeline Projects | 832-660-6569 |
| Mr. Eric Hevle | Offshore Gulf of Mexico Director for Nexens Petroleum | Chevron Blind Faith and BP Thunder Horse Pipeline Projects | 281-353-7242 |
| Dr. Marybeth Mulchy | Investigator for the Chemical Safety Board | BP Macondo oil spill in Gulf of Mexico | 202-591-4223 |
| Mr. William Mevis | R J Pipeline of America | Williams Brother Broomvang Nansen Pipeline Project, Gulf of Mexico | 713-775-9274 |
| Mr. Jeremy Price | Project Manager at KBR | Anadarko Hassi-Berkin Pipeline Project in Africa | 281-654-5342 |
| Mr. Mark Mateer | Shell Oil Company | W Ho, Par, Cardinal, Tigris Pipeline Projects | 832-722-2003 |

*\*Responsibilities for these projects include the design, fabrication, inspection and testing of pipeline and related oil and gas related equipment used in the oil industry.*

**4.0 RESPONSES**



*P. O. Box 5811*
*Kingwood, Texas 77325*

*Office: 832 418 9180*
*Fax:713-481-8428*
*SKYPE: 281-968-0727*

*From the desk of G. A. Aaker, Jr., PE.*

<table>
<tr><td colspan="2">

**Prepared Specifically for:**
### DC Federal District Court Judge BOASBERG - Washington, DC
**DAKOTA ACCESS PIPELINE PROJECT**
**Independent / 3rd party Assessment-Audit / Root Cause Failure Analysis**
</td></tr>
</table>

| Item Number | Description | Response |
|---|---|---|
| NA | Discount Terms | There are no additional DISCOUNTS.  The billing rate for this work has been discounted from our January 2017, Fee Schedule. |
| NA | Contractor/Offeror | D- U- N -S Number is 025654854 |
| NA | Check if Remittance is Different | No |

**5.0 COST ESTIMATE –PROPOSAL**

**THIS IS A TIME AND MATERIALS PRELIMINARY ESTIMATE ONLY.**  *IT IS NOT POSSIBLE TO ESTIMATE SPECIFIC HOURS FOR EACH LABOR RATE. THE SCOPE OF WORK WILL BE DETERMINED ON "AS NEEDED" BASES BY ES AND THE CLIENT.    THERE ARE LIMITED PROVISIONS FOR SOME TESTING.  THE HOURLY RATES WILL BE ACCORDING TO THE DISCOUNTED FEE SCHEDULE.*

| Item No. 19 | Description | Item Number 23 Unit Price | Item Number 24 Total Amount | Description |
|---|---|---|---|---|
| | Breakout Labor Categories | | | Rates have been discount from our standard/published rates for this project http://engineering-experts.com/16-PDF/GAA/GA-FEE-SCH-DISCOUNTED-DAKOTA-2018.pdf |
| A | 320 hrs. | $265.00/hr. | $84,800 | <SR. ENGINEERING CONSULTANT> Registered Licensed Professional Engineer, 1/2 Time- (20 hours per week) for 4 |



*P. O. Box 5811*
*Kingwood, Texas 77325*

*Office: 832 418 9180*
*Fax:713-481-8428*
*SKYPE: 281-968-0727*

*From the desk of G. A. Aaker, Jr., PE.*

| | | | | |
|---|---|---|---|---|
| | | | | **Prepared Specifically for:**<br>**DC Federal District Court Judge BOASBERG - Washington, DC**<br>**DAKOTA ACCESS PIPELINE PROJECT**<br>**Independent / 3rd party Assessment-Audit / Root Cause Failure Analysis** |
| | | | | months. This is a lead Engineering Position that will be filled by Gordon Aaker, Jr., PE. He will be responsible for ownership of the work performed. Mr. Aaker has 35 years' experience in providing failure analysis to the oil/gas industry. Mr. Aaker has previously worked for the United States Department of Justice on pipeline failures and recently assisted the House of Representatives, Congress of the United States Committee of Energy and Commerce (Congressman Waxman's Office) regarding the BP incident (2010) in the GOM. – 320 HOURS |
| B | 640 hrs. | $265.00/hr. | $169,600.00 | <SR. ENGINEERING CONSULTANT><br>Two (2) Registered Licensed Professional Engineer, 1/2 TIME EACH or 40 hours per week for 4 month @ $ 265.00 per hour. This position will be filled by a variety of specialized consultants (i.e. Controls Engineer, Mechanical Engineer, Design Engineer, Stress Ana. Engineer, Non-Destructive Testing Engineer). <u>THEY WILL BE TEMPORARILY ASSIGNED ON A CASE BY CASES BASES WITH CONCURRENCE</u>. – 640 HOURS |
| C | 640 hr. | $175.00 | $112,000.00 | <ENGINEER> One (1) Engineer, full time- 40 hours per week for 4 month @ $175.00 per hour. This position will be filled by a variety of specialized consultants (i.e. Controls Engineer, Mechanical Engineer, Design Engineer, Stress Ana. Engineer, Electrical |



*P. O. Box 5811*
*Kingwood, Texas 77325*

*Office: 832 418 9180*
*Fax:713-481-8428*
*SKYPE: 281-968-0727*

*From the desk of G. A. Aaker, Jr., PE.*

| Prepared Specifically for: |
|---|
| **DC Federal District Court Judge BOASBERG - Washington, DC** |
| **DAKOTA ACCESS PIPELINE PROJECT** |
| **Independent / 3rd party Assessment-Audit / Root Cause Failure Analysis** |

| | | | | |
|---|---|---|---|---|
| | | | | Engineer, Non-Destructive Testing Engineer). <u>THEY WILL BE TEMPORARILY ASSIGNED ON A CASE BY CASES BASES WITH CONCURRENCE.</u> – 640 HOURS<br><br>*NOTE: The combined hours for Full Time Engineers Will Be shared among other Engineering Consultant Specializing in different engineering disciplines, as required.* |
| D | 640 hr. | $125.00 | $80,000.00 | <SR. TECHNICAL ASSISTANCE> full time- 40 hours per week for 4 month @ $125.00 per hour. To provide supplemental technical support to the Engineer staff. <u>THEY WILL BE TEMPORARILY ASSIGNED ON A CASE BY CASES BASES WITH CONCURRENCE OF THE CLIENT.</u> – 640 HOURS<br><br>*NOTE: Technical Assistance will be utilized in lieu of engineering hours to reduced cost, where possible.* |
| E | Other Direct Costs | | $ 3,000.00 | <MISC PHOTOGRAPHY / VIDEO> - if necessary |



*P. O. Box 5811*
*Kingwood, Texas 77325*

*Office:  832 418 9180*
*Fax:713-481-8428*
*SKYPE:  281-968-0727*

*From the desk of G. A. Aaker, Jr., PE.*

| Prepared Specifically for: |
| --- |
| **DC Federal District Court Judge BOASBERG - Washington, DC** |
| **DAKOTA ACCESS PIPELINE PROJECT** |
| **Independent / 3rd party Assessment-Audit / Root Cause Failure Analysis** |

| | | | | |
| --- | --- | --- | --- | --- |
| F | Travel Expenses (Per Diem) 30 days | $250/day | $7,500.00 | Travel will be based from Houston Texas<br><br><PER DIEM> 30 days @ $250.00 per day per diem per person. (estimated)<br><br>*See:*  *http://www.gsa.gov/portal/category/21287* |
| | (Travel) 10 trips | $1,000 | $ 10,000.00 | <TRAVEL> It is virtually impossible to guess how often and who will be need and when they may be required.   We estimated minimum of 10 trips and an average cost of approximately $1,000.00 per trip |
| | 1 lot | $20,000.00 | $20,000.00 | <MISC. LABORATORY EXPENSES> to utilize Scanning Electron Microscope / EDS to analysis corrosion products and related metallographic examination. |

| | |
| --- | --- |
| **$ 486,900.00** | **PRELIMINARY ESTIMATED TOTAL** |

**5.0 OTHER CHARGES**

**THIS IS A TIME AND MATERIALS PRELIMINARY ESTIMATE ONLY.** *IT IS NOT POSSIBLE TO ESTIMATE SPECIFIC HOURS FOR EACH LABOR RATE. THE SCOPE OF WORK WILL BE DETERMINED ON "AS NEEDED" BASES BY ES AND THE CLIENT.    THERE ARE LIMITED PROVISIONS FOR SOME TESTING.  THE HOURLY RATES WILL BE ACCORDING TO THE DISCOUNTED FEE SCHEDULE.*

It is anticipated that ES will require a minimum of 2 subcontractors.  The subcontracted companies to **ES** include Houston Metallurgical Testing Laboratory, in Houston and potentially a computer modeling



*P. O. Box 5811*
*Kingwood, Texas 77325*

*Office:  832 418 9180*
*Fax:713-481-8428*
*SKYPE:  281-968-0727*

*From the desk of G. A. Aaker, Jr., PE.*

| |
|---|
| **Prepared Specifically for:** |
| **DC Federal District Court Judge BOASBERG - Washington, DC** |
| **DAKOTA ACCESS PIPELINE PROJECT** |
| **Independent / 3rd party Assessment-Audit / Root Cause Failure Analysis** |

(Engineering Critical Assessment/ Finite Element Analysis) subcontractor to be identified later, based on specific needs.

**7.0 KEY PERSONNEL**

    Gordon Aaker, Jr., P.E.   Principal Investigator

    http://engineering-experts.com/16-PDF/GAA/gaa-current-resume.pdf

**8.0 PAYMENT TERMS**

    Payment terms are NET 30 days.  Invoicing will be performed each 2-week period.  Our proposal is valid for 90 days.

**8.0 EXCEPTIONS**

| | ENGINEERING SERVICES PREFERRED |
|---|---|

| | |
|---|---|
| Terms of Payment NET 60 | Net 30 days |
| Invoicing Interval 30 days | Every 14 days |
| Designation of Law | Texas |
| Right to Jury Trial Waived | No – Prefer option for jury |

**9. 0 ENGINEERING SERVICES, L. P.  DESIGNATED CONTACT INFORMATION**

| NEGOTIATOR POINT OF CONTACT | GORDON AAKER |
|---|---|
| Tel: | 281.923.3638 |
| Email: | gaa@engineering-experts.com |
| DUNS: | 025654854 |
| CAGE: | 64XL$_3$ |
| NAICS: | 541330 |
| EIN: | 760668194 |
| Tax Payer ID: | 76-0668194 |
| Socio-Economic Status: | Small, Woman Owned Business |

**Engineering**
Services LP
www.engineering-experts.com

*P. O. Box 5811*
*Kingwood, Texas 77325*

*Office: 832 418 9180*
*Fax:713-481-8428*
*SKYPE: 281-968-0727*

*From the desk of G. A. Aaker, Jr., PE.*

---

| **Prepared Specifically for:** |
| :---: |
| **DC Federal District Court Judge BOASBERG - Washington, DC** |
| **DAKOTA ACCESS PIPELINE PROJECT** |
| **Independent / 3rd party Assessment-Audit / Root Cause Failure Analysis** |

---

We appreciate the opportunity to bid this work.  If you have any question, please give me a call.

Respectfully Submitted,
**Engineering Services, LP**

*[signature]*

Gordon Aaker, Jr., P.E.
President/ Failure Analysis Consultant

**Proposed Pipeline Engineering/Inspector Team (As Needed)**

http://engineering-experts.com/16-PDF/GAA//RESUMES/RESUME-D BENNETT-DAKOTA.pdf

http://engineering-experts.com/16-PDF/GAA//RESUMES/RESUME-D HAMILL-DAKOTA.pdf

http://engineering-experts.com/16-PDF/GAA//RESUMES/RESUME-G AAKER-DAKOTA.pdf

http://engineering-experts.com/16-PDF/GAA//RESUMES/RESUME-J BOMBA-DAKOTA.pdf

http://engineering-experts.com/16-PDF/GAA//RESUMES/RESUME-J CHACKO-DAKOTA.pdf

http://engineering-experts.com/16-PDF/GAA//RESUMES/RESUME-K RODGERS-DAKOTA.pdf

http://engineering-experts.com/16-PDF/GAA//RESUMES/RESUME-P HAMILL-DAKOTA.pdf

http://engineering-experts.com/16-PDF/GAA//RESUMES/RESUME-R VAUGHN-DAKOTA.pdf

http://engineering-experts.com/16-PDF/GAA//RESUMES/RESUME-S BAE-DAKOTA.pdf

http://engineering-experts.com/16-PDF/GAA//RESUMES/RESUME-N PRESCOTT-DAKOTA.pdf

http://engineering-experts.com/16-PDF/GAA//RESUMES/RESUME-J LEWIS-DAKOTA.pdf

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE,<br><br>                Plaintiff,<br><br>and<br><br>CHEYENNE RIVER SIOUX TRIBE,<br><br>            Intervenor Plaintiff,<br><br>      v.<br><br>U.S. ARMY CORPS OF ENGINEERS,<br><br>               Defendant,<br><br>and<br><br>DAKOTA ACCESS, LLC,<br><br>          Intervenor Defendant. | Civil Action No. 16-1534-JEB<br>(consolidated with Case Nos. 16-1796 & 17-267) |

—————————————————

**DECLARATION OF TODD NARDOZZI IN SUPPORT OF
DAKOTA ACCESS, LLC'S RESPONSE TO THE MOTIONS OF STANDING ROCK
SIOUX TRIBE AND CHEYENNE RIVER SIOUX TRIBE FOR "CLARIFICATION"
AND "MEANINGFUL CONSULTATION"**

—————————————————

1.      My name is Todd Nardozzi.  I am a Senior Manager, DOT Compliance, for Energy Transfer Partners, the parent company of Dakota Access, LLC.  For Dakota Access, I am responsible for maintaining the pipeline safety compliance program.  I have more than 9 years of experience in the energy industry maintaining compliance programs for both natural gas and hazardous liquids pipeline operations.

2.      The purpose of this declaration is to provide information about the Pipeline Hazardous

Materials and Safety Administration (PHMSA) audit process.

3.      Starting around 2008, PHMSA introduced an integrated inspection process which utilizes operator risk and safety data information to better focus its inspection resources.  By using data and information about a specific operator and pipeline system, PHMSA can focus inspection resources on those regulatory provisions addressing the greatest identified risks and concerns.

4.      PHMSA begins this inspection process with what is known as a "screening" set of questions designed to allow identification of focus areas.  After the screening of an operator, PHMSA inspects records and procedures, and conducts interviews to develop more focused questions designed to identify potential areas of risk and noncompliance.  PHMSA then focuses on the field conditions and maintenance performance records of the pipeline system.  These inspections can last for a time period as short as 3 weeks for smaller pipeline systems to several months for larger, multistate pipeline systems.

5.      During the construction of the DAPL system, PHMSA maintained a consistent presence on site reviewing and gauging compliance with the regulations found under Subparts C "Design Requirements" and D "Construction" of 49 CFR Part 195.  Major focus areas were materials quality, welder qualification and weld acceptability, coating quality control, valve placement, lowering into ditch processes, and backfilling.

6.      PHMSA Central Region will be conducting a system inspection of the Iowa and Illinois units of DAPL in 2018.  This inspection will include a detailed review of control room operations, leak detection systems, corrosion protection, breakout tanks, operator qualifications, public awareness, damage prevention, regulatory reporting and integrity management along with the written programs and procedures associated with each.  Integrity management includes High Consequence Area (HCA) identification, risk identification and ranking and integrity assessment

methodology and results.

7.      Energy Transfer Partners has applied a mature and robust regulatory compliance program to the Dakota Access pipeline system and does not anticipate any regulatory findings as a result of the pending PHMSA inspection.  However, should any findings in the official form of a Letter of Concern, Warning Letter, Notice of Amendment or Notice of Probable Violation be issued as a result of the PHMSA inspection, Energy Transfer Partners will evaluate the findings and respond accordingly in an official capacity.  It is important to note that any PHMSA findings, depending on their nature may require Energy Transfer Partners to make changes to its overall compliance program and how it is applied to the entirety of the Dakota Access pipeline system and not just the IA and IL units.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed March 16, 2018

_____

Todd Nardozzi

102467218.5

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

STANDING ROCK SIOUX TRIBE,

Plaintiff,

and

CHEYENNE RIVER SIOUX TRIBE,

Intervenor Plaintiff,

v.

U.S. ARMY CORPS OF ENGINEERS,

Defendant,

and

DAKOTA ACCESS, LLC,

Intervenor Defendant.

Civil Action No. 16-1534-JEB
(consolidated with Case Nos. 16-1796 & 17-267)

---

**DECLARATION OF WILLIAM S. SCHERMAN IN SUPPORT OF
DAKOTA ACCESS, LLC'S RESPONSE TO THE MOTIONS OF STANDING ROCK
SIOUX TRIBE AND CHEYENNE RIVER SIOUX TRIBE FOR "CLARIFICATION"
AND "MEANINGFUL CONSULTATION"**

---

I, William S. Scherman, declare as follows:

1.    I am a partner with the law firm of Gibson, Dunn & Crutcher LLP, counsel of record for

Intervenor Defendant Dakota Access, LLC.  I am a member in good standing of the Bar

of this Court.

2.    Attached hereto are true and accurate copies of the following:

- Attachment 1: Letter from Keith Fink, Chief, Operations Division, USACE, to

  Chris Sonneborn, SVP – Engineering, Energy Transfer Partners (Aug. 24, 2017)

- Attachment 2: Letter from Col. John Hudson, District Commander, USACE, to Chairman Harold Frazier, CRST (Feb. 23, 2018)

- Attachment 3: Letter from Col. John Hudson, District Commander, USACE, to Chairman Mike Faith, SRST (Feb. 23, 2018)

- Attachment 4: Letter from Col. John Hudson, District Commander, USACE, to President Troy "Scott" Weston, OST (Feb. 23, 2018)

- Attachment 5: AR ESMT 611-51, Letter from John Yellowbird Steele, President, OST, to Jo-Ellen Darcy, Assistant Secretary of the Army (Dec. 3, 2016), & EarthFax Engineering Group Report (Dec. 2, 2016)

Executed: March 16, 2018

/s/ William S. Scherman
William S. Scherman

# ATTACHMENT 1



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, OMAHA DISTRICT
1616 CAPITOL AVENUE
OMAHA NE 68102-4901

August 24, 2017

Chris Sonneborn
SVP - Engineering
Planning, Interstate, and Liquids Engineering Energy Transfer Partners
1300 Main Street
Houston, TX 77002

Dear Mr. Sonneborn:

The purpose of this letter is to request information that would assist the U.S. Army Corps of Engineers, Omaha District (Corps) in responding to the issues remanded back to the Corps for additional analysis by the U.S. District Court for the District of Columbia. *See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, No. 16-1534, Memorandum Opinion (D. D.C. June 14, 2017)(ECF No. 239).

The Corps requests the following:

1. Please provide a technical analysis of a rupture or spill scenario that takes into account the pipeline as constructed. This scenario would be in addition to the hypothetical scenario that has been used that assumed that the pipeline had been constructed on top of the lake and that any rupture would be a full guillotine break. This worst-case analysis based on a hypothetical scenario was required to comply with Pipeline Hazardous Material Safety Administration (PHMSA) requirements. Since "predicted spills generated by the model [that assumed top of lake construction] do not correlate with the majority of spills seen in actual releases," the Corps is requesting spill modeling that does correlate with the majority of spills and takes into account how the pipeline was actually constructed. *See* N.D. Lake Oahe Crossing Spill Model Discussion, Rev. F, at 13 (April 2016). In this as-built spill scenario, the information we are requesting should include, to the extent possible, locations of any seepage, how much oil is released, how much oil ends up being released into the Lake, pathways and distance of seepage, seasonal considerations, and expected impacts to the environment.

2. Please provide a factual and technical analysis that addresses the issues raised in the following reports:

(a) EarthFax Engineering Group, LLC. Letter to Oglala Sioux Tribe, Subject: Rieview of the Dakota Access Pipeline Project Environmental Assessment Related to Crossing of Flow Easements and Federal Lands (Dec. 2, 2016).



Printed on Recycled Paper

(b) Accufacts Inc., Memorandum to Jan Hasselman, Earthjustice, Re: Accufacts Review of the U.S. Army Corps of Engineers (USACE) Environmental Assessment (EA) for the Dakota Access Pipeline ("DAPL") (Oct. 28, 2016).

(c) ENVY Enerji ve Çevre Yatırımları A.Ş., Technical Engineering and Safety Assessment: Routing, Construction, and Operation of the Dakota Access Pipeline in North Dakota (Jan. 5, 2017).

(d) Hooshang Nezafati, Ph.D., Examining the Potential Adverse Impacts of the Dakota Pipeline Crossings to the Water Quality at the Cheyenne River Sioux Tribe Water Intake in the Missouri River, (Jan. 2017)(ECF 131-5, p. 196).

(e) Second Declaration of Richard B. Kuprewicz (March 24, 2017) (ECF No.195-1).

(f) Kuprewicz Report Update, Filed Under Seal (Feb. 12, 2017) (ECF No. 272-1).

(g) Holmstrom Declaration, (August 7, 2017) (ECF No. 272-4).

(h) Goodman Declaration (August 7, 2017) (ECF No. 272-5) (focusing on pipeline safety and Dakota Access construction).

(i) Goodman Declaration, Exhibit C (August 7, 2017) (ECF No. 272-5) (focusing on the section addressing the Dakota Access Pipeline Risk Analysis).

Please also do the same for any other report that the tribes submitted to the court or Corps, during the period of July 25 through February 8, that are not identified above. Also, please let us know if you need a copy of any report listed above.

3. If there is any relevant new information, please provide an updated risk assessment for the pipeline crossing that addresses the likelihood of rupture or a spill at the Lake Oahe crossing.

4. In light of your factual and technical analysis of the various reports, please address whether, in your view, these reports show the potential effects of the pipeline crossing of Lake Oahe to be highly controversial under the Council for Environmental Quality's National Environmental Policy Act regulations. *See* 40 C.F.R. § 1508.27(b)(4).

5. Please address and provide comments on the Director of the Standing Rock Sioux Tribe's Department of Game, Fish and Wildlife Conservation's declaration filed in *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*. *See* Declaration of Jeff Kelly, Director of Standing Rock Sioux Tribe's Department of Game, Fish and Wildlife Conservation, (filed Feb. 14, 2017) (ECF No. 117-16).

6. Please provide your analysis of the impact of the various spill scenarios on hunting and fishing in the area of the Lake Oahe crossing. Please address any

potential impacts down river, including duration and distance of such impacts. In your analysis, please consider the report prepared by Dr. Gillian Bowser. *See* Gillian Bowser, Ph.D., Assessment and Review Dakota Access Pipeline Environmental Assessment Terrestrial and Aquatic Organisms (Jan. 2017) (ECF No. 131-5). This analysis of potential impacts to hunting and fishing should include and highlight analysis or modeling and supporting data that establishes whether and where the oil would make contact with the shoreline of Lake Oahe, how long that contact would occur, the extent of the contamination and the response and remediation measures Dakota Access would take to mitigate any resulting damages. This should include analysis under the worst case scenario and the as-built scenario. Likewise, provide a similar analysis regarding the extent and effect of an oil spill on the aquatic resources from the pipeline down river toward and past the reservation boundaries as necessary under both the worst case and as built scenarios.

7. Please address the effects of a potential spill on water intakes for irrigation and drinking water down river toward and past the reservation boundaries on both sides of the river under both the worst-case and as-built scenario.

8. Please also provide us with any other information that you believe necessary to address the issues the Court is requiring the Corps to evaluate on remand.

We would appreciate receiving this information within the next 30 days. If you need additional time, please let us know. Following our review of the information you provide, we will determine our next steps in the remand process. Our point of contact for this action is Mr. Brent Cossette, Section 408 Coordinator. Mr. Cossette will be in touch with you within the next several days to address any immediate questions and to schedule any meetings to clarify these requests. In the interim, if you have any questions he can be reached at (402) 995-2712 or by e-mail at brent.j.cossette@usace.army.mil.

Respectfully,

Keith J. Fink
Chief, Operations Division

# ATTACHMENT 2



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, OMAHA DISTRICT
1616 CAPITOL AVENUE
OMAHA NE 68102-4901

February 23, 2018

REPLY TO
ATTENTION
District Commander

Chairman Harold Frazier
Cheyenne River Sioux Tribe
P. O. Box 590
Eagle Butte, South Dakota 57625

Dear Chairman Frazier:

We appreciate your involvement thus far in the Corps' remand analysis process. This letter is in response to your letter dated January 30, 2018, and your previous correspondence. We are not at a point in the National Environmental Policy Act process where we would consider adding cooperating agencies. Nonetheless, we continue to believe that our remand analysis would benefit from information submitted by your Tribe. We look forward to getting that information from you this month in response to our September 25, 2017 and November 27, 2017 letters.

We will provide you a courtesy copy of a letter sent to the Standing Rock Sioux Tribe, with enclosures. The enclosures relate to information requested by the Standing Rock Sioux Tribe and we are providing the documents for your information. Also, we have attached copies of the draft Geographic Response Plan and Oahe Project Irrigation/Municipal Easements list that Dakota Access and the Corps were prepared to discuss and share with your representative, Mr. Nelson, at the February 8, 2018, meeting in Bismarck, North Dakota. The purpose of this meeting was to comply with the Court's order for the parties to coordinate finalization of spill response plans at Lake Oahe. *See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, No. 16-1534, Order (D. D.C. Dec. 4, 2017)(ECF No. 303). However, shortly after the meeting began, Mr. Nelson left the meeting with representatives from the Standing Rock Sioux Tribe and therefore missed the discussion on the updated Geographical Response Plan.

We are in the process of finishing our review of the spill model and the results submitted by Energy Transfer Partners. We are still considering your request for information related to the spill model. Prior to releasing any spill model information, the Corps will consult with other federal agencies to ensure that protected Sensitive Security Information or protected Critical Infrastructure Information is not disclosed.

Please contact Joel Ames at (402) 995-2909 to schedule a time for us to meet at a mutually agreeable location to discuss the information from your Tribe that will inform the remand analysis.

Sincerely,

John L. Hudson, P.E.
Colonel, Corps of Engineers
District Commander

Printed on Recycled Paper

-2-

cc:
Nicole Ducheneaux
Fredericks Pebbles & Morgan LLP
3610 N. 163rd Plaza
Omaha, Nebraska  68116

ATTACHMENT 3



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, OMAHA DISTRICT
1616 CAPITOL AVENUE
OMAHA NE 68102-4901

February 23, 2018

REPLY TO
ATTENTION
District Commander

Chairman Mike Faith
Standing Rock Sioux Tribe
Bldg. #1, North Standing Rock Avenue
P.O. Box D
Fort Yates, North Dakota 58538

Dear Chairman Faith:

We appreciate your involvement thus far in the Corps' remand analysis process. This letter is in response to your letter dated December 18, 2017. We are in the process of finishing our review of the spill model and the results submitted by Energy Transfer Partners, as well as gathering documents related to your request. During that time, please continue in your efforts to provide your information related to the remand issues that we request on September 25, 2017.

Certain items that you have requested and issues that you have raised are the subject of ongoing coordination efforts between the parties in response to the court's December 4, 2017 order on the oil-spill response plan. I am enclosing copies on a disk of the draft Geographic Response Plan and Oahe Project Irrigation/Municipal Easements list that Dakota Access and the Corps were prepared to discuss and share with your representatives at the 8 February 2018 meeting in Bismarck, North Dakota. The purpose of this meeting was to comply with the Court's order for the parties to coordinate finalization of spill response plans at Lake Oahe. *See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, No. 16-1534, Order (D. D.C. Dec. 4, 2017)(ECF No. 303). However, shortly after the meeting began, the Standing Rock Sioux Tribe's representatives left the meeting with a representative from the Cheyenne Rock Sioux Tribe and therefore missed the discussion on the updated Geographical Response Plan, the intakes that exist between the crossing and Mobridge, South Dakota, and what sensitive receptors can be added to the Geographic Response Plan. We look forward to continued coordination with your Tribe and Dakota Access to finalize spill response plans at Lake Oahe.

We also look forward to reviewing the forthcoming submittals from the Tribe and applying that information to our analysis. Please contact Joel Ames at (402) 995-2909 to schedule a time for us to meet at a mutually agreeable location to discuss information from your Tribe that will inform the remand analysis.

Sincerely,

John L. Hudson, P.E.
Colonel, Corps of Engineers
District Commander

Enclosure

-2-

cc: (w/encl):

Jan Hasselman
EarthJustice, Incorporated.
705 2nd Ave, Suite 203
Seattle, Washington  98104-1711

ATTACHMENT 4



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, OMAHA DISTRICT
1616 CAPITOL AVENUE
OMAHA NE 68102-4901

February 23, 2018

REPLY TO
ATTENTION
District Commander

President Troy "Scott" Weston
Oglala Sioux Tribe
P. O. Box 2070
Pine Ridge, South Dakota 57770

Dear President Weston:

This letter is in response to your letter dated December 20, 2017, and your previous correspondence. We appreciate your involvement thus far in the Corps' remand analysis process, including the information that the Tribe provided in your letter. We are not at a point in the National Environmental Policy Act process where we would consider adding cooperating agencies. Nonetheless, we continue to believe that our remand analysis will benefit from the information submitted by your Tribe.

We will provide you a courtesy copy of a letter sent to the Standing Rock Sioux Tribe, with enclosures. The enclosures relate to information requested by the Standing Rock Sioux Tribe and we are providing the documents for your information.

We are in the process of finishing our review of the spill model and the results submitted by Energy Transfer Partners. We are still considering your request for information related to the spill model. Prior to releasing any spill model information, the Corps will consult with other federal agencies to ensure that protected Sensitive Security Information or protected Critical Infrastructure Information is not disclosed.

Please contact Joel Ames at (402) 995-2909 to schedule a time for us to meet at a mutually agreeable location to discuss the information from your Tribe that will inform the remand analysis.

Sincerely,

John L. Hudson, P.E.
Colonel, Corps of Engineers
District Commander

-2-

cc:
Jennifer P. Hughes
Michael Roy
Hobbs Straus Dean & Walker, LLP
2120 L Street NW, Suite 700
Washington, District of Columbia 20037

# ATTACHMENT 5



# **Oglala Sioux Tribe**
## **Office of the President**
### **PO Box 2070**
### **Pine Ridge, SD 57770**
### **Phone: 605.867.5821**
### **Fax 605.867.6076**



December 3, 2016

Jo-Ellen Darcy
Assistant Secretary of the Army for Civil Works
U.S. Army Corps of Engineers
108 Army Pentagon, Room 3E446
Washington, D.C. 20310-0108

   Re: Easement for Dakota Access Pipeline

Dear Assistant Secretary Darcy:

   On behalf of the Oglala Sioux Tribe (Tribe), I am writing to you to in response to your
November 14, 2016 letter to Standing Rock Sioux Tribe (SRST), Energy Transfer Partners, L.P.
and Dakota Access, LLC.  In that letter, you clearly stated that the Army is mindful of the history
of the Great Sioux Nation's repeated dispossessions and that respect and great caution are
required in considering the concerns raised by the Standing Rock Sioux Tribe regarding the
proposed crossing of Lake Oahe by the Dakota Access Pipeline (DAPL).  We appreciate your
statements and that the Army has determined that additional discussion and analysis is warranted
on this most important topic.  As previously conveyed the invitation to provide input must extend
to all tribes of the Oceti Sakowin (Seven Council Fires or Great Sioux Nation).  We, therefore,
hereby submit input from our Tribe, a part of the Oceti Sakowin.  As the Corps' timeline for any
decision on the easement remains unclear, we submit this letter at this time as preliminary input
which we reserve the right to supplement as discussions with the Corps per its November 14th
letter continue.

   The Great Plains Tribal Chairman's Association voted unanimously on November 17,
2016, to call upon the President, the Secretary of the Army, and the Secretary of the Interior to
deny an easement for the DAPL to cross the Missouri River at Lake Oahe.  We point out the
continuing bold and disrespectful behavior of Dakota Access, LLC.  Not only has it refused to
heed the calls of the United States to voluntarily halt construction near the Lake Oahe site, it has
now filed suit against the United States—the very entity from which it requires an easement—
asserting that it has free reign to move forward.  As discussed below, the risk of a spill that could
result from the issuance of an easement to the treaty and statutory rights of the Tribe is so great
that it cannot reasonably be mitigated.  This letter sets forth why a denial of the easement is
warranted and the right path for the Army Corps of Engineers to take.

1

The Tribe has both treaty-based and statutory rights to the waters of Lake Oahe, which are considered sacred by the Tribe and the Oceti Sakowin. The Corps has an independent duty to consider the risk that granting the easement would pose to these rights. The risk assessment it has conducted to date has been wholly inadequate and fails to assess the risk to these rights. As discussed in more detail in Part II of this letter and in the attached independent analysis prepared by Richard White, P.E. of EarthFax Engineering, among other things, the Corps' risk assessments:

- Fail entirely to consider the risks and impacts a spill would have on the treaty and statutory rights of the Tribe and its rights in the Mni Wiconi Project and fail entirely to consider whether proposed mitigation measures would adequately address those risks;

- Make faulty assumptions and fail to properly define a worst case discharge scenario;

- Dramatically underestimate the volume of oil that would result from a spill under even the most conservative scenarios;

- Fail to measure the risk of a spill against the correct legal standard for water quality, including inexplicably using a benzene concentration level that is 3,363 times higher than the applicable legal standard;

- Fail to recognize that a release under the most conservative estimates would render the waters of Lake Oahe unfit for human consumption and require remediation that would take months or even years to complete;

- Fail to demonstrate how mitigation measures would reduce risk and instead only discusses mitigation concepts; and

- Fail to consider the cost a spill would have on water treatment facilities that currently do not have the capacity to treat for benzene or hydrocarbon contamination or the costs associated with providing drinking water to the individuals who would be without drinking water in the event of a spill.

As detailed below, the risks of a spill to the waters of the Lake and to all of its water users are so great they cannot reasonably be mitigated. Engineering cannot solve every problem or mitigate every risk. Sometimes the only reasonable solution is not to proceed with a proposed alternative. This is such a scenario. In this case, the easement should be denied.

**I.     The Corps Has an Independent Legal Obligation to Consider and Assess the Risk the Easement Poses to the Tribe's Treaty and Statutory Rights to the Waters of Lake Oahe and Other Trust Resources**

The Corps has legal obligations under Section 185 of the Mineral Leasing Act and under the National Environmental Policy Act to assess and consider the risks that granting the

USACE_ESMT000612

easement would have on the Tribe's treaty and statutory rights to the waters of Lake Oahe and other trust resources. Because the Tribe's treaty and statutory rights to the water are implicated, the Corps has an independent duty to consider the easement's impact on its treaty rights.

## A. The Mineral Leasing Act

The Mineral Leasing Act (MLA), 30 U.S.C. § 181 et seq., requires federal agencies to meet certain requirements before they grant rights-of-way over federal lands for oil pipelines or certain other uses. The MLA imposes an independent requirement on federal agencies to assess risks and consider stipulations to insure projects do not violate water quality standards, damage property rights, present hazards to health and safety, or threaten the interests of individuals who rely on the biotic resources of the area for subsistence. *Id.* § 185(h)(2). The MLA's obligations are independent of, and supplemental to, an agency's duties under NEPA. By requiring agencies to take measures to protect against hazards, the MLA requirements impose substantive duties far beyond NEPA's requirement to merely assess risks.

In addition, under Section 185(k), agencies are required to provide the public—including local government entities—an opportunity to comment on pending rights-of-way applications.

## B. NEPA

NEPA requires that federal agencies consider potential environmental impacts prior to approving federal actions. NEPA's implementing regulations and federal courts require assessment of all foreseeable direct and indirect impacts, including cumulative impacts and potentially catastrophic impacts.

NEPA requires federal agencies to carry out an Environmental Impact Statement (EIS) before approving proposals for major federal actions significantly affecting the quality of the human environment. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4. When determining whether an EIS is required, an agency may prepare a less detailed Environmental Assessment (EA). 40 C.F.R. §§ 1501.3, 1501.4(b), 1508.9(a). However, the EA must discuss the need for the proposal, the alternatives to the proposal, the environmental impacts of both the proposal and the alternatives, and the agencies and persons consulted. *Id.* § 1508.9(b). Based on its findings in the EA, the agency may determine that it is required to prepare a full EIS, or it may instead issue a Finding of No Significant Impact (FONSI) that sets forth its reasons for why the action will not have a significant effect on the human environment. *Id.* §§ 1501.4(c), (e), 1508.13.

When a court reviews the adequacy of a FONSI, it considers whether the agency: has accurately identified the relevant environmental concerns; has taken a hard look at environmental consequences; is able to make a convincing case for its FONSI; and has shown that, even if there is an impact of true significance, safeguards in the project reduce the impact to a minimum and therefore an EIS is unnecessary. *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 106 (D.D.C. 2006). The EA's hard look must also consider a project's "cumulative impact." 40 C.F.R. § 1508.7; *see also id.* §§ 1508.25(a), 1508.27(b)(7).

3

USACE_ESMT000613

When examining projects that could affect water resources, courts have required agencies to take the requisite hard look at possible impacts on the water caused by the project combined with other associated activity as well as possible impacts on the water caused by a catastrophic event such as a spill, even when risk of such an event is low. *See, e.g.*, *Gov. of Province of Manitoba v. Salazar*, 691 F. Supp. 2d 37, 47–50 (D.D.C. 2010) (holding Bureau of Reclamation failed to take hard look at impacts on river water levels caused by project combined with other existing withdrawal projects and impacts of possible water contamination) ("When the *degree* of potential harm could be great, *i.e.*, catastrophic, the *degree* of analysis and mitigation should also be great."); *Sierra Club*, 459 F. Supp. 2d at 106–08 (finding National Park Service failed to take hard look at impacts caused by project combined with adjacent surface drilling activities and existing oil and gas operations and impacts of possible spills when determining whether to permit directional downhole drilling activities).

## C.   The Corps' Fiduciary Duty to Consider Impacts on Treaty Rights

The Corps, like all other federal agencies, is responsible for carrying out the United States' trust responsibility to tribes. This requires the Corps to fulfill its fiduciary duty to consider and protect treaty rights and trust resources when permitting a project.

The Supreme Court has repeatedly affirmed "the undisputed existence of a general trust relationship between the United States and the Indian people." *United States v. Mitchell*, 462 U.S. 206, 225 (1983). Additionally, where statutes give the federal government responsibility for managing Indian resources for the benefit of Indians, "[t]hey thereby establish a fiduciary relationship and define the contours of the United States' fiduciary responsibilities." *Mitchell*, 436 U.S. at 225. The United States is judged by "the most exacting fiduciary standards" in fulfilling trust and treaty obligations. *Seminole Nation v. United States*, 316 U.S. 286, 297 (1942). Treaties are the "supreme law of the land," U.S. Const., art VI, cl. 2, and "[i]n carrying out its treaty obligations with the Indian tribes, the Government is more than a mere contracting part … it has charged itself with moral obligations of the highest responsibility and trust." *Seminole Nation*, 316 U.S. at 296.

Responsibility for fulfilling trust and treaty obligations runs across all agencies, and courts have stated that "[i]n carrying out its fiduciary duty, it is the federal government's, and subsequently the Corps', responsibility to ensure that Indian treaty rights are given full effect." *Nw. Sea Farms, Inc.*, 931 F. Supp. at 1520. The Corps, therefore, has a fiduciary duty to take treaty rights into consideration when making permitting decisions. *Nw. Sea Farms, Inc. v. U.S. Army Corps of Eng'rs*, 931 F. Supp. 1515, 1519–20 (W.D. Wash. 1996); *see also Muckleshoot Indian Tribe v. Hall*, 698 F. Supp. 1504, 1522–23 (W.D. Wash. 1988).

Only Congress has the authority to modify or abrogate Indian treaty rights. *See Menominee Tribe v. United States*, 391 U.S. 404, 412–13 (1968); *Nw. Sea Farms, Inc.*, 931 F. Supp. at 1520. Therefore, even taking a small portion of or limiting access to a protected treaty right requires denial of a permit request unless congressional approval is obtained. *Muckleshoot Indian Tribe*, 698 F. Supp. at 1511–15; *see also Nw. Sea Farms, Inc.*, 931 F. Supp. at 1520, 1522.

4

USACE_ESMT000614

The Corps, therefore, must reject permits that have more than a *de minimis* impact on tribal treaty rights. *See, e.g.*, *Nw. Sea Farms, Inc.*, 931 F. Supp. at 1519–21, 1522 (stating, in response to argument of *de minimis* impacts on treaty rights, that court must examine whether project affects rights exercised in manner contemplated and protected by treaty). In a recent May 9, 2016 Corps permitting decision, the Corps employed the *de minimis* analysis to reject permit requests.[1] This decision stands as an example of the Corps employing the proper legal analysis required when determining whether to issue a permit that may infringe on treaty rights. In its analysis of whether effects rose past the level of *de minimis*, it considered likely future uses of the treaty rights as well as cultural and spiritual beliefs and practices associated with the treaty rights. When considering whether proposed mitigation measures reduced impacts to a *de minimis* level, the Corps found that regulation on the time and manner of exercise of the treaty rights would itself be an inappropriate limitation unless designed to protect and conserve the treaty resource or sanctioned by Congress.

## D.    The Tribe has Treaty and Statutory Rights That Must be Considered

### 1.  Treaty Rights

The Oglala Sioux Tribe is a sovereign Indian Nation and part of the Oceti Sakowin (Seven Council Fires or Great Sioux Nation). The seven divisions of the Oceti Sakowin, and bands within these seven divisions, signed many treaties with the United States. In 1851, the United States signed the Treaty of Fort Laramie with the Teton and Yankton divisions of the Oceti Sakowin. *See* Treaty of Fort Laramie, 11 Stat. 749 (Sept. 17, 1851).

The United States sought the 1851 Treaty to facilitate westward migration, ensuring passage from the Missouri basin to the West Coast. In this Treaty, the United States agreed to "bind themselves to protect the [] Indian nations against the commission of all depredations by the people of the said United States." *Id.* at art. 3. The Treaty recognized 60 million acres as the territory of the Great Sioux Nation "commencing the mouth of the White Earth River, on the Missouri River; thence in a southwesterly direction to the forks of the Platte River; thence up the north fork of the Platte River to a point known as the Red Bute, or where the road leaves the river; thence along the range of mountains known as the Black Hills, to the headwaters of Heart River; thence down Heart River to its mouth; and thence down the Missouri River to the place of beginning." *Id.* at art. 5. The Treaty also recognized rights outside of the territories demarcated for the Great Sioux Nation, stating at article 5 that "[i]t is, however, understood that, in making this recognition and acknowledgement, the aforesaid Indian nations do not hereby abandon or prejudice any rights or claims they may have to other lands; and further, that they do not surrender the privilege of hunting, fishing, or passing over any of the tracts of country heretofore described." *Id.*

After violating certain terms of the 1851 Treaty by allowing incursions by non-Indians settlers beyond the bounds set in the Treaty, war broke out between the United States and the

---

[1] Army Corps of Engineers, Memorandum for Record, re Gateway Pacific Terminal Project and Lummi Nation's Usual and Accustomed Treaty Fishing Rights at Cherry Point, Whatcom County (May 9, 2016), *available at* http://www.nws.Corps.army.mil/Portals/27/docs/regulatory/NewsUpdates/160509MFRUADeMinimisDetermination .pdf.

5

Great Sioux Nation. The United States sought to end this war by signing the Fort Laramie Treaty of 1868 with several bands of the Great Sioux Nation, including the Oglala. 15 Stat. 635 (Apr. 29, 1868). Within the previously recognized 60 million acre treaty territory, the 1868 Treaty further demarcated a 26 million acre reservation "for the absolute and undisturbed use and occupation" of the signatory tribes. Fort Laramie Treaty of 1868, art. 2. That reservation was called the Great Sioux Reservation and included all of present-day South Dakota west of the low water mark of the east bank of the Missouri River, and adjacent lands in North Dakota. *Id.* The 1868 Treaty affirmed a permanent homeland for the Great Sioux Nation, reserving to the Nation, without limitation, rights to water, natural resources, self-government, and all other rights necessary to make the Great Sioux Reservation a livable homeland. Significantly, the United States Supreme Court in *Winters v. United States*, 207 U.S. 564 (1908), recognized that the federal government when creating an Indian reservation impliedly reserves for the tribe water rights necessary to carry out the purposes for which the land was set aside and that these water rights are paramount to later perfected water rights under state law.

Further, although we reject the Act of March 2, 1889, because the United States never obtained the required three-fourths of adult male signatures to make it a valid act under Section 28 of the Act, we note that it provided that the specified "tract of land, being a part of the Great Reservation of the Sioux Nation, in the Territory of Dakota, is hereby set apart for a permanent reservation for the Indians receiving rations and annuities at the Pine Ridge Agency, in the Territory of Dakota." 25 Stat. 888 § 1 (Mar. 2, 1889). Thus, Congress recognized our rights to water, natural resources, self-government, and all other rights necessary to make the reservation a livable homeland. *See, e.g.*, *Winters*, 207 U.S. at 564, 576–77.

The Oglala Sioux Tribe has treaty rights, property rights, and religious rights in the area of the DAPL's proposed crossing of Lake Oahe. Front and center with regard to the DAPL, the Oglala Sioux Tribe has vested property rights to the natural flow of the Missouri River in its 1851 Treaty territory under the Winters Doctrine and in the waters of the Missouri River under its 1868 Treaty to make the Great Sioux Reservation a livable homeland per the Winters Doctrine. It is worthy of notice that the Tribe's water rights in the Missouri River have been, and are currently, used for recreation in the Corps taking areas along Lake Oahe, including fishing.

Additionally, the Oglala Sioux Tribe has other rights under its treaties, including but not limited to those set forth here. The Oglala Sioux Tribe also has un-extinguished, vested property rights to fish in the Cannon Ball River and Missouri River (outside the boundaries of the Standing Rock Reservation) under Article 5 of the 1851 Treaty. Also, Article 5 of the 1851 Fort Laramie Treaty (11 Stat. 749) provides in pertinent part that the Teton Sioux bands, including the Oglala Band (now the Oglala Sioux Tribe), "do not surrender the privilege of . . . fishing, or passing over any of the tracts of country heretofore described," which includes all of the Oglala Sioux Tribe's 1851 Treaty territory (emphasis added). Thus, the Oglala Sioux Tribe and its members have the right to "pass over" the Corps' lands presently occupied by the Water Protectors under Article 5 of the 1851 Treaty. Also, our tribal members have the right of access to sacred sites on Corps' lands along the Cannon Ball River and Missouri River (including lands within the Corps taking areas), and the freedom to worship through ceremonial and traditional rights, and use and possession of sacred objects at such sacred sites under the 1978 American Indian Religious Freedom Act (42 U.S.C. § 1996).

6

USACE_ESMT000616

The obligations of the United States to the Great Sioux Nation under the 1851 and 1868 Fort Laramie Treaties remain in effect today. Under the United States Constitution, treaties—including Indian treaties—are the "supreme law of the land." U.S. Const., art. VI, cl. 2; *Worcester v. Georgia*, 31 U.S. 515, 531 (1832). The United States, including all of its subdivisions and agencies, is bound to uphold Indian treaties.

It is indisputable that the Tribe has treaty rights in the area of the DAPL's proposed Lake Oahe crossing and in the waters of Lake Oahe and the Missouri River. Together with our sister Sioux Tribes, we own the water in the Missouri River pursuant to our treaties and the Winters Doctrine as part of our rights to our permanent reservation homelands. The Tribe has a legally recognized property right in the waters of the Missouri River: these rights are treaty rights and trust property. As such, they are to be protected by the United States acting as our trustee.

## 2. The Mni Wiconi Project.

Congress has recognized the Tribe's reserved treaty water rights through the Mni Wiconi Project Act of 1988, which carries out, in part, the United States' trust responsibility to facilitate the Tribe's use of these rights. Pub. L. No. 100-516, *as amended*, § 2(a)(5). The Tribe also has statutorily created rights to the Mni Wiconi Project per the Act, and the Project, itself, is a trust resource belonging to the Tribe. *Id.* § 3(e). The United States as the Tribe's trustee must protect these water rights, statutory rights, and trust resources.

The Mni Wiconi Project Act was passed to provide safe drinking water to the Pine Ridge Reservation, the Rosebud Reservation, the Lower Brule Reservation, and non-Indian water districts in southwestern South Dakota. The Project is a monumental clean-drinking water project spanning an approximate 12,500 square mile service area to provide a reliable source of potable water from the Missouri River to a population of approximately 52,000 users, many of whom live on some of the poorest Indian reservations in the United States. The United States has invested more than $450 million in the Project to date and will continue to annually fund operations and maintenance costs.

The Project helps the United States carry out its trust responsibility to our Tribe and facilitates our use of our treaty water rights. In the Mni Wiconi Project Act, Congress specifically set forth that "the United States has a trust responsibility to ensure that adequate and safe water supplies are available to meet the economic, environmental, water supply, and public health needs of the Pine Ridge Indian Reservation." *Id.* at § 2(a)(5). Among the purposes of the Act are to "ensure a safe and adequate municipal, rural, and industrial water supply for the residents of the Pine Ridge Indian Reservation" and to "provide certain benefits to fish, wildlife, and the natural environment of South Dakota, including the Pine Ridge Indian Reservation." *Id.* at § 2(b)(1), (4).

The Act directed the Secretary of the Interior to "plan, design, construct, operate, maintain, and replace a municipal, rural, and industrial water system, to be known as the Oglala Sioux Rural Water Supply System." *Id.* § 3(a).[2] The Act provides that the "[t]itle to the Oglala

---

[2] Section 3 of the Act provides:

USACE_ESMT000617

Sioux Rural Water Supply System shall be held in trust for the Oglala Sioux Tribe by the United States and shall not be transferred or encumbered without a subsequent Act of Congress." *Id.* at § 3(e). The Secretary was authorized to enter agreements to carry out her duties pursuant to the Act and entered into self-determination cooperative agreements with the Tribe under which the Tribe constructed and operates the Oglala Sioux Rural Water Supply System. *Id.* at § 3(b); *see id.* at § 3(h). The Oglala Sioux Rural Water Supply System of the Mni Wiconi Project, not only facilities our use of our water rights, it, itself, is a trust resource.

## II.    The Corps' Risk Assessment to Date Has Been Inadequate and Demonstrates that the Risk of Granting the Easement is so Great that it cannot Reasonably be Mitigated and the Easement Must Be Denied

The Corps has not adequately addressed the risk of the impacts a spill at the Lake Oahe crossing site would have on the Tribe's water rights and the Mni Wiconi Project's statutory and trust protected water resources. The Corps has an independent duty to assess such risks under Section 185 of the Mineral Leasing Act as well as the National Environmental Policy Act (NEPA), but has not done so.

The NEPA analysis the Corps previously conducted for the DAPL is not sufficient to satisfy its risk assessment requirements for issuing an MLA easement. It entirely failed to consider important impacts of the DAPL that both NEPA and Section 185 of the MLA require the Corps to consider. For this reason, the Corps cannot rely on the EA/FONSI it prepared for the DAPL under NEPA in making its decision regarding whether to issue the easement.

---

(a) AUTHORIZATION.-- ... The Oglala Sioux Rural Water Supply System shall consist of –

(1) pumping and treatment facilities located along the Missouri River near Fort Pierre, South Dakota;

(2) pipelines extending from the Missouri River near Fort Pierre, South Dakota, to the Pine Ridge Indian Reservation;

(3) facilities to allow for interconnections with the West River Rural Water System, Lyman-Jones Rural Water System, Rosebud Sioux Rural Water System, and Lower Brule Sioux Rural Water System;

(4) distribution and treatment facilities to serve the needs of the Pine Ridge Indian Reservation, including but not limited to the purchase, improvement and repair of existing water systems, including systems owned by individual tribal members and other residents on the Pine Ridge Indian Reservation;

(5) appurtenant buildings and access roads;

(6) necessary property and property rights;

(7) electrical power transmission and distribution facilities necessary for services to water systems facilities; and

(8) such other pipelines, pumping plants, and facilities as the Secretary deems necessary or appropriate to meet the water supply, economic, public health, and environmental needs of the reservation, including (but not limited to) water storage tanks, water lines, and other facilities for the Oglala Sioux Tribe and reservation villages, towns, and municipalities.

8

The Corps is required to consider impacts on the Tribe's treaty water rights and rights to the Mni Wiconi Project before issuing an MLA permit. The agency must consider all foreseeable direct and indirect impacts and cannot ignore any arguably significant consequences. Impacts considered must include those caused by cumulative activity associated with the project, and the Corps must take into account impacts caused by possible catastrophic events. A crude oil spill from the DAPL into the Missouri River and Lake Oahe would damage the ecology of the river basin and impair the Tribe's treaty water rights and rights to the Mni Wiconi Project.

### A.    The Corps' Risk Assessment to Date is Wholly Inadequate

The Corps has not conducted an independent assessment of risk as required under Section 185 of the MLA, and to the extent the EA/FONSI is relied upon to meet those requirements it is deficient in several significant ways[3]:

#### 1.  It dramatically underestimates the total volume of oil that would likely be released in the event of a spill.

The EA is deficient in that it concludes that the most likely spill volume is 4 bbl or less. But the data relied upon for that assumption includes spills from pipelines of all sizes, not spills from large diameter pipelines.

The EA indicates that the pipeline is designed to convey 570,000 bbl of crude oil per day. That converts to a throughput of approximately 400 bbl per minute. A recent evaluation of the Keystone project demonstrated that the average spill volume for pipelines with a diameter over 16 inches is 1,116 barrels. At a throughput of 400 bbl per minute, this represents less than three minutes of operational flow from the proposed pipeline.

With a throughput of 400 bbl per minute, a five minute spill would result in a release of 2,000 bbl, an hour long spill would result in a release of 24,000 bbl, and a 24 hour spill would result in a release of 570,000 bbl. Yet the EA inexplicably states that an hour long spill event could result in only 10,000 bbl.

#### 2.  A significant release of oil could occur even under the most conservative scenario that assumes that the block valves and spill detection systems work correctly.

Based on the conservative assumption that block valves are placed at the entry and exit points of the horizontal directional drills, that they work correctly, and that the oil in the pipeline sections below the waterline did not back up and drain as well, a spill at the Lake Oahe crossing could result in a release of 4,620 bbl. That is far more than the 4 bbl the EA assumes is typical.

---

[3] See attached December 2, 2016, letter from Richard White of EarthFax Engineering Group, LLC, to the Oglala Sioux Tribe.

9

USACE_ESMT000619

### 3.  It ignores the applicable water quality standard for Lake Oahe.

Section 33-16-02.1 of the North Dakota Administrative Code classifies Lake Oahe as Class I water with an applicable legal standard for benzene of 2.2 µg/L (0.0022 mg/L). The EA/FONSI fails to mention, let alone consider, this standard.

Instead, it plays games with estimated benzene concentration levels that would result from a spill. First, it uses an acute aquatic organism toxicity level of 7.4 mg/L – a level that is 3,363 times higher than the applicable legal standard of 0.0022 mg/L for Lake Oahe. Not surprisingly, the contamination levels estimated by the EA fall below that standard.

But that standard is not the correct standard to use. First, as discussed above, there is an applicable legal standard for benzene that the EA should have used. All of the contamination levels estimated in the EA would far exceed the 0.0022 mg/L threshold for that standard – even using the EA's conservative estimates. This is the standard that applies, not the acute toxicity level for aquatic organisms or even the EPA's MCL for benzene.

Second, even if it were appropriate to use a toxicity level for aquatic organisms to calculate the effect of a spill on aquatic organisms, the standard practice would be to use a concentration known as the No Observed Adverse Effect Level (NOAEL), or the Lowest Observed Adverse Effect Level. The Los Alamos NOAEL value and NOAA chronic concentration level for benzene is 46 µg/L (0.046 mg/L), which is the standard that should have been used.

### 4.  Even a Small Spill Would Exceed the Applicable Legal Standard for Water Quality

Presuming that the results presented in Table 3-7 of the EA are correct, a crude oil spill of approximately 12-13 bbl could result in benzene levels that exceed the applicable legal standard of 0.0022 mg/L. As discussed above, however, the pipeline will have a throughput of 400 bbl per minute. A 12-13 bbl spill could occur in a matter of seconds.

Thus, even assuming that all of the safety technology listed in the EA worked as promised, even a spill of less than a minute would result in impacts to drinking water of the Lake that would exceed the actual legal standard for the waters of the Lake.

### 5.  It fails to address the impact of a catastrophic spill event.

The EA's worst case discharge scenario appears to be 10,000 bbl spilled. Although the EA also includes discussion of a worst case discharge scenario in the Facility Response Plan listed in Appendix L, the relevant portions of that Plan are blacked out. As a result, it is impossible to know whether the Corps even estimated a worst case discharge scenario for the Lake Oahe crossing.

At a throughput of 400 bbl a minute, the EA's estimate of 10,000 bbl spilled represents less than half an hour's time. Yet we know that pipeline safety devices like block valves and

10

SCADA systems fail.  When they do, spills can last many hours before detection and many more before crews can manually address the problem.  A 24 hour spill at the Lake Oahe crossing could result in up to 570,000 bbl of crude oil being released into the waters of the Lake.  The EA fails to address the impact of such a scenario because it assumes that all of the safety technology proposed will work.  It is deficient in that regard.

### 6.  It fails to consider the socio-economic impact a spill would have on downstream water users and water treatment plants.

The Mni Wiconi Project water treatment plant lacks the capacity to treat for benzene or other hydrocarbon contamination and adding that capacity would cost in the millions.  We are unaware that any other tribal water treatment plant has this capacity either.  The EA fails to consider the socio-economic impact a spill would have on the ability of these plants to continue to function in the event of a spill.

If forced to shut down, water users throughout North and South Dakota would be adversely affected.  The EA fails entirely to consider the socio-economic ramifications a spill would have on the Indian and non-Indian people who rely on the waters of the Lake for drinking water, irrigation, and recreational uses.  It also entirely fails to consider the costs associated with providing those users with alternate sources of water.

### 7.  It fails entirely to consider the impact a spill would have on tribes' reserved treaty rights.

The DAPL would cross the Great Sioux Nation's sacred Missouri River and ancestral lands and would infringe upon the treaty rights of tribes of the Great Sioux Nation to water in the Missouri River.  The Corps has not performed any analysis to determine the effects of the DAPL on the tribes' treaty water rights.

Other federal agencies have urged the Corps to uphold its trust obligations to consider tribes' treaty water rights when issuing permits associated with the DAPL.  In a March 29, 2016 letter to the Corps, the Department of the Interior specifically directed it to consider tribal reserved water rights.[4]  The Environmental Protection Agency discussed threats from the DAPL to the Mni Wiconi Project in a March 11, 2016 letter to the Corps.[5]  The Advisory Council on Historic Preservation in a May 19, 2016 letter stated the Corps conducted inadequate tribal consultation and engaged in other procedural flaws in issuing permits.[6]

The Corps' NEPA analysis failed to consider the tribes' treaty water rights, and the Corps has not conducted such an analysis pursuant to Section 185 of the MLA or otherwise.

---

[4] Letter from Lawrence S. Roberts, Acting Assistant Secretary – Indian Affairs, Department of Interior to Brent Cossette, U.S. Army Corps of Engineers, Omaha District 1 (Mar. 29, 2016).
[5] Letter from Philip S. Strobel, Director, NEPA Compliance and Review Program, Environmental Protection Agency to U.S. Army Corps of Engineers, Omaha District 2 (Mar. 11, 2016).
[6] Letter from Reid J. Nelson, Director, Office of Federal Agency Programs, Advisory Council on Historic Preservation to Lt. General Thomas P. Bostick, U.S. Army Corps of Engineers 2–4 (May 19, 2016).

USACE_ESMT000621

It has not even conducted a *de minimis* review. In order to properly conduct such a review, the Corps must examine the DAPL's impacts on both the Tribe's treaty right to take water from the Missouri River as well as its treaty right to access that water. Impacts considered must include cultural and spiritual impacts on the Tribe as well as possible future impacts, including those that would arise if a spill took place. Additionally, the Corps must examine whether the DAPL would affect the Tribe's current manner of use, which is to provide its members with drinking water. If mitigation measures put forward would force the Tribe to alter its current manner of use, such mitigation measures themselves improperly infringe on the Tribe's treaty rights.

Provision of bottled water as a mitigation measure would alter the Tribe's current manner of use of its treaty water rights and thus improperly infringe on those treaty rights. Furthermore, such a plan is wholly impractical. The Corps has a fiduciary duty to examine the DAPL's impacts on the Tribe's treaty rights to both take and access water in the Missouri River. When the Corps does conduct such an analysis, it will find significant impacts to the Tribe's treaty rights from the DAPL. Thus, the easement under the MLA must be denied.

### 8.  It fails to analyze impacts on the Mni Wiconi Project.

The Corps' NEPA analysis failed to analyze the impacts of the DAPL on the Mni Wiconi Project even though the Environmental Protection Agency specifically told the Corps that it must analyze impacts on it and other tribal water projects. Impacts include not only those on the water in the Missouri River from where the Mni Wiconi Project obtains its water for the Tribe's use, but also on the Project, itself, which is a trust resource of the Tribe. The Mni Wiconi Act specifically states that the United States has a trust duty to "to ensure that adequate and safe water supplies are available to meet the economic, environmental, water supply, and public health needs of the Pine Ridge Indian Reservation," yet, the Corps wholly failed to analyze impacts on the Project and its water supply.

## III.   Conclusion

The Corps' risk assessment of the DAPL is wholly lacking. It fails to analyze the DAPL's impacts on the Tribe's treaty and statutory rights. It further demonstrates that the risk of granting the easement is so great that it cannot reasonably be mitigated. The DAPL's request for an easement under the MLA must be denied. In certain circumstances, the only reasonable solution is not to proceed. This is exactly such a circumstance, especially given the treaty and trust obligations the United States owes to us.

Sincerely,

John Yellowbird Steele
President of the Oglala Sioux Tribe

12

cc:    Lowry Crook, Principal Deputy Assistant Secretary
        Sally Jewell, Secretary of the Interior
        Lawrence Roberts, Assistant Secretary – Indian Affairs
        Tracy Toulou, Department of Justice
        Valerie Hauser, Advisory Council on Historic Preservation
        Philip Strobel, Environmental Protection Agency
        Karen Diver, White House Domestic Policy Council
        Tracy Goodluck, White House Public Affairs and Intergovernmental Affairs
        Oglala Sioux Tribal Council
        Jennifer Hughes, Esq.
        Elliott Milhollin, Esq.
        Mark Van Norman, Esq.

USACE_ESMT000623




**EarthFax Engineering Group, LLC**
7324 South Union Park Avenue, Suite 100, Midvale, Utah 84047 • 801.561.1555 • FAX 801.561.1861

December 2, 2016

President John Yellow Bird Steele and Members of the Tribal Council
Oglala Sioux Tribe
P.O. Box 2070
Pine Ridge, S.D. 57770

Subject:  Review of the Dakota Access Pipeline Project
Environmental Assessment Related to
Crossings of Flow Easements and Federal Lands

Dear Mr. Steele and Members of the Tribal Council:

Pursuant to your request, I have reviewed the Environmental Assessment ("EA") concerning crossings of flow easements and Federal lands by the Dakota Access Pipeline Project. This EA was prepared on behalf of the U.S. Army Corps of Engineers, Omaha District and issued in July 2016. My review focused on the EA's discussion of issues related to the occurrence and potential impacts of spills as well as proposed measures presented in the EA to mitigate the impacts of those spills. My comments regarding the EA are outlined below.

**SPILL VOLUME ESTIMATES**

According to Section 3.2.2.2 of the EA, spill volumes of 4, 100, 1,000, and 10,000 barrels ("bbl") were evaluated. The EA notes that 50% of the incidents during their period of review (2002 through 2015) consisted of spills with a volume of 4 bbl or less. This was based on a review of a database maintained by the U.S. Pipeline and Hazardous Materials Safety Administration ("PHMSA").

I did not conduct an extensive independent review of the PHMSA database. However, I did review a summary published as part of the Keystone XL Project[1], which examined onshore crude oil spill data for the period of January 2002 through July 2012. The Keystone summary reached the following conclusions:

- Spill volumes from mainline pipelines tend to be larger than spills from discrete elements, other than tanks;
- Spill volumes from mainline pipeline incidents for 16-inch and larger diameter pipes tend to be larger than spills from smaller diameter pipes and similar to spill volumes from pipeline tanks; and

---

[1] https://keystonepipeline-xl.state.gov/documents/organization/205578.pdf

USACE_ESMT000624

- The dominant causes of spills from mainline pipeline elements are corrosion, manufacturing or construction defects, and outside forces (i.e., third-party damage cause from excavation activities around the buried pipe or from agricultural practices such as deep tilling or drainage tile installation).

The Keystone summary verified that the median (50%) spill volume for all pipeline incidents during the period of interest was small (3 bbl). However, for incidents where the pipeline diameter was reported, the median spill volume during the period of interest was 30 bbl. Furthermore, when evaluating spills only from pipelines with a diameter of 16 inches or larger (i.e., the size class proposed by Dakota Access ("DA") Pipeline for crossing the Missouri River and Oahe Reservoir), the Keystone summary indicated that the median spill volume during the period of interest was 100 bbl, with an average incident volume of 1,116 bbl.

The EA indicates that the pipeline is designed to convey 570,000 bbl of crude oil per day. This converts to a throughput of approximately 400 bbl/minute, assuming constant flow. The median spill volume presented in the Keystone summary for pipelines with a diameter of 16 inches or larger (100 bbl) represents the amount of oil that will flow through the DA Pipeline in 15 seconds. The average spill volume from large diameter pipeline incidents (1,116 bbl) represents less than 3 minutes of planned operational flow for the DA Pipeline.

The spacing of block valves influences spill volumes, since properly operating valves can isolate the defective pipeline location from the remainder of the pipeline. This generally limits the discharge of oil from a spill to those pipeline sections between a block valve and the point of failure. The DA Pipeline Facility Response Plan ("FRP") presented in Appendix L of the EA provides estimates of potential spill volumes, but those estimates were redacted from the FRP. Since I could not find information in the EA regarding planned block valve spacing, I prepared planning-level estimates of potential spill volumes at the Missouri River and Oahe Reservoir crossings as follows:

- Assume that block valves are placed at the entry and exit points for the horizontal directional drills. According to Sovereign Lands Permits for the project provided in Appendix M of the EA, that would place block valves at the following locations;
  - 280 feet from the right bank of the Missouri River (24-inch pipeline),
  - 1,520 feet from the left bank of the Missouri River (24-inch pipeline),
  - 960 feet from the east bank of the full-pool shoreline of Oahe Reservoir (30-inch pipeline), and
  - 1,170 feet from the west bank of the full-pool shoreline of Oahe Reservoir (30-inch pipeline).
- Assume that pipeline failure occurs between the block valves and the river/reservoir bank.
- Assume that all oil is released only from the section of pipe between the valve and the bank. Since the lowest point on the bore will be at an elevation that is several feet below the block valve, this condition assumes that insufficient pressure will exist in the section of pipe on the water-side of the river bank to force oil to the surface. Since the

Page 2

pipeline will be pressurized, this assumption likely results in a spill estimate that will be smaller than may occur in reality.

Based on these assumptions, the following spill volumes could occur at the indicated locations:

- Missouri River, right bank = 157 bbl
- Missouri River, left bank = 850 bbl
- Oahe Reservoir, east bank = 839 bbl
- Oahe Reservoir, west bank = 1,023 bbl

These values are within the range of crude oil spills that I have responded to. Therefore, I do not consider them to be excessively large.

It could be argued that the pipeline will be buried and that some of the crude that leaks would be absorbed by the soil thereby not reaching the water. While this is true, it is important to remember that the pipeline will be under pressure. As a result, there is a reasonable potential that leaks of even small quantities will result in crude oil reaching the surface above a buried pipeline.

This analysis does not account for discharge from the pipeline sections that are below water in the Missouri River and Oahe Reservoir. It also does not account for failures of the block valves or failures upstream from the block valves that result in spills that reach the water bodies. Although the Keystone summary indicates that equipment malfunction is rare, such failures should not be considered inconsequential. In fact, I have been involved in two crude oil spills that were the direct result of equipment failure.

The Keystone summary indicates that mainline valves are typically spaced on intervals of approximately 20 miles. Assuming that the pipelines or their components fail upstream from the closest block valve but in a location that could drain to the Missouri River or Oahe Reservoir, and that topographic conditions and valve spacing allows only 1 mile of pipeline to drain to the water body, the following spill volumes could result:

- 24-inch pipe (i.e., Missouri River crossing) = 2,950 bbl
- 30-inch pipe (i.e., Oahe Reservoir crossing) = 4,620 bbl

Obviously, if the length of pipeline that drains to the water is longer, the spill volume impacting the river or reservoir could be substantially higher.

The above information makes it clear that a spill volume of 4 bbl should not be considered typical. Given the large diameter of the DA Pipelines at the Missouri River and Oahe Reservoir crossings as well as the above data and calculations, the EA should have considered spill volumes well in excess of 100 bbl as a reasonable incident scenario rather than implying that a 4 bbl spill is the norm.

USACE_ESMT000626

**RIVER FLOW RATE**

The spill impact analysis summarized in Table 3-7 of the EA was based on a number of conservative assumptions that are listed on page 46 of the EA. However, the effects of dilution in the water were based on average annual discharge rates of the Missouri River at nearby gaging stations rather than relying on conservatively lower discharge rates. At a minimum, the lowest mean daily discharge rates for the periods of record at the nearby gaging stations should have been used in the analysis. These discharge rates are provided below, based on data obtained from the U.S. Geological Survey web site[2]:

| River | Discharge Rate (cfs) | | Percent |
| Crossing | Mean Annual | Mean Daily Minimum | Difference |
| --- | --- | --- | --- |
| Missouri River | 20,374 | 9,290 | -54.4 |
| Oahe Reservoir | 22,484 | 19,100 | -15.1 |

Using these more conservative discharge rates, the estimated benzene concentrations provided in Table 3-7 of the EA would have been substantially higher at each crossing than indicated (up to approximately twice as high as presented for the Missouri River crossing).

**CONSTITUENTS OF CONCERN**

The evaluation presented in Section 3.2.2.2 of the EA focused on benzene which, as stated therein, "is commonly considered to pose the greatest toxicity threat from crude oil spills." While this is "commonly considered" to be the case, data presented by Benville and Korn[3] indicate that ethylbenzene and p-xylene are generally more toxic than benzene to the organisms tested. These authors also indicate that toxicity of toluene is similar to that of benzene.

Moles et al.[4] found that bulk crude oil was more toxic to the tested organisms than benzene (i.e., median mortality to the tested fishes occurred at crude oil concentrations that were only 10 to 40 percent of the benzene concentrations that caused the same mortality rates). This increased toxicity may be due to the presence of multiple polycyclic aromatic hydrocarbon ("PAH") compounds in crude oil. The National Research Council[5] reports that individual PAH compounds occur in crude oil at concentrations that are generally one-fifth to two-thirds of the magnitude of the benzene concentration. However, a review of data provided by the Savanah

---

[2] http://waterdata.usgs.gov/nwis/dvstat/?referred_module=sw

[3] Benville, P.E., Jr. and S. Korn. 1977. The Acute Toxicity of Six Monocyclic Aromatic Crude Oil Components to Striped Bass (*Morone saxatilis*) and Bay Shrimp (*Crago franciscorum*). Journal of California Fish and Game. Vol. 63, No. 4, pp. 204-209.

[4] Moles, A., S.D. Rice, and S. Korn. 1979. Sensitivity of Alaskan Freshwater and Anadromous Fishes to Prudhoe Bay Crude Oil and Benzene. Transactions of the American Fisheries Society. Vol. 108, No. 4, pp. 408-414.

[5] National Research Council. 1985. Oil in the Sea: Inputs, Fates, and Effects. National Academy Press. Washington, D.C.

USACE_ESMT000627

River National Laboratory[6] and the U.S. Environmental Protection Agency[7] indicates that many of these PAH compounds are substantially more toxic than benzene.

Although crude oil composition varies widely between sources and few toxicity tests have been conducted with crude oil, the EA should have acknowledged that focusing on benzene would not necessarily provide the most conservative impact scenario. Quantitative assessments of individual crude-oil constituents should have also been performed to ensure that benzene was the appropriate compound on which to focus.

## COMPARATIVE CONCENTRATION LIMITS

According to Section 3.2.2.2 of the EA, the spill impact assessment was based on comparisons with two concentration limits for benzene:

- A drinking water maximum contaminant level of 0.005 mg/L and
- An aquatic organism acute toxicity level of 7.4 mg/L

Neither of these is the appropriate point of comparison for benzene for this project. Regulations contained in Section 33-16-02.1 of the North Dakota Administrative Code establish a benzene limit of 2.2 µg/L (0.0022 mg/L) for Class I waters (the classification for, among other water bodies, the Missouri River, including Lake Sakakawea and Oahe Reservoir). This limit is less than half of the concentration used for comparison in the EA analysis.

The EA states that the value of 7.4 mg/L used for ecological impacts was the "lowest acute toxicity threshold for aquatic organisms" listed in EPA's ECOTOX database. However, it does not provide other details regarding this value (i.e., what organism was tested, the type and length of the test, etc.). Based on my independent review of the ECOTOX database, I assume that the 7.4 mg/L value represents an LC50 concentration. An LC50 value is the concentration that is lethal to 50% of the organisms evaluated within the duration of a test. I should note that the lowest LC50 for benzene in my recent search of the ECOTOX database was 5.3 mg/L for a 4-day, flowing-water test performed on Rainbow trout (*Oncorhynchus mykiss*). This difference may have been due to updates to the database in the intervening review times.

Notwithstanding the lower LC50 value from my search of the ECOTOX database, an LC50 value is not usually the appropriate standard against which comparisons should be made when evaluating ecological impacts. The standard approach for an ecological risk assessment is to use a concentration known as the No Observed Adverse Effect Level ("NOAEL"). This is the concentration of a particular pollutant which test results indicate would produce no adverse effects on the tested organism. In the absence of this value, the concentration known as the

---

[6] Friday, G.P. 2005. Ecological Screening Values for Surface Water, Sediment, and Soil: 2005 Update. SRC-TR-2004-00227. Savanah River National Laboratory. Aiken, South Carolina.
[7] Regional Screening Levels (RSLs) - Generic Tables (May 2016). Downloaded from https://www.epa.gov/risk/regional-screening-levels-rsls-generic-tables-may-2016

USACE_ESMT000628

Lowest Observed Adverse Effect Level ("LOAEL") is used in ecological risk assessments. This is the lowest concentration of a pollutant which test results indicate causes some kind of adverse effect (i.e., morphology, growth, development, etc.) on the test organism. The NOAEL and LOAEL concentrations are generally much lower than the LC50, which (as noted above) is based on a 50% organism mortality rate during the test.

Los Alamos National Laboratory maintains a database of screening levels used in ecological risk assessments based on contaminants in air, sediment, soil and water[8]. For benzene (the constituent upon which the EA focused), this database recommends a "No Effect" ecological screening level of 46 µg/L in water and a "Low Effect" ecological screening level of 460 µg/L in water. The compendium published by the Savanah River National Laboratory cited above recommends an ecological screening value of 46 µg/L in surface water. The National Oceanic and Atmospheric Administration has also produced a database of screening-level concentrations for contaminants in sediment, soil, groundwater, and surface water (fresh and marine). The NOAA-recommended ecological screening level for benzene in fresh surface water provided in this database is an acute concentration of 2,300 µg/L and a chronic concentration of 46 µg/L.

Based on the above summary, it is clear that the reference values used in the EA are inappropriate. Assuming that benzene is the appropriate contaminant of concern, more appropriate comparative limits are:

- Drinking water: 2.2 µg/L (based on the North Dakota surface water statute)
- Aquatic organisms: 46 µg/L (based on the Los Alamos NOAEL, the Savanah River screening value, and the NOAA chronic concentration)

It should be noted that the comparative concentrations provided above do not account for the effects of water temperature on ecological risk. Korn et al.[9] found that marine species may be more susceptible to oil spills in colder water due to increased persistence of the pollutants (i.e., reduced evaporation and biodegradation rates) and potential temperature-induced stress that may act synergistically with oil-induced stress. It is reasonable to assume that similar effects would be experienced by fresh-water species. Thus, spills during winter months may reduce the concentration at which impacts occur to aquatic organisms.

Since drinking water intakes occur downstream from the Missouri River and Oahe Reservoir crossings, the critical standard against which potential impacts should be compared is the lower of the above concentrations (i.e., 2.2 µg/L). Assuming that the results presented in Table 3-7 of the EA are correct, this concentration would result from a crude oil spill of approximately 12 to 13 bbl. As indicated above, crude oil spill volumes well in excess of this amount should be

[8] http://www.lanl.gov/environment/protection/eco-risk-assessment.php
[9] Korn, S., D.A. Moles, and S.D. Rice. 1979. Effects of Temperature on the Median Tolerance Limit of Pink Salmon and Shrimp Exposed to Toluene, Naphthalene, and Cook Inlet Crude Oil. Bulletin of Environmental Contamination and Toxicology. Vol. 21, pp. 521-525.

USACE_ESMT000629

considered as reasonable incident scenarios for pipelines with diameters similar to those planned at the Missouri River and Oahe Reservoir crossings.

Section 3.2.2.2 of the EA minimizes the potential impacts of a spill by indicating that "the most probable spill volume (4 barrels or less) does not yield benzene concentrations that exceed the drinking water criteria even with the ultra conservative mixing assumptions." Even though this statement is correct, the calculated benzene concentrations provided in Table 3-7 of the EA for spills with a magnitude of 100 bbl and larger are substantially higher than the drinking water maximum contaminant level for benzene. This obvious conclusion is ignored in the EA narrative. The estimated benzene concentrations provided in Table 3-7 of the EA exceed the benzene maximum contaminant level by factors of more than 3 and nearly 4 at the Oahe Reservoir and Missouri River crossings, respectively, for a 100 bbl spill (a spill volume which, as noted above, is well within the potential for occurrence in the event of an incident). These exceedance factors increase exponential for the 1,000 and 10,000 bbl spills. The degree to which water quality standards are exceeded would have been even greater if the comparative concentration is the North Dakota Class I standard rather than the drinking water standard.

The purpose of a conservative analysis is to determine if a more detailed evaluation is needed. If impacts are not apparent under a conservative set of assumptions, a more comprehensive assessment is not necessary. However, in this case, the conservative assessment indicted that unacceptable impacts could occur under reasonable impact scenarios, especially when considering the spill volume data presented above. Therefore, a more detailed evaluation should have been conducted and/or detailed plans should have been presented to provide a greater assurance that impacts would be mitigated. Neither the more detailed evaluation nor the detailed mitigation plans was provided in the EA.

**SEASONAL CONSIDERATIONS**

Section 3.2.1.2 acknowledges that subfreezing temperatures during winter months will affect emergency response conditions during cleanup of a spill. My experience with multiple oil spill emergency response operations is that winter conditions create significant difficulties that are not present during other periods. Safe operations require that workers be much more careful in cold weather in order to avoid accidents. As a result, workers require more breaks and move slower due to the bundling of clothing that is protective of both cold temperatures and pollutants, daylight hours are shorter, slip-trip-fall risk increases significantly, etc. The EA should have quantified the effect of these factors on response time and the subsequent impacts to human health and the environment.

The EA further states that "pockets of oil naturally contained by the ice can be drilled to and removed using vacuum trucks." This is an oversimplification of oil recovery operations beneath ice. Working on ice presents multiple safety concerns. The trapped oil may move. It will be difficult to determine where the largest pockets of oil occur. Ice will naturally break both on the river and on the reservoir, shifting recovery locations and increasing safety hazards. River discharge rates are generally lower during the winter (resulting in less dilution of the spill) and

Page 7

the time required to recover the oil will be increased (due to entrapment beneath the ice, safety considerations, access difficulties, etc.). These conditions will increase the extent to which the oil dissolves into the water, thereby increasing the downstream impacts to human health and the environment. Thus, a winter spill likely represents the worst-case scenario.

The EA minimizing the consequences of a winter-condition spill by stating that the "ice itself often serves as a natural barrier to the spread of oil." The paper cited in the EA[10] indicates that ice conditions can both benefit and hinder spill response, depending on the timing and type of release. The EA also indicates that winter conditions will be to the advantage of emergency response actions by stating in Section 3.2.2.2 that "winter releases are predicted to have lower impacts . . . as compared to releases occurring during the warmer seasons." Given the added difficulties of working in winter conditions, the unpredictability of ice conditions, the potential for increased contact between water and crude oil trapped beneath the ice, and other factors, it is equally likely that a winter release will have larger impacts compared to a release during other seasons of the year. Therefore, the EA should have presented a more serious, quantitative evaluation of the winter spill scenario to ensure that the adverse impacts of a spill under on those conditions were properly evaluated.

**RELIABILITY AND SAFETY**

Section 3.11 of the EA presents a discussion of pipeline reliability and safety, including an analysis of the risk associated with several threat categories. In the case of each category, the EA ranks the risk as low without a quantitative evaluation.

The Keystone summary cited previously provides data from the PHMSA database regarding pipeline spills during the period of January 2002 through July 2012. A comparison of the conclusions of the EA and data from the Keystone summary based on a review of 71 incidents during the indicated period of record involving mainline pipelines with diameters of 16 inches or larger is provided below:

| Incident Category | EA Risk Rank | Keystone Incident Summary | |
|---|---|---|---|
| | | Number | Percent of Total |
| Third Party Damage | Low | 18 | 25.4 |
| External Corrosion | Low | 11 | 15.5 |
| Internal Corrosion | Low | 18 | 25.4 |
| Pipe Manufacturing Defects | Low | 15 | 21.1 |
| Construction-Related Defects | Low | | |
| Incorrect Operations | Low | 1 | 1.4 |
| Equipment Failure | Low | 0 | 0.0 |
| Natural Forces | Low | 6 | 8.5 |

---

[10] Dickens, D. 2011. Behavior of Spills in Ice and Implications for Arctic Spill Response. OTC Technology Conference.

USACE_ESMT000631

The EA minimizes the risk of system integrity threats by stating that procedures will be implemented to minimize those threats. However, the above data clearly indicate that substantial potential exists for spills to occur in categories that were considered by the EA to be low risk. This is particularly the case for those categories highlighted in yellow. Thus, a quantitative analysis of the risk associated with failure of system components should have been provided in the EA.

Section 3.11 of the EA also states that the impact of a release will be minimized through the use of "motor operated isolation and/or check valves . . . installed on either side of the Missouri River above Lake Sakakawea and Lake Oahe which can be actuated to close as soon as a leak is detected." It is inappropriate for the EA to imply that these valves will close immediately. For several reasons, three of which are stated below, emergency block vales do not close instantaneously upon the occurrence of a leak.

1. Pressure fluctuations are common in crude-oil pipelines. Therefore, supervisory control and data acquisition ("SCADA") systems, which (according to the EA) will be used to monitor operations on the DA Pipeline, generally accept pressure fluctuations within a pre-defined range without reaching an alarm threshold. Hence, if a spill occurs from a pinhole and not as a result of a catastrophic failure, it has been my experience that the incident could go undetected for several days without being detected by the SCADA system. Such an incident is often identified on after a visual inspection of the area r through the use of internal inspection tools. If such a pinhole occurs and results in a leak of 1 gallon per minute, 1,440 gallons (34 bbl) of crude oil would be lost in 1 day. If this spill occurs to the Missouri River or Oahe Reservoir, interpolation data provided in Table 3-7 indicates that the result would be a benzene concentration of approximately 6 μg/L (i.e., exceeding both the maximum drinking water contaminant level and the North Dakota Class I water quality standard). If such a leak occurs for a period of two weeks between visual inspections, the loss would be 480 bbl. Interpolation of data provided in Table 3-7 of the EA indicates that such a spill would result in a benzene concentration of approximately 80 μg/L in the Missouri River and Oahe Reservoir. This concentration is substantially higher than both the maximum contaminant level and the 2.2 μg/L critical concentration for these water bodies (based on North Dakota Class I water quality standard). As presented above, these spill volumes are well within the range of reasonably-possible scenarios.

2. Once a SCADA system sends an alarm, the system is not automatically shut down. Rather, an operator must evaluate the cause of the alarm and determine if a condition exists that warrants shutdown of the pipeline. Such an evaluation takes time. The American Petroleum Institute and the Association of Oil Pipe Lines[11] indicate that "prompt" rupture detection and response "means the alarm can be verified confidently in minutes versus seconds." Based on a throughput of 400 bbl/ minute, 800 bbl of oil

---

[11] American Petroleum Institute and Association of Oil Pipe Lines. 2014. Liquid Petroleum Rupture Recognition and Response. Document downloaded from http://www.aopl.org/wp-content/uploads/2014/09/Pipeline-Rupture-Recognition-and-Response-Final-w-Abstract-August-2014.pdf

Page 9

USACE_ESMT000632

will spill if a response is instituted 2 minutes after a pipeline rupture. Data provided in Table 3-7 of the EA indicate that the benzene maximum contaminant level and Class I water-quality standard would be substantially exceeded in this time frame.

3. The probable initial response action for a rupture would be to close the motor-operated block valve. These valves do not close instantaneously. Global Asset Protection Services[12] indicates that emergency shutdown valves close within 1.0 to 1.5 seconds per inch of diameter. Assuming a high-speed valve that closes within 1.0 second per inch of diameter, the valves on the DA Pipeline segments valuated in the EA would require 24 to 30 seconds to close (depending on the location and assuming the valves are the same diameter as the pipelines at those locations). The flow through the valve will gradually decrease and the valve shuts. Thus, based on a throughput of 400 bbl/min, 80 bbl of oil will spill from a 24-inch diameter valve and 100 bbl will spill from a 30-inch diameter valve as the valves close. Data provided in Table 3-7 of the EA indicate that the benzene maximum contaminant level and the Class I water-quality standard would be substantially exceeded in this time frame.

## IMPACT MITIGATION PLANS

Table 8-2 of the EA states that "in the event of a leak, Dakota Access would work aggressively to isolate the source through the use of remote-controlled shut-off valves, initiate cleanup activities, and contact appropriate federal and state authorities to coordinate leak containment and cleanup." These actions are necessary but are not sufficient to mitigate impacts associated with oil spills of magnitudes that are well within the range of likely volumes if a spill from the DA Pipeline occurs into the Missouri River or Oahe Reservoir.

Section 3.2.1.2 of the EA indicates that "protection and mitigation measures will be implemented in cooperation with intake operators" to minimize the potential impacts of spills at the locations of those intakes. However, the EA does not present a discussion of the "protection and mitigation measures" that are planned. Since the Finding of No Significant Impact is preceded by the word "Mitigated", these mitigation plans should have been detailed in the EA. Instead, the EA presents only general mitigation concepts.

Based on the planning-level spill volumes presented previously and the data provided in Table 3-7 of the EA, it is reasonable to assume that adverse impacts will occur to the quality of water at downstream intakes. Therefore, it is important that plans be developed and mitigation measures be in place to protect water intakes before the DA Pipeline is operated in areas that may impact the Missouri River or Oahe Reservoir.

## MISCELLANEOUS CONCERNS

I also noted the following miscellaneous concerns during my review of the EA:

---

[12] Global Asset Protection Services, LLC. 2015. Emergency Block Valves. GAPS Guidelines No. GAP.8.0.1.3. Hartford, Connecticut.

USACE_ESMT000633

- Section 2.3.2.4 notes that the pipeline trench will be backfilled with the "previously excavated material". No mention is made of pipe bedding (typically a uniform sand or fine gravel). This material is standardly placed around underground piping to provide a uniform fill and minimize the potential for corrosion and physical damage to the pipe during installation and operation. If bedding material is not placed around the pipe, the potential for spill incidents is increased.
- Section 2.3.2.6 of the EA summarizes scour analyses that were performed to support decisions regarding the planned depth of installation of the pipeline beneath the beds of the Missouri River and Oahe Reservoir. The conclusion is reached from these analyses that the Oahe Reservoir crossing is at low risk of scour because deposition of sediment is much more likely than scour of the lake bed due to the ponded water condition of the reservoir. This is true only if the reservoir dam functions properly. Since a 500-year discharge event was used for the scour analyses, the potential extent of scour at this location should have been evaluated assuming that the dam is breached.
- Estimates presented in Section 2.3.2.6 of the EA indicate that the combination of bend scour and contraction scour will result in 32 to 34 feet of scour at the Missouri River crossing. This section also states that the planned depth of the pipeline below the Missouri River at this crossing is 36 feet. Hence, the estimated scour is nearly sufficient to expose the pipeline, which would increase the potential for pipeline failure. The potential for this scour scenario (bend plus contraction scour occurring at the crossing) was quantified by comparing the results of multiple calculation methods and arriving at a factor of safety against exposure of 1.4 to 2.3. However, I could not locate the calculations in the EA that served as the basis for these calculations. Therefore, it is unknown if this approach was appropriate or if these calculations took into account the relative errors of the various equations, which errors would affect the interpretation of the results. Given the potential depth of scour versus the planned depth of pipeline installation, the calculations should have been presented to allow independent review of the risk by the Corps of Engineers.
- Section 3.1.3.1 provides a discussion of landslide potential in the area of concern. This potential is qualitatively described as ranging from moderate to high. The probable depth of the landslide failure surface relative to the depth of the pipeline is also not discussed. Without this information, the potential impact of landslides on the pipeline cannot be properly quantified and assessed.
- Section 3.1.3.2 of the EA indicates that erosion control measures will be implemented "during construction in these areas with slopes greater than 25%." No mention is made of erosion control practices that will be implemented where the ground slope is less than 25%. With the pipeline buried generally at a depth of 36 inches, erosion could be a significant factor in exposure of the pipeline, which in turn would increase the potential for corrosion and physical damage of the pipe. This in turn would increase the potential for failure of the pipeline. Thus, it is important that erosion control measures be implemented in all areas disturbed by pipeline construction, regardless of the ground slope at those locations.

USACE_ESMT000634

- As part of a discussion about erosion control methods to be implemented, Section 3.1.3.2 of the EA indicates that "construction and operation of the Proposed Action facilities . . . would not be expected to increase the potential for significant landslide or slip events". The implication of this statement is that the control of surface erosion will also control landslides. This is an inappropriate conclusion. Surface erosion is a shallow process that typically occurs in the upper few inches of the soil profile. Landslides are generally deep-seated, with failure surfaces that are a few to several feet below the ground surface.
- Section 3.1.3.2 of the EA also states that "the strength and ductility of a properly designed pipeline would allow it to span a considerable distance without compromising its integrity in the event of a landslide or other ground movement, such as subsidence." This statement is true only if the pipeline was designed for such a span. Friction from adjacent soil can place substantial added forces on a pipeline during a landslide, whether those forces are caused by abrupt movements or slow movements.
- Section 3.1.5.2 of the EA indicates that topsoil will be segregated from excavated materials "in agricultural land, and if applicable, other areas where soil productivity is an important consideration." In order to properly revegetate the disturbed area and minimize long-term erosion, it is critical that surficial soil be segregated and replaced throughout the length of the pipeline disturbance, whether the area has agricultural significance or not. My experience with the design of plans to reclaim land that has been disturbed by mining operations has shown that even poor quality surficial soils can be effectively revegetated if properly handled.
- Section 3.2.1.2 of the EA states that hydrostatic testing of the pipeline segments will be conducted prior to installation. While this is important, no mention is made of such testing after the pipeline is installed. Given the length of the bores and the bends that will be necessary to install the pipe beneath the Missouri River and Oahe Reservoir, it would be appropriate to hydrostatically test the pipeline after it is installed and before it is put into operation.
- Section 3.2.2.2 of the EA states that "dispersion, evaporation, dissolution, sorption, photodegradation, biodegradation, and natural attenuation ultimately would allow a return to preexisting conditions in both soil and groundwater" if a spill occurs and no active groundwater remediation occurs. While this statement is technically true, the time frame require for "preexisting conditions" to return to the area would likely be at least several decades unless active remediation occurs. Therefore, relying solely on these natural attenuation factors to remediate groundwater that is contaminated with a crude-oil spill would be inappropriate under most conditions.
- Section 4.2 of the EA states that operational spill-related impacts "would be avoided or greatly reduced . . . by requiring immediate cleanup should a spill or leak occur." This statement oversimplifies efforts and minimizes the impacts that a spill could occur. As noted previously in this letter, even in the event of an "immediate" action, potential spill volumes may be in the range of hundreds to thousands of barrels. My experience has been that cleanup of the impacts associated with crude oil spills of this magnitude will require at least several months or years. Furthermore, the larger the water body, the

Page 12

more difficult the cleanup effort. I was involved in the cleanup of an 800 bbl crude-oil spill into a mountain stream with a pond at the downstream end.  A period of several months was required to reach a point where active remediation efforts were no longer required, even though the stream was small enough and the flow low enough that pressure washing of individual rocks in the bed and banks of the creek was performed. Furthermore, it was more than six years after the spill event before further monitoring and related actions was not required by the State.  Therefore, the EA should have provided a more comprehensive quantitative evaluation of spill impacts rather than implying that a goal of "immediate cleanup" should be sufficient to resolve those concerns.

Please let me know if you have any questions regarding this matter.

Sincerely,

*Richard B. White*

Richard B. White, P.E.
Consulting Civil and Environmental Engineer
EarthFax Engineering Group, LLC

USACE_ESMT000636

## *Richard B. White, P.E.*

### EDUCATION

| | |
|---|---|
| MS, CIVIL AND ENVIRONMENTAL ENGINEERING | 1977 |
| *Utah State University* | *Logan, Utah* |
| | |
| BS, WATERSHED SCIENCE | 1976 |
| *Utah State University* | *Logan, Utah* |
| | |
| SAFETY AT HAZARDOUS MATERIALS SITES | 1986 |
| *EarthFax Engineering, Inc.* | *Midvale, Utah* |

### EXPERIENCE

| | |
|---|---|
| CONSULTING CIVIL AND ENVIRONMENTAL ENGINEER | 2016-PRESENT |
| PRESIDENT | 1982-2016 |
| *EarthFax Engineering Group, LLC* | *Midvale, Utah* |

Mr. White serves as lead engineer on many EarthFax projects, ranging from civil engineering design to environmental assessment and remediation to slope stabilization projects. He provides quality assurance/quality control and internal peer review on many of the company's projects. His core areas of expertise include:

- Assessment and mitigation of environmental impacts resulting from land development
- Design of disturbed-land reclamation plans
- Design of runoff- and sediment-control plans
- Design of stream channel stabilization plans
- Rapid engineering response to oil spills and other environmental emergencies
- Preparation of plans to remediate soil and groundwater contamination
- Interaction with regulatory agencies

Representative projects on which Mr. White has worked are summarized below.

**Oil Spill Response**

Mr. White has served as chief consulting environmental engineer on over 25 oil spills (crude, gasoline, and diesel) in the Intermountain/Rocky Mountain regions of the U.S. In this capacity, he has provided oversight or direct involvement in assessing the extent and magnitude of impacts, designed methods to remediate those impacts, sampled impacted media to confirm the efficacy of remediation efforts, and interacted with regulatory agencies on behalf of the clients. Selected projects are summarized below.

- Served as part of the client's team in in response to a release of diesel fuel to a fresh-water reservoir in northern Utah. A cracked seam in an 8-inch diameter refined products pipeline released approximately 500 barrels of diesel into a stream channel and pond system that conveys storm water to Willard Bay, a man-made fresh-water reservoir situated along the east shore of the Great Salt Lake. Provided technical and engineering expertise during initial delineation of the spill boundaries; responsible for assessing impacts to groundwater; designed groundwater remediation methods; provided input on the design of several water control structures; reviewed mass balance calculations of

USACE_ESMT000637

released and recovered product; and interacted with State regulatory personnel and their subcontractors on behalf of the client.

- Served on the client's emergency response team on a crude oil spill in the metropolitan area of Salt Lake City, Utah. The 800-barrel release originated from an 8-inch diameter pipeline that transports crude oil from western Colorado to refineries in the Salt Lake City area. The event occurred during a series of late spring thunderstorms in Salt Lake City that resulted in short-circuiting of an adjacent high voltage terminal, causing the pipeline to become a receptor of the electrical surge which melted a hole in the line. By the time the release was discovered and controls emplaced, the oil had traveled approximately 10 miles through Salt Lake City toward the Great Salt Lake before it was contained. Responsible for technical input on all EarthFax activities throughout the project, including design of initial response efforts, site assessments, design of remediation methods, and post-event sampling. Specific tasks performed by Mr. White included:

  o Provided technical engineering and environmental expertise to the client and other subcontractors under the Unified Command system during the emergency response and remediation phases of the project.
  o Conducted multiple Shoreline Cleanup and Assessment Technique surveys along the affected waterways to uniformly grade the magnitude of contamination and prioritize future cleanup activities.
  o Provided and reviewed design and construction inspection services for the restoration of the spill site, the impacted waterways, and adjacent properties.
  o Performed confirmation sampling during active remediation efforts and for approximately 5 years after the release to verify that human health and ecological risks in the affected area had been adequately mitigated.

- Served as part of the client's emergency response team on a second crude oil spill in the metropolitan area of Salt Lake City, Utah. This 550-barrel spill occurred approximately 6 months after the above-noted release when a nearby block valve froze during extreme winter temperatures. Approximately 4 acres of land in an adjacent arboretum and amphitheater were affected. Responsible for overseeing initial assessments to delineate the extent of contamination; for designing controls to isolate the contamination during snowmelt; for verification sampling following excavation of the impacted soil; for providing technical advice on environmental, regulatory, and waste disposal matters; for directing excavation efforts; and for providing engineering support during restoration or replacement of impacted structures.

- Served as chief engineer to assess and remediate soil contamination due to leakage from a refined product pipeline in a remote location on the western Snake River Plain in south-central Idaho. Supervised assessment efforts, calculated the quantity of spilled hydrocarbons in the soil to compare with the client's estimate of spilled product based on pipeline flow records, and designed a soil vapor extraction remediation system using multiple vertical vapor extraction points. Calculations confirmed that benzene emissions from the blowers would be below the Idaho Department of Environmental Quality emission rate standard, thus eliminating the need for surface treatment of the emissions. Supervised monitoring efforts during the cleanup process.

- Served as part of the client's emergency response team on the release of diesel fuel to a wetland area adjacent to the north shore of the Great Salt Lake. An estimated 100 barrels of diesel fuel were released through a pin-hole leak in an 8-inch diameter pipeline that conveys refined fuel products from Salt Lake City, Utah to Spokane, Washington, resulting in 22 acres of wetland and upland area being affected. Mr. White provided technical oversight or direct input on this project, including implementation of containment measures, delineating the extent and magnitude of contamination, evaluating remediation alternatives, managing remediation activities, documenting the work, and providing agency liaison. Two unique aspects of the project included responding to the release using low-impact methods (pack mules) to deploy containment booms in the sensitive wetlands and transitional wetland zones, and implementing controlled-burn activities as an acceptable remediation technology. Following completion of the controlled burn, Mr. White designed an approach to enhance bioremediation of the remaining hydrocarbon-impacted upland soil. Subsequent analyses confirmed that this approach was successful.

- Provided technical oversight during assessment and remediation of soil impacted by the release of crude oil from a 3-inch diameter underground lateral crude line that ruptured in a remote area of eastern Utah. Released traveled down an ephemeral drainage for approximately 0.5 mile toward a regionally-important river. Supervised the design of methods to contain the release before it could impact the river. Designed a passive-aeration bioremediation cell, using wind-operated turbines, to remediate approximately 9,200 cubic yards of excavated soils in this remote area. Provided oversight during sampling activities and in the interpretation of the resulting data.

- Served as chief consulting environmental engineer at the site of a crude oil spill located near an important drinking-water reservoir in northern Utah. The release occurred when a contractor for a residential development company ripped through the pipeline with a dozer, breaking the line and releasing 700 barrels of oil onto the ground before the line was shut down. Provided oversight during delineation of the spill site boundary; identification of potential above- and below-ground receptors of concern; collection of numerous soil samples from the spill site as well as background water quality samples from the nearby reservoir; and performance of a geologic study to better understand potential subsurface pathways of migration and how they might affect response activities undertaken to protect surface and groundwater resources. Assisted in the design of a permitted temporary impacted-soil storage area at the base of the spill site.

- Evaluated soil and groundwater contamination near the Trans Niger Pipeline in the Ogoniland region of Rivers State, Nigeria. Spills from these facilities (occurring from deteriorated infrastructure as well as sabotage and crude-oil theft) had created significant environmental impacts in the region. This project included a review of soil and groundwater data collected by others from 9 areas that had been previously remediated. It also included an evaluation of 133 groundwater samples collected from private wells used for domestic purposes near the pipeline. These results of these analyses were compared with risk screening levels established by the Nigerian Department of Petroleum Resources. Prepared reports summarizing the results of the above comparison and provided recommendations for future efforts.

Case 1:16-cv-01534-JEB Document 339-5 Filed 03/16/18 Page 46 of 57

**Mine Site Assessment, Design, and Reclamation**

Mr. White has developed reclamation plans for several areas disturbed by coal and mineral
mining operations. Using site-specific topographic data, he has designed drainage alignments,
profiles, and channel sections to efficiently convey runoff from the reclaimed slopes. He has also
developed reclamation grading plans that balanced earthwork volumes, designed post-mining
runoff- and sediment-control structures, developed topsoil and substitute topsoil redistribution
plans, and developed revegetation plans to restore the areas to productive post-mining land
uses. He has submitted this information to the appropriate regulatory agencies on behalf of his
clients, and provided construction oversight during field implementation of the plans.
Representative projects are summarized below.

- Designed a surface-roughening technique applicable to the semi-arid areas of the western
  United States referred to as "deep gouging." This method results in a variably roughened
  surface that retains precipitation on the immediate slope, thereby enhancing revegetation
  success and substantially reducing erosion potentials. Using established hydrologic
  calculation methods, demonstrated that sediment yields from areas reclaimed with this
  method are significantly reduced when compared with the same areas prior to
  disturbance. Using this reclamation technique, the client received the 2003 Excellence in
  Surface Coal Mining and Reclamation National Award, presented by the U.S.
  Department of Interior, Office of Surface Mining. They were cited "for outstanding
  performance in developing and implementing exemplary mining and reclamation
  methods that maintained sound environmental conditions."

- Developed a plan to reclaim land affected by molybdenum mine and mill located at an
  elevation of over 10,000 feet in Colorado. Expansion of the mining operation was
  projected to result in an affected area of over 6,400 acres, including the open-pit mine,
  tailings impoundments, a waste-rock disposal site, the mill site, and several ancillary
  facilities. Critical issues affecting the design of the reclamation plan included the high-
  altitude location in montane and alpine ecological zones, dealing with a short growing
  season and an average annual snowfall of over 20 feet, the control of acid-mine drainage,
  the location of the site on the continental divide at the headwaters of three major
  drainages, and the fact that much of the surface water from the site discharged into
  watersheds that provided a portion of the drinking-water supply for Denver, Colorado.
  Evaluated areas to be affected by the expansion project and developed topsoil salvaging
  plans for those areas that had not yet been disturbed. Designed reclamation channels to
  safely convey the peak flow from the probable maximum precipitation event around and
  across the tailings in a non-erosive manner. Designed a cover system for the tailings
  impoundments that would shed runoff in a controlled manner and minimize the potential
  for long-term seepage of acidic water from the tailings. The reclamation plan included
  demolition of site structures, placement of the demolition debris in the tailings
  impoundments, construction of the cover system for the tailings, recontouring of selected
  areas, incorporation of lime into the surface of acid-generating material, placement of
  topsoil, and site revegetation.

- Evaluated alternatives for reducing, controlling, and recycling waste rock at a coal mine
  located on Sakhalin Island in the Russian Far East. Evaluated alternatives for minimizing
  environmental pollution resulting from existing mine waste dumps and increasing
  opportunities to recycle this waste; developed a program to control and beneficially reuse
  solid wastes generated by the mine; and prepared a project report that outlined the

feasibility of solid-waste control and recycling at the facility.  Also evaluated alternative underground mining methods to minimize the production of waste rock and assessed the coal burning efficiency of the town boiler to minimize ash production. This project was subsequently designated by the Eurasian-American Partnership for Environmentally Sustainable Economies as a Best Practice.  The citation indicated that the project demonstrated "environmentally sound and economically efficient solutions to environmental problems in Central and Eastern Europe and Eurasia."

- Conducted a hydrogeologic investigation at a surface coal mine located north of Vladivostok in the Russian Far East.  Large quantities of groundwater were flowing uncontrolled into the mine, creating safety hazards due to instability of pit walls and spoil piles.  Furthermore, water being discharged from the mine had the potential of adversely impacting the quality of water in Khanka Lake, an important ecological preserve located downstream from the mine. Evaluated data collected at the site by the Russian Academy of Sciences, conducted field investigations, and interviewed mine personnel familiar with the local hydrogeology.  Designed dewatering wells to intercept the groundwater before it could flow into the mine, thereby eliminating the safety and environmental concerns.  Recommended that water pumped from the dewatering wells be delivered to nearby communities for their domestic use and that the heat from the pumped groundwater be recovered to heat mine buildings and nearby residences.

- Prepared reclamation plans for an existing uranium mine and mill in southeastern Utah.  The project included the design of a suitable cover for the tailings, giving consideration to radon attenuation, and erosion control.  Designed a capillary break that was installed between the tailings and the cover to minimize the potential for moisture (and accompanying contaminants) to migrate in the vadose zone between the tailings and the cover. In accordance with the requirements of the U.S. Nuclear Regulatory Commission, designed a reclamation channel to convey surface runoff resulting from the probable maximum precipitation event across the site without damaging the reclaimed tailings piles.

- Prepared a plan to reclaim land affected by waste from silver and gold mining operations near Park City, Utah.  The 4,800-acre area was planned for residential, commercial, and recreational development.  Over a 100-year period, large quantities of waste rock and tailings contaminated primarily with arsenic and lead had been left in diverse locations throughout the property.  Since sufficient topsoil was not available to cover the exposed waste, the cover system design for the waste rock involved incorporation of mulch into the waste rock and direct revegetation of the mulched surface.  Final reclamation plans also included demolition of remaining structures, construction of diversions to control runoff, and fertilizing and revegetating the reclaimed waste rock and tailings.  The plan was developed to provide long-term protection of the environment under the assumed future scenarios consisting of residential, commercial, and recreational land uses.

- Designed numerous surface-runoff and sediment control facilities for surface and underground coal mines, active and inactive uranium mills, and hazardous-waste management operations.  Facilities have included sedimentation ponds, diversion channels, riprapped channels, land reclamation, check dams, and culverts.  State-of-the-art models have been used to determine peak design flows and to aid in design of the structures.  Design considerations have included selection of the appropriate design storm, avoidance of maximum permissible flow velocities, cost-effective erosion

control, and water-surface profile analyses.  Served as a liaison between the clients and the appropriate regulatory agencies.

• Conducted an investigation at the site of an active uranium mill in southeastern Utah to determine appropriate remedial actions to prevent future groundwater contamination after a plume had developed due to seepage from tailings ponds. Performed surface geophysical investigations (electrical resistivity and very-low-frequency electromagnetic) to determine the extent of contamination, bedrock lithology, and the location of major groundwater-conducting fractures. Utilized water-level and quality data from over 140 previously existing and new monitor wells to aid in defining the extent of groundwater contamination. Conducted long-term pumping tests to determine the anisotropic nature of the groundwater hydraulic system. Modeled the fractured aquifer to determine the rate of contaminant migration and the effectiveness of the proposed remedial action. Designed a remedial-action plan consisting of hydrodynamic control of contaminant migration through the operation of several groundwater recovery wells and pumping this groundwater to evaporation ponds for disposal.

• Conducted groundwater, surface water, and soil investigations at the site of an abandoned copper/lead smelter in Utah which was being considered for addition to EPA's National Priorities List.  Installed multiple monitoring wells to assess groundwater hydraulic and quality conditions. Delineated and sampled areas of smelter wastes, including slag, calcine, baghouse dust, and miscellaneous waste which had accumulated during operation and demolition of the smelter. Data received from the laboratories were interpreted using geochemical and hydrologic models to determine the need for future remedial actions and the effectiveness of natural soils at attenuating the migration of inorganic contaminants from the waste sources. Developed a conceptual remedial-action plan together with work plans for remedial design. Information was also provided in support of the client's pursuit of Innocent Purchaser Defense rules.

• Designed methods to stabilize a steep-slope area of approximately 40,000 square feet that had been affected by a coal outcrop fire.  The fire had originated in an adjacent abandoned underground coal mine and had resulted in denuding of the area and mass failure of several portions of the slope, including multiple rotational failure cracks with depths in excess of 25 feet and top widths in excess of 10 feet.  The design consisted of creating a uniform slope in areas that had been subject to mass failure, installing gabions and anchoring the gabions to the slope using rock bolts, filling the gabions with road-base material and topsoil, and revegetating the area.  Provided construction oversight and survey control during implementation of the project.

• Developed a conceptual dewatering plan for a proposed lead/zinc/silver mine that was projected to encounter significant quantities of hot saline groundwater.  Previous dewatering operations in the region had pumped water to percolation ponds on an alluvial fan that was situated above a valley that relied on groundwater for irrigation of agricultural fields.  Performed investigations to determine the potential of future dewatering operations to impact the valley's groundwater resources.  Reviewed data from local water-supply wells to determine whether or not past impacts had occurred. Evaluated alternatives for mine-water disposal and designed a monitoring program to assess future impacts.  Served as a liaison between the mining company, regulatory agencies, and legal counsel.

- Prepared a reclamation plan for an abandoned mine/mill/smelter complex in Utah. Collected soil, waste, and water samples to delineate acceptable topsoil and structural fill borrow materials and to determine requirements for isolation of waste materials. Prepared reclamation designs, giving consideration to regulatory obligations, demolition of structures, post-mining land uses, soil cover requirements, revegetation, and controlling runoff in a non-erosive manner. The reclamation plan also included plans for shaft and portal closure, backfilling and stabilization of disturbed slopes, reclamation of roads and pads, and general re-contouring of the area. Particular concern was paid to mitigating erosion that had occurred in the area since shutdown of mining operations and the beginning of reclamation. Project costs were also estimated.

- Supervised data collection and analyses to evaluate the migration of inorganic and radioactive contaminants in surface and groundwater from several inactive uranium-mill tailings piles in the western United States. Supervised drilling and monitoring-well construction. Collected soil and water samples for quality analyses. Performed field tests to determine groundwater hydraulics. Analyzed all data to determine existing conditions and probable impacts of implementing proposed remedial actions. Prepared detailed reports for each site and associated sections of environmental assessments. Assisted in preparation of remedial-action plans.

- Evaluated the extent of lixiviant migration at a uranium solution mine in Texas. Developed cost estimates for restoration of groundwater quality at the site.

**Stream Channel Stabilization**

Mr. White has performed and/or managed the assessment and design of over 20 projects to stabilize stream and river channels and beds at oil and gas pipeline crossings. This work has included the following:

- Developed a compendium of stream-bank and channel stabilization methods to assist a petroleum and natural gas pipeline company in controlling the impacts of their operations on the environment. The company operates approximately 2,800 miles of pipelines throughout western Canada and the western and Midwestern United States. The longest of these pipelines extends from Alberta, Canada through parts of Montana, Wyoming, Nebraska, Kansas, Missouri, and Illinois in the United States. Presented the client with 24 approaches that could be used to stabilize stream banks and channel bottoms, depending on the specifics of the site. These included "hard" approaches that rely on non-biodegradable materials such as riprap and concrete to provide stability. They also included "soft" approaches that rely on vegetation and other biodegradable materials, as well as combinations of the two general approaches. Evaluated the effectiveness, environmental consequences, and cost of each approach and provided the client with design and installation guidelines and maintenance recommendations to permit them to evaluate field conditions and, in many cases, select and implement an appropriate stabilization method without further involvement by EarthFax.
- Evaluated stream-crossing locations along the route of a proposed crude-oil pipeline that that was to be constructed for approximately 90 miles from Evanston, Wyoming to Salt Lake City, Utah. Considered various alternatives for installation of the new pipeline across the streams to minimize damage, including spanning, boring, and trenching. Prepared stream-alteration permits for submittal by the client to the U.S. Army Corps of Engineers and the Utah State Engineer's Office. Provided typical design

drawings and specifications as well as construction alternatives for completing the stream channel crossings. In specific instances, collected site-specific survey data, evaluated design discharge rates, designed open channels and erosion-protection features, and provided the client with design drawings used for construction bidding.

- Conducted an investigation of conditions at locations in Kansas and Missouri where historic pipelines had become exposed due to improper stabilization of ground during installation of a new pipeline. Examined the immediate area of concern as well as up- and downstream from that area, performed land surveys, prepared drawings and other documents to detail the design, assisted the client in obtaining stream alteration permits, and reviewed construction information to help the client with project implementation. Developed mitigation designs to stabilize the exposed pipelines while ensuring that up- and downstream areas were not adversely impacted.

- Evaluated conditions at a location in Louisiana where a stream bank adjacent to a 16-inch diameter petroleum pipeline was eroding toward the pipeline. To protect their asset, the pipeline company installed sheet piling as a retaining wall in the stream bank approximately 25 years earlier. However, the lack of a drainage layer behind the sheet piling eventually caused the piling to fail. Developed a design for stabilizing the stream bank at this location, consisting of regrading the channel bank, installing articulated concrete mats on the bank, and planting willow cuttings between the concrete blocks. This approach proved successful at keeping the bank stable during extreme flooding of the area two years after installation.

**Soil and Groundwater Assessment and Remediation**

Supervised environmental characterization efforts at rocket-motor production facilities, petroleum refineries, petroleum pipelines, printed-circuit facilities, abandoned smelter complexes, and other industrial facilities to determine the extent and magnitude of soil and groundwater contamination. Prepared work plans, QA/QC plans, health and safety plans, and contamination assessments. Prepared human-health and ecological risk assessments to establish remediation goals. Developed remedial-action plans to clean up past contamination. Designed remedial measures (including air stripping, vapor extraction, thermal desorption, pump-and-treat, air sparging, dual-phase extraction, excavation and off-site disposal, stabilization/solidification, bioremediation, and natural attenuation). Contaminants included explosives, inorganics, chlorinated solvents, dioxins/furans, and other organics. Selected projects are summarized below.

- Supervised and directly assisted in the performance of multi-year assessment, design, and remediation management services at a petroleum refinery located on 600 acres in northern Utah. This work involved the performance of a RCRA Facility Assessment that included detailed characterization of 28 solid-waste management units to determine the need for remediation of hazardous and non-hazardous sludges, refuse, spent refinery chemicals, tank bottoms, and waste waters; performance of bench- and pilot-scale treatability studies to determine the feasibility of various remedial alternatives; preparation of a refinery-wide numerical groundwater flow and contaminant transport model; assessments of the risk of remediation alternatives on human health and the environment; and negotiations with regulatory authorities to classify groundwater as a separate solid-waste management unit, thereby negating the need to remediate groundwater at each individual location where surface remediation was required. The majority of the solid wastes were remediated through solidification and on-site disposal in onsite closure cells, the design of which included combining wastes with widely varying acid-generation potential to support chemical stabilization of the material.

- Supervised and directly provided long-term environmental engineering services to a major propellant and rocket-motor manufacturing client in northern Utah. Contaminants of concern include explosives (nitroglycerin, HMX, RDX, perchlorates, etc.), organic solvents (TCE, TCA, DCE, Freon, etc.), and inorganics (lead, silver, chromium, etc.). Specific tasks that completed for this client have included:

  o  Performed groundwater quality and hydrogeologic characterizations of the facilities and adjacent areas;
  o  Assessed the extent and magnitude of off-site contamination;
  o  Prepared work plans and bid documents and supervised installation of over 100 monitoring wells, deep piezometers, and observation wells under tight time schedules to meet regulatory constraints;
  o  Determined the effectiveness of monitoring well purging during sampling and assisted the client in changing to low-purge sampling methods, thereby eliminating large amounts of investigation-derived waste;
  o  Performed and analyzed the results of aquifer-characteristics tests in over 100 monitoring wells to assess the hydraulic conditions of the groundwater system;
  o  Numerically modeled groundwater flow and contaminant transport to assist in determining the effectiveness of various remediation alternatives;
  o  Performed human health and ecological risk assessments to establish cleanup criteria;
  o  Modeled flow in the unsaturated zone to assess the potential for migration of contaminants from soil to the underlying groundwater;
  o  Designed a solid-waste landfill for on-site disposal of non-hazardous solid waste;
  o  Performed floodplain encroachment investigations;
  o  Designed and implemented pilot-scales tests to anaerobically bioremediate soil and groundwater that was contaminated with perchlorates and organic solvents;
  o  Conducted a remote drilling investigation of explosives-contaminated soil in six former industrial wastewater collection basins, exercising special precautionary measures due to the potentially-explosive nature of the contaminants; and
  o  Designed a water treatment system to remove perchlorate from storm water prior to discharging to an adjacent wetland.

- Served as chief engineer to evaluate options for remediating legacy contamination adjacent to a drainage canal where it flows through to an oil refinery. Past waste disposal practices at the refinery resulted in hydrocarbon impacts to soils adjacent to the canal. The US EPA expressed concerns that continued seepage of oil into the canal following remediation of the sediments would re-contaminate the canal. Conducted a feasibility study under US EPA guidelines to evaluate alternative approaches to eliminate future impacts from the oil seepage. The design anticipated re-routing approximately 3000 feet of the canal to bypass the area of oil seepage. The impacted soils in the former canal bank would then be mitigated as part of a refinery-wide groundwater remediation effort. Evaluated several options for remediating the residual hydrocarbons in the canal bank, including preparation of conceptual designs and cost estimates for each option, and presented these options to the client for consideration. Prepared a Remedial Design/Remedial Action work plan for the preferred alternative, which consisted of partial excavation of the impacted soil, backfilling of the area to maintain stable conditions, and implementation of monitored natural attenuation.

USACE_ESMT000645

- Designed a soil-vapor extraction ("SVE") pilot-scale test for a Superfund site near Billings, Montana. Reviewed data collected from prior subsurface investigations and rendered a positive opinion on the feasibility of SVE as a remediation approach for the site. Designed the pilot test components, consisting of 14 SVE wells, vacuum pumps, air treatment systems, and monitoring apparatuses. Assisted the client with the process of obtaining proposals from contractors to install the pilot-test components and served as the project engineer during performance of the test.

- Served as chief engineer and manager of a project to evaluate and remediate the impacts of prior mining activities in an area of proposed residential development in southwestern Utah. The area had been the subject of silver and uranium mining from the late 1880s to the mid-1900s, with several areas containing waste rock, tailings, and other contamination of concern. The project included a detailed site characterization investigation, performance of a risk assessment to establish remediation goals, preparation of a detailed work plan for excavation of contaminated soil and waste rock, burial of these materials in an on-site repository, and backfilling the excavated areas with clean soil. Developed a quality assurance project plan, sampling and analysis plan, dust control plan, traffic control plan, and storm water pollution prevention plan and incorporated all of these plans into the detailed remedial action plan for review by the Utah Department of Environmental Quality. Interacted with the State during site remediation and prepared a final report describing all remediation activities. This work was conducted under the Voluntary Cleanup Program of the State of Utah.

- Evaluated alternatives for treatment and disposal of water encountered in an underground coal mine in southeastern Utah. The primary concern associated with this water was high levels of salinity. Options that were evaluated included underground injection, evaporation, beneficial reuse via irrigation, and reverse-osmosis treatment for desalination. Prepared cost estimates as well as a discussion of advantages and disadvantages for each alternative to allow the client to better evaluate their options.

- Designed treatment cells for the bioremediation of contaminated soils, using both bacterial and fungal methods. Contaminants included petroleum hydrocarbons, pesticides, wood preservatives, and dioxins/furans. Work was conducted in Utah, Wyoming, Michigan, North Carolina, and New Zealand.

- Performed statistical analyses of soil and groundwater data collected from industrial facilities. Used these data to calculate exposure point concentrations and risks associated with contaminated media.

- Designed sampling programs to assess the effectiveness of soil remediation efforts. Prepared work plans, outlining data quality objectives, conceptual site models, sampling procedures, analytical procedures, and human risk associated with residual concentrations of the contaminants of concern.

- Prepared human-health and ecological risk assessments at locations where the contaminants of concern included solvents, petroleum hydrocarbons, energetics, and inorganics.

- Supervised assessment and remediation of groundwater contamination resulting from leaking underground storage tanks in Utah and Michigan. Responsible for monitoring

well installation, soil-gas surveys, remediation system design and installation, and treatment system operation.

**Hydrologic and Hydraulic Modeling**

Conducted and managed the performance of detailed hydrologic and hydraulic evaluations of a drainage canal used for several decades to dispose of runoff and wastewater from multiple industries and treatment plants in northern Utah. The purpose of this project was to assess the effects on water-surface profiles during removal of hydrocarbon-impacted sediments from the canal, thereby addressing concerns of the U.S. Environmental Protection Agency and the Utah Department of Environmental Quality. Determined the magnitude of design precipitation events, developed a site-specific rainfall hyetograph, assessed land-use and environmental conditions in the 12,300-acre watershed to portray rainfall-runoff relations, and modeled hydrographs of design runoff events. To meet project needs, estimates were made of peak flows at various locations within the canal for return periods ranging from 2 to 100 years. Seasonal peak flows were also estimated for storms with 2-year return periods to assist in planning sediment removal efforts. Managed hydraulic modeling efforts to determine the elevation of the water surface at various locations in the canal during all storm events.

Supervised modeling efforts to determine groundwater impacts associated with two adjacent surface coal mines in eastern. The need for accuracy was increased by the fact that the coal seam being mined also served as a regional aquifer. Supervised the performance of field tests on existing monitoring wells to assess local groundwater hydraulic conditions. Evaluated data from several monitoring wells and private water-supply wells to determine the shape of the potentiometric surface in the overburden, coal, and underburden for an area of approximately 400 square miles around the mines. The impacts of mining were then determined three-dimensionally using a finite-difference numerical model. Sensitivity analyses were performed to assess the effects of varying model parameters on model output. The time required for water levels to recover following mining was also estimated using the model. Based on the model data and regional studies, the cumulative hydrologic impacts of mining in the region were estimated.

Modeled potential groundwater impacts due to various alternatives for control of the level of the Great Salt Lake. Modeled regional impacts of well-field operation in southwestern Michigan to determine the influence of groundwater withdrawals on the shape of a contaminant plume originating from a Superfund site. Supervised flow and contaminant transport modeling of groundwater at a petroleum refinery and two chemical manufacturing facilities in Utah.

Developed storm water runoff conveyance system master plans for two rural communities in south-central Utah. Several years previously, the towns had converted to a pressurized irrigation system, thus removing the irrigation ditches that had previously also served to control runoff in the area. Prepared master plans and conceptual design information for upgrading the towns' storm water runoff control system. Conducted hydrologic analyses to determine the capacity of the existing storm water runoff conveyance system to convey the design precipitation event. Further hydrologic analyses were then conducted to assist in designing the recommended improvements that would meet the capacity of the design precipitation event. Included in the recommendations for improvements was a site improvement cost estimate. Assisted the client with funding research and submitted successful applications for financial assistance to funding agencies.

**Water Supply Development**

Provided oversight on a project consisting of design engineering and construction management services to upgrade firewater systems at two oil refineries in northern Utah. The completed projects included the installation of over 30,000 feet of new pipeline, with diameters ranging up to 16 inches, to deliver over 6,000 gallons per minute of water throughout the refineries.

Evaluated the water-supply and distribution system for a rural community of approximately 750 people in southern Utah. Developed conceptual plans and preliminary cost estimates for upgrading their system to provide a long-term solution to their water needs, including rehabilitation of a backwater water-supply well, replacement of an old pipeline carrying water from the town's springs to the storage tanks, installation of additional pipes within the town limits to improve their fire-fighting capacity, and installation of an automation system to allow remote communication between the storage tank and the town center. Prepared a preliminary engineering report and assisted the town in obtaining grants and loans from funding agencies. Managed final design and construction of the required improvements. Also assisted the town in obtaining funding for a medical center and a fire station.

Designed a water-supply and -distribution system for a proposed 300-lot summer-home development. Also designed and supervised construction of water-supply wells for municipalities, recreational facilities, a surface coal mine, and an industrial facility. Yields ranged up to several thousand gallons per minute. Conducted siting investigations to locate the wells, using geophysical, photogrammetric, and geologic interpretation. Supervised drilling activities and performed pumping tests to determine the long-term yield of the wells.

Designed a water-supply well with a depth of approximately 5,400 feet to provide industrial water for a surface coal mine in eastern Wyoming. Prepared specifications for construction of the well and subcontracted the drilling services. The well was drilled to supply a yield of approximately 500 gallons per minute of water. Provided oversight of drilling and construction activities throughout the turn-key project.

Conducted hydrologic analyses to determine the adequacy of existing and proposed water supplies for use at coal-fired power plants in Utah. Examined alternative surface and groundwater sources to supplement existing supplies. Conceptually designed alternative supplies.

**Miscellaneous**

Provided review and certification for Spill Prevention, Control, and Countermeasure Plans for a bulk petroleum storage and distribution facility in southeastern Utah, for a manufacturing facility in northern Utah, and for a high-security data center in northern Utah. Conducted onsite inspections of the exterior and interior of single-walled tanks to ensure that the tanks met the integrity requirements of the regulations.

Evaluated alternatives for closure of an open dump that was serving as a location for the disposal of garbage generated from a large community in Nigeria. Also developed conceptual design information for construction of a secure landfill near the open dump, and provided recommendations for equipment to operate the landfill.

Designed an instrumentation network to monitor moisture and contaminant migration in the unsaturated zone at the site of a proposed low-level, high specific-activity radioactive waste

disposal site in Nevada. Developed a conceptual design of a well field capable of producing several thousand gallons-per-minute of brine in Nevada for the production of industrial salts.

## MEMBERSHIPS

Utah Solid and Hazardous Waste Control Board (Member and Chair, 1995-2003)
Utah Centers of Excellence Advisory Council, Utah Office of Technology and Science (2002-present)
U.S. Department of Commerce, Environmental Technologies Trade Advisory Committee (2009-2016) - Chair of Trade Promotion Subcommittee
American Water Works Association

## CERTIFICATIONS AND REGISTRATIONS

Registered Professional Engineer (Arizona, Colorado, Montana, Utah, and Wyoming)



**DEPARTMENT OF THE ARMY**
OFFICE OF THE ASSISTANT SECRETARY
CIVIL WORKS
108 ARMY PENTAGON
WASHINGTON DC 20310-0108

1    .0,    .0

The Honorable Dave Archambault II
Chairman, Standing Rock Sioux Tribe
P.O. Box D
Fort Yates, North Dakota 58538

Kelcy Warren
Chairman and Chief Executive Officer
Energy Transfer Partners, L.P.
8111 Westchester Drive
Dallas, TX 75225

Joey Mahmoud
Executive Vice President
Dakota Access LLC
3738 Oak Lawn Avenue
Dallas, TX 75219

Dear Gentlemen:

I am writing regarding the review that the Department of the Army initiated in September regarding the proposed crossing of the Dakota Access Pipeline (DAPL) under Lake Oahe. As you know, on September 9, 2016, the Department of Justice, the Department of the Army, and the Department of the Interior stated that the Army would move expeditiously to determine whether it would need to reconsider any of its previous decisions regarding DAPL's proposed crossing at the Lake Oahe site. The Army has completed that review, accounting for information it has received from the Tribes and the pipeline company since September, and has concluded that its previous decisions comported with legal requirements.

The Army is mindful of the history of the Great Sioux Nation's repeated dispossessions, including those to support water-resources projects. This history compels great caution and respect in considering the concerns that the Standing Rock Sioux Tribe has raised regarding the proposed crossing of Lake Oahe north of its reservation. The Army recognizes that portions of Lake Oahe remain within the Standing Rock Sioux Tribe's reservation boundaries and the Tribe retains hunting and fishing rights in the lake. Additionally, the Army recognizes that the Tribe relies on Lake Oahe and the Missouri River for drinking water. We take seriously our government-to-government relationship with the Tribe. This history, the importance of Lake Oahe to the Tribe, and our government-to-government relationship call for caution, respect, and particular care regarding the proposed DAPL crossing at Lake Oahe.

As you are aware, the statute governing rights of way for pipelines through Federal lands mandates that the Army "impose requirements for the operation of the pipeline and related facilities in a manner that will protect the safety of workers and protect the public

from sudden ruptures and slow degradation of the pipeline." 30 U.S.C. §185(g). It also requires the Army to "protect the interests of individuals living in the general area of the right-of-way or permit who rely on the fish, wildlife, and biotic resources of the area for subsistence purposes," 30 U.S.C. §185(h)(2)(D). In addition, the statute authorizes the Army to subject a right-of-way to "terms and conditions" "regarding extent, duration, survey, location, construction, operation, maintenance, use, and termination," to protect the environment and public health and safety, 30 U.S.C. §185(k).

Accordingly, the Army has determined that additional discussion with the Standing Rock Sioux Tribe and analysis are warranted. The Army invites the Standing Rock Sioux Tribe to engage in discussion concerning the following topics:

* Potential conditions in an easement for the pipeline crossing, which would further reduce the risk of a spill or rupture, hasten detection and response, or otherwise enhance the protection of Lake Oahe, the Tribe's water supplies, and its treaty rights;
* With such conditions, the risk to the Tribe of a spill from the pipeline crossing Lake Oahe at the proposed location; and
* In light of such conditions, whether to grant an easement for the pipeline to cross Lake Oahe at the location currently proposed.

The Army plans to provide a framing paper to facilitate this discussion with the Standing Rock Sioux Tribe regarding these topics. While these topics are of particular interest to the Army, we welcome any input that the Tribe believes is relevant to the proposed pipeline crossing or easement. The Army will work with the Tribe on a timeline that allows for robust discussion and analysis to be completed expeditiously.

While these discussions and analysis are ongoing, construction on or under Corps land bordering or under Lake Oahe cannot occur because the Army has not made a final decision on whether to grant an easement.

Respectfully,

Jo-Ellen Darcy
Assistant Secretary of the Army
(Civil Works)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

STANDING ROCK SIOUX TRIBE,

Plaintiff,

and

CHEYENNE RIVER SIOUX TRIBE,

Intervenor Plaintiff,

v.

U.S. ARMY CORPS OF ENGINEERS,

Defendant,

and

DAKOTA ACCESS, LLC,

Intervenor Defendant.

Civil Action No. 16-1534-JEB
(consolidated with Case Nos. 16-
1796 & 17-267)

---

**DECLARATION OF TOM SIGUAW IN SUPPORT OF**
**DAKOTA ACCESS, LLC'S RESPONSE TO THE MOTIONS OF STANDING ROCK**
**SIOUX TRIBE AND CHEYENNE RIVER SIOUX TRIBE FOR "CLARIFICATION"**
**AND "MEANINGFUL CONSULTATION"**

---

1.      My name is Tom Siguaw. I am a Senior Director, Engineering and Construction – Major

Projects for Energy Transfer Partners, the parent company of Dakota Access, LLC.  I am the

Project Director for Dakota Access.  I have more than 37 years of experience in the energy industry

2.      In accordance with the Court's December 4, 2017 Order, I have worked with Chuck Frey

on the selection of "a third-party independent expert engineering company to review easement

conditions and regulations, and to assess compliance with all such conditions as well as other

integrity threats."  D.E. 303 at 1-2.  As part of that process, I have prepared solicitations for the four companies from which proposals were sought.

3.      In response to input from Standing Rock Sioux Tribe, we included the firm owned by Gerald A. Aaker in the solicitations.

4.      On February 12, Dakota Access asked Mr. Aaker, Standing Rock's proposed third-party firm, to enter into a confidentiality agreement as part of the solicitation process.  A true and correct copy of that correspondence is attached hereto as Attachment 1.  Mr. Aaker did not respond.

5.      Mr. Aaker's failure to respond delayed the presentation of the solicitation to the proposed third-party firms.

6.      On February 19, despite Mr. Aaker's failure to respond to the requested confidentiality agreement, Dakota Access provided the solicitation to all four companies.  Attached hereto are true and correct copies of that correspondence:

> *Attachment* 2:    February 19, 2018 email from Dakota Access to G. Aaker;
>
> *Attachment* 3:    February 19, 2018 email from Dakota Access to TRC Solutions;
>
> *Attachment* 4:    February 19, 2018 email from Dakota Access to Wood Group;
>
> *Attachment* 5:    February 19, 2018 email from Dakota Access to Process Performance Improvement Consultants ("P-PIC");

7.      Dakota Access attached documents relevant to the solicitation to those emails.  Dakota Access also noted, among other things, that:

> DAPL will make the confidential, relevant information available at its offices (1300 Main Houston, TX 77002) and at Wood Group's offices (17325 Park Row Houston, TX 77084.
> There are multiple files at both locations totaling ~ 4,000 pages.

These were documents that would be reviewed in the assessment itself.  Dakota Access neither required nor expected the companies submitting proposals to review them before responding to the solicitation.

8.     Regarding the "scope" of the assessment, Standing Rock's Motion states at page 15:

[T]he Tribe seeks clarification as to the scope of the audit to include an audit of the pipeline's physical integrity and safety management system, using well-established industry "best practices." For example, the American Petroleum Institute ("API"), the oil industry trade association, has established various pipeline construction and safety management protocols. For example, API-RP-1173 is a set of recommendations for pipeline safety management systems. API-RP-1174 addresses industry best practices for oil spill response planning. API RP 1175 addresses pipeline leak detection programs. The Tribe proposes that the Court clarify its order to state that the scope of the audit should include a review of DAPL's compliance with these established industry standards, within the physical scope of the pipeline where it could affect Tribal resources at Oahe.

9.     Contrary to Standing Rock's assertions, the API's "RP"s, *i.e.* "Recommended Practices," are not "well established industry 'best practices'" or "established industry standards." Nor are these recommendations required under 49 CFR Part 195. Thus, the Pipeline Hazardous Materials and Safety Administration (PHMSA) would *not* require compliance with these RPs as part of an audit or assessment of compliance with federal regulations.

10.    In completing its assessment, the third-party company will need to visit the Dakota Access Control Center and interview key personnel to consider compliance with the Lake Oahe Easement special conditions.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed March 16, 2018

Tom Siguaw

# ATTACHMENT 1

| From: | Garcia, Andres <Andres.Garcia@energytransfer.com> |
|---|---|
| Sent: | Monday, February 12, 2018 6:03 PM |
| To: | gaa@engineering-experts.com |
| Cc: | Frey, Chuck (Charles); Siguaw, Tom |
| Subject: | Confidentiality Agreement |
| Attachments: | Engineering Services LP Confidentiality Agreement.pdf |

Mr. Aaker,

Tom Siguaw asked that I forward you a confidentiality agreement as it pertains to the review Engineering Services, L.P. could be providing as it relates to the Lake Oahe, ND easement.

The confidentiality agreement will be sent to your attention via DocuSign from email address "Andres Garcia dse_na2@docusign.net" for signatory. Upon receiving the partially executed confidentiality agreement back from you, I will route it internally to be fully executed and return a fully executed copy to you via DocuSign.

If you have any questions, please give me a call.

Junior

 

**Andres "Junior" Garcia**
Energy Transfer Partners

**1300 Main Street, Houston, Texas 77002**
**Work: 713.989.7007 | Mobile: 832.405.2599**
**Email:** andres.garcia@energytransfer.com

This email message from the Legal Department of Energy Transfer Partners, L.P. is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

# CONFIDENTIALITY AGREEMENT

THIS CONFIDENTIALITY AGREEMENT (this "Agreement") dated as of February 12, 2018, between Dakota Access, LLC (herein after referred to as "ETC" or "Energy Transfer"), and Engineering Services, L.P. (herein after referred to as "Engineering Services") (collectively "Parties").

<u>Recitals</u>

A.  Energy Transfer and or its Affiliates and Engineering Services have entered or may enter into discussions regarding the review of the US Army Corps of Engineers special conditions imposed on Company's Lake Oahe, ND easement and to assess that Company is in compliance with all such conditions as ordered by the Federal Court (the "Potential Transaction").

B.  Each of Energy Transfer and Engineering Services is willing to provide, or to cause their Affiliates to provide, to the other certain information containing proprietary and non-public information in connection with the Potential Transaction, including, without limitation, certain pipeline design, geotechnical, environmental, and rights-of-way information, subject to and upon the terms and conditions set forth herein.

NOW THEREFORE, in consideration of the premises, the benefits to be derived therefrom by all Parties, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Energy Transfer and Engineering Services hereby agree as follows:

1.     <u>DEFINITIONS</u>. For the purposes of this Agreement, the terms set forth herein shall have the following meaning:

(a)     "Affiliate(s)" shall include and mean a Party's "Parent Company" and "Affiliated Companies." The terms "Parent Company," "Affiliated Companies" and "Controlling Interest" shall be defined as follows: (i) a Party's "Parent Company" shall mean an entity having a "Controlling Interest" in such Party; (ii) a Party's "Affiliated Companies" shall mean any and all entities in which the Party or its Parent Company has a direct or indirect interest; and (iii) a "Controlling Interest" shall mean the ownership of fifty percent (50%) or more of the voting stock or other equity or ownership interests in an entity.

(b)     "Confidential Information" includes all of the following information not expressly excluded by Section 2 of this Agreement: written information and material, in tangible or intangible form (including, without limitation, technical, operating, business, alignment maps, environmental and financial information), relating to the Potential Transaction, which a Disclosing Party provides to a Recipient or a Recipient's Representatives prior to or after the date of execution of this Agreement and in connection with the Recipient's evaluation of the Potential Transaction.

(c)     "Disclosing Party" refers to a Party and/or such Party's Representatives disclosing information pursuant to the terms of this Agreement.

(d)      "Notes" means all notes, analyses, charts, memoranda, graphs, data, summaries and other material derived or prepared by a Recipient or its Representatives from the inspection or review of the Confidential Information.

(e)      "Party" means a party to this Agreement.

(f)      "Parties" means the parties to this Agreement.

(g)      "Recipient" refers to a Party and/or such Party's Representatives receiving information disclosed pursuant to this Agreement.  For the purposes of information that is jointly developed, both Parties shall be considered a "Recipient."

(h)      "Representatives" means the officers, directors, employees, partners, lenders, agents, consultants, legal and financial advisors or other representatives of a Party and/or their Affiliates.

2.      EXCLUSION.  Confidential Information shall not include information that the Recipient can show:

(a)      is developed by the Recipient or its Affiliates without the use of the Confidential Information;

(b)      is or becomes publicly available other than as a result of disclosure thereof by Recipient or its Representatives in breach of this Agreement; or

(c)      is or becomes rightfully acquired by the Recipient or its Representatives without obligations of confidentiality or restrictions as to use, from a source other than the Disclosing Party or its Affiliates or the Representatives of the Disclosing Party or its Affiliates, who, to the best of the knowledge of Recipient, was not under a contractual or other obligation to of confidentiality and/or non-use.

3.      NONDISCLOSURE OF CONFIDENTIAL INFORMATION.  Subject to the provisions of Section 5, the Recipient shall, for a period of ten (10) years from the effective date of this Agreement, (i) keep in strict confidence the Disclosing Party's Confidential Information and any and all Notes; (ii) not, without the express prior written consent of the Disclosing Party, disclose or permit Confidential Information to be disclosed to anyone other than the Recipient's Representatives who have a legitimate need to review and evaluate the Confidential Information to assist the Recipient in its evaluation of the Potential Transaction; and (iii) not use, and not permit its Representatives to use, Disclosing Party's Confidential Information or any Notes for Recipient's or its Representatives' own benefit other than in connection with the evaluation of the Potential Transaction, provided that the restriction against use in this Agreement shall be inapplicable to information retained as mental impressions by the Recipient or its Affiliates, or the Recipient's or its Affiliates' Representatives, incident to review of the Confidential Information.  Any person receiving Confidential Information pursuant to (ii) above shall be informed by the Recipient of and be made aware of this Agreement, the confidential nature of the Confidential Information and the other terms

and conditions of this Agreement.  Each Recipient shall be responsible for any breach of this Agreement by any of its Representatives.

      4.    <u>RETURN OF CONFIDENTIAL INFORMATION</u>.  Upon demand by Disclosing Party, the Recipient shall promptly return or cause to be returned to Disclosing Party all Confidential Information and any copies thereof and shall destroy all Notes and any copies thereof.  If requested the completeness of any such return or destruction of information shall be confirmed in writing to the Disclosing Party by the Recipient.  Return of the Confidential Information and destruction of Notes hereunder shall not extinguish the obligations and liabilities of the Recipient and its Representatives to the Disclosing Party and its Affiliates, if applicable, for non-disclosure and non-use specified herein, which obligations and liabilities shall remain in full force and effect for the period specified in Paragraph 13 below.  Notwithstanding the foregoing in this Section 4, (i) one copy of any Confidential Information and any Notes may be retained by the Recipient's Legal Department solely for the purpose of defending or prosecuting claims arising from the Potential Transaction or this Agreement, and (ii) Recipient and/or its Representatives shall not be deemed to have retained or failed to destroy any Confidential Information and/or Notes which are contained on servers or back-up sources if such Confidential Information and/or Notes are deleted from local hard drives and no attempt is made to recover such Confidential Information and/or Notes from such servers or back-up sources.

      5.    <u>COMPELLED DISCLOSURES</u>.  If the Recipient or any of its Representatives hereunder concludes that it is legally compelled (by oral questions, interrogatories, requests for information, subpoena of documents, civil investigative demand or similar process or otherwise pursuant to applicable law including, without limitation, the rules and regulations of the Securities and Exchange Commission and the New York Stock Exchange) to disclose any Confidential Information or Notes, the Recipient shall provide the Disclosing Party with prompt notice of each such request so that the Disclosing Party may seek an appropriate protective order and/or waive Recipient's obligation to comply with the provisions of this Agreement.  Notwithstanding the foregoing in this Section 5, if in the absence of a protective order or the receipt of a waiver hereunder, the Recipient or any of its Representatives is, in the opinion of its counsel, compelled to disclose Confidential Information or Notes, the Recipient or its Representatives, as applicable, may disclose without liability hereunder (but with at least 5 days' prior written notice to the Disclosing Party) only that portion of Confidential Information or Notes that, in the opinion of counsel, is legally required; provided, however, that the Recipient or its Representatives, as applicable, shall take all practicable measures (through an appropriate protective order or otherwise) to assure that, to the extent possible, confidential treatment will be accorded to any such Confidential Information or Notes disclosed.

      6.    <u>NO REPRESENTATIONS, WARRANTIES, OR LIABILITY</u>. EACH PARTY AND THEIR REPRESENTATIVES ACKNOWLEDGE THAT THE DISCLOSING PARTY AND ITS AFFILIATES MAKE NO EXPRESS OR IMPLIED REPRESENTATIONS, WARRANTIES OR COVENANTS AS TO THE ACCURACY AND/OR COMPLETENESS OF THE CONFIDENTIAL INFORMATION, AND AGREE THAT NEITHER THE DISCLOSING PARTY NOR ITS AFFILIATES SHALL HAVE ANY LIABILITY WHATSOEVER TO THE RECIPIENT OR ITS REPRESENTATIVES FOR ANY USE MADE BY THE RECIPIENT OR ITS

REPRESENTATIVES OF THE CONFIDENTIAL INFORMATION, OR ANY ERRORS THEREIN OR OMISSIONS THEREFROM.  THE RECIPIENT AND ITS REPRESENTATIVES SHALL RELY SOLELY UPON THEIR OWN INDEPENDENT ESTIMATES, COMPUTATIONS, EVALUATIONS, REPORTS, STUDIES AND KNOWLEDGE WITH RESPECT TO THE EVALUATION OF THE POTENTIAL TRANSACTION.  EACH PARTY AGREES THAT IT SHALL BE ENTITLED TO RELY ONLY ON ANY REPRESENTATIONS OR WARRANTIES MADE TO IT BY THE OTHER PARTY IN ANY FINAL AGREEMENT.

7.    <u>BINDING/CONTROLLING LAW</u>.    THIS AGREEMENT SHALL BE CONSTRUED AND GOVERNED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS WITHOUT REGARD TO RULES CONCERNING CONFLICTS OF LAW.  EACH PARTY AGREES THAT ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATED IN ANY WAY TO THIS AGREEMENT SHALL BE BROUGHT SOLELY IN ANY STATE OR FEDERAL COURT SITTING IN HARRIS COUNTY, TEXAS. EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY CONSENTS TO THE JURISDICTION OF ANY SUCH COURT AND HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF ANY ACTION OR PROCEEDING IN ANY SUCH COURT, ANY OBJECTION TO VENUE WITH RESPECT TO ANY SUCH ACTION OR PROCEEDING AND ANY RIGHT OF JURISDICTION ON ACCOUNT OF THE PLACE OF RESIDENCE OR DOMICILE OF EITHER PARTY HERETO.

8.    <u>INJUNCTIVE RELIEF/SPECIFIC PERFORMANCE</u>.    Damages resulting from the Recipient's (including its Representative's) breach of the terms hereof may be impossible to measure accurately, and injuries sustained by the Disclosing Party from any such breach may be impossible to calculate and remedy.  Therefore, the Recipient acknowledges that, in the event of such breach, the Disclosing Party shall be entitled to seek injunctive relief and specific performance of the covenants contained in this Agreement in addition to any other remedy to which it may be entitled at law or in equity.  Moreover, in addition to any other remedies awarded to the Disclosing Party, the Disclosing Party shall have the right to recover all costs (including reasonable attorney's fees) which may be incurred in connection with any action to enforce the obligations of the Recipient or its Representatives, as applicable, to the extent such Party prevails in any such action. In the event of any breach of or dispute under this Agreement, a Party shall be liable only for actual damages as a direct result of the breach of this Agreement and neither Party shall seek, and no court or arbitrator shall award, punitive, consequential, incidental or special damages in any form or amount.

9.    <u>ENTIRE AGREEMENT</u>.    This Agreement constitutes the entire understanding and agreement between the Parties with respect to its subject matter and supersedes all previous communications, both oral and written, representations and understandings between the Parties with respect to the subject matter of this Agreement.

10.    <u>AMENDMENT; WAIVER</u>.   No amendment, modification, and/or discharge of this Agreement shall be valid or binding on the Parties unless made in writing and signed on behalf of each of the Parties by their respective duly authorized officers or Representatives.  No failure in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any

single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any right, power or privilege hereunder.

11.   <u>NO OFFER</u>.   The sole purpose of this Agreement is to provide for access to Confidential Information for the evaluation of the Potential Transaction while protecting and governing the confidentiality and use of the Confidential Information in accordance with the terms hereof.  Furnishing Confidential Information hereunder does not constitute an offer by any Party hereto.  The Parties agree that unless and until a definitive agreement between the Parties with respect to the Potential Transaction has been executed and delivered, and then only to the extent of the specific terms of such definitive agreement, no Party hereto will be under any legal obligation of any kind whatsoever with respect to any transaction by virtue of this Agreement or any written or oral expression with respect to such a transaction by any Party or their respective Representatives, except, in the case of this Agreement, for the matters specifically agreed to herein.  A Party shall be entitled to cease disclosure of Confidential Information hereunder and any Party may depart from negotiations at any time for any reason or no reason without liability to any Party hereto.  However, such departure from negotiations shall not extinguish any rights or obligations which the Party may have under this Agreement.

12.   <u>PRIOR DISCLOSURES</u>.   The Parties acknowledge that before the date this Agreement is executed, certain Confidential Information may have already been exchanged between the Parties. Upon the Parties' express written agreement to treat such information as Confidential Information, the Recipient shall treat the Confidential Information described in the preceding sentence as if it had been exchanged after the effective date of this Agreement.

13.   <u>SURVIVAL</u>. Except as otherwise provided herein, this Agreement and its obligations and liabilities shall remain in full force and effect for a period of ten (10) years from the effective date of this Agreement as first hereinabove written.

14.   <u>NOTICES</u>.   Any and all notices or other communications permitted or required to be given hereunder shall be validly given or made in writing if: (a) personally delivered; (b) delivered and confirmed by telecopier or like instantaneous transmission device; (c) delivered by a reputable overnight delivery service; or (d) deposited in the United States mail, first class, postage prepaid, certified or registered, return receipt requested, addressed as follows:

| | |
|---|---|
| If to ETC: | Keegan Pieper, Associate General Counsel<br>Dakota Access, LLC<br>1300 Main Street<br>Houston, Texas 77002 |
| If to Engineering Services: | Gordon A. Aaker<br>Engineering Services, L.P<br>P.O. Box 5811<br>Kingwood, Texas 77325-5811 |

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**Engineering Services, L.P**

Signature: _____

Name: _____

Title: _____

**Dakota Access, LLC**

Signature: _____

Name: _____

Title: _____

# ATTACHMENT 2

| | |
|---|---|
| **From:** | Siguaw, Tom <Tom.Siguaw@energytransfer.com> |
| **Sent:** | Monday, February 19, 2018 3:56 PM |
| **To:** | gaa@engineering-experts.com |
| **Cc:** | Siguaw, Tom |
| **Subject:** | DAPL - USACE - Remand Letter ****RFQ - THIRD PARTY INDEPENDENT EXPERT ENGINEERING COMPANY REVIEW**** ACTION REQUIRED**** |
| **Attachments:** | 2017.12.04 (303) Order on Remedy During Remand.pdf; 2017.12.04 (304) Mem Op on Remedy During Remand.pdf; Exhibit D_Easement Conditions.pdf; Lake Oahe HDD_AS-BUILT OVERLAY.PDF; Lake Oahe - Alignment Sheets.pdf; DAPL_Post Construction_Easement Conditions_Threat Assess.docx |
| **Importance:** | High |

<u>**To:**</u>  **Engineering Services, LP**
     **Gordon A. Aaker:  281-923-3638**
     gaa@engineering-experts.com
     P.O. Box 5811
     Kingwood - TX - 77325-5811
     Office:  (832) 418-9180

Dakota Access Pipeline (DAPL) is soliciting a Proposal for a third-party independent expert engineering company to review Dakota Access Pipeline - Lake Oahe, ND easement special conditions imposed by the US Army Corps of Engineers, and to assess compliance with all such conditions as well as other integrity threats between the valve sites closest to each shore of Lake Oahe, ND as ordered.

See the following attachments to this email:
     **Judicial Order on Remedy During Remand & Memorandum Opinion**
     **USACE Easement Special Conditions (Exhibit D)**
     **DAPL As-Built Overlay (Lake Oahe HDD Plan and Profile)**
     **DAPL As-Built Alignment Sheet (Lake Oahe Crossing Valve-to-Valve)**
     **DAPL Post Construction Easement Conditions and Threat Assessment**

DAPL will make the confidential, relevant information available at its offices (1300 Main Houston, TX 77002) and at Wood Group's offices (17325 Park Row Houston, TX 77084. There are multiple files at both locations totaling ~ 4,000 pages.

Please include with your proposal the following items:
     List of personnel to be used for this Work (Review / Audit) with their respective resumes and billing rates.
     Required start date so as to complete this Work (Review / Audit) and furnish DAPL a written Final Report by **March 23, 2018**.

Estimated total cost for this Work (Review / Audit).

**Submit Proposal in writing and  via email to the following --- Due 9:00 am on Thursday, February 22, 2018:**
Tom Siguaw
Energy Transfer Partners
1300 Main
Ste. 14.036
Houston, TX  77002
Cell Phone:  713-249-3425
Email:   tom.siguaw@energytransfer.com

You were recommended by Chuck Frey
Thanks

Tom Siguaw
Sr. Director
Energy Transfer Partners
(o)  713-989-2841
(c)  713-249-3425

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

STANDING ROCK SIOUX TRIBE,

    Plaintiff,

    and

CHEYENNE RIVER SIOUX TRIBE,

    Plaintiff-Intervenor,

        v.

U.S. ARMY CORPS OF ENGINEERS,

    Defendant,

    and

DAKOTA ACCESS, LLC,

    Defendant-Intervenor and Cross-
    Claimant.

Civil Action No. 16-1534 (JEB) (and
Consolidated Case Nos. 16-1769 and
16-267)

---

## ORDER

For the reasons set forth in the accompanying Memorandum Opinion, the Court

ORDERS that:

    1.  The parties shall coordinate to finalize an oil-spill response plan affecting Tribal

resources and lands at Lake Oahe, which they shall submit to the Court by April 1, 2018;

    2.  Dakota Access, with input from the Tribes, shall select a third-party independent

expert engineering company to review easement conditions and regulations, and to assess

1

compliance with all such conditions as well as other integrity threats. The results of the independent audit shall be filed with the Court by April 1, 2018; and

3. Dakota Access shall submit to the Court bi-monthly reports including the following information with respect to the segment of the pipeline crossing Lake Oahe (*i.e.*, between the valves closest to each shore of Lake Oahe):

a. Inline-inspection run results or direct-assessment results performed on the pipeline during the reporting period;

b. The results of all internal-corrosion management programs and any actions taken in response to findings of internal corrosion;

c. Any new encroachment on the right-of-way during the reporting period;

d. Any new integrity threats identified during the reporting period;

e. Any reportable incidents that occurred during the reporting period;

f. Any leaks or ruptures that occurred during the reporting period;

g. A list of all repairs on the segment made during the reporting period;

h. Ongoing damage-prevention initiatives on the pipeline and an evaluation of their success or failure;

i. Any changes in procedures used to assess and monitor the segment; and

j. Any company mergers, acquisitions, transfers of assets, or other events affecting the management of the segment.

Dakota Access shall file the first such report on or before December 31, 2017, and shall file subsequent reports every 60 days thereafter until remand is complete.

SO ORDERED.

/s/ James E. Boasberg
JAMES E. BOASBERG

2

United States District Judge

Date:  December 4, 2017

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **STANDING ROCK SIOUX TRIBE,**<br><br>    **Plaintiff,**<br><br>    **and**<br><br>**CHEYENNE RIVER SIOUX TRIBE,**<br><br>    **Plaintiff-Intervenor,**<br><br>      **v.**<br><br>**U.S. ARMY CORPS OF ENGINEERS,**<br><br>    **Defendant,**<br><br>    **and**<br><br>**DAKOTA ACCESS, LLC,**<br><br>    **Defendant-Intervenor and Cross-Claimant.** | **Civil Action No. 16-1534 (JEB) (and Consolidated Case Nos. 16-1769 and 16-267)** |

## <u>MEMORANDUM OPINION</u>

Two months ago, this Court determined that oil could continue to flow through the

Dakota Access Pipeline while the U.S. Army Corps of Engineers conducted further

environmental analyses. See Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers

(Standing Rock IV), 2017 WL 4564714 (D.D.C. Oct. 11, 2017). Although the prior Opinion

declined to vacate the agency's easement approval, it left open the question of whether to impose

any conditions during the remand period. Plaintiffs, the Standing Rock and Cheyenne River

1

Sioux Tribes, have asked for a series of interim measures to monitor the ongoing operation of the

pipeline. Defendants oppose such conditions, arguing that the Tribes have not demonstrated a

need for injunctive relief and that the proposed measures are unnecessary during remand.

As a threshold matter, the Court concludes that the interim conditions are not a request

for injunctive relief; they are instead a means by which the Court can ensure that it receives up-

to-date and necessary information about the operation of the pipeline and the facts on the ground.

It next determines that the requested measures, each of which is tailored to keeping the Court

abreast of the conditions at Lake Oahe pending further Corps analysis, are reasonable and

appropriate.

## I.      Background

As explained in prior Opinions, the parties here are engaged in a protracted dispute over

the placement of the Dakota Access Pipeline (DAPL) under Lake Oahe in North Dakota. See,

e.g., Standing Rock IV, 2017 WL 4564714, at *1-3. The Lake is a federally regulated body of

water that borders the Tribes' reservations, and it is considered sacred within their spiritual

practices. Id.

In their most recent challenge to the project, Plaintiffs alleged that the Corps had erred in

its analysis of the environmental impact of the pipeline crossing, in violation of the National

Environmental Policy Act. See Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers

(Standing Rock III), 255 F. Supp. 3d 101 (D.D.C. June 14, 2017). The Court agreed in part and

remanded the case to the Corps for further analysis. Id. at 140. In a subsequent Opinion, issued

on October 11, 2017, the Court examined whether the NEPA violations warranted vacatur of the

agency's decisions – and thus a stoppage in the oil flow – during remand. See Standing Rock

IV, 2017 WL 4564714. Finding a "significant likelihood" that the Corps could substantiate its

prior conclusions, the Court answered that question in the negative. Id. at *8. In denying such relief, however, it left open the possibility of imposing other, interim conditions during remand. Id. at *12. It ordered further briefing on the issue from both sides, which is now complete.

## II. Analysis

### A. Authority to Issue Conditions

The Court turns first to the matter of its authority to impose conditions during remand. As the Tribes correctly note, this question has already been decided by the prior Opinion, in which the Court found that it possessed jurisdiction to order interim remedies other than vacatur. Id. at *12 (rejecting Defendants' argument that Court lacks jurisdiction to enter interim relief). Although the Court therefore considers this matter largely settled, Defendants nonetheless continue to contend that the proposed conditions are beyond the scope of the Court's power. This is not so.

The fundamental flaw in Defendants' argument is in how they characterize the relief Plaintiffs seek. Defendants assert that the Tribes are, in effect, asking for an injunction. According to the Corps, "Plaintiffs' request for 'alternative measures' is . . . nothing more than a request for additional injunctive relief." ECF 287 (Corps Brief) at 1-2. Asserting that the Tribes fail to meet the test for such a remedy, the Corps contends that Plaintiffs are not entitled to interim relief. Id.

Yet the conditions sought do not constitute injunctive relief. They do not affect Defendants' ongoing environmental analysis, nor do they constrain the outcome of the remand process. Rather, they are largely a means of providing the Court with relevant information during this period. Each of the interim conditions is tailored to address the Court's ongoing concern with the risk of a spill at Lake Oahe – a hazard that the previous Opinion described as "at the center of this Court's prior" decision to remand the matter to the Corps. See Standing

Rock IV, 2017 WL 4564714, at *10. Such information-gathering measures are within the Court's managerial discretion over this pending case. See also West Virginia v. EPA, Order, No. 15-1363 (D.C. Cir. 2017) (ordering EPA to file status reports at 30-day intervals while case held in abeyance).

Because the interim conditions here do not affect the remand process, Defendants' reliance on Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139 (2010), is misplaced. The Court there held that the district court had exceeded its authority when, after vacating the Animal and Plant Health Inspection Service's decision to completely deregulate a genetically engineered crop, it additionally entered an injunction preventing the agency from partially deregulating the crop during the remand period. Id. at 156, 158-59. Such an injunction, the Court concluded, interfered with the agency's authority "to decide whether and to what extent it would pursue a partial deregulation" and thus impermissibly "pre-empt[ed] the very procedure by which the agency could determine . . . that a limited deregulation would not pose any appreciable risk of environmental harm." Id. at 159, 164. The holding in Monsanto thus resolved an issue unconnected with the facts of this case – whether a district court may impose constraints on an agency's authority and decisionmaking during remand. The interim measures proposed here do not have any such effect.

Other cases addressing the scope of a court's supervision during remand are similarly inapposite. These decisions all concern the imposition of injunctive relief relating to the relevant agency's analysis or discretion on remand. See Bennett v. Donovan, 703 F.3d 582, 588-89 (D.C. Cir. 2013) (noting that court would not direct agency on remand "to take [a] precise series of steps" with respect to plaintiffs' mortgage, including "accept[ing] assignment of the mortgage, pay[ing] off the balance . . . and then declin[ing] to foreclose"); Palisades Gen. Hosp. Inc. v.

4

Leavitt, 426 F.3d 400, 403 (D.C. Cir. 2005) (stating that district court lacked authority to "order specific relief" after vacating agency decision); Berge v. United States, 949 F. Supp. 2d 36, 47 (D.D.C. 2013) (noting no district court jurisdiction to "order specific relief that deprives an agency of the ability to reconsider the matter in light of the Court's decision").

Yet here, as explained in more detail below, the conditions are not constraints on the Corps' analysis or a grant of "specific relief" to the Tribes. They do not concern the scope of the remand, nor do they affect the agency's authority over the pipeline. They are instead means by which the Court can gather information about the risks posed by the pipeline pending remand and can ensure that the status quo is preserved for both sides. As discussed in the prior Opinion, such an interim remedy clearly falls within the Court's general equitable powers.

Recent events have made clear, moreover, that there is a pressing need for such ongoing monitoring. Earlier this month, the Keystone Pipeline leaked 210,000 gallons of oil in Marshall County, South Dakota. See Mitch Smith and Julie Bosman, Keystone Pipeline Leaks 210,000 Gallons of Oil in South Dakota, N.Y. TIMES (Nov. 16, 2017), https://www.nytimes.com/2017/ 11/16 /us/keystone-pipeline-leaks-south-dakota.html. The spill occurred near the boundaries of the Lake Traverse Reservation, home of the Sisseton Wahpeton Oyate Tribe, thus highlighting the potential impact of pipeline incidents on tribal lands. Id. Although the Court is not suggesting that a similar leak is imminent at Lake Oahe, the fact remains that there is an inherent risk with any pipeline. As stated in the prior Opinion, "[T]here is no doubt that allowing oil to flow through the pipeline during remand risks the potentially disruptive effect about which the Tribes are most concerned – a spill under Lake Oahe." Standing Rock IV, 2017 WL 4564714, at *10. Such incidents, the Court noted, "have the potential to wreak havoc on nearby communities and ecosystems." Id. at *11. In light of these concerns, it is in the Court's interests to stay

5

abreast of any relevant changes during the remand period and to order the parties to provide up-to-date information about the pipeline's operation. Such reporting will allow the Court to ensure that remand without vacatur remains the appropriate remedy and to monitor any factual developments in this ongoing case.

The Corps is thus incorrect that the interim conditions are "unwarranted" and "unlikely to address Plaintiffs' stated concerns with the operation of the pipeline." Corps Brief at 4. Indeed, Defendants' assertion that the Tribes' "rights, resources, and land are fully protected by the existing easement" presupposes that the status quo will be maintained during the remand process. Id. at 5. Yet without measures to ensure that Defendants share information about ongoing operations, there is no clear way for the Court, the parties, or the public to evaluate the efficacy of the extant safety measures.

B.    Interim Conditions

Plaintiffs request three specific conditions during the remand period: (1) the finalization and implementation of oil-spill response plans at Lake Oahe; (2) completion of a third-party compliance audit; and (3) public reporting of information regarding pipeline operations. See ECF 272 (Tribes' Brief Regarding Remedy) at 36-39. The Court agrees that each of these measures is appropriately tailored to monitoring the status of the pipeline during remand.

As to the first, the Corps contends that the Tribes and Dakota Access "either have resolved, or are in the process of resolving, the Tribe's request" and that the relief sought is therefore not "necessary because it appears that the parties have already engaged in the requested coordination." Corps Brief at 6. Dakota Access similarly states that it is "already coordinating" with the Tribes' emergency-management personnel. See ECF 288 (Dakota Access Brief) at 4. The Court, of course, encourages the parties to collaborate in efforts to resolve any pipeline-

6

related dispute.  Yet, in light of the case's history of contested versions of discussions between Plaintiffs and Defendants, it will not rest on such representations.  Instead, the Court will order that the Corps, Dakota Access, and the Tribes coordinate to finalize spill response plans at Lake Oahe, and that the parties file such plans with the Court by April 1, 2018.  Such a condition is directly related to the risk of a spill during remand, and it is directed to keeping the Court informed as to all parties' efforts to preserve the status quo pending the Corps' further environmental analysis.

The Court will additionally impose the second requested condition – namely, the completion of a third-party compliance audit.  In contesting this measure, Dakota Access relies heavily on the ongoing authority of the Pipeline and Hazardous Materials Safety Administration to ensure DAPL's compliance with federal laws and regulations.  See DA Brief at 5-6.  The Tribes note, however, that PHMSA itself recognized the potential benefit of having an independent, third-party review.  See Tribes Brief at 10.  Defendants' assertion that such a process would be duplicative of PHMSA oversight is therefore unavailing.  As to the Tribes' involvement in the process, the Corps asserts that Plaintiffs are asking for their "own experts [to] actually participate in the audit," Corps Brief at 6, and Dakota Access contends that the Tribes are seeking to "insert[]" themselves into the process.  See DA Brief at 6.  Yet the Tribes in fact request only that they be permitted to participate in the selection of the auditor and have the opportunity to share their relevant data during the audit process.  See Tribes Brief at 10.  This seems reasonable.  The Court will therefore order that Dakota Access select an independent, third-party auditor in consultation with the Tribes.  Because these conditions are imposed in order to keep the Court informed of the circumstances at Lake Oahe pending remand, it will require that the results of this audit process be filed with the Court by April 1, 2018.

Finally, the Court will require that Dakota Access file bi-monthly reports regarding the status of the pipeline during remand, beginning at the end of this month. With respect to this condition, the Corps contends that such reporting is "unnecessary" and "unlikely to lead to any meaningful differences in the safety of the pipeline." Corps Brief at 7. Yet it never explains how additional information and transparency during the remand process would not enhance public safety and the Court's understanding of the facts on the ground. In light of Dakota Access's agreement to "voluntarily" report on many of the issues raised by the Tribes, there is similarly no concern that this condition will be unduly burdensome for the company. See DA Brief at 7. The Court will therefore order that Dakota Access file bi-monthly reports of any repairs or incidents occurring at the segment of the pipeline crossing Lake Oahe.

## III.    Conclusion

The Court, the parties, and the public all have an interest in ensuring that the status quo at Lake Oahe is preserved pending remand. In order to obtain the information necessary to monitor the conditions in North Dakota, and to mitigate the risk of any potential spill, the Court will thus impose a series of interim measures. A separate Order consistent with this Opinion will be issued this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  December 4, 2017

## SPECIAL CONDITIONS
## LAKE OAHE, EASEMENT NO DACW45-2-16-8059

| Condition | |
|---|---|
| 1. | **Procedures and Specifications:** For the pipeline segments crossing Lake Oahe and its "could affect" High Consequence Areas ("could affect" HCAs) (as defined in 49 CFR § 195.450), Grantee must meet the U.S. Army Corp of Engineers easement special conditions by developing, implementing, and maintaining for the duration of the easement all easement special conditions in specifications and procedures for the design, construction, testing, operation and maintenance specifications and procedures as required in 49 CFR §§ 195.100, 195.202, 195.302, and 195.402 and this easement.<br><br>For the purposes of these special conditions, "pipeline segment" is defined as Lake Oahe and the "could affect" HCAs noted in EA for the vicinity of Lake Oahe. |
| 2. | Grantee will conduct all HDD work according to the HDD Construction Plan [August 18, 2015] (Final EA, Appendix B) that it has prepared, and implement the HDD Contingency Plan [March 11, 2011] (Appendix B) in the event of an inadvertent release. |
| 3. | Grantee is not authorized to discharge hydrostatic test water under this easement. |
| 4. | Grantee will follow response, containment, mitigation measures, and cleanup measures described in SPCC, SWPPP, and ECP. |
| 5. | Grantee will use temporary sediment control measures, such as silt fence, to minimize the introduction of sediment into waterbodies during construction and minimize the movement of spoil and sediment from surface runoff during and after construction. |
| 6. | Grantee will return all surface drainage contours and vegetation to preconstruction conditions as much as practical. |
| 7. | Grantee will avoid groundwater contamination by implementing the protective measures set forth in the Project specific spill prevention, control and Countermeasures prepared by the contractor and in the Spill Prevention, Control and Countermeasure Plan [December 2014] (Final EA, Appendix A). |
| | **Documentation Conditions** |
| 8. | The Grantee will submit the Facility Response Plan to the Oahe OPM for review prior to the operation of the pipeline. |
| 9. | The Grantee will submit all plans not final at the time this easement is granted to the Oahe OPM for review and the incorporation of U.S. Army Corps of Engineers comments prior to the Grantee's submittal to the Pipeline and Hazardous Management Safety Administration. These plans include, but are not limited to the following:<br>  a.  Geographical Response Plan,<br>  b.  Operations and Maintenance Manual,<br>  c.  Risk Assessment (Integrity Management Plan), and<br>  d.  Spill Models (Using the National Hydrography Dataset by the U.S. Geological Survey) |
| 10. | The Grantee must send any updated plans in the Facility Response Plan to the Oahe OPM for review by the U.S. Army Corps of Engineers Environmental Compliance Coordinators at the Omaha District Office and the Oahe Project Office within one year of the update. |

EXHIBIT "D"
DACW45-2-16-8059

| | |
|---|---|
| 11. | The Grantee shall provide as-built drawings for the crossing at Lake Oahe to the Oahe OPM within 6 months of the completion of pipeline construction. |
| 12. | All records demonstrating compliance with these easement conditions herein must be maintained for the duration of the easement. |
| | **Pipeline Safety Conditions (Construction)** |
| 13. | **Pipeline Design Factor – Pipelines:** Pipe installed must comply with a design factor of 0.50 or lower in the Lake Oahe crossing and "could affect" HCAs. |
| 14. | **Pipe Girth Weld – Nondestructive Tests:** Grantee must nondestructively test all girth welds in accordance with 49 CFR §§ 195.228, 195.230 and 195.234. |
| 15. | **Pressure Test Level:** The pre-in-service hydrostatic test for mainline pipe must be to a pressure producing a hoop stress of either: a minimum 100% specified minimum yield strength (SMYS) or a minimum of 1.25 times maximum operating pressure (MOP) for eight (8) continuous hours for pipeline segments using a design factor of 0.50 or less. |
| 16. | **Assessment of Test Failures:** Any pipe failure occurring during the pre-in-service hydrostatic test must undergo a root cause failure analysis to include a metallurgical examination of the failed pipe. The results of this examination must preclude a systemic pipeline material issue and the results must be reported to the Operations Project Manager at the Oahe Project Office (Oahe OPM) within 60 days of the failure. |
| 17. | **Coatings for Trenchless Installation:** Coatings used for directional bore, slick bore and other trenchless installation methods must be capable of resisting abrasion and other damage that may occur due to rocks and other obstructions encountered in this installation technique. |
| 18. | **Pipe Coating:** Pipe coatings must be non-shielding to cathodic protection (CP). Coatings such as tape and shrink sleeves would be shielding coatings to CP that protects the pipe from external corrosion. The application of a corrosion resistant coating to the steel pipe must be performed according to a coating application quality control program. The program must address pipe surface cleanliness standards, blast cleaning, application temperature control, adhesion, cathodic disbondment, moisture permeation, bending, minimum coating thickness, coating imperfections and coating repair. |
| 19. | **Field Coating:** Field joint coatings must be non-shielding to CP. Grantee must implement field girth weld joint coating application specification and quality standards to ensure pipe surface cleanliness, application temperature control, adhesion quality, cathodic disbondment, moisture permeation, bending, minimum coating thickness, holiday detection and repair quality. Field coating applicators must use valid qualified coating procedures and be trained to use these procedures. |
| 20. | **Construction Coating Survey after Installation:** Promptly after a ditch for the pipeline is backfilled, but not later than three months after placing the pipeline in service, the operator must perform an assessment to ensure integrity of the coating using direct current voltage gradient (DCVG) or alternating current voltage gradient (ACVG). The operator must repair any coating damage classified as moderate or severe (voltage drop greater than 35% for DCVG or 50 dBµV for ACVG) in accordance with section 4 and Appendix A of NACE SP0502-2008 (or latest edition referenced in 49 CFR § 195.3) within six months of the assessment. |
| 21. | **Mainline Valve(s) with Remote Control or Automatic Shutdown:** |

EXHIBIT "D"
DACW45-2-16-8059

a. Mainline valves with remote control or automatic shutdown for water crossings and reservoirs must be installed on either side of the crossing and additional mainline valves(s) installed either upstream, downstream, or both to protect the water body from the "could affect" HCA on either side of the water crossing. Mainline valves must either be located outside of the flood plain or have valve actuators and other control equipment installed so as to not be impacted by flood conditions.

b. Mainline valves with remote control or automatic shutdown must contain transit inhibit switches that prevent the valves from shutting at a rate (and in conjunction with pumps being shutdown) so that no pressure surges can occur, or other damage caused by unintended valve closures or too fast of a closure.

c. Mainline valves must be remotely controlled and actuated or automatic shutdown, and the Supervisory Control and Data Acquisition (SCADA) system must be capable of closing the valve and monitoring the valve position, upstream pressure and downstream pressure so as to minimize the response time in the case of a failure.   Remote power backup is required to ensure communications are maintained during inclement weather.  Mainline valves must be capable of closure at all times.  If it is impracticable to install a remote controlled valve, Grantee must submit a valve design and installation plan to the appropriate Oahe OPM to confirm the alternative approach provides an equivalent level of safety.

d. Mainline valves in the pipeline segment must have actuation capability (i.e., remote control shut-off, automatic shut-off, manual shut-off where personnel are in proximity, or alternative equivalent technology) to ensure pipeline ruptures are promptly mitigated based upon maximum valve shut-off times, location, and spacing specified.

e. For each mainline valve that is a remote-control shut-off or automatic shut-off valve, the operator must conduct a point-to-point verification between SCADA displays and the mainline valve, sensors, and communications equipment in accordance with 49 CFR § 195.446(c) and (e), or an equivalent verification.

| 22. | **Supervisory Control and Data Acquisition (SCADA) System:**  Grantee must develop, install, operate, and maintain a SCADA system to provide remote monitoring and control of the entire pipeline segment in accordance with 49 CFR Part 195 requirements. |
|---|---|
| 23. | **Computational Pipeline Monitoring (CPM) Leak Detection:** The pipeline segment must have a computational pipeline monitoring (CPM) leak detection system in accordance with 49 CFR § 195.134 and must have adequate pressure sensors at pump stations, laterals, mainline valves and liquid flow volume measurement along the pipeline at inflows, outflows and spaced along the pipeline to perform accurate leak detection.  The pipeline segment must be operated as a continuously pressurized pipeline (with no pressure, slack line pipeline segments).  If the pipeline segment is operated as a slack line pipeline segment, an operating plan must be developed, reviewed by a responsible third party independent expert engineering company and submitted to the Oahe OPM for "no objection" prior to being implemented by Grantee. |
| 24. | Grantee will minimize or avoid impacts on soils by implementing the mitigation measures described in the DAPL Project's Spill Prevention Control and Countermeasure Plan [December 2014] (SPCC), Storm water Pollution Prevention Plan[July 2015] (SWPPP), and Environmental Construction Plan [April 2015 (ECP) as well as requirements of applicable state and federal permits. |

EXHIBIT "D"
DACW45-2-16-8059

| | **Pipeline Safety Conditions (Operation)** |
|---|---|
| 25. | **Overpressure Protection Control:**  Grantee must limit mainline pipeline segment overpressure protection to a maximum of 110% maximum operating pressure (MOP) during surge events consistent with 49 CFR § 195.406(b).  Before commencing operation, Grantee must perform a surge analysis showing how the pipeline segment will be operated to be consistent with these overpressure protection conditions.  Grantee shall equip the pipeline with field devices to prevent overpressure conditions.  Remotely actuated valves or automatic shutoff valves should be fitted with devices that will stop the transit (intentional or uncommanded) of the mainline valve should an overpressure condition occur or an impending overpressure condition is expected.  Sufficient pressure sensors, on both the upstream and downside side of valves, must be installed along the pipeline to conduct real time hydraulic modeling, and which can be used to ensure that an overpressure situation does not occur.  Sufficient pressure sensors must be installed along the pipeline to conduct real time hydraulic modeling, and which can be used to conduct a surge analysis to determine whether pipeline segments have experienced an overpressure condition. |
| 26. | **Cathodic Protection:**  The initial Cathodic Protection system must be operational within six (6) months of placing a pipeline segment in service. Cathodic Protection will be operated and maintained per applicable codes and the Grantee's 'Operations and Maintenance Manual'. Wall thickness testing will be performed in-lieu of periodic hydro tests. The Grantee shall send the inspection reports to the Operations Project Manager at the Oahe Project Office (hereinafter the Oahe OPM)." |
| 27. | **Interference Current Surveys:**  Interference surveys must be performed over the entire  pipeline segment within six months of placing the pipeline in service to ensure compliance with applicable NACE International Standard Practice 0169-2007 (2007 or the latest version incorporated by reference in § 195.3) and 0177 (2007 or the latest NACE standard version, since NACE SP 0177 is not incorporated by reference in 49 CFR § 195.3) (NACE SP 0169-2007 and NACE SP 0177) for interference current levels.  If interference currents are found, Grantee must determine if there have been any adverse effects on the pipeline and mitigate such effects as necessary as required below.<br><br>The interference current mitigation program for the pipeline segment must include:<br><br>    1) As frequently as needed, including when new or uprated high voltage alternating current power lines greater than or equal to 69 kVA or electrical substations are co-located near the pipeline, but not to exceed every seven years conduct an interference survey (at times when static or dynamic voltages are at the highest values for a time period of at least 24-hours) to detect the presence and level of any electrical current that could impact external corrosion where interference is suspected;<br>    2) Analyze the results of the survey to identify locations where interference currents are greater than or equal to 20 Amps per meter squared; and<br>    3) a remedial action plan and apply for any necessary permits within four months of completion of the inspection or testing that identified the presence of deleterious electrical stray current.<br>    4) Implement remedial actions to protect the pipeline segment from detrimental interference currents.  Remedial actions must be completed promptly, but no later than one year after completion of the survey, or as soon as practicable after obtaining necessary permits.  Remedial action means the implementation of measures including, but not limited to, |

EXHIBIT "D"
DACW45-2-16-8059

| | |
|---|---|
| | additional grounding along the pipeline to reduce interference currents below 20 Amps per meter squared. The following criteria shall be used to determine when remedial actions are required. |
| | a) AC-induced corrosion does not occur at AC densities less than 20 A/m2 (1.9 A/ft2). The operator shall monitor these locations per (a) above. |
| | b) AC corrosion is unpredictable for AC densities between 20 to 100 A/m2 (1.9 to 9.3 A/ft2). These locations require an engineering assessment to determine if remediation is required. |
| | c) AC corrosion occurs at current densities greater than 100 A/m2 (9.3 A/ft2). These areas require mitigation. Any location that is determined to require mitigation must be mitigated to reduce the AC current density to less than 20 A/m2. |
| 28. | **Corrosion Surveys:** Grantee must complete corrosion surveys for the pipeline segment within six (6) months of placing the respective CP system(s) in operation to ensure adequate external corrosion protection per NACE RP 0169-2007. The survey shall also address the proper number and location of CP test stations as well as alternating current (AC) interference mitigation and AC grounding programs per NACE RP 0177. At least one (1) CP test station must be located within each "could affect" HCA with a maximum spacing between test stations of one-half mile. |
| 29. | **Initial Inline Inspection (ILI):** Within three (3) years of placing a pipeline segment in service, Grantee must perform a baseline ILI using a high-resolution Magnetic Flux Leakage (HR-MFL) tool, high resolution (HR) deformation tool, and an ultrasonic crack detection tool or equivalent of each. |
| 30. | **ILI Deformation Tool:** Grantee must perform a high resolution deformation tool run after completion of the hydrostatic strength test and backfill of the pipeline segment and prior to placing the pipeline segment in service. Grantee must remediate pipe in accordance with 49 CFR Part 195 and Subpart O. All expanded pipe must be remediated in accordance with PHMSA's "Interim Guidelines for Confirming Pipe Strength in Pipe Susceptible to Low Yield Strength for Liquid Pipeline" dated October 6, 2009 or any subsequent PHMSA update to this guideline. |
| 31. | **Future ILI:** Future ILI inspections must be based upon pipeline segment integrity threats and must include as a minimum of a high-resolution Magnetic Flux Leakage (MFL) tool, high resolution deformation tool, and an ultrasonic crack detection tool or equivalent of each. ILI inspections must be performed on the entire pipeline segment on a frequency consistent with 49 CFR § 195.452(j)(3) assessment intervals or on a frequency determined by fatigue studies or anomalies found that are indicative of actual operating conditions. |
| | 1) Conduct periodic close interval surveys (CIS) along the entire pipeline segment with current interrupted to confirm voltage drops in association with periodic ILI assessments under § 195.452(j)(3). Pipeline segments under Lake Oahe would not be able to CIS due to water segment and depth of directional drill across Lake Oahe. |
| | 2) CIS must be conducted within three (3) months of running ILI surveys when using a five (5) year ILI frequency, not to exceed sixty-eight (68) months, in accordance with 49 CFR § 195.452 (j) (3) assessment intervals. CIS findings must be integrated into ILI Tool findings. |
| 32. | **Internal Corrosion:** Grantee must limit basic sediment and water (BS&W) to 0.5% by volume and report BS&W testing results to A in the annual report. Grantee must report upset conditions causing BS&W level excursions above the limit on the annual report. |

EXHIBIT "D"
DACW45-2-16-8059

|  | |
|---|---|
|  | 1) Grantee must run cleaning pigs twice in the first year and as necessary in succeeding years based on the analysis of oil constituents, liquid test results, weight loss coupons located in areas with the greatest internal corrosion threat and other internal corrosion threats. At a minimum in the succeeding years following the first year Grantee must run cleaning pigs every five years unless analysis necessitates earlier action. <br> 2) Liquids collected during cleaning pig runs, such as BS&W, must be sampled, analyzed and internal corrosion mitigation plans developed based upon lab test results. <br> 3) Grantee shall review the program at least quarterly based upon the crude oil quality and implement adjustments to monitor for, and mitigate the presence of, deleterious crude oil stream constituents. |
| 33. | **Pipeline Patrolling:** Grantee must patrol the pipeline segment right-of-way on a two (2) week interval but not exceeding three (3) weeks, for at least twenty-six (26) times each calendar year, to inspect for excavation activities, ground movement, unstable soil, wash outs, leakage, or other activities or conditions affecting the safe operation of the pipeline segment. |
| 34. | The Grantee shall conduct the following training exercises: <br> 1) A full scale open water and a full scale winter/ice exercises at Lake Sakakawea and Lake Oahe. A full scale exercise will occur once every 3 years (triennial cycle) with the location and type of exercise occurring on alternating schedules (e.g. open water exercise at Lake Sakakawea the following triennial cycle, followed by winter exercise at Lake Oahe the first triennial cycle, followed by winter exercise at Lake Oahe the following triennial cycle, etc.). The first exercise will occur within the first 3 years after the pipeline becomes operational. <br> 2) To facilitate USACE staff involvement, the Grantee shall notify the USACE Environmental Compliance Coordinators at the Omaha District Office and the Oahe Project Office at least ninety (90) days prior to initiation of the training exercises. The Grantee shall also solicit the participation of key stakeholders (federal, state, local, and Tribal) in these exercises. |
| 35. | Within 1 month following the pipeline becoming operational, the Grantee shall provide for an all-weather access and collection point downstream of the HDD crossing at Lake Oahe. The Grantee shall provide an equipment storage facility on non-federal lands that includes a fenced permanent storage area for winter and open water spill response equipment. The storage facility should be placed in a strategic location and near existing facilities that would support access to the water. The Grantee will coordinate with the USACE and any other applicable stakeholders to obtain all necessary permits and approvals prior to construction for any ground disturbing activities associated with these facilities. The storage facility should contain sufficient response equipment at a minimum to mitigate an unintended worst case release for this Lake crossing. |
|  | **Overall Condition from EA** |
| 36. | Grantee is generally responsible for commitments made and mitigation measures in the Final Environmental Assessment, Grantee Pipeline Project Crossing of Flowage Easements and Federal Lands (July 2016), including all Plans includes within Appendices thereof, even if they are not specifically made as a condition to this easement. |

EXHIBIT "D"
DACW45-2-16-8059



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, OMAHA DISTRICT
1616 CAPITIAL AVENUE
OMAHA NE  68102-1618

REPLY TO
ATTENTION OF

February 9 2017

Real Estate Division

Dakota Access LLC
Attn:  Thomas Sigauw
1300 Main
Houston, Texas 77002

Dear Mr. Sigauw:

   Enclosed for your records is a fully executed copy of Easement No. DACW45-2-16-8059.
Thank you for your cooperation.  If you have any questions, please feel free to contact me at
(402) 250-4284 or by e-mail at rick.l.noel@usace.army.mil .

                                Sincerely,

                                Rick L. Noel
                                Chief, Civil Branch, Real Estate Division
                                Real Estate Contracting Officer

Enclosure



NOTE: THIS IS A FULL SIZE DRAWING THAT IS INTENDED
TO BE PRINTED ON A 24" X 36" SHEET OF PAPER.

PLAN
400'        400'
SCALE IN FEET

PROFILE
400'        400'
HORIZONTAL SCALE IN FEET
50'        50'
VERTICAL SCALE IN FEET

CONTRACTOR'S AS-BUILT OVERLAY

NOTE:
1. THE PROVISION OF THIS INFORMATION IS NOT INTENDED TO RELIEVE THE
HDD CONTRACTOR OF THEIR CONTRACTUAL REQUIREMENT TO PROVIDE A
TABULATION OF PILOT HOLE COORDINATES AND AN AS-BUILT DRAWING.
THE PILOT HOLE COORDINATES PRESENTED ARE BASED ON PRELIMINARY
PILOT HOLE SURVEY DATA. THIS INFORMATION SHOULD BE USED TO
EVALUATE THE CONTRACTOR'S AS-BUILT DOCUMENTATION.

LEGEND
——————— DESIGNED HDD ALIGNMENT AND PROFILE
——————— CONTRACTOR AS-BUILT BY MICHELS DIRECTIONAL CROSSINGS

DATUM:
HORIZONTAL: NAD83 with UTM Datum, Zone 14, US Foot; Central Meridian 99° W
VERTICAL: NAVD 88

| REFERENCES | | REVISIONS | | | | |
|---|---|---|---|---|---|---|
| DRAWING NUMBER | REFERENCE DRAWING TITLE | NO. | DESCRIPTION | BY | DATE | CHK'D | APP'D |
| | | O | ISSUED FOR CONSTRUCTION | TJB | 10/13/15 | MAM | JLR |
| | | 1 | ISSUED FOR CONSTRUCTION | MMC | 11/05/15 | MAM | JLR |

| | |
|---|---|
| JLR | 10/02/15 |
| Design | Date |
| TJB | 10/02/15 |
| Drawn | Date |
| MAM | 10/09/15 |
| Checked | Date |
| JLR | 10/13/15 |
| Approved | Date |

GeoEngineers
3050 South Delaware
Springfield, MO 65804
Telephone (417) 831-9700
Fax (417) 831-9777

DAKOTA ACCESS PIPELINE PROJECT
SITE PLAN AND PROFILE

PROPOSED 30" PIPELINE
LAKE OAHE HDD
MORTON AND EMMONS COUNTIES, NORTH DAKOTA

Project No.
18782-011-01
Drawing No.
W_29004_C100012
Sheet
1 of 2

AS-BUILT
07/31/2017

WOOD GROUP USA, INC.

DAKOTA ACCESS, LLC

AS-BUILT ALIGNMENT SHEET
29004.02 CR13-69ST-30
STA. 4220+00 TO STA. 4300+00

MORTON COUNTY, NORTH DAKOTA

W_29004_C010085

AS-BUILT ALIGNMENT SHEET
29004.02 CR13-69ST-30
STA. 4300+00 TO STA. 4400+00
MORTON & DAKOTA COUNTY, NORTH DAKOTA

W_29004_C010086

# Dakota Access Pipeline

# Lake Oahe HDD Crossing

### *Overall Assessment*

- **Pipe Manufacture:** DAPL pipe material meets requirements of API 5L PSL-2: Specification for Line Pipe.
- **Pipeline Operation:** DAPL Pipeline meets requirements of 49 CFR Part 195 - Transportation of Hazardous Liquids by Pipeline and ASME B31.4: Pipeline Transportation Systems for Liquids and Slurries.
- **Integrity Management and Risk Assessment:** DAPL's Integrity management and risk assessment practices follow guidance of RP API 1160: Managing System Integrity for Hazardous Liquids Pipelines.

### *Integrity Assessment*

- **Pipeline Design Factor.** The pipe installed complies with a design factor of 0.50 in the Lake Oahe HDD crossing and could affect HCA's.

- **Pipe Girth Weld - Nondestructive Tests.** DAPL nondestructively tested all girth welds in accordance with 49 CFR §§195.228, 195.230 and 195.234. All machine welds were tested by ultrasonic means; all stick/manual welds were tested by radiographic means.

- **Hydrostatic Test.** The pipe that comprises the HDD is 30" x 0.625" API 5L PSL-2 X70 and was successfully tested twice to a minimum pressure of 1,880 psig. First test was the pre-in-service hydrostatic test at a minimum of 1.25 times maximum operating pressure (MOP) for eight (8) continuous hours performed prior to pulling the pipe under the Lake. Second test was performed under the same conditions after the pipe was pulled under the Lake. There were no failures.

- **Caliper Survey.** No Deformations identified in Caliper Survey performed on March 24, 2017. As reported, the line at the time of the survey appeared to be fairly clean, with a smooth interior wall surface.

- **Construction Coating Survey after Installation.** No actionable coating anomalies were identified on the DCVG Survey performed on April 22, 2017. The DCVG Survey was completed promptly after the ditch for the pipeline was backfilled and covered the entire HDD crossing and encompassed the easement / action area.
  Direct Current Voltage Gradient and is a survey technique used for assessing the effectiveness of coating corrosion protection on buried steel pipe. DAPL is required to repair any coating damage classified as moderate or severe (voltage drop greater than 35% for DCVG or 50 dBμV for ACVG) in accordance with section 4 and Appendix A of NACE SP0502-2008 (or latest edition referenced in 49 CFR § 195.3).

- **AC Mitigation**. Completed an AC (Alternating Current) Potential Close-Interval-Survey from April 19, 2017 through April 21, 2017 traversing form MLV-360, MP 174.80 to HWY 1804, MP 186.70. This survey encompassed the easement / action area.

  DAPL installed four (4) Metricorr ER Probes with Remote Monitoring Units (RMU's) on April 5, 2017, to monitor AC/DC current density, AC/DC potential and corrosion rates. These monitoring probes have been installed such that there are two (2) probes on either side of Lake Oahe with continuous satellite monitoring for each probe. Preliminary analysis of Metricorr data indicates AC current densities < 0.5 A/m2 peak. No remedial action is necessary as AC-induced corrosion does not occur at AC current densities < 20 A/m2 (1.9 A/ft2).

- **Cathodic Protection (CP)**. Completed a native Pipe-to-Soil Close-Interval-Survey (CIS)/CP-Interference CIS from April 19, 2017 through April 21, 2017 traversing form MLV 360, MP 174.80 to HWY 1804, MP 186.70 encompassing the easement / action area. Data analysis indicated no interference issues

  DAPL installed four (4) impressed current ground beds (Unit 340 @ MLV 340, Unit 360 @ MLV 360, Unit 400 @ MLV 400, and Unit 430 @ MLV 430) covering the permitted / action area. These four (4) ground beds were installed April 19, 2017 through April 28, 2017 and were energized on May 23, 2017. Each of these ground beds were monitored for 3 weeks to allow for polarization of the pipeline and a subsequent On/Off CIS was performed June 15, 2017 through June 22, 2017 from MLV 360 to MLV 400 encompassing the easement / action area. Preliminary analysis of this CIS indicate excellent levels of cathodic protection throughout the area with no interference issues.

  DAPL installed test stations at each of its Mainline Valve (MLV) sites on both sides of Lake Oahe, as well as, each of Northern Border Pipeline's MLV sites on both sides of Lake Oahe.

- **Mainline Valves with Remote Control.** Mainline valves with remote control actuators were installed on either side of the Lake Oahe crossing and additional mainline valves were installed on both sides of Lake Oahe to protect the "could affect" HCA on either side of the HDD crossing. These MLV's were located outside of the flood plain so as to not be impacted by flood conditions.

  Since these MLV's are remotely controlled and actuated, the Supervisory Control and Data Acquisition (SCADA) system is capable of closing the valve and monitoring the valve position, upstream pressure and downstream pressure so as to minimize the response time in the case of a failure. Remote power backup is also provided to ensure communications are maintained during inclement weather so that the MLV's are capable of closure at all times. For each of these MLV's, DAPL conducted a point-to-point verification between SCADA displays and the mainline valve, sensors, and communications equipment in accordance with 49 CFR § 195.446(c) and (e), or equivalent verification.

### *Threat Assessment*

- **Integrity Management and Risk Assessment:** DAPL's Integrity management and risk assessment practices follow guidance of RP API 1160: Managing System Integrity for Hazardous Liquids Pipelines.
- Threats considered in this threat assessment follow ASME B31.8S guidelines referenced in API 1160.

**Integrity Assessment – Second Hydrostatic Test**

ENERGY TRANSFER | **MOP ESTABLISHMENT** | **B.10.A** Available Electronically

**Date of Test:** _____

| Project: | **DAPL** | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| AFE No.: | 480000000001 | | | Company : | ☒ DAPL | ☐ ETCOP | ☐ HPL | |
| Test Record Number: | 6754 | | | | | | ☐ Other ____ | |

| | Discharge: | By Permit | | Line Number: | N/A | |
|---|---|---|---|---|---|---|
| **TEST LOCATION** | County/Parish: | Morton County | | Line Name: | DAPL Spread 6 Lake Oahe HDD | |
| | State: | ND | | Valve Section:: | From: MLV - 380 | |
| | Total Footage: | 8,150' | | | To: MLV - 390 | |

| | Reason For Test: | ☒ New | ☐ Uprating | ☐ Class Change | ☐ Integrity | ☐ Fabrication |
|---|---|---|---|---|---|---|
| **(ADDITIONAL TEST INFORMATION)** | Stationing Begin: | MLV - 380 | | Stationing End | MLV - 390 | |
| | Existing Facility MOP: | N/A | | | | |
| | In-Service Date: | TBD | | | | |
| | Other Location Description: | Lake Oahe | | | | |
| | Is a Station Equation involved: ☒ NO ☐ YES If yes, provide | | | | BK/AH ____ | |

| | ALLOWABLE MOP (per design pressure)  ; | | | | Design Pressure Verification ("weakest link" pipe) | | | |
|---|---|---|---|---|---|---|---|---|
| | Sub-section | S | t | D | E | T | F | DP = ((2xSxt)/D)xExTxF |
| | 1 | 70000 | 0.625 | 30 | 1 | 1 | 0.50 | 1458 |
| | 2 | 70000 | 0.429 | 30 | 1 | 1 | 0.72 | 1441 |
| | | | | | | | | |
| **MATERIAL INVENTORY** | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | Minimum pressure rating of other components: | | | ANSI 600 | | | Attach additions sheets if necessary | |
| | S=SMYS, t=wall thickness, D=OD, E= longitudinal joint factor, T=temperature derating factor; F=design factor | | | | | | | |

| | ALLOWABLE MOP (per pressure test) | |
|---|---|---|
| **PRESSURE TEST** | Actual high-point test pressure: 1880 psi | Actual high-point test pressure = 1504 |
| | Test Factor: 1.25 | Test Factor* |
| | * Test factors:  1.1 for Class 1; 1.25 for Class 2 & offshore; 1.5 for Class 3 or 4, risers and platforms, compressor and M& R stations | |

**NOTE:** The Established MOP can be as high as the lesser of the allowable MOP per design pressure or allowable MOP per pressure test, but no less than the existing MOP of the line in which it is installed.

| Established MOP: | 1440 |
|---|---|

Remarks/
Comments: ____

Prepared by: _Matthew Cooper-Harper_   Approved by: _[signature]_

Revision Date: 07/15/16          Retention: Life of the facility

**Integrity Assessment – Caliper Survey**

| ENDURO | Pipeline Services, Inc.            JOB PLACEMENT FORM |
|---|---|
| CUSTOMER: | Energy Transfer Company / Michel's Pipeline |
| REP.: | Cody Wood - Michel's Pipeline |
| | |
| JOB NUMBER: | B16-613F / D.A.P.L - Lake Oahe HDD / Lake Oahe West - Lake Oahe East - MLV 390 |
| LOCATION: | Bismarck, ND |
| | ADDRESS FOR SHIPPING REPORTS: |
| SHIP ADDR 1: | |
| SHIP ADDR 2: | |
| SHIP ADDR 3: | |
| SHIP ADDR 4: | |
| SHIP ADDR 5: | |
| | BILLING INFORMATION |
| DAYS ON SITE: | 5 |
| MOB MAN: | Jeff walker |
| MOB TOOL: | (2) 30" DW DdL™ Caliper Tool |
| OTHER: | (2) Transmitters, (2) Receivers, (2) Geophones, Support Equipment |
| OTHER: | |
| | SIGNATURES: |
| Enduro Representative/Date: | |
| Customer Representative/Date: | |
| DATE | NOTES |
| 3/19/2017 | *B16-613F:*  Travel Day.  Tulsa, OK - York, NE. Contacted customer Cody Wood with Michel's Pipeline.  Run tentatively scheduled for 3/21/17. |
| 3/20/2017 | *B16-613F:*  Travel Day.  York, NE - Bismarck, ND.  Informed Mr. Wood I was on location. |
| 3/21/2017 | *B15-613F:*  Stand-by.  Met with customer at launch location, discussed run parameters and run date has been pushed to 3/23/2017. |
| 3/22/2017 | B16-613F:  Stand-by.  Contacted customer, run moved to evening of  3/23/17. |
| 3/23/2017 | *B16-613F:*  Stand-by.  Contacted customer, run moved to 3/24/17. |
| 3/24/2017 | *B16-613F; D.A.P.L. Lake Oahe HDD; Lake Oahe West - Lake Oahe East - MLV 390; 30" DdL ™ DW x 0.625 x 1.52 Miles:*  9:30 AM, arrived at launch location, discussed plan of the day with Mr. Wood, installed transmitter, tool ready for launch. Tool was launched at 7:00 PM from Lake Oahe West with 7750 CFM / 100 PSI.  Customer personnel tracked the tool at MLV 390, tool passed at 7:58 PM, with an approximate speed of 1.59 MPH. I traveled to L/R #2 North Dakota permanent receive site.  Lake Oahe East - MLV 390 - L/R #2 North Dakota have previously be ran and reported. |
| 3/25/2017 | *B16-613F; D.A.P.L. Lake Oahe HDD; Lake Oahe West - Lake Oahe East - MLV 390; 30" DdL™ DW x 0.625 x 1.52 Miles:* Tool was received at 1:23 AM on 3/25/17.  A brief analysis was performed, tool worked to Enduro standards.  Continued with a complete analysis. |
| 3/26/2017 | *B16-613F:*  Travel Day.  Delivered Field Report, signed off, released from project. |
| 3/27/2017 | *B16-613F:*  Travel Day. |



---

## DdL™ Caliper Survey Field Report

### B16-613F - D.A.P.L. / Lake Oahe HDD / AFE - 480000000002

---

**Run Date: March 24, 2017**

**Report Date: March 25, 2017**

Lake Oahe West

To

Lake Oahe East – M.L.V. 390

Energy Transfer Company / Michels Pipeline

P.O. Box 3489 | Tulsa, OK 74101-3498 | P: 918.446.1934 | www.enduropls.com

Field Caliper Report | Energy Transfer Company / Michels Pipeline | D.A.P.L. / Lake Oahe HDD / AFE -
480000000002 | B16-613F

## Executive Summary – DdL™ Caliper

### General Run Information

| Pipeline Name | D.A.P.L. / Lake Oahe HDD / AFE - 480000000002 | |
|---|---|---|
| Job # | B16-613F | |
| | Launcher | Receiver |
| Station | Lake Oahe West | Lake Oahe East – MLV 390 |
| Location(City/County, state) | Bismarck, ND | Bismarck, ND |
| Date / Time | 3/24/17 7:00 PM | 3/24/17 3/24/17 |

| AGMs | |
|---|---|
| Rec | |
| AGM# Not Rec | |

| Sensors | | Cal. | INS |
|---|---|---|---|
| | Total | 30 | 3Gy. / 3Acc. |
| | Rec. | 30 | 3Gy. / 3Acc. |
| | Bad | 0 | 0 / 0 |

| Product | Air~7750 CFM / 100 PSI |
|---|---|
| Pipe Diameter | 30.000 inches |
| Length | 1.69 miles |
| Hours | 58 min. |

Field Technician:   **Jeff Walker**

Data Analyst:   **Jeff Walker**

### Inspection Quality & Findings

| Deformation Indications | 0 |
|---|---|
| Dent < 2 % O.D. | 0 |
| Dent ≥ 2 % O.D. | 0 |
| Ovalities | 0 |
| Expansions | |

| Irregular Welds | 0 |
|---|---|
| Debris Indications | 0 |
| MFG Indications | 0 |

| Bends | 4 |
|---|---|
| Factory Bends | 4 |
| Field Bends (> 12D) | 0 |

Field Caliper Report | Energy Transfer Company / Michels Pipeline | D.A.P.L. / Lake Oahe HDD / AFE - 480000000002 | B16-613F

**Customer's immediate concerns:**

*Percentage of pipe diameter for a sharp anomaly – 1.00% top / 2.00% bottom*
*Percentage of pipe diameter for ovality – 5.00%*
*Percentage of pipe diameter for expansion – 1.50%*
*Bend radius requirements – 3.00D*

**General Run and Line Information**

On 3/24/2017 the 30 inch DdL™ DW caliper tool was launched from the Lake Oahe West site near Bismarck, ND at 7:00 PM using a total of 7750 CFM and holding 100 PSI to control the speed of the tool.  Tool was tracked by Michels Pipeline personnel at M.L.V 390, tool passed at 7:58 PM with an average speed of 1.59 MPH.

Note: The 30 inch DdL™ DW caliper tool was ran from the Lake Oahe HDD West to L/R #2 North Dakota site, approximately 10.38 miles, however, per customer request, the data collected from Lake Oahe HDD West to Lake Oahe HDD East – M.L.V. 390, approximately 8,065 feet, will only be Field Reported for this survey.  The remaining data recorded has been previously ran and reported.

The DdL™ DW caliper tool was received at the L/R #2 North Dakota site, approximately 10.38 miles from the launch site, near Bismarck, ND on 3/25/17 at 1:23 AM.  A visual inspection of the tool showed no damage.  The data was downloaded in the field and reviewed to confirm that the tool worked to Enduro specifications.

- The line at the time of the survey appeared to be fairly clean, with a smooth interior wall surface.

**Deformations:**

There are 0 Anomalies reported for this line section.

**Bends:**

There are 4 Factory Bends reported for this line section.
- The minimum Bend Radius in this line is 3.00D radius.

For a complete list of all the bends, please refer to the *Bend Listing*.

**Tool and Data Condition:**

- The survey tool was received in good condition.
- All data sets worked correctly and no sensor damage was found.
- All of the data recorded is acceptable.

**Correlation Reporting:**

- The customer *has not* provided Enduro with a pipeline listing.

- The customer *has not* been provided with a .kmz file.

Field Caliper Report | Energy Transfer Company / Michels Pipeline | D.A.P.L. / Lake Oahe HDD / AFE - 480000000002 | B16-613F

| Re-run Conditions | | | |
|---|---|---|---|
| ☐ Due to line conditions, Enduro recommends the survey be re-run. | | | |
| ☐ Due to anomalies found, Enduro recommends a confirming DdL™ Survey. | | | |
| ☐ Other: [please explain] | | | |
| Customer | ☐ Accept   Initials | | ☐ Decline   Initials |

*The below items have been checked and confirmed to be accurate;*

      ☐ *Deformations*

      ☐ *Features*

      ☐ *Bend*

*Respectfully Submitted:*

**ENDURO Pipeline Services, Inc.**

*Submitted to:*

**Energy Transfer Company / Michels Pipeline**

_____

Jeff Walker
**Field Technician**

_____

Cody Wood
**Michel's Pipeline**

Field Caliper Report | Energy Transfer Company / Michels Pipeline | D.A.P.L. / Lake Oahe HDD / AFE - 480000000002 | B16-613F

## Appendix A: Pictures

**Launch**



**Receive**





Field Caliper Report | Energy Transfer Company / Michels Pipeline | D.A.P.L. / Lake Oahe HDD / AFE - 480000000002 | B16-613F

## Appendix B: Glossary

| | |
|---|---|
| AGM | A DdL™ survey tool incorporates an above ground marker (AGM) system, which collects tool passage as well as GPS data. These AGM boxes will be downloaded and verified for tool passage. Gathers satellite information for both atomic time and GPS coordinates. Data from each AGM location can be incorporated into the software and used along with the INS data to calculate GPS coordinates for the entire line. |
| INS Survey | INS Survey: The DdL™ carries a full INS package with 3 gyros and 3 accelerometers. This package, in conjunction with GPS based AGMs, enables the DdL™ to map and provide GPS position on all pipeline events. |
| Deformation Indications | Dents are sized and located identifying deformation/dent anomaly conditions of/or greater than 1% of pipe O.D. on Top and 2% of pipe O.D. on Bottom.  Deformations in the form of OVALITY (of or larger than 5% of pipe O.D.) will be identified. |
| Overburden Relief | Larger pipe diameters will experience a return to round during soil removal; a large portion of the ovality will relieve.  Sharp and Flat anomalies will relieve on the associated ovality aspect of the anomaly.  For this reason the report lists both the over-all and localized dent dimensions which identify the amount of sharp/flat and any associated ovality. The larger the ovality span, the greater the potential for relief. |

**ENDURO**
PIPELINE SERVICES, INC.

**Bend Listing**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| CUSTOMER/CONTRACTOR | Energy Transfer Company / Michel's Pipeline | | | | PIPE DIAMETER | 30.000 in | |
| CUSTOMER LINE ID | D.A.P.L. / Lake Oahe HDD / AFE - 480000000002 | | | | WALL THICKNESS | .625 in | |
| JOB NUMBER | B16-613F | | | | PRODUCT | Air~7750 CFM / 100 PSI | |
| LAUNCH STATION | Lake Oahe West | | | | RUN DATE | 24-Mar-2017 | |
| | Bismarck, ND | | | | FIELD ENGINEER | Jeff Walker | |
| RECEIVE STATION | Lake Oahe East - M.L.V. 390 | | | | CHART ANALYST | Jeff Walker | |
| | Bismarck, ND | | | | REPORT DATE | 03/25/2017 | |
| PIPELINE LENGTH | 1.52 mi | | | | ISSUE # | 1 | |

| Event ID | Event Description | Comment | Enduro Station | Projected Station | Customer Station | Avg Mile Post | MCSD |
|---|---|---|---|---|---|---|---|
| B1 | Bend 45.0 deg. 3.0 Ds Up Turn<br>MCSD: 27.68 | Before u/s w.: 1.2%(0.367) MCSD: 28.4 ID:29.1<br>mph:0.7 Clk:0 to 6<br>After d/s w. : 0.7%(0.211) MCSD: 28.5 ID:28.8<br>mph:1.2 Clk:5 to 11<br>MPH coming into Bend (-10ft): 1.1 Leaving Bend<br>(+10ft): 0.7<br>Min MPH over range: 0.1 at index 2755934 | 8035.67 | 80+36 | | 1.52 | 27.68 |
| B2 | Bend 45.0 deg. 3.0 Ds  Down Turn<br>MCSD: 28.11 | Before u/s w.: 1.2%(0.367) MCSD: 28.4 ID:28.8<br>mph:2.0 Clk:0 to 6<br>After d/s w. : 0.6%(0.171) MCSD: 28.5 ID:28.8<br>mph:2.2 Clk:0 to 6<br>MPH coming into Bend (-10ft): 0.7 Leaving Bend<br>(+10ft): 4.5<br>Min MPH over range: 0.4 at index 2757102 | 8054.22 | 80+54 | | 1.53 | 28.11 |

**ENDURO** PIPELINE SERVICES, INC.

**Field Report**

| | |
|---|---|
| CUSTOMER/CONTRACTOR | Energy Transfer Company / Michels Pipeline |
| CUSTOMER LINE ID | D.A.P.L / Lake Oahe HDD / APE - A800000000000 |
| JOB NUMBER | 516-615F |
| LAUNCH STATION | Lake Oahe West |
| RECEIVE STATION | Lake Oahe East - M.L.V. 390 |
| | Bismarck, ND |
| PIPELINE LENGTH | 1.82 mi |

| | |
|---|---|
| PIPE DIAMETER | 30.000 in |
| WALL THICKNESS | .625 in |
| PRODUCT | Air=7700 CFM / 100 PSI |
| RUN DATE | 24-Mar-2017 |
| FIELD ENGINEER | Jeff Walker |
| CHART ANALYST | Jeff Walker |
| REPORT DATE | 05/26/2017 |
| ISSUE # | 1 |

**Length, Width & Depth Calculations For Deformations**

| Event ID | Event Description | Comment | Enduro Station | Projected Station | Customer Station | Tool Spd | W.T. | Clock n Cn | Dent Geo. | Est. Dent Depth After Excavation | Est. Dent %OD After Excavation | Dent Len. | Dent Wid. | Total Len %OD | Total Size | Total %OD | MCS OD | To Up Weld | Cut Joint Len | To Dn Weld | Len D/S Joint | Latitude | Longitude | Elevation |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| F 1 | Begin Line Pipe | D.A.P.L - Lake Oahe HDD Lake Oahe West - Lake Oahe East Bismarck, ND | 0.00 | 0+00 | | 0.3 | 0.429 | | | | | | | | | | 28.00 | 0.0 | 13.9 | 13.9 | 74.3 | | | |
| W 1 | Wall change to .429 for 329.32 feet - Enduro predicted | Begin 0.429 w.t. | 0.00 | 0+00 | | 0.3 | 0.429 | | | | | | | | | | | 0.0 | 13.9 | 13.9 | 74.3 | | | |
| W 2 | Wall change from .429 to .625 for Tekla x9 feet - Enduro predicted | | 329.32 | 3+29 | | 2.0 | 0.625 | | | | | | | | | | | 0.0 | 29.6 | 29.6 | 70.6 | | | |
| W 3 | Wall change from .625 to .429 for 239.37 feet - Enduro predicted | | 7793.81 | 77+34 | | 3.0 | 0.429 | | | | | | | | | | | 0.0 | 33.0 | 33.0 | 22.8 | | | |
| W 4 | Wall change from .429 to .625 for 4677X.00 feet - Enduro predicted | | 8033.18 | 80+33 | | 1.0 | 0.625 | | | | | | | | | | | 0.0 | 6.3 | 6.3 | 12.4 | | | |
| B 1 | Bend 45.0 deg. 3.0 Ds. Up Turn MCGD: 27.88 | Before u/s w.: 1.2%/0.367 MCGD: 28.4 ID:29.1 mph:5.7 Clk:0 to 6 After d/s w.: 0.6%/0.187 MCGD: 28.0 ID:28.8 mph:2.2 Clk:6 to 11 MPH coming into Bend >10ft: 1.1 Leaving Bend >10ft: 0.7 Min MPH over range: 0.1 at index 27655X4 | 8035.67 | 80+36 | | 0.8 | 0.625 | | | | | | | | | | | 27.88 | 2.5 | 6.3 | 3.8 | 12.4 | | | |
| B 2 | Bend 45.0 deg. 3.0 Ds. Down Turn MCGD: 28.11 | Before u/s w.: 1.2%/0.367 MCGD: 28.4 ID:28.8 mph:2.2 Clk:0 to 6 After d/s w.: 0.8%/0.171 MCGD: 28.0 ID:28.8 mph:2.2 Clk:6 to 11 MPH coming into Bend >10ft: 3.7 Leaving Bend >10ft: 4.5 Min MPH over range: 0.4 at index 2767182 | 8054.22 | 80+54 | | 4.2 | 0.625 | | | | | | | | | | | 28.11 | 2.4 | 5.6 | 3.2 | 6.1 | | | |
| F 2 | End Line Pipe | D.A.P.L - Lake Oahe HDD Lake Oahe West - Lake Oahe East M.L.V. 390 Bismarck, ND | 8065.63 | 80+66 | | 8.6 | 0.625 | | | | | | | | | | | 28.42 | 3.3 | 6.3 | 3.0 | 8.6 | | | |
| B 3 | Bend 45.0 deg. 3.0 Ds. Down Turn MCGD: 27.90 | Before u/s w.: 1.7%/0.497 MCGD: 28.3 ID:28.6 mph:3.6 Clk:0 to 7 After d/s w.: 0.8%/0.226 MCGD: 28.0 ID:28.8 mph:4.3 Clk:6 to 6 MPH coming into Bend >10ft: 4.2 Leaving Bend >10ft: 4.3 Min MPH over range: 2.2 at index 2768781 | 8076.92 | 80+77 | | 8.7 | 0.625 | | | | | | | | | | | 27.90 | 2.6 | 5.7 | 3.2 | 5.8 | | | |
| B 4 | Bend 45.0 deg. 3.0 Ds. Up Turn MCGD: 27.91 | Before u/s w.: 1.6%/0.462 MCGD: 28.3 ID:28.8 mph:4.1 Clk:0 to 6 After d/s w.: 0.8%/0.140 MCGD: 28.0 ID:29.1 mph:5.3 Clk:6 to 11 Leaving Bend >10ft: 6.1 Min MPH over range: 4.1 at index 276.1235 | 8088.06 | 80+88 | | 4.6 | 0.625 | | | | | | | | | | | 27.91 | 2.1 | 6.1 | 4.0 | 6.4 | | | |
| F 3 | End Line Pipe | D.A.P.L - Lake Oahe HDD Lake Oahe East - Lake Oahe East Bismarck, ND | 8926.32 | 89+26 | | 0.3 | 0.625 | | | | | | | | | | | 28.50 | 0.0 | 39.1 | 39.1 | 4.7 | | | |



# Dakota Access Pipeline

# Lake Oahe HDD Crossing

# Threat Assessment

**Prepared for Dakota Access Pipeline System by Dynamic Risk Assessment Systems**

| Threat Assessed | Threat Attributes | Result of Threat Assessment | Assessments/Monitoring Completed | Monitoring / Mitigation Planned |
|---|---|---|---|---|
| External Corrosion | Pipeline HDD Casing | No permanent casing installed. | | N / A |
| External Corrosion | Stray Current/Interference | Completed AC survey and completed mitigation measures to address any concern related to interference. | An AC interference and mitigation study has been conducted to assess AC fault and steady state conditions and associated risks. Based on the outcomes of the study, installation of zinc ribbon wires will effectively mitigate the AC interference. Implementation if this mitigation addresses the potential risk to CP effectiveness and safety. | Continuous monitoring |
| External Corrosion | Pipeline In-Line Inspection  (ILI) | Reassessment plan represents industry standard practice for hazardous liquids pipelines. | | MFL metal loss ILI planned within first 36 months of operation |
| External Corrosion | Cathodic Protection (CP) / Interference survey | The Northern Border pipeline was identified as a possible source of cathodic protection interference in the action area. | A CP interference and mitigation study has been conducted to assess existing CP conditions and associated risks. Based on the outcomes of the study, installation of deep well anode beds effectively mitigate the CP interference. | Continuous monitoring |

| Threat Assessed | Threat Attributes | Result of Threat Assessment | Assessments/Monitoring Completed | Monitoring / Mitigation Planned |
|---|---|---|---|---|
| Internal Corrosion | Product Stream Characteristics | A CEPA study, [1], indicates that under normal operations, oil pipelines with low BS&W (0.25-0.5%) are unlikely to have free water present in them, and with a sufficiently high flow velocity inside the pipe any free water caused by operation upsets will be entrained in the oil by turbulent flow, and the pipe wall will continue to operate in an oil-wet condition. | At low BS&W levels in conjunction with turbulent flow, water will remain entrained in oil and therefore internal corrosion is unlikely to occur. | Continuous SCADA monitoring and control of pipeline operating and flow conditions. |
| Internal Corrosion | Product Stream Flow Characteristics | Turbulent flow controls solids deposition and entrains what little water exists in the product stream. The product stream, in conjunction with the operating and flow characteristics will render the pipe wall in an oil-wet (i.e. non-corrosive) condition, although monitoring and the implementation of appropriate mitigation strategies, where warranted, is required. | | The sediments and water resulted from the cleaning will be monitored and analyzed, and the corrosion inhibition program will be adjusted accordingly. |

| Threat Assessed | Threat Attributes | Result of Threat Assessment | Assessments/Monitoring Completed | Monitoring / Mitigation Planned |
|---|---|---|---|---|
| Internal Corrosion | Corrosion Prevention / Detection Devices | The use of corrosion detection and prevention devices reduces the likelihood of the undetected internal corrosion in the line. | | MFL metal loss ILI planned within first 36 months of operation |
| Internal Corrosion | Receipt Points | Receipt point monitoring and control ensures that product is maintained within its quality specification. | | Crude oil samples are obtained and analyzed at all receipt points on the pipeline. |
| Internal Corrosion | Chemical Inhibition and Cleaning Pig Programs | Appropriate mitigation strategies for chemical inhibition and cleaning pig programs are implemented to eliminate internal corrosion. | Water traps, located at all receipt points and launcher / receiver sites on the pipeline, have been incorporated into the pipeline design to collect any water and sediments in the flow. Regular analysis of the collected fluid will be conducted to adjust the inhibition program as required. | Adjustment of inhibition program to include Injection of microbial inhibitor chemicals at receipt points and launcher / receiver sites as necessary. |
| Internal Corrosion | Potential source of Analogue ILI Datasets | As the threat of internal corrosion is expected to be low, the lack of an appropriate ILI data set is not a concern at this stage of the assessment. | If further quantitative analysis of failure frequencies is required, it is necessary to identify a suitable data set. | Maintain monitoring program and integrity management plans. |

| Threat Assessed | Threat Attributes | Result of Threat Assessment | Assessments/Monitoring Completed | Monitoring / Mitigation Planned |
|---|---|---|---|---|
| Stress Corrosion Cracking | SCC Susceptibility | Pipelines operating at stress levels greater than 60% SMYS can be considered susceptible to SCC if other factors are present including a susceptible coating system, a susceptible line-pipe material, proximity to pump stations, high operating temperatures (specific to high-pH SCC), and age of the pipeline greater than 10 years. | The use of high performance coating systems, such as those used for DAPL, has proven to be an effective means of preventing SCC. To date, no operating company has ever experienced a failure that was attributed to SCC in a pipeline that was coated with these coating systems. | Maintain integrity management plans. |
| Manufacturing Defects | Pipeline manufacturing procedure specification | The manufacturing procedure specification, together with the inspection and test plan constitute key quality assurance documents that form the basis of sound pipe procurement practices. | Rigorous inspection and test plans conducted at pipe and coating mills. | All defects rejected at mills. |
| Manufacturing Defects | Manufacturer | The vendor vetting and quality assurance procedures implemented are considered appropriate for the assurance of quality line pipe. | Pre-production meetings and routine QA / QC monitoring at pipe and coating mills. | |

| Threat Assessed | Threat Attributes | Result of Threat Assessment | Assessments/Monitoring Completed | Monitoring / Mitigation Planned |
|---|---|---|---|---|
| Manufacturing Defects | Manufacturing Process | While some vintage manufacturing processes are prone to manufacturing defects, modern line pipe manufacturing processes are not commonly associated with characteristic chronic manufacturing defects.  Well-developed Manufacturing Procedure Specifications and Inspection Test Plans are instrumental in maintaining quality assurance. | Rigorous inspection and test plans conducted at pipe and coating mills. | All defects rejected at mills. |
| Manufacturing Defects | Third Party Auditors | Effective deployment of third party audits and inspection to maintain a quality focus during line pipe manufacture, while alerting DAPL to potential quality problems during manufacture and prior to delivery. | Rigorous inspection and test plans conducted at pipe and coating mills. | All defects rejected at mills. |
| Manufacturing Defects | Pressure cycling | Fluctuating operating pressures that are typical of liquids pipelines, can activate pre-existing manufacturing defects. | | Continuous SCADA monitoring and control of pipeline operating and flow conditions. |

| Threat Assessed | Threat Attributes | Result of Threat Assessment | Assessments/Monitoring Completed | Monitoring / Mitigation Planned |
|---|---|---|---|---|
| Manufacturing Defects | Hydrostatic Test | The test pressures represent significant safety factors, ensuring that any manufacturing defects left after the hydrostatic test are not operating at stress levels where they would be considered to be structurally significant. | At mill - Hydrostatic test to 100% SMYS conducted. Upon installation - Hydrostatic test to at least 125% MOP conducted. | Upon installation and prior to acceptance - DAPL requires certification of hydro-tests and ILI Caliper surveys. |
| Manufacturing Defects | Use of Loading / Transportation Specification | The loading and transportation will be carried out in accordance with the specifications in place. This reduces the likelihood of damage to the pipes during transportation and it minimizes the frequency of pipeline failure. | Rigorous inspection and test plans conducted at pipe / coating mills and receipt at pipe yards and delivery to the pipeline right-of-way (ROW). | All transportation of pipe and materials requires inspection report and bills-of-lading. |

| Threat Assessed | Threat Attributes | Result of Threat Assessment | Assessments/Monitoring Completed | Monitoring / Mitigation Planned |
|---|---|---|---|---|
| Construction Defects | Construction Practices | Welding and non-destructive inspection procedures are representative of industry best practices, which maximize the use of low-hydrogen welding processes, and state-of-the-art inspection systems. Construction / transportation specifications are comprehensive to minimize potential for construction-related damage. Such damage can occur, particularly on pipelines that have large-diameter-to-wall thickness ratios (typically > 100:1, which are beyond the D/t ratios used on the DAPL project).  Post-construction in-line inspection is an effective measure of identifying such damage to enable repairs to be made prior to pipeline operation. The minimum hydrostatic test pressure used for DAPL is minimum of 1,800 psi - 1.25 times maximum operating pressure | 100% inspection of field welds using radiographic inspection and approved by third party auditors (Level 3 - CWI) was conducted. Hydrostatic test to at least 1,800 psi - 125% MOP conducted on entire pipeline segments including valves, launchers, receivers and equipment. Inspection with a deformation tool / caliper survey (ILI) after installation to ensure that the pipeline is free of dents, buckles, and excessive out-of-round conditions was conducted. | All defects repaired per PHMSA approved procedures. |

| Threat Assessed | Threat Attributes | Result of Threat Assessment | Assessments/Monitoring Completed | Monitoring / Mitigation Planned |
|---|---|---|---|---|
| | | (MOP). The pipeline may be tested to higher pressure values where specified, dependent upon elevation. | | |
| Construction Defects | Operating Pressure | Maximum operation pressure (MOP) of DAPL pipeline is 1,440 psi. | Continuous SCADA monitoring and control of pipeline operating and flow conditions. | Pipeline Pump Station high-pressure-shutdown set point at 1,400 psi. |
| Third Party Damage | Adjacent land use | The damage prevention measures employed on DAPL are representative of industry best-practice. Additionally, the HDD sections are located in remote area, and the depth | DOC study completed. | Maintain monitoring program and integrity management plans. |
| Third Party Damage | One-call system availability and promotion | | | |
| Third Party Damage | Signage placement | | | |
| Third Party Damage | Use of buried marker tape | | | |
| Third Party Damage | Regulation Regarding requirements to | | | |

| Threat Assessed | Threat Attributes | Result of Threat Assessment | Assessments/Monitoring Completed | Monitoring / Mitigation Planned |
|---|---|---|---|---|
| | notify one-call prior to excavation | of cover at these locations significantly reduce the possibility of exposure to Third Part Damage (TPD). Consequently, the likelihood of TPD is very low. | | |
| Third Party Damage | Response time for locate requests | | | |
| Third Party Damage | Patrol frequency | | | |
| Third Party Damage | Marking and locating methods | | | |
| Third Party Damage | Depth of cover | | | |
| Weather Related or Outside Force | Presence of Geotechnical / Hydro-technical Hazards | Slope Stability Study: A slope stability study was conducted at Lake Oahe HDD location. The report indicates that potential for land sliding as the result of the proposed activities is low [4]. Scour Study: Study results show that the maximum scour at the project site is estimated to be 21 ft. The proposed HDD crossing has a minimum depth of over 90 ft. below the current channel. Therefore, the risk of pipeline exposure is not significant and | Geotechnical / Hydro-technical studies were completed for the proposed HDD crossings at Lake Oahe. In addition to Geotechnical reports, separate studies were completed on the potential of scour and slope stability. | |

| Threat Assessed | Threat Attributes | Result of Threat Assessment | Assessments/Monitoring Completed | Monitoring / Mitigation Planned |
|---|---|---|---|---|
| | | does not warrant further analysis [5]. | | |
| Other Threats | Concomitant Failures | Given the proposed separation distance between DAPL and Northern Border pipeline, the threat of concomitant failure is identified as a potential threat to DAPL.  However, with the depth of the Lake Oahe crossing being 90', it is NOT LIKELY that the DAPL pipeline could be exposed in the blast crater generated by the catastrophic failure of the adjacent natural gas pipeline. | | DAPL maintains continuous communication and joint-risk assessment evaluations with Northern Border operations personnel. |
| Other Threats | Access Restrictions | No access restrictions were identified in the action area. | | |
| Other Threats | Forest fires | No concerns identified in the action area. | | |

# ATTACHMENT 3

| | |
|---|---|
| **From:** | Siguaw, Tom <Tom.Siguaw@energytransfer.com> |
| **Sent:** | Monday, February 19, 2018 3:51 PM |
| **To:** | mrosser@trcsolutions.com |
| **Cc:** | Siguaw, Tom |
| **Subject:** | DAPL - USACE - Remand Letter ****RFQ - THIRD PARTY INDEPENDENT EXPERT ENGINEERING COMPANY REVIEW**** ACTION REQUIRED**** |
| **Attachments:** | 2017.12.04 (303) Order on Remedy During Remand.pdf; 2017.12.04 (304) Mem Op on Remedy During Remand.pdf; Exhibit D_Easement Conditions.pdf; Lake Oahe HDD_AS-BUILT OVERLAY.PDF; Lake Oahe - Alignment Sheets.pdf; DAPL_Post Construction_Easement Conditions_Threat Assess.docx |
| **Importance:** | High |

<u>**To:**</u>  **TRC Solutions**
      **Matt Rosser:  281-698-3063**
      mrosser@trcsolutions.com
      16350 Park Ten Place
      Suite 101
      Houston, TX 77084
      Office:  (281) 698-3063

Dakota Access Pipeline (DAPL) is soliciting a Proposal for a third-party independent expert engineering company to review Dakota Access Pipeline - Lake Oahe, ND easement special conditions imposed by the US Army Corps of Engineers, and to assess compliance with all such conditions as well as other integrity threats between the valve sites closest to each shore of Lake Oahe, ND as ordered.

See the following attachments to this email:
      **Judicial Order on Remedy During Remand & Memorandum Opinion**
      **USACE Easement Special Conditions (Exhibit D)**
      **DAPL As-Built Overlay (Lake Oahe HDD Plan and Profile)**
      **DAPL As-Built Alignment Sheet (Lake Oahe Crossing Valve-to-Valve)**
      **DAPL Post Construction Easement Conditions and Threat Assessment**

DAPL will make the confidential, relevant information available at its offices (1300 Main Houston, TX 77002) and at Wood Group's offices (17325 Park Row Houston, TX 77084). There are multiple files at both locations totaling ~ 4,000 pages.

Please include with your proposal the following items:
      List of personnel to be used for this Work (Review / Audit) with their respective resumes and billing rates.

1

Required start date so as to complete this Work (Review / Audit) and furnish DAPL a written Final Report by **March 23, 2018**.

Estimated total cost for this Work (Review / Audit).

**Submit Proposal in writing and  via email to the following** --- **Due 9:00 am on Thursday, February 22, 2018:**

Tom Siguaw

Energy Transfer Partners

1300 Main

Ste. 14.036

Houston, TX  77002

Cell Phone:  713-249-3425

Email:  tom.siguaw@energytransfer.com

You were recommended by Chuck Frey
Thanks

Tom Siguaw
Sr. Director
Energy Transfer Partners
(o)  713-989-2841
(c)  713-249-3425

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

STANDING ROCK SIOUX TRIBE,

    Plaintiff,

    and

CHEYENNE RIVER SIOUX TRIBE,

    Plaintiff-Intervenor,

        v.

U.S. ARMY CORPS OF ENGINEERS,

    Defendant,

    and

DAKOTA ACCESS, LLC,

    Defendant-Intervenor and Cross-Claimant.

Civil Action No. 16-1534 (JEB) (and Consolidated Case Nos. 16-1769 and 16-267)

---

**ORDER**

For the reasons set forth in the accompanying Memorandum Opinion, the Court ORDERS that:

1. The parties shall coordinate to finalize an oil-spill response plan affecting Tribal resources and lands at Lake Oahe, which they shall submit to the Court by April 1, 2018;

2. Dakota Access, with input from the Tribes, shall select a third-party independent expert engineering company to review easement conditions and regulations, and to assess

1

compliance with all such conditions as well as other integrity threats. The results of the independent audit shall be filed with the Court by April 1, 2018; and

3. Dakota Access shall submit to the Court bi-monthly reports including the following information with respect to the segment of the pipeline crossing Lake Oahe (*i.e.*, between the valves closest to each shore of Lake Oahe):

a. Inline-inspection run results or direct-assessment results performed on the pipeline during the reporting period;

b. The results of all internal-corrosion management programs and any actions taken in response to findings of internal corrosion;

c. Any new encroachment on the right-of-way during the reporting period;

d. Any new integrity threats identified during the reporting period;

e. Any reportable incidents that occurred during the reporting period;

f. Any leaks or ruptures that occurred during the reporting period;

g. A list of all repairs on the segment made during the reporting period;

h. Ongoing damage-prevention initiatives on the pipeline and an evaluation of their success or failure;

i. Any changes in procedures used to assess and monitor the segment; and

j. Any company mergers, acquisitions, transfers of assets, or other events affecting the management of the segment.

Dakota Access shall file the first such report on or before December 31, 2017, and shall file subsequent reports every 60 days thereafter until remand is complete.

SO ORDERED.

/s/ James E. Boasberg
JAMES E. BOASBERG

2

United States District Judge

Date: December 4, 2017

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE, | |
| Plaintiff, | |
| and | |
| CHEYENNE RIVER SIOUX TRIBE, | |
| Plaintiff-Intervenor, | |
| v. | Civil Action No. 16-1534 (JEB) (and Consolidated Case Nos. 16-1769 and 16-267) |
| U.S. ARMY CORPS OF ENGINEERS, | |
| Defendant, | |
| and | |
| DAKOTA ACCESS, LLC, | |
| Defendant-Intervenor and Cross-Claimant. | |

**<u>MEMORANDUM OPINION</u>**

Two months ago, this Court determined that oil could continue to flow through the

Dakota Access Pipeline while the U.S. Army Corps of Engineers conducted further

environmental analyses. See <u>Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers</u>

<u>(Standing Rock IV)</u>, 2017 WL 4564714 (D.D.C. Oct. 11, 2017). Although the prior Opinion

declined to vacate the agency's easement approval, it left open the question of whether to impose

any conditions during the remand period. Plaintiffs, the Standing Rock and Cheyenne River

1

Sioux Tribes, have asked for a series of interim measures to monitor the ongoing operation of the pipeline. Defendants oppose such conditions, arguing that the Tribes have not demonstrated a need for injunctive relief and that the proposed measures are unnecessary during remand.

As a threshold matter, the Court concludes that the interim conditions are not a request for injunctive relief; they are instead a means by which the Court can ensure that it receives up-to-date and necessary information about the operation of the pipeline and the facts on the ground. It next determines that the requested measures, each of which is tailored to keeping the Court abreast of the conditions at Lake Oahe pending further Corps analysis, are reasonable and appropriate.

## I.    Background

As explained in prior Opinions, the parties here are engaged in a protracted dispute over the placement of the Dakota Access Pipeline (DAPL) under Lake Oahe in North Dakota. See, e.g., Standing Rock IV, 2017 WL 4564714, at *1-3. The Lake is a federally regulated body of water that borders the Tribes' reservations, and it is considered sacred within their spiritual practices. Id.

In their most recent challenge to the project, Plaintiffs alleged that the Corps had erred in its analysis of the environmental impact of the pipeline crossing, in violation of the National Environmental Policy Act. See Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers (Standing Rock III), 255 F. Supp. 3d 101 (D.D.C. June 14, 2017). The Court agreed in part and remanded the case to the Corps for further analysis. Id. at 140. In a subsequent Opinion, issued on October 11, 2017, the Court examined whether the NEPA violations warranted vacatur of the agency's decisions – and thus a stoppage in the oil flow – during remand. See Standing Rock IV, 2017 WL 4564714. Finding a "significant likelihood" that the Corps could substantiate its

prior conclusions, the Court answered that question in the negative.  <u>Id.</u> at *8.  In denying such

relief, however, it left open the possibility of imposing other, interim conditions during remand.

<u>Id.</u> at *12.  It ordered further briefing on the issue from both sides, which is now complete.

## II.     Analysis

### A.     <u>Authority to Issue Conditions</u>

The Court turns first to the matter of its authority to impose conditions during remand.

As the Tribes correctly note, this question has already been decided by the prior Opinion, in

which the Court found that it possessed jurisdiction to order interim remedies other than vacatur.

<u>Id.</u> at *12 (rejecting Defendants' argument that Court lacks jurisdiction to enter interim relief).

Although the Court therefore considers this matter largely settled, Defendants nonetheless

continue to contend that the proposed conditions are beyond the scope of the Court's power.

This is not so.

The fundamental flaw in Defendants' argument is in how they characterize the relief

Plaintiffs seek.  Defendants assert that the Tribes are, in effect, asking for an injunction.

According to the Corps, "Plaintiffs' request for 'alternative measures' is . . . nothing more than a

request for additional injunctive relief."  ECF 287 (Corps Brief) at 1-2.  Asserting that the Tribes

fail to meet the test for such a remedy, the Corps contends that Plaintiffs are not entitled to

interim relief.  <u>Id.</u>

Yet the conditions sought do not constitute injunctive relief.  They do not affect

Defendants' ongoing environmental analysis, nor do they constrain the outcome of the remand

process.  Rather, they are largely a means of providing the Court with relevant information

during this period.  Each of the interim conditions is tailored to address the Court's ongoing

concern with the risk of a spill at Lake Oahe – a hazard that the previous Opinion described as

"at the center of this Court's prior" decision to remand the matter to the Corps.  <u>See</u> <u>Standing</u>

3

Rock IV, 2017 WL 4564714, at *10.  Such information-gathering measures are within the

Court's managerial discretion over this pending case.  See also West Virginia v. EPA, Order, No.

15-1363 (D.C. Cir. 2017) (ordering EPA to file status reports at 30-day intervals while case held

in abeyance).

Because the interim conditions here do not affect the remand process, Defendants'

reliance on Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139 (2010), is misplaced.  The

Court there held that the district court had exceeded its authority when, after vacating the Animal

and Plant Health Inspection Service's decision to completely deregulate a genetically engineered

crop, it additionally entered an injunction preventing the agency from partially deregulating the

crop during the remand period.  Id. at 156, 158-59.  Such an injunction, the Court concluded,

interfered with the agency's authority "to decide whether and to what extent it would pursue a

partial deregulation" and thus impermissibly "pre-empt[ed] the very procedure by which the

agency could determine . . . that a limited deregulation would not pose any appreciable risk of

environmental harm."  Id. at 159, 164.  The holding in Monsanto thus resolved an issue

unconnected with the facts of this case – whether a district court may impose constraints on an

agency's authority and decisionmaking during remand.  The interim measures proposed here do

not have any such effect.

Other cases addressing the scope of a court's supervision during remand are similarly

inapposite.  These decisions all concern the imposition of injunctive relief relating to the relevant

agency's analysis or discretion on remand.  See Bennett v. Donovan, 703 F.3d 582, 588-89 (D.C.

Cir. 2013) (noting that court would not direct agency on remand "to take [a] precise series of

steps" with respect to plaintiffs' mortgage, including "accept[ing] assignment of the mortgage,

pay[ing] off the balance . . .  and then declin[ing] to foreclose"); Palisades Gen. Hosp. Inc. v.

4

Leavitt, 426 F.3d 400, 403 (D.C. Cir. 2005) (stating that district court lacked authority to "order specific relief" after vacating agency decision); Berge v. United States, 949 F. Supp. 2d 36, 47 (D.D.C. 2013) (noting no district court jurisdiction to "order specific relief that deprives an agency of the ability to reconsider the matter in light of the Court's decision").

Yet here, as explained in more detail below, the conditions are not constraints on the Corps' analysis or a grant of "specific relief" to the Tribes. They do not concern the scope of the remand, nor do they affect the agency's authority over the pipeline. They are instead means by which the Court can gather information about the risks posed by the pipeline pending remand and can ensure that the status quo is preserved for both sides. As discussed in the prior Opinion, such an interim remedy clearly falls within the Court's general equitable powers.

Recent events have made clear, moreover, that there is a pressing need for such ongoing monitoring. Earlier this month, the Keystone Pipeline leaked 210,000 gallons of oil in Marshall County, South Dakota. See Mitch Smith and Julie Bosman, Keystone Pipeline Leaks 210,000 Gallons of Oil in South Dakota, N.Y. TIMES (Nov. 16, 2017), https://www.nytimes.com/2017/11/16 /us/keystone-pipeline-leaks-south-dakota.html. The spill occurred near the boundaries of the Lake Traverse Reservation, home of the Sisseton Wahpeton Oyate Tribe, thus highlighting the potential impact of pipeline incidents on tribal lands. Id. Although the Court is not suggesting that a similar leak is imminent at Lake Oahe, the fact remains that there is an inherent risk with any pipeline. As stated in the prior Opinion, "[T]here is no doubt that allowing oil to flow through the pipeline during remand risks the potentially disruptive effect about which the Tribes are most concerned – a spill under Lake Oahe." Standing Rock IV, 2017 WL 4564714, at *10. Such incidents, the Court noted, "have the potential to wreak havoc on nearby communities and ecosystems." Id. at *11. In light of these concerns, it is in the Court's interests to stay

abreast of any relevant changes during the remand period and to order the parties to provide up-to-date information about the pipeline's operation. Such reporting will allow the Court to ensure that remand without vacatur remains the appropriate remedy and to monitor any factual developments in this ongoing case.

The Corps is thus incorrect that the interim conditions are "unwarranted" and "unlikely to address Plaintiffs' stated concerns with the operation of the pipeline." Corps Brief at 4. Indeed, Defendants' assertion that the Tribes' "rights, resources, and land are fully protected by the existing easement" presupposes that the status quo will be maintained during the remand process. Id. at 5. Yet without measures to ensure that Defendants share information about ongoing operations, there is no clear way for the Court, the parties, or the public to evaluate the efficacy of the extant safety measures.

B.     Interim Conditions

Plaintiffs request three specific conditions during the remand period: (1) the finalization and implementation of oil-spill response plans at Lake Oahe; (2) completion of a third-party compliance audit; and (3) public reporting of information regarding pipeline operations. See ECF 272 (Tribes' Brief Regarding Remedy) at 36-39. The Court agrees that each of these measures is appropriately tailored to monitoring the status of the pipeline during remand.

As to the first, the Corps contends that the Tribes and Dakota Access "either have resolved, or are in the process of resolving, the Tribe's request" and that the relief sought is therefore not "necessary because it appears that the parties have already engaged in the requested coordination." Corps Brief at 6. Dakota Access similarly states that it is "already coordinating" with the Tribes' emergency-management personnel. See ECF 288 (Dakota Access Brief) at 4. The Court, of course, encourages the parties to collaborate in efforts to resolve any pipeline-

related dispute. Yet, in light of the case's history of contested versions of discussions between Plaintiffs and Defendants, it will not rest on such representations. Instead, the Court will order that the Corps, Dakota Access, and the Tribes coordinate to finalize spill response plans at Lake Oahe, and that the parties file such plans with the Court by April 1, 2018. Such a condition is directly related to the risk of a spill during remand, and it is directed to keeping the Court informed as to all parties' efforts to preserve the status quo pending the Corps' further environmental analysis.

The Court will additionally impose the second requested condition – namely, the completion of a third-party compliance audit. In contesting this measure, Dakota Access relies heavily on the ongoing authority of the Pipeline and Hazardous Materials Safety Administration to ensure DAPL's compliance with federal laws and regulations. See DA Brief at 5-6. The Tribes note, however, that PHMSA itself recognized the potential benefit of having an independent, third-party review. See Tribes Brief at 10. Defendants' assertion that such a process would be duplicative of PHMSA oversight is therefore unavailing. As to the Tribes' involvement in the process, the Corps asserts that Plaintiffs are asking for their "own experts [to] actually participate in the audit," Corps Brief at 6, and Dakota Access contends that the Tribes are seeking to "insert[]" themselves into the process. See DA Brief at 6. Yet the Tribes in fact request only that they be permitted to participate in the selection of the auditor and have the opportunity to share their relevant data during the audit process. See Tribes Brief at 10. This seems reasonable. The Court will therefore order that Dakota Access select an independent, third-party auditor in consultation with the Tribes. Because these conditions are imposed in order to keep the Court informed of the circumstances at Lake Oahe pending remand, it will require that the results of this audit process be filed with the Court by April 1, 2018.

Finally, the Court will require that Dakota Access file bi-monthly reports regarding the status of the pipeline during remand, beginning at the end of this month. With respect to this condition, the Corps contends that such reporting is "unnecessary" and "unlikely to lead to any meaningful differences in the safety of the pipeline." Corps Brief at 7. Yet it never explains how additional information and transparency during the remand process would not enhance public safety and the Court's understanding of the facts on the ground. In light of Dakota Access's agreement to "voluntarily" report on many of the issues raised by the Tribes, there is similarly no concern that this condition will be unduly burdensome for the company. See DA Brief at 7. The Court will therefore order that Dakota Access file bi-monthly reports of any repairs or incidents occurring at the segment of the pipeline crossing Lake Oahe.

## III. Conclusion

The Court, the parties, and the public all have an interest in ensuring that the status quo at Lake Oahe is preserved pending remand. In order to obtain the information necessary to monitor the conditions in North Dakota, and to mitigate the risk of any potential spill, the Court will thus impose a series of interim measures. A separate Order consistent with this Opinion will be issued this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  December 4, 2017

## SPECIAL CONDITIONS
## LAKE OAHE, EASEMENT NO DACW45-2-16-8059

| Condition | |
|---|---|
| 1. | **Procedures and Specifications:** For the pipeline segments crossing Lake Oahe and its "could affect" High Consequence Areas ("could affect" HCAs) (as defined in 49 CFR § 195.450), Grantee must meet the U.S. Army Corp of Engineers easement special conditions by developing, implementing, and maintaining for the duration of the easement all easement special conditions in specifications and procedures for the design, construction, testing, operation and maintenance specifications and procedures as required in 49 CFR §§ 195.100, 195.202, 195.302, and 195.402 and this easement. |
|  | For the purposes of these special conditions, "pipeline segment" is defined as Lake Oahe and the "could affect" HCAs noted in EA for the vicinity of Lake Oahe.. |
| 2. | Grantee will conduct all HDD work according to the HDD Construction Plan [August 18, 2015] (Final EA, Appendix B) that it has prepared, and implement the HDD Contingency Plan [March 11, 2011] (Appendix B) in the event of an inadvertent release. |
| 3. | Grantee is not authorized to discharge hydrostatic test water under this easement. |
| 4. | Grantee will follow response, containment, mitigation measures, and cleanup measures described in SPCC, SWPPP, and ECP. |
| 5. | Grantee will use temporary sediment control measures, such as silt fence, to minimize the introduction of sediment into waterbodies during construction and minimize the movement of spoil and sediment from surface runoff during and after construction. |
| 6. | Grantee will return all surface drainage contours and vegetation to preconstruction conditions as much as practical. |
| 7. | Grantee will avoid groundwater contamination by implementing the protective measures set forth in the Project specific spill prevention, control and Countermeasures prepared by the contractor and in the Spill Prevention, Control and Countermeasure Plan [December 2014] (Final EA, Appendix A). |
| **Documentation Conditions** | |
| 8. | The Grantee will submit the Facility Response Plan to the Oahe OPM for review prior to the operation of the pipeline. |
| 9. | The Grantee will submit all plans not final at the time this easement is granted to the Oahe OPM for review and the incorporation of U.S. Army Corps of Engineers comments prior to the Grantee's submittal to the Pipeline and Hazardous Management Safety Administration. These plans include, but are not limited to the following:<br>  a.  Geographical Response Plan,<br>  b.  Operations and Maintenance Manual,<br>  c.  Risk Assessment (Integrity Management Plan), and<br>  d.  Spill Models (Using the National Hydrography Dataset by the U.S. Geological Survey) |
| 10. | The Grantee must send any updated plans in the Facility Response Plan to the Oahe OPM for review by the U.S. Army Corps of Engineers Environmental Compliance Coordinators at the Omaha District Office and the Oahe Project Office within one year of the update. |

| 11. | The Grantee shall provide as-built drawings for the crossing at Lake Oahe to the Oahe OPM within 6 months of the completion of pipeline construction. |
|-----|---|
| 12. | All records demonstrating compliance with these easement conditions herein must be maintained for the duration of the easement. |
| | **Pipeline Safety Conditions (Construction)** |
| 13. | **Pipeline Design Factor – Pipelines:**  Pipe installed must comply with a design factor of 0.50 or lower in the Lake Oahe crossing and "could affect" HCAs. |
| 14. | **Pipe Girth Weld – Nondestructive Tests:**  Grantee must nondestructively test all girth welds in accordance with 49 CFR §§ 195.228, 195.230 and 195.234. |
| 15. | **Pressure Test Level:**  The pre-in-service hydrostatic test for mainline pipe must be to a pressure producing a hoop stress of either: a minimum 100% specified minimum yield strength (SMYS) or a minimum of 1.25 times maximum operating pressure (MOP) for eight (8) continuous hours for pipeline segments using a design factor of 0.50 or less. |
| 16. | **Assessment of Test Failures:**  Any pipe failure occurring during the pre-in service hydrostatic test must undergo a root cause failure analysis to include a metallurgical examination of the failed pipe. The results of this examination must preclude a systemic pipeline material issue and the results must be reported to the Operations Project Manager at the Oahe Project Office (Oahe OPM) within 60 days of the failure. |
| 17. | **Coatings for Trenchless Installation:**  Coatings used for directional bore, slick bore and other trenchless installation methods must be capable of resisting abrasion and other damage that may occur due to rocks and other obstructions encountered in this installation technique. |
| 18. | **Pipe Coating;** Pipe coatings must be non-shielding to cathodic protection (CP).  Coatings such as tape and shrink sleeves would be shielding coatings to CP that protects the pipe from external corrosion.  The application of a corrosion resistant coating to the steel pipe must be performed according to a coating application quality control program.  The program must address pipe surface cleanliness standards, blast cleaning, application temperature control, adhesion, cathodic disbondment, moisture permeation, bending, minimum coating thickness, coating imperfections and coating repair. |
| 19. | **Field Coating:**  Field joint coatings must be non-shielding to CP.  Grantee must implement field girth weld joint coating application specification and quality standards to ensure pipe surface cleanliness, application temperature control, adhesion quality, cathodic disbondment, moisture permeation, bending, minimum coating thickness, holiday detection and repair quality.  Field coating applicators must use valid qualified coating procedures and be trained to use these procedures. |
| 20. | **Construction Coating Survey after Installation:** Promptly after a ditch for the pipeline is backfilled, but not later than  three months after placing the pipeline in service, the operator must perform an assessment to ensure integrity of the coating using direct current voltage gradient (DCVG) or alternating current voltage gradient (ACVG).  The operator must repair any coating damage classified as moderate or severe (voltage drop greater than 35% for DCVG or 50 dBµV for ACVG) in accordance with section 4 and Appendix A of NACE SP0502-2008 (or latest edition referenced in 49 CFR § 195.3) within six months of the assessment. |
| 21. | **Mainline Valve(s) with Remote Control or Automatic Shutdown:** |

EXHIBIT "D"
DACW45-2-16-8059

| | |
|---|---|
| a. | Mainline valves with remote control or automatic shutdown for water crossings and reservoirs must be installed on either side of the crossing and additional mainline valve(s) installed either upstream, downstream, or both to protect the water body from the "could affect" HCA on either side of the water crossing. Mainline valves must either be located outside of the flood plain or have valve actuators and other control equipment installed so as to not be impacted by flood conditions. |
| b. | Mainline valves with remote control or automatic shutdown must contain transit inhibit switches that prevent the valves from shutting at a rate (and in conjunction with pumps being shutdown) so that no pressure surges can occur, or other damage caused by unintended valve closures or too fast of a closure. |
| c. | Mainline valves must be remotely controlled and actuated or automatic shutdown, and the Supervisory Control and Data Acquisition (SCADA) system must be capable of closing the valve and monitoring the valve position, upstream pressure and downstream pressure so as to minimize the response time in the case of a failure.   Remote power backup is required to ensure communications are maintained during inclement weather.  Mainline valves must be capable of closure at all times.  If it is impracticable to install a remote controlled valve, Grantee must submit a valve design and installation plan to the appropriate Oahe OPM to confirm the alternative approach provides an equivalent level of safety. |
| d. | Mainline valves in the pipeline segment must have actuation capability (i.e., remote control shut-off, automatic shut-off, manual shut-off where personnel are in proximity, or alternative equivalent technology) to ensure pipeline ruptures are promptly mitigated based upon maximum valve shut-off times, location, and spacing specified. |
| e. | For each mainline valve that is a remote-control shut-off or automatic shut-off valve, the operator must conduct a point-to-point verification between SCADA displays and the mainline valve, sensors, and communications equipment in accordance with 49 CFR § 195.446(c) and (e), or an equivalent verification. |
| 22. | **Supervisory Control and Data Acquisition (SCADA) System:**  Grantee must develop, install, operate, and maintain a SCADA system to provide remote monitoring and control of the entire pipeline segment in accordance with 49 CFR Part 195 requirements. |
| 23. | **Computational Pipeline Monitoring (CPM) Leak Detection:** The pipeline segment must have a computational pipeline monitoring (CPM) leak detection system in accordance with 49 CFR § 195.134 and must have adequate pressure sensors at pump stations, laterals, mainline valves and liquid flow volume measurement along the pipeline at inflows, outflows and spaced along the pipeline to perform accurate leak detection.  The pipeline segment must be operated as a continuously pressurized pipeline (with no pressure, slack line pipeline segments).  If the pipeline segment is operated as a slack line pipeline segment, an operating plan must be developed, reviewed by a responsible third party independent expert engineering company and submitted to the Oahe OPM for "no objection" prior to being implemented by Grantee. |
| 24. | Grantee will minimize or avoid impacts on soils by implementing the mitigation measures described in the DAPL Project's Spill Prevention Control and Countermeasure Plan [December 2014] (SPCC), Storm water Pollution Prevention Plan[July 2015] (SWPPP), and Environmental Construction Plan [April 2015 (ECP) as well as requirements of applicable state and federal permits. |

EXHIBIT "D"
DACW45-2-16-8059

| | Pipeline Safety Conditions (Operation) |
|---|---|
| 25. | Overpressure Protection Control:  Grantee must limit mainline pipeline segment overpressure protection to a maximum of 110% maximum operating pressure (MOP) during surge events consistent with 49 CFR § 195.406(b).  Before commencing operation, Grantee must perform a surge analysis showing how the pipeline segment will be operated to be consistent with these overpressure protection conditions.  Grantee shall equip the pipeline with field devices to prevent overpressure conditions.  Remotely actuated valves or automatic shutoff valves should be fitted with devices that will stop the transit (intentional or uncommanded) of the mainline valve should an overpressure condition occur or an impending overpressure condition is expected.  Sufficient pressure sensors, on both the upstream and downside side of valves, must be installed along the pipeline to conduct real time hydraulic modeling, and which can be used to conduct a surge analysis to determine whether pipeline segments have experienced an overpressure condition. |
| 26. | Cathodic Protection:  The initial Cathodic Protection system must be operational within six (6) months of placing a pipeline segment in service. Cathodic Protection will be operated and maintained per applicable codes and the Grantee's "Operations and Maintenance Manual'. Wall thickness testing will be performed in-lieu of periodic hydro tests. The Grantee shall send the inspection reports to the Operations Project Manager at the Oahe Project Office (hereinafter the Oahe OPM)." |
| 27. | Interference Current Surveys:  Interference surveys must be performed over the entire  pipeline segment within six months of placing the pipeline in service to ensure compliance with applicable NACE International Standard Practice 0169-2007 (2007 or the latest version incorporated by reference in § 195.3) and 0177 (2007 or the latest NACE standard version, since NACE SP 0177 is not incorporated by reference in 49 CFR § 195.3) (NACE SP 0169-2007 and NACE SP 0177) for interference current levels.  If interference currents are found, Grantee must determine if there have been any adverse effects on the pipeline and mitigate such effects as necessary as required below.<br><br>The interference current mitigation program for the pipeline segment must include:<br>  1)  As frequently as needed, including when new or uprated high voltage alternating current power lines greater than or equal to 69 kVA or electrical substations are co-located near the pipeline, but not to exceed every seven years conduct an interference survey (at times when static or dynamic voltages are at the highest values for a time period of at least 24-hours) to detect the presence and level of any electrical current that could impact external corrosion where interference is suspected;<br>  2)  Analyze the results of the survey to identify locations where interference currents are greater than or equal to 20 Amps per meter squared; and<br>  3)  a remedial action plan and apply for any necessary permits within four months of completion of the inspection or testing that identified the presence of deleterious electrical stray current.<br>  4)  Implement remedial actions to protect the pipeline segment from detrimental interference currents.  Remedial actions must be completed promptly, but no later than one year after completion of the survey, or as soon as practicable after obtaining necessary permits.  Remedial action means the implementation of measures including, but not limited to, |

EXHIBIT "D"
DACW45-2-16-8059

| | |
|---|---|
| | additional grounding along the pipeline to reduce interference currents below 20 Amps per meter squared. The following criteria shall be used to determine when remedial actions are required.<br><br>a) AC-induced corrosion does not occur at AC densities less than 20 A/m2 (1.9 A/ft2). The operator shall monitor these locations per (a) above.<br>b) AC corrosion is unpredictable for AC densities between 20 to 100 A/m2 (1.9 to 9.3 A/ft2). These locations require an engineering assessment to determine if remediation is required.<br>c) AC corrosion occurs at current densities greater than 100 A/m2 (9.3 A/ft2). These areas require mitigation. Any location that is determined to require mitigation must be mitigated to reduce the AC current density to less than 20 A/m2. |
| 28. | **Corrosion Surveys:** Grantee must complete corrosion surveys for the pipeline segment within six (6) months of placing the respective CP system(s) in operation to ensure adequate external corrosion protection per NACE RP 0169-2007. The survey shall also address the proper number and location of CP test stations as well as alternating current (AC) interference mitigation and AC grounding programs per NACE RP 0177. At least one (1) CP test station must be located within each "could affect" HCA with a maximum spacing between test stations of one-half mile. |
| 29. | **Initial Inline Inspection (ILI):** Within three (3) years of placing a pipeline segment in service, Grantee must perform a baseline ILI using a high-resolution Magnetic Flux Leakage (HR-MFL) tool, high resolution (HR) deformation tool, and an ultrasonic crack detection tool or equivalent of each. |
| 30. | **ILI Deformation Tool:** Grantee must perform a high resolution deformation tool run after completion of the hydrostatic strength test and backfill of the pipeline segment and prior to placing the pipeline segment in service. Grantee must remediate pipe in accordance with 49 CFR Part 195 and Subpart O. All expanded pipe must be remediated in accordance with PHMSA's "Interim Guidelines for Confirming Pipe Strength in Pipe Susceptible to Low Yield Strength for Liquid Pipeline" dated October 6, 2009 or any subsequent PHMSA update to this guideline. |
| 31. | **Future ILI:** Future ILI inspections must be based upon pipeline segment integrity threats and must include as a minimum of a high-resolution Magnetic Flux Leakage (MFL) tool, high resolution deformation tool, and an ultrasonic crack detection tool or equivalent of each. ILI inspections must be performed on the entire pipeline segment on a frequency consistent with 49 CFR § 195.452(j)(3) assessment intervals or on a frequency determined by fatigue studies or anomalies found that are indicative of actual operating conditions.<br><br>1) Conduct periodic close interval surveys (CIS) along the entire pipeline segment with current interrupted to confirm voltage drops in association with periodic ILI assessments under § 195.452(j)(3). Pipeline segments under Lake Oahe would not be able to CIS due to water segment and depth of directional drill across Lake Oahe.<br>2) CIS must be conducted within three (3) months of running ILI surveys when using a five (5) year ILI frequency, not to exceed sixty-eight (68) months, in accordance with 49 CFR § 195.452 (j) (3) assessment intervals.<br><br>CIS findings must be integrated into ILI Tool findings. |
| 32. | **Internal Corrosion:** Grantee must limit basic sediment and water (BS&W) to 0.5% by volume and report BS&W testing results to A in the annual report. Grantee must report upset conditions causing BS&W level excursions above the limit on the annual report. |

**EXHIBIT "D"**<br>DACW45-2-16-8059

EXHIBIT "D"
DACW45-2-16-8059

| | |
|---|---|
| | 1) Grantee must run cleaning pigs twice in the first year and as necessary in succeeding years based on the analysis of oil constituents, liquid test results, weight loss coupons located in areas with the greatest internal corrosion threat and other internal corrosion threats. At a minimum in the succeeding years following the first year Grantee must run cleaning pigs every five years unless analysis necessitates earlier action. |
| | 2) Liquids collected during cleaning pig runs, such as BS&W, must be sampled, analyzed and internal corrosion mitigation plans developed based upon lab test results. |
| | 3) Grantee shall review the program at least quarterly based upon the crude oil quality and implement adjustments to monitor for, and mitigate the presence of, deleterious crude oil stream constituents. |
| 33. | **Pipeline Patrolling:** Grantee must patrol the pipeline segment right-of-way on a two (2) week interval but not exceeding three (3) weeks, for at least twenty-six (26) times each calendar year, to inspect for excavation activities, ground movement, unstable soil, wash outs, leakage, or other activities or conditions affecting the safe operation of the pipeline segment. |
| 34. | The Grantee shall conduct the following training exercises: |
| | 1) A full scale open water and a full scale winter/ice exercises at Lake Sakakawea and Lake Oahe. A full scale exercise will occur once every 3 years (triennial cycle) with the location and type of exercise occurring on alternating schedules (e.g. open water exercise at Lake Oahe the first triennial cycle, followed by winter exercise at Lake Sakakawea the following triennial cycle, followed by a winter exercise at Lake Oahe the following triennial cycle, etc.). The first exercise will occur within the first 3 years after the pipeline becomes operational. |
| | 2) To facilitate USACE staff involvement, the Grantee shall notify the USACE Environmental Compliance Coordinators at the Omaha District Office and the Oahe Project Office at least ninety (90) days prior to initiation of the training exercises. The Grantee shall also solicit the participation of key stakeholders (federal, state, local, and Tribal) in these exercises. |
| 35. | Within 1 month following the pipeline becoming operational, the Grantee shall provide for an all-weather access and collection point downstream of the HDD crossing at Lake Oahe. The Grantee shall provide an equipment storage facility on non-federal lands that includes a fenced permanent storage area for winter and open water spill response equipment. The storage facility should be placed in a strategic location and near existing facilities that would support access to the water. The Grantee will coordinate with the USACE and any other applicable stakeholders to obtain all necessary permits and approvals prior to construction for any ground disturbing activities associated with these facilities. The storage facility should contain sufficient response equipment at a minimum to mitigate an unintended worst case release for this Lake crossing. |
| | **Overall Condition from EA** |
| 36. | Grantee is generally responsible for commitments made and mitigation measures in the Final Environmental Assessment, Grantee Pipeline Project Crossing of Flowage Easements and Federal Lands (July 2016), including all Plans includes within Appendices thereof, even if they are not specifically made as a condition to this easement. |



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, OMAHA DISTRICT
1616 CAPITIAL AVENUE
OMAHA NE 68102-1618

REPLY TO
ATTENTION OF

February 9 2017

Real Estate Division

Dakota Access LLC
Attn: Thomas Sigauw
1300 Main
Houston, Texas 77002

Dear Mr. Sigauw:

    Enclosed for your records is a fully executed copy of Easement No. DACW45-2-16-8059.
Thank you for your cooperation.  If you have any questions, please feel free to contact me at
(402) 250-4284 or by e-mail at rick.l.noel@usace.army.mil .

                    Sincerely,

                    Rick L. Noel
                    Chief, Civil Branch, Real Estate Division
                    Real Estate Contracting Officer

Enclosure



NOTE: THIS IS A FULL SIZE DRAWING THAT IS INTENDED
TO BE PRINTED ON A 24" X 36" SHEET OF PAPER.

CONTRACTOR'S AS-BUILT OVERLAY

NOTE:
1. THE PROVISION OF THIS INFORMATION IS NOT INTENDED TO RELIEVE THE
HDD CONTRACTOR OF THEIR CONTRACTUAL REQUIREMENT TO PROVIDE A
TABULATION OF PILOT HOLE COORDINATES AND AN AS-BUILT DRAWING.
THE PILOT HOLE COORDINATES PRESENTED ARE BASED ON PRELIMINARY
PILOT HOLE SURVEY DATA. THIS INFORMATION SHOULD BE USED TO
EVALUATE THE CONTRACTOR'S AS-BUILT DOCUMENTATION.

DATUM:
HORIZONTAL: NAD83 with UTM Datum, Zone 14, US Foot; Central Meridian 99° W
VERTICAL: NAVD 88

LEGEND
——————— DESIGNED HDD ALIGNMENT AND PROFILE
——————— CONTRACTOR AS-BUILT BY MICHELS DIRECTIONAL CROSSINGS

DAKOTA ACCESS PIPELINE PROJECT
SITE PLAN AND PROFILE

PROPOSED 30" PIPELINE
LAKE OAHE HDD
MORTON AND EMMONS COUNTIES, NORTH DAKOTA

GeoEngineers
3050 South Delaware
Springfield, MO 65804
Telephone (417) 831-9700
Fax (417) 831-9777

Project No.
18782-011-01

Drawing No.
W_29004_C100012

Sheet
1 of 2

REFERENCES
DRAWING NUMBER | REFERENCE DRAWING TITLE

REVISIONS
NO. | DESCRIPTION | BY | DATE | CHK'D | APP'D
0 | ISSUED FOR CONSTRUCTION | TJB | 10/13/15 | MAM | JLR
1 | ISSUED FOR CONSTRUCTION | MMC | 11/05/15 | MAM | JLR

JLR | 10/02/15
Design | Date
TJB | 10/02/15
Drawn | Date
MAM | 10/09/15
Checked | Date
JLR | 10/13/15
Approved | Date

AS-BUILT
07/31/2017

AS-BUILT ALIGNMENT SHEET
29004.02 CR13-89ST-30
STA. 4220+00 TO STA. 4300+00

MORTON COUNTY, NORTH DAKOTA

W_29004_C010085

AS-BUILT ALIGNMENT SHEET
29004.02 CR13-69ST-30
STA. 4300+00 TO STA. 4400+00

MORTON & EMMONS COUNTY, NORTH DAKOTA

DAKOTA ACCESS, LLC

WOOD GROUP USA, INC.

W_29004_C010086

# Dakota Access Pipeline

# Lake Oahe HDD Crossing

## *Overall Assessment*

- **Pipe Manufacture:** DAPL pipe material meets requirements of API 5L PSL-2: Specification for Line Pipe.
- **Pipeline Operation:** DAPL Pipeline meets requirements of 49 CFR Part 195 - Transportation of Hazardous Liquids by Pipeline and ASME B31.4: Pipeline Transportation Systems for Liquids and Slurries.
- **Integrity Management and Risk Assessment:** DAPL's Integrity management and risk assessment practices follow guidance of RP API 1160: Managing System Integrity for Hazardous Liquids Pipelines.

## *Integrity Assessment*

- **Pipeline Design Factor.**  The pipe installed complies with a design factor of 0.50 in the Lake Oahe HDD crossing and could affect HCA's.

- **Pipe Girth Weld - Nondestructive Tests.**  DAPL nondestructively tested all girth welds in accordance with 49 CFR §§195.228, 195.230 and 195.234.  All machine welds were tested by ultrasonic means; all stick/manual welds were tested by radiographic means.

- **Hydrostatic Test.**  The pipe that comprises the HDD is 30" x 0.625" API 5L PSL-2 X70 and was successfully tested twice to a minimum pressure of 1,880 psig.  First test was the pre-in-service hydrostatic test at a minimum of 1.25 times maximum operating pressure (MOP) for eight (8) continuous hours performed prior to pulling the pipe under the Lake.  Second test was performed under the same conditions after the pipe was pulled under the Lake.  There were no failures.

- **Caliper Survey.**  No Deformations identified in Caliper Survey performed on March 24, 2017.  As reported, the line at the time of the survey appeared to be fairly clean, with a smooth interior wall surface.

- **Construction Coating Survey after Installation.**  No actionable coating anomalies were identified on the DCVG Survey performed on April 22, 2017.  The DCVG Survey was completed promptly after the ditch for the pipeline was backfilled and covered the entire HDD crossing and encompassed the easement / action area.
    Direct Current Voltage Gradient and is a survey technique used for assessing the effectiveness of coating corrosion protection on buried steel pipe. DAPL is required to repair any coating damage classified as moderate or severe (voltage drop greater than 35% for DCVG or 50 dBμV for ACVG) in accordance with section 4 and Appendix A of NACE SP0502-2008 (or latest edition referenced in 49 CFR § 195.3).

- **AC Mitigation**.  Completed an AC (Alternating Current) Potential Close-Interval-Survey from April 19, 2017 through April 21, 2017 traversing form MLV-360, MP 174.80 to HWY 1804, MP 186.70. This survey encompassed the easement / action area.

    DAPL installed four (4) Metricorr ER Probes with Remote Monitoring Units (RMU's) on April 5, 2017, to monitor AC/DC current density, AC/DC potential and corrosion rates.  These monitoring probes have been installed such that there are two (2) probes on either side of Lake Oahe with continuous satellite monitoring for each probe.  Preliminary analysis of Metricorr data indicates AC current densities < 0.5 A/m2 peak.   No remedial action is necessary as AC-induced corrosion does not occur at AC current densities < 20 A/m2 (1.9 A/ft2).

- **Cathodic Protection (CP)**.  Completed a native Pipe-to-Soil Close-Interval-Survey (CIS)/CP-Interference CIS from April 19, 2017 through April 21, 2017 traversing form MLV 360, MP 174.80 to HWY 1804, MP 186.70 encompassing the easement / action area. Data analysis indicated no interference issues

    DAPL installed four (4) impressed current ground beds (Unit 340 @ MLV 340, Unit 360 @ MLV 360, Unit 400 @ MLV 400, and Unit 430 @ MLV 430) covering the permitted / action area. These four (4) ground beds were installed April 19, 2017 through April 28, 2017 and were energized on May 23, 2017.  Each of these ground beds were monitored for 3 weeks to allow for polarization of the pipeline and a subsequent On/Off CIS was performed June 15, 2017 through June 22, 2017 from MLV 360 to MLV 400 encompassing the easement / action area. Preliminary analysis of this CIS indicate excellent levels of cathodic protection throughout the area with no interference issues.

    DAPL installed test stations at each of its Mainline Valve (MLV) sites on both sides of Lake Oahe, as well as, each of Northern Border Pipeline's MLV sites on both sides of Lake Oahe.

- **Mainline Valves with Remote Control.**  Mainline valves with remote control actuators were installed on either side of the Lake Oahe crossing and additional mainline valves were installed on both sides of Lake Oahe to protect the "could affect" HCA on either side of the HDD crossing. These MLV's were located outside of the flood plain so as to not be impacted by flood conditions.

    Since these MLV's are remotely controlled and actuated, the Supervisory Control and Data Acquisition (SCADA) system is capable of closing the valve and monitoring the valve position, upstream pressure and downstream pressure so as to minimize the response time in the case of a failure. Remote power backup is also provided to ensure communications are maintained during inclement weather so that the MLV's are capable of closure at all times. For each of these MLV's, DAPL conducted a point-to-point verification between SCADA displays and the mainline valve, sensors, and communications equipment in accordance with 49 CFR § 195.446(c) and (e), or equivalent verification.

### *Threat Assessment*

- **Integrity Management and Risk Assessment:** DAPL's Integrity management and risk assessment practices follow guidance of RP API 1160: Managing System Integrity for Hazardous Liquids Pipelines.
- Threats considered in this threat assessment follow ASME B31.8S guidelines referenced in API 1160.

**Integrity Assessment – Second Hydrostatic Test**

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| ≡ ENERGY TRANSFER | | | **MOP ESTABLISHMENT** | | | | | | **B.10.A**<br>Available Electronically | |

**Date of Test:** _____

| | | | | |
|---|---|---|---|---|
| Project: | **DAPL** | | | |
| AFE No.: | 480000000001 | Company : | ☒ DAPL   ☐ ETCOP | ☐ HPL |
| Test Record Number: | 6754 | | | ☐ Other ____ |

| | | | | | |
|---|---|---|---|---|---|
| **TEST LOCATION** | Discharge: | **By Permit** | | Line Number: | **N/A** |
| | County/Parish: | **Morton County** | | Line Name: | **DAPL** Spread 6 Lake Oahe HDD |
| | State: | **ND** | | Valve Section:: | From: **MLV - 380** |
| | Total Footage: | **8.150'** | | | To: **MLV - 390** |

| | | | | |
|---|---|---|---|---|
| **(ADDITIONAL TEST INFORMATION** | Reason For Test: | ☒ New   ☐ Uprating   ☐ Class Change   ☐ Integrity   ☐ Fabrication | | |
| | Stationing Begin: | **MLV - 380** | Stationing End | **MLV - 390** |
| | Existing Facility MOP: | **N/A** | | |
| | In-Service Date: | **TBD** | | |
| | Other Location Description: | **Lake Oahe** | | |
| | Is a Station Equation involved: ☒ NO   ☐ YES  If yes, provide | | | **BK/AH** ____ |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **MATERIAL INVENTORY** | ALLOWABLE MOP (per design pressure)   ; | | | | | | Design Pressure Verification ("weakest link" pipe) | |
| | Sub-section | S | t | D | E | T | F | DP = ((2xSxt)/D)xExTxF |
| | 1 | 70000 | 0.625 | 30 | 1 | 1 | 0.50 | 1458 |
| | 2 | 70000 | 0.429 | 30 | 1 | 1 | 0.72 | 1441 |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | Minimum pressure rating of other components: | | | | **ANSI 600** | | Attach additions sheets if necessary | |
| | S=SMYS, t=wall thickness, D=OD, E= longitudinal joint factor, T=temperature derating factor; F=design factor | | | | | | | |

| | |
|---|---|
| **PRESSURE TEST** | ALLOWABLE MOP (per pressure test) |
| | Actual high-point test pressure: **1880** psi |
| | Test Factor: **1.25**       Actual high-point test pressure = **1504**<br>Test Factor* |
| | * Test factors: 1.1 for Class 1; 1.25 for Class 2 & offshore; 1.5 for Class 3 or 4, risers and platforms, compressor and M& R stations |

**NOTE:** The Established MOP can be as high as the lesser of the allowable MOP per design pressure or allowable MOP per pressure test, but no less than the existing MOP of the line in which it is installed.

| | |
|---|---|
| Established MOP: | **1440** |

Remarks/ Comments: ____

Prepared by: _Matthew Cooper-Harper_      Approved by: _____

Revision Date: 07/15/16      Retention: Life of the facility

**Integrity Assessment – Caliper Survey**

| *ENDURO* | Pipeline Services, Inc.          JOB PLACEMENT FORM |
|---|---|
| CUSTOMER: | Energy Transfer Company / Michel's Pipeline |
| REP.: | Cody Wood - Michel's Pipeline |
| | |
| JOB NUMBER: | B16-613F / D.A.P.L - Lake Oahe HDD / Lake Oahe West - Lake Oahe East - MLV 390 |
| LOCATION: | Bismarck, ND |
| | ADDRESS FOR SHIPPING REPORTS: |
| SHIP ADDR 1: | |
| SHIP ADDR 2: | |
| SHIP ADDR 3: | |
| SHIP ADDR 4: | |
| SHIP ADDR 5: | |
| | BILLING INFORMATION |
| DAYS ON SITE: | 5 |
| MOB MAN: | Jeff walker |
| MOB TOOL: | (2) 30" DW DdL™ Caliper Tool |
| OTHER: | (2) Transmitters, (2) Receivers, (2) Geophones, Support Equipment |
| OTHER: | |
| | SIGNATURES: |
| Enduro Representative/Date: | |
| Customer Representative/Date: | |

| DATE | NOTES |
|---|---|
| 3/19/2017 | *B16-613F:*  Travel Day.  Tulsa, OK - York, NE. Contacted customer Cody Wood with Michel's Pipeline.  Run tentatively scheduled for 3/21/17. |
| 3/20/2017 | *B16-613F:*  Travel Day.  York, NE - Bismarck, ND.  Informed Mr. Wood I was on location. |
| 3/21/2017 | *B15-613F:*  Stand-by.  Met with customer at launch location, discussed run parameters and run date has been pushed to 3/23/2017. |
| 3/22/2017 | B16-613F:  Stand-by.  Contacted customer, run moved to evening of  3/23/17. |
| 3/23/2017 | *B16-613F:*  Stand-by.  Contacted customer, run moved to 3/24/17. |
| 3/24/2017 | *B16-613F; D.A.P.L. Lake Oahe HDD; Lake Oahe West - Lake Oahe East - MLV 390; 30" DdL ™ DW x 0.625 x 1.52 Miles:*  9:30 AM, arrived at launch location, discussed plan of the day with Mr. Wood, installed transmitter, tool ready for launch. Tool was launched at 7:00 PM from Lake Oahe West with 7750 CFM / 100 PSI.  Customer personnel tracked the tool at MLV 390, tool passed at 7:58 PM, with an approximate speed of 1.59 MPH. I traveled to L/R #2 North Dakota permanent receive site.  Lake Oahe East - MLV 390 - L/R #2 North Dakota have previously be ran and reported. |
| 3/25/2017 | *B16-613F; D.A.P.L. Lake Oahe HDD; Lake Oahe West - Lake Oahe East - MLV 390; 30" DdL™ DW x 0.625 x 1.52 Miles:*  Tool was received at 1:23 AM on 3/25/17.  A brief analysis was performed, tool worked to Enduro standards.  Continued with a complete analysis. |
| 3/26/2017 | *B16-613F:*  Travel Day.  Delivered Field Report, signed off, released from project. |
| 3/27/2017 | *B16-613F:*  Travel Day. |



## DdL™ Caliper Survey Field Report

### B16-613F - D.A.P.L. / Lake Oahe HDD / AFE - 480000000002

**Run Date: March 24, 2017**

**Report Date: March 25, 2017**

Lake Oahe West

To

Lake Oahe East – M.L.V. 390

Energy Transfer Company / Michels Pipeline

P.O. Box 3489 | Tulsa, OK 74101-3498 | P: 918.446.1934 | www.enduropls.com

Field Caliper Report | Energy Transfer Company / Michels Pipeline | D.A.P.L. / Lake Oahe HDD / AFE -
480000000002 | B16-613F

# Executive Summary – DdL™ Caliper

## General Run Information

| Pipeline Name | D.A.P.L. / Lake Oahe HDD / AFE - 480000000002 | |
|---|---|---|
| Job # | B16-613F | |
| | Launcher | Receiver |
| Station | Lake Oahe West | Lake Oahe East – MLV 390 |
| Location(City/County, State) | Bismarck, ND | Bismarck, ND |
| Date / Time | 3/24/17 7:00 PM | 3/24/17 3/24/17 |

| AGMs | |
|---|---|
| Rec | |
| AGM# Not Rec | |

| Sensors | | Cal. | INS |
|---|---|---|---|
| | Total | 30 | 3Gy. / 3Acc. |
| | Rec. | 30 | 3Gy. / 3Acc. |
| | Bad | 0 | 0 / 0 |

| Product | Air~7750 CFM / 100 PSI |
|---|---|
| Pipe Diameter | 30.000 inches |
| Length | 1.69 miles |
| Hours | 58 min. |

**Field Technician:**   Jeff Walker

**Data Analyst:**   Jeff Walker

## Inspection Quality & Findings

| Deformation Indications | 0 |
|---|---|
| Dent < 2 % O.D. | 0 |
| Dent ≥ 2 % O.D. | 0 |
| Ovalities | 0 |
| Expansions | |

| Irregular Welds | 0 |
|---|---|
| Debris Indications | 0 |
| MFG Indications | 0 |

| Bends | 4 |
|---|---|
| Factory Bends | 4 |
| Field Bends (> 12D) | 0 |

Field Caliper Report | Energy Transfer Company / Michels Pipeline | D.A.P.L. / Lake Oahe HDD / AFE - 480000000002 | B16-613F

**Customer's immediate concerns:**

> *Percentage of pipe diameter for a sharp anomaly – 1.00% top / 2.00% bottom*
> *Percentage of pipe diameter for ovality – 5.00%*
> *Percentage of pipe diameter for expansion – 1.50%*
> *Bend radius requirements – 3.00D*

**General Run and Line Information**

On 3/24/2017 the 30 inch DdL™ DW caliper tool was launched from the Lake Oahe West site near Bismarck, ND at 7:00 PM using a total of 7750 CFM and holding 100 PSI to control the speed of the tool.  Tool was tracked by Michels Pipeline personnel at M.L.V 390, tool passed at 7:58 PM with an average speed of 1.59 MPH.

Note: The 30 inch DdL™ DW caliper tool was ran from the Lake Oahe HDD West to L/R #2 North Dakota site, approximately 10.38 miles, however, per customer request, the data collected from Lake Oahe HDD West to Lake Oahe HDD East – M.L.V. 390, approximately 8,065 feet, will only be Field Reported for this survey.  The remaining data recorded has been previously ran and reported.

The DdL™ DW caliper tool was received at the L/R #2 North Dakota site, approximately 10.38 miles from the launch site, near Bismarck, ND on 3/25/17 at 1:23 AM.  A visual inspection of the tool showed no damage.  The data was downloaded in the field and reviewed to confirm that the tool worked to Enduro specifications.

- The line at the time of the survey appeared to be fairly clean, with a smooth interior wall surface.

**Deformations:**

There are 0 Anomalies reported for this line section.

**Bends:**

There are 4 Factory Bends reported for this line section.
- The minimum Bend Radius in this line is 3.00D radius.

For a complete list of all the bends, please refer to the *Bend Listing*.

**Tool and Data Condition:**

- The survey tool was received in good condition.
- All data sets worked correctly and no sensor damage was found.
- All of the data recorded is acceptable.

**Correlation Reporting:**

- The customer *has not* provided Enduro with a pipeline listing.

- The customer *has not* been provided with a .kmz file.

Field Caliper Report | Energy Transfer Company / Michels Pipeline | D.A.P.L. / Lake Oahe HDD / AFE - 480000000002 | B16-613F

| Re-run Conditions | | | |
|---|---|---|---|
| ☐ Due to line conditions, Enduro recommends the survey be re-run. | | | |
| ☐ Due to anomalies found, Enduro recommends a confirming DdL™ Survey. | | | |
| ☐ Other: [please explain] | | | |
| Customer | ☐ Accept | Initials | ☐ Decline   Initials |

*The below items have been checked and confirmed to be accurate;*

☐ *Deformations*

☐ *Features*

☐ *Bend*

*Respectfully Submitted:*

**ENDURO Pipeline Services, Inc.**

*Submitted to:*

**Energy Transfer Company / Michels Pipeline**

_____

Jeff Walker
**Field Technician**

_____

Cody Wood
**Michel's Pipeline**

Field Caliper Report | Energy Transfer Company / Michels Pipeline | D.A.P.L. / Lake Oahe HDD / AFE - 480000000002 | B16-613F

## Appendix A: Pictures

**Launch**



**Receive**





Field Caliper Report | Energy Transfer Company / Michels Pipeline | D.A.P.L. / Lake Oahe HDD / AFE - 480000000002 | B16-613F

# Appendix B: Glossary

| | |
|---|---|
| **AGM** | *A DdL™ survey tool incorporates an above ground marker (AGM) system, which collects tool passage as well as GPS data. These AGM boxes will be downloaded and verified for tool passage. Gathers satellite information for both atomic time and GPS coordinates. Data from each AGM location can be incorporated into the software and used along with the INS data to calculate GPS coordinates for the entire line.* |
| **INS Survey** | *INS Survey: The DdL™ carries a full INS package with 3 gyros and 3 accelerometers. This package, in conjunction with GPS based AGMs, enables the DdL™ to map and provide GPS position on all pipeline events.* |
| **Deformation Indications** | *Dents are sized and located identifying deformation/dent anomaly conditions of/or greater than 1% of pipe O.D. on Top and 2% of pipe O.D. on Bottom. Deformations in the form of OVALITY (of or larger than 5% of pipe O.D.) will be identified.* |
| **Overburden Relief** | *Larger pipe diameters will experience a return to round during soil removal; a large portion of the ovality will relieve. Sharp and Flat anomalies will relieve on the associated ovality aspect of the anomaly. For this reason the report lists both the over-all and localized dent dimensions which identify the amount of sharp/flat and any associated ovality. The larger the ovality span, the greater the potential for relief.* |

# ENDURO
PIPELINE SERVICES, INC.

**Bend Listing**

| | | |
|---|---|---|
| CUSTOMER/CONTRACTOR | Energy Transfer Company / Michel's Pipeline | PIPE DIAMETER: 30.000 in |
| CUSTOMER LINE ID | D.A.P.L. / Lake Oahe HDD / AFE - 480000000002 | WALL THICKNESS: .625 in |
| JOB NUMBER | B16-613F | PRODUCT: Air-7750 CFM / 100 PSI |
| LAUNCH STATION | Lake Oahe West | RUN DATE: 24-Mar-2017 |
| | Bismarck, ND | FIELD ENGINEER: Jeff Walker |
| RECEIVE STATION | Lake Oahe East - M.L.V. 390 | CHART ANALYST: Jeff Walker |
| | Bismarck, ND | REPORT DATE: 03/25/2017 |
| PIPELINE LENGTH | 1.52 mi | ISSUE #: 1 |

| Event ID | Event Description | Comment | Enduro Station | Projected Station | Customer Station | Avg Mile Post | MCSD |
|---|---|---|---|---|---|---|---|
| B1 | Bend 45.0 deg. 3.0 Ds Up Turn MCSD: 27.68 | Before u/s w.: 1.2%(0.367) MCSD: 28.4 ID:29.1 mph:0.7 Clk:0 to 6 After d/s w.: 0.7%(0.211) MCSD: 28.5 ID:28.8 mph:1.2 Clk:5 to 11 MPH coming into Bend (-10ft): 1.1 Leaving Bend (+10ft): 0.7 Min MPH over range: 0.1 at index 2755934 | 8035.67 | 80+36 | | 1.52 | 27.68 |
| B2 | Bend 45.0 deg. 3.0 Ds  Down Turn MCSD: 28.11 | Before u/s w.: 1.2%(0.367) MCSD: 28.4 ID:28.8 mph:2.0 Clk:0 to 6 After d/s w.: 0.6%(0.171) MCSD: 28.5 ID:28.8 mph:2.2 Clk:0 to 6 MPH coming into Bend (-10ft): 0.7 Leaving Bend (+10ft): 4.5 Min MPH over range: 0.4 at index 2757102 | 8054.22 | 80+54 | | 1.53 | 28.11 |

# ENDURO
PIPELINE SERVICES, INC.

**Field Report**

| | |
|---|---|
| CUSTOMER/CONTRACTOR | Energy Transfer Company / Michel's Pipeline |
| CUSTOMER LINE ID | D.A.P.L. / Lake Oahe HDD / APE - A80000000002 |
| JOB NUMBER | 516-412F |
| LAUNCH STATION | Lake Oahe West |
| RECEIVE STATION | Lake Oahe East - M.L.V. 380 |
| | Bismarck, ND |
| PIPELINE LENGTH | 1.62 mi |

| | |
|---|---|
| PIPE DIAMETER | 30.000 in |
| WALL THICKNESS | .625 in |
| PRODUCT | Air-7750 CFM / 100 PSI |
| RUN DATE | 24-Mar-2017 |
| FIELD ENGINEER | Jeff Walker |
| CHART ANALYST | Jeff Walker |
| REPORT DATE | 03/26/2017 |
| Issue # | 1 |

| Event ID | Event Description | Comment | Enduro Station | Projected Station | Customer Station | Tool Spd | W.T. | Clse k On | Dent Geo. | Est. Dent Depth After Excavation | Est. Dent %OD After Excavation | Dent Len. | Total Dent Wid | Total %OD | Total Len. | MCS D | To Grt Weld | Cut Joint Len | To Girth Weld | Len. Grth Joint | Latitude | Longitude | Elevation |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| F 1 | Begin Line Pipe | D.A.P.L - Lake Oahe HDD<br>Lake Oahe West - Lake Oahe East<br>Bismarck, ND | 0.00 | 0+00 | | 0.3 | 0.429 | | | | | | | | | 29.00 | 0.0 | 13.9 | 13.9 | 74.3 | | | |
| W 1 | Wall change to .429 for 329.32 feet - Enduro predicted | Begin 0.429 w.t. | 0.00 | 0+00 | | 0.3 | 0.429 | | | | | | | | | | 0.0 | 13.9 | 13.9 | 74.3 | | | |
| W 2 | Wall change from .429 to .625 for 7464.49 feet - Enduro predicted | | 329.32 | 3+29 | | 2.0 | 0.625 | | | | | | | | | | 0.0 | 29.8 | 29.8 | 70.6 | | | |
| W 3 | Wall change from .625 to .429 for 239.37 feet - Enduro predicted | | 7793.81 | 77+94 | | 3.0 | 0.429 | | | | | | | | | | 0.0 | 33.0 | 33.0 | 22.8 | | | |
| W 4 | Wall change from .429 to .625 for 46778.35 feet - Enduro predicted | | 8033.18 | 80+33 | | 1.0 | 0.625 | | | | | | | | | | 0.0 | 6.3 | 6.3 | 12.4 | | | |
| B 1 | Bend 45.0 deg. 3.0 Ds. Up Turn MCISD: 27.68 | Before u/s w.: 1.2%ID.367\MCISD<br>28.4 ID:29.1 mph:5.7 CIА:0 to 6<br>After u/s w.: 0.9%ID.271\MCISD<br>28.5 ID:28.8 mph:2.2 CIА:6 to 11<br>MPH coming into Bend =10Ft: 1.1<br>Leaving Bend =10Ft: 0.7<br>Min MPH over range: 0.1 at index<br>2765534 | 8036.67 | 80+36 | | 0.8 | 0.625 | | | | | | | | | 27.68 | 2.5 | 6.3 | 3.8 | 12.4 | | | |
| B 2 | Bend 45.0 deg. 3.0 Ds. Down Turn MCISD: 28.11 | Before u/s w.: 1.2%ID.367\MCISD<br>28.4 ID:28.9 mph:2.2 CIА:0 to 6<br>After u/s w.: 0.6%ID.171\MCISD<br>28.5 ID:28.6 mph:2.2 CIА:6 to 11<br>MPH coming into Bend =10Ft: 3.7<br>Leaving Bend =10Ft: 4.5<br>Min MPH over range: 0.4 at index<br>2787182 | 8054.22 | 80+54 | | 4.2 | 0.625 | | | | | | | | | 28.11 | 2.4 | 5.6 | 3.2 | 6.1 | | | |
| F 2 | End Line Pipe | D.A.P.L - Lake Oahe HDD<br>Lake Oahe West - Lake Oahe East<br>M.L.V. 380<br>Bismarck, ND | 8065.63 | 80+66 | | 8.6 | 0.625 | | | | | | | | | 28.42 | 3.3 | 6.3 | 3.0 | 5.6 | | | |
| B 3 | Bend 45.0 deg. 3.0 Ds. Down Turn MCISD: 27.90 | Before u/s w.: 1.7%ID.497\MCISD<br>28.3 ID:28.8 mph:3.6 CIА:1 to 7<br>After u/s w.: 0.8%ID.226\MCISD<br>28.5 ID:28.8 mph:4.8 CIА:6 to 6<br>MPH coming into Bend =10Ft: 4.3<br>Leaving Bend =10Ft: 2.2 at index<br>2769781 | 8076.92 | 80+77 | | 6.7 | 0.625 | | | | | | | | | 27.90 | 2.6 | 5.7 | 3.2 | 6.8 | | | |
| B 4 | Bend 45.0 deg. 3.0 Ds. Up Turn MCISD: 27.91 | Before u/s w.: 1.6%ID.462\MCISD<br>28.3 ID:28.8 mph:4.1 CIА:0 to 6<br>After u/s w.: 0.8%ID.145\MCISD<br>28.5 ID:29.1 mph:5.3 CIА:6 to 11<br>MPH coming into Bend =10Ft: 5.9<br>Leaving Bend =10Ft: 6.1 at index<br>2761235 | 8088.06 | 80+88 | | 4.6 | 0.625 | | | | | | | | | 27.91 | 2.1 | 6.1 | 4.0 | 6.4 | | | |
| F 3 | End Line Pipe | D.A.P.L - Lake Oahe HDD<br>Lake Oahe West - Lake Oahe East<br>Bismarck, ND | 8926.32 | 89+26 | | 0.3 | 0.625 | | | | | | | | | 28.50 | 0.0 | 39.1 | 39.1 | 4.7 | | | |



**High-Low Velocity vs Station**

B16-613F,  D.A.P.L. / Lake Oahe HDD / AFE - 480000000002   Mar 24, 2017

# Dakota Access Pipeline

# Lake Oahe HDD Crossing

# Threat Assessment

**Prepared for Dakota Access Pipeline System by Dynamic Risk Assessment Systems**

| Threat Assessed | Threat Attributes | Result of Threat Assessment | Assessments/Monitoring Completed | Monitoring / Mitigation Planned |
|---|---|---|---|---|
| External Corrosion | Pipeline HDD Casing | No permanent casing installed. | | N / A |
| External Corrosion | Stray Current/Interference | Completed AC survey and completed mitigation measures to address any concern related to interference. | An AC interference and mitigation study has been conducted to assess AC fault and steady state conditions and associated risks. Based on the outcomes of the study, installation of zinc ribbon wires will effectively mitigate the AC interference. Implementation if this mitigation addresses the potential risk to CP effectiveness and safety. | Continuous monitoring |
| External Corrosion | Pipeline In-Line Inspection  (ILI) | Reassessment plan represents industry standard practice for hazardous liquids pipelines. | | MFL metal loss ILI planned within first 36 months of operation |
| External Corrosion | Cathodic Protection (CP) / Interference survey | The Northern Border pipeline was identified as a possible source of cathodic protection interference in the action area. | A CP interference and mitigation study has been conducted to assess existing CP conditions and associated risks. Based on the outcomes of the study, installation of deep well anode beds effectively mitigate the CP interference. | Continuous monitoring |

| Threat Assessed | Threat Attributes | Result of Threat Assessment | Assessments/Monitoring Completed | Monitoring / Mitigation Planned |
|---|---|---|---|---|
| Internal Corrosion | Product Stream Characteristics | A CEPA study, [1], indicates that under normal operations, oil pipelines with low BS&W (0.25-0.5%) are unlikely to have free water present in them, and with a sufficiently high flow velocity inside the pipe any free water caused by operation upsets will be entrained in the oil by turbulent flow, and the pipe wall will continue to operate in an oil-wet condition. | At low BS&W levels in conjunction with turbulent flow, water will remain entrained in oil and therefore internal corrosion is unlikely to occur. | Continuous SCADA monitoring and control of pipeline operating and flow conditions. |
| Internal Corrosion | Product Stream Flow Characteristics | Turbulent flow controls solids deposition and entrains what little water exists in the product stream. The product stream, in conjunction with the operating and flow characteristics will render the pipe wall in an oil-wet (i.e. non-corrosive) condition, although monitoring and the implementation of appropriate mitigation strategies, where warranted, is required. | | The sediments and water resulted from the cleaning will be monitored and analyzed, and the corrosion inhibition program will be adjusted accordingly. |

| Threat Assessed | Threat Attributes | Result of Threat Assessment | Assessments/Monitoring Completed | Monitoring / Mitigation Planned |
|---|---|---|---|---|
| Internal Corrosion | Corrosion Prevention / Detection Devices | The use of corrosion detection and prevention devices reduces the likelihood of the undetected internal corrosion in the line. | | MFL metal loss ILI planned within first 36 months of operation |
| Internal Corrosion | Receipt Points | Receipt point monitoring and control ensures that product is maintained within its quality specification. | | Crude oil samples are obtained and analyzed at all receipt points on the pipeline. |
| Internal Corrosion | Chemical Inhibition and Cleaning Pig Programs | Appropriate mitigation strategies for chemical inhibition and cleaning pig programs are implemented to eliminate internal corrosion. | Water traps, located at all receipt points and launcher / receiver sites on the pipeline, have been incorporated into the pipeline design to collect any water and sediments in the flow. Regular analysis of the collected fluid will be conducted to adjust the inhibition program as required. | Adjustment of inhibition program to include Injection of microbial inhibitor chemicals at receipt points and launcher / receiver sites as necessary. |
| Internal Corrosion | Potential source of Analogue ILI Datasets | As the threat of internal corrosion is expected to be low, the lack of an appropriate ILI data set is not a concern at this stage of the assessment. | If further quantitative analysis of failure frequencies is required, it is necessary to identify a suitable data set. | Maintain monitoring program and integrity management plans. |

| Threat Assessed | Threat Attributes | Result of Threat Assessment | Assessments/Monitoring Completed | Monitoring / Mitigation Planned |
|---|---|---|---|---|
| Stress Corrosion Cracking | SCC Susceptibility | Pipelines operating at stress levels greater than 60% SMYS can be considered susceptible to SCC if other factors are present including a susceptible coating system, a susceptible line-pipe material, proximity to pump stations, high operating temperatures (specific to high-pH SCC), and age of the pipeline greater than 10 years. | The use of high performance coating systems, such as those used for DAPL, has proven to be an effective means of preventing SCC. To date, no operating company has ever experienced a failure that was attributed to SCC in a pipeline that was coated with these coating systems. | Maintain integrity management plans. |
| Manufacturing Defects | Pipeline manufacturing procedure specification | The manufacturing procedure specification, together with the inspection and test plan constitute key quality assurance documents that form the basis of sound pipe procurement practices. | Rigorous inspection and test plans conducted at pipe and coating mills. | All defects rejected at mills. |
| Manufacturing Defects | Manufacturer | The vendor vetting and quality assurance procedures implemented are considered appropriate for the assurance of quality line pipe. | Pre-production meetings and routine QA / QC monitoring at pipe and coating mills. | |

| Threat Assessed | Threat Attributes | Result of Threat Assessment | Assessments/Monitoring Completed | Monitoring / Mitigation Planned |
|---|---|---|---|---|
| Manufacturing Defects | Manufacturing Process | While some vintage manufacturing processes are prone to manufacturing defects, modern line pipe manufacturing processes are not commonly associated with characteristic chronic manufacturing defects.  Well-developed Manufacturing Procedure Specifications and Inspection Test Plans are instrumental in maintaining quality assurance. | Rigorous inspection and test plans conducted at pipe and coating mills. | All defects rejected at mills. |
| Manufacturing Defects | Third Party Auditors | Effective deployment of third party audits and inspection to maintain a quality focus during line pipe manufacture, while alerting DAPL to potential quality problems during manufacture and prior to delivery. | Rigorous inspection and test plans conducted at pipe and coating mills. | All defects rejected at mills. |
| Manufacturing Defects | Pressure cycling | Fluctuating operating pressures that are typical of liquids pipelines, can activate pre-existing manufacturing defects. | | Continuous SCADA monitoring and control of pipeline operating and flow conditions. |

| Threat Assessed | Threat Attributes | Result of Threat Assessment | Assessments/Monitoring Completed | Monitoring / Mitigation Planned |
|---|---|---|---|---|
| Manufacturing Defects | Hydrostatic Test | The test pressures represent significant safety factors, ensuring that any manufacturing defects left after the hydrostatic test are not operating at stress levels where they would be considered to be structurally significant. | At mill - Hydrostatic test to 100% SMYS conducted. Upon installation - Hydrostatic test to at least 125% MOP conducted. | Upon installation and prior to acceptance - DAPL requires certification of hydro-tests and ILI Caliper surveys. |
| Manufacturing Defects | Use of Loading / Transportation Specification | The loading and transportation will be carried out in accordance with the specifications in place. This reduces the likelihood of damage to the pipes during transportation and it minimizes the frequency of pipeline failure. | Rigorous inspection and test plans conducted at pipe / coating mills and receipt at pipe yards and delivery to the pipeline right-of-way (ROW). | All transportation of pipe and materials requires inspection report and bills-of-lading. |

| Threat Assessed | Threat Attributes | Result of Threat Assessment | Assessments/Monitoring Completed | Monitoring / Mitigation Planned |
|---|---|---|---|---|
| Construction Defects | Construction Practices | Welding and non-destructive inspection procedures are representative of industry best practices, which maximize the use of low-hydrogen welding processes, and state-of-the-art inspection systems. Construction / transportation specifications are comprehensive to minimize potential for construction-related damage. Such damage can occur, particularly on pipelines that have large-diameter-to-wall thickness ratios (typically > 100:1, which are beyond the D/t ratios used on the DAPL project). Post-construction in-line inspection is an effective measure of identifying such damage to enable repairs to be made prior to pipeline operation. The minimum hydrostatic test pressure used for DAPL is minimum of 1,800 psi - 1.25 times maximum operating pressure | 100% inspection of field welds using radiographic inspection and approved by third party auditors (Level 3 - CWI) was conducted. Hydrostatic test to at least 1,800 psi - 125% MOP conducted on entire pipeline segments including valves, launchers, receivers and equipment. Inspection with a deformation tool / caliper survey (ILI) after installation to ensure that the pipeline is free of dents, buckles, and excessive out-of-round conditions was conducted. | All defects repaired per PHMSA approved procedures. |

| Threat Assessed | Threat Attributes | Result of Threat Assessment | Assessments/Monitoring Completed | Monitoring / Mitigation Planned |
|---|---|---|---|---|
| | | (MOP). The pipeline may be tested to higher pressure values where specified, dependent upon elevation. | | |
| Construction Defects | Operating Pressure | Maximum operation pressure (MOP) of DAPL pipeline is 1,440 psi. | Continuous SCADA monitoring and control of pipeline operating and flow conditions. | Pipeline Pump Station high-pressure-shutdown set point at 1,400 psi. |
| Third Party Damage | Adjacent land use | The damage prevention measures employed on DAPL are representative of industry best-practice. Additionally, the HDD sections are located in remote area, and the depth | DOC study completed. | Maintain monitoring program and integrity management plans. |
| Third Party Damage | One-call system availability and promotion | | | |
| Third Party Damage | Signage placement | | | |
| Third Party Damage | Use of buried marker tape | | | |
| Third Party Damage | Regulation Regarding requirements to | | | |

| Threat Assessed | Threat Attributes | Result of Threat Assessment | Assessments/Monitoring Completed | Monitoring / Mitigation Planned |
|---|---|---|---|---|
| Third Party Damage | notify one-call prior to excavation | of cover at these locations significantly reduce the possibility of exposure to Third Part Damage (TPD). Consequently, the likelihood of TPD is very low. | | |
| Third Party Damage | Response time for locate requests | | | |
| Third Party Damage | Patrol frequency | | | |
| Third Party Damage | Marking and locating methods | | | |
| Third Party Damage | Depth of cover | | | |
| Weather Related or Outside Force | Presence of Geotechnical / Hydro-technical Hazards | Slope Stability Study: A slope stability study was conducted at Lake Oahe HDD location. The report indicates that potential for land sliding as the result of the proposed activities is low [4]. Scour Study: Study results show that the maximum scour at the project site is estimated to be 21 ft. The proposed HDD crossing has a minimum depth of over 90 ft. below the current channel. Therefore, the risk of pipeline exposure is not significant and | Geotechnical / Hydro-technical studies were completed for the proposed HDD crossings at Lake Oahe. In addition to Geotechnical reports, separate studies were completed on the potential of scour and slope stability. | |

| Threat Assessed | Threat Attributes | Result of Threat Assessment | Assessments/Monitoring Completed | Monitoring / Mitigation Planned |
|---|---|---|---|---|
| | | does not warrant further analysis [5]. | | |
| Other Threats | Concomitant Failures | Given the proposed separation distance between DAPL and Northern Border pipeline, the threat of concomitant failure is identified as a potential threat to DAPL.  However, with the depth of the Lake Oahe crossing being 90', it is NOT LIKELY that the DAPL pipeline could be exposed in the blast crater generated by the catastrophic failure of the adjacent natural gas pipeline. | | DAPL maintains continuous communication and joint-risk assessment evaluations with Northern Border operations personnel. |
| Other Threats | Access Restrictions | No access restrictions were identified in the action area. | | |
| Other Threats | Forest fires | No concerns identified in the action area. | | |

ATTACHMENT 4

| From: | Siguaw, Tom <Tom.Siguaw@energytransfer.com> |
|---|---|
| Sent: | Monday, February 19, 2018 3:53 PM |
| To: | Carpenter, David (WG Mustang) (david.carpenter@woodplc.com) |
| Cc: | Siguaw, Tom |
| Subject: | DAPL - USACE - Remand Letter ****RFQ - THIRD PARTY INDEPENDENT EXPERT ENGINEERING COMPANY REVIEW**** ACTION REQUIRED**** |
| Attachments: | 2017.12.04 (303) Order on Remedy During Remand.pdf; 2017.12.04 (304) Mem Op on Remedy During Remand.pdf; Exhibit D_Easement Conditions.pdf; Lake Oahe HDD_AS-BUILT OVERLAY.PDF; Lake Oahe - Alignment Sheets.pdf; DAPL_Post Construction_Easement Conditions_Threat Assess.docx |
| Importance: | High |

**To:**   **Wood Group**
        **David Carpenter:  713-907-6434**
        David.carpenter@woodplc.com
        17325 Park Row
        Houston, TX 77084

Dakota Access Pipeline (DAPL) is soliciting a Proposal for a third-party independent expert engineering company to review Dakota Access Pipeline - Lake Oahe, ND easement special conditions imposed by the US Army Corps of Engineers, and to assess compliance with all such conditions as well as other integrity threats between the valve sites closest to each shore of Lake Oahe, ND as ordered.

See the following attachments to this email:
        **Judicial Order on Remedy During Remand & Memorandum Opinion**
        **USACE Easement Special Conditions (Exhibit D)**
        **DAPL As-Built Overlay (Lake Oahe HDD Plan and Profile)**
        **DAPL As-Built Alignment Sheet (Lake Oahe Crossing Valve-to-Valve)**
         **DAPL Post Construction Easement Conditions and Threat Assessment**

DAPL will make the confidential, relevant information available at its offices (1300 Main Houston, TX 77002) and at Wood Group's offices (17325 Park Row Houston, TX 77084. There are multiple files at both locations totaling ~ 4,000 pages.

Please include with your proposal the following items:
        List of personnel to be used for this Work (Review / Audit) with their respective resumes and billing rates.

Required start date so as to complete this Work (Review / Audit) and furnish DAPL a written Final Report by **March 23, 2018**.

Estimated total cost for this Work (Review / Audit).

**Submit Proposal in writing and  via email to the following --- Due 9:00 am on Thursday, February 22, 2018:**

Tom Siguaw

Energy Transfer Partners

1300 Main

Ste. 14.036

Houston, TX  77002

Cell Phone:  713-249-3425

Email:  tom.siguaw@energytransfer.com

You were recommended by Chuck Frey

Thanks

Tom Siguaw

Sr. Director

Energy Transfer Partners

(o)  713-989-2841

(c)  713-249-3425

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

STANDING ROCK SIOUX TRIBE,

    Plaintiff,

    and

CHEYENNE RIVER SIOUX TRIBE,

    Plaintiff-Intervenor,

      v.

U.S. ARMY CORPS OF ENGINEERS,

    Defendant,

    and

DAKOTA ACCESS, LLC,

    Defendant-Intervenor and Cross-Claimant.

Civil Action No. 16-1534 (JEB) (and Consolidated Case Nos. 16-1769 and 16-267)

---

## ORDER

For the reasons set forth in the accompanying Memorandum Opinion, the Court ORDERS that:

1. The parties shall coordinate to finalize an oil-spill response plan affecting Tribal resources and lands at Lake Oahe, which they shall submit to the Court by April 1, 2018;

2. Dakota Access, with input from the Tribes, shall select a third-party independent expert engineering company to review easement conditions and regulations, and to assess

1

compliance with all such conditions as well as other integrity threats.  The results of the

independent audit shall be filed with the Court by April 1, 2018; and

3. Dakota Access shall submit to the Court bi-monthly reports including the following

information with respect to the segment of the pipeline crossing Lake Oahe (*i.e.*, between the

valves closest to each shore of Lake Oahe):

a. Inline-inspection run results or direct-assessment results performed on the pipeline

during the reporting period;

b. The results of all internal-corrosion management programs and any actions taken in

response to findings of internal corrosion;

c. Any new encroachment on the right-of-way during the reporting period;

d. Any new integrity threats identified during the reporting period;

e. Any reportable incidents that occurred during the reporting period;

f. Any leaks or ruptures that occurred during the reporting period;

g. A list of all repairs on the segment made during the reporting period;

h. Ongoing damage-prevention initiatives on the pipeline and an evaluation of their

success or failure;

i. Any changes in procedures used to assess and monitor the segment; and

j. Any company mergers, acquisitions, transfers of assets, or other events affecting the

management of the segment.

Dakota Access shall file the first such report on or before December 31, 2017, and shall file

subsequent reports every 60 days thereafter until remand is complete.

SO ORDERED.

/s/ James E. Boasberg
JAMES E. BOASBERG

2

United States District Judge

Date:  December 4, 2017

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STANDING ROCK SIOUX TRIBE,** | |
| **Plaintiff,** | |
| **and** | |
| **CHEYENNE RIVER SIOUX TRIBE,** | |
| **Plaintiff-Intervenor,** | |
| **v.** | **Civil Action No. 16-1534 (JEB) (and Consolidated Case Nos. 16-1769 and 16-267)** |
| **U.S. ARMY CORPS OF ENGINEERS,** | |
| **Defendant,** | |
| **and** | |
| **DAKOTA ACCESS, LLC,** | |
| **Defendant-Intervenor and Cross-Claimant.** | |

## <u>MEMORANDUM OPINION</u>

Two months ago, this Court determined that oil could continue to flow through the Dakota Access Pipeline while the U.S. Army Corps of Engineers conducted further environmental analyses.  See Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers (Standing Rock IV), 2017 WL 4564714 (D.D.C. Oct. 11, 2017).  Although the prior Opinion declined to vacate the agency's easement approval, it left open the question of whether to impose any conditions during the remand period.  Plaintiffs, the Standing Rock and Cheyenne River

1

Sioux Tribes, have asked for a series of interim measures to monitor the ongoing operation of the pipeline. Defendants oppose such conditions, arguing that the Tribes have not demonstrated a need for injunctive relief and that the proposed measures are unnecessary during remand.

As a threshold matter, the Court concludes that the interim conditions are not a request for injunctive relief; they are instead a means by which the Court can ensure that it receives up-to-date and necessary information about the operation of the pipeline and the facts on the ground. It next determines that the requested measures, each of which is tailored to keeping the Court abreast of the conditions at Lake Oahe pending further Corps analysis, are reasonable and appropriate.

## I.      Background

As explained in prior Opinions, the parties here are engaged in a protracted dispute over the placement of the Dakota Access Pipeline (DAPL) under Lake Oahe in North Dakota. See, e.g., Standing Rock IV, 2017 WL 4564714, at *1-3. The Lake is a federally regulated body of water that borders the Tribes' reservations, and it is considered sacred within their spiritual practices. Id.

In their most recent challenge to the project, Plaintiffs alleged that the Corps had erred in its analysis of the environmental impact of the pipeline crossing, in violation of the National Environmental Policy Act. See Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers (Standing Rock III), 255 F. Supp. 3d 101 (D.D.C. June 14, 2017). The Court agreed in part and remanded the case to the Corps for further analysis. Id. at 140. In a subsequent Opinion, issued on October 11, 2017, the Court examined whether the NEPA violations warranted vacatur of the agency's decisions – and thus a stoppage in the oil flow – during remand. See Standing Rock IV, 2017 WL 4564714. Finding a "significant likelihood" that the Corps could substantiate its

2

prior conclusions, the Court answered that question in the negative. Id. at *8. In denying such relief, however, it left open the possibility of imposing other, interim conditions during remand. Id. at *12. It ordered further briefing on the issue from both sides, which is now complete.

## II.  Analysis

### A.  Authority to Issue Conditions

The Court turns first to the matter of its authority to impose conditions during remand. As the Tribes correctly note, this question has already been decided by the prior Opinion, in which the Court found that it possessed jurisdiction to order interim remedies other than vacatur. Id. at *12 (rejecting Defendants' argument that Court lacks jurisdiction to enter interim relief). Although the Court therefore considers this matter largely settled, Defendants nonetheless continue to contend that the proposed conditions are beyond the scope of the Court's power. This is not so.

The fundamental flaw in Defendants' argument is in how they characterize the relief Plaintiffs seek. Defendants assert that the Tribes are, in effect, asking for an injunction. According to the Corps, "Plaintiffs' request for 'alternative measures' is . . . nothing more than a request for additional injunctive relief." ECF 287 (Corps Brief) at 1-2. Asserting that the Tribes fail to meet the test for such a remedy, the Corps contends that Plaintiffs are not entitled to interim relief. Id.

Yet the conditions sought do not constitute injunctive relief. They do not affect Defendants' ongoing environmental analysis, nor do they constrain the outcome of the remand process. Rather, they are largely a means of providing the Court with relevant information during this period. Each of the interim conditions is tailored to address the Court's ongoing concern with the risk of a spill at Lake Oahe – a hazard that the previous Opinion described as "at the center of this Court's prior" decision to remand the matter to the Corps. See Standing

3

Rock IV, 2017 WL 4564714, at *10. Such information-gathering measures are within the

Court's managerial discretion over this pending case. See also West Virginia v. EPA, Order, No.

15-1363 (D.C. Cir. 2017) (ordering EPA to file status reports at 30-day intervals while case held

in abeyance).

Because the interim conditions here do not affect the remand process, Defendants'

reliance on Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139 (2010), is misplaced. The

Court there held that the district court had exceeded its authority when, after vacating the Animal

and Plant Health Inspection Service's decision to completely deregulate a genetically engineered

crop, it additionally entered an injunction preventing the agency from partially deregulating the

crop during the remand period. Id. at 156, 158-59. Such an injunction, the Court concluded,

interfered with the agency's authority "to decide whether and to what extent it would pursue a

partial deregulation" and thus impermissibly "pre-empt[ed] the very procedure by which the

agency could determine . . . that a limited deregulation would not pose any appreciable risk of

environmental harm." Id. at 159, 164. The holding in Monsanto thus resolved an issue

unconnected with the facts of this case – whether a district court may impose constraints on an

agency's authority and decisionmaking during remand. The interim measures proposed here do

not have any such effect.

Other cases addressing the scope of a court's supervision during remand are similarly

inapposite. These decisions all concern the imposition of injunctive relief relating to the relevant

agency's analysis or discretion on remand. See Bennett v. Donovan, 703 F.3d 582, 588-89 (D.C.

Cir. 2013) (noting that court would not direct agency on remand "to take [a] precise series of

steps" with respect to plaintiffs' mortgage, including "accept[ing] assignment of the mortgage,

pay[ing] off the balance . . . and then declin[ing] to foreclose"); Palisades Gen. Hosp. Inc. v.

4

Leavitt, 426 F.3d 400, 403 (D.C. Cir. 2005) (stating that district court lacked authority to "order

specific relief" after vacating agency decision); Berge v. United States, 949 F. Supp. 2d 36, 47

(D.D.C. 2013) (noting no district court jurisdiction to "order specific relief that deprives an

agency of the ability to reconsider the matter in light of the Court's decision").

Yet here, as explained in more detail below, the conditions are not constraints on the

Corps' analysis or a grant of "specific relief" to the Tribes. They do not concern the scope of the

remand, nor do they affect the agency's authority over the pipeline. They are instead means by

which the Court can gather information about the risks posed by the pipeline pending remand

and can ensure that the status quo is preserved for both sides. As discussed in the prior Opinion,

such an interim remedy clearly falls within the Court's general equitable powers.

Recent events have made clear, moreover, that there is a pressing need for such ongoing

monitoring. Earlier this month, the Keystone Pipeline leaked 210,000 gallons of oil in Marshall

County, South Dakota. See Mitch Smith and Julie Bosman, Keystone Pipeline Leaks 210,000

Gallons of Oil in South Dakota, N.Y. TIMES (Nov. 16, 2017), https://www.nytimes.com/2017/

11/16 /us/keystone-pipeline-leaks-south-dakota.html. The spill occurred near the boundaries of

the Lake Traverse Reservation, home of the Sisseton Wahpeton Oyate Tribe, thus highlighting

the potential impact of pipeline incidents on tribal lands. Id. Although the Court is not

suggesting that a similar leak is imminent at Lake Oahe, the fact remains that there is an inherent

risk with any pipeline. As stated in the prior Opinion, "[T]here is no doubt that allowing oil to

flow through the pipeline during remand risks the potentially disruptive effect about which the

Tribes are most concerned – a spill under Lake Oahe." Standing Rock IV, 2017 WL 4564714, at

*10. Such incidents, the Court noted, "have the potential to wreak havoc on nearby communities

and ecosystems." Id. at *11. In light of these concerns, it is in the Court's interests to stay

abreast of any relevant changes during the remand period and to order the parties to provide up-to-date information about the pipeline's operation. Such reporting will allow the Court to ensure that remand without vacatur remains the appropriate remedy and to monitor any factual developments in this ongoing case.

The Corps is thus incorrect that the interim conditions are "unwarranted" and "unlikely to address Plaintiffs' stated concerns with the operation of the pipeline." Corps Brief at 4. Indeed, Defendants' assertion that the Tribes' "rights, resources, and land are fully protected by the existing easement" presupposes that the status quo will be maintained during the remand process. Id. at 5. Yet without measures to ensure that Defendants share information about ongoing operations, there is no clear way for the Court, the parties, or the public to evaluate the efficacy of the extant safety measures.

B.     Interim Conditions

Plaintiffs request three specific conditions during the remand period: (1) the finalization and implementation of oil-spill response plans at Lake Oahe; (2) completion of a third-party compliance audit; and (3) public reporting of information regarding pipeline operations. See ECF 272 (Tribes' Brief Regarding Remedy) at 36-39. The Court agrees that each of these measures is appropriately tailored to monitoring the status of the pipeline during remand.

As to the first, the Corps contends that the Tribes and Dakota Access "either have resolved, or are in the process of resolving, the Tribe's request" and that the relief sought is therefore not "necessary because it appears that the parties have already engaged in the requested coordination." Corps Brief at 6. Dakota Access similarly states that it is "already coordinating" with the Tribes' emergency-management personnel. See ECF 288 (Dakota Access Brief) at 4. The Court, of course, encourages the parties to collaborate in efforts to resolve any pipeline-

6

related dispute.  Yet, in light of the case's history of contested versions of discussions between Plaintiffs and Defendants, it will not rest on such representations.  Instead, the Court will order that the Corps, Dakota Access, and the Tribes coordinate to finalize spill response plans at Lake Oahe, and that the parties file such plans with the Court by April 1, 2018.  Such a condition is directly related to the risk of a spill during remand, and it is directed to keeping the Court informed as to all parties' efforts to preserve the status quo pending the Corps' further environmental analysis.

The Court will additionally impose the second requested condition – namely, the completion of a third-party compliance audit.  In contesting this measure, Dakota Access relies heavily on the ongoing authority of the Pipeline and Hazardous Materials Safety Administration to ensure DAPL's compliance with federal laws and regulations.  See DA Brief at 5-6.  The Tribes note, however, that PHMSA itself recognized the potential benefit of having an independent, third-party review.  See Tribes Brief at 10.  Defendants' assertion that such a process would be duplicative of PHMSA oversight is therefore unavailing.  As to the Tribes' involvement in the process, the Corps asserts that Plaintiffs are asking for their "own experts [to] actually participate in the audit," Corps Brief at 6, and Dakota Access contends that the Tribes are seeking to "insert[]" themselves into the process.  See DA Brief at 6.  Yet the Tribes in fact request only that they be permitted to participate in the selection of the auditor and have the opportunity to share their relevant data during the audit process.  See Tribes Brief at 10.  This seems reasonable.  The Court will therefore order that Dakota Access select an independent, third-party auditor in consultation with the Tribes.  Because these conditions are imposed in order to keep the Court informed of the circumstances at Lake Oahe pending remand, it will require that the results of this audit process be filed with the Court by April 1, 2018.

Finally, the Court will require that Dakota Access file bi-monthly reports regarding the status of the pipeline during remand, beginning at the end of this month.  With respect to this condition, the Corps contends that such reporting is "unnecessary" and "unlikely to lead to any meaningful differences in the safety of the pipeline."  Corps Brief at 7.  Yet it never explains how additional information and transparency during the remand process would not enhance public safety and the Court's understanding of the facts on the ground.  In light of Dakota Access's agreement to "voluntarily" report on many of the issues raised by the Tribes, there is similarly no concern that this condition will be unduly burdensome for the company.  See DA Brief at 7.  The Court will therefore order that Dakota Access file bi-monthly reports of any repairs or incidents occurring at the segment of the pipeline crossing Lake Oahe.

## III.    Conclusion

The Court, the parties, and the public all have an interest in ensuring that the status quo at Lake Oahe is preserved pending remand.  In order to obtain the information necessary to monitor the conditions in North Dakota, and to mitigate the risk of any potential spill, the Court will thus impose a series of interim measures.  A separate Order consistent with this Opinion will be issued this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  December 4, 2017

| | |
|---|---|
| 11. | The Grantee shall provide as-built drawings for the crossing at Lake Oahe to the Oahe OPM within 6 months of the completion of pipeline construction. |
| 12. | All records demonstrating compliance with these easement conditions herein must be maintained for the duration of the easement. |
| | **Pipeline Safety Conditions (Construction)** |
| 13. | **Pipeline Design Factor – Pipelines:** Pipe installed must comply with a design factor of 0.50 or lower in the Lake Oahe crossing and "could affect" HCAs. |
| 14. | **Pipe Girth Weld – Nondestructive Tests:** Grantee must nondestructively test all girth welds in accordance with 49 CFR §§ 195.228, 195.230 and 195.234. |
| 15. | **Pressure Test Level:** The pre-in-service hydrostatic test for mainline pipe must be to a pressure producing a hoop stress of either: a minimum 100% specified minimum yield strength (SMYS) or a minimum of 1.25 times maximum operating pressure (MOP) for eight (8) continuous hours for pipeline segments using a design factor of 0.50 or less. |
| 16. | **Assessment of Test Failures:** Any pipe failure occurring during the pre-in-service hydrostatic test must undergo a root cause failure analysis to include a metallurgical examination of the failed pipe. The results of this examination must preclude a systemic pipeline material issue and the results must be reported to the Operations Project Manager at the Oahe Project Office (Oahe OPM) within 60 days of the failure. |
| 17. | **Coatings for Trenchless Installation:** Coatings used for directional bore, slick bore and other trenchless installation methods must be capable of resisting abrasion and other damage that may occur due to rocks and other obstructions encountered in this installation technique. |
| 18. | **Pipe Coating:** Pipe coatings must be non-shielding to cathodic protection (CP). Coatings such as tape and shrink sleeves would be shielding coatings to CP that protects the pipe from external corrosion. The application of a corrosion resistant coating to the steel pipe must be performed according to a coating application quality control program. The program must address pipe surface cleanliness standards, blast cleaning, application temperature control, adhesion, cathodic disbondment, moisture permeation, bending, minimum coating thickness, coating imperfections and coating repair. |
| 19. | **Field Coating:** Field joint coatings must be non-shielding to CP. Grantee must implement field girth weld joint coating application specification and quality standards to ensure pipe surface cleanliness, application temperature control, adhesion quality, cathodic disbondment, moisture permeation, bending, minimum coating thickness, holiday detection and repair quality. Field coating applicators must use valid qualified coating procedures and be trained to use these procedures. |
| 20. | **Construction Coating Survey after Installation:** Promptly after a ditch for the pipeline is backfilled, but not later than three months after placing the pipeline in service, the operator must perform an assessment to ensure integrity of the coating using direct current voltage gradient (DCVG) or alternating current voltage gradient (ACVG). The operator must repair any coating damage classified as moderate or severe (voltage drop greater than 35% for DCVG or 50 dBμV for ACVG) in accordance with section 4 and Appendix A of NACE SP0502-2008 (or latest edition referenced in 49 CFR § 195.3) within six months of the assessment. |
| 21. | **Mainline Valve(s) with Remote Control or Automatic Shutdown:** |

**EXHIBIT "D"**
DACW45-2-16-8059

a.   Mainline valves with remote control or automatic shutdown for water crossings and reservoirs must be installed on either side of the crossing and additional mainline valves(s) installed either upstream, downstream, or both to protect the water body from the "could affect" HCA on either side of the water crossing. Mainline valves must either be located outside of the flood plain or have valve actuators and other control equipment installed so as to not be impacted by flood conditions.

b.   Mainline valves with remote control or automatic shutdown must contain transit inhibit switches that prevent the valves from shutting at a rate (and in conjunction with pumps being shutdown) so that no pressure surges can occur, or other damage caused by unintended valve closures or too fast of a closure.

c.   Mainline valves must be remotely controlled and actuated or automatic shutdown, and the Supervisory Control and Data Acquisition (SCADA) system must be capable of closing the valve and monitoring the valve position, upstream pressure and downstream pressure so as to minimize the response time in the case of a failure.   Remote power backup is required to ensure communications are maintained during inclement weather. Mainline valves must be capable of closure at all times.  If it is impracticable to install a remote controlled valve, Grantee must submit a valve design and installation plan to the appropriate Oahe OPM to confirm the alternative approach provides an equivalent level of safety.

d.   Mainline valves in the pipeline segment must have actuation capability (i.e., remote control shut-off, automatic shut-off, manual shut-off where personnel are in proximity, or alternative equivalent technology) to ensure pipeline ruptures are promptly mitigated based upon maximum valve shut-off times, location, and spacing specified.

e.   For each mainline valve that is a remote-control shut-off or automatic shut-off valve, the operator must conduct a point-to-point verification between SCADA displays and the mainline valve, sensors, and communications equipment in accordance with 49 CFR § 195.446(c) and (e), or an equivalent verification.

| 22. | **Supervisory Control and Data Acquisition (SCADA) System:**  Grantee must develop, install, operate, and maintain a SCADA system to provide remote monitoring and control of the entire pipeline segment in accordance with 49 CFR Part 195 requirements. |
|---|---|
| 23. | **Computational Pipeline Monitoring (CPM) Leak Detection:** The pipeline segment must have a computational pipeline monitoring (CPM) leak detection system in accordance with 49 CFR § 195.134 and must have adequate pressure sensors at pump stations, laterals, mainline valves and liquid flow volume measurement along the pipeline at inflows, outflows and spaced along the pipeline to perform accurate leak detection.  The pipeline segment must be operated as a continuously pressurized pipeline (with no pressure, slack line pipeline segments).  If the pipeline segment is operated as a slack line pipeline segment, an operating plan must be developed, reviewed by a responsible third party independent expert engineering company and submitted to the Oahe OPM for "no objection" prior to being implemented by Grantee. |
| 24. | Grantee will minimize or avoid impacts on soils by implementing the mitigation measures described in the DAPL Project's Spill Prevention Control and Countermeasure Plan [December 2014] (SPCC), Storm water Pollution Prevention Plan[July 2015] (SWPPP), and Environmental Construction Plan [April 2015 (ECP) as well as requirements of applicable state and federal permits. |

EXHIBIT "D"

DACW45-2-16-8059

| | **Pipeline Safety Conditions (Operation)** |
|---|---|
| 25. | **Overpressure Protection Control:** Grantee must limit mainline pipeline segment overpressure protection to a maximum of 110% maximum operating pressure (MOP) during surge events consistent with 49 CFR § 195.406(b). Before commencing operation, Grantee must perform a surge analysis showing how the pipeline segment will be operated to be consistent with these overpressure protection conditions. Grantee shall equip the pipeline with field devices to prevent overpressure conditions. Remotely actuated valves or automatic shutoff valves should be fitted with devices that will stop the transit (intentional or uncommanded) of the mainline valve should an overpressure condition occur or an impending overpressure condition is expected. Sufficient pressure sensors, on both the upstream and downside side of valves, must be installed along the pipeline to conduct real time hydraulic modeling, and which can be used to conduct a surge analysis to determine whether pipeline segments have experienced an overpressure condition. Sufficient pressure sensors must be installed along the pipeline to conduct real time hydraulic modeling, and which can be used to conduct a surge analysis to determine whether pipeline segments have experienced an overpressure condition. |
| 26. | **Cathodic Protection:** The initial Cathodic Protection system must be operational within six (6) months of placing a pipeline segment in service. Cathodic Protection will be operated and maintained per applicable codes and the Grantee's 'Operations and Maintenance Manual'. Wall thickness testing will be performed in-lieu of periodic hydro tests. The Grantee shall send the inspection reports to the Operations Project Manager at the Oahe Project Office (hereinafter the Oahe OPM)." |
| 27. | **Interference Current Surveys:** Interference surveys must be performed over the entire pipeline segment within six months of placing the pipeline in service to ensure compliance with applicable NACE International Standard Practice 0169-2007 (2007 or the latest version incorporated by reference in § 195.3) and 0177 (2007 or the latest NACE standard version, since NACE SP 0177 is not incorporated by reference in 49 CFR § 195.3) (NACE SP 0169-2007 and NACE SP 0177) for interference current levels. If interference currents are found, Grantee must determine if there have been any adverse effects on the pipeline and mitigate such effects as necessary as required below.<br><br>The interference current mitigation program for the pipeline segment must include:<br><br>1) As frequently as needed, including when new or uprated high voltage alternating current power lines greater than or equal to 69 kVA or electrical substations are co-located near the pipeline, but not to exceed every seven years conduct an interference survey (at times when static or dynamic voltages are at the highest values for a time period of at least 24-hours) to detect the presence and level of any electrical current that could impact external corrosion where interference is suspected;<br>2) Analyze the results of the survey to identify locations where interference currents are greater than or equal to 20 Amps per meter squared; and<br>3) a remedial action plan and apply for any necessary permits within four months of completion of the inspection or testing that identified the presence of deleterious electrical stray current.<br>4) Implement remedial actions to protect the pipeline segment from detrimental interference currents. Remedial actions must be completed promptly, but no later than one year after completion of the survey, or as soon as practicable after obtaining necessary permits. Remedial action means the implementation of measures including, but not limited to, |

EXHIBIT "D"
DACW45-2-16-8059

additional grounding along the pipeline to reduce interference currents below 20 Amps per meter squared. The following criteria shall be used to determine when remedial actions are required.
  a) AC-induced corrosion does not occur at AC densities less than 20 A/m2 (1.9 A/ft2). The operator shall monitor these locations per (a) above.
  b) AC corrosion is unpredictable for AC densities between 20 to 100 A/m2 (1.9 to 9.3 A/ft2). These locations require an engineering assessment to determine if remediation is required.
  c) AC corrosion occurs at current densities greater than 100 A/m2 (9.3 A/ft2). These areas require mitigation. Any location that is determined to require mitigation must be mitigated to reduce the AC current density to less than 20 A/m2.

| 28. | **Corrosion Surveys:** Grantee must complete corrosion surveys for the pipeline segment within six (6) months of placing the respective CP system(s) in operation to ensure adequate external corrosion protection per NACE RP 0169-2007. The survey shall also address the proper number and location of CP test stations as well as alternating current (AC) interference mitigation and AC grounding programs per NACE RP 0177. At least one (1) CP test station must be located within each "could affect" HCA with a maximum spacing between test stations of one-half mile. |
|---|---|
| 29. | **Initial Inline Inspection (ILI):** Within three (3) years of placing a pipeline segment in service, Grantee must perform a baseline ILI using a high-resolution Magnetic Flux Leakage (HR-MFL) tool, high resolution (HR) deformation tool, and an ultrasonic crack detection tool or equivalent of each. |
| 30. | **ILI Deformation Tool:** Grantee must perform a high resolution deformation tool run after completion of the hydrostatic strength test and backfill of the pipeline segment and prior to placing the pipeline segment in service. Grantee must remediate pipe in accordance with 49 CFR Part 195 and Subpart O. All expanded pipe must be remediated in accordance with PHMSA's "Interim Guidelines for Confirming Pipe Strength in Pipe Susceptible to Low Yield Strength for Liquid Pipeline" dated October 6, 2009 or any subsequent PHMSA update to this guideline. |
| 31. | **Future ILI:** Future ILI inspections must be based upon pipeline segment integrity threats and must include as a minimum of a high-resolution Magnetic Flux Leakage (MFL) tool, high resolution deformation tool, and an ultrasonic crack detection tool or equivalent of each. ILI inspections must be performed on the entire pipeline segment on a frequency consistent with 49 CFR § 195.452(j)(3) assessment intervals or on a frequency determined by fatigue studies or anomalies found that are indicative of actual operating conditions.<br>1) Conduct periodic close interval surveys (CIS) along the entire pipeline segment with current interrupted to confirm voltage drops in association with periodic ILI assessments under § 195.452(j)(3). Pipeline segments under Lake Oahe would not be able to CIS due to water segment and depth of directional drill across Lake Oahe.<br>2) CIS must be conducted within three (3) months of running ILI surveys when using a five (5) year ILI frequency, not to exceed sixty-eight (68) months, in accordance with 49 CFR § 195.452 (j) (3) assessment intervals.<br>CIS findings must be integrated into ILI Tool findings. |
| 32. | **Internal Corrosion:** Grantee must limit basic sediment and water (BS&W) to 0.5% by volume and report BS&W testing results to A in the annual report. Grantee must report upset conditions causing BS&W level excursions above the limit on the annual report. |

EXHIBIT "D"
DACW45-2-16-8059

| | |
|---|---|
| | 1) Grantee must run cleaning pigs twice in the first year and as necessary in succeeding years based on the analysis of oil constituents, liquid test results, weight loss coupons located in areas with the greatest internal corrosion threat and other internal corrosion threats. At a minimum in the succeeding years following the first year Grantee must run cleaning pigs every five years unless analysis necessitates earlier action. <br> 2) Liquids collected during cleaning pig runs, such as BS&W, must be sampled, analyzed and internal corrosion mitigation plans developed based upon lab test results. <br> 3) Grantee shall review the program at least quarterly based upon the crude oil quality and implement adjustments to monitor for, and mitigate the presence of, deleterious crude oil stream constituents. |
| 33. | **Pipeline Patrolling:** Grantee must patrol the pipeline segment right-of-way on a two (2) week interval but not exceeding three (3) weeks, for at least twenty-six (26) times each calendar year, to inspect for excavation activities, ground movement, unstable soil, wash outs, leakage, or other activities or conditions affecting the safe operation of the pipeline segment. |
| 34. | The Grantee shall conduct the following training exercises: <br><br> 1) A full scale open water and a full scale winter/ice exercises at Lake Sakakawea and Lake Oahe.  A full scale exercise will occur once every 3 years (triennial cycle) with the location and type of exercise occurring on alternating schedules (e.g. open water exercise at Lake Sakakawea the following triennial cycle, etc.). The first exercise will occur within the first 3 years after the pipeline becomes operational. <br><br> 2) To facilitate USACE staff involvement, the Grantee shall notify the USACE Environmental Compliance Coordinators at the Omaha District Office and the Oahe Project Office at least ninety (90) days prior to initiation of the training exercises.  The Grantee shall also solicit the participation of key stakeholders (federal, state, local, and Tribal) in these exercises. |
| 35. | Within 1 month following the pipeline becoming operational, the Grantee shall provide for an all-weather access and collection point downstream of the HDD crossing at Lake Oahe. The Grantee shall provide an equipment storage facility on non-federal lands that includes a fenced permanent storage area for winter and open water spill response equipment.  The storage facility should be placed in a strategic location and near existing facilities that would support access to the water.  The Grantee will coordinate with the USACE and any other applicable stakeholders to obtain all necessary permits and approvals prior to construction for any ground disturbing activities associated with these facilities. The storage facility should contain sufficient response equipment at a minimum to mitigate an unintended worst case release for this Lake crossing. |
| | **Overall Condition from EA** |
| 36. | Grantee is generally responsible for commitments made and mitigation measures in the Final Environmental Assessment, Grantee Pipeline Project Crossing of Flowage Easements and Federal Lands (July 2016), including all Plans includes within Appendices thereof, even if they are not specifically made as a condition to this easement. |

EXHIBIT "D"
DACW45-2-16-8059



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, OMAHA DISTRICT
1616 CAPITIAL AVENUE
OMAHA NE  68102-1618

REPLY TO
ATTENTION OF

February 9 2017

Real Estate Division

Dakota Access LLC
Attn:  Thomas Sigauw
1300 Main
Houston, Texas 77002

Dear Mr. Sigauw:

    Enclosed for your records is a fully executed copy of Easement No. DACW45-2-16-8059.
Thank you for your cooperation.  If you have any questions, please feel free to contact me at
(402) 250-4284 or by e-mail at rick.l.noel@usace.army.mil .

Sincerely,

Rick L. Noel
Chief, Civil Branch, Real Estate Division
Real Estate Contracting Officer

Enclosure



COUNTY & STATE
TOWNSHIP & RANGE
TRACT NO.
FOOTAGE

MORTON COUNTY, NORTH DAKOTA
TOWNSHIP 134 NORTH, RANGE 79 WEST

LEGEND

NOTES

COATING
MATERIAL
COVER (T)
PROFILE
SCALE: 1" = 500' H.
1" = 100' V.
STATIONING

AS-BUILT
07/31/2017

BILL OF MATERIALS

REFERENCE DRAWINGS

WOOD GROUP USA, INC.

DAKOTA ACCESS, LLC

MATCH LINE STA. 4220+00

SEE DWG. W_29004_C010084
MATCH LINE STA. 4220+00

DAKOTA ACCESS, LLC

6" AS-BUILT PIPELINE

NATURAL GROUND

TOP OF 30" AS-BUILT PIPELINE

MATCH LINE STA. 4300+00

SEE DWG. W_29004_C010086
MATCH LINE STA. 4300+00

ENGINEERING RECORD

OLD DRAWING NO.

AS-BUILT ALIGNMENT SHEET
29004.02 CR13-89ST-30
STA. 4220+00 TO STA. 4300+00

MORTON COUNTY, NORTH DAKOTA

W_29004_C010085

# Dakota Access Pipeline

# Lake Oahe HDD Crossing

## *Overall Assessment*

- **Pipe Manufacture:** DAPL pipe material meets requirements of API 5L PSL-2: Specification for Line Pipe.
- **Pipeline Operation:** DAPL Pipeline meets requirements of 49 CFR Part 195 - Transportation of Hazardous Liquids by Pipeline and ASME B31.4: Pipeline Transportation Systems for Liquids and Slurries.
- **Integrity Management and Risk Assessment:** DAPL's Integrity management and risk assessment practices follow guidance of RP API 1160: Managing System Integrity for Hazardous Liquids Pipelines.

## *Integrity Assessment*

- **Pipeline Design Factor.** The pipe installed complies with a design factor of 0.50 in the Lake Oahe HDD crossing and could affect HCA's.

- **Pipe Girth Weld - Nondestructive Tests.** DAPL nondestructively tested all girth welds in accordance with 49 CFR §§195.228, 195.230 and 195.234. All machine welds were tested by ultrasonic means; all stick/manual welds were tested by radiographic means.

- **Hydrostatic Test.** The pipe that comprises the HDD is 30" x 0.625" API 5L PSL-2 X70 and was successfully tested twice to a minimum pressure of 1,880 psig. First test was the pre-in-service hydrostatic test at a minimum of 1.25 times maximum operating pressure (MOP) for eight (8) continuous hours performed prior to pulling the pipe under the Lake. Second test was performed under the same conditions after the pipe was pulled under the Lake. There were no failures.

- **Caliper Survey.** No Deformations identified in Caliper Survey performed on March 24, 2017. As reported, the line at the time of the survey appeared to be fairly clean, with a smooth interior wall surface.

- **Construction Coating Survey after Installation.** No actionable coating anomalies were identified on the DCVG Survey performed on April 22, 2017. The DCVG Survey was completed promptly after the ditch for the pipeline was backfilled and covered the entire HDD crossing and encompassed the easement / action area.
  Direct Current Voltage Gradient and is a survey technique used for assessing the effectiveness of coating corrosion protection on buried steel pipe. DAPL is required to repair any coating damage classified as moderate or severe (voltage drop greater than 35% for DCVG or 50 dBµV for ACVG) in accordance with section 4 and Appendix A of NACE SP0502-2008 (or latest edition referenced in 49 CFR § 195.3).

- **AC Mitigation**.  Completed an AC (Alternating Current) Potential Close-Interval-Survey from April 19, 2017 through April 21, 2017 traversing form MLV-360, MP 174.80 to HWY 1804, MP 186.70. This survey encompassed the easement / action area.

    DAPL installed four (4) Metricorr ER Probes with Remote Monitoring Units (RMU's) on April 5, 2017, to monitor AC/DC current density, AC/DC potential and corrosion rates.   These monitoring probes have been installed such that there are two (2) probes on either side of Lake Oahe with continuous satellite monitoring for each probe.  Preliminary analysis of Metricorr data indicates AC current densities < 0.5 A/m2 peak.   No remedial action is necessary as AC-induced corrosion does not occur at AC current densities < 20 A/m2 (1.9 A/ft2).

- **Cathodic Protection (CP)**.  Completed a native Pipe-to-Soil Close-Interval-Survey (CIS)/CP-Interference CIS from April 19, 2017 through April 21, 2017 traversing form MLV 360, MP 174.80 to HWY 1804, MP 186.70 encompassing the easement / action area. Data analysis indicated no interference issues

    DAPL installed four (4) impressed current ground beds (Unit 340 @ MLV 340, Unit 360 @ MLV 360, Unit 400 @ MLV 400, and Unit 430 @ MLV 430) covering the permitted / action area. These four (4) ground beds were installed April 19, 2017 through April 28, 2017 and were energized on May 23, 2017.  Each of these ground beds were monitored for 3 weeks to allow for polarization of the pipeline and a subsequent On/Off CIS was performed June 15, 2017 through June 22, 2017 from MLV 360 to MLV 400 encompassing the easement / action area. Preliminary analysis of this CIS indicate excellent levels of cathodic protection throughout the area with no interference issues.

    DAPL installed test stations at each of its Mainline Valve (MLV) sites on both sides of Lake Oahe, as well as, each of Northern Border Pipeline's MLV sites on both sides of Lake Oahe.

- **Mainline Valves with Remote Control.**  Mainline valves with remote control actuators were installed on either side of the Lake Oahe crossing and additional mainline valves were installed on both sides of Lake Oahe to protect the "could affect" HCA on either side of the HDD crossing. These MLV's were located outside of the flood plain so as to not be impacted by flood conditions.

    Since these MLV's are remotely controlled and actuated, the Supervisory Control and Data Acquisition (SCADA) system is capable of closing the valve and monitoring the valve position, upstream pressure and downstream pressure so as to minimize the response time in the case of a failure. Remote power backup is also provided to ensure communications are maintained during inclement weather so that the MLV's are capable of closure at all times. For each of these MLV's, DAPL conducted a point-to-point verification between SCADA displays and the mainline valve, sensors, and communications equipment in accordance with 49 CFR § 195.446(c) and (e), or equivalent verification.

### *Threat Assessment*

- **Integrity Management and Risk Assessment:** DAPL's Integrity management and risk assessment practices follow guidance of RP API 1160: Managing System Integrity for Hazardous Liquids Pipelines.
- Threats considered in this threat assessment follow ASME B31.8S guidelines referenced in API 1160.

**Integrity Assessment – Second Hydrostatic Test**

ENERGY TRANSFER

**MOP ESTABLISHMENT**

**B.10.A**
Available Electronically

Date of Test: _____

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Project: | **DAPL** | | | Company : | | | | ☐ HPL |
| AFE No.: | 480000000001 | | | | ☒ DAPL | ☐ ETCOP | | ☐ Other ____ |
| Test Record Number: | 6754 | | | | | | | |

| TEST LOCATION | Discharge: | By Permit | | Line Number: | N/A | |
|---|---|---|---|---|---|---|
| | County/Parish: | Morton County | | Line Name: | DAPL Spread 6 Lake Oahe HDD | |
| | State: | ND | | Valve Section:: | From: MLV - 380 | |
| | Total Footage: | 8,150' | | | To:  MLV - 390 | |

| (ADDITIONAL TEST INFORMATION | Reason For Test: | ☒ New | ☐ Uprating | ☐ Class Change | ☐ Integrity | ☐ Fabrication |
|---|---|---|---|---|---|---|
| | Stationing Begin: | MLV - 380 | | Stationing End | MLV - 390 | |
| | Existing Facility MOP: | N/A | | | | |
| | In-Service Date: | TBD | | | | |
| | Other Location Description: | Lake Oahe | | | | |
| | Is a Station Equation involved: ☒ NO ☐ YES  If yes, provide | | | | BK/AH ____ | |

| MATERIAL INVENTORY | ALLOWABLE MOP (per design pressure)  ; | | | | | Design Pressure Verification ("weakest link" pipe) | | |
|---|---|---|---|---|---|---|---|---|
| | Sub-section | S | t | D | E | T | F | DP = ((2xSxt)/D)xExTxF |
| | 1 | 70000 | 0.625 | 30 | 1 | 1 | 0.50 | 1458 |
| | 2 | 70000 | 0.429 | 30 | 1 | 1 | 0.72 | 1441 |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | Minimum pressure rating of other components: | | | ANSI 600 | | | Attach additions sheets if necessary | |

S=SMYS, t=wall thickness, D=OD, E= longitudinal joint factor, T=temperature derating factor; F=design factor

| PRESSURE TEST | ALLOWABLE MOP (per pressure test) |
|---|---|
| | Actual high-point test pressure: 1880 psi |
| | Test Factor: 1.25                    Actual high-point test pressure = 1504 |
| | Test Factor* |
| | * Test factors:  1.1 for Class 1; 1.25 for Class 2 & offshore; 1.5 for Class 3 or 4, risers and platforms, compressor and M& R stations |

**NOTE:** The Established MOP can be as high as the lesser of the allowable MOP per design pressure or allowable MOP per pressure test, but no less than the existing MOP of the line in which it is installed.

**Established MOP:** 1440

Remarks/ Comments: ____

Prepared by: Matthew Cooper-Harper

Approved by: _____

**Integrity Assessment – Caliper Survey**

| | |
|---|---|
| *ENDURO* | **Pipeline Services, Inc.          JOB PLACEMENT FORM** |
| CUSTOMER: | Energy Transfer Company / Michel's Pipeline |
| REP.: | Cody Wood - Michel's Pipeline |
| | |
| JOB NUMBER: | B16-613F / D.A.P.L - Lake Oahe HDD / Lake Oahe West - Lake Oahe East - MLV 390 |
| LOCATION: | Bismarck, ND |
| | ADDRESS FOR SHIPPING REPORTS: |
| SHIP ADDR 1: | |
| SHIP ADDR 2: | |
| SHIP ADDR 3: | |
| SHIP ADDR 4: | |
| SHIP ADDR 5: | |
| | BILLING INFORMATION |
| DAYS ON SITE: | 5 |
| MOB MAN: | Jeff walker |
| MOB TOOL: | (2) 30" DW DdL™ Caliper Tool |
| OTHER: | (2) Transmitters, (2) Receivers, (2) Geophones, Support Equipment |
| OTHER: | |
| | SIGNATURES: |
| Enduro Representative/Date: | |
| Customer Representative/Date: | |

| DATE | NOTES |
|---|---|
| 3/19/2017 | *B16-613F:* Travel Day. Tulsa, OK - York, NE. Contacted customer Cody Wood with Michel's Pipeline. Run tentatively scheduled for 3/21/17. |
| 3/20/2017 | *B16-613F:* Travel Day. York, NE - Bismarck, ND. Informed Mr. Wood I was on location. |
| 3/21/2017 | *B15-613F:* Stand-by. Met with customer at launch location, discussed run parameters and run date has been pushed to 3/23/2017. |
| 3/22/2017 | B16-613F: Stand-by. Contacted customer, run moved to evening of 3/23/17. |
| 3/23/2017 | *B16-613F:* Stand-by. Contacted customer, run moved to 3/24/17. |
| 3/24/2017 | *B16-613F; D.A.P.L. Lake Oahe HDD; Lake Oahe West - Lake Oahe East - MLV 390; 30" DdL ™ DW x 0.625 x 1.52 Miles:* 9:30 AM, arrived at launch location, discussed plan of the day with Mr. Wood, installed transmitter, tool ready for launch. Tool was launched at 7:00 PM from Lake Oahe West with 7750 CFM / 100 PSI. Customer personnel tracked the tool at MLV 390, tool passed at 7:58 PM, with an approximate speed of 1.59 MPH. I traveled to L/R #2 North Dakota permanent receive site. Lake Oahe East - MLV 390 - L/R #2 North Dakota have previously be ran and reported. |
| 3/25/2017 | *B16-613F; D.A.P.L. Lake Oahe HDD; Lake Oahe West - Lake Oahe East - MLV 390; 30" DdL™ DW x 0.625 x 1.52 Miles:* Tool was received at 1:23 AM on 3/25/17. A brief analysis was performed, tool worked to Enduro standards. Continued with a complete analysis. |
| 3/26/2017 | *B16-613F:* Travel Day. Delivered Field Report, signed off, released from project. |
| 3/27/2017 | *B16-613F:* Travel Day. |



---

## DdL™ Caliper Survey Field Report

### B16-613F - D.A.P.L. / Lake Oahe HDD / AFE - 480000000002

---

**Run Date: March 24, 2017**

**Report Date: March 25, 2017**

Lake Oahe West

To

Lake Oahe East – M.L.V. 390

Energy Transfer Company / Michels Pipeline

P.O. Box 3489 | Tulsa, OK 74101-3498 | P: 918.446.1934 | www.enduropls.com

Field Caliper Report | Energy Transfer Company / Michels Pipeline | D.A.P.L. / Lake Oahe HDD / AFE - 480000000002 | B16-613F

## Executive Summary – DdL™ Caliper

### General Run Information

| Pipeline Name | D.A.P.L. / Lake Oahe HDD / AFE - 480000000002 | |
|---|---|---|
| Job # | B16-613F | |
| | Launcher | Receiver |
| Station | Lake Oahe West | Lake Oahe East – MLV 390 |
| Location(city/County, state) | Bismarck, ND | Bismarck, ND |
| Date / Time | 3/24/17 7:00 PM | 3/24/17 3/24/17 |

| | AGMs | |
|---|---|---|
| | Rec | |
| | AGM# Not Rec | |

| Sensors | | Cal. | INS |
|---|---|---|---|
| | Total | 30 | 3Gy. / 3Acc. |
| | Rec. | 30 | 3Gy. / 3Acc. |
| | Bad | 0 | 0 / 0 |

| Product | Air~7750 CFM / 100 PSI |
|---|---|
| Pipe Diameter | 30.000 inches |
| Length | 1.69 miles |
| Hours | 58 min. |

**Field Technician:**  Jeff Walker

**Data Analyst:**  Jeff Walker

### Inspection Quality & Findings

| Deformation Indications | 0 |
|---|---|
| Dent < 2 % O.D. | 0 |
| Dent ≥ 2 % O.D. | 0 |
| Ovalities | 0 |
| Expansions | |

| Irregular Welds | 0 |
|---|---|
| Debris Indications | 0 |
| MFG Indications | 0 |

| Bends | 4 |
|---|---|
| Factory Bends | 4 |
| Field Bends (> 12D) | 0 |

Field Caliper Report | Energy Transfer Company / Michels Pipeline | D.A.P.L. / Lake Oahe HDD / AFE - 480000000002 | B16-613F

**Customer's immediate concerns:**

> *Percentage of pipe diameter for a sharp anomaly – 1.00% top / 2.00% bottom*
> *Percentage of pipe diameter for ovality – 5.00%*
> *Percentage of pipe diameter for expansion – 1.50%*
> *Bend radius requirements – 3.00D*

**General Run and Line Information**

On 3/24/2017 the 30 inch DdL™ DW caliper tool was launched from the Lake Oahe West site near Bismarck, ND at 7:00 PM  using a total of 7750 CFM and holding 100 PSI to control the speed of the tool.  Tool was tracked by Michels Pipeline personnel at M.L.V 390, tool passed at 7:58 PM with an average speed of 1.59 MPH.

Note: The 30 inch DdL™ DW caliper tool was ran from the Lake Oahe HDD West to L/R #2 North Dakota site, approximately 10.38 miles, however, per customer request, the data collected from Lake Oahe HDD West to Lake Oahe HDD East – M.L.V. 390, approximately 8,065 feet, will only be Field Reported for this survey.  The remaining data recorded has been previously ran and reported.

The DdL™ DW caliper tool was received at the L/R #2 North Dakota site, approximately 10.38 miles from the launch site, near Bismarck, ND on 3/25/17 at 1:23 AM.  A visual inspection of the tool showed no damage.  The data was downloaded in the field and reviewed to confirm that the tool worked to Enduro specifications.

- The line at the time of the survey appeared to be fairly clean, with a smooth interior wall surface.

**Deformations:**

There are 0 Anomalies reported for this line section.

**Bends:**

There are 4 Factory Bends reported for this line section.
- The minimum Bend Radius in this line is 3.00D radius.

For a complete list of all the bends, please refer to the *Bend Listing*.

**Tool and Data Condition:**

- The survey tool was received in good condition.
- All data sets worked correctly and no sensor damage was found.
- All of the data recorded is acceptable.

**Correlation Reporting:**

- The customer *has not* provided Enduro with a pipeline listing.

- The customer *has not* been provided with a .kmz file.

Field Caliper Report | Energy Transfer Company / Michels Pipeline | D.A.P.L. / Lake Oahe HDD / AFE - 480000000002 | B16-613F

| Re-run Conditions | | | |
|---|---|---|---|
| ☐ Due to line conditions, Enduro recommends the survey be re-run. | | | |
| ☐ Due to anomalies found, Enduro recommends a confirming DdL™ Survey. | | | |
| ☐ Other: [please explain] | | | |
| Customer | ☐ Accept   Initials | | ☐ Decline   Initials |

*The below items have been checked and confirmed to be accurate;*

☐ *Deformations*

☐ *Features*

☐ *Bend*

*Respectfully Submitted:*

**ENDURO Pipeline Services, Inc.**

*Submitted to:*

**Energy Transfer Company / Michels Pipeline**

_____

Jeff Walker
**Field Technician**

_____

Cody Wood
**Michel's Pipeline**

Field Caliper Report | Energy Transfer Company / Michels Pipeline | D.A.P.L. / Lake Oahe HDD / AFE - 480000000002 | B16-613F

# Appendix A: Pictures

**Launch**



**Receive**





Field Caliper Report | Energy Transfer Company / Michels Pipeline | D.A.P.L. / Lake Oahe HDD / AFE - 480000000002 | B16-613F

# Appendix B: Glossary

| | |
|---|---|
| **AGM** | *A DdL™ survey tool incorporates an above ground marker (AGM) system, which collects tool passage as well as GPS data. These AGM boxes will be downloaded and verified for tool passage. Gathers satellite information for both atomic time and GPS coordinates. Data from each AGM location can be incorporated into the software and used along with the INS data to calculate GPS coordinates for the entire line.* |
| **INS Survey** | *INS Survey: The DdL™ carries a full INS package with 3 gyros and 3 accelerometers. This package, in conjunction with GPS based AGMs, enables the DdL™ to map and provide GPS position on all pipeline events.* |
| **Deformation Indications** | *Dents are sized and located identifying deformation/dent anomaly conditions of/or greater than 1% of pipe O.D. on Top and 2% of pipe O.D. on Bottom.  Deformations in the form of OVALITY (of or larger than 5% of pipe O.D.) will be identified.* |
| **Overburden Relief** | *Larger pipe diameters will experience a return to round during soil removal; a large portion of the ovality will relieve.  Sharp and Flat anomalies will relieve on the associated ovality aspect of the anomaly.  For this reason the report lists both the over-all and localized dent dimensions which identify the amount of sharp/flat and any associated ovality. The larger the ovality span, the greater the potential for relief.* |

**Bend Listing**

| ENDURO PIPELINE SERVICES, INC. | | |
|---|---|---|

| | |
|---|---|
| CUSTOMER/CONTRACTOR | Energy Transfer Company / Michel's Pipeline |
| CUSTOMER LINE ID | D.A.P.L. / Lake Oahe HDD / AFE - 480000000002 |
| JOB NUMBER | B16-613F |
| LAUNCH STATION | Lake Oahe West |
| | Bismarck, ND |
| RECEIVE STATION | Lake Oahe East - M.L.V. 390 |
| | Bismarck, ND |
| PIPELINE LENGTH | 1.52 mi |

| | |
|---|---|
| PIPE DIAMETER | 30.000 in |
| WALL THICKNESS | .523 in |
| PRODUCT | Air -7750 CFM / 100 PSI |
| RUN DATE | 24-Mar-2017 |
| FIELD ENGINEER | Jeff Walker |
| CHART ANALYST | Jeff Walker |
| REPORT DATE | 03/25/2017 |
| ISSUE # | 1 |

| Event ID | Event Description | Comment | Enduro Station | Projected Station | Customer Station | Avg Mile Post | MCSD |
|---|---|---|---|---|---|---|---|
| B1 | Bend 45.0 deg. 3.0 Ds Up Turn MCSD: 27.68 | Before u/s w.: 1.2%(0.367) MCSD: 28.4 ID:29.1 mph:0.7 Clk:0 to 6 After d/s w. : 0.7%(0.211) MCSD: 28.5 ID:28.8 mph:1.2 Clk:5 to 11 MPH coming into Bend (-10ft): 1.1 Leaving Bend (+10ft): 0.7 Min MPH over range: 0.1 at index 2755934 | 8035.67 | 80+36 | | 1.52 | 27.68 |
| B2 | Bend 45.0 deg. 3.0 Ds  Down Turn MCSD: 28.11 | Before u/s w.: 1.2%(0.367) MCSD: 28.4 ID:28.8 mph:2.0 Clk:0 to 6 After d/s w. : 0.6%(0.171) MCSD: 28.5 ID:28.8 mph:2.2 Clk:0 to 6 MPH coming into Bend (-10ft): 0.7 Leaving Bend (+10ft): 4.5 Min MPH over range: 0.4 at index 2757102 | 8054.22 | 80+54 | | 1.53 | 28.11 |

**ENDURO** PIPELINE SERVICES, INC.

**Field Report**

| | |
|---|---|
| CUSTOMER/CONTRACTOR | Energy Transfer Company / Michel's Pipeline |
| CUSTOMER LINE ID | D.A.P.L / Lake Oahe HDD / APE - A800000000000 |
| JOB NUMBER | 316-612F |
| LAUNCH STATION | Lake Oahe West |
| | Bismarck, ND |
| RECEIVE STATION | Lake Oahe East - M.L.V. 390 |
| | Bismarck, ND |
| PIPELINE LENGTH | 1.02 mi |

| | |
|---|---|
| PIPE DIAMETER | 30.000 In |
| WALL THICKNESS | .635 In |
| PRODUCT | Air=7700 CFM / 100 PSI |
| RUN DATE | 24-Mar-2017 |
| FIELD ENGINEER | Jeff Walker |
| CHART ANALYST | Jeff Walker |
| REPORT DATE | 03/26/2017 |
| ISSUE # | 1 |

| Event ID | Event Description | Comment | Enduro Station | Projected Station | Customer Station | Tool Spd | W.T. | Clock On | Dent Geo. NOD | Est. Dent Depth After Excavation | Est. Dent %OD After Excavation | Dent Length | Total Dent Wid | Total Size | Total %OD Len. | MCD | To U/S Weld | Cut Out U/S Joint | To D/S Weld | Lac. D/S Joint | Latitude | Longitude | Elevation |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| F 1 | Begin Line Pipe | D.A.P.L - Lake Oahe HDD Lake Oahe West - Lake Oahe East Bismark, ND | 0.00 | 0+00 | | 0.3 | 0.429 | | | | | | | | | 29.00 | 0.0 | 13.9 | 13.9 | 74.3 | | | |
| W 1 | Wall change to .429 for 329.32 feet - Enduro predicted | Begin 0.429 w.t. | 0.00 | 0+00 | | 0.3 | 0.429 | | | | | | | | | 0.0 | 13.9 | 13.9 | 74.3 | | | | |
| W 2 | Wall change from .429 to .625 for 7454.49 feet - Enduro predicted | | 329.32 | 3+29 | | 2.0 | 0.626 | | | | | | | | | 0.0 | 29.6 | 29.6 | 70.6 | | | | |
| W 3 | Wall change from .625 to .625 for 239.37 feet - Enduro predicted | | 7783.81 | 77+84 | | 3.0 | 0.625 | | | | | | | | | 0.0 | 33.0 | 33.0 | 22.8 | | | | |
| W 4 | Wall change from .429 to .625 for 46779.33 feet - Enduro predicted | | 8033.18 | 80+33 | | 1.0 | 0.625 | | | | | | | | | 0.0 | 6.3 | 6.3 | 12.4 | | | | |
| B 1 | Bend 45.0 deg. 3.0 Ds. Up Turn MCGD: 27.68 | Before u/s w.: 1.2%ID.367\MCGD: 28.4 ID:29.1 mph:5.7 C/A:0 to 6 After d/s w.: .0.7%ID.211\MCGD: 28.6 ID:28.8 mph:1.2 C/A:5 to 11 MPH coming into Bend =10/Ri: 1.1 Leaving Bend =10/Ri: 0.7 Min MPH over range: 0.1 at index 2765934 | 8035.67 | 80+36 | | 0.6 | 0.626 | | | | | | | | | 27.68 | 2.6 | 6.3 | 3.6 | 12.4 | | | |
| B 2 | Bend 45.0 deg. 3.0 Ds. Down Turn MCGD: 28.11 | Before u/s w.: 1.2%ID.367\MCGD: 28.4 ID:28.8 mph:2.2 C/A:0 to 6 After d/s w.: .0.6%ID.171\MCGD: 28.6 ID:28.8 mph:2.2 C/A:6 to 6 MPH coming into Bend =10/Ri: 3.7 Leaving Bend =10/Ri: 4.5 Min MPH over range: 0.4 at index 2767162 | 8054.22 | 80+54 | | 4.2 | 0.626 | | | | | | | | | 28.11 | 2.4 | 5.6 | 3.2 | 6.1 | | | |
| F 2 | End Line Pipe | D.A.P.L - Lake Oahe HDD Lake Oahe West - Lake Oahe East M.L.V. 390 Bismark, ND | 8065.83 | 80+66 | | 8.6 | 0.626 | | | | | | | | | 28.42 | 3.3 | 6.3 | 3.0 | 5.6 | | | |
| B 3 | Bend 45.0 deg. 3.0 Ds. Down Turn MCGD: 27.90 | Before u/s w.: 1.7%ID.497\MCGD: 28.3 ID:28.8 mph:3.6 C/A:1 to 7 After d/s w.: .0.8%ID.226\MCGD: 28.6 ID:28.8 mph:4.8 C/A:8 to 8 MPH coming into Bend =10/Ri: 6.4 Leaving Bend =10/Ri: 4.3 Min MPH over range: 2.2 at index 2768791 | 8076.92 | 80+77 | | 6.7 | 0.626 | | | | | | | | | 27.90 | 2.6 | 6.7 | 3.2 | 6.8 | | | |
| B 4 | Bend 45.0 deg. 3.0 Ds. Up Turn MCGD: 27.91 | Before u/s w.: 1.6%ID.462\MCGD: 28.3 ID:28.8 mph:4.1 C/A:0 to 6 After d/s w.: .0.8%ID.140\MCGD: 28.6 ID:28.9.1 mph:5.3 C/A:6 to 11 MPH coming into Bend =10/Ri: 5.9 Leaving Bend =10/Ri: 6.1 Min MPH over range: 4.1 at index 2761236 | 8088.06 | 80+88 | | 4.6 | 0.626 | | | | | | | | | 27.91 | 2.1 | 6.1 | 4.0 | 6.4 | | | |
| F 3 | End Line Pipe | D.A.P.L - Lake Oahe HDD Lake Oahe West - Lake Oahe East Bismark, ND | 8926.32 | 89+26 | | 0.3 | 0.626 | | | | | | | | | 28.50 | 0.0 | 39.1 | 39.1 | 4.7 | | | |



**High-Low Velocity vs Station**

B16-613F,  D.A.P.L. / Lake Oahe HDD / AFE - 480000000002   Mar 24, 2017

# Dakota Access Pipeline

# Lake Oahe HDD Crossing

# Threat Assessment

**Prepared for Dakota Access Pipeline System by Dynamic Risk Assessment Systems**

| Threat Assessed | Threat Attributes | Result of Threat Assessment | Assessments/Monitoring Completed | Monitoring / Mitigation Planned |
|---|---|---|---|---|
| External Corrosion | Pipeline HDD Casing | No permanent casing installed. | | N / A |
| External Corrosion | Stray Current/Interference | Completed AC survey and completed mitigation measures to address any concern related to interference. | An AC interference and mitigation study has been conducted to assess AC fault and steady state conditions and associated risks. Based on the outcomes of the study, installation of zinc ribbon wires will effectively mitigate the AC interference. Implementation if this mitigation addresses the potential risk to CP effectiveness and safety. | Continuous monitoring |
| External Corrosion | Pipeline In-Line Inspection  (ILI) | Reassessment plan represents industry standard practice for hazardous liquids pipelines. | | MFL metal loss ILI planned within first 36 months of operation |
| External Corrosion | Cathodic Protection (CP) / Interference survey | The Northern Border pipeline was identified as a possible source of cathodic protection interference in the action area. | A CP interference and mitigation study has been conducted to assess existing CP conditions and associated risks. Based on the outcomes of the study, installation of deep well anode beds effectively mitigate the CP interference. | Continuous monitoring |

| Threat Assessed | Threat Attributes | Result of Threat Assessment | Assessments/Monitoring Completed | Monitoring / Mitigation Planned |
|---|---|---|---|---|
| Internal Corrosion | Product Stream Characteristics | A CEPA study, [1], indicates that under normal operations, oil pipelines with low BS&W (0.25-0.5%) are unlikely to have free water present in them, and with a sufficiently high flow velocity inside the pipe any free water caused by operation upsets will be entrained in the oil by turbulent flow, and the pipe wall will continue to operate in an oil-wet condition. | At low BS&W levels in conjunction with turbulent flow, water will remain entrained in oil and therefore internal corrosion is unlikely to occur. | Continuous SCADA monitoring and control of pipeline operating and flow conditions. |
| Internal Corrosion | Product Stream Flow Characteristics | Turbulent flow controls solids deposition and entrains what little water exists in the product stream. The product stream, in conjunction with the operating and flow characteristics will render the pipe wall in an oil-wet (i.e. non-corrosive) condition, although monitoring and the implementation of appropriate mitigation strategies, where warranted, is required. | | The sediments and water resulted from the cleaning will be monitored and analyzed, and the corrosion inhibition program will be adjusted accordingly. |

| Threat Assessed | Threat Attributes | Result of Threat Assessment | Assessments/Monitoring Completed | Monitoring / Mitigation Planned |
|---|---|---|---|---|
| Internal Corrosion | Corrosion Prevention / Detection Devices | The use of corrosion detection and prevention devices reduces the likelihood of the undetected internal corrosion in the line. | | MFL metal loss ILI planned within first 36 months of operation |
| Internal Corrosion | Receipt Points | Receipt point monitoring and control ensures that product is maintained within its quality specification. | | Crude oil samples are obtained and analyzed at all receipt points on the pipeline. |
| Internal Corrosion | Chemical Inhibition and Cleaning Pig Programs | Appropriate mitigation strategies for chemical inhibition and cleaning pig programs are implemented to eliminate internal corrosion. | Water traps, located at all receipt points and launcher / receiver sites on the pipeline, have been incorporated into the pipeline design to collect any water and sediments in the flow. Regular analysis of the collected fluid will be conducted to adjust the inhibition program as required. | Adjustment of inhibition program to include Injection of microbial inhibitor chemicals at receipt points and launcher / receiver sites as necessary. |
| Internal Corrosion | Potential source of Analogue ILI Datasets | As the threat of internal corrosion is expected to be low, the lack of an appropriate ILI data set is not a concern at this stage of the assessment. | If further quantitative analysis of failure frequencies is required, it is necessary to identify a suitable data set. | Maintain monitoring program and integrity management plans. |

| Threat Assessed | Threat Attributes | Result of Threat Assessment | Assessments/Monitoring Completed | Monitoring / Mitigation Planned |
|---|---|---|---|---|
| Stress Corrosion Cracking | SCC Susceptibility | Pipelines operating at stress levels greater than 60% SMYS can be considered susceptible to SCC if other factors are present including a susceptible coating system, a susceptible line-pipe material, proximity to pump stations, high operating temperatures (specific to high-pH SCC), and age of the pipeline greater than 10 years. | The use of high performance coating systems, such as those used for DAPL, has proven to be an effective means of preventing SCC. To date, no operating company has ever experienced a failure that was attributed to SCC in a pipeline that was coated with these coating systems. | Maintain integrity management plans. |
| Manufacturing Defects | Pipeline manufacturing procedure specification | The manufacturing procedure specification, together with the inspection and test plan constitute key quality assurance documents that form the basis of sound pipe procurement practices. | Rigorous inspection and test plans conducted at pipe and coating mills. | All defects rejected at mills. |
| Manufacturing Defects | Manufacturer | The vendor vetting and quality assurance procedures implemented are considered appropriate for the assurance of quality line pipe. | Pre-production meetings and routine QA / QC monitoring at pipe and coating mills. | |

| Threat Assessed | Threat Attributes | Result of Threat Assessment | Assessments/Monitoring Completed | Monitoring / Mitigation Planned |
|---|---|---|---|---|
| Manufacturing Defects | Manufacturing Process | While some vintage manufacturing processes are prone to manufacturing defects, modern line pipe manufacturing processes are not commonly associated with characteristic chronic manufacturing defects.  Well-developed Manufacturing Procedure Specifications and Inspection Test Plans are instrumental in maintaining quality assurance. | Rigorous inspection and test plans conducted at pipe and coating mills. | All defects rejected at mills. |
| Manufacturing Defects | Third Party Auditors | Effective deployment of third party audits and inspection to maintain a quality focus during line pipe manufacture, while alerting DAPL to potential quality problems during manufacture and prior to delivery. | Rigorous inspection and test plans conducted at pipe and coating mills. | All defects rejected at mills. |
| Manufacturing Defects | Pressure cycling | Fluctuating operating pressures that are typical of liquids pipelines, can activate pre-existing manufacturing defects. | | Continuous SCADA monitoring and control of pipeline operating and flow conditions. |

| Threat Assessed | Threat Attributes | Result of Threat Assessment | Assessments/Monitoring Completed | Monitoring / Mitigation Planned |
|---|---|---|---|---|
| Manufacturing Defects | Hydrostatic Test | The test pressures represent significant safety factors, ensuring that any manufacturing defects left after the hydrostatic test are not operating at stress levels where they would be considered to be structurally significant. | At mill - Hydrostatic test to 100% SMYS conducted. Upon installation - Hydrostatic test to at least 125% MOP conducted. | Upon installation and prior to acceptance - DAPL requires certification of hydro-tests and ILI Caliper surveys. |
| Manufacturing Defects | Use of Loading / Transportation Specification | The loading and transportation will be carried out in accordance with the specifications in place. This reduces the likelihood of damage to the pipes during transportation and it minimizes the frequency of pipeline failure. | Rigorous inspection and test plans conducted at pipe / coating mills and receipt at pipe yards and delivery to the pipeline right-of-way (ROW). | All transportation of pipe and materials requires inspection report and bills-of-lading. |

| Threat Assessed | Threat Attributes | Result of Threat Assessment | Assessments/Monitoring Completed | Monitoring / Mitigation Planned |
|---|---|---|---|---|
| Construction Defects | Construction Practices | Welding and non-destructive inspection procedures are representative of industry best practices, which maximize the use of low-hydrogen welding processes, and state-of-the-art inspection systems. Construction / transportation specifications are comprehensive to minimize potential for construction-related damage. Such damage can occur, particularly on pipelines that have large-diameter-to-wall thickness ratios (typically > 100:1, which are beyond the D/t ratios used on the DAPL project).  Post-construction in-line inspection is an effective measure of identifying such damage to enable repairs to be made prior to pipeline operation. The minimum hydrostatic test pressure used for DAPL is minimum of 1,800 psi - 1.25 times maximum operating pressure | 100% inspection of field welds using radiographic inspection and approved by third party auditors (Level 3 - CWI) was conducted. Hydrostatic test to at least 1,800 psi - 125% MOP conducted on entire pipeline segments including valves, launchers, receivers and equipment. Inspection with a deformation tool / caliper survey (ILI) after installation to ensure that the pipeline is free of dents, buckles, and excessive out-of-round conditions was conducted. | All defects repaired per PHMSA approved procedures. |

| Threat Assessed | Threat Attributes | Result of Threat Assessment | Assessments/Monitoring Completed | Monitoring / Mitigation Planned |
|---|---|---|---|---|
| | | (MOP). The pipeline may be tested to higher pressure values where specified, dependent upon elevation. | | |
| Construction Defects | Operating Pressure | Maximum operation pressure (MOP) of DAPL pipeline is 1,440 psi. | Continuous SCADA monitoring and control of pipeline operating and flow conditions. | Pipeline Pump Station high-pressure-shutdown set point at 1,400 psi. |
| Third Party Damage | Adjacent land use | The damage prevention measures employed on DAPL are representative of industry best-practice. Additionally, the HDD sections are located in remote area, and the depth | DOC study completed. | Maintain monitoring program and integrity management plans. |
| Third Party Damage | One-call system availability and promotion | | | |
| Third Party Damage | Signage placement | | | |
| Third Party Damage | Use of buried marker tape | | | |
| Third Party Damage | Regulation Regarding requirements to | | | |

| Threat Assessed | Threat Attributes | Result of Threat Assessment | Assessments/Monitoring Completed | Monitoring / Mitigation Planned |
|---|---|---|---|---|
| Third Party Damage | notify one-call prior to excavation | of cover at these locations significantly reduce the possibility of exposure to Third Part Damage (TPD). Consequently, the likelihood of TPD is very low. | | |
| Third Party Damage | Response time for locate requests | | | |
| Third Party Damage | Patrol frequency | | | |
| Third Party Damage | Marking and locating methods | | | |
| Third Party Damage | Depth of cover | | | |
| Weather Related or Outside Force | Presence of Geotechnical / Hydro-technical Hazards | Slope Stability Study: A slope stability study was conducted at Lake Oahe HDD location. The report indicates that potential for land sliding as the result of the proposed activities is low [4]. Scour Study: Study results show that the maximum scour at the project site is estimated to be 21 ft. The proposed HDD crossing has a minimum depth of over 90 ft. below the current channel. Therefore, the risk of pipeline exposure is not significant and | Geotechnical / Hydro-technical studies were completed for the proposed HDD crossings at Lake Oahe. In addition to Geotechnical reports, separate studies were completed on the potential of scour and slope stability. | |

| Threat Assessed | Threat Attributes | Result of Threat Assessment | Assessments/Monitoring Completed | Monitoring / Mitigation Planned |
|---|---|---|---|---|
| | | does not warrant further analysis [5]. | | |
| Other Threats | Concomitant Failures | Given the proposed separation distance between DAPL and Northern Border pipeline, the threat of concomitant failure is identified as a potential threat to DAPL.  However, with the depth of the Lake Oahe crossing being 90', it is NOT LIKELY that the DAPL pipeline could be exposed in the blast crater generated by the catastrophic failure of the adjacent natural gas pipeline. | | DAPL maintains continuous communication and joint-risk assessment evaluations with Northern Border operations personnel. |
| Other Threats | Access Restrictions | No access restrictions were identified in the action area. | | |
| Other Threats | Forest fires | No concerns identified in the action area. | | |

ATTACHMENT 5

| | |
|---|---|
| **From:** | Siguaw, Tom <Tom.Siguaw@energytransfer.com> |
| **Sent:** | Monday, February 19, 2018 3:48 PM |
| **To:** | JSZ@P-PIC.com; Mark Hereth |
| **Cc:** | Siguaw, Tom |
| **Subject:** | DAPL - USACE - Remand Letter ****RFQ - THIRD PARTY INDEPENDENT EXPERT ENGINEERING COMPANY REVIEW**** ACTION REQUIRED**** |
| **Attachments:** | 2017.12.04 (303) Order on Remedy During Remand.pdf; 2017.12.04 (304) Mem Op on Remedy During Remand.pdf; Exhibit D_Easement Conditions.pdf; Lake Oahe HDD_AS-BUILT OVERLAY.PDF; Lake Oahe - Alignment Sheets.pdf; DAPL_Post Construction_Easement Conditions_Threat Assess.docx |
| **Importance:** | High |

## To:   Process Performance Improvement Consultants, LLC

John Zurcher:  713-494-1052
JSZ@P-PIC.com

Mark Hereth:  713-294-6650
MLH@P-PIC.com

Dakota Access Pipeline (DAPL) is soliciting a Proposal for a third-party independent expert engineering company to review Dakota Access Pipeline - Lake Oahe, ND easement special conditions imposed by the US Army Corps of Engineers, and to assess compliance with all such conditions as well as other integrity threats between the valve sites closest to each shore of Lake Oahe, ND as ordered.

See the following attachments to this email:
> **Judicial Order on Remedy During Remand & Memorandum Opinion**
> **USACE Easement Special Conditions (Exhibit D)**
> **DAPL As-Built Overlay (Lake Oahe HDD Plan and Profile)**
> **DAPL As-Built Alignment Sheet (Lake Oahe Crossing Valve-to-Valve)**
> **DAPL Post Construction Easement Conditions and Threat Assessment**

DAPL will make the confidential, relevant information available at its offices (1300 Main Houston, TX 77002) and at Wood Group's offices (17325 Park Row Houston, TX 77084. There are multiple files at both locations totaling ~ 4,000 pages.

Please include with your proposal the following items:
> List of personnel to be used for this Work (Review / Audit) with their respective resumes and billing rates.
> Required start date so as to complete this Work (Review / Audit) and furnish DAPL a written Final Report by **March 23, 2018**.

Estimated total cost for this Work (Review / Audit).

**Submit Proposal in writing and  via email to the following --- Due 9:00 am on Thursday, February 22, 2018:**

Tom Siguaw
Energy Transfer Partners
1300 Main
Ste. 14.036
Houston, TX  77002
Cell Phone:  713-249-3425
Email:  tom.siguaw@energytransfer.com

You were recommended by Chris Lason, ETP
Thanks

Tom Siguaw
Sr. Director
Energy Transfer Partners
(o)  713-989-2841
(c)  713-249-3425

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

STANDING ROCK SIOUX TRIBE,

    Plaintiff,

    and

CHEYENNE RIVER SIOUX TRIBE,

    Plaintiff-Intervenor,

       v.

U.S. ARMY CORPS OF ENGINEERS,

    Defendant,

    and

DAKOTA ACCESS, LLC,

    Defendant-Intervenor and Cross-
    Claimant.

Civil Action No. 16-1534 (JEB) (and
Consolidated Case Nos. 16-1769 and
16-267)

<u>**ORDER**</u>

For the reasons set forth in the accompanying Memorandum Opinion, the Court

ORDERS that:

    1.  The parties shall coordinate to finalize an oil-spill response plan affecting Tribal

resources and lands at Lake Oahe, which they shall submit to the Court by April 1, 2018;

    2.  Dakota Access, with input from the Tribes, shall select a third-party independent

expert engineering company to review easement conditions and regulations, and to assess

1

compliance with all such conditions as well as other integrity threats. The results of the independent audit shall be filed with the Court by April 1, 2018; and

3. Dakota Access shall submit to the Court bi-monthly reports including the following information with respect to the segment of the pipeline crossing Lake Oahe (*i.e.*, between the valves closest to each shore of Lake Oahe):

a. Inline-inspection run results or direct-assessment results performed on the pipeline during the reporting period;

b. The results of all internal-corrosion management programs and any actions taken in response to findings of internal corrosion;

c. Any new encroachment on the right-of-way during the reporting period;

d. Any new integrity threats identified during the reporting period;

e. Any reportable incidents that occurred during the reporting period;

f. Any leaks or ruptures that occurred during the reporting period;

g. A list of all repairs on the segment made during the reporting period;

h. Ongoing damage-prevention initiatives on the pipeline and an evaluation of their success or failure;

i. Any changes in procedures used to assess and monitor the segment; and

j. Any company mergers, acquisitions, transfers of assets, or other events affecting the management of the segment.

Dakota Access shall file the first such report on or before December 31, 2017, and shall file subsequent reports every 60 days thereafter until remand is complete.

SO ORDERED.

/s/ James E. Boasberg
JAMES E. BOASBERG

2

United States District Judge

Date:  December 4, 2017

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

STANDING ROCK SIOUX TRIBE,

    Plaintiff,

    and

CHEYENNE RIVER SIOUX TRIBE,

    Plaintiff-Intervenor,

    v.

U.S. ARMY CORPS OF ENGINEERS,

    Defendant,

    and

DAKOTA ACCESS, LLC,

    Defendant-Intervenor and Cross-Claimant.

Civil Action No. 16-1534 (JEB) (and Consolidated Case Nos. 16-1769 and 16-267)

## MEMORANDUM OPINION

Two months ago, this Court determined that oil could continue to flow through the Dakota Access Pipeline while the U.S. Army Corps of Engineers conducted further environmental analyses. See Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers (Standing Rock IV), 2017 WL 4564714 (D.D.C. Oct. 11, 2017). Although the prior Opinion declined to vacate the agency's easement approval, it left open the question of whether to impose any conditions during the remand period. Plaintiffs, the Standing Rock and Cheyenne River

1

Sioux Tribes, have asked for a series of interim measures to monitor the ongoing operation of the

pipeline.  Defendants oppose such conditions, arguing that the Tribes have not demonstrated a

need for injunctive relief and that the proposed measures are unnecessary during remand.

As a threshold matter, the Court concludes that the interim conditions are not a request

for injunctive relief; they are instead a means by which the Court can ensure that it receives up-

to-date and necessary information about the operation of the pipeline and the facts on the ground.

It next determines that the requested measures, each of which is tailored to keeping the Court

abreast of the conditions at Lake Oahe pending further Corps analysis, are reasonable and

appropriate.

## I.     Background

As explained in prior Opinions, the parties here are engaged in a protracted dispute over

the placement of the Dakota Access Pipeline (DAPL) under Lake Oahe in North Dakota.  See,

e.g., Standing Rock IV, 2017 WL 4564714, at *1-3.  The Lake is a federally regulated body of

water that borders the Tribes' reservations, and it is considered sacred within their spiritual

practices.  Id.

In their most recent challenge to the project, Plaintiffs alleged that the Corps had erred in

its analysis of the environmental impact of the pipeline crossing, in violation of the National

Environmental Policy Act.  See Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers

(Standing Rock III), 255 F. Supp. 3d 101 (D.D.C. June 14, 2017).  The Court agreed in part and

remanded the case to the Corps for further analysis.  Id. at 140.  In a subsequent Opinion, issued

on October 11, 2017, the Court examined whether the NEPA violations warranted vacatur of the

agency's decisions – and thus a stoppage in the oil flow – during remand.  See Standing Rock

IV, 2017 WL 4564714.  Finding a "significant likelihood" that the Corps could substantiate its

prior conclusions, the Court answered that question in the negative.  Id. at *8.  In denying such

relief, however, it left open the possibility of imposing other, interim conditions during remand.

Id. at *12.  It ordered further briefing on the issue from both sides, which is now complete.

## II.    Analysis

### A.    Authority to Issue Conditions

The Court turns first to the matter of its authority to impose conditions during remand.

As the Tribes correctly note, this question has already been decided by the prior Opinion, in

which the Court found that it possessed jurisdiction to order interim remedies other than vacatur.

Id. at *12 (rejecting Defendants' argument that Court lacks jurisdiction to enter interim relief).

Although the Court therefore considers this matter largely settled, Defendants nonetheless

continue to contend that the proposed conditions are beyond the scope of the Court's power.

This is not so.

The fundamental flaw in Defendants' argument is in how they characterize the relief

Plaintiffs seek.  Defendants assert that the Tribes are, in effect, asking for an injunction.

According to the Corps, "Plaintiffs' request for 'alternative measures' is . . . nothing more than a

request for additional injunctive relief."  ECF 287 (Corps Brief) at 1-2.  Asserting that the Tribes

fail to meet the test for such a remedy, the Corps contends that Plaintiffs are not entitled to

interim relief.  Id.

Yet the conditions sought do not constitute injunctive relief.  They do not affect

Defendants' ongoing environmental analysis, nor do they constrain the outcome of the remand

process.  Rather, they are largely a means of providing the Court with relevant information

during this period.  Each of the interim conditions is tailored to address the Court's ongoing

concern with the risk of a spill at Lake Oahe – a hazard that the previous Opinion described as

"at the center of this Court's prior" decision to remand the matter to the Corps.  See Standing

Rock IV, 2017 WL 4564714, at *10.  Such information-gathering measures are within the

Court's managerial discretion over this pending case.  See also West Virginia v. EPA, Order, No.

15-1363 (D.C. Cir. 2017) (ordering EPA to file status reports at 30-day intervals while case held

in abeyance).

Because the interim conditions here do not affect the remand process, Defendants'

reliance on Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139 (2010), is misplaced.  The

Court there held that the district court had exceeded its authority when, after vacating the Animal

and Plant Health Inspection Service's decision to completely deregulate a genetically engineered

crop, it additionally entered an injunction preventing the agency from partially deregulating the

crop during the remand period.  Id. at 156, 158-59.  Such an injunction, the Court concluded,

interfered with the agency's authority "to decide whether and to what extent it would pursue a

partial deregulation" and thus impermissibly "pre-empt[ed] the very procedure by which the

agency could determine . . . that a limited deregulation would not pose any appreciable risk of

environmental harm."  Id. at 159, 164.  The holding in Monsanto thus resolved an issue

unconnected with the facts of this case – whether a district court may impose constraints on an

agency's authority and decisionmaking during remand.  The interim measures proposed here do

not have any such effect.

Other cases addressing the scope of a court's supervision during remand are similarly

inapposite.  These decisions all concern the imposition of injunctive relief relating to the relevant

agency's analysis or discretion on remand.  See Bennett v. Donovan, 703 F.3d 582, 588-89 (D.C.

Cir. 2013) (noting that court would not direct agency on remand "to take [a] precise series of

steps" with respect to plaintiffs' mortgage, including "accept[ing] assignment of the mortgage,

pay[ing] off the balance . . .  and then declin[ing] to foreclose"); Palisades Gen. Hosp. Inc. v.

4

Leavitt, 426 F.3d 400, 403 (D.C. Cir. 2005) (stating that district court lacked authority to "order specific relief" after vacating agency decision); Berge v. United States, 949 F. Supp. 2d 36, 47 (D.D.C. 2013) (noting no district court jurisdiction to "order specific relief that deprives an agency of the ability to reconsider the matter in light of the Court's decision").

Yet here, as explained in more detail below, the conditions are not constraints on the Corps' analysis or a grant of "specific relief" to the Tribes. They do not concern the scope of the remand, nor do they affect the agency's authority over the pipeline. They are instead means by which the Court can gather information about the risks posed by the pipeline pending remand and can ensure that the status quo is preserved for both sides. As discussed in the prior Opinion, such an interim remedy clearly falls within the Court's general equitable powers.

Recent events have made clear, moreover, that there is a pressing need for such ongoing monitoring. Earlier this month, the Keystone Pipeline leaked 210,000 gallons of oil in Marshall County, South Dakota. See Mitch Smith and Julie Bosman, Keystone Pipeline Leaks 210,000 Gallons of Oil in South Dakota, N.Y. TIMES (Nov. 16, 2017), https://www.nytimes.com/2017/11/16 /us/keystone-pipeline-leaks-south-dakota.html. The spill occurred near the boundaries of the Lake Traverse Reservation, home of the Sisseton Wahpeton Oyate Tribe, thus highlighting the potential impact of pipeline incidents on tribal lands. Id. Although the Court is not suggesting that a similar leak is imminent at Lake Oahe, the fact remains that there is an inherent risk with any pipeline. As stated in the prior Opinion, "[T]here is no doubt that allowing oil to flow through the pipeline during remand risks the potentially disruptive effect about which the Tribes are most concerned – a spill under Lake Oahe." Standing Rock IV, 2017 WL 4564714, at *10. Such incidents, the Court noted, "have the potential to wreak havoc on nearby communities and ecosystems." Id. at *11. In light of these concerns, it is in the Court's interests to stay

abreast of any relevant changes during the remand period and to order the parties to provide up-to-date information about the pipeline's operation. Such reporting will allow the Court to ensure that remand without vacatur remains the appropriate remedy and to monitor any factual developments in this ongoing case.

The Corps is thus incorrect that the interim conditions are "unwarranted" and "unlikely to address Plaintiffs' stated concerns with the operation of the pipeline." Corps Brief at 4. Indeed, Defendants' assertion that the Tribes' "rights, resources, and land are fully protected by the existing easement" presupposes that the status quo will be maintained during the remand process. Id. at 5. Yet without measures to ensure that Defendants share information about ongoing operations, there is no clear way for the Court, the parties, or the public to evaluate the efficacy of the extant safety measures.

B.    Interim Conditions

Plaintiffs request three specific conditions during the remand period: (1) the finalization and implementation of oil-spill response plans at Lake Oahe; (2) completion of a third-party compliance audit; and (3) public reporting of information regarding pipeline operations. See ECF 272 (Tribes' Brief Regarding Remedy) at 36-39. The Court agrees that each of these measures is appropriately tailored to monitoring the status of the pipeline during remand.

As to the first, the Corps contends that the Tribes and Dakota Access "either have resolved, or are in the process of resolving, the Tribe's request" and that the relief sought is therefore not "necessary because it appears that the parties have already engaged in the requested coordination." Corps Brief at 6. Dakota Access similarly states that it is "already coordinating" with the Tribes' emergency-management personnel. See ECF 288 (Dakota Access Brief) at 4. The Court, of course, encourages the parties to collaborate in efforts to resolve any pipeline-

6

related dispute.  Yet, in light of the case's history of contested versions of discussions between Plaintiffs and Defendants, it will not rest on such representations.  Instead, the Court will order that the Corps, Dakota Access, and the Tribes coordinate to finalize spill response plans at Lake Oahe, and that the parties file such plans with the Court by April 1, 2018.  Such a condition is directly related to the risk of a spill during remand, and it is directed to keeping the Court informed as to all parties' efforts to preserve the status quo pending the Corps' further environmental analysis.

The Court will additionally impose the second requested condition – namely, the completion of a third-party compliance audit.  In contesting this measure, Dakota Access relies heavily on the ongoing authority of the Pipeline and Hazardous Materials Safety Administration to ensure DAPL's compliance with federal laws and regulations.  See DA Brief at 5-6.  The Tribes note, however, that PHMSA itself recognized the potential benefit of having an independent, third-party review.  See Tribes Brief at 10.  Defendants' assertion that such a process would be duplicative of PHMSA oversight is therefore unavailing.  As to the Tribes' involvement in the process, the Corps asserts that Plaintiffs are asking for their "own experts [to] actually participate in the audit," Corps Brief at 6, and Dakota Access contends that the Tribes are seeking to "insert[]" themselves into the process.  See DA Brief at 6.  Yet the Tribes in fact request only that they be permitted to participate in the selection of the auditor and have the opportunity to share their relevant data during the audit process.  See Tribes Brief at 10.  This seems reasonable.  The Court will therefore order that Dakota Access select an independent, third-party auditor in consultation with the Tribes.  Because these conditions are imposed in order to keep the Court informed of the circumstances at Lake Oahe pending remand, it will require that the results of this audit process be filed with the Court by April 1, 2018.

Finally, the Court will require that Dakota Access file bi-monthly reports regarding the status of the pipeline during remand, beginning at the end of this month.  With respect to this condition, the Corps contends that such reporting is "unnecessary" and "unlikely to lead to any meaningful differences in the safety of the pipeline."  Corps Brief at 7.  Yet it never explains how additional information and transparency during the remand process would not enhance public safety and the Court's understanding of the facts on the ground.  In light of Dakota Access's agreement to "voluntarily" report on many of the issues raised by the Tribes, there is similarly no concern that this condition will be unduly burdensome for the company.  See DA Brief at 7.  The Court will therefore order that Dakota Access file bi-monthly reports of any repairs or incidents occurring at the segment of the pipeline crossing Lake Oahe.

## III.    Conclusion

The Court, the parties, and the public all have an interest in ensuring that the status quo at Lake Oahe is preserved pending remand.  In order to obtain the information necessary to monitor the conditions in North Dakota, and to mitigate the risk of any potential spill, the Court will thus impose a series of interim measures.  A separate Order consistent with this Opinion will be issued this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  December 4, 2017

## SPECIAL CONDITIONS
## LAKE OAHE, EASEMENT NO DACW45-2-16-8059

| Condition | |
|---|---|
| 1. | **Procedures and Specifications:** For the pipeline segments crossing Lake Oahe and its "could affect" High Consequence Areas ("could affect" HCAs) (as defined in 49 CFR § 195.450), Grantee must meet the U.S. Army Corp of Engineers easement special conditions by developing, implementing, and maintaining for the duration of the easement all easement special conditions in specifications and procedures for the design, construction, testing, operation and maintenance specifications and procedures as required in 49 CFR §§ 195.100, 195.202, 195.302, and 195.402 and this easement.<br><br>For the purposes of these special conditions, "pipeline segment" is defined as Lake Oahe and the "could affect" HCAs noted in EA for the vicinity of Lake Oahe.. |
| 2. | Grantee will conduct all HDD work according to the HDD Construction Plan [August 18, 2015] (Final EA, Appendix B) that it has prepared, and implement the HDD Contingency Plan [March 11, 2011] (Appendix B) in the event of an inadvertent release. |
| 3. | Grantee is not authorized to discharge hydrostatic test water under this easement. |
| 4. | Grantee will follow response, containment, mitigation measures, and cleanup measures described in SPCC, SWPPP, and ECP. |
| 5. | Grantee will use temporary sediment control measures, such as silt fence, to minimize the introduction of sediment into waterbodies during construction and minimize the movement of spoil and sediment from surface runoff during and after construction. |
| 6. | Grantee will return all surface drainage contours and vegetation to preconstruction conditions as much as practical. |
| 7. | Grantee will avoid groundwater contamination by implementing the protective measures set forth in the Project specific spill prevention, control and Countermeasures prepared by the contractor and in the Spill Prevention, Control and Countermeasure Plan [December 2014] (Final EA, Appendix A). |
| | **Documentation Conditions** |
| 8. | The Grantee will submit the Facility Response Plan to the Oahe OPM for review prior to the operation of the pipeline. |
| 9. | The Grantee will submit all plans not final at the time this easement is granted to the Oahe OPM for review and the incorporation of U.S. Army Corps of Engineers comments prior to the Grantee's submittal to the Pipeline and Hazardous Management Safety Administration. These plans include, but are not limited to the following:<br>a. Geographical Response Plan,<br>b. Operations and Maintenance Manual,<br>c. Risk Assessment (Integrity Management Plan), and<br>d. Spill Models (Using the National Hydrography Dataset by the U.S. Geological Survey) |
| 10. | The Grantee must send any updated plans in the Facility Response Plan to the Oahe OPM for review by the U.S. Army Corps of Engineers Environmental Compliance Coordinators at the Omaha District Office and the Oahe Project Office within one year of the update. |

**EXHIBIT "D"**
**DACW45-2-16-8059**

| | |
|---|---|
| 11. | The Grantee shall provide as-built drawings for the crossing at Lake Oahe to the Oahe OPM within 6 months of the completion of pipeline construction. |
| 12. | All records demonstrating compliance with these easement conditions herein must be maintained for the duration of the easement. |
| | **Pipeline Safety Conditions (Construction)** |
| 13. | **Pipeline Design Factor – Pipelines:** Pipe installed must comply with a design factor of 0.50 or lower in the Lake Oahe crossing and "could affect" HCAs. |
| 14. | **Pipe Girth Weld – Nondestructive Tests:** Grantee must nondestructively test all girth welds in accordance with 49 CFR §§ 195.228, 195.230 and 195.234. |
| 15. | **Pressure Test Level:** The pre-in-service hydrostatic test for mainline pipe must be to a pressure producing a hoop stress of either: a minimum 100% specified minimum yield strength (SMYS) or a minimum of 1.25 times maximum operating pressure (MOP) for eight (8) continuous hours for pipeline segments using a design factor of 0.50 or less. |
| 16. | **Assessment of Test Failures:** Any pipe failure occurring during the pre-in-service hydrostatic test must undergo a root cause failure analysis to include a metallurgical examination of the failed pipe. The results of this examination must preclude a systemic pipeline material issue and the results must be reported to the Operations Project Manager at the Oahe Project Office (Oahe OPM) within 60 days of the failure. |
| 17. | **Coatings for Trenchless Installation:** Coatings used for directional bore, slick bore and other trenchless installation methods must be capable of resisting abrasion and other damage that may occur due to rocks and other obstructions encountered in this installation technique. |
| 18. | **Pipe Coating:** Pipe coatings must be non-shielding to cathodic protection (CP). Coatings such as tape and shrink sleeves would be shielding coatings to CP that protects the pipe from external corrosion. The application of a corrosion resistant coating to the steel pipe must be performed according to a coating application quality control program. The program must address pipe surface cleanliness standards, blast cleaning, application temperature control, adhesion, cathodic disbondment, moisture permeation, bending, minimum coating thickness, coating imperfections and coating repair. |
| 19. | **Field Coating:** Field joint coatings must be non-shielding to CP. Grantee must implement field girth weld joint coating application specification and quality standards to ensure pipe surface cleanliness, application temperature control, adhesion quality, cathodic disbondment, moisture permeation, bending, minimum coating thickness, holiday detection and repair quality. Field coating applicators must use valid qualified coating procedures and be trained to use these procedures. |
| 20. | **Construction Coating Survey after Installation:** Promptly after a ditch for the pipeline is backfilled, but not later than three months after placing the pipeline in service, the operator must perform an assessment to ensure integrity of the coating using direct current voltage gradient (DCVG) or alternating current voltage gradient (ACVG). The operator must repair any coating damage classified as moderate or severe (voltage drop greater than 35% for DCVG or 50 dBµV for ACVG) in accordance with section 4 and Appendix A of NACE SP0502-2008 (or latest edition referenced in 49 CFR § 195.3) within six months of the assessment. |
| 21. | **Mainline Valve(s) with Remote Control or Automatic Shutdown:** |

EXHIBIT "D"
DACW45-2-16-8059

a. Mainline valves with remote control or automatic shutdown for water crossings and reservoirs must be installed on either side of the crossing and additional mainline valves(s) installed either upstream, downstream, or both to protect the water body from the "could affect" HCA on either side of the water crossing. Mainline valves must either be located outside of the flood plain or have valve actuators and other control equipment installed so as to not be impacted by flood conditions.

b. Mainline valves with remote control or automatic shutdown must contain transit inhibit switches that prevent the valves from shutting at a rate (and in conjunction with pumps being shutdown) so that no pressure surges can occur, or other damage caused by unintended valve closures or too fast of a closure.

c. Mainline valves must be remotely controlled and actuated or automatic shutdown, and the Supervisory Control and Data Acquisition (SCADA) system must be capable of closing the valve and monitoring the valve position, upstream pressure and downstream pressure so as to minimize the response time in the case of a failure.   Remote power backup is required to ensure communications are maintained during inclement weather.  Mainline valves must be capable of closure at all times.  If it is impracticable to install a remote controlled valve, Grantee must submit a valve design and installation plan to the appropriate Oahe OPM to confirm the alternative approach provides an equivalent level of safety.

d. Mainline valves in the pipeline segment must have actuation capability (i.e., remote control shut-off, automatic shut-off, manual shut-off where personnel are in proximity, or alternative equivalent technology) to ensure pipeline ruptures are promptly mitigated based upon maximum valve shut-off times, location, and spacing specified.

e. For each mainline valve that is a remote-control shut-off or automatic shut-off valve, the operator must conduct a point-to-point verification between SCADA displays and the mainline valve, sensors, and communications equipment in accordance with 49 CFR § 195.446(c) and (e), or an equivalent verification.

| 22. | **Supervisory Control and Data Acquisition (SCADA) System:** Grantee must develop, install, operate, and maintain a SCADA system to provide remote monitoring and control of the entire pipeline segment in accordance with 49 CFR Part 195 requirements. |
| 23. | **Computational Pipeline Monitoring (CPM) Leak Detection:** The pipeline segment must have a computational pipeline monitoring (CPM) leak detection system in accordance with 49 CFR § 195.134 and must have adequate pressure sensors at pump stations, laterals, mainline valves and liquid flow volume measurement along the pipeline at inflows, outflows and spaced along the pipeline to perform accurate leak detection.  The pipeline segment must be operated as a continuously pressurized pipeline (with no pressure, slack line pipeline segments).  If the pipeline segment is operated as a slack line pipeline segment, an operating plan must be developed, reviewed by a responsible third party independent expert engineering company and submitted to the Oahe OPM for "no objection" prior to being implemented by Grantee. |
| 24. | Grantee will minimize or avoid impacts on soils by implementing the mitigation measures described in the DAPL Project's Spill Prevention Control and Countermeasure Plan [December 2014] (SPCC), Storm water Pollution Prevention Plan[July 2015] (SWPPP), and Environmental Construction Plan [April 2015 (ECP) as well as requirements of applicable state and federal permits. |

EXHIBIT "D"
DACW45-2-16-8059

| | **Pipeline Safety Conditions (Operation)** |
|---|---|
| 25. | **Overpressure Protection Control:** Grantee must limit mainline pipeline segment overpressure protection to a maximum of 110% maximum operating pressure (MOP) during surge events consistent with 49 CFR § 195.406(b). Before commencing operation, Grantee must perform a surge analysis showing how the pipeline segment will be operated to be consistent with these overpressure protection conditions. Grantee shall equip the pipeline with field devices to prevent overpressure conditions. Remotely actuated valves or automatic shutoff valves should be fitted with devices that will stop the transit (intentional or uncommanded) of the mainline valve should an overpressure condition occur or an impending overpressure condition is expected. Sufficient pressure sensors, on both the upstream and downside side of valves, must be installed to ensure that an overpressure situation does not occur. Sufficient pressure sensors must be installed along the pipeline to conduct real time hydraulic modeling, and which can be used to conduct a surge analysis to determine whether pipeline segments have experienced an overpressure condition. |
| 26. | **Cathodic Protection:** The initial Cathodic Protection system must be operational within six (6) months of placing a pipeline segment in service. Cathodic Protection will be operated and maintained per applicable codes and the Grantee's "Operations and Maintenance Manual'. Wall thickness testing will be performed in-lieu of periodic hydro tests. The Grantee shall send the inspection reports to the Operations Project Manager at the Oahe Project Office (hereinafter the Oahe OPM)." |
| 27. | **Interference Current Surveys:** Interference surveys must be performed over the entire pipeline segment within six months of placing the pipeline in service to ensure compliance with applicable NACE International Standard Practice 0169-2007 (2007 or the latest version incorporated by reference in § 195.3) and 0177 (2007 or the latest NACE standard version, since NACE SP 0177 is not incorporated by reference in 49 CFR § 195.3) (NACE SP 0169-2007 and NACE SP 0177) for interference current levels. If interference currents are found, Grantee must determine if there have been any adverse effects on the pipeline and mitigate such effects as necessary as required below.<br><br>The interference current mitigation program for the pipeline segment must include:<br>1) As frequently as needed, including when new or uprated high voltage alternating current power lines greater than or equal to 69 kVA or electrical substations are co-located near the pipeline, but not to exceed every seven years conduct an interference survey (at times when static or dynamic voltages are at the highest values for a time period of at least 24-hours) to detect the presence and level of any electrical current that could impact external corrosion where interference is suspected;<br>2) Analyze the results of the survey to identify locations where interference currents are greater than or equal to 20 Amps per meter squared; and<br>3) a remedial action plan and apply for any necessary permits within four months of completion of the inspection or testing that identified the presence of deleterious electrical stray current.<br>4) Implement remedial actions to protect the pipeline segment from detrimental interference currents. Remedial actions must be completed promptly, but no later than one year after completion of the survey, or as soon as practicable after obtaining necessary permits. Remedial action means the implementation of measures including, but not limited to, |

EXHIBIT "D"
DACW45-2-16-8059

EXHIBIT "D"
DACW45-2-16-8059

| | |
|---|---|
| | additional grounding along the pipeline to reduce interference currents below 20 Amps per meter squared. The following criteria shall be used to determine when remedial actions are required. |
| | a) AC-induced corrosion does not occur at AC densities less than 20 A/m2 (1.9 A/ft2). The operator shall monitor these locations per (a) above. |
| | b) AC corrosion is unpredictable for AC densities between 20 to 100 A/m2 (1.9 to 9.3 A/ft2). These locations require an engineering assessment to determine if remediation is required. |
| | c) AC corrosion occurs at current densities greater than 100 A/m2 (9.3 A/ft2). These areas require mitigation. Any location that is determined to require mitigation must be mitigated to reduce the AC current density to less than 20 A/m2. |
| 28. | **Corrosion Surveys:** Grantee must complete corrosion surveys for the pipeline segment within six (6) months of placing the respective CP system(s) in operation to ensure adequate external corrosion protection per NACE RP 0169-2007. The survey shall also address the proper number and location of CP test stations as well as alternating current (AC) interference mitigation and AC grounding programs per NACE RP 0177. At least one (1) CP test station must be located within each "could affect" HCA with a maximum spacing between test stations of one-half mile. |
| 29. | **Initial Inline Inspection (ILI):** Within three (3) years of placing a pipeline segment in service, Grantee must perform a baseline ILI using a high-resolution Magnetic Flux Leakage (HR-MFL) tool, high resolution (HR) deformation tool, and an ultrasonic crack detection tool or equivalent of each. |
| 30. | **ILI Deformation Tool:** Grantee must perform a high resolution deformation tool run after completion of the hydrostatic strength test and backfill of the pipeline segment and prior to placing the pipeline segment in service. Grantee must remediate pipe in accordance with 49 CFR Part 195 and Subpart O. All expanded pipe must be remediated in accordance with PHMSA's "Interim Guidelines for Confirming Pipe Strength in Pipe Susceptible to Low Yield Strength for Liquid Pipeline" dated October 6, 2009 or any subsequent PHMSA update to this guideline. |
| 31. | **Future ILI:** Future ILI inspections must be based upon pipeline segment integrity threats and must include as a minimum of a high-resolution Magnetic Flux Leakage (MFL) tool, high resolution deformation tool, and an ultrasonic crack detection tool or equivalent of each. ILI inspections must be performed on the entire pipeline segment on a frequency consistent with 49 CFR § 195.452(j)(3) assessment intervals or on a frequency determined by fatigue studies or anomalies found that are indicative of actual operating conditions.<br><br>1) Conduct periodic close interval surveys (CIS) along the entire pipeline segment with current interrupted to confirm voltage drops in association with periodic ILI assessments under § 195.452(j)(3). Pipeline segments under Lake Oahe would not be able to CIS due to water segment and depth of directional drill across Lake Oahe.<br><br>2) CIS must be conducted within three (3) months of running ILI surveys when using a five (5) year ILI frequency, not to exceed sixty-eight (68) months, in accordance with 49 CFR § 195.452 (j) (3) assessment intervals. CIS findings must be integrated into ILI Tool findings. |
| 32. | **Internal Corrosion:** Grantee must limit basic sediment and water (BS&W) to 0.5% by volume and report BS&W testing results to A in the annual report. Grantee must report upset conditions causing BS&W level excursions above the limit on the annual report. |

|   |   |
|---|---|
| | 1) Grantee must run cleaning pigs twice in the first year and as necessary in succeeding years based on the analysis of oil constituents, liquid test results, weight loss coupons located in areas with the greatest internal corrosion threat and other internal corrosion threats. At a minimum in the succeeding years following the first year Grantee must run cleaning pigs every five years unless analysis necessitates earlier action. |
| | 2) Liquids collected during cleaning pig runs, such as BS&W, must be sampled, analyzed and internal corrosion mitigation plans developed based upon lab test results. |
| | 3) Grantee shall review the program at least quarterly based upon the crude oil quality and implement adjustments to monitor for, and mitigate the presence of, deleterious crude oil stream constituents. |
| 33. | **Pipeline Patrolling:** Grantee must patrol the pipeline segment right-of-way on a two (2) week interval but not exceeding three (3) weeks, for at least twenty-six (26) times each calendar year, to inspect for excavation activities, ground movement, unstable soil, wash outs, leakage, or other activities or conditions affecting the safe operation of the pipeline segment. |
| 34. | The Grantee shall conduct the following training exercises: |
| | 1) A full scale open water and a full scale winter/ice exercises at Lake Sakakawea and Lake Oahe. A full scale exercise will occur once every 3 years (triennial cycle) with the location and type of exercise occurring on alternating schedules (e.g. open water exercise at Lake Sakakawea the following triennial cycle, followed by winter exercise at Lake Oahe the first triennial cycle, followed by winter exercise at Lake Oahe the following triennial cycle, etc.). The first exercise will occur within the first 3 years after the pipeline becomes operational. |
| | 2) To facilitate USACE staff involvement, the Grantee shall notify the USACE Environmental Compliance Coordinators at the Omaha District Office and the Oahe Project Office at least ninety (90) days prior to initiation of the training exercises. The Grantee shall also solicit the participation of key stakeholders (federal, state, local, and Tribal) in these exercises. |
| 35. | Within 1 month following the pipeline becoming operational, the Grantee shall provide for an all-weather access and collection point downstream of the HDD crossing at Lake Oahe. The Grantee shall provide an equipment storage facility on non-federal lands that includes a fenced permanent storage area for winter and open water spill response equipment. The storage facility should be placed in a strategic location and near existing facilities that would support access to the water. The Grantee will coordinate with the USACE and any other applicable stakeholders to obtain all necessary permits and approvals prior to construction for any ground disturbing activities associated with these facilities. The storage facility should contain sufficient response equipment at a minimum to mitigate an unintended worst case release for this Lake crossing. |
| | **Overall Condition from EA** |
| 36. | Grantee is generally responsible for commitments made and mitigation measures in the Final Environmental Assessment, Grantee Pipeline Project Crossing of Flowage Easements and Federal Lands (July 2016), including all Plans includes within Appendices thereof, even if they are not specifically made as a condition to this easement. |



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, OMAHA DISTRICT
1616 CAPITIAL AVENUE
OMAHA NE  68102-1618

REPLY TO
ATTENTION OF

February 9 2017

Real Estate Division

Dakota Access LLC
Attn:  Thomas Sigauw
1300 Main
Houston, Texas 77002

Dear Mr. Sigauw:

Enclosed for your records is a fully executed copy of Easement No. DACW45-2-16-8059.
Thank you for your cooperation.  If you have any questions, please feel free to contact me at
(402) 250-4284 or by e-mail at rick.l.noel@usace.army.mil .

Sincerely,

Rick L. Noel
Chief, Civil Branch, Real Estate Division
Real Estate Contracting Officer

Enclosure



NOTE: THIS IS A FULL SIZE DRAWING THAT IS INTENDED
TO BE PRINTED ON A 24" X 36" SHEET OF PAPER.

PLAN

CONTRACTOR'S AS-BUILT OVERLAY

NOTE:
1. THE PROVISION OF THIS INFORMATION IS NOT INTENDED TO RELIEVE THE
HDD CONTRACTOR OF THEIR CONTRACTUAL REQUIREMENT TO PROVIDE A
TABULATION OF PILOT HOLE COORDINATES AND AN AS-BUILT DRAWING.
THE PILOT HOLE COORDINATES PRESENTED ARE BASED ON PRELIMINARY
PILOT HOLE SURVEY DATA. THIS INFORMATION SHOULD BE USED TO
EVALUATE THE CONTRACTOR'S AS-BUILT DOCUMENTATION.

LEGEND
——————— DESIGNED HDD ALIGNMENT AND PROFILE
——————— CONTRACTOR AS-BUILT BY MICHELS DIRECTIONAL CROSSINGS

DAKOTA ACCESS PIPELINE PROJECT
SITE PLAN AND PROFILE

PROPOSED 30" PIPELINE
LAKE OAHE HDD
MORTON AND EMMONS COUNTIES, NORTH DAKOTA

GeoEngineers

3050 South Delaware
Springfield, MO 65804
Telephone (417) 831-9700
Fax (417) 831-9777

Project No. 18782-011-01
Drawing No. W_29004_C100012
Sheet 1 of 2

AS-BUILT ALIGNMENT SHEET
29004.02 CR13-89ST-30
STA. 4220+00 TO STA. 4300+00

DAKOTA ACCESS, LLC

MORTON COUNTY, NORTH DAKOTA

W_29004_C010085

WOOD GROUP USA, INC.

MATCH LINE STA. 4220+00

MATCH LINE STA. 4300+00

SEE DWG. W_29004_C010084
MATCH LINE STA. 4220+00

SEE DWG. W_29004_C010086
MATCH LINE STA. 4300+00

COUNTY & STATE
TRACT NO.
TOWNSHIP & RANGE

MORTON COUNTY, NORTH DAKOTA
TOWNSHIP 134 NORTH, RANGE 79 WEST

COATING

MATERIAL

COVER (FT)

PROFILE
SCALE: 1" = 500' H.
1" = 100' V

STATIONING

BILL OF MATERIALS

REFERENCE DRAWINGS

AS-BUILT
07/31/2017

OLD DRAWING NO.

PROJECT NO.
10395700

TOP OF 30" AS-BUILT PIPELINE

NATURAL GROUND

AS-BUILT ALIGNMENT SHEET
29004.02 CR13-69ST-30
STA. 4300+00 TO STA. 4400+00

MORTON & EMMONS COUNTY, NORTH DAKOTA

W_29004_C010086

DAKOTA ACCESS, LLC

WOOD GROUP USA, INC.

# Dakota Access Pipeline

# Lake Oahe HDD Crossing

## *Overall Assessment*

- **Pipe Manufacture:** DAPL pipe material meets requirements of API 5L PSL-2: Specification for Line Pipe.
- **Pipeline Operation:** DAPL Pipeline meets requirements of 49 CFR Part 195 - Transportation of Hazardous Liquids by Pipeline and ASME B31.4: Pipeline Transportation Systems for Liquids and Slurries.
- **Integrity Management and Risk Assessment:** DAPL's Integrity management and risk assessment practices follow guidance of RP API 1160: Managing System Integrity for Hazardous Liquids Pipelines.

## *Integrity Assessment*

- **Pipeline Design Factor.**  The pipe installed complies with a design factor of 0.50 in the Lake Oahe HDD crossing and could affect HCA's.

- **Pipe Girth Weld - Nondestructive Tests.**  DAPL nondestructively tested all girth welds in accordance with 49 CFR §§195.228, 195.230 and 195.234.  All machine welds were tested by ultrasonic means; all stick/manual welds were tested by radiographic means.

- **Hydrostatic Test.**  The pipe that comprises the HDD is 30" x 0.625" API 5L PSL-2 X70 and was successfully tested twice to a minimum pressure of 1,880 psig.  First test was the pre-in-service hydrostatic test at a minimum of 1.25 times maximum operating pressure (MOP) for eight (8) continuous hours performed prior to pulling the pipe under the Lake.  Second test was performed under the same conditions after the pipe was pulled under the Lake.  There were no failures.

- **Caliper Survey.**  No Deformations identified in Caliper Survey performed on March 24, 2017.  As reported, the line at the time of the survey appeared to be fairly clean, with a smooth interior wall surface.

- **Construction Coating Survey after Installation.**  No actionable coating anomalies were identified on the DCVG Survey performed on April 22, 2017.  The DCVG Survey was completed promptly after the ditch for the pipeline was backfilled and covered the entire HDD crossing and encompassed the easement / action area.

    Direct Current Voltage Gradient and is a survey technique used for assessing the effectiveness of coating corrosion protection on buried steel pipe. DAPL is required to repair any coating damage classified as moderate or severe (voltage drop greater than 35% for DCVG or 50 dBμV for ACVG) in accordance with section 4 and Appendix A of NACE SP0502-2008 (or latest edition referenced in 49 CFR § 195.3).

- **AC Mitigation**. Completed an AC (Alternating Current) Potential Close-Interval-Survey from April 19, 2017 through April 21, 2017 traversing form MLV-360, MP 174.80 to HWY 1804, MP 186.70. This survey encompassed the easement / action area.

    DAPL installed four (4) Metricorr ER Probes with Remote Monitoring Units (RMU's) on April 5, 2017, to monitor AC/DC current density, AC/DC potential and corrosion rates. These monitoring probes have been installed such that there are two (2) probes on either side of Lake Oahe with continuous satellite monitoring for each probe. Preliminary analysis of Metricorr data indicates AC current densities < 0.5 A/m2 peak. No remedial action is necessary as AC-induced corrosion does not occur at AC current densities < 20 A/m2 (1.9 A/ft2).

- **Cathodic Protection (CP)**. Completed a native Pipe-to-Soil Close-Interval-Survey (CIS)/CP-Interference CIS from April 19, 2017 through April 21, 2017 traversing form MLV 360, MP 174.80 to HWY 1804, MP 186.70 encompassing the easement / action area. Data analysis indicated no interference issues

    DAPL installed four (4) impressed current ground beds (Unit 340 @ MLV 340, Unit 360 @ MLV 360, Unit 400 @ MLV 400, and Unit 430 @ MLV 430) covering the permitted / action area. These four (4) ground beds were installed April 19, 2017 through April 28, 2017 and were energized on May 23, 2017. Each of these ground beds were monitored for 3 weeks to allow for polarization of the pipeline and a subsequent On/Off CIS was performed June 15, 2017 through June 22, 2017 from MLV 360 to MLV 400 encompassing the easement / action area. Preliminary analysis of this CIS indicate excellent levels of cathodic protection throughout the area with no interference issues.

    DAPL installed test stations at each of its Mainline Valve (MLV) sites on both sides of Lake Oahe, as well as, each of Northern Border Pipeline's MLV sites on both sides of Lake Oahe.

- **Mainline Valves with Remote Control.** Mainline valves with remote control actuators were installed on either side of the Lake Oahe crossing and additional mainline valves were installed on both sides of Lake Oahe to protect the "could affect" HCA on either side of the HDD crossing. These MLV's were located outside of the flood plain so as to not be impacted by flood conditions.

    Since these MLV's are remotely controlled and actuated, the Supervisory Control and Data Acquisition (SCADA) system is capable of closing the valve and monitoring the valve position, upstream pressure and downstream pressure so as to minimize the response time in the case of a failure. Remote power backup is also provided to ensure communications are maintained during inclement weather so that the MLV's are capable of closure at all times. For each of these MLV's, DAPL conducted a point-to-point verification between SCADA displays and the mainline valve, sensors, and communications equipment in accordance with 49 CFR § 195.446(c) and (e), or equivalent verification.

### _Threat Assessment_

- **Integrity Management and Risk Assessment:** DAPL's Integrity management and risk assessment practices follow guidance of RP API 1160: Managing System Integrity for Hazardous Liquids Pipelines.
- Threats considered in this threat assessment follow ASME B31.8S guidelines referenced in API 1160.

**Integrity Assessment – Second Hydrostatic Test**

| | ENERGY TRANSFER | **MOP ESTABLISHMENT** | | **B.10.A** Available Electronically |
|---|---|---|---|---|

**Date of Test:** _____

| Project: | **DAPL** | | | | | | |
|---|---|---|---|---|---|---|---|
| AFE No.: | 480000000001 | | Company : | ☒ DAPL | ☐ ETCOP | ☐ HPL | |
| Test Record Number: | 6754 | | | | | ☐ Other ____ | |

| **TEST LOCATION** | Discharge: | By Permit | | Line Number: | N/A | |
|---|---|---|---|---|---|---|
| | County/Parish: | Morton County | | Line Name: | DAPL Spread 6 Lake Oahe HDD | |
| | State: | ND | | Valve Section:: | From: MLV - 380 | |
| | Total Footage: | 8,150' | | | To: MLV - 390 | |

| **(ADDITIONAL TEST INFORMATION** | Reason For Test: | ☒ New | ☐ Uprating | ☐ Class Change | ☐ Integrity | ☐ Fabrication |
|---|---|---|---|---|---|---|
| | Stationing Begin: | MLV - 380 | | Stationing End | MLV - 390 | |
| | Existing Facility MOP: | N/A | | | | |
| | In-Service Date: | TBD | | | | |
| | Other Location Description: | Lake Oahe | | | | |
| | Is a Station Equation involved: ☒ NO ☐ YES If yes, provide | | | | BK/AH ____ | |

**MATERIAL INVENTORY**

ALLOWABLE MOP (per design pressure) :   Design Pressure Verification ("weakest link" pipe)

| Sub-section | S | t | D | E | T | F | DP = ((2xSxt)/D)xExTxF |
|---|---|---|---|---|---|---|---|
| 1 | 70000 | 0.625 | 30 | 1 | 1 | 0.50 | 1458 |
| 2 | 70000 | 0.429 | 30 | 1 | 1 | 0.72 | 1441 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

Minimum pressure rating of other components:   ANSI 600   Attach additions sheets if necessary

S=SMYS, t=wall thickness, D=OD, E= longitudinal joint factor, T=temperature derating factor; F=design factor

**PRESSURE TEST**

ALLOWABLE MOP (per pressure test)

Actual high-point test pressure: 1880 psi

Test Factor: 1.25     Actual high-point test pressure / Test Factor* = 1504

* Test factors: 1.1 for Class 1; 1.25 for Class 2 & offshore; 1.5 for Class 3 or 4, risers and platforms, compressor and M& R stations

**NOTE:** The Established MOP can be as high as the lesser of the allowable MOP per design pressure or allowable MOP per pressure test, but no less than the existing MOP of the line in which it is installed.

**Established MOP:** 1440

Remarks/Comments: ____

Prepared by: Matthew Cooper-Harper     Approved by: ____

Revision Date: 07/15/16     Retention: Life of the facility

**Integrity Assessment – Caliper Survey**

| *ENDURO* | Pipeline Services, Inc.       JOB PLACEMENT FORM |
|---|---|
| CUSTOMER: | Energy Transfer Company / Michel's Pipeline |
| REP.: | Cody Wood - Michel's Pipeline |
| | |
| JOB NUMBER: | B16-613F / D.A.P.L - Lake Oahe HDD / Lake Oahe West - Lake Oahe East - MLV 390 |
| LOCATION: | Bismarck, ND |
| | ADDRESS FOR SHIPPING REPORTS: |
| SHIP ADDR 1: | |
| SHIP ADDR 2: | |
| SHIP ADDR 3: | |
| SHIP ADDR 4: | |
| SHIP ADDR 5: | |
| | BILLING INFORMATION |
| DAYS ON SITE: | 5 |
| MOB MAN: | Jeff walker |
| MOB TOOL: | (2) 30" DW DdL™ Caliper Tool |
| OTHER: | (2) Transmitters, (2) Receivers, (2) Geophones, Support Equipment |
| OTHER: | |
| | SIGNATURES: |
| Enduro Representative/Date: | |
| Customer Representative/Date: | |

| DATE | NOTES |
|---|---|
| 3/19/2017 | *B16-613F:* Travel Day. Tulsa, OK - York, NE. Contacted customer Cody Wood with Michel's Pipeline. Run tentatively scheduled for 3/21/17. |
| 3/20/2017 | *B16-613F:* Travel Day. York, NE - Bismarck, ND. Informed Mr. Wood I was on location. |
| 3/21/2017 | *B15-613F:* Stand-by. Met with customer at launch location, discussed run parameters and run date has been pushed to 3/23/2017. |
| 3/22/2017 | B16-613F: Stand-by. Contacted customer, run moved to evening of 3/23/17. |
| 3/23/2017 | *B16-613F:* Stand-by. Contacted customer, run moved to 3/24/17. |
| 3/24/2017 | *B16-613F; D.A.P.L. Lake Oahe HDD; Lake Oahe West - Lake Oahe East - MLV 390; 30" DdL™ DW x 0.625 x 1.52 Miles:* 9:30 AM, arrived at launch location, discussed plan of the day with Mr. Wood, installed transmitter, tool ready for launch. Tool was launched at 7:00 PM from Lake Oahe West with 7750 CFM / 100 PSI. Customer personnel tracked the tool at MLV 390, tool passed at 7:58 PM, with an approximate speed of 1.59 MPH. I traveled to L/R #2 North Dakota permanent receive site. Lake Oahe East - MLV 390 - L/R #2 North Dakota have previously be ran and reported. |
| 3/25/2017 | *B16-613F; D.A.P.L. Lake Oahe HDD; Lake Oahe West - Lake Oahe East - MLV 390; 30" DdL™ DW x 0.625 x 1.52 Miles:* Tool was received at 1:23 AM on 3/25/17. A brief analysis was performed, tool worked to Enduro standards. Continued with a complete analysis. |
| 3/26/2017 | *B16-613F:* Travel Day. Delivered Field Report, signed off, released from project. |
| 3/27/2017 | *B16-613F:* Travel Day. |



---

## DdL™ Caliper Survey Field Report

### B16-613F - D.A.P.L. / Lake Oahe HDD / AFE - 480000000002

---

**Run Date: March 24, 2017**

**Report Date: March 25, 2017**

Lake Oahe West

To

Lake Oahe East – M.L.V. 390

Energy Transfer Company / Michels Pipeline

P.O. Box 3489 | Tulsa, OK 74101-3498 | P: 918.446.1934 | www.enduropls.com

Field Caliper Report | Energy Transfer Company / Michels Pipeline | D.A.P.L. / Lake Oahe HDD / AFE - 480000000002 | B16-613F

# Executive Summary – DdL™ Caliper

## General Run Information

| Pipeline Name | D.A.P.L. / Lake Oahe HDD / AFE - 480000000002 | |
|---|---|---|
| Job # | B16-613F | |
| | Launcher | Receiver |
| Station | Lake Oahe West | Lake Oahe East – MLV 390 |
| Location(City/County, state) | Bismarck, ND | Bismarck, ND |
| Date / Time | 3/24/17 7:00 PM | 3/24/17 3/24/17 |

| | | AGMs | |
|---|---|---|---|
| | | Rec | |
| | | AGM# Not Rec | |

| Sensors | | Cal. | INS |
|---|---|---|---|
| | Total | 30 | 3Gy. / 3Acc. |
| | Rec. | 30 | 3Gy. / 3Acc. |
| | Bad | 0 | 0 / 0 |

| Product | Air~7750 CFM / 100 PSI |
|---|---|
| Pipe Diameter | 30.000 inches |
| Length | 1.69 miles |
| Hours | 58 min. |

Field Technician:   Jeff Walker

Data Analyst:   Jeff Walker

## Inspection Quality & Findings

| Deformation Indications | 0 |
|---|---|
| Dent < 2 % O.D. | 0 |
| Dent ≥ 2 % O.D. | 0 |
| Ovalities | 0 |
| Expansions | |

| Irregular Welds | 0 |
|---|---|
| Debris Indications | 0 |
| MFG Indications | 0 |

| Bends | 4 |
|---|---|
| Factory Bends | 4 |
| Field Bends (> 12D) | 0 |

Field Caliper Report | Energy Transfer Company / Michels Pipeline | D.A.P.L. / Lake Oahe HDD / AFE -
480000000002 | B16-613F

**Customer's immediate concerns:**

*Percentage of pipe diameter for a sharp anomaly – 1.00% top / 2.00% bottom*
*Percentage of pipe diameter for ovality – 5.00%*
*Percentage of pipe diameter for expansion – 1.50%*
*Bend radius requirements – 3.00D*

**General Run and Line Information**

On 3/24/2017 the 30 inch DdL™ DW caliper tool was launched from the Lake Oahe West site near Bismarck, ND at
7:00 PM using a total of 7750 CFM and holding 100 PSI to control the speed of the tool.  Tool was tracked by
Michels Pipeline personnel at M.L.V 390, tool passed at 7:58 PM with an average speed of 1.59 MPH.

Note: The 30 inch DdL™ DW caliper tool was ran from the Lake Oahe HDD West to L/R #2 North Dakota site,
approximately 10.38 miles, however, per customer request, the data collected from Lake Oahe HDD West to Lake
Oahe HDD East – M.L.V. 390, approximately 8,065 feet, will only be Field Reported for this survey.  The remaining
data recorded has been previously ran and reported.

The DdL™ DW caliper tool was received at the L/R #2 North Dakota site, approximately 10.38 miles from the launch
site, near Bismarck, ND on 3/25/17 at 1:23 AM.  A visual inspection of the tool showed no damage.  The data was
downloaded in the field and reviewed to confirm that the tool worked to Enduro specifications.

- The line at the time of the survey appeared to be fairly clean, with a smooth interior wall surface.

**Deformations:**

There are 0 Anomalies reported for this line section.

**Bends:**

There are 4 Factory Bends reported for this line section.
- The minimum Bend Radius in this line is 3.00D radius.

For a complete list of all the bends, please refer to the *Bend Listing*.

**Tool and Data Condition:**

- The survey tool was received in good condition.
- All data sets worked correctly and no sensor damage was found.
- All of the data recorded is acceptable.

**Correlation Reporting:**

- The customer *has not* provided Enduro with a pipeline listing.

- The customer *has not* been provided with a .kmz file.

Field Caliper Report | Energy Transfer Company / Michels Pipeline | D.A.P.L. / Lake Oahe HDD / AFE - 480000000002 | B16-613F

| Re-run Conditions | | | |
|---|---|---|---|
| ☐ Due to line conditions, Enduro recommends the survey be re-run. | | | |
| ☐ Due to anomalies found, Enduro recommends a confirming DdL™ Survey. | | | |
| ☐ Other: [please explain] | | | |
| Customer | ☐ Accept   Initials | | ☐ Decline   Initials |

*The below items have been checked and confirmed to be accurate;*

☐ *Deformations*

☐ *Features*

☐ *Bend*

*Respectfully Submitted:*

**ENDURO Pipeline Services, Inc.**

*Submitted to:*

**Energy Transfer Company / Michels Pipeline**

_____

Jeff Walker
**Field Technician**

_____

Cody Wood
**Michel's Pipeline**

Field Caliper Report | Energy Transfer Company / Michels Pipeline | D.A.P.L. / Lake Oahe HDD / AFE - 480000000002 | B16-613F

## Appendix A: Pictures

**Launch**





**Receive**



Field Caliper Report | Energy Transfer Company / Michels Pipeline | D.A.P.L. / Lake Oahe HDD / AFE - 480000000002 | B16-613F

# Appendix B: Glossary

| | |
|---|---|
| AGM | *A DdL™ survey tool incorporates an above ground marker (AGM) system, which collects tool passage as well as GPS data. These AGM boxes will be downloaded and verified for tool passage. Gathers satellite information for both atomic time and GPS coordinates. Data from each AGM location can be incorporated into the software and used along with the INS data to calculate GPS coordinates for the entire line.* |
| INS Survey | *INS Survey: The DdL™ carries a full INS package with 3 gyros and 3 accelerometers. This package, in conjunction with GPS based AGMs, enables the DdL™ to map and provide GPS position on all pipeline events.* |
| Deformation Indications | *Dents are sized and located identifying deformation/dent anomaly conditions of/or greater than 1% of pipe O.D. on Top and 2% of pipe O.D. on Bottom.  Deformations in the form of OVALITY (of or larger than 5% of pipe O.D.) will be identified.* |
| Overburden Relief | *Larger pipe diameters will experience a return to round during soil removal; a large portion of the ovality will relieve.  Sharp and Flat anomalies will relieve on the associated ovality aspect of the anomaly.  For this reason the report lists both the over-all and localized dent dimensions which identify the amount of sharp/flat and any associated ovality. The larger the ovality span, the greater the potential for relief.* |

**ENDURO** PIPELINE SERVICES, INC.

**Bend Listing**

| | | | |
|---|---|---|---|
| CUSTOMER/CONTRACTOR | Energy Transfer Company / Michel's Pipeline | PIPE DIAMETER | 30.000 in |
| CUSTOMER LINE ID | D.A.P.L. / Lake Oahe HDD / AFE - 480000000002 | WALL THICKNESS | .523 in |
| JOB NUMBER | B16-613F | PRODUCT | Air~7750 CFM / 100 PSI |
| LAUNCH STATION | Lake Oahe West | RUN DATE | 24-Mar-2017 |
| | Bismarck, ND | FIELD ENGINEER | Jeff Walker |
| RECEIVE STATION | Lake Oahe East - M.L.V. 390 | CHART ANALYST | Jeff Walker |
| | Bismarck, ND | REPORT DATE | 03/25/2017 |
| PIPELINE LENGTH | 1.52 mi | ISSUE # | 1 |

| Event ID | Event Description | Comment | Enduro Station | Projected Station | Customer Station | Avg Mile Post | MCSD |
|---|---|---|---|---|---|---|---|
| B1 | Bend 45.0 deg. 3.0 Ds Up Turn<br>MCSD: 27.68 | Before u/s w.: 1.2%(0.367) MCSD: 28.4 ID:29.1<br>mph:0.7 Clk:0 to 6<br>After d/s w.: 0.7%(0.211) MCSD: 28.5 ID:28.8<br>mph:1.2 Clk:5 to 11<br>MPH coming into Bend (-10ft): 1.1 Leaving Bend<br>(+10ft): 0.7<br>Min MPH over range: 0.1 at index 2755934 | 8035.67 | 80+36 | | 1.52 | 27.68 |
| B2 | Bend 45.0 deg. 3.0 Ds Down Turn<br>MCSD: 28.11 | Before u/s w.: 1.2%(0.367) MCSD: 28.4 ID:28.8<br>mph:2.0 Clk:0 to 6<br>After d/s w.: 0.6%(0.171) MCSD: 28.5 ID:28.8<br>mph:2.2 Clk:0 to 6<br>MPH coming into Bend (-10ft): 0.7 Leaving Bend<br>(+10ft): 4.5<br>Min MPH over range: 0.4 at index 2757102 | 8054.22 | 80+54 | | 1.53 | 28.11 |

**ENDURO** PIPELINE SERVICES, INC.

**Field Report**

| Field | Value | Field | Value |
|---|---|---|---|
| CUSTOMER/CONTRACTOR | Energy Transfer Company / Michel's Pipeline | PIPE DIAMETER | 30.000 in |
| CUSTOMER LINE ID | D.A.P.L. / Lake Oahe HDD / AFE - A60000000002 | WALL THICKNESS | .926 in |
| JOB NUMBER | 016-4134 | PRODUCT | Air/7760 CFM / 180 PSI |
| LAUNCH STATION | Lake Oahe West | RUN DATE | 24-Mar-2017 |
| | Bismarck, ND | FIELD ENGINEER | Jeff Walker |
| RECEIVE STATION | Lake Oahe East - M.L.V. 390 | CHART ANALYST | Jeff Walker |
| | Bismarck, ND | REPORT DATE | 03/26/2017 |
| PIPELINE LENGTH | 1.62 mi | ISSUE # | 1 |

| Event ID | Event Description | Comment | Enduro Station | Projected Station | Customer Station | Tool Spd | W.T. | Clock | Length, Width & Depth Calculations For Deformations | | | | | | | | MCS D | To U/S Weld | Cut Joint Len | To D/S Weld | Len. D/S Joint | Latitude | Longitude | Elevation |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Dent Dep. | Est. Dent Depth After Excavation | Est. Dent %OD After Excavation | Dent Len. | Dent Wid. | Total Len. | Total Size | Total %OD | | | | | | | | |
| F 1 | Begin Line Pipe | D.A.P.L.- Lake Oahe HDD Lake Oahe West - Lake Oahe East Bismarck, ND | 0.00 | 0+00 | | 0.3 | 0.429 | | | | | | | | | | 29.00 | 0.0 | 13.9 | 13.9 | 74.3 | | | |
| W 1 | Wall change to .429 for 329.32 feet - Enduro predicted | Begin 0.429 w.t. | 0.00 | 0+00 | | 0.3 | 0.429 | | | | | | | | | | | 0.0 | 13.9 | 13.9 | 74.3 | | | |
| W 2 | Wall change from .429 to .626 for .629.37 feet - Enduro predicted | | 329.32 | 3+29 | | 2.0 | 0.626 | | | | | | | | | | | 0.0 | 29.6 | 29.6 | 70.6 | | | |
| W 3 | Wall change from .626 to .429 for 239.37 feet - Enduro predicted | | 7793.81 | 77+94 | | 3.0 | 0.429 | | | | | | | | | | | 0.0 | 33.0 | 33.0 | 22.8 | | | |
| W 4 | Wall change from .429 for 46778.08 feet - Enduro predicted | | 8033.18 | 80+33 | | 1.0 | 0.626 | | | | | | | | | | | 0.0 | 6.3 | 6.3 | 12.4 | | | |
| B 1 | Bend 45.0 deg. 3.0 Ds. Up Turn MOSD: 27.68 | Before u/s w.: 1.2%/0.367 / MOSD: 28.4 ID 29.1 mph/3.7 CIA ID 6 After d/s w.: 0.7% / 0.211 / MOSD: 28.5 ID 28.8 mph 1.2 CIA 6 In 11 MPH coming into Bend =10% 1.1 Leaving Bend =10% 0.7 Min MPH over range: 0.1 at index 2765034 | 8036.67 | 80+36 | | 0.6 | 0.626 | | | | | | | | | | 27.68 | 2.5 | 6.3 | 3.6 | 12.4 | | | |
| B 2 | Bend 45.0 deg. 3.0 Ds. Down Turn MOSD: 28.11 | Before u/s w.: 1.2%/0.367 / MOSD: 28.4 ID 28.8 mph 2.2 CIA ID 6 6 28.5 ID 28.8 mph 2.2 CIA 6 In 6 MPH coming into Bend =10% 3.7 Leaving Bend =10% 4.5 Min MPH over range: 0.4 at index 2767162 | 8054.22 | 80+54 | | 4.2 | 0.626 | | | | | | | | | | 28.11 | 2.4 | 5.6 | 3.2 | 6.1 | | | |
| F 2 | End Line Pipe | D.A.P.L.- Lake Oahe HDD Lake Oahe West - Lake Oahe East M.L.V. 390 Bismarck, ND | 8065.83 | 80+66 | | 8.6 | 0.626 | | | | | | | | | | 28.42 | 3.3 | 6.3 | 3.0 | 8.6 | | | |
| B 3 | Bend 45.0 deg. 3.0 Ds. Down Turn MOSD: 27.90 | Before u/s w.: 1.7%/0.497 / MOSD: 28.3 ID 28.8 mph 3.6 CIA 1 ID 7 After d/s w.: 0.8% / 0.226 / MOSD: 28.5 ID 28.8 mph/4.6 CIA 6 In 6 MPH coming into Bend =10% 6.4 Leaving Bend =10% 4.3 Min MPH over range: 2.2 at index 2769781 | 8076.92 | 80+77 | | 6.7 | 0.626 | | | | | | | | | | 27.90 | 2.6 | 5.7 | 3.2 | 5.9 | | | |
| B 4 | Bend 45.0 deg. 3.0 Ds. Up Turn MOSD: 27.91 | Before u/s w.: 1.6%/0.462 / MOSD: 28.3 ID 28.8 mph/4.1 CIA 6 ID 6 After d/s w.: 0.8%/0.140 / MOSD: 29.0 ID 28.1 mph/6.3 CIA 6 In 11 MPH coming into Bend =10% 5.9 Leaving Bend =10% 6.1 Min MPH over range: 4.1 at index 2761235 | 8088.06 | 80+88 | | 4.6 | 0.626 | | | | | | | | | | 27.91 | 2.1 | 6.1 | 4.0 | 6.4 | | | |
| F 3 | End Line Pipe | D.A.P.L.- Lake Oahe HDD Lake Oahe West - Lake Oahe East Bismarck, ND | 8926.32 | 89+26 | | 0.3 | 0.626 | | | | | | | | | | 28.50 | 0.0 | 39.1 | 39.1 | 4.7 | | | |



# Dakota Access Pipeline

# Lake Oahe HDD Crossing

# Threat Assessment

**Prepared for Dakota Access Pipeline System by Dynamic Risk Assessment Systems**

| Threat Assessed | Threat Attributes | Result of Threat Assessment | Assessments/Monitoring Completed | Monitoring / Mitigation Planned |
|---|---|---|---|---|
| External Corrosion | Pipeline HDD Casing | No permanent casing installed. | | N / A |
| External Corrosion | Stray Current/Interference | Completed AC survey and completed mitigation measures to address any concern related to interference. | An AC interference and mitigation study has been conducted to assess AC fault and steady state conditions and associated risks. Based on the outcomes of the study, installation of zinc ribbon wires will effectively mitigate the AC interference. Implementation if this mitigation addresses the potential risk to CP effectiveness and safety. | Continuous monitoring |
| External Corrosion | Pipeline In-Line Inspection (ILI) | Reassessment plan represents industry standard practice for hazardous liquids pipelines. | | MFL metal loss ILI planned within first 36 months of operation |
| External Corrosion | Cathodic Protection (CP) / Interference survey | The Northern Border pipeline was identified as a possible source of cathodic protection interference in the action area. | A CP interference and mitigation study has been conducted to assess existing CP conditions and associated risks. Based on the outcomes of the study, installation of deep well anode beds effectively mitigate the CP interference. | Continuous monitoring |

| Threat Assessed | Threat Attributes | Result of Threat Assessment | Assessments/Monitoring Completed | Monitoring / Mitigation Planned |
|---|---|---|---|---|
| Internal Corrosion | Product Stream Characteristics | A CEPA study, [1], indicates that under normal operations, oil pipelines with low BS&W (0.25-0.5%) are unlikely to have free water present in them, and with a sufficiently high flow velocity inside the pipe any free water caused by operation upsets will be entrained in the oil by turbulent flow, and the pipe wall will continue to operate in an oil-wet condition. | At low BS&W levels in conjunction with turbulent flow, water will remain entrained in oil and therefore internal corrosion is unlikely to occur. | Continuous SCADA monitoring and control of pipeline operating and flow conditions. |
| Internal Corrosion | Product Stream Flow Characteristics | Turbulent flow controls solids deposition and entrains what little water exists in the product stream. The product stream, in conjunction with the operating and flow characteristics will render the pipe wall in an oil-wet (i.e. non-corrosive) condition, although monitoring and the implementation of appropriate mitigation strategies, where warranted, is required. | | The sediments and water resulted from the cleaning will be monitored and analyzed, and the corrosion inhibition program will be adjusted accordingly. |

| Threat Assessed | Threat Attributes | Result of Threat Assessment | Assessments/Monitoring Completed | Monitoring / Mitigation Planned |
|---|---|---|---|---|
| Internal Corrosion | Corrosion Prevention / Detection Devices | The use of corrosion detection and prevention devices reduces the likelihood of the undetected internal corrosion in the line. | | MFL metal loss ILI planned within first 36 months of operation |
| Internal Corrosion | Receipt Points | Receipt point monitoring and control ensures that product is maintained within its quality specification. | | Crude oil samples are obtained and analyzed at all receipt points on the pipeline. |
| Internal Corrosion | Chemical Inhibition and Cleaning Pig Programs | Appropriate mitigation strategies for chemical inhibition and cleaning pig programs are implemented to eliminate internal corrosion. | Water traps, located at all receipt points and launcher / receiver sites on the pipeline, have been incorporated into the pipeline design to collect any water and sediments in the flow. Regular analysis of the collected fluid will be conducted to adjust the inhibition program as required. | Adjustment of inhibition program to include Injection of microbial inhibitor chemicals at receipt points and launcher / receiver sites as necessary. |
| Internal Corrosion | Potential source of Analogue ILI Datasets | As the threat of internal corrosion is expected to be low, the lack of an appropriate ILI data set is not a concern at this stage of the assessment. | If further quantitative analysis of failure frequencies is required, it is necessary to identify a suitable data set. | Maintain monitoring program and integrity management plans. |

| Threat Assessed | Threat Attributes | Result of Threat Assessment | Assessments/Monitoring Completed | Monitoring / Mitigation Planned |
|---|---|---|---|---|
| Stress Corrosion Cracking | SCC Susceptibility | Pipelines operating at stress levels greater than 60% SMYS can be considered susceptible to SCC if other factors are present including a susceptible coating system, a susceptible line-pipe material, proximity to pump stations, high operating temperatures (specific to high-pH SCC), and age of the pipeline greater than 10 years. | The use of high performance coating systems, such as those used for DAPL, has proven to be an effective means of preventing SCC. To date, no operating company has ever experienced a failure that was attributed to SCC in a pipeline that was coated with these coating systems. | Maintain integrity management plans. |
| Manufacturing Defects | Pipeline manufacturing procedure specification | The manufacturing procedure specification, together with the inspection and test plan constitute key quality assurance documents that form the basis of sound pipe procurement practices. | Rigorous inspection and test plans conducted at pipe and coating mills. | All defects rejected at mills. |
| Manufacturing Defects | Manufacturer | The vendor vetting and quality assurance procedures implemented are considered appropriate for the assurance of quality line pipe. | Pre-production meetings and routine QA / QC monitoring at pipe and coating mills. | |

| Threat Assessed | Threat Attributes | Result of Threat Assessment | Assessments/Monitoring Completed | Monitoring / Mitigation Planned |
|---|---|---|---|---|
| Manufacturing Defects | Manufacturing Process | While some vintage manufacturing processes are prone to manufacturing defects, modern line pipe manufacturing processes are not commonly associated with characteristic chronic manufacturing defects. Well-developed Manufacturing Procedure Specifications and Inspection Test Plans are instrumental in maintaining quality assurance. | Rigorous inspection and test plans conducted at pipe and coating mills. | All defects rejected at mills. |
| Manufacturing Defects | Third Party Auditors | Effective deployment of third party audits and inspection to maintain a quality focus during line pipe manufacture, while alerting DAPL to potential quality problems during manufacture and prior to delivery. | Rigorous inspection and test plans conducted at pipe and coating mills. | All defects rejected at mills. |
| Manufacturing Defects | Pressure cycling | Fluctuating operating pressures that are typical of liquids pipelines, can activate pre-existing manufacturing defects. | | Continuous SCADA monitoring and control of pipeline operating and flow conditions. |

| Threat Assessed | Threat Attributes | Result of Threat Assessment | Assessments/Monitoring Completed | Monitoring / Mitigation Planned |
|---|---|---|---|---|
| Manufacturing Defects | Hydrostatic Test | The test pressures represent significant safety factors, ensuring that any manufacturing defects left after the hydrostatic test are not operating at stress levels where they would be considered to be structurally significant. | At mill - Hydrostatic test to 100% SMYS conducted. Upon installation - Hydrostatic test to at least 125% MOP conducted. | Upon installation and prior to acceptance - DAPL requires certification of hydro-tests and ILI Caliper surveys. |
| Manufacturing Defects | Use of Loading / Transportation Specification | The loading and transportation will be carried out in accordance with the specifications in place. This reduces the likelihood of damage to the pipes during transportation and it minimizes the frequency of pipeline failure. | Rigorous inspection and test plans conducted at pipe / coating mills and receipt at pipe yards and delivery to the pipeline right-of-way (ROW). | All transportation of pipe and materials requires inspection report and bills-of-lading. |

| Threat Assessed | Threat Attributes | Result of Threat Assessment | Assessments/Monitoring Completed | Monitoring / Mitigation Planned |
|---|---|---|---|---|
| Construction Defects | Construction Practices | Welding and non-destructive inspection procedures are representative of industry best practices, which maximize the use of low-hydrogen welding processes, and state-of-the-art inspection systems. Construction / transportation specifications are comprehensive to minimize potential for construction-related damage. Such damage can occur, particularly on pipelines that have large-diameter-to-wall thickness ratios (typically > 100:1, which are beyond the D/t ratios used on the DAPL project). Post-construction in-line inspection is an effective measure of identifying such damage to enable repairs to be made prior to pipeline operation. The minimum hydrostatic test pressure used for DAPL is minimum of 1,800 psi - 1.25 times maximum operating pressure | 100% inspection of field welds using radiographic inspection and approved by third party auditors (Level 3 - CWI) was conducted. Hydrostatic test to at least 1,800 psi - 125% MOP conducted on entire pipeline segments including valves, launchers, receivers and equipment. Inspection with a deformation tool / caliper survey (ILI) after installation to ensure that the pipeline is free of dents, buckles, and excessive out-of-round conditions was conducted. | All defects repaired per PHMSA approved procedures. |

| Threat Assessed | Threat Attributes | Result of Threat Assessment | Assessments/Monitoring Completed | Monitoring / Mitigation Planned |
|---|---|---|---|---|
| | | (MOP). The pipeline may be tested to higher pressure values where specified, dependent upon elevation. | | |
| Construction Defects | Operating Pressure | Maximum operation pressure (MOP) of DAPL pipeline is 1,440 psi. | Continuous SCADA monitoring and control of pipeline operating and flow conditions. | Pipeline Pump Station high-pressure-shutdown set point at 1,400 psi. |
| Third Party Damage | Adjacent land use | The damage prevention measures employed on DAPL are representative of industry best-practice. Additionally, the HDD sections are located in remote area, and the depth | DOC study completed. | Maintain monitoring program and integrity management plans. |
| Third Party Damage | One-call system availability and promotion | | | |
| Third Party Damage | Signage placement | | | |
| Third Party Damage | Use of buried marker tape | | | |
| Third Party Damage | Regulation Regarding requirements to | | | |

| Threat Assessed | Threat Attributes | Result of Threat Assessment | Assessments/Monitoring Completed | Monitoring / Mitigation Planned |
|---|---|---|---|---|
| | notify one-call prior to excavation | of cover at these locations significantly reduce the possibility of exposure to Third Part Damage (TPD). Consequently, the likelihood of TPD is very low. | | |
| Third Party Damage | Response time for locate requests | | | |
| Third Party Damage | Patrol frequency | | | |
| Third Party Damage | Marking and locating methods | | | |
| Third Party Damage | Depth of cover | | | |
| Weather Related or Outside Force | Presence of Geotechnical / Hydro-technical Hazards | Slope Stability Study: A slope stability study was conducted at Lake Oahe HDD location. The report indicates that potential for land sliding as the result of the proposed activities is low [4]. Scour Study: Study results show that the maximum scour at the project site is estimated to be 21 ft. The proposed HDD crossing has a minimum depth of over 90 ft. below the current channel. Therefore, the risk of pipeline exposure is not significant and | Geotechnical / Hydro-technical studies were completed for the proposed HDD crossings at Lake Oahe. In addition to Geotechnical reports, separate studies were completed on the potential of scour and slope stability. | |

| Threat Assessed | Threat Attributes | Result of Threat Assessment | Assessments/Monitoring Completed | Monitoring / Mitigation Planned |
|---|---|---|---|---|
| | | does not warrant further analysis [5]. | | |
| Other Threats | Concomitant Failures | Given the proposed separation distance between DAPL and Northern Border pipeline, the threat of concomitant failure is identified as a potential threat to DAPL.  However, with the depth of the Lake Oahe crossing being 90', it is NOT LIKELY that the DAPL pipeline could be exposed in the blast crater generated by the catastrophic failure of the adjacent natural gas pipeline. | | DAPL maintains continuous communication and joint-risk assessment evaluations with Northern Border operations personnel. |
| Other Threats | Access Restrictions | No access restrictions were identified in the action area. | | |
| Other Threats | Forest fires | No concerns identified in the action area. | | |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

STANDING ROCK SIOUX TRIBE,

                              Plaintiff,

and

CHEYENNE RIVER SIOUX TRIBE,

                              Intervenor Plaintiff,

            v.

U.S. ARMY CORPS OF ENGINEERS,

                              Defendant,

and

DAKOTA ACCESS, LLC,

                              Intervenor Defendant.

Civil Action No. 16-1534-JEB
(consolidated with Case Nos. 16-
1796 & 17-267)

**[PROPOSED] ORDER DENYING CHEYENNE RIVER SIOUX TRIBE'S REQUEST TO
REQUIRE MEANINGFUL CONSULTATION ON REMAND AND STANDING ROCK
SIOUX TRIBE'S MOTION TO CLARIFY**

Upon consideration of the briefs, exhibits, and all materials filed in support of and in

opposition to the motions, the Court orders that:

1.  Plaintiff Standing Rock Sioux Tribe's motion for clarification regarding remand process and

    remand conditions is DENIED; and

2.  Intervenor Plaintiff Cheyenne River Sioux Tribe's motion to compel meaningful consultation

    is DENIED.

Dated: _____          _____
                                        Hon. JAMES E. BOASBERG
                                        United States District Judge