# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

STANDING ROCK SIOUX TRIBE,

    Plaintiff,

    and

CHEYENNE RIVER SIOUX TRIBE,

    Plaintiff-Intervenor,

    v.

U.S. ARMY CORPS OF ENGINEERS,

    Defendant,

    and

DAKOTA ACCESS, LLC,

    Defendant-Intervenor and Cross-Claimant.

Civil Action No. 16-1534 (JEB) (and Consolidated Case Nos. 16-1769 and 16-267)

## MEMORANDUM OPINION

Once more into the breach over the Dakota Access Pipeline goes this Court, though for the first time addressing claims of the Yankton Sioux Tribe and Robert Flying Hawk, the Chairman of the Tribe's Business and Claims Committee. While the Plaintiffs may have changed, the underlying claims are quite familiar. As with the Standing Rock and Cheyenne River Sioux Tribes before them, the Yankton Sioux challenge the construction and operation of the Dakota Access Pipeline under the National Historic Preservation Act, the National Environmental Protection Act, and the 1851 Treaty of Laramie. Specifically, Plaintiffs allege

that Defendants – the U.S. Army Corps of Engineers, the U.S. Fish and Wildlife Service, and an assortment of federal employees of both agencies – violated the NHPA by failing to adequately consult with the Tribe regarding historical and cultural sites, violated NEPA by unlawfully segmenting their analyses of the pipeline's environmental impacts, and violated the 1851 Treaty by granting approvals for DAPL without first obtaining the Tribe's consent.

Both sides have now filed Cross-Motions for Summary Judgment on the Tribe's NEPA and Treaty-based claims. Defendants additionally urge the Court to dismiss as moot Plaintiffs' NHPA counts, asserting that they are no longer viable in light of DAPL's completed construction. Agreeing that it can provide no effective remedy on this last score, the Court will dismiss the NHPA claims. It will also grant summary judgment for Defendants with respect to Plaintiffs' Treaty-based count, which the Tribe essentially withdrew during briefing. Finally, the Court concludes that Plaintiffs have not shown that the Corps and FWS improperly "segmented" their analysis of the pipeline's environmental consequences, thus yielding summary judgment for Defendants on the NEPA claims as well.

## I.      Background

### A.      Factual and Statutory Background

The lengthy factual history of the Dakota Access Pipeline, a 1,200-mile domestic-oil pipeline running from North Dakota to Illinois, is set forth in this Court's prior Opinions and need not be repeated here. See, e.g., Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers (Standing Rock I), 205 F. Supp. 3d 4, 12-15 (D.D.C. 2016). The Court will, however, provide a brief background of this Tribe's participation in DAPL's development and an overview of the specific federal actions related to the pipeline.

A federally recognized Tribe that is headquartered in Wagner, South Dakota, the Yankton Sioux have approximately 9,000 enrolled members. See ECF No. 292 (Yankton MSJ) at 3. Their Reservation is located in South Dakota, hundreds of miles from the much-contested Lake Oahe crossing and at least 60 miles from any other part of DAPL's path. See ECF No. 321 at 5 (Map 2). The Tribe nonetheless opposes the construction and routing of the pipeline, alleging that it will harm a number of its environmental interests.

Since the pipeline project was proposed, Plaintiffs insist that they have "continually sought to protect" their tribal lands from the "serious risk of harm" it poses. See Yankton MSJ at 4. This assertion is somewhat belied, however, by the record regarding the Tribe's cooperation (or lack thereof) with the federal agencies involved in the project. The Yankton did not attend multiple meetings held by the Corps and FWS to discuss DAPL (meetings that were attended by other interested tribes), see Exhs. I (January 25, 2016, Corps Meeting Log), J (December 8, 2015, Corps Meeting Log), V (List of Invitees to FWS Meetings), W (FWS Meeting Log), nor did they respond to numerous efforts by the Corps and FWS to engage in discussion regarding the pipeline. See Exhs. N (Letter from Col. Henderson, May 10, 2016), O (Letter from Col. Henderson, May 6, 2016), P (Email Chain Discussing Corps' Attempts to Contact Yankton, May 2, 2016), Q (Email Chain Discussing Consultation, April 15-22, 2016), T (Letter from FWS to Chairman Flying Hawk), U (Letter from FWS to Tribal Officer Little). Regardless of the Tribe's level of participation in the consultation process, however, the Yankton have since objected to the pipeline's construction and routing.

In particular, Plaintiffs contest the process by which the Corps and FWS issued a series of permits and permissions necessary for the pipeline to cross federally regulated lands and waters. Although DAPL runs almost entirely across private property, 3% of the pipeline is on federally

managed land and thus required governmental approval.  See Standing Rock I, 205 F. Supp. 3d

at 13.  The permits needed for these portions of the pipeline were issued by four separate entities

– three districts of the Corps and one district of FWS.  In evaluating these permissions, each

agency division conducted an environmental assessment under the National Environmental

Protection Act.

NEPA requires that federal agencies evaluate the environmental effects of major

government actions, but it "imposes only procedural requirements."  Dep't of Transp. v. Public

Citizen, 541 U.S. 752, 756 (2004).  If a project will "significantly" affect the "quality of the

human environment," NEPA requires that the agency complete a detailed Environmental Impact

Statement (EIS).  See 42 U.S.C. § 4332(C).  To determine whether or not there will be such

significant effects, however, the agency first prepares a shorter Environmental Analysis (EA).

This "concise public document" discusses the need for the proposal, the alternatives, the

environmental impacts of the proposed action, and the agencies and persons consulted.  See 40

C.F.R. § 1508.9(a), (b).  If the EA concludes that there will be no significant environmental

impact, the agency may forgo completing a full EIS and may instead issue the EA and a Finding

of No Significance (FONSI).

This was the route chosen by the federal agencies charged with evaluating the DAPL-

related permissions.  In July 2016, the Corps' Omaha District issued an EA and FONSI related to

the crossings of Corps-managed lands and flowage easements at Lake Oahe and Lake

Sakakawea in North Dakota.  See Exh. A (Omaha District EA and FONSI).  In August of that

year, the Corps' St. Louis District issued its own EA and FONSI, which addressed four crossings

in Illinois, three of which spanned less than 700 feet, and one of which crossed a federal flowage

easement for approximately 2.5 miles.  See Exh. B (St. Louis District EA and FONSI).  The

Corps' Rock Island District also issued a permission under Section 408 of the Rivers and Harbors Act for a crossing of the Mississippi River, after the district determined that the proposal qualified for a categorical exclusion under NEPA.  See Exh. C (Rock Island District Memorandum).  Finally, the FWS issued an EA in May 2016 and a FONSI in June of that year, and it granted Dakota Access permission to cross five wetland easements and one grassland easement in North Dakota.  See Exhs. D (FWS EA), E (FWS FONSI).  These easements, which were over 60 miles from the water crossings evaluated by the Corps, affected 71.8 acres of the pipeline route, or less than 1% of the total North Dakota and South Dakota project area.  See FWS EA at 18.  In total, therefore, the federal agencies issued three EAs and complementary FONSIs and one categorical exclusion, each of which in turn facilitated the various permissions and permits needed for DAPL to cross federally managed lands.  It is these NEPA analyses, and the process by which they were conducted, to which Plaintiffs now object.

      B.     <u>Procedural History</u>

      1.     *History of DAPL Litigation*

The Yankton Sioux Tribe initiated the instant suit on September 9, 2016, when it filed a Complaint against the United States Army Corps of Engineers, the United States Fish and Wildlife Service, and four individual Defendants – Dan Ashe, Director of FWS; John W. Henderson, Commander of the Corps' Omaha District; Anthony Mitchell, Commander of the Corps' St. Louis District; and Todd Semonite, the Corps' Commanding General and Chief of Engineers.  See Case No. 16-1796, ECF No. 1 (Yankton Sioux Compl.).  In February 2017, Defendant Dakota Access moved to intervene in support of federal Defendants, a motion that was not opposed by the Tribe and was subsequently granted by the Court.  Id., ECF No. 17 (Dakota Access Motion to Intervene); Minute Order of March 13, 2017 (Granting Motion to

Intervene as Unopposed). That March, upon an unopposed motion by the Corps, the Tribe's case was consolidated with challenges to DAPL filed by the Standing Rock, Cheyenne River, and Oglala Sioux Tribes. See Minute Order of March 17 (Consolidation Order).

