## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STANDING ROCK SIOUX TRIBE,**<br><br>Plaintiff,<br><br>and<br><br>**CHEYENNE RIVER SIOUX TRIBE,**<br><br>Intervenor-Plaintiff,<br><br>v.<br><br>**U.S. ARMY CORPS OF ENGINEERS,**<br><br>Defendant.<br><br>and<br><br>**DAKOTA ACCESS, LLP,**<br><br>Intervenor-Defendant. | **Case No. 1:16-cv-1534-JEB**<br>**[Consolidated with 1:16-cv-1796 and**<br>**1:17-cv-267]**<br><br>**MOTION FOR LEAVE TO FILE**<br>**SUPPLEMENTAL COMPLAINT** |

## INTRODUCTION

Pursuant to Fed. R. Civ. P. 15(d), Plaintiffs Yankton Sioux Tribe and Robert Flying Hawk (together, "Plaintiffs" or "Tribe") hereby respectfully move for leave to file a supplemental complaint in this action. The supplemental complaint challenges Defendant U.S. Army Corps of Engineers' ("Corps") recent decision to affirm its conclusion that issuance of a Mineral Leasing Act easement allowing the Dakota Access Pipeline to cross federal land at Lake Oahe did not involve "significant" environmental impacts under the National Environmental Policy Act ("NEPA"). The supplemental complaint also raises claims under the Administrative Procedure Act ("APA") related to the Corps' failure to comply with its duty to consult with the Tribe which

1

resulted in a decision that was arbitrary, capricious, and not in accordance with law.

Defendant Corps and intervenor Dakota Access, LLC have stated that they will take a position after this motion is filed.

ARGUMENT

Unlike an amended complaint, which "typically rest on matters in place prior to the filing of the original pleading," *United States v. Hicks*, 283 F.3d 380, 385 (D.C. Cir. 2002), a supplemental complaint sets forth "transaction[s], occurrence[s], or event[s] that happened after the date of the pleading to be supplemented." Fed. R. Civ. P. 15(d). A supplemental complaint is used "to set forth new facts that update the original pleading or provide the basis for additional relief; to put forward new claims or defenses based on events that took place after the original complaint or answer was filed; [and] to include new parties where subsequent events have made it necessary to do so." *Hicks*, 283 F.3d at 386 (*citing* 6A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1504 (3d ed.2010)).

Before filing a supplemental complaint, a plaintiff must first request leave from the Court. *Hall v. C.I.A.*, 437 F.3d 94, 100 (D.C. Cir. 2006); Fed. R. Civ. P. 15(d) (providing that a court "may, on just terms, permit a party to serve a supplemental pleading"). A motion for leave to supplement a pleading is "to be freely granted when doing so will promote the economic and speedy disposition of the entire controversy between the parties, will not cause undue delay or trial inconvenience, and will not prejudice the rights of any of the other parties to the action." *Hall*, 437 F.3d at 101 (internal quotation marks omitted); *BEG Investments, LLC v. Alberti*, 85 F.Supp.3d 13, 24 (D.D.C. 2015). Generally, leave to supplement should be freely given. *Id.*; *Wildearth Guardians v. Kempthorne*, 592 F.Supp.2d 18, 23 (D.D.C. 2008). "It is the opposing party's burden

to demonstrate why leave should not be granted." *Lannan Foundation v. Gingold*, 300 F.Supp.3d 1, 12 (D.D.C. 2017).

Here, leave to supplement should be granted. Last year, Plaintiff Standing Rock Sioux Tribe ("SRST") prevailed in part on its challenge to the Corps' findings under NEPA. *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 255 F. Supp. 3d 101 (D.D.C. 2017). This Court remanded the analysis to the Corps for additional analysis on three specific issues at the heart of the SRST's opposition to DAPL. This Court has repeatedly observed that it expects additional proceedings regarding the legality of the remand. In *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 282 F. Supp. 3d 91, 109 (D.D.C. 2017), this Court observed: "After the agency's further work on remand, the parties may well disagree over the sufficiency of its conclusion. If and when such a dispute arises, they will again have the opportunity to address whether Defendants have in fact fulfilled their statutory obligation." Furthermore, in rejecting SRST's request for clarification during the remand process, this Court again emphasized that the tribal plaintiffs would have their day in court once the Corps finalized the remand. "If the Tribes believe that the Corps has not conducted the remand appropriately or has not sought out information it should have, then Plaintiffs are, of course, free to make such arguments in the post-remand briefing that the Court expects will occur." *See* Order, ECF 352 (April 16, 2018), at 2. Regrettably, the Court predicted correctly. The remand turned out to be a one-sided process in which the Tribe was not provided critical technical materials or consulted adequately.

