## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

STANDING ROCK SIOUX TRIBE,

Plaintiff,

and

CHEYENNE RIVER SIOUX TRIBE,

Intervenor Plaintiff,

v.

U.S. ARMY CORPS OF ENGINEERS,

Defendant,

and

DAKOTA ACCESS, LLC,

Intervenor Defendant.

Civil Action No. 16-1534-JEB
(consolidated with Case Nos. 16-
1796 & 17-267)

---

## DAKOTA ACCESS, LLC'S OPPOSITION
## TO PLAINTIFFS' MOTION TO COMPLETE ADMINISTRATIVE RECORD

---

William S. Scherman
David Debold
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
wscherman@gibsondunn.com

*Counsel for Dakota Access, LLC*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................3

    I.     The Original Administrative Record And Plaintiffs' Multiple Opportunities To Challenge It. ..............................................................................................3

    II.    Documents Submitted To Comply With Remand Conditions. ...............................9

    III.   The Remand Analysis. ............................................................................................10

ARGUMENT ...................................................................................................................13

    I.     The Corps Correctly Excluded From The Record Materials Referenced In Documents That The Corps Did Not Prepare. .......................................................14

    II.    It Is Too Late For Plaintiffs To Challenge The Completeness Of The Original Administrative Record ..........................................................................................19

    III.   Plaintiffs Have Not Shown That Documents Required Under The Easement Must Be Added To The Administrative Record. ...................................................23

    IV.   Plaintiffs Have Not Shown That Third-party Assessment Documents Must Be Added To The Administrative Record. .................................................................25

    V.    Plaintiffs' Requests For Final Versions Of Documents Are Either Moot Or Unsupported. ..........................................................................................................27

CONCLUSION ...............................................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
401 U.S. 402 (1971) ............................................................................................ 16

*City of Duluth v. Jewell,*
968 F. Supp. 2d 281 (D.D.C. 2013). ............................................................ 14, 17, 18

*Ethyl Corp. v. EPA*,
541 F.2d 1 (D.C. Cir. 1976) ............................................................................. 13

*Fund for Animals v. Williams,*
245 F Supp. 2d 49 (D.D.C. 2003) ..................................................................... 16

*Naartex Consulting Corp. v. Watt*,
542 F. Supp. 1196 (D.D.C. 1982) ..................................................................... 25

*Oceana, Inc. v. Ross*,
290 F. Supp. 3d 73 (D.D.C. 2018) ..................................................................... 17

*Pac. Shores Subdivision v. U.S. Army Corps of Eng'rs*,
448 F. Supp. 2d 1 (D.D.C. 2006) ................................................. 14, 23, 24, 26, 28

*Pinnacle Armor, Inc. v. United States*,
923 F. Supp. 2d 1226 (E.D. Cal. 2013) ............................................................. 17

*Stand Up for Cal. v. U.S. Dep't of Interior*,
315 F. Supp. 3d 289 (D.D.C. 2018) ................................................................... 24

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
255 F. Supp. 3d 101 (D.D.C. 2017) ................................................ 3, 5, 8, 9, 13, 22

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
282 F. Supp. 3d 91 (D.D.C. 2017). ............................................................. 9, 19, 20

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
 280 F. Supp. 3d 187 (D.D.C. 2017) ............................................................ 9, 10, 25

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
2018 WL 1967112 (D.D.C. Apr. 16, 2018) ................................................ 10, 25, 26

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
301 F. Supp. 3d 50 (D.D.C. 2018) ..................................................................... 8

**TABLE OF AUTHORITIES**
(*continued*)

**Page(s)**

*The Cape Hatteras Access Pres. All. v. U.S. Dep't of Interior*,
667 F. Supp. 2d 111 (D.D.C. 2009). ........................................................................... 24, 26

*Wilmina Shipping AS v. U.S. Dep't of Homeland Sec.*,
No. CV 11-2184 (ABJ), 2013 WL 12340838 (D.D.C. Sept. 4, 2013).......................................... 24

**Statutes**

30 U.S.C. § 195(c) ...................................................................................................... 25

## INTRODUCTION

Standing Rock Sioux Tribe ("Standing Rock"), Cheyenne River Sioux Tribe ("Cheyenne River "), Oglala Sioux Tribe, and Yankton Sioux Tribe (collectively, "Plaintiffs") improperly seek to expand these post-remand proceedings well beyond their permissible boundaries.  Not only is Plaintiffs' Motion to Complete the Administrative Record meritless, granting it would invite them to litigate pre-remand disputes—some for the first time, others yet again—and inject needless delay into a case that already has seen more than its fair share.  Their Motion should be denied.

The Court need look no further than the list of requested items in the Motion's Appendices to see that Plaintiffs are complaining mostly about materials that relate to the adequacy of the *original* administrative record.  Hoping to be excused for their obviousness tardiness, Plaintiffs say they could not complain earlier because "the Corps had not yet filed an administrative record" when summary judgment briefing began in February 2017.  Mot. at 10.  If that timeline were accurate, the problem still would have been of Plaintiffs' own making.  But Plaintiffs' timeline is not accurate.  Every one of Plaintiffs' challenges to the original administrative record is tied to a document found in that part of the record the Corps lodged in November 2016, *three months before* the first summary judgment motion.  Worse yet, Plaintiffs' Motion includes no fewer than 20 requests for documents Plaintiffs say should have been in the original record by virtue of being referenced in the July 2016 Environmental Assessment—a document Plaintiffs had before they even filed this lawsuit.  Moreover, Plaintiffs had many opportunities to litigate the adequacy of the record before this Court ruled on summary judgment, including Cheyenne River's May 2017 Motion to Supplement the Record, which the Court decided as part of the its summary judgment ruling.  Plaintiffs therefore cannot hide behind the fact that in March 2017

the Corps added to the original administrative record so that it included the period between July 2016 and early February 2017 (when an easement issued).  Apart from the fact that Plaintiffs themselves were allowed to challenge the completeness of that later addition to the record, not a single one of Plaintiffs' assertions of incompleteness is directed at that portion.  Not one.  Thus, to the extent the completeness of the original record is somehow relevant today, Plaintiffs have forfeited this part of their Motion.

As for the record developed during the remand, Plaintiffs urge the Court to endorse an overly expansive view of the judiciary's role in Administrative Procedure Act ("APA") cases.  A court reviews the lawfulness of agency action by considering a record consisting of those items the agency decisionmaker considered, not those that a Plaintiff thinks a decisionmaker should have or could have considered.  Nor does the record need to contain documents the agency received for different purposes, such as those related to either easement conditions or conditions the Court imposed on Dakota Access separate from the Corps' remand duties.

Finally, Plaintiffs seek documents mentioned in other documents.  The United States Army Corps of Engineers (the "Corps") has advised that it intends to add to the administrative record those documents specified in Plaintiffs' Motion that the Remand Analysis itself relies upon by name.  That leaves Plaintiffs' desire to have the Corps locate and add to the record various documents that are mentioned elsewhere in the record.  Even though many of these other documents are publicly available, Plaintiffs make no effort to explain how they are necessary to a proceeding limited to three remand issues.  Plaintiffs also misstate the law on the extent to which documents referenced in an administrative record must themselves be in the record.  Plaintiffs' inflated view here of what the APA requires would slow cases like this to a crawl and make a Motion to Complete the Record indistinguishable from discovery disputes in non-APA litigation.

