IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE,<br><br>        Plaintiff,<br><br>  and<br><br>CHEYENNE RIVER SIOUX TRIBE,<br><br>        Plaintiff-Intervenor,<br>  v.<br><br>U.S. ARMY CORPS OF ENGINEERS,<br><br>        Defendant-Cross<br>        Defendant,<br><br>  and<br><br>DAKOTA ACCESS, LLC,<br><br>        Defendant-Intervenor-<br>        Cross Claimant. | Case No. 1:16-cv-1534-JEB<br>(and Consolidated Case Nos. 16-cv-1796<br>and 17-cv-267) |

**JOINT APPENDIX OF REMAND ANALYSIS RECORD**

JOINT APPENDIX OF REMAND ANALYSIS RECORD
(No. 1:16-cv-1534-JEB)

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

Dated:  March 22, 2019.

/s/ Jan E. Hasselman
Jan E. Hasselman, WSBA # 29107
(*Admitted Pro Hac Vice*)
Patti A. Goldman, DCB # 398565
Stephanie Tsosie, WSBA # 49840
(*Admitted Pro Hac Vice*)
Earthjustice
705 Second Avenue, Suite 203
Seattle, WA 98104
Telephone: (206) 343-7340
pgoldman@earthjustice.org
jhasselman@earthjustice.org
stsosie@earthjustice.org
*Attorneys for Plaintiff Standing Rock Sioux Tribe*

/s/ Michael L. Roy
Michael L. Roy (DC Bar No. 411841)
mroy@hobbsstraus.com
Jennifer P. Hughes (DC Bar No. 458321)
jhughes@hobbsstraus.com
Elliott A. Milhollin (DC Bar No. 474322)
emilhollin@hobbsstraus.com
Hobbs, Straus, Dean &Walker, LLP 2120 L
Street, NW, Suite 700
Washington, DC 20037
Telephone: (202) 822-8282
Facsimile: (202) 296-8834
*Counsel for Oglala Sioux Tribe*

/s/ David Debold
William S. Scherman
David Debold
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, NW
Washington, D.C. 20036
(202) 955-8500
wscherman@gibsondunn.com
DDebold@gibsondunn.com
*Counsel for Dakota Access, LLC*

/s/ Joseph V. Messineo
Joseph V. Messineo
Fredericks Peebles & Morgan LLP 3610 North
163rd Plaza
Omaha, NE 68116
Telephone: (402) 333-4053
Facsimile: (402) 333-4761
jmessineo@ndnlaw.com
*Counsel for Cheyenne River Sioux Tribe and
Steve Vance*

/s/ Jennifer S. Baker
Jennifer S. Baker, *Pro Hac Vice*
Jeffrey S. Rasmussen, WA #21121
Fredericks Peebles & Morgan LLP
1900 Plaza Drive
Louisville, CO 80027
Telephone: (303) 673-9600
Facsimile (303) 673-9155
jbaker@ndnlaw.com
*Counsel for Yankton Sioux Tribe and Robert
Flying Hawk*

/s/ Amarveer S. Brar
Jeffrey H. Wood
Acting Assistant Attorney General
Reuben S. Schifman
Amarveer S. Brar
U.S. Department of Justice
Natural Resources Section
P.O. Box 7611
Benjamin Franklin Station
Washington, D.C. 20044
(202) 305-4224 (Schifman)
(202) 305-0479 (Brar)
reuben.schifman@usdoj.gov
amarveer.brar@usdoj.gov
*Attorneys for the United States Army Corps of
Engineers*

JOINT APPENDIX OF REMAND ANALYSIS RECORD
(No. 1:16-cv-1534-JEB)

*Counsel continued from previous page:*

Erica M. Zilioli
U.S. Department of Justice
Environmental Defense Section
P.O. Box 761
Washington, D.C. 20044
(202) 514-6390
Erica.Zilioli@usdoj.gov
*Attorneys for the United States Army Corps of Engineers*

JOINT APPENDIX OF REMAND ANALYSIS RECORD
(No. 1:16-cv-1534-JEB)

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

| JOINT APPENDIX OF REMAND ANALYSIS RECORD | |
|---|---|
| **DESCRIPTION** | **AR PAGE NOS.** |
| Memorandum for Record and Analysis of the Issues Remanded by the U.S. District Court for the District of Columbia Related to the Dakota Access Pipeline Crossing at Lake Oahe | RAR000001-RAR000140 **(SUBJECT TO PROTECTIVE ORDER) [FILED UNDER SEAL]** |
| USACE Review and Analysis of Tribal Comments | RAR000141-RAR000280 **(SUBJECT TO PROTECTIVE ORDER) [FILED UNDER SEAL]** |
| Email from USACE to HDR Engineering, dated August 29, 2018 | RAR000297 |
| Emails between Energy Transfer, HDR Engineering, and USACE, dated August 1-2, 2018 with excerpts from attachments | RAR000742-RAR000747 |
| Emails between Energy Transfer, HDR Engineering, and USACE, dated August 1, 2018 attaching Draft Technical Analysis of Remand Items dated July 31, 2018 | RAR000899-RAR000986 **(SUBJECT TO PROTECTIVE ORDER) [FILED UNDER SEAL]** |
| Draft Technical Analysis of Remand Items, dated July 31, 2018 | RAR000990-RAR001067 |
| Email from HDR Engineering to USACE, dated June 21, 2018, discussing transmission of the Remand Package and Downstream Receptor Report | RAR002547-RAR002548 |
| Email from HDR Engineering to USACE, dated June 21, 2018, attaching draft responses to comments | RAR002618-RAR002642 **(SUBJECT TO PROTECTIVE ORDER) [FILED UNDER SEAL]** |
| Draft Technical Analysis of Remand Items, dated June 20, 2018 | RAR002678-RAR002738 **(SUBJECT TO PROTECTIVE ORDER) [FILED UNDER SEAL]** |
| Review of Potential Environmental Effects of Oil Releases on Downstream Receptors, dated June 21, 2018 | RAR002739-RAR002867 **(SUBJECT TO PROTECTIVE ORDER) [FILED UNDER SEAL]** |
| Draft Appendix C: Comment and Response for Documents Received, dated June 21, 2018 | RAR002868-RAR002894 **(SUBJECT TO PROTECTIVE ORDER) [FILED UNDER SEAL]** |

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

| JOINT APPENDIX OF REMAND ANALYSIS RECORD | |
|---|---|
| **DESCRIPTION** | **AR PAGE NOS.** |
| Draft Appendix A: Various Figures, dated June 21, 2018 | RAR002895-RAR002944 **(SUBJECT TO PROTECTIVE ORDER)** **[FILED UNDER SEAL]** |
| Email from HDR Engineering to USACE, dated June 20, 2018, attaching comment and response table | RAR003001-RAR003006 **(SUBJECT TO PROTECTIVE ORDER)** **[FILED UNDER SEAL]** |
| Email string discussing the transmission of the Sunoco Logistics DOT 195 Maintenance Manual, with attachment, dated April 10, 2018 | RAR004499-RAR004740 **(SUBJECT TO PROTECTIVE ORDER)** **[FILED UNDER SEAL]** |
| Email string discussing the transmission of the Dakota Access Pipeline Risk Assessment (Integrity Management Plan), with attachment, dated April 10, 2018 | RAR004741-RAR004893 **(SUBJECT TO PROTECTIVE ORDER)** **[FILED UNDER SEAL]** |
| Email string discussing the transmission of the as-built drawings for the Lake Oahe crossing, with attachment, dated April 10, 2018 | RAR004894-RAR004901 **(SUBJECT TO PROTECTIVE ORDER)** **[FILED UNDER SEAL]** |
| Email from Energy Transfer to Standing Rock, copying USACE, mentioning "original spill model," dated March 1, 2018 | RAR006565-RAR006566 |
| Spill Model Report, dated February 12, 2018, one of several attachments to internal USACE email | RAR008065-RAR008400 **(SUBJECT TO PROTECTIVE ORDER)** **[FILED UNDER SEAL]** |
| Internal USACE email, dated February 15, 2018, discussing ten numbered items including "Bakken Crude Composition" | RAR008403 |
| Final Evaluation of Hydrocarbon Releases into Lake Oahe using OILMAPLand and SIMAP Trajectory, Fate, and Effects Modeling for the Dakota Access Pipeline | RAR008743-RAR008964 **(SUBJECT TO PROTECTIVE ORDER)** **[FILED UNDER SEAL]** |
| Emails between Energy Transfer, HDR Engineering, and USACE, dated February 6-7, 2018, attaching Spill Model Report comments | RAR009112-RAR009116 **(SUBJECT TO PROTECTIVE ORDER)** **[FILED UNDER SEAL]** |

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

| JOINT APPENDIX OF REMAND ANALYSIS RECORD | |
| --- | --- |
| **DESCRIPTION** | **AR PAGE NOS.** |
| Supplemental Information to Select Comment Responses, draft dated February 1, 2018 [excerpt] | RAR009187-RAR009211 **(SUBJECT TO PROTECTIVE ORDER)** **[FILED UNDER SEAL]** |
| Technical Analysis of Remand Items, draft dated February 4, 2018 | RAR010203-RAR010240 **(SUBJECT TO PROTECTIVE ORDER)** **[FILED UNDER SEAL]** |
| Email from HDR Engineering to USACE, dated November 17, 2017, attaching SXL – Integrity Management Plan Pipeline and associated documents | RAR012015-RAR012237 **(SUBJECT TO PROTECTIVE ORDER)** **[FILED UNDER SEAL]** |
| Attachment to email string discussing write-up on SIMAP modeling and model schedule information, dated November 7, 2017 | RAR012257-RAR012258 |
| Letter from USACE to Energy Transfer, dated August 24, 2017 | RAR013605-RAR013607 |
| DAPL Spill Model Discussion, dated May 3, 2016 [excerpt] | RAR014969 **(SUBJECT TO PROTECTIVE ORDER)** **[FILED UNDER SEAL]** |
| Emergency Response Action Plan and Facility Response Plan, Dakota Access Pipeline, North Response Zone, Version 1.0, dated October 2016 [excerpt] | RAR016716 **(SUBJECT TO PROTECTIVE ORDER)** **[FILED UNDER SEAL]** |
| July 25, 2016 Environmental Assessment [Environmental Assessment: Final Section 408 Environmental Assessment] | USACE_DAPL0071220-USACE_DAPL0071382 |
| Compilation of internal technical comments from USACE ProjNet system, dated June 2, 2016 [ProjNet: Environmental Review of DAPL Project - Comments and Resolutions] | USACE_DAPL0072161-USACE_DAPL0072270 |
| North Dakota Missouri River Crossing Spill Model Discussion | USACE_DAPL0074092-USACE_DAPL0074110 **(SUBJECT TO PROTECTIVE ORDER)** **[FILED UNDER SEAL]** |
| [Email Attachment: North Dakota Lake Oahe Crossing Spill Model Discussion] dated August 4, 2015 | USACE_DAPL0074713-USACE_DAPL0074729 **(SUBJECT TO PROTECTIVE ORDER)** **[FILED UNDER SEAL]** |

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

## CERTIFICATE OF SERVICE

I hereby certify that on March 22, 2019, I electronically filed the foregoing *JOINT APPENDIX OF REMAND ANALYSIS RECORD* with the Clerk of the Court using the CM/ECF system, which will send notification of this filing to the attorneys of record and all registered participants.

*/s/ Jan E. Hasselman*
Jan E. Hasselman

JOINT APPENDIX OF REMAND ANALYSIS RECORD
(No. 1:16-cv-1534-JEB) - 4

# FILED UNDER SEAL

Pursuant to Protective Order

RAR000001 – RAR000140

# FILED UNDER SEAL

Pursuant to Protective Order

RAR000141 – RAR000280

| | |
|---|---|
| **From:** | Kruger, Heath Robert CIV USARMY CENWO (US) |
| **To:** | "Rowe, Steve" |
| **Subject:** | DAPL Documents |
| **Date:** | Wednesday, August 29, 2018 1:56:00 PM |

Steve,

The team is looking for a few document and we were curious if you have them handy. They are looking to add citations in the remand document the documents requested come from the responses to comments in Tables C-1, C-2, and C-3, and the Supplemental Information.

1.   May 2016 Lake Oahe Crossing Report (this may be the original Spill Model?)
2.   FINAL REPORT R-ETP-20160510: Dakota Access Pipeline Project Lake Oahe HDD Crossing Risk Analysis (dated May 10, 2016).
3.   Risk Assessment (see response to comment A10).
4.   Dakota Access Pipeline Project Threat Assessment Report: Missouri River and Lake Oahe HDD River Crossings (dated June 26, 2016)
5.   The response to comment B4 states:  "A review of the site-specific data indicates that the pipeline is already located away from a landslide threat area."  What      site specific data is referenced?


Thanks for your assistance,

Heath

RAR000297

| | |
|---|---|
| **From:** | Rowe, Steve |
| **To:** | Cossette, Brent J CIV USARMY CENWO (US); BORKLAND, CARL G; Michael C Aubele |
| **Cc:** | Shelman, Johnathan A CIV USARMY CENWO (US); Grow, Catherine E CIV USARMY CENWO (US); Casner, Melanie L CIV USARMY CEHQ (US); David Debold; Fleischer, Jason J. |
| **Subject:** | [Non-DoD Source] RE: DAPL Remand - HQ Questions |
| **Date:** | Thursday, August 02, 2018 2:05:53 PM |
| **Attachments:** | Partial Question Responses_2018-08-01.docx |
| | Copy of ND 33-16-02.1.pdf |
| | Lake Oahe Caliper Survey Field Report.pdf |
| | ND Conditioning Order-OR25417.pdf |

Brent,

We are in receipt of the ten questions posed in your email below and the 11th question presented in the email received approximately 10 minutes earlier (related to the PHMSA database).

In an effort to provide a timely turn-a-round, attached please find the responses for 6 of the 11 questions (1, 2, 3, 6, 7 and 10).  We will endeavor to have the remainder to you as soon as possible and anticipate the majority by close of business tomorrow.

Please let us know if you have any questions on this partial submittal.

Steve


Steve Rowe
Pipeline Environmental Practice Lead
HDR
9781 S. Meridian Blvd., Ste 400
Englewood, CO 80112
720.539.6495
steve_rowe@hdrinc.com
hdrinc.com/follow-us



-----Original Message-----
From: Cossette, Brent J CIV USARMY CENWO (US) [mailto:Brent.J.Cossette@usace.army.mil]
Sent: Wednesday, August 1, 2018 9:13 AM
To: Rowe, Steve <Steve.Rowe@hdrinc.com>; BORKLAND, CARL G
<CARL.BORKLAND@energytransfer.com>; Michael C Aubele <Michael.Aubele@energytransfer.com>
Cc: Shelman, Johnathan A CIV USARMY CENWO (US) <Johnathan.A.Shelman@usace.army.mil>; Grow,
Catherine E CIV USARMY CENWO (US) <Catherine.E.Grow@usace.army.mil>; Casner, Melanie L CIV
USARMY CEHQ (US) <Melanie.L.Casner@usace.army.mil>
Subject: DAPL Remand - HQ Questions


All:

Below is a list of questions we received from our Headquarters Counsel.  Please assist with responses for each item.

1. Comment A2 states that "[a]t a minimum, the lowest mean daily discharge rates for the periods of record  at the nearby gaging stations should been used in the analysis..."  After responding that using the lowest mean daily discharge rates in the calculations wouldn't impact the assessment, we state that nevertheless "based on comments received, additional spill modeling was performed...that includes "low flow rates" for Lake Oahe.  Is "low flow rates" synonymous with "lowest mean daily discharge rates?"  If the terms aren't synonymous, what is the basis for using "low flow rates" instead of "lowest mean daily discharge?"

2.  What is the source of the conclusion to Comment A4: "Chronic toxicity levels are inappropriate for comparison to concentrations based on an accidental one-time release of a worst-case discharge.  The chronic toxicity levels are for comparison to longer term exposures...?"  The next sentence suggests these conclusions may derive from North Dakota statutes.  Please provide a citation to the North Dakota statutes that support this conclusion.

3.  Please provide the title and date of the report(s) for the inspection/test referenced in response to comment A18: "DAPL subsequently ran caliper tools over the entire length of the pipeline (post-test) to check ovality and to locate any potential dents.  DAPL had zero findings and zero repairs in North Dakota.  Likewise, DAPL ran a high resolution caliper tool on the Lake Oahe segment post pull and had zero finding."

4.  Does Dakota Access, LLC agree that the study results referenced in comment D8 showing that "benzene and toluene could be present at concentrations greater than maximum contaminant levels (5 micro-g/L for benzene and 1,000micro-g/l for toluene for drinking water) in ground water that comes into contact with fresh crude oil from the study area"  is applicable to the Oahe crossing (in the context of the region's hydrology and geology, and their connection or proximity to downstream water intakes)?  If the study results referenced in comment D8 are not applicable to the Lake Oahe crossing and potential impacts from an operational failure, please explain what factors set it apart from the referenced study.

5.  Is the portion of the response to comment G3 starting with "approximately 70% of the 276 incidents were confined to operators' property..." attributable to the Stamm Declaration?  We need to provide the basis for the conclusion that incidents on the operator's property make these incidents less likely to affect people, property, or environment because product often stays within engineered containment or its impact is limited to facility boundaries.  Even if an impact is limited to facility boundaries, couldn't it still affect people (employees, bystanders, commuters, responders, etc.) or the environment (fumes, seepage, etc.)?

6.  Response to Comment G5: was the DAPL Pipeline Surge Analysis Report prepared pre-July2016 Final EA and FONSI or post?  Is it required by PHMSA regulations or recommended by industry standards?

7.  Page 31 of Document L refers to an NDIC Oil Conditioning Order issued in 2014.  Is the 2014 NDIC Oil Conditioning Order applicable to the pipeline?  If it is, what can we reference to show compliance with the Order?

8.  The response to comment L65 states "[t]he specific operation of the instrumentation to monitor the atmosphere for the safety of emergency responders is defined in the responders health and safety procedures."  Is the "responders health and safety procedures" a document prepared by DAPL for responders addressing a spill/rupture from the Lake Oahe crossing?  Or is this generally referring to health and safety procedures for responders prepared by the responders with input from Dakota Access?

9.  The response to comment L66 needs to begin by explaining when vapor suppressing foam is used and in what conditions it should be used.  Then explain why it would not be appropriate in responding to a spill in Lake Oahe.  Do the industry standards for the vapor suppressing foam technique define "surface water area" as "open areas that are well ventilated" or is this just common sense?

10.  Several responses, including the response to D7, refer to a "pseudo  component approach" utilized in the updated spill modeling.  Is the "pseudo component approach" the breaking down of bulk hydrocarbon into several groups?  Please generally describe the "pseudo component approach" why Dakota Access preferred this methodology."

Thank you,

Brent Cossette

Natural Resource Specialist
Environmental Stewardship
CENWO-OD-TN
Omaha District
1616 Capitol Avenue Suite 9000

Omaha, NE 68102
Work: 402-995-2712
Cell: 402-709-6446

RAR000744

**# 1.** Comment A2 states that "[a]t a minimum, the lowest mean daily discharge rates for the periods of record  at the nearby gaging stations should been used in the analysis..."  After responding that using the lowest mean daily discharge rates in the calculations wouldn't impact the assessment, we state that nevertheless "based on comments received, additional spill modeling was performed...that includes "low flow rates" for Lake Oahe.  Is "low flow rates" synonymous with "lowest mean daily discharge rates?"  If the terms aren't synonymous, what is the basis for using "low flow rates" instead of "lowest mean daily discharge?"

RESPONSE:
The two quoted terms are not synonymous.  The commenter's suggestion — using the lowest mean daily discharge rates for the period of record — means the discharge rate for the one day where the average flow rate (the mean for that day) was the lowest among all days considered.  An absolute lowest value is not typically used for these purposes because it may be an extreme outlier.

As indicated in the RPS Report, data inputs for the modeling efforts were obtained from independent sources with rigorous quality standards.  Hydrodynamics for Lake Oahe were calculated based upon different river flow conditions using discharge data from a USGS and USACE gaging stations (USGS, 2017a) and the USACE monthly reservoir statistics from 1967-2017 (USACE, 2017) — a 50-year period.

Typical hydrologic analysis includes using representative low, mean, or high discharge (i.e., flow) volumes.  In the Spill Model Report, the low flow condition was defined as being the 5th percentile daily flow rate for the 50-year period of record.  This provides for a statistical low flow over a wide range of flow rates without potentially introducing extreme outliers.

U.S. Geological Survey (USGS), 2017a. Surface water data for USA: USGS Surface-Water Monthly
    Statistics for USGS 06342500 MISSOURI RIVER AT BISMARCK, ND Available:
    http://waterdata.usgs.gov/nwis/monthly?. Accessed August 2017.

U.S. Army Corps of Engineers (USACE), 2017. Northwestern Division: Monthly Project Statistics.
    Available: http://www.nwd-mr.usace.army.mil/rcc/projdata.

**# 2.** What is the source of the conclusion to Comment A4: "Chronic toxicity levels are inappropriate for comparison to concentrations based on an accidental one-time release of a worst-case discharge.  The chronic toxicity levels are for comparison to longer term exposures...?"  The next sentence suggests these conclusions may derive from North Dakota statutes.  Please provide a citation to the North Dakota statutes that support this conclusion.

RESPONSE:
The North Dakota Administrative Code (Section 33-16-02.1), includes the following definition on the 2nd page:  "Chronic standard" means the four-day average concentration does not exceed the listed concentration more than once every three years."

Therefore, we do not believe that the 2.2 ug/l chronic level is a valid target to compare to for the primary analysis of impacts, since it is a chronic condition target set to protect against long term exposure.  That is, under these concentrations for a long period of time, fish may suffer growth, reproductive, or other long term consequences.  While it is true based on the modeling results that a one-time event might lead to concentrations exceeding chronic limits in the water column for a period

hours or at most days (based on the worst-case unmitigated modeling results) at one location along the river, the concentrations would not be persistent for the "four-day average concentration [to] exceed the listed concentration more than once every three years."

While these concentrations would not be acceptable as part of an NPDES discharge permit for a continuous discharge, this evaluation is focused on an unlikely one-time event, not an NPDES permit application.

**# 3.** Please provide the title and date of the report(s) for the inspection/test referenced in response to comment A18: "DAPL subsequently ran caliper tools over the entire length of the pipeline (post-test) to check ovality and to locate any potential dents. DAPL had zero findings and zero repairs in North Dakota. Likewise, DAPL ran a high resolution caliper tool on the Lake Oahe segment post pull and had zero finding."

RESPONSE:
As part of the hydro test program, the construction vendor was required to conduct a water based hydro test, and then after dewatering they were required to check pipe ovality with a caliper tool to ensure the hydro test did not deform any of the pipe. There is not one standalone report that summarizes the findings of these caliper tool runs. A copy of the caliper tool run report associated with the Lake Oahe HDD is attached for your reference. As noted on the report, the test was run March 24, 2017.

For simplicity, we recommend that the response to A18 be changed to limit it to just Lake Oahe to yield "DAPL had zero findings and zero repairs in North Dakota" as follows "DAPL had zero findings and zero repairs related to the Lake Oahe crossing".

**# 6.** Response to Comment G5: was the DAPL Pipeline Surge Analysis Report prepared pre-July2016 Final EA and FONSI or post? Is it required by PHMSA regulations or recommended by industry standards?

RESPONSE:
Pre-July 2016 (Report dated November 3, 2015)

Although not required in 195.406(b), a surge analysis is one of the tools utilized as a best practice in general compliance with the requirements of DOT 195.406(b) related to the maximum operating pressure (MOP). The last paragraph of DOT 195.406(b) states that "No operator may permit the pressure in a pipeline during surges or other variations from normal operations to exceed 110 percent of the operating pressure limit established under paragraph (a) of this section. Each operator must provide adequate controls and protective equipment to control the pressure within this limit".

Surge studies can be used to determine if any valve closures can could cause excessive pressures (greater than 110% of MOP) and to recommend what measures can could be taken to mitigate or eliminate the excessive pressure (greater than 110% of MOP) surges. Accordingly, DAPL completed a surge analysis over the entire pipeline system in November of 2015 and implemented the recommendations into the design and construction of the pipeline and valve system.

**# 7.**   Page 31 of Document L refers to an NDIC Oil Conditioning Order issued in 2014.  Is the 2014 NDIC Oil Conditioning Order applicable to the pipeline?  If it is, what can we reference to show compliance with the Order?

RESPONSE:

The 2014 NDIC Oil Conditioning Order applies to producers / production facilities.  The one specific notification requirement for operators applies to transload rail facilities.  Dakota Access is a mid-stream pipeline facility and therefore is not subject to that requirement.  The requirements outlined in the order for producers / production facilities are the responsibility of the producer for compliance before they transfer custody to Dakota Access.

Note: For reference, the oil condition report cited above is available at this location:

https://www.dmr.nd.gov/oilgas/Approved-or25417.pdf

**# 10.**   Several responses, including the response to D7, refer to a "pseudo  component approach" utilized in the updated spill modeling.  Is the "pseudo component approach" the breaking down of bulk hydrocarbon into several groups?  Please generally describe the "pseudo component approach" why Dakota Access preferred this methodology."

RESPONSE:

RPS utilized a pseudo component approach where the bulk hydrocarbon was broken into several groups and effects were determined based upon the chemical composition of the Bakken crude in its entirety (RPS Spill Model Report, 2018, Section 4.3).  The pseudo-component approach is a practical means to answer specific fate and transport questions.  Under this approach, chemicals in the oil mixture are grouped by physical-chemical properties, and the resulting component category behaves as if it were a single chemical with characteristics typical of the chemical group.  Therefore, the fate of any particular chemical can be estimated without introducing an inordinate number of variables (and time) to the analysis.

The individual component modeling would not have added sufficient value relative to the protection of drinking water intakes.  Since little to no DHC is predicted is to be present in the water the column at the level of the drinking water intakes, it can be concluded that no water quality thresholds would be expected to be exceeded.

MORE INFORMATION:

As determined in the modeling results, even at the location of the off-line Fort Yates intake (26.8 miles downstream), the maximum concentration of dissolved hydrocarbons (DHC) is predicted to be only 145 µg/L in the top 5 m (0 to 16.4 ft) of the water column, only 74 µg/L at 5 - 10 m (or 16.4 to 32.8 ft) of depth below the surface, and 0 µg/L between a depth of 10 m (32.8 ft) and the bottom of the river where the drinking water intake was located.   The more water soluble hydrocarbon components of crude oil are the BTEX compounds (benzene, toluene, ethylbenzene, and xylenes).  Benzene has the lowest concentration criteria of the four BTEX class categories in the ND state statutes. To reach a 5 µg/L regulatory threshold for benzene would require a DHC concentration of 22.5 µg/L.

RAR000747

# FILED UNDER SEAL

Pursuant to Protective Order

RAR000899 – RAR000986

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

CECC-ZA                                                                                                          DATE, 2018

MEMORANDUM THRU Deputy Commanding General for Civil Works and Emergency Operations, U.S. Army Corps of Engineers

FOR Assistant Secretary of the Army for Civil Works

SUBJECT: Technical Analysis of Remand Items Regarding DAPL Crossing at Lake Oahe, North Dakota

1. The purpose of this memorandum and its enclosures is to provide information to the Department of the Army documenting and summarizing the actions the U.S. Army Corps of Engineers (USACE) has taken (including the results of those actions) in response to the ruling by the United States District Court for the District of Columbia, dated June 14, 2017, in *Standing Rock Sioux Tribe, et al v. United States Army Corps of Engineers, et al*, Civil Action No. 16-1534. In its June 14 Memorandum Opinion, the Court required the USACE to reconsider, on remand, specified sections of its environmental analysis regarding approvals for the Dakota Access Pipeline Project. In particular, "[a]lthough the USACE substantially complied with NEPA in many areas," the Court agreed "that it did not adequately consider the impacts of an oil spill on fishing rights, hunting rights, or environmental justice, or the degree to which the pipeline's effects are likely to be highly controversial." Opinion at 2.

2. As is demonstrated within the information contained herein, the USACE has performed additional analysis relative to the three topics specified in the Court's opinion:

    • The impacts of an oil spill on fishing and hunting rights;
    • The environmental justice (EJ) implications of the project; and
    • The degree to which the pipeline's effects are likely to be highly controversial.

Applying the applicable law under NEPA, including the requirement of a "hard look" at potential environmental impacts implicated by these three topics, the USACE has identified no new information indicating that actions by the Department of the Army with respect to the Dakota Access Pipeline (DAPL) Project will affect the quality of the human environment to a significant extent not already considered. Therefore, decisions made by the USACE not to complete an Environmental Impact Statement (EIS) were in accordance with the law and neither arbitrary nor capricious.

3. If you have any questions about this memorandum or the enclosure, please contact me at XXXXXX or XXXX at 412-XXXX  or XXXXXXX@usace.army.mil.

                                                     XXXXX

Encl

Draft: July 31, 2018

RAR000990

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE



[PAGE INTENTIONALLY LEFT BLANK]

Draft: July 31, 2018

i

RAR000991

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

# Executive Summary

The Dakota Access Pipeline (DAPL) is approximately 1,168 miles and connects the Bakken and Three Forks oil production region in North Dakota to an existing crude oil market hub near Patoka, Illinois. The portion of DAPL which crosses Lake Oahe at the border between Morton and Emmons Counties in North Dakota, (0.55 miles north of the northern boundary of the Standing Rock Sioux Tribe's [SRST] Reservation) including areas of potential effects is the focus of this remand package. Accordingly, the responses within this document are specific to the DAPL segment associated with the Lake Oahe crossing, including areas of potential effects, unless otherwise noted. The Lake Oahe segment was completed in Spring 2017, and is defined as the length of the pipeline, installed using the horizontal directional drilling (HDD) technique a minimum of 28 meters (m) (92 feet [ft]) below the bed of Lake Oahe and on adjacent federal property over which the USACE has regulatory authority.

On July 25, 2016, an Environmental Assessment (EA) was finalized and published by the U.S. Army Corps of Engineers (USACE) for the portion of the pipeline that crosses Lake Oahe. On June 14, 2017, the United States District Court for the District of Columbia ruled in *Standing Rock Sioux Tribe, et al v. United States Army Corps of Engineers, et al*, Civil Action No. 16-1534 that the USACE reconsider, on remand, specified sections of its environmental analysis regarding approvals for the Dakota Access Pipeline Project.

This remand package details the additional in-depth review and analysis performed by the USACE in response to the three items addressed in the Court's Memorandum Opinion. The three items are detailed below. Due to the amount of information prepared and analyzed for each of these items, additional information is provided as referenced reports or within the Appendices.

### A. The impacts of an oil spill on fishing and hunting rights

The RPS Spill Model Report details the results of the model and analysis of oil spill trajectory, fate, and effects of a 10-day unmitigated oil spill to support evaluation of ecological and human health risks resulting from hypothetical releases of crude oil into Lake Oahe from the Dakota Access Pipeline.

Hypothetical releases of oil from DAPL were modeled at two locations along the Lake Oahe segment. The first location was a hypothetical pipeline at the sediment/ water interface that conservatively estimates a release into Lake Oahe as the actual pipeline was installed a minimum of 28 m (92 ft) below the lake. The second location was the ND-380 valve site on land adjacent to the west side of the lake. Two high release volumes were modeled at each of the above locations. One volume represents the full bore rupture ("FBR") release volumes accepted by the Pipeline and Hazardous Materials Safety Administration (PHMSA) as credible "worst-case" scenarios and the other volume represents the "majority of spills" or the 90th percentile discharge volume of case studies documented in the 2017 PHMSA database.

Using the results of the Spill Model Report, the Downstream Receptor Report analyzed the impacts of an oil spill on key ecological receptors (terrestrial, aquatic, semi-aquatic wildlife, and human receptors). The USACE utilized these two reports to determine the incident frequency and potential magnitude of a release; the fate and transport of an inadvertent release into Lake Oahe; potential impacts to the fishing and hunting resources in and adjacent to Lake Oahe and their duration; and measures in place to mitigate potential impacts.

A large oil spill into Lake Oahe would likely cause a localized fish kill with very limited impacts to the immediate area surrounding the site of the spill. Concentrations of crude oil in the water could result in impacts to aquatic invertebrates utilized as a food source by the local fishery. However, even under the worst-case scenarios, impacts to benthic macroinvertebrates and fish species would be of limited scale

ii

RAR000992

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

and of temporary duration and therefore impacts to fishing in the area would also be limited. None of the model scenarios showed a lake area greater than 0.1 km$^2$ above the biological threshold of 10 µm for surface oil thickness for potential impacts to wildlife. Additionally, this surface oil impact is predicted to be of short duration at any one location.  Time series modeling results show that the 50 µg/L biological threshold for aquatic species in the water column is only exceeded for a number of hours (not days) and only within specific zones within the water column, further limiting the area of potential impacts.

Although a release of crude oil into Lake Oahe during operations could have an adverse effect on game fish species, adherence to the cleanup procedures and remediation activities described in the Lake Oahe Geographical Response Plan (GRP) would reduce impacts on game fish species should a spill occur during operation of the pipeline.

The potential impact to upland hunting along the shore of Lake Oahe is very low. Although some deer or other wildlife species could ingest oil impacted water or eat contaminated vegetation following a spill, the concentration of contaminants would likely not be above acutely toxic thresholds and would not persist long enough to result in a chronic health issue. Furthermore, Lake Oahe is not the only source of fresh water for upland game species. If the western shore of Lake Oahe were to become impacted by an inadvertent release of oil, it is likely that many terrestrial vertebrates would be able to utilize alternative sources of freshwater.

Additionally, in the event of a crude oil release that results in damages to game species or hunting/fishing activities, Dakota Access would help restore, replace, or acquire the equivalent natural resources in accordance with OPA 90. (the Oil Pollution Act of 1990). Under OPA 90, the owner or operator is liable for the costs associated with the containment, cleanup, and damages resulting from a spill. Dakota Access maintains financial responsibility for the duration of the response actions. If the responsible party cannot pay, funds from the Oil Spill Liability Trust Fund are used to cover the cost of removal or damages.

***B.   The environmental justice (EJ) implications of the project***

Although Dakota Access is required by PHMSA to initiate response to a release within six hours, environmental justice implications were also based on the spill model's use of an unmitigated release to represent the worst-case scenario. Utilizing worst-case scenario spill models, it was determined that an *unmitigated* release had a 10% chance of traveling 65 miles in 10 days. This would still put the spill footprint 75.4 miles upstream of the SRST Replacement Intake and 150 miles upstream of the CRST intake. Even if a release was allowed to go unmitigated and travel over 75 miles downstream to reach the SRST Replacement Intake, the river water is not anticipated to exceed regulatory thresholds at the depth of the intake location. In addition, the estimated minimum travel time to reach the non-tribalTribal SCRWD intake for an unmitigated spill at the Lake Oahe crossing is approximately 13-14 hours. Under either a mitigated or unmitigated release, in the unlikely event of a spill sufficient to reach water intakes the non-tribalTribal SCRWD would be impacted first.

DAPL was routed to be co-located with other existing utilities to the greatest extent practicable in order to minimize the impacts on environmental resources (i.e., Lake Oahe and associated lands on the east and west banks), avoid the creation of a new right- of-way (ROW) through the affected communities, and reduce impacts on current land uses. In addition, the routing location was chosen to minimize impacts to EJ communities as there are no census block groups crossed by DAPL where either the poverty level is greater than 20% or the minority population exceeds 50%. Furthermore, the construction of DAPL had the potential to generate economic benefits to the broader local community as construction workers typically

Draft: July 31, 2018

RAR000993

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

utilize local gas stations, convenience stores, and restaurants in the general vicinity of the construction area.

Although a hypothetical release from DAPL would impact EJ communities downstream of the Lake Oahe crossing, this impact is not meaningfully disproportionate as the crossing has the potential to impact both EJ and non-EJ communities. There are five EJ census block groups and two non-EJ census block groups on the west side of the Lake Oahe project centerline and nine non-EJ census block groups on the east side of the Lake Oahe project centerline. (See Figures B-1 and B-2).

### C.  The degree to which the pipeline's effects are likely to be highly controversial

The USACE performed a factual and technical analysis on 18 documents submitted by the tribes, identified any pertinent concerns or issues caused by the DAPL crossing at Lake Oahe, and generated applicable responses to each of those concerns or issues not previously addressed in the final EA. The 18 documents contained opposing viewpoints and relevant issues of concern regarding the construction, operation, pre-operational integrity threat / risk analysis, risk mitigation systems, and the impact of a potential spill on downstream receptors from the pipeline, among others. The issues raised within each of the documents were presented as comment excerpts from which responses were developed to address the various viewpoints and relevant issues. When issues were presented that had been addressed in the EA, the original EA page numbers were provided for reference, and in some cases, additional clarification was provided. After detailed analysis of the comments, and for the reasons set out at length in the Appendices, it was determined that all issues of concern have been adequately addressed, that the remaining disputes are no more than disagreements of qualified experts over the reasoned conclusions to be drawn from available data, and that the potential effects of the project do not rise to the level of highly controversial.

Applying the applicable law under NEPA, the USACE has completed the required "hard look" at potential environmental impacts of the DAPL Lake Oahe crossing. The USACE has reconsidered the relevant portions of the final EA, reviewed and significantly discussed the relevant issues and opposing viewpoints, and conducted significant factual and technical analysis of spill model results, downstream receptor impacts, and impacts to EJ. The USACE has identified no new information indicating that actions by the Department of the Army with respect to the Dakota Access Pipeline (DAPL) Project will affect the environment to a significant extent not already considered. The USACE has determined that the risk of a release from DAPL that significantly impacts Lake Oahe is low. The USACE believes its decision to be fully informed and well-considered in concluding that the DAPL Lake ~~Ohae~~Oahe crossing is not expected to have significant direct, indirect, or cumulative impacts on the environment. Therefore, decisions made by the USACE not to complete an Environmental Impact Statement (EIS) were in accordance with the law and neither arbitrary nor capricious.

iv

Draft: July 31, 2018

RAR000994

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

[PAGE INTENTIONALLY LEFT BLANK]



Draft: July 31, 2018

v

RAR000995

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

# How to Use this Document

The Remand Package consists of the additional analysis and review, including supporting documentation, tables, and figures, of three specific items requested in the June 14, 2017 Memorandum Opinion.  These items are:  A) The impacts of an oil spill on fishing and hunting rights; B) The environmental justice (EJ) implications of the project; and C) The degree to which the pipeline's effects are likely to be highly controversial.  Due to the amount of information prepared and analyzed for each of these items, additional information is provided as supporting reports or within the Appendices (A-C). Below are the components of the Remand Package (each described for ease of navigating the document).

To facilitate review of this Remand Package, we recommend that the reader print out the components of the entire Technical Analysis of Remand Items listed below. XXXXXXXX.

**Technical Analysis of Remand Items and Appendices**

- Introduction and Background of the pipeline project, location, timeline of events, responsible parties.

- Remand Item A: Discussion of impacts of an oil spill on fishing and hunting rights in text format. The discussion is primarily a summary of detailed information from the supporting reports: Spill Model Report and the Downstream Receptor Report.
    - Figures A-1 through A-6 [Appendix A]

- Remand Item B: Environmental Justice (EJ) implications of the project.
    - Figures B-1 and B-2A through B-2E4 [Appendix B]

- Remand Item C: The degree to which the pipeline's effects are likely to be highly controversial (Supporting documents are located in Appendix C).
    - Table C-1: An index of technical documents received from Tribal representatives, plaintiff attorneys and technical specialists.
    - Table C-2: A summary of concerns collectively identified from documents.
    - Table C-3 [Appendix C]: Comment excerpts and responses related to documents [A, B, C, D, J, 5 and 6**] received prior to the issuance of the easement on February 8, 2017.
    - Table C-4 [Appendix C]: Comment excerpts and responses related to documents [E, F, G, H and I**] received after February 8, 2017 that were not available prior to the issuance of the easement.
    - Table C-5 [Appendix C]: Comment excerpts and responses related to documents [K, L, M and N**] received in 2018.
    - Supplemental Information [Appendix C]: Select responses that require additional details or context not able to fit into Tables C-3 and C-4.
        - Figures A15(a) through A15(d), and C9(a) through C9(d) [Appendix C]: Associated figures to the Supplemental Information.
- Overall Conclusions

** - Note that the apparent non-sequential listing of letter or number identifiers is due in part to the timing of the receipt of documents and the USACE coordination with Dakota Access related to supplemental information requests (reference the USACE information request letter dated August 24, 2017 to Dakota Access, LLC).  See footnote to Table C-1 for a more complete explanation.

**Supporting Reports (submitted separately)**
- Spill Model Report: Oil spill modeling and analysis of oil spill trajectory, fate, and effects to support evaluation of ecological and human health risks resulting from hypothetical releases of crude oil into Lake Oahe from the Dakota Access Pipeline.

vi

Draft: July 31, 2018

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

- Downstream Receptor Report: In-depth literature and case study review as well as spill model analysis of hydrocarbon impacts on key ecological receptors (terrestrial, aquatic, semi-aquatic wildlife, and human receptors).



Draft: July 31, 2018

vii

RAR000997

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

**Table of Contents**

Executive Summary ................................................................................................ ii

How to Use this Document ..................................................................................... vi

List of Acronyms ..................................................................................................... ix

Technical Analysis of Remand Items ..................................................................... xii

I.     Introduction and Background .......................................................................... 1

II.    Analysis of Remand Items .............................................................................. 3

    A.   Impacts on Fishing and Hunting Rights ...................................................... 5

        1.   Likelihood of Occurrence and Spill Magnitude ..................................... 5

        2.   Fate and Transport of an Inadvertent Release of Oil into Lake Oahe ... 8

        3.   Potential damages to the fishery and game resources .......................... 12

        4.   Measures in place to mitigate potential impacts ................................... 18

    B.   Environmental Justice ................................................................................ 21

        1.   EJ Methodology .................................................................................... 22

        2.   EJ Results ............................................................................................. 23

        3.   Review of Alternative Environmental Justice Analysis (Saha and Mohai, 2018) ....................... 35

    C.   Highly Controversial Considerations .......................................................... 55

III.   Conclusion ...................................................................................................... 61

Spill Model Report .................................................................................................. 64

Downstream Receptor Report ................................................................................. 65

**Appendices**
    A.   Remand Item A Figures
    B.   Remand Item B Figures
    C.   Remand Item C Tables, Figures and Supplemental Information

Draft: July 31, 2018

RAR000998

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

## List of Acronyms

| | |
|---|---|
| ASME | American Society of Mechanical Engineers |
| bbls | Barrels |
| BO | Biological Opinion |
| CFSR | U.S. National Centers for Environmental Prediction Climate Forecast System Reanalysis |
| CPM | Computational Pipeline Monitoring |
| CRST | Cheyenne River Sioux Tribe |
| DAPL | Dakota Access Pipeline |
| DHC | Dissolved Hydrocarbon Concentrations |
| EA | Environmental Assessment |
| ECD | Erosion Control Devices |
| EFRD | Emergency Flow Restricting Device |
| EIV | Emergency Isolation Valve |
| EJ | Environmental Justice |
| ERDC | U.S. Army Engineer Research and Development Center |
| FBR | Full Bore Rupture |
| fmsl | Feet Above Mean Sea Level |
| FONSI | Finding of No Significant Impact |
| ft | Foot |
| GRP | Geographical Response Plan |
| HCA | High Consequence Area |
| HDD | Horizontal Directional Drilling |
| HR | High Resolution |
| ILI | In-line Inspection |
| ITP | Inspection and Test Plans |
| km | Kilometer |
| m | Meter |

Draft: July 31, 2018

ix

RAR000999

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

| | |
|---|---|
| MFL | Magnetic Flux Leakage |
| MOP | Maximum Operating Pressure |
| NAPL | Non-Aqueous Phase Liquid |
| NCE | New Century Environmental, LLC |
| NDT | Non-Destructive Testing |
| NEPA | National Environmental Policy Act |
| NHPA | National Historic Preservation Act |
| NRDA | Natural Resource Damage Assessment |
| NWIS | National Water Information System |
| NWP | Nationwide Permit |
| OEM | Original Equipment Manufacturer |
| OILMAPLand | Two-dimensional overland and downstream trajectory and fate model |
| OPA 90 | Oil Pollution Act of 1990 |
| OST | Oglala Sioux Tribe |
| PAHs | Polycyclic Aromatic Hydrocarbons |
| PD | Percent Discharge (volume) |
| PHMSA | Pipeline and Hazardous Materials Safety Administration |
| PLC | Programmable Logic Controller |
| RAD | Risk Algorithm Document |
| ROW | Right-of-Way |
| SCADA | Supervisory Control and Data Acquisition System |
| SCRWD | South Central Regional Water District |
| Section 106 | Section 106 of the National Historic Preservation Act of 1966 |
| Section 408 | Section 14 of the Rivers and Harbors Act of 1899, as amended, and codified in 33 USC §408 |
| SIMAP | Spill Impact Model Analysis Package: three-dimensional in-water oil trajectory, fate, and biological effects model |
| SME | Subject Matter Experts |

x

RAR001000

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

| | |
|---|---|
| SRST | Standing Rock Sioux Tribe |
| SRV | Surge Relief Valve |
| THC | Total Hydrocarbon Concentrations |
| µg | Microgram |
| USA | Unusually Sensitive Area |
| USACE | U.S. Army Corps of Engineers |
| WT | Wall Thickness |
| YST | Yankton Sioux Tribe |

xi

Draft: July 31, 2018

RAR001001

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

# Technical Analysis of Remand Items

Draft: July 31, 2018

RAR001002

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

# I.   Introduction and Background

The approximately 1,168-mile Dakota Access Pipeline (DAPL) connects the Bakken and Three Forks oil production region in North Dakota to an existing crude oil market hub near Patoka, Illinois. The pipeline crosses three U.S. Army Corps of Engineers (USACE) Districts: Omaha, Rock Island and St. Louis.

The area of primary concern for present purposes is the Lake Oahe crossing at the border between Morton and Emmons Counties in North Dakota, which is 0.55 miles north of the northern boundary of the Standing Rock Sioux Tribe's (SRST) Reservation (Figure A-1, Appendix A). Accordingly, the responses within this document are specific to the DAPL segment associated with the Lake Oahe crossing, including areas of potential effects, unless otherwise noted. The Lake Oahe segment was completed in Spring 2017, and is defined as the length of the pipeline, installed using the horizontal directional drilling (HDD) technique a minimum of 28 meters (m) (92 feet [ft]) below the bed of Lake Oahe and on adjacent federal property over which the USACE has regulatory authority.

The USACE had three actions on the application submitted by Dakota Access, LLC (Dakota Access):

- First, the USACE issued the permissions required by Section 14 of the Rivers and Harbors Act of 1899 (RHA), 33 U.S.C. § 408 (Section 408), to allow Dakota Access to lay the pipeline at seven locations on real property interests acquired by the USACE for navigation or flood control projects, including a flowage easement north of Lake Sakakawea and Lake Oahe Project lands in North Dakota. However, before the USACE could grant the Section 408 permissions, it first had to determine that the pipeline would not be injurious to the public interest and would not impair the usefulness of the Lake Sakakawea and Lake Oahe Projects.
- Second, the USACE verified activities at more than 200 locations along the DAPL route as consistent with Nationwide Permit (NWP) 12 under the Clean Water Act, 33 U.S.C. § 1344, and Section 10 of the RHA, 33 U.S.C. § 403.
- Finally, the USACE executed a real estate easement authorized by the Mineral Leasing Act, 30 U.S.C. § 185 to lay the pipeline on Lake Oahe Project land, and a consent to cross the flowage easement at Lake Sakakawea. The USACE could not verify the NWP 12 permits at crossings subject to Section 408, or issue the referenced real estate outgrants until the Section 408 determinations were made.

The Section 408 determination was subject to the National Environmental Policy Act (NEPA), and the Omaha District published a draft Environmental Assessment (EA) for public comment on December 8, 2015. See 40 C.F.R. § 1508.9 (defining EAs). After reviewing the comments received, the USACE published the final EA and a Finding of No Significant Impact (FONSI) for the crossing on July 25, 2016. See 40 C.F.R. § 1508.13 (defining FONSIs).

SRST initiated litigation in the U.S. District Court for the District of Columbia (Court) on July 27, 2016, seeking a preliminary injunction to suspend, among other things, the USACE's verifications that water crossings associated with the pipeline met the terms and conditions of NWP 12. SRST's injunction request focused on alleged failures by the USACE to consult under Section 106 of the National Historic Preservation Act (NHPA), 54 U.S.C. § 306108. The Court denied SRST's request for a preliminary injunction on September 9, 2016. SRST appealed that decision to the U.S. Circuit Court of Appeals for the District of Columbia Circuit and the appeal was ultimately dismissed.

On January 24, 2017, the President of the United States issued a Construction of the Dakota Access Pipeline, Memorandum for the Secretary of the Army to review and approve requests to construct and operate the pipeline "to the extent permitted by law and as warranted, and with such conditions as are

1

RAR001003

necessary or appropriate." The USACE issued Dakota Access an easement for the Lake Oahe crossing on February 8, 2017. The SRST and Cheyenne River Sioux Tribe (CRST) filed motions for summary judgment in the U.S. District Court (July 2016). The Lake Oahe segment was completed and began operating on June 1, 2017. In the June 14, 2017 Memorandum Opinion addressing the summary judgment motions, *Standing Rock Sioux Tribe v U.S. Army Corps of Engineers*, 255 F.Supp.3d 101 (Memorandum Opinion), the Court determined that the USACE needed to further consider the following three items:

***A. The impacts of an oil spill on fishing and hunting rights;***

***B. The environmental justice (EJ) implications of the project; and***

***C. The degree to which the pipeline's effects are likely to be highly controversial.***

As a result, the USACE reconsidered the relevant portions of its EA, and the following sections of this document address these three items. Due to the amount of information prepared and analyzed for each of these items, additional information is provided as referenced reports or within the Appendices.

Draft EA Published
12/8/2015
Final EA Published
7/25/2016
SRST Initiated Litigation
7/26/2016
Court Denies Request for Preliminary Injunction
9/9/2016
Documents Filed (see Table C-1)
10/2016- 1/2017
Memorandum to Construct DAPL
1/24/2017
Easement Granted
2/8/2017
Documents Filed (see Table C-1)
2/2017- 8/2017
DAPL In-Service
6/1/2017
SRST-CRST Memorandum Opinion
6/14/2017

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

## II.    Analysis of Remand Items

Per the June 14, 2017, United States District Court for the District of Columbia ruling in *Standing Rock Sioux Tribe, et al v. United States Army Corps of Engineers, et al*, Civil Action No. 16-1534, the USACE has reconsidered, on remand, specified sections of its final EA, reviewed and significantly discussed the relevant issues and opposing viewpoints, and conducted significant factual and technical analysis of spill model results, downstream receptor impacts, and impacts to EJ.

This remand package details the additional in-depth review and analysis performed by the USACE in response to the three items addressed in the Court's Memorandum Opinion.  The three items are detailed below. Due to the amount of information prepared and analyzed for each of these items, additional information is provided as referenced supporting reports or within the Appendices (A-C).



3

Draft: July 31, 2018

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

**Remand Item A: Impacts on Fishing and Hunting Rights**

Draft: July 31, 2018

RAR001006

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

### A.  Impacts on Fishing and Hunting Rights

As noted on page 134 of the Memorandum Opinion, the Court required further consideration of the evaluation of the impacts of an oil spill on fishing and hunting resources. The Court referenced fishing and hunting related concerns expressed by the SRST after the publication of the July 2016 Final EA. Correspondence was received from the SRST, the CRST, the Oglala Sioux Tribe (OST), and the Yankton Sioux Tribe (YST) during February through April 2018 regarding Tribal practices, biological surveys, emergency response coordination, and other issues.  Background information on biological resources, cultural practices or other pertinent information were considered in the USACE analysis of impacts to hunting and fishing and detailed further in the "Review of Environmental Effects of Oil Releases on Downstream Receptors, Dakota Access Pipeline Project, Lake Oahe, North Dakota (HDR, 2018), henceforth referred to in this document as the "Downstream Receptor Report".

In order to provide a more comprehensive evaluation of the impacts of an inadvertent release on fishing and hunting resources, the USACE considered the following:

1. The likelihood of the occurrence of a spill and potential magnitude of a release.
2. The "fate" and transport of an inadvertent release of oil into Lake Oahe.
3. Potential damages to the fishery and game resources in and adjacent to Lake Oahe and their duration (permanent or temporary).
4. Measures in place to mitigate potential impacts. These include both measures to avoid and mitigate the impacts of a spill, mechanisms for restoration and compensation for damages.

**1.  Likelihood of Occurrence and Spill Magnitude**

As stated in the July 2016 EA, given the engineering design and proposed installation methodology, the risk of a release from DAPL that could significantly impact Lake Oahe and the surrounding area is low. In order to determine the likelihood of a release during DAPL operations, the USACE analyzed the frequency of an incident occurring (incident frequency) using publicly available historical data (PHMSA, 2017)[1]. The calculated incident frequency for "onshore pipeline, including valve sites" is 0.00079 incident/mile-year based on an analysis of the active 2004 to 2016 database maintained by the Pipeline and Hazardous Materials Safety Administration[2] (PHMSA, 2017). This equates to the equivalent of one spill every 1,280 years for any one-mile segment.[3]

It should be noted that the calculated incident frequency referenced above includes releases from older pipelines that were not built according to current PHMSA requirements or industry standards. New pipelines benefit from improvements in design, construction, operation, and inspection. Therefore, the actual number of incidents per mile for new pipelines constructed to current requirements and standards is anticipated to be substantially lower than predicted values that are based on a history of releases for all pipelines, regardless of their age.

Additionally, based upon a review of the PHMSA Reportable Incident Data for Hazardous Liquid and Gas Transmission Pipelines (2010-Present), the likelihood of a failure at an HDD crossing—the type used here—is extremely low. Of the 3,838 reportable incidents that occurred over the past 7.5 years, only 3

---

[1] PHMSA, 2017.  Pipeline and Hazardous Materials Safety Administration Pipeline Incident Statistics. http://www.phmsa.dot.gov/pipeline/library/data-stats/pipelineincidenttrends.  Accessed July 2017.
[2] In 2002, PHMSA instituted a 5-gallon spill reporting limit. Prior to this change, only spills over 2,100 gallons or 50 bbls were reported.  The annual report data for hazardous liquids reported by PHMSA is for 2004 through 2016.
[3] Incidents that occurred along DAPL and connecting pipelines during startup and initial operation of the pipeline do not materially change the likelihood of an incident along a given one-mile segment of the pipeline.

Draft: July 31, 2018

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

involved an HDD crossing (0.08%). One was due to internal corrosion of a natural gas pipeline installed in 1957. One was due to an exposed natural gas pipeline. One resulted in a 1.7 bbl release with subsequent 0.9 bbl recovery.

Examination of the PHMSA annual report for hazardous liquids dataset for "onshore pipeline, including valve sites" from 2010 to present shows that the *extent* of a release for the majority of actual pipeline spills is also relatively small (PHMSA, 2017). For pipelines with a diameter of 16 inches or greater, the volume released in 50% of the spills was less than 4 barrels (bbls). Seventy five percent of these spills were below 75 bbls; ninety percent of the spills were below 3,000 bbls; and 95% were below 7,600 bbls. These data demonstrate that most pipeline spills are small and releases of 10,000 bbls or more (considered large spills according to PHMSA) are extremely uncommon (PHMSA, 2017).

Although the risk of a significant release at Lake Oahe is extremely low, in response to Remand Item A, the USACE performed further evaluation of the effects of an inadvertent release to Lake Oahe hunting and fishing resources. The USACE submitted an information request letter, dated August 24, 2017, to Dakota Access requesting, among other things, an analysis of the impact of various spill scenarios at the Lake Oahe DAPL crossing, and asked for the analysis to include both the worst-case scenario and a scenario that more closely correlates with the "majority of spills seen in actual releases".

To address the requests in the USACE letter, additional computational modeling of the Lake Oahe crossing was performed that evaluated hypothetical unmitigated scenarios and the potential fate and transport of crude oil in Lake Oahe in the event of a release. This report, "*Evaluation of Hydrocarbon Releases into Lake Oahe using OILMAPLand and SIMAP Trajectory, Fate, and Effects Modeling for the Dakota Access Pipeline. RPS 2018*" is hereafter referred to as the "Spill Model Report". In the Spill Model Report, releases of oil were modeled at the following two locations along the Lake Oahe segment (Figure A-1, Appendix A):

i.   The first inadvertent release modeled was a hypothetical, full bore rupture (FBR) of a pipeline at the interface of lake-bed sediment and lake water at the center of the Lake Oahe crossing[4]. A hypothetical release at the sediment / water interface provides a conservative estimate of the effects of an actual release and maximizes the speed and total volume of oil entering the water column.

ii.  The second release modeled was a hypothetical FBR at the ND-380 valve site located on land, adjacent to the west side of the lake. The valve site was selected to represent a FBR on the above-ground portion of the pipeline.

Two high release volumes were modeled at each of the above locations in the Spill Model Report:

i.   For the release at the bottom of the Lake Oahe crossing, a FBR volume of 12,517 bbls were used as the worst-case scenario release volume calculated in accordance with 49 CFR § 194.105 guidance. This is the estimated volume of oil that could leave the pipeline under pressure before

---

[4] It is impractical to model an actual release from the rupture of the pipeline as it was installed because the oil would have to rise vertically through the low permeability alluvium and glacial deposits, as well as the low permeability sediments that have accumulated at the bottom of the lake, before reaching the sediment / water interface.

6

Draft: July 31, 2018

RAR001008

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

the pumps are shut down, plus the volume of oil remaining in the pipeline between the next nearest valves[5]. The volume was calculated based on the as-built conditions.

A second volume of 2,934 bbls were used at the Lake Oahe crossing to represent the "majority of spills" based on a review of the PHMSA dataset for "onshore pipeline, including valve sites" from 2010 to present (PHMSA, 2017). This volume was selected as a conservative "majority of spills" as it represents a spill volume that is greater than 90% of actual releases from pipelines 16-inch or greater. As already noted, the model does not account for the 28 m (92 feet) or more of low permeability alluvium and glacial deposits separating the pipeline as-built from the lake bed.

ii. For the valve site, 5,519 bbls were used as the FBR volume as this was the hypothetical worst-case release from this location calculated in accordance with 49 CFR § 194.105 guidance.

The 90 PD volume of 2,934 barrels was used to represent the "majority of spills" at the valve site.

Downstream and near-upstream water intakes for drinking water and local agricultural use were considered to be potentially impacted by a spill from the modeled release locations. The study area for the 10-day unmitigated plume modeling was determined from the initial model results. The study area included approximately 88 river miles extending upstream and downstream of the hypothetical modeled release locations as indicated in Figure A-1, Appendix A. Intakes 1 and 2 are located upstream of the DAPL crossing location while the other intake locations indicated in Table A-1 are all downstream of the DAPL crossing location. Based on the model results, the footprints for potential surface oil exceeding a threshold thickness had a maximum predicted upstream extent due to wind conditions of approximately 3.7 miles and downstream extent of approximately 65.2 miles – all within the predicted study boundary.

**Table A-1. Lake Oahe Water Intakes**

| Water Intake[611] | Description / Owner | Distance Downstream from Crossing Location | |
|---|---|---|---|
| | | Miles | Kilometers |
| 1 | Upstream Intake* | 3.62 | 5.83 |
| 2 | Upstream Intake* | 2.21 | 3.56 |
| 3 | Local Agricultural Intake† | 4.44 | 7.15 |
| 4 | Tribal Agricultural Intake† | 8.08 | 13.00 |
| 5 | South Central Regional Water District Intake† (non-Tribal)† | 11.32 | 18.22 |
| 6 | Unspecified Intake | 24.11 | 38.80 |
| 7 | Fort Yates Municipal Drinking Water Intake | 26.78 | 43.10 |
| 8 | Unspecified Intake | 27.87 | 44.85 |
| 9 | Tribal Farms Agricultural Intake | 29.34 | 47.22 |
| 10 | Unspecified Intake | 37.47 | 60.30 |
| 11 | Unspecified Intake | 38.67 | 62.23 |
| 12 | Unspecified Intake | 43.02 | 69.23 |
| 13 | Unspecified Intake | 47.05 | 75.72 |
| NL¥ | City of Mobridge Municipal Drinking Water Intake (non-Tribal) | 71.5 | 115.1 |
| 14¥ | Standing Rock Sioux Tribe Replacement Drinking Water Intake | 75.41 | 121.36 |

[5] The methodology for this calculation is described in the "Dakota Access Pipeline Project, North Dakota, Lake Oahe Crossing Spill Model Discussion, Document No.: DAPL-WGM-GN000-PPL-STY-0019, Wood Group Mustang Project No.: 10395700. May 2016".

7

Draft: July 31, 2018

RAR001009

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

| 15NL* | Cheyenne River Sioux Tribal Intake | 156 | 251.06 |
|---|---|---|---|

* Upstream intakes were added to account for the potential upstream transport of surface oil by wind.

† List of intakes may not include all agricultural intakes, but represents the distribution of intakes along the Missouri River within the model domain.

§ Although all known drinking water intakes within the model domain are represented in the analysis, it is recognized that additional agricultural / other purpose intakes may be present.  What was modeled was a representative sample with a large geographic spread to represent the distribution of intakes along the Missouri River within the model domain. Note that the operation of some intakes may depend on the season.

¥ Note that the City of Mobridge, the Standing Rock Sioux Tribe Replacement Drinking Water Intake (#14 is), and the Cheyenne River Sioux Tribal Intake are located outside of the model domain.  HoweverThe results figures do not depict these intakes because, as noted in Figure A-4, Appendix A, oil was not predicted to reach this locationthese locations within the modeled 10 day timeframe. Therefore, results figures do not depict this(Note: NL indicates intake not included/assigned number in the Spill Model Report, RPS 2018).

## 2.  Fate and Transport of an Inadvertent Release of Oil into Lake Oahe

This subsection was developed using information from the Spill Model Report, described further below.

The four scenarios described under Consideration 1 above (two locations and two volumes at each location) were modeled to determine the fate and transport of the hypothetical releases. A two-dimensional overland and downstream trajectory and fate model, OILMAPLand, was used in the EA to assess the overland flow portion of potential spills from an upland location until the spill reached the mouth of the Cannonball River at Lake Oahe. In response to the Court's June 14, 2017 Memorandum Opinion, a new three-dimensional in-water oil trajectory, fate, and biological effects model, Spill Impact Model Analysis Package (SIMAP), was used to assess potential downstream effects of a release and provide data to estimate the ecological effects to beneficial uses of Lake Oahe. Simply stated, OILMAPLand (the original tool) models upland spills and SIMAP (the tool added for the remand process) models in-water spills.

The SIMAP modeling system is a comprehensive three-dimensional modeling system that was developed by Applied Science Associates, Inc. (ASA), now operating as RPS, over many years to provide an understanding of the movement, behavior, and potential effects of crude oil for releases into water. SIMAP originated from the oil fates and biological effects sub-models in the Natural Resource Damage Assessment Models for Coastal and Marine Environments (NRDAM/CME) and Great Lakes Environments (NRDAM/GLE), which ASA developed in the early 1990s for the U.S. Department of the Interior for use in "type A" Natural Resource Damage Assessment (NRDA) regulations under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA). The most recent version of the type A models, the NRDAM/CME (Version 2.4, April 1996), was published as part of the CERCLA type A NRDA Final Rule (Federal Register, May 7, 1996, Vol. 61, No. 89, p. 20559-20614). The technical documentation for the NRDAM/CME is in French et al. (1996)[5]. This technical development involved several in-depth peer reviews, as described in the Final Rule.

Although Dakota Access is committed to responding to a release within six hours, the Spill Model Report assumed no mitigation of any kind for the entire model run of 10 days. Almost 300 model runs were performed for each of the four scenarios above to provide a range of calculated fate and transport trajectories. The modeling investigated the influence of environmental variability (e.g., wind and water

---

[5] French, D., M. Reed, K. Jayko, S. Feng, H. Rines, S. Pavignano, T. Isaji, S. Puckett, A. Keller, F.W. French III, D. Gifford, J. McCue, G. Brown, E. MacDonald, J. Quirk, S. Natzke, R. Bishop, M. Welsh, M. Phillips, and B.S. Ingram, 1996. Final Report, The CERCLA Type A Natural Resource Damage Assessment Model for Coastal and Marine Environments (NRDAM/CME), Technical Documentation, Vol. I - V., Office of Environmental Policy and Compliance, U.S. Department of the Interior, Washington, DC, Contract No. 14-0001-91-C-11.

8

Draft: July 31, 2018

RAR001010

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

current conditions) for the modeled time period, during all seasons and over multiple years (as noted below), on trajectory and fate. The simulation timeframes were delineated by seasons (e.g., spring/early summer, fall, and winter – including ice cover) and characteristic flow occurring within the identified timeframes to capture the variable environmental conditions at each site. Site-specific geographic and environmental parameters were used in the modeling of each hypothetical release location including USACE Lake Oahe cross-section data from 2007 and 2012; USGS and USACE discharge data from gaging stations; USACE monthly reservoir statistics from 1967-2017, and wind data from the U.S. National Centers for Environmental Prediction Climate Forecast System Reanalysis (CFSR) model for the period between 2000 and 2010. While the variability in certain environmental parameters was targeted for each scenario (e.g. hydrodynamics, winds, temperature, concentration of total suspended solids, etc.), it is important to note that seasonally appropriate values for all modeled environmental parameters were characterized at each modeled location based upon the identified season for each hypothetical release date modeled. As an example, modeled wintertime conditions with low river flow aligned with low temperature, higher wind speeds, and low total suspended solids, which are characteristic of that specific season.

The detailed results of the modeling of the four unmitigated release scenarios are presented in the Spill Model Report. The Spill Model Report was reviewed by USACE staff at the USACE Omaha District, as well as environmental sciences research specialists at the U.S. Army Engineer Research and Development Center (ERDC) in Vicksburg, Mississippi. The USACE staff is in agreement with the methodology and results presented. The Spill Model Report is incorporated by reference and results are summarized below.

a)   *Spill Model Results*

Each of the four scenarios had 290 individual model runs (97 individual trajectories modeled under springtime high river flow conditions, 96 under summer and fall with average river flow conditions, and 97 under wintertime low river flow conditions) for a total of 1,160 total model runs. Each run was initialized with a different start date/time within the 10-year period of available climate data to sample the range of environmental conditions (notably winds) present over multiple years. The dates and times were selected randomly from within 14 day intervals spanning the entire 10 years of data.

A stochastic or probabilistic approach was employed to determine the footprint and associated probability of areas that may be at increased risk of oil exposure based upon the variability of meteorological and hydrodynamic conditions that might prevail during and after a release. A stochastic scenario is a statistical analysis of results generated from many different individual trajectories of the same release scenario, with each trajectory starting at a randomized start date in a long-term window. For this project, individual trajectory start dates were selected randomly every 10 days throughout the window of environmental data coverage to ensure that the data were adequately sampled (total of 290 individual runs). This stochastic approach allows for the same type of release to be analyzed under varying environmental conditions (e.g., summer vs. winter or one year to the next). The results provide the probable behavior of the potential releases based upon the variability in the environmental data over many years.

The stochastic analysis provides insight into the probable behavior of oil releases given historic wind and current data for the Lake Oahe region. A deterministic analysis was also employed, providing individual trajectory, oil weathering information, expected concentrations or thicknesses of oil contamination, mass balance, and other information related to a single release at a given location and time.

9

Draft: July 31, 2018

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

The intent of the deterministic analysis was to provide representative individual releases, based on specific parameters for each single event, to provide a range of potential biological effects that may be possible under different geographic and environmental conditions. The results of the deterministic simulations provide a time history of the fate and weathering of oil over the duration of the release (mass balance), expressed as the percentage of released oil on the water surface, on the shoreline, evaporated, entrained in the water column, and degraded (RPS, 2018)[6].

Representative deterministic scenarios (i.e., individual trajectories) were identified from each set of stochastic results. Individual scenarios were selected based upon the total area of the oil at the surface (surface oil footprint) at any given time, the mass of oil on shorelines, and the concentration of dissolved hydrocarbons in the water column, based upon a set of highly conservative thresholds for effects to beneficial lake use:

- Surface oil average thickness > 0.01 µm
- Shore oil average concentration > 1.0 g/m$^2$
- Subsurface (within the water column) dissolved hydrocarbon concentrations > 1.0 µg/L.

Individual "worst-case" trajectories of interest were identified and selected from the collection of stochastic results for a deterministic analysis to characterize the upper bound of anticipated effects following a release. The selected deterministic scenarios included the identified 95th percentile runs (i.e. the top 5% worst-case scenarios) for surface oil footprint, mass of oil on shorelines, and water column contamination identified for each release location. Therefore, very low probability spill events (FBR and 90 PD) are modeled and then used to identify even lower probability but credible "worst-cases" (i.e., highly conservative subset of all modeled scenarios) as the basis for spill planning and preparedness.

Stochastic footprints for potential surface oil exceeding a thickness of 0.01 µm had a maximum predicted downstream extent of approximately 65 miles and an upstream extent (which is possible depending on prevailing winds) of approximately four miles. This distribution is illustrated in Figure A-2 (Appendix A) where the top portion shows the probability of surface oil thickness exceeding 0.01 µm and the bottom portion shows the minimum time to threshold exceedance resulting from a FBR (12,517 bbls) at the Lake Oahe crossing (i.e., the greatest volume of release modeled). It should be noted that the screening level for potential ecological effects is 100 µm, making it 10,000 times greater than the threshold of 0.01 µm used in the model. The much smaller surface oil average thickness of 0.01 µm or greater was chosen as a conservative threshold to determine potential effects on lake uses such as fishing or recreational boating given that this is the thickness at which sheens are visible on the water surface.

The lengths (i.e., the distances along the lake) of predicted contamination for dissolved hydrocarbon concentrations exceeding 1 µg/L were slightly shorter (by approximately 10 miles) than those for surface oil exceeding a thickness of 0.01 µm.

While the areas of potential impact in the Spill Model Report were quite large, most of this footprint represents a relatively low probability (<10%) of surface oil thickness > 0.01 µm. Footprints depicting higher probability (90%) of surface oil thickness yield only a fraction of the total footprint. The highest predicted potential (41%) for oil to contact shorelines exceeding 1 g/m$^2$ occurred in the larger volume FBR scenarios from the on-land valve site, due to its origin and initial travel path in proximity to the shore.

---

[6] RPS, 2018. Evaluation of Hydrocarbon Releases into Lake Oahe using OILMAPLand and SIMAP Trajectory, Fate, and Effects Modeling for the Dakota Access Pipeline.

Draft: July 31, 2018

RAR001012

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

For most high and average river flow modeled representative deterministic scenarios under the first model (a release from the Lake Oahe pipeline crossing at the sediment / water interface), it was predicted that by the end of the 10-day simulation period, roughly 45-46% of the released oil evaporated, 26-29% entrained into the water column within a few meters of the lake's surface, 19-21% contacted the shoreline, 4-5% degraded, and <1% adhered to suspended sediments within the water column and sank to the bottom (i.e. sunken oil). Near zero values were predicted in the water column at depths greater than 10 m (32.8 feet). During the wintertime low river flow conditions, modeled with 100% ice cover, released oil was trapped under the ice in the top layers of the water column. Thus, mass balance predictions differed, in that roughly 57% of the released oil was predicted to remain entrained in the water column, while 43% was predicted to degrade.

As was the case with the modeled release from the sediment / water interface, Bakken crude oil was predicted to evaporate rapidly from a release at the above-ground valve site (the second model), with approximately 40-45% evaporating to the atmosphere within the first day.

At the end of the 10-day simulations for this second model, there was little to no oil predicted to remain floating on the water's surface, while it was predicted that >35% of released oil evaporated, >24% entrained into the top layers of the water column, <1% adhered to the sediments, >9% made contact with the shoreline, and >5% decayed. In that same time, a large portion of the released oil remained less than 45 miles downstream of the release location and would be predicted to continue moving downstream as time progressed if left unmitigated. The leading edge of the floating oil for each of the representative deterministic scenarios was predicted to extend 0-50 miles downstream of the release location. The amount of evaporation and degradation was relatively consistent between model simulations with assumed high or average river flow conditions.

Although >35% of the oil was predicted to evaporate within the 10-day modeled period, during high and average river flow conditions, shoreline and surface oiling is possible. Furthermore, under high wind conditions, entrainment of surface oil into the top layers of the water column is possible. A portion of this entrained oil and dissolved hydrocarbons were predicted to result in sediment oiling although the total is still <1%. Oil released from the bottom of Lake Oahe at the sediment/ water interface during low river flow winter conditions with complete ice coverage, experienced much different environmental conditions when compared to the simulations in the high or average river flow conditions.

The wintertime low-flow scenario involved released oil trapped under the ice in the top layers of the water column resulting in a higher percentage of the released oil (roughly 57%) remaining entrained in the water column. Ice cover also affects the total hydrocarbon concentration, which mainly represents whole oil droplets underwater. However, the modeled ice cover also trapped the hydrocarbons in the immediate vicinity of the release location (minimizing its travel downstream) and also prevented shoreline oiling.

It should be noted that the deterministic analysis provided an estimate of the oil's transport through the environment as well as its physical and chemical behavior for a specific set of environmental conditions. The stochastic analysis provided insight into the probable behavior of oil releases given the variability of historic wind and current data over a long time period (i.e. years) for the Lake Oahe region, whereas the deterministic analysis provided individual trajectory, oil weathering information, expected concentrations or thicknesses of oil contamination, mass balance (accounting for the full amount of oil released), or other information related to a single release at a given location and time (i.e. days).

The stochastic thresholds that were used in displaying the results of the spill modeling were highly conservative, meaning they were at the low end of possible thresholds. As such, the stochastic thresholds essentially serve as a binary presence / absence of oil in the associated trajectory and fate results. The

11

RAR001013

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

simple fact that a stochastic threshold is predicted to be exceeded at any single point in time within a scenario therefore does not mean there will be negative effects (see additional discussion under Remand Item B).

It should also be noted that the stochastic and deterministic maps of water column contamination of dissolved hydrocarbons in the Spill Model Report depict the likelihood that concentrations will exceed the identified threshold at any depth within the water column; the maps do not specify the depth at which this threshold will be exceeded. It would therefore be incorrect to interpret the results as if the entire water column (i.e., from surface to bottom) would experience a concentration above the threshold. It is likely that only the top few meters of the water column would experience high concentrations of a particular contaminant, which may not be where the species of concern spends a particular portion of its life cycle. For example the stochastic model results in Figure A-3, Appendix A, show the probability of exceeding 1 µg/L from a spill volume of 12,517 bbls, under Lake Oahe. Figure A-4, Appendix A, shows the composite results from a deterministic scenario for maximum total dissolved hydrocarbon concentration over the 10-day modeling period. These figures represent the maximum concentration of hydrocarbons that was predicted for each location at any point in time during the 10-day modeling period, as well as the maximum concentration at any depth. This is relevant because concentrations may be higher near the surface (the top few meters), associated with floating oil and surface mixing, while concentrations in the subsurface environment may be minimal or non-existent. Table A-2 lists the maximum predicted dissolved hydrocarbon concentrations (DHC) at representative water intake locations at the downstream portion of the model domain at the end of the 10-day modeling period, showing that the highest concentrations occur in the top 5-10 meters, with little to no predicted concentrations at depths below 10 meters.

**Table A-2. Predicted worst-case hydrocarbon contamination at representative locations at the downstream end of the model domain at the end of the 10-day modeling period.**

| Maximum Dissolved Hydrocarbon Concentration (µg/L) in region of intake locations | | | | |
|---|---|---|---|---|
| Depth Bin | 26.8 Miles Downstream (Intake 7 Area) | 38.7 Miles Downstream (Intake 11 Area) | 43.0 Miles Downstream (Intake 12 Area) | 47.1 Miles Downstream (Intake 13 Area) |
| 0-5 m  (0 to 16.4 ft) | 145 | 58 | 62 | 38 |
| 5-10 m  (16.4 to 32.8 ft) | 74 | 2 | 61 | 18 |
| 10-20 m  (32.8 to 65.6 ft) | 0 | 0 | 1 | 2 |
| 20-25 m  (65.6 to 82.0 ft) | 0 | 0 | 0 | 0 |
| Maximum in water column | 145 | 58 | 62 | 38 |

### 3.  Potential damages to the fishery and game resources

The spill modeling described under Consideration #2 was used to characterize the fate and transport of hydrocarbons to provide an understanding of the potential spatial extent, associated probabilities, and potential effects (i.e. acute mortality) that could occur following a large volume release of oil under a range of environmental conditions. Accordingly, potential biological effects were modeled. Aquatic biota (e.g., fish, invertebrates) are affected by DHC (dissolved hydrocarbon concentrations) in the water or sediment. The biological exposure component of the SIMAP model (biological effects model) estimated the volume and area of water (and stream length, as appropriate) that would be affected by surface oil, concentrations of oil components in the water, sediment contamination, and the mass of oil on shorelines.

12

Draft: July 31, 2018

RAR001014

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

It also estimated losses resulting from acute exposure after a spill (i.e., losses at the time of the spill and while acutely toxic concentrations remain in the environment) in terms of direct mortality.

The biological effects model was used to predict the equivalent areas of 100% mortality for each deterministic scenario for surface and shoreline effects, as well as in-water effects at two different sensitivity thresholds including 5 µg/L of dissolved hydrocarbon mixtures (e.g. Polycyclic Aromatic Hydrocarbons [PAHs]), which represented sensitive species; and 50 µg/L of dissolved hydrocarbons, which represented average sensitivity species. Lethal concentration thresholds are expressed as $LC_{50}$, meaning the concentration at which 50% of exposed organisms will die when exposed for a specified duration. Thus, the "snapshots" of maximum concentration of 5 µg/L depicted on maps do not correlate with 50% predicted mortality. Rather, the time varying concentration and the duration of exposure determine the percentage of mortality within each given region. For the relatively short durations of exposure that are predicted for these model results (generally only minutes to several hours), a given concentration would need to be much higher than the relevant $LC_{50}$ threshold before 50% of exposed organisms would die.

Potential effects were assessed based upon conservative thresholds for surface floating oil, shoreline oil, and in-water contamination. Metrics used to discuss results include predicted shortest time to shoreline oiling, maximum concentration of contaminants in the water column, and maximum surface area of floating oil. The 95th percentile scenarios from the stochastic assessment were selected as highly conservative representative deterministic model runs to assess the upper range of predicted effects possible under any condition. Results can be used to identify shorelines, drinking water intakes, and other resources that have the potential to be at risk should there be a large volume release of oil, and determine how much time may be available to protect them.

Overall, the maximum Total Hydrocarbon Concentrations (THC) were in excess of the thresholds for predicted biological effects. However, as noted under Consideration #2, the simple fact that a stochastic threshold is predicted to be exceeded at any single point in time within a scenario does not mean there will be negative effects. To ascertain the true potential acute mortality to aquatic life, it is critical to evaluate both the concentration and duration of exposure. In general, the predicted acute mortality was limited in Lake Oahe due to the relatively short duration of predicted exposure (several hours or less) in a given location.

Any effects would most likely result from acute rather than chronic toxicity. If there were a significant build-up in the sediments, exposure could be both acute and chronic, as the concentrations could remain elevated for longer periods of time. However, all of the modeled scenarios showed <1% of the oil located in the sediments after the 10-day modeling period. Therefore, bioaccumulation of contaminants by sediment-dwelling organisms would also likely be limited and not lead to widespread impacts to the biological community.

The model evaluates mortality and sub lethal effects in biota from dissolved aromatic concentrations in the water or sediment. Mortality is a function of duration of exposure – the shorter the exposure, the higher the concentration before effects occur. The incipient $LC_{50}$ is the asymptotic $LC_{50}$ reached after infinite exposure time (or long enough that that level is approached).

The results of the biological effects model provide estimates of the equivalent area (in km²) of 100% mortality by behavior group for wildlife and fish/ invertebrates. Model output implies that the equivalent area of 100% mortality would be the same for a release that resulted in 100% mortality over 1 km² versus 1% mortality over 100 km². In reality, however, potential acute effects following a release can vary greatly by space, time, and percent mortality.

13

Draft: July 31, 2018

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

*a)* **_Hydrocarbons in the Water Column_**

For the twelve 95th percentile representative "worst-case" scenarios, the maximum area of potential mortality from water column exposure was nearly 30% of the modeled area based on the 5 µg/L threshold for "sensitive aquatic species" (Table A-3). For the same release scenario, the maximum area of potential mortality from water column exposure drops to approximately 2.5% of the modeled area based on the 50 µg/L threshold for aquatic species (Table A-3).

The time series modeling results show that concentrations above biological thresholds occur for short durations only. The 50 µg/L threshold for aquatic species of average sensitivity is exceeded for only a few hours (Figure A-5, Appendix A). Toxicity is a function of concentration and duration; therefore, it is likely that although a relatively large area could be exposed to higher concentrations at some depth in the water column, the acute toxic mortality would be localized. Of the 12 deterministic scenarios selected, only two have mortalities over the equivalent of 10% of the modeled area at the most sensitive (5 µg/L) level. Only one is over the equivalent of 1% of the modeled area at the average sensitivity species (50 µg/L) level.

**Table A-2. River area (km$^2$) and percent of total modeled area (%) affected (for the modeled domain, total area listed in left hand column) by acute toxicity, expressed as equivalent area of 100% mortality for aquatic biota at two sensitivities to PAHs in oil: sensitive (5 µg/L) and average (50 µg/L).**

| Spill Location and Scenario | | Sensitive Species (5 µg/L) | | Average Species (50 µg/L) | |
|---|---|---|---|---|---|
| | | Area (km$^2$) | Percent (%) | Area | Percent |
| **Lake Oahe Pipeline Crossing** <br><br> Total Area: 252 km$^2$ | FBR – 95th Percentile Surface Exposure | 15.2 | 6.0 | <0.1 | <0.1 |
| | FBR – 95th Percentile Water Column Exposure | 1.8 | 0.7 | <0.1 | <0.1 |
| | FBR – 95th Percentile Shoreline Exposure | 15.2 | 6.0 | <0.1 | <0.1 |
| | 90 PD Release – 95th Percentile Surface Exposure | 16.7 | 6.6 | 0.1 | <0.1 |
| | 90 PD Release – 95th Percentile Water Column Exposure | 1.7 | 0.7 | <0.1 | <0.1 |
| | 90 PD Release – 95th Percentile Shoreline Exposure | 17.3 | 6.8 | 0.1 | 0.1 |
| **ND-380 Valve Site** <br><br> Total Area: 252 km$^2$ | FBR – 95th Percentile Surface Exposure | 3.5 | 1.4 | 1.3 | 0.5 |
| | FBR – 95th Percentile Water Column Exposure | 0.3 | 0.1 | <0.1 | <0.1 |
| | FBR – 95th Percentile Shoreline Exposure | 0.3 | 0.1 | <0.1 | <0.1 |
| | 90 PD Release – 95th Percentile Surface Exposure | 0.1 | <0.1 | <0.1 | <0.1 |
| | 90 PD Release – 95th Percentile Water Column Exposure | 74.7 | 29.6 | 6.3 | 2.5 |
| | 90 PD Release – 95th Percentile Shoreline Exposure | 40.8 | 16.2 | <0.1 | <0.1 |

Draft: July 31, 2018

RAR001016

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

b)      *Hydrocarbons on the Water Surface*

The area of potential effects on birds was evaluated as the area of the river covered by oil above the thickness threshold for acute effects at any time during the scenario. The thickness threshold used in modeling scenarios was 10 µm. This threshold does not imply direct loss of all wildlife in the area because actual effects will differ by species depending on the percent likelihood of encountering oil, which is in part based on behavior. All twelve of the deterministic model runs of fate and transport that represent "worst-case" scenarios indicated that < 0.1% of the surface of Lake Oahe would have oil thickness greater than 10 µm (Table A-4).

**Table A-4. Total lake area (km$^2$) and percent (%) of total lake area (for the modeled domain, total area listed in column 1) oiled above a threshold for potential acute effects on wildlife (> 10 µm).**

| | Spill Location and Scenario | Lake Area (km$^2$) | % of Lake Area |
|---|---|---|---|
| **Lake Oahe Pipeline Crossing**<br><br>Total Area: 252 km$^2$ | FBR – 95th Percentile Surface Exposure | <0.1 | <0.1 |
| | FBR – 95th Percentile Water Column Exposure | <0.1 | <0.1 |
| | FBR – 95th Percentile Shoreline Exposure | <0.1 | <0.1 |
| | 90 PD Release – 95th Percentile Surface Exposure | <0.1 | <0.1 |
| | 90 PD Release – 95th Percentile Water Column Exposure | <0.1 | <0.1 |
| | 90 PD Release – 95th Percentile Shoreline Exposure | <0.1 | <0.1 |
| **ND-380 Valve Site**<br><br>Total Area: 252 km$^2$ | FBR – 95th Percentile Surface Exposure | <0.1 | <0.1 |
| | FBR – 95th Percentile Water Column Exposure | <0.1 | <0.1 |
| | FBR – 95th Percentile Shoreline Exposure | <0.1 | <0.1 |
| | 90 PD Release – 95th Percentile Surface Exposure | <0.1 | <0.1 |
| | 90 PD Release – 95th Percentile Water Column Exposure | <0.1 | <0.1 |
| | 90 PD Release – 95th Percentile Shoreline Exposure | <0.1 | <0.1 |

c)      *Hydrocarbons in the Sediments*

It does not appear from the modeling results that accumulation of chemicals into consolidated sediments from a release of oil into Lake Oahe would lead to widespread impacts to the biological community. As the mass balance results from the spill model show (Table A-5), very little of the oil associated with a release would end up in the sediments, with the possible exception of particular near-shore littoral zones where wave action could lead to the incorporation of oil constituents into the sediments.

All of the scenarios showed less than 1% of the oil located in the sediments after the 10-day modeling period. Since feeding by pelagic organisms on benthic prey can then reintroduce sediment-associated

Draft: July 31, 2018

RAR001017

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

contaminants into the pelagic food webs, bioaccumulation of contaminants by sediment-dwelling organisms would also likely be limited.

**Table A-5. Summary of the mass balance information at the Lake Oahe pipeline crossing release location at the end of the 10-day simulations. All values represent a percent of the total volume of spilled oil at the last modeled time step.**

| Scenario | Surface (%) | Evaporated (%) | Water Column (%) | Sediment (%) | Ashore (%) | Degrade (%) |
|---|---|---|---|---|---|---|
| FBR Pipeline Crossing 95th Percentile Surface Oil Exposure | <0.01 | 46.71 | 28.55 | 0.39 | 19.94 | 4.41 |
| FBR Pipeline Crossing 95th Percentile Water Column Exposure | <0.01 | <0.01 | 57.40 | <0.01 | <0.01 | 42.60 |
| FBR Pipeline Crossing 95th Percentile Shoreline Exposure | <0.01 | 46.71 | 28.55 | 0.39 | 19.94 | 4.41 |
| 90 PD Release Pipeline Crossing 95th Percentile Surface Oil Exposure | <0.01 | 45.30 | 29.63 | 0.77 | 19.00 | 5.30 |
| 90 PD Release Pipeline Crossing 95th Percentile Water Column Exposure | <0.01 | <0.01 | 57.32 | <0.01 | <0.01 | 42.68 |
| 90 PD Release Pipeline Crossing 95th Percentile Shoreline Exposure | <0.01 | 46.80 | 26.25 | 0.74 | 21.49 | 4.73 |

d)      *Hydrocarbons on the Shoreline*

For the twelve deterministic model runs of fate and transport that represent the 95th percentile "worst-case" of the modeled scenarios, the maximum area of oil thickness greater than 100 μm was estimated to encompass 8.3% of the modeled shoreline (66 km) for the worst-case scenario at the Lake Oahe crossing (Table A-6). That is to say, a release of even 12,517 bbls directly into Lake Oahe would be expected to oil less than 10% of the Lake Oahe shoreline within the modeled area under the 10-day unmitigated scenario. Under the "majority of spills" volume release (90 PD release) modeled at the sediment / water interface of the Lake Oahe crossing, the estimated length of shoreline affected decreased by about 50%, from 8.3% (66 km) to 4.2% (33 km), with a maximum area of oil thickness greater than 100 μm. It should also be noted that the deterministic scenarios represent the cumulative sum of the individual worst-case of the scenarios (stacked one onto the next); the individual release

16

RAR001018

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

model results would not have impacts of this magnitude. Example of the stochastic and deterministic modeling results for shoreline oil is shown in Figure A-6, Appendix A.

**Table A-6. Shoreline length (km) and (%) of total shoreline (total shoreline lengths in the modeled domain are listed in the left hand column) oiled above a threshold for potential effects to vegetation (> 100 μm).**

| Spill Location and Scenario | | Total Shoreline Length (km) | % of Total Shoreline |
|---|---|---|---|
| **Lake Oahe Pipeline Crossing** <br><br> Total Length: 793 km | FBR – 95th Percentile Surface Exposure | 66.0 | 8.3 |
| | FBR – 95th Percentile Water Column Exposure | <0.1 | <0.1 |
| | FBR – 95th Percentile Shoreline Exposure | 66.0 | 8.3 |
| | 90 PD Release – 95th Percentile Surface Exposure | 25.6 | 3.2 |
| | 90 PD Release – 95th Percentile Water Column Exposure | <0.1 | <0.1 |
| | 90 PD Release – 95th Percentile Shoreline Exposure | 33.4 | 4.2 |
| **Lake Oahe ND-380 Valve Site** <br><br> Total Length: 793 km | FBR – 95th Percentile Surface Exposure | 3.6 | 0.5 |
| | FBR – 95th Percentile Water Column Exposure | 1.4 | 0.2 |
| | FBR – 95th Percentile Shoreline Exposure | 33.0 | 4.2 |
| | 90 PD Release – 95th Percentile Surface Exposure | 17.2 | 2.2 |
| | 90 PD Release – 95th Percentile Water Column Exposure | 5.0 | 0.6 |
| | 90 PD Release – 95th Percentile Shoreline Exposure | 18.6 | 2.3 |

The results of the Spill Model Report were utilized to determine the relative impact of released oil to fish, waterfowl, and terrestrial wildlife. These were summarized in the Downstream Receptor Report. The Downstream Receptor Report was reviewed by USACE staff within the USACE Omaha District and environmental sciences research specialists at the ERDC in Vicksburg, Mississippi. The USACE staff is in agreement with the methodology and results presented and the report is incorporated by reference. The potential impacts to hunting and fishing are summarized below.

*e)*     ***Potential Impacts to Hunting***

Big game and small game mammals prevalent in the Lake Oahe area are susceptible to harm from an oil spill if oil were to coat their fur and thus prevent it from acting as insulation from cold temperatures. Similarly, waterfowl and upland game birds could be affected by thermoregulatory challenges caused by oiling of plumage. Other direct effects include toxicological impacts, which can cause sickness or mortality. Ingestion of oil can cause gastrointestinal irritation, ulcers, bleeding, diarrhea, and digestive complications. Absorption of oil through the skin can lead to liver and kidney damage, anemia, immune and reproduction system issues. Indirect effects such as habitat impacts, food source and nutrient cycling disruptions, and alterations in ecosystem relationships are also possible in the unlikely event of a release. The extent of these effects would depend on the volume of material released; the size of the dispersal area; the type, age, and reproductive state of species present; climate; and the effectiveness of spill response measures implemented.

Draft: July 31, 2018

RAR001019

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

Game species most susceptible to the effects of an oil spill are typically birds and shoreline mammals that would come into physical contact with oil from a spill. However, behavioral responses of terrestrial game species would help to reduce potential adverse effects. Birds and mammals are mobile and generally will avoid oil-impacted areas and contaminated food. When unaffected alternative habitat is available nearby, the mortality of these species would be limited. Because of the behavioral response, and the limited total area that could be affected as described in subparagraph d above, the impact to hunting in the area from an oil spill would be minimal.

Furthermore, Lake Oahe is not the only source of fresh water for terrestrial vertebrates including deer. If the western shore of Lake Oahe was to become impacted by an inadvertent release of oil, it is likely that many terrestrial vertebrates would be able to utilize alternative sources of freshwater. Not including the Cannonball River that lines the entire northern border of the SRST Reservation, there are more than 900 miles of mapped waterways and more than 3,000 ponds within the SRST Reservation based on an analysis of the National Hydrology Dataset and National Wetlands Inventory. Although some deer or other wildlife species could ingest oil impacted water from Lake Oahe following a spill, oil contaminated water would likely not be above toxic thresholds.

*f)*     *Potential Impacts to Fishing*

A large oil spill into Lake Oahe would likely cause a localized fish kill with very limited impacts to the immediate area surrounding the site of the spill. Concentrations of crude oil in the water could result in impacts to aquatic invertebrates utilized as a food source by the local fishery. However, even under the worst-case scenarios, impacts to benthic macroinvertebrates and fish species would be of limited scale and of temporary duration and therefore impacts to fishing in the area would also be limited.

Although a release of crude oil into Lake Oahe during operations could have an adverse effect on game fish species, adherence to the cleanup procedures and remediation activities described in the Lake Oahe Geographical Response Plan (GRP) would reduce impacts on game fish species should a spill occur during operation of the pipeline.

**4.  Measures in place to mitigate potential impacts**

As identified under Easement Condition 8, a DAPL Facility Response Plan (FRP) was prepared and submitted to the USACE for review and comment. As identified under Easement Condition 10, any updates to the FRP will be provided to the USACE. In accordance with Easement Condition 9a, the Lake Oahe GRP was submitted to the USACE for review and comment. USACE comments were incorporated into the current version of the GRP.

Additionally, Dakota Access met with the Emergency Response Coordinators from each of the counties crossed by the entire pipeline. An Emergency Response Planning meeting was held in Bismarck, ND on January 11, 2018. USACE, SRST and Cheyenne River Sioux Tribe (CRST) were invited to participate. USACE and Dakota Access participated in the January meeting, but no SRST or CRST representatives attended.  Another meeting was held in Bismarck, ND on February 8, 2018. USACE, SRST, and CRST were invited to participate.  USACE and Dakota Access participated in the February meeting.  Nine representatives from SRST and one representative from CRST briefly appeared at the February meeting to hand deliver letters from each of the tribes, but did not attend or participate in substantive portions of the Emergency Response Planning Meeting.  A third, and final, meeting was held in Bismarck, ND on March 7, 2018. USACE, SRST, and CRST were invited to participate.  USACE and Dakota Access

Draft: July 31, 2018

RAR001020

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

participated in the March meeting, but no SRST or CRST representatives attended (Table C-4, Appendix C, response to Comment G21).

Although a release of crude oil into Lake Oahe during operations could have an adverse effect on fish and game species, adherence to the cleanup procedures and remediation activities described in the Lake Oahe GRP would reduce impacts on game fish species. It is important to note that all modeled releases were assumed to be unmitigated for the entire 10-day model run. In actuality, in the event of a large rupture such as the ones modeled, Dakota Access would work with others to respond promptly with customary response efforts (e.g., booming, burning, skimming and collection, as appropriate) that would reduce the volume and therefore the downstream impacts described in the Spill Model Report and the Downstream Receptor Report. In the event of a spill of oil into Lake Oahe, the response and restoration efforts would follow the regulations outlined in the National Oil and Hazardous Substance Pollution Contingency Plan (40 CFR § 300). The basic framework, where applicable, for the response management structure is a unified command system that brings together the functions of the federal government, state government, and the responsible party to achieve an effective and efficient response under the authority of the On-Scene Coordinator (OSC).

Trustees for natural resources, as well as a process for the Trustees to assess, quantify, and receive compensation for damages to the natural resources under their jurisdiction are outlined in 40 CFR § 300 §G. In some cases, Trustees have shared responsibilities for some natural resources. In such cases, it is common practice for the Trustees to work collaboratively to devise and carry out a plan for the restoration, rehabilitation, replacement, or acquisition of equivalent natural resources. When assessing damages to natural resources in and surrounding Lake Oahe, the federal, state, and Indian tribe trustees have the option of following the procedures for natural resource damage assessments (NRDA) in 43 CFR § 11.

Additionally, in the event of a crude oil release that resulted in damages to game species or hunting/fishing activities, Dakota Access would help restore, replace, or acquire the equivalent natural resources in accordance with the Oil Pollution Act of 1990 (OPA 90). Under OPA 90, the owner or operator is liable for the costs associated with the containment, cleanup, and damages resulting from a spill. Dakota Access maintains financial responsibility for the duration of the response actions. If the responsible party cannot pay, funds from the Oil Spill Liability Trust Fund are used to cover the cost of removal or damages. The Fund is paid for through a five-cent per barrel fee on imported and domestic oil and also any fines or civil penalties collected from other operators.

Draft: July 31, 2018

RAR001021

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

**Remand Item B: Environmental Justice**



20

Draft: July 31, 2018

RAR001022

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

## B.  Environmental Justice

In its June 14, 2017 Memorandum Opinion, the Court directed the USACE to further consider the environmental justice implications of an oil spill, which the USACE had addressed in Sections 3.9 and 4.10 of the July 2016 EA. In particular, the Court disagreed with the USACE's use of a 0.5-mile radius around the Lake Oahe crossing to define the impact area because 1) it failed to include populations that could be affected by an oil spill downstream of the crossing during operations; and 2) DAPL is a crude oil pipeline, therefore the USACE's reliance on the 0.5-mile buffer typically used in the analysis of transportation and natural gas pipeline projects is not appropriate. The Court also noted that the USACE environmental justice analysis needed to account for potential effects of an oil spill on ~~tribal~~Tribal water intakes, as well as on wildlife and fishery resources. In response to the Court's remand order, the USACE conducted a supplemental environmental justice (EJ) analysis to evaluate potential impacts to minority and/or low-income populations downstream of the DAPL Lake Oahe crossing. Due to concerns voiced by commenters on the DAPL project, this report also analyzes the potential impacts downstream from the North Bismarck Alternative crossing. Furthermore, the EJ analysis was extended to evaluate all users that obtain drinking water from the Missouri River and Lake Oahe. These three aspects of the EJ analysis are discussed separately in this section.

### 1.   PART I – EJ Analysis for DAPL Crossing at Lake Oahe

Various oil spill scenarios were modeled to evaluate the potential fate, transport, and impact to minority and/or low-income populations of~~of~~downstream of the DAPL crossing from a release of crude oil into Lake Oahe. The census block group was selected as the appropriate level of analysis given the rural setting in the vicinity of DAPL. Census block groups are more granular than census tracts, providing more focused analysis of the effects on those living closer to the Missouri River (from which Lake Oahe was formed). In addition, census block group is the lowest (i.e., most granular) geographic level for which U.S. Census Bureau data on populations with income below the poverty level is available.

To better understand, as required by the Court's order, the potential impacts of a spill on downstream ~~tribal~~Tribal entities, this analysis was performed for downstream areas that include the area adjacent to the SRST reservation, as well as the census block group that includes the CRST's drinking water intake on the western shore of Lake Oahe at the southern end of the CRST reservation. Accordingly, the analysis also included the northwestern portion of Sully County, South Dakota on the eastern shore of Lake Oahe (See Figures B-1 and B-2E in Appendix B).

The supplemental EJ analysis shows that 1) there are fewer EJ census block groups than non-EJ census block groups (five EJ versus ~~nine~~eleven non-EJ) along Lake Oahe in the impact area; 2) all five EJ census block groups are located on the western shore of the lake, while the ~~nine~~eleven non-EJ census block groups are located on ~~both sides~~each side of the lake; 3) both the private agricultural and non-~~tribal~~Tribal municipal intakes would be reached before their ~~tribal~~Tribal counterparts; and 4) based on a number of conservative assumptions in the spill model worst-case scenarios, (a) even a 10-day unmitigated release would not travel far enough to reach the current ~~tribal~~Tribal municipal intakes, and (b) impacts to wildlife and fishery resources would be limited both in scope and duration. Therefore, it is determined that a release of oil from DAPL would not disproportionately affect the EJ communities located on and adjacent to the Lake Oahe crossing that would be part of the Proposed Action, nor those located downstream of the Lake Oahe crossing, including where the CRST intake is located.

As noted previously, additional spill modeling was performed, under ~~several~~ different scenarios, to evaluate the potential fate and transport of a release of crude oil at the Lake Oahe crossing.

21

Draft: July 31, 2018

RAR001023

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

Based upon the oil spill model analysis, the farthest that a hypothetical, worst-case, *unmitigated* release would travel after 10 days (based on 1,160 stochastic model runs) is approximately 65 miles downstream. The probability of an unmitigated release traveling this far in 10 days is less than 10%. And this location is still upstream of the SRST Replacement Intake (the new ~~tribal~~Tribal drinking water intake located approximately 75.4 miles downstream of the Lake Oahe crossing – Figure B-2C) and even further upstream of the CRST intake (which lies more than 150 miles downstream of the Lake Oahe crossing – Figure B-2E). As shown in Table A-1, the potential impacts from an unmitigated worst-case release would be minimal at the end of 10 days even for a water intake located 47.1 miles downstream.

The ~~purpose of this additional analysis is to supplement the evaluation of the downstream effects of a possible release during operations. This~~ supplemental analysis, described in greater detail below, does not change the conclusions ~~from~~of the original EJ analysis in the July 2016 EA. Portions of the previous analysis are included here for consistency and ease of reference. The supplemental analysis should not be considered a replacement of, but rather a supplement to, the analysis already presented in the July 2016 EA. ~~The entire methodology and results associated with this additional analysis are presented below.~~

*a)    EJ Methodology*

Executive Order 12898 of 1994 (E.O. 12898) and the Department of Defense's Strategy on Environmental Justice of 1995 direct federal agencies to identify and address any disproportionately high adverse human health or environmental effects of federal actions on minority and/or low-income populations. Minority populations consist of those persons who identify themselves as African American, Hispanic, Asian, American Indian/Alaskan Native, Pacific Islander, one or more race, or two or more races. A minority population exists where the percentage of minorities in an affected area either exceeds 50% or is meaningfully greater than in the general population.

For the purposes of this analysis, the poverty level was used to define low-income populations. The U.S. Census Bureau defines a "poverty area" as a census tract with 20% or more of its residents below the poverty ~~threshold~~level and an "extreme poverty area" as one with 40% or more below the poverty level.

A potential disproportionate impact for EJ purposes may occur when the percentage of minorities in the analysis area exceeds 50% and/or the percentage of low-income residents exceeds 20% of the population. In addition, a disproportionate impact may occur when the percent minority and/or percent low-income are meaningfully greater than those in the reference community.

The methodology utilized for this EJ analysis included, consistent with E.O. 12898, identifying low-income and minority populations within the Lake Oahe crossing area using recent demographic and socioeconomic statistics from the U.S. Census Bureau[7].

U.S. Census Bureau data are typically available at multiple geographic levels. Potentially relevant geographic levels for this project include: state level, county level, tract level, block group level, and block level. For the purposes of this supplement to the EJ analysis, census block group data were selected as the appropriate level due to the overall rural setting in the vicinity of DAPL and the availability of data on populations with income below the poverty level. Census block groups in rural areas, such as those within

---

[7] U.S. Census Bureau.  2015.  2011-2015 American Community Survey 5-Year Estimates.  Download Center. https://factfinder.census.gov/faces/nav/jsf/pages/index.xhtml.  Accessed November 2017.

Draft: July 31, 2018

RAR001024

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

the Dakota Access Pipeline Project analysis area, may cover a larger area because of the lower density of population and may includethe fact that some areas that are not inhabited.

To determine whether DAPL has any disproportionate negative impacts on minority and/or impoverished communities, a three-step analysis was conducted. First, an analysis area was determined, 1 mile from the east and west shorelines of Lake Oahe, from the USACE action area to the CRST intake. Second, those census block groups that fall within or intersect the analysis area (i.e., those that might be impacted by the construction and/or operation of the Lake Oahe segment) that meet the statutory requirements for low-income and minority communities were identified. Third, the census block group population was compared to the county level population, which was utilized as the reference community (or group comparison) for this analysis. County was chosen over state as the preferred geographic unit to define the reference community so as to not dilute minority and poverty populations. If there was a meaningful difference in population between the census block group impacted by DAPL at, adjacent to, or downstream fromof the Lake Oahe crossing and the county in which it is located, a fourth step was taken to analyze the project to determine if DAPL's location at the Lake Oahe crossing would have a disproportionate adverse impact on minority and/or impoverished communities within the analysis area (between the Lake Oahe crossing and the CRST intake).

There is no accepted standard for a spatial limit when analyzing impacts on EJ communities from the construction (as distinct from the operation) of oil pipelines. However, transportation projects, such as under the Federal Transit Administration (a division of the Department of Transportation [DOT]), and natural gas pipeline projects under the Federal Energy Regulatory Commission, typically use a 0.5-mile buffer area to examine EJ effects for linear construction projects. Although DAPL is not a transportation project or a natural gas project, the design and operation of oil pipelines (and natural gas pipelines) are under the jurisdiction of PHMSA, which is also a division of the DOT. Therefore, for purposes of assessing the effects of construction, the additional review and analysis of populations of census block groups under the fourth step included a determination of whether any communities were located within 0.5 mile of DAPL at or adjacent to the crossing of Lake Oahe crossing.

It should be noted that the EJ results for the construction of the pipeline are addressed in the July 2016 EA. In accordance with the Remand Order, the purpose of this additional analysis is to supplement the evaluation of the downstream effects of a possible release during operation. Therefore, although the USACE Action Area affected during construction is fully included in the affected area during operation, the EJ results for the construction of the pipeline are not discussed separately in this document.

Additionally, to address possible effects from pipeline operations, an analysis was performed to determine the potential effects of a worst-case, unmitigated oil release on EJ communities located downstream of the Lake Oahe crossing. By applying a distance-based approach that uses the spill model results described earlier in this document, the analysis took into account the census block groups located as far from the Lake Oahe crossing as CRST's drinking water intake on the western shore of Lake Oahe, and the southern end of Walworth County, South Dakota on the eastern shore of Lake Oahe. This end point fully includes the oil footprint limits predicted in the Spill Model Report for a 10-day, worst-case, unmitigated release originating at the USACE action area.

*b)*    *DAPL Crossing at Lake Oahe EJ Results*

Demographic information foron minority and poverty populations relevant to the EJ analysis, as described above, are presented in Table B-1. The areas identified as EJ communities are shown with red italicized text. The data are presented at different geographic levels (state, county, and census block group) for the

23

Draft: July 31, 2018

RAR001025

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

operational phase of the project for and for each shore of Lake Oahe (east vs. west) separately, for the operational phase of the project. Figures B-1 and B-2 in Appendix B depict the census block groups impacted by DAPL at, adjacent to, or downstream from the Lake Oahe crossing and their EJ status. Non-EJ communities are depicted in light yellow. EJ communities are light purple.

Two census block groups (Tract 204/Block Group 3 and Tract 9665/Block Group 1) are on and adjacent to the crossing of Lake Oahe that is part of the USACE Action Area. However, neither of them has a minority population exceeding 50% or a poverty level greater than 20%. No other census block group is located within the 0.5-mile DOT analysis buffer of the DAPL.

Demographic information for on minority and poverty populations in areas that could be impacted by a worst-case, unmitigated release during operation of the pipeline is also presented in Table B-1. In addition to Including the two census block groups identified above, 16 census block groups on both shores of Lake Oahe are considered in the analysis. As noted above, this EJ analysis has been performed for downstream areas extending to the census block group that includes CRST's drinking water intake.

Five census block groups have a minority population that exceeds 50% and/or a poverty level greater than 20%; all of them are located on the western shore of Lake Oahe (Tract 9408/Block Group 1, Tract 9409/Block Group 1, Tract 9409/Block Group 2, Tract 9411/Block Group 2, and Tract 9417/Block Group 3).

**Future Conditions with No Action [at the Time of the USACE Decision, February 2017]**
Under the "no action" alternative, Dakota Access would not have constructed DAPL, and no disproportionately high or adverse effects on minority and/or low-income populations would have occurred.

Future Conditions with the Dakota Access's Preferred Alternative [at the Time of the **USACE Decision, February 2017**]

**Construction Impacts**
*[As noted above, construction impacts are not included in this Remand Response].*

24

RAR001026

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

| Table B-1. Minority and Low-Income Population Statistics for ~~Federal Lands Project Area~~DAPL Crossing (Data from ACS 2011-2015, 5-year estimates) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Geographic Area** | **Total Population** | **Percent** | | | | | | | | | **Persons Below the Poverty Level** |
| | | **White** | **Black or African Am.** | **Am. Indian and Alaska Native** | **Asian** | **Native Hawaiian and Other Pacific Islander** | **Hispanic** | **Some Other Race** | **Two or More Races** | **Total Minority Population** | |
| **States** | | | | | | | | | | | |
| North Dakota | ~~704,925~~ 721,640 | ~~89.20~~ 87.05 | 1.53~~60~~ | 5.25~~20~~ | 1.15~~22~~ | 0.04 | 2.85 | 0.73~~05~~ | 2.10~~00~~ | ~~10.80~~12.95 | 11.46 |
| South Dakota | 843,190 | ~~85.00~~83.22 | 1.56~~52~~ | 8.61~~30~~ | 1.20 | 0.04 | 3.31 | 0.94~~08~~ | 2.65~~34~~ | ~~15.00~~16.78 | 14.11 |
| **Counties** | | | | | | | | | | | |
| **Comparison Group During Operation (Potential Oil Spill)** | | | | | | | | | | | |
| West Shore — Morton (ND) | ~~28,428~~28,985 | ~~92.86~~91.39 | 0.84~~65~~ | 3.32~~57~~ | 0.23~~14~~ | 0.00 | 2.29 | 0.77~~00~~ | 1.98~~96~~ | ~~7.14~~8.61 | 7.99 |
| West Shore — Sioux (ND) | ~~4,317~~4,380 | ~~13.67~~9.33 | 0.02~~05~~ | ~~82.26~~79.36 | 0.25~~16~~ | 0.07~~11~~ | 3.56 | 0.53~~16~~ | ~~3.20~~2.67 | ~~86.33~~07 | 35.72 |
| West Shore — Corson (SD) | 4,149 | ~~31.00~~30.95 | | ~~66.93~~76 | 0.29 | 0.00 | 0.36~~58~~ | 0.00 | 1.13 | ~~69.00~~05 | 45.58 |
| West Shore — Dewey (SD) | 5,579 | 21.72 | | ~~76.45~~75.57 | 0.29 | 0.00 | 0.04~~91~~ | 0.00 | 1.76 | 78.28 | 27.83 |
| East Shore — Emmons (ND) | ~~3,491~~3,463 | ~~99.28~~96.79 | 0.00 | 0.23~~32~~ | 0.17~~46~~ | 0.00 | 0.12 | 0.00 | 0.32 | ~~0.72~~3.21 | 11.33 |
| East Shore — Campbell (SD) | 1,548 | ~~95.09~~94.90 | 0.00 | 3.49 | 0.78 | 0.00 | 0.19 | 0.00 | 0.65 | ~~4.91~~5.10 | 9.06 |
| East Shore — Walworth (SD) | 5,495 | ~~82.18~~81.31 | 0.20 | 8.83~~50~~ | 2.78 | 0.51 | ~~2.98~~4.68 | 0.00 | 2.51~~02~~ | ~~17.82~~18.69 | 12.24 |
| East Shore — Potter (SD) | 2,307 | ~~93.24~~92.72 | 0.00 | 3.34 | 1.47~~13~~ | 0.00 | 0.87 | 0.00 | 1.95 | ~~6.76~~7.28 | 11.59 |
| East Shore — Sully (SD) | 1,469 | ~~98.03~~97.62 | 0.00 | 0.61~~41~~ | 0.00 | 0.00 | 0.61 | 0.00 | 1.36 | ~~1.97~~2.38 | 5.10 |

**Commented [NJ1]:** Table updated to use the same dataset that SAHA-MOHAI used

Inserted Cells

25

RAR001027

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

**Table B-1. Minority and Low-Income Population Statistics for** ~~Federal Lands Project Area~~DAPL Crossing
(Data from ACS 2011-2015, 5-year estimates)

Commented [NJ1]: Table updated to use the same dataset that SAHA-MOHAI used

| Geographic Area | | Total Population | Percent | | | | | | | | Total Minority Population | Persons Below the Poverty Level |
| | | | White | Black or African Am. | Am. Indian and Alaska Native | Asian | Native Hawaiian and Other Pacific Islander | Hispanic | Some Other Race | Two or More Races | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Block Groups** | | | | | | | | | | | | |
| **Operation (Potential Oil Spill)** | | | | | | | | | | | | |
| West Shore | Block Group 0204-3 | ~~869~~934 | ~~93.4~~49 2.40 | 0.00 | ~~2.88~~1.0 7 | 0.00 | 0.00 | ~~2.88~~4.82 | 0.8100 | ~~6.56~~1.71 | 7.60 | 1.51 |
| | Block Group 9408-1 | ~~996~~961 | ~~10.14~~1 3.32 | 0.00 | ~~88.45~~82 .73 | 0.00 | 0.00 | 1.04 | 0.2031 | ~~1.20~~2.60 | ~~89.86~~.68 | ~~42.80~~ |
| | Block Group 9409-1 | 1,~~618~~710 | 4.~~645~~. 32 | 0.00 | ~~90.85~~88 .19 | 0.4~~31~~ 8 | 0.00 | 3.22 | 0.00 | 4.08~~3~~.10 | ~~95.36~~94. 68 | 35.52 |
| | Block Group 9409-2 | 1,079000 | 7.4~~18~~ 00 | 0.0920 | 85.8210 | 0.28 30 | 1.95 | 4.4530 | 0.40 | 1.70 | 92.5900 | 37.99 |
| | Block Group 9411-2 | 812 | 23.28 | 0.00 | 74.01 | 0.25 | 0.00 | 0.49 | 0.00 | 1.97 | 76.72 | 39.21 |
| | Block Group 9417-2 | 1,384 | 55.64 | 0.00 | 41.26 | 0.00 | 0.00 | 0.00 | 0.00 | 3.11 | 44.36 | 17.59 |
| | Block Group 9417-3 | 1,161 | 10.59 | 0.00 | 86.91~~84~~ .67 | 0.00 | 0.00 | 2.240.00 | 0.00 | 2.50 | 89.41 | 27.12 |
| East Shore | Block Group 9665-1 | ~~784~~793 | 99.239 0.42 | 0.00 | 0.00 | 0.00 | 0.00 | 0.0050 | 0.7700 | 0.779.08 | 9.58 | 9.96 |
| | Block Group 9641-1 | 643 | 97.369 6.89 | 0.00 | 2.64 | 0.00 | 0.00 | 0.0047 | 0.00 | 2.640.00 | 3.11 | 7.78 |
| | Block Group 9652-1 | 789 | 91.25 | 0.00 | 6.08 | 2.66 | 0.00 | 0.00 | 0.00 | 0.00 | 8.75 | 19.63 |
| | Block Group 9652-2 | 980 | 88.378 7.55 | 0.10 | 0.92 | 0.00 | 2.86 | 7.768.57 | 0.00 | 11.630.0 0 | 12.45 | 3.70 |
| | Block Group 9652-3 | 868 | 58.76 | 0.00 | 22.7020 .62 | 15.21 | 0.00 | 0.002.07 | 0.00 | 3.34 | 41.24 | 9.10 |
| | Block Group 9652-4 | 941 | 68.44 | 0.00 | 22.95 | 0.00 | 0.00 | 1.704.57 | 6.910.0 0 | 4.04 | 31.56 | 17.28 |

26

Draft: July 31, 2018

RAR001028

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

| Table B-1. Minority and Low-Income Population Statistics for ~~Federal Lands Project Area~~DAPL Crossing (Data from ACS 2011-2015, 5-year estimates) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Geographic Area** | **Total Population** | **Percent** | | | | | | | | **Total Minority Population** | **Persons Below the Poverty Level** |
| | | White | Black or African Am. | Am. Indian and Alaska Native | Asian | Native Hawaiian and Other Pacific Islander | Hispanic | Some Other Race | Two or More Races | | |
| Block Group 9651-2 | 1,013 | 93.98 | 0.99 | 0.69 | 0.00 | 0.00 | 0.00 | 0.00 | 4.34 | 6.02 | ~~15.40~~12.04 |
| Block Group 0001-2 | 1,020 | 97.35 | 0.00 | 1.27 | 0.00 | 0.00 | 0.78 | 0.00 | 0.59 | 2.65 | 14.67 |
| Block Group 9791-1 | 675 | 98.81 | 0.00 | 0.00 | 0.00 | 0.00 | 0.44 | 0.00 | 0.74 | 1.19 | 5.88 |

Source: U.S. Census Bureau.  2011-2015 American Community Survey (2011-2015 5-Year Estimates).  Total population is based on data from Table B01003. Percent population by race is based on data from Table B03002 and Table B01003.  Population below the poverty level is based on data from Table B17021. State and County totals and percentages were calculated by summation of block group data from these respective tables.
Note: totals may not sum across the table due to rounding used in data collection.

Commented [NJ1]: Table updated to use the same dataset that SAHA-MOHAI used

Inserted Cells

Inserted Cells
Deleted Cells

Inserted Cells
Inserted Cells
Deleted Cells
Inserted Cells

27

Draft: July 31, 2018

RAR001029

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

**Operation Impacts**

As shown in Figures B-1 and B-2 (Appendix B) and discussed above, many census block groups downstream of the Lake Oahe crossing could ~~potentially~~ be affected by a hypothetical, worst-case release; therefore, census block groups on the eastern and western shores of ~~the~~ Lake Oahe were considered in this EJ analysis. From north to south, the analysis area extends from the Lake Oahe crossing to CRST's drinking water intake – approximately 156 miles downstream; and from west to east, it extends one mile west of the west bank and a one mile east of the east bank. As noted above, the southern end point of the affected area fully includes the oil footprint limits predicted in the Spill Model Report for a 10-day, worst-case, unmitigated release originating at the USACE action area.

Although a hypothetical release from DAPL would impact EJ communities downstream of the Lake Oahe crossing, this potential impact is not meaningfully disproportionate given the number of census block groups potentially affected. There are fewer EJ census block groups (five) than non-EJ census block groups (eleven) in the area of potential impact downstream of the DAPL crossing (analysis area). Note also that all EJ census block groups are located on the west shore of Lake Oahe, but non-EJ census block groups are located on both the west shore and the east shore of Lake Oahe.

**Specific Concerns Related to Cultural Practices**

SRST, CRST, OST and YST have reported that they utilize lands surrounding Lake Oahe for various Tribal and cultural practices. The SRST and CRST reservations also border Lake Oahe. Cultural practices could be affected by impacts to water quality, including impacts to aquatic plants used for medicinal and spiritual purposes, or from lake closures in areas used for ceremonies. In each case, ~~analysis~~analyses of the Spill Model Report and the Downstream Receptor Report results show that potential impacts would be of a temporary, and short duration.

**Human Health Concerns**

The typical health effects associated with short-term (acute) inhalation of volatiles from crude oil are headaches, dizziness, nausea, vomiting, cough, respiratory distress, and chest pain. Short-term skin contact with oil could result in dermatitis[8]. Due to the characteristics of Bakken Crude, unsafe conditions for inhalation are not anticipated significantly downwind of the immediate area of a surface plume. Air monitoring would be initiated immediately and continued throughout the duration of clean-up activities. DAPL, in coordination with the Federal On-Scene Coordinator, the State On-Scene Coordinator, and local authorities, including a representative from potentially affected Tribes as determined by the Unified Command, would advise residents to avoid any areas of potentially unsafe conditions and potentially shut down certain portions of the river/river banks for a period of time, should conditions warrant such.

The ~~most probable cause of impacts to~~potential human health ~~would be through~~impact that warrants the greatest concern is contamination of drinking water intakes. However, based on the results of the RPS modeling, the threat to drinking water intakes, especially the ~~tribal~~Tribal water intakes, is very low. ~~More discussion is provided below.~~

---

[8] Solomon, G.M. and S.J. Janssen. 2010. Health Effects of the Gulf Oil Spill. Journal of the American Medical Association. *Journal of the American Medical Association* 304(10):1118-1119.

28

Draft: July 31, 2018

RAR001030

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

**Specific Concerns Related to Tribal Water Intakes**

One part of the environmental justice analysis is whether Tribal water intakes would be disproportionately affected by a hypothetical, unmitigated, worst-case release to Lake Oahe. Table B-2 below provides information relative to select Tribal and non-Tribal intakes downstream of the Lake Oahe crossing.

**Table B-2. Select Tribal and Non-Tribal Water Intakes Downstream of the Lake Oahe Crossing***

| Intake # / Owner<br>[Intake #s Correspond to Spill Model Report] | Distance Downstream from Crossing Location (miles) |
|---|---|
| Intake #3 Agricultural Intake (non-Tribal) | 4.4 |
| Intake #4 Agricultural Intake (Tribal) | 8.1 |
| Intake #5 South Central Regional Water District Drinking Water Intake* (non-Tribal) | 11.3 |
| Intake #7 Former Fort Yates Drinking Water Intake (Tribal). Offline/Not in use. | 26.8 |
| City of Mobridge Municipal Drinking Water Intake (non-Tribal) | 71.5 |
| Intake #14 SRST Replacement Drinking Water Intake** (Tribal) | 75.4 |
| WEB Water District Drinking Water Intake (non-Tribal) | 141.5 |
| CRST's Drinking Water Intake*** (Tribal) | 156.5 |
| Mni Wiconi Water Intake**** (Tribal/non-Tribal***)) | 205 |

Note that only the drinking water and agricultural intakes downstream of the DAPL crossing referenced in this document are shown in this table and only the drinking water intakes listed above are illustrated in Figures B-1 and B-2 (Appendix B).

* The intakes selected hereAdditional information can be found in the Spill Model Report (RPS, 2018).
*Select intakes include both the first Tribal and non-Tribal intakes agricultural andall of the known drinking water intakes encountered.  Additional Tribal drinking water intakes are also presented. downstream within the 156 mile analysis area. Also included are the first two agricultural intakes (one non-Tribal and the other Tribal) downstream from the Lake Oahe crossing. These represent the highest impact agricultural intake locations. Because of the reservation boundaries and EJ block groups on the west side of Lake Oahe, Itit is assumed for the purposes of this analysis that all of the intakes on the west side are Tribal.  Likewise, due toit is assumed that the select intakes presented on the east side of Lake Oahe are non-EJ owned based on the location of the intakes and, the registered water rights owners, and the presence of non-EJ block groups on the east side of Lake Oahe.  Additional information can be found in the Spill Model Report (RPS, 2018). it is assumed that the select intakes presented on the east side of Lake Oahe are non-EJ owned.  Note that only drinking water intakes within the analysis area are illustrated in Figures B-1 and B-2 (Appendix B).  Although the Mni Wiconi intake is much farther downstream and outside of the formal analysis area, it has been included in the text and table for completeness.

** The depth of the Standing Rock Sioux Tribe replacement intake is 60-80 feet, depending on water surface elevation (RPS, 2018).

***This intake is managed by the OST but serves both Tribal and non-Tribal communities. This water intake serves several regional water systems that were all combined into one large system of which the OST Mni Wiconi is one of them.  Intake*** CRST's drinking water intake is a minimum of 40 feet below the surface. Ordinary High Water - 1,617 feet above mean sea level (fmsl); Minimum Pool Elevation - 1,540 fmsl; Intake Elevation - Approx. 1,491 fmsl.

**** The Mni Wiconi water intake, although managed by the OST, serves both Tribal and non-Tribal communities in multiple regional water systems.

Downstream of the Lake Oahe crossing, the river separates private land to the east from tribalTribal land to the west. There are three water supply intakes within 15 miles downstream of this crossing. The first intake fromclosest to the Lake Oahe crossing is approximately 4.4 miles downstream and is for

29

RAR001031

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

agricultural, non-~~tribal~~Tribal use. The second intake is approximately 8.1 miles downstream and is an SRST intake for agricultural use. The third intake, approximately 11.3 miles downstream, is the first potable water intake ~~and,~~ It belongs to the non-~~tribal~~Tribal South Central Regional Water District (SCRWD). It provides water to numerous non-EJ communities within several North Dakota counties to the east of Lake Oahe. The next drinking water intake downstream of the DAPL crossing is also a non-Tribal intake: the municipal intake for the City of Mobridge, located approximately 71.5 miles downstream.

The first reported ~~SRST~~Tribal intake currently used for public consumption is the SRST Replacement Intake located approximately 75.4 miles downstream of the Lake Oahe crossing (south of the Highway 1806 bridge from Wakpala to Mobridge, South Dakota). This intake ~~replaces~~replaced the Fort Yates intake, which according to the US Bureau of Reclamation is now off-line and scheduled for demolition[9]). The Fort Yates intake was located approximately 26.8 miles downstream of the Lake Oahe crossing. The nearest CRST intake is more than 150 miles downstream of the DAPL crossing.

As noted above, the spill model projects that even if a release were allowed to go unmitigated and travel more than 75 miles downstream to reach the SRST Replacement Intake, the concentrations in the water at the depth of the intake location are not anticipated to exceed regulatory thresholds. because no appreciable DHC levels are predicted to be present there. In fact, even at the location of the off-line Fort Yates intake at 26.8 miles downstream, the maximum concentration of ~~dissolved hydrocarbons~~DHC is predicted to be only 145 µg/L in the top 5 m (0 to 16.4 ft) of the water column, only 74 µg/L at 5 - 10 m (or 16.4 to 32.8 ft) of depth below the surface, and 0 µg/L between a depth of 10 m (32.8 ft) and the bottom of the river where the drinking water intake was located.

The concentrations in the upper layers would be further reduced at the SRST Replacement Intake, which is located more than twice the distance downstream, due to dilution; volatilization from the dissolved phase to the atmosphere; adsorption to suspended particulate material and sedimentation; stranding on the shoreline or aquatic plants; or degradation. Because the depth of the SRST Replacement Intake is more than 40 ft below the surface, ~~depending on~~even at minimum water surface ~~elevation~~elevations, the concentration of dissolved hydrocarbons is also predicted to be 0 µg/L at the point where water enters the ~~tribal~~Tribal drinking water intake.

The CRST intake is even less at risk ~~as~~because it is located more than twice as far downstream ~~than~~as the SRST Replacement Intake and therefore the in-stream concentrations would be much lower than those at the SRST Replacement Intake. This would again be due to dilution; volatilization from the dissolved phase to the atmosphere; adsorption to suspended particulate material and sedimentation; stranding on the shoreline or aquatic plants or degradation.

Until it was taken off-line, the Fort Yates municipal drinking water intake was the first known ~~tribal~~Tribal, potable water intake downstream of the Lake Oahe crossing. Even then this put the first of such intakes more than 15 miles further downstream of the Lake Oahe crossing than the non-~~tribal~~Tribal SCRWD intake. The estimated minimum travel time to reach the SCRWD intake for an unmitigated spill at the Lake Oahe crossing is approximately 13-14 hours, compared with a minimum travel time of approximately 49-50 hours to reach the off-line Fort Yates intake. In each of these scenarios, the first oil predicted to reach the intake location ~~was~~would be entrained oil within the water column. In the event that the spill continues unmitigated for an extended period of time, the SCRWD intake would be impacted first. ~~No~~As

[9] ~~The Fort Yates intake is now off-line and scheduled for demolition as per~~ That information is supplied in an email from Tom Thompson, US Bureau of Reclamation, email to Larry Janis, USACE Omaha District on December 12, 2017.

30

Draft: July 31, 2018

RAR001032

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

shown in Figure B-4 and as discussed in Part III, no community served by SCRWD is an EJ community at the census block group level (see Figures B-1 and B-2 in Appendix B). The release would have to go unmitigated for approximately 49-50 hours to reach the former minority community intake at Fort Yates. With this intake now off-line, the time to respond to a release potentially affecting a ~~tribal~~Tribal potable water intake is even greater. It is estimated that a release would have to travel unmitigated for more than 10 days to reach the SRST Replacement Intake west of Mobridge (RPS, 2018). Although well beyond the ~~limits of~~area affected under the detailed modeling, ~~since~~because the Missouri River intake for the CRST is located more than two times further downstream (about 156 miles downstream of the DAPL crossing), it is reasonable to assume that a release would have to travel unmitigated approximately twice as long (or more) to reach the CRST intake. It should also be noted that if any dissolved hydrocarbons remained in the Missouri River and were to reach the Tribal drinking water intake of the CRST, the river water would have already passed yet another non-Tribal drinking water intake, associated with the WEB Water District, at approximately 141.5 miles downstream of the DAPL crossing.

The OST Mni Wiconi intake is even less likely to be impacted than the CRST intake ~~based on the fact that~~because it is another 50 miles downstream of the CRST intake (205 miles downstream of the DAPL crossing) and ~~its location~~is also downstream ~~from~~of the Lake Oahe dam  (which lies approximately 200 miles downstream of the DAPL crossing). The minimum water depth recorded for Lake Oahe for the entire period of record was 1570.2 fmsl. The discharge pipes for the dam are at an elevation of ~~1425~~1,425 fmsl ~~—~~, meaning 46 m (142.5 ft) below ~~the~~that lowest ~~ever~~recorded water depth. Thus, any released hydrocarbons that reach the dam would need to mix within the water column to at least ~~that depth, even though~~142 feet below the lake surface.  This is unlikely as near zero values of hydrocarbons are predicted at depths greater than 10 m  within a few miles of the crossing, at locations much further upstream (see Table A-2).

~~Regardless~~Moreover, as noted in Section 3.2.1.2 of the EA (page 38), the potential for a release to compromise a potable water supply intake would be continually evaluated as part of the response action in the event of a release. Alternative potable water sources are included as part of the contingency plan. Known drinking water intakes were identified in the Spill Model Report and incorporated into the site-specific GRP. ~~Shutting down certain~~ Alternatives include switching to other non-impacted water intakes ~~and utilizing others~~ or utilizing different drinking water sources or bottled water ~~will be evaluated as part of this process~~. The Federal On-Scene Incident Commander would be responsible for assimilating and approving the response actions under ~~the~~ OPA 90.

Similar to the location of drinking water intakes, a private (non-Tribal) agricultural intake is located upstream of the first ~~tribal~~Tribal agricultural intake. Thus, an unmitigated release would reach the agricultural intake serving a non-minority population before reaching an intake associated with a minority population.

Agricultural intakes along Lake Oahe ~~are~~ typically ~~installed differently than drinking water intakes and only~~ need to be installed only 20 feet below the lake surface in lake environments. Therefore, agricultural intakes are not anticipated to be deep permanent intake structures. ~~The~~Rather, the agricultural intake tubes/pipes are typically moveable and extended into the reservoir based on anticipated reservoir water elevations. As a result, it was not possible to rule out the presence of agricultural intakes ~~could not be discounted as not being present~~ within the top 10 m (31.4 ft)), where the modeling ~~indicates~~shows that some level of hydrocarbons could be present if a spill were to occur.

31

Draft: July 31, 2018

RAR001033

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

Therefore, ~~if applicable~~where needed, the intake owners of the potentially impacted downstream agricultural irrigation intakes ~~downstream~~ would be contacted ~~as to~~and advised of the ~~anticipated~~ date ~~/and~~ time of~~that~~ the plume ~~reaching~~is expected to reach ~~the respective locations.~~ relevant intake location. The owners would also be informed of ~~anticipated~~the number of days ~~for~~ the plume is expected to travel over the specific intake and be advised to suspend withdrawals for anticipated plume travel time over ~~their respective~~that intake (nominally four days) plus a conservative buffer time. Alternatively, the agricultural intakes could be extended to the middle of channel through the use of additional pipes to draw from deeper ~~depths~~parts of the lake where the modelling has ~~indicated~~predicted that impacts would ~~not~~ be ~~anticipated~~insignificant or ~~at least significant~~non-existent.

~~In the event of~~If a crude oil release ~~that~~ resulted in the shut-down or relocation of intakes, Dakota Access would be the party responsible ~~party to rectify the situation / pay for the damages~~ for remediation. If the responsible party cannot pay for remediation, funds from the Oil Spill Liability Trust Fund are used to cover the cost.

Based on the above, significant potential health effects to humans are not anticipated. Even in the event of a worst-case, unmitigated spill, neither the ingestion of drinking water above US EPA health limits nor the consumption of impacted agricultural products is anticipated.

~~Given~~In sum, given that:

(i) there is a low probability of a release to Lake Oahe from DAPL based on historic pipeline risk data from PHMSA,

(ii) both private agricultural and non-~~tribal~~Tribal municipal intakes would be reached before their ~~tribal~~Tribal counterparts,

(iii) even a 10-day unmitigated release would not travel far enough to reach the current ~~tribal~~Tribal municipal intakes,

(iv) Dakota Access is required by PHMSA to initiate response to a release within six hours, and

(v) Dakota Access has committed to providing drinking water in the unlikely event that downstream intakes are impacted,

we conclude that there is no disproportionate EJ impact on downstream water intakes from the placement or operation and maintenance of the DAPL pipeline at the Lake Oahe segment.

**EJ Analysis for Fishing and Hunting Resources**

As demonstrated in the Downstream Receptor Report (Section 3.3) and this document (Section II.A.3), even under the worst-case scenarios, impacts to downstream beneficial lake uses were determined to be limited in scale and temporary in duration.

A large release of oil to Lake Oahe would result in some mortality of aquatic species. The ~~highest~~largest estimated area of potential mortality for aquatic species for the worst-case scenarios modeled was 6.3 km² of the modeled area, based on the 50 µg/L biological threshold. Although any fish kill would be a negative consequence, this area represents only 2.5% of the modeled area. Additionally, it is important to note that the time series modeling results show that the 50 µg/L biological threshold for aquatic species in

32

Draft: July 31, 2018

RAR001034

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

the water column iswould only be exceeded for a number of hours (not days) and only within specific zones within the water column, further limiting the area of potential mortality.

Stochastic maps of water column contamination offrom dissolved hydrocarbons depict the likelihood that concentrations will exceed the identified threshold at any depth within the water column, but do not specify the depth at which this occurswould occur. Therefore, the mapping presented in the Spill Model Report does not imply that the entire water column (i.e., from surface to bottom) will experience a concentration above the threshold as toxicity is a function of concentration and duration.

Additionally, the difference in water quality at different zones within the water column, as described forin the water intakes discussion above, is applicable to the biota within the lake as well. At the location of the off-line Fort Yates drinking water intake (26.8 miles downstream of the Lake Oahe crossing), the maximum concentration of dissolved hydrocarbons is predicted to be 145 µg/L in the top 5 m (0 to 16.4 ft) of the water column, 74 µg/L at 5 - 10 m (or 16.4 to 32.8 ft) of depth below the surface, and 0 µg/L below 10 m (32.8 ft) to the bottom of the river. The dissolved hydrocarbon levels that are present and may be acutely toxic to sensitive species at the top of the water column are not modeled to be present in the lower strata beyond the immediate location of aan oil release occurring at the bottom releaseof the lake. Similarly, minimal accumulation of hydrocarbons into the sediments at the bottom of the lake is predicted as all of the scenarios modelsmodeled showed less than 1% of the oil located in the sediments after the 10-day modeling period. This was an identified concern of someSome of the commenters identified as a concern that feeding by bottom dwelling fish on benthic prey can then reintroduce sediment-associated contaminants into the food web. Due to the low levels predicted in the bottom sediments, bioaccumulation of contaminants by sediment-dwelling organisms would likely be limited. Therefore, aquatic biota utilizing the very bottom of the lake during the period of contamination may not be significantly impacted. For the above reasons above, the potential impact to the fishery resources of Lake Oahe is anticipated to be limited.

According to the Standing Rock Game and Fish Department, the Tribe governs all taking of game and fish species by Indians within the exterior boundaries of the Standing Rock Sioux Reservation as defined by the Act of March 2, 1889, 25 Stat. 888, and by non-Indians within the exterior boundaries of the reservation as defined above, on lands held by the United States in trust for the Tribe or for Indians[10]. The Tribe protects and manages fish and wildlife resources of the reservation primarily for subsistence use by tribalTribal members.

The Tribe sets daily and possession limits for a number of fish species including Walleye, Sauger (*Sander canadensis*), Northern Pike, Largemouth Bass (*Micropterus salmoides*), Smallmouth Bass, White Bass, Crappie (*Pomoxis spp.*), Bluegill (*Lepomis macrochirus*) and other sunfish (combined), Yellow Perch (*Perca flavescens*), Muskellunge (*Esox masquinongy*) and hybrids, and Rainbow Smelt (Standing Rock Game and Fish, 2017). No limits are set for catfish or bullheads (family *Ictaluridae*), Burbot (Lota lota), or non-game species. Harvesting of Sturgeon (*Scaphirhynchus spp.*) and Paddlefish (*Polyodon spathula*) is not allowed. In addition, the Tribe sets minimum size limits for Walleye, Sauger, Northern Pike, and Muskellunge and hybrids.

In a declaration ondated November 28, 2016, the director of the Standing Rock Sioux TribesTribe Department of Game, Fish and Wildlife Conservation noted that Lake Oahe is known for its walleye

---

[10] Standing Rock Game and Fish Department. 2017. http://gameandfish.standingrock.org/proclamations/fishingsmall-gameprairie-dog/. Accessed July 2017.

33

Draft: July 31, 2018

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

fishing, and that other commonly caught species include smallmouth bass, white bass, northern pike, channel catfish and perch. The declaration also states that during 2015, the Tribe issued 199 family fishing permits to Tribal members, that most of the fishing by Tribal members takes place on Lake Oahe, and is done for subsistence purposes. According to 2015 ACSAmerican Community Survey 5-year estimates the Standing Rock Sioux Tribe has a population of 5,876. Based on these numbernumbers, approximately 3% of tribal memberTribal members bought fishing licenses in 2015.

In the event of a spill, local game and fish managers would be notified of the expected number of days in which the plume would travel downstream within Lake Oahe and be advised to suspend fishing as appropriate (nominally four days at any specific location, plus a conservative buffer time). Since most species of fish can metabolize and excrete hydrocarbons, bioaccumulation is typically limited[11]. Therefore, increasing duration of exposure even beyond four days would not typically result in higher concentrations in tissues, which limits the potential health effects to humans. It is possible that the biggest impact from petroleum buildup in fish tissues could be residual un-metabolized hydrocarbons that might affect the taste of the fish. It is assumed that the impacts of eating fish with PAHs detectable in the edible tissues would be short term, and therefore not considered to have serious long term impacts to subsistence fishing.

Based on the deterministic model scenarios from the SIMAP model, mortality is predicted for birds and aquatic small mammals utilized for hunting. However, none of the model scenarios showed a lake area greater than 0.1 km$^2$ (or 0.039 square mile) above the threshold of 10 µm surface oil thickness for potential impacts to wildlife. Additionally, this surface oil impact is predicted to be of short duration at any one location.

Oiling of the shoreline along Lake Oahe could also result in mortalities of shorebirds, waterfowl, and semi-aquatic mammals. However, none of the model scenarios showed extensive shoreline oiling. The estimated worst-case scenario is that less than 10% of the shoreline within the modeled area would have oiling above the biological threshold. This amount of shoreline coverage would not be anticipated to have a significant impact on the local wildlife population, especially given the requisite remediation following a spill. Therefore, impacts to wildlife are not anticipated to be significant.

The potential impact to upland hunting along the shore of Lake Oahe is very low. Although some deer or other wildlife species could ingest oil-impacted water or eat contaminated vegetation following a spill, the concentration of contaminants would likely not be above acutely toxic thresholds and would not persist long enough to result in a chronic health issue. Furthermore, Lake Oahe is not the only source of fresh water for upland game species. If the western shore of Lake Oahe were to become impacted by an inadvertent release of oil, it is likely that many terrestrial vertebrates would be able to utilize alternative sources of freshwater.

For the reasons above, the potential impact to hunting resources along the shores of Lake Oahe is anticipated to be limited.

It is also important to note the following about the modeled worst-case scenarios:

---

[11] NMFS (National Marine Fisheries Service). 2017. http://response.restoration.noaa.gov/oil-and-chemical-spills/oil-spills/how-oil-spills-affect-fish-and-whales.html

34

Draft: July 31, 2018

RAR001036

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

1. The worst-case scenarios are developed based on a number of conservative assumptions. As noted earlier, a large spill into Lake Oahe is a low probability event.

2. The modeled scenarios in the Spill Model Report all assume no detection and response, with the various releases allowed to travel unmitigated for 10 days. In reality, even if there were a release into Lake Oahe, it is highly unlikely that it would be allowed to travel unmitigated for even a fraction of that time. Dakota Access would implement its location-specific GRP for Lake Oahe and initiate remedial activities as soon as practicable.

3. In the event of a crude oil release that resulted in damage to game species or hunting/fishing activities, Dakota Access would be held responsible to restore, replace, or acquire the equivalent natural resources in accordance with OPA 90. If the responsible party cannot pay, funds from the Oil Spill Liability Trust Fund are used to cover the cost of removal or damages.

Therefore, it is reasonable to determine that DAPL is not anticipated to have releases to soils or water that would result in high adverse human health or environmental impacts to any populations, including those examined in this EJ analysis.

### c)   Review of Alternative Environmental Justice Analysis (Saha and Mohai, 2018)

The USACE has reviewed *An Environmental Justice Analysis of Dakota Access Pipeline Routes*[12]. The authors utilized the areal apportionment method to calculate population-weighted minority and low-income population statistics. The 1998 *Final Guidance for Incorporating Environmental Justice Concerns in EPA's NEPA Compliance Analyses* advises "not to "artificially dilute or inflate" the affected minority population when selecting the appropriate unit of geographic analysis" (e.g., census tract). The guidance does not specify, however, the method to be used to measure minority and low-income populations. The 2016 *Technical Guidance for Assessing Environmental Justice in Regulatory Actions* specifically discusses spatial identification and aggregating effects (Section 6.5.3). It acknowledges that "GIS-based methods enable analysts to define spatial buffers around an emissions source that are more uniform in size and that are easier to customize to reflect the appropriate scale and characteristics of the emissions being analyzed". However, it does not specify use of discuss the areal apportionment method, simply stating that "The method selected should be the one that is most appropriate for the specific regulatory action". It also warns of a number of challenges that arise when using geospatial data, such as the modifiable areal unit problem (i.e., the fact that results can be sensitive to the level of aggregation used in the analysis).

While the areal apportionment method may be appropriate to evaluate the siting of a project and determine potential EJ issues based on chronic long-term exposures to airborne particulates from a continuous emission source (e.g., evaluation of a compressor station), we disagree with the authors of the report that their methodology utilizing the populations from all census block groups to obtain one population-weighted "EJ value" for each metric is appropriate (much less, required) when evaluating a discrete hypothetical release from a pipeline. The USACE is permitting an oil transmission pipeline; it is not permitting a continuous discharge (or any known discharge) into Lake Oahe. There is a low probability of a release and subsequent impacts to downstream beneficial lake uses. Additionally, as noted in the previous sections, impacts from even a worst-case, unmitigated release to beneficial lake

---

[12] Saha, R. and P. Mohai. 2018. An Environmental Justice Analysis of Dakota Access Pipeline Routes.

35

Draft: July 31, 2018

RAR001037

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

uses, including hunting and fishing resources, were determined to be of limited scale and of temporary duration, with variations from one hypothetical release to another.

We believe that the boundary intersection method utilized in our analysis is in accordance with EPA guidance and allows separate analysis of the EJ and non-EJ areas. The results of our analysis demonstrate that the impacts on EJ populations (predominantly along the western shoreline) would not be disproportionate to the impacts on non-EJ populations (predominantly along the entire eastern shoreline).

An additional reason to not to combine together all of the census block groups together is that, depending on lake and weather conditions, both sidesonly one side of the lake downstream of the DAPL crossing may not be impacted by a spill, or the two sides may not be impacted to the same extent. The modeling results presented in the Spill Model Report indicate that the distribution of downstream plume is highly dependent upon currentcurrents and wind conditions and will not have a uniform distribution along Lake Oahe from bank to bank for any given release. As indicated in that report, wind speed and direction at the water surface affect which shore of Lake Oahe is predominantly impacted by a release. Modeled wind data obtained from the National Centers for Environmental Prediction Climate Forecast System Reanalysis waswere used to provide the best estimates of wind speed and direction over a 10-year record (2000-2010) to produce annual wind "roses" and mean monthly wind speeds (presented as Figures 4-6 and 4-7 in the Spill Model Report, RPS 2018). The model used time-varying or mean wind speeds and directions for the time of the spill and simulation. At the Lake Oahe crossing site, the predominant annual wind directions indicated in the results were north-westerly and south-easterly (direction wind comes from) depending on the time of the year. Highest annual wind speeds were most frequently from the north-west. Winds were notably stronger during winter, with speeds exceeding 10 meters per second (m/s) or 22.4 miles per hour (mph) from the northwest. In the summer, winds were most frequently between 5-10 m/s (11.2-22.4 mph) from the southeast. Therefore, the eastern shore would be more impacted during the winter months with the prevailing winds from the north-westnorthwest and the western shore would be more impacted during the summer months with the prevailing winds from the southeast.

Saha and Mohai also used a different end point for the impacts of a hypothetical spill downstream of the Lake Oahe crossing. The choice of a cut-off point downstream of the Lake Oahe crossing is somewhat subjective. In their report, Saha and Mohai observed that the actual distance that oil would be carried by a spill depends on many factors, simply stating that "40 miles is within the distance of downstream impacts from recent major spills from oil pipelines in the U.S." (page 5). In contrast, and as noted at the beginning of the Environmental Justice section, to assess the potential impacts of a spill on downstream tribalTribal populations subject to this remand, this EJ analysis has been performed for downstream areas extending to the census block group that includes the CRST drinking water intake. However, as most of the west side of Lake Oahe downstream of the Lake Oahe crossing is within reservation lands, the general results and conclusions of the EJ analysis would be no different if the downstream end of the impact area was 40 miles from the Lake Oahe crossing (as in Saha and Mohai) or extended to the CRST drinking water intake (as was done for this analysis).

Furthermore, if the potential impact area should bewas extended south of the CRST intake towards the Lake Oahe dam, as at least one other tribe (the Oglala Sioux Tribe) urges, the percentages of Native American, minority, and poverty populations on both shores of Lake Oahe would be reduced. For instance, if the impact area was extended only three miles south of the CRST intake, it would include one additional census block group in Stanley County (Tract 9601/Block Group 1). That census block group is

36

Draft: July 31, 2018

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

only 2.4% Native American, 2.4% minority, and 7.6% poverty. Likewise, if we were to extend the impact area all the way down to the Sully County/Hughes County border on the eastern shore of Lake Oahe (approximately 24.5 miles to the south of the CRST intake and 181 miles from the Lake Oahe crossing), the impact area would include one additional census block group in Hughes County (Tract 9780/Block Group 1). That census block group is only 4.1% Native American, 8.4% minority, and 2.9% poverty. Finally, extending the impact area all the way down to the Lake Oahe dam (approximately 197 miles from the Lake Oahe crossing) would add another census block group in Hughes County (Tract 9777/Block Group 1) that is less than 1% Native American, less than 1% minority, and 7.6% poverty.

Additionally, ourAnother notable difference in the approach by Saha and Mohai is their use of block level (instead of block group) data to analyze potential impacts on minority communities. Our analysis of minority populationscommunity impacts instead relies on block group data fromfor 2011 – 2015 (5-year estimates) from anthe American Community Survey 5-year estimates, whereas . This is the same dataset that we (and Saha and Mohai chose to use) used for poverty populations. Although the block level data Saha and Mohai used from the 2010 Census. Although blocks arecensus is more granular than block groups, thereby increasing the precision, the tradeoff is a loss of consistency from using mismatched data for the poverty and minority aspects of the analysis, the results are. We do not materially different. Asbelieve this is a wise tradeoff, especially given that, as indicated in Table B-3 below, theusing the block level data would not yield materially different results for this project area. The west shore is still predominantly composed of EJ communities (94.7%), while the east shore is predominantly composed of on non-EJ communities (91.6%). And, overall, the proportion of blocks that are EJ communities (38.0% or 166 out of 437 blocks) is not significantly different from the proportion of block groups that are EJ communities (31.3% or 5 out of 16 block groups). More importantly, conducting the analysis at the block group level allows us to use the same data set (2011-2015 American Community Survey) for both minority and poverty populations, thereby ensuring consistency in the results.

**Table B-3. High-Level Comparison by Geographic Unit**

|  | West Shore | East Shore | Total |
|---|---|---|---|
| Total number of blocks | 440 | 701 | 1,141 |
| Number of inhabited blocks | 150 | 287 | 437 |
| Number of EJ-minority blocks | 142 | 24 | 166 |
| EJ-minority blocks as percent of inhabited blocks | 94.7% | 8.4% | 38.0% |
| Total number of block groups | 7 | 9 | 16 |
| Number of EJ-minority block groups | 5 | 0 | 5 |
| EJ-minority block group as percent of all block groups | 71.4% | 0.0% | 31.3% |

Lastly, another contentious point in Saha and Mohai is that, by reporting statistics on household income, disability rate, persons with less than a high school degree, and unemployed persons in Table 5 and Table 6 of their report, the authors expanded the scope of the EJ analysis beyond what is required in E.O. 12898. Note however, thatIn any event, these socioeconomic characteristics are typically highly correlated with persons below the poverty level, so their inclusion does not provide new insight, nor does it change the conclusions of the EJ analysis.

37

Draft: July 31, 2018

RAR001039

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

**2.   PART II – EJ Analysis for North Bismarck Alternative Crossing**

As indicated in the section above (Part I), there are no disproportionate adverse impacts to EJ or minority communities downstream of the DAPL crossing.  However, due to concerns voiced by commenters on the DAPL project, a supplemental EJ analysis was performed to determine the potential impacts downstream had the North Bismarck Alternative crossing been used. The North Bismarck Alternative analysis area includes 56 miles downstream from the North Bismarck crossing to the DAPL crossing. Beyond the DAPL crossing, the impacts discussed in Part I would begin to be repeated for the overlapping areas.  For example, the impact areas for the next five miles of the North Bismarck crossing (miles 57-62), would be the same as those for the first five miles of the DAPL crossing (miles 0-5).

In order to evaluate the potential impacts, the methodology utilized for the evaluation of the DAPL crossing was also used to evaluate the North Bismarck Alternative.  This includes the analysis of census block groups downstream from the North Bismarck Alternative to the Dakota Access crossing at Lake Oahe.  The results of the analysis of minority and impoverished communities within a one-mile buffer of the Missouri River are present in Table B-4 below. Impacts to the utilization of the Missouri River for hunting, fishing, recreation, and cultural practices would be similar to those identified in the sections above for Lake Oahe and are not repeated here.



38

Draft: July 31, 2018

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

| Table B-4. Minority and Low-Income Population Statistics for North Bismarck Crossing Alternative (Data from ACS 2011-2015, 5-year estimates) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Geographic Area | Total Population | Percent | | | | | | | | Total Minority Population | Persons Below the Poverty Level |
| | | White | Black or African Am. | Am. Indian and Alaska Native | Asian | Native Hawaiian and Other Pacific Islander | Hispanic or Latino | Some Other Race | Two or More Races | | |
| **State** | | | | | | | | | | | |
| North Dakota | 721,640 | 87.05 | 1.60 | 5.20 | 1.22 | 0.04 | 2.85 | 0.05 | 2.00 | 12.95 | 11.46 |
| **Counties** | | | | | | | | | | | |
| *West Shore* Morton (ND) | 28,985 | 91.39 | 0.65 | 3.57 | 0.14 | 0.00 | 2.29 | 0.00 | 1.96 | 8.61 | 7.99 |
| Sioux (ND) | 4,380 | 13.93 | 0.05 | 79.36 | 0.16 | 0.11 | 3.56 | 0.16 | 2.67 | *86.07* | *35.72* |
| *East Shore* Burleigh (ND) | 88,223 | 91.07 | 0.86 | 3.76 | 0.65 | 0.02 | 1.75 | 0.04 | 1.85 | 8.93 | 8.17 |
| Emmons (ND) | 3,463 | 96.79 | 0.00 | 0.32 | 0.46 | 0.00 | 0.12 | 0.00 | 2.31 | 3.21 | 11.33 |
| **Block Groups** | | | | | | | | | | | |
| Block Group 0201-1 | 2,051 | 96.73 | 0.05 | 0.93 | 0.00 | 0.00 | 2.29 | 0.00 | 0.00 | 3.27 | 3.72 |
| Block Group 0201-2 | 1,564 | 83.63 | 1.28 | 3.58 | 1.02 | 0.00 | 0.26 | 0.00 | 10.23 | 16.37 | *20.52* |
| Block Group 0201-4 | 1,177 | 73.58 | 0.00 | 26.42 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 26.42 | 3.91 |
| Block Group 0202-1 | 1,778 | 92.58 | 0.00 | 6.52 | 0.00 | 0.00 | 0.00 | 0.00 | 0.90 | 7.42 | 3.17 |
| Block Group 0202-2 | 1,371 | 98.83 | 0.00 | 0.00 | 1.17 | 0.00 | 0.00 | 0.00 | 1.17 | 1.17 | 3.32 |
| Block Group 0203-1 | 1,558 | 87.48 | 0.00 | 10.40 | 0.00 | 0.00 | 0.13 | 0.00 | 1.99 | 12.52 | 15.27 |
| Block Group 0203-2 | 2,032 | 89.71 | 0.00 | 7.78 | 0.00 | 0.00 | 1.53 | 0.00 | 0.98 | 10.29 | *22.93* |
| Block Group 0203-3 | 3,643 | 95.83 | 0.00 | 1.13 | 0.00 | 0.00 | 1.37 | 0.00 | 1.67 | 4.17 | 4.04 |
| Block Group 0204-1 | 1,511 | 95.43 | 0.00 | 2.58 | 0.00 | 0.00 | 0.00 | 0.00 | 1.99 | 4.57 | 4.43 |
| Block Group 0204-3 | 934 | 92.40 | 0.00 | 1.07 | 0.00 | 0.00 | 4.82 | 0.00 | 1.71 | 7.60 | 1.51 |
| Block Group 9408-1 | 961 | 13.32 | 0.00 | 82.73 | 0.00 | 0.00 | 1.04 | 0.31 | 2.60 | *86.68* | *42.80* |
| Block Group 9409-1 | 1,710 | 5.32 | 0.00 | 88.19 | 0.18 | 0.00 | 3.22 | 0.00 | 3.10 | *94.68* | *35.52* |
| Block Group 9409-2 | 1,000 | 8.00 | 0.20 | 85.10 | 0.00 | 0.30 | 4.30 | 0.40 | 1.70 | *92.00* | *37.99* |

39

Draft: July 31, 2018

RAR001041

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

| | Geographic Area | Total Population | White | Black or African Am. | Am. Indian and Alaska Native | Asian | Native Hawaiian and Other Pacific Islander | Hispanic or Latino | Some Other Race | Two or More Races | Total Minority Population | Persons Below the Poverty Level |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Block Group 101-2 | 1,086 | 88.86 | 3.41 | 0.00 | 0.00 | 0.00 | 7.27 | 0.00 | 0.46 | 11.14 | 3.59 |
| | Block Group 101-3 | 1,448 | 77.28 | 0.97 | 15.81 | 0.90 | 0.00 | 3.45 | 0.00 | 1.59 | 22.72 | 27.79 |
| | Block Group 105-1 | 2,367 | 88.34 | 4.82 | 2.96 | 0.00 | 0.00 | 1.06 | 0.00 | 2.24 | 11.66 | 6.63 |
| | Block Group 105-2 | 1,920 | 97.45 | 0.00 | 0.73 | 0.00 | 0.00 | 0.21 | 0.00 | 1.61 | 2.55 | 13.05 |
| | Block Group 105-3 | 772 | 100.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3.29 |
| | Block Group 106-1 | 1,131 | 88.24 | 0.00 | 11.76 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11.76 | 15.51 |
| | Block Group 106-2 | 1,161 | 40.31 | 3.70 | 36.61 | 0.09 | 0.00 | 1.81 | 0.00 | 17.48 | 59.69 | 51.30 |
| | Block Group 106-3 | 2,300 | 93.83 | 0.00 | 3.61 | 0.57 | 0.00 | 2.00 | 0.00 | 0.00 | 6.17 | 4.43 |
| East Shore | Block Group 107-2 | 1,122 | 92.87 | 0.62 | 1.34 | 0.00 | 0.00 | 3.03 | 0.00 | 2.14 | 7.13 | 20.59 |
| | Block Group 107-3 | 1,823 | 98.03 | 0.00 | 1.32 | 0.00 | 0.00 | 0.66 | 0.00 | 0.00 | 1.97 | 0.77 |
| | Block Group 111.03-1 | 1,505 | 99.20 | 0.00 | 0.00 | 0.80 | 0.00 | 0.00 | 0.00 | 0.00 | 0.80 | 2.33 |
| | Block Group 111.03-2 | 1,887 | 87.44 | 1.59 | 6.41 | 1.80 | 0.00 | 1.96 | 0.37 | 0.42 | 12.56 | 5.11 |
| | Block Group 111.04-2 | 3,215 | 94.34 | 0.00 | 1.99 | 2.21 | 0.00 | 1.28 | 0.00 | 0.19 | 5.66 | 2.18 |
| | Block Group 111.05-1 | 3,052 | 95.48 | 0.00 | 3.01 | 0.00 | 0.00 | 0.33 | 0.00 | 1.18 | 4.52 | 2.15 |
| | Block Group 111.05-2 | 1,146 | 98.69 | 0.00 | 0.70 | 0.00 | 0.00 | 0.61 | 0.00 | 0.00 | 1.31 | 0.00 |
| | Block Group 112-1 | 1,675 | 86.69 | 0.12 | 2.09 | 0.00 | 0.00 | 0.00 | 0.00 | 11.10 | 13.31 | 8.89 |
| | Block Group 112-3 | 1,097 | 92.43 | 0.82 | 4.28 | 0.00 | 0.00 | 1.19 | 0.00 | 1.28 | 7.57 | 1.24 |
| | Block Group 112-4 | 2,129 | 88.30 | 2.68 | 0.94 | 0.00 | 0.00 | 5.31 | 0.00 | 2.77 | 11.70 | 1.92 |
| | Block Group 113-2 | 2,105 | 96.06 | 0.10 | 1.85 | 0.05 | 0.00 | 0.62 | 0.00 | 1.33 | 3.94 | 1.62 |
| | Block Group 114-2 | 1,807 | 95.57 | 0.00 | 1.72 | 0.89 | 0.00 | 0.66 | 0.00 | 1.16 | 4.43 | 2.94 |
| | Block Group 9665-1 | 793 | 90.42 | 0.00 | 0.00 | 0.00 | 0.00 | 0.50 | 0.00 | 9.08 | 9.58 | 9.96 |

**Table B-4. Minority and Low-Income Population Statistics for North Bismarck Crossing Alternative (Data from ACS 2011-2015, 5-year estimates)**

40

Draft: July 31, 2018

RAR001042

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

Source: U.S. Census Bureau, American Community Survey (2015 estimates).



41

Draft: July 31, 2018

RAR001043

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

As shown in Table B-4 above, the communities impacted by an oil release into the Missouri River at the North Bismarck Alternative crossing would include both EJ and non-EJ communities. Eight of the block groups that intersect the one-mile analysis buffer qualify as EJ communities. In total, there are approximately 8,087 minority individuals within the block groups that intersect the one-mile analysis buffer. By way of comparison, the *entire* minority populations of the four counties within 56 miles downstream of the DAPL crossing (Sioux County, ND and Corson County, SD on the west side; and Emmons County, ND and Campbell County, SD on the east side)[13] are only approximately 6,807 minority individuals—fewer than the number within the block groups intersecting the one-mile buffer for the release at the North Bismarck Alternative crossing.

A release to the river at the North Bismarck crossing location would also impact three drinking water intakes within the 56-mile North Bismarck Alternative analysis area as indicated in Table B-5.

**Table B-5. Drinking Water Intakes Downstream of the North Bismarck Alternative Crossing.**

| Drinking Water Intake/ Owner | Distance Downstream from North Bismarck Crossing Location (miles) |
|---|---|
| South Central Regional Water District Missouri River Horizontal Drinking Water Intake Well Field* (non-Tribal) | 1.9 – 2.0 |
| City of Mandan Surface Water Intake (non-Tribal) | 7.1 |
| City of Bismarck Surface Water Intake (non-Tribal) | 11.6 |
| City of Bismarck Missouri River Horizontal Drinking Water Intake Wells* (Well Installed Within Gravel Unit Interface Below Missouri River) | 12.3 |

Drinking water intakes potentially affected by the North Bismarck Alternative Crossing (within the 56-mile analysis area) are illustrated on Figure B-3.
* Both the SCRWD Drinking Water Intake Wells and the City of Bismarck Drinking Water Intake Well are wells that were installed horizontally beneath the Missouri River at the river/groundwater interface below the Missouri River. The SCRWD Missouri River Horizontal Drinking Water Intake Well Field consists of a series of nine intake wells.

---

[13] A release traveling 56 miles downstream of the North Bismarck crossing would only reach approximately the midpoint of the two referenced South Dakota counties (Corson County on the west side and Campbell County on the east side) after passing the two referenced North Dakota counties (Sioux County on the west side; and Emmons County on the east side).  Morton County, North Dakota is not included because the portion immediately downstream of the Lake Oahe crossing (less than 0.5 mile) is uninhabited.

Draft: July 31, 2018

RAR001044

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

The City of Mandan and the City of Bismarck intakes would serve both EJ and non-EJ communities. By contrast, no Tribal drinking water intakes would be impacted within an equivalent 56-mile reach downstream of the DAPL crossing as indicated in Table B-7 in Part III below.

### 3.   PART III – EJ Analysis Drinking Water Intake Distribution

As indicated in Parts I and II above, there are no disproportionate adverse impacts to EJ communities with either the DAPL crossing or the North Bismarck Alternative crossing. Additionally, no significant potential health effects to humans are anticipated in relation to water intakes downstream of the DAPL crossing. Even in the event of a worst-case spill, no oil was modeled to be present at the intake locations for drinking water. Therefore, no ingestion of drinking water above U.S. EPA health limits is anticipated. Out of caution in the event of a release that results in surface oil reaching the intake locations, though, operators would be advised to temporarily shut off water intakes until the plume had passed. In that case, an alternative water source would be provided as described above. We do not believe the resulting temporary inconvenience to users would be classified as an EJ issue under any measure. Regardless, for the sake of completeness we have evaluated the populations served by the water intakes that might be impacted under each alternative.

The same methodology discussed above (section II.B.1.a) was utilized for the evaluation of the drinking water intake distribution. This includes the analysis of census block groups within all drinking water districts that have an intake located on the Missouri River or Lake Oahe from 1) the North Bismarck Alternative crossing to the DAPL crossing (approximately 56 miles) and 2) the DAPL crossing to the CRST intake (approximately 156 miles south of the DAPL crossing). The results of the drinking water intake distribution analysis are present in Table B-6.

43

Draft: July 31, 2018

RAR001045

| Table B-6.  Minority and Low-Income Population Statistics for Water Supply Areas Downstream of North Bismarck Alternative and DAPL Crossings (Data from ACS 2011-2015, 5-year estimates) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Geographic Area | Total Population | Percent | | | | | | | | | |
| | | White | Black or African American | American Indian and Alaska Native | Asian | Native Hawaiian and Other Pacific Islander | Hispanic or Latino | Some Other Race | Two or More Races | Total Minority Population | Persons Below the Poverty Level |
| **States** | | | | | | | | | | | |
| North Dakota | 721,640 | 87.05 | 1.60 | 5.20 | 1.22 | 0.04 | 2.85 | 0.05 | 2.00 | 12.95 | 11.46 |
| South Dakota | 843,190 | 83.22 | 1.52 | 8.30 | 1.20 | 0.04 | 3.31 | 0.08 | 2.34 | 16.78 | 14.11 |
| **Counties** | | | | | | | | | | | |
| Burleigh (ND) | 88,223 | 91.07 | 0.86 | 3.76 | 0.65 | 0.02 | 1.75 | 0.04 | 1.85 | 8.93 | 8.17 |
| Emmons (ND) | 3,463 | 96.79 | 0.00 | 0.32 | 0.46 | 0.00 | 0.12 | 0.00 | 2.31 | 3.21 | 11.33 |
| Grant (ND) | 2,362 | 97.04 | 0.34 | 1.10 | 0.00 | 0.00 | 0.85 | 0.00 | 0.68 | 2.96 | 14.88 |
| Kidder (ND) | 2,430 | 94.73 | 0.00 | 0.00 | 0.00 | 0.00 | 5.02 | 0.00 | 0.25 | 5.27 | 7.62 |
| Logan (ND) | 1,945 | 96.56 | 0.31 | 0.31 | 0.31 | 0.00 | 1.44 | 0.05 | 1.03 | 3.44 | 8.08 |
| McIntosh (ND) | 2,759 | 95.83 | 0.33 | 0.51 | 0.51 | 0.00 | 0.91 | 0.00 | 1.92 | 4.17 | 11.73 |
| Morton (ND) | 28,985 | 91.39 | 0.65 | 3.57 | 0.14 | 0.00 | 2.29 | 0.00 | 1.96 | 8.61 | 7.99 |
| Oliver (ND) | 1,819 | 91.70 | 0.00 | 4.29 | 0.16 | 0.00 | 2.91 | 0.16 | 0.44 | 8.30 | 7.68 |
| Sioux (ND) | 4,380 | 13.93 | 0.05 | 79.36 | 0.16 | 0.11 | 3.56 | 0.16 | 2.67 | 86.07 | 35.72 |
| Brown (SD) | 38,060 | 89.91 | 1.51 | 3.34 | 1.86 | 0.02 | 2.25 | 0.03 | 1.09 | 10.09 | 9.82 |
| Campbell (SD) | 1,548 | 94.90 | 0.00 | 3.49 | 0.78 | 0.00 | 0.19 | 0.00 | 0.65 | 5.10 | 9.06 |
| Clark (SD) | 3,625 | 93.79 | 0.77 | 1.05 | 0.80 | 0.00 | 2.54 | 0.36 | 0.69 | 6.21 | 15.91 |
| Corson (SD) | 4,149 | 30.95 | 0.29 | 66.76 | 0.29 | 0.00 | 0.58 | 0.00 | 1.13 | 69.05 | 45.58 |
| Day (SD) | 5,618 | 87.02 | 0.00 | 9.11 | 0.46 | 0.00 | 1.94 | 0.00 | 1.46 | 12.98 | 22.10 |
| Dewey (SD) | 5,579 | 21.72 | 0.04 | 75.57 | 0.00 | 0.00 | 0.91 | 0.00 | 1.76 | 78.28 | 27.83 |
| Edmunds (SD) | 4,018 | 96.69 | 0.12 | 1.34 | 0.40 | 0.00 | 1.27 | 0.00 | 0.17 | 3.31 | 12.29 |
| Faulk (SD) | 2,359 | 94.07 | 0.00 | 1.78 | 0.13 | 0.00 | 4.03 | 0.00 | 0.00 | 5.93 | 16.37 |
| Hand (SD) | 3,375 | 97.42 | 0.00 | 0.15 | 0.30 | 0.00 | 1.39 | 0.00 | 0.74 | 2.58 | 8.17 |
| McPherson (SD) | 2,263 | 91.47 | 0.22 | 5.70 | 0.35 | 0.00 | 2.08 | 0.00 | 0.18 | 8.53 | 22.06 |
| Marshall (SD) | 4,701 | 83.37 | 0.62 | 8.98 | 0.04 | 0.00 | 4.83 | 0.00 | 2.17 | 16.63 | 15.15 |
| Potter (SD) | 2,307 | 92.72 | 0.00 | 3.34 | 1.13 | 0.00 | 0.87 | 0.00 | 1.95 | 7.28 | 11.59 |
| Spink (SD) | 6,570 | 95.08 | 0.21 | 1.26 | 0.00 | 0.55 | 1.98 | 0.00 | 0.91 | 4.92 | 12.54 |
| Walworth (SD) | 5,495 | 81.31 | 0.20 | 8.50 | 2.78 | 0.51 | 4.68 | 0.00 | 2.02 | 18.69 | 12.24 |
| Ziebach (SD) | 2,833 | 23.72 | 0.28 | 70.56 | 0.74 | 0.00 | 3.67 | 0.00 | 1.02 | 76.28 | 39.55 |

*North Dakota* (row grouping label for Burleigh through Sioux)

*South Dakota* (row grouping label for Brown through Ziebach)

44

Draft: July 31, 2018

RAR001046

| | Geographic Area | | Total Population | Percent | | | | | | | | Total Minority Population | Persons Below the Poverty Level |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | White | Black or African American | American Indian and Alaska Native | Asian | Native Hawaiian and Other Pacific Islander | Hispanic or Latino | Some Other Race | Two or More Races | | |

**Table B-6.  Minority and Low-Income Population Statistics for Water Supply Areas Downstream of North Bismarck Alternative and DAPL Crossings
(Data from ACS 2011-2015, 5-year estimates)**

**Block Groups**

| State | County | ID | Geographic Area | Total Population | White | Black or African American | American Indian and Alaska Native | Asian | Native Hawaiian and Other Pacific Islander | Hispanic or Latino | Some Other Race | Two or More Races | Total Minority Population | Persons Below the Poverty Level |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| North Dakota | Burleigh County | 380150101001 | Block Group 1, Census Tract 101 | 748 | 95.32 | 0.00 | 0.13 | 2.54 | 0.00 | 0.67 | 0.00 | 1.34 | 4.68 | 24.63 |
| | | 380150101002 | Block Group 2, Census Tract 101 | 1,086 | 88.86 | 3.41 | 0.00 | 0.00 | 0.00 | 7.27 | 0.00 | 0.46 | 11.14 | 3.59 |
| | | 380150101003 | Block Group 3, Census Tract 101 | 1,448 | 77.28 | 0.97 | 15.81 | 0.90 | 0.00 | 3.45 | 0.00 | 1.59 | 22.72 | 27.79 |
| | | 380150102001 | Block Group 1, Census Tract 102 | 1,949 | 94.97 | 2.57 | 1.08 | 0.46 | 0.00 | 0.00 | 0.00 | 0.92 | 5.03 | 2.98 |
| | | 380150102002 | Block Group 2, Census Tract 102 | 1,513 | 96.03 | 0.00 | 2.25 | 0.00 | 0.00 | 0.99 | 0.00 | 0.73 | 3.97 | 2.27 |
| | | 380150102003 | Block Group 3, Census Tract 102 | 1,055 | 91.18 | 0.00 | 8.82 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 8.82 | 15.36 |
| | | 380150102004 | Block Group 4, Census Tract 102 | 711 | 61.32 | 0.00 | 33.61 | 0.00 | 0.00 | 5.06 | 0.00 | 0.00 | 38.68 | 62.73 |
| | | 380150103001 | Block Group 1, Census Tract 103 | 1,557 | 93.90 | 0.00 | 3.08 | 3.02 | 0.00 | 0.00 | 0.00 | 0.00 | 6.10 | 6.62 |
| | | 380150103002 | Block Group 2, Census Tract 103 | 1,567 | 97.83 | 1.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.08 | 2.17 | 6.83 |
| | | 380150103003 | Block Group 3, Census Tract 103 | 903 | 95.24 | 0.00 | 0.00 | 0.00 | 0.00 | 4.76 | 0.00 | 0.00 | 4.76 | 1.00 |
| | | 380150103004 | Block Group 4, Census Tract 103 | 597 | 95.48 | 4.36 | 0.17 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4.52 | 8.01 |
| | | 380150103005 | Block Group 5, Census Tract 103 | 714 | 100.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11.03 |
| | | 380150103006 | Block Group 6, Census Tract 103 | 1,363 | 100.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 6.16 |
| | | 380150104001 | Block Group 1, Census Tract 104 | 1,477 | 94.38 | 0.00 | 3.39 | 0.00 | 0.00 | 1.22 | 0.00 | 1.02 | 5.62 | 7.03 |
| | | 380150104002 | Block Group 2, Census Tract 104 | 849 | 91.28 | 0.94 | 0.00 | 0.00 | 0.00 | 5.42 | 0.00 | 2.36 | 8.72 | 8.01 |
| | | 380150104003 | Block Group 3, Census Tract 104 | 1,424 | 91.78 | 3.72 | 0.00 | 0.00 | 0.00 | 3.51 | 0.00 | 0.98 | 8.22 | 1.54 |
| | | 380150105001 | Block Group 1, Census Tract 105 | 2,367 | 88.34 | 4.82 | 2.96 | 0.00 | 0.59 | 1.06 | 0.00 | 2.24 | 11.66 | 6.63 |
| | | 380150105002 | Block Group 2, Census Tract 105 | 1,920 | 97.45 | 0.00 | 0.73 | 0.00 | 0.00 | 0.21 | 0.00 | 1.61 | 2.55 | 13.05 |
| | | 380150105003 | Block Group 3, Census Tract 105 | 772 | 100.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3.29 |
| | | 380150106001 | Block Group 1, Census Tract 106 | 1,131 | 88.24 | 0.00 | 11.76 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11.76 | 15.51 |
| | | 380150106002 | Block Group 2, Census Tract 106 | 1,161 | 40.31 | 3.70 | 36.61 | 0.09 | 0.00 | 1.81 | 0.00 | 17.48 | 59.69 | 51.30 |
| | | 380150106003 | Block Group 3, Census Tract 106 | 2,300 | 93.83 | 0.00 | 3.61 | 0.57 | 0.00 | 2.00 | 0.00 | 6.17 | 4.43 |
| | | 380150107001 | Block Group 1, Census Tract 107 | 1,353 | 94.01 | 0.00 | 3.33 | 0.00 | 0.00 | 1.40 | 0.00 | 1.26 | 5.99 | 9.46 |
| | | 380150107002 | Block Group 2, Census Tract 107 | 1,122 | 92.87 | 0.62 | 1.34 | 0.00 | 0.00 | 3.03 | 0.00 | 2.14 | 7.13 | 20.59 |
| | | 380150107003 | Block Group 3, Census Tract 107 | 1,823 | 98.03 | 0.00 | 1.32 | 0.00 | 0.00 | 0.66 | 0.00 | 1.97 | 0.77 |
| | | 380150108001 | Block Group 1, Census Tract 108 | 2,087 | 85.48 | 0.00 | 10.11 | 0.00 | 0.00 | 0.00 | 0.00 | 4.36 | 14.52 | 19.79 |
| | | 380150108002 | Block Group 2, Census Tract 108 | 1,973 | 87.68 | 0.25 | 8.67 | 0.00 | 0.00 | 1.62 | 0.00 | 1.77 | 12.32 | 10.92 |
| | | 380150109001 | Block Group 1, Census Tract 109 | 1,879 | 92.39 | 0.00 | 1.44 | 0.00 | 0.00 | 5.48 | 0.00 | 0.69 | 7.61 | 9.12 |
| | | 380150109002 | Block Group 2, Census Tract 109 | 1,176 | 74.23 | 6.72 | 12.93 | 0.00 | 0.00 | 3.57 | 0.94 | 1.62 | 25.77 | 18.96 |
| | | 380150109003 | Block Group 3, Census Tract 109 | 1,571 | 97.20 | 0.57 | 0.00 | 0.00 | 0.00 | 0.95 | 0.00 | 1.27 | 2.80 | 1.34 |
| | | 380150110011 | Block Group 1, Census Tract 110.01 | 1,883 | 81.15 | 5.47 | 3.61 | 0.00 | 0.00 | 5.31 | 0.85 | 3.61 | 18.85 | 22.16 |
| | | 380150110012 | Block Group 2, Census Tract 110.01 | 2,393 | 92.77 | 0.00 | 1.50 | 5.22 | 0.00 | 0.00 | 0.00 | 0.50 | 7.23 | 8.73 |

45

Draft: July 31, 2018

RAR001047

| | | | | Percent | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| County | Geographic Area | | Total Population | White | Black or African American | American Indian and Alaska Native | Asian | Native Hawaiian and Other Pacific Islander | Hispanic or Latino | Some Other Race | Two or More Races | Total Minority Population | Persons Below the Poverty Level |
| | 380150110013 | Block Group 3, Census Tract 110.01 | 1,112 | 92.72 | 0.00 | 1.62 | 0.00 | 0.00 | 0.00 | 0.00 | 5.67 | 7.28 | 2.61 |
| | 380150110021 | Block Group 1, Census Tract 110.02 | 3,308 | 87.64 | 1.27 | 0.00 | 0.21 | 0.00 | 3.42 | 0.00 | 7.47 | 12.36 | 2.12 |
| | 380150110022 | Block Group 2, Census Tract 110.02 | 3,029 | 99.74 | 0.07 | 0.00 | 0.00 | 0.00 | 0.20 | 0.00 | 0.00 | 0.26 | 0.33 |
| | 380150111011 | Block Group 1, Census Tract 111.01 | 1,969 | 79.53 | 0.00 | 5.03 | 0.00 | 0.00 | 9.14 | 0.00 | 6.30 | 20.47 | 11.07 |
| | 380150111012 | Block Group 2, Census Tract 111.01 | 789 | 83.40 | 1.14 | 0.63 | 9.38 | 0.00 | 2.41 | 0.00 | 3.04 | 16.60 | 26.74 |
| | 380150111013 | Block Group 3, Census Tract 111.01 | 2,613 | 87.87 | 1.38 | 8.88 | 1.57 | 0.00 | 0.00 | 0.00 | 0.31 | 12.13 | 11.92 |
| | 380150111031 | Block Group 1, Census Tract 111.03 | 1,505 | 99.20 | 0.00 | 0.80 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.80 | 2.33 |
| | 380150111032 | Block Group 2, Census Tract 111.03 | 1,887 | 87.44 | 1.59 | 6.41 | 1.80 | 0.00 | 1.96 | 0.37 | 0.42 | 12.56 | 5.11 |
| | 380150111041 | Block Group 1, Census Tract 111.04 | 1,604 | 94.08 | 0.00 | 0.00 | 5.36 | 0.00 | 0.00 | 0.00 | 0.56 | 5.92 | 0.00 |
| | 380150111042 | Block Group 2, Census Tract 111.04 | 3,215 | 94.34 | 0.00 | 1.99 | 2.21 | 0.00 | 1.28 | 0.00 | 0.19 | 5.66 | 2.18 |
| | 380150111051 | Block Group 1, Census Tract 111.05 | 3,052 | 95.48 | 0.00 | 3.01 | 0.00 | 0.00 | 0.33 | 0.00 | 1.18 | 4.52 | 2.15 |
| | 380150111052 | Block Group 2, Census Tract 111.05 | 1,146 | 98.69 | 0.00 | 0.70 | 0.00 | 0.00 | 0.61 | 0.00 | 0.00 | 1.31 | 0.00 |
| | 380150112001 | Block Group 1, Census Tract 112 | 1,675 | 86.69 | 0.12 | 2.09 | 0.00 | 0.00 | 0.00 | 0.00 | 11.10 | 13.31 | 8.89 |
| | 380150112002 | Block Group 2, Census Tract 112 | 1,486 | 94.35 | 0.00 | 0.00 | 0.00 | 0.00 | 5.65 | 0.00 | 0.00 | 5.65 | 7.87 |
| | 380150112003 | Block Group 3, Census Tract 112 | 1,097 | 92.43 | 0.82 | 4.28 | 0.00 | 0.00 | 1.19 | 0.00 | 1.28 | 7.57 | 1.24 |
| | 380150112004 | Block Group 4, Census Tract 112 | 2,129 | 88.30 | 2.68 | 0.94 | 0.00 | 0.00 | 5.31 | 0.00 | 2.77 | 11.70 | 1.92 |
| | 380150113001 | Block Group 1, Census Tract 113 | 2,723 | 95.67 | 0.00 | 0.77 | 0.00 | 0.00 | 1.84 | 0.00 | 1.73 | 4.33 | 1.29 |
| | 380150113002 | Block Group 2, Census Tract 113 | 2,105 | 96.06 | 0.10 | 1.85 | 0.05 | 0.00 | 0.62 | 0.00 | 1.33 | 3.94 | 1.62 |
| | 380150113003 | Block Group 3, Census Tract 113 | 1,814 | 82.86 | 0.08 | 15.49 | 0.00 | 0.00 | 0.88 | 0.00 | 0.72 | 17.14 | 17.56 |
| | 380150114001 | Block Group 1, Census Tract 114 | 684 | 97.22 | 0.00 | 1.46 | 0.00 | 0.00 | 0.44 | 0.00 | 0.88 | 2.78 | 7.60 |
| | 380150114002 | Block Group 2, Census Tract 114 | 1,807 | 95.57 | 0.00 | 1.72 | 0.89 | 0.00 | 0.66 | 0.00 | 1.16 | 4.43 | 2.94 |
| | 380150115001 | Block Group 1, Census Tract 115 | 831 | 95.67 | 0.00 | 0.36 | 0.36 | 0.00 | 2.53 | 0.24 | 0.84 | 4.33 | 6.98 |
| | 380150115002 | Block Group 2, Census Tract 115 | 771 | 96.89 | 0.00 | 0.65 | 0.00 | 0.00 | 1.04 | 0.00 | 1.43 | 3.11 | 5.71 |
| Emmons County | 380299665001 | Block Group 1, Census Tract 9665 | 793 | 90.42 | 0.00 | 0.00 | 0.00 | 0.00 | 0.50 | 0.00 | 9.08 | 9.58 | 9.96 |
| | 380299665002 | Block Group 2, Census Tract 9665 | 757 | 99.60 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.40 | 0.40 | 14.00 |
| | 380299665003 | Block Group 3, Census Tract 9665 | 783 | 98.08 | 0.00 | 1.40 | 0.51 | 0.00 | 0.00 | 0.00 | 0.00 | 1.92 | 11.40 |
| | 380299665004 | Block Group 4, Census Tract 9665 | 1,130 | 98.50 | 0.00 | 0.00 | 1.06 | 0.00 | 0.00 | 0.00 | 0.44 | 1.50 | 10.44 |
| Grant County | 380379659002 | Block Group 2, Census Tract 9659 | 1,430 | 98.67 | 0.00 | 0.56 | 0.00 | 0.00 | 0.49 | 0.00 | 0.28 | 1.33 | 17.52 |
| Kidder County | 380439668001 | Block Group 1, Census Tract 9668 | 828 | 92.87 | 0.00 | 0.00 | 0.00 | 0.00 | 7.13 | 0.00 | 0.00 | 7.13 | 10.27 |
| | 380439668002 | Block Group 2, Census Tract 9668 | 831 | 99.28 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.72 | 0.72 | 5.17 |
| | 380439668003 | Block Group 3, Census Tract 9668 | 771 | 91.83 | 0.00 | 0.00 | 0.00 | 0.00 | 8.17 | 0.00 | 0.00 | 8.17 | 7.41 |

**Table B-6.  Minority and Low-Income Population Statistics for Water Supply Areas Downstream of North Bismarck Alternative and DAPL Crossings (Data from ACS 2011-2015, 5-year estimates)**

46

Draft: July 31, 2018

RAR001048

**Table B-6.  Minority and Low-Income Population Statistics for Water Supply Areas Downstream of North Bismarck Alternative and DAPL Crossings (Data from ACS 2011-2015, 5-year estimates)**

| Geographic Area | | Total Population | Percent | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | White | Black or African American | American Indian and Alaska Native | Asian | Native Hawaiian and Other Pacific Islander | Hispanic or Latino | Some Other Race | Two or More Races | Total Minority Population | Persons Below the Poverty Level |
| **Logan County** 380479725001 | Block Group 1, Census Tract 9725 | 1,166 | 97.26 | 0.00 | 0.51 | 0.51 | 0.00 | 0.00 | 0.00 | 1.72 | 2.74 | 6.57 |
| 380479725002 | Block Group 2, Census Tract 9725 | 779 | 95.51 | 0.77 | 0.00 | 0.00 | 0.00 | 3.59 | 0.13 | 0.00 | 4.49 | 10.39 |
| **McIntosh County** 380519729001 | Block Group 1, Census Tract 9729 | 1,012 | 95.16 | 0.89 | 0.00 | 0.30 | 0.00 | 2.47 | 0.00 | 1.19 | 4.84 | 10.75 |
| 380519729002 | Block Group 2, Census Tract 9729 | 943 | 97.99 | 0.00 | 0.74 | 0.00 | 0.00 | 0.00 | 0.00 | 1.27 | 2.01 | 11.56 |
| 380519729003 | Block Group 3, Census Tract 9729 | 804 | 94.15 | 0.00 | 0.87 | 1.37 | 0.00 | 0.00 | 0.00 | 3.61 | 5.85 | 13.18 |
| **Morton County** 380590201001 | Block Group 1, Census Tract 201 | 2,051 | 96.73 | 0.05 | 0.93 | 0.00 | 0.00 | 2.29 | 0.00 | 0.00 | 3.27 | 3.72 |
| 380590201002 | Block Group 2, Census Tract 201 | 1,564 | 83.63 | 1.28 | 3.58 | 1.02 | 0.00 | 0.26 | 0.00 | 10.23 | 16.37 | 20.52 |
| 380590201003 | Block Group 3, Census Tract 201 | 710 | 97.89 | 0.00 | 0.70 | 0.00 | 0.00 | 0.70 | 0.00 | 0.70 | 2.11 | 24.23 |
| 380590201004 | Block Group 4, Census Tract 201 | 1,177 | 73.58 | 0.00 | 26.42 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 26.42 | 3.91 |
| 380590202001 | Block Group 1, Census Tract 202 | 1,778 | 92.58 | 0.00 | 6.52 | 0.00 | 0.00 | 0.00 | 0.00 | 0.90 | 7.42 | 3.17 |
| 380590202002 | Block Group 2, Census Tract 202 | 1,371 | 98.83 | 0.00 | 0.00 | 1.17 | 0.00 | 0.00 | 0.00 | 0.00 | 1.17 | 3.32 |
| 380590202003 | Block Group 3, Census Tract 202 | 1,510 | 89.14 | 0.00 | 0.40 | 0.00 | 0.00 | 10.26 | 0.00 | 0.20 | 10.86 | 4.62 |
| 380590202004 | Block Group 4, Census Tract 202 | 1,154 | 74.35 | 12.74 | 5.11 | 0.00 | 0.00 | 3.29 | 0.00 | 4.51 | 25.65 | 5.20 |
| 380590202005 | Block Group 5, Census Tract 202 | 1,761 | 92.50 | 0.00 | 0.45 | 0.00 | 0.00 | 4.60 | 0.00 | 2.44 | 7.50 | 10.91 |
| 380590203001 | Block Group 1, Census Tract 203 | 1,558 | 87.48 | 0.00 | 10.40 | 0.00 | 0.00 | 0.13 | 0.00 | 1.99 | 12.52 | 15.27 |
| 380590203002 | Block Group 2, Census Tract 203 | 2,032 | 89.71 | 0.00 | 7.78 | 0.00 | 0.00 | 1.53 | 0.00 | 0.98 | 10.29 | 22.93 |
| 380590203003 | Block Group 3, Census Tract 203 | 3,643 | 95.83 | 0.00 | 1.13 | 0.00 | 0.00 | 1.37 | 0.00 | 1.67 | 4.17 | 4.04 |
| 380590203004 | Block Group 4, Census Tract 203 | 1,939 | 89.89 | 0.36 | 0.98 | 0.00 | 0.00 | 3.56 | 0.00 | 5.21 | 10.11 | 1.11 |
| 380590204001 | Block Group 1, Census Tract 204 | 1,511 | 95.43 | 0.00 | 2.58 | 0.00 | 0.00 | 0.00 | 0.00 | 1.99 | 4.57 | 4.43 |
| 380590204002 | Block Group 2, Census Tract 204 | 716 | 97.91 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2.09 | 2.09 | 5.03 |
| 380590204003 | Block Group 3, Census Tract 204 | 934 | 92.40 | 0.00 | 1.07 | 0.00 | 0.00 | 4.82 | 0.00 | 1.71 | 7.60 | 1.51 |
| 380590205002 | Block Group 2, Census Tract 205 | 834 | 95.68 | 0.00 | 3.00 | 0.24 | 0.00 | 0.00 | 0.00 | 1.08 | 4.32 | 8.08 |
| 380590205003 | Block Group 3, Census Tract 205 | 1,082 | 98.71 | 0.00 | 0.00 | 0.00 | 0.00 | 0.92 | 0.00 | 0.37 | 1.29 | 7.85 |
| 380590205004 | Block Group 4, Census Tract 205 | 798 | 98.62 | 0.00 | 0.00 | 0.50 | 0.00 | 0.75 | 0.00 | 0.13 | 1.38 | 8.19 |
| **Oliver County** 380659612001 | Block Group 1, Census Tract 9612 | 824 | 92.84 | 0.00 | 5.70 | 0.00 | 0.00 | 1.21 | 0.00 | 0.24 | 7.16 | 7.23 |
| 380659612002 | Block Group 2, Census Tract 9612 | 995 | 90.75 | 0.60 | 3.12 | 0.30 | 0.00 | 4.32 | 0.30 | 0.60 | 9.25 | 8.05 |
| **Sioux County** 380859408001 | Block Group 1, Census Tract 9408 | 961 | 13.32 | 0.00 | 82.73 | 0.00 | 0.00 | 1.04 | 0.31 | 2.60 | 86.68 | 42.80 |
| 380859408002 | Block Group 2, Census Tract 9408 | 709 | 43.86 | 0.00 | 45.42 | 0.56 | 0.28 | 6.77 | 0.00 | 3.10 | 56.14 | 23.38 |
| 380859409001 | Block Group 1, Census Tract 9409 | 1,710 | 5.32 | 0.00 | 88.19 | 0.18 | 0.00 | 3.22 | 0.00 | 3.10 | 94.68 | 35.52 |
| 380859409002 | Block Group 2, Census Tract 9409 | 1,000 | 8.00 | 0.20 | 85.10 | 0.00 | 0.30 | 4.30 | 0.40 | 1.70 | 92.00 | 37.99 |

47

Draft: July 31, 2018

RAR001049

| | Geographic Area | Total Population | Percent | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | White | Black or African American | American Indian and Alaska Native | Asian | Native Hawaiian and Other Pacific Islander | Hispanic or Latino | Some Other Race | Two or More Races | Total Minority Population | Persons Below the Poverty Level |
| **Table B-6. Minority and Low-Income Population Statistics for Water Supply Areas Downstream of North Bismarck Alternative and DAPL Crossings (Data from ACS 2011-2015, 5-year estimates)** | | | | | | | | | | | | |
| **South Dakota — Brown County** 460139513002 | Block Group 2, Census Tract 9513 | 2,041 | 95.39 | 0.00 | 0.20 | 0.00 | 0.00 | 0.98 | 0.00 | 3.43 | 4.61 | 2.56 |
| 460139514001 | Block Group 1, Census Tract 9514 | 3,138 | 94.39 | 4.27 | 0.38 | 0.96 | 0.00 | 0.00 | 0.00 | 0.00 | 5.61 | 9.24 |
| 460139516001 | Block Group 1, Census Tract 9516 | 1,930 | 79.27 | 1.76 | 10.52 | 7.36 | 0.00 | 0.41 | 0.00 | 0.67 | 20.73 | 7.24 |
| 460139516004 | Block Group 4, Census Tract 9516 | 617 | 100.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.78 |
| 460139517001 | Block Group 1, Census Tract 9517 | 950 | 74.11 | 0.00 | 5.79 | 0.00 | 0.00 | 15.47 | 0.00 | 4.63 | 25.89 | **21.68** |
| 460139517002 | Block Group 2, Census Tract 9517 | 1,624 | 92.30 | 1.17 | 4.06 | 0.00 | 0.00 | 2.03 | 0.43 | 0.00 | 7.70 | 14.29 |
| 460139517003 | Block Group 3, Census Tract 9517 | 2,233 | 92.07 | 0.00 | 6.36 | 0.00 | 0.00 | 1.57 | 0.00 | 0.00 | 7.93 | **20.02** |
| 460139518001 | Block Group 1, Census Tract 9518 | 1,741 | 97.76 | 0.00 | 2.07 | 0.00 | 0.00 | 0.00 | 0.17 | 0.00 | 2.24 | 1.51 |
| 460139518003 | Block Group 3, Census Tract 9518 | 1,518 | 98.68 | 1.32 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.32 | 18.35 |
| 460139519001 | Block Group 1, Census Tract 9519 | 602 | 93.85 | 0.00 | 0.00 | 0.00 | 0.00 | 6.15 | 0.00 | 0.00 | 6.15 | 15.45 |
| 460139519002 | Block Group 2, Census Tract 9519 | 1,873 | 91.08 | 0.00 | 2.78 | 0.00 | 0.00 | 5.61 | 0.00 | 0.53 | 8.92 | 1.81 |
| 460139519003 | Block Group 3, Census Tract 9519 | 1,202 | 98.84 | 0.50 | 0.25 | 0.00 | 0.00 | 0.25 | 0.00 | 0.17 | 1.16 | 5.37 |
| 460139520001 | Block Group 1, Census Tract 9520 | 693 | 98.27 | 0.00 | 0.72 | 0.00 | 0.00 | 0.43 | 0.00 | 0.58 | 1.73 | 8.51 |
| 460139520002 | Block Group 2, Census Tract 9520 | 1,446 | 95.30 | 0.00 | 2.35 | 0.00 | 0.00 | 0.00 | 0.00 | 2.35 | 4.70 | 1.52 |
| 460139520003 | Block Group 3, Census Tract 9520 | 405 | 100.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 10.72 |
| 460139520004 | Block Group 4, Census Tract 9520 | 571 | 98.77 | 0.00 | 0.00 | 0.00 | 0.00 | 1.23 | 0.00 | 0.00 | 1.23 | 9.68 |
| 460139520005 | Block Group 5, Census Tract 9520 | 1,509 | 98.28 | 1.72 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.72 | 2.45 |
| **Campbell County** 460219641001 | Block Group 1, Census Tract 9641 | 643 | 96.89 | 0.00 | 2.64 | 0.00 | 0.00 | 0.47 | 0.00 | 0.00 | 3.11 | 7.78 |
| 460219641002 | Block Group 2, Census Tract 9641 | 905 | 93.48 | 0.00 | 4.09 | 1.33 | 0.00 | 0.00 | 0.00 | 1.10 | 6.52 | 9.98 |
| **Clark County** 460259558001 | Block Group 1, Census Tract 9558 | 454 | 100.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2.42 |
| **Corson County** 460319410001 | Block Group 1, Census Tract 9410 | 632 | 91.77 | 0.00 | 6.80 | 0.00 | 0.00 | 0.00 | 0.00 | 1.42 | 8.23 | 9.61 |
| 460319410002 | Block Group 2, Census Tract 9410 | 1,041 | 21.52 | 0.00 | 77.33 | 0.96 | 0.00 | 0.19 | 0.00 | 0.00 | **78.48** | **57.31** |
| 460319411001 | Block Group 1, Census Tract 9411 | 1,664 | 17.49 | 0.72 | 79.39 | 0.00 | 0.00 | 1.08 | 0.00 | 1.32 | **82.51** | **54.86** |
| 460319411002 | Block Group 2, Census Tract 9411 | 812 | 23.28 | 0.00 | 74.01 | 0.25 | 0.00 | 0.49 | 0.00 | 1.97 | **76.72** | **39.21** |
| **Day County** 460379527001 | Block Group 1, Census Tract 9527 | 606 | 98.84 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.16 | 1.16 | 19.06 |
| 460379527002 | Block Group 2, Census Tract 9527 | 1,059 | 93.58 | 0.00 | 1.79 | 0.38 | 0.00 | 3.68 | 0.00 | 0.57 | 6.42 | 14.07 |
| 460379528001 | Block Group 1, Census Tract 9528 | 951 | 96.11 | 0.00 | 1.58 | 1.89 | 0.00 | 0.00 | 0.00 | 0.42 | 3.89 | 16.17 |
| 460379528002 | Block Group 2, Census Tract 9528 | 1,051 | 94.67 | 0.00 | 2.19 | 0.38 | 0.00 | 0.00 | 0.00 | 2.76 | 5.33 | **30.63** |
| 460379529001 | Block Group 1, Census Tract 9529 | 1,367 | 74.03 | 0.00 | 22.09 | 0.00 | 0.00 | 2.41 | 0.00 | 1.46 | 25.97 | **27.29** |
| 460379529002 | Block Group 2, Census Tract 9529 | 584 | 64.73 | 0.00 | 26.20 | 0.00 | 0.00 | 6.34 | 0.00 | 2.74 | 35.27 | **20.72** |

48

Draft: July 31, 2018

RAR001050

| Table B-6.  Minority and Low-Income Population Statistics for Water Supply Areas Downstream of North Bismarck Alternative and DAPL Crossings (Data from ACS 2011-2015, 5-year estimates) | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Percent | | | | | | | | | |
| | Geographic Area | | Total Population | White | Black or African American | American Indian and Alaska Native | Asian | Native Hawaiian and Other Pacific Islander | Hispanic or Latino | Some Other Race | Two or More Races | Total Minority Population | Persons Below the Poverty Level |
| Drewsy County | 460419415001 | Block Group 1, Census Tract 9415 | 856 | 10.75 | 0.23 | 85.75 | 0.00 | 0.00 | 2.69 | 0.00 | 0.58 | 89.25 | 16.77 |
| | 460419415002 | Block Group 2, Census Tract 9415 | 1,766 | 4.70 | 0.00 | 94.34 | 0.00 | 0.00 | 0.11 | 0.00 | 0.85 | 95.30 | 41.68 |
| | 460419417001 | Block Group 1, Census Tract 9417 | 412 | 34.95 | 0.00 | 63.59 | 0.00 | 0.00 | 0.00 | 0.00 | 1.46 | 65.05 | 25.24 |
| | 460419417002 | Block Group 2, Census Tract 9417 | 1,384 | 55.64 | 0.00 | 41.26 | 0.00 | 0.00 | 0.00 | 0.00 | 3.11 | 44.36 | 17.59 |
| | 460419417003 | Block Group 3, Census Tract 9417 | 1,161 | 10.59 | 0.00 | 84.67 | 0.00 | 0.00 | 2.24 | 0.00 | 2.50 | 89.41 | 27.12 |
| Edmunds County | 460459621001 | Block Group 1, Census Tract 9621 | 1,252 | 96.49 | 0.40 | 2.56 | 0.56 | 0.00 | 0.00 | 0.00 | 0.00 | 3.51 | 19.97 |
| | 460459621002 | Block Group 2, Census Tract 9621 | 1,007 | 98.41 | 0.00 | 1.59 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.59 | 5.94 |
| | 460459622001 | Block Group 1, Census Tract 9622 | 731 | 92.61 | 0.00 | 0.55 | 0.82 | 0.00 | 6.02 | 0.00 | 0.00 | 7.39 | 12.04 |
| | 460459622002 | Block Group 2, Census Tract 9622 | 1,028 | 98.15 | 0.00 | 0.19 | 0.29 | 0.00 | 0.68 | 0.00 | 0.68 | 1.85 | 8.75 |
| Faulk County | 460499611001 | Block Group 1, Census Tract 9611 | 879 | 98.86 | 0.00 | 0.80 | 0.00 | 0.00 | 0.34 | 0.00 | 0.00 | 1.14 | 6.31 |
| | 460499611002 | Block Group 2, Census Tract 9611 | 773 | 83.18 | 0.00 | 4.53 | 0.39 | 0.00 | 11.90 | 0.00 | 0.00 | 16.82 | 33.68 |
| | 460499611003 | Block Group 3, Census Tract 9611 | 707 | 100.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 9.04 |
| Hand County | 460599756001 | Block Group 1, Census Tract 9756 | 710 | 98.17 | 0.00 | 0.00 | 0.00 | 0.00 | 0.85 | 0.00 | 0.99 | 1.83 | 6.06 |
| McPherson County | 460899631001 | Block Group 1, Census Tract 9631 | 790 | 100.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 16.38 |
| | 460899631002 | Block Group 2, Census Tract 9631 | 642 | 98.75 | 0.00 | 0.00 | 1.25 | 0.00 | 0.00 | 0.00 | 0.00 | 1.25 | 6.57 |
| | 460899631003 | Block Group 3, Census Tract 9631 | 831 | 77.74 | 0.60 | 15.52 | 0.00 | 0.00 | 5.66 | 0.00 | 0.48 | 22.26 | 38.86 |
| Marshall County | 460919508002 | Block Group 2, Census Tract 9508 | 1,661 | 93.80 | 0.00 | 2.23 | 0.00 | 0.00 | 1.81 | 0.00 | 2.17 | 6.20 | 20.29 |
| | 460919508003 | Block Group 3, Census Tract 9508 | 1,720 | 95.52 | 1.45 | 0.47 | 0.00 | 0.00 | 0.41 | 0.00 | 2.15 | 4.48 | 5.76 |
| Potter County | 461070001002 | Block Group 2, Census Tract 1 | 1,020 | 97.35 | 0.00 | 1.27 | 0.00 | 0.00 | 0.78 | 0.00 | 0.59 | 2.65 | 14.67 |
| Spink County | 461150001001 | Block Group 1, Census Tract 1 | 948 | 91.14 | 1.48 | 2.95 | 0.00 | 3.80 | 0.63 | 0.00 | 0.00 | 8.86 | 7.70 |
| | 461150001002 | Block Group 2, Census Tract 1 | 960 | 100.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 5.65 |
| | 461150002001 | Block Group 1, Census Tract 2 | 785 | 100.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 10.29 |
| | 461150002002 | Block Group 2, Census Tract 2 | 1,109 | 92.25 | 0.00 | 2.25 | 0.00 | 0.00 | 1.35 | 0.00 | 4.15 | 7.75 | 27.58 |
| | 461150002003 | Block Group 3, Census Tract 2 | 938 | 99.79 | 0.00 | 0.00 | 0.00 | 0.00 | 0.21 | 0.00 | 0.21 | 0.21 | 2.86 |
| | 461150003001 | Block Group 1, Census Tract 3 | 668 | 92.66 | 0.00 | 4.04 | 0.00 | 0.00 | 3.29 | 0.00 | 0.00 | 7.34 | 17.93 |
| | 461150003002 | Block Group 2, Census Tract 3 | 1,162 | 91.22 | 0.00 | 0.26 | 0.00 | 0.00 | 7.31 | 0.00 | 1.20 | 8.78 | 14.46 |

49

RAR001051

| Table B-6.  Minority and Low-Income Population Statistics for Water Supply Areas Downstream of North Bismarck Alternative and DAPL Crossings (Data from ACS 2011-2015, 5-year estimates) | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Geographic Area | | | Total Population | White | Black or African American | American Indian and Alaska Native | Asian | Native Hawaiian and Other Pacific Islander | Hispanic or Latino | Some Other Race | Two or More Races | Total Minority Population | Persons Below the Poverty Level |
| Walworth County | 461299651001 | Block Group 1, Census Tract 9651 | 904 | 86.73 | 0.00 | 0.88 | 0.00 | 0.00 | 12.39 | 0.00 | 0.00 | 13.27 | 9.79 |
| | 461299651002 | Block Group 2, Census Tract 9651 | 1,013 | 93.98 | 0.99 | 0.69 | 0.00 | 0.00 | 0.00 | 0.00 | 4.34 | 6.02 | 15.40 |
| | 461299652001 | Block Group 1, Census Tract 9652 | 789 | 91.25 | 0.00 | 6.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 8.75 | 19.63 |
| | 461299652002 | Block Group 2, Census Tract 9652 | 980 | 87.55 | 0.10 | 0.92 | 0.00 | 2.86 | 8.57 | 0.00 | 0.00 | 12.45 | 3.70 |
| | 461299652003 | Block Group 3, Census Tract 9652 | 868 | 58.76 | 0.00 | 20.62 | 15.21 | 0.00 | 2.07 | 0.00 | 3.34 | 41.24 | 9.10 |
| | 461299652004 | Block Group 4, Census Tract 9652 | 941 | 68.44 | 0.00 | 22.95 | 0.00 | 0.00 | 4.57 | 0.00 | 4.04 | 31.56 | 17.28 |
| Ziebach County | 461379416001 | Block Group 1, Census Tract 9416 | 1,793 | 14.50 | 0.00 | 82.71 | 0.00 | 0.00 | 1.84 | 0.00 | 0.95 | 85.50 | 51.27 |
| | 461379416002 | Block Group 2, Census Tract 9416 | 1,040 | 39.62 | 0.77 | 49.62 | 2.02 | 0.00 | 6.83 | 0.00 | 1.15 | 60.38 | 19.03 |

Source: U.S. Census Bureau.  2011-2015 American Community Survey 5-Year Estimates.  Total population is based on data from Table B01003.  Percent population by race is based on data from Table B03002 and Table B01003.  Population below the poverty level is based on data from Table B17021.  State and County totals and percentages were calculated by summation of block group data from these respective tables.

Formatted: Font: (Default) Arial, 9 pt

50

Draft: July 31, 2018

RAR001052

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

For the drinking water supply analysis, all block groups that are served by the various water supply districts/areas were analyzed to determine whether they contained EJ communities. The analysis area includes 56 miles downstream from the North Bismarck crossing to the DAPL crossing, as well as 156 miles downstream from the DAPL crossing to the CRST intake. As shown in Table B-6 above, the communities impacted by an oil release to the Missouri River at either the North Bismarck Alternative or DAPL crossing would include both EJ and non-EJ communities.

Telephone interviews were conducted with public water districts in the analysis area to confirm the location of water intakes/Missouri River well fields as well as the water distribution in the respective districts. Water supply distributors were chosen for interview based on known intakes/wells utilizing the Missouri River or geographic proximity to the Missouri River (i.e., water district bordering the Missouri River).

In addition, it was assumed that Tribal intakes along the Missouri River served all the populations within the reservation boundaries. This may be overly conservative, though, because some within the reservation boundaries may be served by wells away from the river.

As indicated in Table B-7, the first drinking water intakes on the Missouri River (approximately two miles downstream of the North Bismarck Alternative crossing and seven miles north of the City of Bismarck) are the SCRWD Missouri River well field intakes. According to Larry Kassian, Executive Director of SCRWD, this well field consists of nine wells directionally drilled under the Missouri River. These wells are drilled and completed to depths of 15 to 35 feet in the gravel deposits directly below the bottom of the river. The wells extend laterally beneath the river with distances of approximately 30 to 90 feet within permeable gravel and sandy deposits. They were installed in order to utilize Missouri River water/groundwater at the river/groundwater interface. During pumping, a blending of groundwater and Missouri River water is utilized by the wells. At higher pumping rates, a greater percentage of water is pulled from the Missouri River and the travel time through the river sediments below the Missouri River to the wells is decreased.

**Table B-7. List of Tribal and Non-Tribal Drinking Water Intakes Downstream of the North Bismarck Alternative and Lake Oahe Crossings**

| Intake/ Owner<br>*[Intake #s When Present Correspond to RPS Spill Model Report+]* | Distance Downstream from North Bismarck Crossing (miles) | Distance Downstream from Lake Oahe Crossing (miles) |
|---|---|---|
| South Central Regional Water District Missouri River Horizontal Drinking Water Intake Well Field* (non-Tribal) | 1.9 – 2.0 | N/A |
| City of Mandan Surface Water Intake (non-Tribal) | 7.1 | N/A |
| City of Bismarck Surface Water Intake (non-Tribal) | 11.6 | N/A |

51

Draft: July 31, 2018

RAR001053

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

| | | |
|---|---|---|
| City of Bismarck Missouri River Horizontal Drinking Water Intake Wells* (Installed Within Gravel Unit Interface Below Missouri River) | 12.3 | N/A |
| Intake #5 South Central Regional Water District Drinking Water Intake (non-Tribal) | 67.3 | 11.3 |
| Intake #7 Former Fort Yates Drinking Water Intake (Tribal). Not in use. | 82.8 | 26.8 |
| City of Mobridge Drinking Water Intake (non-Tribal) | 127.5 | 71.5 |
| Intake #14 SRST Replacement Drinking Water Intake (Tribal) | 131.4 | 75.4 |
| WEB Water District Drinking Water Intake (non-Tribal)** | 141.5 | 85.5 |
| Gettysburg Drinking Water Intake (associated with the - Mid-Dakota Rural Water District Intake) (non-Tribal). Not in use. | 172.6 | 116.6 |
| CRST's Drinking Water Intake (Tribal) | 212.5 | 156.5 |
| Mid-Dakota Rural Water District Intake (non-Tribal) | 252 | 196 |
| Mni Wiconi Water Intake*** (Tribal/non-Tribal) | 261.0 | 205.0 |

Intakes are illustrated on Figure B-4 in Appendix B.
+ Note that only certain representative drinking water intakes downstream of the DAPL crossing were utilized in the Spill Model Report (RPS, 2018). Those that were included are referenced by intake #.
* Both the SCRWD Drinking Water Intake Wells and the City of Bismarck Drinking Water Intake Well were installed horizontally beneath the Missouri River at the river/groundwater interface. The SCRWD Missouri River Horizontal Drinking Water Intake Well Field consists of nine intake wells.
** WEB Water District also provides drinking water for State Line Water Cooperative.
***This intake is managed by the OST but serves both Tribal and non-Tribal communities. This water intake serves several regional water systems that were all combined into one large system. Because of the reservation boundaries and EJ block groups on the west side of Lake Oahe, it is assumed for the purposes of this analysis that all of the intakes on the west side are Tribal. Likewise, due to the location of the intakes and the registered water rights owners as well as the presence of non-EJ block groups on the east side of Lake Oahe, it is assumed that the select intakes on the east side of Lake Oahe are non-Tribal.

The City of Mandan and the City of Bismarck have drinking water intakes 7.1 and 11.6 miles, respectively, downstream of the North Bismarck Alternative crossing. The City of Bismarck also has a horizontal collection well under the Missouri River, 12.3 miles downstream of the North Bismarck Alternative crossing.

It is assumed that a pipeline located at the North Bismarck location would be placed well below the river within less permeable geologic units (as described for the DAPL crossing at Lake Oahe). However, similar to the assumptions made for the DAPL pipeline in the EJ analysis, it is assumed that any leak from the pipeline under the river could somehow rise through the more impermeable geologic units and reach the Missouri River. It would have to pass through the shallow groundwater contained within the gravel deposits below the Missouri River before reaching the river.

52

Draft: July 31, 2018

RAR001054

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

In summary, the potential impacts to drinking water intakes associated with the North Bismarck Alternative would be greater than with the DAPL crossing.  At least one non-Tribal drinking water intake is located upstream of each Tribal drinking water intake and would therefore be impacted before the respective downstream Tribal intake.

Note: Since, as described under Part I, no drinking water impacts are anticipated from a release at the Lake Oahe crossing, the comparison of drinking water impacts for the respective 156 mile river segments is not necessary. In any event, such an analysis would yield no differences in EJ impacts. To conduct such an analysis, the entire 156 mile portion of the river downstream of the DAPL crossing to the CRST intake would need to be considered. And a comparable analysis of 156 miles downstream from the North Bismarck Alternative would include the first 56 miles to the DAPL crossing and then the first 109 miles downstream of the DAPL crossing. Therefore, both alternatives would include the SRST replacement intake located approximately 75 miles south of the DAPL crossing.



53

Draft: July 31, 2018

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

**Remand Item C: Highly Controversial Considerations**

Draft: July 31, 2018

RAR001056

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

## C.    Highly Controversial Considerations

Under the Council on Environmental Quality (CEQ) regulations, one factor that "should be considered" in evaluating the significance of a proposed action's impact is "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial." 40 C.F.R. § 1508.27(b)(4).

Page 127 and 128 of the Memorandum Opinion cite case law to define the term "controversial" to mean "where a substantial dispute exists as to the size, nature, or effect of the major federal action rather than to the existence of opposition to a use." The Court notes that "something more is required besides the fact that some people may be highly agitated and be willing to go to court over the matter." Indeed, it has to be something more than simply "a disagreement of qualified experts over the 'reasoned conclusions' as to what the data revealed."

In order to consider the degree to which the pipeline's effects are likely to be highly controversial, the USACE requested that Dakota Access perform a factual and technical analysis of issues presented in 18 documents.    Issues included the design; construction; proposed operation; pre-operational integrity threat/risk analysis; risk mitigation systems; the impact of a potential spill from the pipeline on downstream ecological receptors, human receptors such as hunting, fishing, recreation and cultural practices; and environmental justice. The information provided was reviewed by multiple USACE representatives, which consisted of specialists and technical experts in the fields of water resources, engineering, environmental resources, geographic information systems, and modeling. The Court ordered a review of documents received after the Final EA and FONSI were published on July 25, 2016 but before the easement was granted on February 8, 2017. The USACE also reviewed documents received after February 8, 2017, including information from SRST, CRST, OST, and YST regarding Tribal practices, the potential impacts of a spill on specific issues of concern and emergency response coordination issues. A list of documents reviewed and the date each was published is provided in Table C-1 below.

To initiate the technical analysis, the 18 documents were reviewed and assessed for issues of concern. The issues raised within each of the documents are presented as comment excerpts (hereafter referred to as "comments"). A general summary of comments is provided in Table C-2 below. Responses to comments with similar subject matter were grouped together to reduce redundancy in the response process. For comments with similar subject matter, a comprehensive response is provided the first time the issue is addressed and the related comments are identified in association with the first Comment ID for that comment topic. The results of the technical analysis are provided in Tables C-3, C-4, and C-5 based on when the documents were received. Due to their length, Tables C-3, C-4, and C-5 as well as select supplemental information to responses in those tables are provided in Appendix C.

Items contained within the Technical Analysis include:

- **Table C-1**: An index of technical documents analyzed;
- **Table C-2**: A summary of concerns identified from the documents;
- **Table C-3 [Appendix C]**: Comment excerpts and responses related to documents [A, B, C, D, J, 5 and 6**] received prior to the issuance of the easement on February 8, 2017;
- **Table C-4 [Appendix C]**: Comment excerpts and responses related to documents [E, F, G, H and I**] received after February 8, 2017 prior to 2018 that were not available prior to the issuance of the easement;
- **Table C-5 [Appendix C]**: Comment excerpts and responses related to documents [K, L, M and N] received in 2018;

55

Draft: July 31, 2018

RAR001057

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

- **Supplemental Information [Appendix C]**: Select responses that require additional details or context not able to fit into Tables C-3 and C-4; and
- **Part C Figures [Appendix C]**: Associated figures to select responses within this section.

As noted previously, the responses within this document are specific to the Lake Oahe Segment unless otherwise noted. Some of the descriptions in this technical analysis may apply to both of the Project crossings of the Missouri River or the pipeline as a whole; however, the main focus is the Lake Oahe segment.

**Table C-1. Index of Documents**

| ID | Common Name | Document Title | Dated |
|----|-------------|----------------|-------|
| | | Documents Received Prior to February 8, 2017 | |
| A | EarthFax Letter | **Review of the Dakota Access Pipeline Project**<br>Letter to President John Yellow Bird Steele and Members of the Tribal Council Oglala Sioux Tribe<br>Richard White, PE; ~~Earthfax~~EarthFax Engineering Group | 12/2/2016 |
| B | Kuprewicz Letter | **Accufacts Review of the U.S. Army Corps of Engineers (USACE) Environmental Assessment (EA) for the Dakota Access Pipeline ("DAPL")**<br>Memorandum to Jan Hasselman, Earthjustice<br>Richard Kuprewicz | 10/28/2016 |
| C | Envy Report | **Technical Engineering and Safety Assessment: Routing, Construction and Operation of the Dakota Access Pipeline in North Dakota**<br>ENVY Enerji ve Cevre Yatirimlari A.S.<br>*Attachment A-7 of Declaration of Rollie E. Wilson* | 1/5/2017 |
| D | Nezafati Report | **Examining the Potential Adverse Impacts of the Dakota Pipeline Crossings to the Water Quality at the Cheyenne River Sioux Tribe Water Intake in the Missouri River**<br>*Attachment A-10 of Declaration of Rollie E. Wilson* | 01/2017 |
| J | Wilson Decl., Attachment A | **Cheyenne River Sioux Tribe's Preliminary Informational Paper Concerning Dakota Access LLC's Request for an Easement to Cross Lake Oahe, North Dakota,** Pursuant to 30 U.S.C. § 185<br>Harold Frazier<br>*Attachment A of Declaration of Rollie E. Wilson in Support of Cheyenne River Sioux Tribe's Motion for Summary ~~Judgement~~Judgment*<br>*Wilson Decl. Filed February 22, 2017* | 1/18/2017 |
| 5 | Kelly Declaration | **Declaration of Jeff Kelly**<br>Director of Game, Fish, and Wildlife SRST<br>*Filed February 14, 2017* | 11/28/2016 |
| 6 | Bowser Report | **Assessment and Review, Dakota Access Pipeline Environmental Assessment Terrestrial and Aquatic Organisms**<br>Dr. Gillian Bowser, PhD<br>*Attachment A-9 of Declaration of Rollie E. Wilson* | 01/2017 |
| | | Documents Received After February 8, 2017, but Prior to 2018 | |
| E | Kuprewicz Declaration- 2 | **Second Declaration of Richard B. Kuprewicz** (ECF No. 195-1)<br>Earthjustice | 3/24/2017 |

56

Draft: July 31, 2018

RAR001058

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

| | | | |
|---|---|---|---|
| F | Kuprewicz Declaration | **Declaration of Richard B. Kuprewicz** (ECF No. 272-1) **CONFIDENTIAL**<br>Earthjustice | 2/12/2017 |
| G | Holmstrom Declaration | **Declaration of Donald Holmstrom**<br>Earthjustice | 8/7/2017 |
| H | Goodman Declaration | **Declaration of Ian Goodman**<br>Earthjustice | 8/7/2017 |
| I | Goodman Exhibit | **Declaration of Ian Goodman, Section 4- Exhibit C**<br>The Goodman Group | 8/7/2017 |
| Documents Received in 2018 | | | |
| K | SRST EJ Analysis | **An Environmental Justice Analysis of Dakota Access Pipeline Routes**<br>Robin Saha, Ph.D. and Paul Mohai, Ph.D. | 2/23/2018 |
| L | SRST Oil Spill Impact Report | **Impacts of an Oil Spill from the Dakota Access Pipeline on the Standing Rock Sioux Tribe**<br>Mike Faith, Jr. Chairman<br>Standing Rock Sioux Tribe | 2/21/2018 |
| M | SRST Appendices (Extension of L) | **Impacts of an Oil Spill from the Dakota Access Pipeline on the Standing Rock Sioux Tribe - Appendices  CONFIDENTIAL**<br>Mike Faith, Jr. Chairman<br>Standing Rock Sioux Tribe<br>**Appendix C: SRST's Notice of Intent Comments on the Dakota Access Pipeline to the Army Corps of Engineers**<br>**Appendix E: SRST Technical Team Fatal Flaw Analysis Lake Oahe HCA Pipeline Crossing: Safety Instrumented Systems Report**<br>**Appendix F: Preliminary Report: Landslides in the Vicinity of the Dakota Access Pipeline Crossing of the Missouri River Near the Standing Rock Indian Reservation** | 2/21/2018 |
| N | Oglala-White Letter | **Preliminary Evaluation of Dakota Access Pipeline Emergency Response Plans**<br>Richard B. White, P.E., PLLC | 4/18/2018 |
| O* | CRST | **Cheyenne River Sioux Tribe Letter and Attachments** | 4/18/2018 |
| P* | Yankton KSE Affidavit | **Affidavit of Kip Spotted Eagle**<br>Kip Spotted Eagle, Yankton Sioux Tribal Historic Preservation Officer | 4/19/2018 |

*Relevant information from these documents was incorporated into the Downstream Receptor Report; however, no direct issues were identified that required a specific response.

** - Note that the apparent non-sequential listing of letter or number identifiers is due in part to the timing of the receipt of documents and the USACE coordination with Dakota Access related to supplemental information requests (reference the USACE information request letter dated August 24, 2017 to Dakota Access, LLC). Among the items requested in that letter was a factual and technical analysis that addresses the issues presented in nine documents (listed in USACE letter under Item 2, letters "A" through "I"). The nine technical documents present issues concerning the design, construction, proposed operation, pre-operational integrity threat/risk analysis, and risk mitigation systems. Two additional documents, the Kelly Declaration document referenced under Item 5 of the letter, and the Bower Document referenced under Item 6, were also reviewed for technical issues related to the impact of a potential spill from the pipeline on downstream receptors. In addition to the documents specifically listed in the letter from the USACE to Dakota Access, only one additional technical document (Document J) received during the period of July 25, 2016 through February 8, 2017 was identified as containing issues not addressed in the original documents or already satisfactorily addressed within the EA. Additional technical documents were received in 2018 that were identified as containing issues not addressed within the EA (Documents K, L, M, and N).

Draft: July 31, 2018

RAR001059

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

**Table C-2. Summary of Concerns**

| Category | Issue | Summary of Concerns | Document ID |
|---|---|---|---|
| Risk | Risk Evaluation (Incident Occurrence) | A quantitative analysis of the risk associated with failure of system components should have been provided in the EA.<br>The evaluation and conclusion of spill risk and spill volume are not adequate.<br>The risk analysis is missing critical details. | A, B, C, E, F, G,H, J, K, L, M, 6 |
| Risk | Risk Evaluation (Threatened & Endangered Species) | Survey approach for endangered species in the area was insufficient to detect those species.<br>The surveys were conducted at seasonally inappropriate times for the organisms in question. | 6 |
| Risk | Risk Evaluation (Pipeline Damage) | Scour analysis should have been performed with dam breach scenario.<br>Provide basis for scour calculations.<br>Clarify risk of landslide.<br>Describe erosion control practices used, in particular where ground slope is less than 25%.<br>Third party damage is not the leading cause of liquid transmission pipeline ruptures.<br>Clarify causes of pipeline ruptures and risk of damage during construction. | A, B,C, E, F, I, J, L, M |
| Risk | Risk Evaluation (Operator Performance) | Operator's safety performance record should be considered in risk evaluation.<br>A safety culture survey of the company should be conducted. | E, G, J, L, M |
| Risk | Spill Model (Spill Volume) | Worst-case scenario spill volume was understated.<br>-- Spill volume understated to due overstatement of closure time of valves.<br>-- Lowest mean daily discharge rates should be used.<br>-- Report fails to capture the significantly higher transient flow rates associated with rupture.<br>A broader pipeline elevation should be used for pipeline siting and valve placement.<br>The EA did not adequately address how contaminants would travel up and through naturally-occurring geological cracks. | A, B, C, D, E, F, G, J, K, L, M |

58

Draft: July 31, 2018

RAR001060

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

| Category | Issue | Summary of Concerns | Document ID |
|---|---|---|---|
| Risk | Spill Response | Provide an updated winter spill scenario considering movement of oil beneath ice and slower response times.<br>Consider specific oil properties, including volatility and flammability, in spill response.<br>Engage and train tribe in spill response plan.<br>Confidential documents.<br>Bioaccumulation in benthic organisms. | B, C, G, J, 6, L, M |
| Risk | Spill Impacts | Perform quantitative assessments of individual crude-oil constituents, other than benzene.<br>Water quality limits used were inappropriate.<br>Evaluate contaminant movement and impact under winter spill scenario.<br>Consider that properties of spilled oil can change over time, and be a continuous source of toxic substances such as benzene and PAHs.<br>Consider impacts from oil spills to underlying aquifers and downstream drinking water intakes, vegetation, fish, and wildlife, as well as threatened and endangered species. | A, B, C, D, G, J, 5, 6, L |
| Risk | Mitigation | Sufficient and specific mitigation for spill events is not included in EA. Mitigation measures should be in place prior to operation.<br>Specify mitigation measures for water intake locations and leaks under Lake Oahe in the SPCC Plan.<br>Provide evaluation of spill response if immediate remediation is not possible/ adequate to eliminate a continuous source of contamination to the river. | A, C, D, J, L, M |
| Regulatory Compliance | Design Guidelines (Leak Detection) | Leak detection system is not adequately characterized within the EA and supporting documents, or is overstated.<br>Provide additional information on remote leak detection and response. Provide additional design detail and a quantitative analysis of the risk associated with failure of system components. | B, C, D, E, F, G, J, L, M |

59

Draft: July 31, 2018

RAR001061

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

| Category | Issue | Summary of Concerns | Document ID |
|---|---|---|---|
| Regulatory Compliance | Easement Conditions and Compliance | The USACE must take into consideration the interplay between the proposed pipeline and the substantive statutory provisions in the Flood Control Act, which governs Lake Oahe.<br><br>Additional requirements imposed by USACE Conditions are existing requirements.<br><br>Dakota Access has failed to address and ensure that the right-of-way it seeks will not violate applicable air and water quality standards; damage the environment; result in hazards to public health or safety; or negatively impact the interests of individuals living the area who rely on the fish, wildlife and biotic resources of the area for subsistence purposes. | E, J, K, L, M |
| Other Design Considerations | Materials | Provide description of pipe bedding, if used, and the type of fusion bonded epoxy, or FBE, coating used. | A |
| Other Design Considerations | Valves | Potential for surge damage.<br>Length of time to shut the valves in the event of a leak.<br>Components should be designed for winter conditions. | A, B, F, G |
| Other Design Considerations | HDD Crossing | Extremely long HDD has extreme risk, is not proven and presents inspection and maintenance issues. | C, L, M |
| Other Design Considerations | High Consequence Area | The analysis does not accurately or adequately assess and include engineering and construction risks, or the fact that Lake Oahe is the fourth largest freshwater reservoir in the United States supplying water to millions of people. | B, C, E, F, G, J, L |
| Installation Inspections | Hydrostatic Testing | Hydrostatically test the pipeline after it is installed. | A, E |
| Installation Inspections | Radiographic Testing | Weld/ radiographic testing protocols are poorly defined or inadequate. | B, C, F |
| Operation and Maintenance | Pipeline Integrity | Discuss pipeline inspections tools including calibration.<br>Provide additional detail on in-line inspection tools related to action thresholds, corrosion threats and detection of transportation cracking.<br>Quality assurance /quality control protocols are warranted. | B, C, E, M |

60

Draft: July 31, 2018

RAR001062

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

| Category | Issue | Summary of Concerns | Document ID |
|---|---|---|---|
| NEPA Process | EA Content | Relevant pipeline system information important to the federal crossings has not been provided in the EA. Worst-case impact to the federal easements and unusually sensitive areas has not been provided in the public documents associated with the EA. An engineering design and safety risk assessment was not conducted by DAPL. Projects like DAPL should logically consider a comprehensive comparison and evaluation of a broader range of alternatives. Lack of any environmental justice analysis in the EA. Dakota Access is not financially capable. | B, C, D, E, G, H, I, J, K, L, M |
| NEPA Process | EA Content (Climate Change) | The pipeline would contribute man-made climate change by building up the country's oil infrastructure. | D, L, M |

## III.   Conclusion

The USACE has reconsidered the relevant portions of the final EA, reviewed and significantly discussed the relevant issues and opposing viewpoints, and conducted significant factual and technical analysis of spill model results, downstream receptor impacts, and impacts to EJ. Conclusions relative to these items are provided below.

As demonstrated in the Downstream Receptor Report, even under the worst-case scenarios, impacts to downstream beneficial lake uses, including fishing and hunting resources, were determined to be of limited scale and of temporary duration.

Although a large oil spill into Lake Oahe would likely cause a localized fish kill, impacts would be limited to the immediate area surrounding the site of the spill. Concentrations of crude oil in the water could result in impacts to aquatic invertebrates utilized as a food source by the local fishery. However, even under the worst-case scenarios, impacts to benthic macroinvertebrates and fish species would be of limited scale and of temporary duration and therefore impacts to fishing in the area would also be limited. None of the model scenarios showed a lake area greater than 0.1 km$^2$ above the biological threshold of 10 µm for surface oil thickness for potential impacts to wildlife. Additionally, this surface oil impact is predicted to be of short duration at any one location.  Time series modeling results show that the 50 µg/L biological threshold for aquatic species in the water column is only exceeded for a number of hours (not days) and only within specific zones within the water column, further limiting the area of potential mortality.

The estimated worst-case scenario is that <10% of the shoreline within the modeled release area would have oiling above the biological threshold of 10 µm for surface oil thickness for potential impacts to wildlife. It is not anticipated that this amount of shoreline coverage would have a permanent or significant

Draft: July 31, 2018

RAR001063

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

impact on the local wildlife population, especially given the requisite remediation following a spill. Therefore, impacts to wildlife are not anticipated to be significant.

The potential impact to upland hunting along the shore of Lake Oahe is very low. Although some deer or other wildlife species could ingest oil impacted water or eat contaminated vegetation following a spill, the concentration of contaminants would likely not be above acutely toxic thresholds and would not persist long enough to result in a chronic health issue. Furthermore, Lake Oahe is not the only source of fresh water for upland game species. If the western shore of Lake Oahe were to become impacted by an inadvertent release of oil, it is likely that many terrestrial vertebrates would be able to utilize alternative sources of freshwater.

Additionally, in the event of a crude oil release that results in damages to game species or hunting/fishing activities, Dakota Access would help restore, replace, or acquire the equivalent natural resources in accordance with OPA 90. Under OPA 90, the owner or operator is liable for the costs associated with the containment, cleanup, and damages resulting from a spill. Dakota Access maintains financial responsibility for the duration of the response actions. If the responsible party cannot pay, funds from the Oil Spill Liability Trust Fund are used to cover the cost of removal or damages.

DAPL was routed to be co-located with other existing utilities to the greatest extent practicable in order to minimize the impacts on environmental resources (i.e., Lake Oahe and associated lands on the east and west banks), avoid the creation of a new ROW through the affected communities, and reduce impacts on current land uses. In addition, the routing location was chosen to minimize impacts to EJ communities as there are no census block groups crossed by DAPL where either the poverty level is greater than 20% or the minority population exceeds 50%. Furthermore, the construction of DAPL had the potential to generate economic benefits to the broader local community as construction workers typically utilize local gas stations, convenience stores, and restaurants in the general vicinity of the construction area.

Although a hypothetical release from DAPL would impact EJ communities downstream of the Lake Oahe crossing, this impact is not meaningfully disproportionate as the crossing has the potential to impact both EJ and non-EJ communities. There are five EJ census block groups and two non-EJ census block groups on the west side of the Lake Oahe project centerline and nine non-EJ census block groups on the east side of the Lake Oahe project centerline (See Figures B-1 and B-2).

After a detailed factual and technical analysis was performed on 18 documents submitted by the Tribes that contained opposing viewpoints and relevant issues of concern, and for the reasons set out at length in the Appendices, it was determined that all issues of concern have been adequately addressed, that the remaining disputes are no more than disagreements of qualified experts over the reasoned conclusions to be drawn from available data, and that the potential effects of the project do not rise to the level of highly controversial.

Applying the applicable law under NEPA, the USACE has completed the required "hard look" at potential environmental impacts of the DAPL Lake Oahe crossing. The USACE has reconsidered the relevant portions of the final EA, reviewed and significantly discussed the relevant issues and opposing viewpoints, and conducted significant factual and technical analysis of spill model results, downstream receptor impacts, and impacts to EJ. The USACE has identified no new information indicating that actions by the Department of the Army with respect to the Dakota Access Pipeline (DAPL) Project will affect the environment to a significant extent not already considered. The USACE has determined that the risk of a release from DAPL that significantly impacts Lake Oahe is low. The USACE believes its decision to be

Draft: July 31, 2018

RAR001064

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

fully informed and well-considered in concluding that the DAPL Lake Ohae<u>Oahe</u> crossing is not expected to have significant direct, indirect, or cumulative impacts on the environment. Therefore, decisions made by the USACE not to complete an Environmental Impact Statement (EIS) were in accordance with the law and neither arbitrary nor capricious.

63

Draft: July 31, 2018

RAR001065

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE

**Spill Model Report**



64

Draft: July 31, 2018

RAR001066

PRIVILEGED AND CONFIDENTIAL – NOT FOR PUBLIC RELEASE



**Downstream Receptor Report**

65

Draft: July 31, 2018

RAR001067

| From: | Curby, Michelle |
|---|---|
| To: | Cossette, Brent J CIV USARMY CENWO (US) |
| Cc: | Rowe, Steve; Oh, Meghan |
| Subject: | [Non-DoD Source] Remand Package and Downstream Receptor Report - Privileged and Confidential |
| Date: | Thursday, June 21, 2018 4:35:33 PM |

Brent,


Documents have been placed in the AMRDEC Safe Access File Exchange for you to download.

You should find the following documents on the AMRDEC site (Package ID: 14141185).


1.   Remand Package_20180620 V7 (word doc)


2.   Appendices A-C Compiled 20180621 V2 (word doc)


3.   Appendices A-C Compiled 20180621 V2 (pdf)


4.   Appendix C - Table C-3 20180621 V1 (excel table)


5.   Appendix C - Table C-4 20180621 V1 (excel table)


6.   Appendix C - Table C-5 20180621 V1 (excel table)


7.   Appendix C - Compiled Tables C3-C5 20180621 V1 (pdf)


8.   Receptor Report 20180621 V2 (word doc)


9.   Receptor Report 20180621 V2 (pdf)


The Spill Model Report was not included in this set of documents as it was sent previously in Feb 2018.

RAR002547

The files will be available until 7/1/2018.

Please let me know if you have any questions.

Michelle Curby, M.A., CPESC

Environmental Scientist

HDR

5201 South Sixth Street Road
Springfield, IL 62703
D 217.331.5860 M 619.507.1651
michelle.curby@hdrinc.com

hdrinc.com/follow-us <Blockedhttp://hdrinc.com/follow-us>

PRIVILEGED AND CONFIDENTIAL

CONFIDENTIALITY NOTICE: This email, including any attachments, is confidential and may be privileged. If you are not the intended recipient please notify the sender immediately, and please delete it; you should not copy it or use it for any purpose or disclose its contents to any other person.

RAR002548

# FILED UNDER SEAL

Pursuant to Protective Order

RAR002618 – RAR002642

# FILED UNDER SEAL

Pursuant to Protective Order

RAR002678 – RAR002738

# FILED UNDER SEAL

## Pursuant to Protective Order

## RAR002739 – RAR002867

# FILED UNDER SEAL

Pursuant to Protective Order

RAR002868 – RAR002894

# FILED UNDER SEAL

Pursuant to Protective Order

RAR002895 – RAR002944

# FILED UNDER SEAL

## Pursuant to Protective Order

RAR003001 – RAR003006

# FILED UNDER SEAL

## Pursuant to Protective Order

RAR004499-RAR004740

# FILED UNDER SEAL

Pursuant to Protective Order

RAR004499 – RAR004893

# FILED UNDER SEAL

Pursuant to Protective Order

RAR004894 – RAR004901

| | |
|---|---|
| **From:** | Borkland, Carl G |
| **To:** | Doug Crow Ghost |
| **Cc:** | Lindquist, Todd J CIV USARMY CENWO (US); Stasch, Eric D CIV USARMY CENWO (US); Elliott Ward; Mike Faith; dnelson@crstepd.org; Stasch, Eric D CIV USARMY CENWO (US); Everett Iron Eyes; Cossette, Brent J CIV USARMY CENWO (USA); Harlon, William D III CIV USARMY CEHNC (USA); Minter, Justin D; Peter Capossela; Dean DePountis; Janet Thomas; Feiock, Patrick D CIV USARMY CENWO (US) |
| **Subject:** | [Non-DoD Source] RE: Emergency Planning Meeting SRST/ETP/ACOE |
| **Date:** | Thursday, March 01, 2018 8:58:04 AM |
| **Attachments:** | image003.png |
| | image006.png |

Thank you for your email Doug. As you know, the Geographic Response Plan is due to the court on April 1 – one month from today. Dakota Access and the Corps have held two response planning meetings so far. The tribes did not attend the first, held Jan. 11. They appeared at the second, held Feb. 8, only long enough to deliver (and, in Standing Rock's case, read aloud) letters requesting information, among other things. We are confirming availability to meet March 7.

To the extent the Tribes have requested information relevant to response planning, we are prepared to go over that information at the March meeting, just as were prepared to do so at the Feb. 8 meeting. In fact, the draft GRP that we had available at the Feb. 8 meeting and that we will be discussing at the March 7 meeting includes a discussion of remote monitoring and SCADA systems, as well as safety data sheets showing the composition of Bakken Crude (including flammability and toxicity). On February 8, we were also prepared to explain (1) how portions of the Facility Response Plan relevant to response planning at Lake Oahe have been incorporated into the GRP; (2) the location and operation of shut-off valves near Lake Oahe; (3) the results of an unannounced emergency response equipment deployment exercise at Lake Oahe in October 2017 with an initial response of just one hour and full response within 3½ hours; and (4) the approximate number and locations of personnel who would respond to a spill or leak at Lake Oahe.

At the March 7 meeting we are prepared to show and explain, in addition to all of that, the results of the recent spill modeling and discuss how those results are informing the response planning. You asked about maximum spill estimates. You have the original spill model with a worst case discharge of more than 12,000 barrels. The more recent modeling includes a comparable amount as the worst case spill scenario, among other scenarios. You asked for documentation about other spills at other locations. We do not believe that information is necessary or relevant to planning at Lake Oahe. We are open to revisit our view on that after we have met on March 7 and gone over the GRP and the other information I just previewed.

We will not enter the reservation without Standing Rock's permission. We will be meeting March 7 at the Ramada, 1400 E. Interchange Ave, Bismarck ND 58501. We will start at 9:00 a.m. local time. This will be a meeting of persons from each party who are involved in the emergency response planning. We strongly believe that this is the sort of meeting needed to get the GRP completed by April 1. Both tribes have instead requested meetings on their separate reservations. You are asking for senior ETP/Sunoco officials to meet with tribal leaders. Respectfully, that is not the type of meeting we need in order to complete the response planning task.

It is our understanding that the Corps planned to send you the GRP draft that we used at the Feb. 8 meeting. If you do not have it and would like to make arrangements to access it through a secure FTP site, let me know. It is a very large file so I cannot email it. We are working on further updates to the GRP and will have a new draft available to

discuss on March 7.

Finally, as I have said many times before, if you have any information you believe would be helpful to completing the response planning, including any inaccuracies or omissions you have identified in the most recent GRP draft, please send them along before the next meeting.  The only thing we have so far along those lines is a letter you sent separately today from Chairman Faith.  It mentions certain "historic properties of Lakota and Dakota origin in low-lying areas along the Missouri River."  The letter adds that there needs to be an evaluation of the potential impacts of an oil spill and clean-up activities on those properties.

Can you please send us information about the location and nature of these sites?  The letter specifically mentions "Mad Bear I and II."  It would particularly helpful if you could send us a map showing where those properties are so that we can incorporate them (and other information you are able to share about them) into the response planning. Based on the statement in the letter that "ETP personnel are not permitted on Tribal land for the purpose of conducting any field surveys, at this time," the information I am requesting is needed if we are going to keep sites like these "properly protected" and the "impacts mitigated," as the letter requests.

Thank you

C. Gus Borkland

VP- Environmental Projects & Emergency Planning/Response

EHS&S

Energy Transfer Partners

4041 Market Street

Aston, PA 19014

# FILED UNDER SEAL

Pursuant to Protective Order

RAR008065 – RAR008400

**From:**      Cossette, Brent J CIV USARMY CENWO (US)
**To:**         Kruger, Heath Robert CIV USARMY CENWO (US); Tracy, Thomas J CIV USARMY CENWO (US); Grow, Catherine E CIV USARMY CENWO (US); Derosa, Jason R CIV USARMY CENWD (US); Boyd, Milton W CIV USARMY CEHQ (US); Casner, Melanie L CIV USARMY CEHQ (US)
**Subject:**  DAPL Remand - Letter Enclosure Info Current Status
**Date:**      Thursday, February 15, 2018 4:15:42 PM

---

1.  Facility Response Plan without redactions:  We cannot provide due to document being confidential.  DAPL is not willing to share.

2.  Spill Model:  We cannot provide due to document being confidential.  DAPL is not willing to share any part of the model.

3.  Risk Analysis:  We cannot provide due to document being confidential.  DAPL is not willing to share.

4.  Worst Case Discharge Calculation:  We cannot provide due to document being confidential.  DAPL is not willing to share.

5.  Location and SPECS of Shut Off Valves:   We cannot provide due to document being confidential.  DAPL is not willing to share.

6.  DAPL Pipeline Safety Management System and Implementation Plan:  This plan is a best management practice plan and is not mandatory to develop.  It is a API recommended practice.  However, DAPL is currently developing this plan.  DAPL needs more time to consider if they are willing to share.

7.  Actual Response Time:  At DAPL's last no notice exercise the first responders were on location within 1 hour and all personnel were on location with 3 hrs and 20 minutes.  PHMSA requires within 6 hours.  DAPL does not have an issue with sharing this information.

8.   Number and Location of Oahe Personnel:  There are about 40 people at Oahe.

9.  Cathodic Protection:  DAPL does have cathodic protection on the pipeline.  The monitoring requirements are mandated by PHMSA and are adhering to them.  The design is confidential.

10.  Bakken Crude Composition:  I would need more time to collect this information.  The emergency response plans are confidential.


Again the information the Tribe wants to receive cannot be given as enclosures to letters as they are confidential.  The only way this information can be worked is at the Counsel level with non-disclosure agreements conducted between all parties.  DAPL would obviously need to be coordinated with on this.

Brent Cossette

Natural Resource Specialist
Environmental Stewardship
CENWO-OD-TN
Omaha District
1616 Capitol Avenue Suite 9000
Omaha, NE 68102
Work: 402-995-2712
Cell: 402-709-6446

RAR008403

# FILED UNDER SEAL

Pursuant to Protective Order

RAR008743 – RAR008964

# FILED UNDER SEAL

Pursuant to Protective Order

RAR009112 – RAR009116

# FILED UNDER SEAL

Pursuant to Protective Order

RAR009187 – RAR009211

# FILED UNDER SEAL

Pursuant to Protective Order

RAR010203 – RAR010240

# FILED UNDER SEAL

Pursuant to Protective Order

RAR012015 – RAR012237

DRAFT

SIMAP Model:

Previously, Dakota Access has conducted spill modeling utilizing a software package called OILMAPLand. OILMAPLand, developed and administered by RPS, is a two dimensional model capable of predicting the overland path and trajectory in water of a particular volume of oil released from a specified release point. OILMAPLand is sufficient to provide volume and distance calculations to assist in spill planning as it can primarily answer two very specific questions: How much oil could be released at location X, and where would that oil go if unmitigated for Y hours.   However, in order to support the USACE request for additional analysis of a potential spill associated with the DAPL crossing of Lake Oahe, an additional model has been proposed.

SIMAP modeling, also developed and administered by RPS, is a 3-dimensional model that includes trajectory and fate as well as biological effects sub-models.  SIMAP originated from the Natural Resource Damage Assessment Models for Coastal and Marine Environments (NRDAM/CME) and Great Lakes Environments (NRDAM/GLE), which RPS (previously Applied Science Associates or ASA) developed for the U.S. Department of the Interior for use in "type A" Natural Resource Damage Assessment (NRDA) regulations under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA).

Some of the benefits of SIMAP are as follows:

- Examples of specific processes modeled include those related to complex physical and chemical fates such as vertical transport (the result of buoyancy), dissolution (soluble fractions of the hydrocarbons that enter the water), entrainment and resurfacing, emulsion formation (when water mixes with oil to form mousse), and degradation (biological and photo-oxidative processes that breakdown organic carbon compounds)
- SIMAP characterizes oil in the water column, on the water surface, and along shorelines, as well as the amount of oil that makes its way into sediments through sediment interaction, to the atmosphere via evaporation, or degrades naturally.
- SIMAP can be used to model ice-covered environments as well as open-water conditions.

The SIMAP model has been validated against many real-world releases and was recently used for the Natural Resource Damage Assessment for the Deepwater Horizon oil spill.

The RPS SIMAP model would improve upon the RPS OILMAPLand Model by providing the following additional requested information.
- Seasonal considerations (such as ice cover on Lake Oahe)
- Estimation of the concentrations and dynamics of oil that will change over time as they go downstream
  - Measurements of the oil's thickness on the water surface and concentration of hydrocarbons in the water column
  - Expected impacts to the environment
    - Quantitative assessments of individual crude-oil constituents i.e. benzene, PAHs, and other constituents that could potentially be present in concentrations above the drinking water standards
    - Assess potential impacts to water intakes for irrigation and drinking water
  - Expected impacts to hunting and fishing
    - Where oil contacts the shoreline
    - Amount of sediment contamination
    - Toxicity within the water column

Using SIMAP will allow Dakota Access to better quantify potential effects on hunting and fishing, as well as the level of various contaminants that may or may not be present at the agricultural and drinking water intakes downstream from the Lake Oahe crossing.

DRAFT

The SIMAP assessment will take approximately 3 months due to the complexity of the analysis.   A breakdown of the components involved in the timing of the delivery of the SIMAP model is presented below:

**Receipt of USACE Request and Preliminary Model Scenario Development**

**Meet with the USACE to Discuss Model (September 13, 2017)**

**Model Set-up/ Parameter Development (3 weeks)**
- Develop the parameters of the model
  - Characterization of Bakken Light Crude
  - Characterization of habitat and land type (i.e. geospatial information for the model)
  - Measure Lake Oahe's cross sections shape, i.e. obtain multiple water depth measurements
  - Review Lidar and Bathymetry data provided by USACE

**Model Runs of the Various Scenarios (3 weeks)**
- Multiple Model Runs
  - 2 Release Locations
    - Sediment Water Interface (pipeline resting at the bottom of the lake)
    - Pipeline at Valve Site (west of Lake Oahe – Valve Site 380)
  - 2 Release Volumes Specific to Each Location
    - Estimated Volume - Full Bore Rupture
    - Estimated Volume – Majority of Spills
  - 3 Flow Rates
    - Average Lake Oahe Flow
    - High Flow for Lake Oahe
    - Low Flow for Lake Oahe
  - 2 Biological Thresholds

**Result Interpretation and Preparation of Draft Report (4 weeks)**
- Determine model run results that answer the questions posed (e.g. which model run best bounds the worst-case and most-likely-case for impact to hunting and fishing)
- Create figures, charts, and tables from the model runs
- Prepare text to accompany the results
- RPS - peer technical review of report
- RPS - QA/QC the report
- RPS - Senior Technical and Legal review
- Deliver Draft Report to Wood Group Mustang for review and comment
- RPS incorporate comments and prepare Final SIMAP Model Report

**Deliver SIMAP Model Report to USACE (Target Date of December 8, 2017)**

RAR012258



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, OMAHA DISTRICT
1616 CAPITOL AVENUE
OMAHA NE 68102-4901

August 24, 2017

Chris Sonneborn
SVP - Engineering
Planning, Interstate, and Liquids Engineering Energy Transfer Partners
1300 Main Street
Houston, TX 77002

Dear Mr. Sonneborn:

The purpose of this letter is to request information that would assist the U.S. Army Corps of Engineers, Omaha District (Corps) in responding to the issues remanded back to the Corps for additional analysis by the U.S. District Court for the District of Columbia. *See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, No. 16-1534, Memorandum Opinion (D. D.C. June 14, 2017)(ECF No. 239).

The Corps requests the following:

1.  Please provide a technical analysis of a rupture or spill scenario that takes into account the pipeline as constructed. This scenario would be in addition to the hypothetical scenario that has been used that assumed that the pipeline had been constructed on top of the lake and that any rupture would be a full guillotine break. This worst-case analysis based on a hypothetical scenario was required to comply with Pipeline Hazardous Material Safety Administration (PHMSA) requirements. Since "predicted spills generated by the model [that assumed top of lake construction] do not correlate with the majority of spills seen in actual releases," the Corps is requesting spill modeling that does correlate with the majority of spills and takes into account how the pipeline was actually constructed. *See* N.D. Lake Oahe Crossing Spill Model Discussion, Rev. F, at 13 (April 2016). In this as-built spill scenario, the information we are requesting should include, to the extent possible, locations of any seepage, how much oil is released, how much oil ends up being released into the Lake, pathways and distance of seepage, seasonal considerations, and expected impacts to the environment.

2.  Please provide a factual and technical analysis that addresses the issues raised in the following reports:

(a)  EarthFax Engineering Group, LLC. Letter to Oglala Sioux Tribe, Subject: Rieview of the Dakota Access Pipeline Project Environmental Assessment Related to Crossing of Flow Easements and Federal Lands (Dec. 2, 2016).


Printed on Recycled Paper

-2-

(b)  Accufacts Inc., Memorandum to Jan Hasselman, Earthjustice, Re: Accufacts Review of the U.S. Army Corps of Engineers (USACE) Environmental Assessment (EA) for the Dakota Access Pipeline ("DAPL") (Oct. 28, 2016).

(c)  ENVY Enerji ve Çevre Yatırımları A.Ş., Technical Engineering and Safety Assessment: Routing, Construction, and Operation of the Dakota Access Pipeline in North Dakota (Jan. 5, 2017).

(d)  Hooshang Nezafati, Ph.D., Examining the Potential Adverse Impacts of the Dakota Pipeline Crossings to the Water Quality at the Cheyenne River Sioux Tribe Water Intake in the Missouri River, (Jan. 2017)(ECF 131-5, p. 196).

(e)  Second Declaration of Richard B. Kuprewicz (March 24, 2017) (ECF No.195-1).

(f)  Kuprewicz Report Update, Filed Under Seal (Feb. 12, 2017) (ECF No. 272-1).

(g)  Holmstrom Declaration, (August 7, 2017) (ECF No. 272-4).

(h)   Goodman Declaration (August 7, 2017) (ECF No. 272-5) (focusing on pipeline safety and Dakota Access construction).

(i)  Goodman Declaration, Exhibit C (August 7, 2017) (ECF No. 272-5) (focusing on the section addressing the Dakota Access Pipeline Risk Analysis).

Please also do the same for any other report that the tribes submitted to the court or Corps, during the period of July 25 through February 8, that are not identified above.  Also, please let us know if you need a copy of any report listed above.

3.   If there is any relevant new information, please provide an updated risk assessment for the pipeline crossing that addresses the likelihood of rupture or a spill at the Lake Oahe crossing.

4.  In light of your factual and technical analysis of the various reports, please address whether, in your view, these reports show the potential effects of the pipeline crossing of Lake Oahe to be highly controversial under the Council for Environmental Quality's National Environmental Policy Act regulations.  *See* 40 C.F.R. § 1508.27(b)(4).

5.  Please address and provide comments on the Director of the Standing Rock Sioux Tribe's Department of Game, Fish and Wildlife Conservation's declaration filed in *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers.  See* Declaration of Jeff Kelly, Director of Standing Rock Sioux Tribe's Department of Game, Fish and Wildlife Conservation, (filed Feb. 14, 2017) (ECF No. 117-16).

6.  Please provide your analysis of the impact of the various spill scenarios on hunting and fishing in the area of the Lake Oahe crossing.  Please address any

RAR013606

-3-

potential impacts down river, including duration and distance of such impacts. In your analysis, please consider the report prepared by Dr. Gillian Bowser. *See* Gillian Bowser, Ph.D., Assessment and Review Dakota Access Pipeline Environmental Assessment Terrestrial and Aquatic Organisms (Jan. 2017) (ECF No. 131-5). This analysis of potential impacts to hunting and fishing should include and highlight analysis or modeling and supporting data that establishes whether and where the oil would make contact with the shoreline of Lake Oahe, how long that contact would occur, the extent of the contamination and the response and remediation measures Dakota Access would take to mitigate any resulting damages. This should include analysis under the worst case scenario and the as-built scenario. Likewise, provide a similar analysis regarding the extent and effect of an oil spill on the aquatic resources from the pipeline down river toward and past the reservation boundaries as necessary under both the worst case and as built scenarios.

7. Please address the effects of a potential spill on water intakes for irrigation and drinking water down river toward and past the reservation boundaries on both sides of the river under both the worst-case and as-built scenario.

8. Please also provide us with any other information that you believe necessary to address the issues the Court is requiring the Corps to evaluate on remand.

We would appreciate receiving this information within the next 30 days. If you need additional time, please let us know. Following our review of the information you provide, we will determine our next steps in the remand process. Our point of contact for this action is Mr. Brent Cossette, Section 408 Coordinator. Mr. Cossette will be in touch with you within the next several days to address any immediate questions and to schedule any meetings to clarify these requests. In the interim, if you have any questions he can be reached at (402) 995-2712 or by e-mail at brent.j.cossette@usace.army.mil.

Respectfully,

Keith J. Fink
Chief, Operations Division

# FILED UNDER SEAL

Pursuant to Protective Order

RAR014969

# FILED UNDER SEAL

Pursuant to Protective Order

RAR016716

# ENVIRONMENTAL ASSESSMENT
## Dakota Access Pipeline Project Crossings of Flowage Easements and Federal Lands

**Prepared on behalf of:**

## U.S. Army Corps of Engineers – Omaha District
1616 Capitol Avenue, Suite 9000
Omaha, NE 68102

**July 2016**

USACE_DAPL0071220

Environmental Assessment
Dakota Access Pipeline Project
July 2016

# TABLE OF CONTENTS

EXECUTIVE SUMMARY ......................................................................................................1

1.0   INTRODUCTION .......................................................................................................3
   1.1   DAPL Project ........................................................................................... 3
   1.2   Purpose and Need........................................................................................... 3
   1.3   Authority and Scope of the EA ............................................................. 3

2.0   ALTERNATIVES .........................................................................................................5
   2.1   Alternatives Considered but Eliminated from Detailed Analysis ...........................5
      2.1.1   Alternative 1 – Modification of Existing Infrastructure ...................5
      2.1.2   Alternative 2 – Trucking Transportation Alternative..........................5
      2.1.3   Alternative 3 – Rail Transportation Alternative...............................6
      2.1.4   Alternative 4 – Route Alternatives.......................................................7
      2.1.5   Alternative 5 – Major Waterbody Crossing Method Alternatives....................12
   2.2   No Action Alternative ........................................................................... 13
   2.3   The Proposed Action (Preferred Alternative) ......................................... 13
      2.3.1   Location and Detailed Description of the Proposed Action ................. 13
      2.3.2   Description of Construction Techniques and Construction Mitigation Measures
              ........................................................................................................ 17

3.0   THE AFFECTED ENVIRONMENT AND POTENTIAL ENVIRONMENTAL IMPACTS OF THE PROPOSED
      ACTION AND NO ACTION ALTERNATIVE .................................................................23
   3.1   Geology and Soils ................................................................................... 23
      3.1.1   Geology ............................................................................................ 23
      3.1.2   Mineral Resources .......................................................................... 25
      3.1.3   Geologic Hazards ............................................................................ 26
      3.1.4   Paleontology .................................................................................... 28
      3.1.5   Soils .................................................................................................. 29
   3.2   Water Resources...................................................................................... 35
      3.2.1   Surface Waters................................................................................. 35
      3.2.2   Groundwater.................................................................................... 44
      3.2.3   Wetlands ........................................................................................... 49
      3.2.4   Floodplain ....................................................................................... 51
      3.2.5   Levees ............................................................................................... 52
   3.3   Vegetation, Agriculture, and Range Resources ..................................... 52
      3.3.1   Vegetation....................................................................................... 52
      3.3.2   Invasive and Noxious Weeds .......................................................... 56
      3.3.3   Threatened, Endangered, Candidate, and Proposed Plant Species ...................57
   3.4   Wildlife Resources .................................................................................. 57
      3.4.1   Recreationally and Economically Important Species and Nongame Wildlife......57
      3.4.2   Threatened, Endangered, Candidate, and Proposed Wildlife Species ...............58
   3.5   Aquatic Resources................................................................................... 68
      3.5.1   Habitat and Communities............................................................... 68
   3.6   Land Use and Recreation ....................................................................... 70
      3.6.1   Land Ownership ............................................................................. 70
      3.6.2   Land Use........................................................................................... 71

USACE_DAPL0071221

Environmental Assessment
Dakota Access Pipeline Project
July 2016

|  |  | 3.6.3 | Recreation and Special Interest Areas | 73 |
|  | 3.7 | Cultural and Historic Resources and Native American Consultations | | 75 |
|  |  | 3.7.1 | Cultural Resources Studies | 76 |
|  |  | 3.7.2 | Native American Consultations | 79 |
|  | 3.8 | Social and Economic Conditions | | 80 |
|  |  | 3.8.1 | Demographics, Employment, Income and Economic Justice | 80 |
|  | 3.9 | Environmental Justice | | 84 |
|  |  | 3.9.1 | Affected Environment | 84 |
|  |  | 3.9.2 | Impacts and Mitigation | 85 |
|  | 3.10 | Hazardous Waste | | 87 |
|  | 3.11 | Reliability and Safety | | 88 |
|  | 3.12 | Air Quality and Noise | | 94 |
|  |  | 3.12.1 | Air Quality | 95 |
|  |  | 3.12.2 | Noise | 96 |
| **4.0** | **CUMULATIVE IMPACTS** | | | **98** |
|  | 4.1 | Geology and Soils | | 99 |
|  | 4.2 | Water and Aquatic Life Resources | | 100 |
|  | 4.3 | Vegetation, Agriculture, and Range Resources | | 101 |
|  | 4.4 | Threatened, Endangered, Candidate, and Proposed Species | | 102 |
|  |  | 4.4.1 | Interior Least Tern | 102 |
|  |  | 4.4.2 | Whooping Crane | 103 |
|  |  | 4.4.3 | Piping Plover | 103 |
|  |  | 4.4.4 | Rufa Red Knot | 103 |
|  |  | 4.4.5 | Pallid Sturgeon | 103 |
|  |  | 4.4.6 | Conclusion | 104 |
|  | 4.5 | Wildlife Resources | | 104 |
|  | 4.6 | Land Use and Recreation | | 104 |
|  | 4.7 | Cultural and Historic Resources and Native American Consultations | | 105 |
|  | 4.8 | Social and Economic Conditions | | 105 |
|  | 4.9 | Transportation and Traffic | | 106 |
|  | 4.10 | Environmental Justice | | 107 |
|  | 4.11 | Air Quality and Noise | | 107 |
| **5.0** | **IRREVERSIBLE AND IRRETRIEVABLE COMMITMENT OF RESOURCES** | | | **108** |
| **6.0** | **MITIGATION SUMMARY** | | | **109** |
| **7.0** | **FEDERAL, TRIBAL, STATE, AND LOCAL AGENCY CONSULTATION AND COORDINATION** | | | **111** |
| **8.0** | **STATUS OF ENVIRONMENTAL COMPLIANCE** | | | **115** |
| **9.0** | **LIST OF PREPARERS AND REVIEWERS** | | | **126** |
| **10.0** | **ACRONYMS, INITIALS, AND ABBREVIATIONS** | | | **128** |
| **11.0** | **REFERENCES** | | | **131** |
| **12.0** | **FIGURES** | | | **139** |

USACE_DAPL0071222

Environmental Assessment
Dakota Access Pipeline Project
July 2016

## LIST OF TABLES

**Table 2-1:**    North Bismarck Route alternative Evaluation
**Table 2-2:**    North Bismarck Route alternative cost comparison
**Table 2-3:**    Flowage Easements and Federal Land Crossings
**Table 2-4:**    Environmental Assessment Areas of Interest
**Table 3-1:**    Soil Types Mapped on the Flowage Easements Project Area
**Table 3-2:**    Soil Types Mapped on the Federal Lands Project Area and Connected Action
**Table 3-3:**    Soil Impacts on the Flowage Easements Project Area
**Table 3-4:**    Soil Impacts on the Federal Lands Project Area and Connected Action
**Table 3-5**    Waterbodies within the Flowage Easements Project Area
**Table 3-6**    Waterbodies within the Federal Lands Project Area and Connected Action
**Table 3-7:**    Estimated Benzene Concentrations Following a Hypothetical Crude Oil Spill at Project River Crossings
**Table 3-8:**    Wetlands within the Flowage Easements Project Area
**Table 3-9:**    Land Cover Impacts on the Flowage Easements Project Area
**Table 3-10:**    Land Cover Impacts on the Federal Lands Project Area and Connected Action
**Table 3-11:**    Federally Listed Species with Potential to Occur within the Project Area and Connected Action
**Table 3-12:**    Land Use Impacts on the Flowage Easements Project Area
**Table 3-13:**    Land Use Impacts on the Federal Lands Project Area and Connected Action
**Table 3-14:**    Minority and Low-Income Population Statistics for the Flowage Easements Project Area
**Table 3-15:**    Minority and Low-Income Population Statistics for the Federal Lands Project Area
**Table 3-16:**    Noise Values
**Table 7-1:**    Comments Received
**Table 8-1:**    Environmental Permits, Approvals, and Consultations
**Table 8-2**:    Summary of Environmental Impact Avoidance and Mitigation Measures

**Table 9-1:**    List of Reviewers and Preparers

## LIST OF FIGURES

**Figure 1:**    Project Location—Federal Lands and Flowage Easements
**Figure 2:**    Project Layout—Flowage Easements
**Figure 3:**    Project Layout—Federal Lands
**Figure 4:**    Soils—Flowage Easements
**Figure 5:**    Soils—Federal Lands
**Figure 6:**    Natural Resources—Flowage Easements
**Figure 7:**    Natural Resources—Federal Lands
**Figure 8:**    Cultural Resources—Flowage Easements
**Figure 9:**    Cultural Resources—Federal Lands
**Figure 10:**    Land Cover—Flowage Easements
**Figure 11:**    Land Cover—Federal Lands
**Figure 12:**    Route Alternative—Missouri River Crossing
**Figure 13:**    Route Alternative—Lake Oahe Crossing
**Figure 14:**    Cross-Section Diagram of Lake Oahe HDD Crossing

USACE_DAPL0071223

Environmental Assessment
Dakota Access Pipeline Project
July 2016

**Figure 15:**     Cross-Section Diagram of Missouri River HDD Crossing
**Figure 16:**     Whooping Crane Migration Corridor

**LIST OF APPENDICES**

**Appendix A:**     Stormwater Pollution Prevention Plan (SWPPP)/Spill Prevention Control and
                    Countermeasure (SPCC) Plan
**Appendix B:**     HDD Construction Plan - and HDD Contingency Plan
**Appendix C:**     Right-of-Way (ROW) Configurations and Typical Construction Details
**Appendix D**:     Geotechnical Reports
**Appendix E:**     Blasting Plan
**Appendix F:**     Unanticipated Discoveries Plan Cultural Resources, Human Remains, Paleontological
                    Resources and Contaminated Media (UDP)
**Appendix G:**     Environmental Construction Plan (ECP)
**Appendix H**:     Project Maps and HDD Cross-Sections
**Appendix I:**     Cultural Resources Report (Confidential-Not for Public Release)
**Appendix J:**     Sample Scoping Letter, Distribution List, and Comments Received
**Appendix K:**     Notice of Availability of Draft Environmental Assessment (EA) for Comment
**Appendix L:**     Draft Facility Response Plan
**Appendix M**:     Sovereign Lands Permits issued by the North Dakota Office of the State Engineer

USACE_DAPL0071224

Environmental Assessment
Dakota Access Pipeline Project
July 2016

## EXECUTIVE SUMMARY

In accordance with the National Environmental Policy Act (NEPA) and implementing regulations, the following Environmental Assessment (EA) has been prepared to evaluate the effects of the United States Army Corps of Engineers (USACE), Omaha District (District) granting permission to Dakota Access, LLC (Dakota Access) to place a portion of the Dakota Access Pipeline Project (DAPL Project) on federal real property interests acquired and managed for the Garrison Dam/Lake Sakakawea and Oahe Dam/Lake Oahe Projects in North Dakota. Section 14 of the Rivers and Harbors Act of 1899, codified 33 U.S.C. Section 408 (Section 408), authorizes the Corps to grant permission to Dakota Access to modify federal flood control and navigation projects, provided the modifications are not injurious to the public interest and will not impair the usefulness of the projects. The EA addresses the purpose and need of the pipeline, as well as the location and method of installation of the pipeline, but the analysis is limited to the effects of allowing the pipeline to cross federal flowage easements near Lake Sakakawea and federally owned lands at Lake Oahe in North Dakota, to determine whether the placement of the pipeline on federal real property interests is injurious to the public interest or will impair the usefulness of the federal projects.

This EA was prepared by Dakota Access on behalf of the Corps in compliance with the NEPA Act of 1969; the Council on Environmental Quality (CEQ) Regulations (40 CFR 1500-1508); Corps of Engineers Regulation ER 200-2-2 (33 CFR Part 230), and related environmental compliance requirements, including the Section 106 of the National Historic Preservation Act (Section 106). Tribes, Tribal Historic Preservation Offices, State Historic Preservation Offices, the Advisory Council on Historic Preservation, and interested parties were consulted by representatives from Dakota Access and the Corps Omaha District as required by the Programmatic Agreement and the National Historic Preservation Act.

This EA was prepared in accordance with CEQ regulations in Section 1506.5(a) and 1506.5(b), which allow an applicant to prepare an EA for federal actions. The Corps has independently evaluated and verified the information and analysis undertaken in this EA and takes full responsibility for the scope and content contained herein.

The Corps published a draft EA on December 8, 2015, on the U.S. Army Corps of Engineers (USACE) Omaha District website (http://www.nwo.usace.army.mil/Missions/CivilWorks/Planning/ProjectReports.aspx) and hard copies were made available at public libraries in Bismarck, Williston, and Pierre. Additionally, notifications where made to cooperating agencies, other federal, state and local agencies, and signatory and non-signatory Tribes to the Omaha Corps District Programmatic Agreement.

The Corps received comments from 20 reviewers in response to the Draft EA, primarily from individuals believed to be members of the Standing Rock Sioux Tribe, and two sets of comments from EPA. These comments relate to topics in the EA. The Corps fully considered and responded to these comments. There is no new, significant information on environmental effects as a result of these comments. As such, neither a supplemental nor a revised EA will be published for further public review nor are additional NEPA compliance actions required prior to the Corps making a decision on the proposed action.

Impacts on the environment resulting from the placement of the pipeline on federal real property interests is anticipated to be temporary and not significant as a result of Dakota Access's efforts to avoid, minimize, and mitigate potential impacts. Dakota Access will comply with all applicable local, state, and

1

Environmental Assessment
Dakota Access Pipeline Project
July 2016

federal regulations and permits associated with the construction and operation of the pipeline, which is not expected to have any significant direct, indirect, or cumulative impacts on the environment.

2

USACE_DAPL0071226

Environmental Assessment
Dakota Access Pipeline Project
July 2016

## 1.0      INTRODUCTION

Dakota Access is proposing to construct a new crude oil pipeline that would provide transportation service from the Bakken and Three Forks plays in North Dakota through portions of South Dakota and Iowa to a terminus in Patoka, Illinois (Figure 1).  In coordination with the U.S. Army Corps of Engineers, the Applicant, Dakota Access, LLC (Dakota Access), as the non-federal representative for compliance with the NEPA of 1969, the CEQ Regulations (40 CFR 1500-1508), Corps of Engineers Regulation ER 200-2-2 (33 CFR Part 230), and related environmental compliance requirements, prepared this Environmental Assessment to analyze whether the Corps could grant Section 408 permissions for the placement of Dakota Access Pipeline Project (DAPL Project) on federal flowage easements near the upper end of Lake Sakakawea, and federally owned lands at Lake Oahe in North Dakota ("the Requester's Preferred Alternative" or "Proposed Action").  Areas that are potentially impacted by construction and/or operation of the Proposed Action are referred to herein as the Project Area.

### 1.1      DAPL Project

The DAPL Project is an approximately 1,100-mile long crude oil pipeline project beginning near Stanley, North Dakota, and ending at Patoka, Illinois.  The DAPL project, as proposed and being evaluated herein, would cross federal flowage easements near the upper end of Lake Sakakawea north of the Missouri River in Williams County, North Dakota, and federally owned lands at Lake Oahe in Morton and Emmons counties, North Dakota. The EA analysis is limited to these portions of the pipeline only.

### 1.2      Purpose and Need

The purpose and need of the federal action is to determine whether USACE may grant permission for Dakota Access to place the pipeline on federal real property interests acquired and managed by USACE for the Garrison Dam/Lake Sakakawea and Oahe Dam/Lake Oahe projects.  Section 408 authorizes the Corps to grant permission to Dakota Access to modify federal flood control and navigation projects, provided the modifications are not injurious to the public interest and will not impair the usefulness of the projects. The EA addresses the purpose and need of the pipeline, as well as the location and method of installation of the pipeline, but the analysis is limited to the effects of allowing the pipeline to cross federal flowage easements near the upper end of Lake Sakakawea and federally owned lands at Lake Oahe in North Dakota.

### 1.3      Authority and Scope of the EA

The proposed crossings of Corps-owned lands and easements would require the Corps to grant the Section 408 permissions as well as real estate outgrants.  Therefore, the scope of this EA is limited to the crossings of Corps-owned lands and flowage easements.  As noted below, separate Corps authorizations are being sought for Section 404, Section 10, and Section 408 crossings on other portions of the DAPL route. Those actions are not discussed in the EA.

The Proposed Action does not qualify for a Categorical Exclusion from NEPA documentation as defined by ER 200-2-2, 4 March 1998 paragraph 9.  Thus, this EA has been prepared as required under NEPA to determine potential impacts that may occur as result of implementing the Proposed Action.  If it is determined that no significant impacts would be incurred after implementing the mitigation measures

3

Environmental Assessment
Dakota Access Pipeline Project
July 2016

described within this document, the USACE would issue a finding of no significant impact (FONSI). If it is determined that significant impacts would be incurred as a result of construction and/or operations of the Proposed Action, an environmental impact statement (EIS) would be prepared to further evaluate the Proposed Action under NEPA.

This effect analysis is being completed in accordance with CEQ regulations in Section CFR 1506.5(b), which allow an applicant to prepare an EA for a federal action in coordination with the lead federal agency (i.e., Corps). The Corps will use the information in the EA to make a final determination whether to grant the required Section 408 permissions using the information contained herein. The Corps independently evaluated and verified the information and analysis undertaken in this EA and takes full responsibility for its scope and content.

4

USACE_DAPL0071228

Environmental Assessment
Dakota Access Pipeline Project
July 2016

<h2 style="text-align:center">2.0    ALTERNATIVES</h2>

Dakota Access proposes the DAPL Project to efficiently and safely transport at least 570,000 barrels of crude oil per day (bpd) from the Bakken and Three Forks production region in North Dakota to a crude oil market hub located near Patoka, Illinois, and ultimately to refineries located in the Midwest and the Gulf Coast, where 80% of the U.S. refining capabilities exist. Because the Corps can only grant permission for the modification of a federal project if it would not be injurious to the public interest, the EA evaluated alternatives to the construction of the pipeline as a whole, as well as the alignment of the pipeline and method for installation on federal property. The alternatives were compared using the proposed purpose of the DAPL project. The EA also analyzed the potential for the pipeline to impair the usefulness of the federal projects.

### 2.1    Alternatives Considered but Eliminated from Detailed Analysis

### 2.1.1    Alternative 1 – Modification of Existing Infrastructure

There are no other major interstate pipelines that would meet the purpose and need of the Project.  The DAPL Project would be Energy Transfer's (Company's) first asset in the state.  For this reason, the manipulation of operating pressures or additional of pump stations to increase transport capacity in pipelines or altering existing infrastructure to increase storage and transport capacity are not viable options to meet the  purpose and need of the Project.

### 2.1.2    Alternative 2 – Trucking Transportation Alternative

 While trucking is instrumental in the gathering and distribution of crude on a limited scale, trucking as an alternative for transporting volume of crude oil the distances planned for the DAPL Project is not viable. Based on data recorded by the North Dakota Pipeline Authority as recently as November of 2015, approximately 1% of the crude oil in the Williston Basin is transported via truck out of the Williston Basin due to a lack of transport capacity (Kringstad, 2016).  Factors such as road safety, roadway capacity, and a lack of reliability due to seasonal constraints, in addition to other logistical issues involving availability of labor force, trailer truck capacity, and economics, all contribute to truck transportation not being a realistic alternative.

A sharp increase in traffic on North Dakota roads as a result of the rapid expansion in the number of commercial trucks linked to the oil industry speaks to the issues associated with road safety.  In 2012, the Federal Motor Carrier Safety Administration reported a traffic fatality rate in North Dakota of 0.48 per million vehicle miles traveled, with 48 deaths involving a bus or large truck, far surpassing any other state (U.S. Department of Transportation [DOT], 2014).  In the pre-boom years of 2001 to 2005, there was an average of only 13 annual deaths involving commercial trucks.  Furthermore, the economic cost of severe truck crashes has more than doubled between 2008 and 2012.  Much of the increase in the fatality rate can be attributed to the energy production boom, along with the fact that the state's infrastructure still consists of single-lane, rural, and unpaved roads in many areas (Bachman, 2014).  Harsh winter weather and seasonal road restrictions compromise the reliability of truck transportation even further. Based on the above, a pipeline is a safer and more economical alternative than trucking for the volumes transported and distances covered by the DAPL Project.

USACE_DAPL0071229

Environmental Assessment
Dakota Access Pipeline Project
July 2016

Assuming the average oil tanker truck is capable of holding about 220 barrels of oil, the transportation of the initial capacity of the proposed Project (450,000 bpd), would require a total of 2,045 (450,000/220) full trucks to depart the proposed tank terminals daily, and more than 85 (2,045/24) trucks would have to be filled every hour with a 24-hour/day operation.  Time spent in transit, loading/offloading, and additional time for maintenance would add to the number of trucks needed to offset for the DAPL Project. For a trucking mode, an increase in daily truck traffic would lead to an increase in the degradation of public roads as well as contribute to the noise pollution adjacent to the roads.  For both truck and rail modes, an increase in exhaust would be anticipated due to truck and locomotive combustion.  An increase in air pollution would also be anticipated from potential releases during the filling operations for trucks or rail cars.

Analysis of infrastructure considerations (the burden of thousands of additional trucks on county, state, and interstate highways, as well as the loading and offloading facilities that would have to be constructed which would incur their own environmental impacts), economic considerations (e.g., labor costs, purchase and maintenance of hauling equipment, fuel, public infrastructure, etc.), and reliability considerations (e.g., weather, mechanical, manpower, road closures) all contribute to making the truck transportation alternative unviable.

### 2.1.3   Alternative 3 – Rail Transportation Alternative

Reliance on rail as a transportation method in the Williston Basin has drastically increased in recent years, carrying a negligible percentage of the overall market share as recently as 2010 to nearly 60% of the overall market share by mid-2014 (Nixon, 2014).  The rise in the use of rail as a primary transportation method has been driven in large part by the rapid increase in production of crude oil coupled with a lack of pipeline capacity to account for additional supplies.

Negative impacts from the growth in popularity of rail as a method of long-distance transportation of crude oil include delays that disrupt the agricultural sector, reductions in coal-fired power plant inventories, and significant production issues in the food production industry.  In August 2014, reports filed with the federal government indicated that the Burlington Northern Santa Fe Railway had a backlog of 1,336 rail cars waiting to ship grain and other products, while Canadian Pacific Railway had a backlog of nearly 1,000 cars (Nixon, 2014).  For industries, such as those listed, in which the use of pipelines is not an option, the only viable alternative would be increased reliance on trucking, which would exacerbate some of the issues listed in the section above.

Assuming a carrying capacity of 600 barrels per car, a total of 750 rail cars would be required to depart the tank terminal daily to transport 450,000 barrels of crude oil to its final destination.  Loading and offloading 750 rail cars in a day would require servicing more than 31 rail cars per hour.  With an assumption of 125 rail cars per train, six trains would have to depart the tank terminal every day.  With 10 to 12 trains currently leaving the state per day carrying Bakken crude, the DAPL Project would represent a 50 to 60% increase in the number of trains transporting crude oil out of the state, likely exacerbating issues with delays (Horwath and Owings, 2014).

Rail operations on the scale of the DAPL Project do not exist in the U.S.  An oil-by-rail facility designed to handle an average of 360,000 bpd has been proposed in the Port of Vancouver, Washington.  Known as the Vancouver Energy proposal, the project would be the largest rail terminal in the country (Florip, 2014).

USACE_DAPL0071230

Environmental Assessment
Dakota Access Pipeline Project
July 2016

A rail transportation alternative to handle the volumes of the DAPL Project would require the design and construction of 125 to 158% of that of the Vancouver Energy proposal.  A facility of this size would incur its own environmental consequences.

From a safety standpoint, railroad transport consistently reports a substantially higher number of transportation accidents than pipelines (DOT, 2005).  A series of major accidents taking place in 2013 to 2014 in Canada and the U.S. has heightened concern about the risks involved in shipping crude by rail (Fritelli, 2014).

Increases in rail traffic necessary to transport the volume of crude oil proposed by the DAPL project would increase the emissions of combustion products due the use of diesel engines which could have an adverse impact on air quality in the region.   This alternative would also directly affect communities along utilized rail lines by increasing noise and creating transportation delays due to the substantial increasing rail traffic across railroad crossings of roads.

While rail tanker cars are a vital part of the short-haul distribution network for crude oil, pipelines are a more reliable, safer, and more economical alternative for the large volumes transported and long distances covered by the DAPL Project.   This alternative would create delays on the rail lines due to the substantial increase in rail traffic, resulting in shipping delays in other industries such as agriculture that cannot rely on pipeline transportation.  Furthermore, the purpose and need of the Project would not be attainable with the current oil-by-rail infrastructure in the country because rail loading facilities of sufficient size do not exist. As such, rail transportation is not considered a viable alternative.

## 2.1.4    Alternative 4 – Route Alternatives

Although this EA is limited to the pipeline placement on federal real property interests administered by the Corps, major route alternatives were evaluated for the pipeline route as a whole.  During the DAPL Project fatal flaw analysis and early routing process, Dakota Access utilized a sophisticated and proprietary Geographic Information System (GIS)-based routing program to determine the pipeline route based on multiple publicly available and purchased datasets.  Datasets utilized during the Project routing analysis included engineering (e.g., existing pipelines, railroads, karst, powerlines, etc.), environmental (e.g., critical habitat, fault lines, state parks, national forests, brownfields, national registry of historic places, etc.), and land (e.g., fee owned federal lands, federal easements, dams, airports, cemeteries, schools, mining, tribal lands, and military installations, etc.).

Each of these datasets was weighted based on the risk (e.g., low, moderate, or high based on a scale of 1,000) associated with crossing or following certain features.  In general, the route for the pipeline would follow features identified as low risk, avoid or minimize crossing features identified as moderate risk, and exclude features identified as high risk.  For example, the existing pipelines dataset was weighted as a low risk feature, so that the routing tool followed existing pipelines to the extent possible to minimize potential impacts.  An example of a high risk feature is the national park dataset.  Since national parks were weighted for the DAPL Project as high risk, the GIS routing program excluded any national parks from the pipeline route to avoid impacts on these federal lands.  In addition, the routing program established a buffer between the proposed route and certain types of land, such as maintaining a 0.5-mile buffer from tribal lands.

7

USACE_DAPL0071231

Environmental Assessment
Dakota Access Pipeline Project
July 2016

## Route Alternative for the Crossing of Flowage Easements at the Missouri River

Early in the routing process Dakota Access performed a cursory route evaluation to attempt crossing the Missouri River at a location that does not contain flowage easements. This would dictate moving the centerline west of the flowage easements in Williams County. This alternative was not carried forward through the environmental consequences analysis, given that this would require approximately eight additional miles of pipe, an exceedance of an additional 130 acres of workspace, and another major river crossing (Yellowstone River) in addition to the Missouri River. Furthermore, other state and federal properties are located along the river west of the confluence of Missouri and Yellowstone Rivers.

## Route Alternative for the Crossing of Federal Lands at Lake Oahe

Early in the routing phase of the DAPL Project, Dakota Access considered but eliminated an alternative centerline that originated in Stanley, North Dakota, within Mountrail County, where it connected to customer receipt points and headed southwest through Williams County and crossed the Missouri River approximately 8.5 miles east of the Yellowstone River and Missouri River confluence (**Figure 12**). The centerline then headed southeast across the state and crossed Lake Oahe approximately 10 miles north of Bismarck (**Figure 13**), where it then headed south again and entered South Dakota approximately 35 miles east of Lake Oahe in McIntosh County. In addition to other evaluation criteria listed in Table 2.1, the route alternative was in proximity to and/or crossing multiple conservation easements, habitat management areas, National Wildlife Refuges, state trust lands, waterfowl production areas, and private tribal lands.

As a result of public input and comment during this EA process, additional desktop evaluation of the North Bismarck alternative portion of the early route (**Figure 13**) was undertaken. The comparison of this alternative to the preferred route is included in **Tables 2-1** and **2-2** contained herein. As illustrated in the tables, the data substantiates eliminating this route as a viable alternative. While the alternative does avoid Corps fee owned land at Lake Oahe; therefore, would not require a Corps real estate outgrant or Corps EA review, approximately 11-miles of length would be added to the pipeline route, consisting of roughly 165 additional acres of impact, multiple additional road crossings, waterbody and wetland crossings, etc. In addition to the criteria shown in the tables, due to the proximity to Bismarck, the North Bismarck route alternative crossed through or in close proximity to several wellhead source water protection areas that are identified and avoided in order to protect areas that contribute water to municipal water supply wells. The route was also severely constrained by the North Dakota Public Service Commission's 500-ft residential buffer requirement at multiple locations. Furthermore, this route alternative crossed other populated PHMSA high consequence areas (HCAs), that are not present on the preferred route. Pipeline safety regulations use the concept of HCAs to identify specific locales where a release from a pipeline could have the most significant adverse consequences.

8

USACE_DAPL0071232

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 2-1<br>Alternatives Evaluation Matrix Between Preferred Crossing at Lake Oahe and Alternative Crossing North of Bismarck | | | |
|---|---|---|---|
| **Evaluation Factors** | **ALTERNATIVE ROUTE Crossing North of Bismarck** | **PREFERRED ROUTE Crossing at Lake Oahe** | **PREFERRED COMPARED TO ALTERNATIVE ROUTE** |
| Total Overall Route Mileage | | | |
| Total Mileage | 111.0 | 100.4 | **-10.6** |
| Collocation | | | |
| Pipeline (mi) | 0.0 | 34.6 | **+34.6** |
| Powerline (mi) | 2.9 | 6.1 | **+3.2** |
| *Overall Corridor Collocation (%)* | 3% | 41% | **+38%** |
| Amount of Greenfield Crossed (non-collocated areas-mi) | 108.1 | 59.6 | **-48.4** |
| Existing Pipeline Crossing (count) | | | |
| Crossing Count | 6 | 10 | **+4** |
| Floodplain 100 Year | | | |
| Floodplain Crossings (Count) | 13 | 2 | **-11** |
| Total Mileage | 1.4 | 0.2 | **-1.2** |
| Land Cover Types (mi) | | | |
| Agriculture | 42.5 | 36.1 | **-6.4** |
| Developed/Low Intensity | 0.2 | 0.1 | **-0.1** |
| Developed/Open Space | 6.6 | 2.0 | **-4.6** |
| Grass/Pasture | 59.3 | 60.7 | **+1.4** |
| Land Ownership Potential Conflicts | | | |
| USACE Reservoirs - Lake Oahe | 0 | 1 | **+1** |
| Flowlines - NHD* | | | |
| Waterbody Count | 149 | 116 | **-33** |

9

USACE_DAPL0071233

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 2-1 Alternatives Evaluation Matrix Between Preferred Crossing at Lake Oahe and Alternative Crossing North of Bismarck | | | |
|---|---|---|---|
| **Evaluation Factors** | **ALTERNATIVE ROUTE Crossing North of Bismarck** | **PREFERRED ROUTE Crossing at Lake Oahe** | **PREFERRED COMPARED TO ALTERNATIVE ROUTE** |
| Waterbodies- NHD* | | | |
| Perennial | 3 | 1 | **-2** |
| Intermittent | 1 | 0 | **-1** |
| NWI Wetland (count) | | | |
| Freshwater Emergent Wetland | 26 | 5 | **-21** |
| Freshwater Forested/Shrub Wetland | 1 | 0 | **-1** |
| Freshwater Pond | 2 | 0 | **-2** |
| PHMSA Populated Areas Dissolved (mi) | | | |
| Ecological HCA | 2.6 | 2.6 | **0** |
| Highly Populated Areas | 0 | 0 | **0** |
| Other Populated Areas | 1.6 | 0 | **-1.6** |
| Drinking Water HCA | 0 | 0 | **0** |
| Powerline Crossing | | | |
| Total Crossing Count | 14 | 13 | **-1** |
| Transportation Crossing | | | |
| Total Crossing Count | 139 | 112 | **-27** |

* Flowline and waterbody crossings from the U.S. Geological Survey (USGS) National Hydrography Dataset

10

USACE_DAPL0071234

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 2-2 Construction Cost Comparison Between Crossing at Lake Oahe and Alternative Crossing North of Bismarck | | | | |
|---|---|---|---|---|
| | **ALTERNATIVE ROUTE Crossing North of Bismarck** | | **PREFERRED ROUTE Crossing at Lake Oahe** | |
| Length of Segment | 111.0 | miles | 100.4 | miles |
| | 585,974 | feet | 530,112 | feet |
| Cost for Road/Railroad Bores | | | | |
| Number of Road/Railroad Bores | 139 | bores | 112 | bores |
| Total Cost for Road Bores (at $34,600/bore) | $ 4,809,400 | USD | $ 3,875,200 | |
| Cost of Installation for Non-HDD Areas | | | | |
| Length of Pipeline Non-HDD | 580,008 | feet | 522,312 | feet |
| Total Cost for Installation of Non-HDD Section | $ 201,262,915 | USD | $ 181,242,264 | USD |
| Horizontal Directional Drill (HDD) Across Mo River/Lake Oahe | | | | |
| Length of HDD | 5,966 | feet | 7,800 | feet |
| Total Cost of HDD Crossing | $ 7,696,140 | USD | $ 10,062,000 | USD |
| Cost of Geotechnical Investigation | | | | |
| | $ 140,000 | USD | $110,000 | USD |
| Aboveground Facility Costs | | | | |
| Mainline Valves Needed (one per each 10 mile segment) | 11 | valves | 10 | valves |
| Total Cost of Mainline Valves (at $450,000/valve location) | $ 4,995,000 | USD | $ 4,500,000 | USD |
| Right-of-Way Acquisition Costs (at $37/foot) | $ 21,681,053 | USD | $ 19,614,144 | USD |
| Additional Cost Including Engineering and Consultants (at $131,000/mile) | $ 14,538,380 | USD | $ 13,152,400 | USD |
| **Total Cost of Alternative** | **$ 255,122,888** | **USD** | **$ 232,556,008** | **USD** |

11

USACE_DAPL0071235

Environmental Assessment
Dakota Access Pipeline Project
July 2016

A negative number indicates that the value for the proposed action is less than the value for the population that the proposed action is being compared to.

## 2.1.5   Alternative 5 – Major Waterbody Crossing Method Alternatives

Once an optimal route was selected based on the evaluation of impacts discussed in Section 2.1.3, Dakota Access then identified the preferred major waterbody crossing construction method that would meet the purpose and need while minimizing impacts to resources.   Pipeline construction methods utilized at waterbody crossings are highly dependent on the characteristics of the waterbody encountered.  A variety of waterbody crossing techniques were considered during the DAPL Project planning stages for the crossings of major waterbodies, including Dam and Pump, Flume, Open-Cut, and Horizontal Directional Drill.

### Dry Crossings Methods

Two different techniques, including dam and pump and flume crossing methods, are typically used on waterbody crossings well under 100 feet in width and require a temporary diversion of flow within the waterbody.  Because of the large volume of water within the Missouri River system, it is not feasible to temporarily divert the water either by pump or flume, and these methods were ruled out of consideration for the crossing of the Missouri River and Lake Oahe.

### Wet Open-Cut Crossing Method

Aside from trenchless or HDD crossing techniques, the only feasible crossing method from a constructability standpoint for the major waterbodies associated with the Proposed Action is the wet open-cut crossing method, in which flow would be maintained throughout installation of the pipeline. This method of construction would require the construction right-of-way (ROW) to extend right up to the waterbody itself, allowing equipment to operate from the banks of the waterbody to excavate a trench. The sensitive habitat adjacent to the banks of the waterbodies would be cleared of vegetation and graded to create a safe and level workspace that could accommodate excavation equipment and spoil storage for the duration of the open-cut installation (approximately 6 months).  Since the widths of the Missouri River and Lake Oahe at the crossing locations is such that operating trenching equipment entirely from the banks would not be possible, trench excavation in the waterbodies would require equipment operating from barges.  Furthermore, the depth of the waterbodies crossed (15 to 25 feet) exceeds the reach of a backhoe, and the use of mechanical dragline dredgers would be necessary.  Spoil dredged from the bottom of the waterbody would be stored on a spoil barge or otherwise temporarily stockpiled in the waterbody itself.  This method of excavation would greatly influence the overall sediment load generated in the waterbody for the duration of the installation.  The generation of a downstream turbidity plume would have a direct effect on the aquatic habitat of the waterbody.  In addition, the operation of equipment within and on the banks of the waterbody has the potential for adverse effects on surface water quality (i.e., potential contamination of surface water resources from fuel or leaks from the equipment).  Compared to trenchless technology, the open-cut method would incur far greater impacts on sensitive habitat located on both the banks of the waterbodies and within the waterbodies.  Therefore, this method of construction was eliminated from consideration.

USACE_DAPL0071236

Environmental Assessment
Dakota Access Pipeline Project
July 2016

The trenchless construction method known as HDD was selected as the preferred construction method of the Proposed Action, because this method of construction involves far less impacts on resources.  In addition, the Garrison Project – Lake Sakakawea Oil and Gas Management Plan explicitly states that:  Oil and gas pipelines should use directional drilling technology to traverse beneath sensitive habitat areas. Further information regarding the HDD construction method is provided in Section 2.3.2.6 below.

## 2.2     No Action Alternative

Under the "no action" alternative, Dakota Access would not construct the DAPL Project.  The "no action" alternative would not provide the infrastructure necessary to transport light sweet crude oil to refining facilities.  In northwest North Dakota, exploration and production of oil is a major economic activity, with crude oil production being the primary mineral resource of interest.  Although the "no action" alternative itself would not incur direct environmental impacts, it would also not address the existing demand to transport crude oil to refining facilities.   Market demands would likely compel shippers to rely on alternative methods of crude oil transport such as truck or rail.   Although, both the truck and rail alternatives are not sufficient to meet the purpose and need of the Project due to the lack of available infrastructure and other limitations described in Sections 2.1.3 and 2.1.4, it is reasonable to assume that truck and rail traffic would increase if the "no action" alternative were implemented.  These alternative shipping methods would adversely affect resources as described in Sections 2.1.3 and 2.1.4 and throughout this EA.

It is purely speculative to predict the resulting effects and actions that could be taken by another company or Dakota Access' shippers and any associated direct or indirect environmental impacts in response to the "no action" alternative.  However, if this alternative is implemented, it is likely that other methods of transporting crude oil to the marketplace would be implemented and anticipated effects of the "no action" alternative has been carried forward in the environmental analysis of this EA to provide a comparison between it and the impacts of implementing the Preferred Alternative.

## 2.3     The Proposed Action (Preferred Alternative)

### 2.3.1    Location and Detailed Description of the Proposed Action

The DAPL Project originates near Stanley, North Dakota, traversing westerly northwest of Williston then turning south, crossing the Missouri River and traverses southeasterly across the state, exiting through the central portion of the southern border.  Dakota Access proposes to construct the pipeline, ranging in size from 12 to 30 inches in diameter, so that the majority of lands crossed would be privately-owned lands.  The locations for collecting product into the proposed system were largely fixed based on the location of existing terminals.  The first of the six fixed input locations is located at the pipeline's origin near the town of Stanley in Mountrail County.  Three other input locations exist near the towns of Ramberg, Epping, and Trenton in Williams County.  Two additional collection points are located south of the proposed Missouri River crossing on the flowage easements in McKenzie County near the towns of Waterford City and Johnson's Corner.  Connecting the input locations was largely a matter of minimizing length and maximizing the avoidance of sensitive features, developments, public lands, and constructability issues (e.g., steep terrain, potholes, excessive bedrock, etc.), as discussed above in Section 2.1.4 Route Alternatives.  Based on the location of the collection points, crossing the Missouri River (Lake Sakakawea) was unavoidable.  The selected crossing location of the Proposed Action avoids federally-

13

USACE_DAPL0071237

Environmental Assessment
Dakota Access Pipeline Project
July 2016

owned lands to the extent practical, is at a narrow width of the river upstream of the wider Lake Sakakawea, and minimizes impacts on sensitive resources (e.g., piping plover critical habitat, eagle nests, etc.). The pipeline is 24 inches in diameter where it crosses approximately 14,942 feet (2.83 miles) of the Corps flowage easements at the Missouri River and is 30 inches in diameter where it crosses approximately 1,109 feet (0.21 mile) of the Corps-owned federal lands at Lake Oahe.

Within North Dakota, the proposed Supply pipeline crosses seven tracts of flowage easement retained by the Corps located north of the Missouri River in Williams County (**Figure 2**). The proposed DAPL Project Mainline route travels through land owned and managed by the Corps on both sides of the Lake Oahe crossing at the border between Morton and Emmons counties, approximately 0.55 mile north of the northern boundary of the Standing Rock Sioux Reservation (**Figure 3**).

The following narrative relates to **Figures 1** through **3** in Section 12.0 and is provided to assist the reader in identifying the Project Area under consideration in this analysis. **Purple polygons** indicate real estate interests; either the flowage easements that the Corps has with private landowners upstream of Lake Sakakawea, or the fee title lands that the Corps has on the upper end of Lake Oahe. The **red hyphenated line** shows the DAPL Project centerline as it approaches Federal property at the Lake Oahe crossing and temporary workspace areas. The **straight solid redline** indicates the HDD pipeline that will go beneath Corps managed federal surfaces and is the Project Area being considered as part of the Federal action to issue a real estate easement. The **yellow polygon** indicates workspace where temporary work is proposed to be completed that directly supports the HDD installation of the pipeline underneath the river/reservoir. Temporary activities that would occur in this workspace include: welding together pipe, inspecting and testing the pipeline to ensure no leaks are present prior to preparing to install beneath the river/reservoir at both locations.

Potential impacts have to be evaluated in temporary workspace, as actions completed here are directly connected to the ability for the applicant to complete the proposed project (both the **purple and yellow polygons**). Further, these actions are directly connected to the federal decision to allow an easement for the pipeline to cross federal lands in this area. Notice that the Corps is not analyzing the effects of the **red hyphenated line** (DAPL centerline) at the Lake Oahe crossing as it is outside the EA review area. This is an important difference compared to the flowage easement location where temporary work happens to coincide with the orientation of the flowage easements perpendicular to the Missouri River. Therefore, temporary workspace required for portions of the pipeline installed via conventional (non-HDD) methods on the flowage easements is included in the EA review area.

The flowage easements and Corps owned lands associated with the Proposed Action, and the associated Project impact acreages, expressed as construction workspace, are identified in **Table 2-3** below.

| Table 2-3 Flowage Easements and Federal Land Crossings | | |
|---|---|---|
| **Grant of Easement Document Number** | **County** | **Construction Workspace Within Tract (acres)** |
| **Flowage Easements** | | |
| LL3440E | Williams | 9.4 |
| LL3483E-1 | Williams | 10.8 |

14

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 2-3 Flowage Easements and Federal Land Crossings | | |
|---|---|---|
| Grant of Easement Document Number | County | Construction Workspace Within Tract (acres) |
| **Flowage Easements** | | |
| LL3453E | Williams | 10.7 |
| LL3430E | Williams | 5.0 |
| LL3450E-2 | Williams | 5.2 |
| LL3431E | Williams | 14.7 |
| LL3426E-2 | Williams | 3.4 |
| Total Acres | -- | **59.2** |
| **Federally-Owned Lands** | | |
| Federal Land | Morton | 0.4 |
| Federal Land | Emmons | 0.8 |
| Total Acres | -- | **1.2** |

The EA review area includes areas within the Corps flowage easements and federal lands that are potentially impacted by construction and/or operation of the DAPL Project.  The EA review area is hereafter referred to as the Project Area(s).  Actions that occur outside of the flowage easements and the federal lands at the Lake Oahe crossing are considered Connected Actions.  Connected Actions are those actions that are "closely related" and "should be discussed" in the same NEPA document (40 CFR § 1508.25 (a)(i)).  Actions are connected if they automatically trigger other actions that may require an EA, cannot or will not proceed unless other actions are taken previously or simultaneously or if the actions are interdependent parts of a larger action and depend upon the large action for their justification (40 CFR § 1508.25 (a)(i, ii, iii)).  Connected Actions are limited to actions that are currently proposed (ripe for decision).  Actions that are not yet proposed are not Connected Actions, but may need to be analyzed in the cumulative effects analysis if they are reasonably foreseeable.  The only Connected Actions at each individual crossing location associated with the Proposed Action are those that relate to the HDD workspace at the Missouri River crossing and the HDD workspace, HDD stringing area, and the permanent easement on private lands in the vicinity of the Lake Oahe crossing.  The two federal permissions are not connected actions because the locations of each crossing are independent of one another and the location of the first does not dictate the location of the second.

Dakota Access initially proposed an isolation valve to be located within the flowage easements (easement LL3453E); however, the Omaha District has assessed the potential for open water and ice jam flooding within the vicinity of the Project Area in the "Reconnaissance Report, Missouri River, Buford-Trenton Irrigation District, North Dakota" and based on the findings the valve would be located within an area that has the potential to be submerged or damaged by ice jam flooding.  Therefore, the valve has been removed from the Project Area.

The Project Area and Connected Actions analyzed within this EA for both crossings are outlined in **Table 2-4**, which identifies land status (private, Federal or Easement) and provides associated acreages.

15

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 2-4 Environmental Assessment Areas of Interest | | | |
|---|---|---|---|
| **Action/Activity** | **Federal/ Private Land** | **EA Review** | **Acres** |
| **Flowage Easements—Williams County** | | | |
| Construction ROW within Corps flowage easements | Private; Federal Easement | Project Area | 58.0 |
| HDD workspace (exit point) within Corps flowage easement | Private; Federal Easement | Project Area | 1.2 |
| Permanent easement over HDD profile within Corps flowage easement and placement of temporary waterline | Private; Federal Easement | Project Area | 1.2 |
| **Flowage Easements Connected Actions – McKenzie County** | | | |
| HDD workspace (entry point) on private land | Private | Connected Action | 2.0 |
| **Federal Lands and Connected Actions - Morton County** | | | |
| HDD workspace (exit point) on private land | Private | Connected Action | 1.2 |
| HDD stringing area on private land | Private | Connected Action | 13.1 |
| Permanent easement over HDD profile on private land between HDD workspace (exit point) and federal lands | Private | Connected Action | 0.8 |
| Permanent easement over HDD profile on federal lands | Federal | Project Area | 0.4 |
| **Federal Lands and Connected Actions - Emmons County** | | | |
| Permanent easement over HDD profile on federal land | Federal | Project Area | 0.8 |
| Permanent easement over HDD profile on private land between federal land and HDD workspace (entry point) | Private | Connected Action | 0.3 |
| HDD workspace (entry point) on private land | Private | Connected Action | 1.2 |
| **Lake Oahe** | | | |
| Permanent easement over HDD profile across Lake Oahe | N/A | Project Area | 6.3 |

### 2.3.1.1   Flowage Easements

The Missouri River HDD is located just upstream of Lake Sakakawea and downstream of the confluence of the Yellowstone and Missouri rivers.  The proposed crossing of flowage easements near upper Lake Sakakawea (flowage easements) is located in Sections 7, 18, 19, and 30, Township 152 North, Range 103 West, in Williams County, North Dakota (**Figure 2**).  The proposed pipeline is routed parallel to an existing buried natural gas pipeline and associated valve sites, which cross the Missouri River and flowage easements just west of the proposed Dakota Access pipeline.

The HDD exit workspace would be located on a flowage easement tract.  Access to the Project Area on the flowage easements would be via the construction ROW from an existing road (38th Street NW).  No additional temporary access roads would be required.  The Connected Action at the flowage easements includes the HDD entry workspace, located on the south side of the Missouri River on private lands in McKenzie County.  Access to the HDD entry workspace will be via the existing access road located adjacent to the HDD entry workspace.  No additional temporary access roads would be required.

16

USACE_DAPL0071240

Environmental Assessment
Dakota Access Pipeline Project
July 2016

### 2.3.1.2    Federal Lands

The proposed crossing of federally-owned tracts at Lake Oahe (federal lands) is located in Section 10, Township 134 North, Range 79 West in Morton County, North Dakota, and Section 11, Township 134 North, Range 79 West in Emmons County, North Dakota (**Figure 3**).  The proposed pipeline is routed to parallel existing linear infrastructure (an overhead powerline and a buried natural gas pipeline) in this area.  The HDD entry and exit point workspaces and stringing area would be located on private land outside of the federal lands and are considered Connected Actions in this analysis.  HDD design reflects a crossing length of approximately 7,500 feet, of which approximately 5,420 feet occurs beneath the bed of Lake Oahe.

### 2.3.2    Description of Construction Techniques and Construction Mitigation Measures

All facilities associated with the Proposed Action would be designed, constructed, tested, operated, and maintained in accordance with the U.S. DOT regulations in Title 49 CFR Part 195.  Dakota Access is currently developing project-specific plans and would implement best management practices (BMPs) to mitigate for potential construction-related impacts associated with stormwater runoff.  This includes implementation of their Stormwater Pollution Prevention Plan (SWPPP; see **Appendix A**), which includes the Spill Prevention Control and Countermeasure Plan (SPCC Plan) as an appendix.  Additionally, Dakota Access would implement their HDD Construction Plan and HDD Contingency Plan (HDD Construction/Contingency Plan; see **Appendix B**) for inadvertent release of drilling mud during HDD construction work at wetland and waterbody crossings to protect sensitive resources from such releases.  The Proposed Action would be constructed via a combination of conventional and specialized construction procedures, as described below.

### 2.3.2.1    Clearing and Grading

Prior to commencement of ground-disturbing activities, a standard survey and stakeout would be conducted to identify ROW and workspace boundaries and to locate existing foreign utility lines within the construction ROW.  Following completion of the surveys, the construction ROW would be cleared of vegetation and debris.  Clearing of wetlands is limited to removal of woody debris in the forested wetlands above the HDD profile on the north bank of the Missouri River within the flowage easements.  Stumps would be cut flush with the ground and left in place, as described in Section 3.2.3.  Cleared vegetation and debris along the ROW would be disposed of in accordance with federal, state, and local regulations either by burning, chipping and spreading, or transportation to a commercial disposal facility.  Where necessary, to contain disturbed soils during clearing and grading in upland areas, and to minimize potential erosion and sedimentation of wetlands and waterbodies, temporary erosion control devices (ECDs) would be installed prior to initial ground disturbance and maintained throughout construction.  Vegetative buffers would be left where practical at all waterbody crossings to limit the exposure and impact to these features.  Final clearing would take place immediately prior to crossing the feature rather than advance.

### 2.3.2.2    Trenching

Trenching involves excavation of a ditch for pipeline placement and is accomplished through the use of a trenching machine, backhoe, or similar equipment.  Trench spoil would be deposited adjacent to each trench within the construction work areas, with topsoil segregation utilized where necessary based on

USACE_DAPL0071241

Environmental Assessment
Dakota Access Pipeline Project
July 2016

land use (see the typical ROW configuration drawings in **Appendix C**).  In standard conditions, the trench would be excavated to an appropriate depth to allow for a minimum of 36 inches of cover over the pipe.  Ground disturbance associated with conventional pipeline construction is generally limited to approximately 6 to 10 feet below the existing ground surface.  Typically the bottom of the trench would be cut at least 12 inches greater than the width of the pipe.  The width at the top of the trench would vary to allow the side slopes to adapt to local conditions at the time of construction.

### 2.3.2.3    Pipe Stringing, Bending, and Welding

Following preparation of the trench, the new pipe would be strung and distributed along the ROW parallel to the trench.  Depending on available workspace, some pipe may be fabricated off-site and transported to the ROW in differing lengths or configurations.  Pipe would be bent by hydraulic bending machines, as necessary, to conform the pipe to the trench.  Once in place along the ROW, pipe lengths would be aligned, bends fabricated, and joints welded together on skids (i.e., temporary supports).  Welding would be performed in accordance with the American Petroleum Institute Standards, PHMSA pipeline safety regulations, and Company welding specifications.  All welds would be coated for corrosion protection and visually and radiographically inspected to ensure there are no defects.   Segments of completed pipeline would undergo hydrostatic pressure testing as described in Sections 3.2.1.2 and 3.11.

### 2.3.2.4    Pipeline Installation and Trench Backfilling

Completed sections of pipe would be lifted off the temporary supports by side boom tractors or similar equipment and placed into the trench.  Prior to lowering-in, the trench would be visually inspected to ensure that it is free of rock and other debris that could damage the pipe or the coating.  Additionally, the pipe and the trench would be inspected to ensure that the configurations are compatible.  Tie-in welding and pipeline coating would occur within the trench to join the newly lowered-in section with the previously installed sections of pipe.  Following this activity, the trench would be backfilled with the previously excavated material and crowned to approximately 6 inches above its original elevation to compensate for subsequent settling.

### 2.3.2.5    Clean-up and Restoration

Following pipeline installation and backfilling, disturbed areas would be restored and graded to pre-construction contours as closely as practicable.  Construction debris and organic refuse unsuitable for distribution over the construction ROW would be disposed of at appropriate facilities in accordance with applicable regulations.  Permanent ECDs would be installed as appropriate, and revegetation measures would be applied in accordance with the Environmental Construction Plan (ECP; see **Appendix G**), SWPPP, and requirements of applicable state and federal permits.

### 2.3.2.6    Major Waterbody Crossing Method

As previously discussed, the preferred waterbody crossing technique for the Proposed Action is the HDD method.  The HDD method allows for construction across a feature without the excavation of a trench by drilling a hole significantly below conventional pipeline depth and pulling the pipeline through the pre-drilled hole.  As described in subsequent sections of this document and in greater detail in the HDD Construction Plan (**Appendix B**), by utilizing the trenchless technology, Dakota Access would minimize

18

Environmental Assessment
Dakota Access Pipeline Project
July 2016

impacts to resources within and adjacent to the waterbodies crossed and reduce the anticipated duration of the crossing.  The HDD equipment would be staged well outside of the riparian area, avoiding impacts on the steep banks, cultural resources, and sensitive habitat immediately adjacent to the waterbody. Cross sections of the Missouri River and Lake Oahe HDDs are provided in **Figure 14** and **Figure 15**.

Depending on the HDD equipment utilized, to help guide the drill bit along the pipeline ROW, electric-grid guide wires may be laid along the predetermined HDD route.  In thickly vegetated areas, a small path may be cut to accommodate laying the electric-grid guide wires.  Once the electric-grid guide wires are installed, the directional drilling rig would drill a small diameter pilot hole along the prescribed profile. Following the completion of the pilot hole, reaming tools would be utilized to enlarge the hole to accommodate the pipeline diameter.  The reaming tools would be attached to the drill string at the exit point and would then be rotated and drawn back to incrementally enlarge the pilot hole.  During this process, drilling fluid consisting of primarily bentonite clay and water would be continuously pumped into the pilot hole to remove cuttings and maintain the integrity of the hole.  When the hole has been sufficiently enlarged, a prefabricated segment of pipe would be attached behind the reaming tool on the exit side of the crossing and pulled back through the drill hole towards the drill rig.

Fluid pressures can build up within the borehole during HDD operations.  In some instances, this can result in hydraulic fracturing of the substrate and subsequent migration of drilling fluids either into the waterway or to the land surface—this is known as a "frac-out."  The depth of the proposed HDD profiles below the beds of the surface waters to be crossed would minimize the potential for frac-outs to occur.  Additionally, precautions would be taken during all phases of the drilling operation.  A high quality drilling fluid would be used to maintain and protect the integrity of the borehole during the entire HDD operation until the final pipe pull is completed.  The HDD Construction Plan (**Appendix B**) includes more details regarding HDD construction technology and methods.  The work would be performed by an experienced drilling contractor, Michels Directional Crossings, a Division of Michels Corporation, that is knowledgeable in effective HDD practices, including maintaining proper drilling rate, drilling fluid composition, pumping rate of the drilling fluid, pull-back rate, and pumping rate on the back ream, and adjusting these as appropriate for the conditions.

The potential for river channel changes associated with water erosion and scour were considered when selecting the major waterbody crossing methods and locations.  Dakota Access has coordinated with the North Dakota Office of the State Engineer as part of the Sovereign Lands Permitting Process to verify adequate depths for the pipe to be buried relative to geomorphological movements for the Lake Oahe and the Missouri River crossings.  Accordingly, the professional engineering firm evaluating HDD depths for the Proposed Action, GeoEngineers, has performed a scour analysis in order to evaluate the scour risk to the proposed pipeline during 100- and 500-year discharge events for the Lake Oahe and the Missouri River crossings.

The proposed HDD profile under Lake Oahe is designed to provide 92 feet of cover below the bottom of the lake.  Because of the depth of the pipe below the waterbody, and the ponded condition of Lake Oahe, this crossing is at a low risk to geomorphologic movements at the proposed crossing.   The North Dakota Office of the State Engineer has issued Sovereign Lands Permit for the Lake Oahe crossing.  A copy of the permit is included in Appendix M.

USACE_DAPL0071243

Environmental Assessment
Dakota Access Pipeline Project
July 2016

The Missouri River HDD profile is designed to provide a minimum of 36 feet of cover at the crossing location beneath the lowest point of the Missouri River.  This crossing has less proposed cover between the bottom of the waterbody and the top of the buried pipe and it is an active channel.  As part of the Sovereign Lands Permitting Process with the Office of the State Engineer, conservative assumptions were utilized in the analysis of the Missouri River HDD design profile as a factor of safety.  For example, the proposed crossing is not located at a bend in the channel and is located over 3,000 feet downstream of the nearest upstream channel bend.  An analysis of historic photographs of the proposed crossing show that the upstream bend has been stable and in the same location and that the potential downstream migration of this bend is highly unlikely.  However, although bend scour is not likely to propagate downstream to the proposed crossing, to be conservative in their evaluation GeoEngineers assumed that the bend could migrate downstream and negatively influence the crossing.

GeoEngineers estimated the maximum bend scour at the proposed pipeline to be 23 to 25 feet for the 100- and 500-year peak flow events, respectively.  The bend scour at the crossing location would not be additive for successive storms as long-term degradation is assumed to be zero.  Historic aerial imagery and recent Google Earth imagery indicates bar building and deposition of sediments in the Project Area, representing a dynamic sediment environment.  This equates to a high likelihood that there is an adequate upstream sediment supply and likely minimal long term degradation at the proposed crossing location.  In general terms, if the area over the pipeline was to experience a large scour event from one large storm event (up to 23 feet of scour during the 500-year peak flow event following the conservative assumptions), this area would be filled in/covered after the storm event by deposition of sediments from upstream and potential exposure of the pipeline would be negligible.

In addition to bend scour, there is potential for contraction scour that occurs when channel width varies within a short reach of the river.  There is a small contraction upstream of the proposed crossing at the downstream end of the bend approximately 3,000 feet upstream.  The DAPL proposed crossing is not located in a contraction, but actually a small expansion and the contraction point is not likely to migrate downstream to the proposed crossing.  However, to be conservative in their analysis as an additional factor of safety, GeoEngineers assumed that the contraction scour upstream of the proposed crossing could migrate downstream to the proposed crossing location.  Based on this conservative assumption, contraction scour estimates for the 100-year discharge event are approximately 9 feet.  This 100-year contraction scour depth is greater than what would occur during the 500-year event as flood waters spreading across the floodplain actually reduce contraction and therefore reduce the contraction scour depth.

Combining the conservative assumptions from above, the maximum estimated total potential scour depth at the proposed Missouri River HDD site would occur during a 100-year flood event.  This conservatively assumes "worst case" that both the bend scour and the contraction scour migrate downstream and are both realized directly over the pipeline crossing at the same time.  Under this scenario, the bend scour would create a scour of 23 feet and the contraction scour would contribute another 9 feet creating the maximum estimated total potential scour depth of 32 feet below the existing channel elevation during a 100-year flood event.  To assess the factor of safety applied using these assumptions, GeoEngineers utilized general scour equations that take into account bend and contraction scour and compared them to the total scour estimated using the Maynord equation for bend scour and Laursen's live-bed contraction scour equation.  Utilizing the Blodgett equation, Lacey equation, and Blench equation for

20

Environmental Assessment
Dakota Access Pipeline Project
July 2016

general scour, the estimated general scour at the proposed pipeline crossing ranges between 14 to 23 feet for the 100- and 500-year peak flow events.  This results in a total factor of safety of 1.4 to 2.3 for total scour at the proposed crossing.

Based upon their calculated worst-case scenario scour estimate, GeoEngineers considers the risk of scour occurring down to the level of the proposed pipeline to be low and the proposed Missouri River HDD design profile to be appropriate.  The North Dakota Office of the State Engineer has issued Sovereign Lands Permit for the Missouri River crossing.  A copy of the permit is included in Appendix M.

### 2.3.2.7   Minor Waterbody Crossing Methods

There are no minor waterbodies crossed by the pipeline on Corps Fee Lands.  All minor waterbodies encountered on the flowage easements have been identified as falling under the jurisdiction of the Buford/Trenton Irrigation District (BTID) and, in compliance with their regulations, would be crossed via trenchless pipeline construction methods (bores).  Dakota Access is working through the BTID permitting and approval process separately.  One intermittent waterbody has been identified on the south side of the Missouri River crossing, within the connected action area but outside of the flowage easements, and within the HDD workspace.  Temporary impacts to this waterbody would be mitigated during construction with a customized HDD equipment configuration, including the placement of temporary matting/bridging over the feature as necessary to maintain natural water flow during construction, and installation of appropriate ECDs.  Therefore, impacts on surface waters and adjacent sensitive habitat would be minimized by eliminating open-cut pipeline installations and in-stream work for all crossed waterbodies.

### 2.3.2.8   Wetland Crossings

As discussed in Section 3.2.3 below, the only wetlands that would be crossed by the Proposed Action are located within the permanent easement between HDD workspace and the Missouri River on the flowage easements.  As such, no wetlands would be impacted by construction or operation of the facilities within the Project Area/Connected Actions of the federal lands, and no trenching within wetlands would occur within the Project Area on the flowage easements.  A temporary waterline would be laid aboveground, across the wetlands located between the HDD workspace and the north bank of the Missouri River on flowage easement LL3440E (**Figure 6-B**).  No ground disturbing activity would be required for installation of the temporary waterline.   A more detailed discussion regarding wetlands is provided in Section 3.2.3.

### 2.3.2.9   Operation and Maintenance

Following completion of construction, a 50-foot-wide permanent easement that is generally centered on the pipeline (25 feet on either side of the centerline) would be retained along the pipeline route.  The 50-foot-wide easement would be maintained by the Operator in an herbaceous state (cleared of large diameter woody vegetation) to facilitate inspection of the pipeline, operational maintenance, and compliance with the federal pipeline safety regulations.  This 50-foot-wide maintained corridor would be reduced to a 30-foot-wide corridor centered on the proposed pipeline within the wetland area north of the Missouri River in Corps Flowage Easement LL3440E (**Figure 6-B**).

Maintenance of the permanent ROW would entail periodic vegetation clearing measures, in accordance with PHMSA regulation for pipeline inspection.  This may involve selective tree cutting and periodic

21

Environmental Assessment
Dakota Access Pipeline Project
July 2016

mowing.  The use of herbicides would not occur on Corps Fee Lands without obtaining prior approval from the Corps.  Vegetation maintenance of the ROW in areas of active cropland is not expected to occur due to agricultural practices.

22

USACE_DAPL0071246

Environmental Assessment
Dakota Access Pipeline Project
July 2016

### 3.0   THE AFFECTED ENVIRONMENT AND POTENTIAL ENVIRONMENTAL IMPACTS OF THE PROPOSED ACTION AND NO ACTION ALTERNATIVE

## 3.1   Geology and Soils

Under the "no action" alternative, Dakota Access would not construct the DAPL Project and no impacts on geology and soils would occur.  However, if the objectives of the DAPL Project are to be met under the "no action" alternative, other projects and activities would be required and these projects would result in their own impacts on geology and soils, which would likely be similar to or greater than the DAPL Project. If the Project is not constructed, less reliable shipping methods such as truck or rail could result in an adverse effect on geology and soils due to increases in transportation accidents and future construction of infrastructure necessary to support these methods (i.e. additional loading/offloading facilities, rail spurs, etc.).

### 3.1.1   Geology

#### 3.1.1.1   Affected Environment

The Corps flowage easements to be crossed extend approximately 2.83 miles north of the Missouri River in Williams County (**Figure 2**).  Conventional open trench construction methods would be used to install the pipeline on approximately 13,553 feet of the 14,953 feet of flowage easements.  The remaining 1,400 feet would be installed via HDD for the adjacent Missouri River crossing.  The easements and Connected Action lie within the Missouri River valley and floodplain on top of the Quaternary Oahe Formation (Clayton, 1980).  The Oahe Formation is comprised of unconsolidated sediments, including clay, sand, silt, and gravel, with some dispersed organic material.  Geotechnical borings placed on both sides of the river, ranging in depth from 75 to 95 feet below ground surface, confirm the presence of unconsolidated sand, gravel, and clay to at least these depths.  At this location, the Oahe Formation unconformably overlies the Paleocene Bullion Creek Formation, which is made up of silt, sand, clay, sandstone, and lignite, and is the uppermost part of a thick sequence of early Tertiary and late Mesozoic sedimentary formations.  Well borehole data from McKenzie County indicates that this sequence occurs in excess of 15,000 feet thick in certain locations (Freers, 1970).  No soil borings were obtained below the Missouri River crossing because the banks of the Missouri River the length of the crossing is sufficiently short (930 feet) to allow for a comprehensive geotechnical analysis without testing directly beneath the river itself.

The flowage easements crossed by the Proposed Action and area crossed by the Connected Action occur within the Great Plains Physiographic Province, which is characterized by a broad expanse of flat land in the central portion of the U.S.  The easements and the Missouri River Project Area lie within an area where physiography is characterized by low-relief alluvial and floodplain deposits and range in elevation from 1,856 to 1,879 feet above mean sea level (MSL).

The bedrock geology of the Lake Oahe crossing area is characterized by Cretaceous sedimentary formations (Clayton, 1980).  The Fox Hills Formation (sandstone and shale) overlies the Pierre Formation (shale), which has been exposed through erosion along the axis of the Lake Oahe reservoir of the Missouri River.  The surficial geology is characterized by alluvium within the valley and dune deposits moving in an eastward direction.  This was corroborated by geotechnical soil borings that were placed on private lands

23

USACE_DAPL0071247

Environmental Assessment
Dakota Access Pipeline Project
July 2016

on both sides of Lake Oahe that indicate the presence of sands and clays to depths ranging from at least 150 to 235 feet below ground surface (**Appendix D**).

The Lake Oahe crossing area also lies within the Great Plains Physiographic Province.  On the west side of Lake Oahe, the federal land tracts range in elevation from 1,609 to 1,712 feet above MSL.  The HDD exit point workspace ranges from 1,699 to 1,711 feet MSL, and the stringing area ranges from 1,671 to 1,766 feet MSL.  On the east side of Lake Oahe, the federal lands range in elevation from 1,613 to 1,664 feet MSL, and the HDD entry point workspace ranges from 1,636 to 1,644 feet MSL.

### 3.1.1.2   Impacts and Mitigation

To protect the terrain of the Project Area and Connected Actions, Dakota Access would, to the extent feasible, restore the areas affected by pipeline construction to pre-construction contours and similar vegetation (excepting trees within approximately 15 feet of the centerline).  Pre-construction and as-built surveys would be completed and provided to the Garrison Project.

Construction of the pipeline on the flowage easements and Connected Action at the Missouri River crossing would result in minor impacts on topography and geology, and no unique geologic features that have received state or federal protection would be impacted within the Corps flowage easements or Connected Action.

The impacts attributable to the HDD would not be significant.  Vibrations produced during the HDD process are not of a magnitude that would cause any impacts to geologic features or other resources.  Any vibrations associated with the drilling process would be limited to the immediate vicinity of the drilling equipment on the surface and downhole.  The vibrations produced from the downhole tooling are of a very low magnitude and are attenuated very quickly by the formation such that vibrations are not felt at the surface.  A vibration monitoring analysis conducted by GeoEngineers in 2009 found that peak particle velocities were less than 0.07 inches/second within approximately 50 feet of HDD operations.  These velocities are well below that which would cause any structural impacts and moreover, the recorded vibrations were, in fact, imperceptible to human senses (GeoEngineers, 2009).  Primary impacts of open trench installation within the Corps flowage easements or Connected Action would be limited to construction activities and consist of temporary alteration due to grading and trenching operations.

Construction of the pipeline at the Lake Oahe crossing would not result in adverse impacts on topography or geology on federal lands of the Project Area.  Similarly, construction impacts on topography and geology from the Connected Actions would be low to non-existent.  No unique geologic features would be impacted by any aspect of the HDD installation.

No impacts on topography or geology would occur during operations.

Based on recently obtained geotechnical analysis, no blasting would be expected to occur in association with pipeline installation on the Project Area or Connected Actions, given that the HDD would be conducted in unconsolidated or loosely indurated sediments, as described in Section 3.1.1.1.  Although not anticipated, if blasting is found to be necessary, Dakota Access would follow procedures specified in its Blasting Plan (**Appendix E**).

24

Environmental Assessment
Dakota Access Pipeline Project
July 2016

### 3.1.2    Mineral Resources

#### 3.1.2.1    Affected Environment

Williams and McKenzie counties have numerous mineral resources that include petroleum, lignite, halite, sand and gravel, and scoria.  Scoria, sediments baked from the in situ combustion of lignite (Carlson, 1985), is commonly used to surface roads.  Although lignite occurs throughout Williams and McKenzie Counties, there are no lignite beds in the vicinity of the Corps flowage easement crossings (Murphy, 2006; 2007).  A review of aerial photographic and USGS 1:24K topographic coverage indicates that there are no sand, gravel, or scoria pits within 1.5 miles of the Corps flowage easement crossing areas.

Two oil/gas wells are located within the Corps flowage easements (LL3440E), but neither occur within 150 feet of the proposed HDD workspace.  In addition, no oil/gas wells are located within 150 feet of the Connected Action at the Missouri River (North Dakota Department of Mineral Resources, 2015).  Impacts within 150 feet of the Project was used following the Federal Energy Regulatory Commission (FERC) guidelines for the evaluation of construction impacts to well integrity.  Although the Project is not under the jurisdiction of the FERC, FERC guidance was deemed to be an appropriate distance for this evaluation.

The primary mineral resources of Morton and Emmons counties are sand and gravel aggregates.  The older Cretaceous sediments in the vicinity of the Lake Oahe crossing (i.e., scoria) do not contain economical deposits of fossil fuels.  Although lignite occurs in Morton County, no lignite beds were identified in the vicinity of the Lake Oahe crossing.  A review of aerial photographic and USGS 1:24K topographic coverage indicates that there are no sand, gravel, or scoria pits within 1.5 miles of the Lake Oahe crossing.

Since Morton and Emmons Counties are located outside the areal extent of the Bakken Formation, there is little to no development of oil/gas resources.  This is reflected in the fact that no oil/gas wells were located within 150 feet of the federal lands or HDD workspace and stringing area.  However, the proposed pipeline would be co-located with an existing buried natural gas pipeline and an overhead electric transmission line across the lake.

#### 3.1.2.2    Impacts and Mitigation

As noted previously, mineral resources, including lignite, halite, sand and gravel, and scoria occur within the region around the Corps flowage easements and Connected Action; however, the only commercially exploited mineral resources in the direct vicinity of the route are oil and gas, as evidenced by the two wells found within the Corps flowage easements.  These wells would not be impacted by the Proposed Action due to proposed conventional construction methods and distance from the wells.  No impacts on any mineral resources are expected as a result of the proposed flowage easement crossings or Connected Action.

The Proposed Action does not cross active mining areas nor any oil or gas wells and facilities in the vicinity of Lake Oahe.  No impacts to any mineral resources are expected as a result of the proposed Lake Oahe crossing.

USACE_DAPL0071249

Environmental Assessment
Dakota Access Pipeline Project
July 2016

Dakota Access, in accordance with North Dakota One Call, would require that the construction contractor, prior to initiating any ground disturbance activities, identify all underground utilities to minimize the potential for encountering buried utility structures.   Accordingly, the Proposed Action is not expected to have any impact on mineral resources, because there would be no additional surface disturbance required beyond that used for construction.

### 3.1.3    Geologic Hazards

#### 3.1.3.1    Affected Environment

**Earthquakes and Seismic Hazards**

The Project Area, traverses terrain that overall is geologically stable.   The potential seismic hazard was assessed by evaluating the USGS 2014 Seismic Hazard Map.   According to the Seismic Hazard Map, an earthquake that has a 2% chance of being exceeded in a 50-year period would result in peak ground accelerations (PGAs) of 2 to 4 percent gravity (g) in the Project Area and Connected Actions (USGS, 2014a).

Ground movement from an earthquake of this magnitude may cause a light perceived shaking but is not expected to cause any structural damage.   The low seismic hazard of the Project Area is further corroborated by the relatively low number of earthquakes that have historically occurred in North Dakota (North Dakota GIS Hub Data Portal, 2010).

**Landslides**

Landslides refer to the gravity-induced downward and outward movement of slope-forming materials and pose the greatest risk to facilities on or near steep slopes or on soil materials that are susceptible to failure particularly in response to earthquakes or heavy precipitation.   A map developed by the USGS that illustrates the regional potential for the occurrence of landslides was used to evaluate the Project Area for landslide incidence and susceptibility (Radbruch et al., 1982).

Portions of the Project Area within the Corps flowage easements are moderately susceptible to landslides. This includes 59.2 acres (100%) of construction workspace, of which 17.0 acres lies within the 50-foot-wide permanent easement, and 0.55 acre occurs within the 30-foot-wide maintained corridor above the HDD profile within the Corps flowage easement (which would not have surface disturbance aside from selective tree cutting and roots would remain in place).   The HDD entry point on the south side of the Missouri River outside of the flowage easements is considered the Connected Action.   The HDD entry workspace is approximately 2.0 acres and is also moderately susceptible to landslides.

As designed, the Proposed Action does not require any surface impacts to the federally owned lands at Lake Oahe, although , 0.4 acre of the permanent easement through the federal property on the west side of the Lake Oahe (Morton County) is classified as having a high incidence of landslides.   Slopes greater than 25% in the Project Area within federal lands are not found on the east side of Lake Oahe (Emmons County) and comprise less than 0.02 acre on the west side.   Activities related to the HDD crossing outside of the federal lands at the Lake Oahe crossing are considered Connected Actions.   On the west side of Lake Oahe, 1.2 acres of the HDD workspace (exit point) and 13.1 acres of the pipe stringing area are designated as having a high incidence for landslides.   Additionally, the stringing area encompasses

USACE_DAPL0071250

Environmental Assessment
Dakota Access Pipeline Project
July 2016

approximately 1.8 acres of land that is classified as highly susceptible to landslides.  Approximately 0.9 acre within the stringing area has slopes exceeding 25%.  Approximately 1.2 acres of the HDD entry point workspace on the east side of Lake Oahe is designated as having a high incidence of landslides, but there are no slopes within either the east or west HDD workspace that exceed 25%.

**Karst and Subsidence**

Geologic terrane beneath the flowage easements as well as the Connected Actions has potential for karst development owing to the presence of evaporite deposits, consisting of gypsum, salt, anhydrite, and/or potash (Weary and Doctor, 2014).  These deposits range in age from Devonian to Jurassic and occur at depths ranging from 900 to 3,700 meters (3,000 to 12,000 feet).  Fresh water must be present for the necessary dissolution to occur for karst development.  However, since fresh water is not likely to be found at these depths, dissolution and karst development are not likely to occur (Ackerman, 1980).  Even if karst conditions were to develop, any physiographic expression at the ground surface would be negligible given the great depth of these formations.

Geologic terrane beneath the federal lands crossings as well as the HDD workspaces at Lake Oahe area may have potential for karst development due to deposits of gypsum and other evaporates (Weary and Doctor, 2014).  However, a review of topographic and aerial photographic coverages as well as geotechnical testing gave no indication of karst feature development, and no documentation was found to indicate that karst features have actually developed in this area.  Furthermore, an existing buried pipeline and overhead electric transmission line also cross in this location, and no information was found indicating those utilities have been impacted by karst.

Land subsidence may be caused by mining, underlying karst features, and extraction of fluids, such as oil or groundwater.  No surface subsidence effects are expected to be incurred in the Project Area since no mines, oil/gas wells, water wells, or karst development have been identified in the Project Area.  Moreover, despite the fact that oil and gas production has occurred for decades in the Williston Basin, no surface subsidence effects have been documented in that area and, therefore, are not expected to impact the Project Areas within or near the margin of the Williston Basin.

### 3.1.3.2   Impacts and Mitigation

Although landslides can represent a significant geologic hazard during construction and operation of the pipeline, the pipeline would be installed via the HDD to significantly reduce ground disturbing activities in areas with steep slopes (greater than 25%), effectively mitigating the risk.

As previously discussed, no ground disturbing activities would occur within the Project Area on the federal lands.  Ground disturbing activities associated with the HDD workspace and pipe stringing area would be required as part of the Connected Action; however, these activities would consist of clearing and grading only and would occur, at the closest distance, 1,040 feet from the bank of Lake Oahe.  As such, no trenching or excavation activities would occur within the Project Area or Connected Action of the federal lands, thereby reducing the potential for erosion and off-site sedimentation which could otherwise occur as a result of side-slope trench excavation methods and accumulation of water within the trench.

27

USACE_DAPL0071251

Environmental Assessment
Dakota Access Pipeline Project
July 2016

To further mitigate impacts during construction, Dakota Access would utilize erosion and sediment control devices in accordance with the ECP and SWPPP, and in compliance with the National Pollutant Discharge Elimination System (NPDES) program, during construction in these areas with slopes greater than 25%. Dakota Access would install sediment barriers (e.g., silt fence) at the base of slopes and along the sides of slopes, as necessary, to prevent potential siltation downslope of the construction area from entering waterbodies.

Temporary ECDs would be maintained until the areas disturbed by construction have been successfully revegetated or are replaced with permanent ECDs. Following the completion of construction activities, disturbed areas would be restored and graded to pre-construction contours as closely as practical. In order to minimize the potential for future slip or landslide events during operation of the Proposed Action, Dakota Access may install permanent ECDs in addition to performing regular restoration and revegetation activities. Permanent ECDs would be installed in accordance with revegetation measures outlined in the ECP, SWPPP, and specific landowner requests. The effectiveness of revegetation and permanent ECDs would be monitored by Dakota Access' operating personnel during the long-term operation and maintenance of the Proposed Action facilities. Therefore, construction and operation of the Proposed Action facilities on the Project Area and Connected Action of the federal lands would not be expected to increase the potential for significant landslide or slip events or result in adverse impacts on aquatic life resources within Lake Oahe.

Dakota Access has completed a geotechnical analysis of the flowage easement and federal land crossing sites to facilitate engineering and design, including selection of appropriate materials and construction methods to limit any environmental impacts attributable to landslides. Results of the geotechnical analysis are included in **Appendix D**.

The strength and ductility of a properly designed pipeline would allow it to span a considerable distance without compromising its integrity in the event of a landslide or other ground movement, such as subsidence. Arc-welded steel pipelines are the most resistant type of piping, vulnerable only to very large and abrupt ground displacement (e.g., earthquakes, severe landslides) and are generally highly resistant to moderate amounts of permanent deformation. This strength and ductility effectively mitigates the effects of fault movement, landslides, and subsidence. Therefore, by implementing the mitigation measures presented here, impacts on the pipeline from geologic hazards are expected to be minimal.

No impacts associated with seismic activity within the Project Area are anticipated. Due to the limited potential for large, seismically induced ground movements, there is minimal risk of earthquake-related impacts on the pipeline. Therefore, no mitigation beyond designing the proposed pipeline to currently accepted industry specifications is necessary.

### 3.1.4    Paleontology

#### 3.1.4.1    Affected Environment

The surficial geology at the Missouri River crossing is dominated by Quaternary glacial drift materials within the floodplain overlying the Bullion Creek and Sentinel Butte Formations. These bedrock formations have been known to contain wide variety of fossils, including fossilized wood and tree stumps,

USACE_DAPL0071252

Environmental Assessment
Dakota Access Pipeline Project
July 2016

mollusks, leaves, and insects (Hoganson and Campbell, 2002).  Additionally, vertebrate fossils have been found, including turtles, crocodile-like champosaurs, and bear-like titanoides.

The surficial geology at the Lake Oahe crossing is also characterized by Quaternary glacial drift materials; however, it is underlain by the Fox Hills and Pierre Formations.  These formations could contain diverse fossils, including marine reptiles (e.g., mosasaurs, plesiosaurs, sea turtles), fish (e.g., sharks and rays), birds, and invertebrates (Hoganson, 2006).

While there is potential for the bedrock formations underlying the Missouri River and Lake Oahe crossings to contain fossils, all activities, including HDDs, would only penetrate the surficial geology that is dominated by unconsolidated sediments, as evidenced in the geotechnical report provided in **Appendix D**.  The potential for encountering fossils in these unconsolidated sediments at the Missouri River and Lake Oahe crossings is low, as fossils are primarily found in sedimentary rock.

### 3.1.4.2    Impacts and Mitigation

Activities associated with pipeline construction that have the potential to impact paleontological resources are clearing, grading, and trenching, as well as site preparation for HDD operations.  The paleontological resources of concern pertaining to construction of the Proposed Action are vertebrate fossils that may be present in the Paleocene bedrock sediments, and to a lesser degree, in Quaternary alluvium since this type of deposit only rarely contains vertebrate fossils.

In the event paleontological resources are discovered during construction, Dakota Access would implement measures outlined in its Unanticipated Discoveries Plan Cultural Resources, Human Remains, Paleontological Resources and Contaminated Media (UDP) (**Appendix F**) to avoid further impacts on these resources.

Invertebrate fossils are considered to be insignificant, and mitigation measures would not be required, should they be encountered.  However, if vertebrate fossils are found during pipeline construction, Dakota Access would immediately cease construction activities and notify appropriate agency personnel, including the North Dakota state paleontologist as well as the Corps archaeologist.  The appropriate authorities would determine the significance of the find and prescribe the mitigation procedures to be completed prior to resuming pipeline construction.

Operation of the pipeline would not disturb paleontological resources.

### 3.1.5    Soils

#### 3.1.5.1    Affected Environment

Dakota Access identified and assessed soil characteristics in the Project Area and Connected Actions using the Soil Survey Geographic Database, which is a digital version of the original county soil surveys developed by the Natural Resources Conservation Service  (NRCS) for use with GIS (NRCS, 2015).  The areas are located within the Rolling Soft Shale Plain of North Dakota, South Dakota, and Montana.  The dominant soil orders in the Rolling Soft Shale Plain are Mollisols and Entisols, which are shallow to very deep, generally somewhat excessively drained and loamy or clayey (NRCS, 2006).

USACE_DAPL0071253

Environmental Assessment
Dakota Access Pipeline Project
July 2016

The flowage easements and Connected Action are within Zone A of the Missouri River floodplain. Soils within the Project Area are formed out of alluvium deposited by the river over time. Slopes throughout this Project Area are very flat, ranging from 0-2%. Approximately 94% of the flowage easement Project Area and Connected Action would be located within either Scorio silty clay or Lohler silty clay (**Table 3-1, Figure 4**). The Scorio and Lohler silty clay soils are moderately well drained and formed in clayey alluvium. In the case of the Scorio silty clay, the clay alluvium is deposited over a loam alluvium. The Scorio and Lohler soils are identified as Hydrologic Soil Group C, which have slow infiltration rates when thoroughly wet and a slow rate of water transmission. The average depth to the water table across the majority of this Project Area is 4.25 feet. The soils within the flowage easements experience occasional flooding but are not generally ponded. Soil boring data is provided in (**Appendix D**).

| Table 3-1 | | | | | | |
|---|---|---|---|---|---|---|
| **Soil Types Mapped on the Flowage Easements Project Area and Connected Action** | | | | | | |
| Soil Map Unit | Soil Map Unit Name | Project Area (acres) [1] | Farmland Rating | Hydrologic Group [2] (infiltration) | Hydric Rating [3] | Wind Erodibility Group [4] |
| E4039A | Mckeen loam, 0-1% slopes, frequently flooded | 0.1 | None | B/D | 96% | 4L |
| E4051A | Trembles fine sandy loam, slightly wet, 0-1% slopes, occasionally flooded | 0.5 | Farmland of Statewide Importance | A | 0% | 3 |
| E4103A | Lohler silty clay, saline, 0-1% slopes, occasionally flooded | 0.9 | None | C | 0% | 4 |
| E4106A | Lohler silty clay, slightly wet, 0-2% slopes, occasionally flooded | 27.8 | Farmland of Statewide Importance | C | 5% | 4 |
| E4159A | Scorio silty clay, slightly wet, 0-2% slopes, occasionally flooded | 29.9 | Farmland of Statewide Importance | C | 0% | 4 |
| E2725F | Arikara-Shambo-Cabba loams, 9-70% slopes | 2.0 | None | B | 0% | 6 |
| EW | Water | 0.3 | None | N/A | N/A | N/A |
| | **Total** | **61.5** | -- | | | |

[1] The Project Area includes the construction workspace (58.0 acres) and 30-foot maintenance easement (1.0 acre) located on the flowage easements as well as the Connected Action workspace (2.0 acres).
[2] Hydrologic Soil Groups are used to estimate runoff from precipitation: A = high infiltration rate, low runoff potential; B = moderate infiltration rate; C = slow infiltration rate; D = very slow infiltration rate, high runoff potential.
[3] Hydric Rating: Hydric (100%), Hydric (66-99%), Hydric (33-65%), Hydric (1-32%), Not Hydric (0%).
[4] Wind erodibility group in cultivated areas: Group 1 are the most susceptible to wind erosion, and those assigned to group 8 are the least susceptible. 4L indicates calcareous soils.

USACE_DAPL0071254

Environmental Assessment
Dakota Access Pipeline Project
July 2016

The predominant soil type at the federal lands at Lake Oahe is the Flasher-Vebar-Parshall complex. This complex would comprise 7.5 acres (34%) of the Project Area and Connected Action (**Table 3-2, Figure 5**). The Flasher-Vebar-Parshall complex contains 36% Flasher or similar soils, 22% Vebar or similar soils, 15% Parshall or similar soils, and 27% minor components. The Flasher-Vebar-Parshall complex is formed from sandy residuum weathered from sandstone and is steep within the Project Area and Connected Action, with slopes ranging from 9 to 35% (NRCS, 2015). The Flasher-Vebar-Parshall complex is Hydrologic Soil Group D, which has very slow infiltration (high runoff potential) when thoroughly wet. The depth to the water table is greater than 6.5 feet. A majority of the soils within the Project Area and Connected Action are neither frequently flooded nor frequently ponded.

| Table 3-2 Soil Types Mapped on the Federal Lands Project Area and Connected Action | | | | | | |
|---|---|---|---|---|---|---|
| Soil Map Unit | Soil Map Unit Name | Project Area (acres) [1] | Farmland Rating | Hydrologic Group [2] (infiltration) | Hydric Rating [3] | Wind Erodibility Group [4] |
| E0623B | Grail-Belfield clay loams, 2-6% slopes | 2.9 | Farmland of Statewide Importance | C | 0% | 6 |
| E0701F | Dogtooth-Janesburg-Cabba complex, 6-35% slopes | 0.8 | None | D | 3% | 6 |
| E1423F | Flasher-Vebar-Parshall complex, 9-35% slopes | 5.8 | None | D | 0% | 2 |
| E1823A | Parshall fine sandy loam, 0-2% slopes | 0.7 | Farmland of Statewide Importance | A | 0% | 3 |
| E2601C | Amor-Cabba loams, 6-9% slopes | 0.3 | None | C | 0% | 6 |
| E2803B | Amor-Shambo loams, 3-6% slopes | 2.0 | Farmland of Statewide Importance | C | 0% | 6 |
| E3802B | Linton-Mandan silt loams, 2-6% slopes | 2.6 | Farmland of Statewide Importance | B | 0% | 5 |
| E3813A | Grassna silt loam, loess, 1-2% slopes | 1.7 | Prime Farmland | B | 2% | 6 |
| E3813B | Grassna silt loam, loess, 2-6% slopes | 0.5 | Prime Farmland | B | 2% | 6 |
| E4139A | Korchea-Fluvaquents complex, channeled, 0-2% slopes, frequently flooded | 0.4 | None | B | 43% | 4L |
| EW /E49999 | Water | 6.4 | None | N/A | N/A | N/A |
| Total | | 24.1 | -- | | | |

USACE_DAPL0071255

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 3-2 |
| :---: |
| Soil Types Mapped on the Federal Lands Project Area and Connected Action |

| Soil Map Unit | Soil Map Unit Name | Project Area (acres) [1] | Farmland Rating | Hydrologic Group [2] (infiltration) | Hydric Rating [3] | Wind Erodibility Group [4] |
| --- | --- | --- | --- | --- | --- | --- |

[1]  The Project Area includes Connected Action areas.
[2]  Hydrologic Soil Groups are used to estimate runoff from precipitation: A = high infiltration rate, low runoff potential; B = moderate infiltration rate; C = slow infiltration rate; D = very slow infiltration rate, high runoff potential.
[3]  Hydric Rating: Hydric (100%), Hydric (66-99%), Hydric (33-65%), Hydric (1-32%), Not Hydric (0%).
[4]  Wind erodibility group in cultivated areas: Group 1 are the most susceptible to wind erosion, and those assigned to group 8 are the least susceptible. 4L indicates calcareous soils.


**Prime Farmland**

Prime farmland has the best combination of physical and chemical characteristics for producing food, feed, forage, fiber, and oilseed crops and is available for these uses.  Other soils that do not meet the criteria for prime farmland may be considered farmland of statewide importance.  These soils may produce high yields of crops when managed appropriately (NRCS, 2013).  Climate is the primary limiting factor preventing farmland of statewide importance in North Dakota from being considered prime farmland; therefore, specific management techniques or other soil amendments cannot elevate farmland of statewide importance to a prime farmland designation (Sieler, 2015).

Within the flowage easements and Connected Action, 95% of soils are considered farmland of statewide importance, and none of the soils are considered prime farmland.  Approximately 9.5% of the soils on the federal lands, consisting only of Grassna silt loams, are considered prime farmland.  Additionally, Linton-Mandan silt loam and Armo-Sambo loam, which comprise 25% of the soils on federal lands, are designated as farmland of statewide importance.  The remaining soils do not have a farmland designation.

### 3.1.5.2   Impacts and Mitigation

Pipeline construction activities such as clearing, grading, trench excavation, and backfilling, as well as the movement of construction equipment along the ROW may result in temporary impacts on soil resources. Clearing removes protective cover and exposes soil to the effects of wind and precipitation, which may increase the potential for soil erosion and movement of sediments into sensitive environmental areas. Grading and equipment traffic may compact soil, reducing porosity and percolation rates, which could result in increased runoff potential and decreased soil productivity.  Trench excavation and backfilling could lead to a mixing of topsoil and subsoil and may introduce rocks to the soil surface from deeper soil horizons.

Dakota Access would minimize or avoid these impacts on soils by implementing the mitigation measures described in the DAPL Project's SPCC, SWPPP, and ECP as well as requirements of applicable state and federal permits.  These documents would be included as contract documents and enforced as such throughout the DAPL Project.  As a result, impacts on soils as a result of the Proposed Action are expected to be insignificant.

USACE_DAPL0071256

Environmental Assessment
Dakota Access Pipeline Project
July 2016

Temporary erosion and sedimentation control measures may include installation of silt fence, straw bales, slope breakers, trench breakers, erosion control fabric, and mulch.

To minimize potential impacts on soil productivity, topsoil would be separated during trench excavation in agricultural land, and if applicable, other areas where soil productivity is an important consideration. Unless otherwise requested by the landowner, topsoil in cropland would be removed to a maximum depth of 12 inches from the trench and spoil storage area and stored separately from the trench spoil. After the trench is backfilled, topsoil would be returned to its approximate original location in the soil horizon.

Compaction of agricultural soils would be minimized by restricting construction activities during periods of prolonged rainfall. Where unacceptable levels of compaction occur in agricultural lands, a chisel plow or other deep tillage equipment would be utilized to loosen the soil.

Dakota Access would retain environmental inspectors (EIs) to monitor the contractor's compliance with applicable requirements to protect soil resources during construction of the DAPL Project. The Garrison Project would be notified if the EIs document non-compliant activities by the contractor(s) on the Project Area or Connected Action Areas.

Soils would be temporarily disturbed within HDD workspaces during construction at the Missouri River and Lake Oahe crossings. Primary impacts attributable through open trench installation within the Corps flowage easements and Connected Action would be limited to construction activities and consist of temporary alteration of the construction ROW due to grading and trenching operations. **Tables 3-3** and **3-4** present the soil types that would be impacted by construction and maintenance activities. By implementing BMPs and recognized construction methods identified in the ECP (**Appendix G**), impacts to soils should be limited.

Additionally, temporary workspace used for staging HDD operations would impact soils, particularly in association with the HDD entry excavation pit (approximately 5 feet to 15 feet across). The pits would contain the drilling fluid that would be circulated through the borehole during drilling operations and the cuttings that are removed from the borehole. All drilling mud and cuttings would be disposed at an approved location on non-federal lands, which may include land farming on private property or disposal at a licensed disposal facility. Drilling fluid pits at the HDD entry and exit workspaces would be backfilled and the area returned as closely as practical to pre-construction conditions. Dakota Access would implement the erosion control measures described in the SWPPP (**Appendix A**). The HDD workspace sites would be cleared, graded and matted as needed to avoid rutting and minimize compaction.

There would be no soil disturbance outside of the construction workspace. Permanent impacts on soils would be avoided through the implementation of BMPs during construction, restoration, and post-construction revegetation management. A more complete description of BMPs and recognized construction methods can be found in the ECP (**Appendix G**).

There would be no conversion of prime farmland soils to non-agricultural use.

33

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 3-3 Soil Impacts on the Flowage Easements Project Area and Connected Action | | | | |
|---|---|---|---|---|
| Soil Map Unit | Map Unit Name | Project Area Temporary Impacts (acres) | Connected Action Temporary Impacts (acres) | Permanent Impacts (acres) |
| E4039A | McKeen loam, 0-1% slopes, frequently flooded | 0.1 | 0 | 0 |
| E4051A | Trembles fine sandy loam, slightly wet, 0-1% slopes, occasionally flooded | 0.5 | 0 | 0 |
| E4103A | Lohler silty clay, saline, 0-1% slopes, occasionally flooded | 0.9 | 0 | 0 |
| E4106A | Lohler silty clay, slightly wet, 0-2% slopes, occasionally flooded | 27.8 | 0 | 0 |
| E4159A | Scorio silty clay, slightly wet, 0-2% slopes, occasionally flooded | 29.9 | 0 | 0 |
| E2725F | Arikara-Shambo-Cabba loams, 9-70% slopes | 0 | 2.0 | 0 |
| | Total | 59.3 | 2.0 | 0 |

| Table 3-4 Soil Impacts on the Federal Lands Project Area and Connected Action | | | | |
|---|---|---|---|---|
| Soil Map Unit | Map Unit Name | Project Area Temporary Impacts (acres) | Connected Action Temporary Impacts (acres) | Total Impact Acres[1] |
| E0623B | Grail-Belfield clay loams, 2-6% slopes | 0 | 2.9 | 2.9 |
| E0701F | Dogtooth-Janesburg-Cabba complex, 6-35% slopes | 0 | 0.8 | 0.8 |
| E1423F | Flasher-Vebar-Parshall complex, 9-35% slopes | 0.4 | 5.4 | 5.8 |
| E1823A | Parshall fine sandy loam, 0-2% slopes | 0 | 0.7 | 0.7 |
| E2601C | Amor-Cabba loams, 6-9% slopes | 0 | 0.3 | 0.3 |
| E2803B | Amor-Shambo loams, 3-6% slopes | 0 | 2.0 | 2.0 |
| E3802B | Linton-Mandan silt loams, 2-6% slopes | 0 | 2.6 | 2.6 |
| E3813A | Grassna silt loam, loess, 1-2% slopes | 0.7 | 1.0 | 1.7 |
| E3813B | Grassna silt loam, loess, 2-6% slopes | 0 | 0.5 | 0.5 |
| E4139A | Korchea-Fluvaquents complex, channeled,0-2% slopes, frequently flooded | 0 | 0.4 | 0.4 |
| EW | Water | 0.1 | 0 | 0.1 |
| | Total | 1.2 | 16.6 | 17.8 |

[1] All soil impacts on Federal Lands and Connected Action at Lake Oahe are considered to be temporary.

USACE_DAPL0071258

Environmental Assessment
Dakota Access Pipeline Project
July 2016

## 3.2       Water Resources

Under the "no action" alternative, Dakota Access would not construct the DAPL Project, and no impacts on water resources would occur.  However, if the objectives of the DAPL Project are to be met under the "no action" alternative, other projects and activities would be required and these projects would result in their own impacts on water resources, which would likely be similar to or greater than the DAPL Project. Less reliable shipping methods such as truck or rail could result in an adverse effect on water resources due to increases in transportation accidents and future construction of infrastructure necessary to support these methods (i.e. additional loading/offloading facilities, rail spurs, etc.).

### 3.2.1    Surface Waters

#### 3.2.1.1     Affected Environment

The Missouri River is a large perennial river and forms the border between Williams and McKenzie counties.  The flowage easements are located on the north side of Lake Sakakawea in the Lake Sakakawea sub-basin (HUC 11010101) within the Upper Missouri River Basin.  All drainage patterns from the flowage easements flow east and south towards and into the Missouri River/Lake Sakakawea ending at the Garrison Dam.  Once released from the dam, water flows south into the Missouri River (NRCS, 2008).

Lake Oahe is a large reservoir formed behind the Oahe Dam on the Missouri River.  Lake Oahe forms the border between Morton and Emmons counties.  The northern boundary of the Standing Rock Sioux Reservation is located in Sioux County, North Dakota approximately 0.55 mile south of the DAPL Project Area.  The Project Area is located in the Upper Lake Oahe Watershed (HUC 10130102) within the Missouri River Basin and adjoins both sides of Lake Oahe at the crossing.

The Oahe Dam/Lake Oahe project is part of the chain of Missouri River main stem lakes authorized in the Flood Control Act of 1944.  The Oahe Dam is located 6 miles north of Pierre, South Dakota and was placed into operation in 1962.  The dam and associated reservoir (Lake Oahe) are congressionally authorized to provide flood control, hydroelectric power, navigation, irrigation, fish and wildlife enhancement, municipal water supply, water quality, and recreational opportunities to the residents of both South Dakota and North Dakota.  At maximum normal operating pool level (1,617 feet MSL), Lake Oahe extends roughly 231 miles from the Oahe Dam in South Dakota to near Bismarck, North Dakota.  At this level, the lake covers approximately 360,000 acres.  At elevation 1,607.5 feet MSL base flood control elevation, the lake has over 2,250 miles of shoreline.

Lake Oahe can be divided into three segments based on the character of the lake.  The Project Area is located within the northern segment.  The northern segment extends north from the North Dakota/South Dakota state line to the upstream Oahe Dam/Lake Oahe project boundary near Bismarck, North Dakota. This segment is more river-like in appearance and is characterized by both submerged and emergent snags, sandbars, many shallow areas, and a definite current (USACE, 2010a).

Dakota Access conducted field and desktop delineations of the Project Area/Connected Action on the flowage easements and the Project Area/Connected Action of the federal lands.  Field surveys took place upon permission to access the properties in order to verify desktop delineations and ensure that the most accurate, up-to-date data is used for Section 404 of the CWA and/or Section 10 of the RHA permit filings.

USACE_DAPL0071259

Environmental Assessment
Dakota Access Pipeline Project
July 2016

There are four waterbodies (one perennial stream and three ephemeral ditches) within the Project Area on the flowage easements and one intermittent waterbody within the Connected Action **(Figure 6)**.  The Project Area and Connected Action of the federal lands encompass two waterbodies (one lake [Lake Oahe] and one ephemeral stream) **(Figure 7)**.  Waterbody ID, type, surface water classification, and approximate milepost (MP) are summarized in **Table 3-5** and **Table 3-6**.

### 3.2.1.2   Impacts and Mitigation

Direct and indirect impacts on Lake Oahe and the Missouri River would be minimized by using HDD construction methods to install the proposed pipeline underneath the Missouri River and Lake Oahe.  At the Missouri River crossing, a 24-inch pipeline would be installed at least 36 feet below the bottom of the Missouri River.  At Lake Oahe, a 30-inch pipeline would be installed approximately 140 to 210 feet below the ground surface of federal lands and approximately 92 feet below the bottom of Lake Oahe (**Appendix H**).  Additional documentation elaborating on the rationale used to determine suitable HDD depth is provided in Appendix D.  Appendix M includes the Sovereign Lands Permits issued by the North Dakota Office of the State Engineer.

The primary impact that could occur as a result of an HDD is an inadvertent release of drilling fluid directly or indirectly into the waterbody.  Drilling fluid (also referred to as drilling mud) is primarily comprised of water.  However, bentonite clay is added to the water to enhance lubricating, spoil transport and caking properties of the drilling fluid.  Bentonite is a naturally occurring, non-toxic, inert substance that meets National Science Foundation (NSF)/American National Standards Institute (ANSI) Standard 60 Drinking Water Additives Standards and is frequently used for drilling potable water wells.  The potential exists for drilling fluid to leak through previously unidentified fractures in the material underlying the river bed.  Potential release sources of the drilling fluid include the drilling fluid entry/exit pit(s) and the directional borehole itself, which is maintained under pressure to keep it open.  The probability of an inadvertent release is greatest when the drill bit is working near the surface (i.e., near the entry and exit points).  To alleviate this concern, the HDD Contractor plans to install steel surface casing at both the entry and exit locations of the Lake Oahe crossing.  Because the HDD entry and exit points would be set back from the banks of the Missouri River (approximately 1,400 feet north and 300 feet south) and Lake Oahe (approximately 900 feet east and 1,100 feet west) the potential for an inadvertent release to occur in the water would be minimized.  Additionally, geotechnical investigations conducted by Dakota Access indicated that the drill path is not located in materials where there is a high probability of an inadvertent release of drilling fluids that would reach ground surface or enter Lake Oahe.  Therefore, the potential for inadvertently released drilling fluids to enter any waterbody from below or from the shoreline is low.  No downstream impacts to Sovereign Nations from inadvertent release of drilling fluid are anticipated.

The drilling mud and cuttings would be disposed of in accordance with applicable laws and regulations, likely in an existing landfill or by land farming.  Final disposition would be negotiated with the facility or private landowner prior to disposal.  Dakota Access would conduct all HDD work according to the HDD Construction Plan (**Appendix B**), and would implement the HDD Contingency Plan (**Appendix B**) in the event of an inadvertent release.  The HDD Construction Plan establishes a 24-hour a day monitoring program for monitoring and detection of inadvertent releases, including monitoring for loss of drilling fluids.  The HDD Contingency Plan describes monitoring and mitigation procedures for any inadvertent release of drilling mud into the waterbody or areas adjacent to the waterbody and includes procedures to contain and clean up inadvertent releases.

USACE_DAPL0071260

Environmental Assessment
Dakota Access Pipeline Project
July 2016

Dakota Access plans to hydrostatically test the HDD pipeline segments prior to installation at the Lake Oahe and Missouri River crossings.  Hydrostatic testing involves filling the new pipeline segments with water acquired in accordance with applicable permits, raising the internal pressure level, and holding that pressure for a specific period of time per U.S. DOT requirements.

Dakota Access is requesting permission to withdraw water from the Missouri River that would be required for installation of the HDD and hydrostatic testing of the pipeline at the Missouri River crossing. Approximately 470,000 gallons of water would be required for activities associated with the installation of HDD and the hydrostatic testing of HDD pipeline segment.  Dakota Access intends to submit an application to the North Dakota State Water Commission, Water Appropriations Department for a Temporary Water Permit.  The exact number and size of the withdrawal pumps would be determined as a result of the limits imposed by the Temporary Water Permit.  The withdrawal activity would comply with all applicable permit conditions and regulations, including the specifications on permitted intake structures outlined in the Corps' Regional Conditions for North Dakota applicable to NWP 12 (Utility Line Activities) (Corps, 2012).  This regional condition requires that the applicant 1) utilize an intake screen with a maximum mesh opening of ¼-inch; 2) wire, Johnson-like screens must have a maximum distance between wires of 1/8-inch; 3) water velocity at the intake screen shall not exceed ½-foot per second; 4) intake structure shall be floating; and 5) at the beginning of pumping, the intake shall be placed over water with a minimum depth of 20 feet.

The Acquisition point would coincide with the proposed pipeline crossing of the Missouri River.  An 8"x 8" Power Associates 2500 Single Stage Pump would be set on a barge or float anchored just offshore at the proposed permanent easement.  The barge/float would be approximately 12 feet wide by 14 feet long and fitted with a secondary containment structure (an Eagle 4Drum Flexible Containment SpillNest-T8103 or similar).  The pump, capable of withdrawing 2,400 gallons per minute withdrawal and 120 feet of head pressure, would be placed within the secondary containment on the barge/float.

The pump's flexible intake hose would be 8 inches in diameter and connect the screened intake to the pump.  The screened intake (approximately the size of a 55 gallon drum) would be suspended by floats (approximately the size of a tire) within the water column and would be screened to prevent impingement entrainment of foreign objects and aquatic life.  A hard 8-inch diameter take-way pipe extending from the pump would push the water to the top of bank then to the HDD equipment or pipeline section.  This temporary waterline would be laid by hand on top of the ground surface within the permanent ROW, and thus would not require any ground disturbance or trench excavation.  The waterline, barge, pump, and associated equipment would be removed following completion of construction activities.  A depiction of the layout of the barge, pump, and waterline is provided in **Figure 6-B**.

Water needed for HDD construction and hydrostatic testing at the Lake Oahe Crossing in Emmons and Morton counties, North Dakota would not be obtained from Lake Oahe.  Required water would instead be obtained from an alternate surface water, groundwater, or commercial source and transported to the Project Area via water trucks.  Water trucks would not be required to cross Corps Fee Lands.  Prior to construction, Dakota Access would identify a water source for construction activities at the Lake Oahe crossing in accordance with all applicable permits and regulations.

Water discharges associated with hydrostatic testing on Corps flowage easements would be conducted in accordance with applicable permits.  Hydrostatic test water discharges would not occur on Corps fee

37

Environmental Assessment
Dakota Access Pipeline Project
July 2016

property.  Dakota Access would conduct trench dewatering and hydrostatic test discharges in a manner consistent with the North Dakota Pollutant Discharge Elimination System (NDPDES) General Permit NDG-070000.  Discharged hydrostatic test water would not contain additives unless written approval is received from Dakota Access and applicable permits authorize such additives.  EIs would monitor permit compliance.  Where appropriate, water would be discharged into an energy dissipation and/or filtering device, as described in Dakota Access' SWPPP (**Appendix A**) to remove sediment and to reduce the erosive energy of the discharge.

Of the five waterbodies located within the flowage easements Project Area and Connected Action, one ephemeral ditch (d-k8-wi-011) is located within the portion of the Project Area that would be crossed via the Missouri River HDD; therefore, no trenching would occur within this feature.  However, a temporary waterline would be installed across this feature to transport surface water from the Missouri River to the HDD equipment.  The temporary waterline would be laid on top of the ground surface, and no grading or ground disturbance in the vicinity of the waterbody crossed by the waterline would be required.  The hard pipe segments would be hand-carried down the slope and assembled by hand.  No tracked or wheeled equipment would be necessary for construction or removal of the temporary aboveground waterline.  Four waterbodies would be temporarily impacted by pipeline construction.  However, impacts on waterbodies would be minimized by conducting pipeline construction activities in accordance with applicable regulatory requirements and implementing trenchless waterbody construction procedures, as described in sections 2.3.2.6 and 2.3.2.7 and the ECP.

No waterbody would be permanently drained or filled as part of the DAPL Project, and effects on waterbodies are expected to be short-term and minor.  Dakota Access would restore the area as close to its previous state and naturally functioning condition as practicable.  Additionally, Dakota Access would take measures described in Dakota Access' SPCC, SWPPP (Appendix A), and ECP (Appendix G) to minimize the potential for surface water contamination from an inadvertent spill of fuel or hazardous liquids during refueling or maintenance of construction equipment or during operation of aboveground facilities.  Fuel and all other hazardous materials would be stored in accordance with the requirements of Dakota Access' SPCC, SWPPP, and ECP.  These documents also describe response, containment, and cleanup measures.

Drinking water intakes located downstream from the Missouri River and Lake Oahe crossings could be at risk if there was a release that reached these bodies of water in the vicinity of the intake structures.  The Standing Rock Sioux Reservation is located south of the Lake Oahe Project Area and the majority of reservation residents depend on wells for water supply (Standing Rock Sioux Tribe, 2016).  However, the Standing Rock Sioux also have intake structures within the river downstream of the Lake Oahe Project Area.

In order to maintain the integrity of the pipeline, prevent Project losses, and protect the general public and the environment, the operator will inspect, exercise, and deploy Company-owned protective and response equipment in accordance with the National Preparedness for Response Exercise Program (PREP) guidelines.  However, in the unlikely event of a pipeline leak, response measures to protect the users of downstream intakes will be implemented to minimize risks to water supplies.  Dakota Access would be responsible party for implementing the response actions in accordance with Geographical Response Plan (GRP) and the Facility Response Plan (FRP).  The potential for a spill to compromise a potable water supply intake would be continually evaluated as part of the response action.  Alternative sources would be included as part of the contingency planning.  Shutting down certain intakes and utilizing others or

38

Environmental Assessment
Dakota Access Pipeline Project
July 2016

different drinking water sources or bottled water will be evaluated as part of this process.  The Federal On-Scene Incident Commander (USEPA) would be responsible for assimilating and approving the response actions under the Unified Command.   Dakota Access maintains financial responsibility for the duration of the response actions.  The Dakota Access has prepared a FRP that includes measures such as notifications to surrounding communities, affected governments, and utilities in the event of an inadvertent pipeline release.

The FRP complies with the applicable requirements of the Oil Pollution Act of 1990 (OPA 90), and has been prepared in accordance with the National Oil and Hazardous Substances Pollution Contingency Plan (NCP) and the Mid-Missouri Sub-Area Contingency Plan (SACP).  Specifically, this Plan is intended to satisfy the applicable requirements of:

- Pipeline and Hazardous Materials Safety Administration, U.S. Department of Transportation requirements for an OPA 90 plan (49 CFR 194)
- South Dakota Environmental Protection Oil Pipeline Plan Requirements (34A-18).
- American Petroleum Industry (API) RP 1174 - Recommended Practice for Pipeline Emergency Preparedness and Response.
- North Dakota Administrative Code 69-09-03-02

The operator has contractually secured personnel and equipment necessary to respond, to the maximum extent practicable, to a worst case discharge or a substantial threat of such discharge.  The operator requires an annual certification from each Oil Spill Response Organization (OSRO) to assure compliance with the National PREP guidelines.  Each listed OSRO has its own response equipment, including containment booms, absorbents, boats, and vacuum trucks.

Sub-freezing temperatures during the winter months could cause ice to form on the surface of Lake Oahe and the Missouri River.   This layer of ice could impede the deployment of traditional containment booms. However, the ice itself often serves as a natural barrier to the spread of oil (Dickens 2011).  Pockets of oil naturally contained by the ice can be drilled to and removed using vacuum trucks.   Dakota Access's contracted professional emergency responders are prepared to respond under winter conditions so that response procedures can be carried out in accordance PHMSA operational regulations.  Therefore, a release during winter conditions is anticipated to have lesser impacts to water resources, particularly with respect to area of extent, as compared to a release during the warmer months.

A copy of the Draft FRP for the Dakota Access Pipeline North Response Zone is included in Appendix L. Dakota Access anticipates submitting this plan to PHMSA for review and approval in the third quarter of 2016 and will provide a copy of the updated draft to the Corps concurrent with the submittal to PHMSA. The FRP would be in place prior to operating the DAPL Project in accordance with PHMSA and federal regulations.

USACE_DAPL0071263

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 3-5 Waterbodies within the Flowage Easements Project Area and Connected Action | | | | | | | |
|---|---|---|---|---|---|---|---|
| MP | Waterbody ID | Waterbody Type | Flow Type | Delineation Source | Class of Aquatic Resource | ND Surface Water Classification | Area of Impact |
| 92.7 | d-k8-wi-013 | Ditch | Ephemeral | Field | §404 | III | Construction and Permanent ROW |
| 92.77 | s-k8-wi-002 | Stream | Perennial | Field | §404 | III | Construction and Permanent ROW |
| 93.23 | d-k8-wi-007 | Ditch | Ephemeral | Field | §404 | III | Construction and Permanent ROW |
| 94.64 | d-k8-wi-011 | Ditch | Ephemeral | Field | §404 | III | Permanent ROW over HDD Profile (Temporary Waterline) |
| 94.9 | s-m10-wi-001/s-k2-mk-001 | Stream | Perennial | Field | §10 | I | Construction and Permanent ROW |
| 95.1 | s-k2-mk-002 | Stream | Intermittent | Field | §404 | III | Construction and Permanent ROW |

Surface water classifications from North Dakota Administrative Code 33-16-02.1-09:

Class I Streams:  quality of the waters in this class shall be suitable for the propagation or protection, or both, of resident fish species and other aquatic biota and for swimming, boating, and other water recreation.  The quality of the waters shall be suitable for irrigation, stock watering, and wildlife without injurious effects.  After treatment consisting of coagulation, settling, filtration, and chlorination, or equivalent treatment processes, the water quality shall meet the bacteriological, physical, and chemical requirements of the department for municipal or domestic use.

Class III Streams: The quality of the waters in this class shall be suitable for agricultural and industrial uses.  Streams in this class generally have low average flows with prolonged periods of no flow.  During periods of no flow,  they are of limited value for recreation and fish and aquatic biota.  The quality of these waters must be maintained to protect secondary contact recreation uses (e.g. wading), fish and aquatic biota, and wildlife uses.

The only surface waterbody identified on the federal lands Project Area is Lake Oahe (s-kc4-em-001/s-kc4-mo-002), which would be avoided via HDD.  The pipe stringing corridor (Connected Action) at Lake Oahe crosses two drainageways that are indicated on the National Hydrography Dataset.  Field delineations carried out by Dakota Access identified one ephemeral stream (s-kc-4-mo-004) associated with these two drainageways that intersect the pipe stringing corridor of the Connected Action.  Impacts on the delineated waterbody would be entirely within the pipe stringing additional temporary workspace (ATWS) and are expected to be avoided by bridging the waterways for equipment and vehicle traffic during pipe stringing, fabrication and pullback.  No trenching would occur within the pipe stringing ATWS.  While limited grading may be necessary within the pipe stringing ATWS, no grading would be expected to occur within the waterbody itself.  Vegetation may be mowed/brush-hogged, however, no root masses are anticipated to be removed.  Revegetation of these areas would be in accordance with the North

USACE_DAPL0071264

Environmental Assessment
Dakota Access Pipeline Project
July 2016

Dakota tree and shrub regulations and would not be impacted during operation of the Proposed Action. No trees are expected to be cleared on Corps fee-owned lands.

| Table 3-6 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Waterbodies within the Federal Lands Project Area and Connected Action | | | | | | | |
| MP | Waterbody ID | Waterbody Type | Flow Type | Delineation Source | Class of Aquatic Resource | ND Surface Water Classification | Area of Impact |
| 166.3 | s-kc4-em-001 / s-kc4-mo-002 | Lake (Lake Oahe) | N/A | Field | §10 | I | Project Area – Permanent ROW over HDD Profile |
| 166 | s-kc4-mo-004 | Stream | Ephemeral | Field | §404 | III | Connected Action – HDD Stringing Area |

Surface water classifications from North Dakota Administrative Code 33-16-02.1-09:

Class I Streams:  quality of the waters in this class shall be suitable for the propagation or protection, or both, of resident fish species and other aquatic biota and for swimming, boating, and other water recreation.  The quality of the waters shall be suitable for irrigation, stock watering, and wildlife without injurious effects.  After treatment consisting of coagulation, settling, filtration, and chlorination, or equivalent treatment processes, the water quality shall meet the bacteriological, physical, and chemical requirements of the department for municipal or domestic use.

Class III Streams:  The quality of the waters in this class shall be suitable for agricultural and industrial uses.  Streams in this class generally have low average flows with prolonged periods of no flow.  During periods of no flow, they are of limited value for recreation and fish and aquatic biota.  The quality of these waters must be maintained to protect secondary contact recreation uses (e.g. wading), fish and aquatic biota, and wildlife uses.

Environmental Inspectors would monitor compliance with applicable waterbody protection requirements during construction of the facilities.  The ECP (**Appendix G**) and SWPPP (**Appendix A**) describe additional mitigation measures and contain illustrations of how sediment control devices are typically installed at waterbody crossings.  Additionally, Dakota Access would maintain a vegetative buffer until the actual crossing of the waterbody takes place.  Temporary sediment control measures, such as silt fence installed at each crossing, would minimize the introduction of sediment into waterbodies during construction and minimize the movement of spoil and sediment from surface runoff during and after construction.  Permanent erosion control measures, such as vegetation and installation of slope breakers, would effectively stabilize riparian zones.  Dakota Access would stabilize stream banks disturbed during construction using methods as directed by applicable state and/or federal permits.  Trenching and dewatering activities used in construction of the proposed pipeline could temporarily alter surface drainage patterns.  However, these impacts are expected to be localized and temporary, since the contours and vegetation would be returned as closely as practical to pre-construction conditions.  Dewatering activities would be conducted in accordance with applicable permits and Dakota Access' SWPPP and ECP.

All construction equipment utilized on or in waters of the state would be subject to inspection by the Department in accordance with the North Dakota Administrative Code (Title 30, Article 3, Chapter 6-01).  Further, Dakota Access would implement required measures including the removal of all aquatic

USACE_DAPL0071265

Environmental Assessment
Dakota Access Pipeline Project
July 2016

vegetation from vessels, motors, trailers, or construction equipment.  All water would be drained from bilges or confined spaces.  All Aquatic Nuisance Species will be removed from equipment in accordance with the North Dakota Administrative Code (Title 30, Article 3, Chapter 6).  The contractor or his agents or subcontractors must provide the North Dakota Game and Fish Department a reasonable opportunity to inspect any and all vehicles, vessels, pumps and equipment that will be used in the project in or on the waters of the state prior to those items being launched or placed in the waters of the state.

**Water Intake Mitigation Measures**

In the unlikely event of a release during pipeline operations, drinking and irrigation water intakes located downstream from the Missouri River and Lake Oahe crossings could be at risk if hydrocarbons were to reach these bodies of water in the vicinity of the intake structures.  In order to minimize the risk of a pipeline leak and protect the users of downstream intakes, Dakota Access will implement the design and operation measures summarized below as well as all other measures described throughout this EA and in the FRP.

- Pipe specifications that meet or exceed applicable regulations, with a quality assurance program for pipe manufacturers
- Use of the highest quality external pipe coatings (fusion bond epoxy or FBE) to reduce the risk of corrosion, and stress corrosion cracking.
- Active Cathodic Protection applied to the pipeline and facilities
- Four feet of soil cover will be provided over the buried pipeline on either side of the HDD crossings.  The proposed HDD profiles under the Missouri River and Lake Oahe are designed to provide a minimum of 36 feet and 92 feet of cover below the water bodies, respectively.   .
- Pipeline system inspection and testing programs will be implemented prior to operation to ensure the pipeline is built in accordance with the standards and specifications.
- Non-destructive testing of 100 percent of girth welds
- Hydrostatic testing of the pipeline to 125% percent of the Maximum Operating Pressure (MOP).
- A continuous SCADA pipeline monitoring that remotely measures changes in pressure and volume on a continual basis at all valve and pump stations, is immediately analyzed to determine potential product releases anywhere on the pipeline system.
    - Pipeline variables are the parameters pertaining to SCADA systems, instrumentation, fluid properties, physical attributes of pipelines, pressure, temperature, and flowrate
    - Includes pressure transmitters to monitor flowing pressure in real-time and alarm in the event of adverse pressure changes due to potential leaks / releases
    - Includes custody transfer quality meters to monitor pipeline Receipts / Deliveries in real-time and alarm in the event of flowrate discrepancies due to potential leaks / releases
- Leak Detection System - LeakWarn - A Computational Pipeline Monitoring System (CPM) to monitor the pipeline for leaks via computational algorithms performed on a continual basis.
    - Includes separate ultrasonic meters at each pump station to continuously verify and compare flowrates along the pipeline in real-time as part of a leak detection system.
    - This measurement data is immediately analyzed to determine potential product releases anywhere on the pipeline system.
    - The mathematical algorithms are based on physics and abide by the conservation principles of mass, momentum and energy.

USACE_DAPL0071266

Environmental Assessment
Dakota Access Pipeline Project
July 2016

- Periodic pipeline integrity inspection programs using internal inspection tools to detect pipeline diameter anomalies indicating excavation damage, and loss of wall thickness from corrosion.
- Periodic above-ground Close Interval Surveys (CIS) conducted along the pipeline.
- Aerial surveillance inspections will be conducted 26 times per year (not to exceed 3 weeks apart) to detect leaks and spills as early as possible, and to identify potential third-party activities that could damage the pipeline.
- Mainline valves are installed along the pipeline route to reduce or avoid spill effects to PHMSA-defined HCAs.
- Periodic landowner outreach and the implementation of a Public Awareness program
- Participation in "One-Call" and "Before You Dig" notification systems.

Immediately upon discovery of a release of oil that could impact the Missouri River or Lake Oahe, Dakota Access will initiate emergency response efforts, including containment and recovery.

Site-specific GRPs have been developed for the Missouri River and Lake Oahe crossings. These security sensitive documents, submitted to the USACE as Privileged and Confidential, identify site-specific resources and response measures for an immediate, safe, and effective response to a release of crude oil from the Dakota Access Pipeline with the potential to impact the Missouri River near these two crossings. Response measures include, but are not limited to, the deployment of containment or diversionary booms at predetermined locations and oil collection/recovery activities to prevent further migration of crude oil.

Emergency response notifications will be made to Federal, State, and Local agencies and tribal officials as outlined in the FRP. Dakota Access and its contractors will work with Federal, State, local and Tribal officials to protect downstream water intakes. To minimize potential impacts to intakes, protection and mitigation measures will be implemented in cooperation with intake operators.

Dakota Access will identify an all-weather access and collection point downstream of both the Missouri River crossing and Lake Oahe crossing. At each location, Dakota Access will provide an equipment storage facility that includes a permanent storage area for winter and open water spill response equipment. Dakota Access would coordinate with the USACE and any other applicable stakeholders to obtain all necessary permits and approvals prior to construction for any ground disturbing activities associated with these facilities.

Dakota Access will conduct emergency response drills/exercises at both the Missouri River crossing near Williston and the crossing at Lake Oahe. These exercises will include both open water and ice response activities. Regulatory and stakeholder participation will be encouraged and solicited for the exercises. Section 3.2.2.2 Impacts and Mitigation Remediation, Section 3.11 Reliability and Safety and the FRP (Appendix L) contain more detail regarding spill prevention, detection and response measures. The emergency response drills/exercises are further discussed in Section 3.11.

USACE_DAPL0071267

Environmental Assessment
Dakota Access Pipeline Project
July 2016

### 3.2.2    Groundwater

#### 3.2.2.1    Affected Environment

Groundwater occurs within the Project Area of the Corps flowage easements and federal lands in both glacial drift and bedrock aquifers.  Although bedrock aquifers tend to have a greater distribution and be more continuous than Quaternary aquifers, Quaternary aquifers typically provide higher yields to wells.

Groundwater in the bedrock aquifers flows towards the Missouri River and Lake Oahe, a regional groundwater discharge zone.  The water table within phreatic aquifers, which may include both Quaternary and bedrock formations, is typically a subdued replica of the surface topography.  Although groundwater flow directions may vary widely particularly within localized flow regimes, overall regional flow of groundwater in the phreatic aquifer would be to the Missouri River and Lake Oahe.

The most economically important aquifers in the vicinity of the Corps flowage easements are the Cretaceous Dakota Group, the Tertiary Fort Union Group (which includes the Sentinel Butte and Bullion/Tongue River Formations), and glacial drift aquifers of the Quaternary Period (Armstrong, 1969). The glacial drift aquifers are relatively thin at the Project Area, except where they occur in buried or present-day bedrock valleys.  In the absence of Quaternary aquifers, members of the Paleocene Fort Union Group commonly serve as the shallowest aquifer.  Individual aquifer members of the Fort Union Group include, in descending order, the Sentinel Butte, Tongue River, Cannonball, and Ludlow Formations (Croft, 1985).  Other bedrock aquifers of economic importance in the flowage easement region are the late Cretaceous Hell's Creek and Fox Hills Aquifer system and the Cretaceous Dakota Group.

Three domestic wells and six observation wells (one of which has been destroyed) are located on the flowage easements, but occur outside of the Project Area.  The closest well to the proposed pipeline centerline is a domestic well located approximately 430 feet from the centerline.  The flowage easements or Connected Action do not overlie any source water protection areas.

The most economically important aquifers in Morton and Emmons counties, where the federal lands along Lake Oahe are located, include aquifers within the Cretaceous Fox Hills and Hell Creek Formations; the Tertiary Fort Union Group, which includes the Cannonball and Ludlow Formations, Tongue River Formation, and Sentinel Butte Formation (northwest part of the county only); and alluvial and glacial drift aquifers of the Quaternary Period (Ackerman, 1980; Armstrong, 1978).  The Pierre Formation is considered the base of the active near-surface aquifers, because it is thick and relatively impervious.

No water wells are located within 150 feet of the federal lands or Connected Actions at the Lake Oahe crossing.  Impacts within 150 feet of the Project was used following the Federal Energy Regulatory Commission (FERC) guidelines for the evaluation of construction impacts to water wells and springs. Although the Project is not under the jurisdiction of the FERC, FERC guidance was deemed to be an appropriate distance for this evaluation.  Additionally, none of the Project Area or Connected Action overlie any source water protection areas.

USACE_DAPL0071268

Environmental Assessment
Dakota Access Pipeline Project
July 2016

### 3.2.2.2   Impacts and Mitigation

Ground disturbance associated with conventional pipeline construction is generally limited to approximately 6 to 10 feet below the existing ground surface. Where excavation penetrates the water table, potential groundwater impacts from pipeline construction are primarily limited to the radius of influence around the excavation profile.

Construction activities, such as trenching, dewatering, and backfilling that encounter shallow aquifers would cause minor direct and indirect impacts via fluctuations in groundwater levels and/or increased turbidity within the aquifer adjacent to the activity due to dewatering activities. Dewatering would consist of a single or series of submersible pumps that would be lowered into the pipe trench to review excess water to facilitate pipe installation. In cases of greater water infiltration, well pointing (a series of dewatering points along the outside of the trench connected in series to a pump to enable effective dewatering of the trench) may be used. These impacts are temporary (only while the trench is open) and highly localized as the infiltration of the dewatered groundwater is in the immediate vicinity of the dewatering activity.

Construction and dewatering activities are not expected to have a significant direct or indirect effect on regional groundwater flow patterns. Shallow aquifers would quickly reestablish equilibrium if disturbed, and turbidity levels would rapidly subside. Consequently, the effects of construction would be minor and short-term. Impacts on deeper aquifers are not anticipated.

The introduction of contaminants to groundwater due to accidental spills of construction-related chemicals, fuels, or hydraulic fluid could have an adverse effect on groundwater quality. Spill-related impacts from construction activities are typically associated with improper fuel storage, equipment refueling, and equipment maintenance. Dakota Access' SPCC Plan outlines measures that would be implemented to avoid, minimize, prevent, and respond to releases of fuels and other hazardous substances during construction and includes measures for cleanup, documentation, and reporting of spills (**Appendix A**). Project-specific SPCCs would be developed by the selected contractor and implemented throughout construction. By implementing the protective measures set forth in these plans, groundwater contamination due to construction activities is not anticipated. The draft SPCC is included as Appendix B of **Appendix A** (SWPPP); the project-specific plan to be developed by the Contractor would meet or exceed all conditions presented in the draft plan.

Accidental releases from the pipeline system during operations could potentially affect groundwater. Although most components of crude oil are relatively insoluble (Neff and Anderson, 1981), crude oil released into soil can migrate toward water where certain constituents can dissolve into groundwater or surface water in limited amounts. As a liquid, the product would travel along the path of least resistance both laterally and vertically at a rate determined by a number of factors including volume released, soil conditions (permeability, porosity, moisture, etc.), depth to groundwater, and the speed and effectiveness of response and remediation measures.

The DAPL Project would transport light sweet crude oil from the middle Bakken and upper Three Forks formations (Bakken). The Energy Information Administration (EIA) categorizes light sweet crude oil as having an API gravity between 35° and 50° and less than 0.3 wt % sulfur. API gravity is a measure of how heavy or light liquid oil is compared to water: if its API gravity is greater than 10, it is lighter and floats on

45

Environmental Assessment
Dakota Access Pipeline Project
July 2016

water.  The oil extracted from the Bakken has an API gravity generally between 40° and 43° and a sulfur content of less than 0.2 weight percentage (wt %) (Turner, Mason and Company, 2014).  Therefore, the Bakken oil has properties that fall within the mid-range of light sweet crude.

Most crude oil constituents are not very soluble in water.  The dissolved concentration of water soluble compounds (e.g., benzene) is not controlled by the amount of oil in contact with the water, but by the concentration of the specific constituent in the oil (Charbeneau et al., 2000; Charbeneau, 2003; Freeze and Cherry, 1979).  Studies of 69 crude oils found that benzene was the only aromatic or polycyclic aromatic hydrocarbon compound tested that is capable of exceeding the 0.005 ppm groundwater protection threshold values for drinking water (i.e., maximum contaminant levels (MCLs) or Water Health Based Limits) (Kerr et al., 1999 as cited in O'Reilly et al., 2001).

In aquatic environments, crude oil's toxicity is a function of the concentration of its constituent compounds and their toxic effects, along with their solubility (and bioavailability) in water. Based on the combination of toxicity, solubility, and bioavailability, benzene is commonly considered to pose the greatest toxicity threat from crude oil spills (Muller, 1987).  The lowest acute toxicity threshold for aquatic organisms for benzene is 7.4 ppm based on standardized toxicity tests (USEPA, 2016).  .

Accordingly, theoretical concentrations of benzene in river water for a range of potential DAPL Project spills at the two pipeline river crossings are presented in **Table 3-7**.  An assumption of a 1-hour release period for the entire spill volume at each location was used.   The following additional conservative assumptions were developed to estimate potential spill effects for planning purposes:

- The entire volume of a crude oil spill was released due to a catastrophic failure of the pipeline and reached the waterbody;
- Complete, instantaneous mixing occurred;
- The entire benzene content of the crude oil was solubilized into the water column; and
- The receptor is located at the immediate site of the crude oil spill and there is no loss due to evaporation or degradation.

The conservative analysis presented in **Table 3-7** includes a range of values from 4 barrels to 10,000 barrels spilled.  However, examination of the PHMSA dataset from 2002 to 2015 (PHMSA, 2016) indicates that the majority of actual pipeline spills are relatively small and fifty percent of the spills consist of 4 bbls or less.  The spill volume would be likely small due to a number of factors including:

- Most releases are not caused by full ruptures of the pipeline;
- The overburden on the HDD section of the pipeline or the compacted back-fill over a buried pipeline restricts the volume that could be released during a spill and restricts the affected area; and
- Due to anti-siphoning effects, a full gravity drain-down between valve locations on either side of the river crossings rarely occurs.

As indicated in **Table 3-7**, the acute toxicity threshold for aquatic organisms for benzene of 7.4 ppm is not exceeded under any of the hypothetical spill volume scenarios.  The most probable spill volume (4 barrels

46

USACE_DAPL0071270

Environmental Assessment
Dakota Access Pipeline Project
July 2016

or less) does not yield benzene concentrations that exceed the drinking water criteria even with the ultra conservative mixing assumptions.  It should be noted that under real life conditions, the spill and mixing events outlined by the assumptions are beyond physical actualities.  Therefore the use of the upper ranges of spill volumes and the concentrations in the table is limited and is not recommended beyond this NEPA analysis.

| River Crossing | River Flow (cfs) | Acute Toxicity Threshold (ppm) | Benzene MCL (ppm) | Very Small Spill: 4 bbl | Small Spill: 100 bbl | Moderate Spill: 1,000 bbl | Large Spill: 10,000 bbl |
|---|---|---|---|---|---|---|---|
| Missouri River | 20,374 | 7.4 | 0.005 | 0.00075 | 0.019 | 0.19 | 1.88 |
| Lake Oahe | 22,484 | 7.4 | 0.005 | 0.00068 | 0.017 | 0.17 | 1.70 |

**Table 3-7
Estimated Benzene Concentrations Following a Hypothetical Crude Oil Spill at Project River Crossings** (Estimated Benzene Concentration in Surface Water (ppm))

Notes:
- Adapted from Stantec, 2015
- Estimated concentration is based on release of benzene into water over a 1-hour period with uniform mixing conditions.
- Concentrations are based on a 0.28 percent by volume benzene content of the transported material (Marathon Oil 2010).
- bbl - An oil barrel defined as 42 US gallons,
- MCL - Maximum contaminant levels
- ppm – Parts per million
- cfs – Cubic feet per second
- Stream flows are measured mean discharge from the gage stations closest to the pipeline crossings located on the Missouri River at Williston (USGS Station 06330000) and Bismarck (USGS Station 06342500)(USGS 2016; 2016b).

Sub-freezing temperatures during the winter months could cause ice to form on the surface of Lake Oahe and the Missouri River.  This layer of ice will trap oil released below the lake's surface and prevent benzene evaporation from occurring. Therefore, during the winter, evaporative loss will be negligible, and will allow a longer contact between the crude oil and the water column. Additionally, natural undulations in the bottom of the ice will trap the material and reduce horizontal spreading, potentially causing very localized impacts to organisms in prolonged contact with the near-surface water (e.g., phytoplankton) (Dickens 2011). Exposure to fish deeper in the water column would not likely experience adverse impacts. The natural containment of winter releases facilitates cleanup efforts as the pockets of oil can be drilled to and removed using vacuum trucks. Thus, winter releases are predicted to have lower impacts, particularly with respect to area of extent, as compared to releases occurring during the warmer seasons.

USACE_DAPL0071271

Environmental Assessment
Dakota Access Pipeline Project
July 2016

If no active ground water remediation activities were undertaken (see discussion below), dispersion, evaporation, dissolution, sorption, photodegradation, biodegradation, and natural attenuation ultimately would allow a return to preexisting conditions in both soil and groundwater.

**Remediation**

As part of the pipeline operation, which is regulated by the PHMSA, Dakota Access has an ongoing maintenance, inspection, and integrity testing program to monitor the safety of the pipeline system. Monitoring activities include constant remote oversight of the entire system 24/7/365 from the control center, routine inspection of the cathodic protection system, and the use of inspection tools that travel through the inside of the pipeline to check pipe integrity (see Section 3.11 for additional information regarding reliability and safety and the proposed methods for monitoring the Proposed Action facilities). Dakota Access also performs regular aerial flyovers to inspect the pipeline ROW.  In the event of a leak, Dakota Access would work aggressively to isolate the source through the use of remote-controlled shut-off valves, initiate cleanup activities, and contact the appropriate federal and state authorities to coordinate leak containment and cleanup.   To prevent pipeline failures resulting in inadvertent releases, Dakota Access would construct and maintain the pipeline to meet or exceed industry and governmental requirements and standards.  Specifically, the steel pipe would meet PHMSA specifications under 49 CFR § 195, follow standards issued by the American Society of Mechanical Engineers, National Association for Corrosion Engineers and API.  Once installed, the pipeline would be subjected to testing to verify its integrity and compliance with specifications, including hydrostatic pressure testing at the crossings, checking coating integrity, and X-ray inspection of the welds.  The pipeline would be placed into service only after inspection to verify compliance with all construction standards and requirements.  Dakota Access would maintain and inspect the pipeline in accordance with PHMSA regulations, industry codes and prudent pipeline operating protocols and techniques.  The pipeline ROW would be patrolled and inspected by air every 10 days, weather permitting, but at least every three weeks and not less than 26 times per year, to check for abnormal conditions or dangerous activities, such as unauthorized excavation along the pipeline route.

While a release of crude oil into groundwater or a surface waterbody has the potential to cause environmental impacts, the likelihood of such an event is very low.  Dakota Access has detailed provisions for protecting and mitigating potential impacts to water resources in Section 3.11 Reliability and Safety.  Emergency response and remediation efforts have the potential for dramatically reducing the appreciable adverse environmental effects.

In the unlikely event of a spill during operations of the pipeline, impacts to water resources would be further mitigated by following the cleanup procedures and remediation activities described in the Dakota Access' FRP (**Appendix L**).

Specific clean-up procedures and remediation activities would be determined by groundwater remediation specialists within Dakota Access and contracted professional consultants.  Each groundwater mitigation situation is unique and will be treated according to the actual circumstances present.

The first step in the mitigation process consists of the delineation of the plume to define the nature and extent of the release.  If appropriate, Dakota Access would recover product as soon as practical to prevent the spread of contamination using excavators to remove the impacted soils, oil skimmers installed within

48

Environmental Assessment
Dakota Access Pipeline Project
July 2016

collection wells, pumps, and storage containers or vacuum trucks at collection areas or some other method appropriate for the site conditions.

Dakota Access would develop a groundwater remediation plan in coordination with the North Dakota Department of Health and other responsible federal, state or other governmental authorities. The proposed groundwater remediation system would be designed to treat the impacted groundwater by removing the released oil, converting it into harmless products, monitoring natural attenuation, etc.

Released product can often be physically removed from groundwater by several methodologies. The pump and treat method is one of the most widely used physical methods of ground water remediation and consists of pumping the groundwater to surface and then using either biological or chemical treatments to remove the oil. Another common method of removing floating hydrocarbon contaminants is the use of a monitoring-well oil skimmer. This method utilized a belt material with a strong affinity for hydrocarbons to bring the oil to the surface where it can be removed. A dual-phase vacuum extraction removes both contaminated groundwater and soil vapor. A high-vacuum extraction well is installed with its screened section in the zone of contaminated soils and groundwater to remove contaminants from above and below the water table. Released product can also be removed from groundwater by applying various chemical methodologies including ozone and oxygen gas injection, surfactant enhanced recovery, Biological treatment techniques can also be utilized including bioventing and bioaugmentation.

The ground water treatment remediation plan would be selected in coordination with the North Dakota Department of Health and other responsible governmental authorities and may utilize a combination of technologies.

A preliminary evaluation of geology indicates that groundwater within the floodplain throughout most of the Corps flowage easements is less than 6.5 feet deep (GeoEngineers, 2014). The pipeline would be installed in saturated sediments as part of the HDD crossing of Lake Oahe. Due to the nature of HDD methodology, this construction method is inherently not a risk to groundwater resources and uses benign substances (bentonite and water) to penetrate through soil, rock, and groundwater. Construction of the Project Area and Connected Action would not be expected to result in significant negative direct or indirect impacts on groundwater resources.

### 3.2.3    Wetlands

#### 3.2.3.1    Affected Environment

Wetland data for the Project Areas was derived from desktop analyses along the entire route and verified by field delineations. Using data from the U.S. Fish & Wildlife Service's (USFWS) National Wetlands Inventory (NWI) dataset, aerial imagery, and topography, an experienced biologist applied professional judgment to create polygon coverage in GIS to define the areal extent of wetlands. These areas have been field-verified to ensure that the most accurate, up-to-date data is being used for permit filings.

The field wetland investigations were conducted using the on-site methodology set forth in the 1987 Corps of Engineers Wetland Delineation Manual and the 2010 Regional Supplement to the Corps of Engineers Wetland Delineation Manual: Great Plains Region (USACE, 1987; 2010b). In addition to the 1987 Manual and the Regional Supplement, wetland areas were examined through analysis of the

USACE_DAPL0071273

Environmental Assessment
Dakota Access Pipeline Project
July 2016

vegetation, soils, and hydrology, as described in the Classification of Wetland and Deepwater Habitats of the U.S. and The National Wetland Plant List (Cowardin et al., 1979; Lichvar et al., 2014).

### 3.2.3.2    Impacts and Mitigation

The routing analysis utilized to determine the crossing locations was designed to avoid impacts to sensitive environmental resources including wetlands.  Construction workspace on the flowage easements has been selected based on an absence of wetlands within the Project Area and, as confirmed by field verification in 2015, no wetlands would be impacted by trench excavation within the construction ROW, ATWS, HDD workspace, or HDD stringing corridor on the flowage easements or Connected Action.

The field wetland investigations conducted by Dakota Access results identified four wetlands located within the permanent easement on the flowage easements (w-m10-wi-001_PSS, w-m10-wi-001_PEM, w-m10-wi-001_PFO, and w-m10-wi-002_PSS).  These wetlands occur in the portion of the Project Area on the flowage easements that would be constructed via HDD; therefore, no trenching would occur within these wetlands.  However, following construction, a 30-foot-wide corridor centered on the proposed pipeline would be maintained in non-forested state to facilitate inspections of the pipeline, operational maintenance, and compliance with the federal pipeline safety regulations.  The 30 foot permanent ROW would encompass a total of approximately 0.30 acre of the four wetlands.  One of these wetlands (w-m10-wi-001_PFO), approximately 0.05 acre, is classified as a palustrine forested (PFO) wetland and would be converted to shrub-scrub or herbaceous wetland as a result of the Proposed Action since trees would be routinely removed for the life of the pipeline.  The remaining palustrine emergent (PEM) wetland (w-m10-wi-001_PEM) and two palustrine scrub-shrub (PSS) wetlands (w-m10-wi-001_PSS and w-m10-wi-002_PSS), comprising a total of 0.25 acres of the permanent pipeline easement, may require infrequent vegetation clearing of encroaching woody vegetation but would otherwise remain in their natural state. Dakota Access is in the process of obtaining verification for use of NWP 12 for the crossings of wetlands and waterbodies associated with DAPL Project.

Pending approval and receipt of applicable permits and easement permission, a temporary waterline would be installed between the shoreline and the HDD workspace on the flowage easements within the permanent ROW (**Figure 6-B**), in order to supply the HDD equipment with water needed for drilling fluid preparation and hydrostatic testing.  The temporary waterline would be laid on top of the surface, and no ground disturbance of the four wetland features along the permanent easement is anticipated.  The hard pipe segments would be hand-carried down the slope and assembled by hand.  No tracked or wheeled equipment would be necessary for construction or removal of the temporary aboveground pipeline.  No excavation or disturbance of wetlands or the river bank is anticipated.

**Table 3-8** summarizes wetlands within the flowage easements that occur within the permanent ROW, which is 30-feet-wide centered on the centerline over the HDD profile and 50-feet-wide elsewhere.

No wetlands would be impacted by the HDD workspace on private land and the permanent ROW on federal land at the crossing of Lake Oahe, because no wetlands exist within the Project Area and Connected Action Area at the Lake Oahe Crossing.

The ECP and SWPPP specify several measures to protect wetlands and waterbodies from becoming polluted with fuels or other hazardous materials during construction.  These plans prohibit the storage of

50

Environmental Assessment
Dakota Access Pipeline Project
July 2016

fuel or other hazardous materials within 100 feet of a wetland or waterbody.  The ECP also specifies that equipment must be refueled at least 100 feet from waterbodies unless, due to site-specific conditions, there is no practical alternative such as the proposed pumping intake structure located on the barge at the Missouri River Crossing.  In that case, the contractor must implement site-specific protective measures and containment procedures described in the ECP.  Contractors would be required to provide trained personnel, appropriate equipment, and materials to contain and clean up releases of fuel, lubricating oil, or hydraulic fluid that result from equipment failure or other circumstances in accordance with containment plans as described above.

| Table 3-8 Wetlands within the Flowage Easements Project Area | | | | | | |
|---|---|---|---|---|---|---|
| MP | Wetland ID | Wetland Type | Pre-Construction Notice? | Delineation Source | Area (acres) | Impacted Area [1] |
| 94.7 | w-m10-wi-001 | Palustrine Scrub-Shrub | No | Field | 0.07 | Permanent ROW over HDD Profile |
| 94.7 | w-m10-wi-001 | Palustrine Emergent | No | Field | 0.04 | Permanent ROW over HDD Profile |
| 94.8 | w-m10-wi-001 | Palustrine Forested | No | Field | 0.05 | Permanent ROW over HDD Profile |
| 94.9 | w-m10-wi-002 | Palustrine Scrub-Shrub | No | Field | 0.14 | Permanent ROW over HDD Profile |

### 3.2.4    Floodplain

#### 3.2.4.1    Affected Environment

Floodplains refer to the 100-year floodplain, as defined by Federal Emergency Management Agency (FEMA), and as shown on Flood Insurance Rate Maps (FIRM) or Flood Hazard Boundary Maps for all communities participating in the National Flood Insurance Program (NFIP).  The 100-year floodplain is an area subjected to inundation by the 1% chance of an annual flood event.  Executive Order (EO) 11988 (Floodplain Management) requires federal agencies to avoid direct or indirect support of development within the 100-year floodplain whenever there is a practical alternative.

According to the FEMA FIRM map, the seven flowage easements are located within Zone A (the 100-year floodplain) of the Missouri River in Williams County.  A FEMA flood map is not available for the Connected Action within McKenzie County.  The Lake Oahe crossing in Emmons County is located in Zone D, which is an area of undetermined, but possible flood hazards (FEMA, 1987).  FEMA has not completed a study to determine flood hazards for Morton County; therefore, a flood map has not been published at this time.

#### 3.2.4.2    Impacts and Mitigation

The Proposed Action has been designed in accordance with accepted floodplain management practices; therefore, no impacts on floodplain elevations or velocities are anticipated.  Following construction,

51

Environmental Assessment
Dakota Access Pipeline Project
July 2016

disturbed areas would be restored to pre-construction grades and contours, as practical.  If necessary, soil displaced by installation of the 24-inch pipeline on the flowage easements would be removed from the floodplain and hauled to an upland location in order to ensure original floodplain elevations are restored

The Corps Omaha District Flood Risk and Floodplain Management Section (FRFM) is responsible for coordinating compliance with the requirements of EO 11988.  The FRFM reviewed the proposed pipeline plans for the portion of the DAPL Project that crosses the flowage easements for compliance with Appendix A (Typical Cut and Fill Volumes for Land Development Proposals) of NWDR 1110-2-5, Land Development Guidance at Corps Reservoir Projects, and found that the lowest elevation of the Proposed Action on the flowage easements (1872.25 feet MSL) would be above the Garrison flood control pool maximum operation elevation (1854.0 feet MSL).  Therefore, there would be no adverse impacts on the operation of the Garrison flood control pool.  Provided that the site topography is left at its natural ground elevation after construction and all excess material is hauled off site, the FRFM concluded that there are no flood risk and floodplain management concerns associated with the Proposed Action.  On April 7, 2015 the FRFM provided Dakota Access with a memorandum verifying compliance under EO 1198 and recommending approval of the Proposed Action (Krause, 2015).

### 3.2.5   Levees

Based on a search of the Corps National Levee Database and FEMA FIRM maps, no levees are located within 10 miles of the Lake Oahe or flowage easement crossings (Corps, 2014).  Because no levees are located within 10 miles of either crossing, construction of the Proposed Action is not expected to impact levees.

### 3.3   Vegetation, Agriculture, and Range Resources

Under the "no action" alternative, Dakota Access would not construct the proposed DAPL Project and no impacts on vegetation, agriculture, and range resources would occur.  However, if the objectives of the DAPL Project are to be met under the "no action" alternative, other projects and activities would be required and these projects would result in their own impacts on vegetation, agriculture, and range resources, which would likely be similar to or greater than the DAPL Project.  Impacts associated with a future project developed in response to the "no action" alternative are unknown, while only temporary and minor impacts or insignificant permanent impacts on vegetation, agriculture, and range resources would occur as a result of the Proposed Action, as described in the sections below.

### 3.3.1   Vegetation

#### 3.3.1.1   Affected Environment

Land cover was analyzed for the flowage easements and federal lands and associated Connected Actions based on the 2011 USGS National Land Cover Dataset (NLCD) and was field-verified where access was available.  Land cover on the flowage easements is comprised mostly of cultivated crops, which include corn, sugar beets, alfalfa, soybeans, and spring wheat.  Other present land cover types include developed areas, which are primarily roads, pasture/hay/grassland areas that are interspersed with the cultivated crops, emergent wetlands, woody wetlands, mixed forest and deciduous forest associated with the Missouri River.

USACE_DAPL0071276

Environmental Assessment
Dakota Access Pipeline Project
July 2016

Land cover on the federal lands is comprised of cultivated crops, emergent herbaceous wetlands, grassland/herbaceous, and open water.  Over half of the area of the tracts is characterized as grassland/herbaceous, which primarily occurs on the west side of Lake Oahe.  Cultivated cropland consists mainly of oats and canola on the east side of the Lake.

A description of each land cover type encountered at both crossing areas is provided below.

**Cultivated Crop**

The cultivated cropland community is characterized by land used for the production of annual crops, such as corn and soybeans.  This class includes all land being actively tilled.

**Deciduous Forest**

Deciduous forest typically includes trees that are greater than 16 feet tall.  More than 75% of the tree species in this land cover class shed foliage simultaneously in response to seasonal change.

**Mixed Forest**

Mixed forest are generally areas dominated by trees generally greater than 5 meters tall, and greater than 20% of total vegetation cover.  The vegetation cover within mixed forest typically does not have either deciduous or evergreen species greater than 75% of the total tree cover.

**Developed/Open Space**

The developed/open space community type is dominated by lawn grasses and may include some developed areas and roads.  Impervious surfaces account for less than 20% of the total cover.  This class would typically include minor roads and associated ditches.

**Developed/Low Intensity**

The developed/low intensity community includes areas with a mixture of constructed material and vegetation.  These areas most commonly include single-family housing units.  Developed/low intensity in the Project Area is associated with impervious surfaces of larger roads.

**Emergent Herbaceous Wetland**

Refer to Section 3.2.3, which provides a description of data obtained during delineations of the wetlands that would be impacted by the Proposed Action.

**Woody Wetlands**

Refer to Section 4.2.3, which provides a description of data obtained during delineations of the wetlands that would be impacted by the Proposed Action.

USACE_DAPL0071277

Environmental Assessment
Dakota Access Pipeline Project
July 2016

## Grassland/Herbaceous

The grassland/herbaceous community is dominated by graminoid or herbaceous vegetation.  These areas are not subject to intensive management such as tilling but can be utilized for grazing.

## Pasture/Hay

The pasture/hay community type consists of areas of grasses, legumes, or grass-legume mixtures planted for livestock grazing or the production of seed or hay crops, typically on a perennial cycle.

## Open Water

The open water cover type includes areas of open water.  This land cover type is associated with Lake Oahe and the Missouri River.

### 3.3.1.2   Impacts and Mitigation

Temporary impacts on land cover would occur in essentially all areas within the construction footprint of the Project Area and Connected Actions, the vast majority of which would return to pre-construction land cover upon completion of construction.  One exception is at the flowage easement Project Area in forested areas along the permanent easement Impacts on cultivated crops make up the majority of temporary impacts and would return to cultivated crops post-construction.

**Tables 3-9** and **3-10** show land cover types impacted by construction and maintenance activities.  A description of each category is provided below.

| Table 3-9 Land Cover Impacts on the Flowage Easements Project Area and Connected Action | | | | |
|---|---|---|---|---|
| Land Cover Type | Connected Action-Construction Workspace (acres) | Connected Action-Permanent ROW (acres) | Construction Workspace (acres) [1] | Permanent ROW (acres) |
| Cultivated Crops | 0 | 0 | 47.4 | 13.3 |
| Deciduous Forest | 0.9 | 0.2 | 0 | 0 |
| Developed, Low Intensity | 0 | 0 | 0.4 | 0.4 |
| Developed, Open Space | 0.1 | 0.01 | 1.2 | 0.4 |
| Emergent Herbaceous Wetlands | 0 | 0 | 0.9 | 0.4 |
| Hay/Pasture | 0 | 0 | 6.6 | 1.8 |
| Grassland/Herbaceous | 0.1 | 0 | 1.7 | 0.5 |
| Mixed Forest | 0.2 | 0.03 | 0 | 0 |
| Open Water | 0.7 | 0.1 | 0 | 0 |
| Woody Wetlands | 0 | 0 | 1.4 | 0.8 |
| Total | 2.0 | 0.3 | 59.3 [1] | 17.6 |

[1]  Construction workspace includes permanent ROW.

USACE_DAPL0071278

Environmental Assessment
Dakota Access Pipeline Project
July 2016

Permanent impacts on land cover in the federal lands would be limited to the permanent ROW and involve limited tree removal within the permanent easement.  Impacts on land cover as part of the Connected Action would occur on private lands and include the HDD workspaces, stringing area, and the permanent easements between the HDD workspaces and federal lands.

| | Table 3-10 | | |
|---|---|---|---|
| | Land Cover Impacts on the Federal Lands Project Area and Connected Action | | |
| Land Cover | Connected Action– Construction Workspace (acres) | Connected Action– Permanent ROW (acres) | Federal Lands Permanent ROW (acres) [1] |
| Cultivated Crops | 0.0 | 0.0 | 0.1 |
| Emergent Herbaceous Wetlands | 0.0 | 0.0 | 0.4 |
| Woody Wetlands | 0.2 | 0.0 | 0.0 |
| Grassland/ Herbaceous | 15.3 | 1.1 | 0.6 |
| Total | 15.5 | 1.1 | 1.2 |

[1]  Land cover impacts on federal lands are limited to the maintained 50-foot permanent easement and do not include approximately 6.3 acres of permanent easement over the HDD profile across Lake Oahe.  Land cover within the banks of Lake Oahe (open water, woody wetlands, and emergent herbaceous wetlands) would not be disturbed during construction.

**Measures to Protect Vegetation**

Dakota Access would clear the ROW to the extent necessary to assure suitable access for construction, safe operation, and maintenance of the DAPL Project.  Clearing of herbaceous vegetation during construction is anticipated to result in short-term impacts.  Within areas disturbed by construction in the flowage easements Project Area and Connected Actions, Dakota Access would implement active revegetation measures and rapid colonization by annual and perennial herbaceous species to restore most vegetative cover within the first growing season.  In areas that require permanent revegetation, Dakota Access would utilize an NRCS native seed mix that has been selected for the Proposed Action based on the North Dakota State University Extension Service Publication, *Successful Reclamation of Lands Disturbed by Oil and Gas Development and Infrastructure Construction*.  .  Ground disturbing activities would not occur on Corps fee-owned lands; therefore, reseeding is not anticipated in these areas.  However, if reseeding were to become necessary on Corps fee-owned lands, all activities would be conducted in accordance with applicable Lake Oahe or Garrison Project revegetation guidelines.

In non-agricultural areas, vegetation cleared from ATWS would be allowed to revegetate after construction depending on arrangements with the landowner.  Consequently, significant changes in cover types are not anticipated.  Revegetation would allow wildlife species to return to the area after construction is completed.  Temporary revegetation measures may also be implemented to quickly establish ground cover to minimize the potential for soil erosion and noxious weeds to establish.  A temporary seed mix may be applied in these situations.  Revegetation of trees and shrubs would take

USACE_DAPL0071279

Environmental Assessment
Dakota Access Pipeline Project
July 2016

place in accordance with the North Dakota tree and shrub regulations.  The ECP (**Appendix G**) contains more details regarding temporary revegetation.

After completion of waterbody crossings, Dakota Access would revegetate disturbed stream banks in accordance with the ECP, SWPPP, and requirements of applicable state and federal permits.  When constructing in agricultural areas, up to 1 foot of topsoil (organic layer) would be stripped from the trench line and stockpiled separately from trench spoil to preserve the native seed stock.  The ECP contains additional details regarding topsoil segregation.

At stream approaches, the Contractor would leave a 20-foot buffer of undisturbed herbaceous vegetation on all stream banks during initial clearing, except where grading is needed for bridge installation or where restricted by applicable regulations and/or permit conditions.

### 3.3.2    Invasive and Noxious Weeds

#### 3.3.2.1    Affected Environment

The state of North Dakota has 11 state-listed noxious and invasive weeds ("invasive species").  The species listed are: Russian knapweed (*Acroptilon repens*), absinth wormwood (*Artemisia absinthium*), musk thistle (*Carduus nutans*), diffuse knapweed (*Centaurea diffusa*), yellow toadflax (*Linaria vulgaris*), spotted knapweed (*Centaurea maculosa*), Canada thistle (*Cirsium arvense*), leafy spurge (*Euphorbia esula*), dalmatian toadflax (*Linaria dalmatica*), purple loosestrife (*Lythrum salicaria*), and saltcedar (*Tamarix chinensis*).  These state invasive species are controlled and regulated under North Dakota Law (NDCC § 4.1-47-02) (North Dakota Department of Agriculture, 2014a).

Each county in North Dakota has a County Weed Board, which consists of a regulation committee to manage noxious and invasive weeds.  Each of these county boards is responsible for the addition of county-specific invasive species to the state-listed species.  Additional noxious weeds are listed in McKenzie County including field bindweed (*Convolvulus arvensis*), burdock (*Arctium* sp.), black hendane (*Hyoscyamus niger*), houndstongue (*Cynoglossum officinale*), and yellow starthistle (*Centaurea solstitialis*).  No additional invasive species have been identified for listing in Williams, Morton, and Emmons counties.

#### 3.3.2.2    Environmental Impact and Mitigation

Dakota Access sent notifications to the McKenzie, Williams, Morton, and Emmons counties weed boards describing the Proposed Action and requesting any guidance regarding the known locations of noxious and invasive weeds pertaining to that county.  Dakota Access would work with the county weed boards to ensure the ECP contains relevant and necessary mitigation measures that would be implemented to prevent the spread of noxious weed species during construction and operation of the Proposed Action.

USACE_DAPL0071280

Environmental Assessment
Dakota Access Pipeline Project
July 2016

### 3.3.3    Threatened, Endangered, Candidate, and Proposed Plant Species

#### 3.3.3.1    Affected Environment

There is one federally-listed plant species in North Dakota, the threatened western prairie fringed orchid. This plant species is associated with high quality moist, tall grass prairie.  Most of the orchids in North Dakota are located in the Sheyenne National Grasslands in Ransom and Richland counties in the southeastern corner of the state.  The population at Sheyenne National Grasslands is the largest population left in the world, with over 7,000 orchids (USFWS, 2013a).

North Dakota does not have a state threatened and endangered species program or track plant species that are not federally listed.

#### 3.3.3.2    Impacts and Mitigation

There are no known records of western prairie fringed orchids in the Project Area counties, and no suitable habitat was documented; therefore, no effect on the western prairie fringed orchid is expected as a result of the proposed undertaking.  In the unlikely event that any are observed during construction on federal lands, work would stop and the Corps would be contacted.

### 3.4    Wildlife Resources

Under the "no action" alternative, Dakota Access would not construct the DAPL Project, and no impacts on wildlife resources would occur.  However, if the objectives of the DAPL Project are to be met under the "no action" alternative, other projects and activities would be required and these projects would result in their own impacts on wildlife resources, which would likely be similar to or greater than the DAPL Project. Impacts associated with a future project developed in response to the "no action" alternative are unknown, while only temporary and minor impacts, if any, on wildlife resources would occur as a result of the Proposed Action, as described in the sections below.

### 3.4.1    Recreationally and Economically Important Species and Nongame Wildlife

#### 3.4.1.1    Affected Environment

The Proposed Action region is home to a large number of mammal and bird species.  Big game species that occur in the Proposed Action region include pronghorn and white-tailed deer.  Game birds potentially using the types of wildlife habitat in the Project Area include the ruffed grouse, sharp-tailed grouse, pheasant, woodcock, snipe, and doves.  Furbearers and predators potentially occurring within the Project Area include coyote, beaver, badger, red fox, raccoon, bobcat, fisher, mink, weasel, and muskrat. Potential small mammal species occurring within the habitat types associated with the Project Area include pocket gopher, skunk, and white-tailed jackrabbit.

Waterfowl and shorebird species potentially occurring within the Project Area include mallards, pintails, American wigeon, blue-winged teal, western grebe, California gull, Canada goose, common tern, killdeer, Wilson's phalarope, and lesser yellowlegs.  Numerous songbirds, including the American goldfinch, black-

USACE_DAPL0071281

Environmental Assessment
Dakota Access Pipeline Project
July 2016

capped chickadee, cedar waxwing, clay-colored sparrow, lark bunting, song sparrow, tree swallow, western kingbird, western meadowlark, and yellow warbler can be expected to occur in the Project Area.

Numerous species of reptiles and amphibians may also occur within the Project Area.  Some amphibian species that may be expected to occur in the Project Area include the northern leopard frog, tiger salamander, and western chorus frog.  Reptile species that may be expected to occur within the Project Area include common snapping turtle, western painted turtle, common garter snake, and racer (Hoberg and Gause, 1992).

### 3.4.1.2    Impacts and Mitigation

Temporary impacts on wildlife could occur during construction due to clearing of vegetation and movement of construction equipment along the ROW.  The ROW and ATWS would remain relatively clear of vegetation until restoration is completed.  Most wildlife, including the larger and more mobile animals, would disperse from the Project Area as construction activities approach.  Displaced species may recolonize in adjacent, undisturbed areas, or reestablish in their previously occupied habitats after construction has been completed and suitable habitat is restored.  Some smaller, less mobile wildlife species such as amphibians, reptiles, and small mammals have the potential to be directly impacted during clearing and grading activities, but given the limited extent of the proposed crossing, measurable impacts are not anticipated.  No impacts to treaty fishing and hunting rights are anticipated due to construction within the Project Area or Connected Actions.

Herbaceous cover would be seeded on disturbed upland areas during restoration, and it is expected that pre-existing herbaceous and shrub habitats would quickly reestablish themselves.  Consequently, it is expected that the wildlife species that use these habitats would also return within one growing season of construction completion.  Routine clearing of the permanent easement to improve visibility and remove encroaching trees would be performed in compliance with PHMSA requirements.  The lack of trees reestablishing would be the only potential long-term impact to wildlife that depends on forested communities.  This impact is expected to be negligible, as it only pertains to extremely small portions of the permanent easement and very little forested habitat is present within the Project Area and Connected Actions.

### 3.4.2    Threatened, Endangered, Candidate, and Proposed Wildlife Species

The Endangered Species Act (ESA) directs all federal agencies to work to conserve endangered and threatened species.  Crossing the Corps flowage easements and federal lands triggers the consultation procedures of section 7 of the ESA.  This section serves as the Biological Evaluation or written analysis documenting the Corps' conclusions and the rationale to support those conclusions regarding the effects of the Proposed Action on protected wildlife resources.  The Bald Eagle (*Haliaeetus leucocephalus*) was removed from the federal list of threatened and endangered species on August 9, 2007 and is no longer protected under the ESA.  However, the bald eagle is provided protection under the Bald and Golden Eagle Protection Act (BGEPA) and the Migratory Bird Treaty Act (MBTA), which prohibits disturbance of eagles and other raptors.  In order to ensure compliance with these acts, Dakota Access obtained USFWS and state agency data regarding known eagle nests in the vicinity of the Missouri River and Lake Oahe crossings from the North Dakota Game and Fish Department, who houses the eagle location database.  The Proposed Action and Connected action will be over 1,000 feet from known or historic eagle nesting areas.

58

Environmental Assessment
Dakota Access Pipeline Project
July 2016

Based on the known nest data, there are no eagle nests within the USFWS National Bald Eagle Management Guidelines recommend nest buffers of 660 feet for linear construction activities if the activity will be visible from the nest and 330 feet if the activity will not be visible from the nest (USFWS, 2007).  These guidelines are intended to help the public minimize impacts to bald eagles, particularly where they may constitute "disturbance", which is prohibited by the BGEPA. Given the distance from known eagle nesting areas, and the mitigation of use of the HDD method for both the Missouri and Lake Oahe crossings, the Proposed Action is not anticipated to have any effect on Bald or Golden eagles

### 3.4.2.1   Affected Environment

Nine federally listed species have been identified in Williams, McKenzie, Morton, and Emmons counties.  Designated critical habitat for the piping plover also occurs in each of the four counties.  The USFWS concurred with the Corps effect determinations included below in Section 3.4.2.2 for all listed species within the EA review area.

**Interior Least Tern**

In North Dakota, the interior least tern (*Sterna antillarum*) utilizes sparsely vegetated sandbars on the Missouri River.  Birds nest, raise young, and relax on barren river sandbars.  In North Dakota, the least tern is found mainly on the Missouri River from Garrison Dam south to Lake Oahe and on the Missouri and Yellowstone Rivers upstream of Lake Sakakawea.  Approximately 100 pairs breed in North Dakota during the summer before flying to coastal areas of Central and South American and the Caribbean Islands (USFWS, 2013b).

**Whooping Crane**

Whooping cranes (*Grus Americana*) embark on a bi-annual migration from summer nesting and breeding grounds in Wood Buffalo National Park in northern Alberta to the barrier islands and coastal marshes of the Aransas National Wildlife Refuge on the Gulf Coast of Texas.  Twice yearly in the spring and fall, whooping cranes migrate along the Central Flyway, a migratory corridor approximately 220 miles wide and 2,400 miles in length.  The Central Flyway includes eastern Montana and portions of North Dakota, South Dakota, Nebraska, Kansas, Oklahoma, and eastern Texas (USFWS, 2014a) (**Figure 16**).  During the migration, cranes make numerous stops, roosting for short durations in large shallow marshes, and feeding in harvested grain fields.  Approximately 75% of the whooping crane sightings in North Dakota occur within the Central Flyway.  The primary threats to whooping cranes are power lines, illegal hunting, and habitat loss.

**Black-footed Ferret**

The black-footed ferret (*Mustela nigripes*) is a small member of the Mustelidae family native to North American shortgrass and mixed grass prairie.  Prairie dogs make up approximately 90% of the black-footed ferret diet and as such, the species is associated almost exclusively with large complexes of prairie dog towns (USFWS, 2013c; Black-footed Ferret Recovery Implementation Team [BFFRIT], 2011).  Black-footed ferrets are fossorial, nocturnal predators, spending the majority of their time underground in prairie dog burrows, leaving only to hunt (BIFFRIT, 2011).  Once thought to be extirpated in the wild, captive-born

USACE_DAPL0071283

Environmental Assessment
Dakota Access Pipeline Project
July 2016

individuals have been reintroduced to 21 sites in Wyoming, Montana, South Dakota, Colorado, Utah, Kansas, New Mexico, and Arizona since 1991 (USFWS, 2013c).

**Gray Wolf**

A habitat generalist, the gray wolf (*Canis lupus*) historically occupied most habitat types in North America. They show little preference for one cover type over another and successfully utilize alpine, forest, grassland, shrubland, and woodland habitats across their range (Mech, 1974).  Once thought to require wilderness areas with little to no human disturbance, recent range expansions have demonstrated the species' ability to tolerate higher rates of anthropogenic development than previously thought.  Given abundant prey and low rates of human-caused mortality, wolves can survive in proximity to human-dominated environments (Fuller, 1989).

**Northern Long-eared Bat**

Northern long-eared bats (*Myotis septentrionalis*) occur throughout the eastern and north-central U.S. Eastern populations have declined significantly in recent years as a result of white-nose syndrome (WNS), a contagious fungal infection.  Although historically less common in the western portion of its range than in the northern portion, northern long-eared bats occur throughout North Dakota.  Habitat throughout its range includes caves and abandoned mines during the winter and hardwood or mixed forests for roosting and foraging during the summer (USFWS, 2015).

Northern long-eared bats may roost singly or in colonies in cavities, crevices, hollows, or beneath the bark of live and dead trees and/or snags, regardless of tree species.  They prefer trees with a diameter at breast height of at least 3 inches.  Less frequently, Northern long-eared bats have been observed roosting in man-made structures such as sheds or barns.  Northern long-eared bats primarily forage at dusk on insects in forests, but will occasionally forage over small forest clearings and water (USFWS, 2015).

**Piping Plover**

Piping plovers (*Charadrius melodus*) are shore birds that inhabit areas near water, preferring river sandbars and alkali wetlands in the Great Plains for nesting, foraging, sheltering, brood-rearing, and dispersal.  Piping plovers winter along large coastal sand or mudflats near a sandy beaches throughout the southeastern U.S.  Critical Habitat for the piping plover is designated along the Missouri River system throughout North Dakota (USFWS, 2012).

**Dakota Skipper**

The Dakota skipper (*Hesperia dacotae*) is a small butterfly found in dry-mesic and wet-mesic tallgrass and mesic mixed grass prairie remnants characterized by alkaline and composite soils.  The Dakota skipper is a habitat specialist requiring high-quality prairie habitat (i.e., grasslands or discrete patches of habitat within grasslands that are predominantly native and that have not been tilled).  Only 146 populations are documented in three states and two Canadian provinces (McCabe, 1981; Royer and Marrone, 1992; Cochrane and Delphey, 2002; USFWS, 2011; 2013d).  Remaining populations vary in size and density and for the most part are not influenced by dispersal between populations (McCabe, 1981; Dana, 1991; Dana, 1997; Cochrane and Delphey, 2002).  The species overwinters at the base of grasses in the soil of the site

USACE_DAPL0071284

Environmental Assessment
Dakota Access Pipeline Project
July 2016

which they inhabit.  In North Dakota, the skipper typically occupies both wet-mesic and dry-mesic prairie (Royer and Marrone, 1992; Cochrane and Delphey, 2002).  The current status of the Dakota skipper in the state is considered tenuous, and most populations are considered vulnerable due to their extremely isolated nature.

**Rufa Red Knot**

The rufa red knot (*Calidris canutus rufa*) is a large sandpiper noted for its long-distance migration between summer breeding grounds in the Arctic and wintering areas at high latitudes in the Southern Hemisphere (USFWS, 2014b).  Some rufa red knots wintering in the northwestern Gulf of Mexico migrate through interior North America during both spring and fall and use stopover sites in the Northern Great Plains.  During spring and fall migrations, rufa red knots are typically found in marine habitats along the Pacific and Atlantic coasts of North America, generally preferring sandy coastal habitats at or near tidal inlets or the mouths of bays and estuaries.  However, some migrating rufa red knots use sandbars and sandy shore and beach habitats along large rivers and reservoirs of the interior of North America.  This area contains the Atlantic, Mississippi, and Central Flyways (USFWS, 2014g). The species also heavily relies on exposed substrate at wetland edges for stopover habitat, and the suitability of a wetland for rufa red knots depends on water levels and may vary annually (Gratto-Trevor et al., 2001).

**Pallid Sturgeon**

Pallid sturgeon (*Scaphirhynchus albus*) prefer benthic environments associated with swift waters of large turbid, free-flowing rivers with braided channels, dynamic flow patterns, periodic flooding of terrestrial habitats, and extensive microhabitat diversity.  Pallid sturgeon inhabit the Missouri and Mississippi Rivers from Montana to Louisiana and have been documented in the Missouri River downstream from the Fort Peck Dam in Montana to the headwaters of Lake Sakakawea, North Dakota, and downstream from Garrison Dam, North Dakota to the headwaters of Lake Oahe, South Dakota (USFWS, 2014c).  Pallid sturgeon populations are fragmented by dams on the Missouri River and are very scarce in the Lake Oahe portion of the Missouri River.

### 3.4.2.2    Impacts and Mitigation

Dakota Access conducted pedestrian surveys of the workspace within the Project Area at the flowage easements in September 2014 and July 2015 and at the Lake Oahe crossing in April 2015 to assess suitable habitat for listed species.  Given the limited scope of the Proposed Action, minimization measures, and the implementation of specialized construction techniques, the Corps has determined that the Proposed Action would have no effect on the black-footed ferret, gray wolf, northern long-eared bat, and Dakota skipper within the Project Area.  The Corps also determined that the Proposed Action may affect, but is not likely to adversely affect the interior least tern, whooping crane, piping plover, rufa red knot, and pallid sturgeon in the Project Area.  The effect determination for these species that may be affected, but are not likely to be adversely affected was concurred with in a letter received from the USFWS on May 2, 2016.  A Biological Opinion (BO) associated with other portions of the DAPL Project, outside of the EA review area, was issued by the USFWS on May 31, 2016 but is not applicable to this document.  **Table 3-11** lists the impact determinations of the protected species with potential to occur within the Project Area and Connected Action.  A summary of habitat evaluations and the basis for the determination of impacts for each listed species is provided below.

USACE_DAPL0071285

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 3-11 Federally Listed Species with Potential to Occur within the Project Area and Connected Action | | | | | | |
|---|---|---|---|---|---|---|
| Species | Status | County | | | | Impact Determination |
| | | Williams | McKenzie | Morton | Emmons | |
| Interior Least Tern | Endangered | X | X | X | X | May Affect, Not Likely to Adversely Affect |
| Whooping Crane | Endangered | X | X | X | X | May Affect, Not Likely to Adversely Affect |
| Black-footed Ferret | Endangered | | X | X | | No Effect |
| Gray Wolf | Endangered | X | X | X | | No Effect |
| Northern Long-eared Bat | Threatened | X | X | X | X | No Effect |
| Piping Plover | Threatened | X | X | X | X | May Affect, Not Likely to Adversely Affect |
| Dakota Skipper | Threatened | | X | X | X | No Effect |
| Rufa Red Knot | Threatened | X | X | X | X | May Affect, Not Likely to Adversely Affect |
| Pallid Sturgeon | Endangered | X | X | X | X | May Affect, Not Likely to Adversely Affect |

**Interior Least Tern**

Suitable habitat may exist for interior least terns at the Missouri River and at the Lake Oahe crossing depending on precipitation and seasonal flow variations as exposed sand/gravel bars suitable for nesting may be present. Dakota Access proposes to cross the Missouri River and Lake Oahe utilizing the HDD construction method. Pipeline installation via HDD will avoid in-stream disturbance that would otherwise occur if the pipe was installed via the traditional open-cut method, as described in Section 2.1.4.

Potential sources for indirect impacts on interior least terns include the inadvertent release of non-toxic bentonite mud (used for lubricating the drill path) into the waterbody or nesting habitat and noise associated with the drilling equipment. Dakota Access conducted geotechnical analyses at each of the proposed HDD crossings and designed the HDD to minimize the likelihood that the drilling mud is inadvertently released. While the likelihood of an inadvertent release has been minimized to the maximum extent practicable, were it to occur, implementation of Dakota Access' HDD Contingency Plan (**Appendix B**) would minimize any potential impacts on interior least terns by quickly and efficiently containing and removing the released, non-toxic mud.

Operation of the HDD equipment will result in a temporary increase in noise in the immediate vicinity of the HDD activities. Although the HDD entry and exit sites are located more than 960 feet from any suitable interior least tern habitat, it is possible that the activities would be audible if interior least terns are nesting in the area. However, Atwood et al. (1977) found that noise associated with human activities (an airfield in the case of the referenced study) did not affect site fidelity or nesting success of least terns. Similarly, Hillman et al. (2015) found that noise from military and civilian overflights did not impact nest success and that restricting human disturbance to greater than 50 meters (164 feet) from colony boundaries mitigated

62

USACE_DAPL0071286

Environmental Assessment
Dakota Access Pipeline Project
July 2016

adverse impacts to nesting birds. Noise associated with aircraft overflights at low altitudes in the Hillman et al. (2015) study were a minimum of 67.7 decibels (A-weighted) (dBA), greater than the anticipated sound levels generated by HDD equipment. Noise studies conducted at the proposed HDD entry and exit locations indicate that sound levels would be less than 60 dBA at approximately 600 feet from the equipment. Therefore, noise associated with the HDD crossings of the Missouri River and Lake Oahe may affect, but are not likely to adversely affect interior least terns potentially nesting in the area.

Dakota Access plans to withdrawal water from the Missouri River, which is required for activities associated with the installation of the HDD and the hydrostatic testing of the HDD segment. A temporary waterline would be installed at the Missouri River between the shoreline and the HDD workspace on the flowage easements within the permanent ROW (**Figure 6-B**). The temporary waterline would be laid by hand on top of the surface, and no tracked or wheeled equipment would be necessary for installation or removal of the temporary aboveground waterline. No disturbance of the river banks is anticipated. Additionally, installation and removal of the waterline are anticipated to be complete prior to nesting season; therefore, no impacts on the interior least tern are anticipated to occur at the Missouri River. If the water withdrawal activities are not able to be completed prior to nesting season, Dakota Access would conduct surveys prior to placement of the waterline to confirm the presence/absence of interior least terns within the pipeline ROW. If interior least terns are nesting within the pipeline ROW, Dakota Access would postpone water withdrawal activities and contact the Corps and USFWS. Work would only resume when the USFWS has given permission following a survey to ensure interior least terns would no longer be affected. No water withdrawal from or access to Lake Oahe is required to complete the Lake Oahe crossing.

As discussed in Section 2.3.2 above, Dakota Access would routinely maintain its 30 to 50-foot-wide permanent easement, including periodic mowing and removal of woody vegetation. Because suitable interior least tern nesting habitat is on unvegetated flats within the Missouri River and Lake Oahe, routine maintenance activities would not occur within suitable habitat. During operation of the pipeline, in the unlikely event that a leak or spill were to occur and reach interior least tern habitat, Dakota Access would implement its FRP and strictly adhere to PHMSA regulations.

Based on the avoidance and minimization measures, literature review, field investigations, and habitat types present in the proposed Project Area, USACE has determined that the Proposed Action may affect, but is not likely to adversely affect the interior least tern.

**Whooping Crane**

In North Dakota, whooping cranes are only present during the twice-yearly migration between winter grounds and summer nesting sites. As the whooping crane is a migrant and does not breed in North Dakota, the species cannot be confirmed as present in or absent from the Project Area. The results of the habitat assessment field surveys indicate that the Project Area may contain suitable stopover habitat (i.e., agricultural fields). It is anticipated that whooping cranes would avoid the Project Area during active construction, as they tend to avoid areas with human disturbance (Howe, 1989; USFWS, 1994; Lewis and Slack, 2008). The noise and land disturbance from construction activities during the migration periods would likely cause birds to choose more suitable landing and overnight roosting locations away from construction activities given the abundance of similar habitat throughout the migration corridor in North Dakota and in the general vicinity of the Project Area.

USACE_DAPL0071287

Environmental Assessment
Dakota Access Pipeline Project
July 2016

While there is potential for individuals to land in the Project Area during construction, work would halt if a whooping crane is observed within the Project Area and would not resume until the bird leaves the area. Additionally, Dakota Access would notify the Corps and USFWS of the observation. The presence of construction activities within potentially suitable stopover habitat during migration could disturb whooping cranes in the area or cause flying whooping cranes to avoid the area and select other suitable stopover habitat. Due to the abundance of available stopover habitat along the North Dakota migration corridor and in the vicinity of the Project Area (USFWS, 2009a), impacts would be negligible. As illustrated in **Figure 16**, the Project Area represents a minute fraction of the whooping crane migration corridor in North Dakota.

As discussed in Section 2.3.2 above, Dakota Access would routinely maintain its 30 to 50-foot-wide permanent easement, including periodic mowing and removal of woody vegetation. As whooping cranes utilize open fields and emergent wetlands for stopover habitat, affects from maintenance activities would be minimal and would be similar to those described above during construction activities. If whooping cranes were observed in the area during maintenance activities, maintenance personnel would suspend activities until the cranes leave the area. Similarly, if maintenance activities are ongoing at the time of migration, whooping cranes would likely avoid the disturbance area.

In order for whooping cranes to be affected by a spill or leak during operation, an individual would have to be present when the leak or spill occurred or land in the spill itself. Due to the strict adherence to PHMSA regulations designed to prevent spills and leaks during operation, the short timeframe that whooping cranes are present during migration, and the abundance of available stopover habitat along the migration corridor in North Dakota (USFWS, 2009a), the measures implemented by Dakota Access in the event of a leak in accordance with the FRP, such occurrences are unlikely.

Based on the avoidance and minimization measures, literature review, field investigations, and habitat types present in the Project Area, USACE has determined that the Proposed Action may affect, but is not likely to adversely affect the whooping crane.

**Black-footed Ferret**

No suitable black-footed ferret habitat is present in the Project areas. The black-footed ferret has been recorded in Morton County; however, based on occurrence data received from North Dakota Parks and Recreation, there are no documented occurrences within the vicinity of the Proposed Action. Further, it is believed that black-footed ferrets have been extirpated from North Dakota, and no reintroductions have occurred in the state (USFWS, 2013f; North Dakota Game and Fish Department, 2012). Due to the lack of suitable habitat and the distance of the Project areas from known black-footed ferret occurrences, construction, operation, and maintenance activities associated with the Proposed Action would have no effect on black-footed ferrets.

**Gray Wolf**

The gray wolf is listed as endangered in all three counties of the Proposed Action areas in North Dakota (south and west of the Missouri River upstream to Lake Sakakawea and west of the centerline of Highway 83 from Lake Sakakawea to the Canadian border). Wolves in eastern North Dakota are part of the Great Lakes Distinct Population Segment that was delisted by the USFWS in January 2012 (USFWS, 2014e).

64

Environmental Assessment
Dakota Access Pipeline Project
July 2016

North Dakota does not currently have an established breeding population (North Dakota Department of Agriculture, 2014b).  Observations of wolves are sporadic, and it is believed that these individuals are dispersers from adjacent populations (i.e., from Minnesota and Manitoba) (USFWS, 2006; Licht and Fritts, 1994).  Given the unlikely occurrence and high mobility of this species, construction, operation and maintenance activities associated with the Proposed Action would have no effect on gray wolves.

**Northern Long-eared Bat**

The northern long-eared bat is currently listed by the USFWS as threatened in North Dakota.  On April 2, 2015, the USFWS published the final listing in the Federal Registrar with an effective date of May 4, 2015.  The USFWS listed the northern long-eared bat as threatened and chose to exercise the option of issuing an interim 4(d) rule to allow for more flexible implementation of the ESA and "to tailor prohibitions to those that make the most sense for protecting and managing at-risk species."  In areas outside of the 150-mile WNS buffer zone, incidental take from lawful activities is not prohibited.  The State of North Dakota currently falls outside of the WNS 150-mile buffer zone.  Per the exemptions of the interim 4(d) rule, construction, operation and maintenance activities associated with the Proposed Action would have no effect on the northern long-eared bat (USFWS, 2015).

**Piping Plover**

Due to the similarity in life history and habitat requirements, impacts on piping plovers would be similar to those discussed in above for the interior least tern.  Suitable habitat may exist for piping plover at the Missouri River and at the Lake Oahe crossing, depending on precipitation and seasonal flow variations, as exposed sand/gravel bars suitable for nesting may be present.  These areas are also designated as critical habitat for this species under the ESA.  Dakota Access proposes to cross the Missouri River and Lake Oahe utilizing the HDD construction method.  Pipeline installation via HDD will avoid in-stream disturbance that would otherwise occur if the pipe was installed via the traditional open-cut method, as described in Section 2.1.4.

Potential sources for indirect impacts on piping plovers include the inadvertent release of non-toxic bentonite mud (used for lubricating the drill path) into the waterbody or nesting habitat and noise associated with the drilling equipment.  Dakota Access conducted geotechnical analyses at each of the proposed HDD crossings and designed the HDD to minimize the likelihood that the drilling mud is inadvertently released.  While the likelihood of an inadvertent release has been minimized to the maximum extent practicable, were it to occur, implementation of Dakota Access' HDD Contingency Plan would minimize any potential impacts on piping plovers by quickly and efficiently containing and removing the released, non-toxic mud.

Operation of the HDD equipment will result in a temporary increase in noise in the immediate vicinity of the HDD activities.  Although the HDD entry and exit sites are located more than 960 feet from any suitable piping plover habitat, it is possible that the activities would be audible if piping plovers are nesting in the area.  However, piping plovers are frequently observed nesting in and around active sand and gravel mines and do not appear to be deterred by elevated noise levels associated with the operation of equipment (Marcus et al., 2008; Brown et al., 2013).

USACE_DAPL0071289

Environmental Assessment
Dakota Access Pipeline Project
July 2016

As discussed for the interior least tern above, impacts associated with installation of the temporary waterline at the Missouri River required for activities associated with the installation of the HDD and the hydrostatic testing of the HDD segment would be avoided.  If the water withdrawal activities are not able to be completed prior to nesting season as expected, Dakota Access would conduct surveys prior to placement of the waterline to confirm the presence/absence of piping plovers within the pipeline ROW. If piping plovers are nesting within the pipeline ROW, Dakota Access would postpone water withdrawal activities and contact the USFWS and the Corps.  Work would only resume when the USFWS has given permission following a survey to ensure piping plovers would no longer be affected.  No water withdrawal from or access to Lake Oahe is required to complete the Lake Oahe crossing.

As discussed in Section 2.3.2 above, Dakota Access would routinely maintain its 30 to 50-foot-wide permanent easement, including periodic mowing and removal of woody vegetation.  Because suitable piping plover nesting habitat is on unvegetated flats within the Missouri River and Lake Oahe, routine maintenance activities would not occur in suitable piping plover habitat.  In the unlikely event that a leak or spill occurs and reaches piping plover habitat during operation of the pipeline, Dakota Access would implement its FRP and strictly adhere to PHMSA regulations.

Based on the avoidance and minimization measures, literature review, field investigations, and habitat types present in the Project Area, USACE has determined that the Proposed Action may affect, but is not likely to adversely affect the piping plover.

**Dakota Skipper**

There is no suitable Dakota skipper habitat within the Project Area based on species occurrence and grassland analysis.  As such, construction, operation and maintenance activities associated with the Proposed Action would have no effect on this species.

**Rufa Red Knot**

Rufa red knots do not nest in the Project Area and only occur as an occasional migrant.  During spring and fall migrations, the rufa red knot has the potential to occur in North Dakota.  Migrating rufa red knot would likely only occur at migratory stopover habitat (suitable shoreline and sandy beach habitat along major rivers, streams, waterbodies, and wetlands) for a brief amount of time (24 hours or less).  The results of the habitat assessment field surveys indicate that potentially suitable stopover habitat (sandbar and beach habitats) for migrating rufa red knots is present at the Lake Oahe crossing.  Lake Oahe would be crossed using the HDD construction method, and thus would avoid direct impacts on potentially suitable rufa red knot stopover habitat.  While direct impacts to the rufa red knot migratory habitat would be avoided through the HDD construction method at Lake Oahe, indirect impacts could occur due to potential disturbance during construction (i.e., noise or an inadvertent release of non-toxic drilling mud).

During construction, noise associated with the HDD may act as deterrent to rufa red knots potentially migrating through the area.  These individuals may have to travel to other suitable stopover habitat in the area (e.g., upstream or downstream of the Proposed Action area).  Similarly, if an inadvertent release of non-toxic drilling mud were to occur when rufa red knots were present, it could cause individuals to relocate to nearby habitat.

USACE_DAPL0071290

As discussed in Section 2.3.2 above, Dakota Access would routinely maintain its 30 to 50-foot-wide permanent easement, including periodic mowing and removal of woody vegetation.  As rufa red knots utilize suitable shoreline and sandy beach habitat along major rivers, streams, waterbodies, and wetlands for stopover habitat, effects from maintenance activities would be negligible and would be similar to those described above during construction activities.   If rufa red knots were present in the area during maintenance activities they would likely relocate to nearby suitable habitat.  Similarly, if maintenance activities are ongoing at the time of migration, rufa red knots would likely avoid the disturbance area.

In order for rufa red knots to be affected by a spill or leak during operation, an individual would have to be present when the leak or spill occurred or stop on the spill or leak.  Due to the strict adherence to PHMSA regulations designed to prevent spills and leaks during operation and the short timeframe that rufa red knots are present during migration, such occurrences are unlikely.

Based on the avoidance and minimization measures, literature review, field investigations, and habitat types present in the Project Area, USACE has determined that the Proposed Action may affect, but is not likely to adversely affect the rufa red knot.

**Pallid Sturgeon**

Suitable habitat for the pallid sturgeon occurs at the Missouri River and Lake Oahe crossings.  Impacts on suitable habitat would be avoided by crossing these waterbodies via HDD.  As discussed in for the interior least tern above, pipeline installation via HDD will avoid in-stream disturbance that would otherwise occur if the pipe was installed via the traditional open-cut method.

Dakota Access has also minimized the potential for pallid sturgeon to be indirectly affected by the HDD installation across the Missouri River and Lake Oahe.  The only potential source for indirect impacts on pallid sturgeon associated with the HDDs is an inadvertent release of non-toxic bentonite mud (used for lubricating the drill path) into the waterbody.  Dakota Access conducted geotechnical analyses at each of the proposed HDD crossings and designed the HDD to minimize the likelihood that the drilling mud is inadvertently released.   While the likelihood of an inadvertent release has been minimized to the maximum extent practicable, were it to occur, implementation of Dakota Access' HDD Contingency Plan would minimize any potential impacts on pallid sturgeon by quickly and efficiently containing and removing the released, non-toxic mud.

Dakota Access plans to withdraw water from the Missouri River for installation activities and hydrostatic testing of the HDD segment for the Missouri River.  However, potential impacts on the pallid sturgeon or suitable habitat present within the Missouri River would be avoided by implementing the conditions for permitted intake structures outlined in the Corps' Regional Conditions for North Dakota applicable to NWP 12 Utility Line Activities (Corps, 2012) (see Section 3.2.1.2) and as described in the USFWS Recovery Plan for the Pallid Sturgeon (USFWS, 2014f).  No water withdrawal from or access to Lake Oahe is required to complete the Lake Oahe crossing.  The HDD construction method, application of the HDD Contingency Plan, and implementation of the Corps' conditions for the intake structure within the Missouri River would avoid and minimize potential impacts to the pallid sturgeon.

Maintenance activities will not occur within the Missouri River or Lake Oahe; therefore, no impacts on pallid sturgeon would occur.  The depth of the pipeline below the respective rivers and the design and

USACE_DAPL0071291

Environmental Assessment
Dakota Access Pipeline Project
July 2016

operation measures that meet or exceed the respective PHMSA regulations make a release into either waterbody extremely unlikely.  However, in the unlikely event a leak or spill was to occur and reach the Missouri River or Lake Oahe, impacts would be localized.  If pallid sturgeon were present in the area where the spill or leak occurred, they would likely relocate outside of the contaminated area.  Further, oil floats and, as pallid sturgeon are bottom dwellers primarily inhabiting the lower water column (USFWS, 2014c), impacts on pallid sturgeon in the event of a spill, would be minimal.

Based on the avoidance and minimization measures, literature review, field investigations, and habitat types present in the Project Area, USACE has determined that the Proposed Action may affect, but is not likely to adversely affect the pallid sturgeon.

## 3.5    Aquatic Resources

Under the "no action" alternative, Dakota Access would not construct the DAPL Project, and no impacts on aquatic resources would occur.  However, if the objectives of the DAPL Project are to be met under the "no action" alternative, other projects and activities would be required and these projects would result in their own impacts on aquatic resources, which would likely be similar to or greater than the proposed DAPL Project.   Impacts associated with a future project developed in response to the "no action" alternative are unknown, while only temporary and minor impacts, if any, on aquatic resources would occur as a result of the Proposed Action, as described in the sections below.

### 3.5.1    Habitat and Communities

#### 3.5.1.1    Affected Environment

West of Williston, the Missouri River is a braided channel varying in width from 800 feet to over 1,500 feet, with sand bars in many locations.  The Yellowstone River confluence with the Missouri River is approximately 20 miles west of Williston and 3.5 river miles upstream from the proposed Missouri crossing.  East of Williston, the Missouri River feeds into Lake Sakakawea, the third largest man-made lake in the U.S. formed by the Garrison Dam, several hundred miles downstream.  This portion of the Missouri River is home to several fish species, including cutthroat trout, rainbow trout, brown trout, walleye, northern, and sauger.  Amphibians are found along the shores and nearby riparian areas of the Missouri River.  Common species found near the Missouri River crossing include Woodhouse's toad, the northern leopard frog, and western chorus frog (Hoberg and Gause, 1992).

Lake Oahe is a 232-mile-long reservoir that extends upriver from the Oahe Dam on the Missouri River from Pierre, South Dakota, to Bismarck, North Dakota.  Approximately three-quarters of a mile south of the proposed pipeline crossing is the confluence of the Cannonball River into the Missouri.  This portion of the Missouri River is home to several fish species, including walleye, northern pike, and channel catfish.  Amphibians are found along the shores and nearby riparian areas of Missouri River.  Common species found near the Lake Oahe crossing include the Great Plains toad, Woodhouse's toad, northern leopard frog, and tiger salamander (Hoberg and Gause, 1992).

USACE_DAPL0071292

Environmental Assessment
Dakota Access Pipeline Project
July 2016


### 3.5.1.2   Impacts and Mitigation

The Missouri River, including Lake Oahe, is the only waterbody that would be crossed by the Proposed Action with aquatic resources that have potential to be impacted by the Proposed Action.

All subsurface disturbing activities would be set back from the banks of Lake Oahe at the HDD entry point. This provides a buffer of undisturbed land between active construction and the Lake. There is potential, although very low due to setbacks of approximately 1,100 feet on the west bank and 900 feet on the east bank, for sediment to be transported from the workspace into the river during precipitation events, which could increase the local turbidity and sediment load in the lake. These increased loads have potential to temporarily affect sensitive fish eggs, fish fry, and invertebrates inhabiting the river. However, sediment levels would quickly attenuate both over time and distance and would not adversely affect resident fish populations or permanently alter existing habitat. By also implementing the erosion and sediment control measures specified in the ECP (**Appendix G**) and SWPPP (**Appendix A**), the potential for sediment transport is likely avoided or minimized. Following construction, the ROW would be restored, revegetated, maintained in an herbaceous or scrub-shrub state, and monitored in accordance with applicable regulations and permit conditions.

A successfully completed HDD crossing would minimize environmental impacts on Lake Oahe since the pipeline would be installed without disturbing the aquatic and benthic environments. However, crossings via HDD carry a low risk of an inadvertent release of drilling mud, composed primarily of bentonite (a naturally occurring fine clay) slurry. Increased levels of sedimentation and turbidity from an inadvertent release could adversely affect fish eggs, juvenile fish survival, benthic community diversity and health, and spawning habitat. Dakota Access' HDD Construction/Contingency Plan (**Appendix B**) establishes monitoring procedures and prescribes measures to be implemented to minimize the impact in the event it occurs. All HDD operations conducted for crossing the Lake Oahe would adhere to the HDD Contingency Plan and applicable permit conditions to reduce the likelihood of an inadvertent release to minimize and mitigate environmental impacts. Dakota Access' construction contractor would ensure that the appropriate response personnel and containment equipment are available onsite to effectively implement the HDD Contingency Plan.

In addition to the crossing of Lake Oahe, aquatic resources could also be impacted during water withdrawal from the Missouri River, which is required for activities associated with the installation of HDD and the hydrostatic testing of HDD pipeline segment located on the flowage easements. However, water withdrawal activities would be conducted in accordance with all applicable permit conditions and regulations and in a manner that would not reduce water flow to a point that would impair flow or impact aquatic life. Intake screens and floats would also be utilized, as previously discussed in Section 3.2.1.2, to prevent entrainment of aquatic life and avoid impacts on aquatic resources. In addition, by placing the pump within a secondary containment structure on the barge, the potential for impacts on aquatic resources associated with accidental fuel spills or leaks is likely avoided or minimized.

The primary issue related to impacts on the aquatic environment from operation of the Proposed Action would be related to a release from the pipeline. For portions of the pipeline installed beneath the lake, the depth of the pipeline profile, increased wall thickness of the pipe, installation of remotely operated valves on both sides of the river crossing, and monitoring of the system 24/7 would further limit the potential for an inadvertent release into the waterbody. As a result, operations activities are not

69

USACE_DAPL0071293

Environmental Assessment
Dakota Access Pipeline Project
July 2016

anticipated to impact aquatic resources or their habitat.  Adherence to the Dakota Access FRP would minimize potential impacts on aquatic wildlife from potential spills during the operation of the pipeline. In the event of a leak, Dakota Access would work aggressively to contain the leak, initiate cleanup activities, and contact the appropriate authorities, including the Corps.   The FRP is discussed under Section 3.2.1.2 and a draft of the FRP is included in Appendix L.

## 3.6     Land Use and Recreation

Under the "no action" alternative, Dakota Access would not construct the DAPL Project, and no impacts on land use and recreation would occur.  However, if the objectives of the DAPL Project are to be met under the "no action" alternative, other projects and activities would be required and these projects would result in their own impacts on land use and recreation, which would likely be similar to or greater than the DAPL Project.  The impacts associated with a future project developed in response to the "no action" alternative are unknown, while only temporary and minor impacts or insignificant permanent impacts on land use and recreation would occur as a result of the Proposed Action, as described in the sections below.

### 3.6.1     Land Ownership

The proposed 24-inch pipeline would cross seven contiguous Corps flowage easements over eight privately-owned parcels (**Figure 2**) that are associated with the Buford-Trenton-Irrigation District (Garrison Dam).  Based upon Corps-provided easement documents and mapping, the distance across the flowage easements on the north side of the Missouri River in Williams County is approximately 14,953 feet (2.83 miles).

The flowage easements allow the Government to flood and saturate the land, surface, and subsurface of these properties.  Generally, these easements prohibit the construction of structures for human habitation; provide that any other structures require written approval by the Corps; and provide that no mineral exploration, excavation or placement of fill material may occur on the easement area without the prior approval of the Corps.

The proposed pipeline route would also cross federal lands on the east and west banks of Lake Oahe in Morton and Emmons counties.  The distance from the western boundary of federally-owned lands to the eastern boundary of federally-owned lands on both sides of the lake, including the width of the lake, at the proposed crossing location is approximately 6,450 feet.  The proposed pipeline would be routed to parallel existing linear infrastructure (an overhead power line and a buried gas transmission pipeline) across Lake Oahe in the same area.  The HDD entry and exit points, measuring approximately 200 by 250 feet, would be located on private lands, as would the stringing corridor required to facilitate the installation.  The northern boundary of the Standing Rock Sioux Reservation is located approximately 0.55 mile south of the Lake Oahe Project Area.

Dakota Access is securing a 50-foot-wide permanent easement that is generally centered on the pipeline (25 feet on either side of the centerline).  Within the 50-foot-wide easement, a 30-foot corridor free of large woody vegetation, located within flowage easement LL3440E on the north bank of the Missouri River, would be required to allow for a clear line of sight once construction is completed to perform visual inspections during operation of the pipeline.  The corridor would be maintained in a vegetative state.

USACE_DAPL0071294

Environmental Assessment
Dakota Access Pipeline Project
July 2016

### 3.6.2   Land Use

#### 3.6.2.1   Affected Environment

Land use within the Project Area was assigned a classification based on the principal land characteristic in a given area.   Aerial photography, the National Land Cover Database (Multi-Resolution Land Characteristics Consortium, 2011), the Morton County Zoning Map (Morton County, 2014), and the Williams County Comprehensive Plan were used to identify and classify general land use for the Project Area (**Figures 10** and **11**).

**Agricultural Land**

Agriculture is the primary land use within the Project Area.  These lands are primarily used for ranching and cultivating crops.  Agricultural lands allows for land uses such as farming, ranching, animal feeding operations, grain storage, and related functions.  Agricultural land within the flowage easements are primarily pivot irrigated cropland (i.e., areas used for production of annual crops such as corn and soybeans).

**Developed Land**

Developed land includes open space around structures such as homes, farmsteads, outbuildings, well sites, and areas associated with roads and ditches.

**Open Space**

Open space includes all land that is not agriculture or developed; namely wetlands, open water, grasslands, and scrub-shrub.  Open space is found primarily along the river banks.  See sections 3.2 and 3.3 for a discussion on water resources and vegetation.

#### 3.6.2.2   Impacts and Mitigation

The Proposed Action would result primarily in temporary, short-term impacts on land use during construction.  Construction activities would require the temporary and short-term removal of existing agricultural land from crop and forage production within the construction footprint.  During construction, temporary impacts such as soil compaction and crop damage are possible along the construction ROW. Mitigation measures to minimize impacts such as topsoil segregation and decompaction practices would be fully implemented in accordance with the ECP and SWPPP.  Upon the completion of construction activities, the Project Area would be restored and returned to pre-construction land use.

As mentioned above, much of the cropland within the Corps flowage easements uses pivot irrigation systems.  Dakota Access would coordinate with all landowners on acceptable methods for construction and restoration, including potential impacts to irrigated fields.  Compensatory damages would be paid accordingly.

The nearest residence to the Proposed Action on the flowage easements is approximately 1,750 feet east of the pipe centerline.  Temporary impacts on nearby residences could include inconvenience caused by

USACE_DAPL0071295

Environmental Assessment
Dakota Access Pipeline Project
July 2016

noise and dust generated from construction equipment and traffic congestion associated with the transport of equipment, materials, and construction workers.  Impacts from noise and dust during construction would diminish with distance from these areas and would be limited to the time of construction which would typically occur during daylight hours.

The primary impact on family farms would be the loss of standing crops and use of the land within the work area for the seasons during which DAPL Project-related activities occur, as well as potential diminished yields for a few years following construction.  Dakota Access proposes to implement mitigation measures to minimize these potential impacts as described in the ECP.  Dakota Access would repair surface drains and drainage tiles disturbed during ROW preparation, construction, and maintenance activities.  Dakota Access would repair or replace fences and gates removed or damaged as a result of ROW preparation, construction, or maintenance activities.

At Lake Oahe, primary impact on ranching operations would be temporary prohibition of livestock grazing in the construction ROW, workspace areas, and restrictions on livestock movement across the construction ROW and workspace areas during construction.  Given the narrow, linear nature of the DAPL Project and the alignment of the pipeline along property boundaries, livestock grazing reductions and livestock movement restrictions would be minor.  Long-term or permanent impacts on family ranches are not anticipated.  Following construction and restoration, the work area would be restored and ranching would be allowed to continue over the operational ROW.  Landowners would be compensated for temporary loss of land and lower yields.  Grazing activities would return to normal after Revegetation of the disturbed areas.

Once in operation, a permanent 50-foot ROW would be maintained except at segments of the ROW above the HDD profile on the flowage easements (between the HDD workspace and the river shore) that would be maintained by clearing woody vegetation over a 30 foot corridor (a 50 foot easement would still be obtained).  Maintenance would include the removal of any large trees and shrubs; agricultural land use would not be impacted by maintenance activities in this area.  Trees outside of the ROW would be protected by Dakota Access in a manner compatible with the safe operation, maintenance, and inspection of the pipeline.  Applicable regulations would be adhered to regarding tree and shrub removal from along the route.  Field surveys have confirmed that no shelter belts would be impacted within the Project Area or Connected Actions.

Tables 3-12 and 3-13 below detail the acreage of land use impacts associated with the Proposed Action.

| Table 3-12 | | |
|---|---|---|
| Land Use Impacts on the Flowage Easements Project Area and Connected Action | | |
| Land Use | Construction Workspace (acres) [1] | Permanent ROW (acres) [2] |
| Agricultural Land | 54.0 | 15.1 |
| Developed | 1.6 | 0.8 |
| Open Space | 6.0 | 2.0 |
| Total | 61.3 | 17.9 |

[1]  Construction Workspace includes the permanent ROW.
[2]  Permanent ROW includes the 50-foot permanent easement and the 30-foot maintenance easement.

72

USACE_DAPL0071296

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 3-13 Land Use Impacts on the Federal Lands Project Area and Connected Action | | | |
|---|---|---|---|
| Land Use | Construction Workspace (acres) | Connected Action - Permanent ROW (acres) | Federal Lands - Permanent ROW (acres)[1] |
| Agricultural Land | 0.0 | 0.0 | 0.1 |
| Open Space | 15.5 | 1.1 | 1.0 |
| Total | 15.5 | 1.1 | 1.2 |

[1] Land Use Impacts on federal lands are limited to the maintained 50 foot permanent easement and do not include approximately 6.3 acres of permanent easement beneath the HDD profile within the banks of Lake Oahe.

Dakota Access would obtain and comply with applicable state regulations, county permits, and zoning and land use regulations. Permits may include, but are not limited to, grade and fill permits, ditch crossing permits, road and utility permits, and conditional use permits. Dakota Access would retain one or more EIs to monitor compliance with environmental conditions of county permits.

### 3.6.3    Recreation and Special Interest Areas

#### 3.6.3.1    Affected Environment

Generally, recreation and special interest areas include federal, state, or county parks and forests; conservation lands; wildlife habitat management areas; hunter management areas; natural landmarks; scenic byways; designated trails; recreational rivers; and campgrounds. Nearby recreational opportunities in the vicinity of the Project Area and the Connected Action include Wildlife Management Areas (WMAs), Lake Oahe, and the Missouri River, none of which are being impacted by the construction, although the HDD would cross under Lake Oahe itself.

The Missouri River and its shoreline are open to the public and used for recreational activities such as boating, swimming, and fishing. Because the flowage easements are federally regulated and privately owned, there is very limited, if any, recreational opportunities within the flowage easements. Additionally, there is little boating and open water angling on the entire upper end of Lake Sakakawea because of lack of access and extremely turbid water throughout much of the recreational season (USACE, 2007).

Lake Oahe's 2,250 mile shoreline is open to the public and offers a variety of opportunities to outdoor recreationists such as fishing, swimming, sightseeing, camping, and picnicking. More than 1.5 million visitors enjoy Lake Oahe's recreation facilities each year. Fishing is the major recreational activity of visitors to the Oahe project, with 44% of visitors engaging in this activity (USACE, 2010c).

There are no public boat access sites, marinas, or public swimming beaches within one mile of the flowage easements or federal lands crossings. There are no designated state parks or recreation areas, historic

USACE_DAPL0071297

Environmental Assessment
Dakota Access Pipeline Project
July 2016

trails, scenic by-ways, designated wilderness or natural areas or other sensitive land uses that would be affected by the crossings (North Dakota Parks and Recreation Department, 2014).

At the flowage easement crossing, the closest Nationwide Rivers Inventory (NRI) segment is a one mile stretch of the Missouri River within the Fort Union Trading Post National Historic Site, which is about 9.2 river miles upstream from the crossing.  At the federal lands crossing, the closest NRI segment is Square Butte Creek to the Oliver/Mercer County Line, which is about 50 river miles upstream from the Project Area (National Park Service, 2009).

North Dakota has approximately 54,373 miles of river, but no designated wild & scenic rivers (USFWS et al., 2014).

**Wildlife Management Areas**

The North Dakota Game and Fish Department manages the Trenton and Overlook WMAs; neither of which are crossed by the Proposed Action.  The Trenton WMA encompasses 2,647 acres and is located southwest of Williston near Trenton, along the Missouri River and Lake Sakakawea.  About 13.55 acres of the Trenton WMA extends into the eastern portion of flowage easement LL3440E (**Figure 6**) but the closest edge is approximately 800 feet from the HDD workspace.  This area is largely primitive and the landscape has been allowed to develop naturally.  The WMA provides recreational opportunities for fishing and hunting waterfowl, deer, and pheasants.  The Overlook WMA encompasses 32 acres and is located 6.5 miles north of Cartwright, about 1,430 feet west of the HDD entry point in McKenzie County. The Overlook WMA is only accessible by boat and is used for hunting deer.

The Oahe WMA is located along Missouri River and Oahe Reservoir, about 17 miles south of Bismarck (USGS, 2014b).  The proposed pipeline at the Lake Oahe crossing is about 14.5 miles south of the Oahe WMA.

**Water Quality and Recreation**

Section 303(d) of the CWA requires states to submit their lists of water quality limited waterbodies.  This list has become known as the "TMDL list" or "Section 303(d) list." A TMDL is the amount of a particular pollutant a stream, lake, estuary, or other waterbody can "handle" without violating State water quality standards.  The final 2014 Section 303(d) list, which was submitted to Environmental Protection Agency (EPA) as part of the integrated Section 305(b) water quality assessment report and Section 303(d) TMDL list, includes a list of waterbodies not meeting water quality standards and those for which a TMDL is needed.

Lake Sakakawea is on the 2014 Section 303(d) list of impaired waters as not supporting fish consumption because of high levels of methyl-mercury; however, Lake Sakakawea would not be crossed or otherwise impacted as a result of the Proposed Action on the flowage easements.  Lake Oahe is not listed as needing a TMDL and fully supports recreational use (North Dakota Department of Health, 2015).  Because Lake Oahe already meets the state water quality standards, the Proposed and Connected Action Areas are not anticipated to result in impacts that would cause an impairment of water quality or the designated use of Lake Oahe.

USACE_DAPL0071298

Environmental Assessment
Dakota Access Pipeline Project
July 2016

**Wilderness Areas**

The Wilderness Act of 1964 defines wilderness as lands that may contain ecological, geological, scientific, educational, scenic or historical value.  There are three designated wilderness areas within North Dakota: Chase Lake, Lostwood, and Theodore Roosevelt Wilderness Areas.  There are no designated wilderness areas, and no designated Nature Preserves or Natural Areas within one mile of either crossing (Wilderness Institute, 2014).

**Standing Rock Sioux Reservation**

The Standing Rock Sioux Reservation is situated at the border of South Dakota and North Dakota, approximately 0.55 miles south of the Lake Oahe Project Area.  The Cannon Ball River is located along the northern border of the Standing Rock Sioux Reservation in Sioux County, North Dakota.  The western border of the reservation ends at the Perkins County, South Dakota and Adams County, North Dakota lines, while the Missouri River is the eastern border of the reservation.  The southern border of the reservation is located within Dewey and Ziebach counties in South Dakota.  The total land area of the Standing Rock Sioux Reservation is 2.3 million acres and of that, 1,408,061 million is tribally owned.  The Standing Rock Sioux Tribal members are descendants of the Teton and Yankton Bands of the Lakota/Dakota Nations (Standing Rock Sioux Tribe, 2016).  Some of the many attractions within the reservation include Sitting Bull Grave Site, Standing Rock Monument, Fort Manuel, Lewis and Clark Legacy Trail, and the Standing Rock Tribal Office (Standing Rock Tourism, 2016).  The terrain of the reservation consists of river valleys, lakes, woodlands, prairies, and rolling hills.  Big game on the reservation includes white tail deer, mule deer and antelope, while small game includes jackrabbit, cottontail, and squirrel (Standing Rock Sioux Tribe and Standing Rock Sioux Tribe Game & Fish Department, 2016).

### 3.6.3.2   Impacts and Mitigation

The recreational enjoyment of wildlife (such as hunting or bird watching) may be temporarily affected by construction activities, depending on season and location.  However, this effect would be short-term.

Recreationists may observe ROW clearing along the river banks.  Because the pipeline would cross underneath the river via the HDD method, there would be no disruption to the course or cross-current of the river, and would not impact lake/river recreationists.

## 3.7      Cultural and Historic Resources and Native American Consultations

Section 106 of the National Historic Preservation Act of 1966 (NHPA), as amended, and implemented by 36 CFR Part 800, requires Federal lead agencies to assess the effects of permitted actions on historic properties.  Historic properties are defined in the NHPA as prehistoric and historic archaeological sites, standing structures, or other historic resources listed in, or eligible for listing in the National Register of Historic Places (NRHP).

Under the "no action" alternative, Dakota Access would not construct the DAPL Project and no impacts on cultural and historic resources would occur.  However, If the objectives of the DAPL Project are to be met under the "no action" alternative, other projects and activities would be required and these projects could result in their own impacts on cultural and historic resources, which would likely be similar to or

75

Environmental Assessment
Dakota Access Pipeline Project
July 2016

greater than the DAPL Project.  The "no action" alternative would likely result in an increase in truck and rail traffic that could have an adverse effect on cultural, historic and Native American resources. Furthermore, impacts to resources associated with these methods may not be identified and evaluated because the protections afforded under Section 106 of the NHPA would not apply unless a federal permit were to be required.

## 3.7.1    Cultural Resources Studies

The scope of the cultural resource analysis was designed to be commensurate with the Proposed Action. The Proposed Action is to authorize the crossing of federal flowage easements near the upper end of Lake Sakakawea north of the Missouri River in Williams County, North Dakota and federally owned lands at Lake Oahe in Morton and Emmons counties, North Dakota.

The cultural resource information for the Project Area, and for areas in the vicinity of the Proposed Action (to provide context) was obtained through a combination of cultural resources investigations commissioned by Dakota Access on private lands within a 400-foot-wide linear corridor as defined by the DAPL centerline and previous cultural investigations conducted on private lands adjacent to the Proposed Action area, and previous cultural investigations conducted on federal lands.   New cultural resources investigations were not conducted on federal lands as part of the Proposed Action, as no impacts are anticipated to occur on federal lands.

Based on data compiled from previously executed archaeological investigations, it is recognized that much of the region has been inhabited by human populations for approximately 12,000 years.  Throughout much of the state the recorded prehistoric occupations range from Paleoindian Period encampments to Late Prehistoric Period sites.  Multiple sites have been explored that suggest the area was inhabited by societies adapted for lifestyles on the Plains and in the various geographical regions of the state dating back to 6000 BC.  The current Project Area has a moderate to high probability for archaeological deposits based on proximity to permanent water sources, topography, lack of significant ground disturbances, and depositional processes.

### 3.7.1.1    Affected Environment

**Flowage Easements, Williams County, North Dakota**

The Missouri River is a large perennial river that serves as the border between Williams and McKenzie counties, North Dakota.  The flowage easements consist of a series of expansive agricultural fields located on the northern side of the River.  While the individual tracts are privately owned, the USACE maintains easement rights across these tracts to facilitate floodwater control throughout the region.  The DAPL Project proposes to traverse certain sections of these easements, and install the pipeline via HDD under the Missouri River.  As these tracts are federally managed, cultural resources investigations were conducted in accordance with Section 106 of the NHPA, and in compliance with the North Dakota State Historic Preservation Office (NDSHPO) Guidelines Manual for Cultural Resources Inventory Projects (SHSND, 2012).  Specifically, the cultural resources investigations were confined to a 400-foot-wide linear corridor (*survey corridor*), as defined by the DAPL centerline.  Prior to field investigations, a Class I literature and records search was conducted within an expanded *study area corridor*, which extended for a mile on either side of the DAPL centerline.  The Class I literature review determined that the DAPL survey

USACE_DAPL0071300

Environmental Assessment
Dakota Access Pipeline Project
July 2016

corridor traverses one previously recorded site (32WI1367), and that portions of the DAPL survey corridor have been subject to previous surveys (Larson et al. 1987). Site 32WI1367, also known as the Buford-Trenton Irrigation System (BTIS), is a National Register nominated cultural resource consisting of a pumping plant, main canal, and associated irrigation components. The BTIS construction began in 1940 and continued through the 1950's managed by the Department of Interior, Work Progress Administration, and the Farm Security Administration. The DAPL survey corridor traverses one of the extant irrigation canals listed as a contributing element of the BTIS in the northeastern corner of Section 30 of Township 152 North, Range 103 West.

The Class II/III inventory investigations within the DAPL survey corridor across the flowage easements consisted of a combination of pedestrian surveys and shovel probing. Archaeologists walked along fixed transects spaced 30 m (98 ft.) apart within the survey corridor, and systematically excavated shovel probes across high probability settings, or in areas with low surface visibility. The Class II/III investigations resulted in the revisit of the portion of Site 32WI1367 within the survey corridor, and the documentation of a new prehistoric site (32MZ2874) located on the southern banks of the Missouri River (Appendix I). The assessment of site 32WI1367 consisted of mapping and documentation of the canal feature. No artifacts, evidence of features, or other undocumented components were noted. Dakota Access has designed an HDD to install the pipeline below this canal feature. Additionally, the HDD workspace would be off-set a sufficient distance to ensure that no components or associated features of this canal would be adversely impacted.

As site 32MZ2874 is located on the southern banks of the Missouri River, it is not located on USACE-managed flowage easement tracts. However, the site is referenced herein given its proximity to the workspace associated with HDD of the Missouri River. Site 32MZ2874 is a small prehistoric artifact scatter that is recommended as unevaluated for listing in the NRHP pending further testing investigations. The HDD workspace on the southern banks of the Missouri River has been designed to avoid impacting this site and is situated beyond the mapped site boundary. Exclusionary fencing would be installed along the eastern border of the HDD workspace during drilling activities to prevent inadvertent impacts or trespassing.

**Federal Lands – Lake Oahe Crossing: Morton and Emmons Counties, North Dakota**

The proposed crossing of federally-owned tracts at Lake Oahe is located in Section 10, Township 134 North, Range 79 West in Morton County, North Dakota, and Section 11, Township 134 North, Range 79 West in Emmons County, North Dakota (see **Figure 3**). Dakota Access proposes to install the pipeline via HDD below Lake Oahe, and the HDD entry and exit point workspaces and stringing area would be located on private land beyond the boundary of the federal lands. While no activities associated with the Proposed Action will occur on the surface of federal lands, the HDD entry and exit point workspaces and stringing areas are considered Connected Actions, and as such were subject to cultural resources investigations in accordance with Section 106 of the NHPA, and in compliance with the NDSHPO Guidelines (SHSND, 2012). No new cultural resources investigations of any kind were conducted on federal lands in association with the DAPL project as no impacts are anticipated to occur between the HDD workspaces on either side of Lake Oahe. However, previous cultural resource surveys of USACE managed lands are cited in the report; Dakota Access Pipeline Project, Class II/III Cultural Resources Inventory of the Crossings of Flowage Easements and Federal Lands. Prepared collaboratively for Dakota Access, LLC in March of 2016 (Landt and McCord 2016). This report is contained in Appendix I.

77

Environmental Assessment
Dakota Access Pipeline Project
July 2016

Prior to field investigations, a Class I literature and records search was conducted within an expanded study area corridor, which extended for a mile on either side of the DAPL centerline. The Class I literature review determined that no previously recorded sites are located on the private lands within the Connected Action areas (i.e., HDD workspaces and stringing area). A total of 43 previously recorded cultural resources are located within the study area corridor. Of these, 18 are located in Morton County and the remaining 25 are located in Emmons County. These consist of isolated finds and site leads (i.e., resources reported to the SHSND without field verification), prehistoric artifact scatters, and historic resources. A total of 10 of the previously recorded sites within the study area corridor are located on federal lands directly adjacent to the banks of Lake Oahe and the Cannonball River. Specifically, seven of these sites (32MO0001, 32MOx0004, 32MO0054, 32MO0060, 32MO0061, 32MO0064, and 32MO0259) are located in Morton County, on the western side of the Lake Oahe. The remaining three sites (32EM0019, 32EM0021, and 32EM0221) are located in Emmons County, on the eastern side of Lake Oahe. A more comprehensive discussion of these sites and associated mapping detail is provided in Appendix I.

The Class II/III inventory investigations at Lake Oahe took place exclusively within the Connected Action areas located on private lands beyond the limits federal lands (i.e., HDD workspaces and stringing area). The Class II/III inventory investigations within the Connected Action areas associated with the Lake Oahe crossing consisted of a combination of pedestrian surveys and shovel probing. Archaeologists walked along fixed transects spaced 30 m (98 ft.) apart within the survey corridor, and systematically excavated shovel probes across high probability settings, or in areas with low surface visibility. The Class II/III investigations within the Connected Action areas resulted in the documentation of one new archaeological site (32MO570). This site consists of a singular lithic flake in isolated contexts and is recommended as not eligible for listing in the NRHP and no further work is warranted.

### 3.7.1.2   Impacts and Mitigation

The impacts attributable to the HDD on cultural resources would not be significant. The geotechnical analysis performed to support the HDD crossings supports the lack of anticipated impacts due to vibrations related to construction and HDD activities. Vibrations produced during the HDD process are not of a magnitude that would cause any impacts to cultural resources. Vibrations associated with the drilling process would be limited to the immediate vicinity of the drilling equipment on the surface and downhole. The vibrations produced from the downhole tooling are of a very low magnitude and are attenuated very quickly by the formation such that vibrations are never felt at the surface. A vibration monitoring analysis conducted by GeoEngineers in 2009 found that peak particle velocities were less than 0.07 inches/second within approximately 50 feet of HDD operations. These velocities are well below that which would cause any structural impacts and moreover, the recorded vibrations were, in fact, imperceptible to human senses (GeoEngineers, 2009).

**Flowage Easements**

Dakota Access has conducted Class II/III inventory surveys within the 400-foot-wide survey corridor across the flowage easements. The survey investigations resulted in the revisit of site 32WI1367 on the northern side of the Missouri River, and the documentation of site 32MZ2874 on the southern banks of the Missouri River. Impacts to site 32WI1367 would be avoided via HDD to ensure the integrity of construction design for these historic-age features is preserved. Additionally, no impacts to site 32MZ2874 are anticipated to occur as the HDD workspace is located beyond the site boundaries. These management

78

USACE_DAPL0071302

Environmental Assessment
Dakota Access Pipeline Project
July 2016

recommendations have been included as viable avoidance options in the Class II/III report submitted to the USACE regional archaeological staff.  A more thorough discussion of the cultural setting, relevant previous studies, as well as geologic and geomorphic analysis of the region, and results of the current survey with associated mapping detail can be referenced in Appendix I.

**Federal Lands**

Dakota Access has conducted Class II/III inventory surveys within the Connected Action areas on private lands associated with the Lake Oahe crossing.  These investigations resulted in the documentation of one prehistoric site consisting of a singular lithic artifact (32MO570).  This site is recommended as not eligible for listing in the NRHP.  No additional cultural resources were documented within the Connected Action areas associated with the Lake Oahe crossing.  While the Class I background review determined that eight previously recorded sites are located on federal lands, no evidence of these sites was encountered within the Connected Action areas on private lands.

Dakota Access' UDP was developed (Appendix F) for use during all DAPL Project construction activities regardless of jurisdiction or landownership.  The UDP describes actions that would take place in the event that an undocumented cultural resource site is discovered during construction activities.  The UDP explicitly calls for work to stop until the correct authority or agency can be contacted and the find can be properly evaluated.

### 3.7.2   Native American Consultations

The 2004 Programmatic Agreement for the Operation and Management of the Missouri River Main Stem System for Compliance with the National Historic Preservation Act, as amended, (PA) was developed to address challenges associated with cultural and historic resource impacts involved with the ongoing operation and maintenance of the Missouri River system of main stem dams.  This agreement outlines the processes through which affected Tribes, agencies and interested parties are consulted by the Corps on issues that may affect important historic and cultural resources.  These processes are essential to fulfill the Corps' Tribal Trust Responsibilities and also comply with Section 106 of the NHPA.

The United States Department of Defense recognizes its trust responsibilities to federally recognized Indian Tribes and has established an American Indian and Native Alaskan Trust policy that directs its agencies, including the Corps, to work with Tribes in a manner that incorporates tribal needs, traditional resources, stewardship practices, and the development of viable working relationships.  In addition, EO 13175, Consultation and Coordination with Indian Tribal Governments (EO 13175), outlines policy and criteria regarding the establishment of "regular and meaningful consultation and collaboration with tribal officials in the development of Federal policies that have tribal implications, and are responsible for strengthening the government-to-government relationship between the United States and Indian tribes" (https://www.whitehouse.gov/the-press-office/memorandum-tribal-consultation-signed-president).

EO 13175 continues with the following; "History has shown that failure to include the voices of tribal officials in formulating policy affecting their communities has all too often led to undesirable and, at times, devastating and tragic results.  By contrast, meaningful dialogue between Federal officials and tribal officials has greatly improved Federal policy toward Indian tribes.  Consultation is a critical ingredient of a

79

Environmental Assessment
Dakota Access Pipeline Project
July 2016

sound and productive Federal-tribal relationship".  These concepts are reflected in the Omaha District's PA/Section 106 coordination/consultation process.

Section 106 coordination/consultation was initiated for the Proposed Action beginning in October 2014, with an information letter regarding a preliminary geo-testing of the proposed Oahe crossing alignment. Per the Omaha District's usual process, this letter was sent to Tribes, THPOs, SHPOs, agencies and interested parties, soliciting information relevant to the Proposed Action.  Subsequently, the same process was utilized in circulating information and pertinent data for the installation of the Oahe pipeline crossing, in the form of a letter distributed in July 2015. The USACE recommended a "No Historic Properties Subject to Effect" Determination to the North Dakota SHPO and the SHPO concurred on April 22, 2016.

## 3.8      Social and Economic Conditions

Under the "no action" alternative, Dakota Access would not construct the DAPL Project and no impacts on social and economic conditions would occur.  Although the impacts associated with a future project developed in response to the "no action" alternative are unknown,  if the objectives of the DAPL Project are to be met under the "no action" alternative, other projects and activities would likely be required (e.g. transportation of oil by truck or rail).  Alternative shipping methods would likely result in their own impacts on social and economic conditions, such as increases in vehicular accidents and personal injury, worsening traffic congestion, and increased infrastructure deterioration.

The overall DAPL Project is a $3.78 billion dollar investment directly impacting the local, regional, and national labor force by creating nearly 12,000 construction jobs. Dakota Access has publically committed to utilizing American labor to build the pipeline.  Dakota Access has teamed up with the various craft and labor unions in the DAPL Project regions and nationally to ensure the DAPL Project is constructed by highly qualified and experienced local and regional labor resources.  These construction jobs would create considerable labor income and state income tax revenue – including the generation of more than $13.4 million in ad valorem taxes.  Upon authorization, the DAPL Project would put welders, mechanics, electricians, pipefitters, heavy equipment operators, and others within the heavy construction industry to work.

### 3.8.1      Demographics, Employment, Income and Economic Justice

#### 3.8.1.1      Affected Environment

The Proposed Action at the flowage easements and the Missouri River are in McKenzie County and Williams County.  The two census tracts (CT) crossed are CT9625 and CT 9535, respectively.  Demographic information including population, income, and employment statistics for these census tracts, counties in the general geographic area, and the state of North Dakota are provided in **Table 3-14**.  The industries employing the greatest number of persons in these census tracts is agriculture followed by educational services health care and social assistance fields; and construction.

At the Lake Oahe crossing, two Census tracts are crossed, CT9665 in Emmons County and CT204 in Morton County.  Demographic information including population, income, and employment statistics for these census tracts, counties, and the state of North Dakota are provided in **Table 3-15**.  The top three industries

USACE_DAPL0071304

Environmental Assessment
Dakota Access Pipeline Project
July 2016

providing employment in Emmons County are agriculture followed by educational services, health care and social assistance fields, and then construction.  Educational services, health care and social assistance are the leading industry employers in CT204 in Morton County followed by agriculture and retail trade. Although not directly affected by the Proposed Action or Connected Action Areas, Sioux County borders the Missouri River to the west and is south of the Lake Oahe crossing point.  Due to proximity of this county to the project, it has been incorporated as part of the geographical area for the county baseline data for analysis purposes relating to the Lake Oahe crossing.

### 3.8.1.2   Impacts and Mitigation

The Proposed Action is assumed to have a short construction window with a small number of construction workers dedicated to these crossings.  It is possible that counties within the general Project Area (McKenzie, Williams, Morton, Emmons, and Sioux) could experience short-term temporary effects to the local economy through induced spending from construction employees working on the crossing.  No residential homes or farms would be relocated resulting from the proposed action.  Additionally, no demographic changes in the Census tracts affected or the counties representing in the geographical area are anticipated because no permanent employment would be created as a result of the Proposed Action.

The DAPL Project also has tremendous secondary and sustainable economic benefits to the United States by supporting energy independence, increasing employment opportunities, and adding to demand in many manufacturing sectors, which would be a boost to the overall economy.  When considering the economic impact and benefit, once U.S. workers are employed on the DAPL Project, consistent with most infrastructure projects, the workers would spend their earnings in the communities where they work and live, resulting in multiplied economic impacts that would be nearly $5 billion just during the construction phase.  This economic impact would affect manufacturing in many domestic sectors such as the following examples.  It results in new vehicles being purchased, which positively impacts the auto industry.  It would result in new homes being built, which improves and increases the housing construction, resale, and lending business located in the region and across the U.S.  It impacts the food industry by requiring more food services and products to be delivered and consumed in the DAPL Project region.  And it delivers abundant American energy to U.S. markets, thereby enhancing supply.  The list could continue with a description of many secondary benefits, but in summary, the economic impact to the U.S. as well as the immediate region where the pipeline is located is considerable.

USACE_DAPL0071305

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 3-14 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Minority and Low Income Population Statistics for the Flowage Easements Project Area and Connected Action** | | | | | | | | | |
| **Geographic Area** | **Total Population** | **Percent** | | | | | | | |
| | | **White** | **Black or African Am.** | **Am. Indian and Alaska Native** | **Asian** | **Native Hawaiian and Other Pacific Islander** | **Some Other Race** | **Two or More Races** | **Total Minority Population** | **Persons Below the Poverty Level** |
| **State** | | | | | | | | | |
| North Dakota | 704,925 | 89.20 | 1.53 | 5.25 | 1.15 | 0.04 | 0.73 | 2.10 | 10.80 | 11.9 |
| **Counties Within Baseline Analysis (Baseline Area)** | | | | | | | | | |
| McKenzie | 8,333 | 78.98 | 0.22 | 17.16 | 0.60 | 0.00 | 1.04 | 2.00 | 21.02 | 14.6 |
| Williams | 27,066 | 90.76 | 1.12 | 4.16 | 0.55 | 0.03 | 1.27 | 2.12 | 9.24 | 8.2 |
| **Average** | **17,700** | **84.87** | **0.67** | **10.66** | **0.58** | **0.01** | **1.16** | **2.06** | **15.13** | **11.40** |
| **Proposed Action Area** | | | | | | | | | |
| CT9625 | 1,522 | 97.50 | 0.00 | 1.05 | 0.20 | 0.00 | 0.53 | 0.72 | 2.5 | 5.8 |
| CT9535 | 1,708 | 74.41 | 0.47 | 17.15 | 0.00 | 0.00 | 0.00 | 7.96 | 25.59 | 7.7 |
| **Average** | **1,615** | **85.96** | **0.23** | **9.10** | **0.10** | **0.00** | **0.26** | **4.34** | **14.04** | **6.75** |
| **State Comparison to Proposed Action Area** | | | | | | | | | |
| Proposed Action | -703,310 | -3.24 | -1.30 | 3.86 | -1.05 | -0.04 | -0.46 | 2.24 | 3.24 | -5.15 |
| **County Comparison to Proposed Action Area** | | | | | | | | | |
| Proposed Action | -16,085 | 1.09 | -0.43 | -1.56 | -0.48 | -0.01 | -0.89 | 2.28 | -1.09 | -4.65 |

Source: U.S. Census Bureau, American Community Survey (2010-2014 5-year estimates).
Note: totals may not sum across the table due to rounding used in data collection.

USACE_DAPL0071306

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 3-15 Minority and Low Income Population Statistics for Federal Lands Project Area | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Geographic Area | Total Population | Percent | | | | | | | Total Minority Population | Persons Below the Poverty Level |
| | | White | Black or African Am. | Am. Indian and Alaska Native | Asian | Native Hawaiian and Other Pacific Islander | Some Other Race | Two or More Races | | |
| **State** | | | | | | | | | | |
| North Dakota | 704,925 | 89.20 | 1.53 | 5.25 | 1.15 | 0.04 | 0.73 | 2.10 | 10.80 | 11.9 |
| **Counties Within Baseline Analysis (Baseline Area)** | | | | | | | | | | |
| Morton | 27,439 | 93.98 | 0.50 | 3.70 | 0.20 | 0.00 | 0.50 | 1.30 | 6.20 | 8.7 |
| Emmons | 3,491 | 99.28 | 0.00 | 0.23 | 0.17 | 0.00 | 0.00 | 0.32 | 0.72 | 13.5 |
| Sioux | 4,317 | 13.67 | 0.02 | 82.26 | 0.25 | 0.07 | 0.53 | 3.20 | 86.33 | 36.4 |
| **Average** | **15,465** | **68.98** | **0.17** | **28.73** | **0.21** | **0.02** | **0.34** | **1.60** | **31.08** | **58.6** |
| **Proposed Action Area** | | | | | | | | | | |
| CT204 | 3,143 | 96.5 | 0 | 1.4 | 0 | 0 | 0.8 | 1.3 | 3.5 | 4.4 |
| CT9665 | 3,491 | 99.3 | 0 | 0.2 | 0.2 | 0 | 0 | 0.3 | 0.7 | 13.5 |
| **Average** | **3,317** | **97.88** | **0.00** | **0.83** | **0.09** | **0.00** | **0.40** | **0.81** | **2.12** | **8.95** |
| **State Comparison to Proposed Action Area** | | | | | | | | | | |
| Proposed Action | -701,608 | 8.68 | -1.53 | -4.42 | -1.07 | -0.04 | -0.33 | -1.29 | -8.68 | 49.65 |
| **Baseline Area Comparison to Proposed Action Area** | | | | | | | | | | |
| Proposed Action | -12,148 | 28.90 | -0.17 | -27.90 | -0.12 | -0.02 | 0.05 | -0.79 | -28.96 | -2.95 |

Source: U.S. Census Bureau, American Community Survey (2010-2014 5-year estimates).
Note: totals may not sum across the table due to rounding used in data collection.

USACE_DAPL0071307

Environmental Assessment
Dakota Access Pipeline Project
July 2016

## 3.9      Environmental Justice

EO 12898, *Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations*, requires federal agencies to identify and address disproportionately high and adverse human health or environmental of their programs and policies on minority and low-income populations and communities and Indian tribes.  The CEQ guidance suggests that an environmental justice population may be identified if "the minority population percentage of the affected area exceeds 50%, or if the minority population percentage of the affected area is meaningfully greater than the minority population in the general population or other appropriate unit of geographic analysis" (CEQ, 1997).  The CEQ defines low-income populations based on an annual statistical poverty threshold.  In 2013, the poverty threshold for the 48 contiguous states for an individual under the age of 65 living alone was $12,119 (U.S. Census Bureau, 2014).

Under the "no action" alternative, Dakota Access would not construct the proposed Project and no environmental justice impacts would occur.  However, If the objectives of the Project are to be met under the "no action" alternative, other projects and activities would be required and these projects could result in their own environmental injustice impacts, which would likely be similar to or greater than the proposed Project.  It is reasonable to assume that alternative methods of crude oil transportation would be relied on to meet market demands.  Minority or low income communities along utilized rail lines or truck routes could be affected by increasing noise and creating transportation delays due to the substantial increasing truck traffic on county, state and interstate highways as well as rail traffic across railroad crossings.    .

### 3.9.1      Affected Environment

Transportation projects, such as under the Federal Transit Administration, and natural gas pipeline projects under the Federal Energy Regulatory Commission (e.g. Docket Nos. CP12-507-000 and CP12-508-000, DOE FE 12-97-LNG, and FERC/EIS-0252F), typically use a 0.5 mile buffer area to examine Environmental Justice effects.  The census tracts crossed by the Proposed Action encompass an area greater than 0.5 mile radius for the project; therefore additional census tracts were not evaluated.

Since two census tracts are within 0.5 mile of the Flowage Easements at the Missouri River, and another two census tracts are located within 0.5 mile of the federal lands at Lake Oahe, an average of the demographic data from two respective census tracts was compared to the average demographic data of the counties in the general vicinity of each crossing as well as the state of North Dakota demographic data.

For the Flowage easements and Missouri River crossing, which are generally centrally located within McKenzie and Williams Counties, the averaged data from those two counties was used to obtain the Baseline Area data set.

Lake Oahe crossing is generally centrally located within Emmons County on the east side of the Lake, however it is near the southern boundary of Morton County.  Therefore Sioux County (located greater than 0.5 miles) was included in the geographical area of the Lake Oahe.  Thus Morton, Emmons, and Sioux county data was averaged to obtain the Baseline Area data set.

USACE_DAPL0071308

Environmental Assessment
Dakota Access Pipeline Project
July 2016

### 3.9.2     Impacts and Mitigation

For analyzing impacts to the minority and low income populations at the Proposed Action Area at the flowage easements and Missouri River Crossing, Census Tracts CT9625 and CT9535 were compared to the averaged county baseline (McKenzie and Williams Counties – "Baseline Area") data and then to the state data to determine if there were any siting concerns relative to Environmental Justice.

The minority population of the Proposed Action Area at the Missouri River is greater than the state as a whole (3% greater) but lower than surrounding county geographical area (1% lower). Neither of these differences is considered meaningful.

The percentage of the population below the poverty level for the Proposed Action Area at the Missouri River is 5% lower than the state as a whole and also 5% lower than surrounding county geographical area. These differences are not considered meaningful.

For analyzing impacts to the minority and low income populations at the Lake Oahe Crossings, data for the averaged Census Tracts (CT204 and CT9665) was compared to the averaged county baseline (Morton, Emmons and Sioux – "Baseline Area") for the county geographical area (Morton, Emmons, and Sioux Counties – "Baseline Area") data and then to the state to determine if there were any siting concerns relative to Environmental Justice.

Based on this analysis, the minority population of the Proposed Action Area at Lake Oahe is lower than the state as a whole (9% lower). Although the average minority population of the counties geographical baseline is greater than the state as a whole, the minority population in the averaged census tract of the Proposed Action Area at Lake Oahe is much lower than surrounding county geographical area. In this case, the census tracts associated with the Proposed Action Area at Lake Oahe have a meaningfully lower minority percentage (29% lower) than the Baseline Area consisting of the three county area.

No appreciable minority or low-income populations exist within the Census tracts directly affected by the Proposed Action at either crossing (**Tables 3-14 and 3-15**). No local community with appreciable minority or low-income populations exists at either the crossing of federal lands or flowage easements (**Tables 3-14** and **3-15**). Based on this analysis, there is no concern regarding environmental justice to minority populations at the Proposed Action Area at the Missouri River Crossing or at Lake Oahe.

### 3.9.2.1     Standing Rock Sioux Reservation

It is recognized that the Standing Rock Sioux Tribe is downstream of the Lake Oahe Crossing, which has a high population of minorities and low-income residents. Dakota Access and the Corps sought to engage Tribal representatives in the vicinity of the Proposed Action, and especially the Standing Rock Sioux Tribe, in discussion as to the nature of the Project, cultural resource concerns and the Lake Oahe crossing. The initial contact by Dakota Access with the Standing Rock Sioux Tribe was in October of 2014 with additional contacts and subsequent meetings occurring through March 2016. Direct and Indirect impacts from the Proposed and Connected Actions will not affect members of the Standing Rock Sioux Tribe or the Tribal reservation. The Lake Oahe crossing will be installed via HDD beneath the river from private lands adjacent to Corps owned lands to avoid impacts to environmental resources (e.g. water, soil, cultural resources, vegetation, etc.). The HDD drilling process is an expensive technique that itself is a mitigation

USACE_DAPL0071309

Environmental Assessment
Dakota Access Pipeline Project
July 2016

measure with no anticipated effects to the environment including vibration or frac-out within or outside of the Proposed Action for the short duration of the construction project (see sections 2.3.2.6 and 3.1.1.2 for additional information).

As discussed in more detail in sections of this Environmental Assessment (i.e. Section 2.3.1), Dakota Access utilized a complex routing model to examine alignment options for the Project and an array of environmentally protective criteria were used to cite the Project.  Perhaps most important for purposes of this analysis, are the citing criteria that require the avoidance of Tribal reservations and federal lands.  Since the route must cross the Missouri River, it was not practicable to fully avoid federal land (see discussion in Section 2.1.3), and hence the necessity for this EA.  However, maintaining a minimum distance of 0.5 mile from Tribal land, consistent with other federal citing criteria, avoided tribal land as a mitigation and routing measure.  Furthermore, the Proposed Action, and hence the route and installation methods, is at a distance sufficient such that there are no direct or indirect impacts to Tribal lands, members or protected cultural resources.

Another primary consideration in routing included a preference for co-locating the route with existing infrastructure.  The Proposed Action is co-located with existing power and pipe lines across Lake Oahe and partially co-located with a gas line at the flowage easements and Missouri River.  As examples, the routing model affirmatively excludes such locations as Tribal lands, National Registry Historic Places, wilderness, parks, landmarks and an array of other special needs areas.

As a result of this routing criteria, the nature of the action (construction associated with laying an underground oil pipeline), the short term duration of effects, construction and operation on private lands, the concurrent reclamation activities, state of the art construction techniques, use of high quality materials and standards that meet or exceed federal standards, there will be no direct or indirect effects to the Standing Rock Sioux tribe.  This includes a lack of impact to its lands, cultural artifacts, water quality or quantity, treaty hunting and fishing rights, environmental quality, or socio-economic status.  Therefore, there is no resulting adverse or disproportionate impacts of the Proposed Action with respect to Environmental Justice considerations.

The Standing Rock Sioux Reservation boundary is over 0.5 miles south of the Lake Oahe Project Area crossing.  Based on aerial imagery, the closest residence on the Standing Rock Sioux Reservation is a rural residence located greater than 1.5 miles from the Lake Oahe Project Area Crossing.  This distance is well beyond any federal or state siting criteria.  The North Dakota Energy Conversion and Transmission Facility Siting Act Exclusion and Avoidance Areas Criteria (49-22-05.1) establishes an avoidance setback requirement of 500 feet from inhabited rural residences.

The pipeline route expressly and intentionally does not cross the Standing Rock Sioux Reservation and is not considered an Environmental Justice issue.  If it were it determined that there would be some effects to the Standing Rock Sioux Tribe as a low income, minority population, it would not disproportionately or predominately bear impacts from the Proposed Actions (the impacts will actually disproportionately affect private lands, non-low income populations and non-minority populations).   The impacts along the Missouri River and the Lake Oahe crossing are not disproportionate to the tribe.  The Missouri River crossing is on private lands with private lands and US federal lands downstream; the nearest reservation is Fort Berthold approximately 50 miles due east and Standing Rock Reservation is approximately 160 miles southeast. The Lake Oahe HDD crosses under US Federal lands from lands that are privately owned;

86

USACE_DAPL0071310

Environmental Assessment
Dakota Access Pipeline Project
July 2016

private lands continue downstream of the crossing on the east side of the Lake and Standing Rock Reservation (0.55 miles).  Thus, the impacts at best can be said to be equivalent between tribal lands and private landowners at the Lake Oahe crossing.  As stated above, linear projects typically use a 0.5 mile buffer area to examine Environmental Justice effects.  There are no low-income, minority or tribal lands within 0.5 mile of the Proposed Action.

Concerns have been expressed regarding an inadvertent release reaching intake structures on Lake Oahe.  Given the engineering design, proposed installation methodology, quality of material selected, operations measures and response plans the risk of an inadvertent release in, or reaching, Lake Oahe is extremely low.  While the locations of water intakes is not public information for disclosure in this document, there are private and/or non-tribal intakes closer to the Lake Oahe crossing than any intakes owned by the tribe; further demonstrating the lack of disproportionate impacts of an inadvertent release to the Tribe and the reservation.  We understand that due to the rural nature of this area, tribal drinking water supplies are obtained from a combination of wells and surface water.  The siting and construction of oil pipelines upstream of drinking water intakes is not uncommon throughout the United States and is not considered an Environmental Justice issue.  In the unlikely event of a release, sufficient time exists to close the nearest intake valve to avoid human impact.

Dakota Access has committed to plan for the protection of this and other water crossings and associated water intakes as part of its emergency preparedness protocol and in accordance with PHMSA requirements outlined in 49 CFR §§ 194 and 195 (see section 3.11 for further detail).  Tribal representatives have been identified for early contact along with other federal, state and local governments by the Corps as well as independently by the applicant.

Based on the above sections, it has been determined that there are no environmental justice issues or concerns resulting from the Proposed Action.

## 3.10    Hazardous Waste

The EPA (2015) defines hazardous waste as waste that is dangerous or potentially harmful to human health or the environment, occurring as liquids, solids, gases, or sludges.  They can be generated through the disposal of commercial products, such as cleaning fluids or pesticides, or manufacturing processes.  Improper management and disposal of hazardous substances can lead to pollution of groundwater or other drinking water supplies and the contamination of surface water and soil.  The primary federal regulations for the management and disposal of hazardous substances are the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) and the Resource Conservation and Recovery Act (RCRA).

A review of regulated facilities for hazardous materials along the Proposed Action corridor was conducted by searching online records maintained by the EPA (2014).  Presently, there are no recognized Radiation Information Database, Brownfields, Superfund, Toxic Release Inventory, or air emission sites within one mile of the flowage easements and Lake Oahe crossings.  No operating sensitive receptors, such as schools or hospitals, are reported within at least one mile.  Additionally, there are no NPDES discharge sites within one mile of the Project Areas.

USACE_DAPL0071311

Environmental Assessment
Dakota Access Pipeline Project
July 2016

With the Proposed Action, there is potential for temporary impacts to public safety from hazardous material use.  Other hazards to worker safety may also exist along the Proposed Action corridor, but do not pose a significant impact.  Because there were no regulated sites found within the one-mile search radius of the Project Area, no impacts to the Proposed Action, Proposed Action media, or worker safety are expected.  In the unlikely event contamination is encountered during construction, the UDP **(Appendix F)** would be implemented to protect people and the environment and avoid or minimize any effects from unearthing the material.

Any hazardous materials discovered, generated, or used during construction would be managed and disposed of in accordance with applicable local, tribal, state, and federal regulations.  Should emergency response be required during construction, the contractor would have some of their own trained or contracted responders, and local response teams would be expected to assist.

Dakota Access would comply with any laws, regulations, conditions, or instructions issued by the EPA, or any Federal, state, or local governmental agency having jurisdiction to abate or prevent pollution, such as the RCRA, and State hazardous waste management rules.

## 3.11    Reliability and Safety

The PHMSA, a federal agency within the U.S. DOT is the primary federal regulatory agency responsible for ensuring the safety of America's energy pipelines, including crude oil pipeline systems.  As a part of that responsibility, PHMSA established regulatory requirements for the construction, operation, maintenance, monitoring, inspection, and repair of liquid pipeline systems.

Construction activities could present safety risks to those performing the activities, residents and other pedestrians in the neighborhood.  Given the low population density of the area, risks would be limited to workers involved with the Proposed Action.   All activities would be conducted in a safe manner in accordance with the standards specified in the Occupational Safety and Health Administration (OSHA) regulations.

To prevent pipeline failures resulting in inadvertent releases, Dakota Access would construct and maintain the pipeline to meet or exceed industry and governmental requirements and standards.  Specifically, the steel pipe would meet PHMSA specifications under 49 CFR § 195, follow standards issued by the American Society of Mechanical Engineers, National Association for Corrosion Engineers and API.  Once installed, the pipeline would be subjected to testing to verify its integrity and compliance with specifications, including hydrostatic pressure testing at the crossings, checking coating integrity, and X-ray inspection of the welds.  The pipeline would be placed into service only after inspection to verify compliance with all construction standards and requirements.  Dakota Access would maintain and inspect the pipeline in accordance with PHMSA regulations, industry codes and prudent pipeline operating protocols and techniques.  The pipeline ROW would be patrolled and inspected by air every 10 days, weather permitting, but at least every three weeks and not less than 26 times per year, to check for abnormal conditions or dangerous activities, such as unauthorized excavation along the pipeline route.

As discussed in Section 3.2.1.2, Dakota Access has drafted a FRP, in accordance with 49 CFR 194, which details the procedures to be implemented in the event of an inadvertent pipeline release and would be in

USACE_DAPL0071312

Environmental Assessment
Dakota Access Pipeline Project
July 2016

place prior to commencing transportation of crude oil.  The FRP is discussed under Section 3.2.1.2 and a draft of the FRP is included in Appendix L.

Following completion of construction and throughout operation of the Proposed Action facilities, the Operator and qualified contractors would maintain emergency response equipment and personnel at strategic points along the pipeline route.  These personnel would be trained to respond to pipeline emergencies as well as in the National Incident Management System (NIMS) Incident Command System (ICS).  Additionally, contracts would be in place with oil spill response companies that have the capability to mobilize to support cleanup and remediation efforts in the event of a pipeline release.  The Operator would also coordinate with local emergency responders in preventing and responding to any pipeline related problems.   These activities would include conducting and hosting, over a period of time, emergency response drills with both Dakota Access employees and local emergency responders along the pipeline route.

Dakota Access will conduct emergency response drills/exercises in accordance with PREP, which is recognized, and approved, by the EPA, US Coast Guard, and PHMSA.  These emergency response exercises will consist of annual table top exercises and equipment deployment drills.  Dakota Access is committed to conducting a worst case discharge full scale exercise at either the Missouri River crossing near Williston or the crossing at Lake Oahe once every 6 years and will include both open water and ice response.  Dakota Access will alternate the location and type of exercise.  Regulatory and stakeholder participation will be encouraged and solicited for the exercises.

In addition to the testing and inspection measures listed above, Dakota Access would utilize a supervisory control and data acquisition (SCADA) system to provide constant remote oversight of the pipeline facilities.  Power for the SCADA system would be provided from an existing power grid.  In the event of a power outage, a 500 watt Uninterruptable Power Supply would supply low voltage power to the Programmable Logic Controller and communication equipment.  Communication with the SCADA system would be accomplished via satellite (Hughes Global Network) and telephone (4G cellular [ATT] or landline depending on availability/coverage).  Both forms of communication are continually engaged to poll information from these sites for 100% reliable remote monitoring / operation of these sites through the SCADA system to the Operations Control Center (OCC) in Sugarland, Texas (a backup control room is located in Bryan, Texas), and are proven to have the least potential for interruption during pipeline operations.

If an alarm criteria threshold is met, the SCADA system would alert Dakota Access' OCC Operators, located in Sugarland and Bryan, Texas, of rapid drops in pressure, who would then activate the controls as necessary and initiate procedures for an appropriate response.  The OCC prioritizes and responds to all alarms in accordance with the control room management regulations referenced in PHMSA CFR 195.446 (e).  This regulation requires that the OCC Operator have a SCADA system alarm management plan; in general, the plan must include review of the SCADA alarm operations to ensure alarms support safe pipeline operations, identify any required maintenance that may affect safety at least once every calendar month, verify correct safety-related alarm values and descriptions at least once every calendar year when associated field equipment are changed or calibrated, determine effectiveness of the alarm management plan through a yearly review, and monitor content and volume of activity at least once a calendar year to assure controllers have adequate time to review incoming alarms.  Leak Warn, a leading software program for monitoring pipelines, is being tailored to the pipeline facilities, in accordance with Pipeline and

89

Environmental Assessment
Dakota Access Pipeline Project
July 2016

Hazardous Materials Safety Administration requirements.  The Operator would utilize a Computational Pipeline Monitoring System (CPM) to monitor the pipeline for leaks.  The CPM is a state-of-the-art pipeline monitoring tool and features a real-time transient model that is based on pipeline pressure, flow, and temperature data, which is polled from various field instruments every 6 seconds and updates the model calculations to detect pipeline system variations every 30 seconds.  After the system is tuned, this state-of-the-art CPM system is capable of detecting leaks down to 1 percent or better of the pipeline flow rate within a time span of approximately 1 hour or less and capable of providing rupture detection within 1 to 3 minutes.  State–of-the-art leak detection equipment and software utilized during operations or the pipeline will be updated per federal standards in accordance with PHMSA requirements.  In the event that a leak is confirmed through verification, pump station shutdown would be initiated within a predetermined amount of time to effectuate.  Next, the remotely controlled isolation valves (mainline valve sites would be installed on both sides of large waterbody crossings for isolation in the event of an emergency shutdown), which are operable from the OCC, would be closed.  These valves have a closure time of no greater than three (3) minutes.  Monitoring of the pipeline segments installed via HDD would be accomplished in the same manner as those segments installed by conventional methods (i.e., SCADA, internal inspection devices, and aerial patrols).  Typically, repairs are not made on any section of pipe greater than 10 to 20 feet below the ground surface depending on the repair needed.  If a material impact was on the pipeline below the 10-foot depth, operation of the system would be modified accordingly (e.g., reduce operating pressure) or the line would be re-drilled.  If inspections identify an anomaly, requirements would be followed to comply with U.S. DOT requirements.

In the unlikely event of a leak during operations of the pipeline, the Operator would implement the response measures described in the FRP.  Below is a list of typical response activities.  However, each spill mitigation situation is unique and will be treated according to the actual spill circumstances present at the time of release.

Notification:  The Operator will conduct notifications in accordance with federal and state guidelines.  These guidelines, along with additional notification forms/procedures are presented in Appendix B of the FRP.  Local government response agencies would be notified first followed by federal and state agencies as well as surrounding communities, and governments (including tribal governments and utilities) in accordance with the relevant provisions of the FRP and relevant law.  Response notification to such entities as the National Response Center, PHMSA, EPA, USACE, and affected state regulatory entities will be made in accordance with the requirements dictated by the incident type.  A complete list of required notifications is included in the FRP.  In accordance with PHMSA policy, the FRP will be updated every five years or sooner if there are material changes to the Plan.

Mobilize Response Equipment:  Emergency equipment would be available to allow personnel to respond safely and quickly to emergency situations.  Company-owned equipment will be inspected and exercised in accordance with PREP guidelines and would be mobilized and deployed by the Operator from strategic staging locations along the pipeline.  Additionally, the operator will contractually secure OSROs to provide trained personnel and equipment necessary to respond, to the maximum extent practicable, to a worst case discharge or substantial threat of such discharge.  At a minimum, each OSRO will have a containment booms, absorbents, boats, and vacuum trucks available.  A complete list of equipment and list of trained personnel necessary to continue operations of the equipment and staff the oil spill removal organization for each of the OSRO contractors is included in the FRP.

USACE_DAPL0071314

Environmental Assessment
Dakota Access Pipeline Project
July 2016

Response Activities:   Following incident command protocols, the Operator would work in unison to cooperate with and assist fire, police and other first responders when implementing actions to protect personnel, public safety and the environment.   The FRP includes a spill response checklist which lists activities that could be conducted during a spill which would be modified to best address the specific circumstances of a spill event.   Incident response activities may include: initiating spill assessment procedures including surveillance operations, trajectory calculations, and spill volume estimating; berming or deployment of containment and/or sorbent booms; lining shorelines with sorbent or diversion booms to reduce impacts; and recovering contained product as soon as possible to prevent the spread of contamination using appropriate hoses, skimmers, pumps, and storage containers or vacuum trucks at collection areas.  The response activities would continue until an appropriate level of cleanup is obtained as provided by the responsible federal, state or other governmental authorities.  The nature and location of the incident will affect the regulatory and notification requirements, for which more detail is provided in the FRP.  Incidents involving discharges to navigable waters are governed the Oil Pollution Act of 1990.

Dakota Access will implement numerous measures to minimize the risk of a pipeline leak and protect the users of downstream intakes:

1) Spill Prevention, Leak Detection and Spill Response Measures:

Based on a worst case discharge (WCD) scenario specific to Lake Sakakawea and Lake Oahe, calculated by guidance in 49 CFR § 194.105, a largest possible release volume was determined specific to the segment of the pipeline that would cross Corps-managed lands. This calculation was based on environmental assumptions such as air temperature, wind direction/probability and wind speeds that were averaged from data over a one-year period derived from the  U.S. Geological Survey National Hydrological Dataset (NHD, version 2). This information was extrapolated into a 24-hour model. The WCD, at the end of the 24-hour period, produced a surface oil slick attenuation distance, volume remaining in the water column, volume that would be ashore and the volume would evaporate within this timeframe. It is important to note, this WCD scenario is also calculated on the assumption that the pipeline is on top of the river verses HDD. Because the proposed pipeline would be installed at a minimum depth of 36 feet below the Missouri River above Lake Sakakawea and 92 feet below the lakebed of Lake Oahe, there is a greater response time combined with the use of the automated SCADA system.

While the potential risk for a WCD scenario is low, such a spill would result in high consequences. Review and approval of the overall regional FRP, which encompasses the regional DAPL Pipeline response strategies in the event of an oil spill, is the responsibility and jurisdiction of PHMSA. Federal regulations 49 CFR 194 specify minimum requirements of such an FRP. For the proposed project, the DAPL Pipeline FRP will be required to align with the content and directions identified in the Mid-Missouri Sub-Area Contingency Plan.  A tactical GRP specific to a response strategy for Lake Sakakawea and Lake Oahe was provided by the applicant and includes specific response strategies and equipment for all affected water. Both the FRP and GRP will be finalized after construction and be submitted to the USACE for review and the incorporation of USACE comments prior to submittal to PHMSA.

Within these response plans, DAPL training exercise program would be consistent with the exercise requirements as outlined in the PREP Guidelines that were developed by the U.S. Coast Guard in conjunction with PHMSA and EPA. Training exercises include quarterly notification exercise, annual

USACE_DAPL0071315

Environmental Assessment
Dakota Access Pipeline Project
July 2016

tabletop exercises to include a WCD scenario every three years, annual facility-owned equipment deployment exercises annual contractor exercises and unannounced exercises by government agencies.

The applicant has committed to additional full scale open water and full scale winter/ice exercises that will be conducted at Lake Sakakawea and Lake Oahe. A full scale exercise will occur once every 3 years (triennial cycle) with the location and type of exercise occurring on alternating schedules (e.g. open water exercise at Oahe the first triennial cycle, followed by winter exercise at Sakakawea the following triennial cycle, followed by a winter exercise at Oahe the following triennial cycle, etc.). Stakeholder (federal, state, local, and Tribal) involvement will be solicited for each exercise. The first exercise will occur within the first 3 years after the pipeline becomes operational.

   2) Risk Analysis

   While an oil spill is considered unlikely and a high precaution to minimize the chances has been taken, it is still considered a low risk/high consequence event. A risk analysis conducted by DAPL addressed nine industry-recognized pipeline integrity threat categories in combination with public and environmental impact that could occur in the event of a release into Lake Sakakawea and Lake Oahe. These threat categories include the following: 1) third-party damage, 2) external corrosion, 3) internal corrosion, 4) pipe manufacturing defects, 5) construction related defects 6) incorrect operations, 7) equipment failure, 8) stress corrosion cracking and 9) natural forces. DAPL derived the following analysis risk process from the W. Kent Muhlbauer Relative Index Methodology (2004), in accordance with 49 CFR 195.452 "Hazardous Liquid Pipelines in High Consequence Area", API RP 1160 "Managing System Integrity for Hazardous Liquid Pipelines", and ASME B31.8S "Managing System Integrity of Gas Pipelines".

   1 - Third Party Damage

Pipeline failure due to third party damage is ranked low for the Missouri River above Lake Sakakawea and Lake Oahe (36 and 92 feet below the river and lakebed, respectively). The only third party damage that would threaten this portion of the pipeline would be another HDD in the same location of the DAPL Pipeline. Due to tracking technological advances such as submeter accuracy, a permanent and accurate record of the proposed pipeline would be documented so no such possibility of another pipeline being placed via HDD in the same location would occur.

   2 - External Corrosion

Pipeline failure for the portion of the proposed project that crosses Lake Sakakawea is classified as low. The potential is ranked low due to the high performance external coating system that is being used (heavy epoxy-concrete abrasion resistant layer over fusion bonded epoxy) and deep well cathodic protection. This portion of the pipeline is constructed with a thicker wall pipe compared to segments of the pipeline in upland-classified areas. A conservative corrosion growth rate was determined to take 70 years before a through-wall metal loss could occur. Because in-line inspection metal loss detection tools run every five years, external corrosion activity would be detected and mitigated prior to it becoming an integrity threat.

   3 - Internal Corrosion

USACE_DAPL0071316

Environmental Assessment
Dakota Access Pipeline Project
July 2016

Pipeline failure due to the internal corrosion threat for the portion of the proposed project that would cross Lake Sakakawea is ranked low. Causes of internal corrosion would be due to accumulation of water and solids in low spots of the pipeline. However, DAPL internal corrosion mitigation program for the entire DAPL pipeline include chemical analysis of the crude product stream, pipeline operations (maintenance of minimum flow rates that keep entrained water and solids moving through the system), a maintenance pigging program, wall pipe design and in-line inspection performed every five years. The potential does exist, but successful implementation and continual monitoring of the effectiveness of the above programs will mitigate the risk. As with the external corrosion threat, the internal corrosion would be detected and mitigated prior to it becoming an integrity threat.

### 4 - Pipe Manufacturing Defects

Pipeline failure due to manufacturing defects is considered low for the portion of the pipeline that crosses Lake Sakakawea and Lake Oahe. Upon completion of construction and prior to the commissioning of the pipeline, the segment of the pipeline crossing Corps-managed lands would be hydrostatically strength-tested for eight hours at 1,800 psig which would be 1.25 times greater than the 1,440 MAOP. Should any strength-related defects be found in the pipe as a result of the hydrostatic test, this segment of the pipeline would have been over-pressured by more than two-times to have a potential effect on those defects. An over-pressure event of this magnitude is not likely with the equipment installed.

### 5 - Construction Related Defects

Pipeline failure for the segment that crosses under Lake Sakakawea due to construction related defects is categorized as low. All pipe joints would be welded by qualified welders and the required 100% girth weld radiography would provide a two-dimensional grayscale image of the weld. After construction and prior to commissioning of the pipeline, the hydrostatic testing would be performed. After the drill string is installed and prior to the line being put into service, an in-line inspection tool would be ran to identify an injurious mechanical damage that may have gone undetected during construction.

### 6 - Incorrect Operations

Pipeline failure due to incorrect operations (e.g. overpressure event caused by human error) is ranked low for the section of the pipeline that crosses Lake Sakakawea and Lake Oahe. This section of the DAPL pipeline has a design factor nearly 2-times greater than the maximum allowable operating pressure (1440 psig) of the pipeline. In addition, the system is controlled and monitored 24 hours a day, 365 days a year by experienced controllers in the control center in Sugarland, Texas. The system is designed with instruments and pressure relief systems to minimize the opportunity for overpressure.

### 7 - Equipment Failure

Pipeline failure due to equipment failure for the section of the pipeline that crosses the Missouri River above Lake Sakakawea and Lake Oahe are categorized as low. The only equipment located in this section of the pipeline are the shut-off valves on either side of the Missouri River above Lake Sakakawea and Lake Oahe which are remotely operated. These valves are secured in perimeter fencing.

### 8 - Stress Corrosion Cracking

93

USACE_DAPL0071317

Environmental Assessment
Dakota Access Pipeline Project
July 2016

The potential for pipeline failure due to stress corrosion cracking for the portion of the pipe that crosses the Missouri River above Lake Sakakawea and Lake Oahe is ranked as low because this section will operate at a low stress and is externally coated with a fusion bond epoxy coating.

### 9 - Natural Forces

The potential for pipeline failure due to natural forces is ranked low for the segment of the pipeline that crosses Lake Sakakawea and Lake Oahe. The National Pipeline Mapping System, maintained by PHMSA, rates this geographic location for natural hazards as the following: Hurricane- Low; Earthquake- Low; Flood- High and; Landslide-High. Erosion of cover/ exposure of the pipeline to debris during flood conditions is highly unlikely due to the depth of cover at the Missouri River and Lake Oahe crossings (36 feet and 92 feet below the river and lakebed, respectively). In addition, landslide/ creep of the pipeline is highly unlikely as the pipe is at a depth below that which would be affected by land movement.

### 10 - Consequences

In the event that a pipeline failure occurs and product is released into the Missouri River at either crossing, the worst case consequence scenario is ranked high because several drinking water intake High Consequence Areas (HCAs) and multiple ecologically sensitive HCAs could be impacted. To minimize the impact of a release (e.g. size and spread) the pipeline will continuously be monitored by a real-time monitoring and leak detection system , which is considered to be the best available technology; motor operated isolation and/or check valves are installed on either side of the Missouri River above Lake Sakakawea and Lake Oahe which can be actuated to close as soon as a leak is detected; PHMSA-approved FRP will be in place, all weather access and collection points will be staged strategically downstream of each lake crossing, and DAPL has committed to additional full scale open water and full scale winter/ice exercises that will be conducted at Lake Sakakawea and Lake Oahe. A full scale exercise will occur once every 3 years (triennial cycle) with the location and type of exercise occurring on alternating schedules (e.g. open water exercise at Oahe the first triennial cycle, followed by winter exercise at Sakakawea the following triennial cycle, followed by a winter exercise at Oahe the following triennial cycle, etc.). Stakeholder (federal, state, local, and Tribal) involvement will be solicited for each exercise. The first exercise will occur within the first 3 years after the pipeline becomes operational.

## 3.12    Air Quality and Noise

Under the "no action" alternative, Dakota Access would not construct the DAPL Project and no impacts on air quality and noise would occur.  However, If the objectives of the DAPL Project are to be met under the "no action" alternative, other projects and activities would be required and these projects would result in their own impacts on air quality and noise, which would likely be similar to or greater than the DAPL Project.  If the "no action" alternative is implemented and the Project is not constructed, shippers will likely rely on truck or rail to transport crude oil.  Additional road and rail traffic necessary to transport the volume of crude oil proposed by the DAPL project would increase the emissions of combustion products due to the potential releases during the filling operations of trucks or rail cars and the use of diesel engines.  These would be recurring inputs into the environment which could have an adverse impact on air quality in the region.   Similarly, an increase in noise from truck and rail traffic would be widespread

USACE_DAPL0071318

Environmental Assessment
Dakota Access Pipeline Project
July 2016

and long term as opposed to the noise impacts of the preferred action which are temporary and primarily limited to the vicinity of the construction workspace.

## 3.12.1  Air Quality

### 3.12.1.1  Affected Environment

The Clean Air Act (CAA) of 1970 requires that states adopt ambient air quality standards.  The CAA (42 USC 7401 et seq.) establishes ambient air quality standards, permit requirements for both stationary and mobile sources, and standards for acid deposition and stratospheric ozone (O3) protection.  The standards have been established in order to protect the public from potentially harmful amounts of pollutants. Under the CAA, the EPA establishes primary and secondary air quality standards.  Primary air quality standards protect public health, including the health of "sensitive populations, such as people with asthma, children, and older adults." Secondary air quality standards protect public welfare by promoting ecosystem health, and preventing decreased visibility and damage to crops and buildings.

According to the EPA, North Dakota has no nonattainment areas for criteria pollutants.  The Bismarck air quality monitoring station in Burleigh County is located approximately 23 miles north-northwest of the Lake Oahe crossing.  The Bismarck air quality monitoring station measures sulfur dioxide, nitrogen dioxide, particulate matter, ground-level ozone, and meteorological data (North Dakota Department of Health, 2013).  The Williston air quality monitoring station in Williams County is located approximately 18 miles northeast of the flowage easement crossing.  The Williston air quality monitoring station measures particulate matter, ground-level ozone, and meteorological data.  The monitoring objective of both stations is to measure population exposure to air quality parameters.

Monitoring data for these stations from 2003-2013 show pollutant levels for sulfur dioxide, nitrogen dioxide, ozone, and particulate matter did not exceed state or deferral ambient air quality standards at any of the state-operated monitoring sites (North Dakota Department of Health, 2013).

### 3.12.1.2  Impacts and Mitigation

With the Proposed Action, no long-term impacts to air quality would occur; the proposed pipeline would not emit any criteria air pollutants.  Short-term impacts to air quality may occur during construction phase of the Proposed Action.  The contribution of the Proposed Action to greenhouse gas emissions during construction would be considered a minor indirect impact to climate change.

During construction, emissions from fuel-burning internal combustion engines (e.g., transportation trucks, heavy equipment, drill rigs, etc.) would temporarily increase the levels of some criteria pollutants, including carbon monoxide, nitrogen dioxide, ozone, particulate matter, and non-criteria pollutants such as volatile organic compounds.  Construction of the Lake Oahe crossing is likely to take six to eight weeks to complete.  Conventional pipeline construction across the flowage easements would take approximately two weeks and activities at the HDD exit point for crossing the Missouri River on the flowage easement LL3440E would likely operate for four to six weeks.  To reduce the emission of criteria pollutants, fuel-burning equipment running times would be kept to a minimum and engines would be properly maintained.  This temporary increase in emissions is not expected to impact air quality or visibility in the region long-term.

USACE_DAPL0071319

Environmental Assessment
Dakota Access Pipeline Project
July 2016

### 3.12.2  Noise

#### 3.12.2.1  Affected Environment

Sound is a sequence of waves of pressure that propagates through compressible media such as air or water.  When sound becomes excessive, annoying, or unwanted it is referred to as noise.

Decibels (dB) are the units of measurement used to quantify the intensity of noise.  To account for the human ear's sensitivity to low level noises, the decibel values are corrected for human hearing to weighted values known as decibels of the A-weighted scale (dBA; see **Table 3-16**).  The EPA has set values that should not be exceeded.  While the primary responsibility of regulating noise was transferred from the EPA to state and local governments in 1981, the Noise Control Act of 1972 and the Quiet Communities Act of 1978 are still in effect.

| Table 3-16 Noise Values | | |
|---|---|---|
| **Area** | **Noise Level** | **Effect** |
| All areas | Leq (24) < 70 dBA | Hearing |
| Outdoors in residential areas and farms where people spend varying amounts of time in which quiet is a basis for use | Ldn < 55 dBA | Outdoor activity interference and annoyance |
| Outdoor areas where people spend limited time such as school yards, playgrounds, etc. | Leq (24) < 55 dBA | Outdoor activity interference and annoyance |
| Indoor residential areas | Ldn < 45 dBA | Indoor activity interference and annoyance |
| Indoor areas with human activities such as schools, etc. | Leq (24) < 45 dBA | Indoor activity interference and annoyance |

Source: (The Engineering ToolBox, 2015)
Leq: 24-hr equivalent sound level
Ldn: day-night average sound level

The dominant land use in the proposed Project Area is agricultural.  The Day-Night Average Sound (Ldn) level for agricultural crop land is 44 dBA, and rural residential is 39 dBA (The Engineering ToolBox, 2015).

#### 3.12.2.2  Impacts and Mitigation

Construction of the Proposed Action would temporarily affect the noise levels on and around the flowage easement and federal lands crossing areas.  Construction would cause temporary increases in the ambient sound environment in the areas immediately surrounding active construction.  The use of heavy equipment or trucks would be the primary noise source during construction and excavation.  The level of impact would vary by equipment type, duration of construction activity and the distance between the noise source and the receptor.  Construction activities would typically be limited only to daytime hours.  Potential exceptions include work determined necessary based on weather conditions, safety

USACE_DAPL0071320

Environmental Assessment
Dakota Access Pipeline Project
July 2016

considerations, and/or critical stages of the HDD [e.g. if pausing for the night would put the drill at risk of closing or jamming].

Once constructed and in-service, normal pipeline operations are not audible and noise impacts would be limited to the short-term construction window.  Dakota Access would mitigate noise impacts by limiting equipment running times and the duration of Proposed Action construction to the minimum amount necessary to complete the Proposed Action.  Noisy construction activities would typically be limited to the least noise-sensitive times of day (daytime only).

It is not anticipated that the temporary increase in ambient sound levels associated with construction would result in a significant noise impact.

97

USACE_DAPL0071321

Environmental Assessment
Dakota Access Pipeline Project
July 2016

## 4.0     CUMULATIVE IMPACTS

Cumulative impacts to the environment result from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.  Cumulative impacts may result from individually minor but collectively significant actions taking place over a period of time 40 CFR Part 1508.

Consultation with the North Dakota Public Service Commission (NDPSC) personnel, and subsequent evaluation of its online resources, provided a systematic source of information that was useful for evaluating cumulative impacts.  Although the NDPSC does not maintain a centralized repository for energy infrastructure development projects, it provides a summary of siting applications, which offers one metric of energy project development (excluding gathering lines), particularly over time (NDPSC, 2012a).  The siting application summary (NDPSC, 2012b) contains records starting in 1996.  The number of statewide siting applications increases markedly starting in 2007, coinciding with development of the Bakken Formation oil field.  Prior to that, only three to four applications would typically be submitted on an annual basis (NDPSC, 2012a).

Past actions in the vicinity of the Proposed Action include oil and gas development and associated infrastructure, utility installation, and agriculture.  These past activities most likely have had effects on soils, water resources, vegetation, wildlife, land use, visual resources, paleontological resources, and cultural resources.  The DAPL Project route was sited to minimize green-space impacts by co-locating with existing utility corridors over much of its length.  As a result, the flowage easement crossing, as designed, would be co-located with a Oneok/TransCanada natural gas pipeline and the Lake Oahe HDD would be co-located with a natural gas pipeline and a 345 kV power line.  At both of these locations, the predominant land use is agriculture.  In addition to ongoing agricultural practices and the expansion of regional oil and gas development activities, cumulative impacts associated with the DAPL Project as whole were also considered.

If the Corps approval of the Proposed Action markedly changed the rate at which the oil and gas industry grows, or facilitated a rapid increase in production, then the changes in the industry's rate of growth and the associated environmental consequences could be considered along with the effects of the Proposed Action as a cumulative impact and would need to be quantified in this EA.  However, according to Bruce Hicks, North Dakota Industrial Commission's Department of Mineral Resources Oil and Gas Division, the critical factors limiting the rate at which the industry grows within North Dakota is the availability of drill rigs and hydrofracing crews (U.S. Army Corps of Engineers, 2011).  Because the availability of rigs and crews is the critical factor affecting the growth of the industry in the region, approval of the Proposed Action is not anticipated to have a cumulative impact of increasing production or reliance upon non-renewable resources.

Cumulative impacts were evaluated for the following resources and were determined to be negligible or nonexistent based on past and foreseeable future actions in the Project Area and the minor and temporary contribution of the Proposed Action to effects on these resources:

- Geology and Soils                                    Section 4.1
- Water and Aquatic Life Resources                     Section 4.2

USACE_DAPL0071322

Environmental Assessment
Dakota Access Pipeline Project
July 2016

- Vegetation, Agriculture, and Range Resources                                    Section 4.3
- Threatened, Endangered, Candidate, and Proposed Species           Section 4.4
- Wildlife Resources                                                                               Section 4.5
- Land Use and Recreation                                                                   Section 4.6
- Cultural and Historic Resources and Native American Consultations   Section 4.7
- Social and Economic Conditions                                                        Section 4.8
- Transportation and Traffic                                                                  Section 4.9
- Environmental Justice                                                                         Section 4.10
- Air Quality and Noise                                                                         Section 4.11

## 4.1   Geology and Soils

The continued development of oil and gas exploration and production in the region at its current level increases the potential for adverse cumulative impacts to geologic and soil resources.  Cumulative impacts could occur when future utilities seek to be co-located within existing corridors or alternatively when greenfield development occurs in landslide prone or highly erodible areas.  However, with the proper implementation of reclamation and restoration BMPs these impacts can be reduced.

Another potential cumulative impact to geologic resources is the continued development of the mineral resource, which could lead to its depletion.  The mineral resource is understood to be finite.  The effect would be primarily economic to the various entities with financial interests; secondarily there could be indirect impacts, potentially beneficial, associated with technological advances within the industry that would facilitate the recovery of mineral resources that cannot be recovered currently.

Agricultural practices throughout the region as well as the thousands of miles of gathering pipelines that may be built in the region could contribute to cumulative impacts on soils.  Agricultural practices can result in increased erosion and runoff when soils are exposed for long periods such as when fields are fallow or prior to seeding.  Impacts to soils as a result of pipeline installation are temporary and typically associated with excavation activities which may result in compaction and erosion when soils are exposed prior to revegetation.  Impacts to soils as a result of the Proposed Action would be mitigated through the implementation of BMPs which may include topsoil segregation, erosion controls, and decompaction. Furthermore, adherence to NPDES stormwater permits would require adequate design, grading, and use of BMPs to ensure that erosion and sediment control measures are properly utilized.  Generally, because of the utilization of top soil segregation and erosion controls, as well as the minimal workspace requirements and minimum duration of exposed excavations during construction of the Proposed Action, the cumulative impacts on soils when combined with agricultural practices and other pipeline installations would not be significant.

No impacts on mineral extraction, mining, or other deeper geologic resources would be cumulative, since these uses of geologic resources (*i.e.,* mining) do not occur in the Project Area.  Clearing and grading associated with construction of the Proposed Action and other projects in the vicinity could increase soil erosion in the area.  The introduction of contaminants to groundwater due to accidental spills of construction-related chemicals, fuels, or hydraulic fluid could have an adverse effect on groundwater quality.  Because the direct effects would be localized and limited primarily to the period of construction,

USACE_DAPL0071323

Environmental Assessment
Dakota Access Pipeline Project
July 2016

cumulative impacts on geology, soils, and sediments would only occur if other projects were constructed at the same time and place as the Proposed Action facilities.

There are smaller diameter, unregulated, crude oil gathering lines that have leaked and affected soil and ground/surface water.    These pre-existing lines have limited cathodic protection (external corrosion protection) and as such they are not routinely monitored.  The Proposed Action is the construction of a regulated large diameter crude oil transmission line and, as discussed throughout this document, is highly regulated and monitored.   The cumulative impacts of this pipeline are minimized by the regulatory criteria, the monitoring, protections and response implemented by Dakota Access during the operation of the pipeline.

## 4.2    Water and Aquatic Life Resources

Cumulative impacts on water resources (i.e., groundwater, surface waters, wetlands) associated with the Proposed Action would be avoided, temporary, and/or minor, as all surface waterbodies would be crossed via trenchless methods (i.e., HDD or bore), no permanent fill or loss of wetlands are anticipated, and potential spill-related impacts would be avoided or greatly reduced by regulating fuel storage and refueling activities and by requiring immediate cleanup should a spill or leak occur.  Spill response and remediation measures associated with construction activities are discussed in detail in Dakota Access' SWPP, SPCC and ECP.

Recently completed construction or current construction within the vicinity of the Project Area could extend the period of exposure of soils as a result of incomplete revegetation.  These exposed soils may increase the potential for soil erosion or sediment transport via overland flow during precipitation events resulting in sedimentation in surface waterbodies.  These increased loads could have the potential to temporarily impact water quality, wetlands, and sensitive fish eggs, fish fry, and invertebrates inhabiting waterbodies in the Project Area watersheds.  However, all projects, including the DAPL Project as a whole, are subject to regulation by the USACE under the CWA.  By installing the pipeline using the HDD technique at the Missouri River and Lake Oahe crossings, as well as other crossings associated with the DAPL Project as a whole, and implementing the erosion and sediment control measures specified in the ECP (**Appendix G**) and SWPPP (**Appendix A**), the potential for increased sediment loading from terrestrial sources is minimized and the cumulative effect is considered to be negligible.

In addition to water quality impacts associated with sediment loading from erosion and run-off, an inadvertent release of non-hazardous drilling mud could occur during HDD activities, including those at Lake Oahe and the Missouri River.  The likelihood of inadvertent releases of drilling mud is greatly minimized through thorough geotechnical analysis and detailed design/mitigation plans at each crossing and careful monitoring of drilling mud returns and pressure during HDD activities.  If an inadvertent release were to occur within a waterbody during HDD activities, such as those at the Missouri River and Lake Oahe crossings, impacts on water quality and aquatic resources would be minor.  Drilling mud is non-hazardous and impacts on water quality and aquatic resources would be akin to those associated with sediment loading.  Due to the quantity of drilling mud used in relation to the size of waterbodies typically crossed via HDD, impacts would be temporary and mitigated through implementation of an HDD Contingency Plan (**Appendix B**) Impacts on all waterbodies crossed by the DAPL Project in its entirety would be minimized or avoided via HDD and/or use of erosion and sediment control measures; thereby minimizing the potential for cumulative impacts on water and aquatic life resources.

100

Environmental Assessment
Dakota Access Pipeline Project
July 2016

Impacts on water and aquatic life resources associated with sediment loading, including potential inadvertent releases of non-hazardous drilling mud, as a result of the Proposed Action and the DAPL Project as a whole would be temporary and short-term.  Therefore, these impacts, when evaluated with other oil and gas development and infrastructure projects in the region and agricultural practices, would result in minor cumulative impacts on water and aquatic life resources.

Spills or leaks of hazardous liquids during construction and operation of the Proposed Action, or other projects in the vicinity, have the potential to result in long-term impacts on surface and groundwater resources as well as aquatic life resources.  However, construction impacts would be mitigated by the proper design and implementation of BMPs would ensure avoidance, minimization, and/or mitigation of potential impacts on water resources and aquatic resources, as required by the various regulating agencies that have jurisdiction over the DAPL Project.  Operational risks are being mitigated by DAPL Project design to meet or exceed the applicable federal regulations as detailed in Sec 3.11- Reliability and Safety. In the unlikely event of an unanticipated release during operations of the pipeline, the effects would be remediated following the cleanup procedures and remediation activities described in Section 3.2.2.2.Therefore, the potential cumulative impacts from the Proposed Action on water resources and aquatic resources resulting from spills would be minor.

In addition, while construction and operation of the Proposed Action along with the other potential projects and activities could result in cumulative impacts on existing wetlands in the Project Area watersheds, regulation of activities under the CWA by the Corps requires permitting and mitigation for wetland impacts so that there would be no net loss in the regional wetland resources.  Therefore, cumulative impacts on wetland resources in the Project Area would be minimal.

## 4.3    Vegetation, Agriculture, and Range Resources

As described within Section 3.3.1, all vegetation disturbed by construction within the flowage easements and the Project Area/Connected Actions of the federal lands would be restored to pre-construction conditions following the completion of construction activities, with the exception of one PFO wetland located within the permanent ROW on the flowage easements that would be converted to shrub-scrub or herbaceous wetlands.

No forest fragmentation would occur as a result of construction and operation of the Proposed Action. No interior (core) forest habitat is crossed by the Proposed Action, and the only wooded area that would be permanently impacted by the Proposed Action include one PFO wetland (0.05 acre) located within the permanent ROW on the flowage easements between HDD boxes.  However, much of the forest and PFO wetlands in the vicinity of the Project Area have already been fragmented by agricultural activities, roads, and other commercial or industrial developments.  Further, construction of the Proposed Action facilities would not result in the permanent loss of wetland features.  Although trees within a 30-foot corridor centered on the pipeline that could compromise the integrity of the pipeline coating would be selectively removed throughout the operational life of the Proposed Action, this portion of the PFO wetland impacted by the Proposed Action would be converted to PEM or PSS and allowed to revegetate with scrub-shrub or herbaceous species.  Therefore, further fragmentation of wetlands or creation of new forest-edge habitat as a result of the Proposed Action would be negligible.

101

USACE_DAPL0071325

Environmental Assessment
Dakota Access Pipeline Project
July 2016

Generally, the greatest impact to the native vegetative community is associated with past and current agricultural practices.  Pipeline projects impact a relatively small area in relation to the total landscape, as these impacts are typically short in duration and temporary in nature.  Examples of impacts to vegetation, agriculture, and range resources could include introduction of non-native plants and/or noxious weeds, habitat fragmentation, altered vegetative structure, reduced population sizes below critical threshold levels, sedimentation or degradation of surface waters, erosion, and siltation.   However, the implementation of BMPs outlined in the SWPPP (**Appendix A**) and ECP (**Appendix G**) and reclamation of disturbed areas with native vegetation would reduce the chances of adverse individual or cumulative impacts.  In addition, while other project pipeline corridors may require clearing of forested areas and potential habitat fragmentation, temporary workspace areas would be revegetated upon completion of construction.  Further, these projects would be located in a region of North Dakota that is dominated by open or agricultural land, thereby minimizing the potential for permanent habitat fragmentation. Regionally, there have been releases of hazardous material from unregulated, smaller diameter gathering pipelines that have had an adverse effect on vegetation, agriculture and range resources.  In the unlikely event of an unanticipated release during operations of the pipeline, the effects would be remediated following the cleanup procedures and remediation activities described in Section 3.11.  Therefore, the potential cumulative impacts from the Proposed Action on vegetation, agriculture and range resources would be minor.

## 4.4      Threatened, Endangered, Candidate, and Proposed Species

As required by the ESA, the status of each species listed as threatened or endangered is evaluated every 5 years by USFWS to assess its recovery and determine if a change in its listing status is warranted.  Where available, these documents were utilized to identify the potential for ongoing regional oil and gas development to significantly threaten the species listed in the Project area.  For species in which a 5-Year Review was not available, Dakota Access utilized the species Recovery Plan and/or Final Rule to evaluate potential threats on the species resulting from regional oil and gas development.

Species for which no suitable habitat is present in the Project Area or Connected Action Area, such as the black-footed ferret, Dakota skipper, and gray wolf, were not evaluated, as the Proposed Action would not contribute to cumulative impacts on these species.   Further, the northern long-eared bat was not evaluated since the species is not provided federal protection in the Project Area or Connected Action Area under the Interim 4(d) Rule; this area is well outside of the published White-Nose Syndrome Buffer Zone.

Habitat loss and modification are the primary threats to the continued existence of interior least tern, whooping crane, piping plover, rufa red knot, and pallid sturgeon.  The potential cumulative impacts from oil and gas activities in the region on the current listing or potential elevated future listing of these five species are discussed in detail below.

### 4.4.1    Interior Least Tern

The USFWS does not address oil and gas activities, including potential spills, as a potential or ongoing threat to the interior least tern in either the 5-year review, or the recovery plan (USFWS, 2013e).  The primary threat to interior least terns and the cause of the initial population declines resulted from river

102

Environmental Assessment
Dakota Access Pipeline Project
July 2016

channelization, impoundments, and changes in river flow resulting in loss of suitable habitat throughout their range.

### 4.4.2    Whooping Crane

According to the USFWS (2007) International Recovery Plan for the Whooping Crane (*Grus Americana*) the USFWS considers oil and gas activities as a secondary threat, especially within the wintering range in the southeast United States.  Potential threats on whooping cranes along the Central Flyway migratory route in the region of the Proposed Action include loss of stopover habitat from conversion of natural wetlands (e.g., prairie potholes) to croplands, as well as development activities associated with natural gas and oil production.  The Proposed Action would not result in any loss of stopover habitat for the whooping crane; therefore, it would not contribute to cumulative impacts on the species.

### 4.4.3    Piping Plover

The USFWS (2009b) 5-Year Review for the piping plover does specifically address threats from oil and gas activities in North Dakota.  However, impacts from oil and gas activities that are threatening piping plover are associated with the development of oil and gas exploration wells located near the alkali lakes habitat, which accounts for 83% of the U.S. Northern Great Plains piping plover breeding habitat.  The Proposed Action is not located within the vicinity of any of these areas and would therefore not contribute to cumulative impacts on piping plovers.

### 4.4.4    Rufa Red Knot

According to the Final Rule (79 FR 73706) for the rufa red knot (USFWS, 2014b), the USFWS considers oil and gas activities as a secondary threat, especially near the coast (primarily in southeast Texas in the wintering range).  Potential threats to these species along the Central Flyway migratory route in the region of the Proposed Action include loss of stopover habitat from conversion of natural wetlands (e.g., prairie potholes) to croplands and development (including oil and gas exploration).  The Proposed Action would not result in any loss of stopover habitat for the rufa red knot; therefore, it would not contribute to cumulative impacts on the species.

### 4.4.5    Pallid Sturgeon

The USFWS (2014c) Revised Recovery Plan for the Pallid Sturgeon (*Scaphirhynchus albus*) specifically addresses the potential effects of energy development such as oil and gas pipelines on pallid sturgeon.  It states that while a rupture of a pipeline within sturgeon habitat could pose a threat, the impacts would be localized and the magnitude of the impact would be dependent on the quantity and timing of the material released.  It is highly unlikely that a cumulative impact resulting from a spill or leak would occur, as it would require multiple pipelines in the same general area to experience anomalous events simultaneously.  Even if this were to occur, these impacts would be localized and temporary and would likely not result in a significant impact on the recovery of pallid sturgeon, as a whole, as it is found in other waterbodies and in other regions throughout its range (USFWS, 2014c).

USACE_DAPL0071327

Environmental Assessment
Dakota Access Pipeline Project
July 2016

### 4.4.6    Conclusion

The collocation of utilities in established corridors; the proper implementation of erosion control devices; compliance with permits issued for regulated activities; and rapid, thorough, environmentally appropriate reclamation efforts, and design and operation of projects to meet or exceed regulatory requirements are industry standards that, when applied consistently, on a regional basis, would minimize cumulative impacts now and in the future.  Based on the pipeline route, and the utilization of HDDs, the Proposed Action is not likely to have any permanent adverse impacts to habitat utilized by listed species, including aquatic species as discussed in Section 3.4.  Therefore, the Proposed Action will not have a cumulative effect on listed species.

### 4.5    Wildlife Resources

Regionally, the greatest impacts to wildlife (past, present or future) can be associated with agricultural development.  Agricultural land use replaced the existing natural diversity with the monoculture row crops.  The practice also introduced noxious weeds, soil pests, and other exotics, which all had significant cumulative impacts on regional wildlife.  Relative to the habitat and land use impacts associated with past agricultural activities, the Proposed Action impacts, as well as those associated with the oil and gas industry on a regional basis and Connected Actions would be nominal.  This is due to the short duration and small scale of the Proposed Action relative to the regional landscape and the large scale of agricultural activities in the region.

The Proposed Action would not permanently alter the character of the majority of available habitats as most impacts are expected to be temporary (see Section 4.3 for a discussion of vegetation impacts associated with the Proposed Action and the DAPL Project as a whole).  Possible temporary, short-term impacts on wildlife include the temporary displacement of some mobile individuals to similar, adjacent habitats during construction activities.  Further, while other oil and gas projects' pipeline corridors may require clearing of forested habitat (if present), once construction is complete, temporary workspace areas would be able to revegetate.  In addition, the permanent easement would be allowed to revegetate with herbaceous species, which provides habitat to a variety of species that utilize herbaceous and edge habitats.  When analyzed on a regional basis, these impacts do not change significantly in magnitude when compared to the current and historic impacts previously imposed upon the regional wildlife by agricultural development.  Therefore, further habitat fragmentation as a result of the Proposed Action or other oil and gas developments in the region would be negligible and is not anticipated to significantly contribute to cumulative effects on wildlife.

### 4.6    Land Use and Recreation

Regional oil and gas development and related activities could cause an impact to land use and recreation in the Project Area.  However, increased impacts are not anticipated based on the design of the DAPL Project and BMPs that would be implemented to restore the impacted area.  Temporary impacts to land use would potentially occur during the period of active construction but areas would revert to preconstruction use following restoration.  Because construction would be short term and land use conversion would be minimal, the cumulative impact on land use as a result of the Proposed Action would be temporary and minor.

USACE_DAPL0071328

Environmental Assessment
Dakota Access Pipeline Project
July 2016

The flowage easement crossing would be located in an area with a greater density of prior development, while the Lake Oahe crossing would be located in an area with relatively little surface development.  That said, since the Proposed Action has been co-located with existing pipelines the additional impact incurred by the Proposed Action would be negligible if restored as proposed.

The potential cumulative impacts from the Proposed Action on land use and recreation resources resulting from spills would be minor.  Although there have been releases of hazardous material from small diameter, unregulated gathering pipelines that have had an adverse effect on land use and recreation resources, it is highly unlikely for an unanticipated release to occur within the EA review area during operations of the DAPL pipeline, which is subject to DOT construction regulations and pipeline leak detection monitoring guidelines.

In the event of an unanticipated release during operations of the pipeline, the effects would be remediated following the cleanup procedures and remediation activities described in Section 3.11.  Cumulatively, the impacts associated with land use and recreation resources would be minimal.


## 4.7    Cultural and Historic Resources and Native American Consultations

Dakota Access would implement measures to avoid or mitigate adverse effects to cultural resources that have been determined, in consultation with the federal land managing agencies, NDSHPO, and Native American tribes, to be eligible for listing in the NRHP.  At the one potential NRHP-eligible site mapped adjacent to the workspace within the EA review area, Dakota Access would install exclusionary fencing along the outer workspace boundary during construction to prevent inadvertent trespassing by construction staff or vehicles.  This area would be classified generically as sensitive environmental areas, and would be closely monitored by EI staff.  If an unanticipated discovery occurs during construction, Dakota Access would follow the measures described in its UDP (**Appendix F**).

Although the possibility of an unanticipated discovery is low based on the negative findings of the field survey efforts in the Project Area, the measures outlined in the UDP includes a thorough notification protocol which would ensure that the necessary cultural resources specialists and agency personnel are involved to appropriately address the nature and significance and of the find.  The Proposed Action is not anticipated to impact cultural resources; therefore, cumulative impacts associated with the Proposed Action would not occur.

## 4.8    Social and Economic Conditions

Construction of the overall DAPL Project would contribute more than $1 billion in direct spending just for materials – the majority of which would be purchased in the U.S.  Fifty-seven percent of the pipe; the majority of the valves, fittings, valve actuators; and the majority of the remaining materials would be manufactured in the U.S., creating significant opportunities for regional and national manufacturing.  In addition to manufactured goods and services, the DAPL Project would provide $195 million in easement payments to the landowners whose property is crossed by the DAPL Project.

105

Environmental Assessment
Dakota Access Pipeline Project
July 2016

The Proposed Action would have a relatively short construction window with a small number of construction workers dedicated to the crossings.  It is possible that nearby towns could experience short-term temporary increases to the local economy through induced spending from construction employees working on the Proposed Action.  No residential homes or farms would be relocated as a result of the Proposed Action.  Additionally, no demographic changes in the Census tracts affected within the Project Area counties are anticipated because no permanent employees would be created as a result of the Proposed Action.  Therefore, the only indirect socioeconomic impacts from the Proposed Action are likely to be related to the temporary influx of workers, such as increased demand for short term housing and the secondary economic benefits discussed in Section 4.10.

The regional population has dramatically increased over the last seven year period due to oil and gas development; concentrated in the Project Area.  The majority of the current available and transient labor force in the region is involved in the exploration and production of the resources, or construction of related infrastructure, both of which are labor intensive efforts though temporary in nature.  Well rigs are mobile and the number of available drilling leases is limited as well as the mineral resource itself.  For these reasons the labor pool effects associated with the exploration and production of the resource are considered to be a temporary impact.

Regarding cumulative impacts to socioeconomic resources, the Proposed Action would provide a benefit to local merchants and vendors as well as providing potential temporary employment opportunities to the local workforce.  As such, no substantive negative direct, indirect, or cumulative impacts to socioeconomic resources would result from the Proposed Action.

## 4.9    Transportation and Traffic

As discussed in Section 3.3, roads throughout North Dakota have received a sharp increase in truck traffic due to increased oil and gas activity.  The greater amount of traffic has led to a decline in the transportation infrastructure and a decrease in road safety throughout the state.  Additional oil and gas development and production may continue to contribute to cumulative effects on roads in the vicinity of the Project Area requiring a higher frequency of road maintenance and repair on public roadways.

Cumulative impacts from construction of the Proposed Action would temporarily increase traffic in the immediate vicinity of the Project Area.  This increase in traffic would be temporary and is not expected to result in significant impacts to North Dakota's transportation infrastructure.  Road improvements such as grading would be made as necessary and any impacts resulting from Dakota Access's use would be repaired in accordance with applicable local permits.  Traffic interruptions would be minimized to the extent practical and would result in insignificant, temporary cumulative impacts on regional transportation resources as it would be localized to the immediate vicinity of the Project Area and major delivery routes.

During operations of the Proposed Action, there is expected to be a positive effect on traffic resources in North Dakota.  Once in operation, Dakota Access plans to transport 450,000 bpd of crude oil via pipeline which would significantly reduce the demand for the commercial trucking of crude oil on county, state and interstate highways.  It is anticipated that the cumulative effects of the DAPL Project and other future pipeline projects would be beneficial to the transportation infrastructure in North Dakota by decreasing oil hauled by truck traffic and therefore reducing wear and tear on roads and highways.

106

USACE_DAPL0071330

Environmental Assessment
Dakota Access Pipeline Project
July 2016

## 4.10    Environmental Justice

The Proposed Action and Connected Actions and associated cumulative effects where practicable have been co-located with existing utilities and across USACE easements and fee owned property.  The DAPL Project avoids crossing Tribal reservation lands across its entire length.  There are no reasonable past, present or reasonably foreseeable actions that together with these Proposed Actions will have a cumulative significant adverse effect on the environment or a disproportionate impact on low income or minority populations, including the Standing Rock Sioux or other tribes in or around the Project.

Additionally, the holders of the mineral rights and landowners in the region, including particular tribes and tribal members, have witnessed a recent windfall from oil and gas development.  Oil and gas development generally occurs on private land with permission of the landowner.  Given this ascent, there is no disproportionate impact to low income, minority or tribal populations benefited by the Environmental Justice policy.  The DAPL Project was routed to avoid sensitive lands and populations, including tribal lands, and areas and does not have a disproportionate impact on any low income, minority or tribal population benefited by Environmental Justice policy, as discussed in section 3.9, above.  For these reasons, the Proposed Action and its associated cumulative actions and effects have no significant cumulative impact to low-income, minority or tribal populations.

## 4.11    Air Quality and Noise

No operation emissions are associated with the Proposed Action, as no major aboveground facilities would be constructed in the Project Area.  Potential cumulative impacts on air quality would result from concurrent construction of the Project and other development projects in the region.  Cumulative impacts on air quality associated with construction of the Proposed Action would be temporary and short-term; therefore, even if construction of other projects were concurrent with the Proposed Action, cumulative construction-related air quality impacts would be negligible.

Construction of the Proposed Action would affect ambient noise levels at some nearby residences during active construction.  The noise impact of the pipeline construction would primarily originate from the HDD equipment and would be highly localized to the HDD entry and exit sites.  However, because the duration of construction would be short-term, the contribution of the Proposed Action to cumulative impacts on noise would be negligible.

USACE_DAPL0071331

Environmental Assessment
Dakota Access Pipeline Project
July 2016

### 5.0    IRREVERSIBLE AND IRRETRIEVABLE COMMITMENT OF RESOURCES

As required by NEPA, irreversible and irretrievable commitments of resources involved in the Proposed Action should it be implemented, must be addressed in the EA.  Irreversible commitments of resources result in a loss of future options.  Commitments of resources which are irreversible are those resources which are destroyed or consumed and are neither renewable nor recoverable for use by future generations.  Examples of irreversible commitments of resources include consumption of petroleum-based fuels or minerals and destruction cultural resources.  Irretrievable commitments of resources result in a loss of productivity.  Commitments of resources which are irretrievable occur when the productive use or value of a renewable resource is lost for a period of time.  For example, timber or soil productivity may be lost for a period of time resulting in an irretrievable loss of production, but the action is reversible.

Construction activities associated with the Proposed Action would result in the consumption of materials such as aluminum, steel, other metals, wood, gravel, sand, plastics, and various forms of petroleum-based fuels, the use of which would constitute an irreversible commitment of resources.  Most of these materials are nonrenewable and would be irreversibly committed if not recycled or reused during maintenance or at the end of the life of the Proposed Action.

Areas of vegetation removal or conversion along the permanent right-of-way, such as areas where trees or shrubs were established prior to construction but would be maintained in an herbaceous state during operation, would represent an irretrievable commitment of resources.  Additionally, erosion, compaction, or an overall loss of soil productivity could occur if these impacts are not properly mitigated.  Use of water for dust control and hydrostatic testing would also be irretrievable.  Other irretrievable commitments of resources could occur if areas temporarily impacted by construction were not restored.

Overall, there would be a very minimal commitment of irreversible and/or irretrievable resources as a result of the Proposed Action since the majority of impacts would be temporary and would occur within agricultural land.  Additionally, irreversible and/or irretrievable commitments of resources would be minimized through the mitigation measures for the affected environments identified throughout this EA.

USACE_DAPL0071332

Environmental Assessment
Dakota Access Pipeline Project
July 2016

## 6.0     MITIGATION SUMMARY

Dakota Access has selected the Proposed Action to minimize impacts to natural/cultural resources as summarized in Table 8-2. System and routing alternatives were considered for the entire DAPL Project in order to meet purpose and need, design criteria and construction requirements, while minimizing potential impacts to the existing environment and socioeconomic setting. Impacts to the environment would be temporary and not significant as a result of avoiding, minimizing and mitigation any potential impacts. The majority of potential impacts would be mitigated by HDD technology which would bore beneath resources and allow pipeline construction to proceed with the least amount of impacts possible. Dakota Access has would also implement general mitigation measures such as those described in the ECP (**Appendix G**). The ECP has been developed based on decades of experience implementing BMPs during construction in accordance with generally accepted industry practices for linear infrastructure and cross-county pipelines. It is intended to meet or exceed federal, state, and local environmental protection and erosion control requirements, specifications and practices. The ECP describes current construction techniques and mitigation measures that would be employed to minimize the effects of construction on environmental resources. Some of the basic procedures identified in the ECP are listed below:

- BMPs designed to minimize the effects of construction on environmental resources;
- Temporary and permanent erosion and sediment control measures;
- Soil handling procedures designed to preserve the integrity of the soil (e.g., topsoil segregation, decompaction, etc.);
- Wetland and waterbody crossing and stabilization procedures
- Wildlife and livestock mitigation measures
- Restoration and revegetation procedures
- Refueling and waste management procedures
- Weed management procedures
- Winter construction practices
- Stormwater management procedures

Dakota Access incorporates environmental requirements into all construction specifications and the ECP would be included in contract documents and enforced as such throughout the proposed action. The construction contractor(s) must comply with all applicable permits and plans during all phases of construction. In addition to the ECP, the Proposed Action would be constructed in accordance to the measures detailed in Dakota Access' SWPPP, SPCC, HD Construction Plan, HDD Contingency Plan, and UDP.

To further ensure compliance with permits, plans, obligations, and commitments, Dakota Access would have full-time EIs to monitor construction and compliance. The EIs would be responsible for observing construction activities to verify that work is carried out in accordance with environmental permit requirements and ensure that designed avoidance and mitigation measures are properly executed during construction.

No additional mitigation measures were identified for geology and soils; water resources; vegetation, agriculture, and range resources; wildlife resources; aquatic resources; land use and recreation; cultural and historic resources, social and economic conditions; environmental justice; or air and noise. General

USACE_DAPL0071333

Environmental Assessment
Dakota Access Pipeline Project
July 2016

mitigation measures, as described in sections 3.1 through 3.7, or avoidance associated with the trenchless installation (i.e., HDD or bore) of the proposed pipeline are expected to mitigate adverse impacts to resources.

USACE_DAPL0071334

Environmental Assessment
Dakota Access Pipeline Project
July 2016

### 7.0     FEDERAL, TRIBAL, STATE, AND LOCAL AGENCY CONSULTATION AND COORDINATION

The following is a listing of all individuals and agencies consulted during preparation of the EA regardless of whether a response was received.  On March 30, 2015, Dakota Access sent letters to interested parties (indicated by the Corps) requesting comments on the federal actions associated with crossing Corps flowage easements and Corps owned and managed federal land.  A sample request for comment letter sent to individuals and agencies consulted, along with the mailing list and comments received, is included in **Appendix J**.  **Appendix K** contains the Notice of Availability of the Draft EA for comment.  **Table 7-1** includes a summary of agency personnel consulted.

| Table 7-1 Agency/Entity Consultation List | | | |
|---|---|---|---|
| **Agency/Entity** | **Name** | **Address** | **Date Received/ Relevant EA Section** |
| American Rivers | Kristen McDonald | 1101 14th Ave. NW STE 1400 Washington, DC 20005-5637 | N/A |
| Bureau of Indian Affairs - Fort Berthold Agency | Howard Bemer | PO Box 370 New Town, ND 58763 | N/A |
| Bureau of Indian Affairs - Great Plains Regional Office | William Benjamin | 115 Fourth Avenue S.E. Aberdeen, SD 57401 | N/A |
| Bureau of Indian Affairs-Fort Berthold Agency | Earl Silk | P.O. Box 370 New Town, ND 58763 | N/A |
| Bureau of Indian Affairs- Standing Rock | Robert Demery | P.O. Box E Fort Yates, ND 58538 | N/A |
| Bureau of Land Management | Rick Rymerson | 99 23rd Avenue West, Suite A Dickinson, ND 58601 | N/A |
| Dakota Prairie Grasslands | Dennis Neitzke | 1200 Missouri Ave Bismarck, ND 58504 | N/A |
| Dakota Resource Council | Mark Trechock | P.O. Box 1095 Dickinson, ND 58601 | N/A |
| Bismarck-Mandan Development Association | Brian Ritter | 400 East Broadway Avenue, Suite 417 Bismarck, ND 58501 | N/A |
| Morton County Commissioners | Dawn Rhone | 210 2nd Ave NW Mandan, ND 58554 | N/A |
| Morton County Extension Agent | Kari Presler | 210 2nd Ave NW Mandan, ND 58554-3158 | N/A |
| Morton County Weed Board | Wayne Carter | 2916 37th St. NW Mandan, ND 58554 | N/A |
| Emmons County Commissioners | Marlys Ohlhauser | P.O. Box 129 Linton, ND 58552 | N/A |
| Emmons County Extension Agent | Connie Job | Courthouse, Box 278 Linton, ND 58552-0278 | N/A |

111

USACE_DAPL0071335

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 7-1 | | | |
|---|---|---|---|
| **Agency/Entity Consultation List** | | | |
| **Agency/Entity** | **Name** | **Address** | **Date Received/ Relevant EA Section** |
| Emmons County Weed Board | Sam Renschler | 510 Sampson Ave. Linton, ND 58552 | N/A |
| Williams County Commissioners | Beth Innis | 205 East Broadway PO Box 2047 Williston, ND 58802-2047 | N/A |
| Williams County Extension Agent | | 302 East Broadway PO Box 1109 Williston, ND 58802-1109 | N/A |
| Williams County Weed Board | Jim Basaraba | 109 Main St Williston, ND 58801-6018 | N/A |
| National Audubon Society State Office | Genevieve Thompson | 118 Broadway, Suite 512 Fargo, ND 58102 | N/A |
| Natural Resources Conservation Service | Kyle Hartel | PO Box 583 Watford City, ND 58854 | N/A |
| Natural Resources Conservation Service | Michele R. Doyle | 2540 Overlook Lane Mandan, ND 58554-1593 | N/A |
| Natural Resources Conservation Service | Jennifer M. H. Vetter | 318 Broadway St. S Linton, ND 58552-7612 | N/A |
| Natural Resources Conservation Service | David Schmidt | 1106 West 2nd St Williston, ND 58801-5804 | N/A |
| NDSU Dept of Soil Science- Department Chair | | NDSU Dept 7680 PO Box 6050 Fargo, ND 58108-6050 | N/A |
| North Dakota Council of Humane Societies | Leo Keelan | 1948 Anderson Drive Minot, ND 58701 | N/A |
| North Dakota Department of Health | Peter Wax | 600 East Boulevard Bismarck, ND 58505 | N/A |
| North Dakota Farm Bureau | | 4900 Ottawa Street Bismarck, ND 58503 | N/A |
| North Dakota Forest Service | Larry Kotchman | 307 1st Street East Bottineau, ND 58318-1100 | April 22, 2015/ Section 2.0 and Section 3.5 |
| North Dakota Game & Fish Department | Steve Dyke | 100 N. Bismarck Expressway Bismarck, ND 58501-5095 | N/A |
| North Dakota Game & Fish Department | Dave Fryda | 406 Dakota Ave Riverdale, ND 58565 | N/A |
| North Dakota Game & Fish Department | Bruce Kreft | 100 North Bismarck Expressway Bismarck, ND 58501-5095 | N/A |

112

USACE_DAPL0071336

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 7-1 Agency/Entity Consultation List | | | |
|---|---|---|---|
| **Agency/Entity** | **Name** | **Address** | **Date Received/ Relevant EA Section** |
| North Dakota Game & Fish Department | Kent Luttschwager | 13932 West Front Street Williston, ND 58801-8602 | N/A |
| North Dakota Game & Fish Department | Fred Ryckman | 406 Dakota Ave Riverdale, ND 58565 | N/A |
| North Dakota Game & Fish Department | Terry Steinwand | 100 North Bismarck Expressway Bismarck, ND 58501-5095 | N/A |
| North Dakota Industrial Commission - Oil and Gas Division | Lynn Helms | 600 East Boulevard Bismarck, ND 58505 | April 16, 2015/ Section 3.1.2, Section 3.1.3, and Section 3.1.4 |
| North Dakota Industrial Commission - Oil and Gas Division | Bruce E. Hicks | 600 East Boulevard Bismarck, ND 58505 | N/A |
| North Dakota Land Department | Mike Brand | 1707 North 9th St. P.O. Box 5523 Bismarck, ND 58506-5523 | N/A |
| North Dakota Parks & Recreation Department | Kathy Duttenhefner | 1600 East Century Avenue, Suite 3 Bismarck, ND 58503-0649 | April 20, 2015/ Section 3.3.1, Section 3.4 and Section 3.5. |
| North Dakota Petroleum Council | Ron Ness | P.O Box 1395 Bismarck, ND 58502 | N/A |
| North Dakota State Historical Society | Susan Quinnell | 612 East Boulevard Ave. Bismarck, ND 58505 | April 2, 2015/ Section 3.7.1 |
| North Dakota State Water Commission | John Paczkowski | 900 East Boulevard Ave. Bismarck, ND 58505-0850 | N/A |
| North Dakota Tourism Division | Sarah Otte Coleman | P.O. Box 2057 Bismarck, ND 58502-2057 | N/A |
| U.S. Army Corps of Engineers, Regulatory Office | Daniel Cimarosti | 1513 12th St. SE Bismarck, ND 58504 | N/A |
| U.S. Fish and Wildlife Service, North Dakota Field Office | Scott Larson | 3425 Miriam Avenue Bismarck, ND 58501-7926 | N/A |
| USDA-APHIS-WS | Philip Mastrangelo | 2110 Miriam Drive, Suite A Bismarck, ND 58501 | N/A |
| USDA-Natural Resources Conservation Service-North Dakota State Office | Mary Podoll | 220 East Rosser Avenue, Room 270 Bismarck, ND 58502-5020 | April 13, 2015/ Section 3.1.5 and Section 3.2.3 |
| USDOI-Office of Surface Mining Reclamation and Enforcement-Dick Cheney Federal Building | Jeffrey Fleischman | P.O. Box 11018, 150 East B Street, Rm 1018 Casper, WY 82602 | April 13, 2015/ Section 1.1 |

113

USACE_DAPL0071337

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 7-1 Agency/Entity Consultation List | | | |
|---|---|---|---|
| Agency/Entity | Name | Address | Date Received/ Relevant EA Section |
| U.S. Army Corps of Engineers | Omaha District; CENWO-PM-AA | 1616 Capitol Avenue Omaha, NE 68101-4901 | N/A |
| North Dakota Parks & Recreation Department | Mr. Jesse Hanson | 1600 E. Century Ave. Suite 3 Bismarck, ND 58503-0649" | N/A |
| North Dakota Chapter of the Wildlife Society | Mr. Kory Richardson | PO Box 1442 Bismarck, ND 58502 | N/A |
| Sierra Club - North Dakota Office | Mr. Blaine Nordwall | 311 East Thayer Ave Suite 113 Bismarck, ND 58501 | N/A |

USACE_DAPL0071338

Environmental Assessment
Dakota Access Pipeline Project
July 2016

## 8.0     STATUS OF ENVIRONMENTAL COMPLIANCE

**Table 8-1** is a listing of environmental protection statutes and other environmental requirements, as well as the status of Applicant compliance with these statutes and requirements, regarding this EA.

| Table 8-1 Environmental Permits, Approvals, and Consultations | | | |
|---|---|---|---|
| **Jurisdiction** | **Permit or Authorization** | **Status** | **Requirement or Action** |
| **Federal** | | | |
| Corps | RHA, Section 10 | Pending, Application Submitted Dec 2014 | RHA, Section 10: Missouri River/Lake Oahe |
| Corps – Omaha District | Section 404 CWA | Pending, Application Submitted Dec 2014 | NWP 12, Section 404 Waters with PCN |
| | Survey permission, geotechnical investigation | Received April 2015 | Survey permission, geotechnical investigation |
| | Title 30 Rights-of-Way for pipelines through Federal Lands and Temporary Construction License | Pending | Real Estate Outgrant and EA for Crossing the Missouri River/Lake Oahe (Fee title Lands on both sides of river/lake) |
| | Flowage Easement Consent to Cross | Pending | Consent to Cross |
| USFWS | Section 7 Endangered Species Act (ESA) Consultation | Received May 2016 | Compliance under 404 Permit NWP 12 Joint Application |
| Bureau of Reclamation | Letter of consent to cross irrigation works | Received December 2015 | BOR water conveyance facilities, near cities of Buford and Trenton, ND |
| **State** | | | |
| North Dakota Public Service Commission (NDPSC) | North Dakota Energy Conversion and Transmission Facility Siting Act: Certificate of Corridor and Route | Received January 2016 | Siting Application, PU-14-842 |
| North Dakota Office of the State Engineer | Sovereign Land Permit | Permits Received April 2016 | Crossing Permits for the Lake Oahe and the Missouri River Crossings |
| State Historical Society of North Dakota | Section 106 NHPA | Received April 2016 | Section 106 Concurrence/Consultation |

115

USACE_DAPL0071339

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 8-1<br>Environmental Permits, Approvals, and Consultations | | | |
|---|---|---|---|
| **Jurisdiction** | **Permit or Authorization** | **Status** | **Requirement or Action** |
| North Dakota Department of Health | Section 401 Water Quality Certification | Pending | Automatic with NWP 12 |
| | Hydrostatic Test Water Discharge Permit No. NDG07-0000 | Permits Received May 2016 | Obtain permit coverage prior to discharge |
| | North Dakota Pollutant Discharge Elimination System (NDPDES) Construction Stormwater General Permit (NDR10-0000) | Permit Received April 2016 | Obtain permit coverage |

**Table 8-2** provides a summary of the environmental mitigation measures discussed throughout this EA that Dakota Access has committed to as part of the Proposed Action design to avoid or minimize potential impacts on environmental and human resources throughout construction and operation activities.

USACE_DAPL0071340

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 8-2 | |
|---|---|
| Summary of Environmental Impact Avoidance and Mitigation Measures | |
| Resource | Environmental Avoidance/Mitigation Measures |
| Geology and Soils | To protect the terrain of the Project Area and Connected Actions, Dakota Access would, to the extent feasible, restore the areas affected by pipeline construction to pre-construction contours and similar vegetation (excepting trees within approximately 15 feet of the centerline).  Pre-construction and as-built surveys would be completed and provided to the Garrison Project. |
| | Although not anticipated, if blasting is found to be necessary, Dakota Access would follow procedures specified in its Blasting Plan (Appendix E). |
| | Dakota Access, in accordance with North Dakota One Call, would require that the construction contractor, prior to initiating any ground disturbance activities, identify all underground utilities to minimize the potential for encountering buried utility structures. |
| | Dakota Access has completed a geotechnical analysis of the flowage easement and federal land crossing sites to facilitate engineering and design, including selection of appropriate materials and construction methods to limit any environmental impacts attributable to landslides. |
| | The proposed pipeline would be designed and constructed to meet or exceed industry specifications, which would effectively mitigate the effects of fault movement, landslides, subsidence, and subsidence. |
| | In the event paleontological resources are discovered during construction, Dakota Access would implement measures outlined in its Unanticipated Discoveries Plan Cultural Resources, Human Remains, Paleontological Resources and Contaminated Media (UDP) (Appendix F) to avoid further impacts to these resources. |
| | If any vertebrate fossils are found during pipeline construction, Dakota Access would immediately cease construction activities and notify the appropriate agency personnel, including the North Dakota state paleontologist as well as the USACE archaeologist.  The appropriate authorities would determine the significance of the find and prescribe the mitigation procedures to be completed prior to resuming pipeline construction. |
| | Dakota Access would minimize or avoid impacts on soils by implementing the mitigation measures described in the DAPL Project's SPCC, SWPPP, and ECP as well as requirements of applicable state and federal permits.  These documents would be included as contract documents and enforced as such throughout the DAPL Project. |
| | To minimize potential impacts on soil productivity, topsoil would be separated during trench excavation in agricultural land, and if applicable, other areas where soil productivity is an important consideration.  Unless otherwise requested by the landowner, topsoil in cropland would be removed to a maximum depth of 12 inches from the trench and spoil storage area and stored separately from the trench spoil.  After the trench is backfilled, topsoil would be returned to its approximate original location in the soil horizon. |

117

USACE_DAPL0071341

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 8-2 |
|---|
| **Summary of Environmental Impact Avoidance and Mitigation Measures** |

| Resource | Environmental Avoidance/Mitigation Measures |
|---|---|
| | Compaction of agricultural soils would be minimized by restricting construction activities during periods of prolonged rainfall.  Where unacceptable levels of compaction occur in agricultural lands, a chisel plow or other deep tillage equipment would be utilized to loosen the soil. |
| | Dakota Access would retain EIs to monitor the contractor's compliance with applicable requirements to protect soil resources during construction of the DAPL Project.  The Garrison Project would be notified if the EIs have concerns on the Project Area or Connected Action Area. |
| | The HDD workspace sites would be cleared, graded and matted as needed to minimize rutting and compaction. |
| | Permanent impacts to soils would be avoided through the application of BMPs during construction, restoration, and post-construction revegetation management, as outlined in the ECP (Appendix G). |
| Water Resources | Impacts to Lake Oahe and the Missouri River would be minimized by using HDD construction methods to install the proposed pipeline underneath the Missouri River and Lake Oahe. |
| | The HDD Contractor plans to install steel surface casing, where defined in the site specific HDD plans, to reduce the probability of an inadvertent release when the drill bit is working near the surface. |
| | The drilling mud and cuttings would be disposed of in accordance with applicable laws and regulations, likely in an existing landfill or by land farming. |
| | Dakota Access would conduct all HDD work according to the HDD Construction Plan (Appendix B) that it has prepared, and implement the HDD Contingency Plan (Appendix B) in the event of an inadvertent release. |
| | The Missouri River water withdrawal activity would comply with all applicable permit conditions and regulations, including the specifications on permitted intake structures outlined in the USACE's Regional Conditions for North Dakota applicable to NWP 12 (Utility Line Activities).  This regional condition requires that the applicant 1) utilize an intake screen with a maximum mesh opening of ¼-inch, 2) wire, Johnson-like screens must have a maximum distance between wires of 1/8-inch, 3) water velocity at the intake screen shall not exceed ½-foot per second, 4) intake structure shall be floating, and 5) at the beginning of pumping, the intake shall be placed over water with a minimum depth of 20 feet. |
| | The barge/float required for water withdrawal from the Missouri River would be fitted with a secondary containment structure, and the pump would be placed within this structure to contain accidental spills of fuels.  The intake hose would be suspended by floats within the water column and screened to prevent impingement entrainment of foreign objects and aquatic species. |
| | Water discharges associated with hydrostatic testing on Corps flowage easements would be conducted in accordance with applicable permits.  Hydrostatic test water discharges would not occur on Corps fee property. |

118

USACE_DAPL0071342

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 8-2 Summary of Environmental Impact Avoidance and Mitigation Measures | |
|---|---|
| **Resource** | **Environmental Avoidance/Mitigation Measures** |
| | Dakota Access would conduct trench dewatering and hydrostatic test discharges in a manner consistent with the North Dakota Pollutant Discharge Elimination System (NDPDES) General Permit NDG-070000, as applicable. |
| | Discharged hydrostatic test water would not contain additives unless written approval is received from Dakota Access and applicable permits authorize such additives. |
| | Where appropriate, water would be discharged into an energy dissipation and/or filtering device as described in Dakota Access' SWPPP (Appendix A) to remove sediment and to reduce the erosive energy of the discharge. |
| | Impacts to waterbodies would be minimized by conducting pipeline construction activities in accordance with applicable regulatory requirements and waterbody construction procedures described in Section 2.3.2.8 and the ECP. |
| | Fuel and all other hazardous materials would be stored in accordance with the requirements of Dakota Access' SPCC, SWPPP, and ECP.  These documents also describe response, containment, and cleanup measures. |
| | EIs would monitor compliance with applicable waterbody protection requirements during construction of the facilities. The Project ECP (Appendix G) and SWPPP (Appendix A) describe additional mitigation measures and contains illustrations of how sediment control devices should be utilized. |
| | Dakota Access would maintain a vegetative buffer until the actual crossing of the waterbody takes place. |
| | Temporary sediment control measures, such as silt fence, would minimize the introduction of sediment into waterbodies during construction and minimize the movement of spoil and sediment from surface runoff during and after construction. |
| | Dewatering activities would be conducted in accordance with applicable permits and Dakota Access' SWPPP, and ECP. |
| | All surface drainage contours and vegetation would be returned as closely as practical to preconstruction conditions. |
| | The potential for groundwater contamination would be avoided by implementing the protective measures set forth in the Project specific SPCCs prepared by the contractor and in Dakota Access' SPCC Plan (Appendix A). |
| | In the event of a leak, Dakota Access would work aggressively to isolate the source through the use of remote-controlled shut-off valves, initiate cleanup activities, and contact the appropriate federal and state authorities to coordinate leak containment and cleanup.  Dakota Access proposes to meet or exceed all applicable regulations and requirements for pipeline design, construction, and operation. |
| | Construction workspace on the flowage easements has been selected based on an absence of wetlands within the Project area. |
| | Dakota Access is in the process of obtaining verification for use of NWP 12 for the crossings of both the Missouri River and Lake Oahe Section 10 waterbodies. |

119

USACE_DAPL0071343

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 8-2 Summary of Environmental Impact Avoidance and Mitigation Measures | |
|---|---|
| **Resource** | **Environmental Avoidance/Mitigation Measures** |
| | The Project ECP and SWPPP specify several measures to protect wetlands and waterbodies from becoming polluted with fuels or other hazardous materials during construction.  This plan prohibits the storage of fuel or other hazardous materials within 100 feet of a wetland or waterbody.  The ECP also specifies that equipment must be refueled at least 100 feet from waterbodies unless, due to site-specific conditions, there is no practical alternative such as the proposed pumping intake structure located on the barge at the Missouri River Crossing.  In that case, the contractor must implement site-specific protective measures and containment procedures described in the ECP.  Contractors would be required to provide trained personnel, appropriate equipment, and materials to contain and clean up releases of fuel, lubricating oil, or hydraulic fluid that result from equipment failure or other circumstances. |
| | The Project has been designed in accordance with accepted floodplain management practices; no impacts to floodplain elevations or velocities are anticipated.  Following construction, disturbed areas would be restored to pre-construction grades and contours as practical. |
| | If necessary, soil displaced by the installation of the 24-inch pipeline on the flowage easements would be removed from the floodplain and hauled to an upland location in order to ensure original floodplain elevations are restored. |
| | Remotely operated above-ground mainline valve sites would be installed on both sides of the Missouri River and Lake Oahe crossings for isolation in the event of an emergency shutdown. |
| | Dakota Access will identify an all-weather access and collection point downstream of both the Missouri River crossing and Lake Oahe crossing.  At each location, Dakota Access will provide an equipment storage facility that includes a permanent storage area for winter and open water spill response equipment. |
| | Impacts to cultivated crops make up the majority of temporary impacts and would return to cultivated crops post-construction. |
| | Within areas disturbed by construction of the Project, and not being actively cultivated, including the flowage easement Project Area, Dakota Access would implement active revegetation measures and rapid colonization by annual and perennial herbaceous species to restore most vegetative cover within the first growing season. |
| | In areas that require permanent revegetation, Dakota Access would specify appropriate seed mixes, application rates, and seeding dates, taking into account recommendations of appropriate state and federal agencies and landowner requests. |
| | In non-agricultural areas, vegetation cleared from ATWS would be allowed to revegetate after construction depending on arrangements with the landowner. |
| | Temporary revegetation measures may also be implemented to quickly establish ground cover to minimize the potential for soil erosion and noxious weeds to establish.  A temporary seed mix may be applied in these situations.  The Project ECP (Appendix G) contains more details regarding temporary revegetation. |

120

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 8-2 | |
| Summary of Environmental Impact Avoidance and Mitigation Measures | |
| Resource | Environmental Avoidance/Mitigation Measures |
|---|---|
| | When constructing in agricultural areas, a minimum of 1 foot of topsoil (organic layer) would be stripped from the trench line and stockpiled separately from trench spoil to preserve the native seed stock.  The ECP contains additional details regarding topsoil segregation. |
| | At stream approaches, the contractor would leave a 20-foot buffer of undisturbed herbaceous vegetation on all stream banks during initial clearing, except where grading is needed for bridge installation or where restricted by applicable regulations and/or permit conditions. |
| | Dakota Access would work with County Weed Boards to ensure the Project ECP contains relevant and necessary mitigation measures that would be implemented to prevent the spread of noxious weed species during construction and operation of the Project. |
| | Herbaceous cover would be seeded on disturbed upland areas during restoration and it is expected that pre-existing herbaceous and shrub habitats would quickly reestablish themselves. |
| | In the unlikely event that a listed species is encountered on the Project at Corps owned lands during construction, construction activities would stop and the Corps would be contacted. |
| Wildlife Resources | Herbaceous cover would be seeded on disturbed upland areas during restoration and it is expected that pre-existing herbaceous and shrub habitats would quickly reestablish themselves. |
| | In the unlikely event that a listed species is encountered on the Project at Corps owned lands during construction, construction activities would stop and the Corps would be contacted. |
| | Installation and removal of the temporary waterline on the flowage easements are anticipated to be complete prior to nesting season; therefore, impacts on the interior least tern and piping plover are not anticipated.  However, if the water withdrawal activities are not able to be completed prior to nesting season as expected, Dakota Access would conduct surveys prior to placement of the waterline to confirm the presence/absence of these species within the pipeline ROW.  If these species are nesting within the Project Area, Dakota Access would postpone water withdrawal activities at the Missouri River until these species have left the area. |
| | Direct impacts on potentially suitable habitat for the interior least tern and piping plover at the Missouri River and Lake Oahe would be avoided by crossing the waterbodies via HDD. |
| | Lake Oahe would be crossed using a HDD construction method, avoiding impacts on potential migrating rufa red knot loafing habitat. |
| | Impacts on the pallid sturgeon or suitable habitat present within the Missouri River would be avoided by implementing the conditions on permitted intake structures outlined in the USACE's Regional Conditions for North Dakota applicable to NWP 12 (Utility Line Activities) and as described in the USFWS Recovery Plan for the Pallid Sturgeon. |

121

USACE_DAPL0071345

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 8-2 | |
|---|---|
| Summary of Environmental Impact Avoidance and Mitigation Measures | |
| **Resource** | **Environmental Avoidance/Mitigation Measures** |
| | Impacts on the pallid sturgeon or suitable habitat present within Lake Oahe would be avoided by crossing the lake via HDD. |
| Aquatic Resources | A successfully completed HDD crossing would avoid aquatic resource impacts to Lake Oahe since the pipeline would be installed without disturbing the aquatic and benthic environments. |
| | All construction equipment utilized on or in waters of the state would be subject to inspection by the Department in accordance with the North Dakota Administrative Code (Title 30, Article 3, Chapter 6-01).  Further, Dakota Access would implement required measures including the removal of all aquatic vegetation from vessels, motors, trailers, or construction equipment.  All water would be drained from bilges or confined spaces.  All Aquatic Nuisance Species will be removed from equipment in accordance with the North Dakota Administrative Code (Title 30, Article 3, Chapter 6). |
| | All HDD operations conducted for the Missouri River and Lake Oahe crossings would adhere to the HDD Contingency Plan and applicable permit conditions to reduce the likelihood of an inadvertent release to minimize and mitigate environmental impacts.  Dakota Access' construction contractor would ensure that the appropriate response personnel and containment equipment are available onsite to effectively implement the HDD Contingency Plan. |
| | Water withdrawal activities at the Missouri River would be conducted in accordance with all applicable permit conditions and regulations and in a manner that would not reduce water flow to a point that would impair flow or impact aquatic life. |
| | Intake screens and floats would also be utilized during the withdrawal of water from the Missouri River to prevent entrainment of aquatic life and avoid impacts on aquatic resources. |
| | The potential for impacts on aquatic resources associated with accidental fuel spills or leaks during the withdrawal of water from the Missouri River would be avoided or minimized by placing the pump within a secondary containment structure on the barge. |
| | For portions of the pipeline installed beneath the lake, the depth of the pipeline profile, the increased wall thickness of the pipe, the installation of remotely operated valves on both sides of the river crossing, monitoring of the system 24/7, aerial patrols, and in-line inspection, would further limit the potential for an inadvertent release into the river. |
| | Adherence to the GRPs for Lake Oahe and the Missouri River would minimize potential impacts on aquatic wildlife from potential spills during the operation of the pipeline. |

USACE_DAPL0071346

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 8-2 Summary of Environmental Impact Avoidance and Mitigation Measures | |
|---|---|
| **Resource** | **Environmental Avoidance/Mitigation Measures** |
| | Conduct emergency response drills/exercises in accordance with the National Preparedness for Response Exercise Program (PREP) consisting of table top exercises and equipment deployment drills.  Dakota Access has committed to additional full scale open water and full scale winter/ice exercises that will be conducted at Lake Sakakawea and Lake Oahe. A full scale exercise will occur once every 3 years (triennial cycle) with the location and type of exercise occurring on alternating schedules (e.g. open water exercise at Oahe the first triennial cycle, followed by winter exercise at Sakakawea the following triennial cycle, followed by a winter exercise at Oahe the following triennial cycle, etc.). Stakeholder (federal, state, local, and Tribal) involvement will be solicited for each exercise. The first exercise will occur within the first 3 years after the pipeline becomes operational. |
| | In the event of a leak, Dakota Access would work aggressively to contain the leak, initiate cleanup activities, and contact the appropriate authorities, including the Corps. |
| Land Use and Recreation | Mitigation measures to minimize impacts to soils, such as topsoil segregation and decompaction practices, would be fully implemented in accordance with the ECP and SWPPP. |
| | Dakota Access would coordinate with all landowners on acceptable methods for construction and restoration, including potential impacts to irrigated fields. |
| | Dakota Access would repair surface drains and drainage tiles disturbed during ROW preparation, construction, and maintenance activities. |
| | Dakota Access would repair or replace fences and gates removed or damaged as a result of ROW preparation, construction, or maintenance activities. |
| | Following construction and restoration, the work area would be restored and ranching would be allowed to continue over the operational ROW.  Landowners would be compensated for temporary loss of land and lower yields.  Grazing activities would return to normal after revegetation of the disturbed areas. |
| | Trees would be protected by Dakota Access in a manner compatible with the safe operation, maintenance, and inspection of the pipeline.  Applicable regulations would be adhered to regarding tree and shrub removal from along the route. |
| | Dakota Access would obtain and comply with applicable state regulations, county permits, and zoning and land use regulations.  Permits may include, but are not limited to, grade and fill permits, ditch crossing permits, road and utility permits, and conditional use permits.  Dakota Access would retain one or more EIs to monitor compliance with environmental conditions of county permits. |
| Cultural and Historic Resources | In accordance with Section 106 of the NHPA, Dakota Access has made a good faith effort to identify significant historic properties within the Project area.  Based on the result of these efforts, no properties consisted to be eligible, or potentially eligible for listing in the NRHP would be adversely impacted by the proposed Project or Connected Action. |

123

USACE_DAPL0071347

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 8-2 Summary of Environmental Impact Avoidance and Mitigation Measures | |
|---|---|
| **Resource** | **Environmental Avoidance/Mitigation Measures** |
| | Impacts to the NRHP-eligible BTIS (site 32WI1367) would be avoided via HDD to ensure the integrity of construction design for these historic-age features is preserved. |
| | HDD workspaces, as well as staging and stringing areas, would be positioned in excess of 100 feet beyond the mapped boundaries of the previously recorded cultural sites in the vicinity of the Lake Oahe crossing. |
| | Dakota Access' UDP was developed (Appendix F) for use during all DAPL Project construction activities which describes actions that would be taken in the event of a previously unrecorded cultural resource site is discovered during construction activities. The UDP explicitly calls for work to stop until the correct authority or agency can be contacted and the find can be properly evaluated. |
| | The USACE will conduct archeological monitoring of construction for the HDD activities on both sides of Lake Oahe. |
| Social and Economic Conditions | No residential homes or farms would be relocated resulting from the proposed action. |
| | No demographic changes in the Census tracts affected are anticipated, because no permanent employees would be created as a result of the Proposed Action. |
| Hazardous Waste | In the unlikely event contamination is encountered during construction, the UDP (Appendix F) would be implemented to protect people and the environment and avoid or minimize any effects from unearthing the material. |
| | Any hazardous materials discovered, generated, or used during construction would be managed and disposed of in accordance with applicable local, tribal, state, and federal regulations. Should emergency response be required during construction, the contractor would have some of their own trained or contracted responders, and local response teams would be expected to assist. |
| | Dakota Access would comply with all applicable laws and regulations to abate or prevent pollution, such as the RCRA, and State hazardous waste management rules. |
| Reliability and Safety | All activities would be conducted in a safe manner in accordance with the standards specified in the OSHA regulations. |
| | To prevent pipeline failures resulting in inadvertent releases, Dakota Access would construct and maintain the pipeline to meet or exceed industry and governmental requirements and standards. Specifically, the steel pipe would meet PHMSA specifications under 49 CFR § 195, follow standards issued by the American Society of Mechanical Engineers, National Association for Corrosion Engineers and API. |
| | Dakota Access would maintain and inspect the pipeline in accordance with PHMSA regulations, industry codes and prudent pipeline operating protocols and techniques. The pipeline ROW would be patrolled and inspected by air every 10 days, weather permitting, but at least every three weeks and not less than 26 times per year, to check for abnormal conditions or dangerous activities, such as unauthorized excavation along the pipeline route. |

USACE_DAPL0071348

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 8-2 | |
|---|---|
| Summary of Environmental Impact Avoidance and Mitigation Measures | |
| **Resource** | **Environmental Avoidance/Mitigation Measures** |
| | Dakota Access is currently drafting a FRP, in accordance with 49 CFR 194, which details the procedures to be implemented in the event of an inadvertent pipeline release and would be in place prior to commencing transportation of crude oil. |
| | Following completion of construction and throughout operation of the Project facilities, the Operator and qualified contractors would maintain emergency response equipment and personnel at strategic points along the pipeline route. |
| | Contracts would be in place with oil spill response companies that have the capability to mobilize to support cleanup and remediation efforts in the event of a pipeline release.  The operator would also coordinate with local emergency responders in preventing and responding to any pipeline related problems. |
| | A SCADA system would be utilized to provide constant remote oversight of the Project facilities. |
| | A Computational Pipeline Monitoring System (CPM) would be utilized to monitor the pipeline for leaks. |
| | LeakWarn is being tailored to the Project facilities, in accordance with PHMSA requirements, to monitor the pipeline for leaks. |
| Air Quality and Noise | To reduce the emission of criteria pollutants, fuel-burning equipment running times would be kept to a minimum and engines would be properly maintained. |
| | Dakota Access would mitigate noise impacts by limiting equipment running times and the duration of Project construction to the minimum amount necessary to complete the Project.  Noisy construction activities would typically be limited to the least noise-sensitive times of day (daytime). |

125

USACE_DAPL0071349

Environmental Assessment
Dakota Access Pipeline Project
July 2016

## 9.0    LIST OF PREPARERS AND REVIEWERS

Dakota Access, in cooperation with the USACE Preparers, reviewers, consultants and Federal officials include the following:

| Table 9-1 List of Preparers and Reviewers | | |
|---|---|---|
| **Name** | **Title/Office** | **Agency** |
| Omaha District Planning Staff | Environmental Resource Specialist | Corps of Engineers, Omaha District |
| Omaha District Operations Staff | Natural Resource Specialist, Environmental Stewardship | Corps of Engineers, Omaha District |
| Garrison Project Archaeologist | Garrison Dam / Lake Sakakawea Project | Corps of Engineers, Omaha District |
| Bismarck Regulatory Chief | Operations Division | Corps of Engineers, Omaha District |
| Oahe Project Archaeologist | Oahe Dam and Lake Project | Corps of Engineers, Omaha District |
| Omaha District Operations Branch Chief | Operations Division | Corps of Engineers, Omaha District |
| Omaha District Project Engineer | Flood Risk and Floodplain Management Section | Corps of Engineers, Omaha District |
| Garrison Project Staff | Garrison Dam | Corps of Engineers, Omaha District |
| Omaha District Planning Chief | Planning Branch | Corps of Engineers, Omaha District |
| Garrison Operations Project Manager | Garrison Dam / Lake Sakakawea Project | Corps of Engineers, Omaha District |
| Omaha District Real Estate Branch Chief | Real Estate Division | Corps of Engineers, Omaha District |
| Omaha District Cultural Resources | Planning Branch | Corps of Engineers, Omaha District |
| Oahe Project Staff | Oahe Dam | Corps of Engineers, Omaha District |
| Oahe Project Operation Project Manager | Operations Division | Corps of Engineers, Omaha District |
| Omaha District Geotechnical Engineers | Geotechnical Branch | Corps of Engineers, Omaha District |
| Omaha District Attorney | Office of Counsel | Corps of Engineers, Omaha District |
| Omaha District Regulatory Staff | Operations Division | Corps of Engineers, Omaha District |
| Monica Howard | Director Environmental Sciences | Dakota Access, LLC |
| Jonathan Fredland | Environmental Specialist | Perennial Environmental Services, LLC |
| Ashley Thompson | Environmental Specialist | Perennial Environmental Services, LLC |

126

USACE_DAPL0071350

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| Table 9-1 | | |
|---|---|---|
| List of Preparers and Reviewers | | |
| Name | Title/Office | Agency |
| Dennis Woods | Managing Partner | Perennial Environmental Services, LLC |

USACE_DAPL0071351

Environmental Assessment
Dakota Access Pipeline Project
July 2016

## 10.0    ACRONYMS, INITIALS, AND ABBREVIATIONS

| | |
|---|---|
| ANSI | American National Standards Institute |
| API | American Petroleum Institute |
| ATWS | Additional Temporary Workspace |
| BMP | Best Management Practice |
| bpd | barrels per day |
| BTIS | Buford-Trenton Irrigation System |
| CAA | Clean Air Act |
| CERCLA | Comprehensive Environmental Response Compensation and Liability Act |
| CEQ | Council on Environmental Quality |
| CFR | Code of Federal Regulations |
| Corps | U.S. Army Corps of Engineers |
| Company | Energy Transfer Company |
| CWA | Clean Water Act |
| DA | Department of the Army |
| dB | Decibels |
| Dakota Access | Dakota Access, LLC |
| DAPL Project | Dakota Access Pipeline Project |
| DOT | Department of Transportation |
| EA | Environmental Assessment |
| ECP | Environmental Construction Plan |
| ECD | Erosion Control Device |
| EI | Environmental Inspector |
| EO | Executive Order |
| EPA | U.S. Environmental Protection Agency |
| ESA | Endangered Species Act |
| FEMA | Federal Emergency Management Agency |

128

USACE_DAPL0071352

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| | |
|---|---|
| FERC | Federal Energy Regulatory Commission |
| FIRM | Flood Insurance rate Maps |
| FRP | Facility Response Plan |
| FRFM | Flood Risk and Floodplain Management Section |
| g | gravitational acceleration |
| GIS | Geographic Information System |
| GRP | Geographical Response Plan |
| HDD | Horizontal Directional Drilling |
| MP | milepost |
| MSL | Mean Sea Level |
| NDPSC | North Dakota Public Service Commission |
| NDPDES | North Dakota Pollutant Discharge Elimination System |
| NDSHPO | North Dakota State Historic Preservation Office |
| NEPA | National Environmental Preservation Act |
| NFIP | National Flood Insurance Program |
| NHPA | National Historic Preservation Act |
| NLCD | National Land Cover Dataset |
| NPDES | National Pollutant Discharge Elimination System |
| NPS | U.S. National Park Service |
| NRCS | Natural Resources Conservation Service |
| NRHP | National Register of Historic Places |
| NRI | Nationwide Rivers Inventory |
| NSF | National Science Foundation |
| NWI | National Wetland Inventory |
| NWP | Nationwide Permit |
| OSHA | Occupational Safety and Health Administration |
| OSRO | Oil Spill Response Organization |

129

USACE_DAPL0071353

Environmental Assessment
Dakota Access Pipeline Project
July 2016

| | |
|---|---|
| PA | Programmatic Agreement |
| PEM | Palustrine Emergent |
| PFO | Palustrine Forested |
| PHMSA | Pipeline and Hazardous Materials Safety Administration |
| PREP | National Preparedness for Response Exercise Program |
| Project Area | Areas that are potentially impacted by construction and/or operation of the Proposed Action |
| Proposed Action | Crossing of federal flowage easements near the upper end of Lake Sakakawea north of the Missouri River in Williams County, North Dakota and federally owned lands at Lake Oahe in Morton and Emmons counties, North Dakota |
| RCRA | Resource Conservation and Recovery Act |
| RHA | Rivers and Harbors Act |
| ROW | Right-of-Way |
| SPCC | Spill Prevention, Control and Countermeasure Plan |
| SWPPP | Stormwater Pollution Prevention Plan |
| THPO | Tribal Historic Preservation Office |
| UDP | Unanticipated Discoveries Plan Cultural Resources, Human Remains, Paleontological Resources and Contaminated Media |
| USACE | U.S. Army Corps of Engineers |
| USDA | U.S. Department of Agriculture |
| USFWS | U.S. Fish and Wildlife Service |
| USGS | U.S. Geological Survey |
| WMA | Wildlife Management Area |

USACE_DAPL0071354

Environmental Assessment
Dakota Access Pipeline Project
July 2016

## 11.0    REFERENCES

Ackerman, D.J.  1980.  Ground-Water Resources of Morton County, North Dakota, North Dakota Geological Survey Bulletin 7Z – Part III, 51 pp.

Armstrong, C.A.  1978.  Ground-Water Resources of Emmons County, North Dakota, North Dakota Geological Survey Bulletin 66—Part III, 43 pp.

Armstrong, C.A.  1969.  Geology and Ground Water Resources, Williams County, North Dakota, Part III—Hydrology, North Dakota Geological Survey Bulletin 48, 82 pp.

Atwood, J.L., P.D. Jorgensen, R. M. Jurek, and T.D. Manolis.  1977.  California Least Tern Census and Nesting Survey, 1977, Pages 44, California Department of Fish and Game.

Bachman, J. 2014.  North Dakota's Downside to the Oil Boom: Traffic Deaths.  Businessweek. Available at: http://www.businessweek.com/articles/2014-06-09/north-dakotas-downside-to-the-oil-boom-traffic-deaths.

Black-footed Ferret Recovery Implementation Team.  2011.  Black-footed ferret.  Available at http://www.blackfootedferret.org/.

Brown, M.B., J.G. Jorgensen, and L.R. Dinan.  2013.  2013 Interior Least Tern and Piping Plover Monitoring, Research, Management, and Outreach Report for the Lower Platte River, Nebraska. Joint report of the Tern and Plover Conservation Partnership and the Nongame Bird Program of the Nebraska Game and Parks Commission.  Lincoln, NE.

Carlson, C.G.  1985.  Geology of McKenzie County, North Dakota.  North Dakota Geological Survey Bulletin 80—Part I. 48 pp.

Charbeneau, R. J. 2003. Models for Design of Free-Product Recovery Systems for Petroleum Hydrocarbon Liquids. American Petroleum Institute, Publication 4729. Washington, D.C. August 2003.

Charbeneau, R. J., R. T. Johns, L. W. Lake, and M. McAdams. 2000. Free-product recovery of petroleum liquid hydrocarbon liquids. Ground Water Monitoring and Remediation 20(3):147-158.

Clayton, L.  1980.  Geologic Map of North Dakota: USGS, Scale 1:500K.

Cochrane, J.F. and P. Delphey.  2002.  Status Assessment and Conservation Guidelines; Dakota Skipper *Hesperia dacotae* (Skinner) (Lepidoptera: Hesperiidae); Iowa, Minnesota, North Dakota, South Dakota, Manitoba, Saskatchewan.  p.80.  U.S. Fish and Wildlife Service, Twin Cities Field Office, Minnesota.

Council on Environmental Quality.  1997.  Environmental Justice: Guidance under the National Environmental Policy Act.  Executive Office of the President, Washington, D.C.

Cowardin, L. M., V. Carter, F.C. Golet, and E.D. LaRoe.  1979.  Classification of wetlands and deepwater habitats of the United States.  U.S. Department of the Interior, Fish and Wildlife Service, Office of Biological Services, Washington, D.C.

Croft, M.G.  1985.  Ground-Water Resources of McKenzie County, North Dakota, North Dakota Geological Survey Bulletin 80—Part III, 57 p.

131

USACE_DAPL0071355

Environmental Assessment
Dakota Access Pipeline Project
July 2016

Dana, R.  1997.  Characterization of three Dakota skipper sites in Minnesota.  p.17.  Minnesota
Department of Natural Resources, Natural Heritage and Nongame Research Program, St. Paul.

Dana, R.  1991.  Conservation management of the prairie skippers *Hesperia dacotae* and *Hesperia ottoe*:
Basic biology and threat of mortality during prescribed burning in spring. Station Bulletin.  p.63.
Minnesota Agricultural Experiment Station, University of Minnesota, St. Paul.

Dickens, D. 2011. Behavior of Oil Spills in Ice and Implications for Arctic Spill Response.  Arctic
Technology Conference, Houston, Texas, February 7-9, 2011.

Federal Emergency Management Agency.  1987.  Flood Insurance Rate Map (3803270100A),
Unincorporated Areas, Emmons County, North Dakota.

Florip, E.  2014.  Proposed Oil Terminal Would Be Biggest In Volume.  The Columbian.  Available at:
http://www.columbian.com/news/2014/nov/24/proposed-oil-terminal-biggest-volume-
vancouver/.

Freeze, R. A. and J. A. Cherry. 1979. Groundwater. Prentice Hall, Inc. Englewood Cliffs, New Jersey., 604
pp.

Freers, T.F.  1970.  Geology and Ground Water Resources, Williams County, North Dakota, Part 1—
Geology, North Dakota Geological Survey Bulletin 48, 54 pp.

Fritelli, J.  2014.  U.S. Rail Transportation of Crude Oil: Background and Issues for Congress.
Congressional Research Service.  Available at: http://fas.org/sgp/crs/misc/R43390.pdf.

Fuller, T.  1989.  Population dynamics of wolves in North-Central Minnesota.  Wildlife Monographs
105:3-41.

GeoEngineers.  2009.  Vibration Monitoring Report, Bridgewood 22-Inch-Diameter Class Change,
Merrilville, Indiana.

GeoEngineers.  2014.  Preliminary Geology and Geologic Hazards Evaluation, ETC Dakota Access Pipeline,
North Dakota, South Dakota, Iowa, Illinois, 28 p.

Gratto-Trevor, C.L., G. Beyersbergen, H.L. Dickson, P. Erickson, R. MacFarlane, M. Raillard, and T. Sadler.
2001.  Prairie Canada Shorebird Conservation Plan. Prairie Habitat Joint Venture, Canadian
Wildlife Service.  Edmonton, Alberta.

Hillman, M.D., S.M. Karpanty, J.D. Fraser, and A. Derose-Wilson.  2015.  Effects of Aircraft and
Recreation on Colonial Waterbird Nesting Behavior.  The Journal of Wildlife Management
79(7):1192-1198.

Hoberg, T. and C. Gause.  1992.  Reptiles and amphibians of North Dakota.  North Dakota Outdoors
55(1):7-19.  Jamestown, ND: Northern Prairie Wildlife Research Center Available at:
http://www.npwrc.usgs.gov/resource/herps/amrepnd/index.htm.

Hoganson, J.S.  2006.  Prehistoric Life of North Dakota, North Dakota Geological Survey.  Available at:
https://www.dmr.nd.gov/ndfossil/Poster/poster.asp.

Hoganson, J.S. and J. Campbell.  2002.  Paleontology of Theodore Roosevelt National Park, North Dakota
Geological Survey North Dakota Notes No. 9.  Available at:
https://www.dmr.nd.gov/ndgs/ndnotes/ndn9_h.htm.

USACE_DAPL0071356

Environmental Assessment
Dakota Access Pipeline Project
July 2016

Horwath, B., and C. Owings.  2014.  No Keystone XL Means More Oil By Rail, Report Says.  Oil Patch Dispatch.  Available at: http://oilpatchdispatch.areavoices.com/2014/01/31/no-keystone-xl-means-more-oil-by-rail-report-says/.

Howe, M.A.  1989.  Migration of radio-marked whooping cranes from the Aransas-Wood Buffalo population: Patterns of habitat use, behavior, and survival.  U.S. Fish and Wildlife Service, Technical Report 21.

Kerr, J. M., H. R. Melton, S. J. McMillen, R. I. Magaw, and G. Naughton. 1999. Polyaromatic hydrocarbon content of crude oils around the world. In: SPE/EPS Exploration and Production Environmental Conference, SPE 52724 as cited in O'Reilly et al. 2001.

Krause, T.D.  2015.  Flood Risk and Floodplain Management Section; Memorandum for CENWO-OD-E, Executive Order 11988 and NWDR 1110-2-5 Compliance Memo for the Proposed Dakota Access Pipeline (DAPL) Project in Williams County, North Dakota, across Flowage and Saturation Easements.

Kringstad, J. 2016. Energy Development and Transmission Committee. North Dakota Pipeline Authority. Available at: https://ndpipelines.files.wordpress.com/2012/04/kringstad-slides-edtfeb-3-2016.pdf.

Landt, M.J. and B. McCord.  2016.  Class II/III Cultural Resources Inventory of the Crossings of Flowage Easements and Federal Lands.  Alpine Archaeological Consultants, Inc and Gray & Pape, Inc.

Larson, Thomas K., Kurt P. Schweigert, Keith H. Dueholm, Paul H. Sanders, and Dori Penny.  1987.  A Cultural Resource Inventory of the Right Bank of Lake Oahe in Morton and Sioux Counties, North Dakota.  Larson-Tibesar Associates, Inc., Laramie, Wyoming.  Submitted to the USACE, Omaha.

Lewis, T.E., and R.D. Slack.  2008.  Whooping Cranes and Human Disturbance: An Historical Perspective and Literature Review.  North American Crane Workshop Proceedings.  Paper 182.

Licht, D.S. and S.H. Fritts.  1994.  Gray wolf (*Canis lupus*) occurrences in the Dakotas. American Midland Naturalist 132:74-81.

Lichvar, R.W., M. Butterwick, N.C. Melvin, and W.N. Kirchner.  2014.  The National Wetland Plant List: 2014 Update of Wetland Ratings.  Phytoneuron 2014-41: 1-42.

Marathon Oil. 2010. Bakken Oil Storage Tank Emission Models. Presented by Paul Peacock, March 23, 2010. Internet website: http://www.ndoil.org/image/cache/Peacock_-_March_23_2010._ppt.pdf

Marcus, J.F., J.J. Dinan, R.J. Johnson, E.E. Blankenship, and J.L. Lackey.  2007.  Directing nest site selection of Least Terns and Piping Plovers.  Waterbirds 30:251-258.

McCabe, T.L.  1981.  The Dakota skipper, *Hesperia dacotae* (Skinner): range and biology with special reference to North Dakota.  Journal of the Lepidopterists' Society 35(3):179-193.

Mech, L.D.  1974.  *Canis lupus*.  Mammalian Species 37:1-6.

Morton County.  2014.  Morton County Zoning Map.  Available at http://tinyurl.com/mortonzoningmap.

Muller, H. 1987. Hydrocarbons in the freshwater environment. A Literature Review. Arch. Hydrobiol. Beih. Ergebn. Limnol 24:1-69.

USACE_DAPL0071357

Environmental Assessment
Dakota Access Pipeline Project
July 2016

Multi-Resolution Land Characteristics Consortium.  2011.  National Land Cover Database.  Available at: http://www.mrlc.gov/nlcd2011.php.

Murphy, E.C.  2006.  Lignite Reserves, Williston 100K Sheet, North Dakota, North Dakota Geological Survey.  Available at: https://www.dmr.nd.gov/ndgs/Coalmaps/pdf/100K/wlst_100k_c.pdf.

National Park Service.  2009.  Nationwide Rivers Inventory.  Available at http://www.nps.gov/ncrc/programs/rtca/nri/states/nd.html.

Natural Resources Conservation Service.  2015.  Web Soil Survey. Available at http://websoilsurvey.nrcs.usda.gov/.

Natural Resources Conservation Service.  2013.  Farmland Protection Policy Act Annual Report for FY 2012.

Natural Resources Conservation Service.  2008.  Lake Sakakawea 10110101, 8-Digit Hydrologic Unit Profile.  Available at http://www.nrcs.usda.gov/Internet/FSE_DOCUMENTS/nrcs141p2_001513.pdf.

Natural Resources Conservation Service.  2006.  Land Resource Regions and Major Land Resource Areas of the United States, the Caribbean, and the Pacific Basin.  Available at http://www.nrcs.usda.gov/wps/portal/nrcs/detail/soils/survey/?cid=nrcs142p2_053624.

Neff, J. M. and J. W. Anderson. 1981. Response of Marine Animals to Petroleum and Specific Hydrocarbons. Applied Science Publishers, London. 177 pp.

Nixon, R.  2014.  Grain Piles Up, Waiting For A Ride, As Trains Move North Dakota Oil.  New York Times.  Available at: http://www.nytimes.com/2014/08/26/us/grain-piles-up-waiting-for-a-ride-as-trains-move-north-dakota-oil.html.

North Dakota Department of Agriculture.  2014a.  Noxious Weeds.  Available at: http://www.nd.gov/ndda/program/noxious-weeds.

North Dakota Department of Agriculture.  2014b.  Endangered Species Descriptions.  Available at: http://www.nd.gov/ndda/program-info/endangered-species-protection/endangered-species-descriptions.

North Dakota Energy Conversion and Transmission Facility Siting Act, North Dakota Administrative Code 49-22-05.1 Available at:  http://www.legis.nd.gov/cencode/t49c22.pdf?20160408183906.

North Dakota Department of Health.  2015.  North Dakota 2014 Integrated Section 305(b) Water Quality Assessment Report and Section 303(d) List of Waters Needing Total Maximum Daily Loads.  Available at: https://www.ndhealth.gov/wq/sw/Z7_Publications/IntegratedReports/2014_North_Dakota_Integrated_Report_Final_20150428.pdf.

North Dakota Department of Health.  2013.  North Dakota Air Quality Monitoring Data Summary 2013.  Available at https://www.ndhealth.gov/aq/AmbientMonitoring.htm.

North Dakota Department of Mineral Resources.  2015.  Oil and Gas Division, Oil and Gas ArcIMS Viewer.  Available at: https://www.dmr.nd.gov/OaGIMS/viewer.htm.

USACE_DAPL0071358

Environmental Assessment
Dakota Access Pipeline Project
July 2016

North Dakota Game and Fish Department.  2012.  Black-footed Ferret.  Available at: http://gf.nd.gov/wildlife/fish-wildlife/id/mammals/carnivores/ferret.

North Dakota GIS Hub Data Portal.  2010.  Earthquake Locations.  Available at: https://apps.nd.gov/hubdataportal/srv/en/main.home.

North Dakota Parks and Recreation Department.  2014.  North Dakota Parks and Recreation Department Home Page.  Available at http://www.parkrec.nd.gov/index.html#1.

Radbruch-Hall, D.H., R.B. Colton, W.E. Davies, I. Lucchitta, B.A. Skipp, and D.J. Varnes.  1982.  Landslide Overview Map of the Conterminous United States, USGS Landslide Hazards Program.  Available at: http://landslides.usgs.gov/hazards/nationalmap/.

Royer, R.A. and G.M. Marrone.  1992.  Conservation status of the Dakota skipper (*Hesperia dacotae*) in North and South Dakota.  p.44.  U.S. Fish and Wildlife Service.  Denver, Colorado.

Sieler, Steve.  July 6, 2015.  State Soil Liaison, Natural Resources Conservation Service, North Dakota.  Personal Communication with Amy Williams, Staff Biologist, Perennial Environmental, LLC.

Standing Rock Sioux Tribe. 2016.  Environmental Profile. Available at: http://standingrock.org/environmental-profile/.

Standing Rock Sioux Tribe Game & Fish Department. 2016. Dates and Fees.  Available at: http://gameandfish.standingrock.org/dates-and-fees/.

Standing Rock Tourism. 2016. Attractions.  Available at: http://www.standingrocktourism.com/information/events.asp.The Engineering ToolBox.  2015.  Ldn – Day and Night Sound Level.  Available at: http://www.engineeringtoolbox.com/sound-level-d_719.html.

Turner, Mason and Company, 2014. The North Dakota Petroleum Council Study on Bakken Crude Properties. Prepared for the North Dakota Petroleum Council.

U.S. Army Corps of Engineers.  2014.  National Levee Database.  Available at: http://nld.usace.army.mil/egis/f?p=471:1:.

U.S. Army Corps of Engineers.  2012.  Omaha District, North Dakota Regulatory Office. Nationwide Permit Regional Conditions for North Dakota.  Available at: http://www.nwo.usace.army.mil/Missions/RegulatoryProgram/NorthDakota.aspx.

U.S. Army Corps of Engineers.  2011. Omaha District, Garrison Dam/Lake Sakakawea Project North Dakota Surplus Water Report. Available at: http://www.swc.nd.gov/pdfs/corps_final_surplus_storage_lake_sakakawea.pdf.

U.S. Army Corps of Engineers. 2010a. Summary of Engineering Data – Missouri River Main Stem System.

U.S. Army Corps of Engineers. 2010b. Regional Supplement to the Corps of Engineers Wetland Delineation Manual: Great Plains Region (Version 2.0).  ERDC/EL TR-10-1, U.S. Army Engineer Research and Development Center, Vicksburg, MS.

U.S. Army Corps of Engineers.  2010c. Oahe Dam/Lake Oahe Final Master Plan.  Missouri River, South Dakota and North Dakota. Design Memorandum MO-224.

USACE_DAPL0071359

Environmental Assessment
Dakota Access Pipeline Project
July 2016

U.S. Army Corps of Engineers.  2007.  Garrison Dam/Lake Sakakawea Master Plan with Integrated Programmatic Environmental Assessment, Missouri River, North Dakota. Update of Design Memorandum MGR-107D.

U.S. Army Corps of Engineers.  1987.  Corps of Engineers Wetland Delineation Manual, Technical Report Y-87-1, U.S. Army Engineer Waterways Experiment Station, Vicksburg, MS.

U.S. Census Bureau.  2014.  American Fact Finder. Available at: http://factfinder.census.gov/faces/nav/jsf/pages/index.xhtml.

U.S. Department of Transportation.  2015.  Transportation Accidents by Mode.  Office of the Assistant Secretary for Research and Technology.  Available at: http://www.rita.dot.gov/bts/sites/rita.dot.gov.bts/files/publications/national_transportation_statistics/html/table_02_03.html.

U.S. Department of Transportation.  2014.  Pocket Guide to Large Truck and Bus Statistics. Federal Motor Carrier Safety Administration.  Available at: http://www.fmcsa.dot.gov/sites/fmcsa.dot.gov/files/docs/FMCSA%20Pocket%20Guide%20to%20Large%20Truck%20and%20Bus%20Statistics%20-%202014%20-%20508C.pdf.

U.S. Environmental Protection Agency.  2015.  Hazardous Waste Website.  Available at: http://www.epa.gov/osw/hazard/index.htm.

U.S. Environmental Protection Agency.  2014.  Enviromapper for Envirofacts. http://epa.gov/emefdata/em4ef.home.

U.S. Environmental Protection Agency.  2012.  Environmental Justice Showcase Communities.  Available at: http://www.epa.gov/environmentaljustice/grants/ej-showcase.html.

U.S. Environmental Protection Agency. 2016. ECOTOX User Guide: ECOTOXicology Database System. Version 4.0. Available: http:/www.epa.gov/ecotox/

U.S. Fish and Wildlife Service (USFWS). 2007. National Bald Eagle Management Guidelines. Arlington, VA.  May 2007.

U.S. Fish and Wildlife Service.  2015.  Endangered and Threatened Wildlife and Plants; Threatened Species Status for the Northern Long-Eared Bat With 4(d) Rule; Final Rule and Interim Rule.  80 Federal Register 17973.

U.S. Fish and Wildlife Service.  2014a.  Species profile: Whooping Crane (*Grus americana*). Environmental Conservation Online System.  Available at: http://ecos.fws.gov/speciesProfile/profile/speciesProfile.action?spcode=B003.

U.S. Fish and Wildlife Service.  2014b.  Endangered and Threatened Wildlife and Plants; Threatened Species Status for the Rufa Red Knot; Final Rule. 79 FR 73705.

U.S. Fish and Wildlife Service.  2014c.  Revised recovery plan for the Pallid sturgeon (*Scaphirhynchus albus*).  Denver, Colorado: Mountain-Prairie Region, U.S. Fish and Wildlife Service.

U.S. Fish and Wildlife Service.  2014d.  Species profile: Black-footed ferret (*Mustela nigripes*). Environmental Conservation Online System.  Available at: http://ecos.fws.gov/speciesProfile/profile/speciesProfile?spcode=A004.

USACE_DAPL0071360

Environmental Assessment
Dakota Access Pipeline Project
July 2016

U.S. Fish and Wildlife Service.  2014e.  Species profile: Gray wolf (*Canis lupus*).  Environmental Conservation Online System.  Available at: http://ecos.fws.gov/tess_public/SpeciesReport.do?lead=6&listingType=L.

U.S. Fish and Wildlife Service.  2014f.  Revised Recovery Plan for the Pallid Sturgeon (*Scaphirhynchus albus*).  Available at: http://ecos.fws.gov/docs/recovery_plan/Pallid%20Sturgeon%20Recovery%20Plan%20First%20Revision%20signed%20version%20012914_3.pdf.

U.S. Fish and Wildlife Service.  2014g. Rufa Red Knot Background Information and Threats Assessment.Available at: http://www.fws.gov/northeast/redknot/pdf/20141125_REKN_FL_supplemental_doc_FINAL.pdf.

U.S. Fish and Wildlife Service.  2013a.  Western prairie fringed orchid (*Platanthera praeclara*). Available at: http://www.fws.gov/northdakotafieldoffice/endspecies/species/western_prairie_fringed_orchid.htm.

U.S. Fish and Wildlife Service.  2013b.  North Dakota Field Office; Least Tern (*Sterna antillarum*).  Available at: http://www.fws.gov/northdakotafieldoffice/endspecies/species/least_tern.htm.

U.S. Fish and Wildlife Service.  2013c.  North Dakota Field Office; Black-footed ferret (*Mustela nigripes*).  Available at: http://www.fws.gov/northdakotafieldoffice/endspecies/species/black-footed_ferret.htm.

U.S. Fish and Wildlife Service.  2013d.  Endangered and Threatened Wildlife and Plants; Threatened status for Dakota skipper and Endangered Status for Poweshiek skipperling; and Designation of critical habitat for the Dakota skipper and Poweshiek skipperling. Proposed Rule.  78 Federal Register 63574.

U.S. Fish and Wildlife Service.  2013e.  Interior Least Tern (*Sternula antillarum*) 5-Year Review: Summary and Evaluation.  Available at: http://www.fws.gov/southeast/5yearReviews/5yearreviews/interiorLeastTern5yrReivew102413.pdf.

U.S. Fish and Wildlife Service.  2013f.  Black-footed Ferret Draft Recovery Plan, Second Revision.  Available at: https://www.fws.gov/mountain-prairie/species/mammals/blackfootedferret/2013DraftRevisedRecoveryPlan.pdf.

U.S. Fish and Wildlife Service.  2012.  Endangered Species: Piping Plover.  Available at: http://www.fws.gov/mountainprairie/species/birds/pipingplover/.

U.S. Fish and Wildlife Service.  2009a.  Whooping Cranes and Wind Development – An Issue Paper.  Available at: http://www.fws.gov/southwest/es/oklahoma/documents/te_species/wind%20power/whooping%20crane%20and%20wind%20development%20fws%20issue%20paper%20-%20final%20%20april%202009.pdf

U.S. Fish and Wildlife Service.  2009b.  Piping Plover (*Charadrius melodus*) 5-Year Review: Summary and Evaluation. Available at:

USACE_DAPL0071361

Environmental Assessment
Dakota Access Pipeline Project
July 2016

http://www.fws.gov/northeast/endangered/PDF/Piping_Plover_five_year_review_and_summary.pdf

U.S. Fish and Wildlife Service.  2007.  International Recovery Plan Whooping Crane (*Grus americana*), Third Revision.  Available at: http://ecos.fws.gov/docs/recovery_plan/070604_v4.pdf.

U.S. Fish and Wildlife Service.  1994.  Whooping Crane Recovery Plan.  Available at: https://www.fws.gov/southwest/es/arizona/Documents/RecoveryPlans/WhoopingCrane.pdf.

U.S. Fish and Wildlife Service, National Park Service, Bureau of Land Management, and U.S. Forest Service.  2014.  National Wild and Scenic Rivers System.  Available at http://www.rivers.gov/north-dakota.php.

U.S. Geological Survey.  2014a. North Dakota 2014 Seismic Hazard Map, USGS Earthquake Hazards Program.  Available at: http://earthquake.usgs.gov/earthquakes/states/north_dakota/hazards.php.

U.S. Geological Survey.  2014b. Northern Prairie Wildlife Research Center.  North Dakota Wildlife Management Area Guide - WMAs by County.  Available at http://www.npwrc.usgs.gov/resource/wildlife/wmaguide/county.htm.

U.S. Geological Survey. 2016. National Water Information System data available on the World Wide Web (USGS Water Data for the Nation), accessed May 9, 2016 at http://waterdata.usgs.gov/nwis/dvstat?referred_module=sw&site_no=06330000&por_06330000_2=720709,00060,2,1928-10-01,1965-07-31&format=html_table&stat_cds=mean_va&date_format=YYYY-MM-DD&rdb_compression=file&submitted_form=parameter_selection_list.

USGS. 2016b. National Water Information System data available on the World Wide Web (USGS Water Data for the Nation), accessed May 9, 2016 at http://nwis.waterdata.usgs.gov/nd/nwis/uv?cb_00060=on&format=gif_stats&site_no=06342500&period=3143&begin_date=2007-10-01&end_date=2016-05-09.

Weary, D.J. and D.H. Doctor.  2014.  Karst in the United States: A Digital Map Compilation and Database, USGS Open-File Report 2014-1156, 23 p.

Wilderness Institute.  2014.  List of Wilderness Areas by Location. University of Montana, College of Forestry and Conservation.  Available at http://www.wilderness.net/NWPS/stateView?state=ND.  Accessed November 2014.

USACE_DAPL0071362

Environmental Assessment
Dakota Access Pipeline Project
July 2016

## 12.0    FIGURES

**Figure 1:**      Project Location—Federal Lands and Flowage Easements
**Figure 2:**      Project Layout—Flowage Easements
**Figure 3:**      Project Layout—Federal Lands
**Figure 4:**      Soils—Flowage Easements
**Figure 5:**      Soils—Federal Lands
**Figure 6:**      Natural Resources—Flowage Easements
**Figure 7:**      Natural Resources—Federal Lands
**Figure 8:**      Cultural Resources—Flowage Easements
**Figure 9:**      Cultural Resources—Federal Lands
**Figure 10:**     Land Cover—Flowage Easements
**Figure 11:**     Land Cover—Federal Lands
**Figure 12:**     Route Alternative—Missouri River Crossing
**Figure 13:**     Route Alternative—Lake Oahe Crossing
**Figure 14:**     HDD Cross Section—Missouri River Crossing
**Figure 15:**     HDD Cross Section—Lake Oahe Crossing
**Figure 16:**     Whooping Crane—Central Flyway

USACE_DAPL0071363



Proposed DAPL Centerline

DAKOTA ACCESS, LLC

Dakota Access Pipeline Project
Figure 1
Project Location
Federal Lands and Flowage Easements

1:2,534,400

UTM 83-14F        Date: April, 2015

Path: P:\GIS\Client\ETC_EnergyTransfer\DakotaAccess_DAPL\Maps\ENV\ND_Flowage\Easements\01_ND_ProjectLocation_Land.mxd
Source: ArcGIS Online Mapping

USACE_DAPL0071364



USACE_DAPL0071365



Milepost labels: 164.5, 165, 165.5, 166, 166.5, 167, 167.5

ND-MO-198.000
ND-MO-199.000
ND-EM-009.000

Elevation Morton

Cannon Ball River

North Dakota

- ● Milepost
- — Project Centerline
- --- DAPL Centerline
- ▭ Workspace
- ▭ USACE Federal Lands
- ▨ Standing Rock Sioux Reservation

0        1,750
▬▬▬▬ Feet

DAKOTA ACCESS, LLC

**Dakota Access Pipeline Project**
**Figure 3**
**Project Layout**
**Federal Lands**
**Morton County and**
**Emmons County, North Dakota**

| | 1:21,000 |
|---|---|
| UTM 83-14F | Date: February, 2016 |

Path: P:\GIS\Client\ETC_EnergyTransfer\DakotaAccess_DAPL\Maps\ENV\ND_FlowEasements\03ND_LakeOahe_LandLayout.mxd
Source: ArcGIS Online Mapping

USACE_DAPL0071366





Dakota Access Pipeline Project
Figure 4-B
Soils
Flowage Easements
Williams County, North Dakota

| Page 2 of 2 | 1:15,000 |
| UTM83-13F | Date: August, 2015 |

Path: P:\GIS\Client\ETC_EnergyTransfer\DakotaAccess_DAPL\Maps\ENV\ND_FlowEasements\04ND_B_FlowEasement.mxd

USACE_DAPL0071368



Dakota Access Pipeline Project
Figure 5
Soils
Federal Lands
Morton County and
Emmons County, North Dakota

USACE_DAPL0071369



Milepost

Project Centerline

DAPL Centerline

Workspace

Field Delineated Waterbody

Field Delineated PEM Wetland

Field Delineated PFO Wetland

Field Delineated PSS Wetland

USACE Flowage Easements

North Dakota

DAKOTA ACCESS, LLC

Dakota Access Pipeline Project
Figure 6-A
Natural Resources
Flowage Easements
Williams County, North Dakota

| Page 1 of 2 | 1:15,000 |
| --- | --- |
| UTM83-13F | Date: August, 2015 |

0    1,200
Feet

Path: P:\GIS\Client\ETC_EnergyTransfer\DakotaAccess_DAPL\Maps\ENV\ND_FlowEasements\06ND_A_FlowEasementNaturalResources.mxd

USACE_DAPL0071370



LL3430E

LL3453E

93.5

94

LL3483E-1

94.5

LL3440E

d-k8-wl-011

w-m10-wl-001_PSS

w-m10-wl-001_PEM

w-m10-wl-001_PEM

w-m10-wl-001_PFO

w-m10-wl-001_PSS

w-m10-wl-002_PSS

95

s-k2-mk-001

e-k2-mk-002

Missouri River

38th St NW

39th St NW

150th Ave NW

**North Dakota**

● Milepost

▮ Barge Location With
Pumping Intake Structure

— Project Centerline

--- DAPL Centerline

= = Temporary Above Ground Waterline

▢ Workspace

— Field Delineated Waterbody

▮ Field Delineated PEM Wetland

▮ Field Delineated PFO Wetland

▮ Field Delineated PSS Wetland

▢ USACE Flowage Easements

**DAKOTA ACCESS, LLC**

**Dakota Access Pipeline Project**
**Figure 6-B**
**Natural Resources**
**Flowage Easements**
**Williams County, North Dakota**

| Page 2 of 2 | 1:15,000 |
|---|---|
| UTM83-13F | Date: August, 2015 |

0        1,200
Feet

Path: P:\GIS\Client\ETC_EnergyTransfer\DakotaAccess_DAPL\Maps\ENV\ND_FlowEasements\06ND_B_FlowEasementNaturalResources.mxd

USACE_DAPL0071371



Milepost
Project Centerline
DAPL Centerline
Field Delineated Waterbody
Workspace
USACE Federal Lands

Standing Rock Sioux Reservation

North Dakota

DAKOTA ACCESS, LLC

**Dakota Access Pipeline Project**
**Figure 7**
**Natural Resources**
**Federal Lands**
**Morton County and**
**Emmons County, North Dakota**

| 1:21,000 |
| UTM 83-14F | Date: February, 2016 |

0    1,750
Feet

Path: P:\GIS\Client\ETC_EnergyTransfer\DakotaAccess_DAPL\Maps\ENV\ND_FlowEasements\07ND_LakeOahe_NaturalResources.mxd
Source: ArcGIS Online Mapping

USACE_DAPL0071372



USACE_DAPL0071373



USACE_DAPL0071374



Dakota Access Pipeline Project
**Figure 10-A**
**Landcover**
**Flowage Easements**
**Williams County, North Dakota**

USACE_DAPL0071375



Dakota Access, LLC

Dakota Access Pipeline Project
Figure 10-B
Landcover
Flowage Easements
Williams County, North Dakota

| Page 2 of 2 | 1:15,000 |
|---|---|
| UTM83-13F | Date: September, 2015 |

Path: P:\GIS\Client\ETC_EnergyTransfer\DakotaAccess_DAPL\Maps\ENV\ND_FlowEasements\10ND_B_Landcover.mxd

USACE_DAPL0071376



Dakota Access Pipeline Project
Figure 11
Landcover
Federal Lands
Morton County and
Emmons County, North Dakota

USACE_DAPL0071377



Preferred Alternative
Route Alternative
USACE Garrison Flowage Easements
Other Government Lands

North Dakota

DAKOTA ACCESS, LLC

**Dakota Access Pipeline Project**
**Figure 12**
**Route Alternative**
**Missouri River Crossing**
**Williams County, North Dakota**

0  2  4  8 Miles

1:400,000

NAD 1983 UTM Zone 14N     Date: July, 2015

Path: P:\GIS\Client\ETC_EnergyTransfer\DakotaAccess_DAPL\Maps\ENV\ND_FlowEasements\12ND_Missouri_R_Xing.mxd

USACE_DAPL0071378



**Legend:**
- Preferred Alternative
- Route Alternarive
- USACE Garrison Flowage Easements
- Standing Rock Sioux Reservation
- USACE Lake Oahe Fee-Owned Land
- Other Government Lands

North Dakota

**DAKOTA ACCESS, LLC**

**Dakota Access Pipeline Project
Figure 13
Route Alternative
Lake Oahe Crossing
Emmons & Morton Counties, North Dakota**

1:696,293

NAD 1983 UTM Zone 14N    Date: April, 2016

0 2 4 8 Miles

Path: P:\GIS\Client\ETC_EnergyTransfer\DakotaAccess_DAPL\Maps\ENV\ND_FlowEasements\13ND_Lake_Oahe_Xing_update20160412.mxd

USACE_DAPL0071379

FIGURE 14



CROSS-SECTION DIAGRAM OF LAKE OAHE HDD CROSSING

USACE_DAPL0071380

FIGURE 15



CROSS-SECTION DIAGRAM OF MISSOUR RIVER HDD CROSSING



DAPL Action Area

Whooping Crane Migration Corridor

Whooping Crane Migration Corridor from Whooping Cranes & Wind
Development - An Issue Paper By Regions 2 and 6, U. S. Fish and
Wildlife Service April 2009 (Stehn, T, and T. Wassenich. 2008.
Whooping crane collisions with power lines: an issue paper.
2006 North American Crane Workshop. In press.)

0      40
|———————| Miles

DAKOTA ACCESS, LLC

Figure 16
Dakota Access Pipeline Project
USACE ND Flowage Easement/408 Areas

Whooping Crane Migration Corridor

| | 1:2,800,000 |
|---|---|
| UTM 83-14F | Date: March, 2016 |

Path: P:\GIS\Client\ETC_EnergyTransfer\DakotaAccess_DAPL\Maps\ENV\WoopingCrane\01_ND_ProjectLocation_Land.mxd
Source: ArcGIS Online Mapping

USACE_DAPL0071382

---

UNCLASSIFIED\\FOR OFFICIAL USE ONLY

---

**Project: (450474) DAPL     Review:**

**Use the form below to select criteria for the report**

a. Comment Type (req.)  ⦿ Any  ○ Critical

| DAPL Environmental Analysis |
| --- |
|  |

b. Review(s) (opt.)

c. Evaluation Status (opt.) | Please select from below ∨ |

d. BackCheck Status (opt.) | Please select from below ∨ |

e. Discipline (opt.) | Please select from below                          ∨ |

f. Keyword(s) (opt.) |   |  ○

g. Start Date (opt.) |   |

h. End Date (opt.) |   |

i. Comment ID(s) (opt.) |   |  ○

Generate Report

---

## DAPL Environmental Analysis

Displaying 178 comments for the criteria specified in this report.

| Id | Discipline | Section/Figure | Page Number | Line Number |
| --- | --- | --- | --- | --- |
| 6116831 | Geotechnical | 4.1.3.1 | n/a | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

Earthquakes and Seismic Hazard paragraph. Please include acceleration values discussed in the paragraph for the 2% and 4% exceeded within 50 year period

Submitted By: Jason Wagner (402-995-2276). Submitted On: Jun 09 2015

---

**1-0** Evaluation **Concurred**
Subsequent EA draft will be revised as follows (Section 4.1.3.1, Page 20-21):
The potential seismic hazard was assessed by evaluating the USGS 2014 Seismic Hazard Map[15]. According to the Seismic Hazard Map, earthquake peak ground acceleration (PGA) that has a 2 percent chance of being exceeded in 50 years has a value between 2 and 4 percent of gravity (g) for the Project Area and Connected Action.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jun 24 2015  (Attachment: ND_2014_Seismic_Hazard_Map.pdf)

---

USACE_DAPL0072161

1-1 Backcheck Recommendation **Close Comment**
The response addresses my comment.

Submitted By: Jason Wagner (402-995-2276) Submitted On: Jul 10 2015.
Current Comment Status: ~~Comment Closed~~

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6116834 | Geotechnical | Appendix E | n/a | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

Blast Plan: Where will blasting be needed? There are no details as to if and where blasting may be needed.

Submitted By: Jason Wagner (402-995-2276). Submitted On: Jun 09 2015

1-0 Evaluation **Concurred**
EA Text (Section 4.1.1.2, Page 19) reads as follows:
Based on recently obtained geotechnical analysis, no blasting is expected in association with pipeline installation on the Project Area or Connected Actions given that the HDD will be conducted in unconsolidated or loosely indurated sediments, as described in Section 4.1.1.1. Although not anticipated, if blasting is found to be necessary, Dakota Access will follow procedures specified in its Blasting Plan (Appendix E).

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jun 24 2015

1-1 Backcheck Recommendation **Close Comment**
Response addresses my comment

Submitted By: Jason Wagner (402-995-2276) Submitted On: Jul 10 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6121653 | Geotechnical | 3.1 and drill logs in appendices | n/a | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

In Section 3.1 geology of the area is discussed and states that

Geologic mapping indicates the Holocene Age (11,700 yrs to present) Coleharbor Formation overlies the Fox Hills Formation on the east side of Lake Oahe. The Coleharbor consists of sand and gravel river sediments. The Pierre Formation may be encountered below the Fox Hills Formation, particularly on the east side of Lake Oahe. The Pierre consists primarily of dark gray shale derived from marine offshore sediment (Bluemle, 1979), (Bluemle, 1984), (USGS Mineral Resources).

In section 4.1.4.1 states "pipeline construction, including HDD activities, are not expected to penetrate the Cretaceous Pierre Formation as evidenced by the geotechnical borings (Appendix D), which indicate that the HDD would only penetrate the surficial geology that is dominated by unconsolidated sediments."

Looking at the ND geologic map the drill logs and the HDD profile in the appendix of the EA I question the statements above or would like clarification. Will the directional drill be at least partially in bedrock or not and if so what formation? LO-B-1 boring indicates a lot of high blowcount material int he boring leading me to believe that maybe the Fox Hills or maybe the Pierre Shale.

Please clarify the statements in Section 3 and 4 and note on profile if bedrock is expected. This may be important for mud design etc.

Submitted By: Jason Wagner (402-995-2276). Submitted On: Jun 12 2015

USACE_DAPL0072162

**1-0** Evaluation **Concurred**
While high blowcount materials were encountered in the borings and portions of the HDD profile are located within these materials, the recovered soils were indicative of highly consolidated glacial deposits and not bedrock and as such we infer that the HDD profile penetrates the Coleharbor Formation. Sieve analyses and Atterberg limits determinations were completed on the soil samples recovered from the borings to characterize the soils and help in the development of a drilling fluid plan for HDD operations.

As requested, a note will be added to the HDD profile for Lake Oahe clarifying that bedrock is not expected to be encountered.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jun 24 2015

**1-1** Backcheck Recommendation **Close Comment**
The response addresses my comment

Submitted By: Jason Wagner (402-995-2276) Submitted On: Jul 10 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6139124 | Operations | Table 1-2 | 3 | n/a |

Comment Classification: Unclassified\\For Official Use Only (U\\FOUO)

The fourth line within the table says the exit point within Corps flowage easement. Are you planning to HDD North to South or South to North? I don't believe the Corps has flowage easements on the south side of the river.

Submitted By: Brent Cossette (402-995-2712). Submitted On: Jun 26 2015

**1-0** Evaluation **Concurred**
The table is correct. The HDD will exit on the flowage easements on the North side of the River. The entry point of the HDD will be on the South side of the River on Private land. Drilling will occur from South to North.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 01 2015

**1-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Jul 13 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6139127 | Operations | 1.1.1 Flowage Easements | 4 | Last Sentence of Last Paragraph |

Comment Classification: Unclassified\\For Official Use Only (U\\FOUO)

What about the access road? How much fill will be added for the road within the flowage easement? Which flowage easements will be impacted. Corps Flood Plain Section only reviewed the valve location and not the road. Should get similar engineering drawings for the road with elevations to confirm with Flood Plain there are no issues.

Submitted By: Brent Cossette (402-995-2712). Submitted On: Jun 26 2015

**1-0** Evaluation **Concurred**
Access road would be located on the same Flowage Easement as Valve Site (LL3453E). Requested

USACE_DAPL0072163

drawing is attached. NOTE THAT NO FILL INCREASING THE ELEVATION WILL BE ADDED.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 07 2015  (Attachment: Valve_Site_and_Road_Typical_103957-MLV-ND-160-B_(3).pdf)

---

**1-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Jul 13 2015.
Current Comment Status: Comment Closed

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|----|-----------|----------------|-------------|-------------|
| **6139130** | Operations | 1.1.2 Federal Lands | 5 | Last Sentence of First Section |

Comment Classification: Unclassified\\For Official Use Only (U\\FOUO)

This statement is confusing. Does the 5,420 feet get the pipeline from entry to exit point? Is there any back trenching occurring on fee property. If so, the Corps would like for the HDD to extend the entire length so this does not occur.

Submitted By: Brent Cossette (402-995-2712). Submitted On: Jun 26 2015

---

**1-0** Evaluation **Concurred**
EA text: The HDD entry and exit point workspaces and stringing area will be placed on private land outside of the federal lands and are considered Connected Actions in this analysis. HDD design reflects a crossing length of approximately 7,500 feet of which approximately 5,420 feet is beneath the bed of Lake Oahe.

The HDD has been designed to span the entire width of Corps lands. The 5,420 is the length beneath Lake Oahe. The entire HDD, from entry to exit point, is approximately 7,500 and spans the COE owned lands; no excavation of any kind will occur on Federal owned lands. This is visually depicted on the figures produced for the EA. "

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 01 2015

---

**1-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Jul 13 2015.
Current Comment Status: Comment Closed

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|----|-----------|----------------|-------------|-------------|
| **6139131** | Operations | 2.2.1 Open-Cut | 10 | Third Sentence |

Comment Classification: Unclassified\\For Official Use Only (U\\FOUO)

There is no plans for this open bank trenching to occur on Corps fee lands is there?

Submitted By: Brent Cossette (402-995-2712). Submitted On: Jun 26 2015

---

**1-0** Evaluation **Concurred**
Open-Cut waterbody crossings for pipeline installation will not be utilized on Corps fee lands. Pipe will be installed via HDD only on Corps Owned lands.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 07 2015

---

**1-1**

USACE_DAPL0072164

Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Jul 13 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6139132 | Environmental | n/a | n/a | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**
(Document Reference: scoping letters)

The scoping letters section included conversations between the applicant and NRCS. A letter from NRCS was referenced but not attached. Recommend the NRCS letter be included in the scoping letters section.

Submitted By: William Harlon (402-995-2500). Submitted On: Jun 26 2015

1-0 Evaluation **Concurred**
NRCS letter dated 4/13/2015 from State Soil Scientist, Wade Bott, is found in the Appendix J (page 426 of 429).

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 01 2015

1-1 Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: William Harlon (402-995-2500) Submitted On: Jul 15 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6139135 | Operations | 4.1.5.2 Impacts and Mitigation | 28 | Eighth Paragraph First Sentence |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

Mud pits on Corps lands? If so, can they be off Corps lands? They need to be a closed loop system. Need to clarify within the EA.

Submitted By: Brent Cossette (402-995-2712). Submitted On: Jun 26 2015

1-0 Evaluation **Concurred**
"Mud pits are required to implement the HDD crossing method. There are no mud pits on the Corps fee owned lands, one is located on the flowage easements. The term ""closed loop system"" is applicable to drilling wells, not horizontal directional drills. Language from the Garrison Oil and Gas Management Plan for your reference:

Garrison Project Oil and gas Management Plan, Appendix D, Construction of Facilities #10 Closed Loop Systems: The use of a completely closed loop system including all muds, fluids, and cuttings, will be required on all wells located on Corps lands. No reserve pits will be allowed on the well location. All waste will be properly disposed of in a State approved disposal facility. Operators are not allowed to dispose of waste in commercial waste pits. The Applicant must provide documentation of all closed loop systems to the Garrison Project.

Appendix F of the Oil and Gas Management plan addresses/acknowledges the need for mud pits with respect to pipeline HDDs. There does not appear to be a restriction against these being on COE lands, the restriction for pits is clear with respect to exploration/production wells. Clips from the Oil and Gas Management Plan Appendix is provided below in respect to the need and placement of pits.

Appendix F, A Partial List of Requirements for Pipeline Installation Using HDD Techniques, letter b states:

USACE_DAPL0072165

Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Jul 13 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6139142 | Environmental | n/a | n/a | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**
(Document Reference: scoping letters)

Response to the ND Public Service Commission indicates that reforestation guidelines will be followed. This would be accurate for those properties that are not owned in fee title by the Corps. Trees removed for construction and/or operational purposes by lessees on Corps fee property will be mitigated per Corps policy. This would apply to trees and shrubs removed at the Oahe crossing.

Submitted By: William Harlon (402-995-2500). Submitted On: Jun 26 2015

1-0 Evaluation **Concurred**
We think this this comment referring to the response to Liz Smith, ND Forest Service rather than ND Public Service Commission (NDPSC). The Tree and Shrub replanting regulations described in the response to the ND Forest Service are to meet NDPSC "Tree and Shrub Mitigation Specifications". There are no trees on the Corps Fee owend lands at Lake Oahe that would be cleared; reforestation is not applicable to Corps Fee owned lands.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 01 2015

1-1 Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: William Harlon (402-995-2500) Submitted On: Jul 15 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6139144 | Operations | 4.1.5.2 Impacts and Mitigation | 33 | Second to Last Sentence |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

The statement of "extent practicable" is throughout the document. What does this mean? Mitigation needs to occur and monitoring to ensure full reclamation takes place is what is required. This statement makes it seem that you could do 50% and consider that "extent practicable".

Submitted By: Brent Cossette (402-995-2712). Submitted On: Jun 26 2015

1-0 Evaluation **Concurred**
"EA Text: Trenching and dewatering activities used in construction of the proposed pipeline could temporarily alter surface drainage patterns. However, these impacts are expected to be localized and temporary since the contours and vegetation will be returned to preconstruction conditions to the extent practicable. Dewatering activities will be conducted in accordance with applicable Permits and Dakota Access' SWPPP, and ECP.
The term ""extent practcable"" is a common term in the industry with respect to regulatory compliance. USACE Nationwide Permit Defines Practicable as: Available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purpose. Extent Practicable or Maximum Extent Practicable (MEP) is often cited in USACE regulations and is generally left up to interpretation by the designer and the reviewer of each Project/Plan. "

USACE_DAPL0072167

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 01 2015

---

**1-1** Backcheck Recommendation **Open Comment**
An Environmental Analysis is meant to quantify the impacts so you can cumulatively decide on the total impacts. You must clearly state what the impacts are and what you plan on doing to mitigate those impacts. USACE must make a decision on total impacts therefore we must know what those impacts are.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Jul 13 2015.

**2-0** Evaluation **Concurred**
Based on 7/15/15 comment resolution meeting the EA will be reviewed and revised where "extent practicable" is used. All instances where a description of a quantifiable impact or mitigation measure is possible will be clarified. See Revised EA sections 3.1.1.2, .3.1.5.2, 3.2.1.2 and 3.6.2.2.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 22 2015

---

**2-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Aug 17 2015.

**2-2** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Aug 17 2015.
Current Comment Status: Comment Closed

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| **6139147** | Environmental | n/a | n/a | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**
(Document Reference: general EA)

I did not see refernece to a vegetation maintenance plan in the EA. How will vegetation be maintained on the ROW after construction. For example, will chemical or mechanical methods be used?

Submitted By: William Harlon (402-995-2500). Submitted On: Jun 26 2015

---

**1-0** Evaluation **Concurred**
Ongoing vegetation of the permanent ROW would entail periodic vegetation clearing measures in accordance with PHMSA regulation for pipeline inspection.  This may involve selective tree cutting and periodic mowing.  The use of herbicides will not occur on Corps Fee Lands without obtaining prior approval from the USACE.  Vegetation maintenance of the right-of-way in areas of active cropland is not expected to occur due to agricultural practices.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 07 2015

---

**1-1** Backcheck Recommendation **Close Comment**
Recommend an environmental commitment to replace trees & shrubs per Corps policy and vegetation maintenance occur outside of nesting season.

Submitted By: William Harlon (402-995-2500) Submitted On: Jul 15 2015.
Current Comment Status: Comment Closed

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| **6139150** | Operations | 4.2.2.2 impacts and Mitigation | 35 | Last Paragraph Third Sentence |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

USACE_DAPL0072168

The EA states monitoring activities includes remote oversight. Is this a SCADA system? If so, how will this system receive power/signal (i.e. fiber optic, wireless)? Past incidents have shown wireless works marginally at best because of the remoteness of these areas. You should expand on this technology and describe the installation within the EA.

Submitted By: Brent Cossette (402-995-2712). Submitted On: Jun 26 2015

---

1-0 Evaluation **Concurred**
The SCADA system will be used for remote monitoring oversight.  Power will be provided from the existing power grid.   In the event of a power outage, a 500 watt Uninterruptable Power Supply will supply low voltage power to the Programmable Logic Controller and communication equipment.  Communication with the monitoring system will be accomplished primarily via satellite with a telephone back-up (4G cellular or landline depending on availability/coverage).  The communications system will be evaluated for what works best at the valve site and the system with the least potential for interruption during operations will be utilized.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 07 2015

---

1-1 Backcheck Recommendation **Open Comment**
This should be included within the EA. Information such as this helps with your risk factors. May want to expand on what else you plan on doing to decrease risk of a spill. Operation and maintenance plan for example would be a good resource to pull this information from once you develop and send for our review.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Jul 13 2015.

2-0 Evaluation **Concurred**
This information has be added to EA section 3.11 (formerly 4.11) Reliability and Safety.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 22 2015

---

2-1 Backcheck Recommendation **Open Comment**
THe EA does not state what power sources will be used for the SCADA system. It states what might be used based on available coverage.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Aug 17 2015.

3-0 Evaluation **Concurred**
Section 3.10- Reliability and Safety states "Power for the SCADA system would be provided from an existing power grid. In the event of a power outage, a 500 watt Uninterruptable Power Supply would supply low voltage power to the Programmable Logic Controller and communication equipment."

Submitted By: Jonathan Fredland (7134627121) Submitted On: Sep 11 2015

---

3-1 Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Brent Cossette (402-995-2712). Submitted On: Oct 21 2015.
Current Comment Status: Comment Closed

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6139151 | Environmental | 1.1.1 | 4 | n/a |

Comment Classification: Unclassified\\For Official Use Only (U\\FOUO)
(Document Reference: EA)

What is the elevation for all shut off valves? Is that elevation susceptible to ice jams, flooding debris, etc? Will they be accessible when the Missouri River is in flood stage?

Submitted By: William Harlon (402-995-2500). Submitted On: Jun 26 2015

---

USACE_DAPL0072169

**1-0** Evaluation **Concurred**
Please provide information on the potential of flooding in the vicinity of the valve site in question. Information that the USACE provides would assist Dakota Access in determining risks from flooding/ice at the valve site and addressing potential impacts in the EA.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 07 2015

---

**1-1** Backcheck Recommendation **Open Comment**
Please provide elevation of valve locations.

Submitted By: William Harlon (402-995-2500) Submitted On: Jul 15 2015.

**2-0** Evaluation **Concurred**
The valve site on the flowage easements is at an elevation of 1873.29 to 1872.00.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 22 2015

---

**2-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: William Harlon (402-995-2500) Submitted On: Sep 04 2015.
Current Comment Status: Comment Closed

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| **6139156** | Operations | 4.2.3.1 Affected Environment | 36 | First Paragraph Second Sentence |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

The National Wetland Inventory dataset is not that accurate. These need to be identified by field biologists walking the route identifying all wetlands.

Submitted By: Brent Cossette (402-995-2712). Submitted On: Jun 26 2015

---

**1-0** Evaluation **Concurred**
"Since this initial draft of the EA, the areas where access was previously denied has been granted; all areas have been field verified. We will revise the EA to clarify that NWI data, along with aerial imagery and topographic maps were used to provide baseline data. Field delineations per the USACE guidelines have occurred on 100% of the Project and Connected Action areas by qualified biologists.
"

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 01 2015

---

**1-1** Backcheck Recommendation **Open Comment**
Good, I will want to verify the information before the comment is closed.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Jul 13 2015.

**2-0** Evaluation **Concurred**
Noted. See section 3.2.3 of the revised EA.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 22 2015

---

**2-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Aug 17 2015.
Current Comment Status: Comment Closed

---

USACE_DAPL0072170

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| **6139160** | Environmental | n/a | n/a | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**
(Document Reference: EA)

I did not see reference in the EA where the control room for the pipeline will be located. Recommend that the control room, leak detection system, utilities to SCADA, etc be evaluated in the EA.

Submitted By: William Harlon (402-995-2500). Submitted On: Jun 26 2015

**1-0** Evaluation **Concurred**
Control room is located in Sugarland, Texas with a backup control room in Bryan, Texas.  Leak Warn, a leading software program for monitoring pipelines, is being tailored to the Dakota Access Project in coordination with PHMSA requirements.  The Operator will utilize a Computational Pipeline Monitoring System (CPM) to monitor the pipeline for leaks.  The CPM is a state-of-the-art pipeline monitoring tool and features a real-time transient model that is based on pipeline pressure, flow and temperature data which is polled from various field instruments every 6 seconds and updates the model calculations to detect pipeline system variations every 30 seconds.  After the system is tuned, this state-of-the-art CPM system is capable of detecting leaks down to 1% or better of the pipeline flow rate within a time span of approximately 1 hour or less and capable of providing rupture detection within 1 - 3 minutes.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 07 2015

**1-1** Backcheck Recommendation **Open Comment**
Can DAPL elaborate on what utility will be used to transmit data to the control room. Does the EA evaluate how alarms in the control room will be handled?

Submitted By: William Harlon (402-995-2500) Submitted On: Jul 15 2015.

**2-0** Evaluation **Concurred**
Revised text on SCADA communication incorporated into the EA in Section 3.11. The valves will be connected via cellular and satellite service. Based on existing utilities in the immediate area using these same systems, we have knowledge that both systems are reliable for communications needs.
No, the EA does not evaluate how alarms will be handled.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Aug 05 2015

**2-1** Backcheck Recommendation **Open Comment**
Please address within the EA.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Oct 29 2015.

**3-0** Evaluation **Concurred**
The following has been added to the revised EA to address how alarms will be handled (Section 3.11, Page 65-66): The OCC prioritizes and responds to all alarms in accordance with the control room management regulations referenced in PHMSA CFR 195.446 (e). This regulation requires that the OCC Operator have a SCADA system alarm management plan; in general, the plan must include review of the SCADA alarm operations to ensure alarms support safe pipeline operations, identify any required maintenance that may affect safety at least once every calendar month, verify correct safety-related alarm values and descriptions at least once every calendar year when associated field equipment are changed or calibrated, determine effectiveness of the alarm management plan through a yearly review, and monitor content and volume of activity at least once a calendar year to assure controllers have adequate time to review incoming alarms.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Nov 02 2015

**3-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Nov 03 2015.
Current Comment Status: Comment Closed

USACE_DAPL0072171

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6139161 | Operations | Table 4-11 | 46 | n/a |

Comment Classification: Unclassified\\For Official Use Only (U\\FOUO)

Why is the Northern Long Eared Bat not included?

Submitted By: Brent Cossette (402-995-2712). Submitted On: Jun 26 2015

### 1-0 Evaluation **Concurred**
"

We will edit the EA to include a heading for the NLEB and include the information below
The NLEB is currently listed by the USFWS as threatened in North Dakota. On April 2, 2015, the USFWS published the final listing in the Federal Registrar with an effective date of May 4, 2015. The USFWS listed the northern long-eared bat as threatened and chose to exercise the option of issuing an interim 4(d) rule to allow for more flexible implementation of the ESA and "to tailor prohibitions to those that make the most sense for protecting and managing at-risk species". In areas outside of the 150-mile WNS buffer zone, incidental take from lawful activities will be allowed. The state of North Dakota currently falls outside of the WNS 150-mile buffer zone. Per the exemptions of the interim 4(d) rule, the Project would not negatively impact the northern long-eared bat. (U.S. Fish and Wildlife Service. 2015. Endangered and Threatened Wildlife and Plants; Threatened Species Status for the Northern Long-Eared Bat With 4(d) Rule.) "

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 01 2015

### 1-1 Backcheck Recommendation **Open Comment**
I will want to verify within the EA before this comment is closed.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Jul 13 2015.

### 2-0 Evaluation **Concurred**
See Section 3.4.2 of the Revised EA.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 22 2015

### 2-1 Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Aug 17 2015.
Current Comment Status:

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6139167 | Environmental | 2.2 Water body crossings | n/a | n/a |

Comment Classification: Unclassified\\For Official Use Only (U\\FOUO)
(Document Reference, EA)

The Corps preferred method for pipelines, utilities, etc to cross water bodies is via HDD methods. HDD limits the impacts to aquatic resources.

Submitted By: William Harlon (402-995-2500). Submitted On: Jun 26 2015

### 1-0 Evaluation **Concurred**
The HDD Technique will be utilized to cross the Missouri River and Lake Oahe. There are no waterbodies crossed by the pipeline on Corps Fee Lands other than Lake Oahe. All irrigation canals within the Flowage Easements would be crossed via trenchless technology (boring) in coordination with the irrigation districts; the canals account for all waterbodies on the Flowage Easements. therefore there will be no open cut of waterbodies for the project or connected action. The EA will be updated to reflect this.

USACE_DAPL0072172

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 07 2015

---

**1-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: William Harlon (402-995-2500) Submitted On: Jul 15 2015.
Current Comment Status: Comment Closed

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|----|-----------|----------------|-------------|-------------|
| 6139169 | Operations | 4.6.2.2 Impacts and Mitigation | 55 | Last Paragraph First Sentence |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

You should include discussion on the South side valve location.

Submitted By: Brent Cossette (402-995-2712). Submitted On: Jun 26 2015

---

**1-0** Evaluation **Concurred**
The valve site on the south side of the Missouri River will be located on private land. Therefore, the valve site is not part of the Project Area and is not discussed in the EA. To clarify, the area to be included in the EA was defined in coordination with the Corps EA group to be the flowage easements north of the Missouri River only. Because of the type of authorization needed across the easements, it was confirmed that the analysis of the flowage easements would be for the flowage easements only and that there was no "connected section"; the Misouri River HDD. Anything south of the river is outside of this scope.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 01 2015

---

**1-1** Backcheck Recommendation **Open Comment**
General description of the south valve would be all that is needed.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Jul 13 2015.

**2-0** Evaluation **Concurred**
EA revised with text" An additional valve will be placed on the south side of the Missouri River, approximately 1,860 feet from the river." in Section 3.6.2.2

Submitted By: Jonathan Fredland (7134627121) Submitted On: Aug 05 2015

---

**2-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Oct 21 2015.
Current Comment Status: Comment Closed

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|----|-----------|----------------|-------------|-------------|
| 6139174 | Environmental | 2.1.1 Clearing & Grading | n/a | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**
(Document Reference: EA)

What is the anticipated timeline for clearing and grading? Recommend that contstruction and maintenance activities on Corps property not conflict with T&E species and occur outside of the nesting season.

Submitted By: William Harlon (402-995-2500). Submitted On: Jun 26 2015

---

USACE_DAPL0072173

### 1-0 Evaluation **Concurred**
Construction activities will commence upon receipt of applicable authorizations. The HDD is anticipated to commence in the winter of 2015/2016. It is anticipated that open trench construction will take place later in the spring after the thaw and when the roads are suitable for transporting heavy equipment.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 01 2015

### 1-1 Backcheck Recommendation **Close Comment**
Recommend an environmental commitment to minimize environmental impacts by scheduling construction and maintenance activities outside of the nesting season.

Submitted By: William Harlon (402-995-2500) Submitted On: Jul 15 2015.

Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6139178 | Operations | 4.6.2.2 Impacts and Mitigation | 56 | Seventh Paragraph Third Sentence |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

How will these shelter belts be protected? The Corps requires HDD to be done to avoid/minimize impacts.

Submitted By: Brent Cossette (402-995-2712). Submitted On: Jun 26 2015

### 1-0 Evaluation **Concurred**
"EA text: Shelter belts and trees will be protected by Dakota Access to the extent practicable in a manner compatible with the safe operation, maintenance, and inspection of the pipeline. Applicable regulations will be adhered to regarding tree and shrub removal from along the route.
Upon completion of field surveys subsequent to drafting the EA, we have confirmed that there are no shelter belts that will be impacted within the Project Area or Connected Action. The language in the EA will be revised accordingly. "

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 01 2015

### 1-1 Backcheck Recommendation **Open Comment**

Submitted By: Brent Cossette (402-995-2712) Submitted On: Jul 13 2015.

### 2-0 Evaluation **Concurred**
On 7/15/15 at the comment resolution meeting Brent indicated that he had meant to close this comment since no shelter belts will be impacted.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 22 2015

### 2-1 Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Aug 17 2015.

Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6139183 | Environmental | Drawing P12-22 | n/a | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**
(Document Reference: EA Appendix A)

The discharge of hydrostatic water will need to be reviewed and approved prior to discharge onto Corps property.

USACE_DAPL0072174

Submitted By: William Harlon (402-995-2500). Submitted On: Jun 26 2015

**1-0** Evaluation **Concurred**
"Discharges of Hydrostatic Test water will not occur on Corps owned lands. Discharge on flowage easements will be conducted in accordance with Hydrostatic Test Water Discharge Permit No. NDG07-0000 to be obtained from the ND Department of Health prior to discharge. No discharge on Corps Owned Lands is proposed, only in the flowage easement within the HDD workspace for the exit point.
Does this comment mean that the hydrostatic test discharge needs to included in the EA or there is another approval process?"

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

**1-1** Backcheck Recommendation **Close Comment**
Recommend the hydrostatic test discharge proposed on Corps flowage easement property be included in the EA. This discussion of this topic in the EA should also clarify there is no intention of discharges on Corps fee property. Consideration should be given to minimize environmental impacts associated with the hydrostatic test discharge(s).

Submitted By: William Harlon (402-995-2500) Submitted On: Jul 15 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6139195 | Environmental | n/a | n/a | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**
(Document Reference: EA Appendices)

The titles of appendices is unclear in many examples. For example, Appendix A references both SPCC and SWPPP but Appendix B is also titled SPCC. Recommend revising all appendices for clarity of title, reference, etc.

Submitted By: William Harlon (402-995-2500). Submitted On: Jun 26 2015

**1-0** Evaluation **Concurred**
Appendix A of the EA is the SWPPP. The SPCC is Appendix B of the SWPPP to comply with federal regulation. References to the SCPP will be clarifed as (Appendix B of Appendix A). The fly sheet to the SWPPP's Appendices will be edited to clarify the commenter's confusion.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 01 2015

**1-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: William Harlon (402-995-2500) Submitted On: Jul 15 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6139244 | Environmental | Appendix B- Reportable Quantities | n/a | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**
(Document Reference: EA Appendices)

Recommend clarifying that reports to the NRC should be immediate. Corps (roject and District ECC's) should be also be contacted immediately for spills on Corps property.

USACE_DAPL0072175

Submitted By: William Harlon (402-995-2500). Submitted On: Jun 26 2015

**1-0** Evaluation **Concurred**
Appendix B of the SPCC, Reportable Quantities, will be updated by the Construction Contractor once selected. The SPCC will include "NRC should be notified immediately in the event of a reportable spill." The Corps Regional and District ECC's will be included for contact regarding reportable spills on Corps owned Property.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 01 2015

**1-1** Backcheck Recommendation **Close Comment**
To clarify, all spills on Corps fee and flowage easement properties should be reported to the Project and District ECC.

Submitted By: William Harlon (402-995-2500) Submitted On: Jul 15 2015.

Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6139245 | Operations | 4.12.2.2 Impacts and Mitigation | 56 | General Comment |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

Least Tern and Piping Plover are sensitive to noise. Will this construction occur during their nesting period? Especially, for Oahe there is critical habitat near the right of way location. I think something needs to be said within the EA about these impacts and what the mitigation measures will be.

Submitted By: Brent Cossette (402-995-2712). Submitted On: Jun 26 2015

**1-0** Evaluation **Concurred**
Dakota Access will commence HDD of both Rivers upon receipt of all applicable authorizations. We anticipate this will take place early in the first quarter of 2016 and continue through early spring 2016, ideally prior to the nesting season. It is expected that the HDD would at least commence prior to the nesting season thus the drilling activities and respective noise would deter the species from nesting in the noise impact area. It should be noted that the HDD point on the flowage easements is greater than 1,400 feet from the habitat and 960 feet and 1125 feet at Lake Oahe, which is beyond the typically recommended buffer distance for nesting birds. Further, the habitat in question is subject to industrial ship traffic along the Missouri River. The HDD noise is not expected to have a discernible impact to the species.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 07 2015

**1-1** Backcheck Recommendation **Open Comment**
What you just described is good background and information. Put this type of information within the EA. It helps quantify the work and impacts and generally describes the things you will do to mitigate those potential impacts.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Jul 13 2015.

**2-0** Evaluation **Concurred**
This information will be added to the EA. See section 3.4.2.2 of the revised EA.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 22 2015

**2-1** Backcheck Recommendation **Open Comment**
The Interior Least Tern section (i.e. 3.4.2.2 Impacts and Mitigation, page 55) describes possible water withdrawal. I thought you pulled that request?

Submitted By: Brent Cossette (402-995-2712) Submitted On: Aug 17 2015.

**3-0**

USACE_DAPL0072176

Evaluation **Concurred**
The request to withdrawal water from Lake Oahe was pulled based on comments received, but Dakota Access maintained the request to withdrawal water from the Missouri River. This revised water withdrawal request was submitted to the COE on July 1, 2015. The July 1 submittal to the COE is attached.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Sep 11 2015  (Attachment: Revised_Water_Withdrawal_Write-Up.msg)

**3-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Oct 21 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6139249 | Environmental | Appendix C | n/a | n/a |

Comment Classification: Unclassified\\For Official Use Only (U\\FOUO)
(Document Reference: EA Appendices)

The State reporting requirements should list the contact numbers and weblinks for each state involved in the permit area.

Submitted By: William Harlon (402-995-2500). Submitted On: Jun 26 2015

**1-0** Evaluation **Concurred**
Appendix C of the SPCC, State Requirements, will be updated by the Construction Contractor to include ND Department of Heath Spill Reporting website and contact numbers.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 01 2015

**1-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: William Harlon (402-995-2500) Submitted On: Jul 15 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6139254 | Environmental | Appendix C | n/a | n/a |

Comment Classification: Unclassified\\For Official Use Only (U\\FOUO)
(Document Reference: EA Appendices)

I believe the State of ND requires spills of 25 or more gallons of oil released on land to be reported to the ND Dept of Health.

Submitted By: William Harlon (402-995-2500). Submitted On: Jun 26 2015

**1-0** Evaluation **Concurred**
Per the ND Department of Health Spill Reporting website : Specific minimum quantities for mandatory reporting of spills have not been established. All spills which may potentially impact waters of the state, either surface water or ground water, must be reported.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 01 2015

**1-1**

USACE_DAPL0072177

Backcheck Recommendation **Open Comment**
I recall a spill response presentation where the presenter indicated that the NDDOH required reporting of oil spills greater than 25 gallons on land. Recommend a clarification from NDDOH.

Submitted By: William Harlon (402-995-2500) Submitted On: Jul 15 2015.

**2-0** Evaluation **Concurred**
It was asked at the 7/15/15 meeting that Dakota Access confirm there is no minimum reporting volume for spills in North Dakota. Kary Crowdus, NDDH Environmental Specialist confirmed via telephone conversation with Jonathan Fredland (7/16/15, 9:00 a.m.) that there is no 25 gallon or any minimum quantity for mandatory reporting of spills in North Dakota.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 16 2015

---

**2-1** Backcheck Recommendation **Close Comment**

Submitted By: William Harlon (402-995-2500) Submitted On: Sep 04 2015.
Current Comment Status: Comment Closed

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| **6139256** | Environmental | Appendix H | n/a | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**
(Document Reference: EA Appendices)

The spill response contractors should be provided to the Corps prior to commencement of construction activities on Corps property.

Submitted By: William Harlon (402-995-2500). Submitted On: Jun 26 2015

---

**1-0** Evaluation **Concurred**
Appendix H of the SPCC, Emergency Response Contractors; Disposal and Treatment Facilities, will be updated by the Construction Contractor prior to construction. The updated SPCC will be provided to the Corps at that time.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 01 2015

---

**1-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: William Harlon (402-995-2500) Submitted On: Jul 15 2015.
Current Comment Status: Comment Closed

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| **6139258** | Environmental | Appendix C | n/a | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**
(Document Reference: EA Appendices)

Would the inspection forms and instructions be better placed in Appendix A SWPPP?

Submitted By: William Harlon (402-995-2500). Submitted On: Jun 26 2015

---

**1-0** Evaluation **Concurred**
Inspection Forms and Instructions are currently included in the SWPPP (EA Appendix A). The Inspection Forms and Instructions are Appendix C of the SWPPP. The confusion is likely due to the SPCC being part

USACE_DAPL0072178

of the SWPPP (Appendix B) and all are included in one PDF for the purposes of the EA review. Fly sheets will be updated to clarify the commenter's confusion. The bookmarks within the PDF document can be used to navigate the appendices an avoid confusion.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 01 2015

**1-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: William Harlon (402-995-2500) Submitted On: Jul 15 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6139262 | Environmental | Appendix B | n/a | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**
(Document Reference: EA Appendices)

Recommend that the referenced Appendix B HDD plan should be renamed or consolidated with the geotech plan.

Submitted By: William Harlon (402-995-2500). Submitted On: Jun 26 2015

**1-0** Evaluation **Concurred**
Appendix B of the EA contains the HDD Construction Plan and HDD Contingency Plan. The HDD Contractor will conduct all HDD work according to Appendix B. The Geotechnical Data Report (Appendix D) was completed to provide existing surface and subsurface soil and groundwater conditions to facilitate engineering and design. Does the comment refer to combining the HDD Construction Plan and the HDD Contingency Plan with the Geotechnical Data Report? Please clarify what plans are recommended to be consolidate/renamed.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 08 2015

**1-1** Backcheck Recommendation **Close Comment**
During review, it seemed reasonable to me for the HDD plans to be included with the geotech plan since they are related topics.

Submitted By: William Harlon (402-995-2500) Submitted On: Jul 15 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6139268 | Operations | 7.0 Federal, Tribal, State, and Local Agency Consultation and Coordination | 77 | General Comment |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

Comments received should be noted along with responses.

Submitted By: Brent Cossette (402-995-2712). Submitted On: Jun 26 2015

**1-0** Evaluation **Concurred**
Comments received as well as all Dakota Access responses are included as Attachment J.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 01 2015

**1-1** Backcheck Recommendation **Close Comment**
Closed without comment.

USACE_DAPL0072179

Submitted By: Brent Cossette (402-995-2712) Submitted On: Jul 13 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6139278 | Operations | Stormwater Pollution Prevention Plan - 3.1.3.2 Revegetation and Seeding | 8 | General Comment - First Bullet |

Comment Classification: Unclassified\\For Official Use Only (U\\FOUO)

Seed Mixture: Only native mixtures will be allowed on Corps property. Any revegetation/reclamation that occurs on Corps fee property needs to be approved by the Corps. The Garrison Project has pre-approved seed mixes.

Submitted By: Brent Cossette (402-995-2712). Submitted On: Jun 26 2015

Revised Jun 26 2015.

1-0 Evaluation **Concurred**
SWPPP Text: Seed, fertilizer, and agricultural lime application will be accomplished at the following rates and mixtures unless otherwise instructed by applicable permits or land managing agency requirements: Other alternative seed mixes specifically requested by the landowner or land-managing agency may be used. Please provide the Garrison Project pre-approved seed mixes and clarify if "Corps Property" is in reference to Corps fee land, corps easements, or both. The requirement will be added to the construction line list, which the contractor uses to maintain compliance with any specific conditions.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 01 2015

1-1 Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Jul 13 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6139280 | Operations | Stormwater Pollution Prevention Plan - 5.0 Inspections | 13 | First Paragraph Last Sentence |

Comment Classification: Unclassified\\For Official Use Only (U\\FOUO)

The Corps works toward 80% density of pre-construction cover.

Submitted By: Brent Cossette (402-995-2712). Submitted On: Jun 26 2015

Revised Jun 26 2015.

1-0 Evaluation **Concurred**
"SWPPP text: The Project area should be considered stabilized when construction activity ceases and a uniform perennial vegetative cover of at least 70 percent density of pre-construction cover has been established.
The SWPPP will be updated to reflect 80% density per COE goals. To clarify, Corps owned lands should have no impacts requiring revegetation and the flowage easements are largely in crop production, therefore reseeding would not apply in those locations. "

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

USACE_DAPL0072180

**1-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Jul 13 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|----|-----------|----------------|-------------|-------------|
| 6139287 | Operations | Stormwater Pollution Prevention Plan - 8.2 Contractor's/Subcontractor's Certification | 18 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

Do you mean NPDES permit?

Submitted By: Brent Cossette (402-995-2712). Submitted On: Jun 26 2015

**1-0** Evaluation **Concurred**
"SWPPP text: I certify under penalty of law that I understand the terms and conditions of the NDPDES permit that authorizes the stormwater discharges associated with industrial activity from the construction site identified as part of this certification.
Per NDPDES General Permit:The Federal Clean Water Act (FCWA, 1972, and later amendments in 1977, 1981, and 1987, etc.) established water quality goals for the navigable (surface) waters of the United States. One mechanism for achieving the goals of the Clean Water Act is the National Pollutant Discharge Elimination System (NPDES), by which the United States Environmental Protection Agency (US EPA) has oversight authority. In 1975 the State of North Dakota was delegated primacy of the NPDES program by EPA. The state governor accepted the delegation and the state legislature assigned the power and duty for conducting NPDES permitting and enforcement to the North Dakota Department of Health (NDDH). The legislature defined North Dakota Department of Health's authority and obligations for the waste water discharge permit program in North Dakota Administrative Code (NDAC) 33-16, which was promulgated pursuant to North Dakota Century Code (NDCC) 61-28. The NDDH uses North Dakota Pollutant Discharge Elimination System (NDPDES) as its permitting title."

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 01 2015

**1-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Jul 13 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|----|-----------|----------------|-------------|-------------|
| 6139291 | Environmental | Karts & Subsidence | 22 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**
(Document Reference: EA)

This section indicates that the proposed alignment does not come into close proximity to mines or oil & gas well pads. However, a scoping letter response from the Office of Surface mining indicates that the current alignment 'appears to extend just southwest of the Coyote Creek Mine in Mercer County ND." Recommend including this and inclusion of adjacent well pads in the analysis of this section.

Submitted By: William Harlon (402-995-2500). Submitted On: Jun 26 2015

**1-0** Evaluation **Concurred**
"EA text: No surface subsidence effects are expected to be incurred in the Project Area since no mines, oil/gas wells, water wells, or karst development have been identified in the Project vicinity. The Project Area and Connected Action Area is not located within or near Mercer County where the Cayote

USACE_DAPL0072181

Creek Mine is found, it is approximately 80 miles from Lake Oahe and greater than 100 miles to the Missouri River crossings. Section 4.1.2, Mineral Resources, includes more on mineral resources within the vicinity of the Project. "

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 01 2015

---

**1-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: William Harlon (402-995-2500) Submitted On: Jul 15 2015.
Current Comment Status: Comment Closed

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6139296 | Environmental | 4.2.1.2 Impacts & Mitigation | 31 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**
(Document Reference: EA)

Recommend rewording "due to a prohibition of water extraction from the Missouri River"

Submitted By: William Harlon (402-995-2500). Submitted On: Jun 26 2015

---

**1-0** Evaluation **Concurred**
"EA text: However, due to a prohibition of water extraction from the Missouri River system, water needed for HDD construction and hydrostatic testing will be obtained from alternate surface water, groundwater, or municipal sources.
Dakota Access will revise the wording based on information recently provided clarifying the ability for acquisition at various locations along the Missouri River. "

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 07 2015

---

**1-1** Backcheck Recommendation **Open Comment**
Can DAPL provide the page(s) where water withdrawals from the Missouri River are referenced?

Submitted By: William Harlon (402-995-2500) Submitted On: Jul 15 2015.

**2-0** Evaluation **Concurred**
Water withdrawals from the Missouri River are referenced in Sections: 2.3.1, 2.3.2.9, 3.2.1.2, and 3.2.3.2. Page numbers are not available as the draft EA is still in a working stage and page numbers are subject to change.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Aug 05 2015

---

**2-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Oct 29 2015.
Current Comment Status: Comment Closed

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6139302 | Environmental | 4.2.1.2 Impacts & Mitigation | 32 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**
(Document Reference: EA)

I cannot find a copy of the referenced "NDG-0700000" NPDES permit. Recommend providing a copy of the document or correcting the referenced permit number. Also recommend adding the equivalent SD NPDES permit number.

USACE_DAPL0072182

Submitted By: William Harlon (402-995-2500). Submitted On: Jun 26 2015

1-0 Evaluation **Concurred**
NDPDES Permit for Temporary Dewatering and Hydrostatic Testing (Permit No. NDG07-0000) will be obtained prior to discharges of Hydrostatic test water in North Dakota. The permit will be applied for closer to the discharge date. Additional information can be found at . SD NPDES permits are not discussed in this EA because the South Dakota portion of the DAPL Project is not part of the Project Area or Connected Action.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 01 2015

1-1 Backcheck Recommendation **Open Comment**
Are you indicating that the crossing of Lake Oahe in SD is not part of the Project Area or Connected Action?

Submitted By: William Harlon (402-995-2500) Submitted On: Jul 15 2015.

2-0 Evaluation **Concurred**
Yes. The Lake Oahe crossing is in North Dakota.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 16 2015

2-1 Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: William Harlon (402-995-2500) Submitted On: Sep 04 2015.
Current Comment Status: Closed Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---------|---------------|----------------|-------------|-------------|
| 6139320 | Environmental | n/a | n/a | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**
( Document Reference: general EA )

I did not see reference of a risk analysis for pipeline spills in the EA. Recommend inclusion of such analysis into the EA due to the size and scope of this transportation pipeline.

Submitted By: William Harlon (402-995-2500). Submitted On: Jun 26 2015

1-0 Evaluation **Concurred**
What does the commenter mean by "risk analysis"?

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 07 2015

1-1 Backcheck Recommendation **Open Comment**
I have seen risk analysis and risk assessments as interchangable terminology.

Submitted By: William Harlon (402-995-2500) Submitted On: Jul 15 2015.

2-0 Evaluation **Concurred**
North Dakota Lake Oahe Crossing Spill Model Discussion is attached.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Aug 07 2015  (Attachment: DAPL_ND_Lake_Oahe_Crossing_Spill_Model_Discussion_Rev-A.pdf)

2-1 Backcheck Recommendation **Open Comment**
Please include booming strategies and collection points for worst case scenario discharges. Also, include where you would gain access via water for response.

USACE_DAPL0072183

Submitted By: Brent Cossette (402-995-2712) Submitted On: Nov 03 2015.

**3-0** Evaluation **Concurred**
Booming locations/collection points and potential access locations are shown in the respective ICS 204 Assignment Lists included in the Geographical Response Plans. These plans were submitted to Brent Cossette on September 10, 2015 via email and uploaded into ProjNet under comment #6139347. Please note that both documents are privileged and confidential and are not for public release.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Nov 03 2015

---

**3-1** Backcheck Recommendation **Open Comment**
If I understand the regulation(s) correctly, both proposed pipeline crossings would fall under the EPA Region 8 Mid-Missouri River Sub-Area Contingency Plan. I referenced this document with the Lake Oahe Spill Model referenced and attached above. I noticed that some of your data does not appear to correlate with the Mid-Missouri SACP. I believe it would be a good idea to have the proposed plans follow the guidelines in the SACP. For instance, the SACP uses a planning distance of 27 hours following a discharge. The SACP also uses the USGS National Hydrography Dataset (NHD) to determine velocity data to plot the 27 hour projection. It is unclear to me what dataset your spill plan used. It is also unclear to how your plan determined the projected spill volume. The SACP lists a conservative estimate of 50,800 bbls released for a 30" pipe, which I believe is the size of the pipe at the Oahe crossing. The SACP also indicates that spill control points be pre-estabilished and coordinated through the appropriate land management agency. I believe these control points need to be more clearly defined in the EA and that NEPA analysis, including cultural approval, be conducted.

Submitted By: William Harlon (402-995-2500) Submitted On: Nov 05 2015.

**3-2** Backcheck Recommendation **Open Comment**
Clearly show how the volume was calculated.

How was the 6 hour response time calculated?

What are you going to do for cultural up front inspections/clearances at the control points?

Steve Way POC EPA region 8

Submitted By: Brent Cossette (402-995-2712) Submitted On: Nov 06 2015.

**4-0** Evaluation **Concurred**
Please see the attached word document with DAPL's responses to Mr. Harlon's comment.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Nov 12 2015  (Attachment: Response_to_Open_Harlon_Comment_Items_(6139320)_11-11-15.docx)

---

*Backcheck not conducted*

**5-0** Evaluation **Concurred**
Also attached is a confidential White Paper discussing Federal Spill Prevention and Control Regulation of Oil Transmission Pipelines.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Nov 12 2015  (Attachment: Oil_Spill_Planning_White_Paper_11-11-15.pdf)

---

*Backcheck not conducted*

**6-0** Evaluation **Concurred**
In response to our call with Steve Way, Dennis Woods received a call back Mellissa Payan (EPA Region 8 - 303-312-6511). She explained that Mr. Way does the field response coordination while she handles the permitting. Therefore, Mr. Way passed the request for consultation/clarification to Ms. Payan to respond.

Ms. Payan concurred with our assertion that the EPA only has jurisdiction over non-transportation related sites. She indicated that the authority for our Spill Planning for the pipeline solely falls to the DOT PHMSA.

Please let us know if you need any additional clarifications for William to close out his comments relative to the EA.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Nov 16 2015

---

USACE_DAPL0072184

**6-1** Backcheck Recommendation **Open Comment**
Has a risk assessment/analysis been completed for each of the Missouri River crossings associated with this proposed project?

Submitted By: William Harlon (402-995-2500) Submitted On: Feb 20 2016.

**7-0** Evaluation **Concurred**
As indicated in the response to Comment 6356954, DAPL has conducted worst case risk analysis for the pipeline crossings at each of the Missouri River locations.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Mar 17 2016

---

**7-1** Backcheck Recommendation **Open Comment**
During the recent meeting on 3/31/16, the Team discussed the potential to update each of the spill modeling plans for items such as specifying the USGS gauge station used for flow data, expanding spill trajectory to 24 hours, including all HCA's, etc. Since then, the Corps has supplied an intake dataset for Lake Sakakawea to PHMSA as means to hopefully resolve an apparent data gap. The Team discussed these variables would likely impact risk calculations. It's my understanding that these updates are forthcoming.
Tom Siguaw also clarified that the current risk analysis only pertained to design factors. Tom also indicated that items like risk factors and weighted consequences are typically addressed in a subsequent risk analysis for O&M of the pipeline. In order to be consistent with other pipeline proposals, I would ask that DAPL also provide a risk analysis for the O&M life of the pipeline at each River crossing. If the Corps Planning section concurs, some level of information from the risk analysis should be referenced in the EA.

Submitted By: William Harlon (402-995-2500) Submitted On: Apr 07 2016.

**8-0** Evaluation **Concurred**
The Spill Model reports for Lake Oahe and the Missouri River were revised to contain the following information:
* Tables and Figures related to downstream HCAs that would be encountered by an unabated plume by milepost. Both the 6-hour and 24-hour cases were included.
* Example calculations presented in Appendix 2.
* Reference for the data source for the river flow information.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Apr 12 2016  (Attachment: DAPL-Missouri_River_Spill_Model_Report_2016-04-11.pdf)

---

*Backcheck not conducted*

**9-0** Evaluation **Concurred**
Revised Missouri River Spill Model Report is attached to the previous evaluation. The revised Lake Oahe Spill Model Report is attached here.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Apr 12 2016  (Attachment: DAPL-Lake_Oahe_Spill_Model_Report_2016-04-11.pdf)

---

*Backcheck not conducted*

**10-0** Evaluation **Concurred**
The submittal of an integrity risk report was initially discussed during the Open Comments meeting on 3/31/2016 and this topic was further discussed during a telephone call on 4/8/2016 between Mr. Harlon, Tom Siguaw, and Steve Rowe. During the 4/8/2016 discussion, Mr. Siguaw reiterated that the requirements for an operating pipeline are different than for gathering lines. PHMSA requires operating pipelines to conduct periodic O&M integrity risk inspections and analyses and then to prepare mitigative strategies as necessary. The findings of the testing and analysis, and any mitigation measures, are reported to PHMSA in an Integrity Management Plan (IMP). Mr. Siguaw explained that IMP for the operating pipeline are prepared after the pipeline construction is complete and the initial tests on the pipeline installation have been performed. The operating pipeline is required to make the IMP available to PHMSA within one year of construction. The testing/analysis/and identification of mitigation measures is what we believe to the spirit of what Mr. Harlon is looking for with his data request. Mr. Siguaw indicated that because the input parameters are not even available yet, it is not possible to provide a meaningful IMP document at this time. However, DAPL agrees to a condition of approval in the Corps easement to make the IMP available to the USACE (or applicable pipeline segments under Corps jurisdiction as appropriate). DAPL will also make available the bi-annual risk review and IMP updates as appropriate. Documents will either be provided directly to the USACE or they will be made available through PHMSA pending access and confidentiality requirements.

USACE_DAPL0072185

Submitted By: Jonathan Fredland (7134627121) Submitted On: Apr 13 2016

**10-1** Backcheck Recommendation **Close Comment**
On 5/23/16, DAPL agreed to insert risk analysis section in the EA which confirms low risk but high consequences. DAPL also agreed to mitigation measures to reduce this unavoidable risk and impacts if a spill were to occur in the Missouri River. The applicant has committed to additional full scale open water and full scale winter/ice exercises that will be conducted at Lake Sakakawea and Lake Oahe. A full scale exercise will occur once every 3 years (triennial cycle) with the location and type of exercise occurring on alternating schedules (e.g. open water exercise at Oahe the first triennial cycle, followed by winter exercise at Sakakawea the following triennial cycle, followed by a winter exercise at Oahe the following triennial cycle, etc.). Stakeholder (federal, state, local, and Tribal) involvement will be solicited for each exercise. The first exercise will occur within the first 3 years after the pipeline becomes operational.j. Within one year of operation of the pipeline, DAPL must provide for an all-weather access and collection point downstream of the HDD crossings at Lake Oahe and Lake Sakakawea. DAPL must provide an equipment storage facility on non-federal lands that includes a fenced permanent storage area for winter and open water spill response equipment. The storage facility should be placed in a strategic location and near existing facilities that would support access to the water. DAPL would coordinate with the USACE and any other applicable stakeholders to obtain all necessary permits and approvals prior to construction for any ground disturbing activities associated with these facilities. The storage facility should be maintained throughout the life of the pipeline and contain sufficient response equipment at a minimum to mitigate an unintended worst case release for this crossing.

Submitted By: William Harlon (402-995-2500) Submitted On: May 24 2016.
Current Comment Status:

| Id | Discipline | Section/Figure | Page Number | Line Number |
|----|-----------|----------------|-------------|-------------|
| 6139347 | Environmental | n/a | n/a | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**
(Document Reference: general EA)

**[Critical/Flagged]**

I did not see reference to a spill response plan for the operation of the pipeline after construction is complete. Recommend that this be included in the analysis of the EA.

Submitted By: William Harlon (402-995-2500). Submitted On: Jun 26 2015

**1-0** Evaluation **Concurred**
A Facility Response Plan (equivalent to an Emergency Response Plan) is currently in draft form per PHMSA regulations and can be provided to the USACE once it is finalized and approved by PHMSA (expected the third quarter of 2016).

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 07 2015

**1-1** Backcheck Recommendation **Open Comment**
Can DAPL provide discussion of the FRP in the EA? The Missouri River is a very important resource in the upper Midwest. Understanding the risk and having an adequate response plan are common key factors in minimizing impacts if a release were to occur in the Missouri River. The hydraulics of the Missouri River, drastic variances in weather, and remoteness of the region make time critical response actions very challenging.

Submitted By: William Harlon (402-995-2500) Submitted On: Jul 15 2015.

**2-0** Evaluation **Concurred**
A discussion on the of the Facility Response Plan is included in the revised EA, Section 3.5.1.2. Additional details regarding Dakota Access commitment to emergency response is provided in Section 3.11, Reliability and Safety.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 22 2015

USACE_DAPL0072186

*Backcheck not conducted*

**3-0** Evaluation **Concurred**
Geographical Response Plan Pipeline Crossing at the Missouri River Emmons County, North Dakota is attached.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Sep 11 2015  (Attachment: Geographical_Response_Plan_DAPL_Lake_Oahe.pdf)

**3-1** Backcheck Recommendation **Close Comment**
Reference comment id# 6139320 backcheck.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Nov 06 2015.

**4-0** Evaluation **Concurred**
Geographical Response Plan Pipeline Crossing at the Missouri River McKenzie and Williams Counties, North Dakota is attached.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Sep 11 2015  (Attachment: Geographical_Response_Plan_DAPL_Missouri_River_.pdf)

*Backcheck not conducted*
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|----|-----------|----------------|-------------|-------------|
| 6141075 | General | n/a | 3 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

the number of acres for flowage easements differ in table 1 (59.3)and table 2 (58)

Submitted By: Amee Rief (4029952544). Submitted On: Jun 29 2015

**1-0** Evaluation **Concurred**
"Table 1-1 (59.3 acres) includes all areas impacted by the Project within the flowage easements. Table 1-2 (58 acres) refers to only acres within the Construction footprint. The difference of 1.3 acres is the areas that were not going to be accessed during construction and therefore not part of the Construction ROW and only including the permanent easement over HDD profile (1.2 acre) and the permanent access road (0.1 acre). These areas are listed separately in the table.
Due to the potential availability of water use from the Missouri River, we will reflect access over the HDD profile along the permanent easement in the construction footprint due to the required water line. "

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 01 2015

**1-1** Backcheck Recommendation **Open Comment**
There is no discussion of water withdrawal from the MR in the analysis or of a water line.

Submitted By: Amee Rief (4029952544) Submitted On: Jul 08 2015.

**2-0** Evaluation **Concurred**
As previously stated in the Submitted Discussion: "Due to the potential availability of water use from the Missouri River, we will reflect access over the HDD profile along the permanent easement in the construction footprint due to the required water line."

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 09 2015

**2-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Amee Rief (4029952544) Submitted On: Nov 06 2015.
Current Comment Status: Comment Closed

USACE_DAPL0072187

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141096 | General | 1.1.1 | 4 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

**[Critical/Flagged]**

What is the length and depth of the HDD crossing for the Missouri River?

Submitted By: Amee Rief (4029952544). Submitted On: Jun 29 2015

**1-0** Evaluation **Concurred**
The HDD exits the Corps Flowage Easements at an elevation 1800 feet. The maximum depth of the pipe on the flowage easements is 69 feet. The remainder of the HDD is outside of the Project Area as defined in coordination with the COE and is not discussed in the EA.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

**1-1** Backcheck Recommendation **Open Comment**
the Missouri River is under the jusrisdiction of the Corps. Additionally effects of HDD crossing of the river needs to analyzed in this EA.

Submitted By: Amee Rief (4029952544) Submitted On: Jul 08 2015.

**1-2** Backcheck Recommendation **Open Comment**
Section 3.2.1 surface water and 3.5.1 do not discuss impacts to the Missouri river at the HDD crossing

Submitted By: Amee Rief (4029952544) Submitted On: Nov 06 2015.

**1-3** Backcheck Recommendation **Close Comment**
3.2.1.2 and 3.5.1 Impacts and Mitigation (EA 11/2/2015)has this information included. Includes impacts discussion.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Nov 06 2015.

**2-0** Evaluation **Concurred**
The Project has been clearly defined as the boundaries of the flowage easements and the Lake Oahe crossing with the connected action being the areas for the HDD. It was confirmed with Brent Cossette that the Missouri River crossing was outside the scope of the EA. A PCN under NWP 12 has been submitted to the COE regarding the HDD of the Missouri River.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 09 2015

*Backcheck not conducted*
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141100 | Environmental | 1.1 | n/a | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

This section describes the proposed action. Appears pre-decisional as the P/N and alternatives have not been discussed. The sections should be reorganized to show we thought about our purpose and need for the projects and what alternatives were evaluated before selecting the Proposed Project.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

**1-0** Evaluation **Concurred**
The P/N and alternatives section will be restructured to avoid appearing pre-decisional based on input

USACE_DAPL0072188

from Johnathan Shelman on 7/6/15.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 07 2015

**1-1** Backcheck Recommendation **Close Comment**
Agree with change.

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Jul 24 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| **6141105** | Biology-Ecology | 1.2 Purpose and Need | 5-6 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**
(Document Reference: CEQ Reg 1502.13)

In accordance with CEQ Reg 1502.13- "The statement shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternative including the proposed action". Please ensure that the Purpose and Need statement is succinctly and accurately portraying how the propsed action will fulfill the purpose and need of the proposed project.

Submitted By: Rebecca Podkowka (4029952677). Submitted On: Jun 29 2015

**1-0** Evaluation **Concurred**
Replace with the following: The purpose of the Proposed Action is to consider providing Dakota Access with a ROW easement across federal owned lands and Corps managed flowage easements to meet the overall objectives for the Dakota Access Pipeline Project. Federal actions, or actions which are potentially subject to Federal control and responsibility, must undergo an environmental review process to show compliance with the National Environmental Policy Act (NEPA). In this case, the Federal Action necessitating the need for NEPA compliance is the granting of easements by the USACE for the proposed pipeline construction through Federal lands and consent to easements across USACE flowage easements.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

**1-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Rebecca Podkowka (4029952677) Submitted On: Jul 13 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| **6141106** | Environmental | 1.1 | 8 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**
(Document Reference: connected actions paragraph)

Location / transportation of water obtained for hydrostatic testing is also a connected action and should be included in narrative and table below. Alternatives evaluated to obtain water (from the lake, river or elsewhere) need to be included in the alternatives considered narrative and through the environmental consequences sections of this EA.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

**1-0** Evaluation **Concurred**
Appropriate edits will be made to the respective sections of the EA.

USACE_DAPL0072189

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

---

**1-1** Backcheck Recommendation **Close Comment**
ok.

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Jul 24 2015.
**Current Comment Status:** Comment Closed

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141109 | Environmental | 1.2 | n/a | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

P/N statement needs to be simplified. I suggest something along the lines of "the purpose of the project is to safely and efficiently transport crude oil from a production region in North Dakota to the east coast where refineries exist to meet market demands for petroleum based products." Probably make the first paragraph work with some rewording.

All this other descriptive information should go in another section.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

---

**1-0** Evaluation **Concurred**
The EA will be revised accordingly.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

---

**1-1** Backcheck Recommendation **Close Comment**
ok

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Jul 24 2015.
**Current Comment Status:** Comment Closed

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141111 | Biology-Ecology | 4.0 | 18 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**
(Document Reference: CEQ 1502.14(c))

No Action Alternative need to depict what it consists of, not just that it doesn't need the Purpose and Need. The NAA could include circumventing federal property (thereby negating the need for NEPA) and/or the no construction of the pipeline

Submitted By: Rebecca Podkowka (4029952677). Submitted On: Jun 29 2015

---

**1-0** Evaluation **Concurred**
A route alternative that avoids all USACE owned and managed lands in ND will be added to the alternatives section. Support for not carrying this analysis forward will be provided describing the additional impacts of the route alternative (additional miles/acres of disturbance) and other sensitive areas that may be traversed.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 07 2015

---

**1-1** Backcheck Recommendation **Close Comment**
Closed without comment.

USACE_DAPL0072190

Submitted By: Rebecca Podkowka (4029952677) Submitted On: Jul 13 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141112 | Environmental | 1.2 | 11 | n/a |

Comment Classification: Unclassified\\For Official Use Only (U\\FOUO)

This paragraph and the following two need to be moved to social impact considerations and there is repetitive text. See word document for clarification.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

Revised Jun 29 2015.

#### 1-0 Evaluation Concurred
The three paragraphs will be moved to the social impact considerations section.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

#### 1-1 Backcheck Recommendation Close Comment
ok

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Jul 24 2015.
Current Comment Status: Comment Closed

| id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141119 | Environmental | 1.3 | 12 | n/a |

Comment Classification: Unclassified\\For Official Use Only (U\\FOUO)

The Authority and Scope section needs to go after the relocated purpose and need or at least somewhere in the very beginning of the document.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

Revised Jun 29 2015.

#### 1-0 Evaluation Concurred
The EA will be reorganized so the Purpose and Need is followed by the Project Description which is followed by the Authority and Scope.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

#### 1-1 Backcheck Recommendation Close Comment
ok

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Jul 24 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|

USACE_DAPL0072191

| 6141122 | Biology-Ecology | 4.0 | 18 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**
(Document Reference: CEQ 1502.14(a))

Adequate and equal consideration needs to be given to all alternatives, to include the NAA. Describe in further detail how alternative routes were eliminated. Bring forward considered alternatives and NAA in affected envrionment/env consequences

Submitted By: Rebecca Podkowka (4029952677). Submitted On: Jun 29 2015

**1-0** Evaluation **Concurred**
No Action Alternative section/discussion will be amended based on input from Johnathan Shelman on 7/6/15.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 07 2015

**1-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Rebecca Podkowka (4029952677) Submitted On: Jul 13 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141127 | Environmental | 2.0 | 14 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

This section goes into describing the proposed action and should not precede the alternative analysis.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

**1-0** Evaluation **Concurred**
The "Typical Construction Sequence and Construction Mitigation Measures" will be put after the "Alternatives" section.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

**1-1** Backcheck Recommendation **Close Comment**
ok

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Jul 24 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141131 | Environmental | 2.1.1 | 14 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

Ensure discussion of impacts included regarding wetlands is in the environmental consequences section.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

**1-0** Evaluation **Concurred**
Impacts to wetlands is discussed in Section 4.2.3.2 Impacts and Mitigation.

USACE_DAPL0072192

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

**1-1** Backcheck Recommendation **Close Comment**
   ok

   Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Jul 24 2015.
   Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141134 | Environmental | 2.1.3 | 15 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

What about hydrostatic testing and the process of obtaining the water to complete the test?

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

**1-0** Evaluation **Concurred**
   Prior to June, the applicant was informed that water appropriation was not permitted from the Missouri River
   system. EA text will be updated to account for the possibility of water appropriations. Discussion of
   Hydrostatic Testing is found in Section 4.2.1.2, page 31, last paragraph.

   Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

**1-1** Backcheck Recommendation **Close Comment**
   ok

   Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Jul 24 2015.
   Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141143 | General | 2.3 | 12 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

the first paragraph in this section states topsoil segregation would be utilized. the second paragraph states topsoil
segregation would be utilized "as practical". Topsoil needs to be segregated in wetlands. Addition of contruction mats
needs to occur where rutting is anticitpated not after it is experienced.

Submitted By: Amee Rief (4029952544). Submitted On: Jun 29 2015

**1-0** Evaluation **Concurred**
   EA text: Topsoil segregation techniques will be utilized in unsaturated wetlands to preserve the seed bank
   and allow for expedited successful restoration of the disturbed area. Wetland crossings for the Project
   may be accomplished via the conventional lay method in accordance with all applicable permit conditions.
   Construction techniques for this method are similar to the opencut method in upland areas; however, top
   soil segregation techniques will be utilized as practical in nonsaturated features to facilitate revegetation
   following the completion of construction activities. Where excessive rutting is anticipated or experienced,
   construction mats will be used to minimize disturbances to wetland hydrology and to maintain soil
   structure. We have determined that there will be no excavation in wetlands, thus topsoil segregation in
   wetlands is moot and respective discussions will be removed from the EA. We will add language that
   mats will be used where rutting is anticipated.

   Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

USACE_DAPL0072193

**1-1** Backcheck Recommendation **Close Comment**

Submitted By: Amee Rief (4029952544) Submitted On: Jul 08 2015.
Current Comment Status:

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| **6141170** | Environmental | 2.2.1 | 15 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

Considering the high potential for a frac-out (safety factor less than 1.0 at some locations) during the drill as indicated in the HDD plan, shouldn't you consider this as a potential alternative at Oahe? If our engineers are do not think the risk is something we can accept and DAPL still wishes to cross the reservoir than this would be the only other way. DAPL would have to work through 408 to see if this would be allowable. This comment doesn't need to be addressed in this section, but later in the alternative development / env. consequences sections.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

**1-0** Evaluation **Concurred**
The HDD technique is preferable to the Open-cut pipeline construction method due to a greater potential for adverse impacts to environmental and cultural resources. The EA will be amended to include a discussion of an open-cut installation in the Alternatives Considered but Eliminated from Detailed Analysis.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 07 2015

**1-1** Backcheck Recommendation **Open Comment**
Please take the open cut method out of the "Proposed Action" alternative description and place in Section 2.1.

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Jul 24 2015.

**2-0** Evaluation **Concurred**
Open Cut method has been moved to section 2.1.4 as requested.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Aug 05 2015

**2-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Oct 20 2015.
Current Comment Status:

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| **6141197** | General | 4.1.3.2 | 22 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

there needs to be an analysis of effects of landlides on the aquatic habitat, is there potential for landslides to reach the Missouri River?

Submitted By: Amee Rief (4029952544). Submitted On: Jun 29 2015

**1-0** Evaluation **Concurred**
The potential of Project activities influencing landslide that may reaching the Missouri River is mitigated by rigorous engineering and construction methods . Chiefly, the crossing locations have been selected to avoid

USACE_DAPL0072194

steep slopes and unstable landforms and ground-disturbing activities for the Project will avoid significant slopes via HDD method of construction near the Missouri River. Construction will not occur perpendicular to the slopes at the crossings and Project activities will not increase the potential for landslides to reach the aquatic habitat.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 07 2015

1-1 Backcheck Recommendation **Open Comment**
On the west side of Lake Oahe, 1.2 acres of the HDD workspace (exit point) and 13.1 acres of the pipe stringing area are designated as having a high incidence for landslides. Additionally, the stringing area encompasses approximately 1.8 acres classified as highly susceptible to landslides. Approximately 0.9 acre within the stringing area has slopes exceeding 25%. Approximately 1.2 acres of the HDD entry point workspace on the east side is designated as having a highly incidence of landslides--- This needs to be analyzed for effects

Submitted By: Amee Rief (4029952544) Submitted On: Jul 08 2015.

2-0 Evaluation **Concurred**
"Text has been revised in EA Section 3.1.3.2 as follows: As previously discussed, no ground disturbing activities will occur within the Project Area on the federal lands. Ground disturbing activities associated with the HDD workspace and pipe stringing area will be required as part of the Connected Action; however, these activities will consist of clearing and grading only and will occur, at the closest distance, 1,040 feet from the bank of Lake Oahe. As such, no trenching activities will occur within the Project Area or Connected Action of the federal lands, thereby reducing the potential for erosion which could otherwise occur as a result of side-slope trench excavation methods and accumulation of water within the trench. However, the probability of slips or landslide events increases by clearing vegetation and grading contours in areas with steep slopes. Therefore, Dakota Access will utilize additional erosion and sediment control devices in accordance with the ECP and SWPPP, and in compliance with the National Pollutant Discharge Elimination System (NPDES) program, during construction in these areas with slopes greater than 25%. Additionally, Dakota Access will install sediment barriers (e.g., silt fence) at the base of slopes and along the sides of slopes, as necessary, to prevent potential siltation downslope of the construction area from entering waterbodies.the lake.

Temporary erosion control devices (ECDs) will be maintained until the areas disturbed by construction have been successfully revegetated. Following the completion of construction activities, disturbed areas will be restored and graded to pre-construction contours as closely as possible. In order to minimize the potential for future slip or landslide events during operation of the Project facilities, Dakota Access may install permanent ECDs in addition to performing regular restoration and revegetation activities. Permanent ECDs will be installed in accordance with revegetation measures outlined in the ECP, SWPPP, and specific landowner requests. The effectiveness of revegetation and permanent ECDs will be monitored by Dakota Access' operating personnel during the long-term operation and maintenance of the Project facilities. Therefore, construction and operation of the Project facilities on the Project Area and Connected Action of the federal lands are not anticipated to increase the potential for significant landslide or slip events or result in adverse impacts on aquatic life resources within waterbodies.
"

Submitted By: Jonathan Fredland (7134627121) Submitted On: Aug 05 2015

2-1 Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Amee Rief (4029952544) Submitted On: Nov 06 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141244 | Environmental | 2.2.4 | 16 | n/a |

Comment Classification: Unclassified\\For Official Use Only (U\\FOUO)

...fluid consisting primarily of bentonite and clay...

Incinuates other substances are part of the drilling fluid. What else is in it?

USACE_DAPL0072195

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

**1-0** Evaluation **Concurred**
We will remove the word "primarily". We only intend to add water.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

**1-1** Backcheck Recommendation **Close Comment**
ok

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Jul 24 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141246 | Environmental | 2.2.4 | 16 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

This section needs to be revised because the HDD plan has been completed recently and this narrative does not reflect that.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

**1-0** Evaluation **Concurred**
We will revise accordingly.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

**1-1** Backcheck Recommendation **Close Comment**
ok

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Jul 24 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141249 | Environmental | 2.2.4 | 16 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

Add the name of HDD contractor. If unknown at this time add the statement that the Corps would need to approve HDD contractor.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

**1-0** Evaluation **Concurred**
Michels Corporation will be the HDD contractor. We will provide the respective information.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

**1-1** Backcheck Recommendation **Close Comment**
ok

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Jul 24 2015.

USACE_DAPL0072196

Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141252 | Environmental | 3.0 | 18 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

The alternatives discussion should follow the purpose and need statement prior to the description of work associated with the preferred action.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

> **1-0** Evaluation **Concurred**
> The sections will be reorganized based on this and other comments received.
>
> Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

> **1-1** Backcheck Recommendation **Close Comment**
> ok
>
> Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Jul 24 2015.
> Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141261 | Environmental | 3.0 | 18 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

....could not be avoided..statement near bottom of page

What about north of Bismarck? The proposed crossing is very near the upper end of Federal property at Oahe. Elaborate on why you did not choose to avoid Corps land. What sensitive properties lay in the areas just north of the proposed crossing outside federal property?

Also, the pipeline could have avoided our easements as well by going just west of where the proposed pipeline currently is planned to cross. The decision making process needs to be clearly conveyed in this narrative.

These alignments would meet the purpose and need of the project and are viable for environmental impact assesment and should be brought through that discussion.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

> **1-0** Evaluation **Concurred**
> Based on 7/6/15 discussion with Johnathan Shelman and Brent Cossette at the USACE, the Alternative Section will be amended to address a route alternative that was eliminated from detailed analysis.
>
> Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 07 2015

> **1-1** Backcheck Recommendation **Open Comment**
> Please add the map as indicated by comment from AT1 and JF 2.
>
> Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Jul 24 2015.
> **2-0** Evaluation **Concurred**
> Figures 12 and 13 have been added to the EA in reference to Section 2.1.3
>
> Submitted By: Jonathan Fredland (7134627121) Submitted On: Aug 05 2015

USACE_DAPL0072197

**2-1** Backcheck Recommendation **Open Comment**
I see the figures listed in the TOC, but they are not in either the edited or clean version narrative of what was submitted.

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Oct 20 2015.

**2-2** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Oct 21 2015.

**3-0** Evaluation **Concurred**
Figures are a standalone attachment and are not included in the text of the document. The entire updated figure package is attached including figures 12 and 13.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Oct 21 2015  (Attachment: Revised_EA_Figures_9-10-15.pdf)

*Backcheck not conducted*
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| **6141265** | Environmental | 4.0 | 22 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

CEQ requires that the "no action" alternative be brought forward through the environmental analysis (1502.14 (d)).

Again, I think since it states above that the crossing locations chosen on the reservoir/rivers were done to limit impacts to "sensitive" resources, those alternatives should be brought forward through the environmental consequences section. The decision maker (Colonel) needs to compare the merits (good or bad) of the Proposed action against these other alternatives that meet the purpose and need for the project (CEQ 1502.14 (c))

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

**1-0** Evaluation **Concurred**
The EA will be revised accordingly.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

**1-1** Backcheck Recommendation **Close Comment**
ok

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Jul 24 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| **6141269** | Environmental | 4.1.1.2 | 24 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

State that pre-construction and as-built surveys will be completed and those drawings will be provided to the Garrison Project. Trees that are impacted on fee land would have to be mitigated.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

Revised Jun 29 2015.

USACE_DAPL0072198

**1-0** Evaluation **Concurred**
"EA text: Section 4.1.1.2 Impacts and Mitigation (Geology) To protect the terrain of the Project Area and Connected Actions, Dakota Access will, to the extent practicable, restore the areas affected by pipeline construction to pre?construction contours and similar vegetation (excepting trees within approximately 15 feet of the centerline).
EA will be updated to state: Pre-construction and as-built surveys will be completed and provided to the Garrison Project.
We do not typically discuss tree mitigation in regard to geology. "

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

**1-1** Backcheck Recommendation **Close Comment**
ok

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Jul 24 2015.
Current Comment Status:

| Id | Discipline | Section/Figure | Page Number | Line Number |
|----|-----------|----------------|-------------|-------------|
| 6141273 | Environmental | 4.1.3.2 | 27 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

Update narrative to reflect findings in the HDD report.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

**1-0** Evaluation **Concurred**
The narrative will be updated to reflect the HDD report.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

**1-1** Backcheck Recommendation **Close Comment**
ok

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Jul 24 2015.
Current Comment Status:

| Id | Discipline | Section/Figure | Page Number | Line Number |
|----|-----------|----------------|-------------|-------------|
| 6141278 | Environmental | 4.1.4.2 | 28 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

Add Corps archaeologist to list of those that need to be contacted if cultural resources are found.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

Revised Jun 29 2015.

**1-0** Evaluation **Concurred**
The Corps archaeologist will be added to the list to be contacted.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

**1-1**

USACE_DAPL0072199

Backcheck Recommendation **Close Comment**
ok

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Jul 24 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141285 | Environmental | 4.1.5.1 | 28 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

..if managed appropriately...under prime farmland

If this is the "if irrigated than considered prime farmland" designation than state that or whatever management
techniques would make them prime farmland.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

**1-0** Evaluation **Concurred**
This statement is not referring to "if irrigated than considered prime farmland." Based on consultation with
the North Dakota NRCS, there are no management techniques that would allow soils designated as
farmland of statewide importance to be considered prime farmland in the state. The limiting factors
precluding farmland of statewide importance from a prime farmland designation pertain to climate, and
cannot be addressed with management techniques. The EA text will be updated to avoid confusion.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 07 2015

**1-1** Backcheck Recommendation **Close Comment**
ok

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Jul 24 2015.
Current Comment Status: Comment Closed

| id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141289 | Environmental | 4.1.5.2 | 28 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

4th paragraph

An unsaturated wetland? Wetlands don't have to be saturated to be given impact consideration. I recommend that you
do not impact wetlands, even temporarily flooded wetlands for any length of time. If this is planned it needs to be
coordinated with Regulatory and mitigated appropriately from a CW perspective if on fee title land.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

Revised Jun 29 2015.

**1-0** Evaluation **Concurred**
"EA text: To minimize potential impacts on soil productivity, topsoil will be segregated during trench
excavation in agricultural land, unsaturated wetlands, and if applicable, other areas where soil productivity
is an important consideration.
The referenced EA text is applicable to topsoil segregation techniques only. All wetlands regardless of
saturation were given impact consideration as described in Section 4.2.3. Topsoil segregation in saturated
or inundated wetlands is not feasible. "

USACE_DAPL0072200

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

1-1 Backcheck Recommendation **Close Comment**
ok

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Jul 24 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141294 | Environmental | 4.1.5.2 | 33 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

6th paragraph

The Garrison Project should be notified if the inspectors have concerns on Corps or connected action lands.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

Revised Jun 29 2015.

1-0 Evaluation **Concurred**
"EA text: Dakota Access will retain environmental inspectors (EIs) to monitor the contractor's compliance
with applicable requirements to protect soil resources during construction of the DAPL Project.
EA will be amended to state ""The Garrison Project will be notified if the EIs have concerns on the Project
Area or Connected Action Area."

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

1-1 Backcheck Recommendation **Close Comment**
ok

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Jul 24 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141339 | General | 4.1.4.1 | n/a | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

what are the effects/impacts to paleontology at the Missouri River HDD crossing?

Submitted By: Amee Rief (4029952544). Submitted On: Jun 29 2015

1-0 Evaluation **Concurred**
Based on geotechnical borings collected at the Missouri River crossing, the HDD will pass through
unconsolidated alluvial material and will not penetrate the underlying bedrock formations. Alluvial material
only rarely contains fossils, as these deposits are generally too young. Therefore, the Missouri River HDD
Crossing is not anticipated to impact fossils. The Unanticipated Discovery Plan (Appendix F) describes
measures to be followed in the event that a paleontological resource is encountered on the ROW.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 07 2015

1-1

USACE_DAPL0072201

Backcheck Recommendation **Close Comment**
please add to the EA

Submitted By: Amee Rief (4029952544) Submitted On: Jul 08 2015.
Current Comment Status:

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| **6141370** | General | 4.2.1.2 | 31 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

Impacts would be reduced not "avoided" as there is the potential for frac outs

Submitted By: Amee Rief (4029952544). Submitted On: Jun 29 2015

**1-0** Evaluation **Concurred**
Dakota access is confident in the design and construction of the HDD to overcome the potential for frac outs
and stands by their position that impacts would be avoided by utilizing the HDD method of pipeline
construction.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 07 2015

**1-1** Backcheck Recommendation **Open Comment**
Effects of fracking needs to be addressed in the EA as it does occur

Submitted By: Amee Rief (4029952544) Submitted On: Jul 08 2015.

**2-0** Evaluation **Concurred**
Fracking is process related to down hole exploration and production and is not relevant to the EA.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 22 2015

**2-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Amee Rief (4029952544) Submitted On: Nov 06 2015.
Current Comment Status:

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| **6141389** | General | n/a | 32 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

**[Critical/Flagged]**

the table and discussion of effects is missing information about the Missouri River HDD crossing

Submitted By: Amee Rief (4029952544). Submitted On: Jun 29 2015

**1-0** Evaluation **Concurred**
Missouri River HDD was expressly excluded from the EA as the scope of the Action and Connected Action
was clearly defined when drafting the scoping letters. At the flowage easements, only the flowage
easements were required to be included in the EA.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

**1-1**

USACE_DAPL0072202

Backcheck Recommendation **Open Comment**
Crossing the MR is a required part of your proposed plan and effects of the crossing need to be analyzed.

Submitted By: Amee Rief (4029952544) Submitted On: Jul 08 2015.

**2-0** Evaluation **Concurred**
See response to comment # 6141096

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 09 2015

**2-1** Backcheck Recommendation **Close Comment**
The Missouri River crossing has been added to the EA since the time of this comment.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Nov 06 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141399 | General | n/a | 34 | 10 |

Comment Classification: Unclassified\\For Official Use Only (U\\FOUO)

tables 4-5 and 4-6 indicate the streams are ephemeral, can construction to cross them occur in the dry season to minimize impacts?

Submitted By: Amee Rief (4029952544). Submitted On: Jun 29 2015

**1-0** Evaluation **Concurred**
"Construction will occur upon receipt of all applicable approvals.
Since we do not have firm commitments as to when this will happen, we cannot commit to crossing ephemeral streams with no protected resources during the dry season. Waterbodies of all types are routinely successfully crossed conventionally during periods of flow. However, all waterbodies on the flowage easements will be crossed utilizing trenchless technology (HDD or bore). The ephemeral stream related to the Lake Oahe HDD is on the HDD stringing corridor (Connected Action), no instream activities are anticipated. If flowing water is present, a bridge will be installed to facilitate activities in the area. The EA will be revised to reflect this information."

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 07 2015

**1-1** Backcheck Recommendation **Open Comment**
where will the HDD workspaces on the flowage easements be located? The stream on the Oahe stringing corridor has a defined channel and riparian area so is not ephemeral.

Submitted By: Amee Rief (4029952544) Submitted On: Jul 08 2015.

**2-0** Evaluation **Concurred**
HDD workspace within the flowage easements is shown in the EA figures. An ephemeral stream is not defined by the presence or absence of a defined channel or riparian area. Nationwide Permit Definitions (USACE Omaha District Website) Ephemeral stream: : An ephemeral stream has flowing water only during, and for a short duration after, precipitation events in a typical year. Ephemeral stream beds are located above the water table year-round. Groundwater is not a source of water for the stream. Runoff from rainfall is the primary source of water for stream flow.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 09 2015

**2-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Amee Rief (4029952544) Submitted On: Nov 06 2015.
Current Comment Status: Comment Closed

USACE_DAPL0072203

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141420 | General | table 4-6 | 33 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

the first stream has a flow type of "no"?

Submitted By: Amee Rief (4029952544). Submitted On: Jun 29 2015

---

**1-0** Evaluation **Concurred**
Steam ID s-d-mo-014 will be updated to read "Ephemeral" in the Flow Type column of table 4-6.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

---

**1-1** Backcheck Recommendation **Open Comment**
These stream types need to be field varified so actual effects of crossing can be determined.

Submitted By: Amee Rief (4029952544) Submitted On: Jul 08 2015.

**2-0** Evaluation **Concurred**
All areas of the Project and connected action have been field verified. The crossing of this ephemeral feature will be limited to stringing pipe for the HDD.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 09 2015

---

**2-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Amee Rief (4029952544) Submitted On: Nov 06 2015.
Current Comment Status: Comment Closed

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141539 | Environmental | n/a | 33 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

We do not allow pits for drilling on our property as outlined in the Oil and Gas Management plan.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

---

**1-0** Evaluation **Concurred**
"Appendix F of the Oil and Gas Management plan addresses/acknowledges the need for mud pits with respect to pipeline HDDs. There does not appear to be a restriction against these being on COE lands, the restriction for pits is clear with respect to exploration/production wells. Clips from the appendix provided below. To clarify, there is no feasible way to complete an HDD without the use of a mud pit at the entry/exit point.

Appendix F, A Partial List of Requirements for Pipeline Installation Using HDD Techniques, letter b states: Detailed drawings showing the plan location of the entrance and exit pits with respect to the levee embankments.
Letter o states: The exit and entrance pits at the ends of the design drill path shall be at least 300-feet landside of any landside levee toe and at least 50-feet riverside of any riverside levee toe. Where the design drill path is within 100-feet of either levee toe, the drill path shall be level and in rock or a minimum of 50-feet below the base of the flood protection system.
Additionally, Appendix F includes an Example HDD frac out plan that states: Drill fluid is easily contained by standard erosion and sedimentation control measures such as stray bales and silt fence. Drill fluid would be contained on entry and exit worksites by hay bales and silt fence installed and maintained around the perimeter of each site. Within the boundaries of the worksites drill fluid would be controlled through the use

USACE_DAPL0072204

of pits at the crossing entry and exit points and typical fluid handling equipment such as trash pumps. Drill fluid is released regularly on the drill rigs as part of normal operations when sections of drill pipe are separated. The worksite will be graded such that fluid released on the rig will flow into the fluid pit in front of the rig. "

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

---

**1-1** Backcheck Recommendation **Close Comment**
ok

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Jul 24 2015.
Current Comment Status: Comment Closed

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| **6141540** | Environmental | n/a | 33 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

5th paragraph ....statewide importance...

As you state above, the FPPA considers statewide important soils prime farmland. You need to fill out the NRCS Prime Farmland Conversion Sheet (Form AD-1006) and submit to local NRCS contact for guidance.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

---

**1-0** Evaluation **Concurred**
Based on consultation with the North Dakota NRCS, the privately funded Dakota Access Pipeline Project is not subject to requirements under the Farmland Protection Policy Act (FPPA). The FPPA only applies to projects in which federal funds are utilized.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 07 2015

---

**1-1** Backcheck Recommendation **Close Comment**
ok

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Jul 24 2015.
Current Comment Status: Comment Closed

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| **6141543** | Environmental | n/a | 35 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

4th paragraph.

...Additional field surveys....

Need verification that this is completed. Items that are "to-do" should be compiled in a list somewhere in this document so we can track them. Or has this been done since we received this document?

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

Revised Jun 29 2015.

---

**1-0** Evaluation **Concurred**
We are complete with surveys on the Corps flowage easements and the HDD and connected action at

USACE_DAPL0072205

Lake Oahe. The language in the EA will be revised accordingly.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

**1-1** Backcheck Recommendation **Close Comment**
  ok

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Jul 24 2015.
Current Comment Status:

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| **6141547** | Environmental | 4.2.1.2 | 35 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

Need to update assessment following the recently released HDD document. I'll make a few comments, but the entire section needs to be revised.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

**1-0** Evaluation **Concurred**
  The assessment will be updated based on the recent HDD document.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

**1-1** Backcheck Recommendation **Close Comment**
  ok

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Jul 24 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| **6141576** | Environmental | 4.2.1.2 | 36 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

2nd paragraph contains another reference to a pit on our property. See other pit comment.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

**1-0** Evaluation **Concurred**
  See Comment #6139135 response.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 07 2015

**1-1** Backcheck Recommendation **Close Comment**
  ok

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Jul 24 2015.
Current Comment Status:

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| **6141579** | Environmental | 4.2.1.2 | 36 | n/a |

USACE_DAPL0072206

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

2nd paragraph states inadvertent releases are low. The HDD plan states that they are moderate to very high. Again, this entire narrative needs to be rewritten since the release of the HDD plan.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

---

**1-0** Evaluation **Concurred**
The narrative will be revised to reflect the information in the HDD plan.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

---

**1-1** Backcheck Recommendation **Close Comment**
ok

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Jul 24 2015.
Current Comment Status: Comment Closed

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141584 | General | 4.2.2.2 | 35 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

line 2 of this paragraph, states ground disturbance is limited to 6 to 10 feet below the surface, this contradicts earlier statements.

Submitted By: Amee Rief (4029952544). Submitted On: Jun 29 2015

---

**1-0** Evaluation **Concurred**
"EA text: Ground disturbance associated with conventional pipeline construction is generally limited to approximately six to ten feet below the existing ground surface. Where excavation penetrates the water table, potential groundwater impacts from pipeline construction are primarily limited to the radius of influence around the excavation profile.
This discussion reflects conventional pipeline construction, not HDDs. "

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

---

**1-1** Backcheck Recommendation **Open Comment**
"Ground disturbance associated with conventional pipeline construction is generally limited to approximately six to ten feet below the existing ground surface"---needs to be added to Page 9, section 2.1.2 to clarify trenching activity.

Submitted By: Amee Rief (4029952544) Submitted On: Jul 08 2015.

**2-0** Evaluation **Concurred**
Revision will be made as recommended.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 09 2015

---

**2-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Amee Rief (4029952544) Submitted On: Nov 06 2015.
Current Comment Status: Comment Closed

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|

USACE_DAPL0072207

| **6141619** | General | n/a | 36 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**
(Document Reference: 3rd paragraph)

states the ground water of flowage easments is less than 6.5 feet deep, what is the groundwater depth at the Missouri River crossing? with shallow groundwater and the length of pipeline over the easements will very likely have an effect on groundwater

Submitted By: Amee Rief (4029952544). Submitted On: Jun 29 2015

#### 1-0 Evaluation **Concurred**
"EA text: A preliminary evaluation of geology indicates that groundwater within the floodplain throughout most of the Corps flowage easements is less than 6.5 feet deep. 33 The pipeline will be installed in saturated sediments as part of the HDD crossing of Lake Oahe. Due to the nature of HDD methodology, it is inherently not a risk to groundwater resources, uses benign substances (bentonite and water) to penetrate through soil, rock, and groundwater. Construction of the Project Area and Connected Action is not expected to significantly negatively impact groundwater resources.
Please advise what impacts is the commentor suggesting be addressed?"

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

#### 1-1 Backcheck Recommendation **Open Comment**
there are no impacts to ground water discussed for the flowage easments. if the ground water is less than 6.5 feet deep and your trench if 6 to 10 feet deep, you would be trenching over 12 miles in water, and laying a pipe that if leaked would be in the groundwater, these impacts need to be addressed.

Submitted By: Amee Rief (4029952544) Submitted On: Jul 08 2015.

#### 2-0 Evaluation **Concurred**
The pipeline is being designed and constructed to meet or exceed all federal regulations. While a leak on the flowage easements would negatively impact groundwater in the area of the leak until properly remediated, this is highly unlikely due to the proper design, construction, and operation of the system. A Facility Response Plan is being drafted for submittal to PHMSA prior to operation in accordance with regulations, this is not a document that is able to be finalized until toward the end of construction. Please note that the pipeline will have cathodic protection to prevent corrosion, continual monitoring via a SCADA system, routine in-line inspections to detect anomalies, and regular aerial patrols.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Aug 05 2015

#### 2-1 Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Amee Rief (4029952544) Submitted On: Nov 06 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| **6141622** | Environmental | 4.2.1.2 | 36 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

3rd paragraph states that extracting water is prohibited. That is not true. Water from Garrison may be obtained through a surplus water agreement and technically the same applies for Oahe, but the ASA has not signed off on the Surplus Water EA for that project.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

#### 1-0 Evaluation **Concurred**
Language will be updated to reflect the applicant's recent clarification from the corps on the availability of

USACE_DAPL0072208

water from areas along the Missouri River.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

**1-1** Backcheck Recommendation **Close Comment**
ok

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Jul 24 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141636 | Environmental | 4.2.2.2 | 40 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

4th paragraph

..Project specific SPCCs will be developed.....

Please provide these and include in the narrative. If speculative, include what these measures might be and why they would need to be implemented.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

**1-0** Evaluation **Concurred**
EA text: Project specific SPCCs will be developed by the selected contractor and implemented throughout construction. By implementing the protective measures set forth in these Plans, groundwater contamination due to construction activities is not anticipated. The draft SPCC is included as Appendix B of Appendix A (SWPPP); the project specific plan to be developed by the contractor will meet or exceed all condition presented in the draft.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

*Backcheck not conducted*

**2-0** Evaluation **Concurred**
EA text: Project specific SPCCs will be developed by the selected contractor and implemented throughout construction. By implementing the protective measures set forth in these Plans, groundwater contamination due to construction activities is not anticipated. The draft SPCC is included as Appendix B of Appendix A (SWPPP); the project specific plan to be developed by the contractor will meet or exceed all condition presented in the draft.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

**2-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Oct 23 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141638 | Environmental | 4.2.2.2 | 40 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

5th paragraph

Add that remotely controlled shut off valves will also be installed.

USACE_DAPL0072209

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

**1-0** Evaluation **Concurred**
Shut-off valves will be installed and information added to the second last sentence of the paragraph
mentioned.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 07 2015

**1-1** Backcheck Recommendation **Close Comment**
ok

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Jul 24 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| **6141640** | Environmental | 4.2.3.1 | 40 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

1st paragraph

Any update due to recent surveys?

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

**1-0** Evaluation **Concurred**
Surveys have been completed on all lands in the scope of the EA, the flowage easements, the Lake Oahe
HDD and associated workspaces. Revisions to the EA will be made throughout based on the results of the
completed surveys.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

**1-1** Backcheck Recommendation **Close Comment**
ok

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Jul 24 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| **6141641** | Environmental | 4.2.3.2 | 41-42 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

1st paragraph

We need pre/post disturbance surveys.

Is regulatory aware that you are draining wetlands? Is this temporary? Explain what a trench plug is.

The description indicates that topsoil would be replaced in unsaturated wetlands. What about the topsoil in saturated
wetlands?

All disturbed areas on fee lands will need to be reseeded in accordance with the Garrison Project revegetation
guidelines.

USACE_DAPL0072210

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

---

**1-0** Evaluation **Concurred**
"Based on completed surveys, there are no excavation impacts to wetlands on lands addressed in this EA.
The language throughout will be revised accordingly.
To clarify the language that reviewed, impacts to assumed wetlands would have been automatically
authorized under NWP 12, so there was no need to notify regulatory.
Trench plugs are described in the SWPPP and are barriers within the trench installed so that the trench isn't
a conduit for draining the hydrology in a wetland.
Topsoil segregation is largely only feasible in unsaturated wetlands, it is typically not feasible in saturated or
inundated wetlands, hence the language about returning topsoil in unsaturated wetlands only.
No impacts to Corps owned lands are anticipated that would warrant reseeding on corps owned lands.
Please clarify, that if reseeding is needed at Lake Oahe, the Garrison Project guidelines would bee be
implemented? "

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

---

**1-1** Backcheck Recommendation **Open Comment**
Use Lake Oahe guidelines if they are available, if not Garrison is geographically similar enough that they
could be used.

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Jul 24 2015.

**2-0** Evaluation **Concurred**
Revised EA Section 3.3.1.2: Ground disturbing activities will not occur on Corps fee-own lands; therefore
reseeding is not anticipated in these areas. However, if reseeding where to become necessary on Corps
fee-owned lands, all activities would be in accordance with applicable Lake Oahe or Garrison Project
revegetation guidelines.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Aug 05 2015

---

**2-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Oct 20 2015.
Current Comment Status: Comment Closed

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| **6141643** | Environmental | 4.2.3.2 | 43 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

3rd paragraph

...remove trees...

All trees removed on fee property would have to be mitigated as outlined in the Garrison Tree Mitigation Plan

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

---

**1-0** Evaluation **Concurred**
"EA text: However, following construction, a 30? foot?wide corridor centered on the proposed pipeline would
be maintained in non?forested state to facilitate inspections of the pipeline, operational maintenance, and
compliance with the federal pipeline safety regulations.
No trees are expected to be removed from Corps owned property. "

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

---

USACE_DAPL0072211

**1-1** Backcheck Recommendation **Close Comment**
ok

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Jul 24 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141646 | Environmental | 4.3.1.2 | 47 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

2nd paragraph

...rapid colonization..

On Fee lands you will have to reseed with a mix approved by the Garrison Project.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

**1-0** Evaluation **Concurred**
"EA text: Active revegetation measures and rapid colonization by annual and perennial herbaceous species in the disturbed areas will restore most vegetative cover within the first growing season. In areas that require permanent revegetation, Dakota Access will specify appropriate seed mixes, application rates, and seeding dates, taking into account recommendations of appropriate state and federal agencies and landowner requests.
It is understood that Corps Fee lands would require approved reseeding mixtures. However, there are no ground disturbing activities expected on Corps owned lands. "

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

**1-1** Backcheck Recommendation **Close Comment**
ok

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Jul 24 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141648 | Environmental | 4.3.3.2 | 49 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

That does not mean they are not there. If one is found during survey's or construction, work must stop and the Corps must be contacted.

Use Section 7 ESA determination verbiage. If there is the possibility that they could be present but not effected, the call would be "may effect, but would not likely adversely effect".

Update effect calls throughout document to use correct terminology.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

Revised Jun 29 2015.

**1-0** Evaluation **Concurred**
"EA text will be revised as follows: There are no known records of western prairie fringed orchids in the Project Area counties and no suitable habitat was documented; therefore no impact is expected as a result

USACE_DAPL0072212

of the proposed undertaking. In the unlikely event that any are observed during construction on federal lands, work will stop and the Corps would be contacted."

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

---

**1-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Oct 23 2015.
Current Comment Status: Comment Closed

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141656 | General | 4.2.3.2 | 37 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

this section needs clarification, there is discussion of the effects of surface construction in wetlands but also states the wetlands will be avoided by HDD

Submitted By: Amee Rief (4029952544). Submitted On: Jun 29 2015

---

**1-0** Evaluation **Concurred**
Clarification on types of wetland impacts will be made. All wetlands will be HDD'd, there will be no excavation in any wetlands.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

---

**1-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Amee Rief (4029952544) Submitted On: Nov 06 2015.
Current Comment Status: Comment Closed

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141662 | General | table 4-8 | 38 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

are the area/acres the acres of disturbance? what is the percetage of the total area of each wetland cleared of vegatation?

Submitted By: Amee Rief (4029952544). Submitted On: Jun 29 2015

---

**1-0** Evaluation **Concurred**
The wetland acreage in Table 4-8 was based on preliminary desktop data of the wetland area within the stringing corridor. The area has since been field verified and it does not meet wetland criteria. As the area is not considered to be a wetland Table 4-8 and Section 4.2.3.2 will be updated accordingly.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 07 2015

---

**1-1** Backcheck Recommendation **Open Comment**
are the area/acres the acres of disturbance? what is the percetage of the total area of each wetland cleared of vegatation?

Submitted By: Amee Rief (4029952544) Submitted On: Jul 08 2015.

USACE_DAPL0072213

**2-0** Evaluation **Concurred**

The area/acres in Table 4-8 showed wetland acreage within the area of disturbance. We do not delineate wetlands beyond the survey corridor in accordance with our landonwer survey permissions, so we cannot comment on the % of the total area of each wetland cleared of canopy cover. However, field verification has indicated that there is not a wetland at the location indicated in Table 4-8 and the table will be updated accordingly. To clarify, based on recent field verification the only wetlands that would be affected are limited to be clearing of canopy cover along the HDD profile on the north bank of the Missouri River within the flowage easement. The acres of this vegetation maintenance is in Table 4-7.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 09 2015

---

**2-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Amee Rief (4029952544) Submitted On: Nov 06 2015.
Current Comment Status: Comment Closed

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141664 | Environmental | 4.4.2 | 50 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

You don't have the Northern Long Eared Bat in here. Pretty sure Project on our land is within its range and if trees are coming down than a may effect, but would not likely adversely effect call would be prudent.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

---

**1-0** Evaluation **Concurred**
"We will add a section for the species and clarify the no effect determination.
The species is listed by the USFWS as threatened in North Dakota. Per the exemptions of the interim 4(d) rule, the Project would not negatively impact the northern long-eared bat. (U.S. Fish and Wildlife Service. 2015. Endangered and Threatened Wildlife and Plants; Threatened Species Status for the Northern Long-Eared Bat With 4(d) Rule.) "

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

---

**1-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Oct 23 2015.
Current Comment Status: Comment Closed

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141665 | Environmental | 4.4.2.1 | 50 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

1st paragraph

Change all calls to correct verbiage as stated in the Section 7 ESA manual. This comment is applicable to anywhere in any document where you are making an ESA effect call and will not be repeated. In response to comment, note where changes were made.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

---

**1-0**

USACE_DAPL0072214

Evaluation **Concurred**
Effect determination verbiage will be updated in the EA upon our continued consultation with the ND USFWS Field Office. Dakota Access is of the opinion that it may be a "no effect".
Section 4.4.2 ""not likely to adversely affect"" will be changed to ""no effect"". The Draft EA included an effect determination of ""not likely to adversely affect"" (i.e. ""may affect, not likely to adversely affect"") for the piping plover and least tern. However, Dakota Access has determined that the Project will have no effect on all listed species within the Proposed Action or Connected Action areas. The no effect determinations will be further defined in Section 4.4.2 within the revised EA."

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 08 2015

---

**1-1** Backcheck Recommendation **Open Comment**
Disagree. The narrative only speaks to when the construction of the pipeline will occur. What about the potential that leaks may affect shorelines that species use? Because the presence of these species may occur and even if the applicant speculates the probability of a leak is low throughout the life of the pipeline, we would make a "may effect, but would not likely adversely effect" call for listed species in this area. The FWS will provide concurrence or not.

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Jul 24 2015.

**2-0** Evaluation **Concurred**
EA has been revised to show a May Affect, Not Likely to Adversely Affect determination for the piping plover, interior least tern and pallid sturgeon. See revised EA section 3.4.2.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Aug 07 2015

---

**2-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Oct 20 2015.
Current Comment Status: Comment Closed

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141666 | Environmental | 4.4.2.1 | 50 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

Table 4-11

Place table after narrative for each species below.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

---

**1-0** Evaluation **Concurred**
Table 4-11 is a summary table that is supported by the preceding paragraph and kicks off the discussion of the subsequent discussions. Please clarify that we are just being asked to put the table at the end instead of the beginning.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

---

**1-1** Backcheck Recommendation **Open Comment**
Yes, but the impact determination needs to be updated as discussed in the previous backcheck.

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Jul 24 2015.

**2-0** Evaluation **Concurred**
EA has been revised to show a May Affect, Not Likely to Adversely Affect determination for the piping plover, interior least tern and pallid sturgeon. See revised EA section 3.4.2.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Aug 07 2015

---

USACE_DAPL0072215

**2-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Oct 20 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141668 | Environmental | 4.4.2.2 | 53+ | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

Include effect determination call in each species impact determination paragraph below.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

**1-0** Evaluation **Concurred**
The effect determination will be included in the individual species write-up.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

**1-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Oct 23 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141669 | Environmental | 4.4.2.2 | 53+ | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

For Terns and Plovers, add a note that additional reduction of potential impacts would occur if construction occurred outside of about mid-April to the end of August.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

Revised Jun 29 2015.

**1-0** Evaluation **Concurred**
A note will be included for Terns and Plovers, regarding reduction of potential impacts would occur if construction was outside the respective nesting season.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

**1-1** Backcheck Recommendation **Close Comment**
ok

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Jul 24 2015.
Current Comment Status: Comment Closed.

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141671 | Environmental | 4.4.2.2 | 53+ | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

USACE_DAPL0072216

Note that if any of the listed species are encountered on Corps property during construction, that work would stop and the Corps would be contacted. We'll contact the FWS.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

---

**1-0** Evaluation **Concurred**
A note will be included that If listed species are encountered in Corps lands, construction would stop and Corps would be contacted.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

---

**1-1** Backcheck Recommendation **Close Comment**
ok

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Jul 24 2015.
Current Comment Status: Comment Closed

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|----|-----------|----------------|-------------|-------------|
| 6141672 | General | n/a | 43 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

3rd paragraph, are there standing water wetlands? they were not identified or analyzed in the wetlands section.

Submitted By: Amee Rief (4029952544). Submitted On: Jun 29 2015

---

**1-0** Evaluation **Concurred**
Standing water wetlands are not anticipated.
We will remove all references/discussions of conventional construction through wetlands as this does not apply to the EA scope.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

---

**1-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Amee Rief (4029952544) Submitted On: Nov 06 2015.
Current Comment Status: Comment Closed

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|----|-----------|----------------|-------------|-------------|
| 6141676 | Environmental | 4.4.2.2 | 57 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

Rufa Red Knot

Do not agree w/effect determination of no effect. Suitable habitat exists in the project area and although unlikely a red knot may stopover during construction, it is possible. Change to may effect, but would not likely adversely effect throughout document.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

Revised Jun 29 2015.

---

USACE_DAPL0072217

**1-0** Evaluation **Concurred**

Rufa red knot do not nest in the project area and only occur as an occasional migrant. In the event that a migrating rufa red knot is in the area during construction, they will likely avoid the area and utilize other suitable foraging habitat which is abundant throughout the region. Because rufa red knot is not expected to be present in the project area during construction, the project will have no effect on this species. This is being confirmed with the USFWS. EA text will be revised as follows for clarification: During spring and fall migrations, the rufa red knot has the potential to occur in North Dakota. Migrating rufa red knot would likely only occur at migratory stopover habitat (suitable shoreline and sandy beach habitat along major rivers, streams, waterbodies, and wetlands) for a brief amount of time (24 hours or less). The results of the habitat assessment field surveys indicate that potentially suitable loafing habitat (sandbar and beach habitats) for the migrating rufa red knot is present at the Missouri River and Lake Oahe. The Missouri River and Lake Oahe will be crossed using a HDD construction method, avoiding impacts to potential migrating rufa red knot loafing habitat. Based on the results of the habitat assessment field survey, the brief amount of time that rufa red knots could be in the area, and the proposed implementation of a HDD construction method to cross the Missouri River and Lake Oahe, Dakota Access has determined that construction of the Project would have no effect on migrating rufa red knots.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 07 2015

**1-1** Backcheck Recommendation **Open Comment**

Disagree. The possibility of impact, whether direct or indirect, exists because the project occurs within the red knot's range therefore our call would be "may effect, but would not likely adversely effect". No effect determinations are those with 100% no possibility of effect. The verbiage in your response (e.g. "will likely avoid") alludes to the potential possibility that they may occur or may be disturbed, which makes a no effect determination inaccurate for this, and other avian, species.

This backcheck comment is applicable to all the birds that are listed under ESA within the project area.

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Jul 24 2015.

**2-0** Evaluation **Concurred**

We are unaware of the "100% no possibility for effect" to reach a "no effect" determination under the ESA. Per NMFS ESA Section 7 Effects Determination Guidance ( March 2014) no effect determination does not require 100% no possibility of effect but rather no plausible effects. a) Some examples of when a "no effect" conclusion would be reached are: The species occurs in the action area and may be present at the time of the project, but there are no plausible (i.e., no credible) routes of effects (beneficial or adverse) to the species. A route of effect could be implausible if it would require a series of exceedingly rare events to occur in a particular sequence, in order to impact individuals of a listed species or habitats. A single event could also be in this category if the route of effect is so unrealistic its occurrence would be implausible . Because a transient red knot would more than likely stopover for less than 24 hours, the loafing habitat is being avoided via HDD, and the abundance of suitable habitat in the region it is not plausible that the species would be exposed to any potentially harmful/beneficial elements of the action.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Aug 07 2015

**2-1** Backcheck Recommendation **Open Comment**

Our call in our EA that you are preparing for us is "may effect, but would not likely adversely effect".

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Oct 20 2015.

**3-0** Evaluation **Concurred**

To address comment 6141676, the impact for all birds that are listed under the ESA within the Project area will be changed to a "may affect, not likely to adversely affect" as requested.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Oct 21 2015

**3-1** Backcheck Recommendation **Open Comment**

Ok. I will close when I see in EA. Current 10-7-15 version still has no effect.

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Oct 23 2015.

**4-0** Evaluation **Concurred**

Updated section 3.4.2 Threatened, Endangered, Candidate, and Proposed Wildlife Species is attached. The impact determinations have been changed to "May Affect, Not Likely to Adversely Affect" for the requested species.

USACE_DAPL0072218

Submitted By: Jonathan Fredland (7134627121) Submitted On: Nov 04 2015  (Attachment: DAPL_TandE_Assessment_from_USACE_EA_103015.docx)

**4-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Nov 05 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|----|-----------|----------------|-------------|-------------|
| 6141684 | General | 4.3.3.2 | 44 | n/a |

Comment Classification: Unclassified\\For Official Use Only (U\\FOUO)

Needs a weed control and prevention plan

Submitted By: Amee Rief (4029952544). Submitted On: Jun 29 2015

**1-0** Evaluation **Concurred**
Please advise how a weed control plan is applicable to Threatened, Endangered, Candidate, and Proposed listed Plant Species; of which none are known to occur on the project area and no suitable habitat was documented.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

**1-1** Backcheck Recommendation **Open Comment**
should be 4.3.2.2 noxious weeds section, needs a prevention plan.

Submitted By: Amee Rief (4029952544) Submitted On: Jul 08 2015.

**2-0** Evaluation **Concurred**
Noted. Does the COE have a plan they use or one that they like to see used?

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 09 2015

*Backcheck not conducted*

**3-0** Evaluation **Concurred**
Based on meeting notes from 7/15/15: Pipeline construction on Corps owned lands will be completed via HDD. Ground disturbance is not anticipated on Corps owned lands and a prevention plan is not required.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 16 2015

**3-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Amee Rief (4029952544) Submitted On: Nov 06 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|----|-----------|----------------|-------------|-------------|
| 6141685 | Environmental | 4.5.1.2 | 57 | n/a |

Comment Classification: Unclassified\\For Official Use Only (U\\FOUO)

Update 2nd paragraph w/new HDD plan information.

Where will the containment equipment be located?

How long are the response times of appropriate response personnel?

USACE_DAPL0072219

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

---

**1-0** Evaluation **Concurred**
Containment equipment will be onsite in the HDD additional work space and containment/cleanup efforts will begin immediately upon discovery of a frac-out. The HDD Plan contains more details regarding such.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 07 2015

---

**1-1** Backcheck Recommendation **Open Comment**
Do you plan on submitting a risk analysis similar to the example that we provided?

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Jul 24 2015.

**2-0** Evaluation **Concurred**
North Dakota Lake Oahe Crossing Spill Model Discussion is attached.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Aug 07 2015  (Attachment: DAPL_ND_Lake_Oahe_Crossing_Spill_Model_Discussion_Rev-A1.pdf)

---

**2-1** Backcheck Recommendation **Open Comment**
Why are the spill model plans for the Missouri River and Oahe crossings different? The former seems more qualitative the latter is quantitative. One example is the use of PHMSA approved spill calculation software (OILMAP Land).

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Oct 21 2015.

**2-2** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Oct 23 2015.
Current Comment Status: Comment Closed

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141687 | Cultural Resources | 4.7 | 64 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

I am entering Dave Cain's cultural comments:

General comment re: CR evaluation..

Overall comment: The archaeologists do not feel very comfortable with commenting because we have not initiated government to government consultation to find out firsthand what our PA partners think. However some comments are provided with that caveat.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

---

**1-0** Evaluation **Concurred**
Comment noted.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 07 2015

---

**1-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Aug 07 2015.
Current Comment Status:

---

USACE_DAPL0072220

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141689 | Cultural Resources | 4.7 | 64 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

1st paragraph

This is oversimplified for us. We have the PA, as you are aware and it will require us to do more than "take into consideration".

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

**1-0** Evaluation **Concurred**
EA text revised as follows: Section 106 of the National Historic Preservation Act of 1966 (NHPA), as amended, and implemented by 36 CFR Part 800, requires Federal lead agencies "to assess the effects" [instead of take into consideration] of permitted actions on historic properties.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 07 2015

**1-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Aug 07 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141690 | Cultural Resources | 4.7 | 64 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

2nd paragraph

...Class II Recon inventories...

List the authorizations (ARPA permits and written consent of the land managers to conduct class II inventory) here. The Omaha district, by way of the PA, requires our partners a review of the permit applications for survey conducted on Fee title. If Fee title was not included that should be outlined.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

**1-0** Evaluation **Concurred**
At the direction of the Corps, Corps fee owned lands were not surveyed. This will be clarified in the text. EA text revised as follows: Survey investigations were restricted to those properties where land access was voluntarily given by landowners. As detailed in Appendix I, an Archaeological Resource Protection Act (ARPA) permit was not required for any fee title or federal lands as all Class II/III surveys were conducted exclusively across private lands where the HDD entrance and exit workspaces will be located.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 06 2015

**1-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Aug 07 2015.
Current Comment Status: Comment Closed

USACE_DAPL0072221

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141692 | Cultural Resources | 4.7.1 | 64 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

..Native American habitation..

And Euro American, Lets not forget about the whole "settlement of the west" part of our history.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

1-0 Evaluation **Concurred**
Appropriate revision will be made in regards to Native American habitation and Euro American settlement history.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

1-1 Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Aug 07 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141695 | Cultural Resources | 4.7.1.1 | 64 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

first paragraph

...flowage easement Project Area.

This is not very descriptive of the location studied. The state refers to this area as the Garrison Study Unit, The USACE calls it part of the Garrison Dam Project. The rest of the interested parties might only recognize this area as associated with Lake Sakakawea. If you don't establish that here It needs to be done sooner.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

1-0 Evaluation **Concurred**
"EA text: Cultural resources background studies and field surveys were conducted within the flowage easement Project Area. Portions of the flowage easement Project Area have been subject to previous surveys.
The ""flowage easement"" project area is one of the two distinct project areas under evaluation in this EA and defined/described in the beginning of the EA and referred to accordingly throughout. "

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

1-1 Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Aug 07 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|

USACE_DAPL0072222

| 6141697 | Cultural Resources | 4.7.1.1 | 64 | n/a |
|---------|--------------------|---------|-----|-----|

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

1st paragraph

...horzintal directional drill and snow fenceing...

Has the SHPO approved this method of avoidance/mitigation? If so this would be a good point to advertise your diligence. If not, go talk to them and get a letter. That letter will need to be a supporting document in the appendices.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

---

**1-0** Evaluation **Concurred**
The SHPO has told us that they will consult with the federal agency in accords with Section 106. If the COE wishes to issue us the designated Dakota Access and the non-federal representative, please provide this in writing and we will coordinate with the SHPO respectively.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

---

**1-1** Backcheck Recommendation **Open Comment**
Dave Cain reply:

It is stated in the cultural summary that all mitigation efforts will be reviewed by the SHPO. I was drawing attention to the fact that HDD under an eligible site is a mitigation effort and needs to be treated as such.

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Aug 07 2015.

**2-0** Evaluation **Concurred**
Agreed. HDD technique has been identified as a mitigation effort in the EA and would be reviewed by SHPO once government to government consultation occurs. EA text Section 3.7.1.2: Regarding the NRHP-eligible BTIS (site 32Wl1367), the Project proposes to traverse one historic canal feature that has been determined to be an eligible component of the site. Impacts to this feature would be avoided via HDD to ensure the integrity of construction design for these historic-age features is preserved. This management recommendation has been included as a viable avoidance option in the Class III report submitted to both the ND SHPOs office that the USACE regional archaeological staff. To date, the SHPO has deferred consultation to the regional USACE archaeologist and has not provided comment regarding these avoidance options.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Aug 07 2015

---

**2-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Oct 21 2015.
Current Comment Status: Comment Closed

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|----|-----------|----------------|-------------|-------------|
| 6141698 | Cultural Resources | 4.7.1.1 | 64 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

2nd paragraph

Was sub surface testing conducted? Or was the alignment pedestrian surveyed? This is a flood plain near one of the largest navigable waterways in the US. I think some sort of geomorphic discussion needs to happen to address, buried horizons, sunken steam boats, and sterile recently accreted stream load.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

---

USACE_DAPL0072223

**1-0** Evaluation **Concurred**

EA Text Revised as Follows: The Class II/Class III cultural resource inventory of the proposed Project Area was conducted in accordance with the North Dakota SHPO Guidelines Manual for Cultural Resources Inventory Projects (SHSND 2012). As outlined in Appendix I, systematic survey methods employed by field crews included surface inspection and shovel probing. Surface inspection was conducted in areas with surface visibility greater than 10 percent along fixed 15 m (49 ft) interval transects. Shovel probes were excavated on a 30 m grid in areas with less than 10 percent surface visibility. In general, shovel probing was employed minimally to document soil profile data as the majority of these areas are dominated by expansive agricultural pastures with high surface visibility. The surveys resulted in the assessment of the portion of Site 32WI1367 within the survey corridor. Dakota Access will entirely avoid impacting this NRHP-eligible canal feature by installing the pipe via HDD in this area. The HDD workspace will be off-set a sufficient distance to ensure that no components or associated features of this canal will be adversely impacted. Aside from this previously recorded site, the surveys were negative with no cultural materials encountered on the surface or within any of the shovel probes. A more thorough discussion of the cultural setting, previous studies, as well as geologic and geomorphic analysis of the region, and results of the current survey are found in Appendix I.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 07 2015

---

**1-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Aug 07 2015.
Current Comment Status: Comment Closed

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| **6141699** | Cultural Resources | 4.7.1.1 | 65 | n/a |

Comment Classification: Unclassified\\For Official Use Only (U\\FOUO)

Last paragraph

Please outline the ARPA authorizations (permit numbers) for this survey. If no fee title land was surveyed state that. It is likely that if the survey was not conducted it will need to be due to the recent unveiling of the need to draw industrial water from Oahe.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

---

**1-0** Evaluation **Concurred**

No USACE Fee lands were included in the surveys we conducted. According to the GIS data obtained from SHPO, which was confirmed by the USACE, the USACE lands had been previously surveyed. Further, no physical impacts were anticipated as these parcels were to be avoided by HDD. EA text will be revised as follows: Cultural resources surveys were not conducted across USACE-owned lands as the Class I literature search determined that these federally-owned properties have been sufficiently surveyed for cultural resources as detailed in Appendix I (Figures 5b and 5c). Class II/IIII survey investigations were restricted to those properties where land access was voluntarily given by private landowners. As detailed in Appendix I, an Archaeological Resource Protection Act (ARPA) permit was not required for any fee title or federal lands as all Class II/III surveys were conducted exclusively across private lands where the Project workspaces will be located. Water will not be withdrawn from Lake Oahe.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 07 2015

---

**1-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Aug 07 2015.
Current Comment Status: Comment Closed

---

USACE_DAPL0072224

| Id | Discipline | Section/Figure | Page Number | Line Number |
|----|-----------|----------------|-------------|-------------|
| 6141702 | Cultural Resources | 4.7.1.2 | 65 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

1st paragraph

In the event that it happens on non-fed land. If an impact happens on USACE fed land the district commander or his agent is the authority for considering such measures.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

---

1-0 Evaluation **Concurred**
The language in section 4.7.1.2 will be revised to clarify the authority on Corps fee owned lands.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

---

1-1 Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Aug 07 2015.
Current Comment Status: Comment Closed

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|----|-----------|----------------|-------------|-------------|
| 6141703 | Cultural Resources | 4.7.1.2 | 65 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

2nd paragraph

Just above you state that the SHPO will be involved in making this decision. How was the SHPO involved in this mitigation decision?

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

---

1-0 Evaluation **Concurred**
The EA clearly says this is what is proposed. The report that was reviewed and has been submitted to the SHPO includes this measure. No Comments from the SHPO have been received to date. The SHPO is awaiting the federal agency to initiate consultation in accordance with 106.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

---

1-1 Backcheck Recommendation **Open Comment**
Dave Cain reply:

And this is why it is problematic to conduct reviews before consultation is initiated.

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Aug 07 2015.

2-0 Evaluation **Concurred**
Understood. Please initiate consultation with the SHPO or designate Dakota Access as the non-federal representative so that consultation can occur without further delay.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Aug 07 2015

---

2-1 Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Oct 21 2015.

USACE_DAPL0072225

Current Comment Status: Comment

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| **6141705** | Cultural Resources | 4.7.1.2 | 65 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

3rd paragraph

Is this a recommendation to effect or a determination. Please use the catch words from section 106 to make reference to what you are doing here.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

**1-0** Evaluation **Concurred**
EA text revised as follows: In accordance with Section 106 of the NHPA, Dakota Access has made a good faith effort to identify significant historic properties within the Project area. Based on the result of these efforts, no properties recommended as eligible, or potentially eligible for listing in the National Register of Historic Places (NRHP) will be adversely impacted by the proposed Project or Connected Action.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 07 2015

**1-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Aug 07 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| **6141706** | Cultural Resources | 4.7.1.2 | 65 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

4th paragraph

Avoided by how far. It is a standard 100 foot for the Omaha district.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

**1-0** Evaluation **Concurred**
EA text will be revised as follows: Although there are seven previously documented cultural sites within the 400-foot survey corridor in the vicinity of the Lake Oahe crossing, these sites will not be adversely impacted by the Project. HDD workspaces, as well as staging and stringing areas will be positioned in excess of 100' beyond the mapped boundaries of these previously recorded sites. Additionally, Class III survey efforts conducted within the Project workspace directly adjacent to these site boundaries were negative for cultural resources thus confirming that no cultural components associated with these sites stretch into the currently defined workspace areas. Overview maps depicting workspace design in relation to these previously recorded sites is provided in Appendix I.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 07 2015

**1-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Aug 07 2015.
Current Comment Status: Comment Closed

USACE_DAPL0072226

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141707 | General | 4.4.2.2 | 49 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

which species were field varified (include year of survey and methodology) and which were desktop

Submitted By: Amee Rief (4029952544). Submitted On: Jun 29 2015

> **1-0** Evaluation **Concurred**
> Habitat assessments for all species were field verified. We will update to include the survey dates.
>
> Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

> **1-1** Backcheck Recommendation **Close Comment**
> Closed without comment.
>
> Submitted By: Amee Rief (4029952544) Submitted On: Nov 06 2015.
> Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141711 | Cultural Resources | 4.7.2 | 65 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

1st paragraph

Much has changed with this project since then. We are still uncertain of the alignment on their traditional lands, as well this project affects much more than the SRST. We consult with nearly 30 Missouri River tribes on every undertaking and this is why consultation is taking so long to initiate. We do not initiate until we know what we are consulting about. This project has not even been formally proposed.

A word to the wise: the Corps does not like to sign and accept documents as their own when they are being blamed for the inaccuracies and short comings within. Get your ducks in a row, tell us what your ducks are doing, and we will initiate consultation for your proposal.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

> **1-0** Evaluation **Concurred**
> EA Text revised as follows: In October 2014, Dakota Access met with representatives of the Standing Rock Sioux Tribe and the Tribal Historic Preservation Office (THPO) of the Standing Rock Sioux Tribe to informally introduce the Project, and inquire about any potential areas of interest or cultural importance traversed by the Project. This meeting was meant as a good faith effort to discuss this project with the tribe due to the proximity of their reservation to the Lake Oahe crossing in early routing evaluation. Formal consultation with federally-recognized tribal entities for those portions of the Project on federal or fee titled lands will be initiated by the federal agency per Section 106 of the National Historic Preservation Act (NHPA) which requires government to government consultations with tribal entities.
>
> Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 07 2015

> **1-1** Backcheck Recommendation **Close Comment**
> Closed without comment.
>
> Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Aug 07 2015.
> Current Comment Status: Comment Closed

USACE_DAPL0072227

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141714 | Environmental | 4.12.2.2 | 74 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

Would construction hours be during normal weekday business hours near residential / commercial areas?

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

Revised Jun 29 2015.

---

**1-0** Evaluation **Concurred**
Construction activities would typically be limited only to daytime hours. Potential exceptions include critical HDD operations or work determined necessary based on weather conditions, safety considerations, and/or critical stages of the HDD [e.g. if pausing for the night would put the drill at risk of closing or jamming].

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 07 2015

---

**1-1** Backcheck Recommendation **Close Comment**
ok

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Jul 24 2015.
Current Comment Status: Comment Closed

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141716 | Environmental | 5.0 | 75 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

Need to add discussion of irreversible and irretrievable commitment of resources for all resource narratives or in a separate section if you prefer. Where appropriate resources can be combined to create a succinct discussion is acceptable.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

Revised Jun 29 2015.

---

**1-0** Evaluation **Concurred**
A section with a brief discussion concerning the irreversible and irretrievable commitment of resources will be added to the Draft EA.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 07 2015

---

**1-1** Backcheck Recommendation **Open Comment**
I would remove "destruction *of* cultural resources" as an example. Just find something else to substitute just so there is no inference this is occurring.

At the end of the last sentence in Ch. 5, reference chapter / table where mitigation measures are summarized.

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Jul 24 2015.

**2-0** Evaluation **Concurred**
EA text revised as follows: Examples of irreversible commitments of resources include consumption of petroleum based fuels or minerals and permanent alteration of environmental resources.

USACE_DAPL0072228

Submitted By: Jonathan Fredland (7134627121) Submitted On: Aug 05 2015

---

**2-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Oct 21 2015.
Current Comment Status: Comment Closed

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141722 | General | n/a | 50 | 5 |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

how close of proximity are they located?

Submitted By: Amee Rief (4029952544). Submitted On: Jun 29 2015

---

**1-0** Evaluation **Concurred**
"EA text: Based on known occurrence data, the black?footed ferret has been recorded in Morton County but not in close proximity to the proposed Lake Oahe crossing location."
EA text will be updated to provide distances from Project area of known blackfooted ferret occurrence data in Morton County.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

---

**1-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Amee Rief (4029952544) Submitted On: Nov 06 2015.
Current Comment Status: Comment Closed

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141732 | General | n/a | 51 | 5 |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

**[Critical/Flagged]**

need to discuss the potential Impacts of a frac out on plovers and critical habitat

Submitted By: Amee Rief (4029952544). Submitted On: Jun 29 2015

---

**1-0** Evaluation **Concurred**
Dakota Access maintains it's position that a likelihood of a frac out is negligible and does not warrant evaluation in this decision document as the frac out potential is being managed by implementation of the measures described in the HDD Pian.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 07 2015

---

**1-1** Backcheck Recommendation **Open Comment**
from the EA "Fluid pressures can build up within the borehole during HDD operations. In some instances, this can result
in hydraulic fracturing of the substrate and subsequent migration of drilling fluids either into the waterway or to the land surface--this is known as a "frac?out."
effects to species needs to be addressed

---

USACE_DAPL0072229

Submitted By: Amee Rief (4029952544) Submitted On: Jul 08 2015.

**2-0** Evaluation **Concurred**
EA has been revised to show a May Affect, Not Likely to Adversely Affect determination for the pallid sturgeon. See revised EA section 3.4.2. Based on the safety factor resulting from the construction implementation plan for the HDD, the potential for a frac-out to breach the surface (land or river bottom) is negligible. Frac-out potential will be discussed in detail during the August 12 meeting.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Aug 07 2015

**2-1** Backcheck Recommendation **Close Comment**
Meeting was held August 15th with DAPL, HDD contractor, and USACE Engineering Division. USACE Engineering has reviewed and approved.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Nov 06 2015.
Current Comment Status:

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141749 | General | n/a | 52 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

[Critical/Flagged]

Pallid sturgeon, no effect means absolutly no effect. impacts of frac outs need to be discussed here.

Submitted By: Amee Rief (4029952544). Submitted On: Jun 29 2015

**1-0** Evaluation **Concurred**
The sediment load of a frac-out in the main channel of Lake Oahe would result in insignificant impacts to the pallid sturgeon due to the volume and velocity of the water and the mobility and biological characteristics of the species. A spawning habitat requires a hard substrate bottom, which is derived from fast moving currents, which precludes deposition of fine particulate matter such as those resulting from an inadvertent release of drilling mud. The planned HDD would result in no effect to the species.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 07 2015

**1-1** Backcheck Recommendation **Open Comment**
data indicate that pallid sturgeon free embryos, as young as five days post-hatch, are able to survive to age-1 in the Missouri River between Fort Peck Dam and Lake Sakakawea

Submitted By: Amee Rief (4029952544) Submitted On: Jul 08 2015.

**2-0** Evaluation **Concurred**
The Missouri River HDD is not part of the previously defined, and recently verified, scope for this EA. The Lake Oahe Crossing is outside of the river segment referenced in the comment. The potential for an in water frac-out is negligible. Further drilling mud is a benign naturally occurring material of clay particles, which would readily dissipate into the water column due to the size and flow of the river. No impact to the pallid sturgeon is anticipated.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 22 2015

**2-1** Backcheck Recommendation **Open Comment**
were the effects of the Missouri river crossing on T and E species submitted to FWS? I cannot close this comment until I see the BA and the BO from FWS

Submitted By: Amee Rief (4029952544) Submitted On: Nov 06 2015.

**2-2** Backcheck Recommendation **Close Comment**
The BA is integrated within the EA. A BO is not expected at this point because USACE is informally consulting with the USFWS.

USACE_DAPL0072230

Additionally, a BA is being completed for the entire pipeline for regulatory. These crossings are covered within that as well.

Also, see comment 6154194.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Nov 06 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141781 | General | 4.4.2 | 46 | n/a |

Comment Classification: Unclassified\\For Official Use Only (U\\FOUO)

this section is missing an analysis of the northern long-eared bat

Submitted By: Amee Rief (4029952544). Submitted On: Jun 29 2015

**1-0 Evaluation Concurred**
EA will be revised to include the Northern Long-Eared Bat and the 4(d) rule for a no effect determination.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

**1-1 Backcheck Recommendation Close Comment**
Closed without comment.

Submitted By: Amee Rief (4029952544) Submitted On: Nov 06 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141787 | Environmental | 5.0 | 76 | n/a |

Comment Classification: Unclassified\\For Official Use Only (U\\FOUO)

Combine water and aquatic resource narratives into one cumulative impact discussion as they are essentially synonyms. No discussion of past actions and impacts on these resources. What about the spills from pipelines that have historically impacted the lake? What about erosion and sedimentation cumulative impacts to water quality from incremental impacts due to future development? What about the increased risk of spills as more wells/pipelines are constructed and their potential impact the lake? Need a more robust discussion.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

Revised Jun 29 2015.

**1-0 Evaluation Concurred**
Section 5.2 and 5.6 will be combined as recommended.
EA text will be amended as follows: Recently completed construction or current construction within the vicinity of the proposed Project could extend the period of exposure of soils as a result of incomplete revegetation. These exposed soils may increase the potential for soil erosion resulting in sedimentation in surface waterbodies, which could adversely impact water quality and fish in the Project watersheds. However, all of these projects would be subject to regulation by the USACE under the Clean Water Act. In addition, spills or leaks of hazardous liquids during construction of the proposed Project or other projects in the vicinity have the potential to result in long-term impacts on surface and groundwater resources as well as aquatic life resources. However, implementation of BMPs required by the various regulating agencies that have jurisdiction over the projects would ensure avoidance, minimization, and/or mitigation of potential impacts on water resources and aquatic resources. Furthermore, impacts on water

USACE_DAPL0072231

and aquatic resources associated with the Project will be avoided, temporary, and/or minor, as all surface waterbodies will be crossed via trenchless methods (i.e., HDD or bore), no permanent fill or loss of wetlands are anticipated, and potential spill-reiated impacts will be avoided or greatly reduced by regulating fuel storage and refueling activities and by requiring immediate cleanup should a spill or leak occur. Therefore, cumulative impacts on water resources and aquatic resources would be negligible.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 07 2015

**1-1** Backcheck Recommendation **Close Comment**
ok

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Jui 24 2015.
Current Comment Status:

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141789 | Environmental | 5.3 | 77 | n/a |

Comment Classification: Unclassified\\For Official Use Only (U\\FOUO)

i've seen pipeline scars across the landscape years after construction has been completed. I think short and temporary are not accurate as pipelines can operate for decades and the vegetation is managed (mowed) while the pipe is operating.

Elaborate on effects of habitat fragmentation from past (none), to current level and what is reasonably foreseeable.

Add section of EA where reader can find more details.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

**1-0** Evaluation **Concurred**
No forest fragmentation will occur as a result of construction and operation of the Project within the flowage easements and the Project Area/Connected Actions of the federal lands. No interior (core) forest habitat is crossed by the Project, and the only wooded area that would be affected by the Project include one PFO wetland (0.05 acre) located within the permanent ROW on the flowage easements between HDD boxes. However, much of the forest and PFO wetlands in the vicinity of the Project area has already been fragmented by agricultural activities, roads, and other commercial or industrial developments. Further, construction of the proposed Project facilities wiii not result in the permanent loss of wetland features. Although trees within a 30-foot corridor centered on the pipeline that could compromise the integrity of the pipeline coating and hamper visual inspection will be selectively removed throughout the operational life of the Project, this portion of the PFO wetland would be converted to PEM or PSS and allowed to revegetate with scrub-shrub or herbaceous species. Therefore, further fragmentation of wetlands or creation of new forest-edge habitat as a result of the Project will be negligible.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 07 2015

**1-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Jul 24 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141791 | Environmental | 5.4 | 77 | n/a |

Comment Classification: Unclassified\\For Official Use Oniy (U\\FOUO)

Add discussion of past actions. How has oil and gas development (and associated development) helped contribute, if at aii, to the decline in these species? Risks of spills increase with every pipeline that is installed on or next to these

USACE_DAPL0072232

species habitat. How does that increase in risk and potential adverse impact to sensitive species habitat contribute towards the continued listing or new listing of these species?

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

**1-0** Evaluation **Concurred**
Specific information regarding impacts on threatened and endangered species is not available for past oil and gas development, and thus cannot be evaluated for cumulative impacts. However, all existing facilities would be subject to regulations under the Endangered Species Act and thus, would have avoided, minimized, and/or mitigated for impacts on threatened and endangered species prior to construction and operation of the project.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 07 2015

**1-1** Backcheck Recommendation **Open Comment**
No information exists? Former applicants have completed this request. You may ask the FWS if they have any reference material. I would still like the questions that I ask to be answered in this section. It may require you to forecast using your best knowledge and available reference material.

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Jul 24 2015.

**2-0** Evaluation **Concurred**
Revised text has been incorporated into Section 4.4 as follows: As required by the Endangered Species Act, the status of each species listed as threatened or endangered is evaluated every 5 years by USFWS to assess its recovery and determine if a change in its listing status is warranted. Where available, these documents were utilized to identify the potential for ongoing regional oil and gas development to significantly threaten the species listed in the Project area. For species in which a 5-Year Review was not available, Dakota Access utilized the species Recovery Plan and/or Final Rule to evaluate potential threats on the species resulting from regional oil and gas development.
Species in which no suitable habitat is present in the Project Area or Connected Action Area, such as black-footed ferret, Dakota skipper, northern long-eared bat, and gray wolf, were not evaluated, as the Project will not contribute to cumulative impacts on these species.
Habitat loss and modification are the primary threats to the continued existence of pallid sturgeon, interior least tern, rufa red knot, whooping crane, and piping plover. The potential cumulative impacts from oil and gas activities in the region on the current listing or potential elevated future listing of these five species are discussed in detail below.
The USFWS (2014c) Revised Recovery Plan for the Pallid Sturgeon (Scaphirhynchus albus) specifically addresses the potential effects of energy development such as oil and gas pipelines on pallid sturgeon. It states that while a rupture of a pipeline within sturgeon habitat could pose a threat, the impacts would be localized and the magnitude of the impact would be dependent on the quantity and timing of the material released. It is highly unlikely that a cumulative impact resulting from a spill or leak would occur, as it would require multiple pipelines in the same general area to experience anomalous events simultaneously. Even if this were to occur, these impacts would be localized and temporary and would likely not result in a significant impact on the recovery of pallid sturgeon, as a whole.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Aug 05 2015

*Backcheck not conducted*

**3-0** Evaluation **Concurred**
Continuation of Section 4.4 Revision: According to the Final Rule (79 FR 73706) for the rufa red knot (USFWS, 2014b) and the USFWS (2007) International Recovery Plan for the Whooping Crane (Grus americana), the USFWS considers oil and gas activities as a secondary threat, especially near the coast (primarily in southeast Texas in the wintering range). Potential threats to these species along the Central Flyway migratory route in the region of the Project include loss of stopover habitat from conversion of natural wetlands (e.g., prairie potholes) to croplands and development (including oil and gas exploration). The Project will not result in any loss of stopover habitat for either the whooping crane or rufa red knot; therefore, it will not contribute to cumulative impacts on either species as result of regional oil and gas activities.
The USFWS does not address oil and gas activities, including potential spills, as a potential or ongoing threat to the interior least tern in either the 5-year review, or the recovery plan (USFWS, 2013e). The primary threat to interior least terns and the cause of the initial population declines resulted from river channelization, impoundments, and changes in river flow resulting in loss of suitable habitat throughout their

USACE_DAPL0072233

range.

The USFWS (2009) 5-Year Review for the piping plover does specifically address threats from oil and gas activities in North Dakota. However, impacts from oil and gas activities that are threatening piping plover are associated with the development of oil and gas exploration wells located near the alkali lakes habitat, which accounts for 83% of the U.S. Northern Great Plains piping plover breeding habitat. The Project is not located within the vicinity of any of these areas and will therefore not contribute to cumulative impacts on piping plovers resulting from oil and gas activities.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Aug 05 2015

**3-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Oct 21 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| **6141792** | Environmental | 5.5 | 77 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

Agree agriculture has effect, but a discussion of effects of oil and gas development (well pads and pipelines as the latter doesn't exist without the former) needs to be included with an emphasis on habitat fragmentation.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

**1-0** Evaluation **Concurred**
Information regarding cumulative impacts on habitat fragmentation associated with the proposed Project and oil and gas development in the region is provided in the response to comment #6141789

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 07 2015

**1-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Oct 23 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| **6141795** | Environmental | 5.6 | 77 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

See comment about Section 5.2

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

**1-0** Evaluation **Concurred**
See Comment # 6141787

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 07 2015

**1-1** Backcheck Recommendation **Close Comment**
ok

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Jul 24 2015.

USACE_DAPL0072234

Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141800 | Cultural Resources | 5.8 | 78 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

1st paragraph

...all practical measures...

This is loose. I would suggest "DAPL will take every measure possible to avoid AND appropriately mitigate. Practical Measures doesn't seem to obligate the applicant to much of anything.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

1-0 Evaluation **Concurred**
"EA text: Dakota Access will take all practical measures to avoid or appropriately mitigate adverse effects to cultural resources that have been determined, in consultation with the federal land managing agencies, NDSHPO, and Native American tribes, to be eligible for listing in the National Register of Historic Places (NRHP). Those NRHP?eligible sites that have been avoided via reroute or HDD located beyond actual workspace but in close proximity to construction, operation or maintenance activities may experience cumulative impacts in the form of looting. In such cases, Dakota Access will install exclusionary fencing along the border of workspace areas in proximity to such resources to ensure no inadvertent trespassing occurs.
Dakota Access would not implement a measure that isn't practical, 'possible' is too broad of a term for us to commit to. If we avoid an impact, we would not mitigate it.
We will reword ""Dakota Access will implement measures to avoid or mitigate adverse effects..."""

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

1-1 Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Aug 07 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141802 | Cultural Resources | 5.8 | 78 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

1st paragraph

..no inadvertent trespassing...

I assume you are talking about snow fencing? Fencing at all draws attention to the location of sites. This is not a protective measure that will mitigate the proximity of a site. Fencing is usually placed temporarily to draw attention to a sensitive area for heavy equipment operators. How long will the fences be in place?

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

Revised Jun 29 2015.

1-0 Evaluation **Concurred**
"We are not looking to mitigate proximity, we are looking to mitigate impacts. "exclusion fencing" is used

USACE_DAPL0072235

to identify a number of sensitive resources along the edges of a pipeline corridor including cultural resources, sensitive habitat, unapproved landowners, etc.
Heavy equipment is operated in every stage of construction and restoration.
We anticipated the exclusion fencing would be in place from clearing through restoration.
Please advise on a measure you feel is more appropriate."

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

**1-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Aug 07 2015.
Current Comment Status:

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141805 | Cultural Resources | 5.8 | 78 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

2nd paragraph

...incidence...

This suggests the measure of probability. Which suggests some quantitative analysis. This statement is highly qualitative. Use possibility.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

Revised Jun 29 2015.

**1-0** Evaluation **Concurred**
We will replace "incidence" with "possibility".

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

**1-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Aug 07 2015.
Current Comment Status:

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141810 | General | 4th paragarph | 53 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**
**[Critical/Flagged]**

what about the Missouri River HDD site?

Submitted By: Amee Rief (4029952544). Submitted On: Jun 29 2015

**1-0** Evaluation **Concurred**
We are not clear what this comment is or where it is referencing.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

https://www.projnet.org/projnet/binKornHome/index.cfm                6/2/2016

USACE_DAPL0072236

**1-1** Backcheck Recommendation **Open Comment**
there is no dicussion of the MR HDD site in the effects to aquatic resources section even though the EA states "The Missouri River, including Lake Oahe, is the only waterbody crossed by the Project with aquatic resources that have potential to be impacted by the Project."

Submitted By: Amee Rief (4029952544) Submitted On: Jul 08 2015.

**2-0** Evaluation **Concurred**
The Missouri River impacts for this EA are limited to the potential withdrawal of water. The Missouri River crossing is not part of the previously defined, and recently verified, scope for this EA.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 09 2015

---

**2-1** Backcheck Recommendation **Close Comment**
See comment response 6141389.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Nov 06 2015.
Current Comment Status: Comment Closed.

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141811 | Cultural Resources | n/a | n/a | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

2nd paragraph

...contribution to the understanding of cultural resources..

Really? Because it has been my experience that when something is inadvertently crushed or ripped from the earth there is not much to learn from its mutilated context. This is arguable at least. The Native American perspective of such a "positive spin" will set the stage for argument during the public comment period.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

---

**1-0** Evaluation **Concurred**
EA text revised as follows: Although the possibility of an unanticipated discovery is low based on the negative findings of the field survey efforts, the measures outlined in the UDP includes a thorough notification protocol which will ensure that the necessary cultural resources specialists and agency personnel are involved to appropriately address the nature significance and of the find.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 07 2015

---

**1-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Aug 07 2015.
Current Comment Status: Comment Closed.

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141815 | Environmental | 5.9 | 78 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

Add discussion here or in another section on transportation and traffic cumulative effects (likely positive).

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

---

USACE_DAPL0072237

**1-0** Evaluation **Concurred**

Transportation and Traffic Cumulative Impact Section will be added to Section 5.0 as follows: As discussed in Section 3.3, roads throughout North Dakota have received a sharp increase in truck traffic due to increased oil and gas activity. The greater amount of traffic has led to a decline in the transportation infrastructure and a decrease in road safety throughout the state. Additional oil and gas development and production may continue to contribute to cumulative effects on roads in the vicinity of the Project Area requiring a higher frequency of road maintenance and repair on public roadways.

Construction of the project would temporarily increase traffic in the immediate vicinity of the Project Area. This increase in traffic would be temporary and is not expected to result in significant impacts to North Dakota's transportation infrastructure. Road improvements such as grading would be made as necessary and any impacts resulting from Dakota Access's use would be repaired in accordance with applicable local permits. Traffic interruptions would be minimized to the extent practical and would result in insignificant, temporary cumulative impacts on regional transportation resources as it would be localized to the immediate vicinity of the Project Area and major delivery routes.

During operations of the Project, there is expected to be a positive effect on traffic resources in North Dakota. Once in operation, DAPL plans to transport 450,000 bpd of crude oil via pipeline which would significantly reduce the demand for the commercial trucking of crude oil on county, state and interstate highways. It is anticipated that the cumulative effects of the Project and other future pipeline projects would be beneficial to the transportation infrastructure in North Dakota by decreasing oil hauled by truck traffic and therefore reducing wear and tear on roads and highways.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 08 2015

---

**1-1** Backcheck Recommendation **Close Comment**
ok

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Jul 24 2015.
Current Comment Status: Comment Closed

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|----|-----------|----------------|-------------|-------------|
| 6141818 | Environmental | 5.10 | 78 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

Are there any low-income, minority, or subsistence population in or around the project area?

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

---

**1-0** Evaluation **Concurred**
There are no appreciable minority or low-income populations exist in the census tracts at either crossing. Also there is no evidence of subsistence populations in or around the Project Area. See EA Section 4.9.2 for details.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 07 2015

---

**1-1** Backcheck Recommendation **Close Comment**
ok

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Jul 24 2015.
Current Comment Status: Comment Closed

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|----|-----------|----------------|-------------|-------------|
| 6141820 | Environmental | 6.0 | 80 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

USACE_DAPL0072238

bullet points

The specific action, what impact it is potentially mitigating and the resource that may be impacted is what I would like to see in a table that could be handed to the contractor / construction supervisor. See next comment.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

Revised Jun 29 2015.

---

**1-0** Evaluation **Concurred**
A-typical commitments are summarized in a construction line list that is issued to the contractor. It indicates all special circumstances committed to by tract. We can provide you the matrix requested below prior to construction once all applicable authorizations and easements have been acquired as the conditions are typically finalized in the easement, authorized permit, etc. This document is not available at this time.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

---

**1-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Johnathan Shelman (402-995-2708) Submitted On: Oct 23 2015.
Current Comment Status: Comment Closed

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| **6141830** | General | 2nd paragarph | 55 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

last sentence contradicts earlier statements about vegetation

Submitted By: Amee Rief (4029952544). Submitted On: Jun 29 2015

---

**1-0** Evaluation **Concurred**
"EA text: The corridor will be maintained in a vegetative state.
Please specify what the contradiction is. Do we need to specify that vegetative maintenance wouldn't take place on agricultural lands?"

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

---

**1-1** Backcheck Recommendation **Open Comment**
from the EA "The corridor will be
maintained in a vegetative state." also states the ROW would be cleared of vegetation.

Submitted By: Amee Rief (4029952544) Submitted On: Jul 08 2015.

**2-0** Evaluation **Concurred**
The construction ROW where conventional trenching will occur will be cleared of vegetation prior to construction. Once construction is complete, the ROW would be maintained in a vegetative state. The ROW over the HDD segment on flowage easement will be cleared of canopy cover, not of all vegetation. Edits to the text will be made to better clarify this.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 09 2015

---

**2-1** Backcheck Recommendation **Close Comment**
Closed without comment.

USACE_DAPL0072239

Submitted By: Amee Rief (4029952544) Submitted On: Nov 06 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141831 | Environmental | 8.0 | 85 | n/a |

Comment Classification: Unclassified\\For Official Use Only (U\\FOUO)

Either in another section or included in this one I would like to see a matrix of all the commitments made to avoid or mitigate with respect to any given resource for quick reference by the contractor. I want it to be included in the plans and specs that the contractor has and be available for construction supervisor to have in the field when they are on Corps property.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Jun 29 2015

1-0 Evaluation **Concurred**
A-typical commitments are summarized in a construction line list that is issued to the contractor. It indicates all special circumstances committed to by tract. We can provide you the matrix requested below prior to construction once all applicable authorizations and easements have been acquired as the conditions are typically finalized in the easement, authorized permit, etc. This document is not available at this time.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 07 2015

1-1 Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Johnathan Shelman (402-995-2708). Submitted On: Oct 23 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6141866 | General | water quality | 59 | n/a |

Comment Classification: Unclassified\\For Official Use Only (U\\FOUO)

[Critical/Flagged]

section contradicts Aquatic Resources section that states may be impacts from fracking and run off from the HDD working sites

Submitted By: Amee Rief (4029952544). Submitted On: Jun 29 2015

1-0 Evaluation **Concurred**
"EA text: Section 303(d) of the CWA requires states to submit their lists of water quality limited waterbodies. This list has become known as the "TMDL list" or "Section 303(d) list." A TMDL is the amount of a particular pollutant a stream, lake, estuary, or other waterbody can ""handle"" without violating State water quality standards. The final 2014 Section 303(d) list, which was submitted to Environmental Protection Agency (EPA) as part of the integrated Section 305(b) water quality assessment report and Section 303(d) TMDL list, includes a list of waterbodies not meeting water quality standards and which need TMDLs. Lake Sakakawea is on the 2014 Section 303(d) list of impaired waters as not supporting fish consumption because of high levels of methyl?mercury. Lake Oahe is not listed as needing a TMDL and fully supports recreational use. The Proposed and Connected Action Areas are not anticipated to impact Water Quality or Recreation at Lake Oahe.
The Aquatic resources section discusses all aquatic resources, i.e. the canals and minor waterbodies and wetlands. Based on the layout, no run-off from the project is anticipated to impact Lake Oahe. "

USACE_DAPL0072240

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

**1-1** Backcheck Recommendation **Close Comment**
A SWPPP (Storm Water Pollution Prevention Plan), Environmental Construction Plan, and SPCC (Spill Prevention Control and Countermeasure)were provided.

Frack out concerns were reviewed by USACE Engineering Division.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Nov 06 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| **6141910** | General | 4.7.1.1 | 60 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

**[Critical/Flagged]**

were surveys conducted on Missouri River crossing site?

Submitted By: Amee Rief (4029952544). Submitted On: Jun 29 2015

**1-0** Evaluation **Concurred**
Surveys have been completed for all areas covered in this EA. This will be clarified in the EA.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 02 2015

**1-1** Backcheck Recommendation **Close Comment**
Clarification that surveys were completed within Section 3.7.1.1.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Nov 06 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| **6142022** | General | soils | 72 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

cummulative effects of soil erosion from pipeline ground disturbance and ag land cultivation?

Submitted By: Amee Rief (4029952544). Submitted On: Jun 29 2015

**1-0** Evaluation **Concurred**
Other past and present actions that may contribute to cumulative impacts to soil resources include accelerated soil erosion due to agriculture practices in the vicinity of the Project Area. When vegetation is disturbed whether it be for pipeline construction or the tilling of farmland, exposed topsoil is subject to wind and water erosion at a accelerated rate. Implementation of BMPs described in section 4.1.5 and timely reclamation of disturbed areas with vegetation after construction in coordination with the farmers, will reduce the chances of cumulative impacts to soil erosion.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 07 2015

**1-1** Backcheck Recommendation **Close Comment**
Closed without comment.

USACE_DAPL0072241

Submitted By: Amee Rief (4029952544) Submitted On: Nov 06 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6142029 | General | 5.2 | 72 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

This section is lacking any cummulative effects analysis for water resources, only mentions wetlands

Submitted By: Amee Rief (4029952544). Submitted On: Jun 29 2015

**1-0 Evaluation Concurred**
A discussion on cumulative impacts to water resources will be added to section 5.2. See Comment #
6141787 response for detail regarding cumulative impacts to water resources.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 08 2015

**1-1 Backcheck Recommendation Close Comment**
Closed without comment.

Submitted By: Amee Rief (4029952544) Submitted On: Nov 06 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6142049 | General | 5.4 | 73 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

**[Critical/Flagged]**

this section contradicts earlier effects analysis which indicated there would be impacts.

Submitted By: Amee Rief (4029952544). Submitted On: Jun 29 2015

**1-0 Evaluation Concurred**
The Draft EA included an effect determination of may affect, not likely to adversely affect for the piping
plover and least tern, and no effect on the remaining listed species. However, Dakota Access has
determined that the Project will have no effect on all listed species within the Action Area. The no effect
determinations will be further defined in Section 4.4.2 within the revised EA, thereby clarifying that Section
5.4 is stated correctly in the Draft EA and that the Project is not likely to impact any habitat utilized by listed
species.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 08 2015

**1-1 Backcheck Recommendation Close Comment**
The effects determination was modified from no effect to may effect not likely to adversely effect.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Nov 06 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6142059 | General | 5.6 | 73 | n/a |

USACE_DAPL0072242

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

what about effects of fracking?

Submitted By: Amee Rief (4029952544). Submitted On: Jun 29 2015

**1-0** Evaluation **Concurred**
The Project is not a Oil and Gas development project. Cumulative effects of hydraulic fracturing or "fracking" is not relevant to cumulative impacts of the Project.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 08 2015

**1-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Amee Rief (4029952544) Submitted On: Nov 06 2015.
Current Comment Status:

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---------|------------|----------------|-------------|-------------|
| 6142072 | General | 4.1 | 67 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

How would pipeline be monitored or repaired in the HDD locations?

Submitted By: Amee Rief (4029952544). Submitted On: Jun 29 2015

**1-0** Evaluation **Concurred**
Monitoring of HDD segments would be accomplished in the same manner as the conventionally installed segments (i.e. SCADA, Internal Inspection Devices, and Aerial Patrols). Typically, repairs are not made on any section greater than 10 - 20 feet below ground surface depending on the repair needed. If a material impact was on the line below the 10' depth, operation of the system would be modified accordingly (e.g. reduce operating pressure) or the line would be re-drilled. If inspections identify an anomaly, requirements would be followed to comply with DOT requirements.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 07 2015

**1-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Amee Rief (4029952544) Submitted On: Nov 06 2015.
Current Comment Status:

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---------|------------|----------------|-------------|-------------|
| 6154194 | Operations | n/a | n/a | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

**[Critical/Flagged]**

Overall Comment: The EA is missing a biological assessment. This comment is being made by Brent Cossette (Operations) and Planning (John Shelman).

Submitted By: Brent Cossette (402-995-2712). Submitted On: Jul 10 2015

USACE_DAPL0072243

**1-0** Evaluation **Concurred**
Based on discussion from the 7/15/15 Comment Resolution Meeting: A statement has been added to EA Section 3.4.2 (formerly 4.4.2) Threatened, Endangered, Candidate, and Proposed Wildlife Species stating: The Endangered Species Act (ESA) directs all Federal agencies to work to conserve endangered and threatened species. Under Section 7 of the ESA, the USACE is required to consult with the USFWS when any action the agency carries out, funds or authorizes may affect a listed species. This section serves as the Biological Evaluation or written analysis documenting the USACE's conclusions and the rationale to support those conclusions regarding the effects of the Proposed Action on protected wildlife resources.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jul 22 2015

**1-1** Backcheck Recommendation **Open Comment**
We will need a letter from USFWS that confirms this determination.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Oct 23 2015.

**2-0** Evaluation **Concurred**
The Threatened and Endangered, Candidate, and Proposed Wildlife Species Section (Section 3.4.2) from the EA has been submitted to the USFWS along with a letter requesting concurrence that the format and level of analysis in this section is adequate for informal consultation. As soon as a written response is received from USFWS it will be provided to the USACE.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Nov 04 2015

**2-1** Backcheck Recommendation **Open Comment**
USACE will wait on concurrence from USFWS. Will need before decision document.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Feb 29 2016.

**3-0** Evaluation **Concurred**
Attached, please find a copy of the USFWS Concurrence Letter for the DAPL project.

Submitted By: Jonathan Fredland (7134627121) Submitted On: May 13 2016 (Attachment: DAPL_Section_7_Response_Letter_5-2-16.pdf)

**3-1** Backcheck Recommendation **Close Comment**
USACE received concurrence from USFWS.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Jun 01 2016.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| **6245728** | Operations | CRM Report 2.1 Flowage Easements | 8 | Paragraph 1 last sentence |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

The last sentence references the valve site within the flowage easement.

Submitted By: Brent Cossette (402-995-2712). Submitted On: Sep 24 2015

**1-0** Evaluation **Concurred**
Text has been revised to remove valve site reference

Submitted By: Jonathan Fredland (7134627121) Submitted On: Oct 07 2015

**1-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Oct 21 2015.
Current Comment Status: Comment Closed

USACE_DAPL0072244

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6245731 | Operations | CRM Report 2.1 Flowage Easements | 8 | Paragraph 2 First Sentence |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

The first sentence of paragraph 2 references the valve location within the flowage easement.

Submitted By: Brent Cossette (402-995-2712). Submitted On: Sep 24 2015

---

**1-0** Evaluation **Concurred**
Text has been revised to remove valve site reference

Submitted By: Jonathan Fredland (7134627121) Submitted On: Oct 07 2015

---

**1-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Oct 21 2015.
Current Comment Status: Comment Closed

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6245733 | Operations | CRM Report Figure 4a | 19 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

Legend in figure references valve site within flowage easement.

Submitted By: Brent Cossette (402-995-2712). Submitted On: Sep 24 2015

---

**1-0** Evaluation **Concurred**
Figure has been revised to remove valve call-out from legend

Submitted By: Jonathan Fredland (7134627121) Submitted On: Oct 07 2015

---

**1-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Oct 21 2015.
Current Comment Status: Comment Closed

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6245744 | Operations | CRM Report Figure 4b | 20 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

Figure references the location and describes it within the legend.

Submitted By: Brent Cossette (402-995-2712). Submitted On: Sep 24 2015

---

**1-0** Evaluation **Concurred**
Figure has been revised to remove valve call-out from legend and from the mapping exhibit

USACE_DAPL0072245

Submitted By: Jonathan Fredland (7134627121) Submitted On: Oct 07 2015

---

**1-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Oct 21 2015.
Current Comment Status: Comment Closed

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6245745 | Operations | CRM Report Figure 4c | 21 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

Legend of figure references the valve location within the flowage easement.

Submitted By: Brent Cossette (402-995-2712). Submitted On: Sep 24 2015

---

**1-0** Evaluation **Concurred**
Figure has been revised to remove valve call-out from legend

Submitted By: Jonathan Fredland (7134627121) Submitted On: Oct 07 2015

---

**1-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Oct 21 2015.
Current Comment Status: Comment Closed

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6245746 | Operations | CRM Report Figure 4d | 22 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

Legend of figure references the valve location within the flowage easement.

Submitted By: Brent Cossette (402-995-2712). Submitted On: Sep 24 2015

---

**1-0** Evaluation **Concurred**
Figure has been revised to remove valve call-out from legend

Submitted By: Jonathan Fredland (7134627121) Submitted On: Oct 07 2015

---

**1-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Brent Cossette (402-995-2712). Submitted On: Oct 21 2015.
Current Comment Status: Comment Closed

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6245748 | Operations | O&M Summary-Background Information/Construction Specifications: | 1 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

USACE_DAPL0072246

Within the fourth paragraph it references valve locations within the flowage easements. This is inaccurate as it has been removed.

Submitted By: Brent Cossette (402-995-2712). Submitted On: Sep 24 2015

---

**1-0** Evaluation **Concurred**
Revision has been made to remove valve from flowage easements.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Oct 07 2015

---

**1-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Oct 21 2015.
Current Comment Status: Comment Closed

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| **6245753** | Operations | Appendix I Cultural Resources Report - Figure 2 | 5 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

Need to revise it is showing the valve location that is being removed out of the flowage easement.

Submitted By: Brent Cossette (402-995-2712). Submitted On: Sep 24 2015

---

**1-0** Evaluation **Concurred**
Figure has been revised to remove valve

Submitted By: Jonathan Fredland (7134627121) Submitted On: Oct 07 2015

---

**1-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Oct 21 2015.
Current Comment Status: Comment Closed

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| **6245757** | Operations | Appendix I Cultural Resources Report - Figure 4 | 18 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

Figure needs to be revised as it is showing the valve location that is being removed from the flowage easement.

Submitted By: Brent Cossette (402-995-2712). Submitted On: Sep 24 2015

---

**1-0** Evaluation **Concurred**
Figure has been revised to remove valve

Submitted By: Jonathan Fredland (7134627121) Submitted On: Oct 07 2015

---

**1-1** Backcheck Recommendation **Close Comment**
Closed without comment.

USACE_DAPL0072247

Submitted By: Brent Cossette (402-995-2712) Submitted On: Oct 21 2015.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6356952 | General | n/a | n/a | n/a |

Comment Classification: Unclassified\\For Official Use Only (U\\FOUO)

Document Formatting: Since I initially made the comment regarding risk assessments in ProjNet, the applicant has provided a series of separate documents. Some of these documents were supplied in email, some are found within a response in ProjNet, and many are in various formats and titles.
Potential Solution: I recommend that all of these be consolidated into one comprehensive document titled Response Plans.

Submitted By: William Harlon (402-995-2500). Submitted On: Jan 16 2016

1-0 Evaluation **Concurred**
All of the information that can be included in the document has been included and is referenced throughout the document.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jan 22 2016

1-1 Backcheck Recommendation **Close Comment**
i am closing this comment but would like to acknowledge that the material contained within 2 Spill Models, 2 GRP's, and 2 FRP's has increased review time. As such, resolution of comments has also been lengthened due to the time between new, separate submittals. It's my understanding that the operator has agreed to include redacted FRP's in the EA, which I hope will include appendices for the GRP's and Spill Models for each of the Missouri River crossings.

Submitted By: William Harlon (402-995-2500) Submitted On: Feb 20 2016.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6356954 | Risk Assessment | n/a | n/a | n/a |

Comment Classification: Unclassified\\For Official Use Only (U\\FOUO)

**[Critical/Flagged]**

Applicability into the EA: My initial comment was in reference to materials not being present in the EA. I just recently realized that much of this information was labeled as "Privileged and Confidential" by the applicant and did not make it into the EA. I believe this is problematic in two primary ways: a) I believe response plans for this pipeline (as proposed) are required by 49 CFR Section 194 and b) we have received multiple public comments regarding the conclusions provided by similar pipeline requests.
Potential Solution: Provide the material in a revised EA. I would recommend that the Corps complete a separate 'in-house' risk analysis, especially if the applicant is not agreeable to making the information public.

Submitted By: William Harlon (402-995-2500). Submitted On: Jan 16 2016

1-0 Evaluation **Concurred**
Information provided to the COE as "Privileged and Confidential" is protected by federal law and cannot be published in a public document. While these plans are required by 49 CFP 194, the information contained within is not public, no one can FOIA these documents from PMHSA either. These documents will remain part of the record as "privileged and confidential". As this information and requirement is under the jurisdiction of PHMSA, duplicating the applicant's efforts by the COE is unnecessary as factors outside the control and jurisdiction are incorporated into these plans.

USACE_DAPL0072248

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jan 22 2016

---

**1-1** Backcheck Recommendation **Open Comment**
Has a risk assessment/analysis been completed for each of the Missouri River crossings? Is the operator going to include redacted versions of the FRP in the EA, including appendices for each of the spill models and GRP's?

Submitted By: William Harlon (402-995-2500) Submitted On: Feb 20 2016.

**2-0** Evaluation **Concurred**
DAPL has conducted worst case risk analysis for the pipeline crossings at each of the Missouri River locations including an analysis of the flow distance and the time that it would take for the first oil from an unabated release to travel downstream and reach water intakes. A redacted version of the FRP will be included with the EA. The spill models and the GRPs will be submitted to the USACE as "Privileged and Confidential" documents. More information related to the relationship of the FRP, GRPs and Spill Models is provided as the response to Comment 6400949. We recommend that this comment be closed and indicate that this issue is being addressed as part of Comment 6400949.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Mar 17 2016

---

**2-1** Backcheck Recommendation **Close Comment**
This comment was entered essentially as a follow up to #6139320, where the lack of risk analysis was mentioned. This particular comment essentially requested that the risk analysis be incorporated into the EA. Since then, DAPL has indicated that some of the information is Privileged & Confidential, but has provided all of the information to the Corps and allowed redacted versions to be included in the EA. This comment is being closed due to the material being included in the EA. However, 6139320 is left open because of data gaps in the spill modeling, risk analysis, and EA.

Submitted By: William Harlon (402-995-2500) Submitted On: Apr 07 2016.
Current Comment Status: Comment Closed

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6356955 | Risk Assessment | n/a | n/a | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

Authority: I concede that the ultimate approval of said response plans rests with the Office of Pipeline Safety (§ 194.119 (d)) and that approval is technically required before the pipeline is operational (§ 195.402 (a)). However, I believe that the Response Plans are a critical component of the NEPA process because they help to identify risk and potential impacts. On page 6 of "North Dakota Lake Oahe Crossing Spill Model Discussion" the applicant indicates, "Each simulated spill is then analyzed to determine which locations along the pipeline pose the greatest risk, thus allowing DAPL to mitigate potential risks in the design phase." To me, this statement does a very good job summarizing Response Plans role in the overarching Avoid-Minimize-Mitigate steps of NEPA.
Potential Solution: Update the accuracy and content of the response plans for both the Oahe and Williston crossings.

Submitted By: William Harlon (402-995-2500). Submitted On: Jan 16 2016

---

**1-0** Evaluation **Concurred**
The plans for the Lake Oahe and Missouri River crossings are current to date.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jan 22 2016

---

**1-1** Backcheck Recommendation **Open Comment**
The FRP and GRP do not include WCD calculations for the river crossing near Williston. The FRP and GRP do not include details regarding how the operator will minimize risk and mitigate impacts from spills under ice conditions and/or by groundwater pathways.

Submitted By: William Harlon (402-995-2500) Submitted On: Feb 20 2016.

**2-0**

USACE_DAPL0072249

Evaluation **Concurred**
The Spill Model Report for the Missouri River contains the worst case discharge information for the crossing near Williston. information on how the pipeline will be designed and tested to prevent pipeline failures resulting in inadvertent releases and therefore minimize risk to surface and groundwater is discussed in the Spill Model Reports.The FRP has been revised to include Section 5.7 Spill Under Ice, and Section 5.8 Spill On Ice. Discussion relative to why this information is not repeated in each document is provided with the response to Comment 6356966. We recommend that this comment be closed and indicate that this issue is being addressed as part of Comment 6356966.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Mar 17 2016

**2-1** Backcheck Recommendation **Close Comment**
Reference comment # 6356966, which remains open to address projection data and HCA's. Tom Siguaw indicated during a 3/31/16 meeting that updated mapping will be provided to the Corps to show all HCA's that could be impacted by a 24 spill incident at each of the 2 River crossings.

Submitted By: William Harlon (402-995-2500) Submitted On: Apr 07 2016.
Current Comment Status:

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6356958 | Risk Assessment | n/a | n/a | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

Coordination within the Region 8 RRT: The Corps, PHMSA, EPA, Coast Guard, and other RRT members have collectively discussed lessons learned from recent high profile spills in our Region (e.g. Silvertip, Yellowstone, Blacktail Creek, etc). Such lessons have included the solubility of Bakken Crude in the water table during ice-over conditions (Yellowstone) and impacts to groundwater (Blacktail Creek). As with any emergency, the cooperating agencies discussed potential ways to avoid similar mistakes in the future. To that end, I greatly appreciate the comments that EPA Region 8 has provided to a handful of these larger pipeline requests that many believe may have the potential to impact resources on a regional scale. I believe a common goal would be to incorporate the best response plans possible to improve response actions and hopefully reduce impacts of any future spills.
Potential Solution: Provide response plans to the EPA and/or Region 8 RRT for review and a means to resolve any of their draft EA comments.

Submitted By: William Harlon (402-995-2500). Submitted On: Jan 16 2016

**1-0** Evaluation **Concurred**
Melisa Payan (EPA Region 8) confirmed in a telephone conversation with Dennis Woods that the EPA only has jurisdiction over non-transportation related sites. She indicated that the authority for our Spill Planning for the pipeline solely falls to the DOT PHMSA and not the EPA. See response to comment 6139320 for more details.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jan 22 2016

**1-1** Backcheck Recommendation **Open Comment**
Has the EA been revised to show how the operator plans to minimize risk and/or mitigate spill impacts? In particular, does the EA include a discussion on environmentally sensitive areas (T&E, cultural resources, water intakes, etc) and spill detection and mitigation procedures (i.e. solubility of Bakken crude in the water table, response conditions for ice and/or groundwater releases, etc)?

Submitted By: William Harlon (402-995-2500) Submitted On: Feb 20 2016.

**2-0** Evaluation **Concurred**
The EA includes a discussion on how the operator plans to minimize risk and/or mitigate spill impacts as well as a discussion on environmentally sensitive areas. Threatened and Endangered Species is discussed in Section 3.4.2. Cultural Resources is discussed in Section 3.7. Potential impacts to ground water is discussed in Section 3.2.2.2. Spill detection and mitigation procedures is discussed in Section 3.11 Reliability and Safety (additional text has been added to this section in response to other comments). More information regarding spill mitigation measures is found in the Facility Response Plan which has been added to the EA as Appendix L. Potential impacts to water intakes and response conditions for ice has been added

USACE_DAPL0072250

to the discussion in Section 3.2.1 Surface Waters. A discussion on the solubility of Bakken crude in the water table has been added to Section 3.2.2 Ground Water.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Mar 17 2016

---

**2-1** Backcheck Recommendation **Open Comment**
Surface waters section of the EA does not include reference to all HCA's that could be impacted from a release into the Missouri River at either of the pipeline crossings. The groundwater section of the EA does not include the solubility table referenced in the last response. The groundwater section does not include reference to how contaminants would be contained, recovered, and/or treated in groundwater. A correlation could be made to the risk analysis, which shows a relatively low risk of occurrence but a high consequence if a spill were to occur to either surface water and/or groundwater.

Submitted By: William Harlon (402-995-2500) Submitted On: Apr 07 2016.

**3-0** Evaluation **Concurred**
Discussion addressing the previous question regarding the solubility of Bakken crude in the water table (WH 2/20) has been added to the groundwater section (3.3.2.2). A new subsection "Remediation" has been added under 3.3.2.2 that describes how contaminants would be contained, recovered, and/or treated in groundwater.
Tables illustrating HCAs downstream of each of the two crossings are presented in the respective spill plans. These tables are not presented in the EA as it is our understanding that the location of specific HCAs should not be released in public docucuments.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Apr 13 2016

---

**3-1** Backcheck Recommendation **Open Comment**
Based on our discussions today, it appears that the solubility of Bakken crude oil under the ice is still lacking from the EA. The reference to a 'solubility table' in the EA is also not present. Please add these two items so the comment can be closed.

Submitted By: William Harlon (402-995-2500) Submitted On: May 06 2016.

**4-0** Evaluation **Concurred**
Requested table and proposed text to accompany the previously added dissolution text in the EA Section 3.2.2.2 is attached.

Submitted By: Jonathan Fredland (7134627121) Submitted On: May 12 2016  (Attachment: Proposed_Table-Text_Insert_for_Dissolution_Secton.docx)

---

*Backcheck not conducted*

**5-0** Evaluation **Concurred**
The text requested relative to the impact of ice cover on Bakken crude was included in the attached draft EA (Section 3.2.2.2) in red-line. Note: this verison of the EA was sent to Brent Cossette, Johnathan Shelman, and William Harlon on 5/10/16 via email from Steve Rowe.

Submitted By: Jonathan Fredland (7134627121) Submitted On: May 12 2016  (Attachment: DAPL_COE_EA-Draft_Final-2016-05-10.docx)

---

**5-1** Backcheck Recommendation **Close Comment**
On 5/23/16, DAPL agreed to revisions of the EA. EPA Region 8 had previously conducted research on the solubility of Bakken crude in the water table. Should funding become available through private or public resources, I would strongly encourage the industry and regulatory agencies to continue evaluations of Bakken Crude in the water and under ice.

Submitted By: William Harlon (402-995-2500) Submitted On: May 24 2016.
Current Comment Status: Comment Closed

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6356961 | Risk Assessment | n/a | n/a | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

USACE_DAPL0072251

§ 194.103 Significant and substantial harm; operator's statement: Did the operator prepare a significant and substantial harm operators statement? I did not see it specifically listed in the Lake Oahe spill model and/or geographic response plans for Emmons and/or Williams County crossings. I also did not see reference to water intakes and/or environmentally sensitive areas in the applicants' plans. The Williams County crossing does not have a spill model discussion.
Potential Solution: I recommend the inclusion (if warranted) of a substantial harm operator's statement. Exhibits can be generated to show spill projections that are consistent with the Sub-Area Contingency Plan. (EPA TERA viewer shows at least 2-3 municipal intakes downstream of the Oahe crossing and the Williston intake downstream of the Williams County crossing). Include reference to mitigating measures for cultural resources and T&E species in the Response Plan. Draft a spill model discussion for the Williston crossing.

Submitted By: William Harlon (402-995-2500). Submitted On: Jan 16 2016

**1-0** Evaluation **Concurred**
Both the Lake Oahe and Missouri River spill models were sent to Jonathan Shelman on October 21, 2015 and forwarded to Mr. Harlon on January 7, 2016. If required, the Significant and Substantial Harm; Operator's statement would be issued as part of the Facility Response Plan prior to operating the Project, in accordance with PHMSA and federal regulations. Affects to water resources are found in the Draft EA Section 3.2 Water Resources. Specific municipal intake locations are not available per EPA's Guidance and Municipal Facilities' Policy.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jan 22 2016

**1-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: William Harlon (402-995-2500) Submitted On: Feb 20 2016.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| **6356963** | Risk Assessment | n/a | n/a | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

§ 194.105 Worst case discharge: The methodology and calculations are still unclear.
Potential Solution: The applicant could clarify if they are using historic discharge data or their best estimate for determining detection and shutdown times. The applicant could clarify how the worst case scenario volume was calculated and this can be verified by someone in our engineering section. I cannot find reference to what the largest line volume is after shutdown (this is one of the key factors in the volume equation).

Submitted By: William Harlon (402-995-2500). Submitted On: Jan 16 2016

**1-0** Evaluation **Concurred**
"Operators best estimate is used for determining shutdown times in accordance with 40 CFR Section 194.105. As indicated in the Lake Oahe and Missouri River Spill Model Reports, the worse-case release was calculated based on pipe diameter, flow rate, valve location, valve and pump shut down times, and the elevation profile along the pipeline following the DOT PHMSA–approved spill model. The calculation was based on the following factors:
• Maximum pump shutdown response time
• Longest duration for a mainline valve closure
• Maximum flowrate in the pipeline
• Largest opening in the pipeline - assumes a full-diameter (guillotine) separation
See response to comment # 6139320 for more information. "

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jan 22 2016

**1-1** Backcheck Recommendation **Open Comment**
It appears that the methodology and WCD volume has changed in the FRP as what was referenced above

USACE_DAPL0072252

and in the Oahe spill model. The spill model for Oahe calculated the WCD to be 12,501 bbl but the FRP calculated the WCD to be 25,174 bbl. Has the WCD calculation for the Williston crossing also changed? The Williston crossing WCD was not referenced in the FRP but was calculated to be 3,691 bbl in the Williston spill model.

Submitted By: William Harlon (402-995-2500) Submitted On: Feb 20 2016.

**2-0** Evaluation **Concurred**
While hypothetical worst case discharge analysis have been performed for Lake Sakakawea and Lake Oahe , this information will not be included within the FRP. As discussed with Mr. David Lehman of PHMSA on February 23, 2016, if an operator can demonstrate that they have the response team and equipment to respond to a worst case scenario, then PHMSA is satisfied that they have the response team and equipment to respond to smaller releases and the operator is not required to incorporate these other scenarios into the FRP. The complete response/rationale for the separation of the presentation of the WCD numbers within the FRP and the respective GRPs is presented under Comment 6400949. We recommend that this comment be closed and indicate that this issue is being addressed as part of Comment 6400949.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Mar 17 2016

---

**2-1** Backcheck Recommendation **Close Comment**
Justin Minter (Sunoco) clarified during a meeting on 3/31/16 in Omaha that the WCD volume of 25,174 bbl was calculated for a spill at mile post 294 in South Dakota. He also mentioned that the 12,501 bbl volume has been consistent for the Lake Oahe crossing. Steve Rowe later provided the rationale for the calculations behind this volume in a follow up email on 4/5/16.
Given: 600,000 bbl. of oil are projected to flow through the pipeline per day.
600,000/24 = 25,000 bbls per hr
25,000/60 = 416.6 bbls per minute
Given: the pump stations are designed to shut down in 9 minutes
Therefore in a nine minute period 416.6 * 9 = 3750 bbls
The volume of oil remaining in the pipeline between the next nearest valves is calculated as follows:
Given: the volume of a cylinder is pi*r^2*Length
Given: there are 63,360 inches in a mile
Given: there are 9,702 cubic inches in a bbl of oil
Therefore the volume in one mile of 30" diameter pipe is: 3.14159 * 15^2 * 63,360 in/mile = 44,786,507.04 cubic inches
44,786,507.04 cubic inches = 4,616 bbls of oil in one mile of 30" diameter pipe
In the case of lake Oahe, there is approx. 3.4 miles of pipe between MLV-ND-380 and MLV-ND-390 (see graph below)
Some of the oil will be retained in the valleys created by topography and will not flow out of a rupture directly over top of Lake Oahe, there areas are shown below in green.
If you take the remaining line segments between the two valves you have approximately 1.9 miles of pipe that you can expect to drain down.
The Total Volume of Oil Released = The volume of oil that leaves the pipeline under pressure before the pumps are shut down + the volume of oil remaining in the pipeline between the next nearest valves.
Therefore the total volume spilled in this location = 3750 bbls + 4616*1.8958 = 12,501 bbls.
This matches the computer generated number of 12,501 bbls for this area.

Submitted By: William Harlon (402-995-2500) Submitted On: Apr 07 2016.
Current Comment Status: Comment Closed

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| **6356966** | Risk Assessment | n/a | n/a | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

§ 194.107 General response plan requirements: The current geographic response plans and Oahe spill model are not consistent with the Mid-Missouri Sub-Area Contingency Plan. The estimated spill projection downstream does not appear to use a 27 hour projection as do the EPA and US Coast Guard for this ACP.
Potential Solution: Each response plan must include procedures and a list of resources for responding, to the maximum extent practicable, to a worst case discharge and to a substantial threat of such a discharge. I recommend clarifying the spill volume calculation, utilizing a 27 hour spill projection downstream, addressing measures to protect water intakes and environmentally sensitive areas, addressing solubility of Bakken crude oil in the water table, and how to address spill response in winter conditions when the surface water is frozen.

USACE_DAPL0072253

Submitted By: William Harlon (402-995-2500). Submitted On: Jan 16 2016

**1-0** Evaluation **Concurred**
The US Department of Transportation Pipeline and Hazardous Materials Safety Administration (DOT PHMSA) is the governing body for the transportation of oil via pipelines. See comment # 6139320 response for additional information on how responsibilities are allocated between the DOT and the US Environmental Protection Agency (EPA) for spill contingency planning relating to the transportation of oil. 6 Hour Response Time: The DOT PHMSA requires that an operator must respond to a spill in a reasonable amount of time and that the response time shall be no more than 24 hours. ASA utilized the real-project time commitment of DAPL of 6 hours for emergency response in the development of the spill model.   This is the real-project time required for response equipment to arrive on site and for personnel to begin control and containment of the release. If an alarm criteria threshold is met, the SCADA system would alert Operators at Dakota Access' Operations Control Center who would then activate the controls as necessary and initiate procedures for the response. DAPL will have contracts in place with oil spill response companies that have the capability to mobilize to support cleanup and remediation efforts in the event of a pipeline release.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jan 22 2016

**1-1** Backcheck Recommendation **Open Comment**
The FRP's and GRP's do not include details regarding how the operator will minimize risk and mitigate impacts to environmentally sensitive areas. This includes ice conditions or groundwater pathways.

Submitted By: William Harlon (402-995-2500) Submitted On: Feb 20 2016.

**2-0** Evaluation **Concurred**
Information on how the pipeline will be designed and tested to prevent pipeline failures resulting in inadvertent releases and therefore minimize risk to surface and groundwater is presented in Section 5.0 of the Spill Model Reports. This section also provides and overview of monitoring activities after commissioning. Additional details regarding the design and operation measures that the operator will utilize to minimize the risk of spills is provided in Section 7.0 of the Spill Model reports. Steps to mitigate impacts associated with an inadvertent release are described within the FRP and GRP documents, The FRP has been revised to include Section 5.7 Spill Under Ice, and Section 5.8 Spill On Ice. As the GRP documents are a companion document and subordinate to the FRP, this information is not replicated in the GRP documents. [Note: information on how the pipeline will be designed, tested, and monitored is not repeated within the FRP or GRP documents as the intent of these documents is spill planning and response.]

Submitted By: Jonathan Fredland (7134627121) Submitted On: Mar 17 2016

**2-1** Backcheck Recommendation **Open Comment**
Of the 5 items listed in the original comment, 2 remain unresolved. Based upon the last meeting on 3/31/16, DAPL indicated that the spill models would be updated for a 24 hour downstream distance. The current documents included only 6 hour projections for both River crossings. DAPL also indicated a lack of intake data on the PHMSA database. The Corps supplied an intake dataset for Lake Sakakawea to PHMSA on 4/6/16. Since DAPL appears to be working on resolutions, I would anticipate this comment will be closed once the projection modeling and all HCA's are updated.

Submitted By: William Harlon (402-995-2500) Submitted On: Apr 07 2016.

**3-0** Evaluation **Concurred**
The Spill Model reports for Lake Oahe and the Missouri River were revised to contain the following information:
\* Tables and Figures related to downstream HCAs that would be encountered by an unabated plume by milepost. Both the 6-hour and 24-hour cases were included.
\* Example calculations presented in Appendix 2.
\* Reference for the data source for the river flow information.

Revised Spill Model Reports have been uploaded to ProjNet on comment # 6139320.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Apr 13 2016

**3-1** Backcheck Recommendation **Open Comment**
During our last meeting on 5/6/16, it was noted that the river velocity was derived from the River Reach Database (Version RF3). I am not familiar with this database and it is different from the USGS National

USACE_DAPL0072254

Hydrographic Database that has been referenced in past discussions. The Mid-Missouri Sub-Area Contingency Plan references the USGS NHD in their spill modeling. I recommend inclusion of the USGS NHD or verification there is no negligible difference between the RF3 and USGS NHD.

Submitted By: William Harlon (402-995-2500) Submitted On: May 09 2016.

**3-2** Backcheck Recommendation **Close Comment**
DAPL has agreed to additional mitigation measures and will be submitting revised spill models, FRP/GRP, IMP, etc prior to submission to PHMSA and prior to commissioning the line.

Submitted By: William Harlon (402-995-2500) Submitted On: May 24 2016.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| **6356967** | Risk Assessment | n/a | n/a | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

§ 194.115 Response resources: The current response plans do not clearly show what resources the operator will use to mitigate or prevent a substantial threat of a worst case discharge.
Potential Solution: Include explanation for how resources will be used for all 3 tiers of response activities.

Submitted By: William Harlon (402-995-2500). Submitted On: Jan 16 2016

**1-0** Evaluation **Concurred**
Tier I: Consists of company owned resources and local personnel. This tier will consists of defensive and offensive tactics. Tier II: Consists of company owned resources, area personnel and local oil response contractors personnel and resources. This tier will consists of defensive and offensive tactics. Tier III: Consists of company owned resources, nationwide company personnel and nationwide personnel from oil response contractors. This tier will consists of defensive and offensive tactics. Each response is unique based on the details and facts of the release. The response will be structured based on the Incident Command System (ICS). The responsible party, local, state and federal incident commanders will enter into a unified command to develop an incident action plan (IAP) to state objectives and tactics to respond to incidents.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jan 22 2016

**1-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: William Harlon (402-995-2500) Submitted On: Feb 20 2016.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| **6356971** | Risk Assessment | n/a | n/a | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

Notification Overview: Each of the submitted Geographic Response Plans have a referenced notification overview. However, both lack notification of regulatory agencies (NRC, NDDOH, PHMSA, EPA, etc) and the Corps.
Potential Solution: Update the notification lists in respective response plans for each crossing. Each list could mirror what is required in SPCC plans and can include notification timelines.

Submitted By: William Harlon (402-995-2500). Submitted On: Jan 16 2016

**1-0** Evaluation **Concurred**
The Geographic Response Plans have been developed for use as a "field" response aide during the incipient stages of a response. Detailed regulatory agency notification requirements, including agency

USACE_DAPL0072255

contact numbers, notification timelines and reportable quantities, are included in the Facility Response Plan (FRP). The FRP will be consulted and utilized for making the necessary agency notifications.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jan 22 2016

---

**1-1** Backcheck Recommendation **Open Comment**
Notification lists in the FRP were not comprehensive and lacked many agencies/trustees.

Submitted By: William Harlon (402-995-2500) Submitted On: Feb 20 2016.

**2-0** Evaluation **Concurred**
As indicated in the response to Comment 6400951, additional agency and trustee contacts were added to Table 2-3 of the FRP. If additional information is still required, we recommend that this comment be closed and indicate that this issue is being addressed as part of Comment 6400951.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Mar 17 2016

---

**2-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: William Harlon (402-995-2500) Submitted On: Mar 30 2016.
Current Comment Status:

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|----|-----------|----------------|-------------|-------------|
| **6356974** | Environmental Engineering | n/a | n/a | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

SPCC: ProjNet comment ID # 6139249 has been closed previously but the correction as indicated by the applicant is not reflected in the EA. This is relating to the NDDOH Spill Reporting website and contact numbers. I would consider reopening this comment and request an accurate notification overview be provided in the SPCC plan.

Submitted By: William Harlon (402-995-2500). Submitted On: Jan 16 2016

---

**1-0** Evaluation **Concurred**
Appendix C of the SPCC, State Requirements, will be updated by the Construction Contractor to include ND Department of Heath Spill Reporting website and contact numbers. It is acknowledged that the construction contractor has not yet been Identified, therefore the SPCC is still in draft form.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jan 22 2016

---

**1-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: William Harlon (402-995-2500) Submitted On: Feb 20 2016.
Current Comment Status:

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|----|-----------|----------------|-------------|-------------|
| **6356977** | Risk Assessment | n/a | n/a | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

Facility Response Plan: ProjNet Comment # 6139347 was administratively closed and referenced by DAPL for inclusion into the EA. However, It appears only one general sentence was included in the EA. I would consider reopening this comment and request, as i had above, the response plans be incorporated into the EA as originally requested.

USACE_DAPL0072256

Submitted By: William Harlon (402-995-2500). Submitted On: Jan 16 2016

**1-0** Evaluation **Concurred**
Response plans are considered confidential.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Jan 22 2016

**1-1** Backcheck Recommendation **Open Comment**
Did the operator agree to include a redacted FRP in the EA, including appendices for GRP's and spill models for each of the 2 river crossings?

Submitted By: William Harlon (402-995-2500) Submitted On: Feb 20 2016.
**2-0** Evaluation **Concurred**
A redacted version of the FRP will be included with the EA. The spill models and the GRPs will be submitted to the USACE as "Privileged and Confidential" documents. More information related to the relationship of the FRP, GRPs and Spill Models is provided as the response to Comment 6400949. We recommend that this comment be closed and indicate that this issue is being addressed as part of Comment 6400949.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Mar 17 2016

**2-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: William Harlon (402-995-2500) Submitted On: Mar 30 2016.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6400949 | Risk Assessment | n/a | n/a | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**
(Document Reference: FRP, GRP, Spill Models)

Due to Lake Sakakawea and Lake Oahe being environmentally sensitive areas, I recommend that DAPL update the FRP by including the volume of small, medium, and worst case discharges into each of the Reservoirs. Ideally, a risk analysis and response strategy maps would accompany at least the worst case discharge volume for each of the two Reservoir crossings.

Submitted By: William Harlon (402-995-2500). Submitted On: Feb 20 2016

**1-0** Evaluation **Concurred**
DAPL has developed a FRP which identifies the Worst Case Discharge, as required by PHMSA and defined in 49 CFR 194.105 (referred to as the PHMSA worst case discharge). The FRP also identifies, and ensures, by contract or other approved means, the resources necessary to respond to a worst case discharge.

DAPL has also conducted a "hypothetical" worst case risk analysis for the pipeline crossing at each of these locations. The calculated worst case discharge volumes at the Missouri River crossings near Lake Sakakawea and Lake Oahe are significantly less than the PHMSA worst case discharge volume as identified in the FRP. Because the FRP identifies, and ensures, the resources necessary to respond to the PHMSA worst case discharge by extension, it ensures the resources necessary to respond to a worst case discharge at the Missouri River crossings near Lake Sakakawea and Lake Oahe.

Because Lake Sakakawea and Lake Oahe are important to the coordination efforts with the USACE, DAPL has developed Geographical Response Plans (GRP's) for the Missouri River crossings, near Lake Sakakawea and Lake Oahe, to facilitate a rapid and effective response during the incipient stages of a release. The GRP's include tactical response/mitigation measures, as well as maps depicting potential

USACE_DAPL0072257

access, containment, and staging areas. However, each response is unique and, as such, response/mitigation measures will be implemented according to the actual circumstances at the time of the release. The respective GRPs were developed in consideration of these worst case hypothetical discharge scenarios at the Missouri River crossings.

While hypothetical worst case discharge analysis have been performed for Lake Sakakawea and Lake Oahe, this information will not be included within the FRP. As discussed with Mr. David Lehman of PHMSA on February 23, 2016, if an operator can demonstrate that they have the response team and equipment to respond to a worst case scenario, then PHMSA is satisfied that they have the response team and equipment to respond to smaller releases and the operator is not required to incorporate these other scenarios into the FRP. Additionally, the worst case discharge volumes are considered "Security Sensitive Information" by both DAPL and PHMSA and are protected from public disclosure and therefore will not be included within the respective GRP documents. Although the GRPs will be issued as Privileged and Confidential, these documents will be utilized during training exercises and the security of this information cannot be guaranteed.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Feb 26 2016

---

*Backcheck not conducted*

**2-0** Evaluation **Concurred**
"Discussion was added to Section 7.3 so that it is on the record that an alternative worst case discharge volume has been calculated for both the Missouri River crossing near Buford, ND and the Missouri River crossing near Cannon Ball, ND. Because the alternative worst case discharge volume calculated at each of these locations is significantly less than the actual worst case discharge volume (as required by PHMSA), it is concluded that the notification procedures and mitigation and response measures outlined the FRP are sufficient to respond to an alternative worst case discharge at either of the Missouri River crossings,

These alternative worst case discharge volumes are presented for USACE review with the respective spill model reports. The inclusion of alternative worst case discharge volumes into the FRP would provide no material value for PHMSA. As noted during the conference call with Mr. Lehman, if there is a spill, then the FRP is available on site. Even if the spill was a small release to an upland area, parties that respond to the notification may potentially be on site and may potentially have access to the FRP.

Therefore, it is DAPL's opinion that the benefits of inclusion of the alternative worst case spill information for both the Missouri River crossing near Buford and the Missouri River crossing near Cannon Ball in the FRP are outweighed by the risk of a mechanism for potential exposure of data.

We request that the USACE respect our sensitivity to this matter and concur with our position that the presentation of this information in the respective spill model reports is sufficient.
"

Submitted By: Jonathan Fredland (7134627121) Submitted On: Mar 17 2016

---

**2-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: William Harlon (402-995-2500) Submitted On: May 09 2016.
Current Comment Status: Comment Closed

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6400950 | Risk Assessment | n/a | Cover page | n/a |

Comment Classification: Unclassified\\For Official Use Only (U\\FOUO)
(Document Reference: FRP)

I recommend that additional regulatory citations are added to the cover page and the applicant insures the FRP addresses compliance with the requirements of each citation. These include: 49 CFR 192.615; 40 CFR 112 EPA Oil Pollution Prevention; 33 CFR 154 US Coast Guard; NCP and Mid-Missouri SACP; 29 CFR 1910 OSHA; OPA 90.

Submitted By: William Harlon (402-995-2500). Submitted On: Feb 20 2016

USACE_DAPL0072258

**1-0** Evaluation **Concurred**
Appendix B to 40 CFR 112 outlines the Memorandum of Understanding (MOU) among the Secretary of the Interior, Secretary of Transportation, and the Administrator of the EPA. The MOU delegates regulatory authority to the Secretary of Transportation (PHMSA) for interstate and intrastate onshore pipeline systems, including pumps and appurtenances related thereto, as well as in-line and breakout storage tanks. As such, DAPL complies with 49 CFR 194.

- The FRP's have been drafted to comply with OPA 90 as promulgated in 49 CFR 194 and to be consistent with the applicable Area Contingency Plan. The current reference in the FRP to the "applicable Area Contingency Plans (ACP)" will be changed to the "Mid-Missouri Sub-Area Contingency Plans (SACP)"

- 49 CFR 192.615 applies to operators of gas pipelines. DAPL is not a gas pipeline, but rather a liquids (oil) pipeline that complies with 49 CFR 194.

33 CFR 154 applies to Marine Transportation Related (MTR) facilities. DAPL is not a MTR, but rather a liquids (oil) pipeline that complies with 49 CFR 194.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Feb 22 2016

**1-1** Backcheck Recommendation **Open Comment**
Citations to original comment will be added to the cover page.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Feb 23 2016.

**2-0** Evaluation **Concurred**
Appendix B to 40 CFR 112 outlines the Memorandum of Understanding (MOU) among the Secretary of the Interior, Secretary of Transportation, and the Administrator of the EPA. The MOU delegates regulatory authority to the Secretary of Transportation (PHMSA) for interstate and intrastate onshore pipeline systems, including pumps and appurtenances related thereto, as well as in-line and breakout storage tanks. As such, DAPL complies with 49 CFR 194.

- The FRP's have been drafted to comply with OPA 90 as promulgated in 49 CFR 194 and to be consistent with the applicable Area Contingency Plan. The current reference in the FRP to the "applicable Area Contingency Plans (ACP)" will be changed to the "Mid-Missouri Sub-Area Contingency Plans (SACP)"

- The FRP will be updated to include a statement indicating that DAPL will comply with 29 CFR 1910, as applicable, during emergency response activities.

- 49 CFR 192.615 applies to operators of gas pipelines. DAPL is not a gas pipeline, but rather a liquids (oil) pipeline that complies with 49 CFR 194.

33 CFR 154 applies to Marine Transportation Related (MTR) facilities. DAPL is not a MTR, but rather a liquids (oil) pipeline that complies with 49 CFR 194.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Feb 26 2016

**2-1** Backcheck Recommendation **Open Comment**
DAPL will include applicable citations within the FRP. Once done comment will be closed.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Feb 29 2016.

**3-0** Evaluation **Concurred**
"The Cover Page was modified to change the applicable Area Contingency Plans (ACP) to the "Mid-Missouri Sub-Area Contingency Plan (ACP),

Table 6.2 has been revised to indicate that all Company responders designated in the Plan must have 24 hours of initial spill response training in accordance with 29 CFR 1910:
"

Submitted By: Jonathan Fredland (7134627121) Submitted On: Mar 17 2016

**3-1** Backcheck Recommendation **Open Comment**
Per the latest copy provided by email from Brent Cossette, the following citations were still absent from the cover page: 29 CFR 1910, 40 CFR 112, OPA 90, and NCP/Mid-Missouri SACP.

USACE_DAPL0072259

Didn't the applicant agree to list these references on the cover page?

Submitted By: William Harlon (402-995-2500) Submitted On: Mar 30 2016.

**4-0** Evaluation **Concurred**
The requested references for 29 CFR 1910, 40 CFR 112, OPA 90, and Mid-Missouri SACP have been added to the cover page of the FRP.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Apr 11 2016  (Attachment: 2016_4_7_Cover_Page.pdf)

*Backcheck not conducted*
**5-0** Evaluation **Concurred**
Also attached is the revised Page 1 (1.1. Purpose and Plan) from the Draft FRP which includes the requested references.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Apr 11 2016  (Attachment: 2016_4_7_Page_1.pdf)

**5-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: William Harlon (402-995-2500) Submitted On: Apr 13 2016.
Current Comment Status:

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| **6400951** | Risk Assessment | 2 | n/a | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**
(Document Reference: FRP)

Recommend adding USACE, USFWS, State Wildlife Agencies, Standing Rock, and Three Affiliated Tribes for any spill into the Missouri River. I did not notice a description of how each of the 3 Tier responses will be covered.

Submitted By: William Harlon (402-995-2500). Submitted On: Feb 20 2016

**1-0** Evaluation **Concurred**
The FRP will be revised to include notification to the USACE for releases into the Missouri River. Likewise, the FRP's will be revised to include notification information for the USFWS, State Wildlife Agencies, Standing Rock, and the Three Affiliated Tribes.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Feb 26 2016

**1-1** Backcheck Recommendation **Open Comment**
DAPL will include agencies listed in FRP. Once completed comment will be closed.

More description needed for the 3 tier response. Reference comment ID 6356967 seems have addressed the 3 tier description. Note this comment is already closed. DAPL will add to FRP.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Feb 29 2016.

**2-0** Evaluation **Concurred**
"Contact information for the USFWS, North Dakota Game and Fish Department, South Dakota Game, Fish and Parks, the SRST, three individuals for the SRST, and a contact for the Three Affiliated Tribes were added to Table 2-3.

The 3-Tiered approach for responding to a pipeline failure has been added to Section 4.0
"

Submitted By: Jonathan Fredland (7134627121) Submitted On: Mar 17 2016

USACE_DAPL0072260

**2-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: William Harlon (402-995-2500) Submitted On: Mar 30 2016.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| **6400952** | Risk Assessment | 3 | 16 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**
(Document Reference: FRP)

I apologize if this was addressed earlier but do we know what types of communication will be used at each of the River crossings.

Submitted By: William Harlon (402-995-2500). Submitted On: Feb 20 2016

**1-0** Evaluation **Concurred**
Dakota Access would utilize a supervisory control and data acquisition (SCADA) system to provide constant remote oversight of the pipeline facilities including each of the river crossings. Communication with the SCADA system will be accomplished via satellite (i.e., Hughes Global Network) and telephone (4G cellular [i.e., ATT] or landline depending on availability/coverage). Both forms of communication are continually engaged to poll information from these sites for 100% reliable remote monitoring / operation of these sites through the SCADA system to the Operations Control Center (OCC) in Sugarland, Texas (a backup control room is located in Bryan, Texas), and are proven to have the least potential for interruption during pipeline operations.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Feb 26 2016

**1-1** Backcheck Recommendation **Close Comment**
Communication has been adequately covered. EA was edited as well.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Feb 29 2016.

**2-0** Evaluation **Concurred**
Section 3.1 already includes a statement that the Company's SCADA system acquires data via a satellite network and that the communication system has redundancy to provide accurate and reliable data to the pipeline operators. It is assumed that the more detailed response above contains the information that Mr. Harlon needed for internal review but that this detail is not needed for the FRP and therefore was not added to the FRP.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Mar 17 2016

**2-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: William Harlon (402-995-2500) Submitted On: Mar 30 2016.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| **6400953** | Risk Assessment | 3.3 Response Equipment | n/a | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**
(Document Reference: FRP)

Does the applicant have separate equipment caches for groundwater, fast moving water, and/or ice conditions?

Submitted By: William Harlon (402-995-2500). Submitted On: Feb 20 2016

USACE_DAPL0072261

**1-0** Evaluation **Concurred**
DAPL has their own equipment and has contracted professional Oil Spill Response Organizations (OSRO's) so that response procedures can be carried out in accordance with federal response requirements including groundwater, fast moving water, and/or ice conditions. Company owned response equipment is listed in the FRP. Any specialized response equipment, beyond company owned response equipment, will be provided by OSRO's and/or contractors. DAPL has contracted with the National Response Corporation, an international response organization, which maintains contracts with hundreds of OSRO's nationwide. Resources for all response types can be mobilized as needed. A listing of contractor response equipment is included in the FRP and will continually be evaluated and updated as necessary.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Feb 26 2016

**1-1** Backcheck Recommendation **Close Comment**
Verified in the FRP. Comment can be closed.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Feb 29 2016.

**2-0** Evaluation **Concurred**
It is assumed that the more detailed response above contains the information that Mr. Harlon needed for internal review but that this detail is not needed for the FRP and therefore was not added to the FRP. As noted above, Brent closed during the 2/29 meeting.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Mar 17 2016

**2-1** Backcheck Recommendation **Close Comment**
Thank you for reopening the comment and allowing the reviewer to close the comment. The OSRO information was included in the latest FRP provided by Brent Cossette on 3/25/16. This information should stay in the final version of the FRP.

Submitted By: William Harlon (402-995-2500) Submitted On: Mar 30 2016.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6400954 | Risk Assessment | Table 2-3 and Table 2-4 | n/a | n/a |

Comment Classification: Unclassified\\For Official Use Only (U\\FOUO)
(Document Reference: FRP)

Table 2-3 and Table 2-4 did not include mention of the Trustees that I listed in item #3 above.

Submitted By: William Harlon (402-995-2500). Submitted On: Feb 20 2016

**1-0** Evaluation **Concurred**
The Trustees/stakeholders will be added to the notification tables (Table 2-3 and Table 2-4) as mentioned in #3 above.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Feb 26 2016

**1-1** Backcheck Recommendation **Open Comment**
DAPL will include in the FRP. Once done comment will be verified and closed.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Feb 29 2016.

**2-0** Evaluation **Concurred**
"
Because Table 2-4 is Emergency Services Contact Information, these contacts would not be applicable and repetition of the contact information for these trustees is unnecessary. DAPL revises the previous response to read as follows: The Trustees/stakeholders have been added to Table 2-3.
"

USACE_DAPL0072262

Submitted By: Jonathan Fredland (7134627121) Submitted On: Mar 17 2016

---

**2-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: William Harlon (402-995-2500) Submitted On: Mar 30 2016.
Current Comment Status: Comment Closed

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| **6400955** | Risk Assessment | 5.1 Exercise Requirements | 30 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**
(Document Reference: FRP)

I recommend that each of the requirements for PHMSA, EPA, OSHA, and US Coast Guard be listed out to insure compliance of regulations are met through the FRP.

Submitted By: William Harlon (402-995-2500). Submitted On: Feb 20 2016

Revised Feb 20 2016.

---

**1-0** Evaluation **Concurred**
DAPL will conduct emergency response drills/exercises in accordance with the National Preparedness for Response Exercise Program (PREP), which is recognized, and approved, by the EPA, USCG, and PHMSA.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Feb 26 2016

---

**1-1** Backcheck Recommendation **Open Comment**
DAPL will include PREP as an appendix to the FRP.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Feb 29 2016.

**2-0** Evaluation **Concurred**
"The FRP has been updated to include the PREP Training and Record Guide in Attachment H. The purpose of this guidance document is to outline the exercise requirements and identify the roles and responsibilities of key individuals in order to maintain compliance

The following was added to Section 6.1: The Company participates in the National Preparedness for Response Exercise Program (PREP) in order to satisfy the exercise requirements of PHMSA and EPA. Emergency responders, regulatory agencies and other stakeholders are routinely invited to observe or participate in table top and equipment deployment drills. A description of exercise requirements and documentation procedures is included in Appendix H.

Table 6-2 was updated to indicate that spill management team personnel training will follow the PREP Training and Record Guide.
"

Submitted By: Jonathan Fredland (7134627121) Submitted On: Mar 17 2016

---

**2-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: William Harlon (402-995-2500) Submitted On: Mar 30 2016.
Current Comment Status: Comment Closed

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|

USACE_DAPL0072263

**6400956**   Risk Assessment       Emergency Response Training            34                    n/a
Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**
(Document Reference: FRP)

I recommend that the operator include reference/narrative to describe how Internal Notification Exercises, Internal Tabletop Exercises, Owner/Operator Equipment Deployment Exercises, and Unannounced Exercises will be conducted.


Submitted By: William Harlon (402-995-2500). Submitted On: Feb 20 2016

Revised Feb 20 2016.

---

**1-0** Evaluation **Concurred**
As mentioned in item #7, DAPL will conduct emergency response drills/exercises in accordance with PREP. The FRP's will be revised to include a reference to DAPL's PREP Guidance document. The PREP Guidance document will be included as an Appendix in the FRP.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Feb 26 2016

---

**1-1** Backcheck Recommendation **Open Comment**
DAPL will include PREP as an appendix to the FRP. Once complete we can verify and close the comment.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Feb 29 2016.

**2-0** Evaluation **Concurred**
"The training program is described in Section 6.3 of the FRP. The PREP Training and Record Guide included in Appendix H provides details of the individual exercise requirements including frequency, scope, objectives, records, credit, and roles and responsibilities. These requirements include: Qualified Individual (QI) Notifications, Tabletop Exercises, Equipment Deployment Exercises, Telephone Verification Exercise, Emergency Procedures Exercises, and the annual FRP Review.

The deployment of DAPL-owned emergency equipment identified on page 4 of 17 of the PREP Training and Record Guide. The purpose is to demonstrate the ability of personnel to deploy and operate response equipment. The deployment of OSRO-Owned emergency equipment is also identified on page 4 of 17 of the PREP Training and Record Guide. This is done annually.

As indicated on page 4 of 17, the deployment of DAPL-owned emergency equipment is done semi-annually and one deployment per year must be unannounced. As indicated on page 7 of 17, all facilities are subject to Government-Initiated Unannounced Exercises and AREA Exercises. . All terminal or pipeline facilities are required to participate as directed by the EPA, USCG, and/or PHMSA as requested. Government-Initiated Unannounced Exercises are described on page 16 of 17.
"

Submitted By: Jonathan Fredland (7134627121) Submitted On: Mar 17 2016

---

**2-1** Backcheck Recommendation **Close Comment**
Overview of the PREP is sufficient but the Corps and our stakeholders would like to insure that unavoidable risk, especially towards high consequence areas (HCAs), is mitigated. Examples could include establishing a permanent, all weather access point(s), holding periodic on-site mandatory full scale response exercises (including open water and ice scenarios at both Lake Oahe and Lake Sakakawea) with stakeholder involvement, etc. This comment can be closed but note comment 6400962 is left open for any unresolved mitigation measures.

Submitted By: William Harlon (402-995-2500) Submitted On: Mar 30 2016.
Current Comment Status: Comment Closed

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| **6400957** | Risk Assessment | Emergency Response Training | 34 | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**

USACE_DAPL0072264

(Document Reference: FRP)

I recommend that the operator identify any response zones outside of North/South Dakota.

Submitted By: William Harlon (402-995-2500). Submitted On: Feb 20 2016

Revised Feb 20 2016.

---

**1-0** Evaluation **Concurred**
The DAPL has been divided into two response zones. The North Response Zone covers North and South Dakota. DAPL respectfully requests further clarification on the request for response zones outside of North and South Dakota be provided.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Feb 26 2016

---

**1-1** Backcheck Recommendation **Open Comment**
This is important because the same spill response contractors are not required to practice in multiple response zones if they are the same contractor used for multiple zones. A contractor practicing spill response in Texas does not give much specific details to the downstream receptors in North Dakota.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Feb 29 2016.

**2-0** Evaluation **Concurred**
DAPL has identified, and has contracted, OSROs local to the Project Area. The local OSROs have been identified on Table 2-5 of the North Response Zone FRP. DAPL commits to having these local OSROs participate in response drills/exercises, including the table top exercises and equipment deployment exercises related to Lake Sakakawea and Lake Oahe discussed under the response to Comment 6400962

Submitted By: Jonathan Fredland (7134627121) Submitted On: Mar 17 2016

---

**2-1** Backcheck Recommendation **Close Comment**
Overview of the PREP is sufficient but the Corps and our stakeholders would like to insure that unavoidable risk, especially towards high consequence areas (HCAs), is mitigated. Examples could include establishing a permanent, all weather access point(s), holding periodic on-site mandatory full scale response exercises (including open water and ice scenarios at both Lake Oahe and Lake Sakakawea) with stakeholder involvement, etc. This comment can be closed but note comment 6400962 is left open for any unresolved mitigation measures.

Submitted By: William Harlon (402-995-2500) Submitted On: Mar 30 2016.

Current Comment Status: Comment Closed

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|----|------------|----------------|-------------|-------------|
| **6400958** | Risk Assessment | Appendix A, OPA 90 | n/a | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**
(Document Reference: FRP)

The specific items listed for Section 5 are currently not described in the actual narrative.

Submitted By: William Harlon (402-995-2500). Submitted On: Feb 20 2016

Revised Feb 20 2016.

---

**1-0** Evaluation **Concurred**
DAPL recognizes that the tables referenced in Section 5 of Appendix A are not fully populated within the Draft FRP. Once contact information for the specified positions becomes available, the appropriate tables referenced in Section 5 of Appendix A will be completed. The USACE will be provided copies of the updated

---

USACE_DAPL0072265

version of the FRP as it becomes available.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Feb 26 2016

**1-1** Backcheck Recommendation **Open Comment**
DAPL needs to add within the FRP as a narrative. Once done will verify and close comment.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Feb 29 2016.

**2-0** Evaluation **Concurred**
The following tables have been updated with the respective contact names: Table 1-1, Table 2-1, and Table 2-2. It is assumed that telephone numbers for every individual are not required at this time for Mr. Harlon's internal review. However, telephone numbers will be added as this document is finalized. This information will be required for PHMSA approval of the final document. As committed during the PHMSA meeting on February 23, 2016, DAPL will provide the USACE with a redacted version of the Final FRP. The unredacted versions with telephone numbers would be available on the PHMSA secure site to the appropriate individuals, including those from the USACE. Mr. Harlon confirmed during the February 23rd meeting that the appropriate USACE staff would have access to the secure website.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Mar 17 2016

**2-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: William Harlon (402-995-2500) Submitted On: Mar 30 2016.
Current Comment Status:

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| **6400959** | Risk Assessment | Appendix E, Response Zone Maps | n/a | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**
(Document Reference: FRP)

Can the operator clarify what "Other Population Zones" refer to? Legend items such as environmentally sensitive areas (i.e. all of Lake Sakakawea and Lake Oahe), drinking water intakes, drinking water areas, and Corps recreation areas are all not identified on the response maps. I did not see any response strategy maps for flow distances, booming strategies, etc. What is DAPL proposing to do to minimize the impact to these sites in the event a spill occurs?

Submitted By: William Harlon (402-995-2500). Submitted On: Feb 20 2016

Revised Feb 20 2016.

**1-0** Evaluation **Concurred**
Drinking water intakes located downstream from the Missouri River crossing near Lake Oahe would potentially be at risk if there was a release that reached these bodies of water in the vicinity of the intake structures. In order to maintain the integrity of the pipeline, prevent Project losses, and protect the general public, the operator will inspect and exercise company-owned equipment in accordance with the PREP guidelines. The FRP includes measures such as notifications to surrounding communities, affected governments, and utilities in the event of an inadvertent pipeline release.

Once water intakes immediately downstream of the Missouri River crossings are provided to DAPL by the USACE, these water intakes will be included in the respective GRP documents. Mitigation measures, including notification procedures, will be identified to protect water intakes which could potentially be at risk.

The response mapping will be updated with environmentally sensitive areas (as identified in the Mid-Missouri River Sub-Area Contingency Plan), drinking water intakes, and Corps recreation areas.

DAPL will also utilize the water intake information to calculate flow distances to the four SRST intakes and any other intakes immediately downstream of the crossings that are identified by the USACE.

USACE_DAPL0072266

As described in the response to item #3, DAPL will update the FRP to include notification information for the USACE, USFWS, State Wildlife Agencies and the Standing Rock Sioux Tribe.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Feb 26 2016

*Backcheck not conducted*

**2-0** Evaluation **Concurred**
Text regarding the flow distance and the time that it would take for the first oil from an unabated release to travel downstream and reach water intakes has been incorporated into the spill planning documents. DAPL and its contractors will work with Federal, State, local, and Tribal officials to protect downstream drinking water and irrigation water intakes. To minimize potential impacts to intakes, protection and mitigation measures will be implemented in cooperation with intake operators.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Mar 17 2016

**2-1** Backcheck Recommendation **Close Comment**
The solubility table and revised spill models, risk analysis, etc helped to show the level of mitigation necessary at each Lake crossing. Environmental commitments for training and all weather collection and access points are sufficiently addressed in the EA and covered in the easement conditions.

Submitted By: William Harlon (402-995-2500) Submitted On: May 24 2016.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6400961 | Risk Assessment | n/a | n/a | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**
(Document Reference: FRP)

I recommend consideration be given to include reference to the following in the FRP: Environmental Response Scenarios (in-situ, bioremediation, ice, etc specific to characteristics of Bakken Crude); Waste Management; Natural Resource Damage Assessment (NRDA); Historical/Archaeological Resources;

Submitted By: William Harlon (402-995-2500). Submitted On: Feb 20 2016

**1-0** Evaluation **Concurred**
The FRP will be updated to include consideration for Environmental Response Scenarios, Waste Management, Natural Resource Damage Assessment, and Historical/Archaeological Resources as recommended.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Feb 26 2016

**1-1** Backcheck Recommendation **Open Comment**
DAPL needs to update the FRP. Will verify once completed and close comment.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Feb 29 2016.

**2-0** Evaluation **Concurred**
Section 3.2 has been updated to indicate that consideration will be given to the use of alternative response strategies, NRDA, and Historical/Archaeological Resources. Should alternative response strategies, such as in-situ burning or the use of dispersants, as identified in the Mid-Missouri River Sub Area Contingency Plan or the Region 8 Regional Contingency Plan, Sunoco Pipeline will seek approval from the Regional Response Team prior to implementation.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Mar 17 2016

**2-1** Backcheck Recommendation **Close Comment**
Closed without comment.

USACE_DAPL0072267

Submitted By: William Harlon (402-995-2500) Submitted On: Mar 30 2016.
Current Comment Status: Comment Closed

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| 6400962 | Risk Assessment | Owner/Operator Equipment Deployment Exercises | n/a | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**
(Document Reference: FRP)

As a condition of approval in the FRP and Corps easement, I recommend that the operator be required to conduct at least 1 open water AND 1 ice exercise at Lake Sakakawea OR Lake Oahe once every 5 years. The operator shall alternate the type and location of each training. This would include stakeholder participation, downstream water intake protection measures, etc.

Submitted By: William Harlon (402-995-2500). Submitted On: Feb 20 2016

**1-0** Evaluation **Concurred**
Emergency response exercises will be conducted in accordance with PREP and will include an annual table top exercise. A worst case, or alternate worst case, discharge exercise will be conducted every triennial cycle. DAPL is committed to conducting a worst case discharge exercise at Lake Sakakawea or Lake Oahe during the first triennial cycle following the commencement of operations. The exercise scenario will be designed to include either an open water response or an ice response. Regulatory and stakeholder participation will be encouraged and solicited for the exercise.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Feb 26 2016

**1-1** Backcheck Recommendation **Open Comment**
Need to clarify the triennial cycle. Practicing only one time in North Dakota does not seem like a reasonable mitigation measure. Recommendation for once every 5 years in North Dakota to include both open water and ice methods.

Submitted By: Brent Cossette (402-995-2712) Submitted On: Feb 29 2016.

**2-0** Evaluation **Concurred**
"DAPL understands that the reviewer is recommending worst case discharge exercises at Lake Sakakawea or Lake Oahe be conducted more than just one time in North Dakota as a mitigation measure and that these include both open water and ice response. In accordance with this requested mitigation, DAPL proposes to conduct an alternate worst case discharge exercise at Lake Sakakawea or Lake Oahe once every 6 years (multiple of 3 to match the triennial cycle) and will include both open water and ice response. DAPL will alternate the location and type of exercise as recommended.
With this additional agreed-upon mitigation added, the complete answer to the original question is as follows: Emergency response exercises will be conducted in accordance with PREP and will include an annual table top exercise. A worst case, or alternate worst case, discharge exercise will be conducted every triennial cycle. DAPL is committed to conducting an alternate worst case discharge exercise at either Lake Sakakawea or Lake Oahe once every 6 years and will include both open water and ice response. DAPL will alternate the location and type of exercise. Regulatory and stakeholder participation will be encouraged and solicited for the exercise.
"

Submitted By: Jonathan Fredland (7134627121) Submitted On: Mar 17 2016

**2-1** Backcheck Recommendation **Open Comment**
During the 3/31/16 meeting, the Team discussed confusion with some of the wording referring to commitments in the last statement. I recommend that DAPL rework the response to more accurately reflect the conversations from that meeting. As an example, we discussed the commitment being full-scale exercises (open and ice) at Lake Oahe and/or Lake Sakakawea once every 6 years.

Submitted By: William Harlon (402-995-2500) Submitted On: Apr 07 2016.

**3-0**

USACE_DAPL0072268

Evaluation **Concurred**
Emergency response exercises will be conducted in accordance with PREP and will include an annual table top exercise. DAPL is committed to conducting a worst case discharge full scale exercise at either Lake Sakakawea or Lake Oahe once every 6 years and will include both open water and ice response. DAPL will alternate the location and type of exercise. Regulatory and stakeholder participation will be encouraged and solicited for the exercise.

This commitment has also been added to the text of the EA to Section 3.11 - Reliability and Safety. DAPL agrees to this language being added as a condition of approval in the Corps easement if appropriate.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Apr 11 2016

---

**3-1** Backcheck Recommendation **Close Comment**
In the event that a pipeline failure occurs and product is released into the Missouri River at either crossing, the worst case consequence scenario is ranked high because several drinking water intake High Consequence Areas (HCAs) and multiple ecologically sensitive HCAs could be impacted. To minimize the impact of a release (e.g. size and spread) the pipeline will continuously be monitored by a real-time monitoring and leak detection system , which is considered to be the best available technology; motor operated isolation and/or check valves are installed on either side of the Missouri River above Lake Sakakawea and Lake Oahe which can be actuated to close as soon as a leak is detected; PHMSA-approved FRP will be in place, all weather access and collection points will be staged strategically downstream of each lake crossing, and DAPL has committed to additional full scale open water and full scale winter/ice exercises that will be conducted at Lake Sakakawea and Lake Oahe. A full scale exercise will occur once every 3 years (triennial cycle) with the location and type of exercise occurring on alternating schedules (e.g. open water exercise at Oahe the first triennial cycle, followed by winter exercise at Sakakawea the following triennial cycle, followed by a winter exercise at Oahe the following triennial cycle, etc.). Stakeholder (federal, state, local, and Tribal) involvement will be solicited for each exercise. The first exercise will occur within the first 3 years after the pipeline becomes operational.

Submitted By: William Harlon (402-995-2500) Submitted On: May 24 2016.
Current Comment Status: Comment Closed

---

| Id | Discipline | Section/Figure | Page Number | Line Number |
|---|---|---|---|---|
| **6400963** | Risk Assessment | n/a | n/a | n/a |

Comment Classification: **Unclassified\\For Official Use Only (U\\FOUO)**
(Document Reference: FRP, GRP, Spill Models)

Can the FRP, 2 GRP's, and 2 spill models be downloaded onto ProjNet?

Submitted By: William Harlon (402-995-2500). Submitted On: Feb 20 2016

---

**1-0** Evaluation **Concurred**
These documents will be downloaded to ProjNet as they become available. DAPL will notify both Brent and William Harlon when each of these items have been uploaded.

Redacted Version of the FRP is attached.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Mar 17 2016  (Attachment: 2016_3_15_DAPL_North_FRP_Redacted.pdf)

---

*Backcheck not conducted*
**2-0** Evaluation **Concurred**
Attached, please find the revised Lake Oahe Spill Response Plan that has been updated based on comments and discussions with Brent Cossette and William Harlon.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Mar 21 2016  (Attachment: DAPL-Lake_Oahe_Spill_Model_Report_2016-03-18.pdf)

---

USACE_DAPL0072269

*Backcheck not conducted*

**3-0** Evaluation **Concurred**
Attached, please find the revised Missouri River Spill Response Plan that has been updated based on comments and discussions with Brent Cossette and William Harlon.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Mar 21 2016  (Attachment: DAPL-Missouri_River_Spill_Model_Report_2016-03-18.pdf)

---

*Backcheck not conducted*

**4-0** Evaluation **Concurred**
Attached, please find the revised Geographical Response Plan (GRP) for the Lake Oahe Crossing.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Mar 21 2016  (Attachment: 2016_3-20_Geographical_Response_Plan_Lake_Oahe.pdf)

---

*Backcheck not conducted*

**5-0** Evaluation **Concurred**
Attached, please find the revised Geographical Response Plan (GRP) for the Missouri River Crossing.

Submitted By: Jonathan Fredland (7134627121) Submitted On: Mar 21 2016  (Attachment: 2016_3-20_Geographical_Response_Plan_Missouri_River.pdf)

---

**5-1** Backcheck Recommendation **Open Comment**
The material requested has been provided but I unfortunately have to leave the comment open as a placeholder while the Corps reviews the documents.

Submitted By: William Harlon (402-995-2500) Submitted On: Mar 30 2016.

**6-0** Evaluation **Concurred**
Please close if review is complete.

Submitted By: Jonathan Fredland (7134627121) Submitted On: May 13 2016

---

**6-1** Backcheck Recommendation **Close Comment**
Closed without comment.

Submitted By: William Harlon (402-995-2500) Submitted On: May 24 2016.
Current Comment Status:

---

**UNCLASSIFIED\\FOR OFFICIAL USE ONLY**
Patent 11/892,984 ProjNet property of ERDC since 2004.

USACE_DAPL0072270

# FILED UNDER SEAL

Pursuant to Protective Order

USACE_DAPL0074092 –
USACE_DAPL0074110

# FILED UNDER SEAL

Pursuant to Protective Order

USACE_DAPL0074713 –
USACE_DAPL0074729