IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STANDING ROCK SIOUX TRIBE,

           Plaintiff,

   and

CHEYENNE RIVER SIOUX TRIBE,

           Plaintiff-Intervenor,

   v.

U.S. ARMY CORPS OF ENGINEERS,

           Defendant-Cross
           Defendant,

   and

DAKOTA ACCESS, LLC,

           Defendant-Intervenor-
           Cross Claimant.

Case No. 1:16-cv-1534-JEB
(and Consolidated Case Nos. 16-cv-1796
and 17-cv-267)

**PLAINTIFF STANDING ROCK SIOUX TRIBE'S MOTION
FOR SUMMARY JUDGMENT ON REMAND**

      Plaintiff Standing Rock Sioux Tribe hereby respectfully moves for summary judgment on

its claims that defendant U.S. Army Corps of Engineers' actions and decisions on remand are

arbitrary, capricious, and contrary to law.  For the reasons laid out in the accompanying

memorandum, the Tribe respectfully asks this Court to grant its motion for summary judgment,

vacate and remand the Corps' decisions challenged in this case, and direct the Corps to perform a

PLAINTIFF STANDING ROCK SIOUX TRIBE'S
MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534-JEB) - 1

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

full environmental impact statement as required by law.  This motion is accompanied by a

proposed order.

Respectfully submitted this 16th day of August, 2019.

/s/ Jan E. Hasselman
Jan E. Hasselman, WSBA # 29107
(Admitted Pro Hac Vice)
Stephanie Tsosie, WSBA # 49840
(Admitted Pro Hac Vice)
Patti A. Goldman, DCBA # 398565
Earthjustice
705 Second Avenue, Suite 203
Seattle, WA 98104
Telephone: (206) 343-7340
jhasselman@earthjustice.org
stsosie@earthjustice.org
pgoldman@earthjustice.org

*Attorneys for Plaintiff*

PLAINTIFF STANDING ROCK SIOUX TRIBE'S
MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534-JEB) - 2

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

## CERTIFICATE OF SERVICE

I hereby certify that on August 16, 2019, I electronically filed the foregoing *Plaintiff Standing Rock Sioux Tribe's Motion for Summary Judgment on Remand* with the Clerk of the Court using the CM/ECF system, which will send notification of this filing to the attorneys of record and all registered participants.

/s/ Jan E. Hasselman
Jan E. Hasselman

PLAINTIFF STANDING ROCK SIOUX TRIBE'S
MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534-JEB) - 3

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE,<br><br>         Plaintiff,<br><br>and<br><br>CHEYENNE RIVER SIOUX TRIBE,<br><br>         Plaintiff-Intervenor,<br>v.<br><br>U.S. ARMY CORPS OF ENGINEERS,<br><br>         Defendant-Cross<br>         Defendant,<br><br>and<br><br>DAKOTA ACCESS, LLC,<br><br>         Defendant-Intervenor-<br>         Cross Claimant. | Case No. 1:16-cv-1534-JEB<br>(and Consolidated Case Nos. 16-cv-1796<br>and 17-cv-267) |

**[PROPOSED ORDER] GRANTING PLAINTIFF STANDING ROCK SIOUX TRIBE'S
MOTION FOR SUMMARY JUDGMENT ON REMAND**

      This matter comes before the parties cross motions for summary judgment on remand.

Having reviewed the parties' pleadings, exhibits, and the entire record of this case, it is hereby

ORDERED that plaintiff Standing Rock Sioux Tribe's motion for summary judgment is hereby

GRANTED and the cross motions filed by defendant and intervenor are hereby DENIED.  The

final environmental assessment and finding of no significant impact, and Mineral Leasing Act

easement, that are the subject of this litigation are hereby VACATED and REMANDED to

[PROPOSED] ORDER GRANTING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534-JEB) - 1

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

defendant Army Corps of Engineers.  Because plaintiff has demonstrated that the impacts of the

defendant's decisions are "significant" under the National Environmental Policy Act ("NEPA"),

defendant is hereby DIRECTED to commence preparation of an environmental impact statement

as required by law.


IT IS SO ORDERED.



Dated:  _____          _____

                                        JAMES E. BOASBERG
                                        United States District Judge



Presented by:


*/s/ Jan E. Hasselman*
Jan E. Hasselman, WSBA # 29107
(*Admitted Pro Hac Vice*)
Stephanie Tsosie, WSBA # 49840
(*Admitted Pro Hac Vice*)
Patti A. Goldman, DCBA # 398565
Earthjustice
705 Second Avenue, Suite 203
Seattle, WA 98104
Telephone: (206) 343-7340
jhasselman@earthjustice.org
stsosie@earthjustice.org
pgoldman@earthjustice.org

*Attorneys for Plaintiff*


[PROPOSED] ORDER GRANTING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534-JEB) - 2

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 16, 2019, I electronically filed the foregoing

[PROPOSED] ORDER GRANTING PLAINTIFF STANDING ROCK SIOUX TRIBE'S

MOTION FOR SUMMARY JUDGMENT ON REMAND with the Clerk of the Court using the

CM/ECF system, which will send notification of this filing to the attorneys of record and all

registered participants.

*/s/ Jan E. Hasselman*
Jan E. Hasselman

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE,<br><br>               Plaintiff,<br><br>   and<br><br>CHEYENNE RIVER SIOUX TRIBE,<br><br>               Plaintiff-Intervenor,<br>   v.<br><br>U.S. ARMY CORPS OF ENGINEERS,<br><br>               Defendant-Cross<br>               Defendant,<br><br>   and<br><br>DAKOTA ACCESS, LLC,<br><br>               Defendant-Intervenor-<br>               Cross Claimant. | Case No. 1:16-cv-1534-JEB<br>(and Consolidated Case Nos. 16-cv-1796<br>and 17-cv-267) |

**MEMORANDUM IN SUPPORT OF STANDING ROCK SIOUX TRIBE'S
MOTION FOR SUMMARY JUDGMENT ON REMAND**

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

FACTUAL BACKGROUND......................................................................................2

    I.      BACKGROUND TO THE COURT'S 2017 SUMMARY JUDGMENT
          DECISION .................................................................................................2

    II.     THE COURT FINDS "SIGNIFICANT" FLAWS IN THE CORPS'
          FINAL EA. ...............................................................................................3

    III.   THE CORPS CONDUCTS A REMAND PROCESS THAT SHUTS OUT
          THE TRIBE...............................................................................................5

    IV.   THE REMAND AFFIRMS THE PRIOR "SIGNIFICANCE"
          DETERMINATION....................................................................................9

STATUTORY OVERVIEW .....................................................................................10

ARGUMENT............................................................................................................12

    I.      THE REMAND RELIES ON A FLAWED "WORST CASE" SPILL
          ESTIMATE. .............................................................................................13

          A.     The Corps' Decision Relied on a Deeply Flawed Worst Case
                 Discharge. ..............................................................................................13

          B.     The WCD Is Not Even a "Best Case" Scenario, Let Alone a
                 "Worst Case" One. ..................................................................................16

               1.     Failure to include detection time. ................................................17

               2.     Failure to include valve closure times or adverse weather
                    conditions. ...................................................................................20

          C.     The Flawed WCD Infects the Other Critical Remand Documents. ..........24

    II.     THE RISK ASSESSMENT ON REMAND IS ARBITRARY. ...........................26

          A.     Failure to Consider ETP Safety Record....................................................26

          B.     Failure to Implement Industry Best Practices ...........................................30

          C.     Failure to Address Unique Safety Risks of Bakken Crude......................32

MEMORANDUM IN SUPPORT OF STANDING ROCK SIOUX
TRIBE'S MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534-JEB) - i

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

III.    THE CORPS ARBITRARILY DISMISSES ENVIRONMENTAL
        JUSTICE IMPACTS...................................................................................34

        A.    The Oahe Crossing Indisputably Has Environmental Justice
              Impacts...................................................................................34

        B.    The Tribe will be Disproportionately Impacted by Harm to its
              Cultural Resources...............................................................36

        C.    The Corps Masks the Disproportionate Impacts on the Tribe. .................38

IV.    THE REMAND PROCESS VIOLATED NEPA AND CONSULTATION
        POLICIES...........................................................................................39

        A.    Consultation Policies Require a Good Faith Exchange of
              Information...........................................................................39

        B.    The Corps Conducted a Secretive Remand Process that Violated
              NEPA and its own Consultation Procedures. ...........................................42

V.     THE CORPS' NHPA ANALYSIS WAS UNLAWFUL. ...................................45

        A.    The Tribe's NHPA Claim Is "Capable of Repetition while Evading
              Review." ...............................................................................46

        B.    The Corps' Failed to Adequately Consider "Indirect" Effects. ................47

VI.    THE COURT SHOULD VACATE THE EASEMENT AND ORDER AN
        EIS......................................................................................................50

CONCLUSION...................................................................................................54

MEMORANDUM IN SUPPORT OF STANDING ROCK SIOUX
TRIBE'S MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534-JEB) - ii

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*American Rivers v. FERC*,
   895 F.3d 32 (D.C. Cir. 2018) ............................................................................. 10, 16, 26, 53

*Aldrich v. SEC*,
   139 F.3d 22 (D.C. Cir. 1998) .............................................................................................52

*Allen v. Nat'l Institutes of Health*,
   974 F. Supp. 2d 18 (D. Mass. 2013) ..................................................................................37

*Allina Health Serv. v. Sebelius*,
   746 F.3d 1102 (D.C. Cir. 2014) .........................................................................................51

*Ameren Services Co. v. Fed. Energy Reg. Comm'n*,
   880 F.3d 571 (D.C. Cir. 2018) ...........................................................................................51

*Biodiversity Conservation Alliance v. U.S. Bureau of Land Management*,
   404 F. Supp. 2d 212 (D.D.C. 2005) ...................................................................................42

*Cheyenne River Sioux Tribe v. Jewell*,
   205 F. Supp. 3d 1052 (D.S.D. 2016) ..................................................................................40

*Christian Knights of Ku Klux Klan Invisible Empire, Inc. v. D.C.*,
   972 F.2d 365 (D.C. Cir. 1992) ...........................................................................................46

*Citizens to Preserve Overton Park v. Volpe*,
   401 U.S. 402 (1971) ...........................................................................................................40

*In re Core Communs., Inc.*,
   531 F.3d 849 (D.C. Cir 2008) ............................................................................................52

*Crenshaw Subway Coal. v. Los Angeles Cty. Met. Trans. Auth.*,
   2015 WL 6150847 (C.D. Cal. Sept. 23, 2015) ............................................................ 38, 39

*CropLife America v. EPA*,
   329 F.3d 876 (D.C. Cir. 2003) ...........................................................................................51

*CTIA-Wireless Ass'n v. FCC*,
   466 F.3d 105 (D.C. Cir. 2006) ...........................................................................................49

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

*Diné Citizens Against Ruining Our Environment v. Bernhardt*,
    923 F.3d 831 (10th Cir. 2019) ............................................................. 53

*Greyhound Corp v. ICC*,
    668 F.2d 1354 (D.C. Cir. 1981) ........................................................... 52

*Humane Soc. of United States v. Zinke*,
    865 F.3d 585 (D.C. Cir. 2017) ............................................................. 51

*Kingdomware Techs., Inc. v. United States*,
    136 S. Ct. 1969 (2016) ........................................................................ 46

*In re Long–Distance Tel. Serv. Fed. Excise Tax Refund Litig.*,
    853 F. Supp. 2d 138 (D.D.C. 2012) ..................................................... 51

*Lower Brule Sioux v. Deer*,
    911 F. Supp. 395 (D.S.D. 1995)........................................................... 41

*Montgomery Envtl. Coal. v. Costle*,
    646 F.2d 568 (D.C. Cir. 1980) ............................................................. 46

*Morton v. Ruiz*,
    415 U.S. 199 (1974) ............................................................................. 40

*Nat'l Parks Conserv. Assoc. v. Semonite*,
    916 F.3d 1075 (D.C. Cir. 2019) ...................................................*passim*

*Nat'l Parks Conserv. Assoc. v. Semonite*,
    925 F.3d 500 (D.C. Cir. May 31, 2019) ............................................... 53

*Nat'l Women's Law Ctr. v. Office of Management and Budget*,
    358 F. Supp. 3d 66 (D.D.C. 2019) ....................................................... 51

*New York v. Nuclear Regulatory Comm'n*,
    681 F.3d 471 (D.C. Cir. 2012) ............................................................. 24

*Oglala Sioux Tribe v. Andrus*,
    603 F.2d 707 (8th Cir. 1979) ............................................................... 40

*Oglala Sioux Tribe v. U.S. Nuclear Reg. Comm'n*,
    896 F.3d 520 (D.C. Cir., 2018) ............................................................ 53

*Oregon Natural Desert Association v. Rose*,
    921 F.3d 1185 (9th Cir. 2019) ........................................................ 42, 45

*Ralls Corp. v. Comm. on Foreign Inv. in U.S.*,
    758 F.3d 296 (D.C. Cir. 2014)............................................................. 46

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

*SecurityPoint Holdings, Inc. v. TSA*,
  867 F.3d 180 (D.C. Cir. 2017) .......................................................................51

*Sierra Club v. FERC*,
  867 F.3d 1357 (D.C. Cir. 2017) ....................................................................39

*Sierra Club v. U.S. Dept. of Interior*,
  899 F.3d 260 (4th Cir. 2018) ........................................................................53

*Sierra Club v. U.S. Forest Serv.*,
  897 F.3d 582 (4th Cir. 2018) ........................................................................53

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  205 F. Supp. 3d 4 (D.D.C. 2016) ................................................. 45, 48, 49, 50

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  280 F. Supp. 3d 187 (D.D.C. 2017) .......................................................4, 5, 6

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  282 F. Supp. 3d 91 (D.D.C. 2017) ...........................................................4, 50

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  301 F. Supp. 3d 50 (D.D.C. 2018) .................................................................45

*Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*,
  249 F. Supp. 3d 516 (D.D.C. 2017) .............................................................44

*Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*,
  255 F. Supp. 3d 101 (D.D.C. 2017) .....................................................*passim*

*Stewart v. Azar*,
  313 F. Supp. 3d 237 (D.D.C., 2018) .............................................................51

*Theodore Roosevelt Conserv. Partnership v. Salazar*,
  616 F.3d 497 (D.C. Cir. 2010) ......................................................................41

*TOMAC v. Norton*,
  433 F.3d 852 (D.C. Cir. 2006) ......................................................................17

*United Keetoowah Band of Cherokee Indians in Oklahoma v. Fed. Comms.
  Comm'n*,
  2019 WL 3756373 (D.C. Cir. Aug. 9, 2019) ...............................................48

*Wedgewood Village Pharmacy v. DEA*,
  509 F.3d 541 (D.C. Cir. 2007) ......................................................................51

*WildEarth Guardians v. Zinke*,
  368 F. Supp. 3d 41 (D.D.C. 2019) ................................................. 20, 21, 53

MEMORANDUM IN SUPPORT OF STANDING ROCK SIOUX
TRIBE'S MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534-JEB) - v

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

*Wyoming v. Jewell*,
136 F. Supp. 3d 1317 (D. Wyo. 2015) ...............................................................................42

*Yankton Sioux Tribe v. Kempthorne*,
442 F. Supp. 2d 774 (D.S.D. 2006) ....................................................................................40


**Statutes**

33 U.S.C. § 1321(j)(5)(A)(i) ...................................................................................................13

54 U.S.C. § 300320 .................................................................................................................47

54 U.S.C. § 306102(b)(5)(A) ..................................................................................................49

54 U.S.C. § 306108 .................................................................................................................47

Mineral Leasing Act .................................................................................................................3

National Environmental Policy Act ................................................................................*passim*

National Historic Preservation Act § 106 .......................................................................*passim*


**Regulations**

33 C.F.R. Part 325, App. B(8)(f) ............................................................................................17

33 C.F.R. Pt. 325 App. C.5(f) .................................................................................................49

36 C.F.R. § 800.4(a)(1) ...........................................................................................................47

36 C.F.R. § 800.14(a) ..............................................................................................................49

40 C.F.R. § 1501.2 .............................................................................................................42, 43

40 C.F.R. § 1501.4(b) ........................................................................................................41, 44

40 C.F.R. § 1506.5(a),(b) ........................................................................................................17

40 C.F.R. § 1506.6 .............................................................................................................41, 44

40 C.F.R. § 1508.27(b) ............................................................................................................12

40 C.F.R. § 1508.28 .................................................................................................................10

40 C.F.R. § 1508.28(b) ............................................................................................................11

MEMORANDUM IN SUPPORT OF STANDING ROCK SIOUX
TRIBE'S MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534-JEB) - vi

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

49 C.F.R. § 192.905 ....................................................................................................... 12

49 C.F.R. § 194.05 .................................................................................................... 13, 22

49 C.F.R. § 194.105(b)(1) ................................................................................. 13, 14, 27, 29

49 C.F.R. § 195.452(f) .....................................................................................................5

49 C.F.R. § 195.452 .......................................................................................................45

**Federal Register**

58 Fed. Reg. 244 (Jan. 5, 1993) .......................................................................................18

70 Fed. Reg. 8734, 8740 (Feb. 23, 2005) ..................................................................... 22, 25

80 Fed. Reg. 26644 (March 13, 2014) ..............................................................................32

82 Fed. Reg. 5543 (Jan. 18, 2017) .....................................................................................3

**Other Authorities**

Andrew Maykuth, *Pennsylvania launches criminal investigation into Mariner
    East pipeline project,* Philadelphia Inquirer (March 12, 2019) ............................................28

MEMORANDUM IN SUPPORT OF STANDING ROCK SIOUX
TRIBE'S MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534-JEB) - vii

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

## INTRODUCTION

Over a year after this Court remanded the environmental analysis for the Dakota Access Pipeline ("DAPL"), the U.S. Army Corps of Engineers ("Corps") concluded that it would not provide the full environmental review required by law for federal actions with "significant" effects. While the decision came as a grave disappointment to the Standing Rock Sioux Tribe ("Tribe"), it was not a surprise. The remand was a sham from its inception. The Corps never re-evaluated any of the controversial key assumptions that went into its finding of non-significance. It never engaged with the Tribe or its technical experts, shared critical information, or responded to the Tribe's concerns. Instead, the Corps outsourced most of the remand to DAPL, and ignored the Tribe's criticisms as well as its demands for transparency. The result is an irretrievably flawed decision, developed through a process that fell far short of legal standards. With DAPL's proposal to double the flow of the pipeline, the unexamined risks to the Tribe continue to grow.

