IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE,<br><br>              Plaintiff,<br><br>     and<br><br>CHEYENNE RIVER SIOUX TRIBE,<br><br>              Plaintiff-Intervenor,<br>     v.<br><br>U.S. ARMY CORPS OF ENGINEERS,<br><br>              Defendant-Cross<br>              Defendant,<br><br>     and<br><br>DAKOTA ACCESS, LLC,<br><br>              Defendant-Intervenor-<br>              Cross Claimant. | Case No. 1:16-cv-1534-JEB<br>(and Consolidated Case Nos. 16-cv-1796<br>and 17-cv-267) |

**MOTION OF PLAINTIFF OGLALA SIOUX TRIBE
FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff Oglala Sioux Tribe ("Tribe") hereby moves for partial summary judgment under

Fed. R. Civ. P. 56. The Tribe seeks partial summary judgment as to those pre-remand claims in

its initial complaint that it preserved, *see* Plaintiff Oglala Sioux Tribe's Notice Regarding Non-

Remand Claims It Will Pursue, ECF No. 385, and on its claims challenging the Defendant U.S.

Army Corps of Engineers' decision on remand as being arbitrary, capricious, and in violation of

law.

This motion is supported by the accompanying memorandum and the Declaration of Michael L. Roy and Exhibit A thereto. A proposed order is attached herewith. The Tribe also adopts and relies upon the arguments made by Plaintiff Standing Rock Sioux Tribe in support of its motion for summary judgment filed this day.

Respectfully submitted,

s/ *Michael L. Roy*
Michael L. Roy (DC Bar No. 411841)
mroy@hobbsstraus.com
Jennifer P. Hughes (DC Bar No. 458321)
jhughes@hobbsstraus.com
Elliott A. Milhollin (DC Bar No. 474322)
emilhollin@hobbsstraus.com
Hobbs, Straus, Dean & Walker, LLP
1899 L Street NW, Suite 1200
Washington, DC  20036
202-822-8282 (Tel.)
202-296-8834 (Fax)
*Attorneys for Oglala Sioux Tribe*

Mario Gonzalez
Gonzalez Law Office
522 7th St 202
Rapid City, SD 57701
(605) 716-6355
*Of Counsel for Oglala Sioux Tribe*

August 16, 2019

**CERTIFICATE OF SERVICE**

I hereby certify that on August 16, 2019, I electronically filed the foregoing MOTION OF PLAINTIFF OGLALA SIOUX TRIBE FOR PARTIAL SUMMARY JUDGMENT, and the accompanying [PROPOSED] ORDER GRANTING PLAINTIFF OGLALA SIOUX TRIBE'S MOTION FOR PARTIAL SUMMARY JUDGMENT, with the Clerk of the Court using the CM/ECF system, which will send notification of this filing to the attorneys of record and all registered participants.

*/s/ Michael L. Roy*
Michael L. Roy

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE,<br><br>        Plaintiff,<br><br>   and<br><br>CHEYENNE RIVER SIOUX TRIBE,<br><br>        Plaintiff-Intervenor,<br>v.<br><br>U.S. ARMY CORPS OF ENGINEERS,<br><br>        Defendant-Cross<br>        Defendant,<br><br>   and<br><br>DAKOTA ACCESS, LLC,<br><br>        Defendant-Intervenor-<br>        Cross Claimant. | Case No. 1:16-cv-1534-JEB<br>(and Consolidated Case Nos. 16-cv-1796<br>and 17-cv-267) |

**[PROPOSED] ORDER GRANTING PLAINTIFF OGLALA SIOUX TRIBE'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

This matter comes before the Court on the parties' cross motions for summary judgment

following remand.  Having reviewed the parties' pleadings, exhibits, and the entire record of this

case, it is hereby ORDERED that plaintiff Oglala Sioux Tribe's motion for summary judgment is

hereby GRANTED and the cross motions filed by Defendant U.S. Army Corps of Engineers and

Defendant-Intervenor Dakota Access, LLC are hereby DENIED.  The final environmental

assessment and finding of no significant impact, and easement granted by Defendant U.S. Army

Corps of Engineers to Defendant-Intervenor Dakota Access, LLC dated February 8, 2017, and

Defendant's decision following remand dated August 31, 2018 that are the subject of this

litigation are hereby VACATED and REMANDED to Defendant U.S. Army Corps of Engineers.

Defendant is hereby DIRECTED to commence preparation of an environmental impact

statement as required by the National Environmental Policy Act.


SO ORDERED.

Dated: _____     _____
                                    JAMES E. BOASBERG
                                    United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE, | Case No. 1:16-cv-1534-JEB |
| Plaintiff, | (and Consolidated Case Nos. 16-cv-1796 and 17-cv-267) |
| and | |
| CHEYENNE RIVER SIOUX TRIBE, | |
| Plaintiff-Intervenor, | |
| v. | |
| U.S. ARMY CORPS OF ENGINEERS, | |
| Defendant-Cross Defendant, | |
| and | |
| DAKOTA ACCESS, LLC, | |
| Defendant-Intervenor-Cross Claimant. | |

**MEMORANDUM OF PLAINTIFF OGLALA SIOUX TRIBE IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT**

Michael L. Roy (DC Bar No. 411841)
mroy@hobbsstraus.com
Jennifer P. Hughes (DC Bar No. 458321)
jhughes@hobbsstraus.com
Elliott A. Milhollin (DC Bar No. 474322)
emilhollin@hobbsstraus.com
Hobbs, Straus, Dean & Walker, LLP
1899 L Street NW, Suite 1200
Washington, DC  20036
202-822-8282 (Tel.)
202-296-8834 (Fax)
*Attorneys for Oglala Sioux Tribe*

Mario Gonzalez
Gonzalez Law Office
522 7th St 202
Rapid City, SD 57701
(605) 716-6355
*Of Counsel for Oglala Sioux Tribe*

August 16, 2019

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

FACTUAL BACKGROUND AND PROCEDURAL HISTORY ..................................................2

I.     The Oglala Sioux Tribe and its Rights in Waters of the Missouri River ...........................3

       A.     Treaties.............................................................................................................3

       B.     The Tribe's Rights Under the Mni Wiconi Act ........................................................4

II.    Tribe's Opposition to DAPL, and Its Participation in This Case .......................................5

III.   The Corps' Remand Process and Decision.......................................................................6

LEGAL STANDARD..............................................................................................................7

ARGUMENT .........................................................................................................................9

I.     PRE-REMAND CLAIMS ...........................................................................................11

       A.     The Corps Violated the Tribe's Rights under the Mni Wiconi Act......................11

       1.     The Act Imposes a Trust Obligation on the United States to
              Provide Clean Drinking Water to the Tribe ...............................................11

       2.     The Corps Failed to Consider the Impacts of DAPL on the
              Tribe's Mni Wiconi Rights, as Required ....................................................12

       3.     The Corps Failed to Consult with the Tribe Concerning the
              Potential Impacts on the Mni Wiconi Project Prior to Issuance
              of the FONSI or the Easement ...................................................................15

II.    REMAND CLAIMS ..................................................................................................16

       A.     Corps Did Not Meet Its Consultation Obligations to the Tribe with
              Respect to the Remand.............................................................................16

       B.     The Corps' Remand Analysis is Fundamentally Flawed........................................17

**TABLE OF CONTENTS (cont.)**

1.    The Risk Assessment is Arbitrary and Capricious ...................................17

2.    The Worst Case Discharge Analysis is Arbitrary and Capricious, and Its Arbitrariness Infects the Entire Remand Analysis .........................17

3.    The Remand Analysis Relies on an Arbitrary 10-day Spill Model Simulation Period........................................................................................19

C.    The Remand Analysis Does Not Support the Corps' Conclusion that There Are No Significant Impacts ...................................................................23

D.    The Remand Analysis Does Not Correct the Corps' Failure to Consider Impacts on the Mni Wiconi Project/OSRWSS ......................................................26

E.    The Court Should Vacate the Easement and Order an EIS ..................................28

CONCLUSION...........................................................................................................28

# TABLE OF AUTHORITIES

**Cases**

*Arizona v. California*,
   460 U.S. 605 (1983)..................................................................................................... 3

*Friends of the Earth, Inc. v. U.S. Army Corps of Eng'rs*,
   109 F. Supp. 2d 30 (D.D.C. 2000).............................................................................. 8

*Michigan v. EPA*,
   135 S.Ct. 2699 (2015)................................................................................................. 8

* *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983)........................................................................................ 9, 10, 26

*Muckleshoot Indian Tribe v. Hall*,
   698 F. Supp. 1504 (W.D. Wash. 1988)..................................................................... 13

