**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **STANDING ROCK SIOUX TRIBE,** | **Case No. 1:16-cv-1534-JEB** |
| | **[Consolidated with 1:16-cv-1796 and** |
| **Plaintiff,** | **1:17-cv-267]** |
| **and** | |
| **CHEYENNE RIVER SIOUX TRIBE,** | **PLAINTIFFS YANKTON SIOUX TRIBE** |
| | **AND ROBERT FLYING HAWK'S** |
| **Intervenor-Plaintiff,** | **MOTION FOR SUMMARY JUDGMENT** |
| **v.** | |
| **U.S. ARMY CORPS OF ENGINEERS,** | |
| **Defendant,** | |
| **and** | |
| **DAKOTA ACCESS, LLP,** | |
| **Intervenor-Defendant.** | |

Pursuant to Fed. R. Civ. P. 56(a), Plaintiffs Yankton Sioux Tribe and Robert Flying Hawk, through their attorneys, hereby move this Court for summary judgment on all of its remaining claims, to wit:

1.      Violation of the National Environmental Policy Act, 42 U.S.C. § 4321, *et seq*.

2.      Violation of Defendants' duty to consult pursuant to Executive Order No. 13175, 65 Fed. Reg. 67249 (Nov. 9, 2000), ("EO 13175") and agency and departmental policies regarding development of the environmental assessment.

3.      Violation of Defendants' duty to consult during the remand process.  In support of this Motion, Plaintiffs have attached the accompanying memorandum.

WHEREFORE, Plaintiffs Yankton Sioux Tribe and Robert Flying Hawk respectfully request that this Court grant this motion, order preparation of an EIS, and vacate the underlying approvals for the Pipeline.

Respectfully submitted this 16th day of August, 2019.

YANKTON SIOUX TRIBE, et al.

*s/ Jennifer S. Baker*
Jennifer S. Baker, OKBA #21938
(*Pro Hac Vice*)
Jeffrey S. Rasmussen, WA #21121
(*Pro Hac Vice*)
Fredericks Peebles & Patterson LLP
1900 Plaza Drive
Louisville, CO 80027
Phone: (303) 673-9600
Facsimile: (303) 673-9155
jbaker@ndnlaw.com
jrasmussen@ndnlaw.com

*s/ Patricia A. Marks*
Fredericks Peebles & Patterson LLP
Patricia A. Marks, DCBA #446702
401 9th Street, N.W., Suite 700
Washington, D.C. 20004
Phone:  (202) 450-4887
Facsimile:  (202) 450-5106
pmarks@ndnlaw.com

*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **STANDING ROCK SIOUX TRIBE,** | **Case No. 1:16-cv-1534-JEB** |
| | **[Consolidated with 1:16-cv-1796 and** |
| **Plaintiff,** | **1:17-cv-267]** |
| **and** | |
| **CHEYENNE RIVER SIOUX TRIBE,** | **PLAINTIFFS YANKTON SIOUX TRIBE** |
| | **AND ROBERT FLYING HAWK'S** |
| **Intervenor-Plaintiff,** | **MEMORANDUM IN SUPPORT OF** |
| | **MOTION FOR SUMMARY JUDGMENT** |
| **v.** | |
| **U.S. ARMY CORPS OF ENGINEERS,** | |
| **Defendant,** | |
| **and** | |
| **DAKOTA ACCESS, LLP,** | |
| **Intervenor-Defendant.** | |

## INTRODUCTION

The Yankton Sioux Tribe, a federally recognized sovereign Indian tribe headquartered in

Wagner, South Dakota, and Robert Flying Hawk, Chairman of the Yankton Sioux Tribe Business

and Claims Committee (collectively, "Tribe"), bring this motion for summary judgment against

the U.S. Army Corps of Engineers ("USACE"), Lieutenant General Todd Semonite, Commanding

General and Chief of Engineers, Colonel John Hudson, Omaha District Commander,[1] and Colonel

Anthony Mitchell, St. Louis District Commander (collectively, "Federal Defendants") on the

---

[1] Colonel John Hudson succeeded Colonel John Henderson, originally named as a defendant in
this case, as USACE Omaha District Commander during the pendency of this case.

grounds that Federal Defendants took actions relating to the Dakota Access Pipeline ("Pipeline") that were arbitrary, capricious, abuses of discretion, and contrary to law, in violation of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, et seq., the National Historic Preservation Act ("NHPA"), 54 U.S.C. § 300101, et seq., and the Administrative Procedure Act ("APA"), 5 U.S.C. § 551, et seq.

## STATEMENT OF FACTS

To avoid duplication and in the interest of judicial economy, the Tribe adopts the "Factual Background" found on pages 2-10 of the Standing Rock Sioux Tribe's memorandum in support of its motion for summary judgment ("SRST Memorandum"), also filed on this 16th day of August, 2019, and incorporates it as if fully set forth herein. In addition, the Tribe offers the following facts in support of its motion.

## BACKGROUND

The Pipeline is a roughly 1,100-mile-long, up to 2.5-foot-diameter crude oil pipeline that passes through the Tribe's ancestral homeland, treaty territory, and aboriginal title lands, including areas of great cultural, spiritual, and historical significance to the Tribe and its members. USACE_DAPL 71237. In order to construct the Pipeline and commence operations, Dakota Access, LLP ("Dakota Access") requested and received multiple permits, easements, preconstruction notification ("PCN") verifications, and other approvals from Federal Defendants. These requests for permits, easements, verifications, and other approvals for the Pipeline triggered numerous responsibilities for the Federal Defendants, including the duty to consult with the Tribe as required under the NEPA, NHPA, Executive Order No. 13175 ("EO 13175"), Exec. Order No. 13175, 65 Fed. Reg. 67249 (Nov. 9, 2000), and numerous policies and regulations of the Department of Defense ("DOD") and the USACE.

