**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **STANDING ROCK SIOUX TRIBE; YANKTON SIOUX TRIBE; ROBERT FLYING HAWK; OGLALA SIOUX TRIBE,** | **Case No. 1:16-cv-1534-JEB (and Consolidated Case Nos. 16-cv-1796 and 17-cv-267)** |
| Plaintiffs, | |
| and | |
| **CHEYENNE RIVER SIOUX TRIBE, ET AL.** | |
| Intervenor-Plaintiffs, | |
| v. | |
| **U.S. ARMY CORPS OF ENGINEERS,** | |
| Defendant. | |
| and | |
| **DAKOTA ACCESS, LLP,** | |
| Intervenor-Defendant. | |

**CHEYENNE RIVER SIOUX TRIBE'S MOTION FOR SUMMARY JUDGMENT AND
JOINDER TO MOTION FOR SUMMARY JUDGMENT**

In accordance with Federal Rule of Civil Procedure 56(a), Intervenor-Plaintiff Cheyenne River Sioux Tribe ("Tribe"), a federally-recognized Indian Tribe, respectfully moves this Court to enter summary judgment in favor of the Tribe as to the U.S. Army Corps of Engineers' ("Corps") decision on remand.  The Tribe also hereby joins the Standing Rock Sioux Tribe's  motion for summary judgment, ECF Nos. 433, filed on August 16, 2019.

The Tribe bases this motion on the pleadings and other papers on file, the statement of facts incorporated herein with references to the Remand Administrative Record ("RAR") pursuant to

Local Rule 7(h)(2), the following memorandum of points and authorities, and any argument of counsel that may be heard by the Court, and respectfully asks the Court to enter the proposed order filed concurrently with this motion.

 Dated:  August 16, 2019

Respectfully submitted,

/s/ Nicole E. Ducheneaux
Nicole E. Ducheneaux (DC Bar No. NE001)
Big Fire Law & Policy Group LLP
1404 South Fort Crook Road
Bellevue, NE 68005
Telephone: (531) 466-8725
Facsimile: (531) 466-8792
Email: nducheneaux@bigfirelaw.com


/s/ Tracey A. Zephier
Tracey A. Zephier, *pro hac vice*
Cheyenne River Sioux Tribe
Office of the Attorney General
P.O. Box 590
Eagle Butte, SD 57625
Telephone: (605) 964-6686
Facsimile (605) 964-1160
Email: crstag@protonmail.com


*Counsel for Cheyenne River Sioux Tribe*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 16, 2019, I electronically filed the foregoing document with the

Clerk of the Court using the CM/ECF system, which will send notification of this filing to the

attorneys of record and all registered participants.

*/s/ Nicole Ducheneaux*
Nicole E. Ducheneaux

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STANDING ROCK SIOUX TRIBE; YANKTON SIOUX TRIBE; ROBERT FLYING HAWK; OGLALA SIOUX TRIBE,**<br><br>        **Plaintiffs,**<br><br>        **and**<br><br>**CHEYENNE RIVER SIOUX TRIBE, ET AL.**<br><br>                **Intervenor-Plaintiffs,**<br><br>**v.**<br><br>**U.S. ARMY CORPS OF ENGINEERS,**<br><br>                **Defendant.**<br><br>        **and**<br><br>**DAKOTA ACCESS, LLP,**<br><br>                **Intervenor-Defendant.** | **Case No. 1:16-cv-1534-JEB (and Consolidated Case Nos. 16-cv-1796 and 17-cv-267)** |

**CHEYENNE RIVER SIOUX TRIBE'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND MOTION TO JOIN PLAINTIFF STANDING ROCK SIOUX TRIBE'S AND OGLALA SIOUX TRIBE'S MOTIONS FOR SUMMARY JUDGMENT**

TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

FACTUAL BACKGROUND ........................................................................................... 3

   I.     FACTUAL AND PROCEDURAL FACTS LEADING UP TO THE 2017 REMAND
       DECISION ................................................................................................................ 3

   II.    PARTIAL SUMMARY JUDGMENT DECISION AND RELATED ORDERS ........... 6

   III.   THE CORPS FAILS TO ADEQUATELY CONSULT WITH THE TRIBE ................. 7

STANDARD OF REVIEW AND CANONS OF CONSTRUCTION ........................................ 16

   I.     STANDARD OF REVIEW ........................................................................................ 16

   II.    CANONS OF CONSTRUCTION ................................................................................ 17

ARGUMENT ...................................................................................................................... 17

   I.     JOINDER IN THE MOTION FOR SUMMARY JUDGMENT OF THE STANDING
       ROCK SIOUX TRIBE IS APPROPRIATE ................................................................. 17

   II.    THE REMAND PROCESS VIOLATED NEPA AND CONSULTATION POLICES 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Albuquerque Indian Rights v. Lujan,*
    930 F.2d 49 (D.C. Cir. 1991) ........................................................................................17, 18

*Assiniboine & Sioux Tribes v. Oil & Gas Conservation,*
    792 F.2d 783 (9th Cir. 1986) ..............................................................................................17

*Baltimore Gas & Elec. Co. v. Natural Res. Def. Council,*
    462 U.S. 87 (1983) ..............................................................................................................17

*Cheyenne River Sioux Tribe v. Jewell,*
    205 F. Supp. 2d 1052 (D.S.D. 2016) ..................................................................................19

*Choctaw Nation of Indians v. United States,*
    318 U.S. 423 (1943)............................................................................................................14

*Citizens to Preserve Overton Park v. Volpe,*
    401 U.S. 402 (1971)......................................................................................................17, 18

*Cobell v. Babbit,*
    91 F. Supp. 2d 1 (D.D.C. 1999) ........................................................................................17

*Confederated Tribes and Bands of the Yakama Nation v. U.S. Department of*
    *Agriculture,*
    No. 10-3050, 2010 WL 3434091 (E.D. Wash. Aug. 30, 2010) ..........................................22

*Indian Educators Fed'n Local 4524 of Am. Fed'n of Teachers, AFL-CIO v.*
    *Kempthorne,*
    541 S. Supp. 2d 257, 264-65 (D.D.C. 2008) .....................................................................17

*Klamath Tribes v. United States,*
    No. 96-381, 1996 WL 925409 (D. OR. Oct. 2, 1996) ........................................................22

*Montana v. Blackfeet Tribe of Indians,*
    471 U.S. 759, 766 (1985) ...................................................................................................17

