## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| STANDING ROCK SIOUX TRIBE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CHEYENNE RIVER SIOUX TRIBE, | ) | |
| | ) | |
| Intervenor-Plaintiff | ) | |
| | ) | Case No. 1:16-cv-1534-JEB |
| v. | ) | |
| | ) | |
| U.S. ARMY CORPS OF ENGINEERS, | ) | |
| | ) | |
| Defendant-Cross-Defendant | ) | |
| | ) | |
| and | ) | |
| | ) | |
| DAKOTA ACCESS, LLP, | ) | |
| | ) | |
| Intervenor-Defendant | ) | |
| Cross-Claimant | | |

**MOTION OF NATIONAL CONGRESS OF AMERICAN INDIANS, GREAT PLAINS TRIBAL CHAIRMAN'S ASSOCIATION, ASSOCIATION OF AMERICAN INDIAN AFFAIRS, AMERICAN CIVIL LIBERTIES UNION, AMERICANS FOR INDIAN OPPORTUNITY, INDIAN LAW RESOURCE CENTER, INTER TRIBAL ASSOCIATION OF ARIZONA, TRIBAL LAW AND POLICY INSTITUTE, UNITED SOUTH AND EASTERN TRIBES SOVEREIGNTY PROTECTION FUND, AND FOURTEEN INDIAN TRIBES FOR LEAVE TO FILE *AMICI CURIAE* BRIEF IN SUPPORT OF TRIBAL MOTIONS FOR SUMMARY JUDGMENT**

The National Congress of American Indians ("NCAI"), founded in 1944, is the nation's oldest and largest organization comprised of American Indian and Alaska Native tribal governments and their citizens.  NCAI serves as a forum for consensus-based policy development among its member tribes from every region of the country.  Its mission is to inform the public and

all branches of the federal government about tribal self-government, treaty rights, and a broad range of federal policy issues affecting Native nations, tribes, and pueblos.

The Great Plains Tribal Chairman's Association ("GPTCA") is an organization comprised of the tribal leadership of the 16 treaty tribes located in North Dakota, South Dakota and Nebraska. Its primary purpose is to defend the member tribes' inherent rights, to promote the welfare of the people, and to protect the sovereignty of each tribe.

The Association on American Indian Affairs ("AAIA"), founded in 1922, is the oldest non-profit American Indian and Alaska Native advocacy organization and is governed by an all-Native American board of directors. One of its primary goals is to advocate for the protection of Native American lands, environmental and cultural resources. Over the course of its 97-year history, AAIA has been working with Indian tribes to draft appropriate legislation, providing training and technical assistance to Indian tribes and the general public, and has been actively participating in the environmental and cultural review processes required by federal and state laws by providing comments and legal assistance for Indian tribes, as well as assisting Indian tribes to develop appropriate tribal laws, policy, and guidance on these matters.

The American Civil Liberties Union ("ACLU") is a nationwide, nonprofit, nonpartisan organization with approximately two million members and supporters dedicated to the principles of liberty and equality embodied in the Constitution and this nation's civil rights laws. ACLU National Policy 313 "supports the rights of Native American peoples to (1) A tribal land base and appurtenant natural resources, . . . and (4) Enforcement of the commitments made to them by the United States in treaties, compacts, and by other governmental actions." ACLU therefore has an organizational interest in the outcome of this case.

Founded in 1970, Americans for Indian Opportunity ("AIO") advances, from an indigenous worldview, the cultural, political and economic rights of indigenous peoples in the United States and around the world.  Since its earliest days AIO has worked with federal agencies to craft Indian policy and has trained federal employees in proper implementation of those policies.

The Indian Law Resource Center is an American Indian non-profit legal and advocacy organization (www.indianlaw.org) incorporated in 1978 that provides assistance to Indian and Alaska Native Nations and other indigenous peoples throughout the Americas who are working to protect their lands, resources, environment, cultural heritage, and human rights.

The Inter Tribal Association of Arizona ("ITAA") is an intertribal organization comprised of 21 federally recognized Indian tribes with lands located primarily in Arizona, as well as in California, New Mexico and Nevada.  The member tribes of the ITAA have worked together since 1952 to provide a united voice for tribal governments on common issues and concerns. The representatives of ITAA are the highest elected tribal officials from each Indian tribe, including tribal chairpersons, presidents and governors.

Tribal Law and Policy Institute ("TLPI") is a Native American operated non-profit whose mission is to enhance and strengthen tribal sovereignty and justice while honoring community values, protecting rights, and promoting well-being.  TLPI works to empower Native communities to create and control their own institutions for the welfare of all community members now and for future generations.  TLPI is guided by the principle that Indian Nations' collaboration with state and federal entities should recognize and validate tribal sovereignty and recognize and respect local cultural differences.

United South and Eastern Tribes Sovereignty Protection Fund ("USET SPF") is a non-profit organization representing 27 federally recognized tribal nations in 13 states stretching from

Texas to Maine.  USET SPF works at the regional and national level to educate federal, state, and local governments about the unique historic and political status of its member tribal nations. USET SPF is dedicated to enhancing the development of federally recognized tribal nations, to improving the capabilities of tribal governments, and to assisting USET SPF member tribal nations in dealing effectively with public policy issues and in serving the broad needs of Indian people.

The fourteen "Tribal Nations Amici" listed following the cover page hereto include federally recognized sovereign American Indian or Alaska Native tribal governments with government-to-government relationships with the United States.  The Tribal Nations Amici assert their sovereignty and engage regularly with federal agencies executing their tribal consultation obligations.

Tribal Nations Amici are joined by other, similarly situated national and regional inter-tribal and advocacy organizations and the ACLU, each of which share an interest in the crucial role of tribal consultation in federal agency decision making.  *Amici Curiae* hereby seek leave to file the brief attached hereto.  The brief is in support of Motions for Summary Judgment filed by the Standing Rock Sioux Tribe (ECF 433), Oglala Sioux Tribe (434), Yankton Sioux Tribe (435) and Cheyenne River Sioux Tribe (436).   This Motion is timely filed as it is filed within seven days of these motions for summary judgment.

Pursuant to LCvR 7(o)(2), counsel has contacted counsel for the parties concerning this Motion.  Plaintiff and Plaintiff-Intervenor Tribes consent to this Motion.  Defendant U.S. Army Corps of Engineers takes no position on this Motion.   Intervenor-Defendant-Cross Claimant Dakota Access, LLP opposes this Motion.

*Amici Curiae*, with their broad experience safeguarding tribal sovereignty interests and civil rights, can assist the Court in clarifying the broad scope of tribal consultation and the

consultative process needed to fulfill the United States government's trust obligations to Indian tribes. As tribal governments and sovereign entities that interact with United States government agencies daily, the Tribal Nations Amici, are in a distinct position to assist the Court in detailing the government-to-government relationship between the United States and Indian tribes, and the importance of tribal consultation to that relationship.

*Amici Curiae* do not replicate the arguments that Plaintiffs raise in their Motions for Summary Judgment. Granting this Motion will not prejudice any party, and will facilitate this Court's disposition of this case by offering the Court additional insight into the federal government's tribal consultation responsibilities.

For the foregoing reasons, the *Amici Curiae* respectfully request that this Court grant their motion to file the attached amici curiae brief. Pursuant to LCvR 7(o)(2), a proposed order accompanies this motion.

