**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE, YANKTON SIOUX TRIBE; ROBERT FLYING HAWK; OGLALA SIOUX TRIBE, | Case No. 1:16-cv-1534-JEB (and Consolidated Case Nos. 16-cv-1796 and 17-cv-267) |
| Plaintiffs, | |
| and | |
| CHEYENNE RIVER SIOUX TRIBE, | |
| Plaintiff-Intervenor, | **ARMY CORPS' OPPOSITION TO PLAINTIFF CHEYENNE RIVER'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT OF CROSS MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| U.S. ARMY CORPS OF ENGINEERS, | |
| Defendant-Cross Defendant, | |
| and | |
| DAKOTA ACCESS, LLC, | |
| Defendant-Intervenor-Cross Claimant. | |

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

PROCEDURAL AND FACTUAL BACKGROUND...................................................................2

    I.       THE COURT'S NARROW REMAND TO THE CORPS.....................................2

    II.      THE CORPS' EFFORTS TO SECURE INFORMATION AND
            CONSULTATION IN WRITING FROM CHEYENNE RIVER ..........................2

    III.    EFFORTS TO MEET WITH, PROVIDE INFORMATION TO, AND
            SECURE FEEDBACK FROM CHEYENNE RIVER ...........................................5

    IV.    CHEYENNE RIVER'S PROVISION OF INFORMATION IN RESPONSE
            TO THE CORPS' SEPTEMBER 25, 2017 REQUEST .........................................7

    V.      MEETING BETWEEN CHEYENNE RIVER AND THE CORPS........................8

STANDARD OF REVIEW ...................................................................................................10

ARGUMENT ....................................................................................................................11

    I.       THE CORPS REASONABLY TAILORED ITS REMAND ANALYSIS
            TO MATCH THE COURT'S REMAND..............................................................11

    II.      CHEYENNE RIVER HAS FAILED TO IDENTIFY ANY DUTY TO
            CONSULT ..........................................................................................................15

    III.    THE CORPS FULFILLED ANY DUTY TO CONSULT WITH
            CHEYENNE RIVER ........................................................................................21

CONCLUSION...................................................................................................................24

# TABLE OF AUTHORITIES

**Cases**

*Albuquerque Indian Rights v. Lujan,*
   930 F.2d 49 (D.C. Cir. 1991) ............................................... 11

*Ams. for Safe Access v. DEA,*
   706 F.3d 438 (D.C. Cir. 2013) ............................................. 11

*Appalachian Power Co. v. EPA,*
   208 F.3d 1015 (D.C. Cir. 2000) ........................................... 16

*Ark Initiative v. Tidwell,*
   64 F. Supp. 3d 81 (D.D.C. 2014) ................................... 10, 11

*Ark Initiative v. Tidwell,*
   816 F.3d 119 (D.C. Cir. 2016) ............................................. 10

*Barrick Goldstrike Mines, Inc. v. Browner,*
   215 F.3d. 45 (D.C. Cir. 2000) .............................................. 16

*Biodiversity Conservation All. v. U.S. Bureau of Land Mgmt.,*
   404 F. Supp. 2d 212 (D.D.C. 2005) ..................................... 14

*Blue Ridge Envtl. Def. League v. NRC,*
   716 F.3d 183 (D.C. Cir. 2013) ............................................. 13

*Bowman Transp., Inc. v. Ark.–Best Freight Sys., Inc.,*
   419 U.S. 281 (1974) ............................................................ 11

*Cement Kiln Recycling Coal. v. EPA,*
   493 F.3d 207 (D.C. Cir. 2007) ............................................. 16

*Cheyenne River Sioux Tribe v. Jewell,*
   205 F. Supp. 3d 1052 (D.S.D. 2016) ................................... 19

*Chickasaw Nation v. United States,*
   534 U.S. 84 (2001) .............................................................. 11

*Cobell v. Kempthorne,*
   532 F. Supp. 2d 37 (D.D.C. 2008) ...................................... 11

*Cobell v. Salazar,*
   573 F.3d 808 (2009) ............................................................ 11

*Confederated Tribes and Bands of Yakama Nation v. USDA,*
   No. Cv- 10-3050-EFS, 2010 WL 3434091 (E.D. Wash. Aug. 30, 2010) ................................ 18

*Fund For Animals, Inc. v. Rice,*
   85 F.3d 535 (11th Cir. 1996) ............................................... 14

*Greater Yellowstone Coal. v. Flowers,*
   359 F.3d 1257 (10th Cir. 2004) ........................................... 13

*Hoopa Valley Tribe v. Christie*,
   812 F.2d 1097 (9th Cir. 1986) ...................................................................... 20

*Klamath Tribes v. United States*,
   No. 96-381- HA, 1996 WL 924509 (D. Or. Oct. 2, 1996) ...................................... 18

*Mid States Coal. for Progress v. Surface Transp. Bd.*,
   345 F.3d 520 (8th Cir. 2003) ........................................................................ 14

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983)..................................................................................... 10

*Muckleshoot Indian Tribe v. Hall*,
   698 F. Supp. 1504 (W. D. Wash. 1988).............................................................. 19

*Muscogee (Creek) Nation v. Hodel*,
   851 F.2d 1439 (D.C. Cir. 1988) ..................................................................... 11

*N. Arapaho Tribe v. Burwell*,
   118 F. Supp. 3d 1264 (D. Wyo. 2015)................................................................ 16

*Oglala Sioux Tribe v. Andrus*,
   603 F.2d 707 (8th Cir. 1979) ........................................................................ 20

*Protect Nantucket Sound, Inc. v. U.S. Dep't of the Army*,
   398 F.3d 105 (1st Cir. 2005).......................................................................... 13

*Sierra Club v. U.S. Army Corps of Eng'rs*,
   277 F. App'x 170 (3d Cir. 2008) ..................................................................... 14

*Sierra Club v. U.S. Army Corps of Eng'rs*,
   450 F. Supp. 2d 503 (D. N.J. 2006).................................................................. 14

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
   255 F. Supp. 3d 101 (D.D.C. 2017)............................................ 1, 2, 12, 15, 17, 18, 20, 21, 23

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
   280 F. Supp. 3d 187 (D.D.C. 2017)........................................................ 5, 6, 7, 8, 9, 10

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
   282 F. Supp. 3d 91 (D.D.C. 2017).............................................................. 2, 4, 5, 12

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
   301 F. Supp. 3d 50 (D.D.C. 2018)................................................................... 16

*TOMAC v. Norton*,
   4433 F.3d 852 (D.C. Cir. 2006) ..................................................................... 13

*TOMAC v. Norton*,
   240 F. Supp. 2d 45 (D.D.C. 2003)................................................................... 13

*United Keetoowah Band of Cherokee Indians in Okla. v.FCC*,
   933 F.3d 728 (D.C. Cir. 2019)................................................................... 20, 23

*WildEarth Guardians v. U.S. Fish & Wildlife Serv.*,
    784 F.3d 677 (10th Cir. 2015) .................................................................................. 14

