**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

STANDING ROCK SIOUX TRIBE,
YANKTON SIOUX TRIBE; ROBERT FLYING
HAWK; OGLALA SIOUX TRIBE,

                  Plaintiffs,

    and

CHEYENNE RIVER SIOUX TRIBE,

                  Plaintiff-Intervenor,

    v.

U.S. ARMY CORPS OF ENGINEERS,

                  Defendant-Cross
                  Defendant,

    and

DAKOTA ACCESS, LLC,

                  Defendant-Intervenor-
                  Cross Claimant.

Case No. 1:16-cv-1534-JEB
(and Consolidated Case Nos. 16-cv-1796
and 17-cv-267)

**FEDERAL DEFENDANTS' OPPOSITION
TO PLAINTIFF YANKTON SIOUX
TRIBE'S MOTION FOR SUMMARY
JUDGMENT AND MEMORANDUM IN
SUPPORT OF CROSS-MOTION FOR
SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

PROCEDURAL AND FACTUAL BACKGROUND ....................................................... 2

    I.     Consultation with Yankton prior to remand ......................................................... 2

    II.    The Court's narrow remand to the Corps and entry of judgment on
          Yankton's pre-remand-claims ................................................................................. 3

    III.   The Corps' efforts to obtain information relating to the three remand issues
          from Yankton in writing ........................................................................................ 4

    IV.   The Corps' meeting with Yankton ........................................................................ 8

STANDARD OF REVIEW ................................................................................................. 9

ARGUMENT ....................................................................................................................... 10

    I.     Yankton's claim that the Corps failed to adequately consult with Yankton
          prior to remand is moot, and, even if it were not, the Corps did not violate
          any duty to consult with Yankton prior to remand ............................................... 10

        A.    Yankton's pre-remand consultation claims are barred by law of the
             case and because they are moot ............................................................... 10

        B.    With the exception of the National Historic Preservation Act,
             Yankton fails to identify a potential legal basis for a duty to engage
             in any consultation with Yankton prior to remand .................................. 16

        C.    The Corps met any duty to consult with Yankton prior to remand .......... 19

    II.    Yankton's post-remand claims should be denied because the Corps had no
          duty to consult with Yankton on remand ............................................................. 21

    III.   The Corps' environmental justice analysis was reasonable ................................ 27

    IV.   The parties cannot address whether the Court should vacate the easement at
          this stage of proceedings ....................................................................................... 29

CONCLUSION .................................................................................................................... 29

# TABLE OF AUTHORITIES

**Cases**

*Ams. for Safe Access v. DEA*,
  706 F.3d 438 (D.C. Cir. 2013) ................................................................................... 9

*Appalachian Power Co. v. EPA*,
  208 F.3d 1015 (D.C. Cir. 2000) ............................................................................... 17

*Ark Initiative v. Tidwell*,
  64 F. Supp. 3d 81 (D.D.C. 2014) ......................................................................... 9, 10

*Armstrong v. FAA*,
  515 F.3d 1294 (D.C. Cir. 2008) ............................................................................... 13

*Barrick Goldstrike Mines, Inc. v. Browner*,
  215 F.3d. 45 (D.C. Cir. 2000) .................................................................................. 17

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*,
  419 U.S. 281 (1974) .................................................................................................. 10

*Bunker Ltd. P'ship v. United States*,
  820 F.2d 308 (9th Cir. 1987) .................................................................................... 12

*Butte Cty. v. Chaudhuri*,
  887 F.3d 501 (D.C. Cir. 2018) .................................................................................. 10

*Cement Kiln Recycling Coal. v. EPA*,
  493 F.3d 207 (D.C. Cir. 2007) .................................................................................. 17

*Fund for Animals, Inc. v. BLM*,
  460 F.3d 13 (D.C. Cir. 2006) .................................................................................... 14

*Grass Works Lawn Care v. Acosta*,
  No. CV 18-1581 (RMC), 2019 WL 1981087 (D.D.C. May 3, 2019) ...................... 12

*Guedes v. ATF*,
  920 F.3d 1 (D.C. Cir. 2019) ................................................................................ 12, 16

*James Luterbach Constr. Co. v. Adamkus*,
  781 F.2d 599 (7th Cir. 1986) .................................................................................... 12

*Jones v. Bernanke*,
  538 F. Supp. 2d 53 (D.D.C. 2008) ............................................................................ 11

*Kingdomware Techs., Inc. v. United States*,
  136 S. Ct. 1969 (2016) .............................................................................................. 15

*Kleppe v. Sierra Club*,
  427 U.S. 390 (1976) ............................................................................................ 27, 28

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ...................................................................................................... 9

*Mpoy v. Fenty*,
 901 F. Supp. 2d 144 (D.D.C. 2012) ........................................................................ 10

*N. Arapaho Tribe v. Burwell*,
 118 F. Supp. 3d 1264 (D. Wyo. 2015) ............................................................... 16, 17

*Newdow v. Roberts*,
 603 F.3d 1002 (D.C. Cir. 2010) ............................................................................. 13

*Payne v. District of Columbia*,
 808 F. Supp. 2d 164 (D.D.C. 2011) ........................................................................ 27

*Potomac River Ass'n v. Lundeberg Md. Seamanship Sch., Inc.*,
 402 F. Supp. 344 (D. Md. 1975) ............................................................................ 14

*Powder River Basin Res. Council v. U.S. Bureau of Land Mgmt.*,
 37 F. Supp. 3d 59 (D.D.C. 2014) ...................................................................... 27, 28

*ProtectMarriage.com - Yes on 8 v. Bowen*,
 752 F.3d 827 (9th Cir. 2014) ............................................................................ 12, 15

*Sierra Club v. U.S. Army Corps of Eng'rs*,
 277 F. App'x 170 (3rd Cir. 2008) .......................................................................... 15

*Sierra Club v. U.S. Army Corps of Eng'rs*,
 803 F.3d 31 (D.C. Cir. 2015) ............................................................................ 14, 15

*Standing Rock Sioux Tribe v. U. S. Army Corps of Eng'rs*,
 282 F. Supp. 3d 91 (D.D.C. 2017) ....................................................................... 3, 21

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
 255 F. Supp. 3d 101 (D.D.C. 2017) ............................................. 3, 11, 21, 24, 29

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
 301 F. Supp. 3d 50 (D.D.C. 2018) .................... 1, 4, 10, 12, 15, 16, 18, 19, 20, 21, 27

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
 No. 16-1534 (JEB), 2019 U.S. Dist. LEXIS 4420 (D.D.C. Jan. 10, 2019) ............... 11

*TOMAC v. Norton*,
 240 F. Supp. 2d 45 (D.D.C. 2003) ........................................................................ 22

*TOMAC v. Norton*,
 433 F.3d 852 (D.C. Cir. 2006) ............................................................................... 22

*Tri–Valley CAREs v. U.S. Dep't of Energy*,
 671 F.3d 1113 (9th Cir. 2012) ............................................................................... 27

*United Keetoowah Band of Cherokee Indians in Okla. v. FCC*,
 933 F.3d 728 (D.C. Cir. 2019) .......................................................................... 21, 26

*Yankton Sioux Tribe v. U.S. Army Corps of Eng'rs*,
 209 F. Supp. 2d 1008 (D.S.D. 2002) ..................................................................... 13

*Yankton Sioux Tribe v. U.S. Dep't of Health & Human Servs.,*
  496 F. Supp. 2d 1044 (D.S.D. 2007) ............................................................................ 20, 22

## Statutes

5 U.S.C. § 706(2)(A) ............................................................................................................ 9

54 U.S.C. § 302706(a)-(b) ................................................................................................. 19

## Regulations

36 C.F.R. § 800.4 ............................................................................................................... 19

36 C.F.R. § 800.4(a)(4) ..................................................................................................... 20

## Other Authorities

Executive Order 13175 § 10 .............................................................................................. 16

## INTRODUCTION

This Court previously considered the Yankton Sioux Tribe's claims that the U.S. Army Corps of Engineers and U.S. Fish and Wildlife Service failed to appropriately consult with the Tribe.  The Court found that, rather than availing itself of Federal consultation efforts, "Yankton did not attend multiple meetings held by the Corps and [the United States Fish and Wildlife Service (FWS)] to discuss DAPL (meetings that were attended by other interested tribes), . . . nor did they respond to numerous efforts by the Corps and FWS to engage in discussion regarding the pipeline."  *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 301 F. Supp. 3d 50, 55 (D.D.C. 2018) ("*Standing Rock VI*").  The Court dismissed Yankton's consultation claims as moot, holding that it could "provide no meaningful remedy to address Plaintiffs' alleged injuries" arising from their NHPA claims because the pipeline was fully constructed.  *Id*. at 64.

