**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE, YANKTON SIOUX TRIBE; ROBERT FLYING HAWK; OGLALA SIOUX TRIBE, | Case No. 1:16-cv-1534-JEB (and Consolidated Case Nos. 16-cv-1796 and 17-cv-267) |
| Plaintiffs, | |
| and | **OPPOSITION TO PLAINTIFF OGLALA SIOUX TRIBE'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT OF THE ARMY CORPS' CROSS-MOTION FOR SUMMARY JUDGMENT** |
| CHEYENNE RIVER SIOUX TRIBE, | |
| Plaintiff-Intervenor, | |
| v. | |
| U.S. ARMY CORPS OF ENGINEERS, | |
| Defendant-Cross Defendant, | |
| and | |
| DAKOTA ACCESS, LLC, | |
| Defendant-Intervenor-Cross Claimant. | |

# TABLE OF CONTENTS

I.     INTRODUCTION ..........................................................................................................1

II.    FACTUAL AND PROCEDURAL BACKGROUND.......................................................2

    A.    THE CORPS' EFFORTS TO CONSULT WITH OGLALA ..................................2

    B.    THE CORPS' REMAND ANALYSIS....................................................................4

    C.    PROCEDURAL BACKGROUND...........................................................................5

III.   ARGUMENT...................................................................................................................6

    A.    OGLALA SIOUX'S PRE-REMAND CLAIMS ARE UNSUPPORTED IN
            BOTH FACT AND LAW, BUT, EVEN IF THE CORPS' PRE-REMAND
            ANALYSIS WERE DEFICIENT IN CONSIDERING OGLALA'S
            WATER INTAKES, THE CORPS CORRECTED ANY SUCH
            DEFICIENCY DURING REMAND .......................................................................6

          1.     The Mni Wiconi Act does not impose any relevant trust duty upon
                the Corps ....................................................................................................6

          2.    The Corps' approvals 205 miles upstream of Oglala's water intakes
                do not breach any conceivable trust duty to Oglala....................................8

           3.    Oglala's argument that the Corps failed to consider Oglala's water
                intakes prior to remand is, at most, harmless error because the Corps
                considered the water intakes in the remand process ...................................11

          4.    The Corps' efforts to consult with Oglala prior to remand were
                sufficient .................................................................................................12

    B.    OGLALA'S CLAIMS REGARDING THE CORPS' REMAND
            ANALYSIS FAIL BECAUSE THE CORPS REASONABLY EXAMINED
             THE THREE ISSUES REMANDED BY THE COURT .....................................14

          1.     The Corps reasonably consulted with Oglala regarding the remand ........14

          2.    The Corps' risk assessment was reasonable ............................................16

          3.    The Worst Case Discharge analysis was entirely proper, in part
                because the Corps reasonably considered the EarthFax report
                submitted by Oglala, which confirms that the Corps adopted a
                conservative approach to analyzing spill risk ............................................16

4.      The Spill Model Report's modeling of low-possibility spills for ten days was both conservative and reasonable because: (1) hydrocarbons evaporate and decay; (2) mitigation would commence well before ten days; (3) any spill would be blocked by the Oahe Dam; and (4) any spill would not reach the depth of the Oglala water intakes ......................................................................................................17

5.      The Corps considered water quality impacts and concluded no EIS was needed ...............................................................................................21

IV.     CONCLUSION.......................................................................................................23

# TABLE OF AUTHORITIES

## Cases

*Cobell v. Salazar*,
573 F.3d 808 (D.C. Cir. 2009) ........................................................................ 7

*Commercial Drapery Contractors, Inc. v. United States*,
133 F.3d 1 (D.C. Cir. 1998) .......................................................................... 10

*Dep't of Transp. v. Pub. Citizen*,
541 U.S. 752 (2004) ...................................................................................... 13

*Duncan's Point Lot Owners Ass'n, Inc. v. FERC*,
522 F.3d 371 (D.C. Cir. 2008) ........................................................... 18, 19, 20

*Ill. Commerce Comm'n. v. Interstate Commerce Comm'n*,
848 F.2d 1246 (D.C. Cir. 1988) .................................................................... 12

*Powder River Basin Res. Council v. BLM*,
37 F. Supp. 3d 59 (D.D.C. 2014) .................................................................. 22

*Pub. Emps. for Envtl. Responsibility v. Hopper*,
827 F.3d 1077 (D.C. Cir. 2016) .................................................................... 12

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
205 F. Supp. 3d 4 (D.D.C. 2016) ..................................... 2, 4, 5, 13, 16, 21

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
255 F. Supp. 3d 101 (D.D.C. 2017) ................... 6, 8, 9, 14, 15, 16, 17, 18

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
301 F. Supp. 3d 50 (D.D.C. 2018) ................................................................ 12

*Theodore Roosevelt Conservation P'ship v. Salazar*,
616 F.3d 497 (D.C. Cir. 2010) ...................................................................... 10

*Transmission Access Policy Study Grp. v. FERC*,
225 F.3d 667 (D.C. Cir. 2000) ................................................................. 10, 11

*United States v. Jicarilla Apache Nation*,
564 U.S. 162 (2011) ........................................................................................ 6

*United States v. L.A. Tucker Truck Lines*,
344 U.S. 33 (1952) ........................................................................................ 13

*United States v. Navajo Nation*,
537 U.S. 488 (2003) ........................................................................................ 6

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
435 U.S. 519 (1978) ............................................................................. 13, 21, 22

*Wildearth Guardians v. Jewell*,
738 F.3d 298 (D.C. Cir. 2013) ...................................................................... 18

**Statutes**

Pub. L. No. 516, 102 Stat. 2566 (1988) ............................................................................................ 6

# I.   INTRODUCTION

The Oglala Sioux Tribe Reservation is located in southwestern South Dakota.  It does not border the Missouri River, and the intakes for its water system are located 205 miles downstream of the point where the Dakota Access Pipeline crosses the Missouri River.

