**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE, YANKTON SIOUX TRIBE; ROBERT FLYING HAWK; OGLALA SIOUX TRIBE, | Case No. 1:16-cv-1534-JEB (and Consolidated Case Nos. 16-cv-1796 and 17-cv-267) |
| Plaintiffs, | |
| and | |
| CHEYENNE RIVER SIOUX TRIBE, | **OPPOSITION TO PLAINTIFF STANDING ROCK SIOUX TRIBE'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT OF THE ARMY CORPS' CROSS-MOTION FOR SUMMARY JUDGMENT** |
| Plaintiff-Intervenor, | |
| v. | |
| U.S. ARMY CORPS OF ENGINEERS, | |
| Defendant-Cross Defendant, | |
| and | |
| DAKOTA ACCESS, LLC, | |
| Defendant-Intervenor-Cross Claimant. | |

## TABLE OF CONTENTS

Introduction ......................................................................................................... 1

background ......................................................................................................... 2

    I.      Factual and procedural background ............................................. 2

    II.     The Corps' actions on remand .................................................... 2

          A.     The Corps took a hard look at impacts on hunting and fishing ......................................................................... 2

          B.     The Corps took a hard look at environmental justice ............... 3

          C.     The Corps took a hard look at the "highly controversial" intensity factor ....................................................... 5

          D.     The Corps' consultation with Standing Rock. ......................... 7

Legal Standard ................................................................................................. 10

Argument ......................................................................................................... 11

    I.      The Corps complied with NEPA ............................................... 11

          A.     NEPA does not require analysis of a "worst case scenario"................. 11

          B.     The Corps properly considered Standing Rock's critique of the Corps' methods and data and reasonably concluded there was not sufficient scientific controversy that an EIS was required ......................................................... 13

          1.     The Corps' NEPA decision-making and methodological choices are subject to "extreme deference" ......................... 13

          2.     The Spill Model Report is methodologically sound and required by PHMSA regulation ............................... 14

          3.     The Corps Risk assessment was reasonable ........................... 21

          4.     The Corps' conclusion that there was not sufficient controversy and that an EIS was required was neither arbitrary nor capricious ........................................... 25

          C.     The Corps properly considered Environmental justice on remand......................................................... 28

    II.     The Corps' remand process was neither arbitrary nor capricious. The Corps reasonably tailored its remand analysis to match the Court's instructions .............................................................. 30

      A.      Standing Rock failed to identify any duty to consult.............................. 35

      B.      The Corps fulfilled any duty to consult with Standing Rock.................. 36

III.     Standing Rock's NHPA claims are moot, but even if they were not,
the Corps complied with the NHPA .................................................................... 39

      A.      Standing Rock's NHPA claims are moot................................................ 39

      B.      The Corps fully complied with the NHPA ............................................ 43

CONCLUSION......................................................................................................................... 45

## TABLE OF AUTHORITIES

Cases

*Ark Initiative v. Tidwell*,
  64 F. Supp. 3d 81 (D.D.C. 2014) .......................................................................................... 11

*Ark Initiative v. Tidwell*,
  816 F.3d 119 (D.C. Cir. 2016) ............................................................................................. 11

*Armstrong v. FAA*,
  515 F.3d 1294 (D.C. Cir.  2008) ..................................................................................... 40, 41

*Biodiversity Conservation All. v. U.S. Bureau of Land Mgmt.*,
  404 F. Supp. 2d 212 (D.D.C. 2005) ...................................................................................... 32

*Blue Ridge Envtl. Def. League v. NRC*,
  716 F.3d 183 (D.C. Cir. 2013) ............................................................................................. 31

*Bowman Transp., Inc. v. Ark.–Best Freight Sys., Inc.*,
  419 U.S. 281 (1974) .............................................................................................................. 11

*Bunker Ltd. P'ship v. United States*,
  820 F.2d 308 (9th Cir. 1987) ............................................................................................... 40

*Chem. Mfrs. Ass'n v. EPA*,
  28 F.3d 1259 (D.C. Cir. 1994) ................................................................................... 18, 19, 20

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
  467 U.S. 837 (1984) ......................................................................................................... 15, 16

*Cheyenne River Sioux Tribe v. Jewell*,
  205 F. Supp. 3d 1052 (D.S.D. 2016) .................................................................................... 36

*Christian Knights of the Ku Klux Klan Invisible Empire, Inc. v. D.C.*,
  972 F.2d 365 (D.C. Cir. 1992) ............................................................................................. 41

*Coal. on Sensible Transp., Inc. v. Dole*,
  826 F.2d 60 (D.C. Cir. 1987) ............................................................................................... 25

*Colo. River Cutthroat Trout v. Salazar*,
  898 F. Supp. 2d 191 (D.D.C. 2012) ...................................................................................... 28

*Comanche Nation of Okla. v. Zinke*,
  754 F. App'x 768 (10th Cir. 2018) ....................................................................................... 33

*Conservation Cong. v. U.S. Forest Serv.*,
  235 F. Supp. 3d 1189 (E.D. Cal. 2017) ................................................................................ 27

*Conservation Cong. v. U.S. Forest Serv.*,
  775 F. App'x 298 (9th Cir. 2019) ......................................................................................... 27

*Crenshaw Subway Coal. v. Los Angeles Cty. Metro. Transp. Auth.*,
  No. CV 11-9603 FMO, 2015 WL 6150847 (C.D. Cal. Sept. 23, 2015) ........................... 29, 30

*Defs. of Wildlife v. Bureau of Ocean Energy Mgmt.*,
   684 F.3d 1242 (11th Cir. 2012) ................................................................. 11, 12, 26

*EarthReports, Inc. v. FERC*,
   828 F.3d 949 (D.C. Cir. 2016)................................................................. 24, 25

*Edwardsen v. U.S. Dep't of Interior*,
   268 F.3d 781 (9th Cir. 2001) ................................................................. 12

*Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
   2018 WL 5919096 (C.D. Cal. Nov. 9, 2018)................................................ 14, 29

*Friends of the Earth v. U.S. Army Corps of Eng'rs*,
   109 F. Supp. 2d 30 (D.D.C. 2000)................................................................. 27

*Fund for Animals, Inc. v. BLM*,
   460 F.3d 13 (D.C. Cir. 2006)................................................................. 42

*Fund For Animals, Inc. v. Rice*,
   85 F.3d 535 (11th Cir. 1996) ................................................................. 33

*Grass Works Lawn Care v. Acosta*,
   No. CV 18-1581 (RMC), 2019 WL 1981087 (D.D.C. May 3, 2019) ...................... 41

*Guedes v. BATFE*,
   920 F.3d 1 (D.C. Cir. 2019)................................................................. 39, 40

*Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*,
   702 F.3d 1156 (10th Cir. 2012) ................................................................. 14, 27

*Hoopa Valley Tribe v. Christie*,
   812 F.2d 1097 (9th Cir. 1986) ................................................................. 35

*James Luterbach Constr. Co. v. Adamkus*,
   781 F.2d 599 (7th Cir. 1986) ................................................................. 40

*Kennecott Greens Creek Mining Co. v. Mine Safety & Health Admin.*,
   476 F.3d 946 (D.C. Cir. 2007)................................................................. 17

*Kingdomware Techs., Inc. v. United States*,
   136 S. Ct. 1969 (2016)................................................................. 41

*Lands Council v. McNair*,
   629 F.3d 1070 (9th Cir. 2010) ................................................................. 12

*Limerick Ecology Action, Inc. v. Nuclear Regulatory Comm'n*,
   869 F.2d 719 (3d Cir. 1989) ................................................................. 12

*Lower Brule Sioux Tribe v. Deer*,
   911 F. Supp. 395 (D.S.D. 1995) ................................................................. 34

*Marsh v. Or. Nat. Res. Council*,
   490 U.S. 360 (1989)................................................................. 28, 29

*Mid States Coal. for Progress v. Surface Transp. Bd.*,
  345 F.3d 520 (8th Cir. 2003) ................................................................ 33

*Montgomery Environmental Coalition v. Costle*,
  646 F.2d 568 (D.C. Cir. 1980) .............................................................. 41

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ................................................................................ 10

*Myersville Citizens for a Rural Cmty., Inc. v. FERC*,
  783 F.3d 1301 (D.C. Cir. 2015) ............................................................ 13

*Nat'l Wildlife Fed'n v. Norton*,
  332 F. Supp. 2d 170 (D.D.C. 2004) ...................................................... 27

*National Parks Conservation Association v. Semonite*,
  916 F.3d 1075 (D.C. Cir. 2019) ............................................................ 26

*National Wildlife Federation v. Secretary of Department of Transportation*,
  ,374 F. Supp. 3d 634 (E.D. Mich. 2019) ............................................... 16

*National Wildlife Federation v. Secretary of Department of Transportation*,
  374 F. Supp. 3d 634 (E.D. Mich. 2019) ............................................... 17

*New York v. Nuclear Regulatory Comm'n*,
  681 F.3d 471 (D.C. Cir. 2012) .............................................................. 12

*New York v. U.S. Nuclear Regulatory Comm'n*,
  824 F.3d 1012 (D.C. Cir. 2016) ............................................................ 23

*Newdow v. Roberts*,
  603 F.3d 1002 (D.C. Cir. 2010) ............................................................ 40

*Nw. Envtl. Advocates v. Nat'l Marine Fisheries Serv.*,
  460 F.3d 1125 (9th Cir. 2006) .............................................................. 27

*Oglala Sioux Tribe v. Andrus*,
  603 F.2d 707 (8th Cir. 1979) ................................................................ 35

*Ohio Forestry Ass'n v. Sierra Club*,
  523 U.S. 726 (1998) .............................................................................. 23

*Potomac River Ass'n v. Lundeberg Md. Seamanship Sch., Inc.*,
  402 F. Supp. 344 (D. Md. 1975) ........................................................... 42

*ProtectMarriage.com - Yes on 8 v. Bowen*,
  752 F.3d 827 (9th Cir. 2014) ........................................................... 40, 41

*Ralls Corp. v. Committee on Foreign Investment*,
  758 F.3d 296 (D.C. Cir. 2014) .............................................................. 40

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989) .............................................................................. 11

*Sierra Club v. U.S. Army Corps of Eng'rs*,
  277 F. App'x 170 (3d Cir. 2008) ............................................................. 33

*Sierra Club v. U.S. Army Corps of Eng'rs*,
  450 F. Supp. 2d 503 (D. N.J. 2006) ......................................................... 33

*Sierra Club v. U.S. Army Corps of Eng'rs*,
  803 F.3d 31 (D.C. Cir. 2015) .................................................................. 42

*Sierra Club v. U.S. Dep't of Transp.*,
  753 F.2d 120 (D.D.C. 1985) .................................................................... 28

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  205 F. Supp. 3d 4 (D.D.C. 2016) ............................................................ 44

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  255 F. Supp. 3d 101 (D.D.C. 2017) .................................................... passim

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  280 F. Supp. 3d 187 (D.D.C. 2017) ............................................ 8, 9, 10, 15

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  282 F. Supp. 3d 91 (D.D.C. 2017) ...................................................... passim

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  301 F. Supp. 3d 50 (4th Cir. 2018) ......................................... 39, 42, 43, 44

*Theodore Roosevelt Conservation Partnership v. Salazar*,
  616 F.3d 497 (D.C. Cir. 2010) ................................................................ 34

*TOMAC v. Norton*,
  No. CIV.A01-0398 JR, 2005 WL 2375171 (D.D.C. Mar. 24, 2005) ....................... 13

*TOMAC, Taxpayers of Mich. Against Casinos v. Norton*,
  433 F.3d 852 (D.C. Cir. 2006) .................................................... 31, 32, 34

*Town of Cave Creek, Ariz. v. F.A.A.*,
  325 F.3d 320 (4th Cir. 2003) .................................................................. 26

*Town of Marshfield v. FAA*,
  552 F.3d 1 (1st Cir. 2008) ................................................................. 14, 38

*Transmission Access Policy Study Grp. v. FERC*,
  225 F.3d 667 (D.C. Cir. 2000) ................................................................ 23

*United Keetoowah Band of Cherokee Indians in Okla. v. FCC*,
  933 F.3d 728 (D.C. Cir. 2019) ........................................................... 35, 39

*United Keetoowah Band of Cherokee Indians in Okla. v. FCC*,
  933 F.3d 728 (D.C. Cir. 2019) ................................................................ 44

*WildEarth Guardians v. U.S. Fish & Wildlife Serv.*,
  784 F.3d 677 (10th Cir. 2015) ............................................................... 32

*WildEarth Guardians v. Zinke*,
    368 F. Supp. 3d 41 (D.D.C. 2019) ................................................................................... 27, 38

*Yankton Sioux Tribe v. Kempthorne,*
    442 F. Supp. 2d 774 (D.S.D. 2006) ................................................................................ 35, 36

Statutes

25 U.S.C. § 2011(b)(1) ............................................................................................................ 36

5 U.S.C. § 706(2)(A) ............................................................................................................... 10

Regulations

40 C.F.R. § 1501.2(d) .............................................................................................................. 33

40 C.F.R. § 1501.4(b) .............................................................................................................. 33

40 C.F.R. § 1508.27 ................................................................................................................. 13

40 C.F.R. § 1508.27(b)(4) ................................................................................................. 5, 7, 13

49 C.F.R. § 194.105(a) ............................................................................................................. 15

C.F.R. Part 800 ......................................................................................................................... 44

**ABBREVIATIONS**

| | |
|---|---|
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| ETP | Energy Transfer Partners |
| FONSI | Finding of No Significant Impact |
| HDD | Horizontal Directional Drilling |
| NEPA | National Environmental Policy Act |
| NHPA | National Historic Preservation Act |
| PHMSA | Pipeline and Hazardous Materials Security Administration |
| SCADA | Supervisory Control and Data Acquisition System |
| SIMAP | Spill Impact Model Application Package |

# INTRODUCTION

In response to this Court's remand order, the Corps undertook a comprehensive analysis of the three limited items remanded for additional consideration.  Following months of obtaining and evaluating information from the Standing Rock, Cheyenne River, Oglala, and Yankton Sioux Tribes, as well as Energy Transfer Partners (ETP) and technical analysis by Corps' experts, the Corps produced its remand analysis that ultimately affirmed the Corps' conclusion that no Environmental Impact Statement (EIS) is needed.

