**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

STANDING ROCK SIOUX TRIBE,

                        Plaintiff,

and

CHEYENNE RIVER SIOUX TRIBE,

                    Plaintiff-Intervenor,

     v.

U.S. ARMY CORPS OF ENGINEERS,

                     Defendant,

and

DAKOTA ACCESS, LLC,

        Defendant-Intervenor-Cross Claimant.

Case No. 1:16-cv-01534-JEB

---

**DAKOTA ACCESS, LLC'S CONSOLIDATED MEMORANDUM OF LAW
IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT AND
IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT ON REMAND**

---

William S. Scherman
David Debold
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
wscherman@gibsondunn.com

*Counsel for Dakota Access, LLC*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION .......................................................................................................1

BACKGROUND .........................................................................................................2

I.     The Application Process And The July 25, 2016 Final EA And FONSI ...............3

II.    Between July 25, 2016 And The February 3, 2017 Easement Decision.................4

III.    This Litigation And The Remand Order...................................................................5

IV.    The Remand Period.................................................................................................7

V.    The Corps' Remand Decision And Analysis ..........................................................9

ARGUMENT ............................................................................................................14

I.    The Tribes Raise Arguments That Fall Beyond The Remand's Scope ................14

II.    The Corps Adequately Addressed The Remand Topics .......................................19

    A.    The Corps Reasonably Determined That The Environmental Effects Of Granting An Easement Are Not Likely To Be Highly Controversial...................................................................................................20

        1.    The Corps' Determination That A Spill Is Unlikely Is Not Highly Controversial.....................................................................21

        2.    The Corps' Worst-Case Discharge Calculation Is Not Highly Controversial Either.....................................................................25

        3.    The Corps' Assessment Of The Impact Of A Worst-Case Discharge Is Not Highly Controversial.........................................33

    B.    The Corps Reasonably Assessed And Explained The Impact Of A Spill On Hunting And Fishing ...................................................................39

    C.    The Corps Provided A Robust Analysis Of Environmental-Justice Impacts..................................................................................................42

III.    The Corps Met Its Obligations To Consult With Tribal Authorities Both Before And During The Remand........................................................................46

    A.    The Tribes Misconstrue The Scope And Enforceability Of The Obligations At Issue......................................................................................46

1.    Relief Under The National Historic Preservation Act Is Foreclosed Because Construction Of The Pipeline Is Complete ...46

2.    The Tribes Rely On Inapplicable And Nonbinding Guidance Documents For The Remaining Consultation Claims ...................49

3.    The Corps Was Not Required To Repeat Its Consultation Process On Remand ........................................................................52

B.    The Corps Exceeded Any Obligation To Consult ......................................53

1.    Pre-Remand Consultation ...............................................................53

2.    Consultation On Remand ................................................................57

IV.    The Corps Is Entitled To Summary Judgment On The Tribes' Remaining Challenges To The Corps' Pre-Remand Decisions ................................................64

A.    Oglala's Treaty And Trust Claims Under The Mni Wiconi Act Are Meritless.....................................................................................................64

B.    This Court Should Grant Judgment For The Corps On CRST's Outstanding Pre-Remand Claims...............................................................65

CONCLUSION.........................................................................................................................66

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Iron & Steel Inst. v. EPA,*
    886 F.2d 390 (D.C. Cir. 1989) ........................................................................................16

*Am. Rd. & Transp. Builders Ass'n v. EPA,*
    588 F.3d 1109 (D.C. Cir. 2009) ....................................................................................15

*Am. Rivers v. FERC,*
    895 F.3d 32 (D.C. Cir. 2018) ........................................................................................29

*Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta,*
    785 F.3d 710 (D.C. Cir. 2015) ......................................................................................51

*Bayou Liberty Ass'n v. U.S. Army Corps of Eng'rs,*
    217 F.3d 393 (5th Cir. 2000) ........................................................................................49

*Boll v. U.S. Army Corps of Eng'rs,*
    255 F. Supp. 2d 520 (W.D. Pa. 2003) .....................................................................18, 19

*Boll v. Safe Harbor Marina, Ltd.,*
    114 F. App'x 467 (3d Cir. 2004) ..................................................................................19

*Caesar v. West,*
    195 F.3d 1373 (Fed. Cir. 1999) ....................................................................................53

*Chamber of Commerce v. SEC,*
    443 F.3d 890 (D.C. Cir. 2006) ......................................................................................53

*Church of Scientology v. United States,*
    506 U.S. 9 (1992) ..........................................................................................................47

*City of Bos. Delegation v. FERC,*
    897 F.3d 241 (D.C. Cir. 2018) ......................................................................................27

*EarthReports, Inc. v. FERC,*
    828 F.3d 949 (D.C. Cir. 2016) ......................................................................................25

*El Paso Nat. Gas Co. v. United States,*
    750 F.3d 863 (D.C. Cir. 2014) ......................................................................................64

*Friedman v. FAA,*
    890 F.3d 1092 (D.C. Cir. 2018) ....................................................................................14

*Friends of the Earth v. Hintz,*
    800 F.2d 822 (9th Cir. 1986) ............................................................................28

*Heartland Reg'l Med. Ctr. v. Leavitt,*
    415 F.3d 24 (D.C. Cir. 2005) ......................................................................14, 19

*Holy Cross Wilderness Fund v. Madigan,*
    960 F.2d 1515 (10th Cir. 1992) .......................................................................18

*Indian River Cty. v. Dep't of Transp.,*
    348 F. Supp. 3d 17 (D.D.C. 2018) ...................................................................28

*Marsh v. Or. Nat'l Res. Council,*
    490 U.S. 360 (1989) .........................................................................................31

*Moten v. U.S. Air Force, Bd. for Corr. of Military Records,*
    No. 2:18-cv-2179, 2019 WL 357901 (D. Ariz. Jan. 29, 2019) ........................50

*Myersville Citizens for a Rural Cmty., Inc. v. FERC,*
    783 F.3d 1301 (D.C. Cir. 2015) ............................................................19, 30, 32

*N. Slope Borough v. Andrus,*
    642 F.2d 589 (D.C. Cir. 1980) .........................................................................64

*Naartex Consulting Corp. v. Watt,*
    542 F. Supp. 1196 (D.D.C. 1982) ....................................................................18

*Naartex Consulting Corp. v. Watt,*
    722 F.2d 779 (D.C. Cir. 1983) .........................................................................18

*Nat'l Archives & Records Admin. v. Favish,*
    541 U.S. 157 (2004) .........................................................................................29

*Nat'l Parks Conservation Ass'n v. United States,*
    177 F. Supp. 3d 1 (D.D.C. 2016) .....................................................................27

*Neighborhood Transp. Network, Inc. v. Pena,*
    42 F.3d 1169 (8th Cir. 1994) ...........................................................................49

*Oceana, Inc. v. Ross,*
    275 F. Supp. 3d 270 (D.D.C. 2017) ............................................................14, 53

*Oceana, Inc. v. Ross,*
    920 F.3d 855 (D.C. Cir. 2019) .........................................................................14

*People for the Ethical Treatment of Animals, Inc. v. Gittens,*
    396 F.3d 416 (D.C. Cir. 2005) .........................................................................48

*Robertson v. Methow Valley Citizens Council,*
   490 U.S. 332 (1989)................................................................................................31

*Sierra Club v. EPA,*
   325 F.3d 374 (D.C. Cir. 2003)..............................................................................53

*Sierra Club v. FERC,*
   867 F.3d 1357 (D.C. Cir. 2017)............................................................................42

*Spencer v. Kemna,*
   523 U.S. 1 (1998).................................................................................................48

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
   205 F. Supp. 3d 4 (D.D.C. 2016)...................................................3, 46, 48, 49, 54

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
   249 F. Supp. 3d 516 (D.D.C. 2017)......................................................................62

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
   255 F. Supp. 3d 101 (D.D.C. 2017).....................1, 4, 5, 6, 13, 14, 15, 17, 19, 20, 21, 25, 27,
   28, 30, 31, 34, 35 36, 39, 40, 42, 43, 45,
   46, 50, 51, 53, 54, 56, 57, 62, 64, 65, 66

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
   282 F. Supp. 3d 91 (D.D.C. 2017)...........1, 2, 5, 6, 7, 14, 20, 28, 39, 42, 44, 45, 52, 53, 57, 58

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
   301 F. Supp. 3d 50 (D.D.C. 2018)......................................................46, 47, 48, 55

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
   No. 1:16-cv-1534, 2018 WL 1967112 (D.D.C. Apr. 16, 2018).............................63

*Te-Moak Tribe of W. Shoshone v. U.S. Dep't of Interior,*
   608 F.3d 592 (9th Cir. 2010) ...............................................................................53

*TNA Merch. Projects, Inc. v. FERC,*
   857 F.3d 354 (D.C. Cir. 2017)..............................................................................18

*United States v. Jicarilla Apache Nation,*
   564 U.S. 162 (2011).............................................................................................64

*United States v. Navajo Nation,*
   556 U.S. 287 (2009).............................................................................................65

*W. Va. v. EPA,*
   362 F.3d 861 (D.C. Cir. 2004)...........................................................15, 16, 30, 32

*Wis. Valley Improvement Co. v. FERC*,
    236 F.3d 738 (D.C. Cir. 2001) ..................................................................25

**Statutes**

5 U.S.C. § 551(13) ..............................................................................................52

30 U.S.C. § 185 .....................................................................................................3

Mni Wiconi Project Act of 1988, Pub. L. No. 100-516, 102 Stat. 2566 § 2(a)(4) ......................64

**Regulations and Executive Order**

33 C.F.R. pt. 325, App. B(7) ..................................................................................3

40 C.F.R. § 1502.9(c) ............................................................................................9

49 C.F.R. § 194.105(b)(1) ...............................................................................23, 30

82 Fed. Reg. 5543 (Jan. 18, 2017) .........................................................................5

Exec. Order No. 13,766, 82 Fed. Reg. 8657 (Jan. 24, 2017) .................................25

**Other Authorities**

DoD Instruction 4710.02 ..........................................................................50, 54, 56

DoD Instruction 4710.02 § 3.4(e) .........................................................................50

DoD Instruction 4710.02 § 6.1 (2006) ..................................................................52

DoD Instruction § 3.3(b) .......................................................................................51

DoD Instruction § 3.3(e)(1) ...................................................................................51

DoD Instruction § 3.5(b) .......................................................................................51

DoD Instruction, E2 (2006) ..................................................................................51

DoD Instruction § E2.5 (2006) .............................................................................51

DoD Instruction § E2.7 (2006) .............................................................................51

DoD Instruction § E2.9 (2006) .............................................................................51

*Memorandum for Commanders, Directors and Chiefs of Separate Offices, US
    Army Corps of Engineers: Tribal Consultation Policy*,
    Dep't of Army ...............................................................................................52

Safety Recommendation P-12-004, NTSB (Feb. 21, 2018),
   https://tinyurl.com/y4e7jxn2 ................................................................................................25

Safety Recommendation P-12-009, NTSB,
   https://tinyurl.com/y2t5lcyv ................................................................................................25

## INTRODUCTION

This Court ordered a limited remand; it did not require the U.S. Army Corps of Engineers re-do its analysis from scratch.  The Court also explained that the Corps could cure the "three discrete flaws" in its explanations using information already in its possession.  *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F. Supp. 3d 91, 96, 98-101 (D.D.C. 2017) ("*SRST III*").

Plaintiffs' utter failure to recognize these limits renders most of their arguments beside the point, most prominently on the question of whether the project's effects are "highly controversial." The Court ordered the Corps to consider scientific critiques—seven documents in all—that Plaintiffs submitted to the agency between July 25, 2016 and February 3, 2017, and state whether those documents identify flaws in the Corps' analysis that rise to the level of highly controversial effects. *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 127-29 (D.D.C. 2017) ("*SRST II*").  The Corps complied on remand, setting forth more than 175 pages of point-by-point rebuttals to each of the criticisms that the Court identified, *id.* at 129, plus dozens more. RAR 102-140 & 141-280.  Yet Plaintiffs barely address what the Corps said in these detailed responses.  Instead, they launch a fresh assault on the worst-case spill analysis and the Corps' overall risk assessment, relying heavily on concerns that either had been raised (and addressed) in the *original* administrative record (pre-July 25, 2016) or that Plaintiffs raised for the first time *after* the decision to issue an easement (February 3, 2017).  In fact, Plaintiffs rely most heavily on criticisms they raised well after the June 2017 remand order itself.  Thus, apart from the lack of merit to any of these criticisms, they are not properly before the Court.

Plaintiffs also allege that the Corps failed to engage in adequate consultation.  But the Corps did consult with Plaintiffs, including through dialogue about the information that would assist in addressing the remand topics and meetings with tribal representatives.  This was more than the remand required because, as this Court noted, the Corps could correct the deficiencies in

its earlier explanations using information *already* in hand, *SRST III*, 282 F. Supp. 3d at 100-01, which includes the product of the Corps' pre-remand consultations and public comment process.

In the end, Plaintiffs want the Court to turn their process-based claims into a vehicle for second-guessing agency decisions that Plaintiffs would not have made. But this is not an inquiry that the law permits. The statutes applicable here instead required the Corps to take a hard look at the consequences of the requested actions. The Corps applied its expertise to determine that, although a high-volume spill would have serious consequences, the low likelihood of such an event yielded a finding of no significant impact. That predictive judgment and other determinations leading to it were not arbitrary, capricious, or contrary to law.

This litigation has long since reached the point where enough is enough. Despite the Court's clear directive of a remand confined to three discrete topics—and even though the Court has already rejected efforts to "rewind the clock" to "return to" issues "long since decided," D.E. 392, Order Denying Leave to Amend Complaint, at 1—Plaintiffs indiscriminately attack the Final EA, FONSI, and easement as if the Court had told the parties to "return to the starting blocks," *id.* at 5. In failing to recognize that the ship has long since sailed on the great bulk of their arguments, Plaintiffs ignore the Court's admonition that "[t]o require [Dakota Access] and the Government to relitigate issues already decided at an earlier stage would impose substantial expense and concomitant uncertainty." *Id.* The Court should enter judgment for the Corps.

## BACKGROUND

The Court already knows this case's "many twists and turns." *SRST III*, 282 F. Supp. 3d at 94. This section therefore focuses on facts most relevant to the scope of the remand that led to Plaintiffs' current motions.

I.      **The Application Process And The July 25, 2016 Final EA And FONSI**

The genesis of the remand is the Corps' approval for Dakota Access to install a pipeline across federal jurisdictional areas, including deep below Lake Oahe.  This included an easement under the Mineral Leasing Act, 30 U.S.C. § 185, to cross the federal land on the Lake's shores. The process began in late 2014.  *See* USACE_DAPL 71137; OAHE 34.

The Corps' initial review, culminating in an Environmental Assessment (EA) and Finding of No Significant Impact (FONSI), was extensive.  USACE_DAPL 71174, 71220.  Although a combined EA and FONSI document "normally should not exceed 15 pages," 33 C.F.R. pt. 325, App. B(7), this EA was 163 pages with 700 pages of appendices.  That length allowed the Corps to address, in a comprehensive manner, efforts to preserve historical and cultural resources, and issues related to environmental impact and environmental justice.  USACE_DAPL 71304-11.

The Corps devoted substantial effort during this process to tribal consultation, thus "exceed[ing]" its legal obligations.  *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 205 F. Supp. 3d 4, 32 (D.D.C. 2016) ("*SRST I*"); *see also*, *e.g.*, USACE_DAPL 69606 (referencing National Historic Preservation Act Section 106 consultation and Section 408 consultation for Oglala); USACE_DAPL 69758 (CRST); USACE_DAPL 69755 (SRST); USACE_DAPL 69702 (Yankton).  In fact, an entire section of the EA addresses consultation.

The Tribes commented on many issues, including the risk of a spill, potential damage to Lake Oahe, and environmental justice.  *See*, *e.g.*, USACE_DAPL 66765 (SRST); USACE_DAPL 80039 (SRST); USACE_DAPL 064221 (CRST).[1]  The Corps carefully tracked comments from the Tribes and others to show how the Final EA addressed each concern.  USACE_DAPL 72463.

---

[1]  Oglala opted out of the initial process.  Yankton submitted nothing during the comment period on the EA.

The Corps reached its finding of no significant impact (FONSI) through the judicially approved "high consequence, but low likelihood" mode of reasoning: *i.e.*, a large oil spill could have serious consequences, but the risk of such an event was "extremely low" given "the engineering design, proposed installation methodology, quality of material selected, operations measures and response plans." USACE_DAPL 71311. The Corps noted here that Dakota Access took dozens of steps "to minimize the risk of a pipeline leak," such as "[p]ipe specifications that meet or exceed applicable regulations," "[u]se of the highest quality external pipe coatings," "inspection and testing programs," "continuous . . . pipeline monitoring that remotely measures changes in pressure and volume on a continual basis," a "Leak Detection System" that "monitor[s] the pipeline for leaks via computational algorithms performed on a continual basis," and routine "[a]erial surveillance inspections" to "detect leaks and spills as early as possible, and to identify potential third-party activities that could damage the pipeline." USACE_DAPL 71266-67.

## II.     Between July 25, 2016 And The February 3, 2017 Easement Decision

The delay that ensued between the July 25, 2016 EA/FONSI and the Corps' decision on February 3, 2017 to deliver a corresponding easement for the Lake Oahe crossing was unusual, to say the least. Specifically, even though the Army "'concluded that its previous decisions comported with legal requirements,'" it insisted in September 2016 on "'additional discussion'" and "'additional analysis'" before delivering that easement. *SRST II*, 255 F. Supp. 3d at 117-19 (quoting D.E. 56-1, at 1 and D.E. 172-7). This added analysis included several memoranda from the Corps, USACE_ESMT 652, 1213, the Army, USACE_ESMT 602, and the Interior Department (USACE_ESMT 565, since withdrawn, D.E. 127-15). In December 2016, the Army opined that further discussion would be "best accomplished" by "preparing an Environmental Impact Statement (EIS)," even though the Army reiterated that "the Corps' prior reviews and actions have comported with legal requirements." USACE_ESMT 602 ¶¶ 12, 15.

During this six-month interim period, the Tribes and other interested parties submitted more comments to the Corps, many of which overlapped substantially with, and at times duplicated, earlier comments. USACE_ESMT 235-36. Dakota Access will not repeat here the numerous ways in which this unnecessary interim period was tainted by influences external to the proper administrative process and flatly inconsistent with the Final EA and FONSI. *See* D.E. 57, at 49-67.

In the final days of the previous administration, the Army published a notice of intent to prepare an EIS. USACE_ESMT 467; 82 Fed. Reg. 5543 (Jan. 18, 2017). Then, on February 7, 2017, after the change in administrations, the Army published a notice of termination of that intent, D.E. 95; USACE_ESMT 103, and issued the easement the following day, USACE_ESMT 1. *SRST II*, 255 F. Supp. 3d at 120. The decision to deliver the easement was memorialized in a memorandum dated February 3, 2017. USACE_ESMT 224-40. The memorandum explained that the additional materials received since the July 25, 2016 Final EA had "not raised significant new circumstances or presented any new information that would require supplemental NEPA documentation." USACE_ESMT 235-37; *see also* USACE_ESMT 225, 232 (explaining that the Corps' easement decision was "the subject of a robust administrative process" that "did not identify any new information indicating that actions by the Department of the Army will affect the quality of the human environment to a significant extent not already considered").

## III.     This Litigation And The Remand Order

In February 2017, after litigation over non-NEPA claims, Plaintiffs began briefing summary judgment. On June 14, 2017, the Court granted the Corps summary judgment in part and denied it in part. "Although the Court found that the agency had 'substantially complied' with [NEPA]," it "identified three discrete deficiencies in the Corps' analysis." *SRST III*, 282 F. Supp. 3d at 94. "The Court held that the Corps had insufficiently addressed: (1) the degree to which the project's effects are likely to be highly controversial; (2) the consequences of a spill for the Tribes'

fishing and hunting rights; and (3) the environmental-justice impacts of the project." *Id*. at 96. "Aside from the discrete issues that" were "the subject of the remand, the Court conclude[d] that the Corps complied with its statutory responsibilities." *SRST II*, 255 F. Supp. 3d at 160.

After supplemental briefing, the Court declined to vacate the Corps' approvals pending remand. *SRST III*, 282 F. Supp. 3d at 109. It reached that decision by "assess[ing] the likelihood that, on remand, the Corps w[ould] be able to justify its prior decision to issue an EA and FONSI, rather than preparing a full EIS." *Id*. at 98. The Court found such a likelihood because the three issues involved decisions that were "'potentially lawful but insufficiently or inappropriately explained.'" *Id*. at 103. Importantly, the Court added that the Corps did not need to "begin anew" in addressing the three remand issues. *Id.* at 98.

As for the first topic—the degree to which the project's effects were likely to be highly controversial—the Corps' error was a failure to discuss "expert reports submitted to the Corps *after* the Final EA was published" in July 2016 "but *before* the Corps again decided in February 2017 that an EIS was not required." *SRST II*, 255 F. Supp. 3d at 129. "It may well be the case that the Corps reasonably concluded that these expert reports were flawed and unreliable and thus did not actually create any substantial evidence of controversial effects," but "the Corps never said as much." *Id.* The Court therefore reasoned that, "[a]lthough the Corps must give careful consideration to the expert critiques, it is well positioned to provide such explanation on remand." *SRST III*, 282 F. Supp. 3d at 99. "Correcting this flaw does not require that [agencies] begin anew, but only that they better articulate their reasoning below." *Id.* at 98.

Similarly, as to the second topic, potential effects of a spill on hunting and fishing resources, the Court explained that "Defendants' task on remand is a narrow one"; the Corps "already has the data it needs to determine the impact of a spill on fish and game," *SRST III*, 282 F.

Supp. 3d at 99-100; and the Corps' spill-effects assessment would be conducted "in light of its prior determination that the risk of rupture under Lake Oahe is low." *Id.* at 100.

On the third topic, environmental-justice impacts, the Court explained that the Corps need only "provide a more robust analysis on remand," adding that "multiple aspects of the record suggest that the Corps is likely to justify issuing an EA, rather than completing an EIS." *SRST III*, 282 F. Supp. 3d at 101. That existing support included: "the minimal risk of an oil spill under Lake Oahe," which "reduces the likelihood that the project will have a significant impact on the surrounding communities," *id.*; "the relocation of the [SRST] water-intake structure" about "50 miles further downstream," which makes effects on drinking water even less likely, *id.*; and "the Corps' already-conducted assessment of the alternative pipeline route through Bismarck," which showed that this alternative posed much higher risks overall than the chosen route, thus "increas[ing] the likelihood that the agency will find that DAPL's environmental-justice impacts do not require an EIS," *id.* at 101-02.

## IV.    The Remand Period

As was true of the Corps' path to its original decisions, its remand process went far beyond what the law requires. Rather than simply review the existing record, the Corps requested further information from all parties. For example, the Corps asked Dakota Access to prepare a supplemental oil spill model that "takes into account the pipeline as constructed." RAR 13605. This "would be in addition to the hypothetical scenario" used pre-remand "that assumed that the pipeline had been constructed on the top of the lake and that any rupture would be a full guillotine break." *Id.* The Corps later used this additional modeling to better understand the impacts of a spill on hunting and fishing (topic 2) and environmental-justice factors (topic 3).

The Corps likewise gave Plaintiffs opportunities to submit more information. On September 25, 2017, the Corps wrote each Tribe seeking information and supporting documentation relevant to effects a spill could have on tribal resources, especially fish and game. RAR 2005-06 (CRST); RAR 13325-27 (SRST); RAR 10900-11 (Oglala); RAR 13323-24 (Yankton). The Corps, having advised the Court that it expected to complete the remand process by the end of 2017, D.E. 258, at 1, asked each Tribe to submit its information by the end of October. But the Tribes all failed to do so, even as to the Corps' straightforward requests for the number of hunting and fishing licenses and game tags each Tribe recently issued. *See*, *e.g.*, RAR 13325.

Instead of submitting this information, "or any other details" the Tribes "wish[ed] to provide," RAR 13325, by the end of October, Plaintiffs sought to turn the tables by asking the Corps to give *them* information, presumably so they could offer additional critiques of the project. For example, a day before the Tribes were supposed to provide information requested in the Corps' letters, CRST asked the Corps for a copy of the updated spill modeling information that Dakota Access was preparing and further advised it would need "90 additional days" to provide the information the Corps requested on the second remand topic (hunting and fishing resources). *See* RAR 12273. After the Corps responded that it would like to have CRST's hunting and fishing responses by December 20, 2017, RAR 11995, the Tribe stated (on December 18) that it could not make a submission before January 30, 2018, RAR 11961. Then, on January 30, 2018, the Tribe said it would need "until the end of February 2018." RAR 10350-51. But that date also came and went without any of the requested information. On March 30, 2018, the Corps sent another letter, setting April 20, 2018 as the new deadline for any submissions. RAR 5801.

