**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **STANDING ROCK SIOUX TRIBE; YANKTON SIOUX TRIBE; ROBERT FLYING HAWK; OGLALA SIOUX TRIBE,** | **Case No. 1:16-cv-1534-JEB (and Consolidated Case Nos. 16-cv-1796 and 17-cv-267)** |
| **Plaintiffs,** | |
| **and** | |
| **CHEYENNE RIVER SIOUX TRIBE, ET AL.** | |
| **Intervenor-Plaintiffs,** | **INTERVENOR-PLAINTIFF CHEYENNE RIVER SIOUX TRIBE'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO THE U.S. ARMY CORPS OF ENGINEERS' AND DAKOTA ACCESS'S CROSS-MOTIONS FOR SUMMARY JUDGMENT** |
| **v.** | |
| **U.S. ARMY CORPS OF ENGINEERS,** | |
| **Defendant.** | |
| **and** | |
| **DAKOTA ACCESS, LLP,** | |
| **Intervenor-Defendant.** | |

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

STANDARD OF REVIEW .....................................................................................................1

ARGUMENT ..........................................................................................................................2

I.    The Corps Is Obligated by Treaty to Consult with the Tribe When Its Actions
      Impact the Tribe's Hunting, Fishing, and Water Rights. .................................................... 2

      A.    The United States Has a Trust Obligation to the Cheyenne River Sioux Tribe
            to Assert and Defend the Tribe's Water, Hunting, and Fishing Rights....................... 2

      B.    Department of Defense Instructions Are Binding Agency Guidance.......................... 5

II.   Failure to Consult in Good Faith with the Tribe Harmed the Corps' Understanding
      of the Tribe's Utilization of their Hunting and Fishing Rights and the
      Environmental Justice Consequences of the Lake Oahe Crossing...................................... 7

      A.    The Corps Failed to Make a Good Faith Effort to Consult with the Cheyenne
            River Sioux Tribe on Remand. ................................................................................... 8

      B.    The Corps Does Not Properly Contextualize the Harm That Would Be
            Caused by Spill Impacts. .......................................................................................... 10

CONCLUSION.....................................................................................................................14

TABLE OF AUTHORITIES

**CASES**

*Albuquerque Indian Rights v. Lujan*, 930 F.2d 49, 58 (D.C. Cir. 1991) ......................................... 2

*Cheyenne-Arapaho Tribes of Okla. v. United States*, 966 F.2d 583, 591 (10th Cir. 1992) ............ 2

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 401, 416 (1971) ............................... 1

*Cobell v. Babbit*, 91 F. Supp. 2d 1, 46 (D.D.C. 1999) .................................................................... 2

*Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989) ...................................................... 1

*Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1324-25 (D.C. Cir. 2015) 10

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101 (D.D.C.) ...... 8, 10

*United States v. Dion*, 476 U.S. 734, 738 (1986) ........................................................................... 5

*United States v. Jicarilla Apache Nation*, 564 U.S. 162, 207 (2011) ........................................... 5

*Wellford v. Ruckelshaus*, 439 F.2d 598, 601 (D.C. Cir. 1971) ...................................................... 2

Western Water Policy Act of 1992, Pub. L. 102-575 ...................................................................... 4

*Winters v. United States*, 207 U.S. 564, 576-78 (1980) .................................................................. 4

**OTHER AUTHORITIES**

25 C.F.R. § 1000.325 ....................................................................................................................... 3

5 U.S.C. § 706(2)(A) ........................................................................................................................ 1

25 U.S.C. § 11632(a)(5) ................................................................................................................... 5

68 Stat. 1191, 1192-93, § VI, § 10 .................................................................................................. 5

84 Fed. Reg. 1,201-02 (Feb. 1, 2019) ............................................................................................. 9

Act of March 2, 1889 ............................................................................................................... 3, 4, 5

Administrative Procedure Act, 5 U.S.C. § 706(2)(A) ...................................................................... 1

American Indian Religious Freedom Act, 42 U.S.C. § 1996 ........................................................... 6

Cheyenne River Taking Act..................................................................................... 3

*Criteria and Procedures for the Participation of the Federal Government in Negotiations for the*

    *Settlement of Indian Water Rights Claims*, 55 Fed. Reg. 9223 (Mar. 12, 1990) ...................... 5

Dep't of Def. Instruction 4710.02 § 6.2.................................................................. 6, 7

*Dep't of Def.* Instruction 4715.3 ............................................................................. 6

*Dep't of Def.* Instruction 4715.3 §§ 1(a), 2(b)(2). ...................................................... 6

Dep't of Def. Instruction 5025.01 ........................................................................... 6

Dept of Def. Grants and Agreement, 32 C.F.R. 22....................................................... 6

Executive Order 13175, "Consultation and Coordination with Indian Tribal Governments,"

    November 6, 2000................................................................................................ 6, 7

Flood Control Act of 1944, Pub. L. 78-54, ch. 665, 58 Stat. 887 (Dec. 22, 1944),........................ 4

Presidential Memorandum on "Government-to-Government Relationship with Tribal

    Governments, 59 Fed. Reg. 22951, 22952 (April 29, 1994) .................................................. 6, 7

Pub. L. 83-776, ch. 1260, 68 Stat. 1191..................................................................... 4

Secretary of Defense Policy on "Department of Defense American Indian and Alaska Native

    Policy," October 20, 1998.................................................................................. 6

*Treaty of Fort Laramie with Sioux, Etc.*,11 Stat. 749 (Sept. 17, 1851) ...................................... 3, 5

*Treaty with the Sioux – Brule, Oglala, Miniconjou, Yanktonai, Hunkpapa, Blackfeet, Cuthead,*

    *Two Kettle, Sans Arc, and Santee – And Arapahoe*, 15 Stat. 635 (Apr. 29, 1868)................. 3, 5

## INTRODUCTION

The U.S. Army Corps of Engineers ("Corps") and Dakota Access[1] perpetuate their callous and, ultimately, false position regarding the Corps' obligation to consult with tribes on actions that have the potential to impact Treaty rights and trust resources.  The Corps alternately claims that: (1) it has no such obligation, (2) even if it did, its consultation efforts on remand were good enough; and finally (3) any impacts are unimportant.  The Corps has an admitted obligation to consult.  Its remand consultation efforts were obstructionist and disrespectful.  And the impacts of a spill on the people of the Cheyenne River Sioux Tribe ("Tribe") pose a physical and cultural threat to the Tribe's very existence that would infringe on actionable Treaty rights affirmed by this Court in June 2017.  The Corps failed to meaningfully consult with the Tribe on remand and therefore its decision on remand was arbitrary, capricious, and illegal.

## STANDARD OF REVIEW

Courts review agency decisions pursuant to the Administrative Procedure Act, which requires that courts set aside agency decisions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). Courts evaluating whether an agency decision was arbitrary or capricious "'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' This inquiry must be 'searching and careful,' but 'the ultimate standard is a narrow one.'" *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 401, 416 (1971)).  Despite the limitations imposed by arbitrary and capricious review, Treaty and trust violations are subject to "the most exacting fiduciary standards." *Cobell*

---

[1] As Dakota Access largely duplicates the Corps' arguments, this brief addresses primarily those advanced by the agency.

*v. Babbit*, 91 F. Supp. 2d 1, 46 (D.D.C. 1999). The "courts in this Circuit recognize that the *Chevron* principle of deference to administrative interpretations is subjugated by the long-standing canon that 'statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Albuquerque Indian Rights v. Lujan*, 930 F.2d 49, 58 (D.C. Cir. 1991). In instances where an agency "has traditionally expressed one position to Congress and the Indian tribes, it is essential that the legitimate expectation of Indians not be extinguished by what amounts to an *ad hoc* determination." *Id.* Furthermore, "close scrutiny of administrative action is particularly appropriate when the interests at state are not merely economic interests . . . but personal interests of life and health." *Cobell v. Babbit*, 91 F. Supp. 2d at 46; *see also Wellford v. Ruckelshaus*, 439 F.2d 598, 601 (D.C. Cir. 1971).

## ARGUMENT

**I.     The Corps Is Obligated by Treaty to Consult with the Tribe When Its Actions Impact the Tribe's Hunting, Fishing, and Water Rights.**

### A.     The United States Has a Trust Obligation to the Cheyenne River Sioux Tribe to Assert and Defend the Tribe's Water, Hunting, and Fishing Rights.

The Corps is obligated to consult with the Cheyenne River Sioux Tribe when agency action has the potential to affect the Tribe's water, fishing, and hunting rights as a consequence of the United States' trust responsibility, which has been affirmed and reiterated by treaties, statutes, regulations, and case law. As discussed at length in prior briefing, "[w]here the United States is obligated to act as a fiduciary, its conduct must not merely meet the minimal requirements of administrative law, but must also pass scrutiny under more stringent standards demanded of a fiduciary." ECF 207 at 23-24 (citing *Cheyenne-Arapaho Tribes of Okla. v. United States*, 966 F.2d 583, 591 (10th Cir. 1992)). The United States' failure to consider all relevant aspects of a project and its impact on the Tribe's interests violates its fiduciary duty, rendering any subsequent action based on that insufficient analysis arbitrary and capricious. *Id.* at 24. Water rights and natural

2

resource rights are indisputably trust assets held by the United States for tribes. *See, e.g.*, 25 C.F.R. § 1000.325.

The Fort Laramie Treaties of 1851 and 1868, the Act of March 2, 1889, and the Cheyenne River Taking Act, affirm and reaffirm that the United States long has recognized the Tribe's enforceable treaty right to fish and hunt in and around the Missouri River, as well as the Tribe's reserved rights in the water of the Missouri River itself. The 1851 Fort Laramie Treaty established the initial reservation of the Great Sioux Nation. *Treaty of Fort Laramie with Sioux, Etc.*, 11 Stat. 749 (Sept. 17, 1851) ("1851 Fort Laramie Treaty") In this initial treaty, the Tribe and its members reserved the right to access clean water from any body of water within their reservation, including the Missouri. *Id.* at art. 5. Further, the privileges of hunting and fishing were also expressly retained by the Great Sioux Nation, and the subsequent Cheyenne River Sioux Tribe. *Id.* at art. 6. The 1868 Treaty with the Great Sioux Nation, the *Treaty with the Sioux – Brule, Oglala, Miniconjou, Yanktonai, Hunkpapa, Blackfeet, Cuthead, Two Kettle, Sans Arc, and Santee – And Arapahoe* recognized the same unlimited reservation of the relevant rights set forth in the 1851 Fort Laramie Treaty, in addition to other extensive reservations of rights. 15 Stat. 635 (Apr. 29, 1868) ("1868 Fort Laramie Treaty").

The United States like wise addressed and reaffirmed the Tribe's Act of 1889, which states:

> That the following tract of land, being a part of the said Great Reservation of the Sioux Nation, in the Territory of Dakota, is hereby set apart for a permanent reservation for the Indians receiving rations and annuities at the Cheyenne River Agency, in the said Territory of Dakota, namely: Beginning at a point in the center of the main channel of the Missouri River, ten miles north of the mouth of the Moreau River, said point being the southeastern corner of the Standing Rock Reservation; thence down said center of the main channel of the Missouri River, including also entirely within said reservation all islands, if any, in said river, to a point opposite the mouth of the Cheyenne River; thence west to said Cheyenne River, and up the same to its intersection with the one hundred and second meridian of longitude; thence north along said meridian to its intersection with a line due west from a point in the Missouri River ten miles north of the mouth of the Moreau

River; thence due east to the place of beginning.

Act of March 2, 1889, ch. 206, 25 Stat. 888 § 4. "The reservation includes treaty lands, appurtenant waters, natural resources, grazing, timber, mineral rights, hunting and fishing rights, usufructuary rights, and absolute and undisturbed use, occupancy and ownership rights, self-government and treaty rights." ECF 240 at 15.

It is further well-established law that the United States creates vested water rights for Indian tribes when reservations are created. *See Winters v. United States*, 207 U.S. 564, 576-78 (1980). In particular, *Winters* recognized that the United States has an obligation to protect tribal reserved rights from impairment by upstream users. *Id.* at 522-78. Section 3002(9) of the Western Water Policy Act of 1992, Pub. L. 102-575, title XXX, statutorily re-affirms those obligations, stating that "the federal government recognizes its trust responsibilities to protect Indian water rights and assist Tribes in the wise use of these resources." The Corps itself recently recognized the Cheyenne River Sioux Tribe's treaty rights to hunt, fish, and irrigate farmland with water from the Missouri River constituted "water rights to both surface and ground water [that] constitute and [Indian Trust Asset]." ECF 208-1 at 15.

The Flood Control Act of 1944, Pub. L. 78-54, ch. 665, 58 Stat. 887 (Dec. 22, 1944), granted Defendant Army Corps of Engineers the authority to dam the Missouri River, including the Oahe Dam, and control over of the resulting federally-owned reservoir, Lake Oahe. Public Law 83-776, the Oahe Taking Act, authorized the Corps to seize over 100,000 acres of tribal lands along the Missouri near the proposed location of the Oahe Dam for the Oahe Reservoir (also known as Lake Oahe). Pub. L. 83-776, ch. 1260, 68 Stat. 1191.  Although it devastated the Cheyenne River Sioux Tribe and its people, the Act did not abrogate or alter the "rights of the Tribe or its members to use the waters of the Missouri River, the Tribe's natural resources, . . . hunting and

fishing rights . . . of the absolute and undisturbed occupancy and ownership, self-government and treaty rights not inconsistent with the Act." ECF 240 at 16 (citing 68 Stat. 1191, 1192-93, § VI, § 10). Furthermore, it is the standing statutory "policy of the United States[ ] that all Indian communities . . . be provided with safe and adequate water supply . . . ." 25 U.S.C. § 11632(a)(5). Because "Indian reserved water rights are vested property rights for which the United States has a trust responsibility," the Corps is bound to consider the reserved rights of the tribe when making administrative decisions. *Criteria and Procedures for the Participation of the Federal Government in Negotiations for the Settlement of Indian Water Rights Claims*, 55 Fed. Reg. 9223 (Mar. 12, 1990).

