IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE, | Case No. 1:16-cv-1534-JEB (and Consolidated Case Nos. 16-cv-1796 and 17-cv-267) |
| Plaintiff, | |
| and | |
| CHEYENNE RIVER SIOUX TRIBE, | |
| Plaintiff-Intervenor, | |
| v. | |
| U.S. ARMY CORPS OF ENGINEERS, | |
| Defendant-Cross Defendant, | |
| and | |
| DAKOTA ACCESS, LLC, | |
| Defendant-Intervenor-Cross Claimant. | |

**STANDING ROCK SIOUX TRIBE'S OPPOSITION TO CROSS-MOTIONS FOR SUMMARY JUDGMENT; REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON REMAND**

STANDING ROCK SIOUX TRIBE'S
SUMMARY JUDGMENT OPPOSITION/REPLY
(No. 1:16-cv-1534-JEB)

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

ARGUMENT ......................................................................................................1

I.    DEFENDANTS CANNOT AVOID JUDICIAL REVIEW OF THE
REMAND ..................................................................................................3

    A.    The Tribe's Claims Are Appropriately Before the Court. ...........................3

    B.    The Corps' Plea for "Extreme Deference" is Inapposite. ...........................6

II.    THE FLAWED WORST CASE SPILL ESTIMATE ...........................................8

    A.    The Corps Cannot Avoid Review by Asserting that a WCD Is Not
Required. ..................................................................................................8

    B.    The WCD Cannot Withstand Arbitrary and Capricious Review. ...............10

        1.    Defendants' efforts to misdirect the Court and reframe the
issues. ..................................................................................................10

        2.    The WCD does not account for any detection time. ......................13

        3.    The WCD does not account for valve closure or the risk of
power failure. ..................................................................................17

III.    THE FLAWED RISK ASSESSMENT ..............................................................18

    A.    ETP Safety Record. ..................................................................................19

    B.    Industry Best Practices. ............................................................................22

    C.    Bakken Crude Safety Risks. .....................................................................24

IV.    THE FLAWED ENVIRONMENTAL JUSTICE ASSESSMENT ......................25

V.    THE FLAWED CONSULTATION PROCESS ..................................................27

    A.    The Corps Has a Duty to Meaningfully Consult with the Tribe. ...............28

    B.    The Corps Violated its Duty to Consult. ..................................................31

VI.    THE FLAWED NATIONAL HISTORIC PRESERVATION ACT
PROCESS ..................................................................................................35

STANDING ROCK SIOUX TRIBE'S
SUMMARY JUDGMENT OPPOSITION/REPLY
(No. 1:16-cv-1534-JEB) - i

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

A.     The Tribe's NHPA Claim Is "Capable of Repetition while Evading Review"..................................................................................35

B.     The Corps Failed to Consider Indirect Effects Under NHPA....................38

CONCLUSION............................................................................................................39

STANDING ROCK SIOUX TRIBE'S
SUMMARY JUDGMENT OPPOSITION/REPLY
(No. 1:16-cv-1534-JEB) - ii

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Appalachian Power Co. v. E.P.A.*,
  208 F.3d 1015 (D.C. Cir. 2000) ........................................................29

*Armstrong v. F.A.A.*,
  515 F.3d 1294 (D.C. Cir. 2008) ........................................................37

*Ashton v. Pierce*,
  541 F.Supp. 635 (D.D.C. 1982) ........................................................30

*Cape Cod Hosp. v. Sebelius*,
  630 F.3d 203 (D.C. Cir. 2011) ............................................................3

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) .......................................................................3, 7

*City of Davis v. Coleman*,
  521 F.2d 661 (9th Cir. 1975) ............................................................20

*Conserv. Law Found. v. Ross*,
  No. 18-1087-JEB (D.D.C. Oct. 28, 2019) ...........................................6

*Defenders of Wildlife v. Bureau of Ocean Energy Mgmt.*,
  684 F.3d 1242 (11th Cir. 2012) .....................................................9, 10

*Delaware Riverkeeper Network v. F.E.R.C.*,
  753 F.3d 1304 (D.C. Cir. 2014) ........................................................20

*Delta Air Lines v. Export–Import Bank*,
  85 F.Supp.3d 436 (D.D.C. 2015) ........................................................4

*Doe v. Sullivan*,
  938 F.2d 1370 (D.C. Cir. 1991) ........................................................36

*Dubois v. U.S. Dept. of Agriculture*,
  102 F.3d 1273 (1st Cir. 1996) ..........................................................20

*General Elec. Co. v. E.P.A.*,
  290 F.3d 377 (D. C. Cir. 2002) ........................................................28

STANDING ROCK SIOUX TRIBE'S
SUMMARY JUDGMENT OPPOSITION/REPLY
(No. 1:16-cv-1534-JEB) - iii

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

*High Country Conserv. Advocates v. U.S. Forest Serv.*,
    52 F.Supp.3d 1174 (D. Colo. 2014)................................................................9

*Honig v. Doe*,
    484 U.S. 305 (1988)......................................................................................36

*Houston, Tex. v. Dep't of Hous. & Urban Dev.*,
    24 F.3d 1421 (D.C. Cir. 1994)......................................................................37

*Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019)....................................................................................6

*Lower Brule Tribe v. Deer*,
    911 F.Supp. 395 (D.S.D. 1995) ....................................................................30

*Meister v. U.S. Dept. of Agriculture*,
    623 F.3d 363 (6th Cir. 2010) ..........................................................................7

*Montgomery Envtl. Coal. v. Costle*,
    646 F.2d 58 (D.C. Cir. 1980).........................................................................35

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut.
    Auto. Ins. Co.*,
    463 U.S. 29 (1983)...........................................................................................3

*Myersville Citizens for a Rural Cmty. v. F.E.R.C.*,
    783 F.3d 1301 (D.C. Cir. 2006) ......................................................................6

*Nat'l Parks Conserv. Assoc. v. Semonite*,
    916 F.3d 1075 (D.C. Cir. 2019) .........................................................2, 3, 7, 19

*Nat'l Parks Conserv. Assoc. v. Semonite*,
    925 F.3d 500 (D.C. Cir. 2019) ........................................................................2

*Nat'l Wildlife Fed. v. Norton*,
    306 F.Supp.2d 920 (E.D. Cal. 2004)..............................................................30

*National Ass'n of Clean Water Agencies v. E.P.A.*,
    734 F.3d 1115 (D.C. Cir. 2013) ......................................................................7

*New York v. U.S. Nuclear Reg. Comm'n*,
    824 F.3d 1012 (D.C. Cir. 2016) ......................................................................8

*NRDC v. Daley*,
    209 F.3d 747 (D.C. Cir. 2000) ........................................................................8

*Oceana, Inc. v. Ross*,
    275 F.Supp.3d 270 (D.D.C. 2017)...................................................................5

STANDING ROCK SIOUX TRIBE'S
SUMMARY JUDGMENT OPPOSITION/REPLY
(No. 1:16-cv-1534-JEB) - iv

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

*Oglala Sioux Tribe of Indians v. Andrus*,
  603 F.2d 707 (8th Cir. 1979) ...................................................29

*Oregon Nat'l Desert Assoc. v. Rose*,
  921 F.3d 1185 (9th Cir. 2019) ..............................................7, 31

*Oregon Nat. Res. Council v. Marsh*,
  52 F.3d 1485 (9th Cir. 1995) ...................................................6

*Oregon Nat'l Desert Assoc. v. Rasmussen*,
  451 F.Supp.2d 1202 (D. Or. 2006) .........................................20

*Ralls Corp. v Comm. on Foreign Inv. in U.S.*,
  758 F.3d 296 (D.C. Cir. 2014) .............................................35, 36

*Resolute Forest Prod. v. U.S. Dep't of Agric.*,
  187 F.Supp.3d 100 (D.D.C. 2016) ...........................................4

*Robertson v. Methow Valley Citizens Counc.*,
  490 U.S. 332 (1989) ...............................................................23

*Safari Club Int'l v. Jewell*,
  842 F.3d 1280 (D.C. Cir. 2016) .............................................37

*Scheduled Airlines Traffic Offices, Inc. v. Department
  of Defense*,
  87 F.3d 1356 (D.C. Cir. 1996) ................................................7

*Sierra Club v. Sigler*,
  695 F.2d 957 (5th Cir. 1983) ...................................................9

*Sierra Club v. U.S. Army Corps of Eng'rs*,
  803 F.3d 31 (D.C. Cir. 2015) .................................................38

*Sierra Club v. U.S. Forest Serv.*,
  843 F.2d 1190 (9th Cir. 1988) ...............................................10

*South Fork Band Counc. v. Dept. of Interior*,
  588 F.3d 718 (9th Cir. 2009) .................................................23

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  282 F.Supp.3d 91 (D.D.C. 2017) .....................................25, 27, 34

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  255 F.Supp.3d 101 (D.D.C. 2017) ...................................4, 18, 23

*TOMAC v. Norton*,
  433 F.3d 852 (D.C. Cir. 2006) ...............................................30

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

*United Keetoowah Band of Cherokee Indians v. Fed. Comms.*
  *Comm'n*,
  933 F.3d 728 (D.C. Cir. 2019) ........................................................................29, 34

*West Virginia v. E.P.A.*,
  362 F.3d 861 (D.C. Cir. 2004) ...........................................................................5, 6

*Wildearth Guardians v. Zinke*,
  368 F.Supp.3d 41 (D.D.C. 2019) ...........................................................................16

*Yankton Sioux Tribe v. Kempthorne*,
  442 F.Supp.2d 774 (D.S.D. 2006) ...........................................................................29

**Statutes**

Administrative Procedure Act.........................................................................................1

APA.....................................................................................................................3, 7, 8

Clean Water Act...........................................................................................................5

Mineral Leasing Act ....................................................................................................5

National Environmental Policy Act ..................................................................... *passim*

National Historic Preservation Act ....................................................................... *passim*

**Other Authorities**

33 C.F.R. § 325 ...........................................................................................................39

40 C.F.R. § 1500.1 ........................................................................................................9

40 C.F.R. § 1501.2 ......................................................................................................31

40 C.F.R. § 1502.9(c).................................................................................................31

40 C.F.R. § 1508.27(b)(10).................................................................................10, 18

49 C.F.R. § 194.05(b)(1).............................................................................................10

49 C.F.R. § 194.105(b) ...............................................................................................12

49 C.F.R. § 195.05(b) .................................................................................................16

Exec. Order 13175, 65 Fed. Reg. 67249 (Nov. 6, 2000) ...................................28, 29, 31

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

INTRODUCTION

Faced with damning evidence that the Court-ordered remand was irretrievably flawed on both substantive and procedural grounds, Defendant U.S. Army Corps of Engineers ("Corps") and Intervenor Dakota Access Pipeline, LLC ("DAPL") employ a variety of tactics to misdirect the Court. They seek to reframe the dispute as a "battle of the experts" regarding the Corps' choice of competing methodologies, and a substantive attack on its policy choices. They seek to dismiss most of the Standing Rock Sioux Tribe's arguments as outside the scope of the remand, demanding that the Court pretend that the administrative record developed over a year-long remand does not exist. They insist that the Corps owed no duty to the Tribe to conduct the remand, and to share in good faith critical technical information with its staff and experts.

None of these tactics should succeed. Under well-accepted principles of judicial review of agency actions, the Corps must demonstrate that it considered all of the evidence presented to it during the remand, and articulated a rational connection between this evidence and the conclusions it made. With respect to critical issues such as the worst case discharge ("WCD"), DAPL's worst-in-class safety record, or the illusory promise to employ industry "best practices," this is a standard that the Corps cannot meet. Its flawed assumptions cascaded throughout the remand, in a broken process in which technical materials were withheld and the Tribe precluded from effectively commenting. This Court should again find that the Corps' decision failed to meet the standard of National Environmental Policy Act ("NEPA") and the Administrative Procedure Act ("APA"). This time, however, the underlying permits should be vacated pending compliance with NEPA via a full environmental impact statement ("EIS").

