# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE, YANKTON SIOUX TRIBE; ROBERT FLYING HAWK; OGLALA SIOUX TRIBE,<br><br>　　　　　　Plaintiffs,<br><br>　and<br><br>CHEYENNE RIVER SIOUX TRIBE,<br><br>　　　　　　Plaintiff-Intervenor,<br>　v.<br><br>U.S. ARMY CORPS OF ENGINEERS,<br><br>　　　　　Defendant-Cross Defendant,<br><br>　and<br><br>DAKOTA ACCESS, LLC,<br><br>　　　　　Defendant-Intervenor-Cross Claimant. | Case No. 1:16-cv-1534-JEB<br>(and Consolidated Case Nos. 16-cv-1796 and 17-cv-267)<br><br><br><br>**ARMY CORPS' REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON THE CHEYENNE RIVER SIOUX TRIBE'S CLAIMS** |

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

ARGUMENT ........................................................................................................................1

    I.    The Cheyenne River Sioux Tribe remains unable to identify a duty to consult .................................................................................................................1

    II.    The Corps fulfilled any duty to consult with the Cheyenne River Sioux Tribe .....................................................................................................................4

CONCLUSION...................................................................................................................11

## TABLE OF AUTHORITIES

**Cases**

*Am. Iron & Steel Inst. v. EPA*,
  115 F.3d 979 (D.C. Cir. 1997) ........................................................................................... 5

*El Paso Nat. Gas Co. v. United States*,
  750 F.3d 863 (D.C. Cir. 2014) ........................................................................................... 3

*Hopi Tribe v. United States*,
  113 Fed. Cl. 43 (2013) ....................................................................................................... 3

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ............................................................................................................. 5

*New York v. EPA*,
  413 F.3d 3 (D.C. Cir. 2005) ........................................................................................ 5, 10

*Shoshone-Bannock Tribes v. Reno*,
  56 F.3d 1476 (D.C. Cir. 1995) ........................................................................................... 3

*Stand Up for Cal.! v. U.S. Dep't of Interior*,
  204 F. Supp. 3d 212 (D.D.C. 2016) ........................................................................... 6, 8, 9

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  255 F. Supp. 3d 101 (D.D.C. 2017) ......................................................................... 2, 4, 10

*United States v. Navajo Nation*,
  537 U.S. 488 (2003) ........................................................................................................... 2

*Winters v. United States*,
  207 U.S. 564 (1908) ........................................................................................................... 2

**Statutes**

5 U.S.C. § 706(2)(A) ................................................................................................................ 5

25 U.S.C. § 1632(a) ................................................................................................................. 3

25 U.S.C. § 1632(a)(5) ............................................................................................................. 3

Pub. L. No. 102-575, 106 Stat. 4600 (1992) ............................................................................ 3

**Regulations**

25 C.F.R. § 1000.325 ............................................................................................................... 3

Exec. Order No. 13175, 65 Fed. Reg. 67,249 (Nov. 6, 2000) ................................................. 4

**INTRODUCTION**

Cheyenne River Sioux Tribe's Opposition to the Corps' Motion for Summary Judgment fails to identify a mandatory duty to consult with the Tribe on this Court's narrow remand, much less establish that the Corps failed to comply with any duty to consult. As set forth in the Corps' Memorandum in Support of its Motion for Summary Judgment, the Corps reasonably tailored its remand analysis, including its consultation with the Tribe, to match the Court's limited remand. ECF No. 446 at 11-15. The Tribe's opposition fails because it does not even attempt to engage with this argument.

The Tribe instead argues that Department of Defense Instructions somehow create mandatory consultation duties. But the Tribe admits that all the Instruction does is not preclude the application of any mandatory duties imposed by other sources. The Tribe's claims therefore fail because the Tribe cannot identify a statute or regulation imposing a mandatory duty to consult.

Finally, the Tribe largely declines to address the portions of the Corps' brief establishing the Corps' repeated efforts to obtain information from the Tribe regarding its hunting and fishing practices. These undisputed efforts—the consultation that the Tribe challenges—are more than sufficient to comply with any consultation duty. The Tribe has not refuted the Corps' showing that it undertook a steadfast and good faith effort to consult with the Tribe, despite the Tribe's refusal to meaningfully engage. The Corps therefore respectfully submits that this Court should grant its motion for summary judgment.

