**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE, YANKTON SIOUX TRIBE; ROBERT FLYING HAWK; OGLALA SIOUX TRIBE, | Case No. 1:16-cv-1534-JEB (and Consolidated Case Nos. 16-cv-1796 and 17-cv-267) |
| Plaintiffs, | |
| and | **REPLY BRIEF IN SUPPORT OF ARMY CORPS' MOTION FOR SUMMARY JUDGMENT WITH RESPECT TO OGLALA SIOUX TRIBE'S CLAIMS** |
| CHEYENNE RIVER SIOUX TRIBE, | |
| Plaintiff-Intervenor, | |
| v. | |
| U.S. ARMY CORPS OF ENGINEERS, | |
| Defendant-Cross Defendant, | |
| and | |
| DAKOTA ACCESS, LLC, | |
| Defendant-Intervenor-Cross Claimant. | |

**TABLE OF CONTENTS**

I.      INTRODUCTION ...........................................................................................................1

II.     ARGUMENT ...............................................................................................................1

      A.      Oglala's Mni Wiconi Act claims should be dismissed because the Act
             imposes no relevant trust duty on the Corps and the Corps has breached no
             such duty ..........................................................................................................1

      B.      The Remand Analysis reasonably examined any risk to Oglala.............................4

            1.      The Spill Model's ten-day analysis period was more than reasonable ........4

            2.      The Worst Case Discharge Analysis was reasonable ..................................7

            3.      The Corps reasonably concluded that its approvals at the Lake Oahe
                crossing would not cause significant environmental impacts.....................9

      C.      Oglala identifies no mandatory consultation duty either before or after
             remand.  Regardless, the Corps' consultation efforts were wholly
             appropriate ......................................................................................................11

            1.      The Corps' pre-remand consultation complied with any duties ...............13

            2.      The Corps' post-remand consultation complied with any duty ................15

III.    CONCLUSION............................................................................................................18

# TABLE OF AUTHORITIES

## Cases

*Appalachian Power Co. v. EPA*,
  208 F.3d 1015 (D.C. Cir. 2000) .............................................................................................. 12

*Australians for Animals v. Evans*,
  301 F. Supp. 2d 1114 (N.D. Cal. 2004) .................................................................................... 7

*Bennett v. Spear*,
  520 U.S. 154 (1997) ................................................................................................................ 17

*Cobell v. Salazar*,
  573 F.3d 808 (D.C. Cir. 2009) .................................................................................................. 2

*Columbia Falls Aluminum Co. v. EPA*,
  139 F.3d 914 (D.C. Cir. 1998) .................................................................................................. 6

*Eagle-Picher Indus., Inc. v. EPA*,
  759 F.2d 905 (D.C. Cir. 1985) .................................................................................................. 5

*El Paso Nat. Gas Co. v. United States*,
  750 F.3d 863 (D.C. Cir. 2014) .................................................................................................. 2

*In re Grand Jury Subpoena, Miller*,
  438 F.3d 1141 (D.C. Cir. 2005) .............................................................................................. 11

*Jackson v. Culinary Sch.*,
  27 F.3d 573 (D.C. Cir. 1994) .................................................................................................. 11

*Jackson v. Culinary Sch.*,
  59 F.3d 254 (D.C. Cir. 1995) .................................................................................................. 11

*Lands Council v. McNair*,
  629 F.3d 1070 (9th Cir. 2010) .................................................................................................. 9

*Minisink Residents for Envtl. Pres. & Safety v. FERC*,
  762 F.3d 97 (D.C. Cir. 2014) .................................................................................................. 10

*Morton v. Ruiz*,
  415 U.S. 199 (1974) ................................................................................................................ 11

*New York v. EPA*,
  413 F.3d 3 (D.C. Cir. 2005) .................................................................................................. 6, 7

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  205 F. Supp. 3d 4 (D.D.C. 2016) ............................................................................................ 14

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  255 F. Supp. 3d 101 (D.D.C. 2017) ............................................................................. 4, 10, 12

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
　282 F. Supp. 3d 91 (D.D.C. 2017) ......................................................................................... 16

*Texas v. United States*,
　523 U.S. 296 (1998) ................................................................................................................... 3

*Theodore Roosevelt Conservation P'ship v. Salazar*,
　616 F.3d 497 (D.C. Cir. 2010) ................................................................................................ 10

*United States v. White Mountain Apache Tribe*,
　537 U.S. 465 (2003) ................................................................................................................... 3

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*,
　435 U.S. 519 (1978) ................................................................................................................. 17

*Wildearth Guardians v. Jewell*,
　738 F.3d 298 (D.C. Cir. 2013) ................................................................................................ 13

*Yankton Sioux Tribe v. Kempthorne*,
　442 F. Supp. 2d 774 (D.S.D. 2006) ....................................................................................... 11

**Statutes**

33 U.S.C. § 1321(j)(5)(D) ............................................................................................................ 10

# I.      INTRODUCTION

The Oglala Sioux Tribe's Opposition to the United States' Motion for Summary Judgment hinges on Oglala's unsupported assertions that the Tribe's water intakes will be impacted by a low-possibility oil spill at the Lake Oahe crossing, which is located 205 miles upstream.  Oglala's claims fail because the administrative record provides ample support for the Corps' conclusion that those intakes are highly unlikely to be impacted.

