**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE, YANKTON SIOUX TRIBE; ROBERT FLYING HAWK; OGLALA SIOUX TRIBE, | Case No. 1:16-cv-1534-JEB (and Consolidated Case Nos. 16-cv-1796 and 17-cv-267) |
| Plaintiffs, | |
| and | **REPLY BRIEF IN SUPPORT OF ARMY CORPS' MOTION FOR SUMMARY JUDGMENT WITH RESPECT TO STANDING ROCK SIOUX TRIBE'S CLAIMS** |
| CHEYENNE RIVER SIOUX TRIBE, | |
| Plaintiff-Intervenor, | |
| v. | |
| U.S. ARMY CORPS OF ENGINEERS, | |
| Defendant-Cross Defendant, | |
| and | |
| DAKOTA ACCESS, LLC, | |
| Defendant-Intervenor-Cross Claimant. | |

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ...................................................................................................... 1

II.     ARGUMENT .............................................................................................................. 2

        A.      The Corps fully complied with NEPA ............................................................ 2

                1.      Deference is due to the Corps' choice of methodology ...................... 3

                2.      It was wholly appropriate for the Corps to use PHMSA's "worst
                        case discharge" regulation to estimate spill volume .......................... 4

                3.      NEPA does not require consideration of impacts based on a "worst
                        case" discharge .................................................................................. 8

                4.      The Corps' consideration of spill risk was reasonable ...................... 9

        B.      The Tribe's critiques do not demonstrate sufficient "controversy" to
                establish that the Corps was arbitrary to conclude that no EIS was needed ....... 11

        C.      The Corps' consideration of environmental justice was not arbitrary and
                capricious ..................................................................................................... 13

        D.      Standing Rock remains unable to establish a mandatory consultation duty. ...... 15

        E.      The Corps more than fulfilled any duty to consult. ........................................ 17

        F.      Standing Rock's NHPA claims should be dismissed ...................................... 20

                1.      Standing Rock cannot establish that its NHPA claim is capable of
                        repetition but evading review ............................................................. 20

                2.       The Corps fully complied with the NHPA ........................................ 23

III.    CONCLUSION ........................................................................................................ 25

## <u>TABLE OF AUTHORITIES</u>

Cases

*Appalachian Power Company v. EPA*,
  208 F.3d 1015 (D.C. Cir. 2000) ........................................................................... 16

*Arapaho Tribe v. Burwell*,
  118 F. Supp. 3d 1264 (D. Wyo. 2015) .................................................................. 17

*Bayou Liberty Ass'n, Inc. v. U.S. Army Corps of Eng'rs*,
  217 F.3d 393 (5th Cir. 2000) ................................................................................. 21

*Citizens Against Burlington, Inc. v. Busey*,
  938 F.2d 190 (D.C. Cir. 1991) ................................................................................. 4

*Confederated Tribes of Grand Ronde Cmty. of Or. v. Jewell*,
  75 F. Supp. 3d 387 (D.D.C. 2014) ........................................................................... 9

*Confederated Tribes of Grand Ronde Cmty. of Or. v. Jewell*,
  830 F.3d 552 (D.C. Cir. 2016) ................................................................................. 9

*Conservation Cong. v. U.S. Forest Serv.*,
  235 F. Supp. 3d 1189 (E.D. Cal. 2017) ................................................................ 13

*Conservation Cong. v. U.S. Forest Serv.*,
  775 F. App'x 298 (9th Cir. 2019) .................................................................... 13, 14

*Crenshaw Subway Coal. v. L.A. Cty. Metro. Transp. Auth.*,
  No. CV 11-9603 FMO (JCX), 2015 WL 6150847 (C.D. Cal. Sept. 23, 2015) ....... 15

*Defs. of Wildlife v. Bureau of Ocean Energy Mgmt.*,
  684 F.3d 1242 (11th Cir. 2012) ............................................................................... 9

*Dine Citizens Against Ruining Our Env't v. Bernhardt*,
  923 F.3d 831 (10th Cir. 2019) ............................................................................... 25

*Edwardsen v. U.S. Dep't of Interior*,
  268 F.3d 781 (9th Cir. 2001) ................................................................................... 9

*Fla. Keys Citizens Coal., Inc. v. U.S. Army Corps of Eng'rs*,
  374 F. Supp. 2d 1116 (S.D. Fla. 2005) .................................................................... 4

*Friends of Endangered Species, Inc. v. Jantzen*,
  760 F.2d 976 (9th Cir. 1985) ................................................................................. 12

*Friends of the Earth, Inc. v. U.S. Army Corps of Eng'rs*,
  109 F. Supp. 2d 30 (D.D.C. 2000) ........................................................................ 12

*General Electric Company v. EPA*,
  290 F.3d 377 (D.C. Cir. 2002) ............................................................................... 16

*GMC v. EPA*,
  363 F.3d 442 (D.C. Cir. 2004) ............................................................................... 16

*Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*,
    702 F.3d 1156 (10th Cir. 2012) ................................................................ 12

*Hoosier Envtl. Council v. U.S. Army Corps of Eng'rs*,
    722 F.3d 1053 (7th Cir. 2013) ............................................................... 4, 5

*Indus. & Fin. Mkts. Ass'n v. CFTC*,
    67 F. Supp. 3d 373 (D.D.C. 2014) .......................................................... 16

*Kennecott Greens Creek Mining Co. v. Mine Safety & Health Admin.*,
    476 F.3d 946 (D.C. Cir. 2007) ................................................................... 3

*Kowal v. MCI Commc'ns Corp.*,
    16 F.3d 1271 (D.C. Cir. 1994) ................................................................. 23

*Lower Brule Sioux Tribe v. Deer*,
    911 F. Supp. 395 (D.S.D. 1995) .............................................................. 18

*Nat'l Wildlife Fed'n v. Norton*,
    332 F. Supp. 2d 170 (D.D.C. 2004) ........................................................ 13

*Nat'l Wildlife Fed'n v. Sec'y of Dep't of Transp.*,
    374 F. Supp. 3d 634 (E.D. Mich. 2019) ................................................. 6, 7

*Nat'l Wildlife Fed'n v. Sec'y of U.S. Dep't of Transp.*,
    286 F. Supp. 3d 836 (E.D. Mich. 2017) .................................................... 5

*National Parks Conservation Association v. Semonite*,
    916 F.3d 1075 (D.C. Cir. 2019) ......................................................... 11, 12

*Nw. Envtl. Advocates v. Nat'l Marine Fisheries Serv.*,
    460 F.3d 1125 (9th Cir. 2006) ................................................................ 12

*Or. Nat. Desert Ass'n v. Rose*,
    921 F.3d 1185 (9th Cir. 2019) ................................................................ 16

*People for the Ethical Treatment of Animals, Inc. v. U.S. Fish & Wildlife Serv.*,
    59 F. Supp. 3d 91 (D.D.C. 2014) ............................................................ 22

*Ralls Corp. v. Comm. on Foreign Inv. in U.S.*,
    758 F.3d 296 (D.C. Cir. 2014) ................................................................ 21

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989) ............................................................................. 2, 9

*Sierra Club v. Fed. Energy Regulatory Comm'n*,
    867 F.3d 1357 (D.C. Cir. 2017) ................................................. 2, 3, 4, 15

*Sierra Club v. U.S. Army Corps of Eng'rs*,
    295 F.3d 1209 (11th Cir. 2002) .............................................................. 4, 8

*Sierra Club v. U.S. Army Corps of Engineers*,
    803 F.3d 31 (D.C. Cir. 2015) .................................................................. 23

