**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE, YANKTON SIOUX TRIBE; ROBERT FLYING HAWK; OGLALA SIOUX TRIBE, | Case No. 1:16-cv-1534-JEB (and Consolidated Case Nos. 16-cv-1796 and 17-cv-267) |
| Plaintiffs, | |
| and | |
| CHEYENNE RIVER SIOUX TRIBE; SARA JUMPING EAGLE ET AL., | |
| Plaintiff-Intervenors, | |
| v. | |
| U.S. ARMY CORPS OF ENGINEERS, | |
| Defendant-Cross Defendant, | |
| and | |
| DAKOTA ACCESS, LLC, | |
| Defendant-Intervenor-Cross Claimant. | |

---

**DAKOTA ACCESS, LLC'S CONSOLIDATED REPLY IN SUPPORT OF CROSS-MOTION AGAINST STANDING ROCK SIOUX TRIBE, CHEYENNE RIVER SIOUX TRIBE, OGLALA SIOUX TRIBE, YANKTON SIOUX TRIBE, AND ROBERT FLYING HAWK, FOR SUMMARY JUDGMENT ON REMAND**

---

William S. Scherman
David Debold
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
wscherman@gibsondunn.com

*Counsel for Dakota Access, LLC*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................... iii

INTRODUCTION ................................................................................................ 1

ARGUMENT ....................................................................................................... 2

I.     Plaintiffs Raise Several Arguments That Fall Beyond The Remand's Scope ........ 2

II.    The Corps Adequately Addressed The Remand Topics ............................... 5

     A.     The Corps Reasonably Determined That The Environmental Effects Of Granting An Easement Are Not Likely To Be Highly Controversial ............................................................... 5

         1.     The Corps' Determination That A Spill Is Unlikely Is Not Highly Controversial ........................................ 6

         2.     The Corps' Worst-Case Discharge Calculation Is Not Highly Controversial Either ........................................ 8

         3.     The Corps' Assessment Of The Impact Of A Worst-Case Discharge Is Not Highly Controversial .................. 14

     B.     The Corps Reasonably Assessed And Explained The Impact Of A Spill On Hunting And Fishing ................................. 17

     C.     The Corps Provided A Robust Analysis Of Environmental-Justice Impacts ............................................... 19

III.   The Corps Met Its Obligations To Consult With Tribal Authorities Both Before And During The Remand .................................. 21

     A.     The Tribes Misconstrue The Scope And Enforceability Of The Obligations At Issue ........................................ 21

         1.     Relief Under The National Historic Preservation Act Is Foreclosed Because Construction Of The Pipeline Is Complete ... 21

         2.     The Tribes Rely On Inapplicable And Nonbinding Guidance Documents For The Remaining Consultation Claims .................. 23

         3.     The Corps Was Not Required To Repeat Its Consultation Process On Remand ....................................... 25

     B.     The Corps Exceeded Any Obligation To Consult ..................... 26

         1.     Pre-Remand Consultation ........................................ 26

i

        2.       Consultation On Remand ................................................................28

IV.     Plaintiffs' Trust Claims Are Meritless ....................................................31

CONCLUSION ...........................................................................................................33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Burlington N. R.R. Co. v. Surface Transp. Bd.*,
  75 F.3d 685 (D.C. Cir. 1996) ................................................................22

*Cape Hatteras Access Pres. All. v. U.S. Dep't of Interior*,
  731 F. Supp. 2d 15 (D.D.C. 2010) ..........................................................7

*City of Waltham v. U.S. Postal Serv.*,
  11 F.3d 235 (1st Cir. 1993) ..................................................................28

*Del Monte Fresh Produce Co. v. United States*,
  570 F.3d 316 (D.C. Cir. 2009) .............................................................22

*Elec. Privacy Info. Ctr. v. IRS*,
  910 F.3d 1232 (D.C. Cir. 2018) ...........................................................23

*Friedman v. FAA*,
  890 F.3d 1092 (D.C. Cir. 2018) .............................................................4

*Heartland Reg'l Med. Ctr. v. Leavitt*,
  415 F.3d 24 (D.C. Cir. 2005) .................................................................9

*United States ex rel. K&R Ltd. P'ship v. Mass. Hous. Fin. Agency*,
  456 F. Supp. 2d 46 (D.D.C. 2006) .........................................................3

*Meister v. U.S. Dep't of Agric.*,
  623 F.3d 363 (6th Cir. 2010) ...............................................................10

*Montgomery Envtl. Coal. v. Costle*,
  646 F.2d 568 (D.C. Cir. 1980) .............................................................22

*Nat'l Parks Conserv. Assoc. v. Semonite*,
  916 F.3d 1075 (D.C. Cir. 2019) .............................................................5

*New York v. Nuclear Regulatory Comm'n*,
  681 F.3d 471 (D.C. Cir. 2012) .............................................................18

*Oceana, Inc. v. Ross*,
  275 F. Supp. 3d 270 (D.D.C. 2017) ................................................3, 4, 25

*Or. Nat. Desert Ass'n v. Rose*,
  921 F.3d 1185 (9th Cir. 2019) .........................................................10, 24

*Ralls Corp. v. Comm. on Foreign Inv. in U.S.*,
  758 F.3d 296 (D.C. Cir. 2014) ..................................................................................22, 23

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989) .................................................................................................16

*Sierra Club v. EPA*,
  325 F.3d 374 (D.C. Cir. 2003) ..................................................................................25

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  255 F. Supp. 3d 101 (D.D.C. 2017) ....................................5, 6, 8, 9, 12, 15, 25, 26, 27, 31, 32

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  282 F. Supp. 3d 91 (D.D.C. 2017) ..............................................................6, 19, 25

*Te-Moak Tribe of W. Shoshone v. U.S. Dep't of Interior*,
  608 F.3d 592 (9th Cir. 2010) ....................................................................................25

*United Keetoowah Band of Cherokee Indians in Okla. v. FCC*,
  933 F.3d 728 (D.C. Cir. 2019) ..................................................................................25

*United States v. Navajo Nation*,
  537 U.S. 488 (2003) .................................................................................................31

*United States v. Sum of $70,990,605*,
  4 F. Supp. 3d 189 (D.D.C. 2014) ........................................................................18, 32

*United States v. White Mountain Apache Tribe*,
  537 U.S. 465 (2003) .................................................................................................32

*West Virginia v. EPA*,
  362 F.3d 861 (D.C. Cir. 2004) ..........................................................................3, 5, 13

*Wis. Valley Improvement Co. v. FERC*,
  236 F.3d 738 (D.C. Cir. 2001) ...............................................................................5, 8

**Regulations**

36 C.F.R. § 800.2(c)(2)(ii)(C) ..................................................................................24

40 C.F.R. § 1501.6 ...................................................................................................30

40 C.F.R. § 1508.27(b)(10) .........................................................................................8

49 C.F.R. § 194.105 .................................................................................................12

49 C.F.R. § 194.105(b)(2) ....................................................................................12, 13

49 C.F.R. § 194.121 .................................................................................................................12

**Other Authorities**

DoD Instruction 4710.02 § 6.1 (2006) .......................................................................................25

DoD Instruction 4710.02 § 6.2 (2006) .......................................................................................24

DoD Instruction 4710.02 § 6.6 (2006) ...............................................................................24, 26

## INTRODUCTION

The Army Corps of Engineers properly discharged its duty to address the three discrete topics in this Court's remand order.  As explained in Dakota Access's Cross-Motion, the Corps prepared a lengthy, detailed remand analysis, with ample documentation, that thoroughly considered:  how a possible oil leak could affect hunting and fishing rights; the environmental-justice implications of the federal action; and a handful of criticisms from Plaintiffs' consultants in seven documents that Plaintiffs submitted to the Corps between late July 2016 and early February 2017.

Dakota Access's Cross-Motion explained how the Corps' analysis satisfied the remand order as to all three topics.  First, in a point-by-point explanation that Plaintiffs still repeatedly ignore, the Corps correctly concluded that the consultants' criticisms were unfounded and therefore did not render the project's effects highly controversial.  As for the other two topics, the Corps acknowledged that Plaintiffs' unique interests would render a major oil spill a high-consequence event.  The Corps then reaffirmed its finding of no significant impact ("FONSI"), because, among other things, the risk of a high-consequence event is very low, especially considering the containment, mitigation, and remediation steps in place.  This Court has already rejected challenges to this low-likelihood-of-a-significant-impact conclusion.

Plaintiffs' latest briefs refuse to focus on these discrete remand topics.  Instead, they try to relitigate issues that were the subject of the earlier summary judgment briefing and this Court's opinion, including whether a spill will occur and how large one might be.  They insist they can raise criticisms of, *e.g.*, the worst-case discharge estimate ("how large") and the Corps' risk assessment ("whether"), even though the same criticisms were already *before* the Corps in the original administrative record (pre-July 25, 2016) or were first raised *after* the Corps decided to deliver an easement without an environmental impact statement (post-February 3, 2017).