For the past fourteen months, others among the consolidated Plaintiffs have made multiple attempts to prevent oil from flowing through the pipeline. Indeed, this Court has now issued five Opinions in this case – all addressing various claims by the Standing Rock and Cheyenne River Sioux Tribes. These Tribes' first pass at preventing pipeline construction was a motion for a preliminary injunction based solely on the NHPA, asserting that the ongoing clearing and grading of the land along DAPL's route disrupted sacred tribal sites. See Standing Rock I, 205 F. Supp. 3d at 7-9. On September 9, 2016, the Court denied emergency relief, and construction proceeded. Id. at 37.

On February 8, 2017, the Corps granted Dakota Access an easement pursuant to the Mineral Leasing Act, authorizing it to cross federal lands at Lake Oahe and complete the pipeline. See ECF No. 172-11 (Easement). The next day, Cheyenne River filed another motion for preliminary injunction and an application for a temporary restraining order, this time alleging violations of the Religious Freedom Restoration Act. See ECF Nos. 98, 99; Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers (Standing Rock II), 239 F. Supp. 3d 77, 81 (D.D.C. 2017), appeal dismissed, No. 17-5043, 2017 WL 4071136 (D.C. Cir. May 15, 2017). Believing these religious-freedom claims unlikely to succeed, the Court issued an Opinion denying this preliminary injunction as well. See Standing Rock II, 239 F. Supp. 3d at 80. As these emergency motions were ongoing, Standing Rock and Cheyenne River filed cross-motions for summary judgment. See ECF Nos. 117 (SRST MSJ), 131 (CRST MSJ), 172 (Corps MSJ), 185 (DA MSJ). Now focusing on their environmental claims, the Tribes challenged the Corps'

decision to issue the easement on the basis of its July 25, 2016, EA and FONSI, contending that the agency had violated NEPA by failing to complete a full EIS.

On June 14, 2017, two weeks after DAPL became fully operational, the Court granted in part and denied in part the parties' motions and remanded certain issues to the Corps. See Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers (Standing Rock III), 255 F. Supp. 3d 101 (D.D.C. 2017). It rejected Plaintiffs' motion with respect to their claims under the Mineral Leasing Act and upheld the majority of the Corps' determinations under NEPA. Id. at 152, 147. It granted the Tribes' motion, however, with respect to three discrete flaws in the Corps' environmental analysis. Id. at 147. Although the Court remanded these issues to the Corps for further analysis, it did not decide whether the easement should be vacated pending such remand. Id. at 147-48. That determination followed in the Court's October 11, 2017, Opinion, in which it concluded that there was a "serious possibility" that the Corps would be able to substantiate its prior determinations and thus denied vacatur pending remand. See Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers (Standing Rock IV), 2017 WL 4564714 (D.D.C. Oct. 11, 2017). Finally, this past December, the Court issued an Opinion imposing a series of interim measures during the remand process, each tailored to keeping the Court informed as to the conditions at Lake Oahe pending further analysis by the Corps. See Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers (Standing Rock V), 2017 WL 6001726 (D.D.C. Dec. 4, 2017). The remand process remains ongoing and will extend past April 2, 2018. See ECF No. 338 (Corps' Notice).

2.    *Yankton Motion for Summary Judgment*

Only now, as that remand is ongoing and further analysis is underway, have the Yankton Sioux and Robert Flying Hawk chosen to enter the fray. On November 13, 2017, they brought

the instant Motion for Partial Summary Judgment on the basis of their claims arising under NEPA and the Tribe's 1851 Treaty of Laramie with the United States. See Yankton MSJ. Specifically, the Tribe asserts that Defendants violated NEPA by segmenting their evaluation of DAPL's environmental impacts among multiple federal agencies and Corps divisions. Id. at 5-16. Arguing that the various federal permissions for the pipeline are "connected" or "similar" actions under the meaning of NEPA's implementing regulations, Plaintiffs contend that Defendants were thus required to conduct a consolidated, programmatic assessment of the approvals. Id. at 5-6. Plaintiffs additionally move for summary judgment on their claim that, by failing to obtain the Tribe's free and informed consent prior to granting authorizations for DAPL's construction, the Corps and FWS violated the Tribe's 1851 Treaty of Fort Laramie and the federal government's trust responsibilities to the Tribe. Id. at 19-29.

On January 10, 2018, federal Defendants filed their Opposition to Plaintiffs' claims and cross-moved for partial summary judgment. See ECF No. 320 (Corps Opp.) Dakota Access, as a Defendant-Intervenor and Cross-Claimant, also filed its own Opposition and brief in support of federal Defendants' Cross-Motion. See DA Opp. In their briefing, Defendants additionally moved to dismiss the Tribe's NHPA claims as moot in light of DAPL's completed construction and current operation. Plaintiffs filed their Reply and Opposition on January 26, 2018, in which they continue to request summary judgment on their NEPA counts, but "withdraw" their Motion with respect to their Treaty- and trust-based claims. See ECF No. 324 (Yankton Reply). They also oppose Defendants' Motion with respect to the dismissal of their NHPA claim, asserting that the related counts in their Complaint remain viable. With briefing complete, the Court must now determine whether summary judgment is appropriate for either party.

## II.     Legal Standard

The parties have cross-moved for partial summary judgment on the administrative record. The summary-judgment standard set forth in Federal Rule of Civil Procedure 56(c), therefore, "does not apply because of the limited role of a court in reviewing the administrative record." Sierra Club v. Mainella, 459 F. Supp. 2d 76, 89 (D.D.C. 2006); see also Bloch v. Powell, 227 F. Supp. 2d 25, 30 (D.D.C. 2002), aff'd, 348 F.3d 1060 (D.C. Cir. 2003). "[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." Sierra Club, 459 F. Supp. 2d at 90 (quotation marks and citation omitted). "Summary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the [Administrative Procedure Act] standard of review." Loma Linda Univ. Med. Ctr. v. Sebelius, 684 F. Supp. 2d 42, 52 (D.D.C. 2010) (citation omitted), aff'd, 408 Fed. App'x. 383 (D.C. Cir. 2010).

The Administrative Procedure Act "sets forth the full extent of judicial authority to review executive agency action for procedural correctness." FCC v. Fox Television Stations, Inc., 556 U.S. 502, 513 (2009). It requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action is arbitrary and capricious if, for example, the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins., 463 U.S. 29, 43 (1983). This is a "narrow" standard of review, under which "a court is not to substitute its

judgment for that of the agency." Id. Rather, the Court "will defer to the [agency's] interpretation of what [a statute] requires so long as it is 'rational and supported by the record.'" Oceana, Inc. v. Locke, 670 F.3d 1238, 1240 (D.C. Cir. 2011) (quoting C & W Fish Co. v. Fox, 931 F.2d 1556, 1562 (D.C. Cir. 1991)). Although a reviewing court "may not supply a reasoned basis for the agency's action that the agency itself has not given," a decision that is not fully explained may, nevertheless, be upheld "if the agency's path may reasonably be discerned." Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 285-86 (1974) (citations omitted).

### III.  Analysis

####   A.   Preliminary Issues

Before turning to the crux of this case – the Tribe's NEPA challenge to Defendants' environmental assessments – the Court first pauses to address four preliminary issues.

#####     1.  *LCvR 7(h)*

First, and simplest, is the question of whether Plaintiffs are correct that, because Defendants "failed to controvert any facts identified by [the Tribe] in the statement of material facts[,] . . . this Court should assume Plaintiffs' facts are admitted" under Local Rule 7(h). See Yankton Reply at 3. They are not. Indeed, as Defendants accurately note, Rule 7(h) does not apply in cases such as this one in which judicial review is based solely on the administrative record. See All. for Nat. Health U.S. v. Sebelius, 775 F. Supp. 2d 114, 118 (D.D.C. 2011) (noting that "in cases in which judicial review is based solely on the administrative record, the parties are not required to submit statements of disputed or undisputed material facts") (internal quotations omitted). The Court, therefore, will not treat Plaintiff's facts as admitted and will instead evaluate the parties' claims on the basis of the underlying administrative record.