In supplementing its complaint to challenge the remand decision, the Tribe has not acted with any improper or dilatory motive, nor does supplementation prejudice any party. Moreover, supplementation is in the interests of justice and judicial economy: the Tribe would have the right to initiate a new lawsuit against the Corps if supplementation is denied. *See Thorp v. District of*

*Columbia*, 325 F.R.D. 510, 514 (D.D.C. 2018) (denying supplementation in favor of a new lawsuit where claims are insufficiently related); *see also Quaratino v. Tiffany & Co.*, 71 F.3d 58, 66 (2d Cir. 1995) ("leave to file a supplemental pleading should be freely permitted when the supplemental facts connect it to the original pleading.")  Here, given the history of this case and this Court's oversight over the remand process, it makes more sense to bring these claims in the context of the existing litigation than initiate a new one.

The focus of the proceedings on remand will be whether the remand lawfully addressed the shortcomings identified by this Court in its partial summary judgment decision, and whether the Corps adequately consulted with the Tribe, subject to the judicial review standards of the APA.

CONCLUSION

For the foregoing reasons, the Tribe's motion for leave to supplement its complaint should be GRANTED. A proposed order is submitted herewith.

Dated: November 26, 2018.

YANKTON SIOUX TRIBE, et al.

By: *Jennifer S Baker*

Jennifer S. Baker, OKBA# 21938
(*Pro Hac Vice*)
Jeffrey S. Rasmussen, WA #21121
(*Pro Hac Vice*)
Fredericks Peebles & Morgan LLP
1900 Plaza Drive
Louisville, CO 80027
Phone: (303) 673-9600
Facsimile: (303) 673-9155
jbaker@ndnlaw.com
jrasmussen@ndnlaw.com
*Attorneys for Plaintiffs*

_s/ Patricia A. Marks_
Fredericks Peebles & Morgan LLP
401 9th Street, N.W., Suite 700
Washington, D.C. 20004
Phone:  (202) 450-4887
Facsimile:  (202) 450-5106
pmarks@ndnlaw.com
_Attorney for Plaintiffs_

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 26th day of November, 2018, a copy of the foregoing was filed electronically with the Clerk of the Court. The electronic filing prompted automatic service of the filing to all counsel of record in this case who have obtained CM/ECF passwords.

Catherine Wiland
Legal Assistant

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STANDING ROCK SIOUX TRIBE,**<br><br>Plaintiff,<br><br>and<br><br>**CHEYENNE RIVER SIOUX TRIBE,**<br><br>Intervenor-Plaintiff,<br><br>v.<br><br>**U.S. ARMY CORPS OF ENGINEERS,**<br><br>Defendant.<br><br>and<br><br>**DAKOTA ACCESS, LLP,**<br><br>Intervenor-Defendant. | **Case No. 1:16-cv-1534-JEB**<br>**[Consolidated with 1:16-cv-1796 and**<br>**1:17-cv-267]**<br><br>**FIRST SUPPLEMENTAL COMPLAINT** |

## <u>INTRODUCTION</u>

1.      Pursuant to Fed. R. Civ. P. 15(d), Plaintiffs Yankton Sioux Tribe and Robert Flying Hawk (together, "Plaintiffs" or "Tribe") hereby file this supplemental complaint in connection with federal actions relating to the Dakota Access Pipeline ("DAPL").  DAPL is a 1,168-mile-long crude oil pipeline that crosses under the Missouri River at Lake Oahe.

2.      This supplemental complaint addresses events that have occurred since this Court granted in part the Standing Rock Sioux Tribe's ("SRST") Motion for Partial Summary Judgment on June 14, 2017.  *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101 (D.D.C. 2017).  In that decision, this Court found unlawful and remanded the environmental

analysis conducted by Defendant U.S. Army Corps of Engineers ("Corps") for additional consideration on specific issues. It further admonished the Corps to give "serious consideration" to the errors identified in its decision, warning that compliance with the law "cannot be reduced to a bureaucratic formality, and the Court expects the Corps not to treat remand as an exercise in filling out the proper paperwork *post hoc*." *Standing Rock Sioux Tribe*, 282 F. Supp. 3d at 109.

3.     The remand process is now complete and has resulted in another final decision by the Corps.

4.     Regrettably but not surprisingly, the Corps ignored this Court's admonition to approach the remand with an open mind. Instead, it treated the remand as a *post hoc* effort to justify its unlawful decision to circumvent an adequate review of the pipeline and its impacts on the Tribe and the Tribe's rights.

5.     In the remand decision, the Corps, without qualification, affirmed its original decision to authorize the pipeline without the comprehensive environmental review required by the National Environmental Policy Act ("NEPA").

6.     Rather than "serious consideration" of the remand issues, the Corps produced a one-sided analysis that failed to provide a fair or transparent review of the matters this Court remanded to it.

7.     This supplemental complaint challenges the Corps' remand decision, which is a final agency action subject to review by this Court under the Administrative Procedure Act, 5 U.S.C. § 701, *et seq*. ("APA"), and the process underlying it. As directed by Fed. R. Civ. P. 15(d), this supplemental complaint focuses on the additional background and claims that have arisen since the Tribe's Original Complaint was filed.