Maybe those are Plaintiffs' goals.  After all, they make no secret of the fact that they are once again preparing extra-record declarations in the hope of turning this lawsuit into a battle of experts over the merits of decisions entrusted to the judgment of the Corps.  As the Court noted at the last status conference, Plaintiffs are free to make whatever arguments they wish about the appropriateness of extra-record materials.  But they are not free to invoke the Court's powers so they can embark on a fishing expedition for documents, not properly part of the record, that Plaintiffs then hope to leverage into even more extra-record materials.

## BACKGROUND

### I.   The Original Administrative Record And Plaintiffs' Multiple Opportunities To Challenge It.

The completeness of the administrative record has been a point of contention in this matter since the beginning.  Over the course of this litigation, the Corps lodged an initial administrative record in support of its decisions regarding the Dakota Access Pipeline ("DAPL"), followed by numerous additions over time in reaction to new developments.  The parties also challenged the completeness of the record, as detailed below.

On November 10, 2016, the Corps lodged the original administrative record (labeled "USACE_DAPL") for the July 25, 2016 grant of a Section 408 Permit and Nationwide Permit ("NWP 12") for DAPL.  D.E. 55.  *See also Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs* ("*Standing Rock I*"), 255 F. Supp. 3d 101, 116 (D.D.C. 2017); D.E. 209-9 at 149–53 (NWP 12 Permit); D.E. 209-10 at 54 (Section 408 Permit).  The same day, the Court held a status conference at which it set forth the process for addressing concerns with the record.  Counsel for Standing Rock told the Court that despite its desire to "move this ahead expeditiously" Standing Rock would need "a month to review the record" to "resolve any potential concerns about the scope of the record" because "you never know what might be omitted."  D.E. 60 (Nov. 10, 2016

Status Conf. Hr'g Tr.) at 5:22-6:3, 6:9-15.  The Corps agreed that the parties should have time to "provide any proposals" "if the Government missed anything." *Id.* at 9:1-9.  The Court thus issued a minute order setting the next status conference for December 9, 2016 and directing the parties, in the interim, to "review the administrative record and meet and confer . . . to resolve any disputes regarding completeness."  Nov. 10, 2016 Minute Order.

Only Dakota Access moved to supplement the original administrative record in response to the Court's Order.  D.E. 58.  Based on Dakota Access's motion, which related to a cross claim about an easement at Lake Oahe under the Mineral Leasing Act, at the next status conference the Court ordered the Corps to supplement the record with documents concerning such an easement. D.E. 101 (Dec. 9, 2016 Status Conf. Hr'g Tr.) at 18:15-19:10.  No other parties raised concerns about the completeness of the administrative record despite the Court's inquiries on the subject. *Id.* at 20:11-16 (asking the parties whether there were "any other issues that anybody wants to raise," to which Standing Rock and Cheyenne River both responded no).

Per the Court's December 9 order, the Corps supplemented the original administrative record on January 6, 2017 (labeled "OAHE") with documents created on or before July 25, 2016 that concerned the easement to cross Lake Oahe.  That same day, Cheyenne River and Standing Rock moved to dismiss Dakota Access's cross-claim and opposed Dakota Access's motion for summary judgment.  D.E. 74, 78.  Although both tribes commented therein on the state of the record and even asserted alleged deficiencies, neither tribe moved to complete or supplement the original administrative record.  *See, e.g.*, D.E. 74 (CRST Mot. Dismiss) at 26 ("[I]t is critical that the 87,000-page record now before the Court concerning permissions granted to Dakota Access under Section 408 of the Rivers and Harbors Act does not contain anything that satisfies the requirements of 30 U.S.C. § 185 or the regulations developed in conjunction with it.").  Instead, to

the extent they identified a specific problem, they relied on the court record to fill the gap.  *See*

D.E. 78 at 10 n.2 ("A copy of the draft EA that was released to the public does not appear to

have been included in the administrative record.  A copy was filed with this Court previously in

this litigation.").

After it became clear that the Corps was prepared to deliver a signed easement, D.E. 89,

Standing Rock and Cheyenne River began expressing concern about the administrative record

for the impending easement decision, but articulated no concerns about the adequacy of the orig-

inal administrative record lodged in November 2016.  The Corps issued the easement on Febru-

ary 8, 2017.  *Standing Rock I*, 255 F. Supp. 3d at 120; D.E. 96-1 (Easement).  Two days earlier,

at a status conference, Standing Rock's counsel asked the Court to order the Corps to "compile

the administrative record while . . . making its decision" as to the easement "and file the adminis-

trative record at the time that it makes the decision" so that "the parties have an opportunity to

look at that material."  D.E. 104 (Feb. 6, 2017 Status Conf. Hr'g. Tr.) at 8:17-23.  The Court

stated:  "to the extent [the two tribes are] bringing challenges based on earlier . . . alleged NEPA

violations, that administrative record I trust is complete already."  *Id.* at 17:23-18:3.  When the

Corps answered "Correct," the Court further clarified, stating "[i]n other words, anything predat-

ing July 25th.  So the question then would be the administrative record that relates to any grant

of an easement this week or next week."  *Id.* at 18:4-9.  Neither Standing Rock nor Cheyenne

River disagreed with the Court's statement that the record for decisions pre-dating the antici-

pated issuance of a signed easement was "complete already."

At a status conference held one week later, after the Corps delivered the easement, the

Court once again confirmed that there were no objections (apart from Dakota Access's pending

motion) to the administrative record lodged three months earlier.  At that conference, the Corps

estimated it would "be able to provide the administrative record for the February 8th easement decision [on] March 10th." D.E. 119 (Feb. 13, 2017 Status Conf. Hr'g Tr.) at 39:20-24. When the Corps expressed concern that Plaintiffs might try to include in their summary judgment briefing issues for which the record was not yet complete, *id.* (referencing post-July 25, 2016 actions), the Court stated its understanding that, "to the extent that" the tribes "[are] saying there should have been an EIS before the July decision, then . . . the administrative record is all set." *Id.* at 39:25-40:3. Plaintiffs did not correct the Court.

More than three months *after* the original administrative record was filed*,* Standing Rock and Cheyenne River separately moved for partial summary judgment on February 14, 2017 and February 23, 2017, respectively. D.E. 117 (SRST Mot. Summ. J.); D.E. 131 (CRST Mot. Summ. J.). In those motions, neither tribe suggested that the original administrative record (covering agency action up to July 25, 2016) was incomplete.[1]

On March 21, 2017, the Corps lodged the administrative record for the February 8, 2017 easement decision (labeled "USACE_ESMT") and "for the special use permit challenged in Case No. 1:16-cv-1796, *Yankton Sioux Tribe, et al v. U.S. Army Corps of Engineers, et al.*" (labeled "USFWS_DAPL"). D.E. 181 (Corps' Notice of Administrative Record for easement and special use permit).[2] Plaintiffs argued in their later briefing that the Court should consider extra-record

---

[1]   Cheyenne River acknowledged that the then-existing administrative record lacked documents for the period between July 25, 2016 and February 8, 2017. But rather than wait for that part of the record, as discussed during the February 13 status conference, they went ahead and challenged actions after July 25 and "appended . . . declarations and exhibits outside of that record." D.E. 131 at 2 n.1. Standing Rock's motion also raised post-July 25 challenges without waiting for the record. *See* D.E. 117.