The National Environmental Policy Act ("NEPA") requires more. This Court gave the Corps a second chance to fix "significant" flaws in its initial findings. Instead, the remand only uncovered more problems. The remand rests on a broken technical foundation, first by relying on a fundamentally flawed "worst case" discharge estimate, and second, by ignoring critical issues, like DAPL's abysmal safety record, in its risk analysis. The remand traded one gerrymandered environmental justice analysis for another, with the Corps still unwilling to acknowledge that siting the pipeline immediately upstream of the Standing Rock Reservation presents serious environmental justice concerns. The process itself, in which the remand was conducted behind closed doors, was inconsistent with NEPA and binding Tribal consultation policies. The Tribe highlighted these problems during the remand again and again, to no avail. This Court should set aside the remand decision, order the Corps to prepare an EIS, and vacate the easement until the Corps fully complies with the law.

MEMORANDUM IN SUPPORT OF STANDING ROCK SIOUX
TRIBE'S MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-01534-JEB) - 1

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

FACTUAL BACKGROUND

I.      BACKGROUND TO THE COURT'S 2017 SUMMARY JUDGMENT DECISION

        This Court is already familiar with much of the background of this dispute, which pits

multiple Native American Tribes against a major crude oil pipeline crossing unceded ancestral

homelands.  *See Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 255 F. Supp. 3d

101, 114-20 (D.D.C. 2017) ("*Standing Rock III*").  The Standing Rock Sioux Tribe is a federally

recognized Indian Tribe and successor to the Great Sioux Nation, or *Oceti Sakowin*.  Since time

immemorial, its members have lived, hunted, fished, and practiced religious ceremonies in a way

that it is intimately tied to the landscape adjacent the Missouri River.  Starting in the mid-1800s,

the Great Sioux Nation and the United States government entered into treaties in which a

substantial portion of the North American plains were reserved for the "absolute and undisturbed

use and occupation" of the Sioux.  ECF 117-1 at 11.  The United States violated the promises it

made in the treaties, and Congress enacted statutes that stripped vast areas of land out of the

Sioux reservation, creating the scattered system of smaller reservations that exists today.  *Id*.  In

the 20th century, the U.S compounded that legacy of dispossession by building a dam on the

Missouri River that inundated the best remaining lands on the Standing Rock reservation, forcing

hundreds of families from their homes.  These losses were devastating to the Tribe's economy

and culture, and their effects still are felt profoundly today.  Historians have described the

construction of the Missouri River dams as "without doubt, the single most destructive act ever

perpetuated on any Tribe by the United States."  RAR 7486-87 (Oahe Dam "destroyed 99% of

the timber" on the reservation and reduced wild game and plant supply by 75%).

        The debate over the Dakota Access Pipeline ("DAPL") played out against this backdrop

of government-imposed trauma and its attendant societal effects.  DAPL proposed to traverse the

Missouri at Lake Oahe just a half mile upstream of the Standing Rock reservation, crossing

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

Sioux treaty lands that were stolen.  ECF 117-1 at 7.  The Oahe crossing site is rich in cultural

significance, and the placement of a massive crude oil pipeline beneath the river—considered

sacred by the Tribe and central to ceremonies essential to Tribal identity—was a grave threat.

Accordingly, the Tribe vigorously opposed the siting of the pipeline from its inception, including

by filing this lawsuit against the Corps for authorizing portions of the pipeline without adequate

environmental and cultural reviews.  *Id.* at 7-8.  The Tribe's principled opposition to DAPL

attracted global attention, and led to one of the largest gatherings of Native peoples in modern

times.  After this Court denied the Tribe's motion for a preliminary injunction in September,

2016, the U.S. government announced that it would give additional consideration to the Tribe's

concerns, refusing to grant the Mineral Leasing Act ("MLA") easement pending further review.

*Standing Rock III*, 255. F. Supp. 3d at 117.  By December 2016, the Corps decided that no

easement would be issued without a full environmental impact statement ("EIS"), which was to

focus on the impacts of the pipeline on the Tribe, and route alternatives.  *Id.* at 119; 82 Fed. Reg.

5543 (Jan. 18, 2017) (notice of intent to prepare EIS).  President Trump reversed that decision

immediately upon assuming office in January of 2017, and directed the Corps to issue the

permits. *Standing Rock III*, 255. F. Supp. 3d at 119-20.

II.       THE COURT FINDS "SIGNIFICANT" FLAWS IN THE CORPS' FINAL EA.

The Tribe promptly filed a motion for summary judgment challenging the Corps'

reversal.  In June 2017, a few weeks after DAPL became operational, this Court issued a

decision granting the motion in part.  While upholding the Corps' finding that "the risk of an oil

spill is low," *id.* at 127, the Court found that the Corps' Final Environmental Assessment ("Final

EA"), USACE_DAPL 71220, had failed to consider expert critiques, raising questions about

whether the project was "highly controversial" under the regulations—one of the criteria that

MEMORANDUM IN SUPPORT OF STANDING ROCK SIOUX
TRIBE'S MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534-JEB) - 3

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

triggers a full EIS.  *Id.* at 129.[1]  The Court also faulted the Corps' environmental justice analysis

and its failure to assess the impacts of an oil spill on the Tribe's hunting and fishing rights.

While upholding the Corps' NEPA compliance in other respects, the Court characterized these

flaws as "substantial."  The Court remanded the FONSI and EA back to the Corps for additional

analysis.  The Court later denied the Tribe's request to vacate the easement.  *Standing Rock*

*Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F. Supp. 3d 91 (D.D.C. 2017) ("*Standing Rock*

*IV*").  In that decision, the Court found that the "disruptive consequences" of shutting down the

pipeline did not weigh in favor of remand without vacatur.  *Id.* at 107 ("vacatur would be, at

most, an invitation to substantial inconvenience").  However, the Court found a "substantial

possibility" that the Corps would be able to substantiate its decision not to prepare an EIS.  *Id.* at

101.  The Court nonetheless admonished the Corps that "[c]ompliance with NEPA cannot be

reduced to a bureaucratic formality, and the Court expects the Corps not to treat remand as an

exercise in filling out the proper paperwork *post hoc*."  *Id.* at 109.  In a subsequent opinion, the

Court reaffirmed that it had the authority to impose conditions on the pipeline during the remand,

and found conditions warranted in light of the risk of an oil spill that could "wreak havoc on

nearby communities and ecosystems."  *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,

280 F. Supp. 3d 187 (D.D.C. 2017).  The Court ordered completion of oil spill response plans

and a third-party compliance audit, as well as regular reporting from DAPL to the Court.  *Id.*[2]

---

[1] There is some tension between these two parts of the Court's order, as a primary focus of the expert critiques was, in fact, the risk of oil spills.  *Standing Rock III*, 255 F. Supp. 3d at 129.

[2] As to the audit, although the Court ordered DAPL to select an independent auditor "in consultation with the Tribes," DAPL actually selected an auditor over the Tribe's objections, unilaterally dictated the scope of the audit, and conducted it behind closed doors.  ECF 336. Even so, the audit documented multiple examples of non-compliance with easement conditions. For example, the audit revealed that DAPL had not complied with easement conditions requiring that it submit its risk assessment and an operations and maintenance ("O&M") manual to the Corps.  ECF 347-2 at 7.  Indeed, the DAPL-specific documentation required by the easement

MEMORANDUM IN SUPPORT OF STANDING ROCK SIOUX
TRIBE'S MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534-JEB) - 4

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

III.     THE CORPS CONDUCTS A REMAND PROCESS THAT SHUTS OUT THE TRIBE.

Just weeks after the Court's summary judgment decision, Tribal Chairman Dave

Archambault II wrote the Corps to "begin a dialogue" and "address the importance of the Corps

providing a full opportunity for Tribal participation" in the remand.  RAR 13278.  The Chairman

explained that the Tribe was in possession of critical information relevant to the remand, and

urged the Corps not to "rubber-stamp" DAPL's analyses without sharing information with the

Tribe's technical experts.  RAR 13282.  Months passed with no response.  In late September, the

Tribes received a short form letter asking for data on fishing licenses and permits, harvest

reports, and related studies.  RAR 13325.  The letter also asked that the Tribe "verify the

completeness" of a list of documents previously submitted by the Tribe.  *Id.*  The Tribe promptly

replied, noting that the information requested was "framed far too narrowly" and "does not

adequately address the full range of matters" within the scope of the remand.  RAR 13275.  The

letter highlighted the urgency of allowing the Tribe to review DAPL's technical submissions.

"The Tribe has a right to see what is being claimed and what the Corps is considering, and to

provide appropriate technical and legal responses."  RAR 13276.  A response from the Corps to

the new Chairman, Mike Faith, responded to none of these concerns and instead simply

expressed a willingness to meet with the Tribe—but only once written submissions had been

provided.  RAR 11998.

Chairman Faith promptly responded, expressing alarm that the Corps was seeking to

"unilaterally determine what information you will consider and when."  RAR 11258.  The letter

criticized the Corps for failing to discuss spill risks and impacts, "suggesting that you plan to

---

simply does not exist, RAR 4499-4500 (no DAPL specific O&M plan), even though required by
federal law for HCA sites.; 49 C.F.R. § 195.452(f).  The Tribe has pointed out DAPL's
noncompliance with the easement, but the Corps has never taken any action.  RAR 3342.

MEMORANDUM IN SUPPORT OF STANDING ROCK SIOUX
TRIBE'S MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534-JEB) - 5

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

give no meaningful consideration to any new information." *Id.* The letter called out the interrelated nature of the flaws identified by this Court, specifically noting how "the determination of worst case spill discharge (the subject of robust criticism from multiple independent experts) would have a significant effect on both hunting and fishing and environmental justice concerns." *Id.* The letter also identified technical materials that the Tribe requested for review. When no response was received, the Tribe tried again in early January, outlining in detail the Corps' legal obligations to consult, and affirming that a "data request is not consultation." RAR 11227. No response was ever received to this letter.

While the Corps was stonewalling the Tribe, it was closely partnering with DAPL to justify the original decision. RAR 10353. Its first official step, on August 24, 2017, was to effectively outsource the remand to DAPL, asking for a "technical analysis on a rupture or spill" and a "factual and technical analysis that addresses" the various expert critiques identified by this Court. RAR 13605. In fact, the Corps went so far as to outsource key legal questions, asking DAPL to determine whether the expert reports submitted by the Tribes met the "highly controversial" standard under NEPA. RAR 13606. This close collaboration extended even to DAPL's litigation counsel in this case. RAR 6379.[3] The first version of the Corps' final remand report was drafted by DAPL and sent to the Corps for review in early February, 2018, long before the completion of any technical reports like the spill model. RAR 10097. Even though the Corps had neither met with nor received any information from the Tribe, that first draft declared that the Corps "had identified no new information" calling into question the original

---

[3] For example, the Corps' counsel observed that the "risk analysis" provided by DAPL "more describes how a risk analysis would be done rather than providing any actual analysis," and inquiring if anything further was available. RAR 6379. DAPL's litigation team responded by scheduling a telephone call. RAR 6378. No further discussion on the topic is evident.

MEMORANDUM IN SUPPORT OF STANDING ROCK SIOUX
TRIBE'S MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534-JEB) - 6

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

determination of insignificance.  RAR 10165.[4]  This dismissive language remained through multiple drafts and was incorporated into the final version, even though the Tribe provided extensive "new information" calling the results into question.  RAR 813; RAR 001.

The Tribe's efforts to contribute to the remand were severely hampered by the Corps' persistent refusal to share any technical information, such as revised spill models.  Even so, on February 21, the Tribe presented the Corps with a comprehensive technical report, with multiple appendices, running several hundred pages.  RAR 7499 ("Remand Report").  The Report uncovered significant, persistent flaws with the Corps' approach to assessing both risk and consequences, as well as extensive cultural information on the impacts of a spill.  Chairman Faith's cover letter observed that the Corps appeared to be wrapping up the remand process but still had not consulted with the Tribe, and urged the Corps "in the strongest possible terms" to "fully evaluate the impacts that an oil spill would have on our way of life…"  *Id.*

As the remand sped towards a predetermined conclusion, the Tribe sought every opportunity to get the Corps to engage in good faith.  For example, the Tribe passed the first of multiple resolutions highlighting the continued risks of the pipeline and the urgency for full reconsideration of the critical issues.  RAR 6387.  The resolution highlighted the fact that "the estimates of a worst case oil release…are based on unrealistic assumptions, and the environmental impacts of an oil spill are far greater than disclosed…"  RAR6387-88.  The resolution highlighted the cultural importance of hunting and fishing on the reservation, the cumulative harm from past activities like construction of Oahe Dam, and the company's abysmal safety and compliance record.  RAR 6388.  Another resolution highlighted a range of technical

---

[4] Similarly, the meeting notes from a meeting in September 2018 between DAPL and the Corps—literally the first step in the remand process—declared that "there is no new information that would lead to a change in the likelihood of a rupture or spill" at Oahe.  RAR 13336.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

concerns, this time focusing on the flawed "independent audit" that DAPL conducted without

Corps oversight.  RAR 3152.  Concerned that the remand process was "in jeopardy of producing

a deeply flawed result," the Tribe also asked this Court to order the Corps to provide the Tribe

with the technical information it sought, and to consult with the Tribe.  ECF 336 at 8.[5]

The first meeting between Corps staff and Tribe took place in March, 2018.  RAR 5820.