*Myersville Citizens for a Rural Cmty., Inc. v. F.E.R.C.*,
   783 F.3d 1301 (D.C. Cir. 2015)................................................................................. 8

*Nat'l Parks Ass'n v. Semonite*,
   916 F.3d 1075 (D.C. Cir. 2019)................................................................................. 28

*Seminole Nation v. United States*,
   316 U.S. 286 (1942)................................................................................................... 12

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
   255 F. Supp. 3d 101 (D.D.C. 2017).......................................................... 1, 2, 12, 14

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
   No. CV 16-1534, 2019 WL 2028709 (D.D.C. May 8, 2019)................................... 23

* *United States v. Mitchell*,
   463 U.S. 206 (1983)................................................................................................... 11

* *United States v. White Mountain Apache Tribe*,
   537 U.S. 465 (2003)................................................................................................... 11

*Winters v. United States*,
   207 U.S. 564 (1908)................................................................................................... 3

**Statutes**

5 U.S.C. § 706.............................................................................................................. 8

11 Stat. 749 (Sept. 17, 1851)....................................................................................... 3

15 Stat. 635 (Apr. 29, 1868) ....................................................................................... 3

42 U.S.C. § 4332(C) .................................................................................................... 7

Section 106 of the National Historic Preservation Act (54 U.S.C. § 306108) ........ 5, 15

Act of Mar. 2, 1889, 25 Stat. 888 (1889).................................................................... 3

# TABLE OF AUTHORITIES (cont.)

Mni Wiconi Project Act of 1988, Pub. L. No. 100-516, 102 Stat. 2566 (1988)........... 4, 11, 14, 27

Pub. L. No. 103-434, 108 Stat. 4526 (1994)................................................................. 4

Pub. L. No. 105-277 (1998) ......................................................................................... 4

Pub. L. No. 106-53, 113 Stat. 269 (1999)................................................................... 4

Pub. L. No. 107-367 (2002) ......................................................................................... 4

Pub. L. No. 110-161, 121 Stat. 1844 (2007)............................................................... 4

**Regulations**

40 C.F.R. § 1500.1(a).................................................................................................. 7

40 C.F.R. § 1501.4(a).................................................................................................. 8

40 C.F.R. § 1508.13 .................................................................................................... 8

40 C.F.R. § 1508.27 .................................................................................................... 15

40 C.F.R. § 1508.9 ...................................................................................................... 8

82 Fed. Reg. 5543 (Jan. 18, 2017) ............................................................................. 6

N.D. Admin. Code § 33-16-02.1.................................................................................. 25

S.D. Admin. R. § 74:51:03:02 (2019).......................................................................... 25

S.D. Admin. R. § 74:51:03:05 (2019).......................................................................... 25

**Other Authorities**

Council on Envtl. Quality, *Environmental Justice Guidance Under
   the National Environmental Policy Act* (1997)....................................................... 15

Dep't of the Army, *American Indian & Alaska Native Policy* (Oct. 24, 2012)............................ 13

DOD Instruction 4710.02............................................................................................. 13

Memorandum from Acting Secretary, Dep't of Interior, Feb. 6, 2017........................ 12

U.S. Army Corps of Engineers. 2010. Final Oahe Dam/Lake Oahe Master
   Plan: Missouri River, South Dakota and North Dakota. Design
   Memorandum MO-224. Omaha District. Omaha, Nebraska.................................... 12

# INTRODUCTION

The Mni Wiconi Project Act recognizes that the United States has a trust responsibility to provide clean water to Plaintiff Oglala Sioux Tribe ("Tribe"). Pursuant to the Act, the United States, through the Secretary of the Interior, constructed and maintains the Oglala Sioux Rural Water Supply System ("OSRWSS"), a component of the Mni Wiconi Project, title to which is held in trust for the Tribe by the United States. The OSRWSS draws water from an intake in the Missouri River, downstream of the Dakota Access Pipeline ("DAPL") crossing on Lake Oahe. The Environmental Analysis ("EA") and the decision to issue the easement to Defendant-Intervenor Dakota Access, LLC ("Dakota Access") were arbitrary and capricious and contrary to law because, *inter alia*, the U.S. Army Corps of Engineers ("Corps") did not consider the impacts of DAPL on the OSRWSS in the event of a spill, and because the Corps failed to consult with the Tribe concerning the impacts notwithstanding the Tribe's rights under the Mni Wiconi Project Act, the National Environmental Policy Act ("NEPA"), and binding agency consultation policies.

The Court previously held, on the Standing Rock Sioux Tribe's motion for summary judgment, that the Corps' decision not to issue an Environmental Impact Statement ("EIS") "largely complied with NEPA," but that there were "substantial exceptions," requiring remand: "the agency failed to adequately consider the impacts of an oil spill on Standing Rock's fishing and hunting rights and on environmental justice, and in February 2017, it did not sufficiently weigh the degree to which the project's effects are likely to be highly controversial in light of critiques of its scientific methods and data." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 147 (D.D.C. 2017) ("*Standing Rock III*"). The Corps' decision on remand did not correct the problems with the pre-remand environmental analysis. The Corps

1

outsourced most of the analysis to Dakota Access, and failed to adequately consult with plaintiff

tribes during the remand. Dakota Access's studies and the Corps' conclusions are woefully

inadequate and unsupported by the record, understate both the risk of a spill and the impacts that

a spill would have on the environment, and do not support a finding of no significant impact.

Even with underestimates of the worst case discharge, and an inadequate spill model, the studies

nonetheless predicted worst-case scenarios that would result in 30% mortality to sensitive

species within a 75 square kilometer area, and the spill model report prepared by Dakota

Access's contractor acknowledged that a spill would present "effects [that] have the potential to

be both significant and adverse, on time scales that range from days to years." RAR 8953. Yet

the Corps nonetheless concluded that an EIS was not required. The remand decision did address

the OSRWSS intake in a cursory fashion, but its conclusion that the OSRWSS will not be

impacted in the event of a spill is based on the same flawed analyses that permeates the rest of

the remand analysis and is not supported by the record.

   For the reasons discussed herein, this Court should set aside the remand decision, order

that an EIS be performed, and vacate the underlying permits and easement.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

   The Court is familiar with the background of this case, which has been the subject of

multiple published decisions, including the decision granting partial summary judgment to the

Standing Rock Sioux Tribe ("SRST"), and leading to the partial remand. *Standing Rock III*, 255

F. Supp. 3d at 148. To avoid unnecessary repetition, the Tribe will not address in this

background section the Court's summary judgment decision, or summarize the remand decision,

instead referring the Court to SRST's memorandum in support of its motion for summary

judgment being filed today.  The Tribe addresses below background and procedural history related specifically to the Tribe and its unique claims and arguments.

**I.      The Oglala Sioux Tribe and its Rights in Waters of the Missouri River**

**A.  Treaties**

The Tribe, as member of the Great Sioux Nation, is a party to the 1851 Treaty of Fort Laramie and the 1868 Great Sioux Nation Treaty. 11 Stat. 749 (Sept. 17, 1851); 15 Stat. 635 (Apr. 29, 1868). The 1851 Treaty recognized 60 million acres along the Missouri River as the territory of the Great Sioux Nation. 11 Stat. 749, art. 5. The 1868 Treaty demarcated a 26 million acre reservation "for the absolute and undisturbed use and occupation" of the signatory tribes. 15 Stat. 635, art. 2. That reservation was called the Great Sioux Reservation and included all of present day South Dakota west of the low water mark of the east bank of the Missouri River, and adjacent lands in North Dakota. *Id.* The 1868 Treaty affirmed a permanent homeland for the Great Sioux Nation, reserving to the Nation, without limitation, rights to water, natural resources, self-government, and all other rights necessary to make the Great Sioux Reservation a livable homeland, which the United States pledged to protect.

In 1889, the United States divided the Great Sioux Reservation, creating the Pine Ridge Indian Reservation ("Reservation") for the Tribe. Act of Mar. 2, 1889 § 1, 25 Stat. 888, 888 (1889). The creation of the Reservation also reserved, without limitation, rights to water, natural resources, and all other rights necessary to secure the Reservation as a home for the Tribe. In particular, water rights are reserved to the tribes on reservations by the United States to carry out the purposes for which the lands were reserved—to serve as a livable homeland. *See Winters v. United States*, 207 U.S. 564, 576-77 (1908); *Arizona v. California*, 460 U.S. 605, 616 (1983).

**B.  The Tribe's Rights Under the Mni Wiconi Act**

Congress enacted the Mni Wiconi Project Act of 1988, Pub. L. No. 100-516, 102 Stat.