## LACK OF CONSULTATION IN DEVELOPMENT OF THE EA

In December 2015, the USACE Omaha District released a draft environmental assessment ("Draft EA") that failed to mention, let alone analyze, the negative impacts of a pipeline spill on tribal rights.  USACE_DAPL 11982-12043.  Fellow tribes submitted multiple technical and legal comments on the Draft EA documenting the cultural importance of the proposed crossing location, as well as the proposed project's proximity to water intakes and fish and wildlife relied on by tribal members for "subsistence, cultural and religious practices."   USACE_DAPL 69160; USACE_DAPL 84805 (laying out evidence of oil spill risks).  Additionally, tribes urged the USACE to prepare an environmental impact statement ("EIS") to assess alternative routes that did not implicate lands in which Plaintiff Tribes hold treaty rights.  *E.g*., USACE_DAPL 67075; USACE_DAPL 67025; USACE_DAPL 4777.

During the comment period for the Draft EA, a number of federal agencies also raised concerns about the Draft EA's lack of consideration of tribal interests.  For example, the federal Department of the Interior, an agency with extensive responsibility for ensuring fulfillment of the U.S. trust responsibility, asserted that the "potential impact on [tribal] trust resources" necessitated preparation of a full EIS.  USACE_DAPL 5750.  The U.S. Environmental Protection Agency ("EPA") highlighted the deficiency that the Draft EA "did not include any information on coordination and consultation with tribal governments other than in connection to historic and cultural resource impacts."  USACE_DAPL 73190.

The Tribe wrote the USACE multiple times during the USACE's original NEPA analysis to request formal consultation on matters related to the Pipeline, including on March 17, 2016, USACE_DAPL 66279, April 13, 2016, USACE_DAPL 68344-68350, and April 29, 2016, USACE_DAPL 64400, in order to discuss the Tribe's concerns prior to any USACE decision on

the Pipeline.  In these letters, the Tribe expressed its concerns with the USACE's noncompliance

with its consultation duties as part of the EA preparation.  For example, in his April 13, 2016 letter,

Plaintiff Chairman Robert Flying Hawk detailed the USACE's responsibilities under the NHPA

and NEPA, particularly highlighting the USACE's duty to consult with tribes in good faith.

USACE_DAPL 68344-68350.  The letter also asserted the Tribe's position that the USACE's

Draft EA was insufficient and outlined grounds for why an EIS must be prepared instead. *Id.*

In response to the Tribe's many letters, on May 6, 2016, the USACE acknowledged in a

formal letter the Tribe's numerous "concerns with [USACE's] interpretation and implementation

of the National Environmental Policy Act (NEPA) and the National Historic Preservation Act

(NHPA)."  USACE_DAPL 64293.  Further, Colonel John Henderson, Defendant Colonel John

Hudson's predecessor, acknowledged the government-to-government relationship stemming from

the United States' "trust responsibilities" to the Tribe and <u>assured the Tribe the agency would</u>

<u>"continue to engage in consultation and consideration of [its] comments</u>." *Id.* (emphasis added).

Eventually, a *pre*-consultation meeting between the Tribe and the USACE was set for May

18, 2016.  USACE_DAPL 64234.  The heading for the meeting's agenda clearly stated "Pre-

Consultation Meeting with the Army Corps of Engineers."  USACE_DAPL 64234.  Further, the

agenda plainly indicated that the Tribe sought to discuss the development of consultation protocols

with the USACE, to discuss the Tribe's expectations of the USACE going into consultation, <u>and</u>

<u>to schedule the government-to-government consultation with the Tribe's General Council, the</u>

<u>Tribe's governing body</u>.[2] *Id.*  Moreover, emails between USACE employees the day after the

---

[2] Unlike many tribes, the Tribe's government was not established pursuant to the Indian
Reorganization Act and the Tribe therefore has a somewhat unique governance structure.  The
governing body of the Tribe, which is vested with decisionmaking power pursuant to the Tribe's
constitution, is its General Council.  An informally convened group of tribal members, such as that

meeting show that the USACE knew that the Tribe understood the meeting to be a *pre*-consultation meeting.  USACE_DAPL 64213.

The USACE never explained to the Tribe that it would treat the "pre-consultation meeting" to be actual government-to-government consultation.  Thus, the Tribe continued to prepare for formal consultation with the USACE following the pre-consultation.  Subsequent to the meeting, Chairman Flying Hawk sent Colonel Henderson a letter with the subject line "Follow-Up from Pre-Consultation Meeting" explaining that "the Yankton Sioux Tribe is aware that there are several burials located at PCN's in South Dakota" and that "[t]o date, the Tribe has not been consulted regarding these burials."  USACE_DAPL 67621.  Chairman Flying Hawk concluded by stating that "[w]e look forward to engaging in consultation with the Corps . . . regarding these burials as well as a multitude of other aspects pertaining to the proposed Dakota Access Pipeline." *Id*. (emphasis added).  However, the USACE did not attempt to meet with the Tribe to obtain additional information on the burials at the PCN sites despite the Chairman's voiced concerns.  In fact, the USACE did not ask the Tribe any questions regarding the burial sites.  Instead, the USACE wrote the Tribe's Tribal Historic Preservation Officer a letter explaining that the Tribe could work *with Dakota Access* and participate in monitoring efforts during construction.  USACE_DAPL 67484.

After pre-consultation, the USACE never followed up to inquire about the Tribe's multitude of concerns regarding the then-proposed project and, even though it knew that the Tribe had outstanding concerns and believed the consultation process to be ongoing, never contacted the Tribe to let the Tribe know that it had decided to unilaterally terminate the barely-initiated

---

present at the pre-consultation meeting, does not have authority to speak for the Tribe in government-to-government consultation.

consultation process.  Even though the USACE knew the Tribe still had numerous issues about which it wanted to consult, on July 25, 2016, the USACE Omaha District issued its Final EA, which purported to analyze the potential effects of the Pipeline crossing federal real property interests administered by the USACE, and corresponding Finding of No Significant Impact ("FONSI").  USACE_DAPL 71220-382; USACE_DAPL 71174-75.

## LACK OF CONSULTATION DURING THE REMAND PROCESS

On June 14, 2017, this Court ordered the USACE to further consider three issues that were inadequately, if at all, addressed in the EA:  1) the impacts of an oil spill on hunting and fishing rights, 2) the environmental justice implications of the easement, and 3) the significant scientific "controversy" regarding the impacts of the proposed federal action.  *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs* (*Standing Rock III*), 255 F. Supp. 3d 101 (D.D.C. 2017).