*Morton v. Ruiz,*
    415 U.S. 199, 236 (1974) ...................................................................................................18

*Motor Vehicle Mfrs' Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    436 U.S. 29 (1983) ..............................................................................................................16

*Muckleshoot Indian Tribe v. Hall*,
  692 F. Supp. 1504 (W.D. Wash. 1988)....................................................................23

*Muscogee (Creek) Nation v. Hodel*,
  851 F.2d 1439 (D.C. Cir. 1988) ...........................................................................17

*Oglala Sioux Tribe v. Andrus*,
  6903 F.2d 707 (8th Cir. 1979) .............................................................................19

*Seminole Nation v. United States*,
  316 U.S. 286 (1942).............................................................................................17

*\*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs.*,
  205 F. Supp. 3d 4 (D.D.C. 2016).....................................................................1, 2, 3

*\*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  255 F. Supp. 3d 101 (D.D.C. 2017).................................................................1, 2, 6

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  280 F. Supp. 3d 187 (D.D.C. 2017).........................................................................7

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  282 F Supp. 3d 91 (D.D.C. 2017).............................................................................6

*Wellford v. Ruckelshaus*,
  439 F.2d 598, 601 (D.C. Cir. 1971).......................................................................17

*Yankton Sioux Tribe v. Kempthorne*,
  442 F. Supp. 2d 774 (D.S.D. 2006) .......................................................................19

**Statutes**

5 U.S.C. § 706(2)(A)..................................................................................................16

25 U.S.C. § 479a.........................................................................................................3

Act of March 2, 1889, 25 Stat. 888.............................................................................5

Administrative Procedure Act....................................................................................16

Flood Control Act of 1944...........................................................................................5

Mineral Leasing Act..................................................................................................16

National Environmental Policy Act ...........................................................................16

National Historic Preservation Act .............................................................................1

NHPA.........................................................................................................................18

## Other Authorities

40 C.F.R. § 1501.6 ...............................................................................................................8, 9

40 C.F. R. § 1501.6, and (3)....................................................................................................7

84 Fed. Reg. 1202 (Feb. 1, 2019) ...........................................................................................3

1851 Fort Laramie Treaty, 11 Stat. 749 (Sep. 17, 1851) ........................................................4

1868 Sioux Nation Treaty, 15 Stat. 635 (Apr. 29, 1868).........................................................4

Dep't of Def. Instruction 4710.02, § 5.3.4 ...........................................................................19

*Memorandum for Commanders, Directors, and Chiefs of Separate Officers*, U.S.
     *Army Corps of Engineers: Tribal Consultation Policy,* Dep't of Army, Nov. 1,
     2012.......................................................................................................................1, 19, 20

## INTRODUCTION

In 2012, the Department of Defense issued a memorandum for senior officials of the U.S. Army Corps of Engineers ("Corps") formalizing and explicating the Corps' tribal consultation obligations. It includes a simple, descriptive, binding, and almost beautiful definition of consultation as it must be conducted by the U.S. Army Corps of Engineers ("Corps") when it engages with Indian tribes. Consultation is, pursuant to the binding Department of Defense definition:

> Open, timely, meaningful, collaborative and effective deliberative communication process that emphasizes trust, respect, and shared responsibility. To the extent practicable and permitted by law, consultation works toward mutual consensus and begins at the earliest planning stages, before decisions are made and actions are taken; an active and respectful dialogue concerning actions taken by the [Corps] that may significantly tribal resources, tribal rights, (including treaty rights) or Indian lands.

*Memorandum for Commanders, Directors, and Chiefs of Separate Officers, U.S. Army Corps of Engineers: Tribal Consultation Policy*, Dep't of Army, Nov. 1, 2012 at Section 3.b.

The willingness of the Corps to meet its consultation obligations to the Tribes in this matter has been key question since this litigation commenced three years ago. Indeed, consultation was among the first issues taken up by this Court in 2016 when the Standing Rock Sioux Tribe first moved for preliminary injunction for violations of the National Historic Preservation Act ("NHPA"). *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs.*, 205 F. Supp. 3d 4 (D.D.C. 2016) (hereafter *"Standing Rock I"*). The Court addressed the question again in the context of the Cheyenne River Sioux Tribe's claims in *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101 (D.D.C. 2017) (hereafter *Standing Rock III"*).

Although the Tribe disagreed with the Court's conclusion in both instances that the Corps' consultation efforts were not arbitrary and capricious, the Cheyenne River Sioux Tribe ("Tribe") was mindful of the perception that had emerged from the administrative record in the mind of the

decision-maker that the Tribes had "largely refused to engage in consultations," while the Corps had put its back into a workmanlike and, in the Court's view, unsuccessful effort to engage the Tribes. *Standing Rock I*, 205 F. Supp. 3d at 32; *Standing Rock III*, 255 F. Supp. 3d at 155-60.

When this Court ruled in the Tribes' favor on partial summary judgment in June 2017, the prospect of a remand process to reconsider three of the issues that were most important to the Tribe was a major victory. It was extraordinary not only because the Tribe gained an opportunity to revisit the merits of the dispute, but also because the Tribe gained an opportunity to participate in the consultation process with the benefit of two roadmaps to what should be exemplary tribal participation in consultation: this Court's analysis of consultation in *Standing Rock I* and *Standing Rock III*.

So, beginning in July 2017, the Cheyenne River Sioux Tribe began a serious, protracted effort to engage in meaningful consultation with the Corps as defined in the Corps own consultation policies and as guided by this Court's decisions in *Standing Rock I* and *Standing Rock III*. What ensued was a year of frustrating, fruitless correspondence and communication with an unresponsive agency. At one point **231 days** elapsed between the time the Tribe first communicated a reasonable request for information on the remand process, documents, and requested cooperating agency status and when the Corps finally offered a ***partial*** response. The Tribe was forced to send ***six consecutive letters*** to Corps leadership just to obtain that unsatisfying response. The Tribe furthermore struggled for months to receive relevant information and to schedule a substantive meeting with the Corps and the oil company, finding communications on this issue to be confusing and inadequate. When the Corps finally made itself available for a substantive, in-person consultation with the Tribe, the Corps presented almost no useful information, despite bringing with it eight high level agency officials.

The lack of clarity, the poor communication, and the general confusion generated by the Corps' conduct in the remand process made a mockery of the definition of consultation in the Corps' own policies. Instead engaging with the Tribe in an open, collaborative, and respectful dialogue between two governments, the Corps' process was secretive, one-sided, and marked by lack of professionalism, and disrespect to Tribal leaders and institutions. The process seemed rigged, punitive, and Kafkaesque. Nothing the Tribe did was sufficient to warrant a reasonable, intelligible response from the Corps or from the oil company.