Respectfully submitted this 23rd day of August 2019,

> s/ *Michael R. Sklaire*
> Michael R. Sklaire, D.D.C. Bar ID 445364
> GREENBERG TRAURIG, LLP
> 1750 Tysons Blvd., Suite 1000
> McLean, VA 22102
> Telephone: 703-749-1300
> Fax: 703-749-1301
> sklairem@gtlaw.com
>
> Jennifer H. Weddle *(Pro Hac Vice to be submitted)*
> Troy A. Eid *(Pro Hac Vice to be submitted)*
> Kyle R. Montour
> GREENBERG TRAURIG, LLP
> 1200 17th St., Suite 2400
> Denver, CO  80202
> Telephone: 303-572-6500
> Fax: 303-572-6540
> weddlej@gtlaw.com
> eidt@gtlaw.com
> montourk@gtlaw.com
> *Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of August 2019, a copy of the foregoing **MOTION OF NATIONAL CONGRESS OF AMERICAN INDIANS, GREAT PLAINS TRIBAL CHAIRMAN'S ASSOCIATION, ASSOCIATION OF AMERICAN INDIAN AFFAIRS, AMERICAN CIVIL LIBERTIES UNION, AMERICANS FOR INDIAN OPPORTUNITY, INDIAN LAW RESOURCE CENTER, INTER TRIBAL ASSOCIATION OF ARIZONA, TRIBAL LAW AND POLICY INSTITUTE, UNITED SOUTH AND EASTERN TRIBES SOVEREIGNTY PROTECTION FUND, AND FOURTEEN INDIAN TRIBES FOR LEAVE TO FILE AMICI CURIAE BRIEF IN SUPPORT OF TRIBAL MOTIONS FOR SUMMARY JUDGMENT** was filed with the Clerk of the Court through the CM/ECF system and on counsel of record who are registered CM/ECF users.

s/ *Michael R. Sklaire*
Michael R. Sklaire

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| STANDING ROCK SIOUX TRIBE, | ) | |
| Plaintiff, | ) | |
| and | ) | |
| CHEYENNE RIVER SIOUX TRIBE, | ) | |
| Intervenor-Plaintiff | ) | |
| v. | ) | |
| U.S. ARMY CORPS OF ENGINEERS, | ) | Case No. 1:16-cv-1534-JEB |
| Defendant-Cross-Defendant | ) | |
| and | ) | |
| DAKOTA ACCESS, LLP, | ) | |
| Intervenor-Defendant Cross-Claimant | ) | |

**BRIEF OF *AMICI CURIAE* NATIONAL CONGRESS OF AMERICAN INDIANS, GREAT PLAINS TRIBAL CHAIRMAN'S ASSOCIATION, ASSOCIATION OF AMERICAN INDIAN AFFAIRS, AMERICAN CIVIL LIBERTIES UNION, AMERICANS FOR INDIAN OPPORTUNITY, INDIAN LAW RESOURCE CENTER, INTER TRIBAL ASSOCIATION OF ARIZONA, TRIBAL LAW AND POLICY INSTITUTE, UNITED SOUTH AND EASTERN TRIBES SOVEREIGNTY PROTECTION FUND, AND FOURTEEN INDIAN TRIBES IN SUPPORT OF TRIBAL MOTIONS FOR SUMMARY JUDGMENT**

Derrick Beetso
General Counsel
NATIONAL CONGRESS OF
AMERICAN INDIANS
Embassy of Tribal Nations
1516 P Street NW
Washington, DC 20006
Phone: (202) 466-7767
Fax: (202) 466-7797

*Counsel for National Congress of American Indians*

Michael Sklaire
Troy A. Eid
Jennifer Weddle
Kyle Montour
GREENBERG TRAURIG LLP
1750 Tysons Blvd.,
Suite 1000
McLean, VA 22102
Phone: (703) 749-1300
Fax: (703) 749-1301

*Counsel for Amici Curiae\**

*\*Amici Curiae Listed Individually on Following Pages*

Joel West Williams
Senior Staff Attorney
NATIVE AMERICAN
RIGHTS FUND
1514 P Street NW (Rear),
Suite D
Washington, DC  20005
Phone: (202) 785-4166
Fax: (202) 822-0068

*Counsel for Amici Curiae\**

*\*Amici Curiae Listed Individually on Following Pages*

**TRIBAL NATIONS AMICI**

1. Big Valley Band of Pomo Indians of the Big Valley Rancheria

2. Confederated Tribes of the Umatilla Indian Reservation

3. Fort Belknap Indian Community

4. Hoonah Indian Association

5. Miccosukee Tribe of Indians of Florida

6. Nez Perce Tribe

7. Pascua Yaqui Tribe

8. Ramapough Lenape Nation

9. Red Cliff Band of Lake Superior Chippewa Indians

10. Rosebud Sioux Tribe

11. San Carlos Apache Tribe

12. Seneca Nation

13. Swinomish Indian Tribal Community

14. Wampanoag Tribe of Gay Head (Aquinnah)

# TABLE OF CONTENTS

TRIBAL NATIONS AMICI ................................................................................................ i

TABLE OF AUTHORITIES ............................................................................................ iii

INTERESTS OF AMICI CURIAE .................................................................................... 1

PRELIMINARY STATEMENT ....................................................................................... 4

ARGUMENT ..................................................................................................................... 7

    I.    The Corps Failed to Engage in 'Meaningful' Tribal Consultation
        as Required by Federal Statutory and Common Law. ...................................... 7

        A.    The Federal Trust Responsibility ............................................................ 8

        B.    NEPA, Other Federal Laws and Policies and The Trust
              Doctrine Are All Mutually Reinforcing .................................................. 9

    II.    Tribal Consultation is Judicially Enforceable. ............................................... 11

        A.    The Cumulative Weight of Federal Policies Demonstrates
              the Importance of Tribal Consultation. .................................................. 11

        B.    The Corps Failed to Fulfill Its Own Tribal Consultation Policies. .......... 14

        C.    Courts Have Held That Tribal Consultation Must Be Meaningful. .......... 17

CONCLUSION ................................................................................................................ 22

# TABLE OF AUTHORITIES

## Cases

*California Wilderness Coalition v. United States DOE*,
   631 F.3d 1072 (9th Cir. 2011) ............................................................................... 20

*Center for Biological Diversity v. United States BLM*,
   2017 U.S. Dist. LEXIS 137089 (D. Nev. 2017) .................................................... 20

*Pit River Tribe v. United States Forest Serv.*,
   469 F.3d 768 (9th Cir. 2006) ................................................................................... 8

*Cherokee Nation v. Georgia*,
   30 U.S. 1 (1831) ...................................................................................................... 8

*Confederated Tribe & Bands of Yakima Indian Nation v. FERC*,
   746 F.2d 466 (9th Cir. 1984) ................................................................................. 20

*Confederated Tribes & Bands of the Yakama Nation v. Dep't of Agric.*,
   2010 U.S. Dist. LEXIS 96797 (E.D. Wa. 2010) ................................................... 12

*Johnson v. M'Intosh*,
   21 U.S. 543 (1823) ................................................................................................... 8

*Lower Brule Sioux Tribe v. Deer*,
   911 F. Supp. 395, 401 (D. S.D. 1995) .................................................................. 20

*Quechan Tribe v. Dep't of the Interior*,
   755 F.Supp.2d 1104 (C.D. Cal. 2010) ........................................................... 11, 19

*Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs*,
   255 F.Supp.3d 101 (D.D.C. 2017) ...................................................................... 4, 7

*Te-Moak Tribe of Western Shoshone of Nev. v. United States DOI*,
   608 F.3d 592 (9th Cir. 2010) ................................................................................. 20

*United States v. Winans*,
   198 U.S. 371 (1905) ................................................................................................. 9

*Worcester v. Georgia*,
   31 U.S. 515 (1832) ............................................................................................... 8, 9

*Wyoming v. Dep't of the Interior*,
   136 F.Supp.3d 1317 (D. Wyo. 2015) ............................................................... 11, 17

*Yankton Sioux Tribe v. Kempthorne*,
   442 F.Supp.2d 774 (D.S.D. 2006) ................................................................... 13, 20

**Other Authorities**

Advisory Council on Historical Preservation,
 *Consultation with Indian Tribes in the Section 106 Review Process:*
 *A Handbook* (Dec. 2012) ........................................................................................ 9

Colette Routel & Jeffrey Holth,
 *Toward Genuine Tribal Consultation in the 21st Century,*
 46 U. Mich. J. L. Reform 417 (2013) ...................................................................... 8