*Yankton Sioux Tribe v. Kempthorne*,
    442 F. Supp. 2d 774 (D.S.D. 2006) .......................................................................... 19

*Yankton Sioux Tribe v. Kempthorne*,
    442 F. Supp. 2d 774 (D.S.D. 2006) .......................................................................... 19

*Yankton Sioux Tribe v. U.S. Dep't of Health & Human Servs.*,
    496 F. Supp. 2d 1044 (D.S.D. 2007) ........................................................................ 19

**Statutes**

25 U.S.C. § 2011(b)(1) .............................................................................................. 19

25 U.S.C. § 2011(b)(2)(B) ......................................................................................... 19

5 U.S.C. § 706(2)(A) .................................................................................................. 10

**Regulations**

40 C.F.R. § 1501.4(b) ............................................................................................ 14, 15

40 C.F.R. § 1508.27(b)(4) .......................................................................................... 10

**Other Authorities**

Executive Order 13175 ............................................................................................... 16

**INTRODUCTION**

This Court previously considered Cheyenne River's claims that the Army Corps failed to appropriately consult with Cheyenne River regarding the Dakota Access Pipeline crossing at Lake Oahe, roughly 70 miles north of Cheyenne River's reservation.  The Court held that the Corps satisfied any duty to consult regarding its issuance of the Rivers and Harbors Act Section 408 permission and easement for the Lake Oahe crossing.  *Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 155-61 (D.D.C. 2017) ("*Standing Rock IV*"). Cheyenne River's single claim here—that the Corps violated an alleged duty to consult with Cheyenne River—should be rejected because neither the Court's narrow remand instructions nor any law imposed upon the Corps a mandatory duty to engage in any consultation with Cheyenne River.

In any event, even if there were such a consultation duty, the Corps would have again satisfied it by engaging, and attempting to engage even further, with Cheyenne River to thoroughly evaluate the possible impacts that a low possibility oil spill might have on the Tribe. The Corps repeatedly asked Cheyenne River for information related to the Court's remand order. And while Cheyenne River transmitted several letters to the Corps shortly after remand, those letters did not provide new information.  Cheyenne River repeatedly declined to engage with the Corps, going so far as to request information and then refuse to attend meetings where it was told it would receive the information it purportedly sought.  The Corps repeatedly sought specific information from Cheyenne River, met with Cheyenne in those limited instances that Cheyenne agreed to meet, and fully considered the limited information Cheyenne belatedly submitted over 200 days after it was first requested.  In sum, the Corps properly engaged with Cheyenne River during the remand and the Tribe has failed to sustain its burden of showing that the Corps'

remand decision was in any way arbitrary or capricious.

## PROCEDURAL AND FACTUAL BACKGROUND

### I.     The Court's narrow remand to the Corps

In June 2017, the Court "found that the Corps 'largely complied' with NEPA's requirements, and it granted remand on only a narrow subset of the Tribes' NEPA claims." *Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs*, 282 F. Supp. 3d 91, 103 (D.D.C. 2017) ("*Standing Rock V*").   The Court held that the Corps "failed to adequately consider the impacts of an oil spill on Standing Rock's fishing and hunting rights and on environmental justice[.]"   *Standing Rock IV*, 255 F. Supp. 3d at 147.   The Court also indicated that its remand applied to Cheyenne River.   *Id.* at 160 ("In sum, then, the Court reaches the same decision on Cheyenne River's claims as it did on Standing Rock's.   Aside from the discrete issues that will be the subject of remand, the Court concludes that the Corps complied with its statutory responsibilities.").

The Court characterized "Defendants' task on remand [as] a narrow one."   *Standing Rock V*, 282 F. Supp. 3d at 99.   For example, "[w]hile the Tribes now reiterate that they place a 'high importance . . . on hunting and fishing,' . . . the Corps on remand must take a 'hard look' at the impact of DAPL on only the resources themselves" rather than engaging in the "existential-scope analysis" favored by the Tribes.   ."   *Id.* at 99.   The Court held that this "is not a case in which the agency 'must redo its analysis from the ground up.'"   ."   *Id.* at 100 (citation omitted).

### II.    The Corps' efforts to secure information and consultation in writing from Cheyenne River

Cheyenne River transmitted several letters to the Corps early in the remand process. Those letters essentially re-sent information that had already been filed in this case or otherwise provided to the Corps.   Letter from Chairman Frazier, Cheyenne River, to D. Lamont, Assistant

Sec'y of the Army (Civil Works) (July 7, 2017), RAR13700-06.  Cheyenne River's initial letters

also claimed, however, that the Tribe would provide information regarding the Lake Oahe

crossing's impacts on water and cultural practices.  *Id*. at 3, RAR13702; Letter from Chairman

Frazier to R. McCarthy, Acting Sec'y of the Army at 3 (Aug. 15, 2017), RAR13611.  Cheyenne

River's third letter also identified Chairman Harold Frazier as "the Tribe's point of contact."

Letter from Chairman Frazier to Col. Hudson (Sept. 8, 2017), RAR13367-68.  The Army

responded on September 11, 2017 and noted that the Corps "is in the process of addressing the

remand and expects to seek information" from Dakota Access and the four Plaintiff tribes.

Letter from D. Lamont, Acting Assistant Sec'y of the Army (Civil Works), to Chairman Frazier

(Sept. 11, 2017), RAR13366.

On September 13, 2017, the Corps held an internal discussion about its remand process.

The agenda indicates that the Corps "[d]iscuss[ed the] path forward" and the timeline for its

remand analysis at that meeting.  Minutes of meeting re: DAPL Remand Discussion (Sept. 13,

2017), RAR13365.  Following that meeting, the Corps requested that Cheyenne River provide

information: (1) regarding Cheyenne River's hunting and fishing practices; (2) on game species;

(3) on "distinct cultural practices . . . that are connected to Lake Oahe"; and (4) regarding which

cultural practices should be treated confidentially.  Letter from Col. Hudson to Chairman Frazier

(Sept. 25, 2017), RAR13330-31.  The Corps also asked that Cheyenne River verify that a list of

documents previously submitted by Cheyenne River was complete.  *Id*. at 2, RAR13331.  The

Corps requested that the Tribe respond within 30 days and stated that it would "determine the

next steps in the remand process and whether we need any additional information from your tribe

after we receive the requested information and documentation."  *Id*. at 3, RAR13332.

Cheyenne River responded to the Corps by stating that it would "not be able to submit the

requested materials within the Corps' requested timeline" but "expect[ed] to be able to [do so by] early 2018."  Letter from Chairman Frazier to Col. Hudson at 2 (Oct. 24, 2017), RAR12293. Cheyenne River noted that, as set forth in Corps' October 6, 2017 status report, ECF No. 281, the Corps did not expect to receive a draft spill model from Dakota Access until early December.  ." *Id*.  Cheyenne River requested "90 additional days after receipt of spill modeling information to submit our remand materials" and unspecified reports.  Letter from Chairman Frazier to Col. Hudson, RAR12293.  The Corps agreed to Cheyenne's request for more time and asked that the Tribe "submit the requested materials by December 20, 2017 so that [the Corps] can maintain the schedule that we provided to the court."  Letter from Col. Hudson to Chairman Frazier (Nov. 27, 2017), RAR11996.