Yankton's second summary judgment motion again challenges the Corps' consultation with the Tribe.  It too should be denied because the Corps had no duty to consult with Yankton on its remand analysis.  But even if the Corps had a duty to consult with Yankton, the Corps more than satisfied that duty by engaging, and attempting to engage even more, with Yankton to obtain information regarding any Yankton hunting, fishing, or cultural practices that could conceivably be impacted by a spill into Lake Oahe.  Rather than provide that information, Yankton largely engaged in protracted disputes regarding typographical errors in the Corps' requests and Yankton's own inapplicable consultation policy.  As set forth below, the record establishes that the Corps complied with any duty to engage with Yankton by reasonably engaging with the Tribe and seeking information tailored to the Court's remand.

## PROCEDURAL AND FACTUAL BACKGROUND

**I.     Consultation with Yankton prior to remand**

As detailed in the Federal Defendants' January 10, 2018 Cross-Motion for Summary

Judgment, the Corps made multiple efforts to consult with Yankton between November 3, 2014

and the dates of the challenged agency decisions in July 2016.  ECF No. 317-1 at 5-7.[1]

Yankton's response to the Corps' initial consultation effort was to defer commenting on drilling

test bore holes near Lake Oahe to the Standing Rock and Cheyenne River Sioux Tribes.  Email

from L. Gravatt, Yankton, to R. Harnois, Corps (Nov. 3, 2014), USACE_67125.  Yankton was

invited to, but failed to attend, consultation meetings attended by other tribes.  List of Tribes

Invited to Feb. 18-19, 2016 Meeting in Niobrara, Neb., USFWS_1977-78; Ponca Tribe of

Nebraska Dakota Access Pipe Line Meeting Sign in Sheet (Feb. 18, 2016), USFWS_1974-76;

Tr. of Meeting in Sioux Falls, S.D. (Jan. 25, 2016), USACE_66575-77; Dakota Access Tribal

Consultation Meeting Sign In Sheet (Dec. 8, 2015), USACE_66810.

On March 17, 2016, Yankton requested a consultation meeting with the Corps on March

31, 2016.  Letter from Chairman Flying Hawk to Col. Henderson (Mar. 17, 2016) (Ex. K),

USACE_64260.  Between March 17, 2016 and May 10, 2016, the Corps made numerous efforts

to meet with Yankton.  Yankton canceled the March 31, 2016 meeting and did not respond to

numerous phone calls, emails, and text messages.  Letter from Col. Henderson to Chairman

Flying Hawk (May 10, 2016), USACE_64286; Letter from Col. Henderson to Chairman Flying

Hawk (May 6, 2016), USACE_64293-94; Corps email chain (May 2, 2016), USACE_64320-23;

Corps email chain (Apr. 22, 2016), USACE_65413-15.

---

[1] The Corps incorporates those facts rather than repeat all of them here.

On May 18, 2016, the Corps met with numerous Yankton representatives.  Letter from

Col. Henderson to Chairman Flying Hawk (May 2, 2016), USACE_64286.  On June 17, 2016

Yankton informed the Corps that it was "finalizing its Consultation Protocols."  Letter from

Chairman Flying Hawk to Col. Henderson (June 17, 2016) (Ex. R), USACE_64074.  The Corps

issued its Finding of No Significant Impact regarding Lake Oahe on July 25, 2016.  Finding of

No Significant Impact (July 25, 2016), USACE_71179.

## II.  The Court's narrow remand to the Corps and entry of judgment on Yankton's pre-remand-claims

On June 14, 2017, the Court "found that the Corps 'largely complied' with NEPA's

requirements, and it granted remand on only a narrow subset of the Tribes' NEPA claims."

*Standing Rock Sioux Tribe v. U. S. Army Corps of Eng'rs*, 282 F. Supp. 3d 91, 103 (D.D.C.

2017) ("*Standing Rock V*").  The Court held that the Corps "failed to adequately consider the

impacts of an oil spill on Standing Rock's fishing and hunting rights and on environmental

justice[.]"  *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 147

(D.D.C. 2017) ("*Standing Rock IV*").  The Court also indicated that its remand applied to

Cheyenne River but did not mention Yankton.  *Id*. at 160.

The Court characterized "Defendants' task on remand [as] a narrow one."  *Standing Rock

V*, 282 F. Supp. 3d at 99.  For example, "[w]hile the Tribes now reiterate that they place a 'high

importance . . . on hunting and fishing,' . . . the Corps on remand must take a 'hard look' at the

impact of DAPL on only the resources themselves" rather than engaging in the "existential-scope

analysis" favored by the Tribes.  *Id*. at 99.  The Court held that this "is not a case in which the

agency 'must redo its analysis from the ground up.'"  *Id*. at 100 (citation omitted).  The Court's

remand order did not reference Yankton.

Yankton subsequently sought summary judgment.  *See* ECF No. 292.  The Court denied

Yankton's motion and granted Federal Defendants' motion for summary judgment on Yankton's

NEPA and NHPA claims, noting that Yankton's insistence that "they have 'continually sought to

protect' their tribal lands from the 'serious risk of harm' it poses . . . is somewhat belied,

however, by the record regarding the Tribe's cooperation (or lack thereof) with the federal

agencies involved in the project."  *Standing Rock VI*, 301 F. Supp. 3d at 55.  The Court found

that Yankton "did not attend multiple meetings held by the Corps and FWS to discuss DAPL

(meetings that were attended by other interested tribes)" and did not "respond to numerous

efforts by the Corps and FWS to engage in discussion regarding the pipeline."  *Id.*

## III.    The Corps' efforts to obtain information relating to the three remand issues from Yankton in writing

On September 25, 2017, the Corps sought information regarding hunting, fishing, and

cultural practices at Lake Oahe.  Letter from Col. Hudson to Yankton Bus. & Claims Comm.

(Sept. 25, 2017), RAR13323-24.  The Corps requested the information within thirty days and

stated that it would "determine the next steps in the remand process and whether we need any

additional information from your tribe after we receive the requested information and

documentation."  *Id.*  While the first paragraph of the letter contained a typographical error

referencing "the Oglala Sioux Tribe," the letter was addressed to Yankton, and explicitly

directed to Yankton Chairman Flying Hawk and Secretary Sully.  *Id.*  The Corps sent the letter to

Yankton and called to confirm receipt.  Email from J. Ames to Sec'y Sully (Sept. 26, 2017),

RAR13318; Email from J. Ames to B. Cossette (Spt. 28, 2017), RAR 13317.

On September 29, 2017, Yankton acknowledged receipt.  Yankton correctly identified

that the September 25 letter mistakenly referred to Oglala and stated its intention "to participate

to the fullest extent possible in the remand process."  Letter from Chairman Flying Hawk to Col. Hudson (Sept. 29, 2017), RAR13307-08.

On October 2, 2017, the Corps partially corrected its letter by removing a reference to an Oglala study.  Letter from Col. Hudson to Yankton Bus. & Claims Comm. (Oct. 2, 2017), RAR13305-06.  The transmittal email to Chairman Flying Hawk stated that "[t]he enclosed letter has the issues where the Corps of Engineers could use your assistance."  *Id*. at RAR13304.