At this late stage in the case, Oglala for the first time pursues several claims challenging actions taken by the U.S. Army Corps of Engineers prior to this Court's denial in large part of motions for summary judgment brought by the Standing Rock, Cheyenne River, and Yankton Sioux Tribes.  These pre-remand claims assert that the Corps' breached an alleged trust duty to provide Oglala with clean water and failed to consult with Oglala prior to remand.  But Oglala identifies no trust duty to provide clean water.  Nor does Oglala establish that the Corps' actions relating to the Lake Oahe crossing breached any conceivable trust duty.  Moreover, the Corps met any duty to consult with Oglala prior to remand and cured any failure to adequately consult with Oglala during remand.  Oglala's pre-remand claims fail because the Corps examined the risk that a large, low-possibility oil spill poses to Oglala and reasonably determined that a pipeline operational failure is not likely to impact, let alone significantly impact, the Oglala intakes.

Oglala also makes several claims challenging the Corps' analysis of the narrow set of issues remanded by the Court.  Oglala again asserts that the Corps failed to adequately consult with it and challenges the portion of the Corps' remand analysis modeling a worst case discharge.  Oglala's post-remand claims fail for much the same reasons as its pre-remand claims.  The Corps had no duty to consult with Oglala on remand, but nonetheless reasonably used the Court's remand order to guide its engagement with Oglala.  Moreover, the Corps' analysis of a worst case discharge was conservative because: 1) a substantial portion of spilled hydrocarbons

would evaporate or decay; 2) any oil that reached Oahe Dam would float at or near the surface of the water rather than pass through water intakes located 140-feet below the lowest recorded depth of Lake Oahe; and 3) any spill would be mitigated well before it could conceivably travel the 205 miles to Oglala's intakes.  Simply put, the Corps' remand analysis confirmed that the Corps reasonably determined that even if a low-possibility oil spill occurs, it would not impact Oglala's water intakes.  The Corps therefore respectfully submits that this Court should grant the Corps' motion for summary judgment and deny Oglala's motion for summary judgment.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     The Corps' efforts to consult with Oglala

As this Court previously noted, the Corps reached out to many tribes in 2015 seeking their comments regarding portions of the Dakota Access Pipeline crossings within the Corps' jurisdiction.  *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 205 F. Supp. 3d 4, 15-16 (D.D.C. 2016).  The Corps specifically "request[ed Oglala's] engagement and/or comments by September 30, 2015."  Letter from Col. Henderson to President Yellowbird Steele (Sep. 3, 2015), USACE69608.  Many tribes met with the Corps or responded to the Corps' request prior to the Corps completing its Environmental Assessment ("EA") for Lake Oahe in July 2016.  *See* List of Tribes (Apr. 1, 2016), USACE66086 (listing 8 tribes).  Oglala did not.  Oglala first sought to engage with the United States regarding the pipeline on September 25, 2016—one month after the Environmental Assessment was issued.  Letter from President Yellowbird Steele (Sept. 25, 2016), RAR10912-24; ECF No. 434-2 at 15-16.  Where tribes engaged with the Corps, the Corps required Dakota Access to reroute pipeline segments in response to comments from the Lower

Sioux Indian Community and the Osage Nation.  Letter from J. Rodgers, Osage, to B. Vollman,

Corps (Mar. 8, 2016), USACE53; Mem. for Record (July 25, 2016), USACE67371,

USACE67374 (Upper Sioux survey and reroute).  And while the Court remanded three narrow

issues to the Corps in response to Standing Rock's and Cheyenne River's Motions for Summary

Judgment, Oglala did not file a Complaint until February 2017 and did not move for either a

preliminary injunction or summary judgment.  *See Standing Rock Sioux Tribe v. U.S. Army

Corps of Eng'rs*, 2019 U.S. Dist. LEXIS 4420, at *11 (D.D.C. Jan. 10, 2019).

Following the Court's remand of three narrow issues to the Corps, the Corps wrote letters

to Oglala seeking information regarding the remand issues, including potential hunting and

fishing impacts, and stating that the Corps would determine next steps after receiving that

information.  Letter from Col. Hudson to President Weston (Sept. 25, 2017), RAR13328-29;

Letter from Col. Hudson to President Weston (Nov. 27, 2017), RAR11999.  Oglala's response

generally deferred to Standing Rock and Cheyenne River on issues relating to hunting and

fishing because those tribes' reservations "border Lake Oahe."  Letter from President Weston to

Col. Hudson (Dec. 20, 2017), RAR10909-10.  After receipt of Oglala's letter, the Corps asked

for additional information regarding Oglala's hunting, fishing, and cultural practices.  Letter

from Col. Hudson to President Weston (Mar. 30, 2018), RAR4911.

Oglala responded by identifying three primary concerns, only two of which could

conceivably be within the remand analysis: (1) Oglala was not listed as an authority to be

contacted in the event of a spill; and (2) the Mni Wiconi Intake was not on the list of water

intakes downriver of the crossing.  Letter from President Weston to Col. Hudson (Apr. 20, 2018),

RAR3428-29.  The Corps determined that a spill would not cause significant impacts.  Mem. for

Record (Aug. 31, 2018), RAR1-2; Review of Potential Envtl. Effects of Oil Releases on

Downstream Receptors (June 2018), RAR2848.  Nonetheless, the Corps added Oglala to the list

of authorities to be contacted in the event of a spill.  Review and Analysis of Tribes'

Submissions (Aug. 31, 2018), RAR276; Email from J. Ames to J. Hughes (June 7, 2018),

RAR3107.  And the Corps added the Mni Wiconi Intake to the list of downriver intakes, noting

that it is 205 miles from the Lake Oahe crossing and that eight other intakes are located between

those two points.  Mem. for Record at RAR92.

Oglala also provided a "Preliminary Evaluation of Dakota Access Pipeline Emergency

Response Plans" to the Corps on April 18, 2018.  RAR3430.  That evaluation acknowledged that

Oglala's reservation is located in "southwestern South Dakota" and that the water intakes that

serve Oglala's reservation are located approximately 205 miles downstream of the Lake Oahe

crossing.  *Id*. at RAR3430-31.  Oglala's analysis highlighted the estimate "that <u>at least</u> 1 hour of

time will be required after a spill begins" for a response contractor to "be enroute [sic] to the spill

site" and that it would take a number of hours to transport spill-response equipment to the Lake

Oahe crossing.  *Id*. at RAR3432-33.