In contesting the remand analysis under National Environmental Policy Act (NEPA), Standing Rock argues that the Corps did not consider the risk of a spill adequately because it relied in part on a Spill Model Report that, according to the Tribe, did not properly account for a worst case discharge.  But the Spill Model report is consistent with Pipeline and Hazardous Materials Security Administration (PHMSA) regulations and goes well beyond what is required by NEPA, which does not require consideration of a "worst case scenario" at all.  The Corps' reliance on the Spill Model Report is within the agency's discretion and in no way arbitrary or capricious.  And this Court has already held that the Corps' risk assessment analysis is reasonable.  Standing Rock also faults the Corps' environmental justice analysis, arguing that it is "gerrymandered," despite a record that shows a robust analysis substantially broader in scope than the remanded analysis, and that analyzes impacts specific to Tribes and tribal members over hundreds of miles.  Ultimately, the Corps carefully and reasonably considered the environmental impacts of its action, including the risk and potential impact of a spill, and specifically responded to the Plaintiffs' critiques.  The Corps was reasonable to conclude that no EIS was needed.

The Corps also acted reasonably in conducting the remand, appropriately seeking information from the Tribes, and consulting with Standing Rock even though it had no obligation to do so.  Standing Rock has demonstrated no legal duty to undertake additional consultation. The Corps' actions on remand went beyond what was required by this Court's remand order, by NEPA, and by any duty to consult.  The Corps was in no way arbitrary and capricious.

Finally, this Court should reaffirm its dismissal of Standing Rock's National Historic Preservation Act (NHPA) claims as moot.  As this Court previously held, it can order no relief that would redress Standing Rock's alleged injuries.  Standing Rock falls far short of meeting its burden to prove that its challenge to the application of the NHPA based on the unique consultation in this case is either capable of repetition or unavoidably evades review.  Moreover, Standing Rock's NHPA claims would fail even if they were not moot, because the Corps reasonably considered the indirect effects of its actions at the Lake Oahe crossing.

The Corps therefore respectfully submits that the Court should deny Standing Rock's motion for summary judgment and grant the Corps' cross-motion for summary judgment.

## BACKGROUND

### I.      Factual and procedural background

The factual and procedural background to this dispute is well known to the Court.  In June 2017, the Court "found that the Corps 'largely complied' with NEPA's requirements, and it granted remand on only a narrow subset of the Tribes' NEPA claims."  *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F. Supp. 3d 91, 103 (D.D.C. 2017) ("*Standing Rock V*").  The Court held that the Corps "failed to adequately consider the impacts of an oil spill on Standing Rock's fishing and hunting rights and on environmental justice" as well as the degree to which the environmental effects of the Corps' action is "likely to be highly controversial." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 147 (D.D.C. 2017) ("*Standing Rock IV*").  The Corps considered these topics on remand as described below.

### II.     The Corps' actions on remand

#### A.      The Corps took a hard look at impacts on hunting and fishing

On the first remand issue—the potential impacts from an oil spill on the Tribes' hunting and fishing rights—the Court noted that the Corps considered the consequences of an oil spill on the Tribes' treaty rights, but found "the Corps analysis fell short, however, when it stated simply that the primary issue related to the impacts of the aquatic environment from operations of

DAPL would be related to a release from the pipeline, without explaining what those effects would be." *Standing Rock V*, 282 F. Supp. 3d at 99 (citation omitted).  The Court also explained that although the Corps addressed the effects of pipeline construction on wildlife, the Corps did not "consider the consequences of a spill." *Id.*  The Court described these issues as "far from incurable" and found it was highly likely that the Corps could substantiate its prior findings. *Id.* at 99-100.  The Court instructed the Corps to "simply connect the dots," *id.* at 100, as it "already has the data it needs to determine the impact of a spill on fish and game," and because the Corps need only "take a 'hard look' at the impact of DAPL on the resources themselves." *Id.* at 99.

The Corps did just that in a comprehensive document describing potential consequences of a spill on hunting and fishing, relying in large part on input from the Tribes that the Corps gathered during remand. *See* Mem. for Record (Aug. 31, 2018), RAR5-13.  The remand analysis describes the potential effects of a hypothetical spill on game and fish, including both direct and indirect effects. *Id*. at RAR41-42.  Upon completion of its in-depth study, the Corps' remand of analysis "did not reveal any significant impacts because the risk of an incident is low and any impacts to hunting and fishing resource will be of limited scope and duration." *Id*. at RAR44.

**B.     The Corps took a hard look at environmental justice**

The second issue the Corps addressed on remand was environmental justice.  The Court instructed the Corps to "provide a more robust analysis on remand" to cure deficiencies in the Corps' analysis with respect to census tracts upstream from the crossing versus downstream, the consideration of communities within more than .5 miles of the crossing, and to consider information related to cultural and social factors specific to Tribal populations. *Standing Rock V*, 282 F. Supp. 3d at 100-01.  The Court found that the Corps' environmental justice analysis was not "so lacking as to cast serious doubt on its decision to issue an EA." *Id.* at 100.

On remand, the Corps addressed these concerns in multiple ways.  The Corps considered the relevant environmental justice guidance as well as information from the existing record and supplemental analysis.  Mem. for Record at RAR56-57.  The Corps considered the Tribes' input

and analyzed impacts on water intakes 156 miles away.  *Id*. at RAR65.  The Corps also used U.S. Census bureau demographic and socioeconomic statistics to identify low-income and minority groups near the Lake Oahe crossing and the proposed North Bismarck route.  *Id*. at RAR70-81.

The Corps reaffirmed that "a catastrophic spill is not expected," and "[i]f there is a spill, there are not likely to be any significant adverse human health or environmental effects on any population from the pipeline's operation at the Lake Oahe crossing."  *Id*. at RAR61, 82. "Despite the low risks. . . the Corps undertook a comprehensive review of the potential effects of a release on the low-income and minority populations identified in the affected area."  *Id*. at RAR82.  The review focused on "specific cultural, spiritual, and ceremonial practices at or near Lake Oahe" that the Tribes identified, as well as "subsistence and traditional hunting and fishing practices" and "water intakes and associated human health concerns."  *Id*.

The Corps' analysis expands the EA's geographic extent of analysis, applies input from the Tribes, and further considers "the interrelated environmental, socioeconomic and cultural factors that may amplify the environmental effects of a potential spill on Tribal populations."  *Id*. at RAR45.  Specifically, the Corps analyzed "the area downstream of the Lake Oahe crossing all the way to the Cheyenne River Sioux water intake" to assess whether the Corps' permission "results in disproportionately high and adverse human health or environmental effects on minority populations, including Tribes, and low-income populations in the unlikely event of a large spill."  *Id*. at RAR100.  The Corps analyzed in detail potential environmental justice impacts on drinking water intakes, hunting and fishing, and traditional cultural, spiritual, and ceremonial practices.  *Id.*  The Corps also compared the potential environmental justice impacts of the proposed North Bismarck route to the chosen route.  After comprehensively reviewing environmental justice, the Corps ultimately concluded that "there is not a significant potential environmental effect to low-income or minority populations requiring [an EIS]."  *Id*.

### C.      The Corps took a hard look at the "highly controversial" intensity factor

Lastly, the Corps considered the degree to which the environmental effects of the easement for the pipeline to cross federal property are "likely to be highly controversial."  40 C.F.R. § 1508.27(b)(4).  "The term 'controversial' refers to cases where a substantial dispute exists as to the size, nature, or effect of the major federal action rather than to the existence of opposition to a use."  *Standing Rock IV*, 255 F. Supp. at 127–28 (citation omitted).

In its June 2017 opinion, this Court charged the Corps with addressing certain expert reports Plaintiffs submitted after the EA was published (but before the Corps again decided in February 2017 that an EIS was not required).  *Standing Rock IV*, 255 F. at 127-29.  The Court reasoned "it may well be the case that the Corps reasonably concluded that these expert reports were flawed or unreliable and thus did not actually create any substantial evidence of controversial effects" but that "the agency did not demonstrate that it considered, as the CEQ regulations require, the degree to which the project's effects are likely to be highly controversial, despite being presented with evidence of scientific flaws."  *Id.* at 129.

The Court made clear that "[c]orrecting this flaw does not require that Defendants begin anew, but only that they better articulate their reasoning below."  *Standing Rock V*, 282 F. Supp. 3d at 98.  The Court expected the Corps to "give careful consideration to the expert critiques," that is, the expert critiques submitted after the Final EA was published but before the Corps' February 2017 decision.  *Id.* at 99.  Thus, all the Court ordered the Corps to do is "exercise its judgment in analyzing Plaintiffs' expert critiques."  *Id.*  The Court noted that there is a "serious possibility that" the Corps "will be able to substantiate the prior EA."  *Id.*

On remand, the Corps exhaustively considered the critiques presented by the Tribes' reports, including those related to: "the design; construction; proposed operation; pre-operational integrity threat/risk analysis; risk mitigation systems; the impact of a potential spill from the pipeline on downstream ecological receptors, human receptors such as hunting, fishing, recreation and cultural practices; and environmental justice."  Mem. for Record at RAR103.

Although the Court's remand order only called for the Corps to give careful consideration to the expert critiques submitted after the Final EA was published but before the Corps' February 2017 decision, the Corps nonetheless requested additional factual and technical analysis of the issues presented by the Tribes from ETP, *id.*, and met with ETP and the Tribes multiple times. *Id.*

The Corps required ETP to produce its spill model report and explain its methodology to the Corps' satisfaction. *Id.* at RAR110. ETP provided responses to the Tribes' comments and provided supplemental information detailing the validity of the methodology and clarifying misconceptions. Corps officials "including specialists and technical experts in the fields of water resources, engineering, environmental resources, geographic information systems, and modeling, reviewed the information provided by ETP and the Tribes." *Id.* at RAR103; Email from M. Noel, Corps (Oct. 13, 2017), RAR13270; Email from B. Cossette, Corps (Jan. 8, 2018), RAR10950. The Corps then carefully considered the Tribes' critiques, the information provided by the Tribes and ETP, and their own officials' review and published a review and analysis of tribal submissions. Mem. for Record at RAR1; Review and Analysis of Tribes' Submissions ("Analysis of Submissions") (Aug. 31, 2018), RAR141-280. Within these documents, the Corps analyzed in even greater detail 28 specific critiques which they believe may implicate the "highly controversial" significance factor because they suggest the possibility of a dispute exists "as to the size, nature, or effect" of the impacts of the Corps' permissions. *Id.* at RAR144.

The Corps' analysis of these issues spans 30 pages of detailed technical analysis, Mem. for Record at RAR110-40, supported by the further review document. Analysis of Submissions at RAR141-280. The issues addressed include the most significant issues identified by the Tribes' reports, such as methodological critiques of spill volumes, river flow rates, oil recovery operations beneath ice in the worst case scenario, failure of system components, whether emergency block valves would close immediately. *See* Mem. for Record at RAR110-40.

After this exhaustive review, the Corps concluded that the Tribes' critiques did not fundamentally draw the Corps' methodology or data into question. The Corps concluded

"[w]hile there may be other methods for predicting oil spill effects, it is not likely that employing further methods will result in substantively different views or information that is more comprehensive than what the Corps has considered here." *Id*. at RAR139-40.  Ultimately the Corps' analysis did not reveal a "substantial dispute" about the effects of the Corps' action of granting permission for the pipeline to cross federal property.  The Corps found that the effects of the federal action are not "likely to be highly controversial." *Id*. at RAR140 (citing 40 C.F.R. § 1508.27(b)(4)).

### D.     The Corps' consultation with Standing Rock.

In the process of complying with this Court's order, the Corps sought information from and consulted with the Plaintiff tribes, including Standing Rock.

The Corps first contacted Standing Rock about the remand less than two weeks after an internal scoping meeting.  Letter from Col. Hudson to Chairman Archambault (Sept. 25, 2017), RAR13325-27.  The Corps requested that Standing Rock provide the Corps with information: (1) regarding Standing Rock's hunting and fishing practices; (2) on game species; (3) on "distinct cultural practices . . . that are connected to Lake Oahe" and; (4) regarding "additional demographic data . . . beyond what is obtainable from the U.S. Census." *Id*.  The Corps also asked that Standing Rock verify that a list of documents previously submitted by the Tribe was complete.  *Id*. at RAR13326-27.  The Corps requested that Standing Rock provide its response within 30 days and stated that it would "determine the next steps in the remand process and whether we need any additional information from your tribe after we receive the requested information and documentation." *Id*. at RAR13327.