When CRST ultimately responded on April 20, 2018, it began by disputing the Corps' need for many of the requested details. RAR 2006 (taking issue with requests to "quantify the nature

of our Treaty-derived hunting, fishing and gathering rights," because "how we use our Treaty rights has no impact on the nature of the right," and "[o]ur Treaties guarantee us the right to hunt, fish, and gather all of the fauna and flora on our Reservation and in Lake Oahe no matter how we are currently exercising that right"). The main portion of CRST's data response was a report written 13 years earlier. RAR 2013-2233 (cultural assessment of habitats on CRST reservation).

The remand process took much longer than it should have. The Corps' December 2017 target for completion slipped to early April 2018. Dakota Access did what it could to keep to that schedule by responding timely to the Corps' information requests. RAR 13362-63, 12241, 12015, 11956, 11605, 11445. But SRST did not provide information to the Corps until March 5, 2018. RAR 6433. The other three Tribes provided responses to the September 2017 letters on April 20, 2018. RAR 2005 (CRST); RAR 2247 (Yankton); RAR 3427 (Oglala). Accordingly, consultation meetings at the Tribes' reservations did not occur until late May and early June 2018. *See* RAR 3100 (SRST); RAR 3278 (CRST); RAR 3035 (Yankton); RAR 3040 (Oglala).

## V.      The Corps' Remand Decision And Analysis

The remand ended on August 31, 2018, with a "Memorandum for Record," accompanied by the Corps' 138-page Remand Analysis addressing the three remand topics. RAR 1-2; RAR 3-140. The Corps explained that it had sought input from all parties, "conducted its own analysis of available information and considered materials in the administrative record," and "fully considered 'the impacts of an oil spill on fishing rights, hunting rights, or environmental justice, or the degree to which the pipeline's effects are likely to be highly controversial.'" RAR 1. That thorough review "did not reveal 'significant new circumstance[s] or information relevant to environmental concerns.' 40 C.F.R. § 1502.9(c)." *Id.* The Corps therefore reaffirmed the July 2016 EA and FONSI without the need to prepare supplemental NEPA documentation such as an EIS. *Id.*

9

The supporting Remand Analysis devoted extensive consideration to each remand topic: hunting and fishing; environmental justice; and highly controversial effects.

<u>Hunting and fishing</u>.   First, the review "did not reveal any significant impacts" to hunting and fishing rights, "because the risk of an incident is low and any impacts to hunting and fishing resources will be of limited scope and duration."   RAR 1.   The Corps began by comprehensively documenting fish and game resources in the area.   RAR 4-44.   It then used the results of additional spill modeling to help assess possible effects of a spill on those resources.   Four scenarios were newly modeled:   two release locations (the lake bed at the center of Lake Oahe, and the valve closest to the Lake) combined with two spill assumptions (a worst-case full-bore rupture scenario, and one more closely correlating with release amounts for the majority of spills).   RAR 19-22. The supplemental, peer-reviewed, spill model (called Spill Impact Model Analysis Package or SIMAP), which had been developed for use by the Department of the Interior, allowed the Corps to assess "the movement, behavior, and potential effects of crude oil releases into water" in three dimensions (as compared to two dimensions originally).   RAR 22.   The model "assumed no response or mitigation of any kind for the entire model run of 10 days."   RAR 23.   Using ten years of local weather data, the modeling tested each scenario under 290 separate model runs that replicated springtime high river flow conditions (97 simulations), summer and fall average river flow conditions (96 simulations), and wintertime low river flow (97 simulations).   *Id.*   This resulted in 1,160 total model runs, capturing "14-day intervals spanning the entire 10 years of data."   *Id.*

The modeling then applied "a set of highly conservative thresholds"—measured as oil thickness, average shore oil concentration, and subsurface hydrocarbon concentrations—to determine "effects to beneficial lake use."   RAR 24.   In large part because the model predicted short exposure durations for any given spot (*i.e.*, several hours or less), "the predicted acute mortality

was limited." RAR 34 (noting that while longer exposure periods would occur if the oil built up in sediment, "all of the modeled scenarios showed <1% of the oil located in the sediments after the 10-day modeling period"). For each potential measure of impact, relevant thresholds were exceeded only for short durations, were confined to small areas, or both. RAR 35 (hydrocarbons in water column); RAR 36 (on water surface); RAR 37 (in sediments); RAR 39 (on shoreline). The Corps thus concluded, after careful review of the data relevant to possible spills, that "impacts to game resources would be limited," RAR 42, and, "even under the unmitigated worst-case discharge scenarios, impacts to fish species would be of limited scale and of temporary duration" such that "impacts to fishing in the area would also be limited," RAR 43.

Environmental justice. The Corps next determined that granting the approvals "does not result in disproportionately high and adverse human health or environmental effects on minority populations, including Tribes, and low-income populations." RAR 1. Before reaching this conclusion, the Corps addressed each of this Court's criticisms of its original environmental-justice analysis. First, the Corps greatly expanded "the EA's geographic extent of analysis" beyond 0.5 miles. RAR 45, 65-70. Second, the Corps "applie[d] input provided by" the Tribes "through targeted Tribal outreach." RAR 45. Third, the Corps "consider[ed] the interrelated environmental, socioeconomic and cultural factors that may amplify the environmental effects of a potential spill on Tribal populations located along Lake Oahe," including "drinking water intake concerns, hunting and fishing concerns, and concerns regarding effects to traditional cultural, spiritual, and ceremonial practices." *Id.* Finally, the Corps conducted "an additional review of the North Bismarck route alternative in comparison to the built alignment." *Id.*

The new geographic scope for this analysis starts one-half-mile north of the Lake Oahe crossing and runs south more than 150 miles to CRST's drinking water intake. RAR 46. Along

that entire length of the Lake, the Corps accounted for every census block group that comes within a mile of the Lake's eastern and western shores. *Id.* And to better assess possible drinking water effects, the Corps supplemented this dataset with populations served by the relevant intakes, regardless of how far their census block group was from either shore. *Id.*

The Corps conducted a multi-factor analysis to determine "there is not a significant potential environmental effect to low-income or minority populations requiring further analysis in an environmental impact statement or requiring any additional mitigation." RAR 100. These factors included the low likelihood of any spill reaching the human environment of minority or low-income populations, RAR 57-59, 82, and the results of the hunting and fishing analysis mentioned above, RAR 59-61. The Corps also considered the effects of a hypothetical spill at the North Bismarck Alternative Route and "reaffirm[ed]" that "the Lake Oahe crossing area contains fewer potentially affected minority individuals than does the North Bismarck Alternative crossing, and that water intakes (and the minority and low-income populations that rely on them) would be at greater risk with the North Bismarck Alternative." RAR 62; *see also* RAR 99. The Corps factored into its analysis the Tribes' views that "impacts to the waters and ecosystem of Lake Oahe" (i) would be "extremely detrimental to their way of life," RAR 83, and (ii) "are heightened due to the cumulative effects of the construction of the Lake Oahe reservoir itself," RAR 84. *See also* RAR 84-87 (recognizing various potential impacts unique to the Tribes).

Highly controversial effects. Finally, the Corps found that the effects of the federal action are not likely to be highly controversial, because the information that this Court required the Corps to address did not demonstrate "that a substantial dispute exists as to the size, nature, or effect of the federal action." RAR 2.

The material at issue on this topic consists of seven expert critiques that the Tribes submitted during the interim period between the Final EA (July 25, 2016) and the Corps' decision on February 3, 2017 to deliver the Lake Oahe easement. *SRST II*, 255 F. Supp. 3d at 129 (finding fault in the Corps' silence as to "expert reports submitted to the Corps <u>after</u> the Final EA was published but <u>before</u> the Corps again decided in February 2017 that an EIS was not required").

The Corps on remand carefully analyzed each specific critique found in 18 different documents that it received from Plaintiffs after July 25, 2016, even though 11 of these documents postdated the Corps' February 2017 decision to deliver the easement. *See* RAR 104-105. The Corps' task was made more burdensome by what this Court already noted as SRST's failure to follow up on its "general references" to the expert critiques "with specific statements made by the Tribe, agencies, or experts critiquing the Corps' methodology or data." *SRST II*, 255 F. Supp. 3d at 128 (noting that this "does not help the Court to evaluate [SRST's] argument").

To minimize repetition caused by overlap and duplication in these multiple critiques, the Corps identified six general categories (such as regulatory compliance and risk); broke each category into issues; and then summarized each concern under each issue. RAR 105-109. The end result was a total of 28 comments that potentially "implicated the NEPA highly controversial intensity factor." RAR 110. The Corps then determined, as set forth at length in its Remand Analysis, that "none of the comments show that a substantial dispute exists as to the size, nature, or effect of the major federal action." RAR 110-140. In a separate "Review and Analysis of Tribes' Submissions" (the "Submission Review") the Corps addressed in detail *every* discrete comment in all eighteen documents—339 comments in all. RAR 141-280.[2]

---

[2] The labeling that the Corps applied to these documents (and its responses) is explained following the table at RAR 105 and in the introduction to another copy of the same table at RAR 141. The only documents that fell within the interim period (*i.e.*, after July 25, 2016 but before February 3, 2017), are identified in that table as A, B, C, D, J, 5, and 6. Those documents are at

**ARGUMENT**

**I.     The Tribes Raise Arguments That Fall Beyond The Remand's Scope**

As explained *supra*, this Court issued a limited remand order, confined to "three discrete deficiencies in the Corps' analysis." *SRST III*, 282 F. Supp. 3d at 94; *SRST II*, 255 F. Supp. 3d at 160.  This Court further determined that the Corps did not need to "begin anew" in addressing these topics.  *SRST III*, 282 F. Supp. 3d at 98.  That is consistent with the legal rule that agencies need not "'star[t] from scratch'" on remand.  *Oceana, Inc. v. Ross*, 275 F. Supp. 3d 270, 288 (D.D.C. 2017), *aff'd*, 920 F.3d 855 (D.C. Cir. 2019).  To "compl[y] with [a remand]," they must "fil[l] the analytical gap identified [by the court]."  *Heartland Reg'l Med. Ctr. v. Leavitt*, 415 F.3d 24, 29 (D.C. Cir. 2005) (calling it the "only obligation" on remand).

Hence, "the only question [this Court] must answer is whether [the Corps] 'filled th[at] analytical gap.'"  *Friedman v. FAA*, 890 F.3d 1092, 1097 (D.C. Cir. 2018) (alteration omitted).  But Plaintiffs pretend these limitations do not exist, instead attacking the Corps' July 2016 FONSI and Final EA, and its February 2017 easement, indiscriminately.  They seek to reopen issues already addressed in the original administrative process and this Court's prior decisions.  Not one of their briefs has a separate section addressing the first remand topic (highly controversial effects), and the Tribes barely mention the second one (hunting and fishing).  *See* D.E. 433-2, at 6, 7, 34-35, 37, 38; D.E. 434-2, at 16; D.E. 436-1, at 14.  Only the third topic (environmental justice) has its own argument heading.  D.E. 433-2, at 34-39; D.E. 435-1, at 10-14; *see also* D.E. 434-2, at 26.  The Tribes instead force the Court and Defendants to divine whether or how Plaintiffs' arguments might fall within the remand's scope.

---

RAR 1237-413:  A (EarthFax Dec. 2, 2016 letter, RAR 1242); B (Kuprewicz/Accufacts Oct. 26, 2016 letter, RAR 1256); C (Envy Jan. 5, 2016 report, RAR 1271); D (Nezafati Jan. 2017 report, RAR 1339); J (CRST Jan. 18, 2017 preliminary informational paper, RAR 1366); 5 (Kelly Nov. 28, 2016 declaration, RAR 1395); 6 (Bowser Jan. 2017 report, RAR 1400).

As noted earlier, the Court clearly defined that scope.  It directed the Corps to review previously unaddressed criticisms in "expert reports submitted to the Corps *after* the Final EA was published" in July 2016 "but *before* the Corps again decided in February 2017 that an EIS was not required."  *SRST II*, 255 F. Supp. 3d at 129.  These are the only criticisms that the Corps had to consider in addressing the first remand topic.

Adding insult to the injury of Plaintiffs ignoring this limit, they criticize the Corps for adhering to it.  For example, they find it both "mysterious" and "[o]d[d]" that "the vast majority of" the 28 comments the Corps addressed in the section of the Remand Analysis addressing allegations of highly controversial effects (RAR 102-140) "preceded the Court's summary judgment decision."  D.E. 433-2, at 9-10.  And "[o]ddly," they add, the Remand Analysis "ignores the extensive information about ETP's safety record provided *during* the remand."  *Id.* at 29 (emphasis added).  But there is nothing "odd" at all about the Corps using the remand to address precisely the seven expert critiques that this Court said it needed to address:  *i.e.*, those that the Tribes submitted between July 25, 2016 and February 3, 2017.

Claims that "were not raised at the time" of the Corps' earlier decisions "are not properly before this Court."  *W. Va. v. EPA*, 362 F.3d 861, 864-65 (D.C. Cir. 2004).  Plaintiffs cannot evade that rule by pointing to statements that "were included in the remand record" or criticisms that the Corps mentioned on remand.  D.E. 433-2, at 15 n.10.  The Corps "did not reopen these issues in the remand proceedings" merely by "'respond[ing] on the merits'" to some of the Tribes post-interim-period comments.  *W. Va.*, 362 F.3d at 872.  An agency's decision to "respon[d] to . . . arguments" on remand is "rarely if ever . . . sufficient" to reopen its prior determinations for review.  *Am. Rd. & Transp. Builders Ass'n v. EPA*, 588 F.3d 1109, 1114 (D.C. Cir. 2009).  Remand is "not a license" to "comment on matters other than those actually at issue, goad [the] agency into

a reply, and then sue on the grounds that the agency ha[s] re-opened . . . the issue." *W. Va.*, 362

F.3d at 872 (quoting *Am. Iron & Steel Inst. v. EPA*, 886 F.2d 390, 398 (D.C. Cir. 1989)). "[H]aving

forgone the ability to attack these aspects of the" EA and easement while they were "being prom-

ulgated and initially challenged in court," the Tribes "cannot now do so." *Id.*

The problem for Plaintiffs—and, ultimately, for the Court—is that the motions fail to spec-

ify which criticisms, under the highly controversial effects topic, Plaintiffs' experts raised for the

first time (or even at all) during the relevant six-month period.  Yankton never cites the pages of

the remand record, or the corresponding USACE_ESMT pages, where these critique documents

are found.  CRST cites them only as background or in connection with its consultation arguments.

And the sections of SRST's and Oglala's briefs relevant to highly controversial effects (D.E. 433-

2, at 13-34; D.E. 434-2, at 17-28) cite these seven documents only a handful of times.  *See* D.E.

433-2, at 14-15, 18, 26 (citing USACE_ESMT 624, 1078-79, 1271, 1278; RAR 1294, 1331, 1345-

47, 16686); D.E. 434-2, at 19, 23, 25 (citing USACE_ESMT 626-27, 629).  One of those citations

is simply to concede that the Corps addressed the report.  *See* D.E. 434-2, at 23-24 (citing

USACE_ESMT 627).[3]

As it turns out, many of the Tribes' arguments are based on criticisms that were raised, and

that the Corps rejected, *before* the July 25, 2016 EA and FONSI issued.  The Tribes argue, for

example, that the Corps underestimated the time needed to detect and respond to a spill, citing:

(1) a 2012 PHMSA report purportedly showing that "spill detection technology . . . actually detects

leaks in [only] a small percentage of cases," D.E. 433-2, at 18; (2) "real world" examples of leaks

---

[3]  The Tribes also cite the easement (USACE_ESMT 39) and a since-withdrawn memorandum
from the Department of the Interior (USACE_ESMT 594).  D.E. 433-2, at 15, 22; D.E. 127-15.
Also, as noted earlier, the Corps addressed on remand critiques in 11 documents that Plaintiffs
submitted after February 3, 2017.

in the Kalamazoo and Yellowstone Rivers, *id.* at 18, 23; and (3) concerns about "adverse weather conditions," *id.* at 22-23. They also argue that the Corps failed to consider the "special risks posed by Bakken crude." *Id.* at 32. But, as Plaintiffs' own citations demonstrate, the Corps considered each of these concerns *before* it issued the July 25, 2016 EA and FONSI. The administrative record for those decisions uses the prefix USACE_DAPL. *See*, *e.g.*, USACE_DAPL 64446, 65386 (2012 PHMSA report and Kalamazoo and Yellowstone River leaks); *id.* at 66183-87 ("extreme weather conditions" and "specific environmental problems . . . from . . . Bakken crude"). This Court has already held that "none of the evidence before the Corps as of July 25, 2016—including SRST's comments"—"suggested substantial methodological or data flaws in the Corps' analysis." *SRST II*, 255 F. Supp. 3d at 128-29. Thus, those arguments are foreclosed.

Plaintiffs base yet other arguments on criticisms they raised *after* the relevant six-month period (*i.e.*, after the Corps decided to deliver the easement). In fact, SRST already asked this Court to consider some of the same criticisms when it unsuccessfully moved to support its original summary judgment motion with extra-record evidence. *See SRST II*, 255 F. Supp. 3d at 125 ("failure rates of spill-detection systems"; "winter conditions"). The Court, in rejecting that effort, explained that "[t]he EA addressed each factor for which the Tribe marshals extra-record evidence." *Id.* at 124; *e.g.*, *id.* at 125 (holding that the Corps adequately addressed the Tribes' "'criticism'" that the EA underestimated the "'tim[e] [needed] for responding to a spill,'" and used "'the wrong drinking water standard'" (citing EarthFax report advocating 2.2 μg/L benzene limit, USACE_ESMT 628)).[4] Thus, even if the Tribes could show that their experts made such criticisms

---

[4]   The Court also held that the Corps adequately responded to input that the EPA and Department of the Interior offered both before and during the interim period. *SRST II*, 255 F. Supp. 3d at 128-29, 143. The remand on highly controversial effects was limited to interim-period "expert reports"—not criticisms from other agencies. *Id*. at 129.

during the interim period, the Court's rejection of them is law of the case; the Corps was not required to revisit these issues either. *TNA Merch. Projects, Inc. v. FERC*, 857 F.3d 354, 363 (D.C. Cir. 2017).  Plaintiffs cannot relitigate them.  *E.g.*, D.E. 433-2, at 11 n.8, 14-15 (input from other agencies), 20-21 (response time after detection); D.E. 434-2, at 25 n.8 (2.2 µg/L benzene limit).

Moving even later in time, the Tribes repeatedly invoke other criticisms that they first leveled *after* the remand order itself.  Citing the remand record, the Tribes argue, for example, that the Corps' worst-case spill estimate is out of line with the 50,000-barrel figure used in EPA's Mid-Missouri Subarea Contingency Plan ("SACP"), and that the estimate fails to account for "the potential loss of power" at the pipeline valves, D.E. 433-2, at 15, 21-22 (citing RAR 3325, 6578, 14888).  These were not raised in the interim period, nor were they "uncovered" during the remand.  *Id.* at 1.  The original record already contained the 50,000-barrel SACP estimate, USACE_DAPL 72184, 72252, and backup power is an easement condition, USACE_ESMT 39.

A final category of arguments exceeds the remand's scope for yet another reason.  Plaintiffs' complaints that the pipeline fails to comply with certain easement conditions—complaints that are undocumented and inaccurate—belong, if anywhere, in enforcement proceedings rather than an APA challenge to a decision to issue the easement in the first place.  This Court has already explained that "compliance with easement conditions" is "separate from" what the Corps was required to consider in complying with the remand order.  D.E. 418, at 11-12.  Enforcement is the agency's prerogative, and therefore not the proper basis for an APA challenge.  *Naartex Consulting Corp. v. Watt*, 542 F. Supp. 1196, 1202 (D.D.C. 1982), *aff'd*, 722 F.2d 779 (D.C. Cir. 1983) (no private right of action in Mineral Leasing Act); *Holy Cross Wilderness Fund v. Madigan*, 960 F.2d 1515, 1523 n.10 (10th Cir. 1992) (declining to address enforcement of permit conditions in deciding permit challenge); *Boll v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 2d 520, 531 (W.D. Pa.

2003) (court lacked jurisdiction to address permit enforcement in context of challenge to permitting decision), *aff'd sub nom. Boll v. Safe Harbor Marina, Ltd.*, 114 F. App'x 467 (3d Cir. 2004).[5]

Dakota Access has prepared a chart to assist the Court in identifying those criticisms that should be disregarded because they were first raised either before the Final EA date or after the Corps decided to deliver the easement without an EIS.  *See* Dates for Criticisms under "Highly Controversial Effects" Remand Topic, attached as Exhibit 1 to the Declaration of William S. Scherman ("Scherman Declaration").

## II.    The Corps Adequately Addressed The Remand Topics

As explained above, the question before this Court is whether the Corps "complied with the" remand order "by filling the analytical gap identified" by this Court.  *Heartland*, 415 F.3d at 29.  The Corps did.  It supplemented nearly 900 pages of EA and appendices with a 138-page Remand Analysis (RAR 3-140) and a 140-page Submission Review (RAR 141-280) addressing the three remand topics that this Court ordered it to review:  highly controversial effects (RAR 102-280), hunting and fishing (RAR 4-44), and environmental justice (RAR 45-101).  The Corps' thorough analysis more than satisfied its obligation on each remand topic, and Plaintiffs do not show otherwise with their invitation to "flyspeck the [Corps'] findings in search of any deficiency no matter how minor."  *SRST II*, 255 F. Supp. 3d at 122 (quoting *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1322-23 (D.C. Cir. 2015)).

---

[5] The same is true for the argument that Dakota Access has failed to "'meet or exceed' all regulatory" and "industry standards" and "'follow standards' of the [American Petroleum Institute (API)]," as the Corps purportedly committed Dakota Access to doing in the Final EA.  *Id*. at 30 (quoting USACE_DAPL 71312, 71319, 71263).

### A.     The Corps Reasonably Determined That The Environmental Effects Of Granting An Easement Are Not Likely To Be Highly Controversial.

The Corps' first task on remand was to reexamine "the degree to which the project's effects are likely to be highly controversial," *SRST III*, 282 F. Supp. 3d at 96, as asserted in seven expert reports Plaintiffs submitted to the Corps between the July 25, 2016 EA and the February 3, 2017 decision to deliver the easement, *SRST II*, 255 F. Supp. 3d at 129.   The Corps documented its completion of that task in a Remand Analysis and Submission Review that together span 179 pages.  RAR 102-280.  This exhaustive analysis of each specific critique in 18 different documents that the Tribes submitted after July 25, 2016 (including 11 that the Corps had no duty to analyze because they post-dated the interim period) reaffirmed the Corps' earlier "high consequence, but low likelihood" finding:  The "extremely low" risk of a high-volume spill made further analysis unnecessary despite the serious consequences that one could generate.  RAR 119.  The Corps concluded that "none of the comments show that a substantial dispute exists as to the size, nature, or effect" of the pipeline's environmental impacts.  RAR 110.  That satisfies this Court's direction to "give careful consideration to the expert critiques," *SRST III*, 282 F. Supp. 3d at 99, including each of the specific criticisms that this Court directed the Corps to consider, only some of which the Tribes now contest.[6]  This determination of "the degree to which the project is likely to be highly controversial fits squarely within the realm of those 'factual disputes' committed to agency expertise."  *Id*.  It should be affirmed.

---

[6]  *See SRST II*, 255 F. Supp. 3d at 129; RAR 18, 117-19 and *infra* at 21-22, 30-31 (spill volumes from pipelines with 16-inch or larger diameters); RAR 28-29, 112-113 (river-flow rates); RAR 112-15, 145-49, 199-200, 202-04, 257 and *infra* at 34-36 (benzene concentration limits); RAR 116-20, 151-55 (quantitative analysis of risk of failure of system components); RAR 120-24, 155-59, 227, 254 and *infra* at 31-33 (valve closure times); RAR 127-29, 131-32, 175-78, 180, 184, 223-24, 232, 260 (corrosion threats); RAR 129-130, 178-80, 205, 228 (pipeline elevation, profile, maximum operating pressure, valve location, and location and type of leak detection monitoring devices).