"As a general rule, Indians enjoy exclusive treaty rights to hunt and fish on lands reserved to them, unless such rights were clearly relinquished by treaty or have been modified by Congress." *United States v. Dion*, 476 U.S. 734, 738 (1986). As previously discussed, hunting and fishing rights were reserved by the Cheyenne River Sioux Tribe in the Fort Laramie Treaties of 1851 and 1868, as well as the Act of 1889, and reaffirmed in the mid-century Acts relating to the Oahe Dam and Lake Oahe. It is without question that the "Corps' duty to the Tribe is a moral obligation of the highest responsibility and trust that should be judged by the most exacting fiduciary standards." *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 207 (2011). As a result, the Corps owes just as great of a specific trust obligation to the Cheyenne River Sioux Tribe for their hunting and fishing rights as the Corps owes them for their water rights.

**B.      Department of Defense Instructions Are Binding Agency Guidance.**

The Army Corps of Engineers would like this Court to believe that Department of Defense Instructions are not binding upon it because of some standardized clause attempting to avoid further obligating themselves to Indian tribes means that they are not bound by the Instruction. ECF 446 at 16. However, Department of Defense Instructions are a common form of internal

regulatory guidance used by the Department of Defense to "[e]stablish[ ] policy and assign[ ] responsibilities within a functional area assigned to an OSD [Component head's charter, including defining the authorities and responsibilities of a subordinate official or element when these don't meet the criteria for a charter. May provide general procedures for implementing policy." Dep't of Def. Instruction 5025.01 at 17, Declaration of Nicole E. Ducheneaux, Exhibit A.

Despite their protestations, the Corps incorrectly asserts that § 6.2 of Dep't of Def. Instruction 4710.02 "establishes that the Instruction provides non-binding guidance." ECF 446 at 16. The Corps seems to base this assumption on the documents that the Instruction incorporates in § 6.2. ECF 131-3 at 4. These documents are:

a. *Dep't of Def.* Instruction 4715.3;
b. Secretary of Defense Policy on "Department of Defense American Indian and Alaska Native Policy," October 20, 1998;
c. Executive Order 13175, "Consultation and Coordination with Indian Tribal Governments," November 6, 2000;
d. Presidential Memorandum on "Government-to-Government Relationship with Tribal Governments," September 23, 1994;
e. Title 32, Code of Federal Regulations, Part 22, "DoD Grants and Agreements: Award and Administration," current edition; and
f. Section 1996a of Title 42, United States Code, American Indian Religious Freedom Act.

§ 6.2. ECF 131-3, Attach. C, at 1, 6. The Corps claims that some—not all—of these documents contain various statements limiting the enforceability of those documents against the United States government. ECF 446 at 16. Defendant Corps is correct in stating that Document C, Dep't of Def. Instruction 4715.3, does not apply to it because it is expressly excluded; further, Documents G and H are also not currently applicable. *Dep't of Def.* Instruction 4715.3 §§ 1(a), 2(b)(2). Nevertheless, Document D, the 1998 Policy, states:

> This policy is not intended to, and does not, grant, expand, create, or diminish any legally enforceable rights, benefits, or trust responsibilities, substantive or procedural, **not otherwise granted or created under existing law**. Nor shall this policy be construed to alter, amend, repeal, interpret, or modify tribal sovereignty, any treaty rights, or other rights of any Indian tribes, or to preempt, modify, or limit

the exercise of any such rights.

ECF 131, Attach. C, at 1, fn. 2 (emphasis added). This language, however, merely states that the Department of Defense is not recognizing any new rights to tribes, not that it is precluding the enforcement of existing rights. *Id*. Document E, Executive Order 13175, states that "[t]his order is intended only to improve the internal management of the executive branch, and is not intended to create  any right, benefit, or trust responsibility, substantive or procedural, enforceable at law by a party against the United States, its agencies, or any person." Exec. Order 13175 § 10, ECF 131-3, Attach. C, 67249, 67252. Once again, this language does not preclude the enforcement of existing trust responsibilities or rights, merely the creation of new ones. Furthermore, the fact that this Executive Order is only internally applicable to the executive branch in no way absolves the Corps of Engineers from compliance because it is an executive agency. Lastly, Document F, the 1994 Memorandum on Government-to-Government Relations, contains language almost identical to that of Document E, thus the same argument applies. Presidential Memorandum on "Government-to-Government Relationship with Tribal Governments, 59 Fed. Reg. 22951, 22952 (April 29, 1994). The Corps offers no case law to support their assertion that the fact that § 6.2 of Dep't of Def. Instruction 4710.02 incorporates these varied guidances means that Dep't of Def. Instruction 4710.02 itself is non-binding. Rather, this is just an attempt to avoid a trust responsibility the Corps is well aware exists, as discussed in the previous section of this brief.

**II.      Failure to Consult in Good Faith with the Tribe Harmed the Corps' Understanding of the Tribe's Utilization of their Hunting and Fishing Rights and the Environmental Justice Consequences of the Lake Oahe Crossing.**

### A.     The Corps Failed to Make a Good Faith Effort to Consult with the Cheyenne River Sioux Tribe on Remand.

The Corps disregarded the Tribe's efforts to become a cooperating agency and failed to participate meaningfully in the bi-lateral governmental relationship between the Tribe and the Corps. The Tribe began efforts to contact the Corps within 30 days of this Court's issuance of *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 255 F. Supp. 3d 101 (D.D.C.) (hereafter "*Standing Rock IV*"), at which time the Tribe requested to be considered a Cooperating Agency pursuant to 40 C.F.R. § 1501.6, and explicitly requested bilateral governmental consultation regarding the remand. RAR013700. Two months and three letters later, The Tribe finally heard from the Corps, who merely requested information and did not provide any response to CRST's three letters. RAR001366; RAR001330**.**   In fact, the Corps did not acknowledge the Cheyenne River Sioux Tribe's request for Cooperating Agency status until February 23, 2018, at which time the Corps informed the Tribe that the Corps "was not at a point in the [NEPA] process where [it] would consider adding a cooperating agency." RAR 006600. While the Corps has made its own allegation that the Tribe did not properly participate in the process, it does not deny the glaring and salient fact: the Cheyenne River Sioux Tribe sent no less than **six** written communications to the Corps requesting consultation and cooperation that went unaddressed for over 200 days before the Corps provided only the denial of their request for Cooperating Agency status. Importantly, the examples that the Corps cites that it believes demonstrate the Tribe's inadequate participation in this process (ECF 446 at 21-22), all stem from the Corps' own dysfunctional communication with the Tribe and its representatives, including the agency's obstinate refusal to respond to reasonable, proper letter requests for information and cooperation (ECF 436-1 at 7-16).  The Corps in its briefing belittles the Tribe's good faith efforts to engage in a process that is commensurate with the solemnity of United States' treaty obligations and the

importance of treaty rights to the Tribe and flippantly excuses itself for its failure to meet its

fiduciary obligation thusly:

> It is of no moment that Cheyenne[2] [sic] transmitted a couple letters of limited substance early in the remand period.  The Corps considered those letters, sought specific information, offered to hold several meetings, offered to transmit additional information, met with Cheyenne [sic] on those limited instances that Cheyenne [sic] agreed to meet, and fully considered the information Cheyenne belatedly submitted over 200 days after it was first requested.

ECF 446 at 23. This explanation endorses a consultation model that perverts bilateral, cooperative

government-to-government interaction.   The Corps admits in its briefing that it perceives its

consultation obligation to permit it to behave however it wants; it is acceptable to ignore Tribal

correspondence in whole; it is acceptable to establish arbitrary timelines that fail to consider Tribal

needs; it is acceptable to dictate terms and manners of communication without any Tribal input;

and it is acceptable to engage in a wholly one-sided dictatorial process that does not resemble any

definition of government-to-government consultation.  That is simply not sufficient.

---

[2] The Corps refers to the Tribe throughout its brief as "***Cheyenne***."  We are not the ***Cheyenne*** Tribe.  We are the ***Cheyenne River Sioux Tribe***, comprised of four ***Lakota*** or ***Sioux*** bands segregated on the ***Cheyenne River Sioux Reservation*** by the Act of March 2, 1889.  The Reservation is named for the river that constitutes our southern boundary, which is known in English as the Cheyenne River and in Lakota as *Wakpa Waste'* or "Good River."  *See*  Ernestine Chasing Hawk, *Cheyenne River Reservation: The People of Wakpa Waste' Oyanke*, Rapid City Journal, May 30, 2019, https://rapidcityjournal.com/news/latest/cheyenne-river-reservation-the-people-of-wakpa-waste-oyanke/article_6716bdf8-3980-51ea-940e-40f21a066125.html (last accessed Oct. 29, 2019).  The Cheyenne are a linguistically, culturally, and politically separate tribe organized as wholly separate federally-recognized tribes – the Cheyenne and Arapahoe Tribes of Oklahoma and the Northern Cheyenne Tribe of the Northern Cheyenne Indian Reservation.  See 84 Fed. Reg. 1,201-02 (Feb. 1, 2019).  While misusing such terminology may be of "no moment" to the Corps, this is a careless, offensive error that matters to the Tribe; and it is not the first time that the Corps has made this error in this litigation.  In prior summary judgment briefing, the Corps erroneously claimed that the administrative record demonstrated that it had considered comments provided by the Cheyenne River Sioux Tribe.  ECF 183 at 35.  In fact, the referenced material referred to the Northern Cheyenne Tribe, EA App. J., ECF 172-4 at 71757-71766.  *Id.*  It is a disrespectful and momentous mistake.

**B.      The Corps Does Not Properly Contextualize the Harm That Would Be Caused by Spill Impacts.**

The Corps all but concedes that the consultation process was insufficient in its briefing, but takes a no harm – no foul approach – *even if we did fail our consultation obligation, what's the difference?*  The difference is immense.  The Court in *Standing Rock IV* held that whether the Corps sufficiently addressed the effect of a spill on the Tribe's hunting and fishing rights, as well as the environmental justice impacts of the Corps' actions, depended upon whether the Corps had given a 'hard look' at those factors. *Standing Rock IV*, 255 F. Supp. 3d at 133-34.   "Hard look" was recently defined by the D.C. Circuit as follows: "[A]n agency has taken a 'hard look' at the environmental impacts of a proposed action if the statement contains sufficient discussion of the relevant issues and opposing viewpoints, and the agency's decision is fully informed and well-considered." ECF 239 at 38 (quoting *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1324-25 (D.C. Cir. 2015). The Court further remanded the issues of spill impacts on both usufructuary rights and on environmental justice for further explanation by the Corps. *Standing Rock IV*, 255 F. Supp. 3d at 140. The Corps submitted their remand filings to the Court on August 31, 2018 in their "Analysis of the Issues Remanded by the U.S. District Court for the District of Columbia Related to the Dakota Access Pipeline Crossing at Lake Oahe" ("Remand Report") and "Review and Analysis of the Tribes' Submissions." RAR000001-140 and RAR 000140-280.

The Remand Report acknowledges that the Corps still does not know what impacts a spill would have on the human population downstream of the spill impact area. Regarding fish consumption from a spill area, the Remand Report states that "[t]ribal members could have health issues if they consume fish, like walleye, pike, and catfish, that have eaten contaminated prey. . . . ***But not much is known about the actual impact of eating fish that have ingested oil.*"* RAR 90

10

(emphasis added). "Light oils and petroleum products can cause acute toxicity in fish, but the toxic event is generally over fairly quickly." *Id.* Further, the same report also notes that "[s]pill response activities could also impact fish," and that a spill "into Lake Oahe would likely cause a localized fish kill." *Id.* Somehow, however, the Corps finds that this information means that the impacts are not "a disproportionately high and adverse impact because of the low probability of a spill, and the limited extent of the expected effects," despite the fact that the Corps admits that they do not know what would happen if tribal members consumed fish that have ingested oil, and that both the oil itself and the spill efforts could cause a toxic event. *Id.* How can the Corps know that the impact on consumable fish populations will be "low risk" or "very short term" if they do not know what the impact actually is on human health? The Corps' responses on remand fail to meet the requirements of this Court in *Standing Rock IV* that the Corps "explain what the effects would be" on game and fish. ECF 239 at 42.

Importantly, moreover, the Corps' analysis fails to consider in any meaningful way, the extent to which such toxicity would impact the Tribal people who rely on the River. The reason that they do not address this question – which notably is ***the central question of this analysis*** – is that the Corps did not engage with the Tribe in consultation in a manner that permitted the Tribe to review the Corps' conclusions and data ahead of time and then engage in an informed discussion on the subject. As the Corps admits, the Corps unilaterally sought broad categories of information from the Tribe with no explanation, which it expected the Tribe to submit in a vacuum without having an opportunity to review the Corps' data or analysis. ECF 446 at 23. The Corps moreover expected the Tribe to do so within 30 days of its request. RAR013330. The Corps' consultation model, therefore, is one predicated on box-checking, not taking the requisite "hard look," honoring the United States' actionable obligation to preserve treaty rights, or showing even minimal respect

to the Tribes.  This is not sufficient consultation and insufficient consultation has consequences.

The same shortcomings are present in the Corps' remand analysis of a spill's impact on game on the Cheyenne River Sioux Reservation. These impacts are also de-contextualized from the true magnitude of their impact because the Corps glosses over Cheyenne River Sioux Tribal members' reliance upon these resources for day-to-day survival.  Significantly, the Corps concludes that "[o]il spills could have indirect effects on semi-aquatic animals by altering their habitat or food quality or availability," "big game and small game mammals prevalent in the Lake Oahe area are susceptible to harm from an oil spill if oil were to coat their fur" or, in the case of game birds and water fowl, their feathers, and "[i]ndirect effects such as habitat impacts, food source and nutrient cycle disruption, and alterations in ecosystem relationships are also possible in the event of a release." RAR 000041. Once again, the Corps justifies these impacts as acceptable because "the chance of an oil spill is low" and "[a]ny impact to game species from the cleanup response would likely be offset by the benefits of the response," despite not knowing the specific effects of such a toxic a spill on game animals, and more importantly Tribal subsistence hunters, to ingest. RAR 000042, 44. The Corps fails even to begin to consider how even a 'temporary' impact would be devastating for the Cheyenne River Sioux Tribe, despite knowing that Tribal members rely on these resources for *survival* as a major food source. RAR 000086, 88-90.  Would the Corps label similar impact thresholds differently if instead of 'fish' and 'game' the impacted resources were 'grocery stores?' For the Tribe, their hunting and fishing rights *are* an integral 'supermarket' that enable Tribal members to afford enough protein to survive. RAR 000007.