ARGUMENT

The D.C. Circuit significantly clarified the legal landscape governing the Tribe's NEPA claims since this Court's 2017 summary judgment ruling. Earlier this year, it held that an Army

STANDING ROCK SIOUX TRIBE'S
SUMMARY JUDGMENT OPPOSITION/REPLY
(No. 1:16-cv-1534-JEB) - 1

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

Corps finding of insignificance for a power line crossing the James River was unlawful.  *Nat'l Parks Conserv. Assoc. v. Semonite*, 916 F.3d 1075 (D.C. Cir. 2019) ("important questions about both the Corps' chosen methodology and the scope of the project's impact remain unanswered"). The Court scrutinized the two key determinants of NEPA significance: "context," which assesses the setting of the impact, and "intensity," which evaluates ten factors enumerated in NEPA's regulations, observing that "[i]mplicating any one of the factors may be sufficient to require development of an EIS."  *Id*. at 1082.  The Court honed in on the NEPA "controversy" intensity factor, finding that the Corps gave inadequate attention to expert critiques of its methodologies and conclusions.  *Id*. at 1085-86.  Some comments came from federal and state agencies with expertise over the resources in question, while others came from individuals or organizations with expertise; the Court did not weigh these contributions differently.  The Court also found that the project triggered other intensity factors, like the "unique characteristics of the area," and the degree to which the project could impact historic sites.  *Id*. at 1086-87.  Finding that Congress "created the EIS process to provide robust information in situations precisely like this one," the Court vacated the permits and directed the Corps to prepare an EIS.  *Id*. at 1089.[1]

It would be hard to find a controlling precedent more on point.  The Corps makes an unconvincing attempt to distinguish *Semonite* on the facts, while DAPL fails even to mention it. As in *Semonite*, the "context" of the Oahe crossing is a landscape of great cultural, ecological, and economic significance, and the site of repeated depredations of the Sioux Nation by the U.S. Government.  As in *Semonite*, the record includes detailed critiques of the Corps' methods, assumptions, and conclusions from qualified experts, revealing major "controversy" over the

---

[1] The panel later modified the remedy portion of its ruling to remand the case to the District Court to decide whether to vacate.  *Nat'l Parks Conserv. Assoc. v. Semonite*, 925 F.3d 500, 502 (D.C. Cir. 2019).  It did not amend the part of its order directing the Corps to prepare an EIS.

STANDING ROCK SIOUX TRIBE'S
SUMMARY JUDGMENT OPPOSITION/REPLY
(No. 1:16-cv-1534-JEB) - 2

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

project's impacts.  As in *Semonite*, other intensity factors—like the unique characteristics of the

area and its undisputed cultural importance—also support an EIS.  *See, e.g.,* RAR 6587

(documenting cultural sites that would be impacted by spill).  This Court should follow suit.

I.      DEFENDANTS CANNOT AVOID JUDICIAL REVIEW OF THE REMAND

        A.      <u>The Tribe's Claims Are Appropriately Before the Court.</u>

        As its primary argument on cross-motion, DAPL seeks to sidestep the Tribe's arguments

completely, based on a mistaken notion of the scope of the remand.  DAPL believes that review

of the remand decision is limited to the narrow question of whether the Corps explained why a

handful of specific scientific critiques, submitted to the Corps prior to its final easement decision,

do not rise to a level of "controversy" under NEPA.  DAPL Summary Judgment Opp. (ECF 456)

("DAPL Opp.") at 14-19.  DAPL argues that since the Corps did not need to undergo any

process at all, the Court should ignore the remand administrative record altogether.  The Corps

for the most part does not join this overreaching argument.  It can be easily discarded.[2]

        It is black letter law that under the APA, agency action is reviewed on the basis of the

complete underlying administrative record.  *Citizens to Preserve Overton Park, Inc. v. Volpe*,

401 U.S. 402, 420 (1971).  An agency's decision is arbitrary and capricious if it "entirely failed

to consider an important aspect of the problem" or its explanation "runs counter to the evidence

before the agency."  *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463

U.S. 29, 43 (1983).  Action is also arbitrary when the agency fails to respond to "relevant and

significant public comments."  *Cape Cod Hosp. v. Sebelius*, 630 F.3d 203, 211 (D.C. Cir. 2011).

_____

[2] DAPL's memorandum is accompanied by two lengthy tables developed by its counsel.  ECF
456-1.  The Court should strike this material.  It is not any form of evidence, and it would not be
appropriate in any event to rely on extra-record materials in light of the Court's prior.  The tables
constitute argument by counsel that violate DAPL's already-expanded page limits.

STANDING ROCK SIOUX TRIBE'S
SUMMARY JUDGMENT OPPOSITION/REPLY
(No. 1:16-cv-1534-JEB) - 3

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

This standard applies to agency decisions pursuant to a court-ordered remand no differently.

*See, e.g., Resolute Forest Prod. v. U.S. Dep't of Agric.*, 187 F.Supp.3d 100, 102 (D.D.C. 2016)

("Although Defendants' second explanation [on remand] was better than its first, it nonetheless

raised as many questions as it answered."); *Delta Air Lines v. Export–Import Bank*, 85 F.Supp.3d

436, 446 (D.D.C. 2015).  Here, the remand record contains new information about spill risks and

impacts that was not available at the time of the original decision, for example, a revised spill

model and an evaluation of spill impacts.  The Tribe provided extensive information as to the

level of "controversy" around the Corps' technical conclusions.  RAR 7451.  The Remand

decision even claims to address it.  RAR 142.  Whatever the truth of DAPL's assertion that the

Corps need not have conducted any process beyond additional explanation, DAPL Opp. at 1-2,

the Corps evidently did not think so, which is why it sought additional information from all

parties.  The Court must review the remand that the Corps actually conducted, not DAPL's

speculative, counterfactual one.

 DAPL's argument fails for a separate reason.  One of the subjects of the remand was the

Corps' failure to assess whether its decision was "highly controversial" in light of expert

critiques of both spill risk and spill impacts.  *Standing Rock Sioux Tribe v. U.S. Army Corps of

Eng'rs*, 255 F.Supp.3d 101 (D.D.C. 2017) ("*Standing Rock III*").  As the Tribe documented in its

opening motion, those expert critiques identified each of the concerns that are the subject of the

remand motion.  For example, the Tribe's expert critiques devoted considerable detail to the

question of the worst-case discharge estimate.  USACE_ESMT 1078 (noting lack of public

information on WCD estimate but that it is likely "understated").  Once the remand was

underway, the Tribe provided more detailed written information on the issue.  Standing Rock

Summary Judgment Memorandum (ECF 433-2) ("SRST Mem.") at 15-16.  The Corps and the

STANDING ROCK SIOUX TRIBE'S
SUMMARY JUDGMENT OPPOSITION/REPLY
(No. 1:16-cv-1534-JEB) - 4

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

Tribe also discussed it during meetings. *Id.* at 8. Similarly, there was extensive expert input during the period before the easement that the risk assessment was flawed. *See infra* § III. The Corps invited input from the Tribe during the remand process, and the Tribe expanded upon its concerns, this time with the benefit of the full record which had not been available at the time of its initial critiques. In other words, the claims that are the focus of the Tribe's remand motion encompass and expand upon the "controversy" developed in the original expert critiques that were the subject of the remand. Accordingly, these questions are properly before the Court.[3]

The cases cited by DAPL reveal why it is the Tribe that has the upper hand in this matter. For example, while the court in *Oceana, Inc. v. Ross*, 275 F.Supp.3d 270, 288 (D.D.C. 2017), affirmed that the agency need not "start from scratch" on its entire decision, it observed that "Oceana is correct that NMFS could not ignore important evidence when it developed" its new decision on remand. The Tribe does not argue that the Corps had to start its Mineral Leasing Act easement and Clean Water Act permitting "from scratch." Rather, all of its input during the remand were focused on the questions put to the Corps by the Court: whether expert critiques of the Corps' risk and impact analysis were "highly controversial" under NEPA, whether the decision has environmental justice impacts, and the extent of potential impacts on hunting and fishing. The question for this Court is whether the Corps "ignore[d] important evidence," or failed to explain its decision in light of it, when it finalized the remand. *Id.*

DAPL's reliance on *West Virginia v. E.P.A.*, 362 F.3d 861 (D.C. Cir. 2004) is even more unavailing. There, like here, parties challenged an agency's new decision after winning a remand on specific issues. Unlike here, plaintiffs sought to raise entirely new claims *against the*

---

[3] While the Court rejected some of the Tribe's arguments about consideration of risk, it also faulted the Corps for not addressing expert critiques which focused on risk. DAPL seeks to exploit the first part of the ruling to circumvent review of the remand, while ignoring the latter.

STANDING ROCK SIOUX TRIBE'S
SUMMARY JUDGMENT OPPOSITION/REPLY
(No. 1:16-cv-1534-JEB) - 5

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

*original action* that had never been raised during the prior administrative proceedings, and played no part of their original case.  The Court observed that these new "claims are forfeit."  *Id.* at 872.  This motion bears no resemblance to that.  Here, the Tribe successfully challenged the Corps' refusal to explain whether controversy around the risks and impacts of an oil spill warranted the additional attention of an EIS.  During the Corps' remand on that subject, these concerns received closer attention and elaboration at the invitation of the Corps—indeed, that was the whole point of the remand.  The Tribe is not trying to inject "new issues" that were not previously part of its concerns with the pipeline, but rather is showing how the Corp's decision on remand is arbitrary in light of the record before it.  There is nothing objectionable about that.  *Oregon Nat. Res. Council v. Marsh*, 52 F.3d 1485, 1488–91 (9th Cir. 1995) (rejecting claim that NEPA remand was narrow and that agency was constrained in what it could consider).

B.      The Corps' Plea for "Extreme Deference" is Inapposite.

The Corps next seeks refuge in a plea for "extreme deference" to its technical judgments.  Corps Summary Judgment Opp. (ECF 458) ("Corps Opp.") at 13.  There are three reasons why the concept is inapposite here.  First, the Corps relies on cases where agencies were applying their technical judgment to matters within their specialized areas of expertise.  *Id.*, *citing Myersville Citizens for a Rural Cmty. v. F.E.R.C.*, 783 F.3d 1301, 1309 (D.C. Cir. 2006).  But while the Corps has expertise in water resources and wetlands, it is not the expert agency and has no technical expertise in pipeline engineering, risk, safety management, or spill response—all of which are delegated to other agencies.  "Extreme" deference is not appropriate in such circumstances.  *Kisor v. Wilkie*, 139 S. Ct. 2400, 2416 (2019) (an "agency's interpretation must in some way implicate its substantive expertise, as the basis for deference ebbs when the subject matter of a dispute is distant from the agency's ordinary duties"); *Conserv. Law Found. v. Ross*, No. 18-1087-JEB (D.D.C. Oct. 28, 2019) (refusing to grant deference to non-expert agency).

STANDING ROCK SIOUX TRIBE'S
SUMMARY JUDGMENT OPPOSITION/REPLY
(No. 1:16-cv-1534-JEB) - 6

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

The Corps also has no expertise in the interpretation of pipeline-related statutes, the WCD

regulation, or other regulatory standards governing pipelines, as that task is entrusted to the

Pipeline and Hazardous Materials Safety Administration ("PHMSA").  This Court owes no

deference to the Corps' interpretation of legal and regulatory standards either.  *Semonite*, 916

F.3d at 1088; *Scheduled Airlines Traffic Offices, Inc. v. Department of Defense*, 87 F.3d 1356,

1361 (D.C. Cir. 1996) (no deference where agency "has not been entrusted to administer"

statute).