**ARGUMENT**

**I.      The Cheyenne River Sioux Tribe remains unable to identify a duty to consult.**

The Tribe's assertion that the United States has a "trust obligation . . . to assert and

defend" the Cheyenne River Sioux Tribe's "water, hunting, and fishing rights," ECF No. 464 at 2-5, both overstates the Corps' trust duties and misses the point. The Tribe's Opposition attempts to convert these alleged trust duties into specific consultation duties. *Id*. The Tribe's claim fails because it identifies no specific trust duty, much less a specific duty to consult.

As this Court held, Tribes must identify a specific trust-creating statute or regulation to pursue a breach-of-trust claim. *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 143-44 (D.D.C. 2017) ("To bring a breach-of-trust claim, the Tribe 'must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties.'") (quoting *United States v. Navajo Nation*, 537 U.S. 488, 506 (2003)." Tribal arguments premised on an enforceable trust duty fail where the Tribe "does not point in its Motion to a specific statute, treaty, executive order, or other provision that gives rise to specific fiduciary duties." *Id*. The Tribe's assertion that the Corps owes it a mandatory duty to consult under the 1851 and 1868 Fort Laramie Treaties, the Oahe Taking Act, and *Winters v. United States*, 207 U.S. 564 (1908), ECF No. 464 at 2-5, does not withstand scrutiny. The Tribe points to no language in these sources imposing any relevant duties. Indeed, the Court already rejected the Tribe's claim that these purported sources establish "specific fiduciary or other duties." *Standing Rock Sioux Tribe*, 255 F. Supp. 3d at 155. The Tribe's attempt to recycle these arguments should similarly be denied.

The Tribe's limited attempt to buttress its already-rejected trust duty argument is similarly unpersuasive. The Tribe's citation, ECF No. 464 at 4-5, to United States policy regarding providing Indian communities with water omits significant qualifying language. The statute the Tribe attempts to rely upon vests the Indian Health Service – not the Corps – with discretionary authority to provide federal assistance to construct and maintain sanitation facilities

based on Congress' finding that "it is in the interest of the United States, and it is the policy of the United States, that all Indian communities . . . be provided with safe and adequate water supply systems and sanitary sewage waste disposal systems **as soon as possible**." 25 U.S.C. § 1632(a)(5) (emphasizing language omitted by the Tribe).[1]  To be clear, Congress's finding that the Indian Health Service should try to provide tribes with safe water supplies falls far short of creating a mandatory duty for the Corps to ensure that no pollution could conceivably enter the Tribe's water supply.  *See Shoshone-Bannock Tribes v. Reno*, 56 F.3d 1476, 1482 (D.C. Cir. 1995) (United States need not assert water rights claims on behalf of tribe because "an Indian tribe cannot force the government to take a specific action unless a treaty, statute or agreement imposes, expressly or by implication, that duty."); *Hopi Tribe v. United States*, 113 Fed. Cl. 43, 50 (2013) (dismissing case alleging arsenic contamination of tribal water supply because no statute "expressly imposes a duty on defendant to protect the quality of plaintiff's water supply").[2]  Plaintiff's citation to a 1990 set of procedures for participating in water rights settlement negotiations similarly lacks any duty-creating language.  ECF No. 464 at 5.  In short, the Tribe's trust duty claims fail because the Tribe identifies no applicable duty.

Moreover, the Tribe effectively admits that Department of Defense Instruction 4710.02 does not impose any enforceable consultation obligation.  ECF No. 464 at 6-7.  As the Tribe notes, the Instruction and the documents upon which the Instruction is based do "not preclude the

---

[1] The Tribe appears to attempt to cite to 25 U.S.C. § 1632(a).  *See* ECF No. 464 at 5 (citing "25 U.S.C. § 11632(a)(5)").  The Tribe's citation to the non-existent 25 C.F.R. § 1000.325 is more difficult to comprehend.  Regardless, merely holding an asset in trust imposes no action-mandating fiduciary duty on the United States.  *El Paso Nat. Gas Co. v. United States*, 750 F.3d 863, 893-94 (D.C. Cir. 2014).