First, Oglala fails to identify any trust duty to eliminate all risks, however slight, that governmental action might somehow impact Oglala's water supply.  And even if Oglala is correct that the Corps has a trust duty to provide Oglala with clean drinking water, the Corps has not breached that duty because no Corps action has harmed Oglala's water quality.  Second, Oglala is incorrect that the Corps' remand analysis is deficient.  To the contrary, the record establishes that in the unlikely event of an oil spill, Oglala's water intakes are highly unlikely to be impacted because: 1) a significant amount of any spilled oil will decay or evaporate; 2) any remaining oil will be mitigated well before it travels over 200 miles downstream to Oglala's intakes; and 3) Oahe Dam, which sits between the Lake Oahe crossing and Oglala's intakes, would prevent oil from proceeding downstream.  Finally, Oglala's challenges to consultation should be rejected because the Tribe fails to identify a mandatory consultation duty.  Regardless, the Corps' consultation efforts were neither arbitrary nor capricious and more than satisfied any consultation obligation.

The Corps therefore respectfully submits that this Court should grant the Corps' motion for summary judgment and deny Oglala's motion for summary judgment.

# II.      ARGUMENT

## A.      Oglala's Mni Wiconi Act claims should be dismissed because the Act imposes no relevant trust duty on the Corps and the Corps has breached no such duty.

As set forth in the United States' Memorandum, Oglala's claim that the Corps has breached an alleged trust duty to provide Oglala with clean water fails because Oglala cannot

identify a relevant mandatory trust duty, much less a breach of such a duty.  ECF No. 450 at 6-

11.  Oglala's responses fall far short of establishing either that the Corps owes Oglala any

relevant duty or that the Corps' approval of a pipeline crossing 205 miles upstream of Oglala's

water intakes has breached any conceivable trust duty.

Oglala's trust claim fails to identify a specific trust duty, which is required to have a

claim.  *El Paso Nat. Gas Co. v. United States*, 750 F.3d 863, 895 (D.C. Cir. 2014) ("A statute's

invocation of trust terminology is not itself dispositive, since the statute may create either a

judicially enforceable trust . . . or a 'bare trust,' not judicially enforceable."); *id*. at 892 ("We

hold . . . that the Tribe has failed to state a claim for relief because the Tribe has not identified a

substantive source of law establishing *specific fiduciary duties*, a failure which is fatal to its trust

claim[.]").  Oglala correctly notes that the Mni Wiconi Act ties the United States' provision of

water to Oglala to the maintenance and operation of the Oglala Sioux Rural Water Supply

System.  ECF No. 461 at 5.  But as the United States stated, maintenance and operation of the

water system is dependent on annual appropriations.  ECF No. 450 at 6-8.  And trust obligations

are cabined by funding.  *Id*. at 7 (citing *Cobell v. Salazar*, 573 F.3d 808, 811 (D.C. Cir. 2009)).[1]

In other words, Congress did not impose a cost-unlimited, perpetual obligation on the entire

federal government by funding the creation and annual maintenance of Oglala's water system.

Oglala's trust claim also fails because it fails to identify a breach of a relevant trust duty.

The Corps did not violate any duty to provide Oglala with clean water through granting

permission for the Dakota Access pipeline to cross under Lake Oahe.  Oglala cites no authority

---

[1] Oglala's citation to a 2001 opinion in *Cobell*, ECF No. 461 at 6, highlights Oglala's failure to grapple with adverse precedent.  As the Corps pointed out, the D.C. Circuit subsequently clarified that the Indian canon of construction does not impose cost-unlimited obligations on the United States, but is instead cabined by the limitations Congress places on funding.  ECF No. 450 at 7 (quoting *Cobell v. Salazar*, 573 F.3d 808, 811 (D.C. Cir. 2009)).

supporting its assertion that a small risk that an alleged breach of trust may occur on some future

date is, standing alone, a breach of trust.[2]  *Cf. Texas v. United States*, 523 U.S. 296, 300, 118 S.

Ct. 1257, 1259 (1998) ("A claim is not ripe for adjudication if it rests upon 'contingent future

events that may not occur as anticipated, or indeed may not occur at all.'").

 Oglala's misapplication of *United States v. White Mountain Apache Tribe*, ECF No. 461

at 7, is telling.  In that case, the tribe alleged that the United States allowed buildings owned by

the tribe but occupied by the United States to suffer $14 million in damages in contravention of a

trust duty.  537 U.S. 465, 469 (2003).[3]  In other words, the breach of trust allegations that the

Supreme Court held survived a motion to dismiss were based on alleged, quantified damage to

trust property.  *Id*.  Here, in contrast, Oglala points to no current damage to any trust property or

breach of any trust duty.  Oglala's claim hinges on a hypothetical future disruption of its water

supply based upon an unlikely spill that the Corps determined would not imperil Oglala's water

intakes.  Oglala does not allege that its water system has been damaged or that its water quality is

currently impaired by Corps authorizations.  Oglala cites to no statute imposing a trust duty to

eliminate any conceivable possible disruption of Oglala's water supply in the future.  In sum,

Oglala's claim fails because it neither cites to a relevant trust duty nor establishes that the Corps

breached any such duty.