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  255 F. Supp. 3d 101 (D.D.C. 2017) ................................................................... 9, 11

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  282 F. Supp. 3d 91 (D.D.C. 2017) ........................................................................ 18

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  301 F. Supp. 3d 50 (D.D.C. 2018) ........................................................................ 21

*TOMAC v. Norton*,
  433 F.3d 852 (D.C. Cir. 2006) ....................................................................... 15, 16

*Wildearth Guardians v. Jewell*,
  738 F.3d 298 (D.C. Cir. 2013) .............................................................................. 24

*WildEarth Guardians v. Zinke*,
  368 F. Supp. 3d 41 (D.D.C. 2019) .................................................................. 13, 19

*Wood ex rel. United States v. Am. Inst. in Taiwan*,
  286 F.3d 526 (D.C. Cir. 2002) .............................................................................. 23

*Yankton Sioux Tribe v. Kempthorne*
  442 F. Supp. 2d 774 (D.S.D. 2006) ...................................................................... 18

*Yankton Sioux Tribe v. Kempthorne*,
  442 F. Supp. 2d 774 (D.S.D. 2006) ...................................................................... 17

*Yankton Sioux Tribe v. Kempthorne*,
  442 F. Supp. 2d 774 (D.S.D. 2006) ...................................................................... 18

**Statutes**

33 U.S.C. § 1321(j)(5)(D) ................................................................................... 5, 6

**Regulations**

40 C.F.R. § 1508.27(b)(4) ...................................................................................... 11

49 C.F.R. § 194.105 ................................................................................................. 6

49 C.F.R. § 194.119(b) ............................................................................................ 5

49 C.F.R. § 194.119(d) ............................................................................................ 5

82 Fed. Reg. 1860, 1874-75 (Jan. 6, 2017) ......................................................... 23

**Executive Orders**

Executive Order 13175 ........................................................................................... 17

# I.      INTRODUCTION

As the Corps established in its Memorandum in Support of Summary Judgment, Standing Rock's claims should be dismissed because the Corps' remand analysis complied with this Court's instructions and carefully evaluated the Tribes' hunting and fishing rights, environmental justice concerns, and the degree to which the decision was "highly controversial." At bottom, the Corps' remand analysis was wholly supported by a robust administrative record and neither arbitrary nor capricious.

Standing Rock's attacks on the Corps' methodology for estimating the volume and risk of a spill fall far short of establishing that the Corps was arbitrary or capricious. In addition to having its own experts review the proposed spill model methodology and the results thereof, the Corps reasonably relied on the regulations and method of the relevant expert agency, the Pipeline and Hazardous Materials Security Administration (PHMSA), to assess spill risk and volume. Standing Rock has not shown this was arbitrary and capricious, or that the Corps' approvals were "highly controversial." Standing Rock's environmental justice claim is similarly unpersuasive. The Corps' detailed discussion of environmental justice is thorough and more than sufficient under the National Environmental Policy Act (NEPA). And Standing Rock's consultation claim should be dismissed because: 1) the Tribe identifies no mandatory duty to consult; and 2) the Corps' consultation complied with any reasonable duty.

Finally, Standing Rock's effort to revive its admittedly moot National Historic Preservation Act (NHPA) claims should be denied because those claims are not capable of repetition but evading review. Regardless, the NHPA claims fail on the merits because the Corps' reasonably considered indirect effects of its actions at Lake Oahe. The Corps therefore respectfully submits that the Court should grant the Corps' motion for summary judgment.

## II.      ARGUMENT

### A.      The Corps fully complied with NEPA

Standing Rock does not dispute that under NEPA the Corps need not evaluate the impacts

from a worst case scenario.  *See* ECF No. 458 at 12.  Rather, Standing Rock argues that having

opted to use spill volume methodology from the PHMSA "worst case discharge" regulation, the

Corps must reasonably apply that methodology.  ECF No. 465 at 9.  The Corps easily meets this

standard.  The spill volume methodology and estimate used in the Corps' NEPA analysis was

fully explained, reasonable, and is the same as used in the PHMSA-approved spill response plan.

Standing Rock's claim that the Corps' spill volume calculation was unreasonable rests on

an interpretation of the "worst case discharge" regulation that is inconsistent with the

interpretation of PHMSA, the expert agency that administers the regulation and that is owed

deference.  And while Standing Rock never gives a definite alternative methodology, its critiques

imply a methodology that would require modeling an absolute worst case scenario—a guillotine-

like total rupture of the pipeline that is undetected and compounded by the failure of each

successive component of the pipeline's leak detection and monitoring safeguards all at once.

Such a methodology is not called for in the regulation nor is it required by NEPA.  *See*

*Robertson v. Methow Valley Citizens Council,* 490 U.S. 332 (1989).

Standing Rock's arguments regarding spill risk fare no better.  The Corps chose to rely on

PHMSA's approach and data to model and predict a spill rather than some other approach

preferred by the Tribes, but that does not make the Corps' approach arbitrary or capricious under

NEPA.  *See Sierra Club v. Fed. Energy Regulatory Comm'n*, 867 F.3d 1357, 1369 (D.C. Cir.

2017).  The Corps, in its discretion, relied on the PHMSA-required methodology for determining

spill volume and PHMSA data to determine spill risk.  That was wholly appropriate and

unassailable as a matter of law.  Finally, the Corps extensively considered environmental justice and the Tribe has not demonstrated the Corps' analysis to be arbitrary and capricious.

### 1.      Deference is due to the Corps' choice of methodology

Standing Rock challenges the Corps' choice of methodology to determine the risk of an oil spill at Lake Oahe and the amount of oil that could be released as arbitrary and not deserving of deference.  ECF No. 465 at 6-7.  Standing Rock argues that "expertise in pipeline engineering, risk, safety management, or spill response" lies with other agencies and that therefore no deference is due to the Corps' choice.  *Id.*  This argument is flawed for several reasons.

First, one agency that has specific technical expertise that warrants deference, as Standing Rock acknowledges, is PHMSA.  *Id.* at 7.  As explained in greater depth below, by statute and regulation PHMSA is tasked with evaluating spill response plans.  These spill response plans include a "worst case discharge" spill volume as specified by PHMSA regulation.  PHMSA is entitled to "an extreme degree of deference" in their evaluation of these spill response plans.  *See Kennecott Greens Creek Mining Co. v. Mine Safety & Health Admin.*, 476 F.3d 946, 956 (D.C. Cir. 2007).  The worst case discharge analysis here was based on a "PHMSA-approved" spill model.  RAR12-13; RAR14964.  PHMSA reviewed and ultimately approved the spill response plan that used this model; this is strong evidence that its methodology was sound and consistent with PHMSA's regulation.  RAR6442-44; *see also* ECF No. 277-1 at 39.

Moreover, the Corps technical experts reviewed the PHMSA methodology as applied to the Lake Oahe crossing before relying upon it.  *See* USACE72220, 2252-254, 72258.  Plaintiff suggests the Corps is not due deference because it lacks specific expertise in "pipeline engineering," ECF No. 465 at 6.  But Corps officials "including specialists and technical experts in the fields of water resources, engineering, environmental resources, geographic information systems, and modeling," RAR103, have been involved at every phase of the agency's approval

3

processes including the remand effort.  This expertise is relevant to the choice of a reasonable methodology for determining spill volume and suggests deference is due to the Corps. Moreover, even if the Corps lacked technical expertise, the law is clear that so long as the analysis underlying an agency's methodological choice is "reasonable and adequately explained," the agency's "choice among reasonable analytical methodologies is entitled to deference."  *Sierra Club*, 867 F.3d at 1368; *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 198 (D.C. Cir. 1991).  There can be no doubt that the Corps' methodology is both reasonable and adequately explained in numerous technical documents.  *See, e.g.*, RAR14971; (Spill model report); RAR17286-17331 (Surge Analysis Report); RAR8747.