The table that Dakota Access included with its Cross-Motion collects the record citations showing the extent to which Plaintiffs' current criticisms fall outside the remand's scope.  D.E. 456-1, Ex. 1.  Plaintiffs do not contest the table's accuracy or completeness.  Nor could they.  Thus, if the Court *itself* does what Plaintiffs still refuse to do—*i.e.*, search the full administrative record to identify when Plaintiffs first raised the criticisms that are the subject of the pending motions— the Court will find, as the table shows, that Plaintiffs repeatedly base their arguments on criticisms that they did not uniquely raise between July 25, 2016 and February 3, 2017.

Even if the Court were to reach Plaintiffs' arguments, none would undermine the validity of the Corps' conclusion that a high consequence spill is unlikely.  And Plaintiffs' limited challenges to the Corps' assessment of effects on hunting and fishing resources and environmental-justice considerations are improper attacks on how the Corps elected to proceed after accurately acknowledging what effects could occur.  Because the Corps fully complied with the law, the Court should grant it summary judgment on all counts.

## ARGUMENT

## I.     Plaintiffs Raise Several Arguments That Fall Beyond The Remand's Scope

Plaintiffs continue to advance challenges that they first raised either:  (1) before the July 25, 2016 EA and FONSI; (2) after the February 3, 2017 easement decision, including through extra-record evidence previously presented to this Court; (3) during the remand; or (4) after the remand.  D.E. 456, at 16-19, 31-32.  This Court has already rejected many of these arguments, and others are forfeited, as Dakota Access demonstrated point-by-point in its Cross-Motion and as further discussed below.  Yet Plaintiffs' latest briefs refuse to engage with record support capable of showing that even one of these forfeited arguments is properly before the Court.

Instead of countering the substance of Dakota Access's table showing the extent to which Plaintiffs' claims are grounded in portions of the record that fall outside the remand, D.E. 456-1,

Ex. 1, Plaintiffs ask the Court to strike it, *e.g.*, D.E. 465, at 3 n.2.  There is no basis to do so, because that table merely provides "organizational work that the Court would otherwise have to take upon itself," and that "consists overwhelmingly—or perhaps entirely—of information and argument presented elsewhere in the parties' various submissions." *United States ex rel. K&R Ltd. P'ship v. Mass. Hous. Fin. Agency*, 456 F. Supp. 2d 46, 53 (D.D.C. 2006).  And Plaintiffs cannot dispute that if the Court were to strike that table and search the record itself, it would come to the same conclusion:  Plaintiffs repeatedly advance arguments that exceed the remand's scope.

*West Virginia v. EPA*, 362 F.3d 861 (D.C. Cir. 2004), squarely forecloses Plaintiffs' argument that they can cite "new information" that "[t]he Tribe provided" themselves during the remand period simply because it appears in the administrative record.  D.E. 465, at 4.  Even where an agency "'respond[s] on the merits'" to comments submitted during "remand proceedings"— meaning those comments will necessarily appear in the remand record—the agency's decision to do so "d[oes] not reopen" aspects of its decisions not "raised in the initial litigation."  *West Virginia.*, 362 F.3d at 872.  *West Virginia* is on all fours with this case, despite Plaintiffs' contrary assertion, D.E. 465, at 5-6:  The parties challenged the assumptions underlying an agency's model, the district court remanded for further explanation, on remand the agency "decided to retain" its prior model while "provid[ing] a fuller explanation," and the court declined to consider challenges to aspects of the model that were first raised on remand.  362 F.3d at 866-67, 871-72.

*Oceana, Inc. v. Ross*, 275 F. Supp. 3d 270 (D.D.C. 2017), does not help Plaintiffs either.  *See* D.E. 465, at 5.  That court vacated the agency's methodology and remanded for the agency to adopt another—not give a fuller explanation for the original methodology.  *Oceana*, 275 F. Supp. 3d at 287-88.  The court thus had to consider challenges to new aspects of a new method: a method first adopted on remand.  And even in that context, the court emphasized that the agency

need not "'star[t] from scratch.'"  *Id.* at 288.  That is all the more so here, because many factors in the Corps' decision previously went unchallenged, or the Court upheld them before it remanded.

Plaintiffs also assert that the Corps opened the door to Plaintiffs' new arguments by asking Dakota Access for "a revised spill model and an evaluation of spill impacts."  D.E. 465, at 4.  But, with limited exceptions, the Tribes do not challenge the *new* aspects of these analyses; they challenge well-settled inputs that the earlier models had employed—for example, the same worst-case discharge calculation that the Corps used before it issued the July 2016 EA and the February 2017 easement.  Plaintiffs had every opportunity to challenge those inputs back then, and this Court previously addressed many of those criticisms before it limited this remand topic to specific critiques Plaintiffs' consultants offered between July 25, 2016 and February 3, 2017.  So long as the Corps "'filled the analytical gap'" in the EA by addressing *those* specific critiques—as it did, *see infra* at 5-17—the agency was free to rely on the same worst-case discharge inputs in the new models it requested.  *Friedman v. FAA*, 890 F.3d 1092, 1097 (D.C. Cir. 2018) (alteration omitted).  Plaintiffs make no attempt to confine their criticisms to "fact-finding" that was new on remand.  D.E. 460, at 2.

The Tribes cannot evade this limitation by purporting to "amplif[y]"—or "elaborat[e]" and "expand upon"—criticisms that the remand order required the Corps to address.  *E.g.*, D.E. 465, at 5-6, 18.  Plaintiffs would need to ascend to improperly high levels of generality if they wanted to link their new arguments to criticisms within the remand's scope, and they fail even to try, nor do they cite authority that required the Corps to address each new elaboration.

Plaintiffs likewise did not obtain license to expand the remand's scope when the Corps "invited input from the Tribe during the remand process."  D.E. 465, at 5; D.E. 460, at 3.  Apart from the rule that a remand's scope is set by the Court, not the agency, the Corps requested specific

information within the remand's limited scope—information showing the extent the Tribes rely on hunting and fishing, demographic information relevant to environmental justice, and help confirming the list of documents that contain expert comments for the Corps to address on the topic of "highly controversial" effects.  RAR 13323-27, 13328-32.  When Plaintiffs' comments addressed "'matters other than those actually at issue'" during the remand, Plaintiffs did not somehow assume the power to expand the matters subject to judicial review.  *West Virginia*, 362 F.3d at 872.

## II.    The Corps Adequately Addressed The Remand Topics

### A.    The Corps Reasonably Determined That The Environmental Effects Of Granting An Easement Are Not Likely To Be Highly Controversial

Plaintiffs still fail to identify any expert critique that the Corps failed to address from the seven documents it received between July 25, 2016 and February 3, 2017.  Instead Plaintiffs misstate the law, contending that the environmental impact of the Corps' decision is "highly controversial" under *Nat'l Parks Conserv. Assoc. v. Semonite*, 916 F.3d 1075 (D.C. Cir. 2019), if "the record includes detailed critiques" from "qualified experts."  D.E. 465, at 2.  *Semonite* reaffirms that "'the fact that some people may be highly agitated and be willing to go to court over [a] matter'" is not enough to make the matter highly controversial.  916 F.3d at 1083.  In *Semonite* there was more; "those raising concerns" about the agency's methodology were not interested parties, but neutral "government agencies with 'special expertise'" conferred by law.  *Id.* at 1084.  *Semonite* therefore does not require an EIS simply because the Tribes solicited consultants to draft lengthy critiques.  The Corps' reasoned rejection of those critiques is entitled to deference.  *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 127 (D.D.C. 2017) ("*SRST II*") (citing *Wis. Valley Improvement Co. v. FERC*, 236 F.3d 738, 746 (D.C. Cir. 2001)).

### 1.    The Corps' Determination That A Spill Is Unlikely Is Not Highly Controversial

Plaintiffs disregard the scope of the remand when they try to reopen the Corps' determination that the risk of a high-volume spill is "extremely low."  USACE_DAPL 71311.  Plaintiffs attack the Corps' original risk analysis without any effort to tie those attacks to the criticisms that the remand order required the Corps to address.  Instead of asking this Court to find fault in the Corps' responses to *those* criticisms, Plaintiffs broadly claim that "issues of risk were integral to the unaddressed expert critiques that triggered the remand."  D.E. 465, at 18-19.  But this Court's summary judgment opinion listed the critiques that the Corps had not addressed.  *See SRST II*, 255 F. Supp. 3d at 129; *see also Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F. Supp. 3d 91, 98-103 (D.D.C. 2017) ("*SRST III*").  Dakota Access has shown how the Corps addressed each, D.E. 456, at 20 n.6, and none matches the issues Plaintiffs raise here.  Indeed, each expert critique SRST now cites in its reply on this issue, D.E. 465, at 19, raised either a distinct concern that the Tribes have abandoned—such as corrosion, *see* USACE_ESMT 1079-80—or one that postdated the February 3, 2017 easement decision, *see* RAR 1465 (Aug. 7, 2017 declaration); RAR 1430 (Feb. 12, 2017 declaration).  Each argument also fails on the merits.

a.  ETP/Sunoco's Safety Record.  The Corps adequately addressed ETP's safety record, even though this criticism is untimely.  *See* D.E. 456, at 22-24.