2.    *Treaty and Trust Claims*

The Court next looks at the Tribe's Treaty-based claims.  Plaintiffs' Motion relies in part

on the first count of their Complaint, which alleged that Defendants violated the 1851 Treaty of

Laramie, the federal trust responsibilities to the Tribe, and the United Nations Declaration on the

Rights of Indigenous Peoples (UNDRIP).  See Compl., ¶¶ 81-90.  More specifically, Plaintiffs

assert that Defendants failed to "consider the impacts of [their] actions to the Tribe's 1851 Treaty

Rights" and that the Corps breached its "fiduciary duty to consider how its actions may affect a

tribe's treaty rights."  Yankton MSJ at 20, 29.  In their Oppositions and Cross-Motions,

Defendants contend that this matter was already disposed of in Standing Rock II.  They argue,

moreover, that regardless of this Court's prior Opinion, Plaintiffs are unable to identify any

retained tribal rights in land or waters that would be affected by DAPL's construction.  See

Corps Opp. at 18-19 (stating that "Plaintiffs offer no "compelling reason why this Court should

reconsider" its prior Opinion addressing treaty rights), 27-28 (noting that Yankton's current

lands are 230 miles away from the Lake Oahe crossing and the Tribe has "not identified any

possibility . . . that a spill would impact [its] lands"); DA Opp. at 21 ("Yankton's arguments

based on treaty and trust obligation are indistinguishable from those the Court already considered

and resolved.").

Plaintiffs were apparently persuaded by such arguments.  In its Reply, the Tribe stated

that "after reviewing [f]ederal Defendants' response, and given the complexities of rules for

interpretation of treaties, Plaintiffs hereby withdraw the [] claim presented in their motion for

partial summary judgment regarding [Defendants'] failure to consider the Tribe's treaty rights,

and choose not to pursue that claim at this time."  Yankton Reply at 2.

This attempt at a limited "withdrawal" is, unfortunately for the Tribe, not a fruitful legal tactic. Parties are not permitted to float trial balloons in motions for summary judgment, only to retract but preserve their claims when the opposing party makes a stronger argument. Instead, by retreating from their Treaty-based claims "after reviewing" Defendants' response, the Tribe has essentially conceded that the Court should grant the Corps' Cross-Motion for Summary Judgment on this issue. See Abraham v. Diagnostic Ctr. Hosp. Corp. of Texas, 138 F. Supp. 2d 809, 816 (S.D. Tex. 2001) (granting summary judgment for opposing party when plaintiff "cho[se] not to pursue" a given claim raised in initial motion for summary judgment).

Yet even if the Tribe had not withdrawn the relevant portions of its Motion, it would not have prevailed. Defendants are correct that in light of this Court's prior Opinion rejecting nearly identical trust and treaty arguments made by the Standing Rock and Cheyenne River Sioux Tribes, Yankton's claims are ultimately futile. See Standing Rock III, 255 F. Supp. 3d at 145. Indeed, Plaintiffs make no attempt to distinguish their position from that deemed deficient in Standing Rock III. They instead assert that they "object to this Court's holding in [its] June 14, 2017, Memorandum Opinion" and "incorporate[] Standing Rock Sioux Tribe's arguments . . . as to why treaties and U.S. trust responsibilities can provide the law to apply." Yankton MSJ at 30 n.4; see id. at 29 n.3 ("adopt[ing]" Standing Rock's arguments regarding federal Defendants' "enhanced responsibility to consider Tribe's treaty rights"). Disagreement, however, is not a legal basis for this Court to reverse its prior conclusions. Having already held that the Corps did not have to address the 1851 "Treaty rights *qua* Treaty Rights" and that the "general trust relationship between the Government and Indian tribes . . . alone does not afford an Indian tribe with a cause of action against the Government," Standing Rock III, 255 F. Supp. 3d at 131, 145, the Court finds no grounds for letting the Tribe proceed on this portion of Count I.

The Court will additionally grant summary judgment with respect to Plaintiffs' UNDRIP claim. As Defendants accurately note, courts have consistently held that UNDRIP is a non-binding declaration that does not create a federal cause of action. See Corps Opp. at 19 n.8; Isaac v. Sigman, 2017 WL 2267264, at *6 (D.N.J. May 24, 2017) (collecting cases). The Tribe makes no argument as to why this Court should find otherwise. It will thus grant summary judgment in favor of Defendants on this entire count.

      3.    *Standing*

Defendants additionally contend that the Tribe falls short of establishing standing for the purpose of bringing their NEPA and NHPA claims. See Corps Opp. at 29. In particular, the Corps asserts that Plaintiffs "do not provide a specific and concrete plan to return to or use Lake Oahe specifically or identify how any federal action causes them harm." Id. at 30. The Tribe's declarations, according to Defendants, "do not establish current or future use of the areas around Lake Oahe" and instead only "mention past visits" to the area and the fact that "unnamed tribal members hunt, gather and perform ceremony with water including the Missouri River in North and South Dakota." Id. The Corps casts these assertions as "generalized grievance[s]" and thus insufficient to confer standing under Article III. Id. at 29.

In order to establish standing, a plaintiff must show that: (1) she has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, rather than conjectural or hypothetical; 2) the injury is caused by, or fairly traceable to, the challenged action; and 3) it is likely, rather than merely speculative, that the injury will be redressed by a favorable decision. See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., 528 U.S. 167, 180–81 (2000). Because Plaintiffs here seek to enforce a procedural right – namely, Defendants' alleged violation of NEPA by conducting separate environmental analyses – they may, however, "assert that right

without meeting all the normal standards for redressability and immediacy." Summers v. Earth Island Inst., 555 U.S. 488, 496 (2009).  To defeat a defendant's summary-judgment motion, a plaintiff must make these required showings by averring specific facts; conclusory allegations in a complaint or other pleading are insufficient to establish standing on summary judgment.  See Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888–89 (1990).  In environmental cases, "plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity."  Friends of the Earth, 528 U.S. at 183 (quoting Sierra Club, 405 U.S. at 735).

Here, the Court concludes that the Tribe adequately pled these requisites for standing.  Plaintiffs' declarations discuss Tribe members' past use of the areas affected by DAPL's construction and operation, including those surrounding Lake Oahe, as well as the injuries they fear from the pipeline's presence on such lands.  See Decl. of Faith Spotted Eagle, ¶¶ 12, 19-23 (stating that she has "performed ceremony and prayer at Lake Oahe and near the proposed Missouri River crossing site" and "[i]n doing so . . . used water" for "medicine and for spiritual purposes," "gathered medicine very near the pipeline corridor at Lake Oahe," and that DAPL will "result in . . . emotional, spiritual, psychological, and cultural damage" to the Yankton people via the potential destruction of such resources); Decl. of Kip Spotted Eagle, ¶¶ 10-13 (stating that Tribal members "continue[] to hunt, gather and perform ceremony with water . . . including near the pipeline," and that he has "been invited to hunt and fish in this area by members of the Standing Rock Sioux Tribe");  Decl. of Glenn Drapeau, ¶¶ 9-10 (stating that the Tribe, of which he is a member, "depend[s] on a number of plants that grow . . . near and within the pipeline corridor, including the Lake Oahe crossing area, for prayer, ceremony, and

medicine," and that "[o]peration of the Pipeline will harm . . . [the Tribe's] sacred water, sacred burial sites, and . . . way of life and spirituality").

Such averments of use of the areas affected by the pipeline and allegations of specific harms that may befall declarants and the Tribe from DAPL's presence are sufficient for Plaintiffs to establish injury in this case. See Friends of the Earth, 528 U.S. at 181; W. Land Exch. Project v. U.S. Bureau of Land Mgmt., 315 F. Supp. 2d 1068, 1078–79 (D. Nev. 2004) (finding standing under NEPA when "colorable, if somewhat attenuated, geographical nexus between the areas visited by [Plaintiff] and BLM's action"). Standing is thus no bar here.

4.     *NHPA Claims*

The Court last considers whether Plaintiffs' NHPA claims should be dismissed as moot, in light of the fact that "construction is complete and oil is flowing." Standing Rock IV, 2017 WL 4564714, at *11. The Tribe brings four claims for relief under the NHPA, alleging that: (1) "[i]n the development of the Corps Omaha EA[,] . . . [the] Corps violated the consultation requirement contained in the NHPA" and unlawfully found that no historical properties would be affected by its actions; (2) "[i]n issuing NWP 12, [the] Corps violated . . . the NHPA," and its decision to approve NWP was thus "arbitrary, capricious, an abuse of discretion, and not in accordance with law"; (3) by "issu[ing] letters verifying more than 200 [pre-construction notifications] for [DAPL] located in North Dakota, South Dakota, Iowa, and Illinois without meaningfully consulting with the Tribe," including "at least eleven of which are on the Tribe's aboriginal title lands," the Corps violated the NHPA; and (4) the Corps violated the Act by defining the area of potential effects "unlawfully narrowly" and thus failed to account for the fact that "[t]he clearing, grading, excavation, and construction that would occur along [DAPL's] route would destroy . . . historic or culturally significant sites encountered." Compl., ¶¶ 91-92,

103-104, 115-117, 122-129, 131-140.  Defendants respond that all of these counts are now moot, as "the alleged injury complained of . . . has already occurred and cannot be redressed by a favorable judicial decision."  Corps Reply at 10.