8.      The Tribe seeks a declaration that the Corps' decision to affirm its original decision without a comprehensive environmental review and adequate consultation with the Tribe was arbitrary, capricious, and in violation of the APA, NEPA, and the Department of Defense's ("DOD") and the Corps' tribal consultation policies.  The Tribe asks that the Corps' approval of the Mineral Leasing Act ("MLA") easement authorizing construction of DAPL under Lake Oahe be vacated pending full compliance with the NEPA and the APA.

JURISDICTION AND VENUE

9.      This supplemental complaint presents claims under the APA, which authorizes a federal court to find unlawful and set aside any final agency action that is "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706.  Plaintiffs bring these claims on their own behalf and on behalf of the Yankton Sioux Tribe's members.

10.     Jurisdiction arises under 28 U.S.C. § 1362 ("district courts shall have original jurisdiction of all civil actions, brought by any Indian Tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States"); § 1331 (general federal question jurisdiction); § 2201 (declaratory relief); § 2202 (injunctive relief).

11.     Venue in this district is appropriate under 28 U.S.C. § 1391(e) because it is the district in which the defendant resides and in which "a substantial part of the events or omissions giving rise to the claim occurred."  No party has contested jurisdiction or venue during this litigation to date.

**PARTIES**

9.      Plaintiff Yankton Sioux Tribe is a federally recognized Indian tribe that is not incorporated under the Indian Reorganization Act, but rather, is governed by a duly adopted

constitution and by-laws through its General Council. The Tribe is a member of the *Oceti Sakowin* ("Seven Council Fires," also known as the Great Sioux Nation).  Plaintiff Yankton Sioux Tribe brings this suit on its own behalf and as *parens patriae* on behalf of its members to protect its members' cultural, historic, and environmental interests in its 1851 Treaty territory, its ancestral lands, and the Yankton Sioux Indian Reservation.

10.    Plaintiff Robert Flying Hawk is the Chairman of the Yankton Sioux Tribe Business and Claims Committee.  The claims against Defendants are made in Plaintiff Flying Hawk's personal and official capacity as *parens patriae* on behalf of the enrolled members of the Yankton Sioux Tribe.

32.    Defendant U.S. Army Corps of Engineers is a federal agency charged with administering and enforcing Sections 404 and 408 of the Clean Water Act regarding the discharge of dredged or fill material into waters of the United States and issuing leases under the MLA.

32.    Defendant Colonel John Henderson was the Omaha District Commander for the Corps until July 26, 2017, when he was replaced by Colonel John Hudson.  Until July 26, 2017, he oversaw the Corps' consultation with the Tribe during the remand process.

33.    Defendant Colonel John Hudson, current Omaha District Commander, oversaw the Corps' consultation with the Tribe during the remainder of the remand process.

34.    Lieutenant General Todd Semonite, Colonel Anthony Mitchell, U.S. Fish and Wildlife Service, and Director Dan Ashe are named defendants in the Tribe's original complaint. Upon information and belief, the supplemental claims raised herein do not involve these Defendants.

35.    Intervenor-Defendant Dakota Access, LLC is a limited liability company formed to construct and own the Dakota Access Pipeline ("DAPL").  Energy Transfer Partners, L.P.,

Sunoco Logistics Partners, L.P., and Phillips 66 are the beneficial owners of Dakota Access, LLC.

36.     By filing this action, the Tribe does not waive its sovereign immunity and does not consent to suit as to any claim, demand, offset, or cause of action of the United States, its agencies, officers, agents, or any other person or entity in this or any other court.

## FACTUAL ALLEGATIONS

I.     PROCEDURAL HISTORY

37.     The Tribe filed this action on September 8, 2016, raising multiple statutory and common law claims against the Corps, Lieutenant General Semonite, Colonel Henderson, Colonel Mitchell, U.S. Fish and Wildlife Service, and Defendant Ashe regarding permits and other authorizations granted to Dakota Access, LLC that were necessary to construct DAPL.

38.     On March 17, 2017, this Court issued an order consolidating the Tribe's action with *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 16-1534 and *Oglala Sioux Tribe v. U.S. Army Corps of Engineers*, 17-267.

39.     DAPL is a crude oil pipeline that runs approximately 1,168 miles from North Dakota, through South Dakota and Iowa, and into Illinois.

40.     DAPL required multiple federal easements, authorizations, and permissions from multiple federal agencies to construct, operate, and maintain the pipeline.  On July 27, 2016, the Corps' Omaha District issued a Final EA and Finding of No Significant Impact ("FONSI") and authorized several permits.

41.     At that time, however, the Corps did not authorize an easement to cross federally owned land at Lake Oahe.  On September 9, 2016, the Corps stated that it would not authorize DAPL construction on this land until it could determine whether it would need to reconsider prior decisions regarding the Lake Oahe site.