[2]   Standing Rock acknowledged to the Court that it received this portion of the record a few days earlier, on March 16, 2017. D.E. 175 at 2.

materials, but they made no mention of the materials that their current Motion complains about. *See, e.g.*, D.E. 195 (SRST Reply Br. Mot. Summ. J., filed Mar. 28, 2017) at 2-3 (arguing for consideration of new declarations); *see also id.* at 3 n.2 ("The Tribe also is submitting a second declaration from its expert, which responds to arguments made by the Corps and DAPL in their briefs and to the administrative record, which was provided after the Tribe filed its summary judgment motion.").

Cheyenne River also advised the Court during this period that the "Tribe and Corps are currently consulting on further additions to the Administrative Record in this case" and that "[s]hould consultations on this issue fail, the Tribe will move to supplement." D.E. 207 (CRST Reply Br. Mot. Summ. J., filed Apr. 13, 2017) at 9-10 n.2. The Corps did, indeed, consult with both tribes and Dakota Access about the adequacy of the record after the final portion was lodged on March 21, 2017. In a May 5, 2017 Notice, the Corps advised that after "both Dakota Access, LLC, and Plaintiff Tribes requested that the Corps supplement its administrative records with several specific documents, or classes of documents," the Corps "re-reviewed its files in response to those requests" and determined that more documents should be added. D.E. 221 (Notice of Adding Documents to the November 10, 2016 and March 21, 2017 Administrative Records) at 1-2.

Cheyenne River believed that still more documents belonged in the record. Thus, on May 4, 2017, while both Cheyenne River's and Standing Rock's summary judgment motions were still pending, Cheyenne River moved to supplement the administrative record. That Motion to Supplement sought to add eight documents that the Corps allegedly received before February 3, 2017, two of which predated the July 2016 decision granting Dakota Access the permits to construct the pipeline. D.E. 220 (CRST Mot. Suppl.) at 3-4. Cheyenne River claimed that the

documents it sought were "in front of the agency when it made its decision, and additional documents that are highly relevant to determining whether the Corps met its statutory duties in issuing the FONSI and granting an easement." D.E. 237 (CRST Reply Br. Support Mot. Suppl., filed on June 8, 2017) at 1. Cheyenne River did not challenge in that Motion to Supplement the absence of any of the documents that Plaintiffs now claim should have been part of the original (*i.e.*, pre-remand) administrative record. The other Plaintiffs stood silent.

The Court expressly considered Cheyenne River's Motion to Supplement the Record when it ruled on summary judgment. In a contemporaneous Minute Order, the Court denied Cheyenne River's Motion finding that the documents "would not change the outcome in its [] Opinion on the various Cross-Motions for Summary Judgment." June 14, 2017 Minute Order.[3]

Yankton Sioux Tribe separately moved for partial summary judgment on November 13, 2017, relying on the pre-remand administrative record lodged on November 10, 2016 (USACE_DAPL), January 6, 2017 (OAHE), and March 21, 2017 (USACE_ESMT), as supplemented on May 5, 2017. D.E. 292. Yankton Sioux Tribe did not contend that the record needed to be completed with any missing documents. In denying this later motion for summary judgment, the Court treated the administrative record as complete. *See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 301 F. Supp. 3d 50, 59 (D.D.C. 2018) ("The Court, therefore, will not treat Plaintiff's facts as admitted and will instead evaluate the parties' claims on the basis of the underlying administrative record.").

---

[3]    This Court also addressed Cheyenne River's Motion to Supplement in its June 14, 2017 opinion remanding the action to the agency, noting that there was "good cause to protect from public disclosure certain information in some spill-model reports that, if released, could endanger life or physical safety," *Standing Rock I*, 255 F. Supp. at 124; that the "EA addressed each factor" for which the Tribe attempted to submit extra-record evidence, *id.*; and that "the Court will not engage with [Standing Rock's arguments regarding the deficiencies in the EA's analysis] that post-date[] February 8, 2017," *id.* at 125.

**II.     Documents Submitted To Comply With Remand Conditions.**

On June 14, 2017, this Court remanded for the Corps to consider three specific issues—
(1) the degree to which the project's effects are likely to be highly controversial; (2) the conse-
quences of a spill for the Tribes' fishing and hunting rights; and (3) the environmental-justice
impacts of the project. *Standing Rock I*, 255 F. Supp. 3d at 112.  In light of its decision to re-
mand, the Court then considered "whether or not to *vacate* the Corps' environmental assessment,
as well as the easement." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs* ("*Standing
Rock II*"), 282 F. Supp. 3d 91, 94 (D.D.C. 2017).  On October 11, 2017, the Court declined to va-
cate, finding a "significant likelihood" that the Corps would be able to substantiate its prior con-
clusions.  There, the Court reminded Plaintiffs that it "previously found that the Corps 'largely
complied' with NEPA's requirements" and that the remand concerned only a discrete subset of
the Tribes' NEPA claims. *Id.* at 103.

As an alternative to vacatur, the Court imposed certain conditions to be implemented dur-
ing the remand period as a "means by which the Court can gather information about the risks
posed by the pipeline pending remand and can ensure that the status quo is preserved for both
sides." *See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs* ("*Standing Rock III*"), 280
F. Supp. 3d 187, 189-90, 191-92 (D.D.C. 2017) (The remand conditions "do not affect Defend-
ants' ongoing environmental analysis, nor do they constrain the outcome of the remand pro-
cess."); *see id.* at 190 ("[T]he interim conditions here do not affect the remand process."); *see id.*
(The conditions "do not concern the scope of the remand, nor do they affect the agency's author-
ity over the pipeline.").  With those principles in mind, the Court imposed three specific condi-
tions during the remand period:  coordination of an oil-spill response plan; a third-party assess-
ment of Dakota Access's compliance with easement conditions; and bimonthly reports from Da-
kota Access on the conditions at Lake Oahe. *See id.* at 191-92.

On March 2, 2018, Standing Rock moved to clarify, among other things, the Court's re-

mand conditions, seeking an order directing the Corps to provide "the Tribe with technical infor-

mation" that it had requested relative to remand; "information necessary . . . to participate in oil

spill response planning;" and "relief as to the independent third-party audit," particularly "selec-

tion of auditor; scope of audit; and protocols for conducting the audit."  D.E. 336 (SRST Mot.

Clarify Remand Order) at 1, 14.  The Court denied Standing Rock's motion, reiterating that the

conditions imposed were "'means of providing the Court with relevant information during th[e]

[remand] period'" and "were not 'constraints on the Corps' analysis' and did 'not concern the

scope of the remand.'"  *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs* ("*Standing

Rock IV*"), 2018 WL 1967112, at *1 (D.D.C. Apr. 16, 2018) (quoting *Standing Rock III*, 280 F.

Supp. 3d at 189-90).  In so holding, the Court acknowledged Standing Rock's belief that "the

Corps is mishandling the remand process *beyond the aforementioned limited conditions*" but de-

clined to "insert[] itself into the minutiae" and noted that Plaintiffs are "free to make such argu-

ments in the post-remand briefing."  *Id.* (emphasis added).