Tribal elected officials, staff, and experts laid out in detail the litany of flaws in the DAPL risk

and consequence analysis, the flaws in the remand process, and the lack of transparency involved

in the Corps' refusal to share technical information.  *Id.*; RAR 4120 (list of fifty technical

questions).  On May 22, Col. Hudson finally met with the Tribe's staff and Council for the first

time in the nearly year-old remand process and betrayed a complete lack of familiarity with any

of the issues that the Tribe had raised.  RAR 3287.  The Colonel acknowledged that he was

unaware that the government's oil spill response plan for the Missouri included a "worst case"

spill estimate over four times larger than DAPL's—even though the Tribe had laid out this

problem on several occasions.  RAR 3288.  Even so, Col. Hudson refused to reconsider the

flawed worst case estimate, or any of the other critical issues identified by the Tribe.  *Id.*  After

the meeting, the Tribe urged him again to revisit the issue, highlighting even more data

challenging the Corps' conclusions.  *Id.*  It also submitted a package of materials focusing on the

abysmal safety record compiled by DAPL's corporate parents, Energy Transfer Partners ("ETP")

and Sunoco.  RAR 335.[6]

---

[5] The Court denied the motion and observed that the Tribe was free to make its arguments in "the post-remand briefing that the Court expects will occur."  ECF 352, at 2.

[6] Around the same time, Tribal staff and the Corps engaged in a separate set of communications pertaining to spill response planning, as directed by the Court in the Order imposing conditions during the remand.  Those discussions are not the focus of this motion.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

IV.     THE REMAND AFFIRMS THE PRIOR "SIGNIFICANCE" DETERMINATION.

On August 31, 2018, the Corps concluded the remand process with a short memo announcing that it had uncovered no "significant new circumstances or information" that would warrant additional NEPA review at the Oahe crossing—the same conclusion that DAPL drafted for it at the start of the remand process.  RAR 01.  The decision document is supported by an analysis that discussed each of the three flaws identified by this Court.  RAR 03 ("Remand Analysis").  It is further supported by three documents: a technical analysis of an oil spill in Lake Oahe ("Spill Model Report"), RAR 8743; a review of oil spills on "downstream receptors" ("Downstream Receptor Report"), RAR 2739; and a "review and analysis of Tribes' submissions" ("Submission Review"), RAR 141.  All four documents were drafted by DAPL, although the Remand Analysis and Submission Review were finalized by the Corps.

As to Tribal hunting and fishing, the Remand Analysis summarizes the results of the technical studies and concludes that the risk of a spill would be low and that impacts to fish and wildlife would be minor.  Remand Analysis, at 1-47.  As to environmental justice, the Report mostly relies on the same purportedly limited risk and impacts, but also finds that more minorities and low-income people would be harmed by a spill in the alternative pipeline route since that route would affect more people overall.  *Id.* at 42-99.  The Corps section on "controversy," i.e. disagreement among experts as to critical facts, is the most mysterious. Basing its findings on the Submission Review, the Remand Analysis announces that of the 339 comments it received, almost all either reflected either a "misunderstanding" of previous analyses, or a "general disagreement" about scope.  *Id.* at 107.  Only 28 of those comments, the Corps concludes, could be seen as "potentially disputing the conclusions reached by the Corps." *Id.*  This review walks through the 28 comments and dismisses them.  Oddly, the vast majority of these 28 comments preceded the Court's summary judgment decision, for example, expert

MEMORANDUM IN SUPPORT OF STANDING ROCK SIOUX
TRIBE'S MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534-JEB) - 9

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

reports that were part of the previous administrative record or filed in this case.  Only three of the 28 issues arise from Standing Rock's hundreds of pages of comments during the remand, and in each case address a single, narrow issue.  In all, the Corps' efforts to address the Tribe's extensive technical submissions (which were repeatedly emphasized in meetings, letters, and resolutions) amount to roughly one page of the Remand Analysis.

Since then, the risks presented by DAPL are poised to increase significantly.  DAPL has filed materials with four state utility commissions announcing its intention to increase the operation of the pipeline from 570,000 barrels a day to 1.1 million.[7]  Such an action would not just materially alter the Corps' environmental review, but would violate the terms of the easement, which are limited to the operations plan already considered by the Corps.  ESMT 009. To the Tribe's knowledge, DAPL has not sought any permission from the Corps for the proposal.

## STATUTORY OVERVIEW

The determination as to whether an action has a "significant" enough impact to trigger an EIS requires consideration of both "context" and "intensity." 40 C.F.R. § 1508.28.  As to context, "significance varies with the setting of the proposed action."  *Id.*  "Considering context is critical because the significance of an action can vary based on the setting and surrounding circumstances*." American Rivers v. FERC*, 895 F.3d 32, 49 (D.C. Cir. 2018).  As to intensity, CEQ regulations list several factors that can trigger a finding of significance warranting an EIS. These factors include: "unique characteristics of the geographic area such as proximity to historic or cultural resources," the degree to which the effects are "likely to be highly controversial;" and the degree to which the effects are "highly uncertain or involve unique or

---

[7] *See* https://psc.nd.gov/database/documents/19-0204/008-020.pdf.  The Court should take judicial notice of these official agency documents.  FRE 201.

MEMORANDUM IN SUPPORT OF STANDING ROCK SIOUX
TRIBE'S MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534-JEB) - 10

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

unknown risks." 40 C.F.R. § 1508.28(b).  As the D.C. Circuit affirmed this year, the Court's role in a NEPA challenge is to determine whether the agency is "able to make a convincing case" for its finding of no significant impact.  *Nat'l Parks Conserv. Assoc. v. Semonite*, 916 F.3d 1075, 1082 (D.C. Cir. 2019).  "Implicating *any one* of the [intensity] factors may be sufficient to require the development of an EIS."  *Id.* (emphasis added).

In *Semonite*, the D.C. Circuit applied these standards to find unlawful a Corps determination that electrical transmission lines through an historic area did not involve sufficiently significant impacts to warrant an EIS.  First, the Court found that robust technical criticism from entities with "special expertise" triggered a finding that the action was "controversial" under NEPA.  *Id.* ("If such comments, representing just a small sample of the many criticisms in the record, do not cast substantial doubt on the adequacy of the Corps' methodologies, then we are unsure what would.") (internal citations omitted).  The decision cited "repeated criticism from many agencies who serve as stewards of the exact resources at issue, not to mention consultants and organizations, with on-point expertise."  *Id.* at 1085.[8]  The Court also found that the "unique characteristics" of the historic area visually impacted by the transmission lines weighed in favor of an EIS.  Because the Corps failed to make a "convincing case" that an EIS was unnecessary, *id.* at 1087-88, the Court directed the Corps to prepare an EIS.  *See supra* at § VI.

---

[8] Some of these comments had been withdrawn after the change in administrations.  However, the Court found the fact that "two Interior Secretaries had diametrically different views about the same project on the same facts simply reinforces its controversial nature."  *Id.* at 1085.  Here, the Advisory Council on Historic Preservation, the Environmental Protection Agency, and the Solicitor of the Department of Interior all strongly criticized the Corps' environmental analysis.  The Corps ultimately chose to prepare an EIS.  While the Corps' decisions were reversed (and the Solicitor's memo withdrawn) by the Trump administration, these reversals similarly highlight the project's "controversial" nature.

MEMORANDUM IN SUPPORT OF STANDING ROCK SIOUX
TRIBE'S MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534-JEB) - 11

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

ARGUMENT

In the Final EA, the Corps concluded that the impacts of the DAPL crossing of the Missouri River were so insignificant that no EIS was required.  The Corps affirms that conclusion in the Remand Analysis.  That decision is deeply flawed in both substance and in process.  The "context" for its decision is a place of extraordinary importance to the Tribe; a landscape of profound cultural and religious importance; and the water supply for the Tribe and millions of others.  It takes place on land promised to the Sioux in perpetuity by the U.S. government only to be stolen a few years later, and on land condemned for construction of Oahe Dam, which destroyed the best lands left on the reservation.  The Missouri River is also a designated high consequence area ("HCA") under federal law, which requires heightened protections from crude oil pipelines.  49 C.F.R. § 192.905.  In other words, the Corps' authorization of a major oil pipeline that puts the Tribe at risk did not take place on a blank slate, but in a context of a profoundly special place and a pattern of government-imposed trauma.

As to the "intensity" factors, the Corps' dismissal of the risks and impacts of oil spills in the Missouri implicates multiple factors indicating that an EIS is warranted.  This Court has ruled that an agency's conclusion that no EIS is needed is unlawful where "scientific or other evidence…reveals flaws in the methods or data relied upon by the agency."  *Standing Rock III*, 255 F. Supp. 3d at 128.  The D.C. Circuit emphasized the importance of this factor in *Semonite*, where it relied on technical critiques of a Corps' EA to find it unlawful.  916 F.3d at 1082.  The persistent critiques of the Corps' analysis during the remand record also highlight how both spill risks and impacts are "uncertain" and involve "unknown" risks—precisely the kind of risks that should be tested through a full EIS process.  40 C.F.R. § 1508.27(b).  Intensity is also implicated by the presence of cultural and historic resources that were and could be affected.  *Id*.

MEMORANDUM IN SUPPORT OF STANDING ROCK SIOUX
TRIBE'S MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534-JEB) - 12

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

I.      THE REMAND RELIES ON A FLAWED "WORST CASE" SPILL ESTIMATE.

    A.      <u>The Corps' Decision Relied on a Deeply Flawed Worst Case Discharge.</u>

Federal law requires onshore pipeline operators to develop a "worst case discharge"

("WCD") analysis as part of their oil spill response planning.  33 U.S.C. § 1321(j)(5)(A)(i); 49

C.F.R. § 194.05.  PHMSA regulations define WCD to be

> the *largest* volume, in barrels (cubic meters), of the following: (1) The pipeline's
> *maximum* release time *in hours*, plus the *maximum* shutdown response time *in hours*
> (based on historic discharge data or in the absence of such historic data, the operator's
> best estimate), multiplied by the *maximum* flow rate expressed in barrels per hour (based
> on the *maximum* daily capacity of the pipeline), plus the largest line drainage volume
> after shutdown of the line section(s) in the response zone expressed in barrels….

*Id*. § 194.105(b)(1) (emphasis added).  Development of a valid WCD is critical to assessing the

potential consequences of a pipeline to human health, the environment, and Treaty resources, and

preparing emergency response plans that ensure resources are available in the event of a disaster.

DAPL first generated a WCD at the Oahe crossing early during the approval process.  Remand

Analysis, at 19 n. 10 (methodology for WCD came from May 2016 Wood Group spill model);

RAR 6565 (referring to "original spill model with a worst case discharge of more than 12,000

barrels").  That initial model claimed a WCD of 12,501 barrels of crude oil at the Oahe crossing.

USACE-DAPL 74725.  While it did not specifically document all of the assumptions that went

into this conclusion, it claimed that the pipeline could be shut down in 12.9 minutes.

USACE_DAPL 74721 ("The mainline pumps are shutdown within 9 minutes of detection, and

the adjacent block valves are completely closed within an additional 3.9 minutes.")  However,

internal discussions reveal that the WCD was based on the nine-minute pump shutdown time

only.  USACE_DAPL 72253.  The WCD was determined by multiplying the pipeline's pumping

rate (416.6 barrels per minute) by the time it would take to shut down the pumps (nine minutes),

accounting for 3,750 barrels.  Added to this is the oil between the pumps that would drain out

MEMORANDUM IN SUPPORT OF STANDING ROCK SIOUX
TRIBE'S MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534-JEB) - 13

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

through a breach once valves are closed, an additional 8,751 barrels.  *Id.*

Even prior to any external critique, evidence in the record indicated that this WCD wildly underestimated the real worst case.  An internal Corps review highlighted the fact that the Mid-Missouri Subarea Contingency Plan ("SACP"), an EPA-developed spill regional response plan, "conservatively" estimated a WCD from a 30-inch pipeline on the Missouri to be 50,000 barrels—over four times as large as DAPL's WCD.  USACE_DAPL 72184 ("I noticed some of your data does not appear to correlate to the Mid-Missouri SACP"); 72252 (recommending spill models that are "consistent" with mid-Missouri plan).  The Corps never addressed these comments.[9]  The Final EA referenced the WCD in support of the conclusion that the pipeline's risks and impacts were too insignificant to trigger an EIS.  *See, e,g,* USACE_DAPL 72377.

The WCD also came under repeated criticism prior to issuance of the easement.  For example, the Tribe prepared an expert critique of the Corps' risk analysis that strongly critiqued the WCD and emphasized the importance of realistic detection and response times in assessing the worst case spill.  ESMT 1079 ("all too many recent failures have released oil well beyond the claimed pipeline worst case determinations").  The Tribe also devoted considerable attention to the issue in its scoping comments on the proposed EIS.  RAR 7681.  The analysis dug into the specifics of the spill detection system, highlighting numerous unsupported assumptions and citing numerous real world examples of spills where those assumptions proved false.  RAR 7686 (discussing barriers to proper spill detection)  The scoping document recommended a worst case release assumption of eight hours, which reflected the "actual (proven in use) performance" of the pipeline's emergency systems.  RAR 7689. The Interior Solicitor also cited PHMSA's WCD

---

[9] Even so, DAPL submitted a Facility Response Plan ("FRP") that falsely claimed to be consistent with the Mid-Missouri SCAP.  USACE_DAPL 71784.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

regulation and highlighted the Corps' duty to consider a valid "worst case" scenario.  ESMT 594.

In the litigation that ensued, the Tribe pointed to these and other critiques of the WCD, highlighting, for example, how the proposed response times were "highly unlikely" and that they wrongfully assumed valves would "close immediately."  ECF 195 at 13, *citing* ESMT 1078 (Accufacts report); ESMT 624 (EarthFax report).  It submitted expert declarations that called out the wildly unsupported response and closure times embedded in the Corps' WCD.  Holmstrom Decl. (ECF 272-4) at ¶ 8-9; Kuprewicz Decl. (ECF 118-1) ¶ 15-20.[10]  The Court cited these critiques in finding that the Corps had failed to consider the degree to which the project's impacts are likely to be "highly controversial."  *Standing Rock III*, 255 F. Supp. 3d at 129.

Once this Court remanded the EA back to the Corps, the WCD became a primary focus.  An entire section of the Tribe's Remand Report was devoted to the flaws in the WCD, RAR 7500-06, and the cascading problems that result from it, like underestimating the impacts of benzene contamination in Lake Oahe.  RAR 7497.  The Tribe showed how the nine-minute shutdown time on which the WCD is based is "**incomplete and grossly underestimates the WCD.**"  RAR 7503 (emphasis in original).  It repeatedly called out the gulf between the WCD and the Mid-Missouri SCAP estimate of 50,000 barrels, even handing paper copies of both to Corps staff.  RAR 6578.  The Tribe's March 2018 resolution highlighted the weakness of the WCD, listing eight separate factors that called the WCD into question.  RAR 6391.  The Tribe described the shortcomings of the WCD to the Corps in detail in meetings. RAR 5820: RAR 3299; RAR 4112 (WCD "**is totally and completely unrealistic.**") (emphasis in original).

Remarkably, however, the Corps never revisited the flawed WCD at any point during the

---

[10] Although the Court declined to consider these declarations on summary judgment, they were included in the remand record.  RAR 1461 (Holmstrom); RAR 1427 (Kuprewicz).

MEMORANDUM IN SUPPORT OF STANDING ROCK SIOUX
TRIBE'S MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534-JEB) - 15

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

remand.  Nor did it otherwise address the repeated, detailed expert critiques of the WCD.

Instead, it simply incorporated the original WCD into the final Remand Analysis, without

making any effort to address any of the expert criticisms.  Remand Analysis, at 18, 108.[11]  It

supplemented the original barrel estimate with an additional, lower estimate for a WCD at the

valve site, although the calculations for the estimate are not provided.  The Remand Analysis

says not a word about the persistent critiques of the WCD, but simply restates the original

estimates, and even falsely claims that they are "very conservative."  Remand Analysis, at 108.

An internal Corps technical review not once brought up the issue of the WCD.  RAR 8455.  The

Submission Review says nothing at all about the Mid-Missouri SCAP, the completely unrealistic

response times, the failure to address adverse weather conditions, and other factors.  RAR 141.

Worst of all, the Corps doubled down on the flawed WCD by allowing DAPL to build it into the

Spill Model and Downstream Receptor Report—the two primary technical documents that arose

out of the remand.  Remand Analysis, at 18-21.