2566 (1988) ("Mni Wiconi Act")[1] to "ensure a safe and adequate municipal, rural, and industrial

water supply for the residents of the Pine Ridge Indian Reservation" and to "provide certain

benefits to fish, wildlife, and the natural environment of South Dakota, including the Pine Ridge

Indian Reservation[.]" *Id.* § 2(b)(1), (4). The Mni Wiconi Act declares that the "United States

has a trust responsibility to ensure that adequate and safe water supplies are available to meet the

economic, environmental, water supply, and public health needs of the Pine Ridge Indian

Reservation[.]" *Id.* § 2(a)(4).

The Mni Wiconi Act requires the Secretary of the Interior to "plan, design, construct,

operate, [and] maintain" the portion of the Mni Wiconi Project serving the Reservation: the

OSRWSS. *Id.* § 3(a). The OSWRSS was authorized to include the full battery of infrastructure

needed to operate a water system—pumping and treatment facilities located along the Missouri

River where water intake occurs; pipelines to the Reservation; distribution and treatment

facilities to serve the needs of the Reservation; and such facilities as the Secretary of the Interior

deems necessary or appropriate to meet the water supply, economic, public health, and

environmental needs of the Reservation. *Id.* The Act provides that the "[t]itle to the [OSRWSS]

shall be held in trust for the Oglala Sioux Tribe by the United States…." *Id.* § 3(e).

In the Mni Wiconi Act, Congress found that "the best available, reliable, and safe rural

and municipal water supply to serve the needs of the Pine Ridge Indian Reservation [and other

users] is the Missouri River." *Id.* at § 2(a)(5). The water intake for the OSRWSS is in the

---

[1] The Act has been amended by Pub. L. No. 103-434, 108 Stat. 4526 (1994); Pub. L. No. 105-277 (1998); Pub. L. No. 106-53, 113 Stat. 269 (1999); Pub. L. No. 107-367 (2002); and Pub. L. No. 110-161, 121 Stat. 1844 (2007). All of the citations in this memorandum to the Mni Wiconi Act are to the original act, Pub. L. No. 100-516, 102 Stat. 2566, except as noted.

Missouri River, 205 miles downstream of the DAPL crossing at Lake Oahe. RAR 92;

USACE_ESMT 1358-59.

## II.      Tribe's Opposition to DAPL, and Its Participation in This Case

The Corps did not consult with the Tribe concerning environmental impacts of the

proposed pipeline prior to issuance of the EA and Finding of No Significant Impact ("FONSI").

A Corps' letter to the Tribe prior to the FONSI was limited to review under Section 106 (54

U.S.C. § 306108) of the National Historic Preservation Act ("NHPA"). USACE_DAPL 69606.

After issuance of the FONSI, and following a decision by the Corps to temporarily halt

construction while considering NEPA compliance, the Tribe wrote to the Secretary of the Army

and other officials, requesting reconsideration of the decision not to perform an EIS.

USACE_ESMT 1353. The Tribe asserted that the FONSI was inadequate for several reasons,

including an inadequate worst case spill analysis, failure to consider the impacts on the Mni

Wiconi Project, failure to adequately assess impacts on wildlife, and that there had been no

meaningful consultation with the Tribe in violation of binding policy directives. *Id*. at 1354-61,

1364-65.

On November 14, 2016, the Assistant Secretary of the Army for Civil Works decided that

additional environmental analysis and discussion with the SRST were warranted before making a

final decision on whether to grant the easement. USACE_ESMT 1001. In response to the letter

announcing that decision, the Tribe wrote to the Assistant Secretary, reiterating its views on the

EA. USACE_ESMT 611. It included as an attachment a report from Richard White of EarthFax

Engineering Group, LLC ("EarthFax"), with a technical critique of the EA. USACE_ESMT 624.

After hearing the Tribe's concerns, and those of other tribes as well, the Assistant

Secretary of the Army for Civil Works, in a memorandum dated December 4, 2016, announced

that the Corps would not grant the easement on the then-current record and that it would prepare an EIS prior to granting the easement. USACE_ESMT 604. The memorandum announcing the decision stated that the "robust consideration of reasonable alternatives that I am directing, together with an analysis of potential spill risk and impacts, and treaty rights, is best accomplished… by preparing an [EIS]." *Id.* The Corps subsequently published a Notice of Intent ("NOI") to prepare the EIS. USACE_ESMT 467; 82 Fed. Reg. 5543 (Jan. 18, 2017).

Four days after his inauguration, President Trump issued a memorandum entitled "Presidential Memorandum Regarding Construction of the Dakota Access Pipeline" directing the Corps to reconsider the December 4 memorandum and the NOI. USACE_ESMT 430. The NOI was subsequently withdrawn, USACE_ESMT 103, and the easement to DAPL ("Easement") was granted. USACE_ESMT 1.

The Tribe filed suit on February 11, 2017, three days after the Easement was granted. Its separate action was later consolidated with this case. Minute order 3/16/2017. The Tribe filed an amicus brief supporting SRST's motion for summary judgment, ECF No. 138, but did not file its own motion for summary judgment prior to the remand. On December 19, 2018, per the Court's minute order entered December 12, 2018, the Tribe filed a notice as to pre-remand claims that it was preserving. ECF No. 385.

### III.    The Corps' Remand Process and Decision

On August 31, 2018, the Corps concluded the remand process with the two-page "Memorandum for Record" announcing that it had uncovered no "significant new circumstances or information" that would warrant additional NEPA review of the Easement. RAR 1 ("Remand Decision"). The Remand Decision stated that the rationale supporting these findings was contained in an enclosure entitled "Analysis of the Issues Remanded by the U.S. District Court

for the District of Columbia Related to Dakota Access Pipeline Crossing at Lake Oahe,"

("Remand Analysis"), and in the administrative record. RAR 2. The principal documents relied

on by the Corps in its decision—a technical analysis of an oil spill in Lake Oahe ("Spill Model

Report"), RAR 8743; a review of oil spills on "downstream receptors" entitled "Evaluation of

Hydrocarbon Releases into Lake Oahe using OILMAPLand and SIMAP Trajectory, Fate, and

Effects Modeling for the Dakota Access Pipeline. Final Report Prepared for Energy Transfer

Partners," (Feb. 12, 2018) ("Downstream Receptor Report"), RAR 2739; and the "Review and

Analysis of Tribes' Submissions" ("Submission Review"), RAR 141—were prepared by Dakota

Access or its consultants, and were not shared by the Corps with the Tribe in draft or final during

the remand, although the Tribe requested that it be provided information provided to the Corps

by Dakota Access during the remand. RAR 12272; RAR 11566.

Although the OSRWSS water intake was outside of the study area chosen for the spill

model, in the Remand Analysis the Corps also addressed, for the first time, the impacts of the

operation of the pipeline on the OSRWSS water intake, concluding that the OSRWSS intake will

not be impacted for two reasons: first, because it is too far downriver, and second, because

hydrocarbons that reach the Oahe Dam would not pass through the dam and flow downstream

because of the level at which hydrocarbons would appear in the water column. RAR 94.

## LEGAL STANDARD

NEPA is the "basic national charter for protection of the environment." 40 C.F.R. §

1500.1(a). It mandates that public officials "make decisions that are based on understanding of

environmental consequences, and take actions that protect, restore, and enhance the

environment." *Id.* § 1500.1(c). NEPA requires agencies to prepare an EIS for every "major

Federal action[] significantly affecting the quality of the human environment[.]"  42 U.S.C. §

4332(C).

When considering a proposed action under NEPA, an agency must first determine

whether the action requires an EIS. *Friends of the Earth, Inc. v. U.S. Army Corps of Eng'rs*, 109

F. Supp. 2d 30, 35 (D.D.C. 2000) (citing 40 C.F.R. § 1501.4(a)). To make that determination, an

agency prepares an EA. 40 C.F.R. § 1508.9. If the agency determines that no EIS is required it

must report its decision in a FONSI. *Id.*; 40 C.F.R. §§ 1501.4(e), 1508.13. To issue a FONSI and

decline to prepare an EIS, the agency must have concluded that there would be no significant

impact or have planned measures to mitigate such impacts to a level of no significance.

*Myersville Citizens for a Rural Cmty., Inc. v. F.E.R.C.*, 783 F.3d 1301, 1322 (D.C. Cir. 2015).

When reviewing an agency decision to forego preparation of an EIS in favor of a FONSI a court

must apply a four-step analysis, asking "whether the agency (1) has accurately identified the

relevant environmental concern, (2) has taken a hard look at the problem in preparing its EA, (3)

is able to make a convincing case for its finding of no significant impact, and (4) has shown that

even if there is an impact of true significance, an EIS is unnecessary because changes or

safeguards in the project sufficiently reduce the impact to a minimum." *Id.* at 1322 (internal

quotations omitted).