The Tribe repeatedly attempted to engage in consultation with the USACE in good faith during the remand process, submitting many requests for information and for meetings, and submitting information intended to inform the USACE's analysis of the remand issues.  RAR 561; RAR 6402; RAR 3449-52.

The USACE erroneously sent the Tribe letters requesting information from the *Oglala Sioux Tribe* in September, October, and November 2017.[3]  RAR 13309-10; RAR 13305-06; RAR 12001.  Responding to each of these letters, the Tribe asserted that, while it could not provide information on behalf of the *Oglala Sioux Tribe*, it "intend[ed] to participate to the fullest extent possible in the remand process."  RAR 13307-08; RAR 13256-57, ECF No. 305-4; RAR 11979-80.

---

[3] On December 14, 2017, the USACE submitted a letter to this Court dated October 20, 2017 requesting information from the Tribe to assist it in the remand process.  RAR 13040.  The Tribe was not aware of this letter until it was submitted to the Court on December 14, 2017.

In its very first response, the Tribe enclosed its *Ihanktonwan* Consultation *Wo'ope* ("Consultation Protocols"), the Tribe's protocols for government-to-government consultation, and requested that the USACE proceed to consult with the Tribe in accordance therewith.  RAR 13307-16.  The Tribe repeated this request in its subsequent letters.  RAR 3449-58; RAR 6412-18; RAR 10343-49.  On April 20, 2018, the Tribe wrote to the USACE, inviting it to meet for pre-consultation on May 31, 2018, and explaining that the "purpose of this *preconsultation* meeting shall be to exchange preliminary information and for the U.S. Army Corps of Engineers to provide an overview of the project at issue and the remand process."  RAR 3449 (emphasis added).  The Tribe also once again attached its Consultation Protocols to the April 20, 2018 letter.  RAR 3449-58.

In an effort to resolve concerns expressed by the USACE regarding the Tribe's Consultation Protocols, counsel for the Tribe engaged in communication with counsel for USACE.  Responding to the letter in a May 27, 2018 email, Thomas Tracy, District Counsel for the Corps Omaha District, stated that he "appreciate[s] the provision of the protocols from the Tribe that will help advise the Corps of Engineers of the general standards expected for consultation with the Yankton Sioux Tribe," and that "[the Consultation Protocols are] an area where the parties may not always agree, but we certainly can aspire to reach an understanding, if not an agreement."  RAR 17096.  However, despite repeated prompting by the Tribe's counsel, neither Mr. Tracy nor any other USACE official or employee has provided the Tribe with its final concerns or proposed changes to the Consultation Protocols or indicated that the Consultation Protocols would not be followed.  Responding to an email from the Tribe's counsel sent July 25, 2018, Mr. Tracy stated that "[t]he protocols being [sic] further discussed within the Corps of Engineers.  I will provide a more detailed response when I can."  RAR 17092.  To date, no such response has been provided.

On May 30, 2018, the Tribe wrote to the USACE to reiterate that the May 31, 2018 meeting would not be a consultation but, rather, a *preliminary informational session* which would give the USACE the opportunity to provide an overview of the remand process and the issues on remand. RAR 3205.  The Tribe also explained that consultation can only take place with the General Council, its governing body, which would not be attending the informational session.  *Id*.  When Colonel Hudson responded to the letter, he acknowledged that he understood that the meeting was not with the Tribe's General Council, which would be necessary for government-to-government consultation the Tribe.  RAR 3207.  Notably, he did not mention that the USACE might later assert that this meeting constituted the required tribal consultation, despite every effort of the Tribe to inform him otherwise.  *Id*.  Even more tellingly, in an internal USACE email, Colonel Hudson callously informed USACE counsel Thomas Tracy that he was "not particularly concerned with what they do or don't call it."  RAR 3199 (emphasis added).  This email further reveals that the Colonel had no plans for a second meeting, something he should have told the Tribe during pre-consultation so the Tribe was on notice that the pre-consultation meeting would be its only opportunity.  *Id*.  The USACE had no intention of meaningfully consulting with the Tribe and taking its interests and concerns seriously during the remand process, let alone treating the Tribe with the respect due.

During the May 31, 2018 informational session (or pre-consultation session), Chairman Flying Hawk and other tribal members in attendance repeatedly stressed that the Tribe had issues it would need to address with the USACE following the informational session.[4]  RAR 3191-95. For example, Faith Spotted Eagle, Chair of the *Ihanktonwan* Treaty Steering Committee, explained

---

[4] Due to the Tribe's unique governance structure, the attendees at the pre-consultation meeting were not authorized to speak for the Tribe itself.

to Colonel Hudson at the end of the session that the Tribe had "three pages of questions" to ask. RAR 3195.

Following the meeting, the Tribe sent the USACE a letter stating that the Tribe felt "this preliminary meeting went well and looks forward to continuing conversations with you, leading up to actual consultation." RAR 3115 (emphasis added). Even though the Tribe had been explicit with the USACE that numerous issues remained undiscussed following the informational session, when the USACE responded to the Tribe's letter two months later (on August 3, 2018), it did not ask the Tribe for any additional information or seek a consultation meeting. Instead, the USACE bluntly and unapologetically told the Tribe that it "expect[ed] to finish by August 10, 2018," a mere seven days after the date the statement was transmitted. RAR 732.

Finally, throughout the remand process, the USACE refused to provide critical information requested by the Tribe. For example, the Tribe asked the USACE twice to share with it a copy of the oil spill model, the data used in the model, and any associated report, so that the Tribe could review such materials and provide input to the USACE as to their reliability and accuracy. RAR 3115. The USACE never provided this information.

## LEGAL ARGUMENT

I.  **FEDERAL DEFENDANTS ACTED ARBITRARILY, CAPRICIOUSLY, AND NOT IN ACCORDANCE WITH LAW DURING THE REMAND PROCESS AND IN THE DECISION TO AFFIRM THE PRIOR FINDING OF NO SIGNIFICANT IMPACTS**

### A. The Remand Analysis Relies on a Flawed "Worst Case" Spill Estimate

Because this matter is covered thoroughly in the SRST Memorandum and the Tribe agrees with the Standing Rock Sioux Tribe's ("SRST") arguments, to avoid duplication, and in the interest of judicial economy, the Tribe adopts Argument Section I, pages 13-26, of the SRST Memorandum and incorporates it as if fully set forth herein.