Although the Tribe was guided by the Court's decisions in *Standing Rock I* and *Standing Rock III* as to how to properly engage in consultation with the Corps, the obligation to properly consult rests on the U.S. government, not on the Tribes. Importantly, the Corps has shown that it knows how to engage in proper consultation that is open, timely, meaningful collaborative, mutual, and respectful as required by its policies because that is how it engaged with the oil company. Unfortunately, the Corps owes no legal obligation to Energy Transfer Partners and its failure to so engage the Tribe is unlawful, violates the Corps' trust duty to the Tribe, and is arbitrary and capricious such that it should be set aside

## FACTUAL BACKGROUND

I.  FACTUAL AND PROCEDURAL FACTS LEADING UP TO THE 2017 REMAND DECISION

This Court is well aware of the historical, factual, and procedural background of this case. The Tribe, therefore, will recount only those facts necessary to discuss the present controversy. The Cheyenne River Sioux Tribe is a federally-recognized Indian Tribe. 25 U.S.C. § 479a; 84 Fed. Reg. 1202 (Feb. 1, 2019). The people of the Cheyenne River Sioux Tribe are members of the *Oceti Sakowin* (Seven Council Fires), also known as the Great Sioux Nation, which includes the Lakota, Dakota, and Nakota people. *E.g.*, ECF 99 at p. 2. The Tribe is comprised of four of the seven bands

of the Lakota: *Itazipco*, *Minnicoujou*, *Oohenumpa*, and *Siha Sapa*.  *Id.*  Before the United States confined the Lakota people to Reservations in the late 19th century, the people lived a nomadic lifestyle following the buffalo in their aboriginal territory, which spanned the Dakotas, Montana, Wyoming, Nebraska, and beyond.  RAR013726.

The Lakota of the present-day Cheyenne River Sioux Tribe were savvy and formidable such that the United States entered into two significant Treaties with them.  First, the Treaty, now known as the 1851 Fort Laramie Treaty, 11 Stat. 749 (Sep. 17, 1851), in which the *Oceti Sakowin* reserved to itself a vast territory spanning large sections of Montana, Wyoming, and Nebraska in exchange for the United States' promise to "protect" the Great Sioux Nation "against the commission of all depredations by the people of the United States, after the ratification of this treaty."  *Id.*; RAR013727.  Then, in 1868, the United States entered into a Treaty now known as the 1868 Sioux Nation Treaty, 15 Stat. 635 (Apr. 29, 1868), in which the *Oceti Sakowin* reserved to itself all of the lands west of the low water mark of the Missouri River and adjacent lands as our permanent homeland, including without limitation appurtenant waters, natural resources, grazing, timber, mineral rights, hunting and fishing rights, usufructuary rights, and absolute and undisturbed use, occupancy, ownership, self-government and treaty rights protected by the United States' honor, the Full Faith and Credit of the United States, the federal trust responsibility, and the Constitution of the United States.  *Id.*; RAR 13727.  The reservation of the *Oceti Sakowin's* permanent homeland includes the sacred pledge by the United States that it would be a livable homeland.  *Id.*  Although the United States serially and illegally dispossessed the Lakota in the years following the Treaties, the Treaties were never fully, legally abrogated and these commitments remain the supreme law of the land under the U.S. Constitution.  RAR013827.

In 1889, the United States dispossessed the Tribe when it carved the former Great Sioux

Reservation down into nine much smaller reservations, including the present-day Cheyenne River Sioux Reservation, to make way for white settlers to make their homes and their fortunes on Lakota land. Act of March 2, 1889, 25 Stat. 888.   While the Act creating the Cheyenne River Sioux Reservation constituted a further dispossession, it promised the Tribe a permanent home that constitutes the homeland of the Tribe today.  RAR013728-29.  The Reservation includes the Tribe's treaty lands, appurtenant waters, natural resources, grazing, timber, mineral rights, hunting and fishing rights, usufructuary rights, and absolute and undisturbed use, occupancy and ownership, self-government, and treaty rights. RAR013729.

Like the Standing Rock Sioux Tribe, the Cheyenne River Sioux Tribe was devastated by the enactment of the Flood Control Act of 1944, which directed the Corps to construct the Oahe Dam on the Missouri River to provide federal flood control for Americans living in St. Louis, Missouri, more than 800 miles downstream of the Tribe's Reservation.  *Id.*  The Oahe Dam destroyed more Indian land than any other public works project in American history.  *Id.*  The Cheyenne River Sioux Tribe lost 104,120 acres to the flood, including the Tribe's most valuable rangeland and arable land, nearly all of its timber, wild fruit, and wildlife resources.  *Id.*  Traditional medicines growing by the river and sacred stone cairns were inundated and lost.  *Id.*  The game that provided the people with both food and income were reduced by 75 percent.  *Id.*

In the post-Pick-Sloan world of the Cheyenne River Sioux Tribe, as acknowledged by the U.S. Army Corps of Engineers in 2005, the waters of Lake Oahe are the sole source of clean, potable drinking water available for this Reservation that is the size of the Connecticut.  ECF 131-1 at ¶ 56.  The waters are likewise critical to the Tribe's culture and sacred ceremonies.  *See generally* ECF No. 99.  The loss of these waters would devastate the Tribe's people and lands.  *See id*.; ECF 131-1 at ¶ 56. Consequently, the Tribe and its people have always viewed the siting of a crude oil

pipeline under its most critical natural resource to be an existential threat to the Tribal way of life.

As a result, the Tribe itself has opposed the approval and construction of the pipeline since it first

learned that the Defendants were making preparations and it intervened in the present lawsuit at the

earliest opportunity in 2016.  ECF No. 11.

The months following the commencement of this lawsuit were tumultuous, but finally

resulted in the issuance of the permits on January 24, 2017.  *Standing Rock III*, 255 F. Sup. 3d at

119.

## II.    PARTIAL SUMMARY JUDGMENT DECISION AND RELATED ORDERS

The Cheyenne River Sioux Tribe and the Standing Rock Sioux Tribe both filed motions for

partial summary judgment shortly after issuance of the permits.  ECF No. 131.  In June 2017, this

Court issued its decision granting the Tribes' motions for summary judgment on three important

questions.  First, the Court found that the Corps' decision to permit the construction of the pipeline

was arbitrary and capricious as it did not properly consider expert materials submitted by the Tribes

that challenged the Corps' conclusions concerning the spill risk and other factors, implicating the

question whether the project was "highly controversial."  *Standing Rock III*, 255 F. Supp. 3d at 129.