Corps Tribal Consultation Policy (Oct. 4, 2012) ................................................... 15, 16

Corps Tribal Nations Program, Tribal Policy Principles ............................................. 15

DOD Instruction 4710 ................................................................................................... 10

Exec. Order No. 13175,
 65 Fed. Reg. 67249 (Nov. 9, 2000) .......................................................................... 12

Executive Order 13604 "Improving Performance of Federal Permitting
 and Review of Infrastructure Projects" (Mar. 22, 2012) ......................................... 13

Jennifer H. Weddle,
 *Navigating Cultural Resources Consultation: Collision Avoidance*
 *Strategies for Federal Agencies, Energy Project Proponents and Tribes,*
 60 Rocky Mtn. Min. L. Inst. 22-1 (2014) ................................................................ 10

President George W. Bush Presidential Memorandum
 "Government-to-Government Relationship with Tribal Governments
 to the Heads of Executive Departments and Agencies,"
 2 Pub. Papers 2177 (Sept. 23, 2004) ........................................................................ 12

President Bill Clinton's Presidential Memorandum
 "Government-to-Government Relations with Native American
 Tribal Governments" (Apr. 29, 1994) ...................................................................... 12

R.L. Van Antwerp, *Memorandum For Commanders, Directors, and*
 *Chiefs of Separate Offices, US Army Corps of Engineers Re: Sovereignty*
 *and Government-to-Government relations with American Indian and*
 *Alaska Native Tribal Governments: USACE Tribal Policy Principles,*
 U.S. Army Corps of Eng'rs, (May 10, 2010) ........................................................... 14

Tarah Bailey, Note, *Consultation with American Indian Tribes: Resolving*
 *Ambiguity and Inconsistency in Government-to-Government Relations,*
 29 Colo. Nat. Res. Energy & Envtl. L. Rev. 195 (2018) .......................................... 21

Thomas P. Bostick,
   *Memorandum For Commanders, Directors, and Chiefs of Separate Offices,*
   *US Army Corps of Engineers Re: Tribal Consultation Policy,*
   U.S. Army Corps of Eng'rs (Nov. 1, 2012) ............................................................................ 14

Timothy Q. Purdon, Katherine S. Barrett Wiik, Dr. Aryn Conrad,
   *DAPL: Storm Clouds on the Horizon in Indian Country,*
   65 Federal Lawyer (June 2017) ............................................................................................. 21

Troy A. Eid, *Beyond Dakota Access Pipeline: Energy Development*
   *and the Imperative for Meaningful Tribal Consultation,*
   95 Univ. of Denv. L. Rev. 593 (2018) ................................................................................... 21

## Regulations

40 C.F.R. § 1508 ................................................................................................................. 22

74 Fed. Reg. 57881 ............................................................................................................. 22

## CORPORATE DISCLOSURE CERTIFICATION

Pursuant to Local Civil Rule 7.1 and Federal Rule of Civil Procedure 7.1, I, Michael R. Sklaire, the undersigned counsel of record for Proposed *Amici Curiae*, certify that to the best of my knowledge and belief, Proposed *Amici Curiae* do not have parent companies, subsidiaries or affiliates with any outstanding securities in the hands of the public.

s/ *Michael R. Sklaire*
Michael R. Sklaire

**INTERESTS OF AMICI CURIAE**

The National Congress of American Indians ("NCAI"), founded in 1944, is the nation's oldest and largest organization comprised of American Indian and Alaska Native tribal governments and their citizens.[1] NCAI serves as a forum for consensus-based policy development among its member tribes from every region of the country. Its mission is to inform the public and all branches of the federal government about tribal self-government, treaty rights, and a broad range of federal policy issues affecting Native nations, tribes, and pueblos.

The Great Plains Tribal Chairman's Association ("GPTCA") is an organization comprised of the tribal leadership of the 16 treaty tribes located in North Dakota, South Dakota and Nebraska. Its primary purpose is to defend the member tribes' inherent rights, to promote the welfare of the people, and to protect the sovereignty of each tribe.

The Association on American Indian Affairs ("AAIA"), founded in 1922, is the oldest non-profit American Indian and Alaska Native advocacy organization and is governed by an all-Native American board of directors. One of its primary goals is to advocate for the protection of Native American lands, environmental and cultural resources. Over the course of its 97-year history, AAIA has been working with Indian tribes to draft appropriate legislation, providing training and technical assistance to Indian tribes and the general public, and has been actively participating in the environmental and cultural review processes required by federal and state laws by providing comments and legal assistance for Indian tribes, as well as assisting Indian tribes to develop appropriate tribal laws, policy, and guidance on these matters.

---

[1] CORPORATE AND COUNSEL DISCLOSURE STATEMENTS. Pursuant to Federal Rule of Appellate Procedure 26.1, each of amici curiae makes the following disclosure: amicus curiae has no parent corporation and issues no stock. No counsel for a party authored this brief in whole or in part, and no person or entity other than amici, their members, or their counsel made any monetary contribution toward the preparation or submission of this brief.

The American Civil Liberties Union ("ACLU") is a nationwide, nonprofit, nonpartisan organization with approximately two million members and supporters dedicated to the principles of liberty and equality embodied in the Constitution and this nation's civil rights laws. ACLU National Policy 313 "supports the rights of Native American peoples to (1) A tribal land base and appurtenant natural resources, . . . and (4) Enforcement of the commitments made to them by the United States in treaties, compacts, and by other governmental actions." ACLU therefore has an organizational interest in the outcome of this case.

Founded in 1970, Americans for Indian Opportunity ("AIO") advances, from an indigenous worldview, the cultural, political and economic rights of indigenous peoples in the United States and around the world. Since its earliest days AIO has worked with federal agencies to craft Indian policy and has trained federal employees in proper implementation of those policies.

The Indian Law Resource Center is an American Indian non-profit legal and advocacy organization (www.indianlaw.org) incorporated in 1978 that provides assistance to Indian and Alaska Native Nations and other indigenous peoples throughout the Americas who are working to protect their lands, resources, environment, cultural heritage, and human rights.

The Inter Tribal Association of Arizona ("ITAA") is an intertribal organization comprised of 21 federally recognized Indian tribes with lands located primarily in Arizona, as well as in California, New Mexico and Nevada. The member tribes of the ITAA have worked together since 1952 to provide a united voice for tribal governments on common issues and concerns. The representatives of ITAA are the highest elected tribal officials from each Indian tribe, including tribal chairpersons, presidents and governors.

Tribal Law and Policy Institute ("TLPI") is a Native American operated non-profit whose mission is to enhance and strengthen tribal sovereignty and justice while honoring community

values, protecting rights, and promoting well-being.  TLPI works to empower Native communities to create and control their own institutions for the welfare of all community members now and for future generations.  TLPI is guided by the principle that Indian Nations' collaboration with state and federal entities should recognize and validate tribal sovereignty and recognize and respect local cultural differences.

United South and Eastern Tribes Sovereignty Protection Fund ("USET SPF") is a non-profit organization representing 27 federally recognized tribal nations in 13 states stretching from Texas to Maine.  USET SPF works at the regional and national level to educate federal, state, and local governments about the unique historic and political status of its member tribal nations. USET SPF is dedicated to enhancing the development of federally recognized tribal nations, to improving the capabilities of tribal governments, and to assisting USET SPF member tribal nations in dealing effectively with public policy issues and in serving the broad needs of Indian people.

The fourteen "Tribal Nations Amici" listed following the cover page hereto include federally recognized sovereign American Indian or Alaska Native tribal governments with government-to-government relationships with the United States.  The Tribal Nations Amici assert their sovereignty and engage regularly with federal agencies executing their tribal consultation obligations.

These organizations and Tribal Nations Amici are joined by other, similarly situated national and regional inter-tribal and advocacy organizations, which share an interest in the crucial role of tribal consultation in federal agency decision making.