On December 18, 2017, Cheyenne River transmitted a letter to the Corps stating it would be unable to provide the remand materials requested by the Corps until "January 30, 2018 at the earliest."  Letter from Chairman Frazier to Col. Hudson (Dec. 18, 2017), RAR11961.  Cheyenne then sent a follow-up letter indicating that it "does not anticipate having final remand materials until the end of February 2018."  Letter from Chairman Frazier to Col. Hudson at 1-2 (Jan. 30, 2018), RAR10350.  The letter also criticized the Corps for neither providing Cheyenne River with spill model results nor making Cheyenne River a "cooperating agency" in the remand.  *Id*.[1]

The Corps responded by explaining that the Corps was "not at a point in the National Environmental Policy Process where we would consider adding cooperating agencies."  Letter from Col. Hudson, Corps, to Chairman Frazier, Cheyenne River (Feb. 23, 2018), RAR6600.  The Corps reemphasized, though, its request for information from Cheyanne River, explaining that its

---

[1] The Corps only received the first draft of the spill model on December 19, 2017, at which time it started its internal review.  Email from S. Rowe (Dec. 19, 2017), RAR11604.

"remand analysis would benefit from the information" it had requested in September.  ."  *Id.*

### III.    Efforts to meet with, provide information to, and secure feedback from Cheyenne River

While the Corps was attempting to obtain the information it requested on September 25, 2017, Dakota Access also attempted to engage with Cheyenne River in spill response planning. The spill response planning efforts responded to the Court's December 4, 2017 order that "the Corps, Dakota Access, and the Tribes coordinate to finalize spill response plans at Lake Oahe, and that the parties file such plans with the Court by April 1, 2018."  *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 280 F. Supp. 3d 187, 191 (D.D.C. 2017).

Dakota Access began planning a meeting to finalize spill response plans by December 8, 2017, proposing nine potential meeting dates between December 19, 2017 and January 12, 2018 in order to meet the Court's deadline.  Email from C. Borkland, Energy Transfer Partners ("ETP") (Dec. 8, 2017), RAR11255; Email from C. Borkland, ETP (Jan. 12, 2018), RAR10316-19.  Bismarck, North Dakota was selected as the location for a January 11, 2018 meeting instead of the Corps' offices in Omaha, Nebraska "to make it more convenient for Standing Rock and Cheyenne River."  Emails from C. Borkland, ETP, RAR12252-54.  Dakota Access encouraged Standing Rock and Cheyenne River to propose any corrections to the draft geographic response plan in advance of the meeting.  Email from C. Borkland, ETP (Dec. 20, 2017), RAR11234. Dakota Access proposed to spend the entire January meeting reviewing "that plan with the Corp[s] and Tribes" and making modifications to the draft plan.  Emails from C. Borkland, ETP, RAR11230-311.  Cheyenne River did not attend the January 11, 2018 meeting.  Email from C. Borkland, ETP (Jan. 12, 2018), RAR10316-17.

On January 12, 2018, Dakota Access sent a follow-up email to Standing Rock and Cheyenne River.  *Id.*  That email noted that neither tribe had responded to a proposed meeting in

February 2018 and again invited Cheyenne River to present "any information" it wanted Dakota

Access to consider, including "any errors or relevant omissions" in the draft "Geographic

Response Plan or Facility Response Plan."  Email from C. Borkland, ETP (Jan. 12, 2018)

RAR9086-87.  On January 26, 2018, Dakota Access sent another follow-up email confirming

plans to hold the next meeting on February 8 in Bismarck.  Email from C. Borkland, ETP (Jan.

26, 2018), RAR10316.  In planning for the February 8, 2018 meeting, Dakota Access and the

Corps responded to a letter from Standing Rock stating that they would be willing to travel to

Standing Rock for a meeting, and proposed five dates in March for such a meeting.  Email from

C. Borkland, ETP (Feb. 5, 2018), RAR9083.

On February 8, 2018, Cheyenne River attended the spill response planning meeting only

to hand-deliver two letters to Energy Transfer Partners in Bismarck, North Dakota inviting

company representatives to the Tribe's reservation in South Dakota—approximately 150 miles

away—on the same day (i.e., February 8, 2018).  Email from B. Cossette, Corps (Feb. 12, 2018)

(attaching letters from Cheyenne River), RAR8727-8734; Dakota Access Pipeline Meeting

Minutes (Feb. 8, 2018), RAR9101-02; Email from C. Borkland, ETP (Feb. 14, 2018), RAR8453.

In leaving the February 8 meeting after introductions, Cheyenne River passed up an opportunity

to review and "take with them" copies of the then-current draft spill plans and receive additional

information that Cheyenne River purportedly sought.  Email from C. Borkland, ETP (Feb. 14,

2018), RAR8453; Email from C. Borkland, ETP (Mar. 1, 2018), RAR6565-66.  Approximately

three weeks later, the Corps provided Cheyenne with copies of the Geographic Response Plan

and other information that it was prepared to discuss at the February 8, 2018 meeting.  Letter

from Col. Hudson to Chairman Frazier (Feb. 23, 2018), RAR6600.  The Corps noted that it was

still considering Cheyenne River's "request for information related to the spill model."  *Id.*

On March 1, 2018, Dakota Access transmitted an email regarding the upcoming March 7, 2018 meeting.  The email noted that Cheyenne River had the original spill model, and that the revised model "includes a comparable amount as the worst case spill scenario."  Email from C. Borkland, ETP at 1 (Mar. 1, 2018), RAR6565.  Dakota Access stated that it would be "prepared to show and explain . . . the results of the recent spill modeling and discuss how those results are informing the response planning."  *Id.*  Dakota Access similarly promised to provide an updated Geographic Response Plan at the March 7 meeting.  *Id.*

Cheyenne River again declined to attend the March 7, 2018 meeting.  Letter from D. Nelson, Cheyenne River, to C. Borkland, ETP (Mar. 6, 2018), RAR6431.  Cheyenne River stated that it would not attend the meeting based upon its purported understanding that it would be required to "absorb and respond" to "complicated technical information without prior access." *Id.*  In sum, Cheyenne River chose not to attend meetings in January, February, and March, 2018. Review and Analysis of Tribes' Submissions (Aug. 31, 2018), RAR239-40.

On March 14, 2018, the Corps transmitted an updated version of the Geographic Response Plan "that Dakota Access and the Corps were prepared to discuss and share with [Cheyenne River] had they been present at the March 7, 2018, meeting."  Letter from Col. Hudson to Chairman Frazier (Mar. 14, 2018), RAR5894.

**IV.    Cheyenne River's provision of information in response to the Corps' September 25, 2017 request**

On March 30, 2018, the Corps sent a final request to Cheyenne River seeking the information the Corps originally requested on September 25, 2017.  Letter from Col. Hudson to Chairman Frazier (Mar. 30, 2018), RAR5801; Letter from Col. Hudson to Chairman Frazier (Sept. 25, 2017) (setting initial deadline of October 24, 2017), RAR13330-32.  The March 30 letter set a final deadline of April 20, 2018 for Cheyenne River to respond to the Corps' requests

and stated that "[a]fter this date, we will have to finalize our review with the information that we have."  Letter from Col. Hudson to Chairman Frazier (Mar. 30, 2018), RAR5801.