On October 6, 2017, Yankton's attorneys transmitted a letter to the Department of Justice.  Letter from J. Baker, Fredericks Peebles & Morgan, to M. Marinelli, U.S. Dept. of Justice (Oct. 6, 2017), RAR13256-57.  The letter noted that the October 2 letter again incorrectly referred to Oglala.  Yankton nonetheless stated that it "intends to participate to the fullest extent possible in the remand process."  *Id*. at RAR13256.  It asserted that the Corps "needs to clearly communicate to the Tribe how it intends to [engage with the Tribe] and identify information within the Tribe's knowledge and possession that the Tribe should submit for the Corps' review."  *Id*.  Yankton stated its understanding that "time is of the essence in the remand process" but that the Corps' typographical mistakes were "delaying the process" of Yankton compiling the information identified in the Corps' letters to Yankton.  *Id*. at RAR13257.

On October 20, 2017, the Corps transmitted a corrected letter to Yankton.  Email from J. Ames, Corps, to Chairman Flying Hawk (Oct. 20, 2017), RAR13039-41.  The letter sought information: (1) regarding hunting and fishing practices; (2) on game species; (3) on "distinct cultural practices . . . that are connected to Lake Oahe;" and (4) regarding which cultural practices should be treated confidentially.  *Id*.  The Corps requested the information within thirty days and stated that it would "determine the next steps in the remand process and whether we need any additional information from your tribe after we receive the requested information and

documentation." *Id.* The letter was sent to Chairman Flying Hawk's email address. *Compare id.* at RAR13039 *with* Email from J. Ames to Chairman Flying Hawk (Aug. 7, 2018), RAR559.

On November 27, 2017, the Corps transmitted another letter to Yankton. Letter from Col. Hudson to Chairman Flying Hawk (Nov. 27, 2017), RAR12001. The letter followed up with Yankton regarding the Corps' request for "information from your Tribe to assist" in the remand process. *Id.* The Corps requested that Yankton provide that information by December 20, 2017. *Id.*

Yankton responded on December 12, 2017, by indicating that Yankton had not yet begun attempting to collect information in response to the Corps' requests because it was interpreting the Corps' letters to Yankton as an "attempt to avoid consultation." Letter from Chairman Flying Hawk to Col. Hudson (Dec. 12, 2017), RAR11979-80.

The Corps filed its October 20, 2017 letter to Yankton with the Court in December 2017 to refute Yankton's claims that the Court was failing to engage with them. Corps' Reply to the Yankton Sioux Tribe and Robert Flying Hawk's Response to the Corps' Status Report Regarding Remand, ECF No. 306-1.

On January 30, 2018, Yankton transmitted a letter to the Corps. Letter from Chairman Flying Hawk to Col. Hudson (Jan. 30, 2018), RAR10343-49. Yankton, in turn, claimed that it only became aware of the October 20 letter when it was filed in Court. Letter from Chairman Flying Hawk to Col. Hudson (Jan. 30, 2018), RAR10343-49. Yankton characterized the Corps' request as "a letter unilaterally requesting information from the Tribe" and asserted that the Corps was required to comply with Yankton's consultation protocols. *Id.* Yankton also asserted that it was "actively compiling information responsive" to the Corps' letter. *Id.*

Yankton sent a separate letter in March indicating that it was continuing to gather the information requested by the Corps.  Letter from Chairman Flying Hawk to Col. Hudson (Mar. 7, 2018), RAR6412.  Yankton also asserted that the Corps' letter "contains a unilateral request for information and does not invite the legally mandated tribal consultation[.]"  *Id.*

The Corps responded by stating that the Corps looked forward to receiving the information it requested and that the "remand analysis could benefit from that information."  Letter from Col. Hudson to Chairman Flying Hawk (Mar. 14, 2018), RAR5892.  The Corps further noted that "any meeting" would be more productive if Yankton provided the requested information in advance.  *Id.*

On March 30, 2018, the Corps followed up regarding its previous information requests.  Letter from Col. Hudson to Chairman Flying Hawk (Mar. 30, 2018), RAR5802.  The Corps stated that it "continues to believe that our remand analysis would benefit from the information submitted by your tribe.  However, we also must finalize our review of the three remand issues."  *Id.*  The Corps therefore set "a deadline of April 20, 2018" for the information and stated that "[a]fter this date, we will have to finalize our review with the information that we have."  *Id.*  The Corps noted that it would "determine the remaining steps in the remand process and whether we need any additional information from" Yankton after receiving any information.  *Id.*

Yankton responded on April 20 by providing a single, two-page affidavit containing general information regarding Yankton's Tribal Historical Preservation Officer.  Letter from Chairman Flying Hawk to Col Hudson (Apr. 20, 2018), RAR3449-58.  Yankton requested an extension of the Corps' deadline to provide information regarding Yankton's practices because "[t]he Tribe has been seeking information from federal agencies, some of which converted the information requests to Freedom of Information Act requests."  *Id.*

**IV.    The Corps' meeting with Yankton**

On May 30, 2018, Yankton requested that the Corps confirm that a planned May 31 meeting "is not consultation."  Letter from Chairman Flying Hawk to Col. Hudson (May 30, 2018), RAR3205.  In discussing Yankton's request, Colonel Hudson stated that, instead of being concerned with Yankton's characterization of the meeting, he was "going to address the status of the Remand and get their input."  Email from Col. Hudson to T. Tracy, Corps (May 30, 2018), RAR3199.  Colonel Hudson noted that he did not anticipate the need for an additional meeting with Yankton "unless they provide new information that would warrant another meeting."  *Id*.  That same day, the Corps responded that, regardless of whether Yankton's entire General Council could attend, the Corps was "willing to meet with whomever is designated by the Tribe as having relevant information regarding . . . the three remanded issues from the District Court."  Letter from Col. Hudson to Chairman Flying Hawk (May 30, 2018), RAR3207.

On May 31, 2018, Yankton met with the Corps on Yankton's reservation.  Meeting Notes, Yankton Sioux Tribe Consultation Meeting (May 31, 2018), RAR3191-95.  Yankton's comments at the meeting focused on issues beyond the remand's scope.  *Id*. at RAR3192, (discussing pollutants currently in the Missouri River); *id*. at RAR3193 (payment for alleged destruction of Teepees); *id* at RAR3194 (proposing reconstructing the pipeline over the Missouri River).  The Corps noted that some of Yankton's consultation protocols are problematic.  *Id*. at RAR3193.  Yankton provided some general statements, such as the assertion that its members "fish everywhere."  *Id*.  Colonel Hudson clarified for Yankton that the Corps was looking for information, including information regarding the impact of a potential spill on "hunting and fishing."  *Id*.  Several Corps personnel subsequently indicated that they sought "information on where [Yankton members] hunt/fish."  *Id* at RAR3194.  Yankton noted that it had another "3

pages of questions" that it wanted to ask but made no indication that it would provide additional information in response to the Corps' requests.  *Id*. at RAR3195.

Ultimately, the Corps' remand decision incorporated and addressed information provided by Yankton.  The Corps reviewed documents, comments, and reports submitted both before and after the easement was granted on February 8, 2018.  Mem. for Record (Aug. 31, 2018), RAR102.  For example, the Corps relied upon the April 19, 2018 Affidavit of Kip Spotted Eagle, Yankton's Tribal Historic Presentation Officer, to inform its understanding of the importance of hunting and fishing to Yankton.  *Id.* at RAR88.

## STANDARD OF REVIEW

The Administrative Procedure Act (APA) requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"  5 U.S.C. § 706(2)(A).  Under this "narrow" standard of review—which appropriately encourages courts to defer to the agency's expertise—an agency is required to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983) (internal quotation marks and citation omitted); *Ark Initiative v. Tidwell*, 64 F. Supp. 3d 81, 90-91 (D.D.C. 2014), *aff'd*, 816 F.3d 119 (D.C. Cir. 2016).