The Corps and Oglala held a meeting in June 2018 wherein Oglala made a presentation to

the Corps on water-quality issues.  Oglala Sioux Tribe Meeting with U.S. Army Corps of Eng'rs

(June 1, 2018), RAR3172.

### B.      The Corps' remand analysis

In addressing the three remand issues, the Corps reviewed the information it already had

in its possession from the original administrative records, considered all of the information it

received from Oglala, the other Plaintiff tribes, and Dakota Access, and conducted additional

research in response to that information.  Mem. for Record at RAR1-140; Review and Analysis

of Tribes' Submissions at RAR141-280.  Ultimately, the Corps determined that Oglala's water

intakes "are not anticipated to be affected by even a worst-case unmitigated release." *Id.* at

RAR278.[1]  The Corps based this analysis on: (1) Oglala's intakes being located 205 miles

downstream of the Lake Oahe crossing; (2) Oahe Dam's location between the crossing and water

intakes; and (3) modeling showing that oil floats well above the level of both the Oahe Dam

intakes and the Oglala intakes.  *Id.*  In other words, the Corps determined that even if the pipeline

experienced a worst-case spill into Lake Oahe and no one took any action to clean up the spilled

oil, Oglala's water intakes still would not be impacted.

### C.     Procedural Background

Oglala "waited to file their initial Complaint until February 2017."  *Standing Rock Sioux*

*Tribe v. U.S. Army Corps of Eng'rs*, 2019 U.S. Dist. LEXIS 4420, at *11 (D.D.C. Jan. 10, 2019).

It then sought to amend its original complaint after remand.  *Id.* at *7.  The Court denied that

motion, holding that amendment would be futile.  *Id.*  In so holding, the Court noted that once it

"granted summary judgment to the Corps on most claims while remanding others, moreover, it

fully expected that only the remanded claims would remain to be decided.  While . . . the Court

permitted amendment following remand, this was simply for Plaintiffs to refine any claims

relating to remand, not to return to the starting blocks."  *Id.* at *11.

---

[1] An unmitigated release is a hypothetical, modeled spill scenario where no response efforts are
taken to contain or collect the release.  Evaluation of Hydrocarbon Releases into Lake Oahe
Modeling (Feb. 12, 2018), RAR8746.

### III.   ARGUMENT

**A.   Oglala Sioux's pre-remand claims are unsupported in both fact and law, but, even if the Corps' pre-remand analysis were deficient in considering Oglala's water intakes, the Corps corrected any such deficiency during remand**

#### 1.   The Mni Wiconi Act does not impose any relevant trust duty upon the Corps

Oglala asserts that the Corps breached a trust duty to Oglala that was imposed upon the United States by the Mni Wiconi Act.  ECF No. 434-2 at 11-16.  Oglala's argument fails because the Act imposed no relevant trust duty upon the Corps.  And even if Oglala was correct that the Act imposes upon the United States a trust duty to provide clean water to Oglala, the Corps did not violate that duty by permitting the pipeline to cross under Lake Oahe 205 miles upstream of Oglala's intakes.  Oglala's claim should be rejected because Oglala has failed to establish that any Corps decision relating to the Lake Oahe crossing compromises Oglala's water quality.

As this Court previously noted "'[t]he trust obligations of the United States to the Indian tribes are established and governed by statute rather than the common law.'"  *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 143 (D.D.C. 2017) ("*Standing Rock IV*") (quoting *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 165 (2011)). "To bring a breach-of-trust claim, the Tribe 'must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties.'"  *Id*. (quoting *United States v. Navajo Nation*, 537 U.S. 488, 506 (2003)).  Because the United States discharges its general trust responsibility by complying with general statutes and regulations, analysis of any specific trust duty must therefore focus on Congress's express acceptance of responsibilities.  *Id*. at 144 (citations omitted); *Jicarilla*, 564 U.S. at 177.  Oglala must identify a "specific provision creating fiduciary or trust duties that the Corps violated."  *Standing Rock IV*, 255 F. Supp. 3d at 145.

Oglala's contention that the Mni Wiconi Act imposed trust duties on the Corps relating to Corps approvals at issue does not withstand scrutiny. Oglala's argument is based upon an act that is titled "An Act to authorize construction of the Mni Wiconi Rural Water Supply Project, and for other purposes." Mni Wiconi Project Act of 1988, 100 Pub. L. No. 516, 102 Stat. 2566 ("Mni Wiconi Act"). While Oglala is correct that the Mni Wiconi Act identifies a trust duty, it overstates the scope of that duty. The Act provides that "the United States has a trust responsibility to ensure that adequate and safe water supplies are available to meet the economic, environmental, water supply, and public health needs of the Pine Ridge Indian Reservation." *Id.* § 2(a)(4). The Act explicitly directs and funds the Secretary of the Interior "to plan, design, construct, operate, maintain, and replace a municipal, rural, and industrial water system . . . ." *Id*. § 3(a). But even Congress' direction to maintain the water system is cabined by limited Congressional appropriations. *Id*. § 10(a)-(b) (providing funding for both the construction and maintenance of the water system); *Cobell v. Salazar*, 573 F.3d 808, 811 (D.C. Cir. 2009) ("Congress's limited appropriation undercut any 'mandate to indulge in cost-unlimited accounting—in fact, [it] suggest[ed] quite the opposite.'") (citation omitted). So the Department of the Interior may have breached a trust duty if it failed to build the water system. *See* Mni Wiconi Act § 3. Oglala's suggestion, ECF No. 434-2 at 11-16, that the Act imposes additional trust duties is simply not supported by the statutory language. For example, by requiring submission of recommendations "for financing and implementing mitigation plans for fish and wildlife losses incurred as a result of the construction and operation of the Oahe Dam Reservoir" to Congress, the Mni Wiconi Act does not support finding a related trust duty. Mni Wiconi Act § 6(b). To the contrary, by explicitly addressing fish and wildlife issues regarding Oahe Dam in

a manner that limits agency responsibilities to making recommendations for mitigating losses

from the dam's construction, Congress suggested the opposite of a perpetual trust obligation. *Id.*

Critically, the Mni Wiconi Act imposes no duty on any federal agency to eliminate all

conceivable risks, however slight, posed by federal actions hundreds of miles upstream of the

water system. Simply put, the Corps has not permitted an oil spill or any degradation of Oglala's

water. Oglala does not, and cannot, establish that its water has been rendered unsafe by a non-

existent oil spill. Nor can it sustain a claim that it can premise a breach of trust claim with

respect to the Oahe crossing on the Mni Wiconi Act.