On October 6, 2017, Standing Rock responded, in part, by inviting the Corps to visit Standing Rock for consultation.  Letter from Chairman Archambault to Col. Hudson (Oct. 6, 2017), RAR13275-77.  On November 27, 2017, the Corps responded by stating that it would meet with Standing Rock at its Reservation, but believed that such a meeting would be more productive after the Tribe provided requested information.  Letter from Col. Hudson to Chairman

Faith (Nov. 27, 2017), RAR11998.  The Corps also stated that it was "available to meet via teleconference to discuss any of your Tribe's questions."  *Id.*

While the Corps was attempting to obtain the information it requested on September 25, 2017, Dakota Access also tried to engage Standing Rock in spill response planning.[1]  The spill response planning efforts responded to the Court's December 4, 2017 order that the Parties "coordinate to finalize spill response plans at Lake Oahe, and that the parties file such plans with the Court by April 1, 2018."  *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 280 F. Supp. 3d 187, 191 (D.D.C. 2017).  Dakota Access and the Corps promptly began planning to finalize spill response plans.  Emails from C. Borkland, ETP (Dec. 2017), RAR11252-55; Email from C. Borkland, ETP (Jan. 12, 2018), RAR10316-19.  Dakota Access proposed to spend the entire meeting reviewing and modifying "that plan with the Corp[s] and Tribes."  Email from C. Borkland, ETP (Jan. 3, 2018), RAR11230-31.  Standing Rock did not attend the January 11, 2018 meeting.  Email from C. Borkland, ETP (Jan. 12, 2018), RAR10316-17.

On January 4, 2018, Standing Rock responded to the meeting invitation by requesting information regarding spill modeling and the nature of Bakken crude oil.  Letter from Chairman Faith to C. Borkland, ETP (Jan. 4, 2018), RAR11249-50.  Dakota Access and the Corps stated that they would be willing to travel to Standing Rock, and proposed five dates in March for such a meeting.  Email from C. Borkland, ETP (Feb. 5, 2018), RAR9082-83.

On February 8, 2018, Standing Rock attended the spill response planning meeting only to request that ETP schedule a meeting at Standing Rock and hand-deliver a letter demanding ten types of information.  Letter from Chairman Faith to ETP (Feb. 8, 2018), RAR9096-99 (also requesting Facility Response Plan and Spill Model); Dakota Access Pipeline Meeting Minutes (Feb. 8, 2018), RAR9101-02; Email from C. Borkland, ETP (Feb. 14, 2018), RAR8453.  In

---

[1] Standing Rock attempts to addressing the discussions by asserting that they are "a separate set of communications pertaining to spill response planning . . . [that] are not the focus of this motion."  ECF No. 433-2 at 8 n.6.  Far from being irrelevant, these discussions establish that the Corps engaged in a good faith effort to obtain information from Standing Rock.

leaving the February 8 meeting after introductions, Standing Rock passed up an opportunity to review and "take with them" copies of the then-current draft spill response plans and receive additional information that Standing Rock purportedly sought.  Email from C. Borkland, ETP (Feb. 14, 2018), RAR8453; Email from C. Borkland, ETP (Mar. 1, 2018), RAR6565-66.

On February 23, 2018, the Corps provided Standing Rock with copies of the Geographic Response Plan and other information that it was prepared to discuss at the February 8, 2018 meeting.  Letter from Col. Hudson to Chairman Faith (Feb. 23, 2018), RAR6604-05.

In planning for a meeting scheduled for March 7, 2018, Standing Rock first granted ETP permission to meet with Chairman Faith but refused permission "to go to potential clean-up sites."  Letter from Chairman Faith to ETP (Feb. 28, 2018), RAR6588-89.  On March 1, 2018, Dakota Access noted that the Geographic Response Plan sent to Standing Rock on February 23 addressed "remote monitoring and SCADA systems, as well as . . . the composition of Bakken Crude."  Email from C. Borkland, ETP (Mar. 1, 2018), RAR6565.  Dakota Access stated that it would be "prepared to show and explain . . . the results of the recent spill modeling and discuss how those results are informing the response planning" and promised to provide an updated Geographic Response Plan at the March 7 meeting.  *Id*.  The Corps then provided the Facility Response Plan that Standing Rock requested.  Letter from Col. Hudson to Chairman Faith (Mar. 5, 2018), RAR6436 (highlighting requested information on personnel and Bakken crude).

Standing Rock's response was to issue a Tribal Resolution resolving that "due to the disrespectful, patronizing and unproductive communications of ETP . . . no meeting [shall] be held with [ETP] at this time."  Res. No. 80-18 (Mar. 6, 2018), RAR6429.  Standing Rock's resolution was based on its incorrect assertion that it did not receive requested information.  *Id*. at RAR6425-26.  In sum, Standing Rock chose not to attend meetings in January, February, and March, 2018.  Analysis of Submissions at RAR239-40.[2]

---

[2] The Corps nonetheless sent Standing Rock information from those meetings.  Letter from Col. Hudson to Chairman Faith (Mar. 14, 2018), RAR5893.

Nonetheless, the Corps met with Standing Rock twice.  The Corps met with the Tribe at its reservation to discuss issues relating to the remand and "propose[d] to come back . . . to discuss the questions and information in more detail."  Meeting Notes (Mar. 26, 2018), RAR4128-33; Email from D. Crow Ghost to J. Ames (Mar. 12, 2018), RAR6373 (seeking "a few hours" for meeting).  The Corps followed up by requesting that the Tribe provide the materials that it presented.  Letter from Col. Hudson to Chairman Faith (Mar. 30, 2018), RAR5803.

After refusing to allow the inspection of potential clean-up sites on Standing Rock land, Standing Rock requested that an upcoming meeting include an inspection of valves located on private land.  Letter from Chairman Faith to J. Ames (May 16, 2018), RAR3338.  Dakota Access declined.  Email from B. Cossette to Col. Hudson (June 4, 2018), RAR3119.

The Corps and Standing Rock met again on May 22, where the Corps responded to a list of questions the Tribe raised at the last meeting.  Meeting Notes (May 22, 2018), RAR3056-61.

The Corps repeatedly pushed back its expected date for completing the remand because it continued to receive information from both Standing Rock and Dakota Access.  ECF No. 361 at 1.  On August 31, 2018, the Corps issued a "Review and Analysis of Tribes' Submissions." RAR141-280.  The review addressed, among other things, the information Standing Rock provided.  *E.g.*, *id*. at RAR171-80 (analyzing Earthjustice submission).  The Corps further took into consideration Standing Rock's submissions in its Memorandum for Record.  *E.g.*, Mem. for Record at RAR5-6 (discussing hunting and fishing), RAR8-10 (discussing fishing).

## LEGAL STANDARD

The Administrative Procedure Act requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"  5 U.S.C. § 706(2)(A).  Under this "narrow" standard of review—which appropriately encourages courts to defer to the agency's expertise—an agency is required to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Motor Vehicle*

*Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983) (internal

quotation marks and citation omitted); *Ark Initiative v. Tidwell*, 64 F. Supp. 3d 81, 90–91

(D.D.C. 2014), *aff'd,* 816 F.3d 119 (D.C. Cir. 2016).

It is not enough, then, that the court would have come to a different conclusion from the

agency. *Ark Initiative*, 64 F. Supp. 3d at 90–91. "The reviewing court 'is not to substitute its

judgment for that of the agency,'" *id.*, nor to "disturb the decision of an agency that has

examine[d] the relevant data and articulate[d] . . . a rational connection between the facts found

and the choice made." *Id*. at 91 (citations omitted). A decision that is not fully explained is to be

upheld "if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Ark.–Best

Freight Sys., Inc.,* 419 U.S. 281, 286 (1974); *Ark Initiative*, 64 F. Supp. 3d at 91.

## ARGUMENT

### I.     The Corps complied with NEPA

#### A.     NEPA does not require analysis of a "worst case scenario"

A large portion of Standing Rock's NEPA argument rests on an unstated and incorrect

assumption: that NEPA analysis requires an agency to evaluate the effects of a worst case

scenario. ECF No. 433-2 at 16-24. Not so. *See Robertson v. Methow Valley Citizens Council,*

490 U.S. 332 (1989) (NEPA does not require a "worst-case" analysis). Nonetheless, the Corps

based some of its analysis on an extremely pessimistic "worst case discharge" figure derived

from a Spill Model Report prepared pursuant to PHMSA regulations. Much of Standing Rock's

argument is essentially a substantive challenge to this Spill Model Report and *PHMSA's*

methodology for determining a worst case discharge. But Standing Rock has not sued PHMSA,

and even if it had, what the "worst case discharge" regulation requires and what NEPA requires

are not the same. Evaluating potential impacts from a spill based on PHMSA's "worst case

discharge" regulation was reasonable—and indeed more than what was required under NEPA.

The Eleventh Circuit has directly considered the issue in a challenge to an offshore oil

spill response plan. *Defs. of Wildlife v. Bureau of Ocean Energy Mgmt.*, 684 F.3d 1242, 1250

(11th Cir. 2012).  The plaintiffs argued an EIS had improperly failed to evaluate impacts of a "worst case discharge."  *Id.*  The Circuit held an agency "is not required to base its NEPA analysis on a worst case scenario . . ." and upheld the agency's "reliance on analysis based on a lower spill rate, which it determined to be more likely than the worst case discharge, was not arbitrary or capricious or in violation of NEPA."  *Id.*  So, too, did the Ninth Circuit, which contrasted the worst case discharge regulation with NEPA, finding the regulation "specifies the contents of the worst-case scenario required in a spill response plan, rather than an EIS."  *Edwardsen v. U.S. Dep't of Interior*, 268 F.3d 781, 785 (9th Cir. 2001).  The Ninth Circuit also concluded "an EIS need not include a worst-case scenario."  *Id.*

Rather than analyze the impacts of a "worst case scenario," NEPA instead required the Corps to "examine[] the consequences of the harm in proportion to the likelihood of its occurrence."  *Limerick Ecology Action, Inc. v. Nuclear Regulatory Comm'n*, 869 F.2d 719, 739 (3d Cir. 1989); *New York v. Nuclear Regulatory Comm'n*, 681 F.3d 471, 478, 478 (D.C. Cir. 2012) (citation omitted) (agency should "look at both the probabilities of potentially harmful events and the consequences if those events come to pass."); *The Lands Council v. McNair,* 629 F.3d 1070, 1078 (9th Cir. 2010) (concluding that agency could reasonably "rely on the more probable calculation" rather than "the outer possible, though unlikely, range").

The Corps did this, and indeed even analyzed impacts it reasonably determined were exceedingly unlikely, including those stemming from a "worst case discharge."  But even this is not enough for Standing Rock, who argues the "worst case discharge" was not sufficiently pessimistic.  The Tribe's argument is essentially that the Corps was required to analyze an oil spill that resulted from an extremely unlikely parade of horribles: a full bore rupture of the pipeline, compounded by multiple valve malfunctions, compounded by failure of the state-of-the-art leak detection systems, and compounded by additional human error.  *See, e.g.*, ECF No. 433-2 at 16-24.  NEPA requires no such analysis.  As discussed at length below, the PHMSA-required Spill Model Report that calculated a "worst case discharge" was reasonable and indeed

exceedingly conservative.  The Report modeled an oil spill many orders of magnitude larger than is likely for this type of pipeline, given its construction and the safety features in place.  It would have been reasonable for the Corps to analyze impacts smaller than those predicted from this "worst case discharge."  But the Corps nonetheless evaluated potential impacts from the PHMSA regulations' "worst case discharge"—going above and beyond what was required under NEPA.

> **B.      The Corps properly considered Standing Rock's critique of the Corps' methods and data and reasonably concluded there was not sufficient scientific controversy that an EIS was required**
>
> > **1.      The Corps' NEPA decision-making and methodological choices are subject to "extreme deference"**

As discussed above, pages 5-7, on remand the Corps considered the degree to which the environmental effects of the Corps' easement for the Pipeline to cross federal property "are likely to be highly controversial."  40 C.F.R. § 1508.27(b)(4).  This "controversy" factor is simply one of the many factors an agency "should consider" when assessing whether "intensity" of impacts warrants creation of an EIS.  40 C.F.R. § 1508.27.  The Corps' consideration of the "controversy" factor is a part of its larger decision of whether to prepare an EIS, which is "is entitled to deference."  *TOMAC v. Norton*, No. CIV.A.01-0398 JR, 2005 WL 2375171, at *1 (D.D.C. Mar. 24, 2005), *aff'd sub nom. TOMAC, Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d 852 (D.C. Cir. 2006) (citation omitted).

Review of an agency's decision-making is even more deferential when, as here, the Court considers the agency's "evaluation of 'scientific data within its technical expertise.'"  *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1308 (D.C. Cir. 2015).  In that situation courts afford the agency "'an extreme degree of deference.'"  *Id.* (citation omitted).  Indeed, in this very case this Court has reasoned that "to the extent the Tribes' experts disagree with the Corps' technical assessments or overall conclusion, such disagreements are 'a classic example of a factual dispute the resolution of which implicates substantial agency expertise.'"  *Standing*

*Rock IV,* 255 F. Supp. 3d at 127 (citation omitted).  "In such situations, courts "must defer to 'the informed discretion of the responsible federal agencies.'"  *Id.* (citations omitted).

Finally, even a finding of "controversy" does not itself automatically mandate preparation of an EIS.  *Town of Marshfield v. FAA,* 552 F.3d 1, 5 (1st Cir. 2008) ("[C]ontroversy is not decisive but is merely to be weighed in deciding what documents to prepare"); *Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1181 (10th Cir. 2012) (that a project is controversial does not mean the Corps "must" prepare an EIS); *Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 2018 WL 5919096, at *13 (C.D. Cal. Nov. 9, 2018).

Standing Rock asks the Court not to defer to the Corps' analysis on the technical matter of the proper methodology for determining spill risk and magnitude and whether an EIS is required, but rather to "flyspeck" this analysis and adopt some undefined alternative methodology preferred by Standing Rock for determining a "worst case discharge" and assessing overall spill risk.  Standing Rock's arguments are not persuasive and the Corps was certainly not arbitrary or capricious in its consideration of spill risk and Plaintiffs' methodological critiques.  Ultimately, the Corps complied with the NEPA regulation's mandate to "consider" whether Standing Rock's information rendered the impacts of the Corps' action "highly controversial" and were reasonable to conclude they did not.