1.      **The Corps' Determination That A Spill Is Unlikely Is Not Highly Controversial**

The Corps' FONSI rested, in part, on the finding that the risk of a high-volume oil spill is "extremely low."  USACE_DAPL 71311; RAR 119.  This Court has already rejected challenges to that determination.  *SRST II*, 255 F. Supp. 3d at 125-27.  Because the EA set forth "the specific factors that undergirded its risk analysis and explain[ed] their application to DAPL," the Court found that "the EA reasonably gives the necessary content to its top-line conclusion that the risk of a spill is low."  *Id.* at 127.  The Court rejected SRST's argument that the risk assessment inadequately addressed topics like leak detection systems and water quality, and it emphasized that any disagreement with "the Corps' technical assessments or overall conclusion . . . 'implicates substantial agency expertise.'"  *Id.*  The Court's opinion thus made clear that the Corps should address certain *effects* of spills, not their *likelihood*, on remand.  *Id.*  Apart from addressing specific expert criticisms from the interim period, the Corps had no need to re-do its determination that a spill is unlikely.

SRST nonetheless objects that the Corps "did no new work on the question of spill risk." D.E. 433-2, at 26.  Apart from that argument exceeding the remand's scope, it is factually wrong. The Corps "supplement[ed]" its analysis of spill likelihood with PHMSA data on the "frequency of reported hazardous liquid 'accidents' . . . per 1,000 pipeline miles."  RAR 14, 58.  The data confirmed that the risk of a spill is "low," and the risks of a significant spill even smaller:  Per 1,000 miles of crude oil pipeline, there were 0.957 spills per year from 2004 to 2017.  RAR 16. For pipelines measuring 16 inches or greater (like this one), 75% of spills since 2010 involved fewer than 105 barrels, and 95% involved fewer than 7,600 barrels.  RAR 18.  And the risk is even lower for pipelines, such as this one, that meet applicable PHMSA requirements, employ new

technologies, and are installed through horizontal directional drilling (HDD).  RAR 18-19.  "[T]he likelihood of a failure at an HDD crossing is extremely low."  RAR 19.

SRST has no good excuse for overlooking this "new work"; it pointed to the same material in its motion to supplement the RAR.  D.E. 401, at 8.  That work, which the Tribes do not challenge, independently confirms that the risk of a spill is low.  Instead, Plaintiffs renew their attack on the *original* risk assessment, claiming the Corps failed to account for the safety record of Dakota Access's corporate parents, Energy Transfer Partners (ETP) and Sunoco, or implement industry best practices.  D.E. 433-2, at 26, 30.  Both claims are baseless.

a. <u>ETP/Sunoco's Safety Record</u>.  The Tribes argue that the Corps improperly "dismissed" concerns about ETP's and Sunoco's safety records.  *See* D.E. 433-2, at 28.  But Plaintiffs misstate the proper role of any such concerns, and the Corps more than adequately addressed them even had they been relevant and timely.

As previewed above, Plaintiffs' first problem is untimeliness.  They admit that their argument rests on "information about ETP's safety record provided *during* the remand."  D.E. 433-2, at 29 (emphasis added).  In fact, with only one exception, they cite documents submitted after February 3, 2017.  *See*, *e.g.*, RAR 330 (Aug. 2018 email attachments); RAR 335-36 (July 2018 letter); RAR 377, 379 (July 2018 email attachment); RAR 414, 416 (May 2018 order); RAR 1464 (Aug. 2017 declaration); RAR 6377 (Jan. 2018 email); RAR 6388 (Mar. 2018 resolution); RAR 7503, 7506-11 (Feb. 2018 report); RAR 7645 (Feb. 7, 2017 appendix to Feb. 2018 report).

As for the relevance of this information, Plaintiffs misstate the law.  They claim that PHMSA regulations required the Corp to consider "'historic discharges,' *i.e.*, the operators' record."  D.E. 433-2, at 27.  But this argument relies on a regulation stating only that historic response times can be used as a variable when computing "worst case" spill volumes, not their likelihood.

49 C.F.R. § 194.105(b)(1).  PHMSA regulations did not require a company-specific safety record analysis.

Plaintiffs' legal errors aside, the sole item they put forth from the applicable interim period is a single sentence in an October 2016 letter stating the number of spills and leaks attributed to Sunoco over a seven-year period that the author chose (2010-2016).  *See* USACE_ESMT 1278.  But Plaintiffs' letter failed to provide important context—the frequency of spills *per mile* of pipelines operated, which is PHMSA's metric for spill likelihood.  *See* RAR 14.  The Corps reasonably concluded that the Tribes thus offered no "specific alternative methodology or particular criteria" for assessing the likelihood of a spill.  RAR 236.  SRST's brief simply repeats that shortcoming.  D.E. 433-2, at 29 (faulting Corps for not evaluating risk "in light of ETP's safety and compliance record," but offering no "specific" method or "particular criteria" that could replace PHMSA's spill-per-mile methodology).

In any event, the Corps addressed this issue by showing that the Tribes' cherry-picked examples overstated the risk of a spill affecting Lake Oahe.  The Corps explained that "approximately 70% of the 276 incidents [referenced in the PHMSA data] were confined to operators' property" and thus comparable incidents "would not reach Lake Oahe or any other land or water used by the Tribe."  RAR 235 (quotation marks omitted, alterations in original) (referring to data cited by Tribal expert for 2006-2016 and noting that Dakota Access's valve facilities "are located in upland locations that have been graded and leveled" and further secured by fencing so "there are no openings to the outside environment for oil to be released").  Moreover, "Sunoco's pipeline operations and maintenance are regularly inspected by regulators, and these inspections have increased substantially in both frequency and intensity since 2013."  *Id.* (quoting declaration from ETP's Vice President of Crude and Liquid Pipeline Operations).  For example, "[b]etween 2013

and 2016, Sunoco had over 90 targeted, system-wide program or site-specific PHMSA and state inspections for existing pipeline systems and new construction." *Id.* (quoting same). Furthermore, "Sunoco completed two comprehensive Employee Safety Culture Surveys over the past 10 years." RAR 239.

Finally, the Tribes mischaracterize their own evidence. They fault the Corps for ignoring a Dakota Access "spill." D.E. 433-2, at 28 (quoting RAR 560). But the reported spill was of mud during construction, not oil during operations, RAR 560; *see also* RAR 384, and the Corps properly explained that it did not have the relevant inspection report "because the reported spill" of mud "was not on Corps property." RAR 560. Nor is it accurate to say that an agency employee "summarily dismissed" information from the Tribes because he forwarded it to colleagues without adding expressions of "concern." D.E. 433-2, at 28 (citing RAR 330 and RAR 9526).

The record speaks for itself: Even the most "dismissive" examples the Tribes could find instead establish the Corps' consideration of safety concerns, that, in any event, are neither relevant nor timely raised.

b. Industry Standards. The record also belies Plaintiffs' assertion of "no evidence that [Dakota Access] meets the API's rigorous design and safety standards." D.E. 433-2, at 30-31.

The Submission Review is replete with proof that this pipeline meets API standards. *See*, *e.g.*, RAR 155-156 (valves "have been sized and specified to meet the industry standard API Spec-ification 6D for the design, manufacturing, testing and documentation of such valves"); RAR 183 ("all welds" will be or have been "subjected to x-ray" and "evaluated based on acceptance criteria (e.g., API 1104)"); RAR 205 (leak system "will be modeled, configured and tuned" "in accordance with PHMSA requirements and ARI-RP-1130 guidance"); RAR 273 (LeakWarn system installed in accordance with API-RP-1130 guidance). The risk assessment report likewise addresses Dakota

Access's compliance with API standards.  *See, e.g.*, RAR 14882 (welding in accordance with API 1104); RAR 14894 (line pipes designed in accordance with API 5L); RAR 14909 (approach for changing processes, procedures and physical assets based on API RP 581).

The Corps' consideration of applicable agency (*i.e.*, PHMSA) standards satisfied NEPA. *See EarthReports, Inc. v. FERC*, 828 F.3d 949, 957 (D.C. Cir. 2016).[7]  This Court already explained as much.  *See SRST II*, 255 F. Supp. 3d at 126.  Plaintiffs' preference among competing standards—such as the decision to follow API 1130 for the LeakWarn system rather than API 1173, *see* D.E. 433-2, at 31—is "a classic example of a factual dispute the resolution of which implicates substantial agency expertise."  *SRST II*, 255 F. Supp. 3d at 127 (quoting *Wis. Valley Improvement Co. v. FERC*, 236 F.3d 738, 746 (D.C. Cir. 2001)).  The Court "must defer to the informed discretion" of the Corps.  *Id.* (quoting *Wis. Valley*, 236 F.3d at 747).

### 2. The Corps' Worst-Case Discharge Calculation Is Not Highly Controversial Either

The second part of the Corps' "high consequence, but low likelihood" determination is spill volume, which the Corps used to assess potential effects on human populations and hunting and fishing.  RAR 13, 2753, 8069.  On remand, RAR 251, the Corps used a "worst case discharge" of 12,517 barrels (updated from 12,501 barrels, USACE_DAPL 74725; RAR 111), which was the largest volume of oil that could be expected to flow from this pipeline segment in the event of a "full bore rupture" "guillotine" cut, RAR 229.  This was well "within the range" of the Tribes'

---

[7]  The Tribes falsely characterize PHMSA regulations as "indisputably weaker than API standards" and out of line with Congressional safety directives and National Transportation Safety Board (NTSB) recommendations.  D.E. 433-2, at 30.  To the contrary, PHMSA has implemented an NTSB-approved solution for oil spill response plan procedures following a "government wide regulatory review required by executive order."  Safety Recommendation P-12-004, NTSB (Feb. 21, 2018), https://tinyurl.com/y4e7jxn2; *see also* Exec. Order No. 13,766, 82 Fed. Reg. 8657 (Jan. 24, 2017); Safety Recommendation P-12-009, NTSB, https://tinyurl.com/y2t5lcyv.

estimates, RAR 213, and even "170% larger" than the 4,620-barrel figure that one of those experts called "realistic." RAR 144.[8]

ETP calculated the discharge volume using PHMSA-approved modeling software. RAR 143. The "computer generated" result, USACE_DAPL 72253, accounted for the time to detect and respond to a spill, the oil flow rate, and the unique topography and valve positions for the relevant pipeline segment, USACE_DAPL 74719-22. As the Corps recognized, the model was "very conservative." RAR 144. It assumed: (1) a full diameter (guillotine) break, which is not typical for larger pipelines like DAPL, *id.*; (2) a full gravity drain-down, which is rare due to "anti-siphoning effects," *id.*; (3) a pipeline lying directly on top of the ground (for land crossings) or the water (for water crossings), even though this one is underground—in fact, 92 feet below Lake Oahe—which "restricts the volume that could be released," *id.*; and (4) valve closure times of 3.9 minutes, RAR 254, even though the Tribes' own experts estimated that a more realistic closure time would be just 24 to 30 seconds, RAR 120; USACE_ESMT 633. A fifth conservative assumption was that oil would continue to flow at the full "pumped flow rate" for 9 full minutes, even though the pumps will have started to shut down. RAR 227. Given these assumptions, the Corps determined that ETP's estimates would "overestimate the majority of spills seen in actual releases." RAR 144.

This Court previously addressed several aspects of the Corps' spill volume analysis and determined that the Corps adequately accounted for: "failure rates of spill-detection systems," the

---

[8] The Tribes ask this Court to ignore that the Corps modeled a spill so much larger than the amount that their own expert said "could result" from a leak. USACE_ESMT 625-626 (EarthFax); D.E. 434-2, at 19. But that estimate, by someone who had every reason to use a larger number if credible, is helpful confirmation that the Corps' modeling was sound. *See also* USACE_ESMT 626 (Tribe's expert defends 1,023-barrel estimate, and even lower values for other locations, as "within the range of crude oil spills" to which he has responded).

difficulty of detecting "'a slow leak,'" and what the Tribes called "'startlingly optimistic'" response times.  *SRST II*, 255 F. Supp. 3d at 125.

On remand, the Corps addressed the worst-case discharge at length, in the context of the three remand topics.  *E.g.*, RAR 111-12, 120, 122, 124, 128, 143-44, 157, 159, 175-76, 207, 213, 226-27, 229, 236, 245-47, 249, 251, 253-55, 260, 278.  The Remand Analysis and Submission Review devoted an entire subcategory to "[s]pill [v]olume," and directly addressed both the Tribes' assertion that the "[w]orst-case spill volume was understated," RAR 107, and their criticisms of the assumptions underlying that calculation, including each criticism specifically identified by this Court, *see supra* at 20, n.6.

The Tribes' contrary assertion—that the Corps never "revisited" the worst-case discharge "at any point on remand" and "sa[id] not a word about the [Tribes'] persistent critiques" of that calculation, D.E. 433-2, at 15-16—blinks reality.  The Corps' analysis of the worst-case discharge was thorough and well supported.[9]  As explained below, Plaintiffs fail to show otherwise.

a.  Reliance on ETP Modeling.  At the threshold, the Tribes seek to relitigate the Corps' reliance on ETP's spill modeling.  D.E. 433-2, at 16.  But, as this Court already recognized, "CEQ regulations permit an applicant — here, Dakota Access — to prepare the EA as long as the agency

---

[9]  Dakota Access's recent proposal to increase the amount of oil that flows through the pipeline at a future date, D.E. 433-2, at 10, 51 n.31, 52, is not before the Court (and Plaintiffs do not argue otherwise).  Dakota Access is currently working with state and federal regulators to comply with the regulatory process and obtain any authorizations that may be needed, including for the installation of additional equipment several miles from Lake Oahe.  That process will likely include a new analysis in compliance with the easement conditions.  "[T]he adequacy of an environmental impact statement"—or here, an EA—"is judged by reference to the information available to the agency at the time of review."  *City of Bos. Delegation v. FERC*, 897 F.3d 241, 253 (D.C. Cir. 2018).  The Corps properly based its review on the expected throughput at the time, because agencies need not conjure up "inchoate" future plans.  *Nat'l Parks Conservation Ass'n v. United States*, 177 F. Supp. 3d 1, 26-27 (D.D.C. 2016); *see also City of Bos. Delegation*, 897 F.3d at 253 (agency had no need to consider a possible development that was in a "preliminary stage" where "information about its scope at the time" the agency issued the original EIS was limited).

independently evaluates the information submitted." *SRST II*, 255 F. Supp. 3d at 150-52.  "The Corps' regulations do not require the Corps to undertake an independent investigation or to gather its own information upon which to base an EA." *Friends of the Earth v. Hintz*, 800 F.2d 822, 834-35 (9th Cir. 1986).  Indeed, "[a]n EA may be based entirely upon information supplied by the applicant." *Id.* at 834.  Evidence of independent evaluation includes emails between the agency and applicant with questions about the information at issue, records of meetings about the information, requests that the applicant amend a study in some way, and an agency's statements that it is doing or has done an independent analysis. *See*, *e.g.*, *Indian River Cty. v. Dep't of Transp.*, 348 F. Supp. 3d 17, 55 (D.D.C. 2018), *appeal pending*, No. 19-5012 (D.C. Cir. 2019).

The Corps met this obligation.  As this Court explained, "the Corps provided ample input to Dakota Access" on the substance of the EA, and engaged in "meaningful back-and-forth" with Dakota Access including on "how spill volume and response times were calculated." *SRST II*, 255 F. Supp. 3d at 151.  Rather than re-investigate the spill volume on remand, the Corps' task was to respond to the interim-period critiques. *SRST III*, 282 F. Supp. 3d at 99.

The Corps nonetheless engaged actively with ETP on this topic.  It "requested additional information from ETP," including "additional oil spill modeling," "an analysis of the impact of various spill scenarios," and "a factual and technical analysis of issues presented in the Tribal documents," RAR 14, 19, 103.  The Corps specified the modeling parameters, *e.g.*, RAR 19 (specific spill scenarios), and "Corps experts at the Corps Engineering Research and Development Center reviewed the spill model and validated it." RAR 14.  "The Corps met ETP numerous times, including on October 19, 2017, November 28, 2017, January 11, 2018, February 8, 2018, and March 7, 2018" and discussed both "the information [ETP] provided and information that was still pending at the time." RAR 103.  The remand record is replete with correspondence between the

Corps and ETP representatives in which the Corps "required ETP to . . . address gaps, and explain the selected methodologies."  RAR 110; *see*, *e.g.*, RAR 426-28, 454-45, 3047, 13605-07.

That makes this case nothing like *American Rivers v. FERC*, where the agency relied upon a "more-than-decade-old-survey" of studies and estimates; failed to collect updated information; and relied on "estimates . . . entirely unmoored from any empirical, scientific, or otherwise verifiable study or source."  895 F.3d 32, 50 (D.C. Cir. 2018); *see* D.E. 433-2, at 16-17.  ETP supplied information uniquely in ETP's possession, and the Corps reviewed ETP's analysis at every step.

b.  <u>Detection Time</u>.  Plaintiffs next attack variables included in the worst-case discharge model, beginning with the assertion that detection time was omitted from the model.  But the Remand Analysis clarifies that the discharge model "includes . . . detection time."  RAR 254.  It will take 9 minutes "to detect a break on the line and shutdown pumps," which "includes 1 minute of detection time."  *Id.*  This is not a "last minute assertion" by the Corps, D.E. 433-2, at 19.  Rather, it was always explicit in the worst-case discharge model that "leak-detection" was one of the "primar[y]" determinants of "[s]pill volume."  USACE_DAPL 74723.  There was no need to break out detection time as a separate component.  USACE_DAPL 74721 ("[d]etection and [s]hutdown" time of 12.9 minutes included 9 minutes for detecting the spill and shutting down the pumps).  Because the Corps has resolved the earlier wording inconsistency, *compare id., with* USACE_DAPL 72253, that clarification is entitled to a "'presumption of regularity'" and truthfulness.  *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 174 (2004) (requiring "clear [contrary] evidence" to rebut the presumption).

The amount of detection time used is also reasonable.  The pipeline's "state-of-the-art" LeakWarn system can detect a rupture within 1 to 3 minutes by monitoring pressure changes in the pipeline.  RAR 205.  The lower number was proper here, *cf.* D.E. 433-2, at 20 n.14, because

the "typical time of detection for a WCD rupture"—the very largest spill—is "less than 1 minute," RAR 254.  In any event, the Tribes forfeited this criticism by not timely raising it with the Corps, *W. Va.*, 362 F.3d at 864-65, and their quibble over 2 minutes—amounting to 833.2 barrels of spill volume at the pipeline's 416.6 barrel/minute flow rate, USACE_DAPL 72253—is precisely the type of "'minor'" dispute that courts need not resolve under NEPA, *SRST II*, 255 F. Supp. 3d at 122; *see also Myersville*, 783 F.3d at 1322-23 (dismissing dispute over whether proposal would affect 102 acres or 527 acres as improper "'flyspeck[ing]'").[10]

The Corps adequately considered and rejected the Tribes' "real-world examples" of longer detection times.  D.E. 433-2, at 18; *see also* USACE_ESMT 1079.  Not only did the Corps already address the point before issuing its Final EA, it reasonably based its analysis "on the specific parameters associated with this pipeline being installed at this particular location"—including the specific "pipe diameter, flow rate, valve location, leak detection and valve shut down times, and the land elevation profile along the pipeline"—"[r]ather than . . . data from . . . different pipeline[s]."  RAR 255, 8111.  (The same considerations explain why the Corps was not required to use the 50,000-barrel spill estimate found in EPA's Mid-Missouri SACP, D.E. 433-2, at 14, 24.)

Many of the Tribes' examples of detection times also involved slower or smaller leaks, rather than the "worst case" guillotine break modeled here.  RAR 255; *see*, *e.g.*, RAR 252 (Permian Express II:  8,600 barrels from a "pinhole leak"); RAR 2463, 2805 (Bridger Poplar (Yellowstone 2015):  1,200 barrels, detected within an hour); RAR 16685-86 (Tesoro (2013):  leak from a "dime-sized hole").  The Court already rejected the Tribes' concerns about "'slow leak[s].'"  *SRST II*,

---

[10]   The same is true of Plaintiffs' complaint that PHMSA's worst-case discharge regulation speaks of detection time in "hours" rather than minutes.  *See* D.E. 433-2, at 18.  The regulation's use of a common unit of measurement ("release time in hours, plus . . . response time in hours" times "flow rate . . . in barrels per hour," 49 C.F.R. § 194.105(b)(1)), does not mean the Corps needed to use a full hour when the pumps and valves would take a fraction of an hour to close.

255 F. Supp. 3d at 125.  Even so, the Corps further addressed them on remand, explaining that the pipeline's detection system is "capable of detecting leaks down to 1 percent or less," and "sensitive to smaller changes in flow rate and pressure" that would trigger a "detectable meter imbalance" and "alarm[s] to the Control Center" for a leak below 1 percent.  RAR 205-06.

The Tribes' other examples are similarly inapposite due to the age of those pipelines and other physical differences.  The July 2010 Kalamazoo River leak involved a 40-year-old pipeline, and the controllers ignored "numerous alarms."  RAR 1331.  The December 2016 Belle Fourche leak involved a 50-year-old pipeline damaged by a landslide, RAR 1294, 1345-47, 1920—a risk that this Court already held the Corps adequately addressed, *SRST II*, 255 F. Supp. 3d at 124-25.  The Corps' conclusion that these examples are not predictive of the worst-case discharge here is yet another "classic example of a factual dispute the resolution of which implicates substantial agency expertise."  *Marsh v. Or. Nat'l Res. Council*, 490 U.S. 360, 376 (1989).

The Court has similarly rejected the Tribes' general concerns about "failure rates of spill-detection systems."  *SRST II*, 255 F. Supp. 3d at 125; *see also* USACE_ESMT 1271.  The pipe-line's detection system is "modeled, configured and tuned" in accordance with PHMSA and API guidance, RAR 205, and ETP regularly maintains and tests it as required by the easement condi-tions, RAR 173-74.  Given that NEPA does not even require PHMSA's "worst case" analysis, the Corps had no obligation to consider the "highly speculative" possibility that a large spill and a detection system failure will coincide.  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 356 (1989).

b.  <u>Valve Closure Times</u>.  The Tribes next complain that the modeling assumed the valves would "close immediately." D.E. 433-2, at 15 (citing USACE_ESMT 624, 1078); *see also* RAR 120, 124, 155, 159.  But the worst-case discharge allots 3.9 minutes for valves to close.  RAR 254.

The model report itself includes that time period as an input, USACE_DAPL 74719, and identifies "valve closure rates" as a "primar[y]" determinant of "[s]pill volume."   USACE_DAPL 74723.

In contending that the math in one document shows otherwise, D.E. 433-2, at 13-14 (citing USACE_DAPL 72253), Plaintiffs have waited too long to make an argument that nonetheless lacks merit.   The original administrative record disclosed both the 3.9 minutes and the math details that the Tribes now attack, *see* USACE_DAPL 72253, 74719, 74721, yet the Tribes never before argued any inconsistency.   In depriving Dakota Access and the Corps of an opportunity to respond on the administrative record, Plaintiffs forfeited this argument.   *W. Va.*, 362 F.3d at 864-65.

It also can be shown from the existing record that the Tribes have gone astray with this contention.   The worst-case discharge is the sum of two quantities:   (1) the oil that would be pumped through the pipeline during the first 9 minutes *before* the pumps are shut down; and (2) the amount that would "drain down" *after* shutdown "due to the effects of gravity."   USACE_DAPL 72253, 72269, 74719-20, RAR 227.   Spillage during the 3.9 minutes of valve closure is part of the second quantity, because the valves begin to close *after* the pumps shut down.   Thus, it was correct for the *first* quantity to be "based on the 9-minute pump shutdown time only," D.E. 433-2, at 13.[11]

The Tribes are left to speculate that a loss of power at the valves—due, *e.g.*, to adverse weather conditions—might impede valve closure.   D.E. 433-2, at 20-24.   But concerns about adverse weather were raised *before* the July 25, 2016 EA, and thus resolved by the Court's prior

---

[11]   Plaintiffs' error aside, a different mistake would still doom their argument.   Applying the full flow rate (416.6 barrels per minute, USACE_DAPL 72253), to the time the valves are closing (3.9 minutes, RAR 254), yields just 1,624.74 barrels.   Plaintiffs get to 21,000 barrels by mistakenly assuming the valves would *never* close.   D.E. 433-2, at 20; RAR 121.   And even 1,624.74 would be much too high, because the flow rate slows substantially after the pumps are shut down.   RAR 227.   Thus, given the multiple conservative assumptions built into the model, *see supra* at 26, even the erroneously asserted failure to account for closure time would not have undermined the Corps' bottom-line worst-case estimate.   *See Myersville*, 783 F.3d at 1322-23.

summary judgment order.  *See supra* at 16-17.  Also, Plaintiffs rely here on comments they made *after* the interim period, D.E. 433-2, at 2-22 (citing May 2018 correspondences (RAR 3332, 3319, 3154, 3288)), placing them beyond what the Corps was required to address, *see supra* at 17-18. The Corps nonetheless explained that:  (1) "[t]he valves and settings are designed to meet operating temperatures ranging from -20 degrees to +150 degrees Fahrenheit," RAR 248; (2) if power fails, "the valve will remain in its last position (*i.e.*, "fail safe" position)," RAR 157; and (3) "[i]f re-quired, the valve actuator can be operated manually via the integrated hand wheel," *id*.  In any event, the easement conditions require ETP to maintain backup power at the valves. USACE_ESMT 39.  ETP has complied with that condition, as confirmed by the independent audit filed with this Court.  D.E. 349-2, at 14 (confirming "[r]emote back up power" at valves).  And compliance with easement conditions is an enforcement issue, not a valid NEPA challenge.  *See supra* at 18-19.