The Corps' lack of understanding is a product of its failure to meaningfully consult.  If the Corps had engaged in a consultation that included more than demanding Tribal information in a vacuum without providing the Tribe with data and analysis before-hand, and something more than

staring dumbly at Tribal experts pleading to make themselves understood, perhaps the Corps could have provided an actual serious analysis of this question.  Further, while impacts upon the Tribe's hunting and fishing rights may be of "no moment" to the U.S. Army Corps of Engineers in this proceeding, they are at the very center of the rights the Tribe reserved to itself in the operative Treaties and precisely why this Court found the Corps' prior neglect of these Supreme Laws of the Land to be arbitrary and capricious in *Standing Rock IV.*  The Corps' callous inattention to these issues on remand remains arbitrary and capricious.

In a similarly misguided manner, the Corps mistakenly believes that the duration of the impact is a sufficient mitigating factor for the environmental justice impacts of an oil spill on plant life, especially medicinal plant life. Despite the fact that the Corps recognizes that "[a]ll four Tribes identify practices, customs, or other uses that *could* be affected by impacts to Lake Oahe water quality, *including impacts to aquatic plants used for medicinal and spiritual purposes*, or from lake closures in areas used for ceremonies," the Corps somehow determines that temporary impacts are nevertheless justifiable even though the tribes view such impacts as "extremely detrimental to their way of life." RAR 000083 (emphasis added). Further, the Corps "considered [the Tribe's] input that these vegetation resources have been historically diminished and may be at increased risk" and is aware that a "large unmitigated release of oil near or in Lake Oahe would likely result in mortality of vegetation." RAR 000085. Nevertheless, the Corps persists in asserting that "spill impacts would be of a temporary and short duration," despite hearing feedback from tribes that the temporality of the impact does not mitigate its severity. RAR 000087. For some reason, the Corps is under the mistaken belief that damage to Tribal sacred resources would be acceptable to the Tribes if it is brief and 'minimized.'

Once again, the Corps' failure to grasp the impact of the "mortality of vegetation" that

Tribal people rely upon for traditional medicines and for religious practices derives from its refusal to participate in meaningful, bilateral, government-to-government consultation.  As set forth in the materials provided by the Tribe during the remand process, hunting, fishing, and the gathering of traditional plants and medicines is essential to the Lakota way of life.  RAR003461-3685.  These elements of Lakota life were crucial to Tribal physical survival when the Tribe reserved these rights for the Lakota people in the 1851 and 1868 Treaties because they provide the food that nourished Lakota bodies, the medicines that healed Lakota bodies, and the sacred plants that are so critical to sustaining Lakota spirituality.  As the Tribe emphasized in the remand process, moreover, these are not dead, bygone considerations.  Hunting, fishing, and the gathering of traditional plants and medicines *still* provides the food that nourishes Lakota bodies, the medicines that heal Lakota bodies, and the sacred plants that are essential to Lakota religion.  *Id.*  And hunting, fishing, and gathering of traditional plants are rights defined in living, legal operative documents that impose strict obligations upon the United States, that have never been abrogated and constitute the Supreme Law of the Land.

Finally, loss of Lakota Treaty rights, even for a short period of time, would devastate the Lakota people – not just because Lakota people still rely on hunting, fishing, and traditional medicine, but also because these are powerful and fundamental elements of Lakota culture and identity, which the United States worked to extinguish for 100 years.  It is not an overstatement to say that loss of these Treaty rights by introduction of harmful toxins would amount to cultural genocide.

## **CONCLUSION**

Based on the foregoing, the Cheyenne River Sioux Tribe respectfully requests that this Court grant its Motion for Summary Judgment and deny the U.S. Army Corps of Engineers' and Dakota Access's Cross Motions for Summary Judgment.

14

Dated:  October 30, 2019

Respectfully submitted,

/s/ Nicole E. Ducheneaux
Nicole E. Ducheneaux (DC Bar No. NE001)
Big Fire Law & Policy Group LLP
1404 South Fort Crook Road
Bellevue, NE 68005
Telephone: (531) 466-8725
Facsimile: (531) 466-8792
Email: nducheneaux@bigfirelaw.com

/s/ Tracey A. Zephier
Tracey A. Zephier, *pro hac vice*
Cheyenne River Sioux Tribe
Office of the Attorney General
P.O. Box 590
Eagle Butte, SD 57625
Telephone: (605) 964-6686
Facsimile (605) 964-1160
Email: crstag@protonmail.com

*Counsel for Cheyenne River Sioux Tribe*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 30, 2019, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of this filing to the attorneys of record and all registered participants.

*/s/ Nicole Ducheneaux*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE; YANKTON SIOUX TRIBE; ROBERT FLYING HAWK; OGLALA SIOUX TRIBE, | Case No. 1:16-cv-1534-JEB (and Consolidated Case Nos. 16-cv-1796 and 17-cv-267) |
| Plaintiffs, | |
| and | |
| CHEYENNE RIVER SIOUX TRIBE, ET AL. | DECLARATION OF NICOLE E. DUCHENEAUX IN SUPPORT OF INTERVENOR-PLAINTIFF CHEYENNE RIVER SIOUX TRIBE'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO THE U.S. ARMY CORPS OF ENGINEERS' AND DAKOTA ACCESS'S CROSS-MOTION FOR SUMMARY JUDGMENT |
| Intervenor-Plaintiffs, | |
| v. | |
| U.S. ARMY CORPS OF ENGINEERS, | |
| Defendant. | |
| and | |
| DAKOTA ACCESS, LLP, | |
| Intervenor-Defendant. | |

I, Nicole E. Ducheneaux, declare as follows:

1.      I am counsel of record for Intervenor-Plaintiff Cheyenne River Sioux Tribe.  I have been admitted to practice before this Court.

2.      A true and correct copy of the Dep't of Def. Instruction 5025.01 is attached hereto as **Exhibit A**.

I declare under the penalty of perjury that the foregoing is true and accurate to the best of my knowledge.

Dated: October 30, 2019

Nicole E. Ducheneaux

1

Case No. 1:16-cv-1534-JEB and
Consolidated Case Nos. 16-cv-1796 and 17-cv-267

CHEYENNE RIVER SIOUX TRIBE

EXHIBIT A



# DoD Instruction 5025.01

## DoD Issuances Program

| | |
|---|---|
| **Originating Component:** | Office of the Chief Management Officer of the Department of Defense |
| **Effective:** | August 1, 2016 |
| **Change 3 Effective:** | May 22, 2019 |
| **Releasability:** | Cleared for public release. Available on the Directives Division Website at https://www.esd.whs.mil/DD/. |
| **Reissues and Cancels:** | DoD Instruction 5025.01, "DoD Issuances Program," June 6, 2014, as amended |
| **Approved by:** | David Tillotson III, Assistant Deputy Chief Management Officer |
| **Change 3 (Administrative) Approved by:** | Edward J. Burbol, Chief, Directives Division, Washington Headquarters Services for the Chief Management Officer |

**Purpose:** This issuance, in accordance with the authority in DoD Directives (DoDDs) 5105.82 and 5105.53 and the July 11, 2014 Deputy Secretary of Defense Memorandum:

- Establishes policy, assigns responsibilities, and provides procedures for the development, coordination, approval, publication, and review of DoD issuances.

- Discontinues Secretary's policy memorandums as a type of DoD issuance used in the DoD Issuances Program.

- Establishes the DoD Issuances Website at https://www.esd.whs.mil/DD/ (unclassified) and https://directives.whs.smil.mil/ (classified) as the official DoD source for issuances and processing guidance. The DoD Issuances Website is referred to as "the Website" in this issuance.

- Establishes the Directives Portal System at https://apps.sp.pentagon.mil/sites/dodips/Pages/Site/Home.aspx (unclassified) and https://entapps.osd.smil.mil/sites/dodips/Pages/Site/home.aspx (classified) as the official site for requesting and obtaining issuance coordination and legal review. The Directives Portal System is referred to as "the Portal" in this issuance.

*DoDI 5025.01, August 1, 2016*
*Change 3 Effective May 22, 2019*

# TABLE OF CONTENTS

SECTION 1:  GENERAL ISSUANCE INFORMATION ....................................................................... 4
  1.1.  Applicability. .................................................................................................................... 4
  1.2.  Policy. ............................................................................................................................... 4
  1.3.  Information Collections. ................................................................................................... 5
  1.4.  Summary of Change 3. ..................................................................................................... 5
SECTION 2:  RESPONSIBILITIES .................................................................................................. 6
  2.1.  Chief Management Officer of the Department of Defense (CMO). ................................. 6
  2.2.  Director, WHS. ................................................................................................................. 6
  2.3.  General Counsel of the Department of Defense (GC DoD). ............................................ 7
  2.4.  IG DoD. ............................................................................................................................ 8
  2.5.  OSD Component Heads. ................................................................................................... 8
  2.6.  Directors of Defense Agencies and DoD Field Activities. .............................................. 9
  2.7.  DoD Component Heads. ................................................................................................... 9
  2.8.  Secretaries of the Military Departments, Chairman of the Joint Chiefs of Staff, and
        Chief, National Guard Bureau (NGB). ........................................................................... 10
SECTION 3:  ISSUANCE FOCAL POINTS ...................................................................................... 11
  3.1.  OSD Components, Military Departments, OCJCS, and NGB. ....................................... 11
  3.2.  OSD Components. ........................................................................................................... 11
SECTION 4:  GENERAL PROVISIONS .......................................................................................... 13
  4.1.  Issuances and the Issuance Process. ............................................................................... 13
    a.  Types. .......................................................................................................................... 13
    b.  Stages and Their Timelines. ........................................................................................ 13
    c.  Complex, Sensitive, or Controversial Issuances. ........................................................ 13
  4.2.  DoD Issuances Website. .................................................................................................. 13
    a.  Unclassified Website. .................................................................................................. 13
    b.  Classified Website. ...................................................................................................... 14
    c.  General Website Content. ............................................................................................ 14
  4.3.  Directives Portal System. ............................................................................................... 19
    a.  Coordination Requests. ............................................................................................... 19
    b.  Coordination Responses. ............................................................................................. 19
    c.  Legal Reviews. ............................................................................................................ 20
    d.  Timeline Tool. ............................................................................................................. 20
  4.4.  Distribution of DoD Issuances and Policy Memorandums. ........................................... 20
    a.  Releasability. ............................................................................................................... 20
    b.  Distribution. ................................................................................................................ 20
SECTION 5:  REVISION AND COORDINATION OF DOD ISSUANCES ............................................. 22
  5.1.  Currency, Changes, Cancellations, and Expirations. ..................................................... 22
    a.  DoDD, DoDI, DoDM, and AI Currency. ................................................................... 22
    b.  DTM Currency. ........................................................................................................... 22
    c.  Changes. ...................................................................................................................... 23
    d.  Cancellations. .............................................................................................................. 23
    e.  Expiration. ................................................................................................................... 24

5.2. Coordination Process - Standards and Requirements. ................................................... 24
    a. Required Coordinators. ................................................................................................. 24
    b. Coordination Type. ...................................................................................................... 24
    c. Coordination Duration. ................................................................................................ 25
    d. Coordination Level and Authorities. ........................................................................... 25
5.3. Coordination Process - Responses, Resolving Issues. ................................................... 26
    a. Coordination Responses. .............................................................................................. 26
    b. Making Comments. ....................................................................................................... 26
    c. Adjudicating Comments. ............................................................................................... 26
    d. Resolving Nonconcurs. ................................................................................................. 27
    e. Extension and Late Coordinations. ............................................................................. 28
    f. No Response to Coordination Request. ........................................................................ 28
    g. Recoordinations. .......................................................................................................... 28
SECTION 6:  LEGAL REVIEWS ................................................................................................. 30
6.1. Purpose of the Legal Review. ....................................................................................... 30
6.2. Types of Legal Reviews. ............................................................................................... 30
    a. During Development. .................................................................................................... 30
    b. LOR. ............................................................................................................................. 30
    c. LSR. .............................................................................................................................. 30
SECTION 7:  SPECIAL CONCERNS ............................................................................................ 32
7.1. Information Requirements, Forms, and FR. ................................................................. 32
    a. Issuances that Reference or Prescribe Information Collection Requirements. ............ 32
    b. Issuances that Reference or Prescribe DoD Internal Information Collections. ........... 32
    c. Issuances that Reference or Prescribe Forms. .............................................................. 32
    d. FR Issuances. ................................................................................................................ 32
7.2. Charters. ....................................................................................................................... 33
7.3. DoD Executive Agent (DoD EA) Designation. ............................................................. 33
7.4. Classified, FOUO, and Controlled Unclassified Information (CUI). ............................ 33
7.5. Unions Granted National Consultation Rights. ............................................................ 34
GLOSSARY .............................................................................................................................. 35
    G.1. Acronyms. .................................................................................................................. 35
    G.2. Definitions. ................................................................................................................. 36
REFERENCES ........................................................................................................................... 42

TABLES

Table 1. Timelines for Coordination and Completion of DoD Issuances .................................... 15
Table 2. Types of Issuances ........................................................................................................ 17
Table 3. Issuance Process Overview ........................................................................................... 18

*DoDI 5025.01, August 1, 2016*
*Change 3 Effective May 22, 2019*

# SECTION 1: GENERAL ISSUANCE INFORMATION

**1.1. APPLICABILITY.** This issuance applies to OSD, the Military Departments, the Office of the Chairman of the Joint Chiefs of Staff (OCJCS) and the Joint Staff, the Combatant Commands, the Office of the Inspector General of the Department of Defense (IG DoD), the Defense Agencies, the DoD Field Activities, and all other organizational entities within the DoD (referred to collectively in this issuance as the "DoD Components").

**1.2. POLICY.**

a. The DoD will have a DoD Issuances Program for the development, coordination, approval, publication, and review of issuances.

(1) Issuances will be used to codify DoD policy and guidance in accordance with this issuance, DoD Instruction (DoDI) 5025.13, and Administrative Instructions (AIs) 15 and 102.

(2) Issuances will consist of DoDDs, DoDIs, DoD manuals (DoDMs), directive-type memorandums (DTMs), and AIs. See Glossary for definitions and descriptions. All other DoD publications, as defined in this Glossary, must be converted into either DoDIs or DoDMs when they are reissued.