Second, the record demonstrates that it was DAPL—not the Corps—that originally

derived the WCD, and the Corps applied little or no "expertise" to assess its validity beyond

simply double-checking the math.  USACE_DAPL 72253.  It also did virtually nothing to revisit

the WCD or risk analysis during the remand, despite many requests from the Tribe.  It cannot

demand "extreme deference" to expertise that it never exercised.  *Oregon Nat'l Desert Assoc. v.

Rose*, 921 F.3d 1185, 1190-91 (9th Cir. 2019) ("we cannot defer to a void"); *Meister v. U.S.

Dept. of Agriculture*, 623 F.3d 363, 367 (6th Cir. 2010) ("An agency is not entitled to deference

simply because it is an agency. …[F]or courts to defer to them, agencies must do more than

announce the fact of their comparative advantage; they must actually use it.").

Finally, what the Corps really wants is not deference, but abdication of the Court's duty

to perform a "thorough, probing in-depth review" of agency action under the APA.  *Citizens to

Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971).  The Tribe's opening brief is a

roadmap to important issues that the Corps failed to consider, and multiple instances in which its

conclusions could not be squared with the record.  Courts in this circuit do not shrink from the

task of reviewing agency action because it involves technical questions.  *See, e.g., National Ass'n

of Clean Water Agencies v. E.P.A.*, 734 F.3d 1115, 1145 (D.C. Cir. 2013) (overturning EPA

STANDING ROCK SIOUX TRIBE'S
SUMMARY JUDGMENT OPPOSITION/REPLY
(No. 1:16-cv-1534-JEB) - 7

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

technical decisions even where applying deference); *New York v. U.S. Nuclear Reg. Comm'n*, 824 F.3d 1012, 1022 (D.C. Cir. 2016) ("deference extends only so far as the NRC's decision is not arbitrary or capricious").  Agencies do not insulate decisions from APA review by simply throwing a cloak of science around them.  *NRDC v. Daley*, 209 F.3d 747 (D.C. Cir. 2000) ("[W]e do not hear cases merely to rubber stamp agency actions… The Service cannot rely on reminders that its scientific determinations are entitled to deference in the absence of reasoned analysis to cogently explain why its additional recommended measures satisfied the [statute's] requirements.").  The questions posed in this motion are not particularly complicated:  for example, was the Corps' WCD adequately explained in light of the absence of any time to detect a spill or the possibility that valves might not close?  Did the Corps consider ETP's abysmal safety record in declaring that the chances of a spill were too small to warrant an EIS?  The Tribe asks nothing unusual in this case—just that the Court undertake the review directed by the APA.

## II.    THE FLAWED WORST CASE SPILL ESTIMATE

When it comes to the worst case discharge estimate ("WCD"), two key matters are not in dispute.  First, the WCD sits at the heart of the Corps' NEPA determination, and is built in as the core assumption in the remand's technical studies.  Second, DAPL derived the WCD prior to this Court's summary judgment ruling, but the Corps neither recalculated it during the remand, nor even considered doing so, despite persistent and well-supported technical critiques.  RAR 22 n. 10 (WCD came from 2016 Wood Group analysis).  The Corps seeks to sidestep the deficiencies in the WCD with an array of tactics that are easily refuted.

### A.    The Corps Cannot Avoid Review by Asserting that a WCD Is Not Required.

The Corps' primary effort is to argue that since there was never any duty to develop a WCD in the first place, this Court has no business assessing it.  Corps Opp. at 11.  This argument need not detain the Court for long.  All parties agree that determining NEPA "significance" in

STANDING ROCK SIOUX TRIBE'S
SUMMARY JUDGMENT OPPOSITION/REPLY
(No. 1:16-cv-1534-JEB) - 8

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

the context of a potential oil spill requires an assessment of the consequences of an accident in relation to its likelihood. *Id*. at 12. Here, the Corps used the WCD as the primary surrogate for the first half of that equation. The Corps does not try to refute the fact that the WCD was used to justify the NEPA insignificance finding directly, as well as indirectly since it served as the primary input in the technical documents to emerge from the remand, like the Spill Model Report and Downstream Receptor Report. *See* SRST Mem. at 13-14. The issue is not whether NEPA requires a WCD, but rather whether the Corps' assessment of the potential consequences of a spill—using the WCD as a surrogate—was arbitrary.

The argument also contravenes the basic norms of administrative law discussed above. *See supra* § I.A. Agencies cannot rely on arbitrary technical analyses in NEPA, even where there is no specific duty to prepare them. In other words, once an agency chooses to conduct an analysis, it has to do it adequately. *High Country Conserv. Advocates v. U.S. Forest Serv.*, 52 F.Supp.3d 1174, 1191 (D. Colo. 2014) ("Even though NEPA does not require a cost-benefit analysis, it [is] nonetheless arbitrary and capricious to" do one improperly); *Sierra Club v. Sigler*, 695 F.2d 957, 965 (5th Cir. 1983) (holding that when Corps complies with non-mandatory NEPA standard voluntarily, Court must still judge whether it complied with that standard). NEPA regulations demand that the information used "must be of high quality." 40 C.F.R. § 1500.1; *id*. § 1502.24 (agencies must "insure the professional integrity, including scientific integrity" of analysis). Accordingly, even if a particular analysis is not mandatory, it cannot rely on junk science or false assumptions.

The Corps' reliance on *Defenders of Wildlife v. Bureau of Ocean Energy Mgmt*., 684 F.3d 1242 (11th Cir. 2012), is inapposite. There, the agency decided not to use the WCD prepared during the spill-planning process in its NEPA analysis, instead opting for a different

STANDING ROCK SIOUX TRIBE'S
SUMMARY JUDGMENT OPPOSITION/REPLY
(No. 1:16-cv-1534-JEB) - 9

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

estimate that the agency deemed more likely. *Id.* at 1249-50.  The Court found that the agency

had provided a "plethora" of information sustaining the alternative analysis, and upheld it.  *Id.*

Here in contrast, the Corps did not use an alternative spill estimate.  Instead, it places all of its

chips on the WCD originally developed by DAPL.  Having placed that estimate at the heart of its

NEPA finding, the Corps cannot now disavow it, and this Court has an obligation to evaluate

whether it is rational and adequately supported by the record.

      B.    <u>The WCD Cannot Withstand Arbitrary and Capricious Review.</u>

On the merits, the Corps struggles to defend a remand decision that makes no attempt to

grapple with the WCD's well-documented shortcomings.  Instead, it mostly seeks to redirect the

question onto more favorable terrain.  These efforts should not succeed.

      1.    *Defendants' efforts to misdirect the Court and reframe the issues.*

As a threshold tactic, the Corps tries to reframe the Tribe's challenge as an attack on the

*substance* of the WCD regulation, rather than the *application* of the regulation in this instance.

Corps. Opp. at 11.  That effort fails at the gate.  The Tribe has never challenged the WCD

regulation; rather, it has explained why this WCD does not comply with it.  The regulation—

which is mandatory for pipelines like DAPL—calls for a calculation of the "maximum" release

time "in hours," including the "maximum response [e.g. detection and shutdown] time in hours,"

based on historic spills, the flow rate, and largest potential drain-down volume.  49 C.F.R. §

194.05(b)(1).  This WCD fails to do any of that.[4]  Instead, the WCD incorporates the absolute

*minimum* conceivable potential release time, nine minutes, an estimate that includes literally zero

---

[4] The violation of a federal or state regulatory standard is one of the ten "intensity" factors in
determining NEPA significance.  40 C.F.R. § 1508.27(b)(10); *Sierra Club v. U.S. Forest Serv.*,
843 F.2d 1190, 1195 (9th Cir. 1988) (agency violated NEPA when it failed to consider whether
project would comply with state water quality standards).

STANDING ROCK SIOUX TRIBE'S
SUMMARY JUDGMENT OPPOSITION/REPLY
(No. 1:16-cv-1534-JEB) - 10

time to detect a spill, make the decision to shut down the pumps, and close the valves, and assumes that every safety system works perfectly. That is not a problem with the regulation but with the Corps' refusal to adhere to it.

Its next tactic is to invoke a single report submitted by the Oglala Sioux Tribe (the "Earthfax" report), and erroneously claim that it urged consideration of a lower WCD than the one adopted by the Corps. Corps Opp. at 19-20.[5] This is a remarkably disingenuous argument. Oglala's summary judgment motion explained in detail why characterizing the volumes in that early expert review as a WCD is false. ECF 434-2. The Earthfax report does not propose, either explicitly or implicitly, a WCD or anything like it. Nor does it critique the Corps' WCD, as that estimate was not even available at the time the report was prepared. Instead, it offers a range of potential spill scenarios and examines how they would impact water quality, none of which were characterized as a "worst case" spill. Moreover, since the report preceded much of the specific information available later, the report made assumptions that proved incorrect. For example, the report assumed that valve spacing and topographic conditions would prevent more than one mile of the pipeline's volume from draining into the Lake. Based on that assumption, the report observed that a potential spill volume of 4,620 barrels "could result" from the "drain-down" volume of oil left in the pipeline. USACE_ESMT0625-26. "Obviously," the report qualified, "if the length of pipeline that drains to the water is longer, the spill volume impacting the river or reservoir could be substantially higher." *Id.* Of course, it is now known that there are 1.9 miles of pipe that would drain into Oahe, considerably increasing this component of the potential spill

---

[5] The Corps' assertion that the Tribe "relies" on the Earthfax report is also misleading. The Tribe has never indicated that the potential spills discussed in the Earthfax report constitute a WCD at all, let alone a legitimate one. The report was one of several sources cited by the Tribe critiquing the Corps' false assumption that valves would close immediately. *See* ECF 195, at 13.

STANDING ROCK SIOUX TRIBE'S
SUMMARY JUDGMENT OPPOSITION/REPLY
(No. 1:16-cv-1534-JEB) - 11

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

volume.  USACE_DAPL72253 (calculating 8,751 barrels from pipeline drain-down).[6]  The

Earthfax report is also explicit that it does not consider things like the potential for valve failure,

which would also increase spill volumes, USACE_ESMT0625-26, nor does it include either

detection time or pump shutdown time, both of which are a necessary part of a WCD.  For the

Corps to repeatedly and misleadingly highlight the Earthfax report, at the expense of extensive

evidence that contradicts the WCD, speaks volumes.

    The Corps also tries to make up for the flaws in the WCD by asserting that it is overly

conservative in other respects.  But these arguments do not offset the WCD's many flaws,

particularly given that the regulation itself calls for the "largest volume" possible spill that

specifically forecloses some of their arguments.  49 C.F.R. § 194.105(b).  The Corps also fails to

justify these "conservative" assumptions in light of evidence in the record that undercuts them.

For example, the Corps repeatedly argues that an assumed "guillotine" cut is implausible.  Corps

Opp. at 16.  To the contrary, major spills virtually always involve major ruptures.  In the

Kalamazoo River spill, the pipeline opened up laterally, creating an opening that was *larger* than

what would occur in a guillotine cut.  RAR 1324, 1345 (80-inch gash in 30-inch pipeline).  The

Corps also continues to rely on a claimed "anti-siphoning" effect that is inconsistent with the

WCD regulation (which calls for the "largest line drainage volume after shutdown"), and that has

been disputed since the early days of this process, RAR 1436 ("this concept for water does not

simply apply to crude oil").  And it continues to pretend that "nearly 100 feet" of soil on the

pipeline would prevent spills even though its own studies show that a spill in the pipeline near

Lake Oahe (where it is shallowly buried) would find its way into the water.  RAR 8855

---

[6] Similarly, the report estimated valve closure times based on generic data.  But engineering
specific to DAPL showed that valve closure would take substantially longer than the estimates
used by Earthfax.  DAPL Opp. at 26.