[2] Contrary to the Tribe's assertion, ECF No. 464 at 4, Section 3002 of the Western Water Policy Act of 1992 is a series of non-binding findings in support of an act directing a presidential review of water policy.  Reclamation Projects Authorization and Adjustment Act of 1992, Pub. L. No. 102-575, §§ 3002-03, 106 Stat. 4600, 4693-95.

enforcement of existing trust responsibilities or rights, merely the creation of new ones." *Id*. at 7. That is precisely the Government's argument. The Instruction prohibits the creation of new, enforceable consultation responsibilities because it is based upon documents that prohibit the creation of new, enforceable responsibilities. ECF No. 446 at 15-18. The Tribe is correct, ECF No. 464 at 7 (noting that Executive Order 13175 "does not preclude the enforcement of existing trust responsibilities"), that the key question is not whether Department of Defense Instruction 4710.02 imposes a consultation obligation but instead whether existing trust (or statutory) responsibilities require consultation. The Tribe's consultation argument fails because, as before, it does not identify an applicable statute or regulation imposing a duty to consult. *Standing Rock Sioux Tribe*, 255 F. Supp. 3d at 155.

**II.     The Corps fulfilled any duty to consult with the Cheyenne River Sioux Tribe**

Even if a duty to consult existed, as the Corps established in its Memorandum, the Corps did attempt to consult and work productively with the Tribe but the Tribe largely declined to engage in the Corps' many good faith efforts to consult with the Tribe. ECF No. 446 at 2-10, 21-24. Rather than contesting this fact, the Tribe's response rests upon allegations that the Corps ignored Tribal correspondence sent before the Corps requested information from the Tribe as part of the remand analysis in September 2017, established arbitrary timelines, and improperly dictated the manner of communication between the Corps and the Tribe. ECF No. 464 at 9. The Tribe's allegations are not only unsupported, but affirmatively disproved by the record.

Contrary to the Tribe's assertion that the Corps ignored its correspondence, *see id.*, the Corps respectfully responded to the Tribe's communications, including providing the Tribe with the information it purportedly sought and opportunities for in-person meetings. ECF No. 446 at 3-8. Contrary to the Tribe's assertion that the Corps enforced "arbitrary timelines" on the Tribe,

ECF No. 464 at 9, the Corps repeatedly revised its remand timeline to reasonably accommodate the Tribe's requests for additional time. ECF No. 446 at 3-4, 7-8. And contrary to the Tribe's assertion that the Corps dictated "manners of communication," the Corps attempted to engage the Tribe in a respectful manner. For example, the Corps agreed to the Tribe's request to meet in person on several occasions, including to discuss spill model results that the Tribe purportedly needed, ECF No. 464 at 9, only for the Tribe to ultimately refuse to participate in the meeting. ECF No. 446 at 5-8. In other words, the Tribe's brief misconstrues the record of the Corps' respectful consultation.

The Tribe's Reply incorrectly asserts that alleged deficiencies in the Corps' consultation resulted in the Corps lacking information regarding the impact of eating fish that have ingested oil. ECF No. 464 at 10-11. This argument fails because: 1) the Corps' reasonably engaged in consultation, including seeking information regarding this very issue; and 2) in the event that the Tribe possessed some unspecified information that it claims the Corps should have considered, the Tribe failed to provide it in response to the Corps' consultation efforts, which included multiple written and in-person requests for data and information.[3] Moreover, it is too late for the Tribe to transform its consultation claim in to substantive claim that the Corps' analysis was

---

[3] NEPA does not require the Corps to prepare a fish study. *New York v. EPA*, 413 F.3d 3, 31 (D.C. Cir. 2005) ("Incomplete data does not necessarily render an agency decision arbitrary and capricious, for '[i]t is not infrequent that the available data do not settle a regulatory issue, and the agency must then exercise its judgment in moving from the facts and probabilities on the record to a policy conclusion.'") (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983)); *Am. Iron & Steel Inst. v. EPA*, 115 F.3d 979, 1004 (D.C. Cir. 1997) ("Possessing imperfect scientific information, it had to decide whether to proceed on that basis or to invest the resources to conduct the perfect study. It chose to do the former. This is the type of decision to which this court will generally apply the deferential standard of 5 U.S.C. § 706(2)(A)."). To the extent that the remand analysis might have benefitted from additional data, the Tribe did not produce such data despite asserting that it has special expertise in assessing environmental impacts.