 Oglala does not contest that the Corps established that its Environmental Assessment

("EA") considered downstream water intakes that lie closer to the Lake Oahe crossing than

---

[2] Indeed, Oglala undercuts its trust duty theory later in its brief by recognizing that the theoretical future threat to its water quality might be addressed by installing additional water treatment measures.  ECF No. 461 at 15.

[3] To be clear, the White Mountain Apache Tribe did not allege hypothetical future damage to a building or that the United States breached a fiduciary duty by failing to study potential future damage to buildings.  So contrary to Oglala's assertion, ECF No. 461 at 7, *White Mountain Apache Tribe* imposes no duty to study hypothetical future harms from low-probability events.

Oglala's intakes and determined that such intakes would not be impacted because "response measures to protect the users of downstream intakes will be implemented to minimize risks to water supplies." ECF No. 450 at 11-12. As the Court held with respect to Standing Rock, the Corps' EA "adequately discussed the impacts of . . . 'a low risk/high consequence event,' . . . on water[.]" *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 133 (D.D.C. 2017). Oglala is simply incorrect, ECF No. 461 at 6, that the Corps had to reference Oglala's water intakes by name in order to conclude that its downstream water intakes were not threatened by the Corps' actions. And Oglala cites no case supporting its assertion that the Corps was required to conduct a more detailed analysis for Oglala, whose intakes are located almost 130 miles downriver from Standing Rock's intakes. *See* Mem. for Record, RAR92. Oglala's claim therefore also fails because the Corps considered the risk to all downstream water supplies, including Oglala's.

**B.      The Remand Analysis reasonably examined any risk to Oglala**

As the Corps established in its Memorandum, any alleged deficiency in considering Oglala's water system was cured by the remand analysis that explicitly considered the system and determined that there are several reasons why it will not be impacted in the event of a low possibility spill. ECF No. 450 at 11-12, 17-21. It was wholly reasonable for the Corps to determine that Oglala's water intakes will not be impacted by a slow-moving spill over 200 miles upstream. As set forth below, Oglala's reply falls far short of establishing that the Corps' analysis was deficient.

**1.      The Spill Model's ten-day analysis period was more than reasonable.**

As the Corps established in its Memorandum, the spill model was both conservative and reasonable because: 1) hydrocarbons evaporate and decay; 2) mitigation would commence well

before ten days; and 3) any spill would be blocked by the Oahe Dam.  ECF No. 450 at 17-21.

Oglala's response is that the Corps' conclusions are arbitrary because they did not model

mitigation efforts.  ECF No. 461 at 9-10.

In fact, the Corps used an overly conservative assumption that mitigation would not occur

for ten days after a spill, even though, in reality, it is expected that mitigation would occur within

a matter of hours after any spill.  The Corps' use of this assumption was conservative and

eminently reasonable.  Oglala does not, and cannot, challenge the EA's conclusion that

"[i]mmediately upon discovery of a release of oil that could impact the Missouri River or Lake

Oahe, Dakota Access will initiate emergency response efforts, including containment and

recovery.  Environmental Assessment (July 2016), USACE71266-67 (describing mitigation with

focus on protecting water intakes).  Nor does Oglala reasonably challenge the conclusion that

mitigation efforts would prevent any oil from reaching Oglala.  *Cf.* Mem. For Record, RAR66

(Standing Rock stated that studying an area 40 miles downstream from the Lake Oahe crossing is

reasonable).  And Oglala's assertion that the Corps did not take mitigation into consideration is

refuted by the record.  As Colonel Hudson stated, the Corps conservatively assumed that it

would take ten days to effectively respond to a spill even though the pipeline company ("ETP")

said that it could do so in six hours.  ECF No. 450 at 18-19.

The cases that Oglala relies upon, ECF No. 461 at 9-10, stand for the unremarkable

proposition that an agency is entitled to deference in its use of predictive models.  *Eagle-Picher*

*Indus., Inc. v. U.S. EPA*, 759 F.2d 905, 921-22 (D.C. Cir. 1985) ("An agency may utilize a

predictive model so long as it explains the assumptions and methodology it used in preparing the

model. . . . 'We can reverse only if the model is so oversimplified that the agency's conclusions

from it are unreasonable.'") (citation omitted).  And *Columbia Falls Aluminum Co. v.*

*Environmental Protection Agency* is inapposite because that case struck down an agency action

when the agency knew that its key assumptions were wrong.  139 F.3d 914, 923 (D.C. Cir.