Finally, given PHMSA's expert status and role in the regulatory scheme, it was reasonable for the Corps to rely upon PHMSA's methodology.  *See, e.g.*, *Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1222 (11th Cir. 2002) ("[Plaintiff] bears a heavy burden to prove that the Corps was arbitrary and capricious in relying upon the [other expert agency's] determination of a matter firmly within that agency's area of expertise."); *Fla. Keys Citizens Coal., Inc. v. U.S. Army Corps of Eng'rs*, 374 F. Supp. 2d 1116, 1157 (S.D. Fla. 2005) ("[T]he Corps is entitled to rely on, and did reasonably rely on, the considered judgment of other agencies with particular expertise."); *Hoosier Envtl. Council v. U.S. Army Corps of Eng'rs*, 722 F.3d 1053, 1061 (7th Cir. 2013).

      **2.**     **It was wholly appropriate for the Corps to use PHMSA's "worst case discharge" regulation to estimate spill volume**

Standing Rock argues that the Corps' inconsistency with Tribe's interpretation of the Worst Case Discharge regulation has caused the modeled spill volume to be unreasonably low,

tainting the Corps' NEPA analysis.  ECF No. 465 at 10-12.[1]  But what is curiously absent from Standing Rock's analysis is any mention of the role of PHMSA, despite the Tribe's acknowledgement that the agency is entrusted with "interpretation of pipeline-related statutes, the WCD regulation, [and] other regulatory standards governing pipelines."  *Id.* at 7.  By relying on the methodology outlined in PHMSA's regulations and the PHMSA-approved spill response plan, the Corps acted reasonably.

PHMSA's role comes from the Clean Water Act, which requires certain pipeline operators to create a plan that, *inter alia*, ensures "the availability of private personnel and equipment necessary to remove to the maximum extent practicable a worst case discharge . . . and to mitigate or prevent a substantial threat of such a discharge."  33 U.S.C. § 1321(j)(5)(D).  In accordance with the Clean Water Act, *id.* § 1321(j)(5)(A)(i), PHMSA promulgated regulations to govern the preparation and submission of the response plans. *See Nat'l Wildlife Fed'n v. Sec'y of U.S. Dep't of Transp.*, 286 F. Supp. 3d 836, 845 (E.D. Mich. 2017).

Consistent with this authority, PHMSA evaluates response plans submitted to it by applying a standard set of regulatory review criteria.  In the case of the third statutory requirement addressing responses to worst case discharges, PHMSA checks for the plan elements required by the regulations and if the plan contains the required elements and no deficiencies are found, PHMSA issues a letter of approval.  49 C.F.R. § 194.119(d); *see e.g., Nat'l Wildlife Fed'n*, 286 F. Supp. 3d at 840 n.2.  If deficiencies are found, PHMSA issues a letter of correction requiring the operator to submit a revised plan.  49 C.F.R. § 194.119(b); *see,*

---

[1] PHMSA is not a party to this case, thus it is not fair for the Tribe to complain the record lacks internal PHMSA documents explaining the agency's reasoning or process.  ECF No. 465 at 13 n.8.  Regardless, the record is clear that the Spill Response Plan was updated "based on comments from PHMSA."  RAR6443.

*e.g., Nat'l Wildlife Fed'n v. Sec'y of Dep't of Transp.*, 374 F. Supp. 3d 634, 654 (E.D. Mich. 2019), *appeal docketed*, No. 19-1609 (6th Cir. June 4, 2019).  In this case, PHMSA reviewed the spill response plan and the plan was updated based on PHMSA's comments.  RAR6443.  Ultimately, PHMSA issued a letter of approval of the plan, and did not identify deficiencies with respect to the worst case discharge calculation or any other element of the plan.  RAR253; *see also* ECF No. 277-1 at 39 (PHMSA letter of approval).  Standing Rock does not directly challenge PHMSA's determination that the plan met the requirements of 33 U.S.C. § 1321(j)(5)(D)—indeed, PHMSA is not a party to this case.  But by arguing that the Corps was arbitrary and capricious to rely on the spill volume figure in the spill response plan, Standing Rock is functionally arguing that PHMSA's determination that the spill response plan (based on the "PHMSA-approved spill model," RAR14964) was arbitrary.  Not so.

The regulations specify how the worst case discharge is to be calculated and require the operator to provide the methodology, including calculations, used to arrive at the volume. 49 C.F.R. § 194.105.  The worst case discharge is the largest volume, in barrels, of one of three scenarios identified in the regulations: (1) the largest possible discharge from a pipeline segment in the zone (according to a specified calculation); (2) the largest foreseeable discharge based on the maximum historic discharge within the zone (with certain adjustments); and (3) the size of the largest breakout tank or battery of breakout tanks in the zone (with certain adjustments).  *Id.* § 194.105(b).  This was the calculation done in the spill model, RAR14971, and documented in the spill response plan that was approved by PHMSA. RAR6490-6494; ECF No. 277-1 at 39.

Standing Rock's argument seems to be that the calculation of the "maximum release time" and "maximum shutdown response time" must incorporate "maximum" human error, "real world pipeline releases that took hours or even days to detect" ECF No 465 at 14, as well as

"valves failing due to power loss or other problem." *Id.* at 15.  While these factors could in theory be captured by the regulation's reference to "historic discharge data," no historic data exist for this new pipeline.  Therefore, the regulation calls for an operator's "best estimate," which was provided here, and evaluated by PHMSA.  PHMSA considers the reasonableness of response times and shutdown times provided by pipeline operators, including with respect to valve operations, human decision-making, and other factors, in their review.  Standing Rock merely attempts to substitute its preferred method of evaluating these factors for that used by the expert agency; as noted above, this attempt is inappropriate.

Standing Rock's interpretation is unreasonable because the literal "maximum" time would be unlimited:  a spill could always take longer to detect or a malfunctioning valve could always take longer to be closed.  Standing Rock's interpretation would also render superfluous the consideration of line segments.  PHMSA regulation requires operators to consider "[t]he line sections with the highest throughput and largest drainage volume between block valves on pump stations" in order to arrive at the highest volume discharge figure.  RAR6492.  In so doing, the methodology (and underlying regulation) necessarily assume that the block valves function properly—otherwise there would be no need for the volume of the line section between valves.