SRST never denies that the sole expert critique here that falls within the period relevant to the remand—an October 2016 letter (USACE_ESMT 1278)—made no effort to compare ETP's safety record to other operators on a *per-mile* basis.  That is the critical comparison for assessing the risk of a spill at a particular location (Lake Oahe).  D.E. 456, at 23.  More *total* spills than other pipeline companies is (if true) unrevealing as to one of the nation's largest pipeline companies.

Plaintiffs never tried to show whether or to what extent ETP's *per-mile* spill rate exceeded rates for other companies.  SRST's failure to address this omission is fatal to its argument.

Further, the Corps fully addressed ETP's safety record by explaining that 70% of ETP's spills were confined to its property and that ETP had taken several new steps since 2013 to improve safety.  RAR 235; D.E. 456, at 23-24.  SRST's counter—that 30% of spills were "*not* confined to operator property," D.E. 465, at 21—fails again to show how ETP compares to others using apples-to-apples figures.  SRST likewise discounts ETP's post-2013 safety improvements as occurring during part of the "same period" for which SRST provided spill data, *id.*, but the *majority* of that period (seven years out of the eleven between 2006 and 2016) fails altogether to account for safety improvements that the Corps found dispositive.

Finally, SRST says it had "no obligation" to provide the Corps a "specific roadmap" for considering ETP's spill history, even though it is SRST that insists a new approach was needed.  D.E. 465, at 20 & n.15.  Even now, SRST has no "'alternative methodology'" to offer.  *Id.*  "NEPA allows the agency the discretion of what methodology to use and does not require the use of the best scientific methodology available."  *Cape Hatteras Access Pres. All. v. U.S. Dep't of Interior*, 731 F. Supp. 2d 15, 35 (D.D.C. 2010).  It therefore follows that the Corps also was not required to invent a new methodology, especially when there was no reason to believe it would be superior to that which the Corps has previously applied to this project and others.

b.  Industry Standards.  SRST's next argument—that Dakota Access is not fulfilling its purported "promise" in the EA to "comply with industry 'best practices,'" D.E. 465, at 22—like-wise exceeds the remand's scope.  Dakota Access showed (and multiple courts have held) that compliance with the terms of an agency's order is a matter of enforcement that must be raised before the agency, not in a court challenge to the order.  D.E. 456, at 18-19 & n.5 (citing cases).

The closest SRST comes to responding is a misleading statement that "violation of regula-tory standards" is relevant under NEPA regulations.  D.E. 465, at 18.  What the regulation actually says is that in assessing agency action under NEPA, the agency should consider whether "the action"—here, granting permissions based on the EA—"threatens a violation of . . . requirements imposed for the protection of the environment."  40 C.F.R. § 1508.27(b)(10).  A permission to cross Lake Oahe did not threaten to violate the EA supporting that permission.

Without disputing Dakota Access's ample record evidence that it meets multiple API standards and *all* PHMSA *regulatory* standards, D.E. 456, at 24-25, SRST points to a handful of API standards—API 1173, 1174, and 1175—that it claims Dakota Access was required to meet but did not, D.E. 465, at 23.  Because SRST has disclaimed any argument that "impos[ing] com-pliance with API standards" is "mandatory," D.E. 465, at 22, the Court "must defer to the [Corps'] informed discretion" in deciding which to impose.  *SRST II*, 255 F. Supp. 3d at 127 (quoting *Wis. Valley*, 236 F.3d at 746-47).  For API 1174, the EA recognized that Dakota Access's response plan was "intended to satisfy" it, USACE_DAPL 71263, and the Corps' Submission Review on remand rejected the Tribes' argument that it does not, RAR 240, 262.  SRST does not cite, much less refute, that determination.  As for API 1173 and 1175, the EA pages that SRST cites make no mention of them or any other particular API standard (beyond stating that API 1174 is already satisfied).  *See* D.E. 433-2, at 30 (citing USACE_DAPL 71312, 71319, 71263).  Even if the EA *had* required something more, it would be for the Corps to address in an enforcement context.

## 2. The Corps' Worst-Case Discharge Calculation Is Not Highly Controversial Either

Plaintiffs yet again exceed the scope of the remand when they complain that the Corps "did virtually nothing to revisit the WCD" (worst-case discharge) "during the remand."  D.E. 465, at 7. The Court *upheld* the Corps' analysis of the impact of a spill—including, by necessary implication,

the worst-case discharge underlying that analysis—*except* to the extent the Corps needed to (1) address expert critiques the Corps received between the EA and easement decisions, and (2) extend its analysis to hunting and fishing. *SRST II*, 255 F. Supp. 3d at 129, 133-34. The Corps was thus free to rely on the same worst-case discharge analysis on remand, including in addressing hunting and fishing, so long as it "fill[ed] the analytical gap" from not addressing those specific critiques. *Heartland Reg'l Med. Ctr. v. Leavitt*, 415 F.3d 24, 29 (D.C. Cir. 2005). Apart from the Corps' point that it was not even required to evaluate impacts from a worst-case scenario, D.E. 473, at 2, Plaintiffs still fail to show that any of their WCD-based arguments are challenges to how the Corps responded to that set of critiques, let alone show any flaw in those responses.

a. <u>Conservative assumptions</u>. As to the merits of this foreclosed issue, SRST insists that the Corps was wrong in stating that the worst-case discharge made multiple conservative assumptions. *Compare* D.E. 465, at 12, *with* D.E. 456, at 26. Each challenge fails. (1) The calculation assumes a full guillotine break, which is rare for larger pipelines like DAPL. SRST counters with just one example of a supposed guillotine break—the Kalamazoo River spill—which instead involved a long "gash" in a 40-year old pipeline, unlike the state-of-the-art pipeline here. RAR 1331. That supposed exception proves the rule. (2) An underground pipeline like DAPL "restricts the volume that could be released." RAR 144. SRST's only response—that Dakota Access's "own studies" show that a spill would reach Lake Oahe, D.E. 465, at 12 (citing RAR 8855)—misreads the record. The cited portion of the study concerns a "surface release" at the "valve site," where the worst-case discharge would already be much smaller—just 5,519 barrels—than a worst-case spill from the underground portion of the pipeline. RAR 8747, 8854-55. And the study finds that more than 25% of that oil—1,435.5 barrels—would *not* reach Lake Oahe, confirming that the

estimate *is* conservative.  (3) The original record explained how anti-siphoning effects would re-

duce the drain-down below the worst-case estimate.  USACE_DAPL 71270.  The Corps correctly

rejected SRST's criticism on this point, which went only to the "extent" of the reduction in drain-

down.  RAR 229.  And SRST first raised this concern after the easement issued, in a February 12,

2017 declaration.  RAR 1436.  (4) Plaintiffs ignore entirely that the Corps' calculation conserva-

tively assumes oil flowing out of a break in the pipeline at the full pumped flow rate for the full

shutdown period, even though the pumps will have started shutting down.[1]

Even if these assumptions were not conservative—but even more so because they *are*—

the Corps' worst-case discharge analysis is beyond reproach.

b.  <u>Reliance on ETP Modeling</u>.  Faced with clear authority that allowed ETP to supply

modeling to the Corps, and clear evidence that the Corps scrutinized that modeling before using

it, D.E. 456, at 27-29, SRST pivots to arguing for the first time that the Corps' use of ETP's mod-

eling precludes the Court from deferring to the Corps' expertise, D.E. 465, at 7.  But this case is

nothing like those SRST cites, which denied deference because the agency "did not use *any*

method" to derive its assumptions, *Or. Nat. Desert Ass'n v. Rose*, 921 F.3d 1185, 1191 (9th Cir.

2019), or relied on a third party who provided "scarcely any basis" for his estimate, *Meister v. U.S.*

*Dep't of Agric.*, 623 F.3d 363, 373-75 (6th Cir. 2010).  Given the undisputed evidence that the

---

[1]  Plaintiffs likewise cannot avoid their own expert's concession that a discharge of 4,620 barrels—far below the Corps' 12,517-barrel worst-case discharge estimate—would be a proper "planning-level estimat[e] of potential spill volumes."  USACE_ESMT 625-26.  Plaintiffs claim this estimate was "not intended as calculations of WCD," D.E. 460, at 8; *see also* D.E. 465, at 11, but it was not arbitrary or capricious for the Corps to assume a discharge almost three times greater than what *Plaintiffs'* expert said "'could'" result, D.E. 456, at 26 n.8.  It also does not matter when Oglala Sioux Tribe (the Tribe whose expert submitted this estimate) had access to the original record, because even doubling that expert's number to account for 1.9 miles of drain-down (the Corps' figure), instead of 1 mile (the expert's assumption), D.E. 465, at 11-12, would leave a spill well short of 12,517 barrels.