 Article III of the U.S. Constitution limits federal courts to resolving actual cases or controversies and thus "prevents their passing on moot questions – ones where intervening events make it impossible to grant the prevailing party effective relief."  Burlington N. R.R. Co. v. Surface Transp. Bd., 75 F.3d 685, 688 (D.C. Cir. 1996) (citing Church of Scientology v. United States, 506 U.S. 9, 11 (1992)).  Put otherwise, mootness is established when no opportunity remains for the court to provide "any meaningful relief to Plaintiffs' alleged injuries."  Sierra Club v. U.S. Army Corps of Eng'rs, 803 F.3d 31, 44 (D.C. Cir. 2015) (quotation omitted).

Here, Plaintiffs claim that the Corps violated the NHPA's requirement that a "federal agency . . . consult with Indian tribes that attach cultural or religious significance to property affected by the agency's undertakings."  Standing Rock III, 255 F. Supp. 3d at 155 (internal quotation marks and citation omitted).  The Tribe alleged in its Complaint that, as a result of this inadequate consultation, DAPL's ongoing construction would pose an impermissible risk to tribal sites.  The question now is whether, in light of DAPL's completion, there remains any means by which the Court can still grant Plaintiffs "meaningful relief."

The Court concludes that the answer is in the negative.  The alleged "injuries" arising from Defendants' NHPA violations are tethered to the timeline of DAPL's construction and operation; in other words, tribal consultation and the granting of relevant federal permissions are actions that take place prior to the execution of a given project.  See Standing Rock I, 205 F. Supp. 3d at 7 (NHPA "encompasses sites of cultural or religious significance to Indian tribes and

requires that federal agencies consult with tribes <u>prior to</u> issuing permits that might affect these

historic resources"). Indeed, in its very first Opinion in this case, the Court found as much. A

year and a half ago, addressing Standing Rock's similar contention, this Court wrote that "[t]he

risk that construction may damage or destroy cultural resources is now moot for the 48% of the

pipeline that has already been completed." <u>Id.</u> at 35. It noted that "whatever harms may have

occurred from DAPL construction, the Court's intervention . . . can no longer avoid them"; as a

result, for those sites at which construction was complete, the "die [was] cast." <u>Id.</u> This

conclusion, moreover, reflected Standing Rock's own understanding of the Act, as the Tribe

explicitly acknowledged the potential for construction activities to moot its NHPA claims against

Defendants. <u>See</u> ECF No. 24 (Standing Rock Reply) at 19-20, 23-24 (stating that "should DAPL

be permitted to continue construction[,] . . . then the [] consultation process sought by the Tribe

would be rendered moot" and noting that such consultation would "no longer be meaningful in

those areas" in which "construction (including clearing and grading) has been completed").

The specter of mootness raised in Standing Rock's earlier filings has now come to pass –

construction is complete and oil is flowing through the pipeline. This advancement in DAPL's

development in turn dooms Yankton's NHPA efforts. The Tribe's first three claims mentioned

above are explicitly premised on alleged violations of the consultation requirements under § 106

of the Act. Now that construction of the pipeline has occurred, the Court agrees with Defendants

(and the Standing Rock Sioux) that such consultation would no longer be "meaningful."

Similarly, the Court is unable to order effective relief with respect to Plaintiff's final NHPA

claim, which alleges that the Corps improperly defined the area of potential effects. This count

relies on the Tribe's assertion that "the clearing, grading, excavation, and construction that would

occur along the duration of the [p]ipeline route would destroy any historic or culturally

significant sites encountered."  Compl., ¶ 139.  These construction-related activities have now occurred, and, accordingly, the potential for the preservation of historic or cultural sites no longer exists.  Cf. Sierra Club, 803 F.3d at 43-44 (stating that, in the NEPA context, "claims relating to the construction of [a] pipeline" may be moot and citing cases in which "the completion of the [challenged] project . . . eliminated the opportunity for any meaningful relief," but finding that claims "addressing the environmental impacts resulting from the enhanced use of" the pipeline remained viable).

Although the Tribe asserts in its Reply that meaningful relief remains available because the "risk of a spill through operation and maintenance of the Pipeline still . . . threatens the Tribe's cultural and historic sites," such an emphasis on ongoing harms is nowhere to be found in Plaintiffs' Complaint, nor are such prospective injuries supported by the record.  See Yankton Reply at 3, 30-31; Benavides v. Hous. Auth. of San Antonio, Tex., 238 F.3d 667, 670 (5th Cir. 2001) (dismissing NHPA claims as moot when challenged project was partially constructed and "there [was] no evidence on the record that further agency review could possibly affect" the "substantially-completed" project).  Instead, Plaintiffs' NHPA claims and relevant declarations are predicated upon a concern with pre-construction consultation and assessments.  See Yankton Reply at 29 (requesting relief under NHPA based on Defendants' alleged errors in "identifying the area of potential effects too narrowly and violat[ing] duties to consult with the Tribe . . . [on] protection of historic and cultural locations").  The time for such conversations and evaluations has passed.  The Court therefore concludes that there are no "live remedial implications" to Plaintiffs' claims.  See Sierra Club, 803 F.3d at 43; Finca Santa Elena, Inc. v. U.S. Army Corps of Engineers, 62 F. Supp. 3d 1, 5 (D.D.C. 2014) (discussing "long line of cases in the courts of appeal holding environmental challenges to completed construction projects to be moot"); Bayou

Liberty Ass'n, Inc. v. U.S. Army Corps of Eng'rs, 217 F.3d 393, 397–98 (5th Cir. 2000) (finding no ability to grant "meaningful relief" when challenged construction had "been substantially completed").

This conclusion is not altered, moreover, by the fact that the Tribe sought both injunctive and declaratory relief with respect to its NHPA claims.  See Compl. at 32-33.  Plaintiffs assert that the Court is still able to grant its requested declaratory remedies, and that their NHPA claims thus remain viable.  See Yankton Reply at 31.  Yet, as is evident from the discussion above, any declaration by the Court at this point in time – after construction is complete and the clearing, grading, and excavation have taken place – would be of no practical effect.  To issue declaratory relief would be tantamount to issuing an advisory opinion, a result not within this Court's power.  See Weiss v. Sec'y of U.S. Dep't of Interior, 459 F. App'x 497, 500 (6th Cir. 2012) (dismissing NHPA claims as moot when "effects on the [site's] historic character have already occurred," as Court could not "give any meaningful relief and any declaratory judgment would be an advisory opinion") (internal citation and quotation marks omitted); Bayou Liberty Ass'n, 217 F.3d at 397–98 (finding request for declaratory judgment in NHPA suit after challenged construction had occurred "amounts to a request for an advisory opinion from this court").  Because it can provide no meaningful remedy to address Plaintiffs' alleged injuries arising from their NHPA claims, the Court will dismiss the relevant counts of the Tribe's Complaint as moot.

B.    NEPA

The Court at last turns to what remains of the Cross-Motions for Summary Judgment – i.e., Plaintiffs' NEPA claims.  The Tribe's Motion focuses on Count VI of its Complaint, which alleges that federal Defendants "unlawfully piecemealed and segmented approval and analysis of the Pipeline utilizing three separate EAs and FONSIs."  Yankton Compl., ¶ 168.  Specifically,

Plaintiffs allege that the Corps and FWS violated NEPA's "anti-segmentation principle" by choosing to issue discrete EAs for the various components of the pipeline requiring federal permissions. Id., ¶ 166. This principle seeks to prevent agencies from "avoid[ing] the NEPA requirement that an EIS be prepared for all major federal actions with significant environmental impacts by dividing an overall plan into component parts." Taxpayers Watchdog, Inc. v. Stanley, 819 F.2d 294, 298 (D.C. Cir. 1987). The Tribe claims that here, such "segmentation of Federal approvals" violated NEPA's implementing regulation, 40 C.F.R. § 1508.25, which addresses the environmental analysis of "connected, cumulative, or similar" actions. See Yankton MSJ at 9-14. Defendants respond that the decision to issue separate EAs and FONSIs was well within their discretion. See Corps Reply at 2. They assert that the three EAs at issue – the Omaha Corps District, St. Louis Corps District, and FWS assessments – were not "connected" or "similar" actions, and that § 1508.25 thus did not require any omnibus analysis of the various federal approvals.