42.     After several months of additional consideration regarding the easement, the Corps announced on December 4, 2016, that the MLA easement would not be granted without a comprehensive analysis of alternatives and impacts.  Shortly thereafter, the Corps formally initiated that process with a notice of intent to prepare an environmental impact statement ("EIS"), requesting public input on the critical issues and scope of the EIS.

43.     A new U.S. President was inaugurated on January 20, 2017.  On January 24, the new President executed a "Presidential Memorandum" directing the Corps to abandon the December 4 decision and the EIS process.

44.     The Corps shortly thereafter issued the MLA easement at Lake Oahe without additional environmental review, and formally terminated the EIS process.

45.     Construction of the pipeline under Lake Oahe resumed immediately.

46.     Around this time, the SRST filed a Motion for Partial Summary Judgment on its NEPA, Treaty, and APA claims against the Corps.  The Cheyenne River Sioux Tribe ("CRST") joined the SRST's Motion and filed its own Motion for Partial Summary Judgment on additional claims.

47.     This Court issued its opinion on the SRST and CRST's partial summary judgment motions on June 14, 2017.  While rejecting some of the tribes' claims, the Court agreed that the Corps' analysis of three specific issues was arbitrary, capricious, and in violation of NEPA.  First, the Court ruled that the Corps failed to adequately analyze the impacts of an oil spill on hunting and fishing rights.  Second, the Court held that the Corps' consideration of environmental justice implications of the permit was flawed.  Finally, the Court held that the Corps failed to address the significant scientific "controversy" around its dismissal of oil spill risk and impacts.  The Court remanded the analysis back to the Corps for further consideration in light of its decision.

48.     This Court subsequently directed the finalization of oil spill response plans, completion of a third-party audit, and public reporting on various measures. *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 2017 WL 6001726, at *2 (D.D.C. 2017).

## II.     CONSULTATION POLICIES

49.     Former President William J. Clinton promulgated Executive Order No. 13175 ("E.O. 13175") on November 9, 2000.  E.O. No. 13175, Sec. 2, 65 Fed. Reg.  67249 (November 9, 2000).  E.O. 13175 reaffirmed the United States' government-to-government relationship with tribes as well as the United States' trust responsibility to tribes.  *Id.*

50.     E.O. 13175 required all agencies to establish procedures to ensure meaningful and timely consultation with tribes during the development of regulatory policies that have tribal implications.  *Id.*

51.     DOD Instruction 4710.02 regarding Interactions with Federally-Recognized Tribes ("DOD Instruction") was issued in 2006 in order to implement E.O. 13175, as well as DOD policies and directives.[1]

52.     The DOD Instruction applies to "[a]ll DoD operations, activities, and installations that require interactions with tribes."  DOD Instruction at 1.   Pursuant to the DOD Instruction, agencies "shall consult with tribes whenever proposing an action that may have the potential to significantly affect protected tribal resources, tribal rights, or Indian lands."  *Id*. at 4.

53.     The DOD Instruction's Guidance for Consultation with Tribes specifically acknowledges that "[c]onsultation may require multiple meetings over a period of months."

---

[1] The DOD issued a new DOD Instruction effective on September 24, 2018.  Because this DOD Instruction was not effective during the remand, the 2006 DOD Instruction is the version quoted herein.

54.     In 2012, the Corps formalized its tribal consultation procedures ("Corps Consultation Policy").  In its Corps Consultation Policy, the Corps defined consultation as:

> Open, timely, meaningful, collaborative and effective deliberative communication process that emphasizes trust, respect and shared responsibility.  To the extent practicable and permitted by law, consultation works toward mutual consensus and begins at the earliest planning stages . . . ; an active an respectful dialogue concerning actions taken by the USACE that may significantly affect tribal resources, tribal rights (including treaty rights) or Indian lands.

Corps Consultation Policy at 2.

55.     The Corps Consultation Policy further provides that the Corps "will ensure that it addresses Tribal concerns regarding protected Tribal resources, tribal rights (including treaty rights) and Indian lands." *Id*. at 3.

56.     Additionally, the Corps acknowledged that, "[i]n recognition of the varied organizations and customs of different Tribes, written protocols for consultation procedures may be considered and implemented at the local level with a specific Tribe." *Id*. at 4.

57.     The Tribal Consultation Policy was in fact kept "purposefully general in nature because each of the 565 federally recognized American Indian and Alaska Native Tribe are distinct and separate governments, requiring a consultation process that may be completely unique to them."  Mem. from U.S. Army Commanding Lieutenant General to U.S. Army Corps of Eng'rs (Nov. 1, 2012).

III.     CONSULTATION DURING THE REMAND PROCESS.

58.     The Tribe repeatedly attempted to engage with the Corps in good faith during the remand process, submitting many requests for information and for meetings, and submitting information intended to inform the Corps' analysis of the remand issues.