## III.   The Remand Analysis.

After the Court issued its summary judgment ruling, the Corps developed and deployed a

plan to evaluate the narrow issues on remand.  D.E. 281 (Corps' Notice of Revised Schedule For

Remand).  This plan included requesting and analyzing information from both the Tribes and

Dakota Access.  *Id.* at 2 & n.1.  Dakota Access engaged with the Corps during this process and

provided information on a timely basis.  *See* D.E. 326 (February 2018 Corps remand status report

stating that Dakota Access provided various information to assist with the remand).  Plaintiffs

did not.  D.E. 337 at 1.

For example, on August 24, 2017, the Corps requested information in eight general areas,

including a "technical analysis of a rupture or spill scenario;" "factual and technical analysis"

raised in reports submitted by the Tribes, such as the Nezafati Report and the ENVY Report; and

an "analysis of the impact of the various spill scenarios on hunting and fishing in the area of the

Lake Oahe crossing." RAR13605-607. In September of 2017, the Corps requested information

from Plaintiffs regarding their hunting, fishing, and other cultural practices. D.E. 337 at 1. On

February 1, 2018, the Corps reported to the Court that it was reviewing submittals from Dakota

Access including a "risk analysis, Integrity Management Plan, environmental justice data, and

hunting and fishing impacts analysis." D.E. 326 (Feb. 1, 2018 Corps Status Report Regarding

Remand) at 2; *see also, e.g.*, RAR12015-237 (email attaching submittals). On March 16, 2018,

the Corps informed the Court that it had just received a response to its September 2017 infor-

mation request from Standing Rock—five months past the response due date—while the remain-

der of Plaintiffs provided no response whatsoever. D.E. 337 at 1; D.E. 338 at 2. And in June of

2018, the Corps reported that it received additional submittals from Dakota Access including a

"spill risk analysis, Geographic Response Plan, [and] Integrity Management Plan," and stated

that it would continue to "work[] with [Dakota Access] to develop environmental justice data,

and an analysis regarding potential impacts to hunting and fishing." D.E. 357 (June 8, 2018

Corps Status Report Regarding Remand) at 1. This iterative process continued, *see, e.g.*, D.E.

361 (Aug. 7, 2018 Corps Status Report Regarding Remand), until the Corps completed remand

on August 31, 2018, D.E. 362 (Aug. 31, 2018 Corps Status Report Regarding Remand).[4]

---

[4]    Plaintiffs assert it was improper for the Corps to start on a draft of its remand analysis conclusions "in February of 2018, before they had even received the Tribes' remand submis-sions." Mot. at 4-5. Plaintiffs omit that, by then, the Tribes were already four months late in re-sponding to information requests for a remand process that the Corps originally hoped to com-plete in 2017. *See* D.E. 338 at 2; D.E. 258 at 3 (Corps anticipates completion between late No-vember and December 2017). Despite this tardiness, the Corps carefully analyzed the materials received from Plaintiffs before finalizing its decision. RAR141-280; *see also* D.E. 355 at 2 (May 2018 Corps remand status report explaining it "continues to review and consider" information Plaintiffs provided). Nor should the Court be concerned when an agency writes a decision such

After giving notice to the Court and the parties that remand was complete, the Corps issued its decision concluding that "a formal reconsideration of the July 2016 Final Environmental Assessment and Finding of No Significant Impact or the preparation of supplemental National Environmental Policy Act documentation is not required."  D.E. 362-1 (Aug. 31, 2018 Remand Decision) at 1.  The Corps additionally determined that "the risk of an [oil spill] incident is low and any impacts to hunting and fishing will be of limited scope and duration;" that granting Dakota Access the July 25, 2016 permits and February 8, 2017 easement "does not result in disproportionately high and adverse human health or environmental effects on minority populations, including Tribes, and low-income populations;" and that "the effects of the federal action here are not 'likely to be highly controversial.'"  *Id.* at 1-2.

On February 4, 2019, the Corps lodged the administrative record for the remand analysis with the prefix "RAR."  D.E. 398.  The Remand Analysis is comprised of 140 pages outlining the Corps' analysis of the impacts on fishing and hunting resources, RAR4-44; the effects on environmental justice, RAR45-101; and the degrees to which the effects of the pipeline are to be highly controversial, RAR102-140.  Altogether, the administrative record is roughly 17,000 pages, and includes, among other items, the documents and analysis the Corps requested of Dakota Access, *see, e.g.*, RAR2547-48 (email from Dakota Access discussing transmission of the Remand Package and Downstream Receptor Report), RAR9112-116 (email from Dakota Access including the Spill Model Report), and a detailed review of documents in which the Tribes and their consultants expressed concerns, RAR141-280.

---

that it can "withstand judicial review."  Mot. at 5.  Every agency (or lower court judge, for that matter) committed to following the law necessarily does just that.

Plaintiffs now move to complete the administrative record.  This Court should deny that Motion for the reasons set forth below.

## ARGUMENT

Plaintiffs seek to vastly expand the scope of the remand and this Court's review thereof by inflating the already expansive administrative record with dozens of documents that are irrelevant to the limited questions before this Court following completion of the remand.  Plaintiffs offer no evidence that these supposedly missing documents were actually before the Corps *and* that the decisionmaker considered them in reaching the remand decision.  Even if these documents were "relevant"—which is not the test—most are already publicly available through a basic Google search.  There is no basis to further complicate and delay resolution of this litigation by forcing the Corps to expand the record.

The fate of Plaintiffs' motion is tied to the limited nature of this Court's review on the merits.  This Court has recognized that the "narrow" scope of APA review leaves no room for the Court to "'substitute its judgment for that of the agency.'"  *Standing Rock I*, 255 F. Supp. 3d at 121 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983)).  Plaintiffs' own authorities confirm that review of the evidence before the agency "must be performed with conscientious awareness of its limited nature," and is "designed *solely* to enable the court to determine whether the agency decision was rational and based on consideration of the relevant factors."  *Ethyl Corp. v. EPA*, 541 F.2d 1, 36 (D.C. Cir. 1976) (en banc) (emphasis added).

Commensurate with that limited purpose, the APA requires the Corps to produce an administrative record that includes only those "documents and materials that the agency directly or indirectly considered"—"nothing more nor less.  *Pac. Shores Subdivision v. U.S. Army Corps of*

*Eng'rs*, 448 F. Supp. 2d 1, 4 (D.D.C. 2006) (quotation marks, citations and alteration omitted).  The touchstone for inclusion of a document in the administrative record, in short, is that the agency actually "considered" the document as part of its decision.  *Id.* (quotation marks and citations omitted).  "[T]he administrative record 'should not include materials'"—even "'relevant materials'"—"'that were not considered by agency decisionmakers.'"  *Id.*

Plaintiffs thus face a heavy burden in challenging the Corps' completion of the administrative of record.  The Corps "is entitled to a strong presumption of regularity[] that it properly designated the administrative record," *Pac. Shores*, 448 F. Supp. 2d at 5, and therefore "[a] court that orders an administrative agency to supplement the record of its decision is a rare bird."  *City of Duluth v. Jewell*, 968 F. Supp. 2d 281, 287 (D.D.C. 2013) (quotation marks omitted).  To overcome that presumption, Plaintiffs must present "clear evidence" that the agency actually "considered" materials that were not included in the record.  *Pac. Shores*, 448 F. Supp. 2d at 4-5 (quotation marks omitted).  Plaintiffs fall short of that burden on every count.