      B.      <u>The WCD Is Not Even a "Best Case" Scenario, Let Alone a "Worst Case" One.</u>

      The WCD—which lies at the heart of the Corps findings as to NEPA significance—is

inconsistent both with the governing PHMSA regulation and the evidence in the record.  Rather

than a true "worst case" situation involving the "largest foreseeable" release based on detection

and shutdown times measured "in hours," in "adverse weather conditions," the Corps derived a

WCD from assumptions that are literally impossible to achieve.  RAR 6387-88.  Despite

sustained critiques, the Corps never subjected the DAPL-supplied WCD to scrutiny.  Its failure

to do so is not just arbitrary and capricious, it is inconsistent with NEPA.  *American Rivers*, 895

---

[11] At some point, the original 12,501 barrel estimate shifted to a figure a few barrels higher.  *Id.*
at 18.  The reasons for this shift are not evident from the record.

MEMORANDUM IN SUPPORT OF STANDING ROCK SIOUX
TRIBE'S MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534-JEB) - 16

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

F.3d at 50 (agency's "acceptance, hook, line, and sinker, of Alabama Power's outdated estimates, without any interrogation or verification of those numbers, is, in a word, fishy."); 40 C.F.R. § 1506.5(a),(b) (agency must "independently evaluate the information submitted and shall be responsible for its accuracy"); 33 C.F.R. Part 325, App. B(8)(f) ("In all cases, the district engineer should document in the record the Corps' independent evaluation of the information and its accuracy…").

As the Tribe has explained repeatedly, the WCD "is based on a 'best case' scenario in which all systems function precisely as intended—i.e., the incident is discovered as quickly as physically possible, the correct decision and response is immediately initiated, and all equipment such as controls, sensors, pumps and valves function as intended."  RAR 1465; RAR 3288.  It assumes a spill will be detected *literally* instantaneously; that the pumps will be closed in the shortest conceivable time with no room for human or technological error; that the valves will close instantly despite the impossibility of doing so, especially because of the lack of backup power; and that no setbacks will be encountered despite the challenging winters in North Dakota. Each of these flaws was carefully documented by the Tribe.  The Corps ignored it all, in violation of NEPA.  *TOMAC v. Norton*, 433 F.3d 852, 860 (D.C. Cir. 2006) (court must ensure that "no arguably significant consequences have been ignored").[12]

1.      *Failure to include detection time.*

A critical flaw in the WCD is the absence of *any* detection time, i.e., the time it takes for a major spill to be discovered and acted upon by the people in the control room.  Instead, the WCD assumes a spill is detected and the decision made to shut off the pipeline *instantaneously*.

---

[12] Of course, none of the Corps' WCD analysis reflects DAPL's new plan to double the flow of the pipeline to 1.1 million barrels per day.

MEMORANDUM IN SUPPORT OF STANDING ROCK SIOUX
TRIBE'S MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534-JEB) - 17

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

RAR 14985.  This grave error was carefully documented by the Tribe.  RAR 7501.  The Remand

Report cited both the PHMSA WCD regulation as well as guidance that calls for "detection

time" to be included in WCD estimates.  *Id. citing* 58 Fed. Reg. 244 (Jan. 5, 1993) ("The

operator must determine and utilize a realistic shutdown time based on the pipeline's operating

and design characteristics, including leak detection and shutdown capability.").  The Tribe also

documented how PHMSA itself has found that the spill detection technology touted by DAPL

actually detects leaks in a small percentage of cases.  RAR 7505 (remote detection systems in

place at DAPL detect leaks between 20% and 28% of the time).  ESMT 1271.  Indeed, this is

acknowledged in ETP's own Facility Response Plan.  RAR 6459.  The Tribe repeatedly urged

that the time "from the initiation of the leak until discovery be measured in hours rather than

minutes," as the WCD regulation directs.  RAR 7405.

In the real world, spills and leaks take hours or even days to detect and to make the

decision to shut off the pipeline.  A 2016 leak in ETP's Permian II pipeline released 8,600

barrels over twelve days before it was detected.  RAR 7491.  It took seventeen hours to detect

and shut down the massive Kalamazoo River breach, which spilled 30,000 barrels of oil.  RAR

1331.  While this litigation was underway, a nearby oil pipeline ruptured—spilling almost the

identical amount of oil as DAPL's "worst case" scenario.  RAR 1294; RAR 1920.  That pipeline

was six inches in diameter (DAPL is 30 inches) and the spill went unnoticed for hours after

remote systems failed to identify the incident.  RAR 1345-47.  A 2013 pipeline spill in North

Dakota released 20,000 barrels, far more than DAPL's WCD.  RAR 16686.  These real-world

examples reveal that the "worst case" estimate for DAPL—involving literally zero detection

time—is not just flawed, but absurd on its face.[13]

---

[13] The Corps' failure to account for detection time is particularly mystifying since it was an issue

MEMORANDUM IN SUPPORT OF STANDING ROCK SIOUX
TRIBE'S MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534-JEB) - 18

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

Despite this wealth of evidence relating to the missing detection time, the Remand

Analysis does not even mention the issue.  The only references to detection time state that the

system is "capable" of detecting leaks within an hour and ruptures "within 1 to three minutes,"

Remand Analysis, at 123, ignoring that the WCD omits even these modest estimates.  The

Submission Review takes a different tack, claiming that detection time is already accounted for:

> According to ETP, the *typical time of detection for a WCD rupture is less than 1 minute*
> through SCADA and LeakWarn systems, which trigger the alarms and initiate the
> shutdown procedure.  The reference to the mainline pumps being shutdown within 9
> minutes of detection is not just limited to pump shutdown time *as it already includes 1
> minute for time of detection*.
>
> As indicated in the response to Comment L31, the Corps reviewed the Lake Oahe
> Crossing Report numerous times resulting in numerous revisions by the applicant.
> DAPL's 12.9 minute (total) is based on the sum of the time to detect a break on the line
> and shutdown pumps (9 minutes) and the time to close the valves (3.9 minutes for
> standard valves).  These times have been consistently presented and utilized in the
> calculations of the FBR volume at Lake Oahe.

RAR 254 (emphasis added).  This startling last-minute assertion is at odds with everything else

in the record.  The original source for the WCD—the first Oahe spill model—declared "mainline

pumps are shut down *within 9 minutes of detection*," USACE_DAPL 74721 (emphasis added),

indicating that the nine minutes are initiated after a spill had been detected and the decision to

shut down the pipeline was made.  Any ambiguity was clarified in a later iteration of the

document that stated that "pump stations are *designed to shut down* in 9 minutes."  RAR 14985

(emphasis added); USACE_DAPL 72253 (same).  There is not a word about "detection time"

---

prior to the remand.  The Tribe pointed to extensive record evidence that the claimed leak
detection systems were far less effective than claimed, ECF 195 at 19, and describing detection
and shutdown times as "startlingly optimistic."  *Id*. at 20.  The Tribe documented how "[m]any
recent pipeline failures spilled far more than their claimed 'worst case discharges.'"  *Id*. at 21;
2nd Holmstrom Decl. (ECF 342-1) at ¶ 11 ("the WCD calculation that forms the basis of the oil
spill response plan is gravely underestimated. It does not appear to include any time at all to
detect the release, even though this can be hours or days.")

MEMORANDUM IN SUPPORT OF STANDING ROCK SIOUX
TRIBE'S MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534-JEB) - 19

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

being included in the nine-minute pump shut-down estimate anywhere in the record.

Finally, even if a single minute of detection time were built into the model, which it was not, the notion that a pipeline spill would be detected and acted on within one minute is an appalling misrepresentation of the record, decades of real-world experience, and governing regulations. Events have repeatedly proven that major spills take hours or days to detect and act on. Nothing in the record supports a one minute detection time.[14] Where a plaintiff shows that the "magnitude of effects is significantly higher" than represented in a NEPA document, an EA must be set aside. *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 82 (D.D.C. 2019). The Corps consistently ignored the Tribe's input related to detection time, and treated the pre-remand WCD as a *fait accompli*. NEPA requires more.

> ## 2. *Failure to include valve closure times or adverse weather conditions.*

Once pumps are shut down in a spill, the next step is to close the valves (also known as emergency flow restriction devices or "EFRDs") on either side of Lake Oahe to prevent remaining oil in the pipeline from draining out. Closure of these valves is critical; once pumps are shut down, an additional 21,000 barrels would drain into Oahe unless the valves are fully closed—almost tripling the WCD. Remand Analysis, at 118. However, the WCD ignores several issues with respect to this critical step, all of them carefully documented in the record.

As a threshold matter, it takes around four minutes to shut down the valves via remote control *after* a spill is detected and the pumps turned off. USACE_DAPL 74721. But the WCD does not account even for these minutes. USACE_DAPL 72253; RAR 14967, 14985. Instead, it

---

[14] The Remand Analysis states that DAPL's system is "capable" of detecting a rupture "within 1 to 3 minutes." Remand Analysis, at 123. The Corps' use of the very lowest end of the scale is yet another example of how it relies on the most aggressively optimistic, best case assumption rather than the mandatory worst case.

MEMORANDUM IN SUPPORT OF STANDING ROCK SIOUX
TRIBE'S MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534-JEB) - 20

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

is based only on the amount of oil lost during the nine-minute pump shutdown time, plus the drain-down of the pipeline between the valves once they are shut. *Id*. The Tribe explicitly brought this flaw to the Corps' attention. RAR 7501. In response to this concern, the Corps falsely stated that the WCD incorporates the 3.9 minute valve closure. RAR 254; Remand Analysis, at 117 (rejecting criticism that valves would close immediately because closure time of three minutes is assumed); *id*. at 124. This inexplicable omission, by itself, results in a significant underestimate of the WCD that by itself renders the Corps analysis useless.

Unfortunately, the mistake gets substantially worse. The 3.9 minute claim is itself a "best case" scenario which doesn't account for any technical or human error or the time required for control room operators to interpret and act upon data. RAR 7501. As the Tribe pointed out many times, such assumptions have no place in a "worst case" estimate. RAR 1465 ("People make mistakes. Equipment malfunctions. Systems are deficient."). One problem, repeatedly brought to the Corps' attention, is the potential loss of power at the valves. Even the Corps concedes that the valves require an adequate power supply in order to close, and in the event of a loss of power, valves would remain open in a rupture. Remand Analysis, at 119. However, the valves are connected to the local power grid and lack any backup power supply, and hence will not close in the event of a power outage—a foreseeable event in the remote area around Lake Oahe. RAR 14888 (threat assessment report acknowledges that "only primary power" is provided at Oahe valve site); RAR 3325 (acknowledging that "electrical availability" is a key issue, and even noting the existence of "power failure alarms").

The Tribe brought this issue to the Corps' attention repeatedly. It wrote a letter to the Corps specific to this issue, and then made a second request for the Colonel to conduct a site visit so he could see for himself. RAR 3332; RAR 3319 (calling out the lack of backup power in the

MEMORANDUM IN SUPPORT OF STANDING ROCK SIOUX
TRIBE'S MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534-JEB) - 21

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

Tribe's "50 Questions" document).  In its May 2018 resolution, the Tribe cited the Corps' failure to ensure backup power at the valves, describing it as a "significant oversight and a major flaw." RAR 3154; *see also* RAR 3288 ("I explained that we often have lightning strikes out here on the prairie.  Secondary power and safety system instrumentation should be strictly required, but the Corps has not done so.").  Indeed, "remote backup power" is required by the easement, and "manual shut-off" only permissible "where personnel are in proximity."  ESMT 39.

But the Corps never made any effort to address the Tribe's concerns about the potential loss of power at the valves, even though it would result in an additional 21,000 barrels of oil spilled into Lake Oahe.  Early in the process, the Corps recognized that alternative power supply was important to maintain the integrity of the remote detection system, but never extended that concern to the valves themselves.  USACE_DAPL 72169.  In the Submission Review, the Corps fails to respond to the Tribe's repeated requests that it either provide backup power at the valves, or build the possibility of a power failure into its WCD analysis.  Instead, it simply observes that there is a manual "hand-wheel" on the valves that allow for manual closure.  RAR 157. However, the "worst case" spill estimate does not account for any time at all to close the valves, to say nothing of the time required to drive out to both sides of the remote Oahe crossing locations to manually close them.  At the pipeline's WCD discharge rate of 416 barrels a minute, it would take less than an hour for the full 21,000 barrels to drain out of the pipe.

The failure to address the loss of power at the valves is particularly inexplicable in light of the requirement that the WCD address adverse weather conditions—the most foreseeable cause of a power outage.  49 C.F.R. § 194.5.  PHMSA rules confirm that in determining the WCD, operators "are required to consider the weather history for the area surrounding the pipeline and the effects of adverse weather on the time needed to shut down a pipeline."  70 Fed.

MEMORANDUM IN SUPPORT OF STANDING ROCK SIOUX
TRIBE'S MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-01534-JEB) - 22

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

Reg. 8734, 8740 (Feb. 23, 2005). The Tribe repeatedly called out this issue to the Corps. RAR 7465 ("DAPL does not address the adverse weather impact on the WCD for the shutdown of the pipeline. Issues include harsh ND winter conditions, deep snow, extreme cold and availability and operation of the shutdown valves in extreme environments."); 7500 (discussing weather impacts).[15] It noted the importance of adverse weather on determining a WCD in its May 2018 resolution. RAR 6388 ("DAPL does not address the adverse weather impact on the WCD for the shutdown of the pipeline" in light of "hard ND winter conditions, deep snow, extreme cold").

Adverse weather conditions are critical in other respects too. The 2015 Poplar pipeline spill on the Yellowstone River occurred when the river was frozen over, inhibiting response and delaying clean up. RAR 7474; RAR 2806 ("Winter conditions combined with thawing of the ice cover resulted in unsafe working conditions and only a limited amount of oil could be recovered from the river.") Oil travelled sixty miles downriver. RAR 7474.[16] While Lake Oahe spends a good portion of the year frozen, the WCD does not in any way reflect that detection could be delayed and response worsened by iced-over conditions. The WCD gave zero consideration to weather conditions and how they could contribute to a power outage. Instead, the Corps simply assumes that spills would be detected instantaneously, that valves could close instantaneously,

---

[15] The Corps' "response" to this concern was no response at all, simply affirming that DAPL had the ability to "safely and quickly" respond to emergencies, and that the valves would be unaffected by cold. RAR 248.

[16] Based on the experience of the 2015 Poplar pipeline spill, the EPA pointed out early in the process that a Bakken crude spill during iced-over conditions created "unique" risks that caused impacts to be higher than would be expected, and made several recommendations for addressing the greater risks. USACE_DAPL 5747. The Corps rejected those recommendations, asserting that the Poplar pipeline carried heavier crudes, not Bakken. USACE_DAPL 72433. The Corps was wrong. RAR 7474. The Corps further claimed that a Bakken spill would remain trapped at the surface of the water under the ice. USACE_DAPL 72433. This is contradicted by its own spill model, which finds that oil would be entrained in the water column. RAR 8749 (25-29% of spilled oil would be entrained in top few meters).

and that all of the human and mechanical systems would work perfectly to shut down the pumps

in the fastest times conceivable.  Its reliance on manual closure of the valves ignores not just the

time it would take to close the valves, but the fact that "adverse weather conditions" could make

it impossible to do so.  That is not in any respects a valid "worst case" scenario.

      C.     The Flawed WCD Infects the Other Critical Remand Documents.

      The Corps' failure to address the shortcomings of the WCD is no minor matter, as it lies

at the heart of the Corps' remand conclusion that no EIS is required.  Remand Analysis, at 16,

40.  The Corps compounded the error by building the WCD into the two key technical reports

that emerged from the remand process.  The Spill Model Report studies the impacts of two spills:

the WCD and a smaller spill that was deemed more likely to occur, RAR 8747, falsely claiming

this estimate is "highly conservative."  RAR 8779.  Neither DAPL nor the Corps ever studied a

larger volume—like the EPA's 50,000 barrel estimate, or one that included a reasonable time to

detect a spill, or the additional 21,000 barrels that would spill in the event of valve failure—that

would more accurately reflect a true "worst case" scenario.[17]  As a result, the report's

conclusions about the fate and impacts of an oil spill are irretrievably flawed.