Under the Administrative Procedure Act ("APA"), the reviewing court sets aside an

agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law[.]" 5 U.S.C. § 706(2)(A). An agency's obligation to engage in "reasoned

decisionmaking" means that "[n]ot only must an agency's decreed result be within the scope of

its lawful authority, but the process by which it reaches the result must be logical and rational."

*Michigan v. EPA*, 135 S.Ct. 2699, 2706 (2015). Although "a court is not to substitute its

judgment for that of the agency," the arbitrary and capricious standard demands that the agency "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotations omitted). On the other hand, when the record demonstrates that an agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [made a decision that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise[,]" it has acted in an arbitrary and capricious manner. *Id.*

## ARGUMENT

The Corps' issuance of the FONSI, the Easement, and now the Remand Decision, ignore valid Tribal concerns about potential impacts of the DAPL crossing at Lake Oahe, in violation the Tribe's procedural and substantive rights under the Mni Wiconi Act, NEPA, and binding consultation policies.

The Corps did not consider the trust obligation to the Tribe or the potential impacts on the OSRWSS intake, nor did it consult with the Tribe concerning those impacts, prior to issuance of the EA, the FONSI or the Easement. During the remand, the Corps again failed to meet its consultation obligations with respect to the Tribe and its concerns. The Corps ignored the Tribe's requests to review information prepared by Dakota Access during the remand, and met with the Tribe without providing such information, and only after the Spill Model Report had been finalized and Dakota Access and the Corps had completed most of the Remand Analysis.

The Corps' Remand Decision is deeply flawed. It underestimates both the risk and volume of a spill. It relies heavily on spill modeling that arbitrarily limits the analysis to a 10-day

period, even though oil will continue to flow downstream after ten days and even though the

Spill Model Report predicts that maximum hydrocarbon concentrations will occur under some

scenarios on day 10. Limiting modeled scenarios to a 10-day period artificially truncates the

analysis of environmental impacts of a spill, preventing the Remand Analysis from adequately

assessing the extent of contamination that might be caused by a spill. The Remand Decision does

not take a hard look at the potential significant impacts of the pipeline because it relies on studies

that minimize the size and impact of a potential spill.

Notwithstanding the fundamental flaws in the Remand Decision and underlying analyses,

the decision and analyses show impacts that exceed any shown in the EA, and that are

significant. As one example, in discussing potential impacts to fish, the Spill Model Report

predicts that a discharge at the ND-380 valve site at the 90th percentile discharge volume would

result in almost 30% mortality of sensitive aquatic species over an area of 74.7 square

kilometers. RAR 8943. The Spill Model Report concludes with this ominous statement: "In the

unlikely event of a pipeline rupture or a valve loss resulting in a release of oil in the magnitude

modelled here ..., the resulting effects have the potential to be both significant and adverse, on

time scales that range from days to years." RAR 8953. In concluding that no EIS was required

without even discussing this conclusion, the Corps therefore "failed to consider an important

aspect of the problem," *Motor Vehicle Mfrs. Ass'n of U.S.*, 463 U.S. at 43, and its decision is

arbitrary and capricious.

The Remand Analysis sweeps aside the Tribe's concerns about impact to the OSRWSS in

a cursory fashion, and without addressing the fiduciary responsibility of the United States to

provide clean drinking water to the Tribe. The Corps' conclusion that the intake would not be

impacted because it is too far downriver, and because of the level of hydrocarbons in the water

column, which it claims would be stopped by the Oahe Dam, RAR 94, is unsupported by the record. Because the Spill Model is limited to a 10-day duration, it does not predict when oil will reach the Oahe Dam or the OSRWSS intake, or what the hydrocarbon levels will be when it does. RAR 115. The Spill Model does not predict where oil will settle in the water column after the 10-day study duration, or how it will react when it reaches the Oahe Dam, a solid object that impedes its flow at most levels, while at the same time allowing flow through discharge pipes and turbines to the Missouri River.

## I.   PRE-REMAND CLAIMS

### A.  The Corps Violated the Tribe's Rights under the Mni Wiconi Act

1.   The Act Imposes a Trust Obligation on the United States to Provide Clean Drinking Water to the Tribe

Pursuant to the Mni Wiconi Act, the "United States has a trust responsibility to ensure that adequate and safe water supplies are available to meet the economic, environmental, water supply, and public health needs of the Pine Ridge Indian Reservation…." Mni Wiconi Act § 2(a)(4). Further, the Mni Wiconi Act creates a trust corpus in the OSRWSS held by the United States for the benefit of the Oglala Sioux Tribe, and the United States is required to operate and maintain the OSRWSS per statute, thus creating a specific trust duty. *Id.* § 3(a), (e) ("Title to the [OSRWSS] shall be held in trust for the Oglala Sioux Tribe by the United States….").

The Mni Wiconi Act therefore imposes an enforceable duty on the United States, including the Corps, to refrain from acting in a way to degrade these rights. *See United States v. White Mountain Apache Tribe*, 537 U.S. 465, 468-69 (2003) (determining that a law that directs the Secretary of Interior to hold lands in trust for the tribe created a fiduciary duty to maintain, protect, repair, and preserve the property; while the statute did not have specific language regarding maintenance and repair, common-law trust principles independently require any

trustee to preserve and maintain trust assets); *United States v. Mitchell*, 463 U.S. 206, 225 (1983)

(acknowledging "the undisputed existence of a general trust relationship between the United

States and the Indian people" that informs its interpretation of more specific statutes); *Seminole*

*Nation v. United States*, 316 U.S. 286, 297 (1942) (stating that in discharging the treaty relations

with Tribes, the Government must act under "obligations of the highest responsibility and trust").

As the Solicitor for the Department of Interior noted, "the federal government's trust relationship

counsels that the Corps' conduct will be reviewed pursuant to the most exacting fiduciary

standards." USACE_ESMT 580, Memorandum from Acting Sec'y to Acting Solicitor, Tribal

Treaty and Environmental Statutory Implications of the Dakota Access Pipeline, M-37038 (Dec.

4, 2016) (internal quotations omitted).[2] The express trust language in the Mni Wiconi Act

distinguishes the Tribe's Mni Wiconi Act claim from the SRST breach of trust claim, which the

Court denied on summary judgment. *Standing Rock III*, 255 F. Supp. 3d at 145 ("Standing Rock

has not identified a specific provision creating fiduciary or trust duties that the Corps

violated[.]").

> ## 2. The Corps Failed to Consider the Impacts of DAPL on the Tribe's Mni Wiconi Rights, as Required

The Department of the Army, of which the Corps is a part, recognizes that the Army will

. . . "meet its responsibilities to Federally-recognized Tribes as derived from the federal trust

---

[2] This opinion was subsequently suspended by the Acting Secretary of the Interior "[t]o facilitate the Corps' granting of the easement" to Dakota Access, *Standing Rock III*, 255 F. Supp. 3d at 120 (citing ECF No. 127-15 (Memorandum from Acting Secretary, Dep't of Interior, Feb. 6, 2017)), and was withdrawn by the Acting Solicitor subsequent to the Court's decision in *Standing Rock III*, because "[t]he Corps made its decision, the record for judicial review has been completed, and any reconsideration for further decision-making by the Corps will be governed by the orders and guidance by the courts." Memorandum from Principal Deputy Solicitor appointed as Acting Solicitor to Sec'y, Assistant Sec'y, and Dir., Withdrawal of M-37038, Tribal Treaty and Environmental Statutory Implications of the Dakota Access Pipeline, M-37047 (July 7, 2017) at 2, https://www.doi.gov/sites/doi.gov/files/uploads/m-37047.pdf. The opinion withdrawing Solicitor's Opinion M-37038 says nothing about the government's trust responsibility to the Tribe.

doctrine, treaties, and agreements" and "the importance of understanding and <u>addressing</u> the

concerns of Federally-recognized Tribes prior to reaching decisions on matters that may have the

potential to significantly affect tribal rights, tribal lands, or protected tribal resources." Dep't of

the Army, *American Indian & Alaska Native Policy* (Oct. 24, 2012) (emphasis added)[3]; *see also*

RAR 3138 (stating that the Corps "will work to meet trust obligations, protect trust resources,

and obtain Tribal views of trust and treaty responsibilities … in accordance with provisions of

treaties [and] laws…."); RAR 13975 (DOD Instruction 4710.02 §§ 4.1 (Department of Defense

policy to meet trust responsibility set out in treaties and statutes), 4.4 (policy to take tribal

resources into consideration), 5.3.4 (obligation to consult with tribes).[4] Courts have also

recognized that the Corps owes a duty under these treaty and trust responsibilities to consider

treaty and trust rights before issuing permits. *See, e.g.*, *Nw. Sea Farms Inc. v. U.S. Army Corps of

Eng'rs*, 931 F. Supp. 1515, 1520 (W.D. Wash. 1996) ("[T]he duties imposed by the trust

relationship owed by the Corps to the [tribe] mandates that the Corps take treaty rights into

consideration."); *Muckleshoot Indian Tribe v. Hall*, 698 F. Supp. 1504, 1523 (W.D. Wash. 1988)

(upholding an injunction against the construction of a marina for lack of consideration of the

effect on tribal treaty rights).