### B.  The Risk Assessment on Remand is Arbitrary

Because this matter is covered thoroughly in the SRST Memorandum and the Tribe agrees with SRST's arguments, to avoid duplication, and in the interest of judicial economy, the Tribe adopts Argument Section II, pages 26-34, of the SRST Memorandum and incorporates it as if fully set forth herein.

### C.  The USACE Arbitrarily Dismisses Environmental Justice Impacts

Because this matter is covered thoroughly in the SRST Memorandum and the Tribe agrees with SRST's arguments, to avoid duplication, and in the interest of judicial economy, the Tribe adopts Argument Section III, pages 34-39, of the SRST Memorandum and incorporates it as if fully set forth herein.  In addition, the Tribe asserts the following.

The scope of the USACE's environmental justice analysis is unlawfully narrow, as it wholesale excludes impacts on the Tribe which, as discussed below, imperil the Tribe and its members culturally, spiritually, and at a subsistence level.  The mere fact that the Tribe's present-day-recognized reservation is located over half a mile from the Lake Oahe crossing should in no way minimize or marginalize the Tribe's interests at and in the vicinity of the Lake Oahe crossing or the impacts of the federal action on the Tribe.

As this Court recognized in *Standing Rock III,* the USACE was required to conduct an analysis of environmental justice impacts of the federal action pursuant to Executive Order 12898 ("EO 12898"), Exec. Order No. 12898, 59 Fed. Reg. 7629 (Feb. 16, 1994).  255 F. Supp. 3d 101, 136.  This Court also properly found the USACE's efforts in this analysis lacking.  *Id.* at 140. Because it is an Indian tribe and a minority community that would be impacted by the USACE's decision, the Tribe fully expected such impacts to be included in the USACE's environmental justice analysis and was never informed otherwise.  Moreover, as discussed herein, the Tribe was

deprived of the opportunity to meaningfully consult on such impacts because no meeting was held for that purpose.

The Council on Environmental Quality ("CEQ")[5] has published guidance to help agencies avoid just this type of error.  RAR 16153-86.  As SRST points out, SRST Memorandum at 37, it is the CEQ's instruction that, in assessing environmental justice concerns, "[a]gencies should recognize the interrelated cultural, social, occupational, historical, or economic factors that may amplify the natural and physical environmental effects of the proposed agency action."  RAR 16162.  In addition, "[a]gencies should recognize that the question of whether agency action raises environmental justice issues is highly sensitive to the <u>history or circumstances of a particular community or population</u>, the particular type of environmental or human health impact, and the nature of the proposed action itself."  RAR 16161 (emphasis added).  This means that the geographic scope of the environmental justice review for this federal action must include the full 1851 Treaty Territory, with respect to Indigenous communities of the signatory tribes, because the *Oceti Sakowin*[6] as a whole, while forcibly divided and relocated onto isolated pockets of land, continues to exist and exercise its cultural, spiritual, and subsistence practices throughout its treaty territory.  While the Tribe's present-day-recognized reservation may not be considered to be in the immediate vicinity of the Lake Oahe crossing, because that crossing is within the Tribe's treaty and ancestral territory, and because a spill or even repairs of the pipeline would impact the Tribe's

---

[5] The CEQ is a federal body established in the Executive office of the President through NEPA. 42 U.S.C. § 4342.  Its duties include "to review and appraise the various programs and activities of the Federal Government in the light of the policy set forth in Title I of [NEPA] for the purpose of determining the extent to which such programs and activities are contributing to the achievement of such policy."  *Id*. at § 4344.
[6] The *Oceti Sakowin*, or "Seven Council Fires," is comprised of the Nakota, Dakota, and Lakota bands which include what are now known as the Yankton Sioux Tribe, the Oglala Sioux Tribe, the Standing Rock Sioux Tribe, and the Cheyenne River Sioux Tribe.  The *Oceti Sakowin* is sometimes referred to as "Sioux" or the "Great Sioux Nation."

ability to exercise its traditional practices on its traditional lands, as discussed below, and could damage or destroy cultural resources, the USACE's action has a disproportionate effect on the Tribe.

Environmental justice impacts in urban and even most rural areas differ from such impacts in a tribal context because of the nature of land ownership, historical land use, and uniquely land-based practices tribes exercise both traditionally and in modern times. A more expansive environmental justice review is consistent with the EPA's prior comments and is required by EO 12898. As this Court has already noted, "the EPA urged the Corps to expand its analysis for purposes of assessing environmental-justice considerations from 'the area of construction disturbance' to 'the impacts of the proposed project,'" which will clearly be felt by the Tribe as discussed below. *Standing Rock III*, 255 F. Supp. 3d at 116 (quoting ECF No. 209-8 at 126) (emphasis added). This Court also took note of the EPA letter advising the USACE that "the area of analysis to assess potential impacts to EJ communities should correspond to the impacts of the proposed project instead of only the area of construction disturbance." *Standing Rock* III, 255 F. Supp. 3d at 138; ECF No. 209-08 at 126 (emphasis added).

Traditional methods of delineating the scope of environmental justice impacts do not work where, as here, a federal action will affect a minority population that relies on a geographic area greater than its locality for subsistence and to fulfill its cultural and spiritual needs. Indian tribes within their treaty territory are unique in this respect and the federal trust responsibility mandates that the unique relationship tribes have with the land be accounted for in the NEPA process, including the environmental justice analysis. This is recognized by DOD policy, which states that, "[a]s tribal boundaries have shifted and tribes have migrated, tribes that seem far removed

geographically may have a traditional interest in assets and actions at specific, present-day installations."  DOD Instruction, ECF No. 131-4 at 29.