The Court further found that the Corps' decision was arbitrary and capricious to the extent that it

did not include a proper environmental justice analysis.  *Id.*  at 136.  Finally, the Court determined

that the Corps improperly failed to consider the impact of a spill on the Tribes' treaty hunting and

fishing rights.  *Id.* 138-39.  The Court considered whether to vacate on remand in a separate round

of briefing, and ultimately determined that remand without vacatur was appropriate.  *Standing Rock

Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F Supp. 3d 91 (D.D.C. 2017) (hereafter "*Standing

Rock IV*").  Despite failing to vacate the Corps' decision on remand, the Court acknowledged the

ongoing risk posed to the Tribes by the possibility of a pipeline failure during the pendency of the

remand period, noting the existence of catastrophic failures of other oil pipelines in the region. *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 280 F. Supp. 3d 187, 190-91 (D.D.C. 2017) (hereafter "*Standing Rock V*").  In light of that, the Court imposed various remand conditions up on the parties that reflected the seriousness of the spill risk, including an order that "the Corps' Dakota Access, and the Tribes coordinate to finalize spill response plans at Lake Oahe. . . ," a condition "directly related to the risk of a spill during remand. . . ."

## III.    THE CORPS FAILS TO ADEQUATELY CONSULT WITH THE TRIBE

The Tribe took incredibly seriously the opportunity that it had during this remand process and began immediately to make contact with the Corps to engage in consultation and to participate in the remand to the greatest extent possible.  Consequently, less than 30 days after the court's order on summary judgment, on **July 7, 2017,** the Tribe transmitted correspondence to Colonel John Henderson and Acting Assistant Secretary for Civil Works, Douglas Lamont, in which the Tribe (1) resubmitted to the Corps numerous technical materials related to the substance of the remand, (2) requested to participate in the remand process as a Cooperating Agency pursuant to 40 C.F. R. § 1501.6, and (3) specifically requested government-to-government consultation on the remand process and substance.  RAR013700.  The Tribe received no response.

After receiving no response, on **August 15, 2017**, the Tribe elevated its request to Ryan McCarthy, the Acting United States Secretary of the Army, and Douglas Lamont with a carbon copy to Colonel Hudson, forwarding the prior correspondence and reiterating the prior requests, including requests for pre-decisional consultation.  RAR013609.  On **September 8, 2017**, still having received no response, the Tribe sent a third letter to the Corps forwarding prior correspondence and requesting a response from the Corps.  RAR013367-68.  On **September 11, 2017,** the Tribe finally received a response that merely acknowledged the Tribe's request for

consultation.  It addressed none of the Tribe's timely and respectful requests to participate in the remand process as a Cooperating Agency pursuant to 40 C.F.R. § 1501.6 or its specific request for government-to-government consultation on the remand process and substance.  The letter contained no substantive response at all

Then on **September 25, 2017**, after subjecting the Tribe to two months of radio silence as to substance, the Corps transmitted correspondence requesting that the Tribe submit specific remand information to the Corps *within 30 days*.  RAR013330.  The requested information included: (1) the Tribe's hunting, fishing, and outdoor recreation code; (2) information concerning wildlife licenses and permits; (3) information concerning subsistence hunting permits; (4) harvest reports for 2015, 2016, and 2017; (5) documentation of hunting and fishing reciprocity between Cheyenne River and Standing Rock; (6) studies related to game species in relation to Lake Oahe; (7) "[d]ocumentation of distinct cultural practices of the Tribe that are connected to Lake Oahe;" and (8) verification that six previously submitted reports from the Tribe's were complete."  Again, the correspondence completely ignored the Tribe's timely and respectful requests to participate in the remand process as a Cooperating Agency pursuant to 40 C.F.R. § 1501.6 or its specific request for government-to-government consultation on the remand process and substance.

Then, having barely communicated with the Tribe with regard to the remand over four months of the remand period, after having responded to none of the Tribe's specific questions and concerns set forth in multiple correspondences, and after having engaged in no substantive consultation with the Tribe whatsoever, the Corps filed a notice to this Court advising that it had consulted with **Dakota Access** concerning **Dakota Access's** substantive submissions for the remand and that the Corps' remand decision would be delayed in light of **Dakota Access's** timeline for submission of additional spill modeling.  ECF No. 281.

On **October 24, 2017**, the Tribe responded to the September 25th letter advising that 30 days was too short for the Tribe to meaningfully respond to its questions and further requested adjustment of the proposed timeline to allow the Tribe to review and evaluate Dakota Access's new forthcoming spill modeling data.  RAR012292-93.

On **November 27, 2017**, the Corps responded to the Tribe's October 24, 2017 correspondence.  However, instead of acknowledging any of the Tribe's reasonable requests for further information, consultation, or any kind of mutual exchange between the two governments as set forth in the Tribe's multiple letters over the five months, the Corps simply advised that it would require the Tribe's answers to the Corps' numerous questions by December 20, 2017.

In response, the Tribe sent another correspondence to the Corps on **December 18, 2017**, requesting substantive responses to its prior requests to participate in the remand process as a Cooperating Agency pursuant to 40 C.F.R. § 1501.6 and its specific request for government-to-government consultation on the remand process and substance.  RAR011961.  The Tribe received no response.  Then on **January 30, 2018,** still having received absolutely no communication from the Corps concerning the many issues that were relevant to a meaningful remand process, the Tribe sent additional correspondence to the Corps addressing the agency's failure to respond to or even acknowledge the Tribe's repeated, good faith, substantive requests and concerns.  RAR010350-51.  The letter, from Cheyenne River Sioux Tribal Chairman Harold Frazier to Colonel John Hudson, was stern in its assessment of the Corps insulting communications with the Tribe:

> My last correspondence to you addressed your failure to respond to the Tribe's request to review Dakota Access's spill modeling and the Tribe's request to participate in this remand as a cooperating agency.  You still have not responded.  Furthermore, you have not even acknowledged receipt of my correspondence concerning the remand.  In this process, which is so critical to the Tribe's interest and in light of the government-to-government relationship, your failure to respond is not only unprofessional, but disrespectful to the special relationship between our two governments and the integrity of this remand process.