## PRELIMINARY STATEMENT

*Sovereignty has to mean something, it has to be more than a name, it has to be that tribes decide for themselves what is right.*

> — United States Secretary of the Interior Ryan Zinke in his first address to a national gathering of tribal nations during the opening plenary session at the 2017 NCAI Mid-Year Conference, June 14, 2017.[2]

What sovereignty means—putting meat on the bones of the role Indian tribes play in our federalism, and specifically the role of Indian tribes in federal permitting of energy infrastructure—is the central question of this remand.

In exhaustive opinions over several years, this Court has whittled the universe of environmental issues in this case down, now directing the U.S. Army Corps of Engineers (the "Corps") "to consider the impacts of an oil spill on fishing rights, hunting rights, or environmental justice, or the degree to which the pipeline's effects are likely to be highly controversial." *Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs*, 255 F.Supp.3d 101, 112 (D.D.C. 2017) ("*Standing Rock III*").   In declining to vacate the underlying permitting decision, this Court observed that the Corps' decision is "devoid of any discussion of the methodological and data flaws identified in the reports" and "wholly ignores" material submitted by Plaintiff Tribes, *id*. at 129, and provided the Corps with a potential roadmap for the Corps to explain itself, offering possibilities such as technical findings that the voluminous expert reports contravening the Corps' analysis were "flawed or unreliable and thus did not actually create any substantial evidence of controversial effects." *Id*.

---

[2]  Reported at  http://www.ncai.org/news/articles/2017/06/14/u-s-department-of-the-interior-doi-secretary-ryan-zinke-gives-his-first-address-to-a-gathering-of-tribal-nations-at-the-ncai-2017-mid-year-conference.

In response to this Court's direction, on August 31, 2018, the Corps produced a two-page Memorandum for Record stating the Corps' conclusions about the issues reviewed on remand. ECF 362, Exh. 1.  That scant Memorandum for Record merely repeats its initial conclusions, which the Corps purports to validate in its 137-page "Analysis of the Issues Remanded by the U.S. District Court for the District of Columbia Related to the Dakota Access Pipeline Crossing at Lake Oahe," (the "Remand Analysis") wherein the Corps dresses up its rosy outlook with more words, but essentially the same conclusory statements.

The Corps' anemic effort on remand merely regurgitates prior conclusions.  While the Corps does show its work in the Remand Analysis, it still fails to meet its fundamental obligation: to consider the Tribes' views and respond to them in consultation.  Far from engaging in Tribal consultation, the Corps merely scheduled a single, *pro forma* meeting—not a single thing about the Corps' analysis or action changed one iota because of any tribal input on remand.  The Corps again breezed past the numerous flaws identified in the experts' reports and ignored the extensive body of materials amassed by the tribes regarding the potential impacts of an oil spill on fishing rights, hunting rights, or environmental justice.  Additionally, the Corps refused the Tribes' repeated requests to review the Corps' technical materials. *See, e.g.,* RAR 13276; RAR 11998; RAR 11258; RAR 11227; RAR 561; RAR 6402; RAR 3449-52; RAR 3115; RAR 12271; RAR 12272; RAR 11555-56; RAR 5800; RAR 11260; RAR 6436; RAR 3287; RAR 8403.  A two-way dialogue (consultation) is impossible when one of the two parties to the consultation has never seen the materials.

Instead of addressing the degree to which the project's effects are likely to be highly controversial, the Corps simply clings to what it did—and did not do—before, notwithstanding this Court's explicit instructions to the contrary.  The Corps' unsupported repetition of its prior

conclusions, particularly the Corps' hollow announcement that the obviously highly controversial project is not "highly controversial" (Remand Analysis, at 99), despite years and thousands of pages of litigation filings and thousands of people camping in place for months to try to stop the project—evokes images of Obi-Wan Kenobi waving his hand and pronouncing to weak-minded stormtroopers "these aren't the droids you're looking for," as if merely stating it makes it so.  In *Star Wars*, such declaratory subterfuge worked, but it should not here.

This Court should grant the Motions for Summary Judgment filed by the Standing Rock Sioux, Oglala Sioux, Yankton Sioux, and Cheyenne River Sioux Tribes because both statutory law and federal common law require it.  Additionally, the Court should critically evaluate the Corps' assertion that it complied with the National Environmental Policy Act ("NEPA") against the backdrop of the panoply of federal laws and policies that guide and inform the government-to-government relationship between the United States government and Indian tribes.  The Corps' remand falls short because tribal consultation is one of the cornerstones of federal environmental permitting.  It cannot be that tribal rights to petition the federal government are limited—as the Corps' dismissive approach to the Tribes' information and analysis suggests—to little more than a veritable right to shake one's angry fist at the sky.

The Tribes provided in-depth scientific data and reasoned arguments about the impacts of the Corps' permit for pipeline location beneath Lake Oahe and the resultant negative impacts to fishing, hunting and environmental justice and likewise detailed the highly controversial nature of the permit's effects.  *See generally* RAR 7499; RAR 3173; RAR 7500-06; RAR 7497; RAR 7503; RAR 6578; RAR 5820; RAR 3299; RAR 4112; RAR 3332; RAR 3319; RAR 7465; RAR 7500; RAR 7506-09; RAR 335; RAR 377; RAR 339; RAR 1464; RAR 7449-51; RAR 7771; RAR 7756; RAR 7774; RAR 3803; RAR 3815.  In response, the Corps effectively whistled past and changed

nothing about its analysis.  Nor did the Corps address any of the new material submitted by the

Tribes on remand.  *See, e.g.,* RAR 813; RAR 001; RAR 141; Remand Analysis, at 108 (failing to

engage tribal criticisms of the Corps' worst case discharge analysis).

Tribal sovereignty, as former Secretary Zinke said, has to mean something.  If the Corps'

remand survives as-is—notwithstanding this Court's order—the bedrock requirement of

meaningful government-to-government consultation between Indian tribes and the United States

would be placed severely at risk.

## ARGUMENT

I. **THE CORPS FAILED TO ENGAGE IN 'MEANINGFUL' TRIBAL CONSULTATION AS REQUIRED BY FEDERAL STATUTORY AND COMMON LAW.**

In its decision to remand, this Court instructed the Corps to show its work with respect to

two items: (a) the fishing/hunting/environmental justice impacts; and (b) the extent to which the

project's effects are highly controversial.  *Standing Rock III*, 255 F.Supp.3d at 129.  As this Court

recognized, "the CEQ regulations require" that the Corps demonstrate its consideration of these

issues.  *Id*.; 40 C.F.R. § 1508.27(b)(4).  And, the agency's consideration of those issues necessarily

entails tribal consultation.  In other words, the Corps need not merely show its work, it must also

show that its work was informed by tribal input.  The record on remand shows that the Corps'

approach changed not one iota.  That is not consultation and evades the controlling federal legal

framework.

NEPA, numerous other federal laws and policies—including the National Historic

Preservation Act and various Presidential executive orders and directives discussed herein—and

longstanding U.S. Supreme Court precedent require the Corps and other federal agencies to engage

in meaningful consultation with Indian tribal governments on matters affecting them.  The Corps'

own policies impose these obligations as well.  At a minimum, the Corps should have explained

how it considered and its reasons for rejecting the extensive information and analysis submitted by the Tribes.  Indeed, the Corps' effort on remand was so conclusory that it did not even comment on, let alone rebut, a significant amount of the additional information provided by the Tribes in response to the Court's order.  In other words, the Corps did not even do the bare minimum to comply with its most basic obligations to consult with the Tribes on a government-to-government basis.  Such compliance with federal tribal consultation provisions is necessary for the federal government to meet its minimum fiduciary obligations to Indian tribes.  *Cf. Pit River Tribe v. United States Forest Serv.*, 469 F.3d 768, 788 (9th Cir. 2006).

### A.     The Federal Trust Responsibility

NEPA tribal consultation requirements flow from the federal trust responsibility that the United States government has assumed in its relations with Indian tribes—a bedrock of federal common law whose jurisprudential roots trace back to the early 19th Century, and which have been enshrined in numerous U.S. Supreme Court decisions.