On April 20, 2018, Cheyenne River responded to the Corps' September 25, 2017 request—207 days after that request was transmitted.  Letter from Chairman Frazier to Col. Hudson (Apr. 20, 2018), RAR3459-60.  Cheyenne River's response included a March 2005 cultural assessment, *id*. at RAR3467-685, and a January 30, 2017 declaration, *id*. at RAR3691-98.  Cheyenne River declined to provide specific information regarding the connection between Cheyenne River's cultural practices and Lake Oahe.  *Id*. at 2, RAR3460.

## V.    Meeting between Cheyenne River and the Corps

Cheyenne River identified Chairman Frazier as "the Tribe's point of contact" for communications regarding remand.  Letter from Chairman Frazier to Col. Hudson at 2 (Sept. 8, 2017), RAR13368.  On April 10, 2018, in the wake of Cheyenne River declining to attend meetings in January, February, and March, the Corps contacted Chairman Frazier to schedule a meeting.  Email from J. Ames, Corps, to Chairman Frazier (Apr. 10, 2018), RAR4135; Email from J. Ames, Corps, to T. Tracey, Corps (Apr. 11, 2018), RAR4137.  On April 12, Chairman Frazier scheduled a meeting with the Corps on late May and the Corps requested the name of the Cheyenne River representative responsible for coordinating the meeting.  Email from Chairman Frazier to J. Ames, Corps (Apr. 11, 2018), RAR4135.  On May 3, May 7, and May 8, 2018, the Corps attempted to contact Chairman Frazier to plan the May meeting, including the agenda for that meeting.  Email from J. Ames, Corps, to Chairman Frazier (May 3, 2018), RAR3359; Email from J. Ames to Chairman Frazier (May 7, 2018), RAR3358; Email from J. Ames to Chairman Frazier (May 8, 2018), RAR3354; Email from J. Ames to T. Tracey, Corps (May 8, 2018), RAR3353.  The Corps and Cheyenne River met in Green Grass, South Dakota on May 29, 2018.

Tr. of Meeting (May 29, 2018), RAR1173-1212.  At that meeting, Colonel John Hudson and Corps representatives attended and participated in multiple presentations by Cheyenne River. Final Agenda (May 29, 2018), RAR3285.  Colonel Hudson made two presentations.  Tr. of May 29, 2018 Meeting at 8:11-9:25, RAR1174-75; *Id*. at 102:17-107:15, RAR1198-99.  Colonel Hudson also responded to numerous questions.  *See. e.g., id*. at 110:3-111:11, RAR1200 (responding to Chairman Frazier regarding Corps' process); *id*. at 112:22-114:6, RAR1200-01 (responding to Chairman's Frazier's questions about alleged property destruction).

On August 31, 2018, the Corps issued a "Review and Analysis of Tribes' Submissions." RAR141-280.  The review addressed, among other things, the materials Cheyenne River provided in April 2018.  *Id*. at RAR142, RAR170-71.  The Corps also issued a Memorandum for the Record that further took into consideration Cheyenne River's submissions.  Memorandum for Record at 3 (Aug. 31, 2018), RAR6 (discussing Cheyenne River's hunting and fishing); *id*. at 62-63, RAR65-66 (extending analysis to Cheyenne River water intake based on comments).[2]

The Corps addressed the three issues remanded to it by seeking input from Energy Transfer Partners and the Plaintiff Tribes.  Memorandum for Record at 1 (Aug. 31, 2018), RAR1.  The Corps concluded that "the potential impacts of an oil spill to hunting and fishing resources did not reveal any significant impacts because the risk of an incident is low and any

---

[2] The Corps addressed information provided by Cheyenne River.  Cheyenne River's factual background section in its motion for summary judgment incorrectly asserts, ECF No. 436-1 at 14 (citing RAR3285), that the "Tribe presented extensive testimonial information, including . . . presentation on the use of traditional plants and medicines in the exercise of Tribal treaty rights and their relationship to Lake Oahe by a Tribal spiritual leader" and a "presentation of the spiritual relationship to Lake Oahe presented by the Tribal Historic Presentation Officer." However, as the Corps noted, Cheyenne River's presentations at the May 29, 2018 meeting did not convey specific information about these topics and the impact of a potential spill on the Tribe's interests.  *Compare* Final Agenda (May 29, 2018), RAR3285 *with* Tr. of May 29, 2018 Meeting at RAR1189-91 (I. Looking Horse) & RAR1191-93 (S. Vance).

impacts to hunting and fishing resource[s] will be of limited scope and duration." *Id*.  The Corps

also found that "granting permission and conveying a right-of-way to Energy Transfer Partners

to construct and operate a portion of the DAPL under federally-owned Corps-managed land does

not result in disproportionately high and adverse human health or environmental effects on

minority populations, including Tribes, and low-income populations. *Id*.  The Corps also

determined that the Tribes "did not provide information that demonstrated that a substantial

dispute exists as to the size, nature, or effect of the federal action" and, therefore, "that the

effects of the federal action here are not 'likely to be highly controversial.'" *Id*. at 2, RAR2

(quoting 40 C.F.R. § 1508.27(b)(4)).

## STANDARD OF REVIEW

The Administrative Procedure Act (APA) requires courts to "hold unlawful and set aside

agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion,

or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A).  Under this "narrow" standard

of review—which appropriately encourages courts to defer to the agency's expertise—an agency

is required to "examine the relevant data and articulate a satisfactory explanation for its action

including a rational connection between the facts found and the choice made." *Motor Vehicle*

*Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983) (internal

quotation marks and citation omitted); *Ark Initiative v. Tidwell*, 64 F. Supp. 3d 81, 90–91

(D.D.C. 2014), *aff'd,* 816 F.3d 119 (D.C. Cir. 2016).

It is not enough, then, that the court would have come to a different conclusion from the

agency. *Ark Initiative*, 64 F. Supp. 3d at 90–91.  "The reviewing court 'is not to substitute its

judgment for that of the agency,'" *id.*, nor to "disturb the decision of an agency that has

examine[d] the relevant data and articulate[d] . . . a rational connection between the facts found

and the choice made." *Id*. at 91 (quoting *Ams. for Safe Access v. DEA,* 706 F.3d 438, 449 (D.C.

Cir. 2013)).  A decision that is not fully explained is to be upheld "if the agency's path may

reasonably be discerned."  *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S.