It is not enough, then, that the court would have come to a different conclusion from the agency.  *Ark Initiative*, 64 F. Supp. 3d at 90-91.  "The reviewing court 'is not to substitute its judgment for that of the agency,'" *id.*, nor to "disturb the decision of an agency that has examine[d] the relevant data and articulate[d] . . . a rational connection between the facts found and the choice made."  *Id*. at 91 (quoting *Ams. for Safe Access v. DEA*, 706 F.3d 438, 449 (D.C.

Cir. 2013)).  A decision that is not fully explained is to be upheld "if the agency's path may

reasonably be discerned."  *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.,* 419 U.S. 281,

286 (1974); *Ark Initiative*, 64 F. Supp. 3d at 91.

Absent any specific command, an agency is generally free to determine how to conduct a

remand at its discretion.  *Butte Cty. v. Chaudhuri*, 887 F.3d 501, 506 (D.C. Cir. 2018).

## ARGUMENT

I.     **Yankton's claim that the Corps failed to adequately consult with Yankton prior to
       remand is moot, and, even if it were not, the Corps did not violate any duty to
       consult with Yankton prior to remand**

Having lost its initial challenge to the Corps' consultation, Yankton now attempts to

revive its claim that the Corps violated an alleged duty to engage in meaningful consultation with

Yankton prior to remand.  The Court already denied Yankton's pre-remand claims as moot,

*Standing Rock VI*, 301 F. Supp. 3d at 75, and Yankton provides no substantive or procedural

basis for reversing that decision.  But even if the Court considered Yankton's consultation

claims, those claims fail because the Corps satisfied any conceivable duty to consult with

Yankton.

A.     **Yankton's pre-remand consultation claims are barred by law of the case and
       because they are moot**

Yankton's effort to revive its pre-remand claims should be rejected because this Court

has already entered judgment on "Count One of Plaintiff's Complaint and as to Plaintiff's NHPA

and NEPA claims."  *Standing Rock VI*, 301 F. Supp. 3d at 75.  *See Mpoy v. Fenty*, 901 F. Supp.

2d 144, 150 (D.D.C. 2012) ("Under the law-of-the-case doctrine, 'a court involved in later

phases of a lawsuit should not re-open questions decided . . . by that court or a higher one in

earlier phases.'").  Yankton's supplemental complaint nonetheless contains a NEPA claim that

"incorporate[s] and restate[s] all previous paragraphs" of Yankton's original complaint.  First

Suppl. Compl. ¶ 97, ECF No. 379-1.  And Yankton challenges the "Federal Defendants'"[2]

consultation with Yankton in developing the July 2016 Environmental Assessment.  ECF No.

435-1 at 19-21.  Yankton's claims should be denied because Yankton is simply incorrect, *id.* at

19, that its pre-remand "consultation-related claims . . . remain unresolved."

      This Court's grant of summary judgment on Yankton's pre-remand NEPA and NHPA

claims bars Yankton from reviving them.  *Jones v. Bernanke*, 538 F. Supp. 2d 53, 60 (D.D.C.

2008) (where a Plaintiff "re-alleges the counts in the first complaint" after summary judgment

was granted on those claims, "the court's earlier decision . . . bars . . . the re-alleged claims in the

amended complaint"); *see also Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, No. 16-

1534 (JEB), 2019 U.S. Dist. LEXIS 4420, *11 (D.D.C. Jan. 10, 2019) ("Once the Court granted

summary judgment to the Corps on most claims while remanding others, moreover, it fully

expected that only the remanded claims would remain to be decided. . . . [While] the Court

permitted amendment following remand, this was simply for Plaintiffs to refine any claims

relating to remand, not to return to the starting blocks.").  Yankton's pre-remand consultation

claims are subsumed within its NHPA claims.  *See id.* at *13; Compl. at 15-25, *Yankton Sioux

Tribe v. U.S. Army Corps of Eng'rs*, No. 1:16-cv-01796 (D.D.C. 2016).  Yankton's effort to

revive its dismissed pre-remand consultation claims should therefore be denied.

      This Court should also reaffirm its decision that Yankton's pre-remand consultation

claims are moot because this Court can provide no meaningful relief where the pipeline has been

---

[2] Yankton's use of the phrase "Federal Defendants" is somewhat confusing as Yankton's original
complaint named the United States Fish and Wildlife Service (FWS).  *See* First Suppl. Compl. ¶
34, ECF No. 379-1.  Yet Yankton's supplemental complaint and brief do not raise any arguments
against the Fish and Wildlife Service.  *Id.*; ECF No. 435-1.  The Court should therefore grant
summary judgment with respect to any conceivable remaining claims against FWS because no
issues involving FWS have been briefed or raised by Yankton.

constructed.  *Standing Rock VI*, 301 F. Supp. 3d at 61-64.  Yankton is incorrect, ECF No. 435-1 at 19, that its pre-remand consultation claims fit into the narrow category of cases that are capable of repetition but evading review.  Yankton bears the burden of proving that the particular wrongs that it allegedly suffered are capable of repetition but evading review.  *Guedes v. ATF*, 920 F.3d 1, 15 (D.C. Cir. 2019).  Yankton fails to identify the legal standard, much less establish, that "(i) the challenged action is 'in its duration too short to be fully litigated prior to its cessation or expiration,' and (ii) there is a 'reasonable expectation that the same complaining party will be subject to the same action again.'"  *Id.* at 14 (citations omitted).

First, Yankton does not meet its burden of establishing that the challenged action is too short to be fully litigated prior to its cessation or expiration.  "For a controversy to be 'too short to be fully litigated prior to cessation or expiration,' it must be of '*inherently* limited duration.' This is so because the 'capable of repetition, yet evading review' exception is concerned not with particular lawsuits, but with classes of cases that, absent an exception, would *always* evade judicial review."  *ProtectMarriage.com - Yes on 8 v. Bowen*, 752 F.3d 827, 836 (9th Cir. 2014) (citation omitted).  "[A] party may not profit from the 'capable of repetition, yet evading review' exception to mootness, where through his own failure to seek and obtain a stay he has prevented an appellate court from reviewing the trial court's decision."  *Bunker Ltd. P'ship v. United States*, 820 F.2d 308, 311 (9th Cir. 1987) (exception does not apply to "situations where the failure of parties to take certain actions has precluded review as a practical matter").  As in the case of a challenge to a waste water treatment plant, the pipeline "was not built in a day."  *James Luterbach Constr. Co. v. Adamkus*, 781 F.2d 599, 602 (7th Cir. 1986) (mootness exception inapplicable).  In short, Yankton failed to take actions that would have prevented its NHPA claims from being rendered moot.  *See, e.g.*, *Grass Works Lawn Care v. Acosta*, No. CV 18-1581

(RMC), 2019 WL 1981087, at *6 (D.D.C. May 3, 2019) (plaintiff could not avail itself of the exception where it "waited four months after their applications were denied to file suit and never timely requested a preliminary injunction or other expedited relief."); *Armstrong v. FAA*, 515 F.3d 1294, 1296 (D.C. Cir. 2008).

Yankton was first provided notice of the pipeline in 2014.  Yankton's failure to avail itself of multiple opportunities to consult is perhaps most telling with respect to its allegation that "several burials" were located at unspecified pre-construction notification sites in South Dakota. Letter from Chairman Flying Hawk to Col. Henderson (June 17, 2016), USACE_64074; ECF No. 435-1 at 4-5.  Yankton could have alerted the Corps to the specific locations of these alleged burial sites at: 1) any of the consultation meetings it declined to attend; 2) the March, 2016 meeting that Yankton canceled; 3) the May, 2016 consultation meeting; or 4) through written correspondence.  *See* pages 2-3, above.  Alternatively, Yankton could have sought a preliminary injunction under the Native American Grave Protection and Repatriation Act, as Yankton did when remains were inadvertently discovered near Pickstown, South Dakota.  *Yankton Sioux Tribe v. U.S. Army Corps of Eng'rs*, 209 F. Supp. 2d 1008, 1009-10 (D.S.D. 2002); *see Newdow v. Roberts*, 603 F.3d 1002, 1009 (D.C. Cir. 2010) (to avail itself of the exception, a plaintiff must "make a full attempt to prevent his case from becoming moot, an obligation that includes filing for preliminary injunctions and appealing denials of preliminary injunctions").  Yankton did none of these things, failing to challenge pipeline construction until that construction was complete.  If there was an absence of meaningful consultation in this case, it is because Yankton failed to provide information that would have made that consultation more meaningful.