> **2.      The Corps' approvals 205 miles upstream of Oglala's water intakes
> do not breach any conceivable trust duty to Oglala**

Even if the Mni Wiconi Act imposed a duty to make adequate and safe water available to

Oglala, Oglaga does not, and cannot, establish that Corps approvals 205 miles upstream breached

any such duty. First, as this Court held, the Lake Oahe Environmental Assessment "reasonably

gives the necessary content to its top-line conclusion that the risk of a spill is low." *Standing

Rock IV*, 255 F. Supp. 3d at 127. The risk that a low possibility spill might impact Oglala's

intakes is further reduced by a number of factors.

In the unlikely event of a spill, hydrocarbons would evaporate or be mitigated well before

reaching Oglala's water intakes. Review and Analysis of Tribes' Submissions at RAR278. And

the fact that hydrocarbons remain close to the surface means that any unmitigated, unevaporated

hydrocarbons would either be stopped by the Oahe Dam or pass well above the Oglala intakes.

*Id.* In short, the Corps' remand analysis makes clear that it is effectively impossible for Ogala's

water intakes to be impacted by such a spill. Oglala's breach of trust claim fails because no

Corps action has threatened, much less impacted, Oglala's water.

Oglala's water intakes sit approximately 205 miles downstream of the Lake Oahe crossing.  Mem. for Record at RAR92; ECF No. 434-2 at 4-5.  If the Oahe Dam did not exist, it would take many days for an unmitigated, unimpeded oil spill to reach the water surface above Oglala's intakes.  *See* Mem. for Record at RAR60 (hypothetical worst case spill would travel 65 miles in ten days).  Hydrocarbon concentrations would naturally decrease in the days following a spill because hydrocarbons evaporate or decay.  *Id*. at RAR28 (in some model runs, 40-45% of any oil spilled in the above-ground scenarios studied would evaporate within one day); Evaluation of Hydrocarbon Releases into Lake Oahe Modeling at RAR8876, RAR8907 (summaries of mass balances for different scenarios identifying percentages of oil that evaporate and degrade, among other things, in first ten days of an unmitigated spill).  While Oglala appears to suggest that hydrocarbon concentrations would continue to increase in the days following a spill, ECF No. 434-2 at 21-22 (claiming that the model "predicts a maximum condition" of various contaminants "at the end of the model period"), the model predicts something else—that hydrocarbon concentrations would decrease over time.  *E.g*., Evaluation of Hydrocarbon Releases into Lake Oahe Modeling at RAR8883-86, RAR8892-95, RAR8901-04, RAR8913-16 (displaying lower maximum concentrations farther downstream of the Lake Oahe crossing). This natural evaporation and decay decreases the risk posed by even an unmitigated spill.

Further, even though the Corps adopted the extremely conservative assumption that any spill into Lake Oahe would not be mitigated, the modeling still establishes that Oglala's intakes would not be impacted.  Modeling establishes that the Oahe Dam would be a barrier to oil because oil floats at or near the water's surface.  Review and Analysis of Tribes' Submissions at RAR278 ("[M]aximum predicted concentrations of hydrocarbons in the water column for a hypothetical worst-case release were within 5 m of the surface.").  Concentrations decrease

rapidly, such that at depths of more than 10 meters, "near zero values" of hydrocarbons are predicted.  *Id.*  The discharge pipes that allow water to flow downstream from Lake Oahe are more than 140 feet below Lake Oahe's "lowest recorded water depth."  Mem. for Record at RAR94.  Therefore, "[a]ny released hydrocarbons that reach the dam would need to mix" so that they penetrate "at least 142 feet below the lake surface."  *Id.*  To be clear, the Oahe Dam's discharge pipes are more than 110 feet below the water level at which hydrocarbons are predicted.

Oglala's challenge to the Corps' conclusion that the Oahe Dam presents a barrier to oil flowing downstream of the dam is based on extra-record evidence and should be stricken.  ECF No. 434-2 at 27 (unquantified 2010 description of water at Oahe Dam as turbulent).  "The APA limits judicial review to the administrative record 'except when there has been a strong showing of bad faith or improper behavior' or when the record is so bare that it prevents effective judicial review.'"  *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 514 (D.C. Cir. 2010) (quoting *Commercial Drapery Contractors, Inc. v. United States*, 133 F.3d 1, 7 (D.C. Cir. 1998)).  Oglala had ample opportunity to attempt to submit materials to the Corps for consideration both before and after remand and can offer no justification for its attempt to introduce the evidence now.  *See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 2019 U.S. Dist. LEXIS 77341, at *17-18 (D.D.C. May 8, 2019) (resolving administrative record disputes).  But even if the Court were to consider Oglala's extra-record evidence, it establishes, at most, that the water at the Oahe Dam is somewhat turbulent.  At no point has Oglala provided comments to the Corps indicating, much less establishing, that turbulence at the Oahe Dam would cause oil to enter water intakes that are 140 feet below the lake's lowest recorded depth.  Regardless, the Corps' determination that oil floating near the surface is unlikely to pass Lake

Oahe is entitled to deference.  *See Transmission Access Policy Study Grp. v. FERC*, 225 F.3d 667, 736 (D.C. Cir. 2000).

Perhaps most importantly, the risk that the unevaporated, not decayed portion of any spill would travel approximately 200 miles downriver, pass Oahe Dam through water intakes located over 100 feet below the maximum modeled depth of hydrocarbons, travel the remaining five miles to Oglala's water intakes, and then be distributed without treatment[2] to consumers is even further reduced by the fact that mitigation would commence within hours.  The Corps imposed easement conditions on Dakota Access that effectively ensure that any spill would be promptly mitigated.  *See* DAPL Easement (Dec. 3, 2016), ESMT42 (Easement Condition 35); Pages 17-20, below.  And Oglala's own comments make clear that mitigation efforts would start the day of a spill, rather than ten days after a spill.  Preliminary Evaluation of Dakota Access Pipeline Emergency Response Plans at 3-4 (April 18, 2018), RAR3432-33.