### 2.   The Spill Model Report is methodologically sound and required by PHMSA regulation

Standing Rock argues that the PHMSA-required Spill Model Report analyzing a worst case discharge is "Not Even a 'Best Case Scenario.'"  ECF No. 433-2 at 16.  In other words, the Tribe argues the regulation's methodology underestimates the volume of oil that could be released in a severe spill.  *Id.*  In fact, the challenged Spill Model Report relies on a number of extremely unlikely and pessimistic assumptions that boost the assumed volume of oil above what even *Plaintiffs' own experts* called for.  The line drawing and scientific expertise implicated in this determination makes it the precise type of issue subject to "extreme deference."

14

**a.    The Spill Model Report complies with PHMSA regulation
and the Corps' reliance thereon was wholly appropriate**

Congress delegated authority to the President to "issue regulations which require an . . .
operator . . . to prepare and submit to the President a plan for responding, to the maximum extent
practicable, to a worst case discharge." 33 U.S.C. § 1321(j)(5)(A)(i). PHMSA, acting on that
delegated authority, promulgated regulations that provide specific instructions to operators as to
what they must do to meet these Clean Water Act requirements. Those regulations represent a
reasonable methodology for calculating a worst case discharge and are entitled to deference.
*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 840 (1984). The PHMSA
regulation at issue here provides for the pipeline operator to "determine the worst case discharge
. . . and provide the methodology, including calculations, used to arrive at the volume." 49
C.F.R. § 194.105(a). The regulation provides for the operator to conduct quantitative analysis:
arrive at the largest volume by taking the pipeline's maximum release time plus the maximum
shutdown time and multiplying this by the maximum flow rate, plus the largest line drainage
volume after shutdown of the line sections in question. *Id.* at 194.105(b)(1). The regulations
provide for using "the operator's best estimate" of the shutdown response time in situations such
as this where there is not "historic discharge data" for the pipeline. *Id.*

To make this calculation, the "operator," ETP, with technical input from the Corps,[3]
adopted a quantitative "PHMSA-approved spill model" employing technical software called
OILMAPLand and SIMAP. DAPL Project – N.D. Lake Oahe Crossing Spill Model Discussion
(May 3, 2016), RAR14964. OILMAPLand is a "two-dimensional overland and downstream
trajectory and fate model," and SIMAP is a "three-dimensional in-water oil fate and biological
effects model." Evaluation of Hydrocarbon Releases into Lake Oahe Modeling ("Modeling
Evaluation") (Feb. 12, 2018), RAR8746; Draft SIMAP Report (Nov. 12, 2017), RAR12243. The

---

[3] *See, e.g.*, Spill Model Report ProjNet Tracker Comments (Feb. 5, 2018), RAR9537; Email
from M. Noel, Corps (Oct. 13, 2017), RAR13270; Emails from M. Noel, Corps (Nov. 22, 2017),
RAR12006; Downstream Receptor ProjNet Tracker Comments (Feb. 6, 2018), RAR9502.

method employed by the regulations and, in turn, these models significantly "overestimate[s] the majority of spills seen in actual releases" for several reasons, including that it assumes a guillotine-like complete bisection of the pipeline, which is exceedingly rare—particularly for a large-diameter pipe.  Mem. for Record at RAR111; DAPL Project Lake Oahe Spill Model Discussion at RAR14977.  The method also assumes that the pipeline is resting on the surface of the water and therefore assumes that when severed, oil immediately enters the waterbody.  Mem. for Record at RAR111.  In reality the pipeline is buried nearly 100 feet below Lake Oahe, and the layers of soil and rock would serve to "virtually eliminat[e]" the ability of oil to leak and potentially enter the waterway.  *Id*. at RAR13, RAR58.  Moreover, the spill model does not account for anti-siphoning effects, which would further limit oil released.  *See id.* at RAR111.  These assumptions (along with other conservation assumptions) result in a worst case discharge analysis that is extremely pessimistic, consistent with the regulatory directive, and reasonable.

Standing Rock never directly proposed an alternative quantitative methodology to the methodology set out in PHMSA's regulation (requiring the operator arrive at a figure by multiplying the pipeline's maximum release time plus the maximum shutdown time by the maximum flow rate).  Nor does Standing Rock critique the calculations performed.  Instead, it appears to advocate a *qualitative* model that describes what may occur assuming a failure of each pipeline component compounded by unspecified human error.  *See, e.g.*, ECF No. 433-2 at 21 (calling for analysis in which "People make mistakes.  Equipment malfunctions.  Systems are deficient.").  Such a qualitative analysis was rejected by the only court to consider the argument.

In *National Wildlife Federation v. Secretary of Department of Transportation*, the plaintiffs challenged a response plan, arguing that in a "worst case" discharge scenario required considering a spill in a certain area.  374 F. Supp. 3d 634, 648 (E.D. Mich. 2019), *appeal docketed,* No. 19-1609 (6th Cir. June 4, 2019).  As here, the plaintiff had "not explained why as a quantitative matter, [operator's] calculations are incorrect.  Instead, [the plaintiff] attempts to confuse the matter by equating "worst case discharge," which under the regulations relates to the

largest volume of oil, with a "worst case scenario," which it would argue is an oil spill [within certain areas]." The Court rejected this approach, holding that "[t]here is no basis in the regulations for [the plaintiff's] *qualitative* argument…" *Id.*

The same is true here. Rather than the quantitative calculation called for by the regulations and applied in Dakota Access' spill modeling software, Standing Rock seeks to impose an unspecified alternative methodology that qualitatively describes a cascade of cumulative failures of every component of the pipeline. *See, e.g.*, ECF No. 433-2 at 21. But assuming that such quantitative failures—that a full bore rupture is not detected, if detected the pumps would fail to stop and valves would fail to close, and further unspecified human error would compound the situation—would result in a theoretically unlimited discharge. Such a result would be not useful to emergency response planners and federal regulators and is not what is required by the PHMSA regulation or NEPA. Rather, the regulation that defines the scope of a "worst case discharge" calls for a quantitative calculation. That is the calculation conducted by the OILMAP and SIMAP software that resulted in the Spill Model Report to which Standing Rock objects. This calculation was reasonable, compliant with PHMSA regulation and, as discussed above, more than what was required under NEPA. Therefore Standing Rock has failed to show that the Corps was arbitrary or capricious.

### b. Standing Rock's critiques of the Spill Model Report's methodology are not sufficient to demonstrate "controversy" or that the Corps was arbitrary

The PHMSA-required spill model methodology that was in turn reviewed by and used by the Corps is entitled to "an extreme degree of deference" because it "involve[s] complex judgments about sampling methodology and data analysis that are within the agency's technical expertise," *Kennecott Greens Creek Mining Co. v. Mine Safety & Health Admin.*, 476 F.3d 946, 956 (D.C. Cir. 2007). Standing Rock seeks to overcome this deference by arguing the spill model differed from its conception of a "worst case scenario." But a model need not account for every set of facts and scenarios, and "[t]o require as much would be to defeat the purpose of

using a model." *Chem. Mfrs. Ass'n v. EPA*, 28 F.3d 1259, 1265 (D.C. Cir. 1994).[4]  Regardless,

the assumptions that underlie the model adopted by the Corps are entirely appropriate and within

the Corps' expertise and discretion.  Finally, while Standing Rock critiques the methodology

used here, it never offered an alternative spill model methodology, despite the fact that it retained

its own experts.  Indeed, the closest it comes is the calculation performed by Oglala's expert,

EarthFax, which resulted in a spill volume estimate considerably smaller than that studied in the

Spill Model Report.  *See* DAPL Envtl. & Emergency Resp. Presentation (June 1, 2018),

RAR3124.  This again demonstrates the reasonableness of the Corps' methodological choices.

    First, it was proper to assume a full bore pipeline rupture would be detected quickly.

The pipeline is equipped with a state-of-the-art monitoring tool that uses real-time modeling

based on pipeline pressure, flow, and pipeline and ground temperature data.  Analysis of

Submissions at RAR205.  Field instruments scan these data every six seconds, and the model

calculations used to detect system variations are updated every thirty seconds.  *Id.*  Moreover, the

pipeline uses a system called "LeakWarn" a software program that provides additional

monitoring.  This advanced modeling and leak detection complies with applicable PHMSA

regulations as well as industry guidance (specifically, API Recommended Practice 1130—

Computational Pipeline Monitoring for Liquid Pipelines).  *Id.* at RAR273.

    Next, it was reasonable to assume that once a full bore pipeline rupture is detected, the

valves would close and pumps would shut down within 12.9 minutes.  *Id.* at RAR254.  The

LeakWarn and other detection systems can detect a worst case discharge rupture in less than one

minute, as the pipeline is scanned every six seconds and modeled every thirty seconds.  *Id.* at

RAR205.  After a leak is detected the pumps can be shut down within nine minutes, which

includes the time in which the rupture is detected.  *Id.* at RAR254.  The Spill Model assumed

that it would take 3.9 minutes to close the valves.  *Id.*  This assumption was the highest (and thus

---

[4] Dakota Access nonetheless ran 290 models for four different scenarios—a total of 1,160 model
runs.  Modeling Evaluation at RAR8748.

most conservative) number drawn from modeling done in a Surge Analysis Report.  *Id.* at RAR157; RAR17286-17331 (Surge Analysis Report).  The modeling done as part of the Surge Analysis Report shows closure times ranging in seconds, from roughly 2.9 minutes to about 3.7 minutes.  *See also* Analysis of Submissions at RAR173 (Description of monitoring tools and features that enable the detection time).  While Standing Rock on remand questions these methodological choices, it is notable that they are consistent with—or even more conservative than—the assumptions of Plaintiffs' own experts who did not account for an extended detection time in their October 28, 2016 Report.  Letter from EarthFax to President Steele (Dec. 2, 2016), ESMT626; Analysis of Submissions at RAR174, 223.

Third, it was reasonable to assume that adverse weather conditions would not prevent the leak detection system and valves from operating.  The valves are kept in climate controlled enclosures, protected from the elements and monitored at all times from the off-site Supervisory Control and Data Acquisition System (SCADA).  *See* Resp. to Standing Rock Inquiry (May 14, 2018), RAR3325.  The SCADA is kept in constant communications contact with the valves via multiple redundant communications methods.  *Id.*  In the event of a power outage, the values are equipped with power failure alarms that would immediately inform the monitors in the SCADA that action was needed.  The valves have a "fail safe" mode and are able to be manually closed manually (ie, without power) consistent with spill response planning efforts.  *Id.*

A final and compelling reason why it was neither arbitrary nor capricious to use the Spill Model Report relied upon by Corps experts is that it is even more conservative than Plaintiffs' experts' estimates of the volume of oil that could be released in a spill at the crossing.  In the EarthFax report, Oglala's expert calculated spill volumes of between 1,023 and 4,620 barrels for the Oahe reservoir.  Letter from EarthFax to President Steele (Dec. 2, 2016), ESMT626.[5]  In a presentation, the Earthfax representative generally reaffirmed this estimate, providing a spill

---

[5] While the EarthFax report was submitted by Oglala, Standing Rock relies upon it.  ECF433-2.

estimate of between "2,950 to 4,620 bbl of crude oil."  DAPL Envtl. & Emergency Resp. Presentation at RAR3124.  The Spill Model Report, however, ultimately modeled larger volumes.  Modeling Evaluation at RAR8747.  The Earthfax expert did not assume, as Standing Rock now claims is required, that the spill estimate models cumulative failure of various pipeline components such as the valves.  To the contrary, the Earthfax report accounts for proper functioning of valves, noting: "[t]he spacing of block valves influences spill volumes, since properly operating valves can isolate the defective pipeline location from the remainder of the pipeline.  This generally limits the discharge of oil from a spill to those pipeline sections between a block valve and the point of failure."  Letter from EarthFax to President Steele (Dec. 2, 2016), ESMT625.  This section of the report concluded "the EA should have considered spill volumes well in excess of 100 bbl as a reasonable incident scenario."  *Id.* at ESMT626.  Of course the Spill Model Report ultimately did model spill volumes of considerably more than 100 bbl.

In sum, it is not credible to claim a full bore rupture resulting in oil immediately entering the water body is "not even a best case scenario," as Standing Rock asserts.[6]  Indeed, the ultimate worst case discharge estimate was at least 170 *larger* than Plaintiffs' experts estimated.  Mem. for Record at RAR111.  Moreover, the Spill Model Report notes that actual documented spills are "significantly less than the maximum theoretical volumes" calculated in spill models—indeed, "50% of all documented incidents, the actual release volume was less than 0.75% of what the computer models predicted."  DAPL Project Lake Oahe Spill Model Discussion at RAR14971.  Standing Rock's top line conclusion that the Spill Model Report is unreasonably optimistic is not supported by the record.  Nor are Standing Rock's more specific critiques.  The Corps' reliance on the Spill Model Report was not arbitrary or capricious.

---

[6] An actual "best case scenario" would be the pipeline operating as expected and not leaking, as most pipelines do the vast majority of the time.  To the extent a "best case scenario" assumes a spill occurs, a "best case scenario" spill would be a very small leak, detected immediately. Indeed, this is much closer to the typical spill as evidenced by PHMSA data. *See* Mem. for Record at RAR18-19.