### 3.    The Corps' Assessment Of The Impact Of A Worst-Case Discharge Is Not Highly Controversial

The final component of the Corps' "high consequence, but low likelihood" analysis is the Corps' assessment of the impact of the spill volumes at issue.  The Tribes have focused on three principal types of effects:  (1) impacts on water resources; (2) flammability of Bakken crude oil; and (3) hunting and fishing impacts.  As to the first two topics, the Court need only address highly controversial effects that the Tribes' experts first raised during the interim period.  *See supra* at 14-19.  Impacts on hunting and fishing are discussed separately in Part II.B *infra*.

a.    <u>Impact on Water Resources</u>.  As noted above, the Corps originally used worst-case discharge spill modeling to assess water resource impacts.  USACE_DAPL 74722, 74726.  Even assuming that a pipeline resting on top of the lake suffers a full guillotine cut, the model calculated a "relatively low" "risk rank of 3" on a scale of 1 (lowest) to 10 (highest).  USACE_DAPL 74726.

Despite that numeric result, the Corps determined that "the worst case consequence scenario is ranked high because several drinking water intake High Consequence Areas (HCAs) and multiple ecologically sensitive HCAs could be impacted."  USACE_DAPL 71318.  Combining this with the "very low" risk of a spill, the Corps' bottom-line conclusion was that there would be no significant impact.  *See* USACE_DAPL 71272-73.  This Court affirmed this assessment of the potential impact on water resources.  *SRST II*, 255 F. Supp. 3d at 133.

As explained earlier, to help address the hunting and fishing and environmental justice topics on remand, the Corps requested additional modeling from Dakota Access that "take[s] into account the pipeline as constructed," including the mitigating fact that the pipeline is built beneath the lake surface.  RAR 13605.  Dakota Access produced a 338-page report (RAR 8065-402) that modeled the movement, behavior, and potential effect of hypothetical releases of oil traveling unmitigated over a 10-day simulation period.  *See supra* at 10-11; RAR 22-23, 8068.

The report recognized that some water intakes close to the pipeline could be affected by a spill, RAR 8270, but confirmed, for each modeled scenario, that much of that oil would evaporate, dissolve, disperse, and degrade due to natural processes.  RAR 278, 8270.  And even if no cleanup occurred, most of the rest would remain within 10 meters of the surface, above the location of many water intakes.  RAR 278, 8270.  As a result, the Corps concluded that water intakes located further downstream from the spill—including those used by SRST, CRST, and Oglala—would not be affected.  RAR 278.

The arguments not already addressed above lack merit too.

(i)  Benzene Threshold.  The Tribes have a pre-remand argument in Oglala's assertion that benzene levels would exceed acceptable levels under certain spill scenarios.  D.E. 434-2, at 25.  The EA used a 5 µg/L (0.005 ppm) benzene threshold for drinking water, and found that even a

"small" (100 barrel) spill would temporarily exceed this threshold.  USACE_DAPL 71270-71.  The Corps factored this finding into its original "high consequence, but low likelihood" bottom line.  USACE_DAPL 71272-73.

Oglala complains that "benzene levels would exceed the 5 µg/L level under certain spill scenarios."  D.E. 434-2, at 25.  Putting aside that this was not a criticism unique to one of the interim-period documents, the Corps *agreed* with Oglala (as just noted).  "'NEPA does not mandate particular consequences'" even when an action may have "adverse environmental effects."  *SRST II*, 255 F. Supp. 3d at 113.  Thus, as long as the Corps "'examine[d] the consequences of the harm in proportion to the likelihood of its occurrence'"—as it clearly did here—it was free to conclude that "'the overall expected harm [was] insignificant and thus could support a FONSI.'"  *Id.* at 132.  Moreover, this Court already considered the benzene levels that the Corps openly acknowledged and affirmed the Corps' analysis on this issue.  *Id.* at 133.  There is no error.

Oglala's only interim-period criticism here is that the Corps should have used a lower benzene threshold.  D.E. 434-2, at 25 n.8 (citing USACE_ESMT 629).  That argument is meritless.  The Corps' 5 µg/L threshold was based on a scientific study ("Kerr et al., 1999 as cited in O'Reilly et al., 2001").  USACE_DAPL 71270.  This is one of the studies the Corps added to the record after Plaintiffs protested its omission.  D.E. 418, at 6; RAR 18459-72.  Now that it is in the record, Plaintiffs do not even mention it.  (The same is true for the other items Plaintiffs successfully moved to be added to the record.)  The Court "must defer to the [Corps'] informed discretion" on which threshold to use.  *SRST II*, 255 F. Supp. 3d at 127 (quotation marks omitted).  In any event, the Corps reasonably explained that the choice between a 2.2 µg/L threshold and a 5 µg/L threshold makes no difference:  A "small" (100 barrel) spill would exceed either threshold, but a "very small"

(4 barrel) spill would not exceed either threshold.  USACE_DAPL 71271, RAR 114.[12]

(ii) <u>10-day Simulation Period.</u>  The Tribes' remaining water resources arguments take aim at the additional modeling the Corps had Dakota Access perform on remand.  Even without more modeling, however, the Court has already upheld the EA's water resource analysis.  *SRST II*, 255 F. Supp. 3d at 133.  The Corps' decision to use additional modeling on two discrete remand topics does not reopen that entire analysis to a do-over.  *See supra* at 15-16.

Yet that is what Oglala seeks.  Its principal challenge is that the supplemental model's 10-day simulation period is arbitrary, D.E. 434-2, at 19, and thus understates effects on drinking water, D.E. 434-2, at 20-21, 26-27.  Even if drinking water impacts were still at issue, though, the added modeling could not change the outcome.  The Corps explained that the model conservatively "assumes a plume of oil traveling *unmitigated* for 10 days" even though ETP "committed to less than a 6 hour response time."  RAR 219 (emphasis added).  The response plan calls for it to contain and recover the oil.  RAR 6479-80.  The Corps was thus well within its "informed discretion" to assume ETP would respond to and mitigate a spill by the end of day 10.  *SRST II*, 255 F. Supp. 3d at 127 (quotation marks omitted).

Further, this modeling shows that even a guillotine-cut spill that continued unmitigated for more than 10 days—an unprecedented scenario—would have only a limited effect on drinking water.  As oil travels downstream from a hypothetical spill, it gradually evaporates, dissolves, disperses, and degrades due to natural processes, and more of it tends to be located closer to the surface, rather than at the lower depths (below 10 meters) where water intakes are located.  RAR

---

[12]  Oglala's response gets these facts wrong.  The Corps never said that a 100 barrel spill *would not* exceed the 2.2 µg/L threshold.  *See* D.E. 434-2, at 25 n.8.  Rather, it agreed with Oglala that a 100 barrel spill *would* exceed that threshold, and the higher one too, which is why it did not matter which threshold was more accurate.  RAR 114.

278, 8270.  (Oglala calls this a "best case scenario," D.E. 434-2, at 25, but the opposite is true:  It is based on the "*maximum* predicted concentrations from *any point in time* for *all 1160 model runs*."  RAR 8270 (emphases added)).  The spill report was able to conclude that SRST's intake likely would be unaffected even after a 10-day period of such unmitigated oil flow.  RAR 278, 8270.  The Corps, in turn, reasonably concluded that the CRST and Oglala (OSRWSS) intakes—more than twice the distance downstream, RAR 94, 8099—would be unaffected.  RAR 278.[13]

All of this is beside the point, moreover, because the Corps has already acknowledged and accounted for the fact that "several drinking water intake[s] . . . could be impacted." USACE_DAPL 71318.  The Corps' bottom line on this issue is not highly controversial.

(iii)  Impacts on the Mni Wiconi Project.  Oglala's argument that the Corps failed to consider the impact of a spill on the Mni Wiconi Project fails for the same reason.  D.E. 434-2, at 26. Oglala refers here to its OSRWSS intake, 205 miles downstream of the pipeline crossing.  *Id*. at 5. Because that intake is "downstream of the Lake Oahe dam (which lies approximately 200 miles downstream of the DAPL crossing)," and because the discharge pipes for the dam are located at least 46 meters (142 feet) below the surface, "[a]ny released hydrocarbons that reach the dam would need to mix within the water column at least 142 feet below the lake surface."  RAR 94. Apart from the fact that oil would be contained long before it could reach the dam, the model predicts no hydrocarbons below 10 meters anywhere, even after 10 days of unmitigated oil flow, so no oil would get past the dam.  Given the Corps' reasoned conclusion that a spill thus will not reach the Oglala intake, it satisfied its obligations.

---

[13]   The maximum total hydrocarbon ("THC") and dissolved total hydrocarbon ("DHC") numbers cited by Oglala, D.E. 434-2, at 21, do not suggest otherwise.  Those numbers each involve oil concentrations at the surface of the water or on the shoreline, not below the surface where water intakes are located.  RAR 8883, 8901-02, 8913-14, 8932, 834.

b. <u>Bakken Crude Oil</u>.  The second spill impact addressed by the Tribes is that Bakken crude is more flammable than other forms of crude.  D.E. 433-2, at 32-33.  The Tribes claim the Corps failed to consider the corresponding safety concerns, but they continue to disregard that flammability is a factor that *favors* pipeline transport.

Contrary to Plaintiffs' assertion, the record demonstrates that the Corps examined the potential risks posed by Bakken crude oil.  The Corps explained that "ETP performed additional spill modeling and assessed downstream risks to human health from a release of Bakken crude into the waterways," RAR 247, and that the risks of "an unmitigated release of Bakken crude . . .  are addressed in the Downstream Receptor Report," RAR 251-252 (citing Downstream Receptor Report at 80-91, RAR 2832-43).  The Corps also pointed to the Final EA, which considered "Bakken crude oil hazards."  RAR 247 (citing Final EA at 45-48, USACE_DAPL 71269-72).

The Corps further explained why Plaintiffs' concerns about Bakken crude were misplaced.  Bakken crude incidents in the recent past "all involved an initial ignition source, such as a train derailment and associated sparking at the time of release.  This is typically not the case with most pipeline releases."  RAR 237.  For example, the comments referenced a PHMSA safety alert that "applied to train derailments" and a 2014 NDIC Oil Conditioning Order that applied to producers and "transload rail facilities operators." RAR 251.  The Corps explained that the same risks would not apply to DAPL, a mid-stream pipeline facility.  *See id.*

Plaintiffs do not say how these responses are inadequate.  Instead, they merely reinforce the point with more examples of rail incidents—*e.g.*, the "Quebec rail disaster," D.E. 433-2, at 33—and PHMSA 2014 guidance that is based on "preliminary inspections conducted after recent rail derailments," RAR 16018.  Pipeline transport is safer because any initial oil leak would be shielded from air.

Even if Bakken crude posed such a risk here, the Corps explained the protections in place. The first response would be to "conduct air monitoring to ensure protection of the public and responders" including "elimination of any potential ignition sources." RAR 237. "Continuous monitoring is conducted to verify that Lower Effect Levels (LELs) and any potential vapors remain below safe working levels." RAR 237-38. If they rise above that level, "the appropriate protections are implemented immediately, including evacuations if necessary." RAR 238. The type of oil does not render the risk assessment here highly controversial.

### B.      The Corps Reasonably Assessed And Explained The Impact Of A Spill On Hunting And Fishing

Plaintiffs have little to say about the Corps' consideration of the second remand topic: "the consequences of a spill for the Tribes' fishing and hunting rights." *SRST III*, 282 F. Supp. 3d at 96. Because Plaintiffs cannot dispute that the Corps fully explained such consequences, they instead disagree with what should follow from that explanation. That is not a valid NEPA claim.

The Court recognized that the Corps had "gathered information regarding Lake Oahe's fish and wildlife, and . . . conducted a lengthy analysis of the possible toxicity arising from various spill scenarios," to conclude that "'under no spill scenario would the acute toxicity threshold for aquatic organisms be exceeded.'" *SRST III*, 282 F. Supp. 3d at 99-100 (citing *SRST II*, 255 F. Supp. 3d at 133-34; D.E. 172-1, at 58-59, 104 (discussing wildlife near Lake Oahe); *id.* at 47, 48, 101 (discussing exposure of Lake Oahe fish to oil spill); *id.* at 45-46 (discussing potential toxic effects of spill)). The Corps' job on remand was to "simply connect the dots." *SRST III*, 282 F. Supp. 3d at 100.

The Corps did that and more. Out of an abundance of caution it requested the additional modeling discussed above of "hypothetical unmitigated spill scenarios" to estimate "concentra-

tions of hydrocarbons in the water column and effects on fish and wildlife resources or 'down-stream receptors.'" RAR 14. After reviewing and validating the spill modeling methodology, RAR 4-44, the Corps concluded that "the potential impacts of an oil spill to hunting and fishing resources did not reveal any significant impacts because the risk of an incident is low and any impacts to hunting and fishing resource will be of limited scope and duration," RAR 44; *see also* RAR 42 ("[n]one of the models predicated a lake area with a surface oil thickness above the threshold that could potentially impact game species"; "[b]irds and mammals are mobile and generally will avoid oil-impacted areas and contaminated food"); RAR 43 (oil spill would "likely cause a localized fish kill" but the impacts would be "limited . . . to the immediate area surrounding the site of the spill").

After obtaining a remand on this issue, the Tribes have little to say in response to the Corps' careful and detailed analysis. Oglala alone takes issue with it—sort of. As already addressed *supra* at 36-37, it argues that a 10-day unmitigated release simulation is too short, D.E. 434-2, at 19-23, even though the Corps concluded that the response time would be less than six hours. Oglala's main complaint, though, is that the Corps' new work "resulted in an analysis that showed that an oil spill could result in significant impacts" not previously acknowledged. D.E. 434-2, at 23. But, putting aside whether that is a fair characterization, Oglala's argument gets it nowhere. The Corps concluded—as the law permits—that it need not conduct an EIS to consider further potential significant impacts from a large spill because the likelihood of a high-consequence spill was low. RAR 118-19. Thus, by acknowledging that this low likelihood event "could result in significant impacts," D.E. 434-2, at 23, the Corps did all that this Court required.

Moreover, Oglala's characterization—unlike the Corps' treatment of this issue on remand—is incomplete. Oglala selectively quotes from the Downstream Receptor Report to assert,

for example, that a "'large unmitigated release of oil' (*i.e.*, in the amounts modeled in the Spill Model Report) to Lake Oahe or near Lake Oahe 'would likely result in mortality' of" various resources.  D.E. 434-3, at 24.  But Oglala omits that such effects, even from a hypothetical unmitigated spill, are expected to be limited.  *See*, *e.g.*, RAR 2769 ("Based on the results of the computational modeling (RPS, 2018) and the resulting estimates of hydrocarbons on and near the shoreline, the potential unmitigated effects on riparian, wetland, and aquatic plants is expected to be limited."); RAR 2791 (same for benthic macroinvertebrates); RAR 2806 (same for fish).

Oglala similarly cherry-picks a single data point from the Spill Model Report, which it characterizes as predicting "almost 30% mortality of sensitive aquatic species of an area of 74.7 square kilometers, and 2.5% for other aquatic species." D.E. 434-2, at 24 (citing RAR 8943).  The Report makes clear that this is a statistical anomaly.  Unique weather conditions produced a single iteration of high mortality rates out of 1,160 runs of the model.  RAR 8941-42 (one model run involved a large storm passing within the first day of the release followed by six days of sustained winds that caused "the nearly complete entrainment of surface oil" in the water column.).  This outlier result for an outlier event (a high-volume spill) fits comfortably within the Corps' reasoning that no EIS was needed given the low likelihood of a significant environmental event.

Oglala additionally claims that the Corps did not address the potential impacts of the pipeline "on the implementation of mitigation plans for fish and wildlife and terrestrial losses due to the Oahe Dam." *See* D.E. 434-2, at 27-28.  To the contrary, the Corps did address this concern, stating that "Pre-Project baseline conditions for the Environmental Assessment include the existence of the dam in place which was completed in 1962" and "[n]o permanent habitat loss is anticipated even under the worst-case scenarios."  RAR 246.

Ultimately, NEPA required a hard look.  The record shows that the Corps did exactly that,

providing a thorough explanation of a spill's consequences for tribal fishing and hunting rights.

### C.      The Corps Provided A Robust Analysis Of Environmental-Justice Impacts

The Corps' final task on remand was to "provide a more robust analysis" of "the environmental-justice impacts of the project." *SRST III*, 282 F. Supp. 3d at 96, 101.  The Corps did so by addressing each specific item this Court identified (geographic scope of the analysis; unique potential impacts on tribal interests, and relevance of the North Bismarck alternative).  Now that the Corps has complied, Plaintiffs pivot to what is principally a policy objection.  They say the Corps should have preferred a route that poses risks to *more* low-income and minority persons because that way such possible impacts would be shared by a greater *proportion* of other groups.  But, apart from the dubiousness of such a policy, this Court has already explained that the outcome of the Corps' added environmental-justice analysis "would not compel the Corps to alter its prior decision to issue an EA and FONSI."  *SRST III*, 282 F. Supp. 3d at 101; *see also id.* at 102 ("Under NEPA, an agency is 'not required to select the course of action that best serves environmental justice, only to take a hard look at environmental justice issues.'" (quoting *Sierra Club v. FERC*, 867 F.3d 1357, 1368 (D.C. Cir. 2017) (quotation marks omitted))).

The Corps complied with its obligations with a significantly more robust analysis.  In more than 50 pages of its Remand Analysis, RAR 45-101, and separate responses to comments from the Tribes, *see*, *e.g*., RAR 241-44, the Corps filled the analytical gaps that the Court identified.

1. Geographic scope.  The Corps began by fully addressing objections to the geographic scope of its analysis.  That 156-mile stretch of Lake Oahe that it studied is many-fold greater than the area used in environmental-justice analyses for oil pipeline projects that the Tribes cited for comparison.  *See SRST II*, 255 F. Supp. 3d at 138 (referencing two Tribal exhibits:  D.E. 117-22 (assessing environmental-justice impacts 14 miles downstream of crossings); D.E. 195-6 (considering spill impacts up to 40 river-miles downstream)); *see also* D.E. 195, at 25 n.23.  As the Corps

explained, the area it considered stretched well beyond "the farthest that a hypothetical, worst-case, unmitigated release would travel after 10 days"—*i.e.*, "approximately 65 miles downstream from the Lake Oahe crossing," RAR 60—in order to "account [for] the tribes' differing technical and scientific views regarding the likelihood of a large spill," RAR 67.

No Plaintiff seriously disputes that the new geographical scope suffices. Yankton takes a different tack, arguing that the Corps needed to consider ways in which its members "make beneficial use of the property" near the Lake Oahe pipeline crossing. D.E. 435-1, at 13. But "[i]t was not feasible to quantify non-resident tribal member visits and include them in the tabulation" of environmental-justice impacts from an oil spill "because that information either is not tracked, or was not provided to the Corps in response to our information requests." RAR 68-69. Instead, the Corps "considered the substantive input from these groups when evaluating the potential effects on Native American populations overall." *Id.* That was a proper exercise of agency judgment.

2. <u>Unique interests of Tribal members</u>. That leads to the second way in which the Corps improved its environmental-justice analysis. It analyzed the potential effects of an oil spill on the Tribes in light of how each Tribe's cultural practices and social and economic circumstances may "amplify" the impact of an oil spill. *SRST II*, 255 F. Supp. 3d at 140. The Corps started with its finding, which Plaintiffs unsuccessfully challenged in 2017, of an "extremely low risk of a spill reaching the waters of Lake Oahe," RAR 82. This means that "significant adverse human health or environment effects are not expected to impact any population downriver of the Lake Oahe crossing," including minority and low-income populations. RAR 100. This Court has already explained that "the minimal risk of an oil spill under Lake Oahe reduces the likelihood that the project will have a significant impact on the surrounding communities," which led the Court to expect that "the Corps is likely to justify issuing an EA, rather than completing an EIS." *SRST III*,

282 F. Supp. 3d at 101.  Thus, the Tribes' challenges on environmental justice are tied to the fate

of their meritless attacks on the Corps' conclusion that a high-impact spill is unlikely.

Plaintiffs' challenges fail even without that fatal flaw.  The Tribes accuse the Corps of

improperly considering impacts to *non-tribal* members, D.E., 433-2, at 36-38, but the Corps also

considered the potential for heightened impacts to minority and low-income populations.  Specif-

ically, the Corps acknowledged the potential for amplified, disproportionate effects on each Tribe

given their distinct spiritual and cultural practices (RAR 83-87), hunting and fishing practices

(RAR 88-90), and water intakes (RAR 91-98).  The Corps drew on technical documentation, such

as the Downstream Receptor Report, and considered comments and expert reports from each

Tribe.[14]  *See* RAR 82.  The Corps agreed that the Tribes' cultural and spiritual practices were

uniquely vulnerable to impacts if a large spill occurred in certain ways, but ruled out dispropor-

tionate impacts given the "temporary and short duration" and low likelihood of any impacts.  RAR

86-87.  The same was true for Tribal hunting and fishing activities.  RAR 90 (citing, *inter alia*, an

SRST report).  And the Corps also found a "very low" threat to Tribal water intakes situated far

from the Lake Oahe crossing.  RAR 89-94.  That coheres with this Court's observation that the

location of SRST's drinking water intake (the closest of the three) was "likely to justify" an insig-

nificance finding on this topic.  *SRST III*, 282 F. Supp. 3d at 101.

3.  <u>North Bismarck alternative</u>.  The Corps' environmental-justice analysis is independently

supported by consideration of a different route—upstream of Bismarck, North Dakota (the "North

---

[14]  Yankton asserts that it was "deprived of the opportunity to meaningfully consult on [environmental-justice] impacts because no meeting was held for that purpose." D.E. 435-1, at 10-11.  But this Court noted that the Corps was in a position to justify its decision on the existing record.  Even so, as explained *infra* at 57-64, Yankton passed up opportunities to consult on this and other remand topics.  Further, the Corps considered Yankton's "substantive input . . . when evaluating the potential effects on Native American populations overall."  RAR 69; *see also* RAR 68 (referencing Affidavit of Kip Spotted Eagle, Yankton Sioux Tribe, Apr. 19, 2018).

Bismarck alternative"). RAR 53, 62, 98-100. As this Court has recognized, consideration of alternatives is the core of a reasoned environmental-justice analysis. *SRST III*, 282 F. Supp. 3d at 101-02. In fact, CEQ guidance states that possible disproportionate effects on tribes "should," *inter alia,* "heighten agency attention to alternatives (including alternative sites)." RAR 16202.

This Court has already acknowledged that "the alternative Bismarck crossing would pass much closer to a drinking-water intake than the Lake Oahe location does," and that "[t]he two water intakes downstream from the Bismarck site serve 84,504 people, while those downstream from the Oahe intakes serve 8,037." *SRST III*, 282 F. Supp. 3d at 102; *see also SRST II*, 255 F. Supp. 3d at 134-37. As this Court stated, the "[r]isks presented to this tenfold increase in population *must*, *of course*, be considered when the Corps evaluates the environmental-justice impacts, if any, of the Lake Oahe crossing." *SRST III*, 282 F. Supp. 3d at 102 (emphasis added).

The Corps' reasoned analysis of the North Bismarck alternative on remand disposes of the Tribes' environmental justice arguments. The Corps reaffirmed that a spill at the Lake Oahe crossing would affect *fewer* minority and low-income individuals and was less risky to drinking water. RAR 98-99. The Tribes raise a policy dilemma that might appear on a college Ethics exam: Is it better to subject more disadvantaged individuals to possible harms on the ground that those harms would be shared by even larger numbers of non-disadvantaged persons? D.E. 433-2, at 36-37. But, as already explained, an agency's obligation to consider environmental justice effects does not compel it to choose a particular outcome. The Corps was entitled to conclude that a ten-fold increase in the number of persons harmed by a hypothetical spill is too high a price to pay in the service of spreading that pain around.