(3) Secretary's policy memorandums are no longer supported as DoD issuances by this issuance. Instead, memorandums prepared in accordance with Volume 1 of DoDM 5110.04 and signed by the Secretary or Deputy Secretary may be used to quickly establish or implement DoD policy and guidance outside of the DoD issuance process. These memorandums will be published on the Website to ensure there is one official central DoD repository for DoD policy. Policies established by these memorandums will be incorporated into appropriate DoD issuances within 12 months unless otherwise directed by the Secretary or Deputy Secretary.

b. The governing principles of the DoD Issuances Program are:

(1) The development and maintenance of DoD policy and guidance is a core DoD activity and is important to the entire Department.

(2) The Secretary and Deputy Secretary of Defense establish DoD policy primarily in issuances, since issuances provide the policy framework for the operation of DoD.

(3) OSD Component heads who also serve as Principal Staff Assistants may only establish DoD policy within their functional area of responsibility as part of the conditional authority delegated in their respective chartering DoDD and the process in this issuance.

(4) The development and maintenance of DoD policy requires a common departmental understanding of the policies and procedures governing the DoD Issuances Program. It requires DoD Component investment in fulfilling their responsibilities, such as collaborating in the development of issuances and providing timely coordination.

*DoDI 5025.01, August 1, 2016*
*Change 3 Effective May 22, 2019*

(5)  OSD Components must maintain an accurate policy framework within their functional area of responsibility that is updated to reflect changes as they occur to ensure the effective and efficient functioning of the DoD and its components.

(6)  DoD Components will provide prompt, accurate, and relevant comments in the coordination of DoD policy and guidance.

(7)  The issuance process will be timely, responsive, repeatable, and transparent. Methods to elevate critical issues or legal or political objections will be an integral part of the issuance process.

(8)  Whether developing or coordinating on issuances, DoD Components must place a high priority on processing issuances that codify policy or provide guidance as directed:

   (a)  By the Secretary or Deputy Secretary of Defense;

   (b)  In new or amended Executive orders or White House memorandums; or

   (c)  In new or amended statutes.

c.  DTMs must be issued **only** for time-sensitive actions as defined in the Glossary and **only** when time constraints prevent publishing a new issuance or incorporating a change to an existing issuance.  DTMs must not be used to permanently change or supplement existing issuances. They will be effective for no more than 12 months from the date signed, unless an extension is approved by the Director for Administration and Organizational Policy, Office of the CMO (DA&OP OCMO).

## 1.3.  INFORMATION COLLECTIONS.

a.  The routine coordination requests required in this issuance do not require licensing with a report control symbol in accordance with Paragraph 1b(9) of Enclosure 3 of Volume 1 of DoDM 8910.01.

b.  The DoD Issuances Agenda Report, referred to in Paragraph 2.5.c, has been assigned report control symbol DD-DCMO(A,Q)2607 in accordance with the procedures in Volume 1 of DoDM 8910.01.

## 1.4.  SUMMARY OF CHANGE 3.  The changes to this issuance are administrative and:

a.  Correct the total work days in Table 1.

b.  Update references, organizational titles, and URLs for accuracy.

*DoDI 5025.01, August 1, 2016*
*Change 3 Effective May 22, 2019*

## SECTION 2: RESPONSIBILITIES

### 2.1. CHIEF MANAGEMENT OFFICER OF THE DEPARTMENT OF DEFENSE (CMO). In addition to the responsibilities in Paragraph 2.5, the CMO:

a. Establishes DoD policy for developing, processing, coordinating, approving, publishing, and cancelling issuances.

b. Through the DA&OP OCMO:

(1) Oversees the DoD Issuances Program.

(2) Determines whether a proposed new or revised DoDD meets the criteria to be a directive as defined in the Glossary and provides an appropriate recommendation to the Secretary or Deputy Secretary of Defense.

(3) Coordinates on all issuances in accordance with the timelines in Table 1.

(4) Reviews and determines whether to approve requests for extensions to expiration dates of issuances forwarded by the Directives Division, Executive Services Directorate (ESD), Washington Headquarters Services (WHS).

c. Mediates unresolved coordination issues between OSD or DoD Component heads. Refers unresolved nonconcurs to the Deputy Secretary of Defense as appropriate.

d. Develops, maintains, and oversees chartering DoDDs (also referred to as "charters" in this issuance) through Organizational Policy and Decision Support, Office of the DA&OP OCMO (OP&DS/DA&OP/OCMO).

### 2.2. DIRECTOR, WHS. Under the authority, direction, and control of the CMO through the DA&OP OCMO and in addition to the responsibilities in Paragraphs 2.6 and 2.7, the Director, WHS:

a. Administers the DoD Issuances Program.

b. Approves AIs proposed by the WHS components and processed in accordance with this issuance.

c. Through the OCMO Primary Issuances Focal Point, convenes an OSD issuances planning meeting quarterly, or as needed. This meeting will address broad issues affecting the processing of issuances within the Department and review the OSD Component issuance plans.

d. Through the Chief of the Directives Division, ESD, WHS:

*DoDI 5025.01, August 1, 2016*
*Change 3 Effective May 22, 2019*

(1)  Establishes and maintains standard formats, templates, and procedures for developing and processing issuances and publishes them on the Website.  Approves or disapproves requests for waiver of issuance standards and procedures as described in this issuance and on the Website.

(2)  Helps the OSD Components determine whether an issuance should be published as a DoDD, DoDI, DoDM, DTM, or AI.

(3)  Provides guidance to help the DoD Components fulfill their responsibilities in the DoD Issuances Program.

(4)  Tracks and reports DoD Component compliance with the issuance process timelines in Table 1 as appropriate.  Also tracks and reports DoD Component compliance with negotiated timelines for complex, sensitive, or controversial issuances.  At a minimum, the applicable Primary Issuance Focal Points will be notified when timelines are not met.

(5)  Alerts and seeks comment on non-administrative changes to the issuance process or standards from the affected Issuance Focal Points before they are implemented.

(6)  Oversees the editorial and compliance review and electronic publication of issuances.  Oversees electronic publication of policy memorandums signed by the Secretary and Deputy Secretary of Defense.

(7)  Serves as the official record keeper for issuances.  Oversees the maintenance and preservation of documents that constitute the official records of issuances in accordance with AI 15 and DoDI 5015.02.

(8)  Establishes and maintains the unclassified and classified Website and Portal.

(9)  Processes issuances published or changed after March 25, 2012 for cancellation on the 10-year anniversary of their original publication dates in accordance with the March 25, 2012 Deputy Secretary of Defense Memorandum, unless an extension is approved.

## 2.3.  GENERAL COUNSEL OF THE DEPARTMENT OF DEFENSE (GC DOD).

In addition to the responsibilities in Paragraph 2.5, and in accordance with the procedures in Section 6, the GC DoD:

a.  As requested, provides legal advice to the office of primary responsibility (OPR) when drafting proposed issuances and during the adjudication of formal coordination comments.

b.  Provides all required legal reviews of issuances as described in Section 6 in accordance with the timelines in Table 1.

c.  Notifies the DA&OP OCMO, in writing through the Directives Division:

(1)  Of positions that, in addition to those listed in Paragraph 6.2., are authorized to provide legal sufficiency reviews (LSRs) on behalf of the GC DoD.

*DoDI 5025.01, August 1, 2016*
*Change 3 Effective May 22, 2019*

(2)  When changes in these positions or authorizations occur.

**2.4.  IG DOD.**  In addition to the responsibilities in Paragraph 2.5, the IG DoD coordinates on all issuances in accordance with the timelines in Table 1.  Among other things, the IG DoD reviews issuances to ensure findings in evaluations, audits, and investigations are appropriately addressed or implemented.

**2.5.  OSD COMPONENT HEADS.**  The OSD Component heads:

a.  Implement the DoD Issuances Program in their respective Components as described in this issuance and on the Website.

b.  Review existing issuances to determine whether any such issuances should be modified, streamlined, expanded, or canceled to keep DoD policy accurate, effective, and efficient.

c.  Provide the DA&OP OCMO with a report of Component issuances that will be developed or revised during the calendar year.  This report must be provided yearly by January 1 and updated, as necessary, each quarter.  The Components and Directives Division will use the report to help expedite issuance development as necessary.  A proposed timeline will be provided for each issuance identified as complex, sensitive, or controversial if the issuance cannot adhere to the timeline in Table 1.

d.  In their capacity as OPR for issuances within their functional area:

(1)  Develop, revise, coordinate, and cancel issuances in accordance with this issuance and the timelines in Table 1.

(2)  Approve new or revised issuances in accordance with this issuance.

(3)  Notify the Directives Division within 7 workdays upon discovering that policy or guidance must be codified in a DoD issuance as a result of:

(a)  Secretary or Deputy Secretary of Defense direction;

(b)  A new or amended Executive order or White House memorandum; or

(c)  A new or amended statute.

(4)  In accordance with Paragraph 4.1.c, notify the Directives Division immediately when an issuance is identified as complex, sensitive, or controversial.  This will preferably occur at the beginning of the issuance process but it can happen at any point during the process.  If the issuance cannot adhere to the timeline in Table 1, the OPR will provide a proposed timeline for processing the issuance to the Directives Division.  The timeline must include a specific proposed publication date.

e.  Review and coordinate on the proposed issuances of other OSD Components in accordance with the timelines noted in Table 1 and the procedures on the Website.

f.  Notify the DA&OP OCMO, in writing through the Directives Division:

(1)  Of positions that, in addition to those listed in Paragraph 5.2.d.(1) and 5.2.d.(2), are authorized to request or provide coordination on issuances on their behalf.

(2)  When changes in these positions or authorizations occur.

g.  Appoint at least one primary and one alternate Issuance Focal Point who will implement the processes in Section 3.  Provide written documentation of the appointments and any changes in those appointments to the DA&OP OCMO through the Directives Division.  The term "Issuance Focal Point" as used in this issuance will include both the primary and alternate unless otherwise specified.

(1)  The Primary Issuance Focal Point must be a senior level leader in the grade of O-7, Senior Executive Service (SES), Senior Leader, or equivalent and above.

(2)  The Alternate Issuance Focal Point should be senior in grade (O-6, General Schedule (GS) 15, or equivalent).

## 2.6. DIRECTORS OF DEFENSE AGENCIES AND DOD FIELD ACTIVITIES.  As delegated in their charter, the Directors of Defense Agencies and DoD Field Activities:

a.  Coordinate on issuances through their respective OSD Component heads.

b.  Establish and maintain, for the functions assigned, an appropriate publications system for regulations, instructions, and reference documents produced by the Defense Agency or DoD Field Activity as well as any changes made to those publications.

c.  Ensure all DoD Components and non-DoD federal agencies with equity in a Defense Agency or DoD Field Activity publication (see Glossary) are given the opportunity to coordinate when that publication is written, changed, or revised.

d.  Develop Defense Agency or DoD Field Activity publications with language that is clear and concise to the audience intended, in accordance with DoDI 5025.13.

e.  Serve as the official record keeper for their publications, by overseeing the maintenance and preservation of supporting and historical documents that constitute the official records of those publications in accordance with AI 15 and DoDI 5015.02.

## 2.7. DOD COMPONENT HEADS.  The DoD Component heads, except for the Directors of the Defense Agencies and DoD Field Activities:

a.  Implement the DoD Issuances Program in their respective Components as described in this issuance and on the Website.

b.  Review and coordinate on proposed issuances in accordance with the timelines noted in Table 1 and the procedures on the Website.

*DoDI 5025.01, August 1, 2016*
*Change 3 Effective May 22, 2019*

c. Ensure that the official records of all their coordinations on issuances, to include the original signed coordinations, are preserved and maintained in accordance with DoDI 5015.02.

## 2.8. SECRETARIES OF THE MILITARY DEPARTMENTS, CHAIRMAN OF THE JOINT CHIEFS OF STAFF, AND CHIEF, NATIONAL GUARD BUREAU (NGB). In addition to the responsibilities in Paragraph 2.7, the Secretaries of the Military Departments, Chairman of the Joint Chiefs of Staff, and Chief, NGB:

a. Designate at least one primary and one alternate Issuance Focal Point who will implement the processes in Section 3. Provide written documentation of the appointments and any changes in those appointments to the DA&OP OCMO through the Directives Division.

(1) The Primary Issuance Focal Point must be a senior level leader in the grade of O-7, SES, Senior Leader, or equivalent and above.

(2) The Alternate Issuance Focal Point should be senior in grade (O-6, GS-15, or equivalent).

b. Notify the DA&OP OCMO, in writing through the Directives Division:

(1) Of positions that, in addition to those listed in Paragraph 5.2.d.(1) and 5.2.d.(2), are authorized to request or provide coordination on issuances on their behalf.

(2) When changes in these positions or authorizations occur.

*DoDI 5025.01, August 1, 2016*
*Change 3 Effective May 22, 2019*

# SECTION 3: ISSUANCE FOCAL POINTS

## 3.1. OSD COMPONENTS, MILITARY DEPARTMENTS, OCJCS, AND NGB.

a.  The Primary Issuance Focal Point:

(1)  Engages with other Primary Issuance Focal Points as necessary to facilitate the resolution of nonconcurs and other disagreements, and to ensure the timeliness of issuance process actions, including development and coordination.

(2)  May provide documentation of Component withdrawal of a nonconcur in accordance with Paragraph 5.3.d.(2).

b.  The Alternate Issuance Focal Point:

(1)  Assists the Primary Issuance Focal Point as necessary.

(2)  Tracks and manages incoming issuance coordination requests and ensures coordination is completed by the suspense dates generated by the Portal and in accordance with this issuance.

(3)  Provides issuance status to the Primary Issuance Focal Point, Component head, and to the Directives Division.

(4)  Elevates coordination impasses or unresolved nonconcurs to the Primary Issuance Focal Point as appropriate.

(5)  Oversees and manages their respective Component's use of the Portal.

c.  The Issuance Focal Points will meet on a regular basis at the discretion of the Directives Division to discuss issuance status, non-administrative changes in issuance processing or standards, and any other items of interest or concern.

d.  These responsibilities cannot be delegated.

## 3.2. OSD COMPONENTS.

a.  Unless otherwise noted, the Primary Issuance Focal Point can delegate the duties in this paragraph to the Alternate Issuance Focal Point, but no lower.  In addition to the requirements in Paragraphs 3.1.a. and 3.1.c., the OSD Component's Primary Issuance Focal Point:

(1)  Oversees the status of issuances for which their Component is OPR.

(2)  Ensures that those issuances are processed in accordance with this issuance.