STANDING ROCK SIOUX TRIBE'S
SUMMARY JUDGMENT OPPOSITION/REPLY
(No. 1:16-cv-1534-JEB) - 12

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

(modeling spill from valve site).  Major spills from buried pipelines find their way into the water

with alarming frequency.  The Corps never explains its continued reliance on assertions that have

been credibly refuted.  The Corps is also notably silent about EPA's contingency plan for the

Missouri River, which estimates the WCD from a 30-inch pipeline to be 50,000 barrels—over

four times as large as DAPL's WCD.  SRST Mem. at 14.  In short, there is nothing

"conservative" about this WCD.[7]

>    2.    *The WCD does not account for any detection time.*

As the Tribe documented, the WCD omits any time to detect a pipeline spill and make

the decision to act on it by initiating pump shutdown, even though this is often the critical factor

in determining the size of pipeline spills.  SRST Mem. at 17; RAR 1431 ("Control room

operators get alarms which vary in their importance, priority, and creditability.  Numerous and

false leak detection alarms are a problem that plague control room operations.").  The Corps

barely makes any attempt to defend this critical failure besides offering the conclusory statement

that it was "proper to assume a full bore pipeline rupture would be detected quickly."  Corps

Opp. at 18.  But it points to no record evidence that it gave even a moment's consideration to the

issue, nor can any be found.[8]  Nor does the Corps try to defend the untenable claim that the nine-

minute pump shutdown time includes one minute of detection time, an unsupported addition to

the record at the tail-end of the remand process.  SRST Mem. at 17-20.  Its retreat is

---

[7] The Corps argument that the Tribe never claimed that the WCD is "completely contrary to accepted professional practice" is puzzling.  Corps Opp. at 27.  The Tribe repeatedly said exactly that.  *See* RAR 7504 (WCD is "contrary to known, well-regarded studies of actual industry performance and grossly underestimate WCD"); RAR 7506-09 (documenting DAPL's inconsistencies with best professional practices in industry).

[8] Although the Corps states that PHMSA "did not object" to the WCD, Corps. Opp. at 27, it is unable to point to a single document in the record in which PHMSA weighed in on the matter, or even show that it was given the opportunity to do so.  The only expert input in the record on the WCD was highly critical.

STANDING ROCK SIOUX TRIBE'S
SUMMARY JUDGMENT OPPOSITION/REPLY
(No. 1:16-cv-1534-JEB) - 13

unsurprising, given that the model deriving the WCD was explicit that the "pumps are designed to be shut down in nine minutes."  RAR 14985; USACE_DAPL 74721 (pumps are shut down "within 9 minutes of detection"); USACE_DAPL 72253 ("pump stations are designed to shut down in 9 minutes").  Even the Corps' own brief lets slip the truth: "*after a leak is detected* the pumps can be shut down in nine minutes."  Corps Opp. at 18 (emphasis added).  No extra minute of detection time is built into the WCD, nor would there be any support for such an insignificant amount of time if it were. [9]

Similarly, the Corps has nothing to say about the many real-world pipeline releases that took hours or even days to detect, nor does it point to any indication in the record that it grappled with these examples and reached a reasonable conclusion in light of them.  For its part, DAPL offers the astonishing claim that the "typical time" for detection of a major rupture is one minute, even though the Tribe is unaware of even a single example of any rupture being detected that quickly.  RAR 1327 (list of major spills).[10]  DAPL also claims that spills from older pipelines offer no lessons for a modern one.  DAPL Opp. at 31.  This argument is not just unsupported by any record citation, it is factually incorrect.  The Tribe provided the Corps with data, even including a chart showing that "Newer Pipelines Have Greater Failure Rates" than older ones. RAR 2516; *see also* RAR 7491 (12-day Permian Express leak in brand new pipeline); USACE_ESMT 1273, USACE_DAPL 65394 (Keystone pipeline had 35 leaks in first year of operation); RAR 6388 ("Recently-constructed pipelines, such as DAPL, have demonstrated a

---

[9] DAPL attempts obfuscate these admissions by asserting that the Corps "resolved" a "wording inconsistency."  DAPL Opp. at 29.  But there was no inconsistency at to resolve—DAPL's spill model and the Corps' internal calculation say the same thing: pump stations require nine minutes to shut down *after* a spill is detected and the decision is made to shut them down.

[10] Its claim that the Tribe "forfeited" this criticism by not raising it earlier is baffling, as the absence of any detection time has been a key feature of the Tribe's advocacy for some time.

STANDING ROCK SIOUX TRIBE'S
SUMMARY JUDGMENT OPPOSITION/REPLY
(No. 1:16-cv-1534-JEB) - 14

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

higher rate of serious oil spills.").  Moreover, as the Tribe has consistently demonstrated, older pipelines typically use the same technology for detecting leaks used by DAPL, technology that has repeatedly failed during major spills.  RAR 7490 ( "highly-touted leak detection systems have a poor record of effective operation").[11]  In any event, DAPL's claim that the Corps reached a "conclusion that these examples are not predictive" is not backed up with a citation to any place in the record where the Corps considered the issues and reached any such conclusion. To the contrary, as with so many other things, the Corps signed off on the WCD without considering these critiques.

Rather than acknowledge the missing detection time, the Corps attempts another pivot, accusing the Tribe of seeking a "qualitative" rather than quantitative WCD assessment, and bizarrely complaining that the Tribe has never "critiqued the calculations" performed in the WCD.[12]  Corps Opp. at 16.  The Tribe has never sought a "qualitative" spill estimate, and it has been critiquing the "calculations" embedded in the WCD model from the very outset of this process.  The Tribe has provided extensive information that the WCD was flawed and should be revised, for example, to include reasonable time to detect and act on a spill.  Similarly, the WCD did not consider the possibility of the valves failing due to power loss or other problem, which by

---

[11] Even DAPL concedes as much.  It observes that the Kalamazoo River spill occurred when operators failed to act on warnings in the remote detection system.  DAPL Opp. at 31.  Their implicit argument that ETP operators would never make a similar mistake is belied by common sense as well as ETP's appalling safety record.  RAR 1324 ("The system cannot decide to close the pipeline by itself and requires human instruction. Human error will always exist in the system.")  Warnings in the leak detection systems do not, by themselves, shut down a pipeline: that is a management decision made by humans based on multiple data points, one that experience has shown again and again to be a time-consuming and frequently error-plagued process.  RAR 1431.

[12] It also complains that the Tribe never supplied it with any alternative approach to the WCD regulation.  Corps Opp. at 16.  But the Tribe only asked that the WCD regulation be applied correctly, e.g., with an appropriate "maximum" release time, not that some other method be used.

STANDING ROCK SIOUX TRIBE'S
SUMMARY JUDGMENT OPPOSITION/REPLY
(No. 1:16-cv-1534-JEB) - 15

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

itself would triple the WCD.  These are explanations of why the "quantitative" analysis reached the wrong result, not a request to perform a wholly different form of analysis.  There was no need for the Corps to use an alternative model—it just needed to use the existing one properly.

Next, the Corps denigrates the Tribe's concerns by complaining that addressing them would mean a "theoretically unlimited" spill.  Corps Opp. at 17.  But that has never been the Tribe's argument either.  The WCD regulation requires a numerical estimate of a worst-case spill, based on specific parameters and verifiable data.  Agencies and companies use these estimates all the time.  The Tribe has not asked for anything different here.  The Tribe understands that the regulation allows for the application of reasonable discretion, and that a different WCD might pass muster under arbitrary and capricious review even if lower than the one the Tribe thought most accurate.  However, that does not mean that the Corps can ignore entire categories of serious problems.  *WildEarth Guardians v. Zinke*, 368 F.Supp.3d 41, 82 (D.D.C. 2019) (upholding agency approach where agency "considered Plaintiffs' suggested methodologies and explained why it did not use them").

For example, the WCD does not account for DAPL's parent companies' (ETP and Sunoco) safety record, which is an issue impacting both the question of likelihood (what is the chance of a spill?) as well as the question of consequences (what is the worst-case spill scenario in light of the operator's historic record?).  The WCD regulation explicitly calls for consideration of "historic discharge data" in calculating the WCD.  49 C.F.R. § 195.05(b).  The Corps misleadingly states that this reference is limited to historic discharge data "for the pipeline."  Corps Opp. at 15.  However, no such qualification appears in the regulation, or anywhere else, nor would it make any sense—since a new pipeline will never have "historic" spill data.  There can be no dispute that: a) the Tribe repeatedly urged the Corps to consider ETP's record in

STANDING ROCK SIOUX TRIBE'S
SUMMARY JUDGMENT OPPOSITION/REPLY
(No. 1:16-cv-1534-JEB) - 16

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

evaluating the WCD, b) the Corps never did so; and c) the Corps never explained why it did not.

That is textbook "arbitrary and capricious" agency action.

> 3.      *The WCD does not account for valve closure or the risk of power failure.*

The Corps also does not appear to dispute that the WCD fails to include the additional 3.9

minutes for valve closure.  SRST Mem. at 20.  The Corps' observation that a 2017 study—

developed *after* the WCD was derived—found that the closure times might be a few seconds less

is hardly enlightening given that the WCD accounts for no valve closure time at all.  Corps Opp.

at 19.  DAPL, in contrast, conjures an excuse that has no basis in reality.  It asserts that volume

lost during the 3.9 minutes of valve closure is already included, as part of the volume remaining

in the pipeline once valves are closed.  DAPL Opp. at 32.  That is patently false—the drain down

volume is a simple calculation of the volume of oil remaining in the pipeline between the valves

*once the pipeline is shut down and valves closed*.  USACE_DAPL 72253.  It does not

contemplate that the valves would be in the process of closing during those four minutes—during

which time additional oil would continue to flow into the "drain-down" area while it spilled.

Four more minutes of flow at the pipeline's pumping rates by itself would constitute a major

spill, and alone constitutes a major error in the WCD.

As to the risk of a valve failure—which no one disputes would add another 21,000 barrels

of oil to the WCD, nearly tripling it—the Corps offers no response.  Corps Opp. at 19.  The

Corps does not deny that there is no backup power at the valves, so that in the event of a power

failure they would remain in the open position.[13]  RAR 3288 (Corps "acknowledged that there is

no back-power for the shut-off valves").  Instead, it offers only the conclusory claim that it was

"reasonable to assume" that valves would function properly.  *Id*.  Yet again, however, the Corps

---

[13] "Fail safe" means that valves remain in the position they are in when power is lost.  RAR 157.

STANDING ROCK SIOUX TRIBE'S
SUMMARY JUDGMENT OPPOSITION/REPLY
(No. 1:16-cv-1534-JEB) - 17

offers no evidence in the record that it ever considered the issue of backup power, and made any kind of "reasonable" decision in light of the information available to it. It makes no effort to explain why such an assumption would be "reasonable" in light of the documented risk of power failure in the remote Oahe crossing area.