arbitrary and capricious. *Stand Up for Cal.! v. United States DOI*, 204 F. Supp. 3d 212, 309 n.48 (D.D.C. 2016) ("The plaintiffs have waived this new argument by asserting it for the first time in their reply brief"). Regardless, the Corps actually took a hard look at tribal hunting and fishing issues and determined that the Tribe is highly unlikely to be impacted by an oil spill because it is highly unlikely that the pipeline will spill any oil into Lake Oahe and it is even more unlikely that tribal members will consume animals that have been contaminated with hydrocarbons. *E.g.* Mem. for Record (Aug. 31, 2018), RAR88-90.

The Tribe's assertion that the Corps' consultation somehow fell short rings hollow. ECF No. 464 at 10-11 (asserting without citation that the Corps "all but concede[d] that the consultation process was insufficient"). Far from conceding that its consultation process was insufficient, the Corps detailed the numerous ways in which it consulted with the Tribe. ECF No. 446 at 2-10, 21-24. While the Corps will not repeat those arguments in full, it notes that the Tribe's suggestion that the Corps somehow failed to consult on the hunting, fishing, and environmental justice issues is simply false. The Corps explicitly and repeatedly sought information regarding the Tribe's hunting and fishing practices, including detailed information regarding the fish taken by the Tribe's members from Lake Oahe. Letter from Col. Hudson to Chairman Frazier (Sept. 25, 2017), RAR13330-31; Letter from Col. Hudson to Chairman Frazier (Nov. 27, 2017), RAR11996. Rather than engage productively with the Corps, the Tribe for many months withheld the 2005 and January 30, 2017 materials that formed the bulk of its April 20, 2018 response, refused to provide information regarding potential cultural impacts,[4] and declined to attend a meeting where it would have received spill model results that it now claims

---

[4] The Tribe notably does not contest that it rebuffed the Corps' efforts to obtain information on the potential impact of a spill on tribes' cultural practices after the Tribe's initial letters claimed that the Tribe would provide such information. ECF No. 446 at 2-4, 21.

were essential to consultation. ECF No. 446 at 3-8, 21-24. And rather than provide more information on its fishing practices at the May 29, 2018 consultation meeting, the Tribe's presentation on hunting and fishing rights and comments provided no additional information on fishing practices. Tr. of Meeting (May 29, 2018), RAR1188 (complaining about consultation), 1189 (asserting that fish currently have tumors because of existing contaminants), 1211 (indicating that members eat fish from the Missouri). The Corps' consultation efforts on hunting and fishing issues, in particular, meet any reasonable standard despite the Tribe's failure to fully avail itself of consultation opportunities.

In addition to seeking information from the Tribe, the Corps incorporated the information the Tribe eventually provided into its remand analysis. Rather than advance its argument that the Corps' remand analysis was undermined by the alleged consultation deficiencies, the Tribe's citation to the remand record, ECF No. 464 at 10-14, highlights that the Corps reasonably considered the Tribe's information in evaluating potential impacts of a low-possibility spill on the Tribe. As set forth below, the remand record repeatedly and thoroughly examined the Tribe's comments.

The Tribe's focus on fishing illustrates the reasonableness of both the Corps' consultation and its ultimate conclusion that impacts to tribal fishing would be limited because the impacts to "fish species would be of limited scale and of temporary duration." Mem. for Record, RAR90. The downstream receptor report the Corps incorporated analyzed both the general properties of oil and fish, and the specific modeled spills, and concluded that "[b]ased on expected concentrations shown to occur in the majority of the unmitigated scenarios modeled by RPS, it is not likely that a fish advisory would be put in place; if a fish advisory would be issued it would be expected to be very short term and localized to the furthest upstream portions of Lake Oahe."