1998).  Here, Oglala not only falls far short of establishing that any key assumptions are wrong,

the Corps based its adoption of the spill model on a review by the Army's Engineer Research

and Development Center's environmental sciences research specialists.  Mem. for Record,

RAR23; DAPL Remand Comments from ERDC ProjNet system (Feb. 14, 2018), RAR8424,

RAR8430 (ERDC approval of modeling approach).  Here, the Corps addressed limitations in

predicting the hypothetical mediation of a hypothetical oil spill by dramatically increasing the

projected mitigation time.  The Corps' implementation of conservative, well-supported modeling

assumptions is reasonable and entitled to deference.  *New York v. EPA*, 413 F.3d 3, 30 (D.C. Cir.

2005).

Oglala's remaining challenge to the Corps' conclusion that oil will not impact Oglala's

intakes is that the Administrative Record fails to establish that oil floats.[4]  ECF No. 461 at 13-15.

Oglala is incorrect, as the Administrative Record provides ample support for the conclusion that

oil floats and is generally confined to the top thirty feet of the water column.  ECF No. 450 at 5,

9-11, 20-21.[5]  NEPA permits the Corps to draw reasonable conclusions based on present

---

[4] Oglala's suggestion that the Corps' citation to multiple reasons why Oglala's intakes would not
be impacted is an effort to shift the Court's focus from reviewing one of those reasons, ECF No.
461 at 13 n.9, is simply incorrect.  Contrary to Oglala's assertion, the fact that oil floating near
the surface would not pass through the Oahe Dam intakes over 140 feet below the surface,
standing alone, provides sufficient support for the Corps' conclusion.  And contrary to Oglala's
assertion that it was incapable of providing comments regarding its unsupported theory that oil
will pass through the Oahe dam intakes, ECF No. 461 at 14 n.11, Oglala provides no reason why
it required information from the Corps to provide support for Oglala's current theory that the
Oahe dam intakes will ingest oil floating over 100 feet above the dam intakes.

[5] Oglala's assertion that the Corps' conclusion that oil will float above the Oahe dam intakes
depends on the assumption that water "at a certain level will not pass through the dam," ECF No.
46 at 14 n.12, betrays a misunderstanding of the Corps' assumptions.  Contrary to Oglala's
assertion, the Corps' analysis is based on the well-established facts that: 1) the Oahe dam intakes

knowledge.  *Australians for Animals v. Evans*, 301 F. Supp. 2d 1114, 1127 (N.D. Cal. 2004).

This discrete conclusion—that oil floating within the top thirty feet of Lake Oahe will not pass

through intakes located more than 140 feet below the surface—was entirely sound and neither

arbitrary nor capricious.

When taken as a whole, the Corps' conclusion that Oglala's water intakes will not be

impacted in the event of a spill is unassailably reasonable and in no way arbitrary or capricious.

First, the spill model's duration is reasonable because the model predicted that a substantial portion

of any released oil would either evaporate or decay within ten days. ECF No. 450 at 18.  Second, the

spill model's assumption that a spill would be unmitigated for ten days was extremely conservative

because mitigation would commence well before the end of the ten-day period.  *Id*. at 18-20.  Third,

if some unevaporated, undecayed, unmitigated oil somehow traveled approximately thirty days[6] and

over 200 miles downstream to Oahe Dam, that oil would still be highly unlikely to pass through the

dam's water intakes.  *Id*. at 20-21.  In sum, the Corps' conclusion that Oglala's water intakes will

not be impacted by Corps' approvals far upstream was reasonable and should be upheld.

## 2.      The Worst Case Discharge Analysis was reasonable

Oglala and Standing Rock argue that the Corps' NEPA analysis is flawed because the

Corps' spill volume estimate (based on PHMSA's "worst case discharge" regulation's

methodology) is arbitrary and capricious for, *inter alia*, failing to account for a valve

malfunction, human error, and other factors that would have resulted in a higher spill volume.

*See* ECF No. 433-1.  Faced with the uncomfortable reality that their own experts employed a

---

only allow water located at a depth of at least 140 feet to pass through the dam; and 2) oil floats
within the top thirty feet of the water column.  ECF No. 450 at 10.

[6] The model predicts that an unmitigated spill would travel approximately 65 miles in ten days.
Mem. for Record, RAR60.

methodology that is similar to the Corps' (and indeed, resulted in a spill volume estimate *lower* than that used by the Corps), ECF No. 450 at 16-17, Oglala has no real response.[7]  Oglala asserts that the similarity of Earthfax's methodological approach "in no way undercuts the argument made by SRST and joined by the Tribe that the WCD calculation is not supported by the record and is arbitrary and capricious."  ECF No. 460 at 9.  Oglala's argument is that EarthFax lacked certain data when making their calculation, and this explains the similarity in approaches.  This argument is based on a factually incorrect premise—the Tribes had the spill model methodology and other data they claim they needed before submitting their report.  But more importantly, because Earthfax's underlying methodology—regardless of any data inputs—is similar to the Corps', it suggests the Corps' estimate and approach was not arbitrary.