The methodology used in the spill response plan here assumed the valves did not malfunction, but shut down in the slowest time that could be reasonably expected, based on technical modeling done on a Surge Analysis Report.  RAR157; RAR17286-17331 (Surge Analysis Report).  The modeling done as part of the Surge Analysis Report shows valve closure times ranging in seconds, from roughly 2.9 minutes to about 3.7 minutes.  *See also* RAR173. The Spill Model assumed that it would take 3.9 minutes to close the valves.  *Id.*; RAR254.  This assumption was the highest (i.e., maximum) number drawn from modeling done in the Surge

Analysis Report.  RAR157; RAR17286-17331 (Surge Analysis Report).  This approach complies with PHMSA's regulation and was reasonable to use as part of the Corps' NEPA analysis.[2]

Standing Rock is correct that the model relied upon by the Corps assumes that the state of the art leak detection system would detect a full bore rupture.  ECF No. 465 at 13; *see* ECF No. 458 at 20; RAR205, 273.  But the Tribe has not demonstrated that this approach is unsupported by the record.  The record is replete with information regarding the system's sophistication, its compliance with regulatory and industry standards, and how it can quickly detect even small leaks.  *See* RAR205, RAR273; ESMT3680.  That the Tribe presented some evidence that even state of the art leak detection systems can fail, *see* ECF No. 465 14-15, is not evidence that the Corps was unreasonable to rely on assessments of its own experts and PHMSA in adopting a methodology that models a functioning leak detection system.  This is simply one choice among many reasonable choices that could go into modeling a spill.  That the Corps did not adopt the approach advocated by the Tribe but instead that used in the PHMSA-approved spill response plan does not mean the Corps acted arbitrarily.  *See, e.g.*, *Sierra Club*, 295 F.3d at 1222.

### 3.    NEPA does not require consideration of impacts based on a "worst case" discharge

Ultimately, even if Standing Rock were entirely correct that the Corps had used a methodology that is not truly a "worst case" discharge, it would not be evidence that the Corps failed to comply with NEPA.  *See* ECF No. 458 at 12-13.  The Tribe has never disputed that NEPA requires no "worst case" analysis at all.  Indeed, Standing Rock does not dispute that

---

[2] Indeed, a PHMSA report shows that a plurality of considered pipelines were shut down in less than a minute. ESMT3764; *see also* ESMT3712.  And the response plan notes that "[a]lthough the entire discharge volume of each line was used for the worst case discharge, in an actual spill event, it would take days to drain the line completely. The line would be sealed early in the response effort."  RAR6492.

NEPA permits evaluating impacts from a spill less severe than a worst case discharge.[3]  *Cf.* ECF No. 465 at 9-10.  The Tribe only argues that "[h]aving placed that estimate at the heart of its NEPA finding, the Corps cannot now disavow it."  *Id.* at 10.  But the Corps never disavowed its spill volume analysis—to the contrary, the Corps' opening brief explained in detail how its methodology was reasonable and fully supported by the record.  ECF No. 458 at 16-23. Standing Rock essentially argues that the Corps' approach is inconsistent with NEPA because the Corps' spill volume estimate is less than what the tribe believes a true "worst case" discharge would be.  This argument is inconsistent with the persuasive precedent from courts across the country that have evaluated this precise issue, *id.* at 12-14, and also inconsistent with the rule in this Circuit that NEPA does not require a "worst-case" analysis.  *Robertson,* 490 U.S. at 354-55; *Confederated Tribes of Grand Ronde Cmty. of Or. v. Jewell*, 75 F. Supp. 3d 387, 423 (D.D.C. 2014), *aff'd*, 830 F.3d 552 (D.C. Cir. 2016).  The Corps exceeded NEPA's requirements.

### 4.      The Corps' consideration of spill risk was reasonable

This Court has already rejected challenges to the Corps' determination in the Finding of No Significant Impact (FONSI) that the risk of a severe oil spill is low.  *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 125-27 (D.D.C. 2017); *see* USACE71311; RAR119.  Because the environmental assessment (EA) provided "the specific factors that undergirded its risk analysis and explain[ed] their application to DAPL," the Court found that "the EA reasonably gives the necessary content to its top-line conclusion that the risk of a spill is low."  *Standing Rock Sioux Tribe*, 255 F. Supp. 3d at 127.  Standing Rock does not ever directly address this Court's earlier ruling.  Instead, it appears to argue that though the

---

[3] To be clear, it is the Corps position that it *did* evaluate impacts from a "worst case discharge" as defined by PHMSA regulation—going above and beyond what NEPA requires.  *See Defs. of Wildlife v. Bureau of Ocean Energy Mgmt.*, 684 F.3d 1242, 1250 (11th Cir. 2012); *Edwardsen v. U.S. Dep't of Interior*, 268 F.3d 781, 785 (9th Cir. 2001).

Corps' original conclusion regarding spill risk was found reasonable, after the Corps bolstered this conclusion with additional PHMSA data and analysis, the Corps' conclusion regarding spill risk is now arbitrary and capricious.  This argument is not persuasive.

The Tribe identifies three concerns regarding risk of a spill it alleges were ignored by the Corps.  ECF No. 465 at 18-19.  Not so.  The Corps used highly detailed PHMSA data from which it was able to calculate the number of spills per mile broken down by pipeline characteristics including age, diameter, and whether it was installed via horizontal directional drilling (HDD).  *See* RAR19; ESMT1123, 1255-59; ESMT3680.  This highly specific, targeted data allowed the Corps to reasonably conclude that the risk of spill for this specific pipeline is extremely low, and if one occurred it would likely be of a small amount.  RAR19.  The Corps was reasonable to use extensive PHMSA data to make this determination.

Standing Rock argues that instead of this approach or in addition to this approach, the Corps should have considered Energy Transfer Partners' (ETF) specific safety record in more depth.  ECF No. 465 at 19.  The Corps responded to the Tribe's concern about ETP's safety record by noting that the types of spills the Tribe had identified were largely on ETP's own property, and then after considering the Tribe's input, the Corps intended to continue basing its risk assessment on PHMSA data that is specific to the type of pipeline at issue rather than the operator.  Similarly, the Corps responded to the Tribe's comments regarding Bakken Crude and industry best practices, noting that PHMSA did not treat Bakken Crude differently in emergency response documents, and that the pipeline is consistent with or exceeds applicable regulatory standards, and contains specific easement conditions imposed by the Corps with the advice of PHMSA.  While of course not identical to the precise best practices advocated by the Tribe, they serve the same goal of ensuring pipeline safety.  RAR232-34; RAR13.  In sum, the Corps'

consideration of the spill risk was done reasonably in reliance on the data of the agency with

particular expertise in assessing such risk, and this approach was not arbitrary or capricious.

**B.      The Tribe's critiques do not demonstrate sufficient "controversy" to
          establish that the Corps was arbitrary to conclude that no EIS was needed**

On remand, the Corps went above and beyond what was required by the Court,

exhaustively considering the scientific critiques presented by the Tribes' reports, requesting

additional factual and technical analysis of the issues presented by the Tribes from ETP, and

requiring ETP to produce its spill model report and explain its methodology to the Corps'

satisfaction.  RAR110.  After extensive review by technical experts, the Corps found that the

Tribes' critiques did not fundamentally draw the Corps' methodology or data into question.  *Id.*

at RAR103; RAR13270; RAR10950.  The Corps concluded "[w]hile there may be other methods

for predicting oil spill effects, it is not likely that employing further methods will result in

substantively different views or information that is more comprehensive than what the Corps has

considered here."  RAR139-40.  Ultimately the Corps' analysis did not reveal a "substantial

dispute" about the effects of the Corps' actions.  The Corps found that the effects of the federal

action are not "likely to be highly controversial."  RAR140 (citing 40 C.F.R. § 1508.27(b)(4)).

Standing Rock's argument appears to be that this conclusion was arbitrary and

capricious, because "the record includes detailed critiques of the Corps' method…revealing

major 'controversy'" ECF No. 465 at 2.  But a plaintiff's inclusion of a critique from a retained

expert is insufficient to demonstrate controversy.  Standing Rock relies heavily on *National

Parks Conservation Association v. Semonite*, 916 F.3d 1075, 1083 (D.C. Cir. 2019), *amended on

reh'g in part*, 925 F.3d 500 (D.C. Cir. 2019), to argue that a dispute over methodology can be

sufficient to demonstrate a project is "highly controversial."  Yet inexplicably, while asserting

"[i]t would be hard to find a controlling precedent more on point," ECF No. 465 at 2-3, Standing

Rock does not refute the Corps' arguments that the case is quite distinguishable.  *See* ECF No.