Corps applied its expertise by meeting with ETP and requiring it to "address gaps, and explain [its] methodologies," RAR 103, 110, that expertise is entitled to deference.

      c.  <u>Detection Time</u>.  SRST persists in asserting that the worst-case discharge "omits any time to detect a pipeline spill."  D.E. 465, at 13-14.  But the Corps' Remand Analysis could not be clearer:  the worst-case discharge calculation "includes 1 minute for time of detection" in the 9 minutes "to detect a break on the line and shutdown pumps."  RAR 254.  Plaintiffs do not contest that this statement is entitled to a presumption of regularity and truthfulness, D.E. 465, at 29, and at least four separate documents, including two that pre-date the remand, confirm that the calculation accounts for detection time.  *See* USACE_DAPL 74721 (Aug. 2015 spill model discussion describing "[d]etection and [s]hutdown" time of 12.9 minutes including 3.9 minutes for valve closure) (bold omitted); RAR 14888 (June 2016 dynamic risk report assuming 9 minutes for "[d]iagnosis, pump shutdown, and isolation initiation"); RAR 8112 (Feb. 2018 spill model report assuming 9 minutes "to detect break on the line and shutdown [the] pumps"); RAR 5828 (Mar. 2018 letter from Tribe attorney acknowledging that Corps "accepted the 9 minute detection and shutdown time").  To claim otherwise, SRST quotes the Corps' brief as letting "slip the truth: '*after a leak is detected* the pumps can be shut down in nine minutes.'"  D.E. 465, at 14.  But SRST omits the rest of that very sentence, which says that this figure of nine minutes "includes the time in which the rupture is detected," D.E. 458, at 21.

      SRST also misstates the *basis* for the 1 minute of detection time.  It is not the "'typical time'" for *other* "major rupture[s]"—which involve different leak detection systems.  D.E. 465, at 14.  It is the "typical time of detection for a WCD . . . through [the] SCADA and LeakWarn systems" used on *this* pipeline, RAR 254—"state-of-the-art" systems that detect spills in 1 to 3 minutes, RAR 205, with larger spills (like a full guillotine cut) at the lower end, RAR 254.

As Dakota Access explained, the Corps reasonably chose to use DAPL's specific parameters rather than more general data about different pipelines. D.E. 456, at 30-31. SRST wrongly says this reasoning is not "backed up with a citation," D.E. 465, at 15—the citation is RAR 255. It was reasonable to use DAPL-specific parameters because the Tribes' examples involve either: (1) slower or smaller leaks like Permian Express II, not the guillotine cut assumed here; or (2) older pipelines with less effective leak detection systems. D.E. 456, at 30-31. SRST's reply again invokes Permian Express II as an example of a newer pipeline, D.E. 465, at 14, still ignoring that it involved a smaller (8,600-barrel) "pinhole" leak. RAR 252. SRST further argues that some newer pipelines leak more *frequently*, D.E. 465, at 14-15, but that says nothing about how quickly leaks are *detected*. And SRST's assertion that "older pipelines typically use the same technology for detecting leaks used by DAPL," *id.* at 15, is unsupported. The page SRST intends to cite (RAR 7490) makes no such comparison, instead presenting SRST's own assertion (unadorned by citation or example) that "highly-touted leak detection systems have a poor record"—an argument that this Court already rejected, *SRST II*, 255 F. Supp. 3d at 125; that Dakota Access refuted again in its Cross-Motion, D.E. 456, at 31; and that Plaintiffs fail to defend against.

Lastly, SRST again misreads a PHMSA regulation in asserting that it requires consideration of "the operator's historic record." D.E. 465, at 16. The regulation requires pipeline operators to calculate a worst-case discharge and prepare a response plan that must be updated regularly. 49 C.F.R. §§ 194.105, 194.121. For that calculation, the operator must consider the "historic discharge," "if one exists," "for the line section" of the pipeline at issue—not historic discharges for *other* pipelines. *Id.* § 194.105(b)(2). In other words, the pipeline operator must update its response plan if a spill occurs by recalculating the WCD for the relevant pipeline section using the response

time for that spill.  The regulation applies to both old and new pipelines, and pipelines expressly

are not required to consider historic discharges "for the line section" if none "exists."  *Id.*

    d.  <u>Valve Closure Times</u>.  Like detection time, the variable of 3.9 minutes for valves to

close is spelled out expressly in both the remand analysis, RAR 254, and the spill report, which

states clearly that spill volume was "calculated by the OILMAPLand [computer] model" based on

"the sum of":  (1) "the volume released during the period when the pumps are operating"; (2) "the

volume able to drain unimpeded by any valves *before the valves are closed*"; and (3) "the volume

available to drain from the pipeline between adjacent valves once the valves are closed."  RAR

8112 (emphasis added).  Plaintiffs' continued insistence to the contrary thus ignores the record.

    Plaintiffs stick with their forfeited argument, asserting tension between a math calculation

in the *original* administrative record and the Corps' statement that it accounted for the time needed

for valves to close.  D.E. 465, at 17 (citing USACE_DAPL 72253).  Plaintiffs do not dispute that

this argument is based solely on that original record.  *See* D.E. 456, at 31-32.  And in litigation

over the record's scope following remand, SRST urged the Court to require the Corps to produce

"an email from a DAPL contractor that 'provided the rationale for the calculations'" about which

it now complains.  D.E. 401, at 12.  This Court declined, ruling that such claims "are moot given

that the Court has already passed on the lawfulness of the agency decision supported by that rec-

ord."  D.E. 418, at 9; *see also West Virginia*, 362 F.3d at 872 (under "'black letter . . . law,'" claims

that could have been raised pre-remand are forfeited).  It would be particularly unfair to entertain

this argument after Plaintiffs, through their delay, deprived Dakota Access and the Corps of the

opportunity to make a record explaining why there is no inconsistency.

    Dakota Access's Cross-Motion also fully responded to Plaintiffs' argument about valve

failure, D.E. 456, at 32-33, and Plaintiffs ignore the argument's flaws.  The argument rests on

concerns raised both *before* the July 25, 2016 EA, and *after* the February 3, 2017 easement deci-

sion, but not during the intervening period—the only one relevant to this remand topic.  And the

Corps adequately addressed valve failure in any event, explaining that the equipment can withstand

extreme operating temperature ranges, RAR 248; power loss triggers an alarm, allowing immedi-

ate corrective action, RAR 157; and the valve actuator can be operated manually if needed, *id.*[2]

> **3.     The Corps' Assessment Of The Impact Of A Worst-Case Discharge Is
> Not Highly Controversial**

a.  <u>Benzene</u>.  Oglala continues to accuse the Corps of using the wrong benzene threshold

for drinking water (2.2 µg/L rather than 5 µg/L), *see* D.E. 460, at 13, without even bothering to

engage with the Corps' principal response: The choice between standards makes no difference

because a "small" (100-barrel) spill would exceed either threshold, but a "very small" (4-barrel)

spill would not exceed either threshold.  USACE_DAPL 71271; RAR 114; D.E. 456, at 35-36.

Further, as Dakota Access explained, D.E. 456, at 35, the Corps' 5 µg/L threshold is sup-

ported by the very scientific literature (O'Reilly et al. 2001) that the Tribes succeeded in adding to

the record.  USACE_DAPL 71270; D.E. 401, at 9 (SRST moves to complete record with O'Reilly

and other articles); D.E. 418, at 6-7 (Court Order stating O'Reilly will be added); *see also* RAR

18459-72.  Oglala claims that this study does not address benzene levels, D.E. 460, at 13, but it

does.  O'Reilly states "Maximum Contaminant Levels" for "Benzene" of 5.00E-03 mg/L, RAR

18464, which equals 5 µg/L.  O'Reilly's source for this point, *see* EPA, *Soil Screening Guidance:*

---

[2]  SRST correctly notes that the remote backup power at the valves is for communication with
sensors rather than to close valves remotely.  D.E. 465, at 18.  But SRST is wrong to say that this
proves a violation of easement conditions.  The easement does not say that backup power must be
capable of closing the valves.  USACE_ESMT 39.  And even if it did, that would be an
enforcement issue instead of a challenge to granting the easement.  Also, as the Corps explains,
the Corps was not required to assume "a cascade of cumulative failures of every component."  D.E.
458, at 19; *see also* D.E. 473, at 7.

*User's Guide* at 86 (1996), *available at* https://tinyurl.com/sky9c97, cited at RAR 18464, explicitly supports the threshold level the Corps used for benzene.

      b.  <u>10-day Simulation Period / Impacts on the Mni Wiconi Project</u>.  Oglala's remaining arguments on drinking water impacts exceed the remand's scope.  D.E. 456, at 36.  This Court upheld the Corps' drinking water analysis.  *SRST II*, 255 F. Supp. 3d at 133.  The Corps' decision to bolster its analysis with additional modeling did not reopen the issue.  And even if it could, the model's conservative 10-day spill period was more than reasonable given ETP's commitment to respond to any spill using mitigation methods within 6 hours of detection.  D.E. 456, at 36.