1. *Deference to Agencies*

In evaluating the parties' Cross-Motions, the Court begins with the question of deference. According to federal Defendants, "[A]n agency's scoping decision is entitled to deference," including the Corps' and FWS's decision to "limit[] their review to areas within their jurisdiction." Corps Opp. at 8. Plaintiffs counter, somewhat confusingly, that because federal Defendants "are part of the same entity – the United States – and the United States is required to conduct the NEPA analysis," no deference is due to the agencies' independent scoping determinations. See Yankton Reply at 13. This line of argument is unavailing, as the scoping process clearly falls under the authority of each agency charged with conducting a NEPA analysis. As the Supreme Court has held, "An agency enjoys broad discretion in determining

how best to handle related, yet discrete, issues in terms of procedures and priorities." Mobil Oil Exploration & Producing Se. Inc. v. United Distribution Cos., 498 U.S. 211, 230 (1991) (citations omitted); see also Weiss v. Kempthorne, 580 F. Supp. 2d 184, 188 (D.D.C. 2008) (discussing deference given to agency decision in context of NEPA's connected-actions regulation); Thomas v. Peterson, 753 F.2d 754, 758 (9th Cir. 1985) (noting that agencies are given "considerable discretion" in defining scope of an environmental analysis), abrogated on other grounds by Cottonwood Envtl. Law Ctr. v. US Forest Serv., 789 F.3d 1075, 1090 (9th Cir. 2015). Plaintiffs' suggestion that agency discretion is somehow subsumed by the ultimate oversight of the "United States" is simply untethered from any legal support. Similarly futile is the Tribe's contention that because "[s]coping informs the rest of the analysis[,] . . . a defective scoping should not be entitled to deference." Yankton Reply at 13-14. This statement puts the cart of conclusion before the horse of deference. In other words, the initial question is whether an agency's scoping decision is due deference as a matter of law. If so, the Court then considers whether this presumption is rebutted by any arbitrary or capricious action during the decisionmaking process.

Here, the Court agrees with Defendants that the Corps' and FWS's scoping determinations are entitled to deference under NEPA. As this Circuit has held, "[T]he line-drawing decisions necessitated" in agencies' "treatment of [a] project's relation to other government activities" are "vested in the agencies, not the courts." Coal. on Sensible Transp., Inc. v. Dole, 826 F.2d 60, 66 (D.C. Cir. 1987). The "latters' role," therefore, "is simply to ensure that" the agency's scoping decision does not violate the law. Id. (quotation omitted). Indeed, even when an environmental analysis "addresses one of a series of closely related proposals, the decision whether to prepare a programmatic impact statement is committed to the agency's

discretion." Grunewald v. Jarvis, 776 F.3d 893, 904-05 (D.C. Cir. 2015). The Court addressed this standard in Standing Rock I, when it held that the determination of "the scope of the effects" of federal permission related to DAPL fell "squarely within the expertise of the [agency]" and was "entitled to deference under the APA." 205 F. Supp. 3d at 31. In light of this deferential standard, it is up to Plaintiffs to show that the agencies acted "arbitrarily in refusing to prepare one comprehensive" evaluation or in "determin[ing] the region, if any, with respect to which a comprehensive statement is necessary." Kleppe v. Sierra Club, 427 U.S. at 412, 416; see Grunewald, 776 F.3d at 905 (in determining whether comprehensive environmental analysis was "necessary," court will overturn agency decision only if it "is arbitrary and capricious"); Earth Island Inst. v. Elliott, 2017 WL 5526572, at *13 (E.D. Cal. Nov. 17, 2017) ("A plaintiff must show that an agency's decision not to prepare a single EIS was an arbitrary action.").

2.      *Framework of Segmentation Analysis*

Deference thus established, the Court next discusses the general parameters of Plaintiffs' claim that the Corps and FWS impermissibly "segmented" their environmental analysis.

Under NEPA, an agency acts unlawfully when it "divides connected, cumulative, or similar federal actions into separate projects and thereby fails to address the true scope and impact of the activities that should be under consideration." Delaware Riverkeeper Network v. FERC, 753 F.3d 1304, 1314 (D.C. Cir. 2014); see PEACH v. U.S. Army Corps of Eng'rs, 87 F.3d 1242, 1247 (11th Cir. 1996) (stating that anti-segmentation rule ensures agencies "cannot evade [their] responsibilities under [NEPA] by artificially dividing a major federal action into smaller components, each without a significant impact") (internal quotation marks and citation omitted).

The initial task in addressing a segmentation claim is identifying the "overall plan" or "major federal action" that has allegedly been sub-divided. See Save Barton Creek Ass'n v. Fed. Highway Admin., 950 F.2d 1129, 1139 (5th Cir. 1992) (noting that "[t]he case law which deals with . . . improper segmentation almost always involves a situation where a 'major Federal action' is found to exist and then the [issue] of segmentation is evaluated"). Here, both sides struggle somewhat with this definitional question.

According to Defendants, the Tribe is identifying the federal action at issue as "the entire pipeline" project, see Corps Opp. at 9, which they contend is squarely precluded by the D.C. Circuit's holding in Sierra Club, 803 F.3d at 44. There, the court disagreed with the plaintiff's position that the Corps had violated NEPA by failing to conduct a "review of the entire pipeline" at issue. Id. at 44. It found instead that the "connected actions regulation . . . does not dictate that NEPA review encompass private activity outside the scope of the sum of the geographically limited federal actions." Id. at 49. The court thus rejected the plaintiff's contention that the entire pipeline, the vast majority of which fell outside federal control, should have been addressed in a programmatic environmental analysis. Id. at 50-51.

The Tribe, Defendants assert, is making "functionally the same argument" here. See Corps Opp. at 9. If Plaintiffs were in fact asserting that NEPA required a DAPL-wide assessment, the Corps would be correct in deeming such a claim futile. The Tribe would, moreover, be precluded from making such an argument not only by the holding in Sierra Club, but also by one of the Court's prior Opinions in this case. In Standing Rock I, it rebuffed Standing Rock's argument that federal Defendants were required to engage in a whole-pipeline analysis. The Court denied the need for any such comprehensive evaluation, finding that "a federal agency with limited jurisdiction over specific activities related to a pipeline" is not

"required to consider all the effects of the entire pipeline."  205 F. Supp. 3d at 31; see also Sierra

Club, Inc. v. Bostick, 787 F.3d 1043, 1051-54 (10th Cir. 2015) (holding Corps was not required

to prepare NEPA analysis of entire pipeline when verifying permits for 485-mile oil pipeline

crossing over 2,000 waterways); Winnebago Tribe of Neb. v. Ray, 621 F.2d 269, 272-73 (8th

Cir. 1980) (concluding same for electric utility line).

    Yet the Court believes that the Yankton Sioux's segmentation claim is more nuanced

than Defendants contend.  Although the Tribe certainly confuses the matter somewhat by

referring repeatedly to the "entire pipeline project" and the "impacts of the [p]ipeline," it also

raises the narrower argument that NEPA required a "comprehensive agency action review of the

connected and similar federal actions" related to DAPL.  See Yankton Reply at 1, 8, 10; Yankton

MSJ at 6 (emphasis added).  Plaintiffs contrast this claim with "whole pipeline review,"

explaining that they are limiting their challenge to the series of actions within federal permitting

authority.  See Yankton Reply at 9-10.

    This narrower claim, contrary to Defendants' assertions, is not precluded by Sierra Club.

Rather, it fits within a line of argument explicitly left open by that opinion.  As the court there

noted, plaintiff had, at oral argument, advanced the claim that "the connected action regulation

require[s] that the federal actions in this case – the easements, the other areas within federal

jurisdiction" – should have been considered connected and "analyzed together" under NEPA.

See 803 F.3d at 51.  The court stated that such a claim "for NEPA analysis limited to the

[federal] verification and easement areas" was "an accurate statement of the connected actions

doctrine."  Id. at 44, 51.  Because plaintiffs had forfeited such an argument below, however, the

Circuit "had no occasion to consider it."  Id. at 51, 44.