59.     The Corps mistakenly sent the Tribe letters requesting information from the Oglala Sioux Tribe in September, October, and November.[2]  In response to each of these letters, the Tribe explained that, while it could not provide information on behalf of the Oglala Sioux Tribe, it "intend[ed] to participate to the fullest extent possible in the remand process."

60.     In its very first response, the Tribe enclosed the *Ihanktonwan* Consultation *Wo'ope* ("Consultation Protocols"), the Tribe's protocols for government-to-government consultation and requested that the Corps proceed to consult with the Tribe in accordance with those protocols.  The Tribe repeated this request in the subsequent letters.

61.     On April 20, 2018, the Tribe wrote to the Corps, inviting it to meet for a preconsultation on May 31, 2018, explaining that the "purpose of this preconsultation meeting shall be to exchange preliminary information and for the U.S. Army Corps of Engineers to provide an overview of the project at issue and the remand process."

62.     The Tribe also once again attached its Consultation Protocols to the April 20, 2018 letter.

63.     Responding to the letter in a May 27, 2018 email, Thomas Tracy, District Counsel for the Corps Omaha District, stated that he "appreciate[s] the provision of the protocols from the Tribe that will help advise the Corps of Engineers of the general standards expected for consultation with the Yankton Sioux Tribe," and that "[the Consultation Protocols are] an area where the parties may not always agree, but we certainly can aspire to reach an understanding, if not an agreement."  However, despite repeated prompting by the Tribe's counsel, neither Mr. Tracy nor any other Corps official or employee has provided the Tribe with its final concerns or proposed

---

[2] On December 14, 2017, the Corps submitted a letter to this Court dated October 20, 2017 requesting information from the Tribe to assist it in the remand process.  The Tribe was not aware of this letter until it was submitted to the Court on December 14, 2017.

changes to the Consultation Protocols or indicated that the Consultation Protocols would not be followed.

64.     Responding to an email from the Tribe's counsel sent July 25, 2018, Mr. Tracy stated that "[t]he protocols being [sic] further discussed within the Corps of Engineers.  I will provide a more detailed response when I can."  To date, no such response has been provided.

65.     Despite the Tribe's efforts, no good faith effort has been made by the Corps to resolve this "important" matter.[3]

66.     On May 30, 2018, the Tribe wrote to the Corps to reiterate that the May 31, 2018 meeting was not a consultation but a preliminary informational session which would give the Corps the opportunity to provide an overview of the remand process and the issues on remand. The Tribe also explained that the Tribe's General Council, its governing body, would not be attending the information session, a prerequisite to consultation under the Consultation Protocols.

67.     When Colonel Hudson responded to the letter, he noted that he understood that the entire General Council for the Tribe would not be attending the session.  Notably, he did not mention that the Corps might later assert that this meeting constituted the required consultation with the Tribe's government.

68.     During the May 31, 2018 informational session, Chairman Flying Hawk and others repeatedly stressed that the Tribe had additional issues it would need to address with the Corps following the informational session.

---

[3] Upon receipt of the Consultation Protocols in 2016, Charles Smith of the Office of the Assistant Secretary of the Army, which oversees the Corps, described the Consultation Protocols as an "important protocol," stating that he would ensure that it was broadly distributed "from HQ to Division to Omaha District."

69.     For example, Faith Spotted Eagle, Chair of the Ihanktonwan Treaty Steering Committee, explained at the end of the session that "we absolutely need another meeting because we have got like 3 pages of questions that we haven't gotten to," to which a representative from the Corps responded "Okay we will work on that."

70.     Following the meeting, the Tribe sent the Corps a letter stating that the Tribe felt "this preliminary meeting went well and looks forward to continuing conversations with you, leading up to actual consultation."

71.     Even though the Tribe had made it very clear that it had additional issues to discuss following the informational session, when the Corps responded to the Tribe's letter two months later, it did not ask the Tribe for any additional information or seek a consultation meeting.  Instead the Corps simply told the Tribe that it "expect[ed] to finish by August 10, 2018."

72.     Finally, throughout the remand process, the Corps largely refused to provide any of the critical information requested by the Tribe.  For example, the Tribe asked the Corps twice to share with it a copy of the oil spill model, the data used in the model, and any associated report, so that the Tribe could review it and provide input to the Corps as to its reliability and accuracy. The Corps never provided this information.

IV.    THE CORPS' CONCLUSION OF THE REMAND PROCESS

73.     The Corps concluded the remand process on August 31, 2018, with a two-page "memorandum for record" documenting the Corps' position that there was no need to formally reconsider its July 2016 Environmental Assessment ("EA") and FONSI, and stating that an EIS was not necessary.

74.     As to the three flaws identified by this Court, the Corps asserted that its review of the potential impacts to hunting and fishing resources "did not reveal any significant impacts

because the risk of an incident is low and any impacts to hunting and fishing resource [sic] will be

of limited scope and duration."