I.   **The Corps Correctly Excluded From The Record Materials Referenced In Documents That The Corps Did Not Prepare.**

Plaintiffs argue that the administrative record is incomplete because the Remand Analysis purportedly "cites to and relies on a number of technical supporting documents that are not in the record."  Mot. at 8-9.  To the extent Plaintiffs have identified documents that the Corps' Remand Analysis itself relied upon through express reference, the Corps is now including them.  *See* Mot. at 8-9 (noting that Remand Analysis references:  "EFRD Inspection and Test Plans," a "DAPL Pipeline Surge Analysis Report," a "Close Interval Survey," and specified scholarly sources).  But an agency has no obligation to include within its record documents referenced in *other* documents that *another* party prepared.  This request should therefore be denied.

**A.**     At the Corps' direction as part of the remand process, Dakota Access submitted lengthy responses to Plaintiffs' comments about the project, referencing information in Dakota Access's possession such as "EFRD Inspection and Test Plans," RAR9194, a November 2015 "DAPL Pipeline Surge Analysis Report," RAR746, 2627, and a "Close interval survey . . . conducted in June 2017," RAR2633.  In addition, although nothing in this Court's Remand Order required the Corps to undertake any additional studies on remand, the Corps went above and beyond the remand's requirements by "request[ing] additional oil spill modeling and analysis from ETP to supplement the finding in the Final EA."  RAR14.  Dakota Access produced the reports requested by the Corps, including a Spill Model Report and Downstream Receptor Report, RAR2739-2867, 8065-8402, each of which exceeds 300 pages and cites or references "numerous studies" and other authorities.  Mot. at 9.[5]

The administrative record already includes the comment responses and the reports that Dakota Access submitted to the Corps during the remand.  *See, e.g.*, RAR2739-2867, 3001-3006, 8065-8402, 12015-12237.  And the Corps is now adding specific items that the Remand Analysis itself identified.[6]  The Corps has even agreed to add two studies that the Remand Analysis mentions indirectly—in the context of discussing the Downstream Receptor Report's references to

---

[5]     The Spill Model Report and Down Stream Receptor Report, each prepared by Dakota Access and its consultants to respond to requests from the Corps, are summary reports of the potential impact of an unmitigated worst-case oil spill based on as-built modeling of the Dakota Access pipeline, and the potential impact such a spill could have downstream.  This modeling was significantly more advanced than the modeling prepared in support of the original Environmental Assessment, assessing certain as-built scenarios rather than a hypothetical guillotine cut directly on top of the waters of Lake Oahe.  Although not necessary to the Corps' fulfilment of its remand duties, this modeling and analysis enhanced the Corps' ability to assess the potential impacts of a spill on Plaintiffs' hunting and fishing rights.

[6]     The fact that the Corps is adding these to the record presumably means that the Corps has concluded they meet the relevant criteria.  It should not be treated as a concession that all materials mentioned in a decision document are properly part of the record.

the studies.  Mot. at 9 (citing RAR 42-43 & 89-90, where the Lee, K. et al (2015) and Langangen

O. (2017) studies are referenced).  But Plaintiffs seek even more:  "all sources cited in . . . the

Downstream Receptor Report and Spill Model Report," including every listed reference in each

document.  Mot. at 10; Mot. at 9 (noting that the Downstream Receptor Report has a 12-page

single-spaced reference list).  That goes beyond what the record must contain.  The Corps need

not include secondary sources and technical documents referenced in documents that the Corps

did not prepare or otherwise adopt as its own.  The Corps readily requested Dakota Access's un-

derlying sources when it believed it had reason to evaluate those sources independently.  *E.g.*,

RAR297.  Plaintiffs fail to identify any correspondence in the record in which the Corps found it

necessary to have in its possession anything not already in the record.

The issue here is not, as Plaintiffs put it, whether a document cited in a document cited by

an agency might "reveal key issues that the [agency] failed to grapple with in its final decision."

Mot. at 8.  Rather, under the APA, a Court does not "'second-guess agency decisions'" by "'re-

viewing *more* than the information before the agency at the time of its decision.'"  *Fund for Ani-*

*mals v. Williams*, 245 F Supp. 2d 49, 55-56 & n.5 (D.D.C. 2003) (alterations omitted), *vacated*

*on other grounds sub nom. Fund for Animals, Inc. v. Hogan*, 428 F.3d 1059 (D.C. Cir. 2005).

The Court's job is to assess the record "that was before the [agency] at the time it made its deci-

sion."  *Citizens to Pres. Overton Park, Inc. v. Volpe,* 401 U.S. 402, 420 (1971), *abrogated on*

*other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

To that end, the administrative record is properly limited to documents considered by the

Corps itself in reaching the decisions documented in the Remand Analysis, not the documents

cited in documents from other parties.  Plaintiffs' own authorities recognize the "limited proposi-

tion" that "an extra-record document that is cited in the agency's *actual decision document* indi-

cates 'consideration of the contents of the [extra-record] document' by the decision-maker."

*Pinnacle Armor, Inc. v. United States*, 923 F. Supp. 2d 1226, 1241-42 (E.D. Cal. 2013).  The

"actual decision document" here is the Remand Analysis, not Dakota Access's comment re-

sponses, the Downstream Receptor Report, or the Spill Model Report.  The mere fact that the

Corps "relied on [a document] in making its decision" is not "evidence that [it] considered the

record of material underlying the [document]."  *City of Duluth*, 968 F. Supp. 2d at 290.  Plaintiffs

conflate the Corps' "mer[e] mentions [of] a document" with a "cit[ation]" that "indicates that the

[agency] consulted and thought about . . . that document directly" in making its decision.  As

Plaintiffs' own cases confirm, "the mere mention of a document in [an] agency's decision or the

record does not always mean . . . that the agency considered the document," let alone that the

agency was required to do so.  *Oceana, Inc. v. Ross*, 290 F. Supp. 3d 73, 79 (D.D.C. 2018).[7]

      **B.**    Apart from mining Dakota Access's documents for sources omitted from the ad-

ministrative record, Plaintiffs claim that the Remand Analysis "cites to and relies on a 'report' on

---

      [7]    Although the Corps is adding studies mentioned on the only pages of the Remand Analy-
sis identified in Plaintiffs' Motion, Mot. at 9 (citing RAR42-43; 89-90), Plaintiffs do not explain
how having those citations (or any others) in the record is necessary to summary judgment.  The
Remand Analysis cites one for this basic proposition:  "The possibility that an oil spill could
harm fishery resources is 'well established.'"  RAR 42 (citing Downstream Receptor Report's
citation of Lee, K., et al, Expert Panel Report on the Behavior and Environmental Impacts of
Crude Oil Released into Aqueous Environments, Royal Society of Canada (2015)).  Presumably
Plaintiffs will not take issue with that statement, any more than they might quarrel with this sen-
tence in the Remand Analysis, supported by the same study:  "An oil spill has the potential to af-
fect fish directly through acute or chronic toxicity or indirectly by altering essential habitat."  *Id.*
In any event, the same study is publicly available at https://cepa.com/wp-content/up-
loads/2016/11/OIW-Report.compressed1.pdf.  As for other studies cited on those four pages, the
Remand Analysis itself gives the link to a government website or the full citation to a scientific
journal article.  Although it is highly unlikely, given the APA's deferential review standard, that
the contents of any such document will bear on the Court's merits rulings, nothing stops a party
from urging a court to consider a legally relevant, publicly available document cited (as opposed
to formally included) in a paginated administrative record.