      The Downstream Receptor Report picks up where the Spill Model leaves off, and

assesses the impacts of the mistaken WCD on fish, wildlife, and people.  RAR 2753.[18]  When the

Corps sent these two documents to its internal reviewers, it did not provide any of the Tribe's

---

[17] Even so, the DAPL-prepared spill study was forced to concede that the results of a WCD had "the potential to be both significant and adverse, on time scales that range from days to years." RAR 8953; *New York v. Nuclear Regulatory Comm'n*, 681 F.3d 471, 482 (D.C. Cir. 2012) (EIS for accident can be avoided only where agency shows overall harm is "insignificant").

[18] These reports have been reviewed by the Tribe's technical team and found to be deeply flawed themselves.  Because the Court has not allowed submission of extra-record evidence, the Tribe does not have an opportunity to discuss those flaws here.  Suffice it to say that these flaws are amplified by the fact that the reports are based on a hopelessly inadequate WCD.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

critiques or even mention the criticisms of the WCD.  RAR 12006.  Not surprisingly, the

technical comments also failed to identify the problem, focusing narrowly on whether the

"model" that was used was well accepted.  RAR 12009.  Thus, while the Corps' internal

reviewers may have "validated" DAPL's spill modelling methodology, Remand Analysis at 11,

they never questioned the single most important premise built into the model—the amount of oil

that would wind up in the water in a "worst case" spill.  Here again, the Tribe labored to bring

these concerns to the attention of the Corps, even though these technical reports were withheld

from it.  For example, in its Remand Report, the Tribe explained in detail how the analysis of

benzene on human health in the event of a spill was premised on an impossibly low worst case

spill volume.  RAR 7497.  As the Tribe explained, an analysis based on a valid WCD would

yield benzene concentrations over 1000 times the "maximum contaminant level" allowed under

federal law.  *Id*.  The Corps never said a word in response to this concern.

* * *

This Court previously found that the Corps' NEPA analysis was "significantly" flawed in

three key respects.  At the heart of each of those three issues was the Corps' faulty assumption

that the impacts of an oil spill would be modest.  However, in conducting the remand, the Corps

never actually revisited this key assumption.  Instead, it left a heavily criticized, controversial,

and arbitrary WCD in place, and built that estimate into additional technical analyses.  The

WCD—which forms the core of the remand's affirmation of the original significance

determination—was subject to "consistent and strenuous opposition, often in the form of

concrete objections to the Corps analytical processes and findings" from entities "with subject-

matter expertise." *Semonite*, 916 F.3d at 1086.  This is more than enough to trigger an EIS under

CEQ's "controversy" and "uncertain risks" factors.  If an EIS can be required on electrical

transmission lines that would spoil the view, surely a 30-inch oil pipeline crossing under one of

MEMORANDUM IN SUPPORT OF STANDING ROCK SIOUX
TRIBE'S MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534-JEB) - 25

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

the nation's most critical water supplies, in a culturally rich landscape, deserves the same. *Id.* at

1087; *see also American Rivers*, 895 F.3d at 55 (vacating dam relicensing decision due to failure

to prepare an EIS). As the D.C. Circuit said in *Semonite*, "Congress created the EIS process to

provide robust information in situations precisely like this one, where, following an

environmental assessment, the scope of a project's impacts *remain both uncertain and

controversial.*" *Id.* at 1088 (emphasis added). Nothing less is warranted here.

## II.    THE RISK ASSESSMENT ON REMAND IS ARBITRARY.

While the WCD addresses the impacts of a "worst case" spill, a risk assessment addresses

the chances that an incident will take place. While this Court previously upheld the Corps'

conclusion that the risk of a spill was low, it also found that the Corps failed to grapple with

expert critiques, many of which were focused on spill risk. *Standing Rock III*, 255 F. Supp. 3d at

125-30. Accordingly, the question of risk was a key issue in the remand, and the Tribe

documented several errors in the Corps' undercounting of risk. The Corps never addressed any

of these issues. Indeed, it did no new work on the question of spill risk at all: the main technical

reports address what happens when a WCD spill occurs, not the likelihood of one. As noted

above, the Corps waved off 311 of 339 substantive comments as based on a "misunderstanding

of previous analysis" or "general disagreement with the scope of the analysis." Remand

Analysis, at 107. Of the 28 comments it did address, none involves the controversy around risk.

### A.    Failure to Consider ETP Safety Record.

During the last phase of this litigation, the Tribe consistently called out the record of

DAPL's corporate parents, ETP and Sunoco, which have the worst safety record in the industry.

ESMT 1278 (Sunoco "is responsible for over 200 pipeline spills and leaks since 2010 alone,

which means it spills crude oil more frequently than any of its competitors"); RAR 1464

(highlighting importance of considering past performance in assessing risk); RAR 7645 (EIS

MEMORANDUM IN SUPPORT OF STANDING ROCK SIOUX
TRIBE'S MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534-JEB) - 26

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

scoping comments).  Once the remand kicked off, the Tribe took every opportunity to highlight

anew the importance of including ETP's cavalier approach to safety in the Corps' risk

determination.  RAR 6377; RAR 6388 ("ETP and Sunoco prior performance was not considered

in a valid risk assessment").  In its Remand Report, the Tribe explained in detail how the risk of

an incident was much higher for DAPL than national averages indicate.  RAR 7506-09.  The

Report explains how ETP/Sunoco pipelines experienced 421 spills between 2006 and 2017, a

rate of three a month, "the most of any pipeline operator for that period."  *Id.*  It revealed how

Sunoco pipeline projects had been shut down four times in three states recently, an

"unprecedented" level of enforcement.  RAR 7409.[19]

Ignoring an operator's safety record is not just arbitrary, it is contrary to law.  PHMSA

regulations require consideration of "historic discharges," i.e., the operators' record, in

calculating a pipeline's WCD.  RAR 7503; 49 C.F.R. § 194.105(b)(1).  Industry "best practices"

also require consideration of past spill incidents in assessing risk and developing safety plans.

RAR 7510-11; RAR 7503.  The Tribe's Remand Report discussed past disasters, like Sunoco's

recent major spill on the Permian II pipeline, and highlighted the need for including this issue in

an evaluation of risk.  *Id.*  The Tribe supplemented this information as the remand process

unfolded.  RAR 4116 (Sunoco described in Pennsylvania legislative hearing as "bad apple" and

"rogue company," with "wanton disregard for the safety" of communities).  In July of 2018, the

Tribe sent in additional comments specifically focusing on the issue.  RAR 335.  Even so, during

a meeting with the Tribe, "Corps officials appeared unfamiliar with the concerns regarding

---

[19] During the project's initial internal review, a Corps commentator observed that the WCD
calculations were "unclear," and asked whether DAPL was "using historic discharge" or
something else.  USACE_DAPL 72252.  The response indicated that neither historic data nor a
surrogate was built into the WCD.  *Id.*  The issue appears to have been dropped.

MEMORANDUM IN SUPPORT OF STANDING ROCK SIOUX
TRIBE'S MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534-JEB) - 27

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

unevaluated risks" and the importance of considering ETP's safety record.  RAR 336.  The Tribe

submitted a comprehensive report that "reveals widespread noncompliance" by ETP, noting that

"noncompliance is systemic" at the company's pipelines.  RAR 377.  That report observed one

reportable incident at ETP/Sunoco pipelines every 11 days over 15 years, releasing 87,000

barrels of oil and other hazardous liquids.  RAR 379.  The Tribe also attached a recent decision

from the Pennsylvania Public Utilities Commission shutting down an ETP pipeline and stopping

construction at another, finding that the company's deliberate mismanagement created "an

imminent risk" to the public.  RAR 414 (ordering shutdown "before a potential catastrophic

event occurs"); RAR 416 ("given the release and accident history of Sunoco, there is a grave risk

of rupture").  The Ohio Department of Environmental Protection concluded that Sunoco's

attitude was "dismissive" of public health and safety.[20]  RAR 336.  The Corps' chief legal

counsel summarily dismissed this critical information in a short email, claiming it was "[n]othing

that was new information or changes the remand decision."  RAR 330.  Similarly, when

informed of a DAPL spill that occurred during construction, the Corps dismissed it since the spill

"was not on Corps property," even though consistent with a nationwide pattern of carelessness.

RAR 560.  Nor did the Corps show any concern when information showed eight spills on ETP's

Bakken pipeline (of which DAPL is a part) in its first year of operation.  RAR 9526.

    The Remand Analysis does nothing with this information, and continues to simply cite

national averages of all pipeline accidents without any special consideration of ETP's record.

Remand Analysis, at 11.  At the last minute, the Corps added a paragraph to the Analysis that

---

[20] Since then, things have only gotten worse.  The state of Pennsylvania and two counties have
initiated criminal proceedings against ETP/Sunoco over their repeated violations at the Mariner
East pipeline.  *See* Andrew Maykuth, *Pennsylvania launches criminal investigation into Mariner
East pipeline project,* Philadelphia Inquirer (March 12, 2019).

MEMORANDUM IN SUPPORT OF STANDING ROCK SIOUX
TRIBE'S MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534-JEB) - 28

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

touches on the subject.  Remand Analysis at 133-34; RAR 235-36; RAR 736 (language added in

August 2018).  Oddly, it refers only to the Tribe's earlier litigation declaration, and ignores the

extensive information about ETP's safety record provided during the remand.  In responding to

the Tribe's request that ETP's safety record be considered, the Corps simply quoted an ETP

executive's litigation declaration saying that the company had several "targeted, system-wide

programs or site-specific PHMSA and state inspections for existing pipeline systems and new

construction."  Remand Analysis, at 133-34.  The declaration also observed that 70% of the

hundreds of ETP/Sunoco pipeline incidents in recent years "were confined to the operators'

property."  *Id.*  The Corps deems these sufficient to account for the issue, despite the fact that

whether or not a spill incident is confined to an operators' property is not actually material to the

question of "risk," and even though the company's various "safety" programs had not prevented

a worst-in-the-industry pattern of noncompliance.  RAR 384 (current ETP pipeline project has

"resulted in over 2.4 million gallons of spills, over 100 notices of violations and other non-

compliance issues, and 6 stop-work orders").  The Corps also complains that the Tribe had not

identified a "specific alternative methodology or particular criteria or performance metrics that

the Corps should have considered," and dismisses the issue on that basis too.  Remand Analysis,

at 134.  But the Tribe *did* identify a specific proposal: stop discounting risk by relying on

national averages, and evaluate it in light of ETP's safety and compliance record, as regulations

and industry best practices demand.  The Tribe even specifically provided the Corps with API

"recommended practices" for safety systems.  RAR 339; RAR 1464.  The record is otherwise

silent on this issue. [21]   The Corps' dismissal of the issue of ETP's record does not reflect any

---

[21] The record contains two reports on risk produced by DAPL, a "Threat Assessment" and a
"Risk Analysis," neither of which says a word about ETP/Sunoco's abysmal record.  RAR
14919; 14861.

MEMORANDUM IN SUPPORT OF STANDING ROCK SIOUX
TRIBE'S MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534-JEB) - 29

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

legitimate grappling of a key issue, in violation of NEPA.

      B.     <u>Failure to Implement Industry Best Practices</u>

The Final EA claimed that DAPL would "meet or exceed" all regulatory standards as well as industry standards, making it so safe that no EIS was required.  USACE_DAPL 71312; 71319 (Tribe will not be impacted due to "state of the art construction techniques").  Indeed, it explicitly claimed that DAPL would "follow standards" of the API and other industry bodies. *Id*.; *see also* 71263 (FRP intended to satisfy the requirements of API 1174).  That claim was never true—there was and is no evidence that DAPL meets the API's rigorous design and safety standards, which did not even appear in the administrative record.  The Tribe showed how DAPL did not come close to complying with API best practices.  RAR 1464 ("the PHMSA standards that are applicable to the Dakota Access Pipeline…are predominately out of date with key modern standards" like API); *id*. at § 32 (discussing API 1173, which emphasizes "safety culture" and processes).  The Tribe provided an entire section in its EIS scoping comments on these standards, focusing on how the EA's failure to assess compliance with API 1173 and other standards was a "major failing" of the EA that needed to be addressed.  RAR 7641.

During the remand, the Tribe took every opportunity to point out that API standards require a far more detailed set of processes to manage safety, reduce risks, and address accidents than provided under PHMSA regulations or the easement conditions.  As the Tribe and many others have shown, PHMSA regulations are indisputably weaker than API standards promised in the Final EA—indeed the inadequacy of PHMSA regulations is why the industry felt a need to adopt better voluntary standards.  RAR 7511 ("The finding that current pipeline regulations are inadequate has been identified in numerous recent government reports, recommendations, studies, and Congressional action."); RAR 7639-40 (discussing PHMSA's failure to implement Congressional safety directives and National Transportation Safety Board recommendations).

MEMORANDUM IN SUPPORT OF STANDING ROCK SIOUX
TRIBE'S MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534-JEB) - 30

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

The Tribe also demonstrated how the EA's promise to implement "best practices" like API standards was illusory.  For example, the Remand Report explained how API 1173 establishes ongoing safety processes and management systems that are a critical improvement on PHMSA regulatory minimums.  RAR 7510.  It discusses API 1133, which addresses criteria for pipelines in High Consequence Areas, and API 1175, which governs leak detection systems, and which was developed in response to broad recognition that existing approaches—including those adopted by DAPL—are insufficient.  RAR 7511.  The Tribe highlighted how "DAPL and the Corps of Engineers stated in the Final EA that they would follow the requirements in API RP 1174," which governs spill response planning, but that "it must be emphasized here that DAPL has fulfilled none of those provisions…"  RAR 7522.  The Tribe's resolutions also highlighted the failure to implement API standards.  RAR 3153; RAR 6392.

The Corps ignores or evades these repeatedly expressed concerns.  The Remand Analysis does not say a word about API 1173, 1174, and 1175—the most up-to-date standards for pipeline management and response—or any other industry best practice.  The Submission Review acknowledges the existence of the Tribe's concerns, but does not provide any coherent response.  In response to the Tribe's critique that DAPL should be required to implement API 1173, the Corps responded that it was implementing API 1130, a different API standard addressing different topics.  RAR 173, 273; RAR 3328.[22]  In other places, the Corps backpedals, asserting that DAPL is consistent with regulatory standards, RAR 232-34, without acknowledging either that they are weaker or that it had previously promised more.  The record reveals zero internal discussion about the issue, or even the recognition that the claim that DAPL would meet API

---

[22] API 1130 does not even appear in the record, indicating that the Corps never made any effort to ensure DAPL was compliant with that standard either.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

"best practices" was false.  Not a single Corps staffer questioned the basis for the claim.  Not one email suggests that the Corps intends to require what the EA promises, or asks whether the Corps can evade an EIS with the false promise of using API standards.  *See, e.g,* RAR 8455.  To the contrary, DAPL produced a "risk assessment" report that yet again claimed to compare DAPL operations to "industry best practices," but then is silent about the key API risk management and response standards.  RAR 14869.[23]  As with every major concern, the record reflects a sham review designed to paper over flaws, not grapple with serious expert critiques and controversy.

C.    Failure to Address Unique Safety Risks of Bakken Crude.

A final risk factor that the Tribe emphasized throughout the remand was the special risks posed by Bakken crude oil, which is uniquely flammable and toxic compared to other forms of crude.  The Remand Report devoted an entire chapter to the issue.  RAR 7492.  That discussion highlighted how the "starting point for any effective chemical safety risk assessment" is to deal with the "specific harm from the hazardous materials that may be released" in an incident.  RAR 7493.  It discussed the unusual dangers of explosive Bakken crude, which were brought into sharp and tragic focus in a 2013 rail disaster that killed 47 people.  *Id.*  The Tribe's Report discussed how the "higher concentration of lighter hydrocarbons" in Bakken crude presented unique risks to first responders, the public, and the environment during spills.  RAR 7495.  Both PHMSA and the state of North Dakota have issued safety alerts calling out Bakken crude's unusual flammability.  RAR 7493; *see also* 80 Fed. Reg. 26644 (March 13, 2014) (safety standard for "high hazard flammable" oil transportation).

---

[23]  The proposed doubling of the pipeline volume highlights the importance of these standards. Under API 1173, proposed operational changes have to identify and address "potential risks" and provide an "analysis of implications."  RAR 362.  Because the Corps never actually made compliance with API standards a condition—contrary to the promise in the EA—nothing holds DAPL to meeting this standard before doubling pipeline volumes.