　　　Prior to the issuance of the EA and the FONSI, the Environmental Protection Agency

("EPA") commented on the draft EA, stating that it should consider the impacts of the pipeline

on the Mni Wiconi Project. USACE_DAPL 73188. The Department of Interior concurred in the

EPA comment letter. USACE_DAPL 72159. Notwithstanding this comment, the Corps did not

---

[3] https://www.usace.army.mil/Portals/2/docs/civilworks/tribal/CoP/2013_nap_brochure.pdf.
[4] The version of DOD Instruction 4710.02 found in the administrative record was replaced on September 24, 2018, https://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodi/471002p.pdf?ver=2018-11-28-143903-320. It imposes similar requirements. *Id*. §§ 1.2 (stating that the Department of Defense "must comply with ... Federal trust doctrine"), 2.3(d) (indicating that there is an obligation to consult with tribes).

address potential impacts to the Mni Wiconi Project in the EA or FONSI. The EA and FONSI do not mention the Oglala Sioux Tribe, the Mni Wiconi Project, or the OSRWSS. USCAE_DAPL 13680, 71220.

Once the EA and FONSI issued, the Tribe submitted comments to the Corps stating that an EIS should be performed and that impacts of the pipeline on the Mni Wiconi Project had not been considered in the EA and FONSI, and should be considered. USACE_ESMT 618; USACE_ESMT 1357. The Tribe's comments included a detailed technical report by EarthFax, USACE_ESMT 624, which raised issues that this Court later held had not been addressed by the Corps before it issued the Easement, requiring remand. *Standing Rock III*, 255 F. Supp. 3d at 129.

Given that the Mni Wiconi Act provides the substantive source of law that establishes the specific fiduciary duties of the government—providing clean drinking water to residents of the Reservation and ensuring that the OSRWSS is maintained and preserved for that purpose and others—the Corps' failure to take any look, much less a hard look, at the DAPL's effects on the OSRWSS establishes that its environmental review is deficient and the permits for DAPL violate the APA. The EA/FONSI said nothing at all with regard to the Mni Wiconi Act, the OSRWSS, or the United States' "trust responsibility to ensure that adequate and safe water supplies are available to meet the economic, environmental, water supply, and public health needs of the Pine Ridge Indian Reservation[,]" Mni Wiconi Act § 2(a)(4), or its duty to operate and maintain the OSRWSS to "ensure a safe and adequate municipal, rural, and industrial water supply for the residents of the Pine Ridge Indian Reservation…." *Id.* § 2(b)(1). The Corps' pre-remand review completely failed to consider impacts on the OSRWSS, the federal governments' duties, or the potential of a spill to contravene the duties to preserve and maintain the water supply and the

14

system itself. This is a failure to meet the requirements of NEPA that requires the agencies to consider the effects on public health or safety, the extent to which the effects of the action are likely to be highly controversial, whether there are effects that are highly uncertain or involved unique or unknown risks, environmental justice concerns, and the effects of the actions on the human environment. 40 C.F.R. § 1508.27. *See also* Council on Envtl. Quality, *Environmental Justice Guidance Under the National Environmental Policy Act*, at 14 (1997) ("Where environments of Indian tribes may be affected, agencies must consider pertinent treaty, statutory, or executive order rights and consult with tribal governments in a manner consistent with the government-to-government relationship."). In sum, there is no indication in the Corps' analyses as to whether DAPL's approval will prevent the United States from carrying out its duties under the Mni Wiconi Act without injuring the Tribe or the trust resource itself.

Without the requisite "hard look" at the effects of the project on the Tribe's trust resources and the ability of the Secretary to carry out his trust duties, the Corps violated NEPA, its trust obligation to the Tribe in the Mni Wiconi Act, and the APA.

3. The Corps Failed to Consult with the Tribe Concerning the Potential Impacts on the Mni Wiconi Project Prior to Issuance of the FONSI or the Easement

The Corps has an obligation to consult with the Tribe concerning any action that could impact the Tribe's rights in the Mni Wiconi Project, under NEPA and binding policies adopted by the Corps and the Department of the Army and Defense. The Tribe adopts the arguments of SRST in its motion for summary judgment as to this obligation. *See also supra* at 13 (citing consultation policies).

The Corps did not consult with the Tribe on the operation of the pipeline and its possible impacts prior to issuance of the EA and FONSI. The Corps wrote to the Tribe concerning consultation under Section 106 of the NHPA, USACE_DAPL 69606, but Section 106

15

consultation on impacts of construction to historic and cultural properties is separate and distinct from consultation concerning possible environmental impacts of operation of the pipeline. The EA's list of agencies and tribes consulted does not include the Tribe. USCACE_DAPL 71335.

After the issuance of the EA, and prior to issuance of the Easement, the Tribe requested consultation with the Corps, and scheduled a consultation with the Corps for January 17, 2017, USACE_ESMT 475-76, but no such consultation occurred prior to the issuance of the Easement.

The Corps therefore breached its obligation to consult with the Tribe concerning the impacts of the pipeline on the Tribe's rights in the Mni Wiconi Project.

## II.     REMAND CLAIMS

### A.  Corps Did Not Meet Its Consultation Obligations to the Tribe with Respect to the Remand

As set out in the SRST summary judgment brief, the Corps outsourced the technical and legal review to Dakota Access, and did not consult in a meaningful way with the Tribes. The Corps wrote to the Tribe requesting very limited information concerning hunting and fishing, game species, and tribal cultural practices connected to Lake Oahe, and seeking confirmation that the EarthFax report was the only report provided by the Tribe to the Corps after issuance of the FONSI. RAR 13328. The Corps letter provided no information to the Tribe concerning the remand. In response, the Tribe insisted on its right to provide additional information, the right to review information provided to the Corps during the remand by Dakota Access, status as a cooperating agency, and consultation. RAR 12271, 12272; RAR 11555, 11566. The Corps never did provide the Tribe with any information prepared by Dakota Access, and set a deadline for the Tribe to provide information concerning the remand even though the Tribe had not been provided any Dakota Access work product. RAR 5800.

The Corps did eventually meet with the Tribe on June 1, 2018, RAR 103; RAR 3172;

RAR 3123, long after the Spill Model Report had been finalized, RAR 8743 (Spill Model

Report, dated Feb. 12, 2018), and after Dakota Access and the Corps had completed most of the

remand analysis. *See e.g.*, RAR 10203 (draft of Remand Analysis, dated Feb. 4, 2018); RAR

8489 (draft of Downstream Receptor Report, dated Feb. 13, 2018); RAR 10952 (earlier draft of

Downstream Receptor Report, dated Dec. 21, 2017). But the Corps did not provide the Spill

Model Report or other critical analyses performed for the remand prior to or at the meeting, or

discuss those analyses in any meaningful way. RAR 3173-77. In failing to share information

with the Tribe at that meeting, the Corps lost its last opportunity to engage in meaningful

consultation with the Tribe. Despite not being presented any information developed during the

course of the remand prior to the meeting, the Tribe could have even at the eleventh hour

provided technical review of information, as the Tribe had present at the meeting Richard White,

RAR 3173, the engineer formally with EarthFax who had prepared the EarthFax report, and who

is qualified to speak to the technical issues. The Corps simply failed to meet its consultation

obligation to the Tribe on remand. The Corps' Remand Decision must therefore be set aside as

arbitrary and capricious and contrary to law.

### B.  The Corps' Remand Analysis is Fundamentally Flawed

#### 1.   The Risk Assessment is Arbitrary and Capricious

The Tribe adopts the arguments made in SRST's brief in support of its motion for

summary judgment that the Corps' risk assessment on remand is arbitrary and capricious.

#### 2.   The Worst Case Discharge Analysis is Arbitrary and Capricious, and Its Arbitrariness Infects the Entire Remand Analysis

The Tribe adopts the arguments made in SRST's brief in support of its motion for

summary judgment that the Corps' worst-case discharge ("WCD") analysis is deeply flawed, and

that this analysis infects the entire Remand Analysis on which the Remand Decision is based. As set out in the SRST brief, the WCD calculated by Dakota Access is actually not the worst case discharge, but is actually much too low, because, *inter alia*, it relies on overly optimistic shut-down and detection times.