Although its reservation lies downriver from the Standing Rock Sioux Reservation and the Lake Oahe crossing, like SRST, the Tribe will be disproportionately impacted by harm to its cultural resources.  Why else would the Tribe have made such efforts to engage the USACE in consultation and even bring this action?  The Tribe's members make beneficial use of the property that would be affected by pipeline operations through hunting, fishing, harvesting traditional medicines, and ceremony.  RAR 3451-52; ECF No. 290-6 at 3; ECF No. 290-4 at 3.  These subsistence and cultural activities are crucial to the Tribe's identity and to "preserving our history as Indigenous, *Ihanktonwan* (Yankton) people."  RAR 3452; ECF No. 290-5 at 3; ECF No. 290-6 at 3.  Subsistence hunting and fishing within the 1851 Treaty territory, including the land at issue, provide a much-needed source of nutrition for under-resourced tribal families.  RAR 3451. Furthermore, as the Tribe's Tribal Historic Preservation Officer has explained, tribal youth depend on access to traditional sites and resources, including those affected by Defendants' decisions, to learn and grow in accordance with their traditions, culture, and spiritual beliefs.  RAR 3452 (Tribe's Tribal Historic Preservation Officer discussing aspirations of taking his son to treaty land near Cannonball, North Dakota (near the Lake Oahe crossing) to "show him the ways and the places of our ancestors" and of his wife and mother taking his daughter there "to gather these plans for medicines and for ceremony").

Water, *mni*, is of the utmost importance to the Tribe, and the Missouri River is particularly sacred.  ECF No. 290-5 at 2 (statement of spiritual leader Glenn Drapeau that "[t]he waters of the Missouri River are our first medicine and must not be polluted.").  The impacts of a spill at the

Lake Oahe crossing would be devastating.  As *Ihanktonwan* Treaty Steering Committee Chair

Faith Spotted Eagle explained,

> [w]ater resources are used by our communities not only for drinking and household
> needs, but for cultural and spiritual practices, and our people cultivate a relationship
> with the water that is centered in our spiritual beliefs, practices, and inherent powers
> as a sovereign nation.  We cannot sustain the alteration of our relationship with the
> water that will result from the DAPL water crossings, including the Lake Oahe
> crossing.

ECF No. 290-4 at 4.  Water is a common element in all of the Tribe's ceremonies.  *Id*.  "If the

pipeline were to leak, as all pipelines do, it could contaminate our ceremonial water.  The

contamination of water used for ceremony would be devastating to our spiritual and cultural

practices as *Ihanktonwan* (Yankton)."  *Id*.  "We must have unpolluted water for our healing

ceremonies.  The purpose of these healing ceremonies is to heal all types of ailments, mental and

physical.  The health of our people is therefore contingent on unpolluted water."  ECF No. 290-5

at 3.  These sacred and subsistence uses of the water by the Tribe are not limited to the Tribe's

Reservation, and they extend to the Lake Oahe crossing site.  ECF No. 290-4 at 4 ("I myself have

gathered medicine very near the pipeline corridor at Lake Oahe so that I can practice my spirituality

. . . When we travel into our 1851 Treaty lands, such as in the area near the Lake Oahe crossing,

we gather and use the water in that area."); ECF No. 290-5 at 3 ("We also depend on a number of

plants that grow in our treaty territory near and within the pipeline corridor, including the Lake

Oahe crossing area, for prayer, ceremony, and medicine.").  The importance of the land at issue is

shared among all tribal signatories to the 1851 Fort Laramie Treaty, including the Yankton Sioux

Tribe, and the impacts on all such tribes, including the Yankton Sioux Tribe, must be accounted

for in an environmental justice review.

## II.   FEDERAL DEFENDANTS ACTED ARBITRARILY, CAPRICIOUSLY, AND NOT IN ACCORDANCE WITH LAW WHEN THEY VIOLATED THEIR DUTY TO ENGAGE IN MEANINGFUL CONSULTATION WITH THE TRIBE

Federal statutes, regulations, Executive Orders, and the USACE's own internal instructions governing policies and procedures mandate that the USACE consult with the Tribe when considering an action that could implicate or harm the Tribe's interests.   Without proper consultation, the USACE's decisions relating to the Pipeline cannot be upheld by this Court because they are arbitrary, capricious, abuses of discretion, and not in accordance with law, and are therefore in violation of the APA.

EO 13175, in recognition of the unique relationship between the federal government and Indian tribes, directs agencies to consult with tribes when undertaking actions that have tribal implications.   Exec. Order No. 13175, Sec. 2.

In accordance with EO 13175 as well as agency policies, directives, and Presidential memoranda, the DOD released DOD Instruction 4710.02 ("DOD Instruction" or "Instruction") in 2006, which governs interactions with federally recognized tribes.   ECF No. 131-4 at 23-31.[7]   This DOD Instruction applies to all operations, activities, and installations that require interactions with tribes.   *Id.* at 23.   Under the DOD Instruction, agencies must consult with tribes whenever proposing an action that has the potential to significantly affect protected <u>tribal resources, rights, or Indian lands</u>, and must <u>ensure consultation with tribes that have cultural or historic affiliation with lands at issue</u>, as the Tribe does here.   *Id.* at 26, 30.   The Instruction notes that consultation may require multiple meetings over a period of months.   *Id.* at 29.   It is therefore fully within the parameters of the DOD Instruction that more than one meeting be held, as the Tribe was relying

---

[7] The DOD issued a new DOD Instruction effective on September 24, 2018. Because this DOD Instruction was not effective during the remand, the 2006 DOD Instruction is the version quoted herein.

upon.  The DOD Instruction also directs the agencies to consider and respect tribal protocols like the Tribe's Consultation Protocols which were entirely neglected, if not mocked, by the USACE. *Id.* at 30; RAR 3199 (email from Colonel Hudson scoffing at the Tribe's distinction between consultation and pre-consultation, stating "I'm not particularly concerned with what they do or don't call it").