*Id.*

The Tribe was incensed therefore when, on **February 2, 2018**, the Corps submitted a Status Report to this Court advising that it had been reviewing "various submittals" from the oil company and had been having "ongoing discussions with Energy Transfer Partners (including two meetings on December 21, 2017 and January 24-25, 2018) about the information they have provided." ECF No. 326 at p. 2. The Corps flatly ignored explicit, repeated, respectful requests from Tribe for consultation on the remand process, Cooperating Agency status, and information about spill modeling. The Corps failed even to acknowledge the requests and deny them. The Tribe filed a response to the status report on **February 7, 2018,** advising the Court of the Corps' repeated failure to engage with the Tribe and requesting an order requiring the Corps to engage in meaningful consultation. ECF 327.

Also, on February 7, 2019, the Tribe became aware that Energy Transfer Partners had planned a meeting in North Dakota that it expected both Standing Rock and Cheyenne River representatives to attend to discuss emergency response planning. Consequently, the Tribe sent two letters requesting that the oil company schedule an in-person meeting with the Cheyenne River Sioux Tribe during the same trip. RAR008453; RAR009127. The oil company did not respond either to the general request for an in-person consultation or to the request for in-person consultation on February 8, 2019. Instead, it held a meeting in Bismarck on February 8, 2019 during which it planned to distribute the draft spill plans to Tribal officials for the first time. RAR009101-03; RAR008453. Tribal officials from both the Cheyenne River Sioux Tribe and the Standing Rock Sioux Tribe attended the meeting to advise they had not received adequate information for meaningful participation in the meeting and hence requested a meeting at a later date that included topics to which both the oil company and the Tribes had agreed. *Id.* The Tribal representatives

made both written and oral requests for such a future meeting and further requested that the meeting occur on tribal lands.  *Id.*; RAR008453; RAR009127.  In light of their concerns with the adequacy of the information available to them at the present meeting and their expectation that their request for a future meeting would be entertained, the Tribal officials did not stay for the rest of the meeting. *Id.*

The oil company official who planned the meeting later complained to the Corps that the Tribes had requested things that the oil company did not want to give them, stating that  "CRST did not invite us to the CRST reservation on Feb. 8 until Feb. 8, after we had already told SRST a few days earlier that we would not be coming to the SRST reservation for the meeting and the meeting location would remain in Bismarck."  RAR008453.  The oil company's complaint failed to note the more general letter that requested an on-Reservation consultation at any time, which was emailed to the oil company on February 7, 2018.  RAR009128.

Then suddenly, out of the blue on **February 23, 2018**, after **231 days** and six unanswered written communications to the Corps requesting consultation on the remand process and Cooperating Agency status the Corps transmitted a letter to the Tribe thanking the Tribe for its involvement in the remand process and stating that it was "not at a point in the [NEPA] process where [it] would consider adding cooperating agency."  RAR006600.  The Corps then promised to provide "courtesy cop[ies]" of information related to the remand process.  *Id.*  The Corps then admonished the Cheyenne River Sioux Tribe for not attending the entire February 8, 2019 meeting. It did not, however, acknowledge either Tribes' written and oral requests for further meetings and consultation on response planning,.  *Id.*

On **March 1, 2019**, The Tribe finally received a response from the oil company concerning its request for a further meeting inviting Tribal officials to attend a March 7, 2019 meeting to discuss

technical data.  The Tribe advised the oil company as follows:

> You chose to wait until a nearly a month after [the Tribe's request for both information regarding spill response planning and an in-person meeting] to advise that you would not accept our invitation to meet on our Reservation and advised of a date for a meeting seven days hence.  Also, as of March 1, 2019, you had not provided us with any data or information related to the remand process.

> As I'm sure you can appreciate, we cannot possibly attend a meeting to discuss data and analysis that Dakota Access has presumably been developing for at least the past six months without first having the opportunity to review an [sic] analyze that information.  To expect us to appear at this meeting and absorb and respond to such complicated technical information without prior access to that information is unreasonable and unfair.

> Further, as you are aware, my Tribe is severely lacking in resources.  Unlike Dakota Access, we do not have technical experts working in-house or the kind of vast financial resources that your company enjoys.  In order to properly prepare and participate in your meeting we will need, at the very least, two weeks lead time to provide the data and information you have prepared to our experts and arrange for their attendance at the meeting.

> Significantly, we remain concerned that Dakota Access continues to focus primarily on the concerns of the Standing Rock Sioux Tribe.  I would remind you that the Court has imposed remand obligations as to both Tribes.

> It is our hope to accomplish the rest of this process in an open and organized manner.  In light of that, we request the following with regard to scheduling a further meeting:

> 1. That Dakota Access provide a comprehensive list of any and all data, analysis, or other information that will be relevant to our upcoming meeting;
> 2. That Dakota Access make any and all data, analysis, or other information that will be relevant to our upcoming available to the Cheyenne River Sioux Tribe as soon as possible; and
> 3. That Dakota Access work with the Tribe to schedule a meeting to discuss the above-referenced data, analysis, or information at least two weeks after transmission.

> If Dakota Access will cooperate with the Tribe on these reasonable requests, we will consent to meet with Dakota Access off-Reservation, including Bismarck, North Dakota or Pierre, South Dakota.

RAR006431-32.  The Tribe's letter was cc'd to the lead decision makers at the Corps.  The Tribe

never received a satisfactory response from any party with regard to its request to the oil company and no meeting ever occurred.

Finally, in April of 2018, officials from the Corps began reaching out to Chairman Frazier to arrange a meeting between those two parties in late May. ***Despite the fact that nearly all of the Tribe's correspondences directed the Corps to make meeting arrangements with the Tribe's attorneys***, ***Corps officials contacted the Chairman directly at his email without even a carbon copy to the Tribe's attorneys.*** *See* RAR004902. Corps officials then complained internally that they had difficulty reaching the Chairman, the Tribal government's chief executive. *See* RAR004137; RAR003353. Indeed, Tribal Liaison Joel Ames, who certainly understands that a Tribal chief executive handles everything from lobbying in D.C. to obtaining emergency assistance for tribal members needing gas money for medical visit, had the audacity complain as follows, notwithstanding the fact that he was ignoring the communication protocol requested by the Tribe:

> I tried calling the Chairman again, was told he is now in DC. I left a message with his office, sent him a text (again), and sent him a [sic] email. Last week he responded to a text saying he was in a council meeting and would get back to me. I'm not sure why he is making this so difficult …………..Joel

A meeting between the Corps and the Cheyenne River Sioux Tribe was finally arranged for late **May 29, 2018**. Observing the protocol that the Tribe had urged the Corps and the oil company to observe of providing written information well in advance of a meeting on the same issues, the Tribe transmitted its written and documentary responses to the Corps' written inquiries (RAR013330) on **April 20, 2019.** RAR003426. Having been denied by the Corps the opportunity to participate in any way in the structuring of the remand process and having received little to no response to the Tribe's requests for information, the Tribe offered some critique of the nature of the remand inquiry, in addition to providing the Corps with the requested documents, in addition to expert analysis.