The federal trust responsibility, also known as the trust doctrine, was first articulated in three opinions written by Chief Justice Marshall: *Johnson v. M'Intosh*, 21 U.S. 543 (1823); *Cherokee Nation v. Georgia*, 30 U.S. 1 (1831); and *Worcester v. Georgia*, 31 U.S. 515 (1832) (referred to collectively as the "Marshall Trilogy").  The doctrine imposes at least three broadly defined duties on the federal government: (1) to provide federal services to members of Indian tribes, such as health care and education; (2) to protect tribal resources, including cultural and natural resources; and (3) to protect tribal sovereignty and self-governance.  Colette Routel & Jeffrey Holth, *Toward Genuine Tribal Consultation in the 21st Century*, 46 U. Mich. J. L. Reform 417, 430-35 (2013).

With respect to the latter category—tribal sovereignty—Article I of the U.S. Constitution recognizes Indian tribes as one of four types of sovereign authority, along with the federal

government, the states, and foreign countries.  The Marshall Trilogy recognizes that although tribal nations ceded lands to the United States, they also retained inherent powers of self-governance that endure unless and until they are divested by Congress.  *See Worcester*, 31 U.S. at 559-60.  A central aspect of the federal-tribal relationship is that Indian tribes were promised the protection of the United States, while at the same time retaining their rights to self-government.  *Worcester*, 31 U.S. at 520 ("The very fact of repeated treaties with [tribes] recognizes it, and the settled doctrine of the law of nations is that a weaker power does not surrender its independence—its right to self-government—by associating with a stronger and taking protection.  A weak state, in order to provide for its safety, may place itself under the protection of one more powerful without stripping itself of the right of government and ceasing to be a state") (Marshall, C.J.).  Subsequent Supreme Court decisions have reinforced that the foundation of the federal government's trust responsibility rests on Indian tribes' retained sovereign powers.  *See e.g., United States v. Winans*, 198 U.S. 371, 381 (1905) ("treaty was not a grant of rights to the Indians, but a grant of rights from them – a reservation of those [rights] not granted").  Tribal consultation is a primary mechanism for ensuring that the federal government satisfies its federal trust responsibilities.

**B.     NEPA, Other Federal Laws and Policies and The Trust Doctrine Are All Mutually Reinforcing**

NEPA, the National Historic Preservation Act, and other federal laws, as well as their applicable accompanying regulations, expressly acknowledge that a federal agency's duty to consult directly with Indian tribes flows from the federal government's overarching trust responsibility.  In short, federal law sets Indian tribes—as governments—apart for heightened engagement with federal permitting agencies.  *See, e.g.* Advisory Council on Historical Preservation ("ACHP"), *Consultation with Indian Tribes in the Section 106 Review Process: A Handbook*, at 2 (Dec. 2012); Jennifer H. Weddle, *Navigating Cultural Resources Consultation:*

*Collision Avoidance Strategies for Federal Agencies, Energy Project Proponents and Tribes,* 60 Rocky Mtn. Min. L. Inst. 22-1 (2014).

The Corps' treatment of the Tribes throughout the project approval process demonstrates that the Corps did not seek the full participation of the Tribes and did not consult with them in a timely and meaningful manner.  It did the opposite; the Corps habitually disregarded the Tribes' repeated requests to engage in a dialogue and provide the Tribes a full opportunity to participate in meaningful consultation. *See* RAR 13278; *see also* RAR 13325; RAR 11227.  In the remand process, the Corps' deliberate indifference was particularly acute.  It was not until months into the remand process that the Corps communicated with the Tribes.  Then, it took the Corps months to reply to the Tribes' communications.  *See* RAR 11998; *see also* RAR 11227.

To add insult to injury, the Corps' responses were generally written, one-way requests for the Tribes to verify documents, review limited data requests, or provide narrow information.  *See* RAR 13325; *see also* RAR 11998. Such requests consistently failed to reply to the tribal concerns. *See id.*  The Corps also refused to share any technical information or reports with the Tribes, including revised spill models, risk analyses, WCD calculations, and valve specifications. RAR 8403.  This is a marked departure from the Department of Defense's ("DOD") consultation policy, which defines consultation as "information and opinion respectfully exchanged in both directions." DOD Instruction 4710.02, § G.2.

Corps staff eventually met with the Standing Rock Sioux Tribe in March 2018. *See*  RAR 5820.  Later, the Standing Rock Sioux Tribe's first meeting with Col. Hudson occurred on May 22, 2018. *See* RAR 3287.  The other Plaintiff Tribes each had a single meeting with the Corps on remand (Cheyenne River-May 29, 2018; Yankton-May 31, 2018; Oglala, June 1, 2018). *See* Remand Analysis, at 100; *see also* RAR 103; RAR 3205; RAR 3172; RAR 3123.  During these

meetings, the Tribes detailed the shortcomings in the remand process, the Corps' risk and consequence analysis, and the extent to which the Corps shared technical information. *See* RAR 5820; *see also* RAR 4120. However, the Corps refused to consider the Tribes' identified issues, including serious health and safety concerns related to Bakken crude. *See* RAR 3288; *see also* RAR 3289. In fact, the Corps' remand analysis says that the Corps identified "no new information" to justify a new environmental assessment—despite hundreds of pages of technical and cultural information that the Tribes submitted. *See* RAR 10203; *see also* RAR 001. Generally, the Corps skimmed over the information already in the record prior to remand.

The Corps' delay in involving the Tribes during the project process placed the Tribes at a consultative disadvantage and undermined the Tribes' abilities to effectively share their concerns. The Corps' persistent refusal to engage in a two-way, government-to-government dialogue with the Tribes resulted in the Corps' failure to demonstrate that it has met its obligations on remand as directed by the Court's order. *Standing Rock III*, 255 F.Supp.3d at 129.

## II.    TRIBAL CONSULTATION IS JUDICIALLY ENFORCEABLE.

### A.    The Cumulative Weight of Federal Policies Demonstrates the Importance of Tribal Consultation.

Presidential executive orders, directives and policies mandate that the Corps and all other federal entities engage in meaningful, government-to-government consultation with tribes on an ongoing basis in order to fulfill the federal trust responsibility. *See e.g., Wyoming v. Dep't of the Interior*, 136 F.Supp.3d 1317 (D. Wyo. 2015) (invalidating Bureau of Land Management ("BLM") rules on hydraulic fracturing on BLM and tribal lands) (reversed on other grounds); *Quechan Tribe v. Dep't of the Interior*, 755 F.Supp.2d 1104 (C.D. Cal. 2010) (invalidating solar project permit); and *Confederated Tribes & Bands of the Yakama Nation v. Dep't of Agric.*, 2010 U.S. Dist. LEXIS

96797, *14 (E.D. Wa. 2010) (granting preliminary injunction on landfill project adjacent to tribal lands over deficient tribal consultation).

President Bill Clinton's Presidential Memorandum of April 29, 1994, "Government-to-Government Relations with Native American Tribal Governments," directed the heads of Executive departments and agencies (1) to operate within a government-to-government relationship with tribal governments; (2) to consult openly and candidly with tribal governments prior to taking actions that affect them; (3) to assess the impact of Federal Government plans, projects, programs, and activities on tribal trust resources and consider tribal governments rights and concerns during their development; and (4) to take appropriate steps to remove procedural impediments to working with tribal governments on activities that affect the trust property and/or governmental rights of the tribes.