281, 286 (1974); *Ark Initiative*, 64 F. Supp. 3d at 91.[3]

## ARGUMENT

### I.    The Corps reasonably tailored its remand analysis to match the Court's remand

Cheyenne's River's motion is built upon the misunderstanding that the Court's narrow

remand required the Corps to commence consultation as though the Corps was conducting an

entirely new analysis.  ECF No. 436-1 at 18-22.  It did not.[4]

The Court previously held that the Corps engaged in a robust consultation process

regarding the Environmental Assessment.  The Court reviewed the Administrative Record and

---

[3] Cheyenne River is incorrect, ECF No. 436-1 at 17, to suggest that this case is controlled by the Indian canon of construction.  The Indian canon has no applicability to the Corps' administrative action taken pursuant to the Court's narrow remand.  The canon applies to interpreting ambiguities in statutes or treaties intended to benefit tribes and are guides that need not be conclusive. *Chickasaw Nation v. United States*, 534 U.S. 84, 94 (2001).  Regardless, the Court need not reach this issue because the Corps is not arguing that *Chevron* deference applies to this case and Cheyenne River does not argue in its brief that the Indian canon applies to this case. Regardless, because there is no ambiguity in either the Court's remand or any applicable statute the Indian canon does not apply to this case.  *See id*.

Nonetheless, the Corps notes that Cheyenne River overstates the import of the Indian canon of construction.  The District Court in *Cobell* cited several cases for the proposition that *Chevron* deference "is 'trumped'" by the Indian canon.  *Cobell v. Kempthorne*, 532 F. Supp. 2d 37, 89 (D.D.C. 2008) (citing *Albuquerque Indian Rights v. Lujan,* 930 F.2d 49 (D.C. Cir. 1991) and *Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439 (D.C. Cir. 1988)).  However, the D.C. Circuit disagreed, noting that *Chevron* deference "can be 'trumped'" in certain circumstances, but can control over the Indian canon of construction in other circumstances. *Cobell v. Salazar*, 573 F.3d 808, 811-12 (2009) ("Chevron deference does not disappear from the process of reviewing an agency's interpretation of those statutes it is trusted to administer for the benefit of Indians, although the deference applies with muted effect.").

[4] Cheyenne River joins in several arguments made by Standing Rock.  ECF No. 436-1 at 17-18. The Corps hereby incorporates its Opposition to Standing Rock's Motion for Summary Judgment and Memorandum in Support of the Corps' Cross-Motion for Summary Judgment.

found that "the record clearly indicates that the Corps solicited Cheyenne River's views on the

DAPL project well before publishing the EA and issuing the Section 408 permit and easement,

and communicated regularly with [Cheyenne River representatives by] phone calls, letters, and

in-person meetings." *Standing Rock IV*, 255 F. Supp. 3d at 155-159.  It therefore rejected

Cheyenne River's claim that the Corps' consultation breached alleged duties under "Department

of Defense Instruction 4710.02 and NEPA's implementing regulations."  *Id*. at 155.  The Court

concluded that the Corps' "actions were sufficient to satisfy the early-comment and consultation

goals articulated in the Defense Department Instruction and NEPA's implementing regulations."

*Id*.

The foundation of robust consultation led, in part, to the Court's conclusion that "the

Corps 'largely complied' with NEPA's requirements" and thus the remand was to be "on only a

narrow subset of the Tribes' NEPA claims."  *Standing Rock V*, 282 F. Supp. 3d at 103; *Standing

Rock IV*, 255 F. Supp. 3d at 112 (the Corps "substantially complied with NEPA in many areas").

Far from requiring the Corps to begin the NEPA process over again, the Court required the

Corps to review only several "discrete issues" on remand.  *Standing Rock IV*, 255 F. Supp. 3d at

161; *Standing Rock V*, 282 F. Supp. 3d at 91.  Cheyenne River is simply incorrect, ECF No. 436-

1 at 18-22, that the Corps was required to conduct its remand analysis as though it was starting

an entirely new NEPA process.  *See Standing Rock V*, 282 F. Supp. 3d at 98 (Correcting NEPA

deficiency "does not require that Defendants begin anew").  As set forth below, the Corps

reasonably tailored its analysis to that remand and sought appropriate information from Dakota

Access, Cheyenne River, and the other tribal plaintiffs.

Cheyenne's challenge to consultation during a remand process is similar to *TOMAC v.

Norton*, in which the district court "concluded that BIA sought out and properly considered the

available data, thereby fulfilling its responsibility under NEPA" with respect to the majority of

the NEPA challenges. *TOMAC v. Norton*, 4433 F.3d 852, 858 (D.C. Cir. 2006) (citation

omitted).[5]  The Court found two "flaws" in the agency's analysis and "remanded the EA to the

agency 'for such further evaluation and elaboration of its reasoning as BIA desires to submit

concerning secondary growth issues.'"  *Id.* (quoting *TOMAC v. Norton*, 240 F. Supp. 2d 45, 52

(D.D.C. 2003).  The D.C. Circuit upheld the agency's remand analysis despite the fact that the

agency did not seek *any* additional comments.  *TOMAC*, 433 F.3d at 861-62 ("The record here

indicates that BIA sought comment on the original draft EA and provided detailed responses to

comments it received.  The EA Supplement merely amplified the issues that had been addressed

in BIA's original 2001 EA, so the agency reasonably concluded that further public comment was

unnecessary.  On this record, we find no merit in TOMAC's claim that another round of public

comment was required.").  The D.C. Circuit explicitly found that "BIA acted appropriately given

the prior public involvement, and no statute or regulation requires anything more."  *Id.*  To be

clear, the Corps was not required to begin its environmental analysis anew.  It was instead

required to address the discrete issues posed by the Court's narrow remand.

    Cheyenne River is incorrect to the extent that it suggests, ECF No. 436-1 at 21-22, that

_____

[5] While it is unnecessary for the Court to reach this issue because of the Corps' robust efforts to
obtain tribal comments on the remand analysis, it is far from clear that any public comment
would have been necessary even if the Corps started from scratch with a new Environmental
Assessment.  *See Blue Ridge Envtl. Def. League v. NRC*, 716 F.3d 183, 189 (D.C. Cir. 2013)
("Although Petitioners contend that similar public comment is mandatory for all EAs, we have
held that 'the agency has significant discretion in determining when public comment is required
with respect to EAs.'"); *TOMAC*, 433 F.3d at 861 ("[N]othing in the CEQ regulations suggests
that another comment round is necessary following an agency's issuance of a supplemental EA.
And two of our sister Circuits have found that public input during the EA process is not
required.") (citing *All. to Protect Nantucket Sound, Inc. v. U.S. Dep't of the Army*, 398 F.3d 105,
115 (1st Cir. 2005); *Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1279 (10th Cir.
2004)).