Yankton also fails to establish that it has a reasonable expectation that it will be subject to the same action again.  The "capable of repetition yet evading review" exception does not apply

to highly fact-specific cases such as the Corps' consultation efforts.  For example, the D.C.

Circuit refused to apply the exception to a NEPA challenge to wild horse gathering because

"[p]articular decisions to remove wild horses and burros are highly fact-specific.  How a herd

will be managed in the future after the initial culling is anyone's guess, as the Bureau makes

clear.  It may depend on climate, on how many new births occur, on the mortality rate of the

horses, on whether fertility control is used as a management tool, and on many other factors

specific to a herd and to the area in which it is located."  *Fund for Animals, Inc. v. BLM*, 460

F.3d 13, 22-23 (D.C. Cir. 2006).  The D.C. Circuit held that the mootness exception did not

apply because it was "an open question" as to whether there would be similar future actions, the

magnitude of such possible future actions, and the manner in which those actions would be

evaluated by the agency.  *Id*.  The D.C. Circuit's reasoning is particularly applicable to the

Corps' permitting decisions.  *See, e.g.*, *Potomac River Ass'n v. Lundeberg Md. Seamanship Sch.,*

*Inc.*, 402 F. Supp. 344, 351-52 (D. Md. 1975) (mootness exception inapplicable because "the

Corps has a specific set of procedures geared to operate differently for every permit

application").  This is particularly true where, as here, the Department of Defense Instruction that

Yankton relies upon, ECF No. 435-1 at 19-21, has been replaced and therefore could not apply to

future consultations.[3]

    The D.C. Circuit applied these principles to identify the types of claims that are rendered

moot by a pipeline's construction.  *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 43-44

(D.C. Cir. 2015).  The D.C. Circuit distinguished ongoing pipeline operation from cases such as

---

[3] The version of Department of Defense Instruction 4710.02 in place during the challenged
decisions was cancelled and replaced on September 24, 2018.  DOD Instruction 4710.02 (Sept.
24, 2018) available at:
https://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodi/471002p.pdf.

"environmental challenges to the Corps filling wetlands," which "were moot once the construction was fully completed because it was undisputed that the wetlands could not be restored." *Id*. (citing *Sierra Club v. U.S. Army Corps of Eng'rs*, 277 F. App'x 170, 173 (3rd Cir. 2008)). As this Court previously held, Yankton's consultation claims exclusively belong in the latter category. *Standing Rock VI*, 301 F. Supp. 3d at 63 (Yankton's complaint includes no "emphasis on ongoing harms"). The alleged, but never identified, cultural sites that form the basis for Yankton's consultation claim are similar to the wetlands—if they were destroyed they cannot be restored. Yankton's claim is therefore moot.

The single case Plaintiff cites is inapposite. *Kingdomware Techs., Inc. v. United States* involved a challenge to a contract procured by the Department of Veterans Affairs for an "Emergency Notification Service for four medical centers" that "sends important information to Department personnel" in emergencies. 136 S. Ct. 1969, 1974 (2016). The Supreme Court affirmed that the "capable of repetition, yet evading review" exception "applies 'only in exceptional [circumstances.]'" *Id*. at 1976. In *Kingdomware*, an injunction would have left the agency without the emergency notification service and performance on the contract was completed within fifteen months. *See id*. at 1975. *Kingdomware* therefore presented the type of issue that "will only ever present a live action until a particular date, after which the alleged injury will either cease or no longer be redressible." *ProtectMarriage.com - Yes on 8*, 752 F.3d at 836. It is distinguishable from cases—such as this one—"[where] a court can ensure that a live controversy persists until the action is fully litigated by enjoining the challenged conduct until the litigation concludes." *Id*. *Kingdomware* also did not involve a highly-specific factual inquire, turning instead on the likelihood that the agency would continue to refuse to apply a statutory requirement that restricted bidding to veteran-owned businesses. *Id*.

Yankton has not even attempted to meet its burden of proving that the particular wrongs that it allegedly suffered are capable of repetition but evading review.  *Guedes*, 920 F.3d at 15.  This Court should therefore affirm that Yankton's pre-remand consultation claims are moot because it can "provide no meaningful remedy to address Plaintiffs' alleged injuries" as the pipeline is fully constructed.  *Standing Rock VI*, 301 F. Supp. 3d at 64.  The Court's analysis need proceed no farther.

### B.     With the exception of the National Historic Preservation Act, Yankton fails to identify a potential legal basis for a duty to engage in any consultation with Yankton prior to remand

While this Court need not reconsider Yankton's pre-remand consultation claims, those claims still fail as a matter of law and fact.  Yankton asserts that "Federal statutes, regulations, Executive Orders, and the [Corps'] own internal instructions . . . mandate that the [Corps] consult with" Yankton.  ECF No. 435-1 at 15.  Yankton is incorrect.  Indeed, many of the sources Yankton relies upon explicitly provide that they do not impose such a duty.

Yankton first contends that Executive Order 13175 requires agencies to consult with tribes.  *Id.* at 15, 19-20.  But Executive Order 13175 makes clear that it "is intended only to improve the internal management of the executive branch, and is not intended to create any right, benefit, or trust responsibility, substantive or procedural, enforceable at law by a party against the United States, its agencies, or any person."  Executive Order 13175 § 10.  "[The plain language of Executive Order 13175 does not provide any right enforceable in this judicial action alleged by the Tribe."  *N. Arapaho Tribe v. Burwell*, 118 F. Supp. 3d 1264, 1281 (D. Wyo. 2015).  *Cf. Standing Rock VI*, 301 F. Supp. 3d at 59-60 (United Nations Declaration on the Rights of Indigenous Peoples, non-binding declarations does not create a federal cause of action).  To be clear, Executive Order 13175 created no enforceable duty to consult.

Yankton's next assertion, that Department of Defense Instruction 4710.02 imposes an enforceable duty to consult, ECF No. 435-1 at 11, fares no better.  Department of Defense Instruction 4710.02 is a guidance document and thus is presumed non-binding unless there is evidence or practice to the contrary.  *See Cement Kiln Recycling Coal. v. EPA*, 493 F.3d 207, 228 (D.C. Cir. 2007).  While guidance documents may be binding if they threaten enforcement against, or create legal consequences for a third party regulated entity, neither situation is present here.  *See Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000); *see also Barrick Goldstrike Mines, Inc. v. Browner*, 215 F.3d. 45, 48 (D.C. Cir. 2000).  The Instruction's "Procedures" section indicates that it is non-binding, and cannot be the basis for the Tribe's claim that the Corps violated a duty to consult.

Section 6.2 of the Instruction indicates that the Instruction provides non-binding guidance.  It states that Components shall consult with tribes in accordance with requirements specified in References (c) through (h).  Reference E is Executive Order 13175, which provides no enforceable right.  *See N. Arapaho Tribe*, 118 F. Supp. 3d at 1281.  Reference D is a 1998 policy that likewise provides that the "policy neither enlarges nor diminishes the Department's legal obligations . . . nor does the policy provide an independent cause of action upon which the Department may be sued."  Sec'y of Def. Policy on "Dep't of Def. American Indian & Alaska Native Policy" (Oct. 20, 1998).[4]  Reference F is a September 1994 Memorandum that contains similar language.  Mem. on Gov't-to-Gov't Relations with Native American Tribal Gov'ts at 937 (Apr. 29, 1994) ("This memorandum . . . is not intended to, and does not, create any right to administrative or judicial review, or any other right or benefit or trust responsibility, substantive

---

[4] The policy is available at: https://web.archive.org/web/20070715115240/https://www.denix.osd.mil/denix/Public/Native/Outreach/policy.html.

or procedural, enforceable by a party against the United States."). Reference C, which is Department of Defense Instruction 4715.3, explicitly does not apply to the Corps. Dept. of Def. Instruction 4715.3 §§ 1(a), 2(b)(2).[5] References G and H address statutes that are not at issue here—the Archaeological Resources Protection Act and the American Indian Religious Freedom Act.