Oglala identifies no trust duty that the Corps violated.  The Corps considered Oglala's intakes and reasonably concluded that they "are not anticipated to be affected by even a worst-case unmitigated release."  Review and Analysis of Tribes' Submissions at RAR278.  In sum, even if the Corps owes a trust duty to provide clean water to Oglala, it has not violated such a duty here.

**3.      Oglala's argument that the Corps failed to consider Oglala's water intakes prior to remand is, at most, harmless error because the Corps considered the water intakes in the remand process**

Oglala is incorrect, ECF No. 434-2 at 12, that the Corps failed to consider Oglala's "Mni Wiconi Rights" prior to remand because the Corps actually considered "water intakes located

_____

[2] The Mni Wiconi Act authorized and funded water treatment facilities.  Mni Wiconi Act §§ 3(a)(1), 3(a)(4), 4(c)(1).

downstream from the Missouri River and Lake Oahe crossings" in its Environmental

Assessment.  USACE71262.  The Corps considered such risks, determining that "in the unlikely

event of a pipeline leak, response measures to protect the users of downstream intakes will be

implemented to minimize risks to water supplies."  *Id.*  That conclusion is entitled to deference,

and Oglala has not and cannot show that the Corps was arbitrary or capricious.

Regardless, Oglala's argument fails because, as Oglala recognizes, the Corps considered

the water system on remand.  ECF No. 434-2 at 26-28.  It is nearly impossible for Oglala's water

intakes—205 miles downstream from the Lake Oahe crossing—to be impacted by any oil spill.

*See* pages 8-11, above; pages 17-20, below.  Any failure to consider Oglala's water intakes prior

to remand is harmless error because the Corps' explicit consideration of Oglala's intakes during

remand cured any prejudice.  *See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,* 301

F. Supp. 3d 50, 73-74 (D.D.C. 2018); *Pub. Emps. for Envtl. Responsibility v. Hopper*, 827 F.3d

1077, 1087 (D.C. Cir. 2016) (no prejudice from Coast Guard's failure to consider alternative

locations for a wind farm that Interior Department rejected as inferior); *Ill. Commerce Comm'n.*

*v. Interstate Commerce Comm'n*, 848 F.2d 1246, 1257 (D.C. Cir. 1988) (order to prepare EIS or

EA on remand would be meaningless because commission did not ignore environmental

consequences).  Even if the Corps' initial analysis of water intakes was inadequate, which it was

not, the Corps has now explicitly analyzed the theoretical impact of a low-possibility leak on

water intakes more than 200 miles downriver.  Oglala's claim should therefore be dismissed.

### 4.      The Corps' efforts to consult with Oglala prior to remand were sufficient

Oglala's argument that the Corps' easement analysis was flawed because the Corps failed

to consult with Oglala does not withstand scrutiny.  Oglala, like the other tribes, fails to identify

a duty to consult or how the Corps breached any duty to consult prior to remand.  ECF No. 434-2

at 15-16.[3]  Oglala, unlike other tribes, failed to respond to the Corps' requests for comments until "[a]fter the issuance of the EA" in July 2016.  *Id.* at 16.[4]

The Supreme Court has long held that a plaintiff must participate in an agency's administrative decision-making process in order to later advance a claim in federal court.  *See Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 553–54 (1978); *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764-65 (2004).  This long-standing rule is based on "[s]imple fairness to those who are engaged in the tasks of administration, and to litigants," and "requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice."  *United States v. L.A. Tucker Truck Lines*, 344 U.S. 33, 37 (1952).  It is therefore "incumbent upon intervenors who wish to participate to structure their participation so that it is meaningful, so that it alerts the agency to the intervenors' position and contentions."  *Vt. Yankee*, 435 U.S. at 553.  Allowing a plaintiff to disregard the administrative process but then succeed in litigation, the Supreme Court cautioned, could incentivize "making cryptic and obscure reference" and then faulting an agency for not addressing them— undermining the goals of the administrative process.  *Id.* at 553-54.

As Oglala admits, it did not engage in the consultation process until "[a]fter the issuance of the EA."  ECF No. 434-2 at 16.  Other tribes engaged in a timely manner.  And the Corps required Dakota Access to reroute pipeline segments in response to comments from the Lower Sioux Indian Community and the Osage Nation.  Letter from J. Rodgers, Osage, to B. Vollman,

---

[3] The Corps hereby incorporates the portions of its Oppositions to Standing Rock's, Cheyenne River's, and Yankton's motions for summary judgment addressing the alleged duty to consult, which are also being filed today.

[4] The Corps first reached out to Oglala on October 24, 2014.  DAPL Geotech PA Information Letter (Oct. 24, 2014), USACE67130.

Corps (Mar. 8, 2016), USACE53; Mem. for Record (July 25, 2016), USACE67371,

USACE67374 (Upper Sioux survey and reroute).  The public administrative process is discussed

in depth in Federal Defendants' prior motion for summary judgment and that discussion is

incorporated by reference herein.  ECF No. 287 at 2-8.  Regardless of any alleged failure to

consult prior to issuing the easement, the Corps consulted with Oglala regarding its water intakes

throughout the remand process, including a meeting on June 1, 2018 in Rapid City, South

Dakota.

> **B.      Oglala's claims regarding the Corps' remand analysis fail because the Corps reasonably examined the three issues remanded by the Court**

> **1.      The Corps reasonably consulted with Oglala regarding the remand**

As set forth in its oppositions to Standing Rock's, Cheyenne River's, and Yankton's

motions for summary judgment, the Corps tailored its request for information from the tribes to

the Court's remand.  That remand order held that the Corps "failed to adequately consider the

impacts of an oil spill on Standing Rock's fishing and hunting rights and on environmental

justice." *Standing Rock IV*, 255 F. Supp. 3d at 147.  The Corps therefore reasonably sought

information from Oglala regarding "hunting and fishing activities" and "studies or reports on

game species" and "distinct cultural practices of the Tribe that are connected to Lake Oahe."

Letter from Col. Hudson to President Weston (Sept. 25, 2017), RAR13328.  Charged with

examining the impacts of an oil spill on tribal rights and practices, the Corps sought information

about the source that could reasonably provide information regarding those practices—the tribes.