### 3. The Corps Risk assessment was reasonable

Next, Standing Rock again argues the Corps' evaluation of the risk of an oil spill was "arbitrary"—despite acknowledging that this Court "has previously upheld the Corps' conclusion that the risk of a spill was low." ECF No. 433-2 at 26. Revisiting whether the Corps properly evaluated spill risk overall was not within the scope of what the Court required on remand. The narrow issues on remand are whether the Corps properly considered Standing Rock's expert reports and whether they demonstrated the easement's effects were so "controversial" that the Corps was arbitrary to find an EIS was not required. *Standing Rock IV,* 255 F. Supp. 3d 127–28. Regardless, on remand the Corps reviewed the information relied upon in the original EA, conducted additional analysis, and reasonably concluded that risk of spill was low "particularly in light of the engineering and design considerations" including the use of horizontal directional drilling (HDD). Mem. for Record at RAR14.

In order to further evaluate the risk of a spill from the pipeline, the Corps reviewed historical annual report data obtained from PHMSA. *Id.* This data revealed that the leading cause of accidents is corrosion which is a particular risk for older pipelines which may not have been built according to current PHMSA requirements or industry standards. Newer pipelines such as the DAPL employ sophisticated anti-corrosion technologies. *Id.* at RAR18. Moreover, the Corps, as part of the original easement approval, required specific conditions to "improve the efficacy of anti-corrosions measures and further reduce the likelihood of an oil release." *Id.*; DAPL Easement (Dec. 3, 2016), ESMT37.

The most relevant data the Corps reviewed—data for onshore pipelines of similar size, including valve sites, revealed a low risk of spill. And that the spills that did occur were quite small: more than half were less than four barrels total, and more than seventy five percent were below 105 barrels total. Mem. for Record at RAR18. The Corps therefore concluded that the data demonstrated that "most pipeline spills are small" and large releases (10,000 barrels or more) are "extremely uncommon." *Id.* at RAR19; DAPL Project Lake Oahe Spill Model

Discussion at RAR14971 (noting that actual documented spill volumes were "significantly less than the maximum theoretical volumes calculated by the computer models").

Moreover, the Corps observed that pipelines installed via HDD, as DAPL was, experience yet lower risk of release.  Mem. for Record at 19.  The relevant dataset (comprising thousands of accidents since 2010) show that only three spills in the dataset involved HDD, and none were comparable since they involved, respectively, pipelines installed in 1957 and exposed pipelines.  In sum, the Corps concluded "the chance of an oil spill at the Lake Oahe crossing is low and even if there were a spill, it would be of a small amount."  *Id.*  That conclusion is entitled to deference, and Plaintiffs have not shown that it is arbitrary or capricious.

### a.   It was reasonable to consider PHMSA data in assessing risk

Standing Rock argues that instead of relying on PHMSA's data and methodology about spill risk, the Corps should have used an unspecified alternative methodology that considered ETP's safety record.  Standing Rock never explained how it proposed the Corps do this.  But regardless, it was reasonable to rely on the PHMSA data the Corps obtained.

Standing Rock's argument is based on a declaration that asserted a risk analysis should "focus on the operator of the pipeline and their actual performance."  Mem. for Record at RAR136.  The Corps asked for the "specific alternative methodology," *id*. at RAR137, that Standing Rock were proposing so that the Corps could evaluate risk in accordance with Plaintiffs' apparent preference.  However, Standing Rock did not clarify how it wished the Corps to operationalize this proposed methodology.  Instead, the Tribe's declarant did "not identify a specific alternative methodology or particular criteria or performance metrics that the Corps should have considered."  *Id.*  Standing Rock's statement in its brief that the Corps "stop discounting risk by relying on national averages, and evaluate [risk] in light of ETP's safety and compliance record" sheds no additional light.  ECF No. 433-2 at 29.  Without some concrete performance metric or methodology offered by the Tribe, the Corps was reasonable to rely on PHMSA's data to determine the general risk of a spill.

Moreover, in response to this critique, the Corps sought additional information for ETP, who identified that 70% of the incidents within PHMSA's data were confined to the operator's property and that in recent years ETP has undergone extensive PHMSA and internal reviews. Mem. for Record at RAR136-37.  As the vast majority of the spills Standing Rock urges the Corps to consider occurred on the operator's property, the Corps was reasonable to conclude that such a spill at the Oahe crossing "would not reach Lake Oahe or any other land or water used by the Tribe." *Id.* at RAR137.

Finally, even if the PHMSA data the Corps relied upon was incomplete in the sense it did not include more specific data on ETP's safety record, an agency does not engage in arbitrary or capricious decision-making "by relying on incomplete data." *New York v. U.S. Nuclear Regulatory Comm'n*, 824 F.3d 1012, 1022 (D.C. Cir. 2016) (citation omitted).  "To the contrary, such judgments are "entitled to deference," *id.*, and a challenge to the agency's assumptions must be more than "an effort by [a petitioner] to substitute its own analysis" for the agency's, *Transmission Access Policy Study Grp. v. FERC*, 225 F.3d 667, 737 (D.C. Cir. 2000).  Standing Rock's challenge here is at best "an effort by [a plaintiff] to substitute its own analysis" for the agency's, and this is not sufficient to demonstrate the agency's actions arbitrary.  *Transmission Access Policy Study Grp.* 225 F.3d at 737; *U.S. Nuclear Regulatory Comm'n*, 824 F.3d at 1022.

> **b.  Whether the pipeline complies with specific "best practices"
> does not render its impacts "highly controversial" or the
> Corps' analysis arbitrary**

Standing Rock argued in its submissions that ETP should be required to comply with certain "industry best practices," and argues in its brief that failure to adopt these practices renders the Corps' decision-making arbitrary.  ECF No. 433-2 at 30.  This misses the mark in several ways.

First, NEPA is a procedural statute that "simply guarantees a particular procedure, not a particular result."  *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 737 (1998).  That the Corps did not ultimately impose additional conditions requiring "best practices" upon ETP is not

evidence the decision-making was arbitrary or the environmental impacts are "highly controversial." So long as, consistent with the "rule of reason," the Corps considered the environmental impacts of its decision to allow the pipeline to cross federal property (including by taking into account, among other things, information from Plaintiffs' and their experts) the Corps has complied with NEPA.

Moreover, the Corps explained in its response to the Standing Rock's remand report discussion of best practices that the pipeline is consistent with or exceeds applicable regulatory standards. Analysis of Submissions at RAR232-34. This Court has already found that it is proper to rely on regulatory standards in evaluating impacts under NEPA. *Standing Rock IV,* 255 F. Supp. 3d at 126 (citing *EarthReports, Inc. v. FERC*, 828 F.3d 949, 957 (D.C. Cir. 2016)). The Corps—in consultation with PHMSA—imposed 36 specific significant conditions designed to ensure safety upon the easement. DAPL Easement (Dec. 3, 2016), ESMT37-42; Mem. for Record at RAR13. That the Corps did not impose additional conditions or best practices that Plaintiffs preferred is not evidence the NEPA analysis was arbitrary, or that the impacts of the Corps' action are likely to be "highly controversial." It is Plaintiffs' burden to show that the Corps' decision-making was arbitrary and capricious because the science behind the Corps' determinations is highly controversial. Standing Rock has not met that burden.

**c.   Type of oil within the pipeline does not render its impacts "highly controversial" or the Corps' analysis arbitrary**

There is no dispute that the pipeline contains Bakken crude oil, which has slightly different properties from other types of oil. But there is not sufficient scientific controversy as to the nature of this oil to render the overall impacts of the Corps' action "highly controversial." The Corps reviewed the Standing Rock's submissions regarding Bakken crude oil and its potential impact on emergency response, and independently researched the oil's characteristics. *See* Light Crude Oil, RAR7378-82; Modeling Evaluation at RAR8748; Envtl. Pollution Article (July 12, 2017), RAR13687. PHMSA does not treat "Bakken" crude any differently than other

crude oil and PHMSA does not require different procedures in responding to releases of Bakken oil. Analysis of Submissions at RAR237. The Corps also noted that the relevant spill response plan includes continuous air monitoring to protect first responders, including from Bakken oil that Standing Rock argued was more flammable. *Id.* As with Standing Rock's comments regarding industry best practices, the Corps reasonably considered the Plaintiffs' submissions regarding Bakken crude and concluded that compliance with existing regulatory standards and PHMSA emergency response guidance documents was sufficient. While Standing Rock would like additional review of impacts stemming specifically from a spill of Bakken crude, the Corps' NEPA review is not unreasonable simply because more could be done. "It is of course always possible to explore a subject more deeply and to discuss it more thoroughly. The line-drawing decisions necessitated by this fact of life are vested in the agencies, not the courts." *Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 66 (D.C. Cir. 1987).

### 4. The Corps' conclusion that there was not sufficient controversy and that an EIS was required was neither arbitrary nor capricious

Lost in Standing Rock's flyspecks of the Corps' methodological choices is the bigger picture: that the Court largely upheld the Corps' NEPA analysis as reasonable. As it relates to the "controversy" factor, the Court only directed the Corps to explain its consideration of certain reports. The Court was clear that "[c]orrecting the flaw does not require [the Corps to] begin anew, but only that they better articulate their reasoning below." *Standing Rock V*, 282 F. Supp. 3d. at 98. Thus, with respect to the highly controversial question the Court ordered the Corps to simply "exercise its judgment in analyzing Plaintiffs' expert critiques." *Id.* at 99.

Standing Rock does not argue that the Corps did not properly considered their 2017 expert reports. Instead the Tribe focuses on the Spill Model Report and risk assessment to argue "anew" that the overall analysis was arbitrary, or alternately (it is not totally clear from Standing Rock's brief) that there is now sufficient "controversy" that the Corps was arbitrary to conclude no EIS was required. This argument has no merit, even if consistent with the Court's remand.

Standing Rock's criticisms of the Spill Model report and risk assessment do not demonstrate that the impacts of the Corps' actions are "highly controversial."  An action is highly controversial only if there is "a substantial dispute . . . as to the size, nature, or *effect* of the major federal action."  *Town of Cave Creek, Ariz. v. F.A.A.,* 325 F.3d at 331.  But while Standing Rock focuses myopically on impacts from a worst case discharge it is important to remember that the Corps' is not permitting a worst case discharge—the Corps is granting an easement for a portion of the pipeline to cross federal property, the *expected* result of which his no discharge at all.  *See Defs. of Wildlife*, 684 F.3d at 1250 ("This project concerns [drilling operations], not an expected oil spill from those operations.  Thus, the expected operations under the [drilling operations] will not have a significant effect on the endangered species.").  The impacts of pipelines are well known from PHMSA data and not controversial.  As discussed above, after a comprehensive review of data from the expert agency, PHMSA, (as well as the entire record and remand record), the Corps concluded that "the chance of an oil spill at the Lake Oahe crossing is low and even if there were a spill, it would be of a small amount."  Mem. for Record at RAR19.  There is no true "controversy" regarding the underlying scientific method that justifies this conclusion.

Standing Rock primarily relies on *National Parks Conservation Association v. Semonite*, 916 F.3d 1075, 1083 (D.C. Cir. 2019), *amended on reh'g in part*, 925 F.3d 500 (D.C. Cir. 2019), to argue that a dispute over methodology can be sufficient to demonstrate a project is "highly controversial."  The methodological dispute at issue in *National Parks* is highly distinguishable.  In *National Parks,* "a specialist at the Department of Energy . . . found the Corps' analyses 'scientifically unsound' and 'completely contrary to accepted professional practice.'"[7] Id. at 1080.  Similarly, the Park Service argued the analysis "d[id] not meet [its] standards."  *Id.* at 1084.  Other agencies with relevant experience expressed similar concerns.

---

[7] While not directly relevant here, the report in question was prepared by the specialist in his personal capacity, not on behalf of the Department.

In contrast, here, PHMSA—the agency with additional expertise on pipeline safety—provided the data that the Corps used to assess spill risk and did not object to the worst case discharge methodology or underlying assumptions.  DAPL Project Lake Oahe Spill Model Discussion at RAR14964; Modeling Evaluation at RAR8747 (Spill Model Report's "full bore rupture release volumes accepted by the PHMSA").  While "not dispositive," PHMSA's role here is "additional evidence of a lack of controversy."  *Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1182 (10th Cir. 2012); *Nw. Envtl. Advocates v. Nat'l Marine Fisheries Serv.,* 460 F.3d 1125, 1139 (9th Cir. 2006); *Nat'l Wildlife Fed'n v. Norton,* 332 F. Supp. 2d 170, 185 (D.D.C. 2004).  *Cf. Friends of the Earth v. U.S. Army Corps of Eng'rs,* 109 F. Supp. 2d 30, 43 (D.D.C. 2000) (controversy where "three federal agencies and one state agency have all disputed the Corps evaluation").

Moreover, in this case even the Plaintiffs' own experts do not argue the oil spill modeling done here is "completely contrary to accepted professional practice."  Nor could they given that it was created using the industry standard OILMAP and SIMAP software.  Indeed, Plaintiffs' experts adopted a similar methodology in their expert reports—and ultimately predicted a smaller discharge than the more conservative PHMSA methodology used here.  *See* pages 17-20, above.  This case is thus more similar to *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 82 (D.D.C. 2019).  In *WildEarth*, Plaintiffs offered an alternative methodology for analyzing impacts related to greenhouse gas emissions.  The court found that "although WildEarth and other organizations raised concerns about the climate change Methodologies—or lack thereof—employed by BLM . . . BLM considered Plaintiffs' suggested methodologies and explained why it did not use them."  *Id.*; *see also Conservation Cong. v. U.S. Forest Serv.*,  235 F. Supp. 3d 1189, 1203 (E.D. Cal. 2017), *aff'd*, 775 F. App'x 298 (9th Cir. 2019) (the agency "considered opposing viewpoints and chose to rely on the conclusions of its own experts; those conclusions are tailored to this specific Project.  This cited disagreement does not trigger the 'highly controversial' factor").  The same is true here.  The Corps reviewed the Plaintiffs'

critiques and adequately explained why it was reasonable to rely on PHMSA data and PHMSA-required spill model methodology.  *See* pages 13-22, above.