The Tribes' complaints amount to disagreement with how the Corps used information that Plaintiffs themselves say is "obvious" in the Corps' remand analysis. D.E. 433-2, at 39. The

Corps filled the analytical gap that precipitated the remand, as the Court anticipated it could.  That is all that NEPA requires.

## III.   The Corps Met Its Obligations To Consult With Tribal Authorities Both Before And During The Remand

Unable to show that the Corps' remand analysis was anything short of rigorous, the Tribes recycle their argument that consultation was insufficient.  D.E. 433-2, at 39-45; D.E. 434-2, at 15-17; D.E. 435-1, at 15-24; D.E. 436-1, at 18-22.  This Court already rejected similar arguments from SRST, CRST, and Yankton.  *SRST I*, 205 F. Supp. 3d at 27-33 (SRST); *SRST II*, 255 F. Supp. 3d at 155-61 (CRST); *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 301 F. Supp. 3d 50, 61-64 (D.D.C. 2018) ("*SRST IV*") (Yankton).  The argument fares no better as applied to the Corps' consultations with Oglala before the remand or with all four Tribes on remand.

### A.   The Tribes Misconstrue The Scope And Enforceability Of The Obligations At Issue

The Tribes' consultation claims rest in large part on a mischaracterization of the Corps' obligations and their enforceability.  Those errors are three-fold.

#### 1.   Relief Under The National Historic Preservation Act Is Foreclosed Because Construction Of The Pipeline Is Complete

More than three years ago this Court held that SRST's claims under the National Historic Preservation Act ("NHPA") lacked merit, *SRST I*, 205 F. Supp. 3d at 27-33, and the D.C. Circuit agreed, Order, *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, No. 16-5259, Doc. 1640062, at 1 (D.C. Cir. Oct. 9, 2016) (denying injunction pending appeal).[15]  Plaintiffs persist,

---

[15]  This Court rejected all four arguments it was able to "infer" from SRST's motion.  *SRST I*, 205 F. Supp. 3d at 27.  It found that:  (1) the Corps fully "discharge[d] its NHPA obligations" before re-promulgating Nationwide Permit 12 ("NWP 12"), the general permit covering the pipeline's water crossings, *id*. at 27-29; (2) the Corps properly identified the pipeline crossings at which additional consultation would occur per NWP 12's preconstruction notice and verification ("PCN") process, *id*. at 29-30; (3) the Corps reasonably limited its NHPA review to areas potentially affected directly and indirectly by construction at federal waterways, rather than

however, even though this Court went on to add at the summary judgment stage that no meaningful relief was available under that statute in any event—*i.e.*, the NHPA claims had become moot.  D.E. 433-2, at 45-54; D.E. 435-1, at 2, 18-19, 21; *SRST IV*, 301 F. Supp. 3d at 61-64 (no "meaningful relief" is available under the NHPA now that "'construction is complete and oil is flowing'" through the pipeline).  Both conclusions remain sound.

The Tribes concede it is too late to enjoin construction, and nothing in the record suggests that the continued "'operation and maintenance of the Pipeline'"—even in the unlikely event of a "'spill'"—threatens any "'cultural and historic sites'" protected by the NHPA.  301 F. Supp. 3d at 61-63.  With no "prospective injuries," no prospective relief as to this pipeline is possible.  *Id.* at 63.  So, instead of an injunction, Plaintiffs want "declaratory relief" that would address the NHPA's application in other cases involving future projects.  D.E. 433-2, at 50.

Although such a request is more of an issue for the Corps, Plaintiffs have not overcome mootness.  A claim becomes moot when it is "impossible for the court to grant 'any effectual relief whatever' to a prevailing party."  *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992).  Since injunctive relief is unavailable, and declaratory relief "would be tantamount to issuing an [impermissible] advisory opinion," the Court cannot grant an "effective remedy," and the Tribes' NHPA claims are moot.  *SRST IV*, 301 F. Supp. 3d at 54, 64.

The Tribes invoke the exception for claims that are "capable of repetition, yet evad[e] review." D.E. 433-2, at 46.  But this exception "applies only in exceptional situations . . . where the following two circumstances are simultaneously present: (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that

---

potentially affected areas along the entire length of the pipeline that are beyond the Corps' jurisdiction, *id*. at 31-32; and (4) the Corps "exceeded its NHPA [consultation] obligations at many of the PCN sites," including at Lake Oahe, *id*. at 32-33.

the same complaining party will be subject to the same action again." *Spencer v. Kemna*, 523 U.S. 1, 17 (1998) (quotation marks and alterations omitted).  Neither circumstance is present here.

The Tribes argue that the "action" capable of repetition is "NHPA consultatio[n]" that gives rise to a dispute over "the 'scope' of [the Corps'] responsibilities under the [NHPA]."  D.E. 433-2, at 46-47; *see also* D.E. 433-3 ¶ 9.  But the question of the scope of such obligations is tied to the unique facts of this project and the jurisdiction of the Corps.  "The 'wrong' that is, or is not, 'capable of repetition' must be defined in terms of the precise controversy it spawns." *People for the Ethical Treatment of Animals, Inc. v. Gittens*, 396 F.3d 416, 422 (D.C. Cir. 2005).  To grant the declaratory relief the Tribes seek under the NHPA, the Court would have to decide whether it was permissible for the Corps to limit its consultation for this project to impacts on areas around federally regulated waterways.  Indeed, this Court has already found that the Corps properly exercised its discretion.  *SRST I*, 205 F. Supp. 3d at 31.  In analyzing the Corps' determination "that the route taken by the pipeline through private lands, up to a certain point approaching a federally regulated waterway, is driven by factors that have little to do with the discrete activities that the Corps needs to permit," the Court necessarily considered the unique route of the pipeline and the Corps' limited jurisdiction in that context.  *Id.* at 32.  As a result, the Tribes' NHPA claims present a unique question that will not recur.  No declaratory judgment issued in this case would inform a different project.  A future project would not present an abstract question of the scope of obligations under Section 106, but rather whether the agency's determination in *that* case, given its jurisdiction and the facts of *that* project itself, was permissible.  The Tribes make no showing that this question, as to this pipeline, is likely to recur.[16]

---

[16]  To the extent the Tribes are questioning the Corps' NHPA analysis as distinct from the scope of the Corps' responsibilities under the statute, that question is similarly far too intertwined with the specific facts of this case to recur.

Nor are such claims likely to evade review.  To the contrary, SRST already *had* review in this case.  It sought a preliminary injunction based on its NHPA claims, and this Court addressed them all, finding them likely to be without merit.  *SRST I*, 205 F. Supp. 3d at 27-33.  SRST appealed, and sought an injunction pending appeal, challenging this Court's rulings on the likelihood of success.  *See* Emergency Mot. for Inj. Pending Appeal, *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, No. 16-5259, Doc. 1635228, at 6-14 (D.C. Cir. Sept. 12, 2016).  The D.C. Circuit stayed construction pending consideration of that motion, Order, *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, No. 16-5259, Doc. 1636309, at 1 (D.C. Cir. Sept. 16, 2016), and went on to conclude that SRST "ha[d] not carried its burden of persuasion on [the preliminary injunction] factors," including "likelihood of success," Order, *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, No. 16-5259, Doc. 1640062, at 1 (D.C. Cir. Oct. 9, 2016).  This availability of preliminary injunctive relief means that a future occurrence of such claims in a future proceeding would likewise not evade review.  *See Neighborhood Transp. Network, Inc. v. Pena*, 42 F.3d 1169, 1173 (8th Cir. 1994).  The fact that Plaintiffs failed to meet the test for a preliminary injunction in this case (*i.e.*, the courts ruled that their claims had no likely merit) does not mean that future *meritorious* claims would evade review.  *Bayou Liberty Ass'n v. U.S. Army Corps of Eng'rs*, 217 F.3d 393, 398-99 (5th Cir. 2000).

In short, the NHPA is not a factor in this case.  The Tribes must base their consultation claims on other authority.

### 2.       The Tribes Rely On Inapplicable And Nonbinding Guidance Documents For The Remaining Consultation Claims

Outside of the NHPA, the Tribes rely on a mix of case law, Executive Orders, guidance documents, regulations, and treaties to argue the scope of alleged consultation obligations.  The Corps has already explained how many of these authorities—including Department of Defense

("DoD") Instruction 4710.02, "the Corps' general fiduciary duty to the Tribes," and the Corps' NEPA regulations—impose no duty on the Corps to consult with tribal authorities.  D.E. 183, at 39-42.  This Court declined to reach the legal issue in deciding CRST's consultation claims because it held that the Corps adequately consulted with CRST under any standard.  *SRST II*, 255 F. Supp. 3d at 156.  Even if some of these authorities could be read to impose any binding obligations, they are far less extensive than the Tribes contend.

The Tribes' threshold error is their reliance on a version of DoD Instruction 4710.02 that post-dates the remand.  The version adopted on September 14, 2006, D.E. 24-11, was in effect when the Corps consulted with the Tribes both before and during the remand, *see Moten v. U.S. Air Force, Bd. for Corr. of Military Records*, No. 2:18-cv-2179, 2019 WL 357901, at *3 n.4 (D. Ariz. Jan. 29, 2019).  The Tribes, however, also erroneously cite to a significantly revised version adopted on September 24, 2018, *see* https://tinyurl.com/y66vlhaa, nearly a month *after* the Corps completed its remand analysis, RAR 1.  *Compare* D.E 433-2, at 40-41 & n.26 (citing 2018 version), *with* D.E. 435-1, at 15-16 & n.7 (citing 2006 version); D.E. 436-1, at 18-19 (same).

The two versions of the document differ materially, including in two important ways:

*First*, only the 2018 version includes the statement, cited by SRST, D.E. 433-2, at 41, that "consultation may not be delegated to consultants and contractors," DoD Instruction 4710.02 § 3.4(e) (2018).  Thus, putting aside whether this statement bars a project proponent's participation in a joint consultation process with the agency and tribes—such as facilitating the exchange of information with tribal authorities, *e.g.*, *SRST II*, 255 F. Supp. 3d at 157 (spill response plans)—the statement does not apply here.

*Second*, the Tribes rely on provisions that were in a separate guidance document attached to the 2006 version.  This document, labeled "Enclosure 2" or "E2," was expressly framed in non-

binding, advisory language that could not possibly be construed as creating enforceable obligations on the part of the Corps. DoD Instruction, E2 (2006) ("guidance . . . designed to facilitate the consultation process and to make it more productive") (capitalization altered). Unlike the body of the 2006 document, which specified provisions that DoD components and personnel "shall" follow, *e.g.*, *id.* §§ 5.2, 5.3, Enclosure 2 used softer language, *e.g.*, *id.* §§ E2.1 ("should"); E2.2 ("is appropriate"); E2.3 ("may"). "The language employed by [DoD]" in Enclosure 2 made clear that it neither "create[d] new rights," "impose[d] new obligations," nor "narrowly limit[ed] administrative discretion," and thus lacked "'the force and effect of law.'" *Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785 F.3d 710, 716-17 (D.C. Cir. 2015).

This non-binding guidance document plays a central role in Plaintiffs' consultation allegations. Yankton, for example, argues that the DoD Instruction "directs the agencies to consider and respect tribal protocols like the Tribe's Consultation Protocols." D.E. 435-1, at 16. But the only provision that referenced tribal protocols was part of Enclosure 2's non-binding "guidance," not the text of the Instruction. *Compare* DoD Instruction § E2.7 (2006), *with* DoD Instruction § 3.5(b) (2018). The same is true for the statement, upon which Yankton says it "rel[ied]," that "consultation may require multiple meetings over a period of months." D.E. 435-1, at 15; *compare* DoD Instruction § E2.5 (2006), *with* DoD Instruction § 3.3(e)(1) (2018). (The use of "may" also means there will be scenarios where multiple meetings over a period of months are not needed.) Finally, this non-binding document is also the source for the statement that the Corps should "giv[e] careful consideration to all the available evidence and points of view before making the final decision." *Compare* DoD Instruction § E2.9 (2006), *with* DoD Instruction § 3.3(b) (2018); *see* D.E. 433-2, at 41. While this guidance may have helped to "make [consultation] more productive," DoD Instruction, E2 (2006), it imposed no binding duty.

51

The Tribes rely on still more non-binding guidance to advocate a limitless obligation on the Corps to "'share information that is not otherwise controlled or classified.'"  D.E. 436-1, at 19 (quoting *Memorandum for Commanders, Directors and Chiefs of Separate Offices, US Army Corps of Engineers: Tribal Consultation Policy*, Dep't of Army § 5.b(5) (Nov. 1, 2012), RAR 13984-90 ("Corps Policy")).  That document expressly states that it "is not intended to, and does not grant, expand, create, or diminish any legally enforceable rights, benefits, or trust responsibilities, substantive *or procedural*, not otherwise granted under existing law."  Corps Policy § 10 n.2, RAR 13990 (emphasis added).

This leaves the Tribes' repeated refrain that the Corps should consult with tribal authorities "'early in the planning process'" to ensure "'time for the tribal government to provide meaningful comments.'"  D.E. 433-2, at 41; *see also* D.E. 435-1, at 20 (same); D.E. 436-1, at 19 (same).  But that language does not constrain the Corps' discretion to adapt the nature or method of consultation to the circumstances.  So long as the Tribes had sufficient time to provide comments, the Corps had no obligation to accept their demands on the time, place, or manner of consultation.

### 3.    The Corps Was Not Required To Repeat Its Consultation Process On Remand

Even if any of the non-binding consultation guidance had instead been an obligation, the Corps adequately consulted before it made its initial EA and easement decisions.  It was not required to consult with the Tribes a second time on remand.

As previously noted, the Court's remand order did not require the Corps to "begin anew." *SRST III*, 282 F. Supp. 3d at 98, 109.  The relevant agency actions—the EA, FONSI, and easement—remained in place pending remand.  *See* 5 U.S.C. § 551(13) (defining "agency action" as any "rule, order, license, sanction, relief, or the equivalent or denial thereof"); *see also* DoD Instruction 4710.02 § 6.1 (2006) (Instruction triggered by "propose[d]" new "action").  The Corps'

job was merely to give a "'reasoned explanation'" for what it had already done, *SRST III*, 282 F.

Supp. 3d at 98—that is, to "simply connect the dots" on the "discrete" topics of the remand, not

"'redo its analysis from the ground up,'" or take new action, *id.* at 100-01; *SRST II*, 255 F. Supp.

3d at 147, 160.

A remand without vacatur merely "mark[s] a continuation of the case." *Caesar v. West*,

195 F.3d 1373, 1374 (Fed. Cir. 1999) (per curiam).  It does not require an agency to "'star[t] from

scratch.'"  *Oceana*, 275 F. Supp. 3d at 288.  It also leaves to the agency's discretion the selection

of public inputs to complete its work—such as whether and how to engage in "additional fact

gathering," *Chamber of Commerce v. SEC*, 443 F.3d 890, 900 (D.C. Cir. 2006), or whether to

engage in new notice-and-comment rulemaking, *Sierra Club v. EPA*, 325 F.3d 374, 382 (D.C. Cir.

2003).  Because the Corps had previously completed its tribal consultation obligations, it was the

agency's judgment call whether to consult further.  *See Te-Moak Tribe of W. Shoshone v. U.S.

Dep't of Interior*, 608 F.3d 592, 609 (9th Cir. 2010) (agreeing that "in light of the [agency's] pre-

vious consultation with the Tribe for the original [project]," the agency fulfilled its NHPA consul-

tation duties).

### B.      The Corps Exceeded Any Obligation To Consult

Under any conceivable standard, the Corps' consultation process more than sufficed.  Both

before and during the remand, the Corps gave each Tribe multiple opportunities to present views

and concerns on the full range of relevant issues.  The only impediments were entirely of the

Tribes' making, including refusals to participate in good faith and insistence on veto power over

the manner in which consultation would occur.  Another remand would only reward this obstinacy.

### 1.      Pre-Remand Consultation

The Court has already recognized the Corps' extensive consultation with tribal authorities

leading up to the July 25, 2016 EA and the February 8, 2017 easement.  The record that this Court

reviewed shows an agency that endeavored in good faith to meet and exceed its consultation goals. Nothing in the Tribes' latest submissions undermines that account.

The Court's decision denying SRST's motion for a preliminary injunction is indicative. The Court found the Tribe unlikely to succeed on the merits of its NHPA claims because, *inter alia*, the Corps "exceeded its NHPA [consultation] obligations" as to water crossings where such consultation was required, including Lake Oahe, even though SRST "largely refused to engage in consultations." *SRST I*, 205 F. Supp. 3d at 32-33. SRST points to nothing in the record that might call these factual findings into question. Thus, not only is the challenge to the Corps' determination of "area of potential effects" moot, D.E. 433-2, at 47-50; *see supra* at 47-49, SRST's refusal to consult would doom that claim on the merits.

The Court likewise granted summary judgment to the Corps on consultation claims CRST brought under, *inter alia*, DoD Instruction 4710.02 and NEPA's implementing regulations. The Court ruled that, even assuming the Corps had *binding* obligations here, its "actions were sufficient to satisfy the early-comment and consultation goals articulated in" those authorities. *SRST II*, 255 F. Supp. 3d at 159. It found that "the Corps did endeavor to consult early with the Tribe and gave it the opportunity to offer meaningful comments on the proposed crossing at Lake Oahe," *id.* at 156, citing the Corps' "regula[r]" communications with tribal leaders "via phone calls, letters, and in-person meetings," *id.* at 159. That determination is unassailable.

When Yankton sought summary judgment on similar consultation claims, the Court reached the same result. As for consultation relevant to NEPA, it explained that "Plaintiffs, like the rest of the public, seem to have had no difficulty . . . voicing their concerns regarding the agencies' conclusions." *SRST IV*, 301 F. Supp. 3d at 74. The Court also noted Yankton's "cooperation (or lack thereof) with the federal agencies involved in the project," explaining that Yankton

"did not attend multiple meetings held by the Corps and [the Fish and Wildlife Service] to discuss" the project and did not "respond to numerous efforts by the Corps and FWS to engage in discussion regarding the pipeline." *Id.* at 55.   Yankton's pre-remand summary judgment briefing already advanced arguments it makes now, including that meetings with the Tribes qualified solely as "pre-consultation" efforts. *Compare* D.E. 292, at 4-5 (Yankton Pre-remand MSJ), *with* D.E. 435-1, at 3-6 (Yankton Post-remand MSJ).

Despite these rulings, Yankton renews the fight over pre-remand consultation, and Oglala joins it anew.   These arguments fail for largely the same reasons the Court previously stated.

a. <u>Yankton</u>.   Yankton, which complains about consultation relevant to NEPA, the DoD Instruction, and Corps guidance, D.E. 386; D.E. 435-1, at 19-21, has no answer to this Court's well-supported finding that the Tribe "did not attend multiple meetings held by the Corps . . . to discuss" the pipeline and did not "respond to numerous efforts by the Corps . . . to engage in discussion regarding the pipeline." *SRST IV*, 301 F. Supp. 3d at 55.   Nor can it deny that it "had no difficulty . . . voicing [its] concerns regarding the agencies' conclusions." *Id.* at 74.

Nothing in Yankton's current brief supports a different conclusion.   Yankton insists that it "wrote the [Corps] multiple times" before the July 25, 2016 EA, but also acknowledges that the Corps "respon[ded]" and held a meeting with tribal representatives.   D.E. 435-1, at 3-5.   The Tribe, not the Corps, chose who would attend on its behalf and what issues to raise at the meeting. *See* USACE_DAPL 64234.   Yankton cannot manufacture a violation out of its unilateral decision to characterize this as a "pre-consultation meeting" or through its demands for additional meetings. D.E. 435-1, at 4-5.   The record instead shows that this meeting gave the Tribe its early opportunity to provide meaningful comment.   How Yankton chose to use that opportunity was up to it; the law required nothing more from the Corps.

b. Oglala. Oglala also makes pre-remand consultation claims under the DoD Instruction, Corps guidance, and NEPA regulations. D.E. 385; *see also* D.D.C. Case No. 1:17-cv-267, D.E. 1 ¶¶ 21-24 (citing DoD Instruction 4710.02 and Corps guidance); *id.* ¶¶ 48, 52 (citing NEPA regulations). It insists that the Corps' consultation with it in satisfaction of its *NHPA* obligations is a "separate and distinct" issue, D.E. 434-2, at 15-16, but consultation during the "more robust" NHPA process can fulfill other consultation goals, *SRST II*, 255 F. Supp. 3d at 159.

The record is clear that the Corps satisfied those goals as found in the guidance and NEPA regulations. The agency initiated consultation with Oglala early in its review of the project, and it gave the Tribe many opportunities to offer meaningful comments, only to have Oglala squander them. The Corps first contacted Oglala offering consultation in a February 2015 letter, followed up by a March 2015 phone call. USACE_DAPL 5628. The Corps followed with another letter on September 3, 2015 seeking to "determine [Oglala's] interest in consulting on this undertaking." USACE_DAPL 69606. The Corps asked for "engagement and/or comments by September 30, 2015." USACE_DAPL 69608. Hearing no response, in November 2015 the Corps called a tribal representative to confirm receipt of that letter, and it emailed the letter to Oglala's Tribal Historic Preservation Officer. USACE_DAPL 5634. Again, the record shows no response from Oglala.

The Corps also invited Oglala to three meetings to consult on a wide range of project topics: December 8, 2015 and January 25, 2016 in Sioux Falls, South Dakota, USACE_DAPL 79890, 66810, 66824, 68918, and February 18-19, 2016 in Niobrara, Nebraska, USACE_DAPL 69071, 66415-19, 66422. Attendees included the Corps, Dakota Access, and other tribes. Oglala did not attend. Nonetheless, the Corps continued to include an Oglala representative on emails to tribes

56

about consultation.  *See*, *e.g.*, USACE_DAPL 66258, 84463-64.  Some tribes scheduled consulta-

tion with the Corps over the next few months; Oglala did not.  *See* USACE_DAPL 66086.

Oglala admits it did not submit a request to consult until January 6, 2017, D.E. 434-2, at

16; USACE_ESMT 475-76—six months *after* the EA issued and more than two years since the

Corps' initial outreach.  By then, the Corps had fulfilled the consultation goals outlined in the DoD

Instruction, Corps guidance, and NEPA regulations of early outreach and "the opportunity to offer

meaningful comments," *SRST II*, 255 F. Supp. 3d at 156.  Furthermore, the Corps received and

considered Oglala's comments about the project before it issued the easement.  *See*

USACE_ESMT 1353 (Sept. 25, 2016 Letter from Oglala to the President, the Army, DOJ, and

DOI).  The Tribe's complaint of inadequate pre-remand consultation rings hollow.[17]

## 2.    Consultation On Remand

The Corps' consultation efforts on remand similarly went beyond any legal or practical

need.  Although the Corps had no duty to consult during a remand—after all, its task was to "con-

nect the dots," *SRST III*, 282 F. Supp. 3d at 100, not create dots—the Corps did far more.

Remand consultation played out much like the pre-remand version:  The Corps' numerous

requests for information and comments from the Tribes, and its attempts to schedule meetings,

were met with silence or refusal.  The Tribes responded late (if at all), insisted on expanding the

remand beyond its prescribed scope, and declined to attend meetings held for their benefit.

Throughout, the Tribes also tried to brand the Corps' consultation efforts as anything but.  *See*,

*e.g.*, RAR 3202-3204 (May 30, 2018 Yankton letter to the Corps seeking confirmation that an

---

[17]   Because the record plainly documents the Corps' many unsuccessful efforts to consult with
Oglala, the absence of Oglala's name in the EA is a red herring.  *Compare* D.E. 434-2, at 16 (citing
USACE_DAPL 71335), *with SRST II*, 255 F. Supp. 3d at 159 (setting aside "confusion" over who
the EA listed as consulting parties and finding adequate consultation with CRST under the DoD
Instruction and NEPA based on the record of the Corps' actions).

upcoming meeting "is not consultation"); RAR 11246-48 (Jan. 4, 2018 SRST letter).  They also insisted that consultation be open-ended, which is just as unreasonable as motions practice with limitless sur-replies.  *See*, *e.g.*, RAR 561 (June 5, 2018 Yankton letter to the Corps: "[Yankton] looks forward to continuing conversations with you, leading up to actual consultation").  This story is familiar for a reason; these are the same tactics the Tribes used pre-remand.  *See supra* at 53-57.[18]

The Court should once again rule that the Corps consulted adequately with the Tribes.

a.  <u>The Corps contacted the Tribes early and often</u>.  The Corps engaged in consultation with the Tribes over the course of 11 months through requests for information, phone calls, emails, and in-person meetings.  The Corps started on September 25, 2017 by sending letters to each Tribe requesting specific information about hunting and fishing practices within "the next thirty days" after which the Corps would "determine the next steps in the remand process and whether [it] need[ed] any additional information."   RAR 13325 (to SRST), 13330 (to CRST), 13328 (to Oglala), 13323 (to Yankton).[19]

b.  <u>The Tribes delayed their responses</u>.  The Corps initially anticipated completing the re-mand by late December 2017, D.E. 258, at 1, but the Tribes made that impossible through repeated delay in responding to the Corps' letters.  *See*, *e.g.*, RAR 13275 (Oct. 6, 2017 SRST letter to Corps), 12272 (Oct. 24, 2017 Oglala letter to Corps), 11961-62 (Dec. 18, 2017 CRST letter to Corps), 10307 (Jan. 30, 2018 Yankton letter to Corps).  SRST and Oglala justified such delay by

---

[18]  For more details, see the remand consultation timeline attached as Exhibit 2 to the Scherman Declaration.