(3)  Attends OCMO quarterly DoD issuances planning meetings.  If unable to attend, the Primary Issuance Focal Point is responsible for finding a replacement Component representative

to attend.  The designated representative should be at the SES, general or flag officer, or equivalent level.

(4)  Notifies the Directives Division within 7 days upon discovering that policy or guidance must be codified in a DoD issuance as a result of Secretary or Deputy Secretary of Defense direction.

(5)  Notifies and provides justification to the Directives Division of:

(a)  Any issuances that must be expedited through the issuance process.

(b)  Any issuances that are complex, sensitive, or controversial.

(c)  Proposed timelines for development of complex, sensitive, or controversial issuances.

b.  In addition to the responsibilities in Paragraphs 3.1.b. and 3.1.c., the OSD Component's Alternate Issuance Focal Point:

(1)  Tracks and manages the issuances for which their Component is OPR to ensure they are in compliance with this issuance.

(2)  Submits issuances to the Directives Division at each stage of the process in accordance with this issuance and the Website.

(3)  Provides issuance status to their Component's Primary Issuance Focal Point, Component head, and to the Directives Division.

(4)  Attends the DoD Issuances Training Class within 3 months of their appointment and as appropriate for refresher training.  Encourages and helps facilitate the attendance of action officers (AOs) in the class.

(5)  Serves as a point of contact and source of information on issuance processing within the Component for AOs.

## SECTION 4: GENERAL PROVISIONS

### 4.1. ISSUANCES AND THE ISSUANCE PROCESS.

a. **Types.** There are five types of issuances: DoDDs, DoDIs, DoDMs, DTMs, and AIs. Table 2 includes information about the purpose and content, page length, and signature level of each type of issuance. Full definitions of the issuance types are in the Glossary.

b. **Stages and Their Timelines.** The issuance process has five stages as shown in Table 3. Table 1 contains information regarding the amount of time each stage will take. OPRs must follow the timelines. The CMO and OSD Component heads will be notified if issuances don't meet Table 1 timelines.

(1) Stage 1 must be timed for those issuances described in Paragraph 1.2.b.(9) and may be timed for all other issuances.

(2) The timelines may not apply if the issuance is identified as complex, sensitive, or controversial; however, the issuance must be actively worked.

(3) The Directives Division may close an issuance action, including actions for complex, sensitive, or controversial issuances if, in coordination with the OPR Issuance Focal Point, the Directives Division determines an issuance is not being actively worked.

c. **Complex, Sensitive, or Controversial Issuances.** These issuances may deal with politically or legally sensitive subjects, impact DoD Component activities, or impose requirements on or require approval or concurrence from government agencies outside DoD. The OPR or GC DoD will identify these issuances upon discovery to the Directives Division. The officials authorized to identify issuances as complex, sensitive, or controversial are the heads, principal deputies, and Primary Issuance Focal Points of the OPR and the GC DoD.

### 4.2. DOD ISSUANCES WEBSITE.

The Website is the official source for publication of all approved DoD issuances as well as policy memorandums signed by the Secretary and Deputy Secretary of Defense. If an issuance isn't published on the Website, it will not be considered authoritative. OSD Components will ensure that their issuances are submitted to Directives Division to be published on the Website. The Website addresses are on the first page of this issuance.

a. **Unclassified Website.** The unclassified Website contains:

(1) All current unclassified and For Official Use Only (FOUO) issuances. FOUO issuances are published under proper access controls in accordance with Volume 4 of DoDM 5200.01.

(2) Current unclassified memorandums signed by the Secretary and Deputy Secretary of Defense establishing policy as of the date of this issuance. These memorandums are published under proper access controls in accordance with Volume 4 of DoDM 5200.01.

*DoDI 5025.01, August 1, 2016*
*Change 3 Effective May 22, 2019*

(3)  A searchable database of cancelled issuances and policy memorandums signed by the Secretary or Deputy Secretary.

b.  **Classified Website.**  The classified Website contains:

(1)  The information available on the unclassified Website.

(2)  All current classified issuances and policy memorandums signed by the Secretary and Deputy Secretary of Defense, up to and including SECRET as of the date of this issuance.

c.  **General Website Content.**  To support a more agile and flexible issuance process, the Website will provide direction and guidance on the development, revision, coordination, approval, and publication of issuances.  Specifically, the Website will contain information regarding:

(1)  Format, writing style, and content standards.

(2)  Instructions for preparing, coordinating, and completing an issuance.

(3)  A DoD Component-specific list of positions authorized or delegated authority to initiate coordination, provide coordination, and approve issuances for publication.

(4)  An explanation of the issuance numbering system.

(5)  Templates, forms, common reference citations, and examples.

(6)  Use of plain language in all issuances, in accordance with DoDI 5025.13.

(7)  Topical online video training.

*DoDI 5025.01, August 1, 2016*
*Change 3 Effective May 22, 2019*

## Table 1.  Timelines for Coordination and Completion of DoD Issuances

| Stage | Stage | Action | Number of Workdays[3] | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | New or Reissuance | Substantive Changes | Cancellations | DTM |
| Development | 1A | AO drafts issuance | 30 | 20 | - | 20 |
| | 1B | AO coordinates issuance within OPR | 10 | 10 | 5 | 10 |
| Precoordination | 2A | Directives Division provides precoordination review | 5/8/11[3] | 5 | 1 | 5 |
| | 2B | AO revises issuance | 3/6/9 | 3 | - | 3 |
| | 2C | Directives Division reviews issuance before legal objection review (LOR)[1] | 2 | 2 | - | - |
| | 2C | Office of the General Counsel of the Department of Defense (OGC) provides LOR[1] | 10/15/15 | 10 | - | - |
| | 2D | AO incorporates OGC changes[1] | 3/6/9 | 3 | - | - |
| | 2D | AO gets DD Form 106 signed and requests formal coordination | 5 | 5 | 5 | 5 |
| Formal Coordination | 3A | Directives Division reviews issuance package before formal coordination | 2 | 2 | 1 | 2 |
| | 3A | Formal coordination | 15/18/21 | 10 | 10 | 10 |
| | 3B | AO revises issuance | 10/13/16 | 10 | 3 | 10 |
| Presignature | 4A | Directives Division provides presignature review | 4/7/10 | 4 | 2 | 4 |
| | 4B | AO revises issuance | 3/6/9 | 3 | 3 | 3 |
| | 4C | Directives Division reviews issuance before LSR | 2 | 2 | 1 | 2 |
| | 4C | OGC provides LSR | 25/30/30 | 15 | 10 | 15 |
| | 4D | AO incorporates OGC changes | 3/6/9 | 3 | 3 | 3 |
| | 4D | Defense Office of Prepublication and Security Review (DOPSR) provides clearance[2] | 2 | 2 | - | 2 |

1. LORs are optional except for Federal Register (FR) issuances.  LORs are not required for cancellations.
2. DOPSR review is required for unclassified issuances that will be released to the public only.
3. Numbers displayed in an x/y/z format are based on issuance page length:  the x number applies to issuances ≤ 35 pages, the y number applies to issuances 36 to 70 pages, and the z number applies to issuances ≥ 71 pages.  Numbers not using the x/y/z format are hard timelines and are not dependent on the size of an issuance.

*DoDI 5025.01, August 1, 2016*
*Change 3 Effective May 22, 2019*

Table 1.  Timelines for Coordination and Completion of DoD Issuances, Continued

| Stage | Stage | Action | Number of Workdays[3] | | | |
|---|---|---|---|---|---|---|
| | | | New or Reissuance | Substantive Changes | Cancellations | DTM |
| Signature and Publication | 5A | AO prepares issuance package and gets issuance approved for publication | 5/8/11 | 5 | 5 | 5 |
| | 5B | Directives Division publishes issuance | 2 | 2 | 2 | 2 |
| | | Total Work Days | 126/155/179 without LOR 141/178/205 with LOR | 101 without LOR 116 with LOR | 51 | 101 |

1. LORs are optional except for Federal Register (FR) issuances.  LORs are not required for cancellations.
2. DOPSR review is required for unclassified issuances that will be released to the public only.
3. Numbers displayed in an x/y/z format are based on issuance page length:  the x number applies to issuances ≤ 35 pages, the y number applies to issuances 36 to 70 pages, and the z number applies to issuances ≥ 71 pages.  Numbers not using the x/y/z format are hard timelines and are not dependent on the size of an issuance.

*DoDI 5025.01, August 1, 2016*
*Change 3 Effective May 22, 2019*

**Table 2.  Types of Issuances**

| Issuance Type | Purpose and Content | Length | Signature/Approval Level (Those "acting" or performing the duties of a vacant position whose incumbent is authorized to establish DoD policy or guidance may also approve the issuance for publication) |
|---|---|---|---|
| **DoDD** | **Establishes policy**, delegates authority, and assigns responsibilities.  Consists only of one or more of these elements: <br> - Non-delegable responsibilities assigned to the Secretary or Deputy Secretary of Defense <br> - Charters <br> - Assignment of **new** functions and resources between or among the DoD Components <br> - Assignment of DoD Executive Agents <br> - Matters of special interest to the Secretary or Deputy Secretary of Defense | No more than 12 pages, with no procedures. **Exception**:  chartering directives are not restricted. | - Secretary or Deputy Secretary of Defense <br> - Under Secretaries of Defense, as delegated in their respective charter, may approve charters for their subordinate OSD Presidentially-appointed, Senate-confirmed (PAS) positions when the charters are reissued. |
| **DoDI** | **Establishes policy** and assigns responsibilities within a functional area assigned in an OSD Component head's charter, including defining the authorities and responsibilities of a subordinate official or element when these don't meet the criteria for a charter.  May provide general procedures for implementing policy. | No more than 50 pages. If more than 50 pages are required, a DoDI will be separated into volumes. | OSD Component heads |
| **DoDM** | **Implements policy** established in a DoDD or DoDI by providing detailed procedures for carrying out that policy. | If more than 100 pages are required, a DoDM will be separated into volumes. | - OSD Component heads or their Principal Deputies <br> - OSD PAS officials |
| **DTM** | Serves the same purpose as a DoDD, DoDI, or DoDM but is issued **only** for time-sensitive actions that affect current issuances or that will become issuances. | No more than 20 pages including attachments. | - The Secretary or Deputy Secretary of Defense; <br> - If establishing policy, the OSD Component head; or <br> - If implementing policy, the OSD Component Principal Deputy or an OSD PAS official |
| **AI** | **Implements DoD policy** established in a DoDD or DoDI for the WHS-serviced Components or **establishes policy** for the WHS-serviced Components.  Provides general procedures for carrying out policy. | No more than 50 pages. | CMO or Director, WHS |
| **Issuance duration** | **DoDDs, DoDIs, DoDMs, and AIs** – Issuances published before March 25, 2012 should be updated or cancelled within 10 years of their publication date.  Issuances published or changed after March 25, 2012 will be processed for cancellation by the Directives Division on the 10-year anniversary of their original publication dates in accordance with the March 25, 2012 Deputy Secretary of Defense Memorandum, unless an extension is approved. <br> **DTMs** – DTMs will be incorporated into an existing issuance, converted to a new issuance, reissued, or cancelled within 12 months of the date approved, unless the DA&OP OCMO approves an extension. | | |

*DoDI 5025.01, August 1, 2016*
*Change 3 Effective May 22, 2019*

**Table 3.  Issuance Process Overview**



| Stage | Description |
|---|---|
| 1.  Development | 1A - AO drafts the issuance (should informally consult with legal counsel at this stage).<br>1B - AO coordinates issuance within the OPR.  The AO may also informally coordinate the issuance with external stakeholders, as appropriate. |
| 2.  Precoordination | 2A – Issuance Focal Point requests and the Directives Division provides a precoordination review of the issuance and DD Form 106.<br>2B - AO revises the issuance and DD Form 106 as necessary.<br>2C - Focal Point may request and OGC provide an LOR (see Section 6).  AO incorporates OGC comments.<br>2D – Focal Point gets DD Form 106 signed and requests release on the Portal (see Section 5) for coordination with applicable DoD Components. |
| 3.  Formal Coordination | 3A - Issuance is coordinated via the Portal with DoD Components<br>3B - AO adjudicates and incorporates comments in the issuance as appropriate.  Asks for OGC's legal advice, if necessary. |
| 4.  Presignature | 4A – Focal Point requests and the Directives Division provides a review of the issuance and supporting documentation.<br>4B - AO revises the issuance and supporting documentation as necessary.<br>4C – Focal Point requests and OGC provides the LSR (see Section 6).<br>4D – Focal Point requests DOPSR review of unclassified issuances for publication on the Website. |
| 5.  Approval and Publication | 5A - AO prepares issuance package and requests issuance approval through Focal Point.<br>5B – Focal Point sends the MS Word file of the issuance, along with the hard copy  or Adobe .pdf of the complete package to the Directives Division for publication to the Website and archiving. |

*DoDI 5025.01, August 1, 2016*
*Change 3 Effective May 22, 2019*

**4.3.  DIRECTIVES PORTAL SYSTEM.**  DoD Components must use either the unclassified or classified Portals for the actions described in this paragraph.  Detailed procedures for access to and use of the classified or unclassified Portals are on the Portal and the Website.  The Portal address is on the first page of this issuance.  DoD Components and OGC will use the Portal for reviews as described in this issuance and the Website process guidelines.

  **a.  Coordination Requests.**

   (1)  Posting.  The OSD Components, through their Issuance Focal Point, will post the issuance to the Portal for coordination.  The issuance will be held until reviewed and approved for release by the Directives Division.

    (a)  Unclassified and FOUO issuances (including the DD Form 106, "DoD Issuances Program Coordination  Initiation," and DD Form 818, "DoD Issuance Coordination Response") will be posted on the unclassified Portal.

    (b)  Classified issuances up to and including SECRET (including the DD Form 106 and DD Form 818) will be posted on the classified Portal.  The unclassified DD Form 106 must also be posted to the unclassified Portal so coordinating officials who don't normally work on the classified network are notified that a classified issuance needs coordination.

   (2)  Directives Division Review.  Upon review and approval by the Directives Division, the coordination request will be distributed by the Directives Portal System to the DoD Components selected on the DD Form 106.