DAPL, in contrast, claims that there *is* backup power, seriously misrepresenting the conclusions of the "audit" using a partial quotation. DAPL Opp. at 33. The audit confirms that there is remote power available "to maintain communications" with the valve sites—not backup power that could close them. ECF 347-2 at 13. DAPL's own threat assessment acknowledges that there is no backup power to close the valves. RAR 14888. And while a violation of an easement condition is an enforcement issue, it is also a factor in assessing whether the WCD is arbitrary—one that the Tribe repeatedly urged the Corps to consider. *See also* 40 C.F.R. § 1508.27(b)(10) (violation of regulatory standards an "intensity" factor under NEPA).

In sum, the WCD lies at the heart of the original FONSI as well as the remand's conclusion affirming it. The Spill Model Report models the WCD to evaluate what would happen if it spilled into Lake Oahe. The Downstream Receptor Report assesses what the WCD would do to fish, wildlife, and people. These studies, in turn, informed the Corps' conclusion that the impacts of a spill are limited and manageable. This Court finds the WCD arbitrary in light of the Tribe's persistent expert critiques.

## III.   THE FLAWED RISK ASSESSMENT

The question of the "likelihood" of a spill event constitutes the other half of the equation that the Corps must assess under NEPA. Unaddressed expert critiques undercutting the Corps' dismissal of risk was a key factor that led to the remand. *Standing Rock III*, 255 F.Supp.3d at 129 (listing critiques of risk analysis). These critiques were amplified during the remand, but were either dismissed with minimal explanation or ignored completely. In its opposition, the

STANDING ROCK SIOUX TRIBE'S
SUMMARY JUDGMENT OPPOSITION/REPLY
(No. 1:16-cv-1534-JEB) - 18

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

Corps neither explains why these issues do not rise to the level of "controversy" warranting an EIS, nor attempts to draw a rational connection between the facts in the record and its conclusion. *Semonite*, 916 F.3d at 1077 (EIS required where qualified technical experts had "serious misgivings" about Corps' conclusions). In fact, it is difficult to see what new work the Corps undertook to resolve these questions during the remand at all. The Corps failed to address controversy over risk with respect to three key issues: ETP's safety record; the failure to implement industry best practices despite the promise in the EA to do so; and the unique safety risks of Bakken crude oil.

      A.    <u>ETP Safety Record.</u>

The Tribe's opening brief documents how the Tribe provided the Corps with detailed information about ETP's worst-in-class safety and compliance record, but how that information was never considered during the remand. The Corps' response starts with a familiar pivot—that issues of risk were "not within the scope" of the remand, and hence it was under no obligation to consider the Tribe's concerns in the first place. Corps Opp. at 21. This is not correct: issues of risk were integral to the unaddressed expert critiques that triggered the remand. *See, e.g.,* USACE_ESMT001080 ("The risk analysis is missing critical details."); RAR 1465 ("A valid risk analysis would recognize the history of the operator, but that didn't happen here… I believe that the EA gravely underestimates the risk of leaks and spills."); RAR 1430. And since the Corps in the next breath claims to have addressed ETP's record during the remand, it cannot escape accountability for its conclusions. Moreover, its citation to unrelated matters that it did consider in assessing risk, Corps Opp. at 21-22, does not absolve it for failing to consider and explain its decision in light of the specific issues associated with ETP's record.[14]

---

[14] DAPL's complaint that PHMSA regulations do not require "company-specific safety analysis," DAPL Opp. at 23, is also unhelpful. PHMSA does not have *any* regulations that

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

The Corps next argues that it was the Tribe's burden to supply it with an "alternative methodology" to evaluate risk.  Corps Opp. at 21.  That argument fails too.[15]  The Tribe has no obligation to provide the Corps with a specific roadmap on how to assess technical matters before it.  *City of Davis v. Coleman*, 521 F.2d 661, 671 (9th Cir. 1975) ("Compliance with NEPA is a primary duty of every federal agency; fulfillment of this vital responsibility should not depend on the vigilance and limited resources of environmental plaintiffs.  It is the federal agency, not environmental action groups or local government, which is required by NEPA to produce an EIS");  *Dubois v. U.S. Dept. of Agriculture*, 102 F.3d 1273, 1291 (1st Cir. 1996) (rejecting argument that plaintiffs need to provide specific data when commenting: "Such 'specifics' are not required.");  *Oregon Nat'l Desert Assoc. v. Rasmussen*, 451 F.Supp.2d 1202, 1212 (D. Or. 2006) (plaintiff does not need to provide agency with information in order for agency to consider the issue).  As this Circuit has emphasized, "an agency must fulfill its duties to 'the fullest extent possible.'"  *Delaware Riverkeeper Network v. F.E.R.C.,* 753 F.3d 1304, 1310 (D.C. Cir. 2014).  The Tribe did its part by highlighting with extensive data that the Corps' risk conclusions could not be justified in light of ETP's safety record.  It was the Corps' job to consider the information "to the fullest extent possible."  *Id.*

In any event, there is no need for a specific model for the Corps to consider ETP's record.  SRST Mem. at 29.  The issue is not particularly complicated.  The Corps concedes that it relied on generic national statistics to conclude that the risk of a major spill is low.  Corps Opp. at 21-

---

dictate what another agency considers in a NEPA analysis.

[15] The Corps claims that it asked the Tribe to provide such a methodology but that the Tribe refused.  Corps Opp. at 22.  That is false.  The document cited by the Corps as evidence of such request was the remand decision itself.  RAR 137.  The Corps never engaged on this issue, despite the Tribe's many efforts.  RAR 330 (dismissing Tribe's safety information as "nothing new").

STANDING ROCK SIOUX TRIBE'S
SUMMARY JUDGMENT OPPOSITION/REPLY
(No. 1:16-cv-1534-JEB) - 20

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

22.  Notably, there is no regulation, guidance, or safety standard that supports this approach.[16]

The Tribe's Remand Analysis explained why reliance on these generic statistics presented an

incomplete picture in light of ETP's worst-in-the-industry safety record.  After the May meeting,

at which "Corps officials appeared unfamiliar with" the issue, the Tribe tried again, providing

additional data.  RAR 336.  There may have been any number of ways in which the Corps could

have addressed the issue—particularly in light of the generally qualitative approach it used.

What it cannot do is pretend the concern does not exist.  Its justification that 70% of ETP spills

were confined to its property (which the Corps oddly characterizes as "the vast majority") is

neither explained nor even a plausible explanation for otherwise side-stepping a focal issue

during the remand.  Why the Corps found this figure reassuring is not evident: the fact that 30%

of ETP's hundreds of spill incidents are *not* confined to operator property should have been a

major red flag.  RAR 7506-09 (calculating 421 spills between 2006 and 2017, a rate of three a

month).  Nor does the Corps explain how the Tribe's concerns were addressed by the fact that

ETP underwent two "employee safety culture surveys" over the past decade, when that is the

same period during which it racked up the industry's worst safety record.  DAPL Opp. at 24.

The Corps' attempt to salvage its findings by saying it is not arbitrary to rely on "incomplete

data" is also unpersuasive.  Corps Opp. at 23.  All of the data on ETP's safety record was

available to the Corps; it just failed to consider it or explain its decision in light of it.  That is

textbook "arbitrary and capricious" agency conduct.

---

[16] Indeed, as the Tribe explained, "high consequence, low frequency" events like oil spills do not translate into "low risk" issues that warrant only casual scrutiny.  RAR 7507.  If this was true, we would not have regulatory agencies to closely manage risks of commercial airliners or nuclear power plants.  A company with the worst safety record in the industry should not be permitted to hide behind generic industry statistics to deflect from their own poor performance.

STANDING ROCK SIOUX TRIBE'S
SUMMARY JUDGMENT OPPOSITION/REPLY
(No. 1:16-cv-1534-JEB) - 21

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

B.      Industry Best Practices.

The Tribe's opening brief explained how the EA's insignificance finding was based on a false promise that DAPL would comply with industry "best practices," including key API standards.  SRST Mem. at 30-32.  Standards like API 1173, which focuses on historic performance to manage risks and continually improve safety, are of critical importance, especially for an operator with ETP's safety record.  *Id.*; RAR 336.  The remand record shows that despite this promise, industry best practices were never considered by the Corps.  *Id.* Although the Tribe raised this issue repeatedly, the Corps never says a word about it in its remand decision.

In its opposition, the Corps barely offers any defense of this failure.  Instead, it tries to reframe the Tribe's challenge as a substantive one, attacking a straw-man argument—whether it is *obligated* to impose compliance with API standards—that the Tribe never made.  Corps Opp. at 23.  The Tribe never argued that API standards are mandatory.  Rather, the Tribe explained how the Corps' risk analysis is arbitrary because it relies on compliance with industry best practices that the Corps neither studied nor established as permit conditions, and with which DAPL does not comply.  As to the Tribe's real argument, the Corps is mostly silent.

Next, the Corps backpedals, ignoring the EA's false claim that industry best practices would be implemented by asserting that the project complies with *regulatory* standards.  Corps Opp. at 24.  But there was extensive technical input both before and during the remand that current pipeline regulatory standards are entirely inadequate—which is precisely why API developed better voluntary standards.  RAR 1464 ("To the extent that DAPL or the Corps imply that simply satisfying federal regulations represents the state of the art or cutting edge of pipeline safety, they are wrong.  Our regulatory infrastructure is widely regarded as inadequate for crude oil pipelines.").  The Corps' continued reliance on regulatory minimums in the face of these

STANDING ROCK SIOUX TRIBE'S
SUMMARY JUDGMENT OPPOSITION/REPLY
(No. 1:16-cv-1534-JEB) - 22

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

critiques is precisely the kind of technical input "that reveals flaws in the methods or data relied

upon by the agency in reaching its conclusions." *Standing Rock III*, 255 F.Supp.3d at 128.

While this Court previously found that reliance on PHMSA regulatory standards was not

unreasonable, it also found that the Corps failed to address expert critiques about its risk

assessment.  In any event, the question is not whether the Corps can rely on PHMSA standards.

The question is whether it was arbitrary to rely on API standards for a finding of insignificance

when those standards were neither evaluated nor implemented.  *Robertson v. Methow Valley*

*Citizens Counc.*, 490 U.S. 332, 352 (1989) ("mitigation [must] be discussed in sufficient detail to

ensure that environmental consequences have been fairly evaluated"); *South Fork Band Counc.*

*v. Dept. of Interior*, 588 F.3d 718, 726 (9th Cir. 2009) ("An essential component of a reasonably

complete mitigation discussion is an assessment of whether the proposed mitigation measures

can be effective.").  The Tribe provided a wealth of information on why certain API standards

would provide a significant reduction in risk if implemented.  The Corps neither considered nor

mandated compliance with these standards, and makes no attempt to justify its decision claiming

that they are in place.

    DAPL takes a different approach, claiming the pipeline *does* in fact comply with the API

standards.  But it cites to other standards, some of them outdated, that were not the subject of the

Tribe's input during the remand.  The Tribe focused on the most modern API standards that

govern safety management and leak detection systems developed in response to recent accidents

and regulatory failures.  *Compare* DAPL Opp. at 24 (citing API 1130 and 1104) *with* SRST

Mem. at 30-32 (focusing on API 1173, 1174, and 1175); RAR 7510-11 (discussing importance

of modern API standards).  The standards cited by DAPL neither compete with nor are a

substitute for the ones cited by the Tribe.  Moreover, even the standards that DAPL relies on do

STANDING ROCK SIOUX TRIBE'S
SUMMARY JUDGMENT OPPOSITION/REPLY
(No. 1:16-cv-1534-JEB) - 23

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

not appear in the record.  DAPL is unable to point to any indication that the Corps actually

considered these standards, or made a reasoned decision about which ones to impose and which

ones not to.  Had the Corps assessed the various API standards and offered a reasoned

justification for choosing to mandate some but not others, based on the application of technical

expertise, it might be able to withstand arbitrary and capricious review.  But it did not, opting

instead to let stand the false assurance of compliance with industry "best practices" that are not

being implemented.