RAR2837.[5]  The Tribe does not suggest how additional consultation might alter the Corps' conclusion that "[a]n oil spill into Lake Oahe would likely cause a localized fish kill with very limited impacts to the immediate area surrounding the site of the spill" because fish are well-suited to move away from the oil.  The Tribe likewise fails to establish that an alleged consultation deficiency led the Corps to arbitrarily conclude that fishing impacts on the Tribe's reservation, many miles downriver from the Lake Oahe crossing, are highly unlikely.  Mem. for Record, RAR90.

The Tribe does not suggest how additional consultation might have changed these conclusions.  The Tribe had over 200 days to compile and submit information regarding its hunting, fishing, and cultural practices.  ECF No. 446 at 8.[6]  The Corps considered the material the Tribe provided and noted that "Tribal members rely on fishing for subsistence and for their culture."  Mem. for Record, RAR6.  Indeed, the Corps took note of the Tribe's customary fishing locations – none of which are near the Lake Oahe crossing.  *Id*. ("Popular fishing locations for CRST members include 'waters near Blackfoot, South Dakota, in Bender Bay, around the confluence of Moreau River and Lake Oahe, and around the confluence of the Cheyenne River

---

[5] To the extent that the Court considers the Corps' conclusions rather than its consultation, it is important to note that the Corps' analysis was not limited to its consultation with the Tribe.  For example, based on "fish tissue samples" studied after an oil spill in Michigan, a protective fish consumption advisory was lifted.  RAR2834.  Similarly, while a spill in Montana led to a short-term fish consumption advisory, follow-up tests "showed no detectible levels of petroleum contamination in edible muscle tissue, and the advisory was lifted."  RAR2835-37.  These results support the Corps' conclusions regarding limited impacts to Tribal fishing.

[6] The Tribe first asserted that an Environmental Impact Statement was required on December 10, 2015.  Letter from E. White Feather to Superintendent, Cheyenne River Agency (Dec. 10, 2015), USACE66801.  And the Tribe first contacted the Corps regarding the remand on July 7, 2017.  That letter stated that the Tribe possessed information and expertise necessary for the remand.  Letter from Chairman Frazier to D. Lamont, Army (July 7, 2017), RAR13373.  The Tribe nonetheless failed to provide substantive information for the Corps' review until April 20, 2018.

and Lake Oahe.'").[7]  None of these locations would be impacted by a highly localized fish kill. In other words, the Corps took a hard look at the Tribe's fishing practices based on the information the Tribe submitted.  While the Tribe may not like the Corps' conclusions, it failed to submit information regarding its fishing practices that undermine the Corps' conclusions.

The Corps similarly took a hard look at potential hunting impacts.  Mem. for Record, RAR41-42, 88-90.  The Tribe's selective citation to the remand analysis regarding hunting omits the conclusion that the spill modeling does not predict "a surface oil thickness above the threshold that could potentially impact game species" and that mitigation efforts would reduce the volume and downstream impacts.  *Id*. at RAR42.  The Tribe similarly omits the fact that "[b]irds and mammals are mobile and generally will avoid oil-impacted areas and contaminated food."  *Id*. at RAR89.  To be clear, any impacts of any spill would be both localized and temporary.  *Cf*. ECF No. 464 at 11-12.  And with respect to the localized nature of any impacts, the Tribe falls far short of establishing shortcomings in the Corps consultation regarding hunting and fishing impacts from a spill many miles from the Tribe's reservation.[8]

Importantly, the Tribe does not suggest, ECF No. 464 at 11-13, how additional consultation might have led to any different analysis.  The Corps asked the Tribe about its hunting and fishing practices and provided the Tribe with ample time to provide any relevant information before engaging in a follow-up meeting.  ECF No. 446 at 2-8, 21-24.  The Tribe provided certain information and fails to suggest how it was prevented from providing any

---

[7] The confluence of the Moreau River and Lake Oahe is  south of the Standing Rock Sioux Tribe Reservation and the confluence of the Cheyenne River and Lake Oahe is located at the southern border of the Cheyenne River Sioux Tribe's reservation.  Mem. for Record, RAR52, 64; Cultural Assessment of Riparian Habitats on the Cheyenne River Sioux Indian Reservation (Mar. 2005), RAR3523-24.