First, it is factually incorrect that the Tribes lacked sufficient data to determine a spill estimate.  *Cf.* ECF No. 460 at 8-9.  The Tribes had the original spill model methodology and worst case discharge formula—and therefore the ability to analyze and comment on the spill model assumptions—by no later than November 10, 2016, when these administrative record materials were transmitted to the Tribe.  Comments from ERDC ProjNet system, USACE72252-53 (providing methodology, spacing of block valves and worse case discharge calculations); Mem. for Record, RAR112; Notice of Lodging Admin. Record, ECF No. 55 (Nov. 10, 2016).[8]  The Earthfax report was submitted to the Corps approximately a month later. Letter from J. Steele, Oglala to J. Darcy, Army (Dec. 3, 2016), ESMT611 (attaching Earthfax report).

---

[7] Oglala is incorrect that the Corps admitted that Oglala's proposed oil spill calculation was anything other than a worst case discharge calculation.  Mem. for Record, RAR111 ("As can be seen from Table III-3, ETP's estimated worst-case release volume for the Lake Oahe crossing exceeded the estimate based on the desktop calculation provided by EarthFax").

[8] The Corps provided the Spill Model Discussion, (Aug. 5, 2015), USACE74713, to Plaintiffs pursuant to the protective order on approximately January 12, 2017.

Second, regardless of the specifics such as exact spacing of block valves, topography, valve shut-down times and other inputs that made up EarthFax's estimates of spill volume, Oglala cannot deny that they adopted a fundamentally similar methodology to the Corps. Namely, Earthfax appears to have multiplied the volume of oil contained in a given line segment by the volume of oil contained therein.  ESMT625.  Earthfax did not consider qualitative factors like human error, or unspecified valve malfunctions, as the Tribes now argue was required.  *Cf.* ECF No. 433-1.  That Earthfax used different inputs (ie, the actual volume and line segment lengths) does not suggest that their underlying methodology was unreasonable.   Because Oglala's own experts did not adopt a methodology the Tribes now claim is required, it is not persuasive to argue that the Corps should have done so.

### 3.   The Corps reasonably concluded that its approvals at the Lake Oahe crossing would not cause significant environmental impacts.

Oglala identifies that one of the many spills modeled as part of the Spill Model Report could result in up to 30% mortality of certain sensitive aquatic species.  ECF No. 460 at 12.  Oglala then argues that "[b]y not directly addressing the serious adverse effects of a spill shown by the models… the Corps 'failed to consider an important aspect of the problem.'" ECF No. 460 at 12.  This argument is not persuasive.

The modeled spill Oglala focuses on is one of many that were simulated, some with more severe impacts and aquatic species and some with less.  *See* RAR 8943.  Such a spill is not the anticipated result of the Corps' action, it is merely one of the worst scenarios that was modeled.  NEPA simply does not require an analysis of environmental impacts under every possible scenario, nor does it require analysis of the most pessimistic or "worst case" scenario.  *See* ECF No. 450 at 16; *see, e.g.*, *Lands Council v. McNair,* 629 F.3d 1070, 1078 (9th Cir. 2010) (agency could reasonably "rely on the more probable calculation" rather than "the outer possible, though

unlikely, range"). In choosing to base effects on water quality impacts that were drawn from a more likely—though still improbable and unlikely—modeled spill, the Corps in no way violated NEPA.

Moreover, the modeled scenario that Oglala relied on is one in which a severe spill is entirely unmitigated. ECF No. 460 at 12; RAR 8943. But any spill from the pipeline is required to be mitigated by law, easement condition, and the applicable Response Plan. 33 U.S.C. § 1321(j)(5)(D); ESMT37, 39-42; (easement conditions regarding mitigation); RAR6436-564 (Facility Response Plan). The Final EA set forth "how [the] effects [of a spill] would be mitigated and addressed." Mem. for Record, RAR57. Oglala's own comments make clear that mitigation efforts would start promptly. Preliminary Evaluation of Dakota Access Pipeline Emergency Response Plans at 3-4 (April 18, 2018), RAR3432-33. Oglala does not respond to the caselaw that makes clear that impacts under NEPA may consider mitigation, as was done here. *See, e.g.*, *Standing Rock Sioux Tribe*, 255 F. Supp. 3d at 132 (citing *Minisink Residents for Envtl. Pres. & Safety v. FERC*, 762 F.3d 97, 112 (D.C. Cir. 2014)); *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 515 (D.C. Cir. 2010).

Finally, it strains credulity to argue the Corps "failed to consider" impacts on aquatic species when the original EA and Remand document extensively discusses impacts on such species, including impacts resulting from a severe and unanticipated spill. *See, e.g.*, Mem. for Record, RAR23-36. That this discussion was premised on a slightly less catastrophic modeled spill is not evidence that the Corps' analysis was in any way arbitrary or capricious, or failed to consider impacts of a spill on aquatic species.