458 at 29-30.  As explained in the Corps' opening brief, the methodological critiques at issue in

*Semonite* were found to come from federal agencies with subject matter expertise.  *Id.* at 1080.

In contrast, here, PHMSA—the agency with subject matter expertise on pipeline safety and spill

modeling—provided the data that the Corps used to assess spill risk and approved a spill

response plan that used the worst case discharge methodology Standing Rock challenges here.

Several circuit courts have found "evidence of a lack of controversy" where, as here,

relevant federal and state agencies did not question an agency's NEPA analysis or methodology.

*Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1182 (10th

Cir. 2012); *Nw. Envtl. Advocates v. Nat'l Marine Fisheries Serv.*, 460 F.3d 1125, 1139 (9th Cir.

2006).  In contrast, as in *Semonite*, courts have found the "highly controversial" factor to be

implicated where federal or state agencies with particular expertise in the area call into question

the given environmental analysis.  *See also Friends of the Earth, Inc. v. U.S. Army Corps of*

*Eng'rs*, 109 F. Supp. 2d 30, 43 (D.D.C. 2000).  This case is in the former category.  Here, the

relevant federal agency, PHMSA, did not object to the Corps' analysis of spill volume or spill

impacts.  Nor did any state agency with relevant expertise.  Instead, the methodological critiques

at issue come from plaintiff's retained experts—and this is less persuasive evidence of

controversy.  *See Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 986 (9th Cir.

1985) (no controversy where agreement among state and federal regulators but "appellant and its

two experts are critical of the Biological Study" that informed the EA).

This is not to say that the Tribes' retained experts do not have a good faith disagreement

about the best methodology to employ in evaluating oil spill risk or volume.  But as this Court

held, "the existence of diverse thought in the scientific literature does not necessarily equate to

scientific controversy." *Nat'l Wildlife Fed'n v. Norton*, 332 F. Supp. 2d 170, 185 (D.D.C. 2004).

There are many ways to model any complex phenomenon, including an unanticipated oil spill.

But that Standing Rock has identified an alternative methodology for evaluating the risk and

extent of an oil spill is not sufficient to show a "controversy" such that an Environmental Impact

Statement (EIS) was required.  To hold otherwise would run counter to the "rule of reason"

which guides every step of the NEPA process, and the principle that agencies are entitled to rely

upon the conclusions of their own experts.  *See WildEarth Guardians v. Zinke*, 368 F. Supp. 3d

41, 58, 82 (D.D.C. 2019); *Conservation Cong. v. U.S. Forest Serv.*, 235 F. Supp. 3d 1189, 1203

(E.D. Cal. 2017), *aff'd*, 775 F. App'x 298 (9th Cir. 2019).  The Corps' conclusion that there was

not such "controversy" over the impacts of its action—including impacts stemming from an

unanticipated oil spill—that an EIS was required is not arbitrary or capricious.

**C.**     **The Corps' consideration of environmental justice was not arbitrary and capricious**

In its environmental justice analysis, the Corps reiterated that "a catastrophic spill is not

expected."  RAR61.  However, "[d]espite the low risk [of a spill]. . . the Corps undertook a

comprehensive review of the potential effects of a release on the low-income and minority

populations identified in the affected area."  RAR82.  The review focused on "specific cultural,

spiritual, and ceremonial practices at or near Lake Oahe" that the Tribes identified, as well as

"subsistence and traditional hunting and fishing practices" and "water intakes and associated

human health concerns."  *Id.*  After reviewing these issues that had the potential to impact the

Tribes uniquely, the Corps concluded that in light of spill response and other mitigation, "[i]f

there is a spill, there are not likely to be any significant adverse human health or environmental

effects on *any population* from the pipeline's operation at the Lake Oahe crossing."  RAR61, 81

(emphasis added). Thus the Corps concluded "there is not a significant potential environmental

effect to low-income or minority populations requiring [an EIS]." *Id.* Standing Rock's argument is that even though the Corps concluded the overall risk of a spill was low and its potential impacts would be limited, it was arbitrary to conclude that a spill would not have disproportionate impacts on tribal members. This argument misunderstands the Corps' analysis.

Standing Rock quotes a portion of the Corps' brief to attempt to argue the Corps is inconsistent. ECF No. 465 at 27 (citing ECF No. 458 at 30). In doing so, the Tribe omits a crucial word (without notifying the Court that it has done so, for instance through brackets or an ellipse). While likely unintentional, the misquotation reveals the flaw apparent in the Tribe's overall environmental justice argument. The quoted sentence of the Corps' opening brief reads in full: "And only by reading out the first half of the Corps analysis could the Tribe find that the Corps does not disclose disproportionate *potential* impacts on Tribes and tribal members." ECF No. 458 at 33 (emphasis added). In its reply, Standing Rock omits the word "potential" to claim the Corps is inconsistent for claiming both that it did and did not disclose disproportionate impacts on Tribes and Tribal members. ECF No. 465 at 27. In so doing the Tribe reveals its misunderstanding with the Corps analysis.

Standing Rock also misconstrues the Corps' treatment of the North Bismarck alternative on remand. In response to the Court's remand instructions, the Corps sought to provide more detail to elaborate on the North Bismarck route comparison. By gathering additional detail on demographics and drinking water intakes, the Corps was able to confirm the basic findings of that comparison, consistent with this Court's ruling. ECF No 284 at 15.

The Corps analyzed potential environmental justice impacts on drinking water intakes, hunting and fishing, and traditional cultural, spiritual, and ceremonial practices. RAR82. In so doing, the Corps drew from Tribal input to consider "Tribal cultural, spiritual, and ceremonial

practices and beliefs that are vulnerable to impacts from a potential spill" including the "use of the lands, waters and resources surrounding and within Lake Oahe." RAR83, 86-89. The Corps expressly found that "[i]mpacts to the quality of water required for spiritual ceremonies, temporary degradation of habitat for plants used for medicinal and ceremonial purposes, loss of enjoyment of Lake Oahe for recreation and ceremonial use during lake closures could all be *potential impacts* that are unique to tribal populations." RAR87 (emphasis added). But the Corps does not expect its action (granting permission for a pipeline to cross federal property) to result in a catastrophic unmitigated spill.[4] Therefore, the Corps does not anticipate impacts that would disproportionately adversely impact any environmental justice community. The Corps' detailed discussion of environmental justice is thorough and more than sufficient under NEPA. *See, e.g.*, *Sierra Club*, 867 F.3d at 1369.

**D.      Standing Rock remains unable to establish a mandatory consultation duty.**

As the Corps' Memorandum established, ECF No. 458 at 34-40, Standing Rock fails to identify an applicable mandatory consultation duty. Standing Rock's Reply brief does not correct this shortcoming. Standing Rock's arguments regarding alleged consultation duties fails to seriously address the Corps' argument, ECF NO. 458 at 34-40, that the scope of consultation on remand impacts the nature of any consultation. Standing Rock's assertion that *TOMAC v. Norton*, 433 F.3d 852 (D.C. Cir. 2006), is inapposite because it "is limited to the case's facts," ECF No. 465 at 30-31, is unpersuasive.[5] *TOMAC* upheld an agency's remand analysis despite

---

[4] This distinguishes this case from the only case cited by the tribe in the environmental justice section of its opening brief, in which certain effects (environmental impacts due to construction of a transportation project) were expected to occur from the agency's action. *See Crenshaw Subway Coal. v. L.A. Cty. Metro. Transp. Auth.*, No. CV 11-9603 FMO (JCX), 2015 WL 6150847, at *9 (C.D. Cal. Sept. 23, 2015).