      Oglala claims that if the Corps wanted to "take mitigation into consideration" it should have built a "model that included mitigation," instead of modeling the unmitigated flow of the spill over 10 days.  D.E. 460, at 9.  But it cites no authority requiring the Corps to construct *any* additional model on remand, let alone a model that attempted to track the effect of mitigation.  And using a conservative 10-day simulation period was a reasonable way to account for mitigation.

      What is more, the Corps recognized that over time, any spilled oil will evaporate, dissolve, disperse, degrade, and move towards the surface of the water, farther from water intakes.  D.E. 456, at 36-37.  Oglala professes confusion because the model predicts that some intakes would show more hydrocarbons on day 10 than on day 9.  D.E. 460, at 11.  But that is the obvious consequence of a shrinking oil plume traveling downstream over time, reaching distant points for the first time on day 10 (meaning they had been oil-free on day 9).

      Oglala further argues that the simulation period was too short because it did not track the movement of oil 205 miles downstream to the Oglala OSRWSS intake (the Mni Wiconi Project), D.E. 460, at 13-15—about as far as Washington, D.C. is from New York City, and four times the furthest distance that oil was predicted to travel in a 10-day period, RAR 8072.  As Dakota Access

explained, not only would oil be contained well before day 10, the Corps was able to conclude that oil would be too close to the surface following day 10 of unmitigated flow to pass through the Lake Oahe dam to Oglala's intake, or to reach the depths of that intake.  D.E. 456, at 37.

Oglala counters with speculation that "turbulence" would somehow allow oil to pass through the dam.  D.E. 460, at 14.  But the only "evidence" it cites is a single quote from an extra-record document simply stating that "'[t]he area around the [Oahe Dam] intakes is a good fishery because the turbulent water attracts many species of fish.'"  D.E. 434-2, at 27.  All Oglala said about this document in its opening brief was that "the Corps has recognized that the water at the dam is turbulent."  *Id.*  None of that explains how turbulence could cause the oil—nearly all of which had risen to depths above 10 meters (33 feet) by day 10 of the simulation, while still more than 100 miles from the dam, RAR 8072—to "mix within the water column to at least 142 feet below the lake surface" where the discharge pipes for the dam are located.  RAR 94.  The Corps was not required to consider that "highly speculative" possibility.  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 356 (1989).[3]

c.  Bakken Crude Oil.  SRST blinks reality with its continued insistence that the record lacks discussion of Bakken crude's "unique" toxicity.  D.E. 465, at 24-25.  Dakota Access already showed multiple references to this issue, D.E. 456, at 38 (citing RAR 237-38, 251-52), and the record is replete with others discussing that oil's properties.  *See* RAR 2788 (stating that Bakken is "high in low molecular weight narcotic compounds such as BTEX" that "evaporate faster than

---

[3]  Oglala now adds, as part of its criticisms of the 10-day simulation period, that "hydrocarbons on or near the surface impact wildlife."  D.E. 460, at 11.  But not one word in its opening brief suggests that a longer simulation period would better predict the impact of a spill on fish and wildlife, and this vague statement would fail to make out a coherent argument even if timely. Regardless, the model already predicted the effect of hydrocarbons on or near the surface as of day 10.  RAR 8270.  And the model predicts the oil will evaporate, dissolve, disperse, and degrade as it moves downstream thereafter, *reducing* any possible effect on fish and game.  *Id.*

they dissolve, such that toxic concentrations within the water column may not be reached"); RAR 2806 (case study of Jan. 2015 Bakken crude release into Yellowstone River); USACE_DAPL 71269-70 (discussing effect of Bakken's API gravity and sulfur content on its solubility and tox-icity). That is far more than SRST bothered to say on the issue in its opening brief, which merely states that Bakken is "uniquely . . . toxic" without identifying any toxic property that the Corps allegedly failed to address. D.E. 433-2, at 32.

As for Bakken's "unique flammability," D.E. 465, at 25, Dakota Access noted the Corps' explanation that flammability is a concern for train derailments and transload rail facilities, not pipeline spills. D.E. 456, at 38. SRST remarkably says that this analysis is "not actually reflected anywhere in the record," D.E. 465, at 25, even though Dakota Access *quoted* the relevant portion of the Submission Review, which states that recent Bakken crude incidents "all involved an initial ignition source, such as a train derailment and associated sparking at the time of release. This is typically not the case with most pipeline releases." RAR 237 (quoted in D.E. 456, at 38). SRST also has no response to Dakota Access's evidence that the Corps identified sufficient protections to mitigate any risks associated with Bakken crude. D.E. 456, at 39.

## B. The Corps Reasonably Assessed And Explained The Impact Of A Spill On Hunting And Fishing

On the second remand topic, Plaintiffs continue to say nothing that could cast doubt on the Corps' thorough assessment and reasonable conclusion that the impacts to hunting and fishing resources would be "limited" and of "limited scale and of temporary duration," respectively, RAR 42-43, and in any event would not trigger an EIS because the likelihood of a high-consequence spill is low. RAR 118-19.

SRST asserts, without legal citation, that "'high consequence, low frequency' events . . . do not translate into 'low risk' issues," D.E. 465, at 21 n.16, but binding D.C. Circuit precedent allows

agencies to "discoun[t]" the "'significance of possible adverse consequences . . . by the improbability of their occurrence,'" *New York v. Nuclear Regulatory Comm'n*, 681 F.3d 471, 478-79 (D.C. Cir. 2012).  The question is not, as SRST asserts, whether some low probability risks merit regulation.  Rather, under NEPA, the "weighing of the probability and the consequences" is up to the Corps, whose determination "merit[s] considerable deference."  *Id.* at 482.  Given the low risk of a spill, the Corps reasonably discounted the supposedly "significant" impacts that Plaintiffs say *could* result in the unlikely event of a high-volume spill.  D.E. 460, at 11-12.

In any event, Plaintiffs continue to overstate spill impacts.  As Dakota Access showed, the Downstream Receptor Report establishes that impacts on game and fish from a hypothetical unmitigated spill are expected to be limited.  D.E. 456, at 40-41 (citing RAR 2769, 2791, 2806); *see also* RAR 2847-48 ("[B]ehavioral responses of terrestrial game species would help to reduce potential adverse effects," so "the impact to hunting in the area from an oil spill would be minimal.").  That evidence—which Plaintiffs fail to address—is not overcome by Oglala's continued reliance on "one iteration" (out of 1,160 model runs).  D.E. 460, at 12.  As Dakota Access explained, exceedingly rare weather conditions produced that outlier.  RAR 8779, 8941-42.

Lastly, Cheyenne River Sioux Tribe ("CRST")—through the lens of its consultation argument—now attempts to raise new hunting and fishing arguments.  It argues principally that the Corps failed to "'explain what the effects would be' on game and fish" because the agency:  (1) acknowledged that "'not much is known about the actual impact of eating fish that have ingested oil'"; and (2) failed to consider "how even a 'temporary' impact [on hunting and fishing] would be devastating" for CRST.  D.E. 464, at 10-12 (emphasis omitted).  Yet CRST's opening brief did not even address hunting and fishing, and "arguments raised for the first time in a reply brief are not considered."  *United States v. Sum of $70,990,605*, 4 F. Supp. 3d 189, 197 n.5 (D.D.C. 2014).

Even if considered, CRST's arguments fail on the merits.  The Remand Analysis explained that "[m]ost species of fish can metabolize and excrete hydrocarbons, so bioaccumulation is limited," and "warnings about eating fish or a moratorium could mitigate this potential impact" in the unlikely event they were necessary "for a short time."  RAR 90.  The absence of scientific studies on the impact of eating fish that ingested oil also is not the Corps' failing.  As for CRST's predictions of dire consequences, D.E. 464, at 12, 14, nothing in the Downstream Receptor Report or any other source suggests that even a worst-case impact of a worst-case discharge would so much as temporarily deprive the CRST reservation of sufficient inland food sources.  CRST presented no evidence to that effect and, to the contrary, most game species "are not dependent on the aquatic environment," RAR 2828, and can access "alternative sources of freshwater," RAR 2848.  Nor does the Tribe account for Dakota Access's commitment to help "restore, replace, or acquire the equivalent" hunting and fishing resources in the unlikely event of a spill.  RAR 2849.

### C.    The Corps Provided A Robust Analysis Of Environmental-Justice Impacts

On the third remand topic, the Corps expanded the geographic scope of its environmental-justice analysis and recognized Plaintiffs' unique interests.  D.E. 456, at 42.  After accounting for these factors, the Corps concluded that the low likelihood of a high-consequence event and a comparison to the alternative route warranted no different outcome.  *Id.* at 12.  Plaintiffs concede that recognizing "environmental justice impacts does not, by itself, require that permits be denied, or trigger an EIS."  D.E. 465, at 27.  They also concede that the Corps "acknowledges" and "does not dispute" a spill's "'uniquely Tribal impacts.'"  *Id.* at 26 (quoting RAR 85, 88, USACE_ESMT 594).  Yet they persist in the mistaken view that these acknowledgements make the need for an EIS "obvious."  *Id.* at 25-26.  As this Court has recognized, that is not the law; "an agency is not required to select the course of action that best serves environmental justice, only to take a hard look at environmental justice issues."  *SRST III*, 282 F. Supp. 3d at 102 (quotation marks omitted).