For this Court, then, the decision in Sierra Club serves only to identify a lacuna in the binding precedent – how to apply the anti-segmentation rule to federal actions encompassed within a larger, private project. Here, Plaintiffs are challenging federal Defendants' decision to issue "three separate and distinct EAs, three separate and distinct FONSIs, and one categorical exclusion classification for their own respective actions related to the Pipeline project," in lieu of a consolidated analysis of all such federal permissions related to DAPL. See Yankton MSJ at 11. This limited anti-segmentation claim appears to fit within the narrow opening left ajar by the holdings of Sierra Club and this Court's prior Opinion. See Sierra Club, 803 F. 3d at 49 (recognizing potentially viable claim that an agency "unlawfully failed to perform NEPA analysis on sections . . . short of the entire length of the pipeline" that fell under federal control). The Court treats in turn the Tribe's arguments on "connected actions" and "similar actions."

3. *Connected Actions*

Having established the framework of the anti-segmentation rule and the parameters of Plaintiffs' NEPA claims, the Court begins with the Tribe's allegation that Defendants violated the Act's implementing regulation, 40 C.F.R. § 1508.25, by not treating the DAPL-related permissions as "connected" actions requiring a programmatic environmental analysis.

Under § 1508.25(a)(1), connected actions are those that "(i) automatically trigger other actions which may require [an EIS]; (ii) cannot or will not proceed unless other actions are taken previously or simultaneously; or (iii) are interdependent parts of a larger action and depend on the larger action for their justification." Although Defendants argue that this regulation applies only to EIS analyses, and not EAs (as were issued in this case), this contention conflicts with Circuit precedent stating that "when determining the contents of an EA or an EIS, an agency must consider all connected actions." Delaware Riverkeeper, 753 F.3d at 1314 (emphasis

added).  The Court will therefore proceed with the assumption that, if the various DAPL permissions are in fact "connected actions" under NEPA, Defendants were required to include them within the scope of a consolidated environmental review – whether it took the form of an EIS or an EA.

So, are the discrete federal permissions here in fact "connected"?  Plaintiffs offer four major arguments in favor of finding such a relationship: (1) the federal projects do not have "substantial independent utility"; (2) the approval of each federal permit constrained the consideration of alternatives for other portions of the pipeline; (3) the permits and permissions were "justified by" a larger federal action; and (4) the federal projects are "interdependent" and have a "synergistic" environmental effect.  The Court addresses each separately.

a.  Substantial Independent Utility

Under this Circuit's decision in Taxpayers, federal projects can only be analyzed separately if each project has, *inter alia*, "substantial independent utility."  819 F. 2d at 298.  In other words, this test asks "whether one project will serve a significant purpose even if a second related project is not built."  Hammond v. Norton, 370 F. Supp. 2d 226, 247 (D.D.C. 2005) (quoting Coal. on Sensible Transp., 826 F.2d at 69).  On this issue, Plaintiffs argue that "no separate component of the Pipeline considered by Federal Defendants and analyzed in three separate EAs can possibly have independent utility" because "[i]f one federal approval for the Pipeline had been denied, Pipeline construction could not have been completed and the whole project would have been rendered utterly useless."  Yankton MSJ at 13.

This line of argument, as Defendants accurately note, ignores the facts on the ground. Most significantly, 97% of DAPL runs through private land.  This means that vast swaths of the pipeline could be constructed without any federal permissions or permits whatsoever, and that, if

a given federal authorization was denied for a portion of the remaining 3%, the project could be re-routed to avoid the contentious crossing or easement.  See Standing Rock I, 205 F. Supp. 3d at 32 (noting that "the route taken by the pipeline through private lands . . . is driven by factors that have little to do with the discrete activities that the Corps needs to permit").  Indeed, such re-routing occurred throughout the lifespan of the pipeline project, including in response to the findings of the FWS EA.  See FWS EA at 7, 13-16 (discussing route modifications and alternatives); Standing Rock I, 205 F. Supp. 3d at 14 (noting that pipeline route was "modified 140 times in North Dakota alone to avoid potential cultural resources"); Exh. Y (Letter from Jackie Rodgers of Osage Nation confirming DAPL reroute at Mississippi River crossing); Corps Opp. at 14 n.7 (noting prior re-routing).  Far from rendering the "whole project . . . entirely useless," the denial of one federal approval could simply result in a shift in the pipeline's course.

It follows, therefore, that each discrete federal permission had "substantial independent utility," as each would allow that portion of the pipeline to proceed as planned, while any denial would result in re-routing – with no apparent impact on the other federally regulated components of the project.  Cf. City of Williams v. Dombeck, 151 F. Supp. 2d 9, 19–20 (D.D.C. 2001) (finding water-transportation system connected to larger federal action because construction of water pipeline "[would] not proceed unless [the other action] proceeds previously or simultaneously") (internal quotation marks omitted).

The limited federal involvement with DAPL and the potential for re-routing additionally distinguishes this case from Delaware Riverkeeper, upon which Plaintiffs rely.  In that case, the projects at issue addressed upgrades to a natural-gas pipeline, meaning that a federal agency – FERC – had jurisdiction over projects along its entire length.  See 753 F.3d at 1307-08.  Because FERC was tasked with analyzing the environmental impacts of construction and operation for

the whole pipeline, there was simply no way for it to be re-routed so as to not require agency approval.  Id. at 1308 (noting that the approvals were "physically, functionally, and financially connected and interdependent").  If FERC had approved certain segments and denied others, the project could not proceed.  As the court in Delaware Riverkeeper found, each phase of the pipeline's approval and permitting process "fit with the others like puzzle pieces," and thus the "agency was obliged to assess the entire pipeline for environment[al] effects."  Id. at 1319.

DAPL, by contrast, is not so beholden to overall federal approval; as this Court noted in Standing Rock I, "[N]o permitting" does not mean "no pipeline."  205 F. Supp. 3d at 31.  The project's construction and routing could instead be tailored or modified to avoid problematic federal lands or water.  Id.  This conclusion remains as true today as when the Court issued its first Opinion in this case.  It follows, therefore, that the Corps' and FWS's actions related to the pipeline have "substantial independent utility."  The denial of one federal approval for this pipeline does not preclude, or even necessarily affect, the remaining federal actions.

b.  Consideration of Alternatives

The Tribe next posits that "each approval issued [by the Corps and FWS] sufficiently constrained the consideration of alternatives for other portions of the pipeline to mandate consideration of all approvals in a single NEPA document."  Yankton MSJ at 13.  According to Plaintiffs, the "approval of one segment clearly foreclosed the opportunity to consider other reasonable alternatives, as the approval of one segment at a specific location decreased route options for other segments of the pipeline."  Id.  Defendants counter that their consideration of alternatives to each permit and permission was not so constrained, pointing to the fact that the EAs each "contains a section devoted to alternatives to the federal action."  DA Opp. at 19

Defendants have the better of this argument. Indeed, a review of the three EAs at issue demonstrates that the two Corps districts and FWS clearly considered a full panoply of alternatives – including, in each case, a "no-action" alternative that consisted of a scenario in which the pipeline was not constructed. See Omaha Dist. EA at 12-13; St. Louis Dist. EA at 12-15; FWS EA at 15. As made evident by the agencies' analyses, the approval for any one crossing or permission did not restrict the consideration of different route options or alternatives for the other proposed actions. See also Coal. on Sensible Transp., 826 F.2d at 69 (rejecting claim that project approval would "restrict consideration of alternatives for related projects" because no indication that each permission would "effectively commit [federal] decisionmakers to a future course of action").

### c. Larger Federal Action

Plaintiffs next assert that the various federal permits and permissions are "connected" because they "are justified by a larger federal action" – that is, but for an overarching federal project, the discrete approvals would not have been required. They contend that the actions of the Corps and FWS were "clearly parts of a larger action," stating that "the permits and permissions issued by Federal Defendants were part of, and justified by, the . . . greater implementation of the Pipeline." Yankton Reply at 10-11. Yet, as discussed above, any suggestion that DAPL as a whole constitutes a "federal action" is unavailing in light of Sierra Club and Standing Rock II. The narrower question, therefore, is whether the federal permits and permissions were justified by any larger federal action and thus required a consolidated NEPA analysis. See Yankton Reply at 12 (acknowledging that Tribe "do[es] not argue that the entire pipeline should have been analyzed, but rather, that the permits and permissions . . . should have been analyzed together in a single NEPA process"); see also Sierra Club v. U.S. Army Corps, 64

F. Supp. 3d 128, 154 (D.D.C. 2014), aff'd, 803 F.3d 31 (stating that "connected actions regulation requires that the impact on the environment of all aspects of a <u>particular major federal action</u> be evaluated together") (emphasis added).