75.     As to the issue of environmental justice, the Corps asserted that the Oahe crossing

"does not result in disproportionately high and adverse human health or environmental effects on

minority populations, including Tribes, and low-income populations."

76.     As to the issue of whether the Corps' conclusions were likely to be "highly

controversial," the Corps incorrectly characterized the tribes' input as simply being opposed to the

pipeline authorizations, stating that they did not "provide information that a substantial dispute

exists as to the size, nature, or effect of the federal action."

77.     The Memorandum stated that the rationale supporting these findings was

contained in the "enclosed document" and in the administrative record.  However, at the time the

Memorandum was filed, no such "document" was enclosed or provided to the Tribe or the Court.

It was not until October 1, 2018, that undersigned counsel was provided with a copy of the analysis

supporting the remand decision ("Remand Analysis"), which was subject to confidentiality

restrictions and could not be shared publicly.  On October 24, 2018, a redacted version of the

remand analysis was made available for the public.

78.     The Remand Analysis mostly reiterates the flawed conclusions of the Corps'

earlier analyses.

79.     For example, the Remand Analysis continues to calculate risk based on generic

national statistics, without regard to any of the unique risk factors of this project in this place, in

light of DAPL's parent companies' abysmal safety record.

80.     Like the prior EA, the Remand Analysis fails to grapple with extensive evidence

that the risks of slow, undetectable leaks is higher than it claims.

81.     The Remand Analysis ignores Dakota Access' failure to utilize vital industry pipeline safety standards despite the Corps claim in the EA to do so.

82.     Similarly, it continues to underestimate the impacts of an oil spill (which rely on its erroneous worst case discharge ("WCD") analysis and risk estimates) and the elevated hazards of Bakken crude oil, and to overestimate the ability of responders to clean it up—all of which place emergency responders at risk.

83.     A key shortcoming of the remand analysis is its failure to provide a lawfully adequate WCD.  In the remand analysis, the Corps essentially repeats the identical WCD from before the remand.

84.     Furthermore, the Corps fails to address the impact of circumstances listed in the 49 C.F.R. § 194.5 definition of WCD, including adverse weather conditions.

85.     The WCD also fails to implement the formula required by 49 C.F.R. § 194.105(b)(1), including consideration of the operator's "historic discharge[s]" and its conclusion is dependent upon the Corps' use of unrealistic shutdown times that bear little resemblance to multiple real-world pipeline incidents.

86.     As noted, Dakota Access' parent companies have among the industry's worst safety records, which by law should have been considered in developing the WCD, but was not.

87.     The remand also ignored critical findings regarding Dakota Access' failure to comply with easement conditions; for example, the requirement of supplying independent power to shutoff valves near Lake Oahe and an undocumented spill incident.

88.     The remand analysis also calculates the risk and impacts of an oil spill based on DAPL's original capacity.  While the remand process was underway, however, Dakota Access'

corporate parents publicly announced their intention to expand the capacity of DAPL by 100,000 barrels a day.

89.     On information and belief, expansion could take place without additional Corps authorization at Lake Oahe.  The Corps conducted no new analyses to respond to DAPL's announced intention to increase capacity by 100,000 barrels a day.

90.     Such an increase fundamentally alters both the risks of a spill as well as its potential impacts.

91.     As such, the remand analysis is already out of date and inapplicable to anticipated future operations of the pipeline.

92.     The above examples are intended as illustrations of the flaws in the Corps' analysis, not a comprehensive list.

93.     These and other fundamental flaws in the Corps' estimate of the risk and impact of oil spills infect all three of the remand topics.

94.     For example, the Remand Analysis dismisses the potential impacts to fish and game by reasoning that the risk of an oil spill is low and its impacts manageable—a conclusion that is fundamentally flawed due to the underestimated WCD and the other reasons discussed above.

95.     The Remand Analysis incorporates and asserts that it is based upon on a number of technical documents that are cited throughout the document.

96.     For example, the "Spill Model Report" is a technical document describing the results of various oil spill scenarios.  Neither this document nor any other technical document was ever made available to the Tribe during the course of the remand, despite many requests.  Nor have

they been made available to the Tribe or its counsel subsequent to the finalization of the Remand

Analysis, again despite requests.

## **CLAIMS FOR RELIEF**

### I.   FIRST CLAIM FOR RELIEF – VIOLATION OF NEPA

97.   Plaintiffs hereby allege and incorporate and restate all previous paragraphs of this

complaint and of their Original Complaint.

98.   Under NEPA, federal agencies are required to prepare an EIS for "major Federal

actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).