pipeline spills that it compiled from Pipeline and Hazardous Materials Safety Administration ('PHSMA') data." Mot. at 8. In actuality, the Remand Analysis refers not to any "report" compiled by the Corps, but to "historical annual *report data* obtained from the [PHMSA] webpage." RAR14 (emphasis added; referring to reports of incidents). The Remand Analysis reproduces all of the relevant data and even links to the relevant websites. RAR14-16. Plaintiffs strain to manufacture a flaw in the record by using *City of Duluth* to argue it is "insufficient to merely cite to a website in order to include a document in the record." Mot. at 8. But in that case the Court merely directed the agency to try to "obtain a hard copy" of a single article that the agency conceded was part of the record but that could "no longer be accessed" online by the time of the litigation because the link to it was no longer valid. 968 F. Supp. 2d at 294. There is no such issue here: Three of the four websites linked in the relevant section of the Remand Analysis remain active, and the content for the fourth—at the top of RAR15—has moved, but remains publicly available at its new location. *See* https://www.phmsa.dot.gov/data-and-statistics/pipeline/annual-report-mileage-hazardous-liquid-or-carbon-dioxide-systems. If Plaintiffs had simply asked how to find a new link, Dakota Access could have easily pointed them in the right direction without burdening this Court with a question that Google answers.[8]

C.      Plaintiffs finally contend that the Remand Analysis "block quotes portions of the original environmental assessment that, in turn, cite to studies or other technical reports that are not included in this record or the original one." Mot. at 8-9. Although the Corps will now be including the only study Plaintiffs identify in making that argument, Plaintiffs may not use this post-remand litigation as an opportunity to advance arguments that were available pre-remand.

---

[8]      Plaintiffs filed their Motion without seeking Dakota Access's position on any of the documents at issue. The first time Dakota Access saw (or even heard of) the December 21, 2018 letter that Plaintiffs include with their Motion was while reading the filed Motion.

This Court has already explained that the remand "does not require that Defendants begin anew, but only that they better articulate their reasoning below." *Standing Rock II*, 282 F. Supp. 3d at 98. The fact that the Corps references the original EA as the starting point for that better articulation is not an open invitation for Plaintiffs to argue, for the first time, that the EA itself was insufficiently supported in ways that Plaintiffs were free to assert the first time around. Plaintiffs' new challenges to the Corps' original EA decision (including any challenge to the completeness of the administrative record for that decision) are therefore forfeited.[9]

In sum, non-Corps documents cited in other non-Corps documents need not be added to the administrative record.

## II.     It Is Too Late For Plaintiffs To Challenge The Completeness Of The Original Administrative Record

The majority of the documents at issue in Plaintiffs' Motion are items that Plaintiffs say should have been in the *original* administrative record. That challenge comes far too late. The Corps produced the administrative record for the July 25, 2016 EA more than two years ago in November 2016 (USACE_DAPL prefix). As detailed above, after the Corps added pre-July 25, 2016 documents related to the easement decision in January 2017 (OAHE prefix), the Corps produced the rest of the administrative record relevant to the easement decision in March 2017

---

[9]     Plaintiffs' factual premise—that they need such documents to "reveal" what the Corps missed—is also wrong. Take their one example, "O'Reilly et al. 2001." Mot. at 9. Plaintiffs are not left to "guess" whether that study supports the Remand Analysis. *Id.* (asserting that it's "anyone's guess" whether the study does so). Plaintiffs have had this study since before the original summary judgment ruling. The same citation to O'Reilly appears in Plaintiffs' own expert report, which Cheyenne River filed with the Court on February 22, 2017, in support of summary judgment. *See* D.E. 131-6 at 219 (Nezafati Report) (citing, as reference no. 65, Kerr. et al. "as cited in O'Reilly et al. 2001"); D.E. 135-5 at 219 of 234. Thus, while the Corps is adding O'Reilly to the record, Plaintiffs misstate their need to have access to it.

(USACE_ESMT prefix).  The Court has already decided challenges to final agency actions cor-

responding to that record, and it made clear that the remand "does not require that Defendants

begin anew, but only that they better articulate their reasoning below."  *Standing Rock II*, 282 F.

Supp. 3d at 98.  The issue before this Court, in short, is not the Corps' original decisions but its

decisions on remand.  Moreover, Plaintiffs' arguments challenging the pre-remand record's ade-

quacy rely solely on information appearing within the four corners of documents Plaintiffs have

had since November 2016.  Thus, whatever the relevance of the earlier documents to the remand

decisions, Plaintiffs have forfeited their opportunity to complain about the sufficiency of any part

of the pre-remand record.

Plaintiffs try to excuse their long overdue challenge by asserting that this is their first

chance to complain about the original record:

> When SRST filed its motion for summary judgment in February of 2017, the
> Corps had not yet filed an administrative record.  ECF 117.  Instead, the record
> was filed while summary judgment briefing was already well underway.  ECF
> 181.  Accordingly, there was never an opportunity for any plaintiff Tribe to chal-
> lenge the scope or adequacy of the original administrative record during the initial
> round of summary judgment motions.

Mot. at 10.

These three sentences are so false and misleading it is hard to know where to begin.

*First*, in every one of Plaintiffs' complaints today about the original record they say that the sup-

posed deficiency is evident from the face of a document found in the first installment of the ad-

ministrative record that the Corps produced in November 2016 (USACE_DAPL), Mot. at 19-20,

Appendix A, more than three months before any Plaintiff filed for summary judgment, D.E. 117,

131.[10]  Plaintiffs do not raise a single complaint about the administrative record for the easement

---

[10]      A small number of documents that bear the USACE_DAPL prefix were made available
to Plaintiffs in late December 2016 because of confidentiality issues.  Only one of them

decisions (USACE_ESMT) that was produced in March 2017.  *Second*, as for the records Plaintiffs received in November 2016, the Court gave all parties a month to "review the administrative record and meet and confer . . . to resolve any disputes regarding completeness."  Nov. 10, 2016 Minute Order.  Dakota Access moved to supplement the record, but Plaintiffs did not.  *See supra* at 4.  On February 6, 2017, Plaintiffs stood silent in response to this Court's statement that "the administrative record . . . is complete already."  D.E. 104 (Feb. 6, 2017 Status Conf. Hr'g. Tr.) at 17:23-18:9.  Nor did they disagree on February 13, 2017, with the Court's statement that "the administrative record is all set."  D.E. 119 (Feb. 13, 2017 Status Conf. Hr'g Tr.) at 39:14-40:3, 42:16-21.[11]

*Third*, even *after* the Corps lodged the remainder of the record in March 2017, Cheyenne River submitted extra-record evidence in support of summary judgment without mentioning the need for a single one of the documents Plaintiffs now say was missing.  D.E. 207 at 9 & n.2 (CRST Reply Br. Mot. Summ. J.).  Standing Rock likewise did not raise any of these supposed omissions even after successfully moving for more time to file its combined Summary Judgment Reply and Opposition to the Corps' Cross-Motion so that its arguments could be based on the additional record materials.  D.E. 175.[12]  *Fourth*, the Corps consulted with both tribes and Dakota

---

(USACE_DAPL 74722) is referenced in Plaintiffs' Appendix of Documents Missing from the Original Administrative Record.  All of the others were produced in November 2016.