MEMORANDUM IN SUPPORT OF STANDING ROCK SIOUX
TRIBE'S MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534-JEB) - 32

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

The Tribe emphasized these safety concerns in its many letters, meetings, and resolutions.  RAR 7633 (EIS scoping comments); RAR 11260 (seeking information from the Corps on composition of Bakken crude and how its specific hazards will be addressed); RAR 6388 (March 2018 resolution discusses greater health and safety risks in Bakken crude); RAR 4113 (properties of Bakken crude "create an elevated risk of acute and chronic health risks" that have never been evaluated); RAR 8733 ("composition of Bakken crude will influence its behavior upon a release").  After the May 2018 meeting, Chairman Faith emphasized that the crude carried by DAPL "poses unique health risks as compared to heavier crude oils," but that the Corps had told him that it "had not ever considered this."  RAR 3289 (requesting that Corps consult with Indian Health Service on vulnerable population impacts).

The Corps never addressed the issue in any serious way.  Nothing about the safety risks of explosive Bakken crude appears in the Remand Analysis.  All of the technical studies—such as the Spill Model and Downstream Receptor report—were generated based on generic information about crude oil generally, not Bakken specifically.  No special provisions in the facility response plans or geographic response plans—which are supposed to identify what to do in the event of a release—make any provision for Bakken's unusual and well-documented safety risks.  In the Submission Review, the Corps dismisses concerns about Bakken risks by citing a 2012 emergency planning guidebook, RAR 237, even though that document preceded the Quebec rail disaster, multiple federal and state safety warnings (including several from PHMSA), and other recent data on Bakken dangers.  RAR 16018 (PHMSA 2014 guidance "reinforcing the requirement to properly test, characterize, classify and where appropriate degasify hazardous materials prior to and during transportation").  It also dismisses Bakken's flammable properties by pointing out the PHMSA and state safety alerts did not specifically

MEMORANDUM IN SUPPORT OF STANDING ROCK SIOUX
TRIBE'S MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534-JEB) - 33

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

apply to pipelines, as if this somehow alters the oil's chemical properties in a spill.  RAR 251.[24]

Simply put, Bakken presents unique risks, and those risks need to be addressed in determining

whether the Oahe crossing presented "significant" impacts under NEPA.  The Corps barely made

any attempt to do so, instead cherry picking citations to pretend the problem did not exist.

III.    THE CORPS ARBITRARILY DISMISSES ENVIRONMENTAL JUSTICE IMPACTS.

A.    The Oahe Crossing Indisputably Has Environmental Justice Impacts.

"The purpose of an environmental justice analysis is to determine whether a project will

have a *disproportionately* adverse effect on minority and low income populations."  *Standing

Rock III*, 255 F. Supp. 3d at 140 (emphasis added).  Citing CEQ guidance, this Court found the

Corps' environmental justice analysis deficient in two key respects: first, it failed to accurately

consider the full geographic area that would be impacted by an oil spill, and second, it neglected

to consider the Tribe's "distinct cultural practices" that would be affected by a spill.  *Id.*  The

Corps was required to reconsider these issues on remand.

During the remand, the Tribe provided extensive comments on the environmental justice

implications of locating the crossing at Lake Oahe.  First, it submitted declarations from Tribal

members who use areas in and around Lake Oahe for cultural and subsistence practices, and in

some instances, the areas under Lake Oahe before it was flooded.  Steven Sitting Bear describes

how hunting and fishing have been essential to his life, from his childhood ("basically we had to

hunt or we would not eat"), to his college education ("If it were not for the hunting and fishing

resources on the Reservation that provided a way for me to enhance my economic situation, I

would not be where I am today").  RAR 7749-51.  Geraldine Agard, as an elder, relies on a

_____

[24] The claim is also untrue, as many standards apply generically and hence to DAPL too.  *See, e.g.,* RAR 7493 (state vapor pressure standards); RAR 7633 (National Response Team concerns about Bakken).

MEMORANDUM IN SUPPORT OF STANDING ROCK SIOUX
TRIBE'S MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534-JEB) - 34

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

designated hunter to receive game and, in turn, shares it within her community.  RAR 7771.

Reliance on game is not just an issue of subsistence, but a deeply embedded, traditional cultural

practice inextricable from Tribal members' identity.  The Tribe also highlighted the use of plants

for subsistence, cultural, and medicinal purposes.  For Butch Thunder Hawk, gathering plants for

food and medicine is also a cultural and community activity.  RAR 7756.  These opportunities

were greatly diminished after the Corps flooded the reservation to construct Oahe Dam, and

preserving plants is of paramount importance today.  RAR 7758; RAR 7768 ("We have to keep

our earth and soil and water clean so we can use it for medicine.  If oil gets into the ground, then

we cannot use the plants for medicine.  There are things that we have to use which must be

pure").  Other resources are present along Lake Oahe and the Missouri River, such as rocks used

to heat sweat lodges.  *Id*.  The water from the Lake is also used in cultural and spiritual practices.

RAR 7762 ("We still go to the Missouri River to get water that we use for sweats and other

ceremonies").  The water itself is a vital component in sustaining the Tribe's cultural, spiritual,

and subsistence practices: "When we were asked how we use the water or how we view the

Missouri River, we answer – *Mni Waconi*.  We have heard this term since we were little and it is

the only way to describe how important the River is to us.  We know how to live off the land and

the water, and the game, fish and plants which are given life by the water.  We know how to take

care of ourselves.  But we cannot survive if the water is polluted."  RAR 7774.

The Tribe supplemented this testimony with a detailed report by two of the nation's

preeminent experts in assessing environmental justice impacts.  RAR 3803.  The report provided

a detailed quantitative analysis of the minority and low-income populations affected by the Oahe

crossing, and compared them to the North Bismarck route alternative.  The results were stark: the

report identified "large racial disparities" with the Oahe crossing that "indicate serious

MEMORANDUM IN SUPPORT OF STANDING ROCK SIOUX
TRIBE'S MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534-JEB) - 35

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

environmental justice concerns."  Specifically, the report estimates that the population

percentage of Tribal members alone is between 9.2 and 17 times greater for the Oahe crossing

than the North Bismarck alternative.  RAR 3813.  For example, even using the methodology that

results in the least detailed data, the report found that 60.7% of the population below the Oahe

crossing is minority while the population below the alternative site is only 9.35%.  RAR 3829.

"The dramatic differences between the demographic composition of the areas at risk for the

[Lake Oahe Crossing] where the pipeline was built and currently operates and the alternative

route considered underscore the environmental injustice" of the Corps' decision.  RAR 3815.

The Corps, handed both a wealth of cultural information as well as a detailed report by

leading experts, refused even to concede the existence of an environmental justice problem.  Its

startling conclusion that there are no environmental justice implications to siting a major piece of

risky infrastructure immediately upstream of an Indian reservation rests on three false premises.

First and foremost, it dismisses environmental justice concerns based on the belief that the risks

of an oil spill are low and consequences are modest—hence there can be no "disproportionately

high and adverse impact" regardless of any other data.  Remand Analysis, at 87.  Second, it

papers over the implications of a spill by asserting that non-Tribal members would also be

affected, thereby masking the deep impacts uniquely felt by the Tribe.  Finally, the Corps

disguises the disproportionate impact of the Oahe crossing by focusing on the raw numbers of

people impacted by the alternatives.  The first issue needs no elaboration—its conclusion is

invalid for the same reasons that the risk and impact analyses discussed above are invalid.  The

other two issues are discussed below.

B.    The Tribe will be Disproportionately Impacted by Harm to its Cultural Resources.

An environmental justice impact is "the adverse or beneficial result of exposure or other

environmental consequences of the proposed action" and "can include ecological, aesthetic,

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

historic, cultural, economic, social, or health impacts to minority populations and low-income

populations in the affected environment."  RAR 15049.  Impacts may be unique to the

community, such as "cultural vulnerabilities (e.g., traditional cultural properties and ceremonies,

fish consumption practices)."  RAR 15036.  The Tribe's declarations describe in detail the vital

role the area in, around, and under Lake Oahe has played in sustaining the Tribe.  Although the

Corps broadly examines the impacts that an oil spill would have on plants and game in the

abstract, and briefly acknowledges the Tribe's interest in them, for the Tribe and its members

these adverse impacts ripple through the community and can permeate multiple aspects of

traditional lifeways.  RAR 7762 (tanned hides collected from Tribal hunters used to repair drums

for ceremonies); RAR 7766 (food hunted and gathered used for community celebrations).

　　　While the Remand Analysis acknowledges that an oil spill will have impacts on the

Tribe's cultural and subsistence resources, it diminishes those adverse impacts by asserting that

the impacts will be felt by all populations in the affected area.  Remand Analysis, at 83 ("the

shoreline along reservation boundaries and non-tribal land are both at risk").  This conclusion is

completely at odds with the purpose of conducting an environmental justice analysis, which is to

determine whether a project will have a *disproportionate* adverse effect on minority and low-

income populations.  *Allen v. Nat'l Institutes of Health*, 974 F. Supp. 2d 18, 47 (D. Mass. 2013).

The impacts to the Tribe's cultural, spiritual, and traditional practices will only be borne by the

Tribe.  The CEQ recommends that in considering environmental justice under NEPA, "Agencies

should recognize the interrelated cultural, social, occupational, historical, or economic factors

that may amplify the natural and physical environmental effects of the proposed agency action."

RAR 16162.  "Agencies should recognize that the impacts within minority populations, low-

income populations, or Indian tribes may be different from impacts on the general population

MEMORANDUM IN SUPPORT OF STANDING ROCK SIOUX
TRIBE'S MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534-JEB) - 37

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

due to a community's distinct cultural practices." RAR 16167. Impacts felt by minority and low-income populations can be different than those felt by the general population, and those differences are what makes them disproportionate.

A district court rejected a similar tactic in *Crenshaw Subway Coal. v. Los Angeles Cty. Met. Trans. Auth.*, 2015 WL 6150847, *30 (C.D. Cal. Sept. 23, 2015). In *Crenshaw*, an FEIS found that most properties that would be displaced by project construction were owned or leased by minorities and low-income individuals. In spite of that finding, the FEIS determined that the effects would occur uniformly along the project and hence would not disproportionately affect minority or low-income populations. The district court rejected that reasoning: "Given that the [agency] acknowledged that 94 percent of the affected area belongs to a minority group, the fact that different segments of the corridor are similarly impacted does not mean that minority groups are not disproportionately affected by the Project as a whole." *Id.*[25] Here, as in *Crenshaw*, the Corps trivializes the impacts to the Tribe by rationalizing that they would also be felt by non-Tribal members. Remand Analysis, at 83. In doing so, the Corps erases the fact that the Tribe will be affected differently. The Tribe's ability to hunt, gather, conduct ceremonies, and to fully be a part of the land that has sustained them since time immemorial, would be adversely affected in the event of an oil spill. The general population will not be similarly affected. The Corps' rationale subverts the entire purpose of an environmental justice analysis.

C.     The Corps Masks the Disproportionate Impacts on the Tribe.

In the Final EA's environmental justice analysis, the Corps unlawfully gerrymandered the scope of the affected area to a narrow area mostly upstream of the Reservation. *Standing Rock*

---

[25] The *Crenshaw* court affirmed the FEIS, but only because it admitted that minority communities may bear a disproportionate burden. *Id.* Here, the Corps continues to deny any disproportionate impact on the Tribe, despite indisputable evidence to the contrary.

MEMORANDUM IN SUPPORT OF STANDING ROCK SIOUX
TRIBE'S MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534-JEB) - 38

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

*III*, 255 F. Supp. 3d at 140.  On remand, the Corps expanded the scope of the affected area.

Remand Analysis, at 64-65.  To avoid a finding of environmental justice impacts, however, it

skews the comparison of the Oahe crossing to the North Bismarck alterative.  *Id*. at 70-73.  It

compares the *total* populations of minorities impacted by the two routings, and finds that there

would be 4,594 individuals potentially affected downstream of the North Bismarck alternative,

compared to 4,162 individuals affected in a similar area for the Oahe crossing.  *Id*. at 95-96.  On

the basis of this comparison, the Corps concludes that the study "reaffirms the conclusions in the

EA," as the Oahe crossing site "contains fewer potentially affected minority individuals than

does the North Bismarck Alternative crossing…"  *Id*. at 97.

This conclusion, however, masks the *disproportionate* impacts of the Oahe crossing,

which lies at the heart of environmental justice analyses.  More people overall would be affected

by a spill from the North Bismarck site.  However, there is no dispute that Tribal members make

up a substantial majority of the population of the area downstream of Oahe, while minorities

make up a small percentage of the population of the area affected by the alternative.  While the

raw numbers of minorities affected by the two routes are similar, one has a heavily

disproportionate impact on environmental justice communities—the disclosure of which is the

entire point of the analysis.  The Tribe understands that under NEPA, all the Corps needs to do is

"recognize and discuss" the disproportionate impact of its choices on the Tribe.  *Sierra Club v.

FERC*, 867 F.3d 1357, 1370 (D.C. Cir. 2017).  But the Corps steadfastly refuses to do so, instead

finding new misleading ways to avoid admitting the obvious.  The remand environmental justice

analysis is no better than its original one, and should be set aside.

IV.    THE REMAND PROCESS VIOLATED NEPA AND CONSULTATION POLICIES.

A.    <u>Consultation Policies Require a Good Faith Exchange of Information.</u>

An agency's failure to comply with its own internal procedures renders its decision

MEMORANDUM IN SUPPORT OF STANDING ROCK SIOUX
TRIBE'S MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534-JEB) - 39

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

arbitrary and capricious.  *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 417 (1971).

This is true even where they are more rigorous than would otherwise be required by statute.

*Morton v. Ruiz*, 415 U.S. 199, 235 (1974).  Accordingly, where an agency adopts policies that

require it to meaningfully consult with a Tribe prior to making a decision, its failure to do so is

unlawful.  *Oglala Sioux Tribe v. Andrus*, 603 F.2d 707, 713-14 (8th Cir. 1979) (where agency

"has established a policy requiring prior consultation with a tribe, and has thereby created a

justified expectation on the part of the Indian people that they will be given a meaningful

opportunity to express their views before Bureau policy is made, that opportunity must be

afforded");  *Cheyenne River Sioux Tribe v. Jewell*, 205 F. Supp. 3d 1052 (D.S.D. 2016); *Yankton

Sioux Tribe v. Kempthorne*, 442 F. Supp. 2d 774 (D.S.D. 2006) (agency's "failure to comply

with its own consultation policy violates general principles that govern administrative

decisionmaking").

This Court recognized that the Corps is bound by various directives that require

meaningful, transparent, and open consultation prior to making a decision that affects a Tribe.

*Standing Rock III*, 255 F. Supp. 3d at 155-56.  DOD Instruction 4710.02 "establishes policy,

assigns responsibilities, and provides procedures" for all Department of Defense entities,

including the Corps, in their interactions with Tribes.[26]  Its directives are mandatory:  the Corps

"must consult" when "proposing an action that may have the potential to significantly affect

tribal resources, tribal rights, or Indian lands."  *Id.* § 3.1.  Consultation includes "information and

opinion respectfully exchanged in both directions;" while "meaningful consultation" means "a

good faith effort to engage the tribe early enough in the planning process to consider potential

---

[26] The current version of DOD Instruction 4710.02 appears here:
https://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodi/471002p.pdf?ver=2018-11-28-143903-320.  The record contains an earlier version of the policy.  RAR 13975.

MEMORANDUM IN SUPPORT OF STANDING ROCK SIOUX
TRIBE'S MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534-JEB) - 40

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

effects of the proposed action or project on the tribe and consider tribal input in the decision making process." *Id.* at G.2.  The Corps "must involve tribal governments early in the planning process," meaning the Tribe must have an opportunity to participate "in time for the tribal government to provide meaningful comments that may affect the decision." *Id.* at 3.3.(a)(1); 3.3(e)(12) (emphasizing that consultation must be initiated "early" in process).  Consultation is not complete until the Tribe's concerns have been satisfied, consensus reached, or until the Corps "has given careful consideration to all available evidence and points of view, and determined a final course of action." *Id.*  Consultation "may not be delegated to consultants and contractors." *Id.* at 3.4(e).  The Corps has adopted its own consultation principles, which affirm that Tribes have rights to "be involved in Federal decisions or activities that have a potential" to affect their interests, and "have the right to be treated with appropriate respect and dignity."  RAR 3138. The principles bind the Corps to "reach out" to "involve Tribes in collaborative processes designed to ensure information exchange, [and] consideration of disparate viewpoints before and during decision making…" *Id.*  In contrast to policies that expressly do not create binding rights, these two policies are binding.  *Lower Brule Sioux v. Deer*, 911 F. Supp. 395 (D.S.D. 1995).