In order to bolster its claim that its WCD calculation is reasonable, in the Remand Analysis the Corps falsely claims that the EarthFax report submitted by the Tribe estimates even lower WCD volumes. The Remand Analysis states that EarthFax calculated WCD at the Lake Oahe crossing to be 4,620 bbls. RAR 111. The Corps concluded that Dakota Access calculated a higher volume for WCD than did EarthFax. *Id*. This conclusion is false and unsupportable, as can readily be seen from the EarthFax report, and the portion of the EA that the report was addressing.

The EA stated that a WCD had been calculated based on U.S. Pipeline and Hazardous Materials Safety Administration ("PHMSA") regulations, USACE_DAPL 71315, but it did not state what that volume was. Rather than evaluate a WCD spill, Section 3.2.2.2 of the EA evaluated lower spill volumes of 4, 100, 1,000 and 10,000 bbls. USACE_DAPL 71270-71. The WCD that had been calculated prior to issuance of the EA was set out in a spill model document that was not made available to the Tribe until after it filed suit and was provided the administrative record (on April 10, 2017). USACE_DAPL 74725 (spill model prediction of release volume), 74729 (stating this was WCD). The EA also downplayed the possibility of a larger spill. USACE_DAPL 71270 ("the majority of actual pipeline spills are relatively small and fifty percent of the spills consist of 4 bbls or less").

In its December 2, 2016 report, EarthFax did not address the WCD calculation from the spill model, which it did not have because it had not yet been provided to the Tribe. Rather, it

addressed the spill volumes used in the EA. EarthFax reviewed data maintained by the PHMSA

and objected to the lower spill volumes analyzed in the EA as being unrealistic. EarthFax did

acknowledge that a spill of 4,620 bbl "could result," but in so stating EarthFax was comparing

that volume to the <u>lower</u> volumes in the EA—not to the higher volumes. The EarthFax report

concluded: "The above information makes clear that a spill volume of 4 bbl should not be

considered typical. …[T]he EA should have considered spill volumes well in excess of 100 bbl

as reasonable incident scenario rather than implying that a 4 bbl spill is the norm."

USACE_ESMT 626. Nowhere in its report did EarthFax calculate WCD, label the 4,620 bbl

volume as WCD, or compare that volume to the WCD calculated by Dakota Access.

Further, Richard White, author of the EarthFax report, made his position on this issue

very clear in a presentation to the Corps on June 1, 2018. RAR 3123 ("EA Basis: Considered

spill volumes up to 10,000 bbl but focused on a spill volume of 4 bbl."). The Corps'

mischaracterization of the EarthFax report, especially in light of Mr. White's presentation of this

very issue to the Corps at a meeting, serves to underscore the point made above regarding the

importance of meaningful consultation with Indian tribes.

3. The Remand Analysis Relies on an Arbitrary 10-day Spill Model Simulation
Period

The Remand Analysis relies heavily on additional spill modeling that arbitrarily limits

analysis to a 10-day period. Neither the Remand Analysis nor the Spill Model Report provide a

basis for limiting analysis of the effects of a spill to a 10-day period. Like the erroneous WCD

calculation, this fundamental flaw infects the entirety of the Corps' remand analysis and its

ultimate conclusions stated in the Remand Decision.

In the Spill Model Report, the modeled duration of each simulated spill was stated to be

10 days. *See* RAR 8746. This 10-day duration was used to determine the study boundary of the

project area, terminating the boundary at 74.67 miles downstream. RAR 8775 ("The study boundary was terminated at 120.2 km (74.67 miles downstream….")); *cf.* RAR 87 (stating that "model domain" ended 65 miles downstream). The SRST's drinking water intake is 75.41 miles downstream, just outside the study boundary. RAR 8777. Drinking water intakes for CRST and the Tribe were also outside the study area. *Id.*; RAR 65-67.

The Spill Model Report acknowledges that in the event of a spill, oil will continue to flow downstream after ten days: "At the end of the 10-day simulations, a large portion of the released oil would remain upstream of intake #13 (approximately 72.4 km (45 mi) downstream of the release location) and would be predicted to continue moving downstream as time progressed." RAR 8750. Yet, neither the Spill Model Report nor the Remand Analysis address what happens on day 11, or 12, or after. Limiting modeled scenarios to a 10-day period artificially truncates the analysis of environmental impacts of a spill, such as the impacts on downstream drinking water intakes, preventing the Remand Analysis from adequately assessing the extent of contamination that might be a caused by a worst case discharge. The Remand Analysis simply states that it would take more than 10 days for an unmitigated spill to reach the CRST intake, RAR 93, and longer to reach the downstream OSRWSS intake, making it "even less likely to be impacted." RAR 94.[5] By relying on the spill modeling that artificially ends after 10 days—even while acknowledging that oil will continue to flow downstream after 10 days— the Corps arbitrarily avoids consideration of the potential impacts after the 10-day period or outside of the study boundary.

Further, neither the Remand Analysis nor the Spill Model Report ever provides a rationale for limiting the spill model analysis to a 10 day period. This is so despite the fact that a

---

[5] The Remand Analysis's discussion of the potential impacts to the OSRWSS intake is discussed further below at 26-28.

Corps official specifically requested that justification be provided for the model duration. RAR

12009. The only explanation found in the record is in notes of a May 29, 2018 meeting between

the Corps and CRST in which the Corps stated that the spill model "assumed that there was no

significant response [to an oil spill] for a 10-day period of time," and explained that this was

longer than the 6 hours within which Dakota Access assured they could respond to a spill. RAR

1198. But no justification was provided for why a 10-day period was chosen or why the

modeling should end at the first day of the assumed response. Even if a response did begin on

day 10, there is a need to analyze the effects of the oil spill beyond the initial day of a response.

While other documents provide spill response plans, RAR 6439; RAR 6890, those documents do

not assess the continuing effects of a spill as clean-up proceeds. The Corps arbitrarily and

capriciously cut off analysis of what the effects would be if an oil spill reached downstream

tribal water intakes by relying on a spill model that ends at 10 days, creating a study boundary

just short of the first tribal water intake. The Corps thus avoids any meaningful analysis of the

effects of the project on those intakes, as well as on other impacts outside of the study boundary

or after the 10-day period.

The Spill Model Report itself indicates that the models should have been run for a longer

period of time. Several figures presented in the Spill Model Report show the maximum total

hydrocarbon ("THC") and dissolved total hydrocarbon ("DHC") concentrations predicted to

occur at the various intakes within the study boundary under various scenarios on day 10.[6] *See*

RAR 8883 (THC concentration of 2,000 µg/L at intake 13 on day 10 following full-bore rupture

("FBR") at Lake Oahe crossing under the surface oil exposure release scenario); RAR 8901

(THC concentration of 2,000 µg/L at intake 13 on day 10 following FBR spill at the crossing

---

[6] The Spill Model Report explains: "THC represents the total amount of oil ... in the water column, while DHC represents the total amount of hydrocarbons that are in solution." RAR 8851.

under the shoreline contact exposure release scenario); RAR 8902 (THC concentration of 650

µg/L at water intake 13 on day 10 following the 90th percentile discharge volume ("90 PD")

release at the crossing under the shoreline contact exposure release scenario); RAR 8913 (THC

concentration of 12 µg/L at intake 13 on day 10 following the FBR spill at the ND-380 valve site

under the surface oil exposure release scenario); RAR 8914 (THC concentration of 9 µg/L at

intake 10 on day 10 following the 90 PD spill at the ND-380 valve site under the surface oil

exposure release scenario); RAR 8932 (THC concentration of 440 µg/L at intake 11 on day 10

following the 90 PD spill at the ND-380 valve site under the shoreline contact exposure release

scenario); RAR 8934 (DHC concentration of 2 µg/L at water intake 11 on day 10 following the

90 PD spill at the ND-380 valve site under the shoreline contact exposure release scenario).[7] In a

case like this where a model predicts a maximum condition to exist at the end of the model

period, it is impossible to predict how that condition would have changed had the model been

run for a longer duration. If the model were run for a longer period, concentrations could

increase or the effects of the spill could spread further. Failure to model effects beyond the 10-

day window avoids meaningful analysis of the effects of a spill.