The Colonel's email is illustrative of the USACE's fundamental lack of understanding of, and resulting failure to meet, its legal duty to consult with the Tribe on a government-to-government basis.   The purpose of the Tribe's Consultation Protocols, which were repeatedly provided to the Colonel during the remand process,[8] is to facilitate meaningful, government-to-government consultation between the Tribe and federal agencies in a way that is compatible with the Tribe's governance structure.  As noted above, the Tribe's government was not established pursuant to the Indian Reorganization Act – it is a "non-IRA" tribe.  The Tribe is governed by its Constitution, which establishes the Tribe's General Council as its governing body.  The Tribe does not have a tribal council that can speak on its behalf – the General Council must be convened for the requisite meaningful consultation to occur, which the Tribe informed the USACE of time and time again.  For the Corps to come in and expect the Chairman and a small group of interested tribal members to speak for the Tribe is to wholly disregard the Tribal government and tribal law, which is a violation of federal law and policy and the Tribe's right to self-government.[9]  Moreover, it is a throwback to the days of treaty signing when federal agents all-too-often forced their way

---

[8] RAR 3303-09; RAR 3449-58; RAR 6412-18; RAR 10343-49; RAR 13307-16.

[9] *E.g.*, Exec. Order 13175 ("Agencies shall respect Indian tribal self-government and sovereignty"); DOD Instruction, ECF No. 131-4 at 30 (recognizing that "[t]ribal governments differ from each other in their organizational structures"); Corps Consultation Policy, *Id*. at 34-35 (recognizing that "Tribes are responsible for their own governance and management," and that the "USACE will maintain a government-to-government relationship with Tribes").

onto tribal lands to "procure" those lands for the United States by obtaining consent from whomever they could, effectively choosing whom they wanted to consider "tribal leaders," rather than seeking consent from the individual(s) with authority to speak for the People. *See* Nabakov, Peter, ed., <u>Native American Testimony</u> (1991); (speaking generally about the history of federal treaty making, Nabakov writes: "Often those who approved the treaty were any agreeable Indians the negotiators could hastily collect for a meeting, or a clan leader who was unauthorized to speak for the entire tribe.  (One American emissary was overheard to brag that he would bring a treaty with the Sioux to a successful conclusion even if only two warriors signed.)").

The Tribe's Consultation Protocols have been established to inform federal agencies about the Tribe's unique governance structure and cultural norms and to establish a process by which consultation with the governing body can be most effective and efficient.  In doing so, these Consultation Protocols describe the difference between pre-consultation and government-to-government consultation.  RAR 3455-47.  In essence, the purpose of pre-consultation is to allow the agency and interested tribal members to prepare for a meaningful formal consultation meeting between the agency and the Tribe's General Council, which is the Tribe's governing body and thus the only tribal body capable of government-to-government consultation.  *Id.*

For the USACE to completely disregard the directives instituted by the DOD throughout its review of the proposed project, all the way through the remand process and decision, is unlawful, arbitrary, and capricious.  *Oglala Sioux Tribe v. Andrus*, 603 F.2d 707, 713-14 (8th Cir. 1979) (where agency "has established a policy requiring prior consultation with a tribe, and has thereby created a justified expectation on the part of the Indian people that they will be given a meaningful opportunity to express their views before Bureau policy is made, that opportunity must be afforded"); *Cheyenne River Sioux Tribe v. Jewell*, 205 F. Supp. 3d 1052 (D.S.D. 2016); *Yankton*

*Sioux Tribe v. Kempthorne*, 442 F. Supp. 2d 774 (D.S.D. 2006) (agency's "failure to comply with its own consultation policy violates general principles that govern administrative decisionmaking").

Environmental statutes also mandate agency consultation with Indian tribes. Both NEPA and the NHPA are "stop look and listen" statutes that require the agency to take a "hard look" at the environmental and cultural consequences of its proposed action. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989); *Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dep't of Interior*, 608 F.3d 592, 607 (9th Cir. 2010). NEPA requires agencies to take a hard look at environmental consequences of proposed actions and requires solicitation and consideration of public input. 40 C.F.R. § 1506.6. Determination of whether stakeholders were adequately involved in the development of an EA "is a fact-intensive inquiry made on a case-by-case basis." *Biodiversity Conservation Alliance v. U.S. Bureau of Land Mgmt.*, 404 F. Supp. 2d 212, 220 (D.D.C. 2005).

Section 106 of the NHPA requires agencies to take into account the effects of their undertakings and to consult with Indian tribes and Tribal Historic Preservation Officers. 54 U.S.C. § 306108; 36 C.F.R. § 800.5(d)(1). Consultation is the heart of the Section 106 process. Federal agencies are required to identify and engage consulting parties including Indian tribes. 36 C.F.R. § 800. Section 106 puts responsibility for compliance with consultation on the federal agency.

The very purpose of these statutes and their implementing regulations is to avoid precisely what the USACE has done here—undertake a perfunctory review to reach a predetermined outcome, without actual consultation with stakeholders, including the Tribe.

The USACE cannot be deemed to have complied with NEPA, the NHPA, the DOD Instruction, and the APA unless it engaged in meaningful consultation with the Tribe. Meaningful

consultation requires communication early and often, and necessitates respecting a Tribe's consultation policy, providing ample opportunity for the Tribe to raise questions and engage in dialogue, especially in areas of expertise like hunting and fishing, environmental justice, and risks from spills into sacred waterways.  *See* DOD Instruction 4710.02; *Yankton Sioux Tribe v. Kempthorne*, 442 F. Supp. 2d at 785.

Because the Tribe agrees with SRST's arguments and to avoid duplication, and in the interest of judicial economy, the Tribe adopts Argument Section IV, pages 39-46, of the SRST Memorandum and incorporates it as if fully set forth herein in addition to the information provided above to support its consultation claims.

While the Court previously decided the Tribe's pre-remand NHPA claims, the consultation-related claims discussed below remain unresolved.  Furthermore, for the reasons set forth in Argument Section V(A), pages 46-47, of the SRST Memorandum, which the Tribe adopts and incorporates as if fully set forth herein, the Tribe renews its motion on those previously decided claims because the USACE's unlawful actions which egregiously violated the NHPA are "capable of repetition yet evading review." *Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1976 (2016).

### A.  Federal Defendants Failed to Consult with the Tribe in their Development of the EA and in their Decisionmaking Process to Permit the Lake Oahe Crossing

In the development of the EA, Defendants violated the consultation requirements contained in EO 13175 and DOD and USACE policies including the DOD Instruction, and the United States Army Corps of Engineers Tribal Consultation Policy, Oct. 4, 2012 ("Corps Consultation Policy"). ECF No. 131-4 at 23-77.