First, the Tribe noted that its inquiry into the nature of the Tribe's Treaty-derived hunting, fishing, and gathering rights was inappropriate, as the manner in which the Tribe uses its Treaty rights has no impact on the nature of the right.  RAR003426 (citing *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 202 (1999); *Choctaw Nation of Indians v. United States*, 318 U.S. 423, 431 (1943).  Second, the Tribe objected to the Corps' request for detail concerning the practice of the Tribe's religion and its historical origins.  In the correspondence, Chairman Frazier explained, "You may not understand that your request is actually an inquiry into whether our Native religious beliefs are legitimate…. I believe that inquiry was racist.  If you believe that our Lakota religious believes are not legitimate or justified, I would request in return that you describe why the Corps believes the ritual and spiritual purity of Lake Oahe is not significant to our *inipi* and our Sun Dance ceremonies."  Finally, the Tribe noted that it could not provide complete expert reports without the ability to review final spill modeling and other technical studies.  RAR003426.

The meeting was held on May 29, 2018 in Green Grass, South Dakota on the Cheyenne River Sioux Indian Reservation.  RAR003278.  It was attended by various officials of the Corps, including Colonel Hudson.  The Tribe presented extensive testimonial information, including the following: (1) technical critiques of spill risk based on all available materials by its expert Steve Martin; (2) presentation of the nature of Tribal use of its treaty-reserved water rights by the director of the Mni Waste Water Company; (3) presentation of the Tribal exercise of its treaty hunting and fishing rights and the relationship to Lake Oahe by the Section 106 Clean Water Act Coordinator for the Tribe; (4) presentation on the use of traditional plants and medicines in the exercise of Tribal treaty rights and their relationship to Lake Oahe by a Tribal spiritual leader; (5) presentation of the spiritual relationship to Lake Oahe presented by the Tribal Historic Preservation Officer; and (6) comments from selected Tribal members.  RAR003285.

The Corps was invited to make a presentation of its own information related to the project and the remand. *Id.* The Corps had the following personnel in attendance:

- Colonel John Hudson, USACE Commander;

- Tom Tracey, USACE District Counsel;

- Keith Fink, USACE Chief Operations Division;

- Joel Ames, USACE Tribal Liaison;

- Erick Stasch, USACE Oahe Operations Project Manager;

- Brent Cossette, USACE Section 408 Coordinator;

- Mike Glasch, USACE PAO Office; and

- Julie Jacobson, USACE Cultural.

RAR003278.

The meeting was a rare, even historic, opportunity for these two parties to sit down face to face to discuss the important and controversial issues that have caused the instant ***three year-long litigation***. Despite the wealth of technical and policy expertise that the Corps brought with it, and the breadth of information the Corps could have presented concerning its analysis, and its decision-making on remand, the Corps' presentation consisted of a basic generic statement provided by Colonel John Hudson, concerning the most general description of the oil company's revised spill plan. ***Indeed, Colonel Hudson's presentation takes up just four full pages of a 159-page court reporter's transcript of the meeting.*** RAR003239-40. None of the other presumably useful and knowledgeable Corps officials who made the long trek to Green Grass, South Dakota that day uttered a word. It is not clear why they were there.

Corps officials ultimately complained about the thoughtful substantive presentation presented in good faith by the Cheyenne River Sioux Tribe when Corps officials in attendance

15

presented almost nothing and were otherwise mute and wholly unhelpful.   "You can compare the proposed topics relevant to the Remand [sic] and then review the meeting notes and the actual information received.  They don't match up very well."  RAR003093

## STANDARD OF REVIEW AND CANONS OF CONSTRUCTION

I.    STANDARD OF REVIEW

Challenges to agency compliance with the Mineral Leasing Act ("MLA"), and the National Environmental Policy Act ("NEPA") are reviewed pursuant to the Administrative Procedure Act ("APA").  Courts reviewing agency decisions under the APA must set aside agency actions that they determine are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Agency action is arbitrary and capricious where an agency has "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs' Ass'n v. State Farm Mut. Auto. Ins. Co.*, 436 U.S. 29, 42 (1983).  Although the Court's review is narrow, it must nevertheless conduct "a thorough, probing, in-depth review" of the agency's decision. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415-16 (1971).  A decision, moreover, may only be upheld where the "agency considered the relevant factors and articulated a rational connection between the facts found and the choice made."  *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 105 (1983).

Violations of the 1851 and 1868 Treaties and the Corps' fiduciary and trust resources are subject to "the most exacting fiduciary standards."  *Cobell v. Babbit*, 91 F. Supp. 2d 1, 46 (D.D.C. 1999) (citing *Seminole Nation v. United States*, 316 U.S. 286, 296-97 (1942); *Assiniboine & Sioux Tribes v. Oil & Gas Conservation*, 792 F.2d 783, 794 (9th Cir. 1986).  "'Close scrutiny of

administrative action is particularly appropriate when the interests at stake are not merely economic interests . . . but personal interests of life and health.'" *Id.* (quoting *Wellford v. Ruckelshaus*, 439 F.2d 598, 601 (D.C. Cir. 1971)).

## II.   CANONS OF CONSTRUCTION

When construing statutes, treaties, and executive orders affecting tribes, "the courts in this Circuit recognize that the *Chevron* principle of deference to administrative interpretations is subjugated by the long-standing canon that 'statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit.'" *Albuquerque Indian Rights v. Lujan*, 930 F.2d 49, 58 (D.C. Cir. 1991) (quoting *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985)); *see also Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439, 1441 (D.C. Cir. 1988). This canon of construction has "special strength" because of the "distinctive obligation of trust incumbent upon the Government . . . ." *Indian Educators Fed'n Local 4524 of Am. Fed'n of Teachers, AFL-CIO v. Kempthorne*, 541 S. Supp. 2d 257, 264-65 (D.D.C. 2008) (citing *Seminole Nation v. United States*, 316 U.S. at 296). As the Supreme Court has noted, where an agency "has traditionally expressed one position to Congress and the Indian tribes, 'it is essential that the legitimate expectation of Indians not be extinguished by what amounts to an *ad hoc* determination.'" *Albuquerque Indian Rights*, 930 F.2d at 58 (quoting *Morton v. Ruiz*, 415 U.S. 199, 236 (1974)).