President Clinton subsequently expanded on this call for tribal consultation and coordination in Executive Order No. 13175. Executive Order No. 13175 was not limited to cultural resource issues, and it directed agencies to implement an accountable process to ensure "meaningful and timely input by tribal officials in the development of regulatory policies that have tribal implications." Exec. Order No. 13175, 65 Fed. Reg. 67249 (Nov. 9, 2000). Later, President George W. Bush directed federal agencies to adhere to the principles of tribal sovereignty and self-determination and "work with tribal governments in a manner that cultivates mutual respect and fosters greater understanding to reinforce these principles." Memorandum from President George W. Bush on Government-to-Government Relationship with Tribal Governments to the Heads of Executive Departments and Agencies, 2 Pub. Papers 2177 (Sept. 23, 2004). Then, on November

5, 2009, President Obama issued a memorandum endorsing Executive Order No. 13175 and reiterating President Clinton's directions to agencies.[3]

Federal agencies have also reaffirmed the importance of tribal consultation.  In January 2017, the Departments of the Interior, Army, and Justice released a report based on comments from 59 tribes and 8 organizations representing tribal interests.  *See* U.S. Dept. of Interior et al., *Final Report, Improving Tribal Consultation and Tribal Involvement in Federal Infrastructure Decisions*, at 2.[4]  Comments were unique to each tribe's respective experiences, but the report revealed a common theme—a need for improved tribal consultation.  *See id*.  Based on this input, the final report encouraged agencies to undertake a detailed analysis of their own consultation policies and practices.  The report also provided specific recommendations to help agencies comply with their federal trust responsibility to tribes.  *See id*. at 2-3.  Recommendations included improving the timing and scope of consultation, building stronger federal-tribal relationships, increasing training opportunities for federal agency staff, integrating tribal input in federal decision-making, improving tribal access to resources, and committing to building tribal capacity. *See id*. at 19-23.

As another example, "consultation" has been defined as a process of government-to-government dialogue between the federal agency and Indian tribes regarding proposed federal actions in a manner intended to secure meaningful and timely tribal input. *See Yankton Sioux Tribe v. Kempthorne*, 442 F.Supp.2d 774, 783-784 (D.S.D. 2006) (quoting Bureau of Indian Affairs Government-to-Government Consultation Policy).   Consultation includes processes to guarantee

---

[3] Executive Order 13604 "Improving Performance of Federal Permitting and Review of Infrastructure Projects" (Mar. 22, 2012) mandated its implementation consistent with Executive Order 13175 and President Obama's Memorandum of November 5, 2009, thus elevating the Presidential Memorandum to Executive Order status.

[4] Available at https://www.bia.gov/sites/bia.gov/files/assets/as- ia/pdf/idc2-060030.pdf.

that tribes are: (1) timely notified of the formulated or proposed federal action; (2) informed of the potential impact on tribes of the formulated or proposed federal action; (3) informed of those federal officials who may make the final decisions with respect to the federal action; (4) given the opportunity to provide input and recommendations on such proposed action to be fully considered by those officials responsible for the final decision; and (5) advised of the rejection of tribal recommendations on such action from those federal officials making such decisions and the basis for such rejections. *Id.* Consultation does not mean merely the right of tribal officials, as members of the general public, to be consulted, or to provide comments. *Id.*

**B.    The Corps Failed to Fulfill Its Own Tribal Consultation Policies.**

The Corps "recognizes the sovereign status of Tribal governments and [its] obligation for pre-decisional government-to-government consultation" in order to "ensure effective and mutually beneficially relationships with tribal partners."    Thomas P. Bostick, *Memorandum For Commanders, Directors, and Chiefs of Separate Offices, US Army Corps of Engineers Re: Tribal Consultation Policy*, U.S. Army Corps of Eng'rs (Nov. 1, 2012).[5]    According to the Corps, "[f]ulfilling the Tribal trust responsibility is required by law" and doing so "is good for the Nation, the Tribes and the Corps."  R.L. Van Antwerp*, Memorandum For Commanders, Directors, and Chiefs of Separate Offices, US Army Corps of Engineers Re: Sovereignty and Government-to-Government relations with American Indian and Alaska Native Tribal Governments: USACE Tribal Policy Principles*, U.S. Army Corps of Eng'rs, (May 10, 2010).[6]

---

[5] Available at https://www.spk.usace.army.mil/Portals/12/documents/tribal_program/USACE%20Native%20American%20Policy%20brochure%202013.pdf.
[6] Available at https://www.spk.usace.army.mil/Portals/12/documents/tribal_program/USACE%20Native%20American%20Policy%20brochure%202013.pdf.

The Corps' Tribal Consultation Policy highlights that the "federal government has a unique legal and political relationship with Tribal governments that recognizes self-government and self-determination" and that "[the Corps] will ensure that it addresses Tribal concerns regarding tribal resources, tribal rights (including treaty rights) and Indian lands."  Corps Tribal Consultation Policy (Oct. 4, 2012), at 2-3.[7]  Similarly, Corps policy recognizes that "[t]here are responsibilities to Tribes resulting from the Federal Trust Doctrine, as well as from Treaties, statutes, regulations, Executive Orders and agreements between the United States government and tribal governments." *Id*. at 2.  One way in which the Corps "support[s] Tribal self-determination, self-reliance and capacity building" is "by…[u]tilizing Tribal knowledge for planning purposes and to inform operational activities."  *See id*. at 4.

One of the goals of the Tribal Consultation Policy is an "[o]pen, timely, meaningful, collaborative and effective deliberative communication process that emphasizes trust, respect and shared responsibility."  *Id*.  In recognition of the special considerations due to tribal interests, the Corps' Tribal Nations Program states that it has adopted certain Tribal Policy Principles, including that: "[the Corps] will involve Tribes collaboratively, before and throughout decision making, to ensure the timely exchange of information, the consideration of disparate viewpoints, and the utilization of fair and impartial dispute resolution processes."  Corps Tribal Nations Program, Tribal Policy Principles.[8]  Consistent with this principle, the Corps' Tribal Consultation Policy stresses that "[t]o the extent practicable and permitted by law, consultation works toward mutual consensus and begins at the earliest planning stages, before decisions are made and actions are

---

[7] Available at
https://www.spk.usace.army.mil/Portals/12/documents/tribal_program/USACE%20Native%20American%20Policy%20brochure%202013.pdf.
[8] Available at https://www.usace.army.mil/Missions/Civil-Works/Tribal-Nations/.

taken; an active and respectful dialogue concerning actions taken by the [Corps] that may significantly affect tribal resources, tribal rights (including treaty rights) or Indian lands." *Id*.

Accordingly, "[c]onsultation [is] an integral, invaluable process of [Corps] planning and implementation." *Id*. at 3. The agency's policy provides that "[w]hen appropriate, potentially affected Tribes…will be contacted by letter, telephone or e-mail sufficiently early to allow a timely review of the proposed action." *Id*. Also, the Corps' policy requires a district level Corps representative to effectively interact with an affected tribe and review any activity that has the potential to significantly affect tribal resources, including permit applications. *See id*. The Corps will take into consideration comments of "Tribes with an interest in a particular activity." *See id*. at 4. The Corps Tribal Consultation Policy also recognizes the need to develop consultation procedures for individual projects or programs "at the local level to meet the needs of particular Tribe(s)." *See id*. "Requests for consultation by a Tribe to [the Corps] will be honored." *Id*.

In its Tribal Consultation Policy, the Corps "recognizes the importance of strict compliance with…statutes concerning cultural and natural resources" and that such "statutes may not comprise the full range of consultation, nor of cultural property and resource protection." *Id*. So, the Corps is required to "maintain open lines of communication through consultation with Tribes during the decision-making process for those matters that have the potential to significantly affect protected tribal resources, tribal rights (including treaty rights) and Indian lands." *Id*. at 5. "Pre-decisional consultation" is an important aspect of the Corps' "planning, management, budgetary, operational, and legislative initiatives." *Id*. at 5-6. The Corps likewise runs afoul of DOD consultation policy, which binds the Corps. DOD Instruction 4710.02, § 1.1. That policy defines consultation as "rarely a singular event but rather part of a process to inform a pending decision or course of action, it is information and opinion respectfully exchanged in both directions." *Id*. at § G.2.