the Corps was required to seek Cheyenne River's comments on all of the information provided by Dakota Access.  Even if Cheyenne River's challenge did not arise under a narrowly-circumscribed remand, an agency has significant discretion and need only involve the public "to the extent practicable" in preparing an Environmental Assessment.  *Biodiversity Conservation All. v. U.S. Bureau of Land Mgmt.*, 404 F. Supp. 2d 212, 220 (D.D.C. 2005) (quoting 40 C.F.R. § 1501.4(b)); *WildEarth Guardians v. U.S. Fish & Wildlife Serv.*, 784 F.3d 677, 698 (10th Cir. 2015) (Agencies can "shield[] from public notice and comment the documents the EA relied upon. . . .").  And if the Corps were required to reopen public comment each time it received responses from the applicant to previous public comments, "the comment period could continue in a never-ending circle."  *Sierra Club v. U.S. Army Corps of Eng'rs,* 450 F. Supp. 2d 503, 535 (D. N.J. 2006) (upholding Corps' decision not to open a supplemental notice and comment period following submission of studies by the permit applicant in response to negative comments, which the Corps relied upon in granting the permit), *vacated as moot by Sierra Club v. U.S. Army Corps of Eng'rs*, 277 F. App'x 170, 173 (3d Cir. 2008); *Fund For Animals, Inc. v. Rice*, 85 F.3d 535, 545 (11th Cir. 1996) (recognizing Corps' discretion in determining whether to issue supplemental public notice and upholding its permit decision even though the Corps did not reopen the comment period after an applicant added a 2.5 mile access road to project after the close of the comment period).[6]  So even if the Corps was preparing an Environmental Assessment anew, which it was not, the Corps need only involve the public to the extent

---

[6] While this case does not involve an Environmental Impact Statement, the Corps notes that, even in cases where an EIS is appropriate, "NEPA does not require an additional round of public comments every time an agency revises, supplements, or improves its analysis in response to the public comments on a DEIS."  *Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 548 (8th Cir. 2003).  Indeed, "[i]f agencies were required to issue a supplemental statement with every project adjustment, it would discourage them from making corrections and improvements in response to public comments."  *Id.*

"practicable."  40 C.F.R. § 1501.4(b).

The Corps reasonably used the Court's remand to guide its interactions with Cheyenne River.  The Court held that the Corps "did not sufficiently weigh the degree to which the project's effects are likely to be highly controversial in light of critiques of its scientific methods and data."  *Standing Rock IV*, 255 F. Supp. 3d at 147.  In other words, the Court clearly tied the Corps analysis of whether the project was highly controversial to the Tribes' critiques.  *Id*. at 127-129, 147.  The Corps reasonably asked Cheyenne River to confirm the completeness of its critiques.  Letter from Col. Hudson to Chairman Frazier (Sept. 25, 2017), RAR13330-32.  The Court similarly charged the Corps with addressing tribal hunting, fishing, and environmental justice issues on remand.  *Standing Rock IV*, 255 F. Supp. 3d at 112.  Here too, the Corps reasonably sought information from Cheyenne River.  Letter from Col. Hudson to Chairman Frazier (Sept. 25, 2017), RAR13330-31.  Just as the Corps need not go to Dakota Access for information about tribal cultural practices, the Corps need not go to Cheyenne River to critique Cheyenne River's own critique.  The Corps instead reasonably sought a response to the tribes' critiques from Dakota Access.  RAR13605-07.

## II.    Cheyenne River has failed to identify any duty to consult

While it clear that the Corps went to great lengths to consult with and obtain input from Cheyenne River, the Tribe nonetheless argues that the Corps' consultation effort was not proper.  ECF No. 436-1 at 18-22.  Cheyenne's brief fails, however, to identify any law that requires the Corps to consult on remand.  Indeed, even if the Court had not narrowly defined the remand analysis, Cheyenne River's claims would fail because there is no applicable consultation duty.

First, Cheyenne River is incorrect, ECF No. 436-1 at 18, that Department of Defense Instruction 4710.02 imposes any consultation requirement on the Corps.  Department of Defense

Instruction 4710.02 is a guidance document and thus is presumed non-binding unless there is evidence or practice to the contrary. *See Cement Kiln Recycling Coal. v. EPA*, 493 F.3d 207, 228 (D.C. Cir. 2007). While guidance documents may be binding if they threaten enforcement against, or create legal consequences for a third party regulated entity, neither situation is present here. *See Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000); *see also Barrick Goldstrike Mines, Inc. v. Browner*, 215 F.3d 45, 48 (D.C. Cir. 2000). The Instruction's "Procedures" section makes clear that it is non-binding, and cannot be the basis for the Tribe's claim that the Corps violated a duty to consult.

Section 6.2 of the Instruction establishes that the Instruction provides non-binding guidance. ECF No. 131-4 at 23-31. It states that Department of Defense Components shall consult with tribes in accordance with requirements specified in References (c) through (h). Reference E is Executive Order 13175, "is intended only to improve the internal management of the executive branch, and is not intended to create any right, benefit, or trust responsibility, substantive or procedural, enforceable at law by a party against the United States, its agencies, or any person." Exec. Order No. 13175 § 10. "[T]he plain language of Executive Order 13175 does not provide any right enforceable in this judicial action alleged by the Tribe." *N. Arapaho Tribe v. Burwell*, 118 F. Supp. 3d 1264, 1281 (D. Wyo. 2015). *Cf. Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,* 301 F. Supp. 3d 50, 59-60 (D.D.C. 2018) (non-binding declarations does not create a federal cause of action). Reference F is a September 1994 Memorandum that contains similar language. Mem. on Gov't-to-Gov't Relations with Native American Tribal Gov'ts at 937 (Apr. 29, 1994) ("This memorandum . . . is not intended to, and does not, create any right to . . . judicial review, or any other right or benefit or trust responsibility, substantive or procedural, enforceable by a party against the United States"). Reference C, which is

Department of Defense Instruction 4715.3, explicitly does not apply to the Corps.  Dept. of Def.

Instruction 4715.3 §§ 1(a), 2(b)(2).[7]  References G and H address statutes that are not at issue

here, the Archaeological Resources Protection Act and the American Indian Religious Freedom

Act.

Section 6.3 of the Instruction provides that the Corps should undertake consultation

where its actions may *significantly affect* (1) protected trust resources, (2) tribal rights, or (3)

Indian lands.  Dep't of Def. Instruction 4710.02 at 4; *see also id.*, §§ 5.3.4 and 6.1.  But here, the

Corps concluded that the Corps' actions would *not* significantly affect the human environment—

including tribal hunting, fishing, or water rights or tribal lands.  Environmental Assessment at 1-

2, USACE_DAPL71225.  This conclusion was confirmed by the Corps' thorough remand

analysis which is fully supported by an administrative record.  Memorandum for Record (Aug.

31, 2018), RAR1-140.  Therefore, on its own terms, the Department of Defense guidance

imposed no additional consultation requirement.

Notably, Section 6.6's suggestion that the Corps involve tribes early in the planning

process highlights the inappropriateness of striking down the Corps' remand analysis in this case.

Dep't of Def. Instruction 4710.02, § 6.6.  As the Court already held, the Corps involved

Cheyenne River early and repeatedly in the original planning process.  *Standing Rock IV*, 255 F.

Supp. 3d at 155.  The Corps similarly involved Cheyenne River early in the remand process.

Indeed, the Corps began seeking information from Cheyenne River on September 25, less than

two weeks after an internal scoping meeting.  Minutes of meeting re: DAPL Remand Discussion

(Sept. 13, 2017), RAR13365; Letter from Col. Hudson to Chairman Frazier (Sept. 25, 2017),

---

[7] DOD Instruction 4715.3 available at:
https://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodi/471503p.pdf?ver=2019-02-28-120916-070

RAR13330-31.  And the Corps and Dakota Access invited Cheyenne River to meetings in

January, February, and March to share information and solicit comments.  Email from C.