Section 6.3 of the Instruction provides that the Corps should undertake consultation where its actions may *significantly affect* (1) protected trust resources, (2) tribal rights, or (3) Indian lands. Dep't of Def. Instruction 4710.02 at 4; *see also id.*, §§ 5.3.4, 6.1. But here, the Corps concluded that the Corps' actions would *not* significantly affect the human environment, including tribal hunting, fishing, or water rights or tribal lands. Envtl. Assessment (July 2016), USACE71225-26. This conclusion was confirmed by the Corps' remand analysis. Mem. for Record, RAR1-140. Therefore on its own terms the Department of Defense guidance imposed no additional consultation requirement. But even assuming there were such a requirement, as discussed below, the Corps more than satisfied it in this case.

And Section 6.6's suggestion that the Corps involve tribes "early in the planning process" highlights the inappropriateness of striking down the Corps' remand analysis in this case. Dep't of Def. Instruction 4710.02, § 6.6. While this is non-mandatory guidance, the Corps made numerous efforts to engage Yankton throughout the process for evaluating the Lake Oahe crossing. Email from L. Gravatt, Yankton, to R. Harnois, Corps (Nov. 3, 2014), USACE_ 67125 (deferring consultation to Standing Rock and Cheyenne River); *Standing Rock VI*, 301 F. Supp. 3d at 55. It is of no surprise that Yankton declined any consultation, given that its reservation is

---

[5] DOD Instruction 4715.3 available at:
https://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodi/471503p.pdf?ver=2019-02-28-120916-070.

roughly "hundreds of miles away from the . . . Lake Oahe crossing." *Id.* In any event, the Corps met any requirement to involve Yankton early in the process well before remand.

Yankton is incorrect, ECF No. 435-1 at 17-18, that Corps policies provided Yankton with a justified expectation that the Corps would hold many meetings with Yankton's General Council regarding the remand process. As discussed below, Yankton had no justified expectation to participate in the remand at all because it prevailed on none of its claims on summary judgment. And the Corps' correspondence tailoring its remand analysis to the remand issues identified by the Court, made clear that Yankton should promptly share any responsive information.

### C. The Corps met any duty to consult with Yankton prior to remand

Yankton identifies a single statute that contains a potentially mandatory duty to consult. But under any reasonable interpretation, the administrative record establishes that the Corps met any pre-remand duty to consult with Yankton.

The National Historic Preservation Act provides that "a Federal agency shall consult with any Indian tribe or Native Hawaiian organization that attaches religious and cultural significance to" properties "of traditional religious and cultural importance" that "may be determined to be eligible for inclusion on the National Register" of Historic Places. 54 U.S.C. § 302706(a)-(b).[6] The regulations refute Yankton's assertion, ECF No. 435-1 at 4-5, 16, 21, that the Corps can only meaningfully consult with Yankton by repeatedly meeting with every Yankton adult at a General Council meeting.[7] They instead state that the agency should, "in consultation with the

---

[6] The Corps can only ask about such properties—it cannot compel a Tribe to divulge the location of such sites. 36 C.F.R. § 800.4.

[7] Yankton's self-created consultation "Protocols" stated that the General Council is composed of every Yankton member over the age of 18. Yankton Protocol § (C)(11), RAR13311-15. To the extent Yankton seeks, ECF No. 435-1 at 21, to rely on its consultation protocols to attack the

[Tribal Historic Preservation Officer] . . . [g]ather information from any Indian tribe . . . to assist in identifying properties." 36 C.F.R. § 800.4(a)(4).  Contrary to Yankton's effort to recast the NHPA's consultation requirement, meetings with Yankton's leadership can be sufficient to meet even a statutorily-imposed consultation duty.  *See Yankton Sioux Tribe v. U.S. Dep't of Health & Human Servs.,* 496 F. Supp. 2d 1044, 1049, 1055-56 (D.S.D. 2007) (rejecting Yankton's challenge to sufficiency of consultation because agency held "two meetings held at the Fort Randall Casino to solicit the Tribe's views and discuss" the proposed federal action).  As discussed below, the Corps repeatedly attempted to engage Yankton and met with Yankton prior to remand, thereby fulfilling any duty to consult under the NHPA.

Yankton misleadingly suggests that the Corps' efforts to obtain information from Yankton began on May 18, 2016.  ECF No. 435-1 at 21.  Yankton's response to the Corps' initial consultation effort was to defer commenting on test bore holes near Lake Oahe to Standing Rock and Cheyenne River.  Email from L. Gravatt, Yankton, to R. Harnois, Corps (Nov. 3, 2014), USACE_67125.  The record establishes instead that the Corps repeatedly sought to engage with Yankton, but "Yankton did not attend multiple meetings held by the Corps and FWS to discuss DAPL (meetings that were attended by other interested tribes), . . . nor did they respond to numerous efforts by the Corps and FWS to engage in discussion regarding the pipeline." *Standing Rock VI*, 301 F. Supp. 3d at 55.  Contrary to Yankton's assertion that the Corps "denied the Tribe the opportunity to comment on the proposed action," ECF No. 435-1 at 21, the Corps

---

Corps pre-remand consultation, its efforts suffer from another fatal flaw—Yankton did not finalize its consultation protocols until after June 17, 2016.  Letter from Chairman Flying Hawk to Col. Henderson (June 17, 2016), USACE_64074.  By that time Yankton had deferred to other tribes and failed to attend numerous meetings.  *See* pages 2-3, above.  Yankton cannot base its pre-remand claims on the Corps failure to abide by Yankton's unfinished policy.

repeatedly provided Yankton with opportunities to comment over the course of more than two years and Yankton repeatedly failed to take advantage.  Yankton's pre-remand consultation claim also fails because the record establishes that the Corps fulfilled any obligation by consulting with Yankton in any ordinary sense of the word.  *United Keetoowah Band of Cherokee Indians in Okla. v. FCC*, 933 F.3d 728, 750-51 (D.C. Cir. 2019) (upholding consultation where agency "presented abundant evidence that it 'consulted' Tribes in the ordinary sense of the word, and the Tribes have offered no other concrete standard by which to judge the [agency's] efforts").

## II.     Yankton's post-remand claims should be denied because the Corps had no duty to consult with Yankton on remand

Yankton is incorrect, ECF No. 435-1 at 22, that the Court's remand order required any consultation with Yankton.  The Court partially granted Standing Rock and Cheyenne River's motions for summary judgment.  It remanded "only a narrow subset of the Tribes' NEPA claims" based on its conclusion that the Corps "'largely complied' with NEPA's requirements[.]"  *Standing Rock V*, 282 F. Supp. 3d at 103; *Standing Rock IV*, 255 F. Supp. 3d at 112 (the Corps' "substantially complied with NEPA in many areas").  Far from requiring the Corps to begin the NEPA or NHPA process over again, the Court required the Corps to review several "discrete issues" on remand.  *Standing Rock IV*, 255 F. Supp. 3d at 160.  Yankton prevailed on none of its claims and was not included in the remand order.  *Id.*; *Standing Rock VI*, 301 F. Supp. 3d at 54.  The remand order therefore imposed no requirement on the Corps to engage with Yankton.