The Court also held that the Corps "did not sufficiently weigh the degree to which the

project's effects are likely to be highly controversial in light of critiques of its scientific methods

and data." *Standing Rock IV*, 255 F. Supp. 3d at 147.  In other words, the Court clearly tied the

Corps' analysis of whether the project was highly controversial to the tribes' critiques. *Id*. *See*

also, *id.* at 118 (citing EarthFax report), 125 (noting various critiques in EarthFax Report), 129 (noting that expert reports submitted after the EA, but before February 2017, including EarthFax Report, critique the Corps' analysis).  The Corps reasonably asked Oglala to confirm that the December 2, 2016 EarthFax report was the only report that it had submitted.  Letter from Col. Hudson to President Weston (Sept. 25, 2017), RAR13328-29.  Just as the Corps need not go to Dakota Access for information about tribal cultural practices, the Corps need not go to Oglala to critique Oglala's own critique.  The Corps instead reasonably sought a response to the tribes' critiques from Dakota Access.  Letter from K. Fink, Army to C. Sonneborn, ETP (Aug. 24, 2017), RAR13605-06.

Notably, the Corps explicitly stated that it would "determine the next steps in the remand process and whether we need any additional information from your tribe after we receive the requested information and documentation."  Letter from Col. Hudson to President Weston (Sept. 25, 2017), RAR13329.  Whereas Dakota Access began responding substantively to the Corps' request within weeks, *compare* Letter from K. Fink, Army to C. Sonneborn, ETP (Aug. 24, 2017), RAR13605 *with* Meeting Minutes (Sept. 13, 2017), RAR13360, Oglala responded to the Corps' September 25, 2018 information request by generally deferring to Standing Rock and Cheyenne River because those tribes' reservations "border Lake Oahe."  Letter from President Weston to Col. Hudson (Dec. 20, 2017), RAR10909-10.  The Corps then demonstrated its commitment to consultation by providing Oglala with information on spill response planning and following up with Oglala to seek "additional information" regarding Oglala's hunting, fishing, and cultural practices.  Letter from Col. Hudson to President Weston (Feb. 23, 2018), RAR6597; Letter from Col. Hudson to President Weston (Mar. 30, 2018), RAR4911.  And the Corps

incorporated Oglala's comments and fully addressed Oglala's concerns regarding an oil spill reaching Oglala's water intakes.

### 2.      The Corps' risk assessment was reasonable

Oglala "adopts" Standing Rock's arguments regarding the Corps' risk assessment.  ECF No. 434-2 at 17.  The Corps hereby incorporates its response to those arguments.

### 3.      The Worst Case Discharge analysis was entirely proper, in part because the Corps reasonably considered the EarthFax report submitted by Oglala, which confirms that the Corps adopted a conservative approach to analyzing spill risk

Oglala similarly adopts Standing Rock's arguments regarding the worst case discharge analysis.  ECF No. 434-2 at 17-18.  Oglala's adoption of Standing Rock's arguments relating to the Corps' worst-case discharge analysis, *id.*, is unavailing for the reasons set forth in the Corps' response to that motion.

Moreover, Oglala's attempt to bolster Standing Rock's arguments does not withstand scrutiny.  Oglala asserts that the Corps "falsely claim[ed]" that a June 1, 2018 presentation made by Oglala's expert, EarthFax, suggested a lower worst-case discharge into Lake Oahe than the Corps actually studied.  *Id.* at 17-19.  Oglala confusingly states that the EA evaluated spill volumes of up to 10,000 barrels but that EarthFax was comparing spill volumes of 4,620 to the "lower volumes in the EA."  *Id.*[5]  But the EarthFax presentation stated that "[a]ssuming 1 mile of pipeline drains during a spill, 2,950 to 4,620 bbl of crude oil would drain to the river/lake."  DAPL Envtl. & Emergency Resp. Doc. Review PowerPoint Presentation (June 1, 2018), RAR3124.[6]  Rather than model the narrow range of volumes EarthFax suggested, the

---

[5] The Corps notes that its analysis in support of its EA—as set forth in the documents Oglala cites—actually considered releases of much large quantities of oil.  Envtl. Assessment (July 2016), USACE71270-71; HDD Execution Plan of Procedure (Aug. 18, 2015), USACE74725.

[6] As set forth in the environmental assessment, "[d]ue to anti-siphoning effects, a full gravity

actual spill model studied more conservative releases.  Evaluation of Hydrocarbon Releases into

Lake Oahe Modeling at RAR8747.  Put another way, the spill model adopted a number of

conservative assumptions that led it to analyze a worst case discharge almost three times larger

than the largest discharge suggested by Oglala.

Oglala argues that Earthfax did not label its analysis as a "Worst Case Discharge."  ECF

No. 434-2 at 17.  While this is correct, Earthfax was clearly providing a "[s]pill [v]olume

[e]stimate[]."  Letter from EarthFax to President Yellowbird Steele (Dec. 2, 2016), ESMT624.

In so doing, Earthfax roughly adhered to the methodology of the PHMSA-compliant spill model,

noting first the flow rate and the line draining, and factoring in the role of valves.  *Id.* at

ESMT626.  Earthfax did not adopt a qualitative approach to determining a "Worst Case

Discharge" as now advocated by Plaintiffs.  *Cf.* ECF No. 433-2 at 21.