Plaintiffs have critiqued the adopted methodology for preparing a Spill Model Report and determining a worst case discharge, but ultimately, PHMSA and the Corps are "entrusted with the responsibility of considering the various modes of scientific evaluation and theory and choosing the one appropriate for the given circumstances."  *Sierra Club v. U.S. Dep't of Transp.*, 753 F.2d 120, 129 (D.D.C. 1985).  The Corps was not "required to accept every possible method of . . . analyzing data" here.  *Id.; Colo. River Cutthroat Trout v. Salazar*, 898 F. Supp. 2d 191, 205 (D.D.C. 2012) ("Although the plaintiffs raise plausible criticisms of the methodology chosen . . ., an agency's choice of methodology need only be reasonable to be upheld.") (citation omitted).  When specialists express conflicting views, an "agency must have discretion to rely on the reasonable opinions of its own qualified experts even if . . . a court might find contrary views more persuasive."  *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989).

### C.      The Corps properly considered environmental justice on remand

The Corps appropriately and comprehensively considered environmental justice impacts on remand.  *See* pages 3-4, above.  While Standing Rock would have preferred the Corps conduct a slightly different analysis, the Tribe's three arguments[8] are insufficient to show that the Corps' consideration of environmental justice was arbitrary.

First, Standing Rock argues that the Corps was arbitrary in its consideration of environmental justice because it "trivializes the impacts to the Tribe by rationalizing that they would also be felt by non-Tribal members."  ECF No. 433-2 at 38.  This argument is not persuasive.  The Corps' environmental justice analysis carefully considers impacts that are specific to the Tribes.  In a section of the Remand document captioned "Tribal cultural, spiritual,

---

[8] SRST's first argument is merely a cross application of their general disagreement with the Corps' conclusion that the risk of a spill was low and thus there is not likely to be an impact. ECF No. 433-2 at 36.  That argument is addressed at pages 21 to 22 of this brief.

and ceremonial practices and beliefs that are vulnerable to impacts from a potential spill" the Corps carefully assesses inputs from the Tribes regarding the "use of the lands, waters and resources surrounding and within Lake Oahe." Mem. for Record at RAR83. This section relies extensively on representations from each Tribe on a broad range of topics specific to the Tribes including their religious and cultural beliefs, their specific uses of plants, animals, and other resources in the area. *Id.* at RAR86-89. The Corps expressly found that "[i]mpacts to the quality of water required for spiritual ceremonies, temporary degradation of habitat for plants used for medicinal and ceremonial purposes, loss of enjoyment of Lake Oahe for recreation and ceremonial use during lake closures could all be potential impacts that are unique to tribal populations." *Id.* at RAR87. The Corps never claims these tribe-specific potential impacts would be felt by the population at large.

The only case Standing Rock cites in support of this argument is easily distinguishable. In *Crenshaw Subway Coal. v. Los Angeles Cty. Metro. Transp. Auth.*, No. CV 11-9603 FMO, 2015 WL 6150847, at *31 (C.D. Cal. Sept. 23, 2015), the court *affirmed* the agency's NEPA analysis but criticized its reasoning. The agency had found that impacts were not disproportionate though they were largely borne by minority and low income groups because "the effects would be distributed equally along the project alignment." *Id.* at *30. The Court critiqued this reasoning, noting "if a minority community is substantially impacted by the Project and the rest of Los Angeles County is not, it matters little that the sub-parts of the minority community have been impacted equally." *Id.* This case is distinguishable for the simple reason that the Corps makes no such claim of "uniform" impacts as it relates to the Tribes' issues of concern. To the contrary, the Corps "recognizes that many uses and benefits of Lake Oahe are unique to the Tribes. . . ." Mem. for Record at RAR84. As such, the Corps "considered the location of the tribal populations in light of where the modeled spills are expected to have the most impact," *id.* at RAR86, and "identified numerous uses of Lake Oahe that are specific to

Tribal communities." *Id*. at RAR87. *See also id*. at RAR88 (tribal hunting and fishing practices susceptible to impacts from a potential spill); RAR91 (tribal water intake considerations).

Standing Rock's second argument fares no better. The Tribe argues that the Corps "masks the disproportionate impact" on Tribes because the Corps concluded that the Lake Oahe crossing "contains fewer potentially affected minority individuals than does the North Bismarck Alternative crossing." ECF No. 433-2 at 38-39. Standing Rock does not dispute this conclusion as a factual matter—the record is clear that there are more minority individuals surrounding the North Bismarck location. And only by reading out the first half of the Corps analysis could the Tribe find that the Corps does not disclose disproportionate potential impacts on Tribes and tribal members. As the proceeding discussion makes clear, the Corps—with input from the Tribes themselves—carefully documented the Tribes' uses of the area and the potential impacts that would be specific to Tribes and tribal members. The Corps elsewhere in the document concludes, correctly, that the North Bismarck Alternative had an overall larger potential impact on minority individuals. *See id*. at RAR75-82. This is largely because of the larger minority population in the Bismarck area. *Id.* But this reality does not detract from the Corps' discussion of tribe-specific impacts which is present throughout the entire remand document.[9]

In sum, the Corps took a "hard look" at environmental justice and carefully documented potential disproportionate impacts on the tribal members and other environmental justice communities. That Standing Rock would conduct the analysis differently is not sufficient to show the analysis was arbitrary.

## II.    The Corps' remand process was neither arbitrary nor capricious. The Corps reasonably tailored its remand analysis to match the Court's instructions

The Corps reasonably used this Court's remand order to guide its engagement with Standing Rock on remand. Standing Rock misinterprets this Court's grant of summary judgment

---

[9] The Corps notes that, as set forth in its opposition to Yankton's motion for summary judgment, Yankton argues that the Corps' environmental justice analysis should have spanned hundreds of miles spread across four different states. *See* ECF No. 435-1 at 11; RAR3142.

to the Corps as "recognize[ing]" that the Corps "is bound by various directives that require meaningful, transparent, and open consultation." ECF No. 433-2 at 40 (citing *Standing Rock IV*, 255 F. Supp. 3d at 155-56). The Court previously held that the Corps engaged in a robust consultation process regarding the EA. The Court reviewed the Administrative Record and found that "the record clearly indicates that the Corps solicited Cheyenne River's views on the DAPL project well before publishing the EA and issuing the Section 408 permit and easement, and communicated regularly with [Cheyenne River representatives by] phone calls, letters, and in-person meetings." *Standing Rock IV*, 255 F. Supp. 3d at 155-159. It therefore rejected the claim that the Corps' consultation breached alleged duties under "Department of Defense Instruction 4710.02 and NEPA's implementing regulations" because the Corps' "actions were sufficient to satisfy the early-comment and consultation goals articulated in the Defense Department Instruction and NEPA's implementing regulations." *Id*. Contrary to Standing Rock's interpretation, the Court held that, because the Corps satisfied any duty to consult with Cheyenne River, it "need not address the Corps' alternative contention that the DoD Instruction and NEPA's implementing regulations do not impose binding consultation duties." *Id.* at 156. As set forth below, Standing Rock is incorrect that the Corps had a mandatory duty to consult, particularly given the narrow scope of remand. Regardless, the record establishes that the Corps fulfilled any consultation duty.

Standing Rock's challenge to consultation during a remand process is similar to *TOMAC v. Norton*, in which the district court "concluded that BIA sought out and properly considered the available data, thereby fulfilling its responsibility under NEPA" with respect to the majority of the NEPA challenges. 433 F.3d at 858 (citation omitted).[10] The Court found two "flaws" in the

---

[10] While it is unnecessary for the Court to reach this issue because of the Corps' robust efforts to obtain tribal comments on the remand analysis, it is far from clear that any public comment would have been necessary even if the Corps was starting from scratch with a new EA. *See Blue Ridge Envtl. Def. League v. NRC*, 716 F.3d 183, 189 (D.C. Cir. 2013) ("Although Petitioners contend that similar public comment is mandatory for all EAs, we have held that 'the agency has

agency's analysis and "remanded the EA to the agency 'for such further evaluation and elaboration of its reasoning as BIA desires to submit concerning secondary growth issues.'"  *Id.* (c).  The D.C. Circuit upheld the agency's remand analysis despite the fact that the agency did not seek *any* additional comments.  *TOMAC*, 433 F.3d at 861-62 ("The record here indicates that BIA sought comment on the original draft EA and provided detailed responses to comments it received.  The EA Supplement merely amplified the issues that had been addressed in BIA's original 2001 EA, so the agency reasonably concluded that further public comment was unnecessary.  On this record, we find no merit in TOMAC's claim that another round of public comment was required.").  The D.C. Circuit found that "BIA acted appropriately given the prior public involvement, and no statute or regulation requires anything more."  *Id.*  To be clear, the Corps was not required to begin its environmental analysis anew.  It was instead required to address the discrete issues posed by the Court's narrow remand.

Standing Rock is incorrect to the extent that it claims, ECF No. 433-2 at 42-45, that the Corps was required to seek the Tribe's comments all of the information provided by Dakota Access.  Even if Standing Rock's challenge did not arise under a narrowly-circumscribed remand, an agency has significant discretion and need only involve the public "to the extent practicable" in preparing an EA.  *Biodiversity Conservation All. v. U.S. Bureau of Land Mgmt.*, 404 F. Supp. 2d 212, 220 (D.D.C. 2005) (quoting 40 C.F.R. § 1501.4(b))[11]; *WildEarth Guardians v. U.S. Fish & Wildlife Serv.*, 784 F.3d 677, 698 (10th Cir. 2015) (agencies can "shield[] from public notice and comment the documents the EA relied upon. . . .").  And if the Corps were required to reopen public comment each time it received responses from the

---

significant discretion in determining when public comment is required with respect to EAs.'"); *TOMAC*, 433 F.3d at 861 ("[N]othing in the CEQ regulations suggests that another comment round is necessary following an agency's issuance of a supplemental EA.  And two of our sister Circuits have found that public input during the EA process is not required.") (citations omitted).

[11] Standing Rock's citation, ECF No. 433-2 at 42, to *Biodiversity Conservation Alliance* for the proposition that determining the adequacy of stakeholder involvement in developing an EA is curious, as that Court upheld an agency decision where the agency: 1) did not circulate a draft EA for public comment; and 2) allowed a single, thirty-day comment period after advising the public of proposed action.  404 F. Supp. 2d at 220.

applicant to previous public comments, "the comment period could continue in a never-ending

circle." *Sierra Club v. U.S. Army Corps of Eng'rs,* 450 F. Supp. 2d 503, 535 (D. N.J. 2006)

(upholding Corps' decision not to open a supplemental notice and comment period following

submission of studies by the permit applicant in response to negative comments, which the Corps

relied upon in granting the permit), *vacated as moot by Sierra Club v. U.S. Army Corps of*

*Eng'rs*, 277 F. App'x 170, 173 (3d Cir. 2008); *Fund For Animals, Inc. v. Rice*, 85 F.3d 535, 545

(11th Cir. 1996) (recognizing Corps' discretion in determining whether to issue supplemental

public notice and upholding its permit decision even though the Corps did not reopen the

comment period after an applicant added a 2.5 mile access road to project after the close of the

comment period).[12]   Standing Rock's submission of additional information on July 23, 2018,

requiring the Corps to delay completing its remand analysis illustrates that the specter of a never-

ending comment period is no idle threat.   ECF No. 361 at 2; Email from T. Tracy, Corps (July

23, 2018), RAR1070.   So even if the Corps were preparing an EA anew, which it was not, the

Corps need only involve the public to the extent "practicable."   40 C.F.R. § 1501.4(b).[13]

The Corps reasonably used the Court's remand to guide its interactions with Standing

Rock.   The Court held that the Corps "did not sufficiently weigh the degree to which the

project's effects are likely to be highly controversial in light of critiques of its scientific methods

and data."   *Standing Rock IV*, 255 F. Supp. 3d at 147.   In other words, the Court clearly tied the

Corps' analysis of whether the project was highly controversial to the Tribes' critiques.   *Id*. at

---

[12] While this case does not involve an Environmental Impact Statement, the Corps notes that even in cases that where an EIS is appropriate, "NEPA does not require an additional round of public comments every time an agency revises, supplements, or improves its analysis in response to the public comments on a DEIS."   *Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 548 (8th Cir. 2003).   Indeed, "[i]f agencies were required to issue a supplemental statement with every project adjustment, it would discourage them from making corrections and improvements in response to public comments."   *Id.*
[13] The NEPA regulations also provide the Corps with discretion in engaging with state and tribal governments.   *Comanche Nation of Okla. v. Zinke*, 754 F. App'x 768, 775 (10th Cir. 2018) ("Agencies should consult with 'appropriate State and local agencies and Indian tribes.' 40 C.F.R. § 1501.2(d). The regulation's use of the term 'appropriate' suggests an agency possesses discretion in determining which bodies to consult.").

127-129, 147.  The Corps reasonably asked Standing Rock to confirm the completeness of its

critiques.  Letter from Col. Hudson to Chairman Archambault (Sept. 25, 2017), RAR13325-27.