[19]  The Corps' request for similar information from each Tribe (such as the number of hunting licenses each Tribe issued, Tribal harvest summaries, reports on game species within each reservation, and hunting or fishing permit reciprocity among the Tribes) did not make this a "form letter."  D.E. 433-2, at 5.  If the Corps had asked for *less* information from one Tribe than it did from another, the Court would no doubt be hearing allegations of unequal treatment.

insisting that the Corps' information requests were too narrow and that they needed to give the Corps "a much broader range of information and materials" than the Corps found necessary. RAR 13275 (SRST); RAR 12271 (Oglala). Yankton, for its part, relied on a typographical error that the Corps had already fixed to justify its non-response. RAR 11950-51 (Dec. 12, 2017 Yankton letter to Corps saying it "is unable to provide" information because the letter referred to Oglala's interests, not Yankton's); RAR 13039 (Oct. 20, 2017 Corps' corrected letter).

From October 2017 to March 2018, SRST and CRST said they would not discuss remand issues with the Corps until they had access to technical information, such as a current Facility Response Plan and the additional spill model results. *See* RAR 13277 (Oct. 6, 2017 SRST letter to Corps), 11958 (Dec. 18, 2018 SRST letter to Corps), 8728 (Feb. 7, 2018 CRST letter to Corps), 8732 (Feb. 8, 2018 SRST letter to ETP). They held firm on this even though Dakota Access had given SRST a revised Geographic Response Plan and Facility Response Plan in October 2017. *See* D.E. 298-1 ¶ 2.

The Corps and Dakota Access attempted to schedule several meetings with SRST and CRST during the remand, RAR 9082-9090, but the Tribes continued to be unresponsive and uncooperative. For instance, SRST representatives arrived at a February 8, 2018 meeting with the Corps and Dakota Access in Bismarck, only to read a statement declaring that the meeting needed to be on its reservation and cover discussion of the additional spill modeling. RAR 9101, 8731-34. CRST showed up late only to hand out two letters stating, *inter alia*, that a meeting should occur that day on *its* reservation. RAR 9102, 8727-30.[20] Neither Tribe engaged substantively.

---

[20] Although CRST dated these letters February 7, RAR 8727-30, the record is clear that CRST hand delivered both at the February 8 meeting, already well under way in Bismarck—a meeting that the parties had discussed via email days earlier. RAR 9102 (meeting minutes), 8453, 8727 (email confirming hand delivery of letters at meeting), 9082-83 (February 5 email to both Tribes referencing Bismarck meeting that had been proposed on January 26). Despite this clear record evidence, CRST's brief falsely asserts: "the Tribe became aware of" the upcoming Bismarck

Dakota Access will not repeat here the details it previously set forth documenting the Corps' and Dakota Access's efforts to engage with the Tribes during the remand.  *See* D.E. 339, at 12-21.[21]  One other detail bears mention, though, because SRST touts this as its prime "example" of how "the Tribe sought every opportunity to get the Corps to engage in good faith."  D.E. 433-2, at 7.  SRST cites one of "multiple resolutions" its Council passed highlighting its concerns about the pipeline and "the urgency for full reconsideration of the critical issues."  *Id.* (starting with RAR 6387).  But if a public resolution criticizing an agency could ever be good faith engagement, it would not be one drafted *in lieu of* attending a meeting that was scheduled so that the agency could engage with the Tribe.  Yet that is what SRST did.  D.E. 339, at 19-20 (SRST is told it would have access to the spill modeling results at a March 7, 2018 meeting, but SRST's representative failed to show because he was waiting for the Council to pass its resolution).

Despite SRST's and CRST's failure to attend meetings, the Corps made sure they received the meeting handouts, such as updated Geographic Response Plans.  RAR 6594 (Feb. 23, 2018 Corps letter to SRST); RAR 6599-6601(same to CRST); RAR 6596-6598 (same to Oglala); RAR 5893 (Mar. 14, 2018 Corps letter to SRST), 5894 (same to CRST).

   c.  The Tribes finally engage with the Corps in March 2018.  SRST and CRST began to engage with the Corps in March 2018.  On March 5 and 15, 2018, the Corps started receiving

---

meeting "on February 7"; it then "sent two letters requesting" an "in-person meeting" with CRST during the same trip; but Dakota Access "did not respond" to the letters and "[i]nstead held a meeting in Bismarck on February 8."  D.E. 436-1, at 10.  Making matters worse, CRST falsely states that "on February 7, 2018" it "emailed" Dakota Access a "more general letter that requested on-Reservation consultation at any time," *id.* at 11—as if one day's notice would suffice to require the Corps and Dakota Access to meet more than 150 miles from Bismarck—but that is the *other* mis-dated letter that the Tribe hand delivered *during* the February 8 meeting, RAR 8729.

[21]  SRST now seeks to separate the emergency response planning efforts from the remand topics, but it was SRST that insisted on linking the two at the time.  *See* RAR 6386 (March 2018 SRST letter requiring access to Facility Response Plan and Spill Model as a prerequisite to meeting for discussion of emergency response planning).

SRST's substantive remand responses—the first from any Tribe.  *See* RAR 6433 (Mar. 5, 2018 receipt of SRST report dated Feb. 21, 2018), 5855 (Mar. 15, 2018 receipt of SRST environmental justice report dated Feb. 23, 2018).  Then, on March 26, 2018, SRST attended a meeting with the Corps "to discuss the Remand issues."  RAR 4129.  CRST chose not to attend.  RAR 4133.  Also in March, the Corps responded to Yankton's consultation request with the contact information for the person who would schedule a meeting.  RAR 6412 (Mar. 7, 2019 Yankton letter to Corps), 5892 (Mar. 14, 2018 Corps letter to Yankton).  Yankton did not respond.

On March 30, 2018, the Corps sent each Tribe a letter setting April 20, 2018 as the deadline for them to submit information, including the documentation that the Corps first requested six months earlier.  RAR 5800-03.  On April 20, 2018, CRST and Yankton provided substantive responses for the first time, and Oglala submitted additional information.[22]  RAR 2005 (CRST), 2247 (Yankton), 3427 (Oglala).

The Corps then held meetings on each Tribe's reservation.  RAR 3100 (SRST on May 22, 2018), RAR 3278 (CRST on May 29), RAR 3035 (Yankton on May 31), RAR 3040 (Oglala on June 1).  The record belies the Tribes' criticisms of the Corps' level of engagement at these meetings.  SRST, for example, accuses Colonel Hudson, the head of the Corps' contingent, of "a complete lack of familiarity" with any issues the Tribe raised at the meeting.  D.E. 433-2, at 8.  But SRST's Chairman said nothing of the sort in a post-meeting letter in which he pulled no punches when it came to voicing concerns.  RAR 3288 (commending the Colonel for the "respectful dialogue and engagement" under his command before listing many criticisms of the project).  CRST complains that the Tribe did most of the talking at its meeting, D.E. 435-1, at 15-16, even though

---

[22]  Oglala had previously sent the Corps a 49-page letter with legal arguments that far exceeded the remand topics and merely "refer[red]" the Corps "to SRST and CRST" for the requested information about hunting and fishing impacts.  RAR 11555; *see* RAR 11564-65.

it was the Tribe's agenda that allotted just 30 minutes for a "Corps presentation" after three hours of Tribal presentations and remarks.  RAR 3285; *see also* 3278.  In any event, a meeting transcript shows that Colonel Hudson engaged with the Tribe throughout the meeting.  *See* RAR 3214-77. And Yankton merely reprises the distinction, which this Court already rebuffed, between "pre-consultation" and "consultation." D.E. 435-1, at 7-9; *supra* 55.

In the final months of the remand, the Tribes continued to foster delay.  Yankton and SRST provided additional information to the Corps on June 5, 2018 (RAR 3115) and July 23, 2018 (RAR 1070), respectively, with Yankton seeking "continuing conversations . . . leading to actual consultation," RAR 561.  These late submissions included information on topics already raised and considered, such as the safety records of Dakota Access's parent companies.  *See* RAR 1070.  Only after wading through these latest submissions did the Corps complete the remand.  D.E. 362.

d.  <u>The Tribes' challenges to the remand consultation process are misplaced</u>.  This history leaves no doubt that the Corps made great strides to consult with the Tribes.  Rather than show a lack of consultation, Plaintiffs argue that the Corps needed to give them various items during the remand.  *See* D.E. 433-2, at 45; 434-2, at 16; D.E. 435-1, at 24.  That also misses the mark.  As discussed, *supra*, Plaintiffs can point to nothing in the guidance and regulations requiring the Corps to provide such information to the Tribes for consultation.  This assertion is also inconsistent with the Court's earlier opinions rejecting similar arguments.  *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 249 F. Supp. 3d 516, 522-24 (D.D.C. 2017); *SRST II*, 255 F. Supp. 3d at 124. And it ignores that the remand's purpose was for the Corps to explain its decisions.  The Court also did not require the Corps to give this information to Plaintiffs in its December 4, 2017 remand remedy order or its April 16, 2018 order denying the Tribes' requests to require further actions during the remand.  *See* D.E. 293-1, at 2 (proposed order requesting "all documentation necessary

to engage in meaningful spill response planning," including "unredacted drafts" of facility response, geographic response plans, and spill models); D.E. 303, at 1 (omitting such condition in remand order); *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, No. 1:16-cv-1534, 2018 WL 1967112, at *1 (D.D.C. Apr. 16, 2018) (denying motion to clarify that the Corps must provide technical information to the Tribes).

Further, in arguing they were disadvantaged by a "refusal to share technical information," the Tribes cite to a "list of fifty technical questions," D.E. 433-2, at 8, that SRST gave to the Corps before the March 26, 2018 meeting, RAR 4120-23. But the Corps already took the concerns into account in reaching its easement decision. USACE_ESMT 544, 556-59 (same questions raised in December 2016). As Dakota Access explained to the Court when this issue first arose, "to the extent the additional information sought by the Tribes is relevant to response planning, it is in the" Geographic Response Plan "that the Tribes . . . declined to discuss with the Corps and Dakota Access, or it was otherwise made available as part of the response planning discussions." D.E. 339, at 37 n.12; *see, e.g.*, RAR 3282 (May 29, 2018 meeting notes reflecting that the Corps gave CRST "details of the results of the spill model"). The Tribes had access to information they say they needed for meaningful consultation.

The Tribe's remaining arguments are makeweight. They have no basis to complain about the timing for the Corps' initial outreach, *see* D.E. 433-2, at 5; D.E. 436-1, at 8, when the Corps ended up giving them more than six months to provide information and did not conclude the remand until August 31, 2018. Nor did the Corps rush to judgment by stating in a draft document that it "had identified no new information" to upend its insignificance determination. D.E. 433-2, at 6-7 (quoting RAR 10165). That statement was as true on the day the draft was prepared—*i.e.*,

before the Tribes got around to providing information, RAR 10097 (February 4, 2018 draft)—as it is now, RAR 1-2.

The Corps engaged in sufficient consultation.  The fact that Plaintiffs are unsatisfied with the result is no reason to rule otherwise.

## IV. The Corps Is Entitled To Summary Judgment On The Tribes' Remaining Challenges To The Corps' Pre-Remand Decisions

### A. Oglala's Treaty And Trust Claims Under The Mni Wiconi Act Are Meritless

The Court need not dwell long on Oglala's allegation that the Corps violated trust and treaty obligations to the Tribes under the Mni Wiconi Project Act of 1988, Pub. L. No. 100-516, 102 Stat. 2566 § 2(a)(4) ("Mni Wiconi Act").  D.E. 434-2, at 11-16.  The Corps' additional analysis on remand more than sufficed in addressing these asserted obligations.  *See supra* at 33-34.

This Court has already rejected similar trust and treaty claims by SRST and CRST.  *SRST II*, 255 F. Supp. 3d at 130-34, 143-45.  Such claims must be based on "an unambiguous provision by Congress that clearly outlines a federal trust responsibility."  *Id*. at 144 (quoting *N. Slope Borough v. Andrus*, 642 F.2d 589, 612 (D.C. Cir. 1980)).  A trust obligation is inferred only where a plaintiff can identify "a substantive source of law establishing *specific fiduciary duties*," which "overlaps with the APA's requirement that a plaintiff allege 'that an agency failed to take a *discrete agency action that it is required to take*.'"  *Id*. at 144-45 (quoting *El Paso Nat. Gas Co. v. United States*, 750 F.3d 863, 892 (D.C. Cir. 2014) (emphases in original)).  Because the government does not "assum[e] all the fiduciary duties of a private trustee" every time it creates a "'limited'" trust obligation, its duty sweeps no more broadly than the specific duty it assumed.  *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 174 (2011).

Oglala relies mainly on Section 2(a)(4) of the Mni Wiconi Act, in asserting a commitment "to ensure that adequate and safe water supplies are available to meet the economic, environmental, water supply, and public health needs of the Pine Ridge Indian Reservation." D.E. 434-2, at 11. The government meets that obligation through the OSRWSS water supply system. *Id.* at 1. Oglala argues that a potential future oil spill could be large enough to interfere with the operation of the OSRWSS. But the possibility that one day the government would need to take more steps to fulfill this commitment does not refute that the government is *currently* in compliance. Further, this Court has already recognized that "an agency may assess impacts on treaty rights by analyzing the effects on a specific resource identified in the treaty." *SRST II*, 255 F. Supp. 3d at 131. The Corps' careful analysis, including its conclusion that the Tribe's water supply is too remote to be affected by a spill, *see supra* at 33-34, fully satisfies that obligation. For similar reasons, the Corps is in compliance with Section 3(e)'s directive that the "[t]itle to the [OSRWSS] shall be held in trust for the Oglala Sioux Tribe by the United States." D.E. 434-2, at 3(e). Nor can Oglala refute that the Corps established mitigation plans for environmental impacts from operating the Lake Oahe dam pursuant Section 6(b) of the Act. D.E. 434-2, at 27-28.

The obligations that Oglala seeks to impose on the Corps thus "fal[l] outside [the statute's] domain." *United States v. Navajo Nation*, 556 U.S. 287, 298-99 (2009). "Because [Oglala] has not identified a specific provision creating fiduciary or trust duties that the Corps violated, its breach-of-trust argument—whether considered a separate count or part of its larger APA cause of action—cannot survive." *SRST II*, 255 F. Supp. 3d at 145.

### B.     This Court Should Grant Judgment For The Corps On CRST's Outstanding Pre-Remand Claims

This Court "defer[red] a decision" on certain CRST claims "that may be affected by the remand." *SRST II*, 255 F. Supp. 3d at 160; *see*, *e.g.*, *id.* at 146 (general conditions of NWP 12);

65

*id.* at 150 (injury to public interest); *id.* at 153 (interference with Lake Oahe project).  The parties

fully addressed each claim previously.  *E.g.*, D.E. 172, at 44-46 (general conditions of NWP 12);

D.E. 183, at 20-22 (injury to public interest); *id.* at 17-20 (interference with Lake Oahe project).

Now that the Corps has complied with the remand order by providing additional explanations for

its original determinations, this Court should grant summary judgment to Defendant on these other

claims for the reasons stated in that earlier briefing.[23]

## CONCLUSION

This Court should deny Plaintiffs' motions for summary judgment, grant Dakota Access's

cross-motion for summary judgment in favor of the Corps, and enter judgment for the Corps.

Dated:  October 9, 2019

Respectfully submitted,

 /s/ William S. Scherman
William S. Scherman
David Debold
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
wscherman@gibsondunn.com

*Counsel for Dakota Access, LLC*

---

[23]  In the previous round of summary judgment motions, the Court scheduled separate briefing on the appropriate remedy, noting that the parties cannot "fully address" the relevant factors without knowing "whether or to what extent" a remand is needed.  *SRST II*, 255 F. Supp. 3d at 147.  Dakota Access therefore reserves its arguments as to the inappropriateness of vacatur until such time as the Court may find further briefing necessary.

**CERTIFICATE OF SERVICE**

I hereby certify that on this 9th day of October, 2019, I electronically filed the foregoing

document using the CM/ECF system.  Service was accomplished by the CM/ECF system.


   /s/ William S. Scherman
William S. Scherman
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
wscherman@gibsondunn.com

*Counsel for Dakota Access, LLC*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

STANDING ROCK SIOUX TRIBE,

                              Plaintiff,

and

CHEYENNE RIVER SIOUX TRIBE,

                              Plaintiff-Intervenor,

        v.                                                Case No. 1:16-cv-01534-JEB

U.S. ARMY CORPS OF ENGINEERS,

                              Defendant,

and

DAKOTA ACCESS, LLC,

        Defendant-Intervenor-Cross Claimant.

**DECLARATION OF WILLIAM S. SCHERMAN IN SUPPORT OF**
**DAKOTA ACCESS, LLC'S CONSOLIDATED MEMORANDUM OF LAW IN**
**OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND**
**IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT ON REMAND**

I, William S. Scherman, declare as follows:

1.      I am a partner with the law firm of Gibson, Dunn & Crutcher LLP, counsel of record for Defendant-Intervenor-Cross Claimant Dakota Access, LLC.  I am a member in good standing of the Bar of this Court.

2.      Attached to my declaration are two exhibits that summarize materials in the administrative record for this litigation that are relevant to Plaintiffs' challenges to the Remand Analysis prepared by the U.S. Army Corps of Engineers.

3.      **Exhibit 1** is a chart that identifies the record materials on which Plaintiffs rely for certain criticisms they have briefed relevant to the remand topic of agency consideration of highly controversial effects.  Because Plaintiffs' briefing does not show the dates that these criticisms were raised during the administrative process, this exhibit provides that missing information in table format.  The exhibit additionally identifies certain (although not all) additional record materials relevant to each criticism and the dates of those materials.

4.      **Exhibit 2** is a timeline that details, as reflected in the administrative record, events relevant to the Corps' consultation with each Tribe during the remand period.  This exhibit begins with a high-level timeline that shows in graphic form when each party was active in the consultation process, and proceeds with a detailed account with dates and record citations of each parties' involvement in consultation over time.

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on October 9, 2019

      /s/ William S. Scherman_____
      William S. Scherman

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

STANDING ROCK SIOUX TRIBE,

Plaintiff,

and

CHEYENNE RIVER SIOUX TRIBE,

Plaintiff-Intervenor,

v.

U.S. ARMY CORPS OF ENGINEERS,

Defendant,

and

DAKOTA ACCESS, LLC,

Defendant-Intervenor-Cross Claimant.

Case No. 1:16-cv-01534-JEB

**DECLARATION OF WILLIAM S. SCHERMAN**

# EXHIBIT 1

**Dates of Tribes' Criticisms Under "Highly Controversial Effects" Remand Topic**

| Criticism As Raised in Tribes' Motions | Dates of Sources Cited by Tribes for their Criticism | Other Examples of Related Materials Dated Before 7/25/2016 or After 2/3/2017 |
|---|---|---|
| **Leak detection technology frequently does not work**<br><br>The Tribe documented how PHMSA itself has found that the spill detection technology actually detects leaks in a small percentage of cases (*RAR 7505, USACE_ESMT 1271*), as acknowledged even in ETP's own Facility Response Plan (*RAR 6459*).<br><br>**D.E. 433-2 at 18** | *USACE_ESMT 1271* (<span style="color:green">**10/10/2016**</span> Letter from Sierra Club et al to Corps identifies "incidents," only one of which (a gasoline spill in Alabama) post-dates the Final EA)<br><br>*RAR 7505* (<span style="color:purple">**2/21/18**</span> SRST Spill Impacts Report cites 2012 PHMSA study finding that one leak detection system detects leaks 28% of the time)<br><br>*RAR 6459* (<span style="color:purple">**4/17**</span> Facility Response Plan states detection of discharge may occur by the pipeline controllers or two sources of visual detection) | *USACE_DAPL 0084807* (<span style="color:red">**4/26/16**</span> letter from Earthjustice to Corp states that a 2012 PHMSA study "offered ample reason to be skeptical of DAPL's claim to be able to detect ruptures within '1 to 3 minutes'")<br><br>*RAR 1427-1439* (<span style="color:purple">**2/12/2017**</span> Kuprewicz declaration re failure rates of leak-detection systems and inability to discover slow underground leaks), *cited in* 255 F. Supp. 3d at 124-25 |

<span style="color:red">**Red date**</span> = pre-July 25, 2016   <span style="color:green">**Green date**</span> = between July 25, 2016 and February 3, 2017   <span style="color:purple">**Purple date**</span> = after February 3, 2017

**Red date** = pre-July 25, 2016   **Green date** = between July 25, 2016 and February 3, 2017   **Purple date** = after February 3, 2017

| Criticism As Raised in Tribes' Motions | Dates of Sources Cited by Tribes for their Criticism | Other Examples of Related Materials Dated Before 7/25/2016 or After 2/3/2017 |
|---|---|---|
| **The nine-minute estimate for shutting down pumps ignores the time it takes to detect a leak** The WCD fails to include any detection time in the nine-minute pump shut-down estimate, despite the Tribe's repeated urging (*RAR 14985, 7501, 7503, 7505; USACE_DAPL 74721; USACE_DAPL 72253*). **D.E. 433-2 at 15, 17-20.** | *RAR 14985* (**5/3/16** version of original spill model states "the pump stations are designed to shut down in 9 minutes") *RAR 7501, 7503, 7505* (**2/21/18** SRST Spill Impacts Report states nine-minute shutdown time incomplete; "calculation lacked any time to detect the WCD and associated variables") *USACE_DAPL 74721* (**8/5/2015** version of original spill model states "mainline pumps are shutdown within 9 minutes of detection") *USACE_DAPL 72253* (**4/7/2016** comment states "the pump stations are designed to shut down in 9 minutes") | |

**Red date** = pre-July 25, 2016   **Green date** = between July 25, 2016 and February 3, 2017   **Purple date** = after February 3, 2017

| Criticism As Raised in Tribes' Motions | Dates of Sources Cited by Tribes for their Criticism | Other Examples of Related Materials Dated Before 7/25/2016 or After 2/3/2017 |
|---|---|---|
| **Valves will not close instantaneously**<br><br>In this litigation SRST pointed to various critiques of the WCD, highlighting, for example, that the response times "wrongfully assumed valves would 'close immediately.'"  (ECF 195 at 13, citing *USACE_ESMT 624* (EarthFax Report)).  The WCD does not account for the approximately 4 minutes it takes to shut down the valves after a spill is detected and the pumps are turned off.  (*USACE_DAPL 74721, 72253, RAR 14967, 14985*).  SRST explicitly brought this to the Corps' attention.  (*RAR 7501*).<br><br>**D.E. 433-2 at 15, 20-21**. | *USACE_ESMT 624, 632* (**12/2/16** EarthFax Report states it is inappropriate for the EA to imply that valves will close immediately because they "do not close instantaneously upon the occurrence of a leak")<br><br>*USACE_DAPL 74721* (**8/5/15** version of original spill model includes "an additional 3.9 minutes" to completely close block valves)<br><br>*USACE_DAPL 72253* (**4/7/16** comment provides math for WCD volume)<br><br>*RAR 14967, 14985*  (**5/3/16** version of original spill model includes "an additional 3.9 minutes" to completely close block valves, and provides math for WCD)<br><br>*RAR 7501* (**2/21/18** SRST Spill Impacts Report states original WCD calculation lacked any time for shutting down the valves) | |