   (3)  Coordinators Without Portal Access.  The OPR must distribute coordination requests directly to any coordinators who don't have access to the Portal (often identified as "Other" in item 11c of the DD Form 106).  A list of organizations with Portal access is on the Website.  The OPR may send requests for non-DoD federal agency coordination through the DoD Executive Secretary to the Executive Secretary of the desired federal agency.

   (4)  Suspense Date.  The coordination period begins when the coordination request is released on the Portal and is sent to the requested coordinators.  The suspense date is automatically calculated by the Portal using the timelines in Table 1 or the specific timelines agreed to between the OPR and the Directives Division for complex, sensitive, or controversial issuances.  The suspense date is displayed on the Portal and in the coordination request sent by the Portal.

  **b.  Coordination Responses.**

   (1)  All DoD Components must record their formal coordination on the Portal by providing the appropriate level signature on the DD Form 818.  Coordinators also have the option to post a signed memorandum that includes the coordinating official's title and signature date on the Portal.  All official comments must be recorded on the DD Form 818 and must be posted to the Portal in Microsoft Word format by the suspense date.  Classified issuance coordination requests can only be responded to on the classified Portal.

*DoDI 5025.01, August 1, 2016*
*Change 3 Effective May 22, 2019*

(2)  Coordinators that don't have Portal access may return copies of their coordinations (DD Form 818 or signed memorandum) to the OPR by mail, e-mail, or fax by the suspense date. The OPR must send copies of these coordinations to the Directives Division at whs.mc-alex.esd.mbx.dod-directives@mail.mil.

c.  **Legal Reviews.**  OGC must use the Portal to report the results of LORs and LSRs.  See Section 6 for procedural details.

d.  **Timeline Tool.**  A tool is available on the Portal to help project the time required to complete an issuance based on where the issuance is in the issuance process.  This tool should be used to project the timeline for completing complex and sensitive issuances.

## 4.4.  DISTRIBUTION OF DOD ISSUANCES AND POLICY MEMORANDUMS.

a.  **Releasability.**

(1)  **Options.**  Release and distribution of issuances and policy memorandums will be either "cleared for public release" or "not cleared for public release" (see Glossary).  Issuances and policy memorandums published on the unclassified Website, including those that are unclassified but available only to users with valid DoD public key infrastructure (PKI) authorization, must be cleared for public release by DOPSR in Stage 4D of the issuances process (see Table 3).

(2)  **For Issuances.**  The issuance OPR must:

(a)  Determine the appropriate release and distribution option for each issuance in accordance with the review and clearance requirements in DoDD 5230.09 and DoDI 5230.29.

(b)  Indicate the releasability of the issuance in Item 5 of the DD Form 106; in the issuance itself; and in the action memorandum requesting issuance approval.  The action memorandum must also include a statement that the requirements of DoDD 5230.09 and DoDI 5230.29 have been met.

(3)  **For Policy Memorandums.**  Policy memorandums signed by the Secretary or Deputy Secretary of Defense won't be accessible by the public through the Website.  If an OPR wants to authorize the public release of a policy memorandum, the OPR must obtain approval from the DoD Executive Secretary and then complete the review and clearance requirements in DoDD 5230.09 and DoDI 5230.29.

b.  **Distribution.**

(1)  The Directives Division will distribute issuances by publishing them on the unclassified or classified Website, according to their releasability.  The DoD Components won't download or publish issuances on their websites.  Instead, they will link to the Website.  The Correspondence Management Division, ESD, WHS, will continue to distribute memorandums signed by the Secretary and Deputy Secretary of Defense.  The Directives Division will also

electronically distribute those memorandums establishing policy by publishing them on the Website, since that serves as the official central repository for DoD policy.

(a)  Access to FOUO issuances will be limited to individuals with a valid DoD PKI card in accordance with DoDI 8520.02.

(b)  Access to policy memorandums signed by the Secretary or Deputy Secretary of Defense will generally be limited to individuals with a valid DoD PKI card in accordance with DoDI 8520.02.

(c)  For classified issuances, the unclassified Website will provide the issuance type, number, date, unclassified title, OPR, and releasability statement identifying the issuance as classified.

(d)  For issuances that are released and distributed only by the originating OSD Component, the unclassified and classified Websites will provide the issuance type, number, date, unclassified title, OPR, and the OPR contact information.  The OPR will distribute copies of these issuances as appropriate.

(2)  The Directives Division may return approved issuances to the OPR's Primary Issuance Focal Point unpublished if critical issues are identified, including:

(a)  Version control failure;

(b)  Authority approving the issuance was not notified of unresolved high priority issues (e.g., unresolved nonconcurs) identified during earlier stages of review;

(c)  Unresolved legal comments identified by OGC during LSR;

(d)  Changes (other than administrative) made after LSR was completed; or

(e)  Responsibilities were added to a DoD or OSD Component other than the OPR and the Component concerned was not given the chance to comment on the change.

*DoDI 5025.01, August 1, 2016*
*Change 3 Effective May 22, 2019*

# SECTION 5: REVISION AND COORDINATION OF DOD ISSUANCES

## 5.1. CURRENCY, CHANGES, CANCELLATIONS, AND EXPIRATIONS.
On the first workday of each quarter, the Directives Division will provide the OSD Component Issuance Focal Points with a list of the issuances for which their Component is the OPR that are due to be reissued or require a change or cancellation within the next 18 months.

### a. DoDD, DoDI, DoDM, and AI Currency.

(1) Currency. An issuance is considered current when the information contained within it is accurate and in effect according to the criteria in Paragraph 5.1.a.(2). Issuances are living documents that should be regularly maintained. Changes are permitted and encouraged and will be processed in accordance with Paragraph 5.1.b and the standards on the Website.

(2) Currency Criteria. The OSD Component heads must ensure that each issuance for which they are the OPR is reviewed annually and revised, changed, or cancelled as appropriate. During the review, the OSD Component heads will ensure that:

(a) Each policy statement is verified as consistent with law and the policies of the current administration (the President, Secretary and Deputy Secretary of Defense, and OSD Component head).

(b) Each assignment of authority or responsibility is verified to be a current requirement and is appropriately assigned.

(c) The references are valid, correctly titled, and the most current versions are cited.

(d) The organizational entities cited throughout the issuance are accurate.

(3) Reissue. An issuance nearing its 10-year anniversary of publication must be reissued if it is still required. Whenever an issuance is no longer required, it must be cancelled in accordance with Paragraph 5.1.c.

### b. DTM Currency. The OSD Component heads:

(1) Will, before the DTM's expiration (12 months from the publication date):

(a) Incorporate the DTM into an existing DoDD, DoDI, AI, or DoDM;

(b) Convert the DTM to a new DoDD, DoDI, AI, or DoDM; or

(c) Cancel the DTM.

(2) May request DA&OP OCMO approval of an extension for a DTM and must provide compelling justification to support the extension. The Chief, Directives Division, may approve requests for DTM extension, and will forward recommended disapprovals to the DA&OP OCMO for final determination.

(3)  Must prepare and process a new DTM or issuance if the extension request is disapproved by the DA&OP OCMO.

(4)  May, if necessary, request that administrative changes be made to DTMs. Substantive changes to DTMs will not be supported without compelling justification since they are of limited duration and must be incorporated into a new or existing issuances within 12 months of publication.

c.  Changes.  A change amends less than 25 percent of the content of an existing issuance.

(1)  The two types of changes, administrative and substantive, are defined in the Glossary.

(a)  Administrative changes to issuances don't require formal coordination or legal reviews.

(b)  Substantive changes:

<u>1</u>.  Must be coordinated at the appropriate level for the type of issuance being changed in accordance with Paragraphs 5.2.d.(1) and 5.2.d.(2).

<u>2</u>.  Must follow the standard issuance process, unless otherwise determined by the Chief, Directives Division.

<u>3</u>.  Require an LSR; an LOR is optional.

<u>4</u>.  Will be coordinated with the appropriate DoD Components, as determined by the Directives Division in consultation with the OPR.

(2)  Coordinating agencies will comment on changing text (in red) only.

(3)  Upon receipt of the appropriate OSD official's approval of a change, the Directives Division will verify the changes, add the issuance change number and effective date beneath the original date, and publish the issuance on the Website according to its releasability statement as described in Paragraph 4.4.a.  The issuance keeps its original publication or approval date and, if applicable, the original signature.

d.  Cancellations.

(1)  An issuance will be cancelled when the OPR determines it has served its purpose, is no longer needed, and isn't appropriate for incorporation into a new, revised, or existing issuance.

(2)  Cancellations must follow the standard issuance process, unless otherwise determined by the Chief, Directives Division.  Cancellation of issuances not being incorporated into a new, revised, or existing issuance:

(a)  Do not require an LOR or DOPSR clearance.

(b) Must be coordinated at the appropriate level for the type of issuance being cancelled in accordance with Paragraphs 5.2.d.(1) and 5.2.d.(2).

(c) Must list all Components that were identified as primary coordinators on the last action (issuance, revision, etc.) as collateral coordinators on the DD Form 106 in order to expedite processing.

(d) Require an LSR to make sure an issuance is not mistakenly cancelling policy or guidance still required to implement a statute or Executive order.

(3) Upon receipt of the appropriate OSD official's approval of a cancellation, the Directives Division will verify the cancellation requirement, remove the issuance from the list of current issuances, and add it to the list of cancelled issuances on the Website.

e. **Expiration.** Issuances published before March 25, 2012 should be updated or cancelled within 10 years of their publication date. An issuance published or changed after March 25, 2012 may be processed for cancellation by the Directives Division on the 10-year anniversary of its original publication date in accordance with the March 25, 2012 Deputy Secretary of Defense Memorandum, unless an extension is approved. The Chief, Directives Division, may approve requests for issuance extension, and will forward recommended disapprovals to the DA&OP OCMO for final determination.

## 5.2. COORDINATION PROCESS - STANDARDS AND REQUIREMENTS.

a. **Required Coordinators.**

(1) OSD and DoD Component heads with equity in an issuance must be listed on the DD Form 106 as coordinating officials. OSD and DoD Component heads specifically assigned responsibilities must be designated as primary coordinators as described in Paragraph 5.2.b.

(2) OPRs must also coordinate with any non-DoD federal agencies having equity in an issuance in accordance with Paragraph 4.3.a(3). This coordination may be listed on the DD Form 106 in Item 11, labeled "Other" or handled separately as appropriate.

(3) DTMs must be coordinated with the mandatory coordinators, at a minimum, and must receive an LSR. Due to the time-sensitive nature of DTMs, all coordinators (except for mandatory) will be collateral.

b. **Coordination Type.** The three types of coordinations are mandatory, primary, and collateral.

(1) Mandatory. An "M," pre-filled on the DD Form 106, indicates that coordination with IG DoD and the CMO is mandatory.

(2) Primary. A "P" indicates that an official has equity in the issuance and coordination is desired. If coordination isn't provided by the suspense date, the OPR must continue with the issuance approval process in accordance with Paragraph 5.3.e. Issuances must not be delayed

waiting for late coordination or comments; however, the missing coordination must be addressed in the action memorandum requesting issuance approval so the approving official can make an informed decision when approving or disapproving an issuance.

(3) Collateral. A "C" indicates that an official has no apparent equity in an issuance, but is being provided an informational copy and has the option to comment. An issuance must not be delayed waiting for late coordination or comments from a collateral coordinator. Collateral coordinators will be included on the list of coordinating officials only if they provide coordination by the suspense date.

c. **Coordination Duration.** Issuances that exceed the timeline in Table 1 risk becoming obsolete with current DoD and U.S. policy. In order to prevent this from happening, coordinations are valid for a limited time as described in this paragraph.

(1) Coordinations are considered valid for:

(a) DoDDs, DoDIs, DoDMs, and AIs. Up to 60 working days (3 months) from the date of the Portal coordination suspense.

(b) DTMs. Up to 50 working days (9 weeks) from the date of the Portal coordination suspense.

(2) Coordinations for FR issuances are valid for an unlimited period of time as long as the associated rulemaking action is being actively worked by the OPR.

d. **Coordination Level and Authorities.**

(1) DoDDs, DoDIs, and DTMs Establishing Policy. Those officials authorized to coordinate on DoDDs, DoDIs, and DTMs establishing DoD policy include:

(a) The OSD Component heads and their Principal Deputies.

(b) The Chairman and Vice Chairman of the Joint Chiefs of Staff and the Director and Vice Director of the Joint Staff.

(c) The Combatant Commanders (coordination must occur through the OCJCS).

(d) The Secretaries, Under Secretaries, Assistant Secretaries, General Counsels, and Administrative Assistants of the Military Departments.

(e) The Chief and Vice Chief, NGB.

(2) DoDMs, AIs, and DTMs Implementing Policy. In addition to the officials listed in Paragraph 5.2.d(1), coordination may be provided by:

(a) The OSD PAS officials and the Deputy Assistant Secretaries of Defense.

(b) The DoD Deputy IGs.

*DoDI 5025.01, August 1, 2016*
*Change 3 Effective May 22, 2019*

(c)  The Directors and Vice Directors of the Joint Staff Directorates.

(3)  Delegated Authorities.  A listing of other officials who have been delegated coordination authority in accordance with Paragraphs 2.5.f and 2.8.b is available on the Website ("Authorized Component Coordinators").

## 5.3.  COORDINATION PROCESS - RESPONSES, RESOLVING ISSUES.

a.  Coordination Responses.  The only acceptable types of responses during formal coordination are:

(1)  Concur Without Comment.

(2)  Concur With Comment.

(3)  Nonconcur With Comment.  Coordinators must specify on the DD Form 818 which comments are grounds for the nonconcur.  A nonconcur is typically used only when an issuance contains:

(a)  A violation of the law or contradiction of Executive Branch policy or of existing policy in a DoDD, DoDI, or other instrument approved by the Secretary or Deputy Secretary of Defense.

(b)  An unnecessary risk to safety, life, limb, or DoD materiel; waste or abuse of DoD appropriations; or unreasonable burden on a DoD Component's resources.

(4)  No Comment.  A coordinator responds to a request for coordination but does not concur, nonconcur, or comment.  This response signifies the coordinator has reviewed the issuance and does not have an equity interest in it.

b.  Making Comments.  All coordinators and AOs must use the DD Form 818 to record and adjudicate official comments.

(1)  Comments included may:

(a)  Indicate that information in the issuance (or the issuance as a whole) appears to be or is potentially unnecessary, incorrect, misleading, confusing, or inconsistent; or

(b)  Address a DoD Component's disagreement with the proposed responsibilities, requirements, or procedures.