       C.      <u>Bakken Crude Safety Risks.</u>

       The Corps' response to the Tribe's concerns about the unique safety risks of volatile

Bakken crude is the most dismissive of all.  Corps Opp. at 24-25.  It claims to have given the

issue careful study but does not, and cannot, point to any indication in the Remand Analysis, or

elsewhere in the record, suggesting that the Tribe's extensive technical input was ever heard and

considered.  Nor does it deny that the safety handbook it relied on is nearly a decade old and

preceded virtually all of the recent safety information developed after numerous Bakken-related

accidents.  Here again, the Tribe provided a robust technical critique of the Corps' approach to

assessing risk, one that encompassed an entire chapter of its Remand Report and numerous other

outreach efforts.  RAR 3289 (Corps never consulted with Indian Health Service on health risks

of Bakken crude).  The Corps makes no effort to justify its conclusion in light of these critiques,

instead falling back on a breezy dismissal that it is "always possible to explore a subject matter

more deeply."  Corps Opp. at 25.  The Corps must explain its decision in light of the evidence in

the record, and coherently consider whether expert critiques of its data and methods rendered the

decision controversial.  There is no evidence that it did.

       For its part, DAPL pursues a familiar strategy of misdirection.  It claims that the Tribe's

concerns about the unique risks of Bakken crude were, in fact, studied in the Downstream

STANDING ROCK SIOUX TRIBE'S
SUMMARY JUDGMENT OPPOSITION/REPLY
(No. 1:16-cv-1534-JEB) - 24

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

Receptor Report.  DAPL Opp. at 38.  It also observes that the word "Bakken" appears in the EA.

But the Downstream Receptor report has nothing to do with safety and first responders, and does

not say a word about the unique risks of Bakken crude.  Neither does the EA or FONSI.  DAPL

then repeats its fallback position that the unique flammability of Bakken supports the decision to

authorize the pipeline, because of a claimed lower risk of ignition compared to rail transport.

The claim is also not actually reflected anywhere in the record, nor does it make any sense.

Ignition only becomes a concern once Bakken crude has spilled from whatever it is being

transported in, whether a rail car or a pipeline.  Spills occur in uncontrolled environments where

ignition is impossible to predict.  Moreover, this Court has already found that pipelines are not

necessarily safer than rail cars.  *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,* 282

F.Supp.3d 91, 107 (D.D.C. 2017*) ("Standing Rock IV")* ("Defendants have failed to persuade the

Court that transport by train is significantly more dangerous than allowing oil to continue to flow

beneath Lake Oahe."); RAR 1506.  A spill of Bakken crude from DAPL would put Tribal

responders in jeopardy.  The Corps' repeated claim that the risks and consequences of spills are

minor failed to grapple with these special risks.

IV.     THE FLAWED ENVIRONMENTAL JUSTICE ASSESSMENT

It seems impossible to dispute that siting a major crude oil pipeline yards upstream of a

Tribal reservation with a history of government-sponsored harm, and one of the poorest

communities in the nation, presents serious environmental justice implications.  RAR 3803.

Indeed, the Tribe presented the Corps with a detailed expert study that explained in detail just

how "disproportionately" the pipeline's burdens fell on the Tribe.  *Id.*  As the Tribe's expert

report concluded, and which no one has made any attempt to refute:

> The findings of large racial and socioeconomic disparities associated with [the Corps]
> Selected Route indicate serious environmental justice concerns…. It is clear from our
> analysis that there are significant environmental justice concerns associated with the

STANDING ROCK SIOUX TRIBE'S
SUMMARY JUDGMENT OPPOSITION/REPLY
(No. 1:16-cv-1534-JEB) - 25

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

DAPL route that were not identified in the NEPA environmental review process as a result of a number of major flaws with the EJ analysis approved by the ACE.  That potential disproportionate impacts to American Indians were not adequately considered raises questions about how seriously and thoroughly EJ issues were investigated and taken into account in pipeline decision making and whether the federal trust responsibilities were abrogated.

RAR 3815.

Yet while the Corps devoted nearly 60 pages of its remand analysis to an environmental justice analysis, it still found itself unable to concede the obvious.  Instead, it concluded that there are no significant impacts on low-income or minority populations warranting an EIS or additional mitigation.  RAR 100.  It reaches this conclusion primarily because of the alleged "low probability" and "limited extent of expected effects" of a spill, RAR 87, a conclusion that is unsustainable for the many reasons discussed above.  The Corps further diminishes the impact of a spill on the Tribe by weighing impacts on non-Tribal members, and masks the disproportionate impact on environmental justice populations by shifting the focus from disproportionate impacts to the total numbers of people impacted.  Its conclusions are arbitrary and must be set aside.

The Corps does not dispute that a spill would have, in the words of former Chairman Archambault, "uniquely Tribal impacts which are grounded in our culture, traditions and history and *which go far beyond those faced by non-Tribal communities*."  RAR 85; USACE_ESMT 594 ("The Standing Rock and Cheyenne River Sioux Reservations are the permanent and irreplaceable homelands for the Tribes.").  It even grudgingly acknowledges the Tribe's perspective in places.  RAR 88.  But it then diminishes the significance of this acknowledgment by weighing the impacts of non-Natives as equivalent.  RAR 86 ("the shoreline along the reservation boundaries and non-tribal land are both at risk").  It also reaches a conclusion—that there is no environmental justice problem—that cannot be squared with the unique impacts that would be felt exclusively by Tribal members and that are carefully documented in the record.

STANDING ROCK SIOUX TRIBE'S
SUMMARY JUDGMENT OPPOSITION/REPLY
(No. 1:16-cv-1534-JEB) - 26

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

The Tribe understands that a concession by the Corps that there are environmental justice

impacts does not, by itself, require that permits be denied, or trigger an EIS.  The law does,

however, hold the agency accountable to telling the truth.  The Corps appears unable to do so.

As to the comparison of the route to the North Bismarck alternative, the Corps has very

little to say.  It claims that it did "disclose disproportionate impacts on Tribes and Tribal

members."  Corps Opp. at 30.  But the document repeatedly finds exactly the opposite.  RAR 1,

65 ("there is no disproportionately high or adverse effects to minority or low-income populations

anticipated"), 100.  And its discussion of the North Bismarck alternative speaks for itself—the

Corps explicitly concludes that this alternative is less preferable from an environmental justice

standpoint because it would harm more "potentially affected minority individuals" in total.  RAR

99.  But this would virtually always be the outcome in a comparison between a wealthier

metropolitan area and an Indian Reservation, and fails to grapple with the seriously

disproportionate impact on tribal members of the Oahe route.[17]  This is contrary to law.  § 30392,

Exec. Order 12,898, 59 Fed. Reg. 8113 (Feb. 16, 1995) (agencies shall use population data "to

determine whether their [activities] have disproportionately high and adverse human health or

environmental effects on minority populations and low-income populations.").  The Corps'

updated environmental justice analysis is just as flawed as the original.

V.    THE FLAWED CONSULTATION PROCESS

In response to the Tribe's claim that the remand process violated both NEPA and binding

_____

[17] Obviously, the Tribe does not argue that the overall numerical impacts should be hidden.
DAPL Opp. at 45.  This Court has already held otherwise.  *Standing Rock IV* at 102.  The
problem is that the comparison focuses on the total numerical impacts exclusively, and does not
mention the disproportionate impacts documented in the Tribe's report.  RAR 3803.  Moreover,
DAPL's attempt to repackage the issue as a substantive choice between the two options—rather
than a procedural duty to disclose—also misses the mark.  DAPL Opp. at 45.  While the Corps
gets to choose, it cannot do so without disclosing the tradeoffs.

STANDING ROCK SIOUX TRIBE'S
SUMMARY JUDGMENT OPPOSITION/REPLY
(No. 1:16-cv-1534-JEB) - 27

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

consultation policies, the Corps returns to a familiar refrain.  It had no duty to consult with the

Tribe, it argues, and even if it did, it complied with that duty.  It also predictably tries to shift

blame onto the Tribe.  The record, however, tells a different story.  The core issue here concerns

the Tribe's repeatedly ignored requests for information—not whether the Corps held a meeting.

Despite the fraught relationship, the Tribe sought sufficient technical data so it could provide a

fully informed analysis.  As the Tribe's submissions demonstrate, it provides relevant, high-

quality technical and cultural input.  And while nothing prevented the Corps from sharing that

information, it steadfastly refused to so.  While the Corps' consultation duties are flexible, there

are limits.  This process ran afoul of them.

> A.      The Corps Has a Duty to Meaningfully Consult with the Tribe.

The Corps' first strategy to address the Tribe's claim is to disavow that its policies

impose any obligations at all, mischaracterizing DOD Instruction 4710.02 as nonbinding

"guidance."  Corps Opp. at 35 (incorporating ECF 183 at 39-42).  That effort must fail.  *General

Elec. Co. v. E.P.A.*, 290 F.3d 377, 383 (D. C. Cir. 2002) ("an agency pronouncement will be

considered binding as a practical matter if it either appears on its face to be binding, or is applied

by the agency in a way that indicates it is binding") (citation omitted).  Instruction 4710.02 is

styled not as guidance but as an "Instruction" and is framed in plainly mandatory terms.  RAR

13975.  It "implements DOD policy, assigns responsibilities, and provides procedures" for

military interactions with Tribes.  *Id.*  The Instruction states that the Corps "shall" consult with

Tribes in accordance with numerous specific standards, including the DOD American Indian and

Alaska Native Policy, Executive Order 13175, 65 Fed. Reg. 67249 (Nov. 6, 2000), and a

Presidential memorandum on relationships with Tribal governments.  RAR 13978-80.[18]  It

---

[18] The DOD Policy is available at https://www.denix.osd.mil/na/policy/dod-policies/american-indian-and-alaska-native-policy/.  The 1994 Presidential Memorandum is available at

STANDING ROCK SIOUX TRIBE'S
SUMMARY JUDGMENT OPPOSITION/REPLY
(No. 1:16-cv-1534-JEB) - 28

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

directs DOD leaders to "develop additional policy and guidance as needed" to implement the

Instruction.  *Id.*  Removing any doubt, the Instruction includes a separate enclosure called

"Guidance for Consultation with Tribes," which is framed in more optional terms such as "may"

and "should."  RAR 13977.  The Instruction also does not contain the disclaimer appearing in

some other policies that it does not establish binding rights or responsibilities.  *See, e.g.,* RAR

13990 (Corps consultation policy); *but see Appalachian Power Co. v. E.P.A.*, 208 F.3d 1015,

1023 (D.C. Cir. 2000) (holding "guidance" to be binding despite similar disclaimer).  The Corps

cannot pretend Instruction 4710.02 is meaningless.[19]

The Corps' effort to distinguish the caselaw fares no better.  For example, it argues that

*Yankton Sioux Tribe v. Kempthorne*, 442 F.Supp.2d 774 (D.S.D. 2006), is inapplicable because it

involved a statutory duty to consult.  Corps Opp. at 35.  Obviously, the Tribe is not invoking the

same source of authority as in that case (which concerns education funding).  Here, the Corps'

duties arise under DOD policies and NEPA, and the holding of *Yankton Sioux Tribe*—that

agencies must comply with their own consultation policies—is plainly applicable.  Its attempt to

distinguish *Oglala Sioux Tribe of Indians v. Andrus*, 603 F.2d 707, 710 (8th Cir. 1979), also

fails.  As the Corps concedes, that case involved an agency violating consultation duties by

making a decision before consultation had even occurred.  *See United Keetoowah Band of*

*Cherokee Indians v. Fed. Comms. Comm'n,* 933 F.3d 728, 750 (D.C. Cir. 2019).  That is

precisely what happened here: drafts of the remand document confirming that "no new

---

https://www.justice.gov/archive/otj/Presidential_Statements/presdoc1.htm.