[8] *See* RAR31, 33, 40, 65 (the in water and shoreline hydrocarbon concentrations do not reach the Tribe's reservation, which is over 75 miles downriver).

additional information regarding the impact of "toxicity" on its members.  ECF No. 464 at 11.  Among other things, the Tribe had the original spill model methodology and worst case discharge formula—and therefore the ability to analyze and comment on the spill model assumptions—by no later than November 10, 2016, when these administrative record materials were transmitted to the Tribe.  Comments from ERDC ProjNet system, USACE72253; Mem. for Record, RAR112; Notice of Lodging Admin. Record, ECF No. 55 (Nov. 10, 2016).[9]  As the Tribe notes in its Opposition, the Corps incorporated the information it received from the Tribe into the Remand Analysis.  ECF No. 464 at 12 (citing Mem. for Record for proposition that members rely on game for survival).  In sum, the Tribe fails to identify a deficiency in consultation.  *Cf. Standing Rock IV*, 255 F. Supp. 3d at 160 (Tribe must "explain how lacking access to those documents hindered its ability to meaningfully comment and consult on the EA").  In other words, the Corps respectfully listened to the Tribe.

The Tribe is correct that the manner in which parties approach "consultation has consequences."  ECF No. 464 at 12.  The Corps made a robust effort to engage with the Tribe by tailoring its consultation to match the Court's remand.  ECF No. 446 at 11-15.  The Tribe identifies no deficiency in the Corps' consultation process.  Nor does it rebut the Corps' showing that the Tribe failed to fully avail itself of the Corps' robust consultation efforts.  *Id.* at 21-24.  The record establishes that the Corps reasonably consulted with the Tribe as part of its hard look at hunting and fishing, treaty, and cultural resources issues.  This Court should grant summary judgment to the Corps because its consultation fulfilled any conceivable duty.

---

[9] To the extent the Tribe's Opposition rests on its failure to attend a meeting to discuss the updated spill model results on remand, the Tribe notably fails to offer any compelling justification for its failure to attend that meeting.  ECF No. 446 at 22.

**CONCLUSION**

The Corps respectfully submits that this Court should deny the Cheyenne River Sioux Tribe's motion for summary judgment and grant the Corps' motion for summary judgment because the Corps had no duty to consult with the Tribe on remand. Regardless, the Corps' efforts to engage with the Tribe to address the issues remanded by the Court were beyond reasonable, complied with any conceivable duty to consult, and were under no circumstance arbitrary or capricious.

Dated: November 20, 2019               Respectfully submitted,

                                       JEAN E. WILLIAMS
                                       Deputy Assistant Attorney General
                                       Environment & Natural Resources Division

                                       By: /s/ *Matthew Marinelli*
                                       REUBEN SCHIFMAN, NY BAR
                                       MATTHEW MARINELLI, IL Bar 6277967
                                       U.S. Department of Justice
                                       Natural Resources Section
                                       P.O. Box 7611
                                       Benjamin Franklin Station
                                       Washington, DC 20044
                                       Phone: (202) 305-4224 (Schifman)
                                       Phone: (202) 305-0293 (Marinelli)
                                       Fax: (202) 305-0506
                                       reuben.schifman@usdoj.gov
                                       matthew.marinelli@usdoj.gov

                                       ERICA M. ZILIOLI, D.C. Bar 488073
                                       U.S. Department of Justice
                                       Environmental Defense Section
                                       P.O. Box 7611
                                       Washington, DC 20044
                                       Phone: (202) 514-6390
                                       Fax: (202) 514-8865
                                       Erica.Zilioli@usdoj.gov

                                       *Attorneys for the United States Army Corps of Engineers*

OF COUNSEL:

MILTON BOYD
MELANIE CASNER
U.S. Army Corps of Engineers
Office of Chief Counsel
Washington, DC

**CERTIFICATE OF SERVICE**

I hereby certify that on November 20, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of this filing to the attorneys of record and all registered participants.

*/s/ Matthew Marinelli*
Matthew Marinelli