**C.     Oglala identifies no mandatory consultation duty either before or after remand. Regardless, the Corps' consultation efforts were wholly appropriate.**

Oglala's arguments regarding the Corps' consultation policies also fail because those policies are neither: 1) enforceable; nor 2) apply in this case.  Oglala's reliance, ECF No. 461 at 15, on *Morton v. Ruiz*, 415 U.S. 199 (1974), is illustrative.   In *Ruiz*, the Supreme Court held that the Bureau of Indian Affairs could not restrict a statutory benefit available to all Indians to only Indians living on reservations without following the procedures set forth in the BIA Manual.  415 U.S. at 204-05, 234-35.  *Ruiz* therefore stands for the unremarkable proposition that agencies must follow statutes and that "[b]efore the BIA may extinguish the entitlement of these otherwise eligible beneficiaries, it must comply, at a minimum, with its own internal procedures."  *Id*. at 235.  *See also, In re Grand Jury Subpoena, Miller*, 438 F.3d 1141, 1153 (D.C. Cir. 2005) (distinguishing *Ruiz* from case where guidelines state that they do not create enforceable rights); *Jackson v. Culinary Sch.*, 27 F.3d 573 at 584 (D.C. Cir. 1994) (distinguishing Ruiz because it turned on "underlying existence of an enforceable right" and holding that agency handbook setting forth internals rules was not enforceable), reinstated in relevant part by *Jackson v. Culinary Sch.*, 59 F.3d 254, 255 (D.C. Cir. 1995).  Oglala seeks to flip these propositions on their head, failing to identify any statutory entitlement to consultation and instead attempting to locate a mandatory duty in agency materials that explicitly disclaim that they are creating any such duty.[9]

And as set forth in the Corps' opening briefs, Department of Defense Instruction 4710.02 does not create enforceable consultation duties.  Oglala tries to buttress this argument by citing

---

[9] Oglala similarly misapplies, ECF No. 461 at 15, *Yankton Sioux Tribe v. Kempthorne*, 442 F. Supp. 2d 774 (D.S.D. 2006).  That case, unlike this one, involved a: 1) statutory consultation requirement; and 2) likelihood that an agency provided the tribe with misinformation.  *Id.* at 785.

the Corps' consultation policy in support of its assertion that the Corps treats the DOD

Instruction 4710.02 as mandatory.  ECF No. 461 at 17.  On the contrary, the very document that

Oglala relies upon explicitly provides that "[t]his policy is not intended to, and does not grant,

expand, create, or diminish any legally enforceable rights . . . not otherwise granted or created

under existing law."  Corps Tribal Consultation Policy (Oct. 4, 2012), RAR13990.  And the

Department of the Army Memorandum that Oglala twice relies upon ECF No. 461 at 7, 17,

similarly provides that it "does not grant, expand, create or diminish any legally enforceable

rights . . . not otherwise granted or created under existing law."  Mem. for Principal Official of

Headquarters, Dept. of the Army (Oct. 24, 2012).

Oglala's argument that, despite this clear language to the contrary, the Corps'

consultation guidance is enforceable is based upon a misinterpretation of *Appalachian Power

Co. v. Environmental Protection Agency*, 208 F.3d 1015 (D.C. Cir. 2000).  *Appalachian Power*

set aside EPA guidance that imposed new standards on regulated parties without conducting

statutorily-required rulemaking.  *Id*. at 1028 ("In directing State permitting authorities to conduct

wide-ranging sufficiency reviews and to enhance the monitoring required in individual permits

beyond that contained in State or federal emission standards . . . EPA has in effect amended"

regulations promulgated through notice and comment rulemaking).  Instruction 4710.02, unlike

the affirmative, penalty-imposing guidance at issue in *Appalachian Power*, is not a proclamation

having the force of law.  It instead seeks to guide the agency in applying explicitly non-binding

policy.  Instruction 4710.02 therefore creates no enforceable consultation requirements.  In other

words, Oglala cannot maintain a cause of action under either the Administrative Procedure Act

or a tribal trust responsibility absent a statute or regulation establishing a specific duty.  *See

Standing Rock Sioux Tribe*, 255 F. Supp. 3d at 144-45.

And as set forth in the Corps' Memorandum in Support of Summary Judgment with respect to Cheyenne River's claims, Instruction 4710.02 does not apply in this case because: 1) it only applies where Corps actions may significantly affect tribal resources or rights; and 2) Oglala has not established that the Corps' actions may significantly impact the Tribe.  ECF No. 446 at 17.  Oglala's effort to rebut this argument only serves to highlight Oglala's failure to meet its burden of establishing that Instruction 4710.02 applies.  Oglala's claims are based on oil traveling 205 miles downstream despite natural evaporation and degradation, evading mitigation efforts for approximately a month, and passing through a dam whose water intakes are located well-below the oil.  *See* ECF No. 450 at 8-11, 17-21.  Despite ample opportunity, Oglala failed to submit comments establishing that a spill 205 miles upstream of its intakes might impact the Tribe.[10]  Regardless, as set forth below, the Corps' consultation with Oglala complied with any relevant standard.

**1.      The Corps' pre-remand consultation complied with any duties.**

As set forth in the Corps' Memorandum, Oglala's suggestion that it had: 1) no notice that the Lake Oahe crossing might involve environmental review; and 2) no opportunity to provide information regarding its water intakes prior to July, 2016 when finalization of the EA "raised concerns regarding the Mni Wiconi Project," ECF No. 461 at 19-20, is misleading and unsupportable.