[5] Standing Rock is incorrect that a case involving comment on an issue beyond the agency's knowledge in an initial challenge to an EA, as opposed to a limited remand, is more applicable.

the agency considering no additional comments—a fact that illustrate that the Corps'

consultation on this Court's limited remand was reasonable.  433 F.3d at 861-62.  At a minimum,

*TOMAC* stands for the principle that a limited remand does not mandate unlimited consultation.

Contrary to Standing Rock's assertion, ECF No. 465 at 28, *General Electric Company v.*

*EPA*, 290 F.3d 377 (D.C. Cir. 2002), is inapposite.  That case focuses on the impact that agency

directives have on regulated parties: "an agency document will be considered binding if 'the

affected private parties are reasonably led to believe that failure to conform will bring adverse

consequences.'" *Gen. Elec.*, 290 F.3d at 383.  The D.C. Circuit subsequently held that letters that

neither "imposed new requirements on regulated parties [n]or exclusively guided . . . subsequent

enforcement activities" were not binding agency policy.  *GMC v. EPA*, 363 F.3d 442, 451 (D.C.

Cir. 2004).  Agency statements explaining policy are similarly nonbinding where there was

"nothing within that announcement on which market participants could 'rely'" on as a regulatory

safe harbor.  *Sec. Indus. & Fin. Mkts. Ass'n v. CFTC*, 67 F. Supp. 3d 373, 419 (D.D.C. 2014)

(citing *General Electric's* statement that "if the language of the document is such that private

parties can rely on it as a ... safe harbor by which to shape their actions, it can be binding as a

practical matter").  Standing Rock, in contrast, is not a regulated party forced to choose between

following guidance or risking a penalty.  Its reliance on *General Electric* is therefore misplaced.[6]

Standing Rock's characterization of the Instruction as implementing policy, assigning

responsibilities, and providing procedures for interactions with tribes, ECF No. 465 at 28, omits

---

ECF No. 465 at 31 (citing *Or. Nat. Desert Ass'n v. Rose*, 921 F.3d 1185 (9th Cir. 2019)
(addressing comments on photographs, rather than "technical documents" as Tribe claims).
[6] Standing Rock similarly misapplies, ECF No. 465 at 29, *Appalachian Power Company v. EPA*.
208 F.3d 1015, 1028 (D.C. Cir. 2000) ("In directing State permitting authorities to conduct wide-
ranging sufficiency reviews and to enhance the monitoring required in individual permits beyond
that contained in State or federal emission standards . . . EPA has in effect amended" regulations
promulgated through notice and comment rulemaking).

the critical qualification, from the very sentence Standing Rock relies upon, that the Instruction

only does so "in accordance with" references a through f.  RAR13975.  As the Corps explained,

ECF No. 448 at 16-18, references a through f either explicitly disclaim that they create

substantive rights or are inapplicable to this case.  *E.g. N. Arapaho Tribe v. Burwell*, 118 F.

Supp. 3d 1264, 1281 (D. Wyo. 2015) ("the plain language of Executive Order 13175 does not

provide any right enforceable in this judicial action alleged by the Tribe.").[7]  The Instruction

does not transmute these nonbinding statements into binding ones by providing guidance for

interacting with tribes in accordance with non-binding procedures.

As the Corps established, the cases that Standing Rock relies upon as the basis for a

mandatory duty to consult are inapposite because they involved a statutorily-imposed

consultation duty or affirmative misrepresentation by an agency.  ECF No. 458 at 39-40.

Standing Rock's effort to brush aside this argument fails to address the critical role that statutes

play in creating mandatory duties.  *Yankton Sioux Tribe v. Kempthorne* held that BIA violated a

mandatory, statutorily-imposed consultation duty.  442 F. Supp. 2d 774 (D.S.D. 2006).  Standing

Rock misapplies Yankton Sioux by contending that similar mandatory consultation duties exist

absent similar statutory language.  The United States does not contest that statues such as the

NHPA can impose mandatory consultation duties.  *See* ECF No. 448 at 19-20.  But no similar

statutorily duty to consult is applicable to Standing Rock's non-NHPA claims.[8]

**E.     The Corps more than fulfilled any duty to consult.**

As the Corps established, it provided Standing Rock with a meaningful opportunity to

consult on the remand analysis.  The centerpiece of Standing Rock's response is the Tribe's

---

[7] The 1994 "Presidential statement on consultation" that Standing Rock relies on, ECF No. 465
at 28-29 n.18, 32, is also unenforceable.  And the Tribe's suggestion, *id.* at 32, that the Interior
Department increased the Department of Defense's consultation duties is without support.
[8] As explained in Section II(F), Standing Rock's NHPA claims are both moot and meritless.

misstatement that that the Corps made a decision regarding its remand analysis before engaging in consultation.  ECF No. 465 at 29-30.  The Corps already disproved this assertion, as the draft analysis changed so much between February 2018 and August 2018 that Standing Rock was unable to recognize it.  ECF No. 458 at 40-43.  Standing Rock was unable to recognize the relationship between the draft and final remand documents, in part, because the Corps incorporated information provided by the Plaintiff tribes through written submissions and meetings between February and August.  *Id.*  In other words, Standing Rock is flatly incorrect that the Corps made any final decision prior to consultation.

Standing Rock had ample and meaningful opportunities to participate in the Corps' decisionmaking.  *Id.*  The Tribe is simply incorrect, ECF No. 465 at 31-35, that the Corps failed to provide it with an opportunity to meaningfully consult.[9]  The Corps followed the remand process suggested by the remand order by: 1) seeking information tailored to address the hunting, fishing, and environmental justice issues early in the remand process; and 2) evaluating the expert reports Standing Rock **already submitted** to consider the degree to which the pipeline's effects are likely to be highly controversial.  *See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F. Supp. 3d 91, 98-103 (D.D.C. 2017); RAR13325-27.  The Corps and Dakota Access invited Standing Rock to meetings in January, February, and March, 2018 to share information that Standing Rock requested, including information developed during the initial remand analysis outlined in the Corps' September 25, 2017 letter.  ECF No. 458 at 41-42. The Corps incorporated the additional information the Tribes provided before making its final

---

[9] Standing Rock is incorrect, ECF No. 465 at 30 n.20, that the Corps miscited *Lower Brule Sioux Tribe v. Deer*, 911 F. Supp. 395 (D.S.D. 1995).  *Lower Brule* characterized "meaningful consultation" as requiring no more than a two-hour meeting at which BIA "notifies the Council of the BIA's proposed action, justifying his reasoning" followed by the Tribe providing its position on the proposed action.  *Id.*, 911 F. Supp. at 401.  The Corps far exceeded this standard.

determination on August 31, 2018.  *Id.* at 42-44.  To be clear, Standing Rock's argument, ECF
No. 465 at 35, that "it was too late to reopen the process" by the time the Corps met with
Standing Rock in March and May, 2018, ECF No. 458 at 11, is false because the Corps did not
conclude the remand process until August 31, 2018.  Standing Rock was able to, and actually
did, engage with the Corps in a manner that affected the Corps' decisionmaking.  RAR1-140.[10]