Despite conceding that the Corps acknowledged environmental impacts from a possible spill, Plaintiffs elsewhere complain that the Corps did not acknowledge enough.  But these arguments largely rest on the same points, refuted above, about the likelihood, magnitude, and effects of a spill.  The remainder are flat-out record mischaracterizations.  For example, the Corps did not state, as SRST describes the agency's assessment of possible environmental effects, that "there is no disproportionately high or adverse effects to minority or low-income populations anticipated."  D.E. 465, at 27 (quoting RAR 65).  The Corps said that "there is no disproportionately high or adverse effects to minority or low-income populations anticipated *from potential effects to water intakes*," RAR 65 (emphasis added)—a proposition that SRST no longer contests because the locations of the water intakes make that statement true.

Beyond misstating both the law and the record, or repurposing arguments addressed elsewhere, SRST takes issue with the Corps' choice between the Lake Oahe route and one that would pass north of Bismarck.  D.E. 465, at 27.  SRST does not dispute that more minority and low-income people would be affected by a spill under the North Bismarck alternative.  Instead, SRST complains that this "would virtually always be the outcome in a comparison between a wealthier metropolitan area and an Indian Reservation."  *Id.*  But even were that broad assertion true, it incorrectly assumes that the choice of pipeline routes will always be urban versus rural.  And while rural residents might prefer a route that exposes larger numbers of urban minorities and urban poor to a risk, no law compelled the Corps to honor that preference.

Yankton Sioux Tribe, for its part, now calls its own earlier challenge to the geographic scope of the Corps' environmental-justice analysis "a red herring."  D.E. 467, at 5.  Regardless, the Corps properly applied its analysis to "the area that could have foreseeably been impacted by the federal action."  D.E. 448, at 27.  Yankton likewise does not defend its call for the Corps to

consider Yankton members' use of property outside of their reservations.  D.E. 435-1, at 13.  As

Dakota Access explained, the Corps concluded that this would be infeasible to quantify.  D.E. 456,

at 43 (quoting RAR 68-69).  And while Yankton continues to insist that the Corps ignored the

Tribes' "traditional and cultural practices," D.E. 467, at 5, Dakota Access showed that the Corps

did consider them, D.E. 456, at 44 (citing RAR 83-87).  Yankton has no response.

### III.   The Corps Met Its Obligations To Consult With Tribal Authorities Both Before And During The Remand

As for consultation, the Tribes are still wrong on the law and the facts.  They continue to

misconstrue the scope of the Corps' consultation obligations by relying on National Historic

Preservation Act ("NHPA") claims that Dakota Access showed were moot and authorities that

Dakota Access showed were non-binding, while ignoring Dakota Access's authorities proving that

no further consultation was required on remand.  *See* D.E. 456, at 46-53.  In any event, the Tribes

present nothing to rebut Dakota Access's detailed showing of the Corps' significant efforts to en-

sure the Tribes had early opportunities to provide input on the agency's decisions before and during

remand.  *Id.* at 53-64; D.E. 456-1, Ex. 2 (remand timeline).  Nor do they contest this Court's prior

findings as to the sufficiency of consultation.  *See* D.E. 456, at 53-55.  The Court should enter

summary judgment for the Corps on these claims as to all Plaintiffs.

### A.   The Tribes Misconstrue The Scope And Enforceability Of The Obligations At Issue

#### 1.   Relief Under The National Historic Preservation Act Is Foreclosed Because Construction Of The Pipeline Is Complete

Now that construction is complete, Plaintiffs do not dispute the unavailability of pipeline-

specific relief for their NHPA challenge to the Corps' decision to approve construction.  That claim

is therefore moot unless it is both "capable of repetition" and likely to "evade review" if not re-

viewed here.  Neither requirement is met.

SRST confirms that its NHPA claim is not capable of repetition because it turns on factual questions unique to this case.  SRST's claim is that the Corps improperly excluded the "pipeline right-of-way entering and exiting the boreholes" from the "area of potential effect ('APE') that determines the scope of NHPA consultation."  D.E. 465, at 38.  In the Tribe's view, the claim depends on whether Dakota Access's activity in this area is an "indirect effect" of the Corps' permit decision, *id.* at 39, which turns at least in part on whether the Corps' decision is a "but for" cause of the activity, and whether the activity is "integrally related" to and "directly associated" with the work authorized by the Corps, USACE_DAPL 64248, *cited in* D.E. 465, at 39 n.24.  These are quintessential project-specific questions of fact.  Indeed, SRST's latest brief cites no case law on the issue.  And Yankton likewise frames the issue as a fact dispute:  whether the Corps "engaged in the appropriate level of consultation."  D.E. 467, at 9.  Such a claim is unlikely to repeat.

Nor would such claims evade review.  While SRST emphasizes that preliminary relief was denied in this case, D.E. 465, at 35-36, both this Court and the D.C. Circuit considered the merits of the claim *before* denying that relief, so no review was evaded.  D.E 456, at 49.  SRST cannot dispute that if a future *meritorious* claim raised the same issue, preliminary injunctive relief would preserve the possibility of review.  *Id.*  That distinguishes this case from those cited by Plaintiffs in which a preliminary injunction would not have preserved the possibility of review.  *See Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 323 (D.C. Cir. 2014) (challenged freeze on foreign transaction would expire or be superseded before adjudication even if preliminary injunction were granted); *Montgomery Envtl. Coal. v. Costle*, 646 F.2d 568, 578 (D.C. Cir. 1980) (delays in administrative review would prevent litigation until just before challenged permit expired); *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316 (D.C. Cir. 2009) (issuance of permits would moot challenges to short delay in issuance); *Burlington N. R.R. Co. v. Surface Transp. Bd.*,

75 F.3d 685, 690 (D.C. Cir. 1996) (expiration of contract would moot challenges to order requiring filing of tariff one year before expiration).  Far from supporting Plaintiffs' view that a claim evades review "if the challenged action takes two years or less," D.E. 465, at 35; *see also* D.E. 467, at 9, these cases confirm that this rule does not apply where, as here, a claim "would not have been mooted" if preliminary relief were granted.  *Ralls*, 758 F.3d at 323.

### 2.     The Tribes Rely On Inapplicable And Nonbinding Guidance Documents For The Remaining Consultation Claims

The Tribes now admit they overplayed their hand in relying on various inapplicable or nonbinding authorities—case law, Executive Orders, guidance documents, regulations, and treaties— to press their views on consultation requirements.  Yankton concedes that many of these documents are "nonbinding," D.E. 467, at 10, and SRST agrees that "the Corps' consultation duties are flexible," D.E. 465, at 28.[4]  The Tribes also admit that the 2006 version of Department of Defense ("DoD") Instruction 4710.02, RAR 13978-83—not the 2018 version—was applicable during the remand, D.E. 465, at 29 n.19; D.E. 460, at 16 n.14.  This undercuts the Tribes' reliance on:  (1) the 2018 version's restrictions on delegating consultation duties to consultants and contractors; and (2) other requirements that do not appear in the portion of the 2006 version that the Tribes claim is binding, but instead appear in a separate, non-binding "Enclosure."  D.E. 456, at 50-51.

The Tribes insist that the "core issue" here is "not whether the Corps held a meeting," but whether it was required to share technical information as part of the consultation process.  D.E. 465, at 28.  Yet none of the authorities they cite, *see id.*; D.E. 460, at 19; D.E. 464, at 11, imposes this requirement.  The "Enclosure" attached to DoD Instruction 4710.02 suggests that consultation

---

[4]  Yankton's suggestion that noncompliance with non-binding guidance is "arbitrary and capricious," D.E. 467, at 10 (emphasis omitted), is frivolous.  "A non-binding document cannot impose on an agency an enforceable duty to act."  *Elec. Privacy Info. Ctr. v. IRS*, 910 F.3d 1232, 1245 (D.C. Cir. 2018).

proceed with "information and opinion respectfully exchanged in both directions," RAR 13981, but that is both non-binding and too general to prove a duty to share the specific documents at issue here. The DoD Instruction to give Tribes "an opportunity to comment on a proposed action," DoD Instruction 4710.02 § 6.6 (2006), addresses gathering information from the Tribes, not the other way around. The 1994 Presidential statement recommending "'open and candid'" consultation—which SRST made no mention of in its opening brief—falls short of requiring the exchange of any particular documents. D.E. 465, at 28 n.18, 32.[5] And the former Secretary of the Interior's 2016 statement that sharing a certain document with the Tribes was "warrant[ed]," USACE_ESMT 595, is non-binding, cites no authority, and was later retracted.[6]

Yankton likewise fails to defend its insistence that the Corps had to follow the Tribes' specific consultation protocols. D.E. 467, at 14-15. It admits that "Corps guidance does not *mandate* compliance with tribal consultation protocols." *Id.* at 14. And the NHPA regulation it cites— stating that the Corps should consult "in a manner sensitive to the concerns and needs of the Indian tribe," 36 C.F.R. § 800.2(c)(2)(ii)(C)—is inapposite both because Plaintiffs' NHPA claims are moot, and because the regulation on its face does not compel the Corps to let Yankton dictate the consultation process unilaterally.