Here, Plaintiffs can identify no such overarching federal project upon which the various permissions rely. Instead, the record is clear that federal permission was needed for only limited, discrete components of DAPL's construction. <u>See</u> Corps Opp. at 10 (noting that "there was no single proposal for the pipeline submitted to Corps and FWS"). Although all of the federal authorizations were part of the pipeline project, the project was not itself a federal undertaking. <u>See</u> <u>Sierra Club</u>, 803 F.3d at 49 (noting that while oil pipeline at issue was "undoubtedly a single physically, functionally, and financially connected project," "less than five percent [was] subject to federal review," and thus agency was not required to evaluate impact of entire pipeline) (internal quotation marks omitted). This again distinguishes the facts of this case from those of <u>Delaware Riverkeeper</u>, in which FERC had jurisdiction over the entire pipeline, and each related permission was thus contingent upon the agency's approval of the pipeline's overall certification. The agency actions at issue here, by contrast, are not "justified by" or reliant upon any broader federal permission. <u>See</u> <u>Sierra Club v. US Army Corps of Eng'rs</u>, 990 F. Supp. 2d 9, 37 (D.D.C. 2013) (noting "general reluctance to conclude that federal action with respect to a small portion of a pipeline" is sufficient to "federalize the entire project").

d. Synergistic Effect

Last, the Tribe is unable to demonstrate that the discrete federal permissions were "interdependent" or that they had any "synergistic effect." Plaintiffs cite to <u>Kleppe v. Sierra Club</u>, 427 U.S. 390 (1976), which held that proposals that have a "synergistic environmental impact upon a region . . . must be considered together." <u>Id.</u> at 410. Here, however, the Tribe is

unable to identify any such synergy connecting the discrete DAPL permissions. Each of the EAs and FONSIs addresses geographically isolated crossings or easements, and there is no suggestion in the record that environmental impacts in one location would have repercussions for another. Indeed, it is difficult to imagine how the construction of a river crossing in Illinois could possibly affect the environment at Lake Oahe, which is located hundreds miles away and separated by the states of Iowa and South Dakota. See DA Opp. at 1 (Map 1). This, therefore, is not a case in which the environmental impacts or harms arising from a set of discrete federal permissions would, if combined, be greater than the sum of the parts.

This lack of interaction between the sites addressed in each EA distinguishes this case from NRDC v. Hodel, 865 F.2d 288 (D.C. Cir. 1988). Hodel involved the federal review of permissions for a series of offshore drilling leases in two ecologically sensitive locations. Id. at 297. The Secretary of the Interior had determined that each lease would not have a significant environmental effect, a conclusion plaintiff challenged under § 1508.25. Id. at 298. The court in Hodel agreed. It held that the Secretary had erred by separately evaluating the lease permissions because, acting together, the discrete drilling locations would affect marine mammals and migratory species. Id. at 299-300. While a single drilling lease may not have had such effect, the court found that the actions were connected by their interdependent and synergistic impacts. By failing to consider the cumulative effects of all the leases, the Secretary impermissibly ignored the actual environmental repercussions of granting the multiple permissions.

Here, by contrast, the permissions at issue are for ecologically distinct waters and lands. Counter to Plaintiffs' assertion that the sites are "interdependent," Yankton MSJ at 14, there is no indication that DAPL's passage through one crossing or easement would have spillover environmental effects at another. The Court, consequently, finds no basis upon which to deem

the federal approvals "interdependent" or as having any synergistic environmental impact.  See Earth Island Inst., 2017 WL 5526572, at *14 (separate NEPA review appropriate where actions in question were located in different watersheds on opposite sides of Greenhorn Mountains).

4. *Similar Actions*

In addition to maintaining that the approvals were "<u>connected</u> actions," Plaintiffs assert that the Corps' and FWS's assessments were "<u>similar</u> actions" under § 1504.25.  The Court begins with the threshold issue of whether the Tribe has in fact forfeited this claim.  According to Defendants, the "similar actions" contention is unavailable, as "neither Plaintiffs nor any other commenter raised the argument that FWS and the Corps' actions should be considered together as 'similar actions,'" Corps Opp. at 13 n.5, and "[i]t is well-established that issues not raised in comments before the agency are waived."  DA Opp. at 24 (quoting <u>Nat'l Wildlife Fed'n v. EPA</u>, 286 F.3d 554, 562 (D.C. Cir. 2002)).  In response, the Tribe asserts that it need not have identified the similar-actions claim during the comment period "because a different entity . . . had explicitly raised the issue."  Yankton Reply at 25.  Plaintiffs then refer to a lone comment on the proposed St. Louis District EA that quoted the text of § 1508.25, including the "connected, cumulative, or similar actions" language.  <u>Id.</u> at 27 (citing St. Louis EA, Comment 2-2).  Plaintiffs also argue that, regardless of whether the similar-actions argument was raised in comments, the Court should not consider it forfeited because it falls within the realm of those "so obvious that there is no need for a commentator to point [it] out specifically in order to preserve its ability to challenge a proposed action."  <u>Id.</u> at 28 (quoting <u>Dep't of Transp. v. Pub. Citizen</u>, 541 U.S. 752, 765 (2004)).

After examining the underlying record, the Court agrees with Defendants that the "similar actions" issue was not raised "with sufficient specificity reasonably to alert the agency"

during the comment period.  See Tex Tin Corp. v. EPA, 935 F.2d 1321, 1323 (D.C. Cir. 1991).

The single mention of the word "similar" in the comments appears to be the one Plaintiffs cite

from the St. Louis EA, which arises in the context of reciting verbatim the full language of §

1504.25.  Neither that comment, nor any other, makes any attempt to apply that "similar actions"

text to the DAPL decisionmaking process or argues that federal Defendants erred in failing to

consider their respective permissions and permits under that prong of the regulation.  As

Defendants acknowledge, this is in contrast to the "connected actions" issue, which was

explicitly raised and addressed in depth by a number of commenters.  See, e.g., Exh. 14 (Sierra

Club Comment) (discussing § 1504.25, but addressing only "connected actions" prong of

regulation).  While the Tribe is correct that it may rely on the comments of other entities in

arguing against waiver, see Nat. Res. Def. Council v. EPA, 824 F.2d 1146, 1151 (D.C. Cir.

1987), here it cannot show that any entity sufficiently raised the "similar actions" claim before

the agencies so as to give them notice of the issue.  See Northside Sanitary Landfill, Inc. v.

Thomas, 849 F.2d 1516, 1519 (D.C. Cir. 1988) (holding that "by neglecting timely to put the

[agency] on proper notice of its objections, [Plaintiff] has forfeited its right to have this court

examine those objections on the merits").

Similarly, Plaintiffs cannot demonstrate that the issue is "so obvious" that it need not

have been pointed out in order to be preserved as a basis for a later legal challenge.  See Dep't of

Transp., 541 U.S. at 765.  Indeed, it stands to reason that if the "similar actions" argument was so

self-evident, the multiple commenters who addressed the issue of segmentation would have at

least referred to such an allegedly straightforward claim.  The fact that the comments instead

discussed only the "connected actions" prong of § 1508.25 speaks to the relative obscurity of the

"similar actions" issue.  Because no commenter made any substantive contention that the

agencies' actions were similar, and because such an argument was not "obvious," the Court will deem this issue forfeited.

Out of an abundance of caution, however, the Court also notes that even if this claim were preserved, the Tribe would still not prevail. Under § 1508.25, similar actions are those that, "when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography." Plaintiffs contend that the federal permissions at issue in this case share such a resemblance. In particular, the Tribe focuses on the "common timing" of the Corps' and FWS's actions, noting that the agencies' decisionmaking processes "took place at roughly the same time," with the relevant federal permits and permissions issued within a span of ten months. See Yankton MSJ at 15; Reply at 19.

Simultaneity of agency actions is not, however, dispositive of their similarity. Instead, § 1508.25 clearly states that the ultimate question is whether a set of actions "ha[s] similarities that provide a basis for evaluating their environmental consequences" in a single assessment. As this Circuit has put it, a comprehensive analysis is appropriate under § 1508.25 when the "sufficiently similar character of actions is such that [a programmatic analysis] is the 'best way' to assess their combined impacts." Coal. on Sensible Transp., 826 F.2d at 70 n.8 (citation omitted). Such a standard does not, contrary to the Tribe's suggestion, mandate that all actions with temporal proximity are "best" assessed in a single EIS or EA.