99.   Binding Council of Environmental Quality ("CEQ") regulations further define

whether impacts are "significant" enough to warrant a full EIS, requiring consideration of both

"context" (i.e., the various scales, regions, and interests affected by the action) and "intensity" (i.e.,

the "severity of the impact").  40 C.F.R. § 1508.27.  With respect to the latter, the regulations lay

out several factors that are to be considered.  Examples of these criteria include: "the degree to

which the proposed action affects public health or safety;" "unique characteristics of the

geographic area such as proximity to historic or cultural resources . . . ;" the degree to which the

effects on the environment "are likely to be highly controversial," are "highly uncertain" or

"involve unique or unknown risks;" and "the degree to which the action . . . may cause loss or

destruction of significant scientific, cultural, or historical resources."  *Id.*

100.   In June of 2017, the Court found "significant" flaws in the Corps' analysis of the

risk and impacts of its decision to authorize DAPL underneath Lake Oahe, and ordered the Corps

to conduct a remand to give "serious consideration" to those flaws. Mem. Op. 28, ECF No. 371-

1.

101.    By concluding the remand by affirming its original decision, the Corps acted arbitrarily, capriciously, contrary to the evidence before it, and in violation of NEPA and the CEQ regulations and contrary to the APA.

102.    The Corps also acted arbitrarily, capriciously, and in violation of NEPA and the CEQ regulations by failing to meaningfully engage with the Tribe by providing information so that the Tribe could provide input during the remand.

II.    SECOND CLAIM FOR RELIEF – VIOLATION OF DUTY TO CONSULT

103.    Plaintiffs hereby allege, incorporate, and restate all previous paragraphs of this complaint and of their Original Complaint.

104.    DOD and Corps policy and instructions required the Corps to engage in meaningful consultation with the Tribe during the remand.  Corps Consultation Policy; DOD Instruction.

105.    When an agency has

established a policy requiring prior consultation with a tribe, and has thereby created a justified expectation on the part of the Indian people that they will be given a *meaningful opportunity to express their views* before [agency] policy is made, *that opportunity must be afforded*.  Failure of the [agency] to make any real attempt to comply with its own policy of consultation not only violates those general principles which govern administrative decision-making, but also violates "the *distinctive obligation of trust incumbent upon the Government* in its dealings with these dependent and sometimes exploited people."

*Oglala Sioux Tribe of Indians v. Andrus*, 603 F.2d 707, 721 (8th Cir. 1979), *quoting Morton v. Ruiz*, 415 U.S. 199 (1975) (internal citations omitted) (emphasis added).

106.    An agency's actions that are entitled to the force and effect of law are arbitrary and capricious if they fail to comply with departmental policies requiring meaningful consultation with an affected tribe.  *Wyoming v. United States Dep't of the Interior*, 136 F. Supp. 3d 1317, 1346

(D. Wyo. 2015), *vacated and remanded sub nom. Wyoming v. Sierra Club*, No. 15-8126, 2016 WL 3853806 (10th Cir. July 13, 2016).

107.     For the duration of the remand process, the Corps refused to engage in meaningful consultation with the Tribe.

108.     Under the Corps Consultation Policy, consultation requires a meaningful and collaborative process that "emphasizes trust, respect and shared responsibility."   Corps Consultation Policy at 2.  Additionally, under this policy the Corps "will ensure that it addresses Tribal concerns regarding protected Tribal resources, tribal rights (including treaty rights) and Indian lands."  *Id*. at 3.  Further, the Corps' Consultation Policy acknowledges that, "[i]n recognition of the varied organizations and customs of different Tribes, written protocols for consultation procedures may be considered and implemented at the local level with a specific Tribe."  *Id*. at 4.

109.     Instead of collaboratively working with the Tribe to ensure that it addressed Tribal concerns, however, the Corps unilaterally informed the Tribe that the consultation process was over – even when it knew that the Tribe believed the consultation process was ongoing and had roughly "3 pages of questions that" it still needed to discuss.   Meeting between U.S. Army Corps of Engineers and the Yankton Sioux Tribe (May 31, 2018) (statement by Faith Spotted Eagle).

110.     The Corps never followed up regarding the Tribe's request for an additional meeting and did not even request a list of the outstanding questions so that it could ensure that it addressed Tribal concerns.

111.     Further, though the Tribe attempted to create a clear consultation procedure with the Corps by repeatedly sending the Corps and its counsel copies of the Consultation Protocols and requesting that the Corps' counsel review and provide redlines indicating any concerns or

17

desired changes, the Corps has failed to provide a substantive response to the Tribe's request, preventing mutual agreement to the protocols.

112.     The Corps did not alert the Tribe to its unilateral decision that consultation was over until the Tribe received a letter from the Corps on August 10 in response to the Tribe's June 5, 2018 letter informing the Tribe that it looked forward to "continuing conversations with you, leading up to actual consultation" that the Corps "expect[ed] to finish by August 10, 2018."

113.     The Tribe, which had up to this point justifiably believed that consultation would be ongoing, never had the opportunity to have its entire General Council convened to meet with the Corps, a required by the Consultation Protocols, or to present its remaining questions and concerns to the Corps.

114.     Thus, the Corps effectively ignored any potential concerns yet to be raised by the Tribe because it was the Tribe's belief that there would be *formal* and *ongoing* tribal consultation on a government-to-government basis.