[11]     Plaintiffs had another prime opportunity to complain about certain of the documents that they now seek to add.  From February to April 2017, the parties litigated whether the spill model discussion documents (also called spill model reports) should be subject to a protective order.  D.E. 92, 146, 149, 161.  In opposing a protective order, the Tribes argued that spill model discussion documents must be made public because they contained key information needed to challenge the Corps' spill risk analysis.  D.E. 149 at 2.  But Plaintiffs did not complain, as they do now, that the underlying spill *model* was needed.  *See* Mot. at 11.  Moreover, to Dakota Access's knowledge, the administrative record contains the totality of documents the Corps received relevant to spill modeling.

[12]     It also bears mention that the Court did not require any Plaintiff to jump the gun by filing a summary judgment motion before the Corps lodged the final part of the record.  That was

Access about the adequacy of the record in April 2017, which resulted in the Corps adding more documents in May 2017 as requested by the parties. D.E. 221. *Fifth*, one of the tribes—Cheyenne River—was dissatisfied with the adequacy of the Corps' supplementation and therefore filed a Motion to Supplement the Administrative Record in May 2017. D.E. 220. The Court ruled on that Motion when it issued its summary judgment opinion in June 2017. June 14, 2017 Minute Order. The Court's ruling did not address any of the documents at issue in the current Motion because Cheyenne River's Motion *did not complain about them*.[13] (Standing Rock made no complaints that the Corps' updates were incomplete.) *Sixth*, when Yankton Sioux Tribe filed its motion for summary judgment months later (November 2017), it did not complain about the adequacy of the administrative record either.

The upshot is that the Court need not speculate about what would have happened "[h]ad the Tribes had the opportunity to move to complete the record with these documents earlier in the litigation." Mot. at 12. They had multiple opportunities, yet passed on them. It is just plain wrong for Plaintiffs to assert that "there was never an opportunity for any plaintiff Tribe to chal-

---

Standing Rock's and Cheyenne River's decision. D.E. 119 at 26:10-16, 37:6-12. The Corps sought to postpone summary judgment briefing until the easement record was available. *See id.* at 39:14-24. Dakota Access shared the Corps' concerns about briefing issues for which the record did not yet exist. *Id.* at 38:10-22.

[13]   Plaintiffs even base their current Motion on several documents that they must have closely examined because they focused on them in their earlier summary judgment briefing. *Compare* Mot. at 11 (referencing USACE_DAPL72161, a compilation of "internal technical comments" from the Corps' internal "ProjNet" system) *with* D.E. 208 at 1 (citing pages within the same document—"AR72162-72270"); D.E. 212 at 2 (SRST Errata to Joint Appendix adding "USACE_DAPL72161-72270"). The Court referenced the same ProjNet document in its June 2017 opinion. *Standing Rock I*, 255 F. Supp. 3d at 151. Cheyenne River's Motion to Supplement the Record did not argue, as Plaintiffs do now, that anything mentioned in those documents needed to be added to the record.

lenge the scope or adequacy of the original administrative record during the initial round of summary judgment motions." *Id.* at 10.  The Court should not countenance their effort to drag these proceedings out further with complaints that are patently untimely and grounded in fake excuses.

## III.   Plaintiffs Have Not Shown That Documents Required Under The Easement Must Be Added To The Administrative Record.

Plaintiffs seek to "complete" the remand record with documents they say are called for under the terms of the Lake Oahe easement, supposedly because the documents relate to the "integrity and safe operation of the pipeline." Mot. at 13-14.  The subtext to their request is that they would like to know if Dakota Access is "out of compliance with these easement conditions." *Id.* at 13.  Plaintiffs also rely here on the results of the third-party assessment that this Court ordered as an "interim" remand condition. *Id.* at 13 n.4.  Plaintiffs seek here to go outside the administrative record in search of documents that would be relevant, if at all, to a different type of proceeding:  an action to enforce the easement conditions.  The Court should reject that effort.

Plaintiffs' request here is based on an overly broad interpretation of an agency's requirements when compiling a record.  The issue is not whether a document supposedly is "centrally relevant to the issues before" an agency. Mot. at 14 (asserting that the requested materials "bear[] on the integrity and safe operation of the pipeline").  "[T]he Corps is not obligated to include every potentially relevant document existing within the agency.  Only those documents that were directly or indirectly considered by the Corps' decisionmaker(s)," and not simply received by the Corps, "should be included in the administrative record." *Pac. Shores*, 448 F. Supp. at 7.  And parties seeking to add documents to the record must "put[] forth concrete evidence" that those documents "were actually before the decisionmakers" when they made their

decision.  *The Cape Hatteras Access Pres. All. v. U.S. Dep't of Interior*, 667 F. Supp. 2d 111,

114 (D.D.C. 2009).  Plaintiffs have put forth nothing to meet their burden.

Plaintiffs speculate that because they do not see certain documents relevant to the ease-

ment conditions "[e]ither DAPL is out of compliance with these easement conditions, or the

Corps has failed to provide materials that have been provided to it[.]"  Mot. at 13.[14]  But if there

are no compliance issues, it does not follow that a remand decisionmaker would need to consider

underlying documents related to those conditions.  Plaintiffs are left to argue that these docu-

ments are "relevant to the issues before the Corps on remand," but that is not the test.  *See Pac.*

*Shores*, 448 F. Supp. 2d at 6 ("Pacific Shores cannot meet its burden simply by asserting that the

documents are relevant[.]"); *Stand Up for Cal. v. U.S. Dep't of Interior*, 315 F. Supp. 3d 289,

295 (D.D.C. 2018) ("Plaintiffs' mere assertion that these documents 'are obviously important to

the decision' do not warrant supplementing the record.").  The fact that the Corps noted the exist-

ence of easement conditions in its remand analysis, *see* Mot. at 14, is not "concrete evidence"

that the Corps relied on documents related to those conditions in making its remand decision,

*Wilmina Shipping AS v. U.S. Dep't of Homeland Sec.*, No. CV 11-2184 (ABJ), 2013 WL

12340838, at *3 (D.D.C. Sept. 4, 2013) (to warrant supplementation, "[t]he agency must have

considered the omitted records in making their decision").

What this really comes down to is Plaintiffs' desire to obtain discovery that would only

be relevant, if at all, to an enforcement action for alleged non-compliance with the terms under

which the Corps granted its permissions.  That is separate from the question whether the Corps

---

[14]    Notably, some of the documents mentioned in the easement conditions need only be cre-
ated under special circumstances not relevant here.  *E.g.*, D.E. 96-1 at 37 (condition 16) (requir-
ing submission of a "root cause failure analysis" arising out of hydrostatic testing only if there
was a "pipe[line] failure").

should have *issued* a permit or easement.  Plaintiffs' own complaints show they have not brought

such an enforcement action.  *See generally* D.E. 1, 37, 97-1, 106-1, 240-42, 371, 377-79; D.E. 1,

No. 17-267 (Feb. 11, 2017 D.D.C.) (OST Complaint); D.E. 1, No. 16-1796 (Sept. 8, 2016

D.D.C.) (YST Complaint).  Nor could they have.  The Corps issued the easement under the Min-

eral Leasing Act, D.E. 96-1 at 2, which has no citizen suit provision.  30 U.S.C. § 195(c); *see*

*also Naartex Consulting Corp. v. Watt*, 542 F. Supp. 1196, 1202 (D.D.C. 1982), *aff'd*, 722 F.2d

779 (D.C. Cir. 1983) ("An analysis of the Mineral Leasing Act and its underlying purposes . . .

reveals that Congress did not intend to create a private right of action to police against transgres-

sions of the Act by private parties.").