NEPA—whose very purpose is to engage with the public and stakeholders, and be responsive to their concerns—also requires an adequate process to achieve these goals.  "Under NEPA, agencies must permit the public to play a role in the decisionmaking process and the implementation of that decision." *Theodore Roosevelt Conserv. Partnership v. Salazar*, 616 F.3d 497, 518 (D.C. Cir. 2010) (citations omitted).  CEQ regulations require agencies to "make diligent efforts to involve the public" in implementing NEPA; provide notice of availability of "environmental documents so as to inform those persons and agencies who may be interested or affected;" hold meetings or hearings whenever there is "substantial environmental controversy"

MEMORANDUM IN SUPPORT OF STANDING ROCK SIOUX
TRIBE'S MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534-JEB) - 41

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

or "substantial interest" in doing so.  40 C.F.R. § 1506.6; *id.* § 1501.4(b) (agencies must involve

the public in the EA process "to the extent practicable")*; id.* § 1501.2 (requiring NEPA process

to begin "at the earliest possible time").  Determination of whether stakeholders were adequately

involved in the development of an EA "is a fact-intensive inquiry made on a case-by-case basis."

*Biodiversity Conservation Alliance v. U.S. Bureau of Land Management*, 404 F. Supp. 2d 212,

220 (D.D.C. 2005).  In *Oregon Natural Desert Association v. Rose*, 921 F.3d 1185, 1192 (9th Cir.

2019), for example, the court set aside an EA that relied on technical materials that were not

available for public comment.  It found that this approach, "caused the agency not to be fully

aware of the environmental consequences of the proposed action, thereby precluding informed

decisionmaking and public participation."  *Id*.

> B.    The Corps Conducted a Secretive Remand Process that Violated NEPA and its own Consultation Procedures.

The Corps did not fulfill its obligations under these policies, nor meet the Tribe's

reasonable expectations that it would play a meaningful role in the remand—which was centrally

focused on the Tribe and matters within its expertise.  First, the Corps did not initiate

consultation "early" in the process, as required.  Despite many requests from the Tribe to initiate

a dialogue soon after this Court's ruling, the remand was months underway before the Corps

communicated for the first time—and then only to ask for limited data regarding hunting and

fishing permits.  RAR 13325 (Sept. 25, 2017); *compare Wyoming v. Jewell*, 136 F. Supp. 3d

1317, 1344-45 (D. Wyo. 2015) (fracking rule enjoined because agency did not "meaningfully"

consult with Tribe until late in the process).  Despite the Tribe's swift objection, RAR 13275,

months passed before any other communication was received, and it only reiterated the Corps'

demand for the narrow information from the Tribe previously requested.  RAR 11998; RAR

11227 ("Timely consultation would involve dialogue with the Tribe on the data needs for the

MEMORANDUM IN SUPPORT OF STANDING ROCK SIOUX
TRIBE'S MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534-JEB) - 42

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

study, rather than a demand for marginally relevant information"). A February 2018 draft of the

Remand Analysis written by DAPL concluded that there was "no new information" that

warranted revisiting the original EA. RAR 10203. This draft language for the EA's conclusion,

which preceded any form of Tribal consultation or input, remained unchanged through the

various drafts of the Remand Analysis, and emerged intact in the final decision. RAR 001. By

the time the Tribe submitted its technical report, the process was too far along for the Tribe's

submission to have any effect on the outcome. RAR 7449 ("Notwithstanding my repeated

requests for a meeting, the Corps has refused to consult" with Tribe "on a study whose very

purpose is to determine the impacts of an oil spill on our Tribe and our Treaty-protected hunting

and fishing rights."). While the Tribe was finally able to get a meeting with the Colonel in May,

2018—nearly a year after the Court's remand order—the Corps refused to engage in any

discussion on the WCD, risk analysis, or the other key issues. RAR 3288.[27]

     Second, meaningful consultation, under the Tribal consultation policies that bind the

Corps, means an open two-way exchange of information. DOD 4710.02 § G.2. The Tribe made

this point emphatically from its earliest communication: it needed access to the technical

analyses provided by DAPL so that it could assess them, provide relevant technical information

to the Corps, and effectively inform a final decision. RAR 13282 ("the Corps should open up the

process and allow the Tribe and its experts, along with independent third party experts, to

---

[27] The Tribe's critique of the flawed WCD provides an example. The Tribe pointed out the flaws in the WCD, such as the absence of detection or valve closure times, both before and after the remand began. On not one single occasion did the Corps attempt to address the problem. No correspondence so much as references the issue, nor is there any internal dialogue about it. By the time the Tribe met with the Colonel in May of 2018 and emphasized the issue again, he told them that the Corps would not revisit this issue. RAR 3288. In other words, the Corps ignored the Tribe's concerns until the end of the remand, and then deemed them too late. This approach violates both NEPA and tribal consultation policies. DOD 4710.02 § 3.3(b); 40 C.F.R. § 1501.2.

MEMORANDUM IN SUPPORT OF STANDING ROCK SIOUX
TRIBE'S MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534-JEB) - 43

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

provide the Corps with the necessary information"); RAR 13276 ("one of the basic deficiencies

in the Corps' process to this point has been that certain critical technical information, including

with respect to spill models, has not been made available").  It affirmed this point in countless

meetings, letters, and Tribal resolutions.  RAR 5820; RAR 6390; RAR 3287.  Other Tribes did

so too.  RAR 3422; RAR 6404.  But the Corps refused to share any information, offering a litany

of false excuses for doing so.  At one point, it claimed to be coordinating with other agencies to

ensure the protection of confidential information.  RAR 6436.  No evidence of any such

coordination appears in the record, nor did any coordination result in providing the Tribe with

the technical materials.  Later, the Corps offered a different excuse, telling the Tribe that it

needed to check with the Department of Justice before releasing the draft spill model.  RAR

3287.  Again, no such communication is in the record, nor did the Corps ever provide the

information.[28]  Instead, the record reveals only that DAPL was not "willing to share" any of the

documents (including the facility response plan, spill model, risk analysis, WCD calculation, and

valve specifications) with the Tribe.  RAR 8403.

By withholding this critical information from the Tribe, without any legitimate reason,

the Corps violated its consultation processes and NEPA.  40 C.F.R. § 1501.4(b) (requiring public

involvement to the extent "practicable"); § 1506.6 (requiring "diligent efforts" to involve public).

The result was a broken process that achieved a broken result, to the Tribe's detriment.  The

Tribe never had any insight into the process, was never able to review and comment on the

technical reports, and spent most of the remand in the dark.  For example, it never saw the Spill

---

[28] While this Court has previously found that some information can be protected from public
disclosure, *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 249 F. Supp. 3d 516
(D.D.C. 2017), a protective order allowing the Tribes and their technical experts to view
confidential documents has been in place since June of 2017.  ECF 235.  The Corps never made
any effort to share these documents under the Protective Order.

MEMORANDUM IN SUPPORT OF STANDING ROCK SIOUX
TRIBE'S MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534-JEB) - 44

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

Model or Downstream Receptor reports until the remand was finalized and the administrative

record was provided.[29]  Until the supplemental administrative record was filed, the Tribe had no

idea that DAPL had never developed pipeline segment-specific risk management (Integrity

Management Plans) and Operations and Maintenance Manuals, as required by the Final EA,

easement, and DOT pipeline regulations.  49 C.F.R. § 195.452; 195.402.  The absence of these

plans, as revealed by the audit, are major risk factors and inconsistent with established industry

best practices.  RAR 6379 (Corps lawyer asking DAPL for "risk analysis or other document

addressing risk specific to the Oahe crossing"— but no response in record).  The Tribe never had

the opportunity to explain to the Corps why it needed to insist on DAPL-specific plans, rather

than generic materials.  As a result, the Corps' decision to affirm the EA was uninformed by the

Tribe's technical and cultural expertise in the key subjects of the remand.  *Oregon Natural*

*Desert*, 921 F.3d at 1192 (setting aside EA for relying on technical materials not subject to

comment).  Its Submission Review ignores the vast majority of the Tribe's technical

submissions, ignoring most of the key points it made and focusing on a handful of narrow points.

This is plainly not a "collaborative processes designed to ensure information exchange," as

Corps and DOD policies require.  Instead, it is a process designed to handicap the Tribe from

getting in the way of a predetermined result.

V.      THE CORPS' NHPA ANALYSIS WAS UNLAWFUL.

        The Corps' compliance with § 106 of the National Historic Preservation Act ("NHPA")

was the subject of the Tribe's preliminary injunction motion.  *Standing Rock Sioux Tribe v. U.S.*

*Army Corps of Eng'rs*, 205 F. Supp. 3d 4 (D.D.C. 2016) ("*Standing Rock I*").  The Court later

---

[29] In contrast, DAPL had all but unlimited access.  Indeed, DAPLs lawyers *in this litigation* were given the opportunity to review and comment on the technical studies.  RAR 8744.

MEMORANDUM IN SUPPORT OF STANDING ROCK SIOUX
TRIBE'S MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534-JEB) - 45

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

found that the NHPA claims were moot once construction was complete. *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 301 F. Supp. 3d 50, 62-64 (D.D.C. 2018). However, the implications of this decision present ongoing problems for the Tribe, and legal questions will continue to arise without any opportunity for the Tribe to obtain resolution. Accordingly, the Tribe asks the Court to revisit its core NHPA claim relating to the scope of NHPA review.

A.    The Tribe's NHPA Claim Is "Capable of Repetition while Evading Review."

Courts have jurisdiction over cases that would otherwise be moot if the controversy is "capable of repetition, yet evading review." *Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1976 (2016). First, "the challenged action [must be] in its duration too short to be fully litigated prior to cessation or expiration, and, second, there must be "a reasonable expectation that the same complaining party [will] be subject to the same action again." *Id.* at 1976; *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 321 (D.C. Cir. 2014). The first element is easily met if the action lasts less than two years, *see Ralls Corp*, 758 F.3d at 321, although the D.C. Circuit has applied the exception in longer instances. *Montgomery Envtl. Coal. v. Costle*, 646 F.2d 568 (D.C. Cir. 1980) (four year permit). The second element is met when the parties are capable of being impacted by the same *legal* issue—i.e. the specific facts need not be repeated as long as the legal issue could arise again. The D.C. Circuit has decided this latter test should not "be applied with excessive stringency," *Ralls Corp.*, 758 F.3d at 324, and has emphasized that only a "reasonable expectation" of repetition must be shown. *Christian Knights of Ku Klux Klan Invisible Empire, Inc. v. D.C.*, 972 F.2d 365, 370 (D.C. Cir. 1992).

The Tribe's NHPA claim easily meets these standards. Most NHPA consultations take place on a timeframe of months from the initiation of the process to the construction that would render it moot. Declaration of Jon Eagle, Sr., at ¶ 6. As the experience in this case demonstrates, the Tribe was barely able to get into the district court on a preliminary injunction

before construction was substantially complete—let alone resolve the claim and litigate any appeals to completion.  Second, the legal questions presented in this appeal are not just "capable" of repetition, they are all but certain to arise again.  The Tribe's Historic Preservation Office ("THPO") receives over 250 requests to consult with federal agencies annually, and participates in around 50.  *Id.* at ¶ 5.  The "scope" of responsibilities under the statute is highly likely to arise again.  For example, there are other crude oil pipelines proposed in the Tribe's ancestral homelands that will need Corps permits.  It is possible, if not probable, that such permitting would trigger the same dispute over the scope of § 106 review that happened here.  *Id.* at ¶ 9.

> B.      The Corps' Failed to Adequately Consider "Indirect" Effects.

The Court should grant summary judgment to the Tribe on its claim that the Corps improperly identified the scope of its NHPA obligations.  Section 106 requires that prior to issuance of any federal funding, permit, or license, agencies must take into consideration the effects of that "undertaking" on historic properties.  54 U.S.C. § 306108; ECF 5 (overview of NHPA).  The "undertaking" includes projects "in whole or in part under the *direct or indirect* jurisdiction of a Federal agency."  54 U.S.C. § 300320.  A threshold step in the § 106 consultation process is determining the area of potential effects ("APE") of the undertaking.  36 C.F.R. § 800.4(a)(1).  The APE includes the area "within which an undertaking may directly *or indirectly* cause alterations in the character or use of historic properties…."  *Id.* § 800.16(d).

With DAPL, the Corps did not apply these standards, asserting instead that § 106 only applied in areas of *direct* impacts.  Specifically, the APE for the Oahe crossing included the bore holes, stringing and staging areas, and access routes.  USACE_DAPL 65417.  "The APE for this project will **not** include construction of any portion of the pipeline alignment that extends past the bore pit locations…."  *Id.* (emphasis in original).  The court made this determination even though the Corps' own maps showed known cultural sites directly in the pipeline right-of-way

MEMORANDUM IN SUPPORT OF STANDING ROCK SIOUX
TRIBE'S MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534-JEB) - 47

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

just yards outside of the boreholes.  ECF 6-43 at 15-16 (Figures 3 & 4).[30]  The Corps affirmed

this narrow formulation in the litigation, declaring in its preliminary injunction brief that its

NHPA obligations effectively stop at the waters' edge.  ECF 21 at 29-31.

This Court upheld the Corps' approach, even though it writes "indirect effects" out of the

statute.  The Tribe asks the Court to reconsider.  First, the Court framed the question as a choice

between applying consultation only to jurisdictional waters, or to the entire pipeline.  It is true

that the Tribe initially asked for an injunction reaching the entire pipeline based on the nearly

800 stream, river, or wetland crossings in 359 miles of pipeline route in North Dakota alone—

meaning there were more than two CWA jurisdictional areas per mile of pipeline.  ESMT 2916-

18.  But the situation became more nuanced as the litigation progressed and the dispute became

focused on the Oahe crossing site.  As the Tribe observed, the Court does not to resolve the

question of whether the Oahe crossing means the whole pipeline is subject to § 106; rather, the

issue is where the Corps' refusal to consult outside the boreholes and access road at the Oahe

site, despite the presence of known cultural sites, was arbitrary and unlawful.  ECF 24 at 11.

Second, this Court erred by deferring to the Corps, instead of the Council, on matters of

interpretation of the NHPA instead.  *Standing Rock I*, 205 F. Supp. 3d at 31.  The Corps'

inadequate scope of review was at the heart of the Council's numerous comments and decision to

formally object to the Corps' findings.  USACE_DAPL 4936 (urging Corps to expand the scope

of § 106 review); 5649 (criticizing Corps compliance); 5716 (objection letter).  This Court's

opinion barely mentioned these objections, even though this Circuit has stated clearly that courts

should defer to the Council on the interpretation of the NHPA.  *United Keetoowah Band of*

---

[30] The Corps NHPA determination letter appears at USACE_DAPL 65416, but appears to have left out the maps attached to it.  The complete original is in the Court record at ECF 6-43.

MEMORANDUM IN SUPPORT OF STANDING ROCK SIOUX
TRIBE'S MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534-JEB) - 48

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

*Cherokee Indians in Oklahoma v. Fed. Comms. Comm'n,* 2019 WL 3756373, at *5 (D.C. Cir. Aug. 9, 2019) ("We owe no deference to the FCC's interpretations of the NHPA or NEPA, which are primarily administered by the Advisory Council, and the Council on Environmental Quality respectively.") (citations omitted); *CTIA-Wireless Ass'n v. FCC*, 466 F.3d 105, 117 (D.C. Cir. 2006) ("Congress has entrusted one agency with interpreting and administering section 106 of the NHPA: the Council."). The D.C. Circuit recently confirmed this explicitly. *Id.*; *Semonite*, 916 F.3d at 1088 (rejecting Corps position that it must only consider "direct" impacts under NHPA, finding court "owe[s] no deference to the Corps' interpretation of a statute it does not administer.").