The arbitrary 10-day limitation of the spill model is a fundamental flaw that undermines

the entirety of the Remand Analysis. The Remand Analysis refers to or cites the Spill Model

Report a total of 130 times. The Remand Analysis insists that there will be no impact to tribal

water intakes because the farthest a worst-case discharge will flow is 65 miles downstream

within 10 days. RAR 60. Like the Spill Model Report, the Remand Analysis fails to ask the

---

[7] The water intakes are unlabeled in the figures cited in the paragraph above, but their locations are shown at RAR 8778, and their distance from the DAPL crossing are shown on RAR 8777. Water intake 13, for example, an unspecified intake, RAR 8777, is the furthest downstream, at 47 miles from the DAPL crossing, and is expected to experience its highest concentration of THC or DHC on a day 10 under some scenarios, per the pages of the Spill Model Report cited above.

crucial and obvious question of what happens after 10 days, once again cutting short the Corps'

analysis of the effects of a spill in order to avoid examining impacts to tribal water intakes.

The Downstream Receptor Report also heavily relied on the Spill Model Report, and it is

therefore limited to a 10-day duration. RAR 2741 ("This report is a summary of the results of the

Spill Model report and of the assessment of potential impacts to receptors downstream of the

Lake Oahe crossing"); RAR 2759, 2761, 2773 (figures showing results of 10 day modeling).

The Court has recognized that the Remand Analysis relied heavily on the Spill Model and the

Downstream Receptor Report. *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, No. CV

16-1534, 2019 WL 2028709, at *4 (D.D.C. May 8, 2019) (denying plaintiffs' motion to complete

administrative record).

In relying on a spill model that arbitrarily studies the effects of a spill for only ten days,

the Remand Decision is arbitrary and capricious, and must be set aside.

### C. The Remand Analysis Does Not Support the Corps' Conclusion that There Are No Significant Impacts

Although the Corps' responses to the tribes' expert reports was far from adequate, the

analyses in the Spill Model Report and Downstream Receptor Report differed from those

supporting the EA in some ways, in part in an apparent attempt to avoid the experts' criticisms.

The new models, however, were not only deficient—as shown above, concerning the arbitrary

WCD calculation and arbitrary 10-day spill model duration—they also resulted in an analysis

that showed that a spill could result in significant impacts not shown in the EA or in any

environmental analysis prior to issuance of the Easement.

In its pre-remand report, EarthFax noted that the EA focused on the effects of benzene

contamination, that other constituents of crude oil were more toxic than benzene, and that those

components should have been studied as well. USACE_ESMT 627. The Spill Model Report

recognizes that other components of oil "have the potential to cause negative effects and/or acute mortality as they are more persistent than the benzene," and that "compounds other than benzene may be responsible for negative effects including the pro-active closure of downstream water intakes." RAR 8851. The Downstream Receptor Report states: "[Polycyclic aromatic hydrocarbons (PAHs)] and more highly substituted benzenes ..., which have a higher likelihood of remaining within the environment for a longer period of time, have the potential to cause more persistent negative effects and/or acute mortality." RAR 2757. The spill model therefore models THC and DHC, and not benzene. RAR 8851. *See supra* at 21 n.6.

This analysis leads to results that demonstrate that an oil spill could have significant impacts, even using the woefully inadequate WCD employed for purposes of the remand, and the arbitrary 10-day study duration. The Downstream Receptor Report finds that a "large unmitigated release of oil" (i.e., in the amounts modelled in the Spill Model Report) to Lake Oahe or near Lake Oahe "would likely result in mortality" of vegetation, RAR 2769, 2784, benthic macroinvertebrates, RAR 2791, fish, RAR 2806, amphibians and reptiles, RAR 2812, birds, RAR 2819, and semi-aquatic mammals, RAR 2832, causing impacts to hunting, RAR 2847, fishing, RAR 2848, and recreational and cultural practices. RAR 2849. In discussing potential impacts to fish, the Downstream Receptor Report notes the findings of the Spill Model Report, which predicts, *inter alia*, that a discharge at the ND-380 valve site at the 90th percentile discharge (PD) volume (less than a full-bore rupture) would result in almost 30% mortality of sensitive aquatic species over an area of 74.7 square kilometers, and 2.5% for other aquatic species. RAR 8943; *see also* RAR 8812-13, 8941-42 (explaining modeling and the results); RAR 2757, 2806-07 (explaining modeling and results). Further, the Spill Model report notes that it underestimates mortality to fish and wildlife: "It should be noted that injury resulting from non-

acute mortality due to a spill (e.g., chronic effects, delayed mortality such as reduced cardiac

fitness …) are not accounted for in the exposure model. Therefore, the results predicted by the

biological exposure model may be considered underestimates for fish and wildlife." RAR 8820.

The spill model also predicts that spills will result in concentrations of hydrocarbons

exceeding chronic limits in water columns, possibly for several days. RAR 114; RAR 2838

(discussing possible need to close intake 5). Further, figures included in the Spill Model Report

show maximum THC concentrations in excess of 252.5 µg/L and DHC concentrations exceeding

22.5 µg/L. *See, e.g.*, RAR 8883, 8884, 8885, 8902, 8933, 8934. According to the Remand

Analysis, these amounts equate to 5 µg/L of benzene, which the Remand Analysis states is the

proper standard for benzene, even though North and South Dakota set stricter standards. RAR 93

n.25, 114-15.[8] As a result, benzene levels would exceed the 5 µg/L level under certain spill

scenarios. The Remand Analysis attempts to explain this away by arguing that the spill model

predicts that no hydrocarbons would be present at tribal drinking water intakes at Fort Yates and

SRST because the intakes are 10 meters below the surface, and the spill model predicts no

dissolved hydrocarbons below 10 meters, RAR 114-15, but that assumes a best case scenario,

and ignores the applicable water quality standards.[9]

---

[8] EarthFax noted that the EA used a 5 µg/L standard for benzene, and that it should have used the lower standard set by North Dakota for the Missouri River of 2.2 µg/L. USACE_ESMT 629. *See* N.D. Admin. Code § 33-16-02.1 App. 1 (classifying Missouri River as Class I); *id.*, §§ 33-16-02.1-09 (3) (Tables 2 applies to Class I streams); *id.*, Table 2 (setting benzene standard at 2.1 µg/L, or 0.1 µg/L less than stated in EarthFax report)). Likewise, South Dakota classifies the Missouri River as a domestic water supply, S.D. Admin. R. §§ 74:51:03:05, 74:51:03:02 (2019), and sets the applicable standard for benzene at 2.2 µg/L. *Id.* § 74:51:01:55, 74:51:01:55 App. B. The Remand Analysis argues that the 2.2 µg/l level should not apply because (1) it says the North Dakota standard is a "chronic" standard which should not be applied, and (2) it would not be exceeded based on a 100 bbl spill. RAR 114. This is incorrect because the North Dakota standard is not identified as a chronic standard, and because the standard is exceeded in the modelled spills, as discussed above. The Remand Analysis does not address the South Dakota standard.

[9] The Remand Analysis's discussion of the OSRWSS intake is addressed below at 26-28.

The Spill Model Report concludes with this ominous statement: "In the unlikely event of a pipeline rupture or a valve loss resulting in a release of oil in the magnitude modelled here …, the resulting effects have the potential to be both significant and adverse, on time scales that range from days to years." RAR 8953. Notwithstanding this concluding statement in a document that the Corps commissioned and relied upon greatly, the Corps concluded that no EIS was required. Further, the Corps reached that conclusion without even discussing the Spill Model Report's conclusion that impacts of an oil spill would be significant and potentially long-lasting. The Corps therefore "failed to consider an important aspect of the problem," *Motor Vehicle Mfrs. Ass'n of U.S.*, 463 U.S. at 43, and its decision is arbitrary and capricious.

### D.  The Remand Analysis Does Not Correct the Corps' Failure to Consider Impacts on the Mni Wiconi Project/OSRWSS

The Remand Analysis does not address the fiduciary responsibility of the United States to provide clean drinking water to the Tribe and to maintain the OSRWSS. It does, however, briefly address potential impacts of the pipeline on the OSRWSS, concluding that the OSRWSS intake will not be impacted for two reasons: first, because it is too far downriver, and second, because hydrocarbons that reach the Oahe Dam would not pass through the dam and flow downstream because of their level in the water column. RAR 94; *see also* RAR 67 (refusing to consider potential impacts to OSRWSS water intake for purposes of environmental justice analysis because intake was outside project boundary, and because census blocks along Missouri River between project boundary and OSRWSS intake are not majority minority). These conclusions are unsupported by the record, and are arbitrary and capricious.