In 2000, President Clinton issued EO 13175, which requires federal agencies to engage in "meaningful consultation" with tribes when considering a federal undertaking.  Exec. Order No.

13175.   NEPA's implementing regulations require an agency conducting a NEPA review to comply with relevant executive orders.  40 C.F.R. § 1502.25.

The DOD Instruction "implements DoD policy, assigns responsibilities, and provides procedures for DoD interactions with federally-recognized tribes."  ECF No. 131-4 at 23.  Pursuant to the DOD Instruction, the DOD's policy is to "[m]eet its responsibilities to tribes as derived from the Federal trust doctrine, treaties, and agreements between the United States Government and tribal governments, and to comply with Federal statutes, regulations, Presidential Memorandums, and Executive Orders governing DoD interactions with tribes."  *Id*. at 24.  The DOD Instruction allocates responsibility to heads of DOD components to "[c]onsult with federally-recognized tribal governments on a government-to government basis on matters that may have the potential to significantly affect protected tribal resources, tribal rights, or Indian lands."  *Id*. at 26.  Furthermore,

> [t]he DoD Components shall involve tribal governments early in the planning process for proposed actions that may have the potential to affect protected tribal rights, land, or resources, and shall endeavor to complete consultations prior to implementation of the proposed action.  Early involvement means that a tribal government is given an opportunity to comment on a proposed action in time for the tribal government to provide meaningful comments that may affect the decision.

*Id*. at 26-27.

The Corps Consultation Policy acknowledges the consultation mandate contained in EO 13175 and requires the USACE to honor and fulfill its federal trust responsibility, address tribal concerns regarding tribal resources, tribal rights (including treaty rights), and Indian lands, protect tribal resources under the USACE's jurisdiction, maintain a government-to-government relationship with tribes, and make tribal consultation an integral process of USACE planning and implementation.  *Id.* at 34-35.  This necessarily includes procuring tribal input and taking that input

into consideration with respect to an activity that has potential to significantly affect tribal resources, tribal rights (including treaty rights), and Indian lands.  The Corps Consultation Policy defines consultation as an "[o]pen, timely, meaningful, collaborative and effective deliberative communication process that emphasizes trust, respect, and shared responsibility." *Id.* at 34.

At no point during Defendants' preparation of the EA did Defendants engage in meaningful, government-to-government consultation with the Tribe, and at no point did Defendants engage in consultation that meets the definition contained in the USACE's own policy.

On May 18, 2016, representatives from the USACE attended a pre-consultation meeting with the Tribe at the Tribe's request in order to lay the groundwork for consultation on the EA regarding the Lake Sakakawea and Lake Oahe crossings in North Dakota.  The Tribe put the USACE fully on notice that this was a *pre*-consultation meeting to lay the groundwork for *actual* consultation.  USACE_DAPL 64213; USACE_DAPL 64234.  The May 18, 2016 meeting was the first and only meeting between the Tribe and the USACE regarding the Pipeline before the remand order, and the USACE issued the EA and FONSI before the Tribe had an opportunity to engage in meaningful consultation with the USACE.  The USACE denied the Tribe the opportunity to comment on the proposed action in time for the Tribe to provide meaningful comments that may affect the USACE's decision in violation of EO 13175, the DOD Instruction, the Corps Consultation Policy, the NHPA, and NEPA.

The USACE utterly and completely failed to engage in meaningful consultation with the Tribe regarding the proposed action.  Defendant USACE's failure to comply with the consultation requirements contained in EO 13175, the DOD Instruction, the Corps Consultation Policy, the NHPA, and NEPA resulted in a FONSI that was arbitrary, capricious, an abuse of discretion, and not in accordance with law and which must be held unlawful and set aside pursuant to the APA.

**B.  Federal Defendants Failed to Consult with the Tribe During the Remand Process**

Adherence to the Court's order on remand required meaningful consultation with the Tribe. It is clear from the record that the USACE did not meet its obligation to meaningfully consult with the Tribe during the remand process, therefore the outcome of the remand is inadequate and unlawful.

The USACE's remand decision is a final agency action subject to review under the APA. 5 U.S.C. § 701, et seq.  The USACE's remand process, and thus the outcome, was unlawful because the USACE's failure to comply with its own procedures is arbitrary and capricious and an abuse of discretion under the APA.  *Oglala Sioux Tribe v. Andrus*, 603 F.2d 707, 713-14 (8th Cir. 1979); *Cheyenne River Sioux Tribe v. Jewell*, 205 F. Supp. 3d 1052 (D.S.D. 2016); *Yankton Sioux Tribe v. Kempthorne*, 442 F. Supp. 2d 774 (D.S.D. 2006).  DOD Instruction 4710.02, discussed above, <u>requires</u> all DOD entities, including the USACE, to consult when proposing an action that may significantly affect tribal resources, rights, or lands.

Meaningful consultation requires transparent communication, early and often throughout the process, in good faith to consider the Tribe's positions.  The USACE's remand process was woefully inadequate in this respect.  It excluded the Tribe and made no real effort to meaningfully consult with the Tribe on any of the remanded issues.  The Tribe has expertise and important information related to these areas that it had no meaningful opportunity to discuss with the USACE, and the lack of consultation renders the remand process deficient and unlawful.

As discussed above in the Statement of Facts, after the remand order, the Tribe submitted numerous requests for meetings and information from the USACE.  RAR 561; RAR 6402; RAR 3449-52.  Letters sent to the Tribe by the USACE came too late in the process and repeatedly requested information about the interests of another tribe, the Oglala Sioux Tribe, which the Tribe

was not in a position to answer – and which the Tribe, in turn, repeatedly pointed out.  RAR 13305-06; RAR 13323-24; RAR 11979-80.  The USACE asserted in a Status Report filed with this Court on December 1, 2017, ECF No. 302, that it sent letters to Plaintiff Tribes on September 25, 2017. The Tribe received a letter from the USACE with that date; however, that letter requested information from the Oglala Sioux Tribe regarding the Oglala Sioux Tribe's interests.  RAR 13323-24.  The USACE failed to modify the September 25 letter, and sent a second and then third letter to the Tribe erroneously requesting the same information pertaining to the Oglala Sioux Tribe.  RAR 13305-06; RAR 21001.  The Tribe had repeatedly notified the USACE of the error and requested a corrected letter, and did so again in its Response to the Status Report, ECF No. 305.  RAR 13307-16; RAR 11979-80; RAR 13256-57, ECF No. 305-4.  It was not until this issue was raised in the Status Report, ECF No. 302, that the USACE corrected this issue, but it was too little, too late.  RAR 10343.  These actions show that the USACE was not paying attention to the Tribe's name or its correspondence, let alone considering the Tribe's interests or taking the Tribe seriously in its remand process.  The Tribe also repeatedly provided to the USACE its Consultation Protocols - the administrative record shows that the Tribe has provided the Consultation Protocols no fewer than **five times**.  RAR 3303-09; RAR 3449-58; RAR 6412-18; RAR 10343-49; RAR 13307-16.