## ARGUMENT

## I.   JOINDER IN THE MOTION FOR SUMMARY JUDGMENT OF THE STANDING ROCK SIOUX TRIBE IS APPROPRIATE

The Cheyenne River Sioux Tribe hereby joins the Standing Rock Sioux Tribe's motion for summary judgment as to following claims and arguments: (I) the remand relies on a flawed "worst case" spill estimate; (II) the risk assessment on remand is arbitrary; (III) the Corps arbitrarily

dismisses environmental justice impacts; (IV) the remand process violated NEPA and consultation policies; and the Corps' NHPA analysis was unlawful.  In light of these claims and arguments, the Cheyenne River Sioux Tribe likewise requests respectfully that this Court vacate the easement and order an EIS.

Mindful of the Court's request that Plaintiffs refrain from briefing issues fully covered by other parties, the Cheyenne River Sioux Tribe incorporates by reference the Standing Rock Sioux Tribe's arguments as to claims (I) through (IV) as listed in the preceding paragraph.  In light of the Tribe's unique factual circumstances as to consultation, the Tribe offers further discussion regarding that issue below.

## II.     THE REMAND PROCESS VIOLATED NEPA AND CONSULTATION POLICES

The Tribe hereby incorporates by reference Section IV of the Standing Rock Sioux Tribe's motion to dismiss for its discussion of the Corps' violation of consultation policies.  ECF No. 433-2 at pp. 39-45.  As noted fully in Standing Rock's motion to dismiss, the Corps' failure to comply with its own procedures is arbitrary and capricious.  *See Citizens to Preserve Overton Park,* 401 U.S. at 417.  This concept applies to agency tribal consultation policies, which create a "justified expectation on the part of Indian people that they will be given a meaningful opportunity to express their views before [agency] policy is made. . . ." *Oglala Sioux Tribe v. Andrus*, 6903 F.2d 707, 713-14 (8th Cir. 1979).  *See also Cheyenne River Sioux Tribe v. Jewell*, 205 F. Supp. 2d 1052 (D.S.D. 2016); *Yankton Sioux Tribe v. Kempthorne*, 442 F. Supp. 2d 774 (D.S.D. 2006).

Corps consultation policies are unambiguous.  The Corps is required to consult with tribes "on a government-to-government basis on matters that may have the potential to significantly affect protected tribal resources, tribal rights, or Indian Lands . . ."  Dep't of Def. Instruction 4710.02, § 5.3.4.  Corps policies recognize that this requirement is especially significant where treaty rights

and tribal reserved rights are at issue. AR 0000757-59.  Department of Defense policies further require the Corps to "involve tribal governments early in the planning process for proposed actions…. Early involvement means that a tribal government is given an opportunity to comment on proposed action in time for the tribal government to provide meaningful comments that may affect the decision."  Dep't of Def. Instruction 4710.02 Section 6.6.  The administrative record for a decision must "show that the Department of Defense has given careful consideration to all the available evidence and points of view before making a final decision."  Dep't of Def. Instruction 4710.02 Enclosure 2, § E2.9.  Further, the Corps' Tribal Consultation Policy requires that consultation be an "[o]pen, timely, meaningful, collaborative and [an] effectively deliberative process that emphasizes trust, respect and shared responsibility, and that "consultation works toward mutual consensus and begins at the earliest planning stages, before decisions and actions are taken." *Memorandum for Commanders, Directors, and Chiefs of Separate Officers, U.S. Army Corps of Engineers: Tribal Consultation Policy*, Dep't of Army, Nov. 1 2012 at Section 3.b.  A meaningful consultation is one characterized by "a good faith effort to engage the tribe early enough in the planning process to consider potential effects of the proposed action or project on the tribe and consider tribal input in the decision-making process."  Dep't of Def. Instruction 4710.02, G2. The Corps is required to "share information that is not otherwise controlled or classified information" as part of the tribal consultation process."  *Id.* at Section 5.b.(5).

The long, frustrating interaction between the Corps and the Cheyenne River Sioux Tribe during the remand process bears not even a passing resemblance to the consultation requirements outlined by the Corps' and the Department of Defense's self-imposed and binding policies. The words that stand out so sharply in this debacle are the ones that describe a proper consultation as "[o]pen, timely, meaningful, collaborative and [an] effectively deliberative process that emphasizes

trust, respect and shared responsibility, and that "works toward mutual consensus and begins at the earliest planning stages, before decisions and actions are taken." *Memorandum for Commanders, Directors, and Chiefs of Separate Officers, U.S. Army Corps of Engineers: Tribal Consultation Policy*, Dep't of Army, Nov. 1, 2012 at Section 3.b. There is not a single adjective or value described in that excerpt that could possibly be applied to the instant remand process and not for lack of effort on the part of the Cheyenne River Sioux Tribe.

Beginning on July 7, 2017, less than a month after the remand, the Tribe began pleading with the Corps for a genuine, collaborative consultation that included sharing of information regarding the process, deadlines, tribal input on the analysis, and simply any information that would assist the Tribe with being a good consultation partner. RAR013700; RAR13609; RAR013367-68; RAR012292-93; RAR011961; RAR010350-51. Specifically, the Tribe requested meaningful, substantive information from the Corps regarding the most basic questions about the remand and requesting an opportunity to participate on **July 7, 2017**, **August 15, 2017**, **September 8, 2017**, **October 24, 2017**, **December 18, 2017**, and **January 30, 2018**. It is true that the Corps corresponded with the Tribe during this time, but ***none of the Corps' correspondence was responsive to the Tribe's six letters***. The Corps blatantly ignored the content of the Tribe's letters and corresponded only to make a unilateral request for limited information from the Tribe. The Corps sat smugly behind a closed door for six months, while the Tribe, desperate to participate in a process that implicates its very existence, banged its head pointlessly against that closed door in the hope that the Corps would open up. It did not.