16

The DOD's and the Corps' policies, memoranda, and principles recognize that meaningful, timely, two-way consultation is an integral and required aspect of fulfilling the Corps' tribal trust responsibility.  Yet, inexplicably, on remand, the Corps affords no weight to any of the Tribes' input and addresses none of the Tribes' new information on remand, all of which relates to the Tribes' efforts to protect their treaty rights and lands. *See, e.g.,* RAR 001; RAR 141; RAR 94; RAR 67; RAR 254; Remand Analysis, at 83 (rejecting significance of tribal economic, cultural, and spiritual concerns from effect of a spill due to the unpredictability of prevailing winds and seasonal conditions); Remand Analysis, at 87 (dismissing environmental justice concerns because of the "low probability of a spill, and the limited extent of the expected effects"); Remand Analysis, at 18, 108 (utilizing original WCD without addressing criticisms received during remand process); Remand Analysis, at 107 (tossing out 311 comments because, according to the Corps, such comments concurred with the Corps' conclusions); Remand Analysis, at 123-24 (failing to address tribal issues with detections times and continuing to rely upon original detection times); Remand Analysis, at 117 (continuing to speculate valve shutdown time of three minutes as a "conservative estimate" despite contrary tribal concerns and information).  The Corps-Tribal interaction on remand was plainly not a two-way street.  Here, the federal government shrugged off its self-imposed tribal consultation requirements, a circumstance especially egregious in light of the specific treaty rights the Tribes seek to enforce and protect in this case.

### C.    Courts Have Held That Tribal Consultation Must Be Meaningful.

Tribes' rights to consultation with federal departments and agencies are not merely superficial.   In *Wyoming v. Dep't of the Interior* for instance, the court issued a nationwide injunction preventing the BLM from implementing its proposed rules regulating hydraulic fracturing on BLM and tribal lands after determining that federal officials had failed to engage in meaningful consultation with affected tribes. *Wyoming v. Dep't of the Interior*, 136 F.Supp.3d

1317, 1344-46 (D. Wyo. 2015).  In its reasoning that the BLM had failed to participate in adequate

tribal consultation, the *Wyoming* court cited to the Department of Interior's Policy on Consultation

with Indian Tribes that: "Consultation is a process that aims to create effective collaboration with

Indian tribes and to inform Federal decision-makers. Consultation is built upon government-to-

government exchange of information and promotes enhanced communication that emphasizes

trust, respect, and shared responsibility…"  *Id*. at 1344.  The court repeatedly noted the lack of

meaningful tribal consultation: "The consultation process should include the incorporation of tribal

views in the decision-making process, respect for tribal sovereignty, and meaningful dialogue

where the viewpoints of tribes and the DOI are shared, discussed, and analyzed."  *Id*. at 1345.  The

court reasoned that the "DOI's policies and procedures reflect the unique relationship between

Indian tribes and the federal government and recognize Indian tribes' right to self-governance and

tribal sovereignty."  *Id*. at 1345.  Accordingly, Judge Skavdahl held that the BLM's efforts to hold

four regional tribal consultation meetings, distributing copies of a draft rule to affected tribes for

comment, and offering to meet individually with tribes following the regional meetings did not

satisfy the BLM's tribal consultation requirements because such conduct "reflect[ed] little more

than that offered to the public in general."  *Id*. at 1345-46.  The Corps' tribal consultation policies

mirror those of the Department of the Interior in the *Wyoming* case, but the Corps' purported

consultation efforts here pale in comparison to those that the *Wyoming* court found inadequate.

Per *Wyoming*, "meaningful" consultation is not achieved by inviting tribal leaders to talk

with the Corps about thousands of pages of scientific reports or failing to make any changes in

response to tribal feedback about the project.  Listening sessions are not meaningful consultation.

Meaningful consultation starts at the beginning of an agency effort, not on a remand.  It means

getting tribal views before putting pen to paper.  It means making changes to the proposed permit

in response to tribal feedback.  It does not mean meeting with a tribe for a few hours.  Because the Corps has summarily dismissed tribal feedback about the project, the Corps' actions should be deemed just as arbitrary and capricious as those of the BLM in *Wyoming*.

Similarly, in *Quechan Tribe*, the court issued a preliminary injunction enjoining a BLM solar energy project where the BLM had not adequately consulted with the affected tribe: "the consultation requirement is not an empty formality; rather, it 'must recognize the government-to-government relationship between the Federal Government and Indian tribes' and is to be 'conducted in a manner sensitive to the concerns and needs of the Indian tribe.'" *Quechan Tribe*, 755 F.Supp.2d at 1108-09 (citing 36 C.F.R. § 800.2(c)(2)(ii)(C)).  The court reasoned that, although BLM had sent numerous letters and communications to the Quechan Tribe, that the sheer volume of documents was not meaningful because the BLM's communications were "replete with recitals of law (including Section 106), professions of good intent, and solicitations to consult with the Tribe" and "documentation that might support a finding that true government-to-government consultation occurred [was] painfully thin."  *Quechan Tribe*, 755 F.Supp.2d at 1118.  Mere *pro forma* recitals did not, by themselves, show BLM complied with the law.  *Id*.  Furthermore, the court pointed out that BLM first met with the Tribe "well after the project was approved."  *Id*.  The court added that "government agencies are not free to glide over requirements imposed by Congressionally-approved statutes and duly adopted regulations."  *Id*. at 1119.  Notably, *Quechan Tribe* reasoned that even though the BLM "did a lot of consulting in general" that "didn't show that its consultation with the [T]ribe was adequate under the regulations."  *Id*. at 1112.

Myriad cases have addressed the scope of meaningful consultation.[9]  What flows from these cases is that tribal consultation is not exacting; it does not have a single mold or method that applies across all government agencies under all circumstances.  Tribal consultation may vary depending on the circumstances of the federal action and implication of tribal interests.  The approaches to consultation with federal agencies likewise vary from tribe to tribe.

Yet some basic parameters for tribal consultation are discernible from the cases, regulations, and administrative guidance.  Consultation must represent a government-to-government robust dialogue that allows for a substantive exchange of information.  Such exchange should actively involve tribes in the decision-making process early and often and in a thorough manner such that the agency and tribes significantly engage on the issues.  As a government-to-government exchange, tribal sovereignty must be respected by federal agencies demonstrating active listening as opposed to mere passive receipt of tribal views.  Consultation should gather and incorporate tribal views and opinions to avoid any adverse effects on tribal interests and concerns.  Tribal consultation is a cooperative discourse that continues as the parties share their viewpoints.  The result of a tribal consultation's effective collaboration and exchange of ideas should be that the agency and the tribes have listened to, discussed, and addressed each other's expressed concerns.  An agency's tribal consultation efforts need to provide more back and forth than what is generally offered to the public—an agency needs to generally commit to extra, meaningful efforts to engage tribes.  Sheer volume of consultation is insufficient; consultation must create a

---

[9] *See, e.g., Lower Brule Sioux Tribe v. Deer*, 911 F. Supp. 395, 401 (D. S.D. 1995); *Confederated Tribe & Bands of Yakima Indian Nation v. FERC*, 746 F.2d 466, 475 (9th Cir. 1984); *California Wilderness Coalition v. United States DOE*, 631 F.3d 1072, 1088 (9th Cir. 2011); *Yankton Sioux Tribe v. Kempthorne*, 442 F. Supp. 2d 774, 784 (D. S.D. 2006); *Te-Moak Tribe of Western Shoshone of Nev. v. United States DOI*, 608 F.3d 592, 597-598 (9th Cir. 2010); *Center for Biological Diversity v. United States BLM*, 2017 U.S. Dist. LEXIS 137089 (D. Nev. 2017).

platform that permits good-faith, constructive dialogue that seeks agreement on the issues. Tribal consultation cannot be cursory and inadequate, and cannot consist mostly of informational meetings or general correspondence.  Consultation needs to be more than a procedural speed bump; it must be an opportunity to reflect on the effect that federal projects and policies have on tribal concerns and sovereignty.