Borkland, ETP at 1 (Mar. 1, 2018), RAR6565.  Cheyenne River's failure to fully engage cannot

be held against the Corps.  In sum, Cheyenne River establishes neither that the Instruction

applies here nor that it imposes mandatory consultation duties on the Corps.

     Cheyenne River is also incorrect to the extent that it bases its claim on the Corps' tribal

consultation policy.  The policy's definition of consultation states that, to the extent possible,

consultation should include an active and respectful dialogue concerning the Corps' actions.

Tribal Consultation Policy § 3.b., ECF No. 131-3.  The Corps should, among other tasks,

maintain open lines of communication during the decision making process, provide Tribes with

points of contact for project-related issues, and encourage partnership on projects with Tribes

wherever possible.  *Id.* at § 6.  As noted below, the Corps acted consistent with this policy and

kept open lines of communication and actively and respectfully engaged in dialogue with

Cheyenne River through appropriate points of contact.

     Cheyenne River's reliance on three district court cases from the Ninth Circuit, ECF No.

436-1 at 22, two of which are unpublished, is not persuasive.  In *Klamath Tribes v. United States*,

the Court relied on U.S. Forest Services' previous acknowledgement of a need to consult with an

Indian Tribe regarding timber resources rather than any specific duty.  No. 96-381-HA, 1996 WL

924509, at *8 (D. Or. Oct. 2, 1996).  In *Confederated Tribes and Bands of Yakama Nation v.

USDA*, the U.S. Department of Agriculture offered that it planned to consult as required by the

National Historic Preservation Act where it was unclear whether the agency considered the

Yakama Nation's comments.  No. cv-10-3050-EFS, 2010 WL 3434091, at *2 (E.D. Wash. Aug.

30, 2010).  Cheyenne River's citation to *Muckleshoot Indian Tribe v. Hall* is even more

inapposite, as that case declined to address alleged NEPA violations.  698 F. Supp. 1504, 1516

(W. D. Wash. 1988).

And Cheyenne River's citation to three other cases involving consultation with the

Oglala, Cheyenne River, and Yankton Sioux Tribes, ECF No. 436-1 at 18, actually highlights the

reasonableness of the Corps' efforts to engage the tribes on remand rather than supporting the

Tribe's position.  *Yankton Sioux Tribe v. Kempthorne* is distinguishable because it applied a

statute that contained an explicit, affirmative consultation duty to require consultation.  442 F.

Supp. 2d 774, 784 (D.S.D. 2006) (citing 25 U.S.C. § 2011(b)(2)(B) , which provides: "By law,

consultation requires open discussion of all potential issues or changes between the BIA and the

Tribes"); *see also* 25 U.S.C. § 2011(b)(1) ("All actions under this Act shall be done with active

consultation with tribes.").[8]  Cheyenne River does not point to a similar statute here.  And

whereas the Bureau of Indian Affairs likely undermined the consultation process by misstating

facts about its challenged policies in *Yankton Sioux Tribe*, 442 F. Supp. 2d at 785, the record

here establishes that the Corps never misled Cheyenne River regarding remand.  *E.g.,* Letter

from Col. Hudson to Chairman Frazier (Sept. 25, 2017), RAR13330-32 (seeking information and

stating that the Corps would determine next steps after receiving the information).

Regardless, even if the Corps had an affirmative duty to provide a meaningful

opportunity to consult before making a decision, a different Yankton challenge to consultation

makes clear that, where there is no new decision, there is no requirement to engage in additional

consultation.  *Yankton Sioux Tribe v. U.S. Dep't of Health & Human Servs.*, 496 F. Supp. 2d

1044, 1057 (D.S.D. 2007) ("Even if Plaintiffs had an enforceable right to notice and an

---

[8] *Cheyenne River Sioux Tribe v. Jewell*, 205 F. Supp. 3d 1052, 1057 (D.S.D. 2016), which
Plaintiff also relies upon, ECF No. 436-1 at 18, arose under the same statute.

opportunity to be heard pursuant to the Tribal Consultation Policy, the Court finds there was no new or additional duty to consult with the Tribe in this case because closure of the emergency room on September 30, 2006 was not a new decision."). In other words, the Corps' pre-remand consultation, standing alone, is sufficient to satisfy any consultation duty.

Cheyenne River primarily relies upon *Oglala Sioux Tribe v. Andrus*, 603 F.2d 707, 710 (8th Cir. 1979), to assert that it had an enforceable expectation that it could express its views before agency policy is made. The D.C. Circuit recently found *Oglala Sioux* "inapposite" because "there an agency official 'acknowledged at trial' that the contested decision 'had already been made prior to' the first meeting between Tribal members and agency officials discussing the decision." *United Keetoowah Band of Cherokee Indians in Okla. v. FCC*, 933 F.3d 728, 750-51 (D.C. Cir. 2019) (citing *Oglala Sioux*, 603 F.2d at 710). In other words, the agency made its initial decision in *Oglala Sioux* before the agency even met with tribe.

In contrast, this Court held, "the record clearly indicates that the Corps solicited Cheyenne River's views on the DAPL project well before publishing the EA and issuing the Section 408 permit and easement, and communicated regularly with [Cheyenne River representatives by] phone calls, letters, and in-person meetings." *Standing Rock IV*, 255 F. Supp. 3d at 155-159. Moreover, the Bureau of Indian Affairs failed to contest that its policy required consultation in *Oglala Sioux*. 603 F.2d at 718. The Ninth Circuit found *Oglala Sioux* to be inapposite on that basis, noting that, where BIA did not concede the issue, guidelines are not "the same as regulations that must be applied," especially when they "are in letter form and unpublished" and intended to "give direction to the [agency]." *Hoopa Valley Tribe v. Christie*, 812 F.2d 1097, 1103 (9th Cir. 1986). The Ninth Circuit noted BIA's guidelines therefore "do not establish legal standards that can be enforced." *Id*. In sum, *Oglala Sioux* does nothing to support

Cheyenne River's position here.

### III.    The Corps fulfilled any duty to consult with Cheyenne River

In evaluating Cheyenne River's previous claims that the Corps' consultation violated

Department of Defense Instruction 4710.02 and NEPA, the Court held that the Corps met any

applicable consultation duty.  *Standing Rock IV*, 255 F. Supp. 3d at 155-60 (declining to address

the Corps' contention that neither the instruction nor NEPA's implementing regulations impose

binding consultation duties).  Cheyenne River's second attempt to raise these arguments fails for

the same reason.  The Corps again repeatedly attempted to engage with Cheyenne River.  And

Cheyenne River again failed to avail itself of the Corps' repeated efforts to consult with the

Tribe.  As before, the Corps' consultation efforts were reasonable under any standard.