But if the Corps had a duty to consult with Yankton on remand, it met any such duty by repeatedly seeking information from Yankton in a manner that was specifically tailored to the Court's remand.  This case is similar to *TOMAC v. Norton*, in which the Court "concluded that

BIA sought out and properly considered the available data, thereby fulfilling its responsibility under NEPA" with respect to the majority of the NEPA challenges.  433 F.3d 852, 858 (D.C. Cir. 2006).  The Court found two "flaws" in the agency's analysis and "remanded the EA to the agency 'for such further evaluation and elaboration of its reasoning as BIA desires to submit concerning secondary growth issues.'"  *Id*. (quoting *TOMAC v. Norton*, 240 F. Supp. 2d 45, 52 (D.D.C. 2003)).  The D.C. Circuit upheld the agency's remand analysis despite the fact that the agency did not seek <u>any</u> additional comments.  *Id.* at 861-62 ("The record here indicates that BIA sought comment on the original draft EA and provided detailed responses to comments it received.  The EA Supplement merely amplified the issues that had been addressed in BIA's original 2001 EA, so the agency reasonably concluded that further public comment was unnecessary.  On this record, we find no merit in TOMAC's claim that another round of public comment was required.").  The D.C. Circuit explicitly found that "BIA acted appropriately given the prior public involvement, and no statute or regulation requires anything more."  *Id*.; *see also Yankton Sioux Tribe*, 496 F. Supp. 2d at 1057 ("Even if Plaintiffs had an enforceable right to notice and an opportunity to be heard pursuant to the Tribal Consultation Policy, the Court finds there was no new or additional duty to consult with the Tribe in this case because closure of the emergency room on September 30, 2006 was not a new decision.").  To be clear, the Corps was not required to begin its environmental analysis anew.  It was instead required to address the discrete issues posed by the Court's narrow remand.

Yankton's post-remand consultation claim fails because the Corps did indeed undertake all appropriate efforts to consult with Yankton.  Yankton's assertion that it had "no meaningful opportunity to discuss" unspecified "important information," ECF No. 435-1 at 22, is belied by the Corps' repeated requests for remand related information.  By October 20, 2017, the Corps

sought information: (1) regarding hunting and fishing practices; (2) on game species; (3) on
"distinct cultural practices . . . that are connected to Lake Oahe;" and (4) regarding which
cultural practices should be treated confidentially.  *See* pages 4-9, above.  The Corps
transparently stated that it would "determine the next steps in the remand process and whether
we need any additional information from your tribe after we receive the requested information
and documentation."  *Id*.  The letter was transmitted to Chairman Flying Hawk.  *Compare* Email
from J. Ames, Corps, to Chairman Flying Hawk (Oct. 20, 2017), RAR13039-41, *with* email from
J. Ames, Corps, to Chairman Flying Hawk (Aug. 7, 2018), RAR559.  And the Corps followed up
numerous times in an effort to obtain the information.  *See* pages 4-9, above.  There can be no
legitimate dispute that the Corps explicitly and repeatedly requested any important information
Yankton might have.

Yankton did not promptly provide the requested information.  It instead relied on letters
containing references to Oglala to avoid compiling requested information, even though the letter
were addressed to Yankton and Yankton understood the reference to Oglala to be a typographical
error.  *See* Letter from Col. Hudson to Yankton Bus. & Claims Comm. (Oct. 2, 2017),
RAR13304-06 ("The enclosed letter has the issues where the Corps of Engineers could use your
assistance."); Letter from Chairman Flying Hawk to Col. Hudson (Dec. 12, 2017), RAR11979-
80 (asserting that letter seeking information from Yankton was an effort to avoid consulting with
Yankton).  Despite understanding that "time is of the essence in the remand process," Yankton
claimed that typographical mistakes were "delaying the process" of Yankton compiling the
information identified in the Corps' letters to Yankton.  Letter from J. Baker, Fredericks Peebles
& Morgan, to M. Marinelli, U.S. Dept. of Justice (Oct. 6, 2017), RAR13256-57.  Rather than
interpret letters to Yankton as a request for information, Yankton asserted that the Corps "needs

to clearly communicate to the Tribe how it intends to [engage with the Tribe] and identify information within the Tribe's knowledge and possession that the Tribe should submit for the Corps' review." *Id.* Yankton's decision to not begin compiling and providing information about its allegedly-impacted tribal practices in response to the Corps' September 25 and October 2 letters[8] is difficult to square with Yankton's demand that it be afforded an opportunity to provide information.

Regardless, by October 20, 2018, the Corps did what Yankton asked and clearly communicated both: 1) the information it sought from Yankton; and 2) that it would determine any next steps only after obtaining the information. The Corps correctly used the Court's remand relating to tribal hunting, fishing, and environmental justice issues to guide its interactions with Yankton. *See Standing Rock IV*, 255 F. Supp. 3d at 161. Rather than agreeing that it would follow Yankton's self-created consultation protocols, the Corps explicitly and repeatedly stated that it would determine next steps only after receiving Yankton's response to the Corps' request for information regarding hunting, fishing, and cultural practices. *E.g.*, Letter from Col. Hudson to Yankton Bus. & Claims Comm. (Sept. 25, 2017), RAR13323-24; Email from J. Ames, to Chairman Flying Hawk (Oct. 20, 2017), RAR13039-41. The Corps was correctly carrying out its mandates under NEPA and the Court's order. Yankton, as it did pre-remand, refused to meaningfully engage and only toward the end of the remand period provided limited information via letters and attendance at one meeting.

Even if Yankton is correct that it was unaware that the Corps sought information from Yankton until December 1, 2017, ECF No. 435-1 at 22-23, Yankton provides no support for its

---

[8] Yankton appears to have delayed any effort to compile information for the Corps until after receiving the Corps' October 20 and November 27, 2017 letters, as well. *See* pages 4-7, above.

assertion that such a request came "too late in the process." *Id.* To the contrary, the Corps analyzed and incorporated the information that Yankton provided on April 20, 2018, into the Corps' remand analysis. Email from B. Cossette (Apr. 23, 2018), RAR3384; Mem. for Record at RAR88 (relying upon April 19, 2018 Affidavit of Kip Spotted Eagle, Yankton's Tribal Historic Preservation Officer, to inform its understanding of the importance of hunting and fishing to Yankton); *id.* at RAR5; *id.* at RAR68.

Yankton failed to fully avail itself of repeated opportunities to provide information within the Tribe's knowledge and possession even though it understood that the Corps did not intend to conduct consultation pursuant to Yankton's protocol. Letter from Chairman Flying Hawk to Col. Hudson (Mar. 7, 2018), RAR6412-18 (asserting that the Corps' letter "contains a unilateral request for information and does not invite the legally mandated tribal consultation"); Letter from Col. Hudson to Chairman Flying Hawk (Mar. 14, 2018), RAR5892 ("any meeting" would be more productive if Yankton provided the requested information in advance); Letter from Col. Hudson to Chairman Flying Hawk (Mar. 30, 2018), RAR5802 (setting "deadline of April 20, 2018" for Yankton to provide the requested information and stating that "[a]fter this date, we will have to finalize our review with the information that we have"). Despite that awareness, and seven months after the Corps' September 25, 2017 request, Yankton submitted a two-page affidavit as its sole written response to the Corps' information requests. Letter from Chairman Flying Hawk to Col Hudson (Apr. 20, 2018), RAR3449-52.

Yankton appears to have chosen to focus on trying to enforce its own inapplicable consultation protocols over providing the requested information. To that end, Yankton sent a letter on May 30, 2018, attempting to confirm that a meeting the next day was not consultation. Letter from Chairman Flying Hawk to Col. Hudson (May 30, 2018), RAR3205. That same day,

the Corps responded that regardless of whether Yankton's entire General Council could attend, the Corps was "willing to meet with whomever is designated by the Tribe as having relevant information regarding . . . specifically, the three remanded issues from the District Court."  Letter from Col. Hudson to Chairman Flying Hawk (May 30, 2018), RAR3207.  In other words, the Corps again stated that it sought particular information relating to the three remand issues from Yankton.