> **4.      The Spill Model Report's modeling of low-possibility spills for ten days was both conservative and reasonable because: (1) hydrocarbons evaporate and decay; (2) mitigation would commence well before ten days; (3) any spill would be blocked by the Oahe Dam; and (4) any spill would not reach the depth of the Oglala water intakes**

Oglala's primary critique of the remand analysis appears to be that the spill model

simulations modeled only a ten-day period following a low-possibility oil spill.  ECF No. 434-2

at 19-23.  Oglala contends that the worst-case spill modeling is inadequate because the model

indicates that such a spill, if unmitigated, would still be moving downstream toward Oglala's

water intakes after ten days.  *Id.*  And as Oglala recognizes, the model indicates that a worst-case

spill might reach approximately 65 miles downstream of the Lake Oahe crossing if unmitigated

for ten days.  *Id.*; Mem. for Record at RAR60 ("[T]he farthest that a hypothetical, worst-case,

---

drain down between valve locations on either side of the river crossings rarely occurs."  Envtl.
Assessment (July 2016), USACE71270.

unmitigated release would travel after 10 days (based on 1,160 stochastic model runs) is approximately 65 miles downstream from the Lake Oahe crossing.").  Oglala falls far short of establishing that there is even a remote possibility that such a low-probability spill would reach Oglala's water intakes.  And Oglala never submitted any models or studies supporting its claim that an unmitigated oil spill would still be moving toward Oglala's water intakes after ten days, much less that such a spill would reach Oglala.  "'The NEPA process involves an almost endless series of judgment calls,' and 'the line-drawing decisions necessitated by the NEPA process are vested in the agencies, not the courts.'"  *Wildearth Guardians v. Jewell*, 738 F.3d 298, 312 (D.C. Cir. 2013) (quoting *Duncan's Point Lot Owners Ass'n, Inc. v. FERC*, 522 F.3d 371, 376 (D.C. Cir. 2008)).  The Corps' use of a spill model that assumes that a low-possibility spill will be unmitigated for ten days was particularly conservative and wholly appropriate, as it is extraordinarily unlikely that any oil spill would approach, much less impact, Oglala's intakes.

First, the spill model's duration is reasonable because the model predicted that a substantial portion of any released oil would either evaporate or decay within ten days.  Mem. for Record at RAR28.  Indeed, 40-45% of any oil spilled in the above-ground scenarios studied would evaporate within one day.  *Id*; Evaluation of Hydrocarbon Releases into Lake Oahe Modeling at RAR8876, RAR8907 (summaries of mass balance for different modeling scenarios setting forth percent of oil that would evaporate or decay).

Second, the spill model's assumption that a spill would be unmitigated for ten days was extremely conservative and reasonable because mitigation would commence well before the end of the ten-day period.  As Colonel Hudson stated:

> Dakota Access is committed to responding to a release within six hours.  For this
> model we assumed that there was no significant response for a 10-day period of
> time.  So instead of the six hours that the pipeline company says they'd be able to

> respond to, we assumed for modeling purposes that it would be 10 days before an
> effective response would be put in place.

Transcript of May 29, 2018 meeting, RAR1198.  As Oglala recognized, Dakota Access assured

the Corps that it would respond to a spill within six hours.  ECF No. 434-2 at 21 (citing

RAR1198).  Indeed, Oglala's own comments make clear that a response to the modeled spills

would take hours—not ten days.  Letter from R. White to President Weston (Apr. 18, 2018),

RAR1998-99, RAR2004.

Moreover, the Corps used easement conditions to ensure that Dakota Access would be

able to promptly respond to any spill.  The Final EA set forth "how [the] effects [of a spill]

would be mitigated and addressed."  Mem. for Record at RAR57.  The Corps, after consulting

with the Pipeline and Hazardous Materials Safety Administration, included conditions in the

easement that are explicitly designed to prevent the possibility that a spill would go unmitigated

for 10 days.  Email from S. Nanney, PHMSA (Oct. 25, 2016), ESMT1173-90.  Easement

Condition 4 requires Dakota Access to "follow response, containment, mitigation measures, and

cleanup measures described in" the projects Spill Prevention Control and Countermeasure Plan

and Stormwater Pollution Prevention Plan.  DAPL Easement at ESMT37.  Easement Condition

35 provides:

> Within 1 month following the pipeline becoming operational, the Grantee shall
> provide for an all-weather access and collection point downstream of the HDD
> crossing at Lake Oahe. The Grantee shall provide an equipment storage facility on
> non-federal lands that includes a fenced permanent storage area for winter and
> open water spill response equipment. The storage facility should be placed in a
> strategic location and near existing facilities that would support access to the
> water. . . . . The storage facility should contain sufficient response equipment at a
> minimum to mitigate an unintended worst case release for this Lake crossing.

*Id*. at ESMT42.  And Easement Conditions 33 and 34 required Dakota Access to conduct regular

patrols and exercises designed to, respectively, prevent and prepare for spills.  *Id*.  Relatedly,

Dakota Access's Facility Response Plan confirmed that Dakota Access complied with the easement conditions by staging spill response equipment near Cannon Ball, ND.  Facility Response Plan (Apr. 2017), RAR6465-66.  This spill equipment would be used to mitigate any spill well before ten days.  *Id*. at RAR6462-68, RAR6479-81.

Oglala's assertion that the Corps should have extended the modeling for as long as it might take for an unmitigated spill to reach Oglala's water intakes does not withstand scrutiny. After moving 65 miles in ten days, an unmitigated spill would have to travel an additional 150 miles to reach Oglala's water intakes.  Mem. for Record at RAR60.  In other words, Oglala's argument is predicated on the assumption that the modeled spills would be left unmitigated for more than 30 days.  Such an assumption finds no support in the record.  And Oglala points to no regulation or statute that required the Corps to extend the model as suggested by Oglala.  *See Ga. River Network v. U.S. Army Corps of Eng'rs*, No. 4:10-cv-267, 2012 U.S. Dist. LEXIS 37012, at *76-77 (S.D. Ga. Mar. 19, 2012) (Corps NEPA analysis reasonable despite not conducting the fishing study proposed by plaintiff).  The Corps' modeling of an unmitigated oil spill for ten days was more than reasonable.

Finally, even if some small portion of a spill continued downstream after ten days, it is extraordinarily unlikely that any such oil would reach Oglala's intakes.  As set forth above, "near zero values" of hydrocarbons are predicted below depths of ten meters.  Review and Analysis of Tribes' Submissions at RAR278.  Hydrocarbons are therefore unlikely to pass Oahe Dam because they would have to mix at least 142 feet below Lake Oahe's lowest recorded water level to reach the discharge pipes that allow water to flow downstream from Lake Oahe.  Mem. for Record at RAR94.  To the extent that Oglala's arguments rest upon the assumption that oil, after floating at the top of the water column for ten days, oil will behave differently and sink to the

depth of the Oahe Dam and water system intakes, ECF No. 434-2 at 26-27, Oglala's arguments

should be rejected because it failed to timely raise such concerns.  Regardless, Corps conclusions

are entitled to deference.  *Vt. Yankee*, 435 U.S. at 553.