The Court similarly charged the Corps with addressing tribal hunting, fishing, and environmental

justice issues on remand.  *Standing Rock IV*, 255 F. Supp. 3d at 112.  Here too, the Corps

reasonably sought information from Standing Rock.  *Id*.  Just as the Corps need not go to Dakota

Access for information about tribal cultural practices, the Corps need not go to Standing Rock to

critique Standing Rock's own critique.  The Corps instead reasonably sought a response to the

tribes' critiques from Dakota Access.  Letter from K. Fink, Army to C. Sonneborn, ETP (Aug.

24, 2017), RAR13605-07.

Standing Rock's citation to *Lower Brule Sioux Tribe v. Deer*, 911 F. Supp. 395 (D.S.D.

1995), ECF No. 433-2 at 41, illustrates the reasonableness of the Corps' consultation here.  In

that case, the Court recognized that a "one to two hour meeting" at which the agency provides

justification for its reasoning satisfies consultation.  *Lower Brule Sioux Tribe*, 911 F. Supp. at

401.  The Corps' engagement here far outstripped that standard, as it engaged in a robust effort

that included: 1) providing information to Standing Rock; 2) attempting to meet with the Tribe

numerous times; 3) meeting with the Tribe twice; and (4) considering and relying on information

the Tribe provided in the final remand analysis.  *See* pages 7-10, above, and 38-39, below.

And Standing Rock's citation of *Theodore Roosevelt Conservation Partnership v.*

*Salazar*, 616 F.3d 497, 518 (D.C. Cir. 2010) is similarly unavailing.  While Standing Rock is

correct that the D.C. Circuit noted that agencies must permit the public to play a role in agency

decisionmaking under NEPA, it also held that "the Bureau need not include the public in the

preparation of every EA."  616 F.3d at 519.  Indeed, the D.C. Circuit affirmed that agencies have

significant discretion in determining when public comment is necessary.  *Id*. (citing *TOMAC*,

433 F.3d at 861).  Moreover, the D.C. Circuit held that the agency need not release draft EAs for

comment absent unusual circumstances.  *Id*.  Here, Standing Rock had an opportunity to

comment on the EA.  Indeed, the remand in large part concerns tribal comments on the EA.  And

as set forth below, the Corps reasonably tailored its analysis to that remand and sought appropriate information from Dakota Access, Standing Rock, and the other tribal plaintiffs.

### A.    Standing Rock failed to identify any duty to consult

While it clear that the Corps went to great lengths to consult with and obtain input from Standing Rock, the Tribe nonetheless argues that the Corps violated a duty to consult in accordance with Department of Defense Instruction 4710.02.  ECF No. 433-2 at 40.  Indeed, even if the Court had not narrowly defined the remand analysis, Standing Rock is incorrect that Instruction 4710.02 imposes any consultation requirement on the Corps.[14]

Standing Rock's citation to three cases involving consultation with the Oglala, Cheyenne River, and Yankton Sioux Tribes, ECF No. 433-2 at 40, highlights the reasonableness of the Corps' consultation efforts.  The D.C. Circuit recently found the discussion of consultation in *Oglala Sioux Tribe v. Andrus*, 603 F.2d 707, 710 (8th Cir. 1979) "inapposite" because the agency in *Oglala* "'acknowledged at trial' that the contested decision 'had already been made prior to' the first meeting between Tribal members and agency officials discussing the decision." *United Keetoowah Band of Cherokee Indians in Okla. v. FCC*, 933 F.3d 728, 750-51 (D.C. Cir. 2019) (citing *Oglala Sioux*, 603 F.2d at 710).[15]  In other words, the agency made its initial decision in *Oglala Sioux* before the agency even met with tribe.  The record here establishes otherwise.  *See* pages 7-10, above.  *Yankton Sioux Tribe v. Kempthorne* is also distinguishable because it applied a statute that contained an explicit, affirmative consultation duty to require consultation.  442 F.

---

[14] Multiple tribes argued that Instruction 4710.02 imposed mandatory consultation duties.  Rather than repeat the entirety of its arguments to the contrary, the Corps hereby incorporates pages 15 through 17 of its Opposition to Cheyenne River's Motion for Summary Judgment.  The Corps also hereby incorporates page 29 of its Opposition to Yankton's Motion for Summary Judgment in response to Standing Rock's argument, ECF No. 433-2 at 50-53, that this Court should vacate the Lake Oahe easement.

[15] The Ninth Circuit found *Oglala Sioux* to be inapposite because, where the issue was not conceded by BIA, guidelines are not "the same as regulations that must be applied. . . . are in letter form and unpublished . . . [and] give direction to the [agency]."  *Hoopa Valley Tribe v. Christie*, 812 F.2d 1097, 1103 (9th Cir. 1986).  The Ninth Circuit noted BIA's guidelines therefore "do not establish legal standards that can be enforced."  *Id.*

Supp. 2d 774, 784 (D.S.D. 2006) (citing 25 U.S.C. § 2011(b)(2)(B) which provides: "By law, consultation requires open discussion of all potential issues or changes between the BIA and the Tribes."); *see also* 25 U.S.C. § 2011(b)(1) ("All actions under this Act shall be done with active consultation with tribes.").[16]  Standing Rock does not point to a similar statute here.  And whereas the Bureau of Indian Affairs likely undermined the consultation process by misstating facts about its challenged policies in *Yankton Sioux Tribe*, 442 F. Supp. 2d at 785, Standing Rock does not allege, much less establish, any similar misstatement.

> **B.**     **The Corps fulfilled any duty to consult with Standing Rock**

In evaluating Cheyenne River's previous claims that the Corps' consultation violated Department of Defense Instruction 4710.02 and NEPA, the Court held that the Corps met any applicable consultation duty.  *Standing Rock IV*, 255 F. Supp. 3d at 155-60.  Standing Rock's claim here fails for the same reason.  The Corps repeatedly attempted to engage, and actually consulted, with Standing Rock.

Standing Rock's attacks on the Corps' remand contain multiple mischaracterizations. First, Standing Rock is incorrect, ECF No. 433 at 42 that the Corps failed to engage with it early enough in the remand process.  The Corps first "conducted its own analysis of available information and considered materials in the administrative record."  Mem. for Record at RAR1. The Corps began seeking information from Standing Rock on September 25, less than two weeks after an internal scoping meeting.  Minutes of meeting re: DAPL Remand Discussion (Sept. 13, 2017), RAR13365; Letter from Col. Hudson to Chairman Archambault (Sept. 25, 2017), RAR13325-27.  And the Corps and Dakota Access invited Standing Rock to meetings in January, February, and March to share information and solicit comments.  Email from C. Borkland, ETP (Mar. 1, 2018), RAR6565.  Standing Rock fails to establish how the Corps'

---

[16] *Cheyenne River Sioux Tribe v. Jewell*, 205 F. Supp. 3d 1052, 1057 (D.S.D. 2016), which Plaintiff also relies upon, ECF No. 436-1 at 18, arose under the same statute.

efforts to engage with Standing Rock multiple times over almost a year came too late in the remand.  Standing Rock's failure to fully engage cannot be held against the Corps.

Much of Standing Rock's challenge to the Corps' remand process, ECF No. 433-2 at 43-45, amounts to the unsupported allegation that the Corps failed to provide Standing Rock with information.  As set forth above, the Corps reasonably tailored its analysis to the remand and focused on the Standing Rock reports that were the subject of the remand.  And while the Corps had no duty to provide Standing Rock with additional information, *see* pages 30-36, above, Standing Rock either received or could have received much of the information it claims was wrongfully withheld.  Standing Rock's February 8, 2018 letter demanded ten types of information.  Letter from Chairman Faith to ETP (Feb. 8, 2018), RAR9096-99 (also requesting Facility Response Plan and Spill Model).[17]  Standing Rock relies on a February 15 email to assert that Dakota Access refused to share much of the requested information.  ECF No. 433-2 at 44 (citing RAR8403 to assert that Dakota Access was unwilling to share various information).  While Standing Rock correctly characterizes the email, the story did not end on February 15.

On February 23, 2018, the Corps provided Standing Rock with copies of the Geographic Response Plan and other information that it was prepared to discuss at the February 8, 2018 meeting.  Letter from Col. Hudson to Chairman Faith (Feb. 23, 2018), RAR6604-05.  On March 1, 2018, Dakota Access responded to Standing Rock's information requests by noting that the Geographic Response Plan that was most recently sent to Standing Rock on February 23 contained discussions on "remote monitoring and SCADA systems, as well as . . . the composition of Bakken Crude" —thereby addressing two of Standing Rock's requests.  Email from C. Borkland, ETP (Mar. 1, 2018), RAR6565.  Dakota Access stated that it would be "prepared to show and explain . . . the results of the recent spill modeling and discuss how those

---

[17] In leaving the February 8 meeting after presenting its letter, Standing Rock passed up an opportunity to review and "take with them" copies of the then-current draft spill response plans and receive additional information that it purportedly sought.  Email from C. Borkland, ETP (Feb. 14, 2018), RAR8453; Email from C. Borkland, ETP (Mar. 1, 2018), RAR6565-66.

results are informing the response planning" and promised to provide an updated Geographic

Response Plan at the March 7 meeting.  *Id.*  Rather than attend and receive this information,

Standing Rock passed a resolution stating its refusal to meet with ETP.  Res. No. 80-18 (Mar. 6,

2018), RAR6429.  The Corps nonetheless provided the Facility Response Plan that Standing

Rock requested.  Letter from Col. Hudson to Chairman Faith (Mar. 5, 2018), RAR6436

(highlighting information on personnel and Bakken crude Standing Rock requested).  In sum,

Standing Rock received much of the information it sought within a month of its February 8, 2018

demand.  *Cf.* Letter from Chairman Faith to ETP (Feb. 8, 2018), RAR9096-99.  Standing Rock's

characterization of the quantity of information it received does not withstand scrutiny.

  Standing Rock similarly mischaracterizes the nature of the Corps' remand analysis.

Standing Rock claims that the Corps rubber stamped Dakota Access's analyses, ECF No. 433-2

at 5.  Its primary support is Standing Rock's assertion that multiple versions of a document

contain similar language stating that "no new information" calls into question the Corps' original

Finding of No Significant Impact.  *Id.* at 5-7, 43.  Standing Rock is incorrect, *id.* at 43, that both

a February 2018 draft and the final remand analysis contain identical language.  *Compare* Mem.

for Record at RAR1-2; Technical Analysis of Remand Items (Feb. 4, 2018), RAR10203.  And

contrary to Standing Rock's core theory that the Corps rubber-stamped Dakota Access's work

without considering tribal input, the draft analysis changed so much between February 2018 and

August 2018 that Standing Rock was unable to recognize it.

  Indeed, Standing Rock filed a motion to complete the administrative record, claiming that

"several versions of a draft 'technical analysis' of the three remand issues appear.  RAR990;

RAR8612; RAR10203.  Final versions of these documents do not appear in the administrative

record and should be produced if they exist."  ECF No. 401 at 16.  In response, the Corps

explained that "[t]hrough various revisions, formatting, and edits based on Corps comments, the

documents evolved over time to become the final Corps Remand Analysis document and related

comments and responses."  ECF No. 402 at 17 (citing Mem. for Record at RAR1-140).  Thus,

the final versions that Plaintiffs request are already contained in the remand record." *Id.*[18]  To be

clear, between February and August, the Corps shared information with Standing Rock, obtained

written information from the Tribe, met twice with the Tribe, and incorporated that information

into its analysis to such a degree that the February draft analysis was rendered unrecognizable.

*E.g.* Mem. for Record at RAR5-10, 40-43, 45, 58, 61, 66-69, 82-86, 88-91, 102-139

(incorporating tribal input).  Standing Rock is simply incorrect to suggest that this process fell

short of any duty to consult.  The remand record establishes to the contrary that the Corps

fulfilled any obligation by consulting with Standing Rock in any ordinary sense of the word.

*United Keetoowah Band*, 933 F.3d at 750-51 (upholding consultation where agency "presented

abundant evidence that it 'consulted' Tribes in the ordinary sense of the word, and the Tribes

have offered no other concrete standard by which to judge the [agency's] efforts").  The Corps'

efforts to obtain information from and consult with Standing Rock were wholly proper and by no

means arbitrary or capricious, particularly given the narrow scope of the Court's remand.

## III.     Standing Rock's NHPA claims are moot, but even if they were not, the Corps complied with the NHPA

### A.     Standing Rock's NHPA claims are moot

Standing Rock's effort to revive its NHPA claims fail because, as the Tribe itself

recognized, its NHPA claims were moot as soon as construction was complete.  This Court

should reaffirm its decision that pre-remand NHPA claims are moot because this Court can

provide no meaningful relief.  *Standing Rock VI*, 301 F. Supp. 3d at 61-64.  Standing Rock is

incorrect, ECF No. 433-2 at 45-50, that its pre-remand consultation claims fit into the narrow

category of cases that are capable of repetition but evading review.  Standing Rock bears the

burden of proving that the particular wrongs that it allegedly suffered are capable of repetition

but evading review.  *Guedes v. BATFE*, 920 F.3d 1, 15 (D.C. Cir. 2019).  It fails to establish

either that "(i) the challenged action is 'in its duration too short to be fully litigated prior to its

---

[18] Standing Rock dropped its challenge to the completeness of the record.  ECF No. 405 at 11-12.

cessation or expiration,' [or] (ii) there is a 'reasonable expectation that the same complaining party will be subject to the same action again.' *Guedes*, 920 F.3d at 14.