**Red date** = pre-July 25, 2016   **Green date** = between July 25, 2016 and February 3, 2017   **Purple date** = after February 3, 2017

| Criticism As Raised in Tribes' Motions | Dates of Sources Cited by Tribes for their Criticism | Other Examples of Related Materials Dated Before 7/25/2016 or After 2/3/2017 |
|---|---|---|
| **History of other spills and leaks shows detection and response can take hours or days**<br><br>Before the easement was issued, SRST's expert strongly critiqued detection and response times (*USACE_ESMT 1079*), and highlighted how the proposed response times were "highly unlikely." (*USACE_ESMT 1078*). PHMSA has found that spill detection technology detects leaks in a small percentage of cases. (*RAR 7505*). Detection and response times are inconsistent with real world examples in the record. (*RAR 7491, 1294, 1331, 1920, 1345-47, 16686, ECF 342-1*).<br><br>**D.E. 433-2 at 14, 15, 17-18** | *USACE_ESMT 1078-79* (10/28/16 Accufacts Report states that the "claimed release parameters" in the EA are "highly unlikely given the lack of more detailed information in the EA," and "all too many recent failures have released oil well beyond the claimed pipeline worst case determinations")<br><br>*RAR 7505* (2/21/18 SRST Spill Impacts Report refers to 2012 PHMSA study on leak detection)<br><br>*RAR 7491* (2/21/18 SRST Report refers to August 2016 oil leak in Texas)<br><br>*RAR 1294* (1/18/2017 CRST comments mention "recent" Belle Fourche leak)<br><br>*RAR 1920* (2/21/18 SRST Spill Impacts Report appendix references Belle Fourche leak caused by landslide)<br><br>*RAR 1331 & 1345-47* (1/18/2017 CRST comments mention 2010 Kalamazoo River spill)<br><br>*RAR 16686* (1/18/2017 CRST comments mention 2013 North Dakota spill)<br><br>*ECF 342-1* at 5 (3/23/2018 (second) declaration of Donald Holmstrom states detection can take "hours or days") | *USACE_DAPL 66183* (3/24/16 SRST Suppl. Comments on Draft EA, refer to Yellowstone River spill and Kalamazoo River spill to show detection difficulties)<br><br>*USACE_DAPL 69163* (1/8/16 SRST Comments on Draft EA point to January 2015 Yellowstone River spill)<br><br>*USACE_DAPL 66290* (3/11/16 EPA letter to the Corp raises the 2015 Bridger Poplar Pipeline spill to recommend that "th[e] revised DRAFT EA note that a winter response on ice for a spill scenario involving Bakken crude actually can be more difficult than a 'typical' ice response") |

**Red date** = pre-July 25, 2016   **Green date** = between July 25, 2016 and February 3, 2017   **Purple date** = after February 3, 2017

| Criticism As Raised in Tribes' Motions | Dates of Sources Cited by Tribes for their Criticism | Other Examples of Related Materials Dated Before 7/25/2016 or After 2/3/2017 |
|---|---|---|
| **Potential for power loss at valves**<br><br>The WCD fails to account for the potential loss of power at the valves, which the Tribe addressed repeatedly (*RAR 3332, 3319, 3154, 3288*)  Remote backup power is required by the easement. (*USACE_ESMT 39*).<br><br>**D.E. 433-2 at 21-22** | *RAR 3332* (**5/16/18** Letter from SRST to Corps Tribal Liaison requests a visit to valve sites)<br><br>*RAR 3319* (**5/14/18** document responds to SRST questions, including: "What provisions were considered for back-up power supplies, accumulators, etc.")<br><br>*RAR 3154* (**5/1/18** SRST Resolution criticizes independent assessment of compliance with easement conditions (conducted during remand per Court order) for "fail[ing] to verify the availability of back-up power for the operation of the shut-off valves")<br><br>*RAR 3288* (**5/25/18** SRST letter from SRST states that SRST's Chairman told the Corps on May 22, 2018 that secondary power is needed for valves due to lightning strikes on the prairie) | |

**Red date** = pre-July 25, 2016   **Green date** = between July 25, 2016 and February 3, 2017   **Purple date** = after February 3, 2017

| Criticism As Raised in Tribes' Motions | Dates of Sources Cited by Tribes for their Criticism | Other Examples of Related Materials Dated Before 7/25/2016 or After 2/3/2017 |
|---|---|---|
| **Effects of weather impacts on WCD**<br><br>The WCD fails to consider the effect of adverse weather conditions, despite the Tribe's concerns (*RAR 7465, 7500, 6388*) and past experience (*RAR 7474, 2806*).<br><br>**D.E. 433-2 at 22-23** | *RAR 7465* (**2/21/18** SRST Spill Impacts Report states DAPL did not address in the WCD the impact of adverse weather on time to shut down pipeline)<br><br>*RAR 7500* (**2/21/18** SRST Spill Impacts Report states that under PHMSA's required approach WCD must account for discharge in adverse weather conditions)<br><br>*RAR 6388* (**3/6/18** SRST Resolution 080-18 states that "DAPL does not address the adverse weather impact on the WCD for the shutdown of the pipeline. Issues include harsh ND winter conditions, deep snow, extreme cold and availability and operation of the shutdown valves in extreme environment.")<br><br>*RAR 7474* (**2/21/18** SRST Spill Impacts Report describes January 17, 2015 Bridger Poplar Pipeline rupture when "ice covered much of the Yellowstone River") | *USACE_DAPL 66183, 66186* (**3/24/16** SRST Suppl. Comments on Draft EA, refer to extreme weather conditions that will complicate detection and response time and how draft EA says nothing about ice cover over Lake Oahe)<br><br>*USACE_DAPL 5747* (**3/11/16** EPA letter recommends revisions to draft EA to account for response challenges in winter conditions) |

<span style="color:red">**Red date**</span> = pre-July 25, 2016    <span style="color:green">**Green date**</span> = between July 25, 2016 and February 3, 2017    <span style="color:purple">**Purple date**</span> = after February 3, 2017

| Criticism As Raised in Tribes' Motions | Dates of Sources Cited by Tribes for their Criticism | Other Examples of Related Materials Dated Before 7/25/2016 or After 2/3/2017 |
|---|---|---|
| **Disconnect between WCD and Mid-Missouri SACP estimate of 50,000 barrels**<br><br>Internal Corps review highlighted that Mid-Missouri Subarea Contingency Plan (SACP) conservatively estimated 50,000 barrel spill.  (*USACE_DAPL 72184, 72252*.)  The Tribe repeatedly called out the "gulf between the WCD and Mid-Missouri SACP estimate of 50,000 barrels." (*RAR 6578.*)<br><br>**D.E. 433-2 at 14-15 & 24** | *USACE_DAPL 72184* (<span style="color:red">11/5/15</span> Corps comment notes that SACP uses a 50,800 barrel spill volume)<br><br>*USACE_DAPL 72252* (<span style="color:red">1/16/16</span> Corps comment notes that if a particular statement's inclusion in a document is warranted, the exhibits for it could be generated to show projections consistent with SACP)<br><br>*RAR 6578* (<span style="color:purple">2/28/18</span> internal Corps email states that SRST Councilman hand delivered a copy of the SACP and said DAPL's response plan does not follow it) | |

Red date = pre-July 25, 2016   Green date = between July 25, 2016 and February 3, 2017   Purple date = after February 3, 2017

| Criticism As Raised in Tribes' Motions | Dates of Sources Cited by Tribes for their Criticism | Other Examples of Related Materials Dated Before 7/25/2016 or After 2/3/2017 |
|---|---|---|
| **Failure to consider ETP safety record**<br><br>The risk assessment failed to consider ETP and Sunoco's safety record, despite the Tribe's attention to it (*USACE_ESMT 1278; RAR 1464, 7645, 6377, 6388, 7506-09, 7409, 7510-11, 7503, 4116, 335-36, 377, 379, 414, 416, 384*).<br><br>**D.E. 433-2 at 26-29** | *USACE_ESMT 1278* (**10/10/2016** Letter from Sierra Club et al. to Corps cites Reuters analysis of number of spills by Sunoco Logistics Partners LP, the future operator of DAPL)<br><br>*RAR 1464-65* (**8/7/17** Holmstrom Declaration notes Sunoco has "one of the lower performing safety records of any pipeline operator in the industry for spills and releases" and "[a] valid risk analysis would recognize the history of the operator, but that didn't happen here")<br><br>*RAR 7645* (**2/7/17** SRST NOI Comments note "the EIS needs to examine the safety record of Sunoco" to adequately address oil spill risks)<br><br>*RAR 6377* (**2/27/18** Email from SRST requests documentation for all prior reported spills from ETP/Sunoco pipelines)<br><br>*RAR 6388* (**3/6/18** SRST Resolution states ETP and Sunoco incurred more incidents between 2006 and 2017 than other operators)<br><br>*RAR 7503, 7506-11* (**2/21/18** SRST Spill Impacts Report questions exclusion of ETP/Sunoco history in WCD; states ETP and Sunoco incurred more incidents between 2006 and 2017 than other operators)<br><br>*RAR 4116* (**4/14/18** email attaches newspaper article titled re criticisms of Sunoco natural gas pipeline construction project in PA)<br><br>*RAR 335-36* (**7/6/18** Letter from SRST Chairman to Corps refers to history of Sunoco pipelines)<br><br>*RAR 377, 379, 384* (**7/23/18** Corps email attaches April 2018 Greenpeace Report on ETP/Sunoco spills)<br><br>*RAR 414, 416* (**5/21/18** Pennsylvania Public Utility Commission Order finds need for relief and study related to PA pipeline project) | |

Red date = pre-July 25, 2016   Green date = between July 25, 2016 and February 3, 2017   Purple date = after February 3, 2017

| Criticism As Raised in Tribes' Motions | Dates of Sources Cited by Tribes for their Criticism | Other Examples of Related Materials Dated Before 7/25/2016 or After 2/3/2017 |
|---|---|---|
| **Failure to implement industry best practices**<br><br>There is no evidence that DAPL meets the API's standards.  The Tribe emphasized these standards throughout (*RAR 1464, 7641, 7639-40, 7510-11, 7522, 3153, 6392*).  In response to the Tribe's critique that DAPL should be required to implement API 1173, the Corps responded that it was implementing API 1130, a different API standard (*RAR 7510*).  DAPL produced a Risk Assessment report that is silent on key API standards (*RAR 14869*).<br><br>**D.E. 433-2 at 30-32** | *RAR 1464* (**8/7/17** Holmstrom Declaration filed 8/7/17, states that PHMSA standards are out of date with key modern standards)<br><br>*RAR 7639-41* (**2/7/17** SRST NOI Comments state safety standards are dated)<br><br>*RAR 7510-11* (**2/21/18** SRST Spill Impacts Report states that various sources identify inadequacy of current pipeline regulations, and encourages use of API 1173 and 1133)<br><br>*RAR 7522* (**2/21/18** SRST Spill Impacts Report states DAPL does not meet API RP 1174's requirements)<br><br>*RAR 3153* (**5/1/18** SRST Resolution asserts failure to comply with API standards)<br><br>*RAR 6392* (**3/6/18** SRST Resolution asserts failure to comply with API standards)<br><br>*RAR 14869* (**6/26/16** DAPL Threat Assessment Report, finalized 7/26/16) | |

<span style="color:red">**Red date**</span> = pre-July 25, 2016   <span style="color:green">**Green date**</span> = between July 25, 2016 and February 3, 2017   <span style="color:purple">**Purple date**</span> = after February 3, 2017

| Criticism As Raised in Tribes' Motions | Dates of Sources Cited by Tribes for their Criticism | Other Examples of Related Materials Dated Before 7/25/2016 or After 2/3/2017 |
|---|---|---|
| **Bakken Crude Oil Properties**<br><br>The Remand Analysis does not address the safety risks of Bakken crude specifically, rather than crude oil generally, despite concerns about its risks (*RAR 7492-95, 7633, 6388, 4113, 8733, 3289, 16018*).<br><br>**D.E. 433-2 at 32-33** | *RAR 7492-95* (<span style="color:purple">2/21/18</span> SRST Spill Impacts Report states flammability and related risks of Bakken crude oil)<br><br>*RAR 7633* (<span style="color:purple">2/7/17</span> SRST NOI Comments refer to benzene risks of Bakken oil)<br><br>*RAR 11260* (<span style="color:green">12/18/17</span> SRST letter seeks information on Bakken oil)<br><br>*RAR 6388* (<span style="color:purple">3/6/18</span> SRST Resolution states Bakken oil presents flammability and other risks)<br><br>*RAR 4113* (<span style="color:purple">3/26/18</span> SRST document states that Bakken oil presents unique hazards)<br><br>*RAR 8733* (<span style="color:purple">2/8/2018</span> SRST letter to ETP expresses interest in discussing composition of Bakken oil)<br><br>*RAR 3289* (<span style="color:purple">5/25/18</span> letter from SRST Chair to Corps refers to health effects from exposure to Bakken oil)<br><br>*RAR 16018* (<span style="color:red">1/2/14</span> PHMSA Safety Alert states "recent derailments and resulting fires indicate that the type of crude oil being transported from the Bakken region may be more flammable than traditional heavy crude oil") | *USACE_DAPL 66187* (<span style="color:red">3/24/16</span> SRST Suppl. Comments on Draft EA recommends that pipeline safety be assessed in light of extreme weather conditions and environmental conditions that arise from spill of Bakken crude oil)<br><br>*USACE_DAPL 71771* (<span style="color:red">5/15</span> draft EA scoping document contains responses to EPA comments regarding Bakken crude oil) |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE,<br><br>                              Plaintiff,<br><br>and<br><br>CHEYENNE RIVER SIOUX TRIBE,<br><br>                       Plaintiff-Intervenor,<br><br>        v.<br><br>U.S. ARMY CORPS OF ENGINEERS,<br><br>                              Defendant,<br><br>and<br><br>DAKOTA ACCESS, LLC,<br><br>        Defendant-Intervenor-Cross Claimant. | Case No. 1:16-cv-01534-JEB |

**DECLARATION OF WILLIAM S. SCHERMAN**

# EXHIBIT 2

**<u>Overview of Remand Timeline</u>**



**Remand Timeline**

| | Corps | Dakota Access (DA) | SRST | CRST | OST | YST |
|---|---|---|---|---|---|---|
| June 2017 | | | · 6/29/2017 Letter to Army and the Corps requesting information on remand and consultation (RAR 14388-93) | | | |
| July 2017 | · 7/17/2017 Corps told the Court it expects to finish remand by end of 2017 (D.E. 258 at 1) | | | · 7/7/2017 Letter to Army asking to be a cooperating agency in preparing any EIS and attaching "materials previously submitted to the Corps" or "filed in this litigation" (RAR 13709-14387) | | |
| August 2017 | · 8/24/2017 Letter to DA with remand information requests (RAR 13605-07) | | | · 8/15/2017 Letter to Army requesting information about the remand, and stating that CRST is "preparing additional materials that it intends to submit to the Corps" (RAR 13369-71) | | |

|  | Corps | Dakota Access (DA) | SRST | CRST | OST | YST |
|---|---|---|---|---|---|---|
| September 2017 | · 9/11/2017 Letter to CRST from Army stating that the Corps will contact CRST soon about the remand. (RAR 13366)<br>· 9/13/2017 Meeting between the Corps and DA regarding fulfilling the Corps' information requests (RAR 13360-64)<br>· 9/25/2017 Letters to SRST (RAR 13325-27), CRST (RAR 13330-32), OST (RAR 13328-29), and YST (RAR 13323-24) seeking specific information related to the remand "in the next thirty days"<br>· 9/28/2017 Calls to YST and OST to confirm receipt of letters; left voicemails for both (RAR 13317) | · 9/13/2017 Meeting between the Corps and DA regarding fulfilling the Corps' information requests (RAR 13360-64) |  | · 9/8/2017 Letter to the Corps requesting information about the remand (RAR 13367-68) |  | · 9/29/2017 Letter to the Corps complaining that the Corps' letter requested information from the wrong Tribe (RAR 13307-16) |

| | Corps | Dakota Access (DA) | SRST | CRST | OST | YST |
|---|---|---|---|---|---|---|
| October 2017 | · 10/2/2017 Email to YST attaching corrected information request (RAR 13304-06)<br>· 10/6/2017 Notice of Revised Schedule for Remand (D.E. 281)<br>· 10/19/2017 email to SRST Chairman requesting a time for a call (RAR 13044)<br>· 10/20/2017 Email to YST attaching a "corrected DAPL Remand Letter" (RAR 13039-41)<br>· 10/20/2017 Email to DA transmitting documents filed (RAR 12298-13038)<br>· 10/27-30/2017 Emails among the Corps and SRST to schedule a meeting (RAR 12260-61) | · 10/2017 DA provided GRP and FRP to SRST (D.E. 298 at 3; D.E. 288-1 ¶ 4 (Ex. 1, Borkland Decl.)<br>· 10/2017 DA emergency response planning efforts with CRST/SRST (D.E. 288 at 4; D.E. 288-1 ¶¶ 4-7 (Ex. 1, Borkland Decl.)) | · 10/6/2017 Letter to the Corps stating SRST will need more time to provide the requested information (RAR 13275-83) | · 10/24/2017 Letter to the Corps seeking 90-day extension for response to the Corps' information request (RAR 12273-81) | · 10/24/2017 Response to Corps' 9/24/2017 letter, requesting unspecified amount of time to respond and asking Corps for information the Corps has gathered on remand (RAR 12271-72); also confirmed receipt and reiterated information in letter by phone (RAR 12270) | · 10/6/2017 Letter to DOJ complaining of mistake about the Tribe's misnaming in the Corps' 9/25/2017 and 10/5/2017 letters (RAR 13255-69) |
| November 2017 | · 11/9/2017 Email to DA scheduling meeting to discuss comments from technical documents and reports (RAR 12252)<br>· 11/9/2019 Email to DA scheduling meeting to review draft responses to | · 11/7/2017 Email to Corps regarding SIMAP modeling (RAR 12255)<br>· 11/9-14/2017 Email to the Corps attaching draft spill model and scheduling a time to give the Corps a spill model | · 11/27/2017-12/22/2018 Emails among the Corps and SRST to schedule a meeting, first set for December 18 and then January so that the Tribe could provide the requested information before the meeting | | | · 11/16/2017 Voicemails to the Corps in response to 10/2/2017 letter (RAR 12238-39) |

| | Corps | Dakota Access (DA) | SRST | CRST | OST | YST |
|---|---|---|---|---|---|---|
| | the tribal technical reports (RAR 12253)<br>· 11/09-22/2017 Email chain with DA regarding ERDC-EPW's spill model comments and webinar scheduling (RAR 12006-12)<br>· 11/17-22/2017 Email chain with DA discussing spill model presentation (RAR 12003-05)<br>· 11/09-22/2017 Email chain with DA about spill model comments and webinar scheduling (RAR 12006-12012)<br>· 11/14/2017 Email to DA requesting spill model inputs and assumptions (RAR 12551)<br>· 11/27/2017 Letters to SRST (RAR 11997-98), CRST (RAR 11995-96) and OST (RAR 11999) requesting materials by 12/20/2017 to maintain remand schedule (RAR 11997-98)<br>· 11/27/2017 Letter responding to YST's 9/29/2017 letter and requesting information (RAR 11993-94) | presentation (RAR 12241-50)<br>· 11/09-22/2017 Email chain with DA regarding ERDC-EPW's spill model comments and webinar scheduling (RAR 12006-12)<br>· 11/14/2017 Email to Corps responding to request for spill model inputs and assumptions (RAR 12551)<br>· 11/17-22/2017 Email chain with Corps discussing in-person spill model presentation (RAR 12003-12005)<br>· 11/17/2017 Email to the Corps attaching the "Integrity Management Plan Pipeline and associated documents" (RAR 12015-237) | (RAR 11261-63, 11983-85) | | | |

| | Corps | Dakota Access (DA) | SRST | CRST | OST | YST |
|---|---|---|---|---|---|---|
| | · 11/27-12/22/2018 Emails among the Corps and SRST to schedule a meeting, first set for December 18 and then January so that the Tribe could provide the requested information before the meeting (RAR 11261-63, 11983-85) | | | | | |
| December 2017 | · 12/1/2017 Status Report re Remand (D.E. 302)<br>· 12/7/2017 Email to DA transmitting agenda for 12/7 meeting regarding remand (RAR 11981-82)<br>· 12/7-12/2017 Email chain with DA discussing  water intake (RAR 11975-78)<br>· 12/12/2017 Email to DA stating Ft Yates Intake has been taken off-line (RAR 3072)<br>· 12/14/2017 Corps Reply to YST Response to Status Report (D.E. 306)<br>· 12/18/2019 Email to DA regarding Comment Response Documents (RAR 11953-54)<br>· 12/18/2017 Email to DA requesting documents | · 12/07-12/2017 Email chain with Corps discussing water intake (RAR 11975-78)<br>· 12/8/2017 Email from DA to the Corps, SRST, and CRST to schedule an emergency response planning meeting in December or January, and attaching draft Geographic Response Plan (GRP) (RAR 11252)<br>· 12/15/2017 Email to the Corps confirming delivery of technical documents (RAR 11955-57)<br>· 12/15-18/2017 Emails to Corps regarding submission of documents related to analysis of technical | · 12/18/2018 Letter to Corps requesting technical information and stating it needs to meet with the Corps before it responds to the Corps' requests (RAR 11958-60) | · 12/18/2017 Letter to the Corps stating it will make no submission before 1/30/2018, and requesting additional information and cooperating agency status (RAR 11961-62) | · 12/20/2017 49-page letter to Corps regarding DAPL (RAR 11555-11603)<br>· 12/20/2019 Emails among the Corps and OST confirming receipt of December 20 Letter to the Corps (RAR 11376-426) | · 12/6/2017 Response to Corps Status Update (D.E. 305), stating three letters from the Corps were addressed to OST<br>· 12/12/2017 Letter responding to Corps' prior letters complaining that they are addressed to the wrong tribe, and thus the Tribe cannot respond (RAR 11950-52) |

| | Corps | Dakota Access (DA) | SRST | CRST | OST | YST |
|---|---|---|---|---|---|---|
| | related to analysis of technical information (RAR 11955)<br>· 12/19-1/16/2018 Email chain with DA regarding Spill Model Results presentation (RAR10878-82)<br>· 12/20/2017 Emails among the Corps and OST confirming receipt of December 20 Letter to the Corps (RAR 11376-11426)<br>· 12/20/2018 Emails to DA regarding downloads and Draft Environmental Justice track changes (RAR 11427-44) | information (RAR 11955-57)<br>· 12/18/2017 Email to Corps responding to email about Comment Response Documents (RAR 11953)<br>· 12/19/2017 Email to the Corps confirming delivery of "Environmental Justice Discussion" and noting Spill Model Report will be sent separately, and the Downstream Receptor Report will be sent within the next day (RAR 11605)<br>· 12/19/2019 Email to the Corps regarding distribution of Spill Model Report before a planned January 16 meeting (RAR 11604; RAR 11606-949)<br>· 12/19/2017 Email to Corps regarding technical review of document and Spill Model Report (RAR 11604)<br>· 12/20/2018 Emails to Corps regarding downloads and Draft Environmental Justice | | | | |

|  | Corps | Dakota Access (DA) | SRST | CRST | OST | YST |
|---|---|---|---|---|---|---|
|  |  | track changes (RAR 11427-44)<br>· 12/20/2017 Email to the Corps submitting comment response tables (RAR 11445-554)<br>· 12/20/2017 Follow-up email from DA to the Corps, SRST, and CRST to set up an emergency response meeting, and soliciting comments on the GRP from the Tribes (RAR 11253-54)<br>· 12/22/2017 Email to Corps confirming Draft Downstream Receptor Report has been uploaded (RAR 11267)<br>· 12/29/2017 DA First Bi-Monthly Status Report (D.E. 315)<br>· 12/31/2017 Follow-up email from DA to the Corps, SRST, and CRST offering January 10-12 as meeting dates that work for the Corps and DA (RAR 11252) |  |  |  |  |
| January 2018 | · 1/2/2018 Email from the Corps noting SRST's request for separate January 10 meeting and stating Corps will meet | · 1/11/2018 Emergency response planning meeting between the Corps and DA in | · 1/4/2018 Letter to DA tentatively agreeing to meet in February on SRST reservation for response planning, and | · 1/30/2018 Letter to the Corps indicating that CRST will need "until the end of February 2018" to submit |  | · 1/2/2018 Surreply on Corps Status Report (D.E. 316) [also filed |