(2)  If nonconcurring, coordinators must specify on the DD 818 which of their comments are the basis for their nonconcur.

c.  Adjudicating Comments.  The OPR AO will adjudicate the coordinators' comments in accordance with the instructions on the DD Form 818-1, "Consolidated DoD Issuance Comment Matrix," and guidance on the Website.

*DoDI 5025.01, August 1, 2016*
*Change 3 Effective May 22, 2019*

d. **Resolving Nonconcurs.**

(1) The OPR **must** attempt to resolve a nonconcur before an issuance is approved and published. If the nonconcur itself is in violation of law, DoD policy, or Executive order, the OPR only needs to notify the coordinator.

(2) If the OPR already has a resolution process in effect, it may use that process to resolve the nonconcur in a timely manner, within 15 workdays from the coordination suspense date. If that is not the case, OPRs will take the following steps:

(a) Step 1. AOs will engage the point(s) of contact who made the comment leading to the nonconcur to resolve the issue. If it is not mutually resolved 5 work days from the coordination suspense date, AOs will notify their Alternate Issuance Focal Point. The Alternate will engage the Primary Issuance Focal Point for assistance as needed. In the case of a charter, the Alternate must also engage the Director, OP&DS/DA&OP/OCMO, who will work with the Primary to try to resolve the nonconcur.

(b) Step 2. The OPR Primary Issuance Focal Point will contact the Primary Issuance Focal Point of the nonconcurring Component to try to resolve the nonconcur. If it is not mutually resolved within a total of 10 work days from the coordination suspense date, the OPR Primary Issuance Focal Point will either:

1. Decide to proceed despite the unresolved nonconcur; or

2. Request assistance from the OPR's approving authority (as defined in the Glossary) or the approving authority's Principal Deputy.

(c) Step 3. If the Primary Issuance Focal Point chooses to involve the approving authority or the approving authority's Principal Deputy, either of those individuals will contact their counterpart in the nonconcurring Component and request the CMO facilitate resolving the nonconcur. If it is not mutually resolved within 15 work days from the coordination suspense date, the CMO will:

1. Advise the OPR approving authority or the approving authority's Principal Deputy to proceed despite the unresolved nonconcur; or

2. Engage the Deputy Secretary of Defense requesting a decision to resolve the nonconcur.

(3) Resolution of a nonconcur must be documented by the coordinating DoD Component's written formal withdrawal of their nonconcur except when the comments identified as the basis for the nonconcur are accepted in full and incorporated into the issuance (in which case, no formal withdrawal of the nonconcur is required). The coordinating DoD Component will provide the nonconcur withdrawal to the Directives Division. The written formal withdrawal from the coordinating agency will be in the form of either a signed DD Form 818, a signed memorandum, or digitally signed e-mail. It may be signed:

(a) At the same (or higher) level as the original coordination; or

*DoDI 5025.01, August 1, 2016*
*Change 3 Effective May 22, 2019*

(b)  By the Primary Issuance Focal Point.  This authority may **not** be delegated.

(4)  If the OPR is unable to resolve a nonconcur:

(a)  The nonconcur and the steps taken to resolve the nonconcur as described in Paragraph 5.3.d.(1) must be addressed in the action memorandum.  Both sides of the disagreement must be clearly and succinctly addressed in the memo, along with a recommendation for the approving authority to make an informed decision to approve or disapprove the issuance.

(b)  If the approving authority chooses not to approve the issuance with the unresolved nonconcurs and the steps described in Paragraphs 5.3.d(1)(a) and (b) have been taken, the approving authority must engage his or her counterpart as described in Paragraph 5.3.d(1)(c).

e.  **Extension and Late Coordinations.**

(1)  The OPR may grant an extension to the timeline in Table 1, with the concurrence of Directives Division, but the timeline for measuring the progress of an issuance will not be modified.

(2)  If a primary coordinator provides coordination after the Portal suspense date, the OPR should consider including the coordination and comments; however, it isn't required if it delays progress of the issuance.

(3)  The action memorandum requesting issuance approval must acknowledge receipt of the late coordination and explain, if necessary, why the OPR proceeded without including the comments so the approving authority can make an informed decision to approve or disapprove the issuance.  The OPR should consider incorporating the late comments in the next update or substantive change to the issuance.

f.  **No Response to Coordination Request.**  If primary coordinators don't respond by the suspense date, either to the Portal or (for those coordinators without access to the Portal) directly to the AO, the OPR will:

(1)  Enter "No Response" next to that primary coordinator on the list of coordinating officials that is submitted with the action memorandum.

(2)  Explain in the action memorandum why it is appropriate for the signature authority to approve the issuance for publication without a primary coordinator's response so the approving authority can make an informed decision to approve or disapprove the issuance.

g.  **Recoordinations.**

(1)  The Directives Division may require recoordination of an issuance to ensure that the DoD Components with equities have the opportunity to comment if the OPR made substantial changes to an issuance resulting from the comment adjudication process (e.g., new policy was established or responsibilities assigned outside the OPR).

*DoDI 5025.01, August 1, 2016*
*Change 3 Effective May 22, 2019*

(2) The Directives Division will identify these matters to the OSD Component's Alternate Issuance Focal Point and discuss the need to recoordinate the issuance.

# SECTION 6:  LEGAL REVIEWS

**6.1.  PURPOSE OF THE LEGAL REVIEW.**  The general purpose of the legal review is to analyze issuances to determine whether they are consistent with applicable law, identify and address legal risks, and improve legal defensibility.

**6.2.  TYPES OF LEGAL REVIEWS.**  LORs and LSRs must be conducted by the OGC at the Associate Deputy General Counsel level or above.  LORs are approved at the Associate Deputy General Counsel level or higher.  The GC DoD, Principal Deputy GC DoD, Deputy General Counsel, or a delegated authority will approve LSR determinations.

   **a.  During Development.**  It is the OPR's responsibility to work with the relevant attorney in OGC during the initial development and drafting of the issuance as appropriate.

   **b.  LOR.**

      (1)  OGC provides LORs at the OPR's request and for all issuances that are currently codified in the Code of Federal Regulations (CFR).  The LOR will take place after precoordination review and before posting the issuance on the Portal for formal coordination.

      (2)  Except for issuances that have previously been identified as requiring publication in the FR, the OPR retains the right to withdraw their request for LOR at any time before the LOR finding is made and post the issuance for formal coordination.  If the OPR chooses that option, they must notify OGC immediately of the review termination.

      (3)  If OGC determines that an issuance is legally objectionable or it is returned to the OPR for action without a determination, it must be reworked.  The reviewing Associate Deputy General Counsel will identify the concerns with the issuance and recommend corrective actions.

         (a)  Once the issuance is updated to accommodate OGC's findings and comments, the OPR will provide a copy of the updated issuance to the Directives Division to determine if the issuance must go back to the precoordination stage.

         (b)  At a minimum, the corrected issuance must be submitted to OGC through the Portal for a second LOR.

   **c.  LSR.**

      (1)  OGC will provide LSRs for all issuances in accordance with the Portal suspense date.  The OGC Issuance Focal Point should notify the OPR's Issuance Focal Point if the suspense date won't be met.

      (2)  If OGC determines an issuance is not legally sufficient or it is returned to the OPR for action without a determination, it must be reworked.  The reviewing OGC attorney will identify the concerns with the issuance and recommend corrective actions.

(a)  Once the issuance is updated to accommodate OGC's findings and comments, the OPR will provide a copy of the updated issuance to the Directives Division to determine if the issuance must be recoordinated or go back to the precoordination stage.

(b)  At a minimum, the corrected issuance must be submitted to OGC through the Portal for another LSR.

*DoDI 5025.01, August 1, 2016*
*Change 3 Effective May 22, 2019*

# SECTION 7: SPECIAL CONCERNS

## 7.1. INFORMATION REQUIREMENTS, FORMS, AND FR.

a. **Issuances that Reference or Prescribe Information Collection Requirements.** The DoD Components must comply with DoDI 8910.01 and Volumes 1 and 2 of DoDM 8910.01, when referencing or prescribing a DoD information collection (as defined in DoDM 8910.01) in an issuance.

b. **Issuances that Reference or Prescribe DoD Internal Information Collections.**

(1) In accordance with Volume 1 of DoDM 8910.01 DoD internal information collections prescribed in issuances may be coordinated with the issuance to prevent duplication of effort.

(2) Cost information for the collection must appear on the DD Form 106.

(3) If the DD Form 106 is submitted to the Directives Division before formal coordination without cost information for the collection or with cost information that was not obtained in accordance with guidance provided to the OPR by the Directives Division, the request for formal coordination will be denied. The OPR will have to correct the DD Form 106, have the corrected version signed, and request formal coordination again.

c. **Issuances that Reference or Prescribe Forms.** The OSD Components must comply with DoDI 7750.07 and DoD 7750.07-M when referencing a form in an issuance.

d. **FR Issuances.**

(1) Issuances may require publication as a rule in the FR in accordance with AI 102.

(2) When drafting or updating an FR issuance, the OPR will check first, in consultation with OGC or the Advisory Committee, Regulatory, and Audit Matters Office, OCMO, to see if any policy or procedures affecting the public are already codified in the CFR. If they are, the issuance should cite that CFR rule as a reference rather than repeating the codified language, so that the DoD issuance will only contain policy and procedures affecting DoD.

(3) FR issuances will follow the standard issuance process; however, the timelines in Table 1 will be affected.

(4) The OSD Components must comply with this issuance and guidance on the Website when preparing FR issuances and AI 102 when preparing the associated rule. In accordance with AI 102, an FR issuance cannot be published on the Website until the Office of Management and Budget has approved publication of its corresponding interim final rule or final rule.

(5) When an FR issuance has served its purpose and is no longer required, the OPR must simultaneously:

(a) Cancel the FR issuance in accordance with the procedures in this issuance.

(b) Following the procedures in AI 102, work with OGC and the Advisory Committee, Regulatory, and Audit Matters Office, OCMO, to determine if the associated rule can be removed from the CFR.

(6) When the requirement for an issuance to be published as a rule in the CFR no longer exists, the OPR must comply with the procedures in AI 102 to remove the associated rule from the CFR.

## 7.2. CHARTERS.

a. OP&DSD OCMO develops and maintains all charters in coordination with the staff of the organization or position being addressed by the charter. Charters must:

(1) Define the scope of functional responsibilities and identify all delegated authorities for the chartered organization or position.

(2) Be organized in a unique DoDD format.

b. The Under Secretaries of Defense, as delegated in their respective charters, may approve charters for their subordinate OSD PAS positions for publication when the charters are reissued. The Secretary or Deputy Secretary of Defense will continue to approve for publication all initial charters for newly established PAS positions. OP&DSD OCMO will develop and maintain those charters approved for publication by the Under Secretaries of Defense.

c. The OPR may develop DoDIs to define the administration and operations of boards, councils, committees, and other subordinate officials and elements of the DoD Components when their proposed issuance does not meet the definition of a chartering DoDD (see Glossary). OP&DSD OCMO may help the OSD Components prepare these DoDIs, as requested.

## 7.3. DOD EXECUTIVE AGENT (DOD EA) DESIGNATION. DoD EAs are usually designated in a DoDD.

a. OP&DSD OCMO will oversee the implementation of the DoD EA process for the CMO, consistent with DoDD 5101.1.

b. The OSD Components must consult with OP&DSD OCMO regarding all proposed issuances that designate, update, or terminate DoD EA assignments before posting the issuances on the Portal for formal coordination.

## 7.4. CLASSIFIED, FOUO, AND CONTROLLED UNCLASSIFIED INFORMATION (CUI). The coordination standards and requirements for coordinating classified and FOUO issuances and CUI are the same as those for unclassified issuances. The DoD Components must handle classified and FOUO issuances, and classified and FOUO information that is part of the

*DoDI 5025.01, August 1, 2016*
*Change 3 Effective May 22, 2019*

issuance process, in accordance with Volume 1 of DoDM 5200.01.  CUI is addressed in Volume 4 of DoDM 5200.01.

## 7.5. UNIONS GRANTED NATIONAL CONSULTATION RIGHTS.

a.  OPRs whose issuances contain substantive changes in conditions of employment, including personnel policies and practices and other bargaining unit matters that affect DoD civil service and non-appropriated fund employees, must send copies of their issuance to the appropriate unions for comment after presignature review is complete in accordance with Subchapter 711 of DoDI 1400.25 and Section 2426 of Title 5, CFR.

b.  OPRs should contact the Labor Employee Relations Division of the Defense Civilian Personnel Advisory Service, Office of the Under Secretary of Defense for Personnel and Readiness, for help in meeting this requirement as soon as it is identified.

*DoDI 5025.01, August 1, 2016*
*Change 3 Effective May 22, 2019*

## GLOSSARY

### G.1. ACRONYMS.

| | |
|---|---|
| AI | administrative instruction |
| AO | action officer |
| | |
| CFR | Code of Federal Regulations |
| CUI | controlled unclassified information |
| | |
| DA&OP | Director for Administration and Organizational Policy |
| CMO | Chief Management Officer of the Department of Defense |
| DD | DoD (form) |
| DoDD | DoD directive |
| DoD EA | DoD Executive Agent |
| DoDI | DoD instruction |
| DoDM | DoD manual |
| DOPSR | Defense Office of Prepublication and Security Review |
| DTM | directive-type memorandum |
| | |
| ESD | Executive Services Directorate |
| | |
| FOUO | For Official Use Only |
| FR | Federal Register |
| | |
| GC DoD | General Counsel of the Department of Defense |
| GS | General Schedule |
| | |
| IG DoD | Inspector General of the Department of Defense |
| | |
| LOR | legal objection review |
| | |
| LSR | legal sufficiency review |
| | |
| NGB | National Guard Bureau |
| NIPRNET | Non-Secure Internet Protocol Router Network |
| | |
| OCJCS | Office of the Chairman of the Joint Chiefs of Staff |
| OCMO | Office of the Chief Management Officer of the Department of Defense |
| OGC | Office of the General Counsel of the Department of Defense |
| OP&DS | Organizational Policy and Decision Support |
| OPR | office of primary responsibility |
| | |
| PAS | Presidentially-appointed, Senate-confirmed |
| PKI | public key infrastructure |

| SES | Senior Executive Service |
| SIPRNET | SECRET Internet Protocol Router Network |
| U.S.C. | United States Code |
| WHS | Washington Headquarters Services |

G.2. **DEFINITIONS.** Unless otherwise noted, these terms and their definitions are for the purpose of this issuance.