[19] Instruction 4710.02 was amended on September 24, 2018, a few weeks after the conclusion of
the remand process.  The 2006 version of the Instruction, which appears at RAR 13975, was
applicable during the remand.  The Tribe's opening brief mistakenly cited to a few portions of
the 2018 version.  However, the 2006 version is the stronger policy.  For example, it makes
compliance with otherwise non-binding consultation policies mandatory.  RAR 13978.

STANDING ROCK SIOUX TRIBE'S
SUMMARY JUDGMENT OPPOSITION/REPLY
(No. 1:16-cv-1534-JEB) - 29

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

information" was received were circulating long before any input from the Tribe.  RAR 10203;

RAR 10354 (Corps strategizing how to "refute the existence of" controversy).[20]

The Corps pursues the same misleading tactics with respect to its duties under NEPA.

The Tribe obviously understands that CEQ regulations do not contain specific prescriptions for

Tribal engagement during the remand of an inadequate NEPA analysis—they simply do not go

into that level of detail.  That hardly means that the Corps has no obligations to engage with the

Tribe under NEPA, as defendants suggest.  NEPA requires stakeholder involvement on an EA to

the greatest extent "practicable," a legal term of art that allows an agency some discretion but

nonetheless imposes meaningful obligations.  *Ashton v. Pierce*, 541 F.Supp. 635, 641 (D.D.C.

1982) ("The dictionary definition of 'practicable' is 'possible to practice or perform' or 'capable

of being put into practice, done, or accomplished.'  A synonym for practicable is 'possible.'  The

courts have consistently interpreted the term 'practicable' as requiring far more than a mere

balancing of conveniences."); *Nat'l Wildlife Fed. v. Norton*, 306 F.Supp.2d 920, 928 (E.D. Cal.

2004) ("'Practicable' is often used in the law to mean something along the lines of 'reasonably

capable of being accomplished.'") (citations omitted).

The Corps' citation to *TOMAC v. Norton*, 433 F.3d 852 (D.C. Cir. 2006), is unhelpful.  In

*TOMAC*, the Court found that under the totality of the circumstances of a limited remand, the

agency was not obligated to hold public comment on a new draft EA.  *Id*. at 861.  That decision

is limited to the case's facts.  The *TOMAC* court did not hold that additional process or outreach

---

[20] The Corps also misstates the holding of *Lower Brule Tribe v. Deer*, 911 F.Supp. 395 (D.S.D. 1995), which held that agencies must comply with their own consultation policies.  Corps Opp. at 34.  That court did not find that a "one to two hour" meeting satisfies agencies' consultation duties in general, or even in that case specifically—this language appears in a description of how consultation had occurred in the past.   The extent and scope of consultation is case-specific and fact intensive.  DOD Policy, *supra*, at 5.

STANDING ROCK SIOUX TRIBE'S
SUMMARY JUDGMENT OPPOSITION/REPLY
(No. 1:16-cv-1534-JEB) - 30

*Earthjustice*
*810 Third Ave., Suite 600*
*Seattle, WA  98104*
*(206) 343-7340*

would *never* be required, nor does it address the fact that the Tribe is not "the public" when it comes to this remand.  Exec. Order 13175, *supra* (U.S. government has a "unique legal relationship with Indian tribal governments").  Other cases, like *Oregon Nat'l Desert Assoc. v. Rose* (which both the Corps and DAPL noticeably decline to address), have found public involvement in an EA inadequate.  921 F.3d 1185, 1192 (9th Cir. 2019) (failure to make available technical documents in EA "preclude[d] informed decisionmaking").  As DOD policy recognizes, there is no "'one-size-fits-all' prescription for consultations with Indian Tribes." DOD Policy, *supra*, at 5.  Even the Corps agrees that public comment on an EA is required where there are "unusual circumstances."  Corps Opp. at 34.  It would be difficult to imagine a more "unusual" situation than the Corps' flawed permitting for DAPL, and the court-ordered remand to reconsider matters within the Tribe's special expertise.

B.  <u>The Corps Violated its Duty to Consult.</u>

Because the Corps owed a duty to the Tribe, under both its own policies and NEPA, the next question is whether it satisfied that duty during the remand.  The answer to that question is no.  DOD Instruction 4710.02 states that the Corps "shall involve tribal governments early in the planning process... .  Early involvement means that a tribal government is given an opportunity" to participate such that it "may affect" the decision.  RAR 13978.  NEPA imposes the same obligation.  40 C.F.R. § 1501.2.  The remand process violated this duty: the draft remand analysis declared that there was no "new information" long before the Tribe had any opportunity for input.  RAR 10203.[21]  Moreover, the Corps repeatedly ignored the Tribe's input on issues

---

[21] The phrase "no new information" recurs throughout the remand record.  *See, e.g.,* Downstream Receptor Rep. at RAR 2647.  It may be that the Corps was applying the standard for preparation of a supplemental EIS.  40 C.F.R. § 1502.9(c) (SEIS must be prepared if there are "new circumstances or information" that have bearing on impacts).  That is not the correct standard for the remand however—the question is whether the Corps' decision was arbitrary and capricious

STANDING ROCK SIOUX TRIBE'S
SUMMARY JUDGMENT OPPOSITION/REPLY
(No. 1:16-cv-1534-JEB) - 31

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

like the flawed WCD and ETP safety record until the process was almost complete, and then told

the Tribe that it was too late to revisit these issues.  RAR 3288.  If these duties mean anything,

the Tribe should have been involved early enough to have an impact on the decision.

Similarly, the 1994 Presidential statement on consultation (which is made mandatory in

DOD Instruction 4710.02) mandates an "open and candid" consultation process "so that all

interested parties may evaluate for themselves the potential impact" of proposals.  *See* 1994

Memorandum, *supra* at (b).  The DOD consultation policy (also made mandatory via DOD

Instruction 4710.02) requires consulting in "good faith" throughout the decisionmaking process

so that the Tribe's views are given "due consideration."  DOD Policy, *supra*, at 5.  As

documented above, however, the process was in no respect "open and candid."  To the contrary,

it was closed and secretive, with the Corps withholding critical technical materials that the Tribe

repeatedly sought.  In the initial permitting process, the Department of the Interior Solicitor

agreed that keeping technical work secret from the Tribe violated consultation duties

USACE_ESMT 585 ("the Corps has an obligation to ensure that any risks to treaty rights are

eliminated through an open and independent process"); USACE_ESMT 595 (Corps must share

information with the Tribe).  Just as it was arbitrary and capricious for the Corps to ignore the

Tribe's concerns about spill risk and impacts under NEPA, it also violated the Corps' duty to

consult in good faith under consultation policies.

As noted, NEPA regulations also require involvement of the public in the EA rewrite as

much as "practicable," and the Corps failed to adhere to that standard too.  The Tribe is a

sovereign nation, and the subject of the remand involved matters within the special expertise of

the Tribe—its rights are greater than those of the "public."  The Tribe explained, again and

---

in light of the full record.

STANDING ROCK SIOUX TRIBE'S
SUMMARY JUDGMENT OPPOSITION/REPLY
(No. 1:16-cv-1534-JEB) - 32

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

again, that it needed to access the technical materials in order to participate in the remand.

Confidential materials could easily have been provided pursuant to the protective order, and

hence there was no "practicable" reason for the Corps to refuse to engage with the Tribe as it

requested.[22]  Rather than address these very real issues, the Corps complains that allowing the

Tribe to comment on technical materials would result in a "never-ending circle" of process.

Corps Opp. at 33.  Of course, the Tribe does not seek a never-ending circle of comment.  It

sought a reasonable, practicable opportunity to review key technical materials so it could

comment before the Corps finalized a decision.  By withholding them, SRST Mem. at 44, the

Corps fell short of a "practicable" level of Tribal involvement.[23]

Predictably, the Corps and DAPL respond by falsely attacking the Tribe for "refusing" to

consult.  This insulting tactic cannot be squared with the record.  SRST Mem. at 43-44

(documenting Tribe's requests for consultation).  While defendants devote considerable attention

to a meeting that the Tribe's emergency response staff chose not to attend, that meeting was not

part of the remand.  It concerned this Court's directive that the parties work together on oil spill

response planning as an interim measure.  RAR 6594 (meeting was held "in response to the

court's Dec. 4, 2017 order on the oil-spill response plan").  Even DAPL acknowledged the

distinction, for example telling the Tribe that the requested information was not "necessary or

relevant to planning at Lake Oahe."  RAR 6565.  Regardless, the Tribe was within its rights to

---

[22] The question here is not whether the Corps could have conducted no remand process and
survived judicial review, as that is not what happened.  Instead, it worked closely with DAPL,
sharing information and allowing their lawyers to oversee technical materials, while shutting out
the Tribe.  That is not the "good faith" and "open" review required by consultation policies.

[23] The Tribe's opening brief documented some of the ways in which the Corps' approach
undermined the integrity of the remand.  For example, the Corps was unaware that there was no
DAPL-specific Integrity Management Plan or Operations and Maintenance manual until the
remand was complete.  SRST Mem. at 4-5; 45; RAR 4499 (O&M manual does not include
DAPL or any other ETP assets).  The Corps' brief fails to say anything about it.

STANDING ROCK SIOUX TRIBE'S
SUMMARY JUDGMENT OPPOSITION/REPLY
(No. 1:16-cv-1534-JEB) - 33

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

insist upon access to the technical reports and data in advance of the meeting so that it could be prepared to provide input, and decline to participate in what it felt was a sham meeting when that information was not forthcoming.  ECF 336, at 13 ("The Tribe's technical team has advised the Tribe that attempting to develop spill plans without a full understanding of potential spill events, risks, and dynamics is not a useful endeavor.").

Defendants also misleadingly claim that all of the missing information would have been shared had the Tribe participated in the spill response meeting.  DAPL Opp. at 59-60.  To the contrary, it was clear that neither the Corps nor DAPL was willing to "share" either the drafts or the underlying work behind critical technical products of the remand like the Spill Model or Downstream Receptor reports.  RAR 8403; RAR 3287 (focusing on obtaining Spill Model).  Even the documents that were provided, like the facility response plan, included "significant" redactions.  RAR 4113.  Tribal emergency response staff were not interested in being told the "results" of flawed spill modeling at a meeting—as the Tribe previously explained, it needed access to the work itself so that it could provide useful input.  ECF 336.

In sum, the duty to consult still means something.  Agencies must "seek, discuss, and consider" the views of Tribes, even if they do not ultimately adopt their views.  *United Keetoowah Band of Cherokee Indians v. Fed. Comms. Comm'n,* 933 F.3d 728, 750 (D.C. Cir. 2019).  They must do so "in good faith."  The record in this case shows that the Corps approached the remand with the sole objective of justifying its original decision, and it engaged with the Tribe in a way that ensured that it would not impede that objective.  *Standing Rock IV* at 109 ("the Court expects the Corps not to treat remand as an exercise in filling out the proper paperwork *post hoc*.").  The Corps never provided the Tribe with the information it needed, it never discussed the Tribe's concerns about key issues like the WCD or ETP's record, and it

STANDING ROCK SIOUX TRIBE'S
SUMMARY JUDGMENT OPPOSITION/REPLY
(No. 1:16-cv-1534-JEB) - 34

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

never "considered" whether Tribal input warranted a different conclusion. Instead, by the time

the Tribe finally had a meeting with the Corps, it was too late to reopen the process. If this

satisfies the Corps' duties, it is hard to know what would not.