---

[10] This is the type of line-drawing decision necessitated by NEPA that is vested in the implementing agencies.  *See Wildearth Guardians v. Jewell*, 738 F.3d 298, 312 (D.C. Cir. 2013). The alternative proposed by Oglala appears to be that the Corps may never draw lines based on the determination that a proposed action will not impact a Tribe in order to focus its consultation on tribes closer to the relevant Corps actions.  Ogala's reasoning would instead require the Corps to consult with a tribe whose water intakes were located at the mouth of the Mississippi River based upon the Tribe's assertion that a spill in Lake Oahe might reach that far.

The Corps recognizes a duty to consult under the National Historic Preservation Act and fulfilled that duty by engaging or attempting to engage in consultation with tribes, including Oglala.  *See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 205 F. Supp. 3d 4, 8-9, 20-22 (D.D.C. 2016).  That consultation process included ample opportunity to comment on all tribal concerns, including any concerns Oglala had about its water supply.  The Corps sent paper and electronic copies of a consultation letter explicitly referencing the Clean Water Act on November 20, 2015.  Letter from M. Chieply, Corps, to Chairman Archambault, Standing Rock (Nov. 20, 2015), USACE66822; Distribution list for Nov. 20, 2015 letter, USACE66824.  The Corps made the draft EA available for public comment, including by posting online.  Notice of Draft EA (Dec. 28, 2015), USACE71777; Letter from P. Strobel, EPA to B. Cossette, Corps (Mar. 11, 2016), USACE73191; Envtl. Assessment (July 2016), USACE71225.  And the administrative record makes clear that the other Plaintiffs understood that they could, and should, provide comments regarding their environmental concerns based on the Draft EA.  Letter from Chairman Archambault, Standing Rock, to L. Crook, Army (Mar. 24, 2016), USACE66166-2221; Agenda, Yankton Sioux Tribe (May 18, 2016), USACE64234 (providing for discussion of NEPA).

As the Corps stated, "[d]uring the development of the Draft EA there were opportunities for the public and Tribes to submit comments.  In addition, after the public comment period had ended, the Corps held additional meetings and conducted site visits with interested Tribes during the months of January, February, March, April, and May of 2016.  Comments received during these site visits and meetings were all considered by the Corps and incorporated into the Final EA accordingly."  Letter from Col. Henderson, Corps, to L. Roberts, Interior (June 28, 2016), USACE64058.  *See also*, Letter from Col. Henderson to President Steele (Sept. 3, 2015),

USACE69606-08.  Oglala's unique and complete failure to engage in consultation prior to

finalization of the EA is fatal to Oglala's challenge to the Corps' pre-remand consultation.

While the Court's analysis need proceed no farther, Oglala's argument that the Corps'

allegedly deficient consultation caused the Corps to omit Oglala's Mni Wiconi Project from its

EA is similarly without merit.  First, Oglala disproves its argument that the Corps failed to

consider the Mni Wiconi Project by citing, ECF No. 461 at 21, to a letter that instead establishes

that EPA requested that the Corps address "downstream water supplies," including but not

limited to the Mni Wiconi Project.  Letter from P. Strobel, EPA to B. Cossette, Corps (Mar. 11,

2016), USACE73188.  As the Corps noted in its Memorandum, the Corps' Final EA actually

considered "water intakes located downstream from the Missouri River and Lake Oahe

crossings."  ECF No. 450 at 11-12 (quoting USACE71262); Envtl. Assessment (July 2016),

USACE71225 ("The Corps received comments from 20 reviewers in response to the Draft EA,

primarily from individuals believed to be members of the Standing Rock Sioux Tribe, and two

sets of comments from EPA. These comments relate to topics in the EA. The Corps fully

considered and responded to these comments.").  Oglala cites no case requiring the Corps to

explicitly address a single water intake rather than addressing downstream intakes as a group.

To the contrary, it was entirely reasonable for the Corps to address Oglala's intakes located over

200 miles downriver along with other intakes along the river.  In other words, the Corps

reasonably addressed downstream intakes, including Oglala's, despite Oglala's failure to provide

timely comments.

**2.      The Corps' post-remand consultation complied with any duty.**

As the Corps established in its Memorandum, it used the Court's remand order to focus

its consultation efforts on Oglala's hunting, fishing, and cultural practices.  ECF No. 450 at 14-

16.  Oglala's critique of the Corps' consultation during the remand process ignores these issues and instead asserts that the Corps was required to "seek further information" from Oglala regarding the EarthFax report that Oglala submitted on December 2, 2016.  ECF No. 461 at 22. Oglala's argument fails because it ignores the Court's remand order directing the Corps to address the report Oglala already submitted rather than require consultation so that Oglala could create a new report.

Rather than direct the Corps to obtain further information from Oglala to address the degree to which the pipeline's effects on the environment are likely to be highly controversial, the Court instead, directed that correcting the Corps' failure to fully consider this issue "does not require that Defendants begin anew, but only that they better articulate their reasoning below." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F. Supp. 3d 91, 98 (D.D.C. 2017). The Court further indicated that the Corps need not seek more information from Oglala regarding Oglala's own critique by stating that "[a]lthough the Corps must give careful consideration to the expert critiques [including the December 2, 2016 EarthFax report], it is well positioned to provide such explanation on remand." *Id.* at 99.[11]  In other words, consultation on remand must train on the past critique rather than new ones.