Standing Rock's effort to sidestep its failure to take full advantage of consultation should
be rejected.  As the Corps established, Standing Rock was either provided or offered the majority
of the information it claims was wrongfully withheld.  ECF No. 458 at 41-43.  Standing Rock
attempts to minimize its failure to attend a March 7, 2018 meeting to discuss the spill model by
claiming that the meeting was for "emergency response staff" and "not part of the remand."
ECF No. 465 at 33.[11]  But Standing Rock's Chairman received the email and the information
offered was responsive to his request regarding remand.  RAR6565; RAR13276.  Standing
Rock's refusal to hear information it claims is necessary and refusal to attend a meeting at which
it could, at a minimum, ask follow-up questions about the spill model because it needs "a full
understanding of potential spill events" is difficult to comprehend.[12]  To be clear, the Corps did

---

[10] The Corps already refuted Standing Rock's claim, ECF No. 465 at 33 n.23, that "there was no
DAPL-specific Integrity Management Plan or Operations and Maintenance manual until the
remand was complete."  ECF No. 402 at 13-14.

[11] The Tribe's attempt to elide its nonattendance at emergency planning meetings is troubling
given its representation that it must be involved in such planning.  ECF No. 272 at 36-37.  The
Geographic Response Plan nonetheless remains "a living document" and will be updated if the
Tribe provides "new relevant information."  RAR270.

[12] Standing Rock received the assumptions and inputs for the spill model by November 10, 2016.
It had the original spill model and worst case discharge formula—and therefore the ability to
analyze and comment on the model's assumptions—when these administrative record materials
were transmitted.  USACE72252-53 (providing spacing of block valves and worse case
discharge calculations); RAR112; ECF No. 55.  As Dakota Access noted, the more "recent
modeling includes a comparable amount as the worst case spill scenario, among other scenarios."
RAR6565.

not demand that Standing Rock produce a spill model at the March 7, 2018 meeting—it instead

offered Standing Rock an opportunity to obtain information Standing Rock claims it needed.

And Standing Rock's assertion that the Facility Response Plan it received included "'significant'

redactions" notably cites to Standing Rock's letter.  ECF No. 465 at 34.[13]  Standing Rock cannot

reasonably refuse information while simultaneously claiming that the Corps is violating

consultation duties by failing to provide information that Standing Rock refuses to receive.  By

any standard, the Corps engaged with Standing Rock in a prompt and reasonable manner.

**F.      Standing Rock's NHPA claims should be dismissed**

> **1.      Standing Rock cannot establish that its NHPA claim is capable of
> repetition but evading review**

Standing Rock's NHPA claim is moot, and it has failed to establish that its claim is

subject to the capable of repetition exception to mootness.  The Tribe's attempt to revive its

NHPA claim hinges entirely on its argument that it is somehow challenging a general Corps

policy regarding NHPA implementation and "only seeks a final ruling on the scope of NHPA

review."  ECF No. 465 at 37.  The Tribe ignores a prior ruling by this Court that already rejected

that argument and misapplies D.C. Circuit precedent in a vain attempt to resurrect its mooted

claim.  Standing Rock's argument is nothing more than an allegation that the Corps might

somehow violate the NHPA in another as-yet-unidentified future pipeline permit application that

might impact some Tribal interest.  The Court should deny the Tribe's NHPA claim as moot.

As an initial matter, this Court has already addressed the Tribe's contention that it is

seeking declaratory relief regarding the scope of NHPA review under some alleged Corps policy

that is likely to be applied to the Tribe in the future.  This Court held that:

---

[13] Standing Rock's assertion does not survive scrutiny of the administrative record.  *Compare* RAR6459-60 with RAR16817-18; RAR6446-51 with RAR16804-09.

> any declaration by the Court at this point in time—after construction is complete and the clearing, grading, and excavation have taken place—would be of no practical effect.  To issue declaratory relief would be tantamount to issuing an advisory opinion, a result not within this Court's power. . . .  Because it can provide no meaningful remedy to address Plaintiffs' alleged injuries arising from their NHPA claims, the Court will dismiss the relevant counts of the Tribe's Complaint as moot.

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 301 F. Supp. 3d 50, 64 (D.D.C. 2018).

Standing Rock seeks a declaration to resolve what the Tribe describes as "a long-standing conflict between the Advisory Council on Historic Preservation (ACHP) and the Corps relating to the scope of review for Corps permits."  ECF No. 465 at 37.  So not only is the Tribe seeking an impermissible advisory opinion, but it is seeking an advisory opinion to resolve an alleged conflict between the Council and the Corps.  Arguments so far removed from an actual case or controversy between the Tribe and the Corps cannot sustain Article III standing.  In short, this Court has already properly rejected the argument that a request for declaratory relief regarding the scope of NHPA review can save a mooted claim.  *See also Bayou Liberty Ass'n, Inc. v. U.S. Army Corps of Eng'rs*, 217 F.3d 393, 398 (5th Cir. 2000) ("Therefore, any general declaratory judgment regarding Corps' procedures in issuing other permits would be an advisory opinion.").

The Tribe argues that its NHPA claims evade review because the Corps' NHPA consultation process is too short to be fully litigated prior to cessation.  ECF No. 465 at 35.  The Tribe relies on *Ralls Corp. v. Comm. on Foreign Inv. in  Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296 (D.C. Cir. 2014), but fails to account for the significant factual distinctions that render it inapplicable to the NHPA claims here.  In *Ralls Corp.*, the D.C. Circuit made clear that the claims evaded review in part because even if the court had enjoined the order at issue, "there is no indication that the [agency's] process would have stopped in its tracks."  *Id.* at 323. Here, in contrast, an injunction would have stopped the pipeline in its tracks, and the Court could have fully evaluated the merits of the Tribe's NHPA claims at summary judgment.  The Tribe,

however, failed to show that it was entitled to preliminary injunctive relief on any of its claims, including failing to show that it was likely to succeed on the merits of its NHPA claims.

The Tribe simply ignores the fact that a Corps permit application and approval process is inherently highly fact-bound.  Each application implicates a myriad of variables, and is tied to the unique facts of each potential action – the location, type of construction, and proximity to tribal cultural resources, among others.  The Tribe therefore cannot carry its burden to show that there is a reasonable expectation that it would be subject to the same alleged legal wrong again.[14] Indeed, any claims related to some hypothetical future Corps decision on a hypothetical future pipeline permit application are unripe and the Tribe cannot establish standing.

Faced with this reality, the Tribe resorts to arguing that it is raising a purely legal question regarding the scope of NHPA review.  But the Tribe cannot raise a challenge to Corps policy as a whole, or to the validity of Corps regulations without a connection to a concrete agency action.  *People for the Ethical Treatment of Animals*, 59 F. Supp. 3d at 99 ("challenge to an agency policy . . . is better suited for an appeal to the Executive or to Congress.).

The Tribe cannot point to any plans, let alone imminent plans, to conduct NHPA review of a pipeline that implicates the Tribe's cultural or historical resources.  The Tribe relies solely on its own unsupported speculation that: 1) a future pipeline might be planned; 2) the future pipeline would require Corps permits; 3) the future pipeline would potentially affect the Tribe's cultural resources; and 4) the Corps will somehow fail to comply with NHPA duties to the

---

[14] In addition to not satisfying the mootness exception, claims related to a hypothetical future Corps decision on a hypothetical future pipeline permit application are not ripe.  *People for the Ethical Treatment of Animals, Inc. v. U.S. Fish & Wildlife Serv.*, 59 F. Supp. 3d 91, 99 (D.D.C. 2014) (D.C. Circuit requires concrete dispute to know what defendant's policy is).