---

[5]  SRST acknowledges that this policy is not binding on its own terms when it suggests that the DoD Instruction "makes compliance with otherwise non-binding consultation policies mandatory." D.E. 465, at 29 n.19 (citing RAR 13978). Presumably, SRST means DoD Instruction 4710.02 § 6.2 (2006), which provides that "DoD Components shall consult with tribes in accordance with the requirements of" certain referenced policies, regulations, and statutes. But the use of "requirements" means actions that are *already* mandatory.

[6]  SRST has backed off the slim case law it cited in its opening brief for the idea that the Corps must give the Tribes specific or sensitive information during consultation. *See* D.E. 433-2, at 42, 45. That one case "found public involvement in an EA inadequate," D.E. 465, at 31, but it does not help the Tribe's cause here. *Id.* at 31 (citing *Or. Nat. Desert*, 921 F.3d at 1192, which found a NEPA decision-making process deficient because the Corps did not publicly disclose information about the nature of the project before making its significance determination).

In short, the Corps' sole duty was to consult "in the ordinary sense of the word."  *United Keetoowah Band of Cherokee Indians in Okla. v. FCC*, 933 F.3d 728, 750 (D.C. Cir. 2019).

### 3.    The Corps Was Not Required To Repeat Its Consultation Process On Remand

Plaintiffs still cite no authority for their baseless assertion that the Corps was required to repeat it consultation efforts on remand.  They do not deny that imposing such a requirement would conflict with case law, *Te-Moak Tribe of W. Shoshone v. U.S. Dep't of Interior*, 608 F.3d 592, 609 (9th Cir. 2010), and with the principle that agencies need not "'star[t] from scratch'" on remand, *Oceana*, 275 F. Supp. 3d at 288.  D.E. 456, at 52-53.  And they offer no basis in statute, regulation, or principle to distinguish *tribal* consultation from similar procedural requirements, such as notice-and-comment rulemaking, that under settled authority agencies need not repeat on remand.  *See, e.g.*, *Sierra Club v. EPA*, 325 F.3d 374, 382 (D.C. Cir. 2003).

The Tribes are not helped by arguing that the remand decision was a new "final agency action."  D.E. 467, at 12-13.  Under DoD Instruction 4710.02 § 6.1 (2006), consultation is triggered by "proposing" an action that may "significantly affect" tribal resources, rights, or land.  But the remand decision neither proposed nor executed such an action.  The Corps already approved pipe-line construction and delivered an easement—the actions that the Tribes claim affect their interests.  *Cf.* RAR 102 ("the major federal action is the granting of the right-of-way").  The EA assessed the "'impact of [these] proposed action[s],'" *SRST II*, 255 F. Supp. 3d at 112; it was not a separate action.  Nor was the remand decision, which merely provided "further explanation" for the Corps' prior actions.  RAR 4.  Because the Court, over Plaintiffs' objections, left the easement in place during the remand, the Corps did not need to take new action; it only had to explain its previously proposed and executed actions.  *SRST III*, 282 F. Supp. 3d at 98-99.

Oglala fares no better in demanding a right to consult as to the new information that the

Corps solicited from Dakota Access.  D.E. 460, at 22-23.  The purpose of consultation is to obtain the Tribes' input on the "proposed actions"—authorizing construction and delivering the easement—not the Corps' explanation for those actions.  DoD Instruction 4710.02 § 6.6 (2006).  Oglala could have expressed pre-remand any concerns it had about those actions.

### B.      The Corps Exceeded Any Obligation To Consult

### 1.      Pre-Remand Consultation

Under any standard, the Corps' consultation efforts more than sufficed.  Only Yankton and Oglala challenge the Corps' pre-remand consultation, but their latest briefs are unpersuasive.

Yankton still offers no response to the Court's findings that it was able to voice its concerns to the Corps despite passing up consultation opportunities.  D.E. 456, at 55.  While it quarrels over the law discussed *supra* in Part III.A, it is silent on the record.  D.E. 467, at 6-11.

Oglala, meanwhile, does not dispute that the Corps contacted the Tribe as early as October 2014 about the proposed project, or that the Tribe was invited to participate in the NHPA consultation process in February, March, September, and November of 2015.  D.E. 460, at 19-20; *see also* USACE_DAPL 5628, 5634, 67130, and 69608.  Oglala also acknowledges that the Corps invited the Tribe to several meetings to discuss the project.  D.E. 460, at 20.  Nonetheless, Oglala faults the Corps for only seeking Tribal input on impacts to historical properties under the NHPA, and it claims that the NHPA and NEPA consultation processes cannot overlap.  *Id.*  This Court already rejected CRST's attempt to separate NHPA and NEPA consultation efforts, finding that the "NHPA's implementing regulations encourage federal agencies 'to coordinate compliance' with Section 106 [of the NHPA] *and* NEPA."  *SRST II*, 255 F. Supp. 3d at 159.

Moreover, Oglala received email correspondence clarifying that consultation was not limited to Section 106 issues, *see, e.g.*, USACE_DAPL 69071 (Feb. 1, 2016 email from Michelle Dippel, HDR, to tribal representatives, including Oglala, offering "to meet with you to discuss the

overall project"), and the record shows that the meetings to which Oglala was invited—but declined attending—concerned more than Section 106 consultation.  For example, the 100-plus-page transcript from the January 25, 2016 public meeting in Sioux Falls, South Dakota shows that the discussion included topics ranging from pipeline safety, USACE_DAPL 69023-31, to the permitting process under the Endangered Species Act, USACE_DAPL 68951-54.  The agenda for the two-and-a-half day meeting also included time for "[o]pen [d]iscussion."  USACE_DAPL 79890. Likewise, the February 18-19, 2016 meeting in Niobrara, Nebraska that Oglala skipped included such topics as the "spill response plan" and pipeline safety, in part because the attending Tribes decided to raise these issues.  USACE_DAPL 66415-19.  Given these open-ended invitations and discussions, Oglala's complaint that the Corps failed to offer consultation about the Mni Wiconi Project specifically, *see* D.E. 460, at 21, is disingenuous.

Oglala shrugs off these opportunities to consult, arguing that it "cannot be expected to conduct environmental review every time the United States contacts it regarding cultural or historic preservation concerns," and suggesting that its opportunity to respond was limited because the Corps addressed its letters to Oglala's historic preservation officer.  D.E. 460, at 20.  That defies credulity.  Oglala knew this was a large pipeline project—indeed, it drew national attention.  And Oglala's President submitted comments on various topics in September 2016.  USACE_ESMT 1353.  The fact that Oglala belatedly submitted comments critiquing the project's environmental impacts, *id.*, and sought consultation on those effects after the EA issued, USACE_ESMT 475-76, shows it made a conscious choice to sit on the sidelines until it was too late.[7]

---

[7]  This Court's remand for further explanation of a report Oglala submitted, *SRST II*, 255 F. Supp. 3d at 128, does not mean the Corps failed to consult, as Oglala asserts, D.E. 460, at 21.  The Court found that the Corps satisfied any consultation duties as to CRST even though it likewise remanded as to criticisms that CRST submitted.  *SRST II*, 255 F. Supp. 3d at 159.  The remand concerned the adequacy of the Corps' *response* to Plaintiffs' input, not its effort to obtain that input through consultation.

Even if this Court were to find that the pre-remand consultation with Oglala was insufficient, remand would not be necessary because the Corps would have remedied any deficiency through its subsequent efforts to consult on remand. *See City of Waltham v. U.S. Postal Serv.*, 11 F.3d 235, 244-45 (1st Cir. 1993).

### 2.     Consultation On Remand

Nothing in Plaintiffs' briefs rebuts the evidence, cited by Dakota Access, detailing the Corps' extensive efforts for nearly a year to consult with the Tribes. D.E. 456, at 57-64; D.E. 456-1, Ex. 2 (compare column showing Corps' efforts to column showing Tribes' responses).

*First*, it is still wrong for Plaintiffs to say they had no meaningful opportunity to affect the remand outcome. D.E. 465, at 29-30. The Corps' February 2018 statement that it had "identified no new information" that changed its conclusions, RAR 10203, was true; none of the Tribes had yet even submitted new information. *See* D.E. 456, at 60-61. And it remained true at the end of the remand because the Tribes' information did not move the needle—not because the Corps ignored it. The Remand Analysis addressed the Tribes' submissions at length.