The implementing regulation, moreover, also lists common geography as another potential indicator of similarity – a factor that, in this case, cuts against finding such commonality between the DAPL-related permissions. As discussed above, the three EAs and FONSIs were for geographically and ecologically distinct areas of federal control. As

Defendants note, the assessments addressed actions that were "not physically connected" and instead were "spread over hundreds of miles across multiple states." Corps Opp. at 16. The permissions and permits, moreover, were for different environmental resources: the Omaha District EA addressed the crossing of Lakes Oahe and Sakakawea; the St. Louis EA looked at a series of lake, creek, and channel crossings and drainage districts in Illinois; and the FWS EA was concerned with the agency's jurisdiction over wetland and grassland easements.

Such geographic isolation and ecological diversity, the Corps contends, defeat any suggestions of similarity between the federal actions. Plaintiffs counter that "[w]hile the geographic locations for the various agency actions are not the same, they all occurred along the same linear pipeline route," and thus "[t]here can be no doubt that Federal Defendants' actions were 'similar.'" Yankton MSJ at 16 (emphasis omitted). The Court does not share the Tribe's certainty on this issue. Instead, it finds that the geographic and substantive differences among the three actions demonstrate that they are not "similar" within the meaning of § 1508.25.

Plaintiffs also vaguely allude to other alleged similarities among the DAPL-related actions. Although it focuses largely on the temporal overlap between the various federal permissions, the Tribe asserts that "Defendants' actions involved the same singular pipeline which would transport the same crude oil, rendering the actions' potential impacts similar if not identical." Yankton MSJ at 15. Again, this argument does not reflect the reality of the pipeline – a project that spans four states over its 1,200-mile route. The discrete parcels of federal lands and easements the pipeline encounters along this corridor are not, simply by virtue of being in DAPL's path, "similar." Indeed, one need only reference the EAs at issue in this case to understand that, far from presenting "identical" environmental considerations, each federal permission reflects site-specific and distinct ecological concerns. Although the pipeline may be

a "singular" private undertaking, its environmental impacts and the related federal assessments are far more diverse.

* * *

In sum, the Court concludes that Defendants' environmental assessments are not "connected" or "similar" federal actions. Instead, they are discrete analyses that address ecologically and geographically disparate areas of federal jurisdiction. The Corps and FWS, accordingly, were under no obligation to consider these authorizations together. The Court observes, moreover, that a major rationale for the anti-segmentation rule is especially inapplicable in this case. Enforcement of the principle seeks, in large part, to prevent agencies from disguising the actual environmental impacts of a given governmental project by dividing the action into artificially created components. See Macht v. Skinner, 715 F.Supp. 1131, 1135 (D.D.C. 1989), aff'd, 889 F.2d 291 (D.C. Cir. 1989) (anti-segmentation principle serves to "weed out projects which are pretextually segmented, and for which there is no independent reason to exist"). Yet this is not a case in which a broader agency action was fragmented into arbitrary parts in order to hide its total environmental effect. DAPL is a largely private project, and Defendants' decision to treat the limited federal involvement with the pipeline as discrete agency actions evinces no bad faith or attempt to circumvent NEPA's environmental protections. Such a determination was instead a reasonable exercise of the agencies' discretion, and the Court will therefore defer to Defendants' decision to conduct three separate EAs and FONSIs in this case.

C.     Harmless Error

Finally, even if Defendants' actions did violate NEPA, the Court concludes that such violations did not prejudice Plaintiffs, as there is no indication that the agencies would have reached a different outcome if they had in fact considered the DAPL-related actions *in toto*.

The Tribe argues that the Court should not apply harmless-error doctrine in this context, noting that certain cases finding improper segmentation of NEPA analyses have not explicitly addressed the question of prejudice. See Yankton Reply at 21. Yet just because other courts have not applied harmless error does not prevent this Court from doing so. Rather, the inquiry into whether a NEPA plaintiff suffered prejudice is well established in the relevant precedent. See, e.g., Pub. Employees for Envtl. Responsibility v. Hopper, 827 F.3d 1077, 1087–88 (D.C. Cir. 2016) (applying harmless-error analysis in NEPA context); Save Our Heritage, Inc. v. FAA, 269 F.3d 49, 59–62 (1st Cir. 2001) (same); Laguna Greenbelt, Inc. v. U.S. Dep't of Transp., 42 F.3d 517, 527 (9th Cir. 1994) (same).

Defendants assert that the Tribe has identified "no concrete environmental impact that was missed by the alleged segmenting of the discrete permissions" by the Corps and FWS. See Corps Opp. at 17-18. The Court agrees. The Tribe describes the actual impact of Defendants' allegedly improper segmentation in only the vaguest of terms, stating that the use of separate analyses left the Tribe "with no means to truly understand or weigh in on the vast cumulative impacts this project can and will have on the human environment" and generally alleging that by using three separate EAs, Defendants "concealed the cumulative environmental impacts of the project." Yankton MSJ at 2.

Yet there is no indication in the record that Defendants "concealed" any cumulative environmental impacts or that they "faile[ed] to do the analysis . . . to determine the cumulative impacts" of all of the federal actions. See Yankton Reply at 5-6. On the contrary, each of the three EAs contains a section explicitly titled "cumulative impacts," discussing the potential cumulative effects of each permission and addressing the potential for the relevant permit to interact with other federal actions – including those related to the pipeline. See Omaha EA at 98-

107; FWS EA at 33-35; St. Louis EA and FONSI at 83-94.  If the agencies were attempting to "hid[e] the ball" as to DAPL's cumulative impacts, see Yankton MSJ at 19, they did a poor job indeed.

Beyond providing no evidence of Defendants' alleged "concealment," Plaintiffs have not identified any actual harms that arose from the division of the agencies' analysis.  The goal of NEPA is to ensure that the public is provided with relevant information and the opportunity to participate in agency decisionmaking.  See Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349 (1989) (NEPA "guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decision-making process and the implementation of that decision").  In this case, Plaintiffs provide no explanation as to how Defendants' alleged segmentation of the DAPL-related permissions frustrated such ends.

In fact, the high volume of comments and active public dialogue throughout the permitting process undermine any conclusion that NEPA's participatory goals were somehow stymied by the use of three separate EAs.  See Yankton MSJ at 5 (acknowledging "multitude of comments" regarding Defendants' actions).  Although the Tribe may have preferred that the assessments be combined into a single document, there is no indication in the record that such consolidation would have had any meaningful effect.  Plaintiffs, like the rest of the public, seem to have had no difficulty reviewing the three discrete documents – or voicing their concerns regarding the agencies' conclusions.  See Nevada v. Dep't of Energy, 457 F.3d 78, 90–91 (D.C. Cir. 2006) (finding lack of prejudice from alleged NEPA violation when "[t]he many comments submitted in response to the []EIS manifest that the public had sufficient information to comment").

Contrary to the Tribe's assertion that "had [Defendants] not broken the analysis into three pieces, it would seem a foregone conclusion that the cumulative impact would have easily crossed the threshold for requiring an EIS" rather than an EA, see Yankton Reply at 5, the record in this case does not support such an assumption. Because the Tribe is unable to specifically explicate, much less demonstrate, how Defendants' discrete analyses "inherently lowered the level of environmental review that they conducted," id. at 22, the Court is unconvinced that any omnibus assessment would have altered the agencies' analysis. As Plaintiffs can demonstrate no actual harm arising from the use of the three EAs, the Court concludes that any improper segmentation in this case constitutes harmless error.

* * *

As a final note, the Court observes that its conclusions today are not necessarily the end of the road for the Yankton Sioux's involvement with DAPL. As of October 20, 2017, the Tribe has been contacted by Defendants and asked to provide input during the ongoing remand analysis. See ECF No. 306, Exh. 1 (Letter from Corps requesting information from Yankton to assist in remand). Plaintiffs will therefore have the opportunity to voice their remaining concerns regarding the Corps' environmental assessments and, if they choose, to engage in an active dialogue with Defendants as this case continues to move forward.

IV.     **Conclusion**

For the foregoing reasons, the Court will deny Plaintiffs' Motion for Summary Judgment, grant Defendants' Cross-Motion for Summary Judgment, and dismiss Plaintiffs' Count I as moot. A contemporaneous Order so stating will issue this day.

.

/s/ *James E. Boasberg*
                                        JAMES E. BOASBERG
                                        United States District Judge

Date:  March 19, 2018