115.     Consultation is intended to be government-to-government, and the consultation process must therefore be adapted to the Tribe's form of government.

116.     The governing body of the Yankton Sioux Tribe is its General Council, which consists of enrolled members age 18 and older, making the Tribe more of a pure democracy than many other tribal governments and mandating that consultation occur with the Tribe's General Council.

117.     The General Council has not delegated its consultation to any other entity, thus the lack of consultation with the General Council means that the required government-to-government consultation has not occurred.

18

118.    Moreover, the Corps Consultation Policies provide that the Corps "will share information that is not otherwise controlled or classified information."  Corps Consultation Policy at 3.

119.    However, throughout the remand process, the Corps consistently failed to provide requested documents to the Tribe in a timely manner, if at all.

120.    The Corps and Colonel Hudson ignored policies related to consultation with Tribe.

121.    The Corps' "consultation" with the Tribe was a far cry from open, timely, meaningful, collaborative, and effective deliberative communication.

122.    Moreover, by taking two months to respond to the Tribe's letter indicating that it looked forward to ongoing consultation only to inform the Tribe that it would be finalizing its review very shortly thereafter, it fully failed to "maintain open lines of communication through consultation."  Corps Consultation Policy at 5.

123.    Additionally, by ending the consultation process when it knew that the Tribe had outstanding questions, the Corps and Colonel Hudson did not "ensure that it address[ed] Tribal concerns regarding protected tribal resources, tribal rights (including treaty rights) and Indian lands."  Corps Consultation Policy at 3.

124.    Finally, the Corps and Colonel Hudson undermined the consultation process by failing to provide the Tribe requested documentation necessary to its review.

125.    As a result, the Corps' conclusions were arbitrary, capricious, and otherwise not in accordance with the Corps' duties under the DOD Instruction and the Corps Consultation Policy, in violation of the APA.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

11.     Declare that the Remand Analysis, and the underlying MLA easement which it attempted to address, is arbitrary, capricious, and in violation of NEPA and the APA;

12.     Vacate the Remand Analysis, the final EA and FONSI, and the underlying MLA easement pending full compliance with the law;

13.     Direct the Corps to resume the EIS process initiated in November 2016 and provide Plaintiffs with all technical documents related to oil spill and impact so that they can participate meaningfully in such EIS process;

14.     Retain jurisdiction over this matter to ensure that the Corps complies with the law;

15.     Award Plaintiffs their reasonable fees, costs, expenses, and disbursements, including attorneys' fees, associated with this litigation; and

16.     Grant Plaintiffs such further and additional relief as the Court may deem just and proper.

Dated: November 26, 2018.

YANKTON SIOUX TRIBE, et al.

By:_s/ Jennifer S. Baker _____
Jennifer S. Baker, OKBA# 21938
(*Pro Hac Vice*)
Jeffrey S. Rasmussen, WA #21121
(*Pro Hac Vice*)
Fredericks Peebles & Morgan LLP
1900 Plaza Drive
Louisville, CO 80027
Phone: (303) 673-9600
Facsimile: (303) 673-9155
jbaker@ndnlaw.com
jrasmussen@ndnlaw.com
*Attorneys for Plaintiffs*

*s/ Patricia A. Marks*

Fredericks Peebles & Morgan LLP
401 9th Street, N.W., Suite 700
Washington, D.C. 20004
Phone:  (202) 450-4887
Facsimile:  (202) 450-5106
pmarks@ndnlaw.com
*Attorney for Plaintiffs*

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 26th day of November, 2018, a copy of the foregoing

was filed electronically with the Clerk of the Court.  The electronic filing prompted automatic

service of the filing to all counsel of record in this case who have obtained CM/ECF passwords.


*s/Catherine Wiland*
Catherine Wiland
Legal Assistant

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE; YANKTON SIOUX TRIBE; ROBERT FLYING HAWK; OGLALA SIOUX TRIBE, | |
| Plaintiffs, | |
| and | |
| CHEYENNE RIVER SIOUX TRIBE, | Case No. 1:16-cv-01534 (JEB) |
| Intervenor Plaintiff, | (Consolidated with Cases No. 1:16-cv-1796 and 1:17-cv-00267) |
| v. | |
| U.S. ARMY CORPS OF ENGINEERS, | |
| Defendant, | |
| and | |
| DAKOTA ACCESS, LLC, | |
| Intervenor Defendant. | |

**PROPOSED ORDER GRANTING PLAINTIFF YANKTON SIOUX TRIBE'S MOTION
FOR LEAVE TO FILE SUPPLEMENTAL COMPLAINT**

Plaintiff Yankton Sioux Tribe has filed a Motion for Leave to File Supplemental

Complaint. Having reviewed the parties' pleadings, exhibits, and the entire record of the case, it

is hereby ORDERED that the motion is GRANTED.

Dated:_____

_____
The Honorable James E. Boasberg
United States District Judge