Accordingly, Plaintiffs have not met their burden to "complete" the record with docu-

ments referenced in the conditions of the easement.

**IV.     Plaintiffs Have Not Shown That Third-party Assessment Documents Must Be
          Added To The Administrative Record.**

Plaintiffs also seek to "complete" the record with materials cited in or underlying a third-

party assessment of Dakota Access's compliance with the easement conditions, which this Court

required as an "interim remand condition."  Mot. at 14; *see also Standing Rock III*, 280 F. Supp.

3d at 191-92.  This too is improper.  The Court made it clear that the interim remand conditions

"do not affect Defendants' ongoing environmental analysis, nor do they constrain the outcome of

the remand process."  *Standing Rock III*, 280 F. Supp. 3d at 189; *see also Standing Rock IV*,

2018 WL 1967112, at *1.  "They are instead means by which the Court can gather information

about the risks posed by the pipeline pending remand and can ensure that the status quo is pre-

served for both sides."  *Standing Rock III*, 280 F. Supp. 3d at 190.  The Court also found in its

April 2018 decision denying Plaintiffs' motions to compel compliance with and clarify the re-

mand conditions, that those motions were "essentially moot" because "Dakota Access has com-

plied with the Court's directive." *Standing Rock IV*, 2018 WL 1967112, at *1.  The Court set

aside Plaintiffs' remaining concerns "that the Corps is mishandling the remand process *beyond*

*the* aforementioned limited [remand] conditions," saying that it expects post-remand briefing

about such concerns.  *Id.* (emphasis added).  That ruling put the remand conditions to rest.

In trying to revive those conditions now, Plaintiffs again miss the distinction between

documents that a party thinks an agency decisionmaker should have considered and those that it

actually did.  *See supra* 23-25; Mot. at 14-15 (asserting that the documents are "salient to the

Corps' decision on remand" and relate to the Plaintiffs' claims about Dakota Access's environ-

mental compliance and safety records).  Plaintiffs also again miss the difference between an

agency decisionmaker considering a document prepared by another party and considering a doc-

ument mentioned in the third-party-prepared document.  *See Cape Hatteras*, 667 F. Supp. 2d at

114.  In addition, the issue in a challenge like those here is whether the decisionmaker considered

a document, not whether someone at the agency possessed it (if, in fact, the agency received such

a document).  Plaintiffs fall well short of the required strong showing.  *See Pac. Shores*, 448 F.

Supp. 2d at 6-7.

The one example that Plaintiffs say is "of particular concern" helps show how far short

they are of the mark.  Mot. at 15.  It involves "an incident where drilling mud breached the con-

tainment facilities and clean-up was in progress."  *Id*.  But Plaintiffs miss the boat once again on

their fishing expedition.  The third-party assessment is clear on its face that this "incident" took

place during *construction* of the pipeline, not its operation.  *See* D.E. 349-2 at 3-4 (reporting that

Dakota Access complied with the Easement Condition requiring it to "conduct all HDD work according to the HDD Construction Plan") (bold and italics omitted).  It has nothing to do with the Corps' remand analysis.[15]

In short, there is no legal basis for including documents underlying the third-party assessment.

## V.    Plaintiffs' Requests For Final Versions Of Documents Are Either Moot Or Unsupported.

Plaintiffs' request to complete the record with final versions of certain documents should be denied as moot to the extent that the record already contains some of them, and it is unsupported as to the rest.

First, Plaintiffs seek final versions of a draft "technical analysis," a draft "risk analysis" report, and draft appendices, but final iterations of each already appear in the remand record. The first three documents in the remand record are a 2-page memorandum for the record (RAR1-2); the 138-page Remand Analysis with a narrative, maps, and figures (RAR3-140); and a 140-page document with more granular responses to the Plaintiffs' various submissions, including a point-by-point refutation of each criticism that is the subject of this Court's ruling on the "highly controversial" topic (RAR141-280).  A comparison confirms that these documents contain, in final form, the content of the draft documents Plaintiffs have identified.  The draft "technical analysis" documents (RAR909, RAR2678, RAR10203) include the draft memorandum for the

---

[15]    Even if construction issues had been included in the remand's scope, the third-party assessments' recounting of this "incident" shows the efficacy of Dakota Access's environmental compliance during that phase too.  It notes that while there was a breach in the side of a containment pit dug for spent drilling mud during the Horizontal Directional Drill under Lake Oahe, "clean-up activities were in progress" and "the Environmental Control Devices (ECD) that had been installed performed as expected and helped prevent migration of the drilling mud to the water."  D.E. 349-2 at 4.

record and some of the narrative analysis.  Parts of the narrative analysis are also taken, at times

verbatim, from a draft "Appendix C" with responses to comments, *compare, e.g.*, RAR2911-12

(draft) *with* RAR111 (final), and a draft "risk analysis" report, *compare, e.g.*, RAR9190-9192

*with* RAR116-18 (final).

While there is additional material in the final document, it is easy to see the evolution

from draft to final.  For example, the July 2018 draft includes redline edits to a table that are re-

flected in the final document.  *Compare* RAR1027-29 *with* RAR73-74; *also compare* RAR1015

("However, as noted under Consideration #2, the simple fact that a stochastic threshold is pre-

dicted to be exceeded at any single point in time within a scenario does not mean there will be

negative effects.") *with* RAR34 ("However, that a stochastic threshold is predicted to be ex-

ceeded at any single point in time within a scenario does not mean there will be negative ef-

fects.").  Likewise, iterations of the technical figures and maps in the draft "Appendices A and

B" appear in the final Remand Analysis.  *Compare, e.g.*, RAR2898 (draft) *with* RAR27 (final);

RAR2908 (draft) *with* RAR51 (final); RAR2915 (draft) *with* RAR118 (final).  And draft re-

sponses to the Plaintiffs' comments (RAR2868) are reformatted and included, mostly verbatim,

in the final document (RAR141-280).

Second, it is not necessary for the Corps to include a copy of the April 2018 revised facil-

ity response plan ("FRP") unless this updated document was considered by the Corps deci-

sionmaker for the remand decision.  It is not enough to "imply that the Corps possessed some of

the documents because Plaintiffs obtained them through a Freedom of Information request;" in-

stead, there must be "evidence that the Corps' decisionmaker(s) were actually aware of the . . .

documents Plaintiffs seek to include." *Pac. Shores*, 448 F. Supp. 2d at 6-7.  The Corps con-

firmed in its opposition to this Motion that the April 2018 FRP "was not before the Corps during

the remand decision-making process." D.E. 402 at 17 n.3. The Corps is entitled to a "strong presumption of regularity[]" here. *Pac. Shores*, 448 F. Supp. 2d at 5.

## CONCLUSION

For the reasons stated above, the Court should deny Plaintiffs' Motion to Complete the Administrative Record.

Dated: March 11, 2019

Respectfully submitted,

/s/ William S. Scherman
William S. Scherman
David Debold
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500
wscherman@gibsondunn.com

*Counsel for Dakota Access, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 11th day of March, 2019, I electronically filed the foregoing

document using the CM/ECF system.  Service was accomplished by the CM/ECF system.


/s/ William S. Scherman
William S. Scherman
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
wscherman@gibsondunn.com

*Counsel for Dakota Access, LLC*