The Court also erred by relying on the Corps' NHPA regulations. *Standing Rock I*, 205 F. Supp. 3d at 31. The Corps' regulations implementing § 106, like those of other agencies regulated by the NHPA, are not valid unless consistent with Council regulations and approved by the Council. 54 U.S.C. § 306102(b)(5)(A); 36 C.F.R. § 800.14(a). But the Council never approved the Corps' NHPA regulations—which disclaim any responsibility for "identifying or assessing" sites "outside the permit area"—and has repeatedly said they are inconsistent with its binding NHPA regulations. 33 C.F.R. Pt. 325 App. C.5(f); ESMT 1498 (Corps regulations are "fundamentally inconsistent" with statute); ECF 6-63 (Corps regulations "do not fulfill the requirements of" § 106). The "scope" of § 106 review is not a matter within the Corps' technical expertise, but a question of legal interpretation within the expertise of the Council. If the Court defers to the right agency and regulations, it will find the Corps' position to be unlawful. USACE_DAPL 5717 (concluding that the Corps had incorrectly defined scope of review).

Finally, while the Court faulted the Tribe for not taking advantage of the consultation opportunities that were provided, the Tribe was taking a principled stance in opposition to the

MEMORANDUM IN SUPPORT OF STANDING ROCK SIOUX
TRIBE'S MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534-JEB) - 49

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

Corps' narrow scope of review.  USACE_DAPL 64264 (declining "to participate in incomplete

surveys and partial compliance efforts"); 64247 (criticizing narrow APE that left out pipeline

route).  The Tribe was offered the chance to consult on the borehole and access road, but never

on the pipeline route itself.  Its decision to "hold out for more," as this Court put it, was an

insistence that the law be followed, and should not be used against it.  *Standing Rock I*, 205 F.

Supp. 3d at 32.  The destruction of sacred sites a mile and a half away from Lake Oahe proved

the Tribe's point: had § 106 consultation extended some reasonable distance beyond the

borehole, those sites might have been preserved.  But the Corps never gave the Tribe that

opportunity, and its unlawfully narrow interpretation of its duties gave DAPL the green light to

build "to the water's edge" before permitting was complete.  *Id*. at 25.

　　　　While the damage to the Tribe's cultural resources cannot be undone, the Court should

give the Tribe declaratory relief that will ensure that the law is applied correctly in the future.

## VI.    THE COURT SHOULD VACATE THE EASEMENT AND ORDER AN EIS.

　　　　The Tribe previously explained that the remedy for a NEPA violation is vacatur of the

underlying permit.  ECF 272; 280.  This Court did not agree, finding that the Corps was likely to

"substantiate" its decision on remand.  *Standing Rock IV*, 282 F. Supp. 3d at 102.  Even so, the

Court emphasized that "[c]ompliance with NEPA cannot be reduced to a bureaucratic formality,

and the Court expects the Corps not to treat remand as an exercise in filling out the proper

paperwork *post hoc*."  *Id*. at 109.  As documented above, the Corps ignored this admonition.  The

remand was never a good faith attempt to revisit the "substantial" flaws in the Final EA, or to

gather technical and cultural input from the Tribe.  The Corps' failure to comply with NEPA a

second time changes the remedy analysis.  Rather than simply give the Corps another do-over,

the Court should vacate the easement and order the Corps to prepare an EIS.

　　　　First, applying the *Allied-Signal* factors, the flaws in the remand are significant.  For

MEMORANDUM IN SUPPORT OF STANDING ROCK SIOUX
TRIBE'S MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534-JEB) - 50

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

example, the Corps' reliance on a fatally flawed WCD, or its refusal to consider ETP's abysmal record, are not the kind of problems that can be remedied with additional "explanation."[31] Instead, they call into question whether the Corps' bottom-line conclusion that no EIS was necessary was correct.  In *Nat'l Women's Law Ctr. v. Office of Management and Budget*, 358 F. Supp. 3d 66, 93 (D.D.C. 2019), this Court vacated a rule where the "government's deficiency is not that it failed to explain OMB's 'reasoning,' but that OMB's reasoning lacked support in the record."  The failure to address an important aspect of the problem is a "major shortcoming" warranting vacatur.  *Humane Soc. of United States v. Zinke*, 865 F.3d 585, 614 (D.C. Cir. 2017); *SecurityPoint Holdings, Inc. v. TSA*, 867 F.3d 180, 185 (D.C. Cir. 2017) ("[T]he court *must vacate* a decision that 'entirely failed to consider an important aspect of the problem.'") (emphasis added); *Wedgewood Village Pharmacy v. DEA*, 509 F.3d 541, 552–53 (D.C. Cir. 2007) (same).  Given the failures to address abundant evidence that the WCD and risk analysis were profoundly flawed, there is "substantial doubt" as to whether the Corps "chose correctly" in affirming the FONSI.  *Stewart v. Azar*, 313 F. Supp. 3d 237, 273 (D.D.C., 2018) (vacating rule). As the D.C. Circuit recently emphasized, where it is "at least uncertain" whether the same result can be reached, vacatur is appropriate.  *Ameren Services Co. v. Fed. Energy Reg. Comm'n*, 880 F.3d 571, 585 (D.C. Cir. 2018).

Moreover, insofar as the remand was procedurally flawed, vacatur is all but mandatory. *Allina Health Serv. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014) ("deficient notice is a 'fundamental flaw' that almost always requires a vacatur"); *CropLife America v. EPA*, 329 F.3d 876, 879 (D.C. Cir. 2003) (vacating regulation issued without notice and comment); *In re Long–*

---

[31] Since the Court previously found that the "disruptive consequences" of vacatur did not weigh heavily against it, the Tribe will not address that issue further here.  Indeed, DAPL's proposal to double capacity increases the risks of the Corps' mistakes and weighs in favor of vacatur.

MEMORANDUM IN SUPPORT OF STANDING ROCK SIOUX
TRIBE'S MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534-JEB) - 51

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

*Distance Tel. Serv. Fed. Excise Tax Refund Litig*., 853 F. Supp. 2d 138, 144 (D.D.C. 2012).  The

process here was flawed from its inception, and left the Tribe in the dark on the key technical

issues and constrained their ability to participate.  These procedural deficiencies call for vacatur.

      An agency's failure to comply with the law despite the "second chance" of a remand also

weighs in favor of vacatur.  "When a court has already remanded a case to an administrative

agency for failure to explain adequately its decision, and the agency, on remand, again fails to

provide a reasoned basis for its conclusions, a reviewing court can set aside the agency's

decision…."*Aldrich v. SEC*, 139 F.3d 22, 226 (D.C. Cir. 1998); *Greyhound Corp v. ICC*, 668

F.2d 1354, 1364 (D.C. Cir. 1981) (vacating after remand, finding "no useful purpose to be served

by allowing the Commission another shot at the target"); *see also In re Core Communs., Inc.*,

531 F.3d 849 (D.C. Cir 2008) ("Having repeatedly, and mistakenly, put our faith in the

Commission, we will not do so again.").  Here, refusing to vacate a second time would reward

the Corps for its inadequate effort, and would do little to incentivize an adequate and timely EIS.

In the meantime, the risk of an oil spill or leak is borne by the Tribe.  The Court should put the

burden of getting NEPA right on the Corps, not the Tribe.  Equally relevant is DAPL's proposal

to double the capacity of the pipeline.  Vacatur would prevent DAPL from proceeding without a

new environmental review that looks at the impact of expanded operations.

      Second, subsequent to the Court's remedy decision, new precedents weigh in favor of

vacatur and support an order directing an EIS.  In *Semonite,* the D.C. Circuit vacated a Corps

permit authorizing construction of transmission wires through a historic area without a full EIS.

916 F.3d at 1089.  Finding that several of the criteria governing whether a project's impacts are

"significant" had been triggered, the Court vacated the permit and directed the Corps to prepare

an EIS.  *Id.*  On rehearing, the Court observed that the fact that construction of the project had

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

been completed was no barrier to vacatur, as the transmission lines could simply be taken down. *Nat'l Parks Conserv. Assoc. v. Semonite*, 925 F.3d 500 (D.C. Cir. May 31, 2019). The Court found that the district court was in the better position to determine a remedy (including vacatur) that would "protect the purpose and integrity of the EIS process," and remanded accordingly. *Id.* at 502. The Court did not alter its directive that the agency prepare an EIS. *See also Oglala Sioux Tribe v. U.S. Nuclear Reg. Comm'n*, 896 F.3d 520, 536 (D.C. Cir., 2018) (a "purely procedural" violation of NEPA is a "serious" deficiency weighing in favor of vacatur "because the point of NEPA is to require an adequate EIS before a project goes forward"); *American Rivers*, 895 F.3d at 55 (vacating dam licensing order after finding NEPA violations); *WildEarth Guardian*, 368 F. Supp. 3d at 85 (imposing injunction in lieu of vacating NEPA-deficient leases).

Other circuits have vacated permits for substantially-completed projects like pipelines where compliance with environmental statutes is flawed. In *Sierra Club v. U.S. Forest Serv.*, 897 F.3d 582, 606 (4th Cir. 2018), the Fourth Circuit vacated Forest Service permits for a gas pipeline after finding that land management agencies had not properly complied with law. *Id.* The same Circuit vacated permits for a different pipeline after finding they were issued without full compliance with other environmental laws. *Sierra Club v. U.S. Dept. of Interior*, 899 F.3d 260, 295 (4th Cir. 2018). Construction of both projects, which were at least partially complete, has been stalled since then. *See also Diné Citizens Against Ruining Our Environment v. Bernhardt*, 923 F.3d 831, 859 (10th Cir. 2019) (vacating drilling approvals without NEPA and NHPA compliance). These cases demonstrate that courts should not hesitate to shut down major projects where compliance with environmental and safety standards is incomplete.

///

///

MEMORANDUM IN SUPPORT OF STANDING ROCK SIOUX
TRIBE'S MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534-JEB) - 53

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

CONCLUSION

For the foregoing reasons, the Tribe respectfully asks that this Court grant its summary

judgment motion, order the Corps to prepare an EIS, and vacate the underlying permits for

DAPL.

Respectfully submitted this 16th day of August, 2019.

/s/ Jan E. Hasselman

Jan E. Hasselman, WSBA # 29107
(*Admitted Pro Hac Vice*)
Stephanie Tsosie, WSBA # 49840
(*Admitted Pro Hac Vice*)
Patti A. Goldman, DCBA # 398565
Earthjustice
705 Second Avenue, Suite 203
Seattle, WA 98104
Telephone: (206) 343-7340
jhasselman@earthjustice.org
stsosie@earthjustice.org
pgoldman@earthjustice.org

*Attorneys for Plaintiff*

MEMORANDUM IN SUPPORT OF STANDING ROCK SIOUX
TRIBE'S MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534-JEB) - 54

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

## CERTIFICATE OF SERVICE

I hereby certify that on August 16th, 2019, I electronically filed the foregoing

*Memorandum in Support of Standing Rock Sioux Tribe's Motion for Summary Judgment on*

*Remand* with the Clerk of the Court using the CM/ECF system, which will send notification of

this filing to the attorneys of record and all registered participants.


*/s/ Jan E. Hasselman*
Jan E. Hasselman

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE,<br><br>                         Plaintiff,<br><br>and<br><br>CHEYENNE RIVER SIOUX TRIBE,<br><br>                         Plaintiff-Intervenor,<br>    v.<br><br>U.S. ARMY CORPS OF ENGINEERS,<br><br>                         Defendant-Cross<br>                         Defendant,<br><br>and<br><br>DAKOTA ACCESS, LLC,<br><br>                         Defendant-Intervenor-<br>                         Cross Claimant. | Case No. 1:16-cv-1534-JEB<br>(and Consolidated Case Nos. 16-cv-1796<br>and 17-cv-267)<br><br><br>**DECLARATION OF JON EAGLE, SR.<br>IN SUPPORT OF PLAINTIFF<br>STANDING ROCK SIOUX TRIBE'S<br>MOTION FOR SUMMARY<br>JUDGMENT ON REMAND** |

## I.      QUALIFICATIONS AND RELEVANT EXPERTISE

1.      My name is Jon Eagle Sr.  I am the Tribal Historic Preservation Officer

("THPO") for the Standing Rock Sioux Tribe, and an enrolled member of the Tribe.  I was

appointed by the SRST Council to serve in this capacity on February 8th, 2016 and have served

in this capacity since that time.  I have previously submitted sworn declarations in this action

describing my background, expertise, and the cultural and historical importance of the Lake

DECLARATION OF JON EAGLE, SR. IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534) - 1

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

Oahe site crossed by the Dakota Access Pipeline ("DAPL").  I submit this declaration in support of the Tribe's motion for summary judgment.

2.      In 2016, the Tribe asked for a preliminary injunction from this Court stopping construction of DAPL due to violations of the National Historic Preservation Act ("NHPA").   In its decision denying that injunction, this Court made some interpretations of the statute that are problematic for my office and our ability to do our work protecting sites of historical and cultural importance to the Tribe.

3.      For example, this Court found that the U.S. Army Corps of Engineers has no duty to consult with the Tribe under NHPA on the impacts of the pipeline outside of jurisdictional waterways.  This ruling presents a major problem because, as we learned with DAPL, there were historic sites of major significance that were in the pipeline's right of way immediately outside of waters of Lake Oahe.  The configuration of the pipeline through Lake Oahe had serious impacts on historic sites, but under the precedent established by this Court, such sites were left unprotected by the Court's ruling.

4.      There is relatively little caselaw interpreting section 106 of the NHPA.  The Court's decision could be influential in how agencies interpret the law and in my view will give them "cover" to avoid consultation and circumvent the law's intention.

5.      The Standing Rock THPO receives invitations from federal agencies to consult under § 106 approximately 250 times per year.  These invitations come from a range of federal agencies, including the U.S. Army Corps of Engineers ("Corps"), U.S. Fish and Wildlife Service, Bureau of Land Management, U.S. Department of Transportation and many others.  We do not have anywhere near the resources to consult on every project.  So we prioritize the projects with

DECLARATION OF JON EAGLE, SR. IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534) - 2

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

the biggest impacts, and participate in what I estimate to be about 50 formal consultation processes each year.

6.      The timing of the §106 consultation process varies substantially depending on the specifics of the project.  A typical timeline for a federal project would be between six and ten months from the time we first are invited to consult until the time construction begins.  Some bigger projects, for example, projects that require a full environmental impact statement ("EIS") can take up to a few years, but these are not common.

7.      North Dakota is one of the leading oil production areas in the nation, and production continues to grow.  Additional pipelines are being proposed in North Dakota that could impact the Tribe's ancestral homelands and Treaty-reserved areas.  For example, this summer, two companies announced that they were pursuing a $1.6 billion pipeline, carrying 350,000 barrels of crude per day, out of the Bakken oil fields in North Dakota.  The route has not been announced but given its location will very likely impacts Standing Rock cultural interests. If the Corps declines to perform an EIS for any permitting on this pipeline, as it has done in the past, it is very likely that any § 106 consultation would move quickly—within months—before construction begins.

8.      The experience of DAPL itself highlights the problem.  Because the Corps does not require § 106 consultation on areas outside of jurisdictional waterways, a significant amount of construction was complete before there was any consultation and before there was any permit to challenge in Court.

9.       For these reasons, I believe that the legal question presented in the Court's preliminary injunction—specifically, the scope of the Corps' consultation obligation under

DECLARATION OF JON EAGLE, SR. IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534) - 3

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7310*

§ 106—will continue to arise and that we will never have the opportunity to fully test our legal position before the question becomes moot because construction is complete.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.  Executed on August 8, 2019, at Fort Yates, North Dakota.

Jon Eagle, Sr.

DECLARATION OF JON EAGLE, SR. IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT ON REMAND
(No. 1:16-cv-1534) - 4

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

## CERTIFICATE OF SERVICE

I hereby certify that on August 16, 2019, I electronically filed the foregoing *Declaration of Jon Eagle, Sr. In Support of Plaintiff Standing Rock Sioux Tribe's Motion For Summary Judgment on Remand* with the Clerk of the Court using the CM/ECF system, which will send notification of this filing to the attorneys of record and all registered participants.


*/s/ Jan E. Hasselman*
Jan E. Hasselman

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*