The main flaw with this cursory discussion is that, as noted above, the Spill Model is fundamentally flawed because it relies on an erroneous WCD calculation and an arbitrary 10-day study model. Because the Spill Model is limited to a 10-day duration, it does not predict when oil

will reach the Oahe Dam or the OSRWSS intake, or what the hydrocarbon levels will be when it does. RAR 115 ("The Spill Model report does not predict affects from the modeled hypothetical releases to … the water intakes for … [the Tribe]…."). The Spill Model predicts where oil will settle in the water column during the 10-day period, but not where it will settle after that, or where it will settle further downstream.

Further, the Spill Model is based on unimpeded flow downstream in Lake Oahe. The model does not predict what will happen when water reaches a solid object like the Oahe Dam that impedes its flow at most levels, while at the same time allowing flow through discharge pipes and turbines to the Missouri River. That oil may settle at a certain level while flowing unimpeded downstream within Lake Oahe during the 10-day study tells us nothing about where oil will settle when it reaches the Oahe Dam and its flow is impeded, or how oil within the water column will react when it reaches the dam. In fact, the Corps has recognized that the water at the dam is turbulent. Exhibit A to Declaration of Michael L. Roy (U.S. Army Corps of Engineers. 2010. Final Oahe Dam/Lake Oahe Master Plan: Missouri River, South Dakota and North Dakota. Design Memorandum MO-224. Omaha District. Omaha, Nebraska at 6-8) ("The area around the [Oahe Dam] intakes is a good fishery because the turbulent water attracts many species of fish.").

The Mini Wiconi Act also provided for the implementation of mitigation plans for fish and wildlife and terrestrial losses due to the Oahe Dam. Mni Wiconi Act § 6(b), as amended by Pub. L. No. 103-434, § 809(2), 108 Stat. 4526, 4544 (1970) ("The Secretary [of Interior], in cooperation with ... [South Dakota] Indian tribes ... and other Federal agencies, shall develop and submit recommendations to the Congress for financing and implementing mitigation plans for fish and wildlife and terrestrial losses incurred as a result of the construction and operation of the

Oahe Dam Reservoir...."), but those plans have not been developed or implemented. RAR 11564-65. During the remand, the Tribe called for the Corps to address the potential impacts of DAPL on those mitigation plans, *id.*, but the Corps did not address such impacts in the record or decision.

### E. The Court Should Vacate the Easement and Order an EIS

The Tribe adopts the argument of the SRST in support of its motion for summary judgment that remand should be with vacatur of the Easement, and that the Court should order that an EIS be performed. *See Nat'l Parks Ass'n v. Semonite*, 916 F.3d 1075, 1088 (D.C. Cir. 2019) ("Congress created the EIS process to provide robust information in situations precisely like this one, where, following an environmental assessment, the scope of a project's impacts *remain both uncertain and controversial*.") (emphasis added).

### CONCLUSION

For the foregoing reasons, the Tribe's Motion for Summary Judgment should be GRANTED, and the Court should order that the Easement be vacated, and that an EIS be performed.

Respectfully submitted,

s/ *Michael L. Roy*
Michael L. Roy (DC Bar No. 411841)
mroy@hobbsstraus.com
Jennifer P. Hughes (DC Bar No. 458321)
jhughes@hobbsstraus.com
Elliott A. Milhollin (DC Bar No. 474322)
emilhollin@hobbsstraus.com
Hobbs, Straus, Dean & Walker, LLP
1899 L Street NW, Suite 1200
Washington, DC  20036
202-822-8282 (Tel.)
202-296-8834 (Fax)
*Attorneys for Oglala Sioux Tribe*

Mario Gonzalez
Gonzalez Law Office
522 7th St 202
Rapid City, SD 57701
(605) 716-6355
*Of Counsel for Oglala Sioux Tribe*

August 16, 2019

**CERTIFICATE OF SERVICE**

I hereby certify that on August 16, 2019, I electronically filed the foregoing

MEMORANDUM OF PLAINTIFF OGLALA SIOUX TRIBE IN SUPPORT OF ITS MOTION

FOR PARTIAL SUMMARY JUDGMENT with the Clerk of the Court using the CM/ECF

system, which will send notification of this filing to the attorneys of record and all registered

participants.


*/s/ Michael L. Roy*
Michael L. Roy

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE,<br><br>           Plaintiff,<br><br>   and<br><br>CHEYENNE RIVER SIOUX TRIBE,<br><br>               Plaintiff-Intervenor,<br>   v.<br><br>U.S. ARMY CORPS OF ENGINEERS,<br><br>               Defendant-Cross<br>               Defendant,<br><br>   and<br><br>DAKOTA ACCESS, LLC,<br><br>               Defendant-Intervenor-<br>               Cross Claimant. | Case No. 1:16-cv-1534-JEB<br>(and Consolidated Case Nos. 16-cv-1796<br>and 17-cv-267) |

**DECLARATION OF MICHAEL L. ROY IN SUPPORT OF OGLALA SIOUX
TRIBE'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

I, Michael L. Roy, declare as follows:

1.     I am counsel for Plaintiff Oglala Sioux Tribe. I am a member in good standing of

the District of Columbia bar, and have been admitted to practice before this Court.

2.     Attached as Exhibit A hereto is a true and correct copy of the cover page and page

6-8 of "U.S. Army Corps of Engineers. 2010. Final Oahe Dam/Lake Oahe Master Plan: Missouri

River, South Dakota and North Dakota. Design Memorandum MO-224. Omaha District. Omaha,

Nebraska." The complete report is available online at

http://usace.contentdm.oclc.org/digital/collection/p16021coll7/id/92/ (last visited Aug. 3, 2019).


       I declare under penalty of perjury that the foregoing is true and correct.


                                   */s/ Michael L. Roy*                 
                                   Michael L. Roy (DC Bar No. 411841)

August 16, 2019

**CERTIFICATE OF SERVICE**

I hereby certify that on August 16, 2019, I electronically filed the foregoing

DECLARATION OF MICHAEL L. ROY IN SUPPORT OF OGLALA SIOUX TRIBE'S

MOTION FOR PARTIAL SUMMARY JUDGMENT and Exhibit A thereto with the Clerk of

the Court using the CM/ECF system, which will send notification of this filing to the attorneys of

record and all registered participants.


*/s/ Michael L. Roy* _____
Michael L. Roy (DC Bar No. 411841)

# EXHIBIT A

No. 1:16-cv-1534-JEB

Exhibit A to Declaration of Michael L. Roy in Support of Plaintiff Oglala Sioux Tribe's Motion for Partial Summary Judgment.



**U.S. Army Corps
of Engineers**
Omaha District

# Final Oahe Dam/Lake Oahe
# Master Plan
## Missouri River, South Dakota and North Dakota

## Design Memorandum MO-224

**September 2010**

The intake structure is located at the east end of Oahe Dam.  A visitor center and the historic Oahe Chapel are located immediately northeast of the dam.  The Visitor Center has several displays depicting the construction of the dam and the natural resources of the area.  Oahe Chapel was the worship and educational center for the Oahe Mission that was located at Peoria Flats about five miles up river from its present location.  The chapel was moved to the face of the dam before the site was covered with water.   There are two scenic overlooks located just north of the chapel.  These are furnished with picnic shelters and tables and are accessed off SD Highway 1804.

There are some major cutbanks located in the northern portion of this MU.  Mid-Dakota Rural Water System has a water intake in this area.  This unit contains an area that is a staging and storage area for outside maintenance supplies.

The CRMP has identified cultural sites in this area.  Prior to any future development at or near this area, an evaluation must be made to determine if the development would affect any historic properties that may be eligible for the National Register or any Traditional Cultural Properties and the best way to avoid, minimize, or mitigate potential impacts.

<u>Area Use</u>.  Visitation to the facilities offered at the dam embankment is low.  However, many visitors pass through the area to reach other recreation areas.   At the powerhouse, the lobby and observation balcony provide interpretive displays about the purpose and construction of the Oahe Dam and the Corps hydropower function on the Missouri River.  Daily tours of the powerhouse are conducted throughout the summer recreation season when tourists, school groups, special interest groups, and local residents visit the dam.  During the remainder of the year, tours are available by prior arrangement.

The area around the intakes is a good fishery because the turbulent water attracts many species of fish.  The cool, deep water in the intake area makes this a good area for salmon fishing.  Fishermen who are attracted by catches of walleye and trout also use the stilling basin.

<u>Resource Objectives</u>.
- Accomplish power generation, flood control, and maintenance of the project
- Maintain the operational integrity of the dam and related facilities
- Provide opportunities for visitors to the project to learn of the mission of the Corps of Engineers on the Missouri River and to learn of the process of hydropower generation
- Manage vegetation resources in a manner best suited to the operational needs of the area
- Promote ecological integrity by controlling noxious weeds
- Preserve, monitor, and protect any cultural resources
- Strive to minimize any potential environmental impact from the operation of the dam and structures