A pre-consultation meeting was held on May 31, 2018, but government-to-government consultation never occurred between the Tribe's General Council and the USACE.  RAR 3205. Without a government-to-government consultation meeting, the USACE cannot have met its consultation obligations to the Tribe.  The failure to hold a second meeting is even more egregious since the Tribe had made clear it had additional questions and concerns necessitating a formal consultation.  RAR 3191-95.

Even after repeated requests, the USACE refused to share necessary information with the Tribe, including the oil spill model, model data, and reports.  RAR 561.  Sharing information used to make decisions is a bare minimum requirement for consultation.  The USACE cannot be permitted to get away with this sham of a remand review.  The USACE never engaged with the Tribe in good faith, and it unilaterally terminated the process with one week notice, knowing full well the Tribe was relying on another meeting to constitute actual consultation.  Rather than include the Tribe early and often throughout the remand process, the USACE made a perfunctory effort to justify its original decision, paying lip service to this Court's order.  The USACE did not take the remand seriously or approach it with an open mind as required by the Court.  The FONSI is therefore unfounded, and this Court should vacate all approvals for the Pipeline and order the USACE to prepare an EIS.

**III.    THE COURT SHOULD VACATE THE EASEMENT AND ORDER AN EIS**

Because this matter was covered thoroughly in the SRST Memorandum and the Tribe agrees with SRST's arguments, to avoid duplication, and in the interest of judicial economy, the Tribe adopts Argument Section VI, pages 50-53, of the SRST Memorandum and incorporates it as if fully set forth herein.

<u>**CONCLUSION**</u>

For the foregoing reasons, the Tribe respectfully requests that this Court grant its motion for summary judgment, order preparation of an EIS, and vacate the underlying USACE approvals for the Pipeline.

Respectfully submitted this 16th day of August, 2019.

YANKTON SIOUX TRIBE, et al.

s/ Jennifer S. Baker
Jennifer S. Baker, OKBA #21938
(*Pro Hac Vice*)
Jeffrey S. Rasmussen, WA #21121
(*Pro Hac Vice*)
Fredericks Peebles & Patterson LLP
1900 Plaza Drive
Louisville, CO 80027
Phone: (303) 673-9600
Facsimile: (303) 673-9155
jbaker@ndnlaw.com
jrasmussen@ndnlaw.com


s/ Patricia A. Marks
Patricia A. Marks, DCBA #446702
Fredericks Peebles & Patterson LLP
401 9th Street, N.W., Suite 700
Washington, D.C. 20004
Phone:  (202) 450-4887
Facsimile:  (202) 450-5106
pmarks@ndnlaw.com

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STANDING ROCK SIOUX TRIBE,**<br><br>        **Plaintiff,**<br><br>**and**<br><br>**CHEYENNE RIVER SIOUX TRIBE,**<br><br>        **Intervenor-Plaintiff,**<br><br>**v.**<br><br>**U.S. ARMY CORPS OF ENGINEERS,**<br><br>        **Defendant,**<br><br>**and**<br><br>**DAKOTA ACCESS, LLP,**<br><br>        **Intervenor-Defendant.** | **Case No. 1:16-cv-1534-JEB**<br>**[Consolidated with 1:16-cv-1796 and**<br>**1:17-cv-267]**<br><br><br>**[PROPOSED]**<br>**ORDER GRANTING PLAINTIFF**<br>**YANKTON SIOUX TRIBE'S**<br>**MOTION FOR SUMMARY JUDGMENT**<br>**ON REMAND** |

This matter comes before the Court on Plaintiff's Motion for Summary Judgment.  Having reviewed the parties' pleadings, exhibits, and the entire record of this case, it is hereby ORDERED that Plaintiff Yankton Sioux Tribe's Motion for Summary Judgment is hereby GRANTED.  The final environmental assessment, finding of no significant impact, and Mineral Leasing Act easement that are the subject of this litigation are hereby VACATED and REMANDED to Defendant U.S. Army Corps of Engineers.  Because Plaintiff has demonstrated that the impacts of the Defendants' decisions are "significant" under the National Environmental Policy Act, Defendants are hereby DIRECTED to commence preparation of an environmental impact statement as required by law.

IT IS SO ORDERED.


Dated: _____            _____

                                        JAMES E. BOASBERG
                                        United States District Judge


Presented by:



                                        YANKTON SIOUX TRIBE, et al.


                                        *s/ Jennifer S. Baker*
                                        Jennifer S. Baker, OKBA #21938
                                        (*Pro Hac Vice*)
                                        Jeffrey S. Rasmussen, WA #21121
                                        (*Pro Hac Vice*)
                                        Fredericks Peebles & Patterson LLP
                                        1900 Plaza Drive
                                        Louisville, CO 80027
                                        Phone: (303) 673-9600
                                        Facsimile: (303) 673-9155
                                        jbaker@ndnlaw.com
                                        jrasmussen@ndnlaw.com


                                        *s/ Patricia A. Marks*
                                        Fredericks Peebles & Patterson LLP
                                        Patricia A. Marks, DCBA #446702
                                        401 9th Street, N.W., Suite 700
                                        Washington, D.C. 20004
                                        Phone:  (202) 450-4887
                                        Facsimile:  (202) 450-5106
                                        pmarks@ndnlaw.com

                                        *Attorneys for Plaintiffs*