When the Corps finally responded to the Tribe's letters **231 days later**, it was simply to say no to one aspect of a multifaceted request. RAR006600. The Tribe's remaining questions about the nature of the remand process and further detail about how the Tribe could be involved, as well

as requests for more specific documentary information, were never answered.   The Corps demonstrated no willingness to be collaborative.   Its process was wholly one-sided, lacking any mutuality, and leaving no room for shared responsibility.   It admitted of no accountability to the Tribe at all.

Working with the oil company, the Corps then engaged in a short and confusing campaign to schedule a meeting on spill response planning without providing information beforehand, which ultimately did not serve any tribal interests.   Then finally, the Corps organized a bizarre, uninformative meeting with the Tribe in which a raft of bureaucrats sat silently while a puzzled Tribe made presentations that were completely unappreciated.   RAR003278; RAR003285; RAR003239-40; RAR003093.   There was nothing open, timely, meaningful, collaborative, or deliberative about either the meeting or the events that led up to it.  Nothing in the Corps' interaction with the Tribe demonstrated trust, respect, or shared responsibility, except perhaps the obligatory use of polite language.  And as there was no dialogue, no real exchange of information between the Corps and the Tribes, no meaningful back-and-forth on any issue, and there was no mutual consensus.  There was not even the possibility of a consensus because the Tribes were permitted to understand very little about the Corps' decision-making process.

What is most maddening about this process from the Tribal perspective is that only the Tribes were treated this way.  We know enough about the Corps' interaction with the oil company to paint a fairly clear picture of their consultation process.  On February 2, 2018, the Corp advised this Court that it had reviewed materials provided by the oil company and that it had been having "ongoing discussions with Energy Transfer Partners (including two meetings on December 21, 2017 and January 24-25, 2018) about the information they have provided."  Three days of substantive meetings cannot happen without open, timely, meaningful, collaborative discussion and

a mutual consensus about issues and topics.  Likewise, it would be utterly surprising to discover that the Corps became frustrated after trying to set up a consultation via text with Energy Transfer Partners CEO, Kelcy Warren, instead of corresponding in a business-like manner with the company's properly designated point of contact.  One also has difficulty imagining the Corps shipping a busload of bureaucrats to the Energy Transfer Partners Headquarters in Dallas, Texas for a meeting, only to have them sit silently in a row pointlessly staring at the board of directors.  And the administrative record in this matter demonstrates that the Corps did not send wholly unresponsive correspondences reacting to the oil company's good faith questions about the remand process.

The Corps, of course, is not obligated to take the Indians' side after engaging in tribal consultation.  The Corps *is* obligated, however, to actually engage in meaningful consultation with tribes.  It is their self-imposed obligation and one that binds them.  It is also a binding obligation that emanates from Treaties with tribes and from the government's obligations as a fiduciary. *Klamath Tribes v. United States*, No. 96-381, 1996 WL 925409, at *8 (D. OR. Oct. 2, 1996); *Confederated Tribes and Bands of the Yakama Nation v. U.S. Department of Agriculture*, No. 10-3050, 2010 WL 3434091, at *4 (E.D. Wash. Aug. 30, 2010); *Muckleshoot Indian Tribe v. Hall*, 692 F. Supp. 1504 (W.D. Wash. 1988).  As much as the Corps may feel cozy and warm with the oil industry, it has no such trust relationship with that industry and even a cursory search of Department of Defense policies will not reveal any written obligation to engage in meaningful consultation with Kelcy Warren, his board of directors, shareholders, or engineers.  The stark contrast between the Corps' relationship with the two groups should demonstrate conclusively that the Corps has violated its consultation duty as a matter of law such that its remand decision is arbitrary and capricious and should be set aside.

22

Dated:  August 16, 2019

Respectfully submitted,

/s/ Nicole E. Ducheneaux
Nicole E. Ducheneaux (DC Bar No. NE001)
Big Fire Law & Policy Group LLP
1404 South Fort Crook Road
Bellevue, NE 68005
Telephone: (531) 466-8725
Facsimile: (531) 466-8792
Email: nducheneaux@bigfirelaw.com

/s/ Tracey A. Zephier
Tracey A. Zephier, *pro hac vice*
Cheyenne River Sioux Tribe
Office of the Attorney General
P.O. Box 590
Eagle Butte, SD 57625
Telephone: (605) 964-6686
Facsimile (605) 964-1160
Email: crstag@protonmail.com

*Counsel for Cheyenne River Sioux Tribe*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 16, 2019 I electronically filed the foregoing document with the

Clerk of the Court using the CM/ECF system, which will send notification of this filing to the

attorneys of record and all registered participants.


/s/ *Nicole E. Ducheneaux*
Nicole E. Ducheneaux

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STANDING ROCK SIOUX TRIBE; YANKTON SIOUX TRIBE; ROBERT FLYING HAWK; OGLALA SIOUX TRIBE,**<br><br>**Plaintiffs,**<br><br>**and**<br><br>**CHEYENNE RIVER SIOUX TRIBE, ET AL.**<br><br>**Intervenor-Plaintiffs,**<br><br>**v.**<br><br>**U.S. ARMY CORPS OF ENGINEERS,**<br><br>**Defendant.**<br><br>**and**<br><br>**DAKOTA ACCESS, LLP,**<br><br>**Intervenor-Defendant.** | **Case No. 1:16-cv-1534-JEB (and Consolidated Case Nos. 16-cv-1796 and 17-cv-267)**<br><br><br>**[PROPOSED] ORDER GRANTING INTERVENOR-PLAINTIFF, CHEYENNE RIVER SIOUX TRIBE'S MOTION FOR SUMMARY JUDGMENT ON REMAND** |

This matter comes before the Court on the parties' cross motions for summary judgment following remand.  Having reviewed the parties' pleadings, exhibits, and the entire record of this case, it is hereby ORDERED that Intervenor-Plaintiff, Cheyenne River Sioux Tribe's Motion for Summary Judgment is hereby GRANTED and that the cross motions filed by Defendant U.S. Army Corps of Engineers and Intervenor-Defendant Dakota Access, LLC are hereby DENIED. The final environmental assessment and finding of no significant impact, and easement granted by Defendant U.S. Army Corps of Engineers to Intervenor-Defendant Dakota Access, LLC dated February 8, 2017, and Defendant's decision following remand dated August 31, 2018 that are the subject of this litigation are hereby VACATED and REMANDED to the Defendant U.S. Army

Corps of Engineers.   Defendant is hereby DIRECTED to commence preparation of an environmental impact statement as required by the National Environmental Policy Act.

SO ORDERED.

Dated: _____, 2019

_____

Hon. James E. Boasberg
United States District Court Judge