As a critical component of tribal sovereignty, tribal consultation is intended to protect tribal needs, interests, rights, and resources. Through meaningful tribal consultation, the government should maintain open and constant communications with tribes.  These communications should center around a respectful relationship using a dialogue that prioritizes identifying and considering tribal interests.  Ultimately, this dialogue should develop tailored solutions to address specific and unique needs of tribal communities. [10]

In sum relevant authorities cited herein demonstrate that, to satisfy their consultation obligations, federal agencies must deal in good faith with all the facts in front of them and with the legitimate objections of Indian tribes by engaging in early, frequent and two-way dialogue.  In this case, nowhere is the consultation failure more evident than in the Corps' cramped

---

[10] *See* Troy A. Eid, *Beyond Dakota Access Pipeline: Energy Development and the Imperative for Meaningful Tribal Consultation*, 95 Univ. of Denv. L. Rev. 593, 604 (2018); *see also* Tarah Bailey, Note, *Consultation with American Indian Tribes: Resolving Ambiguity and Inconsistency in Government-to-Government Relations*, 29 Colo. Nat. Res. Energy & Envtl. L. Rev. 195, 205 (2018); Timothy Q. Purdon, Katherine S. Barrett Wiik, Dr. Aryn Conrad, *DAPL: Storm Clouds on the Horizon in Indian Country*, 65 Federal Lawyer (June 2017); Gabriel Galanda, *The Federal Indian Consultation Right: A Frontline Defense Against Tribal Sovereignty Incursion*, American Bar Association Government Affairs Practice Committee Newsletter (Winter 2010-2011), at 3, available at http://apps.americanbar.org/buslaw/committees/CL121000pub/newsletter/201101/galanda.pdf; Karen Atkinson, Esq., *Why Do We Consult Tribes? A Legal and Policy Perspective, Office of Collaborative Action and Dispute Resolution*, available at https://www.doi.gov/pmb/cadr/programs/native/gtgworkshop/Implementing-the-Government-to-Government-Relationship.

interpretation of "highly controversial" found at page 99 of its Remand Analysis.  The Corps appears to understand "highly controversial" to mean solely flawed with respect data or methods. *Id*. (citing *Nat'l Parks Conservation Assoc. v. U.S.*, 177 F.Supp.3d 1, 22 (D. D.C. 2016).  That narrow view ignores the plain meaning of the words "highly controversial" found at 40 C.F.R. § 1508.27(b)(4).  The Corps' overly formalistic approach to what "highly controversial" means is exactly the sort of thing that tribal consultation exists in federal law to avoid.

Importantly, consultation acts as a safeguard against the federal government repeating the historic failure to include voices of tribal officials in formulating projects and policies that affect tribal communities.  *See* Memorandum of November 5, 2009—Tribal Consultation, 74 Fed. Reg. 57881 (Nov. 9, 2009).  This failure to hear tribal voices and uphold the federal trust responsibility has had devastating effects on tribal communities and cultures.  Many if not most tribal governments lack either a credible tax base or equivalent revenue sources for financing basic public services.  Yet tribes nevertheless routinely must expend their own scarce resources to evaluate the impacts of commercial ventures not of their own making that may provide few if any direct benefits to them, and which have the potential to devastate them.  The principles of tribal sovereignty and self-determination, and the tribal consultation requirements that spring from these principles, exist to combat such a hostile environment.  It is paramount, and to a certain extent, a matter of survival, that the voices of Indian tribes be heard in the manner that federal law and principles of tribal sovereignty require.

## CONCLUSION

The Corps' remand effort is an echo-chamber of its deficient engagement with the Tribes all along.  In the absence of two-way consultation, the Corps has failed to meet its federal legal obligations.  Accordingly, the Tribes' Motions for Summary Judgment should be granted.  The Court should hold the Corps accountable for its failures.

Respectfully submitted this 23rd day of August 2019,

s/ *Michael R. Sklaire*
Michael R. Sklaire, D.D.C. Bar ID 445364
GREENBERG TRAURIG, LLP
1750 Tysons Blvd., Suite 1000
McLean, VA 22102
Telephone: 703-749-1300
Fax: 703-749-1301
sklairem@gtlaw.com

Jennifer H. Weddle *(Pro Hac Vice to be submitted)*
Troy A. Eid *(Pro Hac Vice to be submitted)*
Kyle R. Montour
GREENBERG TRAURIG, LLP
1200 17th St., Suite 2400
Denver, CO  80202
Telephone: 303-572-6500
Fax: 303-572-6540
weddlej@gtlaw.com
eidt@gtlaw.com
montourk@gtlaw.com

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of August 2019, a copy of the foregoing **BRIEF OF *AMICI CURIAE* NATIONAL CONGRESS OF AMERICAN INDIANS, GREAT PLAINS TRIBAL CHAIRMAN'S ASSOCIATION, ASSOCIATION OF AMERICAN INDIAN AFFAIRS, AMERICAN CIVIL LIBERTIES UNION, AMERICANS FOR INDIAN OPPORTUNITY, INDIAN LAW RESOURCE CENTER, INTER TRIBAL ASSOCIATION OF ARIZONA, TRIBAL LAW AND POLICY INSTITUTE, UNITED SOUTH AND EASTERN TRIBES SOVEREIGNTY PROTECTION FUND, AND FOURTEEN INDIAN TRIBES IN SUPPORT OF TRIBAL MOTIONS FOR SUMMARY JUDGMENT** was filed with the Clerk of the Court through the CM/ECF system and on counsel of record who are registered CM/ECF users.

s/ *Michael R. Sklaire*
Michael R. Sklaire

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| STANDING ROCK SIOUX TRIBE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CHEYENNE RIVER SIOUX TRIBE, | ) | |
| | ) | |
| Intervenor-Plaintiff | ) | |
| | ) | Case No. 1:16-cv-1534-JEB |
| v. | ) | |
| | ) | |
| U.S. ARMY CORPS OF ENGINEERS, | ) | |
| | ) | |
| Defendant-Cross-Defendant | ) | |
| | ) | |
| and | ) | |
| | ) | |
| DAKOTA ACCESS, LLP, | ) | |
| | ) | |
| Intervenor-Defendant | ) | |
| Cross-Claimant | | |

**PROPOSED ORDER GRANTING MOTION OF MOTION OF NATIONAL CONGRESS OF AMERICAN INDIANS, GREAT PLAINS TRIBAL CHAIRMAN'S ASSOCIATION, ASSOCIATION OF AMERICAN INDIAN AFFAIRS, AMERICAN CIVIL LIBERTIES UNION, AMERICANS FOR INDIAN OPPORTUNITY, INDIAN LAW RESOURCE CENTER, INTER TRIBAL ASSOCIATION OF ARIZONA, TRIBAL LAW AND POLICY INSTITUTE, UNITED SOUTH AND EASTERN TRIBES SOVEREIGNTY PROTECTION FUND, AND FOURTEEN INDIAN TRIBES FOR LEAVE TO FILE AMICI CURIAE BRIEF IN SUPPORT OF TRIBAL MOTIONS FOR SUMMARY JUDGMENT**

THIS MATTER having come before the Court on the Motion for Leave to File *Amici Curiae* Brief in Support of Tribal Motions for Summary Judgment, and this Court having reviewed such motion and being fully advised;

IT IS ORDERED that the Motion for Leave to File Amici Curiae Brief in Support of Tribal Motions for Summary Judgment is granted; and

IT IS FURTHER ORDERED that the Clerk of Court shall file the submitted Brief of Amici Curiae National Congress Of American Indians, Great Plains Tribal Chairman's Association, Association of American Indian Affairs, American Civil Liberties Union, Americans for Indian Opportunity, Indian Law Resource Center, Inter Tribal Association of Arizona, Tribal Law and Policy Institute, United South and Eastern Tribes Sovereignty Protection Fund, and Fourteen Indian Tribes In Support Of Tribal Motions For Summary Judgment.

.

Dated this ___ day of _____ 2019.

_____
JAMES E. BOASBERG
United States District Judge