The record demonstrates that the Corps was committed to understanding the potential

impact of a spill on tribes' cultures and reasonably asked Cheyenne River about potentially-

impacted cultural practices.  Letter from Col. Hudson to Chairman Frazier (Sept. 25, 2017),

RAR13330-31.  While Cheyenne River's brief characterizes the request as inappropriate, ECF

No. 436-1 at 14, the Corps sought such information to advance its environmental justice analysis.

And the Corps incorporated tribal information to the extent possible, focusing its review, in part,

on "the specific cultural, spiritual, and ceremonial practices at or near Lake Oahe that have been

identified by the [Tribes] as vulnerable to the impacts of a potential spill."  Memorandum for

Record at 79 (Aug. 31, 2018), RAR82.

The Corps repeatedly sought to meet with Cheyenne River.  Email from C. Borkland,

ETP (Mar. 1, 2018), RAR6565-66.  But Cheyenne River repeatedly declined to attend meetings.

*Id*.  Indeed, Cheyenne River representatives attended a February 8, 2018 meeting in Bismarck,

North Dakota only to hand-deliver a letter inviting the Corps to meet with Cheyenne River that

very day in Green Grass, South Dakota—but then promptly left the meeting without engaging

substantively to discuss the remand or taking copies of information that they purportedly sought.

Email from B. Cossette, Corps (Feb. 12, 2018), RAR8727-8734 (attaching letters from Cheyenne

River); email from C. Borkland, ETP (Feb. 14, 2018), RAR8453.  Cheyenne River was informed

that it would be provided with information regarding the spill model at the March 7, 2018

meeting.  Email from C. Borkland, ETP (Mar. 1, 2018), RAR6565-66 (Dakota Access would be

"prepared to show and explain . . . the results of the recent spill modeling and discuss how those

results are informing the response planning").[9]  Remarkably, Cheyenne refused to attend that

meeting despite repeatedly requesting the spill model results.  Letter from Chairman Frazier to

Col. Hudson at 1-2 (Jan. 30, 2018), RAR10350 (criticizing Corps for not providing spill model);

Letter from D. Nelson, Cheyenne River, to C. Borkland, ETP (Mar. 6, 2018), RAR6431

(refusing to attend meeting).  And even more remarkably, Cheyenne River now claims that

consultation was deficient because it did not receive the information it would have received if it

attended the March 7, 2018 meeting.  ECF No. 436-1 at 19-21.  As before, the Corps discharged

any duty it might have to consult with Cheyenne River.

     Cheyenne River's assertion, ECF No. 436-1 at 22, that the Corps failed to correspond

"with . . . the properly designated point of contact" is similarly meritless.  As Cheyenne River

admits, *id*. at 13, and as detailed above, the Corps repeatedly reached out to Chairman Frazier.

Cheyenne River identified Chairman Frazier as "the Tribe's point of contact" for

communications regarding remand.  Letter from Chairman Frazier to Col. Hudson at 2 (Sept. 8,

2017), RAR13368.  The Corps' directing its communications to Chairman Frazier was therefore

---

[9] Dakota Access similarly promised to provide an updated Geographic Response Plan at the
March 7 meeting.  *Id.*

imminently reasonable.

Cheyenne River's claim also fails because the Tribe does not explain how it was prejudiced by any lack of information.  Cheyenne River suggests that the Corps breached an unidentified duty by failing to provide the Tribe with information.  ECF No. 436-1 at 2, 9, 14. Setting aside the facts that Cheyenne River failed to attend meetings that would have provided information it purportedly sought, Email from C. Borkland, ETP (Mar. 1, 2018), RAR6565-66, and that the Corps nonetheless provided requested information, Letter from Col. Hudson to Chairman Frazier (Feb. 23, 2018), RAR6600, Cheyenne River "does not explain how lacking access to those documents hindered its ability to meaningfully comment and consult on the EA when it was given access to the draft several months before the final version was published and offered repeated access to Corps personnel." *Standing Rock IV*, 255 F. Supp. 3d at 160.

The remand record establishes that, just as the Corps gave Cheyenne River "the opportunity to offer meaningful comments" prior to remand, *Standing Rock IV*, 255 F. Supp. 3d at 156, the Corps fulfilled any consultation obligation by consulting with Cheyenne River in any ordinary sense of the word.  *United Keetoowah Band of Cherokee Indians in Okla.*, 933 F.3d at 750-51 (upholding consultation where agency "presented abundant evidence that it 'consulted' Tribes in the ordinary sense of the word, and the Tribes have offered no other concrete standard by which to judge the [agency's] efforts").  It is of no moment that Cheyenne transmitted a couple letters of limited substance early in the remand period.  The Corps considered those letters, sought specific information, offered to hold several meetings, offered to transmit additional information, met with Cheyenne in those limited instances that Cheyenne agreed to meet, and fully considered the information Cheyenne belatedly submitted over 200 days after it was first requested.  Cheyenne's entire argument on summary judgment is devoted to the theory

that the Corps had a duty to consult—but the Corps had no such duty.  The Tribe's argument also rests on the theory that the Corps failed to consult—but the record establishes that the Corps went above and beyond all reasonable expectations in an effort to consult despite Cheyenne's intentional refusal to meaningfully engage.  Cheyenne had opportunity after opportunity to fully participate in the remand process but instead chose to focus on repeating generalized grievances. In sum, the Corps' efforts to obtain information from and consult with Cheyenne River were wholly proper and by no means arbitrary or capricious, particularly given the narrow scope of the Court's remand.

## CONCLUSION

The Corps respectfully submits that this Court should deny Cheyenne River's motion for summary judgment and grant the Corps' motion for summary judgment because the Corps had no duty to consult with Cheyenne River on remand.  But even if the Corps had a duty to consult, any such duty was circumscribed by the Court's narrow remand, and the Corps' efforts to engage with Cheyenne River to address the issues remanded by the Court were beyond reasonable, complied with any conceivable duty to consult, and were under no circumstance arbitrary or capricious.

Dated: October 9, 2019                                Respectfully submitted,

JEAN E. WILLIAMS
Deputy Assistant Attorney General
Environment & Natural Resources Division

By: /s/ Matthew Marinelli
REUBEN SCHIFMAN, NY BAR
MATTHEW MARINELLI, IL Bar 6277967
U.S. Department of Justice
Natural Resources Section
P.O. Box 7611
Benjamin Franklin Station
Washington, DC 20044

Phone: (202) 305-4224 (Schifman)
Phone: (202) 305-0293 (Marinelli)
Fax: (202) 305-0506
reuben.schifman@usdoj.gov
matthew.marinelli@usdoj.gov

ERICA M. ZILIOLI, D.C. Bar 488073
U.S. Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, DC 20044
Phone: (202) 514-6390
Fax: (202) 514-8865
Erica.Zilioli@usdoj.gov

*Attorneys for the United States Army Corps of Engineers*

OF COUNSEL:

MILTON BOYD
MELANIE CASNER
U.S. Army Corps of Engineers
Office of Chief Counsel
Washington, DC

## CERTIFICATE OF SERVICE

I hereby certify that on October 9, 2019, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will send notification of this filing to the

attorneys of record and all registered participants.

*/s/ Erica Zilioli*
Erica Zilioli