Rather than providing the requested information within the Tribe's knowledge and possession, Yankton used the May 31, 2018 meeting to focus on issues beyond the remand's scope.  Meeting Notes, Yankton Sioux Tribe Consultation Meeting (May 31, 2018), RAR3192 (discussing pollutants currently in the Missouri River); *id*. at RAR3193 (payment for alleged destruction of Teepees); *id* at RAR3194 (proposing reconstructing the pipeline over the Missouri River).  Colonel Hudson clarified for Yankton that the Corps was looking for information, including information regarding the impact of a potential spill on hunting and fishing.  *Id*. Several Corps personnel subsequently indicated that they sought "information on where [Yankton members] hunt/fish."  *Id* at RAR3194.  And despite the Corps' requests for particular information, Yankton's statements about the remand issues were general—including the presentation by Yankton's Tribal Historic Preservation Officer  *Id*. at RAR3193 (asserting that Yankton members "fish everywhere"); Agenda § VII (May 31, 2018), RAR3190.  If Yankton possessed additional important hunting, fishing, or cultural information relevant to the remand, the Tribe did not avail itself of multiple opportunities to provide such information.

In sum, the record establishes that the Corps reasonably engaged, or attempted to engage, with Yankton to obtain information regarding the narrow issues remanded by the Court.  The Corps' efforts were reasonable.  *See United Keetoowah Band of Cherokee Indians*, 933 F.3d at

747. And Yankton's complaint that the Corps did not comply with an inapplicable protocol cannot obscure the fact that Yankton failed to avail itself of the opportunity to provide additional information to the Corps. *Cf. Payne v. District of Columbia*, 808 F. Supp. 2d 164, 174 (D.D.C. 2011) (A party "should not complain about a lack of due process when he failed to avail himself of the procedural measures that could have provided him with meaningful relief.").

## III.    The Corps' environmental justice analysis was reasonable

Yankton's argument that the Corps was required to conduct a broad environmental justice review "includ[ing] the full 1851 Treaty Territory," ECF No. 435-1 at 10-14, does not withstand scrutiny. The Corps hereby incorporates its response to Standing Rock's environmental justice argument rather than duplicate its analysis of environmental justice law here. *See* Corps' Opposition to Standing Rock's Summary Judgment Motion at 3-4, 28-30 (Oct. 9, 2019). Nonetheless, the Corps notes that Yankton's assertion that the Corps should have considered the entire 1851 Sioux Treaty territory, ECF No. 435-1 at 11, is unsupportable. Yankton's proposal is wildly overbroad, particularly given that this Court granted summary judgment for the Corps on Yankton's fiduciary duty claims. *See Standing Rock Sioux Tribe VI*, 301 F. Supp. 3d at 59-60. Specifically, this Court rejected Yankton's contention that the Corps owed Yankton a fiduciary duty based upon alleged rights reserved in the 1851 Treaty of Fort Laramie.

The Corps was reasonable to limit its consideration to the area that could have foreseeably been impacted by the federal action. "The 'identification of the geographic area' within which a project's impacts on the environmental resources may occur 'is a task assigned to the special competency of the appropriate agencies.'" *Powder River Basin Res. Council v. U.S. Bureau of Land Mgmt.*, 37 F. Supp. 3d 59, 75 (D.D.C. 2014) (quoting *Tri–Valley CAREs v. U.S. Dep't of Energy,* 671 F.3d 1113, 1127 (9th Cir. 2012)); *Kleppe v. Sierra Club,* 427 U.S. 390, 414

(1976)).  Furthermore, "[e]ven if environmental interrelationships could be shown conclusively to extend across" a greater geographic scope than that selected by the agency, "practical considerations of feasibility might well necessitate restricting the scope" of analysis.  *Kleppe,* 427 U.S. at 414.  The Court should therefore hold that the Corps' environmental justice analysis was reasonable.[9]

The Corps "relied on advanced modeling, historical data regarding spill size and frequency, known past and present exposures and impacts to tribal populations, and substantive input from tribal communities to define the geographic extent" of its environmental justice analysis.  Mem. for Record, RAR65.  In response to input from the Tribes, "the Corps decided to include the [Cheyenne River] drinking water intake (156.5 miles downstream) . . . even though the model predicts the oil footprint would not extend that far even in a worst-case discharge scenario."  *Id.* at RAR66.  Going even farther, hundreds of miles downstream and inland as Yankton urges would be unreasonable.  *Cf. Powder River Basin Res. Council,* 37 F. Supp. 3d at 75 ("[I]t is rational for [the agency] to choose the boundary of the area the Proposed Action will govern as the area for analyzing impacts.").  The area of land Yankton argues should have been included spans hundreds of miles spread across four different states.  *See* Dakota Access Pipeline Envtl. And Emergency Response Presentation (June 1, 2018), RAR3142.  Even a catastrophic spill is not likely to affect an area that large, particularly as portions of this area are not proximate to Lake Oahe.  The Corps was reasonable to limit its consideration of impacts, including on environmental justice concerns, to a more narrow area than Yankton demands.

---

[9] Yankton adopts by reference pages 13 through 39 of Standing Rock's brief, including Standing Rock's critique of the Corps' environmental justice analysis.  The Corps hereby adopts its response to the arguments raised in those pages, which are set forth in the Corps' Opposition to Standing Rock's motion for summary judgment.

**IV.     The parties cannot address whether the Court should vacate the easement at this stage of proceedings**

Yankton is incorrect that the Court should vacate the easement.  As this Court previously noted, "'[t]he decision whether to vacate depends on the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed.' '[A] serious possibility that the [agency] will be able to substantiate its decision on remand' cautions in favor of remanding rather than vacating." *Standing Rock IV,* 255 F. Supp. 3d at 147 (citation omitted).  The parties cannot reasonably evaluate the seriousness of any deficiencies, at a minimum, until the Court identifies any such deficiencies.  The Corps therefore contends that, if the Court finds any deficiency in the Corps' remand analysis, it should order briefing on the appropriate remedy.

**CONCLUSION**

The Corps respectfully submits that this Court should deny Yankton's motion for summary judgment and grant the Corps' motion for summary judgment.  It is too late for Yankton to raise or relitigate its pre-remand claims.  Even if it were not, Yankton's claims fail because the Corps fulfilled any duty to consult with Yankton.  Yankton's post-remand claims also fail because neither law nor this Court's remand require the Corps to consult with Yankton.  And in any event, the Corps satisfied any consultation duty by repeatedly seeking information relevant to the narrow issues remanded by the Court.  Lastly, Yankton's environmental justice claims fail because the Corps' analysis was reasonable.

Dated: October 9, 2019

Respectfully submitted,

JEAN E. WILLIAMS
Deputy Assistant Attorney General
Environment & Natural Resources Division

By: */s/ Matthew Marinelli*

REUBEN SCHIFMAN, NY BAR
MATTHEW MARINELLI, IL Bar 6277967
U.S. Department of Justice
Natural Resources Section
P.O. Box 7611
Benjamin Franklin Station
Washington, DC 20044
Phone: (202) 305-4224 (Schifman)
Phone: (202) 305-0293 (Marinelli)
Fax: (202) 305-0506
reuben.schifman@usdoj.gov
matthew.marinelli@usdoj.gov

ERICA M. ZILIOLI, D.C. Bar 488073
U.S. Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, DC 20044
Phone: (202) 514-6390
Fax: (202) 514-8865
Erica.Zilioli@usdoj.gov

*Attorneys for the United States Army Corps
of Engineers*

OF COUNSEL:

MILTON BOYD
MELANIE CASNER
U.S. Army Corps of Engineers
Office of Chief Counsel
Washington, DC

## CERTIFICATE OF SERVICE

I hereby certify that on October 9, 2019, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will send notification of this filing to the

attorneys of record and all registered participants.


*/s/Erica Zilioli*