In sum, the spill model's multiple conservative assumptions establish that the Corps'

conclusions—that Oglala's water intakes located 205 miles downstream of the Lake Oahe

crossing are unlikely to be impacted by any spill—are reasonable.

### 5.      The Corps considered water quality impacts and concluded no EIS was needed

Oglala is incorrect that the Corps "failed to consider an important aspect of the problem,"

namely, the water quality impacts of a "worst case discharge" oil spill.  ECF No. 434-2 at 26.

Oglala argues that the Spill Model Report and Downstream Receptor Report suggest that "a spill

could result in significant impacts" such that an EIS is required.  *Id.* at 23.  Oglala misreads these

documents, and improperly reads them in isolation.  The Corps' conclusions regarding water

quality and impacts of a "worst case discharge" were reasonable and no EIS was needed.

Oglala points to portions of the Spill Model Report that discuss potential impacts from a

"worst case discharge" including on vegetation, invertebrates, fish, and water quality.  *Id*. at 24.

Oglala is then critical of the Corps' conclusion such potential impacts were not "significant" as

the term is used in the NEPA context.  *Id.*; *cf.* Mem. for Record at RAR44.  Oglala

misunderstands the Spill Model Report and its purpose.  The Report was not intended to model

the expected or even likely impacts of the Corps' action.  Rather, the Report models "very low

probability spill events" that are "then used to identify even lower probability but credible 'worst

cases' (i.e., highly conservative subset of all modeled scenarios) as the basis for spill planning

and preparedness."  Evaluation of Hydrocarbon Releases into Lake Oahe Modeling at RAR8748-

49.  The Report makes clear that "the hypothetical releases modeled in spill trajectory modeling studies are in no way intended to predict a specific future event."  *Id*. at RAR8751.

Oglala also asserts that the Corps reached its conclusion regarding significance without properly discussing the Spill Model Report. ECF No. 434-2 at 24-25.  In fact, the Corps discussed the Spill Model Report at length.  The Remand document discussed the Spill Model results, Mem. for Record at RAR23-33, including potential impacts of the oil spills modeled on fish and wildlife including on hunting and fishing resources, including by discussing impacts associated with hydrocarbons in the water column, in sediments, on the water surface, and on the shoreline.  *Id*. at RAR33-39.  The Corps also described the likelihood of the type of spill identified in the Report, and the safety factors in place to prevent such a spill.  *See* Corps' Opposition to Standing Rock's Motion for Summary Judgment at 11-22 (Oct. 9, 2019).  As discussed above, the Corps concluded that "the chance of an oil spill at the Lake Oahe crossing is low and even if there were a spill, it would be of a small amount."  Mem. for Record at RAR19.

Finally, the Corps discussed how the Spill Model Report "assumed no response or mitigation of any kind for the entire model run."  *Id*. at RAR23.  In reality, ETP is required by federal law to have in place response plans and to mitigate any potential spills.  Thus, the Remand document observed that, "[i]n the event of a large rupture such as the ones modeled [in the Spill Model Report], the pipeline operator would work with others to respond promptly with response efforts. . . that would reduce the volume and therefore the downstream impacts described in the Spill Model Report and the Downstream Receptor report."  *Id*. at RAR42.  It was appropriate to consider this mitigation in the Corps' determination of whether its proposed action would have significant impacts.  *See, e.g.*, *Powder River Basin Res. Council v. BLM*, 37 F.

Supp. 3d 59, 82 (D.D.C. 2014) (discussion of mitigation supports agency's environmental review).

In light of the low risk of a spill and safety and mitigation measures in place, the Corps was reasonable to conclude that the impacts of its action were not so significant as to require an environmental impact statement. While Oglala focuses on the Spill Model Report's discussion of an unmitigated "worst case discharge," it is important to remember the Corps is not permitting a worst case discharge as modeled in the Spill Model Report and has taken steps to ensure that such a worst case discharge neither occurs nor remains unmitigated. Rather, the Corps is granting an easement for a portion of the pipeline to cross federal property. Therefore, that the Spill Report Model concludes an unmitigated "worst case discharge" would have significant environmental effects is not the equivalent of stating that the Corps' actions would ultimately have significant effects. The Corps considered modeled discharges and reasonably concluded that "the risk of an incident is low" and that any impacts would be minimal. Mem. for Record at RAR1, RAR44. Ultimately, the Corps was reasonable to conclude that there would be no significant impacts from its proposed action.

## IV.    CONCLUSION

The Corps respectfully submits that the Court should grant the Corps' motion for summary judgment because the Corps appropriately engaged with Oglala, appropriately considered the risk to Oglala from a low-probability oil spill, and reasonably concluded that water intakes located 205 miles from the Lake Oahe crossing were not threatened, much less impacted, by the any Corps' action.

Dated: October 9, 2019                    Respectfully submitted,

                                          JEAN E. WILLIAMS
                                          Deputy Assistant Attorney General

United States Department of Justice
Environment & Natural Resources Division

By: */s/ Matthew Marinelli*
REUBEN SCHIFMAN, NY BAR
MATTHEW MARINELLI, IL Bar 6277967
U.S. Department of Justice
Natural Resources Section
P.O. Box 7611
Benjamin Franklin Station
Washington, DC 20044
Phone: (202) 305-4224 (Schifman)
Phone: (202) 305-0293 (Marinelli)
Fax: (202) 305-0506
reuben.schifman@usdoj.gov
matthew.marinelli@usdoj.gov

ERICA M. ZILIOLI, D.C. Bar 488073
U.S. Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, DC 20044
Phone: (202) 514-6390
Fax: (202) 514-8865
Erica.Zilioli@usdoj.gov

*Attorneys for the United States Army Corps of Engineers*

OF COUNSEL:
MILTON BOYD
MELANIE CASNER
U.S. Army Corps of Engineers
Office of Chief Counsel
Washington, DC

## CERTIFICATE OF SERVICE

I hereby certify that on October 9, 2019, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will send notification of this filing to the

attorneys of record and all registered participants.

*/s/ Erica Zilioli*
Erica Zilioli