First, Standing Rock does not meet its burden of establishing that the challenged action cannot be fully litigated.  "For a controversy to be 'too short to be fully litigated prior to cessation or expiration,' it must be of '*inherently* limited duration.'  This is so because the 'capable of repetition, yet evading review' exception is concerned not with particular lawsuits, but with classes of cases that, absent an exception, would *always* evade judicial review." *ProtectMarriage.com - Yes on 8 v. Bowen*, 752 F.3d 827, 836 (9th Cir. 2014) (citation omitted). "[A] party may not profit from the 'capable of repetition, yet evading review' exception to mootness, where through his own failure to seek and obtain a stay he has prevented an appellate court from reviewing the trial court's decision." *Bunker Ltd. P'ship v. United States*, 820 F.2d 308, 311 (9th Cir. 1987) (exception inapplicable to "situations where the failure of parties to take certain actions has precluded review as a practical matter.").  As in the case of a challenge to a waste water treatment plant, the pipeline "was not built in a day." *James Luterbach Constr. Co. v. Adamkus*, 781 F.2d 599, 602 (7th Cir. 1986) (mootness exception inapplicable).

The two D.C. Circuit cases that Standing Rock cites serve only to highlight that Standing Rock failed to establish that the challenged action was too short in duration to be fully litigated. *Ralls Corp. v. Committee on Foreign Investment* involved an agency order that could last for only 90 days before either expiring or being superseded.  758 F.3d 296, 323 (D.C. Cir. 2014). The D.C. Circuit *contrasted Ralls* with a case where a Plaintiff could pursue a preliminary injunction through appeal.  *Id.*  ("In *Armstrong,* had Armstrong successfully moved to enjoin the administrative proceeding, his claim most likely would not have been mooted.") (citing *Armstrong v. FAA*, 515 F.3d 1294, 1296 (D.C. Cir. 2008)).  *Armstrong* requires a plaintiff to "make a full attempt to prevent his case from becoming moot, an obligation that includes filing for preliminary injunctions and appealing denials of preliminary injunctions." *Newdow v.*

*Roberts*, 603 F.3d 1002, 1009 (D.C. Cir. 2010) (interpreting *Armstrong*, 515 F.3d at 1296); *see also Grass Works Lawn Care v. Acosta*, No. CV 18-1581 (RMC), 2019 WL 1981087, at *6 (D.D.C. May 3, 2019). *Montgomery Environmental Coalition v. Costle* similarly involved a challenge to a permit that would expire in four years that could not be challenged within that time period. 646 F.2d 568, 581 (D.C. Cir. 1980). And C*hristian Knights of the Ku Klux Klan Invisible Empire, Inc. v. D.C.* involved a challenge to a permit for a march that was limited to a single day. 972 F.2d 365, 367-68 (D.C. Cir. 1992). There was no way to resolve the controversy prior to the day of the contested march without the march either occurring or not occurring. In contrast, Standing Rock could have fully prosecuted its preliminary injunction motion but failed to take actions that would have prevented its NHPA claims from being rendered moot.

      *Kingdomware Techs., Inc. v. United States* is also inapposite. It involved a challenge to a contract procured by the Department of Veterans Affairs for an "Emergency Notification Service for four medical centers" that "sends important information to Department personnel" in emergencies. 136 S. Ct. 1969, 1974 (2016). The Supreme Court affirmed that the "capable of repetition, yet evading review" exception "applies 'only in exceptional situations.'" *Id*. at 1976. In *Kingdomware*, an injunction would have left the agency without the emergency notification service and performance on the contract was completed within fifteen months. *See id*. at 1975. *Kingdomware* therefore presented the type of issue that "will only ever present a live action until a particular date, after which the alleged injury will either cease or no longer be redressible." *ProtectMarriage.com - Yes on 8,* 752 F.3d at 836. It is distinguishable from cases – such as this one – where "a court can ensure that a live controversy persists until the action is fully litigated by enjoining the challenged conduct until the litigation concludes." *Id*.

      Standing Rock also fails to establish that it has a reasonable expectation that it will be subject to the same action again. The "capable of repetition yet evading review" exception does not apply to highly fact-specific cases such as the challenged consultation efforts. For example,

the D.C. Circuit refused to apply the exception to a NEPA challenge to wild horse gathering because "[p]articular decisions to remove wild horses and burros are highly fact-specific. How a herd will be managed in the future after the initial culling is anyone's guess, as the Bureau makes clear. It may depend on climate, on how many new births occur, on the mortality rate of the horses, on whether fertility control is used as a management tool, and on many other factors specific to a herd and to the area in which it is located." *Fund for Animals, Inc. v. BLM*, 460 F.3d 13, 22-23 (D.C. Cir. 2006). The D.C. Circuit held that the mootness exception did not apply because it was "an open question" as to whether there would be similar future actions, the magnitude of such possible future actions, and the manner in which those actions would be evaluated by the agency. *Id.* The D.C. Circuit's reasoning is applicable to the Corps' permitting decisions. *See Potomac River Ass'n v. Lundeberg Md. Seamanship Sch., Inc.*, 402 F. Supp. 344, 351-52 (D. Md. 1975) (mootness exception inapplicable because "Corps has a specific set of procedures geared to operate differently for every permit application"). This is particularly true where, as here, the Department of Defense Instruction that Standing Rock relies upon, ECF No. 433-2 at 40-42, has been replaced and therefore could not apply to future consultations.[19]

The D.C. Circuit applied these principles to identify the types of claims that are rendered moot by a pipeline's construction. *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 43-44 (D.C. Cir. 2015). It distinguished ongoing pipeline operation from cases such as "environmental challenges to the Corps filling wetlands," which "were moot once the construction was fully completed because it was undisputed that the wetlands could not be restored." *Id.* (citation omitted). As this Court previously held, Yankton's consultation claims exclusively belong in the latter category. *Standing Rock VI*, 301 F. Supp. 3d at 63. The Court based its decision, in part, on Standing Rock's admission that construction would moot its claims:

---

[19] The version of Instruction 4710.02 in place during the challenged decisions was cancelled and replaced on September 24, 2018. DOD Instruction 4710.02 (Sept. 24, 2018), available at: *https://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodi/471002p.pdf.*

> Standing Rock's own understanding of the Act, as the Tribe explicitly
> acknowledged the potential for construction activities to moot its NHPA claims
> against Defendants. See ECF No. 24 (Standing Rock Reply) at 19-20, 23-24
> (stating that "should DAPL be permitted to continue construction[,] . . . then the []
> consultation process sought by the Tribe would be rendered moot" and noting that
> such consultation would "no longer be meaningful in those areas" in which
> "construction (including clearing and grading) has been completed").

*Id.* at 62-63.  It is far too late for Standing Rock to reverse course now.  As this Court held, it can

"provide no meaningful remedy to address Plaintiffs' alleged injuries" because the pipeline is

fully constructed.  *Standing Rock VI*, 301 F. Supp. 3d at 64; Order, *Standing Rock Sioux Tribe v.*

*U.S. Army Corps of Eng'rs*, No. 16-5259 (D.C. Cir. Jan. 18, 2017) (dismissing Standing Rock's

appeal).  The Court's analysis need proceed no farther.

## B.       The Corps fully complied with the NHPA

While this Court need not reexamine Standing Rock's moot NHPA claim, the claim fails

as a matter of fact and law.  Standing Rock mischaracterizes the Corps' August 18, 2016

preliminary injunction brief as "declaring . . . that [the Corps'] NHPA obligations effectively

stop at the waters' edge."  ECF No. 433-2 at 48 (citing ECF No. 21 at 29-31).  Standing Rock

ignores the Corps' description of the indirect effects that it considered.  The Corps stated that:

> HDD construction at the Lake Oahe crossing will be confined to privately owned
> lands outside of federal property managed by the [Corps]. . .  No construction
> activities will take place on federal lands . . .  However, since the action of placing
> a pipeline under federal lands is a permitted activity, the HDD construction is
> considered a federal undertaking . . .  Any construction activity related to the HDD
> installation is considered as part of this undertaking, regardless of land ownership.
> Hence, all bore pits, stringing areas, staging/temporary work areas and access
> routes, even though located outside the corps boundary, are subject to review as
> part of this action.  The [Area of Potential Effect] for this project will not include
> construction for any portion of the pipeline alignment that extends past the bore
> pit locations (with the exception of those portions of the alignment identified as
> access routes or staging/temporary work areas).

Letter from R. Harnois to F. Swenson (Apr. 22, 2016), USACE65417.  In other words: 1) there

were no direct effects on Corps' lands because the pipeline passes under those lands; 2) the

Corps considered indirect effects from "bore pits, stringing areas, staging/temporary work areas

and access routes" on private land outside of the Corps' boundary; and 3) the Corps considered

portions of the pipeline alignment outside of the Corps' boundary where that alignment was also

identified as access roads and a work area.  *Id.* The Corps' definition of the Area of Potential

Effect included five sites "due to their position in relation to the project corridor" and concluded

that "[t]hey are not in the construction zone due to HDD passing the pipeline well beneath any

potential cultural strata."  *Id.* at USACE65418.  Standing Rock is simply wrong that the Corps

considered no indirect effects and provided no workable, much less legally-required, alternative

to the indirect effects actually considered by the Corps.

Moreover, the Corps engaged in substantial consultation with Standing Rock regarding

the Lake Oahe crossing.[20]  Standing Rock overstates and misapplies the D.C. Circuit's recent

opinion in *United Keetoowah Band*, 933 F.3d 728.  ECF No. 433-2 at 48-49.  *United Keetoowah*

*Band* did not overturn the well-established D.C. Circuit precedent that "federal undertakings"

under the NHPA are similar to "major federal actions" under NEPA.  *Standing Rock Sioux Tribe*

*v. U.S. Army Corps of Eng'rs*, 205 F. Supp. 3d 4, 31 (D.D.C. 2016).  The Tribe nonetheless relies

on Advisory Council letters asserting that the pipeline was federalized.  ECF No. 433-2 at 48-49.

But as this Court found, the Advisory Council and Standing Rock focused improperly on

federalizing the entire pipeline.  *Standing Rock Sioux Tribe*, 205 F. Supp. 3d at 22-23; Letter

from J. Eagle, Sr. to Col. Henderson (May 17, 2016), USACE64262-64 (refusing to fully avail

itself of the opportunity to engage in consultation in an effort to federalize the entire pipeline);

ECF No. 433-2 at 50 (admitting that Standing Rock made a conscious decision to withhold

---

[20] Standing Rock appears to contend that the Corps' consultation at Lake Oahe was inconsistent with ACHP regulations.  ECF 433-2 at 49.  This is incorrect. The Corps consulted with tribes in accordance with an ACHP-approved programmatic agreement.  Letter from Sec'y Darcy to J. Fowler, ACHP (July 25, 2018), USACE67394-95; *id*. at 67393 (Corps examines "indirect effects outside the permit area"); Programmatic Agreement for the Operation and Mgmt. of the Mo. River Main Stem System for Compliance with the NHPA (Mar. 19, 2004), USACE67201-42. The Corps implements the ACHP-approved programmatic agreement in accordance with the 36 C.F.R. Part 800 regulations.  *Id.* at USACE67207.  Furthermore, the Corps identified and evaluated effects to sites located outside of the permit area but within a one-mile radius.  DAPL Geotech PA Information Letter (Oct. 24, 2014), USACE67131; Email from R. Harnois (Mar. 23, 2016), USACE66222; Letter from R. Harnois to F. Swenson (Apr. 22, 2016), USACE65416.

consultation to "hold out for more."). As in *United Keetoowah Band*, the Corps' efforts to consult with Standing Rock meet any reasonable definition of consultation under the NHPA.

## CONCLUSION

The Corps' remand analysis was wholly proper and in no way arbitrary or capricious. The Corps carefully and reasonably considered the environmental impacts of its action, including the risk of a spill and the potential impacts of such a spill, and reasonably concluded that no EIS was needed. The Corps also acted reasonably in its conduct of the remand, appropriately seeking information from the Tribes, and consulting with Standing Rock even though it had no legal obligation to do so. Finally, this Court should reaffirm its dismissal of Standing Rock's NHPA claims as moot. Standing Rock's NHPA claims also fail because the Corps reasonably considered the indirect effects of its actions at the Lake Oahe crossing. The Corps therefore respectfully submits that the Court should deny Standing Rock's motion for summary judgment and grant the Corps' motion for summary judgment.

Dated: October 9, 2019

Respectfully submitted,

JEAN E. WILLIAMS
Deputy Assistant Attorney General
Environment & Natural Resources Division

.

By: */s/   Matthew Marinelli*
MATTHEW MARINELLI, IL Bar 6277967
REUBEN S. SCHIFMAN, NY Bar
U.S. Department of Justice
Natural Resources Section
P.O. Box 7611
Benjamin Franklin Station
Washington, DC 20044
Phone: (202) 305-0293 (Marinelli)
Phone: (202) 305-4224 (Schifman)
Fax: (202) 305-0506
matthew.marinelli@usdoj.gov
reuben.schifman@usdoj.gov

ERICA M. ZILIOLI, D.C. Bar 488073
U.S. Department of Justice

Environmental Defense Section
P.O. Box 7611
Washington, DC 20044
Phone: (202) 514-6390
Fax: (202) 514-8865
Erica.Zilioli@usdoj.gov

*Attorneys for the United States Army Corps of Engineers*

OF COUNSEL:

MILTON BOYD
MELANIE CASNER
U.S. Army Corps of Engineers
Office of Chief Counsel
Washington, DC

## CERTIFICATE OF SERVICE

I hereby certify that, on the 9th day of February, 2019, a copy of the foregoing was filed through the Court's CM/ECF management system and electronically served on counsel of record.

*/s/ Matthew Marinelli*                      .
Matthew Marinelli
U.S. Department of Justice
Natural Resources Section
P.O. Box 7611
Benjamin Franklin Station
Washington, DC 20044
Phone: (202) 305-0293
Fax: (202) 305-0506
matthew.marinelli@usdoj.gov