| | Corps | Dakota Access (DA) | SRST | CRST | OST | YST |
|---|---|---|---|---|---|---|
| | once Tribe provides requested information (RAR 11251)<br>· 1/3-4/2018 Emails to DA discussing Emergency planning meeting (RAR 11229-31)<br>· 1/4-5/2018 Email chain among the Corps, DA, SRST, and CRST arranging for a January emergency response planning meeting; neither Tribe attended (RAR 9533-36)<br>· 1/4/2018-2/7/2018 Emails among the Corps, DA, SRST, and CRST scheduling February meeting; as of 1/26/2018, neither Tribe had replied with their availability (RAR 9529-36)<br>· 1/8/2018-1/16/2018 Emails to DA regarding Downstream Receptor Report comments and asking about changes to IMP (RAR 10876-77)<br>· 1/18/2018 Emails among the Corps and SRST in which the Corps plans to attend meeting with SRST and FWS on January 24, and looks | Bismarck (RAR 9532-34)<br>· 1/16/2018 Email to Corps confirming there have not been changes to IMP (RAR 10876)<br>· 1/22/2019 Email to Corps regarding 1/24-1/25 comment review meeting agenda (RAR 10399)<br>· 1/23/2018 Email to Corps responding to request to address missing comment (RAR 10359; 10362-77)<br>· 1/24/2018 Email to Corps responding to request for response to comment (RAR 10356)<br>· 1/24/2018 Email to Corps setting up follow-up meeting to 1/24 meeting (RAR 10358) | requesting technical information (RAR 11249-50)<br>· 1/4/2018 Letter to the Corps regarding consultation (RAR 11224-28)<br>· 1/18/2018 Emails among the Corps and SRST in which the Corps plans to attend meeting with SRST and FWS on January 24, and looks forward to seeing SRST at a conference in Bismarck on January 30 (RAR 10417-18)<br>· 1/19/2018-2/7/2018 Email chain among the Corps, SRST, and Fish and Wildlife Service (FWS) arranging meeting about Missouri River Recovery Management Plan (RAR 9117-25)<br>· 1/29-30/2018 Email string re Corps' request for SRST Chairman's current email address (RAR 10342) | remand information (RAR 10350-51) | | same at D.E. 309, 314-1]<br>· 1/30/2018 Letter to the Corps indicating Tribe is "currently in the process of gathering information" (RAR 10307-14) |

| | Corps | Dakota Access (DA) | SRST | CRST | OST | YST |
|---|---|---|---|---|---|---|
| | forward to seeing SRST at a conference in Bismarck on January 30 (RAR 10417-18) <br> · 1/19/2018-2/7/2018 Email chain among the Corps, SRST, and FWS arranging meeting about Missouri River Recovery Management Plan (RAR 9117-25) <br> · 1/22-1/23/2018 Email to DA sending agenda and current comment report for 1/24-1/25 comment review meeting and asking for DA to address missing comment (RAR 10359-61; 10401-15) <br> · 1/24/2018 Emails to DA requesting response to comment (RAR10356-57) <br> · 1/25/2018-2/5/2018 Emails to DA regarding NRDA information and Downstream Receptor Report. (RAR 9508-10) <br> · 1/25/2018 Email to DA sending Corps emails discussing CEQ regulations (RAR 10354-55) <br> · 1/29/2018-1/30/2018 Email string re Corps' | | | | | |

| | Corps | Dakota Access (DA) | SRST | CRST | OST | YST |
|---|---|---|---|---|---|---|
| | request for SRST Chairman's current email address (RAR 10342)<br>· 1/29/2018 Letter from the Corps to SRST noting cancelled January 24 meeting due to government shutdown, and referencing a January 30 meeting (RAR 10352)<br>· 1/31/2018 Email to DA transmitting agenda for 2/1/2018 meeting on Remand Decision (RAR 10337-38) | | | | | |
| February 2018 | · 2/1/2018 Remand Status Report (D.E. 326)<br>· 2/2/2018 Email to DA transmitting photos for comment (RAR 10324-33)<br>· 2/6/2018 Email to DA about updated RPS Technical Report (RAR 9112-13)<br>· 2/6/2018 Email to DA about review of Draft Remand Document (RAR 9262)<br>· 2/7/2018 Email to DA transmitting agenda for meeting about comments (RAR 9106-09) | · 2/5/2018 Email regarding Downstream Receptor Report and NRDA information (RAR 9508)<br>· 2/4-6/2018 Emails to Corps transmitting draft Remand Document and Appendices A-C (RAR 9153-258; RAR 10097-202)<br>· 2/4-6/2018 Emails to Corps regarding review of Draft Remand Document (RAR 9262-9263)<br>· 2/5/2018 Email confirming receipt of | · 2/2/2018 Letter inviting DA to SRST reservation for February 8 meeting (RAR 8479, 8487)<br>· 2/8/2018 Letter hand-delivered to DA stating SRST will not participate in February 8 meeting (RAR 8731-34)<br>· 2/8/2018 Meeting among the Corps, DA, SRST, and CRST; SRST and CRST stated in person they would not participate (RAR 8736-38, RAR 8735-40)<br>· 2/23-26/2018 emails, initiated by the Corps, | · 2/7/2018 Response to Corps' 2/1/2018 Status Report (D.E. 326) & Request for Meaningful Consultation (D.E. 327)<br>· 2/8/2018 Meeting among the Corps, DA, SRST, and CRST; SRST and CRST stated in person they would not participate (RAR 8736-38, RAR 8735-40)<br>· 2/8/2018 Two letters to the Corps (dated 2/7/2018, but hand | | |

| | Corps | Dakota Access (DA) | SRST | CRST | OST | YST |
|---|---|---|---|---|---|---|
| | · 2/7/2018 Email to DA stating Downstream Receptor Report has been received and requesting back checks (RAR 9126)<br>· 2/8/2018 Meeting among the Corps, DA, SRST, and CRST; SRST and CRST stated in person that they would not participate (RAR 8736-38, RAR 8735-40)<br>· 2/8/2018 Emails to DA arranging call to discuss Spill Plan Meeting and reminder about back checks (RAR 9092-93)<br>· 2/13/2018 Emails to DA asking for ETP letter and question about documents at meetings (RAR 8453-54)<br>· 2/22-28/2018 Email chain between attorneys for Dakota Access and Corps coordinating responses (RAR 6376-80)<br>· 2/23/2018 Letter to SRST responding to prior correspondence and attaching the current draft GRP it was prepared to share at the | NRDA information and incorporation into Downstream Receptor Report (RAR 9508)<br>· 2/7/2018 Email to Corps confirming receipt of email transmitting agenda for meeting about comments (RAR 9104)<br>· 2/7/2018 Email to Corps discussing RPS Spill Model Report and transmitting spreadsheet of RPS Spill Model Report comments (RAR 9112-16)<br>· 2/8/2018 Email to Corps arranging call to discuss Spill Plan Meeting (RAR 9092)<br>· 2/14/2018 Email to Corps transmitting documents being reviewed for RPS Report or Downstream Receptor Report (RAR 8431-52)<br>· 2/13/2018 Email to Corps transmitting letter requested and also attaching email (RAR 8479-87)<br>· 2/14/2018 Email to Corps responding to emails about ETP letter | with SRST and the Corps about scheduling a meeting on the "Remand [I]ssues" (RAR 6602-03)<br>· 2/24-3/1/2018 Emails, initiated by DA, among the Corps, DA, SRST, and CRST scheduling emergency response planning meeting; CRST did not contribute (RAR 6565-77)<br>· 2/28/2018 Meeting with the Corps, USFWS, and SRST regarding "Missouri River Recovery Management Plan" (RAR 9124-25)<br>· 2/28/2018 Letter to DA suggesting emergency response planning meeting on SRST reservation on March 7 and requesting the GRP (RAR 6588-89) | delivered 2/8/2018) requesting a meeting on 2/8/2018 in South Dakota (RAR 8727-30; see also RAR 8729, RAR 8735-40)<br>· 2/24-3/1/2018 Emails, initiated by DA, among the Corps, DA, SRST, and CRST scheduling emergency response planning meeting; CRST did not contribute (RAR 6565-77) | | |

| | Corps | Dakota Access (DA) | SRST | CRST | OST | YST |
|---|---|---|---|---|---|---|
| | February 8 meeting (RAR 6594; 6642-6886)<br>· 2/23/2018 Letter to CRST regarding prior correspondence, and attaching the current draft GRP it was prepared to share at the February 8 meeting (RAR 7132-7376)<br>· 2/23/2018 Letter to OST attaching the current GRP and reporting that the Corps is still reviewing the spill model (RAR 6887-7131)<br>· 2/23-26/2018 Emails, initiated by the Corps, with SRST and the Corps about scheduling a meeting on the "Remand [I]ssues" (RAR 6602-03)<br>· 2/24-3/1/2018 Emails, initiated by DA, among the Corps, DA, SRST, and CRST scheduling emergency response planning meeting; CRST did not contribute (RAR 6565-77)<br>· 2/28/2018 Meeting with the Corps, USFWS, and SRST regarding "Missouri River | and documents at meetings (RAR 8453)<br>· 2/24-3/1/2018 Emails, initiated by DA, among the Corps, DA, SRST, and CRST scheduling emergency response planning meeting; CRST did not contribute (RAR 6565-77)<br>· 2/28/2018 DA Second Bi-Monthly Status Report (D.E. 334) | | | | |

13

| | Corps | Dakota Access (DA) | SRST | CRST | OST | YST |
|---|---|---|---|---|---|---|
| | Recovery Management Plan" (RAR 9124-25) | | | | | |
| March 2018 | · 3/5/2018 Letter to SRST providing draft Facility Response Plan and other information (RAR 6436-6564)<br>· 3/7/2018 Meeting with the Corps and DA; SRST and CRST were invited but did not attend<br>· 3/13-23/2018 Emails and calls among the Corps and SRST about March 26 meeting logistics (RAR 5847, 5850-54, 6372-73)<br>· 3/14/2018 Letter to SRST enclosing the draft GRP the Tribe would have received had it attended the March 7 meeting (RAR 5893)<br>· 3/14/2018 Letter to CRST enclosing the draft GRP the Tribe would have received had it attended the March 7 meeting (RAR 5894)<br>· 3/16/2018 Notice re Remand Schedule (D.E. 338 at 1-2): "As a result of difficulties in obtaining requested | · 3/7/2018 Meeting with the Corps and DA; SRST and CRST were invited but did not attend | · 3/5/2018 SRST submits oil spill impact report to the Corps via letter dated 2/21/2018 (RAR 6433, 7451-7774)<br>· 3/7/2018 Meeting with the Corps and DA; SRST and CRST were invited but did not attend<br>· 3/7/2018 Email of letter to the Corps (dated March 6) attaching Resolution Regarding Planning Meetings (RAR6385-96)<br>· 3/7/2018 Emails among the Corps and SRST arranging time to meet (RAR 6398-99, 6406, 6408)<br>· 3/13-23/2018 Emails and calls among the Corps and SRST about March 26 meeting logistics (RAR 5847, 5850-54, 6372-73)<br>· 3/15/2018 Email to the Corps submitting environmental justice analysis (RAR 5855-91) | · 3/6/2018 Letter to DA declining to attend March 7 meeting, requesting to meet once DA has provided various technical data (RAR 6431-32)<br>· 3/7/2018 Meeting with the Corps and DA; SRST and CRST were invited but did not attend<br>· 3/26/2018 Meeting between the Corps and SRST "to discuss the Remand issues," which CRST chose not to attend (RAR 4129, 4133) | | · 3/7/2018 Letter responding to the Corps' "undated" letter from 10/5/2017, attaching the Tribe's consultation protocols and advising that YST "continues to gather the requested information." (RAR 6412-18) |

|  | Corps | Dakota Access (DA) | SRST | CRST | OST | YST |
|---|---|---|---|---|---|---|
|  | information from the Plaintiff Tribes in a timely manner, the Corps no longer believes it will be able to complete the remand by April 2, 2018." <br>· 3/26/2018 Meeting between the Corps and SRST "to discuss the Remand issues," which CRST chose not to attend (RAR 4129, 4133) <br>· 3/30/2018 Letters to SRST (RAR 5803), CRST (RAR 5801), YST (RAR 5802), and OST (RAR 5800) setting an April 20, 2018 deadline for further submissions. |  | · 3/26/2018 Meeting between the Corps and SRST "to discuss the Remand issues," which CRST chose not to attend (RAR 4129, 4133); at the meeting, SRST gave the Corps a package of information (RAR 3365-68, 4111-25), including a list of 50 questions it provided during pre-remand consultation (USACE_ESMT 556-59) |  |  |  |
| April 2018 | · 4/2/2018 Status Report re Remand (D.E. 348): Received significant information from ETP and ongoing discussions to develop analyses of 3 remand issues. Set April 20, 2018 as the deadline for tribal submissions, expects to provide an ETA for completing the remand by May 2, 2018 <br>· 4/6-10/2018 Emails among the Corps and | · 4/2/2018 DA filed GRP with Court (D.E. 346 & 346-1) <br>· 4/2/2018 DA provided easement condition compliance report from third-party auditor (D.E. 347, -1, -2) <br>· 4/19/2018 Emails to Corps transmitting SRST Impact Document, Appendices and Environmental Justice |  | · 4/10-12/2018 Email chain between the Corps and CRST coordinating meeting (RAR 4135) <br>· 4/20/2018 Submits remand information, including a March 2005 report, a February 2017 declaration filed in this case (D.E. 99-4), and two brief declarations | · 4/6/2018 Letter to Corps confirming receipt of GRP, Emergency Response Action Plan ("ERAP"), and FRP on 3/31/2018 and requesting a consultation meeting on 4/18/2018 in Rapid City, SD (RAR 4906-07) | · 4/20/2018 Letter to the Corps attaching Tribal consultation protocols and an affidavit about hunting and fishing practices; asking for a 2-week extension to submit additional |

| | Corps | Dakota Access (DA) | SRST | CRST | OST | YST |
|---|---|---|---|---|---|---|
| | OST scheduling June 1 consultation meeting (RAR 4903-04)<br>· 4/10-4/12/2018 Email chain between the Corps and CRST coordinating meeting (RAR 4135)<br>· 4/11/2018 Email to DA discussing review of SRST information and transmitting SRST information (RAR 4138-4497)<br>· 4/12-20/2018 Emails from Corps to YST seeking to scheduling meeting; no response from YST (RAR 3438-39, 4099, 4109)<br>· 4/19/2018 Email to Dakota Access regarding meeting about SRST information and transmitting agenda (RAR 4103-04)<br>· 4/23/2018 Email to DA transmitting supplemental information from OST and YST (RAR 3372-82) | document (RAR 3699-4098)<br>· 4/30/2018 DA Third Bi-Monthly Status Report (D.E. 353) | | dated April 20, 2018 (RAR 2005-246) | · 4/6-10/2018 Emails among the Corps and OST scheduling June 1 consultation meeting (RAR 4903-04)<br>· 4/20/2018 Provides a report to the Corps critiquing the project plans (GRP, FRP, ERAP) and confirming a 6/1/2018 meeting with the Corps (RAR 3427-37) | information; and inviting the Corps to a 5/31/2018 "preconsultation meeting" (RAR 2247-56)<br>· 4/20-8/27/2018 Email chain with Corps discussing consultation protocols (RAR 17092-100) |
| May 2018 | · 5/2/2018 Remand Status Report (D.E. 355 at 2) (reporting the Corps is "scheduled to meet with | · 5/14/2018 Email to Corps regarding sending SRST questions before meeting with | · 5/1/2018 SRST passes resolution regarding remand (RAR 3152-56) | · 5/3-9/2018 Correspondence reflecting the Corps' attempts to confirm | · 5/10-31/2018 Emails among the Corps and OST regarding | · 5/21/2018 Email to the Corps advising that YST's Vice |

| | Corps | Dakota Access (DA) | SRST | CRST | OST | YST |
|---|---|---|---|---|---|---|
| | each Tribe by June 1" and will provide a specific date to complete the remand by June 8, 2018)<br>• 5/3-9/2018 Correspondence reflecting the Corps' attempts to confirm details for May 30 meeting with CRST (RAR 3353-34, 3358-59; see also RAR 3346, 3349)<br>• 5/3/2018 Email from the Corps requesting call with SRST, and call, about May 22 meeting logistics (RAR 3360-61)<br>• 5/8-11/2018 Emails among the Corps and SRST discussing May 22 meeting agenda (RAR 3342-44, 3347-48, 3357)<br>• 5/14/2018 Email to Dakota Access requesting SRST questions prior to meeting with Commander (RAR 3341)<br>• 5/18/2018 Email to SRST requesting a call about proposed site visit (RAR 3331) | Commander (RAR 3340) | • 5/3/2018 Email from the Corps requesting call with SRST, and call, about May 22 meeting logistics (RAR 3360-61)<br>• 5/8-11/2018 Emails among the Corps and SRST discussing May 22 meeting agenda (RAR 3342-44)<br>• 5/16/2018 Letter to the Corps requesting a site visit to Lake Oahe during May 22 meeting (RAR 3332)<br>• 5/22/2018 Meeting with the Corps and SRST (RAR 3297-302, 3311); SRST invited YST to observe, but YST did not attend (RAR 3297, 3303-09)<br>• 5/25/2019 Letter to the Corps following up on May 22 meeting (RAR 3286-89) | details for May 30 meeting with CRST (RAR 3353-54, 3358-59; see also RAR 3346, 3349)<br>• 5/29/2018 Meeting with the Corps and CRST (RAR 1172-1236, 3278-85) | consultation meeting logistics (RAR 3178-88, 3210-13, 3293-95, 3345) | Chairman will be observing the May 22 meeting between the Corps and SRST, but that he is not authorized to consult, and attaching the Tribes' protocols (RAR 3303-09)<br>• 5/30/2018 Letter to the Corps seeking confirmation that the 5/31/2018 meeting "is not consultation" (RAR 3202-04)<br>• 5/31/2018 Meeting with the Corps (RAR 3094; RAR 3035-39) |

| | Corps | Dakota Access (DA) | SRST | CRST | OST | YST |
|---|---|---|---|---|---|---|
| | · 5/22/2018 Meeting with the Corps and SRST (RAR 3297-3302, 3311)<br>· 5/29/2018 Meeting with the Corps and CRST (RAR 1172-1236, 3278-85)<br>· 5/30/2018 Letter to YST acknowledging receipt of YST's letter (RAR 3207)<br>· 5/31/2018 Meeting with the Corps (RAR 3094; RAR 3035-39) | | | | | |
| June 2018 | · 6/1/2018 Meeting with OST in Rapid City, SD (RAR 3173-77)<br>· 6/5-13/2018 Emails among the Corps and OST concerning OST's emergency point of contact (RAR 3084-87, 3107-09)<br>· 6/8/2018 Remand Status Report (D.E. 357 at 2) stating the Corps "plans to finish its consideration and analysis of the information submitted by the Tribes and consider issues identified at the meetings with the Tribes," and "expects to review all appropriate information and issue its | · 6/20/2018 Email to Corps with Remand Package text attached (RAR 2551-52)<br>· 6/20/2018 Email to Corps with Remand Package attached for review (RAR 2945-3000)<br>· 6/20/2018 Email to Corps transmitting Appendix C – Table C-4: Comment and Response for Documents Received After to Easement Agreement Date of February 8 2017 (RAR 3001-3006)<br>· 6/20/2018 Email to Corps transmitting | | | · 6/1/2018 Meeting with the Corps (RAR 3172, RAR 3173-77), where it gave presentations about emergency response planning (RAR 3123-58) and the remand (RAR 3159-71)<br>· 6/5-13/2018 Emails among the Corps and OST concerning OST's emergency point of contact (RAR 3084-87, 3107-09) | · 6/5/2018 Letter to the Corps following up on 5/31/2018 meeting and asking for information including the spill model and underlying data (RAR 3115) |

| | Corps | Dakota Access (DA) | SRST | CRST | OST | YST |
|---|---|---|---|---|---|---|
| | decision on the remand issues no later than August 10, 2018." <br>· 6/12/2018 Email with DA regarding spill modeling question (RAR 3091-92) <br>· 6/12-13/2018 Emails with DA regarding Ft Yates water intake (RAR 3070-71) <br>· 6/13/2018 Email to YST attorney seeking previously-requested emergency points of contact (RAR 1165) <br>· 6/13/2018 Email to DA regarding agricultural intake (RAR 3076) <br>· 6/21/2018 Email to DA confirming download of Remand Package, appendices, and Downstream Receptor Report (RAR 2545) <br>· 6/21/2018 Email to DA forwarding Corps' question about whether Environmental Justice discussed in the route alternative <br>· 6/21/2018 Email to DA regarding SCRWD water intake (RAR 2551) | Appendix C- Table C-5: Comment and Response for Documents in Spring 2018 (RAR 3007-15); <br>· 6/20/2018 Email to Corps transmitting Appendix C - Table C-3: Comment and Response for Documents Received Prior to Easement Agreement date of February 8, 2017 (RAR 3016-30) <br>· 6/20/2018 Email to Corps with link to download documents that were ready to print (RAR 3031-33) <br>· 6/21/2018 Email to Corps regarding Remand Report, appendices, and Downstream Receptor Report available for download (RAR 2545-46) <br>· 6/21/2018 Emails to Corps with Appendix C - Tables 3, 4, and 5, attached (RAR 2618-77) <br>· 6/29/2018 DA Fourth Bi-Monthly Status Report re Pipeline Conditions at Lake Oahe (D.E. 358) | | | | |

| | Corps | Dakota Access (DA) | SRST | CRST | OST | YST |
|---|---|---|---|---|---|---|
| | · 6/21/2018 Email to DA about chronology of events in Remand Package text (RAR 2553) | | | | | |
| July 2018 | · 7/12/2018 Follow-up email to YST attorney, marked high priority, seeking emergency point of contact information (RAR 1164)<br>· 7/17/2018 Email response to YST seeking 24/7 phone number for emergencies (RAR 1163) | | · 7/23/2018 Letter to the Corps (dated 7/6/2018 and postmarked 7/19/2018) providing information (RAR 1070-158) | | | · 7/16/2018 Email response to the Corps providing emergency points of contact for YST (RAR 1164)<br>· 7/17/2018 Email response clarifying emergency points of contact for YST (RAR 1163) |
| August 2018 | · 8/1/2018 Email to DA asking questions regarding PHMSA data (RAR 989)<br>· 8/1/2018 Email to DA regarding questions from headquarters (RAR 424-25)<br>· 8/3/2018 Letter to YST responding to prior letters (RAR 559-61)<br>· 8/3/2018 Email to DA asking about | · 8/1/2018 Email to Corps addressing why one-mile-wide buffers chosen with document and graphics attached responding to Corps' questions (RAR 899-986)<br>· 8/1/2018 Email to Corps replying to questions from headquarters (RAR 423-24)<br>· 8/2/2018 Email responding to Corps | | | | |

20

| | Corps | Dakota Access (DA) | SRST | CRST | OST | YST |
|---|---|---|---|---|---|---|
| | confidentiality of items to be included in the administrative record (RAR 423)<br>· 8/7/2018 Remand Status Report (D.E. 361) notifying the Court it needed until August 31, 2018 to complete the remand process because it received new information from SRST and ETP in late July and August.<br>· 8/9/2018 Email to DA with additional questions regarding PHMSA data (RAR 323-24)<br>· 8/9/2018 Email to DA confirming receipt of final Lake Oahe Caliper Field Study Report (RAR 422)<br>· 8/10/2018 Email to DA discussing revisions to highly controversial section and responses to comments (RAR 328-29)<br>· 8/29/2018 Email to DA requesting additional documents (RAR 297)<br>· 8/31/2018 Remand Status Report (D.E. 362 at 1) stating that "the remand is now complete" | questions regarding PHMSA data (RAR 733-40)<br>· 8/3/2018 Email to Corps regarding possible clarification to Environmental Justice section (RAR 562-66)<br>· 8/8/2018 Email responding to Corps email about confidentiality of record materials (RAR 422)<br>· 8/6/2018 Emails to Corps with revisions to Environmental Justice section and discussing possibility of further edits (RAR 562-63)<br>· 8/6/2018 Email to Corps with redline version of Environmental Justice section attached and discussing looking into redactions (RAR 650-731)<br>· 8/9-13/2018 Emails between Corps and DA discussing PHMSA questions<br>· 8/9/2018 Email to Corps requesting information about materials submitted by SRST (RAR 432) | | | | |

|  | Corps | Dakota Access (DA) | SRST | CRST | OST | YST |
|---|---|---|---|---|---|---|
|  | and attaching a copy of the Corps' remand Memorandum for the Record (D.E. 362-1). The Corps stated its Remand analysis and the RAR would be released after undergoing a confidentiality review. | · 8/16/2018 Email to Corps responding to additional questions regarding PHMSA data (RAR 316-21)<br>· 8/29/2018 Emails between Corps and DA discussing requested additional evidence and clarifying use of terms DAPL Crossing and Directional Drill (RAR 298-300)<br>· 8/29/2018 Emails between Corps and DA discussing Corps request for documents and clarifying what site-specific data indicates that the pipeline is located away from a landslide threat area (RAR 293-96)<br>· 8/29-30/2018 Emails between DA and Corps regarding final Environmental Justice diagrams (RAR 281-82) |  |  |  |  |