**administrative change**. A change that alters only nonsubstantive portions of an issuance (e.g., titles or dates of references, organizational names or symbols).  Changes to an issuance that are limited to language copied directly (word-for-word) from law or written direction from the Secretary or Deputy Secretary of Defense are considered administrative, as compliance with the requirements are mandatory and coordination is unnecessary.

**administrative comment**. Comment concerning nonsubstantive aspects of an issuance, such as dates of references, organizational symbols, and format.

**AI**. A DoD issuance, no more than 50 pages in length, that provides general procedures for implementing policy for the administration of the WHS-serviced Components.  AIs implement policy established in DoDDs or DoDIs.  AIs are approved for publication by the CMO or the Director, WHS.

**approving authority.** The individual, usually an OSD Principal Staff Assistant or PAS official, who is granted authority by law, chartering DoDD, or this issuance to establish DoD policy or guidance through approval for publication of a DoD issuance.

**CFR.** Defined in AI 102.

**chartering DoDD**. See the DoDD definition.  Also referred to as a "charter" in this issuance.

**cleared for public release**. Defined in DoDD 5230.09.

**Defense Agency**. An organization established and specifically designated a Defense Agency by the Secretary of Defense according to Section 191 of Title 10, United States Code (U.S.C.), to perform supply or service activities common to more than one Military Department.

**Defense Agency or DoD Field Activity publication**. Any document produced by a Defense Agency or DoD Field Activity that assigns responsibilities or provides procedures directing or limiting the actions of, or imposing a financial obligation on:

   DoD Components; or

By mutual agreement, non-DoD federal agencies.

**Directives Portal System**. The website at
https://apps.sp.pentagon.mil/sites/dodips/Pages/Site/Home.aspx (unclassified) and
https://entapps.osd.smil.mil/sites/dodips/Pages/Site/home.aspx (classified) that the DoD
Components must use to coordinate DoD issuances and request and receive legal reviews.

**DoD Component**. One of these offices that compose the DoD according to DoDD 5100.01:

OSD

Military Departments

OCJCS and the Joint Staff

Combatant Commands

Office of the IG DoD

Defense Agencies

DoD Field Activities

Other organizational entities within the DoD

**DoDD**. A DoD issuance that exclusively establishes policy, assigns responsibility, and delegates authority to the DoD Components. DoDDs won't contain procedures. They must be one of these two types of issuances:

**chartering DoDD**. A DoDD that establishes the mission, responsibilities, functions, relationships, and delegated authorities of an OSD Component head or other OSD PAS official, a Defense Agency or DoD Field Activity director, or other major DoD or OSD Component head, as required. Also referred to as an "organizational charter," "charter Directive" or, in this issuance, as a "charter." Chartering DoDDs comprise a unique DoDD format, developed by OP&DS/DA&OP/OCMO in coordination with Directives Division, and are exempt from the page limit for DoDDs. Chartering DoDDs must be approved for publication by the Secretary or Deputy Secretary of Defense. An exception is made for Under Secretaries of Defense delegated the appropriate authority in their chartering DoDDs; if this authority is delegated, the Under Secretaries of Defense may approve chartering DoDDs for their subordinate OSD PAS positions for publication when the charter is reissued.

**direct oversight DoDD**. A DoD issuance, no more than 12 pages in length, reserved for subjects requiring direct oversight by the Secretary or Deputy Secretary of Defense, approved for publication only by the Secretary or Deputy Secretary of Defense, and consisting only of one or more of these types of information:

Non-delegable responsibilities assigned to the Secretary or Deputy Secretary of Defense.

*DoDI 5025.01, August 1, 2016*
*Change 3 Effective May 22, 2019*

Assignment of functions and resources between or among the DoD and/or OSD Component heads. More specifically, this is when the fundamental responsibilities, functions, or authorities of the Component head are being defined or redefined. These major assignments shouldn't be confused with the collateral functions routinely mentioned in an issuance in which an OSD Component head assigns a responsibility to (and coordinates with) another Component head to perform a task within an assigned functional area.

DoD EA assignments, which consist of the designation of a DoD EA and the assignment of related responsibilities and authorities.

Matters of special interest to the Secretary or Deputy Secretary of Defense such as advisory boards or urgent operational or military matters. They may be items selected by the Secretary or Deputy Secretary or recommended by an OSD Component head.

**DoD EA**. Defined in Joint Publication 1-02.

**DoD Field Activity**. An organization established and specifically designated a DoD Field Activity by the Secretary of Defense in accordance with Section 191 of Title 10, U.S.C. to perform supply or service activities common to more than one Military Department.

**DoDI**. An issuance that establishes policy and assigns responsibilities within a functional area assigned in an OSD Component head's chartering DoDD, including defining the authorities and responsibilities of a subordinate official or element when these don't meet the criteria for a chartering DoDD. DoDIs may also provide general procedures for implementing that policy. DoDIs:

Must be approved for publication only by an OSD Component head.

Must include the Component's chartering DoDD as a reference and, for the Components whose chartering DoDDs have not been updated to include the authority to establish policy in DoDIs, they must include this issuance as a reference.

Must be no more than 50 pages in length. DoDIs exceeding 50 pages in length must be separated into two or more volumes.

**DoD issuance**. Also called "issuance" in this issuance. One of the five types of issuances published by the DoD in accordance with this issuance that establishes or implements DoD policy, designates authority, assigns responsibilities, or provides procedures. Issuances apply to more than one DoD Component and include DoDDs, DoDIs, DoDMs, DTMs, and AIs.

**DoD Issuances Program**. The single, uniform program that the DoD Components must use to develop, coordinate, approve, publish, and review DoD issuances.

**DoD Issuances Website**. The unclassified NIPRNET website at https://www.esd.whs.mil/DD/ and the classified SIPRNET website at https://directives.whs.smil.mil/ that serve as the sole DoD source for electronic distribution of DoD issuances. The Website also serves as the source for standards for writing issuances.

**DoDM**.  A DoD issuance providing procedures for implementing policy established in DoDDs and DoDIs.  DoDMs must include the specific, procedural information formerly published as DoD publications.  Although all DoD publications are now categorized as DoDMs, those that don't specifically state that they are DoDMs (i.e., catalogs, compendiums, directories, handbooks, indexes, inventories, lists, modules, pamphlets, plans, series, standards, supplements, and regulations) must be converted into DoDIs or DoDMs when they are reissued as appropriate.  DoDMs must be approved for publication by the OSD Component heads, their Principal Deputies, or the OSD PAS officials as authorized by their chartering DoDDs.  DoDMs exceeding 100 pages in length must be separated into two or more volumes.

**DoD policy**.  A set of principles and associated guidelines to direct and limit DoD actions in pursuit of objectives, operations, and plans.

**DoD publication**.  A former type of DoD issuance that provides detailed procedures for implementing policy established in DoDDs and DoDIs.  DoD publications include these types of issuances approved and signed before October 28, 2007:  catalogs, compendiums, directories, handbooks, indexes, inventories, lists, modules, pamphlets, plans, series, standards, supplements, and those regulations identified on the Website by the "-R" extension, excluding DoD 7000.14-R.  All DoD publications are now categorized as DoDMs.

**DTM**.  A DoD issuance that establishes DoD policy or implements policy established in existing DoDDs and DoDIs; assigns responsibilities; and may provide procedures.  DTMs concerning subjects requiring direct oversight by the Secretary or Deputy Secretary of Defense must be signed by the Secretary or Deputy Secretary of Defense.  DTMs that establish DoD policy must be signed by the OSD Component heads.  DTMs that implement policy may be signed by OSD Component heads, their Principal Deputies, or OSD PAS officials as authorized by their respective chartering DoDDs.  DTMs will be issued **only** for time-sensitive actions and **only** when time constraints prevent publishing a new issuance or incorporating a change to an existing issuance.  DTMs must not be used to permanently change or supplement existing issuances.  They will be effective for no more than 12 months from the date signed, unless extended in accordance with this issuance.  "Time sensitive" actions are those that are:

Directed by Executive order;

Directed by the Secretary or Deputy Secretary of Defense;

A matter of urgent national security;

A matter of urgent DoD policy as determined by an OSD Component head;

Required by recent (less than 3 months) change in law, statute, or government-wide regulation; or

Necessary to prevent imminent danger to life and health.

**equity**.  A case in which the policies, responsibilities, or procedures in an issuance or Defense Agency or DoD Field Activity publication direct or limit the actions of, or impose a financial obligation on:

DoD Components; or

By mutual agreement, non-DoD federal agencies.

**final rule**. Defined in AI 102.

**FR**. Daily publication by the U.S. Government that prints the regulations and notices of the various executive departments and agencies of the federal government that affect the public or agencies outside their own.

**FR issuance.** An issuance that levies requirements or restrictions on the public or government employees outside the DoD, and as such requires codification of the relevant issuance material in the CFR as a final rule in accordance with AI 102 and applicable law.

**interim final rule**. Defined in AI 102.

**Issuance Focal Point.** An individual appointed in writing by an OSD Component head, Secretary of a Military Department, the Chairman of the Joint Chiefs of Staff, or the Chief, NGB, to oversee the administration of the DoD Issuances Program on his or her behalf.  Section 2 of this issuance discusses the authoritative levels of Primary and Alternate Issuance Focal Points, and their responsibilities are assigned in Section 3.

**mandatory coordinators.** The offices of the IG DoD and CMO are required to review all issuances as they go through the formal coordination stage of processing due to their equity in issuance development, implementation, and enforcement.  They are marked with an "M" on the DD Form 106.

**not cleared for public release.** Defined in DoDD 5230.09.  For the purpose of this issuance, "not cleared for public release" includes FOUO issuances, classified issuances, and issuances whose release the OPR has determined it must control.

**OPR.** The OSD Component that has been designated as being responsible for the development, management, and maintenance of an issuance by reason of:

The subject of the issuance falling within their functional area as defined in their charter; or

Specific designation by the Secretary of Defense or Deputy Secretary of Defense.

**organizational charter.** A chartering DoDD as described in the DoDD definition.

**OSD.** Defined in DoDD 5100.01.

**OSD Component.** One of the offices that compose OSD whose principal reports directly to the Secretary or Deputy Secretary of Defense.

**OSD PAS official.** One of those OSD officials listed in Chapter 4 of Title 10, U.S.C., appointed from civilian life by the President, by and with the advice and consent of the Senate.

**other organizational entity within the DoD.** An organization established by law, the President, or under the authority of the Secretary of Defense in accordance with Sections 113 or 125 of Title 10, U.S.C., but specifically excluding entities within OSD, the Military Departments, the OCJCS, the Combatant Commands, the Office of the IG DoD, the Defense Agencies, and the DoD Field Activities. These organizations include, but are not limited to, the NGB.

**Principal Staff Assistants**. Defined in DoDD 5100.01.

**substantive change.** A change that amends an essential section(s) of an issuance that appears to be or is potentially unnecessary, incorrect, misleading, confusing, or inconsistent with other sections.

**WHS Component.** A directorate or office of WHS consistent with DoDD 5110.04.

**WHS-serviced Components.** OSD, the Defense Agencies and DoD Field Activities, and other components of the DoD that are serviced by WHS.

*DoDI 5025.01, August 1, 2016*
*Change 3 Effective May 22, 2019*

# REFERENCES

Administrative Instruction 15, "OSD Records and Information Management Program," May 3, 2013, as amended

Administrative Instruction 102, "Office of the Secretary of Defense (OSD) Federal Register (FR) System," November 6, 2006, as amended

Code of Federal Regulations, Title 5, Section 2426

Deputy Secretary of Defense Memorandum, "Improving Department Guidance – Department of Defense Issuances," March 25, 2012

Deputy Secretary of Defense Memorandum, "Reorganization of the Office of the Deputy Chief Management Officer," July 11, 2014

DoD 7000.14-R, "Department of Defense Financial Management Regulations (FMRs)," date varies by volume

DoD 7750.07-M, "DoD Forms Management Program Procedures Manual," May 7, 2008, as amended

DoD Directive 5100.01, "Functions of the Department of Defense and Its Major Components," December 21, 2010

DoD Directive 5101.1, "DoD Executive Agent," September 3, 2002, as amended

DoD Directive 5105.53, "Director of Administration and Management (DA&M)," February 26, 2008

DoD Directive 5105.82, "Deputy Chief Management Officer (DCMO) of the Department of Defense," October 17, 2008

DoD Directive 5110.04, "Washington Headquarters Services (WHS)," March 27, 2013

DoD Directive 5230.09, "Clearance of DoD Information for Public Release," August 22, 2008, as amended

DoD Instruction 1400.25, Subchapter 711, "DoD Civilian Personnel Management System: Labor Management Relations," December 1996

DoD Instruction 5015.02, "DoD Records Management Program," February 24, 2015, as amended

DoD Instruction 5025.13, "DoD Plain Language Program," April 11, 2013, as amended

DoD Instruction 5230.29, "Security and Policy Review of DoD Information for Public Release," August 13, 2014, as amended

DoD Instruction 5545.02, "DoD Policy for Congressional Authorization and Appropriations Reporting Requirements," December 19, 2008

DoD Instruction 7750.07, "DoD Forms Management Program," October 10, 2014

DoD Instruction 8520.02, "Public Key Infrastructure (PKI) and Public Key (PK) Enabling," May 24, 2011

DoD Instruction 8910.01, "Information Collection and Reporting," May 19, 2014

DoD Manual 5110.04, Volume 1, "DoD Manual for Written Material:  Correspondence Management," October 26, 2010, as amended

DoD Manual 5200.01, Volume 1, "DoD Information Security Program: Overview, Classification, and Declassification," February 24, 2012, as amended

DoD Manual 5200.01, Volume 4, "DoD Information Security Program: Controlled Unclassified Information (CUI)," February 24, 2012, as amended

DoD Manual 8910.01, Volume 1, "DoD Information Collections Manual: Procedures for DoD Internal Information Collections," June 30, 2014, as amended

DoD Manual 8910.01, Volume 2, "DoD Information Collections Manual: Procedures for DoD Public Information Collections," June 30, 2014, as amended

Office of the Chairman of the Joint Chiefs of Staff, " DoD Dictionary of Military and Associated Terms," current edition

United States Code, Title 10