## VI.   THE FLAWED NATIONAL HISTORIC PRESERVATION ACT PROCESS

### A.   <u>The Tribe's NHPA Claim Is "Capable of Repetition while Evading Review".</u>

The Tribe's opening brief argued that while its National Historic Preservation Act

("NHPA") claim may have been rendered moot by the completion of construction, it was

nonetheless subject to the exception to mootness for actions "capable of repetition while evading

review." Defendants make an unconvincing effort to argue otherwise.

First, the Corps disputes that NHPA consultation on a private construction project is

inherently of too short a duration to be "fully litigated" prior to its cessation. Corps Opp. at 39-

40. But it ignores D.C. Circuit precedent holding that this standard is satisfied if the challenged

action takes two years or less—which the court characterizes as the default "rule" for assessing

the question. *Ralls Corp. v Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 321 (D.C. Cir. 2014).

In the context of challenges to environmental permits, courts allow an even longer timeline.

*Montgomery Envtl. Coal. v. Costle,* 646 F.2d 58, 578 (D.C. Cir. 1980). NHPA consultations, in

contrast, usually take only a few months. Notably, neither defendant has a word to say about the

declaration from the Tribe's historic preservation officer describing NHPA timeframes. Eagle

Decl. ¶ 6 (ECF 433-3). As this Court has seen, pipeline construction proceeds rapidly once

permits are in hand.

The Corps cites out-of-circuit cases observing that it is the duty of a plaintiff to seek

preliminary injunctive relief. Corps Opp. at 40. But the Tribe moved for a preliminary

injunction within days of the Corps' issuance of the initial permits, and sought an emergency

stay pending appeal immediately after this Court denied it. Contrary to DAPL's claim that the

STANDING ROCK SIOUX TRIBE'S
SUMMARY JUDGMENT OPPOSITION/REPLY
(No. 1:16-cv-1534-JEB) - 35

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

D.C. Circuit resolved the issue, the court did not shed any light on its reasons for denying the

emergency stay besides the fact that the Tribe did not "carry its burden" on the four stay factors.

Then, ignoring a request from three federal agencies to voluntarily cease construction within

twenty miles of Lake Oahe, DAPL completed construction immediately thereafter and

successfully moved to dismiss the appeal as moot before any ruling on the merits.  It is hard to

fathom what actions the Corps thinks the Tribe should have taken to "fully" resolve its NHPA

claims before DAPL's actions rendered them moot.  Corps Opp. at 41.  If the Corps thinks that

the denial of a preliminary injunction fully resolves a claim, it is incorrect.  *Ralls Corp*., 758 F.3d

at 321 (plaintiff must have opportunity to litigate case through to U.S. Supreme Court).

Next, the Corps denies that the Tribe has any "reasonable expectation" that the question

of the scope of NHPA review will arise again.  But it makes no effort to contest the Tribe's

declaration that it is invited to consult literally hundreds of time per year, and that there are new

pipeline proposals likely to cross the Tribe's ancestral homelands and trigger Corps' permits.

Eagle Decl. ¶¶ 5-7.  The standard is "whether the controversy [is] *capable* of repetition and

not… more probable than not," *Honig v. Doe*, 484 U.S. 305, 320 (1988) (emphasis in original), a

standard that should not be applied with "excessive stringency."  *Ralls Corp*., 758 F.3d at 324;

*Doe v. Sullivan,* 938 F.2d 1370, 1378–79 (D.C. Cir. 1991) ("It is enough ... that the litigant faces

some likelihood of becoming involved in the same controversy in the future.").  While the Corps

cites cases declining to apply the exception where plaintiff's claims are highly fact-bound, the

questions raised by the Tribe concerning the proper scope of NHPA review are primarily legal.

"The question is not 'whether the precise historical facts that spawned the plaintiff's claims are

likely to recur' but 'whether the legal wrong complained of by the plaintiff is reasonably likely to

recur." *Ralls Corp.*, 758 F.3d at 324 (citations omitted).  The Tribe is not pressing all of its

STANDING ROCK SIOUX TRIBE'S
SUMMARY JUDGMENT OPPOSITION/REPLY
(No. 1:16-cv-1534-JEB) - 36

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

original NHPA claims, such as the more fact-bound question of whether the consultation was adequate, but only seeks a final ruling on the scope of NHPA review.

As the Tribe has explained, there is a long-standing conflict between the Advisory Council on Historic Preservation ("Council") and the Corps relating to the scope of NHPA review for Corps permits.  SRST Mem. at 49.  The Tribe's claim also raises the question, never conclusively resolved by any court, of the legitimacy of the Corps' NHPA regulations.  *Id.* (Council asserts that Corps regulations are not valid); *see also Houston, Tex. v. Dep't of Hous. & Urban Dev.*, 24 F.3d 1421, 1428 (D.C. Cir. 1994) ("It is well-established that if a plaintiff challenges both a specific agency action and the policy that underlies that action, the challenge to the policy is not necessarily mooted merely because the challenge to the particular agency action is moot.")  These are live conflicts, and the Corps has never indicated that it intends to change its approach to NHPA consultation.  *Compare Safari Club Int'l v. Jewell*, 842 F.3d 1280 (D.C. Cir. 2016).  In short, this is not a case where the question is so fact-bound that it "will never rise again." *Armstrong v. F.A.A.*, 515 F.3d 1294, 1296 (D.C. Cir. 2008).

The parties' remaining arguments serve only to distract.  The Corps' attempt to reframe the Tribe's NHPA claim as relying on the DOD Instruction is disingenuous—the two have nothing to do with one another.  Corps Opp. at 42.  DAPL similarly muddles distinct issues. DAPL Opp. at 46-51.  The Tribe's NHPA claim focuses on the Corps' failure to consider indirect effects of the pipeline prior to the initial round of permits.  It is legally and factually distinct from the remand consultation claim, which asserts that the Corps failed to comply with its consultation policies and NEPA during the remand.  Similarly, the Corps' attempt to accuse the Tribe of "reversing course" ignores the fact that the Tribe has conceded (and this Court already found) that the claim is moot, but is here arguing that an exception applies.

STANDING ROCK SIOUX TRIBE'S
SUMMARY JUDGMENT OPPOSITION/REPLY
(No. 1:16-cv-1534-JEB) - 37

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

In *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 44 (D.C. Cir. 2015), the D.C. Circuit recognized that considering a case moot where agencies "merely ignore the requirements of NEPA *as well as other statutes requiring pre-construction authorization or review*, build [their] structures before a case gets to court, and then hide behind the mootness doctrine," would be unacceptable.  The Tribe did everything it could to press its NHPA claim before it became moot.  It is exactly the kind of situation to which the "capable of repetition" exception applies.

B.    The Corps Failed to Consider Indirect Effects Under NHPA.

As to the merits of the Tribe's NHPA argument, the Corps and DAPL barely offer any defense.  First, the parties do not refute the Tribe's showing that the Corps deemed the pipeline right-of-way entering and exiting the boreholes to be outside of the area of potential effect ("APE") that determines the scope of NHPA consultation.  Corps Opp. at 39.  Nor do they dispute that there were potential cultural sites in the right-of-way immediately outside of the boreholes, and hence outside of the APE.  USACE_DAPL 65417 (pipeline route not within APE); ECF 6-43 at 15-16 (maps of sites).  Instead, the Corps argues that it considered the staging area and access road used to reach the borehole to be within the APE, and hence it must have adequately considered "indirect" effects.  But the Corps never offered any basis for excluding the 75-yard-wide path of destruction coming in and out of the boreholes from the APE then, nor does it attempt to do so now.  Moreover, its claim that it looked at sites within a mile of the borehole is a misdirection, because when it came to NHPA, it only offered to consult within the APE—omitting cultural sites outside of it.  UACE_DAPL 64247 (documenting sites).  Neither defendant makes any effort to engage this legal error.  While the Corps may struggle to find a principled justification for including some of the pipeline without including all of it, the answer

STANDING ROCK SIOUX TRIBE'S
SUMMARY JUDGMENT OPPOSITION/REPLY
(No. 1:16-cv-1534-JEB) - 38

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

cannot be that *none* of the pipeline is an indirect effect.[24]

As to this Court's deference to the Corps instead of the Council—which is charged by statute with interpreting the NHPA and promulgating regulations—the Corps offers no response. SRST Mem. at 49-50.  The Council is the agency to which this Court must defer, and the Council agreed with the Tribe that the scope of consultation was too narrow.  *Id.*  It also chastised the Corps for relying on regulations that were never approved by the Council, rendering them invalid under NHPA.  *Id.*  The Court should reconsider its preliminary injunction decision to the extent that it deferred to the Corps rather than the Council on a matter of interpretation of the NHPA.  Defendants offer no argument to the contrary.

Finally, defendants return to their favorite refrain: that the Corps' consultation was adequate and that any problem stemmed from the Tribe's refusal to participate.  While the Tribe continues to disagree strongly with the Court's characterization of the § 106 process in its preliminary injunction ruling, it is beside the point on the question presented here.  The Court found the consultation to be adequate *within the scope of the APE.*  If, on summary judgment, the Court found the APE unlawfully narrow, it means that the consultation process was not adequate because it left out important areas.  Indeed, the Tribe's refusal to participate in what it believed to be a sham consultation process will have proven prescient.

## CONCLUSION

In one respect, the Tribe and DAPL are in agreement: *enough is enough*.  DAPL Opp. at 2.  The Corps spent well over a year coming up with a remand decision that did exactly what the Court told it not to—filling out paperwork justifying its original decision *post hoc*.  All the while,

---

[24] Even under the Corps' unapproved standards, a portion of the pipeline should have been included in the APE as an indirect effect. App. C to 33 C.F.R. § 325 at § 2(a); USACE_DAPL 64248 (explaining why pipeline route was indirect effect even under Corps regulations).

STANDING ROCK SIOUX TRIBE'S
SUMMARY JUDGMENT OPPOSITION/REPLY
(No. 1:16-cv-1534-JEB) - 39

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

the potential for a spill, which has never been properly disclosed, has been borne by the Tribe.

The Tribe respectfully asks that this Court grant its summary judgment motion, order the Corps

to prepare an EIS, and vacate the underlying permits for DAPL.[25]

Respectfully submitted this 30th day of October, 2019.

*/s/ Jan E. Hasselman*
Jan E. Hasselman, WSBA # 29107
(*Admitted Pro Hac Vice*)
Patti A. Goldman, DCBA # 398565
Earthjustice
810 Third Avenue, Suite 610
Seattle, WA 98104
Telephone: (206) 343-7340
jhasselman@earthjustice.org
pgoldman@earthjustice.org

*Attorneys for Plaintiff*

---

[25] Neither the Corps nor DAPL address the question of remedy, and hence have waived further argument on the issue.

STANDING ROCK SIOUX TRIBE'S
SUMMARY JUDGMENT OPPOSITION/REPLY
(No. 1:16-cv-1534-JEB) - 40

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

## CERTIFICATE OF SERVICE

I hereby certify that on October 30, 2019, I electronically filed the foregoing *Standing Rock Sioux Tribe's Opposition To Cross-Motions For Summary Judgment; Reply In Support Of Motion For Summary Judgment On Remand* with the Clerk of the Court using the CM/ECF system, which will send notification of this filing to the attorneys of record and all registered participants.

*/s/ Jan E. Hasselman*
Jan E. Hasselman

STANDING ROCK SIOUX TRIBE'S
SUMMARY JUDGMENT OPPOSITION/REPLY
(No. 1:16-cv-1534-JEB) - 41

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*