After staying silent regarding turbulence at Oahe Dam during the remand analysis, Oglala's asserts in its briefs that it was unable to provide comments relating to turbulence at Lake Oahe dam during the remand.  ECF No. 461 at 14.  This assertion is undercut by the Cheyenne River Sioux Tribe's comment regarding turbulence in general.  NOI comments, Dakota Access Pipeline Crossing, Attachment 10 at 10, RAR13923 (turbulence increases oil

---

[11] The Corps notes that it is far from clear that the Court's remand includes the Mni Wiconi water intakes.

dispersion, which "may serve to increase the surface area of oil susceptible to dissolution and degradation processes and thereby limit the potential for physical impacts").  Oglala's assertion that it could not reasonably be expected to voice its environmental concerns before receiving the final remand analysis simply does not withstand scrutiny.  Oglala cannot base its challenge on its untimely and unsupported assertion that the turbulence at Oahe Dam is so great that it causes oil to sink more than four times the maximum depth established in the administrative record.  *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 553-54 (1978).

The Corps nonetheless addressed all of Oglala's comments on remand.  To the extent that Oglala now argues that it could not provide comments related to spill modeling because it lacked critical information, ECF No. 461 at 23, Oglala falls far short of establishing that it lacked any information.  To the contrary, Oglala had the original spill model methodology and worst case discharge formula—and therefore the ability to analyze and comment on the spill model assumptions—by no later than November 10, 2016, when these administrative record materials were transmitted to the Tribe.  Comments from ERDC ProjNet system, USACE72253; Mem. for Record, RAR112; Notice of Lodging Admin. Record, ECF No. 55 (Nov. 10, 2016).  Oglala similarly fails to establish, ECF No. 461 at 23, that the Corps actually made its remand decision prior to consulting with the Tribe.[12]  To the contrary, the June 1, 2018 consultation meeting preceded the Corps' August 31, 2018 remand decision by three months.  *See* ECF No. 450 at 3-4 (also addressing Corps' consideration of Oglala's April 18, 2018 written submission).  As the Corps established in addressing Standing Rock's overlapping claims, Oglala's assertion that the Corps had completed most of its remand analysis before consulting with Oglala is false, as the

---

[12] Any suggestion that the spill model is a final agency action is incorrect because the spill model is not the consummation of any decision-making process. *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).

analysis was revised so significantly that between February and August 2018 that the Tribes

could not recognize the final analysis.  ECF No. 452 at 38-39.  Indeed, the remand decision

disproves Oglala's argument by addressing Oglala's comments after remand, as well as the

EarthFax Report.  Mem. for Record, RAR45, RAR82-84, RAR94, RAR103, RAR110-26.  In

particular, the remand analysis explains in detail why the Oglala intakes located over 200 miles

downriver from the Lake Oahe crossing are not at risk.  Review and Analysis of Tribes'

Submissions (Aug. 31, 2018), RAR278-79.  Oglala has offered no cogent argument as to why

that conclusion is arbitrary or capricious.

### III.    CONCLUSION

The Corps respectfully submits that the Court should grant the Corps' motion for

summary judgment because the Corps appropriately engaged with Oglala, appropriately

considered the risk to Oglala from a low-possibility oil spill, and reasonably concluded that

water intakes located 205 miles from the Lake Oahe crossing were not threatened, much less

impacted, by the any Corps' action.

Dated: November 20, 2019                    Respectfully submitted,

                                            JEAN E. WILLIAMS
                                            Deputy Assistant Attorney General
                                            United States Department of Justice
                                            Environment & Natural Resources Division

                                            By: */s/ Matthew Marinelli*
                                            REUBEN SCHIFMAN, NY BAR
                                            MATTHEW MARINELLI, IL Bar 6277967
                                            U.S. Department of Justice
                                            Natural Resources Section
                                            P.O. Box 7611
                                            Benjamin Franklin Station
                                            Washington, DC 20044
                                            Phone: (202) 305-4224 (Schifman)
                                            Phone: (202) 305-0293 (Marinelli)
                                            Fax: (202) 305-0506

reuben.schifman@usdoj.gov
matthew.marinelli@usdoj.gov

ERICA M. ZILIOLI, D.C. Bar 488073
U.S. Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, DC 20044
Phone: (202) 514-6390
Fax: (202) 514-8865
Erica.Zilioli@usdoj.gov

*Attorneys for the United States Army Corps of Engineers*

OF COUNSEL:

MILTON BOYD
MELANIE CASNER
U.S. Army Corps of Engineers
Office of Chief Counsel
Washington, DC

## CERTIFICATE OF SERVICE

I hereby certify that on November 20, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of this filing to the attorneys of record and all registered participants.

*/s/ Matthew Marinelli*
Matthew Marinelli