Tribe.[15]  These unsupported assumptions cannot revive this Court's jurisdiction over the Tribe's

mooted claim.  *See Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994); *Wood*

*ex rel. United States v. Am. Inst. in Taiwan*, 286 F.3d 526, 534 (D.C. Cir. 2002) ("Statements by

counsel, of course, are not evidence.") (citation omitted).  The Tribe has failed to establish that

any of its mooted claims are capable of repetition sufficient to establish the exception to

mootness.  *See* ECF No. 448 at 14 (noting that Instruction 4710.02 has been replaced); 82 Fed.

Reg. 1860, 1874-75 (Jan. 6, 2017) (reissuing Nationwide permits with modifications).

Finally, the Tribe relies on *Sierra Club v. U.S. Army Corps of Engineers*, 803 F.3d 31, 44

(D.C. Cir. 2015), to make a policy argument that it is unfair to allow a project to be constructed

and then permit the agency to "hide behind the mootness doctrine."  ECF No. 465 at 38.  That

case, however, does not even address exceptions to the mootness doctrine.  It held that the case

was not moot, and distinguished it from cases involving claims, like this NHPA claim, where a

court can provide no relief.  *Sierra Club*, 803 F.3d at 43 ("This case is thus distinguishable from

those in which the court could not provide any of the relief sought.").  The Tribe has failed to

establish that its NHPA claims are subject to the capable of repetition exception to mootness, and

the Court should render judgment in favor of the Corps on those claims.

### 2.      The Corps fully complied with the NHPA

As the Corps established, ECF No. 458 at 48-49, Standing Rock's claim fails because the

Corps reasonably considered indirect effects of the pipeline at Lake Oahe under the NHPA.

Standing Rock's response continues to misrepresent the Corps' consideration of indirect effects

---

[15] The Tribe repeatedly cites to the Eagle Declaration as evidence of the imminence of new
pipelines and permits that will subject the Tribe to the same alleged NHPA violations that it
challenged in this case.  Mr. Eagle offers mere speculation, rather than evidence, that a pipeline
project may require a Corps permit near the Tribe's ancestral homelands at some future time.

in describing the Area of Potential Effects the Corps considered.  Standing Rock is incorrect, ECF No. 465 at 38, that the Corps failed to consider indirect effects.   The Corps simply did not consider all of the purported indirect effects that Standing Rock now contends should have been considered.  While Standing Rock may not be satisfied with the line drawn by the Corps, the Corps is entitled to deference in drawing the lines necessitated by conducting NHPA review.  *See Wildearth Guardians v. Jewell*, 738 F.3d 298, 312 (D.C. Cir. 2013).

The Tribe is also incorrect that the "Corps deemed the pipeline right-of-way entering and exiting the boreholes to be outside of the area of potential effect."  ECF No. 465 at 38; USACE66293 (inspection included locations "near the project APE").  The Corps considered within the area of potential effects (APE): 1) the pipeline route from the water's edge to the borehole; 2) "bore pits, stringing areas, staging/temporary work areas and access routes" on private land outside of the Corps' boundary; and 3) portions of the pipeline alignment outside of the Corps' boundary where that alignment was also identified as access roads and a work area. USACE65416-18.  Indeed, maps similar to the extra-record ones Standing Rock relies on illustrate that a cultural site lies on the pipeline route between the borehole and the water and that Corps considered that site.  *See* USACE66138-39 (illustrating survey and route of northern border pipeline), 66124 (site outside APE "was impacted by a previous pipeline" and is "not considered significant" because "no artifacts were found during the current survey").  That cultural site was among the sites the Corps evaluated as being within the APE.  USACE65418.

Standing Rock's characterization that the Corps "only offered to consult within the APE" is supported only by Standing Rock's letter characterizing the consultation.  ECF No. 465 at 38 (citing USACE64247).  It is unclear how Standing Rock developed its view of the limited nature of consultation, as the record illustrates that the Corps inspected and consulted on several sites

outside the APE.  USACE66293-95; USACE67005-06.  Where tribes engaged in site-specific

consultation, the Corps addressed their concerns by requiring Dakota Access to reroute pipeline

segments.  USACE66335; USACE67371, 67374 (Upper Sioux survey and reroute); USACE53.

Standing Rock ultimately falls short of establishing that the APE was unreasonably defined.

"Establishing an [APE] requires a high level of agency expertise, and as such, the agency's

determination is due a substantial amount of discretion." *Dine Citizens Against Ruining Our*

*Env't v. Bernhardt*, 923 F.3d 831, 846 (10th Cir. 2019) (quotation omitted).

And Standing Rock is incorrect, ECF No. 465 at 39, that the Corps did not respond to its

argument that the ACHP's letters somehow render the Corps' NHPA analysis invalid.  ECF No.

458 at 49.  To the extent that the Court wishes to revisit this issue, the Corps hereby incorporates

its 2016 opposition to Standing Rock's motion for a preliminary injunction.  ECF No. 21 at 13-

18, 29-38; USACE64266-68 (describing consultation).  But, as set forth above, the Court need

not, and should not, revisit Plaintiff's admittedly moot claims because they do not meet the

narrow exception for cases that are capable of repetition yet evading review.

### III.   CONCLUSION

The Corps' remand analysis was wholly proper and in no way arbitrary or capricious.

The Corps reasonably considered the environmental impacts of its action, including the risk of a

spill and the potential impacts of such a spill, and reasonably concluded that no EIS was needed.

The Corps' consultation with Standing Rock supported the Corps' reasonable environmental

justice analysis and fulfilled any duty to consult.  Finally, Standing Rock's NHPA claims fail

both because they are moot and meritless.  The Court should therefore deny Standing Rock's

motion for summary judgment and grant the Corps' motion for summary judgment.

Dated: November 20, 2019                        Respectfully submitted,

JEAN E. WILLIAMS
Deputy Assistant Attorney General
Environment & Natural Resources Division

.

By: /s/ Reuben Schifman
MATTHEW MARINELLI, IL Bar 6277967
REUBEN S. SCHIFMAN, NY Bar
U.S. Department of Justice
Natural Resources Section
P.O. Box 7611
Benjamin Franklin Station
Washington, DC 20044
Phone: (202) 305-0293 (Marinelli)
Phone: (202) 305-4224 (Schifman)
Fax: (202) 305-0506
matthew.marinelli@usdoj.gov
reuben.schifman@usdoj.gov

ERICA M. ZILIOLI, D.C. Bar 488073
U.S. Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, DC 20044
Phone: (202) 514-6390
Fax: (202) 514-8865
Erica.Zilioli@usdoj.gov

*Attorneys for the United States Army Corps of Engineers*

OF COUNSEL:

MILTON BOYD
MELANIE CASNER
U.S. Army Corps of Engineers
Office of Chief Counsel
Washington, DC

## CERTIFICATE OF SERVICE

I hereby certify that, on the 20th day of November, 2019, a copy of the foregoing was filed through the Court's CM/ECF management system and electronically served on counsel of record.

/s/  Reuben Schifman                    .
Reuben Schifman

U.S. Department of Justice
Natural Resources Section
P.O. Box 7611
Benjamin Franklin Station
Washington, DC 20044
Phone: (202) 305-4224
Fax: (202) 305-0506
reuben.schifman@usdoj.gov