*Second*, although nothing required the Corps to disclose the response plans and spill models that Plaintiffs requested, *supra* at 23-24, the Corps did provide them, D.E. 456, at 59-60, *contra* D.E. 465, at 28, 33; D.E. 464, at 8-9; D.E. 460, at 22-24. Plaintiffs do not dispute that the Corps gave them draft Geographic Response Plans and Facility Response Plans and offered to discuss them. *See* D.E. 456, at 59-60. The Tribes raise the odd objection that these "response plans" were offered in the context of "oil spill response planning," *see* D.E. 465, at 33, but, either way, Plaintiffs had access to them. The Corps also offered to present and discuss the spill model results with CRST, RAR 6565, 8453, and did discuss them with SRST on May 22, 2018, RAR 3298, and with Oglala on June 1, 2018, RAR 3176. SRST complains that it wanted the models, not the results, D.E. 465, at 34, but fails to identify any information it was unable to obtain about the models that

would have made a material difference in the consultation process.  Oglala, for its part, cites no record evidence that it ever requested the spill models.  *See* D.E. 460, at 10 n.6, 22.  If Plaintiffs truly wanted additional information at certain meetings, D.E. 465, at 33-34, they should have attended them and constructively participated.  At bottom, Plaintiffs still fail to show that they were disadvantaged by a supposed lack of information.  D.E. 456, at 63.

*Third*, CRST is wrong that the Corps approached consultation as a "one-sided dictatorial process."  D.E. 464, at 9.  Instead, CRST set the agenda and location for its May 29, 2018 consultation meeting with the Corps.  RAR 3359 (May 3, 2018 email from the Corps to CRST asking to "work out some details" for an upcoming meeting), 3285 (agenda for May 29, 2018 meeting on CRST letterhead).  And CRST did not even give the Corps the agenda until its representatives had arrived in South Dakota.  RAR 3278.  The Corps also honored each of CRST's three requests for more time to respond to the Corps' September 2017 request for information, RAR 12273-81, 11961-62, 10350-51, thus lengthening the remand process for the Tribes' benefit, *see* RAR 5801.  Declining to do *everything* on CRST's terms was neither dictatorial nor one-sided.

CRST simply cannot pin its non-participation on the Corps.  D.E. 464, at 8.  The record shows that any "dysfunctional communication" during this period, *id.*, stemmed from the Tribe.  For example, CRST did not engage in an email discussion with the Corps, Dakota Access, and SRST to schedule a March 7, 2018 response planning meeting, RAR 6565-77; then it reached out to Dakota Access, the day before the meeting and without notice to the Corps, to say it would not attend, RAR 6431-32.  Likewise, CRST "was invited" to a March 26, 2018 spill response planning meeting "but did not attend."  RAR 4133.  The Corps nonetheless gave CRST much of the information it requested at least five months before the remand ended.  RAR 7132-7376, 5894.  CRST then submitted its views on the project to the Corps, RAR 2005-246, and met with the Corps to

29

discuss items on the Tribe's agenda, RAR 3285; and the Corps considered the Tribe's concerns in its Remand Analysis, *see, e.g.*, RAR 45 ("this analysis applies input provided by the Cheyenne River Sioux (CRST)"), RAR 141-42.

CRST makes much of its requests for cooperating agency status and the timing of the Corps' response.  D.E. 464, at 8.  But cooperating agency status is irrelevant to consultation here.  CEQ regulations provide that the lead agency (the Corps) may invite other agencies to participate in preparing an EIS.  40 C.F.R. § 1501.6.  Because the Corps was revisiting its decision whether to prepare an EIS—not *preparing* one—those regulations did not apply.  The Corps said this in its February 23, 2018 letter, which denied CRST's request for cooperating agency status and renewed the Corps' request for the Tribe's input on remand.  RAR 7132 ("We are not at a point in the National Environmental Policy Act process where we would consider adding cooperating agencies.  Nonetheless, we continue to believe that our remand analysis would benefit from information submitted by your Tribe.").  The Tribe conveniently ignores that the Corps had been seeking that input, without success, since September 2017.  RAR 13330-32.

*Fourth*, Yankton cannot erase from the record the Corps' efforts to meet with Tribal leadership by labeling those meetings "pre-consultation."  D.E. 467, at 6, 15.  The Corps was not required to accept Yankton's meeting protocols, *see supra* at 24, and Yankton had no authority to impose them unilaterally.  Yankton's argument is especially disingenuous as to the remand period, because the Corps advised Yankton on May 7, 2018 that a process of two or more meetings may not be feasible given "the time constraints . . . on this remand process."  RAR 17096-97.  The Corps also suggested that Yankton's proposed procedures may be undesirable for some meetings, depending on the action at issue.  RAR 17095.  The parties simply did not agree that Yankton's multistep meeting provision would apply to the parties' May 31, 2018 meeting.  *See* RAR 17095-

96; RAR 17094 (Yankton's counsel proposes that the Corps "redline the protocols . . . to propose changes" following the May 31 meeting).

Nor was consultation limited to in-person meetings. The Corps gave Yankton multiple chances to provide its views. The Corps initiated contact with Yankton regarding the remand in September 2017, RAR 13323-24, 13304-06; and the Tribe wrote to the Corps in both January and March 2018 that it was still gathering responsive information, RAR 10308, 6412. It took Yankton until April 20, 2018, after a final request from the Corps, RAR 5802, to respond to the Corps' September 2017 information request, RAR 2247-56, and that response consisted of a two-page affidavit. The Corps announced in June 2018 that it would complete the remand in August 2018, D.E. 357, at 2, and Yankton and the Corps remained in contact about the project until just before the remand analysis issued, *see, e.g.*, RAR 1163-65, 17092-100. In sum, the Corps gave Yankton more than sufficient opportunity to consult.

## IV.   **Plaintiffs' Trust Claims Are Meritless**

Oglala still cannot prevail on a claim that the Corps breached supposed trust obligations "to ensure that adequate and safe water supplies are available" to the Tribe. D.E. 460, at 5. Adequate and safe supplies are available to Oglala to this day; a spill would not impair them, *see supra* at 15-16; and the government could provide an alternative water source should one ever be needed. D.E. 456, at 64-65.

Unable to avoid these flaws in its original argument, Oglala asserts a further duty to "consider the possible impacts of a pipeline or other project on the Tribe's rights." D.E. 460, at 7. The Corps *did* consider those impacts, *see supra* at 15-19, even though it had no trust or treaty obligation to do so. Oglala never "identif[ies] a substantive source of law" for that "*specific* fiduciary . . . dut[y]," as required by controlling precedent. *SRST II*, 255 F. Supp. 3d at 143-44 (quoting *United States v. Navajo Nation*, 537 U.S. 488, 506 (2003)) (emphasis added).

None of Oglala's authorities transforms an alleged failure to *deliberate* about trust impacts into an independent breach of trust.  D.E. 460, at 7.  *United States v. White Mountain Apache Tribe*, 537 U.S. 465 (2003), held that a tribe could sue the government for money damages for allowing trust property to "fall into ruin"—not for failing to anticipate future property threats before any harm materializes.  *Id.* at 475.  Oglala's other authorities do not address the *scope* of the government's "trust responsibilities"; they merely direct the Corps to "meet" them.  D.E. 460, at 7-8.  The Corps' obligation to consider Oglala's water rights thus extends no farther under trust law than it does under NEPA.

CRST, meanwhile, now offers up a trust claim for the first time.  D.E. 464, at 2-5.  Its opening brief mentioned several treaties as background, D.E. 436-1, at 4-5, but never specified (much less proved) any duty that the Corps breached under any treaty, so any trust argument is forfeited, *Sum of $70,990,605*, 4 F. Supp. 3d at 197 n.5.  CRST now claims that several authorities impose "an obligation to protect tribal reserved rights from impairment by upstream users," D.E. 464, at 4, but this Court already considered those same authorities and concluded that "[n]one of these sources . . . establishes specific fiduciary or other duties."  *SRST II*, 255 F. Supp. 3d at 155.  Even if they did, CRST's trust claims would fail for the same reasons Oglala's fail:  Speculation that a spill might occur in the future does not establish a breach of trust.

**CONCLUSION**

This Court should deny Plaintiffs' motions for summary judgment, grant Dakota Access's

Cross-Motion for Summary Judgment in favor of the Corps, and enter judgment for the Corps.

Dated:  November 25, 2019                          Respectfully submitted,


                                                    /s/ William S. Scherman
                                                   William S. Scherman
                                                   David Debold
                                                   GIBSON, DUNN & CRUTCHER LLP
                                                   1050 Connecticut Avenue, N.W.
                                                   Washington, D.C.  20036
                                                   (202) 955-8500
                                                   wscherman@gibsondunn.com

                                                   *Counsel for Dakota Access, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 25th day of November, 2019, I electronically filed the forego-

ing document using the CM/ECF system.  Service was accomplished by the CM/ECF system.

 /s/ William S. Scherman
William S. Scherman
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
wscherman@gibsondunn.com

*Counsel for Dakota Access, LLC*